# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

HARDEN MANUFACTURING ）
CORPORATION, individually and on behalf of ）
itself and all others similarly situated, ）
　　　　　　　　　　　　　　　　　）
　　　　　　　　　　　Plaintiff, ）
　　　　　　　　　　　　　　　　　）
　　　v.　　　　　　　　　　　　　）　　Civil Action No. _____
　　　　　　　　　　　　　　　　　）
PFIZER, INC. and PARKE-DAVIS, a division ）
of Warner-Lambert Company, ）
　　　　　　　　　　　　　　　　　）
　　　　　　　　　　　Defendants. ）

04 - 10981 PBS

MAGISTRATE JUDGE Bowler

## CLASS ACTION COMPLAINT

RECEIPT # _____
AMOUNT $ _____
SUMMONS ISSUED _____
LOCAL RULE 4.1 _____
WAIVER FORM _____
MCF ISSUED _____
BY DPTY. CLK. _____
DATE _____5-17-04_____

## TABLE OF CONTENTS

I.     NATURE OF THE ACTION ..................................................................................1

II.    PARTIES ...........................................................................................................6

III.   JURISDICTION AND VENUE ..........................................................................7

IV.    STATEMENT OF FACTS ..................................................................................8

    A.     Parke-Davis's Decision to Avoid FDA Approval and the "Off-Label" Marketing Scheme..........................................................................................................8

    B.     Parke-Davis's Systematic Payments to Doctors for the Purpose of Increasing Neurontin Prescriptions .......................................................................................13

        1.     "Consultants" Meetings ...............................................................14

        2.     Medical Education Seminars .......................................................18

        3.     Grants and "Studies".................................................................20

        4.     Payments to "Authors" of Ghost Written Articles........................24

        5.     Speakers' Bureau ........................................................................25

    C.     Parke-Davis's Use of "Medical Liaisons" to Promote Neurontin "Off-Label".....27

    D.     Illegal "Off-Label" Promotion Has Continued as Has the Continuing Impact of the Earlier Misconduct..........................................................................................38

    E.     "Off-Label" Promotion is Illegal .........................................................................42

    F.     Fraudulent Concealment ......................................................................................47

    G.     The Role of Non-Physician Technical Writers, Physicians and Vendors in Defendants' Marketing Scheme...........................................................................47

    H.     Defendants' Motive .............................................................................................49

    I.     Use of the Mails and Wires..................................................................................49

V.     CLASS ACTION ALLEGATIONS ..................................................................50

VI.    DEMAND FOR RELIEF....................................................................................70

VII.   DEMAND FOR A JURY TRIAL ......................................................................71

Plaintiff Harden Manufacturing Corporation, on behalf of itself and all others similarly situated, files this Class Action Complaint on behalf of all end-payors as more fully described herein. Plaintiff, upon personal knowledge as to facts pertaining to themselves, and upon information and belief as to all other matters, alleges as follows:

## I.    NATURE OF THE ACTION

1.    As detailed in this Complaint, Defendant Pfizer, Inc. ("Pfizer") currently markets and sells the drug Neurontin. Prior to its acquisition of Warner-Lambert in 2000, Neurontin was marketed and sold by Parke-Davis, a division of Warner-Lambert ("Parke-Davis").

2.    Drug companies must apply to the U.S. Food and Drug Administration ("FDA") for approval to sell a new drug. In that approval process, the manufacturer often seeks FDA approval for many different purposes. Often, the FDA approves the drug for a narrower use than sought. Doctors are free to prescribe a drug for a non-approved or "off-label" use. The market for off-label use often vastly exceeds the approved FDA use.

3.    Drug companies spend billions of dollars each year trying to persuade doctors to prescribe their drugs. There are strict federal regulations about what form that promotion can take and, in particular, promoting "off-label" use. These regulations are meant to ensure that drug companies provide doctors trustworthy information, so that medications are prescribed appropriately.

4.    The Food and Drug Administration Act of 1997 ("FDAMA"), 21 U.S.C. § 360aaa *et seq.*, specifically authorizes a manufacturer to disseminate "written information concerning the safety, effectiveness, or benefit of a use not described in the approved labeling of a drug or device," 21 U.S.C. § 360aaa(a), *if it complies with several requirements: The manufacturer must submit an application to the FDA seeking approval of the drug for the "off-label" use; the manufacturer must provide the materials to the FDA prior to dissemination; the materials themselves must be in unabridged form; and the manufacturer must include disclosures that the materials pertain to an unapproved use of the drug, and, if the FDA deems it appropriate,*

-1-

*"additional objective and scientifically sound information ... necessary to provide objectivity and balance."* 21 U.S.C. § 360aaa(b)(1)-(6); *id.* at 360aaa(c); *id.* at 360aaa-1 (emphasis added). Importantly, FDAMA amends the Food, Drug, and Cosmetic Act to prohibit "the dissemination of information *in violation*" of these provisions. 21 U.S.C. § 331(z); *see also id.* at § 360aaa-4(b)(1) (emphasis added).

5.     Thus, although FDAMA permits pharmaceutical manufacturers to disseminate to health care practitioners qualified forms of "written information concerning the safety, effectiveness, or benefit of a use not described in the approved labeling of a drug," 21 U.S.C. § 360aaa(a), manufacturers are permitted to provide only "authorized information" in the form of unabridged peer-reviewed articles or qualified reference publications. *Id.* at § 360aaa-1. But the FDAMA also requires Defendants to furnish federal regulators with advance copies of the information they planned to disseminate:

> Sixty days prior to disseminating the information, the manufacturer must furnish the Secretary of Health and Human Services (Secretary) a copy of the information it plans to distribute, as well as clinical trial information the manufacturer has regarding the off-label use's safety and effectiveness. The manufacturer also must forward to the Secretary any reports it has concerning the safety and effectiveness of the off-label use.

6.     In 1993, the Parke-Davis Division of Warner-Lambert Company received FDA approval to market and sell Neurontin for the treatment of epilepsy. There are two million epileptics in the United States, a number that is not considered to be a large market to a major pharmaceutical company. Starting in 1995, Parke-Davis executives embarked on a scheme the purpose of which was to increase Neurontin sales for diseases with respect to which Neurontin had *not* received FDA approval because it had failed to demonstrate the safety or efficacy of Neurontin to treat these diseases. Parke-Davis's sales department recognized a significant profit potential in the "off-label" promotion of Neurontin for other diseases and at higher dosages than those approved by the FDA. Executives at Parke-Davis decided to completely avoid the normal regulatory process of the FDA pertaining to the marketing of a new use of a drug and to proceed in an illegal fashion in order to capture the lucrative "off-label" market. The decision was also

made to actively conceal the illegal means which would be used to market the drug. Originally, the principal component of the scheme was the hiring and deployment in the field of approximately 60 "medical liaisons," whose real function was to actively solicit physicians to promote "off-label" uses of Neurontin, using cash payments as a reward and incentive. This "off-label" solicitation was to be done in a covert fashion, largely in private meetings with doctors.

7.    In the pharmaceutical industry, medical liaisons are typically individuals with scientific training who are available at a physician's request to provide balanced scientific information about a company's products. They have no legitimate role as salespeople.

8.    At Parke-Davis, many of the "medical liaisons" were hired directly out of the sales department. They were all trained in sales techniques and compensated, in part, on the basis of sales. They had no discernable scientific or medical functions. They had no communication or interaction with Parke-Davis's actual medical research divisions. The medical liaisons were assigned to act as teams with the regular sales representatives. They were given lists of doctors for "cold calls," based on the size of the doctors' practices and their ability to prescribe Neurontin. They were provided with a package of monetary incentives to offer to physicians who got involved in the Parke-Davis program.

9.    Parke-Davis also created a complex array of monetary incentives for physicians who wrote prescriptions for Neurontin. None of these incentives have anything to do with true scientific or medical research or with the safety of patients. These incentives include cash payments to "consultants" and "preceptors," cash payments for a "speakers bureau" and for participation in teleconferences, the award of money for scientifically inadequate and irrelevant "studies," miscellaneous cash payments for access to records of patients who are taking Neurontin, travel and Olympics tickets, and other benefits. The recipients of these awards and benefits were selected by the sales department based on their ability to prescribe Neurontin and to influence other doctors to do so.

-3-

10.     The medical liaisons were trained to use knowingly false information to persuade physicians to use Neurontin for "off-label" uses. Parke-Davis's official sales line in this regard was that because Neurontin is safe at very high doses and produced no significant side effects, there is no problem using it for "off-label" indications. Medical liaisons were trained to tell doctors that evidence exists that Neurontin, in high doses, is effective for control of bipolar mental disorder, monotherapy for seizures, for control of a variety of pain states, for attention deficit disorder, for migraine, for drug and alcohol withdrawal seizures, for restless leg syndrome, and for several other diseases. At the time these statements were made, there was no competent scientific evidence that Neurontin was safe and effective for *any* of these conditions or at dosages beyond the dosage approved by the FDA. The only "evidence" that existed was gossip, case reports from physicians paid by Parke-Davis, self-referential studies and rumor. The medical liaisons were also trained to misrepresent their own credentials to the physicians in order to elevate their own credibility, by saying they were "involved in research." In fact, they were purely involved in sales.

11.     Parke-Davis medical liaisons, using a combination of misrepresentations and cash incentives, encouraged many physicians to experiment with their own patients by prescribing very high levels of Neurontin for a variety of "off-label" indications. Parke-Davis did this with the combined motives of increasing sales, generating a body of "medical practice" and case reports which could later be used for further "off-label" promotion with other physicians. Parke-Davis's sales employees expressed callous disregard for the possibility of adverse reactions occurring during these informal, non-FDA sanctioned, illegal experiments. The Parke-Davis scheme focused in particular on the market for bipolar disorders. It did so by a variety of methods, including sponsoring inexpensive studies, later published in scientific journals, which purported to show favorable results in using Neurontin for non-approved uses. These studies were published by doctors who had received money from Parke-Davis, either in the form of educational grants or some other form of monetary pass-through as described below.

12.    An example of how the scheme works is contained in a proposal to Parke-Davis from a Philadelphia company called Medical Education Systems ("MES"). In the proposal, which was submitted in December 1996, MES requested $160,000 to develop a series of 12 scientific articles to "support epilepsy education." In fact, three of the articles MES proposed related to Neurontin and bipolar disorder. Parke-Davis made sure the articles said what it wanted them to. It approved the authors and topics; it cleared the journals in which the articles were printed; and its executives vetted drafts. In some cases, it approved articles that appear to have been written almost entirely by ghostwriters of the medical education company.

13.    The articles on Neurontin and bipolar disorder reported that some doctors were having success with using Neurontin for their bipolar patients and that Neurontin was a "safe" drug that was easily tolerated, so doctors could quickly increase the doses they gave their patients. As part of the "off-label" marketing scheme, this message was then reinforced by Parke-Davis salesmen when they called on doctors to tell them about the latest research on Neurontin and at teleconferences, lavish dinner meetings and medical seminars where Parke-Davis paid leading doctors to speak to other doctors who were also paid a fee to listen.

14.    Based on these articles, as well as other illegal promotional activity described herein, tens of thousands of bipolar disorder patients are now being treated with Neurontin. However, a scientifically valid study conducted at the Harvard Bipolar Research Program found that patients *did worse on Neurontin than those who were on a sugar pill*. Parke-Davis sponsored this 1998 study, was aware of the results, but did not publish the results until two years later. By that time, Neurontin accounted for $1.3 billion in sales, with over 80% of its use coming from non-approved uses, such as treatment of bipolar disorder.

15.    This "off-label" promotion scheme remained hidden until a complaint by a former medical liaison, Dr. David Franklin, was fully unsealed by the United States District Court for the District of Massachusetts in May 2002.

16.    On information and belief, defendants' "off-label" promotion scheme continued after the filing of Dr. Franklin's whistleblower complaint and still continues. For example,

-5-

through the third quarter of 2002, there were no published scientific studies to support Neurontin's use for a wide variety of diseases that it is being prescribed for including anxiety disorder, attention deficit disorder, bipolar disorder, cluster headache, depression, dosages in excess of 1800 mg per day and many other disorders that physicians are now prescribing Neurontin for that are "off-label." Despite this lack of scientific evidence, Neurontin sales for these and other "off-label" uses have steadily increased, to the point that, according to an article published in the December 1, 2003 issue of MEDICAL MARKETING & MEDIA, 90% of Neurontin sales are for "off-label" use. No other drug in the Untied States has such a high percentage of "off-label" use. The same article estimates that $1.8 billion worth of Neurontin has been sold for "off-label" uses, which means as much as $500 million has been sold for "off-label" purposes in California. This increase in sales, and the repeated and increased prescription of Neurontin for "off-label" uses, without any supporting scientific studies that would be prompting such use, cannot be a random event and could not occur without continuing "off-label" promotion by Defendants' sales force. And twice in the last two years, Pfizer has been found by the Department of Health & Human Services to have engaged in illegal promotional acts with respect to the sale of Neurontin.

17.     In this class action, Plaintiff seeks equitable, injunctive and declaratory relief, including damages for loss of money or property, restitution and/or disgorgement of all illegal profits obtained by Defendants as a result of their unlawful, unfair, or deceptive practices.

## II.    PARTIES

18.     Plaintiff Harden Manufacturing Corporation ("Harden") offers an employee benefit plan established and maintained pursuant to the Employee Retirement Income Security Act, 29 U.S.C. § 1001 et seq., for the purpose of providing health benefits, including prescription drug coverage, to eligible participants and beneficiaries. Harden maintains its principal place of business in Haleyville, Alabama. Harden provides comprehensive health coverage, including prescription drug coverage, for its participating employees and beneficiaries. During the Class

Period, Plaintiff paid for prescription pharmaceuticals manufactured and/or distributed by the Defendant Drug Manufacturers and were injured by the illegal conduct alleged herein.

19.    Defendant Pfizer, Inc. is a Delaware corporation with a principal place of business in New York, New York.  Pfizer is principally engaged in the manufacture and sale of pharmaceuticals.  In 2000, Pfizer acquired Warner-Lambert Company ("Warner-Lambert") including Warner-Lambert's Parke-Davis division.  As a result of the acquisition, Pfizer is responsible for all liabilities which result from any acts or omissions of Parke-Davis or Warner Lambert which occurred prior to the Warner-Lambert acquisition.  At times throughout this First Amended Complaint, Parke-Davis and Pfizer may be referred to collectively as "Defendants."

## III.    JURISDICTION AND VENUE

20.    Subject matter jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331, because this action arises under the laws of the United States, and pursuant to 18 U.S.C. § 1964(c), because this action alleges violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO").

21.    Venue is proper in this Court under 28 U.S.C. § 1391 and 18 U.S.C. § 1965 and because during the Class Periods one or more of the Defendants conducted business in the district, including marketing, advertising, and sales, and because a substantial part of the events giving rise to Plaintiff's claims occurred and a substantial portion of the affected interstate trade and commerce has been carried out in this district.  Further, at all times mentioned in this Complaint, Defendants made misrepresentations and material omissions to residents of the district.

22.    The Court has supplemental jurisdiction over the claims for common law fraud, unjust enrichment, and violation of the consumer protection statutes of the fifty states.

## IV.    STATEMENT OF FACTS

**A.    Parke-Davis's Decision to Avoid FDA Approval and the "Off-Label" Marketing Scheme**

23.    Parke-Davis was principally engaged in the manufacture and sale of pharmaceuticals including prescription pharmaceuticals falling under the jurisdiction and regulation of the FDA.  Pfizer acquired Warner-Lambert in 2000.

24.    In December 1993, the FDA approved Neurontin as "adjunctive therapy" for the treatment of certain types of seizures in adult patients suffering from epilepsy.  "Adjunctive therapy" meant that the drug could not be prescribed by itself for the treatment of epilepsy, but as an add-on drug in the event that a primary anti-epilepsy drug was not successful.  The FDA-approved labeling of Neurontin stated that the drug is only effective at 900 to 1800 mg/day.

25.    At the time Neurontin was approved, Parke-Davis' original patent on Neurontin was set to expire in December 1998.  This left Parke-Davis with only a small window of exclusivity for this drug; after the expiration of the Neurontin patent, Parke-Davis would be forced to share the market for Neurontin with generic drug manufacturers, substantially reducing its profits and its ability to keep Neurontin's retail price high.

26.    At the time Parke-Davis filed its NDA (New Drug Application) with the FDA, Parke-Davis intended Neurontin to be used for other indications besides epilepsy adjunctive therapy.  In October 1990, Parke-Davis filed a patent for Neurontin claiming it to be effective in the treatment of depression.  In November 1990, it filed another patent application for Neurontin claiming it to be effective for the treatment of neurogenerative disease.  In 1995, additional patent applications were filed by Parke-Davis for mania and bipolar disease and for anxiety and panic.  Notwithstanding the claims made in its patent applications, neither Parke-Davis nor Pfizer *ever* sought FDA approval for the use of Neurontin to treat the conditions described in the four patent applications referenced above.

27.    The market for the only approved use for Neurontin — adjunctive therapy for epilepsy patients — is, and was, limited with a potential population of two million epilepsy patients.  On the other hand, the market for the other uses of Neurontin contemplated by Parke-

-8-

Davis, such as pain management, psychiatric disorders, anxiety and depression, were huge.
Parke-Davis knew that if these markets could be tapped, Parke-Davis could enjoy enormous
profits from Neurontin.

28.     Initially, Parke-Davis intended to file supplemental NDAs in order to expand
Neurontin's approved indications, including applications for monotherapy (which would permit
Neurontin to be prescribed by itself for epilepsy treatment) and for various psychiatric and
neurological indications. However, by 1995 Parke-Davis recognized it would be uneconomical
to assume the expense and time necessary to conduct clinical trials necessary to prove that
Neurontin was safe and effective for these uses. Assuming Neurontin could be proven to be safe
and effective, the near-term expiration of the patent meant that generic manufacturers of
Neurontin would reap much of the reward that comes with proving Neurontin could be safely
used for other indications.

29.     Under applicable statutes and regulations, the manufacturer of a prescription drug
regulated by the FDA may not promote or market the use of the drug for purposes or in dosages
other than those approved by the FDA. Uses of a prescription drug for purposes other than those
approved by the FDA are referred to as "off-label" uses. Promotion by a drug manufacturer of
"off-label" uses of prescription drugs is strictly illegal and contrary to the explicit policies and
regulations of the United States Government.

30.     After performing extensive economic analysis, senior officials at Parke-Davis
determined that it was not sufficiently profitable for Parke-Davis to obtain FDA approval for
Neurontin's alternative uses. Instead, Parke-Davis officials developed a strategy that would
allow Parke-Davis to avoid the costs of proving that Neurontin was safe and effective for these
other uses, while allowing Parke-Davis to compete in the lucrative "off-label" markets. As one
aspect of the scheme, Parke-Davis decided to employ a "publication strategy" that would allow it
to promote Neurontin by the massive distribution of publications supposedly written by
independent researchers that purportedly described the scientific evaluation of Neurontin.
Another advantage of this strategy, from Parke-Davis's perspective, was that it could be

employed immediately; there was no need to wait for the results of scientifically conducted clinical trials to determine if Neurontin was actually effective in the treatment of these conditions.

31.    The Parke-Davis scheme consisted of an elaborate and clandestine promotion of "off-label" uses of Neurontin, all in direct contravention of rules and regulations of the FDA and the Health Care Finance Agency and, in particular, for the "off-label" uses of pain control, monotherapy for seizures using extremely high doses, control of bipolar disorder, attention deficit disorder, and other diseases and conditions.

32.    Minutes of meetings held in 1995 showed that marketing and clinical employees of Parke-Davis decided that clinical trials were too expensive and they would take too long, so that by the time the company got the results, the patent on Neurontin would be close to running out and the market would be flooded with cheap copies of Neurontin.

33.    As a result, a group of executives called the "New Products Committee" approved an alternative strategy; in other words, not the strategy that would have involved going to the FDA, but an alternative strategy to generate these additional uses of Neurontin. They decided that Parke-Davis would pay for clinical trials in a range of uses – bipolar disorder, social phobia, migraine, and chronic pain    and then publicize the results of those trials through medical journals and medical conventions. The head of this committee was the then-president of the company, Tony Wild.

34.    These promotions occurred in spite of evidence showing that the drug would not work for these conditions. A Parke-Davis internal memo dated May 5, 1997 posed the central question: "Did it make sense for Parke-Davis to do rigorous and expensive clinical trials to prove to the FDA that Neurontin worked for the burning, tingling pain of diabetic neuropathy?" The memo's answer: "It did not." According to the memo, there was a study that showed Neurontin worked better than a placebo, but more studies would be needed, and the arithmetic did not add up. Neurontin's patent was two and one-half years away from expiring and, when that happened, makers of cheap generic copies would get most of the Neurontin patients. Still,

-10-

the pain market was tempting. The Parke-Davis memo pointed out there were up to 16 million diabetics in the country. Neurontin, with an approved use for epileptic seizures, had a market of two million. The memo also noted that diabetics had used drugs worth at least $15 million to treat pain, and Neurontin already had most of those patients. So, the epilepsy marketing team recommended that Parke-Davis skip the studies and promote Neurontin for pain directly to doctors through educational seminars and other meetings.

35.    Although federal regulations did not permit Parke-Davis to promote unapproved uses of Neurontin, Parke-Davis was permitted to distribute publications created by "third parties" that described results of "off-label" uses of Neurontin, if such material was distributed in response to non-solicited requests from physicians. Parke-Davis decided to exploit this narrow exception by creating events and programs that would allow special Parke-Davis employees and independent contractors under Parke-Davis's control to promote "off-label" usage under circumstances that would allow Parke-Davis to deny, wrongfully, that it had solicited "off-label" usage.

36.    Significant ingenuity and resourcefulness was necessary in order to execute this unlawful scheme without detection. Faced with the fact that its "publication strategy" required publications from independent physicians when no such publications existed, Parke-Davis hired non-physician technical writers to create articles for medical journals and then paid actual specialists to be the articles' "authors." Faced with the fact that its normal marketing force could not deliver the "off-label" message, Parke-Davis trained its medical liaisons — technical employees who were supposed to provide balanced scientific information to doctors - - to sell "off-label" and solicit interest in "off-label" uses. Faced with the fact that in order for a "publication strategy" to actually increase usage of a drug, Parke-Davis required a large group of doctors interested in experimenting on patients, and an even larger group of doctors who were interested in receiving information about those experiments. Parke-Davis generated both groups by liberally distributing payments to both groups of physicians through "consultants" meetings,

speakers' bureaus, medical education seminars, grants, "studies," advisory boards and teleconferences. Further details of these programs are described below.

37.    Notwithstanding their knowledge that they could not promote Neurontin lawfully for non-approved uses, marketing executives at Parke-Davis's headquarters in Morris Plains, New Jersey, and in its five regional customer business units (CBUs), selected a marketing strategy which would deliberately lead to increased "off-label" usage of Neurontin. These executives knew that Parke-Davis was not supposed to create or design the contents of the communications that would be distributed pursuant to the "publication strategy," or do anything to generate the practicing physicians' interest in receiving such communications. As demonstrated below, Parke-Davis ignored these legal requirements and, instead, put into effect a pervasive pattern of illegal conduct described below, lasting from at least 1994 through 1998, and Plaintiff believes, through 2000. The effects of this illegal activity continue today as doctors continue to prescribe Neurontin for "off-label" uses as a direct result of the wrongful activities described below.

38.    The Parke-Davis scheme was carried out by employing these strategies, among others, as described below:

     a.  payment of illegal kickbacks to physicians who prescribed large amounts of Neurontin for "off-label" purposes to patients whose prescriptions were paid for by Medicare or Medicaid;

     b.  the formation of a nationwide network of employees falsely referred to as "medical liaisons" whose actual assigned duties consisted entirely of conventional direct sales activities and which did not include any legitimate scientific activity;

     c.  the illegal direct solicitation of physicians for "off-label" uses;

     d.  the making of false statements to physicians and pharmacists concerning the efficacy and safety of Neurontin for "off-label" uses;

e.    the making of such false statements directly to the Veterans Administration concerning the safety and efficacy of Neurontin for "off-label" uses;

f.    the charging of full price for drugs actually being used in experimental trials and, thus, subject to federal price restriction;

g.    the systematic avoidance of filing requirements with the FDA;

h.    the deliberate avoidance of the FDA's classification of Neurontin as to its therapeutic equivalency and, thus, the avoidance of Medicare and Medicaid price limitations based on therapeutic equivalency;

i.    the use of active concealment to avoid the FDA's enforcement mechanisms and the resultant mandatory interruption of Medicare and Medicaid payments for Neurontin prescriptions;

j.    the use of active concealment to avoid the "formulary" policies of various state agencies administering Medicare and Medicaid programs which are intended to refuse payment for uses of drugs which are not medically recognized as statutorily defined;

k.    the payment or offering of gratuities to Parke-Davis employees in order to procure their silence; and

l.    the active training of Parke-Davis employees in methods of avoiding detection of their activities by the FDA.

Each aspect of the scheme is described below, and certain aspects of the scheme have continued in 2000, 2001 and 2002 and may be ongoing to the present time.

**B.    Parke-Davis's Systematic Payments to Doctors for the Purpose of Increasing Neurontin Prescriptions**

39.    Parke-Davis's "publication strategy" required physicians (and its medical liaisons) to perform the work normally performed by the company's salesmen in order to promote Neurontin. Adoption of this strategy required Parke-Davis to make tens of thousands of

payments to the physicians who would act as a surrogate sales force as well as the practicing physicians who would receive the message. In other words, adoption of the "publication strategy" required Parke-Davis to make thousands of payments to physicians for the purpose of having those doctors either recommend the prescription of Neurontin or to order Neurontin, in violation of the Medicaid anti-kickback regulations. Parke-Davis was aware that these regulations were violated routinely. A description of the various programs Parke-Davis used to make these payments to physicians follows.

### 1.    "Consultants" Meetings

40.    A common ploy by Parke-Davis to funnel illegal payments to physicians to encourage them to prescribe "off-label" was through "consultants" meetings. Under this guise, Parke-Davis recruited physicians to dinners or conferences and paid them to hear presentations about "off-label" uses of Neurontin. Under the guise that these doctors were acting as "consultants," Parke-Davis sometimes (but not always) had the doctors sign sham "consulting agreements." At these meetings, Parke-Davis would give these doctors lengthy presentations relating to Neurontin, particularly regarding "off-label" usage. Presentations would be made by Parke-Davis employees or physician speakers hired by Parke-Davis for the purpose of promoting Neurontin, and attendees' questions relating to the administration of Neurontin use would be solicited and answered. At some conferences, the sponsoring organization or Parke-Davis intentionally posed questions to the speakers about "off-label" use to insure that the attendees were exposed to such information.

41.    At some, but not all, "consultants" meetings a few questions would be posed to the "consultants" regarding Parke-Davis marketing of Neurontin or how the Parke-Davis sales force could provide better service to the doctors. The "consultants" meetings, however, were not held (and the "consultants" were not paid) for the purpose of providing Parke-Davis with expert, independent advice. In many cases, Parke-Davis did not even record the "advice" provided by

its "consultants," and whatever advice was collected was never acted upon or reviewed. Indeed, no legitimate business would need hundreds of "consultants" to advise it on the same topic.

42. Parke-Davis did, however, routinely analyze whether the "consultants" meetings were successful in getting the attendees to change their prescription writing practices. At some meetings, the "consultants" were directly asked if they would write more Neurontin prescriptions as a result of the meeting. Such a question would have been irrelevant if the actual purpose of the meeting was to receive the "consultants'" advice. Parke-Davis also routinely tracked consultants' Neurontin prescription writing practices after these meetings. Using market data purchased from third parties, Parke-Davis analyzed whether the doctors they had paid had, in fact, written more Neurontin prescriptions after the meeting. Again, such data was only relevant if the real purpose of the payments was to influence the doctors to order more Neurontin.

43. A typical consultants' meeting was held in Jupiter Beach, Florida, for neurologists from the North East CBU during the weekend of April 19-21, 1996. The "consultants" selected for this meeting were not chosen on the basis of their consulting acumen but, rather, because of their potential to write Neurontin prescriptions. In a memorandum announcing the event to Parke-Davis personnel, the Neurontin Marketing Team acknowledged that in order to target neurologists with the greatest potential for writing Neurontin prescriptions, sales personnel must select potential attendees from a list of the top prescription writers for anti-epileptic drugs in the Northeast; only persons who fell within this desirable demographic were allowed to be invited.

44. Qualifying physicians were given round-trip airfare to Florida (worth $800.00), two nights' accommodations (worth $340.00), free meals and entertainment, ground transportation and a "consultant's fee" of $250.00. Ample time was provided so that the Parke-Davis "consultants" could enjoy the beach resort. The value of the junket was approximately $2,000.00 per physician.

45. The Jupiter Beach "consultants" meeting included two one-half days of presentations by Parke-Davis relating to Neurontin, including extensive presentations relating to "off-label" uses. Although technically the presentations were provided by an independent

company, Proworx, all aspects of the presentation were designed, monitored and approved by
Parke-Davis. It selected the speakers, picked the presentation topics and previewed the content
of the presentations to make sure that they were acceptable. Parke-Davis paid all expenses
relating to the "consultants" meeting, including all payments to the attendees and the presenters,
all travel, accommodation, meals and entertainment expenses, all presentation expenses, all
expenses and fees incurred by Proworx, and the substantial fees paid to the presenting
physicians. Notwithstanding the FDA's prohibition regarding the provision of promotional
materials on "off-label" uses, Parke-Davis provided written abstracts of the presentations that
detailed "off-label" use of Neurontin to each of its "consultants."

46.     No effort was made to obtain professional advice at Jupiter Beach from the
"consultants" Parke-Davis had wined, dined and entertained during the weekend. A follow-up
memorandum to Parke-Davis marketing officials noted that "the participants were delivered a
hard hitting message about Neurontin" and emphasized that the participants were encouraged to
use Neurontin at higher doses. More importantly, after the conference Parke-Davis generated
"trending worksheets" listing the doctors who attended the "consultants" meeting. These
worksheets enabled Parke-Davis to track Neurontin prescription habits of the attendees before
and after the "consultants" meetings to determine if these "high writing" prescribers wrote more
Neurontin prescription after the conference. Persuading these heavy prescribers to order more
Neurontin for their patients was, in fact, the sole purpose of the Jupiter Beach junket.

47.     Jupiter Beach was not unique. Parke-Davis hosted dozens of "consultants"
meetings between late 1995 and 1997 in which the "consultants" received payments and
gratuities as well as presentations on "off-label" Neurontin use designed to change the
physicians' prescription writing habits. Comparable consultants' meetings included, but were
not limited to, the following:

| Topic | Location | Dates |
|---|---|---|
| Mastering Epilepsy | La Costa Resort, CA | July 20-23, 1995 |

| Topic | Location | Dates |
|---|---|---|
| Mastering Epilepsy | Santa Fe, NM | November 16-19, 1995 |
| Neurontin Consultants Conference | Marco Island, FL | February 2-4, 1996 |
| Pediatric Epilepsy | Hutchinson Island, FL | February 9-11, 1996 |
| Mastering Epilepsy Science | Walt Disney World, FL | February 22-25, 1996 |
| Pediatric Epilepsy | Hutchinson Island, FL | March 8-10, 1996 |
| Mastering Epilepsy | Ritz Carlton, Aspen, CO | April 18-21, 1996 |
| Affective Disorders in Psychiatry | Marco Island, FL | April 20, 1996 |
| Affective Disorder Consultants Conference | Southern Pines, NC | April 27, 1996 |
| Neuropathic Pain Conference | Palm Beach, FL | May 11, 1996 |
| Regional Consultants Conference | Ritz Carlton, Boston, MA | May 10-11, 1996 |
| Epilepsy Management Advisors Meeting | Sheraton Grande Torrey Pines, La Jolla, CA | June 21-23, 1996 |
| Epilepsy Management | Rancho Bernardo, CA | June 28-30, 1996 |
| Use of Anti-Convulsants in Psychiatric Disorders | Short Hills, NJ | October 18-19, 1996 |
| Non-epileptic Uses of Neurontin | Longboat Key, FL | November 6, 1996 |
| Neurological Conditions Conference | Ritz Carlton, Atlanta, GA | September 27-28, 1997 |

Other "consultants" meetings took place in Charleston, SC, Coconut Grove, FL, Naples, FL, Memphis, TN, Louisville, KY, Washington, DC, Aspen, CO, and other places. Hundreds (if not thousands) of physicians received kickbacks to attend these events.

48.    Not all payments to "consultants" were made at conferences as elaborate as Jupiter Beach. Many "consultants" meetings consisted of lavish dinners at local restaurants. The emphasis on these meetings was also on "off-label" uses, and $200 "honorariums" were paid to the physicians who did nothing for the payment except show up. At none of the events did the

"consultants" provide legitimate consultation to Parke-Davis, but at all of the events the "consultants" were encouraged to increase their Neurontin prescription writing.

### 2.    Medical Education Seminars

49.    Another format where Parke-Davis paid kickbacks to physicians to hear "off-label" promotion of Neurontin were programs billed as Continuing Medical Education seminars ("CME"). These conferences and seminars were set up to appear to qualify for an exception to the FDA's "off-label" marketing restrictions which permits physicians to learn about "off-label" uses of pharmaceuticals at independent seminars. Such seminars, however, must be truly independent of the drug companies. The drug companies may make "unrestricted grants" for the purpose of a seminar, but may not be involved in formulating the content of the presentations, picking the speakers or selecting the attendees. None of these requirements were observed with regard to the CME seminars sponsored by Parke-Davis for the promotion of "off-label" uses of Neurontin. While Parke-Davis retained third-party organizations, such as Proworx and MES, to present the event seminars, it had control of virtually every aspect of these events, and the seminar companies obtained Parke-Davis's approval for all content presented at the seminars. Parke-Davis also paid all expenses, including all the seminar companies' fees.

50.    Although the seminar companies acted as the conduit for the payments and gratuities given to the physician attendees, like the Jupiter Beach consultants' meetings, Parke-Davis controlled every aspect of the CME programs. It designed and approved the programs; hand-picked the speakers for the seminars; approved the seminar presentations of the seminars; previewed, in most cases, the contents of the seminars prior to delivery; selected the attendees based on their ability and willingness to prescribe high quantities of Neurontin; evaluated the presentations to make sure Parke-Davis's "message" was appropriately delivered; black-listed presenters whose presentations were not sufficiently pro-Neurontin; and monitored the prescribing patterns of the physicians who attended these conferences to insure the purpose of the conference – increased writing of Neurontin prescriptions – was achieved. Follow-up reports

to marketing executives at Parke-Davis highlighted that the attendees received presentations regarding "off-label" marketing and recommendations for dosages larger than those labeled effective by the FDA. These memoranda also reported to senior executives the pledges made by attendees to order more Neurontin for their patients.

51.   For some seminars, high prescription writing physicians were selected to receive junkets comparable to those Parke-Davis provided to the attendees of the Jupiter Beach "consultants" meetings described above. Others were less lavish, but physicians received free tuition, free accommodations, free meals and cash. Frequently, the Parke-Davis CME seminars were accredited by continuing medical education organizations, which meant that the physicians taking advantage of Parke-Davis's junkets did not have to pay tuition or spend additional time to fulfill their continuing medical education licensure requirements by attending truly independent medical education programs.

52.   Representative CME programs sponsored by Parke-Davis where it paid extensive kickbacks to attending physicians included, but are not limited to, the following:

| Seminar | Location | Date |
|---|---|---|
| Merritt-Putnam Epilepsy Postgraduate Course | | January 19, 1996 |
| Merritt-Putnam Seminar | Chicago, IL | January 26, 1996 |
| New Frontiers in AntiEpileptic Drug Use | California | Sept-Oct 1996 |
| Diabetic Neuropathy | Ritz Carlton, Boston, MA | June 22-24, 1997 |
| Merritt-Putnam Symposium | Key Biscayne, FL | September 11, 1997 |
| Merritt-Putnam Conference on Monotherapy | Palm Springs, CA | September 9, 1997 |
| Merritt-Putnam Conference on Monotherapy | St. Louis, MO | October 3, 1997 |
| Merritt-Putnam Symposium | Boston, MA | December 5, 1997 |

### 3.   Grants and "Studies"

53.     Parke-Davis also made outright payments, in the form of grants, to reward demonstrated Neurontin believers and advocates. Parke-Davis sales managers identified key doctors who actively prescribed Neurontin or programs which were willing to host Neurontin speakers and encouraged such persons or programs to obtain "educational grants" from Parke-Davis. Under this program of kickbacks Parke-Davis paid:

- $2,000.00 to Berge Ninmpolan, MD, "a great Neurontin believer," to attend a neurology seminar in San Francisco in March 1996;

- $1,000.00 to the University of Texas at Houston, Department of Neurology, to host a symposium where presentations would be made regarding successful "off-label" treatment with Neurontin;

- $3,000.00 to the University of Texas Medical School to host a conference in August 1996 at which a well-known specialist in epilepsy, who prescribed Neurontin, would attend;

- $4,000.00 to pay for a neurologist from the University of Texas at San Antonio to attend the American Epilepsy Society Conference in December 1996, a conference at which Parke-Davis was presenting extensive documentation on "off-label" uses for Neurontin;

- $2,500.00 to the University of Texas at Houston to bring Dr. B.J. Wilder to the campus to hold a seminar. Dr. Wilder was one of Neurontin's biggest boosters for "off-label" indications and had been paid tens of thousands of dollars to promote Neurontin's "off-label" uses for Parke-Davis across the country;

- $2,500.00 in June 1996 to pay for representatives from the University of Pennsylvania Medical Center to attend a conference in Saint Petersburg, Russia, on the utilization of anti-epileptic drugs, including Neurontin;

- $5,000.00 to Dr. Alan B. Ettinger, of Stony Brook, NY, in December 1996, a physician who had informed Parke-Davis that he was interested in possibly