end of the third quarter of 2002 "there were no published scientific studies to support
Neurontin's use for" any of these indications or in an increased dose.

97.    Overall, "off-label" sales of Neurontin have steadily increased since 1998, and
from 2000 to the present have consistently remained at 93% to 94% of all sales. Actual sales for
approved uses has declined. Given the absence of scientific support for such uses, the genesis
for those sales can only be past and continuing efforts by Defendants to promote "off-label" use.

98.    These continuing "off-label" promotional efforts are evidenced in part by a July 1,
2002 letter from Dr. Lisa Stockbridge of the Department of Health & Human Services ("HHS")
to Pfizer, in which HHS notified Pfizer that certain of its marketing practices are "*in violation of
the Federal Food, Drug and Cosmetic Act ... because it makes representations about Neurontin
which are false and misleading.*" In particular, HHS had the following objections about Pfizer's
"off-label" promotional activities:

> The presentation on the model of illustrations of cellular activity resulting from
> the administration of Neurontin ("Mechanism of Action"), In conjunction with
> the presentation of the human brain, and the prominent display of the name
> Neurontin makes representations about how Neurontin acts in the human brain.
> This presentation along with the depiction of the human brain and the
> prominent display of the name "Neurontin" suggest that the mechanism of
> action of Neurontin has been established in the human brain. *This suggestion of
> proof of the mechanism of action is false. Specifically, it is contrary to the
> language in the approved product labeling that states that "[t]he mechanism by
> which gabapentin* [Neurontin] *exerts its anticonvulsant action is unknown.*"

> Furthermore, the full presentation of the aforementioned areas of the human
> brain accompanied by purported "Mechanism of Action" and the prominent
> display of the name "Neurontin" is *misleading* because it suggests that
> Neurontin is useful for a broader range of CNS conditions than has been
> demonstrated by substantial evidence (*i.e.*, it can be used for the treatment of
> any specific or non-specific brain disorder through to involve the GABA-ergic
> neurotransmitted system that can originate in these parts of the brain). *Most
> obviously, the solo and prominent mention of the name Neurontin suggests that
> Neurontin can be used as monotherapy for various CNS disorders,
> notwithstanding that with respect to brain disorders, Neurontin is only
> indicated as "adjunctive therapy in the treatment of partial seizures with or
> without secondary generalization in patients over 12 years of age with
> epilepsy" and as "adjunctive therapy in the treatment of partial seizures in
> pediatric patients age 3-12 years.*"

> To address these objections, DDMAC recommends that Pfizer do the
> following:

1.     *Immediately discontinue the use of this model and any* other
       promotional material with the same or similar issues. (Emphasis
       added.)

99.    On information and belief, the foregoing promotional materials were used by

Pfizer employees to promote "off-label" use of Neurontin.

100.   These continuing efforts to illegally promote "off-label" use of Neurontin are also

evidenced in part by a letter from HHS dated June 6, 2001, in which HHS found Pfizer to have

again violated applicable law. This letter was sent by HHS in response to Pfizer's promotional

advertising sent to doctors in 2001 claiming that a study had indicated "Quality of Life

Improvements" with use of Neurontin. HHS found this promotional material to be misleading as

set forth in its letter to Pfizer:

Ms. Andrea Garrity
Director, Regulatory Affairs
Pfizer, Inc.
235 East 42nd Street
New York, New York 10017-5755

Re:    **NDA #s 20-235, 20-882**
       Neurontin (gabapentin)
       MACMIS #10174

Dear Ms. Garrity:

Through routine monitoring and surveillance, the Division of Drug Marketing,
Advertising, and Communications 9DDMAC) has identified a slim jim (ID
#NSJ5095A1) for Neurontin that is *misleading and in violation of the Federal
Food, Drug, and Cosmetic Act and applicable regulations.*

Specifically, this slim jim misleadingly claims improvements in quality of life
(QOL) parameters based on the Neurontin Evaluation of Outcomes in
Neurological Practice (NEON) study. Among other QOL parameters, the
misleading presentation includes improvement in social limitations, memory
difficulties, energy level, and work limitations. The NEON study is not
considered to be substantial evidence for claims of QOL improvements because
it is not a controlled study.

To address these objections, DDMAC recommends that Pfizer do the
following:

1.     Immediately discontinue the use of this slim jim and any other
       promotional material and practices with the same or similar messages.

2.     Respond to this letter within ten days. Your response should include a
       statement of your intent to comply with the above, a list of all

-41-

> promotional materials with the same or similar issues, and your methods
> for discontinuing these promotional materials.  (Emphasis added.)

101.    Pfizer employees had been using the foregoing promotional materials to promote "off-label" use of Neurontin up until this letter of June 6, 2001.

102.    Defendants have sent promotional material to physicians suggesting that Neurontin was "well tolerated" with "proven efficacy" at doses "up to 2400 mg/day" and that doses of 3600 mg/day were also "well tolerated." As noted herein, there was no scientific evidence that would have met with FDA criteria supporting a claim for dosages in excess of 1800 mg/day and these promotional efforts are illegal attempts to encourage "off-label" uses.

103.    The promotional materials referred to above, as well as other promotional activities cited herein, were not submitted to the FDA for approval as required by FDAMA, 21 U.S.C. § 360aaa. Indeed, in the above-cited examples where HHS cited Pfizer for violating federal law, the violations were discovered as a result of HHS's "routine monitoring and surveillance" activities and not because Pfizer had submitted the materials as required by law.

## E.    "Off-Label" Promotion is Illegal

104.    The "off-label" uses of Neurontin which are actively being promoted by Defendants are uses which are not recognized as medically accepted uses by the American Hospital Formulary Service Drug Information, the United States Pharmacopeia-Drug Information, or the American Medical Association Drug Evaluations, or by any peer-reviewed medical literature. Thus, these "off-label" uses are beyond the scope of uses designated by federal law and regulation, in particular 42 U.S.C. § 1396r-8, as eligible coverage by the Medicare and Medicaid programs.

105.    The citations in Drugdex for Neurontin, as of August 1997, indicate that the published scientific literature did not support the use of Neurontin for the following conditions: alcohol detoxification/alcohol withdrawal syndrome, ALS, antidepressant-induced bruxism, anxiety disorder, attention deficit disorder/attention deficit and hyperactivity disorder, behavior problems-dementia related, behavior dyscontrol, dipolar disorder, brachioradial pruritis, back

-42-

pain, Charles Bonnet syndrome, ciguatera poisoning, cluster headache, cocaine dependency, diabetic peripheral neuropathy, depression, dosages in excess of 1800 mg per day, dystonia, essential tremor, failed back surgery syndrome, headache (SUNCT), headache, hemifacial spasm, hiccups, Lesch-Nyhan syndrome, mania, migraine prophylaxis, menopausal hot flashes, mood stabilization, multiple sclerosis complications, myalgias taxane induced neuropathic pain syndromes, neuropathic cancer pain, HIV-related neuropathy, nicotine withdrawal, nystagmus, obsessive-compulsive disorder, orthostatis tremor, pain-postpoliomyelitis pain, pain-RSD, pain disorder, partial seizures-monotherapy, partial seizures-pediatric, partial seizures-refractory, phantom limb syndrome, postherpetic neuralgia, restless les syndrome, trigeminal neuralgia, seizures – acute intermittent prophyria, seizures – brain tumor-induced, seizures – clozapine-induced, seizures – generalized, seizures - status epilepticus, schizophrenia, social phobia, spasticity, or any other indication other than seizures – adjunctive therapy.

106.     As set forth above, despite the lack of scientific support, Defendants engaged in promotional activities for the purpose of having doctors use Neurontin to treat these diseases.

107.     Further, any representations by any agent, employee, or person hired by Parke-Davis that as of August 1997 there was scientific evidence supporting Neurontin's use for: alcohol detoxification/alcohol withdrawal syndrome, ALS, antidepressant-induced bruxism, anxiety disorder, attention deficit disorder/attention deficit and hyperactivity disorder, behavior problems-dementia related, behavior dyscontrol, dipolar disorder, brachioradial pruritis, back pain, Charles Bonnet syndrome, ciguatera poisoning, cluster headache, cocaine dependency, diabetic peripheral neuropathy, depression, dosages in excess of 1800 mg per day, dystonia, essential tremor, failed back surgery syndrome, headache (SUNCT), headache, hemifacial spasm, hiccups, Lesch-Nyhan syndrome, mania, migraine prophylaxis, menopausal hot flashes, mood stabilization, multiple sclerosis complications, myalgias taxane induced neuropathic pain syndromes, neuropathic cancer pain, HIV-related neuropathy, nicotine withdrawal, nystagmus, obsessive-compulsive disorder, orthostatis tremor, pain-postpoliomyelitis pain, pain-RSD, pain disorder, partial seizures-monotherapy, partial seizures-pediatric, partial seizures-refractory,

phantom limb syndrome, postherpetic neuralgia, restless leg syndrome, trigeminal neuralgia, seizures - acute intermittent prophyria, seizures – brain tumor-induced, seizures – clozapine-induced, seizures – generalized, seizures – status epilepticus, schizophrenia, social phobia, spasticity, or any other indication other than the partial seizures-adjunctive therapy; *would have been misleading in that the published literature cited in Drugdex did not support these indications at that time.* On information and belief, representations were made by Defendants' employees that Neurontin was appropriate for treatment of some of the foregoing diseases.

108. The citations in Drugdex for Neurontin as of the third quarter of 2002, indicate that there were no published scientific studies to support Neurontin's use for the following indications: alcohol detoxification/alcohol withdrawal syndrome, ALS, antidepressant-induced bruxism, anxiety disorder, attention deficit disorder/attention deficit and hyperactivity disorder, behavior problems-dementia related, behavior dyscontrol, dipolar disorder, brachioradial pruritis, back pain, Charles Bonnet syndrome, ciguatera poisoning, cluster headache, cocaine dependency, diabetic peripheral neuropathy, depression, dosages in excess of 1800 mg per day, dystonia, essential tremor, failed back surgery syndrome, headache (SUNCT), headache, hemifacial spasm, hiccups, Lesch-Nyhan syndrome, mania, migraine prophylaxis, menopausal hot flashes, mood stabilization, multiple sclerosis complications, myalgias taxane induced neuropathic pain syndromes, neuropathic cancer pain, HIV-related neuropathy, nicotine withdrawal, nystagmus, obsessive-compulsive disorder, orthostatis tremor, pain-postpoliomyelitis pain, pain-RSD, pain disorder, partial seizures-monotherapy, partial seizures-pediatric, partial seizures-refractory, phantom limb syndrome, postherpetic neuralgia, restless leg syndrome, trigeminal neuralgia, seizures – acute intermittent prophyria, seizures – brain tumor-induced, seizures – clozapine-induced, seizures – generalized, seizures - status epilepticus, schizophrenia, social phobia, spasticity, or any other indication other than the partial seizures-adjunctive therapy, partial seizures-pediatric, postherpetic neuralgia, and diabetic peripheral neuropathy.

-44-

109.    With the complete absence of scientific support for treatment of these diseases, sales growth which occurred for the use of Neurontin for these diseases was the result of Defendants' continuing promotional activities.

110.    Any representations by any agent, employee, or person hired by defendants that as of 2003 there was scientific evidence supporting Neurontin's use for: alcohol detoxification/alcohol withdrawal syndrome, ALS, antidepressant-induced bruxism, anxiety disorder, attention deficit disorder/attention deficit and hyperactivity disorder, behavior problems-dementia related, behavior dyscontrol, dipolar disorder, brachioradial pruritis, back pain, Charles Bonnet syndrome, ciguatera poisoning, cluster headache, cocaine dependency, diabetic peripheral neuropathy, depression, dosages in excess of 1800 mg per day, dystonia, essential tremor, failed back surgery syndrome, headache (SUNCT), headache, hemifacial spasm, hiccups, Lesch-Nyhan syndrome, mania, migraine prophylaxis, menopausal hot flashes, mood stabilization, multiple sclerosis complications, myalgias taxane induced neuropathic pain syndromes, neuropathic cancer pain, HIV-related neuropathy, nicotine withdrawal, nystagmus, obsessive-compulsive disorder, orthostatis tremor, pain-postpoliomyelitis pain, pain-RSD, pain disorder, partial seizures-monotherapy, partial seizures-pediatric, partial seizures-refractory, phantom limb syndrome, postherpetic neuralgia, restless les syndrome, trigeminal neuralgia, seizures – acute intermittent prophyria, seizures – brain tumor-induced, seizures – clozapine-induced, seizures – generalized, seizures - status epilepticus, schizophrenia, social phobia, spasticity, or any other indication other than the partial seizures-adjunctive therapy, partial seizures-pediatric, postherpetic neuralgia, and diabetic peripheral neuropathy would have been misleading in that the published literature cited in Drugdex did not support these indications at that time. On information and belief, Defendants made representations that there was scientific evidence supporting use for these diseases.

111.    Any statement or representation made by Parke-Davis, their employees or agents that Neurontin was safe and effective for migraine prophylaxis that provided information only on positive reports or trials while failing to disclose negative studies of similar or better

-45-

methodologic quality would not be a fair and balanced presentation and would be false and misleading. On information and belief, such statements were made during the period from 1995 through 2000.

112.    Any statement or representation made by Parke-Davis, their employees, or agents that Neurontin was safe and effective for treatment of neuropathic pain that provided information on positive reports or trials, while failing to disclose negative studies of similar or better methodologic quality, would not be a fair and balanced presentation and would be false and misleading. On information and belief, such statements were made during the period from 1995 through 2002.

113.    Federal laws and regulations governing the Medicare and Medicaid programs. In particular, 42 U.S.C. § 1320A-7 and 42 C.F.R. § 1001 prohibit kickbacks to physicians and medical care providers. "Kickbacks" have been defined as including payments, gratuities and other benefits paid to physicians who prescribe prescription drugs by the manufacturers of the drugs.

114.    As part of its nationwide program of "off-label" promotion of Neurontin, Parke-Davis established a system of paying kickbacks to physicians who are prescribers of large amounts of Neurontin. These kickbacks were administered by the Parke-Davis sales department, and frequently disguised as consultantships, although unrelated to any scientific or educational activity. The kickbacks took the form of cash payments, travel benefits, entertainment, Olympics tickets and other benefits. Parke-Davis established formal internal guidelines for the award of these benefits to physicians which are based entirely on the amount of prescriptions written by the physicians and the ability of the physician to influence other physicians to begin prescribing Neurontin for "off-label" uses.

115.    These kickbacks are strictly illegal and have had the effect of greatly increasing the amount of Neurontin prescriptions and indirectly the amount of money spent by the federal government for reimbursement of prescriptions covered by Medicare. The payment of these

kick-backs represents the inducement of federal payments through a pattern of fraudulent conduct and constitute false claims within the meaning of 31 U.S.C. § 3729.

116.    As part of its illegal "off-label" promotion of Neurontin, Parke-Davis has instructed and caused its sales personnel and its medical liaison employees to make false statements to physicians, and to provide physicians with written materials containing false statements, concerning the safety and efficacy of Neurontin for "off-label" uses. These statements were made with the intent of, and had the effect of, inducing physicians to increase their "off-label" prescription of Neurontin.

117.    The false and misleading statements made by Defendants' employees to physicians have included representations that scientific evidence exists that Neurontin is an effective remedy for pain, bipolar disorder, attention deficit disorder, reflex sympathetic dystrophy, post-herpetic neuralgia, and monotherapy for seizures. The false and misleading statements also include representations that Neurontin is known to be safe and effective in dosages of up to 4800 mg/day in all populations. The false statements include representations that clinical trials are ongoing or planned with respect to each of the above off-label uses. Each of these statements is unsupported by any legitimate scientific evidence.

## F.    Fraudulent Concealment

118.    Defendants have and continue to conceal their off-label promotional activities. As for events occurring prior to May 2002, when the federal court file in the Franklin *qui tam* case was completely unsealed, in the exercise of reasonable diligence, Plaintiff could not have discovered the scheme alleged herein. Much of the scheme still remains concealed by Defendants.

## G.    The Role of Non-Physician Technical Writers, Physicians and Vendors in Defendants' Marketing Scheme

119.    The non-physician technical writers, physician "authors," and vendors, namely AMM/Adelphic Ltd. ("AMM") and Medical Educational Systems; Inc. ("MES"), (collectively referred to herein as the "Promotional Strategists") were key parties in Defendants' improper

**H.    Defendants' Motive**

123.    Defendants' motive in creating and operating the fraudulent scheme and RICO Enterprises described herein was to fraudulently obtain additional sales and revenues from Neurontin.

124.    The fraudulent scheme was designed to, and did; cause Plaintiff and the Class *to* pay claims for Neurontin to treat conditions for which the drug is not medically necessary. The fraudulent scheme also caused Plaintiff and the Class to pay claims for Neurontin to treat non-FDA approved conditions. In the absence of Defendants' improper conduct, Plaintiff and the Class would not have paid for such Neurontin claims.

**I.    Use of the Mails and Wires**

125.    During the Class Period, Defendants used thousands of mail and interstate wire communications to create and manage their fraudulent scheme. Defendants' scheme involved national marketing and sales plans and programs, and encompassed physicians and victims across the country.

126.    Defendants' use of the mails and wires to perpetrate their fraud involved thousands of communications throughout the Class Period, including:

(a)    Marketing and advertising materials about the off-label uses of Neurontin for which the drug is not safe and medically efficacious, such materials being sent to doctors across the country;

(b)    Communications, including financial payments, with the Vendors, non-physician technical writers, and physician "authors" discussing and relating to the publication of articles touting off-label uses of Neurontin for which the drug is not safe and medically efficacious, as detailed above;

(c)    Communications with the Vendors; doctors and private insurers that fraudulently represented that Neurontin was scientifically proven to be safe and effective for off-label uses;

(d)    Communications with health insurers and patients, including Plaintiff and

-49-

the Classes, inducing payments for Neurontin to be made in reliance on misrepresentations concerning the use of Neurontin for non-medically necessary uses; and

    (e)    Receiving the proceeds of the Defendants' improper scheme.

127.    In addition, Defendants' corporate headquarters have communicated by United States mail and by facsimile with various local district managers, medical liaisons and pharmaceutical representatives in furtherance of Defendants' schemes.

## V.    CLASS ACTION ALLEGATIONS

128.    Under Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this action on behalf of themselves and Class defined as:

> All entities throughout the United States and its territories who, for purposes other than resale, purchased, reimbursed and/or paid for Neurontin for indications not approved by the FDA ("the Class") during the period from January 1, 1994 through the present ("the Class Period"). For purposes of the Class definition, entities "purchased" Neurontin if they paid some or all of the purchase price.

Excluded from the Class are (a) entities who may receive relief in the action entitled *Congress of California Seniors v. Pfizer, Inc.,* Case No. BC289643, Defendants and any entity in which any Defendant has a controlling interest, and their legal representatives, officers, directors, assigns and successors, and any co-conspirators.

129.    The Class consists of numerous entities throughout the United States, making individual joinder impractical, in satisfaction of Rule 23(a)(1). The disposition of the claims of members of the Class in a single class action will provide substantial benefits to all parties and to the Court.

130.    The claims of the representative Plaintiff are typical of the claims of the Class, *as* required by Rule 23(a)(3), in that the representative Plaintiff includes entities that, like all Class members, purchased and/or paid for Neurontin for indications not approved by the FDA. Such representative Plaintiff, like all members of the Class, have been damaged by Defendants' misconduct, in that, among other things, they paid for Neurontin to treat conditions for which the

-50-

drug has not been demonstrated to be medically effective or safe and for which the drug was not FDA-approved.

131.    The factual and legal bases of Defendants' misconduct are common to all members of the Class and represent a common thread of fraud and other misconduct resulting in injury to Plaintiff and all members of the Class.

132.    There are many questions of law and fact common to Plaintiff and the Class, and those questions predominate over any questions that may affect individual Class members, within the meaning of Rule 23(a)(2) and 23(b)(3). Common questions of law and fact include, but are not limited to, the following:

(a)    Whether Neurontin is medically necessary for uses not approved by the FDA;

(b)    Whether Defendants engaged in a fraudulent and/or deceptive scheme of improperly marketing and selling Neurontin for conditions to which it is not safe or medically efficacious;

(c)    Whether Defendants engaged in a fraudulent and/or deceptive scheme of improperly marketing and selling Neurontin to treat conditions for which the drug was not approved by the FDA;

(d)    Whether Defendants instructed or coached doctors on how to conceal the off-label nature of Neurontin on claim forms submitted to Plaintiff and members of the Class;

(e)    Whether it was the policy and practice of Defendants to prepare, fund and publish materials which contained false information and misrepresentations regarding off-label uses for Neurontin;

(f)    Whether Defendants paid non-physician technical writers to write articles containing misinformation and misrepresentations concerning purported scientific evidence regarding the safety and medical efficacy of Neurontin to treat off-label conditions;

-51-

(g)    Whether Defendants paid physicians to "author" articles written by others containing misinformation and misrepresentations concerning purported scientific evidence regarding uses of Neurontin for which it has not been scientifically proven to be safe or medically effective;

(h)    Whether Defendants paid Vendors, namely AMM and MES, to market articles containing misinformation and misrepresentations concerning purported scientific evidence regarding off-label uses of Neurontin for which the drug is not safe or medically necessary;

(i)    Whether Defendants are liable to the Class Members for damages for conduct actionable under common law fraud and unjust enrichment;

(j)    Whether Defendants are liable to the Class Members for damages for conduct actionable under the various state consumer protection laws;

(k)    Whether Defendants engaged in a pattern and practice that directly caused Plaintiff and Class Members to pay for Neurontin claims that were for non-medically necessary uses;

(l)    Whether Defendants engaged in a pattern and practice that directly caused Plaintiff and Class Members to pay for Neurontin claims that were for non-FDA approved uses, and

(m)    Whether Defendants engaged in a pattern of deceptive and/or fraudulent activity with the intent to defraud Plaintiff and the Class Members.

133.    Plaintiff will fairly and adequately represent and protect the interests of the Class, as required by Rule 23(a)(4). Plaintiff has retained counsel with substantial experience in prosecuting nationwide class actions. Plaintiff and its counsel are committed to vigorously prosecuting this action on behalf of the Classes, and have the financial resources to do so. Neither Plaintiff nor its counsel have any interest adverse to those of the Class.

134.    Plaintiff and members of the Class have suffered, and will continue to suffer, harm and damages as a result of Defendants' unlawful and wrongful conduct. A class action is

-52-

superior to other available methods for the fair and efficient adjudication of the controversy under Rule 23(b)(3). Absent a class action, most members of the Class likely would find the cost of litigating their claims to be prohibitive, and will have no effective remedy at law. The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants, and promotes consistency and efficiency of adjudication. Additionally, Defendants have acted and failed to act on grounds generally applicable to Plaintiff and the Classes and require Court imposition of uniform relief to ensure compatible standards of conduct toward the Class, thereby making appropriate equitable relief to the Class as a whole within the meaning of Rule 23(b)(l) and (b)(2).

## TOLLING OF APPLICABLE STATUTES OF LIMITATIONS

135.    Any applicable statutes of limitations have been tolled by Defendants' knowing and active concealment and denial of the facts alleged herein. Plaintiff and members of the Class have been kept in ignorance of vital information essential to the pursuit of these claims, without any fault or lack of diligence on their part. Plaintiff and members of the Class could not reasonably have discovered the fraudulent nature of Defendants' conduct. Accordingly, Defendants are estopped from relying on any statute of limitations.

### FIRST CAUSE OF ACTION
### Violation of 18 U.S.C. § 1962(c)
### (The MES Enterprise)

136.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

137.    Defendants are the "persons" within the meaning of § 1961(3) who conducted the affairs of the enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

138.    MES is an "enterprise" which was created and/or used as a tool to effectuate Defendants' pattern racketeering activity. The Defendant "persons" are distinct from MES as the enterprise.

139.    The MES Enterprise engaged in and affected interstate commerce, because, *inter*

-53-

*alia,* it marketed, sold, purchased or provided Neurontin to thousands of individuals throughout the United States.

140.    Defendants have exerted control over the MES Enterprise; and Defendants have participated in the operation or management of the affairs of the MES Enterprise, through the following actions:

(a)    Defendants have asserted direct control over the information and content disseminated to the Vendors (including MES), doctors and the public regarding the medical safety and efficacy of Neurontin for off-label uses in articles published across the country;

(b)    Defendants have asserted direct control over the creation and distribution of mass-marketing and sales materials sent to Vendors and doctors throughout the United States; and

(c)    Defendants have placed their own employees and agents in positions of authority and control in the MES Enterprise.

141.    Defendants have conducted and participated in the affairs of the MES Enterprise through a pattern of racketeering activity that includes acts indictable under 18 U.S.C. §§ 1341 and 1343 (mail and wire fraud), as described above.

142.    In implementing their fraudulent scheme, Defendants were acutely aware that Plaintiff and members of the Class depend on the honesty of Defendants in representing the safety and medical efficacy of Neurontin's uses.

143.    As detailed above, Defendants' fraudulent scheme consisted of, *inter alia:*

(a)    causing providers to misrepresent the off-label use(s) for which Neurontin was being prescribed so that Plaintiff and members of the Class were unaware that contrary to their plan language they were paying Neurontin claims for off-label uses;

(b)    deliberately misrepresenting the uses for which Neurontin was safe and effective so that Plaintiff and members of the Classes paid for this drug to treat symptoms for which it was not scientifically proven to be safe and effective;

-54-

(c)     publishing or causing to have published materials containing false information upon which physicians, Plaintiff and members of the Class relied upon when choosing to prescribe or pay for Neurontin to treat off-label uses for which the drug is not scientifically proven to be safe or medically efficacious; and

(d)     actively concealing, and causing others to conceal, information about the true safety and efficacy of Neurontin to treat conditions for which it had not been approved by the FDA.

144.     Defendants' scheme was calculated to ensure that Plaintiff and the Class would pay claims for Neurontin to treat a wide variety of uses which Defendants knew were not necessarily treatable with Neurontin.

145.     Each of Defendants' fraudulent mailings and interstate wire transmissions constitute "racketeering activity" within the meaning of 18 U.S.C. § 1961(1). Collectively, these violations constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

146.     Defendants engaged in a pattern of racketeering activity intending to defraud Plaintiff and the Class.

147.     The above described racketeering activities amounted to a common course of conduct intended to deceive Plaintiff and the Classes. Defendants' criminal acts of racketeering had the same pattern and similar purpose of defrauding Plaintiff and the Class. Each such racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiff and the members of the Class. Defendants' fraudulent activities are part of their regular way of conducting their ongoing business and constitute a continuing threat to the property of Plaintiff and the Class.

148.     The pattern of racketeering activity alleged herein and the MES Enterprise are separate and distinct from each other. Defendants engaged in a pattern of racketeering activity alleged herein for the purpose of conducting the affairs of the MES Enterprise. Plaintiff and

members of the Class have been injured in their property by reason of these violations in that Plaintiff and members of the Class have made millions of dollars in overpayments for Neurontin.

149. Plaintiff and the members of the Class relied, to their detriment, on Defendants' fraudulent misrepresentations and omissions.

150. Plaintiff's and the Classes' injuries were directly and proximately caused by Defendants' racketeering activity as described above.

151. By virtue of these violations of 18 U.S.C. § 1962(c), Defendants are jointly and severally liable to Plaintiff and the Class for three times the damages Plaintiff and the Class have sustained, plus the cost of this suit, including reasonable attorneys' fees.

## SECOND CAUSE OF ACTION
## Violation of 18 U.S.C. § 1962(c)
## (The AMM Enterprise)

152. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

153. Defendants are the "persons" within the meaning of 18 U.S.C. § 1961(3) who conducted the affairs of the enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

154. AMM is an "enterprise" which was created and/or used as a tool to effectuate Defendants' pattern of racketeering activity. The Defendant "persons" are distinct from AMM as the enterprise.

155. The AMM Enterprise engaged in and affected interstate commerce, because, *inter alia,* it marketed, sold, purchased or provided Neurontin to thousands of individuals throughout the United States.

156. Defendants have exerted control over the AMM Enterprise, and Defendants have participated in the operation or management of the affairs of the AMM Enterprise, through the following actions:

     (a)    Defendants have asserted direct control over the information and content disseminated to the Vendors (including AMM), doctors and the public regarding the

medical safety and efficacy of Neurontin for off-label uses in articles published across the country;

(b)     Defendants have asserted direct control over the creation and distribution of mass-marketing and sales materials sent to Vendors and doctors throughout the United States; and

(c)     Defendants have placed their own employees and agents in positions of authority and control in the AMM Enterprise.

157.    Defendants have conducted and participated in the affairs of the AMM Enterprise through a pattern of racketeering activity that includes acts indictable under 18 U.S.C. §§ 1341 and 1343 (mail and wire fraud), as described above.

158.    In implementing their fraudulent scheme, Defendants were acutely aware that Plaintiff and members of the Class depend on the honesty of Defendants in representing the safety and medical efficacy of Neurontin's uses.

159.    As detailed above, Defendants' fraudulent scheme consisted of, *inter alia:*

(a)     causing providers to misrepresent the off-label use(s) for which Neurontin was being prescribed so that Plaintiff and members of the Class were unaware that contrary to their plan language they were paying Neurontin claims for off-label uses;

(b)     deliberately misrepresenting the uses for which Neurontin was safe and effective so that Plaintiff and members of the Classes paid for this drug to treat symptoms for which it was not scientifically proven to be safe and effective;

(c)     publishing or causing to have published materials containing false information upon which physicians, Plaintiff and members of the Class relied upon when choosing to prescribe or pay for Neurontin to treat off-label uses for which the drug is not scientifically proven to be safe or medically efficacious; and

(d)     actively concealing, and causing others to conceal, information about the true safety and efficacy of Neurontin to treat conditions for which it had not been approved by the FDA.

-57-

160.    Defendants' scheme was calculated to ensure that Plaintiff and the Class would pay claims for Neurontin to treat a wide variety of uses which Defendants knew were nor necessarily treatable with Neurontin.

161.    Each of Defendants' fraudulent mailings and interstate wire transmissions constitute "racketeering activity" within the meaning of 18 U.S.C. § 1961(1). Collectively, these violations constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

162.    Defendants engaged in a pattern of racketeering activity intending to defraud Plaintiff and the Class.

163.    The above described racketeering activities amounted to a common course of conduct intended to deceive Plaintiff and the Class. Defendants' criminal acts of racketeering had the same pattern and similar purpose of defrauding Plaintiff and the Class. Each such racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiff and the members of the Class. Defendants' fraudulent activities are part of their regular way of conducting their ongoing business and constitute a continuing threat to the property of Plaintiff and the Class.

164.    The pattern of racketeering activity alleged herein and the AMM Enterprise are separate and distinct from each other. Defendants engaged in a pattern of racketeering activity alleged herein for the purpose of conducting the affairs of the AMM Enterprise.

165.    Plaintiff and members of the Class have been injured in their property by reason of these violations in that Plaintiff and members of the Class have made millions of dollars in overpayments for Neurontin.

166.    Plaintiff and the members of the Class relied, to their detriment, on Defendants' fraudulent misrepresentations and omissions.

167.    Plaintiff's and the Class's injuries were directly and proximately caused by Defendants' racketeering activity as described above.

168.     By virtue of these violations of 18 U.S.C. § 1962(c), Defendants are jointly and severally liable to Plaintiff and the Class for three times the damages Plaintiff and the Class have sustained, plus the cost of this suit, including reasonable attorneys' fees.

## THIRD CAUSE OF ACTION
### Violation of 18 U.S.C. § 1962(c)
### (The Promotion Strategist Enterprise)

169.     Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

170.     Defendants are the "persons" within the meaning of 18 U.S.C. § 1961(3) who conducted the affairs of the enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

171.     The enterprise is an association in fact within the meaning of 18 U.S.C. § 1961(4) consisting of each of the three Defendants, Pfizer, Warner-Lambert and Parke-Davis, including their employees and agents, and the non-physician technical writers, physician "authors," and Vendors located throughout the United States who participated in the fraudulent schemes described above (the "Promotional Strategist Enterprise"). The Promotional Strategist Enterprise is an ongoing organization and functions as a continuing unit. The Promotional Strategist Enterprise was created and/or used as a tool to effectuate Defendants' pattern of racketeering activity. The Defendant "persons" are distinct from the Promotional Strategist Enterprise.

172.     The Promotional Strategist Enterprise falls within the meaning of 18 U.S.C. § 1961(4), and consists of a group of "persons" associated together for the common purposes of marketing and selling Neurontin to Plaintiff and the Class and earning profits therefrom.

173.     The Promotional Strategist Enterprise engaged in and affected interstate commerce, because, *inter alia,* it marketed, sold, purchased or provided Neurontin to thousands of individuals throughout the United States.

174.     Each Defendant has exerted control over the Promotional Strategist Enterprise and each has participated in the operation or management of the affairs of the Promotional Strategist Enterprise, through the following actions:

(a)     Defendants have asserted direct control over the information and content disseminated to doctors and the public regarding the medical safety and efficacy of Neurontin for off-label uses in articles published across the country;

(b)     Defendants have asserted direct control over the creation and distribution of mass-marketing and sales materials sent to doctors throughout the United States; and

(c)     Defendants have placed their own employees and agents in positions of authority and control in the Promotional Strategist Enterprise.

175.    Defendants have conducted and participated in the affairs of the Promotional Strategist Enterprise through a pattern of racketeering activity that includes acts indictable under 18 U.S.C. §§ 1341 and 1343 (mail and wire fraud), as described above.

176.    In implementing their fraudulent scheme, Defendants were acutely aware that Plaintiff and the Class depend on the honesty of Defendants in representing the safety and efficacy of Neurontin's uses.

177.    As detailed above, Defendants' fraudulent scheme consisted of *inter alia:*

(a)     causing providers to misrepresent the off-label use(s) for which Neurontin was being prescribed so that Plaintiff and members of the Class were unaware that contrary to their plan language they were paying Neurontin claims for off-label uses;

(b)     deliberately misrepresenting the uses for which Neurontin was safe and effective so that Plaintiff and members of the Class paid for this drug to treat symptoms for which it was not scientifically proven to be safe and effective;

(c)     publishing or causing to have published materials containing false information upon which physicians, Plaintiff and members of the Class relied upon when choosing to prescribe or pay for Neurontin to treat off-label uses for which the drug is not scientifically proven to be safe or medically efficacious; and

(d)     actively concealing, and causing others to conceal, information about the true safety and efficacy of Neurontin to treat conditions for which it had not been approved by the FDA.

-60-

178.   Defendants' scheme was calculated to ensure that Plaintiff and the Class would pay claims for Neurontin to treat a wide variety of uses which Defendants knew were not necessarily treatable with Neurontin.

179.   Each of Defendants' fraudulent mailings and interstate wire transmissions constitute "racketeering activity" within the meaning of 18 U.S.C. § 1961(1). Collectively, these violations constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

180.   Defendants engaged in a pattern of racketeering activity intending to defraud Plaintiff and the Class.

181.   The above described racketeering activities amounted to a common course of conduct intended to deceive Plaintiff and the Class. Defendants' criminal acts of racketeering had the same pattern and similar purpose of defrauding Plaintiff and the Class. Each such racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiff and the Class. Defendants' fraudulent activities are part of their regular way of conducting their ongoing business and constitute a continuing threat to the property of Plaintiff and the Class.

182.   The pattern of racketeering activity alleged herein and the Promotional Strategist Enterprise are separate and distinct from each other. Defendants engaged in a pattern of racketeering activity alleged herein for the purpose of conducting the affairs of the Promotional Strategist Enterprise.

183.   Plaintiff and members of the Classes have been injured in their property by reason of these violations in that Plaintiff and members of the Class have made millions of dollars in overpayments for Neurontin.

184.   Plaintiff and the members of the Class relied, to their detriment, on Defendants' fraudulent misrepresentations and omissions.

185.   Plaintiff's and the Class's injuries were directly and proximately caused by Defendants' racketeering activity as described above.

-61-