# Exhibit E

RESUME

THOMAS M. GREENE

A.    PERSONAL INFORMATION

**Business address:**
Greene & Hoffman, P.C.
125 Summer Street
Boston, MA 02110
Tel: (617) 261-0040
Fax: (617) 261-3558
e-mail: tgreene@greenehoffman.com

**Residence Address:**
210 Randolph Avenue
Milton, MA 02186

**Family background:**
Married, three children

B.    EDUCATION

**High School:** St. John's High School, Shrewsbury, MA

**College:** Boston College, BA, Cum Laude, 1974

**Law School:** Suffolk University Law School, 1977

C.    PROFESSIONAL BACKGROUND

**Professional Certifications:**
Admitted to practice in Massachusetts, 1977; United States District Court, District of Massachusetts,1977; United States District Court, Eastern District of Michigan ,1989

**Employment:**
Assistant District Attorney 1977-1979 (numerous trials in District and Superior Courts; Grand jury work)

Greene & Hoffman, P.C. Association and Partnership, Partner, 1979 – present. Specializing in complex civil litigation with emphasis on wrongful death, product liability, professional liability, and general commercial litigation including directors' and officers' liability and partnership disputes.

1

**Presentations and Seminars:**

*Keynote Speaker,* The 2nd Annual Pharmaceutical Marketing Compliance Congress, January 31 - February 1, 2005
     "The Growing Role of Whistleblowers"

*Panelist,* The Fifth Annual Pharmaceutical Regulatory and Compliance Congress, November 14 - 17, 2004
     "*Qui Tam* Update Panel"

*Panelist,* Fourth Annual Conference for Qui Tam Relators' Counsel, October 14 and 15, 2004
     "The Federal Food, Drug and Cosmetic Act and Its Application to Qui Tam:
     Pharmaceutical and Medical Device Cases"

*Faculty,* National Pharma Audioconference: Lessons of the Pfizer Settlement for Off-Label Promotion - Compliance Issues and Practices, June 23, 2004

*Panelist,* Anatomy of a Medical Malpractice Cast, presented by The Civil Litigation Section of the Massachusetts Bar Association on April 11, 1985.

*Chairman,* Proving Damages in Wrongful Death Cases, Mass. Academy of Trial Attorneys

**Society Memberships:**
Massachusetts Academy of Trial Attorneys
Association of Trial Lawyers of America

**Appointments:**
Appointed to the Plaintiffs' Steering Committee by U.S. District Court Judge John Erwin, Middle District of North Carolina in Re: Air Crash Near Morrisville, NC
Massachusetts Lawyers Weekly, Editorial Board Member, 1986-1989

**Appellate Decisions:**
**Criminal:**

Commonwealth v. Sylvia 380 Mass. 180; 402 N.E.2d 489; 1980 Mass. LEXIS 1063 1980

**Civil:**

MacGlashing v. Dunlop Equip. Co., Nos. 95-2051, 99-2207 89 F. 3d 932; 1996

United States ex. Rel Franklin v. Parke-Davis 96-11651-PBS U.S. Dist. Lexis 15754

United States ex. Rel. Franklin v. Parke-Davis, 96-11651 210 F.R.D.

2

<u>United States ex. Rel. Franklin v. Pfizer, Inc., 96-11651</u> 2002 U.S. Dist. LEXIS 5761

<u>United States ex. Rel. Franklin v. Pfizer, Inc. 96-11651</u> 147 F. Supp. 2d 39 2001

<u>Re: Air Crash near Morrisville, 1:95MD1084, ALL CASES, U.S.District Court for the Middle District of North Carolina</u> U.S. Dist. LEXIS 21827 1997

<u>Re: Air Crash near Morrisville, 1:95MD1084, RE: 1:96CV00472, CV00473, CV00474, CV00475, CV00476, CV00477,</u>  LEXIS 3809 1997

<u>Van Schaick v. Church of Scientology, Inc., C.A. No. 79-2491-G, United States District Court for the District of Massachusetts</u> 535 F. Supp. 1125; 1982 U.S. Dist. LEXIS 11462

**Trial Experience:**

<u>Charlotte Romani v. Central Pharmacy, Inc., et al.,</u> Middlesex Superior Court

<u>Dave Nihan v. _____,</u> Middlesex Superior Court

<u>Janice Whittemore v. Mastrianni,</u> Middlesex Superior Court

<u>Greg Takvorian v. Saybolt Lab,</u> U.S. Department of Labor

<u>Pekka Hatara v. Cooper Industries, Inc.,</u> U.S. District Court, District of Massachusetts

<u>Elizabeth Kast, Executrix v. AMR Corp, American Airlines, Inc.,</u> U.S. District Court, District of Massachusetts

<u>In Re Estate of Carolyn Dudley Taylor,</u> Middlesex Probate Court

<u>Phyllis Hurley v. Phillip Chiotellis,</u> Barnstable Superior Court

<u>Rene Vigneault v. James Pepper,</u> Middlesex Superior Court

<u>LaBretto v. Globe, Inc.,</u> United States District Court, District of Massachusetts

<u>Janice Galligan v. Gerraghty Associates, Inc.,</u> Norfolk Superior Court

<u>James Doe v. Lowell General Hospital, et al.,</u> Middlesex Superior Court

<u>Cabell v. MacDonald,</u> Plymouth Superior Court

<u>Carraway v. Ford Aerospace, et al.,</u> Suffolk Superior Court

<u>Robert Macleod, Trustee, Dearborn Realty Trust v. One Thirty One Corporation</u>, Suffolk Superior Court

<u>Jackie Ranicar v. Pleasant Valley Country Club</u>, Worcester Superior Court

<u>Mejia v. MPH Industries, Inc.</u>, Suffolk Superior Court

<u>Connie Delmore v. Jeffrey Zauderer</u>, Middlesex Superior Court

<u>MacGlashing v. Longwood</u>, United States District Court, District of Massachusetts

<u>David Laliberte v. Edwin Clare, et al.</u>, Norfolk Superior Court

<u>Gloria Payne v. Stop & Shop</u>, Suffolk Superior Court

<u>Edgar v. Raskin, Smith</u>, Middlesex Probate Court

<u>Dana M. Bache v. James M. Beresford, M.D. and Wellesley Women's Care, P.C.</u> Middlesex Superior Court

Numerous criminal trials in District and Superior Courts

**Significant Settlements:**

<u>United States Of America ex rel. David Franklin v.</u>
<u>Pfizer, Inc. and Parke-Davis, Division Of Warner-Lambert Company</u>
United States District Court, District of Massachusetts, C.A. No. 96-11651--PBS
"Whistle Blower Case" Qui Tam False Claims Act

**$152,000,000.00**

<u>United States of America, ex rel. Edward Fergusson v.</u>
<u>GTE Government Systems Corporation and Canadian</u>
<u>Marconi Corporation</u>
United States District Court, District of Massachusetts., C.A. No. 93-10348MA
"Whistle Blower Case" Qui Tam False Claims Act

**$10,000,000.00**
**($5,000,000.00 cash and recall, repair and rewarranty of radios valued at**
**$5,000,000)**

Stephen S. Gray, Chapter 11 Trustee of Molten Metal Technology, Inc. v. Lockheed
Martin Corp., et al.
United States Bankruptcy Court, Adv. Pro. No. 99-1649-JNF
Greene & Hoffman represented a bankruptcy trustee who alleged that a partner who had
taken a failing partnership's sole functioning business unit in a complex corporate
restructuring received repayment of more than its fair share of its debt from an insolvent
high tech business.  The Trustee recovered the majority of the value of the business that
was transferred.

**$9,600,000.00**

Kast v. American Airlines et al.
United States District Court, USDC No. 95-1108PBS/MDL-1084
Airline Disaster

**$8,975,000.00**

Stephen S. Gray, Chapter 11 Trustee of Molten Metal Technology, Inc. v. William
Haney, et al.
United States Bankruptcy Court, Adversary Complaint No.
99-1653
On behalf of the Trustee of a bankrupt high tech company, Greene & Hoffman brought
claims against the company's former officers and directors when they continued to
approve expenditures on nuclear and hazardous waste plants that could never produce
profits to pay back creditors and when the directors and officers misled the creditors and
public regarding the limitations, reliability and state of development of the company's
technology.

**$7,400,000.00**

Charles MacGlashing, et al. v. Dunlop Equipment Co., Inc.,et al. v. Restoration
Preservation Masonry, Inc.
United States District Court, District of Massachusetts., 89 F.3d 932
Construction Site Accident

**$5,234,224.58**

McCuish v. Volkswagenwerk A.G.
22 Mass.App.Ct. 380, rev.gr. 398 Mass. 1102, aff'd.,
400 Mass. 1003 (1987)
Auto Product Liability

**$4,200,000.00**

5

<u>Charles McGettigan v. Diversified Contracting, Inc. et al.</u>
Suffolk Superior Court, C.A. No. 98-4597
Construction Accident/Wrongful Death

**$3,600,000.00**

<u>John Alba, et Al. V. Mobil Auto Club, Inc., et al.</u>
Norfolk Superior Court, C.A. No. 96-01612
Auto Accident

**$3,500,000.00**

<u>Laliberte v. Edwin Clare et al.</u>
Norfolk Superior Court, C.A. No. 92-942
Auto Accident

**$3,050,000.00**

<u>Subramanyan Jayasankar v. General American Life Insurance, Paul Bloom and Paul
Revere Life Insurance Company</u>
Suffolk Superior Court, C.A. No. 96-5507C
Breach of Contract by Disability Insurance Company

**Confidential Settlement**

<u>Rodriguez v. Everready Trucking, et al.</u>
Suffolk Superior Court, C.A. No. 89-6543-C
Auto Product Liability

**$2,075,000.00**

<u>Luis Osorno and Fredy Suarez v. Bossman, Inc., et al.</u>
Suffolk Superior Court, C.A. No. 96-05322B
Construction Accident

**$2,000,000.00**

<u>Michael A. Lubrano v. William S. Zouzas, M.D.</u>
Middlesex Superior Court, C. A. No. 99-03724L
Medical Malpractice

**$1,800,000.00**

6

<u>James Gallagher v. John Moriarty and Associates and Boston Steel Erectors</u>
Middlesex Superior Court, C.A. No. MICV2002-00618
Construction Site Accident

**$1,800,000.00**

<u>Bewley v. George</u>
U.S. District Court, District of New Mexico, C.A. No. 88-871
Medical Malpractice

**$1,700,000.00**

<u>Gregory Roberts and Lynn Roberts v. Donald A. Garland and Donald A. Garland, Inc.</u>
Middlesex Superior Court, C.A. No. 98-638
Automobile Accident

**$1,500,000.00**

<u>Nancy Benech v. Fairmont Copley Plaza Hotel</u>
Suffolk Superior Court, C.A. No. 00-1139
Premises Liability

**$1,500,000.00**

<u>NWT, Inc., et al. v. Coopers & Lybrand, et al.</u>
Middlesex Superior Court, C.A. No. 94-5089-F
Accounting Malpractice

**$1,300,000.00**

<u>Murphy v. New York Dairy Herd, Inc. et al.</u>
Worcester Superior Court, C.A. No. 86-33705
Auto Accident

**$1,250,000.00**

<u>Rhodes v. Walsh Brothers Inc, et al.</u>
Suffolk Superior Court, C.A. No. 92-0106-H
Construction Site Accident

**$1,200,000.00**

7

Mejia v. MPH Industries
Suffolk Superior Court, C.A. No. 88-3938
Product Liability

**$1,000,000.00**

Richard Parker v. Johnson & Johnson
Plymouth Superior Court, C.A. No. 96-0941
Worksite Accident

**$1,000,000.00**

Robert Whelden and Monique Whelden v. Guillermo Candia, M.D.
Suffolk Superior Court, C.A. No. 98-5257E
Medical Malpractice

**$1,000,000.00**

Phillip and Darlene Pallone v.Delta Beckwith Elevator Co.
Suffolk Superior Court
Construction Site Accident

**$1,000,000.00**

Cotelle v. Rhodes Gill & Co., Ltd., et al.
Norfolk Superior Court, C.A. No. 89-03182
Product Liability

**$900,000.00**

Eddys Guerrero a/k/a Israel Torres v. Browning-Ferris Industries, Union Corporation,
Gichner Systems Group, Inc., The Heil Corporation, et al.
Middlesex Superior Court, C.A. No. 92-7153
Product Liability

**$900,000.00**

Peter Lincoln v. Wood Recycling, Inc.
Essex Superior Court, C.A. No. 97-2540A
Worksite Accident

**$900,000.00**

8

Anthony Principe and Mary Principe v. Ronald Mortara
Suffolk Superior Court, C.A. No. 88-6905-E
Medical Malpractice

**$850,000.00**

Fishman v. Brooks
487 N.E.2d 1377 (Mass. 1986)
Legal Malpractice

**$850,000.00**

Michele and Dawnette Niro v. Murida Furniture Co., Inc., d/b/a Rotman's
Worcester Superior Court, C.A. No. 95-0758
Worksite Accident

**$825,000.00**

John Strickland, et al. v. Harvey Goldman, M.D.
Norfolk Superior Court, C.A. No. 84-2612
Medical Malpractice

**$750,000.00**

Gilbertson v. Kasdon
Middlesex Superior Court, C.A. No. 84-3421
Medical Malpractice

**$750,000.00**

Kris Koukoulis and Jessica Lynn Koukoulis v. Tembec Construction Co., Jaakko Poyry,
Inc. and C-Tech Conveyors
Suffolk Superior Court, C.A. No. 92-5610
Product Liability

**$750,000.00**

Ortiz v. E.H. Allen Co.
Suffolk Superior Court, C.A. No. 90-05374
Product Liability

**$550,000.00**

9

Doherty v. Schindler, et al.
Suffolk Superior Court, C.A. No. 90-04764
Auto Accident

**$550,000.00**

MacWhinnie v. Agra, Inc.
Suffolk Superior Court, C.A.  No. 87-6216
Slip & Fall Accident

**$500,000.00**

Renz v. Eunice Fallon, et al.
Suffolk Superior Court, C.A. No. 91-8592-E
Auto Accident

**$500,000.00**

Gregory Takvorian v. Saybolt, Inc.
U.S. Dept. Of Labor Case No. 96-CAA-11
Whistle Blower-Falsifying Lab Results for oxygenated gasoline

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br>ex rel. DAVID FRANKLIN,<br><br>    Plaintiff,<br><br>v.<br><br>PFIZER, INC., and PARKE-DAVIS,<br>DIVISION OF WARNER-LAMBERT,<br>COMPANY,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)    Civil Action No. 96-11651-PBS<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## AFFIDAVIT OF THOMAS M. GREENE

I, Thomas M. Greene, do hereby state and depose the following:

1. I am a partner of the law firm Greene & Hoffman, P.C. I have been a member of the bar since December 1977. Attached to this affidavit, as Exhibit A, is a copy of my professional resume. This affidavit is being submitted in support of the request of the Relator, Dr. David Franklin, for an award of reasonable attorneys' fees and costs. The Relator seeks payment of a fee of $2,830,297.75 plus reimbursement of costs in the amount of $207,972.43.

2. As I will explain below, all of the litigation done by the lawyers in my firm is done on the basis of contingent fee agreements with the clients. Therefore, no lawyer in my firm has a "standard" hourly rate. For purposes of this request for fees, I took into account the experience and skill of the lawyers in my office, the type and complexity of the services rendered by them, the nature of this case and the result achieved, and then compared that information to what I

know to be or, in some cases am informed are, the standard hourly rates of similarly experienced lawyers in Boston rendering similar services in similarly complex cases.

3.    I calculated the requested fee by multiplying the hourly rates of the lawyers who worked on the case ($565 for Thomas G. Hoffman, $535 for myself, $485 for Michael Tabb and $275 for Ilyas Rona) by the total hours devoted by lawyers in the firm (6,477.85).  The extensive work done by paralegals and clerks, all of whom were acting as independent contractors, was submitted as a cost at the exact rates charged by the temporary help we used.  I did not mark up those charges.  The hours of the independent contractors are not in the total hours submitted of 6,477.85.  I estimate that those persons devoted an additional 4,074.35 hours to the case.

4.    Before entering private practice, I worked as an Assistant District Attorney for two years.  In that position I prosecuted numerous criminal cases in the Massachusetts district and superior courts.  In December 1979, I entered private practice, opening an office in Boston, associating with Tom Hoffman.  Between 1979 and the present date, I have concentrated my practice in the area of complex civil litigation representing plaintiffs in product liability, medical malpractice, professional malpractice, construction site accident, aviation, whistleblower and commercial cases.  The commercial cases have included director and officer liability, breach of fiduciary to creditors, breach of contract and partnership disputes.  Currently, my firm, Greene & Hoffman, P.C. has five lawyers, one paralegal and two support personnel.

5.    My trial experience is described in my resume.  See Exhibit A.  The cases listed on my resume include cases settled after empanelment but before trial, during trial, during jury deliberations and tried to verdict.  With minor exceptions, all of my work since I entered private practice has been done on a contingent fee basis.  I have represented individuals and families in cases against some of the largest corporations in the United States, including AMR Corp.,

2

American Airlines, GTE, Mobil Auto Club, Warner-Lambert, AISI Steel, Inc., Mitsubishi, Paul

Revere Life Insurance Company, General American Life Insurance Company, Peat Marwick,

Ford Motor Company, and many others.  Many of my cases have involved representing

plaintiffs, on a contingent fee basis, in cases against large corporations in which the plaintiffs

allege that they have been damaged as a result of a pervasive corporate policy or pattern of

conduct giving rise to liability.  Among other things, these cases tend to involve well-financed

adversaries, represented by large law firms.  They also tend to involve extensive investigation

and discovery, including gaining access to, and reviewing, thousands of documents.

      6.     One of my noteworthy cases involved representing a father and his two young

children in a medical malpractice case for wrongful death against a physician for misdiagnosing

the decedent-mother's colon cancer.  After developing evidence that the physician's

compensation from the decedent's medical insurer included an annual bonus that would increase

in size if the physician limited the number of tests (occult blood in stool) and procedures

(colonoscopy, sigmoidoscopy) ordered, the case settled for a substantial seven-figure settlement.

      7.   Another one of my noteworthy cases involved representing a physician whose

disability payments were wrongfully terminated by an insurance company.  Through painstaking

discovery, evidence was developed to show that the disability insurer had adopted a plan to

terminate benefits of disabled individuals for the sole purpose of reducing losses that the insurer

suffered in its disability line.  The case resolved in a confidential multi-million dollar settlement.

      8.  I have also had experience in False Claims Act cases.  In 1994, I represented an

engineer and West Point graduate who filed a whistleblower lawsuit on behalf of the United

States government against a Fortune 500 company for fraudulently certifying that its product met

specifications required under the contract with the Department of Defense.  The case was

3

successfully settled by recall, repair and rewarranty of the product, a multi-million dollar payment to the U.S. government and a confidential seven-figure settlement for the engineer who was wrongfully terminated from his employment.

9. On November 8, 1996, Judge John Erwin, United States District Court Judge for the Middle District of North Carolina, appointed me to the Plaintiffs' Lead Counsel Committee to represent the interests of all victims and their families in the multi-district litigation arising from the crash of American Airlines' American Eagle flight in Morrisville, North Carolina. In that position, I conducted extensive discovery in the multi-district litigation across the country and won summary judgment on liability in the Middle District. Additionally, I tried damages in the case of Kast v. AMR, Corp., et al., in this Court and after four days of trial secured the highest recovery of all cases tried or settled arising out of the American Eagle crash.

11. My work on the instant case began in July 1996 and continued into June 2004. I have continued to work on the case in an effort to recover on behalf of the Relator reasonable attorneys' fees and costs that are mandatory under the False Claims Act. In connection with the request for reasonable attorneys' fees, I decided to retain independent counsel to make the arguments concerning my own work and the work of others in my firm. The amount of the fees sought on behalf of the Relator does not include my counsel's fees.

11. The attorneys' fees and costs that I seek are for David Franklin and not exclusively for my firm. In accordance with my fee agreement with Dr. Franklin, a portion of the attorneys' fees that the court awards will be paid by Dr. Franklin to my firm.

12. In support of the Relator's request for reasonable attorneys' fees, I have prepared this affidavit to summarize most of the work that I, and others in my firm, performed in this case. A more detailed description of the work is contained in Exhibit B, which is a detailed statement of

4

the time I devoted to this matter. Because of the magnitude of this case, the novelty of many of the issues it involved, the mountain of information that lawyers in my office had to assemble, and the enormous resources and defensive efforts put forth by the defendants and their counsel, I was required to spend a substantial amount of my time on this case during 2002 and 2003.

13. The complaint in this action was filed under seal in 1996. It was not until December 1999 that the government decided not to intervene. As a result of the government's decision, the entire burden fell on my firm to investigate facts and collect evidence to prove that Defendants had illegally promoted off-label uses of Neurontin by making false and deceptive representations to physicians concerning Neurontin's safety and efficacy for a variety of unapproved uses. Additionally, I needed to investigate and collect evidence to prove that the Defendants' false and deceptive marketing caused physicians to write off-label Neurontin prescriptions for Medicaid patients. Finally, I needed to collect evidence to prove that the off-label Neurontin prescriptions were not eligible for reimbursement under the Medicaid program. We faced an enormous effort to master the science underlying the use of Neurontin and to develop the record to prove what the Defendants had done. Also, because some of the theories in the case were novel, we expected to devote substantial time to developing the theory of liability and fully expected, as turned out to be the case, that the Defendants would mount a vigorous defense on the legal issues.

14. Substantially all of the work in this case, beginning in December 1999, was done by me, by another senior lawyer in my office, Michael Tabb, and by my associate, Ilyas J. Rona. When needed, I called on my partner, Tom Hoffman. I handled almost every deposition taken in the case and shared the responsibilities for oral argument at court appearances with Mr. Hoffman and Mr. Tabb. I was the primary contact with the federal government. On occasion, in order to

deal with the mountain of information that we gathered, I hired temporary paralegals and clerks to help sort through the information. As I mentioned above, we paid the temporary help an hourly rate of $15.00 per hour and have included that cost in the costs we are seeking to recover on Dr. Franklin's behalf. We did not "mark-up" the costs of the temporary help, although I am told that it is customary to do so.

15. I was opposed by several law firms, representing the Defendants and various third-party witnesses. The Defendants were represented by lawyers at Davis Polk & Wardwell, as well as by a local law firm. In most cases, multiple lawyers from Davis Polk attended the depositions and the court appearances. As I will explain below, the case was aggressively defended by the Defendants and their counsel, and by many of the third party witnesses and their counsel. I believed throughout the case that these parties were orchestrating a coordinated effort to avoid producing thousands of pages of documents that would establish the Defendants' civil and criminal liability as well as the amount of the illegal payments. Since the damages involved payments made by federal and state governments under various reimbursement programs, obtaining the damage information became a herculean task.

16. The Defendants in this case are among the largest corporations in the world. Pfizer's pharmaceutical business segment is the largest in the world. In 2003, Pfizer's pharmaceutical revenues increased 40%, to $39.6 billion. Pfizer recorded product sales of more than $1 billion for each of nine pharmaceutical products in 2003. Those nine products – Lipitor, Norvasc, Zoloft, Neurontin, Zithromax, Celebrex, Viagra, Zyrtec and Diflucan – represented 70% of the company's pharmaceutical revenues in 2003. See Pfizer's 10-K, year ended 2003, http://www.sec.gov/Archives/edgar/data/78003/000095012304003064/y94722e10vk.htm#000.

Revenue from Neurontin alone for the year 2003 was $2.7 billion, which represented a 19%

increase from the 2002's revenues of $2.3 billion.  See Pfizer's 2003 Financial Report,

http://www.sec.gov/Archives/edgar/data/78003/000095012304003064/y94722exv13.htm.

Simply stated, the defendants had enormous resources to draw on to contest this action.  In

hindsight, the story that David Franklin told me and my partner, Tom Hoffman, in July 1996

began the unraveling of a massive and carefully orchestrated scheme by the Defendants to

violate the law and thereby generate enormous profits.  As the Court is aware, the story ended

when the Defendants agreed in May 2004 to pay $430,000,000.00 in a global settlement of the

criminal and civil cases.

        17. This affidavit sets forth and describes the numerous activities that I engaged in from

1996 to the present day in connection with the successful resolution of this case.  These activities

are divided in the following six sections:  (1) Factual Investigation/Development of Evidence;

(2) Legal Research; (3) Aid to Federal and State Government Investigations; (4) Discovery; (5)

Significant Pleadings and Motion Practice; and (6) Analysis of Evidence, Creation of Work-

Product and Preparation of Case.  The purpose of this affidavit is to organize and summarize the

attached time records.  It is to be read together with, not in place of, the time records.

**I.      Factual Investigation/Development of Evidence**

        18. When the Relator initially contacted me to inform me that he felt that he was being

asked to participate in an illegal marketing scheme, I had no independent knowledge of the drug

Neurontin, how it was being marketed, the indications it was being marketed for, or the impact

of this marketing on the general public and the federal treasury.  In order to fully understand his

allegations and evaluate them in terms of the False Claims Act, I had to meet with Dr. Franklin

several times and interview him extensively. These sessions typically lasted several hours. In most cases, my partner, Mr. Hoffman, joined me.

19. My investigation required me to determine if Dr. Franklin's allegations of off-label marketing and dissemination of false information were supported by documentary evidence. I reviewed hundreds of documents that Dr. Franklin provided to me, which detailed some of the marketing strategies and tactics that Parke-Davis was implementing for a variety of off-label indications. These documents also described the types of statements that Parke-Davis's sales representatives and medical liaisons were instructed to make about the safety and efficacy of Neurontin for these off-label indications.

20. I also listened to, and read transcripts of, a series of recordings that Dr. Franklin made. These lengthy recordings revealed that Parke-Davis's high-level managers instructed and encouraged the marketing of off-label indications for Neurontin. For example, the tapes demonstrate that it was a central strategy of Parke-Davis to pay what amounted to kickbacks to physicians to induce them to write more prescriptions for Neurontin or, at a minimum, to recommend the drug to their peers, who in turn would increase their prescription-writing volume. These recordings proved to be valuable evidence in both the civil and criminal cases.

21. Before filing the complaint, we had to understand the operation of, and methods used by, what was then a relatively new Medicaid prescription drug coverage law. There was hardly any reporting on the law, and few people understood the reimbursement rules for off-label uses of drugs. There was no case law on point. Thus, as an initial matter, Tom Hoffman and I had to review the United States Code, Code of Federal Regulations and the Federal Register, and determine whether off-label prescriptions of Neurontin were covered under Medicaid. After considerable hours of legal research we determined that they were not. Thus, if Dr. Franklin's

8

allegations were true, then Parke-Davis was knowingly defrauding the federal government out of millions of dollars by causing the submission of ineligible claims to Medicaid.

22. Once we determined that Dr. Franklin's allegations were well founded and gave rise to an action under the False Claims Act, we began drafting a complaint and disclosure. This was done under extraordinary time constraints. First, the disclosure had to be detailed, not only because of the heightened pleading requirements for fraud, but also because of the original source rule involved in False Claims Act cases. To the extent that any component of the False Claims Act case was omitted from the disclosure, the government could claim that Dr. Franklin was not the original source and preclude recovery. Furthermore, if any aspect of the case became public knowledge, then the government could claim that Dr. Franklin was not an original source. Second, time was of the essence. If another witness disclosed comparable information to the government, Dr. Franklin would not be considered the original source. For this reason, the complaint had to be drafted as quickly as possible. With the help of several other attorneys, we were able to draft a 15-page complaint and a 30-page disclosure, with 20 exhibits. On August 13, 1996, the complaint was filed under seal in court and served on the United States Department of Justice. See Complaint, Docket 1.

23. The complaint was ordered to be unsealed on January 3, 2000. At that time, I began communicating on a regular basis with Assistant United States Attorney ("AUSA") Thomas Kanwit. I had several lengthy meetings with AUSA Kanwit and other members of the Justice Department, often alone, and often accompanied by my partner, Tom Hoffman, or associates Michael Tabb or Ilyas Rona. I also had a significant number of phone conversations with AUSA Kanwit, discussing evidence, witnesses and other topics.

24. At the time that the complaint was unsealed, no one – except possibly the Defendants – knew just how much Neurontin was paid for by Medicaid, and how much of this utilization was for off-label uses. This data was not available publicly and, as things turned out, it was closely guarded by the Defendants who refused, although required under Fed.R.Civ.P. 26(a)(1) disclosure obligations, to produce it. Recognizing that this information would be crucial to the preparation of this case and the quantification of damages, I began seeking this information from a variety of sources. I requested Neurontin off-label usage data from Warner-Lambert. The pursuit of the information proved to be one of the most daunting and challenging aspects of the case. It would be years before I received any such data, and when I did it was not complete.

25. I began seeking information from the Department of Health and Human Services' Health Care Financing Administration ("HCFA"), later renamed the Centers for Medicare & Medicaid Services ("CMS"). I established personal contacts with several officials within HCFA in order to obtain data. This involved numerous phone conversations and the drafting of several email messages and memoranda to various individuals at HCFA. While HCFA officials were eager to talk over the phone, few, if any, committed to anything in writing and none were willing or able to provide the data we sought. However, I was told that since Medicaid is administered at the state level, I could obtain the data through the various state Medicaid agencies.

26. Under my supervision, my office began sending FOIA requests to each of the 50 state Medicaid offices, seeking data on Neurontin's utilization and the breakdown of such utilization by on-label and off-label indications. This was a very difficult process, requiring significant correspondence with state officials, and significant legal research on the applicable Freedom of Information laws in 50 different states. This method would ultimately yield data from a number of states. Under my supervision, this data was consolidated and analyzed. This analysis

10

consumed many hours of my time, as well as the time of an associate and a paralegal. The finished results showed, dramatically and for the first time, that Neurontin claims against the Medicaid system were skyrocketing and involved millions and millions of dollars.

27. The data I initially received was not enough however. Many states did not provide adequate data, or even any data. Others claimed that they could not retrieve data for certain critical time periods. No state was able to provide an accounting of how much Neurontin use was for off-label indications. At this point, I requested assistance from AUSA Kanwit, who was handling the investigations of both the criminal and civil cases in connection with Dr. Franklin's allegations. It was my understanding that AUSA Kanwit was interested in and seeking exactly the same data that I sought. I specifically asked him for Medicaid data relating to the use of Neurontin and the breakdown of such use by on-label and off-label indications. This was done informally at first, and when that proved unsuccessful, by a subpoena to CMS (formerly known as HCFA). AUSA Kanwit informed me that my subpoena was being referred to another attorney in the Justice Department in Washington. Through this attorney, I was told that I would have to wait a full nine months to obtain such data, and at a cost of $200,000.

28. At this point, I decided to seek the information via subpoenas to state Medicaid agencies. Since late 2001, I had been in contact with David Waterbury, an Assistant Attorney General in the State of Washington. Mr. Waterbury was the Director of the Washington State Medicaid Fraud Control Unit ("MFCU"), and, most importantly for my purposes, was a past President of the National Association of the Medicaid Fraud Control Units and had led state teams who had investigated, prosecuted, and settled Medicaid prescription drug cases in conjunction with cases prosecuted by the Department of Justice. By law, each state is required to have a MFCU, which is generally under the authority of the state attorney general. By statute,

MFCUs are separate and distinct from the state Medicaid agencies.  Nevertheless, state Medicaid agencies are required to respond to reasonable requests for program data from state MFCUs.

29. When I initially contacted Mr. Waterbury, there had never been a state investigation into the marketing of Neurontin and the impact of that marketing on state Medicaid expenditures, given that approximately forty-five cents of each Medicaid dollar is paid for by state funds.  I had several conversations with Mr. Waterbury in which I described the Defendants' illegal marketing scheme and its impact on Medicaid and requested his assistance in collecting Medicaid data.  As a result of my discussions with him, Mr. Waterbury launched an investigation into the marketing of Neurontin on behalf of the National Association of Medicaid Fraud Control Units, and created a task force involving assistant attorneys general from various states.  This task force was known as the "Parke-Davis Team."  I requested Medicaid data from Mr. Waterbury on three separate occasions in the early months of 2002.  Throughout 2002, I engaged in numerous lengthy conference calls with Mr. Waterbury about obtaining data.  Mr. Waterbury told me that the Parke-Davis Team could not release information due to the status of the state investigation.

30. Mr. Waterbury advised me to serve subpoenas on the state Medicaid agencies to obtain the Medicaid data that I had hoped he would be able to produce.  Knowing that the enforcement of 50 different subpoenas from 50 different state agencies would be extremely difficult, I decided that it was necessary to streamline the process.  Based on our own research, we were able to determine that 90% of Neurontin claims were made in only 30 different states.  Under my supervision, subpoenas were drafted and served on those largest states.  Despite cutting the number of subpoenas nearly in half, the process of issuing 30 subpoenas to 30 state

Medicaid state agencies was lengthy, requiring numerous hours of computer research and frequent conversations with process servers all around the country.

31. At the time these subpoenas were served, off-label usage data had never been collected by state Medicaid agencies. States do not require pharmacists to submit information relating to the indication of the prescription when seeking reimbursement. Worse, no state even had a protocol in place to retroactively evaluate claims (known as "pay and chase") for off-label use. Thus, I had to engage in extensive research and have numerous lengthy teleconferences with Medicaid data engineers to design a methodology to retrieve this information. Within several weeks, my office developed two methodologies that could match Neurontin Medicaid claims to off-label uses. Under my supervision, these techniques were described in detail in a memorandum and circulated to the 30 state agencies that had received subpoenas. Enforcing the subpoenas and obtaining information pursuant to the subpoenas spanned several months. Numerous teleconferences were held with my office and state Medicaid officials. My associate, Ilyas Rona, conducted most of these. Simply communicating with 30 state agencies was a massive task. I would meet almost daily with Mr. Rona to receive status updates on subpoena compliance. My office placed and received numerous phone calls, and many teleconferences, some lasting several hours, discussing feasibility of subpoena compliance. Mr. Waterbury urged the state MFCUs to cooperate with the subpoena effort, and he became directly involved with the coordination effort to obtain data via the subpoenas. After many months of intense negotiation and conferring with state Medicaid counsel and data technicians, as well as Mr. Waterbury and his staff, other members of the Parke-Davis Team, and even computer technicians in certain state Medicaid agencies, I was able to receive a significant amount of high-quality data relating to the

off-label use of Neurontin.  Some of this data was used in the Relator's successful opposition to
the Defendants' motion for summary judgment.

32. The lack of information about money spent on off-label uses, and the practical
difficulties of dealing with state bureaucracies, required that we extend our investigative efforts
to private third parties as well.  Those efforts also met with fierce resistance.  Based on the
Defendants' records, I identified  numerous vendors who had been retained by Parke-Davis to (a)
prepare and coordinate marketing events relating to the off-label use of Neurontin, (b) prepare
and publish favorable articles about Neurontin, and (c) collect and provide data relating to the
success of the off-label marketing efforts.  I identified five companies that were the most
prominent, which would receive subpoenas from my office.  These included:  IMS Health, Scott-
Levin, Cline Davis & Mann, Sudler & Hennessey, and Boron Lepore.  I oversaw the
enforcement of these subpoenas, which proved to be extraordinarily time-consuming and
difficult for the following reasons:

    (a)    These five companies engaged in an industry that served and was
heavily dependent on the pharmaceutical industry.  It was our
belief that these companies feared aiding any effort to attack the
business practices of the top pharmaceutical firms in the country or
their business arrangements with that firm.  Thus, one company
completely disregarded our subpoena; two companies withheld
numerous responsive documents (a fact that was not discovered
until after the Defendants filed their motion for summary
judgment); and the Relator was forced to initiate litigation in the
Eastern District of Pennsylvania to obtain limited information from
the fifth company, Verispan.

    (b)    The United States Attorney's office requested, with respect to
Verispan's records, that the Relator not subpoena certain valuable
records known as "verbatims."  (In brief, verbatims are documents,
completed by physicians after a sales visit by a drug company
salesman, that contain the salesman's main marketing message
about the drug.)  This caused a delay of roughly one year, until it
became clear that the "verbatims" would be necessary for the
opposition to a motion for summary judgment.

14

33. The enforcement of these subpoenas required many hours of work, prompting conference calls with in-house and outside counsel for the deponents, the United States Attorney's office, and Defendants' counsel. The enforcement of the subpoenas for the "verbatim" records alone required lengthy phone conversations with me, Michael Tabb and Ilyas Rona and two different law firms, months of negotiation, and even a telephonic hearing with a federal judge in the Eastern District of Pennsylvania. Ultimately, my office received several boxes of documents from third parties, some of which – especially the "verbatims" – proved to be valuable. The Neurontin verbatims revealed that the Defendants' salesmen were promoting off-label uses and making false and misleading statements about the drug.

34. As a result of these efforts, my firm collected an enormous amount of information, including:

> (a) State FOIA data relating to Medicaid utilization of Neurontin;
>
> (b) State Medicaid data obtained via subpoena or from the Parke-Davis Team, which identified the physicians who wrote Neurontin prescriptions and which in some cases indicated whether the prescription was for an on-label indication or off-label indication;
>
> (c) "Verbatim" data, or the survey forms filled out by doctors reciting the statements made to them by Defendants' drugs sales representatives.

35. Once this data was received, numerous hours of attorney and computer-technician time were spent organizing and analyzing that data and preparing it for review by others. This included many hours converting and organizing data, many hours searching and analyzing it, and many hours formatting and printing it. In the case of state FOIA requests, data was tabulated and furnished to the United States Attorney's office, as well as various HCFA officials, to show that Neurontin claims were skyrocketing. In the case of state Medicaid subpoenas, considerably more time was needed to organize and analyze Medicaid data relating to individual physicians,

15

which had been provided to us as "database dumps." This electronic data contained hundreds of

thousands of lines of Medicaid claim data, much of it in code. Under my supervision, this data

was decoded, organized by specific doctor and then analyzed to show changes in prescription

behavior of the doctor after exposure to the Defendants' marketing activities. In addition to the

significant time consumption, this work also required a high degree of computer expertise on the

part of the attorneys in this office, a significant investment in and management of computer

hardware and software resources, and the full time efforts of our computer technician for nearly

two months. This data was also formatted and submitted to the Relator's experts, who then

analyzed the prescription data as part of their expert review of the case.

36. Finally, the "verbatim" data received from Verispan was organized and analyzed in

yet another sophisticated and time-consuming project. The "Verbatim" data represented a few

hundred survey responses, some of them barely legible. The doctors who completed the surveys

were identified only by an internal code number. Under my supervision, the survey responses

were entered in a computer database and then reviewed for off-label marketing. For each

instance of off-label marketing, we attempted to correlate the time and place of the statement to a

marketing event for which we received documentation from the Defendants. This was a difficult

task since the Defendants did not make records of most sales visits, and whatever records were

generated for the most part did not have to be produced by Court order if they were from outside

the northeast sales region. Once we were able to match up the off-label marketing to specific

events, we were able to pare down our list of physician code numbers. These code numbers

were then sorted by state and submitted to David Waterbury, who pursuant to the agreement with

Verispan, would receive the physicans' names and obtain their Medicaid data. This data was

then re-coded and returned to us. This data ultimately proved to be very useful in the preparation

of our opposition to the Defendants' motion for summary judgment.  It was also submitted to the Relator's experts, who then analyzed the prescription data and used it as a basis for opinions expressed in their report that was submitted to the Court.

37. My office also spent significant time researching and reviewing documents relating to a publication known as DrugDex, which was published by Micromedex, a Colorado company. In August 1997, the federal Medicaid statute was amended to incorporate DrugDex as a recognized compendium through which Medicaid agencies could determine eligibility of particular off-label indications.  I initiated an investigation into the relationship between Micromedex and the Defendants.  This investigation revealed that employees of both Parke-Davis and Pfizer were on the editorial and/or advisory board of Micromedex, and had the potential to influence the listing of citations describing Neurontin's off-label usage.  Among other things, our investigation revealed that DrugDex had misleadingly omitted an author's conclusion that Neurontin was probably ineffective in treating diabetic peripheral neuropathy.

38. Under my supervision, we also served a subpoena on Micromedex to obtain various DrugDex records.  The enforcement of this subpoena would consume a significant amount of time, including numerous teleconferences between my associate and counsel for Micromedex, and preparation of a discovery action in the District of Colorado.  We also conducted efforts to obtain DrugDex information relating to Neurontin independently of Micromedex.  My associate and a law clerk spent numerous hours at the Harvard Medical School library, downloading and reviewing DrugDex's quarterly publications via the on-line computer system.  These records would prove valuable in the development of this case.

39. Under my supervision, my office also conducted significant research and study of Warner-Lambert and Pfizer's patents relating to Neurontin.  A consistent theme expressed by the

Defendants was that they did not market Neurontin as effective for off-label uses. Rather, the

Defendants claimed that it was doctors who discovered Neurontin's off-label uses on their own

and who spread their discoveries through word of mouth. The enormous evidence my office

compiled contradicted these claims. For example, my office obtained numerous patent

applications filed by the Defendants from the 1980s and early 1990s (before Neurontin was even

being marketed) wherein Parke-Davis claimed that Neurontin could be effective for a variety of

off-label uses. These included:

    (a)    United States Patent 5,025,035 filed October 12, 1990 covering Neurontin as a
           "Method of treating depression";

    (b)    United States Patent 5,084,479 filed November 23, 1990 covering Neurontin for
           various "Novel methods for treating neurodegenerative diseases";

    (c)    United States Patent 5,510,381 filed May 15, 1995 covering Neurontin as a
           "Method of treatment of mania and bipolar disorder";

    (d)    United States Patent 5,792,796 filed June 6, 1995 covering Neurontin for various
           "Methods for treating anxiety and panic";

    (e)    United States Patent 6,426,368 filed on March 13, 2001 covering Neurontin as a
           "Method for preventing and treating alcoholism."

This patent research involved searching computer patent databases, phone conversations with

patent counsel in New Jersey (whose client was being sued by Parke-Davis for infringement of

one or more of the patents listed above), and considerable review of the documents filed by the

Defendants.

    40. Due to the nature of the case, a significant amount of medical and scientific research

was necessary. Prior to our involvement in the case, there had never been, to my knowledge, a

comprehensive review of the medical literature relating to Neurontin. Through our own

research, we identified hundreds of medical articles that discussed Neurontin and a variety of

off-label uses. I identified four main areas on which a review of the literature needed to focus.

18

These areas were as follows: (1) What were the off-label uses discussed in the medical literature? (2) Is Neurontin effective for any of the off-label uses based on those articles? (3) Do any articles misstate the clinical results or have a flawed methodology? (4) What was the financial arrangement between Parke-Davis and the authors of those articles?

41. Under my supervision, a significant amount of time was spent at the Harvard Medical School library or through on-line search engines searching for and reading journal articles relating to Neurontin. This was an enormous project. Countless hours were spent, either at a medical library, using the Pub-Med search database, or on the Internet, searching for journal articles relating to Neurontin. This research was performed primarily by Ilyas Rona and two law clerks. Mr. Rona and I then carefully reviewed each of the more than 100 articles, discussing at great length the findings of the articles, and whether the Defendants had any knowledge of or control over the articles' content. This topic alone consumed many hours of searching through our payment register, document index, and work-file system by Mr. Rona and me. Alone or with Mr. Rona or Michael Tabb, I discussed with Relator's experts the methodology of each of the underlying studies, the authors' findings and their conclusions. Based on my suspicions, we also investigated the financial ties between the authors and Parke-Davis. In certain cases, the authors had received significant amounts of compensation that was not disclosed in the articles. More egregiously, our investigation also uncovered that in some cases, professional firms hired by Parke-Davis in fact wrote the articles and then paid doctors to lend their names to the publications. This would form the basis of the Relator's allegations that some articles were ghostwritten. Ilyas Rona and I spent many hours researching the subject of ghostwritten articles.

42. Medical research was also necessary to determine the scope of Medicaid coverage. The Medicaid statute relating to prescription drugs, 42 U.S.C. § 1396r-8, states that only those

19

off-label indications that are "supported" by a citation listed in the various compendia are eligible for reimbursement. Thus, our review of medical literature had to carefully include each citation contained in DrugDex. DrugDex listed roughly 50 proposed indications of Neurontin, ranging from alcoholism to spasticity, and including such conditions as hiccups and migraines. Our research showed that while DrugDex classified Neurontin as "effective" or "possibly effective" for most of these indications, in nearly every case, Neurontin's efficacy had in fact not been demonstrated. For example, DrugDex listed Neurontin as being "possibly effective" for bipolar disease, even though studies had demonstrated that Neurontin was less effective than placebo for that indication. DrugDex also listed Neurontin as "effective" for monotherapy, even though clinical trials had failed to demonstrate efficacy and the FDA had specifically rejected Parke-Davis's application for approval of the monotherapy indication. Ilyas Rona and I spent a considerable amount of time comparing DrugDex's classification of a particular off-label indication to the results of our own substantial medical research.

43. My office also spent considerable time seeking and reviewing data from the FDA on adverse impacts of Neurontin. Warner-Lambert marketed Neurontin as safe and effective for a variety of on-label and off-label indications. There was, however, little long-term data on the safety of Neurontin, especially outside of the epilepsy indication. My office spent considerable time reviewing the massive FDA compilation of adverse reactions data to determine whether or not Neurontin had dangerous side effects for any of the various patient populations. This data included numerous adverse reaction reports and took many hours to review.

44. I expended a significant amount of time contacting witnesses in the case. During the course of the government investigation, Parke-Davis denied any wrongdoing. This strategy would have been effective as long as no other employees of Parke-Davis broke the "wall of

silence." I spent a significant amount of time attempting to penetrate this wall. I performed legal research on the ethical rules relating to communications with former employees. Consonant with those rules, I was able to contact and communicate with a number of former employees of Parke-Davis and their counsel. Some of these witnesses confirmed many of the details of Dr. Franklin's disclosure. The contacts with these witnesses, the documents we discovered, and the deposition testimony we elicited ultimately proved instrumental in proving that the Defendants' denials of illegal marketing were in fact false.

45. I also spent a significant amount of time searching for and speaking with consultants. As mentioned, this case involved a number of complex issues that required very specialized knowledge. These issues included the Medicaid reimbursement and rebate system, pharmacy claims, continuing medical education events (CMEs), pharmaceutical marketing and its effect on prescription-writing behavior, and the analysis of DrugDex. In order to understand and investigate these issues, I established contacts with various experts, consultants and witnesses with expertise in these fields. These included:

(a)     Dennis Lyons, an expert in pharmacy claims and Medicaid reimbursement;

(b)     Dr. Jeffrey Linder, a Brigham & Women's Hospital physician, who evaluated DrugDex;

(c)      Ann Hamer, a member of the Oregon state Medicaid Drug Utilization Review Board, with expertise in Medicaid coverage and reimbursement;

(d)     Drs. Landefeld, Steinman and Chren, physicians and experts in pharmaceutical marketing and its effect on prescription-writing behavior;

(e)     C. Eugene Hielhe, a statistician for the California state Medicaid agency, who helped design a method for retrieving off-label Neurontin claims; and

21

(f)     Beth Travola, a former Scott-Levin employee with expertise on the collection of drug sales data.

46. I spent an extensive amount of time conferring with these individuals, discussing the various subjects within their area of expertise. At times, Tom Hoffman, Mike Tabb, or Ilyas Rona joined me. Under my supervision, numerous documents and data files were reviewed and forwarded to some of these experts for their review. In many cases, summarizing memoranda were prepared. The experts frequently would respond with additional questions and requests for further information. At periodic intervals, our experts would furnish me new information or draft reports. I then spent a considerable amount of time reviewing this new evidence.

## II.     Legal Research

47. The senior attorneys from our office who worked on this case, Tom Hoffman, Michael Tabb and myself, all had experience in qui tam litigation and, accordingly, we did not need to devote legal research to learn the structure of the False Claims Act, 31 U.S.C. § 3729, et seq. We were already familiar with fundamental qui tam concepts such as "original source," government intervention, sealing periods, the written disclosure requirements, and the statutes' broad definitions of "know" and "knowingly." Dr. Franklin's case, however, did raise some substantial novel issues of statutory interpretation because we advocated an unusual application of this remedial statute in a manner that had never previously been done.

48. One of the principal legal research questions relating to the False Claims Act statute concerned the type of conduct that constitutes "causing" another person to make a false or fraudulent statement to the United States government. Very few cases seek to hold Defendants liable for "causing" a False Claims Act violation and even fewer of these concern Defendants who are not intentionally making fraudulent statements. The Court will recall that one of the critical issues before it was whether or not Defendants could be liable for causing violations of

22

the False Claims Act if they did not make misrepresentations to the persons who actually

submitted the Neurontin claims to the United States government. The Court will recall that our

analysis of the differences between 28 U.S.C. §§3929(a)(1) and §3929(a)(2) convinced the Court

that the statute did not require "double falsity." Substantial legal research, and the development

of what were untested issues, thus supported this conclusion.

49. Another important legal issue concerned whether the person actually submitting the

false claim to the government had to know that the claim was false. Our research into criminal

applications of the False Claims statute prior to the 1986 amendments of the Act allowed us to

establish that the person who submits the claim could be innocent. In our case, in fact, we had to

establish that liability existed when the drug company caused two different persons, the doctor

and the pharmacist, to cause the submission of a false claim.

50. Other aspects of the False Claim Act required legal research during the course of this

action. To ensure that the Medicaid program would be made whole for the fraud that the

Defendants perpetrated, I did extensive research on the "alternative remedies" clause of § 3730.

I wanted to know whether Medicaid was entitled to any recovery if the federal government

collected a criminal fine from the Defendants, particularly if such a fine was based on the

equitable remedies of disgorgement or restitution.

51. Midway through the litigation, Massachusetts passed its own False Claims Act, and I

examined that statute to determine whether it could be used to recover funds by the

Massachusetts Medicaid program based on the Defendants' marketing activities. I concluded

that while the federal action would likely result in the state recovering their portion of the

Medicaid funds paid for Neurontin, the Relator was only entitled to recover a percentage of those

funds paid to the federal government. However, my investigation indicated that the Relator,

through the use of state false claim act statutes, could recover from the state portion, for those states that permitted state <u>qui tam</u> lawsuits.

52. Accordingly, we began to investigate the False Claims Acts of the individual states. We discovered that 11 states and the District of Columbia had such <u>qui tam</u> provisions. We researched the details of each state, including their statutes of limitations, their original source requirements, their procedural requirements, their substantive scope and their rules relating to intervention and nonintervention. As a result of our research, we initially moved to file a second Amended Complaint containing state <u>qui tam</u> counts. When that was denied, we filed a second action on diversity grounds under the state <u>qui tam</u> provisions of Massachusetts, California, Delaware, District of Columbia, Florida, Hawaii, Illinois, Nevada, Tennessee, Texas, Virginia, and Louisiana.

53. The Relator's claim was that the Defendants' marketing efforts caused the submission of prescriptions ineligible for Medicaid reimbursement. Consequently, the firm had to do extensive research on Medicaid prescription benefits. The Medicaid statute is complex and there are several provisions relating to the provision of prescription drugs, including the principal statute, 42 U.S.C. § 1396r-8. In order to fully understand the Medicaid reimbursement system, we not only had to look up the statutes, but the Medicaid regulations, state Medicaid manuals and published regulatory interpretations of the relevant regulations and statutes as well.

54. The attorneys in my firm and I were required to review specific Medicaid statutes and regulations and provider manuals in each of the states in which we alleged off-label marketing had caused the submission of ineligible Neurontin prescriptions.

55. There were two significant amendments to 42 U.S.C. § 1396r-8, the Medicaid statute, during the relevant time period. The first was in 1993, when Congress created the Medicaid

Drug Rebate Program as part of the Omnibus Budget Reconciliation Act P.L. 106-66. Another

important amendment occurred in 1997 as part of the Balanced Budget Act of 1997. (This was

the amendment that added DrugDex as an authorized compendium for the purpose of

determining whether specific drug uses constituted "medically accepted indications.")

Understanding Congressional intent was critical to the Relator's case. With regard to both of

these amendments, the attorneys in my firm and I invested extensive time researching all

available legislative history regarding these two statutes. Both of these amendments were very

small parts of comprehensive budget acts that covered thousands of pages of the Congressional

Record. Searching for this legislative history was time intensive and quite difficult.

56. Although the Relator was not entitled to enforce the Food, Drug and Cosmetic Act

("FDCA") through the False Claims Act, I had to perform extensive research on the FDCA in

order to determine whether the Defendants' marketing was permissible under that statute. This

is another complex regulatory statute which required significant time to master. My research not

only required me to examine the statute, but the regulatory framework established by the statute.

In addition, the FDA closely regulates drug marketing. Relevant law is created through

regulation and through guidelines established by the FDA and published in the Federal Register.

The FDA's regulatory positions are looked upon as having the force of law in the drug industry,

and I and other attorneys in my firm were required to examine these positions.

57. The FDA Modernization Act of 1997, P.L. 105-115, was another statute that was

highly relevant during the litigation. Part of the statute, codified at 21 U.S.C. § 360aaa, et seq.

restricted off-label promotion by drug companies. Although the statute appeared to clarify that

the conduct at issue was unlawful, the off-label provisions of the statute were found

unconstitutional by the United States District Court for the District of Columbia in Washington

25

Legal Foundation v. Henney, 56 F. Supp. 2d 81 (D.D.C. 1999). That decision was vacated on procedural grounds in Washington Legal Foundation v. Henney, 202 F.3d 331 (D.C. Cir. 2000). Given the procedural nature of the Court of Appeals' decision, substantial controversy existed as to whether the District Court's findings of unconstitutionality continued to have any validity. Moreover, Defendants regularly raised their first amendment rights as a defense to the dissemination of off-label marketing materials. Consequently, attorneys in my firm and I were required to fully research these areas.

58. Another intense area of legal research was the Medicaid Fraud and Abuse statute, 42 U.S.C. § 1320a-7b. The anti-kickback provisions of that statute had been held to be a viable basis for False Claims Act cases in several prior decisions and we later alleged that payments made by Defendants constituted such unlawful kickbacks in this action. Additionally, I was required to review and understand the AMA guidelines regarding physician kickbacks and other industry standards regarding what physicians could properly accept from drug companies and other third parties. Although the Relator did not initially convince the court that his kickback claim should be litigated as a separate count, the Court ultimately recognized that case law supported implied certification FCA claims in the healthcare context, including kickback-based claims. See United States ex rel. Franklin v. Parke-Davis, 2003 U.S. Dist. LEXIS 15754.

III.     **Aid to Federal and State Government Investigations**

59. The successful prosecution of the civil case required that I interact with representatives from both the federal and state governments. It also required that I assist the federal government in their criminal and civil investigations in several ways. I prepared Dr. Franklin for his grand jury testimony by prepping him for meetings with government agents. I attended multiple sessions with government attorneys Thomas Kanwit, Susan Hanson-Philbrick,

26

and Jill Furman, and government agents Leon Drezek, Denis Drum and others, as they prepared

Dr. Franklin for his grand jury testimony. Finally, I accompanied Dr. Franklin to multiple

appearances before the grand jury.

60. Between January 1999 and June 2003, I frequently communicated with AUSA

Kanwit. I often was asked to bring AUSA Kanwit up to speed and to brief him on a number of

subjects. This included informing him routinely about the status of the qui tam case, briefing

him on a number of significant factual and legal issues, and responding to a significant number

of requests for information from the United States Attorney's Office. For example, in response

to a specific request from AUSA Kanwit for evidence of kickbacks, I provided the United States

with an electronic version of the payment register (three volume set) that we created which

reflected payments made by Warner-Lambert to physicians in connection with the marketing of

Neurontin. This payment register detailed over 10,000 payments to over 3,000 different doctors.

Similarly, I furnished AUSA Kanwit with a significant number of documents, including

numerous memoranda and pieces of correspondence on a variety of procedural and substantive

issues that I researched and drafted, and numerous memoranda written by my associates that I

reviewed and edited. The following is a non-exhaustive list of those documents:

    (a)    Medicaid-Reimbursed Claims for Neurontin Prescriptions, 1995-2000, provided on October 12, 2000;

    (b)    Medically Accepted Indications for Gabapentin [Neurontin], 1993-2000, provided on October 12, 2000;

    (c)    Neurontin Patents, provided on November 3, 2000;

    (d)    California Patient Neurontin Claims, provided on November 3, 2000;

    (e)    Medicaid-Reimbursed Claims for Neurontin Prescriptions, 1995-2000, provided on November 3, 2000;

    (f)    Scott-Levin and IMS, provided on December 5, 2000;

27

(g)     Covered Outpatient Drugs and Peer Reviewed Literature, provided on December 6, 2000;

(h)     Correspondence relating to brain tumors in Neurontin clinical trials and tumors in mice in pregabalin, provided on March 20, 2001;

(i)     Correspondence relating to Kickback evidence, provided on April 20, 2001;

(j)     Memorandum relating to Teleconferences, provided on October 30, 2001;

(k)     Memorandum relating to Promotrak and Promostudy Analysis of Parke-Davis Promotional Events and Tactics, provided on December 10, 2001;

(l)     Letter to Thomas Kanwit enclosing list of payments to Drs. Schachter, Beydoun, Browne, Wilder, and Dr. Wilder's Epilepsy Research Foundation of Florida, provided on December 17, 2001;

(m)     Correspondence and graphs relating to Parke-Davis's payments to physicians by time and zip code for Massachusetts and New Jersey;

(n)     Oregon Drug Utilization Review of Neurontin, provided on May 30, 2002;

(o)     Email relating to Aggregate amount of Neurontin prescriptions and total Medicaid reimbursement for the years 1994-1998, provided on June 24, 2002;

(p)     Memoranda relating to Boris Interview, provided on June 27, 2002;

(q)     Memoranda relating to Ruth E. Nemire Interview, provided on June 27, 2002;

(r)     Master Index of Neurontin Notebooks, provided on July 9, 2002;

(s)     John Boris work-file and banker's box of documents relating to Boris, provided on July 30, 2002;

(t)     DrugDex: Summary of Listed Indications For Neurontin 1997-2002, provided on August 12, 2002;

(u)     DrugDex and the Assessment of Damages, provided on August 14, 2002;

28

(v)     Review of Citations Listed in DrugDex, provided on August 14, 2002;

(w)     Off-Label Marketing of Neurontin Volumes I-IV, provided on October 7, 2002;

(x)     Evidence of Off-label Marketing Prior to October 1995 and after December 1996, provided on October 8, 2002;

(y)     Payment Index and Top 30 (physician prescribers) after January 1, 1997, provided on October 8, 2002;

(z)     Timeline of published medical articles containing statements re: off-label Neurontin use, provided on November 4, 2002;

(aa)    Correspondence to Thomas Kanwit re: certification of compliance with statutes and regulations relating to Medicaid, provided on November 6, 2002;

(bb)    Parke-Davis's Marketing Neurontin for Monotherapy, provided on November 22, 2002;

(cc)    Relator's Express and Implied False Certification Cases, provided on December 6, 2002;

(dd)    Estimate of Damages, memorandum and three charts, provided on January 30, 2003;

(ee)    Comparison of Off-label Use: Neurontin vs. Dilantin, provided on February 24, 2003;

(ff)    Expert's Consultation Report; and

(gg)    Chart depicting Peer-Reviewed and Non-Peer Reviewed Citations in DrugDex.

All of the information I provided had obvious relevance to the government's investigation. Nearly all of it was provided in response to direct requests for information from the United States Attorney's Office. These materials are voluminous and constitute my work product. They are available for in camera inspection if the Court wishes to inspect them.

61. As mentioned previously, I also spent a considerable amount of time communicating with David Waterbury, Director of the Washington State MFCU and past President of the

29

National Association of the Medicaid Fraud Control Units. My efforts and assistance to Mr. Waterbury and the state investigation closely paralleled my efforts and assistance to Mr. Kanwit and the federal investigation. In fact, when I first made contact with Mr. Waterbury, there was no state investigation into the marketing of Neurontin. Beginning in late 2001, I had several lengthy conversations with Mr. Waterbury, during which I informed him of Dr. Franklin's allegations and provided him with information relating to the Defendants' marketing activities. The information I provided included: detailed descriptions of the marketing activities, descriptions of the off-label uses for which Neurontin was being marketed; the scope of Medicaid's coverage for off-label uses; and information regarding the efficacy of Neurontin for various off-label indications. The following is a non-exhaustive list of documents that my office provided to Mr. Waterbury:

    (a)    Letter to David Waterbury relating to expert opinion on techniques to identify and retrieve ineligible Medicaid claims, provided on February 26, 2002;

    (b)    Printout of physician names who received kickbacks, provided on March 11, 2002;

    (c)    Letter to David Waterbury attaching Relator's amended complaint, provided on March 11, 2002;

    (d)    Letter to David Waterbury attaching select physician names from North Carolina, provided on April 15, 2002;

    (e)    Letter to David Waterbury attaching Relator's amended complaint, disclosure and exhibits, provided on April 30, 2002;

    (f)    Letter to David Waterbury relating to Oregon Drug Utilization Review of Neurontin, provided on May 30, 2002;

    (g)    Printout of select physician names from Oregon, Delaware, Florida, North Carolina, and Washington (members of the Parke-Davis Team), provided on May 31, 2002;

    (h)    Copies of Subpoenas served on the top 30 states, provided on July 30, 2002;

(i)      Copy of state Medicaid subpoena schedule, provided on July 25, 2002;

(j)      Memorandum to David Waterbury relating to techniques to standardize state Medicaid subpoena responses, provided on August 21, 2002;

(k)      Email message to David Waterbury discussing state subpoena expenses, provided on October 3, 2002;

(l)      Draft affidavit for David Waterbury, provided on October 9, 2002;

(m)      Draft affidavit for David Waterbury with markups, provided on October 10, 2002;

(n)      Email message to David Waterbury discussing Medicaid statute and attaching work-product demonstrating eligibility of various Neurontin indications for Medicaid coverage, provided on November 8, 2002;

(o)      Email message to David Waterbury requesting Medicaid for select doctors organized by state, and attaching NDC codes for Neurontin, provided on November 26, 2002;

(p)      Memorandum to David Waterbury relating to DrugDex Analysis, provided on December 3, 2002;

(q)      Memorandum to David Waterbury relating to Express and Implied Certification theories, provided on December 6, 2002;

(r)      Letter to David Waterbury relating to state provider agreements and attaching various state provider agreements, December 9, 2002;

(s)      Fax to David Waterbury attaching Illinois Provider Agreement, provided on December 10, 2002;

(t)      Fax to David Waterbury attaching Wall Street Journal Article on Neurontin, provided on December 20, 2002;

(u)      Email message to David Waterbury depicting growth of Medicaid utilization of Neurontin from 1994 – 2000, provided January 29, 2003;

(v)      Draft copy of Relator's Expert Report, provided on January 31, 2003;

(w)    Letter to David Waterbury discussing procuring of witnesses who
       testify regarding pharmacy express certifications of compliance
       with state and federal rules and regulations, provided on March 5,
       2003;

(x)    Letter to David Waterbury attaching Scott-Levin "verbatims,"
       provided on March 21, 2003;

(y)    Letter to David Waterbury compiling certification language
       contained in provider agreements and pharmacy claims for the
       states Alabama, California, Florida, Illinois, Massachusetts, North
       Carolina, and Oklahoma, provided on April 7, 2003;

(z)    Fax to David Waterbury attaching additional "verbatim"
       documents, provided on April 3, 2003;

(aa)   Letter to David Waterbury requesting provider agreements and
       pharmacy claim forms, provided on April 10, 2003;

(bb)   Email message to David Waterbury relating to draft affidavit
       language for state Medicaid directors, provided on April 17, 2003;

(cc)   Letter agreement to David Waterbury and Laurence Shtasel
       relating to "verbatims," provided on April 21, 2003;

(dd)   Letter to Christopher Brewer of Parke-Davis Team attaching letter
       agreement to David Waterbury and Laurence Shtasel relating to
       "verbatims," provided on April 22, 2003;

(ee)   Email message to David Waterbury attaching additional requests
       for Medicaid data for "verbatim" physicians, provided on April 30,
       2003;

(ff)   Memorandum to David Waterbury attaching Relator's filings in
       connection with opposition to motion summary judgment,
       provided on May 30, 2003;

These documents are also lengthy and, again, constitute my work product. They are available

for in camera inspection if the Court wishes to review them.

62. As a result of the information I provided, Mr. Waterbury and the National

Association of the Medicaid Fraud Control Units commenced an investigation into the

Defendants' marketing practices. As part of the global settlement of the criminal and civil cases,

the states collectively received approximately $68,400,000.00 (in addition to the federal

government which received $83,600,000.00). Additionally, our investigative efforts produced evidence of potential violations of state consumer protection acts, which prompted a separate investigation by the National Association of Attorneys General's Consumer Protection Units. The global settlement yielded state consumer protection divisions an <u>additional</u> $38,000,000.00.

**IV.    Discovery**

63. A major focus of my time in this case was formal discovery, both written discovery in the form of document requests and interrogatories and deposition discovery. Formal discovery was of paramount importance in this case because many critical facts were solely in the possession of the Defendants. This included such things as internal company documents, proprietary data, and the testimony of current employees, none of which could have been obtained without resorting to formal discovery methods. The discovery, particularly document discovery from the Defendants, was particularly hard fought.

A.    <u>Written Discovery Pursuant to Fed.R.Civ.P. 33 and 34</u>

64. I prepared and, on August 2, 2000, served Relator David Franklin's Response to First Request for Production of Documents from Defendant Warner-Lambert producing a copy of all documents that I had provided to the government.

65. I prepared and, on August 22, 2000, served Relator David Franklin's First Request for Production of Documents from Relator David Franklin to Defendant Warner-Lambert Company seeking the Food and Drug Administrations correspondence to the Defendant, the Department of Veteran Affairs Office of the Inspector General's October 23, 1997 subpoena, and documents concerning the Medical Liaison program, marketing reports and analyses for Neurontin, voice mail messages for specific individuals, Physician Information request forms, documents evidencing payments to physicians, Neurontin Disease Team documents, Core Marketing Team

33

documents, Neurontin slide kits, program materials for advisory boards, consultant meetings, third party vendor documents pertaining to marketing of Neurontin and Neurontin and Marketing Plans and Strategic Plans and documents evidencing sales, revenues, and numbers of off-label prescriptions paid for by the United States.

66. I prepared and, on October 30, 2000, served the Second Request for Production of Documents from Relator David Franklin to Defendant Warner-Lambert Company seeking documents produced to the United States, Food and Drug Administration and Department of Veteran's Affairs, Office of Inspector General.

67. I prepared and, on January 16, 2001, served Relator David Franklin's First Set of Interrogatories to the Defendant, Parke-Davis, Division of Warner-Lambert Company seeking the identity of each physician that had received payment, and the amount of the payment, to be a preceptor, consultant, advisory board member, study participant, speaker's bureau member, or medical article author concerning the marketing of Neurontin.

68. I also prepared and, on January 16, 2001, served Relator David Franklin's Third Request for Production of Documents to the Defendant, Parke-Davis, Division of Warner-Lambert Company seeking copies of each article, paper, case report, letter, study, protocol or writing regarding the off-label uses of Neurontin.

69. I prepared and, on March 2, 2001, served the Fourth Request for the Production of Documents from Relator David Franklin to Defendant Warner-Lambert Company seeking Neurontin Medicaid coverage reports, documents referencing Medicaid reimbursement for off-label Neurontin prescriptions, and standard operating procedures and guidelines for events promoting off-label uses of prescription drugs.

70. I prepared and, on April 24, 2002, served Relator's Fifth Request for Production of Documents seeking Neurontin Development Team meeting minutes, Neurontin Indication Decision Analysis Group Meeting documents, Marketing Planning Committee's Neurontin documents, Neurontin Consultant Program Trending Worksheets, Scott-Levin Verbatim Reports, Promotrak Analysis reports, clinical trial documents and Neurontin prescription data.

71. I prepared and, on May 22, 2002, served Relator's First Request for Production of Documents to Defendant Pfizer Inc. seeking data and documents evidencing Neurontin prescriptions paid for by the Medicaid program and documents evidencing the Defendant's "Publication Strategy" for Neurontin.

72. I also prepared and, on May 22, 2002, served Relator David Franklin's First Set of Interrogatories to the Defendant Pfizer, Inc. seeking data evidencing the total number of Neurontin prescriptions paid for by Medicaid for approved and unapproved uses.

73. I prepared and, on July 11, 2002, served Relator's Second Request for Production of Documents to Defendant Pfizer, Inc., seeking documents to evidence the relationship between physicians, the Defendants, DrugDex and Micromedex.

74. I prepared and, on July 22, 2002, served Relator David Franklin's Second Set of Interrogatories to Defendant Pfizer, Inc. seeking the identity of individuals in the Health Care Management CBU with responsibility for communicating with state and federal Medicaid officials regarding Neurontin's eligibility for Medicaid reimbursement.

75. I prepared and, on September 9, 2002, served Relator's Answers to Defendants Warner-Lambert and Pfizer's Second Request for Production of Documents to Relator David Franklin.

76. I also prepared and, on September 9, 2002, served Relator's Response to Defendants Warner-Lambert and Pfizer's First Set of Interrogatories to Relator David Franklin identifying individuals likely to have "discoverable information" that Relator's may use to support his claims.

B.    Depositions

77. On September 12, 2000, Defendants deposed David Franklin, Ph.D. The deposition was held in Boston, Massachusetts from 9:11am to 5:04pm. James P. Rouhandeh, Barbara D. Diggs and James Murray represented Warner-Lambert. I represented David Franklin.

78. On September 13, 2000, Defendants deposed David Franklin, Ph.D. for a second day. The deposition was held in Boston, Massachusetts from 9:15am to 5:03pm. James P. Rouhandeh, and James Murray represented Warner-Lambert. I represented David Franklin.

79. On September 14, 2000, Defendants deposed David Franklin, Ph.D. for a third day. The deposition was held in Boston, Massachusetts from 9:00am to 5:02pm. James P. Rouhandeh, and James Murray represented Warner-Lambert. I represented David Franklin.

80. On November 21, 2000, Defendants deposed David Franklin, Ph.D. for a fourth day. The deposition was held in Boston, Massachusetts from 9:58am to 5:00pm. Martine M. Beamon and James Murray represented Warner-Lambert. I represented David Franklin.

81. On April 29, 2002, I began taking the deposition of Pfizer, Inc. pursuant to Fed. R.Civ.P. 30(b)(6). The deposition was held in New York, NY from 10:05am to 2:50pm. Martine M. Beamon represented Warner-Lambert. The Defendants produced James Murray who is an associate at Davis, Polk & Wardwell to testify concerning the identity of the person(s) with custody and control of documents evidencing the numerous subjects listed in the Rule 30(b)(6) deposition notice.

36

82. On May 15, 2002, I deposed Maryann K. Farinet, a Rule 30(b)(6) corporate designee, who holds the position of Director, Team Leader in the Sales Finance Department of the United States Pharmaceutical Division of Pfizer. The deposition was held in New York, NY from 10:05am to 4:45pm. James Murray and Eric D. Gill represented Warner-Lambert. Ms. Farinet was designated to testify regarding the following subject:

- Parke-Davis's payments, both direct and those made through third parties, to physicians for consultant meetings, speaker bureau honoraria, medical education seminars, grants, studies, advisory boards, teleconference, and preceptorships referencing Neurontin or Neurontin use for the time period January 1, 1994 to December 31, 1998, including the location of those documents and the identity of the person with custody and control of those documents.

83. On May 16, 2002, I deposed Chris Higgins, a Rule 30(b)(6) corporate designee, who holds the title of Medicaid Manager. The deposition was held in New York, NY from 10:10am to 12:15 p.m. Sean Knowles, James Murray, and Eric Gill represented Warner-Lambert. Mr. Higgins was designated to testify regarding the following subject:

- Parke-Davis's ordering, use, analysis and retention of reports evidencing Medicaid reimbursement for Neurontin prescriptions for the time period of January 1, 1994 to December 31, 1998, including the location of documents evidencing this designated subject and the identities of persons with custody or control of these documents.

84. On May 17, 2002, I deposed James Parker, a Rule 30(b)(6) corporate designee, who holds the title of Director-Team Leader for the Cardiovascular Group and the Worldwide Regulatory Strategy Group. The deposition was held in New York, NY from 10:15am to 3:45pm. Martine M. Beamon and Daniel Wenner represented Warner-Lambert. Mr. Parker was designated to testify regarding the following subjects:

- Parke-Davis's rules policies, procedures, and guidelines to ensure company compliance with the 1994 Inspector General of the Department of Health and Human Services' Special Fraud Alert concerning prescription drug marketing practices that violate the anti-kickback laws, including: improper payment of "research grants" to substantial prescribers of medications; payment to physicians for "studies" of the company's products when the studies were of "questionable scientific value and

require little or no actual scientific pursuit"; and payments to physicians where the physician had offered no particular services of benefit to the drug company but the payment appeared to have been based on the volume of business the doctor generated in the past, or could generate in the future, for the drug company, for the time period of January 1, 1994 to December 31, 1998, including the location of documents evidencing this designated subject and the identities of persons with custody or control of these documents.

- Parke-Davis's rules, policies, and procedures, that concern or relate to the company's compliance with the Food Drug and Cosmetic Act's prohibition against a drug manufacturer's off-label promotion of prescription drugs, for the time period of January 1, 1994 to December 31, 1998, including the location of documents evidencing this designated subject and the identities of persons with custody or control of these documents.

- Parke-Davis's rules, policies, and procedures that govern that company's marketing or promoting approved drugs for uses other than those that set forth in the approved labeling, for the time period of January 1, 1994 to December 31, 1998, including the location of documents evidencing this designated subject and the identities of persons with custody or control of these documents.

- Parke-Davis's rules, policies, procedures, practices and protocols that concern or relate to the company's compliance with the Medicare and Medicaid anti-kickback laws, 42 U.S.C. sec. 1320a-7b(b) prohibiting remuneration, in cash or kind, to induce physicians to order or recommend drugs which may be paid for by a federal healthcare program such as Medicare or Medicaid for the time period of January 1, 1994 to December 31, 1998, including the location of documents evidencing this designated subject and the identities of persons with custody or control of these documents.

- Parke-Davis's knowledge, understanding and/or compliance with the American Medical Association's guidelines pertaining to payments to physicians by drug company manufacturers for the time period of January 1, 1994 to December 31, 1998, including the location of documents evidencing this designated subject and the identities of persons with custody or control of these documents.

- Parke-Davis's document retention policy applicable to documents created during the time period of January 1, 1994 to December 31, 1998, that "relate to marketing, publication, business strategies, policies, initiatives, seminars, training, consultants' meetings or the like relating to Neurontin."

85. On June 4, 2002, I deposed William Sigmond, M.D., a Rule 30(b)(6) corporate

designee, who holds the title of Vice President, Medical and Scientific Affairs. The deposition

was held in New York, NY from 10:14am to 3:55pm. Martine M. Beamon and Daniel E.

38

Wenner represented Warner-Lambert.  Dr. Sigmond was designated to testify regarding the

following subjects:

- Parke-Davis's rules policies, procedures and criteria for the hiring of, and use of, medical liaisons, including their training, job responsibilities and the use of marketing materials, (including but not limited to Parke-Davis Training and Development for Neurontin New-Hire Training manual) for the time period of January 1, 1994 to December 31, 1998, including the location of documents evidencing this designated subject and the identities of persons with custody or control of these documents.

- Parke-Davis's practices and policies regarding oral and written communications between medical liaisons and physicians concerning Neurontin for the time period of January 1, 1994 to December 31, 1998, including the location of documents evidencing this designated subject and the identities of persons with custody or control of these documents.

- Each office visit that a Parke-Davis medical liaison had with a physician to promote, market or discuss Neurontin for the time period of January 1, 1994 to December 31, 1998, including the location of documents evidencing this designated subject and the identities of persons with custody or control of these documents.

- Each physician request that Parke-Davis received from a physician requesting information about Neurontin use for unapproved indications, for the time period of January 1, 1994 to December 31, 1998, including the location of documents evidencing this designated subject and the identities of persons with custody or control of these documents.

86. On June 5, 2002, I deposed James Parker for a second day concerning the subjects

identified above.  The deposition was held in New York, NY from 10:14am to 4:40pm.  Martine

M. Beamon and Eric D. Gill represented Warner-Lambert.

87. On June 6, 7, and 20, 2002, I deposed David Murphy, a Rule 30(b)(6) corporate

designee, who was a Senior Marketing Manager.  The depositions were held in New York, NY.

The deposition on the 6th lasted from 10:20am to 5:00pm; the deposition on the 7th lasted from

9:55am to 4:13pm; and, the deposition on the 20th lasted from 10:15am to 12:00pm.  Warner-

Lambert was represented by James Murray on the 6th, James Murray and Martine M. Beamon on

39

the 7th, and James Murray on the 20th.  Mr. Murphy was designated to testify regarding the

following subject:

- Parke-Davis's payments, both direct and those made through third parties to physicians for consultant meetings, speaker bureau honoraria, medical education seminars, grants, studies, advisory boards, teleconferences, and preceptorships referencing Neurontin or Neurontin use, for the time period of January 1, 1994 to December 31, 1998, including the location of documents evidencing this subject and the identities of persons with custody or control of these documents.

- Parke-Davis's ordering, use, analysis and retention of Neurontin Promo Track reports, Neurontin trending reports, Neurontin trending worksheets, Neurontin tracking data documents, and intervention and events analyses (that reference Neurontin), intervention and event analysis reports (that reference Neurontin), and Neurontin Promostudies for each Event held during the time period of January 1, 1994 to December 31, 1998 including the location of documents evidencing this designated subject and the identities of persons with custody or control of these documents.

- Parke-Davis's tracking Neurontin prescriptions of physicians following the physicians attendance or participation at any Event, held during the time period of January 1, 1994 to December 31, 1998 including the location of documents evidencing this designated subject and the identities of persons with custody or control of these documents.

- Parke-Davis's ordering, use, analysis and retention of Neurontin Promotional Effectiveness studies, Neurontin Promotional Evaluations, Parke-Davis's internal Neurontin Promostudy reports, and Neurontin trending reports for the time period of January 1, 1994 to December 31, 1998 including the location of documents evidencing this designated subject and the identities of persons with custody or control of these documents.

- Parke-Davis's ordering, use, and retention of statistical analyses of physicians' Neurontin prescriptions writing for the purpose of measuring ROI (return on investment) for each Event held during the time period January 1, 1994 to December 31, 1998 including the location of documents evidencing this designated subject and the identities of persons with custody or control of these documents.

- Parke-Davis's ordering, use, analysis and retention of reports that correlate a physician's Neurontin prescriptions with specific medical diagnosis or medical diagnostic code, for the time period of January 1, 1994 to December 31, 1998 including the location of documents evidencing this designated subject and the identities of persons with custody or control of these documents.

88. On September 4, 2002, I deposed Philip Magistro who holds the title of Vice President of Marketing, Business Development at Faulding Pharmaceutical. He was formerly a Senior Director, Global Marketing at Warner-Lambert. The deposition was held in Florham Park, New Jersey from 9:22am to 6:42pm. Warner-Lambert was represented by Martine M. Beamon, Jeremy Kudon, and James Murray. Michael S. Ross represented the deponent.

89. On September 11, 2002, I deposed Carol Ek. The deposition was held in Florham Park, New Jersey from 9:30am to 1:41pm. Eric D. Gill represented Warner-Lambert.

90. On September 16, 2002, I deposed John Boris who worked in the Marketing Intelligence division of Warner-Lambert. The deposition was held in Roseland, New Jersey from 9:14am to 5:55pm. Martine M. Beamon and Sean Knowles represented Warner-Lambert. Michael S. Ross represented the deponent.

91. On September 20, 2002, I deposed Francie Kivel who held a position in the Decision Sciences Group at Parke-Davis. The deposition took place in Ann Arbor, Michigan from 9:20am to 3:45pm. Eric D. Gill represented Warner-Lambert. Michael Ross represented the deponent.

92. On September 24, 2002, I deposed John Allan Crook who held the position of Neurontin Project Manager. The deposition took place in New York, NY from 11:15am to 7:45pm. James Murray and Daniel Wenner represented Warner-Lambert.

93. On September 25, 2002, I deposed John Knoop who held a position in the Neurontin Development Team/Global marketing group. The deposition was held in New York, NY from 9:20am to 5:15pm. Sean Knowles represented Warner-Lambert. Michael Ross represented the deponent.

94. On September 26, 2002, I deposed Edda Guerrero who was formerly a Product Manager for Neurontin at Parke-Davis. The deposition was held in Princeton, New Jersey from

41

10:40am to 3:28pm.  Martine M. Beamon and Eric D. Gill represented Warner-Lambert.  Karen

Green and Francine Rosenzweil represented the deponent.

95. On October 17, 2002, I deposed Janeth Turner who is retired from Warner-Lambert's

Regulatory Affairs Office.  The deposition was held in New York, NY from 10:09am to 6:28pm.

James Murray and Eric D. Gill represented Warner-Lambert.  K. Ann McDonald represented the

deponent.

96. On December 11, 2002, I deposed Joe Pieroni who was formerly the vice-president of

Marketing Planning at Warner-Lambert.  The deposition was held in New York, NY from

9:05am to 12:05pm.  James Murray represented Warner-Lambert.  Michael Ross represented the

deponent.

97. I provided a copy of each deposition transcript to AUSA Thomas Kanwit.

## V.    Significant Pleadings and Contested Motions

98. In addition to the significant efforts I devoted to investigating this case, performing

legal research, communicating with the government, and taking discovery – activities that take

place outside the view of the Court – I spent an extensive amount of time preparing and filing

court documents, preparing for hearings, and appearing before this Court.  It is telling that this

case has generated a docket with well over 350 docket entries and 3 published opinions.  My

efforts in the litigation of this case, through preparation and filing of pleadings, motions,

oppositions, and replies to oppositions, and through preparation for and appearance at numerous

hearings, have been significant and are summarized in this section.

99. After debriefing my client and conducting initial legal and factual research, I assisted

in drafting the complaint and disclosure required by 31 U.S.C. § 3729.  As mentioned above, in

order to preserve Dr. Franklin's status as the original source, I had to work quickly.  With the

42

help of other attorneys in my office, I assisted in the drafting and editing of a nine-count

complaint. We drafted counts for direct sales of Neurontin to the Veteran's Administration,

deliberate avoidance of FDA regulations in connection with Medicare and Medicaid financed

sales, inappropriate experimental use of the drug in order to avoid federal price controls,

violation of Medicare and Medicaid state formularies, unlawful kickbacks in violation of the

Medicaid Fraud and Abuse Act, false statements to physicians, avoiding price controls using

therapeutic equivalency, frustration of federal policy against off-label promotion, and unlawful

off-label promotion of Accupril.

100.    I also assisted in the drafting and editing of the written disclosure of evidence to

the United States government that is required under the statute. This document attempted to set

forth the evidence the Relator had regarding false claims and unlawful promotion of Neurontin

and Accupril. Although Dr. Franklin had only been employed at Warner Lambert for

approximately four months, the disclosure required me to assemble and review all of the

information he had obtained during his tenure and to integrate the documentary evidence into the

written disclosure. Moreover, for the reason set forth above, it was imperative this material be

organized and assembled as quickly as possible. I reviewed the numerous documents that my

client possessed and drafted specific details regarding how Warner Lambert promoted these

drugs for unapproved uses. I also attached many of the documents that best exemplified these

allegations as exhibits.

101.    The Complaint was filed under seal on August 13, 1996, approximately one

month after Dr. Franklin resigned from Warner Lambert. See Complaint, Docket 1. Very little

happened in this litigation for several years, during which time the United States government

investigated Dr. Franklin's claims. The only pleadings filed in the case were requests from the

43

government to extend the time for keeping the complaint under seal and deciding whether it wished to intervene.

102.    In 1999, the Court indicated that it would not continue to grant extensions and ordered the United States government to decide on or before December 21, 1999 whether or not it would intervene.  On December 22, 1999, the United States government informed the court that it would not intervene at this time, leaving open the possibility that the United States would enter the action at some future time.  On January 3, 2000, the Court ordered the Relator's complaint to be served on the Defendants.  The United States government requested our office to delay serving the complaint on the Defendants for as long as possible in order for it to continue to obtain information regarding its potential criminal case and potential intervention in this action.  We acceded to the government's request and did not serve the Complaint until April 28, 2000.  After the government's motion to stay civil discovery was denied, litigation in this case commenced in earnest.

103.    On July 21, 2000, Warner Lambert moved to dismiss the Relator's case on the grounds that it failed to state a cause of action.  The Defendants alleged that the complaint was an improper attempt by the Relator to privately enforce the Food, Drug and Cosmetic Act, that off-label promotion was not a false or fraudulent statement for the purposes of the False Claims Act and that the complaint did not plead with requisite specificity the alleged false statements, in accordance with Fed. R. Civ. P. 9(b).  Over the next two months, I spent a significant amount of time, aided by Michael Tabb and Ilyas Rona, drafting an opposition to the motion to dismiss. This involved numerous hours of drafting, editing, and reviewing re-drafts of the opposition.

104.    On October 12, 2000, I filed the Relator's opposition to Warner Lambert's motion to dismiss.  See Response by David Franklin In Opposition To Motion To Dismiss Complaint,

44

Docket 73. In this memorandum, I articulated the Relator's unique false claim theory. At that time, I was able to demonstrate that the Medicaid statute prohibited reimbursement for prescription drugs unless those drugs were prescribed for a "medically accepted indication." I further established under the Medicaid statutes, particularly 42 U.S.C. § 1396r-8, that uses not approved by the Food and Drug Administration were not ordinarily "medically accepted indications." I further articulated how a drug company, by intentionally promoting off-label, would "knowingly" cause ineligible prescriptions to be submitted for Medicaid reimbursement and that such submissions would constitute "false claims." I also demonstrated that in conjunction with the Relator's disclosure, the Relator had pled fraud with sufficient particularity.

105.    The Defendants' motion to dismiss was heard before the Court on January 9, 2001. Due to the importance of this hearing, I spent a significant amount of time preparing for it, reading the applicable filings and reviewing the legal arguments with Michael Tabb. The Court may recall that during that hearing, the Court acknowledged precedent permitting False Claims Act cases based on violations of the Medicaid kickback statute, but didn't know whether a court had approved a False Claims Act theory based on a drug company causing the submission of ineligible Medicaid prescriptions. Nonetheless, despite the Court's concerns that it was going farther than any other federal court had previously gone, the Court accepted the Relator's false claims theory and denied the Defendants' motion to dismiss on June 25, 2001. The Court's decision, published at 147 F. Supp. 2d 39, is now recognized as a seminal decision in the area of health care qui tam litigation.

106.    During the pendency of the motion to dismiss, the parties started to conduct what quickly became and remained heavily litigated discovery. In fact, the very first contested motion in this case concerned the taking of Dr. Franklin's deposition. On July 3, 2000, even before it

45

had filed its motion to dismiss, Warner Lambert unilaterally noticed Dr. Franklin's deposition for some time in August 2000. Due to work-related obligations, these dates were inconvenient for Dr. Franklin and I requested a one-month extension until mid-September. Characteristic of the Defendants' hardball litigation tactics, Defendants' counsel refused to agree to this postponement and required me to move for a protective order, which the court granted on August 3, 2000.

107.    Obtaining discovery from the Defendants was difficult and extraordinarily time-consuming. On August 22, 2000, I propounded 40 requests for production of documents regarding the most basic topics in the litigation, such as Defendant's marketing of Neurontin, documents relating to its medical liaison program and its involvement with purportedly independent companies that hosted programs on off-label uses of Neurontin. The mere drafting of this request, given its breadth, required a significant amount of effort by my associate, Ilyas Rona, and me.

108.    The Defendants responded with a plethora of objections and even though they theoretically conceded that some of the documents were not objectionable, they would not produce documents acknowledged to be discoverable until their objections to requests with a broader scope were decided. Defendants also claimed that because they were intending to produce a narrow set of the documents that had previously been produced to the United States government, they had no obligation to search their files to see if any additional documents were responsive to the Relator's "broader requests." In essence, their main objection was that because Defendants had produced numerous documents for the United States, they did not have to do an independent search for those documents that were relevant to the Relator's case.

109.    Additionally, Warner Lambert refused to produce any documents, even non-confidential documents, until the Relator had agreed to a confidentiality order. Yet, Defendants'

46

proposal for its confidentiality order was completely unreasonable in that they refused to permit the Relator to provide allegedly confidential information he had learned through discovery to the real party in interest, the United States; they refused to permit the Relator to provide any information relating to the identity of doctors who prescribed Neurontin, which the Relator learned from reviewing such documents, to HCFA or state Medicaid authorities; and they refused to acknowledge that any information Relator had gained as a result of his own investigation of third parties should not be subject to confidentiality restrictions.

110.    There was substantial litigation on Relator's Motion to Compel Production of Documents and the parties' dispute over the terms of the Confidentiality Order.  See Motion by David Franklin to Compel Production of Documents, Docket 81; Memorandum by David Franklin In Support of Motion to Compel Production of Documents, Docket 82; Motion by David Franklin For Leave To File Opposition To Defendant's Motion For Protective Order And Reply To Defendant's Opposition To Relator's Motion To Compel Production Of Documents, Docket 92; Response by David Franklin In Opposition To Motion For Protective Order Limiting The Disclosure Of Confidential Documents, Docket 93; and Affidavit of Thomas M. Greene Re: Opposition Response To Defendant's Motion For Protective Order, Docket 94.  I spent many hours having conference calls with Defendants' counsel, exchanging letters with them, and drafting the court documents.  These disputes were initially heard by the court at the January 9, 2001 hearing, referred to Magistrate Judge Cohen for decision after the court's ruling on the Motion to Dismiss, and were ultimately reviewed again by the Court when the Relator appealed Magistrate Cohen's decision.  I spent a significant amount of time preparing for these hearings as well.  Ultimately, the Court will recall that it granted Relator substantial relief from Magistrate Cohen's rulings.

111.    In its ruling denying Defendants' motion to dismiss, the court required the Relator to re-plead his False Claims Act causes of action so they would incorporate the detail set forth in the Relator's written disclosure. By that time, in early 2001, the Defendants had finally produced documents responsive to the Relator's second request for production of documents. After a lengthy process reviewing those documents, described above, the Relator was prepared to amend his complaint to incorporate not only the original allegations, contained in the disclosure but to also set forth detailed information relating to the off-label promotion of Neurontin gleaned from the documents produced.   With the help of Michael Tabb and Ilyas Rona, I spent a considerable amount of time reviewing the original disclosure as well as the new documents and the index of those documents.  The other attorneys and I also spent a considerable amount of time drafting the Amended Complaint, which was 40 pages and contained numerous exhibits.

112.    In addition to the new allegations, the amended complaint also greatly simplified the structure of the Relator's allegations, consolidating the original nine counts into two:  one count for violation of the False Claims Act through causing the submission of ineligible Medicaid prescriptions and a second count for violating the False Claims Act through payment of unlawful kickbacks.  The Relator's kickback count had been dismissed for technical reasons in the Court's ruling on the Motion to Dismiss but the Relator believed, as reformulated, the kickback count stated a cause of action.  Accordingly, on July 25, 2001, I filed both an amended complaint and a motion to amend in order to proceed on our reformulated kickback theory.  See Motion by David Franklin For Leave To Amend Relator's Count For Violation Of The False Claims Act Due To Payment Of Kickbacks, Docket 111; Memorandum by David Franklin In Support Of [111-1] Motion For Leave To Amend Relator's Count For Violation Of The False Claims Act Due To Payment Of Kickbacks, Docket 112; Motion by David Franklin To Supplant

48

Amended Complaint With Attached Amended Complaint, Docket 117. Extensive briefing accompanied the motion to amend, including many hours spent drafting the motion and a reply brief. I also spent considerable time preparing for the hearing on motion to amend the complaint that was held on January 9, 2002. On February 6, the court denied the Relator's motion to amend. The Court acknowledged that the Relator's reformulated second count stated a cause of action but believed that the addition of a broad kickback count five years after the initial filing of the lawsuit was untimely.

113. In the summer of 2001, I turned my attention to a set of laws that was newer than the federal False Claims Act ("FCA"), namely state false claim statutes that had been enacted in approximately 10 states. In most cases, these state acts were modeled after the federal FCA. My research showed that the same conduct which would constitute a federal false claim would also constitute a false claim in those states with an FCA. This is because each Medicaid claim for reimbursement for a prescription drug is paid with a blend of both federal and state dollars. In August 2001, the Relator moved ex parte (due to similar sealing requirements contained in the state statute) to file a second amended complaint which would include additional counts under 10 state false claim act statutes but in all other respects was the same as the previous amended complaint. Despite the motion, and a motion to reconsider, the Court refused to allow the second amended complaint. For this reason, I drafted, with the assistance of Michael Tabb and Ilyas Rona, a complaint for a separate action under diversity jurisdiction asserting violations of the state FCAs. This action is Commonwealth of Massachusetts ex rel. Franklin v. Pfizer, Inc., 03-11-75-PBS (D. Mass).[1]

---

[1] Under the state False Claims Act statutes, Dr. Franklin would be entitled to attorneys' fees after a successful resolution of the case. The global settlement has resulted in a substantial judgment to the various states, and those states with state qui tam laws have agreed to pay the Relator a portion of their recovery. Accordingly, we are also seeking recovery of attorneys' fees Dr. Franklin would be entitled to under the state's statutes. However, because

114.    At the same time that I attempted to amend the complaint, I also moved for a

substitution of parties based on Pfizer, Inc.'s acquisition of Defendant, Warner Lambert.  The

court ultimately allowed the substitution and ordered that both parties be listed as Defendants.

For what appeared to be predominately public relations reasons, counsel for Defendants

emphatically opposed this motion and substantial time was devoted to what would ordinarily be

a routine filing.

115.    Another example of the difficulty Relator had getting routine information from

the Defendants is the Relator's Notice of Default filed on or about March 25, 2002.  See

Relator's Notice of Default as to Parke-Davis, Docket 164.  Although Defendants never objected

to Count One of the Relator's amended complaint and the court had definitively ruled on the

amended complaint by February 6, 2002, by late March 2002, Defendants had still never

answered Relator's complaint.  Under my supervision, my office drafted a notice of default,

which succeeded in obtaining an answer to the Relator's complaint.

116.    In a previous Order (February 6, 2002), the Court noted that the parties were

sealing far too many exhibits including documents "not even arguably confidential."  Based on

this order, I filed on March 20, 2002 what would be the first of numerous court filings relating to

Defendants' excessive designation of confidentiality.  See Relator's Motion by David Franklin to

Unseal Exhibits to Amended Complaint, Docket 163.  Initially, the specific designations targeted

were the documents attached to the Relator's amended complaint, most of which related to

events and marketing tactics that occurred in 1995, 1996 and 1997, many years before the filing

of the unsealing motion.  I sought to unseal the exhibits to the complaint on the grounds that such

---

the work our firm performed for the state case is so closely related to the work we preformed for the federal case we
are submitting a single fee application to recover all attorneys' fees the Relator is entitled to receive under state and
federal qui tam actions.  In the global settlement agreement, the Relator reserved his rights to collect any fees he was
entitled to receive under all state and federal statutes by filing this fee application.

50

materials could no longer constitute confidential commercial information. The Court's ruling became the basis of most of the unsealing of non-confidential information that later occurred in the action. Nevertheless, this challenge required many hours to review each document and draft arguments indicating why the document was no longer confidential.

117.    In April 2002, a dispute arose between the parties relating to the deposition of the Defendants. The incident is yet another example of the ferocity of the defendants' litigation tactics. On March 15, 2002, the Relator had noticed the deposition of a corporate representative of the Defendants pursuant to Rule 30(b)(6), scheduled to begin on April 29, 2002. For weeks, the Relator heard nothing until April 15, 2002 when the Defendants served a purported "objection" to the corporate representative deposition. Defendants essentially objected to all of the topics set forth in the Relator's notice of deposition and attempted to redefine the areas of inquiry to those of its own choosing without, however, filing a motion for a protective order. Defendants claimed, without supporting evidence, that it could not produce witnesses who could testify to the substantive areas, notwithstanding six weeks of advance notice, and would only produce an individual who would testify about the location of relevant documents. This witness later turned out to be an associate at the law firm representing the Defendants. I spent considerable time engaging in extensive communications with counsel for the Defendants relating to disagreements over the topics that would be covered, the identities of the witnesses who would be produced, and the time when such people could be deposed. I also agreed to a two-week extension on the production of witnesses with substantive knowledge. On the Friday before the first session of the corporate representative deposition was scheduled to take place, Defendants filed an emergency motion seeking a court order. See Motion by Parke-Davis for Protective Order, Docket 174; Affidavit of Martine M. Beamon In Support Of Motion For

51

Protective Order, Docket 175; Memorandum of Law by Parke-Davis in Support of Affidavit Motion for Protective Order, Docket 176.  The court promptly denied the motion, bluntly stating, "the deposition shall go forward."  The deposition did commence, but the Relator was forced several months later, on July 29, 2002, to file a motion to compel production of a corporate representative on two topics in Relator's Rule 30(b)(6) notice for which Pfizer refused to produce a witness.  These motions and the negotiations that surrounded them required me to expend significant time and further delayed the taking of deposition testimony.  Ultimately, Magistrate Judge Cohen did compel Defendants to produce a witness to testify relating to Medicaid topics set forth in Relator's notice of corporate representative deposition.

118.    On June 13, 2002, four news entities, The New York Times Company, National Broadcasting Company, Inc., National Public Radio, Inc. and the Boston Globe ("Media Entities") moved to intervene to obtain access to discovery materials, which the Defendants had designated to be confidential pursuant to the protective order, but which they contended did not constitute confidential commercial information pursuant to Rule 26(c)(7).  See Motion by New York Times Co., Boston Globe, National Broadcasting, National Public Radio to Intervene and to Modify Protective Order, Docket 177.  The Media Entities moved to modify the protective order so such information would no longer be protected.  The Media Entities' motion set off another round of briefing relating to the proper scope of confidentiality and whether marketing plans superceded long ago could constitute confidential commercial information warranting their protection from disclosure.  See Appendix by David Franklin in Support of Relator's Response to Proposed Intervenors' Motion to Modify Protective Order, Docket 194;  Appendix/Exhibits by David Franklin in Support of Reply to Proposed Intervenors' Motion, Docket 195; Appendix/Exhibits by David Franklin in Support of Reply to Proposed Intervenors' Motion,

Docket 196; Appendix/Exhibits by David Franklin in Support of Reply to Proposed Intervenors'

Motion, Docket 197; Memorandum by New York Times Co., Boston Globe, National

Broadcasting Re: Recusal Under 28:455(a), Docket 198; Memorandum by Parke-Davis, Pfizer,

Inc. in Opposition to Motion to Intervene to Oppose Motion to Modify Protective Order; Docket

199; Motion by Parke-Davis, Pfizer, Inc. for Leave to File Memorandum in Excess of 20 Pages,

Docket 200; Response by Parke-Davis, Pfizer, Inc. in Opposition to Motion to Modify Protective

Order, Docket 201; Motion by New York Times Co., National Broadcasting for Leave to File

Reply Memorandum, Docket 202; Memorandum by Parke-Davis, Pfizer, Inc. in Opposition to

Motion to Intervene to Oppose Motion to Modify Protective Order; Docket 204; Motion by New

York Times Co., Boston Globe, National Broadcasting to Unseal All Documents Not Designated

as Confidential, Docket 205; Memorandum of law by New York Times Co., Boston Globe,

National Broadcasting Re: Addressing a Question Raised by the Court at the 7/19/02 Hearing,

Docket 206; Memorandum by Parke-Davis, Pfizer, Inc. in Opposition to Motion to Unseal All

Documents Not Designated as Confidential, Docket 207; Motion by Relator, David Franklin to

Compel Designation of a Corporate Representative on Medicaid Topics and to Impose

Sanctions, Docket 208; Memorandum by David Franklin in Support of Motion to Compel

Designation of a Corporate Representative on Medicaid Topics, Docket 209; Motion by Parke-

Davis, Pfizer, Inc. to Extend Time to 8/6/02 to Send Substantial Portions of The Designated

Documents To The Relator, Docket 211.  I spent a substantial number of hours conferring with

counsel for the Media Entities about their motion.  I also spent a substantial number of hours

reviewing the Defendants' confidentiality designations and identifying those that appeared to be

inappropriate.  I also spent a number of hours preparing for the hearing, which was held on July

19, 2002.  On October 10, 2002, the Court issued its decision, essentially adopting the Relator's

53

position. This decision, published at 210 F.R.D. 257 (D. Mass. 2002), was the second major

opinion issued by the court in this case and is an important decision on the use and abuse of

confidentiality provisions.

119.    The decision is also important because the court recognized the intensity of

litigation between the parties. The court noted that the Defendants were "sophisticated parties

well represented by counsel" and who:

> Have aggressively litigated this case to date: battling over the
> words of the protective order before the magistrate judge;
> appealing his order to this Court; haggling over the scope of
> discovery; and overasserting confidentiality of produced
> documents. Litigation over the protective order itself spanned
> fourteen months, involved seventeen separate docket entries, four
> briefs and three court hearings… Finally, "expedited" has not been
> an adjective to describe defense of this litigation.

210 F.R.D. at 260.

120.    As the date for non-expert discovery came to a close, several additional disputes

between the parties arose. On August 5th, I had to file a motion to compel Defendants to provide

the social security numbers of former Warner Lambert employees (to be used to ascertain their

current addresses) so that I could subpoena those individuals prior to the discovery deadline. See

Emergency Motion by David Franklin to Provide Social Security Numbers with Responses to

Interrogatories, Docket 212. On August 14, 2002, I was forced to notice the deposition of one

former employee's parents in North Carolina because the Defendants would not provide an

address for that employee, although attorneys retained by Defendants were in contact with the

witness (who had moved to England). I spent numerous hours at first negotiating these issues

with Defendants' counsel unsuccessfully and then drafting and filing the resulting court filings.

This is another example of the Defendants' hardball litigation tactics that were clearly designed

to obstruct access to critical information and wear down the opposing parties.

121.    Another example of Defendants' unwillingness to provide discovery to the Relator was their refusal to permit the Relator to take more than the standard 10 depositions notwithstanding the extensive scope of the case and Defendants' position regarding the specificity of evidence that Realtor had to establish in order to recover.  On September 17, 2002, I was required to file an emergency motion to take three additional depositions.  The court granted the motion on September 18, 2002.  See Motion by Relator, David Franklin for Leave to Take More Than Ten Depositions, Docket 237.

122.    On October 15, 2002, I was compelled to move to extend the time for filing expert reports because of the impossibility of obtaining Medicaid data that the Relator's experts needed to review in order to assemble their expert report.  See Motion by David Franklin to Extend Time to 45 Days After State/Fed Gov'ts to Make Disclosures of Expert Testimony, Docket 246.  Given the importance of expert testimony to the Relator's case, which is described more fully in Sections I and VI of the Affidavit, this was an important motion, which was hard fought by the parties.  I spent a considerable amount of time drafting the motion to enlarge time to produce the expert report.  I also spent a considerable amount of time in phone conferences with the experts and David Waterbury on when the data might be available and how soon it could be turned around.  I also had frequent meetings with Ilyas Rona, who was coordinating the subpoena enforcement activities, about which states could provide data and by what date.  I also spent a significant amount of time preparing for the hearing, which was held on November 12, 2002.  The Court ultimately permitted additional time for the Relator to make expert disclosures.

123.    At the November 12th hearing, the Court granted Relator leave to take the deposition of a third party, Verispan, LLC, a data collection company which in the ordinary course of its business surveys physicians about statements made to them by pharmaceutical sales

55

representatives. This survey data is then sold to the pharmaceutical companies as a product known as "verbatims," which allows drug companies to monitor the sales messages of their companies and their competitors. It is also a tool to evaluate the effectiveness of marketing strategies and the efficacy of individual sales representatives. The Relator believed that verbatim documentation would identify doctors who received off-label marketing from Pfizer. Verispan, however, believed that its verbatim data was confidential, and initially refused to produce verbatims responsive to the Relator's request and to identify the physicians who provided such information. Verispan's position required the Relator to file a motion to compel enforcement with a subpoena duces tecum in the Eastern District of Pennsylvania in February 2003. Attorneys in my office and I had to spend a significant amount of time hiring and conferring with local counsel, overseeing the drafting and filing of an extensive memorandum in a foreign court, and preparing for and participating in at least two telephonic hearings that were held on the matter. Ultimately, after substantial negotiation, an agreement was entered into by which Verispan identified the physicians to a third party, state Medicaid employees who obtained the necessary Medicaid billing information but kept the identity of the physician confidential. The value of this information is described in the following section.

124.    On April 14, 2003, Defendants filed a motion for summary judgment. As this court is aware, the motion asserted that the Relator did not have specific evidence to prove Warner Lambert caused the submission of ineligible Medicaid prescriptions, claimed that the Relator was required to prove that false statements were made to physicians, and that the Relator had no evidence of such false statements or that the false statements caused the submission of ineligible Medicaid prescriptions.

56

125.    Defendants' summary judgment motion raised legal and evidentiary arguments, which were later successfully rebutted. One of Defendants' major contentions was that for each "false claim," the Relator was required to show that the submission of the claim had been caused by false statements made by the Defendants, as opposed to Defendants simply marketing products that were ineligible for Medicaid reimbursement. Relator successfully argued that it was not required to prove that Defendants' agents uttered false statements in connection with alleged false claims; the Relator could recover if he proved that the Defendants made true statements knowing that such truthful statements would result in the filing of claims that were ineligible for Medicaid reimbursement.

126.    However, the Relator produced evidence establishing that the statements made by the Defendants, whether true or false, caused individual doctors to write Medicaid prescriptions that were not covered. The Relator also produced evidence cataloguing false statements made to specific physicians. Additionally, the Relator produced affidavits from various states establishing that had the state agencies known that the prescriptions were being submitted for off-label purposes, they would not have authorized reimbursement.

127.    Assembly of materials to oppose summary judgment was a massive project. For approximately two months, Michael Tabb, Ilyas Rona, and I worked on almost nothing else. In the last few weeks before the opposition was filed, we three attorneys, plus one paralegal, were in the office from morning until late evening, and frequently until the early hours of the next morning, seven days a week. During this period, we were only able to take off a half day for Mother's Day. I spent an enormous amount of time drafting and editing the opposition, drafting and editing my affidavit, drafting and editing the separate statement of undisputed facts, drafting and editing the response to the Defendants' statement of undisputed facts, reviewing affidavits of

state Medicaid officials, the experts, David Waterbury, my associate Ilyas Rona and my client

Dr. Franklin. I also had several meetings and telephone conversations with the various

witnesses, experts, government officials who were involved, discussing all of the attendant legal

and factual issues.

128.    The record we assembled in opposition to summary judgment was massive. It

contained approximately nineteen volumes, containing more than 150 exhibits. The final project

filled three bankers' boxes and was filed with the Court. This filing itself summarizes the work

that my staff and I performed. <u>See</u> <u>Assented To Motion to Supplement Relator's Separate</u>

<u>Statement of Disputed Material Facts with the Attached Corrected Version of Same by David</u>

<u>Franklin</u>, Docket 306; <u>Relator's Response to Defts Statement of Alleged Undisputed Material</u>

<u>Facts</u>, Docket 307; <u>Motion for Leave to File Excess Pages in Opposition to Summary Judgment</u>

<u>Motion by David Franklin, USA</u>, Docket 308; <u>Memorandum in Opposition Re Motion for</u>

<u>Summary Judgment Filed by David Franklin</u>, Docket 311; <u>Affidavit in Support Re Pltfs</u>

<u>Memorandum in Opposition to Motion for S/J</u>, Docket 312; <u>Affidavit of Alan S. White in</u>

<u>Support Re Memorandum in Opposition to Motion for S/J</u>, Docket 313; <u>Affidavit of Jeffrey F.</u>

<u>Wells in Support Re Memorandum in Opposition to Motion for S/J</u>, Docket 314; <u>Affidavit of</u>

<u>Lynne Read in Support re Memorandum in Opposition to Motion for S/J</u>, Docket 315; <u>Affidavit</u>

<u>of Martha McNeill In Support Re Memorandum In Opposition To Motion For S/J</u>, Docket 316;

<u>Affidavit of Mary Ann McNeil In Support Re Memorandum In Opposition To Motion For S/J</u>,

Docket 317; <u>Affidavit of Sharman Leinwand In Support Re Memorandum In Opposition To</u>

<u>Motion For S/J</u>, Docket 318; <u>Affidavit of Edward J. Vaccaro In Support Re Memorandum In</u>

<u>Opposition To Motion For S/J</u>, Docket 319; <u>Affidavit of Nancy Nesser In Support Re</u>

<u>Memorandum In Opposition To Motion For S/J</u>, Docket 320; <u>Affidavit of Paul Jeffrey In</u>

Support Re Memorandum In Opposition To Motion For S/J, Docket 321; Affidavit of Philip Soule In Support Re Memorandum In Opposition To Motion For S/J, Docket 322; Exhibits Vol 1; 1-23 In Support Re Affidavit By Thomas Green In Support of Opposition To S/J Motion By David Franklin.. Related Document: Affidavit In Support, Docket 323; Exhibits Volume 2;24-41 In Support of Affidavit By Thomas Greene In Support Opposition To S/J Motion By David Franklin.. Related Document: Affidavit In Support, Docket 324; Exhibits Vol 3; 42-60 In Support Re Affidavit of Thomas Greene In Support of Opposition To S/J By David Franklin.. Related Document: Affidavit In Support, Docket 325; Exhibits Vol 4; Exh 61; Part 1; A-G In Support Re Affidavit of Thomas Greene In Support By David Franklin.. Related Document: Affidavit In Support, Docket 326; Exhibits Vol 5; Exh 61; Part 2; H-O Re Affidavit of Thomas Greene In Support By David Franklin.. Related Document: Affidavit In Support, Docket 327; Exhibits Vol 6; Ex 61; Part 3; P-Z In Support Re Affidavit of Thomas Greene In Support By David Franklin.. Related Document: Affidavit In Support, Docket 328; Exhibits Vol 7 Exh 62-87 In Support Re Affidavit of Thomas Greene In Support By David Franklin.. Related Document: Affidavit In Support, Docket 329; Exhibits Vol 1; 9-50 In Support Re Affidavit of Thomas Greene In Support of Motion By David Franklin.. Related Document: Affidavit In Support, Docket 330; Exhibits Vol II Exh 55-97 Part 1 In Support Re Affidavit of Thomas Greene In Support By David Franklin.. Related Document: Affidavit In Support, Docket 331; Exhibits Vol III; Exh 97 Part 2 In Support Re Affidavit of Thomas Green In Support By David Franklin.. Related Document: Affidavit In Support, Docket 332; Exhibits Vol IV Part 3 In Support Re Affidavit of Thomas Greene In Support By David Franklin.. Related Document: Affidavit In Support, Docket 333; Exhibits Vol V 99-101 In Support Re Affidavit of Thomas Greene In Support By David Franklin.. Related Document: Affidavit In Support, Docket 334;

59

Exhibits Vol VI; 104-133 In Support Re  Affidavit of Thomas Greene In Support By David Franklin.. Related Document:  Affidavit In Support, Docket 335; Exhibits Vol VII Exh 134 In Support Re  Affidavit of Thomas Greene In Support By David Franklin.. Related Document: Affidavit In Support, Docket 336; Exhibits Vol VIII 135-177 In Support Re  Affidavit of Thomas Greene In Support By David Franklin.. Related Document:  Affidavit In Support, Docket 337; Affidavit of David Waterbury In Support Re  Memorandum In Opposition To S/J Motion, Docket 338; Affidavit of Anthony Megathlin In Support Re  Memorandum In Opposition To S/J Motion, Docket 339; Affidavit of Ilyas J. Rona In Support Re  Memorandum In Opposition To S/J Motion, Docket 340; Affidavit of C. Seth Landefeld And Michael Steiman In Support Re  Memorandum In Opposition To S/J Motion, Docket 341; Affidavit of David Franklin In Support Re  Memorandum In Opposition To S/J Motion, Docket 342; Affidavit of Debra Farese In Support Re  Memorandum In Opposition To S/J Motion, Docket 343; Exhibits Vol 8; 88-115 Re  Affidavit of Thomas Greene In Support By David Franklin.. Related Document:  Affidavit In Support, Docket 344; Exhibits Vol 9; 116-149 Re  Affidavit of Thomas Greene In Support By David Franklin.. Related Document:  Affidavit In Support, Docket 345; Exhibits Vol 10; 150-166 Re  Affidavit of Thomas Greene In Support By David Franklin.. Related Document:  Affidavit In Support, Docket 346; Exhibits Vol 10; 167-183 Re  Affidavit of Thomas Greene In Support By David Franklin.. Related Document:  Affidavit In Support, Docket 347; Relator's Separate Statement of Disputed Material Facts, Docket 355.

129.    The Relator's opposition filings set forth extensive evidence showing a policy of off-label promotion, and that specific doctors who heard such promotions did increase their Medicaid off-label prescriptions and therefore submitted Medicaid subscriptions for off-label purposes when they would not have likely done so but for the off-label promotion.  It also

60

detailed numerous false statements made to numerous physicians who proceeded to write a large number of prescriptions for off-label uses of Neurontin to Medicaid patients for a variety of uses that were ineligible for Medicaid coverage. Once all the filings were completed, a hearing was scheduled in June 2003. I spent a significant amount of time preparing for this hearing. On August 22, 2003, the court denied Defendants' motion for summary judgment, adopting most of the positions we had argued in our opposition.

130.    Shortly after we had submitted our opposition to summary judgment, I learned at least one and possibly two third party witnesses had not produced all relevant documents to us that evidenced off-label marketing by the Defendants. On June 13, 2003, I filed a conditional Rule 56 Motion to delay final determination of summary judgment until my office had had a chance to review these documents. See Relator's Conditional Rule 56(f) Motion to Delay Final Determination of Summary Judgment by David Franklin, Docket 358. The court refused to grant the motion but ordered us to examine the documents. There were several boxes of documents, which were in the custody of the U.S. Attorney's office. Under my supervision, an attorney and a paralegal reviewed these documents. I then received a number of documents that evidenced additional off-label marketing of which I was not previously aware. I was in the process of assembling and reviewing those documents when an agreement in principle was reached regarding settlement of this action, the state qui tam action and the criminal charges being considered by the U.S. Attorney. At that time, I ceased active work on litigation and shifted my focus to finalizing a universal settlement of all outstanding issues.

VI.    **Analysis of Evidence, Creation of Work-Product and Preparation of Case**

131.    One of the most challenging aspects of this case was its sheer size and scope. Through discovery, we received in excess of 200,000 pages of documents produced in 84

banker's boxes from the Defendants. The mere act of reviewing these documents took me and an associate several months to complete. The work did not end there. Unless we created a system to categorize, review and retrieve documents, we would never be able to marshal the necessary evidence. Under my supervision, we created and implemented several different mechanisms to extract and organize relevant information.

132. First, Ilyas Rona and I created an index of the more than 200,000 documents. This index took several months of nearly full time work to complete. A hardcopy of the finished document is 173 pages long. The electronic version is searchable. Once completed, our office spent numerous man-hours searching the index for particular documents relating to a variety of subjects or people. For example, before each deposition, the index would be searched to make sure that we had obtained all known documents relating to the deponent.

133. Second, under my supervision, my office created a work-file system. The work-file system was a continuously expanding file system containing documents deemed to be relevant in this case. While not exhaustive, it contained a comprehensive list of topics, people, companies, and types of documents that I created during the review of documents. This list was continuously augmented as new topics, people, companies, and types of documents were discovered. Documents pertaining to each issue-area were placed in a file folder with a serial number matching the topic list. These files filled seven banker's boxes. Some of the documents were then indexed and placed chronologically into roughly a dozen three-ring binders. The creation, maintenance, augmentation, and searching within this system consumed countless hours of my time, as well as my associate's, and the office staff's.

134. The nature of the pharmaceutical industry also presented a significant challenge. Unlike a typical fraud case, where the wrongdoer and the victim directly interact, in this case

Parke-Davis did not interact with Medicaid patients. Parke-Davis marketed the drug to thousands of physicians, and lavished money on thousands more to prescribe the drug, often in the form of gifts, honoraria, resort vacations, and grants. These physicians in turn wrote prescriptions for Medicaid patients, who in turn presented their prescriptions to pharmacies, who in turn submitted claims against the Medicaid system for reimbursement. In order to connect specific claims to Parke-Davis, we needed a comprehensive list of the doctors involved in the marketing of Neurontin.

135.    There was, however, no such list of doctors. The Defendants never produced such a list, instead referring the Relator to find references to doctors scattered over the nearly 200,000 documents. I directed my staff, as well as some independent contractors that I hired, to go through the entire 84 boxes of documents, and enter each reference of payment to a doctor and each instance of attendance of a doctor at a marketing event. The data was entered into Microsoft Excel, so that the records could be sorted and searched by any of a number of different variables. The finished product, a three-volume 754-page compilation containing more than 10,000 payments to more than 3,000 physicians, arranged alphabetically, was called the "Payment Register." See Exhibits Vol 4; Exh 61; Part 1; A-G in Support Re Affidavit Of Thomas Greene In Support By David Franklin, Related Document: Affidavit In Support, Docket 326; Exhibits Vol 5; Exh 61; Part 2; H-O Re Affidavit Of Thomas Greene In Support By David Franklin.. Related Document: Affidavit In Support, Docket 327; Exhibits Vol 6; Ex 61; Part 3; P-Z In Support Re Affidavit Of Thomas Greene In Support By David Franklin. Related Document: Affidavit In Support, Docket 328. This project took several months and required Ilyas Rona and me to spend many hours closely supervising the entry of all data, resolving conflicts in the data (e.g., answering questions such as "Is Dr. B.J. Wilder the same as Billy Joe Wilder?") and

organizing the finished project so it could be presented to the United States Attorney's Office, to our experts, and ultimately to the Court. The Payment Register would prove to be the most used reference in the office over the next two years.

136.    Another valuable reference tool was the "Off-label Marketing Events" books that we created, which was a four-volume set of marketing documents relating to off-label marketing activities. These include the many notorious junkets for doctors in such places as West Palm Beach, FL, Jupiter Beach, Fl, and La Costa, CA. On or about September 2002, the United States Attorney's Office requested information relating to off-label marketing events. I was informed that Defendants' counsel had taken the position that to the extent that off-label marketing had occurred, it only took place between October 1995 and December 1996. The U.S. Attorney's Office asked me to determine whether or not Parke-Davis engaged in off-label marketing outside of that time period, either prior to October 1995 or from 1997 onwards. Under my supervision, Ilyas Rona and two law clerks worked many days searching through the documents index, the Payment Register and my work file system and culled together all documents relating to marketing events. This process yielded partial records for many off-label events. I reviewed these results and determined that it was necessary to search through the entire 200,000 documents produced by the Defendants and locate records necessary to make our collection complete. This secondary review took another couple of days, and we produced as complete a record as possible. When completed, Ilyas Rona and I reviewed these event-documents for off-label content. Once the list of off-label events was determined, the event-documents were bound together in a four-volume set of notebooks. This was then made available to the United States Attorney's Office. In preparation for opposing the Defendants' summary judgment motion, these off-label event notebooks proved to be very valuable. However, due to the nature of the

64

government's request – seeking only events October 1995 and December 1996 – the "off-label events" notebooks did not include events from late 1995 through the end of 1996. Thus, using the same methodology as described above, and a proportional amount of time, my office obtained the records for off-label events during that time period as well. Once completed, the "off-label events" notebooks served as a valuable source for identifying physicians who promoted off-label Neurontin use and Parke-Davis's off-label marketing event agenda.

137. Vital to the Relator's case was evidence that Parke-Davis's upper level management intentionally engaged in, and thus knowingly, caused a fraudulent marketing campaign. For this reason, the Relator spent considerable time reviewing documents that were generated by or presented to upper level management. A key source of this information was the minutes from monthly meetings of the Neurontin Development Team, an interdisciplinary committee of managers from the medical affairs, regulatory, marketing, and legal departments. Although the Defendants never produced the minutes for every monthly meeting, they produced a significant number of them from 1994 to 1998. These minutes contained a wealth of detailed information, including the status of clinical trials for various off-label uses; the regulatory position of various off-label uses vis-à-vis the FDA; the patent protection for various off-label uses; and the marketing strategy for various off-label uses. A considerable amount of time was spent searching for and retrieving these minutes, reviewing them, organizing them chronologically, and summarizing them across the many relevant issues. I routinely met with Ilyas Rona to discuss the significance and content of these documents. This was especially true as new issues emerged in the case. Ultimately, the careful review of these minutes was successful in demonstrating that Parke-Davis's conduct was intentionally coordinated at the highest levels, and was not the isolated actions of rogue sales representatives.

138.    A considerable amount of time was also spent reviewing the various Marketing

Assessments and Indication Decision Analysis memoranda prepared by Parke-Davis for various

indications including psychiatric, migraine and pain uses.  These documents contained detailed

descriptions of the scientific basis for the indications, the status of clinical trials, and the market

share that Parke-Davis hoped to capture through off-label marketing.  Ilyas Rona and I spent

many hours carefully reviewing these documents and discussing the dense information that was

contained therein.  A careful review of these documents was instrumental in demonstrating that

the actual sales of Neurontin, including those to Medicaid, were the intended consequence of

Parke-Davis marketing plans.

139.    Counsel for the Defendants argued that all off-label uses were authorized under

the Medicaid statute.  The argument advanced by the Defendants is in essence that (a) DrugDex

was added as a recognized Medicaid compendium in August 1997, (b) DrugDex "supports"

numerous off-label uses, and (c) therefore, all off-label uses are covered under Medicaid.  As

mentioned above, under my supervision, my office performed a comprehensive, preliminary

review of DrugDex to determine which uses of Neurontin, if any, were "supported" by DrugDex.

It is my understanding that until our expert Dr. Linder performed his review, this was a first-of-

its kind analysis of the scope of Medicaid coverage.  Based on this review, which required the

reviewing and synthesizing of hundreds of journal articles, covering roughly 50 separate

indications listed in a dozen different iterations of DrugDex (DrugDex is published quarterly),

we were able to determine with a high degree of accuracy (our experts only disagreed with our

preliminary findings on one out of the roughly 50 indications) that nearly all of the proposed

indications were not supported by DrugDex.  This was a complex project, consuming many

hours of attorney and staff time.  We then prepared this analysis in a series of color charts,

depicting each proposed indication, and depicting when (if ever) such indication became

"supported" by DrugDex. This preparation took several hours and required numerous meetings

between Ilyas Rona and me. This finished product confirmed our consistently held position that

only a small fraction of Neurontin's proposed indications were "medically accepted indications"

covered under Medicaid.

140.    As mentioned before, one of the biggest challenges confronting the Relator was to

quantify how much Medicaid was spending on Neurontin, and how much of these expenditures

were for off-label uses. On October 11, 2003, the Defendants produced long-sought data relating

to Medicaid expenditures and off-label utilization in response to Relator's interrogatories. This

data came in two sets. The first set contained quarterly Medicaid claims and expenditures for

Neurontin by state. The second set contained Neurontin's utilization by indication, which was

denoted by the use of an ICD-9 code, which is an internationally recognized classification

system that assigns each indication a code number, generally five- or six-digit number. This data

was also quarterly. Under my supervision, this data was manually entered into Microsoft Excel

so that it could be aggregated and analyzed, a process that took many days of law clerk time. At

that point, Ilyas Rona and the law clerks spent another couple of days reviewing the finished

product for errors and making necessary corrections. Once entered and checked, I and my office

staff began a lengthy process of analyzing the data to determine the following: (1) the growth of

Medicaid expenditures between 1994 to 2000; (2) the growth of total uses (Medicaid and non-

Medicaid) between 1994 and 2000; (3) the proportion of off-label use to total use between 1994

and 2000; and (4) the Medicaid share of off-label use. The analysis of this data took Ilyas Rona

and a law clerk many days of continuous work and required considerable knowledge of

Microsoft Excel's graphing functions. I spent numerous hours reviewing their progress. The

result of this analysis was a fairly powerful set of color charts depicting the dramatic rise of Neurontin off-label use and the concomitant impact on Medicaid. These charts and the underlying data were also a key component of our expert's report in this case. See Relator's Separate Statement of Disputed Material Facts, pages following 97, 102, 105, 107 and 123, Docket 355.

141.    Throughout the entirety of the litigation, Defendants denied that they made any false statements regarding Neurontin. Although we did not believe that we had to prove double falsity (meaning false statement coupled with ineligible reimbursement or false certification), we nevertheless were asked by the Court to proffer evidence relating to specific false statements made to specific doctors. We divided our inquiry into two components. First, did Parke-Davis make false statements regarding Neurontin generally? Second, was there a nexus between false statements to specific doctors and specific false claims?

142.    With respect to the first question, we embarked on a time-consuming review of the statements made to doctors concerning off-label indications. This was a complicated multi-step process. First, we had to determine what would constitute a truthful statement for each indication. Given that Neurontin had dozens of proposed indications, my office had to review hundreds of journal articles to evaluate the efficacy of Neurontin for the studied indication. My office also collected evidence on clinical trials to determine whether the articles themselves fairly reflected the results of the trial. We also had to review the regulatory status of each indication with respect to the FDA. This took a significant amount of time, and required frequent searches of the FDA orange book, Parke-Davis documents, and journal articles. Second, we had to determine whether any statements made by Parke-Davis failed to fairly or accurately state the efficacy of Neurontin for a particular indication. For a handful of events, we

68

possessed transcripts of a speaker's presentation or presentations slides, which indicated the ideas that were communicated to physicians. Reviewing the transcripts proved to be extraordinarily time-consuming, as there were thousands of pages of text covering multiple lectures over multiple days. However, we were able to uncover a myriad of false statements. These generally fell into the following categories: (1) falsely or misleadingly stating that Neurontin was effective for an off-label indication when the evidence showed that it wasn't; (2) falsely or misleadingly stating that there was evidence that Neurontin was effective for an off-label indication when there was no evidence; (3) falsely or misleadingly stating that the FDA approved Neurontin for an off-label indication when it hadn't; (4) falsely or misleadingly stating the Neurontin was more effective at greater doses; and (5) falsely or misleadingly suggesting that Neurontin was effective for a particular indication alone (i.e. monotherapy) rather than as an adjunct to another more effective drug. Ilyas Rona and I spent many days reviewing statements that were discernibly false.

143. Once the false statements were catalogued, we had to turn to the second question: proving a nexus between false statements by the Defendants and the submission of claims to Medicaid. As previously described, difficulty arose because of the nature of the prescription drug industry, in which companies like Parke-Davis do not specifically submit claims to Medicaid. Rather, they set into motion a chain of events whereby physicians write prescriptions, which causes pharmacies to submit claims to Medicaid. However, the Defendants produced very few transcripts of marketing events and no recordings. It was therefore difficult to prove what was or wasn't said to doctors at some events. After some litigation in the District Court for the Eastern District of Pennsylvania, we were able to obtain one valuable piece of evidence – "verbatim" data. As previously mentioned, "verbatims" were survey forms completed by

69

doctors, who recorded marketing messages they received from drug company sales representatives. Once we received this data, my office entered this data into Microsoft Excel so that it could be analyzed. Using a complex series of steps, this data was organized so that it could be analyzed by: the off-label indication espoused; the false statement made; the time and place of the event. This entire process took many hours of work by Ilyas Rona and a law clerk. When completed, our analysis was made available to our experts, who found that the data corroborated the Relator's allegations that doctors were routinely exposed to off-label marketing, false statements, or both. Our analysis was also instrumental in the preparation of our opposition to the motion for summary judgment. For example, we were able to find one psychiatrist who: (1) attended a known off-label marketing event (dinner meeting for psychiatrists); (2) received false statements regarding Neurontin's efficacy (regarding bipolar disorder and other psychiatric uses); and (3) happened to live in a state (Florida) from which we were able to obtain physician-specific Medicaid claims data. Not surprisingly, the Medicaid data showed that this physician immediately began prescribing Neurontin for psychiatric uses, including bipolar disorder.

144.    We were able to establish connections between false statements made to doctors and Medicaid claims using information other than the verbatim data. Using our document index, the payment register, the off-label marketing event notebooks, and my work-files, we were able to locate doctors who had been exposed to false statements within states for which we could obtain Medicaid data. This was a very time-consuming project because although there were so many physicians who attended so many events, the materials had to be reviewed to find the much smaller number of physicians who worked in states for which we could obtain Medicaid data. Once physicians from the key states were identified, my office then had to locate all documents relating to the event or events that the physician attended in order to determine