Moreover, the third-party payors do not and cannot assert that either state law or their contracts with their insureds permit them to avoid reimbursing off-label prescriptions.  In fact, some states have gone so far as to prohibit insurers from refusing to reimburse for prescriptions written for off-label indications.  While some states only require reimbursement for off-label prescriptions for specific conditions, others, such as Alabama, Maryland, New Jersey, New Mexico, North Carolina, North Dakota, Ohio, Tennessee, and Washington have no such limitation and require reimbursement for all medically necessary off-label prescriptions.  See, e.g., Ala. Code § 27-1-10.1 (2005); Md. Ins. Code Ann. § 15-804 (2005); N.D. Cent. Code § 26.1-36-06.1 (2005); N.J. Stat. §§ 17B:26-2.1g, 26:1A-36.9 (2004); Tenn. Code Ann. § 56-7-2352 (2004).  Defendants are unaware of a single state statute that categorically allows insurers to avoid reimbursement of a prescription on the basis that it was written for an off-label use.  Accordingly, the third-party payors have suffered no injury because they do not and cannot allege that they were permitted to decline reimbursement for off-label prescriptions.

## IV.    PLAINTIFFS FAIL TO PLEAD OTHER ESSENTIAL ELEMENTS OF RICO

In addition to the foregoing grounds for dismissal, plaintiffs' RICO claims should be dismissed on the separate and independent grounds that plaintiffs do not adequately allege that the RICO enterprises are associations-in-fact, that defendants operated or managed any of the alleged enterprises, or that defendants committed any RICO predicate acts.

### A.    Plaintiffs Do Not and Cannot Allege Adequately that the Alleged Enterprises Are Associations-in-Fact

This Court has employed a six-factor balancing test to determine whether an alleged association-in-fact meets RICO's heightened pleading requirements.  See In re Pharm. Indus. AWP Litig., 307 F. Supp. 2d 196, 203-04 (D. Mass. 2004).  In addition to satisfying this six-

factor test, a RICO plaintiff must also allege that all of the alleged participants in the association-in-fact knew of the fraudulent nature of the enterprise.  Id. at 207.  In light of the knowledge requirement, the six-factor test, and the heightened RICO pleading requirement, it is clear that plaintiffs' association-in-fact allegations are plainly insufficient as a matter of law.

Plaintiffs fail to allege with heightened particularity that all of the participants in the putative associations-in-fact knew of the allegedly fraudulent nature of the enterprise.  As this Court explained in In re Pharmaceutical Industry AWP Litigation, in order to withstand a motion to dismiss, plaintiffs must "cite sufficient fact[s] to support the allegation[s] that [the participants] kn[e]w of the fraudulent nature" of the enterprise.  Id. at 202.  Plaintiffs have failed to cite any such facts.

Both complaints allege the existence of an overarching enterprise consisting of an alleged association-in-fact comprised of defendants, seven to ten vendors, and twenty-eight named, and innumerable other unnamed, physicians.  (Class Compl. ¶¶ 104, 272-74; Coor. Compl. ¶ 95, 191.)[8]  This enterprise is alleged to have pursued a widespread scheme to "provide favorable information on the off-label use of Neurontin" to physicians through meetings and publications. (Class Compl. ¶ 44; see Coor. Compl. ¶ 30.)  While the complaints are littered with minutiae, nowhere do plaintiffs allege with particularity that all of the participants, including the physician and vendor participants, knew of the allegedly fraudulent nature of the enterprise.  Indeed, the

---

[8] In addition to the "Off-Label Promotion Enterprise," the Class Complaint alleges two "sub-enterprises" – the "Peer-Selling Enterprise" and the "Publication Enterprise" – that purportedly consist of the defendants, physicians, and various combinations of the ten companies that it characterizes as vendors or marketing companies. (Class Compl. ¶¶ 96-107.)  The Coordinated Complaint alleges, in the alternative, seven enterprises in addition to the overarching "Promotion Enterprise," each of which is made up of the defendants, physicians, and one of the seven corporations that it characterizes as vendors.  (Coor. Compl. ¶ 169.)  With respect to all of these sub-enterprises and alternative enterprises, plaintiffs' allegations do not materially differ from the overarching enterprise. For that reason, and given page limitations, defendants do not address each such putative enterprise separately but note that plaintiffs fail to allege their existence adequately for the reasons set forth above.

facts of this case bear remarkable similarity to those in In re Lupron(R) Marketing and Sales

Practices Litigation, in which the court held that "there are no allegations (and it is difficult to

see how there could be) that the thousands of doctors who benefited from [the allegedly

improper behavior] were associated together in any meaningful sense, or were even aware of one

another's existence as participants in a scheme to defraud."  295 F. Supp. 2d 148, 173-74 (D.

Mass. 2003).  The allegations in this case are similarly deficient, comprised of conclusory

allegations that the vendors and participating physicians knew that information provided to

doctors was not "fair and balanced."  (Class Compl. ¶ 56; see also Coor. Compl. ¶ 98.)

Plaintiffs also do not allege a legally sufficient common purpose for the associations-in-

fact.  Plaintiffs allege that the purpose of the enterprise was "to reap unlawful and unfair profits."

(Class Compl. ¶¶ 4, 271; see, e.g., Coor. Compl. ¶¶ 192, 205, 218 ("common purpose of

promoting Neurontin for off-label uses and earning profits therefrom").)  The purpose alleged by

plaintiffs – making money – is inadequate as a matter of law to support allegations of an

association-in-fact.  As this Court explained, a RICO plaintiff must allege "a common purpose

more specific than that common to many human endeavors, the reaping of a profit."  In re

Pharm. Indus. AWP Litig., 307 F. Supp. 2d at 204.

The complaints also do not allege with heightened particularity facts indicating any

systematic linkage between or among the purported participants in the alleged enterprises, such

as overlapping leadership, structural or financial ties, or continuing coordination.  See Libertad v.

Welch, 53 F.3d 428, 443 (1st Cir. 1995).  Satisfaction of this prong is critical to a putative RICO

claim; as the In re Lupron court explained, "[w]ithout the elements of organization and control,

whether informal or formal, and the existence of an association, whether legal or factual, any

group of persons sharing a common occupation, e.g., urologists and lawyers, and a similar motive, e.g., greed, could be held to constitute a RICO enterprise."  295 F. Supp. 2d at 174.

Plaintiffs' allegations of systematic linkage are entirely cursory and insufficient to distinguish these alleged associations-in-fact from any legitimate business arrangement.  In the Coordinated Complaint, plaintiffs allege that the vendors and defendants "maintained systematic linkages between themselves, including continuing coordination between their respective marketing teams" and that the vendors "maintained systematic linkages with the physician participants, including continuing coordination of seminars, events and presentations."  (Coor. Compl. ¶ 64; see also Class Compl. ¶¶ 270-71.)  These non-factual, conclusory, and unsupported allegations are typical of the complaints and demonstrate nothing more than plaintiffs' ability to parrot back key phrases that they have located in the relevant case law.

The only attempts to plead facts supporting plaintiffs' conclusory allegations are the vague assertions that representatives of Cline Davis and Physicians World "sat on Parke-Davis's Extended Neurontin Disease Team" (Coor. Compl. ¶ 40; see id. ¶ 47; see also Class Compl. ¶ 52) and that the defendants outsourced the responsibility for arranging the logistics of certain types of meetings to Physicians World, which employed a number of former Warner-Lambert support staff (Coor. Compl. ¶¶ 55-62; see Class Compl. ¶¶ 69-75).  These assertions also are legally insufficient.  "An association in fact must, inter alia, meet a continuity requirement demonstrating that its members function as a continuing unit shown by hierarchal or consensual decision making structure."  In re Mastercard Int'l Inc., 132 F. Supp. 2d 468, 485 (E.D. La. 2001), aff'd, 313 F.3d 257 (5th Cir. 2002) (internal quotations and citations omitted).  "[T]he mere fact that [the alleged members of the enterprise] have engaged in a business relationship is insufficient to establish that [they] functioned as a continuous unit for RICO purposes."  Id.

19

(quotations omitted); see also George Lussier Enters. v. Subaru of New Eng., Inc., No. C-99-109-B, 2000 WL 1466132, at *3 (D.N.H. Jan. 13, 2000) (rejecting putative association-in-fact on the grounds that the "complaint fail[ed] to provide any factual allegations that would suggest that the [enterprise] is an ongoing organization, that its members function as a continuing unit . . . or that it has a larger structure distinct from the individual franchises that allegedly form its membership.") (citing to Libertad, 53 F.3d at 442).  Plaintiffs' allegations in the instant case – limited to discrete instances of legitimate business interactions – fall well short of an ongoing and "established mechanism for decision-making and direction."  In re Lupron(R) Mktg. & Sales Practices Litig., 295 F. Supp. 2d at 174.

Plaintiffs fail to allege with heightened particularity any common communication network for sharing information on a regular basis.  As with the other factors, plaintiffs limit their allegations to a repetition of the statutory mantra without offering any factual support for these allegations, as is required under RICO's heightened pleading standard.  See, e.g., Timberline Northwest v. Paul Hill, 141 F.3d 1179, 1179 (9th Cir. 1998) ("[The Complaint] simply echoes the language of the RICO statute.  It provides few details as to specific times, places, or roles played by individual defendants in the alleged scheme. . . .  The complaint fails to allege with specificity any of the alleged communications between the parties.").  In place of detailed allegations of a common communication network, plaintiffs allege that vendors and defendants "routinely exchanged letters, memoranda, emails and phone calls," as did the vendors and the physician participants.  (Coor. Compl. ¶¶ 50, 62, 73, 81, 86; see also Class Compl. ¶¶ 64.)  This is patently insufficient.  Cursory allegations that the participants made phone calls and sent letters and emails, without any support or factual detail, is exactly the type of "abusive or

vexatious treatment of defendants" that the RICO's heightened pleading requirement is designed to combat.  Miranda v. Ponce Fed. Bank, 948 F.2d 41, 44 (1st Cir. 1991).[9]

**B.     Plaintiffs Have Not Alleged Adequately that Defendants Had Control over the Alleged Enterprises**

Plaintiffs' RICO claims should be dismissed because plaintiffs have not alleged adequately that defendants operated and managed any of the alleged enterprises.  See 18 U.S.C. § 1962(c); Reves v. Ernst & Young, 507 U.S. 170, 179, 113 S. Ct. 1163, 1170 (1993). Specifically, a plaintiff must allege – with heightened particularity – that the defendant exercised such a degree of control over the enterprise that the person operated and managed the enterprise. See Reves, 507 U.S. at 183.  This standard is demanding:  even if a defendant "had substantial persuasive power to induce management [of the enterprise] to take certain actions, this is still not equivalent to having power to conduct or participate directly or indirectly in the affairs of [the enterprise]."  Bowdoin Constr. Corp. v. R.I. Hosp. Trust Nat'l Bank, 869 F. Supp. 1004, 1009 (D. Mass. 1994) (internal quotations omitted), aff'd sub nom. Schultz v. R.I. Hosp., 94 F.3d 721 (1st Cir. 1996).

Plaintiffs offer no facts to support any allegation of control.  Plaintiffs' shortcomings include a failure to allege facts indicating that defendants installed any officials at any of the participants' headquarters, exerted control over the physicians, or supervised and directed the alleged scheme.  The conclusory allegations that plaintiffs offer with respect to the issue of control do not contain a single factual assertion.  (See, e.g., Class Compl. ¶¶ 44, 279-81; Coor. Compl. ¶¶ 39, 195.)  These types of unsupported allegations fall well short of heightened

---

[9] Plaintiffs also have failed to allege adequately the other factors under the six-prong test:  that the participants in the alleged associations-in-fact held meetings where important discussions took place, wore common colors, or conducted common training or instruction.

pleading requirements.  See West 79th St. Corp. v. Congregation Kahl Minchas Chinuch, No. 03 Civ. 8606, 2004 WL 2187069, at *14 (S.D.N.Y. Sept. 29, 2004) ("[N]or is the conclusory allegation that [the individual defendants] controlled or participated directly in the enterprise alleged . . . sufficient without any attending factual allegations offered to support the claim.").

### C.    Plaintiffs' Predicate Act Allegations Are Inadequate

Because the complaints do not allege false statements, scienter, or causation (see Sections I-II), plaintiffs have failed to plead predicate acts of mail or wire fraud.  The only other predicate acts alleged are based on alleged bribery.  (Class Compl. ¶¶ 282, 287, 300.)  These allegations pertain to payments allegedly made to physicians to influence them (i) to make positive statements to other physicians regarding Neurontin and (ii) to increase their prescriptions of Neurontin.  (Class Compl. ¶¶ 210-11, 215, 231.)  Simply alleging that defendants *intended* to induce physicians to change their behavior is insufficient under bribery statutes because plaintiffs have not alleged any actual or anticipated *quid pro quo*.  See, e.g., N.J. Stat. § 2C:21-10(a) (2004) ("A person commits a crime if he solicits, accepts or agrees to accept any benefit *as consideration for* knowingly violating or agreeing to violate a duty of fidelity." (emphasis supplied)).  If such assertions were sufficient to plead bribery, then virtually all forms of medical marketing would be tantamount to commercial bribery.  This inability to allege predicate acts of fraud and bribery results from the fact that plaintiffs have simply borrowed from other litigation allegations of off-label promotion and payments to doctors.  Such alleged violations of the Food,

Drug and Cosmetics Act (the "FDCA") do not constitute predicate acts under the RICO statute.

18 U.S.C. § 1961(1).[10]

## V.   PLAINTIFFS' CONSUMER FRAUD CLAIMS FAIL AS A MATTER OF LAW FOR ADDITIONAL REASONS

### A.   The Third-Party Payors Do Not Have Standing Under the New Jersey Consumer Fraud Act

The third-party payors' claims under the NJCFA should be dismissed for lack of standing.  New Jersey allows business entities to pursue a NJCFA action only in limited circumstances:  "The [NJCFA] does not exclude business entities from its protection so long as they are 'consumers.'  However, to be a consumer respecting the transaction in question, the business entity must be one who uses (economic) goods, and so diminishes or destroys their utilities."  City Check Cashing v. Nat'l State Bank, 582 A.2d 809, 811 (N.J. Super. Ct. 1990). The third-party payors have not consumed or otherwise made use of Neurontin in the manner contemplated by the NJCFA.  See In re Managed Care Litig., 298 F. Supp. 2d 1259, 1303 (S.D. Fla. 2003) (explaining that under the NJCFA a plaintiff "must be a consumer of the product vis-à-vis the defendant.").  Furthermore, in deciding who merits protection under the NJCFA, New Jersey courts have looked to the NJCFA's purpose, namely, to protect unsophisticated consumers from mass marketing by professional sellers.  See Kavky v. Herbalife Int'l of Am., 820 A.2d 677, 683 (N.J. Super. Ct. 2003).  The third-party payor plaintiffs are large business entities with extensive knowledge of the pharmaceutical industry and do not fall within the class of "consumers" whom the NJCFA was intended to protect.

---

[10] In addition, plaintiffs' RICO conspiracy claims fail on the ground that they are merely prefunctory and contain no details of the alleged conspiracy.  See Blaisdell v. City of Rochester, No. Civ. 97-82-M, 2000 WL 36953 (D.N.H. Oct. 19, 1999).

B.      The California Unfair Competition Law
        and the New Jersey Consumer Fraud Act
        Do Not Apply to Non-Residents

There are strong reasons for denying extraterritorial application of plaintiffs' claims under the UCL and the NJCFA to non-residents of California and New Jersey with no relevant connections to these states.  First, there are substantial differences among the UCL, the NJCFA, and the consumer fraud statutes of the remaining jurisdictions.  See, e.g., In re Bridgestone/Firestone, Inc. Tire Prods. Liab. Litig., 288 F. 3d 1012, 1018 (7th Cir. 2002) (finding that "state consumer protection laws vary considerably"); Fink, 839 A.2d at 974-84.  Consequently, application of the UCL and the NJCFA to non-residents would not only be arbitrary and unfair to defendants, but also would raise significant due process problems.  Norwest Mortgage, Inc. v. Superior Court, 85 Cal. Rptr. 2d 18, 24-25 (Ct. App. 1999) (UCL); In re Managed Care Litig., 298 F. Supp. 2d at 1296 (NJCFA); see also Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 821, 105 S. Ct. 2965, 2979 (1985).

Moreover, where exterritorial application of the UCL and the NJCFA will interfere with other states' regulatory regimes, "courts must respect these differences rather than apply one state's law to sales in other states with different rules" to protect their citizens.  Bridgestone/Firestone, 288 F.3d at 1018 (recognizing principle in class certification context); see also BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 568-73, 116 S. Ct. 1589, 1595-98 (1996).  On this basis, "several courts . . . in other multistate class actions have refused to find a single state's law controlling."  Spence v. Glock, GES.m.b.H., 227 F.3d 308, 314 (5th Cir. 2000); see In re Ford Motor Co. Ignition Switch Prods. Liab. Litig., 174 F.R.D. 332, 348 (D.N.J. 1997) ("Each plaintiff's home state has an interest in protecting its consumers from in-state injuries caused by foreign corporations and in delineating the scope of recovery for its citizens under its own

laws.").  Furthermore, the Supreme Court has held that the Commerce Clause prevents one state

from interfering with legitimate decisions made by other states in crafting their regulatory

regimes.  See Healy v. Beer Inst., 491 U.S. 324, 336-37, 109 S. Ct. 2491, 2499-500 (1989).

Given the constitutional ramifications of extraterritorial application of the UCL and the NJCFA,

these statutes should not be applied to claims by non-residents.[11]

Furthermore, "California law embodies a presumption against the extraterritorial

application of its statutes."  Churchill Vill., LLC v. G.E. Co., 169 F. Supp. 2d 1119, 1126-27

(N.D. Cal. 2000), aff'd 361 F.3d 566 (9th Cir. 2004), cert. denied 125 S. Ct. 56 (2004).  Indeed,

in the specific context of the UCL, California courts have determined that this statute was not

intended to regulate conduct outside of the borders of California that impacts non-residents.  See

id.; Norwest Mortgage, 85 Cal. Rptr. 2d at 24.

### C.   The Coordinated Complaint Fails To State a Claim Under the Remaining Consumer Fraud Statutes

The second unfair and deceptive practices claim in the Coordinated Complaint – Count

Eleven – should be dismissed for failure to state a claim under the consumer fraud acts of the

remaining forty-nine states, the District of Columbia, and the Commonwealth of Puerto Rico.

(Coor. Compl. ¶¶ 308-12.)  First, many of the state consumer fraud acts listed in Count Eleven

do not permit, or severely limit the availability of, private causes of action.  See, e.g., Fink, 839

---

[11] The fact that Warner-Lambert was headquartered in New Jersey does not change this analysis.  See Spence, 227 F.3d at 312-14 (finding that Georgia consumer protection law should not apply to a nationwide class despite the fact that defendant's primary place of business was in the state); In re Ford Motor Co. Bronco II Prod. Liab. Litig., 177 F.R.D. 360 (E.D. La. 1997) (rejecting a claim that, based on Ford's place of business, Michigan's laws necessarily should apply to a nationwide class).

A.2d at 974.[12]  Second, a number of these states restrict the potential parties to and subject matter of a consumer protection lawsuit, and such restrictions often operate to bar suits by businesses.[13] Third, a number of state consumer fraud acts require that plaintiffs serve a pre-suit demand letter, which plaintiffs failed to do.[14]  Fourth, state consumer fraud act claims generally must be alleged with specificity.[15]  Despite this requirement, the Coordinated Complaint does not set forth how the factual allegations satisfy each of the fifty-one consumer fraud statutes in Count Eleven or even what those elements are.  Fifth, the Coordinated Complaint fails to allege any nexus, let alone a sufficient connection, with virtually all of the jurisdictions under which plaintiffs have asserted consumer fraud claims in Count Eleven.  Although plaintiffs include lengthy charts identifying numerous meetings in multiple states, the only allegations made with respect to those events is that discussions occurred regarding various off-label uses.  (Coor. Compl. ¶¶ 102, 107, 120, 126, 130.)  The mere fact, however, that off-label uses were discussed at a meeting is not only inadequate as a pleading matter, but also insufficient as a basis for alleging that consumers in those states suffered any harm.  Consequently, plaintiffs have failed to allege a nexus to the

---

[12] See, e.g., Iowa Code Ann. § 714.16(7) (2003) (authorizing only attorney general to bring consumer protection claims); Mont. Code Ann. § 30-14-133(1) (2003) (disallowing class action consumer protection suits); Miss. Code Ann. § 75-24-15(4) (2004) (same); S.C. Code Ann. § 39-5-140(a) (2004) (same); Ala. Code § 8-19-10(f) (2005) (same).

[13] See, e.g., R.I. Gen. Laws § 6-13.1-5.2(a) (2004) (allowing recovery only for goods used for personal, family or household purposes); Ohio Rev. Code Ann. § 1345.01(A) (2005) (defining a "consumer transaction" as one involving goods used for personal, family or household purposes); W. Va. Code § 46A-6-102(b) (2004) (defining a "consumer" as a natural person); N.J. Stat. § 56:8-22 (2004) (defining "consumer commodity" as that "which is consumed or expended in the course of such use").

[14] See Tex. Bus. & Com. Code § 17.505(a) (2004) (requiring a plaintiff to serve a demand letter as a prerequisite to filing a consumer protection suit); Ala. Code § 8-19-10(e) (2005) (same); Ga. Code § 10-1-399(b) (same); Wyo. Stat. §§ 40-12-102(ix) (2004), 40-12-109 (same); Cal. Civ. Code § 1782(a) (2005) (same).

[15] See, e.g., Weaver v. Chrysler Corp., 172 F.R.D. 96, 100 (S.D.N.Y. 1997) (dismissing consumer protection claims for failure to "set forth specific details regarding the allegedly deceptive acts"); In re Universal Serv. Fund Tel. Billing Practices Litig., 300 F. Supp. 2d 1107, 1150 (D. Kan. 2003) (finding that Kansas consumer protection law requires pleading with a high degree of specificity to survive a motion to dismiss).

jurisdictions in question.  Finally, the Coordinated Complaint's failure to plead facts sufficient to

establish either reliance or causation is fatal to plaintiffs' claims under the consumer fraud

statutes they seek to invoke.

**VI.     PLAINTIFFS' CLAIMS SHOULD BE DISMISSED
         ON FIRST AMENDMENT GROUNDS**

Plaintiffs seek to apply statutes and common law to render defendants liable for damages

based on statements by doctors to doctors at meetings (mostly continuing medical education

seminars where doctors are exposed to new medical information) and doctors' publication of

articles in medical journals.[16]  These statements by and between doctors concerned uses of

Neurontin for "off-label" conditions.  It is both legally and medically appropriate for a doctor to

prescribe a FDA-approved medication for off-label uses if the prescribing doctor has determined,

in his or her medical judgment, that the drug may be beneficial to the patient.  Discussion among

doctors and publication of literature regarding their experiences with off-label treatment are

prerequisites to making informed medical decisions.

The subject matter of the speech that plaintiffs attack, therefore, is science.  To purport to

apply statutes and common law to impose liability for the oral or written publication of scientific

information would violate the First and Fourteenth Amendments.  The First Amendment's

protection of scientific speech is firmly established.  Like artistic and political speech, scientific

speech is subject to the "most exacting standard of constitutional review."  <u>Miller v. Johnson</u>,

515 U.S. 900, 920, 115 S. Ct. 2475, 2490 (1995); <u>see</u> <u>Universal City Studios v. Corley</u>, 273 F. 3d

---

[16] By focusing the First Amendment arguments on plaintiffs' physician and publication-based claims,
defendants do not waive other First Amendment positions.

429, 447 (2d Cir. 2001); <u>Bd. of Trs. of Leland Stanford Jr. Univ. v. Sullivan</u>, 773 F. Supp. 472, 474 (D.D.C. 1991).

That the First Amendment applies to the dissemination of off-label information is recognized by the FDA itself, which currently is grappling with how not to run afoul of the First Amendment and which has explicitly sought public comment on such matters. <u>See</u> U.S. Dep't of Health and Human Services, Food and Drug Administration, Request for Comment on First Amendment Issues, 67 Fed. Reg. 34,942-44 (2002) (stating that the FDA "seeks to ensure, however, that its regulations, guidances, policies, and practices comply with the First Amendment"). In particular, the FDA has singled out the dissemination of off-label information as an area in which it is especially concerned about First Amendment issues and has asked whether the First Amendment restricts the "FDA's ability to regulate speech concerning off-label uses." <u>Id.</u> at 34944.[17]

It is well-established that "[a] statute [like RICO or the NJCFA] that is valid on its face because it does not, by its terms, unconstitutionally restrict free speech, may still be examined as applied to a specific case." <u>See</u> John E. Nowak & Ronald Rotunda, <u>Constitutional Law</u> 1155 n.27 (7th ed., 2000) (citation omitted); <u>see also</u> <u>BMW</u>, 517 U.S. at 573 n.17 ("The test is not the form in which state power has been applied but, whatever the form, whether such power has in fact been exercised" and "[r]egulation can be as effectively exerted through an award of damages

---

[17] The FDA has explicitly approved and in fact encouraged the communication of off-label information. In <u>Washington Legal Foundation v. Friedman</u>, an FDA representative admitted at his deposition that, with respect to off-label treatments, "the doctor should have as much information as he feels necessary to use that drug or device on his patient, and that physician is *obligated* to get that information." 13 F. Supp. 2d 51, 67 (D.D.C. 1998) (emphasis added), <u>vacated on other grounds by</u> 202 F.3d 331, 336 (D.C. Cir. 2000); <u>see</u> 21 C.F.R. § 312.7 (stating that federal regulations prohibiting the off-label promotion of drugs are not intended to "restrict the full exchange of scientific information concerning the drug, including dissemination of scientific findings in scientific or lay media").

as through some form of preventive relief" (citations omitted)).  Plaintiffs cannot ask this Court

to impose liability in a manner that infringes upon defendants' First Amendment rights.  See,

e.g., Food Lion Inc. v. Capital Cities, 194 F. 3d 505, 522-24 (4th Cir. 1999).

Because of the allegations of defendants' financial interests, plaintiffs may contend that

the oral and written scientific speech to doctors is not protected by the First Amendment.  In fact,

the speech at issue here is fully protected even if analyzed as commercial speech.  It is neither

"illegal" nor "inherently misleading" for First Amendment purposes.[18]  Consequently, at a

minimum, the Court would have to evaluate the oral and written scientific speech under the test

for commercial speech.  See Va. State Bd. of Pharmacy v. Virginia Citizen's Consumer Council,

425 U.S. 748, 763, 96 S. Ct. 1817 (1976) ("As to the particular consumer's interest in the free

flow of commercial information, that interest may be as keen, if not keener by far, than his

interest in the day's most urgent political debate.").  Under Central Hudson Gas & Electric

Company v. Public Service Commission, 447 U.S. 557, 100 S. Ct. 2343 (1980), the Court would

have to determine (1) whether awarding civil damages to private parties serves a substantial

governmental interest; (2) whether such an award directly advances this governmental interest;

and (3) whether such an award is more extensive than necessary to serve that interest.  See id. at

---

[18] Plaintiffs have not alleged that the speech is unlawful or inherently misleading, nor could they.  The argument that such speech is unlawful has been squarely rejected by the only court to address it.  See Wash. Legal Found. v. Friedman, 13 F. Supp. 2d 51, 66 (D.D.C. 1998) ("only at such time as off-label prescriptions are proscribed by law could the FDA legitimately claim that speech at issue addresses 'illegal activities'"), vacated on other grounds by 202 F.3d 331, 336 (D.C. Cir. 2000).  Moreover, federal regulations prohibiting the promotion of drugs explicitly state that they are not intended to "restrict the full exchange of scientific information concerning the drug, including dissemination of scientific findings in scientific or lay media."  See 21 C.F.R. § 312.7.  In addition, speech regarding off-label prescriptions is not inherently misleading.  See, e.g., Wash. Legal Found., 13 F. Supp. 2d at 67.  Indeed, it would be improper to allow plaintiffs to deprive defendants of their constitutional rights simply by characterizing defendants' speech as fraudulent.  See, e.g., Commodity Trend Serv., Inc. v. Commodity Futures Trading Comm'n, 233 F.3d 981, 993 (7th Cir. 2000) ("the government cannot label certain speech as fraudulent so as to deprive it of First Amendment protection").

564-66.  With respect to the last prong of the test, there must be a "reasonable" fit between the means and the end sought to be regulated, but this fit does not have to be "necessarily perfect." Bd. of Trs. of the State Univ. of N.Y. v. Fox, 492 U.S. 469, 478, 480 (1989).

Even under application of the commercial speech test, plaintiffs' lawsuit cannot pass constitutional muster.  Awarding civil damages to private parties based upon communication of science does not serve or directly advance any governmental interest.  Moreover, with respect to the third prong of the commercial speech test, plaintiffs fail to acknowledge that there already is an existing method of protecting any potential governmental interest here – the FDA regulations against off-label promotion.  This fact weighs heavily against the Court finding a "reasonable fit."  See Wash. Legal Found. v. Friedman, 13 F. Supp. 2d 51, 73 (D.D.C. 1998) (finding that FDA regulations restricting certain types of manufacturer promotion of off-label use failed to meet "reasonable fit" test), vacated on other grounds by 202 F.3d 331, 336 (D.C. Cir. 2000); cf. Volin v. Bd. of Pub. Accountancy, 661 N.E.2d 639, 645 n.10 (Mass. 1996) (noting that "[n]o alternative method of protecting the government's interest was pleaded by the plaintiffs in their complaint").

There is, however, another fundamental reason why basing civil liability on such speech fails the "reasonable fit" test.  The Supreme Court has stated that there must be a "fit between the legislature's ends and the means chosen to accomplish those ends" and requires "the government goal to be substantial, and the cost to be carefully calculated."  Fox, 492 U.S. at 480 (citation omitted).  This analysis assumes that the legislature chose a means to accomplish its goal – prohibiting off-label promotion – and "carefully calculated" costs when it did so.  No such balancing has occurred here.  The result of imposing liability would be intolerable under First

Amendment doctrine, especially where the government itself questions whether it can, consistent with the First Amendment, impose any restrictions on speech regarding off-label uses.

## VII.   PLAINTIFFS' STATE LAW CLAIMS ARE PREEMPTED BY THE FDCA

Plaintiffs' state claims are preempted by the FDCA pursuant to the Supremacy Clause of the U.S. Constitution.  Under the doctrine of conflict preemption, any claim that "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," Hines v. Davidowitz, 312 U.S. 52, 67, 61 S. Ct. 399, 404 (1941); see Brehmer v. Planning Bd., 238 F.3d 117, 122 (1st Cir. 2001), is impliedly preempted and must be dismissed.  Because plaintiffs' state law claims stand as an obstacle to the purposes and objectives of the FDCA, these claims should be dismissed.

Pursuant to the Supreme Court's decision in Buckman Company v. Plaintiffs' Legal Committee, 531 U.S. 341, 121 S. Ct. 1012 (2001), a claim is preempted impliedly when three criteria are satisfied.  First, there must already be in place a federal statutory scheme pursuant to which a federal agency is empowered to punish and deter the conduct at issue.  Id. at 348. Second, the agency's authority must be used to achieve a "delicate balance of statutory objectives" that would be skewed by allowing the state law claims to continue.  Id.  Third, the state law claims must rely on a violation of federal law as a critical element in their case.  Id. at 353.  As in Buckman, the state law claims brought by plaintiffs run afoul of all three of these criteria and, accordingly, are preempted by federal law.

### A.   A Federal Statutory Scheme Is Already in Place

Congress has already enacted a federal statutory scheme pursuant to which a federal agency – the FDA – is empowered to punish and deter the conduct of which plaintiffs complain. Plaintiffs' state law claims are, at their essence, a series of recharacterized assertions that

defendants sought to promote the off-label use of Neurontin to physicians in violation of federal laws prohibiting the introduction of a misbranded drug into the marketplace.  As the Supreme Court explained in <u>Buckman</u>, Congress through the FDCA already has granted wide-ranging authority to punish and to deter this type of conduct.  See <u>Buckman</u>, 531 U.S. at 349; <u>see also</u> 21 U.S.C. §§ 331(a), 333(a), 372; 21 C.F.R. § 5.35.

Pursuant to 21 U.S.C. § 372 and 21 C.F.R. § 5.35, "[t]he FDA is empowered to investigate suspected fraud, and citizens may report wrongdoing and petition the agency to take action."  <u>Buckman</u>, 531 U.S. at 349 (internal citations omitted).  Furthermore, under 21 U.S.C. §§ 331(a) and 333(a), "the FDA may respond to fraud by . . . pursuing criminal prosecutions."  <u>Buckman</u>, 531 U.S. at 349.  Citing to these provisions, the <u>Buckman</u> Court found that the FDA was authorized to punish and deter the conduct complained of, and held that this first prong was therefore satisfied.  The provisions granting the FDA's authority to police fraud on itself, 21 U.S.C. §§ 331 and 333, are the same provisions that grant to the FDA the authority to take action against fraud directed to physicians and their patients.  In other words, the statutory scheme that plaintiffs seek to supplant is precisely the same statute that the <u>Buckman</u> Court addressed.  <u>See, e.g.</u>, <u>United States v. Arlen</u>, 947 F.2d 139 (5th Cir. 1991) (holding that 21 U.S.C. §§ 331(a) authorizes the FDA to police fraud on both consumers and the FDA); <u>United States v. Bradshaw</u>, 840 F.2d 871 (11th Cir. 1988) (same).  Thus, as in <u>Buckman</u>, Congress already has enacted a federal statutory scheme which the FDA is exclusively empowered to enforce.  21 U.S.C. §§ 337(a).

**B.      Congress and the FDA Have Struck a Delicate Balance that Would Be Skewed by Permitting These Claims To Advance**

Federal regulation of prescription medication requires a complicated and delicate balancing act.  In an attempt to fashion the proper balance, the FDA has determined that health care professionals are best suited to make decisions about off-label uses of prescription drugs and devices.  See 21 U.S.C. § 396 ("Nothing in this Act shall be construed to limit or interfere with the authority of a health care practitioner to prescribe or administer any legally marketed device to a patient for any condition or disease within a legitimate health care practitioner-patient relationship."); see also James M. Beck & Elizabeth D. Azari, FDA, Off-Label Use, and Informed Consent:  Debunking Myths and Misconceptions, 53 Food & Drug L.J. 71, 76-77 (1998).  Plaintiffs seek to avoid this delicate balance in favor of a state law tort regime involving the laws of all fifty states, the District of Columbia, and Puerto Rico.

The Supreme Court's decision in Buckman is again instructive.  In that case, plaintiffs alleged that the defendants' allegedly fraudulent statements to the FDA triggered liability under state law.  Buckman, 531 U.S. at 343.  After ruling that Congress had already endowed the FDA with the authority to police fraud, the Court held that plaintiffs' state law claims would skew the delicate balance of statutory objectives that Congress had created.  As the Court explained, these state law claims would "exert an extraneous pull on the scheme established by Congress, and [they are] therefore preempted by that scheme."  531 U.S. at 353.

Plaintiffs' proposed alternative scheme in the instant case – application of the tort and consumer fraud law of all 50 states in addition to the FDA's regulation – would trigger the exact same interference with the federal regulatory scheme that the Buckman Court rejected.  Were plaintiffs' state law claims allowed to proceed in the present action, they would expose the entire

pharmaceutical industry to unpredictable and inconsistent civil liability.  As this Court explained in In re Pharmaceutical Industry AWP Litigation:  "[I]n Buckman, the [FDA] was charged with the difficult task of regulating the marketing and distribution of medical devices without intruding upon decisions statutorily committed to the discretion of health care professionals, a task that would be disrupted by state suits."  321 F. Supp. 2d 187, 199 (D. Mass. 2004) (quoting Buckman, 531 U.S. at 349-50 (quotations omitted)).  The concerns that this Court previously expressed likewise are present here.  The FDA is charged with the difficult task of regulating the marketing and distribution of prescription medications.  In the course of executing this Congressional mandate, the FDA must carefully balance whether the dissemination of off-label information to physicians constitutes a prohibited promotional claim of safety or effectiveness or is part of "the full exchange of scientific information" that regulators permit and, indeed, seek to foster.  21 C.F.R. § 312.7.  Interjecting state tort and consumer fraud law into this arena would destroy the delicate balance of statutory objectives that Congress has tasked the FDA with managing.

   **C.   Plaintiffs' State Law Claims Are Predicated**
         **upon an Alleged Violation of the FDCA**

Plaintiffs' state law claims are predicated upon defendants' alleged violation of the FDCA and they therefore fail under the third factor set out by the Buckman Court.  Like the claims in Buckman, plaintiffs' claims are not predicated "on traditional state tort law which had predated the federal enactments in question[].  On the contrary, the existence of these federal enactments is a critical element in their case."  Buckman, 531 U.S. at 353.  Even a cursory review of the complaints reveals that they are littered with allegations that defendants violated the FDCA through their communications with physicians.  (See, e.g., Class Compl. ¶¶ 32, 126,

182, 235; Coor. Compl. ¶¶ 15, 32, 99, 171.)  In fact, plaintiffs' state law claims are little more than a transparent attempt to piggy-back on alleged violations of the FDCA.  See Buckman, 531 U.S. at 353.  Such claims, therefore, are preempted by the FDCA.

## VIII.   PLAINTIFFS' RICO CLAIMS ARE TIME-BARRED

Plaintiffs' civil RICO claims are barred by the four-year statute of limitations applicable to such claims.  See Agency Holding Corp. v. Malley-Duff & Assoc. Inc., 483 U.S. 143, 156-57, 107 S. Ct. 2759, 2767 (1987); Rodriguez v. Banco Cent. Corp., 917 F.2d 664, 665 (1st Cir. 1990).  Courts in this District can and do address compliance with applicable statutes of limitations at the motion to dismiss stage.  See, e.g., Hodas v. Sherburne Powers & Needham, P.C., 938 F. Supp. 60, 65 (D. Mass. 1996) (granting motion to dismiss in civil RICO context on statute of limitations basis).

For civil RICO, the four-year period begins to run when a plaintiff "discovered or should have discovered his injury."  Rodriguez, 917 F.2d at 665; see Lares Group, II v. Tobin, 221 F.3d 41, 44-45 (1st Cir. 2000).  Thus, it is actual or constructive knowledge of the *injury*, and not knowledge of the underlying conduct, that triggers the statute.  See Rotella v. Wood, 528 U.S. 549, 559, 120 S. Ct. 1075, 1083 (2000) (striking down accrual rule based on plaintiff's inquiry notice of defendant's pattern of racketeering); Hodas, 938 F. Supp. at 63 ("[Plaintiff's] plea that he did not know of the 'conduct' that caused his injury is clearly insufficient to alter the accrual date of his claim.  It is the injury and not the fact that it is specifically a 'RICO' injury that is relevant.").  Here, the alleged injury is the payment for off-label uses of Neurontin.  Because plaintiffs suffered their alleged injuries as long as ten years ago, their claims are time-barred.

Presumably recognizing the untimeliness of their claims, plaintiffs assert that defendants engaged in fraudulent concealment, thereby allegedly tolling the running of the statute of

limitations.  (Class Compl. ¶¶ 245-47; Coor. Compl. ¶¶ 179-81.)  Fraudulent concealment, like other fraud claims, must be alleged with particularity.  See Gonzalez-Bernal v. United States, 907 F.2d 246, 250 (1st Cir. 1990).  To plead fraudulent concealment with specificity, plaintiffs must allege:  (1) wrongful concealment of the actions by defendants; (2) failure of the plaintiffs to discover the operative facts within the limitations period; and (3) plaintiffs' due diligence until discovery of the facts.  See Berkson v. Del Monte Corp., 743 F.2d 53, 55 (1st Cir. 1984).  Plaintiffs do not and, indeed, cannot make such allegations, let alone with the requisite particularity.  See Salois v. Dime Sav. Bank, 128 F.3d 20, 26 n.11 (1st Cir. 1997).

To satisfy the first element of the fraudulent concealment claim, plaintiffs must allege with particularity that defendants committed affirmative conduct "which would, under the circumstances of the case, lead a reasonable person to believe that he did not have a claim for relief."  Berkson, 743 F.2d at 56.  They have failed to do so.  Plaintiffs' most specific allegation regarding this point is that "Defendants' involvement was hidden because Defendants hid their financial connections between the physician participants and used the vendor participants as payment intermediaries."  (Class Compl. ¶ 245; Coor. Compl. ¶ 179.)  Plaintiffs thus appear to ground their claim of fraudulent concealment in the idea that defendants' involvement in many of these enterprises remained hidden from them and the public.  This, however, simply restates the RICO claim itself.  See, e.g., Chapple v. Nat'l Starch & Chem. Co., 178 F.3d 501, 506-07 (7th Cir. 1999) ("The defendant's misconduct must be distinct from that which forms the basis of the plaintiff's claim:  '[Fraudulent concealment] denotes efforts by the defendant – above and beyond the wrongdoing upon which the plaintiff's claim is founded – to prevent the plaintiff from suing.'" (citation omitted)).  Moreover, this allegation falls well short of satisfying Rule 9(b) particularity requirements, which compel a plaintiff to plead the specific "time, place, and

36

content" of each alleged act of fraudulent concealment.  Arruda v. Sears, Roebuck & Co., 310

F.3d 13, 19 (1st Cir. 2002).

Furthermore, plaintiffs have not even attempted to plead facts satisfying the two other

elements of fraudulent concealment.  Rather, plaintiffs merely make conclusory allegations that

(i) for unstated reasons, they were not at fault for failing to discover the operative facts that are

the basis of their civil RICO claims, and (ii) they could not reasonably have discovered the

fraudulent nature of the conduct.  (Class Compl. ¶ 247; Coor. Compl. ¶ 181.)  Such conclusory

allegations of fraudulent concealment and due diligence are insufficient as a matter of law.  See

Gonzalez v. United States, 284 F.3d 281 (1st Cir. 2002); Berkson, 743 F.2d at 56-57

("Conclusory allegations of due diligence are not sufficient . . . where a plaintiff has utterly

failed to make even the requisite allegations, he cannot claim that his underlying cause of action

was fraudulently concealed.").

The relevant facts relating to this action were a matter of public record and were well

publicized more than *four* years prior to the filing of this action:[19]

- In January 2000, this Court unsealed the *qui tam* complaint in United States ex rel. Franklin v. Parke-Davis.  (Class Compl. ¶ 240; Coor. Compl. ¶ 176.)  This complaint alleged the same conduct that is the basis of these actions, including, among other things, that Warner-Lambert promoted off-label uses of Neurontin by making false statements to physicians regarding efficacy, as well as illegal payments to doctors. Chaffin Decl. Ex. B.

- On March 28, 2000, Warner-Lambert disclosed in a public SEC filing that the United States Attorney's Office for this District ("USAO") was investigating its alleged off-label promotion of Neurontin.  Chaffin Decl. Ex. C at 10.

---

[19] The earliest date upon which the purported class of third-party payors brought their RICO claims was May 14, 2004.  The earliest date upon which the purported consumer class brought such claims was June 2, 2004.

- On March 30, 2000, *The Wall Street Journal* reported on Warner-Lambert's Form 10-K disclosure, stating that "the [USAO] probe is looking into whether Warner-Lambert marketed [Neurontin] for uses other than the specific ones for which the [FDA] approved it." Chaffin Decl. Ex. D. The *Journal* article also stated that Neurontin sales had increased substantially and that all or most of this increase was attributable to off-label use. Id.

- On April 3, 2000, *The Pink Sheet* – the pharmaceutical industry's leading trade publication – ran the news of the USAO investigation as its lead story. Chaffin Decl. Ex. E (Warner Lambert Neurontin Promotions Under Investigation by U.S. Attorney, THE PINK SHEET, Apr. 3, 2000, at 3-4).

Despite the fact that all of these facts occurred more than four years before plaintiffs' claims were brought, plaintiffs nonetheless allege, inexplicably, that the "earliest that [they] could have reasonably become aware of the fraudulent marketing scheme was May 2003" when the details of the purported scheme were made known through the "filing of previously sealed materials in opposition to Defendants' motion for summary judgment in the qui tam action." (Class Compl. ¶ 246; Coor. Compl. ¶ 180.) In the alternative, plaintiffs allege that they could not have learned of the purported scheme until these details were disclosed when the Court unsealed the amended complaint in the *qui tam* case in April 2002. (Class Compl. ¶ 246; Coor. Compl. ¶ 180.) This contention must be rejected because plaintiffs, while acknowledging that the *qui tam* action is relevant for statute of limitations purposes, do not allege why these filings in the Franklin action are determinative for statute of limitations purposes when the initial complaint was unsealed in January 2000. Plaintiffs cannot possibly rely on the argument that these later filings contained more details than the initial complaint because courts have made it clear that "resort to this equitable doctrine is inappropriate merely because a plaintiff did not know each and every detail of his cause of action within the statutory period." Lares Group v. Tobin, 47 F. Supp. 2d 223, 231 (D.R.I. 1999), aff'd 221 F.3d 41 (1st Cir. 2000).

Moreover, by March 2000, the criminal investigation into the alleged off-label promotion of Neurontin was disclosed, further defeating any argument of fraudulent concealment.  See Blue Cross v. SmithKline Beecham Clinical Labs., 108 F. Supp. 2d 116, 119-20 (D. Conn. 2000) (presuming that "highly publicized, industry-wide" information was known to plaintiff insurers and holding that fraudulent concealment claim could not simply rest on defendants' "failure to own up to illegal conduct").  Having been aware not only of their alleged injuries but also of the alleged misconduct, plaintiffs were not permitted to wait more than four years before bringing their claims.[20]

---

[20] Although defendants have focused their statute of limitations arguments on the federal RICO claims, certain of plaintiffs' state law claims are also subject to statutes of limitations of four years or less and hence are time-barred.  See, e.g., Cal. Civ. Code § 1783 (three years for UCL claims); Mass. Gen. Laws. Ann. ch. 260 § 2A (three years for fraud and three years for unjust enrichment because it is based on same underlying facts as fraud); 42 Pa. C.S. § 5524(7) (two years for fraud); Blue Cross, 108 F. Supp. 2d at 122 ("[Pennsylvania Insurance Fraud count] is governed by Pennsylvania's two year limitation on claims for common law fraud").

## CONCLUSION

For all of the foregoing reasons, the Class Complaint and the Coordinated Complaint should be dismissed with prejudice.

Dated: March 17, 2005

DAVIS POLK & WARDWELL

By:   /s/ James P. Rouhandeh
      James P. Rouhandeh

450 Lexington Avenue
New York, New York 10017
(212) 450-4000

        - and -

HARE & CHAFFIN

By:   /s/ David B. Chaffin
      David B. Chaffin

160 Federal Street
Boston, Massachusetts 02110
(617) 330-5000

*Attorneys for Defendants Pfizer Inc. and
Warner-Lambert Company*