# EXHIBIT A
# Part 2 of 4

30.     In addition to the relatively small demand for Neurontin's approved use, Neurontin also had a short patent protection period.  The patent for gabapentin expired in 1998, and the patent for the use of gabapentin to treat epilepsy expired on or about July 16, 2000. Defendants understood that Neurontin's market share and price would be significantly reduced when generic bioequivalents of Neurontin, anhydrous gabapentin that is not lactam free, entered the market, and that there was a limited period of time to increase demand for Neurontin and charge supra-competitive rates.

31.     During the relevant period, the relevant geographic market is the United States and the relevant product market is Neurontin and its generic bioequivalent, anhydrous gabapentin that is not lactam free.  Defendant Pfizer's share of the relevant geographic and product market for Neurontin and the generic bioequivalent of Neurontin, anhydrous gabapentin that is not lactam free, was 100%.  From 1994 until late 2004, Defendant Pfizer controlled the relevant product market and fixed the price for Neurontin at artificially high or supra-competitive levels.

32.     Generic bioequivalents of Neurontin could and would begin competing with Neurontin after its patents had expired on or about July 16, 2000.  Therefore, in 1994 or 1995, Defendants met and devised an illegal scheme to expand and extend market share and power through a false, deceptive, and misleading marketing campaign and misuse of the legal and regulatory system.  Specifically, Defendants decided to increase demand for Neurontin and interfere with potential generic competitors by illegally marketing Neurontin for certain uses that were not safe and effective, in conjunction with acquiring and using other patents on other forms and methods of using gabapentin for anticompetitive purposes.

33.     Defendants also believed that their scheme would minimize the negative impact generic bioequivalents of Neurontin might have on potential sales of another drug that Defendant Pfizer had been developing, which would be exclusively sold and priced by Defendant Pfizer.

34.     The intensity and scope of Defendants' illegal scheme was aptly summarized by the following directive to medical liaisons by a Sales Director for Defendant Pfizer:

> I want you out there every day selling Neurontin.  Look this isn't just me, it comes down from Morris Plains that Neurontin is more profitable....we know Neurontin's not growing adjunctive therapy, beside that is not where the money is.  Pain management now that's money.  Monotherapy, that's money.  We don't want to share these patients with everybody, we want them on Neurontin only. We want their whole drug budget, not a quarter, not half, the whole thing....We can't wait for them to ask, we need to get out there and tell them up front...That's where we need to be holding their hand and whispering in their ear Neurontin for pain, Neurontin for monotherapy, Neurontin for bipolar, Neurontin for everything...I don't want to see a single patient coming off Neurontin until they have been up to at least 4800 mg/day.  I don't want to hear that safety crap either, have you tried Neurontin, every one of you should take on just to see there is nothing, it's a great drug.

35.     To create additional demand for Neurontin, Defendants implemented a false, deceptive, and misleading marketing program designed to convince the public, including Plaintiffs, that Neurontin was safe and effective for certain uses that were, in fact, not safe and effective.

36.     Defendants represented, directly and by implication, that Neurontin was safe and effective, as those terms are commonly understood, at dosages above 1800 mg/day, as monotherapy for the treatment of epilepsy and seizures, and for the treatment of a myriad of disorders or diseases, including but not limited to, psychiatric disorders, like anxiety, Attention Deficit Disorder, depression, and bipolar; restless leg syndrome; migraine headaches; alcohol withdrawal; spinal cord injury; tremors; Amyotrophic Lateral Sclerosis ("ALS"), otherwise known as Lou Gehrig's disease; painful diabetic and peripheral neuropathy; reflex sympathetic

dystrophy; and general pain management.  Such representations were false, deceptive and misleading or lacked sufficient substantiation.

37.    Defendants represented that Neurontin was safe and effective for certain treatments, as identified above, by using various deceptive business practices, including but not limited to, the following:

      A.    Misrepresenting, directly and by implication, the independence, role, and credentials of its medical liaisons;

      B.    Misrepresenting, directly and by implication, the independence, scientific validity, results, and, at times, existence, of purported medical studies or clinical trials or concealing studies that had shown Neurontin was not effective for certain uses;

      C.    Creating and publishing false, deceptive, and misleading articles related to certain uses of Neurontin, including, but not limited to, misrepresenting, directly and by implication, the identity and independence of the author, the article's scientific validity, and the financial relationship between the Defendant Pfizer, author, and medical journal;

      D.    Misrepresenting, directly and by implication, the purpose and independence of Continuing Medical Education Seminars and other presentations;

      E.    Making payments to doctors to prescribe Neurontin for unproven and possibly dangerous uses, under the guise of consulting or speaking fees, or to participate in purported medical studies that had little, if any, scientific value; and

      F.    Creating and publishing false, deceptive, and misleading advertisements related to Neurontin, including, but not limited to, misrepresenting, directly and by implication, that Neurontin has been proven safe and effective for a broader range of treatment than has actually been established.  For example, an advertisement, published in December 2001,

represented that Neurontin was effective in treating or improving social limitations, memory difficulties, energy level, and work limitations. In another advertisement, published in 2002, Defendant Pfizer represented that Neurontin interacts with the brain in a particular manner and that it was an effective treatment as monotherapy for Epilepsy. These and other advertisements have a tendency and capacity to deceive.

38.     Defendant Pfizer entered into agreements with doctors, providers, marketing firms, and other independent entities to unreasonably restrain trade, further anticompetitive goals, and improperly expand and maintain market share and power. Pursuant to the agreements, Defendant Pfizer paid these third parties money in exchange for the false, deceptive, and misleading promotion of Neurontin. These agreements were intentionally entered into with the full knowledge of Defendant Pfizer's anticompetitive goals and of the effect their actions would have on competition.

39.     For example, Defendant Pfizer entered into an agreement with Defendant Cline, Davis & Mann, a self-described "full service pharmaceutical advertising agency," to develop a marketing program that would improperly expand and grow Defendant Pfizer's market share and power. Such actions were in conjunction with and to maximize the effect of excluding and harassing competitors.

40.     Under the direction or control of Defendants Lodewijk de Vink and Anthony Wild and pursuant to an agreement and in partnership with Defendant Pfizer, Defendant Cline, Davis & Mann:

A.     Developed and wrote Continuing Medical Education seminars and other presentations that were, in fact, Neurontin sales presentations and that contained false, deceptive, and misleading information related to Neurontin and competitors' products;

B.      Actively participated in the creation and implementation of Neurontin's false, deceptive and misleading marketing plans and tactics, as outlined above; and

C.      At all times was privy to and aware of the anticompetitive goals and purpose of the Neurontin marketing program, and substantially assisted in illegally expanding, continuing, and maximizing Defendant's Pfizer's market share and power through false, deceptive, and misleading representations and business practices.

41.     Defendants' representations, both direct and implied, related to certain uses of Neurontin were clearly false and material.  These representations were made to the public, including Plaintiffs, and were likely to and did induce reasonable reliance.  Defendants' false, deceptive, and misleading representations continued for a prolonged period of time, and were not readily susceptible of neutralization or otherwise offset by rivals.

42.     As a direct and proximate cause of Defendant Pfizer's agreements with third parties, sales of Neurontin grew dramatically and Defendant Pfizer's market share and power similarly grew.  Neurontin is a drug widely reimbursed by payers, HMOs, and employer groups, and it is marketed and sold in all fifty states and the District of Columbia.  Since its introduction, sales of Neurontin have increased to approximately $1.7 billion in 2003.

43.     Plaintiffs were directly injured by Defendants' conduct.  Defendants' wrongful action included the misrepresentation of Neurontin's safety and effectiveness, and this fraud directly caused economic loss to Plaintiffs.

44.     Plaintiffs were directly harmed by the deception practiced upon them.  Had Plaintiffs not been deceived by Defendants' misrepresentations about the safety and effectiveness of Neurontin, Plaintiffs would have taken steps to so as not to allow or discourage the purchase of Neurontin at the prices set by Defendant Pfizer.  Among the steps Plaintiffs

might have taken were to change reimbursement rates, block the adjudication of specific unique national drug code ("NDC") numbers, exclude the drug altogether from their formulary, or otherwise dissuade doctors from prescribing Neurontin.

45.     Defendants further sought, in conjunction with the marketing program described above and part of a common scheme, to restrain competition and prevent generic bioequivalents of Neurontin from entering the market by misusing the legal and regulatory system to harass, intimidate, and interfere with competitors.  Defendants' conduct was done intentionally, in bad faith, and as a method to use the legal and regulatory system as an anticompetitive weapon.

46.     Since 1998, Defendants have engaged in a series of lawsuits against manufacturers and distributors who intend to make or have made a generic bioequivalent of Neurontin available to the public.[2]  Defendants engaged in this series of legal proceedings without regard to whether they are successful or unsuccessful.  The lawsuits were knowingly and intentionally filed for the purpose of harassment without regard to the merits, and were not filed in a genuine interest to redress grievances.

47.     Defendants' lawsuits against manufacturers and distributors of a generic bioequivalent of Neurontin were objectively baseless, meaning no reasonable litigant could realistically expect success on the merits or conclude that the lawsuits were reasonably

---

[2] The lawsuits filed by Defendant Pfizer include, but are not limited to, the following: *Warner-Lambert Co. v. Apotex, Inc. and Torpharm*, No. 98 C 4293 (N.D. Ill. filed July 14, 1998); *Warner-Lambert Co. v. Apotex, Inc. and Torpharm*, No. 01-0611 (N.D. Ill. filed February 5, 2001); *Warner-Lambert Co. v. Purepac Pharmaceutical Co. and Faulding Inc.*, No. 98-2749 (D. N.J. filed June 11, 1998); *Warner-Lambert Co. v. Purepac Pharmaceutical Co. and Faulding Inc.*, No. 99-5948 (D.N.J. filed December 20, 1999); *Warner-Lambert Co. v. Purepac Pharmaceutical Co. and Faulding Inc.*, No. 00-2931 (D.N.J. filed June 15, 2000); *Warner-Lambert Co. v. Purepac Pharmaceutical Co. and Faulding Inc.*, No. 00-3522 (D.N.J. filed July 20, 2000); *Pfizer Inc., Warner-Lambert Co. v. Teva Pharmaceuticals*, No. 00-4168 (D.N.J. filed August 24, 2000); *Pfizer Inc., Warner-Lambert Co. v. Teva Pharmaceuticals*, No. 00-4589 (D.N.J. filed September 20, 2000); *Pfizer Inc. v. Zenith Laboratories and Ivax Corp.*, No. 00-6073 (D.N.J. filed December 14, 2000); *Pfizer Inc. v. Zenith Laboratories and Ivax Corp*, No. 01-0193 (D.N.J. filed January 12, 2001); *Pfizer Inc. v. Zenith Laboratories and Ivax Corp.*, No. 01-1537 (D.N.J. filed March 30, 2001).  These pleadings and related orders are incorporated herein by reference.

18

calculated to elicit a favorable outcome, because Defendants knew at the time that each lawsuit was filed that the generic bioequivalents of Neurontin would not infringe upon any valid and enforceable patent for Neurontin or each lawsuit became objectively baseless and Defendants continued to litigate the lawsuit despite this knowledge.

48.     Defendant Pfizer also intentionally made false representations to the Food and Drug Administration ("FDA") in listing patents in the Orange Book.  Specifically, Defendants represented, directly or by implication, that its patents claim a drug or drug product or method of using a drug or drug product that the patents do not claim.  Defendants further represented that a claim of patent infringement could be reasonably asserted that, in fact, could not be reasonably asserted.

49.     For example, Defendants claimed that its patents related to monohydrate gabapentin and low-lactam or lactam-free gabapentin "claim" the brand name drug, Neurontin, even though Neurontin and generic bioequivalents of Neurontin are anhydrous, not monohydrate, and Neurontin and generic bioequivalents of Neurontin are not low lactam or lactam free.

50.     Defendants made these representations to harass and to intimidate competitors that intended to make and distribute generic bioequivalents of Neurontin and to delay competition for Neurontin.  Defendants knew that such representations could provide, at least, a 30-month stay before a generic bioequivalent entered the market, and Defendants misused the legal and regulatory system to improperly obtain that stay.

51.     Upon information and belief, Defendants also intentionally manipulated and delayed its acquisition of patents and timing of interactions with the FDA to extend the automatic stay of generic bioequivalents of Neurontin by, at least, 23 months.

52.     By interfering with or preventing a generic bioequivalent of Neurontin from entering the market, Defendants injured Plaintiffs in their business or property by causing them to pay more than they otherwise would have paid.  As a result of Defendants' unlawful actions, Plaintiffs have been injured in their business or property.  During the relevant period, Plaintiffs did not have an opportunity to fully benefit from competition among generic bioequivalents of Neurontin and Neurontin.

53.     Defendants have known that the principal basis upon which generic pharmaceutical companies compete is not quality or superiority but price.  When a generic manufacturer obtains final approval for a generic bioequivalent drug and that drug is made available, it will be sold by pharmacists as a substitute for brand name drugs, such as Neurontin, and prices are dramatically reduced.  For example, the first generic bioequivalent drug typically enters the market at 60% to 70% of the brand name price.  When a second generic bioequivalent drug enters the market, prices are likely to fall to between 50% to 60% of the brand name drug's price.  Each subsequent competitor can lower the price further until five or more generic bioequivalent drugs have entered the market, and, at that point, the generic bioequivalent drugs' prices stabilize at 20% to 30% of the brand name drug's price.

54.     If a generic bioequivalent of a brand-name drug exists and the physician has not specifically restricted the prescription to the brand-name drug, then for patients covered by Plaintiffs' plans, the pharmacist will fill the prescription with the less expensive, but bioequivalent, generic drug.  In fact, in some states, including Massachusetts and Minnesota, for example, a pharmacist is statutorily required to fill a prescription with a generic bioequivalent of a brand-name drug where the physician has not restricted substitution.  Minn. Stat. § 151.21 (2003); Mass. Gen. Laws ch. 112, § 12D (2004).

55.     Third-party payers, such as Plaintiffs, depend on real competition between pharmaceutical manufacturers.   By preventing competition, Defendant effectively thwarted Plaintiffs' efforts to reduce and control drug costs.

56.     But for Defendants' illegal acts, Plaintiffs could not encourage and/or mandate the use of a generic bioequivalent of Neurontin to achieve significant savings.   Plaintiffs were injured as a direct and proximate cause of Defendants' actions.

57.     The above-described injury is of the type antitrust laws were designed to prevent and flows from that which makes Defendants' conduct unlawful.   Moreover, Plaintiffs' injuries are of the type that the various consumer protection, insurance fraud, and deceptive trade practices acts were enacted to address and redressing the harm caused by and preventing or discouraging future conduct as described herein is in the public interest.

58.     Defendants have no legitimate justification, economic or otherwise, for the above-described violations of law.

## COUNT I

### Unlawful Restraint of Trade by Defendants In Violation of New Jersey Antitrust Act on Behalf of All Plaintiffs

59.     Plaintiffs incorporate and reaver by reference the averments contained in preceding paragraphs 1 through 58.

60.     Defendants' above-described conduct violates the New Jersey Antitrust Act.  N.J. Stat. §§ 56:9-1 to 56:9-19.

61.     Defendants' above-described conduct necessarily and directly restrained and affected trade or commerce in New Jersey and throughout the United States.  N.J. Stat. § 56:9-3.

62.     Plaintiffs are "persons" under the New Jersey Antitrust Act.  N.J. Stat. § 56:9-2.

63.     Defendants are "persons" under the New Jersey Antitrust Act.  N.J. Stat. § 56:9-2.

64.    Defendants' unlawful above-described conduct directly and proximately resulted in increased payments by Plaintiffs for Neurontin or generic bioequivalents of Neurontin.

65.    The economic injury to Plaintiffs and their self-funded customers can be determined through an accurate account of payments for Neurontin.  Plaintiffs' recovery will not pose a risk of double recovery.

66.    As a result of Defendants' above-described conduct, Plaintiffs are entitled to three times the actual damages sustained, in an amount to be proven at trial, as well as reasonable attorneys' fees, disbursements and costs, against Defendant, jointly and severally.  N.J. Stat. § 56:9-12.

## COUNT II

### Unlawful Restraint of Trade by Defendants In Violation of District of Columbia's Antitrust Act on Behalf of Plaintiff CareFirst

67.    Plaintiff CareFirst incorporates and reavers by reference the averments contained in preceding paragraphs 1 through 66.

68.    Defendants' above-described conduct violates the District of Columbia Antitrust Act.  D.C. Code Ann. § 28-4501 (2004).

69.    Defendants' above-described conduct necessarily and directly restrained and affected trade or commerce in District of Columbia.  D.C. Code Ann. § 28-4502.

70.    Plaintiff CareFirst is a "person" under the District of Columbia Antitrust Act. D.C. Code Ann. § 28-4501.

71.    Defendants are "persons" under the District of Columbia Antitrust Act.  D.C. Code Ann. § 28-4501.

72.    Defendants' above-described conduct directly and proximately resulted in increased payments by Plaintiff CareFirst for Neurontin or generic bioequivalents of Neurontin.

22

Word 20113683.1

73.    The economic injury to Plaintiff CareFirst and its self-funded customers can be determined through an accurate account of payments for Neurontin or generic bioequivalents of Neurontin. Plaintiff CareFirst's recovery will not pose a risk of double recovery.

74.    As a direct and proximate result of Defendants' above-described conduct, Plaintiff CareFirst is entitled to three times the actual damages sustained, in an amount to be proven at trial, as well as reasonable attorneys' fees, disbursements and costs, against Defendants, jointly and severally. D.C. Code Ann. § 28-4507.

## COUNT III

**Unlawful Restraint of Trade by Defendants In Violation of the District of Columbia's Prescription Drug Price Information Law on Behalf of Plaintiff CareFirst**

75.    Plaintiff CareFirst incorporates and reavers by reference the averments contained in the preceding paragraphs 1 through 74.

76.    The District of Columbia Prescription Drug Price Information Restraints of Trade law, D.C. Code Ann. § 48-804.02 is designed to protect insurers such as Plaintiffs and their self-funded employer groups from unlawful restraints of trade that cause tortious injury to payers and patients by increasing the cost of health care. The Defendants' acts and practices described in this Complaint fall into the category of the types of acts or practices this provision is meant to prevent.

77.    Plaintiff CareFirst is a "person" within the meaning of D.C. Code Ann. § 48-804.51 (2004).

78.    Defendants are "persons" within the meaning of D.C. Code Ann. § 48-804.51.

79.    Defendants' acts and practices jeopardized and/or raised the net price of, the supply from manufacturers or wholesalers of drugs to the patients and the payers.

Word 2011 13683.1

80.     Defendants have violated the letter and spirit of the Prescription Drug Price Information law by interfering and/or engaging in unlawful and misleading statements, fraudulent conduct, deception and anti-competitive acts as described in this Complaint, in order to continue receiving inflated payments for Neurontin or generic bioequivalents of Neurontin from Plaintiff CareFirst.

81.     Plaintiff CareFirst has been damaged within the meaning of this provision, and is entitled to treble damages inasmuch as the Defendants have engaged in a pattern of violating the District of Columbia Prescription Drug Price Information Restraints of Trade law.

## COUNT IV

### Unlawful Restraint of Trade by Defendants In Violation of Florida Antitrust Act of 1980 on Behalf of Plaintiff BCBS Florida

82.     Plaintiff BCBS Florida incorporates and reavers by reference the averments contained in the preceding paragraphs 1 through 81.

83.     Defendants' above-described conduct violates the Florida Antitrust Act of 1980, Fla. Stat. §§ 542.15 *et seq.* (2003).

84.     Defendants' above-described conduct necessarily and directly restrained and affected trade or commerce in Florida within the meaning of Fla. Stat. §§ 542.17(4) and 542.18.

85.     Plaintiff BCBS Florida is a "person" under the Florida Antitrust Act of 1980. Fla. Stat. § 542.17(3).

86.     Defendants are "persons" under the Florida Antitrust Act of 1980.  Fla. Stat. § 542.17(3).

87.     Defendants' unlawful conduct affected the specifically defined market for Neurontin or generic bioequivalents of Neurontin.

88.    Defendants' possessed the ability to affect the price for Neurontin or generic bioequivalents of Neurontin.

89.    The exclusion of generic drug manufacturers from the market affected or was intended to affect the price of supply of Neurontin or generic bioequivalents of Neurontin in the market.

90.    Defendants' unlawful conduct harmed competition in general.

91.    Defendants' above-described conduct directly and proximately resulted in increased payments by Plaintiff BCBS Florida for Neurontin or generic bioequivalents of Neurontin.

92.    The economic injury to Plaintiff BCBS Florida and its self-funded customers can be determined through an accurate account of payments for Neurontin or generic bioequivalents of Neurontin.  Recovery by Plaintiff BCBS Florida will not pose a risk of double recovery.

93.    As a direct and proximate result of Defendants' above-described conduct, Plaintiff BCBS Florida is entitled to three times the actual damages sustained, in an amount to be proven at trial, as well as reasonable attorneys' fees, disbursements and costs, against Defendants, jointly and severally.  Fla. Stat. § 542.22(1).

## COUNT V

### Unlawful Restraint of Trade by Defendants In Violation of the Illinois Antitrust Act on Behalf of Plaintiffs HCSC and Trustmark

94.    Plaintiffs HCSC and Trustmark incorporate and reaver by reference the averments contained in preceding paragraphs 1 through 93.

95.    Defendants' above-described conduct violates the Illinois Antitrust Act.  740 Ill. Comp. Stat. 10/1 to 10/11 (2004).

96.     Defendants' above-described conduct necessarily and directly restrained and affected trade or commerce in Illinois. 740 Ill. Comp. Stat. 10/1 to 10/11.

97.     Plaintiffs HCSC and Trustmark are "persons" under the Illinois Antitrust Act. 740 Ill. Comp. Stat. 10/1 to 10/11.

98.     Defendants are "persons" under the Illinois Antitrust Act.  740 Ill. Comp. Stat. 10/1 to 10/11.

99.     Defendants' above-described conduct directly and proximately resulted in increased payments by Plaintiffs HCSC and Trustmark for Neurontin or generic bioequivalents of Neurontin.

100.    The economic injury to Plaintiffs HCSC and Trustmark and their self-funded customers can be determined through an accurate account of payments for Neurontin or generic bioequivalents of Neurontin.  Plaintiffs' recovery will not pose a risk of double recovery.

101.    As a direct and proximate result of Defendants' above-described conduct, Plaintiffs HCSC and Trustmark are entitled to three times the actual damages sustained, in an amount to be proven at trial, as well as reasonable attorneys' fees, disbursements and costs, against Defendants, jointly and severally. 740 Ill. Comp. Stat. 10/1 to 10/11.

## COUNT VI

### Unlawful Restraint of Trade by Defendants In Violation of Louisiana Antitrust Act on Behalf of Plaintiff BCBS Louisiana

102.    Plaintiff BCBS Louisiana incorporates and reavers by reference the averments contained in preceding paragraphs 1 through 101.

103.    Defendants' above-described conduct violates the Louisiana Antitrust Act.  La. Rev. Stat. Ann.  §§ 51:121 to 152 (2004).

104.    Defendants' above-described conduct necessarily and directly restrained and affected trade or commerce in Louisiana. La. Rev. Stat. Ann. § 51:122.

105.    Defendants' above-described conduct directly and proximately resulted in increased payments by Plaintiff BCBS Louisiana for Neurontin or generic bioequivalents of Neurontin.

106.    The economic injury to Plaintiff BCBS Louisiana and its self-funded customers can be determined through an accurate account of payments for Neurontin or generic bioequivalents of Neurontin. Plaintiff BCBS Louisiana's recovery will not pose a risk of double recovery.

107.    As a direct and proximate result of Defendants' above-described conduct, Plaintiff BCBS Louisiana is entitled to three times the actual damages sustained, in an amount to be proven at trial, as well as reasonable attorneys' fees, disbursements and costs, against Defendants, jointly and severally. La. Rev. Stat. Ann. § 51:137.

## COUNT VII

### Unlawful Restraint of Trade by Defendants In Violation of Michigan Antitrust Reform Act on Behalf of Plaintiff BCBS Michigan

108.    Plaintiff BCBS Michigan incorporates and reavers by reference the averments contained in preceding paragraphs 1 through 107.

109.    Defendants' above-described conduct unreasonably restrained trade in the market for Neurontin or generic bioequivalents of Neurontin in violation of the Michigan Antitrust Reform Act. Mich. Comp. Laws §§ 445.771 to .778 (2004).

110.    Defendants' above-described conduct necessarily and directly restrained and affected trade or commerce in Michigan. Mich. Comp. Laws § 445.772.

111.    Plaintiff BCBS Michigan is a "person" under the Michigan Antitrust Reform Act. Mich. Comp. Laws § 445.771.

112.    Defendants are "persons" under the Michigan Antitrust Reform Act. Mich. Comp. Laws § 445.771.

113.    As to BCBS Michigan, the above-described unreasonable restraint of trade occurred primarily and substantially within the state of Michigan. Mich. Comp. Laws § 445.772.

114.    Defendants' above-described conduct directly and proximately resulted in increased payments by Plaintiff BCBS Michigan for Neurontin or generic bioequivalents of Neurontin.

115.    The economic injury to Plaintiff BCBS Michigan and its self-funded customers can be determined through an accurate account of payments for Neurontin and generic bioequivalents of Neurontin. Plaintiff BCBS Michigan's recovery will not pose a risk of double recovery.

116.    Defendants' above-described conduct was a willful and flagrant violation of Section 8 of the Michigan Antitrust Reform Act. As a direct and proximate result, Plaintiff BCBS Michigan is entitled to three times the actual damages sustained, in an amount to be proven at trial, as well as reasonable attorney's fees, disbursements and costs, against Defendants, jointly and severally. Mich. Comp. Laws § 445.778.

### COUNT VIII

**Unlawful Restraint of Trade by Defendants In Violation of Minnesota
Antitrust Act of 1971 on Behalf of Plaintiffs BCBS Minnesota and Federated Insurance**

117.    Plaintiffs BCBS Minnesota and Federated Insurance incorporate and reaver by reference the averments contained in preceding paragraphs 1 through 116.

Word 20113683.1

118.   Defendants' above-described conduct violates the Minnesota Antitrust Act of 1971. Minn. Stat. §§ 325D.49 to .66 (2003).

119.   Defendants' above-described conduct necessarily and directly restrained and affected trade or commerce in Minnesota. Minn. Stat. § 325D.54(b).

120.   Plaintiffs BCBS Minnesota and Federated Insurance are "persons" under the Minnesota Antitrust Act of 1971. Minn. Stat. § 325D.50(5).

121.   Defendants are "persons" under the Minnesota Antitrust Act of 1971. Minn. Stat. § 325D.50(5).

122.   Defendants' above-described conduct directly and proximately resulted in increased payments by Plaintiffs BCBS Minnesota and Federated Insurance for Neurontin or generic bioequivalents of Neurontin.

123.   The economic injury to Plaintiffs BCBS Minnesota and Federated Insurance and their self-funded customers can be determined through an accurate account of payments for Neurontin or generic bioequivalents of Neurontin. Plaintiffs' recovery will not pose a risk of double recovery.

124.   As a direct and proximate result of Defendants' above-described conduct, Plaintiffs BCBS Minnesota and Federated Insurance are entitled to three times the actual damages sustained, in an amount to be proven at trial, as well as reasonable attorneys' fees, disbursements and costs, against Defendants, jointly and severally. Minn. Stat. § 325D.57.

## COUNT IX

### Unlawful Restraint of Trade by Defendants In Violation of the Nebraska Antitrust Laws on Behalf of Plaintiff Mutual of Omaha

125.   Plaintiff Mutual of Omaha incorporates and reavers by reference the averments contained in preceding paragraphs 1 through 124.

126.    Defendants' above-described conduct violates the Nebraska Antitrust Laws.  Neb. Rev. Stat. §§ 59-801 *et seq.* (2004).

127.    Defendants' above-described conduct necessarily and directly restrained and affected trade or commerce in Nebraska.  Neb. Rev. Stat. § 59-801.

128.    Plaintiff Mutual of Omaha is a "person" under the Nebraska Antitrust Laws.  Neb. Rev. Stat. § 59-822.

129.    Defendants are "persons" under the Nebraska Antitrust Laws.  Neb. Rev. Stat. § 59-822.

130.    Defendants' above-described conduct directly and proximately resulted in increased payments by Plaintiff Mutual of Omaha for Neurontin or generic bioequivalents of Neurontin.

131.    The economic injury to Plaintiff Mutual of Omaha and its self-funded customers can be determined through an accurate account of payments for Neurontin and generic bioequivalents of Neurontin.  Plaintiff's recovery will not pose a risk of double recovery.

132.    As a direct and proximate result of Defendants' above-described conduct, Plaintiff Mutual of Omaha is entitled to three times the actual damages sustained, in an amount to be proven at trial, as well as reasonable attorneys' fees, disbursements and costs, against Defendants, jointly and severally.  Neb. Rev. Stat. § 59-821.

## COUNT X

### Unlawful Restraint of Trade by Defendants In Violation of New Mexico Antitrust Act on Behalf of Plaintiff HCSC

133.    Plaintiff HCSC incorporates and reavers by reference the averments contained in preceding paragraphs 1 through 132.

Word 20113683.1

134.   Defendants' above-described conduct violates the New Mexico Antitrust Act. N.M. Stat. Ann. §§ 57-1-1 to -19 (2004).

135.   Defendants' above-described conduct necessarily and directly restrained and affected trade or commerce in New Mexico. N.M. Stat. Ann. § 57-1-1.

136.   Plaintiff HCSC is a "person" under the New Mexico Antitrust Act. N.M. Stat. Ann. § 57-1-1.2.

137.   Defendants are "persons" under the New Mexico Antitrust Act. N.M. Stat. Ann. § 57-1-1.2.

138.   Defendants' above-described conduct directly and proximately resulted in increased payments by Plaintiff HCSC for Neurontin or generic bioequivalents of Neurontin.

139.   The economic injury to Plaintiff HCSC and its self-funded customers can be determined through an accurate account of payments for Neurontin and generic bioequivalents of Neurontin. Plaintiff HCSC's recovery will not pose a risk of double recovery.

140.   As a direct and proximate result of Defendants' above-described conduct, Plaintiff HCSC is entitled to three times the actual damages sustained, in an amount to be proven at trial, as well as reasonable attorneys' fees, disbursements and costs, against Defendants, jointly and severally. N.M. Stat. Ann. § 57-1-3.

## COUNT XI

**Unlawful Restraint of Trade by Defendants In Violation of New York
Antitrust Act on Behalf of Plaintiffs WellChoice and Excellus**

141.   Plaintiffs WellChoice and Excellus incorporate and reaver by reference the averments contained in preceding paragraphs 1 through 140.

142.   Defendants' above-described conduct violates the New York Antitrust Act. N.Y. Gen. Bus. Law § 340 (2004).

31

143.     Defendants' above-described conduct necessarily and directly restrained and affected trade or commerce in New York. N.Y. Gen. Bus. Law § 340.

144.     Defendants' above-described conduct directly and proximately resulted in increased payments by Plaintiffs for Neurontin or generic bioequivalents of Neurontin.

145.     The economic injury to Plaintiffs and their self-funded customers can be determined through an accurate account of payments for Neurontin and generic bioequivalents of Neurontin.  Plaintiffs' recovery will not pose a risk of double recovery.

146.     As a direct and proximate result of Defendants' above-described conduct, Plaintiffs are entitled to three times their actual damages sustained, in an amount to be proven at trial, as well as reasonable attorneys' fees, disbursements and costs, against Defendants, jointly and severally.  N.Y. Gen Bus. Law § 340(5).

## COUNT XII

### Unlawful Restraint of Trade by Defendants In Violation of Oklahoma's Antitrust Reform Act on Behalf of Plaintiff BCBS Oklahoma

147.     Plaintiff BCBS Oklahoma incorporates and reavers by reference the averments contained in preceding paragraphs 1 through 146.

148.     Defendants' above-described conduct violates the Oklahoma Antitrust Reform Act. Okla. Stat. tit. 79 § 201 (2004).

149.     Defendants' above-described conduct necessarily and directly restrained and affected trade or commerce in Oklahoma. Okla. Stat. tit. 79 § 201.

150.     Plaintiff BCBS Oklahoma is a "person" under the Oklahoma Antitrust Reform Act. Okla. Stat. tit. 79 § 201.

151.     Defendants are "persons" under the Oklahoma Antitrust Reform Act. Okla. Stat. tit. 79 § 201.

Word 20113683.1