UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE NEURONTIN MARKETING AND SALES PRACTICES LITIGATION | ) ) ) ) |
| THIS DOCUMENT RELATES TO: | ) MDL Docket No. 1629 ) Master File No. 04-10981 ) Judge Patti B. Saris |
| ALL ACTIONS | ) ) |

**JOINT MEMORANDUM OF LAW OF THE CLASS AND COORDINATED
PLAINTIFFS IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I. SUMMARY OF RELEVANT FACTUAL ALLEGATIONS ...........................................1

II. PLAINTIFFS HAVE ALLEGED THAT DEFENDANTS COMMITTED FRAUD ..................................................................................................................5

III. PLAINTIFFS HAVE ALLEGED THAT DEFENDANTS CAUSED THEM INJURIES ..............................................................................................................11

    A. Plaintiffs Have Alleged Proximate Cause ...........................................11

    B. TPPs Were Directly Injured by Defendants' Misconduct ...................14

    C. Plaintiffs Have Alleged Cognizable Injuries ......................................16

IV. PLAINTIFFS ADEQUATELY ALLEGE *RICO* CLAIMS ...........................................18

    A. The Alleged Enterprises are Associations-In-Fact ...............................19

    B. Defendants "Participated" In And "Conducted" The Enterprises ........22

    C. The Numerous Predicate Acts Suffice ..................................................24

V. PLAINTIFFS' CONSUMER FRAUD CLAIMS ARE NOT DEFICIENT ...................24

    A. TPPs Are "Persons" Entitled to the Protections of the NJCFA ...........24

    B. The Protections of the NJCFA and UCL May Be Invoked By Non-Residents ..............................................................................................26

    C. The Coordinated TPPs Have Stated a Claim Under the Remaining Deceptive Practice Statutes .................................................................27

VI. DEFENDANTS' MISCONDUCT IS NOT IMMUNIZED BY THE FIRST AMENDMENT ......................................................................................................28

VII. PLAINTIFFS' STATE LAW CLAIMS ARE NOT PREEMPTED BY THE FDCA ....................................................................................................................31

VIII. PLAINTIFFS' CLAIMS ARE NOT TIME-BARRED ...................................................35

    A. The Timeliness of Plaintiffs' Claims is a Quintessential Jury Issue ...................35

    B. The Claims Were Timely-Filed .........................................................36

IX. PLAINTIFFS HAVE STATED CLAIMS FOR UNJUST ENRICHMENT ...................39

X. CONCLUSION......................................................................................................40

# TABLE OF AUTHORITIES

Page

## CASES

*Aetna Casualty Surety Co. v. P & B Autobody*,
43 F.3d 1546 (1st Cir. 1994)...............................................................................23

*Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*,
483 U.S. 143 (1987)...........................................................................................36

*Bankers Trust Co. v. Rhoades*,
859 F.2d 1096 (2d Cir. 1988) ............................................................................39

*Bates v. Dow Agrosciences LLC*,
-- U.S. --, No. 03-388, 2005 WL 957193 (slip op. Apr. 27, 2005) .......................33

*Bd. of Trs. of the State Univ. of N.Y. v. Fox*,
492 U.S. 469 (1989).........................................................................................30

*Berkson v. Del Monte Corp.*,
743 F.2d 53 (1st Cir. 1984)..............................................................................36

*Bertoglio v. Texas Int'l Co.*,
488 F. Supp 630 (D. Del. 1980).........................................................................38

*Blue Cross v. SmithKline Beecham Clinical Labs*,
108 F. Supp. 2d 116 (D. Conn. 2000)................................................................38

*Board of Trustees of Leland Stanford Jr. University v. Sullivan*,
773 F. Supp. 472 (D.D.C. 1991) ......................................................................29

*Bonilla v. Volvo Car Corp.*, 150 F.3d 62, 69-70 (1st Cir. 1998)..................................8

*Boutiette v. Dickinson*,
No. 990039B, 1999 Mass. Super. LEXIS 507 (Mass. Super. Ct. Dec. 17,
1999) ...............................................................................................................35

*Boyes v. Greenwich Boat Works, Inc.*,
27 F. Supp. 2d 543 (D.N.J. 1998) ....................................................................26

*Brown v. McNeil Labs., Inc.*,
1988 WL 288975 (W.D. Mich. June 29, 1988) ..................................................31

*Buckman Co. v. Plaintiffs' Legal Committee*,
531 U.S. 341 (2001).........................................................................................34

*Caraker v. Sandoz Pharm. Corp.*,
172 F. Supp. 2d 1018 (S.D. Ill. 2001).........................................................31, 35

*Cartwright v. Pfizer, Inc.*,
No. 04cv292 (E.D. Tex. Mar. 31, 2005) ............................................................31

*Central Hudson Gas & Electric Co. v. Public Service Commission*,
447 U.S. 557 (1980).........................................................................................30

*Chapple v. National Starch & Chemical Co.*,
178 F. 3d 501 (7th Cir. 1999) ..........................................................................37

## TABLE OF AUTHORITIES
### (continued)

Page

*Commodity Trend Serv., Inc. v. Commodity Futures Trading Commiss.*,
   233 F.3d 981 (7th Cir. 2000) ...........................................................................29

*Commonwealth of Mass. v. Mylan Laboratories*,
   357 F. Supp. 2d 314 (D. Mass. 2005) .........................................................39, 40

*Day v. AT&T Corp.*,
   63 Cal. App. 4th 325, 74 Cal. Rptr. 2d 55 (1998) ...............................................9

*Desiano v. Warner-Lambert Co.*,
   326 F.3d 339 (2d Cir. 2003) ...............................................................14, 15, 17

*Employment Div., Dept. of Human Resources v. Smith*,
   485 U.S. 660 (1988).........................................................................................29

*Eve v. Sandoz Pharm. Corp.*,
   2002 WL 181972, *2 (S.D. Ind. Jan. 28, 2002)................................................35

*Fink v. Ricoh Corp.*,
   365 N.J. Super. 520, 839 A.2d 942 (N.J. Super. Ct. Law Div. 2003) ...................13

*Food Lion Inc. v. Capital Cities/ABC, Inc.*,
   194 F.3d 505 (4th Cir. 1999) ...........................................................................29

*Friedman v. Rogers*,
   440 U.S. 1 (1979)............................................................................................30

*Grace v. Perception Technology Corp.*,
   128 F.R.D. 165 (D. Mass. 1989)......................................................................26

*Green v. Fund Asset Mgmt., L.P.*,
   245 F.3d 214 (3d Cir. 2001) ............................................................................35

*Hawkins v. Upjohn Co.*,
   890 F. Supp. 609 (E.D. Tex. 1994)...................................................................31

*Heindel v. Pfizer, Inc.*,
   2004 WL 1398024, *13-15 (D.N.J. June 7, 2004) .............................................13

*Hines v. Hash*,
   843 S.W. 2d 464 (Tex. 1992) ...........................................................................27

*Hodas v. Sherburne, Powers & Needham, P.C.*,
   938 F. Supp. 60 (D. Mass. 1996).....................................................................36

*Holmes v. Sec. Investor Prot. Corp.*,
   503 U.S. 258 (1992).........................................................................................14

*Hundred East Credit Corp. v. Eric Schuster Corp.*,
   212 N.J. Super. 350, 515 A.2d 246, 249 (N.J. Super. Ct. App. Div. 1986)...........25

*Hurley v. Lederle Labs.*,
   863 F.2d 1173 (5th Cir. 1988) .........................................................................31

*In re Bridgestone/Firestone Inc.*,
   288 F.3d 1012 (7th Cir. 2001) .........................................................................18

# TABLE OF AUTHORITIES
### (continued)

Page

*In re Buspirone Patent Litig.*,
  185 F. Supp. 2d 363 (S.D.N.Y. 2002) ...................................................................27

*In re Lorazepam & Clorazepate Antitrust Litig.*,
  MDL Docket No. 1290, Misc. No. 99mc0276 (D.D.C. Mar. 30, 2005) ...............16

*In re Lupron® Marketing and Sales Practices Litig.*,
  295 F. Supp. 2d 148 (D.Mass. 2003) ............................................................passim

*In Re Pharm. Indus. Average Wholesale Price Litig. (AWP III)*,
  309 F. Supp. 2d 165 (D. Mass. 2004) ...................................................................31

*In Re Pharm. Indus. Average Wholesale Price Litig. (AWP IV)*, 321 F. Supp. 2d
  187, 194-202 (D. Mass. 2004) ........................................................................31, 35

In re Pharmaceutical Indus. Average Price Litig.,
  263 F. Supp. 2d 172 (D.Mass. 2003) .....................................................20, 31, 34

*In re Pharmaceutical Indus. Average Price Litig.*,
  307 F. Supp. 2d 196 (D. Mass. 2004) ...........................................................passim

*In re Relafen Antitrust Litig.*,
  221 F.R.D. 260 (D. Mass. 2004) ............................................................................26

*In re Rezulin Products Liability Litig.*,
  210 F.R.D. 61 (S.D.N.Y. 2002) .............................................................................18

*Int'l Union of Op. Eng'rs Local 68 Welfare Fund v. Merck & Co., Inc.*,
  No. ATL-L-3015-04 (Super. Ct. Atl. Cty. July 8, 2004) ......................................25

*Island Mortg. of New Jersey v. 3M*,
  373 N.J. Super. 172, 860 A.2d 1013 (N.J. Super. Law. Div. 2004) ......................9

*J. Geils Band Employee Benefit Plan v. Smith Barney Shearson, Inc.*,
  76 F.3d 1245 (1st Cir. 1996)...................................................................................37

*Kaufman v. I-Stat Corp.*,
  165 N.J. 94, 754 A.2d 1188 (N.J. 2000) ...............................................................35

*Kavky v. Herbalife Int'l of Am.*,
  359 N.J. Super. 497, 820 A.2d 677 (N.J. Super. Ct. App. Div. 2003).............24, 25

*Klein v. PDG Remediation*,
  937 F. Supp.  323 (S.D.N.Y. 1996) .......................................................................38

*Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.*,
  191 F.3d 229 (2d Cir. 1999) ...................................................................................14

*Lares Group II v. Tobin*,
  221 F. 3d 41 (1st Cir. 2000)....................................................................................39

*Leon v. Rite Aid Corp.*,
  340 N.J. Super. 462, 774 A.2d 674 (N.J. Super. Ct. App. Div. 2001)....................9

*Libertad v. Welch*,
  53 F.3d 428 (1st Cir. 1995)..................................................................................22

## TABLE OF AUTHORITIES
### (continued)

Page

*Louisiana ex rel. Gremillion v. NAACP*,
   366 U.S. 293 (U.S. 1961) ................................................................................29

*McCall v. PacifiCare of California, Inc.*,
   106 Cal. Rptr. 2d 271, 25 Cal.4th 412 (2001) ...................................................35

*McCallister v. Purdue Pharma L.P.*,
   164 F. Supp. 2d 783 (S.D. W.Va. 2001) ...........................................................31

*Medtronic, Inc. v. Lohr*,
   518 U.S. 470 (1996) ...............................................................................33, 34

*Miller v. Johnson*,
   515 U.S. 900 (1995) .......................................................................................29

*National Org. for Women, Inc. v. Scheidler*,
   510 U.S. 249 (1994) .......................................................................................11

*Neder v. United States*,
   527 U.S. 1 (1999) ...........................................................................................7

*New Jersey Citizen Action v. Schering-Plough Corp.*,
   367 N.J. Super. 8, 842 A.2d 174 (2003) ..........................................................13

*New Jersey Citizen Action v. Schering-Plough Corp.*,
   367 N.J. Super. 8, 842 A.2d 174 (N.J. Super. Ct. App. Div. 2003).......................13

*Ohler v. Purdue Pharma, L.P.*,
   2002 WL 88945 (E.D. La. Jan. 22, 2002) ........................................................31

*Osburn v. Anchor Labs.*,
   825 F.2d 908 (5th Cir. 1987) ........................................................................31

*Payne v. Goodyear Tire & Rubber Co.*,
   216 F.R.D. 21 (D. Mass. 2003).......................................................................27

*Pharmacare v. Caremark*,
   965 F. Supp. 1411 (D. Haw. 1996) ................................................................22

*Phillips Petroleum Co. v. Shutts*,
   472 U.S. 797 (1985).......................................................................................26

*R.I. Laborers' Health & Welfare Fund ex rel. Trustees. v. Philip Morris, Inc.*,
   99 F. Supp. 2d 174 (D.R.I. 2000) ...................................................................15

*Rodriguez-Cirilo v. Garcia*,
   115 F.3d 50 (1st Cir. 1997)...........................................................................12

*Rotella v. Wood*,
   528 U.S. 549 (2000).......................................................................................36

*Salois v. The Dime Savings Bank of N.Y.*,
   128 F.3d 20 (1st Cir. 1997).............................................................................36

*Santiago Hedge v. Parke Davis & Co.*,
   909 F.2d 628 (1st Cir. 1990)...........................................................................36

# TABLE OF AUTHORITIES
## (continued)

Page

*Stathis v. Nat'l Car Rental Sys.*,
  109 F. Supp. 2d 55 (D. Mass. 2000) ........................................................27

*Summit Properties Inc. v. Hoechst Celanese Corp.*,
  214 F.3d 556 (5th Cir. 2000) ............................................................13, 14

*Talbott v. C.R. Bard, Inc.*,
  865 F. Supp. 37 (D. Mass. 1994) ...........................................................35

*Thompson v. Metropolitan Life Ins. Co.*,
  149 F. Supp. 2d 38 (S.D.N.Y. 2001) .......................................................36

*Trollinger v. Tyson Foods, Inc.*,
  370 F.3d 602 (6th Cir. 2004) ................................................................15

*Truck Drivers & Helpers Union v. NLRB*,
  993 F.2d 990 (1st Cir. 1993) ................................................................37

*U.S. ex rel Franklin v. Parke-Davis*,
  2003 WL 22048255, *4-*5 (D. Mass. Aug. 22, 2003) ...........................12

*United Paperworkers Int'l Union v. International Paper Co.*,
  985 F.2d 1190 (2d Cir. 1993) ...............................................................38

*United States of America ex rel. David Franklin v. Parke-Davis*,
  147 F.Supp.2d 39 (D. Mass. 2001) ..........................................10, 13, 32

*United States v. Biesiadecki*,
  933 F.2d 539 (7th Cir. 1991) ..................................................................8

*United States v. London*,
  66 F.3d 1227 (1st Cir. 1995) ................................................................20

*United States v. Turkette*,
  452 U.S. 576 (1981) .............................................................................19

*Universal City Studios, Inc. v. Corley*,
  273 F.3d 429 (2d Cir. 2001) .................................................................29

*V.S.H. Realty, Inc. v. Texaco, Inc.*,
  757 F.2d 411 (1st Cir. 1985) ..................................................................9

*Wershba v. Apple Computer, Inc.*,
  91 Cal. App. 4th 224, 110 Cal. Rptr. 2d 145 (Cal. Ct. App. 2001) .........26

*Williams v. Purdue Pharma Co.*,
  297 F. Supp. 2d 171 (D.D.C. 2003) .......................................................18

*Young v. Lepone*,
  305 F.3d 1, 8-9 (1st Cir. 2002) .............................................................36

*Zorba Contractors v. Housing Auth'y*,
  362 N.J. Super.124, 827 A.2d 313 (N.J. Super. Ct. App. Div. 2003) ........9

## STATUTES

18 Pa. C.S. § 4117(a)(2) ..........................................................................9

## TABLE OF AUTHORITIES
### (continued)

**Page**

21 C.F.R. §202.1(1)(2) (1997) ...........................................................................32

21 U.S.C. § 301, *et seq.* ...................................................................................31

21 U.S.C. § 321(k) & (m) .................................................................................32

21 U.S.C. § 352(f) .............................................................................................32

21 U.S.C. § 360aaa(c) .........................................................................................9

21 U.S.C. § 360aaa-1(a)(2) .................................................................................9

California Business & Professions Code § 17204 ............................................26

N.J.S.A 56:8-2 .....................................................................................................9

N.J.S.A. 2A:14-1 ...............................................................................................35

N.J.S.A. 56:8-19 ................................................................................................26

## OTHER AUTHORITIES

First Circuit Pattern Jury Instructions: Criminal § 4.12 (1998) ........................8

Massachusetts General Laws, ch. § 5A ...........................................................35

The Class Plaintiffs (*Harden Manufacturing Corp., et al.* v. *Pfizer, Inc., et al.*) and the Coordinated Third Party Payer ("TPP") Plaintiffs (*The Guardian Life Insurance Company of America* v. *Pfizer, Inc.* and *Aetna, Inc.* v. *Pfizer, Inc.*) (collectively, "Plaintiffs") respectfully submit this memorandum of law in opposition to defendants Pfizer, Inc. and Warner-Lambert Company's (collectively, "Defendants'") motions to dismiss the Amended Class Action Complaint and the First Coordinated Amended Complaint (the "Complaints").

## I.    <u>SUMMARY OF RELEVANT FACTUAL ALLEGATIONS[1]</u>

Shortly after receiving FDA approval to market its anti-epileptic drug, Neurontin, Parke-Davis, the pharmaceutical drug division of Defendant Warner-Lambert, predicted lifetime sales of only $500 million for the drug, which had only been approved for treating epilepsy in combination with more established medications. *See* Cl. Compl. ¶ 17-19; Coord. Comp. ¶ 16-17. While company officials recognized the market for Neurontin's approved use was limited, its marketing department realized that if Neurontin could be expanded into other, more lucrative markets, such as a pain or psychiatric indications, its potential sales would be substantially greater. *See* Cl. Compl. ¶ 20-31; Coord. Comp. ¶ 18-29. There were two obstacles to achieving such a sales expansion. First, Neurontin was not approved for these uses, and Parke-Davis could not legally promote use of Neurontin for unapproved indications. *See* Cl. Compl. ¶ 31-39; Coord. Comp. ¶ 15. Second, as Parke-Davis's market assessments bluntly recognized, there was no scientific rationale for Neurontin to be effective for these uses (and indeed, an early clinical trial in Europe had demonstrated that Neurontin was not effective for migraine patients). *See* Cl. Compl. ¶ 28, 31, 126, 130, 143-44, 149, 152, 167, 174-75; Coord. Comp. ¶ 99, 104, 107, 114-16

---

[1] Plaintiffs cannot adequately summarize the 96 pages of detailed factual allegations in their Complaints in this 40-page brief, which must also respond to 35 pages of legal argument. Plaintiffs understand that the Court is generally familiar with the evidence presented in the *Franklin* case. These well-documented facts, presented in logical sequence in the Complaints, present a vivid and compelling portrait of a company for whom regulation, truth, and honest dealing are mere obstacles to be overcome in the relentless pursuit of increased sales and profits.

429793.2

121-22, 134-35. This lawsuit arises out of the unlawful and deceptive conduct Defendants engaged in to overcome these obstacles.

In 1995, Parke-Davis executives deliberately decided not to perform clinical trials that would have determined whether Neurontin had any utility for off-label uses in favor of publicizing Neurontin's potential for off-label usage through a publication strategy. *See* Cl. Compl. ¶ 24-31; Coord. Comp. ¶ 18-29. Thereafter, its annual marketing plans for Neurontin contained elaborate strategies and tactics to publicize the drug's "emerging uses." *See* Cl. Compl. ¶ 50-54; Coord. Comp. ¶ 25-29. Parke-Davis could not openly promote Neurontin for these indications. Instead, it paid for numerous events – such as "consultants'" meetings, continuing medical "education" seminars and "advisory" boards – that to outward appearances looked like the type of independent programs where non-approved uses of pharmaceutical drugs could legitimately be discussed. *See* Cl. Compl. ¶ 53-55, 60-104; Coord. Comp. ¶ 40-86. However, working closely with medical marketing firms and cooperating physicians, Defendants carefully controlled the content of these events, ensuring that Neurontin was depicted favorably and as a drug of choice for its unapproved uses. *See, e.g.,* Cl. Compl. ¶ 63, 74, 85; Coord. Comp. ¶ 34.

Defendants' depiction of Neurontin's efficacy for unapproved uses was false and misleading in several respects. Defendants ensured that the programs omitted references to the negative clinical trials that determined that Neurontin does not work for numerous off-label uses featured in these events; misrepresented the nature of the evidence that supported the uses advocated; refused to present negative anecdotal evidence or the views of physicians who opposed Neurontin's off-label use; failed to disclose that almost all publications and studies that supported off-label use had been financed or subsidized by Defendants and initiated pursuant to a

marketing plan designed to expand sales; failed to disclose unfavorable studies that Defendants had financed but then buried if the results were unfavorable; and misrepresented the financial connection between the Defendants and the alleged sponsors of the event. *See* Cl. Compl. ¶ 56; 60-104; Coord. Comp. ¶ 37, 40-86. While the physicians attending these events were told that they were receiving scientific information delivered by objective experts, they were being presented an infomercial.

Defendants created "scientific" publications in much the same way they created "scientific" programs. *See* Cl. Compl. ¶ 105-08; 109-23; Coord. Comp. ¶ 31, 35, 36. Working with marketing firms, they hired technical writers to ghostwrite medical articles and paid physicians to loan their names to the publications. *See id.* The publications were then circulated pursuant to the Publication Strategy as "independent" authority in support of the off-label use of Neurontin. *See* Cl. Compl. ¶ 105.

Defendants' marketing plans also relied upon inducing physicians to prescribe Neurontin off-label through the use of kickbacks. *See* Cl. Compl. ¶ 210-33; Coord. Comp. ¶ 87-95. For the highest prescribing physicians, Defendants held lavish conferences in resorts, paying all of the physicians' expenses so the invitees could hear about the latest uses of Neurontin for unapproved indications. *See* Cl. Compl. ¶ 213, 216, 219; *see, e.g.,* Coord. Comp. ¶ 89. While not all physicians received the "high roller" treatment reserved for the highest prescribers, there were numerous dinner meetings at lavish restaurants, and physicians were often paid honoria of $200 for doing nothing more than showing up. *See* Cl. Compl. ¶ 222. Doctors who might be willing to put their names on case reports or articles, or otherwise champion Neurontin, were given substantial grants. *See* Cl. Compl. ¶ 226-32; Coord. Comp. ¶ 88, 92. Parke-Davis funded numerous "studies" by Neurontin champions that it knew had virtually no scientific merit. *See*

*id;* Coord. Comp. ¶ 25-28, 88.  The object of Defendants' largesse was to induce physicians to ignore their fiduciary duties to their patients by prescribing Neurontin for an unproven use.  *See* Cl. Compl. ¶ 216, 219, 220;  Coord. Comp. ¶ 88.  Such conduct amounts to commercial bribery under state statutes.

The prohibition against directly promoting Neurontin for off-label uses required Defendants to work with medical marketing firms and cooperating doctors (identified as participating vendors and participating physicians, respectively, in Plaintiffs' complaints) in order to publicize Neurontin to the medical community.  *See* Cl. Compl. ¶ 44-104;  Coord. Comp. ¶ 40-95.  Defendants formed one enterprise, with several sub-enterprises, for this purpose. *See* Cl. Compl. ¶ 266-78;  Coord. Comp. ¶ 30-169.  As described in the Complaints, Defendants, with the assistance of participating vendors, promulgated marketing strategies and tactics designed to publicize Neurontin's "emerging uses."  *See* Cl. Compl. ¶ 44-49;  Coord. Comp. ¶ 24-29, 41.  Pursuant to these plans, the enterprise hosted events and created articles in which the Defendants' participation was hidden from view.  *See* Cl. Compl. ¶ 50-104;  Coord. Comp. ¶ 44-95.  Nonetheless, Defendants, through their control over the money flow to the other members of the conspiracy, effectively controlled the content of the presentations and publications.  *See* Cl. Compl. ¶ 48, 44-103;  Coord. Comp. ¶ 39, 80.  The participating physicians were formally retained by the participating vendors to deliver Defendants' message, and were paid with funds received from Defendants.  *See* Cl. Compl. ¶ 96-104;  Coord. Comp. ¶ 88-89.  A relatively small stable of these physicians made numerous appearances for the various vendors, giving essentially the same misleading pro-Neurontin presentations at each event.  *See id.*  The common purpose of all participants in the enterprise was to promote the off-label use of Neurontin, an objective all participants knew could not be legally accomplished by Defendants.  *See* Cl. Compl. ¶ 47;

-4-

Coord. Comp. ¶ 38.   Because there was, and still is, no scientific evidence to support the use of

Neurontin for almost all of the off-label uses it was being touted for, such one-sided

presentations were, by their very nature, highly misleading and full of misrepresentations.  *See*

Cl. Compl. ¶ 124-205; Coord. Comp. ¶ 98, 99-168.

The participating vendors were well aware that their final product was biased and one-

sided; they intentionally created their programs *not* to be fair and balanced.  *See* Cl. Compl. ¶ 56;

Coord. Comp. ¶97-98.  The participating physicians also were aware that the clinical evidence

was insufficient to support the claims that Neurontin was effective for most of the off-label

indications, and shared among themselves (but concealed from attendees) their own significant

doubts that Neurontin really worked for those uses.  *See* Cl. Compl. ¶ 102;  Coord. Comp. ¶ 97-

98.

The promotional enterprise succeeded beyond even Defendants' expectations.  By 2003,

Neurontin was generating more than $2.2 billion in annual revenue for Defendants, more than

four times the revenue Parke-Davis had estimated for the entire life-cycle of the drug.  *See* Cl.

Compl. ¶ 235;  Coord. Comp. ¶ 1, 4.  More than 90% of this revenue was for off-label uses

promoted by the Defendants.  *See id.*  Given the paucity of evidence to support off-label uses of

the drug, and the unprecedented campaign to unlawfully promote those uses, there is little doubt

that these riches were the proverbial "fruit of the poisonous tree."

## II.    PLAINTIFFS HAVE ALLEGED THAT DEFENDANTS COMMITTED FRAUD

Defendants misstate both Plaintiffs' allegations and the law in arguing that Plaintiffs have

not alleged fraud or scienter on the part of Defendants.  First, Defendants misstate the

requirements for alleging fraud and scienter under RICO, Plaintiffs' statutory fraud claims, and

the common law, claiming that to be actionable, Plaintiffs must allege affirmative false

statements.  Defendants cite virtually no case law to support this argument, and ignore the fact

that half-truths, omissions, and nondisclosures are equally actionable.  Second, Defendants completely mischaracterize the factual allegations here.  Not only have Plaintiffs alleged throughout the complaint that Neurontin is ineffective for unapproved uses (which in and of itself defeats Defendants' argument),[2] Defendants further ignore the highly particularized allegations of half-truths, distortions, and misleading omissions detailed in the Complaints.

The crux of Plaintiffs' allegations – detailed in over 100 pages – is that Defendants engaged in an all-out campaign to distort, manipulate, and misrepresent information concerning Neurontin's safety and efficacy for off-label uses to mislead and deceive the medical community. At the same time Defendants knew about studies and data establishing or suggesting that Neurontin was ineffective for off-label uses – or, in some cases, that there was simply no scientific basis for suggesting that Neurontin *was* effective for those uses – Defendants deliberately and systematically force-fed incomplete, inaccurate and misleading information to the medical community regarding those uses, knowing and intending that this would create the impression that Neurontin was effective for such indications.  The Complaints overflow with truly shocking examples of these affirmative misrepresentations, half-truths and omissions, which created a false and misleading impression of the available information concerning the safety and efficacy of Neurontin for various off-label uses.[3]

---

[2] *See, e.g.*, Cl. Comp. ¶ 249 ("The fraudulent scheme was designed to, and did, cause Plaintiffs and the Class to pay for Neurontin prescriptions to treat conditions for which the drug is not effective.  Patients including the individual Plaintiffs, the individual class members, and individual Plaintiffs whose prescription drug charges were paid by TPP class members, and who were prescribed the drug for non-approved uses received no greater relief from, or treatment of, their medical conditions than they would have received from a placebo.  The fraudulent scheme also caused Plaintiffs and the Class to pay for Neurontin prescriptions to treat non-FDA approved conditions for which it was not effective."); *see also* Coord. Comp. ¶ 249.  *See also* Cl. Comp. ¶¶ 3, 4, 45, 102, 152 156, 164, 197, 209, 238; Coord. Comp. ¶¶ 2, 119, 24, 29, 36, 42, 123, 162 (alleging that Neurontin was not proven to be effective for unapproved uses).  While Plaintiffs have clearly alleged that Neurontin is ineffective for unapproved uses, their claims do not depend on proof of that fact.  Rather, it is the *absence* of scientific evidence that Neurontin is effective for unapproved uses that renders Defendants' claims of effectiveness misleading and actionable.

[3] *See* Cl. Comp . ¶ 129-34; Coord. Comp. ¶ 102-06 (at numerous presentations, speakers stated that Neurontin was effective for the treatment of pain; participants were not informed there was no clinical evidence to support these

429793.2

Defendants misstate the law governing Plaintiffs' statutory and common law fraud causes of action.  First, as for the RICO claims, the principal predicate acts alleged by Plaintiffs are mail and wire fraud.  *See* Cl. Comp. ¶ 250-52; Coord. Comp. ¶ 184-85.  Mail and wire fraud require proof that (1) defendants knowingly devised or participated in a scheme to defraud, (2) to obtain money or property by means of false or fraudulent pretenses, representations, and promises, and (3) that the mails or interstate wire facilities were used in carrying out the scheme.  *See Neder v. United States*, 527 U.S. 1, 20 (1999).  According to the First Circuit:

> [T]he *locus classicus* of fraud is a seller's affirmative false statement or *a half truth, i.e., a statement that is literally true but is made misleading by a significant*

claims; only favorable anecdotal evidence was presented to support use; anecdotal evidence of failure to treat pain was not presented); Cl. Comp. ¶ 135-39; Coord. Comp. ¶ 107-11 (after study sponsored by Parke-Davis concluded that Neurontin was ineffective for treatment of diabetic peripheral neuropathy, Parke-Davis misrepresented conclusion to Drugdex, obtaining citation omitting authors' conclusion and falsely stating that authors suggested higher doses may be effective; company continued to promote Neurontin for this use at numerous events, at which conclusion of study was not disclosed); Cl. Comp. ¶¶ 140-48; Coord. Comp. ¶¶ 112-19 (despite unpublished study sponsored by Parke-Davis which demonstrated Neurontin was ineffective for treatment of Restless Leg Syndrome, at numerous events, speakers routinely stated that Neurontin was effective for this use, and results of study were not disclosed; Parke-Davis medical liaisons routinely and falsely told physicians that researcher's patients had 90% favorable response rate; sales representatives regularly and falsely told doctors Neurontin was effective for this use); Cl. Comp. ¶ 149-56; Coord. Comp. ¶ 120-25 (despite clinical trial showing Neurontin was no more effective than a placebo in treating bipolar disorder, speakers at events routinely stated that Neurontin was effective for this use, and presented only favorable case reports; sales representatives regularly and falsely told physicians Neurontin was effective for this use); Cl. Comp. ¶ 157-60; Coord. Comp. ¶ 126-29 (speakers at events routinely stated that Neurontin was effective for treatment of social phobia, despite study sponsored by Parke-Davis which was unable to conclude it was effective); Cl. Comp. ¶ 162-65; Coord. Comp. ¶ 130-32 (despite clinical trial sponsored by Parke-Davis concluding that Neurontin was no more effective than a placebo in treating panic disorder, speakers at events routinely stated that Neurontin was effective for this use, without informing attendees of negative trial); Cl. Comp. ¶ 166-72; Coord. Comp. ¶ 133-40 (despite two clinical trials concluding that Neurontin was not effective as monotherapy for the treatment of epilepsy, and FDA rejection of application for that use, speakers at events asserted that Neurontin was effective for that use, and attendees were not informed of negative trials or FDA rejection; sales representatives routinely and falsely told physicians Neurontin was effective as a monotherapy, and would soon be approved for monotherapy); Cl. Comp. ¶ 173-81; Coord. Comp. ¶ 133-40 (despite study conducted by Parke-Davis concluding that Neurontin was no more effective than a placebo in migraine headache prophylaxis, and negative reports from its own advisory board physicians, speakers at events regularly touted Neurontin as effective for the treatment of migraine, and attendees were not informed of the negative clinical trial or reports; sales representatives routinely and falsely told physicians Neurontin was effective in controlling migraines); Cl. Comp. ¶ 183-97; Coord. Comp. ¶ 148-62 (despite studies indicating that dosages above the FDA-approved recommended maximum of 1800 mg/day were no more effective, and FDA's refusal to increase the maximum dosage because there was no evidence Neurontin was safe at such doses, at numerous events, speakers routinely stated that dosages as high as 4800 mg/day were safe and increased effectiveness, and participants were never informed of negative dose-response studies or that FDA rejected application to allow higher dosages); Cl. Comp. ¶ 198-205; Coord. Comp. ¶ 163-68 (despite study and reports showing that Neurontin could cause serious behavioral side effects, weight gain, and withdrawal syndrome, and that the prevalence of side effects increased with dosage, at numerous events, speakers routinely stated that Neurontin had a low side effect profile and that high dosages did not cause side effects).

*omission.* At common law, fraud doctrine did not impose any broader, general
duty to disclose but it is settled that the mail and wire fraud statutes go somewhat
beyond the common law. Thus, a leading commentary on federal jury
instructions says that even where there is no falsehood or half truth: *"[The]
failure to disclose information may also constitute a fraudulent representation
[under the mail and wire fraud statutes] if the defendant was under a legal,
professional or contractual duty to make such a disclosure. . . ."*

*Bonilla v. Volvo Car Corp.,* 150 F.3d 62, 69-70 (1st Cir. 1998) (citations omitted; emphasis

added).[4]

Here, the fraudulent scheme consists of affirmative misrepresentations, nondisclosures,

half-truths *and* misleading impressions. Defendants were highly selective in releasing

information to the medical community regarding the safety and efficacy of Neurontin for off-

label uses, and deliberately withheld the negative information in their possession. As stated in

*Lupron*, "[w]hether one views the defendants' actions as involving the dissemination of

information that was wholly false, *or false because of an incomplete depiction of the truth*, they

are actionable under the mail and wire fraud statutes." *Lupron*, 295 F. Supp. 2d at 167-68

(emphasis added).[5]

Furthermore, under *Bonilla*, even absent a "falsehood or half truth," Defendants' failure

to disclose negative information in their possession constitutes a "fraudulent representation"

under the mail and wire fraud statutes, because these Defendants were "under a legal . . . [and]

professional . . . duty to make such a disclosure . . . ." 150 F.3d at 70. As alleged in the

---

[4] *See also In re: Lupron Mktg. & Sales Practices Litig.*, 295 F. Supp. 2d 148, 165 (D. Mass. 2003) (concept of fraud
under RICO is "to be construed very broadly" and "[term 'false or fraudulent pretenses'] include[s] actual, direct
false statements, *as well as half-truths and the knowing concealment of facts*") (citing to First Circuit Pattern Jury
Instructions: Criminal § 4.12 (1998) (emphasis added)).

[5] Numerous other courts have echoed this view that mail and wire fraud encompasses affirmative false statements,
half-truths and incomplete depictions of the truth. *See, e.g., United States v. Biesiadecki*, 933 F.2d 539, 543 (7th Cir.
1991) (quoting the jury instruction approvingly: "Under the mail and wire fraud statutes it is unlawful to make false
or misleading statements in furtherance of the scheme. *It is also unlawful to speak half truths or to omit to state
facts necessary to make the statements made in light of the circumstances under which they were made not
misleading.*") (emphasis added).

429793.2

Complaints, pharmaceutical manufacturers are under a legal duty to provide only fair and balanced information regarding their products for off-label use.[6]  The Complaints are replete with instances of material nondisclosures by Defendants, in violation of their duty to disclose. *See* n.3, *supra*.

Similarly, the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1, *et seq*. ("NJCFA") expressly proscribes:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, *or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission* . . . .

N.J.S.A 56:8-2 (emphasis added).[7]  Plaintiffs' allegations are more than sufficient to state a claim under the NJCFA.  Likewise, material omissions and nondisclosures are actionable under California's Unfair Competition Law, Bus. & Prof. Code § 17200, *et seq*. ("UCL"), the Pennsylvania Insurance Fraud Statute, and as common law fraud.[8]

---

[6] *See* 21 U.S.C. § 360aaa-1(a)(2) (manufacturer may not disseminate misleading information on unapproved use); 21 U.S.C. § 360aaa(c) (information on off-label use which is not "objective and balanced" subject to agency action). *See also American Medical Association Guidelines* E-8.061 *Gifts to Physicians from Industry*, at (7), available at http://www.ama-assn.org (revised Jul. 2003) (manufacturers should have no control over speaker or content of educational presentations); *PhRMA Code on Interactions with Healthcare Professionals*, at 9 (adopted April 18, 2002), available at http://www.phrma.org (revised Jan. 2004) (same); Office of Inspector General, *Compliance Program Guidance for Pharmaceutical Manufacturers*, at 34-35 (April 2003) (same); Cl. Comp., ¶¶ 32-38 (alleging duty); Coord. Compl., ¶¶ 15-17.

[7] *See also Leon v. Rite Aid Corp*., 340 N.J. Super. 462, 470, 774 A.2d 674 (N.J. Super. Ct. App. Div. 2001) (holding that "[a] false statement of fact is not, however, an essential ingredient of a plaintiff's cause of action based on affirmative wrongdoing.").  The capacity to mislead is the key ingredient of a claim under the NJCFA, regardless of whether the claim is based on material omissions or affirmative misrepresentations.  *See Island Mortg. of New Jersey v. 3M*, 373 N.J. Super. 172, 177, 860 A.2d 1013 (N.J. Super. Law. Div. 2004).

[8] *See Day v. AT&T Corp*., 63 Cal. App. 4th 325, 332-33, 74 Cal. Rptr. 2d 55, 60 (1998) ("A perfectly true statement couched in such a manner that it is likely to mislead or deceive the consumer, such as by failure to disclose other relevant information, is actionable under [the UCL].");  18 Pa. C.S. § 4117(a)(2) (providing that a person commits the offense if he or she knowingly and with the intent to defraud any insurer or self-insured, presents or causes to be presented to any insurer or self-insured any statement forming a part of, or in support of a claim that contains any false, *incomplete, or misleading* information.) (emphasis added); *Zorba Contractors v. Housing Auth'y*, 362 N.J. Super.124, 139, 827 A.2d 313, 322 (N.J. Super. Ct. App. Div. 2003) (material omissions may constitute common law fraud); *V.S.H. Realty, Inc. v. Texaco, Inc.*, 757 F.2d 411, 414-15 (1st Cir. 1985) (under Massachusetts law, "a party who discloses partial information that may be misleading has a duty to reveal all the material facts he knows to avoid deceiving the other party").

Although the Complaints devote a full 35 pages to a detailed description of Defendants' fraud (Cl. Comp. ¶¶ 115-206, Coord. Comp. ¶¶ 99-168), which Defendants acknowledge specifies "names, dates, and locations" (Br. at 1), they insist that the Court should demand even *more* particularity to satisfy Rule 9(b). A similar argument was rejected by this Court in the related *qui tam* action, *United States of America ex rel. David Franklin v. Parke-Davis*, 147 F. Supp. 2d 39, 49 (D. Mass. 2001): "where the alleged scheme of fraud is complex and far-reaching, pleading every instance of fraud would be ungainly even impossible." In denying the Defendants' motion to dismiss, the Court found that the complaint amply detailed both a "general framework" and "more specific information on the individuals, locations, the precise statements alleged to be false and time-frames involved." *See id.* The same is true of Plaintiffs' Complaints here.[9]

Finally, Defendants make the half-hearted argument that Plaintiffs fail to adequately allege scienter. Rule 9(b) states that "malice, intent, knowledge, and other conditions of mind of a person may be averred generally." However, there is more than enough information contained in the Complaints from which one can infer fraudulent intent. The Complaints are full of allegations of knowing or reckless conduct, including allegations that Defendants: (a) deliberately misrepresented the safety and efficacy of Neurontin; (b) deliberately misrepresented the credentials and qualifications of certain of Defendants' employees in order to market Neurontin for off-label uses; (c) bribed physicians to prescribe Neurontin for off-label uses; (d) knowingly published articles, studies and reports misrepresenting the scientific credibility of data and the authors of the articles, studies and reports; (e) organized seminars and events encouraging physicians to prescribe Neurontin for off-label uses in flagrant violation of

---

[9] As in *Lupron*, "defendants' claim that they lack the required notice is somewhat incredulous given the criminal investigation . . . and the civil settlement with the government that preceded the Amended Complaint." 295 F. Supp. 2d at 170.

federal law, knowing that such uses were not proven to be medically effective; and

(f) intentionally misrepresented and concealed Defendants' lead role in the improper creation and

sponsorship of a variety of seminars, events, articles and publications aimed at selling Neurontin

for off-label uses.[10]

They did all of this in an all-out effort to increase sales of Neurontin. Indeed, Warner

Lambert pled guilty and paid more than $430 million to resolve serious criminal and civil

charges arising out of its off-label promotion of Neurontin. Cl. Comp. ¶¶ 177; Coord. Comp.

¶¶ 241, 243. These factual allegations raise an obvious inference that Defendants knew full well

what they were doing and intended to commit fraud.[11]

## III. PLAINTIFFS HAVE ALLEGED THAT DEFENDANTS CAUSED THEM INJURIES

### A. Plaintiffs Have Alleged Proximate Cause

At the pleading stage of a RICO case, "general factual allegations of injury resulting from

the defendant's conduct may suffice, for on a motion to dismiss we presume that general

allegations embrace those specific facts that are necessary to support the claim." *National Org.*

*for Women, Inc. v. Scheidler*, 510 U.S. 249, 256 (1994). Despite this liberal pleading standard,

Defendants argue that Plaintiffs have not pled any causal link between their misconduct and

Plaintiffs' payments for Neurontin. Plaintiffs have chronicled Defendants' deliberate decision –

taken at the highest corporate levels – to unlawfully promote Neurontin for off-label uses, with

---

[10] *See, e.g.*, Cl. Comp. ¶¶ 31, 40, 45, 53-56, 63, 68, 74, 75, 78-81, 83-86, 89, 91, 95, 96-104, 107-13, 116-122, 125, 128, 129-34, 135-39, 140-42, 144-46, 148, 149-50, 153-54, 156-157, 159, 162-64, 166-71, 178-181, 182, 189-93, 197, 206-12, 223-25, 226, 229-31; Coord. Comp. ¶¶ 17-23, 25, 26, 28, 29-32, 34, 36, 37, 41, 42, 49, 77, 78, 80, 87, 92, 98, 101-105, 107-111, 113-117, 119-125, 126-132, 134-147, 150-162, 167-168, 174-175, 179.

[11] Defendants appear to contend that they cannot be held liable for the resulting misrepresentations, half-truths, and non-disclosures, so long as they withheld from their physician-presenters and sales representatives the negative information in Defendants' possession regarding off-label uses. This is akin to arguing that a company may engage in false advertising with impunity, because the television station or newspaper that actually disseminates the advertising is ignorant of the fraudulent nature of its contents.

the hope and expectation of greatly increasing sales.  Plaintiffs detail the development and execution of Defendants' elaborate scheme over a multi-year period.  *See, e.g.,* Cl. Comp. ¶ 19-49, 234-239; Coord. Comp. ¶¶ 17-39, 170-175.  Plaintiffs allege that they were directly targeted by Defendants' scheme, and that as a result of Defendants' misconduct, sales of Neurontin soared from $97.5 million in 1995 to nearly $2.7 billion in 2003, with 90% of the increased sales for off-label uses.  *See, e.g.,* Cl. Comp. ¶ 27-29, 46, 249-313; Coord. Comp. ¶¶ 4, 23, 33, 171, 183.  In a nutshell, Defendants make the patently absurd argument that Plaintiffs cannot prove that Defendants' carefully crafted plan worked, even though it appears to have worked remarkably well.  That is a jury question, not a basis for a motion to dismiss.

This Court has already held as much in the related *qui tam* litigation, applying "common law tort causation concepts":

> "[T]here are two questions that must be answered to determine if a defendant's conduct 'caused' a plaintiff's injury.  The first question is whether . . . the defendant's conduct was a 'substantial factor' in producing the harm.  The second question is whether the circumstances and causal relationship are such that the law will impose liability on the defendant.  Sometimes this is expressed as a foreseeability test."

> Whether Parke-Davis's conduct was a substantial factor in causing the presentation of false Medicaid claims is a question of fact.  Relator has produced enough evidence on this score to create at least a genuine issue of material fact ….

> As for proximate or legal causation, the Court has already held that Parke-Davis could have foreseen false Medicaid claims being filed, even with the intervening links in the causal chain[.].

*United States ex rel Franklin v. Parke-Davis*, 2003 WL 22048255, *4-5 (D. Mass. Aug. 22, 2003) (quoting *Rodriguez-Cirilo v. Garcia*, 115 F.3d 50, 54 (1st Cir. 1997) (Campbell, J., concurring)) (other citations omitted).  As the quoted language indicates, this Court also rejected Defendants' argument, recycled here, that prescribing physicians constitute an "intervening cause" disrupting the chain of causation:

429793.2

> Defendant argues that Relator has not stated a claim because he has not accounted
> for the independent actions of the physicians who wrote the off-label prescriptions
> and the pharmacists who accepted and filled the off-label prescriptions. In other
> words, Defendant argues that – as a matter of law – . . . the actions of these
> professionals were an intervening force that breaks the chain of legal causation.
> Under black letter law, however, such an intervening force only breaks the causal
> connection when it is unforeseeable.  In this case, when all reasonable inferences
> are drawn in favor of the Relator, the participation of doctors and pharmacists in
> the submission of false Medicaid claims was not only foreseeable, it was an
> intended consequence of the alleged scheme of fraud.

*Franklin*, 147 F. Supp. 2d at 52-53 (citations omitted).  In this case, it was an equally foreseeable

and intended consequence of Defendants' scheme that physicians (in most cases, the same

physicians) would prescribe Neurontin for unapproved uses.[12]  And it was equally foreseeable

that private third party payers, in addition to Medicaid, would receive claims for the cost of those

prescriptions.

Defendants' companion argument, that "plaintiffs may not plead or prove causation

through a fraud-on-the-market theory" (Br. at 12), is similarly unavailing.  According to the very

cases cited by Defendants, that theory is that the *price* of a drug was "driven up to artificially

high levels through demand for them generated by" a misleading direct-to-consumer marketing

campaign.  *New Jersey Citizen Action v. Schering-Plough Corp.*, 367 N.J. Super. 8, 842, A.2d

174 (N.J. Super. Ct. App. Div. 2003).[13]  Plaintiffs advance no such "price inflation" theory here.

*See Summit Properties*, 214 F.3d at 560 ("Of course, if the sales would not have occurred absent

---

[12] In support of their "intervening cause" argument, Defendants' rely exclusively on *New Jersey Citizen Action v. Schering-Plough Corp.*, 367 N.J. Super. 8, 842 A.2d 174 (N.J. Super. Ct. App. Div. 2003).  That case holds that the relationship between *direct to consumer* advertising and physician prescribing behavior is attenuated.  *Id.* at 14-15, 842 A.2d at 177-78.  Plaintiffs need not quarrel with that proposition here, as Defendants' misinformation campaign was directed in the first instance at prescribing physicians, not consumers.

[13] *See also Heindel v. Pfizer, Inc.*, 2004 WL 1398024, *13-15 (D.N.J. June 7, 2004) (rejecting "fraud on the market theory" that "Defendants' failure to advertise potential side effects of Celebrex and Vioxx boosted sales and *caused price inflation*" (emphasis added)); *Summit Properties Inc. v. Hoechst Celanese Corp.*, 214 F.3d 556, 561 (5th Cir. 2000) ("fraud on the market" theory "assumes that prices in an efficient market incorporate the relative importance of public information"); *Fink v. Ricoh Corp.*, 365 N.J. Super. 520, 534, 839 A.2d 942 (N.J. Super. Ct. Law Div. 2003) ("Plaintiffs claim that the price of the RDC-1 camera was artificially inflated by an increase in the product's demand based on the marketing campaign of Ricoh").

429793.2

the fraud, the fraud would have been a 'but for' cause of the plaintiffs' injuries.")[14]

### B.    TPPs Were Directly Injured by Defendants' Misconduct

Defendants argue that the TPP's RICO claims must be dismissed because they "do not and cannot allege that they were directly injured by defendants' alleged conduct." Br. at 13-14. In *Desiano v. Warner-Lambert Co.*, 326 F.3d 339 (2d Cir. 2003), the Second Circuit squarely rejected these very arguments, by these very Defendants, supported by the same legal authorities,[15] for reasons equally applicable here:

> In *Laborers Local 17*, the tobacco companies' alleged tort directly harmed only the smokers, who suffered both a health injury (smoking-related illness) and an economic injury (the purchase price of the fraudulently marketed cigarettes). The smokers' health injuries, in turn, caused economic losses to the insurance companies, who had to reimburse patients for the cost of their smoking-related illnesses. That case was therefore clearly one in which the plaintiffs' damages were entirely derivative of the injuries to their insured. For, as we there noted, "[w]ithout injury to the individual smokers, the [plaintiffs] would not have incurred any increased costs. *Laborers Local 17*, 191 F.3d at 239.

> In the instant case, instead, Plaintiffs allege an injury directly to themselves; an injury, moreover, that is unaffected by whether any given patient who ingested Rezulin became ill. Plaintiffs' claim is that the Defendants' wrongful action was their misrepresentation of Rezulin's safety, and that this fraud directly caused economic loss to them as purchasers, since they would not have bought Defendants' product, rather than available cheaper alternatives, had they not been misled by Defendants' misrepresentations. Thus the damages – the excess money Plaintiffs paid Defendants for the Rezulin that they claim they would not have purchased "but for" Defendants' fraud – were in no way "derivative of damage to a third party."

* * *

Nor does *Holmes* help Defendants' argument. First, since Plaintiffs' claims do

---

[14] Defendants' "fraud on the market" argument fails for the second and independent reason that where, as here, Plaintiffs are the "target[s] of a fraud," they need not prove reliance. *Summit Properties*, 214 F.3d at 561.

[15] Although *Desiano* involved claims under New Jersey law, it expressly held that the plaintiff TPPs satisfied the requirements for pleading proximate cause under *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258 (1992) and *Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.*, 191 F.3d 229 (2d Cir. 1999). *See id.* at 349 ("Defendants' position . . . is that New Jersey's common-law proximate cause requirements mirror those of *Holmes* and *Laborers Local 17.* . . [E]ven assuming arguendo that Defendants are correct, their argument is to no avail, for the situations in *Holmes* and *Laborers Local 17* are significantly different from the instant case.").

429793.2

> not rely on injuries sustained by Rezulin users, the first prong of the *Holmes* test
> for liability is satisfied.  As explained above, Plaintiffs allege (1) that Warner-
> Lambert misrepresented its product to Plaintiffs; and (2) that, because of these
> misrepresentations, the HBPs [Health Benefit Providers] overpaid to purchase
> Rezulin.[16]  No consequential injury is, therefore, at issue. Second, Plaintiffs' suit
> raises no apportionment difficulties because each HBP and its patient co-payer
> has its own, segregable, claim for economic harm, to the extent of their respective
> co-pay.  Finally, as to the third prong in *Holmes*, Plaintiffs correctly note that the
> HBPs, as 90 percent co-payers, are the parties with the largest direct economic
> injury, and are the most motivated parties to pursue recovery from the $1.4 billion
> they paid for Rezulin.

326 F.3d at 349-50 (footnotes omitted).[17]  In so holding, the court observed that "this and other

courts have long recognized the right of HBPs to recover from drug companies amounts that

were overpaid due to illegal or deceptive marketing practices."  326 F.3d at 350 (citations

omitted).  The TPPs have those same rights here.

Similarly, in *In re Pharmaceutical Indus. Average Price Litig.,* 307 F. Supp. 2d 196, 207-

208 (D. Mass. 2004) ("*AWP II*"), this Court rejected as "bordering on the frivolous" these same

causation arguments by Pfizer and its co-defendants:

> The Defendants' arguments are not persuasive.  In the private, end-payor context,
> the harm alleged by Defendants' alleged actions is visited directly upon the end-
> payor Plaintiffs, as they have paid directly for the named drugs....  Similar
> arguments about intervening causes between the setting of an AWP by a
> defendant and injuries to plans and individual co-payors were recently rejected as
> 'border[ing] on the frivolous,' *In re Lupron Marketing and Sales Practices Litig.*,
> 295 F.Supp.2d 148, 175 (D. Mass. 2003) (Stearns, J.), for 'the argument ignores
> ... the corollary requirement that the intervening act be unforeseeable and
> completely independent of any act undertaken by the original actor,' *id.*, a
> requirement not met in this case.

The conclusion that proximate cause exists is supported by the reasoning set forth

---

[16] Despite this language in *Desiano*, the TPPs did not assert a "fraud on the market" theory of damages; rather, as here, they "sought to recover the moneys they spent purchasing" the drug at issue.  326 F.3d at 345.

[17] Defendants' reliance on *R.I. Laborers' Health & Welfare Fund ex rel. Trustees. v. Philip Morris, Inc.*, 99 F. Supp. 2d 174 (D.R.I. 2000) is equally misplaced, as that case was but a carbon copy of *Laborers Local 17*.  The only other case cited by Defendants in support of this argument actually supports Plaintiffs' contention that proximate causation has been appropriately alleged.  *See Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 619 (6th Cir. 2004) (rejecting defendant's argument that employees' union was the more directly injured party and reversing dismissal of employees' RICO claim alleging use of illegal immigrants to suppress salaries).

429793.2

> in *Holmes*:  the Defendants do not argue that there would be any particular
> difficulty in allocating damages; there are no other victims that will be sharing in
> the amounts claimed by Plaintiffs; and as the Plaintiffs are the ones directly
> injured, no other party is better placed to vindicate their interests.

307 F. Supp. 2d at 207-08.[18]  The TPPs are entitled to redress for their direct injuries incurred as

a result of Defendants' fraudulent scheme.

### C.    Plaintiffs Have Alleged Cognizable Injuries

Defendants argue that Plaintiffs have not alleged a "cognizable injury" (Br. at 14) by

failing to allege that Neurontin did not perform as expected.  As noted above, Plaintiffs have

alleged that Neurontin is ineffective (or had not been proven effective) in treating the off-label

conditions for which it was prescribed.  *See* n.2, *supra*.  These allegations alone defeat

Defendants' argument.

Even absent proof that Neurontin is ineffective for these conditions – or a failure of proof

as to whether it is effective or not – Defendants' misrepresentations, half-truths, and non-

disclosures caused Plaintiffs damages, and unjustly enriched Defendants at Plaintiffs' expense.

In *Desiano*, the plaintiff health insurers brought actions against these same Defendants, seeking

recovery of the purchase price of the diabetes drug Rezulin, on the ground that Defendants

fraudulently promoted it as safer and more effective than alternative medications:  "Plaintiffs'

claim is that Defendants' wrongful action was their misrepresentation of Rezulin's safety, and

that this fraud directly caused economic loss to them as purchasers, since they would not have

bought Defendants' product . . . had they not been misled by Defendants' misrepresentations."

326 F.3d at 349.  Defendants recycle the same argument rejected by the Second Circuit in

---

[18] *See also In re Lorazepam & Clorazepate Antitrust Litig.*, MDL Docket No. 1290, Misc. No. 99mc0276 (D.D.C. Mar. 30, 2005) (denying defendants' motion for summary judgment, finding material issues of fact as to whether defendants' conduct proximately caused plaintiff insurance companies to incur damages in connection with reimbursements for prescription drugs, and noting "[a]lthough the physician prescribes, the pharmacist dispenses and the patient takes the medication, *it is the insurer such as plaintiffs who actually pay*." (emphasis in original)) (filed concurrently in Appendix of Unpublished Authorities, Tab 4).

429793.2

*Desiano*:

> Defendants argue . . . that "[i]f Rezulin had been effective in all diabetic patients without any side effects, plaintiffs would have no basis for a claim." But it is easy to see how Defendants' reasoning is flawed. Consider, for example, a hypothetical in which a defendant drug company markets a 'new,' much more expensive drug claiming it is a great advancement (safer, more effective, etc. than metformin—the standard diabetes drug) when in fact the company is simply replicating the metformin formula and putting a new label on it. In other words, the only difference between metformin and the 'new' drug is the new name and the higher prescription price. . . In that case, the 'new' drug would be *exactly* as safe and effective as metformin, and thus there could be no injury to any of the insurance company's insured. Nevertheless, the insurance companies would be able to claim – precisely as they do here—that the defendants engaged in a scheme to defraud it, and that the company suffered direct economic losses as a result.

326 F.3d at 349-50.

Here, Plaintiffs allege that Defendants actively promoted Neurontin for off-label uses, despite their awareness of data and studies – many of which *they themselves* conducted – indicating that it was *in*effective for those uses, or the absence of scientifically sound evidence that it *was* effective. Plaintiffs further allege that Defendants fraudulently induced physicians to prescribe ever higher doses of Neurontin – as high as 266% of the maximum dose Defendants were lawfully permitted to recommend for its *approved* uses – notwithstanding that their own unpublished studies showed that increased doses were no more effective, and without disclosing the fact that the FDA had *denied* Defendants' application to increase the maximum recommended dose because there was no evidence Neurontin was *safe* at higher doses, and no evidence that higher doses were any more effective. Cl. Comp. ¶¶ 183- 197; Coord. Comp. ¶¶ 148-62. Discovery will reveal how many billions of dollars Defendants "earned" as a result of this particular fraud, which is but one of the many Defendants used to "sell' their product to captive audiences of physicians corralled by Defendants' vassals, medical marketing companies masquerading as educators. *See* Cl. Comp. ¶¶ 32-123; Coord. Comp. ¶¶ 30-98 (detailing

Defendants' use of medical marketing companies to lure high-prescribing physicians to resort destinations to receive carefully scripted sales pitches for off-label uses).  As in *Desiano*, Plaintiffs are damaged because they paid for Neurontin tablets that but for Defendants' fraud, they would never have bought at all.[19]

## IV.    PLAINTIFFS ADEQUATELY ALLEGE *RICO* CLAIMS

Plaintiffs allege that Defendants conducted the affairs of the "Off Label Promotion Enterprise" (Cl Comp.) or "Promotion Enterprise" (Coord. Compl.) (collectively, the "Promotion Enterprise" or the "Enterprise"), associations-in-fact consisting of Defendants, eight specific medical marketing firms, dozens of specifically identified physician "authors" and speakers, and numerous non-physician technical writers, each of whom willingly played their assigned part in the Neurontin Medicine Show.  *See* Cl. Compl. ¶¶ 43-114;  Coord. Compl. ¶¶ 30-98.  The Defendants directed the overall Enterprise, and kept most of of the profit.  *See* Cl. Compl. ¶¶ 43-46;  Coord. Compl. ¶¶ 30-39.   Their *consigliere*, the medical marketing firms, were happy to have long and lucrative contracts with a large and stable client, confident that if they were successful in their joint endeavor, more such work lay ahead.  *See* Cl. Compl. ¶¶ 50-95;  Coord. Compl. ¶¶ 40-86.

Next down the food chain were the doctors, who privately expressed concerns to one another about the ethics of spoon-feeding their colleagues mis-information about the scientific

---

[19] Defendants rely on cases in which the crux of the allegations was that the drug or the product was defective in some manner that caused personal injury, and that, although plaintiffs were not personally injured, they were injured solely because they bought the defective product. *See, e.g., In re Rezulin Products Liability Litig.*, 210 F.R.D. 61 (S.D.N.Y. 2002) ("plaintiffs attempt to recharacterize what at root is a product liability suit"); *Williams v. Purdue Pharma Co.*, 297 F. Supp. 2d 171 (D.D.C. 2003). *In re Bridgestone/Firestone Inc.*, 288 F.3d 1012 (7th Cir. 2001), cited by Defendants, highlights the difference.  There, the court gave a hypothetical example involving widgets to make the point that, in the case of defective widgets which injure people, only those injured should be compensated. Otherwise, if uninjured buyers could collect damages on the theory that the risk of failure made the widgets less valuable, the system would overcompensate buyers and lead to excess precautions. *Id.* at 1017 n.1. Here, Plaintiffs are not alleging that Neurontin is less valuable based on a latent defect.  Rather, Plaintiffs are alleging that Defendants caused Plaintiffs to purchase a drug they would not have bought, absent Defendants' unlawful and deceptive promotional activity.

quality of the data supplied them by Defendants to support "emerging uses" for Neurontin.  *See* Cl. Compl. ¶¶ 96-102;  Coord. Compl. ¶¶ 87-95.  When one of the vendors, Cline, Davis & Mann, realized that one of the speakers would describe the negative results of her study on Neurontin, they planted a shill in the audience to cross-examine her.  The following day, Cline-Davis apologized in writing to Defendants for its grievous error in allowing a truly independent voice to be heard, and vowed that such an outrage would "not happen again."  Cl. Comp. ¶ 63; Coord. Compl. ¶ 49.[20]

Though they profited from their common endeavor in different ways, and in different measure (and, perhaps, with varying degrees of enthusiasm), the scheme's participants shared the common purpose of promoting Neurontin as an effective and cutting-edge treatment for unproven uses, in unproven doses.   Plaintiffs' RICO allegations are more than sufficient.[21] satisfy applicable law and the requirements of this Court in *AWP*.

### A.       The Alleged Enterprises are Associations-In-Fact

An association-in-fact enterprise requires only an "ongoing organization, formal or informal," and that "the various associates function as a continuing unit."  *United States v. Turkette*, 452 U.S. 576, 583 (1981).  In *AWP*, this Court identified the factors for a RICO association-in-fact enterprise:

---

[20] The formal connections between Defendants and some of these "independent" "educational" providers are enough to make a corporate lawyer wet his or her pants.  A Cline Davis employee was a formal member of the Parke-Davis Neurontin Extended Disease Team, a high level strategic planning committee.  Cl. Comp. ¶ 62.  Parke-Davis "outsourced" its Marketing Support Services functions for off-label promotional events to Physicians World -- Parke-Davis' marketing staff became full-time employees of Physicians' World, but continued to use Parke-Davis letterhead and toll-free telephone numbers.  Cl. Compl. ¶¶ 69-70.  *See* Cl. Compl. 30-86; Coord. Compl. 43-104.

[21] Plaintiffs' arguments apply to the Promotion Enterprise and the sub-enterprises defined in the Class Complaint and the Alternative Parallel Enterprises defined in the Coordinated Complaint (collectively, "Enterprises").  The Promotion Enterprise is the primary enterprise through which defendants carried out their scheme to promote Neurontin for off-label uses.  The other enterprises include the sub-enterprises in the Class Complaint (Peer-Selling Enterprise and Publication Enterprise) and the Alternative Parallel Enterprises in the Coordinated Complaint: (1) Cline Davis Enterprise; (2) Physicians World Enterprise; (3) Sudler & Hennessy Enterprise; (4) MEDED/ MEDCON Enterprise; (5) MES Enterprise; (6) HCC Enterprise; and (7) AMM/Adelphi Enterprise.

-19-

429793.2

"(1) whether the associates have a common purpose; (2) whether there is systematic linkage, such as overlapping leadership, structured or financial ties or continuing coordination; (3) whether there is a common communication network for sharing information on a regular basis; (4) whether the associates hold meetings and sessions where important discussions take place; (5) whether the associates wear common colors, signs or insignia to make the group identifiable; and (6) whether the group conducted common training and instruction."

*AWP II*, 307 F. Supp. 2d at 203-04 (citation omitted). "None of these factors is dispositive." *AWP I*, 263 F. Supp. 2d 172, 182 (D.Mass. 2003).[22]

Plaintiffs easily satisfy this test because the allegations claim that each Enterprise constituent actively participated in Defendants' scheme and was aware of, and interacted with, other participants in the scheme. Cl. Comp. ¶¶ 56, 78, 99, 102, 114; Coord. Comp. ¶¶ 30-98, 102-168. The non-physician technical writers *knowingly ghost-wrote* articles based on inaccurate, and in some cases no, scientific evidence concerning the safety and efficacy of Neurontin to treat off-label symptoms; the physicians *knowingly lent* their names as "authors" to the articles, misrepresenting the authorship and objectivity of the articles and their content; the physicians *relinquished control* to Defendants of information relayed to the public in such articles, as well as in various seminars and presentations; the physicians *accepted payments* from Defendants in return for agreeing to "author" and have published articles containing misrepresentations; and the vendors *knowingly published* articles in a variety of medical journals

---

[22] In *United States v. London*, 66 F.3d 1227 (1st Cir. 1995), the First Circuit found that there was persuasive evidence of the existence of an association-in-fact enterprise where (1) the defendant and the enterprise were motivated by a common or shared purpose of economic gain (or profit), (2) the two businesses that formed the association-in-fact enterprise operated as a "symbiotic unit" and existed for a common purpose (economic gain), and (3) the enterprise had an ascertainable structure distinct from that inherent in the conduct of a pattern of racketeering activity in that the two businesses forming the enterprise were legitimate entities and did a significant amount of business separate from the pattern of racketeering activity. *Id.* at 1244. *See also United States v. Doherty*, 867 F.2d 47, 68 (1st Cir. 1989) ("ongoing association" and "common purpose" demonstrated by number of acts, their relationship, their having taken place over several years, and consistent participation of central figures); *General Elec. Co. v. Iljin Corp.*, Civ. A. No. 89-40094, 1993 WL 41752 (D. Mass. Feb. 12, 1993) (evidence of various agreements entered into between members of association in fact sufficient to demonstrate ongoing association whose members function as continuing unit).

throughout the country.[23]  Defendants' assertion (Br. at 17) that the Complaints do not allege the

participants' knowledge of the fraudulent nature of the Enterprises is facile, at best.[24]

Defendants cite to *AWP II*, where the allegations about the level of involvement of the

drug price publishers failed to show they "share[ed] a common purpose," because the "publishers

are indifferent as to whether the AWP spread exists or not; their financial interest lies in earning

money through selling books listing numbers.  The spread is irrelevant to their [the publishers']

financial well being."  *AWP II*, 307 F. Supp. 2d at 204.  In stark contrast here, the common

purpose of each of the Enterprises is the promotion of off-label uses of Neurontin for financial

gain.  The Physician "authors" received substantial remuneration, as well as credit and accolades

for published material with minimal to no work.  Cl. Comp. ¶¶ 53, 104, 108, 111, 112; Coord.

Comp. ¶¶ 35, 65, 78, 79-80, 84-85, 93, 95.  And, vendors were paid handsomely for the

publication of numerous articles and the planning of numerous events at the direction of one of

the largest drug manufacturers in the world.  Cl. Comp. ¶¶ 44, 48-49, 53-57, 98-99, 107-114;

Coord. Comp. ¶¶ 30, 31, 34, 40-44, 83-86, 89-92, 94, 96-98, 117.

Defendants also argue the contacts between participants in the Enterprises were "limited

to discrete instances of legitimate business interactions" and therefore they cannot have shared a

---

[23]     Cl. Comp. ¶¶ 39, 43, 45, 49-50, 85, 98, 100, 102, 105-113, 115, 117, 153, 211, 228-229, 251; Coord.
Comp. ¶¶ 3, 31, 34-37, 39, 42, 49, 72, 76, 78-80, 83-85, 89, 92, 95-98, 109, 110, 113, 117, 118, 124, 125.

[24]     Defendants cite *Lupron*, 295 F. Supp. 2d 148 (Br. at 18) for the proposition that Plaintiffs' allegations do
not establish the participants' knowledge of the fraudulent scheme.  In *Lupron*, Judge Stearns upheld two RICO
enterprises, including an association in fact enterprise consisting of three entities.  Judge Stearns dismissed an
enterprise consisting of thousands of doctors whose sole connection to the alleged enterprise was the receipt of
discounted or free samples of the drug in question.  In the present case, by contrast, the Enterprises include a discrete
group of physicians who lent their names to articles in exchange for unearned compensation (indeed *28 doctors are
identified both by name* and the amount of money received for their participation in the scheme). Cl. Comp. ¶ 104;
Coord. Comp. ¶ 95.  Thus, the Enterprises in this case are hardly analogous to the "Physicians Enterprise" in
*Lupron*.  *See also In re Managed Care Litig.*, 185 F. Supp. 2d 1310, 1322-23 (S.D. Fla. 2002) (recognizing
association-in-fact enterprise consisting of a network of each of defendants' health plans, and the primary
physicians, medical specialists, medical laboratories, hospitals, outpatient centers, pharmacies, and home health
agencies who contracted with the defendants.  "All of these entities were said to be 'associated in fact as part of the
health care network with common purposes of providing medical services to the [insurance company's] customers
and earning profits from the providing of those services.").

-21-

common purpose. Br. at 20. This is wrong on the allegations (no fair reading would so limit them) and the law. Dispositive is *Managed Care*[25] where the court rejected defendants' argument that "a RICO enterprise requires a structure beyond that commonly found in ongoing contractual relationships":

> Even if the Court adopted this heightened standard, each National Enterprise pled by the Plaintiffs would likely prevail. All of the relevant published cases cited by the Defendants describe a putative enterprise consisting of either a random collection of contracting entities, independent actors committing criminal acts within a particular industry, or a manufacturer selling a product through independent distributors. The Plaintiffs in the present case have not alleged a series of random contractual exchanges, but a network of physicians, hospitals, pharmacies and health care professionals through which the Defendants deliver health care to the subscribers.

185 F. Supp. 2d at 1323-24 (footnote omitted).[26]

Defendants also are wrong in their assertion (Br. at 18-19) that plaintiffs have not alleged systematic linkages, a common communication network, or structured financial ties between the participants in the various Enterprises. The linkages, communication network and financial ties among the defendants, non-physician technical writers, physician "authors," and vendors are detailed throughout the Complaints. (*See, e.g.,* Cl. Comp. ¶¶ 104; Coord. Comp. ¶ 95).

## B.   Defendants "Participated" In And "Conducted" The Enterprises

RICO makes it unlawful "for any person employed by or associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . .." 18 U.S.C. § 1962(c). In *Reves v. Ernst & Young,*

---

[25]    *See also Pharmacare v. Caremark*, 965 F. Supp. 1411, 1421-23 (D. Haw. 1996) (sustaining RICO "enterprise" defined as association-in-fact between defendant corporate entities "and the doctors who received bribes" from defendants to prescribe defendants' products rather than plaintiffs' competing products).

[26]    *Libertad v. Welch*, 53 F.3d 428, 444 (1st Cir. 1995), cited by Defendants (Br. at 18), supports Plaintiffs' position. In that case, the First Circuit reversed dismissal of the complaint with respect to individuals and organizations that organized a blockade on an abortion clinic, and issued a press release that indicated future coordination and/or cooperation. The other cases cited by Defendants on this issue all involve conclusory allegations, not the detailed allegations in the Complaints of continuing association-in-fact enterprises that satisfy the elements set forth by this Court in *AWP*.

507 U.S. 170, 183 (1993), the Court determined that the phrase "conduct or participate" contemplates only that the defendant be involved in the operation or management of the enterprise. *See also Aetna Casualty Surety Co. v. P & B Autobody*, 43 F.3d 1546, 1559 (1st Cir. 1994) (citing *Reves*, 507 U.S. at 183); *Lupron*, 295 F. Supp. 2d at 171-72 (plaintiffs sufficiently alleged that manufacturer and company took part in directing affairs of drug distributor, a RICO enterprise). The Court in *Reves* observed, "[a]n enterprise also might be 'operated' or 'managed' by others 'associated with' the enterprise who exert control over it . . . ." 507 U.S. at 179 n.4.

Defendants' claim that the allegations are too "conclusory" lacks merit. Br. at 21. As to each enterprise, Plaintiffs allege that Defendants (a) controlled the content of the messages being delivered by the physician participants at each seminar, event and presentation, including the misinformation and false statements concerning the safety, efficacy, effectiveness and usefulness of Neurontin for off-label uses; (b) controlled the stream of information disseminated concerning Neurontin by ensuring that only favorable results were published and disclosed; (c) selected and approved the physician participant(s) to deliver the off-label message at each seminar, event and presentation and selected and approved each physician "author" for the published materials; (d) selected the attendees for each seminar, event and presentation; (e) paid the vendors and the physician participants for their participation; and (f) placed their own employees and agents in positions of authority and control in the Enterprises (and, in at least one example, Physicians World, entered into a strategic partnership involving the commingling of employees).[27] These allegations suffice to plead control.

---

[27] Cl. Comp. ¶¶ 39, 43-45, 49-50, 53-58, 60, 63-65, 69, 73, 75, 81-83, 85, 87, 89-91, 93, 98-100, 102-103, 105-113, 115, 117, 124-135, 139-140, 142-143, 147, 150-155, 157, 160-167, 170, 178-180, 182, 190-192, 197, 202-206, 211, 213-220, 223-226, 228-229, 251; Coord. Comp. ¶ 3, 28, 30-37, 39, 41-43, 45, 48-51, 55-56, 59-61, 63-65, 68-70, 72, 75-80, 82-85, 89-92, 94-98, 102, 104-105, 107, 110-111, 113, 117-118, 120-121, 123, 125-126, 130-132, 137, 139, 141, 144, 146, 154-158, 162, 167-168, 221(g).

429793.2

### C.     The Numerous Predicate Acts Suffice

Plaintiffs plead thousands of instances of mail and wire fraud in furtherance of the fraudulent scheme (*see, e.g.*, Cl. Comp. ¶¶ 250-52).  Defendants focus instead on the sufficiency of Plaintiffs' bribery allegations, claiming that the Complaints' allegations of an intent to induce physicians to act fail to specify "any actual or anticipated *quid pro quo*."  Br. at 22.

Plaintiffs allege that the Physician "Authors" received an Honorarium (of at least $1,000 per article), as well as credit and accolades for published material with minimal to no work to perform.  *See, e.g.,* Cl. Comp. ¶¶ 35, 53, 56, 69, 97, 100-101, 108, 111-112, 117, 205; Coord. Comp. ¶¶ 35, 37, 55, 78, 80, 84, 88, 92-93, 98, 104.  In the aggregate, the Physician Authors received more than two million dollars in exchange for participating in the illegal promotion of off-label uses of Neurontin.  Cl. Comp. ¶¶ 104; Coord. Comp. ¶ 95.  Any fair reading of the Complaints yields allegations of actual *quid pro quo*.

## V.     PLAINTIFFS' CONSUMER FRAUD CLAIMS ARE NOT DEFICIENT

### A.     TPPs Are "Persons" Entitled to the Protections of the NJCFA

Defendants argue that the TPPs lack standing to sue for violations of the NJCFA because (a) the business entity must "use" the goods in question; and (b) the TPPs are large, sophisticated entities not within the class of "persons" the CFA is intended to protect.  Br. at 23.  Defendants are wrong.

In *Kavky v. Herbalife Int'l of Am.*, 359 N.J. Super. 497, 820 A.2d 677 (N.J. Super. Ct. App. Div. 2003), cited by Defendants, the appellate court held the NJCFA applied to the sale of a franchise, which was obviously not "consumed" by the plaintiff franchisee.  *Kavky* expressly rejected the narrow interpretation of the NJCFA contained in *City Check Cashing*, the sole New Jersey authority (other than *Kavky*) relied upon by Defendants:

Although we have occasionally referred to a dictionary definition of a consumer

as "one who uses (economic) goods, and so diminishes or destroys their utilities," *City Check Cashing, Inc. v. Nat. State Bank*, 244 N.J. Super. 304, 309, 582 A.2d 809 (App. Div.) (quoting *Hundred East Credit Corp.*, *supra*, 212 N.J. Super. at 355, 515 A.2d 246, *cert. denied*, 122 N.J. 389, 585 A.2d 391 (1990) ... "some consumer goods may not be dismissed or destroyed through use...." 31 F.3d at 1274, n. 14. Consequently, we agree ... that the result should not turn on "the acceptance of [that] definition."

359 N.J. Super. at 505, 820 A.2d at 582.

Relying upon *Kavky*, a New Jersey trial court recently upheld similar third-party payor claims against Merck for its sales of Vioxx in the face of virtually identical arguments.[28] *Desiano*, cited with approval in *Merck* (at 9-10), likewise held that TPPs had claims under the NJCFA against these same Defendants in connection with the deceptive marketing of another drug, Rezulin.

As the foregoing authorities demonstrate, it is irrelevant that TPPs are "large businesses with extensive knowledge of the pharmaceutical industry." Br. at 23. As one New Jersey appellate court aptly noted:

> Even the most world-wise business entity can be inexperienced and uninformed in a given consumer transaction. Unlawful practices thus can victimize business entities as well as individual consumers.... [T]o exclude business entities from any protection of the Act would contravene its manifest purpose as well as its unambiguous language.

*Hundred East Credit Corp. v. Eric Schuster Corp.*, 212 N.J. Super. 350, 356-57, 515 A.2d 246, 249 (N.J. Super. Ct. App. Div. 1986). Consequently, TPPs – who paid *most* of the costs of Neurontin prescribed for off-label uses – have standing to sue under the NJCFA.

---

[28] *See Int'l Union of Op. Eng'rs Local 68 Welfare Fund v. Merck & Co., Inc.*, No. ATL-L-3015-04 (N.J. Super. Ct. Atl. Cty. July 8, 2004) (filed concurrently in Appendix of Unpublished Authorities, Tab 3, at 7-11) (noting that the NJCFA "actually uses the word 'person' not 'consumer'," and that "[t]here is no dispute that the word 'person' is not limited to individuals"; distinguishing *City Check Cashing* "because [it] involve[d] buyers of wholesale services to resell at retail. . . . [T]he services purchased were not available to the general public which is completely different from . . . Vioxx"). *In re Managed Care Litig.*, 298 F. Supp. 2d 1259 (S.D. Fla. 2003), also cited by Defendants, relies on the same overly restrictive interpretation of the NJCFA recently rejected in *Kavky* and *Merck*. *Id*. at 1303-04.

429793.2

### B.    The Protections of the NJCFA and UCL May Be Invoked By Non-Residents

Defendants' argument that the NJCFA and California's UCL "do not apply to non-residents" (Br. at 24) ignores the fact that these statutes have been applied to protect non-residents in appropriate cases.  *See, e.g., Boyes v. Greenwich Boat Works, Inc.*, 27 F. Supp. 2d 543, 548 (D.N.J. 1998) (applying NJCFA to claim brought by Pennsylvania citizen); *Wershba v. Apple Computer, Inc.*, 91 Cal. App. 4th 224, 242, 110 Cal. Rptr. 2d 145, 159-60 (Cal. Ct. App. 2001) (rejecting argument that UCL cannot apply to claims of nonresident class members).[29]

Defendants do not contend that the NJCFA and UCL contain express territorial limitations,[30] or that they *cannot* be applied to benefit non-residents; rather, they argue that these laws *should* not be applied to benefit nonresidents based on choice of law considerations.  As the Court cautioned the parties at the initial status conference, this battle is premature, and choice of law issues are more appropriately addressed in the context of class certification or summary judgment.[31]  *See In re Relafen Antitrust Litig.*, 221 F.R.D. 260 (D. Mass. 2004) (considering

---

[29] Defendants' argument that extraterritorial application of the UCL and NJCFA "would raise significant due process problems" is likewise a red herring.  In *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985), the Supreme Court expressly held that a single state's law *may* be applied extraterritorially to the claims of nonresidents, so long as that state has "a 'significant contact or significant aggregation of contacts' to the claims asserted by each member of the plaintiff class, contacts 'creating state interests,' in order to ensure that the choice of . . . law is not arbitrary or unfair."  *Id*. at 821-22 (citations omitted).  Class Plaintiffs' allegation that Defendants conceived and orchestrated their scheme to defraud from their New Jersey headquarters (Cl. Comp. ¶ 254) easily satisfies this standard.  *See, e.g., Grace v. Perception Technology Corp.,* 128 F.R.D. 165, 171 (D. Mass. 1989) (applying Massachusetts choice of law rules, applying Massachusetts law to claims of national class; holding *Shutts* test satisfied because the defendant was headquartered in Massachusetts, individual defendants resided in Massachusetts, and the misrepresentations emanated from Massachusetts).

[30] The NJCFA provides that "any person . . . may bring an action" for its violation "in any court of competent jurisdiction."  N.J.S.A. 56:8-19.  Similarly, the UCL provided that actions for its violation may be brought "in a court of competent jurisdiction" by, *inter alia*, any "person" (amended in November 2004 to read "any person who has suffered injury in fact and has lost money or property as a result of such unfair competition").  Cal. Bus. & Prof. Code § 17204.

[31] The Class brings a consumer fraud claim under the NJCFA on behalf of a nationwide class of (i) third-party payers, and (ii) consumers.  The Coordinated Complaint, on the other hand, brings claims under the consumer fraud statutes of all fifty states, the District of Columbia and the Commonwealth of Puerto Rico on behalf of Kaiser, Guardian and Aetna.  Kaiser is headquartered in California and provides health care benefits to its members in Colorado, Georgia, Maryland, Virginia, Oregon, Washington, Hawaii, Ohio and D.C.  *See* Coord. Comp. ¶¶ 6-7.  Guardian is a New York company, and Aetna is a Pennsylvania corporation with its principal place of business in Connecticut.  *Id*. ¶¶ 5, 8.  Guardian and Aetna provide health care benefits to their members in all fifty states.  *Id.*

choice of law issues at the class certification stage).[32]

### C.     The Coordinated TPPs Have Stated a Claim Under the Remaining Deceptive Practice Statutes

Through a series of footnotes, Defendants argue that Count Eleven of the Coordinated

Complaint should be dismissed because the Plaintiffs fail to state a claim under the consumer

fraud statutes of the remaining forty-nine states, the District of Columbia and the Commonwealth

of Puerto Rico.  Br. at 25.  Defendants' arguments are premature and erroneous.[33]  Choice of law

issues should be examined after the factual record is developed and the Court is able to

determine which state has a more significant relationship with the parties and the underlying

circumstances.  *See Stathis v. Nat'l Car Rental Sys.*, 109 F. Supp. 2d 55, 56 (D. Mass. 2000)

(noting that Massachusetts employs a "functional choice of law approach" and considers the

interests of the parties, the states involved and the interstate system as a whole).  These

determinations should be made in the context of class certification or summary judgment rather

---

[32] *See also Payne v. Goodyear Tire & Rubber Co.*, 216 F.R.D. 21, 27 (D. Mass. 2003) (same); *In re Buspirone Patent Litig.*, 185 F. Supp. 2d 363, 377 (S.D.N.Y. 2002) (finding defendant's arguments regarding standing and choice of law matters premature in the motion to dismiss context and deferring such issues until class certification).

[33] For example, Defendants argue that Plaintiffs' claims under the consumer protection statutes of Montana, Mississippi, South Carolina and Alabama should be dismissed because these statutes do not allow class action lawsuits.  This argument is wholly inapplicable considering (1) the Coordinated Complaint is not brought as class action, and (2) the Class Action Complaint does not allege violations of these statutes.  Similarly baseless is Defendants' argument that the Texas, Alabama, Georgia and Wyoming consumer fraud act claims should be dismissed because Plaintiffs failed to serve pre-suit demand letters as required by these statutes.  The purpose of pre-suit demand letters is to give the parties the opportunity to settle the dispute without litigation.  *See Hines v. Hash*, 843 S.W. 2d 464, 465 (Tex. 1992).  Given the scope and breadth of this litigation, Defendants cannot be heard to argue that had Plaintiffs complied with these statutory provisions Defendants would have genuinely been interested in resolving these claims prior to litigation.  Accordingly, Defendants certainly were not prejudiced by the lack of any pre-suit demand.

Defendants' assertions that state consumer fraud act claims "generally must be alleged with specificity" is misplaced; Plaintiffs have sufficiently particularized their RICO and state deceptive practice claims.  Finally, Defendants' contention that Plaintiffs' state consumer fraud act claims should be dismissed because they fail to allege any "nexus" with each respective state jurisdiction is yet another red herring and does not withstand scrutiny.  The Coordinated Complaint alleges that Defendants embarked on a fraudulent scheme to market and sell Neurontin for off-label uses.  This scheme was not limited in geographic scope, but rather sought to increase Defendants' sale of Neurontin to consumers and TPPs throughout the United States.  Thus, the TPPs were harmed, and have valid claims, in every state (and the Commonwealth of Puerto Rico) in which they paid for Neurontin to treat off-label conditions.

than a motion to dismiss. This Court endorsed such an approach in *AWP II* when it declined to reach the merits of defendants' motion to dismiss plaintiffs' multiple state consumer protection claims until summary judgment.  *AWP II*, 307 F. Supp. 2d at 211.  The Court should follow the same procedure here.

## VI.    DEFENDANTS' MISCONDUCT IS NOT IMMUNIZED BY THE FIRST AMENDMENT

Defendants' attempt to hide behind the First Amendment fails because:  (1) they misconstrue the allegations of the case, ignoring the fact that there is no free speech protection for widespread campaigns of false and deceptive acts and practices; (2) there is no protection for conduct where it advances an illegal purpose – a point emphasized by Warner-Lambert's guilty plea; and (3) even if some allegations of the amended complaint could be separately parsed to address off-label promotion unaffected by otherwise false and deceptive conduct, such "commercial speech" may fairly be regulated by the states to protect their substantial governmental interest in the public health and welfare.

First, Defendants' argument ignores the bulk of the allegations against them – that they have engaged in a concerted campaign to disseminate false and misleading information, causing significant damage to consumers and their insurers.  Knowing that the First Amendment cannot shield a commercial wrongdoer from liability for activities that led to its own criminal conviction, Defendants myopically "focus" their First Amendment arguments "on plaintiffs' physician and publication-based claims …"  (Br. at 27, n. 16).  However, the amended complaint is devoid of any "physician and publication based claims" not tethered to Defendants' false and misleading statements, non-disclosures, and unlawful promotional activities.[34]  The First

---

[34] The mischaracterization is most contorted in the opening line to Defendants' First Amendment arguments – casting the claims as "based on statements by doctors to doctors at meetings … and doctors' publication of articles in medical journals."  (Br. at 27).  This is simply not what the case is about.

429793.2

Amendment does *not* bar recovery for fraud.[35]

Defendants' argument that "scientific speech is subject to the 'most exacting standard of constitutional review'" is unavailing.  Br. at 27.[36]  In some circumstances, federal regulations may prohibit the flow of medical information to patients.  *See Rust v. Sullivan*, 500 U.S. 173 (1991) (holding that under applicable regulations, medical professionals at clinics receiving family planning funds from the government could not impart information about abortion to their patients).  This action does not involve any such prior restraint or prohibition of speech,[37] but rather seeks civil redress for fraud.  Nor is scientific or technical information communicated for an unlawful purpose afforded First Amendment protection.  *See Corley*, 273 F.3d at 447 (the "First Amendment does not protect instructions for violating tax laws") (citing *United States v. Raymond*, 228 F. 3d 804, 815 (7th Cir. 2000)).[38]

Third, even if some allegations of the Complaints could fairly be dissected from the body

---

[35] *See Commodity Trend Serv., Inc. v. Commodity Futures Trading Commiss.*, 233 F.3d 981, 992 (7th Cir. 2000) ("Laws directly punishing fraudulent speech survive constitutional scrutiny even where applied to pure, fully protected speech"); *Food Lion Inc. v. Capital Cities/ABC, Inc.*, 194 F.3d 505, 520 (4th Cir. 1999) (holding that "the media have no general immunity from tort or contract liability") (citing *Desnick v. ABC, Inc.*, 44 F.3d 1345, 1355 (7th Cir. 1995)).  *See also Louisiana ex rel. Gremillion v. NAACP*, 366 U.S. 293, 297 (U.S. 1961) ("At one extreme" of the spectrum of free speech "is criminal conduct which cannot have shelter in the First Amendment."); *Employment Div., Dept. of Human Resources v. Smith*, 485 U.S. 660, 671 (1988) (First Amendment protection "does not extend to conduct that a State has validly proscribed").

[36] *Miller v. Johnson*, 515 U.S. 900 (1995) relates to voting rights, not science, holding that "Georgia's congressional redistricting plan cannot be upheld unless it satisfies strict scrutiny, our most rigorous and exacting standard of constitutional review." 515 U.S. at 920.  *Universal City Studios, Inc. v. Corley*, 273 F.3d 429 (2d Cir. 2001) and *Board of Trustees of Leland Stanford Jr. University v. Sullivan*, 773 F. Supp. 472 (D.D.C. 1991) merely provides that First Amendment protection may extend to scientific speech, just as it does to "all ideas having even the slightest redeeming social importance."  *Corley*, 273 F.3d at 446 (internal citations omitted); *Sullivan*, 773 F. Supp. at 474.

[37] Unlike the cases cited by Defendants, Plaintiffs do not seek to impose a prior restraint on speech ("scientific" or otherwise), but rather seek redress for Defendants' fraudulent conduct.  *See, e.g., Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748 (1976) (addressing prior restraint on speech under a governmental requirement, statute or regulation, rather than civil liability incurred by fraud); *Corley*, 273 F.3d 429 (same); *Commodity Trend Serv.*, 233 F.3d (same); *Washington Legal Foundation v. Friedman*, 13 F. Supp.2d 51 (D.D.C. 1998), *vacated on other grounds by* 202 F.3d 331, 336 (D.C. Cir. 2000) (same); *Sullivan*, 773 F. Supp. 472 (D.D.C. 1991) (same); *Volin v. Board of Public Accountancy*, 422 Mass. 175 (1996) (same).

[38] In *Corley*, tax instructions were viewed as analogous to scientific information because of the highly technical nature of such materials.

429793.2

of the claims against Defendants (which realistically they cannot), the resulting "commercial speech" of Defendants remains subject to state regulation in order to protect the substantial government interest in the public health and welfare. *See Washington Legal Foundation*, 13 F. Supp. 2d at 64 ("manufacturer sponsorhip of CME seminars at wich the sponsor's products are discussed . . . are properly classified as commercial speech"). Defendants' own cases establish the point. "Commercial speech [enjoys only] a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values." *Bd. of Trs. of the State Univ. of N.Y. v. Fox*, 492 U.S. 469, 477, 480 (1989) (holding that government need not employ "the least restrictive means" for regulating commercial speech, but rather merely one that is "narrowly tailored to achieve the desired [governmental] objective"). Where commercial speech is at issue, "[t]he government may ban forms of communication more likely to deceive the public than to inform it." *Central Hudson Gas & Electric Co. v. Public Service Commission*, 447 U.S. 557, 563 (1980); *see also Friedman v. Rogers*, 440 U.S. 1 (1979) (holding that the prohibition on practice of optometry under a trade name was a constitutionally permissible state regulation of commercial speech, in furtherance of protecting public from demonstrated deceptive and misleading conduct). This threshold for justifying restraints on commercial speech falls well short of the standard of proof for fraud or deceit. The Supreme Court has held further that the government may prohibit commercial speech that is merely "*related* to illegal activity." *Central Hudson Gas*, 447 U.S. at 563 (emphasis added). Defendants' argument that the speech at issue "is neither 'illegal' nor 'inherently misleading' for First Amendment purposes" assumes a fact (whether there was illegality or deceit as to the conduct alleged in the Complaints) that is not in evidence, and indeed is contradicted by the fact of Warner-Lambert's guilty plea. At a minimum, it is a fact not properly resolved on a motion to dismiss.

## VII.    PLAINTIFFS' STATE LAW CLAIMS ARE NOT PREEMPTED BY THE FDCA

Plaintiffs' state law claims are not preempted by the Food, Drug and Cosmetic Act, 21

U.S.C. § 301, *et seq*. ("FDCA").[39]  This Court recently addressed the preemption issue several

times in the *AWP* litigation,[40] but Defendants ignore the principles set forth in those decisions.

As this Court noted in *AWP I*, the First Circuit has set forth the following framework for

analyzing preemption:

> Congress might show that it intends to preempt state law by explicitly
> withdrawing the power of states to regulate within certain fields. ["express"
> preemption]  Or, Congress might implicitly withdraw the states' power to regulate
> by creating a regulatory system so pervasive and complex that it leaves 'no room'
> for the states to regulate.  ["field" preemption"]  Congress might also enact a law
> such that 'compliance with both federal and state regulations is a physical
> impossibility,' in which case the state statute must yield.  Finally, the Supreme
> Court has noted that, even in the absence of a direct conflict, a state law violates
> the supremacy clause when it 'stands as an obstacle to the accomplishment and
> execution of the full purposes and objectives of Congress.'  ["conflict"
> preemption]  [¶]  The guiding principle throughout the preemption analysis is
> Congressional intent.

*AWP I*, 263 F. Supp. 2d at 186-87 (quoting *Mass. Med. Soc'y v. Dukakis*, 815 F.2d 790, 791 (1st

Cir. 1987) (citation omitted)).

Of the three species of preemption, defendants urge but one – "conflict preemption."  Br.

at 31.  There is no conflict between federal and state law here.  Federal law criminally proscribes

---

[39] This is a "stock" argument that Defendants and other pharmaceutical manufacturers have consistently — and
unsuccessfully — raised in numerous lawsuits involving prescription drugs.  *See Cartwright v. Pfizer, Inc.,* No.
04cv292 (E.D. Tex. Mar. 31, 2005) (stating that "[r]ecently, a number of courts who have considered this exact issue
have ruled in favor of no preemption) (filed concurrently in Appendix of Unpublished Authorities, Tab 1); *Hurley v.
Lederle Labs.,* 863 F.2d 1173, 1176 (5th Cir. 1988) (citing *seventeen* decisions finding no preemption); *Osburn v.
Anchor Labs.,* 825 F.2d 908 (5th Cir. 1987);  *Lupron,* 295 F. Supp. 2d 148; *Ohler v. Purdue Pharma, L.P.,* 2002 WL
88945 (E.D. La. Jan. 22, 2002); *Caraker v. Sandoz Pharm. Corp.,* 172 F. Supp. 2d 1018 (S.D. Ill. 2001);
*McCallister v. Purdue Pharma L.P.,* 164 F. Supp. 2d 783 (S.D. W.Va. 2001); *Hawkins v. Upjohn Co.,* 890 F. Supp.
609 (E.D. Tex. 1994); *Brown v. McNeil Labs., Inc.,* 1988 WL 288975 (W.D. Mich. June 29, 1988).

[40] *See In Re Pharm. Indus. Average Wholesale Price Litig.,* 263 F. Supp. 2d 172 (D. Mass. 2003) (Saris, J.) ("*AWP
I*") (addressing implied conflict preemption and ERISA preemption), *In Re Pharm. Indus. Average Wholesale Price
Litig.,* 309 F. Supp. 2d 165 (D. Mass. 2004) (Saris, J.) ("*AWP III*") (addressing ERISA preemption) and *In Re
Pharm. Indus. Average Wholesale Price Litig.,* 321 F. Supp. 2d 187, 194-202 (D. Mass. 2004) (Saris, J.) ("*AWP IV*")
(articulating presumption against preemption and rejecting preemption under Medicaid statute).

the type of deliberate, off-label marketing campaign waged by these Defendants.[41]  Indeed, this case is the proverbial "poster child" for the proscription.  Defendants reaped billions in sales and profits from their unlawful scheme, but have given back (to the government, not private parties) only a small fraction of that sum.[42]  Plaintiffs' state law claims merely provide the private parties

---

[41] The Food and Drug Administration ("FDA") derives its authority to regulate various aspects of the pharmaceutical industry from a statutory and regulatory scheme embodied in the FDCA.  In order for a prescription drug to be distributed by a manufacturer in interstate commerce, the manufacturer is required to demonstrate, through a series of pre-clinical and clinical trials, that the drug or medical device is both safe and effective for each of its intended uses.  21 U.S.C. § 355(a),(b),(j).  FDA makes its final approval decisions under the "substantial evidence" standard.  *See* 21 U.S.C. § 355(d).

As part of the approval process, the FDA also reviews the proposed "labeling" for the drug including all proposed claims about the drug's risks and benefits, as well as adequate directions for use.  *See, e.g.*, 21 U.S.C. § 352(f).  Labeling is a term of art that encompasses all written, printed or graphic material "(1) upon any [drug or device] or any of its containers or wrappers, or (2) accompanying such [drug or device]."  21 U.S.C. § 321(k) & (m).  The most self-evident form of labeling is the package insert that accompanies the drug, but the term has also been construed to include other forms of drug company promotional activity that are textually related to the product.  See 21 C.F.R. §202.1(1)(2) (1997).  The FDA will only approve the new drug application if the labeling conforms with the uses that the FDA has approved.

Once a drug is approved for a particular use, the FDA does not prevent doctors from prescribing the drug for uses that are different than those approved by the FDA.  However, as this Court observed in *Franklin v. Pfizer*:

> Allowing physicians to prescribe drugs for such 'off-label' usage 'is an accepted and necessary corollary of the FDA's mission to regulate [pharmaceuticals] without directly interfering with the practice of medicine.' *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 121 S. Ct. 1012, 1018, 148 L. Ed. 2d 854 (2001). Though physicians may prescribe drugs for off-label usage, the FDA prohibits drug manufacturers from marketing or promoting a drug for a use that the FDA has not approved.  *See* 21 U.S.C. § 331(d) (prohibiting distribution of drug for non-approved uses); id. § 331(a) (prohibiting distribution of a "misbranded" drug).  A manufacturer illegally "misbrands" a drug if the drug's labeling includes information about its unapproved uses.  *See Washington Legal Foundation v. Henney*, 202 F.3d 331, 333 (D.C. Cir. 2000).  If the manufacturer intends to promote the drug for new uses in addition to than those already approved, the materials on off-label uses must meet certain stringent requirements and the manufacturer must resubmit the drug to the FDA testing and approval process.  202 F.3d at 334 (setting forth the requirements in the Food and Drug Administration Modernization Act of 1997, 21 U.S.C. § 360aaa, *et seq*.).

*Franklin v. Pfizer*, 147 F. Supp.2d 39, 44 (D. Mass. 2001) (Saris, J.)

[42] Apparently, $430 million was not an expensive enough lesson for Pfizer.  Just two weeks ago, the FDA sent Pfizer's chairman, Henry McKinnell, Jr., Ph.D., the following "WARNING LETTER" (caps in original):

> The Division of Drug Marketing, Advertising, and Communications (DDMAC) has reviewed three direct-to-consumer (DTC) print advertisements (ads) titled "Tired of your allergy medicine not working?" (airplane) (ID #ZY179738), "Tired of your allergy medicine not working?" (office) (ID #ZY182060A) and "Maybe it's time to switch allergy medicines" (ID #ZY182060) for Zyrtec® (cetirizine HCl) Tablets, Syrup, and Chewable Tablets submitted by Pfizer Inc . (Pfizer) under cover of Form FDA 2253. The print ads make superiority claims about Zyrtec by suggesting it is clinically superior to some other allergy medicines. To our knowledge, these claims have not been demonstrated by substantial evidence or substantial clinical experience. Therefore, these claims misbrand your drug product in violation of the Federal Food, Drug, and Cosmetic Act (Act) and FDA implementing regulations. See 21 U.S.C. § 352(n) ;

429793.2

injured by this criminal misconduct with compensation for their losses.  Depriving the

wrongdoer of the profit of his wrongdoing, thereby eliminating the incentive for its repetition,

reinforces, rather than conflicts with, federal law.

The Supreme Court said so just *two days* ago, in *Bates v. Dow Agrosciences LLC*, -- U.S.

--, No. 03-388, 2005 WL 957193 (slip op. Apr. 27, 2005).  In *Bates*, the plaintiffs were peanut

farmers whose crops were damaged when they applied a federally-regulated pesticide to crops in

soil with an alkaline pH, prevalent in West Texas, even though the manufacturer stated on the

label that the product was "'recommended in all areas where peanuts are grown.'"  *Id*. at *3.  The

Court held that plaintiffs' common law and statutory consumer fraud claims were not preempted,

relying principally on its decision in *Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996), which held

that "n[o]thing denies Florida the right to provide a traditional damages remedy for violations of

common-law duties when those duties parallel federal requirements.'"  *Id*. at *9 (quoting

*Medtronic*, 518 U.S. at 495).  In *Medtronic*, the Court continued by explaining that "[t]he

presence of a damages remedy . . . merely provides another reason for manufacturers to comply

---

21 CFR 202.1(e)(6).

Food and Drug Adminis. Dep't of Health & Human Services, WARNING LETTER regarding NDA 19-835, 20-346, 21-621 Zyrtec®, located at *www.fda/gov/cder/warn/2005/zyrtec.pdf* (filed concurrently in Appendix of Unpublished Authorities, Tab 2).  The Division further admonished Pfizer's Chairman that it:

> has sent you three previous untitled letters for Zyrtec Tablets/Syrup since 1998. On March 4, 1998, DDMAC issued an untitled letter on a sales brochure that made implied clinical superiority claims based on comparative pharmacodynamic data, but which were not supported by substantial evidence or substantial clinical experience. On December 21, 1998, DDMAC issued an untitled letter on the dissemination of a bibliography of "Abstracts of Selected Zyrtec Literature," which listed abstracts that promoted the superiority of Zyrtec over other antihistamines in the absence of substantial evidence or substantial clinical experience to support that claim, as well as a detailer that implied an unsubstantiated risk of serious cardiovascular events with Claritin. On April 30, 2002, DDMAC issued an untitled letter on a DTC broadcast ad for failing to disclose risk information and for failing to make adequate provision for dissemination of the PI.

> . . . The three DTC print ads cited above make false or misleading claims that Zyrtec is clinically superior to some other allergy medicines, namely, that Zyrtec "works" and that at least some other allergy medicines do not work.

*Id*. at 2.  Dr. McKinnell is the same gentleman who has recently become ubiquitous on television, introducing himself as Pfizer's chairman, reassuring America that "Pfizer will be there."

with identical existing 'requirements' under federal law." *Medtronic*, 518 U.S. at 495. An award of damages in this case will not undermine the federal regulatory scheme; it is a necessary *supplement* to ensure that Pfizer is properly incentivized to deal honestly with the public and their physicians, and comply with federal law. *See* n.41, *supra*.

Defendants' conflict preemption argument also ignores the strong presumption that Congress does not intend to preempt state law in the absence of an express preemption provision. *See AWP I,* 263 F. Supp. 2d at 187-88. Courts have long presumed that the historic police powers of the states were not to be preempted by a federal statute unless that was the "clear and manifest purpose of Congress." *Medtronic,* 518 U.S. at 485 (discussing the "historic primacy of state regulation of matters of health and safety"). Defendants gambled with the health and safety of Plaintiffs or their insureds by fraudulently inducing their physicians to prescribe medication that was ineffective in treating their conditions (or the effectiveness of which was unknown), in lieu of medications that *had* been proven effective, at mega-doses Defendants had no satisfactory evidence were even safe.

Against this backdrop, Defendants invoke *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001). In *Buckman*, the Court found preemption only because "policing fraud against federal agencies is hardly 'a field which the States have traditionally occupied,'" so that "no presumption against pre-emption obtains in this case." 531 U.S. at 347-48 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). Here, by contrast, Plaintiffs do not complain of fraud directed at a federal agency; they complain of fraudulent conduct directed at them and/or their insureds, which falls squarely within the traditional "health and safety" purview of the states. *Medtronic*, 518 U.S. at 485; *see also AWP IV*, 321 F. Supp. 2d at 198 ("matters of public health . . . have been a field traditionally occupied by the states"); *Lupron*,

295 F. Supp. 2d at 177 ("The regulation of medicine . . . seems by tradition to be one of state concern.").[43]  The corresponding presumption against preemption is even stronger when the state law "creates a remedy unavailable under federal law." *Lupron*, 295 F.Supp. 2d at 177 n.31.  As "[t]here is no private right of action under the FDCA" (*Talbott v. C.R. Bard, Inc.*, 865 F. Supp. 37, 45 (D. Mass. 1994)), the "strong presumption" is even stronger in this case.

"Because the presumption against preemption applies, Defendants must show that there manifestly and clearly is an 'actual conflict' between the state claims and the federal statute, and that any impediment is 'severe,' not merely 'modest.'"  *AWP IV*, 321 F. Supp. 2d at 199 (citations omitted).  As set forth above, providing restitution to the intended victims of Defendants' wrongs poses no conflict with federal law.[44]  Accordingly, Plaintiffs' state law claims are not preempted.

## VIII.  <u>PLAINTIFFS' CLAIMS ARE NOT TIME-BARRED</u>[45]

### A.  <u>The Timeliness of Plaintiffs' Claims is a Quintessential Jury Issue</u>

As Judge Stearns recently observed in a closely analogous case, "[w]hether a plaintiff knew or should have known of an injury so as to trigger the running of a statute of limitations is,

---

[43] "Courts have generally read *Buckman*'s specific holding rather narrowly.  Indeed, the Court, in *Buckman*, seemed to go out of its way to focus on the fact that the federal enactment at issue was absolutely critical to the plaintiff's 'fraud on the FDA' claim."  *Caraker*, 172 F.Supp.2d at 1039 n.17 (noting that *Buckman*'s claims were based on the "odd premise" that liability under state law may arise when an actor commits "fraud" on a federal agency); *Green v. Fund Asset Mgmt., L.P.*, 245 F.3d 214, 223 n.7 (3d Cir. 2001); *McCall v. PacifiCare of California, Inc.*, 106 Cal. Rptr. 2d 271, 25 Cal.4th 412 (2001);  *see also Lupron*, 295 F. Supp. 2d at 179 n.33.

[44] *See Eve v. Sandoz Pharm. Corp.*, 2002 WL 181972, *2 (S.D. Ind. Jan. 28, 2002) (*Buckman*, on remand) ("Although *Buckman* precludes a plaintiff from seeking damages because the defendant lied to the FDA, it is something completely different to contend that plaintiff is precluded from seeking damages for injuries due to lies to her.  Notwithstanding that information may have misrepresented to or concealed from the FDA, once defendant undertook to misrepresent those facts to plaintiff, or to conceal from plaintiff facts it was bound to disclose, the plaintiff's claim no longer rests simply on the assertion that the agency was defrauded but on the additional fact that she was defrauded.").

[45] Class Plaintiffs' NJCFA and common law fraud claims are governed by a six-year statute of limitations and are therefore timely.  *See* N.J.S.A. 2A:14-1; *Kaufman v. I-Stat Corp.*, 165 N.J. 94, 127, 754 A.2d 1188 (N.J. 2000).  The limitations period for disgorgement/ unjust enrichment claims is three years from when a plaintiff discovers or should reasonably have discovered, the injury.  *See* Massachusetts General Laws, ch. § 5A; *Bowen v. Eli Lilly & Co., Inc.*, 408 Mass. 204, 205-06, 557 N.E. 2d 739 (1990).  Plaintiffs' state law claims are timely for the same reasons as their RICO claims, discussed *infra*.

with rare exception, a jury issue."[46]  If this case is indeed the "rare exception," it is only because Plaintiffs should be granted summary judgment on this issue.  *Id.*

### B.    The Claims Were Timely-Filed

The statute of limitations on a civil RICO claim is four years.  *Lupron*, 295 F. Supp. 2d at 183-84 (citing *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.,* 483 U.S. 143, 156 (1987)).  The limitations period begins to run when the plaintiff knew or should have known of the injury.  *Rotella v. Wood,* 528 U.S. 549, 553-54 (2000).  Courts routinely deny motions to dismiss (or for summary judgment) based on the alleged failure by plaintiffs to discover their injuries in a timely fashion.  *See Lupron*, 295 F. Supp. 2d at 183-84; *Thompson v. Metropolitan Life Ins. Co.*, 149 F. Supp. 2d 38, 48-53 (S.D.N.Y. 2001) (widespread publicity and press coverage insufficient as a matter of law to find that plaintiffs should have discovered their injuries).[47]

Defendants acknowledge that the statute of limitations governing RICO claims may be tolled under the doctrine of fraudulent concealment (Br. at 35-36),[48] but argue insufficiency of the tolling allegations.  Plaintiffs have alleged that they were unaware of Defendants' deceptive and fraudulent marketing practices relating to Neurontin, and that they exercised the requisite

---

[46] *Lupron*, 295 F. Supp. 2d at 183-84 (citing *Santiago Hedge v. Parke Davis & Co.,* 909 F.2d 628, 633 (1st Cir. 1990)) ("The determination of when appellees had knowledge of 'both the injury and its connection with the act of defendant,' is a question of fact.")); *Young v. Lepone,* 305 F.3d 1, 8-9 (1st Cir. 2002) (factual questions as to whether "storm warnings" were sufficient to put an investor on inquiry notice are only to be determined as a matter of law when the underlying facts are either admitted or undisputed).

[47] Defendants' reliance on *Hodas v. Sherburne, Powers & Needham, P.C.*, 938 F. Supp. 60 (D. Mass. 1996), is misplaced.  In *Hodas*, Plaintiff had actual knowledge of the conduct which he claimed had been concealed, having received a "demand letter describing th[at] very conduct." *Id*. at 64.

[48] "The federal doctrine of fraudulent concealment operates to toll the statute of limitations 'where a plaintiff has been injured by fraud' and 'remains in ignorance of it without any fault or want of diligence or care on his part.'" *Salois v. The Dime Savings Bank of N.Y.,* 128 F.3d 20 (1st Cir. 1997) *quoting Holmberg v. Armbrecht,* 327 U.S. 392, 397, 66 S.Ct. 582, 90 L.Ed. 743 (1946).  "To invoke the doctrine of fraudulent concealment, a plaintiff must plead and prove three elements:  '(1) wrongful concealment of their actions by the defendants; (2) failure of the plaintiff to discover the operative facts that are the basis of his cause of action within the limitations period; and (3) plaintiff's due diligence until discovery of the facts.'"  *Berkson v. Del Monte Corp.,* 743 F.2d 53, 55 (1st Cir. 1984) (internal citations omitted).  This is not a difficult burden to meet at the pleading stage. See *Lupron*, 295 F. Supp. 2d at 183-84.

due diligence.  Cl. Comp.¶¶ 245-47; Coord. Comp. ¶¶ 179-81.  The Complaints allege in great

detail the sophisticated precautions Defendants took to conceal their pattern of wrongdoing,

thereby tolling the limitations period.

Defendants' actions concealing their involvement in the off-label promotion of Neurontin

were inherent in their fraudulent marketing scheme.[49]  The Enterprises were created *precisely* to

make it appear that Defendants did *not* have any role in the promotion of Neurontin for off-label

uses.[50]  These highly specific allegations easily satisfy the requirements of Rule 9(b).  Plaintiffs

need not allege some supernatural act of concealment by the Defendants.

Defendants next claim that four isolated events caused the Neurontin scheme to be "well

publicized" in early 2000.  Br. at 37.  These four events were (a) the unsealing of the *qui tam*

complaint in January 2000, an event that received no public mention whatsoever;[51] (b) a vague

---

[49] The First Circuit does not require plaintiffs to prove that the acts of fraudulent concealment are separate and distinct from the underlying fraud, only that the fraudulent actions are self-concealing.  *See Truck Drivers & Helpers Union v. Nat'l Labor Relations Bd.*, 993 F.2d 990, 998 (1st Cir. 1993) (recognizing that the statute of limitations may be tolled by defendant's self-concealing wrong, and in such cases the burden shifts to the defendant to come forward with facts showing that the plaintiff could have discovered the cause of action with the exercise of reasonable diligence); *see also J. Geils Band Employee Benefit Plan v. Smith Barney Shearson, Inc.,* 76 F.3d 1245 (1st Cir. 1996).  Thus, Defendants' reliance on *Chapple v. National Starch & Chemical Co.*, 178 F. 3d 501 (7th Cir. 1999), is misplaced.

[50] Defendants concealed that they were surreptitiously: (a) misrepresenting the data related to the safety, effectiveness and usefulness of Neurontin for off-label uses; (b) misrepresenting the credentials and qualifications of certain of Defendants' employees as purported specialists, medical researchers, physicians and scientific employees in order to market and sell Neurontin for off-label uses; (c) bribing certain physicians to prescribe Neurontin for off-label uses; (d) publishing articles, studies and reports misrepresenting the scientific credibility of data and the authors of the articles, studies and reports; (e) organizing seminars and events encouraging physicians to prescribe Neurontin for off-label uses, knowing such uses were not proven to be safe or effective; (f) misrepresenting and concealing Defendants' role in the creation and sponsorship of a variety of seminars, events, articles and publications aimed at selling Neurontin for off-label uses; (g) hiding the financial connections between the participants in the scheme; (h) training medical liaisons to unlawfully engage in full-scale promotion of Neurontin; and (i) suppressing unfavorable test findings. *See, e.g.,* Cl. Comp. ¶¶ 31, 40, 45, 53- 56, 63, 68, 74, 75, 78- 81, 83-86, 89, 91, 95, 96-104, 107-13, 116-122, 125, 128, 129-34, 135-39, 140-42, 144-46, 148, 149-50, 153-54, 156- 157, 159, 162-64, 166-71, 178-181, 182, 189-93, 197, 206-12, 223-25, 226, 229-31; Coord. Comp. ¶¶ 17-23, 25, 26, 28, 29-32, 34, 36, 37, 41, 42, 49, 77, 78, 80, 87, 92, 98, 101-105, 107-111, 113-117, 119-125, 126-132, 134-147, 150-162, 167-168, 174-175, 179.

[51] A comprehensive search of the Lexis-Nexis "News, All" database [(date(before 2003) and (pfizer or warner-lambert or warner lambert or parke-davis or parke davis) and neurontin and franklin], which covers virtually every major newspaper and magazine published in the English language, does not reveal a single article concerning the *Franklin* action published prior to March 14, 2002.

reference buried in a voluminous Warner-Lambert public filing to an investigation by the United States Attorney's Office[52]; (c) one cryptic article in one newspaper concerning Neurontin; and (d) one article in one "trade publication."  Br. at 37-38.  These articles, individually and collectively, do not remotely approach the "highly publicized industry-wide" disclosures that might warrant summary judgment, let alone resolution of this issue at the pleading stage.[53]  *A fortiori*, Plaintiffs' claims are timely.

At bottom, Defendants' argument is inherently self-contradictory.  On the one hand, Defendants argue that Plaintiffs' complaints, which overflow with details of Defendants' misconduct unearthed through formal discovery in the *Franklin* litigation, are insufficiently specific to avoid dismissal; on the other hand, Defendants argue that Plaintiffs should have asserted their insufficient claims no later than April 2000, years before any of this information was available to them.  Plaintiffs are not U.S. Attorneys, who can issue investigative subpoenas in search of facts sufficient to sustain a claim; nor are they former employees of Parke-Davis, already in possession of such information.  Their due diligence can only be measured by reference to the specific factual information reasonably available to them *prior* to filing suit.

---

[52] Contrary to the false statement in Defendants' brief (Br. at 37), Warner-Lambert's securities filing did not even disclose that the investigation concerned "off-label" promotion, it merely stated that the inquiry concerned its "promotion of NEURONTIN," without further detail.  Chaffin Decl., Exh. C at 10.  Courts have repeatedly held that such cryptic disclosures  do not even constitute notice to the corporation's own shareholders, let alone to persons and entities with no financial interest in the filing entity.  *See, e.g., United Paperworkers Int'l Union v. International Paper Co.*, 985 F.2d 1190, 1199 (2d Cir. 1993) (Form 10-K not part of "total mix" of information available to shareholders because report was not distributed to shareholders); *Bertoglio v. Texas Int'l Co.*, 488 F. Supp. 630, 643 (D. Del. 1980) (shareholders not "presumably aware" of contents of Form 10-Q, which is not sent to shareholders).

[53] *Cf. Blue Cross v. SmithKline Beecham Clinical Labs*, 108 F. Supp. 2d 116, 123-124 (D. Conn. 2000) – cited by Defendants (Br. at 37) – in which the Court granted summary judgment where "volumes of information" disclosed the operative facts, including a feature story on *60 Minutes* television show and numerous articles in financial and trade publications, and where competitors had also been targeted for similar violations.  *See also Klein v. PDG Remediation*, 937 F. Supp. 323, 327-28 (S.D.N.Y. 1996) (Court held that it could not "find as a matter of law that, to an investor in New York or Colorado, the workings of a Florida grand jury or a Florida state legislative committee is easily accessible and is part of the 'total mix.'  Furthermore, the inquiry into whether information is part of the 'total mix' does not end with the revelation that the information was public, rather the inquiry must turn to whether the investors could have reasonably been aware of the information"); *United Paperworkers*, 985 F.2d at 1199 (defendants "pointed to only eight articles," which the Court considered "sporadic.").

429793.2

None of this information was available to Plaintiffs until May 2003, when previously sealed documents and testimony were filed in opposition to Defendants' summary judgment motion in *Franklin* (or, at the earliest, in April 2002, when the amended complaint in *Franklin* was unsealed, containing specific factual allegations without any such evidence). Plaintiffs' claims are timely.[54]

## IX.    PLAINTIFFS HAVE STATED CLAIMS FOR UNJUST ENRICHMENT

Precious little of Defendants' argument has any bearing on Plaintiffs' unjust enrichment claims.[55] As observed in *Lupron*, "[u]nder the doctrine of unjust enrichment, a plaintiff seeks restitution of a benefit conferred on another whose retention of the benefit at plaintiff's expense would be unconscionable." 295 F. Supp. 2d at 182. "To satisfy the elements of unjust enrichment, a plaintiff must show: (1) an enrichment; (2) an impoverishment; (3) a relation between the enrichment and the impoverishment; (4) an absence of justification and (5) the absence of a remedy provided by law." *Commonwealth of Mass. v. Mylan Laboratories*, 357 F. Supp. 2d 314, 324 (D. Mass. 2005) (citations omitted). Plaintiffs have alleged that Defendants were enriched by billions of dollars at their expense, by engaging in a deceptive campaign of off-label promotion in violation of federal laws that do not provide Plaintiffs with a private right of action. Defendants' conduct in putting the health and safety of the public at risk to earn these unjustified profits presents a quintessential claim of unjust enrichment.[56]

---

[54] At a minimum, Plaintiffs can recover for any damages that were incurred within four years of the filing of the Complaints. As *Lares Group II v. Tobin*, 221 F. 3d 41 (1st Cir. 2000), one of Defendants' own authorities, recognizes: "[E]ach time a plaintiff suffers an injury caused by a violation of 18 U.S.C. § 1962, a cause of action to recover damages based on that injury accrues to plaintiff at the time he discovered or should have discovered the injury." 221 F. 3d at 44 (citing with approval *Bankers Trust Co. v. Rhoades,* 859 F.2d 1096, 1102 (2d Cir. 1988)). As a result of Defendants' ongoing fraud, a new cause of action accrued with respect to each separate payment for Neurontin for off-label use.

[55] Defendants do not even include unjust enrichment in their list of claims asserted by Plaintiffs. Br. at 6. Indeed, it is only mentioned twice in their brief, for the propositions that under Massachusetts law, the claim requires proof of causation, and is subject to a three year statute of limitations. Br. at 11, 39 n.20.

[56] As noted in *Mylan*, while Plaintiffs' other claims provide them with a remedy at law, "[t]he Court . . . will not

-39-

## X.    <u>CONCLUSION</u>

For all of the foregoing reasons, the motions to dismiss should be denied.

Respectfully submitted,

**For the Class:**

Dated: April 29, 2005

  *s/s Barry Himmelstein*

**LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP**
Barry Himmelstein, Esq.
275 Battery Street, 30th Floor
San Francisco, CA 94111-3339

**GREENE & HOFFMAN**
Thomas Greene, Esq.
125 Summer Street
Boston, MA 02110

Thomas M. Sobol, Esq.
**HAGENS BERMAN LLP**
One Main Street, 4th Floor
Cambridge, MA 02142

**DUGAN & BROWNE**
James Dugan, Esq.
650 Poydras Street, Suite 2150
New Orleans, LA 70130

**BARRETT LAW OFFICE**
Don Barrett, Esq.
404 Court Square North
P.O. Box 987
Lexington, MS 39095

---

force Plaintiff to choose its remedy at this stage of the litigation." 357 F. Supp. 2d at 324.

429793.2

**LAW OFFICES OF DANIEL BECNEL, JR.**
Daniel Becnel, Jr., Esq.
106 W. Seventh Street
P.O. Drawer H
Reserve, LA  70084

**Attorneys for Plaintiffs and the Class**


**For Plaintiff Guardian Life Insurance Co. Of America:**

_____*s/s Thomas G. Shapiro*_____
Thomas G.  Shapiro (BBO #454680)
Theodore Hess-Mahan (BBO #557109)
**SHAPIRO HABER & URMY LLP**
53 State Street
Boston, MA 02109
Telephone: 617-439-3939
Facsimile: 617-439-0134


**OF COUNSEL:**

**COHEN, MILSTEIN, HAUSFELD & TOLL, P.L.L.C.**
Linda P. Nussbaum, Esq.
150 East 52nd Street, 30th Floor
New York, NY  10022
Telephone:  (212) 838-7797
Facsimile:  (212) 838-7745

- and -

429793.2

**COHEN, MILSTEIN, HAUSFELD & TOLL, P.L.L.C.**
Michael D. Hausfeld, Esq.
Marlene F. Gibbons, Esq.
Justine J. Kaiser, Esq.
1100 New York Avenue, N.W
West Tower, Suite 500
Washington, DC  20005
Telephone:  (202) 408-4600
Facsimile:  (202) 408-4699


**RAWLINGS & ASSOCIATES, PLLC**
Mark D. Fischer, Esq.
Mark Sandmann, Esq.
325 W. Main Street
Louisville, KY  40202
Telephone:  (502) 587-1279
Facsimile:  (502) 584-8580

**JOEL Z. EIGERMAN, ESQ.**
50 Congress Street, Suite 200
Boston, MA  02109
Telephone:  (617) 367-0014
Facsimile:   (617) 523-5612


**For Plaintiffs Kaiser Foundation Health Plan, Inc. and Kaiser Foundation Hospitals:**

Thomas G.  Shapiro (BBO #454680)
Theodore Hess-Mahan (BBO #557109)
**SHAPIRO HABER & URMY LLP**
53 State Street
Boston, MA 02109
Telephone: 617-439-3939
Facsimile: 617-439-0134

429793.2

**OF COUNSEL:**

**COHEN, MILSTEIN, HAUSFELD & TOLL,**
  **P.L.L.C.**
Linda P. Nussbaum, Esq.
150 East 52nd Street, 30th Floor
New York, NY  10022
Telephone:  (212) 838-7797
Facsimile:  (212) 838-7745

- and -

**COHEN, MILSTEIN, HAUSFELD & TOLL,**
  **P.L.L.C.**
Michael D. Hausfeld, Esq.
Marlene F. Gibbons, Esq.
Justine J. Kaiser, Esq.
1100 New York Avenue, N.W
West Tower, Suite 500
Washington, DC  20005
Telephone:  (202) 408-4600
Facsimile:  (202) 408-4699

**JOEL Z. EIGERMAN, ESQ.**
50 Congress Street, Suite 200
Boston, MA  02109
Telephone:  (617) 367-0014
Facsimile:  (617) 523-5612

-43-

For Plaintiff Aetna, Inc.:


_____*s/s Peter A. Pease*_____
Peter A. Pease, Esq.  (BBO # 392880)

**BERMAN DEVALERIO PEASE**
  **TABACCO BURT & PUCILLO**
One Liberty Square
Boston, MA  02109
Telephone:  617-542-8300
Facsimile:  617-542-1194

**OF COUNSEL:**

**LOWEY DANNENBERG BEMPORAD**
  **& SELINGER, P.C.**
Richard Bemporad, Esq.
Richard W. Cohen, Esq.
Peter St. Phillip Jr., Esq.
Todd S. Garber, Esq.
The Gateway - 11th Floor
One North Lexington Avenue
White Plains, NY  10601-1714
Telephone:  (914) 997-0500
Facsimile:  (914) 997-0035

**BERMAN DEVALERIO PEASE**
  **TABACCO BURT & PUCILLO**
Joseph J. Tabacco, Jr., Esq.
425 California Street, Suite 2025
San Francisco, CA  94104-2205
Telephone:  (415) 433-3200
Facsimile:  (415) 433-6382

**JOHN F. INNELLI, LLC**
John F. Innelli, Esq.
1818 Market Street, Suite 3620
Philadelphia, PA  19103
Telephone:  (215) 5612-1011
Facsimile:  (215) 561-0012