III.     **PLAINTIFFS FAIL TO ALLEGE A COGNIZABLE INJURY**

Defendants' moving brief explained that plaintiffs' complaints fail to plead a cognizable injury because plaintiffs fail to allege with specificity that Neurontin was ineffective for the off-label uses for which it was prescribed.  Defs.' Mem. at 14-16.  In response, plaintiffs claim that the complaints do allege that Neurontin is ineffective for treating all off-label conditions for which it was prescribed.  Pls.' Opp'n at 16 (citing id. at 6 n.2).[5]  While the Class Complaint does make a general assertion that Neurontin is ineffective (Class Compl. ¶ 249), the Coordinated Complaint does not (see, e.g., Coor. Compl. ¶ 183).  Moreover, neither alleges any facts to support the broad allegation that Neurontin is ineffective for all of its off-label uses.  Nor do plaintiffs claim that Neurontin was not effective for them or their insureds.  In fact, it reasonably can be inferred from the length of time that the individual plaintiffs, Smith and Kopa, took Neurontin – Smith (18 months); Kopa (6 months) – that it must have provided some benefit or they would not have continued taking it.  Absent particularized injury, plaintiffs have failed to state a claim for which relief can be granted because they have failed to allege adequately that they suffered a loss.

Plaintiffs also claim that in order to recover, they do not have to allege Neurontin's ineffectiveness.  Pls.' Opp'n at 6 n.2, 16.  Courts have repeatedly dismissed similar claims in the pharmaceuticals context.  See, e.g., Williams v. Purdue Pharma Co., 297 F. Supp. 2d 171 (D.C. Cir. 2003); Rivera v. Wyeth-Ayerst Labs., 283 F.3d 315 (5th Cir. 2002).  Those who receive the benefit of their bargain have no standing to sue.  See Williams, 297 F. Supp. 2d at 176; Rivera,

---

[5] Plaintiffs fail to respond to the defendants' argument that the third-party payors are barred from claiming harm because under the statutes of a number of states they are required to reimburse for off-label prescriptions. Defs.' Mem. at 16.

283 F.3d at 320.  This principle has particular force here, where none of the named plaintiffs allege that Neurontin was ineffective for him or her or for its insureds.

Plaintiffs' effort to distinguish Williams and similar cases is unavailing.  Plaintiffs claim that these cases are inapplicable on the grounds that they involved plaintiffs who were not injured by a defective drug but were suing for economic losses caused by the drug's defect.  Pls.' Opp'n at 18 n.19.  Plaintiffs make a distinction without a difference.  All of these cases involved the failure of plaintiffs to allege that the product did not work for them.  See, e.g., Williams, 297 F. Supp. 2d at 171 (where alleged defects were lack of efficacy and side effects); In re Rezulin Prods. Liab. Litig., 210 F.R.D. 61, 63-64 (S.D.N.Y. 2002) (where alleged defects were safety and side effects concerns).  For this reason, the courts found that no loss had been alleged.  Williams, 297 F. Supp. 2d at 178; In re Rezulin, 210 F.R.D. at 68-69.  Accordingly, as in Williams and In re Rezulin, plaintiffs cannot state a claim unless they come forward with specific facts to support the allegation that Neurontin was ineffective for them or their insureds.

Plaintiffs also try to analogize this case to Desiano, 326 F.3d at 339, claiming that like the plaintiffs in Desiano, they are trying to recover for a drug that they would not have purchased had it not been for the manufacturer's misrepresentations.  Pls.' Opp'n at 16-18.  This reliance on Desiano is misplaced.  The Desiano plaintiffs were not attempting to recover their purchase price; they were attempting to recover the difference between the price of Rezulin and equally effective alternatives to Rezulin which they would have purchased were it not for the manufacturer's misrepresentations.  326 F.3d at 349.  The claimed loss in that case stemmed from an unjustified increase in the price of Rezulin as compared to competitor drugs.  In contrast, plaintiffs here have not pled that there was a cheaper alternative to Neurontin that they would

14

have purchased instead of Neurontin.  Absent such an allegation, plaintiffs have not alleged the type of loss involved in <u>Desiano</u>.

## IV.    PLAINTIFFS FAIL TO PLEAD
## OTHER ESSENTIAL ELEMENTS OF RICO

It has been suggested that "the civil provisions of RICO are the most misused statutes in the federal corpus of law" and that "courts must be wary of putative civil RICO claims that are nothing more than sheep masquerading in wolves' clothing."  <u>W. 79th St. Corp. v. Congregation Kahl Minchas Chinuch</u>, No. 03 Civ. 8606, 2004 WL 2187069, at *5 (S.D.N.Y. Sept. 29, 2004). Plaintiffs here abuse the RICO statute by making vague, factually unsupported allegations that association-in-fact enterprises existed, that defendants controlled the purported enterprises, and that defendants committed RICO predicate acts.

### A.    Plaintiffs Do Not and Cannot Allege Adequately
### that the Alleged Enterprises Are Associations-in-Fact

Defendants' moving brief illustrated plaintiffs' failure to allege an association-in-fact. Defs.' Mem. at 16-21.  In response, plaintiffs blithely gloss over an essential requirement for pleading an association-in-fact:  all of the participants in the association-in-fact must know of the fraudulent nature of the enterprise.  <u>In re Pharm. Indus. AWP Litig.</u>, 307 F. Supp. 2d 196, 207 (D. Mass. 2004) ("<u>AWP II</u>").  Plaintiffs suggest that it is sufficient to allege that the participants were "aware of, and interacted with, other participants" in the alleged scheme.  Pls.' Opp'n at 20. Plaintiffs, however, must allege with heightened particularity facts showing that the participants knew the allegedly fraudulent nature of the enterprise as opposed to merely knew of one another's existence.  <u>AWP II</u>, 307 F. Supp. 2d at 204-05.  As defendants' moving brief illustrated, the complaints have not done this.

15

Plaintiffs do assert that technical writers knowingly wrote articles regarding off-label uses, physicians knowingly published articles under their names, and vendors knowingly published the articles in medical journals. Pls.' Opp'n at 20-21 & n.23. General allegations of knowing behavior, however, are insufficient. Notwithstanding plaintiffs' repeated use of the adverb "knowingly," no evidence of knowledge of the enterprise's fraudulent nature has been alleged.

In addition to their failure to plead the alleged participants' knowledge of the fraudulent nature of the enterprise, plaintiffs also rely on criminal RICO cases that are inapposite. Id. at 20 n.22. The facts of United States v. London and United States v. Doherty can be easily distinguished based upon the very nature of the activities at issue – running an illegal bookmaking business and selling stolen police department promotion exams, respectively. 66 F.3d 1227 (1st Cir. 1995); 867 F.2d 47 (1st Cir. 1989). In both cases, the defendant's knowledge of the fraudulent purpose stemmed from knowledge that the underlying transactions were illegal on their face. London, 66 F.3d at 1243-44; Doherty, 867 F.2d at 52-54. In contrast, paying technical writers to prepare medical articles for publication and hiring medical marketing firms to set up meetings is neither criminal nor the type of endeavor that would give rise to knowledge of an alleged enterprise's fraudulent nature.

With the exception of common purpose, plaintiffs ignore all five of the remaining factors for determining whether an association-in-fact has been alleged. Pls.' Opp'n at 19-22. In addressing common purpose, they misapply the law. Plaintiffs fail to recognize that common purpose "means coordinated activity in pursuit of a common objective." In re Lupron(R) Mktg. & Sales Practices Litig., 295 F. Supp. 2d 148, 173 (D. Mass. 2003). In addition, plaintiffs allege

a "hub and spoke" structure to the purported enterprises, but they have not alleged that there was a "rim to connect the spokes."  In re Pharm. Indus. AWP Litig., 263 F. Supp. 2d 172, 184 (D. Mass. 2003) ("AWP I").  This structural defect is fatal to plaintiffs' allegations of a RICO association-in-fact.  Id. at 182-83.

There is little doubt that the defendants, the doctors who attended medical education programs, and the medical marketing firms benefited from their various interactions. "[M]utually advantageous [business] relationship[s]," however, are not proof of a common purpose to engage in racketeering.  (Coor. Compl. ¶ 93.)  As this Court explained in AWP II, a RICO plaintiff must allege "a common purpose more specific than that common to many human endeavors, the reaping of a profit."  307 F. Supp. 2d at 204.

Plaintiffs' failure to plead a common purpose is further demonstrated by structural flaws in their alleged enterprises, which include innumerable, geographically dispersed and unrelated physicians.[6]  The In re Lupron court held that "there are no allegations (and it is difficult to see how there could be) that the thousands of doctors who benefited from [the allegedly improper behavior] were associated together in any meaningful sense, or were even aware of one another's existence as participants in a scheme to defraud."  295 F. Supp. 2d at 173-74.  Plaintiffs try to distinguish In re Lupron based on the number of doctors allegedly involved.  Pls.' Opp'n at 21 n.24.  Notwithstanding any numerical differences, plaintiffs here, like those in In re Lupron, have

---

[6] Plaintiffs claim that "the Enterprises include a discrete group of physicians who lent their names to articles in exchange for unearned compensation (indeed *28 doctors are identified both by name* and the amount of money received for their participation in the scheme)."  Pls.' Opp'n at 21 n.24.  Plaintiffs plainly mischaracterize their own pleadings.  The list of twenty-eight named doctors was not described as exhaustive; plaintiffs have made allegations regarding innumerable, unnamed physicians, not a discrete group.  (Class Compl. ¶ 104; Coor. Compl. ¶ 95.)

failed to allege that the physician participants here coordinated their activities in order to achieve a common objective.

The association-in-fact that plaintiffs attempt to advance also suffers from a related structural defect. As this court noted in <u>AWP I</u>, hub-and-spoke enterprises where the spokes are not connected fail to satisfy RICO. 263 F. Supp. 2d at 182-83. Like the plaintiffs in <u>In re Lupron</u>, plaintiffs' allegations have failed to tie the technical writers, innumerable doctors, and marketing companies to each other or to suggest that they were associated in any meaningful sense. 295 F. Supp. 2d at 174. As in the <u>AWP</u> litigation, there are no allegations that the alleged participants "have associated together with each other and the drug company as an entity with a common fraudulent purpose, or that there is any common communication network, decision-making process, or organizational structure." <u>AWP I</u>, 263 F. Supp. 2d at 184. There is, in short, "no rim to connect the spokes." <u>Id.</u>[7]

Plaintiffs' reliance on <u>In re Managed Care Litigation</u> to support their assertion of a common purpose is also misplaced. 185 F. Supp. 2d 1310 (S.D. Fla. 2002). In <u>In re Managed Care</u>, the defendants promoted, indeed "celebrated," the alleged association as a "network" directed at the plaintiffs in that case. <u>Id.</u> at 1324. In the instant case, it is not clear that plaintiffs

---

[7] Plaintiffs' citation to <u>General Electric Co. v. Iljin Corp.</u>, No. Civ.A.89-40094, 1993 WL 41752 (D. Mass. Feb. 12, 1993), for the proposition that evidence of agreements among the members of an association is sufficient to demonstrate an ongoing association whose members function as a continuing unit is unavailing. The defendants in <u>Iljin</u> comprised a few, identified parties, all of whom knew and interacted with each other; plaintiffs here cannot claim the same to be true about the defendants, the marketing firms, and the doctors. Plaintiffs' reliance on <u>Pharmacare v. Caremark</u>, 965 F. Supp. 1411 (D. Haw. 1996), is equally unfounded as the First Circuit has not followed the Ninth Circuit in holding that the association-in-fact requirements of existence beyond commission of predicate acts and existence of a control structure can be met simply by pleading a corporation as one of the RICO parties.

even knew of the existence of the various parties involved in the alleged enterprises.  It is

certainly not the case that these alleged participants promoted themselves as a network.

**B.    Plaintiffs Have Not Alleged Adequately that
Defendants Had Control over the Alleged Enterprises**

Defendants' moving brief explained that plaintiffs have failed to plead with heightened

particularity that defendants controlled the alleged RICO enterprises.  Defs.' Mem. at 21-22.

Plaintiffs respond by making general assertions of control and citing numerous paragraphs in the

complaints which do not allege control with sufficient particularity.  Pls.' Opp'n at 23 & n.27.

Plaintiffs' opposition sets forth six ways in which defendants are alleged to have exercised

control over the alleged enterprises.  No specifics have been identified with respect to any of the

allegations.  Id. at 23.  General assertions are not enough to plead control for RICO purposes;

plaintiffs must plead control with heightened particularity.  See Reves v. Ernst & Young, 507

U.S. 170, 183 (1993); Federal Judicial Center, Manual for Complex Litigation 3d § 33.81-82

(1995).

Most of the paragraphs in the complaints cited by plaintiffs do not even make allegations

of control.  (See, e.g., Class Compl. ¶¶ 43, 45, 50; Coor. Compl. ¶¶ 43, 94, 123.)  Those that do

merely make conclusory allegations.  (See, e.g., Class Compl. ¶¶ 44, 49; Coor. Compl. ¶¶ 106,

124.)  For example, paragraph 44 of the Class Complaint alleges that plaintiffs "select[ed] and

approve[d] the content of the programs and the physician participants that would deliver the off-

label message."  (See also Class Compl. ¶¶ 69, 79; Coor. Compl. ¶¶ 77-78.)  The only purported

example shows that a vendor, not defendants, took action to control the content of a seminar.

(Class Compl. ¶ 63.)  Plaintiffs also allege that the defendants "placed their own employees and

agents in positions of authority and control in the Enterprises" (Pls.' Opp'n at 23), but again, fail

19

to plead with specificity.  Although they allege that employees were transferred from Parke-Davis to Physicians World when the job of setting up meetings was outsourced, no facts are alleged that would demonstrate that employees of the defendant were placed in a position of control.  (Coor. Compl. ¶ 56; Class Compl. ¶ 70.)

### C.    Plaintiffs' Predicate Act Allegations Are Inadequate

Defendants' moving brief argued that because plaintiffs' complaints do not allege false statements, scienter, or causation, plaintiffs have failed to plead predicate acts of mail or wire fraud adequately.  Defs.' Mem. at 22.  In response, plaintiffs accuse defendants of ignoring plaintiffs' alleged predicate acts of mail and wire fraud, but this plainly is not the case.  Pls.' Opp'n at 22.  Moreover, these deficiencies in plaintiffs' wire and mail fraud claims apply whether the statements in question are analyzed as misrepresentations, half-truths, or omissions. See Point I at 4.

Defendants also argued that plaintiffs have insufficiently pled bribery as a predicate act because there are no allegations that defendants intended a *quid pro quo*.  Defs.' Mem. at 22.  In response, plaintiffs do little more than cite to conclusory allegations in their complaints, which do not allege that defendants paid physicians in exchange for an agreement by doctors (i) to make positive statements about Neurontin or (ii) to increase their prescriptions of Neurontin. Pls.' Opp'n at 24.  The language of plaintiffs' brief itself highlights what is wrong with their argument:  "Plaintiffs allege that the Physician 'Authors' received an Honorarium . . . as well as credit and accolades for published material with minimal to no work to perform."  Id.  In other words, plaintiffs allege only that defendants paid doctors who performed little to no work.  This is not the equivalent, legal or otherwise, of alleging that honoraria were part of an agreement by

which doctors agreed to change their prescription behavior because of the honoraria.  Being paid

for minimal work, without more, does not constitute bribery.[8]

## V.    PLAINTIFFS FAIL TO ALLEGE A CLAIM<br>UNDER THE VARIOUS CONSUMER FRAUD STATUTES

### A.    The Third-Party Payors Do Not Have Standing<br>Under the New Jersey Consumer Fraud Act

Defendants previously demonstrated that the third-party payors have no standing to sue

under the NJCFA because they are not consumers within the meaning of the act and because the

NJCFA was never meant to apply to sophisticated institutions engaging in business transactions.

Defs.' Mem. at 23.  In response, plaintiffs contend that Kavky v. Herbalife International of

America, 820 A.2d 677 (N.J. Super. Ct. App. Div. 2003), expanded the definition of a consumer

under the NJCFA so that it encompasses third-party payors.  Pls.' Opp'n at 24-25.  Plaintiffs'

argument, however, fails to take into account that to the extent Kavky can be read to expand the

definition of the term "consumer," it did not do so in a way that would give the third-party

payors a claim under the NJCFA.

The definition of a consumer is "one who uses (economic) goods, and so diminishes or

destroys their utility."  Hundred E. Credit Corp. v. Eric Schuster Corp., 515 A.2d 246, 248 (N.J.

Super. Ct. App. Div. 1986).  The Kavky court noted that some goods, such as franchise licenses,

are not capable of being diminished.  820 A.2d at 682.  Because pharmaceutical medicines are

---

[8] Plaintiffs' arguments also ignore the fact that in order to be complicit in bribery, doctors must be in breach of a duty of fidelity, which has no applicability here because doctors are permitted to prescribe Neurontin off-label.  See N.J. Stat. § 2C:21-10(a) (2004).

certainly capable of being diminished, <u>Kavky</u> did not modify the <u>Hundred East</u> definition of consumer in any way that is meaningful in these actions.[9]

Furthermore, the court in <u>Kavky</u> did not conclude that a corporation has standing under the NJCFA.  In <u>Kavky</u> the court found that the acquisition of a vitamin distributorship franchise involved a consumer transaction because the franchises were made widely available to the public and hence, involved the same type of mass-market transaction issues to which the NJCFA was intended to apply.  820 A.2d at 684.  The third-payors here are nothing like the franchisees in <u>Kavky</u> – individuals who answered an Internet ad and paid $85 to be a vitamin distributor.  Accordingly, <u>Kavky</u> neither explicitly nor implicitly expanded the definition of a consumer to encompass third-party payors who did not engage in a consumer transaction.[10]

Plaintiffs also rely on <u>International Union of Operating Engineers Local 69 v. Merck, Inc.</u>, No. ATL-L-3015-04 (N.J. Super. Ct. Atl. Cty. July 8, 2004) ("<u>Local 69</u>") (<u>see</u> Pls.' App. exh. 3), for the proposition that the third-party payors have standing.  Pls.' Opp'n at 25.  In reaching this conclusion, <u>Local 69</u>, an unpublished opinion from a New Jersey trial court, borrowed the definition of consumer from <u>Neveroski v. Blair</u>, 358 A.2d 473 (N.J. Super. Ct. App. Div. 1976).  The court in <u>Neveroski</u>, however, found that a transaction involving a real estate broker did not fall under the NJCFA's scope because the act was not intended to apply to

---

[9]  Plaintiffs also contend that <u>Kavky</u> undermines the court's decision in <u>In re Managed Care Litigation</u>, 298 F. Supp. 2d 1259, 1303 (S.D. Fla. 2003), because the decision relies on the <u>Hundred East</u> definition of consumer. Recent New Jersey Appellate Division decisions, however, have specifically affirmed <u>In re Managed Care</u>'s holding regarding the inapplicability of the NJCFA.  <u>See</u> <u>Medical Soc'y of N.J. v. AmeriHealth HMO, Inc.</u>, 868 A.2d 1162, 1167-68 (N.J. Super. Ct. App. Div. 2005); <u>Medical Soc'y of N.J. v. Oxford Health Plans, Inc.</u>, No. A-1485-03T1 (N.J. Super. Ct. App. Div. Feb. 14, 2005) (<u>see</u> Chaffin Reply Decl. exh. 1).

[10]  Plaintiffs cite <u>Hundred East</u> for the proposition that sophisticated business entities can be victimized as well under the NJCFA.  Pls.' Opp'n at 25.  As the language from <u>Hundred East</u> demonstrates, this decision merely suggests that corporations engaging in consumer transactions, in which they have no particular expertise, might have standing.

business transactions.  See id. at 480.  The language of Neveroski makes clear that the NJCFA
was not meant to apply here:

> [I]t is our considered opinion that the entire thrust of the Consumer Fraud Act is
> pointed to products and services sold to consumers in the popular sense.  Such
> consumers purchase products from retail sellers of merchandise consisting of
> personal property. . . .  The legislative language throughout the statute and the
> evils sought to be eliminated point to an intent to protect the *consumer* in the
> context of the ordinary meaning of that term in the marketplace.

Id.  Consequently, Neveroski provides no support for the argument that reimbursement by third-
party payors is a consumer transaction.[11]

### B.     The California Unfair Competition Law and the New Jersey Consumer Fraud Act Do Not Apply to Non-Residents

Defendants' moving brief also explained that plaintiffs with no relationship to California
or New Jersey are not entitled to the protection of the consumer fraud statutes of those states, and
application of them in such circumstances would unconstitutionally interfere with other states'
freedom to craft their own regulatory regimes.  Defs.' Mem. at 24-25.  The principal thrust of
plaintiffs' response is to complain that the determination as to whether these laws apply
extraterritorially should be postponed until a later stage.  Pls.' Opp'n at 26-27.

As an initial matter, plaintiffs do not deny that that the Commerce Clause prevents a state
from interfering with the legitimate regulatory decisions of other states.  Id. at 26 n.29.  Plaintiffs
also apparently concede that California law embodies a strong presumption against

---

[11] Plaintiffs also seek to support their argument by citing to Desiano v. Warner-Lambert Company, 326
F.3d 339 (2d Cir. 2003).  Desiano, however, is not a New Jersey state court opinion, it cites to no New Jersey
authority, and it laments the fact that it was not in a position to certify any questions to the New Jersey Supreme
Court.  In fact, the court did not even attempt to reconcile its finding that the NJCFA applies to insurers with the
New Jersey case law that the NJCFA was only intended to cover consumer transactions.  Id.

extraterritorial application of its laws, particularly the UCL.  <u>Compare</u> Defs.' Mem. at 25 <u>with</u>

Pls.' Opp'n at 26-27.

Plaintiffs do claim, however, that the fact that Warner-Lambert was once headquartered

in New Jersey qualifies as sufficient contacts such that application of the NJCFA to non-

residents would not violate due process.  Pls.' Opp'n at 26 n.29.  The authority that plaintiffs cite

for this proposition, <u>Grace v. Perception Technology Corporation</u>, 128 F.R.D. 165 (D. Mass.

1989), is distinguishable.  That decision was a securities class action in which the court was

considering pendant Massachusetts state claims.  The court's decision to apply Massachusetts

law to non-residents turned on the fact that not only was the defendant headquartered in

Massachusetts, but the alleged misrepresentations emanated from that state to other states.  <u>Id.</u> at

171.  In contrast, plaintiffs do not assert that the alleged misrepresentations were actually made

within New Jersey, or that any misrepresentations that might have been made in New Jersey

went beyond its borders.  The only cases discussing situations where there is no other relevant

connection to the state besides the defendant's headquarters have determined that this fact is

insufficient in and of itself to satisfy due process.  Defs.' Mem. at 25 n.11; <u>see also</u> <u>In re</u>

<u>Bridgestone/Firestone, Inc. Tires Prods. Liab. Litig.</u>, 288 F.3d 1012, 1016 (7th Cir. 2002).

Plaintiffs also cite two cases as examples of the NJCFA and UCL being applied to the

claims of non-residents.  <u>Wershba v. Apple Computer, Inc.</u>, plaintiffs' lone authority under the

UCL, is readily distinguishable because it also turned on the fact that not only was the

corporation headquartered in California, but the brochures at issue were prepared and mailed

from California to the rest of the country.  110 Cal. Rptr. 2d 145, 160 (Ct. App. 2001).

Moreover, California courts have conclusively determined that out-of-state misconduct directed

24

to non-residents does not give rise to a claim under the UCL, and to so hold would violate due process.  See Shaw Indus., Inc. v. The Superior Court of Los Angeles, No. B167878, 2003 WL 22995267, at *9 (Cal. Ct. App. Dec. 22, 2003); Norwest Mortgage, Inc. v. Superior Court, 85 Cal. Rptr. 2d 18, 22-28 (Ct. App. 1999).  Given that none of the defendants is headquartered in California, no statements are alleged to have been issued from California that went beyond its borders, and there is no allegation of any misrepresentations being made in California, it is clear that extraterritorial application of the UCL is improper.

Boyes v. Greenwich Boat Works, Inc., 27 F. Supp. 2d 543 (D.N.J. 1998), is the only decision that plaintiffs cite regarding the application of the NJCFA.  That decision, however, did not consider the due process or Commerce Clause problems associated with nationwide application of the NJCFA.  Moreover, the case has been distinguished in the multidistrict class action context by the New Jersey Appellate Division.  See Fink v. Ricoh Corp., 839 A.2d 942, 988-89 (N.J. Super. Ct. Law Div. 2003).

As to plaintiffs' argument that the Court should wait until the class certification or summary judgment stage to rule, it should be clear that defendants are not asking the Court to render a choice of law decision and the cases cited by the plaintiffs are, therefore, irrelevant. Rather, defendants are advancing the argument that the UCL and NJCFA are, as a matter of law, inapplicable to the claims of out-of-state residents, including those named plaintiffs that are not California or New Jersey residents.

### C.    The Coordinated Complaint Fails To State a Claim Under the Remaining Consumer Fraud Statutes

Defendants' moving brief detailed the reasons that the Coordinated Complaint failed to allege claims under the consumer fraud statutes of the fifty-one jurisdictions other than

25

California.  Defs.' Mem. at 26-27.  Plaintiffs contend, in response, that choice-of-law issues should be dealt with at a later stage of the case.  Pls.' Opp'n at 27.  Plaintiffs' response again misses the point.  Defendants are not asking the Court to choose the law to apply to the coordinated plaintiffs' claims; rather, they are seeking a ruling that the claims under the fifty-one consumer fraud statutes have failed to state a valid claim under Rule 12(b)(6).  This issue is fully suitable for the Court to resolve at this juncture.

The First Circuit has ruled that in order to survive a motion to dismiss it is necessary to allege the basic elements of a cause of action:

> [M]inimal requirements are not tantamount to nonexistent requirements.  The threshold may be low, but it is real – and it is the plaintiff's burden to take the step which brings his case safely into the next phase of the litigation.  The court need not conjure up unpled allegations or contrive elaborately arcane scripts in order to carry the blushing bride through the portal.

Gooley v. Mobil Oil Corp., 851 F.2d 513, 514 (1st Cir. 1988).  Dismissal is appropriate here because plaintiffs have not even attempted to set forth the individual elements of these statutes, let alone the facts necessary to state a claim under these diverse statutes or to demonstrate a nexus between the alleged conduct and the jurisdictions.  Even under the most liberal of pleading standards, the mere citation to various state statutes, without more, is insufficient to survive a motion to dismiss.[12]

---

[12] In addition, plaintiffs do not respond to the fact that these claims are barred in states that (i) do not permit business entities to sue, (ii) limit the authority of individuals to bring consumer protection suits, or (iii) require demand letters prior to filing suit.  Defs.' Mem. at 26.

## VI.   PLAINTIFFS' CLAIMS SHOULD BE DISMISSED
##        ON FIRST AMENDMENT GROUNDS

Defendants demonstrated that this lawsuit seeks to impose liability for scientific speech –
communications in continuing medical education seminars and other fora to doctors about
medical uses for a drug – and that such speech was subject to the highest form of constitutional
protection, rendering plaintiffs' lawsuit untenable.  Defs.' Mem. at 27-29.  Defendants
alternatively showed that even if the speech in question were analyzed as commercial rather than
scientific speech, plaintiffs' claims could not survive constitutional muster under the test for the
regulation of commercial speech.  Id. at 29-31.  Plaintiffs make three primary points in response.
None has merit.

First, plaintiffs argue that there are no separate physician and publication-based claims
that are not connected to supposedly false and misleading statements, and therefore none of the
claims in the complaints implicate First Amendment concerns.  Pls.' Opp'n at 28-29.  Plaintiffs'
first rationale for ignoring the First Amendment is unavailing.  Plaintiffs have not adequately
alleged false statements or scienter, and thus there are no allegations of fraud.  In any event,
plaintiffs cannot simply label the speech in question "fraudulent" in order to escape the reach of
the First Amendment.  Defs.' Mem. at 29 n.18.[13]  Plaintiffs also say that defendants have a
"contorted" view of the case by characterizing it as involving constitutionally-protected speech
between doctors.  Id. at 28 n.34.  But the guts of this case, and the basis for each count, is doctors
communicating information throughout the medical community regarding off-label uses of

---

[13]  Plaintiffs' reference to Warner-Lambert's guilty plea (Pls.' Opp'n at 28), which did not contain an
admission of "fraudulent" conduct, does not advance their argument.

Neurontin.  Plaintiffs want to levy damages on, and because of, this speech.  The First Amendment forbids that.

As stressed in defendants' moving brief, off-label use and prescription is fully legal and the FDA itself has expressed concerns, and fruitlessly struggled for almost three years, over trying to articulate how to restrict speech about off-label uses in a way that does not offend the First Amendment.  Defs.' Mem. at 26-27.  In this context, plaintiffs cannot maintain that the claims they have alleged – devoid of any specific allegations of fraud – do not violate the First Amendment.  To do so would be tantamount to arguing that all speech regarding off-label uses is illegal as "fraudulent speech," which is contrary to the law, see Wash. Legal Found. v. Friedman, 13. F. Supp. 2d 51, 66, 68-69 (D.D.C. 1998), as well as to the FDA's position on off-label use.[14]

Plaintiffs' second argument why the First Amendment does not apply is that this case involves no prior restraint on speech.  Pls.' Opp'n at 29.  This type of "logic" is, literally, stunning.  The First Amendment prevents the imposition of damages in civil suits just as it prevents prior restraints.  E.g., BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 573 n.17 (1996) ("The test is not the form in which state power has been applied but, whatever the form, whether such power has in fact been exercised" and "[r]egulation can be as effectively exerted through an award of damages as through some form of preventive relief" (citations omitted)); see also Defs.' Mem. at 28-29.

Finally, plaintiffs argue that commercial speech may be regulated by states in order to protect their interest in public health and welfare, and plaintiffs' claims are simply an example of

_____

[14] Plaintiffs state that the First Amendment does not protect conduct where it advances a supposedly illegal purpose.  Pls.' Opp'n at 28-29.  This argument, however, is just a form of bootstrapping; it assumes that off-label use is illegal, which it is not.

28

such regulation.  Pls.' Opp'n at 29-30.  This argument fails on multiple grounds.  First, plaintiffs gloss over what should be the most fundamental step of their argument because it is the most radical, namely explaining why speech about medical uses of a drug made to doctors should be considered "commercial" as opposed to scientific speech absolutely protected by the First Amendment.  Plaintiffs' argument assumes this result, rather than demonstrates it.

Even putting aside this threshold issue, plaintiffs assert that this speech may be the subject of civil liability because it is related to illegal activity and is inherently misleading.  Id. at 30.  In making this argument, plaintiffs ignore the fact that the only court to address these issues has found that such speech neither relates to an illegal activity (off-label prescription) nor is inherently misleading.  See Friedman, 13 F. Supp. 2d at 66, 68-69; see also Defs.' Mem. at 29 n.18.

Moreover, plaintiffs' opposition does not even attempt to address the "reasonable fit" requirement of the First Amendment.  Plaintiffs cannot reasonably claim that state law damages actions for speech concerning off-label use or prescription of drugs are a "reasonable fit" in protecting a state's interest in the health of its citizens.  If federal law does not prohibit off-label speech in and of itself and the federal regulatory body, the FDA, has repeatedly and publicly expressed First Amendment concern about its attempted regulation of off-label use of drugs, the notion that blunt-nosed state damage actions are a carefully crafted "reasonable fit" is absurd.

Furthermore, to the extent that plaintiffs now try to base this case on omissions (liability can be imposed because, they assert, there was a failure to say things that should have been said to doctors, see Pls.' Opp'n at 6-9), they ignore that the First Amendment precludes compelled speech.  E.g., Pacific Gas & Elec. Co. v. Public Utils. Comm'n, 475 U.S. 1 (1986) (plurality

opinion) (holding that California Public Utilities Commission cannot constitutionally require a

privately owned utility company to include in billing envelopes speech of a third party with

which utility did not agree); Riley v. Nat'l Fed'n of the Blind of N.C., Inc., 487 U.S. 781 (1988)

(forcing fundraisers to disclose to potential donors before appealing for funds charitable

contribution level over previous 12 months is unconstitutional); Miami Herald Publ'g Co. v.

Tornillo, 418 U.S. 241, 257 (1974) (state law requiring newspaper to publish contrary view

offends First Amendment); Clifton v. Fed. Election Comm'n, 114 F.3d 1309, 1313 (1st Cir.

1997) ("equal space and prominence restriction" for candidate messages in nonprofit

corporation's voting guide held invalid after court explained that "the Supreme Court has long

treated compelled speech as abhorrent to the First Amendment, whether the compulsion is

directed against individuals or corporations"). The First Amendment precludes the imposition of

damages for not saying to doctors the things plaintiffs argue should have been said.[15]

## VII.    PLAINTIFFS' STATE LAW CLAIMS ARE PREEMPTED BY THE FDCA

Applying the criteria established in Buckman Company v. Plaintiffs' Legal Committee,

531 U.S. 341 (2001), defendants' moving brief explained that plaintiffs' claims – all of which

stem from an alleged violation of federal law – are preempted because the FDA is responsible for

regulating the conduct here consistent with trying to achieve a delicate balance of statutory

purposes. Defs.' Mem. at 31. Plaintiffs' response does not dispute any of the essential points

made by defendants but instead cites to several decisions in which a preemption argument was

---

[15] Plaintiffs contend that speech can be regulated (by retrospective damages actions) by compelling doctors who speak to other doctors about off-label uses to (1) state legal conclusions, namely that Neurontin was not FDA-approved for off-label uses and that it was not effective because it had not been tested in a manner that would satisfy the FDA and (2) express views different from their own, namely that articles or anecdotes suggest that Neurontin in particular cases may have not worked as well for certain off-label uses.

rejected. Pls.' Opp'n at 31-35. These decisions, however, are distinguishable because in none of them was "the existence of . . . federal enactments . . . a critical element in the[] case." Buckman, 531 U.S. at 353. Plaintiffs' claims here closely parallel those in Buckman and are preempted for the same reasons. See, e.g., Fitzgerald v. Smith & Nephew, Inc., 11 Fed. Appx. 335, 339 (4th Cir. 2000) ("Plaintiff rightly acknowledged that [Buckman] precludes her claims of fraud on, and related to, the FDA.").

        As an initial matter, plaintiffs' claims are clearly predicated on violations of federal law. Defendants' moving brief detailed the numerous references in plaintiffs' complaints to federal guidelines and explained that plaintiffs' causes of action are grounded in an allegation that defendants violated the FDCA through their promotional efforts. Defs.' Mem. at 34-35. Not only do plaintiffs fail to dispute this fact, but they openly acknowledge that their claims are derivative of alleged FDCA violations, stating: "*Federal law* criminally proscribes the type of deliberate, off-label marketing campaign waged by these Defendants." Pls.' Opp'n at 31-32 (emphasis added). Plaintiffs' brief also describes in detail the FDA regulations relating to promotion and labeling, further emphasizing that plaintiffs' claims are based on federal law. Id. at 32 n.41.

        In fact, plaintiffs make abundantly clear in their brief what was clear on the face of the complaints, namely that their allegations of off-label promotion in violation of the FDCA and their alleged misleading statements and omissions are one and the same. As plaintiffs claim at the outset of their opposition, efforts to promote Neurontin for off-label uses were, "*by their very nature*, highly misleading and full of misrepresentations." Id. at 5 (emphasis added). Where a private cause of action is intertwined with or derived from a violation of a federal statute, the

31

private cause of action is preempted.  See Nathan Kimmel, Inc. v. DowElanco, 275 F.3d 1199,

1206 (9th Cir. 2002) (explaining the holding of Buckman); Andrx Pharm., Inc. v. Biovail Corp.,

175 F. Supp. 2d 1362, 1369-70 (S.D. Fla. 2001), vacated on other grounds by 276 F.3d 1368

(Fed. Cir. 2002).

    The fact that plaintiffs' claims are predicated on violations of federal law distinguishes

this case from the decisions cited by plaintiffs.  In virtually all of decisions declining to find

preemption cited by plaintiffs, the plaintiffs' claims were based on a manufacturer's duty to

warn, which is quite evidently not a duty based on federal law.  For example, Caraker v. Sandoz

Pharmaceuticals Corporation distinguished Buckman on the basis that Illinois law recognizes a

duty to warn that predates the FDCA.  172 F. Supp. 2d 1018, 1041 (S.D. Ill. 2001) ("Illinois'

duty to warn – the basis of the claims – existed before the regulations at issue, and the existence

of the regulations is not the 'critical element' of the [plaintiffs'] claims.").[16]  Plaintiffs have not

cited a single case where a plaintiff was attempting to use state and common law claims to

recover for an alleged violation of a federal regulation that arose under a statute that is enforced

solely by the federal government.[17]

    Plaintiffs also attempt to address the preemption issue by characterizing their claims as

nothing more than an attempt to compel defendants to compensate private and third-party payors,

in the same way that defendants previously reimbursed the federal government.  Pls.' Opp'n at

---

[16] While not a failure to warn case, the court in In re Lupron distinguished Buckman on the similar basis
that the claims at issue were not based on a violation of federal law.  295 F. Supp. 2d 179 n.33.

[17] Other decisions referenced by plaintiffs are even less applicable, as they do not even consider conflict
preemption.  See Ohler v. Purdue Pharma, L.P., No.CIV.A.01-3061, 2002 WL 88945 (E.D. La. Jan. 22, 2002);
McCallister v. Purdue Pharma L.P., 164 F. Supp. 2d 783 (S.D. W. Va. 2001); Hawkins v. Upjohn Co., 890 F. Supp.
609 (E.D. Tex. 1994).

33.  They further argue that this would strengthen federal law because it would deter future violations.  Id.  This argument ignores the fact that Congress could have included a private right of action for situations where the FDA found there was a violation, but it decided that such a provision might compromise the purposes of the statute.  See Talbott v. C.R. Bard, Inc., 865 F. Supp. 37, 47 (D. Mass. 1994), aff'd, 63 F.3d 25 (1st Cir. 1995) (explaining that Congress purposefully did not include a private right of action as part of the FDCA).  In fact, the argument that the creation of a private right of action would aid enforcement of the FDCA was considered and rejected by Buckman.  531 U.S. at 348.  Furthermore, Congress's intent that the FDCA not include a private right of action strongly weighs in favor of preemption because "Congress's intent is the touchstone of preemption analysis."  In re Lupron, 295 F. Supp. 2d at 177 (quoting Mendes v. Medtronic, Inc., 18 F.3d 13, 16 (1st Cir. 1994)).

Preemption is also called for here because permitting these claims would be an obstacle and would interfere with the FDA's complicated task of policing pharmaceutical manufacturers.  As explained in defendants' moving brief, properly overseeing the regulation of off-label promotion is particularly complicated because the FDA must weigh competing policy goals.  Defs.' Mem. at 34.  In Buckman there was a specific finding that permitting private enforcement would disrupt this process because this potential liability might unduly chill new innovative drug uses, "despite the fact that the FDCA expressly disclaims any intent to directly regulate the practice of medicine, and even though off-label use is generally accepted."  531 U.S. at 350-51.  Additionally, permitting private claims would impair the FDA's regulatory efforts because it would "permit juries to reach a different conclusion than the FDA did . . . thereby imposing a different requirement than that required by the federal requirements."  Kemp v. Medtronic, Inc.,

33

231 F.3d 216, 235-36 (6th Cir. 2000); see also Cupek v. Medtronic, Inc., No. 04-3201, 2005 WL

911323 (6th Cir. Apr. 21, 2005) (reaffirming Kemp).  Even prior to the Buckman decision the

First Circuit had determined that state tort claims for FDCA violations were preempted because

they would interfere with Congress's purposes in passing the FDCA.  See Talbott, 63 F.3d at 29-

30 (finding that permitting such claims would seriously threaten "the balance [Congress] sought

to establish between promoting innovation and protecting human health").

 Plaintiffs cite Medtronic, Inc. v. Lohr, 518 U.S. 470 (1996), for the proposition that

allowing state law claims would not defeat the purposes of the FDCA.  Pls.' Opp'n at 33-34.

The Supreme Court in Buckman, however, expressly distinguished Medtronic on the basis that it

was primarily concerned with causes of action based on duties arising under state law:

> Notwithstanding the fact that Medtronic did not squarely address the question of
> implied pre-emption, it is clear that the Medtronic claims arose from the
> manufacturer's alleged failure to use reasonable care in the production of the
> product, not solely from the violation of FDCA requirements.  In the present case,
> however, the fraud claims exist solely by virtue of the FDCA disclosure
> requirements.  Thus, although Medtronic can be read to allow certain state-law
> causes of actions that parallel federal safety requirements, it does not and cannot
> stand for the proposition that any violation of the FDCA will support a state-law
> claim.

531 U.S. at 352-53.  The Supreme Court's reasons for distinguishing Medtronic equally apply to

Bates v. Dow Agrosciences LLC, also relied upon by plaintiffs, which similarly considered

whether claims seeking to enforce state regulations that parallel federal ones would be expressly

preempted. 125 S. Ct. 1788, 1800-01 (2005) (explaining that the decision closely approximates

Medtronic).

 Finally, plaintiffs claim that there is a presumption against preemption because regulation

of health is an area traditionally reserved to the states.  Pls.' Opp'n at 35-36.  This would be

relevant if plaintiffs' claims were based on either state regulations concerning health or common law duties owed by manufacturers regarding off-label promotion. In <u>In re Lupron</u> the court held that there was a presumption against preemption because the state has traditionally regulated medical costs. 295 F. Supp. 2d at 177. In contrast, plaintiffs here do not and cannot argue that the states have traditionally regulated off-label promotion of pharmaceutical drugs. Moreover, the presumption against preemption was previously addressed and rejected in <u>Buckman</u>. The Supreme Court there found that policing violations of the FDCA was not a field that had traditionally been occupied by state governments, and consequently, "no presumption against pre-emption obtains in this case." 531 U.S. at 347-48.[18]

## VIII.   PLAINTIFFS' RICO CLAIMS ARE TIME-BARRED

Defendants' moving brief explained that the four-year statute of limitations applicable to plaintiffs' civil RICO claims began to run when plaintiffs paid for Neurontin because that is when they "discovered or should have discovered [their] injur[ies]." Defs.' Mem. at 35 (quoting <u>Rodriguez v. Banco Cent. Corp.</u>, 917 F.2d 664, 665 (1st Cir. 1990)). Defendants then described how plaintiffs have failed to allege fraudulent concealment, which must be pled with particularity, because plaintiffs' allegations of due diligence were insufficient and because facts

---

[18] Plaintiffs attempt to distinguish <u>Buckman</u> by claiming that the decision was narrowly based on a fraud-on-the-FDA situation (Pls.' Opp'n at 35 nn.43-44), but this is not a relevant distinction. <u>See, e.g.</u>, <u>Webster v. Pacesetter, Inc.</u>, 259 F. Supp. 2d 27, 36 (D.D.C. 2003) (explaining that a cause of action based on a violation of FDA regulations concerning recordkeeping, labeling, design validation and establishment and maintenance of complaint files would all be preempted under <u>Buckman</u>). Plaintiffs here are arguing that defendants' fraudulent behavior was an attempt to circumvent FDA regulations concerning off-label marketing through a promotion scheme. <u>See</u> Pls.' Opp'n 1-2; (Class Compl. ¶¶ 31-41; Coor. Compl. ¶¶ 17, 23, 32). Moreover, the very provision of the FDCA at issue in <u>Buckman</u> also prohibits fraud on doctors, and claims based on such alleged misconduct are, therefore, also preempted by <u>Buckman</u>.

within the public domain, of which the Court can take judicial notice,[19] demonstrate that the

relevant facts were not concealed and would have been discovered by anyone exercising even

minimal diligence.  Id. at 35-39.  In response, plaintiffs do not dispute that the statute of

limitations commenced at the time they paid for off-label uses of Neurontin.  Instead, plaintiffs

advance three main arguments, none of which defeats defendants' motion.

First, plaintiffs contend that the statute of limitations is a "quintessential jury issue" and

should not be decided on a motion to dismiss.  Pls.' Opp'n at 35.  This ignores well-established

case law dismissing complaints on statute of limitations grounds pursuant to Rule 12(b)(6).  See,

e.g., Callahan v. United States, 337 F. Supp. 2d 348, 369-70 (D. Mass. 2004) (court, partially

relying on publicly available plea agreement, resolving fraudulent concealment against plaintiff

on motion to dismiss and dismissing claim, explaining that "[t]he level of diligence can hardly be

called reasonable under the circumstances here"); Epstein v. C.R. Bard, Inc., No. CIV.A.03-

12297, 2004 WL 1598912, at *3 (D. Mass. July 19, 2004) (dismissing numerous claims on

statute of limitations grounds at motion to dismiss stage); Slavin v. Morgan Stanley & Co., 791

F. Supp. 327, 331 (D. Mass. 1992) (claims barred by statute of limitations because "where

plaintiff has not met his burden of alleging *facts* which could lead to an inference of reasonable

diligence, there is no resulting opportunity for that inference to toll the statute of limitations").[20]

---

[19] It is well-established that "[o]n a motion to dismiss a court may properly look beyond the complaint to matters of public record and doing so does not convert a Rule 12(b)(6) motion to one for summary judgment." Watterson v. Page, 987 F.2d 1, 4 (1st Cir. 1993).

[20] Plaintiffs attempt to rely on In re Lupron, 295 F. Supp. 2d 148, to bolster their claim that the statute of limitations is a "quintessential jury issue." Pls.' Opp'n at 36 n.46.  In re Lupron involved a factual situation very distinct from the case at bar.  In In re Lupron the court noted that "it was only after prolonged digging and the coercive assistance of a federal grand jury" that the government had discovered the injury of which the defendants were attempting to charge the plaintiffs with notice.  Id. at 183.  Plaintiffs could not possibly allege that such (…continued)

Second, plaintiffs posit that defendants engaged in a self-concealing wrong, and therefore, plaintiffs need not plead any affirmative acts of concealment in order to avoid dismissal. Pls.' Opp'n at 37 & n.49. This doctrine does not relieve plaintiffs of the necessity of alleging due diligence with specificity, as evident from one of the cases that plaintiffs themselves cite. The First Circuit does not follow the D.C. Circuit rule placing on the defendant the burden of showing lack of plaintiff's due diligence in self-concealing wrong cases. See Truck Drivers & Helpers Union Local, No. 170 v. N.L.R.B., 993 F.2d 990, 998 (1st Cir. 1993).

Third, plaintiffs argue that the public facts to which defendants pointed, including a public filing, a newspaper article, and a trade publication, are insufficiently public to defeat their allegations of fraudulent concealment. Pls.' Opp'n at 37. As an initial matter, pleading fraudulent concealment is crucial for plaintiffs because defendants have established, and plaintiffs have not contested, that plaintiffs were put on notice of their injuries when they began paying for off-label uses of Neurontin. Plaintiffs argue, instead, that they "could not have discovered the scheme alleged [in the complaints] in the exercise of reasonable diligence." Id. at 36-37 (citing Class Compl. ¶¶ 245-47; Coor. Compl. ¶¶ 179-81). This allegation is inadequate in light of the fact that allegations of off-label promotion of Neurontin came to light more than four years before these actions were brought.

Plaintiffs' contention that the alleged misconduct was not "highly publicized" or "industry-wide" misses the mark as a legal matter. Id. at 38. Plaintiffs mistakenly rely on the standard for determining whether a plaintiff has been put on inquiry notice of the alleged

---

(continued…)

"prolonged digging" was required here when all necessary information regarding plaintiffs' injury was known when plaintiffs paid for Neurontin.

conduct, not whether a plaintiff exercised due diligence after being put on inquiry notice of his injury.  The cases that plaintiffs cite make this clear.  See Blue Cross v. SmithKline Beecham Clinical Labs., Inc., 108 F. Supp. 2d 116, 123-24 (D. Conn. 2000) (addressing whether dissemination of information constituted inquiry notice).

Moreover, plaintiffs could not possibly have exercised due diligence when the misconduct alleged was in the public domain.  In other words, plaintiffs' conclusory allegation that they exercised due diligence cannot stand when the *qui tam* complaint making allegations of fraudulent off-label promotion had been unsealed, Warner-Lambert's SEC filings revealed that promotion of Neurontin was being investigated by the United States' Attorney's Office in Boston, and both the Wall Street Journal and the leading trade journal publicized this investigation into the promotion of Neurontin.

Defendants are not legally required to demonstrate that these disclosures would have informed plaintiffs of every detail that they have included in their lengthy complaints. Defendants' point is that plaintiffs, who were already on inquiry notice of their injury, have not and cannot plead fraudulent concealment or due diligence in light of the facts that were indisputably in the public domain more than four years before they brought these actions. Plaintiffs' assertion that they are not U.S. attorneys does not explain how anyone – especially large insurance companies – exercising reasonable diligence could not have discovered these disclosures.[21]

---

[21]  Plaintiffs also argue that defendants cannot claim that plaintiffs failed to plead their claims with particularity consistent with the argument that there was information available in the public domain to commence their suits.  Pls.' Opp'n at 38.  Plaintiffs cite no law to support this argument.  Moreover, this argument is a red herring – plaintiffs nowhere claim that they refrained from commencing suit in 2000 because they did not believe they had enough facts to assert a claim.

## IX.     PLAINTIFFS FAIL TO PLEAD UNJUST ENRICHMENT

Defendants demonstrated that plaintiffs' unjust enrichment claims should be dismissed because plaintiffs' complaints fail to allege a loss and causation sufficiently and because these claims are barred by the three-year statute of limitations in Massachusetts.  Defs.' Mem. at 11, 15, 39 n.20.[22]  Specifically, defendants explained that plaintiffs have not stated a claim of unjust enrichment for the same reason that plaintiffs cannot maintain their other claims:  without an allegation that Neurontin is ineffective, there can be no loss, and hence no claim of unjust enrichment.  The fact that plaintiffs have alleged no causal link between the alleged misconduct and plaintiffs' payments for Neurontin is also fatal to any claim of unjust enrichment.  Finally, to the extent there was unjust enrichment (which there was not), it certainly would have occurred outside the three-year statute of limitations, and is therefore time-barred.

---

[22] Plaintiffs are mistaken in two respects in footnote 55 of their opposition brief.  First, contrary to plaintiffs' suggestion, defendants do include unjust enrichment in their recitation of plaintiffs' claims.  Defs.' Mem. at 6 ("Both complaints assert claims under Racketeer Influenced and Corrupt Organizations Act ("RICO") and unjust enrichment").  Second, in addition to discussing the unjust enrichment claim under causation and statute of limitations (which plaintiffs acknowledge), defendants also explicitly address it in the loss section of their brief.  Id. at 15 ("This rationale applies equally to plaintiffs' RICO, fraud and unjust enrichment claims.").

**CONCLUSION**

For all of the foregoing reasons and the reasons set forth in defendants' moving brief, the

Class Complaint and the Coordinated Complaint should be dismissed with prejudice.

Dated: May 16, 2005

DAVIS POLK & WARDWELL

By:   /s/ James P. Rouhandeh
      James P. Rouhandeh

450 Lexington Avenue
New York, New York 10017
(212) 450-4000

        - and -

HARE & CHAFFIN

By:   /s/ David B. Chaffin
      David B. Chaffin

160 Federal Street
Boston, Massachusetts 02110
(617) 330-5000

*Attorneys for Defendants Pfizer Inc. and*
*Warner-Lambert Company*

40