# EXHIBIT F

FILED
CLERK, U.S DISTRICT COURT
4-24-03
APR 24 2003
CENTRAL DISTRICT OF CALIFORNIA
BY            DEPUTY

Priority ✓
Send
Enter
Closed
JS-6/JS-6 ✓
JS-2/JS-3
Scan Only

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CONGRESS OF CALIFORNIA SENIORS, et al, | CV 03-1564-SVW (SHSx) |
| Plaintiffs, | |
| v. | ORDER GRANTING MOTION TO REMAND |
| PFIZER, INC. and PARKE-DAVIS, | |
| Defendants. | |



ENTERED ON ICMS
APR 25 2003
CV

I.      Introduction

        Defendants Pfizer, Inc. ("Pfizer") and Parke-Davis ("Parke-Davis") removed this action to federal court pursuant to 28 U.S.C. § 1441.  Defendants contend that this Court has federal question jurisdiction based on their belief that Plaintiffs' Complaint alleges violations of federal law.  Plaintiffs' Complaint, however, alleges only violations of California law, and does not present a federal

19

1  question to be decided by the Court.  For this reason, Plaintiffs'

2  Motion to Remand is hereby GRANTED.

3  II.    **Jurisdictional Analysis**

4       "If at any time before final judgment it appears that the

5  district court lacks subject matter jurisdiction [over a case removed

6  from state court], the case shall be remanded." 28 U.S.C. § 1447.

7  "Federal question jurisdiction over a state-law claim is not created

8  merely because a violation of federal law is an element of the state

9  law claim." Wander v. Kaus, 304 F.3d 856, 859 (9th Cir. 2002).  To

10  the contrary, the incorporation of a federal standard into a state

11  law claim does not give rise to federal question jurisdiction.

12  Merrell Dow, Inc. v. Thompson, 478 U.S. 804 (1986).

13

14       Defendants claim the Court has federal question jurisdiction

15  over this matter because "plaintiffs' state law claims are not only

16  inextricably intertwined with, but also arise from and depend upon,

17  violations of federal statutes and regulations." (Notice of Removal ¶

18  13.)  Defendants contend that the interpretation and application of

19  federal statutes and regulations will be required for adjudication of

20  Plaintiff's claims.  (Id. ¶ 15).  Defendants rely upon Arco Env.

21  Remediation, L.L.C. v. Dept. of Health and Env. Quality, 213 F.3d

22  1108 (9th Cir. 2000) in support of this contention.

23       Defendants' reliance on Arco, however, is misplaced.  In

24  Arco, the court stated the rule that "the presence or absence of

25  federal-question jurisdiction is governed by the 'well-pleaded

26  complaint rule,' which provides that federal jurisdiction exists only

27  when a federal question is presented on the face of the plaintiff's

28

1  properly pleaded complaint." 213 F. 3d at 1113.  Plaintiffs bring

2  this action pursuant to Cal. Bus. & Prof. Code § 17200 and similar

3  state statutes. (Complaint at 1.)  While it is true that the

4  Complaint references putative violations of FDA regulations

5  repeatedly, "the fact that [Plaintiffs'] complaint makes repeated

6  references to [federal law] does not mean that [federal law] creates

7  the cause of action under which [Plaintiffs] sue[]." _Arco_, 213 F.3d

8  1113.

9

10       Rather, the Complaint merely incorporates a federal standard

11  (whether the FDA has approved Defendants' product for certain uses)

12  into Plaintiffs' state law claim for unfair business practices

13  (allegedly, the marketing of the product for unapproved uses.)

14  Because the Complaint pleads only a cause of action provided by

15  California state law, this Court has no federal question jurisdiction

16  over the matter.  See _Merrell Dow_, 478 U.S. at 817 (holding that a

17  violation of a federal statute as an element of a state cause of

18  action did not state a federal claim).

19  **V.**      **CONCLUSION**

20       For the foregoing reasons, Plaintiff's Motion to Remand is

21  hereby GRANTED.

22

23

24  IT IS SO ORDERED.

25

26  DATED:___4/23/03_____

27                         STEPHEN V. WILSON

28                         UNITED STATES DISTRICT JUDGE

ORIGINAL

1   Amanda L. Horn (State Bar No. 213891)
    HAGENS BERMAN LLP
2   700 South Flower Street, Suite 2940
    Los Angeles, CA 90017-4101
3   Telephone: (213) 330-7150
    Facsimile: (213) 330-7152
4       -and-
    Steve W. Berman
5   HAGENS BERMAN LLP
    1301 Fifth Avenue, Suite 2900
6   Seattle, WA 98101
    Telephone: (206) 623-7292
7   Facsimile: (206) 623-0594

8   Attorneys for Plaintiffs

9   [Additional Counsel Listed on Signature Page]

**FILED**

LOS ANGELES SUPERIOR COURT

FEB 0 3 2003

JOHN A. CLARKE, CLERK

BY C. L. COLEMAN, DEPUTY

Case assigned to
Judge Charles McCoy

10

11          **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

12              **FOR THE COUNTY OF LOS ANGELES**

13  CONGRESS OF CALIFORNIA SENIORS      )   Case No.   BC 289643
    ("CCS"), CALIFORNIA PUBLIC INTEREST  )
14  RESEARCH GROUP; USACTION, individually)  **REPRESENTATIVE ACTION**
    and on behalf of itself and the general public, )  **COMPLAINT FOR VIOLATION OF**
15                                        )   **THE UNFAIR COMPETITION LAW**
                          Plaintiffs,    )   **AND THE FALSE ADVERTISING LAW**
16                                        )
            v.                            )
17                                        )
    PFIZER, INC. and PARKE-DAVIS, a division )
18  of Warner-Lambert Company,           )
                                          )   **JURY TRIAL DEMANDED**
19                        Defendants.     )
                                          )

20      Plaintiffs, Congress of California Seniors ("CCS"), California Public Interest Research

21  Group ("CALPIRG") and USAction ("USA") by counsel and for their Representative Action

22  Complaint for Violations of the Unfair Competition Law ("UCL"), Bus. & Prof. Code § 17200, et

23  seq., and the False Advertising Law, Bus. & Prof. Code § 17500, et seq. ("Complaint"), allege

24  upon personal knowledge and belief as to their own acts, and upon information and belief (based

25  on the investigation of counsel) as to all other matters, as to which allegations Plaintiffs believe

26  substantial evidentiary support will exist after a reasonable opportunity for further investigation

27  and discovery, on behalf of the general public, as follows:

28

1676.10 0001 BSC.DOC                        - 1 -

### I.    NATURE OF THE ACTION

1.    As detailed in this Complaint, defendant Pfizer, Inc. ("Pfizer") currently markets and sells the drug Neurontin.  Prior to its acquisition of Warner-Lambert, Neurontin was marketed and sold by Parke-Davis, a division of Warner-Lambert ("Parke-Davis").

2.    Drug companies spend billions of dollars each year trying to persuade doctors to prescribe their drugs.  There are strict federal regulations about what form that promotion can take. The rules are meant to ensure that drug companies give doctors trustworthy information, so that medications are prescribed appropriately.  But drug makers can get around the rules and this case arises from one company's widespread scheme designed to unlawfully promote the sale of the anti-epilepsy drug Neurontin for non-FDA approved uses.

3.    The Parke-Davis Division of Warner-Lambert Company, now owned by Pfizer, received FDA approval to market and sell Neurontin for the treatment of epilepsy.  There are two million epileptics in the United States, a number that is not considered to be a large market to a major pharmaceutical company.  Starting in 1995, Parke-Davis executives embarked on a scheme the purpose of which was to increase Neurontin sales for diseases with respect to which Neurontin had not received FDA approval.  Parke-Davis's sales department recognized a significant profit potential in the "off-label" promotion of Neurontin for other diseases and at higher dosages.  The decision was made to completely avoid the normal regulatory process of the FDA pertaining to the marketing of a new use of a drug and to proceed in an illegal fashion.  The decision was also made to actively conceal the illegal means which would be used to market the drug.  The principal component of the scheme was the hiring and deployment in the field of approximately 60 "medical liaisons," whose real function was to actively solicit physicians to promote "off-label" uses of Neurontin, using cash payments as a reward and incentive.

4.    In the pharmaceutical industry, medical liaisons are individuals with scientific training who are available at physicians' requests to provide balanced scientific information about a company's products.  They have no role as sales people.

5.    At Parke-Davis, many of the "medical liaisons" were hired directly out of the sales department.  They were all trained in sales techniques, and compensated, in part, on the basis of

1    sales. They had no discernable scientific or medical functions. They had no communication or

2    interaction with Parke-Davis's actual medical research divisions. The medical liaisons were

3    assigned to act as teams with the regular sales representatives. They were given lists of doctors for

4    "cold calls," based on the size of the doctors' practices and their ability to prescribe Neurontin.

5    They were provided with a package of monetary incentives to offer to physicians who got involved

6    in the Parke-Davis program.

7        6.    Parke-Davis created a complex array of monetary incentives for physicians who

8    wrote prescriptions for Neurontin. None of these incentives have anything to do with true

9    scientific or medical research. These incentives include cash payments to "consultants" and

10    "preceptors," cash payments for a "speakers bureau" and for participation in teleconferences, the

11    award of money for scientifically irrelevant "studies," miscellaneous cash payments for access to

12    records of patients who are taking Neurontin, travel and Olympics tickets, and other benefits. The

13    recipients of these awards and benefits were selected by the sales department based on their ability

14    to prescribe Neurontin and to influence other doctors to do so.

15        7.    The medical liaisons were trained to use knowingly false information to persuade

16    physicians to use Neurontin for "off-label" uses. Parke-Davis's official sales line in this regard

17    was that since Neurontin is safe at very high doses and produced no significant side effects, there is

18    no problem using it for "off-label" indications. Medical liaisons were trained to tell doctors that

19    evidence exists that Neurontin, in high doses, is effective for control of bipolar mental disorder,

20    monotherapy for seizures, for control of a variety of pain states, for attention deficit disorder, for

21    migraine, for drug and alcohol withdrawal seizures, for restless leg syndrome, and for several other

22    diseases. At the time these statements were made, there was no competent scientific evidence that

23    Neurontin was safe and effective for any of these conditions. The only "evidence" that existed was

24    gossip, case reports from physicians paid by Parke-Davis, self-referential studies, and rumor. The

25    medical liaisons were also trained to misrepresent their own credentials to the physicians in order

26    to elevate their own credibility, by saying they were "involved in research." In fact, they were

27    purely involved in sales.

28

8.      Parke-Davis medical liaisons, using a combination of misrepresentations and cash incentives, encouraged many physicians to experiment with their own patients by prescribing very high levels of Neurontin for a variety of "off-label" indications.  Parke-Davis did this with the combined motives of increasing sales, generating a body of "medical practice," and generating case reports which could later be used for further "off-label" promotion with other physicians.  Parke-Davis's sales employees expressed callous disregard for the possibility of adverse reactions occurring during these informal, non-FDA sanctioned, illegal experiments.  The Parke-Davis scheme focused in particular on the market for bipolar disorders.  It did so by a variety of methods, including sponsoring inexpensive studies, later published in scientific journals, which purported to show favorable results in using Neurontin for non-approved uses.  These studies were published by doctors who had received money from Parke-Davis, either in the form of educational grants or some other form of monetary pass-through as described below.

9.      An example of how the scheme works is contained in a proposal to Parke-Davis from a Philadelphia company called Medical Education Systems ("MES").  In the proposal, which was submitted in December 1996, MES requested $160,000 to develop a series of 12 scientific articles to, quote, "support epilepsy education."  In fact, three of the articles MES proposed, related to Neurontin and bipolar disorder.  Parke-Davis made sure the articles said what it wanted them to.  It approved the authors and topics; it cleared the journals in which the articles were printed; its executives vetted drafts.  In some cases, it approved articles that appear to have been written almost entirely by ghostwriters of the medical education company.

10.     The articles on Neurontin and bipolar disorder reported that some doctors were having success with using Neurontin for their bipolar patients and that Neurontin was a safe drug that was easily tolerated, so doctors could quickly increase the doses they gave their patients.  As part of the "off-label" marketing scheme, this message was then reinforced by Parke-Davis salesmen when they called on doctors to tell them about the latest research on Neurontin and at teleconferences, lavish dinner meetings and medical seminars where Parke-Davis paid leading doctors to speak to other doctors who were also paid a fee to listen.

REPRESENTATIVE ACTION COMPLAINT FOR VIOLATION OF THE UNFAIR COMPETITION LAW

11.    Based on these articles, as well as other illegal promotional activity described herein, tens of thousands of bipolar disorder patients are now treated with Neurontin. However, a scientifically valid study conducted at the Harvard Bipolar Research Program found that patients <u>did worse on Neurontin than those who were on a sugar pill</u>. Parke-Davis sponsored this 1998 study, was aware of the results, but did not publish the results until two years later. By that time, Neurontin accounted for $1.3 billion in sales, with over 80% of its use coming from non-approved uses, such as treatment of bipolar disorder.

12.    In this representative (private attorney general) action, Plaintiffs seek injunctive and declaratory relief, including restitution and/or disgorgement of all illegal profits obtained by Defendants as a result of their unlawful, unfair, or deceptive practices.

## II.    PARTIES

13.    Plaintiff Congress of California Seniors ("CCS") is a nonprofit organization representing over 650,000 Californian senior citizens and their families. It is located at 1228 N Street, Suite 29, Sacramento, California.  CCS's members purchase, and have purchased, prescription pharmaceuticals manufactured and/or distributed by the Defendant Drug Manufacturers and were injured by the illegal conduct alleged herein.  As an unincorporated association, CCS has standing to pursue this representative action pursuant to Section 17204 of the UCL and, *inter alia*, the decisions of the Supreme Court of California in *Stop Youth Addiction, Inc. v. Lucky Stores, Inc.*, 17 Cal. 4th 553 (1998), and *Committee on Children's Television, Inc. v. General Foods Corp.*, 35 Cal. 3d 197 (1983).

14.    Plaintiff California Public Interest Research Group ("CALPIRG") is one of California's leading public interest advocacy groups.  It is located at 1107 9th Street, Suite 601, Sacramento, CA.  During the Class Period, CALPIRG members indirectly purchased Neurontin, manufactured by Defendant, and were injured by the illegal conduct alleged herein.  As an unincorporated association, CALPIRG has standing to pursue this action pursuant to the authorities in ¶ 13.

15.    Plaintiff USAction ("USA") is a nonprofit organization representing over three million members in 33 affiliates, with statewide organizations in 23 states.  USA is the nation's

1676.10 0001 BSC.DOC                                   - 5 -

REPRESENTATIVE ACTION COMPLAINT FOR VIOLATION OF THE UNFAIR COMPETITION LAW

1   largest progressive activist organization, dedicated to issues of social and economic justice. It is

2   located at 1341 "G" Street N.W., 10th Floor, Washington, D.C. During the Class Period, USA

3   members purchased Neurontin, manufactured by Defendant, and were injured by the illegal

4   conduct alleged herein. As an unincorporated association, USA has standing to pursue this action

5   pursuant to the authorities in ¶ 13 above.

6       16.    Defendant Pfizer, Inc. is a Delaware corporation with a principal place of business

7   in New York, New York. Pfizer is principally engaged in the manufacture and sale of

8   pharmaceuticals. In 2000, Pfizer acquired Warner-Lambert Company ("Warner-Lambert")

9   including Warner-Lambert's Parke-Davis division. As a result of the acquisition, Pfizer is

10  responsible for all liabilities which result from any acts or omissions of Parke-Davis or Warner

11  Lambert which occurred prior to the Warner-Lambert acquisition. At times throughout this

12  Complaint, Parke-Davis and Pfizer may be referred to collectively as "Defendants."

### III.   JURISDICTION AND VENUE

14      17.    This Court has subject matter jurisdiction over this representative action pursuant to

15  Bus. & Prof. Code §§ 17204 and 17535. This Court has personal jurisdiction over the parties

16  because Plaintiff and the members of the Class submit to the jurisdiction of the Court and

17  Defendants systematically and continually conducted business in the County of Los Angeles and

18  the State of California.

19      18.    Venue is proper in this Court pursuant to Bus. & Prof. Code §§ 17204 and 17535

20  because Defendants conduct business in the County of Los Angeles in the State of California,

21  including marketing, advertising, and sales directed to California residents. Further, at all times

22  mentioned in this Complaint, Defendants made misrepresentations and material omissions to

23  residents of the County of Los Angeles and the State of California.

24      19.    Federal court subject matter jurisdiction over this class action and representative

25  action does not exist. Complete diversity of citizenship between Plaintiff and Defendants does not

26  exist. Under applicable federal law, damages, punitive damages, attorneys' fees and costs cannot

27  be aggregated to meet the minimum jurisdictional amount for federal court subject matter

28  jurisdiction. Plaintiff asserts no federal question and/or violations of federal law.

## IV.    STATEMENT OF FACTS

**A.    Parke-Davis's Decision to Avoid FDA Approval and the "Off-Label" Marketing Scheme**

20.    Parke-Davis was principally engaged in the manufacture and sale of pharmaceuticals including prescription pharmaceuticals falling under the jurisdiction and regulation of the U.S. Food and Drug Administration. Pfizer acquired Warner-Lambert in 2000.

21.    In December 1993, the FDA approved Neurontin as "adjunctive therapy" for the treatment of certain types of seizures in adult patients suffering from epilepsy. "Adjunctive therapy" meant that the drug could not be prescribed by itself for the treatment of epilepsy, but as an add-on drug in the event that a primary anti-epilepsy drug was not successful. The FDA approved labeling of Neurontin stated that the drug is only effective at 900 to 1800 mg/day.

22.    At the time Neurontin was approved, Park-Davis' original patent on Neurontin was set to expire in December 1998. This left Parke-Davis with only a small window of exclusivity for this drug; after the expiration of the Neurontin patent Parke-Davis would be forced to share the market for Neurontin with generic drug manufacturers, substantially reducing its profits and its ability to keep Neurontin's retail price high.

23.    At the time Parke-Davis filed its NDA (New Drug Application) with the FDA, Parke-Davis intended Neurontin to be used for other indications besides epilepsy adjunctive therapy. In October 1990, Parke-Davis filed a patent for Neurontin claiming it to be effective in the treatment of depression. In November 1990, it filed another patent application for Neurontin claiming it to be effective for the treatment of neurogenerative disease. In 1995, additional patent applications were filed by Parke-Davis for mania and bipolar disease and for anxiety and panic. Notwithstanding the claims made in its patent applications, neither Parke-Davis nor Pfizer ever sought FDA approval for the use of Neurontin to treat the conditions described in the four patent applications referenced above.

24.    The market for the only approved use for Neurontin, adjunctive therapy for epilepsy patients, is, and was, limited with a potential population of two million epilepsy patients. On the other hand, the market for the other uses of Neurontin contemplated by Parke-Davis, such as pain

1    management, psychiatric disorders, anxiety and depression, were huge. Parke-Davis knew that if

2    these markets could be tapped, Parke-Davis could enjoy enormous profits from Neurontin.

3        25.    Initially, Parke-Davis intended to file supplemental NDAs in order to expand

4    Neurontin's approved indications, including applications for monotherapy (which would permit

5    Neurontin to be prescribed by itself for epilepsy treatment) and for various psychiatric and

6    neurological indications. However, by 1995 Parke-Davis recognized it would be uneconomical to

7    assume the expense and time necessary to conduct clinical trials necessary to prove that Neurontin

8    was safe and effective for these uses. Assuming Neurontin could be proven to be safe and effective,

9    the near term expiration of the patent meant that generic manufacturers of Neurontin would reap

10   much of the reward that comes with proving Neurontin could be safely used for other indications.

11       26.    Under applicable statutes and regulations, the manufacturer of a prescription drug

12   regulated by the FDA may not promote or market the use of the drug for purposes or in dosages

13   other than those approved by the FDA. Uses of a prescription drug for purposes other than those

14   approved by the FDA are referred to as "off-label" uses. Promotion by a drug manufacturer of

15   "off-label" uses of prescription drugs is strictly illegal and contrary to the explicit policies and

16   regulations of the United States Government.

17       27.    After performing extensive economic analysis, senior officials at Parke-Davis

18   determined that it was not sufficiently profitable for Parke-Davis to obtain FDA approval for

19   Neurontin's alternative uses. Instead, Parke-Davis officials developed a strategy that would allow

20   Parke-Davis to avoid the costs of proving that Neurontin was safe and effective for these other

21   uses, while allowing Parke-Davis to compete in the lucrative "off-label" markets. As one aspect of

22   the scheme, Parke-Davis decided to employ a "publication strategy" that would allow it to promote

23   Neurontin by the massive distribution of publications supposedly written by independent

24   researchers that purportedly described the scientific evaluation of Neurontin. Another advantage of

25   this strategy, from Parke-Davis's perspective, was that it could be employed immediately – there

26   was no need to wait for the results of scientifically conducted clinical trials to determine if

·27  Neurontin was actually effective in the treatment of these conditions.

·28

28.    The Parke-Davis scheme consisted of an elaborate and clandestine promotion of "off-label" uses of Neurontin, all in direct contravention of rules and regulations of the FDA and the Health Care Finance Agency, and in particular for the "off-label" uses of pain control, monotherapy for seizures using extremely high doses, control of bipolar disorder, attention deficit disorder, and other diseases and conditions.

29.    Minutes of meetings held in 1995 showed that marketing and clinical employees of Parke-Davis decided that clinical trials were too expensive and they would take too long, so that by the time the company got the results, the patent on Neurontin would be close to running out and the market would be flooded with cheap copies of Neurontin.

30.    As a result, a group of executives called the "New Products Committee" approved an alternative strategy − in other words, not the strategy that would have involved going to the FDA, but an alternative strategy to generate these additional uses of Neurontin. They decided that Parke-Davis would pay for clinical trials in a range of uses − bipolar disorder, social phobia, migraine, and chronic pain − and then publicize the results of those trials through medical journals and medical conventions. The head of this committee was the then-president of the company, Tony Wild.

31.    These promotions occurred in spite of evidence showing that the drug would not work for these conditions. An internal memo, dated May 5, 1997, and written on Parke-Davis stationery, poses the central question: "Did it make sense for Parke-Davis to do rigorous and expensive clinical trials to prove to the FDA that Neurontin worked for the burning, tingling pain of diabetic neuropathy?" The memo's answer: "It did not." According to the memo, there was a study that showed Neurontin worked better than a placebo, but more studies would be needed, and the arithmetic did not add up. Neurontin's patent was two and a half years away from expiring, and when that happened, makers of cheap generic copies would get most of the Neurontin patients. Still, the pain market was tempting. The memo points out there were up to 16 million diabetics in the country. Neurontin, with an approved use for epileptic seizures, had a market of two million. The memo also notes that diabetics had used drugs worth at least $15 million to treat pain, and Neurontin already had most of those patients. So the epilepsy marketing team recommended that

1    Parke-Davis skip the studies and promote Neurontin for pain directly to doctors through

2    educational seminars and other meetings.

3        32.    Although federal regulations did not permit Parke-Davis to promote unapproved

4    uses of Neurontin, Parke-Davis was permitted to distribute publications created by "third parties"

5    that described results of off-labeled uses of Neurontin, such material was only distributed in

6    response to non-solicited requests from physicians.  Parke-Davis decided to exploit this narrow

7    exception by creating events and programs that would allow special Parke-Davis employees and

8    independent contractors under Parke-Davis's control to promote "off-label" usage under

9    circumstances that would allow the company to deny, wrongfully, that it had solicited "off-label"

10   usage.

11       33.    Significant ingenuity and resourcefulness was necessary in order to execute this

12   unlawful scheme without detection.  Faced with the fact that its "publication strategy" required

13   publications from independent physicians when no such publications existed, Parke-Davis hired

14   non-physician technical writers to create articles for medical journals and then paid actual

15   specialists to be the articles' "authors."  Faced with the fact that its normal marketing force could

16   not deliver the "off-label" message, Parke-Davis trained its medical liaisons, technical employees

17   who were supposed to provide balanced scientific information to doctors, to sell "off-label" and

18   solicit interest in "off-label" uses.  And faced with the fact that in order for a "publication strategy"

19   to actually increase usage of a drug, Parke-Davis required a large group of doctors interested in

20   experimenting on patients, and an even larger group of doctors who were interested in receiving

21   information about those experiments.  Parke-Davis generated both groups by liberally distributing

22   payments to both groups of physicians through "consultants'" meetings, speakers' bureaus,

23   medical education seminars, grants, "studies," advisory boards and teleconferences.  Further details

24   of these programs are described below.

25       34.    Notwithstanding their knowledge that they could not promote Neurontin lawfully

26   for non-approved uses, marketing executives at Parke-Davis's headquarters in Morris Plains, New

27   Jersey and in its five regional customer business units (CBUs) selected a marketing strategy which

28   would deliberately lead to increased "off-label" usage of Neurontin.  These executives knew that

Parke-Davis was not supposed to create or design the contents of the communications that would be distributed pursuant to the "publication strategy" or do anything to generate the practicing physicians' interest in receiving such communications.   As demonstrated below, Parke-Davis ignored these legal requirements and, instead, put into effect a pervasive pattern of illegal conduct described below, lasting from at least 1994 through 1998, and Plaintiff believes, through 2000.

35.    The Parke-Davis scheme was carried out by employing these strategies, among others, as described below:

    a.    illegal kickbacks to physicians who prescribed large amounts of Neurontin for "off-label" purposes to patients whose prescriptions were paid for by Medicare or Medicaid;

    b.    the formation of a nationwide network of employees falsely referred to as "medical liaisons" whose actual assigned duties consisted entirely of conventional direct sales activities and which did not include any legitimate scientific activity;

    c.    the illegal direct solicitation of physicians for "off-label" uses;

    d.    the making of false statements to physicians and pharmacists concerning the efficacy and safety of Neurontin for "off-label" uses;

    e.    the making of such false statements directly to the Veterans Administration concerning the safety and efficacy of Neurontin for "off-label" uses;

    f.    the charging of full price for drugs actually being used in experimental trials and thus subject to federal price restriction;

    g.    the systematic avoidance of filing requirements with the FDA;

    h.    the deliberate avoidance of the FDA's classification of Neurontin as to its therapeutic equivalency and thus the avoidance of Medicare and Medicaid price limitations based on therapeutic equivalency;

i.    the use of active concealment to avoid the FDA's enforcement mechanisms and the resultant mandatory interruption of medicare and medicaid payments for Neurontin prescriptions;

j.    the use of active concealment to avoid the "formulary" policies of various state agencies administering Medicare and Medicaid programs which are intended to refuse payment for uses of drugs which are not medically recognized as statutorily defined;

k.    the payment or offering of gratuities to Parke-Davis employees in order to procure their silence; and

l.    the active training of Parke-Davis employees in methods of avoiding detection of their activities by the FDA.

Each aspect of the scheme is described below.

**B.    Parke-Davis's Systematic Payments to Doctors for the Purpose of Increasing Neurontin Prescriptions**

36.    Parke-Davis's "publication strategy" required physicians (and its medical liaisons) to perform the work normally performed by the company's salesmen in order to promote Neurontin.  Adoption of this strategy required Parke-Davis to make tens of thousands of payments to the physicians who would act as a surrogate sales force as well as the practicing physicians who would receive the message.  In other words, adoption of the "publication strategy" required Parke-Davis to make thousands of payments to physicians for the purpose of having those doctors either recommend the prescription of Neurontin or to order Neurontin, in violation of the Medicaid kickback regulations.  Parke-Davis was aware that these regulations were violated routinely.  A description of the various programs Parke-Davis used to make these payments to physicians follows.

**1.    Consultants' Meetings**

37.    A common ploy by Parke-Davis to funnel illegal payments to physicians to encourage them to prescribe "off-label" was through "consultants'" meetings.  Under this guise, Parke-Davis recruited physicians to dinners or conferences and paid them to hear presentations

REPRESENTATIVE ACTION COMPLAINT FOR VIOLATION OF THE UNFAIR COMPETITION LAW

about "off-label" uses of Neurontin. Under the fiction that these doctors were acting as consultants, Parke-Davis sometimes (but not always) had the doctors sign sham consulting agreements. At these meetings, Parke-Davis would give these doctors lengthy presentations relating to Neurontin, particularly regarding "off-label" usage. Presentations would be made by Parke-Davis employees or physician speakers hired by Parke-Davis for the purpose of promoting Neurontin, and attendees' questions relating to the administration of Neurontin use would be solicited and answered. At some conferences, the sponsoring organization or Parke-Davis intentionally posed questions to the speakers about "off-label" use to insure that the attendees were exposed to such information.

38.    At some, but not all, "consultants'" meetings a few questions would be posed to the "consultants" regarding Parke-Davis marketing of Neurontin or how Parke-Davis sales force could provide better service to the doctors. The consultants' meetings, however, were not held (and the "consultants" were not paid) for the purpose of providing Parke-Davis with expert, independent advice. Parke-Davis in many cases did not even record the "advice" provided by its "consultants" and what advice was collected was never acted upon or reviewed. Indeed, no legitimate business would need hundreds of "consultants" to advise it on the same topic.

39.    Parke-Davis did, however, routinely analyze whether the "consultants'" meetings were successful in getting the attendees to change their prescription writing practices. At some meetings, the "consultants" were directly asked if they would write more Neurontin prescriptions as a result of the meeting. Such a question would have been irrelevant if the actual purpose of the meeting was to receive the "consultants'" advice. Parke-Davis also routinely tracked consultants' Neurontin prescription writing practices after these meetings. Using market data purchased from third parties, Parke-Davis analyzed whether the doctors they had paid had in fact written more Neurontin prescriptions after the meeting. Again, such data was only relevant if the real purpose of the payments was to influence the doctors to order more Neurontin.

40.    A typical consultants' meeting was held in Jupiter Beach, Florida for neurologists from the North East CBU during the weekend of April 19-21, 1996. The "consultants" selected for this meeting were not chosen on the basis of their consulting acumen, but because of their potential

REPRESENTATIVE ACTION COMPLAINT FOR VIOLATION OF THE UNFAIR COMPETITION LAW

1    to write Neurontin prescriptions.   In a memorandum announcing the event to Parke-Davis
2    personnel, the Neurontin Marketing Team acknowledged that in order to target neurologists with
3    the greatest potential for writing Neurontin prescriptions, sales personnel must select potential
4    attendees from a list of the top prescription writers for anti-epileptic drugs in the Northeast; only
5    persons who fell within this desirable demographic were allowed to be invited.

6        41.    Qualifying physicians were given round-trip airfare to Florida (worth $800.00). two
7    nights accommodations (worth $340.00), free meals and entertainment, ground transportation and a
8    "consultant's fee" of $250.00.  Ample time was provided so that the Parke-Davis "consultants"
9    could enjoy the beach resort.  The value of the junket was approximately $2,000.00 per physician.

10        42.    The Jupiter Beach "consultants'" meeting included two half days of presentations
11    by Parke-Davis relating to Neurontin, including extensive presentations relating to "off-label" uses.
12    Although technically the presentations were provided by an independent company, Proworx, all
13    aspects of the presentation were designed, monitored, and approved by Parke-Davis.  It selected the
14    speakers, picked the presentation topics and previewed the content of the presentations to make
15    sure that they were acceptable.   Parke-Davis paid all expenses relating to the "consultants'"
16    meeting including all payments to the attendees and the presenters, all travel, accommodation,
17    meals and entertainment expenses, all presentation expenses, all expenses and fees incurred by
18    Proworx, and the substantial fees paid to the presenting physicians.  Notwithstanding the FDA's
19    prohibition regarding the provision of promotional materials on "off-label" uses, Parke-Davis
20    provided written abstracts of the presentations that detailed "off-label" use of Neurontin to each of
21    its "consultants."

22        43.    No effort was made to obtain professional advice at Jupiter Beach from the
23    "consultants" Parke-Davis had wined, dined, and entertained during the weekend.  A follow-up
24    memorandum to Parke-Davis marketing officials noted that "the participants were delivered a hard
25    hitting message about Neurontin" and emphasized that the participants were encouraged to use
26    Neurontin at higher doses.    More importantly, after the conference Parke-Davis generated
27    "trending worksheets" listing the doctors who attended the "consultants'" meeting.    These
28    worksheets enabled Parke-Davis to track Neurontin prescription habits of the attendees before and

1676.10 0001 BSC.DOC                                  - 14 -

REPRESENTATIVE ACTION COMPLAINT FOR VIOLATION OF THE UNFAIR COMPETITION LAW

1   after the "consultants'" meetings to determine if these "high writing" prescribers wrote more

2   Neurontin scripts after the conference.  Persuading these heavy prescribers to order more Neurontin

3   for their patients was, in fact, the sole purpose of the Jupiter Beach junket.

4        44.    Jupiter Beach was not unique.   Parke-Davis hosted dozens of "consultants'"

5   meetings between late 1995 and 1997 in which the "consultants" received payments and gratuities

6   as well as presentations on "off-label" Neurontin use designed to change the physicians'

7   prescription writing habits.  Comparable consultants' meetings included, but were not limited to

8   the following:

| Topic | Location | Dates |
|-------|----------|-------|
| Mastering Epilepsy | La Costa Resort, CA | July 20-23, 1995 |
| Mastering Epilepsy | Santa Fe, NM | November 16-19, 1995 |
| Neurontin Consultants Conference | Marco Island, FL | February 2-4, 1996 |
| Pediatric Epilepsy | Hutchinson Island, FL | February 9-11, 1996 |
| Mastering Epilepsy Science | Walt Disney World, FL | February 22-25, 1996 |
| Pediatric Epilepsy | Hutchinson Island, FL | March 8-10, 1996 |
| Mastering Epilepsy | Ritz Carlton, Aspen, CO | April 18-21, 1996 |
| Affective Disorders in Psychiatry | Marco Island, FL | April 20, 1996 |
| Affective Disorder Consultants Conference | Southern Pines, NC | April 27, 1996 |
| Neuropathic Pain Conference | Palm Beach, FL | May 11, 1996 |
| Regional Consultants Conference | Ritz Carlton, Boston, MA | May 10-11, 1996 |
| Epilepsy Management Advisors Meeting | Sheraton Grande Torrey Pines, La Jolla, CA | June 21-23, 1996 |
| Epilepsy Management | Rancho Bernardo, CA | June 28-30, 1996 |
| Use of Anti-Convulsants in Psychiatric Disorders | Short Hills, NJ | October 18-19, 1996 |
| Non-epileptic Uses of Neurontin | Longboat Key, FL | November 6, 1996 |
| Neurological Conditions Conference | Ritz Carlton, Atlanta, GA | September 27-28, 1997 |

REPRESENTATIVE ACTION COMPLAINT FOR VIOLATION OF THE UNFAIR COMPETITION LAW

Other "consultants'" meetings took place at Charleston, SC, Coconut Grove, FL, Naples, FL, Memphis, TN, Louisville, KY, Washington, D.C., Aspen, CO, and other places. Hundreds, if not thousands, of physicians received kickbacks to attend these events.

45.    Not all payments to "consultants" were made at conferences as elaborate as Jupiter Beach. Many "consultants'" meetings consisted of lavish dinners at local restaurants. The emphasis on these meetings was also on "off-label" uses, and $200 "honorariums" were paid to the physicians who did nothing for the payment except show up. At none of the events did the "consultants" provide legitimate consultation to Parke-Davis, but at all of the events the "consultants" were encouraged to increase their Neurontin prescription writing.

### 2.    Medical Education Seminars

46.    Another format where Parke-Davis paid kickbacks to physicians to hear "off-label" promotion of Neurontin were programs billed as Continuing Medical Education seminars ("CME"). These conferences and seminars were set up to appear to qualify for an exception to the FDA's "off-label" marketing restrictions which permits physicians to learn about "off-label" uses of pharmaceuticals at independent seminars. Such seminars, however, must be truly independent of the drug companies. The drug companies may make "unrestricted grants" for the purpose of a seminar, but may not be involved in formulating the content of the presentations, picking the speakers or selecting the attendees. None of these requirements were observed with regard to the CME seminars sponsored by Parke-Davis for the promotion of "off-label" uses of Neurontin. While Parke-Davis retained third party organizations, such as Proworx and MES, to present the event seminars, it had control of virtually every aspect of these events, and the seminar companies obtained Parke-Davis's approval for all content presented at the seminars. Parke-Davis also paid all expenses, including all the seminar companies' fees.

47.    Although the seminar companies acted as the conduit for the payments and gratuities given to the physician attendees, like the Jupiter Beach consultants' meetings, Parke-Davis controlled every aspect of the CME programs. It designed and approved the programs; hand-picked the speakers for the seminars; approved the seminar presentations of the seminars;

previewed, in most cases, the contents of the seminars prior to delivery; selected the attendees based on their ability and willingness to prescribe high quantities of Neurontin; evaluated the presentations to make sure Parke-Davis's "message" was appropriately delivered; black-listed presenters whose presentations were not sufficiently pro-Neurontin; and monitored the prescribing patterns of the physicians who attended these conferences to insure the purpose of the conference – increased writing of Neurontin prescriptions – was achieved. Follow-up reports to marketing executives at Parke-Davis highlighted that the attendees received presentations regarding "off-label" marketing and recommendations for dosages larger than those labeled effective by the FDA. These memoranda also reported to senior executives the pledges made by attendees to order more Neurontin for their patients.

48.    For some seminars, high prescription writing physicians were selected to receive junkets comparable to those Parke-Davis provided to the attendees of the Jupiter Beach "consultants'" meetings. Others were less lavish, but physicians received free tuition, free accommodations, free meals, and cash. Frequently the Parke-Davis CME seminars were accredited by continuing medical education organizations, which meant that the physicians taking advantage of Parke-Davis's junkets did not have to pay tuition or spend additional time to fulfill their continuing medical education licensure requirements by attending truly independent medical education programs.

49.    Representative CME programs sponsored by Parke-Davis where it paid extensive kickbacks to attending physicians, included, but are not limited to, the following:

| Seminar | Location | Date |
|---|---|---|
| Merritt-Putnam Epilepsy Postgraduate Course | | January 19, 1996 |
| Merritt-Putnam Seminar | Chicago, IL | January 26, 1996 |
| New Frontiers in AntiEpileptic Drug Use | California | Sept-Oct 1996 |
| Diabetic Neuropathy | Ritz Carlton, Boston, MA | June 22-24, 1997 |
| Merritt-Putnam Symposium | Key Biscayne, FL | September 11, 1997 |

REPRESENTATIVE ACTION COMPLAINT FOR VIOLATION OF THE UNFAIR COMPETITION LAW

| Seminar | Location | Date |
|---------|----------|------|
| Merritt-Putnam Conference on Monotherapy | Palm Springs, CA | September 9, 1997 |
| Merritt-Putnam Conference on Monotherapy | St. Louis, MO | October 3, 1997 |
| Merritt-Putnam Symposium | Boston, MA | December 5, 1997 |

### 3.    Grants and "Studies"

50.    Parke-Davis also made outright payments, in the form of grants, to reward demonstrated Neurontin believers and advocates. Parke-Davis sales managers identified key doctors who actively prescribed Neurontin or programs which were willing to host Neurontin speakers and encouraged such persons or programs to obtain "educational grants" from Parke-Davis. Under this program of kickbacks Parke-Davis paid:

- $2,000.00 to Berge Ninmpolan, MD, "a great Neurontin believer," to attend a neurology seminar in San Francisco, in March 1996;

- $1,000.00 to the University of Texas at Houston, Department of Neurology to host a symposium where presentations would be made regarding successful "off-label" treatment with Neurontin;

- $3,000.00 to the University of Texas Medical School to host a conference in August 1996 at which a well-known specialist in epilepsy, who prescribed Neurontin, would attend;

- $4,000.00 to pay for a neurologist from the University of Texas at San Antonio to attend the American Epilepsy Society Conference in December 1996, a conference at which Parke-Davis was presenting extensive documentation on "off-label" uses for Neurontin;

- $2,500.00 to the University of Texas at Houston to bring Dr. B.J. Wilder to the campus to hold a seminar. Dr. Wilder was one of Neurontin's biggest boosters for "off-label" indications and had been paid tens of thousands of dollars to promote Neurontin's "off-label" uses for Parke-Davis across the country;

REPRESENTATIVE ACTION COMPLAINT FOR VIOLATION OF THE UNFAIR COMPETITION LAW

- $2,500.00 in June 1996 to pay for representatives from the University of Pennsylvania Medical Center to attend a conference in Saint Petersburg, Russia on the utilization of anti-epileptic drugs, including Neurontin;

- $5,000.00 to Dr. Alan B. Ettinger, of Stony Brook, NY in December 1996, a physician who had informed Parke-Davis that he was interested in possibly doing research in Neurontin and maintained a database of patients who were treated with Neurontin;

- $500.00 to Bruce Ehrenberg, of Boston, MA, a leading speaker for Parke-Davis regarding "off-label" uses of Neurontin, to attend a conference in China;

- $1,000.00 to Israel Abrams, M.D., Paul C. Marshall, M.D., Beth Rosten, M.D. and Spencer G. Weig, M.D., of Worcester, MA, for educational programs in February 1996. According to the local Parke Davis representative requesting the grant, "much of the Neurontin success in Worcester has been attributed to . . . the 4 pediepileptologists below.";

- $1,400.00 to Dr. Ahmad Beydoun of Ann Arbor, MI for post-graduate training in March 1996. This grant was processed on a quick turnaround, the Parke-Davis representative noting "I realize that this is a very short time line; however. Dr. Beydoun is a very important customer.";

- $1,500.00 to Jim McAuley, R.Ph, Ph.D. for educational materials relating to epilepsy. Parke-Davis decided to provide the funds because McAuley was an advocate of Neurontin and he was important in getting another Parke-Davis drug, Cerebyx, accepted on the formulary for Ohio State University; and

- A grant in an unknown amount to University Hospital in Cleveland in exchange for the hosting programs regarding Neurontin's use in treating neuropathic pain at conferences specifically devoted to obtaining referrals from other doctors.

51.    These grants, and others, were charged to the Neurontin marketing budget. Each of these grants was made solely because an individual who would receive the money was a large Neurontin supporter or would host a program where a well-known Neurontin supporter would

1676.10 0001 BSC.DOC                              - 19 -

REPRESENTATIVE ACTION COMPLAINT FOR VIOLATION OF THE UNFAIR COMPETITION LAW

1  recommend that other physicians increase their prescriptions of Neurontin.  Each of these grant

2  awards constituted a reward or kickback for the recipient's advocacy of Neurontin.

3       52.    Parke-Davis's medical liaisons informed leading Neurontin subscribers that

4  significant advocacy for Neurontin would result in the payment of large grants.  These studies did

5  not involve significant work for the physicians.  Often times they required little more than collating

6  and writing up office notes or records.  Indeed, as noted below, Parke-Davis frequently hired

7  technical writers to write the articles for which the "authors" had been given grants.

8       53.    Parke-Davis was aware that these articles and studies provided minimal scientific

9  benefit.  In a letter to the FDA in June 1997, Parke-Davis submitted a list of "studies relating to

10  pain, pain syndromes, and psychiatric disorders" which failed to include any of these numerous

11  studies, purportedly funded by Parke-Davis.  Parke-Davis intentionally neglected to report these

12  "studies" to the FDA because they knew the funded "research" had no scientific value and would

13  not be deemed to be studies by the FDA.  Payments Parke-Davis made for "studies" included, but

14  were not limited to the following:

| Funded Project | Payee | Payment |
|---|---|---|
| Statistical Analysis of Patients Treated With Neurontin For Pain | Hans Hansen, M.D.; Statesville, NC | $7,000.00 |
| Reduction of Sympathetically Medicated Pain and Sudomotor Function | David R. Longmire, M.D.; Russellville, AL | $7,000.00 |
| Data entry for Neurontin and Pain Analysis | Travis Jackson, M.D., David Meyer, M.D.; Winston-Salem, NC | |
| Trial of Neurontin for distal symmetric polyneuropathy associated with AIDS | Joseph Weissman, M.D. Atlanta, GA | $20,000.00 |
| Neurontin for neuropathic pain in chronic pain syndromes | Lavern Brett, M.D. Washington, D.C. | $25,000.00 |
| Retrospective chart analysis of Neurontin use with bipolar disorder patients | Ralph S. Rybeck, M.D. | $5,000.00 |
| Retrospective Analysis of Neurontin in the treatment of pain | David R. Longmire, M.D.; Russellville, AL | $2,000.00 |

REPRESENTATIVE ACTION COMPLAINT FOR VIOLATION OF THE UNFAIR COMPETITION LAW

| Funded Project | Payee | Payment |
|---|---|---|
| Retrospective Analysis of Neurontin in the treatment of chronic pain | Don Schanz, D.O. Traverse City, MI | $8,000.00 |
| Case histories relating to use of Neurontin as an adjuvant analgesic | Elizabeth J. Narcessian, M.D; W. Orange, NJ | $4,000.00 |

Plaintiff has reason to believe that other payments were made to physicians for other "studies" of questionable scientific credibility.

54.    One particularly large study conducted by Parke-Davis served as yet another engine to financially reward physicians for prescribing Neurontin.  In 1995 and 1996, Parke-Davis conducted an enormous Phase IV trial known as STEPS.  Although STEPS took the form of a research clinical trial, it was, in fact, a marketing ploy designed to induce neurologists to become comfortable prescribing Neurontin at a far higher dose than indicated in the FDA approved labeling.  While most clinical studies have a limited number of investigators treating a number of patients qualified for the study, the STEPS protocol called for over 1,200 "investigators" to enroll only a few patients each.  The participating physicians were instructed to titrate their patients to higher than labeled dosages of Neurontin to demonstrate that patients could tolerate high dosages of the drug.  Rewarding physicians for prescribing high doses on Neurontin was another way to increase Neurontin sales because higher per patient dosages increased the amount of Neurontin sold.  Additionally, the STEPS study was also designed to habituate physicians to place non-study patients on Neurontin on doses higher than found effective in the clinical trials monitored by the FDA.

55.    Physicians enrolling in the STEPS study were paid for agreeing to participate in the study and for every patient enrolled.  At the conclusion of the study, Parke-Davis offered each of the 1,200 "investigators" additional cash for each patient the doctor kept on Neurontin after the study ended.  These payments were unquestionably kickbacks, each participating doctor was expressly paid for writing Neurontin prescriptions for their patients.  The number of "investigators" who received such payments are too many for Plaintiff to list.  Additionally, Parke-Davis has

REPRESENTATIVE ACTION COMPLAINT FOR VIOLATION OF THE UNFAIR COMPETITION LAW

exclusive control of the information regarding who received such payments at the conclusion of the STEPS trial.

### 4.   Payments to "Authors" of Ghost Written Articles

56.   Yet another method of rewarding doctors for their advocacy of Neurontin was to pay them honorarium for lending their names to scientific articles which were actually prepared and written by third parties retained by Parke-Davis.   In 1996, Parke-Davis retained AMM/ADELPHI, Ltd. and Medical Education Systems, Inc., to prepare no less than twenty (20) articles for publication in various neurology and psychiatry journals.   Most of these articles concerned "off-label" usage of Neurontin and were generated so that Parke-Davis would have completely controlled publications it could distribute pursuant to its "publication strategy."   The content of these articles were actually written by non-physician technical writers retained by Parke-Davis, and Parke-Davis had the right to control the content of all the articles.   Parke-Davis paid all expenses in connection with the creation of these publications.

57.   Once Parke-Davis and the technical writers conceived the articles, Parke-Davis and its outside firms attempted to find recognized Neurontin prescribers whose names could be used as the authors of these articles.   In some cases, drafts of the articles were completed even before an "author" agreed to place his or her name on the article.   This even occurred in connection with case histories that purported to describe the "author's" personal treatment of actual patients.   The "authors" were paid an honorarium of $1,000.00 to lend their names to these articles, and also were able to claim publication credit on their curriculum vitae.

58.   After the technical writers completed their work, Parke-Davis and its outside firms found journals that would publish the articles.   Parke-Davis's role in creating, approving and sponsoring the articles was hidden from the public.   While the articles might reference that the author received an honorarium from the outside firm, the articles failed to state that the honorarium was paid with money provided by Parke-Davis and that Parke-Davis had approved the content and hired the actual authors.   For example, an article created by Medical Education Systems (MES), *Gabapentin and Lamotrignine:  Novel Treatments for Mood and Anxiety Disorders*, published in

CNS Spectrums noted that "an honorarium was received from Medical Education Systems for preparation of this article," but never revealed Parke-Davis's retention and payment of MES or the fact that MES personnel, while under contract to Parke-Davis, wrote the article.

59.    Parke-Davis used these publications as part of their "publication strategy" by presenting the articles as evidence of independent research conducted by persons with no monetary interest in Neurontin. This impression, of course, was false. Parke-Davis created the articles to promote "off-label" uses for Neurontin, purchased the names and reputations of the authors with kickbacks and controlled the content of the articles.

### 5.    Speakers' Bureau

60.    Parke-Davis also founded the Speakers' Bureau, another method to make large and numerous payments to physicians who recommended Neurontin at teleconferences, dinner meetings, consultants meetings, educational seminars, and other events. These speakers repeatedly gave short presentations relating to Neurontin which they were paid anywhere from $250.00 to $3,000.00 per event. Speakers such as Steven Schachter, B.J. Wilder, Ilo Leppik, Gary Mellick, David Longmire, Gregory Bergey, Michael Merren, David Treiman, Michael Sperling, Martha Morrell, R. Eugene Ramsay, John Pellock, Ahmad Beydoun, Thomas Browne, John Gates, Jeffrey Gelblum, Dennis Nitz, Robert Knobler and others received tens of thousands of dollars annually in exchange for recommending to fellow physicians that Neurontin be prescribed, particularly for "off-label" uses. The payments that these doctors received were far in excess of the fair value of the work they performed for Parke-Davis. Speakers who most zealously advocated Neurontin were hired most frequently for speaking events, notwithstanding the fact that many of these events purported to be independent medical education seminars where independent information was supposed to be delivered. The identity of the doctors in the Speaker's Bureau who received kickbacks through excessive compensation can only be determined after review of the records in the exclusive custody of the Defendant. Plaintiff is aware that extensive payments through the Speaker's Bureau took place between 1995 and 1997, the last year for which Plaintiff has had access to records. Plaintiff is aware that "off-label" promotion of Neurontin pursuant to the

1  "publication strategy" continued after 1997 and accordingly believes such kickback payments

2  continued through 2000.

3        61.    Parke-Davis's marketing personnel, including its medical liaison staff, informed

4  physicians of the lucrative rewards of joining the Neurontin Speaker's Bureau. Physicians were

5  informed that if they prescribed enough Neurontin, they, too, could also be eligible for receiving

6  substantial payments just for describing their clinical experience to peers at events dedicated to

7  promoting Neurontin's "off-label" uses. Parke-Davis marketing personnel, however, made it clear

8  that the only way the doctors could receive such cash payments was if they prescribed substantial

9  amounts of Neurontin to their patients, preferably for "off-label" uses.

10        62.    Parke-Davis either knew that the payments described above constituted kickbacks or

11  acted in reckless disregard of laws and regulations of which it was aware. Parke-Davis was well

12  aware of the Medicare and Medicaid Fraud and Abuse laws, which included the Medicaid anti-

13  kickback statute. It was further aware that the safe harbors established by the Department of

14  Health and Human Services did not cover the extensive payments it made to doctors. Parke-Davis

15  was aware that its payments did not comply with the AMA's guidelines for payments to

16  physicians. It also knew that the payments had been made for the express purpose of encouraging

17  the physicians to order Neurontin for their patients. Parke-Davis was also aware of the Inspector

18  General's Special Fraud Alert which raised particular concerns about drug marketing.

19  Nonetheless, Parke-Davis did nothing to curb its kickback payments to physicians and could not

20  have marketed Neurontin's "off-label" uses without such payments.

21        63.    In 1997, in the wake of an investigation by the FDA, Parke-Davis conducted a

22  review of its marketing practices in light of existing Medicaid kickback regulations. As a result of

23  that review, Parke-Davis determined that none of the programs described above should have been

24  conducted in the manner previously conducted by Parke-Davis. Parke-Davis issued guidelines to

25  comply with Federal Regulations which essentially prohibited each of the programs described

26  above. Nonetheless, the payments to physicians for the "off-label" marketing of Neurontin did not

27  cease and the programs continued at least until 1998. Given that Parke-Davis's records

28  demonstrate payments of inappropriate kickbacks to doctors through 1998, Plaintiff believes that

REPRESENTATIVE ACTION COMPLAINT FOR VIOLATION OF THE UNFAIR COMPETITION LAW

1  such payments continued through the merger of Parke-Davis's parent, Warner-Lambert, with
2  Defendant Pfizer, or perhaps even through the calling of a grand jury regarding Parke-Davis's
3  marketing practices relating to Neurontin.

C.    Parke-Davis's Use of Medical Liaisons to Promote Neurontin "Off-Label"

4
5      64.    Parke-Davis's normal sales force was not permitted to promote "off-label" uses of
6  Neurontin to its physician customers. The FDA, however, permitted drug company representatives
7  to provide: balanced, truthful information regarding "off-label" usage if specifically requested by a
8  physician and if there was no attempt to solicit such information by the drug company.
9  Commencing in 1995, Parke-Davis increasingly hired medical liaisons and trained them to
10  aggressively solicit requests for "off-label" information from physicians. Once this door was open,
11  Parke-Davis trained the medical liaisons to engage in full scale promotion of Neurontin's "off-
12  label" uses, including repetitive distribution of non-scientific, anecdotal information designed to
13  convince physicians that "off-label" usage of Neurontin was safe and effective. In effect, Parke-
14  Davis used the medical liaisons as a surrogate sales force who had liberty to solicit physicians
15  regarding "off-label" uses. Indeed, medical liaisons were selected and promoted based on their
16  ability to sell and sales training was encouraged.

17      65.    On April 16, 1996, at a training session for medical liaisons, Parke-Davis in-house
18  lawyers stopped the video taping of a medical liaison training sessions to advise the liaisons that
19  notwithstanding formal policies to the contrary, liaisons could cold call on physicians so long as
20  they had executed request forms (forms that supposedly verified that the physician had initiated the
21  meeting) at the end of the call. Moreover, the liaisons were informed that the request forms could
22  be filled out by Parke-Davis sales representatives instead of the doctors. Company lawyers also
23  informed the liaisons in training that there was no need to present balanced information to the
24  customers and that liaisons should always remember that sales were necessary in order to keep the
25  company profitable. The liaisons were also informed by the lawyers, off camera, that there really
26  was no definition of "solicitation" and that there were methods to induce the physicians to inquire
27  about "off-label" uses. In effect, once the medical liaison got a meeting with a doctor, there were
28

REPRESENTATIVE ACTION COMPLAINT FOR VIOLATION OF THE UNFAIR COMPETITION LAW

1  ways to get the information about "off-label" uses to the doctor even if the physician had not

2  requested "off-label" information. The lawyers also warned the liaisons under no circumstances

3  should any information about "off-label" uses be put in writing.

4      66.    Medical liaisons were instructed in the clearest possible terms that they were to

5  market and sell Neurontin based on its "off-label" uses. On a teleconference on May 24, 1996,

6  John Ford ("Ford"), a senior marketing executive at Parke-Davis's Morris Plains headquarters

7  directly informed the medical liaisons that in order to market Neurontin effectively, Neurontin had

8  to be marketed for monotherapy, pain, bipolar disorder, and other psychiatric uses, all of which

9  were "off-label." Ford conceded that such marketing had to be primarily performed by the medical

10  liaisons, because they were the only ones who could discuss these matters. At another meeting

11  with the medical liaisons, Ford was even more blunt:

12      "I want you out there every day selling Neurontin. Look this isn't just me,
        it's come down from Morris Plains that Neurontin is more profitable. . . .
13      We all know Neurontin's not growing adjunctive therapy, beside that is
        not where the money is.   Pain management, now that's money.
14      Monotherapy, that's money. We don't want to share these patients with
        everybody, we want them on Neurontin only. We want their whole drug
15      budget, not a quarter, not half, the whole thing . . . .We can't wait for them
        to ask, we need to get out there and tell them up front. . . .That's where we
16      need to be holding their hand and whispering in their ear Neurontin for
        pain, Neurontin for monotherapy, Neurontin for bipolar, Neurontin for
17      everything . . . I don't want to see a single patient coming off Neurontin
        until they have been up to at least 4800 mg/day. I don't want to hear that
18      safety crap either, have you tried Neurontin, every one of you should take
        one just to see there is nothing, it's a great drug."
19

20      67.    Thus, medical liaisons were trained to cold call high decile physicians (those who

21  saw the most patients in a given specialty), and sell them on the "off-label" benefits of Neurontin.

22  A key aspect of this selling was misrepresentation. The first misrepresentation was usually the

23  status of the medical liaisons. With the full approval of marketing officials at Parke-Davis such as

24  John Ford, Phil Magistro, and John Krukar, medical liaisons were routinely introduced as

25  specialists in the specific drug they were presenting at a particular meeting. Thus, medical liaisons

26  could be experts in anti-epileptic drugs at one moment and an hour later be an expert in cardiac

27  medication. Medical liaisons were also encouraged to represent themselves as medical researchers,

28  even thought they neither conducted medical research nor analyzed medical research performed by

1    others. It was not uncommon for medical liaisons to be introduced as physicians, even though they

2    had no such qualifications. Sales personnel were instructed to introduce medical liaisons as

3    scientific employees who were given momentary leave of their academic duties to make an

4    individual presentation to the physician; the fact that the liaisons were part of Parke-Davis standard

5    marketing detail was intentionally hidden.

6        68.    Parke-Davis employees instructed medical liaisons on the procedure that should be

7    followed when presenting "The Neurontin Cold-Call Story" to a neurologist, general practitioner,

8    or psychiatrist who was a target for off label use:

9   - Mention that you are the eyes and ears of Parke-Davis research and that you are gathering clinical info;

- Then ask general questions about the nature of the practice;

- Mention Neurontin and its approved uses, but dismiss them as old news;

- Then ask leading questions about the number of pain patients that the practice sees;

- Then ask a series of questions that determine the practice profile for all of the potential "off-label" uses;

- Next reveal that Parke-Davis "has a great deal of information about the fantastic response rate of patients on Neurontin in all of these disease states";

- Move into a discussion of the clinical trials that this information is demanding;

- And the "90-95% response rate that we are seeing in more than 80% of patients";

- Present the doctor with any publications that are available and point out that many common drugs for pain treatment are in few if any publications;

- Ask the physician to place some patients on Neurontin and tell them that the medical liaison will stay in touch to help develop any case reports;

- Mention that case reports can be lucrative and can lead to clinical trials;

- Offer to do a presentation and luncheon for the entire practice or a group of his friends that will detail all of the "data" we have;

- Invite the physician to consultant meetings in the future and point out that they pay $250 plus a nice trip or meal in the city; and

- If a sales representative is present they should close the sale by asking that the next patient he sees should be put on Neurontin.

69.    It was during the March Parsipanny training that a whistleblower, who is now a plaintiff in a *qui tam* action in federal court in Boston, Dr. Paul Franklin, first witnessed the scope of the "off-label" claims that Parke-Davis intended its medical liaisons to market.  The medical liaisons were provided with new company slides that detailed the "method" to use to increase the use of Neurontin in several different "off-label" practice types.  The slide show contained a slide that showed the "Anecdotal Uses of Neurontin."  The list included the following:[1]

- Reflex sympathetic dystrophy (RSD)

- Peripheral neuropathy

- Diabetic neuropathy

- Trigeminal neuralgia

- Post-Herpetic neuralgia

- Essential tremor

- Restless leg syndrome (RLS)

- Attention deficit disorder (ADD)

- Periodic limb movement disorder

- Migraine

- Bipolar disorder

- Amyotrophic lateral sclerosis (ALS) [Lou Gehrig's Disease]

- Drug or alcohol withdrawal seizures

70.    Executives explained that "this list was very important to the company but that it makes Neurontin look like snake oil, so preempt the laughter by telling your physicians that 'I'm embarrassed to show you the next slide because it makes Neurontin look like snake oil, but the fact

---

[1]    According to the allegations of the *qui tam* action, this slide was often updated with the addition of a new disease state and a new version sent to Dr. Franklin.  It was updated so often that it was originally kept in a different slide format than the rest of the slides he had been given.

REPRESENTATIVE ACTION COMPLAINT FOR VIOLATION OF THE UNFAIR COMPETITION LAW

1    is, we are seeing extra-ordinary results, in some cases up to 90% response in all of these

2    conditions,' that will get their attention." This executive went on to say that, "[n]otice all the

3    studies we talk about, nothing gets a doc more interested in a drug than a study." Richard Grady, a

4    medical liaison, asked if "we have any money to lace studies without big docs." He was instructed

5    to "use the potential of a study to get in the door, even get protocols, but don't waste too much time

6    and don't say you can get them a study, we don't have much money left." He was then told that "if

7    anyone asks for back-up data say we are putting it together, then suggest that the doc put some of

8    his patients on Neurontin and we will help him publish case reports that could help place a study in

9    his practice. Everybody wins."

10        71.   None of the "off-label" claims made in the slide had been substantiated, let alone

11    approved by the FDA. Yet, these claims were a cornerstone of the Parke-Davis scheme to increase

12    sales of Neurontin.

13        72.   Thus, extensive misrepresentations were also made regarding the scientific

14    information concerning "off-label" usage of Neurontin. The following misrepresentations relating

15    to "off-label" usage of Neurontin were routinely made to physicians with the knowledge and

16    consent of marketing personnel at Parke-Davis:

17        1.   *Bipolar Disorder.* Medical liaisons informed psychiatrists that early

18       results from clinical trials evaluating Neurontin for the treatment of bipolar disorder

19       indicated a ninety percent (90%) response rate when Neurontin was started at 900

20       mg/day dosage and increased to a dosage of 4800 mg/day. No such results existed.

21       Nor was any type of clinical trial being conducted other than a pilot study. There

22       were no clinical trials or studies indicating that Neurontin was safe or effective up to

23       4800 mg/day. Indeed, Parke-Davis was in possession at this time of clinical trial

24       evidence which showed that there was no dose response difference between patients

25       who received 600 mg/day, 1200 mg/day and 2400 mg/day. Any data relating to the

26       use of Neurontin in bipolar disorder was strictly anecdotal and of nominal scientific

27       value. Indeed, most of the published reports on this topic had been written and

28       commercially sponsored by Parke-Davis, although this fact was hidden. Medical

1   liaisons were trained to inform psychiatrists that there were 110 reports of adverse
2   effects for Neurontin when used for psychiatric purposes.  In fact, such reports had
3   been reported to Parke-Davis personnel, but Parke-Davis attempted to hide such
4   reports from physicians.

5           2.      *Peripheral Neuropathy, Diabetic Neuropathy, and Other Pain*
6   *Syndromes.*  Medical liaisons were trained and instructed to report that "leaks" from
7   clinical trials demonstrated that Neurontin was highly effective in the treatment of
8   various pain syndromes and that a ninety percent (90%) response rate in the treatment
9   of pain was being reported.  No such body of evidence existed.  Nor was there any
10  legitimate pool of data from which a response rate, much less a ninety percent (90%)
11  response rate, could be calculated.  Medical liaisons were trained to claim support for
12  these findings as a result of inside information about clinical trials where no such
13  information existed.  The only support for these claims was anecdotal evidence of
14  nominal scientific value.  Many of the published case reports had been created and/or
15  sponsored by Parke-Davis in articles which frequently hid Parke-Davis's involvement
16  in the creation of the article.  Parke-Davis's payment for the creation of these case
17  reports was also hidden from physicians.

18          3.      *Epilepsy Monotherapy.*  Medical liaisons were strongly encouraged to
19  push neurologists to prescribe Neurontin as the sole medication to treat epilepsy, even
20  though studies only found it safe and effective as adjunctive therapy.  Medical
21  liaisons were trained to inform neurologists that substantial evidence supported
22  Parke-Davis's claim that Neurontin was effective as monotherapy.  In fact, at this
23  time, Parke-Davis knew that clinical trials regarding Neurontin's efficacy as a
24  monotherapy were inconclusive.  One of Parke-Davis's clinical trials, 945-82,
25  demonstrated that Neurontin was not an effective monotherapy agent; the vast
26  majority of patients in the study taking Neurontin were unable to continue with
27  Neurontin alone.  The same study showed that there was no effective difference
28  between administration of Neurontin at 600, 1200 or 2400 mg.  Notwithstanding this

REPRESENTATIVE ACTION COMPLAINT FOR VIOLATION OF THE UNFAIR COMPETITION LAW

data, the Parke-Davis continued to claim that physicians should use Neurontin at substantially higher doses than indicated by the labeling. Indeed, although medical liaisons routinely claimed Neurontin to be effective as monotherapy, in 1997 the Food and Drug Administration refused to find Neurontin a safe and effective monotherapy.

4.    *Reflex Sympathetic Dystrophy ("RSD")*. Medical liaisons informed physicians that extensive evidence demonstrated the efficacy of Neurontin in the treatment of RSD. The only such evidence that existed was anecdotal reports of nominal scientific value. Medical liaisons were trained to refer to case reports, most of which had been created or sponsored by Parke-Davis, as "studies."

5.    *Attention Deficit Disorder ("ADD")*. Medical liaisons were instructed to inform pediatricians that Neurontin was effective for the treatment of ADD. No data, other than occasional anecdotal evidence, supported this claim. Nonetheless, the medical liaisons were trained to report that large number of physicians had success treating ADD with Neurontin, when no such case reports existed.

6.    *Restless Leg Syndrome ("RLS")*. RLS was another condition where Parke-Davis's medical liaisons were trained to refer to a growing body of data relating to the condition, when no scientific data existed. The only reports were anecdotal, most of which had been created and/or sponsored by Parke-Davis.

7.    *Trigeminal Neuralgia*. Although medical liaisons represented that Neurontin could treat Trigeminal Neuralgia, again no scientific data supported this claim with the exception of occasional anecdotal reports. No data demonstrated that Neurontin was as effective as currently available pain killers, most of which were inexpensive.

8.    *Post-Herpatic Neuralgia ("PHN")*. Medical liaisons were trained to tell physicians that seventy-five percent (75%) to eighty percent (80%) of all PHN patients were successfully treated with Neurontin. Once again, no clinical trial data supported such a claim.

REPRESENTATIVE ACTION COMPLAINT FOR VIOLATION OF THE UNFAIR COMPETITION LAW

9. *Essential Tremor Periodic Limb Movement Disorder ("ETPLMD")*. Medical liaisons were trained to allege that Neurontin was effective in the treatment of these conditions. No scientific data supported such claims with the exception of anecdotal reports of nominal scientific value.

10. *Migraine.* Claims that Neurontin was effective in the treatment of migraine headaches were made by the medical liaisons and were supposedly based on early results from clinical trials. Although pilot studies had been suggested and undertaken, no early results of clinical trials existed to support these claims. Once again, any data relating to treatment of migraines was purely anecdotal and of nominal scientific value. Most of the case reports were either created or sponsored by Parke-Davis.

11. *Drug* and *Alcohol Withdrawal Seizures.* Medical liaisons suggested that Neurontin be used in the treatment of drug and alcohol withdrawals despite the lack of any data supporting Neurontin as an effective treatment for these conditions.

73. Misrepresentations by Parke-Davis were not limited to presentations by medical liaisons. As noted above, publications Parke-Davis distributed as part of its "publication strategy" intentionally misrepresented Parke-Davis's role in the creation and sponsorship of the publications. Physicians were led to believe that the publications were the independent, unbiased research of the authors of the articles. In fact, many of the publications distributed to physicians were created by Parke-Davis and written by third parties retained by Parke-Davis who were under Parke-Davis's control. The fact that these articles were authored by ghost writers retained by Parke-Davis was intentionally hidden, and the fact that the authors had financial ties to Parke-Davis was also intentionally undisclosed. For example, an article widely circulated by Parke-Davis concerning the use of Neurontin in the treatment of Restless Leg Syndrome asserted that the authors Gary A. Mellick and Larry B. Mellick, had not and never would receive financial benefit from anyone with an interest in Neurontin, yet the Mellick brothers had received tens of thousands of dollars for acting as speakers at Parke-Davis events. This financial connection was hidden from the persons who received copies of the Mellick brothers' articles.

1676.10 0001 BSC.DOC                    - 32 -

74.     Defendants' strategy, included paying doctors to appear as authors of journal articles on "off-label" uses of Neurontin, articles that were actually written by nonphysicians working under the direction of the company's marketers. The company then paid hundreds of doctors to attend expensive dinners and weekend retreats, where they were urged to prescribe Neurontin.

75.     Other doctors, often frequent prescribers of Neurontin, were paid to speak to other physicians about Neurontin's benefits. Finally, the company paid doctors to prescribe Neurontin and include those patients in clinical trials, which were designed mainly for marketing purposes.

76.     The company adopted the marketing strategy, after deciding not to perform the clinical trials needed to gain approval of new uses for Neurontin because it believed that the drug would soon lose patent protection.

77.     In fact, Parke-Davis engaged in an extensive and far-reaching campaign to use false statements to promote increased prescriptions of Neurontin.

78.     The scheme used a team of "medical liaisons." While medical liaisons are ordinarily connected to the research divisions of the manufacturer, Parke-Davis's medical liaisons were exclusively employed as sales and promotion personnel.

79.     Parke-Davis's medical liaisons were instructed to make exaggerated or false claims concerning the safety and efficacy of Parke-Davis drugs for "off-label" uses. They were also trained to convey that Neurontin could be prescribed for its various "off-label" uses in amounts of up to 4800 mg/day — far above the maximum dosage of 1800 mg per day approved by the FDA. To bolster their representations to physicians, medical liaisons were encouraged to misrepresent their scientific credentials and to pose as research personnel, rather than as sales representatives.

80.     Doctors were rewarded with kickbacks for prescribing large quantities of Parke-Davis drugs. These alleged kickbacks took various forms. For instance, some doctors were paid sums of money which were ostensibly compensation for drug studies. However, these studies were shams and had no scientific value. Other doctors were paid sums of money under the guise of being compensated for their services as "consultants" or "preceptors" or for participating in a "speaker's bureau." Doctors were also allegedly given cash payments for small record-keeping

REPRESENTATIVE ACTION COMPLAINT FOR VIOLATION OF THE UNFAIR COMPETITION LAW

1    tasks, such as allowing Parke-Davis access to information about the doctors' patients who were

2    receiving Neurontin.. Other doctors prescribing large amounts of Parke-Davis drugs were given

3    gifts such as travel tickets and tickets to the Olympics.

4         81..   When questions arose concerning the availability of reimbursement for prescriptions

5    for "off-label" uses of Parke-Davis drugs, medical liaisons were instructed to coach doctors on how

6    to conceal the "off-label" nature of the prescription.

7         82.   Parke-Davis took numerous actions to conceal its activities from the FDA, including

8    shredding documents, falsifying documents, and encouraging medical liaisons to conduct their

9    marketing activities without leaving a "paper trail" that might be discovered by the FDA.

10        83.   As part of the scheme and as set forth in a *qui tam* action filed by Dr. Paul Franklin,

11   a former Parke-Davis employee:

- Upon order of the company and as a result of training of medical liaisons, Dr. Franklin of Parke-Davis "deliberately contrived reports to mislead physicians into believing that a body of data existed that demonstrated the effectiveness of Neurontin in the treatment of bipolar disease." In fact, no data existed at all to support the use of Neurontin in bipolar disorder.

- Dr. Franklin was trained and instructed to actively deceive physicians with contrived data, falsified "leaks" from clinical trials, scientifically flawed reports, or "success stories" that stated that Neurontin was highly effective in the treatment of a variety of pain syndromes. No such body of evidence existed.

- He was instructed to advise physicians that Parke-Davis had developed a large body of data to support the use of Neurontin as monotherapy.  This was an "outright lie" and left patients unknowingly without good seizure control.

- Medical liaisons were instructed to tell physicians that a great deal of data existed that supported the safe use of Neurontin at levels that exceed 4800 mg/day.  However, clinically significant safety data existed at dosing levels at only 1800 mg/day.

- Parke-Davis provided medical liaisons with slides that stated that Neurontin was effective for the treatment of Attention Deficit Disorders but no data existed to support that claim.

84.   The strategy was a success.  In 2000, Warner-Lambert reported that more than 78%

of Neurontin prescriptions had been written for indications other than epilepsy.  Sales of Neurontin

REPRESENTATIVE ACTION COMPLAINT FOR VIOLATION OF THE UNFAIR COMPETITION LAW

1   that year were $1.3 billion, and they rose to $1.7 billon, according to IMS Health (news/quote), a

2   health care information company.

3       85.    The "off-label" uses of Neurontin which are actively being promoted by Parke-

4   Davis are uses which are not recognized as medically accepted uses by the American Hospital

5   Formulary Service Drug Information, the United States Pharmacopeia-Drug Information, or the

6   American Medical Association Drug Evaluations, or by any peer-reviewed medical literature.

7   Thus, these "off-label" uses are beyond the scope of uses designated by federal law and regulation,

8   in particular 42 U.S.C. § 1396r-8, as eligible coverage by the Medicare and Medicaid programs.

9       86.    There is no valid scientific evidence to support the contention that Neurontin is safe

10  and effective for pain, for monotherapy for seizures, for bipolar disorder, for attention deficit

11  disorder, for reflex sympathetic dystrophy, for post-herpetic neuropathy, or for diabetic

12  neuropathy.   There is no valid scientific evidence concerning the therapeutic equivalence of

13  Neurontin in any of these diseases.  Parke-Davis is currently conducting actual legitimate trials

14  investigating the use of Neurontin for relief of certain types of pain; however, these trials are not

15  complete, and the actual results of these trials have not been made available to any of Parke-

16  Davis's medical liaison employees.

17      87.    Federal laws and regulations governing the Medicare and Medicaid programs

18  prohibit kickbacks to physicians and medical care providers, in particular 42 U.S.C. § 1320A-7 and

19  42 C.F.R. § 1001. "Kickbacks" have been defined as including payments, gratuities, and other

20  benefits paid to physicians who prescribe prescription drugs by the manufacturers of the drugs.

21      88.    As part of its nationwide program of "off-label" promotion of Neurontin, Parke-

22  Davis established a system of kickbacks to physicians who are prescribers of large amounts of

23  Neurontin.   These kickbacks were administered by the Parke-Davis sales department, and

24  frequently disguised as consultantships although unrelated to any scientific or educational activity.

25  The kickbacks took the form of cash payments, travel benefits, entertainment, Olympics tickets,

26  and other benefits.  Parke-Davis established formal internal guidelines for the award of these

27  benefits to physicians which are based entirely on the amount of prescriptions written by the

28

REPRESENTATIVE ACTION COMPLAINT FOR VIOLATION OF THE UNFAIR COMPETITION LAW

1    physicians and the ability of the physician to influence other physicians to begin prescribing

2    Neurontin for "off-label" uses.

3       89.     These kickbacks are strictly illegal and have had the effect of greatly increasing the

4    amount of Neurontin prescriptions and indirectly the amount of money spent by the federal

5    government for reimbursement of prescriptions covered by Medicare. The payment of these kick-

6    backs represents the inducement of federal payments through a pattern of fraudulent conduct and

7    constitute False Claims within the meaning of 31 U.S.C. § 3729.

8       90.     As part of its illegal off-market promotion of Neurontin, Parke-Davis has instructed

9    and caused its sales personnel and its medical liaison employees to make false statements to

10    physicians, and to provide physicians with written materials containing false statements,

11    concerning the safety and efficacy of Neurontin for "off-label" uses. These statements were made

12    with the intent of, and had the effect of, inducing physicians to increase their "off-label"

13    prescription of Neurontin.

14       91.     The false statements made by Parke-Davis employees to physicians have included

15    representations that scientific evidence exists that Neurontin is an effective remedy for pain,

16    bipolar disorder, attention deficit disorder, reflex sympathetic dystrophy, post-herpetic neuralgia,

17    and monotherapy for seizures. The false statements also include representations that Neurontin is

18    known to be safe and effective in dosages of up to 4800 mg/day in all populations. The false

19    statements include representations that clinical trials are ongoing or planned with respect to each of

20    the above off-label uses. Each of these statements is unsupported by any legitimate scientific

21    evidence.

22                            **FIRST CAUSE OF ACTION**

23                **Violations of California Unfair Competition Law**

24              **(Business and Professions Code §§ 17200, *et seq.*)**

.25       92.     The preceding paragraphs of this Complaint are realleged and incorporated by

26    reference as if fully set forth herein.

27

28

93.    Defendants' actions, as complained of herein, constitute unfair trade practices that have the capacity to and do deceive consumers in violation of the Unfair Competition Law, Bus. & Prof. Code §§ 17200, *et seq.*

(a)    Defendants caused third-parties to publish and make factual representations and statements designed to promote Neurontin "off-label" use that were false, misleading, and/or deceptive;

(b)    Defendants unfairly and deceptively sold Neurontin to the public based upon statements made by a third party that Defendants hired or improperly influenced, that were deceptive;

(c)    Defendants omitted material information known to them that would have disclosed materially adverse facts to doctors, in order to induce doctors to prescribe Neurontin;

(d)    Defendants knew that published studies promoting Neurontin for non-approved users lacked the scientific integrity that was expected of such studies and acted to conceal adverse studies;

(e)    Defendants embarked on a marketing scheme that was in violation of state and federal laws with the purpose to deceive the public; and

(f)    Defendants falsely and deceptively marketed Neurontin for uses for which no valid scientific data existed.

94.    All of the conduct alleged herein occurs and continues to occur in Defendants' business. Defendants' wrongful conduct is part of a pattern or generalized course of conduct repeated on thousands of occasions daily. Thus, Defendants' conduct impacts the public interest.

95.    Plaintiffs request that this Court enter such orders or judgments as may be necessary to restore to any person in interest, any money which may have been acquired by means of such unfair practices, as provided in Bus. & Prof. Code § 17203 and Civil Code § 3345, and for such other relief as set forth below.

REPRESENTATIVE ACTION COMPLAINT FOR VIOLATION OF THE UNFAIR COMPETITION LAW

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## SECOND CAUSE OF ACTION

**Untrue and Misleading Advertising**
**(Business and Professions Code § 17500, *et seq.*)**

96.    The preceding paragraphs of this Complaint are realleged and incorporated by reference.

97.    Bus. & Prof. Code § 17500 provides that "[i]t is unlawful for any . . . corporation . . . with intent . . . to dispose of . . . personal property . . . to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated before the public in this state, . . . any statement . . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading . . . ."

98.    As a result of the violations of California law described above, Defendants have been, and will be, unjustly enriched at the expense of Plaintiff and the general public. Specifically, Defendants have been unjustly enriched by its receipt of monies received from customers who purchased Neurontin which is advertised and/or otherwise marketed in this State, and was promoted and sold through advertising and marketing materials which materially misrepresent the quality and functions of the product.

99.    Pursuant to Bus. & Prof. Code § 17535, as a private attorney general suing on behalf of the general public, Plaintiffs are entitled to the remedies set forth below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that the Court enter an order or judgment against Defendants as follows:

A.    Equitable relief in the form of restitution and/or disgorgement of all unlawful or illegal profits received by Defendants as a result of the unfair, unlawful and/or deceptive conduct alleged in this Complaint;

B.    Prejudgment and post-judgment interest on such monetary relief, awarded in accordance with California law;

C.    Injunctive relief in the form of an order stating that Defendants are enjoined from engaging in unfair, unlawful and/or deceptive acts or practices, as set forth in this Complaint;

1        D.    Injunctive relief in the form of an order that Defendants be required to publish

2 notice of the truth regarding Neurontin;

3        E.    An order awarding Plaintiffs the costs of bringing this suit, including attorneys'

4 fees; and

5        F.    All other relief to which Plaintiffs may be entitled at law or in equity.

6    DATED:  February 3, 2003

7                                      HAGENS BERMAN LLP

8

9                                      By

10                                        AMANDA L. HORN

11                                      700 South Flower Street, Suite 2940
                                        Los Angeles, CA  90017-4101
12                                      Telephone:  (213) 330-7150

13                                      STEVE W. BERMAN
                                        HAGENS BERMAN LLP
14                                      1301 Fifth Avenue, Suite 2900
                                        Seattle, WA  98101
15                                      Telephone:  (206) 623-7292

16                                      THOMAS M. SOBOL
                                        HAGENS BERMAN LLP
17                                      225 Franklin Street, 26th Floor
                                        Boston, MA  02110
18                                      Telephone:  (617) 482-3700

19                                      Attorneys for Plaintiffs

20

21

22

23

24

25

26

27

28

1676.10 0001 BSC.DOC                          - 39 -

REPRESENTATIVE ACTION COMPLAINT FOR VIOLATION OF THE UNFAIR COMPETITION LAW

ORIGINAL

| SHORT TITLE: | CASE NUMBER |
|---|---|
| CONGRESS OF CALIFORNIA, ET AL. V. PFIZER, INC, et al SENIORS | |

## CIVIL CASE COVER SHEET ADDENDUM
### CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO DISTRICT

**This form is required in all new civil case filings in the Los Angeles Superior Court**

I. Check the types of hearing and fill in the estimated length of hearing expected for this case:

☒ JURY OR ☐ NON-JURY AND CLASS ACTION?☐ YES ☐ NO   TIME ESTIMATED FOR TRIAL __20__ ☐ HOURS ☒ DAYS.

II. Select the correct district (4 steps):

  **1** After first completing the Civil Case Cover Sheet Form, find the main civil case cover sheet heading for your case in the left margin below, and, to the right in Column 1, the Civil Case Cover Sheet case type you selected.

  **2** Check **one** Superior Court type of action in Column 2 which best describes the nature of this case.

  **3** In Column 3 below, circle the reason for your choice of district that applies to the type of action you have checked.

### Applicable Reasons for Choosing District (See Column 3 below)

1. Class Actions must be filed in Central District.
2. May be filed in Central (Non-PI/PD/O/Out-of-county PI/PD)
3. District where cause of action arose.
4. District where injury, death or damage occurred.
5. District where performance required or defendant resides.
6. District where property is located.
7. District where petitioner resides.
8. District where defendant/respondent functions wholly therein.
9. District where one or more of the parties reside.
10. District where Labor Commissioner Office located.

  **4** Fill in the information requested on page 4 in Item III; complete Item IV. Sign the certificate.

| | -1-<br>Civil Case Cover<br>Sheet Category No. | -2-<br>Type of Action<br>(Check only one) | -3-<br>Applicable Reasons -<br>See Above |
|---|---|---|---|
| **Auto Tort** | Auto (22) | ☐ A7100 Motor Vehicle - Personal Injury/Property Dam./Wrongful Death<br>Is this an uninsured motorist case? ☐ Yes ☐ No | 1., 2., 4. |
| **Other PI/PD/WD Tort** | Asbestos (04) | ☐ A6070 Asbestos Property Damage<br>☐ A7221 Asbestosis - Personal Injury/Wrongful Death | 2.<br>2. |
| | Product Liability (24) | ☐ A7260 Product Liability (not asbestos or toxic/environmental) | 1., 2., 3., 4., 8. |
| | Medical Malpractice (45) | ☐ A7210 Medical Malpractice - Physicians & Surgeons | 1., 2., 4. |
| | Other PI/PD/WD (23) | ☐ A7250 Premises Liability (e.g., slip and fall)<br>☐ A7230 Intentional PI/PD/WD (e.g., assault, vandalism, etc.)<br>☐ A7220 Other Personal Injury/Property Dam./Wrongful Death | 1., 2., 4.<br>1., 2., 4.<br>1., 2., 4. |
| **Non-PI/PD/WD (Other)** | Business Tort (07) | ☐ A6029 Other Commercial/Business Tort (not fraud/breach of contract) | 1., 2., 3. |
| | Civil Rights (08) | ☐ A6005 Civil Rights | 1., 2., 3. |
| | Defamation (13) | ☐ A6010 Defamation (slander/libel) | 1., 2., 3. |
| | Fraud (16) | ☐ A6013 Fraud (no contract) | 1., 2., 3. |
| | Intellectual Proprty (19) | ☐ A6016 Intellectual Property | 2., 3. |
| | Prof. Negligence<br>(25) | ☐ A7240 Other Professional Health Care Malpractice<br>☐ A6017 Legal Malpractice<br>☐ A6050 Other Professional Malpractice (not medical or legal) | 1., 2., 3.<br>1., 2., 3.<br>1., 2., 3. |

| SHORT TITLE: | CASE NUMBER |
|---|---|
| CONGRESS OF CALIFORNIA SENIORS, et al V. PFIZER, INC. | . |

| | -1-<br>Civil Case Cover<br>Sheet Category No. | -2-<br>Type of Action<br>(Check only one) | -3-<br>Applicable Reasons -<br>See Above |
|---|---|---|---|
| **Employment** | Other Non-PI/PD/WD<br>Tort (35) | ☐ A6025  Other Intentional Tort Complaint (not PI/WD/PD) | 1., 2., 3. |
| | | ☐ A6026  Other Tort Complaint Case (not Intentional or PI/WD/PD) | 1., 2., 3. |
| | Wrongful Termination<br>(35) | ☐ A6037  Wrongful Termination | 1., 2., 3. |
| | Other Employment<br>(15) | ☐ A6024  Other Employment Complaint Case | 1., 2., 3. |
| | | ☐ A6109  Labor Commissioner Appeals | 10. |
| **Contract** | Breach of Contract/<br>Warranty<br>(06)<br>(not insurance) | ☐ A6004  Breach of Rental/Lease Contract (not UD or wrongful eviction) | 2., 5. |
| | | ☐ A6008  Contract/Warranty Breach -Seller Plaintiff(no fraud/negligence) | 2., 5. |
| | | ☐ A6019  Negligent Breach of Contract/Warranty (no fraud) | 1., 2., 5. |
| | | ☐ A6028  Other Breach of Contract/Warranty (not fraud or negligence) | 1., 2., 5. |
| | Collections<br>(09) | ☐ A6002  Collections Case-Seller Plaintiff | 2., 5. |
| | | ☐ A6012  Other Promissory Note/Collections Case | 2., 5. |
| | Insurance Coverage<br>(18) | ☐ A6015  Insurance Coverage (not complex) | 1., 2., 5., 8. |
| | Other Contract<br>(37) | ☐ A6009  Contractual Fraud | 1., 2., 3., 5. |
| | | ☐ A6027  Other Contract Dispute(not breach/insurance/fraud/negligence) | 1., 2., 3., 8. |
| **Real Property** | Emnt Dom/Inv. Cond.<br>(14) | ☐ A7300  Eminent Domain/Condemnation Number of parcels_____ | 2. |
| | Wrongful Eviction<br>(33) | ☐ A6023  Wrongful Eviction Case | 2., 6. |
| | Other Real Property<br>(26) | ☐ A6018  Mortgage Foreclosure | 2., 6. |
| | | ☐ A6032  Quiet Title | 2., 6. |
| | | ☐ A6060  Other Real Property(not em. domain, landlord/tenant, foreclosure) | 2., 6. |
| **Unlawful Detainer** | Unlawful Det-<br>Comm(31) | ☐ A6021  Unlawful Detainer-Commercial (not drugs or wrongful eviction) | 2., 6. |
| | Unlawful Det-Resid<br>(32) | ☐ A6020  Unlawful Detainer-Residential (not drugs or wrongful eviction) | 2., 6. |
| | Unlawful Det-Drugs<br>(38) | ☐ A6022  Unlawful Detainer-Drugs | 2., 6. |
| **Judicial Review** | Asset Forfeiture (05) | ☐ A6108  Asset Forfeiture Case | 2., 6. |
| | Petition re Arbitration<br>Award (11) | ☐ A6115  Petition to Compel/Confirm Arbitration | 2., 5. |

ORIGINAL

| SHORT TITLE. | CASE NUMBER |
|---|---|
| CONGRESS. OF CALIFORNIA SENIORS V. PFIZER, INC. ET AL | |

| | -1-<br>Civil Case Cover<br>Sheet Category No. | -2-<br>Type of Action<br>(Check only one) | -3-<br>Applicable Reasons -<br>See Above |
|---|---|---|---|
| **Judicial Review (continued)** | Writ of Mandate<br><br>(02) | ☐ A6151  Writ - Administrative Mandamus<br>☐ A6152  Writ - Mandamus on Limited Court Case Matter<br>☐ A6153  Writ - Other Limited Court Case Review | 2., 8.<br>2.<br>2. |
| | Oth. Jud. Review (39) | ☐ A6150  Other Writ /Judicial Review | 2., 8. |
| **Provisionally Complex Litig.** | Antitrust/Trade Reg.<br>(03) | ☑ A6003  Antitrust/Trade Regulation | 1., 2., 8. |
| | Cnstrction Defect (10) | ☐ A6007  Construction defect | 1., 2., 3. |
| | Clm. Inv Mass Tort (40) | ☐ A6006  Claims Involving Mass Tort | 1., 2., 8. |
| | Securities Litig. (28) | ☐ A6035  Securities Litigation Case | 1., 2., 8. |
| | Tox. Tort/Environm (30) | ☐ A6036  Toxic Tort/Environmental | 1., 2., 3., 8. |
| | Ins Covrage Clms from<br>Complex Case (41) | ☐ A6014  Insurance Coverage/Subrogation (complex case only) | 1., 2., 5., 8. |
| **Enforcement of Judgment** | Enforcement<br>of Judgment<br><br>(20) | ☐ A6141  Sister State Judgment<br>☐ A6160  Abstract of Judgment<br>☐ A6107  Confession of Judgment (non-domestic relations)<br>☐ A6140  Administrative Agency Award (not unpaid taxes)<br>☐ A6114  Petition/Certificate for Entry of Judgment on Unpaid Tax<br>☐ A6112  Other Enforcement of Judgment Case | 2., 9.<br>2., 6.<br>2., 9.<br>2., 8.<br>2., 8.<br>2., 8., 9. |
| **Misc. Civ. Cmplts** | RICO (27) | ☐ A6033  Racketeering Case | 1., 2., 8. |
| | Other Complaints<br>(Not Specified Above)<br><br>(42) | ☐ A6030  Declaratory Relief Only<br>☐ A6040  Injunctive Relief Only (not domestic/harassment)<br>☐ A6011  Other Commercial Complaint Case (non-tort/non-complex)<br>☐ A6000  Other Civil Complaint (non-tort/non-complex) | 1., 2., 8.<br>2., 8.<br>1., 2., 8.<br>1., 2., 8. |
| **Misc. Civil Petitions** | Prtnrshp/Crp. Gov.(21) | ☐ A6113  Partnership and Corporate Governance Case | 2., 8. |
| | Other Petitions<br>(Not Specified Above)<br><br>(43) | ☐ A6121  Civil/Workplace Harassment<br>☐ A6190  Election Contest<br>☐ A6110  Petition for Change of Name<br>☐ A6170  Petition for Relief from Late Claim Law<br>☐ A6100  Other Civil Petition | 2., 3., 9.<br>2.<br>2., 7.<br>2., 3., 4., 8.<br>2., 9. |

-4-

**CIVIL CASE COVER SHEET ADDENDUM**
**CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO DISTRICT**

| SHORT TITLE: CONGRESS OF CALIFORNIA SENIORS, et al v. PFIZER, | CASE NUMBER: INC ET AL |
|---|---|

III. Choose the district:  Enter the address of the accident, party residence or place of business, required performance, or other circumstance you have circled in Column 3 as the proper reason for filing in the district you selected.

| REASON: CHECK THE NUMBER YOU CIRCLED IN -3- WHICH APPLIES IN THIS CASE | ADDRESS. |
|---|---|
| ☑1. ☐2. ☐3. ☐4. ☐5. ☐6. ☐7. ☐8. ☐9. ☐10. | 1228 N. Street, Suite 29 |
| CITY:                STATE:          ZIP CODE: | Sacramento, CA |

IV. Certificate/Declaration of Assignment: The undersigned hereby certifies and declares that the above entitled matter is properly filed for assignment to the **Central** District of the Los Angeles Superior Court under Section 392 et seq., Code of Civil Procedure and Rule 2(b), (c) and (d) of this court for the reason checked above.  I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and this declaration was executed on **February 3, 2003** at **Los Angeles** California.

(SIGNATURE OF ATTORNEY/FILING PARTY)

# New Civil Case Filing Instructions

This addendum form is required so that the court can assign your case to the correct court district for filing and hearing. It satisfies the requirement for a certificate as to reasons for authorizing filing in the district, as set forth in Los Angeles Superior Court Local Rule 2 (d). It must be completed and submitted to the court along with the Civil Case Cover Sheet and the original Complaint or Petition in ALL civil cases filed in any district (including the Central District) of the Los Angeles County Superior Court.

| PLEASE HAVE THE FOLLOWING DOCUMENTS COMPLETED AND READY TO BE FILED IN ORDER TO PROPERLY COMMENCE YOUR NEW COURT CASE: |
|---|

1. Original Complaint or Petition.

2. If filing a Complaint, a completed Summons form for issuance by the Clerk (Summons forms available at the Forms Counter).

3. Civil Case Cover Sheet form required by California Rule of Court 982.2(b)(1), completely filled out (Cover Sheet forms available at the Forms Counter).

4. This "Addendum to Civil Case Cover Sheet" form (Superior Court Form Number 982.2(b)(1)A, revised 7/99), completely filled out and submitted with the Civil Case Cover Sheet. *

5. Payment in full of the filing fee or an Order of the Court waiving payment of filing fees in forma pauperis (fee waiver application forms available at the Filing Window)

6. In case of a plaintiff or petitioner who is a minor under 18 years of age, an Order of the Court appointing an adult as a guardian ad litem to act on behalf of the minor (Guardian ad Litem Application and Order forms available at the Forms Counter).

7. Additional copies of documents presented for endorsement by the Clerk and return to you.

\* With the exception of cases concerning personal injury (including wrongful death) and property damage occurring in this County, Labor Commissioner Appeals, and those types of actions required to be filed in the Central District by Local Court Rule 2(b), all civil actions may be optionally filed either in the Central District or in whichever other district the rule would allow them to be filed. When a party elects to file an action in Central District which would also be eligible for filing in one or more of the other districts, this form must still be submitted with location and assignment information completed.