# EXHIBIT J

LEXSEE 2002 FTC LEXIS 56

In the Matter of BIOVAIL CORPORATION, a corporation

Docket No. C-4060

Federal Trade Commission

*2002 FTC LEXIS 56*

COMPLAINT

October 2, 2002, Complaint

October 2, 2002

[*1]

### COMPLAINT

Pursuant to the provisions of the Federal Trade Commission Act and the Clayton Act, and by virtue of the authority vested in it by said Acts, the Federal Trade Commission, having reason to believe that respondent Biovail Corporation has engaged in conduct that violates Section 7 of the Clayton Act and Section 5 of the Federal Trade Commission Act, and it appearing to the Commission that a proceeding in respect thereof would be in the public interest, hereby issues its complaint, stating its charges as follows:

### I. Nature of the Case

1. This matter concerns Biovail Corporation's illegal acquisition of an exclusive patent license and its wrongful listing of the patent with the U.S. Food and Drug Administration. Each of these actions independently had the potential to block the entry of any bioequivalent generic drug capable of competing with Biovail's lucrative branded Tiazac product and deprives consumers of the substantial benefits of lower-priced generic Tiazac that might have occurred absent Biovail's conduct.

### II. Respondent Biovail Corporation

2. Respondent Biovail Corporation ("Biovail") is a corporation organized under the laws of the Province of Ontario, [*2] Canada, with its principal place of business at 2488 Dunwin Drive, Mississauga, Ontario, Canada. Biovail has offices in the United States located at 3701 Concorde Parkway, Chantilly, Virginia.

3. Biovail manufactures branded and generic pharmaceutical products, and is involved in all stages of pharmaceutical development, from research and development, through clinical testing and regulatory filings, to full-scale manufacturing. For the first six months of 2001, Biovail had product sales of over $ 237 million, and revenues of nearly $ 253 million. Tiazac, the drug at issue in this matter, is an extended-release, diltiazem-based drug that is one of Biovail's largest selling products.

### III. DOV Pharmaceuticals, Inc.

4. DOV Pharmaceuticals, Inc. ("DOV") was formed in 1995. It is incorporated under the laws of the State of Delaware, with its principal place of business in New Jersey. DOV develops drugs to advanced stages in preclinical and clinical development, and then seeks strategic partnerships, joint ventures, or sub-licensing arrangements with larger pharmaceutical companies for the final development and marketing of products. DOV has no commercial manufacturing capability or [*3] experience, and, to date, it has not generated revenue from the sale of any pharmaceutical products.

2002 FTC LEXIS 56, *

5. DOV owns the rights to U.S. Patent Number 6,162,463 ("the '463 patent"), the patent at issue in this matter, which it has licensed to Biovail on an exclusive basis. The pharmaceutical product described in the '463 patent is a unique formulation of diltiazem (the active pharmaceutical ingredient in Biovail's Tiazac) that combines both an immediate-release and an extended-release form of diltiazem.

### IV. Jurisdiction and Interstate Commerce

6. Biovail is, and at all relevant times herein has been, a corporation within the meaning of Section 4 of the FTC Act, 15 U.S.C. § 44.

7. Biovail's general business activities, its acquisition of exclusive rights to the '463 patent from DOV, and its unfair methods of competition alleged below, are "in or affecting commerce" within the meaning of Section 4 of the FTC Act, 15 U.S.C. § 44, and Section 1 of the Clayton Act, 15 U.S.C. § 12.

### V. Statutory and Regulatory Background

8. The Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 301 et seq., as amended by the Drug Price Competition and Patent Term Restoration Act of 1984, codified at 21 U.S.C. [*4] § 355(j) and 35 U.S.C. § 271(e), commonly known as the "Hatch-Waxman Act," requires approval by the U.S. Food and Drug Administration ("FDA") before a company may market or sell a pharmaceutical product in the United States. A company may obtain approval to make and sell a new or branded drug by filing a New Drug Application ("NDA") with the FDA.

9. A generic drug is one that the FDA has found to be "bioequivalent" to a branded drug. Two drugs are considered bioequivalent if they contain the same active pharmaceutical ingredient and if there is no significant difference in the rate, and extent to which, the products are absorbed in the human body under similar experimental conditions, when administered at the same dose. See Food, Drug and Cosmetic Act, 21 U.S.C. § 505(j)(8)(B).

10. Although therapeutically identical to their branded counterparts, generic drugs are typically sold at substantial discounts from the price of the branded drug. In fact, the first generic drug to enter the market often does so at a price 25 percent or more below that of the branded product.

11. The Hatch-Waxman Act establishes a procedure for a branded-drug company to identify to prospective generic competitors [*5] all patents that it believes claim the branded drug. The Act also establishes a process for addressing potential claims of patent infringement against the manufacturer of a proposed generic product.

12. The FDA makes public the patents identified by branded-drug companies as claiming a given product in a publication entitled "Approved Drug Products with Therapeutic Equivalence Evaluations," which is commonly referred to as the "Orange Book."

13. The FDA views its role in listing patents in the Orange Book as "purely ministerial," because it has neither the expertise nor the resources to resolve complex patent coverage issues. 59 Fed. Reg. 50338, 50345 (Oct. 3, 1994). Consequently, the FDA does not scrutinize a party's bases for listing patents in the Orange Book, as long as all the information required by statute has been submitted. Should one company challenge the validity of another's Orange Book listing, the FDA requests only that the NDA holder provide written confirmation that the patent is properly listed.

14. A company may obtain approval to make and sell a generic version of a branded drug by filing an Abbreviated New Drug Application ("ANDA") with the FDA. If a company seeks [*6] to market a generic version of a branded drug prior to the expiration of one or more of the patents listed in the Orange Book as relating to that drug, the generic applicant must provide a certification to the FDA with respect to each such patent.

15. One type of certification a generic applicant may make to the FDA is a "Paragraph IV Certification," in which the applicant claims that the branded-drug company's patent is invalid or will not be infringed by the manufacture, use, or sale of the generic product. This is the form of certification at issue in this matter.

16. When making a Paragraph IV Certification, the generic applicant must provide notice to each patent owner and the branded-drug company listed in the Orange Book.

17. The Hatch-Waxman Act contains provisions that allow a branded-drug company to delay the entry of a generic drug for which a Paragraph IV Certification has been filed, depending on whether a patent infringement suit is initiated. If neither the patent holder nor the branded-drug company files a patent infringement suit against the generic drug applicant within forty-five days of receipt of notification of a Paragraph IV Certification, the FDA review and [*7] approval process may proceed. Upon final FDA approval of the ANDA, the generic applicant is free to market its

product. If, however, a patent infringement suit is filed against the generic drug applicant within the forty-five day period, then final FDA approval of the ANDA is automatically stayed until the earliest of: (a) patent expiration; (b) a final determination by a court of non-infringement or patent invalidity; or (c) the expiration of a thirty month period from the time the patent holder receives the Paragraph IV Certification. This thirty month period, which effectively is an automatic statutory injunction, is commonly referred to as the "30-month stay."

### VI. Tiazac Sold in the United States is the Relevant Market in which to Assess Biovail's Conduct

18. The relevant antitrust product market in which to assess the anticompetitive effects of Biovail's conduct is Tiazac and generic bioequivalent versions of Tiazac. Tiazac is a diltiazem-based prescription drug taken once a day. It is used to treat high blood pressure (hypertension) and chronic chest pain (angina).

19. In addition to Tiazac, other therapeutic agents can be used to treat high blood pressure and chronic chest [*8] pain, including several branded and generic formulations of once-a-day diltiazem, but these other therapeutic agents do not significantly constrain Tiazac's pricing.

20. In contrast, entry of a generic bioequivalent version of Tiazac likely would result in a significant, immediate decrease in the sales of branded Tiazac, and lead to a significant reduction in the average market price paid for Tiazac and its generic bioequivalents.

21. The relevant antitrust geographic market in which to assess the anticompetitive effects of Biovail's conduct is the United States. This is so given the FDA's elaborate regulatory process for approving drugs for sale in the United States, and the fact that the marketing, sales, and distribution of pharmaceuticals occur on a nationwide basis.

### VII. Biovail Has Monopoly Power in the Relevant Market

22. At all times germane to this complaint, Biovail, through its U.S. distributor Forest Laboratories, Inc., of New York, has had 100 percent of the sales in the Tiazac market in the United States.

### VIII. The Threat of Generic Tiazac Entry

23. The FDA approved Tiazac for sale in the United States in September 1995. Shortly thereafter, Biovail, through Forest [*9] Laboratories, Inc., began marketing Tiazac in the United States.

24. Tiazac is an important product for Biovail. In 2000, Tiazac's U.S. sales reached almost $ 200 million, accounting for approximately 38 percent of the total gross sales of products owned by Biovail.

25. On or about June 22, 1998, Andrx Pharmaceuticals, Inc. ("Andrx"), a Florida-based company that develops generic versions of extended-release, branded pharmaceuticals, submitted an ANDA to the FDA to market a generic version of Tiazac. Andrx's application included a Paragraph IV Certification asserting that its generic product would not infringe any patent claiming Tiazac. At the time, the only patent listed in the Orange Book as claiming Tiazac was U.S. Patent Number 5,529,791 ("the '791 patent"), which covers aspects of the extended-release formulation of Tiazac. The basic patent on diltiazem, Tiazac's active pharmaceutical ingredient, expired long before any date relevant to this complaint.

26. On October 7, 1998, Biovail filed a patent infringement lawsuit against Andrx in the U.S. District Court for the Southern District of Florida, alleging that Andrx's proposed generic bioequivalent version of Tiazac would infringe [*10] the '791 patent. By filing this lawsuit, Biovail triggered a provision under the Hatch-Waxman Act preventing the FDA from granting final approval of Andrx's ANDA for up to thirty months.

27. On March 6, 2000, the federal district court ruled in Andrx's favor, finding that its generic bioequivalent version of Tiazac did not infringe the '791 patent. Biovail appealed this decision, and the United States Court of Appeals for the Federal Circuit affirmed the district court's ruling on February 13, 2001.

28. The FDA tentatively approved Andrx's ANDA for generic Tiazac on September 29, 2000, and informed Andrx that the ANDA would be eligible for final approval upon expiration of the 30-month stay, which, because of the decision of the Court of Appeals for the Federal Circuit, would have ended around February 13, 2001. Final FDA approval of Andrx's ANDA, however, was not granted on February 13 or at any other time as of the date of this complaint.

### IX. Biovail's Anticompetitive Conduct

#### a. Biovail Acquired an Exclusive License to the '463 Patent

29. On December 19, 2000, the U.S. Patent and Trademark Office issued the '463 patent to its inventor, Dr. Arnold Lippa, the founder and CEO [*11] of DOV Pharmaceuticals, Inc. Dr. Lippa subsequently assigned the patent to DOV.

30. The product described in the '463 patent is a unique formulation of diltiazem (the same active pharmaceutical ingredient as in Biovail's Tiazac), which combines both an immediate-release and an extended-release form of diltiazem.

31. Within days of the patent's issuance, Biovail approached and met with Dr. Lippa in order to negotiate an exclusive license to the '463 patent.

32. Biovail insisted on completing the license agreement with DOV by no later than January 19, 2001. A patent claiming a pharmaceutical product must be listed in the FDA's Orange Book within thirty days of issuance by the U.S. Patent and Trademark Office in order to trigger Hatch-Waxman Act provisions that could result in a 30-month stay. As a result, January 19 was the last day on which Biovail could list the '463 patent and still be eligible to obtain a second 30-month stay, precluding the FDA from granting final approval of Andrx's application to sell a generic version of Tiazac.

33. On January 12, 2001, Biovail and DOV executed the exclusive license agreement for the '463 patent.

**b. Biovail Listed the '463 Patent in the FDA's [*12] Orange Book**

34. On January 8, 2001, Biovail listed the '463 patent in the Orange Book. In its certification to the FDA supporting the listing, Biovail attested that the '463 patent covers the currently approved formulation of Tiazac.

35. On January 30, 2001, Biovail publicly disclosed that it had listed the '463 patent in the Orange Book. Biovail's press release stated that as a result of this listing, FDA approval of any generic version of Tiazac could be delayed for up to thirty months:

> The effect of Biovail's listing of this Patent in the Orange Book is that the FDA will require every filer of an ANDA for a generic version of Tiazac to also submit a Notice of Certification to Biovail on this Patent. As a result, Biovail will consider whether such ANDA formulation infringes on its listed Patent and will have the legal right to commence a lawsuit against the owner of such ANDA. If Biovail determines to commence such suit within 45 days from receipt of the Notice of Certification, the Hatch Waxman provisions of the [FDCA] will be triggered and the ANDA owner will not be able to obtain final approval for up to 30 months.

36. At the time of listing, Biovail was aware that the [*13] '463 patent did not cover the formulation of Tiazac it was marketing. Further, Biovail knew that absent its exclusive license with DOV, it would not have listed the '463 patent in the Orange Book. The product described in the '463 patent contains at least 1 percent of uncoated or "free" immediate-release diltiazem in addition to extended-release diltiazem in the form of coated beads. By contrast, the only Tiazac formulation that Biovail has ever sold contains only negligible amounts - that is, less than 1 percent - of uncoated immediate-release diltiazem outside the extended-release coated beads. Accordingly, Biovail did not need the '463 patent in order to manufacture and sell its existing FDA-approved formulation of Tiazac, and it could have continued to do so without infringing the '463 patent.

37. Because Biovail listed the '463 patent in January 2001, the FDA was no longer permitted to grant Andrx final approval to launch its generic Tiazac product in February 2001. Instead, Andrx was required to make a new certification to the FDA concerning the '463 patent, potentially further delaying Andrx's entry into the Tiazac market.

**c. Andrx Challenged - and the FDA Questioned - the [*14] Propriety of Biovail's Listing of the '463 Patent**

38. After Biovail's January 30, 2001, press release announcing that it had listed the '463 patent in the Orange Book, Andrx contacted DOV in order to seek a license for the patent. Citing its exclusive agreement with Biovail, DOV refused to discuss such an arrangement with Andrx.

39. On February 1, 2001, Andrx petitioned the FDA to require Biovail to de-list the '463 patent, alleging, among other things, that the '463 patent did not cover the Tiazac product Biovail currently marketed.

40. On February 7, 2001, and again on February 22, 2001, the FDA, consistent with its limited "ministerial role" in listing patents in the Orange Book, sought confirmation from Biovail that the '463 patent was properly listed for Tiazac.

41. On February 26, 2001, as the result of a court filing by Biovail in a federal lawsuit by Andrx to force Biovail to de-list the '463 patent, the FDA learned that Biovail's position was that the '463 patent covered a new formulation of Tiazac that Biovail developed only after it acquired the exclusive license to, and listed, the '463 patent, rather than covering the version of Tiazac that Biovail had been marketing. [*15]

42. On March 20, 2001, the FDA notified Biovail that its new formulation of Tiazac was not approved by the FDA under the Tiazac NDA, and that the FDA would de-list the '463 patent from the Orange Book unless Biovail amended its certification to indicate that the '463 patent claimed the version of Tiazac that the FDA had approved.

43. On March 26, 2001, Biovail submitted a signed declaration to the FDA stating that "Biovail hereby confirms its belief that the '463 patent is eligible for listing in the FDA's Orange Book in connection with Biovail's drug product Tiazac." This declaration did not clarify whether the term "Tiazac" as used by Biovail meant FDA-approved Tiazac (as the FDA required) or Biovail's revised form of the product, which practices the '463 patent.

44. As revealed in papers filed by the FDA in the federal lawsuit by Andrx to force Biovail to de-list the '463 patent, it is clear that the FDA understood Biovail's March 26, 2001, declaration as "affirming the '463 patent covers the currently approved Tiazac product" (emphasis added), and, on that basis, decided not to de-list the '463 patent from the Orange Book. Biovail, however, continued to assert that listing the [*16] '463 patent in the Orange Book was justified because it covers a revised form of Tiazac that Biovail believes falls within the Tiazac NDA, but which the FDA does not.

**d. Biovail Initiated a Patent Infringement Lawsuit against Andrx Based on the '463 Patent**

45. On February 16, 2001, Andrx filed a Paragraph IV certification with the FDA, certifying either that its generic Tiazac product does not infringe the '463 patent or that the patent is not valid. Sometime thereafter, Andrx notified Biovail of this certification.

46. On April 5, 2001, Biovail filed a lawsuit against Andrx alleging infringement of the '463 patent, thereby triggering a second 30-month stay under the Hatch-Waxman Act, and precluding the FDA from granting final approval to Andrx's ANDA for generic Tiazac.

**X. The Anticompetitive Effects of Biovail's Conduct**

47. As a result of Biovail's conduct as alleged herein, consumers have been deprived of the benefits of lower-priced generic competition that might have occurred had the FDA granted final approval to Andrx's generic Tiazac in February 2001. Andrx's generic Tiazac was expected to enter the market at a substantial discount to branded Tiazac, and it was expected [*17] to take almost all of its market share from branded Tiazac. In fact, Biovail's own forecasts projected that generic Tiazac would capture 40 percent of branded Tiazac sales within the first year.

48. The purpose or effect of Biovail's actions was to block Andrx or any other manufacturer of generic Tiazac from entering the relevant market and thereby lowering the price consumers pay for the drug.

49. Biovail's anticompetitive actions are not justified by any countervailing efficiencies.

**XI. Violations Alleged**

**Count 1 - Unlawful Asset Acquisition in Violation of Clayton Act § 7 and FTC Act § 5**

50. Biovail's acquisition of an exclusive license to the '463 patent constitutes an asset acquisition within the meaning of Section 7 of the Clayton Act, 15 U.S.C. § 18.

51. Prior to Biovail's acquisition of an exclusive license to the '463 patent, Biovail had monopoly power in the relevant market.

52. Biovail did not need a license - much less an exclusive license - to the '463 patent in order to make and sell its FDA-approved Tiazac product.

53. Biovail's acquisition of the exclusive license to the '463 patent raised substantial barriers to entry into the relevant market and gave Biovail [*18] the power to exclude competition, thereby protecting Biovail's monopoly in the relevant market, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5 of the FTC Act, 15 U.S.C. § 45.

**Count 2 - Unlawful Monopolization in Violation of FTC Act § 5**

54. Biovail has, and at all times relevant to this complaint has had, monopoly power in the market for Tiazac and generic bioequivalent versions of Tiazac in the United States.

55. Biovail engaged in acts to willfully maintain its Tiazac monopoly. These acts included, but were not limited to: (a) acquiring an exclusive license to the '463 patent for the purpose of listing it in the Orange Book; (b) wrongfully listing the '463 patent in the Orange Book as claiming Tiazac, in order to be eligible for an automatic 30-month stay of FDA approval for any generic Tiazac product; and (c) giving non-responsive answers to questions raised by the FDA about the propriety of listing the '463 patent in the Orange Book so as to avoid de-listing.

56. Biovail's monopolization raised substantial barriers to entry into the relevant market and gave Biovail the power to exclude competition, thereby depriving consumers of the benefits of [*19] lower-priced generic competition that might have occurred had the FDA not been precluded from granting final approval to Andrx's generic Tiazac.

57. Biovail's acts and practices described above are anticompetitive in nature and tendency, and constitute an unfair method of competition in violation of Section 5 of the FTC Act, 15 U.S.C. § 45.

WHEREFORE, THE PREMISES CONSIDERED, the Federal Trade Commission on this second day of October, 2002, issues its complaint against said respondent.

## ORDER:

### DECISION AND ORDER

The Federal Trade Commission ("Commission") having initiated an investigation of certain acts and practices by Respondent Biovail Corporation, hereinafter referred to as "Respondent," and Respondent having been furnished thereafter with a copy of a draft of Complaint that the Bureau of Competition proposed to present to the Commission for its consideration and which, if issued by the Commission, would charge Respondent with violations of Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18, and Section 5 of the Federal Trade Commission Act, as amended, 15 U.S.C. § 45; and

Respondent, its attorneys, and counsel for the Commission having thereafter executed an Agreement Containing [*20] Consent Order ("Consent Agreement"), containing an admission by Respondent of all the jurisdictional facts set forth in the aforesaid draft of Complaint, a statement that the signing of said Consent Agreement is for settlement purposes only and does not constitute an admission by Respondent that the law has been violated as alleged in such Complaint, or that the facts as alleged in such Complaint, other than jurisdictional facts, are true, and waivers and other provisions as required by the Commission's Rules; and

The Commission, having thereafter considered the matter and having determined that it had reason to believe that Respondent has violated the said Acts, and that a Complaint should issue stating its charges in that respect, and having accepted the executed Consent Agreement and placed such Consent Agreement on the public record for a period of thirty (30) days for the receipt and consideration of public comments, and having modified the Decision and Order in certain respects, now in further conformity with the procedure prescribed in Commission Rule § 2.34, 16 C.F.R. § 2.34, the Commission hereby issues its Complaint, makes the following jurisdictional findings and issues [*21] the following Decision and Order ("Order"):

1. Respondent Biovail Corporation is a corporation organized, existing and doing business under and by virtue of the laws of the Province of Ontario, Canada, with its office and principal place of business located at 2488 Dunwin Drive, Mississauga, Ontario, Canada and offices in the United States at 3701 Concorde Parkway, Chantilly, Virginia.

2. The Federal Trade Commission has jurisdiction of the subject matter of this proceeding and of Respondent, and the proceeding is in the public interest.

## ORDER

III.

IT IS ORDERED that, as used in this Order, the following definitions shall apply:

A. "Respondent" means Biovail Corporation, its directors, officers, employees, agents, representatives, predecessors, successors, and assigns; joint ventures, subsidiaries, divisions, groups, and affiliates controlled by Biovail Corporation; and the respective directors, officers, employees, agents, representatives, successors, and assigns of each.

B. "Commission" means the Federal Trade Commission.

C. "Assets To Be Divested" means all Exclusive Licenses to the DOV '463 patent in the Tiazac Field.

D. "ANDA" means an Abbreviated [*22] New Drug Application, as defined under 21 U.S.C. § 355(j) et seq.

E. "Divestiture Date" means the date on which the Respondent has fully completed the divestiture, pursuant to this Order, of the Assets To Be Divested to DOV.

F. "DOV" means DOV Pharmaceuticals, Inc., a Delaware corporation which has its principal place of business at 433 Hackensack Avenue, Hackensack, New Jersey 07601.

G. "DOV '463 Patent" means U.S. Patent No. 6,162,463 issued by the U.S. Patent and Trademark Office on December 19, 2000.

H. "Exclusive License" means a license of intellectual property that (a) restricts the right of the licensor to license the intellectual property to others or (b) grants to the licensee the right to enforce the intellectual property rights against others.

I. "FDA" means the U.S. Food and Drug Administration.

J. "NDA" means a New Drug Application, as defined under 21 U.S.C. § 355(b) et seq.

K. "Notification and Report Form" means the form set forth in the Appendix to Part 803 of Title 16 of the Code of Federal Regulations as amended.

L. "Person" means any natural person, partnership, corporation, company, association, trust, joint venture or other business or legal entity, [*23] including any governmental agency.

M. "Orange Book" means the U.S. Food and Drug Administration publication entitled "Approved Drug Products with Therapeutic Equivalence Evaluations."

N. "30-Month Stay" means the period of time established by 21 U.S.C. § 355(j)(5)(B)(iii) during which the FDA may not grant approval to an ANDA.

O. "Tiazac Field" means any extended release formulation of diltiazem that has been approved by the FDA for sale pursuant to NDA 20-401, or that is described in any ANDA for which approval is sought by referencing NDA 20-401.

P. "Dismissal Date" means the day after the date of the dismissal with prejudice of all of Respondent's claims relating to enforcement of the DOV '463 Patent, including those claims in Biovail Corporation v. Andrx Pharmaceuticals, Inc., Civ. No. 01-CV-6548 (S.D. Fla.).

IV.

**IT IS FURTHER ORDERED** that:

A. No later than thirty (30) days after this Order becomes final, Respondent shall divest, absolutely, in good faith, and only in a manner that receives the prior approval of the Commission, the Assets To Be Divested to DOV.

PROVIDED HOWEVER, Respondent shall not divest the Assets To Be Divested to DOV prior to the Dismissal [*24] Date.

B. Any consideration received by Respondent in exchange for the Assets To Be Divested must be a fixed amount. In particular, such consideration cannot be a function of any revenue generated for DOV by the Assets To Be Divested. Respondent shall not accept any share of royalties or other fees paid by licensees of the DOV '463 Patent in the Tiazac Field.

C. Respondent shall not enter into any agreement with DOV or any other Person that restricts the ability of such Person to provide information to the Commission.

D. Respondent shall place no restrictions on DOV's use of the Assets To Be Divested, and shall not assist in, advise regarding, or act so as to affect in any manner DOV's (1) enforcement of the DOV '463 Patent in the Tiazac Field, (2) licensing of the DOV '463 Patent in the Tiazac Field, or (3) determination of royalties or other fees paid by others for the DOV '463 Patent in the Tiazac Field.

E. Respondent shall not initiate, maintain, or be a party to any legal action to enforce the DOV '463 Patent in the Tiazac Field against any other Person.

F. In order to comply with Paragraph II.E., Respondent shall, within 5 days of signing this Agreement Containing [*25] Consent Order, use its best efforts, including by moving for appropriate judicial relief and attaching this Order, to achieve dismissal with prejudice of any and all claims relating to enforcement of the DOV '463 Patent in the Tiazac Field, including, but not limited to, any and all claims asserted in Biovail Corporation v. Andrx Pharmaceuticals, Inc., Civ. No. 01-CV-6548 (S.D. Fla.).

V.

**IT IS FURTHER ORDERED** that:

A. If Respondent has not divested, absolutely and in good faith and with the Commission's prior approval, the Assets To Be Divested within the time and in the manner required by Paragraph II. of this Order, the Commission may appoint a trustee to divest those assets to DOV. In the event that the Commission or the Attorney General brings an action pursuant to Section 5(l) of the Federal Trade Commission Act, 15 U.S.C. § 45(l), or any other statute enforced by the Commission, Respondent shall consent to the appointment of a trustee in such action. Neither the appointment of a trustee nor a decision not to appoint a trustee under this Paragraph shall preclude the Commission or the Attorney General from seeking civil penalties or any other relief available to it, [*26] including a court-appointed trustee, pursuant to Section 5(l) of the Federal Trade Commission Act, or any other statute enforced by the Commission, for any failure by Respondent to comply with this Order.

B. If a trustee is appointed by the Commission or a court pursuant to Paragraph III.A. of this Order, Respondent shall consent to the following terms and conditions regarding the trustee's powers, duties, authority, and responsibilities:

1. The Commission shall select the trustee, subject to the consent of Respondent, which consent shall not be unreasonably withheld. The trustee shall be a Person with experience and expertise in acquisitions and divestitures. If Respondent has not opposed, in writing, including the reasons for opposing, the selection of any proposed trustee within ten (10) days after receipt of written notice by the staff of the Commission to Respondent of the identity of any proposed trustee, Respondent shall be deemed to have consented to the selection of the proposed trustee.

2. Subject to the prior approval of the Commission, the trustee shall have the exclusive power and authority to divest the Assets To Be Divested.

3. Within ten (10) days after appointment [*27] of the trustee, Respondent shall execute a trust agreement that, subject to the prior approval of the Commission and, in the case of a court-appointed trustee, of the court, transfers to the trustee all rights and powers necessary to permit the trustee to effect the divestiture required by this Order.

4. The trustee shall have twelve (12) months from the date the Commission or court approves the trust agreement described in Paragraph III.B.3. to accomplish the divestiture. If, however, at the end of the

twelve-month period, the trustee has submitted a plan of divestiture or believes that divestiture can be achieved within a reasonable time, the divestiture period may be extended by the Commission, or, in the case of a court-appointed trustee, by the court; provided, however, the Commission may extend the period for no more than two (2) additional periods of twelve (12) months each.

5. The trustee shall have full and complete access to the personnel, books, records, and facilities related to the Assets To Be Divested, the Tiazac Field, or to any other relevant information, as the trustee may request. Respondent shall develop such financial or other information as such trustee may [*28] request and shall cooperate with the trustee. Respondent shall take no action to interfere with or impede the trustee's accomplishment of the divestiture. Any delays in divestiture caused by Respondent shall extend the time for divestiture under this Paragraph in an amount equal to the delay, as determined by the Commission or, for a court-appointed trustee, by the court.

6. The trustee shall use his or her best efforts to negotiate the most favorable price and terms available, subject to Respondent's absolute and unconditional obligation to divest expeditiously at no minimum price. The divestiture shall be made only in a manner that receives the prior approval of the Commission, and only to an acquirer that receives the prior approval of the Commission.

7. The trustee shall serve, without bond or other security, at the cost and expense of Respondent, on such reasonable and customary terms and conditions as the Commission or a court may set. The trustee shall have the authority to employ, at the cost and expense of Respondent, such consultants, accountants, attorneys, investment bankers, business brokers, appraisers, and other representatives and assistants as are necessary to [*29] carry out the trustee's duties and responsibilities. The trustee shall account for all monies derived from the divestiture and all expenses incurred. After approval by the Commission and, in the case of a court-appointed trustee, by the court, of the account of the trustee, including fees for his or her services, all remaining monies shall be paid at the direction of Respondent, and the trustee's power shall be terminated.

8. Respondent shall indemnify the trustee and hold the trustee harmless against any losses, claims, damages, liabilities, or expenses arising out of, or in connection with, the performance of the trustee's duties, including all reasonable fees of counsel and other expenses incurred in connection with the preparation for or defense of any claim, whether or not resulting in any liability, except to the extent that such losses, claims, damages, liabilities, or expenses result from misfeasance, gross negligence, willful or wanton acts, or bad faith by the trustee.

9. If the trustee ceases to act or fails to act diligently, a substitute trustee shall be appointed in the same manner as provided in Paragraph III.A. of this Order.

10. The Commission or, in the case [*30] of a court-appointed trustee, the court, may on its own initiative or at the request of the trustee issue such additional orders or directions as may be necessary or appropriate to accomplish the divestiture required by this Order.

11. The trustee shall have no obligation or authority to administer or maintain the Assets To Be Divested.

12. The trustee shall report in writing to the Commission every thirty (30) days concerning the trustee's efforts to accomplish the divestiture required by this Order.

13. Respondent may require the trustee to sign a customary confidentiality agreement; provided, however, such agreement shall not restrict the trustee from providing any information to the Commission.

**VI.**

**IT IS FURTHER ORDERED** that Respondent shall cease and desist from taking any action that initiates, maintains, or causes to be initiated or maintained, a 30-Month Stay of FDA Final Approval of ANDA No. 75-401.

**VII.**

**IT IS FURTHER ORDERED** that Respondent shall not seek, certify to, or take any action in furtherance of, the listing or continued listing of any patent in the Orange Book in violation of applicable law, including, but not limited to, 21 U.S.C. § 355(b) [*31] and (c)(2) and 21 C.F.R. § 314.53 (b)-(c), as interpreted by the FDA and the courts.

**VIII.**

**IT IS FURTHER ORDERED** that Respondent shall not, without providing prior written notification to the Commission in the manner described in Paragraph VII. ("Notification"), acquire a patent or an Exclusive License to a patent (hereinafter, the "Transaction"), if Respondent seeks or secures the patent's listing in the Orange Book for an NDA which has received FDA approval.

**IX.**

**IT IS FURTHER ORDERED** that Respondent shall provide the Notification required by Paragraph VI. in the form of a letter ("Notification Letter") submitted to the Secretary of the Commission and containing the following information: (1) the docket number and caption name of this Order; (2) a statement that the purpose of the letter is to give the Commission prior notification of a Transaction as required by Paragraph VI. of this Order; (3) identification of the parties participating in the Transaction; (4) a copy of each patent acquired pursuant to the Transaction ("Acquired Patent"); (5) for each Acquired Patent, identification of the Approved NDA(s) in respect to which the Acquired Patent is, or will be, submitted [*32] for listing in the Orange Book; (6) for each such Approved NDA identified in the previous subpart, identification of all Persons who have filed with the FDA an ANDA which references the Approved NDA; (7) a copy of all transactional documents; and (8) a copy of all documents which were prepared by or for any officer(s) or director(s) of Respondent for the purpose of evaluating or analyzing the Transaction.

Respondent shall submit the Notification Letter to the Secretary of the Commission at least thirty (30) days prior to consummating any such Transaction (hereinafter referred to as the "First Waiting Period"). If, prior to expiration of the First Waiting Period, representatives of the Commission make a written request for additional information or documentary material (as if within the meaning of 16 C.F.R. § 803.20), Respondent shall not consummate the Transaction until expiration of thirty (30) days following submission of such additional information or documentary material. Early termination of the waiting periods in this Paragraph may be requested and, where appropriate, granted by letter from the Commission's Bureau of Competition.

PROVIDED, HOWEVER, that, if the Transaction [*33] is subject to the reporting obligations of Section 7A of the Clayton Act, 15 U.S.C. 18a ("HSR Act"), and if a complete and accurate Notification Letter for such Transaction is appended to, and submitted with, a Notification and Report Form filed pursuant to the HSR Act for such Transaction, then Respondent shall not be required to comply further with Paragraph VI. of this Order with respect to such Transaction; except that nothing in this Order shall be construed to relieve Respondent of any obligation to comply with any requirement of the HSR Act.

**X.**

**IT IS FURTHER ORDERED** that:

A. Within sixty (60) days after Respondent has divested the Assets To Be Divested pursuant to Paragraph II.A. of this Order, Respondent shall submit to the Commission a verified written report setting forth in detail the manner and form in which it has complied with Paragraph II.A. of this Order. Respondent shall include in this compliance report copies of all written communications to and from parties to the divestiture, all internal memoranda, and all reports and recommendations concerning the divestiture.

B. Within sixty (60) days after the date this Order becomes final and every sixty (60) [*34] days thereafter until all applicable courts have dismissed with prejudice any and all claims of Respondent relating to enforcement of the DOV '463 Patent in the Tiazac Field, Respondent shall submit to the Commission a verified written report setting forth in detail the manner and form in which it intends to comply, is complying, and has complied with Paragraph II.F. of this Order.

C. One (1) year from the date this Order becomes final, annually thereafter on the anniversary of the date of this Order becoming final, and at such other times as the Commission may require, Respondent shall file a verified written report

2002 FTC LEXIS 56, *

with the Commission setting forth in detail the manner and form in which it is complying, and has complied, with Paragraphs II., IV., and V. of this Order.

### XI.

**IT IS FURTHER ORDERED** that Respondent shall notify the Commission at least thirty (30) days prior to any proposed change in Respondent, such as dissolution, assignment, sale resulting in the emergence of a successor corporation, or the creation or dissolution of subsidiaries or any other change in the corporation that may affect compliance obligations arising out of this Order.

### XII.

**IT IS FURTHER** [*35]   **ORDERED** that, for the purpose of determining or securing compliance with this Order, upon written request, Respondent shall permit any duly authorized representative of the Commission:

A. Access, during office hours and in the presence of counsel, to all facilities and to inspect and copy all books, ledgers, accounts, correspondence, memoranda and other records and documents in the possession or under the control of Respondent relating to any matters contained in this Order; and

B. Upon five (5) days' notice to Respondent and without restraint or interference from it, to interview officers, directors, employees, agents or independent contractors of Respondent relating to any matters contained in this Order.

### XIII.

**IT IS FURTHER ORDERED** that this Order will terminate on October 2, 2012.

ISSUED: October 2, 2002

# EXHIBIT K

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| IN RE NEURONTIN ANTITRUST LITIGATION | : | |
| | : | |
| JANE SALL and RICHARD BRAUSE, on behalf of themselves and all others similarly situated, | : | **MDL Docket No. 1479** |
| | : | Civil Action No. 02-3988(JCL) |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| PFIZER INC. and WARNER-LAMBERT COMPANY, | : | |
| | : | |
| Defendants. | : | |
| | : | |
| KATHY ZAFARANA, on behalf of herself and all others similarly situated, | : | |
| | : | |
| Plaintiff, | : | Civil Action No. 02-2741(JCL) |
| | : | |
| v. | : | **MEMORANDUM & ORDER** |
| | : | |
| PFIZER INC. and WARNER-LAMBERT COMPANY, | : | |
| | : | |
| Defendants. | : | |

**LIFLAND, District Judge**

_____These cases are two of approximately twenty purported class actions that

have been centralized in this Court by order of the Judicial Panel on Multidistrict

Litigation (the "MDL Panel") in which consumers and others allege that

Defendants Pfizer Inc. and Warner-Lambert Company ("Warner-Lambert" or

"Defendants") wrongfully prevented competitors from marketing generic versions

of gabapentin, sold by Defendants under the name Neurontin®. Before the Court

are the Motions of Plaintiffs Jane Sall and Richard Brause, on behalf of

themselves and others similarly situated, and Plaintiff Kathy Zafarana, on behalf

of herself and others similarly situated, to remand these cases to state court for

lack of federal subject-matter jurisdiction. Defendants oppose remand in both

cases. For the foregoing reasons, Plaintiffs' Motions will be denied.

### BACKGROUND

Gabapentin is the generic name for a drug product that is widely used to

treat epilepsy, pain, and neurodegenerative diseases. Relevant here are three

gabapentin patents held by Defendants: U.S. Patent No. 4,894,476 (the "'476

patent"), relating to a monohydrate form of gabapentin; U.S. Patent No. 5,084,479

(the "'479 patent"), relating to the use of gabapentin to treat neurodegenerative

diseases; and U.S. Patent No. 6,054,482 (the "'482 patent"), relating to a form of

gabapentin that contains less than a specified amount of a lactam impurity.

**A.     Sall**

On April 2, 2002, Plaintiffs Jane Sall and Richard Brause filed a state-law

consumer class action in the Superior Court of the State of California for the

County of San Francisco asserting violations of the California Business &

Professions Code, §§ 17200 et seq. ("Unfair Practices Act") arising out of unfair,

-2-

unlawful, and fraudulent business practices directed at keeping competing generic drug manufacturers from entering the California (and national) market to compete with Defendants' brand name drug Neurontin®. Specifically, Plaintiffs allege that Defendants acted improperly in listing certain Neurontin® patents in what is known as the Food and Drug Administration's "Orange Book" because the patents "do not claim or cover the form of gabapentin marketed by Defendants as Neurontin," and by filing "sham patent infringement lawsuits against horizontal generic competitors." Compl. ¶¶ 5-7. The Complaint asserts the following two causes of action: (1) Violation of California's Unfair Trade Practices Act Based Upon Illegal Anti-Trust Activity and (2) Equitable Relief from Unjust Enrichment by Defendants. Plaintiffs seek equitable relief in the form of restitution and/or disgorgement, a permanent injunction enjoining Defendants' continuing violations of the Act, and attorneys' fees/costs. Id. at 21-22.

On or about May 2, 2002, Defendants removed the action to the Northern District of California, pursuant to 28 U.S.C. § 1446, asserting both diversity and federal-question jurisdiction. Plaintiffs then filed a motion in the Northern District of California to remand the action to state court. Thereafter, the case was transferred to this Court pursuant to an order of the MDL Panel. Defendants then opposed Plaintiffs' Motion to Remand.

-3-

**B.    Zafarana**

On May 7, 2002, Plaintiff Kathy Zafarana filed an action in the Superior

Court of New Jersey alleging violations of the New Jersey Consumer Fraud Act,

N.J.S.A. 56:8-1 et seq. (hereinafter the "New Jersey CFA" or the "Act") and New

Jersey common law, on behalf of a nation-wide class of end-users who purchased

Neurontin®.  On May 29, 2002, Zafarana filed a First Amended Class Action

Complaint.  The Amended Complaint asserts claims for violations of the New

Jersey Consumer Fraud Act, N.J.S.A. § 56:8-1 et seq., Am. Compl. ¶¶ 122-30 and

for unjust enrichment, id. ¶¶ 131-41.  Plaintiff seeks declaratory relief, statutory

damages, restitution, disgorgement, constructive trust, an injunction to prevent

further alleged damage to class members, attorneys' fees, and costs.  Id. at 26-27.

The Amended Complaint alleges the following wrongdoing on the part of

Defendants: (1) "Even though the '476 Patent, the '479 Patent and the '482 Patent

do not claim or cover the form of gabapentin marketed by Defendants as

Neurontin, Defendants have listed these patents for Neurontin in the Orange Book

to prevent or delay the FDA from approving generic versions of Neurontin," id. ¶

62; (2) "Defendants have filed sham patent infringement lawsuits against

horizontal generic competitors seeking to manufacture and market generic

formulations, even though Defendants knew that these generic formulations of

Neurontin did not infringe any patent owned by or licensed to Defendants," id. ¶5; and (3) Defendants used their sales force "to actively, and illegally, promote off-label uses of Neurontin," id. ¶ 65.  As a result of this conduct, Plaintiff alleges that she and the "class" are "being denied the opportunity to pay for lower-cost generic versions of Neurontin, paying artificially high prices for Neurontin." Id. ¶ 127. She further complains that she and the "class" are "being denied material information regarding the circumstances surrounding their purchase of Neurontin so that they could make an informed decision as to whether to purchase Neurontin, an alternative therapy or nothing at all." Id.

Defendants removed this action on June 6, 2002, asserting federal-question jurisdiction.  Plaintiff then moved for remand, arguing that the claims asserted do not "arise under" federal law because no violation of any federal statute has been alleged and the claims are founded on the New Jersey CFA and the common law; because Plaintiff's rights to relief under state law do not require resolution of a substantial question of federal law; and because claims concerning off-label promotion are far removed from the pending patent litigation.

By Order of then-Magistrate Judge Chesler dated October 29, 2002, these cases were stayed pending resolution of motions for summary judgment served, filed, or pending in the related patent litigation.  Exempted from the stay were the

instant motions to remand.

## DISCUSSION

The Court must construe the removal statutes strictly and resolve all doubts in favor of remand.  Shamrock Oil and Gas Corp. v. Sheets, 313 U.S. 100, 108 (1941); Brown v. Francis, 75 F.3d 860, 865 (3d Cir. 1996); Abels v. State Farm Fire & Cas. Co., 770 F.2d 26, 29 (3d Cir. 1985); North Jersey Savings & Loan Assoc. v. Fidelity and Deposit Co. of Md., 125 F.R.D. 96, 100 (D.N.J. 1988).  The party seeking removal bears the burden of showing the propriety of removal by establishing the existence of federal subject-matter jurisdiction.  State of New Jersey v. City of Wildwood, 22 F. Supp. 2d 395, 400 (D.N.J. 1998) (citing Dukes v. U.S. Healthcare, Inc., 57 F.3d 350, 359 (3d Cir. 1995); Gateway 2000, Inc. v. Cyrix Corp., 942 F. Supp. 985, 989 (D.N.J. 1996)).

### I.     Federal-Question Jurisdiction

#### A.     Relevant Law

"A district court's federal-question jurisdiction . . . extends over 'only those cases in which a well-pleaded complaint establishes either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law' in that 'federal law is a necessary element of one of the well-pleaded . . . claims.'"  Christianson v. Colt

-6-

Indus. Operating Corp., 486 U.S. 800, 808 (1988).  "It is sufficient that the merits

of the litigation turn on a substantial federal issue that is 'an element, and an

essential one, of the plaintiff's cause of action.'"  U.S. Express Lines, Ltd. v.

Higgins, 281 F.3d 383, 389 (3d Cir. 2002).  A defense cannot create federal-

question jurisdiction.  Franchise Tax Bd. of Cal. v. Construction Laborers

Vacation Trust for So. Cal., 463 U.S. 1, 14 (1983).  Moreover, for a patent law

issue appearing on the face of a complaint to raise a substantial question of federal

law sufficient to create federal-question jurisdiction, the patent law issue must be

necessary to every theory under at least one claim.  Christianson, 486 U.S. at 810.

      A plaintiff cannot avoid removal by failing to plead necessary federal

questions.  Rivet v. Regions Bank of La., 522 U.S. 470, 475 (1998) (citing

Franchise Tax Bd. of Cal., 463 U.S. at 22).  "If a court concludes that a plaintiff

has 'artfully pleaded' claims in this fashion, it may uphold removal even though

no federal question appears on the face of the plaintiff's complaint."  Id.

## B.  Parties' Arguments

### 1.  Sall

      Plaintiffs seek to have this matter remanded, arguing that federal law is

secondary to the wrongs alleged under state law and that federal law would only

be invoked, if at all, in a defensive posture.  That is, Defendants presumably will

assert that the patents were valid and that infringement suits were appropriately filed. Plaintiffs further maintain that allegations concerning Defendants' "bad faith" conduct in filing patents in the Orange Book and misusing them to file infringement suits to keep cheaper generic Neurontin® from the market defeats federal-question jurisdiction because that theory does not require testing of the patent. Rather, recovery turns on whether Defendants had an "impure heart" when they filed patents in the Orange Book and then launched patent infringement suits against Abbreviated New Drug Application ("ANDA") filers based on those patents.

Defendants counter that federal-question jurisdiction exists because resolution of the claim that they have unlawfully precluded potential competitors from marketing generic versions of Neurontin® turns on substantial questions of federal patent law. Defendants argue that the sham litigation allegation depends on a determination that Defendants' patent infringement suits are objectively baseless and the improper listing allegation depends on a determination that a claim of patent infringement could not reasonably be asserted against an ANDA filer. Defendants add that Plaintiffs offer no alternative theories of liability that do not depend on patent law.

## 2.   **Zafarana**

Plaintiff Zafarana argues that allegations concerning Defendants acting in

bad faith when they filed patents in the Orange Book and then misusing them to

file infringement suits to keep cheaper generic Neurontin® from the market do not

involve Defendants' claim of federal-question jurisdiction.  The argument goes

that because Plaintiff may establish liability under the New Jersey CFA by

demonstrating that Defendants' conduct was unconscionable, deceptive, or

fraudulent, as those terms are defined by New Jersey courts–without resort to

testing the validity of Defendants' patents–there is no federal-question

jurisdiction.  Zafarana maintains that all she must establish to prevail is "the

improper insertion of the patents in the Orange Book."  Pl.'s Mem. in Support of

Remand at 10.

More recently, Zafarana sought leave to supplement "the record" with

evidence concerning Warner-Lambert's plea agreement in a suit brought by a

former employee under the federal False Claims Act.  The employee alleged that

Warner-Lambert unlawfully marketed and promoted Neurontin® to pharmacists

and physicians for non-FDA approved uses.  Zafarana argues that "[a] compelling

portion of this case sounds in the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-

1, et seq., and . . . that the defendants illegally marketed the drug Neurontin for

off-label, unapproved uses." Levinson Cert. ¶ 5.  The argument continues that

Warner-Lambert admitted to the conduct alleged by Plaintiff by pleading guilty to

criminal charges and by agreeing to pay $430 Million in monetary penalties

arising from its illegal and fraudulent promotion of unapproved uses for

Neurontin®, and such conduct deprived doctors of proper information upon which

to base their treatment decisions and instead led them to make decisions premised

upon misinformation or inducements provided by Warner-Lambert.  Id. ¶ 6.

Plaintiff maintains that this information is relevant insofar as it validates the illegal

promotion claim and "necessarily marginalizes any federal question issues in this

case."  Id. ¶ 7.

Defendants oppose Zafarana's request to supplement the record, arguing

that the plea agreement is totally irrelevant to the motion for remand.  The

argument goes that this Court has subject-matter jurisdiction because it must

address substantial questions of federal patent law to resolve Plaintiff's sham

litigation and Orange Book claims.  That is so irrespective of Plaintiff's alleged

off-label promotion of Neurontin®.  Defendants add that even if Plaintiff's

allegations about off-label marketing enabled certain class members to recover

damages for off-label sales, those allegations would not permit recovery of

damages for all sales of Neurontin® attributable to the difference in price between

-10-

the branded product and a potential generic competitor. The latter is recoverable only if Plaintiff can show that Warner-Lambert's patent litigation was a sham. Warner-Lambert thus maintains that Plaintiff's allegations concerning off-label promotion do not constitute an alternative theory that would allow the Court to award the recovery Plaintiff seeks without having to come to grips with issues of patent law.

## C.   Analysis

### 1.   Motion for Leave to "Supplement the Record"

The Court first turns to Zafarana's request for leave to supplement the record on its Motion to Remand. Zafarana's allegations of Warner-Lambert's efforts to promote off-label use of Neurontin® are set forth in the Amended Complaint. See e.g., Am. Compl. ¶ 65, 125. Evidence that bolsters or validates those allegations is not properly considered at this juncture; it is simply not relevant to whether, based on the face of the Amended Complaint, Plaintiff's claims arise under federal law. Accordingly, Zafarana's request for leave to supplement the record by way of evidence of Warner-Lambert's promotion of off-label use of Neurontin® is denied.

### 2.   "Arising Under" Jurisdiction

The complaints herein do not squarely assert a federal cause of action.

-11-

Thus, there is no federal-question jurisdiction under the first prong of

Christianson.  This Court must next determine whether the claims "arise under"

federal law.  Several courts have held in favor of remand in cases brought against

drug manufacturers for preventing generic competition.  See, e.g., Ciprofloxacin

Hydrochloride Antitrust Litig., 166 F. Supp. 2d 740 (E.D.N.Y. 2001) (allegations

of collusion to keep generic drug off the market in violation of California's Unfair

Competition Act); McGrew v. Schering-Plough Corp., No. 01-2311, 2001 WL

950790 (D. Kan. Aug. 6, 2001) (allegations of conspiracy to prevent competition

in violation of Kansas law); Altman v. Bayer Corp., 125 F. Supp. 2d 666

(S.D.N.Y. 2000) (allegations of collusion between name-brand manufacturer and

potential manufacturer of generic equivalent to keep generic version off the

market in violation of New York law); Drug Mart Pharmacy Corp. v. Abbott

Labs., No. 00-631 (E.D.N.Y. Aug. 28, 2000) (allegations of sham litigation and

illegal agreements did not "arise under" patent law for purposes of federal-

question jurisdiction).  See also In re Cardizem CD Antitrust Litig., 90 F. Supp. 2d

819 (E.D. Mich. 1999) (allegations of an "impure heart" when filing patent

infringement suit did not turn on substantial question of federal law sufficient to

create federal-question jurisdiction); Aetna United States Healthcare v. Hoechst

Aktiengesellschaft, 54 F. Supp. 2d 1042 (D. Kan. 1999) (allegations that

defendants acted solely to unlawfully delay and prevent competition turned on whether defendant had an "impure heart" when infringement suits were filed and not on validity of patents).

Other courts have concluded that there is federal-question jurisdiction where defendant brand and generic drug makers allegedly conspired to prop up a patent already held to be invalid in order to block generics from the market. E.g., In re Tamoxifen Citrate Antitrust Litigation, 222 F. Supp. 2d 326 (E.D.N.Y. Aug. 26, 2002); Koonan v. Barr Laboratories, Inc., No. C-01-0779 (N.D. Cal. June 25, 2001). In re Tamoxifen Citrate Antitrust Litigation involved allegations that a defendant patentee and defendant generic drug manufacturer entered into an agreement pursuant to which the patentee paid the generic manufacturer over twenty million dollars in return for the generic manufacturer (1) dropping its challenge to validity of the patent that was already found unenforceable and (2) agreeing not to market a generic version of the patented product until expiration of the patent. The court concluded that there was federal-question jurisdiction on the basis that "a [valid] patent holder is permitted to maintain his patent monopoly through conduct permissible under the patent laws," and, therefore, the plaintiffs were required to show that the defendants' conduct was impermissible under the patent laws. Id. at 331.

_____Still another court concluded that federal-question jurisdiction existed on facts nearly identical to this case.  In Stuart v. Pfizer Inc., C.A. No. 2:02-2511, at *15 (W.D. Tenn. Oct. 2, 2002), the plaintiffs alleged that Pfizer and Warner-Lambert engaged in anti-competitive conduct by submitting patents on formulas not equivalent to Neurontin® for inclusion in the FDA's Orange Book and by filing frivolous patent infringement lawsuits against potential competitors. Plaintiffs asserted the following claims for relief:

- violation of Tennessee Unfair Trade Practices Act, Tenn. Code Ann. § 47-25-101 et seq.;
- violation of Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-101 et seq.;
- common law monopolization of the market for Neurontin; and
- unjust enrichment as a result of anti-competitive conduct.

The court concluded that federal-question jurisdiction existed because "[a] determination of sham litigation requires first and foremost resolution of an essential question of federal patent law," and that plaintiff had failed "to offer an alternative theory to support its claims . . . which would not require resolution of federal patent law." Id. at 15-16.  The court reasoned that even if a patent holder files an infringement suit with an "impure heart," as Plaintiffs claim here, a determination that the patent at issue is valid undermines such a claim of fraudulent litigation and legitimizes the patent holder's efforts to market its

-14-

product. Id. at 15 (citing Prof'l Real Estate Investors, Inc. v. Columbia Pictures
Indus., Inc., 508 U.S. 49, 59 (1993)). A claim of sham litigation, without some
other anti-competitive conduct, was held not to justify remand. In so holding, the
court distinguished cases involving agreements, stipulations, or consent judgments
signaling defendants' collusion to maintain a monopoly.

Plaintiffs here seek relief pursuant to California's Unfair Practices Act, New
Jersey CFA, and the common law. To establish liability under California's Unfair
Practices Act, a plaintiff may prove that a defendant's conduct was unlawful,
unfair, or deceptive. Cel-Tech Communications, Inc. v. Los Angeles Cellular
Tele. Co., 20 Cal.4th 163, 180 (1999). Whether a given business practice is
"unfair" under California law broadly "involves an examination of [that practice's]
impact on its alleged victim balanced against the reasons, justification, and
motives of the alleged wrongdoer." Podolosky v. First Healthcare Corp., 50 Cal.
App. 4th 632, 647 (1996). An "unlawful" business practice in violation of §17200
is "anything that can properly be called a business practice and that at the same
time is forbidden by law." People v. McKale, 25 Cal.3d 626, 634 (1979) (quoting
Barquis v. Merchants Collection Ass'n, 7 Cal.3d 94, 113 (1972)). Finally, the
deceit prong requires a showing of a likelihood of deception. Committee on
Children's Television, Inc. v. General Foods Corp., 35 Cal.3d 197, 210-11 (1983).

-15-

Similarly, relief pursuant to the New Jersey CFA turns on "unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact." N.J.S.A. §56:8-1 et seq.

Plaintiffs charge Defendants with attempting to maintain an illegal monopoly that was broader than that to which their patents, even if valid, entitled them. Defendants argue that Plaintiffs' sham litigation claims–as alleged in the Complaints–turn on whether, as a matter of federal patent law, there was a reasonable basis for the patent infringement actions brought by Defendants against potential generic competitors. In other words, this Court cannot determine that the infringement actions are sham without (at the very least) resolving questions of patent infringement (or validity) against the patentee. Then, the Court must also examine whether the infringement actions were instituted without regard to the merits of the underlying cases.[1]

Defendants further urge that the theory of liability based on alleged improper listing of patents in the Orange Book requires resolution of an issue of federal patent law insofar as it turns on the provision that

---

[1] As all litigators know, an objectively baseless lawsuit is far different from a lawsuit that did not turn out to be a winner.

-16-

> [t]he applicant shall file with the application the patent number and
> the expiration date of any patent which claims the drug for which the
> applicant submitted the application or which claims a method of using
> such drug and with respect to which a claim of patent infringement
> *could reasonably be asserted* if a person not licensed by the owner
> engaged in the manufacture, use or sale of the drug.

21 U.S.C. § 355(b)(1) (emphasis added).  A determination on whether a claim of

patent infringement could "reasonably be asserted" against an ANDA filer,

according to Defendants, invokes federal-question jurisdiction.

Finally, as to Zafarana's allegations concerning Warner-Lambert's

promoting off-label use of Neurontin®, Warner-Lambert challenges the

sufficiency of Plaintiff's allegations of harm due to such conduct.  Warner-

Lambert also argues that the off-label promotion is wholly separate from

Zafarana's  principal claim that Defendants improperly prevented all those who

purchased Neurontin®–even for approved uses–from having access to cheaper

generic versions.  It follows, according to Defendants, that the off-label promotion

is not an alternate theory that would allow the Court to decide claims of anti-

competitive conduct without resolving substantial issues of patent law.

This Court concludes that there is federal-question jurisdiction in both <u>Sall</u>

and <u>Zafarana</u>.  The Court is satisfied that the state-law anti-competition claims, as

alleged by Plaintiffs, cannot be resolved without deciding substantial issues of

federal law, i.e., the validity, enforceability, and infringement of defendants'

-17-

patents.  Defendants' ability to stave off competition stands or falls on the scope of

its patents and the rights flowing therefrom.  A determination of the scope of

Defendants' patents is a necessary part of Plaintiff's claims in the first instance

and not, as Plaintiffs argue, merely invoked as a defense.  In short, the legitimacy

of Defendants' conduct depends directly on the scope of the patents.  The

propriety of listing patents in the Orange Book likewise depends directly on the

scope of the claims of the patents.  Thus, this Court agrees with the reasoning and

result of <u>Stuart v. Pfizer Inc.</u>

Finally, the Court concludes that allegations concerning promotion of off-

label use are qualitatively distinct so as not to create an alternate theory of

recovery for Plaintiffs' claims relating to generic competition.[2]

## II.     Diversity Jurisdiction

The Court will next consider whether there is diversity jurisdiction in <u>Sall</u>.

Diversity jurisdiction exists where there is diversity of citizenship and "where the

matter in controversy exceeds the sum or value of $75,000, exclusive of interest

and costs."  28 U.S.C. § 1332(a).  The Supreme Court has interpreted 28 U.S.C. §

1332's "matter in controversy" language as requiring that each plaintiff's claim

---

[2]The Court does not express an opinion whether allegations concerning promotion of off-
label use of Neurontin® are sufficient to state a claim upon which relief may be granted.

satisfy the jurisdictional amount.  <u>Zahn v. Int'l Paper Co.</u>, 414 U.S. 291, 294-95

(1973); <u>Snyder v. Harris</u>, 394 U.S. 332, 336-37 (1969).

Defendants urge that there is diversity jurisdiction here because Plaintiffs

are residents of California, Defendants are Delaware corporations with their

principal places of business in New York and New Jersey, and because the cost to

Defendants of an injunction compelling them to discontinue multiple major patent

infringement litigations would far exceed $75,000.  Defendants initially requested

that the Court stay its consideration of this issue because the United States

Supreme Court had granted a petition for certiorari in <u>Ford Motor Co. v.</u>

<u>McCauley</u>, 534 U.S. 1126 (2002), concerning

> [w]hether the cost of the defendant of complying with an injunction
> sought by a plaintiffs' class may satisfy the amount-in-controversy
> requirement of the diversity statute, where such compliance would
> cost the defendant more than the $75,000 minimum whether it
> covered the entire class or any single member of the class.

However, the Supreme Court subsequently withdrew certiorari as "improvidently

granted."  <u>Ford Motor Co. v. McCauley</u>, 537 U.S. 1 (2002).  This Court thus turns

to Third Circuit law for guidance on this issue.

Claims of each class member--and not merely each named plaintiff--must

satisfy the jurisdictional amount.  In <u>Packard v. Provident Nat'l Bank</u>, 994 F.2d

1039, 1045 (3d Cir. 1993), the Third Circuit reaffirmed that "[i]t is well settled

**III.    Costs**

Lastly, Plaintiff Zafarana requests that "just costs and any actual expenses, including attorneys' fees, incurred as a result of the removal" be assessed against Defendant on the theory that removal was not "fairly supportable." Int'l Brotherhood of Elec. Workers, Local 640 v. Dueck, 148 F. Supp. 2d 955, 964 (D. Ariz. 2000). That request is denied, consistent with this Court's conclusion that removal was proper.

**CONCLUSION**

For the foregoing reasons, the motions to remand these cases for lack of subject-matter jurisdiction will be denied.

Accordingly, **IT IS** on this 7th day of January 2005,

**ORDERED** that the Motion of Plaintiffs Jane Sall and Richard Brause, on behalf of themselves and others similarly situated, for leave to supplement the record is denied; and it is further

**ORDERED** that the Motion of Plaintiffs Jane Sall and Richard Brause, on behalf of themselves and others similarly situated, to remand for lack of subject-matter jurisdiction is denied; and it is further

**ORDERED** that the Motion of Plaintiff Kathy Zafarana, on behalf of herself and others similarly situated, to remand for lack of subject-matter

-21-

jurisdiction is denied; and it is further

**ORDERED** that the Motion of Plaintiff Kathy Zafarana, on behalf of

herself and others similarly situated, to award costs and expenses incurred as a

result of removal is denied.

/s/ John C. Lifland, U.S.D.J.