or reimbursed eligible Trust participants' prescription drug benefits for Neurontin in Alaska and elsewhere other than for resale and was injured by the illegal conduct alleged herein.

11.    Plaintiff Brian Krah is an Illinois resident. He was prescribed and purchased Neurontin for the treatment of generalized anxiety disorder, an off-label use for which Neurontin is not approved.

12.    Defendant Pfizer, Inc. is a Delaware corporation with its principal place of business at 235 East 42nd Street, New York, New York. Pfizer is principally engaged in the manufacture and sale of pharmaceuticals and is one of the largest pharmaceutical companies in the United States.

13.    Defendant Warner-Lambert Company was acquired in June 2000 by Pfizer. This acquisition included Warner-Lambert's Parke-Davis division. Prior to the acquisition, Warner-Lambert was a Delaware corporation that maintained its principal place of business at 201 Gabor Road, Morris Plains, New Jersey. In 1993, Warner-Lambert received FDA approval to market Neurontin in the United States and did so through its Parke-Davis division. After the acquisition, the marketing of Neurontin continued to be managed at the merged-out companies' Morris Plains, New Jersey location.

## III.    JURISDICTION AND VENUE

14.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, because this action arises under the laws of the United States, and 28 U.S.C. § 1964(c), because this action alleges violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962.

15.    This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the violations of the New Jersey Consumer Fraud Act, the Uniform Deceptive Trade Practices Act, and Plaintiffs' allegations of common law fraud and unjust enrichment.

- 5 -

16.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)

and (c), and 18 U.S.C. § 1965. Defendants implemented their fraudulent and deceitful marketing

scheme in this district, as well as nationwide, through physicians, sales representatives, and class

members who reside and transact business in this district. In addition, *In re Neurontin Antitrust*

*Litigation*, MDL 1479, is currently pending in this district in the Newark Vicinage. Furthermore,

Defendants Parke-Davis and Warner-Lambert had their principal places of business in this

district during all times relevant to this Complaint.

## IV.     FACTUAL ALLEGATIONS

### A.     "Off-Label" Uses for Prescription Drugs

17.     A pharmaceutical company may not market a new drug in the United

States until the FDA approves it as safe and effective for specific indications at specified

dosages. The indication and dosages are set forth in the drug's labeling, which the FDA also

approves.

18.     Physicians may prescribe drugs for unapproved uses. Such uses are

deemed "off-label," because they are not listed on the FDA-approved labeling for the drug.

Pharmaceutical companies may not freely market their products for off-label uses. Although the

Food and Drug Administration Act of 1997 ("FDAMA"), 21 U.S.C. § 360aaa, *et seq.*,

specifically authorizes a pharmaceutical company to disseminate "written information

concerning the safety, effectiveness, or benefit of a use not described in the approved labeling of

a drug or device," *id.* § 360aaa(a), this written information must comply with several strict

requirements. The manufacturer must submit an application to the FDA seeking approval of the

drug for the off-label use; the manufacturer must provide the materials its plans to use to market

the drug for off-label uses to the FDA prior to dissemination; the materials must be in unabridged

form; and the manufacturer must include disclosures that the materials pertain to an unapproved

-6-

use of the drug, and, if the FDA deems it appropriate, "additional objective and scientifically sound information . . . necessary to provide objectivity and balance." 21 U.S.C. § 360aaa(b)(1)-(6); *id.* § 360aaa-1; *id.* § 360aaa(c). The dissemination of information in violation of these provisions violates the Food, Drug and Cosmetic Act, as amended by the FDAMA. 21 U.S.C. § 331(z).

        19.    Although the FDAMA permits pharmaceutical companies to disseminate to health care practitioners qualified forms of "written information concerning the safety, effectiveness, or benefit of a use not described in the approved labeling of a drug," 21 U.S.C. § 360aaa(a), manufacturers are permitted to provide only "authorized information" in the form of unabridged peer-reviewed articles or qualified reference publications. *Id.* § 360aaa-1. The FDAMA also requires pharmaceutical companies to furnish federal regulators with advance copies of the information they disseminate. 21 U.S.C. § 360aaa.

**B.**    **Neurontin**

        20.    In December 1993, the FDA approved Neurontin as "adjunctive therapy" for the treatment of certain types of these seizures in adult patients suffering from epilepsy. "Adjunctive therapy" means that the drug cannot be prescribed by itself for the treatment of epilepsy. Rather, it is prescribed in the event that a primary anti-epilepsy drug – or an epilepsy monotherapy – is not successful. The FDA approved labeling of Neurontin stated that the drug is only effective at does ranging from 90 to 1800 mg/day.

        21.    Neurontin has also been approved to treat post-herpetic neuralgia, or pain resulting from nerve damage caused by shingles.

C.    **Parke-Davis's Deliberate Decision to Avoid FDA Approval and Market Neurontin Off-Label**

22.    By the time the FDA approve Neurontin in 1993, Defendants had only five years remaining before their patent for the drug expired. This left Defendants with only a small window of exclusivity for this drug during which it could recap monopolistic profits from its sale. After the expiration of the Neurontin patent, Defendants would be forced to share the market for Neurontin with generic drug manufacturers, substantially reducing their profits and their ability to keep Neurontin's retail price high.

23.    At the time Parke-Davis filed its NDA ("New Drug Application") with the FDA to solicit its approval for Neurontin, Defendants intended Neurontin to be used to treat conditions other than epilepsy. In the early 1990s, Defendants filed several patent applications for Neurontin as a treatment for depression, neurogenerative disease, mania, bipolar disease, and anxiety. Notwithstanding the claims made in their patent applications, Defendants never sought FDA approval for the use of Neurontin to treat any of these conditions.

24.    With approximately two million epileptics in the United States, the market for adjunctive therapy for epilepsy patients is and has always been limited. In comparison, the market for the other uses of Neurontin contemplated by Defendants – pain management, psychiatric disorders, anxiety and depression – were virtually unbounded. Defendants knew that if these markets could be tapped, they could enjoy enormous profits from sales of the drug.

25.    Initially, Defendants intended to file supplemental NDAs in order to expand Neurontin's approved indications, including applications for monotherapy (which would permit Neurontin to be prescribed by itself for epilepsy treatment) and for various psychiatric and neurological indications. However, by 1995 Defendants recognized that it would be uneconomical to assume the expense and time necessary to conduct clinical trials required to

- 8 -

prove that Neurontin was safe and effective for these uses. Assuming Neurontin could be proven

to be safe and effective, the near term expiration of the patent meant that generic manufacturers

of Neurontin would reap much of the reward of proving Neurontin could be safely used for other

indications.

26. After performing extensive economic analysis, senior officials at Parke-

Davis determined that it was not sufficiently profitable for Defendants to obtain FDA approval

for Neurontin's alternative uses. Instead, Parke-Davis officials developed a strategy that would

allow Defendants to avoid the costs of proving that Neurontin was safe and effective for these

other uses, while allowing Defendants to compete in the lucrative off-label markets. Taking

advantage of a loophole in the FDA's off-label marketing rules, Defendants decided to employ a

"publication strategy," by which they would promote Neurontin by the massive distribution of

publications supposedly written by independent researchers that purportedly described the

scientific evaluation of Neurontin. Another advantage of this strategy, from Defendants'

perspective, was that it could be employed immediately – there was no need to wait for the

results of scientifically conducted clinical trials to determine if Neurontin was actually effective

in the treatment of these conditions.

27. Federal laws and regulations do not permit pharmaceutical companies to

promote drugs for unapproved uses, except in the manner described in Paragraphs 17 and 18.

Defendants were allowed to distribute publications authored by third parties that described

results of off-labeled use of Neurontin, provided that such material was only distributed in

response to unsolicited requests from physicians. Defendants decided to exploit this narrow

exception by creating events and programs that would insure a smooth flow of off-label

promotional material from employees and independent contractors under Defendants' control to physicians, while allowing Defendants to deny that they had solicited off-label usage.

28.    Marketing executives at Parke-Davis' headquarters in Morris Plains, New Jersey and in its five regional customer business units (CBUs) knew that Defendants were not supposed to create or design the contents of the communications that would be distributed pursuant to the "publication strategy" or do anything to generate the practicing physicians' interest in receiving such communications. As demonstrated below, Defendants ignored these legal requirements and instead put into effect a pervasive pattern of illegal conduct lasting from at least 1994 through 1998, and Plaintiffs believe, up to the present.

29.    Significant ingenuity and resourcefulness were necessary to execute this unlawful scheme without detection. Faced with the fact that their "publication strategy" required publications from independent physicians when no such publications existed, Defendants hired nonphysician technical writers to create articles for medical journals and then paid actual specialists to be the articles' "authors." Faced with the fact that federal laws and regulations prevented its normal marketing force from delivering the off-label message, Defendants trained their medical liaisons – technical employees who were supposed to provide balanced, scientifically legitimate information to doctors – to sell off-label and solicit interest in off-label uses. In order for a "publication strategy" to increase usage of a drug, Defendants had to have a large group of doctors interested in experimenting on patients, and an even larger group of doctors who were interested in receiving information about those experiments. Defendants generated both groups by liberally distributing payments to groups of physicians through "consultants" meetings, speakers bureaus, medical education seminars, grants, "studies," advisory boards and teleconferences. Further details of these programs are described below.

- 10 -

30.    Parke-Davis carried out its scheme by employing the following strategies,

among others:

- forming a nationwide network of employees falsely referred to as "medical liaisons,"
  whose actual duties consisted entirely of conventional direct sales activities and which
  did not include any legitimate scientific activity;

- paying illegal kickbacks to physicians who prescribed large amounts of Neurontin for
  off-label purposes to patients;

- directly and illegally soliciting physicians to write prescriptions for off-label uses;

- making false statements to physicians and pharmacists concerning the efficacy and safety
  of Neurontin for off-label uses;

- paying or offering gratuities to Defendants' employees in order to procure their silence;
  and

- actively training Defendants' employees to avoid detection of their activities by the FDA.

**D.    Defendants' Use of Medical Liaisons to Promote Off-Label Uses for
Neurontin**

31.    Defendants' normal sales force was not permitted to promote off-label

uses of Neurontin to its physician customers. The FDA, however, permitted drug company

representatives to provide balanced, truthful information regarding off-label usage if specifically

requested by a physician and if there were no attempt to solicit such information by the drug

company. Starting in 1995, Defendants hired medical liaisons and trained them aggressively to

solicit requests for off-label information from physicians. Having opened this door to a

conversation about Neurontin, medical liaisons would then engage in full-scale promotion of

Neurontin's off-label uses, including by providing non-scientific, anecdotal information designed

to convince physicians that off-label usage of Neurontin was safe and effective. In effect, Parke-

Davis used the medical liaisons as a surrogate sales force who marketed Neurontin for off-label

- 11 -

uses. Indeed, medical liaisons were selected and promoted based on their ability to sell, and sales training was encouraged.

### 1.    Training of Medical Liaisons to Misrepresent Neurontin's Uses

32.     With full knowledge that the use of medical liaisons to market Neurontin for off-label purposes was unlawful, Defendants nonetheless intentionally encouraged their personnel to engage in such behavior. When he was hired by Defendants in March of 1996, Dr. Franklin, the whistleblower, was specifically asked whether he would have difficulty working in gray areas or bending rules. High level personnel within Parke-Davis acknowledged to Dr. Franklin that the use of medical liaisons by the South Central, North Central and North East CBUs were thinly disguised methods of evading the FDA's policies on off-label promotion.

33.     Similarly, on April 16, 1996, at a training session for medical liaisons, Defendants' in-house lawyers stopped the videotaping of a medical liaison training session to advise the liaisons that, notwithstanding formal policies to the contrary, liaisons could "cold call" physicians so long as they obtained executed request forms – or forms that supposedly verified that the physician had initiated the meeting – by the end of the call. The liaisons were informed that the request forms could be filled out by Defendants' sales representatives instead of the doctors. Company lawyers also informed the liaisons that there was no need to present balanced information to the customers, and that liaisons should always remember that sales were necessary in order to keep the company profitable.

34.     Continuing their off-camera instruction, Defendants' lawyers told medical liaisons that there really was no definition of "solicitation," and that there were methods to induce physicians to inquire about off-label uses. In effect, the lawyers' message went as follows: once a medical liaison got a meeting with a physician, the liaison could and should use a

- 12 -

number of different techniques to insure that he or she gave the physician unscientific, anecdotal information about off-label uses, even if such information were initially unsolicited.

35.     Confirming the suspect nature of their instructions, the lawyers warned the liaisons under no circumstances should any information about off-label uses be put in writing.

36.     Defendants repeatedly reinforced the instruction that medical liaisons should market and sell Neurontin. In a teleconference on May 24, 1996, John Ford, a senior marketing executive at Parke-Davis' Morris Plains headquarters, told medical liaisons that Neurontin must be marketed for monotherapy, pain, bipolar disease, and other psychiatric uses, all of which were off-label. Because only they could discuss these matters, Ford conceded, medical liaisons effectively had to do Defendants' marketing and sales work.

37.     At another meeting with the medical liaisons, Ford put his instructions in even blunter terms:

> "I want you out there every day selling Neurontin. Look this isn't just me, it's come down from Morris Plains that Neurontin is more profitable . . . . We all know Neurontin's not growing adjunctive therapy, beside that is not where the money is. Pain management, now that's money. Monotherapy, that's money. We don't want to share these patients with everybody, we want them on Neurontin only. We want their whole drug budget, not a quarter, not half, the whole thing . . . . We can't wait for them to ask, we need to get out there and tell them up front . . . . That's where we need to be holding their hand and whispering in their ear Neurontin for pain, Neurontin for monotherapy, Neurontin for bipolar, Neurontin for everything . . . . I don't want to see a single patient coming off Neurontin until they have been up to at least 4800mg/day. I don't want to hear that safety crap either, have you tried Neurontin, every one of you should take one just to see there is nothing, it's a great drug."

38.     The pitch medical liaisons were to use with physicians was rife with both misrepresentations and marketing messages. Defendants trained medical liaisons to proceed through what was deemed the "Neurontin Cold Call Story" when discussing the drug with a

- 13 -

neurologist, general practitioner, or psychiatrist who was a target for off-label use. The "story"
went as follows:

- Mention that you are the eyes and ears of Parke-Davis research and that you are gathering
  clinical information;

- Then ask general questions about the nature of the practice;

- Mention Neurontin and its approved uses, but dismiss them as old news;

- Then ask leading questions about the number of pain patients that the practice sees;

- Then ask a series of questions that determine the practice profile for all of the potential
  off-label uses;

- Next reveal that Parke-Davis "has a great deal of information about the fantastic response
  rate of patients on Neurontin in all of these disease states";

- Move into a discussion of the clinical trials that this information is demanding;

- Mention the "90-95% response rate that we are seeing in more than 80% of patients";

- Present the doctor with any publications that are available and point out that many
  common drugs for pain treatment are in few if any publications;

- Ask the physician to place some patients on Neurontin and tell them that the medical
  liaison will stay in touch to help develop any case reports;

- Mention that case reports can be lucrative and can lead to clinical trials;

- Offer to do a presentation and luncheon for the entire practice or a group of his friends
  that will detail all of the "data" we have;

- Invite the physician to consultant meetings in the future and point out that they pay $250
  plus a nice trip or meal in the city; and

- If a sales representative is present, he or she should close the sale by asking the physician
  to prescribe Neurontin to the next patient he or she sees.

      39.    During a training session for medical liaisons, Dr. Franklin witnessed the

scope of the off-label conditions for which Parke-Davis intended to market Neurontin. One slide

shown at the session, entitled "Anecdotal Uses of Neurontin," included the following as off-label

- 14 -

conditions for which medical liaisons were instructed to promote Neurontin: reflex sympathetic

dystrophy, peripheral neuropathy, diabetic neuropathy, trigeminal neuralgia, post-herpetic

neuralgia, essential tremor, restless leg syndrome, attention deficit disorder, periodic limb

movement disorder, migraine, bipolar disorder, amyotrophic lateral sclerosis (Lou Gehrig's

Disease); and drug or alcohol withdrawal seizures.

   40. Executives explained that "this list was very important to the company but

that it makes Neurontin look like snake oil, so preempt the laughter by telling your physicians

that 'I'm embarrassed to show you the next slide because it makes Neurontin look like snake oil,

but the fact is, we are seeing extraordinary results, in some cases up to 90% response in all of

these conditions,' that will get their attention." This executive went on to say that, "notice all the

studies we talk about, nothing gets a doc more interested in a drug than a study."

   41. None of the claims as to the medical efficacy of Neurontin for the

treatment of any of these conditions has been substantiated.

   2. **Misrepresentations Made by Medical Liaisons**

   42. As discussed above, medical liaisons were trained to "cold call"

physicians, particularly high decile physicians (those who saw the most patients in a given

specialty), and sell them on the off-label benefits of Neurontin. Central to this strategy were

myriad misrepresentations. First, with full approval of Defendants' marketing officials,

including John Ford, Phil Magistro, and John Krukar, medical liaisons routinely misrepresented

themselves as specialists in the specific drug they were presenting at a particular meeting. To

wit, medical liaisons could be experts in anti-epileptic drugs at one moment and an hour later be

an expert in cardiac medication. Medical liaisons were also encouraged to represent themselves

as medical researchers, even thought they neither conducted medical research nor analyzed

medical research performed by others, or as physicians, and even though they had no such

- 15 -

qualifications. Sales personnel were instructed to introduce medical liaisons as scientific

employees who were given momentary leave of their academic duties to make an individual

presentation to the physician; the fact that the liaisons were part of Defendants' standard

marketing detail was intentionally hidden.

    43.  Extensive misrepresentations were also made regarding the scientific

information concerning off-label usage of Neurontin. The following misrepresentations relating

to off-label usage of Neurontin were routinely made to high decile physicians in the North East

and other CBUs with the knowledge and consent of persons such as Phil Magistro, John Krukar,

and other marketing personnel among Defendants' employees. According to Dr. Franklin,

medical liaisons were trained to make these misrepresentations in 1995 and 1996, and

Dr. Franklin believes that this conduct continued after his departure from Warner-Lambert in

1996:

- *Bipolar Disorder.* Medical Liaisons informed psychiatrists that early results from clinical trials evaluating Neurontin for the treatment of bipolar disorder indicated a ninety percent (90%) response rate when Neurontin was started at 900mg/day dosage and increased to a dosage of 4800mg/day. No such results existed. Nor was any type of clinical trial being conducted other than a pilot study. There were no clinical trials or studies indicating that Neurontin was safe or effective up to 4800mg/day. Indeed, Parke-Davis was in possession at this time of clinical trial evidence which showed that there was no dose response difference between patients who received 600 mg, 1200 mg and 2400 mg/day. Any data relating to the use of Neurontin in bipolar disorder was strictly anecdotal and of nominal scientific value. Furthermore, most of the published reports on this topic had been written and commercially sponsored by Parke-Davis, although this fact was hidden. Medical liaisons were trained to inform psychiatrists that there were no reports of adverse effects for Neurontin when used for psychiatric purposes. In fact, such reports had been reported to Parke-Davis personnel but Parke-Davis attempted to hide such reports from physicians.

- *Peripheral Neuropathy, Diabetic Neuropathy, and Other Pain Syndromes.* Medical liaisons were trained and instructed to report that "leaks" from clinical trials demonstrated that Neurontin was highly effective in the treatment of various pain syndromes and that a ninety percent (90%) response rate in the treatment of pain was being reported. No such body of evidence existed. Nor was there any legitimate pool of data from which a response rate, much less a ninety percent (90%) response rate,

could be calculated. Medical liaisons were trained to claim support for these findings in inside information about clinical trials where no such information existed. The only support for these claims were anecdotal evidence of nominal scientific value. Many of the published case reports had been created and/or sponsored by Parke-Davis in articles which frequently hid Parke-Davis's involvement in the article's creation. Parke-Davis's payment for the creation of these case reports was also hidden from physicians.

- *Epilepsy Monotherapy.* Medical liaisons were strongly encouraged to push neurologists to prescribe Neurontin as the sole medication to treat epilepsy, even though studies only found it safe and effective as adjunctive therapy. Medical liaisons were trained to inform neurologists that substantial evidence supported Parke-Davis' claim that Neurontin was effective as monotherapy. In fact, Parke-Davis knew that clinical trials on point had proven inconclusive. One of Parke-Davis' clinical trials, number 945-82, demonstrated that Neurontin was not an effective monotherapy agent. The vast majority of patients in the study taking Neurontin were unable to continue with Neurontin alone. The same study showed that there was no effective difference between administration of Neurontin at 600, 1200 or 2400mg. Notwithstanding this data, the company continued to claim that physicians should use Neurontin at substantially higher doses than indicated by the labeling. Indeed, although medical liaisons routinely claimed Neurontin to be effective as monotherapy, in 1997 the Food and Drug Administration refused to find Neurontin to be a safe and effective monotherapy.

- *Reflex Sympathetic Dystrophy ("RSD").* Medical liaisons informed physicians that extensive evidence demonstrated the efficacy of Neurontin in the treatment of RSD. The only such evidence that existed was anecdotal reports of nominal scientific value. Medical liaisons were trained to refer to case reports, most of which had been created or sponsored as "studies" by Parke-Davis.

- *Attention Deficit Disorder ("ADD").* Medical liaisons were instructed to inform pediatricians that Neurontin was effective for the treatment of ADD. No data, other than occasional anecdotal evidence, supported this claim. Nonetheless, the medical liaisons were trained to report that large number of physicians had success treating ADD with Neurontin, when no such case reports existed.

- *Restless Leg Syndrome ("RLS").* RLS was another condition where Parke-Davis medical liaisons were trained to refer to a growing body of data relating to the condition, when no scientific data existed. The only reports were anecdotal, most of which had been created and/or sponsored by Parke-Davis.

- *Trigeminal Neuralgia.* Although medical liaisons represented that Neurontin could treat Trigeminal Neuralgia, again no scientific data supported this claim with the exception of occasional anecdotal reports. No data demonstrated that Neurontin was as effective as currently available pain killers, most of which were inexpensive.

- 17 -

- *Essential Tremor Periodic Limb Movement Disorder ("ETPLMD")*. Medical liaisons were trained to allege that Neurontin was effective in the treatment of these conditions. No scientific data supported such claims with the exception of anecdotal reports of nominal scientific value.

- *Migraine.* Claims that Neurontin was effective in the treatment of migraine headaches were made by the medical liaisons and were supposedly based on early results from clinical trials. Although pilot studies had been suggested and undertaken, no early results of clinical trials existed to support these claims. Once again, any data relating to treatment of migraines was purely anecdotal and of nominal scientific value. Most of the case reports were either created or sponsored by Parke-Davis.

- *Drug and Alcohol Withdrawal Seizures.* Medical liaisons suggested that Neurontin be used in the treatment of Drug and Alcohol Withdrawals despite the lack of any data supporting Neurontin as an effective treatment for these conditions.

44.    Defendants knew and intended that physicians would rely on the misrepresentations and therefore provide inaccurate and untruthful medical advice to their patients regarding Neurontin's safety and effectiveness as a treatment for off-label conditions. Nonetheless, Defendants' employees routinely made these misrepresentations as part of company policy. In addition to Dr. Franklin, these misrepresentations were made at Defendants' instruction to physicians by, among others, Michael Davies, Joseph McFarland, Phil Magistro, Lisa Kellett, Joseph Dymkowski, Daryl Moy, Richard Grady, Ken Lawler and others.

45.    Not all physicians targeted by Defendants would have received all of the misrepresentations described above. Each specialist would have received the misrepresentations relating to his or her practice. If physician's practice focused on epilepsy, that doctor would not have received information relating to the treatment of ADD, but he or she would have received misrepresentations relating to monotherapy. Regardless of the specialty, unsupported claims of effectiveness for off-label usage was a key portion of medical liaisons presentations relating to Neurontin.

- 18 -

46.    Dr. Franklin reports that the medical liaisons engaged in the following

conduct at Defendants' instruction and with Defendants' knowledge:

- Upon order of the company, and as a result of medical liaison training, Dr. Franklin "deliberately contrived reports to mislead physicians into believing that a body of data existed that demonstrated the effectiveness of Neurontin in the treatment of bipolar disease." In fact, no data existed to support the use of Neurontin for bipolar disease.

- Dr. Franklin was trained and instructed actively to deceive physicians with contrived data, falsified "leaks" from clinical trials, scientifically flawed reports, or "success stories" that states that Neurontin was highly effective in the treatment of a variety of pain syndromes. No such body of evidence existed.

- Dr. Franklin was instructed to advise physicians that Defendants had developed a large body of data to support the use of Neurontin as monotherapy. This was an "outright lie" and left patients unknowingly without good seizure control.

- Medical liaisons were instructed to tell physicians that a great deal of data existed supporting the safe use of Neurontin at levels that exceeded 4800 mg/day. However, clinical safety data existed at dosing levels of only 1800 mg/day.

- Defendants provided medical liaisons with slides that stated that Neurontin was effective for the treatment of ADD, but no data existed to support that claim.

E.    **Parke-Davis' Systematic Payments to Doctors for the Purpose of Increasing Neurontin Prescriptions**

47.    Defendants' "publication strategy" required physicians (and its medical

liaisons) to perform the work normally performed by the Company's salesman in order to

promote Neurontin. Adoption of this strategy required Defendants to make tens of thousands of

dollars in payments both to physicians who would act as a surrogate sales force as well as to

practicing physicians who would receive the Neurontin off-label message. In other words,

pursuant to the "publication strategy," Defendants made thousands of payments to induce

physicians either to recommend the prescription of Neurontin or to order Neurontin, in violation

of federal kickback laws. Defendants knew that their employees and independent contractors

- 19 -

under their control violated these laws and regulations routinely. The following describes the various ways Defendants funneled bribes to physicians.

### 1.  Consultants' Meetings

48.    Defendants regularly used "consultants" meetings to channel illegal payments to physicians to encourage them to prescribe Neurontin for off-label uses. 42 U.S.C. § 1320A-7 and 42 C.F.R. § 1001 prohibit kickbacks to physicians and medical care providers. "Kickbacks" include payments, gratuities, and other benefits paid to physicians who prescribe prescription drugs by the manufacturers of those drugs. Defendants disguised these kickbacks as "consultantships," by purportedly hiring physicians for their expert opinions. Entirely unrelated to any scientific or educational activity, these kickbacks took the form of cash payments, travel benefits, entertainment, and other benefits. Defendants established internal guidelines to govern the award of these benefits to physicians. These guidelines were based on the number of prescriptions the physician wrote for Neurontin and the ability of that physician to influence her colleagues to prescribe Neurontin for off-label purposes.

49.    These consultantships followed a familiar pattern. Defendants recruited physicians to dinners or conferences and paid them to hear presentations about off-label uses of Neurontin. Defendants sometimes (but not always) had the doctors sign sham consulting agreements. At these meetings Defendants would give these doctors lengthy presentations relating to Neurontin, particularly regarding off-label usage. Presentations would be made by Defendants employees or physician speakers hired by Defendants for the purpose of promoting Neurontin, and attendees' questions relating to the administration of Neurontin use would be solicited and answered. At some conferences, the sponsoring organization or Defendants intentionally posed questions to the speakers about off-label use to insure that the attendees were exposed to such information.

- 20 -

50.    At some "consultants" meetings, a few questions would be posed to the "consultants" regarding Defendants marketing of Neurontin or how Defendants sales force could provide better service to the doctors. The consultants' meetings, however, were not held – and the "consultants" were not paid – for the purpose of providing Defendants with expert, independent advice. Defendants in many cases did not even record the "advice" provided by its "consultants," and what little advice was collected was never acted upon or reviewed.

51.    Rather, Defendants routinely analyzed whether consultants meetings successfully influenced physicians' prescription writing practices. At some meetings, the "consultants" were directly asked if they would write more Neurontin prescriptions as a result of the meeting. Such a question would have been irrelevant if the actual purpose of the meeting was to receive the "consultants'" advice. Defendants also routinely tracked consultants' Neurontin prescription writing practices after these meetings. Using market data purchased from third parties, Defendants analyzed whether the doctors they had paid had in fact written more Neurontin prescriptions after the meeting. Again, such data was only relevant if the real purpose of the payments was to influence the doctors to order more Neurontin.

52.    A typical "consultants'" meeting was held in Jupiter Beach, Florida, for neurologists from the Northeast CBU during the weekend of April 19-21, 1996. The "consultants" selected for this meeting were not chosen on the basis of their consulting acumen, but because of their potential to write Neurontin prescriptions. In a memorandum announcing the event to Defendants' personnel, the Neurontin Marketing Team acknowledged that in order to target neurologists with the greatest potential for writing Neurontin prescriptions, sales personnel must select potential attendees from a list of the top prescription writers for anti-

- 21 -

epileptic drugs in the Northeast. Only persons who fell within this desirable demographic were to be invited.

53.     Qualifying physicians were given a round-trip airfare to Florida (worth $800.00), two nights' accommodations (worth $340.00), free meals and entertainment, ground transportation and a "consultant's fee" of $250.00. Ample time was provided so that the Parke-Davis consultants could enjoy the beach resort. The value of the junket was approximately $2,000.00 per physician.

54.     The Jupiter Beach consultants' meeting included two half days of presentations by Defendants relating to Neurontin, including extensive presentations relating to off-label uses. Although technically the presentations were provided by an independent company, Proworx, all Defendants designed, monitored, and approved all aspects of the presentation. They selected the speakers, picked the presentation topics, and previewed the content of the presentations to make sure that they were acceptable. Defendants paid all expenses relating to the consultants' meeting, including all payments to the attendees and the presenters, all travel, accommodation, meals and entertainment expenses, all presentation expenses, all expenses and fees incurred by Proworx, and the substantial fees paid to the presenting physicians. Notwithstanding the FDA's prohibition regarding the provision of promotional materials relating to off-label uses, Defendants provided written abstracts of the presentations that detailed off-label use of Neurontin to each of their "consultants."

55.     Defendants made no effort to obtain professional advice at Jupiter Beach from the "consultants" Defendants had wined, dined, and entertained during the weekend. A follow-up memorandum to Defendants' marketing officials noted that "the participants were delivered a hard hitting message about Neurontin," and emphasized that the participants were

- 22 -

encouraged to use Neurontin at higher doses. More importantly, after the conference Defendants generated "trending worksheets" listing the doctors who attended the consultants' meeting. These worksheets enabled Defendants to track Neurontin prescription habits of the attendees before and after the consultant's meetings to determine if these "high writing" prescribers wrote more Neurontin scripts after the conference. Persuading these heavy prescribers to order more Neurontin for their patients was, in fact, the sole purpose of the Jupiter Beach junket.

56.    Jupiter Beach was not unique. Defendants hosted dozens of consultants' meetings between late 1995 and 1997 in which the "consultants" received payments and gratuities as well as presentations on off-label Neurontin use designed to change the physicians' prescription writing habits. Comparable consultants' meetings included, but were not limited to, the following:

| Topic | Location | Date |
|---|---|---|
| Mastering Epilepsy | La Costa Resort, CA | July 20-23, 1995 |
| Mastering Epilepsy | Santa Fe, NM | Nov. 16-19, 1996 |
| Neurontin Consultants Conference | Marco Island, FL | Feb. 2-4, 1996 |
| Pediatric Epilepsy | Hutchinson Island, FL | Feb. 9-11, 1996 |
| Mastering Epilepsy Science | Walt Disney World, FL | Feb. 22-25, 1996 |
| Pediatric Epilepsy | Hutchinson Island, FL | March 8-10, 1996 |
| Mastering Epilepsy | Aspen, CO | April 18-21, 1996 |
| Affective Disorders in Psychiatry | Marco Island, FL | April 20, 1996 |
| Affective Disorder Consultants Conference | Southern Pines, NC | April 27, 1996 |
| Neuropathic Pain Conference | Palm Beach, FL | May 11, 1996 |
| Regional Consultants Conference | Boston, MA | May 10-11, 1996 |
| Epilepsy Management Advisors Meeting | La Jolla, CA | June 21-23, 1996 |
| Epilepsy Management | Rancho Bernardo, CA | June 28-30, 1996 |
| Use of Anti-Convulsants in Psychiatric Disorders | Short Hills, NJ | Oct. 18-19, 1996 |
| Non-Epileptic Uses of Neurontin | Longboat Key, FL | Nov. 6, 1996 |

| Neurological Conditions Conference | Atlanta, GA | Sept. 27-28, 1997 |
|---|---|---|

Other consultants' meetings took place in Charleston, S.C., Coconut Grove, FL, Naples, FL, Memphis, TN, Louisville, KY, Washington, D.C., Aspen, CO, and other places. Hundreds, if not thousands, of physicians received kickbacks to attend these events.

57.   Not all payments to consultants were made at conferences as elaborate as Jupiter Beach. Many consultants' meetings consisted of lavish dinners at local restaurants. The emphasis on these meetings was also on off-label uses, and Defendants paid $200 "honorariums" to the physicians who did nothing for the payment except show up. At none of the events did the consultants provide legitimate consultation to Defendants, but at all of the events the "consultants" were encouraged to increase their Neurontin prescriptions.

### 2.   Medical Education Seminars

58.   Another format where Defendants paid kickbacks to physicians to hear off-label promotion of Neurontin were programs billed as Continuing Medical Education seminars (CME). These conferences and seminars were set up to appear to qualify for an exception to the FDA's off-label marketing restrictions. This exception permits physicians to learn about off-label uses of pharmaceuticals at independent seminars. Such seminars, however, must be truly independent of the drug companies. The companies may make "unrestricted grants" for the purpose of a seminar, but they may not be involved in formulating the content of the presentations, picking the speakers, or selecting the attendees. Defendants observed none of these requirements with regard to the CME seminars they sponsored for the promotion of off-label uses of Neurontin. While Defendants retained third party organizations, such as Proworx and Medical Education Systems, to present the event seminars, it had control of virtually every aspect of these events. Furthermore, the seminar companies obtained Defendants' approval for

- 24 -

all content presented at the seminars. Defendants also paid all expenses, including all the seminar companies' fees.

59.    Although the seminar companies acted as the conduit for the payments and gratuities given to the physician attendees, Defendants controlled every aspect of the CME programs. They designed and approved the programs; hand-picked the speakers for the seminars; approved the seminar presentations; previewed, in most cases, the contents of the seminars prior to delivery; selected the attendees based on their ability and willingness to prescribe high quantities of Neurontin; evaluated the presentations to make sure Defendants' "message" was appropriately delivered; black-listed presenters whose presentations were not sufficiently pro-Neurontin; and monitored the prescribing patterns of the physicians who attended these conferences to insure the purpose of the conference–increased writing of Neurontin prescriptions–was achieved. Follow-up reports to marketing executives at Parke-Davis highlighted that the attendees received presentations regarding off-label marketing and recommendations for dosages larger than those labeled effective by the FDA. These memoranda also reported to senior executives the pledges made by attendees to order more Neurontin for their patients.

60.    For some seminars, high prescription-writing physicians were selected to receive junkets comparable to those Parke-Davis provided to the attendees of the Jupiter Beach consultants' meetings. Others were less lavish, but physicians still received free tuition, free accommodations, free meals, and cash. Frequently Defendants' CME seminars were accredited by continuing medical education organizations, which meant that the physicians taking advantage of Defendants' junkets did not have to pay tuition or spend additional time to fulfill

- 25 -

325580.1

their continuing medical education licensure requirements by attending truly independent

medical education programs.

    61.    Representative CME programs sponsored by Parke-Davis where it paid

extensive kickbacks to attending physicians, included, but are not limited to, the following:

| Seminar | Location | Date |
| --- | --- | --- |
| Merritt-Putnam Epilepsy Postgraduate Course | | Jan. 19, 1996 |
| Merritt-Putnam Seminar | Chicago, IL | Jan. 26, 1996 |
| New Frontiers in Anti-Epileptic Drug Use | California | Sept.-Oct. 1996 |
| Diabetic Neuropathy | Boston, MA | June 22-24, 197 |
| Merritt Putnam Symposium | Key Biscayne, FL | September 11, 1997 |
| Merritt Putnam Conference on Monotherapy | Palm Springs, CA | Sept. 19, 1997 |
| Merritt-Putnam Conference on Monotherapy | St. Louis, MO | Oct. 3, 1997 |
| Merritt-Putnam Symposium | Boston, MA | Dec. 5, 1997 |

    **3.**    **Grants and "Studies"**

    62.    Defendants also made outright payments, in the form of grants, to reward

demonstrated Neurontin believers and advocates. Defendants' sales managers identified key

doctors who actively prescribed Neurontin or programs which were willing to host Neurontin

speakers and encouraged such persons or programs to obtain "educational grants" from them.

Under this program of kickbacks Defendants paid:

- $2,000.00 to Berge Ninmpolan, MD, "a great Neurontin believer," to attend a neurology seminar in San Francisco, in March 1996.

- $1,000.00 to the University of Texas at Houston Department of Neurology to host a symposium where presentations would be made regarding successful off-label treatment with Neurontin.

- $3,000.00 to the University of Texas Medical School to host a conference in August 1996 at which a well-known specialist in epilepsy, who prescribed Neurontin, would attend.

- $4,000.00 to pay for a neurologist from the University of Texas at San Antonio to attend the American Epilepsy Society Conference in December 1996, a conference at which Parke-Davis was presenting extensive documentation on off-label uses for Neurontin.

- $2,500.00 to the University of Texas in Houston to bring Dr. B.J. Wilder to the campus to hold a seminar. Dr. Wilder was one of Neurontin's biggest boosters for off-label indications and had been paid tens of thousands of dollars to promote Neurontin's off-label uses for Parke-Davis across the country.

- $2,500.00 in June 1996 to pay for representatives from the University of Pennsylvania Medical Center to attend a conference in Saint Petersburg, Russia on the utilization of anti-epileptic drugs, including Neurontin.

- $5,000.00 to Dr. Alan B. Ettinger, of Stonybrook, N.Y. in December 1996, a physician who had informed Parke-Davis that he was interested in possibly doing research in Neurontin and maintained a database of patients who were treated with Neurontin.

- $500 to Bruce Ehrenberg, of Boston, MA, a leading speaker for Parke-Davis regarding off-label use of Neurontin, to attend a conference in China.

- $1000 to Israel Abrams, M.D., Paul C. Marshall, M.D., Beth Rosten, M.D. and Spencer G. Weig, of Worcester MA, for educational programs in February 1996. According to the local Parke Davis representative requesting the grant, "much of the Neurontin success in Worcester has been attributed to . . . the 4 pedi[atric] epileptologists below."

- $1,400 to Dr. Ahmad Beydoun of Ann Arbor, MI for post-graduate training in March 1996. This grant was processed on a quick turnaround, the Parke-Davis representative noting "I realize that this is a very short time line; however, Dr. Beydoun is a very important customer."

- $1,500 to Jim McAuley, R.Ph, Ph.D. for educational materials relating to epilepsy. Parke-Davis decided to provide the funds because McAuley was an advocate of Neurontin and he was important in getting another Parke-Davis drug, Cerebyx, accepted on the formulary for Ohio State University.

- A grant in an unknown amount to University Hospital in Cleveland in exchange for hosting programs regarding Neurontin's use in treating neuropathic pain at conferences specifically devoted to obtaining referrals from other doctors.

    63.     These grants, and others, were charged to the Neurontin marketing budget.

Each of these grants were made solely because an individual who would receive the money was

325580 1

a large Neurontin supporter or would host a program where a well known Neurontin supporter would recommend that other physicians increase their prescriptions of Neurontin. Each of these grant awards constituted a reward or kickback for the recipient's advocacy of Neurontin.

64.     Defendants' medical liaisons informed leading Neurontin subscribers that significant advocacy for Neurontin would result in the payment of large grants. These studies did not involve significant work for the physicians. Often times they required little more than collating and summarizing office notes or records. Oftentimes, the physicians contributed nothing at all to the study; as noted below, Defendants frequently hired technical writers to write the articles for which the "authors" had been given grants.

65.     Defendants were aware that these articles and studies provided minimal scientific benefit. In a letter to the FDA in June 1997, Defendants submitted a list of "studies relating to pain, pain syndromes, and psychiatric disorders" but failed to include any of the studies described in Paragraph 63, purportedly funded by Parke-Davis. Defendants intentionally neglected to report these "studies" to the FDA because they knew the funded "research" had no scientific value and would not be deemed studies by the FDA. Payments Defendants made for these "studies" included, but were not limited to, the following:

| Funded Project | Payee | Payment |
|---|---|---|
| Statistical Analysis of Patients Treated With Neurontin For Pain | Hans Hansen, M.D., Statesville, N.C. | $7,000.00 |
| Reduction of Sympathetically Medicated Pain and Sudomotor Function | David R. Longmire, M.D., Russellville, AL | $7,000.00 |
| Data entry for Neurontin and Pain Analysis | David Meyer, M.D. | [amount unknown] |
| Trial of Neurontin for distal symmetric polyneuropathy associated with AIDS | Joseph Weissman, M.D., Atlanta, GA | $20,000.00 |

- 28 -

| Funded Project | Payee | Payment |
|---|---|---|
| Neurontin for neuropathic pain in chronic pain syndromes | Lavern Brett, M.D., Washington, D.C. | $25,000.00 |
| Retrospective chart analysis of Neurontin use with bipolar disorder patients | Ralph S. Rybeck, M.D. | $5,000.00 |
| Retrospective Analysis of Neurontin in the treatment of pain | David R. Longmire, M.D., Russellville, AL | $2,000.00 |
| Retrospective Analysis of Neurontin in the treatment of chronic pain | Don Schanz, D.O., Traverse City, MI | $8,000.00 |
| Case histories relating to use of Neurontin as an adjuvant analgesic | Elizabeth J. Narcessian, M.D., W. Orange, N.J. | $4,000.00 |

Plaintiffs have reason to believe that other payments were made to physicians for other "studies" of questionable scientific credibility.

66.     One particularly large study conducted by Parke-Davis served as yet another engine to financially reward physicians for prescribing Neurontin. In 1995 and 1996 Parke-Davis conducted an enormous Phase IV trial known as STEPS. Although STEPS took the form of a research clinical trial, it was, in fact, a marketing ploy designed to induce neurologists to gain comfort prescribing Neurontin at a far higher dose than indicated in the FDA-approved labeling. While most clinical studies have a limited numbers of investigators treating a number of patients qualified for the study, the STEPS protocol called for over 1,200 "investigators" to enroll only a few patients each. The participating physicians were instructed to titrate their patients to higher-than-labeled dosages of Neurontin to demonstrate that patients could tolerate high dosages of the drug. Rewarding physicians for prescribing high doses on Neurontin was another way to increase Neurontin sales, as higher per-patient dosages increased the amount of Neurontin sold. Additionally, the STEPS study was also designed to habituate physicians to

- 29 -

place non-study patients on Neurontin on doses higher than those found effective in the clinical trials monitored by the FDA.

67.     Physicians enrolling in the STEPS study were paid for agreeing to participate in the study and for every patient enrolled. At the conclusion of the study, Parke-Davis offered each of the 1,200 investigators additional cash for each patient the doctor kept on Neurontin after the study ended. These payments without question constituted kickbacks, since each participating doctor was expressly paid for writing Neurontin prescriptions for their patients.

**4.     Payments to "Authors" of Ghost Written Articles**

68.     Yet another method of rewarding doctors for their advocacy of Neurontin was to pay them honoraria for lending their names to scientific articles which were actually prepared and written by third parties Defendants had retained. In 1996 Parke-Davis retained AMM/ADELPHI, Ltd. ("AMM") and Medical Education Systems, Inc. ("MES") to prepare no less than twenty articles for publication in various neurology and psychiatry journals. Most of these articles concerned off-label usage of Neurontin. They were generated in a manner such that Defendants would have publications, the content of which they controlled, which they could distribute pursuant to their "publication strategy". Non-physician technical writers were retained by Defendants, and Defendants had the right to control the content of all of the articles. Defendants paid all expenses in connection with the creation of these publications.

69.     Once Defendants and the technical writers conceived the articles, Defendants and their outside firms attempted to find recognized Neurontin prescribers whose names could be used as the authors of these articles. In some cases, drafts of the articles were completed even before an "author" agreed to place his or her name on the article. This occurred even in connection with case histories that purported to describe the "author's" personal

treatment of actual patients. The "authors" were paid an honorarium of $1,000.00 to lend their names to these articles.

70. Defendants and their outside firms also found journals to publish the articles. Defendants' role in creating, approving and sponsoring the articles was hidden from the public. While the articles might reference that the author received an honorarium from the outside firm, the articles failed to state that the honorarium was paid with money provided by Defendants and that Defendants had approved the content and hired the actual authors. For example, an article created by MES, *Gabapentin and Lamotrignine: Novel Treatments for Mood and Anxiety Disorders*, published in *CNS Spectrums*, noted that "an honorarium was received from Medical Education Systems for preparation of this article," but never revealed Defendants' retention of and payment to MES, or the fact that MES personnel, while under contract to Defendants, wrote the article.

71. Publications Defendants distributed as part of their "publication strategy," intentionally misrepresented Defendants' role in the creation and sponsorship of the publications. Physicians were led to believe that the publications were the independent, unbiased research of the authors of the articles. For example, an article widely circulated by Defendants concerning the use of Neurontin in the treatment of Restless Leg Syndrome asserted that the authors Gary A. Mellick and Larry B. Mellick had not and never would receive financial benefit from anyone with an interest in Neurontin,. Yet the Mellick brothers had received tens of thousands of dollars for acting as speakers at Defendants' events.

### 5. Speakers' Bureau

72. Defendants also formed the Speakers' Bureau, another method to make large and numerous payments to physicians who recommended Neurontin at teleconferences, dinner meetings, consultants meetings, educational seminars, and other events. These speakers

325580.1

repeatedly gave short presentations relating to Neurontin, for which they were paid anywhere from $250.00 to $3,000.00 per event. Speakers such as Steven Schachter, B.J. Wilder, Ilo Leppik, Gary Mellick, David Longmire, Gregory Bergey, Michael Merren, David Treiman, Michael Sperling, Martha Morrell, R. Eugene Ramsay, John Pellock, Ahmad Beydoun, Thomas Browne, John Gates, Jeffrey Gelblum, Dennis Nitz, Robert Knobler and others received tens of thousands of dollars annually in exchange for recommending to fellow physicians that Neurontin be prescribed, particularly for off-label uses. The payments that these doctors received greatly exceeded the fair value of the work they performed for Defendants. Speakers who most zealously advocated Neurontin were hired most frequently for speaking events, notwithstanding the fact that many of these events purported to be independent medical education seminars where independent information was supposed to be delivered.

73.     Defendants' marketing personnel, including its medical liaison staff, informed physicians of the lucrative rewards of joining the Speakers' Bureau. They told physicians were informed that if they prescribed enough Neurontin, they could also be eligible for receiving substantial payments just for describing their clinical experience to peers at events dedicated to promoting Neurontin's off-label uses. Defendants marketing personnel, however, made it clear that such invitations hinged on whether physicians prescribed sizeable enough quantities of Neurontin, preferably for off-label uses.

74.     Defendants were well aware that federal law prohibits such kickbacks. They also knew that federal safe harbors did not cover the extensive payments they made to doctors. Furthermore, Defendants were aware that their payments did not comply with the AMA's guidelines for payments to physicians.

75.    In 1997, in the wake of an investigation by the FDA, Parke-Davis conducted a review of its marketing practices in light of existing Medicaid kickback regulations. As a result of that review, Parke-Davis determined that none of the programs described above should have been pursued. Parke-Davis issued guidelines to comply with Federal regulations, which essentially prohibited each of the programs described above. Nonetheless, the payments to physicians for the off-label marketing of Neurontin did not cease, and the programs continued at least until 1998. Plaintiffs believe that such payments continued after the merger of Warner-Lambert with Pfizer, and perhaps up to Warner-Lambert's guilty plea on May 13, 2004.

**F.    Illegal "Off-Label" Promotion Has Continued As Has The Continuing Impact Of The Earlier Misconduct**

76.    As a result of the conduct described above, physicians received large amounts of false information and therefore continue to prescribe Neurontin for off-label uses for which there is no reliable scientific support.

77.    Upon information and belief, Pfizer has routinely marketed Neurontin for off-label indications up until May of 2004, regardless of FDA limitations on the approved use of the particular product. The staggering growth of Neurontin sales for non-approved FDA use highlights this continuing course of conduct. From 1995 to 2003, Neurontin's sales soared from $97.5 million to nearly $2.7 billion. With no reliable scientific studies supporting off-label uses, and with 90% of all prescriptions for Neurontin written for such uses, it is reasonable to infer that this explosion in sales stems from past and continuing promotional efforts by Defendants.

78.    Furthermore, although Neurontin is prescribed for many off-label indications, since 1999 the types of off-label usage continue to be weighted in the precise areas where Defendants focused their unlawful marketing efforts, *i.e.*, as treatments for bipolar disorder, peripheral neuropathy, and migraine headaches.

- 33 -

79.    Various therapeutic substitutes compete for market share in these areas, with aggressive marketing efforts. If any company discontinued their promotional efforts in any of these treatment areas, they would suffer significant losses within that area. Neurontin has suffered no such drop in sales.

80.    Overall, "off-label" sales for Neurontin have steadily increased since 1998, and from 2000 onward have consistently represented 93-94% of all sales. Actual sales for approved uses have declined. Given the dearth of scientific support for off-label uses, this ratio of off-label sales to approved sales must be attributed to the past and continuing efforts by Defendants to promote Neurontin for off-label uses.

81.    Dr. C. Seth Landefeld opined in the *qui tam* litigation that a review of a drug reference source for Neurontin, as of August, 2002, revealed "no published scientific studies to support Neurontin's use for . . . bipolar disorder." As a result of Defendants' illegal promotional activities, physicians have and continue to prescribe Neurontin to tens of thousands of patients who are in need of an effective treatment.

82.    A July 1, 2002, letter from Dr. Lisa Stockbridge of the Department of Health & Human Services ("HHS") confirms that Defendants continued as of that date to engage in off-label promotional efforts. Dr. Stockbridge notified Pfizer that certain of its marketing practices are "in violation of the Federal Food, Drug and Cosmetic Act . . . because [Pfizer] makes representations about Neurontin that are false and misleading." HHS made the following objections to Pfizer's promotional activities:

> The presentation on the model of illustrations of cellular activity resulting from the administration of Neurontin ("Mechanism of Action"), In conjunction with the presentation of the human brain, and the prominent display of the name Neurontin makes representations about how Neurontin acts in the human brain. This presentation along with the depiction of the human brain and the

prominent display of the name "Neurontin" suggest that the mechanism of action of Neurontin has been established in the human brain. *This suggestion of proof of the mechanism of action is false. Specifically, it is contrary to the language in the-approved product labeling that states that " [t]he mechanism by which gabapentin [Neurontin] exerts its anticonvulsant action is unknown."*

Furthermore, the full presentation of the aforementioned areas of the human brain accompanied by purported "Mechanism of Action" and the prominent display of the name "Neurontin" is *misleading* because it suggests that Neurontin is useful for a broader range of CNS conditions than has been demonstrated by substantial evidence (i.e., it can be used for the treatment of any specific or non-specific brain disorder thought to involve the GABA-ergic neurotransmitted system that can originate in these parts of the brain). *Most obviously, the solo and prominent mention of the name Neurontin suggests that Neurontin can be used as monotherapy for various CNS disorders, notwithstanding that with respect to brain disorders, Neurontin is only indicated as "adjunctive therapy in the treatment of partial seizures with or without secondary generalization in patients over 12 years of age with epilepsy" and as "adjunctive therapy in the treatment of partial seizures in pediatric patients age 3-12 years."*

To address these objections, DDMAC recommends that Pfizer do the following:

> *1.      Immediately discontinue the use of this model and any* other promotional material with the same or similar issues. (Emphasis added.)

83.      On information and belief, the promotional materials described in Dr. Stockbridge's letter were used by Pfizer employees to promote off-label uses of Neurontin.

84.      A second HHS letter, from June 6, 2001, again confirms that Pfizer's marketing practices violated federal law. The letter addresses Pfizer's promotional advertising that related to a 2001 study heralding "quality of life improvements" from the use of Neurontin and reads as follows:

325580.1

Ms. Andrea Garrity
Director, Regulatory
Affairs Pfizer, Inc.
235 East 42nd Street
New York, New York 10017-5755

Re:    NDA #s 20-235, 20-882 Neurontin (gabapentin) MACMIS
       # 10174

Dear Ms. Garrity:

Through routine monitoring and surveillance, the Division of Drug
Marketing, Advertising, and Communications 9DDMAC) has
identified a slim jim (ID #NSJ5095A1) for Neurontin that *is
misleading and in violation of the Federal Food, Drug, and
Cosmetic Act and applicable regulations.*

Specifically, this slim jim misleadingly claims improvements in
quality of life (QOL) parameters based on the Neurontin
Evaluation of Outcomes in Neurological Practice (NEON) study.
Among other QOL parameters, the misleading presentation
includes improvement in social limitations, memory difficulties,
energy level, and work limitations. The NEON study is not
considered to be substantial evidence for claims of QOL
improvements because it is not a controlled study.

To address these objections, DDMAC recommends that Pfizer do
the following:

1.     Immediately discontinue the use of this slim jim and any
other promotional material and practices with the same or similar
messages.

2.     Respond to this letter within ten days. Your response
should include a statement of your intent to comply with the above,
a list of all promotional materials with the same or similar issues,
and your methods for discontinuing these promotional materials.

(Emphasis added.) Pfizer employees had used the foregoing promotional materials to market

off-label uses for Neurontin up until the company received this June 6, 2001, letter.

85.    The promotional materials referred to above, as well as other promotional

activities described herein, were not submitted to the FDA for approval as required by FDAMA,

21 U.S.C. § 360aa. In the above-cited examples where HHS cited Pfizer for violating federal

- 36 -

325580.1

law, HHS discovered the violations through its routine monitoring and surveillance activities,

and not because Pfizer submitted its materials to HHS as required by law.

86.    Citations in a medical reference text for Neurontin, as of August 1997,

confirm that there is no basis in the published scientific literature for the use of Neurontin to treat

the following conditions: alcohol detoxification/alcohol withdrawal syndrome, ALS,

antidepressant-induced bruxism, anxiety disorder, attention deficit disorder/attention deficit and

hyperactivity disorder, behavior problems-dementia related, behavior dyscontrol, dipolar

disorder, brachioradial pruritis, back pain, Charles Bonnet syndrome, ciguatera poisoning, cluster

headache, cocaine dependency, diabetic peripheral neuropathy, depression, dosages in excess of

1800 mg per day, dystonia, essential tremor, failed back surgery syndrome, headache (SUNCT),

headache, hemifacial spasm, hiccups, Lesch-Nyhan syndrome, mania, migraine prophylaxis,

menopausal hot flashes, mood stabilization, multiple sclerosis complications, myalgias taxane

induced neuropathic pain syndromes, neuropathic cancer pain, HIV-related neuropathy, nicotine

withdrawal, nystagmus, obsessive-compulsive disorder, orthostatis tremor, pain-

postpoliomyelitis pain, pain-RSD, pain disorder, partial seizures-monotherapy, partial seizures-

pediatric, partial seizures-refractory, phantom limb syndrome, postherpetic neuralgia, restless les

syndrome, trigeminal neuralgia, seizures - acute intermittent prophyria, seizures - brain tumor-

induced, seizures - clozapine-induced, seizures -generalized, seizures - status epilepticus,

schizophrenia, social phobia, spasticity, or any other indication other than seizures - adjunctive

therapy.

87.    Nonetheless, as set forth above, Defendants engaged in promotional

activities to convince physicians to use Neurontin to treat these conditions.

88.    Any representations by any agent, employee, or person hired by Parke-Davis that, as of August 1997, scientific evidence supported Neurontin's use for the conditions listed in Paragraph 86 would therefore have been misleading. Upon information and belief, Defendants' employees made representations that Neurontin was an appropriate treatment for some or all of these conditions.

89.    Citations in a medical reference-text for Neurontin, as of the third quarter of 2002, confirm that there is no basis in the published scientific literature for the use of Neurontin to treat the following conditions: alcohol detoxification/alcohol withdrawal syndrome, ALS, antidepressant-induced bruxism, anxiety disorder, attention deficit disorder/attention deficit and hyperactivity disorder, behavior problems-dementia related, behavior dyscontrol, dipolar disorder, brachioradial pruritis, back pain, Charles Bonnet syndrome, ciguatera poisoning, cluster headache, cocaine dependency, diabetic peripheral neuropathy, depression, dosages in excess of 1800 mg per day, dystonia, essential tremor, failed back surgery syndrome, headache (SUNCT), headache, hemifacial spasm, hiccups, Lesch-Nyhan syndrome, mania, migraine prophylaxis, menopausal hot flashes, mood stabilization, multiple sclerosis complications, myalgias taxane induced neuropathic pain syndromes, neuropathic cancer pain, HIV-related neuropathy, nicotine withdrawal, nystagmus, obsessive-compulsive disorder, orthostatis tremor, pain-postpoliomyelitis pain, pain-RSD, pain disorder, partial seizures-monotherapy, partial seizures-pediatric, partial seizures-refractory, phantom limb syndrome, postherpetic neuralgia, restless les syndrome, trigeminal neuralgia, seizures - acute intermittent prophyria, seizures - brain tumor-induced, seizures - clozapine-induced, seizures - generalized, seizures - status epilepticus, schizophrenia, social phobia, spasticity, or any other indication other

- 38 -

than the partial seizures-adjunctive therapy, partial seizures-pediatric, postherpetic neuralgia, and diabetic peripheral neuropathy.

90.    With the complete absence of scientific evidence to support the use of Neurontin to treat these conditions, the growth in Neurontin sales which occurred due to Neurontin's use for these conditions resulted from Defendants' continuing promotional activities.

91.    Any representations by any agent, employee, or person hired by Parke-Davis that, as of the third quarter of 2002, scientific evidence supported Neurontin's use for the conditions listed in Paragraph 89 would therefore have been misleading.  Upon information and belief, Defendants' employees made representations that Neurontin was an appropriate treatment for some or all of these conditions.

G.    **Government Actions**

92.    As noted above, Dr. Franklin initiated a *qui tam* action on behalf of the United States against Warner-Lambert in 1996.  He alleged two counts of false claims caused by the knowing promotion of prescription sales ineligible for Medicaid Reimbursement and caused by the payment of kickbacks in violation of the Medicaid anti-kickback provisions, 31 U.S.C. § 3729.  The federal court unsealed the complaint in the case in May of 2002.

93.    Fifty-one attorneys general also commenced a lawsuit against Warner-Lambert, alleging violations of state consumer protection laws that occurred when Warner-Lambert promoted Neurontin for various off-label uses.

94.    The United States Attorney for the District of Massachusetts filed a criminal information against Warner-Lambert.  On May 13, 1994, the company pleaded guilty to several violations of the Food, Drug and Cosmetic Act, 21 U.S.C. §§331(a), 331(d), 333(a), 352(f)(1), and 355.  Warner-Lambert was fined $240 million and agreed to cease and desist its

- 39 -

pattern of misconduct. The *qui tam* and the state attorneys general actions settled at the same time, with $24,640,000 of the fine going to Dr. Franklin and $38 million going to the states.

95.     The Assurance of Voluntary Compliance entered into between the states and Warner-Lambert explicitly provided that claims brought by individual consumers and entities were excluded from the settlement.

## V.    FRAUDULENT CONCEALMENT

96.     Plaintiffs were not and could not have become aware of Defendants' misconduct until the complaint in the *qui tam* action was unsealed in May of 2002. Defendants have and continue to conceal their off-label promotional activities. They have done so by, *inter alia*, (a) promoting Neurontin for off-label uses by soliciting physicians to lend their names to articles actually written by Defendants' employees and/or independent contractors under Defendants' control; (b) failing to disclose to the FDA the materials they used to promote Neurontin for off-label uses; (c) using medical liaisons, who are authorized to dispense solicited, scientifically-supported information, as disguised sales representatives; (d) misrepresenting their marketing and sales pitches as educational material at consultants' meetings and CME conferences; and (e) misrepresenting the safety and medical efficacy of Neurontin's off-label uses through their publication strategy. Because of these and other acts of concealment, Plaintiffs could not have discovered the scheme alleged herein in the exercise of reasonable diligence. Much of the scheme remains concealed by Defendants.

## VI.   THE ROLE OF NON-PHYSICIAN TECHNICAL WRITERS, PHYSICIANS AND VENDORS IN DEFENDANTS' MARKETING SCHEME

97.     The non-physician technical writers, physician "authors," and vendors, namely AMM and MES (collectively "Promotional Strategists") were key parties in Defendants' improper marketing and sales scheme. They knowingly and willfully facilitated, communicated,

- 40 -

and distributed the misrepresentations concerning the use of Neurontin for off-label uses. The non-physician technical writers wrote articles based on inaccurate and sometimes no scientific evidence concerning the safety and efficacy of Neurontin to treat off-label symptoms. The physicians lent their names as "authors" to such articles, misrepresenting the authorship and objectivity of such articles. Further, AMM and MES (collectively "Vendors") caused these articles to be published in a variety of medical journals across the country. In addition, the physicians who performed and participated in sham "studies" regarding the safety and efficacy of Neurontin for off-label uses were key parties to Defendants' scheme, as these physicians knowingly misrepresented facts and evidence concerning Neurontin's off-label uses.

98.    The Promotional Strategists were active participants in Defendants' scheme and were aware of, and interacted with, other participants in the fraudulent scheme.

99.    The Promotional Strategists operated collectively, for a common purpose, and as a continuing unit to perpetrate the fraudulent scheme relating to Neurontin.

100.    The Promotional Strategists' collective knowledge, involvement, and activity is evidenced by:

- the failure of the Promotional Strategists to advise government regulators, private insurers, and patients, including Plaintiffs and the Class, of the existence and spread of such misinformation concerning off-label uses of Neurontin;

- the acceptance by the Promotional Strategists of various types of incentives from Defendants in return for their agreement to write, author, and have published articles containing misrepresentations, knowing that other physicians and consumers would rely on such information; and

- 41 -

- the agreement of the Promotional Strategists to permit Defendants to control the information relayed to the public in such articles.

## VII. DEFENDANTS' MOTIVE

101. Defendants' motive in creating and operating the fraudulent scheme and RICO Enterprises described herein was fraudulently to obtain additional revenues from the marketing and sale of Neurontin.

102. The fraudulent scheme was designed to, and did, cause Plaintiffs and the Class to pay for Neurontin prescriptions to treat conditions for which the drug is not medically necessary. The fraudulent scheme also caused Plaintiffs and the Class to pay for Neurontin prescriptions to treat non-FDA approved conditions. In the absence of Defendants' improper conduct, Plaintiffs and the Class would not have paid for such Neurontin prescriptions.

## VIII. USE OF THE MAILS AND WIRES

103. During the Class Period, Defendants used thousands of mail and interstate wire communications to create and manage their fraudulent scheme. Defendants' scheme involved national marketing and sales plans and programs, and encompassed physicians and victims across the country.

104. Defendants' use of the mails and wires to perpetrate their fraud involved thousands of communications throughout the Class Period, including:

- marketing and advertising materials about the off-label uses of Neurontin for which the drug is not safe and medically efficacious, such materials being sent to doctors across the country;

- communications, including financial payments, with the Vendors, non-physician technical writers, and physician "authors" discussing and relating to the publication of

- 42 -

325580.1

articles touting off-label uses of Neurontin for which the drug is not safe and medically efficacious;

- communications with the Vendors, doctors and private insurers that fraudulently misrepresented that Neurontin was scientifically proven to be safe and effective for off-label uses;

- communications with health insurers and patients, including Plaintiffs and the Class, inducing payments for Neurontin to be made in reliance on misrepresentations concerning the use of Neurontin for non-medically necessary uses; and

- receiving the proceeds of the Defendants' improper scheme.

105.    In addition, Defendants' corporate headquarters have communicated by United States mail, telephone, and facsimile with various local district managers, medical liaisons and pharmaceutical representatives in furtherance of Defendants' schemes.

## IX.    CLASS ACTION ALLEGATIONS

106.    Under Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action on behalf of themselves and a Class, defined as:

> All individuals and entities in the United States and its territories who, for purposes other than resale, purchased, reimbursed and/or paid for Neurontin for indications not approved by the FDA during the period from January 1, 1994, through the present. For purposes of the Class definition, individuals and entities "purchased" Neurontin if they paid some or all of the purchase price.

Excluded from the Class are (a) Defendants and any entity in which any Defendant has a controlling interest, and their legal representatives, officers, directors, assignees and successors, and (b) any co-conspirators. Also excluded from the class are any judge or justice to whom this action is assigned, together with any relative of such judge or justice within the third degree of relationship, and the spouse of any such person.

- 43 -

325580.1