BUDD LARNER
David J. Novack
150 JFK Parkway
Short Hills, NJ 07078
(973) 379-4800

NOV 2 4 2004

Attorneys for Plaintiffs

| | |
|---|---|
| ASSURANT HEALTH, INC., a Wisconsin corporation; | **SUPERIOR COURT OF NEW JERSEY, LAW DIVISION** |

**SUPERIOR COURT OF NEW JERSEY, LAW DIVISION**

**BERGEN COUNTY**

Docket No. _L/3282Uy_

<u>CIVIL ACTION</u>

<u>COMPLAINT</u>

**JURY TRIAL DEMANDED**

ASSURANT HEALTH, INC., a Wisconsin corporation;

BLUE CROSS AND BLUE SHIELD OF FLORIDA, INC., a Florida corporation, and its wholly-owned subsidiary, HEALTH OPTIONS, INC., a Florida corporation;

LOUISIANA HEALTH SERVICE & INDEMNITY COMPANY, doing business as BLUE CROSS and BLUE SHIELD OF LOUISIANA, a Louisiana corporation and its subsidiary HMO LOUISIANA, INC., a Louisiana corporation;

BLUE CROSS BLUE SHIELD OF MASSACHUSETTS, a Massachusetts corporation;

BLUE CROSS BLUE SHIELD OF MICHIGAN and its wholly-owned subsidiary, BLUE CARE NETWORK, INC, Michigan corporations;

BLUE CROSS BLUE SHIELD OF MINNESOTA, a Minnesota corporation, and a subsidiary of AWARE INTEGRATED, INC., and its wholly-owned subsidiaries COMPREHENSIVE CARE SERVICES, INC., a Minnesota corporation, FIRST PLAN OF MINNESOTA, a Minnesota corporation, ATRIUM HEALTH PLAN, INC., a Wisconsin corporation, and HMO MINNESOTA, a Minnesota corporation;

GROUP HEALTH SERVICE OF OKLAHOMA, INC., doing business as BLUE CROSS BLUE SHIELD OF OKLAHOMA, an Oklahoma corporation and its wholly-owned subsidiary GROUP HEALTH MAINTENANCE ORGANIZATION, INC., doing business as BLUELINCS HMO, an Oklahoma corporation;

CAREFIRST, INC., a Maryland corporation, and its

wholly-owned subsidiaries, CAREFIRST OF
MARYLAND, INC., a Maryland corporation, WILLSE &
ASSOCIATES, INC., a Maryland corporation, CFS
HEALTH GROUP, INC., a Maryland corporation,
DELMARVA HEALTH PLAN, INC., a Maryland
corporation, FREE STATE HEALTH PLAN, INC., a
Maryland corporation, PATUXENT MEDICAL GROUP,
INC., a Maryland corporation, GROUP
HOSPITALIZATION AND MEDICAL SERVICES,
INC., a company created under federal charter, CAPITAL
CARE, INC., a District of Columbia corporation,
CAPITAL AREA SERVICES, INC., a West Virginia
corporation, BLUE CROSS BLUE SHIELD OF
DELAWARE, INC., a Delaware corporation;

EXCELLUS HEALTH PLAN, INC., a New York
corporation, and its wholly-owned subsidiary EXCELLUS
BENEFIT SERVICES, INC., a New York corporation;

FEDERATED MUTUAL INSURANCE COMPANY, a
Minnesota mutual company;

HEALTH CARE SERVICE CORPORATION, an Illinois
Mutual Legal Reserve Company, on behalf of itself and its
Illinois, New Mexico and Texas Divisions;

MUTUAL OF OMAHA INSURANCE COMPANY, a
Nebraska mutual company;

TRUSTMARK INSURANCE COMPANY, a Delaware
corporation;

WELLCHOICE, INC., a Delaware corporation, and its
wholly-owned subsidiary EMPIRE HEALTHCHOICE
ASSURANCE, INC., a New York corporation, doing
business as EMPIRE BLUE CROSS BLUE SHIELD and
EMPIRE BLUE CROSS, and its wholly-owned
subsidiaries EMPIRE HEALTHCHOICE HMO, INC.,
doing business in New York as EMPIRE BLUE CROSS
BLUE SHIELD HMO and EMPIRE BLUE CROSS
HMO, and doing business in New Jersey as
WELLCHOICE HMO OF NEW JERSEY;

WELLCHOICE INSURANCE OF NEW JERSEY, INC.,
a New Jersey corporation and a wholly-owned subsidiary
of EMPIRE HEALTHCHOICE ASSURANCE, INC., a

526848.W

New York corporation;

                              Plaintiffs,

v.

PFIZER, INC., a Delaware Corporation, and its wholly-
owned subsidiary WARNER-LAMBERT COMPANY;

CLINE, DAVIS & MANN, INC.,
a New York Corporation;

LODEWIJK J.R. DE VINK,
a resident of New Jersey; and

ANTHONY WILD,
a resident of New Jersey,

                              Defendants.

# TABLE OF CONTENTS

INTRODUCTION ...........................................................................................................1

NATURE OF ACTION ...............................................................................................1

PLAINTIFFS ..............................................................................................................2

DEFENDANTS ........................................................................................................10

JURISDICTION AND VENUE ................................................................................12

FACTS .....................................................................................................................12

COUNT I
    Unlawful Restraint of Trade by Defendants In Violation of New Jersey Antitrust Act on
    Behalf of All Plaintiffs.................................................................................21

COUNT II
    Unlawful Restraint of Trade by Defendants In Violation of District of Columbia's
    Antitrust Act on Behalf of Plaintiff CareFirst...........................................22

COUNT III
    Unlawful Restraint of Trade by Defendants In Violation of the District of Columbia's
    Prescription Drug Price Information Law on Behalf of Plaintiff CareFirst...............23

COUNT IV
    Unlawful Restraint of Trade by Defendants In Violation of Florida Antitrust Act of 1980
    on Behalf of Plaintiff BCBS Florida.........................................................24

COUNT V
    Unlawful Restraint of Trade by Defendants In Violation of the Illinois Antitrust Act on
    Behalf of Plaintiffs HCSC and Trustmark ................................................25

COUNT VI
    Unlawful Restraint of Trade by Defendants In Violation of Louisiana Antitrust Act on
    Behalf of Plaintiff BCBS Louisiana .........................................................26

COUNT VII
    Unlawful Restraint of Trade by Defendants In Violation of Michigan Antitrust Reform
    Act on Behalf of Plaintiff BCBS Michigan ...............................................27

COUNT VIII
    Unlawful Restraint of Trade by Defendants In Violation of Minnesota Antitrust Act of
    1971 on Behalf of Plaintiffs BCBS Minnesota and Federated Insurance...................28

i

COUNT IX
    Unlawful Restraint of Trade by Defendants In Violation of the Nebraska Antitrust Laws
    on Behalf of Plaintiff Mutual of Omaha .................................................................................29

COUNT X
    Unlawful Restraint of Trade by Defendants In Violation of New Mexico Antitrust Act on
    Behalf of Plaintiff HCSC .........................................................................................................30

COUNT XI
    Unlawful Restraint of Trade by Defendants In Violation of New York Antitrust Act on
    Behalf of Plaintiffs WellChoice and Excellus .........................................................................31

COUNT XII
    Unlawful Restraint of Trade by Defendants In Violation of Oklahoma's Antitrust Reform
    Act on Behalf of Plaintiff BCBS Oklahoma .............................................................................32

COUNT XIII
    Unlawful Monopolization by Defendants In Violation of New Jersey Law on Behalf of
    All Plaintiffs ............................................................................................................................33

COUNT XIV
    Unlawful Monopolization by Defendants In Violation of District of Columbia Law on
    Behalf of Plaintiff CareFirst ....................................................................................................34

COUNT XV
    Unlawful Monopolization by Defendants In Violation of Florida Antitrust Act of 1980
    Law on Behalf of Plaintiff BCBS Florida .................................................................................35

COUNT XVI
    Unlawful Monopolization by Defendants In Violation of Illinois Law on Behalf of
    Plaintiffs HCSC and Trustmark ...............................................................................................36

COUNT XVII
    Unlawful Monopolization by Defendants In Violation of Louisiana Law on Behalf of
    Plaintiff BCBS Louisiana .........................................................................................................37

COUNT XVIII
    Unlawful Monopolization by Defendants In Violation of Massachusetts Law on Behalf of
    Plaintiff BCBS Massachusetts .................................................................................................38

COUNT XIX
    Unlawful Monopolization by Defendants In Violation of Michigan Law on Behalf of
    Plaintiff BCBS Michigan ..........................................................................................................39

COUNT XX
    Unlawful Monopolization by Defendants In Violation of Minnesota Law on Behalf of
    Plaintiffs BCBS Minnesota and Federated Insurance ..............................................................40

Word 20113683.1

COUNT XXI
    Unlawful Monopolization by Defendants In Violation of Nebraska Law on Behalf of
    Plaintiff Mutual of Omaha ...................................................................................................42

COUNT XXII
    Unlawful Monopolization by Defendants In Violation of New Mexico Law on Behalf of
    Plaintiff HCSC ....................................................................................................................43

COUNT XXIII
    Unlawful Monopolization by Defendants In Violation of New York Law on Behalf of
    Plaintiffs WellChoice and Excellus ...................................................................................44

COUNT XXIV
    Unlawful Monopolization by Defendants In Violation of Oklahoma Law on Behalf of
    Plaintiff BCBS Oklahoma...................................................................................................45

COUNT XXV
    Unfair and Deceptive Trade Practices by Defendants In Violation of New Jersey
    Consumer Fraud Act on Behalf of All Plaintiffs ...............................................................46

COUNT XXVI
    Unfair and Deceptive Trade Practices by Defendants In Violation of the Delaware
    Consumer Fraud Act on Behalf of Plaintiff CareFirst.......................................................47

COUNT XXVII
    Unfair and Deceptive Trade Practices by Defendants In Violation of the Delaware
    Uniform Deceptive Trade Practices Act on Behalf of Plaintiff CareFirst ........................48

COUNT XXVIII
    Unfair and Deceptive Trade Practices by Defendants In Violation of the District of
    Columbia Consumer Protection Procedures Act on Behalf of Plaintiff CareFirst ............49

COUNT XXIX
    Unfair and Deceptive Trade Practices by Defendants In Violation of the Florida
    Deceptive and Unfair Trade Practices Act on Behalf of Plaintiff BCBS Florida.......................51

COUNT XXX
    Unfair and Deceptive Trade Practices by Defendants In Violation of the Illinois
    Consumer Fraud and Deceptive Business Practices Act on Behalf of Plaintiffs HCSC and
    Trustmark ...........................................................................................................................52

COUNT XXXI
    Unfair and Deceptive Trade Practices by Defendants In Violation of the Illinois Uniform
    Deceptive Trade Practices Act on Behalf of Plaintiffs HCSC and Trustmark ...........................53

COUNT XXXII
    Unfair and Deceptive Trade Practices by Defendants In Violation of the Louisiana Unfair
    Trade Practices and Consumer Protection Act on Behalf of Plaintiff BCBS Louisiana .............54

Word 20113683.1

COUNT XXXIII
    Unfair and Deceptive Trade Practices by Defendants In Violation of the Maryland
    Consumer Protection Act on behalf of Plaintiff CareFirst..........................................................55

COUNT XXXIV
    Unfair and Deceptive Trade Practices by Defendants In Violation of Massachusetts'
    Consumer Protection Act on Behalf of Plaintiff BCBS Massachusetts ......................................57

COUNT XXXV
    Unfair and Deceptive Trade Practices by Defendants In Violation of the Michigan
    Consumer Protection Act on Behalf of Plaintiff BCBS Michigan ...............................................57

COUNT XXXVI
    Unfair and Deceptive Trade Practices by Defendants In Violation of the Minnesota
    Uniform Deceptive Trade Practices Act on Behalf of Plaintiffs BCBS Minnesota and
    Federated Insurance ...................................................................................................................59

COUNT XXXVII
    Unfair and Deceptive Trade Practices by Defendants In Violation of the Minnesota
    Prevention of Consumer Fraud Act on Behalf of Plaintiff BCBS Minnesota ...........................60

COUNT XXXVIII
    Unfair and Deceptive Trade Practices by Defendants In Violation of the Nebraska
    Uniform Deceptive Trade Practices Act on Behalf of Plaintiff Mutual of Omaha ....................61

COUNT XXXIX
    Unfair Methods of Competition and Deceptive Practices by Defendants In Violation of
    the Nebraska Consumer Protection Act on Behalf of Plaintiff Mutual of Omaha ....................62

COUNT XL
    Unfair and Deceptive Trade Practices by Defendants In Violation of the New Mexico
    Unfair Practices Act on Behalf of Plaintiff HCSC ...................................................................62

COUNT XLI
    Unfair and Deceptive Trade Practices by Defendants In Violation of the New York
    Deceptive Acts and Practices Law on Behalf of Plaintiffs WellChoice and Excellus ...............64

COUNT XLII
    Unfair and Deceptive Trade Practices by Defendants In Violation of the Oklahoma
    Consumer Protection Act on Behalf of Plaintiff BCBS Oklahoma.............................................65

COUNT XLIII
    Unfair and Deceptive Trade Practices by Defendants In Violation of the Oklahoma
    Deceptive Trade Practices Act on Behalf of Plaintiffs BCBS Oklahoma ..................................66

COUNT XLIV
    Tortious Interference with Business Relationship or Prospective Economic Advantage by
    Defendants Under State Law on Behalf of All Plaintiffs ...........................................................67

Word 20113683.1

COUNT XLV
        Unjust Enrichment by Defendants Under State Law on Behalf of All Plaintiffs ........................68

Plaintiffs, by and through their attorneys, Robins, Kaplan, Miller & Ciresi L.L.P., on behalf of themselves and certain self-funded customers, hereby seek damages, other monetary relief and equitable relief for Defendants' violations of state antitrust and consumer protection laws. Plaintiffs' Complaint is based upon knowledge as to themselves and their own acts, and upon information and belief based on publicly available documents and pleadings as to all other matters, as follows:

## INTRODUCTION

1.      Pfizer, Inc., Warner-Lambert Co., Cline, Davis & Mann, Inc., Lodewijk J.R. de Vink, and Anthony Wild   (unless otherwise identified, collectively referred to herein as "Defendants") engaged in a continuing and on-going scheme to illegally increase market share and power by restraining generic bioequivalents of its popular anti-convulsant drug Neurontin from competing or otherwise entering the market through a false, deceptive, and misleading marketing campaign and misusing the legal and regulatory system.

## NATURE OF ACTION

2.      This action seeks damages and injunctive relief pursuant to state antitrust and state consumer protection statutes, in addition to redress for Defendants' unjust enrichment and tortious interference with Plaintiffs' prospective economic advantage and business relationships. Plaintiffs have paid and continue to pay artificially high prices for Neurontin or generic bioequivalents of Neurontin[1], as a direct result of Defendants' unlawful acts.  Defendants unreasonably prevented and eliminated competition in the market for Neurontin or generic bioequivalents of Neurontin, thereby illegally increasing and maintaining market share and power, and otherwise engaged in fraudulent, unfair, and deceptive acts and practices that directly

---

[1] Hereinafter "generic bioequivalents of Neurontin" or "generic bioequivalent of Neurontin"  means anhydrous gabapentin that is not lactam free, unless otherwise specified.

1

caused Plaintiffs and certain self-funded employer groups to pay inflated prices for Neurontin or generic bioequivalents of Neurontin.

## PLAINTIFFS

3.    Plaintiff Assurant Health, a subsidiary of Assurant, Inc., is a New York corporation with its principal place of business in Milwaukee, Wisconsin. At all times relevant to this action, Assurant Health has been, and is, licensed to do, and is doing, business in the state of Wisconsin and is a payer for prescription drugs, including Neurontin or generic bioequivalents of Neurontin, on behalf of its members and self-funded customers, typically employer-sponsored health plans that contract with Assurant Health to administer claims on their behalf and to pursue recoveries of plan-related losses. Assurant Health is engaged in prescription drug managed-care programs on behalf of its members and self-funded customers. Assurant Health has the authority on behalf of its self-funded customers to pursue claims against the Defendants. As used herein, "Assurant Health" includes its self-funded customers.

4.    Plaintiffs Blue Cross and Blue Shield of Florida, a Florida mutual insurance corporation and its wholly-owned subsidiary, Health Options, Inc., a Florida health care corporation (collectively "BCBS Florida"), are both incorporated under the laws of Florida and have their principal places of business in Jacksonville, Florida. At all times relevant to this action, BCBS Florida has been, and is, licensed to do, and is doing, business in the state of Florida and is a payer for prescription drugs, including Neurontin or generic bioequivalents of Neurontin, on behalf of its members and self-funded customers, typically employer-sponsored health plans that contract with BCBS Florida to administer claims on their behalf and to pursue recoveries of plan-related losses. BCBS Florida is engaged in prescription drug managed-care programs on behalf of its members and self-funded customers. BCBS Florida has the authority

2

on behalf of its self-funded customers to pursue claims against the Defendants. As used herein, "BCBS Florida" includes its self-funded customers.

5.      Plaintiff Louisiana Health Service & Indemnity Company, doing business as Blue Cross and Blue Shield of Louisiana is a Louisiana health services plan corporation incorporated under the laws of the state of Louisiana, and has its principal place of business in Baton Rouge, Louisiana and its wholly-owned subsidiary, Plaintiff HMO Louisiana, Inc. ("HMOLA") is a Louisiana corporation, (collectively "BCBS Louisiana"). At all times relevant to this action, BCBS Louisiana has been, and is, licensed to do, and is doing, business in the state of Louisiana and is a payer for prescription drugs, including Neurontin or generic bioequivalents of Neurontin, on behalf of its members and self-funded customers, typically employer-sponsored health plans that contract with BCBS Louisiana to administer claims on their behalf and to pursue recoveries of plan-related losses. BCBS Louisiana is engaged in prescription drug managed-care programs on behalf of its members and self-funded customers. BCBS Louisiana has the authority on behalf of its self-funded customers to pursue claims against the Defendants. As used herein, "BCBS Louisiana" includes its self-funded customers.

6.      Plaintiff Blue Cross and Blue Shield of Massachusetts, Inc. ("BCBS Massachusetts") is a hospital and medical services corporation organized under the laws of Massachusetts, and has its principal place of business in Boston, Massachusetts. At all times relevant to this action, BCBS Massachusetts has been, and is, licensed to do, and is doing, business in the state of Massachusetts and is a payer for prescription drugs, including Neurontin or generic bioequivalents of Neurontin, on behalf of its members and self-funded customers, typically employer-sponsored health plans that contract with BCBS Massachusetts to administer claims on their behalf and to pursue recoveries of plan-related losses. BCBS Massachusetts is

engaged in prescription drug managed-care programs on behalf of its members and self-funded customers. BCBS Massachusetts has the authority on behalf of its self-funded customers to pursue claims against the Defendants. As used herein, "BCBS Massachusetts" includes its self-funded customers.

7.    Plaintiffs Blue Cross Blue Shield of Michigan and its wholly-owned subsidiary, Blue Care Network, Inc. (collectively "BCBS Michigan") are Michigan health care corporations incorporated under the laws of Michigan, and have their principal places of business in Michigan. At all times relevant to this action, BCBS Michigan has been, and is, licensed to do, and is doing, business in the state of Michigan and is a payer for prescription drugs, including Neurontin or generic bioequivalents of Neurontin, on behalf of its members and self-funded customers, typically employer-sponsored health plans that contract with BCBS Michigan to administer claims on their behalf and to pursue recoveries of plan-related losses. BCBS Michigan is engaged in prescription drug managed-care programs on behalf of its members and self-funded customers. BCBS Michigan has the authority on behalf of its self-funded customers to pursue claims against the Defendants. As used herein, "BCBS Michigan" includes its self-funded customers.

8.    Plaintiffs Blue Cross Blue Shield of Minnesota, a subsidiary of Aware Integrated, Inc., and its wholly-owned subsidiaries Comprehensive Care Services, Inc., First Plan of Minnesota, Atrium Health Plan and HMO Minnesota, (collectively "BCBS Minnesota"), are Minnesota health services plan corporations incorporated under the Minnesota Nonprofit Health Service Plan Corporations Act, Minn. Stat. § 62C (2000), and have their principal places of business in Eagan, Minnesota. At all times relevant to this action, BCBS Minnesota has been, and is, licensed to do, and is doing, business in the state of Minnesota and is a payer for

4

prescription drugs, including Neurontin or generic bioequivalents of Neurontin, on behalf of its subscribers and self-funded customers, typically employer-sponsored health plans that contract with BCBS Minnesota to administer claims on their behalf and to pursue recoveries of plan-related losses. BCBS Minnesota is engaged in prescription drug managed-care programs on behalf of its subscribers and self-funded customers. BCBS Minnesota has the authority on behalf of its self-funded customers to pursue claims against the Defendants. As used herein, "BCBS Minnesota" includes its self-funded customers.

9.      Plaintiff Group Health Service of Oklahoma, Inc., doing business as Blue Cross Blue Shield of Oklahoma, is an Oklahoma health services corporation incorporated under the Oklahoma Hospital Service and Medical Indemnity Corporations, Nonprofit Act, Okla. Stat. tit. 36 Section 2601 et seq., and its wholly-owned subsidiary Plaintiff Group Health Maintenance Organization, Inc., doing business as Bluelincs HMO (collectively "BCBS Oklahoma") have their principal places of business in Tulsa, Oklahoma. At all times relevant to this action, BCBS Oklahoma has been, and is, licensed to do, and is doing, business in the state of Oklahoma and is a payer for prescription drugs, including Neurontin or generic bioequivalents of Neurontin, on behalf of its subscribers, typically employer-sponsored health plans that contract with BCBS Oklahoma to administer claims on their behalf and to pursue recoveries of plan-related losses. BCBS Oklahoma is engaged in prescription drug managed-care programs on behalf of its subscribers.

10.      Plaintiff CareFirst, Inc. is a health services plan corporation incorporated under the laws of Maryland, and has its principal place of business in Owings Mills, Maryland with wholly-owned subsidiaries: Plaintiffs CareFirst of Maryland, Inc., a Maryland corporation with its principal place of business in Owings Mills, Maryland; Willse & Associates, Inc. a Maryland

corporation with its principal place of business in Owings Mills, Maryland; CFS Health Group, Inc., a Maryland corporation with its principal place of business in Owings Mills, Maryland; Delmarva Health Plan, Inc., a Maryland corporation with its principal place of business in Owings Mills, Maryland; Free State Health Plan, Inc., a Maryland corporation with its principal place of business in Owings Mills, Maryland; Group Hospitalization and Medical Services, Inc., a District of Columbia company created under federal charter with its principal place of business in the District of Columbia; Capital Care, Inc., a District of Columbia corporation with its principal place of business in the District of Columbia; Capital Area Services, Inc., a West Virginia corporation with its principal place of business in West Virginia; and BCBS of Delaware, Inc., a Delaware corporation with its principal place of business in Delaware (collectively "CareFirst"). At all times relevant to this action, CareFirst has been, and is, licensed to do, and is doing, business in the state of Maryland and is a payer for prescription drugs, including Neurontin or generic bioequivalents of Neurontin, on behalf of its subscriber and self-funded customers, typically employer-sponsored health plans that contract with CareFirst to administer claims on their behalf and to pursue recoveries of plan-related losses. CareFirst is engaged in prescription drug managed-care programs on behalf of its subscriber and self-funded customers. CareFirst has the authority on behalf of its self-funded customers to pursue claims against the Defendants. As used herein, "CareFirst" includes its self-funded customers.

11.     Plaintiff Excellus Health Plan, Inc. is a New York insurer with its principal offices located in Rochester, New York, with a wholly-owned subsidiary, Plaintiff Excellus Benefit Services, Inc., a New York corporation, headquartered in Syracuse, N.Y. (collectively "Excellus") wholly-owned. At all times relevant to this action, Excellus has been, and is,

6

licensed to do, and is doing, business in the state of New York and is a payer for prescription drugs, including Neurontin or generic bioequivalents of Neurontin, on behalf of its members and self-funded customers, typically employer-sponsored health plans that contract with Excellus to administer claims on their behalf and to pursue recoveries of plan-related losses. Excellus is engaged in prescription drug managed-care programs on behalf of its members and self-funded customers. Excellus has the authority on behalf of its self-funded customers to pursue claims against the Defendants. As used herein, "Excellus" includes its self-funded customers.

12.    Federated Mutual Insurance Company ("Federated Insurance") is a Minnesota mutual corporation, with its principal place of business in Owatonna, Minnesota. At all times relevant to this action, Federated Insurance has been, and is, licensed to do, and is doing, business in the state of Minnesota and is a payer of prescription drugs, including Neurontin or generic bioequivalents of Neurontin, on behalf of its members and self-funded customers, typically employer-sponsored health plans that contract with Federated Insurance to administer claims on their behalf. Federated Insurance is engaged in prescription drug managed-care programs on behalf of its members and self-funded customers. Federated Insurance has the authority on behalf of its self-funded customers to pursue claims against the Defendants. As used herein, "Federated Insurance" includes its self-funded customers.

13.    Plaintiff Health Care Service Corporation ("HCSC") is an Illinois Mutual Legal Reserve Company, which includes its Illinois, New Mexico and Texas Divisions. HCSC is incorporated under the laws of the state of Illinois, and has its principal place of business in Chicago, Illinois. At all times relevant to this action, HCSC has been, and is, licensed to do, and is doing, business in the states of Illinois, Texas and New Mexico, and is a payer for prescription drugs, including Neurontin or generic bioequivalents of Neurontin, on behalf of its members and

7

self-funded customers, typically employer-sponsored health plans that contract with HCSC to administer claims on their behalf and to pursue recoveries of plan-related losses. HCSC is engaged in prescription drug managed-care programs on behalf of its members and self-funded customers. HCSC has the authority on behalf of its self-funded customers to pursue claims against the Defendants. As used herein, "HCSC" includes its self-funded customers.

14.    Plaintiff Mutual of Omaha Insurance Company ("Mutual of Omaha") is a Nebraska mutual company incorporated under the laws of Nebraska, and has its principal place of business in Omaha, Nebraska, with wholly-owned subsidiaries: United of Omaha Life Insurance Company, a Nebraska corporation with its principal place of business in Omaha, Nebraska; United World Life Insurance Company, a Nebraska corporation with its principal place of business in Omaha, Nebraska; Exclusive Healthcare, Inc., a Nebraska corporation, with its principal place of business in Omaha, Nebraska; and Companion Life Insurance Company, incorporated in New York, with its principal place of business in New York (collectively, "Mutual of Omaha"). At all times relevant to this action, Mutual of Omaha has been, and is, licensed to do, and is doing, business in the state of Nebraska and is a payer for prescription drugs, including Neurontin or generic bioequivalents of Neurontin, on behalf of its members and self-funded customers, typically employer-sponsored health plans that contract with Mutual of Omaha to administer claims on their behalf and to pursue recoveries of plan related losses. Mutual of Omaha is engaged in prescription drug managed-care programs on behalf of its members and self-funded customers. Mutual of Omaha is also pursuing the claims of its self-funded customers against the Defendants. As used herein, "Mutual of Omaha" includes its self-funded customers.

8

15.    The Trustmark Insurance Company (Sentinel Group) ("Trustmark") is a Delaware Corporation with its principal place of business in Lake Forest, Illinois. At all times relevant to this action, Trustmark has been, and is, licensed to do, and is doing, business in the state of Illinois and is a payer for prescription drugs, including gabapentin prescription products, on behalf of its members and self-funded customers, typically employer-sponsored health plans that contract with Trustmark to administer claims on their behalf and to pursue recoveries of plan-related losses. Trustmark is engaged in prescription drug managed-care programs on behalf of its members and self-funded customers. Trustmark has the authority on behalf of its self-funded customers to pursue claims against the Defendants. As used herein, "Trustmark" includes its self-funded customers.

16.    Plaintiff WellChoice, Inc. is a corporation incorporated under the laws of Delaware with its principal place of business in New York, New York. Plaintiff WellChoice Inc. wholly owns (through WellChoice Holdings of New York, Inc.) Plaintiff Empire HealthChoice Assurance, Inc. (d/b/a Empire Blue Cross Blue Shield and Empire Blue Cross) ("EHCA") which in turn wholly owns Plaintiff Empire HealthChoice HMO, Inc. (d/b/a Empire Blue Cross Blue Shield HMO and Empire Blue Cross HMO in the state of New York, and d/b/a WellChoice HMO of New Jersey in the state of New Jersey). EHCA is a health insurance corporation incorporated under the laws of New York; and Empire HealthChoice HMO, Inc. is a health maintenance corporation incorporated under the laws of the state of New York. (collectively "WellChoice"). At all times relevant to this action, WellChoice has been, and is, licensed to do, and is doing, business in the state of New York and is a payer for prescription drugs, including Neurontin or generic bioequivalents of Neurontin, on behalf of its members and self-funded customers, typically employer-sponsored health plans that contract with WellChoice to

9

administer claims on their behalf and to pursue recoveries of plan-related losses. WellChoice is engaged in prescription drug managed-care programs on behalf of its members and self-funded customers. WellChoice has the authority on behalf of its self-funded customers to pursue claims against the Defendants. As used herein, "WellChoice" includes its self-funded customers.

17.     Plaintiff WellChoice Insurance of New Jersey, Inc. is a health insurance corporation incorporated under the laws of the state of New Jersey, which has its principal place of business in Iselin, New Jersey ("WellChoice of New Jersey"). WellChoice of New Jersey is a wholly owned subsidiary of EHCA, and at all times relevant to this action, WellChoice of New Jersey has been, and is, licensed to do, and is doing, business in the state of New Jersey and is a payer for prescription drugs, including Neurontin or generic bioequivalents of Neurontin, on behalf of its members and/or self-funded customers, typically employer-sponsored health plans that contract with WellChoice of New Jersey to administer claims on their behalf and to pursue recoveries of plan-related losses. WellChoice of New Jersey is engaged in prescription drug managed-care programs on behalf of its members and self-funded customers. WellChoice of New Jersey has the authority on behalf of its self-funded customers to pursue claims against the Defendants. As used herein, "WellChoice of New Jersey" includes its self-funded customers.

## DEFENDANTS

18.     Defendant Pfizer, Inc. is a Delaware corporation with its principal corporate offices located at 235 East 42nd Street, New York, New York. Defendant Pfizer, Inc. wholly owns Defendant Warner-Lambert Company and its Parke-Davis Division as of June 19, 2000, and Defendant Pfizer, Inc. is the successor corporation to Warner-Lambert Company, Inc., a Delaware Corporation with its principal place of business at 201 Tabor Road, Morris Plains,

Word 20113683.1

New Jersey, and any parent, subsidiary, division, or affiliate of Warner-Lambert Company, Inc. (unless otherwise identified, collectively "Pfizer").

19.     Pfizer is a leading international pharmaceutical company distributing products to 150 countries worldwide, and manufactures and markets several of the world's top-selling brand-name prescription drugs, including Neurontin.   In 2003, Pfizer's net sales worldwide were approximately $45.2 billion.

20.     Since Pfizer's acquisition of Warner-Lambert Company in June 2000, Pfizer has continued to participate in, further, accept the benefits from, and ratify a scheme commenced by Warner-Lambert Company and others to prevent or delay generic versions of Neurontin from being available to the public and misrepresenting Neurontin and its safety and effectiveness.

21.     Defendant Cline, Davis & Mann, Inc. ("Cline, Davis & Mann") is a New York corporation with its principal place of business at 22 East 42nd Street, New York, New York 10017, with offices at 302 Carnegie Center, Suite 102, Princeton, New Jersey 08540.  Defendant Cline, Davis & Mann, Inc. entered into an agreement with Defendant Pfizer and was aware of, participated in, and received the benefits from the conduct alleged in this Complaint.

22.     Defendant Lodewijk J.R. de Vink was the former Chairman, Chief Executive Officer and President of Warner-Lambert Company.   Upon information and belief, Defendant Lodewijk J.R. de Vink is a resident of New Jersey.

23.     Defendant Lodewijk J.R. de Vink has personally benefited from and participated in, directed, knowingly acquiesced to or should have known about and had the power to control the conduct alleged in this Complaint and incorporated herein by reference.

24.     Defendant Anthony Hugh Wild was the former Executive Vice President of Warner-Lambert Company and President of Warner-Lambert Company's Pharmaceutical Sector,

11

and President of Parke-Davis North America. Defendant Anthony Hugh Wild is a resident of New Jersey.

25.    Defendant Anthony Hugh Wild has personally benefited from and participated in, directed, knowingly acquiesced to or should have known about and had the power to control the conduct alleged in this Complaint and incorporated herein by reference.

26.    The acts alleged in this Complaint related to Defendants Pfizer and Cline, Davis & Mann, Inc. were authorized, ordered and performed by their officers, directors, agents, employees, representatives or subsidiaries while engaged in the management, direction, control or transaction of Defendants' businesses.

**JURISDICTION AND VENUE**

27.    Subject matter jurisdiction is proper pursuant to N.J. Stat. § 56:9-10 (2004).

28.    Venue in this Court is proper pursuant to New Jersey Court Rules 4:3-2 (2004). Defendants' conduct as alleged below transpired and/or was carried out in New Jersey and elsewhere in the United States. In addition, Defendants maintain offices, facilities or residences in various locations in New Jersey, including Morris Plains, New Vernon, Parsippany, Peapack, Princeton and Red Bank. Defendants do business in Bergen County.

**FACTS**

29.    Defendant Pfizer began to market anhydrous gabapentin that is not lactam free, under the brand name Neurontin, in or about 1993. Defendant Pfizer marketed Neurontin as a unique and superior product compared to other drugs. The actual demand for Neurontin, however, was small, because Neurontin had only been approved as an anti-convulsant agent for adjunctive treatment, not stand-alone treatment, of seizures for adults with epilepsy up to 1800 mg/day.

12

30.    In addition to the relatively small demand for Neurontin's approved use, Neurontin also had a short patent protection period. The patent for gabapentin expired in 1998, and the patent for the use of gabapentin to treat epilepsy expired on or about July 16, 2000. Defendants understood that Neurontin's market share and price would be significantly reduced when generic bioequivalents of Neurontin, anhydrous gabapentin that is not lactam free, entered the market, and that there was a limited period of time to increase demand for Neurontin and charge supra-competitive rates.

31.    During the relevant period, the relevant geographic market is the United States and the relevant product market is Neurontin and its generic bioequivalent, anhydrous gabapentin that is not lactam free. Defendant Pfizer's share of the relevant geographic and product market for Neurontin and the generic bioequivalent of Neurontin, anhydrous gabapentin that is not lactam free, was 100%. From 1994 until late 2004, Defendant Pfizer controlled the relevant product market and fixed the price for Neurontin at artificially high or supra-competitive levels.

32.    Generic bioequivalents of Neurontin could and would begin competing with Neurontin after its patents had expired on or about July 16, 2000. Therefore, in 1994 or 1995, Defendants met and devised an illegal scheme to expand and extend market share and power through a false, deceptive, and misleading marketing campaign and misuse of the legal and regulatory system. Specifically, Defendants decided to increase demand for Neurontin and interfere with potential generic competitors by illegally marketing Neurontin for certain uses that were not safe and effective, in conjunction with acquiring and using other patents on other forms and methods of using gabapentin for anticompetitive purposes.

13

33.    Defendants also believed that their scheme would minimize the negative impact generic bioequivalents of Neurontin might have on potential sales of another drug that Defendant Pfizer had been developing, which would be exclusively sold and priced by Defendant Pfizer.

34.    The intensity and scope of Defendants' illegal scheme was aptly summarized by the following directive to medical liaisons by a Sales Director for Defendant Pfizer:

> I want you out there every day selling Neurontin. Look this isn't just me, it comes down from Morris Plains that Neurontin is more profitable....we know Neurontin's not growing adjunctive therapy, beside that is not where the money is. Pain management now that's money. Monotherapy, that's money. We don't want to share these patients with everybody, we want them on Neurontin only. We want their whole drug budget, not a quarter, not half, the whole thing....We can't wait for them to ask, we need to get out there and tell them up front...That's where we need to be holding their hand and whispering in their ear Neurontin for pain, Neurontin for monotherapy, Neurontin for bipolar, Neurontin for everything...I don't want to see a single patient coming off Neurontin until they have been up to at least 4800 mg/day. I don't want to hear that safety crap either, have you tried Neurontin, every one of you should take on just to see there is nothing, it's a great drug.

35.    To create additional demand for Neurontin, Defendants implemented a false, deceptive, and misleading marketing program designed to convince the public, including Plaintiffs, that Neurontin was safe and effective for certain uses that were, in fact, not safe and effective.

36.    Defendants represented, directly and by implication, that Neurontin was safe and effective, as those terms are commonly understood, at dosages above 1800 mg/day, as monotherapy for the treatment of epilepsy and seizures, and for the treatment of a myriad of disorders or diseases, including but not limited to, psychiatric disorders, like anxiety, Attention Deficit Disorder, depression, and bipolar; restless leg syndrome; migraine headaches; alcohol withdrawal; spinal cord injury; tremors; Amyotrophic Lateral Sclerosis ("ALS"), otherwise known as Lou Gehrig's disease; painful diabetic and peripheral neuropathy; reflex sympathetic

14

dystrophy; and general pain management.    Such representations were false, deceptive and misleading or lacked sufficient substantiation.

37.    Defendants represented that Neurontin was safe and effective for certain treatments, as identified above, by using various deceptive business practices, including but not limited to, the following:

A.    Misrepresenting, directly and by implication, the independence, role, and credentials of its medical liaisons;

B.    Misrepresenting, directly and by implication, the independence, scientific validity, results, and, at times, existence, of purported medical studies or clinical trials or concealing studies that had shown Neurontin was not effective for certain uses;

C.    Creating and publishing false, deceptive, and misleading articles related to certain uses of Neurontin, including, but not limited to, misrepresenting, directly and by implication, the identity and independence of the author, the article's scientific validity, and the financial relationship between the Defendant Pfizer, author, and medical journal;

D.    Misrepresenting, directly and by implication, the purpose and independence of Continuing Medical Education Seminars and other presentations;

E.    Making payments to doctors to prescribe Neurontin for unproven and possibly dangerous uses, under the guise of consulting or speaking fees, or to participate in purported medical studies that had little, if any, scientific value; and

F.    Creating and publishing false, deceptive, and misleading advertisements related to Neurontin, including, but not limited to, misrepresenting, directly and by implication, that Neurontin has been proven safe and effective for a broader range of treatment than has actually been established.    For example, an advertisement, published in December 2001,

represented that Neurontin was effective in treating or improving social limitations, memory difficulties, energy level, and work limitations. In another advertisement, published in 2002, Defendant Pfizer represented that Neurontin interacts with the brain in a particular manner and that it was an effective treatment as monotherapy for Epilepsy. These and other advertisements have a tendency and capacity to deceive.

38.    Defendant Pfizer entered into agreements with doctors, providers, marketing firms, and other independent entities to unreasonably restrain trade, further anticompetitive goals, and improperly expand and maintain market share and power. Pursuant to the agreements, Defendant Pfizer paid these third parties money in exchange for the false, deceptive, and misleading promotion of Neurontin. These agreements were intentionally entered into with the full knowledge of Defendant Pfizer's anticompetitive goals and of the effect their actions would have on competition.

39.    For example, Defendant Pfizer entered into an agreement with Defendant Cline, Davis & Mann, a self-described "full service pharmaceutical advertising agency," to develop a marketing program that would improperly expand and grow Defendant Pfizer's market share and power. Such actions were in conjunction with and to maximize the effect of excluding and harassing competitors.

40.    Under the direction or control of Defendants Lodewijk de Vink and Anthony Wild and pursuant to an agreement and in partnership with Defendant Pfizer, Defendant Cline, Davis & Mann:

A.    Developed and wrote Continuing Medical Education seminars and other presentations that were, in fact, Neurontin sales presentations and that contained false, deceptive, and misleading information related to Neurontin and competitors' products;

16

B.    Actively participated in the creation and implementation of Neurontin's false, deceptive and misleading marketing plans and tactics, as outlined above; and

C.    At all times was privy to and aware of the anticompetitive goals and purpose of the Neurontin marketing program, and substantially assisted in illegally expanding, continuing, and maximizing Defendant's Pfizer's market share and power through false, deceptive, and misleading representations and business practices.

41.    Defendants' representations, both direct and implied, related to certain uses of Neurontin were clearly false and material.  These representations were made to the public, including Plaintiffs, and were likely to and did induce reasonable reliance.  Defendants' false, deceptive, and misleading representations continued for a prolonged period of time, and were not readily susceptible of neutralization or otherwise offset by rivals.

42.    As a direct and proximate cause of Defendant Pfizer's agreements with third parties, sales of Neurontin grew dramatically and Defendant Pfizer's market share and power similarly grew.  Neurontin is a drug widely reimbursed by payers, HMOs, and employer groups, and it is marketed and sold in all fifty states and the District of Columbia.  Since its introduction, sales of Neurontin have increased to approximately $1.7 billion in 2003.

43.    Plaintiffs were directly injured by Defendants' conduct.  Defendants' wrongful action included the misrepresentation of Neurontin's safety and effectiveness, and this fraud directly caused economic loss to Plaintiffs.

44.    Plaintiffs were directly harmed by the deception practiced upon them.  Had Plaintiffs not been deceived by Defendants' misrepresentations about the safety and effectiveness of Neurontin, Plaintiffs would have taken steps to so as not to allow or discourage the purchase of Neurontin at the prices set by Defendant Pfizer.  Among the steps Plaintiffs

17

might have taken were to change reimbursement rates, block the adjudication of specific unique national drug code ("NDC") numbers, exclude the drug altogether from their formulary, or otherwise dissuade doctors from prescribing Neurontin.

45.    Defendants further sought, in conjunction with the marketing program described above and part of a common scheme, to restrain competition and prevent generic bioequivalents of Neurontin from entering the market by misusing the legal and regulatory system to harass, intimidate, and interfere with competitors. Defendants' conduct was done intentionally, in bad faith, and as a method to use the legal and regulatory system as an anticompetitive weapon.

46.    Since 1998, Defendants have engaged in a series of lawsuits against manufacturers and distributors who intend to make or have made a generic bioequivalent of Neurontin available to the public.[2] Defendants engaged in this series of legal proceedings without regard to whether they are successful or unsuccessful. The lawsuits were knowingly and intentionally filed for the purpose of harassment without regard to the merits, and were not filed in a genuine interest to redress grievances.

47.    Defendants' lawsuits against manufacturers and distributors of a generic bioequivalent of Neurontin were objectively baseless, meaning no reasonable litigant could realistically expect success on the merits or conclude that the lawsuits were reasonably

---

[2] The lawsuits filed by Defendant Pfizer include, but are not limited to, the following: *Warner-Lambert Co. v. Apotex, Inc. and Torpharm,* No. 98 C 4293 (N.D. Ill. filed July 14, 1998); *Warner-Lambert Co. v. Apotex, Inc. and Torpharm,* No. 01-0611 (N.D. Ill. filed February 5, 2001); *Warner-Lambert Co. v. Purepac Pharmaceutical Co. and Faulding Inc.,* No. 98-2749 (D. N.J. filed June 11, 1998); *Warner-Lambert Co. v. Purepac Pharmaceutical Co. and Faulding Inc.,* No. 99-5948 (D.N.J. filed December 20, 1999); *Warner-Lambert Co. v. Purepac Pharmaceutical Co. and Faulding Inc.,* No. 00-2931 (D.N.J. filed June 15, 2000); *Warner-Lambert Co. v. Purepac Pharmaceutical Co. and Faulding Inc.,* No. 00-3522 (D.N.J. filed July 20, 2000); *Pfizer Inc., Warner-Lambert Co. v. Teva Pharmaceuticals,* No. 00-4168 (D.N.J. filed August 24, 2000); *Pfizer Inc., Warner-Lambert Co. v. Teva Pharmaceuticals,* No. 00-4589 (D.N.J. filed September 20, 2000); *Pfizer Inc. v. Zenith Laboratories and Ivax Corp.,* No. 00-6073 (D.N.J. filed December 14, 2000); *Pfizer Inc. v. Zenith Laboratories and Ivax Corp,* No. 01-0193 (D.N.J. filed January 12, 2001); *Pfizer Inc. v. Zenith Laboratories and Ivax Corp.,* No. 01-1537 (D.N.J. filed March 30, 2001). These pleadings and related orders are incorporated herein by reference.

Word 20113683.1

calculated to elicit a favorable outcome, because Defendants knew at the time that each lawsuit was filed that the generic bioequivalents of Neurontin would not infringe upon any valid and enforceable patent for Neurontin or each lawsuit became objectively baseless and Defendants continued to litigate the lawsuit despite this knowledge.

48.    Defendant Pfizer also intentionally made false representations to the Food and Drug Administration ("FDA") in listing patents in the Orange Book. Specifically, Defendants represented, directly or by implication, that its patents claim a drug or drug product or method of using a drug or drug product that the patents do not claim. Defendants further represented that a claim of patent infringement could be reasonably asserted that, in fact, could not be reasonably asserted.

49.    For example, Defendants claimed that its patents related to monohydrate gabapentin and low-lactam or lactam-free gabapentin "claim" the brand name drug, Neurontin, even though Neurontin and generic bioequivalents of Neurontin are anhydrous, not monohydrate, and Neurontin and generic bioequivalents of Neurontin are not low lactam or lactam free.

50.    Defendants made these representations to harass and to intimidate competitors that intended to make and distribute generic bioequivalents of Neurontin and to delay competition for Neurontin. Defendants knew that such representations could provide, at least, a 30-month stay before a generic bioequivalent entered the market, and Defendants misused the legal and regulatory system to improperly obtain that stay.

51.    Upon information and belief, Defendants also intentionally manipulated and delayed its acquisition of patents and timing of interactions with the FDA to extend the automatic stay of generic bioequivalents of Neurontin by, at least, 23 months.

52.    By interfering with or preventing a generic bioequivalent of Neurontin from entering the market, Defendants injured Plaintiffs in their business or property by causing them to pay more than they otherwise would have paid.  As a result of Defendants' unlawful actions, Plaintiffs have been injured in their business or property.  During the relevant period, Plaintiffs did not have an opportunity to fully benefit from competition among generic bioequivalents of Neurontin and Neurontin.

53.    Defendants have known that the principal basis upon which generic pharmaceutical companies compete is not quality or superiority but price.  When a generic manufacturer obtains final approval for a generic bioequivalent drug and that drug is made available, it will be sold by pharmacists as a substitute for brand name drugs, such as Neurontin, and prices are dramatically reduced.  For example, the first generic bioequivalent drug typically enters the market at 60% to 70% of the brand name price.  When a second generic bioequivalent drug enters the market, prices are likely to fall to between 50% to 60% of the brand name drug's price.  Each subsequent competitor can lower the price further until five or more generic bioequivalent drugs have entered the market, and, at that point, the generic bioequivalent drugs' prices stabilize at 20% to 30% of the brand name drug's price.

54.    If a generic bioequivalent of a brand-name drug exists and the physician has not specifically restricted the prescription to the brand-name drug, then for patients covered by Plaintiffs' plans, the pharmacist will fill the prescription with the less expensive, but bioequivalent, generic drug.  In fact, in some states, including Massachusetts and Minnesota, for example, a pharmacist is statutorily required to fill a prescription with a generic bioequivalent of a brand-name drug where the physician has not restricted substitution.  Minn. Stat. § 151.21 (2003); Mass. Gen. Laws ch. 112, § 12D (2004).

20

55.    Third-party payers, such as Plaintiffs, depend on real competition between pharmaceutical manufacturers.   By preventing competition, Defendant effectively thwarted Plaintiffs' efforts to reduce and control drug costs.

56.    But for Defendants' illegal acts, Plaintiffs could not encourage and/or mandate the use of a generic bioequivalent of Neurontin to achieve significant savings.   Plaintiffs were injured as a direct and proximate cause of Defendants' actions.

57.    The above-described injury is of the type antitrust laws were designed to prevent and flows from that which makes Defendants' conduct unlawful.   Moreover, Plaintiffs' injuries are of the type that the various consumer protection, insurance fraud, and deceptive trade practices acts were enacted to address and redressing the harm caused by and preventing or discouraging future conduct as described herein is in the public interest.

58.    Defendants have no legitimate justification, economic or otherwise, for the above-described violations of law.

### COUNT I

**Unlawful Restraint of Trade by Defendants In Violation of
New Jersey Antitrust Act on Behalf of All Plaintiffs**

59.    Plaintiffs incorporate and reaver by reference the averments contained in preceding paragraphs 1 through 58.

60.    Defendants' above-described conduct violates the New Jersey Antitrust Act.  N.J. Stat. §§ 56:9-1 to 56:9-19.

61.    Defendants' above-described conduct necessarily and directly restrained and affected trade or commerce in New Jersey and throughout the United States.  N.J. Stat. § 56:9-3.

62.    Plaintiffs are "persons" under the New Jersey Antitrust Act.  N.J. Stat. § 56:9-2.

63.    Defendants are "persons" under the New Jersey Antitrust Act.  N.J. Stat. § 56:9-2.

21

64.    Defendants' unlawful above-described conduct directly and proximately resulted in increased payments by Plaintiffs for Neurontin or generic bioequivalents of Neurontin.

65.    The economic injury to Plaintiffs and their self-funded customers can be determined through an accurate account of payments for Neurontin.  Plaintiffs' recovery will not pose a risk of double recovery.

66.    As a result of Defendants' above-described conduct, Plaintiffs are entitled to three times the actual damages sustained, in an amount to be proven at trial, as well as reasonable attorneys' fees, disbursements and costs, against Defendant, jointly and severally.  N.J. Stat. § 56:9-12.

## COUNT II

### Unlawful Restraint of Trade by Defendants In Violation of District of Columbia's Antitrust Act on Behalf of Plaintiff CareFirst

67.    Plaintiff CareFirst incorporates and reavers by reference the averments contained in preceding paragraphs 1 through 66.

68.    Defendants' above-described conduct violates the District of Columbia Antitrust Act.  D.C. Code Ann. § 28-4501 (2004).

69.    Defendants' above-described conduct necessarily and directly restrained and affected trade or commerce in District of Columbia.  D.C. Code Ann. § 28-4502.

70.    Plaintiff CareFirst is a "person" under the District of Columbia Antitrust Act. D.C. Code Ann. § 28-4501.

71.    Defendants are "persons" under the District of Columbia Antitrust Act.  D.C. Code Ann. § 28-4501.

72.    Defendants' above-described conduct directly and proximately resulted in increased payments by Plaintiff CareFirst for Neurontin or generic bioequivalents of Neurontin.

73.    The economic injury to Plaintiff CareFirst and its self-funded customers can be determined through an accurate account of payments for Neurontin or generic bioequivalents of Neurontin.  Plaintiff CareFirst's recovery will not pose a risk of double recovery.

74.    As a direct and proximate result of Defendants' above-described conduct, Plaintiff CareFirst is entitled to three times the actual damages sustained, in an amount to be proven at trial, as well as reasonable attorneys' fees, disbursements and costs, against Defendants, jointly and severally.  D.C. Code Ann. § 28-4507.

## COUNT III

### Unlawful Restraint of Trade by Defendants In Violation of the District of Columbia's Prescription Drug Price Information Law on Behalf of Plaintiff CareFirst

75.    Plaintiff CareFirst incorporates and reavers by reference the averments contained in the preceding paragraphs 1 through 74.

76.    The District of Columbia Prescription Drug Price Information Restraints of Trade law, D.C. Code Ann. § 48-804.02 is designed to protect insurers such as Plaintiffs and their self-funded employer groups from unlawful restraints of trade that cause tortious injury to payers and patients by increasing the cost of health care.  The Defendants' acts and practices described in this Complaint fall into the category of the types of acts or practices this provision is meant to prevent.

77.    Plaintiff CareFirst is a "person" within the meaning of D.C. Code Ann. § 48-804.51 (2004).

78.    Defendants are "persons" within the meaning of D.C. Code Ann. § 48-804.51.

79.    Defendants' acts and practices jeopardized and/or raised the net price of, the supply from manufacturers or wholesalers of drugs to the patients and the payers.

80.    Defendants have violated the letter and spirit of the Prescription Drug Price Information law by interfering and/or engaging in unlawful and misleading statements, fraudulent conduct, deception and anti-competitive acts as described in this Complaint, in order to continue receiving inflated payments for Neurontin or generic bioequivalents of Neurontin from Plaintiff CareFirst.

81.    Plaintiff CareFirst has been damaged within the meaning of this provision, and is entitled to treble damages inasmuch as the Defendants have engaged in a pattern of violating the District of Columbia Prescription Drug Price Information Restraints of Trade law.

## COUNT IV

### Unlawful Restraint of Trade by Defendants In Violation of Florida Antitrust Act of 1980 on Behalf of Plaintiff BCBS Florida

82.    Plaintiff BCBS Florida incorporates and reavers by reference the averments contained in the preceding paragraphs 1 through 81.

83.    Defendants' above-described conduct violates the Florida Antitrust Act of 1980, Fla. Stat. §§ 542.15 *et seq.* (2003).

84.    Defendants' above-described conduct necessarily and directly restrained and affected trade or commerce in Florida within the meaning of Fla. Stat. §§ 542.17(4) and 542.18.

85.    Plaintiff BCBS Florida is a "person" under the Florida Antitrust Act of 1980. Fla. Stat. § 542.17(3).

86.    Defendants are "persons" under the Florida Antitrust Act of 1980. Fla. Stat. § 542.17(3).

87.    Defendants' unlawful conduct affected the specifically defined market for Neurontin or generic bioequivalents of Neurontin.

24

88.     Defendants' possessed the ability to affect the price for Neurontin or generic bioequivalents of Neurontin.

89.     The exclusion of generic drug manufacturers from the market affected or was intended to affect the price of supply of Neurontin or generic bioequivalents of Neurontin in the market.

90.     Defendants' unlawful conduct harmed competition in general.

91.     Defendants' above-described conduct directly and proximately resulted in increased payments by Plaintiff BCBS Florida for Neurontin or generic bioequivalents of Neurontin.

92.     The economic injury to Plaintiff BCBS Florida and its self-funded customers can be determined through an accurate account of payments for Neurontin or generic bioequivalents of Neurontin. Recovery by Plaintiff BCBS Florida will not pose a risk of double recovery.

93.     As a direct and proximate result of Defendants' above-described conduct, Plaintiff BCBS Florida is entitled to three times the actual damages sustained, in an amount to be proven at trial, as well as reasonable attorneys' fees, disbursements and costs, against Defendants, jointly and severally.  Fla. Stat. § 542.22(1).

## COUNT V

### Unlawful Restraint of Trade by Defendants In Violation of
### the Illinois Antitrust Act on Behalf of Plaintiffs HCSC and Trustmark

94.     Plaintiffs HCSC and Trustmark incorporate and reaver by reference the averments contained in preceding paragraphs 1 through 93.

95.     Defendants' above-described conduct violates the Illinois Antitrust Act.  740 Ill. Comp. Stat. 10/1 to 10/11 (2004).

25

96.    Defendants' above-described conduct necessarily and directly restrained and affected trade or commerce in Illinois. 740 Ill. Comp. Stat. 10/1 to 10/11.

97.    Plaintiffs HCSC and Trustmark are "persons" under the Illinois Antitrust Act. 740 Ill. Comp. Stat. 10/1 to 10/11.

98.    Defendants are "persons" under the Illinois Antitrust Act.  740 Ill. Comp. Stat. 10/1 to 10/11.

99.    Defendants' above-described conduct directly and proximately resulted in increased payments by Plaintiffs HCSC and Trustmark for Neurontin or generic bioequivalents of Neurontin.

100.    The economic injury to Plaintiffs HCSC and Trustmark and their self-funded customers can be determined through an accurate account of payments for Neurontin or generic bioequivalents of Neurontin.  Plaintiffs' recovery will not pose a risk of double recovery.

101.    As a direct and proximate result of Defendants' above-described conduct, Plaintiffs HCSC and Trustmark are entitled to three times the actual damages sustained, in an amount to be proven at trial, as well as reasonable attorneys' fees, disbursements and costs, against Defendants, jointly and severally. 740 Ill. Comp. Stat. 10/1 to 10/11.

## COUNT VI

### Unlawful Restraint of Trade by Defendants In Violation of
### Louisiana Antitrust Act on Behalf of Plaintiff BCBS Louisiana

102.    Plaintiff BCBS Louisiana incorporates and reavers by reference the averments contained in preceding paragraphs 1 through 101.

103.    Defendants' above-described conduct violates the Louisiana Antitrust Act.  La. Rev. Stat. Ann.  §§ 51:121 to 152 (2004).

26

104.    Defendants' above-described conduct necessarily and directly restrained and affected trade or commerce in Louisiana. La. Rev. Stat. Ann. § 51:122.

105.    Defendants' above-described conduct directly and proximately resulted in increased payments by Plaintiff BCBS Louisiana for Neurontin or generic bioequivalents of Neurontin.

106.    The economic injury to Plaintiff BCBS Louisiana and its self-funded customers can be determined through an accurate account of payments for Neurontin or generic bioequivalents of Neurontin. Plaintiff BCBS Louisiana's recovery will not pose a risk of double recovery.

107.    As a direct and proximate result of Defendants' above-described conduct, Plaintiff BCBS Louisiana is entitled to three times the actual damages sustained, in an amount to be proven at trial, as well as reasonable attorneys' fees, disbursements and costs, against Defendants, jointly and severally. La. Rev. Stat. Ann. § 51:137.

## COUNT VII

### Unlawful Restraint of Trade by Defendants In Violation of Michigan Antitrust Reform Act on Behalf of Plaintiff BCBS Michigan

108.    Plaintiff BCBS Michigan incorporates and reavers by reference the averments contained in preceding paragraphs 1 through 107.

109.    Defendants' above-described conduct unreasonably restrained trade in the market for Neurontin or generic bioequivalents of Neurontin in violation of the Michigan Antitrust Reform Act. Mich. Comp. Laws §§ 445.771 to .778 (2004).

110.    Defendants' above-described conduct necessarily and directly restrained and affected trade or commerce in Michigan. Mich. Comp. Laws § 445.772.

27

111.    Plaintiff BCBS Michigan is a "person" under the Michigan Antitrust Reform Act. Mich. Comp. Laws § 445.771.

112.    Defendants are "persons" under the Michigan Antitrust Reform Act.    Mich. Comp. Laws § 445.771.

113.    As to BCBS Michigan, the above-described unreasonable restraint of trade occurred primarily and substantially within the state of Michigan. Mich. Comp. Laws § 445.772.

114.    Defendants' above-described conduct directly and proximately resulted in increased payments by Plaintiff BCBS Michigan for Neurontin or generic bioequivalents of Neurontin.

115.    The economic injury to Plaintiff BCBS Michigan and its self-funded customers can be determined through an accurate account of payments for Neurontin and generic bioequivalents of Neurontin.  Plaintiff BCBS Michigan's recovery will not pose a risk of double recovery.

116.    Defendants' above-described conduct was a willful and flagrant violation of Section 8 of the Michigan Antitrust Reform Act.  As a direct and proximate result, Plaintiff BCBS Michigan is entitled to three times the actual damages sustained, in an amount to be proven at trial, as well as reasonable attorney's fees, disbursements and costs, against Defendants, jointly and severally.  Mich. Comp. Laws § 445.778.

## COUNT VIII

**Unlawful Restraint of Trade by Defendants In Violation of Minnesota
Antitrust Act of 1971 on Behalf of Plaintiffs BCBS Minnesota and Federated Insurance**

117.    Plaintiffs BCBS Minnesota and Federated Insurance incorporate and reaver by reference the averments contained in preceding paragraphs 1 through 116.

28

118.    Defendants' above-described conduct violates the Minnesota Antitrust Act of 1971. Minn. Stat. §§ 325D.49 to .66 (2003).

119.    Defendants' above-described conduct necessarily and directly restrained and affected trade or commerce in Minnesota. Minn. Stat. § 325D.54(b).

120.    Plaintiffs BCBS Minnesota and Federated Insurance are "persons" under the Minnesota Antitrust Act of 1971. Minn. Stat. § 325D.50(5).

121.    Defendants are "persons" under the Minnesota Antitrust Act of 1971. Minn. Stat. § 325D.50(5).

122.    Defendants' above-described conduct directly and proximately resulted in increased payments by Plaintiffs BCBS Minnesota and Federated Insurance for Neurontin or generic bioequivalents of Neurontin.

123.    The economic injury to Plaintiffs BCBS Minnesota and Federated Insurance and their self-funded customers can be determined through an accurate account of payments for Neurontin or generic bioequivalents of Neurontin. Plaintiffs' recovery will not pose a risk of double recovery.

124.    As a direct and proximate result of Defendants' above-described conduct, Plaintiffs BCBS Minnesota and Federated Insurance are entitled to three times the actual damages sustained, in an amount to be proven at trial, as well as reasonable attorneys' fees, disbursements and costs, against Defendants, jointly and severally. Minn. Stat. § 325D.57.

### COUNT IX

#### Unlawful Restraint of Trade by Defendants In Violation of the Nebraska Antitrust Laws on Behalf of Plaintiff Mutual of Omaha

125.    Plaintiff Mutual of Omaha incorporates and reavers by reference the averments contained in preceding paragraphs 1 through 124.

29

126.    Defendants' above-described conduct violates the Nebraska Antitrust Laws. Neb. Rev. Stat. §§ 59-801 *et seq.* (2004).

127.    Defendants' above-described conduct necessarily and directly restrained and affected trade or commerce in Nebraska. Neb. Rev. Stat. § 59-801.

128.    Plaintiff Mutual of Omaha is a "person" under the Nebraska Antitrust Laws. Neb. Rev. Stat. § 59-822.

129.    Defendants are "persons" under the Nebraska Antitrust Laws. Neb. Rev. Stat. § 59-822.

130.    Defendants' above-described conduct directly and proximately resulted in increased payments by Plaintiff Mutual of Omaha for Neurontin or generic bioequivalents of Neurontin.

131.    The economic injury to Plaintiff Mutual of Omaha and its self-funded customers can be determined through an accurate account of payments for Neurontin and generic bioequivalents of Neurontin. Plaintiff's recovery will not pose a risk of double recovery.

132.    As a direct and proximate result of Defendants' above-described conduct, Plaintiff Mutual of Omaha is entitled to three times the actual damages sustained, in an amount to be proven at trial, as well as reasonable attorneys' fees, disbursements and costs, against Defendants, jointly and severally. Neb. Rev. Stat. § 59-821.

## COUNT X

### Unlawful Restraint of Trade by Defendants In Violation of New Mexico Antitrust Act on Behalf of Plaintiff HCSC

133.    Plaintiff HCSC incorporates and reavers by reference the averments contained in preceding paragraphs 1 through 132.

Word 20113683.1

134.   Defendants' above-described conduct violates the New Mexico Antitrust Act. N.M. Stat. Ann. §§ 57-1-1 to -19 (2004).

135.   Defendants' above-described conduct necessarily and directly restrained and affected trade or commerce in New Mexico. N.M. Stat. Ann. § 57-1-1.

136.   Plaintiff HCSC is a "person" under the New Mexico Antitrust Act. N.M. Stat. Ann. § 57-1-1.2.

137.   Defendants are "persons" under the New Mexico Antitrust Act. N.M. Stat. Ann. § 57-1-1.2.

138.   Defendants' above-described conduct directly and proximately resulted in increased payments by Plaintiff HCSC for Neurontin or generic bioequivalents of Neurontin.

139.   The economic injury to Plaintiff HCSC and its self-funded customers can be determined through an accurate account of payments for Neurontin and generic bioequivalents of Neurontin. Plaintiff HCSC's recovery will not pose a risk of double recovery.

140.   As a direct and proximate result of Defendants' above-described conduct, Plaintiff HCSC is entitled to three times the actual damages sustained, in an amount to be proven at trial, as well as reasonable attorneys' fees, disbursements and costs, against Defendants, jointly and severally. N.M. Stat. Ann. § 57-1-3.

## COUNT XI

### Unlawful Restraint of Trade by Defendants In Violation of New York Antitrust Act on Behalf of Plaintiffs WellChoice and Excellus

141.   Plaintiffs WellChoice and Excellus incorporate and reaver by reference the averments contained in preceding paragraphs 1 through 140.

142.   Defendants' above-described conduct violates the New York Antitrust Act. N.Y. Gen. Bus. Law § 340 (2004).

31

143.    Defendants' above-described conduct necessarily and directly restrained and affected trade or commerce in New York. N.Y. Gen. Bus. Law § 340.

144.    Defendants' above-described conduct directly and proximately resulted in increased payments by Plaintiffs for Neurontin or generic bioequivalents of Neurontin.

145.    The economic injury to Plaintiffs and their self-funded customers can be determined through an accurate account of payments for Neurontin and generic bioequivalents of Neurontin. Plaintiffs' recovery will not pose a risk of double recovery.

146.    As a direct and proximate result of Defendants' above-described conduct, Plaintiffs are entitled to three times their actual damages sustained, in an amount to be proven at trial, as well as reasonable attorneys' fees, disbursements and costs, against Defendants, jointly and severally. N.Y. Gen Bus. Law § 340(5).

## COUNT XII

### Unlawful Restraint of Trade by Defendants In Violation of Oklahoma's Antitrust Reform Act on Behalf of Plaintiff BCBS Oklahoma

147.    Plaintiff BCBS Oklahoma incorporates and reavers by reference the averments contained in preceding paragraphs 1 through 146.

148.    Defendants' above-described conduct violates the Oklahoma Antitrust Reform Act. Okla. Stat. tit. 79 § 201 (2004).

149.    Defendants' above-described conduct necessarily and directly restrained and affected trade or commerce in Oklahoma. Okla. Stat. tit. 79 § 201.

150.    Plaintiff BCBS Oklahoma is a "person" under the Oklahoma Antitrust Reform Act. Okla. Stat. tit. 79 § 201.

151.    Defendants are "persons" under the Oklahoma Antitrust Reform Act. Okla. Stat. tit. 79 § 201.

152.    Defendants' above-described conduct directly and proximately resulted in increased payments by Plaintiff BCBS Oklahoma for Neurontin or generic bioequivalents of Neurontin.

153.    The economic injury to Plaintiff BCBS Oklahoma can be determined through an accurate account of payments for Neurontin and generic bioequivalents of Neurontin. Plaintiff BCBS Oklahoma's recovery will not pose a risk of double recovery.

154.    As a direct and proximate result of Defendants' above-described conduct, Plaintiff BCBS Oklahoma is entitled to three times the actual damages sustained, in an amount to be proven at trial, as well as reasonable attorney's fees, disbursements and costs, against Defendants, jointly and severally. Okla. Stat. tit. 79 § 201.

## COUNT XIII

### Unlawful Monopolization by Defendants In Violation of New Jersey Law on Behalf of All Plaintiffs

155.    Plaintiffs incorporate and reaver by reference the averments contained in the preceding paragraphs 1 through 154.

156.    As described above, Defendants knowingly and willfully engaged in a course of conduct designed to unlawfully acquire and to unlawfully maintain and extend its monopoly power. This course of conduct included filing baseless patent infringement lawsuits against potential competitors seeking to manufacture and market generic bioequivalents of Neurontin. The result of Defendants' unlawful conduct was to injure competition in the market for Neurontin or generic bioequivalents of Neurontin.

157.    Defendant Pfizer possessed monopoly power in the relevant market.

158.    Defendant Pfizer intentionally and wrongfully acquired and maintained its monopoly power in the relevant market, unlawfully conspired to monopolize the relevant market

Word 20113683.1