# EXHIBIT 4

plaintiffs and multimillion dollar award to lawyers, but we certainly can curb a great deal of this nonsense.

I know some of my friends on the other side of the aisle will complain this bill will sound the death knell for class actions in State court. Nothing could be further from the truth. This is an important piece of legislation, but it is also a moderate and reasonable piece of legislation.

Frankly, I liked the original version, but we are where we are today, and I will talk more about that in a moment. The bill on the floor is the product of not one, not two, but three carefully crafted compromises. Not one, not two, but three carefully crafted compromises. These carefully crafted compromises have us to a point where we can enact meaningful reform that respects the ability of States to adjudicate local controversies as class actions while allowing Federal courts to decide truly national class actions.

The House, frankly, would prefer a stronger bill, and so would I. I like the original bill that stalled out at 59 votes last year. But the House also understands that the legislation on the floor is a good bill.

Therefore, the House is prepared to take this up and pass it without amendment, assuming that our carefully crafted compromise is itself not compromised on the Senate floor.

I had an opportunity to talk to Majority Leader TOM DELAY this morning and he reiterated the statement that he and Chairman JIM SENSENBRENNER made last Friday and it is this: If this bill is passed without amendment in the Senate, the House will take it up immediately, pass it, and send it to the President for signature. If it is altered in any way, the House will then follow the regular order and maybe sometime during this Congress we will get a class action bill.

Frankly, in my judgment, those who are skeptical of this bill would be better off with this compromise version than having the House go through the regular order, in which case they would probably pass a bill much different from this compromise. We would ultimately have a conference and in all likelihood, out of that conference might come a bill more like the one we had last year, which stalled out at 59 votes.

So I would say that for those who are not terribly enthusiastic about this compromise, it could get a lot worse from their point of view. This compromise is one that people who have worked on this bill for years are willing to take, and so our challenge is to keep it clean, to defeat the amendments that would slow down the process and prevent this important piece of tort reform legislation from getting to the President for an early signature. So that is where we are.

We have a marvelous opportunity to demonstrate at the beginning of this Congress that we are indeed going to be able to accomplish some important things on a bipartisan basis. This compromise bill appears to have at least 62 Senators who are for it. Let us hold it together. Let us keep it as it is and demonstrate to the American public that we can work together on a bipartisan basis and pass important legislation for our country.

I yield the floor.

The PRESIDING OFFICER. The Senator from Pennsylvania.

Mr. SPECTER. Mr. President, the next Senator to seek recognition is Senator DODD. I am informed Senator LOTT will be coming to the floor shortly to speak, and that soon thereafter Senator DURBIN will offer his amendment. It is now 11:18. That should take the time for floor action until the hour of 12:30 when we are scheduled under a previous order to recess for the party caucuses. So I now yield to Senator DODD.

The PRESIDING OFFICER. The Senator from Connecticut.

Mr. DODD. Mr. President, I begin by thanking our colleague from Pennsylvania for his leadership on this issue as the new chairman of the Senate Judiciary Committee, and also to commend our colleague from Vermont, Senator LEAHY, the ranking Democrat on the committee. Despite their differences on this legislation, we are debating this bill because the managers have gone through the committee process and have produced a product for the consideration of the full Senate. I am pleased this bill is finally before us once again. It has been a year and a half since we last considered this legislation.

I also commend the two leaders, Senators FRIST and Daschle, for working as early as the fall of 2003 to try and craft a compromise. Senator REID of Nevada has picked up on this and I want to particularly commend Senator REID. He has some strong reservations about this bill, as many of our colleagues do, but he has arranged, as the Democratic leader can, for this matter to come forward. Certainly all of my colleagues are fully aware that a determined minority can pretty much stop anything from happening, but the Senator from Nevada, despite his reservations about this legislation, has worked through the process with the distinguished majority leader.

The chairman of the committee, the ranking member, and those who are interested in this bill are trying to move this matter forward. So I would not want to begin my comments without commending the leaders, but particularly the Democratic leader, my leader, for putting in the time and effort to see to it that this matter dealing with class action be a part of the Senate debate.

The legislation has had a rather long and torturous history, going back a number of years. I am not going to recite at length that history. I will only note that several of our colleagues deserve to be acknowledged for their long and steady persistence in bringing the Senate to this point. Those Senators include Senator GRASSLEY of Iowa, Senator KOHL of Wisconsin, Senator HATCH of Utah, and Senator FEINSTEIN of California. They have worked on the Judiciary Committee, in a very strong bipartisan fashion, to try and bring this matter up.

I also want to highlight and mention Senator CARPER of Delaware who has been tireless in his support for this effort. Senator MCCONNELL as well has worked on this issue. Senator LANDRIEU, and Senator SCHUMER, I should mention as well, as a member of the Judiciary Committee, have also been a part of an effort to try and come up with a bill that could enjoy broad-based support.

I mentioned Senators SPECTER and LEAHY at the outset of my remarks as the chairman and ranking member who also worked well together to bring us to this point. I want to point out to my colleagues, of course, as someone who was very much involved in the negotiations back in the fall of 2003, that when the cloture motion failed, as pointed out by the Senator from Kentucky, within a few moments of that vote this Senator rose and offered to the majority at that point a willingness to sit down that day in fact to try and work out differences that would allow for this bill to go forward.

The distinguished majority leader accepted that offer and we immediately began a process to put this bill together. In fact, several of us sent a letter at that time to Senator FRIST. The letter was sent by myself, Senator LANDRIEU, Senator SCHUMER, and Senator BINGAMAN, outlining four areas that we thought if we could be accommodated in these areas the bill could go forward in a bipartisan fashion.

I ask unanimous consent that the letter dated November 14, 2003, from three of my colleagues and me to Senator FRIST be printed in the RECORD.

There being no objection, the material was ordered to be printed in the RECORD, as follows:

U.S. SENATE,
*Washington, DC, November 14, 2003.*
Hon. BILL FRIST,
*Senate Majority Leader,*
*U.S. Capitol, Washington, DC.*

DEAR MAJORITY LEADER FRIST: We agree with the fundamental principle of the pending class action legislation that would permit removal of national class actions to federal court. Under current law, there have been a number of instances of unjustified forum-shopping and other abuses of the legal process. We are committed to helping to reform the law to ensure fair adjudication for all Americans. To that end, we are writing to outline the policies that need to be addressed in order to move the Senate toward a bill that can pass before Congress adjourns for the year.

While we support the general thrust of S. 1751, there are some instances where the legislation goes beyond the scope of what we believe must be addressed. It is our view that we are very close to having a bill that we can support and if we can satisfactorily address each of the following issues, we can move forward quickly with you to pass a reform bill.

Based upon our understanding of the issues that have been discussed by you and the

Democratic Leader, we believe that most of our concerns are readily solvable [while a narrow subset may require some further negotiation to resolve.]

We believe more consideration must be given to the formula for federal removal. We agree that many types of cases are best considered in federal court. At the same time, we would not want the Senate to fashion rules that permit the removal of cases that are truly single-state cases which are appropriately considered in state court. Additionally, we should permit federal court judges to consider a set of factors that includes both state and federal concerns when determining whether a case in the "middlethird" of the current formula should be removed.

Mass tort actions that are not brought as class actions should be removed from the bill. The bill passed by the Judiciary Committee did not contain this language. We understand that the peculiarities of state law in two states may need to be addressed. However, the current mass tort standard is much broader than necessary to address issues raised by two of the fifty states. We want to write a rule that is as precise as possible—in this case, by encompassing actions that are truly class actions, while at the same time excluding any cases that are not.

There are several places in the bill that pre-empt current law or allow for significant deviation from standard practice. This has the effect of encouraging manipulation or abuse by either side, and should not be allowed in reform legislation. The current version of the removal provision permits removal at any time, even during trial. This includes a potential "merry-go-round effect" of repeated removal and remand between state and federal courts. Additionally, the underlying bill does not specify when the court would measure the plaintiff class and it creates a new appellate review of remand orders.

In many cases, plaintiffs, who take the risk of coming forward, should be able to be compensated for that risk. The bill currently requires their recovery to be precisely the same as all other members of the class. Different risks and different damages in civil rights and other claims, should receive different compensation, upon approval of the trial judge.

Lastly, the underlying bill simply restates current law in requiring judges to review coupon settlements. Given the clear problems that have been raised with abusive coupon settlements, we believe it is imperative to include stronger provisions that the attorneys' fees be tied to the actual coupons redeemed.

While time is short in this session, there is no reason why the Senate cannot consider this legislation in a bi-partisan spirit. If we indeed reach agreement, it is critical that the agreement be honored as the bill moves forward—both in and beyond the Senate. We are prepared to work with you toward that end and we look forward to hearing from you soon as possible as to how we can best move this legislation forward.

Sincerely,
MARY L. LANDRIEU.
CHARLES SCHUMER.
CHRISTOPHER J. DODD.
JEFF BINGAMAN.

Mr. DODD. As a result of that letter, we went through several days of negotiations on this bill. The four areas that we sought changes in the bill are the following: Removal of formula including the definition of mass torts; the so-called merry-go-round problem in the bill; coupon settlements; and fair compensation for named plaintiffs. Those are the four areas we identified in the November 14 letter. As a result of our negotiations, we came back with 12 improvements in this bill, agreed to by myself, Senators FRIST, GRASSLEY, HATCH, KOHL, LANDRIEU, and SCHUMER.

I ask unanimous consent that the list of the 12 changes that was a result of that negotiation be printed in the RECORD.

There being no objection, the material was ordered to be printed in the RECORD, as follows:

SUMMARY OF CHANGES TO S. 1751 AS AGREED TO BY SENATORS FRIST, GRASSLEY, HATCH, KOHL, CARPER, DODD, LANDRIEU, AND SCHUMER

THE COMPROMISE IMPROVES COUPON SETTLEMENT PROCEDURES

S. 1751 would have continued to allow coupon settlements even though only a small percentage of coupons are actually redeemed by class members in many cases.

The compromise proposal requires that attorneys fees be based either on (a) the proportionate value of coupons actually redeemed by class members or (b) the hours actually billed in prosecuting the class action. The compromise proposal also adds a provision permitting federal courts to require that settlement agreements provide for charitable distribution of unclaimed coupon values.

THE COMPROMISE ELIMINATES THE SO-CALLED BOUNTY PROHIBITION IN S. 1751

S. 1751 would have prevented civil rights and consumer plaintiffs from being compensated for the particular hardships they endure as a result of initiating and pursuing litigation.

The compromise deletes the so-called "bounty provision" in S. 1751, thereby allowing plaintiffs to receive special relief for enduring special hardships as class members.

THE COMPROMISE ELIMINATES THE POTENTIAL FOR NOTIFICATION BURDEN AND CONFUSION

S. 1751 would have created a complicated set of unnecessarily burdensome notice requirements for notice to potential class members. The compromise eliminates this unnecessary burden and preserves current federal law related to class notification.

THE COMPROMISE PROVIDES FOR GREATER JUDICIAL DISCRETION

S. 1751 included several factors to be considered by district courts in deciding whether to exercise jurisdiction over a class action in which between one-third and two-thirds of the proposed class members and all primary defendants are citizens of the same state.

The compromise provides for broader discretion by authorizing federal courts to consider any "distinct" nexus between (a) the forum where the action was brought and (b) the class members, the alleged harm, or the defendants. The proposal also limits a court's authority to base federal jurisdiction on the existence of similar class actions filed in other states by disallowing consideration of other cases that are more than three years old.

THE COMPROMISE EXPANDS THE LOCAL CLASS ACTION EXCEPTION

S. 1751 established an exception to prevent removal of a class action to federal court when 2/3 of the plaintiffs are from the state where the action was brought and the "primary defendants" are also from that state (the Feinstein formula). The compromise retains the Feinstein formula and creates a second exception that allows cases to remain in state court if: (1) more than 2/3 of class members are citizens of the forum state; (2) there is at least one in-state defendant from whom significant relief is sought and who contributed significantly to the alleged harm; (3) the principal injuries happened within the state where the action was filed; and (4) no other class action asserting the same or similar factual allegations against any of the defendants on behalf of the same or other persons has been filed during the preceding three years.

THE COMPROMISE CREATES A BRIGHT LINE FOR DETERMINING CLASS COMPOSITION

S. 1751 was silent on when class composition could be measured and arguably would have allowed class composition to be challenged at any time during the life of the case. The compromise clarifies that citizenship of proposed class members is to be determined on the date plaintiffs filed the original complaint, or if there is no federal jurisdiction over the first complaint, when plaintiffs serve an amended complaint or other paper indicating the existence of federal jurisdiction.

THE COMPROMISE ELIMINATES THE "MERRY-GO-ROUND" PROBLEM

S. 1751 would have required federal courts to dismiss class actions if the court determined that the case did not meet Rule 23 requirements. The compromise eliminates the dismissal requirement, giving federal courts discretion to handle Rule 23-ineligible cases appropriately. Potentially meritorious suits will thus not be automatically dismissed simply because they fail to comply with the class certification requirements of Rule 23.

THE COMPROMISE IMPROVES TREATMENT OF MASS ACTIONS

S. 1751 would have treated all mass actions involving over 100 claimants as if they were class actions. The compromise makes several changes to treat mass actions more like individual cases than like class actions when appropriate.

The compromise changes the jurisdictional amount requirement. Federal jurisdiction shall only exist over those persons whose claims satisfy the normal diversity jurisdictional amount requirement for individual actions under current law (presently $75,000).

The compromise expands the "single sudden accident" exception so that federal jurisdiction shall not exist over mass actions in which all claims arise from any "event or occurrence" that happened in the state where the action was filed and that allegedly resulted in injuries in that state or in a contiguous state. The proposal also added a provision clarifying that there is no federal jurisdiction under the mass action provision for claims that have been consolidated solely for pretrial purposes.

THE COMPROMISE ELIMINATES THE POTENTIAL FOR ABUSIVE PLAINTIFF CLASS REMOVALS

S. 1751 would have changed current law by allowing any plaintiff class member to remove a case to federal court even if all other class members wanted the case to remain in state court. The compromise retains current law—allowing individual plaintiffs to opt out of class actions, but not allowing them to force entire classes into federal court.

THE COMPROMISE ELIMINATES THE POTENTIAL FOR ABUSIVE APPEALS OF REMAND ORDERS

S. 1751 would have allowed defendants to seek unlimited appellate review of federal court orders remanding cases to state courts. If a defendant requested an appeal, the federal courts would have been required to hear the appeal and the appeals could have taken months or even years to complete.

The compromise makes two improvements: (1) grants the federal courts discretion to refuse to hear an appeal if the appeal is not in the interest of justice; (2) Establishes tight deadlines for completion of any appeals

so that no case can be delayed more than 77 days, unless all parties agree to a longer period.

THE COMPROMISE PRESERVES THE RULEMAKING AUTHORITY OF SUPREME COURT AND JUDICIAL CONFERENCE

The compromise clarifies that nothing in the bill restricts the authority of the Judicial Conference and Supreme Court to implement new rules relating to class actions.

THE COMPROMISE IS NOT RETROACTIVE

Unlike the House bill, the compromise will not retroactively change the rules governing jurisdiction over class actions.

Mr. DODD. I will not go through and name each one of them. Some of them are rather arcane but nevertheless important provisions of this bill, the point being that we were prepared basically in the fall of 2003 to go forward.

We were notified at that point that the first item of business in January of 2004, more than a year ago, would be the class action reform bill. Well, here we are in February of 2005 finally getting to this matter. There was a prepared bipartisan bill over a year ago on class action and we are now dealing with exactly the same bill. As the Senator from Kentucky pointed out, he would have preferred the House bill, the bill that was not approved when the cloture motion was held, and reluctantly is supporting this bill.

There are those of us who could not have supported the House bill or the version that came up in the Senate earlier, but we have worked very hard to put this compromise together over a year ago. So we could have dealt with this a long time ago, but nonetheless we are here today and that is the good news.

I am heartened that the other body has agreed to accept this version if it goes unamended over the next day or so during the debate and consideration of this legislation. I am hopeful that will be the case.

Very briefly, I will go through what we have achieved. As I mentioned, following the vote Senator FRIST asked myself and others, including my good friend from Delaware who is on the floor today, to enter into discussions with him and other Members to explore whether there might be some ways of building greater support for this bill. Senators SCHUMER and LANDRIEU joined in writing a letter to the majority leader, which I have put into the RECORD already, in which we laid out the four areas of our concerns. We subsequently entered into those negotiations among our four offices. Senators GRASSLEY, KOHL, HATCH, and CARPER played very important roles in that consideration. Those negotiations were very productive. We reached significant agreement not on the four original areas of concern but on eight others as well. That point deserves special emphasis. We went into the negotiations seeking improvement on four issues. We emerged with significant changes on 12 issues.

The result is a bill that is now before this body. In my view, it is very fair and balanced, rather modest legislation that addresses a number of well documented shortcomings in our Nation's class action system. It shows what we can accomplish in the Senate when we work together in a bipartisan fashion. As with all good compromises, this bill is entirely satisfactory to no one and in some respects unsatisfactory to everyone.

There are those who will say this bill does not go nearly far enough in rectifying the shortcomings of the class action system in our country. On the other hand, there are those who believe that the sky is falling, that the bill severely impairs the ability of people to gain access to our courts. In my judgment, claims of both sides are vastly overstated. One of the reasons why I believe this is so is that the people on both sides of the legislation, proponents and opponents alike, agree our compromise has made this bill better. It targets more precisely those problems in need of reform and addresses them in an appropriate and effective manner.

We will no doubt discuss those problems in more detail in the coming hours, but allow me to briefly mention two of them. Perhaps the central problem addressed by the compromise is the forum shopping issue. Article III of the Federal Constitution sets forth the circumstances under which cases may be heard in Federal court. Article 2 of Article III extends Federal jurisdiction to suits "between citizens of different States." These are known as diversity cases. The Framers had two separate but related reasons for allowing Federal courts to hear cases between citizens of different States.

Very simply, one was to prevent the possibility that the courts of one State would discriminate against the citizens of another State. The second reason was to prevent the possibility that the courts of one State would discriminate against interstate business and thereby impede interstate commerce. Over the years, however, class action rules have been interpreted in such a way that plaintiffs' lawyers have been able to keep class actions out of Federal court, even those that are precisely the kind of cases for which diversity jurisdiction was created, because of their interstate character. They do this by adding named plaintiffs or defendants solely based on their State of citizenship in order to defeat the diversity requirement.

Alternatively, they allege an amount in controversy that does not trigger the $75,000 threshold for removing cases to Federal court. The result is frequently an absurd one. A slip-and-fall case in which a plaintiff alleges, say, $76,000 in damages can end up in Federal court. At the same time, a case involving millions of plaintiffs from multiple States and billions of dollars in alleged damages is heard in State court, just because no plaintiff claims more than $75,000 in damages or because at least one defendant is from the same State of at least one plaintiff.

Section four of the bill modifies these diversity rules to allow Federal courts to hear diversity cases that have a strong interstate character. In particular, it allows Federal jurisdiction if the amount in controversy alleged by all plaintiffs exceeds $5 million and if any member of the plaintiff class is a citizen of a different State than any defendant. At the same time, the bill creates careful exceptions that allow cases to remain in State courts where those cases are primarily intrastate actions that lack national implications.

The legislation attempts to bring diversity rules more in line with the original purpose of Federal diversity jurisdiction. Cases that are interstate in nature because they involve citizens of multiple States and interstate commerce may be heard in Federal courts. Cases that are not interstate in nature remain in State courts.

A second problem the compromise addresses is the so-called coupon settlements. As our colleagues may know, a growing number of class action cases involves these type of settlements. In a typical coupon settlement, class members receive only a promotional coupon to reduce the cost of a defendant's products while the lawyers for the class action receive a rather large fee that is disproportionate to any client benefit.

For instance, in one case a soft drink company was sued for improperly adding sweeteners in apple juice. The company agreed to settle the case. The settlement required it to distribute to customers a 50-percent coupon off the purchase of apple juice. Meanwhile, class counsel received $1.5 million in cash.

I have no problem with attorneys earning a fee for their services. In fact, the compromise bill places no caps at all on attorney fees, although there were those who wanted to do that.

But what is particularly disturbing about these coupon settlements is class members typically redeem only a small portion of the coupons awarded. In fact, over the years only 10 or 20 percent of coupons were actually redeemed. Yet the attorneys are paid regardless of how many coupons are cashed in.

In effect, there is a negative incentive for counsel for both plaintiffs and defendants to enter into such settlements. Counsel for the plaintiff is paid their fee regardless of the percentage of coupons redeemed. At the same time, counsel for the defendants know they are likely to pay in redeemed coupons only a fraction of what they would pay if they paid cash to settle a case. Meanwhile, the actual class members—the ones who have actually been aggrieved—receive a benefit of little or no value at all.

Our compromise takes several steps to remove this negative incentive to enter into coupon settlements. Most importantly, it states that an attorney's fee incurred to obtain a coupon