022405saris.TXT

22    the plaintiffs pursue their 23(f) rights, and either the

23    Circuit Court does or doesn't take it; in the meantime, the

24    case is moving ahead, and --

25              THE COURT:  Well, I'm going to set the whole schedule

                                                                    27

1    up; and if, in fact, the Circuit doesn't take it, we can all

2    decide what we want to do.

3              MR. ROUHANDEH:  All right.  I think that's fine, your

4    Honor, because it could come back in a slightly different form,

5    which --

6              THE COURT:  A completely different form.

7              MR. ROUHANDEH:  Right.  One or both sides might want

8    different discovery.  So as long as that's still a possibility

9    at that point.

10             THE COURT:  Yes, that's fine.  I think it is in some

11   ways good, as I have a sneak peak.  The ones I've looked at, at

12   one point I gave a lecture on this, and I actually sat and

13   started reading the circuit cases on it, and while many

14   circuits say that merits aren't part of the class discovery

15   process, you know, you often get a little bit of a preview of

16   what they're thinking about it.  So I think we'll see where

17   that goes.

18             Anyway, the hearing in September or October, why don't

19   we say October on the motion for summary judgment.

20             THE CLERK:  October 5th at 2:00 p.m.

21             THE COURT:  Now, I don't know anything about the

22   economics of this case.

23             Is -- is -- Eric Green, is he involved in this case as

24   well?

                              Page 24

022405saris.TXT
25          MR. SOBOL:  Not yet.

28

1          THE COURT:  Not yet.  Is settlement something -- when
2     do I factor that in?
3          MR. SOBOL:  In the -- in my experience with the cases
4     that we've had in this court, your Honor, that are somewhat
5     similar, it's during the briefing part of the class
6     certification that the parties are really sort of joining the
7     issues.  That 12(b)(6) doesn't make an awful lot of sense.
8     People are really sort of butting -- you know, butting heads at
9     class certification.
10          THE COURT:  You sort of need the triage of the issues
11     and then --
12          MR. SOBOL:  Right.
13          THE COURT:  -- and then it makes sense.
14          MR. ROUHANDEH:  Yeah, I'm not sure that I would say
15     it's necessarily to make sense or not, but I would think after
16     class -- if the parties are going to confer and have some sort
17     of mediation, I think it makes sense after you get through the
18     motion to dismiss and after the class cert issues.
19          THE COURT:  Would you discuss amongst yourselves
20     whether you want someone like Eric Green, or whether you -- we
21     have magistrate judges who do it, but I'm going to use up one
22     of them for discovery battles and so they don't like to be the
23     same judge deciding the things and do the mediation.  So this
24     isn't something you can just like a little admiralty case that
25     you can just walk in and do.  I would be reluctant to sort of

29

022405saris.TXT

1    commit a whole magistrate judge's time, unless you wanted that

2    person.  So would you let me know.

3          Would a week be doable, or do you want maybe a couple

4    weeks to discuss possible mediators and schedule something for

5    the class certification time frame?

6          MR. HIMMELSTEIN:  I think two weeks should be

7    sufficient time to discuss it.

8          MR. ROUHANDEH:  A couple of weeks.

9          THE COURT:  Okay.  That would be good.  Now, there are

10   all these other issues that I didn't have time to impanel.  I

11   don't know how strongly you feel about them, like, I don't

12   know, like preserving the evidence and that sort of thing.

13         MR. ROUHANDEH:  Well, your Honor, there are a number

14   that I'll tell you in one simple way.  Our problem with them is

15   that many of them we think are suggestions by the plaintiffs

16   that don't quite look the same as the federal rule that governs

17   the issue, and we're a little reluctant to have a rule that

18   might be, for example, on privileges, on authenticity that

19   departs from the Federal Rules of Civil Procedure such that,

20   you know, we could comply with the federal rules, and they can

21   come back to us and say, ah, but the judge ordered in February

22   that you have to do X, Y, and Z.  So things like preservation,

23   there is -- and I believe this comes from the AWP order.  We

24   said, you know, the parties should comply with the laws

25   regarding preservation.  They proposed something very specific

                                                              30


1    and detailed on preservation.  We don't think that's necessary.

2          THE COURT:  Nowadays the preferred practice in the

3    area of computer-stored information is many of these

Page 26

022405saris.TXT

4    companies -- maybe yours does, too -- routinely deletes,

5    whatever that means, information, and so I think that's the

6    kind of stuff that needs to be preserved.

7         MR. ROUHANDEH:  Yeah, I'm not sure, and there are laws

8    and cases and rules that have to do with all of that.  Theirs

9    doesn't even address that.  It's just a general preservation

10   doc.

11        THE COURT:  Do you think you can all work through it

12   rather than rather than --

13        MR. ROUHANDEH:  We would prefer that, as opposed to --

14        THE COURT:  No, no, no.  No.  No.  I'm talking about

15   in terms of an order.

16        MR. HIMMELSTEIN:  In terms of an order.

17        THE COURT:  We're trying to see their issue, which is,

18   you know, they don't want me to prejudge on these issues, or

19   prejudge it for the magistrate judge, and say, ah-ha, it's

20   here.

21        Can you work through some of the language together?

22        MR. HIMMELSTEIN:  Well, we would be prepared to try.

23        MR. ROUHANDEH:  Yes, sure, we would be prepared to

24   try.

25        THE COURT:  And just simply do this:  If you put your

31

1    language in brackets, and you put yours in brackets, and

2    whoever is the most reasonable, I will cross out the other one.

3         MR. ROUHANDEH:  Okay.

4         THE COURT:  So it's an incentive to be reasonable.

5         MR. ROUHANDEH:  That's fine with us, your Honor.

6         MR. BECNEL:  May it please the Court, Daniel Becnel.

7    I would like to ask the Court maybe to look at the language

Page 27

022405saris.TXT

8     issue this week in the Vioxx litigation by Judge Fallon, who
9     previously handled the Propulsid MDL.  In his pretrial order
10    number one, he only got the case last Friday.  He issued an
11    order on his own volition with, because of his experience in
12    Propulsid, that is, the Court entered an order that does
13    everything everybody would want to negotiate, and I think it
14    would be a good model for you.
15         THE COURT:  I could take the AWP one and adjust it.  I
16    mean I don't know if you've taken a look at it.  Why don't
17    you -- could you send that to me?
18         MR. BECNEL:  I think it's -- the Court could pull it
19    right off of PACER right on the website.  It's right there,
20    PPO, double one.
21         MR. HIMMELSTEIN:  We will send it to you, your Honor.
22         MR. BECNEL:  But we can send it to you, but --
23         THE COURT:  Yeah, that would be useful to send that to
24    me, and also to send me --
25         MR. SOBOL:  AWP.

                                                        32


1          THE COURT:  Yeah, well, I have the AWP.  That one, I
2     can get -- I could just -- you could take that as a template
3     and work through it.
4          MR. BECNEL:  That's all I was suggesting that this was
5     not even parties doing it.  This is --
6          THE COURT:  Yeah.
7          MR. BECNEL:  -- kind of the court doing it on its own
8     volition.
9          THE COURT:  I don't know.  The AWP thing is so complex
10    and extensive.  This will just -- this will be hard, too.  I'm
                            Page 28

022405saris.TXT

11   not trying to demean legal issues here.  I'm just simply saying

12   it's not of the same mass.  That's all I can say.  So that may

13   be a good plan to start with protective orders and what we did

14   on all of these issues, and then sort of work from there.

15           Are any of you on that case or not?

16           MR. ROUHANDEH:  Others, Judge, from my firm are.  In

17   fact, we did look at that, and we've looked at it all the way

18   through, and that's why we moved for class discovery

19   maintenance of documents.  I think our proposal comes straight

20   out of the AWP.

21           THE COURT:  I will be inclined when in doubt to come

22   right out of the AWP case.

23           MR. ROUHANDEH:  I think that's what we've tried to do.

24           THE COURT:  Yes.

25           MR. SOBOL:  May I address two points, your Honor?

                                                              33


1            THE COURT:  Yeah.

2            MR. SOBOL:  The first is I know in my experience doing

3    it, your Honor, that in a case of this size we typically don't

4    set a trial date at this stage.

5            THE COURT:  No.

6            MR. SOBOL:  There are some reasons that you might want

7    to consider doing that here.  First, there is separate nonclass

8    cases that are before you, and so the Guardian and the Aetna

9    matter will be going forward regardless of what happens with

10   class.  There is also some substantial third-party payer

11   entities that have brought cases as well, who are in the class

12   case; and even if there is no class that's certified, they

13   nevertheless will also be proceeding forward with the case as

14   well.  And so we would, you know, ask that we be able to set at

                              Page 29

022405saris.TXT

15    least some notion about when a trial date might be.

16         THE COURT:  Let me turn to the third-party payers.

17    Did you want me just to adopt the schedule for you all as well?

18    This is coordinated with you?

19         MR. SHAPIRO:  Yes, your Honor.

20         THE COURT:  And which -- is there any chance that we

21    might get to a trial on your stuff before we might get to trial

22    on the class?

23         MR. SHAPIRO:  I think the only way we might is

24    depending on what happens with the 23(f) petition on class

25    certification.  That would go on and on and on, because we

                                                              34


1     don't have that issue.

2          THE COURT:  Which -- that's right.

3          MR. SHAPIRO:  We intend to do our own discovery.  We

4     expect it to be coordinated with class discovery.

5          THE COURT:  Sure.

6          MR. SHAPIRO:  You know, it might be easier to get that

7     case to trial rather than the class case.  It may be a simpler

8     case to try.  I think that issue could be addressed when we get

9     closer to that time.

10         THE COURT:  Yeah, my big concern is that I never had

11    to deal with the motion for summary judgment in the whistle

12    blower case, if I'm remembering correctly.  It was resolved

13    before that, but I do remember that there were -- it was -- it

14    was huge -- I mean I just don't remember the boxes.

15         MR. GREENE:  You decided that.

16         THE COURT:  What?

17         MR. GREENE:  You -- no, you wrote an opinion on it.

                          Page 30

022405saris.TXT

18          THE COURT:  Some of it.  There were whole issues.

19          MR. ROUHANDEH:  Right, there were issues that were

20   still remained outstanding after.

21          THE COURT:  There were huge, huge like off-label uses

22   were permitted under state Medicaid.  I was thinking of writing

23   to Tommy Thompson, the Secretary of Defense saying, You tell

24   me.  And then those are the kinds of issues that may or may

25   not -- that were just so big.

                                                              35


1           MR. GREENE:  You were concerned, as I remember, that

2    you and I might grow old together --

3           THE COURT:  Right.

4           MR. GREENE:  -- on that case.

5           THE COURT:  I mean it was huge.  It was just massive.

6    There were pieces of it that I thought were trial ready, but

7    there were huge pieces of it that I just wasn't sure about, and

8    so I -- I'm just worried that it could take me three to six

9    months to write it.  If you want me to just set a trial three

10   to six months down the line without prejudice to Mr. Shapiro

11   and crew coming in and saying please decide it --

12          MR. SOBOL:  Well, I think that that's what we -- here

13   is what we are trying to avoid, your Honor, that we end up in a

14   situation where we have a hearing in October of 2006 on summary

15   judgment; and then if there is a case to proceed forward to

16   trial at that point, and we're looking at a trial that might

17   last about a month, then trying to figure out when in 2007 that

18   that that trial might --

19          THE COURT:  That is realistically what it is.

20          MR. SOBOL:  That's right, but we wouldn't start

21   figuring out when to schedule the time.

                          Page 31

022405saris.TXT

22          THE COURT:  You want a trial in January 2007?  You've
23    got it.
24          MR. SOBOL:  Thank you.
25          THE COURT:  Without prejudice to moving to continue

                                                                36


1     it.
2           MR. SOBOL:  Absolutely.
3           MR. ROUHANDEH:  One -- one clarification point.  I
4     would take it that for by asking for the trial date, the
5     plaintiffs, meaning all the plaintiffs who are plaintiffs in
6     this case, not simply the named reps, but everybody who is
7     signed on to that consolidated class action complaint wants
8     your Honor to try those cases in the District of Massachusetts
9     they're not looking to go back to the transferrer order.
10          THE COURT:  Is one of them mine?
11          MR. ROUHANDEH:  Yeah.
12          MR. SOBOL:  Yes.  Part of it's yours, and that's what
13    had to be tried.  I am not sure if the others had a choice,
14    frankly, as to whether they want to go first.
15          THE COURT:  I haven't actually ever gotten to that
16    multidistrict litigation.  I think they do have a choice.
17          MR. ROUHANDEH:  Yeah.
18          THE COURT:  What's that case?  What is the name of the
19    big MDL case?
20          MR. HIMMELSTEIN:  Lexicon.
21          THE COURT:  That you said you just get it -- excuse
22    me.
23          MR. HIMMELSTEIN:  Lexicon.  Lexicon.
24          THE COURT:  Lexicon, right.
                          Page 32

022405saris.TXT
25          MR. ROUHANDEH:  My point of clarification is just I

37

1    think I hear the plaintiffs saying they would like those cases

2    to be tried here.

3          THE COURT:  I think you're quite right.  They have a

4    choice to go back.

5          MR. SOBOL:  Right.  They do have a choice to go back,

6    and the trial date we're asking for, the cases that are

7    obviously are here before this court, and dealing with who it

8    is, you know, we have got two and a half years to be able to

9    figure that out, or two years to figure that out.  But if we

10   could have the January 2000 [sic] trial date, I can put that on

11   my calendar, and I can make sure I don't schedule a skiing trip

12   for that month.

13          I had one other issue I wanted to address, your Honor.

14          THE COURT:  So you want it before Martin Luther King

15   weekend?

16          MR. SOBOL:  Yes, absolutely.  I much prefer trying

17   cases.

18          THE COURT:  So let's just say sometime in mid-January,

19   2007, as a tentative pencil-it-in date.

20          MR. SOBOL:  The other thing I just wanted to raise.

21   This is a --

22          THE COURT:  Wait a minute.  Let's just get it.

23          MR. SOBOL:  Sorry.

24          THE CLERK:  I need the calendar.

25          THE COURT:  Mr. Alba doesn't have the 2007 schedule

38

022405saris.TXT

1    here.

2         THE CLERK:  Did you say in January?

3         THE COURT:  Just the beginning, just not the first

4    week in January.  The second week in January.

5         THE CLERK:  January 8th, 9:00 a.m.

6         MR. SOBOL:  Is that a Monday or a Tuesday?

7         THE COURT:  We only impanel on Mondays.

8         Okay.

9         MR. SOBOL:  The other thing is, as this court knows,

10   your a MDL court in this particular situation; and although

11   it's not in the case management order, the Court might want to

12   consider the kind of language we have in the AWP case regarding

13   settlement discussions and other state court proceedings and

14   that --

15        THE COURT:  Propose it to me.  Right now I have given

16   you the schedule.  In two weeks why don't you send me who you

17   want as a mediator, and propose either alternative language or

18   agreed-upon language that basically includes stuff like that.

19        MR. SOBOL:  Sure.  All right.

20        THE COURT:  Because I know that came up in the Lupron

21   litigation --

22        MR. SOBOL:  Right.

23        THE COURT:  -- with some of the issues with the

24   various state cases and state judges, and I know we had some

25   protests in the AWP, but I think everyone was satisfied with

                                                              39


1    the way we left it.

2         MR. SOBOL:  Right, it was essentially people will tell

3    one another.

                              Page 34

022405saris.TXT

4          THE COURT:  People talk.

5          MR. SOBOL:  Right.

6          THE COURT:  There's the saying, We talk.

7          MR. SOBOL:  Right.

8          THE COURT:  So...

9          MR. SHAPIRO:  Your Honor, if I can just say on the

10    guardian case, the nonclass case was filed in this district

11    before your Honor.

12          THE COURT:  Okay.  There will be a trial here in front

13    of me if it gets past summary judgment, at least the

14    third-party payer case and the -- my class case.

15          MR. SHAPIRO:  Right.

16          THE COURT:  I was wondering -- I haven't had a chance.

17    I just printed it off the printer this morning.  Does the Class

18    Action Fairness Act affect us at all?

19          MR. ROUHANDEH:  Yes, I think it does, your Honor, to

20    the extent future cases are brought in state courts under that

21    statute.

22          THE COURT:  Is it effective immediately?  That's what

23    I was trying to figure out.

24          MR. ROUHANDEH:  Well, yes, it's for cases filed

25    thereafter.  I believe that it means your Honor may get more

                                                              40



1    cases, because we will remove them and bring them here, if

2    they're filed.

3          THE COURT:  Okay.  But it does not affect retroactive

4    cases filed internally to the state?

5          MR. HIMMELSTEIN:  That is correct.  That only applies

6    to cases filed on or after the effective date.

7          THE COURT:  And who decides?  Does that come to me

                          Page 35

022405saris.TXT

 8    when I decide that all the little benchmarks are met, you know,

 9    primarily of the state and that sort of thing?

10        MR. ROUHANDEH:  Well, I think it would make sense,

11    because if we remove the cases, we would probably bring them to

12    your Honor so that we don't have multiple judges deciding those

13    issues.  We bring those to your Honor to decide are the

14    benchmarks met.

15        MR. HIMMELSTEIN:  It would be the same as it is now --

16        MR. ROUHANDEH:  Under a removal.

17        MR. HIMMELSTEIN:  -- if a transferrer judge wanted to

18    decide to remand before the MDL panel effects a transfer, they

19    would be free to do that, or they could stay their hand, wait

20    for the transfer, and let your Honor make those decisions.

21        THE COURT:  Did you have --

22        MR. BECNEL:  He made the argument.  I just wanted to

23    make sure.

24        THE COURT:  Thank you.

25        MR. GREENE:  I have one point I want to bring to your

                                                              41


 1    attention, and it maybe refreshed your memory in response to

 2    what Mr. Rouhandeh said that the bulk of the documents have

 3    been produced in this case.  If you will recall, Judge, in the

 4    Franklin case that you limited --

 5        THE COURT:  Yes.

 6        MR. GREENE:  You limited discovery from '94 to '98 and

 7    to the Northeast CDU and headquarters.

 8        THE COURT:  Right.

 9        MR. GREENE:  This is a national class action.  There

10    are five other CDUs.  This marketing went on around and across

                                Page 36

022405saris.TXT

11    the country.

12         THE COURT:  I agree.

13         MR. GREENE:  And it was --

14         THE COURT:  I don't know that the years will make that

15    big a difference, but the regional areas might.

16         MR. GREENE:  Well, we've alleged in the complaint that

17    this conduct has continued beyond '98, beyond the merger date

18    with Pfizer, which was June 2000.  We allege it right up to the

19    date of the global settlement in May of 2004.  So the

20    geographic scope that we're going to be looking for in this

21    case is nationwide, all the CDUs, and the time period is up to

22    and including May of 2004.

23         THE COURT:  Well, that's fine.  I'm hoping you put in

24    your document requests right away, you put in your oppositions,

25    and then I can get it to a magistrate judge to resolve this

                                                              42

1     stuff right away.  So if I remember correctly, some of your

2     whistleblowers got hung up a long time on some of this.

3          MR. GREENE:  Yeah, more than 14 months, several

4     issues.  Magistrate Cohen --

5          THE COURT:  No, he did a fine job.

6          MR. GREENE:  No.  No.

7          THE COURT:  It's just it went back and forth on the

8     discovery.

9          MR. GREENE:  That's who it was referred to.

10         And did you have a magistrate in mind, Judge, or --

11         THE COURT:  I do, actually, but I have to ask

12    permission, first so...

13         MR. ROUHANDEH:  Your Honor, I don't think we need to

14    argue the discovery issue right now.  It's positive to say that

                              Page 37

022405saris.TXT

15    they do have documents from other CDUs besides the northeast

16    CDUs, through at least a portion of the relevant period, if not

17    all of the relevant period, but we will hash that out when we

18    get the requests, and we'll communicate with them and see if we

19    can't resolve this.

20           THE COURT:  It's absolutely preserved.

21           MR. ROUHANDEH:  Yeah, absolutely, they are preserved.

22           THE COURT:  Aren't all CDUs, all those requested

23    years, are those parsed out appropriately?

24           MR. ROUHANDEH:  They have been preserved.  They are

25    growing, but they have been there since the beginning.

43

1            THE COURT:  Aren't they all sitting in some warehouses

2    like out of Raiders of the Lost Ark?

3            MR. ROUHANDEH:  There's not quite that many.

4            MR. GREENE:  They're on the second floor of

5    Pfizer's -- one of Pfizer's buildings in New York, and they

6    have a full-time consultant that they hired that's in charge of

7    those documents.  At least that was the status when I deposed

8    one of -- actually, it was Mr. Murray, one of the associates.

9            THE COURT:  That's only, as you said, partially,

10   right?

11           MR. GREENE:  Well, we got partials.  I don't know -- I

12   was never allowed to go into that floor to see what's there,

13   but the approximate 80 boxes that we have is just partial.

14   When Mr. Rouhandeh says that there are some documents from the

15   other CDUs, Judge, like the southeast or the north central,

16   well, sure there are, because those memos would have come

17   through Morris Plains, but every single CDU had its own

Page 38

022405saris.TXT
18    marketing department, and they were following national

19    marketing strategies issued out of Morris Plains.  So it's

20    those documents that we need from the CDUs.  We didn't get

21    them, frankly.

22          MR. ROUHANDEH:  I would disagree with that frankly,

23    but we can talk about it.

24          THE COURT:  Are you all happy?

25          MR. ROUHANDEH:  We're fine.

                                                            44


 1          THE COURT:  Are you all happy?

 2          MR. HIMMELSTEIN:  Your Honor, of all the other issues

 3    we've raised, and I heard your Honor doesn't want to decide a

 4    lot of other stuff today, there is one that I think bears

 5    mentioning, which is the issue of authentication of documents.

 6    This is a very document-intensive case.  It does not make sense

 7    for both sides to spend months of deposition time confirming

 8    the authenticity of documents and that their business records

 9    when I think we all know that probably all are going to fall

10    into that category, but if we don't have some protocol for

11    authentication, we are either going to have to do that --

12          THE COURT:  See what you can agree on.  The problem is

13    that I can't force them to do something that the Rules of

14    Evidence don't provide.  Even though I think it makes a lot of

15    sense.  So see if you can agree on it.

16          MR. HIMMELSTEIN:  Okay.

17          THE COURT:  The other issue that drives me nuts, and

18    fortunately I have been through this before in the last case is

19    overdesignation of confidentiality.  So if there is -- if there

20    is a confidential pricing data, which there may well be, recent

21    data, not so much the old stuff, I don't think that is
                              Page 39

022405saris.TXT

22  confidential for the old stuff, but the recent stuff may well
23  be.  That stuff is obviously confidential, but it doesn't mean
24  that the whole document becomes confidential.  It just means
25  that you redact those pieces.

                                                                45

1       MR. ROUHANDEH:  Your Honor, I continue to believe that
2  there was a complete misunderstanding about overdesignation.
3  That was a tag we put on for other purposes when your Honor
4  said give them all the documents for attorney's eyes only.  We
5  stamped them all confidential.
6       THE COURT:  We're starting -- we're starting fresh,
7  because everything was filed under seal.  Absolutely everything
8  in the last one, and the truth is we have CM/ECF now, and you
9  do have to be careful if some pricing data goes on the web, you
10  are in trouble; on the other hand, it means that it's worse
11  than it was in the olden days, because it means that the public
12  has access to nothing if you seal the entire document.  So the
13  way I have been trying to do it is -- and it's more work for
14  you, I understand that.  For that I'm saying sorry, but
15  basically all that gets redacted out, for example, the
16  confidential pricing information, but the rest of the document
17  is public, and then so it means the filing of two documents.
18       All of you are on CM/ECF, right?
19       MR. ROUHANDEH:  Yes.
20       THE COURT:  It's going to be mandatory, if you haven't
21  already.  People won't be getting notices, unless they are on
22  it.  And then if there is a debate over confidentiality, we can
23  have a debate over a snippet.
24       Do you know if the newspapers are interested in this

                            Page 40

022405saris.TXT
25    one, or they have moved on to greener pastures?

46

1         MR. ROUHANDEH:  I have given up my ability to predict
2    what they might be interested in, but I think it's probably
3    beating a dead horse.
4         THE COURT:  Have you heard any press interest?
5         MR. GREENE:  I periodically get calls.
6         THE COURT:  Actually, there is surprisingly little
7    interest in all this in terms of litigation.
8         MR. GREEN:  Well, I would say in response to your
9    question everyone is interested in whether Pfizer is engaged in
10   off-label promotion; and you know that they limited their plea
11   in the Franklin case to what Warner Lambert did to June 1998,
12   and that's why this discovery period beyond '98 is so -- so
13   critical.
14        THE COURT:  I see.
15        MR. GREENE:  And we do have evidence that Pfizer has
16   engaged in off-label promotion.
17        MR. ROUHANDEH:  I think we would vehemently disagree
18   with that in terms that they have what we didn't have, we are
19   anxious to see that.
20        THE COURT:  I just want to -- let me put it this way.
21   I think the way I have parsed it that even the New York Times
22   or the Wall Street Journal will be able to get access to most
23   of what should be fairly in the public domain on pricing data.
24   I don't even know if that's relevant here, is it?  My guess is
25   it isn't.

47

Page 41

022405saris.TXT

1        MR. ROUHANDEH:  It may or may not.

2        THE COURT:  Maybe customers' lists or something like

3    that, but that kind of stuff will stay confidential.  You put

4    the classic stuff that you put in, but not just every memo that

5    came out of central headquarters.

6        MR. GREENE:  Well, most of this evidence, Judge, is

7    marketing, marketing documents.  It's not really the price of

8    the drug.  We all know what the price of Neurontin was.  It's

9    not a pricing case in that sense.

10       THE COURT:  Well, most of that should be public.

11       MR. GREENE:  Sure.

12       THE COURT:  But there may be something like a customer

13    list, which has been protected in a business setting.

14       MR. GREENE:  Yeah, anything the rule applies around.

15       THE COURT:  What?

16       MR. GREENE:  Anything that the federal rule would

17    define, but I don't see it in this case.

18       THE COURT:  Well, I think the rule is to protect

19    confidential business information, but not necessarily every

20    marketing memo that went out.  Maybe that is what we will have,

21    disputes over gray areas.

22       Okay.  Well, have a wonderful weekend.  Thank you for

23    coming up.  If ever these timings are inconvenient for shuttles

24    back and forth to New York or from Mississippi, let me know.

25    We'll try and adjust what's around a little more convenient for

48

1    all of you.

2        MR. ROUHANDEH:  Thank you, your Honor.

3        MR. BECNEL:  Something that just came up this morning,

Page 42

022405saris.TXT

 4    a number of the PI cases have now been removed, I believe,

 5    through the MDL process.

 6            THE COURT:  By PI you mean?

 7            MR. BECNEL:  Personal injury cases, suicide cases.  I

 8    think may be coming to you.  I just learned of this this

 9    morning.

10            THE COURT:  No, really?

11            MR. GREENE:  There is a conditional transfer order for

12    five suicide cases that I saw a copy of the other day, your

13    Honor, and I think they're headed this way.

14            MR. BECNEL:  I think they're headed this way, and the

15    only reason I'm --

16            THE COURT:  I think I'm heading down there.

17            So that is a little different, right?  I didn't know

18    anything about -- when he said PI, I'm thinking preliminary

19    injunction.

20            So I'm getting some personal injury suits arising out

21    of the Neurontins?

22            MR. ROUHANDEH:  Yes.  Well, your Honor, I understand

23    that the plaintiffs in those cases are going to object to those

24    cases coming to the MDL, but that's --

25            THE COURT:  So that's up to them.

                                                                49

 1            MR. ROUHANDEH:  The panel will have to decide what the

 2    cases will be.

 3            MR. BECNEL:  The only reason I was bringing it up at

 4    this time is because I have a rather large inventory of those

 5    cases also.  I have not filed them yet; and if they do send the

 6    first five here, and you have them, one of the procedures we've

 7    used in the Propulsid and others is allowing them to be filed

                              Page 43

022405saris.TXT

8    directly here rather than filing them in each and every state

9    and then spending two and three months with the MDL panel

10   transferring them to you.  It just makes more sense for you to

11   get them automatically.

12       THE COURT:  You know what the key here, I think, if

13   they make the decision to transfer them here, you call Robert

14   up immediately, and we'll get in here and talk about it,

15   because I'm not even sure we should put it on a completely

16   different discovery track, and that's just like a different

17   case.

18       MR. BECNEL:  There is no question about it, but that

19   is why I brought it up, because I've never found the MDL panel

20   when a MDL judge usually has something that they don't shove

21   everything to him or her.

22       THE COURT:  Right.  I'm not saying that there isn't

23   some overlap.  I don't want to prejudge it for the MDL, but

24   there are all separate issues of causation that I don't have to

25   address here.  I mean if someone committed suicide, what an

                                                              50


1    unfortunate thing, but my guess is that they have all sorts of

2    other things going on.  So that it either enhances or doesn't

3    enhance, but it's just a different set of issues, damages,

4    causation.  So you'll all help me.

5        MR. BECNEL:  I just wanted to bring it to the Court's

6    attention.

7        THE COURT:  I still have another MDL floating out

8    there in Bankruptcy Court, so if that comes in, on asbestos.

9        MR. SOBOL:  Hopefully we'll get it back to you.

10       THE COURT:  Anybody hear the asbestos?

                        Page 44

022405saris.TXT

11          MR. SOBOL:  Mr. Granger and myself have been

12     appointed.

13          · THE COURT:  Can I ask you is there any chance that is

14     going resurrect itself in the next few months?

15          MR. SOBOL:  No.  No.

16          THE COURT:  Because I don't know if I could handle it

17     all.  I just might have to actually check on them.  All right.

18     That's going stay dormant?

19          MR. SOBOL:  It's probably not ever going to come back

20     to your Honor, because the plan of reorganization in the W.R.

21     Grace bankruptcy that resolves those claims.

22          THE COURT:  Thank you very much.

23          ATTORNEYS:  Thank you, your Honor.

24          THE CLERK:  Court is in recess.

25          (At 12:10 p.m., the Court was adjourned.)

                                                           51


1                      C E R T I F I C A T E

2

3          I, Marianne Kusa-Ryll, Certified Realtime

4     Reporter, do hereby certify that the foregoing transcript,

5     consisting of 50 pages inclusive, is a true and accurate

6     transcription of my stenographic notes in Case No. MDL 1629,

7     Neurontin Marketing and Sales Practices Litigation before the

8     Honorable Patti Saris, USDJ, on February 24, 2005, to the best

9     of my skill, knowledge, and ability.

10

11

12                              ...........................

13                              Marianne Kusa-Ryll, RMR, CRR

14                              Official Court Reporter

                         Page 45

022405saris.TXT

15
16
17
18
19
20
21
22
23
24
25