UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re:  NEURONTIN MARKETING AND
        SALES PRACTICES LITIGATION

        MDL Docket No. 1629

        Master File No. 04-10981

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

THIS DOCUMENT RELATES TO:

        Judge Patti B. Saris

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

HARDEN MANUFACTURING CORPORATION, et al. v.
PFIZER INC. and WARNER-LAMBERT COMPANY.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

THE GUARDIAN LIFE INSURANCE COMPANY OF
AMERICA v. PFIZER INC. and

AETNA, INC. v. PFIZER INC.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM IN SUPPORT OF MOTION FOR PROTECTIVE
ORDER CONCERNING SCOPE OF DISCOVERY**

      Defendants Pfizer Inc. and Warner-Lambert Company (together, "Defendants") submit

this memorandum in support of their motion for a protective order concerning the scope of

discovery.

**PRELIMINARY STATEMENT**

      Despite the absence of any allegations of false or misleading statements after 1998,

Plaintiffs have served 252 document demands in this action, nearly all of which seek documents

through the present.  Defendants respectfully request that this Court enter a protective order

limiting the scope of Plaintiffs' discovery regarding the sales and marketing of Neurontin to the

period ending December 31, 1998.  This motion is not only consistent with the allegations of

Plaintiffs' Complaints, it is also consistent with Rule 26(b)(1) of the Federal Rules of Civil

Procedure and the Court's ruling in <u>United States ex rel Franklin v. Parke-Davis, et al.</u>, C.A. No. 96-11651-PBS (D. Mass.), the predecessor litigation that spawned these suits. A protective order is also necessitated by the extraordinary burden that the expanded scope of discovery would impose upon Defendants – a burden that would necessarily lead to a substantial extension of the discovery schedule in this action.

The gravamen of Plaintiffs' complaints is that Defendants allegedly persuaded doctors to prescribe Neurontin for off-label uses through false and misleading statements concerning the suitability of Neurontin for such uses. Although they do attempt to allege a handful of such statements prior to 1998, Plaintiffs' sweeping allegation that the "scheme" continued after 1998 is wholly conclusory and is made only on information and belief. Neither the "information" nor the basis for the "belief," however, has been provided. Thus, when Plaintiffs implausibly aver that the fraudulent scheme continues even today, they do so without any supporting factual allegations. Instead, they simply claim that because sales increased over time, off-label promotion of Neurontin must have occurred after 1998.

This has not stopped Plaintiffs from demanding that Defendants search for and produce all documents concerning the sales and marketing of Neurontin to date. Compliance with this demand would be tremendously burdensome and expensive. The documents relating to 1994 - 1998 alone, which have been produced, fill over 80 boxes. Gathering, reviewing, and producing the sales and marketing documents for six more years would take thousands of hours of work and would be extremely costly. Plaintiffs' approach on document discovery reflects the same disregard for burden, time and expense that their requests for admission do, and the same punitive approach. The breadth of these requests is also inconsistent with the discovery schedule and would lead to a significant delay in that schedule if the requests were allowed to stand.

Plaintiffs' overzealousness with respect to documentary discovery perhaps could be understood if this were the first time the issue had been presented to this Court. But it is not. Judge Saris ruled on it in <u>Franklin</u>. In <u>Franklin</u>, as here, the Relator alleged off-label promotion from 1995 through 1998 but tacked on a sweeping assertion that the alleged fraudulent scheme continued through 2000 (the year his discovery was served). His lawyers – who are members of the Plaintiffs' Steering Committee in this case – moved to compel Defendants to produce sales and marketing documents through 2000. They failed. Judge Saris imposed a 1998 cut-off. Plaintiffs should not be permitted a second bite at the apple.

The fact that the federal government conducted a lengthy investigation of the same alleged off-label promotion and charged Warner-Lambert Company LLC with conduct during 1995 and 1996 only further supports the protective order here. It also demonstrates the reasonableness of Defendants' proposal that sales and marketing discovery be limited to the period prior to December 31, 1998.

For all the foregoing reasons and as set forth more fully below, Plaintiffs should not be permitted to impose on Defendants the monumental task of searching for and producing six more years of documents relating to the sales and marketing of Neurontin.

## **FACTUAL AND PROCEDURAL BACKGROUND**

### **The Allegations of the Complaints**

Two consolidated complaints were filed in this action on February 1, 2005. Pursuant to the first Case Management Order ("CMO1"), a First Coordinated Amended Complaint ("Coor. Compl.") was filed on behalf of a number of insurers and an Amended Class Action Complaint ("Class Compl.") was filed on behalf of putative classes of individuals and third-party payors,

including other insurers. (Docket ## 30, 31).[1] Each of these complaints is over 100 pages long. Distilled to their essence, the two complaints allege that Defendants created and implemented a fraudulent marketing and sales "scheme" to boost the sales of Neurontin. The complaints assert that alleged misrepresentations suggesting that Neurontin is effective for certain, specified off-label uses were made to physicians in three ways: through publication of articles, through statements by physicians; and through statements by sales representatives and medical liaisons.

Plaintiffs identify relatively few incidents of alleged misstatements in the complaints. Not one of them post-dates 1998. (Coor. Compl., ¶¶ 102, 106, 107, 119, 124, 140, 144, 154, 155, 157, 167; Class Compl., ¶¶ 129, 134, 135, 148, 156, 167, 171, 172, 181, 189, 190, 191, 192, 202, 203.) The complaints allege, for example, that Warner-Lambert induced doctors to make favorable statements regarding Neurontin at meetings. (Class Compl. 129, 135, 167; Coor. Compl. 102, 107, 144.) The complaints provide the names of four doctors who allegedly claimed that Neurontin was effective for an off-label use. (Class Compl. 129, 135, 167; Coor. Compl. 102, 107, 144.) Each identified statement by these doctors allegedly took place prior to 1998. The complaints also allege that on eleven occasions, Warner-Lambert's sales representatives made sales pitches to individual physicians claiming that Neurontin was effective for an off-label use. (Class Compl. 134, 148, 156, 171, 181; Coor. Compl. 106, 119, 124, 140.) Each identified occasion is alleged to have occurred prior to December 31, 1998.

With respect to conduct that allegedly occurred after 1998, Plaintiffs allege that, "Upon information and belief, Pfizer has routinely marketed Neurontin for off-label indications up until May of 2004 . . .." (Coor. Compl., ¶ 235, Class Compl., ¶ 171.) Plaintiffs do list in their

---

[1]CMO1 established the procedure and schedule pursuant to which all plaintiffs were to re-plead on a consolidated and/or coordinated basis, Defendants were to move to dismiss the amended complaints, and the parties were to brief the motions.

complaints a handful of meetings or events that allegedly occurred after 1998 (see, e.g., Coor. Compl., ¶¶ 68, 120; Class Compl., ¶ 139), but they do not identify any alleged misrepresentations made at any such meeting or event. Nor do they identify any misrepresentations that they allege occurred in any articles published after 1998 or were made by any sales representatives or medical liaisons after 1998.[2]

The complaints also state that the large increase in Neurontin sales between 1995 to 2003 makes it "reasonable to infer that this explosion in sales stems from illegal past and continuing promotional efforts by Defendants. (Coor. Compl., ¶ 171; Class Compl., ¶235). This supposedly reasonable inference is supported by nothing more than a history of positive sales growth. In short, the complaints do not include any facts supporting an allegation that off-label promotion occurred after December 31, 1998.

**History of the Neurontin Litigation**

As the Court is aware, these actions are not the first time that allegations have been brought against Defendants for alleged conduct relating to Neurontin. Nine years ago, in 1996, a former Warner-Lambert employee, David Franklin, brought a qui tam action in this Court under the False Claims Act against Warner-Lambert Company. The Franklin complaint alleged exactly the same type of conduct as the allegations contained in the Coordinated Complaint and the Class Complaint, and further alleged that such conduct had caused false claims to be submitted to Medicaid for reimbursement relating to prescriptions for off-label uses of Neurontin.

---

[2]The allegations regarding post-1998 meetings fall into three categories: (1) allegations that certain meetings occurred (Class Compl., ¶ 81; Coor. Compl., ¶ 68); (2) allegations that a handful of meetings occurred at which Neurontin's use for off-label indications was discussed, without any assertion that false or misleading statements were made (Class Compl., ¶¶ 150, 157, 162; Coor. Compl., ¶¶ 120, 126, 130); and (3) allegations that at certain meetings, unspecified false or misleading statements were made, with no more description provided than the date and location of the meetings (Class Compl., ¶¶ 129, 170, 179, 197; Coor. Compl., ¶¶ 102, 139, 146, 162). None of these vague allegations are supported by any facts, and all are apparently based solely on information and belief. Such allegations cannot justify the broad discovery sought here.

The <u>Franklin</u> complaint was unsealed in January 2000, and there commenced over four years of litigation before this Court, which included a number of discovery disputes between the parties. One of the primary threshold disputes was with regard to the relevant time period of discovery. Relator Franklin had sought extremely broad categories of documents relating to the sales and marketing of Neurontin through August 22, 2000, the date of the request, arguing (in the context of Relator's motion to compel discovery) that Relator "believes" that Defendants' conduct "lasted through 2000" (<u>Franklin</u> Docket # 117 at 9), and that such conduct "extends from 1994 through at least 1998 and most likely into 2000 ...." (<u>Franklin</u> Docket # 145 at 11). Defendants argued that Relator had not provided any allegations of misconduct in 1999 and 2000 (and, in fact, had stated only the barest of allegations in 1998). On February 6, 2002, this Court rejected Relator's attempt to obtain documents from 1999 and 2000 based on a mere belief rather than specific allegations, and limited discovery to 1994 through 1998. (<u>Franklin</u> Docket # 159 at1).[3]

During the pendency of the <u>Franklin</u> action, Warner-Lambert's conduct relating to Neurontin was simultaneously being investigated by the United States Attorney's Office for the District of Massachusetts for potential violations of the Food Drug & Cosmetic Act ("FDCA"). Warner-Lambert had disclosed the existence of this investigation in March 2000 in its Form 10K filed with the Securities and Exchange Commission. On May 13, 2004, Pfizer – which had acquired Warner-Lambert Company in June 2000 – entered into a global resolution of all actual and potential federal and state government criminal investigations and civil claims, as well as the <u>Franklin</u> matter. Under the global resolution, Warner-Lambert Company LLC agreed to plead guilty to two counts of violating the FDCA, which appeared in a criminal information in <u>United</u>

---

[3]Magistrate Judge Cohen had previously ruled on Relator's motion to compel by restricting discovery to October 1995 through October 1996. (<u>Franklin</u> Docket # 142 at 2-3.)

States v. Warner-Lambert Company LLC, Crim. # 04-10150 RLS (D. Mass.).  All of the conduct charged in the Information occurred before the end of August 1996, well before Pfizer acquired Warner-Lambert.  Defendants were not charged with, and did not admit to, any intent to defraud or mislead.  Nor were they charged with causing harm to any patient.

**Plaintiffs' Document Demands**

Plaintiffs in these actions served their initial document requests on March 11, 2005. Class and Non-Class Plaintiffs' First Request for Production of Documents (the "requests") consists of 252 individual document requests, almost all of which are extremely broad.  Taken as a whole, the requests basically seek every document that could include any reference to Neurontin from the period of January 1, 1994 through May, 2004.  The requests can be roughly divided into two main categories: requests for documents relating to sales and marketing of Neurontin, and requests for documents relating to the safety and efficacy of Neurontin.

The requests in both these categories are very broad.  The documents Plaintiffs seek relating to sales and marketing include all documents relating to marketing strategies and tactical plans, budget forecasts, use of and interaction with outside vendors, tracking of physicians' prescribing habits, efforts to comply with various laws and regulations, provision of grants, and events concerning Neurontin.  Plaintiffs' requests for documents relating to the safety and efficacy of Neurontin seek all underlying clinical data, drafts, and correspondence relating to the over 900 Neurontin clinical trials, as well as to the large number of less formal Neurontin studies.  The number and breadth of the requests is noteworthy, as Judge Saris remarked at the first conference in this case that she believed that discovery in this case essentially had been completed by virtue of the discovery that was taken in the Franklin action.

Defendants served their Responses and Objections to Class and Non-Class Plaintiffs' First Request for Production of Documents (the "responses") on April 11, 2005. Defendants objected to a number of requests on various grounds, including overbreadth, inclusion of vague and ambiguous terms, failure to identify the documents sought with reasonable particularity, and lack of relevance (due in some cases to a failure to confine the request to documents relating to off-label uses of Neurontin).

One over-arching and critical objection (and the subject of this motion) relates to the time period for which Plaintiffs seek discovery. Defendants object to producing sales and marketing materials relating to the entire period from 1994 through 2004 on the grounds that this time period is overly broad. Defendants stated these requests seek documents that are not relevant to this action because they are from a time period that is not grounded in the actual allegations contained in the complaints. Defendants also objected to the time period on the grounds that it is overly broad and that it would be unduly burdensome to produce documents for the entire 10 year period. In response to requests for sales and marketing information, Defendants offered to produce documents relating to the off-label use of Neurontin through December 31, 1998.[4]

Plaintiffs sought to meet and confer regarding Defendants' responses, and due to the breadth of Plaintiffs' requests it was necessary to conduct multiple meet and confer sessions. Accordingly, on May 17th, May 24th, and June 6th, counsel for Defendants and multiple counsel for Plaintiffs met and conferred with respect to Plaintiffs' requests. These three sessions lasted a combined total of more than 14 hours, and the parties went through every one of Plaintiffs' 252 requests.[5] From the very beginning of the first meet and confer session on May 17th, Defendants

_____

[4]Defendants do not seek to limit the responsive time period for the requests relating to safety and efficacy, and have already begun producing documents in these categories.

[5]An additional session occurred on June 16th during which Plaintiffs' 36 interrogatories, 8 of which exclusively seek to discover information about employees, departments, and practices of Pfizer, were discussed.

clearly stated their belief that the relevant time frame for discovery of sales and marketing documents should end on December 31, 1998, and that Defendants should not be required to produce documents relating to Neurontin sales and marketing from more recent years. Defendants reiterated this position at each subsequent meet and confer. Plaintiffs, in turn, noted at each meeting that they disagree with this position and believe they are entitled to discovery through the end of the class period.

It has been clear, therefore, since May 17th and throughout the meet and confer process that the parties have irreconcilable differences concerning the appropriate scope of discovery. The issue of time period for discovery of sales and marketing documents and information is critical and must be resolved as quickly as possible. While there is a motion to dismiss pending – the resolution of which may well resolve this action – discovery has not been stayed and a judicial determination is needed here soon, given the discovery schedule in this action. As discussed further below, Defendants believe that the burden associated with collecting, reviewing and producing documents through May 2004 is such that, should the Court require such production, there is no hope of conforming to the current discovery schedule in this case.

**Undue Burden on Defendants**

Defendants believe that the burden required to produce sales and marketing documents relating to Neurontin from the period after December 31, 1998 would be undue and unwarranted. The requests seek, among many other items, all documents pertaining to Vendors concerning the marketing of Neurontin (see, e.g., Request Nos. 64, 69, 70, 71, 75); all documents relating in any way to any Events[6] at which off-label uses of Neurontin were discussed (see, e.g., Request Nos.

---

[6]The term "Events" is defined in the requests to include "any conference, seminar, gathering, dinner meeting, dinner, meal, advisory board meeting, consultant meeting, speaker event, speaker training, CME, conference call, teleconference, trip, vacation, or weekend getaway attended by physicians, funded, sponsored, or

57 - 63, 65, 66, 76 - 79, 81 - 87); all documents relating to the publication of articles and the communication of information between and among physicians (see, e.g., Request Nos. 117 - 126); all documents relating to payments to physicians or Vendors and all communications about payments (see, e.g., Request Nos. 37 - 49, 61 - 63); all documents relating to market analysis, forecasts, budgets, and projections concerning off-label uses of Neurontin (see, e.g., Request Nos. 18 - 20, 28); all documents relating to the medical liaison budgets and describing or "refer[ing] to" the role of medical liaisons in the marketing, promotion and sales of any of Defendants' drugs (see, e.g., Request Nos. 218 - 220); and all data which reports on physicians who prescribe Neurontin, and all documents relating to any reports or analysis of such data (see, e.g., Request Nos. 151, 152, 178). To respond to Plaintiffs' broad document requests, which interpreted literally would encompass almost every scrap of sales and marketing-related paper concerning Neurontin in the entire company, would impose an undue burden on Defendants.

The task of reviewing and producing documents from prior to December 31, 1998 is made manageable because those documents were collected years ago, much closer to the dates they were created, and all that remains is to review and produce those documents from outside the Northeast Customer Business Unit ("CBU") relating to the off-label use of Neurontin (as documents from the Northeast CBU from prior to December 31, 1998 have already been provided). To produce documents relating to the period after December 31, 1998, however, Defendants would first need to identify all individuals whose files reasonably could contain documents relating to the sales and marketing of Neurontin who were employed by Warner-Lambert in 1999 and 2000, as well as those employed by Pfizer at any point between June 2000 (when Warner-Lambert merged with Pfizer) and May 2004. Defendants estimate that this would

---

paid for in whole or in part by Defendants, whether directly or through a third party which received money from Defendants which was intended to be applied to any of the costs of the Event."

be well over 100 people, even if all sales representatives and medical liaisons were excluded. (See Declaration of Laura Kibbe (attached hereto as Exhibit A) at ¶ 4). The scope of the review that would be required is such that Defendants could not collect, review, and produce all responsive documents for the proposed 10 year time frame before the end of the discovery period in this case, even assuming they hired forty temporary workers to handle portions of this task. Defendants certainly could not produce these materials in time for Plaintiffs to review the documents and utilize them, if they so choose, in depositions prior to the January 30, 2006 fact discovery cut-off date in this action.[7] In fact, based on the attached declaration of Laura Kibbe, it is estimated that the collection, review, and production of these documents would take over a year and cost more than $10 million.

## ARGUMENT

**A.    The Standard For A Protective Order**

Rule 26(c) of Federal Rules of Civil Procedure provides that "upon motion by a party or by the person from whom discovery is sought … the Court may make any order which justice requires to protect a party from annoyance, embarrassment, oppression, or undue burden or expense . . .." Fed. R. Civ. P. 26(c). Rule 26(c) seeks to curtail abuses of the discovery process, and grants the trial court broad discretion to balance "the injury that might result if uncontrolled disclosure is compelled" against the request of the propounding party. Horsewood v. Kids "R" Us, # CIV. A. 97-2441-GTV, 1998 WL 526589, at *2 (D. Kan. Aug 13, 1998) (citing Pansy v. Borough of Stroudsburg, 23 F.3d 772, 787 (3d Cir. 1994), and Sprague v. Thorn Americas, Inc., 129 F.3d 1355, 1368 (10th Cir. 1997) (holding that "the desire to afford 'broad discovery is not without limits and the trial court is given wide discretion in balancing the needs and rights of

---

[7]Were the obligation to collect and produce documents to extend to sales representatives and medical liaisons, the number of custodians would increase to well over 1,000 people, which would obviously require even longer to complete.

both plaintiff and defendant'")).  In the First Circuit, "the breadth of [the trial judge's] discretion in managing pretrial mechanics and discovery is very great."  Fusco v. General Motors Corp., 11 F.3d 259, 267 (1st Cir. 1993).

In the First Circuit's decision in Mack v. Great Atlantic and Pacific Tea Company, Inc., 871 F.2d 179, 187 (1st Cir. 1989), Judge Selya wrote that although "there are no barbed-wire fences marking the precise boundaries of pretrial discovery," litigants "ought not to be permitted to use broadswords where scalpels will suffice, nor to undertake wholly exploratory operations in the vague hope that something helpful will turn up."  Discovery should reflect claims pled with particularity, not general allegations with no basis in fact.  See, e.g., Fed. R. Civ. P. 26(b)(1); Advisory Committee Note to 2000 Amendment to Rule 26(b)(1); United States v. Medtronic, Inc., 2000 WL 1478476 at *3 (D. Kan.) ("[l]itigants have an obligation to tailor discovery to suit the particular exigencies of the litigation"); see also Hickman v. Taylor, 329 U.S. 495, 507 (1947) ("discovery, like all matters of procedure, has ultimate and necessary boundaries").  Thus, in deciding whether to grant a litigant's motion for a protective order to limit the scope of discovery, a court must "balance the inquirer's right to know against the responder's right to be free from unwarranted intrusions," to make a "reasonable reconciliation of the centrifugal and centripetal forces at work in the discovery process."  Mack, 871 F.2d at 187.

Judge Selya's observations were codified via the 2000 amendment to Rule 26.  Before the amendment, Rule 26 permitted discovery as to matters "relevant to the subject matter involved in the pending action . . .."  The rule now permits discovery as to matters "relevant to the claim or defense of any party."  Fed. R. Civ. P. 26(b)(1).  The Advisory Committee Note to the 2000 amendment indicates that the purpose of the change was to ensure that the focus of discovery is the actual claims and defenses in an action and to avoid the use of discovery to

develop new claims or defenses.  Advisory Committee Note to 2000 Amendment to Rule

26(b)(1).  Accordingly, Plaintiffs' discovery requests plainly contravene Rule 26(b)(1).

**B.      Courts Routinely Limit The Temporal Scope
Of Demands And Prohibit Fishing Expeditions**

Courts can, and regularly do, limit the temporal scope of discovery.  For example, in

Medtronic, which was a *qui tam* action (and therefore involved, as does this case, allegations of

fraud), the plaintiff served Medtronic with 158 requests for the production of documents seeking:

"(1) any type of pacemakers, cardiac pacemaker leads, and cardiac defibrillators (2) located in

any Medtronic office within the 50 states or U.S. territories (3) from 1980 to the present."  Id. at

*2.  Medtronic sought a protective order.  In support of the motion, it submitted an affidavit

explaining that it "employs 800 salesmen in 54 districts and another 4,500 people in its 'Cardiac

Rhythm Management' unit," that its "records are stored in over 70 locations" and that during the

twenty year time period specified in the requests, "Medtronic was involved in the implant of 2.6

million cardiac devices."  Id.  The federal district court ruled that the scope of the requests,

covering a twenty year period, was "overly broad, unduly burdensome, and unreasonable"

because the sum of plaintiff's allegations amounted to the facts that he "first observed

[Medtronic's] alleged misconduct when he relocated to Wichita as a Medtronic sales

representative in October 1991," and that he was terminated from the position in 1994.  Id. at *3.

The court ruled that in view of these facts, a "reasonable temporal scope of discovery, absent

other justification, is January 1990 to January 1995."  Id. at *3-4 (also limiting geographical

scope to Wichita area).  The request for a protective order was granted "to prevent annoyance,

oppression, undue burden, and expense," and the plaintiff was instructed to redraft his discovery

requests in accordance with the court's ruling on the appropriate scope of discovery.  Id. at *4.

Similarly, in <u>Mack,</u> an employment discrimination action that pre-dated the amendment to Rule 26(b)(1), the district court had limited the scope of the interrogatories that had been propounded by the plaintiff. On appeal, the plaintiff argued that the district court's restriction of her discovery efforts had contributed to her failure to place her claims within the limitations period set forth under Title VII, 42 U.S.C. § 2000e, because of her inability to find evidence supporting a continuing, serial or systemic violation theory of discrimination on the part of the defendant. The First Circuit rejected this argument:

> Given the context of the litigation, we believe the court had ample justification for deciding that the disputed interrogatories were overly broad with respect to time frame, job classifications, and geographic area. After all, Mack sought data for a 4-year period when a lesser time would plainly have sufficed; she inquired as to nine different job classifications, several of which were clearly immaterial to the case . . . and her request extended to 62 stores, a total that seems unreasonable given [the facts of the case].

<u>Mack,</u> 871 F.2d at 187.

Also instructive is <u>In re Microcrystalline Cellulose Antitrust Litigation,</u> 221 F.R.D. 428 (E.D. Pa. 2004). The plaintiffs in that case claimed that several manufacturers of an ingredient in many processed foods and pills conspired to secure each other's market power in distinct geographic areas. The plaintiffs' general allegation was that the market allocation agreement had been in effect until 1997. <u>Id</u>. The defendants argued that the plaintiffs had not alleged any specific wrongdoing after 1995, so the conspiracy should be considered to have ended in 1995. <u>Id</u>. Despite their own allegations, the plaintiffs demanded that the defendants produce documents through 2003. <u>Id</u>. The defendants offered to produce documents through 2000, but argued that the burden of producing materials from later years would outweigh the minimal benefit to plaintiffs. <u>Id</u>. The court, citing Rules 26(b)(1) and 26(b)(2)(iii), held that even though discovery in antitrust class action cases is broader than in many other cases, the production of materials from 2000 to 2003 would provide minimal beneficial information to the plaintiffs and,

therefore, would not be compelled. Id. at 430. See also Diaz-Padilla v. BMS Holding Co., 2005 U.S. Dist. LEXIS 5879 (D.P.R. Apr. 4, 2005) (plaintiff's attempt to seek broad discovery rejected where he failed to meet his duty to affirmatively set forth sufficient and specific allegations as to the relevance of the requested discovery). The court explained that, "[w]hile Rule 26(b)(1) provides for broad discovery, under the new language "courts should not grant discovery requests based on pure speculations that amount to nothing more than a fishing expedition into actions or past wrongdoing not related to the alleged claims or defenses." Id.; see also Surles v. Air France, 2001 U.S. Dist. LEXIS 10048 at * 11-12 (S.D.N.Y. Jul. 19, 2001) ("Although there is little case law indicating how the new discovery standards should be applied, even under the former version of Rule 26, discovery requests could not be "'based on pure speculation or conjecture.' . . . Accordingly, courts faced with such requests would routinely decline to authorize fishing expeditions." (citations omitted)).

Courts also regularly reject attempts to allege fraud and then to search for a basis for the allegation through discovery. See, e.g., Hayduk v. Lanna, 775 F.2d 441 (1st Cir. 1985). As the First Circuit explained in Hayduk, "[i]n cases in which fraud lies at the core of the action, the rule does not permit a complainant to file suit first, and subsequently to search for a cause of action." Id. at 443 (internal quotations omitted); see also Shamsi v. Dean Witter Reynolds, Inc., 743 F. Supp. 87, 90 (D. Mass. 1990) (fishing expeditions impermissible). In fact, Rule 26(b)(1) now requires courts to limit attempts to use discovery to find new claims.

**C.    Plaintiffs' Time Period Is Not Justified by the Complaint and Would Unduly Burden Defendants**

Plaintiffs are using a "broadsword" where a scalpel will do. In addition to the huge volume of Neurontin-related documents from 1995 through 1998 that they already have, Plainitffs demand the sales and marketing documents from six more years. Rule 26 requires

balance; a discovery demand may not impose "undue" burden and expense. See, e.g., Gill v. Gulfstream Park Racing Ass'n, 399 F.3d 391, 400 & n.5 (1st Cir. 2005). Plaintiffs' demand for six more years of documents is unjustified. The burden and expense of complying with it is "undue," for it would far outweigh the likely benefit to Plaintiffs. A protective order is therefore warranted.

Plaintiffs' complaints do not contain allegations of misconduct by Defendants in the period since 1998. The only alleged misstatements that Plaintiffs have identified in any way occurred prior to December 31, 1998.[8] Plaintiffs have failed to identify any statements that were allegedly made after 1998, much less alleged misrepresentations.

This failure is particularly glaring in light of the fact that Relator's counsel, who is now a member of the Steering Committee for this action, has had over nine years to investigate conduct related to Neurontin and attempt to identify such misrepresentations. The alleged "scheme" of misrepresentations consists, according to Plaintiffs' own complaints, of statements that were purportedly made in the public domain, either to doctors at public events or in articles in the published press. Yet Plaintiffs have failed to come forward with a single statement after December 31, 1998. This failure demonstrates that Plaintiffs are on an impermissible fishing expedition and that their discovery requests are not grounded in any specific allegations that would justify the extraordinary burden Defendants would incur if they must produce documents from the six year period after 1998.

The task of gathering, reviewing, and producing six more years of sales and marketing documents would require many thousands of hours of attorney time, would cost millions of dollars, and would disrupt Defendants' operations. Defendants estimate, conservatively, that

---

[8] Even those statements lack appropriate specificity, as Plaintiffs fail to provide facts to support their allegations of false statements and scienter. (Def. Motion to Dismiss at 11).

they would need to collect documents from over 100 people to respond to Plaintiffs' post-1998 requests. (Kibbe Decl. ¶ 4). It would take hundreds of hours simply to collect this material, and almost 10 months for 40 temporary workers reviewing documents full time to complete the initial review alone. (Kibbe Decl. ¶ 5). The costs associated with collection, processing, and this initial review would be $5 million or more, and these costs do not even include the necessary second review by Pfizer's attorneys for responsiveness, privilege and confidentiality. (Kibbe Decl. ¶¶ 5, 6). The review for confidentiality will be particularly time consuming for Pfizer-era documents due to the fact that more recent materials are more likely to require designation as "Confidential" pursuant to the Protective Order entered by the Court on January 10, 2005.

The entire process, including initial collection, first and second review, and production, would last well over a year and cost over $10 million. (Kibbe Decl. ¶6). Moreover, these estimates assume that Defendants will not be required to collect documents from field level employees. If such collection has to be made, the costs and time that would be incurred to collect and review documents would substantially increase, perhaps as much as three-fold, as there are likely hundreds of such field personnel. In short, Plaintiffs' demands to receive documents from the time since December 31, 1998 would impose extraordinary burden and expense on Defendants. The demands would also result in a dramatic expansion to the schedule that has been entered in this case, as the currently-scheduled completion date for discovery of January 2006 would be impossible to meet if the additional six years worth of documents must be produced.

In Franklin, as here, post-1998 events and circumstances were implicated based only on "belief." In Franklin, Judge Saris rejected an attempt to expand the scope of discovery to include post-1998 events and circumstances. Judge Saris's limitation on discovery should be applied in

this case.[9]  Accordingly, Plaintiffs should not be permitted to impose a massive burden on Defendants based on mere belief, particularly since they have had years to come up with more than mere belief.  The 1998 cut-off that Judge Saris imposed should apply here as well.

The authorities discussed above teach that a temporal limit is appropriate where there is a disconnect between a complaint's allegations and the scope of discovery being pursued.  They also teach that "fishing expeditions" in search of alleged fraud are not to be countenanced.  Here, in a nearly ten-year old controversy, Plaintiffs have not made any factual allegations of misconduct occurring after 1998.  And there is no excuse for their conclusory, non-specific allegations.  Not only have Plaintiffs, and particularly their attorneys who also were Franklin's counsel, had ample time to come up with something more than allegations based solely on information and belief, but Defendants are not the exclusive repository for the information they claim to need from Defendants:  Plaintiffs' allege a scheme that involved dozens of third parties and hundreds if not thousands of physicians.  If there were a basis for such conclusory allegations, it would have been included in the complaints or amended complaints that have been filed over the course of the last year.

Were Plaintiffs permitted to force Defendants to produce six more years of documents, the schedule that the parties and the Court worked to establish would be in jeopardy.  Defendants conservatively estimate that it would take over twelve months to gather, review, and produce the additional documents that Plaintiffs are demanding.  The schedule, however, requires all fact discovery, including document production and depositions, to be completed by January 30, 2006.

_____

[9]Indeed, at the first conference in this case, Judge Saris remarked that she believed that discovery in this case essentially had been completed by virtue of the discovery that was taken in the Franklin action.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court enter a protective order that Plaintiffs are not entitled to discovery concerning the sales and marketing of Neurontin that post-date 1998.

Dated: June 17, 2005

PFIZER INC., et uno,

By their attorneys,

s/James P. Rouhandeh
James P. Rouhandeh
James E. Murray
Deborah L. MacGregor
DAVIS POLK & WARDWELL
450 Lexington Avenue
New York, New York 10017
(212) 450-4000

-and-

s/David B.Chaffin
David B. Chaffin
BBO # 549245
HARE & CHAFFIN
160 Federal Street
Boston, Massachusetts 02110
(617) 330-5000

## CERTIFICATION OF CONSULTATION

Pursuant to Local Rule 37.1, I certify that co-counsel James Murray and I have conferred with opposing counsel in an attempt to narrow or resolve the issue presented by this motion but have been unable to do so. The consultations consisted of numerous meetings with numerous opposing counsel, as described above.

s/Deborah L. MacGregor
Deborah L. MacGregor

# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

------------------------------------------------x
In re: NEURONTIN MARKETING AND          :
      SALES PRACTICES LITIGATION          :
------------------------------------------------x     MDL Docket No. 1629
                            :
THIS DOCUMENT RELATES TO:            :     Master File No. 04-10981
                            :
------------------------------------------------x     Judge Patti B. Saris
                            :
HARDEN MANUFACTURING CORPORATION;    :
LOUISIANA HEALTH SERVICE INDEMNITY COMPANY,    :
dba BLUECROSS/BLUESHIELD OF LOUISIANA; UNION    :
OF OPERATING, LOCAL NO. 68 WELFARE FUND;    :
ASEA/AFSCME LOCAL 52 HEALTH BENEFITS TRUST;    :
GERALD SMITH; and LORRAINE KOPA, on behalf of    :
themselves and all others similarly situated, v. PFIZER INC. and    :
WARNER-LAMBERT COMPANY.                :
                            :
------------------------------------------------x
                            :
THE GUARDIAN LIFE INSURANCE COMPANY OF    :
AMERICA v. PFIZER INC. and            :
                            :
AETNA, INC. v. PFIZER INC.            :
                            :
------------------------------------------------x

## DECLARATION OF LAURA KIBBE

    I, Laura Kibbe, hereby declare as follows:

    1.    I am a Senior Corporate Counsel at Pfizer Inc ("Pfizer"), one of the defendants in the above-captioned matter.

    2.    As part of my responsibilities, I coordinate discovery protocols and procedures, as well as respond to discovery requests. I have been responsible for managing and coordinating large scale document productions since the early 1990s.

3.    The information contained in this declaration is based on my general knowledge of Pfizer's business operations, and the magnitude of the efforts that would be necessary to locate and review information sought by the Plaintiffs in their discovery requests.

4.    After reviewing Plaintiffs' requests for post December 31, 1998 documents from Warner-Lambert and Pfizer-era custodians, I estimate that the documents from a minimum of well over 100 custodians would need to be collected in order to provide those documents. This number does not include personnel based in the field, as addressed below. I further estimate that it would take tens of thousands of hours to collect and review for responsiveness, confidentiality and privilege all documents necessary, including millions of e-mails, to respond to Plaintiffs' requests. In addition, Pfizer would incur costs for lost productivity and other business costs, such as training and contracting non-Pfizer personnel to conduct such a review.

5.    Based upon my experience conducting Pfizer discovery, I also estimate that the majority of the more than 100 potential custodians of documents will have multiple gigabytes of electronic data to be searched and culled, resulting in "reviewable" information in excess of 10 million pages in total. I also estimate that the cost for processing the electronic information, which excludes the cost for reviewing documents, would exceed $1.7 million dollars. When the costs of review are added, I estimate that it would take approximately 40 temporary workers, working 40 hours per week, almost 10 months to review 10 million pages. At the estimated hourly rates of $40 -$60 per hour for temporary workers, which is at the low end of the range of the likely cost, the magnitude of that review would require Pfizer to spend anywhere between $2.9 and $4.3 million in review costs, for a total of $4.6 to $6 million when the processing and initial review of documents for responsiveness is completed, excluding the costs of second

2

review by Pfizer's attorneys for privileged, confidentiality, and responsiveness. This estimate does not include the costs that would be incurred if documents needed to be collected from field sales personnel and field medical liaisons, of which there are hundreds.

6.     This estimate also does not include time and expense for review of documents by Pfizer's firm attorneys for responsiveness, privilege and confidentiality. Even assuming merely 25% of the documents initially reviewed for responsiveness, or approximately 2.5 million pages, are deemed responsive and in need of second review, the completion of this review by Pfizer's firm attorneys would add another one to two months to the total review time. The privilege and confidentiality check would also result in substantial additional costs, which would likely equal or exceed the expense incurred in conducting the initial review. The combined expense incurred in the search, collection, and production of documents in response to Plaintiffs' requests for documents after Dec. 31 1998 is therefore likely to exceed $10 million.

I declare under penalty of perjury under the law of the state of New York that the foregoing is true and correct, and that this declaration executed on 17th day of June 2005 at Waterbury, Connecticut.

Laura M. Kibbe

Laura Kibbe

3