UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| IN RE NEURONTIN MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION | ) ) ) ) | MDL Docket No. 1629 |
| THIS DOCUMENT RELATES TO: | ) ) ) | Master File No. 04-10981 |
| Barlow v. Pfizer Inc., et al, Cause No. A-05-175 (W.D. TX) | ) ) ) ) | Judge Patti B. Saris |

**DEFENDANTS' RESPONSE TO MOTION FOR APPOINTMENT OF JACK W. LONDON, ESQ. TO PRODUCTS LIABILITY PLAINTIFFS' STEERING COMMITTEE**

Defendants Pfizer Inc. and Warner-Lambert Company ("Defendants") submit this memorandum in response to the submission by Plaintiff in Barlow v. Pfizer Inc., et al, Cause No. A-05-175 (W.D. TX), for appointment of Jack London to the Products Liability Plaintiffs' Steering Committee (the "Barlow Motion").

**INTRODUCTION**

Because Plaintiffs have more at stake with respect to the composition of their steering committees than Defendants do, Defendants are hesitant to weigh in on the subject. Defendants will be required, however, to work cooperatively with the steering committees, potentially for a long time. It is important that committee members demonstrate the capacity to fulfill this role.

Unfortunately, there is substantial doubt that Mr. London has this capacity. Attached to the Barlow motion is the Declaration of Jack W. London in Regard to Attorney's Fees and Expenses (the "London Dec."). The declaration contains a number of irrelevant, inaccurate, and inflammatory allegations regarding Defendants' conduct in the Barlow case. In the paragraphs that follow, Defendants describe and refute these allegations, in order both to set the record

straight and to ensure that the Court makes steering committee appointments possessed with all pertinent information.

## FACTS

In his declaration, Mr. London claims that "[a]t every stage of our investigation and in subsequent litigation Pfizer/Warner-Lambert worked zealously to prevent us from discovering critical facts." (London Dec. ¶ 4(c)).  He also alleges that "[p]ublic records indicated, and subsequent discovery eventually confirmed, that Pfizer/Warner-Lambert paid private physicians to promote Neurontin for off-label purposes." Id..  Mr. London identifies Dr. Jay Seastrunk as "one of the physicians paid by Pfizer/Warner-Lambert for this purpose." Id.  Mr. London also claims that Defendants' two removals of the Barlow case were "improvident." Id. at ¶ 4(f).  Not only are these allegations irrelevant to the motion for appointment to the Steering Committee, but all are meritless.  It is particularly disturbing that all of these assertions are found in the context of a sworn declaration supporting a motion for appointment to the Steering Committee, as the Committee will have "sole authority to communicate with Defendants' counsel and the Court on behalf of all Products Liability Plaintiffs …." (Docket # 165, at Ex. A, at 5).  It is also worth noting that Mr. London is seeking appointment to the Steering Committee while simultaneously aggressively opposing transfer to the MDL Court before the Judicial Panel on Multi-District Litigation.  Plaintiff has filed her opposition to transfer before the Panel, and the opposition has not yet been scheduled for a hearing.  As a result, it is likely to be several months before Barlow is transferred to this Court.

Mr. London's allegation that Defendants have "worked zealously" to prevent Plaintiff from discovering relevant facts is at best mistaken.  As reflected in the declaration of Texas counsel for Defendants, since discovery commenced in this litigation, Defendants have fully

cooperated in discovery, seeking to provide to Plaintiff relevant documents, subject to a proper protective order, and in a usable format. (Declaration of Jeffrey Lilly ("Lilly Decl."), attached hereto as Ex. A, ¶¶ 4 – 8; 10 – 15; 17). Defendants objected to the scope and relevance of many of Plaintiff's extremely broad discovery requests, and attempted to work out these issues through the accepted practice of meet and confer sessions. (Lilly Decl. ¶¶ 4 - 8). In contrast, Plaintiff's counsel has engaged in an unrelenting letter-writing campaign and has filed multiple, back-to-back discovery motions, (see Lilly Decl. ¶¶ 5 – 7; 9; 15), which have taken the place of reasoned and reasonable discourse relating to discovery. As demonstrated by the Lilly Declaration, at no point have Defendants attempted in any way – much less "worked zealously" – to prevent Plaintiff from "discovering critical facts."

Second, Mr. London does not identify the "public records" that allegedly indicate that Defendants paid physicians to promote Neurontin for off-label uses, (see London Dec. at ¶ 4(c)), which is not surprising as Defendants are unaware of any such records. Mr. London's assertion that Dr. Seastrunk was the recipient of such payments is belied by a sworn affidavit by Dr. Seastrunk himself that Defendants submitted in connection with their second removal of the Barlow case. In that affidavit, Dr. Seastrunk stated that he "never had an agreement with the company that makes Neurontin regarding promoting Neurontin for off-label use to patients or other doctors." (Seastrunk Aff., attached hereto as Ex. B, ¶ 5). Mr. London blithely disregards this affidavit in asserting in his sworn declaration that Defendants paid Dr. Seastrunk to promote Neurontin. The assertion is both false and deliberately inflammatory. It does not appear, in light of Dr. Seastrunk's affidavit, to have been made in good faith.

Mr. London's assertion that Defendants "improvident[ly]" removed Barlow is equally meritless. Defendants removed the case in good faith, and nothing in Judge Spark's decision

remanding the case indicates otherwise.  In fact, Judge Sparks left open the possibility of

Defendants removing a second time if Dr. Seastrunk were severed or dismissed from the case.

(See Dec. 20, 2004 Order, attached as Ex. C, at 9 n.7).  The doctor has not been dismissed, but

Defendants' counsel subsequently learned in March 2005, that  -- Barlow's allegation to the

contrary notwithstanding -- Dr. Seastrunk was not a citizen of Texas at the time Barlow was

filed.  (Lilly Decl. ¶ 16).  That is, counsel for Defendants learned for the first time several

months after the filing of the case and after the hearing on the first motion to remand that

Plaintiff had incorrectly alleged that Dr. Seastrunk is a citizen of Texas and that the doctor is in

fact a citizen of California.  Upon learning this – which revealed that there always had been

complete diversity – Defendants promptly removed the case on that basis.  (Lilly Decl. ¶ 16).

While Plaintiff alleges that Defendants had prior knowledge of Dr. Seastrunk's citizenship,

neither she nor, more importantly, Mr. London, has a good faith basis to claim that Defendants'

second removal was improvident.  There unquestionably is diversity jurisdiction.

## CONCLUSION

In light of the inaccuracies in Mr. London's sworn declaration – allegations that are not

even relevant to the motion which they purport to support – Defendants have serious and

legitimate concerns about the appointment of Mr. London to the Products Liability Plaintiffs'

Steering Committee.

Dated:  July 1, 2005

DAVIS POLK & WARDWELL
By:    s/James P. Rouhandeh
         James P. Rouhandeh
         James E. Murray

450 Lexington Avenue
New York, New York 10017
(212) 450-4000

4

- and -

HARE & CHAFFIN

By:    s/David B. Chaffin
          David B. Chaffin

160 Federal Street
Boston, Massachusetts 02110
(617) 330-5000

*Attorneys for Defendants Pfizer Inc. and
Warner-Lambert Company*

# EXHIBIT A

**BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

*Irene Barlow v. Pfizer Inc., CA No. A-05-175 (W.D. Tex.)*

IN RE NEURONTIN MARKETING                    **MDL No. 1629**
AND SALES PRACTICES LITIGATION

### DECLARATION OF JEFFREY R. LILLY

1.    My name is Jeffrey R. Lilly.  I am a shareholder at Clark, Thomas & Winters, A
Professional Corporation, and am counsel of record for Pfizer Inc. ("Pfizer") and Warner-
Lambert Company, L.L.C., ("Warner-Lambert"), Defendants in *Barlow v. Pfizer Inc. et al.* now
pending in the United States District Court for the Western District of Texas.  The facts stated
herein are within my personal knowledge, based on my participation in discovery in this matter,
and are true and correct.

2.    Plaintiff Irene Barlow filed suit in the state district court in Travis County, Texas
on July 13, 2004.  Plaintiff claims her suicide attempt was caused by the culpable conduct of
Pfizer and Warner-Lambert in allegedly promoting the drug Neurontin for "off-label" uses.
Defendants removed the case on August 13, 2004.

3.    On August 31, 2004, Plaintiff served Defendants with 58 requests for production.

4.    On October 25, 2004, Defendants objected and responded to Plaintiff's discovery
requests.  Defendants objected, among other things, "to the document requests to the extent they
call for the production of proprietary, commercially sensitive, or other confidential documents,
the probative value of which is outweighed by the company's interest in preserving their
confidentiality.   The company objects to producing any documents until an appropriate
confidentiality stipulation is entered into by the parties and so ordered by the Court."  Subject to
this, Defendants agreed to produce thousands of pages of responsive documents, including the
Neurontin New Drug Application ("NDA") and Investigational New Drug Application ("IND")

which are multi-volume compilations of documents relating to preclinical and clinical trials, labeling, and marketing of the drug.

5.      The next day, on October 26, 2004, Plaintiff's counsel Jack London wrote a letter to my partner, Ken Ferguson, requesting that Defendants' counsel appear at his office for a conference on Defendants' objections on November 1, 2004. Mr. London also questioned why documents had not been provided with Defendants' objections and responses. Mr. Ferguson responded on October 27, 2004, agreeing to a conference, but requesting alternate dates, as we were unavailable on November 1. The letter further explained that Defendants could not produce documents until logistical issues were resolved and a protective order in place.

6.      On November 2, 2004, without further response to Defendants' October 27, 2004 letter and without any earnest attempt to confer, Plaintiff filed a motion to compel requesting that Defendants' objections be overruled in their entirety and all requested documents ordered produced. On November 11, 2004, my partner, Leslie Benitez, wrote to Plaintiff's counsel reiterating that Defendants had agreed to produce documents, but because they contain proprietary, commercially sensitive, and confidential information, production could not occur until we had a protective order in place. With that letter, Ms. Benitez enclosed a proposed protective order.

7.      On November 15, 2004, Mr. London wrote a letter to Ms. Benitez threatening a second motion to compel, incorrectly stating that no objection had been lodged as to the confidential nature of the documents. Mr. London stated: "I have to disagree with your request to enter into a protective order." On November 17, 2004, my office responded to this letter stating that a second motion to compel was unnecessary and premature and that we remained willing to confer in person. We again requested available dates for such a conference. We further explained that while we had voluminous documents ready to be produced, we needed to

have a protective order entered first. That same day, Plaintiff filed her second motion to compel without further conference. The first motion to compel had not yet been ruled upon.

8.     On December 2, 2004, the parties did confer in person. In addition to documents Defendants had already offered subject to protective order (including the NDA and IND), Defendants offered to produce documents from the *Franklin* matter that related to either: (1) Texas; or (2) Bipolar Disorder (the  illness for which Plaintiff was allegedly treated with Neurontin); or (3) the named co-defendant, Dr. Jay Seastrunk.  Plaintiff did not accept this offer. Additionally, no agreement was reached on the form of a protective order.

9.     On December 3, 2004, before either the first or second motion to compel had been ruled upon, Plaintiff filed a "Request for Ruling," on her prior motions to compel. Ignoring the voluminous documents Defendants had offered subject to a protective order during their conference on the previous day, Plaintiff misleadingly stated in this pleading that Defendants "will disclose no documents except by Order of this Court."

10.     On December 9, 2004, I wrote a letter to Mr. London outlining the categories of documents that Defendants had made and would continue to make available to Plaintiff if the parties could agree to a protective order. I also made clear that Defendants had never stated that a "court order" would be required before Defendants would produce these documents. Plaintiff's counsel subsequently agreed to review the documents that we offered related to the *Franklin* matter detailed in this letter.

11.     On December 14, 2004, Defense counsel made available to Plaintiff's counsel approximately 14,000 pages of documents, on the condition that counsel sign the form Western District of Texas protective order prior to reviewing documents. I was out of town on this day. When Mr. London and Mr. Pierce arrived at my office, they represented to my staff that we had agreed that Plaintiff's counsel could review the documents without signing a protective order, referencing my letter of December 9 wherein I stated that no "court order" was necessary for the

review of these documents. (As stated above, the first paragraph in that letter made clear that the documents would only be made available subject to a protective order being in place.) Due to this disagreement, Plaintiff's counsel did not review documents on this day as they refused to sign the protective order.

12.    On December 16, 2004, Plaintiff's counsel signed a protective order, briefly reviewed the documents, and selected all of them for production.

13.    On December 21, 2004, I wrote Plaintiff's counsel advising them that the documents they selected for production should be ready on December 22, 2004.

14.    On December 22, 2004, Defense counsel learned that the case had been remanded. Consequently, as no protective order had been entered by the state Court, I informed Plaintiff's counsel that the document production would have to be delayed until a protective order could be entered in state court. On December 30, 2004, Defendants proposed a state court protective order which included provisions that addressed differences between state and federal law. On January 7, 2005, Plaintiff proposed a different protective order. On January 12, 2005, we informed Plaintiff's counsel that their proposed protective order was not adequate and asked that they let us know what problems they have with our proposal so that we could work to resolve our differences.

15.    On January 26, 2005, Plaintiff's counsel signed their own new version of a protective order and forwarded a check to Defense counsel for the documents. This protective order was not one to which Defendants had agreed. On January 31, 2005, I informed Plaintiff's counsel that we were reviewing their proposed protective order and would not deposit their check until the documents were delivered. Beginning on February 3, 2005, multiple discovery motions were filed by both parties in state court. These motions were set to be heard on March 10, 2005.

16.     On March 1, 2005, I received a call from counsel for co-defendant Dr. Jay Seastrunk. Dr. Seastrunk's counsel informed me that Dr. Seastrunk was at all relevant times a citizen of California, not Texas. On March 8, 2005, my office received a declaration signed by Dr. Seastrunk confirming this fact. On March 9, 2005, Defendants removed the case a second time.

17.     On March 10, 2005, I wrote Mr. London informing him that unless Plaintiff objected, we would file the previously signed form Western District Protective Order with the Court. We would also immediately forward to them the previously reviewed and selected documents, and we did so on March 11, 2005.

18.     On April 1, 2005, Defendants supplemented their production with approximately 304 additional pages of documents as well as a CD containing research reports. On April 7, 2005, Defendants made a second supplementation of their production with approximately 562 additional pages of documents.

19.     On April 25, 2005, Defendants made a third supplementation of their production by providing two of three disks containing over 100,000 documents. (The third disk was forwarded on April 28, 2005.) Because Plaintiff's counsel had objections to the format of the disks, Defendants provided a second set of the disks on June 24, 2005.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Signed this 30th day of June, 2005.

Jeffrey R. Lilly

# EXHIBIT B

## DECLARATION OF DR. JAY SEASTRUNK

1.    My name is Jay Seastrunk M.D. I am over the age of 21, of sound mind, and am fully competent to make this declaration. I have personal knowledge of the facts stated herein and they are true and correct.

2.    I have been domiciled in and a citizen of California since 1999. My wife, Denise Marie Seastrunk has been domiciled in and a citizen of California since 1999.

3.    Attached to this declaration is a true and correct copy of the limited partnership agreement for Rehabilitation Staffing Ltd. Gero-Psychiatric Service Opportunities Inc. was the general partner of this limited partnership. The sole limited partner was the Seastrunk Family Trust. My wife and I are trustees of the Seastrunk Family Trust, and the trust is being administered in California.

4.    Under the terms of the limited partnership agreement, the partnership is automatically dissolved if the general partner is dissolved or otherwise ceases to exist and a new general partner is not appointed within 90 days.

5.    I am physician licensed in Texas and California. I have prescribed Neurontin in my practice for so-called "off-label" uses, such as for chronic fatigue syndrome. I did so based on my experience and professional judgment. I never had an agreement with the company that makes Neurontin regarding promoting Neurontin for off-label use to patients or other doctors. I never made statements about Neurontin to my patients, the public or other doctors that I did not believe to be true and medically justified.

6.    I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

_____
Jay Seastrunk, M.D.

EXHIBIT C

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF TEXAS

AUSTIN DIVISION

FILED

2005 DE 20  Pii 3: 21

BY _____

IRENE BARLOW,

     Plaintiff,

-vs-

PFIZER, INC.; WARNER-LAMBERT
COMPANY, L.L.C., formerly known as
WARNER-LAMBERT COMPANY, including its
division PARKE-DAVIS; DR. JAY
SEASTRUNK, M.D.; REHABILITATION
STAFFING SERVICES, LTD.; and
GERO-PSYCHIATRIC SERVICE
OPPORTUNITY,

     Defendants.

Case No. A-04-CA-527-SS

---

## O R D E R

BE IT REMEMBERED on the 30th day of September 2004, the Court held a hearing in the above-styled cause, specifically to consider Plaintiff Irene Barlow's ("Barlow") Motion to Remand [#7], Defendants Pfizer Inc.'s ("Pfizer") and Warner-Lambert Company, L.L.C.'s ("Warner-Lambert"), formerly known as Warner-Lambert Company, on its own behalf and on behalf of its unincorporated Parke-Davis division, "Response in Opposition to Motion to Remand" [#8], and Plaintiff's Reply [#9]. Having considered the motion, response, and reply, the relevant law, and the case file as a whole, the Court now enters the following opinion and orders.

## I.    Background

On July 13, 2004, Plaintiff filed suit in the 200th Judicial District Court of Travis County, Texas, Cause No. GN402172. This is a products liability case involving the prescription drug Neurontin which is distributed by Pfizer's subsidiary Warner-Lambert, and which was approved by the Food and Drug Administration ("FDA") for the treatment of certain seizure disorders.[1] Plaintiff claims she was prescribed Neurontin for an "off-label" use–to treat her bipolar disorder. Pet. ¶ 26. Plaintiff contends because Neurontin did not improve her psychiatric condition, and she did not receive "appropriate medicine in appropriate doses," she shot herself in the chest with a .38 caliber pistol. Pet. ¶ 27.

Plaintiff named as a nondiverse defendant Jay Seastrunk, M.D. ("Dr. Seastrunk"), a physician who apparently never treated her, but who allegedly made representations "to physicians in Texas" that Neurontin was effective for off-label uses, including bipolar disorder. Pet. ¶¶ 4, 21. Plaintiff also sued two corporations, Rehabilitation Staffing Services, Ltd. ("Rehabilitation Staffing") and Gero-Psychiatric Service Opportunity ("Gero-Psychiatric Service"), allegedly employers of Dr. Seastrunk, under the theory of respondeat superior.[2]

---

[1] Specifically, Neurontin, which is the brand name for the drug gabapentin, was approved by the FDA in 1994 for use as an adjunctive treatment for epilepsy in doses from 900 to 1,800 mg. per day.

[2] Rehabilitation Staffing and Gero-Psychiatric Service are not sued as conspirators. *See Bradford v. Vento*, 48 S.W.3d 749, 761 (Tex. 2001) (an agent cannot conspire with its principal).

On August 13, 2004, Defendants removed the case to this Court on the basis of diversity jurisdiction, alleging Barlow had fraudulently joined Dr. Seastrunk as a defendant in the case.

## II.    Analysis

Defendants removed the case to federal court on the basis of diversity jurisdiction. For this Court to have diversity jurisdiction over a case, the defendants must prove there is complete diversity among the parties in the case—in other words, the plaintiff is diverse from every defendant. 28 U.S.C. § 1332. Thus, the primary issue before this Court is whether Dr. Seastrunk is a proper defendant in this case and, consequently, whether this Court has subject matter jurisdiction over the case under 28 U.S.C. § 1332.

Defendants allege Dr. Seastrunk was fraudulently joined as a defendant,[3] in which case the Court would ignore his Texas citizenship for jurisdictional purposes. To establish Dr. Seastrunk was fraudulently joined, Defendants must satisfy the heavy burden of showing there is no reasonable possibility Barlow could establish a cause of action against Dr. Seastrunk, or that Barlow committed outright fraud in her recitation of the jurisdictional facts. *Burden v. Gen. Dynamics Corp.*, 60 F.3d 213, 217 (5th Cir. 1995); *B., Inc. v. Miller Brewing Co.*, 663 F.2d 545, 549 (5th Cir. 1981); *see also Ross v. Citifinancial, Inc.*, 344 F.3d 458, 462 (5th Cir. 2003) (clarifying "there must be a *reasonable* possibility of recovery, not merely a *theoretical* one."). In evaluating a defendant's assertion of improper joinder, a court must consider all of the factual

---

[3] The Court notes the Fifth Circuit has recently adopted the term "improper joinder" in lieu of the familiar term "fraudulent joinder." *Smallwood v. Ill. Cent. R.R. Co.*, 385 F.3d 568, 571 n.1 (5th Cir. 2004). No substantive difference exists between the two terms. *Id.*

-3-

allegations in the light most favorable to the plaintiff and resolve all of the contested issues of fact in favor of the plaintiff. *Burden*, 60 F .3d at 217.

However, the Court must not "pre-try" substantive factual issues in order to answer the discrete threshold question of whether the joinder of an in-state defendant is fraudulent. *B., Inc.*, 663 F.2d at 546. The Court must not decide whether the plaintiff will actually or even probably prevail on the merits but must look only for a reasonable possibility the plaintiff may do so. *Dodson v. Spiliada Maritime Corp.*, 951 F.2d 40, 42 (5th Cir. 1992); *Travis v. Irby*, 326 F.3d 644, 648 (5th Cir. 2003). If the possibility exists a plaintiff may prevail, then "a good faith assertion of such an expectancy in a state court is not a sham . . . and is not fraudulent in fact or in law." *B., Inc.*, 663 F.2d at 550 (internal quotations and citations omitted).

In this case, Defendants contend Plaintiff has no reasonable possibility of recovery on her claims against Dr. Seastrunk. Specifically, Defendants maintain Plaintiff cannot establish the elements of her conspiracy claim against Dr. Seastrunk. Under Texas law, the elements of conspiracy are: (1) a combination of two or more persons; (2) an object to be accomplished (an unlawful purpose or a lawful purpose by unlawful means); (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result. *Insurance Co. of N. Am. v. Morris*, 981 S.W.2d 667, 675 (Tex. 1998).[4]

---

[4] Conspirators are jointly and severally liable for all acts done by any of them in furtherance of the unlawful combination. *Carroll v. Timmers Chevrolet, Inc.*, 592 S.W.2d 922, 925-26 (Tex. 1979).

-4-

In Count VI of the original petition, Plaintiff asserts: "all Defendants" entered into a "civil conspiracy and a concert of action to pursue a common design, purpose, and intention" (Pet. ¶ 39(a)); "[e]ach Defendant along with one or more additional persons or entities had a meeting of minds about a common object or goal to be accomplished or a common course of action" (Pet. ¶ 39(b)); "[t]hat goal or the course of action used to obtain the goal was unlawful" (Pet. ¶ 39(c)); "[a]t least one of the parties to the conspiracy committed an overt unlawful act or course of conduct in furtherance of the conspiracy" (Pet. ¶ 39(d)); and "[p]lainitff's damages were the proximate result of this conspiracy" (Pet. ¶ 39(e)). Thus, the original petition states a short and plain statement of the minimal elements of a conspiracy claim. The plaintiff also claims in the "Nature of the Action" section of the original petition: "Parke-Davis instructed and caused its personnel and its medical liaison employees to make false statements to physicians and to provide physicians with written materials containing false statements concerning the safety and efficacy of Neurontin for 'off-label' uses" (Pet. ¶ 17); "Defendants' scheme included paying doctors to appear as authors of journal articles to promote the 'off-label' uses of Neurontin" (Pet. ¶ 18); "Defendants, by affirmative misrepresentations and omissions, falsely and fraudulently sought to create the image of safety with regard to their Neurontin drug by relaying positive testimonials, providing false medical research, withholding relevant information from users, misrepresenting the presence of adequate testing of the drug Neurontin for off-label uses, and misrepresenting the severity frequency and presence of side-effects" (Pet. ¶ 22); "Defendants knew and encouraged physicians and patients to undertake the extensive and profitable (to the Defendants) practice of prescribing

-5-

the off-label use of the drug Neurontin" (Pet. ¶ 22); "Defendants' scheme also included illegal 'kickbacks' and rewards to physicians who promoted and prescribed Neurontin for unapproved 'off-label' uses" (Pet. ¶ 23); "[b]eginning on or about 1999 through on or about 2001, Plaintiff Irene Barlow was a victim of the Defendants' scheme and false representations regarding Neurontin" (Pet. ¶ 26); and "Defendants' acts, omissions, and misconduct set out above, each acting individually as well as acting in concert with the other Defendants, were the proximate cause and producing cause of Plaintiff's damages" (Pet. ¶ 28).

After a careful review of the record, the Court cannot find there is no reasonable possibility that any of Plaintiff's causes of action will not succeed in state court.  According to Plaintiff, Defendant Warner-Lambert:

> pleaded guilty to criminal violations of introducing Neurontin into commerce for treatment of bipolar disorder by means of false promotion through sales representatives, through false promotion through medical liaisons to make presentations to physicians, through false promotion in consultant's meetings and advisory board meetings, through false articles in medical literature, and through teleconferences, in each of which it used detail persons and physicians to promote Neurontin for prescription for off-label (unapproved by the FDA) uses for which there was no therapeutic benefit.

Pl.'s Mot. at 4.  Plaintiff attached as exhibits to its original petition, the criminal information to which Warner-Lambert plead guilty and the amended complaint from a civil case against Warner-Lambert.[5]  Pet., Exs. B & C.  Plaintiff notes in the motion to remand the "settlement of [the

---

[5] The crux of the allegations in the civil case was that Parke-Davis engaged in an extensive and far-reaching campaign to use false statements to promote increased prescriptions of Neurontin.  Particularly relevant for this case:

> [Franklin] allege[d] the doctors were rewarded with kickbacks for prescribing large quantities of Parke-Davis drugs. These alleged kick-backs took various forms. For instance, some doctors were allegedly paid sums of money which were ostensibly compensation for drug studies. However,

civil case] was part of the Warner-Lambert Company L.L.C.['s] criminal guilty plea agreement with the United States resulting in 'whistleblower' David Franklin receiving $26.6 million dollars of the $430 million dollar fine paid by Defendants Warner-Lambert Company L.L.C., Pfizer, Inc., and Parke-Davis." Pl.'s Mot. at 4.

> Furthermore, Barlow makes the following allegations against Dr. Seastrunk specifically:

> Defendant Seastrunk is a physician in Texas who represented to physicians in Texas and to the Texas public that Neurontin was beneficial for 'off-label' uses, including bipolar disorder. His representations, like those of the other defendants, were made with the intent to and did induce ordinary treating physicians to increase their 'off-label' prescription of Neurontin to patients, that is to prescribe Neurontin to patients who were diagnosed with and to treat conditions for which Neurontin had not received FDA approval.

Pet. ¶ 21. In support of this claim, Plaintiff points to an article written by Dr. Seastrunk in which he advocated the prescription of Neurontin for treating bipolar disorder in dosages of up to 6,000 mg. per day. Pl.'s Mot., Ex. D. Dr. Seastrunk's advocacy of such use of Neurontin was cited in an article in which Parke-Davis employees are quoted. Pl.'s Mot., Ex. E. Specifically, Dr. Elizabeth Garofalo, who is described as the "senior director in charge of new indication studies at the Parke-Davis Research Division" explained the broad appeal of Neurontin. Pl.'s Mot., Ex. E. According to Plaintiff, these two articles appear at the time and in the manner identified by David

---

[Franklin] allege[d] these studies were shams and had no scientific value. Other doctors were allegedly paid sums of money under the guise of being compensated for their services as "consultants" or "preceptors" or for participating in a "speakers bureau." Doctors were also allegedly given cash payments for small record-keeping tasks, such as allowing Parke-Davis access to information about the doctors' patients who were receiving Neurontin. There [were] also allegations that doctors prescribing large amounts of Parke-Davis drugs were given gifts such as travel and tickets to the Olympics.

*United States ex rel. Franklin v. Parke-Davis, Div. of Warner-Lambert Co.*, 147 F. Supp. 2d 39, 45-46 (D. Mass. 2001).

Franklin as part of Defendants' "publication strategy" and use of physicians to illegally promote the off-label and high dosage use of Neurontin.[6] Pl.'s Reply at 3.

Although the pleadings of Plaintiff appear to depend on circumstantial evidence, the Court notes the burden falls on the removing party to affirmatively demonstrate the existence of federal jurisdiction. *Frank v. Bear Stearns & Co.*, 128 F.3d 919, 921-22 (5th Cir. 1997). In the context of an improper joinder claim, that burden may be satisfied through the use of a procedure akin to that employed in the summary judgment context. *Badon v. R J R Nabisco Inc.*, 224 F.3d 382, 389-90, 393-94 (5th Cir. 2000). Assuming the allegations themselves do not demonstrate the non-diverse defendant's joinder was improper, the removing party may attempt to show "based on evidence outside the pleadings . . . that the plaintiff has no possibility of recovery on the claim." *Id.* at 389. The burden on the party seeking to establish improper joinder is analogous to that of a party moving for summary judgment, thus it bears the initial burden of coming forward with evidence to demonstrate no genuine issues of fact exist. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (holding a party moving for summary judgment bears the initial burden of production); *see also Badon*, 224 F.3d at 390 (holding the court may look past the allegations in the state court petition "if the plaintiff's pleading is pierced" with summary judgment-type evidence).

---

[6] Defendants have not directed the Court to any case under Texas law, and the Court could find none, addressing a similar factual situation in the context of a conspiracy claim.

Here, Defendants have failed to present *any* evidence in support of their assertion Plaintiff cannot maintain a conspiracy claim against Dr. Seastrunk. Instead, they have attempted to put Plaintiff to her proof on her claim for conspiracy against Dr. Seastrunk at the outset of this litigation. In order to meet its heavy burden of demonstrating Barlow has no reasonable probability of prevailing on her state-law claims, Defendants must present the Court with more than their unsubstantiated assertions that Barlow will not be able to prove up her claims at trial. *Little v. Wyeth-Ayerst Labs., Inc.*, No. 99-2244-CIV-T-17F, slip op. at 6 (M.D. Fla. Dec. 9, 1999) (no fraudulent joinder when defendants "presented nothing more . . . than an allegation that the non-diverse individual Defendants were fraudulently joined by Plaintiff"). *Cf. Badon*, 224 F.3d at 393 (holding affidavits submitted by defendants to negate a conspiracy claim were sufficient to overcome the allegations of conspiracy in the plaintiff's petition); *In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine)*, No. MDL 1203, CIV.A. 03-20765, CIV.A. 03-20622, CIV.A. 03-20766, CIV.A. 03-20613, 2004 WL 1824357 (E.D. Pa. Aug. 12, 2004) (uncontroverted affidavits presented by defendants are sufficient to establish fraudulent joinder). Because they have failed to do so, this Court holds it has no subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1447(c).[7]

---

[7] If Dr. Seastrunk is severed or dismissed, then the other defendants may remove the action to federal court.

-9-

III.    **Conclusion**

In accordance with the foregoing:

IT IS ORDERED that Plaintiff Irene Barlow's Motion to Remand [#7] is GRANTED;

IT IS FURTHER ORDERED that any and all remaining pending motions are DISMISSED WITHOUT PREJUDICE to refiling in state court; and

IT IS FINALLY ORDERED that the Clerk SHALL REMAND the above-styled cause to the 200th Judicial District Court of Travis County, Texas.

SIGNED this the 20th day of December 2004.

SAM SPARKS
UNITED STATES DISTRICT JUDGE

-10-