UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION ) ) ) ) | |
| ) | MDL Docket No. 1629 |
| THIS DOCUMENT RELATES TO: ) | Master File No. 04-10981 |
| ) | Judge Patti B. Saris |
| ALL MARKETING AND ) | Mag. Judge Leo T. Sorokin |
| SALES PRACTICES ACTIONS ) | |
| ) | |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO MOTION FOR
PROTECTIVE ORDER CONCERNING SCOPE OF DISCOVERY AND IN SUPPORT
OF MOTION TO COMPEL PRODUCTION OF DOCUMENTS CREATED AFTER
DECEMBER 31, 1998**

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.      INTRODUCTION ................................................................................................ 1

II.     STATEMENT OF FACTS AND PROCEDURAL HISTORY ....................................... 4

        A.      The Franklin Litigation ................................................................. 4

        B.      The Complaints Sufficiently Allege That Defendants' Misconduct
                Continued After 1998 ................................................................... 7

        C.      Two Other Courts Have Already Rejected Defendants' Arguments, and
                Ordered That They Provide Discovery on Their Marketing of Neurontin
                Through the Present ..................................................................... 10

III.    PLAINTIFFS' REQUEST FOR POST-1998 DISCOVERY IS NOT UNDULY
        BURDENSOME ............................................................................................. 12

IV.     CONCLUSION................................................................................................ 19

# TABLE OF AUTHORITIES

**Page**

## CASES

*Carlson Companies v. Sperry & Hutchinson Co.*, 374 F. Supp. 1080 (D. Minn. 1973) ............................................................................................................... 15

*Compagnie Francaise d'Assurance Pour le Commerce Exterieur*, 105 F.R.D. 16, 42 (S.D.N.Y. 1984) ................................................................................................ 17

*Culkin v. Pitney Bowes, Inc.*, 225 F.R.D. 69 (D. Conn. 2004) ................................... 17

*Hickman v. Taylor*, 329 U.S. 495, 67 S. Ct. 385, 91 L.Ed. 451 (1947) ...................... 12

*In re BankAmerica Corp. Securities Litig.*, 210 F.R.D. 694 (E.D. Mo. 2002) ........... 18

*In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508 (E.D. Mich. 2003) .................... 18

*In re Diet Drugs Products Liability Litig.*, 2001 WL 497313 (E.D. Pa. 2001) .......... 18

*In re Folding Carton Antitrust Litig.*, 83 F.R.D. 251 (D.C. Ill. 1978)......................... 17

*In re Ikon Office Solutions, Inc. Securities Litig.*, 194 F.R.D. 166 (E.D. Pa. 2000).................... 18

*In re Linerboard Antitrust Litig.*, MDL No. 1261, 2004 WL 1221350 (E.D. Pa. June 2, 2004)........................................................................................................... 18

*In re Lucent Technologies, Inc. Securities Litig.*, 327 F. Supp. 2d 426 (D.N.J. 2004) ............................................................................................................... 18

*In re Lupron Marketing and Sales Practices Litig.*, 228 F.R.D. 75 (D.Mass. 2005) ................. 18

*In re Maxim Group Inc. Securities Litig.*, 2002 WL 987660 (N.D. Ga. Apr. 23, 2003) ............................................................................................................... 14

*In re Shell Oil Refinery*, 155 F.R.D. 552 (E.D. La. 1993) ......................................... 18

*In re VISA Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d 503 (E.D.N.Y. 2003) ............................................................................................................... 18

*In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231 (D. Del. 2002) ................... 18

*Jackson v. Harvard Univ.*, 111 F.R.D. 472 (D. Mass. 1986) .................................... 15

*Klonoski v. Mahlab*, 156 F.3d 255 (1st Cir. 1998) .................................................... 13

*Robco Distributors, Inc. v. General Glass Intern. Corp.*, 101 F.R.D. 547 (E.D. N.Y. 1984) ......................................................................................................... 15

*Roesburg v. Johns-Manville Corp.*, 85 F.R.D. 292 (E.D. Pa. 1980) ................................... 14, 17

*Tavoulareas v. Piro*, 93 F.R.D. 24 (D.D.C. 1981)...................................................... 15

*United States v. Capitol Services, Inc.*, 89 F.R.D. 578 (E.D. Wis. 1981).................. 15

*Wal-Mart Stores, Inc., v. VISA USA Inc.*, 396 F.3d 96 (2d Cir. 2005) ...................... 18

## RULES

Fed. R. Civ. P. 26(b), Advisory Committee's Note............................................. 13, 14

The Class Plaintiffs (*Harden Manufacturing Corp., et al. v. Pfizer, Inc., et al.*) and the Coordinated Third Party Payer ("TPP") Plaintiffs (*The Guardian Life Insurance Company of America v. Pfizer, Inc. and Aetna, Inc. v. Pfizer, Inc.*) (collectively, "Plaintiffs") respectfully submit this memorandum of law in opposition to defendants Pfizer, Inc. and Warner-Lambert Company's (collectively, "Defendants'") Motion for Protective Order Concerning Scope of Discovery and Plaintiffs' cross Motion to Compel the Production of Documents Created After December 31, 1998, filed herewith.

## I.    **INTRODUCTION**

As Defendants note, Plaintiffs' 252 document requests, while seemingly large in number, "can be roughly divided into two main categories:  requests for documents relating to sales and marketing of Neurontin, and requests for documents relating to the safety and efficacy of Neurontin" (Memorandum in Support of Motion for Protective Order Concerning Scope of Discovery ("Def. Mem.") at 7) -- to which Plaintiffs would add, "for unapproved uses."[1] Plaintiffs have alleged that Defendants unlawfully and fraudulently promoted Neurontin for uses for which it was not proven effective, at dosages it was not proven safe.[2]  Plaintiffs have alleged

---

[1] Indeed, the synonym "off-label use" appears in many, if not most of Plaintiffs' document requests (*see, e.g.,* Class and Non-Class Plaintiffs' First Request for Production of Documents, Nos. 27, 29, 31-49, 52-67), and those requests that do not specifically incorporate the phrase are directed to specific types of improper off-label marketing activities uncovered in the *qui tam* action, *United States ex rel. Franklin v. Parke-Davis, et al.*, C.A. No. 96-11651-PBS (D. Mass.) ("*Franklin*").

[2] Defendants likely made billions of dollars on this particular fraud alone, convincing doctors to prescribe ever higher doses of Neurontin – as high as 266% of the maximum dose Defendants were lawfully permitted to recommend for its *approved* uses – notwithstanding that their own unpublished studies showed that increased doses were no more effective, and without disclosing the fact that the FDA had already *denied* Defendants' application to increase the maximum recommended dose because there was no evidence Neurontin was safe at higher doses, and no evidence that higher doses were any more effective.  Amended Class Action Complaint ("Cl. Comp.") ¶¶ 183-97, and First Coordinated Amended Complaint ("Coord. Comp." and,

that Defendants assembled and operated a highly sophisticated enterprise to accomplish their

unlawful objective.  Plaintiffs have not provided mere conclusory allegations of the existence of

the Neurontin Off-Label Promotion Enterprise (the "Enterprise"); they have chronicled its

creation, development, and operation over a period of several years, based on the limited

discovery obtained by the relator in the *Franklin* case.  *See* Joint Memorandum of Law of the

Class and Coordinated Plaintiffs in Opposition to Defendants' Motions to Dismiss, at 1-7 & n.3,

17-19 & n.20, 21.

Plaintiffs have alleged, in good faith, and with a reasonable basis, that the

Enterprise continued to operate well beyond December 31, 1998.  The relative handful of post-

1998 documents obtained by the relator in *Franklin* contained information on numerous

Neurontin "events" – whose sole purpose was the delivery of a misleading "off-label" sales pitch

to captive audiences of prescribing physicians – extending well beyond this arbitrary point in

time.[3]  Most striking is a March 2000 meeting in New York City of presenting physicians

planning new "educational" programs promoting Neurontin for off-label uses, at which one

psychiatrist lamented to his colleagues that:

> [A]lmost everything I'm talking about [reports of successful off-
> label Neurontin usage] appears in the form of letters to the editor
> or open case series. The amount of controlled trials, the evidence

---

collectively, the "Complaints") ¶¶ 148-62.

[3] Defendants' observation that "Judge Saris remarked at the first status conference in this case that she believed discovery in this case had essentially been completed by virtue of the discovery that was taken in the <u>Franklin</u> action" (Def. Mem. at 7) is highly misleading, as this remark was made *before* Plaintiffs' counsel reminded the Court of the temporal and geographic limits that had been imposed on discovery in that case.  Judge Saris responded that she did not remember having imposed a time limit on discovery in *Franklin*, expressed puzzlement as to why she would have done so, and appeared to accept Plaintiffs' contention that more recent discovery was warranted.  The court reporter, whose computer was subsequently damaged, has promised to prepare a transcript of this hearing, and Plaintiffs will file it with the Court as soon as they receive it.

base for this, is not very good. And there is a sense of feeling awkward—Elizabeth, this is something we should address—there's a sense of getting up there and talking about these things [off-label Neurontin usage] when, maybe, at best, there might be one or two controlled trials that support a given use.

So, clinical use is running way ahead of what research is giving us. I mean, I can't remember, in psychiatry, anything like this, where there's such extensive use of drugs, without there necessarily being an indication or the data we would consider gold standard.

So, one of the questions that I have for you to think about is, can we really say with any certainty that these drugs really work in the way that we're reporting? How confident are you, individually or as a group, that even without the clinical trials, that we can get up in front of clinicians and say, look, trust us that these things do work.

Cl. Compl. ¶ 102.

Defendants do not even bother to deny that the same types of unlawful promotional activities alleged by Plaintiffs continued until well after 1998, but argue that Plaintiffs should not be permitted to discover the details of those activities because Plaintiffs do not already have them. To state the argument is to refute it. Plaintiffs' document requests sweep no more broadly than their case, and the discovery burden on Defendants is fully commensurate with the scope of their misconduct. If Defendants have generated millions of pages of documents engaging in the activities of which Plaintiffs complain, it is not unduly burdensome to require their production.

Defendants protest that "the documents relating to 1994 – 1998 alone, which have been produced, fill over 80 boxes" (Def. Mem. at 2), and that if Plaintiffs are allowed the discovery they seek, Defendants will have to review the files of "over 100 people" (Def. Mem. at 11). These protests display a surprising naivete on the part of Pfizer, the world's largest drugmaker, of the realities of modern complex litigation, and pharamceutical litigation in particular, in which the production of over a million pages of documents has become routine.

Defendants have reaped billions of dollars a year in sales and profits as a result of their unlawful activities;[4] it is not unreasonable to require them to incur whatever time and expense may be necessary to grant Plaintiffs access to the evidence of their misconduct.

Indeed, Defendants' "undue burden" argument has already been rejected by the Hon. Jed S. Rakoff of the Southern District of New York in a number of products liability cases recently transferred to this Court as part of this multidistrict litigation proceeding. At a recent status conference, Judge Saris stated that she had read Judge Rakoff's opinion, and that "it seemed reasonable," dispelling any lingering notion that the time limit on discovery imposed in *Franklin* is presumptively applicable in this much broader case filed eight years later. *See* Reporter's Transcript of Scheduling Conference, May 13, 2005, attached as Exhibit N to the Declaration of Rebecca J. Poate filed concurrently herewith ("Poate Decl."), at 28:1-15.

## II.    STATEMENT OF FACTS AND PROCEDURAL HISTORY

### A.    The *Franklin* Litigation

Defendants point to the *Franklin* case in support of their argument that discovery should be limited to documents created no later than 1998. If anything, this Court's rulings on the scope of discovery in the *Franklin* case vividly illustrate why discovery in *these* cases should continue through the entry in May 2004 of Warner-Lambert's guilty plea and the stipulated injunction ending Defendants' unlawful and abusive marketing practices.[5]

---

[4] Despite the small market for its approved uses, Neurontin was the number 10 drug in sales ($2.4 billion) in 2003 (see http://www.rxlist.com/top200_sales_2003.htm) and the number 11 drug ($2.5 billion) in 1994 (see http://www.rxlist.com/top200_sales_2004.htm). Based on the incomplete information presently available to Plaintiffs, it appears that Neurontin sales from 1999 through 2004 totaled approximately $10 billion, and that over 90% of these sales were for off-label uses. If Defendants have their way, Plaintiffs would be denied access to admissible evidence to establish even these simple and compelling facts.

[5] Defendants argue that the fact that Warner-Lambert was only charged with crimes committed in 1995 and 1996 "further supports the protective order here." Def. Mem. at 3. As every federal

In *Franklin*, Judge Saris rejected the Magistrate Judge's limitation on discovery to little more than the period of time the relator was employed at Warner-Lambert, noting that the amended complaint contained allegations of off-label marketing activities through 1998. *See* Judge Saris's Order dated February 16, 2002, attached as Exhibit D to Poate Decl. The only reason the amended complaint in *Franklin* contained these specifics is because in between the filing of the original and amended complaints, Defendants produced documents which contained evidence that the off-label promotion observed by the whistleblower, Dr. Franklin, continued unabated after he left Warner-Lambert. *See* Relator's Memorandum in Support of Motion for Reconsideration, attached as Exhibit A to Poate Decl. This motion is a transparent attempt by Defendants to prevent Plaintiffs from obtaining any more documents which will — like the documents produced in *Franklin* -- further support and augment Plaintiffs' already detailed allegations.

Specifically, in *Franklin*, the relator served his first set of requests for production of documents in August 2000. *See* Motion for Reconsideration, Exh. A, at 3-4. Parke-Davis refused to produce a single document in response to these requests. After the relator propounded a second set of requests for production, seeking copies of documents Parke-Davis had previously produced in the United States' civil investigation of Parke-Davis' marketing practices relating to Neurontin, Parke-Davis produced those documents to the relator. *See id.* Parke-Davis acknowledged that it had not made an independent search for documents responsive to the relator's first set of requests for production. Plaintiffs moved to compel with regard to the first

---

prosecutor and defense attorney knows, an information filed in connection with a plea bargain merely reflects an agreement by the defendant to plead guilty to lesser charges, not a determination by prosecutors that no additional crimes were committed. It would be less than surprising if Warner-Lambert chose to plead guilty to crimes committed over seven years ago in an effort to escape further civil liability by application of the doctrine of collateral estoppel.

request for production on November 30, 2000.  *See* Relator's Memorandum in Support of Motion to Compel, attached as Exhibit B to Poate Decl.

The relator amended his complaint, based on the documents received from Parke-Davis in response to the second request, to include additional allegations concerning events that occurred after he left Parke-Davis.  The amended complaint alleged that Defendants' misconduct extended from 1994 through at least 1998, and into 2000.  *See* Amended Complaint filed in *Franklin*, at ¶¶ 13, 22, 47, 50, 72, and 76.

Apparently, based on the original complaint and the motions to compel filed prior to the amended complaint, the Magistrate Judge limited discovery to the time period October 1, 1995 through October 31, 1996.  *See* Magistrate Judge Cohen's Order dated December 12, 2001, attached as Exhibit C to Poate Decl, at 2-3.  The rationale for this time limitation was that "[t]he Relator was employed at Parke-Davis for a relatively short period [five months], and his allegations, to the extent that he could plead them with any specificity, are limited to that period of time. . ."  *See id.* at 2.  It is apparent that the Magistrate Judge was relying upon the original complaint, as he cited the Court's prior ruling on a motion to dismiss, in which the Court defined the "'when' of the Relator's complaint" as "the time-frame during which Relator was employed as a Parke-Davis medical liaison."  *See id.* at  3, n.2.

The Court recognized that this ruling was in error.  At a hearing on January 9, 2002, Judge Saris stated repeatedly that if the complaint contained allegations from 1994 to 1998, it was improper to limit discovery to a one year period.  *See* Reporter's Transcript of Motion Hearing dated January 9, 2002, attached as Exhibit E to Poate Decl., at 1-20.  In a tacit admission of both the adequacy of the relator's allegations and Defendants' true motive for resisting additional discovery, defense counsel stated that:

> The only reason they've made allegations related to 1997 and 1998
> is because we produced to them the documents. They were
> picking out documents and they're making new allegations based
> on that. They wouldn't have had that because David Franklin has
> no knowledge, the relator has absolutely no knowledge of anything
> that occurred after 1997. So, they're coming up with new
> allegations based on the documents we produced.

*See* Transcript, Exh. E, at 13. Defendants' true concern in resisting additional discovery is not

the cost of production, but exposure of the full measure of its misconduct.

In his motion for reconsideration of the Magistrate Judge's order, the relator cited

to the allegations in the amended complaint which went beyond 1996. *See* Motion, Exh. A, at

11-12. The Court expanded the scope of discovery to a five-year period. *See* Order, Exh. D, at

1. The Court's reasoning, in its entirety, was expressed as follows:

> The Amended Complaint alleges claims for the period 1994
> through 1998. That is the time frame for discovery.

*Id*. The Court's reasoning, applied in these cases, would permit Plaintiffs discovery through at

least May 2004.

### B.    The Complaints Sufficiently Allege That Defendants' Misconduct Continued After 1998

Defendants' repeated insistence that the Complaints here contain no factual

allegations past 1998 (*see* Def. Mem. at 2) is, quite simply, incorrect. Based in part on the

documents produced in prior litigation, the Complaints here are replete with allegations of

misleading off-label promotion of Neurontin by Defendants occurring after 1998. For example,

the Complaints include references to events at which false and misleading statements were made

about pain in 2000 and 2001 (Cl. Comp. ¶ 129;  Coord. Comp. ¶ 40); events at which false and

misleading statements were made about RSD and restless leg syndrome in 2000 (Cl. Comp. ¶

140); events at which false and misleading statements were made about bipolar disorder in 2000

(Cl. Comp. ¶ 150;  Coord. Comp. ¶ 120); events at which false and misleading statements were

made about social phobia in 2000 (Cl. Comp. ¶ 157; Coord. Comp. ¶ 126); events at which false and misleading statements were made about panic disorder in 2000 (Cl. Comp. ¶ 162; Coord. Comp. ¶ 130); events at which false and misleading statements were made about epilepsy monotherapy in 2000 (Cl. Comp. ¶ 170; Coord. Comp. ¶ 146); events at which false and misleading statements were made about migraine in 2000 (Cl. Comp. ¶ 179; Coord. Comp. ¶ 139); and events at which false and misleading statements were made about dose responsiveness in 2000 (Cl. Comp. ¶ 197; Coord. Comp. ¶ 163).

        The Complaints also contain specific reference to the Neurobehavioral Working Group, a group set up and funded by Pfizer to persuade physicians to prescribe Neurontin for off-label uses for which there was no evidence. Cl. Comp. ¶ 80, 84; Coord. Comp. ¶ 66. The Neurobehavioral Working Group did not commence operations until 2001. As noted above, the Complaints include a verbatim statement, made by one of the physician participants in the Enterprise at a March 2000 meeting of physician participants, candidly expressing his concern that they were engaged in an ongoing conspiracy to mislead their too-trusting colleagues. *See* Cl. Comp. ¶ 102.

        These allegations are more numerous and detailed than those concerning the time period of 1996 through 1998 in the *Franklin* amended complaint and relied upon by the Court to allow discovery through 1998. *See Franklin* Amended Complaint at ¶¶ 31, 36, 37, 45, 47, 50. The *Franklin* amended complaint alleged, without detail, that the conduct lasted through at least 1998, and probably longer. *See id.* at 13, 22. The additional detail regarding various events and payments for off-label promotion consisted solely of five specific events in 1996 and 1997. *See id.* at ¶¶ 31, 36, 37, 45, 47, 50.

        The manner in which the relator came into possession of information concerning

Defendants' post-1998 off-label marketing activities is highly revealing.  In October 2001, the relator subpoenaed two of the medical marketing firms involved in the off-label promotion enterprise, Sudler & Hennessey and Cline Davis & Mann, Inc. (*see* Cl. Comp. ¶¶ 60-65 and 76-81), who together produced only one banker's box of responsive documents.  *See* Affidavit of Ilyas J. Rona ("Rona Decl."), attached as Exhibit K to Poate Decl., ¶¶ 2-3, 9-12.  In April 2003, the U.S. Attorney's Office informed counsel for the relator that it had received 47 boxes of documents from these same firms in response to its civil investigative demands, and that much of this production concerned the 1994 through 1998 time period.  *Id*., ¶ 13.  Even though these documents were clearly responsive to the relator's subpoenas, they had been withheld from production.  *Id*., ¶¶ 4, 13, 22.  This deliberate withholding of documents was apparently orchestrated by Defendants' counsel, Davis, Polk and Wardell, as the boxes had been shipped from its offices to the U.S. Attorney's Office.  *See* Affidavit of Thomas M. Greene, attached as Exhibit J to the Poate Decl., ¶ 4.

Relator's counsel had the opportunity to review about 10 of the 47 boxes produced to the U.S. Attorney (Rona Decl., ¶ 20), and, on one occasion, was permitted to make a number of copies.  Virtually all of the information concerning post-1998 promotional activities contained in the Complaints comes from this small number of copies, which were but a small fraction of the documents produced to the U.S. Attorney.  During their partial review of those documents, relator's counsel – who, as Defendants note, are now co-lead counsel for the Class Plaintiffs in this MDL – saw many more documents demonstrating that Pfizer continued to host events promoting Neurontin for off-label uses long after its acquisition of Warner-Lambert in June 2000.[6]

---

[6] As the *qui tam* action has been settled, relator's counsel no longer have access to these

In June 2001, Pfizer was cited by the Food and Drug Administration for making unsupported health claims concerning Neurontin based on deficient and unreliable studies. *See* Letter dated June 29, 2001, attached as Exhibit L to Poate Decl. In July 2002, Pfizer was again chastized by the FDA for "mak[ing] representations about Neurontin [for off-label uses] that are false and misleading." *See* Cl. Comp. ¶ 238; Coord. Comp. ¶ 173; Letter dated July 1, 2002, attached as Exhibit M to Poate Decl., at 1.

Based on all the foregoing, the Complaints reasonably allege that Defendants' misconduct continued through May 2004. *See* Cl. Comp. ¶ 237; Coord. Comp. ¶ 173. The continued, staggering growth in sales of Neurontin for off-label uses from 1995 through 2003 is fully consistent with these allegations. *See* Cl. Comp. ¶ 236; Coord. Comp. ¶ 171. Defendants do not even bother to deny that they continued to engage in the same type of misconduct after 1998; they contend only that Plaintiffs' allegations of wrongdoing during this time period are insufficient. Defendants' argument confuses the requirements of pleading and proof, as another federal judge has already held.

C.    **Two Other Courts Have Already Rejected Defendants' Arguments, and Ordered That They Provide Discovery on Their Marketing of Neurontin Through the Present**

Remarkably, Defendants neglect to even inform the Court that they have litigated and lost this same argument twice, before two different judges, in the past two months. First, in *In re Neurontin*, Case No. 04 Civ. 6704 in the Southern District of New York, Judge Rakoff rejected Defendants' attempts to limit discovery of Neurontin sales and marketing materials to those in existence prior to 1997:

> Defendants argue that, because the complaint contains no specific allegations of
> wrongdoing subsequent to 1997, it need only turn over marketing materials prior

documents.

to that time. However, the complaint does contain explicit (if generalized) allegations of wrongdoing continuing until at least June 2001. See Complaint ¶ 183. Moreover, plaintiffs' legal theory—that the suicides and suicide attempts were caused by Neurontin that was prescribed because of defendants' wrongful actions—implicitly requires that defendants' alleged deceptions, or at least the effects thereof, have continued at least until the last period of time when doctors could have chosen a different course of action had they been properly informed. . . The fact that in some places the complaint includes more particularized allegations, mostly taken from the information does not render the remainder of the complaint . . . insufficiently detailed to obtain discovery of evidence relevant to the claims and defenses pleaded, see Fed. R. Civ. P. 26(b)(1). It does, perhaps, indicate that plaintiffs have a lesser chance of finding evidence bearing out those allegations, but this is not a consideration the Court may take into account in determining whether 'the burden or expense of the proposed discovery outweighs its likely benefit,' see Fed. R. Civ. P. 26(b)(2) (court should consider 'the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues'). The Court's power to impose limits on discovery of potentially relevant material is meant to prevent parties from using redundant requests to turn discovery into a 'war of attrition.' Fed. R. Civ. P. 26 advisory committee's note. It is not a license for the Court to 'deprive a party of discovery that is reasonably necessary to afford a fair opportunity to develop and prepare the case' because it harbors doubts about that party's ability to find evidence that bears out its allegations.' Accordingly, plaintiffs are permitted to discover evidence of defendants' marketing efforts as of the last day such marketing could be relevant to the claims and defenses pleaded—i.e., the last Neurontin prescription issued to a plaintiff or a plaintiff's decedent in the case. See Incollingo v. Ewing, 282 A.2d 206, 221-23 (Pa. 1971) (upholding introduction of evidence of drug manufacturer's national marketing efforts to show influence on prescribing doctor, but permitting evidence of marketing efforts after the prescription only to show feasibility of warning, not to show negligence). Applying this rule to an individual case is simple. . . .Complicating matters somewhat is the fact that this case now includes many plaintiffs with different incident dates. . . The Court therefore instructs the parties to determine the last date on which marketing efforts could be relevant to any of the cases in this action; that date will be the latest alleged suicide or suicide attempt, unless there is evidence that the prescription allegedly leading to that event took place significantly earlier. Such date will be the cut-off date for discovery of defendants' marketing efforts.

In re Neurontin, Order dated April 25, 2005, attached as Exhibit H to Poate Decl., at 2-5. Judge

Saris has already expressed the view that Judge Rakoff's order, which this Court has inherited

along with the transferred cases in which it was issued, "seemed reasonable." Transcript, Exh. N

to Poate Decl. at 28:1-15.

Applying the same rule here, Plaintiffs are entitled to discovery of Defendants'
off-label marketing activities until "the last day such marketing could be relevant to the claims
and defenses pleaded," which, in this case, is at least through May 2004. Indeed, three of the
class represenatives did not even begin taking or paying for Neurontin until after 1998. *See* Cl.
Comp. ¶¶ 7-9 (ASEA/AFSCME began paying for Neurontin in 2001; Plaintiff Smith used
Neurontin from October 1999 through February 2001, and Plaintiff Kopa took Neurontin from
November 2003 through April 2004). Judge Rakoff's order is fully consistent with Judge Saris'
stated resolution of the issue in *Franklin*, that "[t]he Amended Complaint alleges claims for the
period 1994 through 1998. That is the time frame for discovery." *See* Order, Exh. D to Poate
Decl., at 1. These Complaints, filed years later, allege claims for the period 1994 through May
2004, and that is the proper time period for discovery.

Similarly, in *Young v. Pfizer, Inc. and Parke-Davis*, N.Y Supr. Ct., County of
Orange, Index No. 1062/2004, a New York state court ordered the production of Defendants'
Neurontin Medical Communications, Sales/Marketing, and Visitors' Speakers Bureau databases,
without geographic or time limitation. *See* Order dated April 28, 2005, attached as Exh. I to
Poate Decl.

## III.   PLAINTIFFS' REQUEST FOR POST-1998 DISCOVERY IS NOT UNDULY BURDENSOME

Plaintiffs' document requests far exceed the low threshold required to discover
information that may lead to admissible evidence of Defendants' actionable misconduct. The
Supreme Court has long held that the Federal Rules of Civil Procedure should be broadly and
liberally construed in favor of discovery. *See Hickman v. Taylor*, 329 U.S. 495, 507, 67 S. Ct.
385, 91 L.Ed. 451 (1947) ("The deposition-discovery rules are to be accorded a broad and liberal

treatment."). Although Defendants quote *Hickman* to state that discovery requires "necessary boundaries," they ignore the language immediately preceding that sentence: "We agree, of course, that the deposition-discovery rules are to be accorded a broad and liberal treatment. No longer can the time-honored cry of 'fishing expedition' serve to preclude a party from inquiring into the facts underlying his opponent's case. Mutual knowledge of all the relevant facts gathered by both parties is essential to proper litigation." *See id.* at 507-08. Furthermore, the First Circuit has noted, while citing *Hickman*, that "civil trials in the federal courts no longer need be carried on in the dark. The way is now clear . . . for the parties to obtain the fullest possible knowledge of the issues and facts before trial." *Klonoski v. Mahlab*, 156 F.3d 255, 267 (1st Cir. 1998). Any information or document may be discovered regardless of whether that information or document is itself admissible, provided that it may lead to admissible evidence related to a party's claims or defenses. *See* Fed. R. Civ. P. 26(b), Advisory Committee's Note. "[T]he plain language of this Rule 26(b)(1) contemplates wide-ranging discovery to the fullest possible extent." *Klonoski*, 156 F.3d at 267.

In this case, Plaintiffs have alleged a broad and ongoing scheme by Defendants to misrepresent the safety and effectiveness of Neurontin. *See* Cl. Compl, ¶ 4, Coord. Compl. ¶ 2. Specific allegations include false, deceptive and misleading marketing events organized by Sudler & Hennessy that occurred from 1996 to March 2001, consultant meetings and seminars from 1996 to 2001, "advisory board" meetings that misrepresented the safety and effectiveness of Neurontin related to bipolar disorder from 1998 to 2000, and continued suppression of unfavorable medical studies. *See, e.g.,* Cl. Compl. ¶¶ 80-81, 129, 150, 157, 162, 164, 170, 171, 179, 197; Coord. Compl. ¶¶ 66-67, 102-03, 106, 120, 147.

Defendants concede that the applicable standard is whether the requested

documents are "related to the alleged claims or defenses," but argue that the scope of permissible discovery was substantially narrowed by the 2000 amendment to Rule 26(b)(1). The point is immaterial (in addition to being incorrect), as the discovery sought by Plaintiffs is clearly related to their claims.

Defendants' argument also ignores the fact that the 2000 amendment to Rule 26(b)(1) still gives the trial court authority to order discovery on any matter relevant to the "subject matter" involved in the action for good cause. *See In re Maxim Group Inc. Securities Litig.*, 2002 WL 987660 at *2 (N.D. Ga. Apr. 23, 2003). "The scope of possible discovery has not changed substantially. What has changed is that in order to obtain discovery beyond that which is 'relevant to the claim or defense,' the party seeking such discovery must involve the court." *See id.* The Advisory Committee's note to the 2000 amendment likewise indicates that the scope of permissible discovery remains essentially unchanged:

> The dividing line between information relevant to the claims and defenses and that relevant only to the subject matter of the action cannot be defined with precision. A variety of types of information not directly pertinent to the incident in suit could be relevant to the claims or defenses in a given action. For example, other incidents of the same type, or involving the same product, could be properly discoverable under the revised standard. . . In each instance, the determination whether such information is discoverable because it is relevant to the claims or defenses depends on the circumstances of the pending action.

*See* Fed. R. Civ. P. 26, Advisory Committee Note.

Courts routinely permit discovery beyond the time of specific acts of misconduct alleged in the complaint, because it may lead to admissible evidence. *See, e.g.. Roesburg v. Johns-Manville Corp.*, 85 F.R.D. 292, 296 (E.D. Pa. 1980) (the time period for a discovery request is permissible where "the selected time frame is not wholly unreasonable or irrelevant"). In *Jackson v. Harvard University*, an employment discrimination case, this Court disagreed with a Magistrate Judge's restriction of plaintiff's discovery to a three-year time period prior to the

termination of her employment relationship.  The court found that discovery over a *ten* year time period was necessary to enable plaintiff to show a pattern of discrimination that, in turn, would permit the inference that the decision to deny the plaintiff tenure was based on sex.  *See Jackson v. Harvard Univ.*, 111 F.R.D. 472, 475 (D. Mass. 1986).  And in *Tavoulareas v. Piro*, a libel action brought against a newspaper, the district court set a cut-off date for document production at one year after the date of publication of the last newspaper article which was allegedly defamatory, because documents relevant to the issues, or likely to lead to admissible evidence, might have been generated for some time after date of publication of the last of the articles.  *See Tavoulareas v. Piro*, 93 F.R.D. 24 (D.D.C. 1981).

By definition, events that occur subsequent to the filing of a complaint cannot be specifically alleged therein, yet courts routinely permit such post-complaint discovery in cases alleging a continuing course of misconduct.  *See Carlson Companies v. Sperry & Hutchinson Co.*, 374 F. Supp. 1080 (D. Minn. 1973).  In *Carlson*, the court explained that "where documents requested are relevant to the subject matter involved in the pending litigation, any documents coming into existence after the filing of the complaint and which are requested in supplemental requests are discoverable.  This is especially true where various counts in the complaint allege continuing violations." *Id.* at 1102. *See also Robco Distributors, Inc. v. General Glass Intern. Corp.*, 101 F.R.D. 547 (E.D. N.Y. 1984) (holding that Rule 26(b)(1) does not limit discovery to precomplaint events in cases in which the complaint alleges that a conspiracy was continuing as of the date the complaint was filed); *United States v. Capitol Services, Inc.*, 89 F.R.D. 578 (E.D. Wis. 1981) (holding that relevant discovery sought from defendant through the present date would be ordered in case alleged continuing violation of the Sherman Antitrust Act, notwithstanding objection to producing any discovery for period after filing of complaint).

Therefore, the appropriate question for a court to ask when determining the applicable discovery period is whether the discovery sought may be relevant to the claims asserted, not whether the materials were generated within a time period tied to specific allegations in the complaint.

Defendants' reliance on *In re Microcrystalline Cellulose Antitrust Litig*., 221 F.R.D. 428 (E.D. Pa. 2004), is puzzling.  There, the court provided plaintiffs with discovery extending three years past the alleged end of the conspiracy, but declined to provide them with an additional three years, for a total of six years.  The plaintiffs there had alleged a conspiracy from 1984 until 1997, and they were permitted discovery through 2000 instead of 2003.  As Defendants concede in their moving papers (*see* Def. Mem. at 14), the *Microcrystalline* defendants asserted that the plaintiffs had not "alleged any specific wrongdoing" after 1995.  Nevertheless, the court granted discovery through the end of the alleged conspiracy, 1997, and for an additional 3 years after that.  Here, by contrast, Plaintiffs have alleged that Defendants' unlawful conspiracy continued until at least 2004.[7]

Although a party may object to a discovery request if it is "overly broad" or "unduly burdensome,"

> to assert a proper objection on this basis, however, one must do more than "simply intone the familiar litany that [the discovery requests] are burdensome, oppressive, or overly broad."  Instead, the objecting party bears the burden of demonstrating "specifically how, despite the broad and liberal construction afforded the federal discovery rules, each [request] is not relevant or how each question

---

[7] In *United States v. Medtronic, Inc*., 2000 WL 1478476 (D. Kan. Jul. 13, 2000) also cited by Defendants, the plaintiff alleged only that two Medtronic employees in the Witchita sales district failed to return explanted pacemakers for a warranty credit, and that the relator observed their misconduct while employed at Medtronic from 1991 to 1994.  The court limited the temporal scope of discovery to a five-year period, January 1990 to January 1995, stating that it was a "reasonable temporal scope of discovery, absent other justification."  *See* 2000 WL 1478476 at *3.  Plaintiffs here have alleged far more.

is overly broad, burdensome, or oppressive . . . ."

*Culkin v. Pitney Bowes, Inc.*, 225 F.R.D. 69, 70-71 (D. Conn. 2004) (citations omitted).  *See also Compagnie Francaise d'Assurance Pour le Commerce Exterieur v. Phillips Petroleum Co.*, 105 F.R.D. 16, 42 (S.D.N.Y. 1984).

The sheer fact that responding to discovery requests will require the objecting party to expend considerable time, effort, and expense or may interfere with defendant's business operations is not by itself a sufficient reason to deny discovery.  *See Roesburg v. Johns-Manville Corp.*, 85 F.R.D. 292 (E.D. Pa. 1980); *see also In re Folding Carton Antitrust Litig.*, 83 F.R.D. 251, 254 (D.C. Ill. 1978).  "The question here is not whether such a production would be burdensome to defendant.  Clearly, responding to any document [request] is  burdensome to one degree or another.  The question, for these purposes, is whether responding to [a particular document request] would be *unduly* burdensome."  *Culkin*, 225 F.R.D. at 72.

 Defendants complain of the burden that production of documents created after 1998 would impose upon them.  This case concerns a complex and wide-ranging fraudulent scheme, directed by the world's largest pharmacetical manufacturer and its predecessor over the course of an entire decade, which has earned Defendants many billions of dollars.  Dozens of cases filed all over the country have been transferred to this Court in a multidistrict litigation proceeding.  In the world of complex civil litigation, this case is about as big as it gets.

Despite the size and significance of this litigation, Defendants contend that 80 boxes of documents, covering less than half the relevant time period, should be sufficient for Plaintiffs, and that the burden of collecting documents from approximately 100 employees is too much for the world's largest pharmaceutical company to bear.  In similar litigation, pharmaceutical manufacturers are routinely required to produce *millions* of pages of documents, filling hundreds or thousands of boxes.  *See, e.g., In re Diet Drugs Products Liability Litig.*, 2001

WL 497313, *3 (E.D. Pa. 2001) (document depository contained over 6,000,000 documents); *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 515 (E.D. Mich. 2003) (defendants produced hundreds of boxes of documents containing "over one million pages"); *In re Lupron Marketing and Sales Practices Litig.*, 228 F.R.D. 75, 80 (D.Mass. 2005) (defendant produced 500 boxes of documents); *In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 237 (D. Del. 2002) (defendant produced approximately 447 boxes of documents).[8]   In the most highly-publicized current pharmaceutical litigation, *Vioxx*, Merck has already produced approximately eight million pages of documents.  *See* Poate Decl. at ¶ 16.

Moreover, Defendants' argument regarding both the burden and relevance of such a document production is puzzling in light of the fact that "Defendants do not seek to limit the responsive time periodfor the requests relating to safety and efficacy, and have already begun producing documents in these categories."  Def. Mem. at 8 n.4.  Defendants offer no explanation why documents concerning their off-label marketing activities from 1998-2004 are irrelevant and too burdensome, while documents concerning the safety and efficacy o Neurontin generated after 1998 are relevant and pose no burden at all.[9]  Defendants are not entitled to pick and choose the

---

[8] *See also In re Lucent Technologies, Inc. Securities Litig.*, 327 F. Supp. 2d 426, 449 (D.N.J. 2004) (plaintiffs' counsel reviewed more than 2.6 million pages of documents produced by defendants and more than 500,000 pages produced by third parties); *In re VISA Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d 503, 511 n.8 (E.D.N.Y. 2003) (parties reviewed approximately five million pages of documents); *Wal-Mart Stores, Inc., v. VISA USA Inc.*, 396 F.3d 96, 102 (2d Cir. 2005) ("over five million pages of documents" were produced to plaintiffs); *In re BankAmerica Corp. Securities Litig.*, 210 F.R.D. 694 (E.D. Mo. 2002) (1.5 million pages of documents were produced); *In re Ikon Office Solutions, Inc. Securities Litig.*, 194 F.R.D. 166 (E.D. Pa. 2000) (settling defendants produced over two million pages of documents); *In re Shell Oil Refinery*, 155 F.R.D. 552 (E.D. La. 1993) (over two million pages of documents were produced and reviewed); *In re Linerboard Antitrust Litig.*, MDL No. 1261, 2004 WL 1221350, *10 (E.D. Pa. June 2, 2004) (defendants produced more than 430 boxes of documents containing more than one million pages).

[9] Defendants also insufficiently explain why it will impose no significant burden on them to

types of documents they will provide to, and withhold from, their litigation adversaries.

Defendants' argument also completely ignores the fact that they have already been ordered to produce their post-1998 off-label marketing documents to the plaintiffs in two other cases, including one set of cases already transferred to this Court. There can be no additional burden in providing those same documents to Plaintiffs.

Finally, Defendants make much out of their prior production in the *Franklin* litigation. The relevance of that production to the instant debate weighs in Plaintiffs' favor. Defendants were required to produce four years of documents in that case; here, Plaintiffs are asking for an additional six years of documents. The burden of production in each case is roughly comparable. The only reason that the burden with regard to the production of older documents is now minimal, is because Defendants already produced these documents, or gathered them for production, in connection with prior litigation. Just as Defendants were able to shoulder their discovery burdens then, there is no reason to believe they are incapable of shouldering them now.

## IV.    **CONCLUSION**

The documents requested by Plaintiffs are highly relevant to their claims. The burden on Defendants of producing those documents is a consequence of the scope and duration of their own misconduct, not any overreaching by Plaintiffs. Accordingly, Defendants' motion for a protective order limiting the scope of discovery should be denied, and Plaintiffs' cross-motion to compel the production of documents created after 1998 should be granted.

---

produce documents from its Customer Business Units ("CBUs") that are 7-10 years old, but an insurmountable burden to produce the same types of documents from the same CBUs that are *less* old – a counterintuitive proposition, at best. *See* Def. Mem. at 10-11.

Dated: July 1, 2005                              Respectfully Submitted,


                          By:     /s/ **Barry Himmelstein**
                                 _____
                                 Barry Himmelstein, Esquire
                                 Lieff Cabraser Heimann &
                                 Bernstein, LLP
                                 Embarcadero Center West
                                 275 Battery Street, 30th Floor
                                 San Francisco, CA 94111-3339


                          By:     /s/ **Thomas Greene**
                                 _____
                                 Thomas Greene Esquire
                                 Greene & Hoffman
                                 125 Summer Street
                                 Boston, MA 02110


                          By:     /s/ **Don Barrett**
                                 _____
                                 Don Barrett, Esquire
                                 Barrett Law Office
                                 404 Court Square North
                                 P.O. Box 987
                                 Lexington, MS 39095


                          By:     /s/ **Daniel Becnel**
                                 _____
                                 Daniel Becnel, Jr., Esquire
                                 Law Offices of Daniel Becnel, Jr.
                                 106 W. Seventh Street
                                 P.O. Drawer H
                                 Reserve, LA 70084


                          By:    /s/ **James Dugan**
                                 _____
                                 James Dugan, Esquire
                                 Dugan & Browne
                                 650 Poydras St., Suite 2150
                                 New Orleans, LA 70130


                          *Members of the Class Plaintiffs'
                          Steering Committee*

/s/ **Thomas M. Sobol**

By: _____

Thomas M. Sobol
Hagens Berman Sobol Shapiro LLP
One Main Street, 4th Floor
Cambridge, MA 02142

*Plaintiffs' Liaison Counsel and Member of
the Class Plaintiffs' Steering Committee*


By:     /s/ **Richard Cohen**

Richard Cohen, Esquire
Lowey Dannenberg Bemporad
& Selinger, P.C.
The Gateway
One North Lexington Avenue
White Plains, NY 10601

By:     /s/ **Linda P. Nussbaum**

Linda P. Nussbaum, Esquire
Cohen Milstein Hausfeld & Toll
150 East 52nd Street
Thirteenth Floor
New York, NY 10022

*Members of the Plaintiffs' Non-Class
Steering Committee*