UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| ) | | |
| IN RE NEURONTIN MARKETING, SALES ) | | |
| PRACTICES, AND PRODUCTS LIABILITY ) | MDL Docket No. 1629 | |
| LITIGATION ) | Master File No. 04-10981 | |
| ) | Judge Patti B. Saris | |
| THIS DOCUMENT RELATES TO: ) | Mag. Judge Leo T. Sorokin | |
| ) | | |
| ALL MARKETING AND SALES ) | | |
| PRACTICES ACTIONS ) | | |
| ) | | |

**DECLARATION OF REBECCA J. POATE IN SUPPORT OF PLAINTIFFS'
MEMORANDUM IN OPPOSITION TO MOTION FOR PROTECTIVE ORDER
CONCERNING SCOPE OF DISCOVERY AND IN SUPPORT OF MOTION TO
COMPEL PRODUCTION OF DOCUMENTS CREATED AFTER DECEMBER 31, 1998**

I, REBECCA J. POATE, hereby declare and state as follows:

1.      I am an associate with the law firm of Lieff, Cabraser, Heimann &

Bernstein, LLP, Co-Lead Counsel for the Class Plaintiffs in this action.  I am a member in good

standing of the State Bar of California.  All statements made herein are based on facts personally

known or represented to me, and if called upon, I could testify competently thereto.

2.      On information and belief, attached as Exhibit A is a true and correct copy

of the Relator's Memorandum in Support of His Motion for Reconsideration of Magistrate's

Order Dated December 12, 2001, filed in *United States ex rel. David Franklin v. Parke-Davis,*

*Division of Warner-Lambert Company*, Civil Action No. 9-11651-PBS.

3.      On information and belief, attached as Exhibit B is a true and correct copy

of the Relator's Memorandum in Support of Relator's Motion to Compel Production of

Documents, filed in *United States ex rel. David Franklin v. Parke-Davis, Division of Warner-*

*Lambert Company*, Civil Action No. 9-11651-PBS.

    4.    On information and belief, attached as Exhibit C is a true and correct copy of Magistrate Judge Cohen's December 12, 2001 Order in *United States ex rel. David Franklin v. Parke-Davis, Division of Warner-Lambert Company*, Civil Action No. 9-11651-PBS.

    5.    On information and belief, attached as Exhibit D is a true and correct copy of Judge Patti B. Saris's February 6, 2002 Discovery Order in *United States ex rel. David Franklin v. Parke-Davis, Division of Warner-Lambert Company*, Civil Action No. 9-11651-PBS.

    6.    On information and belief, attached as Exhibit E is a true and correct copy of selected portions of the transcript of a Motion Hearing in front of Judge Patti B. Saris, on January 9, 2002, in *United States ex rel. David Franklin v. Parke-Davis, Division of Warner-Lambert Company*, Civil Action No. 9-11651-PBS.

    7.    On information and belief, attached as Exhibit F is a true and correct copy of a letter brief filed by counsel for Plaintiffs on April 21, 2005, in *In re Neurontin,* Case No. 04 Civ. 6704(JSR) in the Southern District of New York (Honorable Jed Rakoff, presiding).

    8.    On information and belief, attached as Exhibit G is a true and correct copy of a letter brief filed by counsel for Defendants on April 21, 2005, in *In re Neurontin,* Case No. 04 Civ. 6704(JSR) in the Southern District of New York (Honorable Jed Rakoff, presiding).

    9.    On information and belief, attached as Exhibit H is a true and correct copy of Judge Jed S. Rakoff's April 25, 2005 Order in *In re Neurontin,* Case No. 04 Civ. 6704(JSR) in the Southern District of New York.

    11.    On information and belief, attached as Exhibit I is a true and correct copy of Judge Stewart Rosenwasser's April 28, 2005 Order in *Young v. Pfizer, Inc. and Parke-Davis, ,* Case No. 1062/2004 in the Supreme Court of the State of New York, County of Orange.

-2-

12.     On information and belief, attached as Exhibit J is a true and correct copy of the Affidavit of Thomas M. Greene in Support of Relator's Conditional Rule 56(f) Motion, filed in *United States ex rel. David Franklin v. Parke-Davis, Division of Warner-Lambert Company*, Civil Action No. 9-11651-PBS.

13.     On information and belief, attached as Exhibit K is a true and correct copy of the Affidavit of Ilyas J. Rona in Support of Relator's Conditional Rule 56(f) Motion to Delay Final Determination of Summary Judgment, filed in *United States ex rel. David Franklin v. Parke-Davis, Division of Warner-Lambert Company*, Civil Action No. 9-11651-PBS.

13.     On information and belief, attached as Exhibit L is a true and correct copy of a letter dated June 29, 2001 sent by Lisa Stockbridge, Regulatory Reviewer, Division of Drug Marketing, Advertising and Communications at the Department of Health & Human Services for the Food and Drug Administration to Andrea Garrity, Director of Regulatory Affairs at Pfizer, Inc.

14.     On information and belief, attached as Exhibit M is a true and correct copy of a letter dated July 1, 2002 sent by Lisa Stockbridge, Regulatory Reviewer, Division of Drug Marketing, Advertising and Communications at the Department of Health & Human Services for the Food and Drug Administration to O. Lucy Castro, Director of Worldwide Regulatory Strategy at Pfizer, Inc.

15.     On information and belief, attached as Exhibit N is a true and correct copy of selected portions of the transcript of a Scheduling Conference in front of Judge Patti B. Saris, on May 13, 2005, in *In re Neurontin Marketing and Sales Practices Litig.*, Case No. 04-10981-PBS.

16.     Elizabeth Cabraser of Lieff, Cabraser, Heimann & Bernstein LLP is

-3-

currently a member of the Plaintiffs' Steering Committee for *In re VIOXX ® Products Liability Litig.*, MDL Docket No. 1657, and our firm currently represents hundreds of clients with regard to potential personal injury and wrongful death claims arising out of ingestion of VIOXX®. Based on information and belief, Merck has produced approximately eight million pages of documents thus far in the VIOXX ® Mass Tort cases in New Jersey Superior Court, Atlantic County, Hon. Carol B. Higbee, presiding.

17.    On information and belief, attached as Exhibit O is a true and correct copy of Class and Non-Class Plaintiffs' First Set of Requests for Production of Documents.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: July 1, 2005

_____
**Rebecca J. Poate**

454261.1

# EXHIBIT A

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA )
ex rel. DAVID FRANKLIN, )
)
    Plaintiff )    Civil Action No. 96-11651-PBS
)
v. )
)
PARKE-DAVIS, DIVISION OF )
WARNER-LAMBERT COMPANY, )
)
    Defendant )

## RELATOR'S MEMORANDUM IN SUPPORT OF HIS MOTION FOR RECONSIDERATION OF MAGISTRATE'S ORDER DATED DECEMBER 12, 2001

Relator, David Franklin, on behalf of the United States, submits this memorandum in support of his Motion For Reconsideration of Magistrate's Order Dated December 12, 2001. A copy of Magistrate Judge Cohen's Order, dated December 12, 2001 ("Magistrate's Order"), is attached as Exhibit 1.

### FACTUAL AND PROCEDURAL BACKGROUND

This Court's decision on Defendant Parke-Davis's motion to dismiss recognized that the Relator's complaint alleges that Parke-Davis "engaged in an extensive and far-reaching campaign" to induce doctors to prescribe the drug Neurontin for off-label, unapproved uses, which caused Medicaid to pay for Neurontin prescriptions that were not eligible for reimbursement under Medicaid. *United States ex. rel Franklin*, 147 F. Supp 2d 39, 45 (D. Mass. 2001)("*Franklin*"). "The complaint and disclosure. . . describe a fraudulent marketing campaign conducted by Parke-Davis in which kickbacks and unlawful and misleading marketing were allegedly used to encourage doctors to increase their use of Neurontin for unapproved uses." *Id.* at 48. The Court ultimately

found that the complaint sufficiently alleged "that Parke-Davis has caused the submission of numerous off-label prescription for Neurontin to the Medicaid program through both its fraudulent statements about the safety and efficacy of Neurontin and its system of unlawful financial incentives and kickbacks to doctors who prescribe Neurontin." *Id.* at 51.

The Court also examined whether Relator's complaint complied with the pleading requirements of Rule 9(b). It acknowledged the Complaint did not specify every prescription which constituted a false claim to the government, but found that the Relator did not have to meet the same standard which would apply if the alleged fraud was "confined to a small number of transactions about which the Relator had knowledge." *Id.* at 49. Relaxed pleading rules applied to complaints such as the Relator's that "alleged a scheme of fraud (that) is complex and far-reaching". *Id.* One of the factors that permitted the Court to apply a relaxed standard was that "the alleged scheme of fraud may involve numerous transactions or transactions that occur over a long period of time." *Id.* at 47. While the Court found that the Relator's Complaint coupled with the specifics in his disclosure did meet the requirement of Rule 9(b), the Court required Relator to amend his complaint to include the specifics of the disclosure in the Complaint.

Relator filed his Amended Complaint on July 25, 2001. He consolidated the three counts the Court permitted to go forward into a single count for causing false claims through knowing promotion of prescription sales ineligible for Medicaid reimbursement.[1]  Parke-Davis has not challenged the sufficiency of the allegations of the Amended Complaint. The Amended Complaint is far broader and far more detailed than the original. It describes at length Parke-Davis's efforts to set up a parallel marketing system to promote off-label uses of Neurontin. Prohibited from using its usual sales force from such marketing, it intentionally engaged in a "publication strategy," which required numerous kickbacks to provide physicians with incentives to create the independent

---

[1]  Relator also added a second count for causing violations of the False Claims Act through kickbacks, and moved to amend his complaint to add such a count. Relator's motion to amend is still pending before the Court.

"publications" used by its medical liaisons and the payment of an even greater amount of kickbacks to give prescribing physicians an incentive to hear Parke-Davis's pitch. The Amended Complaint gives specific examples of such conduct occurring across the country. The conduct covers the entire time period covered by documents Parke-Davis has produced in this case and sets forth facts why there is reason to believe the conduct continued after the unilateral deadline imposed by Parke-Davis.

The motions before the Magistrate, however, were filed several months before the filing of the Amended Complaint. Relator served his First Request for Production of Documents ("First Request"), a copy of which is attached as Exhibit 2, in August 2000. The forty requests sought documents relating to the following topics:

- False statements and fraudulent conduct involved in Parke-Davis's off-label marketing of Neurontin.

- Parke-Davis's use of medical liaisons.

- Payments to physicians.

- Identities of physicians targeted for Parke-Davis's Neurontin promotions.

- Data gathered by Parke-Davis's tracking Neurontin prescriptions written by specific physicians.

- Proceeds Parke-Davis received from its sales of Neurontin, including payments by Medicaid, and amounts generated from off-label usage.

- Communications involving certain high-level management officials at Parke-Davis regarding the marketing of Neurontin.

Parke-Davis refused to produce a single document in response to the First Request, claiming, that the Relator's requests were overbroad, unduly burdensome, sought documents outside the relevant time period and geographical area, and sought documents not relevant to the litigation.[2] Subsequently, after Parke-Davis agreed to produce documents responsive to Relator's

---

[2]    See Defendant's Responses and Objections to Relator David Franklin's First Request for Production of Documents to Defendant Warner-Lambert Company, attached as Exhibit 3.

Second Request for Production of Document (which sought copies of documents Parke-Davis had previously produced in response to the United States's civil investigations of Parke-Davis's marketing practices relating to Neurontin), Parke-Davis also claimed that any relevant documents responsive to the First Request, would be produced in response to the Second Request. Parke-Davis's attorneys' acknowledged, however, that Parke-Davis had not made an independent search for responsive documents. Relator moved to compel production on November 30, 2000.

At about the same time, a dispute arose between Relator and Parke-Davis regarding the documents Parke-Davis was willing to turn over; those previously turned over to the government pursuant to civil requests for documents. Relator wanted to be able to disclose some of the information within the documents to state and federal government Medicaid officials without requiring the state and federal officials to sign off on the protective order. Relator must obtain information regarding Neurontin prescriptions paid for by Medicaid from state or federal medicaid officials, but believed officials would never provide such information if they were required to agree to comply with court orders in litigation which did not directly affect them. On December 15, 2000, Parke-Davis moved for a protective order. At the hearing on Parke-Davis's motion to dismiss, on January 8, 2001, this court ordered Parke-Davis to produce the documents responsive to the Second Request "For Attorneys' Eyes Only," and referred the motion for protective order and motion to Compel to Magistrate Cohen.

After additional briefing occasioned by the Court's *Franklin* opinion and a hearing in October, the Magistrate ruled on the Motion to Compel and the Motion For Protective Order on December 12, 2001. The Court overruled Relator's objection to requiring state and federal Medicaid officials to sign off on the protective order and specifically affirmed that any confidential documents or information provided to Medicaid officials (or the U.S. Attorney) had to be used solely for the purpose of this action. The Court ordered Parke-Davis to produce documents

4

responsive to most of the documents requests in Relator's First Request, but dramatically reduced the scope of the requests. He ruled that Parke-Davis was only required to produce documents that were created between October 1, 1995 through October 31, 1996. He also limited the geographical scope to documents relating to Parke-Davis's Northeast Customer Business Unit ("CBU"), with one exception, Request 27, for which he allowed national manuals. For several requests which sought Parke-Davis's analyses as to whether its publication strategy for Neurontin was successful, he limited the documents to be produced to formal marketing plans. He also limited documents requesting data on Neurontin sales to those documents that analyzed Medicaid sales of Neurontin.

Relator objects to the restrictions imposed by the Magistrate and seeks their removal pursuant to his motion for reconsideration.

## I.    FEDERAL LAW PROHIBITS MEDICAID OFFICIALS FROM ENTERING AGREEMENTS NOT TO USE INFORMATION PROVIDED BY THE RELATOR

Relator seeks reconsideration of Paragraph 1 (b) and (c) of the Magistrate's Order which limits Relator's disclosure of "Confidential" information to certain individuals and requires that they sign a "Certification" that prohibits their use of "Confidential" information unless it is in connection with the case at bar. A copy of the Proposed Protective Order and the Certification is attached as Exhibit 4. Relator opposes these provisions to the extent they apply to state Medicaid officials and the federal government. Relator does not intend a wholesale sharing of documents marked confidential with State and federal Medicaid officials, however, the Relator does need to provide those officials with information contained in documents – the identities of doctors to whom Parke-Davis marketed and the dates of their contacts – in order to obtain prescription information necessary to prove Parke-Davis's causation of specific false claims. If provision of such information is conditioned on the State signing the Certification attached to the Protective Order, Relator will not be able to obtain this critical data because the States cannot sign the Certification without violating federal law.

The Medicaid Act requires states that participate in the Medicaid program to create and operate a Medicaid Fraud and Abuse Control Units whose function is the investigation and prosecution of violations of all applicable laws regarding any and all aspects of Medicaid fraud. 42 U.S.C §§ 1396a(a)(61), 1396(q)(1)(3). Further, federal law requires state Medicaid agencies to identify, investigate and refer suspected fraud cases to law enforcement officials. See, 42 CFR §§ 455.1, 455.13. Section 455.21 mandates that Medicaid agencies refer all cases of suspected provider fraud to the state's Medicaid fraud control unit. These provisions are mandatory.

The federal regulations do not allow the states to bargain away their right to investigate potential kickback abuse or improper submission of prescriptions to assist a federal False Claims Act case. If Medicaid officials believe the information provided by the Relator is evidence of Medicaid Fraud or Abuse, they must investigate. Accordingly, state officials cannot agree to be bound by the protective order's terms. This means that the Relator cannot get information regarding specific doctors' Medicaid prescription practices.[3] Parke-Davis's insistence on protecting its "commercial" information effectively insulates Parke-Davis from prosecution.

Yet, of course, Parke-Davis's commercial rights are under no threat, even if the two passages to which Relator objects are dropped. While Parke-Davis is entitled to a protective order to prevent disclosure of commercial information to competitors, the United States is not about to enter the drug manufacturing business, or disclose what it has learned to those competitors. Indeed, as Parke-Davis has recognized, the United States could obtain any documents it has not already received by issuing a subpoena. Parke-Davis does not seek a protective order to protect commercial information, but to hamper regulatory enforcement by the states, the government and private parties authorized to pursue fraud under the False Claims Act.

---

[3]    State attorneys general representing state Medicaid departments have informed Relator's counsel that they will not advise their agencies to sign the protective order because of these concerns.

Nor can the Court properly restrict the federal government's investigative power. 42 U.S.C. § 1320a-7c requires the federal government to establish law enforcement programs to control Medicaid fraud and conduct investigations and audits. Like the states, it has no discretion to avoid prosecution of Medicaid fraud that comes to its attention. Nor is the United States restricted to the remedy chosen by a *qui tam* plaintiff when the private citizen brings a False Claims Act case. 31 U.S.C. §3730 (c)(5) expressly provides that the United States has the right to pursue its claim through any other alternative remedy available to the Government including any administrative proceeding. This right would be close to meaningless if the Government could not use the evidence developed in the *qui tam* action to pursue its alternative remedies. As the defrauded party, as well as the party charged with investigatory and regulatory oversight, the United States must be free to use evidence as it sees fit.

Finally it must be noted that Relator would not have to pursue this point if Parke-Davis complied with the positions it took in open court. At the January 8, 2001 hearing before this Court, where Parke-Davis's motion was briefly discussed, Relator informed the Court that it was concerned the protective order would hamper its ability to get the prescription data from the states because the Relator could not disclose names of doctors and dates of contacts it obtained from documents stamped confidential. Relator expressly informed the Court that it did not intend to disclose copies of the documents, just lists of names and dates generated from the documents.

The Court:          Well, what would stop you from doing that?

Mr. Tabb (Relator's Counsel): That's the question that we have here. Can we give the names and the identities of the doctors and the dates of the contacts to the states so that we can get that (prescription) information so that we can prove the case? Can prove that, in fact, it caused these people to write prescriptions.

Mr. Rouhandeh (Parke Davis's counsel): We're not attempting to prevent that from occurring. . . . [Mr. Rouhandeh then expresses concern about Relator attempting to get something outside of discovery without informing Parke-Davis.]

> The Court: What are you talking about? If they get names from the documents and
> they want to call up the states, they could do it without telling you.
>
> Mr. Rouhandeh: That's fine. But before they show any documents to anybody, they
> have to get those parties to agree to the confidentiality order.

Transcript of Motion Hearing, January 8, 2001 ("Transcript"), excerpts of which are attached as

Exhibit 5. Parke-Davis plainly stated that it had no objection to Relator providing the states with

the identities of doctors without the states' agreement to the protective order, so long as documents

were not shown. Yet in its letter of October 12, 2001, Defendant's counsel reneged on its

commitment.

> First, we disagree with your characterization of our position at the January 7, 2001
> hearing. We certainly did not agree that you could that you could provide to third
> parties the names of physicians that you obtain from confidential Company
> documents without following the procedures in our proposed protective order.

Letter of James P. Rouhandeh dated October 26, 2001, to Thomas Greene, attached as Exhibit 6,

responding to Letter of October 12, 2001, attached as Exhibit 7. Parke-Davis's refusal to abide by

its commitments in open court is reason enough to not to make it the beneficiary of a Protective

Order that it can further use to impede legitimate discovery.

## II.    THE MAGISTRATE IMPROPERLY REDUCED THE SCOPE OF THE RELATOR'S DOCUMENT REQUESTS

### A.    Restricting The Scope of Discovery To Time Period Relator was Employed by Parke-Davis Is An Improper Reading of This Court's *Franklin* Opinion and the Allegations of the Amended Complaint

A lower court's order constitutes an abuse of discretion justifying reversal "when a relevant

factor that should have been given significant weight is not considered, when an irrelevant or

improper factor is considered and given significant weight, or when all proper and no improper

factors are considered, but the court in weighing those factors commits a clear error of judgment."

*In re San Juan Dupont Plaza Fire Litigation*, 859 F. 2d 1007, 1019 (1st Cir. 1988). Where a

magistrate has imposed an unduly restrictive time period on discovery that is contrary to the liberal

rules relating to the scope of discovery, vacation of the Magistrate's order is appropriate. *Jackson v. Harvard University,* 117 F.R.D. 472, 475 (D. Mass. 1986) (reversal of magistrate's order restricting discovery to a period of three years, plaintiff was entitled to larger scope of discovery than the period she was employed by defendant).

Here, Magistrate Cohen provided three grounds for restricting the time period of Relator's document requests to October 1995 through October 1996: (1) that Relator only worked for Parke-Davis for a relatively short period, *Order at 2*; (2) that the allegations of fraud Relator has pled with specificity relate to the time period of Relator's employment by Parke-Davis, *Order* at 2-3; and (3) this Court's "instruction" that the "when" of Relator's complaint is the time frame when Relator was employed as a medical liaison at Parke-Davis, *Order* at 3, fn. 2, citing *Franklin,* 147 F. Supp. at 48. Each of these bases are either clearly erroneous or legally irrelevant to a determination of the scope of discovery. Either way, the Magistrate's order merits reversal even under the rigorous standard for reconsideration of a magistrate's decision.

Plainly, the first factor relied upon the Magistrate is completely irrelevant. Nothing in the *qui tam* provisions of the False Claims Act restricts suits against persons accused of defrauding the United States government to only those claims for which the Relator has first hand personal involvement. A relator who discovers a scheme of fraud that *existed* before relator's first contact with the defendant, may prosecute claims that were part of the scheme before the Relator knew of the scheme, as well as incidents that were part of the same scheme but took place after the Relator severed his or her relationship with the Defendant. In the recent TAP Pharmaceuticals *qui tam* action, for example, the Relator, a physician who was offered a kickback by the drug company defendant, had limited contact with the fraudulent scheme, but relatively brief contact was the basis for the United States to recover a record recovery on a decade long-nationwide scheme. *United States ex. rel Gerstetn v. TAP Pharmaceuticals, Inc.* C.A. 98-CV-10547 (D. Mass.). It is the

9

defendant's planning and execution of the fraudulent scheme that sets the relevant time period for a False Claims Act case, not the relator's involvement.

To rule otherwise, would create perverse incentives under the False Claims Act. Ethical relators, such as Dr. Franklin, who promptly resigned after learning that his job required him to participate in fraud against the government, would be penalized for promptly reporting fraudulent conduct, even if it had gone on for years and had cost the United States millions of dollars. Instead, to be able to fully enforce his claim against the responsible parties, the Magistrate's decision would have the relator continue to participate in the illegal venture and not report it to authorities until the defendants had obtained all they could from government payees and ceased the practice.

The Ninth Circuit has ruled that fraudulent conduct by the defendants that was related to the original fraud, but was wholly unknown to the Relator when he filed his original complaint, is still properly within the scope of a *qui tam* action. In *United States ex. rel Barajas v. Northrop Corp.*, 5 F.3d 407 (9th Cir. 1993), the United States conducted an investigation of the relator's sealed complaint and determined that the defendants' fraudulent conduct was broader than reported by the relator. It intervened in some, but not all, of Relator's *qui tam* counts and amended the complaint to add claims relating to fraudulent testing of gyroscopes, a fraud the Relator had not known about. The Relator moved to sever his individual counts, which was allowed, and then moved to amend his own complaint to add a claim for the the gyroscope testing fraud. The amendment was denied and the complaint was dismissed because the District Court refused to allow claims to go forward that were not part of the Relator's original disclosure. The Ninth Circuit reversed and remanded, holding that if the government's allegations concerning gyroscope fraud resulted from the investigation that was the consequence of the relator's original disclosure, the claim was properly before the Court and the Relator could bring it in his own action. 5 F. 3d at 411-12. On remand, the District Court found that the claim was proper, and the Relator did not have to have direct

knowledge of the fraud pursued in his amended complaint. 897 F. Supp. 1274, 1278-82 (C.D. Cal. 1995).

Although *Barajas* was not framed as a discovery dispute, but a controversy over what constitutes an "original source" and a "public disclosure" under 31 U.S.C. §3730, it raises the same core issues as raised in this case: what is the proper scope of a *qui tam* case?; and can the case be expanded beyond the Relator's original disclosures? Plainly, it can. Information wholly unknown to the Relator at the time of filing can be pursued in the *qui tam* case (and accordingly, discovery can be had) if such information arises from the investigation arising out of the Relator's original disclosure. Here, the additional claims are far more closely related than in *Barajas*. *Barajas* concerned product failures and frauds of which the Relator was wholly unaware; the claims Dr. Franklin seeks to pursue are identical to the frauds originally reported, they just happened after (and before) he severed his connection to Parke-Davis.

Magistrate Cohen's second ground for limiting discovery, his finding that the Amended Complaint has only specified fraudulent conduct for the period Dr. Franklin was employed by Parke-Davis, is clearly erroneous. Not only does the Amended Complaint repeatedly state that the pattern of misconduct extends from 1994 through at least 1998 and most likely into 2000, see *e.g.* Amended Complaint ("Am. Com."), ¶¶ 13, 22, 47, 50, 72 and 76, it alleges specific events that took place outside the time frame established by the Magistrate. These include:

- Parke-Davis's decision to get a limited approval from the FDA for Neurontin notwithstanding its intention to market Neurontin for more lucrative markets such as pain, depression, anxiety, and other psychiatric disorders. (1990-1995, Am. Com. ¶¶ 16-19);

- "Consultants'" meetings where physicians were paid and given vacation junkets to hear about use of Neurontin for off-label indications (July 1995-Sept. 1997, Am. Com. ¶ 31);

- "Medical Education Seminars" where physicians were given cash and other valuable items to hear about use of Neurontin for off-label indications (Jan 1996-December 1997, Am. Com. ¶ 36);

11

- Grants and honorarium paid to doctors as rewards for prescribing and promoting Neurontin. (December 1996 and other occasions, Am. Com. ¶ 37);

- Payments to Neurontin backers for studies that had little or no scientific value. (June 1997, ¶ 40);

- Paying doctors to "write" articles that had actually been written by Parke-Davis contractors. (Late 1996-1997, Am. Com. ¶ 43);

- Payments of thousands of dollars to members of Neurontin Speakers' Bureau. (1995-1997, Am. Com. ¶¶ 47-50);

- Misrepresentations by medical liaisons that Neurontin was effective for epilepsy monotherapy when Parke-Davis knew that the FDA had refused to approve Parke-Davis's application for such labeling and knew that clinical testing was inconclusive. (1997, Am. Com. ¶ 56.4);

- Medical liaison promotions to hundreds of doctors identified on Exhibit 7 (1997, Am. Com. ¶ 57).

It is highly significant that Parke-Davis has never moved to dismiss Count I of the Amended Complaint, or strike any of its allegations or exhibits or alleged that the Amended Complaint has not met the specificity requirements of Rule 9(b).[4]   Relators' uncontested pleadings define what is at issue in this litigation, and Parke-Davis's failure to dismiss or strike means that Relator's allegations of misconduct after October 1996 are part of this action.  The Magistrate's Order, accordingly, prohibits Plaintiff from obtaining discovery on allegations that are part of this action. Indeed, if the Magistrate's order had been entered before Parke-Davis responded to the Second Request, Relator would have never obtained many of the documents attached to his Amended Complaint that define the misconduct with which Parke-Davis has been charged.  A United States Magistrate Judge cannot unilaterally limit the allegations to be pursed in a complaint merely because the defendant does not want to produce documents that would be responsive to the claims.

The final ground proposed by the Magistrate for limiting the time period is this Court's statement in *Franklin* that the "when" in Relator's complaint was "the time frame during which the

---

[4]     Parke-Davis's opposition to Relator's Motion to Amend only concerns Relator's request to add Count II, for causing false claims regarding compliance with kickback disclosures.

12

Relator was employed as a Parke-Davis medical liaison in its Northeast *Customer Business Unit*".

147 F. Supp at 48. Relator does not believe this Court intended its Rule 9(b) analysis to limit the

claims or discovery that Relator could present in this action. Moreover, the Court, in *Franklin*, was

analyzing the original Complaint, which has been superseded by the Amended Complaint.

Parke-Davis argued below, and apparently the Magistrate concurred, that where Rule 9(b)

applies, the plaintiff should not have discovery on any other misconduct besides the frauds he has

specifically alleged in his complaint. Such a rule, if it exists, would be completely contrary to the

usual rules permitting a broad scope of discovery. Rule 26(b), of course, permits discovery that is

reasonably calculated to lead to the discovery of admissible evidence. Indeed, as a general rule, the

scope of discovery is not fixed by the specific allegations included in a complaint. *United States*

*v. International Business Machines*, 66 F.R.D. 180 (S.D.N.Y. 1974); 8 Wright, Miller and Marcus,

Federal Practice and Procedure; § 2008, at 101-102 (1994 and 2001 Supp.). Relator is unaware of

any authority that overrules the general rule in cases subject to the specificity requirements of Rule

9(b) (and in the extensive briefing before the Magistrate, Parke-Davis has cited none).

Yet even if such an exception to the general rule existed, the exception clearly would not

apply in those fraud cases that are themselves an exception to the usual requirements of Rule 9(b)

specificity. This Court specifically ruled the usual specificity requirements should not apply here.

*Franklin*, 147 F. Supp. at 47 - 49. The Court noted several circumstances that dictated a loosening

of the Rule's strictures, including that "facts underlying the fraud are 'peculiarly within the

defendants' control,'" "pleading the specifics with regard to every instance of fraudulent conduct

may be impractical" and the "*alleged scheme of fraud involved many transactions or transactions*

*that occur over a long period of time.*" *Id* at 47 (emphasis added). Thus it appears that the Court

was not reviewing the allegations in the Complaint and Disclosure as a definitive statement of the

alleged misconduct at issue, but as a qualitative check "to determine whether the Relator has

13

supplied sufficient allegations concerning the circumstances of the fraud to permit this action to go forward." *Id.*

The Court, of course, recognized that the Relator had sufficiently alleged a fraudulent scheme, but also acknowledged that the Relator could not be expected to set forth all of the fraudulent conduct in his Complaint. *Id* at 49. Based on such a holding, this Court could never have expected the Magistrate to rule that only those allegations specifically plead in the Complaint should be the basis of discovery. It is inconceivable that this Court could recognize that the Relator, who does not have access to the necessary documents, cannot be expected to provide all of the specifics regarding each alleged fraudulent transaction without discovery, and then affirm a ruling prohibiting the Relator from obtaining such discovery. It is equally absurd to argue that the Court never intended the Relator to pursue a larger time frame than the three month period the Relator was employed by Parke-Davis when the Court specifically stated that the "long period of time" of the fraudulent activity was a ground for loosening Rule 9(b)'s specificity requirements. Had the Court intended to restrict the case to the events described in the Disclosure, there would have been no need to employ a relaxed Rule 9(b) review. Reading a discovery limitation into this Court's Rule 9(b) analysis simply makes no sense and leads to absurd conclusions.

Moreover, the Court was, of course, reviewing the original Complaint, which was filed one month after the Relator left Parke-Davis. The original Complaint naturally focused on conduct that occurred while Relator was employed at Parke-Davis. Not only would Relator have had little specific information regarding what occurred after he left, but he clearly could not have known in 1996 anything about Parke-Davis's marketing in 1997, 1998 or 1999. Routinely, courts have recognized that Relators are entitled to discovery of documents and events created after the filing of the complaint, particularly where the Relator alleges in his complaint a continuing course of

14

conduct. *United States v. City of Torrance*, 164 F.R.D. 493, 495 (C.D. Cal. 1995); Wright, Miller

and Marcus, Federal Practice and Procedure, § 2008, at 107 (1994 and 2001 Supp.).

Moreover, here, the original Complaint has been superceded by the Amended Complaint,

which leaves no doubt that the time scope of this action goes beyond dates of Relator's

employment. *See* discussion above.   The unchallenged Amended Complaint makes it plain that

the scope of this litigation goes far beyond October 1996, and consequently, Relator is entitled to

an order compelling production of documents up to 2000.

B.    The Magistrate's Order Improperly  Restricted the Relevant Geographical Area

There is less basis for the Magistrate restricting the geographical scope of discovery than the

time period. While this Court had referred to the "when" in the original complaint, it never referred

to the "where." However, the Court's comments to the parties at the January 8, 2001 hearing make

it clear that the Court recognized that Relator's allegations were national in scope.  This is

particularly true in her colloquy with the U.S. Attorney, where the Court was plainly concerned

about the national scope of the allegations

> The Court: . . .Let's parse off the kickbacks, let's parse off all the alleged false and
> fraudulent information about testing and experimentation, and all of that, just
> serious claims.  If I'm moving that away for a minute, *if all you have is a national
> marketing campaign about off-label uses*, why isn't that just a violation of the Food
> and Drug Act unless these is something false about it? . . .

> The Court: Essentially, the government is taking the side of the plaintiffs in saying
> that to the extent *that there is a national marketing campaign to use drugs in an off-
> label kind of way*, given the fact that it's almost certain some piece of that is going
> to be a submission to the federal government, that, in and of itself, is enough to state
> a claim for a false claim.

Exhibit 5, Transcript at 38, 43  (emphasis added). The Court in its comments to Defendant's

counsel also recognized that Relator's allegations were national in scope.

> The Court: . . . They basically claim *it's not just a national marketing campaign
> about* off-label which is totally honest.  They are saying that it's in conjunction with
> this kickback scheme

Exhibit 5, *Id.* at 48.

The Magistrate's Order ignored the Court's comments. It also ignored statements in *Franklin* that demonstrated that Relator's claims, even in the original Complaint, were not limited to the North East CBU. For example, when the Court discussed Relator's identification of the "who" for Rule 9(b) purposes, the Court noted that "the disclosure identifies by name the individuals who instructed the medical liaisons on how to fraudulently promote off-label use of Neurontin." 147 F. Supp at 48. While some of those individuals are Northeast CBU employees, many of the persons identified in the Disclosure are national figures within Parke-Davis, or members of other CBUs. Indeed the meeting where the Relator was told by company lawyers that off-label promotion was part of his job and he should hide it, occurred in Michigan.

Magistrate Cohen stated that the only specifically alleged allegations in the Amended Complaint concern the Northeast CBU, but this finding is also clearly erroneous. Paragraph 31 identifies consultants' meetings held in California, New Mexico, Florida, Colorado, North Carolina Georgia, South Carolina, Tennessee, Kentucky and Washington, D.C. Paragraph 36 identifies "medical education seminars" in Illinois, California, Massachusetts, Missouri and Florida. Paragraph 37 describes grants to physicians in Texas, California, Pennsylvania, New York, Michigan and Ohio. Paragraph 40 details payments for studies in North Carolina, Alabama, Georgia, Washington, D.C., Michigan and New Jersey. Perhaps most illustrative of the national scope of the allegations is Exhibit 7 to the Amended Complaint, which constitutes a list of physicians who were the targets of Parke-Davis's off-label promotion. Am. Com. ¶ 57. This list of over 3,200 physicians is comprised of doctors from almost every state in the country. The Amended Complaint specifically alleges that these doctors were the targets of the medical liaisons and that liaisons across the country were trained in the same manner as the Relator. Am. Com. ¶ 52, 53, 56 and 57. Finally, the Complaint makes it clear that many key decisions were made at

16

Parke-Davis's headquarters, which was above the regional CBUs, including the decision to evade FDA approval and implement the "publication strategy" with its ensuing kickbacks. Am.Com ¶¶ 16-22. Yet despite clear allegations that this plan was hatched by senior management of Parke-Davis, with only one exception, the Magistrate has refused to permit production of documents from Parke-Davis's headquarters.

In short, the Magistrate improperly ignored this Court's finding that the Relator has alleged "an extensive and far reaching campaign" of misconduct by the Defendants. He has erroneously circumscribed discovery, and his temporal and geographic restrictions must be removed.

C.    Marketing Documents To Be Produced By Parke-Davis Should Not Be Limited To Formal Marketing Plans

Requests 10 and 33 sought, respectively, documents that summarized or analyzed "the marketing, promotion or sales of Neurontin," and documents that describe or reference the strategic plan for the marketing and promotion of Neurontin, "including but not limited to annual and quarterly assessments." The Magistrate limited the documents to be produced to formal marketing plans on the ground that the requests were overbroad and burdensome.

Requests that seek Parke-Davis's analyses of its sales of Neurontin, and whether it met the goals of its strategic plan are not overbroad. While Relator has not identified by title the documents he needs to be produced, he could not be expected to; he was not a marketing employee and did not have access to the variety of marketing reports generated by Parke-Davis. Yet, plainly Parke-Davis performed analyses and well as generated plans, and the documents can be easily segregated.

Assertions of burdensomeness must be measured against the requested documents' relevance. Even if production of certain documents may require effort, if they are critical to the case, they must still be produced. Here, the central issue in the case is whether the defendant's efforts caused the submission of off-label Neurontin prescriptions to Medicaid. Parke-Davis documents that analyze the effectiveness of the marketing efforts which are the heart of Relator's

17

complaint–the publication strategy, marketing by medical liaisons, "consultants" meetings and other events where kickbacks were paid– go to the very core of the case. It is not enough that Relator establish that Parke-Davis intended to market through improper methods, he must prove those methods *caused* false claims. Documents from Parke-Davis analyzing the results of its marketing efforts provide contemporary evidence on this key point, yet the Magistrate's order blocks Relator from obtaining such documents. Putting such documents beyond Relator's reach, and requiring him to rely on testimony of Parke-Davis employees given several years after the fact, is an abuse of discretion.

> D.    Documents Relating to Neurontin Sales and Senior Parke-Davis Officials' Analysis of Sales Should Not Be Limited To Medicaid Sales

Requests 38 and 40 sought documents providing sales information relating to Neurontin.[5] The Magistrate restricted production to documents "prepared by the defendant relating to the analyses of medicaid sales." The problem with the restriction is that such specific documents may not exist. Relator does not contend (and is not required to prove) that Parke-Davis implemented the disputed marketing techniques to increase Medicaid sales specifically; Parke-Davis was clearly attempting to increase all off-label sales of Neurontin. If Medicaid sales were not specifically tracked, direct data relating to the damages caused by Parke-Davis's actions may not exist. But that does not mean that there are no documents in Parke-Davis's possession from which this information can be calculated. Relator has seen documents where Parke-Davis kept track of the percentage of Neurontin sales that were paid for by Medicaid. From these documents, the quantity of Medicaid sales and profits can be derived, but only if Relator is given access to all the documents originally requested in Requests 38 and 40. The Magistrate's limitation improperly blocks access to documents that are calculated to lead to admissible evidence and should be overridden.

---

[5]    Request 38 sought documents that evidence the "total amount of prescriptions filled for off-label uses of Neurontin." Request 40 sought documents providing Parke-Davis's "sales, revenues and profits earned from the sale of Neurontin."

18

Request 39 seeks documents authored or in the possession of senior Parke-Davis officers and marketing personnel relating to the promotion or marketing or sale of Neurontin.  Again this Request was improperly restricted to documents relating to Medicaid sales.  Not only is it uncertain that such documents exist, but discovery regarding what the highest officials and marketing personnel knew about the off-label promotion of Neurontin is plainly relevant.  Under the Magistrate's order, Parke-Davis would not have to produce a memorandum from the President of Parke-Davis, or its highest marketing officials, that instructed subordinates to disregard the anti-kickback regulations or the FDA's off-label marketing rules unless the documents specifically referenced sales of Neurontin to Medicaid patients.  Relator is entitled to know what senior officials knew and instructed regarding off-label sales of Neurontin, regardless of whether such documents concerned Medicaid or not.

E.    Requests For Parke-Davis's Financial Analysis of Its Off-Label Marketing Program or Documents Relating To Payments for Medicaid Prescriptions Are Not Overbroad

The Magistrate refused to compel production of Request 22, which sought documents concerning Parke-Davis's "return on investment for the Medical Liaisons and/or Medical Liaison program" as overbroad.  Actually, it seeks a fairly narrow category of documents.  The Amended Complaint alleges that Parke-Davis expanded its medical liaison program specifically to increase off-label promotion on Neurontin.  Documents which contain financial analyses of whether it made good business sense to expand the program would clearly demonstrate whether the program was, as plaintiff alleges, designed to increase off-label promotion.  The request plainly does not seek information about every expense incurred by the medical liaisons, it seeks financial analyses.  An organization like Parke-Davis in all likelihood performed some sort of analysis before it expanded the program and probably examined whether those objectives were obtained after such expansion.  This request merely seeks such analysis.

19

Finally, the Magistrate did not specifically address Request 37. This appears to have been an oversight, however, the order specifically states that unless otherwise ordered, the Relator's Motion to Compel is denied. *Order* at 4. Accordingly, this Court must formally correct the oversight. Given that Request 37 seeks documents similar to Requests 35 and 36, it should probably be treated in the same manner. Request 37 seeks documents relating to prescriptions for Neurontin paid for in part or entirely by the United States. Such documents would allow the Relator to determine what percentage of Medicaid Neurontin prescriptions were for unlabeled uses.

## CONCLUSION

For the reasons set forth above, the District Court should reconsider the portions of the Magistrate's Order referenced above and remove the discovery restrictions imposed by said Order.

RELATOR, DAVID P. FRANKLIN,
on behalf of THE UNITED STATES
OF AMERICA

By his attorneys,

Dated: December 27, 2001

Thomas M. Greene, Esquire
BBO # 210020
Michael Tabb, Esquire
BBO # 491310
Greene & Hoffman, P.C.
125 Summer Street, 14th floor
Boston, MA 02110
Telephone (617) 261-0040
Facsimile (617) 261-3558

CERTIFICATE OF SERVICE
I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by mail-hand on 12/27/01

20

1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No.
96-11651-PBS

UNITED STATES OF AMERICA ex rel.
DAVID FRANKLIN,

Plaintiff

v.

PARKE-DAVIS, DIVISION OF
WARNER-LAMBERT COMPANY,

Defendant

ORDER

December 12, 2001

COHEN, M.J.

After hearing, it is hereby ordered as follows with respect to the discovery

motions referred to this court for disposition, to wit:

1.    With respect to the matter of a Protective Order, the draft submitted March

6, 2001, shall govern with the following modifications and limitations:

a.    A party may <u>not</u> designate as "Confidential" information contained in

documents which are already in the possession of a third party even if the

documents contain the party's "Confidential" designation;

b.    The disclosure of confidential information shall be limited as set forth in

Part 5 of the draft submitted March 6, 2001.  Any disclosures to

employees of the Department of Health and Human Services and its

Health Care Financing Administration, to state Medicaid administration

officials, and to the United States (including any agency, subdivision, or

department thereof, as well as the United States Attorney's Office) shall

only be made after compliance with paragraph 7 of the draft submitted

March 6, 2001;

c.    Part 4 of the draft submitted March 6, 2001, governing the use of

confidential information shall apply to all persons, corporate entities, and

all governmental bodies, including the United States Government

(including any agency, subdivision, or department thereof, as well as the

United States Attorney's Office).

Defendant shall submit to this court a revised draft of its draft order submitted

March 6, 2001, incorporating these modifications set forth herein on or before the close

of business, Wednesday, December 19, 2001.

2.    Based on the Memorandum and Order (# 104) entered by the district judge

to whom this case is assigned on June 25, 2001, and the Amended Complaint which

followed, this court finds that the document and other discovery requests referred to in

the relator's Motion to Compel Production of Documents (# 81) are far too broad.  The

Relator was employed at Parke-Davis for a relatively short period,[1] and his allegations,

to the extent that he could plead them with any specificity, are limited to that period of

---

[1]    Approximately five months.

-2-

time[2] and to the Northeast Customer Business Unit of Parke-Davis.

Accordingly, relator's Motion to Compel Production of Documents (# 81) is allowed, but only to the following extent:

Document requests Nos. 2, 3, 4, 5, 6, 7, 8, 9, 14, 15, 16, 17, 18, 19, 20, 21, and 33 shall be complied with, limited, in terms of time, to the period October 1, 1995, to and including October 31, 1996, and in terms of geographical locations, to the Northeast Customer Business Unit of Parke-Davis.

Document requests 10 and 33 are clearly overbroad and burdensome. The motion to compel is allowed as to those requests, but limited to formal marketing plans for the period October 1, 1995, to and including October 31, 1996.

The motion is denied as to Document request No. 11 on the ground that it is moot.

The motion is denied as to Document request No. 12.

The motion is denied as to Document request No. 22 on the grounds that that request is overly broad.

The motion is allowed as to Document requests Nos. 23 and 25, limited to off-label uses (including excess dosage) for the period October 1, 1995, to and including October 31, 1996, and limited to documents from the Northeast Customer Business Unit of Parke-Davis.

Document Requests Nos. 24 and 26 are denied as moot.

---

[2]    As Judge Saris has instructed (Memorandum and Order # 104, p. 13):

The "when" of Relator's complaint is to the time-frame during which Relator was employed as a Parke-Davis medical liaison in its Northeast Customer Business Unit.

The motion is allowed as to Document request 27, limited to manuals within the Northeast Customer Business Unit of Parke-Davis for the period October 1, 1995, to and including October 31, 1996, and for national manuals for that same period of time.

The motion is allowed as to Document requests Nos. 38 through 31, limited to off-label uses (including excess dosage) for the period October 1, 1995, to and including October 31, 1996, and limited to documents from the Northeast Customer Business Unit of Parke-Davis.

The motion is denied as to Document request No. 32.

With respect to Document requests Nos. 35, 36, 38, 39 and 40, the motion is allowed as to reports prepared by the defendant relating to analyses of medicaid sales for the period October 1, 1995, to and including October 31, 1996, and limited to such reports prepared by the Northeast Customer Business Unit of Parke-Davis.

In all other respects, the relator's Motion to Compel Production of Documents (# 81) is denied.


UNITED STATES MAGISTRATE JUDGE

2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
——————————————————— )
UNITED STATES OF AMERICA )
ex rel. DAVID FRANKLIN,  )      Civil Action No. 96-11651-PBS
      Plaintiff,         )
                         )
v.                       )      First Request for the Production
                         )      of Documents from Relator David
PARKE-DAVIS, DIVISION OF )      Franklin to Defendant Warner-
WARNER-LAMBERT COMPANY,  )      Lambert Company
                         )
      Defendant          )
——————————————————— )
```

Pursuant to Rule 34 of the Federal Rules of Civil
Procedure, Relator David Franklin ("Relator") requests that
Defendant Parke-Davis, a division of Warner-Lambert Company
("Warner-Lambert" or the "Company") hereby produce for
inspection and copying the documents described below at the
offices of Greene & Hoffman, P.C., 125 Summer Street, Suite
1410, Boston, Massachusetts 02110 on September 21, 2000 at 10:00
a.m. (the "Document Request").

### DEFINITIONS AND INSTRUCTIONS

#### Definitions

1.    "Action" shall mean the proceeding instituted in the
United States District Court for the District of Massachusetts
as United States of America ex rel. David Franklin v. Parke-
Davis, division of Warner-Lambert Company, Civil Action No. 96-
11651-PBS.

2.    "And" includes the word "or" and vice-versa.

3.    "Any" includes the word "all" and vice-versa.

4.    "Complaint" shall mean the Complaint filed by the Relator under seal, on or about August 13, 1996, in this Action.

5.    "Communication" shall have the meaning set forth in Local Rule 26.5.

6.    "Concerning" shall have the meaning set forth in Local Rule 26.5.

7.    "Parke-Davis" shall mean Parke-Davis, a division of Warner-Lambert Company, and any of its predecessors or successors in interest, divisions, offices, subsidiaries, affiliates, and any present or former directors, officers, executives, trustees, employees, agents, attorneys, representatives and any other Person acting or purporting to act on its behalf.

8.    "Warner-Lambert" shall mean Warner-Lambert Company and any of its predecessors or successors in interest divisions, offices, subsidiaries, affiliates, and any present or former directors, officers, executives, trustees, employees, agents, attorneys, representatives and any other Person acting or purporting to act on its behalf, including, but not limited to, Parke-Davis, as a division of Warner-Lambert Company.

9.    "Defendant" shall mean Parke-Davis or Warner-Lambert.

2

10.  "Document" shall have the meaning set forth in Rule
34(a) of the Federal Rules of Civil Procedure, and Local Rule
26.5, and includes all forms of writings as defined in Rule
1001(1) of the Federal Rules of Evidence, and includes any
reduction to tangible form, whether written, recorded, taped,
filmed, videotaped or in computer, digital or magnetic memory or
storage, of communication, information, or data, including any
graphic matter of any kind or nature, however produced or
reproduced, and also includes originals, drafts, and non-
identical copies, wherever located. "Document" shall include,
but not be limited to, books, contracts, agreements,
correspondence, electronic mail, computer tapes, discs, magnetic
memory, printouts and keypunch cards, memoranda, diaries, notes
reports, bulletins, printed forms, telegraphic communications,
pleadings and other legal papers, notes, telexes, telegrams,
telecopies, facsimile reproductions, or "faxes," factual
compilations, data compilations, statistical compilations,
plans, diagrams, journals, change orders, studies, surveys,
sketches, art work, graphics, checks, ledgers, catalogues,
brochures, pamphlets, press releases, advertisements, invoices,
minutes, photographs, microfilms, microfiche, films, personnel
files, quotes, stenographic notes, computer disks, telephone
records, schedules, bids, voice recordings, and transcriptions.
This definition shall apply to all Documents in the possession,

3

custody or control, of the Defendant herein, or that of its attorneys, agents, employees, officers, directors, or representatives, irrespective of who generated, prepared or signed the Documents.

11. "Including" shall mean including, without limitation, the specific matter or Documents described.

12. "Meeting" shall mean any formal or informal assembly, convocation, encounter or contemporaneous presence of two or more Persons for any purpose and shall include telephone conferences and calls.

13. "Person" or "Persons" shall mean any individual, corporation, organization, association, partnership, limited partnership, firm, joint venture, trustee, governmental body, agency, governing board, department or division, or any other entity.

14. "Proceeding" shall mean the proceeding instituted in the United States District Court for the District of Massachusetts as <u>United States of America ex rel. David Franklin v. Parke-Davis, division of Warner-Lambert Company</u>, Civil Action No. 96-11651-PBS.

15. "Relating to" shall mean constituting, consisting of, referring to, reflecting, concerning, discussing, evidencing, commenting on, pertaining to, or having any logical or factual connection with the matter identified, in whole or in part.

4

16.   "Relator" shall mean the Relator David Franklin.


## Instructions

1.   In the event that any Document called for by this Document Request is withheld on the basis claim of privilege, that Document is to be identified as follows: author(s), addressee(s), indicated or blind copy recipient(s), date, subject matter, number of pages, attachments or appendices, all persons to whom distributed, shown or explained, the present custodian, and the nature of the privilege asserted.

2.   In the event that any Document called for by this Document Request has been destroyed, discarded, otherwise disposed of, or no longer exists, that Document is to be identified as completely as possible, including, without limitation, the following information: author(s), addressee(s), indicated or blind copy recipient(s), date, subject matter, date of disposal, reason for disposal, Person authorizing the disposal, the Person disposing of the Document, and identify its last known location and the reason it is no longer in existence.

3.   In the event that any information is redacted from a Document produced pursuant to this Document Request, that information is to be identified and the basis upon which such information is redacted be fully stated.

4.    In construing this Document Request, the singular shall include the plural and the plural shall include the singular.

5.    Unless otherwise stated, the time period for this request shall be from January 1, 1994 to the present.

## DOCUMENTS REQUESTED

### REQUEST NO. 1:

The following Documents referenced in pages 3 and 4 of Defendant Warner-Lambert Company's Memorandum of Law in Opposition to the Government's Motion for a Stay of Civil Discovery:

(a) the "letter request" sent from the Food and Drug Administration to Warner-Lambert on July 19, 1996 ("FDA Letter"); and

(b) the "subpoena from the Department of Veterans Affairs, Office of the Inspector General" dated October 23, 1997 (the "VA Subpoena").

### REQUEST NO. 2:

All feasibility studies, and/or budgetary plans and/or budgetary requests that refer to the use of, and/or seek budgetary approval for the use of Medical Liasions and/or the Medical Liaison program for the time period of 1988 to the present date.

**REQUEST NO. 3:**

All documents that reference requests for funding for use of Medical Liaisons and/or the Medical Liaison program for the time period of 1988 to the present date.

**REQUEST NO. 4:**

All documents that describe or refer to the role of Medical Liaisons in the marketing, promotion and sales of Neurontin and/or Accupril and/or any drug manufactured by the Defendant for the time period of 1988 to the present date.

**REQUEST NO. 5:**

All videotapes made between 1988 and the present date of Medical Liaison and/or sales representative training sessions including but not limited to the videotape made at the Ann Arbor, Michigan training session attended by David Franklin in April 1996.

**REQUEST NO. 6:**

Each and every Neurontin and/or Accupril Key Influencer List from January 1, 1994 to the present.

**REQUEST NO. 7:**

Each and every Neurontin and/or Accupril "movers and shakers" list of physicians from January 1, 1994 to the present.

**REQUEST NO. 8:**

All Xponent data records that list physicians who prescribe and/or potentially prescribe Neurontin and/or Accupril from January 1, 1994 to the present.

**REQUEST NO. 9:**

All Precision Marketing reports and documents that reference or pertain to physicians' prescription writing practices for Neurontin and/or Accupril from January 1, 1994 to the present.

**REQUEST NO. 10:**

Each and every document that summarizes or analyzes the marketing, promotion and sales of Neurontin and/or Accupril for the time period of 1988 to the present date.

**REQUEST NO. 11:**

Each and every voice mail recording of phone messages and/or phone conferences sent, received and/or participated in between 1994 and the present date, by any of the following:  any Medical Liaison, and/or Phil Majestro, and/or John Ford, and/or William Sigmund, and/or Tony Wilde, and/or John Krukar, and/or Tom Gorga, and/or Mike Valentino concerning marketing, promotion and sales of Neurontin and/or Accupril.

**REQUEST NO. 12:**

All transcripts, including all drafts of transcripts, of any voice mail referenced in the preceding request.

8

**REQUEST NO. 13:**

All e-mails sent or received between 1994 and the present date by any of the following: any Medical Liaisons, and/or Phil Majestro, and/or John Ford, and/or William Sigmund, and/or Tony Wilde, and/or John Krukar, and/or Tom Gorga, and/or Mike Valentino concerning marketing, promotion and/or sales of Neurontin and/or Accupril.

**REQUEST NO. 14:**

Each and every document that describes the duties and responsibilities of drug sales representatives and/or Medical Liaisons for the time period of 1990 to the present date.

**REQUEST NO. 15:**

Each and every Physician Information Request Form signed by a physician, and/or drug sales representative, and/or Medical Liaison that pertains to a physician request for information about Neurontin and/or Accupril from January 1, 1994 to the present.

**REQUEST NO. 16:**

Each and every document created between 1994 and the present date that evidences any payment, remuneration, gift, gratuity or consideration paid, directly or indirectly to any physician for participation in preceptorships and/or shadowing programs, pertaining or relating to Neurontin and/or Accupril use.

**REQUEST NO. 17:**

Each and every document created between 1992 and the present date, that evidences or references payment(s) to physicians for consulting services regarding Neurontin and/or Accupril.

**REQUEST NO. 18:**

Each and every document created between 1992 and the present date, that evidences or references payments made to physicians, directly or indirectly, for case studies regarding Neurontin and/or Accupril.

**REQUEST NO. 19:**

Each and every document created between 1992 and the present date, that evidences or references payment to physicians for access to the medical record(s) of patients taking Neurontin and/or Accupril.

**REQUEST NO. 20:**

Each and every document created between 1992 and the present date that evidences or references payment to physicians for participation in speaker bureau programs in which approved uses and/or emerging uses and/or unapproved uses of Neurontin and Accupril were presented.

**REQUEST NO. 21:**

Each and every document created between 1992 and the present date that evidences or references payment to physicians for clinical trials and/or writing peer reviewed medical articles

regarding emerging uses and/or unapproved uses for Neurontin and/or Accupril.

**REQUEST NO. 22:**

Each and every document that projects, analyzes, refers or concerns Defendant's return on investment for the Medical Liaisons and/or Medical Liaison program between 1988 and the present date.

**REQUEST NO. 23:**

Each and every document authored by and/or copied to the Neurontin Disease Team (or any member thereof) that references approved uses and/or emerging uses and/or unapproved uses of Neurontin for the time period of 1988 to the present.

**REQUEST NO. 24:**

Each and every document authored by and/or copied to the Accupril Disease Team (or any member thereof) that references approved uses and/or emerging uses and/or unapproved uses of Accupril for the time period of 1988 to the present.

**REQUEST NO. 25:**

Each and every document authored by and/or copied to the Core Marketing Team (or any member thereof), including but not limited to all minutes of meetings and memoranda, that reference approved uses and/or emerging uses and/or unapproved uses of Neurontin for the time period of 1988 to the present.

11

**REQUEST NO. 26:**

Each and every document authored by and/or copied to the Core Marketing Team (or any member thereof), including but not limited to all minutes of meetings and memoranda, that reference approved uses and/or emerging uses and/or unapproved uses of Accupril for the time period of 1988 to the present.

**REQUEST NO. 27:**

All sales training manuals for Medical Liaisons and/or drug sales representatives for the time period of 1988 to the present.

**REQUEST NO. 28:**

Each and every slide kit for Neurontin and/or Accupril for the time period of 1988 to the present.

**REQUEST NO. 29:**

All materials, written or audio, handed out at courses and/or educational seminars and/or luncheon meetings, and/or dinner meetings and/or conferences and/or advisory board meetings in which the approved uses and/or emerging uses and/or unapproved uses of Neurontin and/or Accupril were presented or discussed for the period of 1988 to the present.

**REQUEST NO. 30:**

All tape recordings, videos, transcripts of proceedings, list of attendees, course/speaker evaluation forms for: courses and/or seminars, and/or luncheon meetings, and/or dinner meetings and/or educational seminars and/or advisory board meetings in which the

approved uses and/or emerging uses and/or unapproved uses of
Neurontin and Accupril were presented or discussed for the period
of 1988 to the present.

REQUEST NO. 31:

Each and every document, including but not limited to
reports, that refer or evidence discussions about approved uses
and/or emerging uses and/or unapproved uses of Neurontin and/or
Accupril occurring during Consulting meetings for the period of
1988 to the present.

REQUEST NO. 32:

Each and every document, including but not limited to
correspondence and reports from Defendant's employees, physicians,
and third party vendors, that refers to the government's
investigation into Defendant's conduct as it pertains to
marketing, promotion and sales of approved uses and/or emerging
uses and/or unapproved uses of Neurontin and/or Accupril for the
period of 1996 to the present.

REQUEST NO. 33:

Each and every document that describes or references the
strategic plan, including but not limited to annual and quarterly
assessments, for the promotion, marketing and sales of Neurontin
and/or Accupril for the time period of 1988 to the present.

13

**REQUEST NO. 34:**

Each and every document that evidences or references a sale of Neurontin and/or Accupril to the United States government for the time period of 1988 to the present.

**REQUEST NO. 35:**

Each and every document that evidences or references a sale of Neurontin and/or Accupril for an unapproved use paid for either entirely or in part by the United States government for the time period of 1988 to the present.

**REQUEST NO. 36:**

Each and every document that evidences or references a prescription for an unapproved use for Neurontin and/or Accupril that was paid for either entirely or in part by the United States government for the time period of 1988 to the present.

**REQUEST NO. 37:**

Each and every document that evidences or references a prescription for Neurontin and/or Accupril that was paid for either entirely or in part by the United States government for the time period of 1988 to the present.

**REQUEST NO. 38:**

Each and every document that evidences or references the total amount of prescriptions filled for off label uses of Neurontin and/or Accupril for the time period of 1988 to the present.

14

**REQUEST NO. 39:**

Each and every document that refers to the promotion, and/or marketing and and/or sale of Neurontin and/or Accupril that are maintained in the files of the following individuals: Laura Johnson, Alan Knoop, John Krukar, John Ford, Mike Valentino, Alan Crook, Phil Majestro, William Sigmund, Edda Guerrero, Tony Wilde for the time period of 1988 to the present.

**REQUEST NO. 40:**

Each and every document that refers or relates to Defendant's sales, revenues and profits earned from the sale of Neurontin and/or Accupril for approved uses, and/or emerging uses and/or unapproved uses for the time period of 1988 to the present.

The Plaintiff,
DAVID FRANKLIN,

By his attorney,

Dated: August 22, 2000          Thomas M. Greene, Esquire
                                BBO #210020
                                Ilyas J. Rona, Esquire
                                BBO #642964
                                Greene & Hoffman, P.C.
                                125 Summer Street, Suite 1410
                                Boston, Massachusetts 02110
                                Telephone: (617) 261-0040
                                Facsimile: (617) 261-3558

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served upon the counsel of record for each other party by first-class mail postage pre-paid on August 22, 2000.

15

3

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

---------------------------------------------------------------x

UNITED STATES OF AMERICA　　　　　　　　:　　Civil Action
ex rel. DAVID FRANKLIN　　　　　　　　　　:　　No. 96-11651-PBS

　　　　　　　　　Plaintiff,　　　　　　　　:

　　　v.　　　　　　　　　　　　　　　　　　:

　　　　　　　　　　　　　　　　　　　　　　:　　Defendant's Responses and
PARKE-DAVIS, DIVISION OF　　　　　　　　　:　　Objections to Relator
WARNER-LAMBERT COMPANY,　　　　　　　　:　　David Franklin's First
　　　　　　　　　　　　　　　　　　　　　　:　　Request for the Production of
　　　　　　　　　　　　　　　　　　　　　　:　　Documents to Defendant
　　　　　　　　　Defendant.　　　　　　　　:　　Warner-Lambert Company

---------------------------------------------------------------x


　　　　　Pursuant to Rule 34 of the Federal Rules of Civil Procedure and subject to the

objections stated below, Defendant Parke-Davis, a division of Warner-Lambert Company

("Warner-Lambert" or the "Company") hereby responds to Relator David Franklin's First

Request for Production of Documents (the "Document Requests"). These responses and

objections are made without in any way waiving or intending to waive, but on the

contrary reserving and intending to reserve:

　　　　　1.　　all questions as to competency, relevance, materiality, privilege and

admissibility as evidence for any purpose of any of the information produced hereunder

or the subject matter thereof;

2.    the right to object on any ground to the use of the information produced hereunder or the subject matter thereof at any trial or hearing in this matter or in any related or subsequent action or proceeding;

3.    the right to object on any ground at any time to a demand for further response or document production; and

4.    the right at any time to revise, supplement, correct, or add to this response.

## GENERAL OBJECTIONS

1.    Warner-Lambert objects to the Document Requests to the extent that they call for production of proprietary, commercially sensitive, or other confidential documents, the probative value of which is outweighed by Warner-Lambert's interest in preserving their confidentiality. Warner-Lambert objects to producing any documents until an appropriate confidentiality stipulation is entered into among the parties and so ordered by the Court.

2.    Warner-Lambert objects to the Document Requests to the extent that they call for production of documents protected from disclosure under the attorney-client privilege, the attorney work product doctrine, or any other legally recognized privilege or immunity. To the extent that any such documents are inadvertently produced in response to the Document Requests, the production of such documents shall not constitute a waiver of Warner-Lambert's right to assert the applicability of any privilege or immunity to the documents, and any such document will be subject to return on demand.

3.    Warner-Lambert objects to the Document Requests to the extent that they call for documents that are not within Warner-Lambert's possession, custody, or control,

2

or are more appropriately sought from third parties to whom requests have been or may be directed.

4.    Warner-Lambert objects to the Document Requests to the extent that they call for production of publicly available documents or information that could be obtained from the Relator's own files or other sources.

## OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS

1.    Warner-Lambert objects to the Definitions and Instructions to the extent that they seek to impose obligations beyond those imposed by the Federal Rules of Civil Procedure, the Local Rules or any other applicable rules.

2.    Warner-Lambert objects to the Instructions to the extent that they define the relevant time period as "from January 1, 1994, to the present" on the grounds that the period is overly broad, unduly burdensome and seeks documents that are not relevant to this litigation.

3.    Warner-Lambert objects to the definition of "Parke-Davis" to the extent that it is defined to include "officers, subsidiaries, affiliates, and any present or former directors, officers, executives, trustees, employees, agents, attorneys, representatives and any other Person acting or purporting to act on its behalf" on the grounds that such definition is overly broad and unduly burdensome, seeks documents that are not relevant to this litigation, and attempts to impose obligations beyond those imposed by the Federal Rules of Civil Procedure.

3

4.    Warner-Lambert objects to the definition of "Warner-Lambert" to the extent that it is defined to include "officers, subsidiaries, affiliates, and any present or former directors, officers, executives, trustees, employees, agents, attorneys, representatives and any other Person acting or purporting to act on its behalf" on the grounds that such definition is overly broad and unduly burdensome, seeks documents that are not relevant to this litigation, and attempts to impose obligations beyond those imposed by the Federal Rules of Civil Proced.

## RESPONSES AND OBJECTIONS TO DOCUMENTS REQUESTED

The foregoing objections are incorporated and made a part of each of the following objections.

**Document Request No. 1:** The following Documents referenced in pages 3 and 4 of Defendant Warner-Lambert Company's Memorandum of Law in Opposition to the Government's Motion for a Stay of Civil Discovery:
(a) the "letter request" sent from the Food and Drug Administration to Warner-Lambert on July 19, 1996 ("FDA Letter"); and
(b) the "subpoena from the Department of Veterans Affairs, Office of the Inspector General" dated October 23, 1997 (the "VA Subpoena").

**Response to Document Request No. 1:** Warner-Lambert objects to Document Request No. 1 on the grounds that it seeks documents outside the time period relevant to this litigation. Subject to and without waiving the foregoing objections, Warner-Lambert will produce the letter request from the Food and Drug Administration, dated July 19, 1996, and the subpoena from the Department of Veterans Affairs, Office of the Inspector

4

General, dated October 23, 1997, once an appropriate confidentiality stipulation is

entered into among the parties and so ordered by the Court.

**Document Request No. 2:** All feasibility studies, and/or budgetary plans and/or budgetary requests that refer to the use of, and/or seek budgetary approval for the use of Medical Liaisons and/or seek budgetary approval for the use of Medical Liaisons and/or the Medical Liaison program for the time period of 1988 to the present date.

**Response to Document Request No. 2:** Warner-Lambert objects to Document

Request No. 2 on the grounds that it is overly broad, unduly burdensome, seeks

documents outside the time period relevant to this litigation and seeks documents that are

not relevant to this litigation.

**Document Request No. 3:** All documents that reference requests for funding for use of Medical Liaisons and/or the Medical Liaison program for the time period of 1988 to the present date.

**Response to Document Request No. 3:** Warner-Lambert objects to Document

Request No. 3 on the grounds that it is overly broad, unduly burdensome, seeks

documents outside the time period relevant to this litigation and seeks documents that are

not relevant to this litigation.

**Document Request No. 4:** All documents that describe or refer to the role of Medical Liaisons in the marketing, promotion and sales of Neurontin and /or Accupril and/or any drug manufactured by the Defendant for the time period of 1988 to the present date.

5

**Response to Document Request No. 4:** Warner-Lambert objects to Document Request No. 4 on the grounds that it is overly broad, unduly burdensome, seeks documents outside the time period relevant to this litigation and seeks documents that are not relevant to this litigation.

**Document Request No. 5:** All videotapes made between 1988 and the present date of Medical Liaison and/or sales representative training session including but not limited to the videotape made at the Ann Arbor, Michigan training session attended by David Franklin in April 1996.

**Response to Document Request No. 5:** Warner-Lambert objects to Document Request No. 5 on the grounds that it is overly broad, unduly burdensome, seeks documents outside the time period relevant to this litigation and seeks documents that are not relevant to this litigation.

**Document Request No. 6:** Each and every Neurontin and /or Accupril Key Influencer List from January 1, 1994 to the present.

**Response to Document Request No. 6:** Warner-Lambert objects to Document Request No. 6 on the grounds that the term "Key Influencer List" is vague and ambiguous and on the grounds that the Request is overly broad, unduly burdensome, and seeks documents outside the time period relevant to this litigation.

**Document Request No. 7:** Each and every Neurontin and/or Accupril "movers and shakers" list of physicians from January 1, 1994 to the present.

**Response to Document Request No. 7:** Warner-Lambert objects to Document Request No. 7 on the grounds that the term "'movers and shakers' list of physicians" is vague and ambiguous and on the grounds that the Request is overly broad, unduly burdensome, and seeks documents outside the time period relevant to this litigation.

**Document Request No. 8:**  All Xponent data records that list physicians who prescribe and/or potentially prescribe Neurontin and/or Accupril from January 1, 1994 to the present.

**Response to Document Request No. 8:**  Warner-Lambert objects to Document Request No. 8 on the grounds that the term "Xponent data records" is vague and ambiguous and that the Request is overly broad, unduly burdensome, seeks documents outside the time period relevant to this litigation and seeks documents that are not relevant to this litigation.

**Document Request No. 9:**   All Precision Marketing reports and documents that reference or pertain to physicians' prescription writing practices for Neurontin and/or Accupril from January 1, 1994 to the present.

**Response to Document Request No. 9:** Warner-Lambert objects to Document Request No. 9 on the grounds that the term "Precision Marketing reports" is vague and ambiguous and on the grounds that the Request is overly broad, seeks documents outside the time period relevant to this litigation and seeks documents that are not relevant to this litigation.

7

**Document Request No. 10:**  Each and every document that summarizes or analyzes the marketing, promotion sales of Neurontin and/or Accupril for the time period of 1988 to the present date.

**Response to Document Request No. 10:**  Warner-Lambert objects to Document Request No. 10 on the grounds that the Request is overly broad, unduly burdensome, seeks documents outside the time period relevant to this litigation and seeks documents that are not relevant to this litigation.

**Document Request No. 11:**  Each and every voice mail recording of phone messages and/or phone conferences sent, received and/or participated in between 1994 and the present date, by and of the following: any Medical Liaison, and/or Phil Majestro, and/or John Ford, and/or William Sigmund, and/or Tony Wilde, and/or John Krukar, and/or Tom Gorga, and/or Mike Valentino concerning marketing, promotion and sales of Neurontin and/or Accupril.

**Response to Document Request No. 11:**  Warner-Lambert objects to Document Request No. 11 on the grounds that the Request is overly broad, unduly burdensome, seeks documents outside the time period relevant to this litigation and seeks documents that are not relevant to this litigation.

**Document Request No. 12:**  All transcripts, including all drafts of transcripts, of any voice mail referenced in the preceding request.

**Response to Document Request No. 12:**  Warner-Lambert objects to Document Request No. 12 on the grounds that the Request is overly broad, unduly burdensome,

8

seeks documents outside the time period relevant to this litigation and seeks documents

that are not relevant to this litigation.


**Document Request No. 13:**  All emails-sent or received between 1994 and the present date by any of the following: any Medical Liaisons, and/or Phil Majestro, and/or John Ford, and/or William Sigmund, and/or Tony Wilde, and/or John Krukar, and/or Tom Gorga, and/or Mike Valentino concerning marketing, promotion and/or sale of Neurontin and/or Accupril.

**Response to Document Request No. 13:**  Warner-Lambert objects to Document

Request No. 13 on the grounds that the Request is overly broad, unduly burdensome,

seeks documents outside the time period relevant to this litigation and seeks documents

that are not relevant to this litigation.


**Document Request No. 14:**  Each and every document that describes the duties and responsibilities of drug sales representatives and/or Medical Liaisons for the time period of 1990 to the present date.

**Response to Document Request No. 14:**  Warner-Lambert objects to Document

Request No. 14 on the grounds that the Request is overly broad, unduly burdensome,

seeks documents outside the time period relevant to this litigation and seeks documents

that are not relevant to this litigation.


**Document Request No. 15:**  Each and every Physician Information Request Form signed by a physician, and/or drug sales representative, and/or Medical Liaison that pertains to a physician request for information about Neurontin and/or Accupril from January 1, 1994 to the present.

**Response to Document Request No. 15:** Warner-Lambert objects to Document

Request No. 15 on the grounds that the term "Physician Information Request Form" is

vague and ambiguous and on the grounds that the Request is overly broad, unduly

burdensome, seeks documents outside the time period relevant to this litigation and seeks

documents that are not relevant to this litigation.

**Document Request No. 16:** Each and every document created between 1994
and the present date that evidences any payment, remuneration, gift, gratuity or
consideration paid, directly or indirectly to any physician for participation in
preceptorships and/or shadowing programs, pertaining or relating to Neurontin and/or
Accupril use.

**Response to Document Request No. 16:** Warner-Lambert objects to Document

Request No.16 on the grounds that the Request is overly broad, unduly burdensome,

seeks documents outside the time period relevant to this litigation and seeks documents

that are not relevant to this litigation.

**Document Request No. 17:** Each and every document created between 1992
and the present date, that evidences or references payment(s) to physicians for consulting
services regarding Neurontin and Accupril.

**Response to Document Request No. 17:** Warner-Lambert objects to Document

Request No. 17 on the grounds that the Request is overly broad, unduly burdensome,

seeks documents outside the time period relevant to this litigation and seeks documents

that are not relevant to this litigation.

10

**Document Request No. 18:** Each and every document created between 1992 and the present date, that evidence or references payments made to physicians, directly or indirectly, for case studies regarding Neurontin and/or Accupril.

**Response to Document Request No. 18:** Warner-Lambert objects to Document Request No. 18 on the grounds that the Request is overly broad, unduly burdensome, seeks documents outside the time period relevant to this litigation and seeks documents that are not relevant to this litigation.

**Document Request No. 19:** Each and every document created between 1992 and the present date, that evidences or references payment to physicians for access to the medical record(s) of patients taking Neurontin and/or Accupril.

**Response to Document Request No. 19:** Warner-Lambert objects to Document Request No. 19 on the grounds that the Request is overly broad, unduly burdensome, seeks documents outside the time period relevant to this litigation and seeks documents that are not relevant to this litigation.

**Document Request No. 20:** Each and every document created between 1992 and the present date, that evidences or references payment to physicians for participation in speaker bureau programs in which approved uses and/or emerging uses and/or unapproved uses of Neurontin and Accupril were presented.

**Response to Document Request No. 20:** Warner-Lambert objects to Document Request No. 20 on the grounds that the Request is vague and ambiguous, overly broad, unduly burdensome, seeks documents outside the time period relevant to this litigation and seeks documents that are not relevant to this litigation.

11

**Document Request No. 21:** Each and every document created between 1992 and the present date that evidences or references payment to physicians for clinical trials and/or writing peer reviewed medical articles regarding emerging uses and/or unapproved uses for Neurontin and/or Accupril.

**Response to Document Request No. 21:** Warner-Lambert objects to Document Request No. 21 on the grounds that the Request is vague and ambiguous, overly broad, unduly burdensome, seeks documents outside the time period relevant to this litigation and seeks documents that are not relevant to this litigation.

**Document Request No. 22:** Each and every document that projects, analyzes, refers or concerns Defendant's return on investment for the Medical Liaisons and/or Medical Liaison program between 1988 and the present date.

**Response to Document Request No. 22:** Warner-Lambert objects to Document Request No. 22 on the grounds that the Request is vague and ambiguous, overly broad, unduly burdensome, seeks documents outside the time period relevant to this litigation and seeks documents that are not relevant to this litigation.

**Document Request No. 23:** Each and every document authored by and/or copied to the Neurontin Disease Team (or any member thereof) that references approved uses and/or emerging uses and/or unapproved uses of Neurontin for the time period of 1988 to the present.

**Response to Document Request No. 23:** Warner-Lambert objects to Document Request No. 23 on the grounds that the Request is overly broad, unduly burdensome,

12

seeks documents outside the time period relevant to this litigation and seeks documents

that are not relevant to this litigation.

**Document Request No. 24:**  Each and every document authored by and/or
copied to the Accupril Disease Team (or any member thereof) that references approved
uses and/or emerging uses and/or unapproved uses of Accupril for the time period of
1988 to the present.

**...se to Document Request No. 24:**  Warner-Lambert objects to Document

Request No. 24 on the grounds that the Request is overly broad, unduly burdensome,

seeks documents outside the time period relevant to this litigation and seeks documents

that are not relevant to this litigation

**Document Request No. 25:**  Each and every document authored by and/or
copied to the Core Marketing Team (or any member thereof), including but not limited to
all minutes of meetings and memoranda, that reference approved uses and/or emerging
uses and/or unapproved uses of Neurontin for the time period of 1988 to the present.

**Response to Document Request No. 25:**  Warner-Lambert objects to Document

Request No. 25 on the grounds that the Request is overly broad, unduly burdensome,

seeks documents outside the time period relevant to this litigation and seeks documents

that are not relevant to this litigation.

**Document Request No. 26:**  Each and every document authored by and/or
copied to the Core Marketing Team (or any member thereof), including but not limited to
all minutes of meeting and memoranda, that reference approved uses and/or emerging
uses and/or unapproved uses of Accupril for the time period of 1988 to the present.

**Response to Document Request No. 26:** Warner-Lambert objects to Document Request No. 26 on the grounds that the Request is overly broad, unduly burdensome, seeks documents outside the time period relevant to this litigation and seeks documents that are not relevant to this litigation.

**Document Request No. 27:** All sales training manuals for Medical Liaisons and/or drug sales representatives for the time period of 1988 to the present.

**Response to Document Request No. 27:** Warner-Lambert objects to Document Request No. 27 on the grounds that the Request is overly broad, unduly burdensome, seeks documents outside the time period relevant to this litigation and seeks documents that are not relevant to this litigation.

**Document Request No. 28:** Each and every slide kit for Neurontin and/or Accupril for the time period of 1988 to the present.

**Response to Document Request No. 28:** Warner-Lambert objects to Document Request No. 28 on the grounds the Request is overly broad, unduly burdensome, seeks documents outside the time period relevant to this litigation and seeks documents that are not relevant to this litigation.

**Document Request No. 29:** All materials, written or audio, handed out at courses and/or educational seminars and/or luncheon meetings, and/or dinner meetings and/or conferences and/or advisory board meetings in which the approved uses and/or emerging uses and/or unapproved uses of Neurontin and/or Accupril were presented or discusses for the period of 1988 to the present.

**Response to Document Request No. 29:** Warner-Lambert objects to Document

Request No. 29 on the grounds the Request is overly broad, unduly burdensome, seeks

documents outside the time period relevant to this litigation and seeks documents that are

not relevant to this litigation.

**Document Request No. 30:** All tape recordings, videos, transcripts of
proceedings, lists of attendees, course/speaker evaluation forms for: courses and/or
seminars, and/or luncheon meetings, and/or dinner meetings and/or educational seminars
and/or advisory board meetings in which the approved uses and/or emerging uses and/or
unapproved uses of Neurontin and Accupril were presented or discussed for the period of
1988 to the present.

**Response to Document Request No. 30:** Warner-Lambert objects to Document

Request No. 30 on the grounds the Request is overly broad, unduly burdensome, seeks

documents outside the time period relevant to this litigation and seeks documents that are

not relevant to this litigation.

**Document Request No. 31:** Each and every document, including but not limited
to reports, that refer or evidence discussions about approved uses and/or emerging uses
and/or unapproved uses of Neurontin and/or Accupril occurring during Consulting
meetings for the period of 1988 to present.

**Response to Document Request No. 31:** Warner-Lambert objects to Document

Request No. 31 on the grounds the Request is overly broad, unduly burdensome, seeks

documents outside the time period relevant to this litigation and seeks documents that are

not relevant to this litigation.

15

**Document Request No. 32:**  Each and every document, including but not limited to correspondence and reports from Defendant's employees, physicians, third party vendors, that refers to the government's investigation into Defendant's conduct as it pertains to marketing, promotion and sales of approved uses and/or emerging uses and/or unapproved uses of Neurontin and/or Accupril for the period of 1996 to the present.

**Response to Document Request No. 32:** Warner-Lambert objects to Document Request No. 32 on the grounds the Request is overly broad, seeks documents that are not relevant to this litigation, and calls for production of documents protected from disclosure under the attorney-client privilege, the attorney-work product doctrine, or other legally recognized privilege or immunity.

**Document Request No. 33:**  Each and every document that describes or references the strategic plan, including but not limited to annual and quarterly assessments, for the promotion, marketing and sales of Neurontin and/or Accupril for the time period of 1988 to the present.

**Response to Document Request No. 33:** Warner-Lambert objects to Document Request No. 33 on the grounds the Request is overly broad, unduly burdensome, seeks documents outside the time period relevant to this litigation and seeks documents that are not relevant to this litigation.

**Document Request No. 34:** Each and every document that evidences or references a sale of Neurontin and/or Accupril to the United States government for the time period of 1988 to the present.

16

**Response to Document Request No. 34:** Warner-Lambert objects to Document Request No. 34 on the grounds the Request is overly broad, unduly burdensome, and seeks documents outside the time period relevant to this litigation.

**Document Request No. 35:** Each and every document that evidences or references a sale of Neurontin and/or Accupril for an unapproved use paid for either entirely or in party by the United States government for the time period of 1988 to the present.

**Response to Document Request No. 35:** Warner-Lambert objects to Document Request No. 35 on the grounds the Request is overly broad, vague and ambiguous, and seeks documents outside the time period relevant to this litigation.

**Document Request No. 36:** Each and every document that evidences or references a prescription for an unapproved use for Neurontin and/or Accupril that was paid for either entirely or in part by the United States government for the time period of 1988 to the present.

**Response to Document Request No. 36:** Warner-Lambert objects to Document Request No. 36 on the grounds that the Request is overly broad, vague and ambiguous, and seeks documents outside the time period relevant to this litigation.

**Document Request No. 37:** Each and every document that evidence or references a prescription for Neurontin and/or Accupril that was paid for either entirely or in part by the United States government for the time period of 1988 to the present.

17

**Response to Document Request No. 37:** Warner-Lambert objects to Document Request No. 37 on the grounds the Request is overly broad, vague and ambiguous, and seeks documents outside the time period relevant to this litigation.

**Document Request No. 38:** Each and every document that evidences or references the total amount of prescriptions filled for off-label uses of Neurontin and/or Accupril for the time period of 1988 to the present.

**Response to Document Request No. 38:** Warner-Lambert objects to Document Request No. 38 on the grounds the Request is overly broad, vague and ambiguous, seeks documents outside the time period relevant to this litigation, and seeks documents that are not relevant to this litigation.

**Document Request No. 39:** Each and every document that refers to the promotion, and/or marketing and and/or [sic] sale of Neurontin and/or Accupril that are maintained in the files of the following individuals: Laura Johnson, Alan Knoop, John Krukar, John Ford, Mike Valentino, Alan Crook, Phil Majestro, William Sigmund, Edda Guerrero, Tony Wilde for the time period of 1988 to the present.

**Response to Document Request No. 39:** Warner-Lambert objects to Document Request No. 39 on the grounds the Request is overly broad, seeks documents outside the time period relevant to this litigation and seeks documents that are not relevant to this litigation.

**Document Request No. 40:** Each and every document that refers or relates to Defendant's sales, revenues and profits earned from the sale of Neurontin and/or Accupril

18

for approved uses, and/or emerging uses and/or unapproved uses for the time period of 1988 to the present.

**Response to Document Request No. 40:**  Warner-Lambert objects to Document Request No. 40 on the grounds the Request is overly broad, unduly burdensome, seeks documents outside the time period relevant to this litigation and seeks documents that are not relevant to this litigation.

Dated: September 19, 2000

Of Counsel:

James P. Rouhandeh
James E. Murray
DAVIS POLK & WARDWELL
450 Lexington Avenue
New York, New York 10017
(212) 450-4000

WARNER-LAMBERT COMPANY

By its attorneys,

David B. Chaffin
BBO No. 549245
HARE & CHAFFIN
160 Federal Street
Boston, Massachusetts 02110
(617) 330-5000

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing document was served by facsimile and first class mail on counsel of record for all parties this 19th day of September, 2000.

James E. Murray

19

4

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA ex rel. DAVID FRANKLIN, | ) ) ) | |
| Plaintiff, | ) ) | Civil Action |
| v. | ) ) | No. 96-11651-PBS |
| PARKE-DAVIS, DIVISION OF WARNER-LAMBERT COMPANY, | ) ) ) | |
| Defendant | ) ) | |

## PROTECTIVE ORDER

Pursuant to Rule 26(c) of the Federal Rules of Civil Procedure, the Court enters the following Protective Order ("Order") limiting the disclosure of discovered information and limiting the use of such information as hereinafter provided. IT IS HEREBY ORDERED THAT:

1.    This Order shall govern the treatment of pleadings, correspondence, legal memoranda, documents (as defined by the Federal Rules of Civil Procedure and the Local Rules) and all other discovery materials which have been or will be filed, exchanged, served, produced or received by the parties during pre-trial proceedings in the above-captioned action, as well as any and all copies, abstracts and summaries (the "Discovery Materials"). Any person, other than the producing party, who shall obtain access to Discovery Materials shall use such Discovery Materials only in connection with the prosecution or defense of the above-captioned action and for no other purpose whatsoever.

2.    Scope.

(a)    All documents and information furnished by a party in conjunction with this litigation which contain or disclose trade secrets or other confidential research, development, or commercial information ("Confidential Information") may be designated CONFIDENTIAL by

said party and furnished to the other parties pursuant to the terms of this Order. The party receiving designated Confidential Information shall treat it as proprietary information and shall not use or disclose the information except for the purposes set forth in this Order or such orders as may be issued by the Court during the course of this litigation. The provisions of this Order extend to all designated Confidential Information regardless of the manner in which it is disclosed, including but not limited to documents, interrogatory answers, responses to requests for admissions, deposition transcripts, deposition exhibits, and any other discovery materials produced by a party in response to or in connection with any discovery conducted in this litigations, and any copies, notes, abstracts or summaries of the foregoing materials.

(b)    A party may not designate as "Confidential" information contained in documents which are already in the possession of a third party even if the documents contain the party's "Confidential" information.

(c)    The designation of information as "Confidential" shall constitute a representation that such document, material or information has been reviewed and that there is a good faith basis for such designation.

3.    Designation of Confidentiality. Pursuant to paragraph 2 above, documents or information may be designated CONFIDENTIAL withing the meaning of this Order in the following ways:

(a)    In the case of documents and the information contained therein, designation shall be made by means of the following legend placed on each page of any such document: "CONFIDENTIAL" or "CONFIDENTIAL PURSUANT TO COURT ORDER."

(b)    In the case of interrogatory answers, responses to request for admissions and the information contained therein, designation shall be made by means of a statement in the

2

answers or responses specifying that the answers or responses or specific parts thereof are designated CONFIDENTIAL. The following legend shall be placed on the front of any set of interrogatory answers or responses to requests for admission containing Confidential Information: "CONTAINS CONFIDENTIAL INFORMATION."

      (c)    In the case of depositions and the information contained in depositions and the information contained in depositions (including exhibits), designation of the portions of the transcript (including exhibits) which contain Confidential Information shall be made by a statement to such effect on the record in the course of the deposition by counsel for the party or witness producing such information, or by letter from such counsel within thirty (30) days of receipt of the deposition transcript or copy thereof (or written notification that the transcript is available), or within thirty (30) days of the entry of this Order, whichever is later. The entire deposition transcript (including exhibits) shall be treated as Confidential under this Order until the expiration of the above-referenced thirty-day period for designation by letter, except that the deponent may review the transcript of his or other own deposition during this thirty-day period. The following legend transcript and each copy of the transcript containing Confidential Information: "CONTAINS CONFIDENTIAL INFORMATION." If all or part of a videotaped deposition is designated as CONFIDENTIAL, the videocassette or other videotape container shall be label with the legend provided for in paragraph 2(a) above.

      (d)    To the extent that matter stored or recorded in the form of electronic or magnetic media (including information, files, databases or programs stored on any digital or analog machine-readable device, computers, discs, networks or tapes) ("Computerized Material") is produced by any party in such form, the producing party may designate such matters as CONFIDENTIAL by cover letter referring generally to such matter. Whenever any party to

whom Computerized Material designated as CONFIDENTIAL is produced reduces such material to hardcopy form, such party shall mark such hardcopy form with the legend provided for in paragraph 3 (a) above.

(e)    To the extent that any party or counsel for any party creates, develops or otherwise establishes on any digital or analog machine-readable device, recording media, computers, discs, networks or tapes any information, files, databases or programs that contain information designated CONFIDENTIAL, that party and/or its counsel must take all necessary steps to insure that access to that electronic or magnetic media is properly restricted to those person who ,by the terms of this Order, may have access to Confidential Information.

(f)    All documents and materials filed with the Court containing or reflecting the contents of Confidential Information shall be filed in sealed envelopes or other appropriate sealed containers on which shall be endorsed the caption to the Litigation, a generic designation of the contents, the words CONFIDENTIAL INFORMATION – SUBJECT TO COURT ORDER and words in substantially the following form:

> This envelope contains documents which are filed under seal in
> this case by [name of party] and, by Order of this Court, dated ___,
> 2001, shall not-be opened nor, the contents displayed or revealed
> except as provided in that order of by further order of the Court.

Any pleading or other paper required to be filed under seal pursuant to this Paragraph shall also bear the legend "FILED UNDER SEAL" in the upper-right hand corner of the cover page of the document. Only whose portions of such documents and materials containing or reflecting Confidential Information shall be considered Confidential and may be disclosed only in accordance with this Order. Where possible, only those portions of such filings which are Confidential Information shall be filed under seal. No party or other person may have access to

4

any sealed document from the files of the Court without an order of the Court. The "Judge's Copy" of a sealed document may be opened by the presiding District Judge, his law clerks and other Court personnel without further order of the Court. Each document filed under seal may be returned to the party which filed it (1) if no appeal is taken, within ninety days after a final judgement is rendered, or (2) if an appeal is taken, within thirty days after the mandate of the last reviewing court which disposes of this litigation in its entirety is filed ("the final resolution of this litigation"). If the party which filed a sealed document fails to remove the document within the appropriate time frame, the document may be destroyed by the Clerk. Regardless of any provision in this Order to the contrary, a party does not have to file a document under seal if the Confidential Information contained or reflected in the document was so designated solely by that party.

    4.   <u>Use of Confidential Information</u>. Any confidential Information received by a party shall be used by that party solely for the purpose of conducting this litigation, <u>United States of America ex rel. David Franklin v. Parke-Davis, Division of Warner-Lambert Co.</u>, No. 96-11651-(PBS), pending in the United States District Court of Massachusetts and shall in no event be used for any business, competitive, personal, private, public or other purpose, except as required by law. If the use of Confidential Information is required by law, the person using such information shall give notice to counsel for the producing party in accordance with paragraph 14 below. This paragraph applies to all persons, corporate entities, and all governmental bodies, including the United States Government (including any agency, subdivision, or department thereof, as well as the United States Attorney's Office).

5.   <u>Disclosure of Confidential Information</u>.  Access to information designated CONFIDENTIAL pursuant to this Order shall be limited to:

(a)     counsel for the parties (including members or associates of such counsel's firm) or in-house counsel for the parties, as well as their paralegal, investigative, secretarial and clerical personnel who are engaged in assisting such counsel in this litigation;

(b)     outside photocopying, data processing or graphic production services employed by the parties or their counsel to assist in this litigation;

(c)     any outside expert, consultant or investigator who is not employed by or affiliated with any party or an affiliate of a party and is retained by counsel for the purposes of consulting, and/or testifying in this litigation, provided that paragraph 7 of this Confidentiality Order has been complied with;

(d)     any party or any director, officer or employee of a party charged with the responsibility for making business decision dealing directly with the resolution of this action;

(e)     any person who authored or received the particular material sought to be disclosed to that person;

(f)     any person currently or formerly employed by the producing or receiving party if that person had regular access to the information contained in the particular confidential material sought to be disclosed to that person during the term of that person's employment with the party that produced or received the Confidential Material, provided that paragraph 7 of this Order has been complied with;

(g)     deponents, trial or hearing witnesses and their counsel in preparation for and/or during deposition or trial hearings, provided that paragraph 7 of this Order has been complied with;

6

(h)    this Court or any other Court exercising jurisdiction with respect to this litigation, Court personnel, jurors, alternate jurors, and qualified person (including necessary clerical personnel) recording, taking or transcribing testimony or argument at any deposition, hearing, trial or appeal in this litigation;

(i)    any other person to whom the party producing the information agrees in writing or on the record in advance of the disclosure, provided that paragraph 7 of this Order has been complied with;

(j)    employees of the Department of Health and Human Services and its Health Care Financing Administration, provided that paragraph 7 of this Order has been complied with;

(k)    state Medicaid administration officials, provided that paragraph 7 of this Order has been complied with; and

(l)    the United States, and any agency, subdivision, or department thereof, including but not limited to, the United States Attorney's Office, provided that paragraph 7 of this Order has been complied with.

6.    Intentionally Omitted.

7.    Notification Of Protective Order.    Confidential Information shall not be disclosed to person described in paragraphs 5(c), 5(f), 5(g), 5(i), 5(j), 5(k) or 5(l) unless and until such person has executed an Agreement of Confidentiality ("Agreement") in substantially the form attached hereto as Exhibit A.  The originals of such Agreements shall be maintained by counsel for the party who obtained them until the final resolution of this litigation.  Agreements shall not be subject to discovery except upon agreement of the parties or further order of the Court after application upon notice and good cause shown.

7

8.   Objections to Designations.  A party shall not be obligated to challenge the propriety of a Confidential Information designation at the time made, and a failure to do so shall not preclude a subsequent challenge thereto.  In the event a party objects to the designation under this Order by another party of any material, the objecting party shall consult with the designating party to attempt to resolve their differences.  If the parties are unable to reach an accord as to the proper designation of the material, the objecting party may apply to the Court for a ruling that, the material shall not be so treated, giving notice to the party which has designated the material.  If such a motion is made, the designating party would have the burden to establish that the designation is proper.  If no such motion is made, the material will remain as designated.  Any documents or other materials that have been designated Confidential shall be treated as Confidential until such time as the Court or any magistrate to whom this matter is assigned rules that such material should not be treated as Confidential.

9.   Use of Confidential Information at Trial or Hearing.  Unless otherwise directed by the Court, a party may, subject to the rules of evidence and further orders of the Court, use any Confidential Information for any purpose at trial or at any hearing before a judicial officer in this litigation.

10.   Preservation of Rights and Privileges.  Nothing contained in this Order shall affect the right, if any, of any party or witness to make any other type of objection, claim, or other response to discovery requests, including, without limitation, interrogatories, requests for admissions, requests for productions of documents or questions at a deposition.  Nor shall this Order be construed as a waiver by any party of any legally cognizable privilege to withhold any

8

Confidential Information, or of any right which any party may have to assert such privilege at any state of this litigation.

11.   Return of Materials. Withing forty-five (45) days after the final resolution of this litigation, all Confidential Information, including all copies, abstracts and/or summaries, shall be returned to counsel for the party that produced it or, if the producing party's counsel so requests, destroyed. As to those materials that contain or reflect Confidential Information, but that constitute or reflect counsel's work product, counsel of record for the parties shall be entitled to retain such work product in their files in accordance with the provisions of this Order, so long as it is clearly marked to reflect that it contains information subject to the Protective Order. Counsel shall be entitled to retain pleadings, affidavits, motions, briefs, other papers filed with the Court, deposition transcripts, and the trial record (including exhibits) even if such materials contain Confidential Information, so long as such Confidential Information, in accordance with the provisions of this Order, are clearly marked to reflect that they contain information subject to a Protective Order.

12.   The inadvertent or unintentional disclosure by the producing party of Confidential Information, regardless of whether the information was so designated at the time of disclosure, shall not be deemed a waiver in whole or in part of a party's claim of confidentiality, either as to the specific information disclosed or as to any other information relating thereto or on the same or related subject matter. Upon learning of an inadvertent or unintentional disclosure of Confidential Information, the producing party shall within thirty (30) days designate such information as Confidential. The obligation to treat such information as Confidential shall run prospectively from the date of designation. Nothing contained within this paragraph prevents a

9

party from challenging such a designation of documents or information pursuant to the procedures contained in paragraph 8.

13.    A party's compliance with the terms of this Order shall not operate as an admission that any particular document is or is not (a) confidential, (b) privileged or (c) admissible in evidence at trial.

14.    Any party or person who has been furnished with documents designated Confidential Information pursuant to this Order who receives a subpoena (or other process) from any person (including natural persons, coronations, partnerships, firms, governmental agencies, departments or bodies, boards or associations) who is not a party to this Order, which subpoena seeks productions or to her disclosure of such Confidential Information, shall promptly and in any case by the close of the next business day give telephonic notice and written notice by overnight delivery or facsimile to counsel for the party who produced or designated the materials as confidential, identifying the material sought and enclosing a copy of the subpoena or other process. The party or person receiving the subpoena shall also inform the person seeking the Confidential Information that such Information is subject to this Order. No production or other disclosure of such information pursuant to the subpoena or other process shall occur before (a) ten (10) days following the date on which notice is given or (b) the return date of the subpoena.

15.    Non-parties who are obliged in this litigation to provide discovery by deposition, production of documents or otherwise, may request the protection of this Order as to said non-party's own Confidential Information. The provisions of this Order shall be binding on the non-party requesting the protection of this Order.

16.    Upon the final resolution of this litigation, the provision of this Order shall continue to be binding.  This Court expressly retains jurisdiction over this action for enforcement of the provisions of this Order following the final resolution of this litigation.

17.    This Order is binding on all parties to this action and on all non-parties who have been served with a copy of this Order, and shall remain in force and effect until modified, superseded, or terminated by consent of the parties or by Order of the Court.


Dated: December __, 2001


_____
United States District Judge

11

EXHIBIT A

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA <br> ex rel. DAVID FRANKLIN, <br><br> Plaintiff, <br><br> - against - <br><br> PARKE-DAVIS, DIVISION OF <br> WARNER-LAMBERT COMPANY, <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) Civil Action <br> ) No. 96-11651-PBS <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

### CERTIFICATION

1.      My name is _____. I live at

_____. I am employed as

(state position) _____ by (state name and address of

employer)_____.

2.      I have read the Protective Order (the ("Order") that has been entered in this case,

and a copy of it has been given to me. I understand the provisions of the Order, and agree to

comply with and to be bound by its provisions.

3.      I declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct.

Executed this ___ day of _____, _____.


_____


12

5

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

```
----------------------------------
DAVID FRANKLIN, UNITED STATES  :      Civil Action
OF AMERICA, EX REL.            :      No. 96-11651-PBS
                               :
        v.                     :      Courtroom No. 13
                               :      1 Courthouse Way
PARKE-DAVIS, DIVISION OF       :      Boston, MA 02210-3002
WARNER-LAMBERT COMPANY         :      2:40 p.m., Monday
----------------------------------   January 8, 2001
```

Motion Hearing


Before:  THE HONORABLE PATTI B. SARIS, District Judge


APPEARANCES:

Greene & Hoffman, P.C., (by Thomas M. Greene, Esq, Thomas M.
  Hoffman, Esq. and Michael Tabb, Esq.),
  125 Summer Street, Boston, MA 02110,
  on behalf of the Plaintiff.

Davis, Polk & Wardwell, (by James P. Rouhandeh, Esq. and
  James E. Murray, Esq.),
  450 Lexington Avenue, New York, NY 10017,
  on behalf of the Defendant.

Hare & Chaffin, (by David B. Chaffin, Esq.),
  160 Federal Street, Boston, MA 02110-1701,
  on behalf of the Defendant.

Thomas E. Kanwit, Assistant United States Attorney,
  1 Courthouse Way, Boston, MA 02210-3002,
  on behalf of the Government.


Marie L. Cloonan
Official Court Reporter
1 Courthouse Way - Suite 5209
Boston, MA 02210-3002 - (617)4326-7086
Mechanical Steno - Transcript by Computer

38

1          THE COURT:  Let's say without that?

2          MR. KANWIT:  Without that?  The doctor's decision,

3     in his or her medical judgment to prescribe a drug, whether

4     it's on-label or off-label, has nothing to do with the False

5     Claims Act.  Parke-Davis cannot market to the doctors,

6     expecting the doctors to say:  Oh, whoa, wait a minute, this

7     is a Medicaid patient, this patient can't get off-label use.

8          THE COURT:  But your position taken -- let's parse

9     off the kickbacks, let's parse off all the alleged false and

10    fraudulent information about testing and experimentation,

11    and all of that, just serious claims.  If I'm moving that

12    away for a minute, if all you have is a national marketing

13    campaign about off-label uses, why isn't that just a

14    violation of the Food and Drug Act unless there is something

15    false about it?

16         MR. KANWIT:  Because, your Honor, what it's doing

17    is causing this submission for false or fraudulent claim.

18    The claim that is ultimately submitted --

19         THE COURT:  But then you're saying every violation

20    of that Act is essentially going to come down to that, or

21    most of them.

22         MR. KANWIT:  Every violation of the Food Drug

23    Cosmetic Act?  No.  No, not necessarily.  There could be --

24    it might be that a private insurer would reimburse for this.

25         THE COURT:  But, let's face it.  In today's world,

43

1   appropriate here.

2           Essentially, the government is taking the side of

3   the plaintiffs in saying that to the extent that there is a

4   national marketing campaign to use drugs in an off-label

5   kind of way, given the fact that it's almost certain some

6   piece of that is going to be a submission to the federal

7   government, that, in and of itself, is enough to state a

8   claim for a false claim.

9           I don't know if I could get that far.

10          MR. KANWIT:  I think if we're not there, we're

11  really close to there.  I'd have to think through.  There

12  has to be some sort of claim on the federal fisc as a

13  foreseeable result.  And what the Court is suggesting is,

14  that that's a virtual certainty, and I agree, that in these

15  kind of national schemes, it is a virtual certainty.  And I

16  think the fact that there is a statutory scheme under the

17  Food Drug and Cosmetic Act and separate False Claim Acts,

18  that's fine.

19          THE COURT:  I agree with that, but I need the false

20  claim.  And so, basically, nothing in the marketing was

21  false.

22          MR. KANWIT:  Well, I disagree with that.

23          THE COURT:  Why?

24          MR. KANWIT:  There are things in the marketing that

25  is false.

48.

1  liable for a doctor deciding whether or not to write

2  something additional on his prescription pad?  All it would

3  have taken for these claims never to have been made was for

4  a doctor to write, "This is for pain" or "This is for

5  an off-label use."  And absent an allegation that we were

6  trying to get doctors to do that or to not do that, I don't

7  see how a company should be liable for inducing a false

8  claim to be made when there is no allegation that we

9  attempted to effect that.

10        And, in fact, there's one thing that they pointed

11  to --

12        THE COURT:  Why do I have to get that from you?

13  They've got a subset.  I'm not sure I'm willing to go to the

14  limits that they're asking me to go to, either.  But, they

15  basically claim it's not just a national marketing campaign

16  about off-label which is totally honest.  They are saying

17  that it's in conjunction with this kickback scheme.

18        MR. ROUHANDEH:  Your Honor, that fails as well.

19        But, I do want to make one final point on this

20  inducement point --

21        THE COURT:  Yes.

22        MR. ROUHANDEH:  -- because they pointed to one

23  example.  They pointed to -- they referred to an example of

24  a situation where there was some attempt to tell the doctor

25  what to write down on the prescription pad, just write

1          MR. ROUHANDEH:  It's 55 boxes.

2          THE COURT:  Right.  Give it to them next week.

3          MR. ROUHANDEH:  Sure.

4          THE COURT:  I mean, there's nothing so sacred about

5     this week versus next week.  So, just give it to them

6     stamped the way you want.  And, in the meantime, I'll refer

7     it to a Magistrate Judge who can work out the terms if

8     you're upset about one term versus another.

9          MR. TABB:  There are only two points, your Honor.

10    Plus, there's -- That's not the only discovery dispute that

11    we have.  There are only two points on the protective order

12    that need to be hashed out.

13         One is the government and is the government allowed

14    to see those documents.  We believe that we are representing

15    the government and that the U. S. Attorney should be

16    entitled to see those documents.

17         THE COURT:  Yes, but it would be walled off from

18    the criminal side.

19         MR. TABB:  So, that is one thing.

20         The second thing, your Honor, has to do with how we

21    are going to use the information in the document which goes

22    to how we can prove this case, which goes to the broadness

23    of what these claims are, your Honor.

24         And it also goes to the 9(b) questions of what

25    information do they have that -- and it will also go to the

59

1    other question of the scope of what's here.

2             THE COURT:  What do you want?

3             MR. TABB:  The question, your Honor, goes to -- the

4    concern we have, your Honor, is can we disclose -- what we

5    are looking for from the documents is the identity of the

6    physicians who have been marketing.

7             THE COURT:  All right.

8             MR. TABB:  In other words, who did they contact?

9    Who did they give tickets to?

10            THE COURT:  All right.

11            MR. TABB:  Who did they contact?  We want to be

12   able to take the lists of names -- not the documents -- but

13   we want to be able to take that list of names and the dates

14   they were contacted and we want to be able to give them to

15   the states.

16            Once we have given that information to the states

17   -- the information, not the documents -- the states can

18   determine whether or not those marketing contacts, whether

19   the person had written off-label Neurontin before or written

20   off-label Neurontin after.

21            We believe that you will see from numerous

22   documents -- this is how we plan to prove the case -- that

23   before they were contacted, they never wrote off-label

24   Neurontin.  After they were contacted, after they were paid,

25   after they were attending conferences, they did write

60

1    off-label Neurontin.

2            THE COURT:  Well, what would stop you from doing

3    that?

4            MR. TABB:  That's the question that we have here.

5    Can we give the names and the identities of the doctors and

6    the dates of the contacts to the states so that we can get

7    that information so that we can prove the case?  Can prove

8    that, in fact, it caused these people to write

9    prescriptions.

10           MR. ROUHANDEH:  We're not attempting to prevent

11   that from occurring.  There are simple procedures.  The

12   protective order perfectly allows anybody who's a witness,

13   anybody who's seen these documents, to provide that

14   information to them.  It's absolutely standard protective

15   order that we've entered, you know, 25, 50 times, obviously

16   subject to your Honor's approval, but the protective order

17   permits them to take information they get from us to use for

18   purposes of this litigation.

19           If they're trying to do something outside of

20   discovery without giving us notice or perhaps --

21           THE COURT:  What are you talking about?  If they

22   get names from the documents and they want to call up the

23   states, they could do it without telling you.

24           MR. ROUHANDEH:  That's fine.  But, before they show

25   any documents to anybody, they have to get those parties to

61

1   agree to the confidentiality order.  Otherwise --

2           THE COURT:  Sure.

3           MR. ROUHANDEH:  -- and that's the provision we're

4   talking about it

5           THE COURT:  Of course.

6           Now, let me deal with it.

7           MR. ROUHANDEH:  The other argument was the

8   government -- the government has the 55 boxes of documents.

9           THE COURT:  All right.  The government has the 55

10  boxes.

11          MR. ROUHANDEH:  We're not trying to prevent these

12  two parties from talking to one another.

13          THE COURT:  All right.  So, then, that issue is

14  moot.

15          So, now what's left?

16          MR. GREENE:  Your Honor?

17          THE COURT:  Don't you guys all talk?

18          MR. ROUHANDEH:  In fact, your Honor, before that

19  motion to compel was made, there was about a ten-minute

20  conversation and that was it.

21          It was our position that if we just had a

22  meaningful meeting to confer, we would take less time with

23  your Honor.

24          THE COURT:  All right.  So, meet and give me a

25  proposed order.

6

# DAVIS POLK & WARDWELL

1300 I STREET, N.W.
WASHINGTON, D.C. 20005

1600 EL CAMINO REAL
MENLO PARK, CA 94025

99 GRESHAM STREET
LONDON EC2V 7NG

450 LEXINGTON AVENUE
NEW YORK, N.Y. 10017
212-450-4000
FAX 212-450-3800

WRITER'S DIRECT
(212) 450-4084

15. AVENUE MATIGNON
75008 PARIS

MESSETURM
60308 FRANKFURT AM MAIN

17-22, AKASAKA 2-CHOME
MINATO-KU, TOKYO 107-0052

3A CHATER ROAD
HONG KONG

October 26, 2001

<u>Via Facsimile and First Class Mail</u>

Re:    United States ex rel. Franklin v. Warner-Lambert
       C.A. No. 96-11651-PBS

Thomas M. Greene, Esq.
Greene & Hoffman, P.C.
125 Summer Street, 14th Floor
Boston, MA 02110

Dear Mr. Greene:

On behalf of Defendant Parke-Davis, division of Warner-Lambert Company (the "Company"), this letter will respond to your letter dated October 12, 2001, which we received by regular mail on October 17, 2001.

With respect to confidentiality designations on documents that have previously been produced on an "attorney's eyes only" basis, we currently intend to provide another copy set of the documents, some of which will bear a "Confidential" stamp pursuant to the protective order that is entered by the Court. We intend to provide this second copy set on a rolling basis, commencing after the protective order is entered. We will also provide you with an invoice for the copying costs for both sets

With respect to your questions regarding information that is contained in confidential documents, we respond as follows. First, we disagree with your characterization of our position at the January 7, 2001 hearing. We certainly did not agree that you could provide to third parties the names of physicians that you obtain from confidential Company documents without following the procedures in our proposed protective order. We also cannot agree with your blanket assertion that none of the information you describe in categories 1 through 5 is ever confidential. We strongly object to any attempt on your part to circumvent the proposed protective order – which applies to the information contained in the documents as well as to the physical documents themselves (see, e.g., paragraph 2) – by simply conveying the Company's confidential information to third parties orally.

Thomas M. Greene, Esq.                    2                    October 26, 2001

Please call me at your convenience if you would like to discuss these matters further.

Very truly yours,

James E. Murray

7

# GREENE & HOFFMAN

### PROFESSIONAL CORPORATION

### COUNSELLORS AT LAW

TELECOPIER
(617) 261-3558

E-MAIL
GREHOF@EROLS.COM

125 SUMMER STREET, 14TH FLOOR
BOSTON, MASSACHUSETTS 02110
(617) 261-0040

October 12, 2001

Mr. James P. Rouhandeh, Esq
Davis Polk & Wardell
450 Lexington Avenue
New York, New York 10017

Re: United States ex. rel. Franklin v. Parke-Davis

Dear Mr. Rouhandeh:

With the issuance of the protective order in the immediate future, we are writing to ask how you intend to identify those documents in the 62 boxes already produced that you assert qualify as "Confidential" under the Confidentiality Order. As you are aware, there was no effort to segregate non-confidential from confidential material in the initial production, and you have previously indicated that you had no intent to subject all of the documents to confidentiality. Are you planning to replace the current documents with new documents containing a new legend? More importantly, when will you be able to make the designation? It is important for us to know which documents are subject to the confidentiality provisions as early as is feasible.

We also have questions regarding what Parke-Davis considers confidential information within documents it intends to mark as confidential. As you are aware, numerous documents evidence contacts between Parke-Davis (or its agents) and physicians who prescribed Neurontin. Presumably, Parke-Davis contends that at least some of these should be "Confidential". At the January 7, 2001 hearing you specifically stated that you had no objection to us sending to the state Medicaid programs names of physicians and dates of contacts that we derived from boxes produced by Parke-Davis without requiring the states to sign off on the protective order. (Transcript of Proceedings, January 7, 2001 at 60 - 61). Would Parke-Davis's position be any different if the communications to the states included additional information, such as:

1.    The amounts received by physicians in connection with any contact.

2.    The date and/or location of the "event" or "program" (if any) that resulted in the contact between the physician and Parke-Davis (or its agents).

3.     The name or title of the "event" or "program", and a description of the event.

4.     A description of any written materials distributed to physician-speakers at such an "event" or "program".

5.     A description of any written materials distributed to physician-attendees at such an "event" or "program" ?

We do not understand such information to be confidential commercial information protectable under Rule 26, even if such information is contained in a document that otherwise contains "Confidential Information". Please let us know if that is your understanding so we can resolve any disputes as soon as possible.

Very truly yours,

Thomas M. Greene