# EXHIBIT B

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA<br>ex rel. DAVID FRANKLIN, | ) | |
| | ) | |
| Plaintiff | ) | Civil Action No. 96-11651-PBS |
| v. | ) | |
| | ) | |
| PARKE-DAVIS, DIVISION OF<br>WARNER-LAMBERT COMPANY, | ) | MEMORANDUM IN SUPPORT OF<br>RELATOR'S MOTION TO COMPEL<br>PRODUCTION OF DOCUMENTS |
| | ) | |
| Defendant | ) | |

### INTRODUCTION TO THE DISCOVERY DISPUTE

On August 22, 2000, David Franklin (the "Relator") served his First Request for Production of Documents ("First Request") on Defendant Warner-Lambert. On largely frivolous grounds, Warner-Lambert has objected to the First Request, and has not produced even a single piece of paper in response.

On November 28, 2000, at about 10:00 am, a telephonic conference was conducted to resolve this discovery dispute pursuant to Local Rule 37.1.[1] Thomas Greene of Boston was present for the Relator; James Murray of New York, along with an undisclosed associate, was present for the Defendant. Warner-Lambert indicated that it would produce "approximately 55 boxes" to the Relator. These boxes, which were compiled and segregated prior to service of the complaint on the Defendant, constitute Warner Lambert's response to requests by the Government for production of documents, and are the subject of Relator's Second Request for Production of Documents ("Second Request"). The Relator does not agree with the Defendant's position that production of these documents, responsive to the Second Request, would satisfy Defendant's obligation to produce all documents responsive to the First Request. The scope of

---

[1] The conference lasted approximately 15 minutes.

the First Request is considerably broader, both in the time frame and the nature of the documents sought.[2] At a minimum, a diligent search by Warner-Lambert is needed to determine the precise quantum of responsive documents that are not included in those "approximately 55 boxes."

Furthermore, the Relator does not agree with Defendant's position that <u>no documents</u> need be produced while there is a motion to dismiss pending. This position is firmly at odds with the efforts expended by the Defendant to depose the Relator over four full-days and is fundamentally unfair in light of the fact that Warner-Lambert has benefited from the production of every single discoverable document within the Relator's possession.

Thus the issue to be decided by this court is whether Defendant Warner-Lambert is obligated to search for and produce all documents that are responsive to the Relator's First Request for Production of Documents, and whether it has failed to carry out this obligation.

## NATURE OF THE CASE

This is a *qui tam* case in which the Relator, a former employee of Warner-Lambert, alleges that Warner-Lambert engaged in a scheme to market and sell its drug product, Neurontin, for *off-label* uses in order to defraud Medicaid and other prescription drug benefit providers. The Relator's First Request for Production of Documents is narrowly tailored, limited primarily to the marketing and promotional activities of Warner-Lambert with respect to Neurontin and Accupril. Specifically, the Relator has alleged that the Defendant concocted a scheme to promote *off-label* uses of Neurontin and Accupril and implemented the scheme with the use and assistance of the company's specially trained Medical Liaisons. Through these and other marketing and promotional activities, Warner-Lambert knowingly caused physicians to write *off-label* prescriptions for Neurontin and Accupril that led to the filing of thousands of false claims

---

[2] Although Mr. Murray conceded that the First and Second Requests differed in scope to some extent, he stated that he was not aware of any investigation to determine precisely what documents, apart from the "approximately 55 boxes" already produced to the government, were in fact responsive to the First Request.

under the Medicaid program. To effectuate its plan, Warner-Lambert targeted specific physicians with large practices that could potentially generate large numbers of prescriptions, and aggressively promoted *off-label* uses of Neurontin and Accupril to these targeted physicians. In so doing, Warner-Lambert deliberately violated FDA regulations and exploited Medicaid's inability to recognize that claims for "non-medically accepted indications" were being submitted.

Accordingly, Relator has requested specific categories of documents concerning the following: documents concerning the Medical Liaison program; the identities of physicians targeted by Defendant's Medical Liaisons, described by the Defendant as "key influencers" and "movers and shakers"; documents, both internally generated as well those produced by consulting services, that identify and track physician prescription writing practices both prior to and subsequent to the physician's exposure to the *off-label* promotional event ("cold-call" visit, dinner meeting, preceptorship, shadowing program, speaker bureau presentation, symposium, etc.); documents describing marketing, and promotion of Neurontin and Accupril; voicemail recordings and email transmissions concerning the marketing, promotion and sales of Neurontin and Accupril; documents showing payments, remunerations, gifts and gratuities to physicians for participation in preceptorships, shadowing programs, consulting services, case studies, speaker bureau programs, and clinical trials concerning Neurontin and Accupril; documents authored by the Neurontin Disease Team, the Accupril Disease Team and the Core Marketing Team that refer to approved uses, *off-label* uses and emerging uses of Neurontin and Accupril.

Relator has personal knowledge that the above-mentioned categories of documents exist—in fact, this lawsuit was commenced based on Relator's exposure to precisely these sorts of documents. Furthermore, this information is clearly relevant to a central issue in this case: by what means did Warner-Lambert cause false claims to be paid through Medicaid.

3

<u>ARGUMENT</u>

Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action. Fed. R. Civ. P. 26 (b)(1). The information sought need not be admissible if the information sought appears reasonably calculated to lead to the discovery of admissible evidence. <u>Id</u>. A defendant has a duty to produce documents undisputedly in its possession when such documents are relevant, the plaintiff is in need of the documents, and the plaintiff has no other access to them. <u>Kozlowksi v. Sears, Roebuck and Co.</u>, 73 F.R.D. 73, 76 (D. Mass. 1976). As set forth below, the documents that Warner-Lambert refuses to produce are relevant to whether the company caused false claims to be submitted to Medicaid.

Warner-Lambert's objections in this regard are largely frivolous.[3] Warner-Lambert objects generally to the temporal scope of the Document Request, which in most cases is "from January 1, 1994, to the present." However, Warner-Lambert was authorized by the FDA to begin marketing Neurontin on January 1, 1994.[4] From that day to the present, Warner-Lambert has been lawfully able to market Neurontin to physicians for its approved use, and has been receiving reimbursement for every Neurontin prescription written for a Medicaid patient by a physician.

Interestingly, Warner-Lambert is silent as to what it considers the relevant time period to be in this case. The company offers no reason, nor could it possibly, why some periods of time

---

[3] For example, Warner-Lambert objects to the way the terms "Parke-Davis" and "Warner-Lambert" are defined. These definitions, however, are virtually identical to those drafted by Warner-Lambert's own counsel as part of the drug company's own request for production that was served on the Relator on July 3, 2000. This *Alice-In-Wonderland* assertion that the terms "Parke-Davis" and "Warner-Lambert" could have one set of meanings when the Defendant is requesting documents, and another when the Defendant is forced to produce documents, is also frivolous.

[4] In several requests, Relator seeks documents dating back to either 1988 or 1992. As will be discussed below, these time periods are also relevant to key pre-marketing and strategic planning activities of the Defendant.

4

during which Medicaid claims were made might be relevant, while other periods of time, during

which Medicaid claims were also being made, would not be relevant.

It cannot be disputed that all requested documents are in the possession of Warner-

Lambert. Furthermore, the Relator cannot obtain these documents from any other source. Based

on the Relator's demonstrable need for the documents he has requested, they should be

produced. See Kozlowski, 73 F.R.D. at 76.

With respect to individual document requests, the Relator states the following:

**Document Request No. 1**: The following Documents referenced in pages 3 and 4 of
Defendant Warner-Lambert Company's Memorandum of Law in Opposition to the
Government's Motion for a Stay of Civil Discovery:
(a) the "letter request" sent from the Food and Drug Administration to Warner-Lambert
on July 19, 1996 ("FDA Letter"); and
(b) the "subpoena from the Department of Veterans Affairs, Office of the Inspector
General" dated October 23, 1997 (the "VA Subpoena").

**Response to Document Request No. 1**: Warner-Lambert objects to Document Request
No. 1 on the grounds that it seeks documents outside the time period relevant to this litigation.
Subject to and without waiving the foregoing objections, Warner-Lambert will produce the letter
request from the Food and Drug Administration, dated July 19, 1996, and the subpoena from the
Department of Veterans Affairs, Office of the Inspector General, dated October 23, 1997, once
an appropriate confidentiality stipulation is entered into among the parties and so ordered by the
Court.

ARGUMENT FOR REQUEST NO. 1: Inexplicably, Warner-Lambert refuses to produce

the FDA Letter and the VA Subpoena in the absence of a signed confidentiality agreement.

Because these documents constitute requests for information by government entities, which were

not privy to any confidential information *at the time such entities requested the information*,

these documents cannot possibly contain any confidential information. A document is not

confidential unless it reveals "a trade secret" or other "commercial information". See F.R.C.P.

26(c)(7). On its face, however, Warner-Lambert's claim of confidentiality is absurd. Even

under the most generous standard, the FDA Letter and the VA Subpoena do not contain any

5

information which is known only to Warner-Lambert or which has any "value" to the company.

See Picker International Corp. v. Imaging Equipment Corp., 931 F. Supp. 18, 23 (D. Mass. 1995). While Warner-Lambert's desire for secrecy is understandable—quite possibly because the documents are incriminating—the FDA Letter and the VA Subpoena are not confidential and should be produced.

**Document Request No. 2:** All feasibility studies, and/or budgetary plans and/or budgetary requests that refer to the use of and/or seek budgetary approval for the use of Medical Liaisons and/or seek budgetary approval for the use of Medical Liaisons and/or the Medical Liaison program for the time period of 1988 to the present date.

**Response to Document Request No. 2:** Warner-Lambert objects to Document Request No. 2 on the grounds that it is overly broad, unduly burdensome, seeks documents outside the time period relevant to this litigation and seeks documents that are not relevant to this litigation.

**Document Request No. 3:** All documents that reference requests for funding for use of Medical Liaisons and/or the Medical Liaison program for the time period of 1988 to the present date.

**Response to Document Request No. 3:** Warner-Lambert objects to Document Request No. 3 on the grounds that it is overly broad, unduly burdensome, seeks documents outside the time period relevant to this litigation and seeks documents that are not relevant to this litigation.

**Document Request No. 4:** All documents that describe or refer to the role of Medical Liaisons in the marketing, promotion and sales of Neurontin and/or Accupril and/or any drug manufactured by the Defendant for the time period of 1988 to the present date.

**Response to Document Request No. 4:** Warner-Lambert objects to Document Request No. 4 on the grounds that it is overly broad, unduly burdensome, seeks documents outside the time period relevant to this litigation and seeks documents that are not relevant to this litigation.

ARGUMENT FOR REQUEST NOS. 2, 3 & 4:  Defendant's *off-label* promotion program included the use of Medical Liaisons to "cold-call" physicians and promote *off-label* uses to the targeted physicians. The requested documents are likely to contain facts relating to the role, function and purpose of the Medical Liaisons and the stated goals of the Medical Liaison program. So too are the Defendant's internal feasibility studies and budgetary requests concerning use of the Medical Liaisons, which are likely to contain relevant facts that describe

6

the manner in which Medical Liaisons were to interface with physicians, and the resources that would be at their disposal.

All of the documents sought in Request Nos. 2, 3, and 4 will provide facts evidencing the Defendant's illegal scheme to promote *off-label* use of Neurontin and Accupril on a nation-wide basis. Plaintiff has alleged that the aggressive and widespread use of the *off-label* promotion program directly caused Medicaid providers to submit claims for reimbursement for prescription drugs that were not eligible for reimbursement under the Medicaid program. Medical Liaisons played a paramount role in the Defendant's aggressive efforts to promote *off-label* use. Thus documentation regarding the use of Medical Liaisons is clearly relevant.

The documents sought in Request Nos. 2, 3, and 4, dating back to 1988, are relevant. Warner-Lambert must concede that its long history of strategic planning for Neurontin predates FDA approval of the drug and even the filing of its application for FDA approval in January 1992. Ostensibly, Warner-Lambert's planning and product development began in the late-1970s, when the company obtained its primary patent for gabapentin (the chemical name for Neurontin), which it claimed could be used to treat certain forms of epilepsy ("the Epilepsy patent").[5] By the late 1980s, Warner-Lambert had clearly started to consider potential other uses for the gabapentin. On October 12, 1990, Defendant filed a patent application, claiming that gabapentin could be used to treat depression ("the Depression patent").[6] On November 23, 1990, Defendant filed another patent application, this time claiming that gabapentin could be used to treat neurodegenerative disease ("the Neurodegenerative Disease patent").[7]

On January 15, 1992, Warner-Lambert applied for FDA approval to market gabapentin, under the name Neurontin, as a treatment for epilepsy. In so doing, Warner-Lambert

---

[5] United States Patent No. 4, 087, 544, issued May 2, 1978.
[6] United States Patent No. 5, 025, 035, issued June 18, 1991.
[7] United States Patent No. 5, 084, 479, issued January 28, 1992.

deliberately chose *not to seek FDA approval* for the other potential uses for gabapentin such as

depression and neurodegenerative disease.[8]

Considering the amount of money that is at stake (current Neurontin sales are estimated

at $2.5 million *each day*), it is almost certain that Warner-Lambert considered the economic

feasibility of promoting *off-label* uses (versus engaging in the costly clinical trials needed to

garner FDA approval for those same uses) and the added revenue it would receive by selling

Neurontin for these *off-label* uses, *before* any such program was implemented. Thus, even as far

back as 1988, documentation of the feasibility plans and budgetary approval requests are relevant

to Warner-Lambert's scheme to market Neurontin *off-label*. There is no temporal or logical

connection between the planning of the scheme to use Medical Liaisons to market Neurontin

<u>illegally</u> for *off-label* uses and the date that Warner-Lambert was <u>legally</u> permitted to market the

drug for epilepsy (January 1, 1994). Any facts that would demonstrate the existence of

Defendant's scheme to promote *off-label* uses for Neurontin, even prior to FDA-approval of the

---

[8] Warner-Lambert's strategy regarding gabapentin had two significant purposes. First, by confining FDA scrutiny of gabapentin to the most narrow use possible—Neurontin was only evaluated for safety and efficacy in relatively low doses as an adjuvant treatment for epilepsy—Warner-Lambert was able to avoid the costly and expensive clinical trials necessary to get FDA approval for other uses. Nevertheless, Warner-Lambert still planned to market Neurontin for a myriad of *off-label* uses at much higher doses, without conducting any large-scale clinical trials.

Second, by seeking patent protection for many of these other uses, Warner-Lambert hoped to extend the period within which it could exclude competitors. Even with certain statutory extensions, Warner-Lambert's Epilepsy patent was set to expire on January 16, 2000. However, Warner-Lambert's patents covering depression, neurodegenerative disease and bipolar disorder are scheduled to expire well after the Epilepsy patent expires; in particular, the Neurodegenerative Disease patent expires on January 2, 2010. Now, in two separate lawsuits, Warner-Lambert is claiming that manufacturers of generic gabapentin are trying to capitalize on the *off-label* market for Neurontin (currently exceeding 75% of the drug's total use), which would necessarily infringe on one or more of Warner-Lambert's other gabapentin patents. See <u>Warner-Lambert Co. v. Purepac Pharm. Co.</u>, C.A. No. 99-5984 (D.N.J. Aug. 25, 2000); <u>Warner-Lambert Co. v. Apotex Corp.</u>, No. 98 C 4293 (N.D. Ill. April 7, 1999). In both cases, Warner-Lambert has asserted that its Neurodegenerative Disease patent will be infringed by the otherwise lawful manufacture and sale of generic gabapentin. Merely by filing these suits, Warner-Lambert was able to impose an automatic 180-day stay of FDA approval against Purepac and Apotex, thus extending the life of its Neurontin monopoly by an additional six months. In effect, Warner-Lambert is attempting to use its other gabapentin patents to prevent generic manufacturers from lawfully entering the Neurontin market even after the Epilepsy patent's expiration date

drug, are relevant; thus this court should permit discovery of those facts dating back to the inception of the scheme.

**Document Request No. 5:** All videotapes made between 1988 and the present date of Medical Liaison and/or sales representative training session including but not limited to the videotape made at the Ann Arbor Michigan training session attended by David Franklin in April 1996.

**Response to Document Request No. 5:** Warner-Lambert objects to Document Request No. 5 on the grounds that it is overly broad, unduly burdensome, seeks documents outside the time period relevant to this litigation and seeks documents that are not relevant to this litigation.

ARGUMENT FOR REQUEST NO. 5: Relator seeks discovery of all videotapes of Medical Liaison training sessions, including the April 1996 videotape of the Medical Liaison training session that occurred in Ann Arbor, Michigan. Because training session videotapes ostensibly depict the ways in which Medical Liaisons are trained, any such tape made between 1988 and the present date is clearly relevant. One videotaped session in particular is very relevant. Relator has alleged that he attended a Medical Liaison training session on April 16, 1996, in which Defendant's employees emphasized the importance of complying with FDA rules and regulations regarding promotion of *off-label* uses—*while the video camera was taping*—but then urged Medical Liaisons to skirt FDA rules and regulations after the video camera was turned off. See Disclosure, at 8-9.

There can be little doubt that the entire purpose of the videotaped portion of that session was to provide Warner-Lambert with proof of proper training practices for exactly this type of situation, *i.e.* a lawsuit. The Relator is entitled to a copy of the April 16th videotape and any other training session videotapes, because these in themselves, offer proof of the Defendant's own awareness of the illegality of its training and sales efforts.

**Document Request No. 6:** Each and every Neurontin and/or Accupril Key Influencer List from January 1, 1994 to the present.

9

**Response to Document Request No. 6**: Warner-Lambert objects to Document Request No. 6 on the grounds that the term "Key Influencer List" is vague and ambiguous and on the grounds that the Request is overly broad, unduly burdensome, and seeks documents outside the time period relevant to this litigation.

ARGUMENT FOR REQUEST NO. 6: Defendant provided Medical Liaisons with lists

of physicians, with high volume practices and who were potentially heavy prescription-writers,

to "cold-call" and promote *off-label* uses of Neurontin and Accupril. Defendant provided the

Relator with lists of physicians described by Defendant as "thought leaders" or "key influencers"

who could heavily prescribe Defendant's drug products. See Disclosure at 14. These documents

are readily identifiable. See Disclosure, Exhibit D. Thus Warner-Lambert's objection that this

request is vague or ambiguous is without any foundation.

Equally unfounded is the assertion that this request falls "outside the time period relevant

to this litigation." Medical Liaisons specifically targeted doctors, known as "key influencers" or

"thought leaders," for *off-label* promotion. Many of these targeted physicians wrote *off-label*

prescriptions for Medicaid patients between January 1, 1994 and the present, which is the only

period of time that Neurontin could legally be marketed under FDA guidelines, and precisely the

time period that is relevant in this action.

**Document Request No. 7**: Each and every Neurontin and/or Accupril "movers and shakers" list of physicians from January 1, 1994 to the present.

**Response to Document Request No. 7**: Warner-Lambert objects to Document Request No. 7 on the grounds that the term "movers and shakers' list of physicians" is vague and ambiguous and on the grounds that the Request is overly broad, unduly burdensome, and seeks documents outside the time period relevant to this litigation.

ARGUMENT FOR REQUEST NO. 7: Relator alleges that the Defendant made cash

payments to physicians, who were "mover and shakers," to induce physicians to write

prescriptions for Parke-Davis's drugs and promote *off-label* uses to other physicians. The

payments were disguised as fees for participating in so-called "speakers bureaus." See

10

Disclosure at 20-21. As before, there can be little concern about vagueness or ambiguity because the "movers and shakers" lists are clearly identified. See Disclosure, Exhibit M.

These lists are relevant because Plaintiff has alleged that the payments to "movers and shakers," which were made to induce *off-label* promotion of Neurontin and Accupril, constituted illegal kickbacks. Furthermore, many of the prescriptions written by the "movers and shakers" were *off-label* prescriptions for Medicaid patients, claims for reimbursement that were not eligible for coverage under the Medicaid program. Thus any evidence of payments to "movers and shakers" which enticed or caused those physicians to write *off-label* prescriptions for Medicaid patients is clearly relevant.

**Document Request No. 8**: All Xponent data records that list physicians who prescribe and/or potentially prescribe Neurontin and/or Accupril from January 1, 1994 to the present.

**Response to Document Request No. 8**: Warner-Lambert objects to Document Request No. 8 on the grounds that the term "Xponent data records" is vague and ambiguous and that the Request is overly broad, unduly burdensome, seeks documents outside the time period relevant to this litigation and seeks documents that are not relevant to this litigation.

ARGUMENT FOR REQUEST NO. 8:  Defendant tracked prescription writing practices of physicians for both the approved use and the *off-label* use of Neurontin and Accupril. The Defendant referred to this information as "Xponent Data," and it is clearly identified in such a way. See Disclosure, Exhibit F. As Exhibit F demonstrates, Xponent data will allow the Relator to show for each physician tracked: his or her specialty, address, size of practice, and a monthly analysis of "new prescriptions"[9] for *off-label* uses for Neurontin. The data on "new prescriptions" provided the Defendant with precise feedback on its "cold-calling" efforts by showing how many prescriptions an individual doctor was writing for patients who had not been receiving Neurontin before.  This information, in conjunction with other facts, is essential to

---

[9] See Disclosure, Exhibit F (the four right-hand-most columns designated as "NMOT Shr" (New Months of Therapy—Share) indicate the rate of new prescriptions for Neurontin).

prove that Defendant's *off-label* promotion efforts caused physicians to write *off-label*

prescriptions.

**Document Request No. 9**:  All Precision Marketing reports and documents that
reference or pertain to physicians' prescription writing practices for Neurontin and/or Accupril
from January 1, 1994 to the present.

**Response to Document Request No. 9**: Warner-Lambert objects to Document Request
No. 9 on the grounds that the term "Precision Marketing reports" is vague and ambiguous and on
the grounds that the Request is overly broad, seeks documents outside the time period relevant to
this litigation and seeks documents that are not relevant to this litigation.

ARGUMENT FOR REQUEST NO. 9:  This request seeks documents that reference

physicians' prescription writing practices for Neurontin and Accupril. Such documents, whether

referred to as "Xponent data," "Precision Marketing reports" or otherwise, are needed to show

that Defendant's *off-label* promotion efforts caused physicians to write off-label prescriptions.

Warner-Lambert's objection that any data evidencing the changes in the prescription writing

practices of physicians is categorically irrelevant should be dismissed out-of-hand.

**Document Request No. 10**:  Each and every document that summarizes or analyzes the
marketing, promotion sales of Neurontin and/or Accupril for the time period of 1988 to the
present date.

**Response to Document Request No. 10**:  Warner-Lambert objects to Document Request
No. 10 on the grounds that the Request is overly broad, unduly burdensome, seeks documents
outside the time period relevant to this litigation and seeks documents that are not relevant to this
litigation.

ARGUMENT FOR REQUEST NO. 10:  Defendant regularly summarized and analyzed

data about its marketing, promotion and sales efforts for Neurontin and Accupril. Routinely, the

Defendant employed consultants such as Scott-Levin, IMS, and others for that purpose. Relator

seeks discovery of all documents connected to this activity.  These documents will identify the

physician targeted, his or her prescription writing practices regarding Neurontin and Accupril

*both prior to and subsequent to* exposure to the *off-label* promotion.  Because these documents

12

will demonstrate whether or not the Defendant's *off-label* promotion caused targeted physician to

write *off-label,* they should also be produced.

**Document Request No. 11**:  Each and every voicemail recording of phone messages and/or phone conferences sent, received and/or participated in between 1994 and the present date, by and of the following; any Medical Liaison, and/or Phil Majestro, and/or John Ford, and/or William Sigmund, and/or Tony Wilde, and/or John Krukar, and/or Tom Gorga, and/or Mike Valentino concerning marketing, promotion and sales of Neurontin and/or Accupril.

**Response to Document Request No. 11**: Warner-Lambert objects to Document Request No. 11 on the grounds that the Request is overly broad, unduly burdensome, seeks documents outside the time period relevant to this litigation and seeks documents that are not relevant to this litigation.

**Document Request No. 12**: All transcripts, including all drafts of transcripts, of any voice mail referenced in the preceding request.

**Response to Document Request No. 12**: Warner-Lambert objects to Document Request No. 12 on the grounds that the Request is overly broad, unduly burdensome, seeks documents outside the time period relevant to this litigation and seeks documents that are not relevant to this litigation.

ARGUMENT FOR REQUEST NOS. 11 & 12:  As the Relator's Disclosure makes

explicit, Medical Liaisons were trained not to write things down to minimize evidence that might

be discovered by the FDA. See Disclosure at 7. To avoid the creation of incriminating

documents, Parke-Davis sent many communications to its Medical Liaisons and sales

representatives through a voicemail system. Exhibit A to the Disclosure contains transcripts of

actual voicemail messages received and saved by the Relator, which provide clear and

convincing evidence that Parke-Davis promoted *off-label* uses—knowing it was illegal—because

it generated enormous profits for the company.  For example, in one recorded message to

Medical Liaisons, John Ford, Parke-Davis's Director of Marketing, emphasized that

"profitability" was the driving force behind the *off-label* promotion of Neurontin:

> I just have a strategic issue that I want to cover…Phil [Majestro], Mike
> [Valentino, President of the NECBU], John [Krukar, Director of Marketing] and
> myself were sitting around a room, talking about the product line and what we

had to do to market it effectively. And with respect to the Medical Liaisons, I think there's more of an importance -- we decided there was more of an importance to be placed on Neurontin right now. And if you think about it, I guess there's a couple of reasons. The first reason is – it really comes down to the key market issue. If we are going to market Neurontin effectively, we have to do it for monotherapy for epilepsy [*off-label*], also for pain [*off-label*] and bipolar [*off-label*] and other psychiatric uses [*off-label*]. And, now, you know that's a labeling issue, and ultimately what that means is the Liaisons have to be the ones that primarily do that. So that's the first reason.

And the second reason is profitability. The Neurontin is as vital or probably more vital in terms of profitability for the corporation and the Northeast CBU right now, so, for those two reasons I think we have to elevate Neurontin to kind of number one Liaison status. And we're not saying that we don't want to get customers excited about the vascular biology message [*off-label* promotion of Accupril] with Accupril, but we just need to kind of prioritize Neurontin as number one, and Accupril number two.

Disclosure, Exhibit A at 1-23, 1-24.

Request Nos. 11 and 12 are extremely narrow in scope; they request only those voicemail communications between specific individuals regarding a specific subject matter during a limited time period, all of which are relevant to this case. Even a cursory review of such transcripts, including the above-excerpt, easily topples Warner-Lambert's frivolous claim that they are not relevant. The frank and candid statements made by high-level individuals on the voicemail tapes offer stark proof of the Defendant's scheme to promote and sell Neurontin *off-label* and should be produced.

**Document Request No. 13**: All emails sent or received between 1994 and the present date by any of the following: any Medical Liaisons, and/or Phil Majestro, and/or John Ford, and/or William Sigmund, and/or Tony Wilde, and/or John Krukar, and/or Tom Gorga, and/or Mike Valentino concerning marketing, promotion and/or sale of Neurontin and/or Accupril.

**Response to Document Request No. 13**: Warner-Lambert objects to Document Request No. 13 on the grounds that the Request is overly broad, unduly burdensome, seeks documents outside the time period relevant to this litigation and seeks documents that are not relevant to this litigation.

14

ARGUMENT FOR REQUEST NO. 13:  Like voicemail tapes, emails sent or received by Phil Majestro, John Ford (Director of Marketing), Dr. William Sigmund (Director of Medical Affairs), Tony Wilde (President of Parke-Davis), John Krukar (Director of Marketing), Tom Gorga (Director of Finance), Mike Valentino (President of the North East Customer Business Unit ("NECBU")), or Medical Liaisons concerning the marketing, promotion and sales of Neurontin and Accupril are highly relevant. The request is very narrow in scope, requesting only email communications between specific individuals regarding a specific subject matter during a limited time period, all which are relevant in this case.  The emails should be produced as well.

**Document Request No. 14**: Each and every document that describes the duties and responsibilities of drug sales representatives and/or Medical Liaisons for the time period of 1990 to the present date.

**Response to Document Request No. 14**: Warner-Lambert objects to Document Request No. 14 on the grounds that the Request is overly broad; unduly burdensome, seeks documents outside the time period relevant to this litigation and seeks documents that are not relevant to this litigation.

ARGUMENT FOR REQUEST NO. 14:  Sales representatives and Medical Liaisons were part of the Parke-Davis team that marketed *off-label* uses of Neurontin and Accupril.  Documents describing their duties and responsibilities will help prove, or disprove, Relator's contention that Medical Liaisons at Parke-Davis served no discernable scientific or medical function but were instead trained in sales techniques, provided with a package of monetary incentives to induce physicians to join the *off-label* promotion program, and given lists of doctors for "cold calls" based on size of the doctors' practices and their ability to prescribe Neurontin. For this reason, documents describing the duties of sales representatives and Medical Liaisons should be produced.

**Document Request No. 15**: Each and every Physician Information Request Form signed by a physician, and/or drug sales representative, and/or Medical Liaison that pertains to a

physician request for information about Neurontin and/or Accupril from January 1, 1994 to the present.

**Response to Document Request No. 15**: Warner-Lambert objects to Document Request No. 15 on the grounds that the term "Physician Information Request Form" is vague and ambiguous and on the grounds that the Request is overly broad, unduly burdensome, seeks documents outside the time period relevant to this litigation and seeks documents that are not relevant to this litigation.

ARGUMENT FOR REQUEST NO. 15: The Food, Drug and Cosmetic Act prohibits

drug companies from promoting *off-label* uses but permits the drug company to make a fair and

balanced presentation to a physician initiated inquiry about an *off-label* use. During the

videotaped portion of the Medical Liaison training in Ann Arbor, Michigan on April 16, 1996,

Parke-Davis's attorneys informed the Relator that *physicians* were required to sign an

Information Request Form to document that the physician had initiated the request for

information about *off-label* uses. See Disclosure at 8. After the video camera was turned off, the

attorneys instructed the Relator to have *the sales representative* fill out the Information Request

Form whenever he was "cold-calling" a physician. Not surprisingly, the Relator witnessed an

incident where Tom Kelly, a Parke-Davis sales representative, falsified two forms to indicate

that Dr. Matthew Gold and Dr. Anthony Valdini had requested *off-label* information about

Neurontin and Accupril prior to "cold-call" visits to them on May 13, 1996 and May 15, 1996

respectively. See Disclosure at 31. See *also* Disclosure, Exhibit T.

Information Request Forms, which are maintained in the ordinary course of business,

constitute the literal "paper trail" of the Defendants interaction with physicians. For this reason,

these forms are centrally relevant in this case, and should be produced.

**Document Request No. 16**: Each and every document created between 1994 and the present date that evidences any payment, remuneration, gift, gratuity or consideration paid, directly or indirectly to any physician for participation in preceptorships and/or shadowing programs, pertaining or relating to Neurontin and/or Accupril use.

16

**Response to Document Request No. 16**: Warner-Lambert objects to Document Request No. 16 on the grounds that the Request is overly broad, unduly burdensome, seeks documents outside the time period relevant to this litigation and seeks documents that are not relevant to this litigation.

**Document Request No. 17**: Each and every document created between 1992 and the present date, that evidences or references payment(s) to physicians for consulting services regarding Neurontin and Accupril.

**Response to Document Request No. 17**: Warner-Lambert objects to Document Request No. 17 on the grounds that the Request is overly broad, unduly burdensome, seeks documents outside the time period relevant to this litigation and seeks documents that are not relevant to this litigation.

**Document Request No. 18**: Each and every document created between 1992 and the present date, that evidence or references payments made to physicians, directly or indirectly, for case studies regarding Neurontin and/or Accupril.

**Response to Document Request No. 18**: Warner-Lambert objects to Document Request No. 18 on the grounds that the Request is overly broad, unduly burdensome, seeks documents outside the time period relevant to this litigation and seeks documents that are not relevant to this litigation.

**Document Request No. 19**: Each and every document created between 1992 and the present date, that evidences or references payment to physicians for access to the medical record(s) of patients taking Neurontin and/or Accupril.

**Response to Document Request No. 19**: Warner-Lambert objects to Document Request No. 19 on the grounds that the Request is overly broad, unduly burdensome, seeks documents outside the time period relevant to this litigation and seeks documents that are not relevant to this litigation.

**Document Request No. 20**: Each and every document created between 1992 and the present date, that evidences or references payment to physicians for participation in speaker bureau programs in which approved uses and/or emerging uses and/or unapproved uses of Neurontin and Accupril were presented.

**Response to Document Request No. 20**: Warner-Lambert objects to Document Request No. 20 on the grounds that the Request is vague and ambiguous, overly broad, unduly burdensome, seeks documents outside the time period relevant to this litigation and seeks documents that are not relevant to this litigation.

ARGUMENT FOR REQUEST NOS. 16, 17, 18, 19 & 20: Parke-Davis's decision to

adopt an illegal *off-label* promotion program to increase revenues required the involvement of

physicians, the gatekeepers of sales, to perform two tasks: first, to write *off-label* prescriptions (sales orders); and second, to encourage other physicians to write *off-label* prescriptions. Parke-Davis solicited physician participation in their *off-label* promotion program by offering them monetary inducements in the form of cash, disguised as payment for case studies, preceptorships, shadowing programs, consulting services, dinner programs, speaker's bureaus, and non-scientific clinical studies. All of these payments constitute kickbacks.[10]

Relator contends that these payments were made for the sole purpose of inducing the physicians to write prescriptions for *off-label* uses and has requested each document evidencing payment. Evidence of *any* payments made to physicians as an inducement to or in exchange for prescription writing is an essential aspect of the Relator's claim that the Defendant engaged in illegal activity that caused claims that were ineligible for reimbursement to be submitted to Medicaid. The requested documents are relevant, even if the payment to a physician occurred prior to January 1, 1994. Pharmaceutical companies routinely consult with physicians prior to FDA-approval either on the medical or marketing aspects of a new drug. Even though no Neurontin prescriptions were written prior to January 1, 1994, there is a reasonable likelihood that some payments or payment arrangements in connection with the marketing of Neurontin were made prior to that date.

**Document Request No. 21**: Each and every document created between 1992 and the present date that evidences or references payment to physicians for clinical trials and/or writing peer reviewed medical articles regarding emerging uses and/or unapproved uses for Neurontin and/or Accupril.

**Response to Document Request No. 21**: Warner-Lambert objects to Document Request No. 21 on the grounds that the Request is vague and ambiguous, overly broad, unduly

---

[10] See Department of Health and Human Services: Publication of OIG Special Fraud Alerts, 59 Fed. Reg. 65,372, 65376 (1994), (stating that a payment or gift may be considered improper under 42 U.S.C. § 1329a-7b(b) if it is: (1) made to a person in a position to generate business for the paying party; (2) related to the volume of business generated; and (3) more than nominal in value and/or exceeds fair market value of any legitimate service rendered to the payor, or is unrelated to any service at all, other than the referral of patients.

burdensome, seeks documents outside the time period relevant to this litigation seeks documents that are not relevant to this litigation.

ARGUMENT FOR REQUEST NO. 21: This request seeks documents evidencing payments to physicians who wrote articles or conducted clinical trials. As is the case with Request Nos. 16 through 20, the requested documents are relevant to prove that physicians were recruited and paid by the Defendant to promote *off-label* uses of Neurontin and Accupril. Specifically, Relator contends that the Defendant recruited physicians to write articles and conduct clinical trials regarding emerging uses or *off-label* uses for Accupril and Neurontin to generate case reports and written articles which were used by the Medical Liaisons to promote *off-label* uses in "cold-call" visits with other doctors. Evidence that the Defendant paid physicians in such a way, or otherwise exerted significant influence on decision-making of the physicians, in order to achieve the company's goals of increased sales and profitability will rebut Warner-Lambert's assertion that it is absolved of any liability because of the "independent medical judgment of the licensed physician." See Warner-Lambert Company's Reply Memorandum of Law In Support of Its Motion To Dismiss the Complaint at 4.

**Document Request No. 22:** Each and every document that projects, analyzes, refers or concerns Defendant's return on investment for the Medical Liaisons and/or Medical Liaison program between 1988 and the present date.

**Response to Document Request No. 22:** Warner-Lambert objects to Document Request No. 22 on the grounds that the Request is vague and ambiguous, overly broad, unduly burdensome, seeks documents outside the time period relevant to this litigation and seeks documents that are not relevant to this litigation.

ARGUMENT FOR REQUEST NO. 22: Medical Liaisons played an important role in the Defendant's *off-label* promotion program. Defendant trained its Medical Liaisons, who served no scientific or medical functions, to work with sales representatives "cold-calling" physicians from lists provided by the Defendant. The lists identified physicians based on the size

19

of the doctors' practices and ability to prescribe large amounts of Neurontin. Moreover, Plaintiff

alleges that Medical Liaisons made presentations concerning *off-label* uses at various

promotional events, such as dinner meeting and conferences.  Documents that discuss

Defendant's financial return on the Medical Liaison program are likely to reference the number

of *off-label* promotional events, the Medical Liaisons role in generating *off-label* prescriptions at

the events and the number of *off-label* sales generated as a result of the Medical Liaisons efforts.

The requested documents are relevant to prove that Medical Liaisons promoted *off-label* uses

and that their efforts generated *off-label* prescriptions.

     **Document Request No. 23**: Each and every document authored by and/or copied to the
Neurontin Disease Team (or any member thereof) that references approved uses and/or emerging
uses and/or unapproved uses of Neurontin for the time period of 1988 to the present.

     **Response to Document Request No. 23**: Warner-Lambert objects to Document Request
No. 23 on the grounds that the Request is overly broad, unduly burdensome, seeks documents
outside the time period relevant to this litigation and seeks documents that are not relevant to this
litigation.

     ARGUMENT FOR REQUEST NO. 23:  Parke-Davis's Neurontin Disease Team

authored and received documents concerning Neurontin and its uses. For the time period of

January 1, 1988 to the present, Plaintiff seeks each document that references the approved use or

*off-label* use of Neurontin. Documents dated between January 1, 1988 and the present date,

authored or received by members of Defendant's Neurontin Disease Team that concern *off-label*

uses of Neurontin, are likely to be relevant to: (1) the identity of members of the Neurontin

Disease Team, (2) whether members were paid, (3) the amount paid and the service rendered for

the payment, (4) the opinions of members of Neurontin Disease Team relative to *off-label* uses,

(5) the dates that *off-label* uses were referred to in documents authored or received by the

Neurontin Disease Team, and (6) the program to promote *off-label* uses of Neurontin.

**Document Request No. 24**: Each and every document authored by and/or copied to the Accupril Disease Team (or any member thereof) that references approved uses and/or emerging uses and/or unapproved uses of Accupril for the time period of 1988 to the present.

**Response to Document Request No. 24**: Warner-Lambert objects to Document Request No. 24 on the grounds that the Request is overly broad, unduly burdensome, seeks documents outside the time period relevant to this litigation and seeks documents that are not relevant to this litigation.

ARGUMENT FOR REQUEST NO. 24: The argument raised in support of Request No. 23 is equally applicable to Request No. 24, which seeks similar documents authored or received by the Accupril Disease Team.

**Document Request No. 25**: Each and every document authored by and/or copied to the Core Marketing Team (or any member thereof), including but not limited to all minutes of meetings and memoranda, that reference approved uses and/or emerging uses and/or unapproved uses of Neurontin for the time period of 1988 to the present.

**Response to Document Request No. 25**: Warner-Lambert objects to Document Request No. 25 on the grounds that the Request is overly broad, unduly burdensome, seeks documents outside the time period relevant to this litigation and seeks documents that are not relevant to this litigation.

**Document Request No. 26**: Each and every document authored by and/or copied to the Core Marketing Team (or any member thereof), including but not limited to all minutes of meeting and memoranda, that reference approved uses and/or emerging uses and/or unapproved uses of Accupril for the time period of 1988 to the present.

**Response to Document Request No. 26**: Warner-Lambert objects to Document Request No. 26 on the grounds that the Request is overly broad, unduly burdensome, seeks documents outside the time period relevant to this litigation and seeks documents that are not relevant to this litigation.

ARGUMENT FOR REQUEST NOS. 25 & 26: For the time period of January 1, 1988 to the present date, Relator seeks Core Marketing Team documents that reference approved uses, emerging uses or unapproved uses of Neurontin and Accupril. Documents that describe the marketing of Neurontin and Accupril go to the heart of the Relator's contention that Defendant engaged in a widespread plan to market *off-label* uses of Neurontin and Accupril to physicians.

21

"Core Marketing" documents, either authored by or received by the Core Marketing Team,

referencing the approved and unapproved uses of Neurontin and Accupril are relevant to prove

the existence and scope of Defendant's program to market *off-label* promotion of Accupril and

Neurontin.

**Document Request No. 27**:  All sales training manuals for Medical Liaisons and/or drug
sales representatives for the time period of 1988 to the present.

**Response to Document Request No. 27**: Warner-Lambert objects to Document Request
No. 27 on the grounds that the Request is overly broad, unduly burdensome, seeks documents
outside the time period relevant to this litigation and seeks documents that are not relevant to this
litigation.

ARGUMENT FOR REQUEST NO. 27:  For the time period of January 1, 1988 to the

present, Request No. 27 seeks all sales training manuals for Medical Liaisons and drug salesmen.

The Relator has alleged that Medical Liaisons were hired by Defendant's sales department,

trained in sales techniques, given lists of doctors to "cold-call" based on the size of the doctors'

practice and ability to prescribe Neurontin *off-label* and armed with a package of monetary

incentives to offer physicians to entice them to prescribe and promote Neurontin *off-label* uses.

Defendant's Associate Director of Medical and Scientific Affairs, Phil Majestro, explicitly

instructed Medical Liaisons to promote *off-label* uses of Neurontin:

> So what we need to do is focus on Neurontin. When we get out there, we want to
> kick some ass; we want to sell Neurontin on pain [*off-label*], all right? And
> monotherapy [*off-label*] and everything we can talk about, that's what we want to
> do. 'Cause I'm embarrassed. I don't know if you guys are embarrassed, but I'm
> embarrassed with where we are with Neurontin. We've got to take it into our own
> hands and really kick some ass on it, all right? Let's do it up. Talk to you soon,
> Bye.

Disclosure, Exhibit A at 1-2, 1-3.

Obviously, every document that has some bearing on the subject of Medical Liaison

training is relevant to allegations that Parke-Davis trained its employees to promote *off-label*

22

uses of Neurontin and Accupril. Plaintiff is entitled to discovery of all sales training manuals for

Medical Liaisons and drug salesman.

**Document Request No. 28**: Each and every slide kit for Neurontin and/or Accupril for the time period of 1998 to the present.

**Response to Document Request No. 28**: Warner-Lambert objects to Document Request No. 28 on the grounds the Request is overly broad, unduly burdensome, seeks documents outside the time period relevant to this litigation and seeks documents that are not relevant to this litigation.

**Document Request No. 29**: All materials, written or audio, handed out at courses and/or educational seminars and/or luncheon meetings, and/or luncheon meetings and/or conferences and/or advisory board meetings in which the approved uses and/or emerging uses and/or unapproved uses of Neurontin and/or Accupril were presented or discusses for the period of 1998 to the present.

**Response to Document Request No. 29**: Warner-Lambert objects to Document Request No. 29 on the grounds the Request is overly broad, unduly burdensome, seeks documents outside the time period relevant to this litigation and seeks documents that are not relevant to this litigation.

**Document Request No. 30**: All tape recordings, videos, transcripts of proceedings, lists of attendees, course/speaker evaluation forms for: courses and/or seminars, and/or luncheon meetings, and/or dinner meetings and/or educational seminars and/or advisory board meetings in which the approved uses and/or emerging uses and/or unapproved uses of Neurontin and Accupril were presented or discussed for the period of 1988 to the present.

**Response to Document Request No. 30**: Warner-Lambert objects to Document Request No. 30 on the grounds the Request is overly broad, unduly burdensome, seeks documents outside the time period relevant to this litigation and seeks documents that are not relevant to this litigation.

**Document Request No. 31**: Each and every document, including but not limited to reports, that refer or evidence discussions about approved uses and/or emerging uses and/or unapproved uses of Neurontin and/or Accupril occurring during Consulting meetings for the period of 1998 to present.

**Response To Document Request No. 31**: Warner-Lambert objects to Document Request No. 31 on the grounds the Request is overly broad, unduly burdensome, seeks documents outside the time period relevant to this litigation and seeks documents that are not relevant to this litigation.

ARGUMENT FOR REQUEST NOS. 28, 29, 30 & 31: The documents requested in

Request Nos. 28 through 31 all constitute direct evidence of the Defendant's *off-label* marketing

and promotional uses. Whether in the form of presentations, slide kits, or handouts at

conferences and consultant meetings, these documents were all used to influence physicians into

writing *off-label* prescriptions. In short, such documents are the proverbial "smoking gun." For

example, Request No. 30 specifically calls upon the Defendant to produce lists of attendees at

conferences or seminars. This information is at the crux of the case; discovery of the identity

these physicians will allow the Relator to correlate the names of those physicians exposed to

Warner-Lamberts' illegal promotion of unapproved uses with the resulting false claims that were

submitted to Medicaid. This type of information is clearly relevant and should be produced.

**Document Request No. 32**: Each and every document, including but not limited to correspondence and reports from Defendant's employees, physicians, third party vendors, that refers to the government's investigation into Defendant's conduct as it pertains to marketing, promotion and sales of approved uses and/or emerging uses and/or unapproved uses of Neurontin and/or Accupril for the period of 1996 to the present.

**Response to Document Request No. 32**: Warner-Lambert objects to Document Request No. 32 on the grounds the Request is overly broad, seeks documents that are not relevant to this litigation, and calls for production of documents protected from disclosure under the attorney-client privilege, the attorney-work product doctrine, or other legally recognized privilege or immunity.

ARGUMENT FOR REQUEST NO. 32: Once again, Warner-Lambert interposes a

frivolous set of objections. By mere definition, virtually every document relating to the

"government's investigation" into the marketing and sales of Neurontin and Accupril from 1996

to the present is relevant in this case. As Warner-Lambert has itself acknowledged, the

government's investigation is in large part a response to allegations made by the Relator based

on things he himself observed. Even ignoring this reality, it is futile for Warner-Lambert to

suggest that the government inquiry into marketing and sales activities with respect to Neurontin

is based on anything other than the same illegal or potentially illegal conduct that is at issue in

this case, i.e. that Parke-Davis's program of *off-label* promotion of Neurontin and Accupril in

violation of the Food, Drug and Cosmetic Act caused the Veterans Administration and Medicaid to pay false claims. Any objections as to relevance are unavailing.

Warner-Lambert also claims that an undisclosed number of responsive documents are protected by "the attorney-client privilege, the attorney-work product doctrine, or other legally recognized privilege or immunity." However, Warner-Lambert has not declared which documents, if any, are in fact privileged; nor has the drug company described the nature of the documents in a manner that will enable the Relator "to assess the applicability of the privilege of the privilege or protection." Warner-Lambert has thus failed to meet the requirement set forth in Fed. R. Civ. P. 26 (b)(5) for withholding documents, and should be compelled by this Court to produce all withheld documents, unless a satisfactory claim of privilege is made.

**Document Request No. 33**: Each and every document that describes or references the strategic plan, including but not limited to annual and quarterly assessments, for the promotion, marketing and sales of Neurontin and/or Accupril for the time period of 1988 to the present.

**Response to Document Request No. 33**: Warner-Lambert objects to Document Request No. 33 on the grounds the Request is overly broad, unduly burdensome, seeks documents outside the time period relevant to this litigation and seeks documents that are not relevant to this litigation.

ARGUMENT FOR REQUEST NO. 33: This request seeks the Defendant's own planning and tracking documents regarding its Neurontin *off-label* promotion scheme. This information is highly relevant because the Defendant's scheme to promote *off-label* uses for Neurontin and Accupril was centrally controlled through its strategic planning functions. Data assessing the impact of its marketing efforts would undercut Warner-Lambert's insistences that it did not "cause" any false claims.

**Document Request No. 34**: Each and every document that evidences or references a sale of Neurontin and/or Accupril to the United States government for the time period of 1988 to the present.

25

**Response to Document Request No. 34**: Warner-Lambert objects to Document Request No. 34 on the grounds the Request is overly broad, unduly burdensome, and seeks documents outside the time period relevant to this litigation.

**Document Request No. 35**: Each and every document that evidences or references a sale of Neurontin and/or Accupril for an unapproved use paid for either entirely or in part by the United States government for the time period of 1998 to the present.

**Response to Document Request No. 35**: Warner-Lambert objects to Document Request No. 35 on the grounds the Request is overly broad, vague and ambiguous, and seeks documents outside the time period relevant to this litigation.

**Document Request No. 36**: Each and every document that evidences or references a prescription for an unapproved use for Neurontin and/or Accupril that was paid for either entirely or in part by the United States government for the time period of 1988 to the present.

**Response to Document Request No. 36**: Warner-Lambert objects to Document Request No. 36 on the grounds that the Request is overly broad, vague and ambiguous, and seeks documents outside the time period relevant to this litigation.

**Document Request No. 37**: Each and every document that evidence or references a prescription for Neurontin and/or Accupril that was paid for either entirely or in part by the United States government for the time period of 1998 to the present.

**Response to Document Request No. 37**: Warner-Lambert objects to Document Request No. 37 on the grounds the Request is overly broad, vague and ambiguous, and seeks documents outside the time period relevant to this litigation.

**Document Request No. 38**: Each and every document that evidences or references the total amount of prescriptions filled for off-label uses of Neurontin and/or Accupril for the time period of 1988 to the present.

**Response to Document Request No. 38**: Warner-Lambert objects to Document Request No. 38 on the grounds the Request is overly broad, vague and ambiguous, seeks documents outside the time period relevant to this litigation, and seeks documents that are not relevant to this litigation.

ARGUMENT FOR REQUEST NOS. 34, 35, 36, 37 & 38: Taken together, these

requests seek a very narrow set of documents which are essential to this case—namely to what

extent did the Defendant cause *off-label* prescriptions to be written, and to what extent did it

cause the United States government to pay for such prescriptions? There is nothing vague or

ambiguous about these requests. Clearly any document that indicates how much money was

paid by the United States for *off-label* prescriptions of Neurontin and Accupril is relevant and should be produced.

**Document Request No. 39**: Each and every document that refers to the promotion, and/or marketing and and/or [sic] sale of Neurontin and/or Accupril that are maintained in the files of the following individuals: Laura Johnson, Alan Knoop, John Krukar, John Ford, Mike Valentino, Alan Crook, Phil Majestro, William Sigmund, Edda Guerrero, Tony Wilde for the time period of 1998 to the present.

**Response to Document Request No. 39**: Warner-Lambert objects to Document Request No. 39 on the grounds the Request is overly broad, seeks documents outside the time period relevant to this litigation and seeks documents that are not relevant to this litigation.

ARGUMENT FOR REQUEST NO. 39:  This requests seeks information relating to key

individuals within Parke-Davis.  Each of these individuals was involved in the Defendant's

scheme in an important capacity.  There is ample evidence to suggest that these individuals

communicated regularly about the promotion and marketing efforts, and routinely shared

information indicating the impact of their program.  For this reason, discovery of their Neurontin

and Accupril files is more than reasonably calculated to lead to the discovery of admissible

evidence and should be permitted.

**Document Request No. 40**:  Each and every document that refers or relates to Defendant's sales, revenues and profits earned from the sale of Neurontin and/or Accupril for approved uses, and/or emerging uses and/or unapproved uses for the time period of 1998 to the present.

**Response to Document Request No. 40**: Warner-Lambert objects to Document Request No. 40 on the grounds the Request is overly broad, unduly burdensome, seeks documents outside the time period relevant to this litigation and seeks documents that are not relevant to this litigation.

ARGUMENT FOR REQUEST NOS. 40:  The arguments with respect to Request Nos.

33, 34, 35, 36, 37, and 38 apply equally to this request.

CONCLUSION

For the reasons set forth above, Defendant Warner-Lambert should be compelled to produce the documents requested by the Relator.

RELATOR, DAVID P. FRANKLIN,
By his attorneys,

Dated: November 30, 2000

*Thomas M. Greene*

Thomas M. Greene, Esquire
BBO # 210020
Greene & Hoffman, P.C.
125 Summer Street, 14th floor
Boston, MA 02110
Telephone (617) 261-0040
Facsimile (617) 261-3558

CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by mail on November 30, 2000.

*Thomas M. Greene*

Thomas M. Greene

# EXHIBIT C

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No.
96-11651-PBS

UNITED STATES OF AMERICA ex rel.
DAVID FRANKLIN,

Plaintiff

v.

PARKE-DAVIS, DIVISION OF
WARNER-LAMBERT COMPANY,

Defendant

ORDER

December 12, 2001

COHEN, M.J.

After hearing, it is hereby ordered as follows with respect to the discovery

motions referred to this court for disposition, to wit:

1.   With respect to the matter of a Protective Order, the draft submitted March

6, 2001, shall govern with the following modifications and limitations:

a.   A party may <u>not</u> designate as "Confidential" information contained in

documents which are already in the possession of a third party even if the

documents contain the party's "Confidential" designation;

b.   The disclosure of confidential information shall be limited as set forth in

Part 5 of the draft submitted March 6, 2001. Any disclosures to

employees of the Department of Health and Human Services and its

Health Care Financing Administration, to state Medicaid administration

officials, and to the United States (including any agency, subdivision, or

department thereof, as well as the United States Attorney's Office) shall

only be made after compliance with paragraph 7 of the draft submitted

March 6, 2001;

c.     Part 4 of the draft submitted March 6, 2001, governing the use of

confidential information shall apply to all persons, corporate entities, and

all governmental bodies, including the United States Government

(including any agency, subdivision, or department thereof, as well as the

United States Attorney's Office).

Defendant shall submit to this court a revised draft of its draft order submitted

March 6, 2001, incorporating these modifications set forth herein on or before the close

of business, Wednesday, December 19, 2001.

2.     Based on the Memorandum and Order (# 104) entered by the district judge

to whom this case is assigned on June 25, 2001, and the Amended Complaint which

followed, this court finds that the document and other discovery requests referred to in

the relator's Motion to Compel Production of Documents (# 81) are far too broad. The

Relator was employed at Parke-Davis for a relatively short period,[1] and his allegations,

to the extent that he could plead them with any specificity, are limited to that period of

---

[1]     Approximately five months.

time[2] and to the Northeast Customer Business Unit of Parke-Davis.

Accordingly, relator's Motion to Compel Production of Documents (# 81) is allowed, but only to the following extent:

Document requests Nos. 2, 3, 4, 5, 6, 7, 8, 9, 14, 15, 16, 17, 18, 19, 20, 21, and 33 shall be complied with, limited, in terms of time, to the period October 1, 1995, to and including October 31, 1996, and in terms of geographical locations, to the Northeast Customer Business Unit of Parke-Davis.

Document requests 10 and 33 are clearly overbroad and burdensome. The motion to compel is allowed as to those requests, but limited to formal marketing plans for the period October 1, 1995, to and including October 31, 1996.

The motion is denied as to Document request No. 11 on the ground that it is moot.

The motion is denied as to Document request No. 12.

The motion is denied as to Document request No. 22 on the grounds that that request is overly broad.

The motion is allowed as to Document requests Nos. 23 and 25, limited to off-label uses (including excess dosage) for the period October 1, 1995, to and including October 31, 1996, and limited to documents from the Northeast Customer Business Unit of Parke-Davis.

Document Requests Nos. 24 and 26 are denied as moot.

---

[2]    As Judge Saris has instructed (Memorandum and Order # 104, p. 13):

The "when" of Relator's complaint is to the time-frame during which Relator was employed as a Parke-Davis medical liaison in its Northeast Customer Business Unit.

The motion is allowed as to Document request 27, limited to manuals within the Northeast Customer Business Unit of Parke-Davis for the period October 1, 1995, to and including October 31, 1996, and for national manuals for that same period of time.

The motion is allowed as to Document requests Nos. 38 through 31, limited to off-label uses (including excess dosage) for the period October 1, 1995, to and including October 31, 1996, and limited to documents from the Northeast Customer Business Unit of Parke-Davis.

The motion is denied as to Document request No. 32.

With respect to Document requests Nos. 35, 36, 38, 39 and 40, the motion is allowed as to reports prepared by the defendant relating to analyses of medicaid sales for the period October 1, 1995, to and including October 31, 1996, and limited to such reports prepared by the Northeast Customer Business Unit of Parke-Davis.

In all other respects, the relator's Motion to Compel Production of Documents (# 81) is denied.



UNITED STATES MAGISTRATE JUDGE

-4-

# EXHIBIT D

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA *ex*      )
*rel.* DAVID FRANKLIN               )
                                    )
            Plaintiff,              )
                                    )
      v.                            )      No. 96-CV-11651-PBS
                                    )
PARKE-DAVIS, DIVISION OF            )
WARNER-LAMBERT COMPANY,             )
                                    )
            Defendant.              )
                                    )

## DISCOVERY ORDER

February 6, 2002

Saris, U.S.D.J.

     The Court rules on Relator's Motion for Reconsideration of

the Magistrate Judge's Order dated December 12, 2001, as follows:

   1.    The Amended Complaint alleges claims for the period

         1994 through 1998.  That is the time frame for

         discovery.

   2.    The Amended Complaint alleges a nation-wide marketing

         scheme.  Therefore, all documents in the possession,

         custody or control of Parke-Davis' headquarters

         relating to marketing, publication, business

         strategies, policies, initiatives, seminars, training,

         consultants' meetings or the like relating to Neurontin

         shall be produced, in addition to such documents from

         the Northeast Business Customer Unit.  At least at this

point, a request for all documents in the possession, custody and control of each business or regional unit in every state and for documents relating to 3200 doctors seems overbroad.

3.   In light of the ongoing criminal investigation, the Magistrate Judge's Order, ¶ 1c, relating to the sharing of documents with the United States Attorney, is not clearly erroneous. However, the government is entitled to copies of all pleadings and copies of all deposition transcripts. 31 U.S.C. § 3730(c)(3). If the government decides to intervene, the parties may revisit the issue.

4.   The Court strikes the Magistrate Judge's Order, ¶ 1b, requiring the Relator to procure confidentiality agreements from state and federal officials when they obtain certain prescription information. However, the Court orders the Relator only to disclose "the identities of doctors to whom Parke-Davis marketed and the dates of their contacts" - as it has promised. (See Docket No. 145, p.5).

5.   Otherwise, the Magistrate Judge's Order is affirmed as not contrary to law or clearly erroneous. The parties shall confer to narrow future disputes.

6.   All responsive documents shall be produced forthwith.

2

Any documents which are not immediately available shall be disclosed within 30 days.

7.  The parties are sealing too many pleadings.  Most of the information contained in the pleadings is not even arguably confidential.  This Court must operate with a presumption of openness.  Therefore, all sealed pleadings will be unsealed in 30 days unless a party submits sufficient justification to maintain the sealing at that time.  From now on, no documents shall be filed under seal without an accompanying written justification.  The parties should narrowly define what is to be sealed.  If, for instance, only the attachment is confidential, only the attachment should be sealed.


PATTI B. SARIS
United States District Judge


3

**EXHIBIT E**

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

```
------------------------------------
DAVID FRANKLIN, UNITED STATES   :        CIVIL ACTION
OF AMERICA, EX REL,             :        No. 96-11651-PBS
                    Plaintiff   :
         v.                     :        Courtroom No. 13
PARKE-DAVIS, DIVISION OF        :        1 Courthouse Way
WARNER-LAMBERT COMPANY,         :        Boston, MA 02210-3002
                    Defendant   :        10:00 a.m., Tuesday
------------------------------------     January 9, 2002
```

Motion Hearing

Before:        THE HONORABLE PATTI B. SARIS,
               UNITED STATES DISTRICT JUDGE

APPEARANCES:

Greene & Hoffman, P.C.,
  (by Thomas M. Greene, Esq. and Michael A. Tabb, Esq.),
  125 Summer Street, Boston, Massachusetts 02110,
  on behalf of the Relator.

Thomas E. Kanwit, Assistant United States Attorney,
  United States Attorney's Office,
  1 Courthouse Way, Boston, Massachusetts 02210,
  an interested party.

Hare & Chaffin, (by David B. Chaffin, Esq.),
  160 Federal Street, Boston, Massachusetts 02110-1701,
  on behalf of the Defendant.

Davis, Polk & Wardwell,
  (by James P. Rouhandeh, Esq., James E. Murray, Esq.),
  450 Lexington Avenue, New York, New York 10017,
  on behalf of the Defendant.


               Marie L. Cloonan
             Federal Court Reporter
          1 Courthouse Way - Room 5209
        Boston, MA 02210 - 617-439-7086
      Mechanical Steno - Transcript by Computer

2

1              THE CLERK:  The case of David Franklin v.

2    Parke-Davis, Civil Action No. 96-11651, will now be heard

3    before this Court.

4              Will counsel please identify themselves for the

5    record.

6              MR. GREENE:  Good morning, your Honor.  Thomas

7    Greene for the relator.

8              MR. TABB:  Michael Tabb for the relator.

9              MR. KANWIT:  Thomas Kanwit for the interested

10   party, the United States.

11             MR. ROUHANDEH:  Jim Rouhandeh for the defendant.

12             MR. MURRAY:  James Murray for the defendant, your

13   Honor.

14             MR. CHAFFIN:  David Chaffin for the defendant, your

15   Honor.

16             THE COURT:  Now, there are several things before

17   me, but I'm not sure whether I should address one of them.

18   There is the motion to amend and it primarily involves the

19   kickback claim.  But, then, there is also a discovery

20   dispute.

21             I have received objections from the plaintiff and a

22   memo from the government.  Was I supposed to receive

23   something from you all or were you going to leave it alone?

24   Do you want to deal with it today or should I deal with it

25   on the papers?  What do you want to do?

3

1          MR. ROUHANDEH:  Well, your Honor, actually, we have

2    an assented-to motion for a one-week extension on our

3    responses to the relator's objections.  What we figured we'd

4    do is give you one response to both the government's papers

5    and the relator's papers.  And I understand that --

6          THE COURT:  Isn't someone here from out of town?

7          MR. MURRAY:  Yes.  We're from New York.

8          THE COURT:  That means you have to fly back up

9    here.  Do you want to just argue it today and then I'll get

10    your written submission and then -- are you prepared to do

11    that or do you want to just deal with the kickback

12    situation?

13          MR. ROUHANDEH:  Well, actually we focused our

14    attention on the kickback situation and have not -- I have

15    not even read the government's latest set of papers on this

16    matter.  So, we prefer to put that off to a later time.

17          THE COURT:  Maybe what I should do is do it on the

18    papers unless I had a question about it.  I don't want to

19    make you fly back up here.  It's just a discovery dispute.

20    And the only thing that makes this a little bit different --

21    let me just focus you on it -- is it looks as if the

22    Magistrate Judge was not focusing on the amended complaint,

23    which, of course, I'm going to allow all of it, except,

24    perhaps, the kickback thing.  So, that's my question:  Is

25    that order still alive?  He didn't have that, right?

4

1          MR. TABB:  Well --

2          MR. ROUHANDEH:  He did have that beforehand, your

3    Honor, and he did consider it.  And it was -- we had a

4    two-hour --

5          THE COURT:  On the amended complaint.

6          MR. ROUHANDEH:  Yes, and he understood that there

7    was an amended complaint and I understanding he --

8          THE COURT:  Because, I hadn't allowed it yet.

9          MR. ROUHANDEH:  I realize that, your Honor.

10          THE COURT:  Well, because, the problem with the way

11    the original complaint was written, it was a little

12    procedural mess, but was what to do with that attachment.

13          MR. TABB:  Yes, your Honor.  The Magistrate was

14    made aware that there was an amended complaint.  He was made

15    aware that your Honor had pending before her Count 2 for

16    kickbacks and we conceded that he needed to rule based upon

17    Count 1 and Count 2 was not yet in his court.

18          THE COURT:  The old or the new complaint?

19          MR. TABB:  Well, the new complaint, your Honor may

20    recall, we had three counts that essentially allege that an

21    improper marketing scheme from Parke-Davis caused physicians

22    to write prescriptions for Neurontin not covered by

23    Medicaid.

24          What we've done in the amended complaint is we have

25    consolidated the three counts that your Honor allowed to go

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.  800-626-6313

5

1    forward as one count.  So, that is the new Count 1.

2            THE COURT:  This is just a simple question.  Did he

3    use the new complaint?

4            MR. MURRAY:  Yes, your Honor.

5            MR. TABB:  Well --

6            MR. MURRAY:  I mean, I think -- I don't have it in

7    front of me, unfortunately, but I think he actually cited it

8    in his order considering the papers and the amended

9    complaint.

10           MR. TABB:  He did make reference to the amended

11   complaint.  Whether he realized it or not, I don't know.

12           Your Honor, I understand, it would be difficult --

13           THE COURT:  I assume -- it was sealed when I got

14   it.  So, I couldn't tell whether someone had -- maybe I will

15   just call him.  It was sealed.

16           MR. MURRAY:  Your Honor, at the hearing, we

17   acknowledged that we were not seeking to -- we weren't

18   objecting to their motion as far as Count 1 was concerned,

19   and so, we argued that the whole hearing was premised on the

20   fact that Count 1 would go forward and that he did consider

21   that.

22           THE COURT:  I think I'm going to call him.

23           MR. MURRAY:  All right.

24           THE COURT:  The only reason I say that is he may

25   have thought that Count 1 was substantially the same.  I

6

1    don't remember the old Count 1, but the new Count 1 says

2    1994 to 1998.  Now, I don't know if he knew that.  I don't

3    remember if the old Count 1 said that so expressly.

4         MR. ROUHANDEH:  Your Honor, we have a two-hour

5    argument at which that point was made repeatedly.  There was

6    a discussion of that issue and what the appropriate time

7    frame for discovery was.

8         THE COURT:  Let me flag this for you.  I have a

9    real hard time narrowing -- regardless of all the other

10   issues, when the claim is 1994 to 1998, it seems like a

11   realistic time frame.  So -- there are all sorts of other

12   very serious questions, which I'm not sure what the right

13   answer is -- very serious questions.  But at the very least,

14   that's where I'm going on that one.

15        I can't tell whether or not he actually saw the

16   revised complaint which says that in about ten different

17   places.  But, I -- when the claim says 1994 to 1998, I don't

18   know how you get away with not having 1994 to 1998.  So, I

19   just wanted to flag that as a serious problem that I had.

20        Now, they may argue that it should be from the

21   beginning of time to the present and you may argue that it

22   should only be 1994 to 1998.  But I'm not just limiting it

23   to the one year of his employment.

24        MR. ROUHANDEH:  Well, it was greater than the

25   period of employment.  He was only employed for four or five

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

7

1    months.  So, it went beyond the period of his employment.

2          Secondly, the question for the Magistrate was

3    whether, as a blanket matter, they were entitled to ten or

4    12 years of discovery or four years or three years.  Simply

5    to say what is the relevant time period, I think that has to

6    be said with respect to each of the specific requests.

7          THE COURT:  Well, let me just tell you, that's

8    an uphill battle for you on that particular issue.  And what

9    I would urge you to do -- there are other issues.  What I'm

10   really worried about, the thing I'm worried the most about,

11   you didn't want me to stay this, as I remember, pending the

12   criminal case.

13         MR. ROUHANDEH:  That's correct.

14         THE COURT:  You fought that hard.

15         Now, I'm confused, I have to tell -- usually,  one

16   is stayed pending another.  I don't deal with this interplay

17   between where the documents can and can't go.  I'm usually

18   -- the government asked for a stay, you opposed it.  I

19   thought because the government sat on this for such a long

20   time that that was fair for you.  But, it comes with certain

21   risks.  What's worrying me is that there are certain things

22   that they need for discovery to go forward and I don't know

23   that I can force the state government to sign a protective

24   order.  So, I am really caught on that, and I hope you'll

25   address that.

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

8

1          MR. ROUHANDEH:  We will address that, your Honor.

2     That is not the -- it is a typical requirement in every

3     protective order that if confidential materials are provided

4     to another party, they have to sign a protective order.  We

5     haven't addressed that there's --

6          THE COURT:  Excuse me.  Yes, that's true when it

7     involves competition.  But, that's different.  I mean, I

8     have no problem with saying that the state and federal

9     governments, I'll just sign the order.  They don't need to

10    sign anything.  I'll just order them, that they cannot

11    release it to competitors.  But, that's different from -- if

12    some -- I don't know -- state regulatory agency wants it.

13    I have a hard time ordering them that they can't turn it

14    over.

15         MR. ROUHANDEH:  Your Honor, I want to make the

16    point that there were -- this matter was briefed for about

17    ten months.  There were hundreds of pages of briefs put in

18    on this issue.  There was a two-hour oral argument before

19    the Magistrate.  I cannot sit here now and address arguments

20    that they made --

21         THE COURT:  I understand.

22         MR. ROUHANDEH:  -- in the papers that I haven't

23    seen.  But, your Honor, the Magistrate Judge knew all of the

24    issues that you were discussing and came down with a ruling

25    that I believe to be reasonable and justified based on the

9

1    circumstances.

2         It doesn't prevent them -- and a lot of what was

3    going on in that case was they gave us requests and refused

4    ever, despite our objections, to modify them in one degree,

5    to change any single word of them.

6         THE COURT:  Well, they're going to eat that.  But,

7    all I'm saying is, I look at it for -- I forget what the --

8    not de novo, but abuse of discretion is the standard.  But,

9    I have --

10         MR. ROUHANDEH:  It might be clear and erroneous.

11         THE COURT:  Clear and erroneous, whatever it is.

12    It's not de novo.  I understand that.  I used to be a

13    Magistrate Judge myself.  I know how much time he took on

14    the whole thing.

15         That having been said, I'm looking at it seriously.

16    And the thing that's confusing to me, and I hope you

17    address, is how I require a state agency to agree not to

18    turn it over to another state agency.  Maybe you're not

19    required in that.  Or, maybe it's just a pure competition

20    matter, and that I have no problem with at all.  Just an

21    order saying they can't turn it over to any of the

22    competitors.  But, that's a question that I'm just hoping

23    you address.  I'm not going to have it -- I just read them

24    all yesterday for the first time, as a matter of fact,

25    because I wasn't sure whether you all would want to address

10

1    them here, today.

2           MR. ROUHANDEH:  Right, and you haven't seen our

3    briefs.  So --

4           THE COURT:  No, I haven't seen anything on your

5    side.  But, I'm taking it seriously.

6           MR. ROUHANDEH:  Yes, I understand.

7           THE COURT:  And the particular thing I'm taking

8    seriously is the 1994 to 1998.  When I reread the amended

9    complaint, it says it about ten times.  You know, that's

10   what it says.

11          Let me look at you.  I don't know that you can get

12   every single piece of paper from the beginning of time

13   across the United States of America.  There's got to be a

14   little give on your part.

15          MR. TABB:  We're more than welcome to give, your

16   Honor.  We can discuss it when we have a hearing, the back

17   and forth.  We are not as unreasonable as Mr. Rouhandeh may

18   paint us at the moment.  We are more than welcome to give so

19   long as, you know, there is a recognition of what the scope

20   is, is a reasonable scope.

21          THE COURT:  Why don't you all try to work something

22   out.  Have you gotten any papers yet?

23          MR. TABB:  What we got, your Honor, is -- you may

24   recall we were here a year ago -- your Honor ordered: Give

25   them the papers that they got from the government, that they

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.  800-626-6313

11

1    turned over to the government.  We got those papers.  We

2    have not gotten, except possibly one document, we have not

3    gotten anything else since that time.

4         And Mr. Rouhandeh has taken the position that most

5    of what we are entitled to is within those papers, and I'm

6    not certain whether they've even looked to see whether

7    there's anything that they haven't turned over that's even

8    within the relevant time period --

9         THE COURT:  Well, have you received everything from

10   the time period -- have you received everything the

11   Magistrate Judge ordered in his order?

12        MR. TABB:  I do not know because Mr. Rouhandeh has

13   not come back to me and said there's nothing else that you

14   haven't received yet.

15        THE COURT:  Have you basically turned over

16   everything that Judge Cohen said you should turn over?

17        MR. ROUHANDEH:  No, we have not.  There was not a

18   time period for that.  They're arguing it while we're in the

19   process of doing that.  It's not a simple matter.

20        THE COURT:  How long will it take?  Because, that's

21   a subset.  I mean, if anything --

22        MR. MURRAY:  I mean --

23        THE COURT:  It's everything he said, northeast

24   region for basically a year or so.

25        MR. MURRAY:  Right.  And the way we had -- I mean,

12

1   this is back to 1996 and so, five or six years ago.

2         If we have to go through all these and collect

3   these documents, we have to go through them twice for two

4   different time periods.  That's going to take, you know,

5   twice as long.

6         THE COURT:  You know what?  Just give them -- I

7   mean, it's just one year for the northeast.  You should be

8   able to give it over to them.

9         MR. ROUHANDEH:  Unfortunately, it's not organized

10  enough.

11        THE COURT:  Well, how many -- how long --

12        MR. ROUHANDEH:  We're happy to do it, your Honor.

13  We're happy to go through and make that production knowing

14  that it will create an additional burden on us to go back

15  again, if your Honor's ruling is different.

16        THE COURT:  Well, how long will it take just to do

17  what the judge said to do?

18        MR. ROUHANDEH:  A couple of weeks, I would say.

19        THE COURT:  Well, so just at least turn that over.

20        MR. ROUHANDEH:  That's fine.

21         Your Honor, just so there's not a misimpression,

22  they have over 60 boxes of documents.  They continue to make

23  statements in their briefs that are absolutely inaccurate,

24  and I would say false, about our willingness to produce

25  documents.  We have given them 60 boxes of documents.  The

13

1      only reason they've made allegations related to 1997 and

2      1998 is because we produced to them the documents.  They

3      were picking out documents and they're making new

4      allegations based on that.  They wouldn't have had that

5      because David Franklin has no knowledge, the relator has

6      absolutely no knowledge of anything that occurred after

7      1997.  So, they're coming up with new allegations based on

8      the documents we produced.  Yet, every time they write a

9      brief to your Honor, and every time they write a brief to

10     the Magistrate -- and he, I believe, recognized this -- they

11     continue to paint us as being unwilling to produce documents

12     in discovery.  We have.  We did --

13              THE COURT:  I believe you.  I don't want to go into

14     it.  I just -- we're not doing it here, today.  But, I just

15     don't want -- this case is so old, it's so old.  I mean, I

16     sat on it for three years and now it's been another -- when

17     did we make it public?

18              MR. GREENE:  May of 2000, your Honor.

19              THE COURT:  It's been two years public.  It's just

20     too old.  It has to be kick-started.  We need to do

21     something with this.  So, it's been sitting in the court

22     system for five years.

23              And so, everyone keeps trying -- you keep trying to

24     expand it and you keep trying -- there's one narrow claim

25     that's probably going to go to trial or at least there's

14

1    going to be -- I need to address in a summary judgment.  I

2    haven't even gotten to the merits yet.  I haven't even hit:

3    Did you make fraudulent statements to get off-label uses?  I

4    mean, that's the one piece that I feel pretty confident at

5    least states a claim.  Okay?  All this other stuff is the

6    frills.  I'd like to just focus on it.  Let's get to the

7    merits on that one claim, and I'm sure -- I'm never sure --

8    there are ten courts that go one way and ten that go another

9    -- but, at least has a chance of seeing the light of day.

10          Would you be prepared to go to trial now on your

11   core claim?

12          MR. GREENE:  We need discovery, your Honor.  We

13   haven't had any discovery.

14          THE COURT:  No depositions, no nothing?

15          MR. GREENE:  We have four document requests out

16   there.  A year ago, you ordered them to produce documents

17   responsive to the second request.  We filed a motion to

18   compel with regard to the first request, and objections they

19   made with regard to the first request they made with regard

20   to the third and fourth request.  So, once the Court

21   addresses the time period and the scope --

22          THE COURT:  We shouldn't be waiting for this.  You

23   can do depositions on anything.

24          MR. GREENE:  We're going to run into the same

25   problem, your Honor.  They're not going to allow --

1          THE COURT:  No, they're not.  Okay?  Do the

2   depositions.

3          When is the discovery cutoff?

4          MR. TABB:  We've never had a Rule 16 conference,

5   your Honor.

6          THE COURT:  Well, we're going to have one today.

7   This is nuts.  I thought we did have -- what did we do when

8   we -- we've never had one?

9          MR. GREENE:  No, your Honor.

10         MR. TABB:  No, your Honor.

11         THE COURT:  All right.  Well, let's do one right

12   now.  When can we finish discovery?  I've seen you so many

13   times, that's hard to believe.  When do you want to do the

14   cutoff for discovery?

15         MR. GREENE:  Well, we really need to get responses

16   to the documents.

17         THE COURT:  Give me a date.

18         MR. GREENE:  When are we going to get the

19   documents?  If we're going to get the documents within two

20   or three months, depending upon how many boxes of documents,

21   we want to go through those documents before we start

22   depositions.

23         THE COURT:  You know, but you have a ton from what

24   the government -- have you ever seen the government stuff?

25         MR. GREENE:  We've seen the 62 boxes of documents

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

16

1    that were produced by the government.  But there's a lot
2    more that's been produced by the government, as I understand
3    --
4                THE COURT:  Your guy has been deposed.  Right?
5                MR. GREENE:  For four days.
6                THE COURT:  So, when do you want to do the 30(b)(6)
7    so they can --
8                MR. GREENE:  Your original order -- well, within 45
9    days of receiving the documents.
10               THE COURT:  Let's just -- let's say all documents
11   -- all documents from the Magistrate Judge's order, which is
12   the least that could be produced, should be produced within
13   14 days.  Right?  You said two weeks for some paralegal to
14   go through them?
15               MR. ROUHANDEH:  Yes, that's fine.
16               THE COURT:  Okay.  All documents from the
17   Magistrate Judge's order.
18               I'm going to get your brief in opposition when?
19               MR. MURRAY:  On the 17th, your Honor.
20               THE COURT:  All right.  On January 17th.
21               So, then, I will rule within some period of time,
22   hopefully soon thereafter, and you will produce any
23   additional documents -- I assume they're just sitting
24   somewhere.  Right?  You have them in your offices.
25               MR. ROUHANDEH:  It depends on the ruling, as to

17

1   whether we have to conduct any additional --

2           THE COURT:  I'm likely to go 1994 to 1998.

3           All right.  So, if I do that, do you have those?

4           MR. ROUHANDEH:  Yes.  It's not going to take two or

5   three months, which was the suggestion.  At most, at the

6   outside, I think it would take a month.

7           THE COURT:  All right.  So, 30 days after I rule.

8   Okay.  So, any documents after my order.  So, that basically

9   puts you into the end of February-ish, maybe early March.

10  All right?

11          And then, you can do the depositions.  How long?

12  How many depositions do you need to take?  It's ten under

13  the local rules.  So, how long would it take you to do ten?

14          MR. GREENE:  Again, once we've reviewed all the

15  documents, I think they can probably be done within a 60-day

16  period.

17          THE COURT:  Okay.  The end of June?

18          MR. GREENE:  You know, this case has sat around for

19  an awful long time, and it hasn't been through any neglect

20  on --

21          THE COURT:  I'm not faulting you.

22          MR. GREENE:  No, I know you're not, your Honor.

23          THE COURT:  When?  When can you do it?

24          MR. GREENE:  At this point, we're being forced to

25  --

18

1          THE COURT:  Tell me when, just give me a date.

2          MR. GREENE:  May I have just a minute, your Honor?

3          (Discussion off the record between Mr. Greene and

4   Mr. Tabb.)

5          MR. GREENE:  I don't think we could complete all

6   the deposition discovery on our timetable and feel

7   comfortable doing a responsible job by the end of next year.

8   December 2002.

9          THE COURT:  The end of this year?

10          MR. GREENE:  Excuse me, this year.

11          THE COURT:  Okay.  I thought we were at December

12   2003.  I don't know.  I think that's too long.  I think six

13   months, seeing how old this thing is.  Why don't we say the

14   end of September.

15          MR. GREENE:  Judge, I agree with you this case is

16   old, but ...

17          THE COURT:  No.  If you get all the documents in

18   March, by September 30th, you'll finish all your documents

19   -- excuse me -- all depositions by 10-30.

20          Is this an expert case?  I think it would have to

21   be a little bit, with all the --

22          MR. GREENE:  Yes, your Honor.

23          THE COURT:  All right.  So, by 10-30, the

24   plaintiffs will have their expert designation.  By 11-30,

25   the defense will do their expert designation.  By 12-30,

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

19

1    we'll do all expert depositions.  So, fact discoveries would

2    end in September.  By 12-30, all expert designations.  By

3    1-30-2003, any Motion for Summary Judgment.  By 2-30, any

4    opposition -- actually, 2-28.  All right.  And then, we'll

5    have a hearing on the inevitable Motion for Summary

6    Judgment, on March 15th, 2002 --

7              MR. MURRAY:  2003, your Honor.

8              THE COURT:  2003.  And, hopefully, as long as the

9    --

10             THE CLERK:  That's a Saturday.

11             THE COURT:  All right, then.  What date?

12             THE CLERK:  The 17th?

13             THE COURT:  The 17th is a Monday.

14             THE CLERK:  Two o'clock.

15             MR. TABB:  That is a Suffolk County holiday, your

16   Honor.  You may recall that we --

17             THE COURT:  Oh, yes.

18             MR. TABB:  Is the Court closed?

19             THE COURT:  Yes, my name's sake.  We'll do it the

20   next day.

21             THE CLERK:  Eighteenth, two o'clock.

22             THE COURT:  All righat.  Federal courts actually do

23   not close for St. Patrick's Day.  And, for the New Yorkers,

24   here, it's known as Evacuation Day.  It's when the British

25   left Boston.  But everyone knows what it really is.  All

20

1     right.

2               (Laughter.)

3               THE COURT:  All right.  So, that gives us a

4     timetable.

5               In the meantime, the government probably can't

6     report to us -- do you know what your status is on whether

7     you are likely to intervene or not?  I mean, you're like the

8     cloud hovering.

9               (Laughter.)

10              MR. KANWIT:  Your Honor, we've known each other for

11    years and you're making an analogy of me to a cloud?

12              THE COURT:  Harry Potter.  You're the wizard with

13    the invisible cloak.

14              (Laughter.)

15              THE COURT:  You're here and you're not here.

16              MR. KANWIT:  My daughter would be really pleased

17    with that.

18              All I can tell you is there is some movement -- I

19    can't be more explicit -- and that we recognize the age of

20    the case.  So that, just hypothetically, if we were to do

21    something, we would do it soon.  There is an intermediate

22    step that I imagine everybody here can imagine.

23              THE COURT:  I actually have never dealt with this

24    before.  I don't know what your role actually is.  And I'm

25    sort of taking your briefs at this point as amicus, but it's

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1    odd.  I think you have a right to comment as long as you

2    haven't made a definite decision.  But I must say I've had

3    this go-around before with you.  It's just been a really

4    long time.

5              MR. KANWIT:  It has been, your Honor, it has been.

6    It is a very difficult and a very complex case.  I know you

7    understand that, everybody here understands it, but it bears

8    repeating.

9              One other thing that I would -- I want to make one

10   short point, your Honor.  As to the objections to the

11   Magistrate Judge's order, as to that, the order in Paragraph

12   4 expressly by its terms applies to us.  It doesn't merely

13   say to the parties, "thou shalt not do this or thou shalt do

14   this."  It says, "the United States may not."  And, in that

15   sense, I think we're a directly affected party.  So,

16   clearly, on that, we have standing.  And beacuse I view that

17   as having such important implications for parallel

18   prosecution, we have asked for oral argument.

19             THE COURT:  Let me say something to you, because I

20   used to be in the civil division and criminal division of

21   the office, and the one thing, years ago, and I know the

22   laws have changed some, there's a very specific way in which

23   you get criminal discovery.  It can be done through the

24   grand jury process and it can be done on the federal rules

25   of criminal procedure if there's ever an indictment.  I

## CERTIFICATE

I, Marie L. Cloonan, Official Reporter of the United States District Court, do hereby certify that the foregoing transcript, from Page 1 to Page 50, constitutes to the best of my skill and ability a true and accurate transcription of my stenotype notes taken in the matter of Civil No. 96-11651, David Franklin, United States of America, Ex Rel vs. Parke-Davis, Division of Warner-Lambert Company.

*Marie L. Cloonan*

# EXHIBIT F



# Finkelstein & PARTNERS
*Counselors At Law*

A Limited Liability Partnership

Howard S. Finkelstein, P.C.
Andrew G. Finkelstein, P.C. (NY & NJ)
George M. Levy
Kenneth L. Oliver, P.C.
Joel S. Finkelstein, P.C. (NY, NJ, MA & FL)
Duncan W. Clark
Ronald Rosenkranz
Robert J. Camera (NY & NJ)
Joseph P. Rones (NY & FL)
Steven Lim
George A. Kohl, 2nd (NY & MA)
Eleanor L. Polimeni
Steven H. Cohen
Francis Navarra

Andrew J. Genna (NY & PA)
Thomas C. Yatto
Elyssa M. Fried-DeRosa
Mary Ellen Wright
Kenneth B. Fromson (NY & NJ)
Joel Bossom
Nancy Y. Morgan (NY & PA)
Andrew L. Spitz
James W. Shuttleworth III
Lawrence D. Lissauer

David E. Gross (NY & NJ)
Bruna L. Horowitz (NY, NJ & MA)
Terry D. Horner

Robert F. Moson
Debra J. Reissman
Michael T. McGarry
Steven P. Shultz (NY & MA)
Julio E. Urrutia
Victoria Lieb Lightcap (NY & MA)
Ann R. Johnson (NY & CT)
Marshall P. Richer
Thomas J. Pronti
Kristine M. Cahill (NY & CT)
Kara L. Campbell (NY & CT)
Arieh Mezoff
Christopher T. Milliman

Silvia Fernandez
Karen M. Ossman (NY & CT)
Marie M. DuSault
Andrew I. Falk

Of Counsel
Jules P. Levine, P.C. (NY & FL)
Michael O. Gittelsohn, P.C.
Joel A. Reback (NY & Israel)
Sheila Rosenrauch
Kenneth G. Bartlett (CT)
Ari Kresch (NY & MI)

(800) 634-1212

REFER TO OUR FILE # 204805

April 21, 2005

Hon. Jed S. Rakoff, U.S.D.J.
United States Courthouse
500 Pearl Street, Room 1340
New York, NY 10007

Re: In Re Neurontin; 04 Civ. 6704(JSR)

Honorable Sir:

At issue is the "scope" of production pertaining to Neurontin: specifically, Plaintiffs seek to compel discovery of information relating to Defendants sales/marketing efforts and communications with physicians and the public without constraints on *geographic location* or a *particular year* since the launch of Neurontin into the marketplace. The information that is maintained via computer database or a traditional file, from the time of Neurontin's entrance into the marketplace to the present time, is essential to Plaintiffs' claims. Discovery of this information may confirm notice to Defendants of the dangers of Neurontin and will demonstrate the Defendants' illegal behavior in marketing Neurontin for 'off-label' purposes.

On 2/20/05, this Court addressed Plaintiffs' motion to compel the entirety of Defendant's adverse event information. In granting Plaintiffs' application without limitation by geography or date, the Court recognized Plaintiffs' need to discoverable information:

> Plaintiffs reasonably need access to multiple databases in order to ascertain whether . . . defendants marketed the drug for uses not approved by federal regulators.... *All* communications have the potential to be relevant since plaintiffs need not prove that their doctors relied on a specific deceptive statement....Defendants' sales and marketing efforts cannot be assessed by looking only at communications directly with plaintiffs' doctors and nearby physicians." In re Neurontin Litigation 04 Civ 6704 (S.D.N.Y January 20, 2005) (emphasis added).

Plaintiffs seek the Court's Order to compel discovery of the entire Neurontin sales/marketing databases, medical communication database, as well as information revealing Defendants' interactions with physicians through its Visiting Speaker's Bureau (VSB),[1] since Neurontin's launch so that Plaintiffs can review *all* communications.

---

[1] It is unclear whether the VSB information is maintained via database or traditional files. However, it is apparent that there are some data kept in database format as described by deponent Suzanne Doft during her examination under oath on 3/29/05: *"For speakers bureau participants, there is an approved database of speakers that a representative can use."* (p.127).

NEWBURGH • ALBANY • SYRACUSE • POUGHKEEPSIE • UTICA • TROY • BINGHAMTON • MIDDLETOWN • NYACK
NEWARK • NEW WINDSOR • GOSHEN • NEW HAVEN • CINCINNATI
Accredited CLE Provider          www.lawampm.com          www.stocklitigationlaw.com
send ALL correspondence to our operations center: 436 Robinson Avenue, Newburgh, NY 12550 • (800)634-1212 • Fax (845)562-3492

**Discovery of the Entire Databases or Files is Necessary and Essential to Plaintiffs' Claims.**

In order establish what Defendants knew and when Defendants knew it, plaintiff must review the full content of information possessed by Defendants. The databases will reveal what information was communicated to the medical community and public; whether Defendants engaged in a pattern or practice of illegal off-label promotion; whether Defendants downplayed or concealed known risks.[2]

This information is relevant to Plaintiffs' claims as it: (i) it will confirm Notice to Defendants --- including Pfizer--- of the dangers of Neurontin; (ii) it will verify the marketing behavior of Defendants ---including Pfizer; (iii) it may provide necessary proof of entitlement to punitive damages.

Defendants may seek to limit discovery of sales and marketing behavior to the years prior to Pfizer's acquisition of Warner Lambert with the misguided position that discovery of Pfizer's marketing behavior is not relevant since only Warner Lambert has been convicted of wrongdoing. Any argument by Defendants to prevent discovery of Pfizer era material is misplaced. Pfizer's actions or inactions are an integral part of Plaintiffs' claims. First, facts exist implicating Pfizer's wrongdoing since acquiring Warner Lambert. On July 1, 2002, through a written communication, the FDA accused Pfizer of making false or misleading representations about Neurontin's benefits and mechanism of action. The FDA contact states in part: "[T]he prominent display of the name 'Neurontin' is misleading because it suggests that Neurontin is useful for a broader range of ...conditions than has been demonstrated by substantial evidence."[3] Second, as part of the June 2004 criminal settlement, Pfizer agreed to implement a Corporate Integrity Agreement for purposes of auditing its own marketing conduct and activity. Pfizer's inclusion in the Corporate Integrity Agreement was a "reflection of Pfizer's ownership of Warner-Lambert and the integration of former Warner-Lambert units and personnel into Pfizer."[4] Third, any argument by Pfizer that it has not engaged in the "off-label" promotion of Neurontin since its acquisition of Warner Lambert is inconsistent with Pfizer's continued sales in the billions between the years 2000-2004, which upon information and belief, was predicated on 83% off-label prescriptions. Plaintiffs should be able to discover the extent to which these sales were based upon continued "off-label" promotion.

**Access will Reveal Defendants' Knowledge about the Benefits and Safety of Its Product.**

What Defendants knew about the risks and benefits of Neurontin, and when Defendants gained that knowledge lies at the heart of Plaintiff's causes of action. This information may be found in multiple databases, including but not limited to Medical Communications, Sales, Speakers Bureau, etc. The Medical Communications database stores information concerning inquiries made by physicians about Neurontin. When a physician ---anywhere in the country--- inquired about Neurontin, Defendants' representative recorded that communication and provided information relevant to the inquiry. The

---

[2] Plaintiff's claims include, *inter alia*: Defendants actions related to research and deceptive practices associated with Neurontin clinical trials; Food and Drug Administration (hereinafter FDA) procedures and regulations and Defendants disclosure, or lack thereof, to the FDA; foreign regulatory actions and experiences abroad which provided notice of the defective product; Defendants misbranded and violated warning duties; Defendants did not disclose or failed to conduct appropriate risk-benefit ratio analysis on pre and post marketing data; defendants withheld unpublished studies; and more.

[3] FDA DDMAC letter; Lisa Stockbridge, Ph.D., Regulatory Reviewer, July 1, 2002.

[4] Sentencing Memorandum of the U.S.; Michael J. Sullivan, U.S. Attorney, June 2, 2004.

database contains a summary of both the physician's comments and the information Defendants provided. All information provided by physicians puts Defendants on notice of potential problems with Neurontin, thereby creating an obligation by Defendants to investigate further, propose new warnings or remove the product from the market.

Similarly, the Sales Databases contain summaries of visits Defendants' sales agents made to physicians. Historically, agents throughout the country record information that physicians provide regarding concerns or complaints about a drug's efficacy, in addition to information regarding any response the sales agent made. The database thus contains the information Defendants possessed regarding defects in Neurontin and reveals when Defendants became aware of this information. Here, Defendants' actual knowledge that its product was ineffective or detrimental is an important component of Plaintiff's negligence, fraud and misrepresentation claims. It does not matter whether Defendants gained this knowledge in Oregon, New York or London. The Plaintiffs' claim is they had the knowledge and failed to take appropriate action. Claims by Defendants that the only relevant information concerns Defendants' interaction with a given plaintiff's physician ignores a central claim by plaintiffs: it makes no difference who informed Defendants of these problems. Undoubtedly, information Defendants possessed regarding the dangers of its product came from physicians who did not treat Plaintiffs and is discoverable in this action.

**Access to Information will Reveal Defendants Behavior in Promoting Neurontin.**

Access to *all* Sales/Marketing information will reveal whether Defendants acted as a reasonably prudent seller in promoting Neurontin for particular uses. Plaintiffs cannot ascertain whether Defendants' actions, and the timing of those actions, in the face of adverse information were reasonable unless Plaintiffs evaluate all data Defendants had at various times.[5] Additionally, discovery of this information is imperative in evaluating Defendants' behavior in complying with FDA regulations. Consequently, this requires Plaintiffs' counsel to take on the task of revealing —via database or file information— Defendants' aggressive off-label promotion.[6] The Sales Database contains relevant, discoverable information related to these tactics. These are relevant to Plaintiffs' claim for both compensatory and punitive damages.

**The Databases Confirm the Information Disseminated by Defendants**

[5] Although Adverse Event disclosure was previously decided by this Court, there is a relationship between discovery of Sales/Marketing and analysis of Adverse Events. Sales representatives must record all *samples* left with each physician in a Sales database. All risk statistics for adverse events are computed by comparing the number of people injured to the number of people who took the drug. Drug companies calculate the denominator (or number of people who took the drug) by assessing pharmacy sales as well as the number of samples distributed. The only way for Plaintiff to verify the accuracy of those calculations is by allowing Plaintiff full access to the Sales database and the sample information contained in such database.

[6] Upon information and belief, the Defendants' tactics in promoting the off label use included the following: (1) encouraging sales representatives to provide one-on-one sales pitches for off-label use; (2) using medical liaisons, who often falsely represented themselves as neutral scientific experts, to work in tandem with sales representatives and directly sell Neurontin to physicians for off label use; (3) paying physicians to allow a sales representative to see patients with the doctor and to participate in discussing a treatment plan; (4) paying physicians with fringe benefits such as trips, meals, hotel rooms, etc., to attend speakers bureau trainings in which doctors received presentations about off-label uses of Neurontin; (5) providing payment to doctors to speak with other doctors about the off-label uses of Neurontin; (6) sponsoring "medical education" events to inform doctors about the off-label uses of Neurontin.

Some of the information upon which physicians rely comes from representatives of Defendants' Medical Communications Department. Historically, such representatives not only man the "800" hotline but also answer inquiries by e-mail and fax as well. The toll-free number is listed in advertising, the PDR and via the internet. The representatives handle inquiries made by a broad range of entities, including physicians, hospitals, health maintenance organizations and even consumers. A review of the Medical Communications Database will reveal all communications to prescribing physicians, as well as what was not told to prescribing physicians.[7] As set forth above, said information is central to plaintiffs' claims.

Physicians received information from Defendants' via multiple outlets. Defendants bombarded the medical community with information regarding Neurontin through direct and indirect marketing means. Defendant enlisted practicing physicians to solicit their fellow physicians to prescribe Neurontin. Defendant specifically paid "thought leaders" to promote benefits of Neurontin for off-label indications. Such indirect marketing measures creates general beliefs about the efficacy of Neurontin, regardless of whether they have direct contact with the manufacturer. Such indirect sales tactics influence a physician's standard prescription practice and continues today. Limiting discovery to solely the direct marketing means exercised on a Plaintiff's doctor would prevent Plaintiffs from uncovering the whole story regarding Defendants' promotion of Neurontin to the medical community at large.

**The Databases Are Essential to Prove a Pattern or Practice of Misconduct and Oppose a Learned Intermediary Defense.**

Evidence of a pattern or practice of over-promoting Neurontin is essential to overcoming Defendants' "learned intermediary" defense. Courts have held that a manufacturer cannot hide behind this defense, even if the manufacturer provided adequate warnings, if the manufacturer engaged in a pattern or practice of deceptive marketing that overwhelmed the effect of the warnings on physician knowledge and beliefs. *See, e.g., Salmon v. Parke, Davis & Co.*, 520 F.2d 1359, 1362 (4th Cir. 1975)(over-promotion may erode the effectiveness of otherwise adequate warnings); *Whitley v. Cubberly*, 210 S.E.2d 289, 291-92 (N.C. App. 1974)(over-promotion to medical community in general as well as to individual physician is relevant). Defendants will argue the learned intermediary defense affirmatively in this litigation but seeks to limit the Plaintiffs' ability to combat that defense.

In *Incollingo v. Ewing*, 282 A.2d 206, 221-222 (Pa. 1971), the plaintiff sued the manufacturer of a dangerous drug and the two physicians prescribing it. One physician testified he considered himself adequately warned of the drug's dangers; the other testified to the converse. The court recognized that evidence regarding the manufacturers' general practice of over-promoting the drug throughout the medical field supported the jury's finding that the warnings were inadequate in that they constituted evidence that could confirm the latter doctor's testimony and dispute the former doctor's claim.[8]

---

[7] Defendants must provide responses to inquiries that are objective, accurate and which are often based upon clinical trial information. In March 2005, the FDA requested that Defendants re-examine their clinical trial data in response to claims that Neurontin may be associated with suicide. To the extent this re-examination demonstrates an association never before disclosed Defendants, then representatives were indeed providing inaccurate information regarding Neurontin's safety.

[8] "As a practical matter, it would have been difficult, if not impossible, to show how the promotional efforts of the manufacturer bore on the judgments of these co-defendants without demonstrating that the efforts were directed to the entire class or group of which they were members." 282 A.2d 206, 221-222 (Pa. 1971).

Plaintiffs cannot be compelled to accept the testimony of his or her individual prescribing physician, whom Defendants may have already indemnified or is in the process of indemnifying. Physicians were likely influenced by Defendants' over-promotion even if they, themselves, were not in direct contact with Defendants' agents. If discovery is limited in the manner Defendants suggest, Defendants will likely argue that millions of individuals have ingested Neurontin, yet Plaintiffs, at most, can point to a single limited geographic area, over a limited period of time, to demonstrate only a few doctors were duped.[9] Unless Plaintiffs have access to the full databases and files reflecting the conduct of Defendants' entire Neurontin sales and marketing force, Plaintiffs risk having insufficient proof of pattern or practice to convince a jury to find fraudulent intent, award punitive damages or reject Defendants' "learned intermediary" defense. *See, e.g., Watkins v. Lundell*, 169 F.3d 540, 546 (8th Cir.), *cert. denied*, 528 U.S. 928 (1999)(evidence of a "pattern, practice or scheme characterized by fraud or deceit" is evidence of reprehensibility to be considered in evaluating punitive damages claim); *In Re: Vitamins Antitrust Litig.*, 2001 U.S. Dist. LEXIS 8904, at 59-73 (D.D.C. 2001) (overruling that part of the Special Master's Report and Recommendation imposing geographic limitation on scope of certain of plaintiffs' discovery where plaintiffs alleged conspiracy).

**The Visiting Speaker's Bureau Files**

Defendants' sales representatives promoted Neurontin to physicians throughout the nation. Defendants interacted with physicians through its Visiting Speaker's Bureau ("VSB") that sponsored numerous programs each year for doctors at which Defendants actively promoted Neurontin. As such, Defendants disseminated essentially unregulated information to the medical community at large through a vast network of communications. Plaintiffs seek to compel disclosure of this information. Moreover, the data will also provide the identities of physicians most knowledgeable about Neurontin. Defendants have contracted with physicians to make presentations throughout the nation to tout the benefits of Neurontin. Information regarding these presentations, including the identities of the physicians, is stored in the VSB files. Further, to the extent these physicians may later serve as experts for the defense, it would be important when challenging the purported expert for Plaintiff to show the expert's previous relationship with the Defendants.

For the reasons set forth above, Plaintiff must be permitted access to Defendants' databases and files without limitation to geographic location or particular timeframe since Neurontin's launch into the marketplace.

Respectfully submitted,

Kenneth B. Fromson (KF8086)

cc    Davis Polk & Wardwell
      Attorneys for Defendants

---

[9] Actions pending in the SDNY venue alone include Plaintiffs whose prescriptions stem from various states: WI, AZ, GA, KY, FL, PA, NY, IL, CA, OR, CO, OK, NC, TN, AL, LA. The list of states expands further if other federal and state court venues are included. Given the national nature of the litigation, it is not reasonable to limit discovery to a geographic area.

-5-

# EXHIBIT G

# DAVIS POLK & WARDWELL

### 450 LEXINGTON AVENUE
### NEW YORK, N.Y. 10017
212 450 4000
FAX 212 450 3800

JAMES P. ROUHANDEH
212 450 4835
james.rouhandeh@dpw.com

1300 I STREET, N.W.
WASHINGTON, D.C. 20005

1600 EL CAMINO REAL
MENLO PARK, CA 94025

99 GRESHAM STREET
LONDON EC2V 7NG

I 3, AVENUE MATIGNON
75008 PARIS

MESSETURN
60308 FRANKFURT AM MAIN

MARQUÉS DE LA ENSENADA, 2
28004 MADRID

I-8-I ROPPONGI
MINATO-KU, TOKYO 106-6033

3A CHATER ROAD
HONG KONG

April 21, 2005

Re:    In re Neurontin, 04-CV-6704 (JSR)

Hon. Jed S. Rakoff
United States District Judge
United States District Court for the
   Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street, Room 1340
New York, New York 10007

Dear Judge Rakoff:

   We write on behalf of defendants in the above-referenced action to oppose the production of the entirety of four databases maintained by defendants' Medical Information and Sales and Marketing departments.[1] Specifically, defendants respectfully ask the Court to deny plaintiffs' request for the portions of these databases that relate to the seven-year period that post-dates plaintiffs' allegations of off-label promotion of Neurontin. Given that plaintiffs have not made a single allegation of off-label promotion after 1997, a temporal limitation is appropriate here in order to curb plaintiffs' attempted expansion of the scope of this litigation and to minimize the undue burden on defendants.

---

[1] The databases are: (1) Warner-Lambert Company's Medical Information database, known as Merlin; (2) Pfizer Inc.'s Medical Information database, known as Pfoenix; (3) Warner-Lambert's Sales and Marketing database, known as CMMS; and (4) Pfizer's Sales and Marketing database, known as CMS. Defendants will refer to the first two as the "MI" databases and the latter two as "CMS" databases. The MI databases contain information that medical information personnel receive as a result of inquiries from health care providers. The CMS databases contain information transmitted from sales representatives regarding their sales calls on doctors.

Judge Jed S. Rakoff                    2                    April 21, 2005

### Limitations on Discovery of the Databases Are Warranted

Although the Federal Rules of Civil Procedure afford plaintiffs broad discovery, it is by no means unlimited. See FRCP 26(b)(2)(iii) (discovery is permitted "regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action . . . relat[ing] to the claim or defense of the party seeking discovery"); Tottenham v. Trans World Gaming Corp., No. 00 Civ. 7697(WK), 2002 WL 1967023, at *2 (S.D.N.Y. June 21, 2002) ("Discovery . . . is not intended to be a fishing expedition, but rather is meant to allow the parties to flesh out allegations for which they initially have at least a modicum of objective support" (internal quotation marks omitted)).

In particular, discovery requests must be properly anchored to allegations made in a plaintiff's complaint. See Sacket v. Liggett Group, Inc., 173 F.R.D. 358, 361 (E.D.N.Y. 1997) ("[T]he parties should not be allowed to roam in shadow zones of relevancy and to explore matter which does not presently appear germane on the theory that it might conceivably become so."); United States v. Consol. Edison Co., No. CV-88-0049 (RJD), 1988 WL 138275, at *1 (E.D.N.Y. Dec. 15, 1988) (denying discovery requests on ground that they were "not targeted at the discovery of evidence related or relevant to the violations alleged in the complaint"). In addition, requests for temporal restrictions have been found to have merit. See Monaco v. Smith, No. 00CIV5845RMBKNF, 2001 WL 815529, at *4 (S.D.N.Y. July 18, 2001) (denying plaintiff's requests for documents on grounds of temporal restriction); In re PE Corp. Sec. Litig., 221 F.R.D. 20, 27, (D. Conn. 2003) (same).

Defendants acknowledge that with respect to discovery relating to the safety of Neurontin, a temporal limitation would not be appropriate. Accordingly, defendants have agreed to produce all documents from the databases relating to the safety of Neurontin. But plaintiffs' effort to obtain marketing information from the databases that are unrelated to safety would result in an unwarranted expansion of the litigation.

The complaints in this action are devoid of any allegation of off-label promotion after 1997.[2] For example, defendants in 1995 are alleged to have performed a "marketing assessment of proposed psychiatric indications for Neurontin" (¶ 158); mounted a similar assessment for the drug's market potential for neuropathic pain (¶ 159); and circulated a memorandum that showed that the main message of sales pitches by 10 of 50 company sales representatives to

---

[2] Defendants refer to the complaint in Gary Lyman v. Pfizer Inc., et al., No. 04 CV 6704 (JSR) as a representative example for the other complaints in this consolidated action. Citations to "¶ ___" refer to paragraphs in the Lyman complaint.

doctors regarding Neurontin were for off-label uses (¶ 163). In the following year, sales representatives allegedly "detailed" a doctor for off-label uses of the drug in Louisiana (¶ 164); proposed that it was appropriate to ask doctors about the use of antiepileptics for painful neuropathies (¶ 165); and recommended that a medical liaison speak to a group of doctors about Neurontin's off-label uses (¶ 166(a-e)). Also in 1996, defendants allegedly organized a consultant meeting in Jupiter Beach, Florida, where doctors were invited to hear presentations of off-label uses of Neurontin, and held an advisory board meeting in Georgia where eighteen doctor consultants and their spouses were treated to tickets to the Olympics and presentations involved discussion of off-label uses (¶¶ 172, 173, 174). Plaintiffs further allege that defendants sponsored unlawful teleconferences in 1996 during which doctors were informed about Neurontin's utility in treating pain (¶ 175, 176).

From 1995 to 1997, plaintiffs allege that defendants held "dozens" of consultants meetings where Neurontin was discussed in the context of affective disorder, psychiatric disorders, neurological conditions and other non-epileptic uses (¶ 177). During this time, defendants allegedly funded a publication strategy that fostered favorable articles of Neurontin's off-label uses (¶ 178); founded speakers' bureaus as a means to funnel money to doctors (¶ 179); and employed medical liaisons to act as little more than sales representatives (¶ 180).[3] In addition, plaintiffs attach to their complaints an Information in which the United States charged Warner-Lambert Company LLC with violations of the Food Drug and Cosmetic Act ("FDCA") arising from specific instances of off-label promotion "[f]rom in or about June of 1995 through in or about August 21, 1996."[4]

In contrast to the allegations from 1995 to 1997, plaintiffs do not in any of their complaints point to a single instance of improper promotional activity after 1997. Instead, plaintiffs allege only generally and without any factual support that off-label promotion occurred in the years following 1997. For example, plaintiffs allege that "through at least June 2001" defendants' "marketing program" included violations of the FDCA resulting from payments to doctors to promote Neurontin off-label and disseminating false statements about the drug (¶ 183). This sweeping statement does not justify discovery of documents from the databases relating to the seven-year period following 1997. Indeed, plaintiffs concede the paucity of their factual allegations: "Defendants made additional fraudulent misrepresentations as to the safety and effectiveness of Neurontin, *which are not detailed herein but will be determined in discovery*" (¶ 184) (emphasis added). Accordingly, plaintiffs' own pleadings fail to provide a basis

---

[3] Plaintiffs also allege that defendants in 1998 sponsored a scientifically valid study of Neurontin's efficacy in treating bi-polar disorder. Plaintiffs allege that defendants then failed to publish the results of the study until 2000. To the extent there is information in the databases relating to these allegations, defendants do not object to producing it.

[4] Information, United States of America v. Warner-Lambert Company, LLC (D.Mass. May 13, 2004).

for expanding discovery beyond the period from 1995 through 1997 and the Court should, therefore, bar their fishing expedition. See Surles v. Air France, No. 00CIV5004RMBFM, 2001 WL 815522, at *4 (S.D.N.Y. July 19, 2001) (discovery request may not be "based on pure speculation or conjecture" (quoting In re Alliance Pharm. Sec. Litig., No. M-8-85, 1995 WL 51189, at *1 (S.D.N.Y. Feb. 9, 1995))). Plaintiffs apparently believe that they are entitled to the databases to determine whether defendants were engaged in off-label promotion at any point after 1997. The purpose of discovery, however, is to enable parties to prove their allegations, not to hunt for them.

Plaintiffs' expansive request for all marketing documents from the databases without regard to date is also not justified by their punitive damages claim. Although a claim for punitive damages may warrant discovery of a defendant's net worth and finances, it does not function to expand litigation into new areas. See e.g., Hazeldine v. Beverage Media, Ltd., No. 94 Civ. 3466 (CSH), 1997 U.S. Dist. LEXIS 8971, at *6-*7 (permitting discovery of defendant's financial information to support plaintiff's punitive damages claim); CEH, Inc. v. FV Seafarer, 153 F.R.D. 491, 498 (D.R.I. 1994) (collecting cases). Because plaintiffs' request for the full contents of the MI and CMS databases is not grounded in the pleadings and falls outside of the limited realm afforded for discovery of matters pertaining to punitive damages, it should be denied.

### Plaintiffs' Request is Unduly Burdensome

Beyond the legally inappropriate nature of plaintiffs' request, production of the entirety of defendants' MI and CMS databases would be unduly burdensome. Courts frequently limit discovery where its burdens outweigh any likely benefits. See Mitchell v. Fishbein, 2005 U.S. Dist. LEXIS 5069, at *13 (S.D.N.Y. March 31, 2005) (finding that Federal Rule 26(b)(2) specifically provides that a court may limit disclosure if, inter alia, "the burden or expense of the proposed discovery outweighs its likely benefit."); Jones v. Hirshfield, 219 F.R.D. 71, (S.D.N.Y. 2003) (noting courts' duty and responsibility to balance the benefit and burden of discovery and that they "should not hesitate to exercise appropriate control over the discovery process." (internal quotation marks omitted)).

Producing the MI and CMS databases without a temporal restriction poses a burden that outweighs any likely benefit to plaintiffs. There are an estimated 1.4 million individual text fields in the two CMS databases maintained by defendants Warner-Lambert Company and Pfizer Inc. that would, at a minimum, require review prior to a production to plaintiffs. See Kibbe Aff. at ¶¶ 2, 4-6. Additionally, these text fields will require redaction in accordance with federal

Judge Jed S. Rakoff                    5                    April 21, 2005

Laws relating to patient confidentiality.  See e.g., 42 U.S.C.S. §1320d et seq.  In addition, the two MI databases contain approximately 110,000 individual text fields that will require review by defendants.  See Kibbe Aff. at ¶¶ 3-6.  These fields will also need to be reviewed so that redaction of federally protected information can be made.  See Nat'l Abortion Fed'n, 2004 WL 292079, at *3.  As a result, the time and expense required to produce the full databases is substantial and would unduly burden defendants.

For all of the foregoing reasons, defendants respectfully request that plaintiffs' request be denied.

Respectfully yours,

James P. Rouhandeh

Attachment
cc w/ att:    Kenneth Fromson, Esq.

By Facsimile & Mail

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - x
                                                 :
                                                 :
IN RE NEURONTIN                                  :     04 CV 6704 (JSR)
                                                 :
                                                 :
- - - - - - - - - - - - - - - - - - - - - - - - x

### AFFIDAVIT OF LAURA M. KIBBE

LAURA M. KIBBE deposes and says,

1.      I am Senior Corporate Counsel for Pfizer Inc, and am responsible for and knowledgeable about the processes by which current Pfizer databases and legacy Parke-Davis and Warner-Lambert databases are collected, reviewed and prepared for production in discovery, including litigation involving Neurontin.  I make this affidavit in support of Defendants' letter brief regarding the scope of production of Defendants' databases dated April 21, 2005 in this matter.

2.      The legacy Warner-Lambert and Pfizer sales and marketing databases (known as CMMS and CMS) contain or correspond with narrative fields into which Defendants' sales representatives enter information regarding sales calls on health care professionals.

3.      The legacy Warner-Lambert database (known as Merlin) and the Pfizer database (known as Pfoenix) maintained by their respective medical information departments contain fields into which Defendant's medical information personnel enter

information regarding inquiries received from health care professionals or consumers, including fields into which narrative text may be entered.

4.      Prior to production of above databases in discovery, the narrative text must be reviewed for content.  The narrative text may contain patient or physician-specific information that is protected by the medical privacy provisions of federal and state law.  Accordingly, Defendants cannot simply produce the databases as is, but must undertake the process described in paragraph 5 below prior to production.

5.      Prior to production in discovery, the CMS, CMMS, Merlin and Pfoenix databases undergo the following process.  The relevant data in the relevant fields of the database is first exported into a delimited format suitable for loading into a commercially available database program (typically Microsoft Access) and sent to a litigation support technology vendor.  The data is then reconstructed into a Microsoft Access database that allows for on-screen review, and manual redaction if necessary, on an individual record-by-record basis.  Once this review is complete, if any of the text fields have been redacted, the original unredacted text fields are replaced by the redacted text fields, and the Microsoft Access database is then produced in its redacted.

6.      The CMS/CMMS databases from 1999 through 2004 contain approximately 1.4 million individual text fields that would need to be reviewed if the entire databases were deemed discoverable.  The Merlin and Pfoenix databases in their

2

entirety contain approximately 110,000 individual text fields that would need to be reviewed if the entire databases were deemed discoverable.

*Laura M. Kibbe*

Laura M. Kibbe

Sworn to this 21 day of April, 2005

Notary Public

MARILYN ANNE BANTI
Notary Public, State of New York
No. 01-7703826
Qualified in New York County
Commission Expires May 31, 20_06

3

# EXHIBIT H

*204805*

**Honorable Jed S. Rakoff**
**United States District Court**
**Southern District of New York**
500 Pearl Street · Room 1340
New York, NY 10007
(212) 805-0401
FAX (212) 805-7935


TO:          Ken Fromson (845) 562-3492
             Jim Rouhandeh (212) 450-3511


FROM:        Judge Jed S. Rakoff


DATE:        April 25, 2005


REGARDING:   In re Neurontin, 04 Civ. 6704


Please see attached.


Number of Pages (including cover):    7

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------X
                                           :
                                           :
In re NEURONTIN                            :    04 Civ. 6704 (JSR)
                                           :
                                           :
-------------------------------------------X         ORDER

JED S. RAKOFF, U.S.D.J.:

Plaintiffs allege that a series of suicides and attempted suicides were caused by the defendants' marketing their drug Neurontin for purposes for which it was not approved (so-called "off-label" uses) and for which defendants had reason to know it was not safe. The Court previously ruled that the defendant drug companies must produce records of adverse events associated with the use of this drug. See Order 2/20/05. Before the Court now is plaintiffs' motion to compel production of various databases related to defendants' sales and marketing efforts and communications with doctors. Defendants, while conceding the discoverability of parts of these databases, seek to limit discovery to events occurring in 1997 and before.[1] For the reasons stated below, the defendants' proposed temporal boundary is modified and plaintiffs' motion granted, subject to some limitations.

-------------------

[1] While defendants' brief is limited to this issue, plaintiffs' brief argues other points that appear not to be contested by defendants, in particular that discovery of this marketing information should not be restricted geographically. Because it is unclear whether an actual controversy exists in this regard, this Order does not address any issues beyond the proposed temporal limitation on discovery.

Much of plaintiffs' complaint[2] consists of generalized
allegations that do not refer to specific dates or incidents.
However, the complaint does allege specific incidents, all taking
place by 1997, of improper marketing of Neurontin for off-label
purposes.  See Complaint ¶¶ 151-183.  It appears that these
specific allegations are largely derived from a criminal
information to which defendants pleaded guilty on June 7, 2004.
See Information, attached to Complaint as Exhibit A; Complaint ¶¶
117-18.  The information contains no allegations subsequent to
1996.

Defendants argue that, because the complaint contains no
specific allegations of wrongdoing subsequent to 1997, it need
only turn over marketing materials prior to that time.  However,
the complaint does contain explicit (if generalized) allegations
of wrongdoing continuing until at least June 2001.  See Complaint
¶ 183.  Moreover, plaintiffs' legal theory -- that the suicides
and suicide attempts were caused by Neurontin that was prescribed
because of defendants' wrongful actions -- implicitly requires
that defendants' alleged deceptions, or at least the effects
thereof, have continued at least until the last point in time
when doctors could have chosen a different course of action had

---

[2]While this case now covers many plaintiffs, plaintiffs'
counsel has filed a virtually identical complaint for each.  For
convenience, this decision refers to a single "complaint," and
paragraph references are to the complaint and answer in Lyman v.
Pfizer, the lead case.

they been properly informed.  This is particularly true because
defendants have interposed a learned intermediary defense, see
Answer at 19, and thereby have explicitly put at issue the
effects of defendants' marketing efforts on the prescribing
doctors' ability to adequately counsel their patients as to
Neurontin's benefits and risks.

The fact that in some places the complaint includes more
particularized allegations, mostly taken from the information,
does not render the remainder of the complaint, which the
defendants do not claim fails to satisfy the minimal standards of
notice pleading,[3] insufficiently detailed to obtain discovery of
evidence relevant to the claims and defenses pleaded, see Fed. R.
Civ. P. 26(b)(1).  It does, perhaps, indicate that plaintiffs
have a lesser chance of finding evidence bearing out those
allegations, but this is not a consideration the Court may take
into account in determining whether "the burden or expense of the
proposed discovery outweighs its likely benefit," see Fed R. Civ.
P. 26(b)(2) (court should consider "the needs of the case, the
amount in controversy, the parties' resources, the importance of

---

[3]While defendants' brief implies that the lack of
specificity indicates that plaintiffs lack a good-faith basis for
their generalized allegations, see Defendants' Brief at 3
(stating that plaintiffs "allege only generally and without any
factual support that off-label promotion occurred in the years
following 1997"), defendants do not move to strike any portion of
the complaint for this reason or for vagueness, and so the Court
cannot ignore the less specific allegations for these purposes.

3

the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues"). The Court's power to impose limits on discovery of potentially relevant material is meant to prevent parties from using redundant requests to turn discovery into a "war of attrition." Fed. R. Civ. P. 26 advisory committee's note. It is not a license for the Court to "deprive a party of discovery that is reasonably necessary to afford a fair opportunity to develop and prepare the case" because it harbors doubts about that party's ability to find evidence that bears out its allegations. Id.

Accordingly, plaintiffs are permitted to discover evidence of defendants' marketing efforts as of the last day such marketing could be relevant to the claims and defenses pleaded -- i.e., the last Neurontin prescription issued to a plaintiff or plaintiff's decedent in this case. See Incollingo v. Ewing, 282 A.2d 206, 221-23 (Pa. 1971) (upholding introduction of evidence of drug manufacturer's national marketing efforts to show influence on prescribing doctor, but permitting evidence of marketing efforts after the prescription only to show feasibility of warning, not to show negligence).[4] Applying this rule to an

_____

[4] Plaintiffs argue that conduct subsequent to the suicides and suicide attempts could be relevant because it furthers plaintiffs' request for punitive damages. Defendants argue that discovery strictly for purposes of punitive damages is limited to a defendant's net worth and finances. The Court need not resolve this issue yet, because for now it finds relatively limited potential use of this material, given the burden on defendants to

individual case is simple. For example, decedent in the lead
case, Lyman v. Pfizer, committed suicide on July 23, 2002,
Complaint ¶ 4. Because the pleadings provide no further details
as to any dates on which Neurontin was prescribed, if Lyman were
an individual case, the Court would cut off discovery of
marketing efforts at July 23, 2002, the last date at which they
could be relevant.

Complicating matters somewhat is the fact that this case now
includes many plaintiffs with different incident dates. Because
the cases have been consolidated for all purposes, it would be
pointless as well as impractical to impose separate discovery
cut-off dates. The Court therefore instructs the parties to
determine the last date on which marketing efforts could be
relevant to any of the cases in this action; that date will be
the latest alleged suicide or suicide attempt, unless there is
evidence that the prescription allegedly leading to that event

---

produce it. See Affidavit of Laura M. Kibbe, sworn to 4/21/05.
While courts in this circuit usually order punitive-damages
discovery to take place concurrently with liability discovery,
this is not a hard-and-fast rule, and concurrent discovery can be
denied where, as here, the hardship to defendant substantially
outweighs the potential benefit to the plaintiff, at least as
seen from this stage of the case. See Tu'Shan Hamm v. Potamkin,
1999 U.S. Dist. LEXIS 5948, at *5-*8 (S.D.N.Y. 1999). Should it
appear as this case progresses that plaintiffs have a substantial
chance to win punitive damages and that this information is
important to such a claim, the Court can order separate discovery
of material specific to punitive damages. See Davis v. Ross, 107
F.R.D. 326, 327 (S.D.N.Y. 1985).

took place significantly earlier.[5]  Such date will be the cut-off date for discovery of defendants' marketing efforts.  Should the parties fail to reach agreement on this date, they are instructed to jointly call chambers immediately for resolution.

SO ORDERED.

JED S. RAKOFF, U.S.D.J.

Dated:    New York, New York
          April 25, 2005

---

[5]If plaintiffs' counsel files additional cases with later event dates that are consolidated into this action's discovery schedule, defendants are expected to update any disclosures already made to conform to such later discovery cut-off dates. Given this possibility, the parties are encouraged to set a cut-off date that accommodates any filings plaintiff expects to make in the near future.

6

# EXHIBIT I

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ORANGE
------------------------------------------------------X
WILLIAM T. YOUNG,

                          Plaintiff,


           -against-

PFIZER INC., and PARKE-DAVIS, a Division                    Index No.  1062/2004
of Warner-Lambert Company and WARNER-
LAMBERT COMPANY
                                                            DECISION AND ORDER
                          Defendants.
------------------------------------------------------X
ROSENWASSER, STEWART A., A.J.S.C.

          At a conference held on April 6, 2004, the Court heard argument concerning outstanding

discovery issues.  While the parties have endeavored to cooperate for the purpose of streamlining

the discovery process, the Court has been involved on an ongoing basis to resolve issues in order

to keep what can only be described as a massive discovery undertaking on track.  The Court has

reviewed and considered the plaintiff's memorandum of law in support of the production of

defendant's databases and defendant's response thereto.

          The remaining outstanding discovery issues are decided as follows:

                    1.  Production of defendant's databases designated "Medical Communications",

"Sales/Marketing" and "Visitors' Speakers Bureau (VSB)" is ordered regarding any and all

information contained in these databases as it relates to Neurontin without geographic limitation.

Any objections as to relevance are reserved for trial.  It is unclear whether the entirety of these

databases are in electronic form, thereby facilitating the search for the information and

documents relevant to Neurontin, the drug at the center of plaintiff's claim.  Therefore, the

defendant shall have forty-five (45) days to comply.

                    2.  Defendant shall provide a list of all employees involved in the research,

development, selling and marketing of Neurontin, setting forth their job title and whether

employed by defendant Pfizer or a predecessor company; and state whether the employee is

currently employed and, if not, when the employment ceased.

                    3.  As to each identified employee, provide any documents relevant to

plaintiff's discovery demands which were created or maintained by such employee. Defendant shall identify the employee or custodial file from which the documents were obtained.

While the Court indicated said documents would be turned over on a "rolling basis" prior to each deposition, upon reflection, discovery would not be facilitated by such process. Plaintiff will be better able to determine which employees it wishes to depose if the documents are all turned over initially. This will avoid a needless duplication of depositions. Therefore, the employee list and corresponding documents shall be turned over within thirty (30) days of the date of this decision.

The foregoing constitutes the decision and order of the Court.

Dated: Goshen, New York
April 20, 2005

ENTER:

HON. STEWART A. ROSENWASSER
Acting Justice of the Supreme Court

FINKELSTEIN & PARTNERS, LLP
436 Robinson Avenue
Newburgh, NY 12330

DAVIS, POLK & WARDWELL
450 Lexington Avenue
New York, NY 10017

**EXHIBIT J**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| **UNITED STATES OF AMERICA**<br>**ex rel. DAVID FRANKLIN,**<br><br>      **Plaintiff,**<br><br>**v.**<br><br>**PARKE-DAVIS, DIVISION OF**<br>**WARNER-LAMBERT COMPANY and**<br>**PFIZER, INC.**<br><br>      **Defendants** | **Civil Action No. 96-11651-PBS**<br><br>**AFFIDAVIT OF THOMAS M. GREENE**<br>**IN SUPPORT OF RELATOR'S**<br>**CONDITIONAL RULE 56(f) MOTION** |

I, Thomas M. Greene, being duly sworn, hereby state and declare as follows:

1.      I am an attorney licensed to practice in the Commonwealth of Massachusetts. I am the lead attorney for the Relator, David Franklin, in the above captioned case. I am personally knowledgeable about the discovery that has been conducted in this matter and the opposition to Defendants' Motion for Summary Judgment submitted by the Relator.

2.      On April 16, 2003 we were informed by Assistant U.S. Attorney Sara Bloom that a significant number of documents had been produced to the U.S. Attorney's office by Sudler & Hennessey ("Sudler") and Cline, Davis & Mann ("CDM"), two companies whose records our office had subpoenaed in October 2001. When I informed Ms. Bloom that we had received very few documents from those corporations, she suggested we should contact their attorney because there may have been additional documents that were not produced for us. Ilyas Rona, an associate in our office, did contact counsel for Sudler and CDM who confirmed that there had been a production to the U.S. Attorney's Office and that additional document responsive to our subpoenas had been

produced. We obtained permission from counsel to review the documents that had been produced to the U.S. Attorney.

3.    On June 4, 2002, after Mr. Rona made an initial review of some of the documents in the U.S. Attorney's custody, I personally reviewed some of the boxes produced by Sudler and CDM. They contain a treasure trove of documentation regarding Parke-Davis's off-label marketing of Neurontin, much of which we had never seen. The documents are far better organized and far more extensive than the Intramed and/or Proworx documents contained in Defendants' production. There are documents relating to numerous events of which we were unaware, and a number of attendee lists identifying physicians who had been exposed to Parke-Davis marketing that we had not previously seen.

4.    I personally saw shipping labels on the boxes that indicated that many of the boxes had come from Davis, Polk and Wardwell, Defendants' law firm. Immediately after viewing the documents, I sent James Rouhandeh a letter requesting information on why these documents had come from Davis Polk, why these documents had not been produced for Relator and why Davis Polk had filed a motion for summary judgment alleging that Relator had no evidence of false statements made to physicians when it knew we had not been given thousands of documents that potentially evidenced such statements. A copy of my letter is attached as Exhibit A.

5.    On June 9, I recieved a response to my June 4, letter from James Murray, an associate at Davis Polk & Wardwell. A copy of Mr. Murray's letter is attached as Exhibit B.

6.    Had the documents recently produced by Sudler and CDM been produced in 2002, my office would have sought information from state Medicaid offices regarding whether the physicians identified in the documents had altered their Medicaid prescribing of Neurontin after

2

attending Parke-Davis events. Also, had those documents been produced in a timely basis we would have used relevant documents to oppose Defendants' Motion For Summary Judgment.

7.    It appears that Sudler and CDM have produced as many, if not more, documents than were produced by Defendants themselves in response to our discovery requests. It will take substantial time for my office to review and analyze fully the information contained in the thousands of relevant documents, at least two to three months. Further, based on past experience, if we seek to obtain prescribing records for selected doctors from state Medicaid offices, it will take between another two to three months to obtain and analyze such data. Finally it will take a substantial amount of time to organize the documents and prepare a response to Defendants' summary judgment motion if the Court does not believe we have already produced sufficient evidence to prove that material issues of fact exist. Accordingly, if the Court is not currently prepared to deny Defendants' Motion for Summary Judgment at this time, Relator requests four to six months to analyze and review the documents that were improperly withheld from the Relator and to prepare a supplemental response.

Signed under the pains and penalties of perjury this 12th day of June, 2003

Thomas M. Greene

CERTIFICATE OF SERVICE
I hereby certify that a true copy of the
above document was served upon the
attorney of record for each other party
by mail (hand) on 6/13/03

3