# EXHIBIT K

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA<br>ex rel. DAVID FRANKLIN, | ) ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Civil Action No. 96-11651-PBS |
| PFIZER, INC., and PARKE-DAVIS,<br>DIVISION OF WARNER-LAMBERT,<br>COMPANY, | ) ) ) ) ) | |
| Defendants | ) ) ) | |

AFFIDAVIT OF ILYAS J. RONA IN SUPPORT OF
RELATOR'S CONDITIONAL RULE 56(f) MOTION TO DELAY FINAL
DETERMINATION OF SUMMARY JUDGMENT

I, Ilyas J. Rona, do hereby state and depose the following:

1.      I am an associate at the law firm of Greene & Hoffman, P.C., and I am an

attorney duly admitted to practice law in the Commonwealth of Massachusetts and to appear

before the United States District Court for the District of Massachusetts.

2.      On or about October 3, 2001, I issued a subpoena directed to Cline Davis & Mann

("CDM"). It was and is my understanding that CMD, in large part through its subsidiary known

as Proworx, was hired by Parke-Davis and subsequently by Pfizer, Inc. ("Defendants") to assist

in the coordination and implementation of marketing events where off-label uses of Neurontin

were discussed.  I understand further that hundreds and possibly thousands of physicians

attended these events.  Attached at Exhibit 1 is a true and accurate copy of the subpoena.

3.      On or about October 3, 2001, I issued a subpoena directed to Sudler & Hennessey

("Sudler"). It was and is my understanding that Sudler, in large part through its subsidiary

known as Intramed, was hired by the Defendants to assist in the coordination and implementation of marketing events where off-label uses of Neurontin were discussed. I understand further that hundreds and possibly thousands of physicians attended these events. Attached at Exhibit 2 is a true and accurate copy of the subpoena.

4.    The information sought by both subpoenas was nearly identical and specifically included "all correspondence...concerning Neurontin" and "any document concerning an Event funded or sponsored, whether in whole or in part, by Warner-Lambert...where Neurontin was discussed." Compare Exhibit 1 with Exhibit 2.

5.    On January 4, 2002, counsel from Davis & Gilbert LLP, which represents both CDM and Sudler, sent a letter apprising me of the status of his clients' compliance in connection with both subpoenas. In that letter, counsel from Davis & Gilbert stated that he was producing documents from Sudler, but that documents from CDM had not yet been received. The letter also noted that the Sudler production was "limited to the relevant dates set forth in Magistrate Cohen's Order dated December 12, 2001." A true and accurate copy of this letter is attached at Exhibit 3.

6.    On January 16, 2002, I sent a reply letter to counsel from Davis & Gilbert. The reply letter stated that although the Relator objected to the temporal limitation stated in ¶ 5 above, it would "without waiving this objection...[seek] only non-objectionable materials at this point." A true and accurate copy of my January 16, 2002 letter is attached at Exhibit 4.

7.    In that same letter, however, I also expressed concern that Sudler's initial production "does not include any documentation relating to numerous physician events set up by Sudler for Parke-Davis."

8.     On January 24, 2002, counsel from Davis & Gilbert sent a letter to me indicating that he was producing documents on behalf of CDM. This letter also responded to the concerns expressed in my letter of January 16, 2002 by stating that the documents produced at that point:

> constitute all of the Sudler and CDM documents from 1995 and 1996 in my possession. No documents were withheld based on relevance or privilege. The sole limitation on these productions is temporal, in accordance with Magistrate Cohen's Order. Should this Order be modified on appeal, based on the Relator's objections, Sudler and CDM will produce all relevant documents pursuant to a subsequent order.

A true and accurate copy of the January 24, 2002 letter from Davis & Gilbert is attached at Exhibit 5.

9.     At that point, the total number of pages produced by both CDM and Sudler was only approximately 500 pages. It did not appear that any of these documents reflected off-label marketing of Neurontin to physicians.

10.     On February 6, 2002, the Court entered a discovery order, which overruled Magistrate Cohen's prior discovery ruling and set the time frame for discovery from 1994 through 1998.

11.     On or about March 4, 2002, I informed counsel for CDM and Sudler that the Court had extended the relevant time through the end of 1998, and he agreed to produce all responsive documents from 1994 through 1998. On or about March 25, 2002, I sent a letter to counsel from Davis & Gilbert memorializing this conversation. A true and accurate copy of my March 25, 2002 letter is attached at Exhibit 6.

12.     In May 2002, I received additional productions from both CDM and Sudler purporting to include all documents from the 1994 to 1998 time period. The final production, for both CDM and Sudler, totaled no more than 2500 pages or one banker's box of material. It did not appear that any of these documents reflected off-label marketing of Neurontin to physicians.

Moreover, no slides, audiotapes or transcripts where produced. Copies of the produced documents were also sent to Defendants' counsel.

13.     On April 16, 2003, at a meeting with Sara Bloom of the United States Attorney's Office ("US Attorney's Office"), I was informed that the US Attorney's Office had received a significant amount of documents from Sudler, much of which was from the 1994 through 1998 time period. I was also informed that documents from CDM were also expected by the US Attorney's Office. At that time, it became evident to me that there was a discrepancy between what had been produced to the Relator in connection with his subpoenas and what was produced to the US Attorney's Office.

14.     The next day, on April 17, 2003, I contacted the attorney for CDM and Sudler and requested that Relator's counsel be allowed to have access to the Sudler and CDM documents that were produced to the US Attorney's Office. Counsel from Davis & Gilbert acknowledged that additional documents responsive to the Relator's subpoenas had been produced for the US Attorney's Office.

15.     Later that same day, I received a copy of written authorization from counsel from Davis & Gilbert to the US Attorney's Office allowing Relator's counsel access to the documents. Copies of the authorization letters are attached at Exhibit 7.

16.     At that time, nobody from our office was able to review these documents due to significant time commitments relating to the preparation of the Relator's opposition to the Defendants' Motion for Summary Judgment. The Defendants had filed their motion for summary judgment on April 14, 2003 and this Court had denied Relator's request to extend the deadline for filing an opposition by one month.

17.     Prior to the filing of Relator's Opposition, we were not informed of the precise quantity of documents from the 1994 to 1998 time period. Only after our opposition was filed did we learn that Sudler and CDM produced 47 storage boxes of documents and other materials such as tapes and slides for the US Attorney's Office.

18.     Once the Relator's opposition had been filed, I made arrangements to visit the US Attorney's Office and review the CDM and Sudler documents.

19.     I was able, along with a law clerk, to review documents on June 3, 2003 and June 11, 2003. Two other attorneys from this office were also able to review documents on June 4, 2003.

20.     All together, a total of more than twenty-five (25) man-hours were spent reviewing documents. In that time, this office was only able to perform a cursory review of ten (10) of the 47 large storage boxes of CDM and Sudler material that is now in the possession of the US Attorney's Office.

21.     Our ability to review this material was limited by the hours that the US Attorney's Office is open, the availability of an employee of the US Attorney's Office to supervise us, the fact that some of the documents were maintained at a different location that was temporarily inaccessible, and the relatively small number of boxes that we were permitted to view at one time.

22.     In reviewing the CDM and Sudler documents, I was able to ascertain the following:

        (a)     There appear to be thousands of documents relating the off-label marketing of Neurontin to physicians between 1994 and 1998.

(b)    Many of these documents include emails and other documents between either CDM or Sudler and the Defendants, which could be used to determine the level of control/independence exerted by the Defendants over the activities of CDM and Sudler.

(c)    There are a significant number of audiotapes and transcripts of Neurontin marketing events held between 1994 and 1998. For example, one set of audiotapes relates to a promotional event held by Parke-Davis for monotherapy that was held in October 1997, after the FDA had rejected Parke-Davis's application for approval to market Neurontin for monotherapy. From the portions of the tapes we reviewed, it appears that attendees were never informed about the FDA rejection. Such tapes and transcripts could be used to determine whether false statements were made to physicians.

(d)    There are a significant number of lectures slides, abstracts, and syllabi for marketing events held between 1994 and 1998. These documents could also be used to determine whether false statements were made to physicians.

(e)    There was a significant number of documents relating to marketing events that were previously unknown to the Relator. Information for these events had not been produced to the Relator by either the Defendants or the parties subpoenaed. This event information includes the dates and location of events, the agendas of the events, and the attendees to the events. This information could be used to identify specific physicians

6

whose off-label Medicaid prescriptions were caused by the Defendants'

conduct.

(f)     There is a significant amount of documentation relating to the manner in

which speakers were selected by Sudler and CDM. These documents

could be used to determine whether purportedly educational events were

in fact genuine CMEs and educational symposia or whether they were in

fact marketing events where the Defendants controlled the content of the

lectures.

(g)     There appear to be number of documents which evidence that Parke-

Davis and Pfizer made statements to physicians relating to the off-label

uses of Neurontin that were false or misleading because they omitted to

disclose negative clinical data or negative anecdotal information known to

Parke-Davis.

Signed under the pains and penalties of perjury this 13ᵗʰ day of June 2003.

_____
Ilyas J. Rona

CERTIFICATE OF SERVICE
I hereby certify that a true copy of the
above document was served upon the
attorney of record for each other party
by mail-hand on 6/13/03

7

# EXHIBIT L

 **DEPARTMENT OF HEALTH & HUMAN SERVICES**     Public Health Service

Food and Drug Administration
Rockville, MD 20857

**TRANSMITTED BY FACSIMILE**

Ms. Andrea Garrity
Director, Regulatory Affairs
Pfizer, Inc.
235 East 42nd Street
New York, New York 10017-5755

Re: NDA #s 20-235, 20-882
    Neurontin (gabapentin)
    MACMIS # 10174

Dear Ms. Garrity:

Through routine monitoring and surveillance, the Division of Drug Marketing, Advertising, and Communications (DDMAC) has identified a slim jim (ID #NSJ5095A1) for Neurontin that is misleading and in violation of the Federal Food, Drug, and Cosmetic Act and applicable regulations.

Specifically, this slim jim misleadingly claims improvement in quality of life (QOL) parameters based on the Neurontin Evaluation of Outcomes in Neurological Practice (NEON) study. Among other QOL parameters, the misleading presentation includes improvement in social limitations, memory difficulties, energy level, and work limitations. The NEON study is not considered to be substantial evidence for claims of QOL improvements because it is not a controlled study.

To address these objections, DDMAC recommends that Pfizer do the following:

1.  Immediately discontinue the use of this slim jim and any other promotional material and practices with the same or similar messages.

2.  Respond to this letter within ten days. Your response should include a statement of your intent to comply with the above, a list of all promotional materials with the same or similar issues, and your methods for discontinuing these promotional materials.

If you have any questions or comments, please contact Ms. Laurie Burke by facsimile at (301) 594-6771, or at the Food and Drug Administration, Division of Drug Marketing, Advertising and Communications, HFD-42, rm. 17B-20, 5600 Fishers Lane, Rockville, MD 20857. DDMAC reminds you that only written communications are considered official.

Andrea Garrity                                                                                   Page 2
Pfizer
NDA 20-235, 20-882 (MACMIS 10174)

In all future correspondence regarding this particular matter, please refer to MACMIS ID # 10174 in
addition to the NDA number.

Sincerely,

*{See appended electronic signature page}*

Lisa L. Stockbridge, Ph.D.
Regulatory Reviewer
Division of Drug Marketing,
 Advertising and Communications

**This is a representation of an electronic record that was signed electronically and this page is the manifestation of the electronic signature.**

```
/s/
---------------------
Lisa Stockbridge
6/29/01 10:10:24 AM
```



## THERAPY THAT'S A PLUS
## FOR YOUR PATIENTS

- Efficacy in a broad range of partial-seizure patients

- Well tolerated in patients

- Simple, predictable pharmacokinetics

- Five dosage strengths for prescribing flexibility

- #1 branded AED in new patient starts[*]

# THERAPY
# THAT'S A PLUS
# FOR YOUR
# PATIENTS



Proven efficacy
Well tolerated
Easily titrated

## NEURONTIN®
## (gabapentin)

*Based on NDC new patient start data, MAT 9/00.

*Please see full prescribing information on last pages.*

RU58855A1   © 2000 Pfizer Inc.   All rights reserved.   Printed in USA/December 2000   U.S. Pharmaceuticals

Proven efficacy
Well tolerated
Easily titrated

## NEURONTIN®
## (gabapentin)

*Please see full prescribing information on last pages.*

# ADD-ON EFFICACY

## for improved partial-seizure control

## STEPS:
## A study of the safety and efficacy of NEURONTIN[1]

- Study of Titration to Effect Profile of Safety

- Study design: 16-week, open-label, prospective, multicenter study (N=2216)

- Purpose: to assess the safety and tolerability of NEURONTIN® used as adjunctive therapy in dosages required for most effective seizure control

- Seizure type: partial seizures, with and without secondary generalization

NEURONTIN is indicated as adjunctive therapy in the treatment of partial seizures with and without secondary generalization in adults (>12 years old).

NEURONTIN is contraindicated in patients who have demonstrated hypersensitivity to the drug or its ingredients.

In controlled clinical trials, the responder rates (≥50% reduction in seizure frequency) in partial-seizure patients ranged from 16% to 26% at NEURONTIN doses of 900 mg, 1200 mg, or 1800 mg/day tid. Seizure-free rates were not assessed in controlled clinical trials.

*Please see full prescribing information on last pages.*

## STEPS:
## Dose-related efficacy[1]



*Cumulative percentage of patients who experienced a ≥50% decrease in partial-seizure frequency (n=1048).



†Cumulative percentage of patients who became seizure free (n=1055).

‡Efficacy analysis included patients who completed approximately 16 weeks of therapy, and compared seizure frequency during the last 4 weeks of study with baseline.

(Adapted from Morrell.[2])


Proven efficacy
Well tolerated
Easily titrated


# NEURONTIN®
## (gabapentin)

2

3

# ADD-ON THERAPY

## with an impact on quality of life

Proven Efficacy

Well Tolerated

Pharmacokinetic Profile

Convenient Dosing

## NEON:
## A study of tolerability and quality of life[4]

- <u>N</u>eurontin <u>E</u>valuation of <u>O</u>utcomes in <u>N</u>eurological Practice

- Study design: 5-month, open-label, prospective, multicenter study (N=141)

- Purpose: to study tolerability, efficacy, and quality-of-life (QOL) assessments of NEURONTIN when used as first add-on to standard AED therapy (phenytoin and/or carbamazepine)

- Seizure type: partial seizures, with and without secondary generalization

NEURONTIN is indicated as adjunctive therapy in the treatment of partial seizures with and without secondary generalization in adults (>12 years old).

NEURONTIN is contraindicated in patients who have demonstrated hypersensitivity to the drug or its ingredients.

In controlled clinical trials, the most common adverse events reported with NEURONTIN vs placebo were somnolence (19.3% vs 8.7%), dizziness (17.1% vs 6.9%), ataxia (12.5% vs 5.6%), fatigue (11.0% vs 5.0%), and nystagmus (8.3% vs 4.0%).

*Please see full prescribing information on last pages.*

## NEON:
## Quality-of-life improvements



Improvement in quality-of-life parameters after 5 months of NEURONTIN adjunctive therapy[1]

(Adapted from Bruni et al.[4])

Partial-seizure patients maintained on NEURONTIN for 5 months at a mean dose of ~1600 mg/day (range: 300 to 1800 mg/day). Assessment was based on responses to QOLIE-10 questionnaire after 5 months of adjunctive therapy.

QOL data were measured by comparing pooled responses from the QOLIE-10 questionnaire given during History/Initiation visits to pooled responses from the same questionnaire given during Completion/Termination visits.[4]

Proven efficacy
Well tolerated
Easily titrated



# NEURONTIN®
## (gabapentin)

# ADD-ON EFFICACY

## with favorable pharmacokinetics

Proven Efficacy

Well Tolerated

Pharmacokinetic Profile

Convenient Dosing

## Pharmacokinetic properties

- Not metabolized by the liver

- Unlikely to be involved in protein-binding drug interactions

- Has no clinically significant effect on steady-state pharmacokinetics of oral contraceptives containing norethindrone acetate and ethinyl estradiol

- Does not require blood level monitoring or liver function tests

### Properties of NEURONTIN

NEURONTIN is indicated as adjunctive therapy in the treatment of partial seizures with and without secondary generalization in adults (>12 years old).

NEURONTIN is contraindicated in patients who have demonstrated hypersensitivity to the drug or its ingredients.

*Please see full prescribing information on last pages.*

## Not appreciably metabolized or protein bound

| | Hepatically metabolized | Protein bound |
|---|---|---|
| NEURONTIN | NO | NO |
| Topiramate | Yes | Yes |
| Lamotrigine | Yes | Yes |
| Levetiracetam | No | No |
| Zonisamide | Yes | Yes |
| Tiagabine | Yes | Yes |
| Valproic acid | Yes | Yes |
| Carbamazepine | Yes | Yes |
| Phenytoin | Yes | Yes |
| Oxcarbazepine | Yes | Yes |

In controlled clinical trials, the most common adverse events reported with NEURONTIN vs placebo were somnolence (19.3% vs 8.7%), dizziness (17.1% vs 6.9%), ataxia (12.5% vs 5.6%), fatigue (11.0% vs 5.0%), and nystagmus (8.3% vs 4.0%).

Proven efficacy
Well tolerated
Easily titrated



# NEURONTIN®
## (gabapentin)

Proven Efficacy

Well Tolerated

Pharmacokinetic Profile

Convenient Dosing

# ADD-ON EFFICACY
with no pharmacokinetic interactions with commonly used AEDs

## No demonstrated pharmacokinetic interactions with commonly prescribed AEDs*



*Carbamazepine, phenobarbital, phenytoin, valproic acid.

This chart is based on information derived from package inserts for the products listed. Consult current full prescribing information for each product for additional information.

NEURONTIN is indicated as adjunctive therapy in the treatment of partial seizures with and without secondary generalization in adults (>12 years old).

NEURONTIN is contraindicated in patients who have demonstrated hypersensitivity to the drug or its ingredients.

In controlled clinical trials, the most common adverse events reported with NEURONTIN vs placebo were somnolence (19.3% vs 8.7%), dizziness (17.1% vs 6.9%), ataxia (12.5% vs 5.6%), fatigue (11.0% vs 5.0%), and nystagmus (8.3% vs 4.0%).



Proven efficacy
Well tolerated
Easily titrated



**NEURONTIN®**
*(gabapentin)*

*Please see full prescribing information on last page.*

# ADD-ON THERAPY
## with simple dose titration

**Proven Efficacy**

**Well Tolerated**

**Pharmacokinetic Profile**

## NEURONTIN therapy starts at an effective dose

- Initial dose of 900 mg/day provides effective control

- For dosing flexibility, NEURONTIN is available in 100-mg, 300-mg, and 400-mg capsules, as well as 600-mg and 800-mg tablets



NEURONTIN is indicated as adjunctive therapy in the treatment of partial seizures with and without secondary generalization in adults (>12 years old).

NEURONTIN is contraindicated in patients who have demonstrated hypersensitivity to the drug or its ingredients.

In placebo-controlled studies, status epilepticus occurred in 0.6% (3/543) of NEURONTIN-treated patients vs 0.5% (2/378) of placebo-treated patients. Because adequate historical data are not available, it is impossible to say whether treatment with NEURONTIN is associated with a higher or lower rate of status epilepticus.

*Please see full prescribing information on last pages.*

## Tolerability‡

- Dosages up to 2400 mg/day have been well tolerated in long-term clinical studies

- Doses of 3600 mg/day have also been administered to a small number of patients for a relatively short duration and have been well tolerated

*Because NEURONTIN is eliminated renally, dosage adjustment is recommended in renally compromised patients or those patients undergoing hemodialysis. Please see Dosage and Administration section of full prescribing information for schedule.

†The maximum time between doses in the tid schedule should not exceed 12 hours.

‡According to current prescribing information, the effective dose of NEURONTIN is 900 mg to 1800 mg, given in divided doses tid.

Proven efficacy
Well tolerated
Easily titrated



**NEURONTIN**®
*(gabapentin)*

**Convenient Dosing**

# ADD-ON EFFICACY

## for improved patient convenience

*Proven Efficacy*

*Well Tolerated*

*Pharmacokinetic Profile*

*Convenient Dosing*

## Consider converting appropriate NEURONTIN capsule patients to convenient tablets





Pills not shown to scale.

NEURONTIN is indicated as adjunctive therapy in the treatment of partial seizures with and without secondary generalization in adults (>12 years old).

NEURONTIN is contraindicated in patients who have demonstrated hypersensitivity to the drug or its ingredients.

In controlled clinical trials, the most common adverse events reported with NEURONTIN vs placebo were somnolence (19.3% vs 8.7%), dizziness (17.1% vs 6.9%), ataxia (12.5% vs 5.6%), fatigue (11.0% vs 5.0%), and nystagmus (8.3% vs 4.0%).

*Please see full prescribing information on last page.*

## Higher-dose NEURONTIN tablets

- May mean simplicity and more convenience for your patients

- Elliptical in shape and film-coated

## More dosage strengths

- Allow for greater dosing flexibility

## Same tolerability and safety profile for all formulations

- No blood level monitoring or liver function tests required

- Not metabolized by the liver



Pills not shown to scale.



Proven efficacy
Well tolerated
Easily titrated

# NEURONTIN®
## (gabapentin)

Proven Efficacy

Well Tolerated

Pharmacokinetic Profile

Convenient Dosing

# References

**1.** Morrell MJ. Dosing to efficacy with Neurontin: the STEPS trial. *Epilepsia.* 1999;40(suppl 6):S23-S26.

**2.** McLean MJ, Morrell MJ, Willmore LJ, et al. Safety and tolerability of gabapentin as adjunctive therapy in a large, multicenter study. *Epilepsia.* 1999;40:965-972.

**3.** Data on file. Pfizer Inc., New York, NY.

**4.** Bruni J, on behalf of the NEON Study Investigators Group. Outcome evaluation of gabapentin as add-on therapy for partial seizures. *Can J Neurol Sci.* 1998;25:134-140.

**5.** Prescribing information for Topamax® (topiramate) Sprinkle Capsules. Ortho-McNeil Pharmaceutical Inc, Raritan, NJ.

**6.** Prescribing information for Lamictal® (lamotrigine) Chewable Dispersible Tablets. Glaxo Wellcome Inc, Research Triangle Park, NC.

**7.** Prescribing information for Keppra™ (levetiracetam) Tablets. UCB Pharma Inc, Smyrna, Ga.

**8.** Prescribing information for Zonegran™ (zonisamide) Capsules. Elan Pharmaceuticals Inc, South San Francisco, Calif.

**9.** Prescribing information for Gabitril® (tiagabine HCl) Filmtab Tablets. Abbott Laboratories, North Chicago, Ill.

**10.** Prescribing information for Depakene® (valproic acid) Capsules. Abbott Laboratories, North Chicago, Ill.

**11.** Prescribing information for Tegretol® (carbamazepine USP) Chewable Tablets. Novartis Pharmaceuticals Canada Inc, Dorval, Quebec.

**12.** Prescribing information for Dilantin® (phenytoin sodium) Kapseals. Pfizer Inc., New York, NY.

**13.** Prescribing information for Trileptal® (oxcarbazepine) Tablets. Novartis Pharmaceutical Corporation, East Hanover, NJ.

Well Tolerated/efficacy | Pharmacokinetic Profile | Convenient Dosing

# Neurontin® (gabapentin) capsules

molecular weight of 171.24. The molecular structure of gabapentin is:



Gabapentin is a white to off-white crystalline solid. It is freely soluble in water and both basic and acidic aqueous solutions.

## CLINICAL PHARMACOLOGY

### Mechanisms of Action

The mechanism by which gabapentin exerts its anticonvulsant action is unknown, but in animal test systems designed to detect anticonvulsant activity, gabapentin prevents seizures as do other marketed anticonvulsants. Gabapentin exhibits antiseizure activity in mice and rats in both the maximal electroshock and pentylenetetrazole seizure models and other preclinical models (e.g., strains with genetic epilepsy, etc.). The relevance of these models to human epilepsy is not known.

Gabapentin is structurally related to the neurotransmitter GABA (gamma-aminobutyric acid) but it does not interact with GABA receptors, it is not converted metabolically into GABA or a GABA agonist, and it is not an inhibitor of GABA uptake or degradation. Gabapentin was tested in radioligand binding assays at concentrations up to 100 µM and did not exhibit affinity for a number of other common receptor sites, including benzodiazepine, glutamate, N-methyl-D-aspartate (NMDA), quisqualate, kainate, strychnine-insensitive or strychnine-sensitive glycine, alpha 1, alpha 2, or beta adrenergic, adenosine A1 or A2, cholinergic muscarinic or nicotinic, dopamine D1 or D2, histamine H1, serotonin S1 or S2, opiate mu, delta or kappa, voltage-sensitive calcium channel sites labeled with nitrendipine or diltiazem, or at voltage-sensitive sodium channel sites with batrachotoxin A 20-alpha-benzoate.

Several test systems ordinarily used to assess activity at the NMDA receptor have been examined. Results are contradictory; no general statement about the effects, if any, of gabapentin at the NMDA receptor can be made.

In vitro studies with radiolabeled gabapentin have revealed a gabapentin binding site in areas of rat brain including neocortex and hippocampus. The identity and function of this binding site remain to be elucidated.

### Pharmacokinetics and Drug Metabolism

All pharmacological actions following gabapentin administration are due to the activity of the parent compound; gabapentin is not appreciably metabolized in humans.

**Oral Bioavailability:** Gabapentin bioavailability is not dose proportional; i.e., as dose is increased, bioavailability decreases. A 400-mg dose, for example, is about 25% less bioavailable than a 100-mg dose. Over the recommended dose range of 300 to 600 mg T.I.D., however, the differences in bioavailability are not large, and bioavailability is about 60 percent. Food has no effect on the rate and extent of absorption of gabapentin.

**Distribution:** Gabapentin circulates largely unbound (<3%) to plasma protein. The apparent volume of distribution of gabapentin after 150 mg intravenous administration is 58±6 L (Mean ±SD). In patients with epilepsy, steady-state predose (Cmin) concentrations of gabapentin in cerebrospinal fluid were approximately 20% of the corresponding plasma concentrations.

**Elimination:** Gabapentin is eliminated from the systemic circulation by renal excretion as unchanged drug. Gabapentin is not appreciably metabolized in humans.

Gabapentin elimination half-life is 5 to 7 hours and is unaltered by dose or following multiple dosing. Gabapentin elimination rate constant, plasma clearance, and renal clearance are directly proportional to creatinine clearance (see Special Populations: Patients With Renal Insufficiency, below). In elderly patients, and in patients with impaired renal function, gabapentin plasma clearance is reduced. Gabapentin can be removed from plasma by hemodialysis.

Dosage adjustment in patients with compromised renal function or undergoing hemodialysis is recommended (see DOSAGE AND ADMINISTRATION, Table 2).

**Special Populations: Patients With Renal Insufficiency:** Subjects (N=60) with renal insufficiency (mean creatinine clearance ranging from 13-114 mL/min) were administered single 400-mg oral doses of gabapentin. The mean gabapentin half-life ranged from about 6.5 hours (patients with creatinine clearance >60 mL/min) to 52 hours (creatinine clearance <30 mL/min) and gabapentin renal clearance from about 90 mL/min (>60 mL/min) to about 10 mL/min (<30 mL/min). Mean plasma clearance (CL/F) decreased from approximately 190 mL/min to 20 mL/min.

Dosage adjustment in patients with compromised renal function is necessary (see DOSAGE AND ADMINISTRATION).

**Hemodialysis:** In a study in anuric subjects (N=11), the apparent elimination half-life of gabapentin on nondialysis days was about 132 hours; during dialysis times a week, it approximately. Hemodialysis rises has a significant effect on gabapentin elimination in anuric subjects.

Dosage adjustment in patients undergoing hemodialysis is necessary (see DOSAGE and ADMINISTRATION).

**Hepatic Disease:** Because gabapentin is not metabolized, no study was performed in patients with hepatic impairment.

**Age:** The effect of age was studied in subjects 20-80 years of age. Apparent oral clearance (CL/F) of gabapentin decreased as age increased. Mean about 225 mL/min in those under 30 years of age to about 125 mL/min in those over 70 years of age. Renal clearance (CLr) and CLr adjusted for body surface area also decreased with age, however, the decline in the renal clearance of gabapentin with age can largely be explained by the decline in renal function. Reduction of gabapentin dose may be required in patients who have renal compromise/impaired renal function.

---

(function, (See PRECAUTIONS, Geriatric Use, and DOSAGE AND ADMINISTRATION.)

that age schemes smaller significance.

A second study compared primarily 1200 mg/day T.I.D. Neurontin (N=101) with placebo (N=98). Additional smaller Neurontin dosage groups (600 mg/day, N=53, 1800 mg/day, N=54) were also studied for information regarding dose responses. Responder rate was higher in the Neurontin 1200 mg/day group (16%) than in the placebo group (8%), but the difference was not statistically significant. The responder rate at 600 mg (17%) was also not significantly higher than in the placebo, but the responder rate at the 1800 mg group (26%) was statistically significantly higher than the placebo rate. Response rate was better in the Neurontin 1200 mg/day group (16%) than in the placebo group (-8.2%) but this difference was also not statistically significant (p = 0.224). A better response was seen in the Neurontin 1800 mg/day group (-8.195) and 1800 mg/day group (-8.223) than in the 1200 mg/day group, with the 1800 mg/day group achieving statistical significance compared to the placebo group.

A third study compared Neurontin 900 mg/day T.I.D (N=111) and placebo (N=109). An additional Neurontin 1200 mg/day dosage group (N=52) provided dose-response data. A statistically significant difference in responder rate was seen in the Neurontin 900 mg/day group (22%) compared to that in the placebo group (10%). Response rate was also statistically significantly superior in the Neurontin 600 mg/day group (-1.14) compared to that in the placebo group (-0.025), and response rate in the 1200 mg/day Neurontin (-1.504) compared to placebo.

Analyses were also performed in each study to examine the effect of Neurontin on preventing secondarily generalized tonic-clonic seizures. Patients who experienced a secondarily generalized tonic-clonic seizure in either the baseline or in the treatment period in all three placebo-controlled studies were included in these analyses. There were several response ratio comparisons that demonstrated a statistically significant advantage for Neurontin compared to placebo and favorable trends for almost all comparisons.

Analysis of responder rate using combined data from all three studies and all doses (N=162, Neurontin-N=89, placebo) also showed a significant advantage for Neurontin over placebo in reducing the frequency of secondarily generalized seizures.

In two of the three controlled studies, more than one dose of Neurontin was used. Within each study the results do not show a consistently increased response to dose. However, looking across studies, a trend toward increasing efficacy with increasing dose is evident (see Figure 1).



FIGURE 1. Responder Rate in Patients Receiving Neurontin® Expressed as a Difference from Placebo by Dose and Study

In the figure, treatment effect magnitude, measured on the Y axis in terms of the difference in the proportion of gabapentin and placebo assigned patients attaining a 50% or greater reduction in seizure frequency from baseline, is plotted against the daily dose of gabapentin administered (X axis).

Although no formal analysis by gender has been performed, estimates of response frequencies (95% confidence intervals) derived from clinical trials (398 men, 297 women) indicate no important gender differences exist. There were no consistent patterns indicating that age had different effects on the response to Neurontin®. There were insufficient numbers of patients of races other than Caucasian to permit a comparison of efficacy among racial groups.

## INDICATIONS AND USAGE

Neurontin® (gabapentin) is indicated as adjunctive therapy in the treatment of partial seizures with and without secondary generalization in adults with epilepsy.

## CONTRAINDICATIONS

Neurontin® is contraindicated in patients who have demonstrated hypersensitivity to the drug or its ingredients.

## WARNINGS

### Withdrawal Precipitated Seizure, Status Epilepticus

Antiepileptic drugs should not be abruptly discontinued because of the possibility of increasing seizure frequency.

In the placebo-controlled studies, the incidence of status epilepticus in patients receiving Neurontin® was 0.6% (3 of 543) versus 0.5% in patients receiving placebo (2 of 378). Among the 2074 patients treated with Neurontin® across all studies (controlled and uncontrolled) 31(1.5%) had status epilepticus. Of these, 14 patients had no prior history of status epilepticus either before treatment or while on other medications. Because adequate historical data are not available, it is impossible to say whether or not treatment with Neurontin® is associated with a higher or lower rate of status epilepticus than would be expected to occur in a similar population not treated with Neurontin®.

### Tumorigenic Potential

In standard preclinical in vivo lifetime carcinogenicity studies, an unexpectedly high incidence of pancreatic

**WARNINGS** (continued)

**PRECAUTIONS**

### Information for Patients

### Laboratory Tests

### Drug Interactions

### Carcinogenesis, Mutagenesis, Impairment of Fertility

### Pregnancy

**PRECAUTIONS** (continued)

### Pediatric Use

### Geriatric Use

### ADVERSE REACTIONS

**TABLE 1. Treatment-Emergent Adverse Event Incidence in Controlled Add-On Trials (Events in at least 1% of Neurontin patients and numerically more frequent than in the placebo group)**

Proven Efficacy
Well Tolerated
Pharmacokinetic Profile
Convenient Dosing

acy

Well Tolerated

Pharmacokinetic Profile

Convenient Dosing

## ADVERSE REACTIONS (continued)

**Body As A Whole:** Frequent asthenia, malaise, face edema, weight gain, weight loss; *Infrequent:* chest pain, fever, viral infection, abscess, chill, neck pain, enlarged abdomen, back pain, general edema, decrease, chill, *Rare:* storage feelings, lassitude, alcohol intolerance, hangover effect.

**Cardiovascular System:** Frequent hypertension; *Infrequent* hypotension, angina pectoris, peripheral vascular disorder, palpitation, tachycardia, migraine, murmur; *Rare:* atrial fibrillation, heart failure, thrombophlebitis, deep thrombophlebitis, myocardial infarction, cerebrovascular accident, pulmonary thrombosis, ventricular extrasystoles, bradycardia, premature atrial contraction, pericardial rub, heart block, pulmonary embolus, hyperlipidemia, hypercholesterolemia, pericardial effusion, pericarditis.

**Digestive System:** Frequent nausea, flatulence, gingivitis; *Infrequent* glossitis, gum hemorrhage, thirst, stomatitis, increased salivation, gastroenteritis, hemorrhoids, bloody stools, fecal incontinence, hepatomegaly; *Rare:* dysphagia, eructation, pancreatitis, peptic ulcer, colitis, blisters in mouth, tooth discolor, perleche, salivary gland enlarged, lip hemorrhage, esophagitis, hiatal hernia, hematemesis, proctitis, irritable bowel syndrome, rectal hemorrhage, esophageal spasm.

**Endocrine System:** *Rare:* hyperthyroid, hypothyroid, goiter, hypoestrogen, ovarian failure, epididymitis, swollen testicle, cushingoid appearance.

**Hematologic and Lymphatic System:** *Frequent* purpura most often described as bruises resulting from physical trauma; *Infrequent* anemia, thrombocytopenia, lymphadenopathy; *Rare:* WBC count increased, lymphostasis, non-Hodgkin's lymphoma, bleeding time increased.

**Musculoskeletal System:** Frequent arthralgia; *Infrequent* tendinitis, arthritis, joint stiffness, joint swelling, positive Romberg test; *Rare:* costochondritis, osteoporosis, bursitis, contracture.

**Nervous System:** Frequent vertigo, hyperkinesia, paresthesia, decreased or absent reflexes, increased reflexes, anxiety, hostility; *Infrequent* CNS tumors, syncope, dreaming abnormal, aphasia, hypesthesia, intracranial hemorrhage, hypotonia, dysesthesia, paresis, dystonia, hemiplegia, facial paralysis, stupor, cerebellar dysfunction, positive Babinski sign, decreased position sense, subdural hematoma, apathy, hallucination, decrease or loss of libido, agitation, paranoia, depersonalization, euphoria, feeling drunk, dopen-ad sensation, suicidal, psychotic depression, crosis: *Rare:* choreoathetosis, orofacial dyskinesia, encephalopathy, nerve palsy, personality disorder, increased libido, subdued temperament, apraxia, fine motor control disorder, meningismus, local myoclonus, hyperesthesia, hypokinesia, mania, neurosis, hysteria, antisocial reaction, pseudo-seizure.

**Respiratory System:** Frequent pneumonia; *Infrequent* epistaxis, dyspnea, apnea, *Rare:* mucositis, aspiration pneumonia, hyperventilation, hiccup, laryngitis, nasal obstruction, snoring, bronchospasm, hypoventilation, lung edema.

**Dermatologic System:** *Infrequent* alopecia, eczema, dry skin, increased sweating, urticaria, hirsutism, seborrhea, cyst, herpes simplex; *Rare:* herpes zoster, skin discolor, skin papules, photosensitive reaction, leg ulcer, scalp seborrhea, psoriasis, desquamation, maceration, skin nodules, subcutaneous nodule, melanosis, skin necrosis, local swelling.

**Urogenital System:** *Infrequent* hematuria, dysuria, urination frequency, cystitis, urinary retention, urinary incontinence, vaginal hemorrhage, amenorrhea, dysmenorrhea, menorrhagia, breast cancer, unable to climax, ejaculation abnormal; *Rare:* kidney pain, leukorrhea, pruritus genital, renal stone, acute renal failure, anuria, glycosuria, nephrosis, nocturia, pyuria, urination urgency, vaginal pain, breast pain, testicle pain.

**Special Senses:** Frequent abnormal vision; *Infrequent* cataract, conjunctivitis, eyes dry, eye pain, visual field defect, photophobia, bilateral or unilateral ptosis, eye hemorrhage, hordeolum, hearing loss, earache, tinnitus, inner ear infection, otitis, taste loss, unusual taste, eye twitching, ear fullness; *Rare:* eye itching, abnormal accommodation, perforated ear drum, sensitivity to noise, eye focusing problem, watery eyes, retinopathy, glaucoma, iritis, corneal disorders, lacrimal dysfunction, degenerative eye changes, blindness, retinal degeneration, diplopia, chemosis, strabismus, eustachian tube dysfunction, labyrinthitis, otitis externa, odd smell.

**Postmarketing and Other Experience**
In addition to the adverse experiences reported during clinical testing of Neurontin®, the following adverse experiences have been reported in patients receiving marketed Neurontin®. These adverse experiences have not been listed above and data are insufficient to support an estimate of their incidence or to establish causation. The listing of alphabetical sequences: blood glucose fluctuation, erythema multiforme, elevated liver function tests, fever, jaundice, Stevens-Johnson syndrome.

## DRUG ABUSE AND DEPENDENCE

The abuse and dependence potential of Neurontin® has not been evaluated in human studies.

## OVERDOSAGE

A lethal dose of gabapentin was not identified in mice and rats receiving single oral doses as high as 8000 mg/kg. Signs of acute toxicity in animals included ataxia, labored breathing, ptosis, sedation, hypoactivity, or excitation.

Acute oral overdoses of Neurontin® up to 49 grams have been reported. In these cases, double vision, slurred speech, drowsiness, lethargy and diarrhea were observed. All patients recovered with supportive care.

Gabapentin can be removed by hemodialysis. Although hemodialysis has not been performed in the few overdose cases reported, it may be indicated by the patient's clinical state or in patients with significant renal impairment.

## DOSAGE AND ADMINISTRATION

Neurontin® is recommended for add-on therapy in patients over 12 years of age. Evidence bearing on its safety and effectiveness in pediatric patients below the age of 12 is not available.

Neurontin® is given orally with or without food.

The effective dose of Neurontin® is 900 to 1800 mg/day and given in divided doses (three times a day) using 300- or 400-mg capsules or 600- or 800-mg tablets. The starting dose is 300 mg three times a day. If necessary, the dose may be increased using 300- or 400-mg capsules or 600- or 800-mg tablets three times a day up to 1800 mg/day. Dosages up to 2400 mg/day have been well tolerated in long-term clinical studies. Doses of 3600 mg/day have also been administered to a small number of patients for a relatively short duration, and have been well tolerated. The maximum time between doses in the T.I.D. schedule should not exceed 12 hours.

It is not necessary to monitor gabapentin plasma concentrations to optimize Neurontin® therapy. Further, because there are no significant pharmacokinetic interactions among Neurontin® and other commonly used antiepileptic drugs, the addition of Neurontin® does not alter the plasma levels of these drugs appreciably.

## DOSAGE AND ADMINISTRATION (continued)

If Neurontin® is discontinued and/or an alternate anticonvulsant medication is added to the therapy, this should 300-mg capsules:

> Yellow hard gelatin capsules printed with "PD" on one side and "Neurontin® 300 mg" on the other; available in:
> Bottles of 100: N 0071-0805-24
> Unit dose 50's: N 0071-0805-40

400-mg capsules:

> Orange hard gelatin capsules printed with "PD" on one side and "Neurontin® 400 mg" on the other; available in:
> Bottles of 100: N 0071-0806-24
> Unit dose 50's: N 0071-0806-40

600-mg tablets:

> White elliptical film-coated tablets printed in black ink with "Neurontin® 600" on one side; available in
> Bottles of 100: N 0071-0416-24
> Bottles of 500: N 0071-0416-30
> Unit dose 50's: N 0071-0416-40

800-mg tablets:

> White elliptical film-coated tablets printed in orange with "Neurontin® 800" on one side; available in:
> Bottles of 100: N 0071-0426-24
> Bottles of 500: N 0071-0426-30
> Unit dose 50's: N 0071-0426-40

**Storage (Capsules)**
Store at Controlled Room Temperature 15°-30°C (59°-86°F).

**Storage (Tablets)**
Store at 25°C (77°F); excursions permitted to 15°-30°C (59°-86°F) [see USP Controlled Room Temperature].

Rx only

Revised August 2000

Manufactured by:
Parke-Davis Pharmaceuticals, Ltd.
Vega Baja, PR 00694

Distributed by:
PARKE-DAVIS
Div of Warner-Lambert Co
Morris Plains, NJ 07950 USA

©1998-'00, PDPL

0418G835

# EXHIBIT M

**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Public Health Service

Food and Drug Administration
Rockville, MD 20857

**TRANSMITTED BY FACSIMILE**


O. Lucy Castro
Director, Worldwide Regulatory Strategy
Pfizer, Inc.
235 East 42nd Street
New York, New York 10017-5755

Re: NDA #s 20-235, 20-882
      Neurontin® (gabapentin)
      MACMIS # 10738

Dear Ms. Castro:

Through routine monitoring and surveillance, the Division of Drug Marketing, Advertising, and
Communications (DDMAC) has identified a model (#NE 102254) for Neurontin (gabapentin) that is
in violation of the Federal Food, Drug, and Cosmetic Act and applicable regulations because it makes
representations about Neurontin which are false or misleading.

On one side, the model has a presentation of the human brain with full presentation of the
hippocampus, the cerebellum, lower medullary structures leading to the spine, and the cerebrum with
a prominent mention of the product name below. On the opposite side of the model is a heading
"Mechanism of Action," under which are illustrations of cellular activity resulting from the
administration of Neurontin and another prominent mention of the product name. The cellular
activities within this " Mechanism of Action" include: a decrease in "Action potential frequency," an
increase in "GABA synthesis," and increase in "GABA release," and the "Regulat[ion] of
intracellular Ca++."

Specifically, DDMAC has the following objections:

The presentation on the model of illustrations of cellular activity resulting from the administration of
Neurontin ("Mechanism of Action"), in conjunction with the presentation of the human brain, and the
prominent display of the name Neurontin makes representations about how Neurontin acts in the
human brain. This presentation along with the depiction of the human brain and the prominent display
of the name "Neurontin" suggest that the mechanism of action of Neurontin has been established in the
human brain. This suggestion of proof of the mechanism of action is false. Specifically, it is contrary
to the language in the approved product labeling that states that "[t]he mechanism by which gabapentin
[Neurontin] exerts its anticonvulsant action is unknown."

Furthermore, the full presentation of the aforementioned areas of the human brain accompanied by
purported "Mechanism of Action" and the prominent display of the name "Neurontin" is misleading
because it suggests that Neurontin is useful for a broader range of CNS conditions than has been

# EXHIBIT N

1           IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF MASSACHUSETTS
2

3

4    IN RE:                      )
     NEURONTIN MARKETING AND     )   CA No. 04-10981-PBS
5    SALES PRACTICES LITIGATION  )

6

7

8
                   SCHEDULING CONFERENCE
9
          BEFORE THE HONORABLE PATTI B. SARIS
10             UNITED STATES DISTRICT JUDGE

11

12

13

14                        United States District Court
                          1 Courthouse Way, Courtroom 19
15                        Boston, Massachusetts
                          May 13, 2005, 2:00 p.m.
16

17

18

19

20

21

22
                      LEE A. MARZILLI
23             CERTIFIED REALTIME REPORTER
               United States District Court
24             1 Courthouse Way, Room 3205
                  Boston, MA  02210
25                   (617)345-6787

1    these motions to ask for permission to file the joint brief,

2    but -- and we're happy to hand one up.

3              THE COURT:  Allowed.

4              MR. ROUHANDEH:  Thank you.

5              MR. GREENE:  Judge, can I bring up an issue related

6    to discovery?  And I'm asking for the Court's guidance.  The

7    last time I was before you and we asked for your guidance and

8    you provided it to Mr. Rouhandeh and I on the Franklin fee

9    issue, we were able to resolve our dispute without coming

10   back before you.  We have a meet-and-confer scheduled next

11   Tuesday at Mr. Rouhandeh's office, and there are a number of

12   attorneys that are coming from across the country for that

13   meeting, and it's in response to Pfizer's objections to our

14   document requests and our interrogatories.  Mr. Finkelstein's

15   cases that are now part of this MDL, or the five that are

16   part of this MDL, have orders from a Federal Court that have

17   ordered production of sales and marketing documents, clinical

18   trials and clinical data, with no time limitation and no

19   geographic limitation.  Mr. Rouhandeh has continued to raise

20   the time restriction in his responses to us to December 31,

21   1998, and I think we can save a lot of briefing time and a

22   lot of time before the magistrate if we could get some

23   guidance from you.  You know that the class action that's

24   before you is national in scope and contains allegations up

25   to the present date.

1          THE COURT:  I read Judge Rackoff's opinion, if

2    that's what you're referring to.

3          MR. GREENE:  Yes, I am.

4          THE COURT:  It seemed reasonable, but, you know,

5    let me put it this way:  It seemed like a reasonable

6    guidepost to start with, but if someone's going to challenge

7    it, they should do it, and I will refer it to a magistrate

8    judge.  I don't know that I could hear arguments.  When I

9    read it -- and I know judge Rackoff is a very reasonable

10   person -- when I read it, it sounded reasonable.  I haven't

11   thought through the issues, and I'd hate to do that without

12   hearing the point/counterpoint, which is always so helpful.

13   And if there's a challenge, I think you should go in there

14   with that as a starting point; but if there's a serious

15   disagreement, you'll just have to go to the magistrate judge.

16         MR. ROUHANDEH:  That's fine, your Honor.  We

17   haven't even had a conversation with Mr. Greene, and Tuesday

18   is the date for our meet-and-confer, and there will be a lot

19   of issues on that agenda, including the fact that we were

20   served yesterday with -- and this is an actual number --

21   42,000 plus requests to admit, and so there are going to be

22   some discovery issues in this case.

23         THE COURT:  That can't be.

24         MR. ROUHANDEH:  But I think we should discuss them

25   next Tuesday before we bring it to your Honor to ask for

1    advisory opinions with respect to --

2              THE COURT:  Is that just a request to admit

3    authenticity of documents?

4              MR. GREENE:  Authenticity.  And you might recall we

5    discussed this with you and we raised it with Mr. Rouhandeh

6    in a hearing, and what the Court said is that it couldn't

7    impose anything beyond what the rules would require regarding

8    authenticity of the Franklin documents document by document,

9    and --

10             MR. ROUHANDEH:  Every single document, whether

11   it's -- whatever it is they have asserted, not every document

12   that they might ever even ask a witness about but every

13   single document.

14             MR. GREENE:  I think we would be able to resolve

15   this.  We tried to raise it last time, and we said this is

16   what would happen if we were forced to --

17             THE COURT:  I didn't know you were talking about

18   42,000 requests to admit.

19             MR. GREENE:  Well, it's all the Franklin

20   documents.  I mean, he's produced them.  He knows they're

21   Pfizer documents.  I think we ought to be able to resolve

22   this, to reach a stipulation without requiring him to respond

23   to each one.  It's very simple if he'd sit down and discuss

24   it with us.

25             THE COURT:  That's what you're supposed to do next

```
 1                    C E R T I F I C A T E

 2

 3
      UNITED STATES DISTRICT COURT )
 4    DISTRICT OF MASSACHUSETTS    ) ss.
      CITY OF BOSTON               )
 5

 6

 7

 8           I, Lee A. Marzilli, Official Federal Court

 9    Reporter, do hereby certify that the foregoing transcript,

10    Pages 1 through 31 inclusive, was recorded by me

11    stenographically at the time and place aforesaid in Civil

12    Action No. 04-10981-PBS, In Re:  Neurontin Marketing and

13    Sales Practices Litigation, and thereafter by me reduced to

14    typewriting and is a true and accurate record of the

15    proceedings.

16           In witness whereof I have hereunto set my hand this

17    20th day of May, 2005.

18

19

20

21

22

23    _____
      LEE A. MARZILLI, CRR
24    OFFICIAL FEDERAL COURT REPORTER

25
```

# EXHIBIT O

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re:     NEURONTIN MARKETING AND<br>SALES PRACTICES LITIGATION | MDL  Docket No.  1629<br><br>Master File No. 04-10981 |
| THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS | Judge Patti B. Saris |

## CLASS AND NON-CLASS PLAINTIFFS' FIRST REQUEST FOR PRODUCTION OF DOCUMENTS

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, the Plaintiffs hereby request Defendants Pfizer, Inc and Warner-Lambert Company produce for inspection and copying the documents and materials described below at the offices of Greene & Hoffman, 125 Summer Street, Suite 1410, Boston, MA 02110 within thirty days of the date of the service of this request.  Plaintiffs further request that such production be made in accordance with the Definitions and Instructions set forth below.

### Definitions and Instructions

### Definitions

The definitions contained in Rule 26.5 of the Local Rules of the United States District Court for the District of Massachusetts are incorporated herein by reference.  Additionally, the following definitions apply to this Document Request:

"And" includes the word "or" and vice-versa.

 "Any" includes the and encompases "all" and vice-versa.

"APT Database" is the database described by James Murray in his March 29, 2002 deposition in the action <u>United States ex. rel. Franklin v. Parke-Davis</u>, No. 96-11651-PBS, United States District Court for the District of Massachusetts.

"Case report" means a written or oral report that describes the treatment of an individual patient.

"CBU" means (a) the divisions within Parke-Davis known as Customer Business Units, including the regional CBUs and the Managed Care CBU; and (2) any division with Pfizer that performed the function of a CBU after the merger of Pfizer and Warner-Lambert.

"Clinical trial" means a formal, blinded, prospective research study on human subjects conducted pursuant to a formal protocol and involving a control group

"CME" shall mean continuing medical education.

"CME Provider" shall mean an institution or entity certified by the Accreditation Council for Continuing Medical Education (ACCME) to provide continuing medical education or to issue CME credits to physicians.

"Communication" shall include oral, written or electronic communications.

"Defendants" shall mean "Pfizer" and "Warner-Lambert" and any of their predecessors or successors in interest, divisions, offices, subsidiaries, affiliates, and any present or former directors, officers, executives, trustees, employees, agents, attorneys, representatives and any other Person acting or purporting to act on its behalf, including, but not limited to, Parke-Davis.

"Document" shall have the meaning set forth in Rule 34(a) of the Federal Rules of Civil Procedure, and Local Rule 26.5, and includes all forms of writings as defined in Rule 1001(1) of the Federal Rules of Evidence, and includes any reduction to tangible form, whether written, recorded,

2

taped, filmed, videotaped or in computer, digital or magnetic memory or storage, of communication, information, or data, including any graphic matter of any kind or nature, however produced or reproduced, and also includes originals, drafts, and non-identical copies, wherever located. "Document" shall include, but not be limited to, books, contracts, agreements, correspondence, electronic mail (email), computer tapes, discs, magnetic memory, printouts and keypunch cards, memoranda, diaries, notes reports, bulletins, printed forms, telegraphic communications, pleadings and other legal papers, notes, telexes, telegrams, telecopies, facsimile reproductions, or "faxes," factual compilations, data compilations, statistical compilations, plans, diagrams, journals, change orders, studies, surveys, sketches, art work, graphics, checks, ledgers, catalogues, brochures, pamphlets, press releases, advertisements, invoices, minutes, photographs, microfilms, microfiche, films, personnel files, quotes, stenographic notes, computer disks, telephone records, schedules, bids, voice recordings, and transcriptions. This definition shall apply to all Documents in the possession, custody or control of the Defendants herein, or that of their attorneys, agents, employees, officers, directors, or representatives, irrespective of who generated, prepared or signed the Documents.

"DRUGDEX System" shall mean the proprietary reference service or product sold, licensed, or marketed by MICROMEDEX under the name DRUGDEX®.

"Event" shall mean any conference, seminar, gathering, dinner meeting, dinner, meal, advisory board meeting, consultant meeting, speaker event, speaker training, CME, conference call, teleconference, trip, vacation, or weekend getaway attended by physicians, funded, sponsored, or paid for in whole or in part by Defendants, whether directly or through a third party which received money from Defendants which was intended to be applied to any of the costs of the Event.

"Events, medical educational programs or educational materials that describe Neurontin's use for off-label indications" includes all events, programs and materials that devote attention to Neurontin's use for off-label indications even if such subject is not the exclusive or primary focus of the event, program or materials.

"FDA" means the United States Food and Drug Administration.

"Goods or Services of Value" means any durable good or any service with a retail value in excess of $50, including but not limited to the provision of travel expenses, accommodations, entertainment or meals.

"Including" shall mean including, without limitation, the specific matter or Documents described.

"Identified Physicians" shall refer to:  Jack Anstandig, Miroslav Backonja, Robert Baraff, Robert Barkin, Carl Bazil, Gregory Bergey, Ahmad Beydoun, Jane Boggs, Blaise Bourgeois, Thomas Browne, Joseph Bruni, Deborah Cantrell, Enrique Carrazana, Gregory Cascino, Mitchell Cohen, F. Michael Cutrer, John DeToledo, Orrin Devinsky, Bruce Ehrenberg, Alan Ettinger, James Ferrendelli, Robert S. Fisher, Bradley Galer, Jeffrey Gelblum, Barry Gidal, Frank Gilliam, Kenneth Gorson, Nina Graves, Hans Hansen, Paul Hardy, Barry Hendin, Gregory Holmes, John Hughs, Terrence Ketter, Jack A. Klapper, Ilo Leppik, Robert Leroy, David Longmire, David Marcotte, Ninan Mathew, Richard Mattson, Alexander Mauskop, Gary Mellick, Michael McLean, Michael Merren, Martha Morrell, George Morris, Solomon Moshe, Bruce Nicholson, Michael Nigro, Dennis Nitz, Douglas Nordli, John Pellock, Mark H. Pollack, Michael Privitera, R. Eugene Ramsey, William Rosenfeld, Edgar Ross, Anthony Ritaccio, Ralph S. Ryback, Rajesh Sachdeo, Raman Sankar, Steven Schachter, Jerome Schnitt, Stephen Silberstein, Michael Smith (Chicago, IL), Andrew Lawrence Stoll, Patricia

4

Suppes, Norman Sussman, David Treiman, Basim Uthman, James Wheless, B. Joe Wilder, John W. Winkelman, and Mark Yerby.

"Identified Vendors" shall refer to the following companies:

1.    Cline Davis & Mann (including, but not limited to its Proworx division);

2.    Physicians' World (including, but not limited to, its Professional Postgraduate Services Division);

3.    Sudler and Hennessy (including, but not limited to, its Intramed division);

4.    Medical Education Programs, Ltd.

5.    Medical Education Consultants, LLC

6.    Medical Educational Services

7.    CME, Inc.

8.    Boron Lapore

9.    AMM/Adelphi

"IMS Data Files" shall mean all electronic database or spreadsheet files, in whatever file format containing data, information, or analytical methods or tools purchased from or licensed from IMS Health.

"Indirect funding" shall mean the funding of an activity or event useful to Defendants' pharmaceutical business, when such activity or event was not directly paid for by the Defendants, but was paid for by a person or vendor with whom Defendants had contracted, and one of the expected services with the contracting party was the funding of such activities and events.

"Indirect payments" shall mean payments made to a third party by or through a person or vendor that has directly contracted with any of the Defendants where one of the expected services

provided by the contracting party is the payment of third parties who are providing services useful to Defendants' pharmaceutical business.

"Letter" shall mean a letter to the editor or similar written communication published in a medical journal, newsletter or publication.

"Medical study" shall mean a research study designed to investigate a specific question regarding the use of a pharmaceutical agent on human subjects. Clinical studies are included within this definition of medical study, however, case reports are not. A record review may or may not be within this definition of medical study.

"MICROMEDEX" shall mean MICROMEDEX, a division of the Thompson Corporation, and any of its predecessors or successors in interest, divisions, offices, subsidiaries, affiliates, and any present or former directors, officers, executives, trustees, employees, agents, attorneys, representatives and any other Person acting or purporting to act on its behalf.

"Neurontin" shall mean the drug with the chemical name gabapentin, marketed under the name Neurontin, and includes all uses or indications thereof.

"Neurontin Drug Evaluation" shall mean that portion of the DRUGDEX System which contains the Drug Evaluation for Neurontin, including but not limited any portions which discuss or set forth indications and Unapproved Indications for Neurontin.

"Off-label" shall mean uses of a drug, or the conditions for use of a drug, which has not received approval by the FDA. Use of a drug at a higher dosage than the dosage stated to be safe and effective in the drug's labeling, or use of a drug as a monotherapy when only approved for adjunct therapy both constitute an "off-label" use.

6

"Parke-Davis" shall mean Parke-Davis, a division of Warner-Lambert Company, and any of its predecessors or successors in interest, divisions, offices, subsidiaries, affiliates, and any present or former directors, officers, executives, trustees, employees, agents, attorneys, representatives and any other Person acting or purporting to act on its behalf.

"Person" or "Persons" shall mean any individual, corporation, organization, association, partnership, limited partnership, firm, joint venture, trustee, governmental body, agency, governing board, department or division, or any other entity.

"Pfizer" shall mean Defendant Pfizer, Inc. and any of its predecessors or successors in interest, divisions, offices, subsidiaries, affiliates, and any present or former directors, officers, executives, trustees, employees, agents, attorneys, representatives and any other Person acting or purporting to act on its behalf, including, but not limited to, Parke-Davis.

"Record review" shall mean a retrospective analysis of the medical records of an individual patient or a group of patients.

"Relating to" shall mean constituting, consisting of, referring to, reflecting, concerning, discussing, evidencing, commenting on, pertaining to, or having any logical or factual connection with the matter identified, in whole or in part.

"Third-party payor" shall mean an non-governmental entity that is (i) a party to a contract, issuer of a policy, or sponsor of a plan, which contract, policy or plan provides prescription drug coverage to natural persons, and is also (ii) at risk, pursuant to such contract, policy or plan, to pay or reimburse the amount associated with the cost of prescription drugs to natural persons covered by such contract, policy or plan (subject to such natural persons satisfying any obligation to pay a deductible and/or co-payment).

7

"Vendor" shall mean an entity which, in the ordinary course of its business, provides one or more of the following services to healthcare or pharmaceutical entities: (a) assistance in organizing, coordinating, planning or managing meetings or events; (b) assistance in writing, editing, placing, publishing or distributing medical articles or medical publications; or (c) assistance or consultation with marketing.

"Verbatims" shall mean the information or statements of physicians compiled by Scott-Levin or Verispan, LLC referred to or known as verbatims.

"Warner-Lambert" shall mean Warner-Lambert Company and any of its predecessors or successors in interest, divisions, offices, subsidiaries, affiliates, and any present or former directors, officers, executives, trustees, employees, agents, attorneys, representatives and any other Person acting or purporting to act on its behalf, including, but not limited to, Parke-Davis.

## Instructions

1.     In the event that any Document called for by this Document Request is withheld on the basis of a claim of privilege, that Document is to be identified as follows: author(s), addressee(s), indicated or blind copy recipient(s), date, subject matter, number of pages, attachments or appendices, all persons to whom distributed, shown or explained, the present custodian, and the nature of the privilege asserted.

2.     In the event that any Document called for by this Document Request has been destroyed, discarded, otherwise disposed of, or no longer exists, that Document is to be identified as completely as possible, including, without limitation, the following information: author(s), addressee(s), indicated or blind copy recipient(s), date, subject matter, date of disposal, reason for

disposal, Person authorizing the disposal, the Person disposing of the Document, and identify its last known location and the reason it is no longer in existence.

3.    In the event that any information is redacted from a Document produced pursuant to this Document Request, that information is to be identified and the basis upon which such information is redacted be fully stated.

4.    In construing this Document Request, the singular shall include the plural and the plural shall include the singular.

5.    These document requests are continuing requests which require supplemental responses if a Defendant, or any person acting on its behalf, obtains additional information called for by a request.  Each supplemental response shall be served on Plaintiffs no later than thirty (30) days after the discovery of the further information, and in no event shall any supplemental response be served later than the date for submission of a pre-trial memorandum.

6.    In producing documents and other materials, you are requested to furnish all documents or things in your possession, custody or control, regardless of whether such documents or materials are possessed directly by you or your directors, officers, agents, employees, representatives, subsidiaries, managing agents, affiliates, investigators, or by your attorneys or their agents, employees, representatives or investigators.

7.    Documents shall be produced as they are kept in the usual course of business or shall be organized and labeled to identify any file number, file name, or any other file identification system utilized by the responding party, as well as the location and custodian of such records.  These requests include shall be deemed to include a request by the Plaintiffs to physically inspect any file

drawer, filing cabinet or any other storage device where documents responsive to these requests are maintained at the time of the inspection of such documents.

8.      Documents attached to each other should not be separated.

9.      Unless otherwise stated, the time period for this Document Request shall be from January 1, 1994 to May, 2004.  A request to provide documents or materials "at any time" is unlimited in temporal scope.

10.     The geographic scope of this Document Request is the United States; however, all requests for documents and other materials which relate to the safety or efficacy of Neurontin, or medical research and study relating to Neurontin are not limited to the United States.

11.     When a request calls for the production of an electronic database file or Data File, this file must be produced in a form compatible with Microsoft Access, or in any other format agreed to by the parties.

12.     If a request calls for the production of database records or database files that no longer exist in electronic form, all hard copies of the requested records and files, even if not entirely complete, should be provided.

**Documents Requested**

1.      NDA 20-235

2.      All supplemental NDAs filed concerning Neurontin.

3.      All documents relating to any clinical trial conducted for the purpose of establishing the safety or efficacy of Neurontin for the treatment of any pain syndrome.

10

4.      All documents relating to any clinical trial conducted for the purpose of establishing the safety or efficacy of Neurontin for the treatment of any psychiatric syndrome.

5.      All documents relating to any clinical trial conducted for the purpose of establishing the safety of Neurontin for use by patients suffering from mental illnesses, including, but not limited to, bipolar disorder, depression, social phobia, anxiety disorder, panic disorder, obsessive compulsion disorder, mania, attention deficit disorder or attention deficit hyperactivity disorder.

6.      All documents relating to any clinical trial conducted at any time for the purpose of establishing efficacy or safety of Neurontin for the treatment of migraine or for migraine prophylaxis.

7.      All documents relating to any clinical trial conducted for the purpose of establishing the efficacy or safety of Neurontin for the treatment of social phobia

8.      All documents relating to any clinical trial conducted for the purpose of establishing the efficacy or safety of Neurontin for the treatment of anxiety disorder.

9.      All documents relating to any clinical trial conducted for the purpose of establishing the efficacy or safety of Neurontin for the treatment of any bipolar disorder.

10.     All documents relating to any clinical trial conducted for the purpose of establishing the efficacy or safety of Neurontin for the treatment of  restless leg syndrome.

11.     All documents relating to any clinical trial conducted for the purpose of establishing the efficacy of Neurontin for the treatment of RSD.

11

12.     All documents relating to any clinical trial conducted for the purpose of establishing the efficacy of Neurontin for the treatment of panic disorder.

13.     All documents relating to any clinical trial conducted for the purpose of establishing the efficacy of Neurontin for the treatment of sleep disorders.

14.     All documents relating to any clinical trial conducted for the purpose of establishing the efficacy of Neurontin at doses greater than 1800 mgs/day.

15.     All documents relating to any clinical trial conducted for the purpose of establishing the efficacy of Neurontin as a monotherapy for the treatment of epilepsy.

16.     All documents created at any time relating to the decision whether or not to file patent applications for Neurontin's use in treating conditions other than epilepsy, including, but not limited to, all clinical studies, research, market analysis or other information which was reviewed in making the decision to file such applications.

17.     All documents created at any time relating to the Neurontin Development Team, including but not limited to meeting minutes, agendas, all reports generated by the Neurontin Development team, and all communications distributed to members of the Neurontin Development Team.

18.     All documents relating to any market analysis of potential, expected or actual sales of Neurontin for any use other than as an adjunctive therapy in the treatment of epilepsy.

12

19.     All documents relating to any forecasts or projections of sales of Neurontin for any use other than as an adjunctive therapy in the treatment of epilepsy.

20.     All documents relating to any forecast or projection of estimated number of Neurontin prescriptions for any use other than as an adjunctive therapy in the treatment of epilepsy.

21.     All documents relating to any review, consideration, analysis, recommendation, approval of Neurontin's sales and marketing within the United States by the Parke-Davis New Product Committee.

22.     Documents sufficient to identify all persons who comprised the New Product Committee at any time it reviewed, considered, analyzed, recommended, or approved any aspect of Neurontin's sales and marketing within the United States.

23.     All documents generated, reviewed, considered, analyzed or communicated by Parke-Davis's regulatory affairs department regarding any requirement (or lack of requirement) that Parke-Davis submit a supplemental NDA in order to engage in any marketing of Neurontin for any use other than as an adjunctive therapy in the treatment of epilepsy.

24.     All documents generated, reviewed, considered, analyzed or communicated by Parke-Davis's regulatory affairs department regarding any recommendation by that department (or any person within that department) regarding Parke-Davis's submission of a supplemental NDA in order engage in any marketing of Neurotin for any use other than as adjunctive therapy in the treatment of epilepsy.

13

25.     All documents, subsequent to 1993, relating to any review, consideration, analysis, recommendation or approval of Neurontin's sales and marketing within the United States by the Parke-Davis Marketing Council.

26.     Documents sufficient to identify all persons who comprised the Parke-Davis Marketing Council at any time it reviewed, considered, analyzed, recommended, or approved any aspect of Neurontin's sales and marketing within the United States subsequent to 1993.

27.     All documents relating to any decision by Parke-Davis or any of the Defendants to publicize off-label uses of Neurontin through articles published in medical journals.

28.     All documents relating to marketing assessments of Neurontin for any use other than as an adjunctive therapy in the treatment of epilepsy.

29.     All documents relating to standard operating procedures within the Defendants for funding Events at which off-label uses of any of Defendants' drug products would be discussed.

30.     All documents relating to standard operating procedures within the Defendants for funding Events at which off-label uses of Neurontin would be discussed.

31.     All documents relating to standard operating procedures within the Defendants for inviting physicians to Events at which off-label uses of any of Defendants' drug products would be discussed.

32.     All documents relating to standard operating procedures within the Defendants for inviting physicians to Events at which off-label uses of Neurontin would be discussed.

33.     All records in Parke-Davis's and Pfizer's clinical communications database that concern requests from physicians for information relating to off-label use of Neurontin.  The response to this request should include all fields of the database for every record produced.

34.     Copies of all articles that were sent to physicians who contacted Defendants requesting information relating to any off-label use of Neurontin.

35.     Copies of all forms of letters that were sent to physicians in response to physician requests for information relating to any off-label use of Neurontin.

36.     All records in any Parke-Davis database, including, but not limited to, the Parke-Davis APT database, relating to all Parke-Davis payments, directly or indirectly, to physicians for the conduct of medical studies on off-label usage of Neurontin.  The response to this request should include all fields of the database for every record produced.

37.     All records in any Pfizer database relating to all payments, directly or indirectly, to physicians for the conduct of medical studies on off-label usage of Neurontin.  The response to this request should include all fields of the database for every record produced.

38.     All documents relating to communications between any of the Defendants and any person who received a payment to conduct, review, design, analyze, write up or propose a medical study relating to any off-label use of Neurontin.

15

39.     All documents relating to internal communications within any of the Defendants relating to the conduct, review, design, analysis, write up, proposal or payment for medical studies relating to any off-label use of Neurontin.

40.     All documents relating to communications between any of the Defendants and any person who requested funding, sponsorship or any form of support to conduct, review, analyze, write up or propose a medical study relating to any off-label use of Neurontin.

41.     All documents relating to communications between any of the Defendants and any person who the Defendants solicited to conduct, review, analyze, write up or propose a medical study relating to any off-label use of Neurontin.

42.     All documents relating to communications between any of the Defendants and any person who received any form of payment to conduct, review, design, analyze, write up or propose a case study relating to any off-label use of Neurontin.

43.     All documents relating to internal communications within any of the Defendants relating to the review, design, analysis, write up, proposal or payment for case studies relating to any off-label use of Neurontin.

44.     All documents relating to communications between any of the Defendants and any person who requested funding, sponsorship or any form of support to conduct, review, analyze, write up or propose a case study relating to any off-label use of Neurontin.

16

45.     All documents relating to communications between any of the Defendants and any person who the Defendants solicited to conduct, review, analyze, write up or propose a case study relating to any off-label use of Neurontin.

46.     All documents relating to communications between any of the Defendants and any person who received any form of payment to conduct, review, design, analyze, write up or propose a record review relating to any off-label use of Neurontin.

47.     All documents relating to internal communications within any of the Defendants relating to the review, design, analysis, write up, proposal or payment for record reviews relating to any off-label use of Neurontin.

48.     All documents relating to communications between any of the Defendants and any person who requested funding, sponsorship or any form of support to conduct, review, analyze, write up or propose a record review relating to any off-label use of Neurontin.

49.     All documents relating to communications between any of the Defendants and any person who the Defendants solicited to conduct, review, analyze, write up or propose a record review relating to any off-label use of Neurontin.

50.     All documents relating to peer marketing or peer to peer marketing of Neurontin.

51.     All documents relating to adopting peer marketing or peer to peer marketing strategies in connection with the marketing of Neurontin

17

52.    All documents relating to use of peer marketing or peer to peer marketing in order to publicize off-label use of Neurontin.

53.    All documents relating to physician visits by medical liaisons at which Neurontin was discussed.

54.    All documents relating to the content of information provided by medical liaisons at physician visits at which Neurontin was discussed.

55.    All records in Defendants' sales call database that relates to calls on physicians by Defendants' representatives where Neurontin was discussed.  The response to this request should include all fields of the database for every record produced.

56.    All records in any database maintained by the Defendants that contains data regarding visits to physicians by Defendants sales personnel or marketing personnel or medical liaisons relating to meetings between Defendants' representatives and physicians at which Neurontin was discussed.  The response to this request should include all fields of the database for every record produced.

57.    All documents relating to Events that presented information concerning the off-label use of Neurontin that were funded, directly or indirectly, by Defendants.

58.    All documents relating to communications between the Identified Vendors or any other Vendor and the Defendants regarding the planning, production, funding, design, hosting, holding, management or occurrence of Events at which the off-label use of Neurontin was discussed.

18

59.    All documents relating to communications between the Defendants and any CME Provider regarding the planning, production, funding, design, hosting, holding, management or occurrence of Events at which the off-label use of Neurontin was discussed.

60.    All documents relating to communications between any Vendor (including but not limited to, the Identified Vendors) and any third party (including, but not limited to, any CME provider) regarding the planning, production, funding, design, hosting, holding, or occurrence of Events at which the off-label use of Neurontin was discussed.

61.    All documents relating to communications between any Vendor, including, but not limited to, the Identified Vendors and the Defendants regarding  payment of persons who would make presentations at Events at which the off-label use of Neurontin was discussed or was expected to be discussed.

62.    All documents relating to communications between  any Vendor, including, but not limited to, the Identified Vendors and the Defendants regarding the payment of, or the provision of Goods or Service of Value to  persons who made presentations at Events at which the off-label use of Neurontin was discussed or was expected to be discussed.

63.    All documents relating to communications between  any Vendor, including, but not limited to, the Identified Vendors and the Defendants regarding  payment of, or the provision of Goods or Service of Value to, persons who attended Events at which the off-label use of Neurontin was discussed or was expected to be discussed.

64.    All documents relating to communications between the Defendants and any Vendor, including, but not limited to, the Identified Vendors regarding strategies and tactics to expand off-label use of Neurontin.

65.    All documents relating to internal communications within the Defendants regarding the payment of, or the provision of Goods or Service of Value to persons who made presentations at Events at which the off-label use of Neurontin was discussed or was expected to be discussed.

66.    All documents relating to internal communications within the Defendants regarding payment of, or the provision of Goods or Service of Value to persons who attended Events at which the off-label use of Neurontin was discussed or was expected to be discussed.

67.    All documents relating to marketing strategies for Neurontin (whether at the national, regional or CBU level).

68.    All documents relating to tactical plans created to implement marketing strategies for Neurontin (whether at the national, regional or CBU level).

69.    All documents relating to any Vendor's, including, but not limited to, the Identified Vendors' design, composition, assistance with, execution, drafting or revision of any Neurontin marketing strategy.

70.    All documents relating to any Vendor's, including, but not limited to, the Identified Vendors' design, composition, assistance with, execution, drafting or revision of any Neurontin tactical plan.

20

71.    All documents relating to any Vendor's, including, but not limited to, the Identified Vendors' consultation with the Defendants regarding Neurontin's marketing plans, marketing strategies or marketing tactics.

72.    All documents relating to any of the Identified Vendors' participation in the Neurontin Extended Disease Team.

73.    All documents relating to any communications from the Neurontin Extended Disease Team to any of the Identified Vendors.

74.    All documents relating to any communications to the Neurontin Extended Disease Team from any of the Identified Vendors.

75.    All documents relating to proposals from any Vendor, including, but not limited to, any of the Identified Vendors, to produce events, programs or educational materials which described the use of Neurontin for off-label indications for the Defendants.

76.    All documents relating to the content of events, programs or educational materials funded directly or indirectly by the Defendants that described the use of Neurontin for off-label indications, including, but not limited to all transcripts, audio tapes, videotapes, abstracts, summaries, synopses or computer generated presentations (such as Powerpoint).

77.    All documents relating to communications between Defendants and CME Providers regarding Defendants' participation in, or funding of, medical education programs that described Neurontin's use for off-label indications.

78.    All documents relating to any event, medical education program or educational materials that describes Neurontin's use for off-label indications that was funded, in whole or in part, by an unrestricted grant by Defendants.

79.    All documents relating to any proposal to produce an event, medical education program or educational materials that describes Neurontin's use for off-label indications that was funded, in whole or in part, by an unrestricted grant by Defendants.

80.    All documents relating to any communications between the Defendants and the Identified Vendors regarding publicizing the off-label use of Neurontin.

81.    All documents relating to any "Consultants' Meeting" where physicians were retained as consultants to the Defendants and, as part of their consulting duties, were exposed to presentations that described Neurontin's use for off-label indications, including but not limited to:

    a.    Documents that identify all attendees;
    b.    Documents that identify all persons who made presentations regarding Neurontin's use for off-label indications;
    c.    Documents that identify the compensation each "consultant" received;
    d.    Documents that identify the compensation paid to each person who made a presentation regarding Neurontin's use for off-label indications;
    e.    Documents that identify all expenses covered for "consultants" who attended the consultants' meetings;
    f.    Documents that identify any other Goods or Service of Value provided to the consultants and/or to persons who made presentations regarding Neurontin's use for off-label indications;
    g.    Documents that evidence the content of the presentations made regarding Neurontin's use for off-label indications;
    h.    Documents that evidence any slides shown at the consultants' meeting regarding Neurontin's use for off-label indications;
    i.    Documents regarding any written materials that were distributed regarding Neurontin's use for off-label indications;

      j.     Documents that identify any consultation the "consultants" provided to the Defendants;

      k.     Documents that evidence any surveys, questionnaires, or similar documents filled out by the "consultants";

      l.     Documents that evidence any effort or attempt by the Defendants to track whether the "consultants" attending the consultants' meeting changed their prescription writing behavior after the consultants' meeting.

82.    All documents relating to any "Advisory Board Meeting" where physicians attending for the purpose of advising the Defendants were exposed to presentations that described Neurontin's use for off-label indications, including but not limited to:

      a.     Documents that identify all attendees;

      b.     Documents that identify all persons who made presentations regarding Neurontin's use for off-label indications;

      c.     Documents that identify the compensation each "advisor" received;

      d.     Documents that identify the compensation paid to each person who made a presentation regarding Neurontin's use for off-label indications;

      e.     Documents that identify all expenses covered for "advisors" who attended the advisory board committee meetings;

      f.     Documents that identify any other Goods or Service of Value provided to the "advisors" and/or to persons who made presentations regarding Neurontin's use for off-label indications;

      g.     Documents that evidence the content of the presentations made regarding Neurontin's use for off-label indications;

      h.     Documents that evidence any slides shown at the advisory committee meeting regarding Neurontin's use for off-label indications;

      i.     Documents regarding any written materials that were distributed regarding Neurontin's use for off-label indications;

      j.     Documents that identify any advice the "advisors" provided to the Defendants;

      k.     Documents that evidence any surveys, questionnaires, or similar documents filled out by the "advisors";

      l.     Documents that evidence any effort or attempt by the Defendants to track whether the "advisors" attending the meeting changed their prescription writing behavior after the meeting.

83.    All documents relating to any "continuing medical education" program produced with an unrestricted grant from the Defendants or from funding otherwise provided by Defendants (either

directly or indirectly) where presentations described Neurontin's use for off-label indications, including but not limited to:

    a.    Documents that identify all attendees;

    b.    Documents that identify all persons who made presentations regarding Neurontin's use for off-label indications;

    c.    Documents that identify the compensation each attendee received;

    d.    Documents that identify the compensation paid to each person who made a presentation regarding Neurontin's use for off-label indications;

    e.    Documents that identify all expenses covered for attendees;

    f.    Documents that identify any other Goods or Service of Value provided to the attendees and/or to persons who made presentations regarding Neurontin's use for off-label indications;

    g.    Documents that evidence the content of the presentations made regarding Neurontin's use for off-label indications;

    h.    Documents that evidence any slides shown at the continuing medical education program regarding Neurontin's use for off-label indications;

    i.    Documents regarding any written materials that were distributed regarding Neurontin's use for off-label indications;

    j.    Documents that evidence any effort or attempt by the Defendants to track whether the attendees changed their prescription writing behavior after the continuing medical education program.

84.    All documents relating to any Events not otherwise covered by Requests 81 through 83 which were produced with an unrestricted grant from the Defendants or from funding otherwise provided by Defendants (either directly or indirectly) where presentations described Neurontin's use for off-label indications, including but not limited to:

    a.    Documents that identify all attendees;

    b.    Documents that identify all persons who made presentations regarding Neurontin's use for off-label indications;

    c.    Documents that identify the compensation each attendee received;

    d.    Documents that identify the compensation paid to each person who made a presentation regarding Neurontin's use for off-label indications;

    e.    Documents that identify all expenses covered for attendees;

    f.    Documents that identify any other Goods or Service of Value provided to the attendees and/or to persons who made presentations regarding Neurontin's use for off-label indications;

    g.    Documents that evidence the content of the presentations made regarding

<blockquote>
Neurontin's use for off-label indications;
</blockquote>

h.    Documents that evidence any slides shown at the Events regarding Neurontin's use for off-label indications;

i.    Documents regarding any written materials that were distributed regarding Neurontin's use for off-label indications;

j.    Documents that evidence any effort or attempt by the Defendants to track whether the attendees changed their prescription writing behavior after the Events.

85.    All documents relating to communications between Defendants and the Identified Vendors regarding CME Providers available to, or committed to, present medical education programs that featured presentations regarding use of Neurontin for off-label indications.

86.    All documents relating to communications between Defendants and CME Providers regarding proposed or actual Events at which off-label uses of Neurontin were discussed or were expected to be discussed.

87.    All documents relating to communications between Defendants and CME Providers regarding the provision of unrestricted grants for proposed or actual Events at which off-label uses of Neurontin were discussed or were expected to be discussed.

88.    All documents relating to a "strategic partnership", as that term is defined and used in the December 22, 1995 letter from Larry Perlow, between Physician's World and Defendants.

89.    All documents relating to services performed by Physicians' World subsequent to December 22, 1995 with regard to the marketing of Neurontin.

90.    All documents relating to Physician's World and Parke-Davis sharing employees, office space, telephone systems and telephone numbers or any other resources.

25

91.     All documents relating to selection of speakers at Events funded directly or indirectly by Parke-Davis where presentations were given that described the use of Neurontin for off-label uses.

92.     All documents relating to the home study program on pain which Physicians' World worked on for Defendants, including, but not limited to:

   a.     Documents relating to the purpose of the home study program;
   b.     Documents relating to the expenses incurred in creating the program and the payment for such expenses;
   c.     Documents relating to the selection of the persons who authored the program;
   d.     Documents related to the distribution of the program;
   e.     Documents that evidence the content of the program; and
   f.     Documents that evidence any effort or attempt by the Defendants to track whether persons who received the program changed their prescription writing behavior after exposure to the program.

93.     All documents relating to the formation of Neurobehavioral Working Group.

94.     All documents relating to any funding or financial support the Neurobehavioral Working Group has received from Defendants directly or indirectly.

95.     All documents relating to communications between the Neurobehavioral Working Group and the Defendants.

96.     All documents relating to communications between any of the Identified Vendors and the Defendants that reference the Neurobehavioral Working Group.

97.     All documents relating to the transfer, directly or indirectly, of any Goods or Service

of Value from Defendants to the Neurobehavioral Working Group or any officer, agent, representative, employee or director of the Neurobehavioral Working Group.

98.    All documents relating to the Events identified in

    a.    paragraphs 65, 75, 81, 86, 90, 91,  129, 135, 150, 170, 179 and 197 of the Amended Class Action Complaint; and

    b.    paragraphs 68, 74 and 102 of the First Coordinated Amended Complaint.

99.    All documents relating to the creation, funding, distribution and presentation of a program called New Frontiers in Social Phobia and Bipolar Disorder.

100.    All documents relating to any workbooks or written materials that were created as part of an educational program entitled New Frontiers in Social Phobia and Bipolar Disorder.

101.    All documents relating to any communications between Defendants and any person who was involved in the creation, funding, orgainization or presentation of New Frontiers in Social Phobia and Bipolar Disorder, or any workbooks or written materials that were created in connection with said program.

102.    All documents relating to communications between Defendants and any physicians who made presentations regarding Neurontin's use for off-label uses at any Event funded directly or indirectly by the Defendants.

103.    All documents relating to communications between Defendants and any of the Identified Physicians regarding Neurontin's use for off-label uses at any Event funded directly or indirectly by the Defendants.

27

104.    All documents relating to any payments by Defendants, whether made directly or indirectly, to any speakers or physicians who made presentations regarding Neurontin's use for off-label uses at any Event funded directly or indirectly by the Defendants.

105.    All documents relating to any payments by Defendants, whether made directly or indirectly, to any of the Identified Physicians.

106.    All documents relating to any transfer of Goods or Service of Value from Defendants, whether made directly or indirectly, to any speakers or physicians who made presentations regarding Neurontin's use for off-label uses at any Event funded directly or indirectly by the Defendants.

107.    All documents relating to any transfer of Goods or Service of Value from Defendants, whether made directly or indirectly, to any of the Identified Physicians.

108.    All documents relating to any exchange of information, test results, clinical study results, clinical trial results, articles, monographs, research proposals, research results, abstracts, grant applications or data relating to off-label use of Neurontin between Defendants and physicians conducting research on Neurontin.

109.    All documents relating to any exchange of information, test results, clinical study results, clinical trial results, articles, monographs, research proposals, research results, abstracts, grant applications or data relating to off-label use of Neurontin between Defendants and speakers or physicians who made presentations regarding Neurontin's use for off-label uses at any Event funded directly or indirectly by the Defendants.

28

110.    All documents relating to any exchange of information, test results, clinical study results, clinical trial results, articles, monographs, research proposals, research results, abstracts, grant applications or data relating to off-label use of Neurontin between Defendants and any of the Identified Doctors.

111.    All documents relating to any communications between the Defendants and the authors of a published article, published letter, poster or abstract that concerns any off-label use of Neurontin.

112.    All documents relating to any communications between the Defendants and the Identified Physicians.

113.    All documents relating to any communications between the Defendants and speakers or physicians who made presentations regarding Neurontin's use for off-label uses at any Event funded directly or indirectly by the Defendants.

114.    All documents relating to any grants made to physicians by the Defendants with funds that were derived from any budget related to Neurontin.

115.    All documents relating to any grants by the Defendants made to any person in connection with Neurontin use or research on Neurontin.

116.    All documents relating to communications between Defendants and the recipients of

29

any grants that were made in connection with Neurontin use or research on Neurontin, or paid, directly or indirectly, from funds the Defendants budgeted for Neurontin marketing.

117.    All documents relating to drafts and revisions of articles or abstracts relating to Neurontin that Defendants reviewed prior to the articles' or abstracts' publication.

118.    All documents relating to communications between the Defendants and any third parties retained by Defendants to assist potential authors of articles or abstracts relating to Neurontin.

119.    All documents relating to any expenditures by Defendants to provide technical writers to assist in the creation of medical articles relating to Neurontin.

120.    Documents sufficient to establish which published articles concerning Neurontin were funded or supported, directly or indirectly, by Defendants.

121.    All records in any of Defendants' databases, including, but not limited to, the Parke-Davis APT database, relating to any payment from Defendants to any author of an article, published letter or abstract that relates to Neurontin.  However, for this request it is not necessary to produce records relating to authors who were employees of the Defendants during the time such authors were employed.  The response to this request should include all fields of the database for every record produced.

122.    All records in any of Defendants' databases, including, but not limited to, the Parke-Davis APT database, relating to all payments from Defendants, directly or indirectly, to any of

30

Identified Physicians.  The response to this request should include all fields of the database for every record produced.

123.    All documents relating to communications regarding the placement of articles or abstracts relating to Neurontin by non-employees of the Defendants in medical journals.

124.    All documents relating to any publication strategy with regard to Neurontin considered, adopted, executed, funded, proposed or rejected by Defendants.

125.    All documents relating to any plans, programs, or efforts to encourage or assist physicians to write articles, published letters, posters or abstracts regarding Neurontin use.

126.    All documents relating to any plans or programs to encourage or assist physicians to instruct, make presentations to, advise, champion, or otherwise speak to other physicians about Neurontin use.

127.    All documents relating to any studies of Neurontin conducted or proposed by Dr. Kenneth Gorson.

128.    All documents relating to any article or abstract written by Dr. Kenneth Gorson concerning his research on Neurontin, including any drafts of any such articles or abstracts.

129.    All documents relating to any payments Dr. Kenneth Gorson received directly or indirectly from the Defendants.

130.    All documents relating to any studies of Neurontin conducted or proposed by Dr. Bruce Ehrenberg.

131.    All documents relating to any article or abstract written by Dr. Bruce Ehrenberg concerning his research on Neurontin, including any drafts of any such articles or abstracts.

132.    All documents relating to any payments Dr. Bruce Ehrenberg received directly or indirectly from the Defendants.

133.    All documents relating to any studies of Neurontin referenced on the three page table produced by the Defendants with Bates Numbers X005087 - X005089.

134.    All documents relating to any articles or abstracts describing the Neurontin studies referenced on the three page table produced by the Defendants with Bates Numbers X005087 - X005089, including any drafts of any such articles or abstracts.

135.    All documents relating to any payments made to physicians in connection with the Neurontin studies referenced on the three page table produced by the Defendants with Bates Numbers X005087 - X005089.

136.    All documents relating to the efficacy or inefficacy of Neurontin for the treatment of any pain syndrome.

137.    All documents relating to the efficacy or inefficacy of Neurontin for the treatment of any psychiatric syndrome.

138.    All documents relating to the efficacy or inefficacy of Neurontin for the treatment of migraine.

139.    All documents relating to the efficacy or inefficacy of Neurontin for the treatment of social phobia

140.    All documents relating to the efficacy or inefficacy of Neurontin for the treatment of anxiety disorder.

141.    All documents relating to the efficacy or inefficacy of Neurontin for the treatment of any bipolar disorder.

142.    All documents relating to the efficacy or inefficacy of Neurontin for the treatment of restless leg syndrome.

143.    All documents relating to the efficacy or inefficacy of Neurontin for the treatment of RSD.

144.    All documents relating to the efficacy or inefficacy of Neurontin for the treatment of panic disorder.

145.    All documents relating to the efficacy or inefficacy of Neurontin for the treatment of sleep disorders.

146.    All documents relating to the efficacy or inefficacy of Neurontin at doses greater that 1800 mgs/day.

147.    All documents relating to the efficacy or inefficacy of Neurontin as a monotherapy for the treatment of epilepsy.

148.    All verbatim reports for Neurontin.

149.    All reports from Scott-Levin or Verispan, LLC which include comments by physicians on sales calls or presentations relating to Neurontin.

150.    All documents relating to any review, analysis or critique of data contained within verbatim reports on Neurontin or other reports Scott-Levin or Verispan, LLC which include comments by physicians on sales calls or presentations relating to Neurontin.

151.    All data, whether generated by Defendants or purchased from third parties, which reports on:

  a.    individual physicians who prescribe Neurontin;
  b.    changes in physicians' prescribing patterns for Neurontin;
  c.    uses for which Neurontin is prescribed;
  d.    type of physicians and specialists that prescribe Neurontin;
  e.    percentage of Neurontin prescribed by different medical specialties;
  f.    percentage of Neurontin prescribed for off-label use;
  g.    total volume of Neurontin prescriptions (in dollars and in terms of numbers of prescriptions);
  h.    volume of Neurontin prescriptions for various uses (in dollars and in terms of numbers of prescriptions).

152.    All documents relating to any reports or analysis of any of the data requested in Request 151.

34

153.    All documents relating to any communications between the Defendants and MICROMEDEX, relating to any citation in the DRUGDEX compendium relating to the off-label use of Neurontin.

154.    Documents sufficient to show the identity of any employee of Defendants who was a member of the DRUGDEX System editorial board.

155.    Documents sufficient to show the identities of any person known to Defendants who forwarded to, submitted to, or brought to the attention of MICROMEDEX information relating to Neurontin's use for off-label uses.

156.    Documents sufficient to show the identifies of all persons known to Defendants who consulted for, were retained by, or who performed editorial duties on behalf of MICROMEDEX relating to the Neurontin Drug Evaluation.

157.    All documents relating to communications or correspondence between (a) MICROMEDEX, on one hand, and (b) Defendants on the other hand, which relate to this Proceeding, or any other legal proceeding, civil or criminal, relating to the marketing of Neurontin.

158.    All documents relating to information forwarded to, submitted to, or brought to the attention of MICROMEDEX relating to any off-label use of Neurontin, including all correspondence, journal articles, and case study reports.

159.    All documents relating to communications or correspondence between (a) MICROMEDEX or the DRUGDEX Division, on the one hand, and (b) Defendants on the other hand, which relate to or discuss any off-label use for Neurontin.

160.    All copies of the Neurontin Drug Evaluation whether in hardcopy form, electronic form or otherwise, including, but not limited to all quarterly iterations.

161.    All documents relating to any interpretations, analyses or critiques of any clinical trials which concerned any off-label use of Neurontin.

162.    All documents relating to any meta-analysis performed relating to any off-label use of Neurontin.

163.    All documents relating to any epidemiological studies concerning any off-label use of Neurontin.

164.    All documents created at any time relating to any clinical testing of Neurontin as a treatment for migraine or migraine prophylaxis.

165.    All documents that were submitted to the FDA in furtherance of NDA 20-235 that relate to Neurontin administration to migraine patients.

166.    All documents relating to any interpretation, analysis or critique of clinical trial 945-82.

36

167.    All documents relating to any interpretation, analysis or critique of clinical trial 945-177.

168.    All documents created at any time relating to whether or not there is a proportionality between the amount of a dose of gabapentin and the amount absorbed by the subject who has taken the drug.

169.    All documents relating to whether increasing the dosage of gabapentin results in more of the drug being absorbed by the human body.

170.    All documents relating to whether Neurontin exhibits dose related responses in humans for dosages greater than 1800 mg per day.

171.    All documents relating to communications between Defendants and the FDA regarding use of Neurontin at dosages in excess of 1800 mg per day.

172.    All documents relating to any public statement by Defendants that Parke-Davis had applied to the FDA for approval of Neurontin as monotherapy for epilepsy and its application had been denied.

173.    All documents relating to any public statement by Defendants that Parke-Davis had applied to the FDA to change the labeling for Neurontin to increase its maximum effective dosage and its application had been denied.

174.    All documents relating to any analysis performed by Defendants to determine whether

visits by medical liaisons to physicians increased the amount of Neurontin prescriptions written by those physicians.

176.    All documents relating to the data reviewed or analyzed by Defendants to determine whether visits by medical liaisons to physicians increased the amount of Neurontin prescriptions written by those physicians.

176.    All documents relating to any efforts by Defendants to track the Neurontin prescribing behavior of physicians who had been visited by a medical liaison.

177.    All documents relating to any efforts by Defendants to track the Neurontin prescribing behavior of physicians who had attended any Event funded, directly or indirectly, by Defendants at which off-label usage of Neurontin was discussed.

178.    All records in any database maintained by the Defendants which contains information regarding the Neurontin prescribing history of individual physicians, whether such records were generated by Defendants or purchased from third parties.  The response to this request should include all fields of the database for every record produced.

179.    All records relating to Neurontin prescriptions in the database that contains "physician-level prescription data." This database was referenced by James Murray on pages 74-75 in his March 29, 2002 deposition in the action United States ex. rel. Franklin v. Parke-Davis, No. 96-11651-PBS, United States District Court for the District of Massachusetts.  The response to this request should include all fields of the database for every record produced.

38

180.     All documents relating to the studies identified in paragraph 229 of the Amended Class Complaint, including, but not limited to all documents that identify payments made in connection with the identified studies.

181.     All documents relating to Defendants' decision to initiate the STEPS study of Neurontin.

182.     All documents relating to the STEPS study of Neurontin that were generated by Parke-Davis's marketing department.

183.     All documents relating to efforts by Defendants to track the prescription writing practices of physicians enrolled as "investigators" in the STEPS study of Neurontin.

184.     All documents relating to efforts by Defendants to comply with the anti-kickback provisions of the Medicare and Medicaid laws in connection with physicians' receipt of payments or Goods or Service of Value.

185.     All documents relating to Defendants' practices with regard to insuring compliance with that anti-kickback provisions of the Medicare and Medicaid law in connection with physicians' receipt of payments, or Goods or Service of Value from the Defendants.

186.     All documents relating to Defendants' efforts to comply with the AMA's guidelines for payments to physicians.

187.    All documents relating to Defendants' interpretation, analysis or critique of the AMA's guidelines for payments to physicians.

188.    All documents relating to Defendants' standard operating procedures regarding payment of physicians for attending:

      a.      consultants' meetings;
      b.      advisory committees;
      c.      dinner meetings;
      d.      continuing medical education seminars;
      e.      teleconferences;
      f.      medical education Events.

189.    All documents relating to Defendants' standard operating procedures regarding payment of physicians for speaking at:

      a.      consultants' meetings;
      b.      advisory committees;
      c.      dinner meetings;
      d.      continuing medical education seminars;
      e.      teleconferences;
      f.      medical education Events.

190.    All documents relating to Defendants' standard operating procedures regarding provision of Goods or Service of Value to physicians attending:

      a.      consultants' meetings;
      b.      advisory committees;
      c.      dinner meetings;
      d.      continuing medical education seminars;
      e.      teleconferences;
      f.      medical education Events.

191.    All documents relating to Defendants' standard operating procedures regarding provision of Goods or Service of Value to physicians speaking at:

      a.      consultants' meetings;

b.    advisory committees;
c.    dinner meetings;
d.    continuing medical education seminars;
e.    teleconferences;
f.    medical education Events.

192.    All documents relating to Defendants' standard operating procedures regarding payment or provision of Goods or Services of Value to physicians writing articles on Defendants' products.

193.    All documents relating to the mechanism of action of Neurontin on the human brain.

194.    All documents relating to Defendants' theories of the mechanism of action of Neurontin.

195.    All documents relating to whether the mechanism of action of Neurontin has been established.

196.    All documents relating to communications regarding the marketing of Neurontin that occurred between Pfizer and any representative of any consumer protection division of any State.

197.    All documents relating to any allegation by any state official that Defendants had violated any consumer protection statute.

198.    All documents relating to grand jury testimony regarding any investigation into Neurontin marketing.

41

199. All documents produced to state officials investigating whether Defendants' marketing practices with regard to Neurontin violated state consumer protections statutes.

200. Organization charts which reflect the marketing department of Parke-Davis between 1993 through 2000.

201. Organization charts which reflect the marketing planning department of Parke-Davis between 1993 through 2000.

202. Organization charts which reflect the marketing departments of Parke-Davis regional CBUs between 1993 and 2000.

203. Organization charts which reflect the structure of the Parke-Davis Managed Care CBU.

204. Organization charts which reflect the marketing department of Pfizer between June 2000 and May 2004

205. Organization charts which reflect the composition of any department within Pfizer that between June 2000 and May 2004 performed the same functions as the Parke-Davis marketing planning department.

206. Organization charts which reflect the marketing departments of regional offices of Pfizer between July 2000 and May 2004.

207.    Organization charts that reflect the composition of any cross-disciplinary team established within Pfizer that concerned any aspects of the life cycle of Neurontin between July 2000 and May 2004.

208.    All documents relating to any reports made by Pfizer prior to the merger of Pfizer and Warner-Lambert regarding Neurontin, including any such reports which were created as part of Pfizer's due diligence prior to the merger.

209.    All documents relating to due diligence Pfizer conducted with regard to the marketing and sales practices of Warner-Lambert prior to the merger of Pfizer and Warner-Lambert.

210.    All documents relating to any analysis, evaluation, critique or examination of Neurontin's marketing, sales practices or life cycle which analysis, evaluation, critique, or examination was performed by Pfizer within one year of the date of the merger between Pfizer and Warner Lambert.

211.    All documents relating to any team or committee within Pfizer that performed the same or similar function as the Neurontin Development Team for the period from July 2000 through May 2004, including, but not limited to all minutes, reports memoranda and summaries.

212.    All documents relating to any team or committee within Pfizer that performed the same or similar function as the Neurontin Indication Decision Analysis Group for the period from July 2000 through May 2004, including, but not limited to all minutes, reports memoranda and summaries.

43

213.    All documents relating to PromoTrak analysis or reports which discuss or reflect the amount or rate of change of Neurontin prescriptions, new months of therapy, or total months of therapy written by physicians.

214.    All documents relating to Plan Trak analysis or reports which discuss or reflect the amount or rate of change of Neurontin prescriptions, new months of therapy, or total months of therapy written by physicians.

215.    All documents relating to promostudies or promostudy reports which discuss or reflect the amount or rate of change of Neurontin prescriptions, new months of therapy, or total months of therapy written by physicians who attended an Event where Neurontin was discussed for any off-label use.

216.    All documents relating to PlanTrak, PromoTrack, or promostudy reports or analysis which discuss or reflect the amount or rate of change of Neurontin prescriptions, new months of therapy, or total months of therapy written by physicians for all attendees and participants of STEPS investigators.

217.    All documents relating to Neurontin Promotional Evaluations, Neurontin Promo Evals, or Neurontin Promotional Effectiveness studies for each Event in which off-label use of Neurontin was discussed.

218.    All documents relating to any feasibility studies, and/or budgetary plans and/or

44

budgetary requests that refer to the use of, and/or seek budgetary approval for the use of Medical Liasions and/or the medical liaison program.

219.    All documents relating to  requests for funding for use of medical liaisons and/or the medical liaison program.

220.    All documents that describe or refer to the role of medical liaisons in the marketing, promotion and sales of Neurontin and/or any drug manufactured by the Defendants.

221.    All documents relating to Neurontin "movers and shakers" or Neurontin "Key Influencers."

222.    All documents relating to Xponent data records that list physicians who prescribe and/or potentially prescribe Neurontin.

223.    All documents relating to Precision Marketing reports and documents that reference or pertain to physicians' prescription writing practices for Neurontin.

224.    All documents relating to Physician Information Request Form signed by a physician, and/or drug sales representative, and/or medical liaison pertaining to physician requests for information about Neurontin.

225.    All documents authored by and/or copied to the Core Marketing Team (or any member thereof), including but not limited to all minutes of meetings and memoranda, that reference approved uses and/or emerging uses and/or unapproved uses of Neurontin.

226.    All documents relating to slide kits provided by Defendants to any medical liaison who made calls to physicians regarding Neurontin.

227.    All documents relating to slides provided by the Defendants to any physician who made a presentation relating to Neurontin at any Event.

228.    All documents relating to approval of slides by Defendants (or by any contractor retained by them, including, but not limited to, the Identified Vendors) to be shown at any presentation relating to Neurontin at any Event.

229.    All documents relating to insurance reimbursement for off-label Neurontin prescriptions.

230.    All documents relating to third party payor reimbursement for off-label Neurontin prescriptions.

231.    All documents relating to Neurontin formulary approval for uses others than adjunct epilepsy therapy.

232.    All documents relating to any disapproval of coverage or reimbursement by an insurance company, third-party payor or government payor for any Neurontin prescription for an off-label use.

233.    All documents relating to marketing, sales or prescribing data regarding Neurontin Defendants have received from IMS Health.

46

234.    All documents relating to any review, analysis or critique of data Defendants received from IMS Health relating to Neurontin.

235.    All documents relating to marketing, sales or prescribing data regarding Neurontin Defendants have received from NDCHealth Corporation.

236.    All documents relating to any review, analysis or critique of data Defendants received from NDCHealth Corporation relating to Neurontin.

237.    All documents relating to studies and clinical trials involving the use of Neurontin to treat off-label conditions, including, but not limited to, the studies and clinical trials identified in paragraphs 108, 122, 127, 128, 132, 137, 142, 143, 152, and 163 of the First Coordinated Amended Complaint.

238.    All documents relating to any communications between medical liaisons or Defendants' sales representatives and any patient or consumer relating to Neurontin.

239.    All documents relating to, concerning or describing the terms of sale and price (including any discount, rebate, free sample of charge back) at which Neurontin was sold by Defendants to any physician, wholesaler, distributor or any other person or entity.

240.    Documents that reflect Defendants' total revenues, income and profit generated directly or indirectly form the sale of Neurontin, including without limitation financial statements, internal reports, memoranda and correspondence.

241.    All documents relating to actual or potential sales of Neurontin, including budgets, forecasts, economic projections, and any memoranda, correspondence, meeting minutes and other documentation discussing such budgets, forecasts and economic projections.

242.    All documents relating to payment or non-payment of claims relating to prescriptions for off-label use of Neurontin by third-party payors.

243.    All documents relating to Defendants' efforts to have Neurontin included on the formularies of third-party payors.

244.    All documents relating to the effect of the development and potential sale of Lyrica (pregabelin) on the marketing of Neurontin, including but not limited to any effect the development of Lyrica had on the decision not to seek approval of Neurontin for off-label uses.

245.    All documents relating to any instructions, comments, advice or communications given by Defendants to physicians or pharmacists regarding how reimbursement should be sought or obtained from third-party payors with regard to Neurontin prescriptions for off-label uses.

246.    All documents relating to any applications or certifications filed with the FDA pursuant to Section 401 of the Food and Drug Administration Modernization Act (FDAMA) with regard to off-label use of Neurontin.

247.    All documents relating to off-label use of Neurontin that Defendants have filed with the FDA pursuant to FDAMA.

48

248.    All documents relating to any lists of articles relating to off-label use of Neurontin that Defendants have submitted to the FDA pursuant to FDAMA.

249.    Copies of all documents relating to off-label use of Neurontin that Defendants have disseminated to physicians and third parties in accordance with FDAMA, including any labels and legends FDAMA requires to be placed upon such materials.

250.    All documents relating to budgets for marketing, advertising, promotion, sale, research and development of Neurontin at the national, regional and CBU level.

251.    All documents relating to any agreements among the Defendants relating to liabilities associated with the allegations and claims presented in this litigation, including, but not limited to any agreements entered into at or about the time of the merger between Warner-Lambert and Pfizer relating to liabilities for unlawful marketing and/or promotion of Neurontin.

252.    All documents relating to any insurance policies held by the Defendants that may provide coverage for the claims that are the subject of this litigation.

*by the Plaintiffs' attorneys,*

*Members of the Class Plaintiffs'*
*Steering Committee*

By:    /s/ Don Barrett
        Don Barrett, Esquire
        Barrett Law Office
        404 Court Square North

49

P.O. Box 987
Lexington, MS 39095


By:    /s/ Daniel Becnel, Jr.
Daniel Becnel, Jr., Esquire
Law Offices of Daniel Becnel, Jr.
106 W. Seventh Street
P.O. Drawer H
Reserve, LA 70084


By:    /s/ James Duggan
James Dugan, Esquire
Dugan & Browne
650 Poydras St., Suite 2150
New Orleans, LA 70130


By:    /s/ Thomas Greene
Thomas Greene, Esquire, BBO # 210020
Greene & Hoffman
125 Summer Street
Boston, MA 02110


By:    /s/ Barry Himmelstein
Barry Himmelstein, Esquire
Lieff Cabraser Heimann & Bernstein
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111-3339


50

By:     /s/ Thomas M. Sobol
        Thomas M. Sobol
        Hagens Berman LLP
        One Main Street, 4th Floor
        Cambridge, MA 02142

51

*Members of the Non-Class Plaintiffs'*
*Steering Committee*

By:    /s/ Linda P. Nussbaum
       Linda P. Nussbaum
       Cohen, Milstein, Hausfeld & Toll PLLC
       150 East 52nd Street, 30th Floor
       New York, NY  10022


By:    /s/ Richard W. Cohen
       Richard W. Cohen
       Lowey Danneberg Bemporad
        & Selinger, P.C.
       The Gateway - 11th Floor
       One North Lexington Avenue
       White Plains, NY  10601-1714


Date:  March 11, 2005