UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE NEURONTIN MARKETING, SALES PRACTICES AND PERSONAL INJURY LITIGATION | )<br>)<br>)MDL Docket No. 1629<br>)<br>)Master File No. 04-10981 |
| THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS | )<br>)<br>)Judge Patti B. Saris<br>)<br>)Magistrate Judge Leo T. Sorokin |

### PERSONAL INJURY PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR ENTRY OF CASE MANAGEMENT NO. 4 AND IN OPPOSITION TO DEFENDANTS' MOTION FOR INCLUSION OF CERTAIN PROVISIONS IN CASE MANAGEMENT ORDER NO.4

Plaintiffs in the product liability, personal injury cases, by and through the law firm of Finkelstein & Partners, hereby oppose Defendants' request for inclusion of bracketed language that appears on pages 6 and 7 of Defendants' proposed case management order. As of this writing, there has been no appointment of a Plaintiffs' Product Liability Steering Committee (PPLSC) to address Defendants' proposal. However, in light of the application for appointment by the law firm of Finkelstein & Partners, submitted on June 17, 2005, this memorandum is provided for the benefit of the Court's evaluation.

Finkelstein & Partners opposes Defendants' requests for inclusion of the following language:

*Scheduling of Depositions.* The Plaintiffs in this MDL proceeding and their counsel shall not notice or otherwise seek to proceed with the deposition of any of Defendants' witnesses without first consulting with all other Plaintiffs' counsel and agreeing upon deposition dates that are acceptable to all of Plaintiffs' counsel.

*Discovery Scope Limitations.* All discovery scope limitations in the non-Products Liability Cases shall apply to the Products Liability Cases, and vice versa, unless good cause is demonstrated. Any objection to the uniform application of discovery scope limitations shall be made within fifteen (15) days of the entrance of the order applying the scope limitation and the parties shall meet and confer within five (5) days of the objections to attempt to resolve the dispute.

This Court should reject Defendants' request for the inclusion of the abovementioned provisions in CMO 4. The provisions are (1) not necessary to ensure the orderly scheduling of depositions in the MDL, and (2) it is not reasonable to uniformly apply *all* discovery scope limitations to both Products Liability cases and Sales/Marketing cases. Uniform application of a particular scope issue should only occur after <u>first</u> determining that good cause exists for such application.

## BACKGROUND

I.    Deposition Scheduling

Over one year ago, Finkelstein & Partners commenced its first personal injury action against Defendants on February 18, 2004, by filing the Summons and Complaint in the New York State Supreme Court, Orange County. (<u>See</u> Complaint, <u>Young v. Pfizer</u>, Ex. A, attached hereto).[1] The action was later removed to the federal court in the Southern District of New York. Finkelstein & Partners, on December 28, 2004, served upon Defendants 30(b)(6) deposition notices in an attempt to proceed with questioning of

---

[1]The Complaint alleges causes of action against Defendants sounding in negligence, breach of warranty, and strict products liability. Issue was joined by service of Defendants' Answer on March 19, 2004. An Amended Complaint was filed on April 20, 2005 and Defendants served an Answer to the Amended Complaint on June 6, 2005. The Amended Complaint alleges two additional causes of action against Defendants, namely, fraudulent misrepresentation, and deceptive acts and practices and false advertising in violation of Sections 349 and 350 of the General Business Law.

corporate witnesses. The <u>Young</u> case was subsequently remanded to Orange County, New York. The 30(b)(6) depositions were never completed.[2] At a court conference on April 6, 2005, Judge Rosenwasser instructed Defendants to "let [Plaintiff's] counsel know within 30 days who [Defendants were] going to produce [for depositions] from Warner-Lambert." The Court ordered that these depositions were to be done "on or before July 15, 2005." (<u>See</u> Transcript p. 64, attached as Ex. B.) Acknowledging Judge Rosenwasser's instruction, Defendants agreed to identify the remaining witnesses by May 4, 2005. (<u>See</u> April 12, 2005 Letter of James Murray, attached as Ex. C.)

Finkelstein & Partners, on May 10, 2005, served additional deposition notices upon Defendants. These notices were cross-noticed in <u>In re Neurontin</u> ---consolidated cases in the Southern District of New York before Judge Rakoff--- and the <u>Young</u> case in Orange County, New York. Faced with a discovery deadline by Judge Rakoff of January 30, 2006, and having still completed only four (4) depositions, Finkelstein & Partners made attempts to move forward with discovery. The consolidated cases in <u>In re Neurontin</u> were later transferred to the MDL.

To date, Defendants have not identified the witnesses as instructed by Judge Rosenwasser or as they indicated would be done in their abovementioned letter. No additional depositions have been scheduled to take place on or before July 15, 2005, as instructed by Judge Rosenwasser in Orange County, New York. There are over fifty (50) personal injury cases filed in New York State Supreme Court, all of which could have these depositions coordinated in the state litigation. Finkelstein & Partners reached out to

---

[2]Topics of the notices pertained to Safety, Regulatory, Marketing, and Advertising. Despite efforts to procure the testimony of corporate witnesses on behalf of <u>each</u> Defendant, only four (4) witnesses have been produced. Multiple depositions remain outstanding as to testimony from corporate representatives who can testify on behalf of Parke-Davis and Warner Lambert.

MDL Plaintiffs' Liaison Counsel for purposes of coordinating depositions with the MDL. However, given Defendants have not provided custodial files corresponding to the witnesses who have been noticed for depositions, the MDL Plaintiffs' Counsel appropriately indicated their inability to move forward with depositions on the dates noticed by Finkelstein & Partners.

II.    Discovery Scope Limitations

Finkelstein & Partners has litigated and successfully defeated Defendants' attempts to limit the scope of discovery. Judge Rakoff, presiding over In re Neurontin, rejected Defendants' request to limit discovery of adverse events to psychiatric adverse events related to suicide. (See Order, dated February 20, 2005, Ex. D attached hereto.) The Court further rejected Defendants' request to confine discovery of adverse events to Defendants Adverse Events Database. Plaintiffs are to be given access to multiple sources within Defendants' control.

By Order, dated April 25, 2005, Judge Rakoff rejected Defendants' request to limit discovery to events occurring in 1997 and before. In rejecting Defendant's **temporal** limitation on scope, Judge Rakoff granted discovery of sales and marketing efforts, and communication with doctors through the date of the latest alleged suicide or suicide attempt of a given plaintiff who brings an action. (See Order, Ex. E attached hereto.)

By Order, dated April 20, 2005, Judge Rosenwasser, in the Young action, ordered Defendants to produce discovery without **geographic** limitation. Similar to Judge Rakoff, he, did not provide any temporal limitation either. (See Order, Ex. F attached hereto).

Defendants have applied for a modification of the order. Plaintiffs have opposed the application and a decision is pending.

## ARGUMENT

I.    *Defendants' Requested Language as to Scheduling of Depositions is Unworkable, and Unnecessary.*

This Court should reject Defendants' request to include in CMO No. 4 the provision entitled: "Scheduling of Depositions." In accordance with the existing CMO, as well as proposed CMO No.4, the Steering Committees are to control the prosecution and direction of Plaintiffs' cases, including but not limited to "the scope, order and conduct of discovery proceedings," as well as "designations as to which attorneys may appear at . . . depositions." The very purpose of the Committees is to "steer" the litigation on an efficient path through discovery. Thus, it is not reasonable to expect the very Committees with authority to schedule depositions to defer to what might be "acceptable" for a single attorney otherwise inconvenienced by a particular date.

If "*all other Plaintiffs' counsel*" would be required to consent to deposition dates, as Defendants propose, the discovery process would clearly be frustrated. It is unworkable, if not impossible, for either appointed Steering Committee to consult with "all other Plaintiffs' counsel" and agree upon deposition dates "acceptable to all of Plaintiffs' counsel." This Court cannot possibly expect the Steering Committees to confer with Plaintiffs' counsel in <u>state</u> courts throughout the U.S.A., who are not bound by this Court's jurisdiction, who may be subject to conflicting discovery deadlines and who may be completely unknown to the Steering Committees in the first place.

II.      *Discovery Scope Limitations Should Not be Applied Uniformly to Products Liability and Non-Products Liability Cases Without First Determining that Good Cause Exists for Such Application.*

This Court should reject the Defendants' requested provision, entitled "Discovery Scope Limitations." Notwithstanding a "common factual core of Plaintiffs allegations" as claimed by Defendants, the inclusion of such a provision would be unreasonable in circumstances where there is lacking an overlap between products and non-products liability cases. The provision may also deprive a party of a full and fair opportunity to be heard on a particular disputed issue. Common sense dictates that the time to decide if uniform application of a discovery scope limitation is appropriate on an issue should be <u>at the time of a motion</u> by either party, where all parties can address the issue in dispute.

There are issues in products and non-products cases that do not necessarily overlap. It is impossible to draw a bright line as to where each and every personal injury/product liability claim can be separated from those sales/marketing claims brought by the Class plaintiffs. Product Liability Plaintiffs will pursue traditional theories that might not be fully explored by the Class plaintiffs. The Class plaintiffs' claims may require different direct proof of conduct by Defendants than must be demonstrated by personal injury/product liability plaintiffs. As such, the Class Plaintiffs' Steering Committee may not seek discovery of all material that the PPLSC deems necessary and relevant to a product liability/personal injury claim.

Defendants' request for the inclusion of this provision would deprive Product Liability Plaintiffs the right to discovery already ordered by Judge Rakoff in the Southern District of New York. As noted in only a footnote, Defendants bring to this Court's attention that they have filed a Motion for Protective Order "to limit the scope of

discovery <u>in the consumer protection cases</u> regarding sales and marketing of Neurontin to

the period ending December 31, 1998." (emphasis added.)  Defendants did <u>not</u> seek to

limit the scope of such discovery in the products liability/personal injury

cases.  However, inclusion of Defendants' requested provision ---if Defendants are

successful in their motion--- would effectively prevent Product Liability Plaintiffs from

seeking disclosure of information pre-1998.

     Not only do Products Liability Plaintiffs oppose such a restraint on discovery, the

Products Liability Plaintiffs, in *In re Neurontin*, have already been granted discovery to at

least 2004[3].  Indeed, Judge Rakoff, in the Southern District of New York, rejected

Defendants' request to limit discovery to the period ending December 31, 1998:

> The Court therefore instructs the parties to determine the last date on which
> marketing efforts could be relevant to any of the cases in this action; *that date will
> be the latest alleged suicide or suicide attempt,* unless there is evidence that the
> prescription allegedly leading to that event, took place significantly earlier.  Such
> date will be the cut-off date for discovery of defendants' marketing efforts.
> [Order, pp. 5-6 (emphasis added).]

     Judge Rakoff's Order is the "law of the case" and Defendants are obligated to

comply with the order.  Defendants' request to include the provision requiring uniform

application of discovery scope limitations, while at the same time submitting an

application <u>only</u> as to consumer cases for there to be temporal limitations, is arguably

an attempt to resuscitate their arguments rejected by Judge Rakoff and to have temporal

limitations placed upon Products Liability Plaintiffs.

---

[3] July 20, 2004 reflects the latest suicide date of another individual, Maria Jarosz, whose estate is
represented by Finkelstein & Partners.  The action was brought in the United States District Court
of New Jersey and was subsequently transferred to the MDL.

Applying Defendants' reasoning to include the requested provision to "avoid the continuing need to make motions," Defendants should not have filed their June 16, 2005 motion to limit discovery in the consumer protection cases. Rather, Defendants should have willingly acknowledged that discovery in the consumer protection cases should be applied with the same uniformity as is in the Product Liability cases.

**CONCLUSION**

For the reasons set forth above, Plaintiffs in the product liability, personal injury cases, by and through the law firm of Finkelstein & Partners, request that this Court reject Defendants' request for inclusion of bracketed language that appears on pages 6 and 7 of Defendants' proposed CMO, No. 4.

Dated: July 5, 2005                    Respectfully Submitted,

                                       By:    /s/ Kenneth B. Fromson
                                              Kenneth B. Fromson (KF8086)
                                              Finkelstein & Partners
                                              436 Robinson Avenue
                                              Newburgh, NY 12550
                                              (845) 562-0203

# EXHIBIT A

*FILE COPY*

FILE #207962/kg

DATE OF FILING:
INDEX #:

**2004 - 1 06 2**

Plaintiff designates
Orange County
as the place of trial. *FEB 1 8 2004*

The basis of venue is:
Plaintiff(s) residence.

Plaintiff resides at:
P. O. Box 590
Newburgh, New York
County of Orange.

SUPREME COURT STATE OF NEW YORK
COUNTY OF ORANGE
-----------------------------------------------------X

WILLIAM T. YOUNG,

                Plaintiff(s),

              -against-

PFIZER INC., PARKE-DAVIS, a division of Warner-Lambert
Company and WARNER-LAMBERT COMPANY,

                Defendant(s).
-----------------------------------------------------X

**SUMMONS**

To the above named defendant(s):

**YOU ARE HEREBY SUMMONED** to answer the complaint in this action and to serve a
copy of your answer, or, if the complaint is not served with this summons, to serve a notice
of appearance, on the Plaintiff's Attorney(s) within –20- days after the service of this
summons, exclusive of the day of service (or within 30 days after the service is complete if
this summons is not personally delivered to you within the State of New York); and in case
of your failure to appear or answer, judgment will be taken against you by default for the
relief demanded in the complaint.

FINKELSTEIN & PARTNERS, LLP
Attorneys for Plaintiff(s)
436 Robinson Avenue
Newburgh, New York 12550
1-845-562-0203

Dated: February 10 , 2004.

DEFENDANT'S ADDRESS:
SEE VERIFIED COMPLAINT

Filé #207962/kg

STATE OF NEW YORK
SUPREME COURT : COUNTY OF ORANGE
-----------------------------------------x
WILLIAM T. YOUNG,

                              Plaintiff,

        -against-                              VERIFIED COMPLAINT

PFIZER INC., PARKE-DAVIS, a
division of Warner-Lambert Company and
WARNER-LAMBERT COMPANY,

                              Defendants.

-----------------------------------------x

        Plaintiff, by attorneys, FINKELSTEIN & PARTNERS, LLP, as and

for the Verified Complaint herein allege upon information and

belief the following:

## STATEMENT OF THE CASE

        1.    This is an action to recover damages for personal

injuries sustained by plaintiff as the direct and proximate

result of defendants' wrongful conduct in connection with the

designing, developing, manufacturing, distributing, labeling,

advertising, marketing, promoting, and selling of the

prescription drug Neurontin, especially for such "off-label"

uses as the treatment of bipolar disorder, a purpose for which

Neurontin had not received FDA approval, and at dosages higher

than had been approved by the FDA and had been properly tested

on humans, even though the drug had not been tested and studied

for that purpose and had not been found to be safe and effective at any dosage for the treatment of bipolar disorder.

## PARTIES AND JURISDICTION

2.   That at all times hereinafter mentioned, the plaintiff, WILLIAM T. YOUNG, was and still is a resident of the County of Orange, State of New York.

3.   That at all times hereinafter mentioned, upon information and belief, the defendant, PFIZER INC., was and still is a foreign corporation organized under the laws of the State of Delaware.

4.   That at all times hereinafter mentioned, upon information and belief, the defendant, PFIZER INC., was and still is a foreign corporation authorized to do business in the State of New York.

5.   That at all times hereinafter mentioned, upon information and belief, the defendant, PFIZER INC., was and still is a business entity actually doing business in the State of New York.

6.   That at all times hereinafter mentioned, upon information and belief, the defendant, PARKE-DAVIS, a division of Warner-Lambert Company, was and still is a foreign corporation organized under the laws of the State of Michigan.

7.   That at all times hereinafter mentioned, upon

information and belief, the defendant, PARKE-DAVIS, a division of Warner-Lambert Company, was and still is a foreign corporation authorized to do business in the State of New York.

8.    That at all times hereinafter mentioned, upon information and belief, the defendant, PARKE-DAVIS, a division of Warner-Lambert Company, was and still is a business entity actually doing business in the State of New York.

9.    That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY was and still is a foreign corporation organized under the laws of the State of Delaware.

10.    That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY, was and still is a foreign corporation authorized to do business in the State of New York.

11.    That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY, was and still is a business entity actually doing business in the State of New York.

12.    That at all times hereinafter mentioned, upon information and belief, the defendant, PARKE-DAVIS, is a division of the defendant, WARNER-LAMBERT COMPANY.

13.    That at all times hereinafter mentioned, upon information and belief, the defendant, PARKE-DAVIS, is a subsidiary of the defendant, WARNER-LAMBERT COMPANY.

3

14.   That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY, is a successor in interest to the defendant, PARKE-DAVIS.

15.   That on a date prior to May 2001, the defendant, WARNER-LAMBERT COMPANY, assumed the assets and liabilities of the defendant, PARKE-DAVIS.

16.   That on a date prior to May 2001, the defendant, WARNER-LAMBERT COMPANY, expressly assumed all liabilities and obligations of the defendant, PARKE-DAVIS.

17.   That on a date prior to May 2001, the defendant WARNER-LAMBERT COMPANY, impliedly assumed all liabilities and obligations of the defendant, PARKE-DAVIS.

18.   That on a date prior to May 2001, the defendant, PARKE-DAVIS, and the defendant, WARNER-LAMBERT COMPANY, merged with each other.

19.   That on a date prior to May 2001, the defendant PARKE-DAVIS, merged with the defendant, WARNER-LAMBERT COMPANY, and defendant, PARKE-DAVIS, became a part of defendant, WARNER-LAMBERT COMPANY.

20.   That on a date prior to May 2001, the defendant, PARKE-DAVIS, and defendant, WARNER-LAMBERT COMPANY, consolidated with each other.

21.   That at all times hereinafter mentioned, upon information and belief, the defendant, PFIZER INC., is a successor in interest to the defendant, PARKE-DAVIS, a division

4

of Warner-Lambert Company.

22. That at all times hereinafter mentioned, upon information and belief, the defendant, PFIZER INC., is a successor in interest to defendant WARNER-LAMBERT COMPANY.

23. That on a date prior to May 2001, the defendant, PFIZER INC., assumed the assets and liabilities of defendant PARKE-DAVIS, a division of Warner-Lambert Company.

24. That on a date prior to May 2001, the defendant, PFIZER INC., assumed the assets and liabilities of the defendant, WARNER-LAMBERT COMPANY.

25. That on a date prior to May 2001, the defendant, PFIZER INC., expressly assumed all liabilities and obligations of the defendant, PARKE-DAVIS, a division of Warner-Lambert Company.

26. That on a date prior to May 2001, the defendant, PFIZER INC., impliedly assumed all liabilities and obligations of the defendant, PARKE-DAVIS, a division of Warner-Lambert Company.

27. That on a date prior to May 2001, the defendant, PFIZER INC., expressly assumed all liabilities and obligations of defendant, WARNER-LAMBERT COMPANY.

28. That on a date prior to May 2001, the defendant, PFIZER INC., impliedly assumed all liabilities and obligations of defendant WARNER-LAMBERT COMPANY.

29. That on a date prior to May 2001, the defendant,

5

PFIZER INC. and defendant, PARKE-DAVIS, a division of Warner-Lambert Company, merged with each other.

30.   That on a date prior to May 2001, the defendant, PFIZER INC. and defendant WARNER-LAMBERT COMPANY, merged with each other.

31.   That on a date prior to May 2001, the defendant, PFIZER INC., and defendant, PARKE-DAVIS, a division of Warner-Lambert Company, merged with each other and defendant, PARKE-DAVIS, a division of Warner-Lambert Company, became a part of defendant PFIZER INC.

32.   That on a date prior to May 2001, the defendant, PFIZER INC. and defendant, WARNER-LAMBERT COMPANY, merged with each other and defendant, WARNER-LAMBERT COMPANY, became a part of defendant, PFIZER INC.

33.   That on a date prior to May 2001, the defendant, PFIZER INC. and defendant, PARKE-DAVIS, a division of Warner-Lambert Company, consolidated with each other.

34.   That on a date prior to May 2001, the defendant, PFIZER INC., and defendant, WARNER-LAMBERT COMPANY, consolidated with each other.

35.   That at all times hereinafter mentioned, upon information and belief, the defendant, PFIZER INC., has its principal place of business in the State of New York.

36.   In the year 2000, the defendant, PFIZER INC., acquired the defendant, WARNER-LAMBERT COMPANY, and as the result of that

acquisition, the defendant, PFIZER INC., is responsible for all liabilities resulting from the acts or omissions of the defendant, WARNER-LAMBERT COMPANY, which occurred prior to such acquisition.

37. In the year 2000, the defendant, PFIZER INC., acquired the defendant, PARKE-DAVIS, a division of Warner-Lambert Company, and as the result of that acquisition, the defendant, PFIZER INC., is responsible for all liabilities resulting from the acts or omissions of the defendant, PARKE-DAVIS, a division of Warner-Lambert Company, which occurred prior to such acquisition.

38. That at all times hereinafter mentioned, upon information and belief, the defendant, PFIZER INC., presently markets and sells the drug Neurontin.

39. That on a date prior to May 2001, the defendant, PFIZER INC., marketed and sold the drug Neurontin.

40. That at all times hereinafter mentioned, upon information and belief, the defendant PFIZER INC. is engaged in the business of designing, manufacturing, advertising, marketing, and selling pharmaceutical drugs, including Neurontin, and in pursuance of this business, transacts business within the State of New York and contracts to provide goods and services in the State of New York.

41. That at all times hereinafter mentioned, upon information and belief, the defendant, PFIZER INC., committed a

7

tortious act inside the State of New York, which caused injury to plaintiff inside the State of New York.

42.    That at all times hereinafter mentioned, upon information and belief, the defendant, PFIZER INC., committed a tortious act outside the State of New York, which caused injury to plaintiff inside the State of New York.

43.    That at all times hereinafter mentioned, upon information and belief, the defendant, PFIZER INC., regularly does and solicits business and engages in a persistent course of conduct in the State of New York, deriving substantial revenue from goods and products consumed in the State of New York.

44.    That at all times hereinafter mentioned, upon information and belief, the defendant, PFIZER INC., expects or should reasonably expect its acts to have consequences in the State of New York, and derives substantial revenue from interstate or international commerce.

45.    That at all times hereinafter mentioned, upon information and belief, the defendant, PARKE-DAVIS, a division of Warner-Lambert Company, presently markets and sells the drug Neurontin.

46.    That on a date prior to May 2001, the defendant, PARKE-DAVIS, a division of Warner-Lambert Company, marketed and sold the drug Neurontin.

47.    That at all times hereinafter mentioned, upon information and belief, the defendant, PARKE-DAVIS, a division

of Warner-Lambert Company, is engaged in the business of
designing, manufacturing, advertising, marketing, and selling
pharmaceutical drugs, including Neurontin, and in pursuance of
this business, transacts business within the State of New York
and contracts to provide goods and services in the State of New
York.

48.    That at all times hereinafter mentioned, upon
information and belief, the defendant, PARKE-DAVIS, a division
of Warner-Lambert Company, committed a tortious act inside the
State of New York, which caused injury to plaintiff inside the
State of New York.

49.    That at all times hereinafter mentioned, upon
information and belief, the defendant, PARKE-DAVIS, a division
of Warner-Lambert Company, committed a tortious act outside the
State of New York, which caused injury to plaintiff inside the
State of New York.

50.    That at all times hereinafter mentioned, upon
information and belief, the defendant, PARKE-DAVIS, a division
of Warner-Lambert Company, regularly does and solicits business
and engages in a persistent course of conduct in the State of
New York, deriving substantial revenue from goods and products
consumed in the State of New York.

51.    That at all times hereinafter mentioned, upon
information and belief, the defendant, PARKE-DAVIS, a division
of Warner-Lambert Company, expects or should reasonably expect

its acts to have consequences in the State of New York, and
derives substantial revenue from interstate or international
commerce.

52.   That at all times hereinafter mentioned, upon
information and belief, the defendant, WARNER-LAMBERT COMPANY
presently markets and sells the drug Neurontin.

53.   That on a date prior to May 2001, the defendant,
WARNER-LAMBERT COMPANY, marketed and sold the drug Neurontin.

54.   That at all times hereinafter mentioned, upon
information and belief, the defendant, WARNER-LAMBERT COMPANY,
is engaged in the business of designing, manufacturing,
advertising, marketing, and selling pharmaceutical drugs,
including Neurontin, and in pursuance of this business,
transacts business within the State of New York and contracts to
provide goods and services in the State of New York.

55.   That at all times hereinafter mentioned, upon
information and belief, the defendant, WARNER-LAMBERT COMPANY,
committed a tortious act inside the State of New York, which
caused injury to plaintiff inside the State of New York.

56.   That at all times hereinafter mentioned, upon
information and belief, the defendant, WARNER-LAMBERT COMPANY,
committed a tortious act outside the State of New York, which
caused injury to plaintiff inside the State of New York.

57.   That at all times hereinafter mentioned, upon
information and belief, the defendant, WARNER-LAMBERT COMPANY,

10

regularly does and solicits business and engages in a persistent course of conduct in the State of New York, deriving substantial revenue from goods and products consumed in State of New York.

58.   That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY, expects or should reasonably expect its acts to have consequences in the State of New York, and derives substantial revenue from interstate or international commerce.

## BACKGROUND

### STATEMENT OF THE CASE

59.   Pursuant to the Food, Drug, and Cosmetic Act ("FDCA") 21 U.S.C. §§ 301 et seq., new pharmaceutical drugs cannot be distributed in interstate commerce unless the sponsor of the drug demonstrates to the satisfaction of the Food and Drug Administration ("FDA") that the drug is safe and effective for each of its intended uses. 21 U.S.C. § 355(a) and (d).

60.   However, the FDCA does not prevent doctors from prescribing a drug approved for a particular use for other uses that are different than those approved by the FDA ("off-label" usage).

61.   Nonetheless, even though physicians may prescribe drugs for "off-label" usage, the FDCA prohibits drug manufacturers themselves from marketing and promoting a drug for a use that the FDA has not approved. 21 U.S.C. § 331(d).

11

62.   A manufacturer illegally "misbrands" a drug if the drug's labeling includes information about unapproved uses or if the manufacturer engages directly or indirectly in marketing or promoting the drug for unapproved uses.

63.   Instead, if a manufacturer desires to market and promote the drug for new uses in addition to those already approved, the materials on "off-label" usage must meet certain stringent requirements and the manufacturer must resubmit the drug to the FDA testing and approval process for the proposed new use.

64.   The above-described statutory and regulatory system and process is designed to protect the public, including plaintiff herein, from the dangers arising from drugs which, although approved for a certain specific condition, disease or purpose, could cause injury and harm if used for an "off-label" purpose without adequate study and testing of the drug for such "off-label" usage, and to protect the public, including plaintiff herein, from the dangers arising from deceptive, misleading, and inaccurate advertising, marketing, and promotional materials issued directly or indirectly by the manufacturer to encourage the "off-label" usage of the drug without adequate testing and study of that drug for such "off-label" usage.

65.   PARKE-DAVIS, a division of Warner-Lambert Company, now owned by PFIZER INC., applied for, and in December, 1993,

received FDA approval to market and sell Neurontin solely for "adjunctive therapy" in the treatment of certain types of seizures in adult patients suffering from epilepsy, and the FDA approved labeling of Neurontin for that purpose and stated that the drug is only effective at 900 to 1800 milligrams per day.

66.    Defendants did not receive FDA approval for any other use of Neurontin except for the above-described treatment of epilepsy or for higher dosages for any purpose, and the FDA never approved the usage of Neurontin at any dosage for the treatment of bipolar disorder.

67.    Commencing in 1995, defendants, as the manufacturer of Neurontin, began to directly and indirectly advertise, market and promote Neurontin for additional "off-label" uses for which FDA approval had not been obtained, including treatment for bipolar disorder and at higher dosages than had been tested and approved, in violation of the above-described statutory and regulatory system and process, including the FDCA, which prohibits manufacturers from directly or indirectly advertising, marketing and promoting a drug for "off-label" usage, and instead requires that the manufacturer resubmit the drug to the FDA testing and approval process for the proposed new use and that the materials issued by the manufacturer relating to the proposed new use meet certain stringent requirements.

68.    Defendants, as the manufacturer of Neurontin, directly and indirectly advertised, marketed and promoted

13

Neurontin for the treatment of bipolar disorder and encouraged that higher dosages than those tested be prescribed, even though defendants knew or should have known that there were not adequate tests and studies establishing and confirming that Neurontin was safe and effective for the treatment of bipolar disorder, and even though defendants knew or should have known that there were no adequate studies showing that Neurontin was safe when prescribed at dosages higher than those approved by the FDA.

69.    That at all times hereinafter mentioned, upon information and belief, the defendants marketed and promoted Neurontin for the treatment of bipolar disorder even though defendants knew or should have known that Neurontin caused many symptoms or related risk factors associated with suicidal behavior by persons suffering from bipolar.

70. Defendants' conduct in promoting "off-label" uses of Neurontin for treatment of bipolar disorder constituted a wanton, callous and reckless disregard of the safety of the public and, in particular of persons suffering from bipolar disorder.

71.    In promoting "off-label" uses of Neurontin, and at higher dosages than approved by the FDA, including treatment of bipolar disorder, defendants acted without regard to the potential danger and harm to persons for whom the drug was prescribed for the treatment of bipolar disorder.

14

72. Defendants actively distributed, sold and placed Neurontin into the stream of commerce and directly and indirectly advertised, marketed and promoted Neurontin as being safe and effective for the treatment of bipolar disorder and in dosages higher than those approved by the FDA, even though the only approved use of Neurontin at that time was as "adjunctive therapy" for the treatment of epilepsy and even though the FDA had specified a maximum recommended dosage.

73. Neurontin is not reasonably safe and effective for the treatment of persons suffering from bipolar disorder, and is not reasonably safe when consumed in higher dosages than those approved by the FDA, and defendants' conduct of illegally advertising, marketing and promoting Neurontin for this "off-label" use was unlawful, deceptive and misleading and was violative of the FDCA.

74. By reason of defendants' conduct of directly and indirectly advertising, marketing and promoting Neurontin for the treatment of bipolar disorder in an unlawful manner, physicians commenced prescribing Neurontin to their patients diagnosed as suffering from bipolar disorder, frequently at dosages higher than those approved by the FDA.

75. That at all times herinafter mentioned, plaintiff was diagnosed by his physician as suffering from bipolar disorder and was being treated by his physician for such condition.

76. That at all times hereinafter mentioned, upon

information and belief, in reliance upon defendants' direct and indirect advertising, marketing and promoting of Neurontin as being safe and effective for the treatment of bipolar disorder, plaintiff's physician prescribed Neurontin to treat plaintiff's bipolar disorder.

77.    That at all times hereinafter mentioned, plaintiff purchased and consumed Neurontin, as recommended and prescribed by his physician and in the dosages prescribed, in an effort to control the effects of bipolar disorder.

78.    The drug Neurontin was not safe and effective for the treatment of plaintiff's condition of bipolar disorder, and plaintiff sustained injury and harm by reason of his consumption of Neurontin as prescribed by his physician in an effort to treat his bipolar disorder.

79.    By reason of plaintiff's consumption of Neurontin in a manner and at a dosage prescribed by his physician in an effort to treat his bipolar disorder, in May of 2001, plaintiff unsuccessfully attempted to commit suicide, thereby sustaining severe personal injuries.

80.    Thereafter plaintiff continued to be prescribed Neurontin for his bipolar condition.

81.    Thereafter, by reason of plaintiff's consumption of Neurontin in a manner and at a dosage prescribed by his physician in an effort to treat his bipolar disorder, on February 5, 2002, plaintiff again unsuccessfully attempted to

commit suicide, and plaintiff thereby sustained further severe personal injuries.

82. The injuries sustained by plaintiff were caused by or were contributed to by plaintiff's consumption of Neurontin at a dosage prescribed by his physician for the treatment of bipolar disorder in a manner consistent with the direct and indirect advertising, marketing and promoting of this drug for such "off-label" use by defendants.

## AS AND FOR A FIRST CAUSE
## OF ACTION AGAINST DEFENDANTS

83. Plaintiff repeats and reiterates the allegations previously set forth herein.

84. That at all times hereinafter mentioned, defendants were under a duty to exercise reasonable care in the design and development of Neurontin and, in particular, in the advertising, marketing and promoting of Neurontin, both directly and indirectly, to ensure that Neurontin was not used in a manner or to treat conditions where defendants knew or should have known that the user could sustain injuries and harm from the drug.

85. That defendants negligently, recklessly, grossly negligently, wantonly and willfully displayed a morally culpable and conscious disregard of the rights of others in that they

17

failed to exercise reasonable care and failed to fulfill the above-stated duty by the manner that defendants, directly and indirectly, advertised, marketed and promoted Neurontin for the treatment of bipolar disorder, even though Neurontin had not been scientifically determined to be safe for the treatment of such condition and even though Neurontin was, in fact, not reasonably safe for the treatment of such conditions and furthermore, said defendant failed to adequately warn of the risk of suicide or aggressive, self-destructive behavior of which defendants new or should have known about.

86.    The aforesaid incident and the injuries sustained by plaintiff were caused by or were contributed to by the negligence, recklessness, gross negligence, wantonness, willfulness, and conscious and callous disregard of the safety of the public, including this plaintiff, on the part of these defendants.

87.    That at all times hereinafter mentioned, upon information and belief, the above-described culpable conduct by defendants was a proximate cause of injuries sustained by plaintiff.

88.    That at all times hereinafter mentioned, plaintiff did not contribute to his injuries by reason of any negligence or culpable conduct on his part.

89.  That by reason of the foregoing, plaintiff was caused to sustain severe and serious personal injuries to his mind and body, some of which, upon information and belief, are permanent with permanent effects of pain, disability, disfigurement and loss of body function.  Further, plaintiff was caused to expend and become obligated for diverse sums of money for the purpose of obtaining medical care and/or cure in an effort to alleviate the suffering and ills sustained as a result of this occurrence. Plaintiff further was caused to lose substantial periods of time from his normal vocation, and upon information and belief, may continue to be restricted in that manner into the future and suffer similar losses.

90.  By reason of the foregoing, plaintiff was damaged in a sum which exceeds the jurisdictional limits of all lower courts which would have jurisdiction of this matter, and in addition, plaintiff seeks punitive and exemplary damages against defendants in an amount to be determined upon the trial of this matter.

AS AND FOR A SECOND CAUSE OF
ACTION AGAINST THE DEFENDANTS

19

91. Plaintiff repeats and reiterates the allegations previously set forth herein.

92. That at all times hereinafter mentioned, upon information and belief, the defendants, by directly and indirectly advertising, marketing and promoting Neurontin for the treatment of bipolar disorder and by placing this drug in the stream of commerce knowing that Neurontin would be prescribed for the treatment of bipolar disorder in reliance upon the representations of defendants, expressly warranted to all foreseeable users of this drug, including plaintiff, that Neurontin was safe and effective for the treatment of bipolar disorder.

93. That the defendants impliedly warranted in manufacturing, distributing, selling, advertising, marketing and promoting Neurontin to all foreseeable users, including plaintiff, that Neurontin was safe and effective for the purposes for which it had been placed in the stream of commerce by defendants, including for the treatment of bipolar disorder; and that Neurontin was reasonably safe, proper, merchantable and fit for the intended purpose, including for the treatment of bipolar disorder.

94. That at all times hereinafter mentioned, plaintiff

relied upon the aforesaid express and implied warranties by defendants.

95. That at all times hereinafter mentioned, plaintiff's use of Neurontin prior to and up to the time of the above-described incident was consistent with the purposes for which defendants directly and indirectly advertised, marketed and promoted Neurontin, and plaintiff's use of Neurontin was reasonably contemplated, intended and foreseen by defendants at the time of the distribution and sale of Neurontin by defendants, and, therefore, plaintiff's use of Neurontin was within the scope of the above-described express and implied warranties.

96. Defendants breached the aforesaid express and implied warranties because Neurontin was not safe and effective for the treatment of bipolar disorder and because plaintiff's use of Neurontin for the treatment of bipolar disorder caused or contributed to the incident described herein.

97. Plaintiff gave appropriate notice to defendants of the breach of the aforesaid express and implied warranties or such notice was otherwise excused.

98. By reason of the foregoing, plaintiff was damaged in a sum which exceeds the jurisdictional limits of all lower courts which would have jurisdiction of this matter, and in addition,

plaintiff seeks punitive and exemplary damages against
defendants in an amount to be determined upon the trial of this
matter.

### AS AND FOR A THIRD CAUSE OF
### ACTION AGAINST THE DEFENDANTS

99.    Plaintiff repeats and reiterates the allegations
previously set forth herein.

100. That at all times hereinafter mentioned, the drug
Neurontin was not suited for the treatment of bipolar disorder
and was not safe and effective for the treatment of bipolar
disorder even though defendants directly and indirectly
advertised, marketed and promoted Neurontin for that purpose.

101. That at all times hereinafter mentioned, the drug
Neurontin was not safe and was not suited for the purpose for
which defendants, directly and indirectly, advertised, marketed
and promoted the drug at the time defendants designed,
manufactured, distributed and sold the drug and placed the drug
in the stream of commerce.

102. That at all times hereinafter mentioned, upon
information and belief, the defendants assumed a strict products
liability to users and to persons using Neurontin, including
plaintiff herein, who sustained injuries, harm and damages by
reason of the use of Neurontin for purposes directly and

indirectly advertised, marketed, and promoted by defendants, including for the treatment of bipolar disorder.

103. By reason of the foregoing, plaintiff was damaged in a sum which exceeds the jurisdictional limits of all lower courts which would have jurisdictional limits of this matter, and in addition, plaintiff seeks punitive and exemplary damages against defendants in an amount to be determined upon the trial of this matter.

WHEREFORE, plaintiff demands judgment against the defendants as follows:

(1) A sum which exceeds the jurisdictional limits of all lower courts which the jury would find to be fair, adequate and just on the First Cause of Action, together with punitive damages and exemplary damages in an amount to be determined upon the trial of this Action;

(2) A sum which exceeds the jurisdictional limits of all lower courts which the jury would find to be fair, adequate and just on the Second Cause of Action, together with punitive damages and exemplary damages in an amount to be determined upon the trial of this Action; and

(3) A sum which exceeds the jurisdictional limits of all lower courts which the jury would find to be fair, adequate and just on the Third Cause of Action, together with the costs and

disbursements of this Action, together with punitive damages and
exemplary damages in an amount to be determined upon the trial
of this Action; together with the interest, costs and
disbursements of this Action.

                          Yours, etc.,

                          FINKELSTEIN & PARTNERS, LLP
                          Attorneys for Plaintiff
                          Office & P.O. Address
                          436 Robinson Avenue
                          Newburgh, New York 12550

                          BY: _____
                              ANDREW G. FINKELSTEIN, ESQ.

TO:   PFIZER INC.
      Defendant
      c/o Secretary of State
      41 State Street
      Albany, New York  12231

      PARKE-DAVIS, a division of
      Warner-Lambert Company
      Defendant
      201 Tabor Road
      Morris Plains, New Jersey  07950

      WARNER-LAMBERT COMPANY.
      Defendant
      201 Tabor Road
      Morris Plains, New Jersey  07950

STATE OF NEW YORK:   COUNTY OF ORANGE    ss:

WILLIAM T. YOUNG, being duly sworn says; I am the plaintiff in the action herein; I have read the annexed Verified Complaint, know the contents thereof and the same are true to my knowledge, except those matters therein which are stated to be alleged on information and belief, and as to those matters I believe them to be true.

WILLIAM T. YOUNG

Sworn to before me on
February 10, 2004.

NOTARY PUBLIC

JUDY A. McGURTY
Notary Public, State of New York
Qualified in Orange County
My Commission Expires 12/3/04

25

# EXHIBIT B

207962

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ORANGE
--------------------------------------------X

WILLIAM YOUNG,

                        Plaintiff,

            -against-                    Index No. 1062/2004

PFIZER INC., PARKE-DAVIS,


                        Defendant.

--------------------------------------------X

                        County Government Center
                        Goshen, New York
                        April 6, 2005

Before:

        HON. STEWART A. ROSENWASSER,
                Acting Supreme Court Justice

Appearances:

        FINKELSTEIN & PARTNERS, ESQS.
        Attorneys for Plaintiff
        436 Robinson Avenue
        Newburgh, New York  12550
    BY: ANDREW FINKELSTEIN, ESQ.
        KENNETH FROMSON, ESQ.

        DAVIS POLK & WARDWELL
        Attorneys for Defendant
        450 Lexington Avenue
        New York, New York  10017
    BY: JAMES P. ROUHANDEH, ESQ.
        JAMES E. MURRAY, ESQ.










                        Patrizia Risoli
                        Court Reporter

Proceedings                                    65

before July 15th.

MR. FROMSON:  So we're being specific,
this is relating 36 already received notice.
I intend to serve additional 36 notices
according to CPLR rules.

THE COURT:  These are ones noticed
within 30 days.  Do it by July 15th.

MR. FROMSON:  I have not heard --
unless, Judge, can you give them a date
certain by which they are to produce the
actual employee files they've been ordered to
provide.  You will order a list but at least
a file themselves.

THE COURT:  Fourteen days prior to
deposition of that witness.

MR. FROMSON:  Judge, my explanation in
say 14 days went to standard operating
procedures for those 36B witnesses.  I'm
referencing actual employee files that
relates to a fact witness should be produced
in a large quantity of hundreds of thousands
of documents, mass production of all their
employee, they've been recovering from all
these records from employees separate and

# EXHIBIT C

# DAVIS POLK & WARDWELL

### 450 LEXINGTON AVENUE
### NEW YORK, N.Y. 10017
212 450 4000
FAX 212 450 3800

1300 I STREET, N.W.
WASHINGTON, D.C. 20005

1600 EL CAMINO REAL
MENLO PARK, CA 94025

99 GRESHAM STREET
LONDON EC2V 7NG

15, AVENUE MATIGNON
75008 PARIS

MESSETURM
60308 FRANKFURT AM MAIN

MARQUÉS DE LA ENSENADA, 2
28004 MADRID

1-6-1 ROPPONGI
MINATO-KU, TOKYO 106-6033

3A CHATER ROAD
HONG KONG

JAMES E. MURRAY
212 450 4064
james.murray@dpw.com

April 12, 2005

Re:    **In re Neurontin**

Kenneth B. Fromson, Esq.
Finkelstein & Partners, LLP
436 Robinson Avenue
Newburgh, N.Y. 12550

Dear Ken:

This will respond to your letter of April 5, 2005.

**Deficiencies**

Despite your agreement to remedy deficiencies on or before April 1, there are several that remain outstanding, as follows:

HIPAA Authorizations

Brodsky

- We do not have authorizations for Drs. Urlich and Abouezzi.

Lyman

- An incorrect address was provided for Dr. F. Broucek. Please reissue the HIPAA authorization.

Minsiquero

- The HIPAA authorization for Dr. Chubaty still reflects an incorrect address. Please reissue the HIPAA authorization.

- You have not provided an authorization for Walter O. Boswell Memorial Hospital, nor any treating physicians at that facility.

Paulsen

Kenneth B. Fromson, Esq.                2                        April 12, 2005

- An incorrect address was provided for the University of Wisconsin. Please reissue the HIPAA authorization.

Smith

- You have not provided an authorization for Dr. Raymond Jackson of Pikeville United Methodist Hospital.

- You have not provided an authorization for Dr. Mirando of the Pikeville Family Practice Clinic.

Sumait

- You have provided the wrong address for MediCal. Please reissue the HIPAA authorization.

Please note that I will be providing a list of additional HIPAA deficiencies that have become apparent since our March 21 letter agreement under separate cover.

### Interrogatory Responses

In each Interrogatory No. 12, Defendants requested the names of witnesses upon whom plaintiffs are relying for assertions regarding marketing and promotion. Similarly, in each Interrogatory No. 15 Defendants sought the names of doctors who are alleged to have relied upon Defendants in their decision to prescribe Neurontin. In response, plaintiffs assert that these are contention interrogatories and do not warrant a response. We disagree, as these are standard interrogatories seeking the names of witnesses. Please let us know your position on this issue, as we may need to seek relief from the Court.

**Other Matters**

As we indicated in our letter of November 23, 2004, we take issue with your desire to share confidential Pfizer materials with other attorneys who represent plaintiffs in other non-related Neurontin actions. As you may recall, we addressed this issue and the confidentiality agreements that were so ordered by Judges Rakoff and Rosenwasser do not permit such disclosure. This issue is furthermore premature, as the status of the actions that been conditionally transferred to the MDL has not been settled. Please confirm you have not shared any confidential materials with any other firm.

Your concerns regarding Jim Parker's deposition are now moot, as they were fully addressed at the conference on April 6. As we discussed before Judge Rossenwasser, we will address the questions you raise regarding the documents

Kenneth B. Fromson, Esq.                    3                    April 12, 2005

and depositions produced from the Franklin litigation on or before April 15. In addition, as ordered by Judge Rosenwasser, we expect to provide you with the adverse event database on or before May 4, 2005. Furthermore, as we discussed before Judge Rosenwasser, we will produce the files of each deponent 14 days prior to the scheduled deposition of that individual.

Finally, as discussed before Judge Rosenwasser, we continue to work to provide you with witnesses for the remaining 30(b)6 depositions. Specifically, we will provide you by May 4, 2005, the names of witnesses designated to testify from the Warner Lambert/Parke-Davis era on issues of (a) Marketing, (b) Regulatory, and (c) Safety Surveillance.

As always, please feel free to call me if you would like to discuss the foregoing.

Very truly yours,

James E. Murray

By E-mail and First Class Mail

# EXHIBIT D

```
+-----------------------------------+
| USDC SDNY                         |
| DOCUMENT                          |
| ELECTRONICALLY FILED              |
| DOC #: _____              |
| DATE FILED: 2.22.05               |
+-----------------------------------+
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------

| | | |
|---|---|---|
| In re NEURONTIN | : | 04 Civ. 6704 (JSR) |
| | : | |
| | : | |

----------------------------------------X         ORDER

JED S. RAKOFF, U.S.D.J.

Plaintiffs allege that a series of suicides and attempted
suicides were caused by the defendants' marketing their drug
Neurontin for purposes for which it was not approved (so-called
"off-label" uses) and for which defendants had reason to know it
was not safe.  They now move to compel discovery of the
defendants' records of adverse events associated with the use of
Neurontin.  Specifically, plaintiffs seek, in addition to the
contents of the adverse event database that defendants maintain
for the product, discovery of references to adverse events in
defendants' "medical communication" and "sales/marketing"
databases.

In response, defendants seek, _first_, to limit discovery to
"psychiatric adverse events related to suicide" such as
depression, and _second_, to confine discovery to the contents of
its adverse events database, excluding the contents of its
medical communication and sales/marketing databases.[1]  The Court

---

[1] Defendants do agree to produce from those databases "all
reference to suicide, suicide ideation, suicide gesture and other
related psychiatric events."  They also agree to produce their
sales and marketing efforts involving the particular physicians
who prescribed Neurontin to plaintiffs and other physicians who

rejects the first limitation.   In many situations, evidence of some other kinds of adverse events may shed light on the question of whether a drug causes the effects at issue in a specific case. See generally In Re: Ephedra Litigation, 04 MD 1598 (S.D.N.Y.), Transcript, 1/10/05.   Moreover, evidence that defendants were aware of a pattern of other effects would go to the reasonableness of defendants' behavior in marketing the drug for off-label purposes generally.

Likewise, the Court rejects the second proposed limitation. Plaintiffs reasonably need access to multiple databases in order to ascertain whether defendants were accurately maintaining their adverse event database, as well as to determine whether defendants marketed the drug for uses not approved by federal regulators.   In the latter respect, it should also be noted that plaintiffs, or some of them, have made a claim that defendants were engaged in deceptive practices in violation of New York General Business Law § 349, a particularly broad statute.   All communications have the potential to be relevant since plaintiffs need not prove that their doctors relied on a specific deceptive statement for these claims.   See Pelman v. McDonald's, 2005 U.S. App. LEXIS 1229 (2d Cir. 2005).   Defendants' sales and marketing efforts cannot be assessed by looking only at communications directly with plaintiffs' doctors and nearby physicians.

---

worked or practiced with them.

2

While the defendants also complain that compliance with plaintiffs' requests would be burdensome, their objection in this respect is largely conclusory, complaining that they will "need to review copious narrative adverse event reports" and that they will be "required under federal law to redact confidential information from these records." Defendants' Brief at 4. Such conclusory assertions of counsel are insufficient to outweigh the articulated need for this discovery, especially in a case touching on public health. Additionally, it is unclear that redaction will be required at this stage, given the general protective order already promulgated in this case. See Order, 2/2/05. Accordingly, plaintiffs' motion to compel discovery is granted in full.

SO ORDERED.

_____
JED S. RAKOFF, U.S.D.J.

Dated:    New York, New York
          February 20, 2005

# EXHIBIT E

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------X
                                 :

In re NEURONTIN                :        04 Civ. 6704 (JSR)
                                   :
                                   :
-------------------------------------------X      ORDER

JED S. RAKOFF, U.S.D.J.:

    Plaintiffs allege that a series of suicides and attempted suicides were caused by the defendants' marketing their drug Neurontin for purposes for which it was not approved (so-called "off-label" uses) and for which defendants had reason to know it was not safe.  The Court previously ruled that the defendant drug companies must produce records of adverse events associated with the use of this drug.  <u>See</u> Order 2/20/05.  Before the Court now is plaintiffs' motion to compel production of various databases related to defendants' sales and marketing efforts and communications with doctors.  Defendants, while conceding the discoverability of parts of these databases, seek to limit discovery to events occurring in 1997 and before.[1]  For the reasons stated below, the defendants' proposed temporal boundary is modified and plaintiffs' motion granted, subject to some limitations.

_____

   [1] While defendants' brief is limited to this issue, plaintiffs' brief argues other points that appear not to be contested by defendants, in particular that discovery of this marketing information should not be restricted geographically.  Because it is unclear whether an actual controversy exists in this regard, this Order does not address any issues beyond the proposed temporal limitation on discovery.

Much of plaintiffs' complaint[2] consists of generalized
allegations that do not refer to specific dates or incidents.
However, the complaint does allege specific incidents, all taking
place by 1997, of improper marketing of Neurontin for off-label
purposes.  See Complaint ¶¶ 151-183.  It appears that these
specific allegations are largely derived from a criminal
information to which defendants pleaded guilty on June 7, 2004.
See Information, attached to Complaint as Exhibit A; Complaint ¶¶
117-18.  The information contains no allegations subsequent to
1996.

Defendants argue that, because the complaint contains no
specific allegations of wrongdoing subsequent to 1997, it need
only turn over marketing materials prior to that time.  However,
the complaint does contain explicit (if generalized) allegations
of wrongdoing continuing until at least June 2001.  See Complaint
¶ 183.  Moreover, plaintiffs' legal theory -- that the suicides
and suicide attempts were caused by Neurontin that was prescribed
because of defendants' wrongful actions -- implicitly requires
that defendants' alleged deceptions, or at least the effects
thereof, have continued at least until the last point in time
when doctors could have chosen a different course of action had

---

[2]While this case now covers many plaintiffs, plaintiffs'
counsel has filed a virtually identical complaint for each.  For
convenience, this decision refers to a single "complaint," and
paragraph references are to the complaint and answer in Lyman v.
Pfizer, the lead case.

2

they been properly informed.  This is particularly true because defendants have interposed a learned intermediary defense, see Answer at 19, and thereby have explicitly put at issue the effects of defendants' marketing efforts on the prescribing doctors' ability to adequately counsel their patients as to Neurontin's benefits and risks.

The fact that in some places the complaint includes more particularized allegations, mostly taken from the information, does not render the remainder of the complaint, which the defendants do not claim fails to satisfy the minimal standards of notice pleading,[3] insufficiently detailed to obtain discovery of evidence relevant to the claims and defenses pleaded, see Fed. R. Civ. P. 26(b)(1).  It does, perhaps, indicate that plaintiffs have a lesser chance of finding evidence bearing out those allegations, but this is not a consideration the Court may take into account in determining whether "the burden or expense of the proposed discovery outweighs its likely benefit," see Fed R. Civ. P. 26(b)(2) (court should consider "the needs of the case, the amount in controversy, the parties' resources, the importance of

---

[3]While defendants' brief implies that the lack of specificity indicates that plaintiffs lack a good-faith basis for their generalized allegations, see Defendants' Brief at 3 (stating that plaintiffs "allege only generally and without any factual support that off-label promotion occurred in the years following 1997"), defendants do not move to strike any portion of the complaint for this reason or for vagueness, and so the Court cannot ignore the less specific allegations for these purposes.

3

the issues at stake in the litigation, and the importance of the
proposed discovery in resolving the issues").  The Court's power
to impose limits on discovery of potentially relevant material is
meant to prevent parties from using redundant requests to turn
discovery into a "war of attrition."  Fed. R. Civ. P. 26 advisory
committee's note.  It is not a license for the Court to "deprive
a party of discovery that is reasonably necessary to afford a
fair opportunity to develop and prepare the case" because it
harbors doubts about that party's ability to find evidence that
bears out its allegations.  Id.

Accordingly, plaintiffs are permitted to discover evidence
of defendants' marketing efforts as of the last day such
marketing could be relevant to the claims and defenses pleaded --
i.e., the last Neurontin prescription issued to a plaintiff or
plaintiff's decedent in this case.  See Incollingo v. Ewing, 282
A.2d 206, 221-23 (Pa. 1971) (upholding introduction of evidence
of drug manufacturer's national marketing efforts to show
influence on prescribing doctor, but permitting evidence of
marketing efforts after the prescription only to show feasibility
of warning, not to show negligence).[4]  Applying this rule to an

---

[4]Plaintiffs argue that conduct subsequent to the suicides
and suicide attempts could be relevant because it furthers
plaintiffs' request for punitive damages.  Defendants argue that
discovery strictly for purposes of punitive damages is limited to
a defendant's net worth and finances.  The Court need not resolve
this issue yet, because for now it finds relatively limited
potential use of this material, given the burden on defendants to

individual case is simple.  For example, decedent in the lead case, Lyman v. Pfizer, committed suicide on July 23, 2002. Complaint ¶ 4.  Because the pleadings provide no further details as to any dates on which Neurontin was prescribed, if Lyman were an individual case, the Court would cut off discovery of marketing efforts at July 23, 2002, the last date at which they could be relevant.

Complicating matters somewhat is the fact that this case now includes many plaintiffs with different incident dates.  Because the cases have been consolidated for all purposes, it would be pointless as well as impractical to impose separate discovery cut-off dates.  The Court therefore instructs the parties to determine the last date on which marketing efforts could be relevant to any of the cases in this action; that date will be the latest alleged suicide or suicide attempt, unless there is evidence that the prescription allegedly leading to that event

---

produce it.  See Affidavit of Laura M. Kibbe, sworn to 4/21/05. While courts in this circuit usually order punitive-damages discovery to take place concurrently with liability discovery, this is not a hard-and-fast rule, and concurrent discovery can be denied where, as here, the hardship to defendant substantially outweighs the potential benefit to the plaintiff, at least as seen from this stage of the case.  See Tu'Shan Hamm v. Potamkin, 1999 U.S. Dist. LEXIS 5948, at *5-*8 (S.D.N.Y. 1999).  Should it appear as this case progresses that plaintiffs have a substantial chance to win punitive damages and that this information is important to such a claim, the Court can order separate discovery of material specific to punitive damages.  See Davis v. Ross, 107 F.R.D. 326, 327 (S.D.N.Y. 1985).

took place significantly earlier.[5]  Such date will be the cut-off
date for discovery of defendants' marketing efforts.   Should the
parties fail to reach agreement on this date, they are instructed
to jointly call chambers immediately for resolution.

    SO ORDERED.

                              JED S. RAKOFF, U.S.D.J.

Dated:    New York, New York
           April 25, 2005

---

[5]If plaintiffs' counsel files additional cases with later
event dates that are consolidated into this action's discovery
schedule, defendants are expected to update any disclosures
already made to conform to such later discovery cut-off dates.
Given this possibility, the parties are encouraged to set a cut-
off date that accommodates any filings plaintiff expects to make
in the near future.

6

# EXHIBIT F

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ORANGE
------------------------------------------------------------X
WILLIAM T. YOUNG,

                 Plaintiff,

      -against-

PFIZER INC., and PARKE-DAVIS, a Division      Index No. 1062/2004
of Warner-Lambert Company and WARNER-
LAMBERT COMPANY
                                  **DECISION AND ORDER**
               Defendants.
------------------------------------------------------------X
ROSENWASSER, STEWART A., A.J.S.C.

At a conference held on April 6, 2004, the Court heard argument concerning outstanding discovery issues. While the parties have endeavored to cooperate for the purpose of streamlining the discovery process, the Court has been involved on an ongoing basis to resolve issues in order to keep what can only be described as a massive discovery undertaking on track. The Court has reviewed and considered the plaintiff's memorandum of law in support of the production of defendant's databases and defendant's response thereto.

The remaining outstanding discovery issues are decided as follows:

       1. Production of defendant's databases designated "Medical Communications", "Sales/Marketing" and "Visitors' Speakers Bureau (VSB)" is ordered regarding any and all information contained in these databases as it relates to Neurontin without geographic limitation. Any objections as to relevance are reserved for trial. It is unclear whether the entirety of these databases are in electronic form, thereby facilitating the search for the information and documents relevant to Neurontin, the drug at the center of plaintiff's claim. Therefore, the defendant shall have forty-five (45) days to comply.

       2. Defendant shall provide a list of all employees involved in the research, development, selling and marketing of Neurontin, setting forth their job title and whether employed by defendant Pfizer or a predecessor company; and state whether the employee is currently employed and, if not, when the employment ceased.

       3. As to each identified employee, provide any documents relevant to

plaintiff's discovery demands which were created or maintained by such employee. Defendant shall identify the employee or custodial file from which the documents were obtained.

While the Court indicated said documents would be turned over on a "rolling basis" prior to each deposition, upon reflection, discovery would not be facilitated by such process. Plaintiff will be better able to determine which employees it wishes to depose if the documents are all turned over initially. This will avoid a needless duplication of depositions. Therefore, the employee list and corresponding documents shall be turned over within thirty (30) days of the date of this decision.

The foregoing constitutes the decision and order of the Court.

Dated: Goshen, New York
     April 28, 2005

ENTER:

HON. STEWART A. ROSENWASSER
Acting Justice of the Supreme Court

FINKELSTEIN & PARTNERS, LLP
436 Robinson Avenue
Newburgh, NY 12330

DAVIS, POLK & WARDWELL
450 Lexington Avenue
New York, NY 10017