UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re: NEURONTIN MARKETING AND ) <br> SALES PRACTICES LITIGATION ) <br> ) <br> ) <br> THIS DOCUMENT RELATES TO: ) <br> ALL ACTIONS ) <br> ) | MDL Docket No. 1629 <br><br> Master File No. 04-10981 <br><br> Judge Patti B. Saris |

### MEMORANDUM IN OPPOSITION TO MOTION TO COMPEL PRODUCTION OF DOCUMENTS CREATED AFTER DECEMBER 31, 1998

Defendants Pfizer Inc. and Warner-Lambert Company (together, "Defendants") submit this memorandum in opposition to Plaintiffs' motion to compel the production of documents created after December 31, 1998.

### PRELIMINARY STATEMENT

Plaintiffs have no factual support in their complaints for their assertion that the defendants promoted Neurontin through false and misleading statements made from January 1999 through May 2004.[1] Plaintiffs' arguments to the contrary are highly implausible. In effect, they are asserting that Defendants engaged in fraudulent off-label promotion after Parke-Davis's activities with respect to Neurontin had become the subject of regulatory scrutiny in late 1996, after the United States Attorney began an investigation into these activities in 1997, after Warner-Lambert

---

[1] The handful of allegedly false and misleading statements in the complaints during the period prior to December 31, 1998 are not alleged with the requisite specificity and their claims based on these alleged statements fail to state a claim, as set forth in Defendants' Motion to Dismiss. (Docket ## 58-60.)

announced the commencement of a grand jury investigation publicly and the press reported it in early 2000, and after Pfizer acquired Warner-Lambert Company and its division Parke-Davis in June 2000. Their argument also ignores the fact that the government never accused Pfizer of having any involvement whatsoever in the off-label marketing of Neurontin that led to the settlement. It also ignores the fact that the government only charged Warner-Lambert Company LLC with specific instances of off-label promotion during 1995 and early 1996 (all of which was non-fraudulent).

Plaintiffs are attempting to use claims based on Parke-Davis's alleged behavior in and before 1998 as a springboard to assert claims based on events from then until May 2004. Whereas some attempt at least has been made to set forth alleged misstatements before 1998 (however unsuccessful), the complaints are devoid of such allegations after 1998. When it comes to 1999 and beyond Plaintiffs simply point to, for example, meetings relating to Neurontin, and then surmise misrepresentations, reliance, causation, and damages. Their conclusory claims to the contrary notwithstanding, Plaintiffs simply have not alleged a single actionable statement (or omission) after 1998. Nothing more than conclusory allegations are made. Allegations such as these should not be permitted to launch a massive discovery effort.[2]

Plaintiffs also inaccurately suggest that Defendants are unwilling to produce more than the 80-plus-box production in Franklin. Defendants have agreed to produce and are in the process of producing a huge volume of documents and multiple extensive databases. Plaintiffs also deny that

---

[2]It would appear that Plaintiffs have adopted a scorched earth approach to this litigation. Plaintiffs have claimed a right to depose the same person twice in this proceeding. Plaintiffs have also attempted to require Defendants to answer 44,872 requests to admit. A demand that Defendants produce every document created before May 1, 2004 concerning the sales and marketing of Neurontin is consistent with Plaintiffs' approach to this litigation.

the search and production they are seeking to force Defendants to conduct would be unduly burdensome, and they distort Judge Saris's ruling on the scope of discovery in Franklin, as well as the rulings of two other judges. Plaintiffs simply do not provide any grounds for the Court to grant the relief they seek, and their motion should be denied.

## ARGUMENT

In their memorandum, as in their complaints, Plaintiffs state, in conclusory fashion, that the "scheme" extended beyond 1998, and then provide no factual details to support this allegation. In fact, the quotation they provide as the "most striking[]" example of their claim shows exactly the opposite. (Plaintiffs' Memo. at 2-3). The quotation, allegedly from a meeting of physicians, simply does not illustrate the making of a false or misleading material representation. Instead, the quotation represents an instance of a physician airing the issue of the type of information available to physicians relating to the use of Neurontin in psychiatry. In fact, the quoted discussion is the sort of informed exchange of views on medical topics that Plaintiffs argue did not occur. If this "evidence" is the best Plaintiffs can do, they clearly do not have enough to force Defendants to undertake the burdensome task of gathering, reviewing, and producing all of the sales and marketing documents relating to Neurontin from 1999 through May 1, 2004.[3]

Plaintiffs next claim that "Defendants do not even bother to deny that the same types of unlawful promotional activities alleged by Plaintiffs continued until well after 1998 . . . ." Although reluctant to take up the Court's time with a statement of the obvious, Defendants do indeed deny that such unlawful promotional activities took place, and further deny that they ever

---

[3]In any event, the quoted discussion at most would warrant discovery of the event described, as opposed to six years of unlimited discovery of sales and marketing.

engaged in any fraudulent conduct with respect to the marketing of Neurontin at any time.

Plaintiffs' next argument is that Defendants want to deny Plaintiffs an opportunity "to discover the details of" the alleged wrongdoing. This argument points up an irreconcilable tension in Plaintiffs' position. On the one hand, they say that they have alleged in sufficient detail that their alleged complex fraudulent scheme continued from 1999 through May 1, 2004. On the other, they claim a need to discover the details of such conduct because they have not had access to discovery from that period. Plaintiffs cannot have it both ways.

Plaintiffs also accuse Pfizer of "surprising naivete" for suggesting that it would be burdensome to search for all sales and marketing documents relating to Neurontin for a six-year period. The Declaration of Pfizer's Laura Kibbe (Docket # 162 at Ex. A.) describes in detail the thousands of hours and millions of dollars the search, review, and production that Plaintiffs are demanding would take and cost. If it is naive to hold Plaintiffs to their burden of pleading fraud before demanding such discovery, then Defendants admit the character defect.[4]

In the final paragraph of their introduction, Plaintiffs assert that two other judges recently rejected the very argument as to undue burden that Defendants have raised here. They then say that Judge Saris essentially adopted one of those judges' decisions (or Plaintiffs' slant on it) during a recent status conference. As explained below, neither assertion is correct. Plaintiffs misconstrue both the other judges' rulings and Judge Saris's comments.

---

[4]Plaintiffs also complain that they will not be able to receive annual sales data related to Neurontin. (Plaintiffs' Memo. at 4 n. 4). Defendants will certainly produce annual sales numbers for Neurontin for the period January 1, 1994 through May 2004. Defendants also note that such information is available in Defendants' annual reports filed with SEC beginning in 1999.

## II. PLAINTIFFS ARE INCORRECT AS TO RELEVANT FACTS AND PROCEDURAL HISTORY

A.  **Judge Saris's Ruling In Franklin Undercuts Plaintiffs' Position**

Plaintiffs contention concerning Judge Saris's ruling in Franklin is based on an incomplete account of the facts and circumstances leading up to the ruling and a misreading of the ruling. Franklin's complaint was unsealed by Judge Saris in early 2000. (Franklin Docket ## 39-44.) On August 22, 2000, Franklin served his first request for production of documents. It sought, among other things, virtually every document on the sales and marketing of Neurontin from as early as 1988 through August 22, 2000, the date of the request. (Franklin Docket # 82.) Three months later, following a 15-minute Rule 37.1 conference, Franklin moved to compel the production of documents. (Franklin Docket # 81.) Warner-Lambert opposed the motion.

Plaintiffs claim that Defendants had refused to produce any documents in response to the first request for production. This is wrong and misleading. Defendants advised Franklin's counsel that over 60 boxes of documents would be produced as soon as an appropriate confidentiality agreement and order was entered and provided a draft of such an agreement to Relator's counsel. In a letter to plaintiffs before the motion to compel was filed, Defendants advised that "[i]n our conversation today, I reiterated that Warner-Lambert would produce approximately 55 boxes of documents that were responsive to both the First Request and the Second Request shortly after our agreement on a confidentiality order." (*See* Exhibit A hereto). The motion to compel was filed before this issue was resolved. Indeed, it was filed before any substantial negotiations on the form of the agreement. In early 2001, while the motion to compel was pending, Judge Saris ordered Warner-Lambert to produce on an "for-attorneys-eyes-only" basis the documents it had agreed to

produce pursuant to a protective order. Warner-Lambert complied, producing 62 boxes of documents (over 160,000 pages). (Franklin Docket ## 94, 98 at 64.)

On July 24, 2001, Magistrate Judge Cohen, to whom the motion to compel had been referred, issued a Procedural Order, instructing Franklin to justify his position as to each individual document request contained in his request for production. (Franklin Docket # 109.) Defendants submitted a memorandum in response to the Procedural Order. They said, among other things,

> As for the appropriate end-date, . . . [i]t is prohibitively unreasonable to suggest that the Company should be required to produce an additional three to four years worth of documents based on such slender support as the Relator's "belief."

((Franklin Docket # 124 at 11 (footnotes omitted).)

On December 12, 2001, Magistrate Judge Cohen denied Franklin's motion to compel as to time period. (Franklin Docket # 142 at 3 (footnotes omitted).) Franklin moved for reconsideration before Judge Saris, arguing that the Magistrate Judge had been "clearly erroneous" in limiting the scope of discovery. He said, "Not only does the Amended Complaint repeatedly state that the pattern of misconduct extends from 1994 through at least 1998 and most likely into 2000 . . ., it alleges specific events that took place outside the time frame established by the Magistrate." (Franklin Docket # 145 at 11; emphasis added.) Therefore, he argued, "Relator is entitled to an Order compelling production of documents up to 2000." (Id. at 15).

On February 6, 2002, Judge Saris ruled on the motion for reconsideration. She rejected Franklin's attempt to obtain documents from 1999 and 2000, but did allow discovery through 1998. She wrote:

> The Amended Complaint alleges claims for the period 1994 through 1998. That is the time frame for discovery.

(Franklin Docket # 159 at 1.) Thus, Plaintiffs' claim to the contrary notwithstanding, Judge Saris rejected the attempt by Franklin, who was represented by attorneys who are on the Steering Committee in this case, to extract two more years of documents from Defendants based on wholly conclusory allegations. If her reasoning is applied here, and it should be, Plaintiffs' motion to compel should be denied.

**B.    The Complaints Do Not Sufficiently Allege Actionable Conduct After 1998**

Plaintiffs aver that "Defendants' repeated insistence that the Complaints here contain no factual allegations past 1998 (*see* Def. Mem at 2) is, quite simply, incorrect." (Plaintiffs' Memo. at 7.) They distort Defendants' position. Nowhere on page 2 of Defendants Memorandum does it say that the complaints "contain no factual allegations past 1998." What it says on page 2 and elsewhere in Defendants' memorandum, and what Defendants' memorandum demonstrates, is that the complaints are bereft of factual allegations of any fraudulent statements after 1998. Plaintiffs' claims require pleading and proof of fraud, not simply of meetings or events. Plaintiffs simply have not met this burden at all during any period. With respect to the period after 1998, they have not set forth any statements whatsoever.

Plaintiffs claim otherwise, citing numerous paragraphs of the two operative complaints. Defendants respectfully urge the Court to review each of these paragraphs so that it can see for itself what has been alleged. It will find no description of any statements or omissions after 1998.[5] Instead, it will find, as Defendants pointed out in their prior memorandum, references to meetings

---

[5] For the Court's convenience, Exhibit B hereto is a compendium of each of the paragraphs that contain, according to section II.B. of Plaintiffs' memo, headed "The Complaints Sufficiently Allege That Defendants' Misconduct Continued After 1998," allegations of fraud.

and events, coupled with broad, conclusory, unsubstantiated allegations. (Defendants' Memo. at 4-5.) Again, fraud cannot be inferred from mere allegations that meetings and events occurred, general assertions that discussions regarding off-label uses took place, or vague, non-specific allegations of false and misleading statements based on information and belief. See, e.g., In re Credit Suisse First Boston Corp., 2005 WL 852455 at * 9 (D. Mass. March 31, 2005) (O'Toole, J.) (dismissing securities fraud claims based in part on refusal to draw requested inference).

Plaintiffs mention the Neurobehavioral Working Group, arguing that it was created to promote off-label uses for Neurontin and that "it did not commence operations until 2001." (Plaintiffs' Memo. at 8.) The argument appears to be, of course, that the allegations concerning this Group are by definition allegations concerning post-1998 fraud because the Group did not exist until 2001. Here again, what Plaintiffs argue in their brief is at odds with what they actually alleged in their Complaints. Not only do the cited paragraphs of the complaints not contain a single allegation of an actual fraud by or in connection with the Group (much less one for which Defendants could be held responsible), but it is not alleged that the Group commenced operations in 2001. Cl. Compl. ¶¶ 80; 84; Coord. Compl. ¶¶ 66; 71.

Plaintiffs also purport to describe the "manner in which [Franklin's counsel, Greene & Hoffman] came into possession of information concerning Defendants' post-1998 off-label marketing activities . . .." (Plaintiffs' Memo. at 8-9.) In the course of the description, Plaintiffs accuse Defendants' counsel of having orchestrated a "deliberate withholding" of third parties' documents in the Franklin action. This accusation is false as Defendants explained in that case and Plaintiffs' argument here is nothing more than an attempt to resuscitate an old discovery dispute from the Franklin action. Moreover, it is telling that despite the fact that a member of their

8

Steering Committee purportedly had access to post-1998 documents, Plaintiffs have failed to come forward with any allegedly false or misleading statements after 1998.

After failing to acknowledge the ramifications of Mr. Greene's access to post-1998 documents, Plaintiffs refer to two FDA letters. The letters, however, are not evidence of the continuation beyond 1998 of the type of conduct alleged in the complaints. Moreover, Plaintiffs ignore that Defendants have already agreed to produce the files that contain the letter and the Company's responses, which are included in the Neurontin NDA.[6]

### C. Plaintiffs Distort The Rulings Of The Two Other Courts

Plaintiffs boldly assert that two other courts already have decided the issues presented by the cross-motions at bar.[7] This simply is not so.

The first discovery order on which Plaintiffs rely is Judge Rakoff's April 25, 2005 Order (the "April 25 Order") in consolidated actions (since transferred here) alleging that Neurontin caused suicide or suicide attempts. According to Plaintiffs, Judge Rakoff "rejected Defendants' attempts to limit discovery of Neurontin sales and marketing materials to those in existence prior to 1997." (Plaintiffs' Memo. at 10.) This is a distortion of the April 25 Order.

The April 25 Order specifically addressed only the production of certain "*databases* related to defendants' sales and marketing efforts and communications with doctors," not *all* documents

---

[6]In addition, the letters could be the subject of targeted discovery, and do not justify the production of every sales and marketing document for a six-year period.

[7]Plaintiffs make much of Defendants' "remarkable" neglect in failing to inform the Court of other decisions on "this same argument." (Plaintiffs' Memo. at 10.) As discussed below, those decisions related to databases, not six years of all sales and marketing information. Moreover, as Plaintiffs themselves twice point out in their papers, the Court was already aware of Judge Rakoff's decision prior to Defendants' filing. (Plaintiffs' Memo. at 4, 11).

concerning the sales and marketing of Neurontin. (Poate Aff., Ex. H (April 25, 2005 Order) at 1 (emphasis added).) In the consolidated actions before Judge Rakoff, then captioned <u>In re Neurontin</u>, 04-CV-6704, Defendants had objected to Plaintiffs' requests for the production of certain databases, including the sales and marketing databases. After considering letter briefs only, Judge Rakoff ruled only that some of the databases should be produced. As a result, Plaintiffs are entirely wrong in claiming that Judge Rakoff rejected Defendants' contention that a temporal limit is necessary lest Defendant be forced to submit to a multi-million dollar fishing expedition designed to unearth evidence (which does not exist) to create claims that are not pleaded.[8]

Furthermore, Judge Rakoff expressly did not address the geographic scope of sales and marketing information. (April 25 Order at 1, n. 1.) He ordered the production of documents from certain of Defendants' databases, specifically reserving the issue of the relevant geographic area, leaving it open to Defendants to limit the geographic scope and Plaintiffs to challenge that limitation if they disagree. Consistent with the Order, Defendants have agreed to produce information from the databases relating to interactions or communications with the plaintiffs' prescribing or treating physicians or, in the alternative, the physicians located in the counties

---

[8]Plaintiffs also seem to put great stock in the comment by Judge Saris that Judge Rakoff's Order "seemed reasonable." (Plaintiffs Memo. at 4, 11.) Plaintiffs neglect, however, to mention the remainder of Judge Saris's comments, which undercut their reliance on the quoted phrase. She said, "[The Order] seemed like a reasonable guidepost to start with, but if someone's going to challenge it, they should do it . . .. I haven't thought through the issues, and I'd hate to do that without hearing the point/counterpoint, which is always very helpful." (Poate Affidavit, Ex. N (transcript) at 28.)

where the plaintiffs and their physicians resided, through the date of the alleged suicide or suicide attempt.[9]

The second discovery order to which Plaintiffs point is similarly limited and similarly unavailing to Plaintiffs. It is an April 20, 2005, Order of Judge Stewart A. Rosenwasser of New York State Supreme Court for Orange County. (Poate Aff., Ex. I (April 20 Order).) As Plaintiffs concede (Plaintiffs' Memo. at 12), Judge Rosenwasser "ordered the production of Defendants' . . . Sales/Marketing . . . *databases*."[10]

Plaintiffs also ignore the fact that producing information from databases is dramatically less burdensome than conducting a nationwide search for six years of documents, reviewing those documents, and producing them. While a database production is burdensome, as the contents must be reviewed to protect confidential patient information, neither Judge Rakoff nor Judge Rosenwasser engaged in the analysis of the burden that the production requested by plaintiffs would impose on defendants. Moreover, neither judge was asked to decide whether Plaintiffs' speculative and legally-insufficient allegations as to 1999 and beyond justify the monumental task that Plaintiffs ask the Court to impose on Defendants.

Given that neither Judge Rakoff nor Judge Rosenwasser addressed the issue that is before this Court, Plaintiffs' reliance on their orders is misplaced. If the orders have any bearing on these

---

[9] It bears noting that Plaintiffs have rejected such targeted discovery. The efficient, targeted approach that Defendants have offered has not satisfied Plaintiffs, who, as noted, insist on every document relating to the sales and marketing of Neurontin from January 1, 1999 through May 1, 2004.

[10] While it is true that Judge Rosenwasser ordered the production of the databases without geographic limitation, Plaintiffs fail to inform the Court that Defendants are pursuing that issue via a motion to vacate or modify the April 20 Order and, if necessary, an appeal to the Appellate Division of the New York State Supreme Court.

cross-motions, it is that they suggest that caution be exercised and that areas as to which discovery is permissible must be narrowly and carefully defined. Defendants have sought to identify the issues as to which Plaintiffs have a legitimate basis for such discovery, and this discovery has been offered. For example, because the issue as to whether Neurontin is safe and effective for a particular use is a matter of scientific fact that is not necessarily time-dependent, Defendants have offered to produce information after 1998 as to the safety and efficacy of Neurontin.[11]

### III. PLAINTIFFS' SUGGESTION THAT IT WOULD NOT BE BURDENSOME FOR DEFENDANTS TO SEARCH FOR, REVIEW, AND PRODUCE SIX MORE YEARS OF DOCUMENTS IS INSUPPORTABLE

Plaintiffs' final argument is that compliance with their demand for every Neurontin sales and marketing document created between December 31, 1998 and May 1, 2004, would not be unduly burdensome. Plaintiffs' memorandum contains not one citation to the declaration of Laura Kibbe, however, so one has to wonder whether Plaintiffs reviewed that declaration, in which Ms. Kibbe describes in detail, based on personal knowledge, the enormity of the burden that Plaintiffs seek to impose on Defendants. Contrary to Plaintiffs' assertions, Defendants have provided an evidentiary basis for claiming undue burden.

Plaintiffs begin their "no burden" argument with a multi-page effort to justify the "broadsword" approach that is disfavored in this Circuit. Mack v. Great Atlantic & Pacific Tea Co., 871 F. 2d 179, 187 (1st Cir. 1989). They cite familiar, dated cases concerning liberal discovery and then claim that they are entitled to such here because they "have alleged a broad and

---

[11]Plaintiffs' argument that Defendants have been inconsistent in offering recent safety and efficacy information while resisting recent sales and marketing information (Plaintiffs' Memo. at 18-19) ignores the fundamental difference between these two types of information. Safety and efficacy data is much more self-contained and much less burdensome to provide. Indeed, much of this information has already been produced or will be made available for inspection and copying.

ongoing scheme by Defendants to misrepresent the safety and efficacy of Neurontin." (Plaintiffs' Memo. at 13.) As discussed above, they have done no such thing. Plaintiffs also exaggerate their rights under the discovery rules, by claiming, incredibly, that the 2000 amendment that tightened Rule 26(b)(1) had little or no purpose and effect, by relying on pre-2000-amendment caselaw, and by ignoring not only the many cases recognizing the amendment's narrowing purpose and effect but also the First Circuit authority discussed in Defendants' prior memorandum.

Plaintiffs cite few cases decided under the December 2000 amendment to Rule 26(b),[12] which is not surprising, given that numerous courts, following the amendment's intent to "involve the courts more actively in managing discovery," have utilized their authority to rein in discovery where it is overbroad, unduly burdensome, or sought in an effort to develop new claims and defenses not set forth in the pleadings. Advisory Committee Notes to 2000 Amendment to Rule 26(b)(2). See, e.g., Guidry v. U.S., 2004 WL 2984808 (E.D. La.) (limiting government's broad discovery requests under amendment); Collens v. City of New York, 222 F.R.D. 249 (S.D.N.Y.) (limiting "fishing expedition" discovery not related to claims or defenses based on amendment);

---

[12] The more recent cases cited by Plaintiffs relate to their contention that massive document cases have become run-of-the-mill, but Plaintiffs' description of several of these cases is misleading. See, e.g., In re Diet Drugs Products Liability Litig., 2001 WL 497313 (E.D. Pa. 2001) (the six million documents produced in this "FenPhen" litigation was the combined total of documents produced by plaintiffs and defendants in an MDL action involving over three thousand civil actions (over 3,000 actions had been transferred to the MDL) brought against the drug's manufacturers and distributors, as well as weight-loss clinics, pharmacies and physicians); In re Cardizem CD Antitrust Litig., 218 F.R.D. 508, 515 (E.D. Mi. 2003) ("hundreds of boxes" containing "over one million pages" described both defendant and third-party document production, and among the plaintiffs were 15 states); In re Lucent Technologies, Inc. Sec. Litig., 327 F. Supp. 2d 426, 449 (D.N.J. 2004) (when plaintiffs' counsel asserted that they had reviewed more than 2.6 million pages of documents, defendants expressed disagreement and court did not decide issue, finding only that plaintiffs' counsel had "dedicated significant time to the case").

BG Real Estate Services, Inc. v. American Equity Insurance Co., 2005 WL 1309048 (E.D. Pa.) (court ruled that the defendants carried their burden of establishing the tremendous burden and expense they faced if required to respond to requests; "[t]he new standard concerning the scope of discovery is *narrower* than the old, pre-2000, broader standard"; "the tone of entitlement to unlimited, unrestricted 'subject matter' discovery struck in plaintiffs' memorandum in opposition to the motions for protective order is off-base"; "Rule 26(b) is not a discovery blank check. It requires balancing and imposes on the court the obligation to rein in overly broad, potentially abusive discovery like some of plaintiffs' requests in this case"); Sanyo Laser Products, Inc. v. Arista Records, Inc., 214 F.R.D. 496 (S.D. Ind. 2003) (identifying courts that have ruled the amendment narrowed landscape significantly); Johnson v. Mundy Indus. Contractors, Inc., 2002 WL 31464984 at *3 (E.D.N.C.) ("2000 amendments 'mandate greater scrutiny of Plaintiff's [discovery] request'"); Surles v. Air France, 2001 WL 1142231 at *1, n.3 (S.D.N.Y.) ("'it is intended that the scope of discovery be narrower than it was, in some meaningful way'"); Conboy v. Edward D. Jones & Co., 2004 WL 1792372 (N.D. Tex.) (under amendment courts "should not allow parties to 'roam in the shadow zones of relevancy to explore matter which does not presently appear germane on the theory that it might conceivably become so.'") (citation omitted); Williams v. Ehlenz, 2004 WL 742076 (D. Minn.) ("parties are not entitled to use the discovery process to develop new claims or defenses not reasonably identified in the pleadings"). Thus, Plaintiffs' claim that despite the 2000 amendment of Rule 26(b), they are entitled to wield a broadsword is wrong as a statement of the law. To the contrary, a party may not use discovery to find claims. But this is precisely the purpose of Plaintiffs' unlimited post-1998 discovery demands.

Furthermore, Defendants have more than adequately established the burden imposed by the demand for all sales and marketing documents from January 1, 1999 through May 1, 2004 through Ms. Kibbe's affidavit. She estimates, conservatively, that it would take hundreds of hours simply to collect documents from over 100 people (and many more if field-level files were required to be searched) and almost 10 months for 40 temporary workers reviewing documents full time to complete the initial review alone. She estimates the costs associated with collection, processing, and the initial review at $5 million or more, and says that these costs do not include the necessary second review by Pfizer's attorneys. She estimates that the entire process, including initial collection, first and second review, and production, would last well over a year and cost over $10 million, and much more if Defendants were required to collect documents from field level employees. She has demonstrated undue burden. Plaintiffs have chosen simply to ignore her.

Plaintiffs' final points are equally ineffective. While they say that Defendants "contend that 80 boxes . . . should be sufficient" (Plaintiffs' Memo. at 17), Defendants have never said this, and Defendants are in the process of producing scores of additional boxes of documents, plus a number of large computer databases. For example, the Neurontin NDAs and INDs alone constitute the equivalent of over 140 boxes of materials (much of which was produced to Plaintiffs on DVD), and Defendants have discussed with Plaintiffs and will offer to make available for inspection over 700 boxes of clinical trial backup materials. Plaintiffs also say that the burden at issue here is not so great when compared to the productions that have been made in other "similar litigation." Even assuming Plaintiffs' blurbs on the other similar litigation are correct, which they are not (see footnote 11 supra), this is not some other litigation, and discovery limits should be set based on the facts of this case, not of some other.

Plaintiffs finally make the entirely irrelevant point that the burden they seek to impose is "roughly comparable" to the burden Defendants shouldered in Franklin, and that this burden is not so heavy because Defendants managed in Franklin. First, Defendants did indeed incur great discovery burdens in the Franklin matter. But more importantly, the question now is whether Defendants should be forced to incur additional undue burden simply to satisfy Plaintiffs' fishing expedition to try to establish claims that Plaintiffs have not pleaded. Plaintiffs' refusal to consider targeted discovery proves that they seek to ignore the balance Rule 26 requires.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court deny Plaintiffs' motion to compel and that it enter a protective order that Plaintiffs are not entitled to discovery concerning the sales and marketing of Neurontin that post-date 1998.

Dated: July 18, 2005

PFIZER INC., et uno,
By their attorneys,

s/James P. Rouhandeh
James P. Rouhandeh
James E. Murray
Deborah L. MacGregor
DAVIS POLK & WARDWELL
450 Lexington Avenue
New York, New York 10017
(212) 450-4000

-and-

s/David B. Chaffin
David B. Chaffin
BBO # 549245
HARE & CHAFFIN
160 Federal Street
Boston, Massachusetts 02110
(617) 330-5000