UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE NEURONTIN MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION | ) ) ) ) ) |
| THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS | ) MDL Docket No. 1629<br>) Master File No. 04-10981<br>)<br>) Judge Patti B. Saris<br>) Magistrate Judge Leo T. Sorokin |

**PRODUCTS LIABILITY PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR PROTECTIVE ORDER CONCERNING SCOPE OF DISCOVERY AS TO PRODUCTION OF DOCUMENTS CREATED AFTER DECEMBER 31, 1998**

Plaintiffs in the products liability/personal injury actions (hereinafter "Products Liability Plaintiffs"), by and through the law firm of Finkelstein & Partners, LLP, hereby oppose Defendants' request to limit the scope of discovery of sales and marketing information to a time period ending December 31, 1998. To date, there has been no appointment of a Plaintiffs' Products Liability Steering Committee to address Defendants' proposal. However, in light of the pending application for appointment by Finkelstein & Partners, submitted on June 17, 2005, this memorandum is provided for the Court's consideration.

As the Court is aware, the Products Liability Plaintiffs are not the target of Defendants' application for a protective order as to the discovery demands served by the Class Plaintiffs and the Coordinated Third Party Payer Plaintiffs ("Non-Class Plaintiffs"). However, given the anticipated coordination of discovery between the Class and Non-Class Plaintiffs and the Products Liability Plaintiffs, the Court granted leave to

Finkelstein & Partners, on behalf of the Products Liability Plaintiffs, to bring to the Court's attention our position and arguments as to why such a protective order should not be granted.

The Court should reject Defendants' request for a protective order limiting the scope of discovery regarding the sales and marketing of Neurontin to the period ending December 31, 1998. On behalf of the Products Liability Plaintiffs represented by Finkelstein & Partners, we adopt the arguments previously submitted to the Court by the Class and Non-Class Plaintiffs, in their Memorandum of Law dated July 1, 2005. In the hopes of avoiding duplicative arguments already brought to the Court's attention, this Memorandum of Law will provide further support and basis for the disclosure of sales and marketing information post-1998.

## I.   Discovery of Sales and Marketing Efforts is Necessary and Essential to the Products Liability Plaintiffs' Claims.

Disclosure of sales and marketing efforts post-1998 not only goes to the issues of fraud and misrepresentation, but such disclosure is necessary for the Products Liability Plaintiffs to pursue traditional theories of negligence and failure to warn, and to rebut Defendants' learned intermediary defense. Disclosure of sales and marketing efforts, maintained via computer database or a traditional document file, from the time of Neurontin's entry into the marketplace to the present time, is essential to Plaintiffs' claims. Discovery of this information may confirm notice to Defendants of the dangers of Neurontin and demonstrate Defendants' illegal behavior in marketing Neurontin for "off-label" purposes.

In order establish *notice*—what Defendants knew and when Defendants knew it— Plaintiffs must review the full content of information possessed by Defendants. This

2

information will reveal what information was communicated to the medical community and public; whether Defendants engaged in a pattern or practice of illegal off-label promotion; and whether Defendants downplayed or concealed known risks.[1]

### A. Disclosure of Sales and Marketing Efforts Post-1998 Will Provide Discoverable Information Regarding Safety Surveillance and Efficacy, an Area Defendants Concede Is Discoverable Without Temporal Limitation.

What Defendants knew about the risks and benefits of Neurontin, and when Defendants gained that knowledge, lie at the heart of Plaintiffs' causes of action. Defendants have represented that they will provide disclosure, without temporal or geographic limitations, pertaining to the safety and efficacy of Neurontin. This safety/efficacy information will be found, in part, through discovery of Defendants' sales and marketing efforts via database, traditional file, or witness testimony. Consequently, equal access to Defendants' sales and marketing efforts is necessary. The two areas are inseparable.

When Defendants' sales agents visit physicians for purposes of detailing and marketing these medical providers, they historically maintain summaries of both the physician's comments and the information they provided. All information provided by physicians, including concerns or complaints about a drug's safety and efficacy, puts Defendants on notice of potential problems with Neurontin, thereby creating an obligation by Defendants to investigate further, propose new warnings or remove the product from the market. Here, Defendants' actual knowledge that its product was

---

[1] Plaintiffs' claims include, *inter alia*: Defendants' actions related to research and deceptive practices associated with Neurontin clinical trials; Food and Drug Administration (hereinafter FDA) procedures and regulations and Defendants disclosure, or lack thereof, to the FDA; foreign regulatory actions and experiences abroad which provided notice of the defective product; Defendants misbranded and violated warning duties; Defendants did not disclose or failed to conduct appropriate risk-benefit ratio analysis on pre and post marketing data; defendants withheld unpublished studies; and more.

ineffective or unsafe is an important component of Plaintiff's negligence and failure to warn claims. It matters not whether this knowledge may exist via other substantive areas of discovery, e.g., safety surveillance or medical communications. Products Liability Plaintiffs are entitled to discover Defendants' knowledge in each area.

Access to *all* Sales/Marketing information will reveal whether Defendants acted as a reasonably prudent seller in promoting Neurontin for particular uses, whether for approved indications or "off-label" uses. Plaintiffs cannot ascertain whether Defendants' actions—or inactions—and the timing of those actions, in the face of information about Neurontin's risks, were reasonable unless Plaintiffs evaluate all data Defendants had from Neurontin's launch into the marketplace to at least 2004.[2] There is a relationship between discovery of Sales/Marketing and analysis of safety surveillance, efficacy and risks/benefits associated with Neurontin.

For example, sales representatives must record all *samples* left with each physician in a sales database. Risk statistics for adverse events are computed by comparing the number of people injured to the number of people who took the drug. Drug companies calculate the denominator (or number of people who took the drug) by assessing pharmacy sales as well as the number of samples distributed. The only way for Plaintiffs to verify the accuracy of those calculations is by allowing Plaintiffs full access—without geographic or temporal limitation—to the Sales/Marketing information and the *sample* data contained in Sales/Marketing materials. Evaluation of safety/efficacy information is central to the Products Liability Plaintiffs' claims and is

---

[2] Judge Rakoff's April 25 Order instructed the parties "to determine the last date on which marketing efforts could be relevant to any of the cases in this action; that date will be the latest alleged suicide or suicide attempt . . ." Consequently, the Products Liability Plaintiffs proposed to defense counsel that July 20, 2004, would be the applicable date, given that it corresponded to the suicide date of Plaintiff's decedent, Maria Jarosz.

inextricably intertwined with discovery of Defendants' sales/marketing efforts. Discovery of one area without the other prevents Plaintiffs from discovering the full extent of Defendants' claimed negligent activities.

Further, discovery of this information is imperative in evaluating Defendants' behavior in complying with FDA regulations. Consequently, this requires Plaintiffs' counsel to take on the task of revealing—via database, traditional document file information, or witness testimony—Defendants' aggressive off-label promotion.[3]

> B. Disclosure of Sales/Marketing Efforts Post-1998 Is Essential to Prove a Pattern or Practice of Misconduct and Oppose a Learned Intermediary Defense.

Evidence of a pattern or practice of over-promoting Neurontin is essential to overcoming Defendants' "learned intermediary" defense. Courts have held that a manufacturer cannot hide behind this defense, even if the manufacturer provided adequate warnings, if the manufacturer engaged in a pattern or practice of deceptive marketing that overwhelmed the effect of the warnings on physician knowledge and beliefs. *See, e.g., Salmon v. Parke, Davis & Co.*, 520 F.2d 1359, 1362 (4th Cir. 1975) (over-promotion may erode the effectiveness of otherwise adequate warnings); *Whitley v. Cubberly*, 210 S.E.2d 289, 291-92 (N.C. App. 1974) (over-promotion to medical community in general as well as to individual physician is relevant). Defendants will

---

[3] Defendants' alleged tactics in promoting off-label use included the following: (1) encouraging sales representatives to provide one-on-one sales pitches for off-label use of Neurontin; (2) using medical liaisons, who often falsely represented themselves as neutral scientific experts, to work in tandem with sales representatives and directly sell Neurontin to physicians for off-label use; (3) paying physicians to allow a sales representative to see patients with the doctor and to participate in discussing a treatment plan; (4) paying physicians with fringe benefits such as trips, meals, hotel rooms, etc., to attend speakers bureau trainings in which doctors received presentations about off-label uses; (5) providing payment to doctors to speak with other doctors about off-label uses; and (6) sponsoring "medical education" events to inform doctors about off-label uses of Neurontin.

argue the learned intermediary defense affirmatively in this litigation but seek to limit the Plaintiffs' ability to combat that defense.

In *Incollingo v. Ewing*, 282 A.2d 206, 221-22 (Pa. 1971), the plaintiff sued the manufacturer of a dangerous drug and the two physicians prescribing it. One physician testified he considered himself adequately warned of the drug's dangers; the other testified to the converse. The court recognized that evidence regarding the manufacturers' general practice of over-promoting the drug throughout the medical field supported the jury's finding that the warnings were inadequate in that they constituted evidence that could confirm the latter doctor's testimony and dispute the former doctor's claim.[4] Unless Plaintiffs have access to materials reflecting the conduct of Defendants' entire Neurontin sales and marketing force, through 2004, Plaintiffs risk having insufficient proof of pattern or practice to convince a jury to find fraudulent intent, award punitive damages or reject Defendants' "learned intermediary" defense. *See, e.g., Watkins v. Lundell*, 169 F.3d 540, 546 (8th Cir.), *cert. denied*, 528 U.S. 928 (1999) (evidence of a "pattern, practice or scheme characterized by fraud or deceit" is evidence of reprehensibility to be considered in evaluating punitive damages claim); *In Re Vitamins Antitrust Litig.*, 2001 U.S. Dist. LEXIS 8904, at *59-73 (D.D.C. 2001) (overruling that part of the Special Master's Report and Recommendation imposing geographic limitation on scope of certain of plaintiffs' discovery where plaintiffs alleged conspiracy). Defendants' sales and marketing efforts post-1998 are no less important than pre-1998 efforts in rebutting Defendants' learned intermediary defense.

---

[4] "As a practical matter, it would have been difficult, if not impossible, to show how the promotional efforts of the manufacturer bore on the judgments of these co-defendants without demonstrating that the efforts were directed to the entire class or group of which they were members." 282 A.2d 206, 221-22 (Pa. 1971).

6

### II. Issues of Fact Exist as to Whether Medical Liaisons and Sales Representatives Failed to Provide Accurate Information About Suicidality and the Use of Neurontin as Recently as 2003.

Defendants' obligations require them to provide accurate, balanced information in response to inquiries about their products. Documents received in discovery thus far demonstrate Defendants' false and misleading responses pertaining to suicide and Neurontin; at the very least, Defendants' failure to provide accurate information raises material issues of fact as to their negligence and failure to warn of safety and efficacy issues. This is not so much an issue of Defendants' affirmative actions, but is demonstrative of potential omissions or inactions by Defendants in inadequately informing the medical community about the risks associated with Neurontin. Unfortunately, this misinformation flows from Defendants' Medical Communication Department to <u>sales representatives</u> and ultimately physicians and Plaintiffs. Illustrative of this fact is Defendants' failure to adequately inform inquirers about relevant medical literature discussing suicide and the use of Neurontin.

Based upon testimony of Defendants' witness, Helen Duda-Racki, relating to both Parke-Davis and Pfizer's Medical Communication departments, Defendants maintain Standard Response Documents to provide in response to familiar or otherwise routine questions. Inquiries not only come from physicians and consumers; they also come from Defendant employees such as medical liaisons and sales representatives in the field. (See Duda-Racki Dep., pp. 69-70, Ex. A, attached hereto.) These inquiries may relate to efficacy, risks, benefits, or adverse events associated with Neurontin. (Duda-Racki Dep., p. 70.) Not only due to obligation, but common sense dictates that Defendants would not want to misinform those seeking information about their product, particularly medical

7

providers. To do so would result in physicians being left without appropriate information to make a decision about a patient's treatment. (Duda-Racki Dep., pp. 113-114, 150-152.)

Defendants' misinformation is reflected in Defendants' standard response of April 2003, regarding suicide:

> A computerized search of the medical literature conducted in April 2003 regarding suicide in association with gabapentin **therapy has failed to identify *any* relevant references.** [Ex. B, attached hereto (emphasis added).]

However, as of October 2003, Defendants' standard response changed:

> [A] computerized search of the medical literature has identified **several references** that discuss suicidality and the use of Neurontin. [Ex. B (emphasis added).]

What is of importance in evaluating the two standard response letters is to address the references and when the references were known—or should have been known—by Defendants. As reflected in the latter standard response, there are six (6) references, and five (5) pre-date the April 2003 standard response document. Id. The failure to include these references in a standard response document before April 2003, illustrates Defendants' failure—whether by fraud or negligence—to provide accurate, balanced information to inquirers, particularly medical providers, about the dangers of Neurontin.

Not only were medical providers likely misinformed, given the lack of a full and complete response that included available references discussing suicidality and Neurontin, but Defendants' Medical Liaisons and Sales Representatives who made inquiries would also have been misinformed and, in turn, would have misinformed the medical providers with whom they had contact. This is yet another example of the relationship between sales/marketing and safety that supports Plaintiffs' need to have

8

discovery without a temporal limitation to 1998. Again, these standard response letters existed in the post-1998 era and would have been relied upon by medical liaisons and sales representatives in the field.

### III. Products Liability Plaintiffs Should Have Access to Post-1998 Documents from Individuals Who Defendants Have Already Identified.

On May 18, 2005, pursuant to their obligations under Rule 26, Defendants disclosed the names of individuals who may have discoverable sales & marketing information, yet they claimed in their memorandum that this had not yet been done, to wit: *"To produce documents relating to the period after December 31, 1998 . . . Defendants would first need to identify all individuals whose files reasonably could contain documents relating to the sales and marketing of Neurontin [through] 2004."* (Defs.' Mem. dated June 17, 2005, p. 10.) In fact, Defendants disclosed ninety-nine (99) individuals likely to have discoverable information and which included individuals whose time period of employment—for sales and marketing—spans the Pfizer era (post-1998). (See Defs.' Supp. Initial Disclosure Statement, Ex. C, attached hereto.) Only six (6) of the Pfizer individuals identified were classified as being within the area of sales and marketing. It is axiomatic that Products Liability Plaintiffs be given the opportunity—at the very least—to recover "discoverable information" from these individuals' custodial files and have the ability to depose these individuals to the extent reasonably necessary.

### IV. Judge Rakoff Has Rejected Defendants' Request to Limit the Temporal Scope of Discovery.

Products Liability Plaintiffs have litigated the temporal limitation issue before Judge Rakoff in the Southern District of New York. Defendants and the Class and Non-Class Plaintiffs have both referenced Judge Rakoff's April 25 Order. (See April 25, 2005

9

Order, attached to Poate Declaration as Ex. H.) The parties have thus far interpreted the decision differently. Defendants have emphasized that the decision applies only to disclosure of *databases*. Plaintiffs contend the decision applies to all of Defendants' marketing *efforts*, given Judge Rakoff's language:

> Accordingly, plaintiffs are permitted to discover evidence of defendants' marketing *efforts* as of the last day such marketing could be relevant to the claims and defenses pleaded --- i.e., the last Neurontin prescription issued to a plaintiff or a plaintiff's decedent in the case . . . The Court therefore instructs the parties to determine the last date on which marketing *efforts* could be relevant to any of the cases in this action . . . Such date will be the cut-off date for discovery of defendants' marketing *efforts*. [Emphasis added.]

Judge Rakoff's language is consistent with Products Liability Plaintiffs' application to that Court, as reflected in the Products Liability Plaintiffs' brief to Judge Rakoff, in which Plaintiffs requested all "information relating to Defendants sales/marketing *efforts* . . . maintained via computer database *or a traditional file*, from the time of Neurontin's entrance into the market place to the present time." Whether discoverable information is in database or traditional document format should be of no moment to the Court. What is important is to recognize the substantive information, not the manner in which it is maintained, in terms of evaluating whether it is discoverable. Applying Judge Rakoff's reasoning to the case at bar, Defendants' marketing *efforts* without temporal limitation are discoverable.

### V. Laura Kibbe's Affidavit Overstates the Purported Burden Upon Defendants.

Defendants rely upon the Affidavit of Pfizer attorney Laura Kibbe for purposes of demonstrating the undue burden Defendants would suffer if they are required to disclose sales/marketing efforts post-1998. Kibbe's Affidavit exaggerates the burden upon

Defendants, and further fails to articulate with particularity the basis for her position. Upon "reviewing Plaintiffs requests for post December 31, 1998 documents," Kibbe estimates collection from over 100 custodians. (See Kibbe Aff., June 17, 2005, ¶ 4.) Noteworthy, Defendants, in their Supplemental Rule 26 disclosure, discussed above, identified a total of six (6) individuals pertaining to Sales and Marketing from the Pfizer era. Kibbe, however, estimates over 10 million pages of material corresponding to approximately 100 custodians without identifying the basis for this conclusion.

At the very least, Defendants should be required to identify with particularity the approximate pages that correspond to particular custodians. For example, Defendants could articulate the pages corresponding to those custodians post-1998 that are referenced in Defendants Supplemental Rule 26 disclosure. Pfizer has done this in similar hormone therapy litigation involving Pfizer's hormone therapy drug, Provera, in which Finkelstein & Partners represents over 200 plaintiffs. Indeed, as recently as July 7, 2005, Pfizer provided a list of custodians along with department files and identified the volumes of material to be disclosed, and the list of custodians will continue on a rolling basis. Previously, on June 21, 2005, Pfizer identified specific key individuals with potentially responsive information, along with their titles, company affiliation, and timeframe with the Defendant company, sometimes spanning over 20 years. (See Ex. D, attached hereto.) Notwithstanding that the Neurontin litigation is separate and distinct from the hormone therapy litigation, there is an important aspect that should be applied here: Defendants should collect and disclose readily available, pertinent information. Pfizer is taking steps in the hormone therapy litigation to produce documents from custodians, some spanning a 20-year period. Pfizer disclosed names of custodians, their titles, their

11

employment timeframe (in decades). Moreover, Pfizer is engaged in a rolling production of materials from key individuals who had "significant responsibility with regard to the products at issue." (Ex. D.)

The Court's attention is respectfully brought to the Affidavit of Keith Altman (Ex. E, attached hereto). Mr. Altman is employed by Finkelstein & Partners and provides litigation support relating to the discovery of electronic and paper information in complex litigation. His affidavit stands in opposition to that provided by Ms. Kibbe. Importantly, Mr. Altman is able to provide resolutions to the Defendants production issues; essentially, to the extent Defendants' motion for protective order is denied and the scope of discovery is not limited, Plaintiffs and Defendants should be able to agree upon a well-constructed set of keywords and search terms that will negate Defendants' claim of undue burden.

Given the gravity of the protective order sought by Defendants and the significant prejudice to Plaintiffs if Defendants' request be granted, the Products Liability Plaintiffs request the opportunity to depose Ms. Kibbe—before the Court reaches a decision—in order to explore the bases of the statements made in her Affidavit and present further papers to this Court on the issue.

## VI. Products Liability Plaintiffs Have Pled Allegations of Fraud or Misleading Statements Post-1998.

Defendants make statements in their Memoranda of Law, dated June 17, 2005 and July 18, 2005, asserting the absence of specific allegations of fraud after 1998. For instance, Defendants state, *"Despite the absence of any allegations of false or misleading statements after 1998, Plaintiffs . . . seek documents through to the present."* (Defs.' Mem., June 17, 2005, p. 1.)   Eight (8) additional complaints have been filed in the

12

Southern District of New York that await transfer to this Court, wherein Products Liability Plaintiffs have specifically pled the facts surrounding the FDA's warning letters of June 29, 2001 and July 1, 2002.[5] As referenced by both parties in their respective memoranda, on July 29, 2001, the FDA identified a slim jim utilized by Defendants as misleading and in violation of the FDCA and applicable regulations. The slim jim misleadingly claimed improvement in quality of life parameters through Neurontin usage without there being substantial evidence of same. On July 1, 2002, through a written communication, the FDA accused Pfizer of making false or misleading representations about Neurontin's benefits and mechanism of action. The FDA contact states in part: "[T]he prominent display of the name "Neurontin" is misleading because it suggests that Neurontin is useful for a broader range of . . . conditions than has been demonstrated by substantial evidence."

Noteworthy, as part of the June 2004 criminal settlement, Pfizer agreed to implement a Corporate Integrity Agreement for purposes of auditing its own marketing conduct and activity. Pfizer's inclusion in the Corporate Integrity Agreement was a "reflection of Pfizer's ownership of Warner-Lambert and the integration of former Warner-Lambert units and personnel into Pfizer."

### VII. Defendants' Unilaterally Imposed Geographic Limitations on Discovery Should Not Be Allowed.

Defendants raise the issue of geographic limitations in their Memorandum. Specifically, Defendants indicate they have agreed only to "produce information from the databases relating to interactions or communications with the plaintiffs' prescribing or

---

[5] Alsberge v. Pfizer Inc., 05 CV 5809; Briggs v. Pfizer Inc., 05 CV 5810; Werner v. Pfizer Inc., 05 CV 6084; Henry v. Pfizer Inc., 05 CV 6087; Colton v. Pfizer Inc., 05 CV 6271; Bentley v. Pfizer Inc., 05 CV 6272; Dixon v. Pfizer Inc., 05 CV 6273; Wendorf v. Pfizer Inc., 05 CV 6274.

treating physicians or, in the alternative, the physicians located in the counties where the plaintiffs and their physicians resided, through the date of the alleged suicide or suicide attempt." (Defs.' Mem., pp. 10-11.) Obviously, this too is an issue of great debate between the parties. Given Defendants' reference to the issue, *although beyond the scope of the current application*, Products Liability Plaintiffs are compelled to respond to Defendants' position so as to avoid significant prejudice to Products Liability Plaintiffs.

### A. Whether by Direct or Indirect Marketing, Defendants' Marketing Tactics Influenced Prescribing Practices.

It does not matter whether Defendants gained knowledge about the dangers of Neurontin in Oregon, New York or London. Plaintiffs' claim is Defendants had the knowledge and failed to take appropriate action. Claims by Defendants that the only relevant information concerns Defendants' interaction with a given plaintiff's physician ignore a central claim by Plaintiffs: it makes no difference who informed Defendants of these problems. Undoubtedly, information Defendants possessed regarding the dangers of its product came from physicians who did not treat Plaintiffs and is discoverable in this action.

Physicians received information from Defendants via multiple outlets. Defendants bombarded the medical community with information regarding Neurontin through direct and indirect marketing means. Defendants enlisted practicing physicians to solicit their fellow physicians to prescribe Neurontin. Defendants specifically paid "thought leaders" to promote benefits of Neurontin for off-label indications. Such indirect marketing measures create general beliefs about the efficacy of Neurontin, regardless of whether Defendants have direct contact with the manufacturer. Such indirect sales tactics influence a physician's standard prescription practice and continues

14

today. Limiting discovery to solely the direct marketing means exercised on a given Plaintiff's doctor would prevent Plaintiffs from uncovering the whole story regarding Defendants' promotion of Neurontin to the medical community at large.

### B. Geographic Limitations Prejudice Plaintiffs' Ability to Rebut Defendants' Learned Intermediary Defense.

A given Plaintiff cannot be compelled to accept the testimony of his or her individual prescribing physician, whom Defendants may have already indemnified or is in the process of indemnifying. Physicians were not "learned" as Defendants will claim. Physicians were likely influenced by Defendants' over-promotion even if they, themselves, were not in direct contact with Defendants' agents. If discovery is limited in the manner Defendants suggest, Defendants will likely argue that millions of individuals have ingested Neurontin, yet Plaintiffs, at most, can point to a *single limited geographic area, over a limited period of time*, to demonstrate only a few doctors were duped. Importantly, Judge Rakoff, in his April 25 Order, recognized Plaintiffs' need to have access to Defendants' marketing efforts:

> "[D]efendants have interposed a learned intermediary defense . . . and thereby have explicitly put at issue the effects of defendants' marketing efforts on the prescribing doctors' ability to adequately counsel their patients as to Neurontin's benefits and risks." [April 25 Order.]

The Court's attention is also referred to Incollingo, *supra*, in which the Court recognized the discoverability of promotional efforts of a defendant manufacturer "in order to demonstrate that the efforts were directed to an entire class or group." 282 A.2d at 221.

### C. Judge Rakoff Recognized Geographic Limitations Were Unreasonable.

Defendants previously litigated the disclosure of Adverse Event information before Judge Rakoff. (See Feb. 20, 2005 Order, Ex. F, attached hereto.) Defendants

15

sought to limit disclosure to psychiatric adverse events related to suicide. In rejecting Defendants' request to limit discovery, Judge Rakoff in dicta recognized Plaintiffs' need for disclosure of sales and marketing *efforts* without geographic limitations:

> *All* communications have the potential to be relevant since plaintiffs need not prove that their doctors relied on a specific deceptive statement . . . Defendants' sales and marketing *efforts* cannot be assessed by looking only at communications directly with plaintiffs' doctors and nearby physicians." [Id. (emphasis added).]

This Court should apply the reasoning applied by Judge Rakoff; imposing a geographic limitation on discovery of sales and marketing efforts would be unreasonable.

## CONCLUSION

For the foregoing reasons, Products Liability Plaintiffs respectfully request that the Court deny Defendants' request for a protective order limiting sales and marketing discovery to a time period before December 31, 1998.

Dated: July 25, 2005

Respectfully submitted,

*Products Liability Plaintiffs*

By: /s/ **Kenneth B. Fromson**
Kenneth L. Fromson, Esquire
Finkelstein & Partners, LLP
436 Robinson Avenue
Newburgh, NY 12550
(845) 562-0203

16