# EXHIBIT A

1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ORIGINAL

04-CV-6704(JSR)

-----------------------------

In Re Neurontin,                    :
                                    :
                                    :
-----------------------------

DATE:   February 24, 2005

TIME:   10:00 a.m.


        Deposition of HELEN DUDA-RACKI, taken

by and before JOYCE SILVER, a Certified Shorthand

Reporter and Notary Public of the State of New

York, held at the office of DAVIS, POLK &

WARDWELL, P.L.L.C, 450 Lexington Avenue, New York,

New York.

2

1

2  A P P E A R A N C E S:

3

4

5     FINKELSTEIN & PARTNERS, LLP
      436 Robinson Avenue
6     Newburgh, New York 12550
      BY: KENNETH B. FROMSON, ESQ.
7     Attorneys for Plaintiff

8     DAVIS, POLK & WARDWELL, P.L.L.C
      450 Lexington Avenue
9     New York, New York 10017
      BY:   JAMES MURRAY, ESQ.
10              And
            KATHRYN CARNEY COLE, ESQ.
11    Attorneys for Defendants, Pfizer Inc.,
      Parke-Davis, a division of Warner-Lambert
12    Company

13

14

15

16

17

18

19

20

21

22

23

24

25

69

HELEN DUDA-RACKI

1   institution.

2        Q.     Okay.  And would inquiries come from

4   employees internally within Pfizer or Parke-Davis

5   at times?

6        A.     Would you rephrase that?

7        Q.     Sure.  Was there anything preventing an

8   employee of the company calling up the medical

9   communications department and making an inquiry

10  about a drug that is sold by the company?

11       A.     No.

12       Q.     With respect to sales representatives,

13  would inquiries regarding the drug that is sold by

14  the company at times come from sales

15  representatives?

16       MR. MURRAY:  Objection.  Do you mean

17  that the sales reps themselves want the

18  information or that they were -- sorry, that's my

19  objection.

20       Q.     Do you understand the question?

21       A.     No.

22       Q.     I'll --

23       A.     Say it again.

24       Q.     Absolutely.  At times do sales

25  representatives contact the medical communication

HELEN DUDA-RACKI                          70

department with inquiries about a drug?

    A.    Yes, they do on behalf of the
physician.

    Q.    Okay. Are you familiar with the term
"medical liaison"?

    A.    Yes.

    Q.    Can you tell me what that is?

    A.    Medical liaison is a field-based
medical colleague who would answer questions on
Pfizer products. They might do presentations.

    Q.    Do the companies at times receive
medical inquiries from medical liaisons?

    A.    Yes.

    Q.    All right. Are inquiries to the
medical communications departments, are they
unsolicited?

    A.    Yes.

    Q.    And can you explain your understanding
of the term "unsolicited"?

    A.    Unsolicited means that you do not
prompt or ask the requester whether they wanted
something or not. It was of their own volition
that they asked for this data or information.

    Q.    Okay. Again, on a generic basis, a

113

HELEN DUDA-RACKI

MR. FROMSON:  I would like to get an answer to my question, though, notwithstanding your objection.

MR. MURRAY:  I think she answered it.

MR. FROMSON:  I know.  My earlier question.

Q.    Which is:  Do you expect physicians to rely upon what is told or otherwise provided to them by employees of the medical communications department?

MR. MURRAY:  And I think -- I'm going to object because I think the word "rely" is ambiguous the way you're using it.

Q.    Well, I understand from your answers what you expect consumers to do with the information, and I'll paraphrase you by saying they would go back to their physicians.

And I understand that you expect certain physicians to use their own judgment but would you agree with me that you would not want to provide faulty information to the physician?

A.    Correct.

MR. MURRAY:  All right.  To the extent that's what you're asking, then that clarifies the

114

HELEN DUDA-RACKI

1

2    ambiguity, then.

3         Q.    You would not want a physician to be

4    misinformed by the company, correct?

5         A.    Correct.

6              MR. MURRAY:  Good, I'm glad you

7    clarified that.

8         Q.    Does the company have anyway of knowing

9    whether a consumer actually shares the information

10   that you provide to him or her with his physician?

11        A.    No, we do not.

12        Q.    Does the company indicate to the

13   consumer, in this particular case the individual

14   who is using the drug, that this information you

15   are providing is for their private use only?

16             MR. MURRAY:  Objection to form.

17        A.    No, we usually don't do that.

18        Q.    In other words, do you tell the

19   individual that they should not repeat this

20   information to anyone?

21        A.    No.

22        Q.    Similarly when you give information to

23   a physician or medical professional, does the

24   company have a way of knowing whether the medical

25   professional shares the answer with other medical

150

HELEN DUDA-RACKI

1

2    The time is 1:15.  We are back on the record.

3         Q.    Earlier we were discussing the

4    company's responses being truthful, not biased and

5    complete.  Do you recall generally?

6         A.    Correct.

7         Q.    Okay.  In the event that an inquiry is

8    made as to the efficacy of a pharmaceutical, is

9    your position the same that those resources we

10   discussed earlier are the resources that are used

11   to provide that answer?

12        A.    Yes.

13        Q.    Okay.  Similarly, would it be the same

14   if there was a question as to the risks of a drug?

15        A.    Yes.

16        Q.    Are you familiar with the term

17   mechanism of action?

18        A.    Yes.

19        Q.    If a query is made to a medical

20   communications employee to explain the mechanism

21   of action of a pharmaceutical, what is the process

22   for responding to that type of inquiry?

23        A.    The same as with all the other

24   inquiries.  We refer to the package insert first.

25   If the question isn't answered in the package

151

HELEN DUDA-RACKI

1

2  insert, then we would go through standard response

3  documents. We would go through literature search

4  and so forth.

5      Q.    Can we agree that a reason to provide

6  complete and relevant information to a medical

7  professional is at least in part so the physician

8  can make an informed decision on whether to use

9  the pharmaceutical and how to prescribe it to a

10  particular patient?

11          MR. MURRAY:  Objection to form.

12      A.    Yes.  It's one piece of information

13  that they can use towards determining whether or

14  not they're going to use the product for that

15  indication.

16      Q.    Would you agree, then that --

17  withdrawn.

18          Would you agree that this one piece of

19  information should be reliable?

20      A.    Yes.

21      Q.    Would you agree, then, that if the

22  information is not reliable or is in some way

23  incorrect, that the medical professional may rely

24  at least in part on incorrect information?

25          MR. MURRAY:  Objection to form and

152

HELEN DUDA-RACKI

2  there's nothing in her testimony about any

3  responses being unreliable.

4      A.    I mean there should not be any

5  documents that are unreliable.  They're approved,

6  they're reviewed, prior to being available.

7      Q.    I guess the magic question is why is

8  that the case?  What are the consequences of not

9  providing reliable information?

10      MR. MURRAY:  Objection to form.

11      Q.    And can you answer that question as the

12  corporate representative here this afternoon?

13      A.    The consequences would be that the

14  physician doesn't have the appropriate information

15  to make his or her judgment.

16      Q.    Okay.  Are you familiar with the fact

17  that Warner-Lambert pled guilty to certain FDA

18  violations back in approximately June of 2004?

19      MR. MURRAY:  I object to the extent

20  you're going to go into great detail on this is

21  beyond the scope.  Go ahead.

22      A.    I'm familiar, but I don't know any of

23  the details.

24      Q.    Okay.  Are you aware that Pfizer, the

25  company by which you're employed, entered into

# EXHIBIT B

The most commonly observed adverse events in epilepsy studies associated with the use of gabapentin in combination with other antiepileptic drugs in patients >12 years of age, not seen at an equivalent frequency among placebo-treated patients, were somnolence, dizziness, ataxia, fatigue, and nystagmus.  In controlled clinical trials, adverse events were usually mild to moderate in intensity.[1]

The most commonly observed adverse events in postherpetic neuralgia (PHN) studies associated with the use of gabapentin in adults, not seen at an equivalent frequency among placebo-treated patients, were dizziness, somnolence, and peripheral edema.  In controlled clinical trials, adverse events were usually mild to moderate in intensity.[1]

The following table lists reports of suicide and/or related events in gabapentin clinical trials of patients with epilepsy or PHN.

**Reports of Arrhythmias and/or Related Events in Gabapentin Clinical Trials of Patients with Epilepsy or PHN**

| | Epilepsy | | | PHN | | |
| | Placebo-controlled adjunctive therapy trials in patients >12 years of age[1,2] | | In clinical trials * [1,3] | Placebo-controlled trials in adults[1,4] | | In pivotal controlled clinical trials in adults † [5] | |
| | Gabapentin (N=543) | Placebo (N=378) | Gabapentin (N=1486) | Gabapentin (N=336) | Placebo (N=227)) | Gabapentin (N=820) | Placebo (N=537) |
| Suicidal | | | 5 (0.3%) | | | | |
| Suicide Gesture | | | 2 (0.1%) | | | | |

\* These controlled and uncontrolled studies included 1486 patients with epilepsy who received gabapentin therapy.  Patients with migraine or spasticity were also included.

† These 5 double-blind, placebo-controlled, multicenter trials were conducted in patients with diabetic peripheral neuropathy, PHN, and mixed neuropathic pain.

A search of our postmarketing safety surveillance database for Neurontin revealed that we have received spontaneous reports of suicide since the market introduction of Neurontin.  Please note that accumulated case reports cannot be used to calculate incidence or estimates of drug risk for the following reasons: 1) the number of reports received may not be reflective of the actual number of cases that have occurred, 2) the actual number of patients receiving gabapentin at any time point is not known, and 3) a causal relationship between gabapentin and these cases has not been established.

A computerized search of the medical literature conducted in April 2003 regarding suicide in association with gabapentin therapy has failed to identify any relevant references.

Refs

Encl.     Neurontin (gabapentin) Package Insert. ‡

1.     Neurontin® (gabapentin) Package Insert.
2.     Data on file (41) - Pfizer Inc.
3.     Data on file (42) - Pfizer Inc.
4.     Data on file (43) - Pfizer Inc.
5.     Data on file (44) - Pfizer Inc.

## SUMMARY

- As stated in the Neurontin U.S. Package Insert, during Neurontin clinical trials in adults and adolescents with epilepsy, the adverse event terms suicidal and suicide gesture were reported as infrequent and rare, respectively. There were no reports in clinical trials in adults with neuropathic pain of various etiologies.

- In a published prospective, observational, multicenter, 2-year study of 3 poison control centers, which evaluated 20 gabapentin-only exposures (including 11 suicide attempts), found doses of 50 mg to 35 grams resulted in minor or no clinical effects.

- Case reports describing suicide attempts in which gabapentin was ingested have been published. However, no causal relationship between the use of gabapentin and the adverse events reported in these cases has been established.

- A search of our postmarketing safety surveillance database for Neurontin revealed that we have received spontaneous reports of suicide and suicide attempts since the market introduction of Neurontin.

- Pfizer Inc does not have any recommendations regarding the management of suicide gesture or suicide attempt in patients receiving gabapentin.

## U.S. CLNICAL TRIALS

The most commonly observed adverse events in epilepsy studies associated with the use of gabapentin in combination with other antiepileptic drugs in patients >12 years of age, not seen at an equivalent frequency among placebo-treated patients, were somnolence, dizziness, ataxia, fatigue, and nystagmus. In controlled clinical trials, adverse events were usually mild to moderate in intensity.[1]

The most commonly observed adverse events in postherpetic neuralgia (PHN) studies associated with the use of gabapentin in adults, not seen at an equivalent frequency among placebo-treated patients, were dizziness, somnolence, and peripheral edema. In controlled clinical trials, adverse events were usually mild to moderate in intensity.[1]

The following table lists reports of suicidal or suicide gesture in gabapentin clinical trials of patients with epilepsy or PHN.

**Table 1.  Reports of Suicidal and Suicide gesture in Gabapentin Clinical Trials of Patients with Epilepsy or PHN * [1,2]**

| COSTART dictionary term † [1] | Epilepsy | | | PHN | | | |
|---|---|---|---|---|---|---|---|
| | Placebo-controlled adjunctive therapy trials in patients >12 years of age[1,3] | | In clinical trials ‡ [1,4] | Placebo-controlled trials in adults[1,5] | | In pivotal controlled clinical trials in adults § [6] | |
| | Gabapentin (N=543) | Placebo (N=378) | Gabapentin (N=1486) | Gabapentin (N=336) | Placebo (N=227)) | Gabapentin (N=820) | Placebo (N=537) |
| Suicidal | 0 | 0 | 6 (0.40%) | 0 | 0 | 0 | 0 |
| Suicide Gesture | 0 | 0 | 2 (0.13%) | 0 | 0 | 0 | 0 |

* Neurontin has been administered to 2074 patients >12 years of age during all adjunctive therapy clinical trials in epilepsy, only some of which were placebo-controlled.  These 2074 patients have data in either the Clinical Safety or Clinical Pharmacology Safety Databases, which were subsequently used to calculate the incidence of adverse events.
† During these Neurontin premarketing trials, all adverse events were recorded by the clinical investigators using terminology of their own choosing.  To provide a meaningful estimate of the proportion of individuals having adverse events, similar types of events were grouped into a smaller number of standardized categories using modified COSTART dictionary terminology.
‡ These controlled and uncontrolled studies included 1486 patients with epilepsy who received gabapentin therapy.
§ These 5 double-blind, placebo-controlled, multicenter trials were conducted in patients with diabetic peripheral neuropathy, PHN, and mixed neuropathic pain.

## POSTMARKETING SAFETY SURVEILLANCE

A search of our postmarketing safety surveillance database for Neurontin revealed that we have received spontaneous reports of suicide and suicide attempts since the market introduction of Neurontin.  Please note that accumulated case reports cannot be used to calculate incidence or estimates of drug risk for the following reasons: 1) the number of reports received may not be reflective of the actual number of cases that have occurred, 2) the actual number of patients receiving gabapentin at any time point is not known, and 3) a causal relationship between gabapentin and these cases has not been established.

## LITERATURE REVIEW

As of October 2003, a computerized search of the medical literature has identified several references that discuss suicidality and the use of Neurontin. A review of some of these references is provided below.

### Prospective Observational Study

Klein-Schwartz et al[7] conducted a noninterventional, prospective, muliticenter collaborative study of reported gabapentin-only exposures and medical outcomes in 3 American Association of Poison Control Centers.  Between April 1, 1998 and April 1, 2000, of a total of 20 gabapentin-only cases reported, 11 (55.0%) were a result of intentional suicide attempt, 5 from therapeutic error, and 4 from unintentional general.  The estimated ingested gabapentin dose was between 50 mg and 35 g.  The duration of clinical effects (drowsiness, lethargy, dizziness, mild tachycardia with normal blood pressure, and hypotension) was under 24 hours and medical

outcomes were coded as no effect (n=8) or minor effect (n=12).  There were no patients with moderate or major effects and there were no deaths.

## Published case reports

**Table 2.  Case Reports of Suicide Attempt in Patients Receiving Gabapentin**

| Patient Description and Amount of Gabapentin Ingested | Concomitant Drugs | Symptoms and Onset | Resolution/Outcome |
|---|---|---|---|
| 61 y/o female with a history of severe COPD, Type 2 DM, hypertension, and previous suicide attempts; ingested up to 180 300 mg capsules (54 g) of gabapentin[8] | Quetipaine 200 mg, bupropion 150 mg, klonopin 1 mg, clopidogrel 75 mg, glyburide 10 mg, losartan 50 mg, metoprolol 100 mg | Several hours after gabapentin ingestion, the patient was unarousable with irregular respirations. A serum drug screen was positive qualitatively for tricyclic antidepressants. | Patient was intubated and treated with gastric lavage and activated charcoal. Starting 10-h post arrival, patient was weaned from the ventilator and extubated.  The patient made an uneventful recovery and was discharged to a psychiatric facility 4 d post ingestion. |
| 19 y/o male with a history of seizure disorder; ingested approximately 100 tablets of gabapentin 300 mg (30 g) in a suicide attempt[9] | 250 tablets of lamotrigine 100 mg | Patient was combative, tachycardic, mildly and hypertensive.  Patient developed QRS and PR prolongation. | Patient was treated with gastric lavage, activated charcoal, and serum alkalization.  Subsequent generalized seizures were controlled by benzodiazepines.  Cardiotoxicity resolved within 24 hours of serum alkalization. |
| 51 y/o male with schizoaffective disorder with a history of painful erection with trazadone; gabapentin 1500 mg in a suicide attempt[10] | Olanzapine 100 mg, paroxetine 20 mg hs | Approximately 16 h after ingestion, patient developed a painful erection after the insertion of a urethral catheter. | 2 lidocaine injections administered and an intracorporeal shunt was surgically placed with resultant detumescence. |
| 31 y/o male with epilepsy; suicidally ingested gabapentin 54 g[11] | divalproex sodium delayed release tablet 105 g | Patient was found hypotensive, bradycardic and unconscious | Patient was treated with gastric lavage, activated charcoal, thiamine, and dextrose.  Concurrent hemoperfusion and hemodialysis in series were used and hemodynamic and neurological function improved. |
| 32 y/o suicidal, epileptic male; gabapentin 91 g[12] | divalproex sodium delayed release tablet 54 g, beer, and whiskey | About 1 h after ingestion, the patient felt dizzy (light-headed), sleepy, depressed, and suicidal. | Patient was treated with IV fluids, gastric lavage, activated charcoal, and metoclopramide.  Slurred speech, dizziness, somnolence, and nystagmus resolved within 12 hours of ingestion. |

Refs.

1.    Neurontin® (gabapentin) Package Insert.
2.    Data on file (45) - Pfizer Inc.
3.    Data on file (41) - Pfizer Inc.
4.    Data on file (42) - Pfizer Inc.
5.    Data on file (43) - Pfizer Inc.
6.    Data on file (44) - Pfizer Inc.
7.    Klein-Schwartz W, Shepard JG, Gorman S, et al.  Characterization of gabapentin overdose using a poison control center case series.  *J Toxicol Clin Toxicol* 2003:41(1):11-15.
8.    Spiller HA, Dunaway MD, Cutino L.  Massive gabapentin and presumptive quetiapine overdose.  *Vet Hum Toxicol* 2002:44(4):243-244.
9.    Paopairchanakorn C, White S, Malafa MJ.  Cardiac and neurologic toxicity from lamotrigine ingestion (abstract).  *J Toxicol Clin Toxicol* 2002;40(5):620-621.
10.   Matthews SC, Dimsdale JE.  Priapism after a suicide attempt by ingestion of olanzapine and gabapentin (correspondence).  *Psychosomatics* 2001;42(3):280-281.
11.   Fernandez MC, Walter FG, Kloster JC, et al.  Hemodialysis and hemoperfusion for treatment of valproic acid and gabapentin poisoning.  *Vet Human Toxicol* 1996:38(6):438-443.
12.   Fernandez MC et al.  Gabapentin, valproic acid, and ethanol intoxication: elevated blood levels with mild clinical effects. *Clin Toxicol* 1996:34(4):437-439

**EXHIBIT C**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| IN RE NEURONTIN | Index No. 04 CV 6704 |
| | Assigned to: |
| | Hon. Jed S. Rakoff |
| | DEFENDANTS' SUPPLEMENTAL INITIAL DISCLOSURE STATEMENT |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## <u>DEFENDANTS' SUPPLEMENTAL DISCLOSURE STATEMENT</u>

PLEASE TAKE NOTICE that, pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure, Defendants Pfizer Inc., Parke-Davis, a division of Warner-Lambert Company and Warner-Lambert Company LLC, Warner-Lambert Company, and Warner Lambert Company LLC ("Defendants") amends their disclosures under Rule 26(a)(1)(A) as follows.

These responses are made subject to all objections as to competence, materiality, relevance, or other objection as to admissibility that may apply in the event that any such response, or the information contained in it, is sought to be used in court. Defendants expressly reserve all such objections.

> **Rule 26(a)(1)(A): The name and, if known, the address and telephone number of each individual likely to have discoverable information that the disclosing party may use to support its claims or defenses, unless solely for impeachment, identifying the subjects of the information.**

Discovery and investigation in this case are on-going. Therefore, based on the information reasonably available, Defendants are unable at the present time to identify each and every individual who would have discoverable information that the Defendants may use to support their claims or defenses in the case, and the subjects of such information. Defendants reserve the right to supplement these disclosures as they become aware of additional individuals who would have such information.

Subject to the foregoing and without waiver of any of Defendants' rights, the following additional individuals may have information that they may use to support their claims and defenses in this case:

**Warner-Lambert**

| | |
|---|---|
| Mi Dong | Clinical Research and Development |
| Elizabeth Garofalo | Clinical Research and Development |
| Ron Martin | Clinical Research and Development |
| Atul Pande | Clinical Research and Development |
| Mark Pierce | Clinical Research and Development |
| Charles Taylor | Clinical Research and Development |
| | |
| Myra Ballina | Drug Safety Surveillance |
| Diane Cairns | Drug Safety Surveillance |
| Rose Rogan | Drug Safety Surveillance |
| Sylvia Tomcyzk | Drug Safety Surveillance |
| | |
| Rubin Bedell | Medical Information |
| Barbara Bonetti | Medical Information |
| Charles Fraser | Medical Information |
| Matt DiGiorgi | Medical Information |
| Helen Duda-Racki | Medical Information |
| Leslie Fierro | Medical Information |
| Robert Lewis | Medical Information |
| Robert Menella | Medical Information |
| Frank Pignataro | Medical Information |

2

| | |
|---|---|
| Mike Davies | Medical Liaisons |
| Joe Dymkowski | Medical Liaisons |
| LeeAnne Fogleman | Medical Liaisons |
| Richard Grady | Medical Liaisons |
| Lisa Kellett | Medical Liaisons |
| Ken Lawlor | Medical Liaisons |
| Joe McFarland | Medical Liaisons |
| Darryl Moy | Medical Liaisons |
| | |
| Elizabeth Attias | Medical and Scientific Affairs – Medical Liaisons |
| Adrian Bal | Medical and Scientific Affairs – Medical Liaisons |
| James Black | Medical and Scientific Affairs – Medical Liaisons |
| Denise Bluhm-Heise | Medical and Scientific Affairs – Medical Liaisons |
| Jyoti Jankowski | Medical and Scientific Affairs – Medical Liaisons |
| Ken Massey | Medical and Scientific Affairs – Medical Liaisons |
| Philip Magistro | Medical and Scientific Affairs – Medical Liaisons |
| Lonia Merte | Medical and Scientific Affairs – Medical Liaisons |
| William Sigmund | Medical and Scientific Affairs – Medical Liaisons |
| | |
| Leslie Magnus-Miller | Medical and Scientific Affairs |
| | |
| Irwin Martin | Regulatory |
| James Parker | Regulatory |
| Alan Rubenstein | Regulatory |
| Janeth Turner | Regulatory |
| | |
| Tom Albright | Sales and Marketing |
| Mary Lou Aquino | Sales and Marketing |
| Diane Beskenis | Sales and Marketing |
| John Boris | Sales and Marketing |
| J. Allen Crook | Sales and Marketing |
| Victor Delimata | Sales and Marketing |
| Robert Doyle | Sales and Marketing |
| John Ford | Sales and Marketing |
| Laura Johnson | Sales and Marketing |
| Tim George | Sales and Marketing |
| Edda Guerrero | Sales and Marketing |
| John Howard | Sales and Marketing |
| John Knoop | Sales and Marketing |
| Nancy Kohler | Sales and Marketing |
| John Krukar | Sales and Marketing |
| Les Lang | Sales and Marketing |
| David Murphy | Sales and Marketing |
| Lawrence Perlow | Sales and Marketing |

3

Jacqueline Rizzo          Sales and Marketing
Doug Saltel               Sales and Marketing
Les Slater                Sales and Marketing
Michael Valentino         Sales and Marketing
John Woychick             Sales and Marketing
Brian Zorn                Sales and Marketing

## Pfizer

Gretchen Dieck            Drug Safety and Risk Management
Tina Ho                   Drug Safety and Risk Management

Carol Ceuba-Jones         Drug Safety Surveillance
Vivian Conde              Drug Safety Surveillance
Yvonne Crichton           Drug Safety Surveillance
Terry Donovan             Drug Safety Surveillance
Janice Groth              Drug Safety Surveillance
Esperanza Molina          Drug Safety Surveillance
Kashia Petchel            Drug Safety Surveillance
Angela Vales              Drug Safety Surveillance
Grazia Zurlo              Drug Safety Surveillance

Bruce Parsons             Medical
Leslie Tive               Medical
Claire Wohlhuter          Medical

Barbara Bonetti           Medical Information
Catherine Clary           Medical Information
Michelle Claussen         Medical Information
Helen Duda-Racki          Medical Information
John Rocchi               Medical Information
Julie Su                  Medical Information
Adrian Vega               Medical Information

Rudi Altevogt             Regulatory
Lucy Castro               Regulatory
Art Ciociola              Regulatory
Andrea Garrity            Regulatory
Stephen Cristo            Regulatory
Manini Patel              Regulatory

Lisa Lardieri             RMRs

4

| Suzanne Doft | Sales and Marketing |
|---|---|
| John Krayacich | Sales and Marketing |
| Andrea Zeucher Malone | Sales and Marketing |
| Avanish Mishra | Sales and Marketing |
| David Probert | Sales and Marketing |
| Meg Yoder | Sales and Marketing |

To the extent any additional discovery and investigation may provide additional facts and legal contentions that may substantially alter these disclosures, Defendants reserve the right to amend without prejudice any and all disclosures herein consistent with these developments, including product identification, identifying other relevant witnesses and additional areas of information which support Defendants' defenses in this case and identifying additional individuals with discoverable information that may be used to support their claims or defenses in this case.

Dated:    New York, New York
          May 16, 2005

DAVIS POLK & WARDWELL

By:

James P. Rouhandeh (JR-2251)
James E. Murray (JM-4006)

450 Lexington Avenue
New York, New York  10017
(212) 450-4000

5

Attorneys For Defendants Pfizer Inc.,
Parke-Davis, a division of Warner-
Lambert Company and Warner-
Lambert LLC, Warner-Lambert
Company, and Warner-Lambert
Company LLC.