## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| ) | Civil Action No. 96-11651--PBS |
| ) | |
| **UNITED STATES OF AMERICA** ) | |
| **ex rel. DAVID FRANKLIN,** ) | |
| **Plaintiff,** ) | |
| ) | AMENDED COMPLAINT |
| **v.** ) | (Filed Under Seal) |
| ) | |
| **PFIZER, INC., and PARKE-DAVIS,** ) | |
| **DIVISION OF WARNER-LAMBERT** ) | |
| **COMPANY** ) | |
| **Defendant** ) | |
| ) | |
| ) | |

### I. PARTIES

1.      Relator David Franklin is a resident of the Commonwealth of Massachusetts and a former employee of the Parke-Davis division of Warner-Lambert Company ("Parke-Davis"). David Franklin is the original source of the facts and information hereinafter set forth concerning the activities of Parke-Davis. The facts averred herein are based upon his personal observation, documents in his possession, and documents produced in discovery in this action.

2.      Defendant Pfizer, Inc. ("Pfizer") is a Delaware corporation with a principal place of business in New York, New York. Pfizer is principally engaged in the manufacture and sale of pharmaceuticals. In 2000, Pfizer acquired Warner-Lambert Company (Warner-Lambert) including Warner-Lambert's Parke-Davis division ("Parke-Davis"). As a result of the acquisition, Pfizer is responsible for all liabilities which result from any acts or omissions of Parke-Davis or Warner-Lambert which occurred prior to the Warner-Lambert acquisition.

3.    Parke-Davis was, until 2000, a division of Warner-Lambert, a corporation with a principal place of business in Morris Plains, New Jersey. At all times material hereto Parke-Davis was principally engaged in the sale and manufacture of pharmaceuticals including prescription pharmaceuticals falling under the jurisdiction and regulation of the United States Food and Drug Administration (FDA).

## II. JURISDICTION

4.    Jurisdiction is based on 31 U.S.C. §3730 and 28 U.S.C. § 1331.

5.    At all times material hereto, Parke-Davis and/or Pfizer regularly conducted substantial business within the Commonwealth of Massachusetts, maintained permanent employees and offices in Massachusetts and made and is making significant sales within Massachusetts. Accordingly, Pfizer is subject to personal jurisdiction in the Commonwealth of Massachusetts pursuant to M.G.L.c. 223A §3.

6.    Venue is appropriate in the District of Massachusetts pursuant to 28 U.S.C. §1391(b)(1) and (2).

## III. FACTS

7.    More prescription drugs are purchased through the Medicaid program than through any other insurance program in the United States. The federal government provides most of the funds used to purchase these pharmaceuticals. Not surprisingly, in order to prevent waste, fraud and abuse, the Medicaid program restricts the types and uses of drugs which may be paid for with federal funds. Additionally, federal regulations prohibit certain marketing practices which have a propensity to lead to the unnecessary and ineffective prescription of pharmaceuticals. These regulatory schemes are designed to insure that Medicaid only pays for drugs which are found to be safe and

2

effective for their prescribed uses, and to insure that physicians who prescribe such drugs do not have ulterior motives for prescribing drugs that will be purchased with federal funds.

8.      In this *qui tam* action Relator David Franklin alleges that Parke-Davis knowingly and deliberately engaged in conduct it knew would lead to the violations of federal Medicaid statutes and regulations designed to restrict Medicaid reimbursement for one of Parke-Davis' patented drugs, Neurontin. Parke-Davis did not directly provide Neurontin to the Medicaid program or issue prescriptions for the drug. Instead, Parke-Davis embarked on a course of unlawful conduct that it knew would lead to the submission by physicians and pharmacists of thousands of Medicaid claims for Neurontin when such prescriptions were not eligible for Medicaid reimbursement. Although most of the physicians and pharmacists were unaware that their Medicaid claims were ineligible for reimbursement, Parke-Davis knew its actions would inevitably cause these Medicaid providers to submit false claims to the federal government. Relator, in the name of the United States, seeks to hold Parke-Davis liable for knowingly causing these false claims to be presented to the United States for payment in violation of 31 U.S.C. § 3729.

### A.      The Regulatory Scheme That Restricts the Marketing and Reimbursement of Neurontin

9.      New pharmaceutical drugs may not be marketed in the United States until the sponsor of the pharmaceutical has proven to the Food and Drug Administration (FDA) that the drug is safe and effective for specific indications at specified dosages. The indications and dosages approved by the FDA are set forth in the drug's labeling, the content of which is also approved by the FDA. Although it is not unlawful for physicians to prescribe approved drugs for indications or at dosages different than those set forth in a drug's labeling, The Food Drug and Cosmetic Act prohibits drug companies from marketing or promoting approved drugs for uses other than those set forth in the

3

drugs' approved labeling. This regulatory scheme protects patients and consumers by insuring that drug companies do not promote drugs for uses other than those found to be safe and effective by an independent, scientific governmental body.

10.     The Medicaid program also relies on the FDA's findings regarding what uses for approved drugs are safe and effective. In 1990, Congress passed the Budget Reconciliation Act which limited reimbursement for prescription drugs to "covered outpatient drugs." Covered outpatient drugs only include drugs used for "medically accepted indications." A medically accepted indication is a use which has been approved by the FDA or one which is supported by specific compendia set forth in the Medicaid statute. Until August, 1997 none of the compendia referenced in the statute supported off-label usage of any approved drugs. Even after August 1997, off-label usage was significantly restricted.

11.     The Medicare and Medicaid anti-kickback laws, 42 U.S.C. § 1320a-7b(b) also regulate drug marketing in order to prevent overutilization of prescription medication. Under the anti-kickback laws, drug companies may not offer or pay any remuneration, in cash or kind, to induce physicians or others to order or recommend drugs which may be paid for by a federal healthcare program such as Medicare or Medicaid. These regulations not only prohibit outright bribes and rebate schemes, but prohibit any payment by a drug company to a physician which has as one of its purposes the inducing of the physician to write additional prescriptions for the company's pharmaceuticals.

12.     Concern about improper drug marketing practices increased at just about the time Parke-Davis began its marketing of Neurontin. In 1994 the Inspector General of the Department of Health and Human Services issued a Special Fraud Alert concerning prescription drug marketing

4

practices that violated the anti-kickback laws. Among the improper practices cited by the Inspector General were drug companies' payment of "research grants" to substantial prescribers of its medications; payments to physicians for "studies" of the company's products when the studies were "of questionable scientific value and require little or no actual scientific pursuit"; and payments to physicians where the physician had offered no particular services of benefit to the drug company but the payment appeared to have been based on the volume of business the doctor generated in the past, or could generate in the future, for the drug company.

13.     As described below, Parke-Davis between 1994 through at least 1998, and probably thereafter, knowingly and intentionally violated the regulatory schemes described above in their marketing of Neurontin. When it intentionally decided to employ these improper marketing practices to promote Neurontin, Parke-Davis knew or should have known that pharmacists and physicians would routinely and necessarily file false claims with the federal government when they sought federal reimbursement for Neurontin prescriptions. But for Parke-Davis' actions most, if not all, of the false claims for the prescription of Neurontin would never have been filed. Although it did not directly contract with the federal government, Parke-Davis was the indirect beneficiary of all of the false claims described herein.

### B. Parke-Davis' Deliberate Decision to Avoid FDA Approval and Market Neurontin Off-Label.

14.     In December 1993, the FDA approved Neurontin as "adjunctive therapy" for the treatment of certain types of these seizures in adult patients suffering from epilepsy. "Adjunctive therapy" meant that the drug could not be prescribed by itself for the treatment of epilepsy, but as an add-on drug in the event that a primary anti-epilepsy drug was not successful. The FDA approved labeling of Neurontin stated that the drug is only effective at 900 to 1800 mg/day.

5

15.    At the time Neurontin was approved, Park-Davis' original patent on Neurontin was set to expire in December 1998. This left Parke-Davis with only a small window of exclusivity for this drug; after the expiration of the Neurontin patent Parke-Davis would be forced to share the market for Neurontin with generic drug manufacturers, substantially reducing its profits and its ability to keep Neurontin's retail price high.

16.    At the time Parke-Davis filed its NDA (New Drug Application) with the FDA Parke-Davis intended Neurontin to be used for other indications besides epilepsy adjunctive therapy. In October 1990, Parke-Davis filed a patent for Neurontin claiming it to be effective in the treatment of depression. In November 1990, it filed another patent application for Neurontin claiming it to be effective for the treatment of neurogenerative disease. In 1995, prior to the Relator becoming an employee of Parke-Davis, additional patent applications were filed by Parke-Davis for mania and bipolar disease and for anxiety and panic. Notwithstanding the claims made in its patent applications, neither Parke-Davis nor Pfizer ever sought FDA approval for the use of Neurontin to treat the conditions described in the four patent applications referenced above.

17.    The market for the only approved use for Neurontin, adjunctive therapy for epilepsy patients, is, and was, limited. On the other hand, the market for the other uses of Neurontin contemplated by Parke-Davis–pain management, psychiatric disorders, anxiety and depression –were huge. Parke-Davis knew that if these markets could be tapped, Parke-Davis could enjoy enormous profits from Neurontin.

18.    Initially, Parke-Davis intended to file supplemental NDAs in order to expand Neurontin's approved indications, including applications for monotherapy (which would permit Neurontin to be prescribed by itself for epilepsy treatment) and for various psychiatric and

6

neurological indications. However, by 1995 Parke-Davis recognized it would be uneconomical to assume the expense and time necessary to conduct clinical trials necessary to prove that Neurontin was safe and effective for these uses. Assuming Neurontin could be proven to be safe and effective, the near term expiration of the patent meant that generic manufacturers of Neurontin would reap much of the reward of proving Neurontin could be safely used for other indications.

19.     After performing extensive economic analysis, senior officials at Parke-Davis determined that it was not sufficiently profitable for Parke-Davis to obtain FDA approval for Neurontin's alternative uses. Instead, Parke-Davis officials developed a strategy that would allow Parke-Davis to avoid the costs of proving that Neurontin was safe and effective for these other uses, while allowing Parke-Davis to compete in the lucrative off-label markets. Taking advantage of a loophole in the FDA's off-label marketing rules, Parke-Davis decided to employ a "publication strategy" that would allow it to promote Neurontin by the massive distribution of publications supposedly written by independent researchers that purportedly described the scientific evaluation of Neurontin. Another advantage of this strategy, from Parke-Davis' perspective, was that it could be employed immediately– there was no need to wait for the results of scientifically conducted clinical trials to determine if Neurontin was actually effective in the treatment of these conditions.

20.     Although federal regulations did not permit Parke-Davis to promote unapproved uses of Neurontin, Parke-Davis was permitted to distribute publications created by third parties that described results of off–labeled use of Neurontin, provided such material was only distributed in response to non-solicited requests from physicians. Parke-Davis decided to exploit this narrow exception by creating events and programs that would allow special Parke-Davis employees and

7

independent contractors under Parke-Davis' control to promote off-label usage under circumstances that would allow the company to plausibly deny that it had solicited off-label usage.

21.     Significant ingenuity and resourcefulness was necessary in order to execute this unlawful scheme without detection. Faced with the fact that its "publication strategy" required publications from independent physicians when no such publications existed, Parke-Davis hired non-physician technical writers to create articles for medical journals and then paid actual specialists to be the articles' "authors". Faced with the fact that its normal marketing force could not deliver the off label message, Parke-Davis trained its medical liaisons, technical employees who were supposed to provide balanced scientific information to doctors, to sell off-label and solicit interest in off label uses. And faced with the fact that in order for a "publication strategy" to actually increase usage of a drug, Parke-Davis required a large group of doctors interested in experimenting on patients, and an even larger group of doctors who were interested in receiving information about those experiments. Parke-Davis generated both groups by liberally distributing payments to both groups of physicians through "consultants" meetings, speakers bureaus, medical education seminars, grants, "studies", advisory boards and teleconferences. Further details of these programs are described below.

22.     Notwithstanding their knowledge that they could not promote Neurontin lawfully for non-approved uses, marketing executives at Parke-Davis' headquarters in Morris Plains, New Jersey and in its five regional customer business units (CBUs) selected a marketing strategy which would deliberately lead to increased off-label usage of Neurontin. These executives knew that Parke-Davis was not supposed to create or design the contents of the communications that would be distributed pursuant to the "publication strategy" or do anything to generate the practicing physicians' interest

8

in receiving such communications. As demonstrated below, Parke-Davis ignored these legal requirements and, instead, put into effect a pervasive pattern of illegal conduct, described below, lasting from at least 1994 through 1998, and Plaintiff believes, through 2000.

### C. Parke-Davis' Systematic Payments to Doctors for the Purpose of Increasing Neurontin Prescriptions

23. Parke-Davis' "publication strategy" required physicians (and its medical liaisons) to perform the work normally performed by the Company's salesman in order to promote Neurontin. Adoption of this strategy required Parke-Davis to make tens of thousands of payments to the physicians who would act as a surrogate sales force as well as the practicing physicians who would receive the message. In other words, adoption of the "publication strategy" required Parke-Davis to make thousands of payments to physicians for the purpose of having those doctors either recommend the prescription of Neurontin or to order Neurontin, in violation of the Medicaid kickback regulations. Parke-Davis was aware that these regulations were violated routinely. A description of the various programs Parke-Davis used to make these payments to physicians follows.

### Consultants' Meetings

24. A common ploy by Parke-Davis to funnel illegal payments to physicians to encourage them to prescribe off-label was through "consultants" meetings. Under this guise Parke-Davis recruited physicians to dinners or conferences and paid them to hear presentations about off-label uses of Neurontin. Under the fiction that these doctors were acting as consultants, Parke-Davis sometimes (but not always) had the doctors sign sham consulting agreements. At these meetings Parke-Davis would give these doctors lengthy presentations relating to Neurontin, particularly regarding off-label usage. Presentations would be made by Parke-Davis employees or physician speakers hired by Parke-Davis for the purpose of promoting Neurontin, and attendees' questions

9

relating to the administration of Neurontin use would be solicited and answered. At some conferences, the sponsoring organization or Parke-Davis intentionally posed questions to the speakers about off-label use to insure that the attendees were exposed to such information.

25.    At some, but not all, "consultants" meetings a few questions would be posed to the "consultants" regarding Parke-Davis marketing of Neurontin or how Parke-Davis sales force could provide better service to the doctors. The consultants' meetings, however, were not held (and the "consultants" were not paid) for the purpose of providing Parke-Davis with expert, independent advice. Parke-Davis in many cases did not even record the "advice" provided by its "consultants" and what advice was collected was never acted upon or reviewed. Indeed, no legitimate business would need hundreds of "consultants" to advise it on the same topic.

26.    Parke-Davis did, however, routinely analyze whether the consultants meetings were successful in getting the attendees to change their prescription writing practices. At some meetings, the "consultants" were directly asked if they would write more Neurontin as a result of the meeting. Such a question would have been irrelevant if the actual purpose of the meeting was to receive the "consultants'" advice. Parke-Davis also routinely tracked consultants' Neurontin prescription writing practices after these meetings. Using market data purchased from third parties, Parke-Davis analyzed whether the doctors they had paid had in fact written more Neurontin prescriptions after the meeting. Again, such data was only relevant if the real purpose of the payments was to influence the doctors to order more Neurontin.

27.    A typical consultants' meeting was held in Jupiter Beach, Florida for neurologists from the North East CBU during the weekend of April 19-21, 1996. The "consultants" selected for this meeting were not chosen on the basis of their consulting acumen, but because of their potential

10

to write Neurontin prescriptions. In a memorandum announcing the event to Parke-Davis personnel, the Neurontin Marketing Team acknowledged that in order to target neurologists with the greatest potential for writing Neurontin prescriptions, sales personnel must select potential attendees from a list of the top prescription writers for anti-epileptic drugs in the Northeast; only persons who fell within this desirable demographic were allowed to be invited. A copy of the Neurontin Marketing Team memorandum is attached as Exhibit 1.

28.     Qualifying physicians were given a round-trip airfare to Florida (worth $800.00), two-nights accommodations (worth $340.00), free meals and entertainment, ground transportation and a "consultant's fee" of $250.00. Ample time was provided so that the Parke-Davis consultants could enjoy the beach resort. The value of the junket was approximately $2,000.00 per physician.

29.     The Jupiter Beach consultants' meeting included two half days of presentations by Parke-Davis relating to Neurontin, including extensive presentations relating to off-label uses. Although technically the presentations were provided by an independent company, Proworx, all aspects of the presentation were designed, monitored, and approved by Parke-Davis. It selected the speakers, picked the presentation topics and previewed the content of the presentations to make sure that they were acceptable. Parke-Davis paid all expenses relating to the Consultants' meeting including all payments to the attendees and the presenters, all travel, accommodation, meals and entertainment expenses, all presentation expenses, all expenses and fees incurred by Proworx, and the substantial fees paid to the presenting physicians. Notwithstanding the FDA's prohibition regarding the provision of promotional materials on off-label uses, Parke-Davis provided written abstracts of the presentations that detailed off-label use of Neurontin to each of its "consultants."

11

30.    No effort was made to obtain professional advice at Jupiter Beach from the "consultants" Parke-Davis had wined, dined, and entertained during the weekend. A follow-up memorandum to Parke-Davis marketing officials noted that "the participants were delivered a hard hitting message about Neurontin" and emphasized that the participants were encouraged to use Neurontin at higher doses. See Exhibit 2. More importantly, after the conference Parke-Davis generated "trending worksheets" listing the doctors who attended the consultants' meeting. These worksheets enabled Parke-Davis to track Neurontin prescription habits of the attendees before and after the consultant's meetings to determine if these "high writing" prescribers wrote more Neurontin scripts after the conference. See Exhibit 3. Persuading these heavy prescribers to order more Neurontin for their patients was, in fact, the sole purpose of the Jupiter Beach junket. A list of the attendees and presenters at the Jupiter Beach Consultants' Meeting is attached as Exhibit 4.

31.    Jupiter Beach was not unique. Parke-Davis hosted dozens of consultants' meetings between late 1995 and 1997 in which the "consultants" received payments and gratuities as well as presentations on off-label Neurontin use designed to change the physicians' prescription writing habits. Comparable consultants' meetings included, but were not limited to, the following:

| Topic | Location | Dates |
| --- | --- | --- |
| Mastering Epilepsy | La Costa Resort, CA | July 20-23, 1995 |
| Mastering Epilepsy | Santa Fe, New Mexico | Nov. 16-19, 1995 |
| Neurontin Consultants Conference | Marco Island, Fla | February 2-4, 1996 |
| Pediatric Epilepsy | Hutchinson Island, Fla | February 9-11, 1996 |
| Mastering Epilepsy Science | Walt Disney World, FL | Feb. 22-25, 1996 |
| Pediatric Epilepsy | Hutchinson Island, Fla | March 8-10,1996 |
| Mastering Epilepsy | Ritz Carlton, Aspen, CO | April 18-21, 1996 |

12

| Affective Disorders in Psychiatry | Marco Island, FL | April 20, 1996 |
| Affective Disorder Consultants Conference | Southern Pines, NC | April 27, 1996 |
| Neuropathic Pain Conference | Palm Beach, FL | May 11, 1996 |
| Regional Consultants Conference | Ritz Carlton, Boston, MA | May 10-11, 1996 |
| Epilepsy Management Advisors Meeting | Sheraton Grande Torrey Pines, La Jolla, CA | June 21-23, 1996 |
| Epilepsy Management | Rancho Bernardo, CA | June 28-30, 1996 |
| Use of Anti-Convulsants in Psychiatric Disorders | Short Hills, N.J. | Oct 18-19, 1996 |
| Non-epileptic Uses of Neurontin | Longboat Key, FL | Nov. 6, 1996 |
| Neurological Conditions Conference | Ritz Carlton, Atlanta, GA | Sept. 27-28, 1997 |

Other consultants' meetings took place at Charleston, S.C., Coconut Grove, FL, Naples, FL, Memphis, TN, Louisville, KY, Washington, D.C., Aspen, CO, and other places. Hundreds, if not thousands, of physicians received kickbacks to attend these events.

32.    Not all payments to consultants were made at conferences as elaborate as Jupiter Beach. Many consultants' meetings consisted of lavish dinners at local restaurants. The emphasis on these meetings was also on off-label uses, and $200 "honorariums" were paid to the physicians who did nothing for the payment except show up. At none of the events did the consultants provide legitimate consultation to Parke-Davis, but at all of the events the "consultants" were encouraged to increase their Neurontin prescription writing.

**Medical Education Seminars**

33.    Another format where Parke-Davis paid kickbacks to physicians to hear off-label promotion of Neurontin were programs billed as Continuing Medical Education seminars (CME).

13

These conferences and seminars were set up to appear to qualify for an exception to the FDA's off-label marketing restrictions which permits physicians to learn about off-label uses of pharmaceuticals at independent seminars. Such seminars, however, must be truly independent of the drug companies. The companies may make "unrestricted grants" for the purpose of a seminar, but may not be involved in formulating the content of the presentations, picking the speakers or selecting the attendees. None of these requirements were observed with regard to the CME seminars sponsored by Parke-Davis for the promotion of off-label uses of Neurontin. While Parke-Davis retained third party organizations, such as Proworx and Medical Education Systems, to present the event seminars, it had control of virtually every aspect of these events, and the seminar companies obtained Parke-Davis' approval for all content presented at the seminars. Parke-Davis also paid all expenses, including all the seminar companies' fees.

34.    Although the seminar companies acted as the conduit for the payments and gratuities given to the physician attendees, like the Jupiter Beach consultants' meetings, Parke-Davis controlled every aspect of the CME programs. It designed and approved the programs; hand-picked the speakers for the seminars; approved the seminar presentations of the seminars; previewed, in most cases, the contents of the seminars prior to delivery; selected the attendees based on their ability and willingness to prescribe high quantities of Neurontin; evaluated the presentations to make sure Parke-Davis' "message" was appropriately delivered; black-listed presenters whose presentations were not sufficiently pro-Neurontin; and monitored the prescribing patterns of the physicians who attended these conferences to insure the purpose of the conference–increased writing of Neurontin prescriptions–was achieved. Follow-up reports to marketing executives at Parke-Davis highlighted that the attendees received presentations regarding off-label marketing and

14

recommendations for dosages larger than those labeled effective by the FDA. These memoranda also reported to senior executives the pledges made by attendees to order more Neurontin for their patients.

35.    For some seminars, high prescription writing physicians were selected to receive junkets comparable to those Parke-Davis provided to the attendees of the Jupiter Beach consultants' meetings. Others were less lavish, but physicians received free tuition, free accommodations, free meals, and cash. Frequently the Parke-Davis CME seminars were accredited by continuing medical education organizations, which meant that the physicians taking advantage of Parke-Davis' junkets did not have to pay tuition or spend additional time to fulfill their continuing medical education licensure requirements by attending truly independent medical education programs.

36.    Representative CME programs sponsored by Parke-Davis where it paid extensive kickbacks to attending physicians, included, but are not limited to, the following:

| Seminar | Location | Date |
| --- | --- | --- |
| Merritt-Putnam Epilepsy Postgraduate Course | | Jan. 19, 1996 |
| Merritt-Putnam Seminar | Chicago, IL | January 26, 1996 |
| New Frontiers in AntiEpileptic Drug Use | California | Sept-Oct 1996 |
| Diabetic Neuropathy | Ritz Carlton, Boston, MA | June 22-24, 1997 |
| Merritt Putnam Symposium | Key Biscayne, FL | September 11, 1997 |
| Merritt Putnam Conference on Monotherapy | Palm Springs, CA | September 19, 1997 |
| Merritt-Putnam Conference on Monotherapy | St. Louis, MO | October 3, 1997 |
| Merritt-Putnam Symposium | Boston, MA | December 5, 1997 |

15

**Grants and "Studies"**

37.    Parke-Davis also made outright payments, in the form of grants, to reward demonstrated Neurontin believers and advocates. Parke-Davis sales managers identified key doctors who actively prescribed Neurontin or programs which were willing to host Neurontin speakers and encouraged such persons or programs to obtain "educational grants" from Parke-Davis. Under this program of kickbacks Parke-Davis paid:

- \$2,000.00 to Berge Ninmpolan, MD, "a great Neurontin believer," to attend a neurology seminar in San Francisco, in March 1996.

- \$1,000.00 to the University of Texas at Houston Department of Neurology to host a symposium where presentations would be made regarding successful off-label treatment with Neurontin.

- \$3,000.00 to the University of Texas Medical School to host a conference in August 1996 at which a well-known specialist in epilepsy, who prescribed Neurontin, would attend.

- \$4,000.00 to pay for a neurologist from the University of Texas at San Antonio to attend the American Epilepsy Society Conference in December 1996, a conference at which Parke-Davis was presenting extensive documentation on off-label uses for Neurontin.

- \$2,500.00 to the University of Texas in Houston to bring Dr. B.J. Wilder to the campus to hold a seminar. Dr. Wilder was one of Neurontin's biggest boosters for off-label indications and had been paid tens of thousands of dollars to promote Neurontin's off-label uses for Parke-Davis across the country.

16

- $2,500.00 in June 1996 to pay for representatives from the University of Pennsylvania Medical Center to attend a conference in Saint Petersburg, Russia on the utilization of anti-epileptic drugs, including Neurontin.

- $5,000.00 to Dr. Alan B. Ettinger, of Stonybrook, N.Y. in December 1996, a physician who had informed Parke-Davis that he was interested in possibly doing research in Neurontin and maintained a database of patients who were treated with Neurontin.

- $500 to Bruce Ehrenberg, of Boston, MA, a leading speaker for Parke-Davis regarding off-label use of Neurontin, to attend a conference in China.

- $1000 to Israel Abrams, M.D., Paul C. Marshall, M.D., Beth Rosten, M.D. and Spencer G. Weig, of Worcester MA, for educational programs in February 1996. According to the local Parke Davis representative requesting the grant, "much of the Neurontin success in Worcester has been attributed to . . . the 4 pedi epileptologists below".

- $1400 to Dr. Ahmad Beydoun of Ann Arbor, MI for post-graduate training in March 1996. This grant was processed on a quick turnaround, the Parke-Davis representative noting "I realize that this is a very short time line; however, Dr. Beydoun is a very important customer".

- $1,500 to Jim McAuley, R.Ph, Ph.D. for educational materials relating to epilepsy. Parke-Davis decided to provide the funds because McAuley was an advocate of Neurontin and he was important in getting another Parke-Davis drug, Cerebyx, accepted on the formulary for Ohio State University.

17

•     A grant in an unknown amount to University Hospital in Cleveland in exchange for
      the hosting programs regarding Neurontin's use in treating neuropathic pain at
      conferences specifically devoted to obtaining referrals from other doctors.

38.     These grants, and others, were charged to the Neurontin marketing budget. Each of
these grants were made solely because an individual who would receive the money was a large
Neurontin supporter or would host a program where a well known Neurontin supporter would
recommend that other physicians increase their prescriptions of Neurontin. Each of these grant
awards constituted a reward or kickback for the recipient's advocacy of Neurontin.

39.     Parke-Davis' medical liaisons informed leading Neurontin subscribers that significant
advocacy for Neurontin would result in the payment of large grants. These studies did not involve
significant work for the physicians. Often times they required little more than collating and writing
up office notes or records. Indeed, as noted below, Parke-Davis frequently hired technical writers
to write the articles for which the "authors" had been given grants.

40.     Parke-Davis was aware that these articles and studies provided minimal scientific
benefit. In a letter to the FDA in June 1997, Parke-Davis submitted a list of "studies relating to pain,
pain syndromes, and psychiatric disorders" which failed to include any of these numerous studies,
purportedly funded by Parke-Davis. Parke-Davis intentionally neglected to report these "studies"
to the FDA because they knew the funded "research" had no scientific value and would not be
deemed to be studies by the FDA. Payments Parke-Davis made for "studies" included, but were not
limited to the following:

| Funded Project | Payee | Payment |
|---|---|---|
| Statistical Analysis of Patients Treated With Neurontin For Pain | Hans Hansen, M.D.; Statesville, NC | $7,000.00 |

18

| | | |
|---|---|---|
| Reduction of Sympathetically Medicated Pain and Sudomotor Function | David R. Longmire, M.D.; Russellville, AL | $7,000.00 |
| Data entry for Neurontin and Pain Analysis | Travis Jackson, M.D., David Meyer, M.D.; Winston-Salem, NC | |
| Trial of Neurontin for distal symmetric polyneuropathy associated with AIDS | Joseph Weissman, M.D. Atlanta, GA | $20,000.00 |
| Neurontin for neuropathic pain in chronic pain syndromes | Lavern Brett, M.D. Washington, D.C. | $25,000.00 |
| Retrospective chart analysis of Neurontin use with bipolar disorder patients | Ralph S. Rybeck, M.D. | $5,000.00 |
| Retrospective Analysis of Neurontin in the treatment of pain | David R. Longmire, M.D.; Russellville, AL | $2,000.00 |
| Retrospective Analysis of Neurontin in the treatment of chronic pain | Don Schanz, D.O. Traverse City, MI | $8,000.00 |
| Case histories relating to use of Neurontin as an adjuvant analgesic | Elizabeth J. Narcessian, M.D; W. Orange, NJ | $4,000.00 |

Plaintiff has reason to believe that other payments were made to physicians for other "studies" of questionable scientific credibility.

41.   One particularly large study conducted by Parke-Davis served as yet another engine to financially reward physicians for prescribing Neurontin.  In 1995 and 1996 Parke-Davis conducted an enormous Phase IV trial known as STEPS.  Although STEPS took the form of a research clinical trial, it was, in fact, a marketing ploy designed to induce neurologists to become comfortable prescribing Neurontin at a far higher dose than indicated in the FDA approved labeling. While most clinical studies have a limited numbers of investigators treating a number of patients qualified for the study, the STEPS protocol called for over 1,200 "investigators" to enroll only a few patients each.  The participating physicians were instructed to titrate their patients to higher than

19

labeled dosages of Neurontin to demonstrate that patients could tolerate high dosages of the drug. Rewarding physicians for prescribing high doses on Neurontin was another way to increase Neurontin sales because higher per patient dosages increased the amount of Neurontin sold. Additionally, the STEPS study was also designed to habituate physicians to place non-study patients on Neurontin on doses higher than found effective in the clinical trials monitored by the FDA.

42.    Physicians enrolling in the STEPS study were paid for agreeing to participate in the study and for every patient enrolled. At the conclusion of the study Parke-Davis offered each of the 1,200 investigators additional cash for each patient the doctor kept on Neurontin after the study ended. These payments were unquestionably kickbacks, each participating doctor was expressly paid for writing Neurontin prescriptions for their patients. The number of investigators who received such payments are too many for the Relator to list. Additionally, Parke-Davis has exclusive control of the information regarding who received such payments at the conclusion of the STEPS trial.

**Payments to "Authors" of Ghost Written Articles**

43.    Yet another method of rewarding doctors for their advocacy of Neurontin was to pay them honorarium for lending their names to scientific articles which were actually prepared and written by third parties retained by Parke-Davis. In 1996 Parke-Davis retained AMM/ADELPHI, Ltd. and Medical Education Systems, Inc., to prepare no less than twenty (20) articles for publication in various neurology and psychiatry journals. Most of these articles concerned off-label usage of Neurontin and were generated so that Parke-Davis would have completely controlled publications it could distribute pursuant to its "publication strategy". The content of these articles were actually written by non-physician technical writers retained by Parke-Davis, and Parke-Davis

20

had the right to control the content of all of the articles. Parke-Davis paid all expenses in connection with the creation of these publications.

44.     Once Parke-Davis and the technical writers conceived the articles, Parke-Davis and its outside firms attempted to find recognized Neurontin prescribers whose names could be used as the authors of these articles. In some cases, drafts of the articles were completed even before an "author" agreed to place his or her name on the article. This even occurred in connection with case histories that purported to describe the "author's" personal treatment of actual patients. The "authors" were paid an honorarium of $1,000.00 to lend their names to these articles, and also were able to claim publication credit on their curriculum vitae.

45.     After the technical writers completed their work, Parke-Davis and its outside firms found journals that would publish the articles. Parke-Davis' role in creating, approving and sponsoring the articles was hidden from the public. While the articles might reference that the author received an honorarium from the outside firm, the articles failed to state that the honorarium was paid with money provided by Parke-Davis and that Parke-Davis had approved the content and hired the actual authors. For example, an article created by Medical Education Systems (MES), *Gabapentin and Lamotrignine: Novel Treatments for Mood and Anxiety Disorders,* published in CNS Spectrums noted that "an honoraium was receieved from Medical Education Systems for preparation of this article", but never revealed Parke-Davis' retention and payment of MES or the fact that MES personnel, while under contract to Parke-Davis, wrote the article. See Exhibit 5 attached hereto.

46.     Parke-Davis used these publications as part of their "publication strategy" by presenting the articles as evidence of independent research conducted by persons with no monetary

21

interest in Neurontin. This impression, of course, was false. Parke-Davis created the article to promote off-label uses for Neurontin, purchased the names and reputations of the authors with kickbacks and controlled the content of the article. Documents identifying the twenty (20) articles and the persons who received payments for lending their names to these articles are attached as Exhibit 6.

### Speakers' Bureau

47.    Parke-Davis also formed the Speakers Bureau, another method to make large and numerous payments to physicians who recommended Neurontin at teleconferences, dinner meetings, consultants meetings, educational seminars, and other events. These speakers repeatedly gave short presentations relating to Neurontin which they were paid anywhere from $250.00 to $3,000.00 per event. Speakers such as Steven Schachter, B.J. Wilder, Ilo Leppik, Gary Mellick, David Longmire, Gregory Bergey, Michael Merren, David Treiman, Michael Sperling, Martha Morrell, R. Eugene Ramsay, John Pellock, Ahmad Beydoun, Thomas Browne, John Gates, Jeffrey Gelblum, Dennis Nitz, Robert Knobler and others received tens of thousands of dollars annually in exchange for recommending to fellow physicians that Neurontin be prescribed, particularly for off-label uses. The payments that these doctors received were far in excess of the fair value of the work they performed for Parke-Davis. Speakers who most zealously advocated Neurontin were hired most frequently for speaking events, notwithstanding the fact that many of these events purported to be independent medical education seminars where independent information was supposed to be delivered. The identity of the doctors in the speakers bureau who received kickbacks through excessive compensation can only be determined after review of the records in the exclusive custody of the Defendant. Plaintiff is aware that extensive payments through the Speakers' Bureau took

22