place between 1995 and 1997, the last year for which plaintiff has had access to records. Plaintiff is aware that off-label promotion of Neurontin pursuant to the "publication strategy" continued after 1997 and accordingly believes such kickback payments continued through 2000.

48. Parke-Davis' marketing personnel, including its medical liaison staff, informed physicians of the lucrative rewards of joining the Neurontin Speaker's Bureau. Physicians were informed that if they prescribed enough Neurontin, they, too, could also be eligible for receiving substantial payments just for describing their clinical experience to peers at events dedicated to promoting Neurontin's off-label uses. Parke-Davis marketing personnel, however, made it clear that the only way the doctors could receive such cash payments was if they prescribed substantial amounts of Neurontin to their patients, preferably for off-label uses.

49. Parke-Davis either knew that the payments described above constituted kickbacks or acted in reckless disregard of laws and regulations of which it was aware. Parke-Davis was well aware of the Medicare and Medicaid Fraud and Abuse laws, which included the Medicaid anti-kickback statute. It was further aware that the safe harbors established by the Department of Health and Human Services did not cover the extensive payments it made to doctors. Parke-Davis was aware that its payments did not comply with the AMA's guidelines for payments to physicians. It also knew that the payments had been made for the express purpose of encouraging the physicians to order Neurontin for their patients. Parke-Davis was also aware of the Inspector General's Special Fraud Alert which raised particular concerns about drug marketing. Nonetheless, Parke-Davis did nothing to curb its kickback payments to physicians, and could not have marketed Neurontin's off-label uses without such payments.

50. In 1997 in the wake of an investigation by the FDA, Parke-Davis conducted a review of its marketing practices in light of existing Medicaid kickback regulations. As a result of that review, Parke-Davis determined that none of the programs described above should have been conducted in the manner previously conducted by Parke-Davis. Parke-Davis issued guidelines to comply with Federal Regulations which essentially prohibited each of the programs described above. Nonetheless, the payments to physicians for the off-label marketing of Neurontin did not cease and the programs continued at least until 1998. Given that Parke-Davis's records demonstrate payments of inappropriate kickbacks to doctors through 1998, Plaintiff believes that such payments continued through the merger of Parke-Davis' parent, Warner-Lambert, with Defendant Pfizer, or perhaps even through the calling of a grand jury regarding Parke-Davis's marketing practices relating to Neurontin.

### D. Parke-Davis's use of Medical Liaisons to Promote Neurontin Off-Label.

51. Parke-Davis's normal sales force was not permitted to promote off-label uses of Neurontin to its physician customers. The FDA, however, permitted drug company representatives to provide balanced, truthful information regarding off-label usage if specifically requested by a physician and if there was no attempt to solicit such information by the drug company. Commencing in 1995 Parke-Davis increasingly hired medical liaisons and trained them to aggressively solicit requests for off-label information from physicians. Once this door was open, Parke-Davis trained the medical liaisons to engage in full scale promotion of Neurontin's off-label uses, including repetition of non-scientific, anecdotal information designed to convince physicians that off-label usage of Neurontin was safe and effective. In effect, Parke-Davis used the medical liaisons as a surrogate sales force who had the liberty to solicit physicians regarding off-label uses.

Indeed, medical liaisons were selected and promoted based on their ability to sell and sales training was encouraged.

52. Parke-Davis knew this use of medical liaisons was inappropriate. When he was hired by Parke-Davis in March 1996, Relator was specifically questioned about whether he had difficulty working in gray areas or bending rules. High level personnel within Parke-Davis acknowledged to Relator that the use of medical liaisons by the South Central, North Central and North East CBUs were thinly disguised methods of evading the FDA's policies on off-label promotion.

53. Similarly, on April 16, 1996, at a training session for medical liaisons Parke-Davis in-house lawyers stopped the video taping of a medical liaison training sessions to advise the liaisons that notwithstanding formal policies to the contrary, liaisons could cold call on physicians so long as they had executed request forms (forms that supposedly verified that the physician had initiated the meeting) at the end of the call. Moreover, the liaisons were informed that the request forms could be filled out by Parke-Davis sales representatives instead of the doctors. Company lawyers also informed the liaisons in training that there was no need to present balanced information to the customers, and that liaisons should always remember that sales were necessary in order to keep the company profitable. The liaisons were also informed by the lawyers, off camera, that there really was no definition of "solicitation" and that there were methods to induce the physicians to inquire about off-label uses. In effect, once the medical liaison got a meeting with a doctor, there were ways to get the information about off-label uses to the doctor even if the physician had not requested off-label information. The lawyers also warned the liaisons under no circumstances should any information about off-label uses be put in writing.

54. Medical liaisons were instructed in the clearest possible terms that they were to market and sell Neurontin based on its off-label uses. On a teleconference on May 24, 1996, John Ford, a senior marketing executive at Parke-Davis' Morris Plains headquarters directly informed the medical liaisons that in order to market Neurontin effectively, Neurontin had to be marketed for monotherapy, pain, bipolar disease, and other psychiatric uses, all of which were off-label. Ford conceded that such marketing had to be primarily performed by the medical liaisons, because they were the only one who could discuss these matters. At another meeting with the medical liaisons, Ford was even blunter:

> "I want you out there every day selling Neurontin. Look this isn't just me, it's come down from Morris Plains that Neurontin is more profitable. . . . We all know Neurontin's not growing adjunctive therapy, beside that is not where the money is. Pain management, now that's money. Monotherapy, that's money. We don't want to share these patients with everybody, we want them on Neurontin only. We want their whole drug budget, not a quarter, not half, the whole thing. . . .We can't wait for them to ask, we need to get out there and tell them up front. . . .That's where we need to be holding their hand and whispering in their ear Neurontin for pain, Neurontin for monotherapy, Neurontin for bipolar, Neurontin for everything. . . . I don't want to see a single patient coming off Neurontin until they have been up to at least 4800mg/day. I don't want to hear that safety crap either, have you tried Neurontin, every one of you should take one just to see there is nothing, it's a great drug."

55. Thus, Relator and the other medical liaisons were trained to cold call high decile physicians (those who saw the most patients in a given specialty), and sell them on the off-label benefits of Neurontin. A key aspect of this selling was misrepresentation. The first thing to be misrepresented was usually the status of the medical liaisons. With the full approval of marketing officials at Parke-Davis such as John Ford, Phil Magistro, and John Krukar, medical liaisons were routinely introduced as specialists in the specific drug they were presenting at a particular meeting. Thus, medical liaisons could be experts in anti-epileptic drugs at one moment and an hour later be

an expert in cardiac medication. Medical liaisons were also encouraged to represent themselves as medical researchers, even thought they neither conducted medical research nor analyzed medical research performed by others. It was not uncommon for medical liaisons to be introduced as physicians, even though they had no such qualifications. Sales personnel were instructed to introduce medical liaisons as scientific employees who were given momentary leave of their academic duties to make an individual presentation to the physician; the fact that the liaisons were part of Parke-Davis standard marketing detail was intentionally hidden.

56. Extensive misrepresentations were also made regarding the scientific information concerning off-label usage of Neurontin. The following misrepresentations relating to off-label usage of Neurontin were routinely made to high decile physicians in the North East and other CBUs with the knowledge and consent of persons such as Phil Magistro, John Krukar, and other marketing personnel at Parke-Davis. In 1995 and 1996 the medical liaisons were trained to make such misrepresentations. Given that medical liaisons were trained to make such statements by senior personnel, Realtor believes such conduct continued after he left the company in July 1996.

    1. *Bipolar Disorder.* Medical Liaisons informed psychiatrists that early results from clinical trials evaluating Neurontin for the treatment of bipolar disorder indicated a ninety percent (90%) response rate when Neurontin was started at 900mg/day dosage and increased to a dosage of 4800mg/day. No such results existed. Nor was any type of clinical trial being conducted other than a pilot study. There were no clinical trials or studies indicating that Neurontin was safe or effective up to 4800mg/day. Indeed, Parke-Davis was in possession at this time of clinical trial evidence which showed that there was no dose response difference between

27

patients who received 600 mg, 1200 mg and 2400 mg/day. Any data relating to the use of Neurontin in bipolar disorder was strictly anecdotal and of nominal scientific value. Indeed, most of the published reports on this topic had been written and commercially sponsored by Parke-Davis, although this fact was hidden. Medical liaisons were trained to inform psychiatrists that there were no reports of adverse effects for Neurontin when used for psychiatric purposes. In fact, such reports had been reported to Parke-Davis personnel but Parke-Davis attempted to hide such reports from physicians.

2.  *Peripheral Neuropathy, Diabetic Neuropathy, and Other Pain Syndromes.* Medical liaisons were trained and instructed to report that "leaks" from clinical trials demonstrated that Neurontin was highly effective in the treatment of various pain syndromes and that a ninety percent (90%) response rate in the treatment of pain was being reported. No such body of evidence existed. Nor was there any legitimate pool of data from which a response rate, much less a ninety percent (90%) response rate, could be calculated. Medical liaisons were trained to claim support for these findings as a result of inside information about clinical trials where no such information existed. The only support for these claims were anecdotal evidence of nominal scientific value. Many of the published case reports had been created and/or sponsored by Parke-Davis in articles which frequently hid Parke-Davis's involvement in the creation of the article. Parke-Davis's payment for the creation of these case reports was also hidden from physicians.

3. *Epilepsy Monotherapy.* Medical liaisons were strongly encouraged to push neurologists to prescribe Neurontin as the sole medication to treat epilepsy, even though studies only found it safe and effective as adjunctive therapy. Medical liaisons were trained to inform neurologists that substantial evidence supported Parke-Davis' claim that Neurontin was effective as monotherapy. In fact, at this time, Parke-Davis knew that clinical trials regarding Neurontin's efficacy as a monotherapy were inconclusive. One of Parke-Davis' clinical trials, 945-82, demonstrated that Neurontin was not an effective monotherapy agent; the vast majority of patients in the study taking Neurontin were unable to continue with Neurontin alone. The same study showed that there was no effective difference between administration of Neurontin at 600, 1200 or 2400mg. Notwithstanding this data, the company continued to claim that physicians should use Neurontin at substantially higher doses than indicated by the labeling. Indeed, although medical liaisons routinely claimed Neurontin to be effective as monotherapy, in 1997 the Food and Drug Administration refused to find Neurontin to be a safe and effective monotherapy.

4. *Reflex Sympathetic Dystrophy ("RSD").* Medical liaisons informed physicians that extensive evidence demonstrated the efficacy of Neurontin in the treatment of RSD. The only such evidence that existed was anecdotal reports of nominal scientific value. Medical liaisons were trained to refer to case reports, most of which had been created or sponsored by Parke-Davis, as "studies."

5. *Attention Deficit Disorder ("ADD")*. Medical liaisons were instructed to inform pediatricians that Neurontin was effective for the treatment of ADD. No data, other than occasional anecdotal evidence, supported this claim. Nonetheless, the medical liaisons were trained to report that large number of physicians had success treating ADD with Neurontin, when no such case reports existed.

6. *Restless Leg Syndrome ("RLS")*. RLS was another condition where Parke-Davis medical liaisons were trained to refer to a growing body of data relating to the condition, when no scientific data existed. The only reports were anecdotal, most of which had been created and/or sponsored by Parke-Davis.

7. *Trigeminal Neuralgia*. Although medical liaisons represented that Neurontin could treat Trigeminal Neuralgia, again no scientific data supported this claim with the exception of occasional anecdotal reports. No data demonstrated that Neurontin was as effective as currently available pain killers, most of which were inexpensive.

8. *Post-Herpatic Neuralgia ("PHN")*. Medical liaisons were trained to tell physicians that seventy-five percent (75%) to eighty percent (80%) of all PHN patients were successfully treated with Neurontin. Once again, no clinical trial data supported such a claim.

9. *Essential Tremor Periodic Limb Movement Disorder ("ETPLMD")*. Medical liaisons were trained to allege that Neurontin was effective in the treatment of these conditions. No scientific data supported such claims with the exception of anecdotal reports of nominal scientific value.

10. *Migraine*. Claims that Neurontin was effective in the treatment of migraine headaches were made by the medical liaisons and were supposedly based on early results from clinical trials. Although pilot studies had been suggested and undertaken, no early results of clinical trials existed to support these claims. Once again, any data relating to treatment of migraines was purely anecdotal and of nominal scientific value. Most of the case reports were either created or sponsored by Parke-Davis.

11. *Drug and Alcohol Withdrawal Seizures*. Medical liaisons suggested that Neurontin be used in the treatment of Drug and Alcohol Withdrawals despite the lack of any data supporting Neurontin as an effective treatment for these conditions.

57. The representations stated above were routinely made to high decile physicians in the North East CBU and other CBUs. Lists of high decile physicians who were targeted to hear the standard medical liaisons approaches, which included the misrepresentations identified in the preceding paragraphs, are attached as Exhibit 7. The lists attached as Exhibit 7 are not definitive or exhaustive. Relator does not know all the physicians to whom all the representations were made and could not possibly know all the names because the information is within the custody and control of Defendant. In addition to himself, Relator is aware that such misrepresentations were made to physicians by Michael Davies, Joseph McFarland, Phil Magistro, Lisa Kellett, Joseph Dymkowski, Daryl Moy, Richard Grady, Ken Lawler and others. Although Relator did not witness medical liaisons from CBUs other than the North East making such representations, because such personnel were trained with him, he believes that the CBU's medical liaisons also delivered the misrepresentations described above as part of their standard pitch on off-label uses.

58. Not all physicians on the lists attached as Exhibit 7 would have received all of the misrepresentations described above. Each specialist would have received the misrepresentations relating to his or her practice. If physician's practice focused on epilepsy, that doctor would not have received information relating to the treatment of ADD, but he or she would have received misrepresentations relating to monotherapy. Regardless of the specialty, unsupported claims of effectiveness for off-label usage was a key portion of medical liaisons presentations relating to Neurontin.

59. Misrepresentations by Parke-Davis were not limited to presentations by medical liaisons. As noted above, publications Parke-Davis distributed as part of its "publication strategy", intentionally misrepresented Parke-Davis' role in the creation and sponsorship of the publications. Physicians were led to believe that the publications were the independent, unbiased research of the authors of the articles. In fact, many of the publications distributed to physicians were created by Parke-Davis and written by third parties retained by Parke-Davis who were under Parke-Davis's control. The fact that these articles were authored by ghost writers retained by Parke-Davis was intentionally hidden, and the fact that the authors had financial ties to Parke-Davis was also intentionally undisclosed. For example, an article widely circulated by Parke-Davis concerning the use of Neurontin in the treatment of Restless Leg Syndrome asserted that the authors Gary A. Mellick and Larry B Mellick, had not and never would receive financial benefit from anyone with an interest in Neurontin, yet the Mellick brothers had received tens of thousands of dollars for acting as speakers at Parke-Davis events. This financial connection was hidden from the persons who received copies of the Mellick brothers' articles.

E. **Parke-Davis' Causation of False Claims.**

32

60. Parke-Davis knew that one quarter to one-third of all Neurontin prescriptions in the United States were paid for by the Medicaid program. Parke-Davis even targeted Medicaid patients as a growth market for Neurontin. Parke-Davis was aware that most of the high decile physicians who they so eagerly targeted, relied heavily on Medicaid for payment. This is not surprising because Parke-Davis was aware that many high volume practices contained a disproportionate share of Medicaid patients.

61. Each physician and pharmacist that participates in Medicaid must sign a provider agreement with his or her state. Although there are variations in the agreements among the states, all states require the prospective Medicaid provider to agree that he/she will comply with all Medicaid requirements, including the fraud and abuse provisions and anti-kick back provisions. Some states, such as Florida, have provider agreements that expressly provide that the submission of a Medicaid claim is an express certification that the provider has complied with all Medicaid requirements, including Medicaid anti-kickback provisions. In other states, such as Massachusetts, the Medicaid claim form itself contains a certification by the provider that the provider has complied with all aspects of the state Medicaid program, including compliance with Federal Regulations. In these states, submission of a Medicaid claim is an express certification by the provider that the services for which reimbursement are sought are eligible for Medicaid reimbursement and that the provider has complied with all Medicaid requirements, including compliance with the anti-kickback provisions.

62. Even in those states in which submission of a Medicaid claim does not constitute an express certification, the Medicaid Provider Agreement conditions participation in the Medicaid Program with compliance with all state and federal Medicaid statutes and regulations. A provider

who fails to comply with these statutes and regulations is not entitled to payment for services rendered to Medicaid patients. By submitting a claim for Medicaid reimbursement in these states, the provider implicitly certifies that the submitted claim is eligible for Medicaid reimbursement and that the provider is in compliance with all state and federal Medicaid requirements including compliance with the anti-kickback regulations.

63. To summarize, pursuant to the terms of each state's provider agreements or the claim forms used to submit claims, all pharmacists and physicians expressly or impliedly certify that the claims they have submitted are eligible for Medicaid payment and that the providers have complied with the statutes and regulations relating to Medicaid including compliance with the Medicaid anti-kickback provisions.

64. Medicaid claims for the payment of off-label Neurontin prescriptions are filed with the states by the pharmacists who fill the Medicaid patients' prescriptions. In most cases, the pharmacist will not know whether the prescription is on-label or off-label, and consequently, does not know whether the prescription is for a medically acceptable use, and consequently, a covered out-patient drug under Medicaid. Nonetheless, because such prescriptions are not eligible for Medicaid reimbursement, submission of such a claim for reimbursement constitutes a false claim for the purposes of 31 U.S.C. § 3729. A pharmacist who does not know the claim is ineligible has not knowingly submitted a false claim and is not liable to the United States pursuant to § 3729(a). However, a person who *knowingly causes* such a claim to be filed is liable for causing a false claim pursuant to § 3729.

65. Parke-Davis knew that off-label prescriptions of Neurontin were not eligible for Medicaid reimbursement. Parke-Davis' former corporate parent, Warner-Lambert, had entered into

34

Neurontin were not medically accepted uses eligible for Medicaid reimbursement, Parke-Davis knowingly and intentionally took steps to increase the number of off-label Neurontin prescriptions submitted to Medicaid. But for Parke-Davis' promotion of off-label uses, most of the ineligible claims for payment of Neurontin prescriptions would have never been filed. Every off-label Neurontin prescription caused by Parke-Davis's off-label promotion of Neurontin is a false claim caused by Parke-Davis for the purposes of 31 U.S.C. § 3729.

66. Submission of a Medicaid claim for reimbursement of a Neurontin prescription that has been induced by a kickback under the Medicaid anti-kickback provisions is also a false claim because the Medicaid program, if it was aware of the kickback, would not pay such a claim. Further, a physician who seeks payment from Medicaid for his treatment of a Medicaid patient for whom he or she has prescribed a drug as a result of his or her receipt of a kickback has also submitted a false certification. Such a physician is not in compliance with the Medicaid anti-kickback provisions, and is no longer eligible to participate in Medicaid. Had the federal or state medicaid officials known that the physician had accepted kickbacks, the physician's claim for treatment of the patient would not be paid. A physician who has accepted kickbacks and knowingly seeks payment from Medicaid for claims related to the kickback is liable for violation of the False Claims Act.

67. Additionally, the person who pays the kickback is equally liable for this type of false claim. Payment of the kickback inevitably causes the recipient Medicaid provider to submit a false certification – the payment of the kickback causes the provider's Medicaid claims to be ineligible because the provider is no longer in compliance with the anti-kickback provisions. Had the payor not paid the kickback, the provider would not have submitted ineligible claims. The person who pays the kickback is as equally responsible as the receiver of the kickback for the resulting false claim.

67. Additionally, the person who pays the kickback is equally liable for this type of false claim. Payment of the kickback inevitably causes the recipient Medicaid provider to submit a false claim – the payment of the kickback causes the provider's Medicaid claims to be ineligible because the provider is no longer in compliance with the anti-kickback provisions. Had the payor not paid the kickback, the provider would not have submitted ineligible claims. The person who pays the kickback is as equally responsible as the receiver of the kickback for the resulting false claim.

68. For the reasons set forth above, Parke-Davis knew that its payments to physicians set forth in Section III.C were kickbacks and that any of those physicians who participated in the Medicaid program would subsequently file false claims. Every Medicaid claim submitted by a physician who took a Neurontin kickback from Parke-Davis is a false claim caused by Parke-Davis for the purposes of 31 U.S.C. § 3729.

## COUNT I

### FALSE CLAIMS CAUSED BY KNOWING PROMOTION OF PRESCRIPTION SALES INELIGIBLE FOR MEDICAID REIMBURSEMENT

69. Relator repeats and re-alleges each and every allegation contained in Paragraphs 1 through 68 as if alleged herein.

70. Parke-Davis has caused the submission of hundreds of thousands of false claims by knowingly promoting to Medicaid providers sales of Neurontin for off-label uses which were not eligible for Medicaid reimbursement. Every prescription for Neurontin which was not written for medically acceptable use that was submitted to Medicaid, constitutes a false claim. Parke-Davis is liable, pursuant to 31 U.S.C. § 3729, for each of those false claims which would not have been written but for Parke-Davis' off-label promotion of Neurontin. At the time it engaged in such unlawful promotional activities, Parke-Davis knew that off-label prescriptions for Neurontin were

ineligible for Medicaid reimbursement and that its activities would, in fact cause numerous ineligible prescriptions to be submitted to Medicaid. Had Parke-Davis not engaged in such promotions, federal funds would not have been used to pay for prescriptions that were not qualified to be reimbursed by Medicaid.

71. In order to cause ineligible claims to be submitted to Medicaid, Parke-Davis engaged in a systematic and extensive course of fraudulent conduct. This conduct included deliberate disregard of FDA regulations concerning off-label promotion (and conduct designed to hide such disregard from the regulatory authorities), deliberate misrepresentations to physicians of the evidence regarding the safety and efficacy of off-label usage of Neurontin; deliberate payment of tens of thousands of kickbacks to encourage physicians to order Neurontin, and deliberate creation of publications designed to appear to be written by neutral independent researchers, when in fact such publications were created and written by Parke-Davis and its agents, and were the products of substantial undisclosed monetary compensation.

72. Relator cannot identify at this time all of the false claims which were caused by Parke-Davis's conduct. The false claims were submitted by pharmacists with whom the Relator has had no dealings and the records of the false claims are not within the Relator's control. Indeed, specification of the vast number of false claims would be burdensome to the Court and the parties. Given the vast number of false claims, their scope and complexity, Realtor is excused from the requirement of specifying each false claim. The time period of the false claims, however was from 1994 through no earlier than 1998, extending, to the best of the Relator's knowledge through the year 2000. Such claims were made across the entire United States.

73.     As a result of Parke-Davis actions, the United States has paid directly or indirectly tens of thousands of false claims and spent hundreds of millions of dollars on prescriptions for a medication that has not been proven to be safe or effective. Congress, the federal government, and the individual states never intended to make such payments and would have never made such payments but for the conduct of Parke-Davis. Although Parke-Davis did not submit the claims and did not directly receive the payments from the states and the United States, Parke-Davis has been the greatest beneficiary from this pattern of unlawful conduct, filling thousands of prescriptions for Neurontin which would have never been placed but for its unlawful conduct.

## COUNT II

### FALSE CLAIMS CAUSED BY PAYMENT OF KICKBACKS IN VIOLATION OF THE MEDICAID ANTI-KICKBACK PROVISIONS

74.     Plaintiff repeats and re-alleges each of the allegations set forth in Paragraphs 1 through 73 as though set forth herein.

75.     Parke-Davis has caused the submission of false claims in violation of 31 U.S.C. § 3729 by paying tens of thousand of kickbacks to Medicaid providers, causing the providers to falsely certify that they have complied with the anti-kickback provisions when in fact they had not. Had Parke-Davis not paid kickbacks to these physicians, the physicians would not have falsely certified expressly or implicitly, that they were in compliance with Medicaid anti-kickback provisions. Additionally, had Parke-Davis not paid kickbacks, the pharmacists submitting claims for reimbursement for Neurontin prescriptions that were induced as the result of the payment of kickbacks would not have expressly or implicitly certified that the claims were made in compliance with the rules and regulations concerning the submission of Medicaid claims.

76. Relator cannot identify at this time all of the false claims which were caused by Parke-Davis' conduct. The false claims were submitted by physicians and pharmacists with whom the Relator has had no dealings and the records of the false claims are not within the Relator's control. Indeed, specification of the vast number of false claims would be burdensome to the Court and the parties. Given the vast number of false claims, their scope and complexity, Realtor is excused from the requirement of specifying each false claim. The time period of the false claims, however was from 1994 through no earlier than 1998, and extending, to the best of the Relator's knowledge, through the year 2000. Such claims were made across the entire United States.

77. As a result of Parke-Davis' actions, the United States has paid directly or indirectly tens of thousands of false claims and spent hundreds of millions of dollars on prescriptions for a medication that has not been proven to be safe or effective. Congress, the federal government, and the individual states never intended to make such payments and would have never made such payments but for the conduct of Parke-Davis. Although Parke-Davis did not submit the claims and did not directly receive Medicaid payments from the states and the United States, Parke-Davis has been the greatest beneficiary from this pattern of unlawful conduct, filling thousands of prescriptions for Neurontin which would have never been placed but for its unlawful conduct.

WHEREFORE, the Plaintiff demands judgment on behalf of the United States, together with all costs, fees, awards, and interests permitted by 31 U.S.C. § 3730 as a result of each and every false claim caused by Parke-Davis.

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL CLAIMS.**

DAVID FRANKLIN, on behalf of
THE UNITED STATES OF AMERICA

By His Attorneys,

*/s/ Thomas M. Greene*
Thomas M. Greene, Esq., BBO # 210020
Thomas G. Hoffman, Esq., BBO # 237320
Michael A. Tabb, Esq., BBO # 491310
GREENE & HOFFMAN, P.C.
125 Summer Street, Suite 1410
Boston, MA 02110
Telephone (617) 261-0040
Facsimile (617) 261-3558