UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In re: NEURONTIN MARKETING, SALES PRACTICES AND PRODUCT LIABILITY LITIGATION | ) ) ) ) ) | MDL Docket No. 1629<br><br>Master File No. 04-10981 |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | ) ) ) ) | Judge Patti B. Saris<br>Magistrate Judge Leo T. Sorokin |

### DEFENDANTS' REPLY MEMORANDUM IN RESPONSE TO PERSONAL INJURY PLAINTIFFS' MEMORANDUM AND IN FURTHER SUPPORT OF DEFENDANTS' MOTION FOR PROTECTIVE ORDER

In prior submissions, defendants Pfizer Inc. and Warner-Lambert Company (together, "defendants") demonstrated that plaintiffs' complaints are bereft of any allegations of false or misleading statements after 1998.[1] In addition, defendants explained the implausibility of any allegation that defendants fraudulently promoted Neurontin during the six years that the government was investigating Parke-Davis's behavior and during the four years after Pfizer, which the government never implicated, acquired Warner-Lambert. Defendants also demonstrated that any attempt to justify the absence of post-1998 allegations on an alleged lack of access to evidence fails because plaintiffs have had unlimited access to their clients – the allegedly defrauded parties – and had some access to post-1998 documents from third parties. And defendants explained that under ample precedent and the recent revision to Rule 26 of the Federal Rules of Civil Procedure,

---

[1] Although plaintiffs do assert a handful of allegedly false and misleading statements prior to 1999, defendants explained in their motion to dismiss that none of those statements prior to 1998 were alleged with the specificity required by Rule 9(b) and by the heightened standard for pleading RICO claims. Those allegations are not relevant to this discovery dispute, as defendants have agreed to produce sales and marketing documents from prior to 1999.

the absence of any allegations of false or misleading statements after 1998 is fatal to the plaintiffs' demand that defendants spend millions of dollars collecting every scrap of paper relating to the sale and marketing of Neurontin after 1998.

The Sales and Marketing Plaintiffs' reply ("Reply" or "Pl. Reply") makes clear that, after multiple opportunities for briefing, the only allegations plaintiffs make relating to the period after 1998 are that meetings concerning Neurontin occurred, sales increased over time, and defendants spent money advertising Neurontin. Plaintiffs do not and cannot allege that misrepresentations were made at the post-1998 events listed in their complaints, nor can they allege that marketing dollars spent after 1998 were in support of fraudulent conduct.

The Personal Injury Plaintiffs also have not put at issue defendants' sales and marketing activities with respect to Neurontin after 1998. Moreover, by their very nature, these cases implicate only sales and marketing activities directed at the doctors who prescribed Neurontin for the plaintiffs. (Documents as to these activities are being gathered and will be produced pursuant to, among other things, Judge Rakoff's April 25, 2005 order, which plaintiffs distort.) Sales and marketing activities that had nothing to do with the decisions of these plaintiffs' doctors are irrelevant to plaintiffs' claims. For example, what may have been said to a doctor in Oklahoma has nothing to do with a New York doctor's decision to prescribe Neurontin to a New York plaintiff. Thus, the Personal Injury Plaintiffs' demand that defendants produce all documents concerning the sale and marketing of Neurontin from 1999 through 2004 obviously exceeds the boundaries of their claims.

Defendants are in the process of providing hundreds of thousands of documents relating to the safety and efficacy of Neurontin, as well as additional documents relating to the pre-1999

2

Neurontin sales and marketing activity of business units that were not at issue in <u>Franklin</u>.

Defendants also are collecting for production sales and marketing documents that are, as explained

below, specifically implicated by the claims asserted by the Personal Injury Plaintiffs.  Further,

defendants are producing safety information from various databases, including the sales database.

In short, defendants are providing the discovery that is called for by the allegations contained in the

complaints.[2]

**ARGUMENT**

**I.  RESPONSE TO SALES AND MARKETING PLAINTIFFS**

At a February hearing in these very proceedings, Judge Saris specifically left open the

question of the appropriate time frame for discovery.  Plaintiffs' effort to impute thoughts and

reactions to Judge Saris in an attempt to argue that she intended to allow discovery of sales and

marketing documents after 1998 is not only inappropriate, but pointless given her statement at that

hearing that the scope of discovery in this case was an issue that she intended to refer to the

Magistrate Judge assigned to the MDL.  Judge Saris's ruling on the scope of discovery in the

<u>Franklin</u> case supports defendants' position, because – contrary to plaintiffs' assertions in their

Reply – plaintiffs allege post-1998 fraud only "upon information and belief," as they did in the

<u>Franklin</u> case for the period after 1998.  Finally, despite plaintiffs' suggestion that defendants are

conflating the standards for a Rule 9(b) motion and a discovery dispute, defendants do not argue

---

[2] Plaintiffs include an odd *non sequitur* in their Reply: "Suspiciously, Defendants have not applied their unilateral time restriction to documents that might assist their defense: such as documents that might support a claim of efficacy for an off-label use." (Pl. Reply at 8.)  Defendants have previously explained that they recognize the obvious proposition that information relating to safety and efficacy is relevant no matter when it was developed.  While defendants are pleased to learn that plaintiffs seem to feel that all such information will actually support defendants' case, in reality information relating to efficacy is of critical importance to plaintiffs, as some of them acknowledged at the July 14, 2005 hearing on defendants' motions to dismiss that plaintiffs need to plead and prove that Neurontin was not effective for each of the off-label uses at issue in this case.

3

that plaintiffs' discovery is limited by Rule 9(b). Were that the case, defendants would refuse to give plaintiffs any discovery, as plaintiffs have failed to satisfy the requirements of Rule 9(b) for the pre-1998 time period. In other words, defendants are providing discovery for the time period in which plaintiffs have alleged fraud, even though those allegations are legally insufficient, as set forth in the motion to dismiss.

## A.    Plaintiffs Distort Judge Saris's Rulings In This Action

Plaintiffs argue that defendants requested a discovery stay in these actions pending resolution of the motions to dismiss and that this request was denied by the Court. (Pl. Reply at 3.) Plaintiffs need to check their facts. At no point did defendants request a stay of discovery until resolution of the motion to dismiss. As evidenced by the transcript for the hearing held before Judge Saris on February 24, 2005, as well as the schedule defendants proposed in their Case Management Order No. 2, defendants requested only that the parties' initial disclosures not be due until the close of the briefing period for the motions to dismiss. The purpose of this request was to allow the parties to focus on briefing before moving to discovery, and this was not a request to stay discovery until a decision was reached on that motion. Moreover, Judge Saris did not deny this request. Instead, she entered the proposed discovery schedule requested by defendants, with one exception: she allowed service of discovery requests and deposition notices to go forward, but provided that initial disclosures and the actual commencement of depositions and production of documents not go forward until May 17, 2005, the day after the final brief on the motions to dismiss was due. (See 2/24/05 Transcript at 9-10; Docket Entry # 47.)

Beyond the fact that plaintiffs have mischaracterized defendants' position relating to the

commencement of discovery, as well as created a mythical denial by Judge Saris of defendants' non-existent request, plaintiffs continue a disturbing trend of attempting to use mental telepathy to determine what was in Judge Saris's mind when she issued certain rulings. Plaintiffs try to infer from the non-existent denial of a non-existent motion that Judge Saris has already ruled that six additional years of discovery should be provided, and that this entire discovery dispute is simply defendants' attempt to ignore the Court's order and impose their own discovery stay. (Pl. Reply at 3 and 3 n.3.)

Plaintiffs' attempt to guess what Judge Saris might have been thinking is a particular waste of effort given what Judge Saris actually said on this issue at the February 24, 2005 conference. At that conference, plaintiffs reminded Judge Saris that she had limited discovery in the <u>Franklin</u> case to the period 1994 through 1998 and to the Northeast Customer Business Unit ("CBU") and headquarters, and pointed out that the MDL consists of a national class action. (2/24/05 Transcript at 42.) Plaintiffs then informed the Court that they "alleged in the complaint that this conduct has continued beyond '98, beyond the merger date with Pfizer, which was June 2000. We allege it right up to the date of the global settlement in May of 2004. So the geographic scope that we're going to be looking for in this case is nationwide, all the CDUs [sic], and the time period is up to and including May of 2004." (<u>Id</u>.) In response, the Court stated:

> I'm hoping you put in your document requests right away, you [defendants] put in your oppositions, and then I can get it to a magistrate judge to resolve this stuff right away.

(<u>Id</u>. at 42-43.) It is clear, therefore, despite plaintiffs' attempt at mind-reading, that the Court anticipated that this discovery dispute would arise and she certainly did not prejudge it in the way that plaintiffs are suggesting.

Plaintiffs' argument that "Defendants' refusal to produce post 1998 documents has had the effect of a discovery stay" also makes no sense.  (Pl. Reply at 3 n.1.)  First, the accusation is illogical, as defendants were the first party to raise this issue by filing their Motion for a Protective Order, rather than waiting for plaintiffs to file a motion to compel.  Defendants wanted to secure an expedient resolution to this matter, as Judge Saris suggested.  Second, there has been no effective "stay" of discovery.  Defendants have produced hundreds of thousands of documents relating to safety and efficacy, hundreds of thousands of pages relating to sales and marketing conduct prior to December 31, 1998, and voluminous databases.  Defendants have also agreed to make available over 700 boxes of clinical trial data.

**B.    Plaintiffs Distort Judge Saris's Ruling in the <u>Franklin</u> Case**

Plaintiffs try to make much of Judge Saris's ruling regarding Rule 9(b) in <u>Franklin</u> (<u>see</u> Pl. Reply at 5), but fail to acknowledge that that case involved different claims under a different statute than those at issue here.  The alleged fraud in the <u>Franklin</u> case involved an alleged attempt to obtain Medicaid reimbursement for supposedly ineligible uses.  In fact, the theory of that case was described in the <u>Franklin</u> Amended Complaint (attached to Pl. Reply as Ex. A to Affidavit of Thomas Greene) as follows:  "In this *qui tam* action Relator David Franklin alleges that Parke-Davis knowingly and deliberately engaged in conduct it knew would lead to the violations of federal Medicaid statutes and regulations designed to restrict Medicaid reimbursement for one of Parke-Davis' patented drugs, Neurontin."  (Franklin Amended Complaint ¶ 8.)  In addition, the key Rule 9(b) issue in <u>Franklin</u> was whether Relator had to identify every false claim that was submitted to the government.  Here, defendants are not arguing that plaintiffs must identify every alleged false and misleading statement after 1998.  The fact remains that plaintiffs have alleged

6

none.

Also crucial to Judge Saris's ruling in <u>Franklin</u> was the conclusion that the strict requirements of Rule 9(b) should be relaxed in that case because the facts underlying the claims were "peculiarly within the defendants' control." (Pl. Reply at 5, quoting <u>Franklin I</u>, 147 F. Supp. 2d at 47 (internal citations omitted).) That is not the case here. Information concerning whether false statements were made to plaintiffs or their physicians is not within the sole control or knowledge of defendants. Indeed, in order to satisfy their Rule 11 obligations, counsel for the individual plaintiffs should have spoken with plaintiffs' physicians to determine whether those physicians were misled, and counsel for the entity plaintiffs should have spoken with their clients to determine if prescriptions were reimbursed as a result of false statements to those plaintiffs or to the doctors who treated their beneficiaries or participants. Plaintiffs should therefore be able to allege that misleading statements were made by speaking to their own clients if, in fact, such statements were made.

Moreover, plaintiffs have had many years since the <u>Franklin</u> case was brought in which to investigate their claims. Considering the nature of the alleged misconduct, in these years plaintiffs surely could have located an article published after 1998 that contains one of the supposed misstatements of which they complain, or talked to a single doctor who claims to have been misled by the company after 1998, or spoken to a single attendee of one of the events plaintiffs list in their complaints.[3]

---

[3] Plaintiffs' description of Judge Saris' ruling on summary judgment in <u>Franklin</u> is also inaccurate. Mr. Greene in his affidavit states that he reviewed post-1998 documents that were similar to pre-1999 events "which were the basis of our evidence that false claims had been submitted to the United States as a result of Parke-Davis causing false and misleading statements to be made to Medicaid providers. Judge Saris, of course, found that we had presented sufficient evidence of such conduct to withstand defendants' motion for summary judgment." (Greene Affidavit ¶ 9.) Because Judge Saris ruled that plaintiffs need only prove the existence of ineligible claims (i.e. false claims), she never

7

**C.**     **Plaintiffs' Post-1998 Allegations Are as Weak as**
          **Those in <u>Franklin</u> for Which Judge Saris Denied Discovery**

Judge Saris rejected Franklin's attempt to extend discovery beyond 1998 based on allegations that are substantively the same as those here, which are woefully inadequate. Plaintiffs acknowledge that Judge Saris's refusal to extend discovery in <u>Franklin</u> to the year 2000 was based on the fact that the allegations after 1998 in <u>Franklin</u> were "tentative and based on 'information and belief.'" (Pl. Reply at 7.) Plaintiffs seek to distinguish that ruling from these actions by stating that their complaints here allege *as fact* that "the conduct and patterns of conduct" continued to occur after 1998, and that accordingly they are entitled to discovery through 2004. Plaintiffs both provide too little and presume too much.

Plaintiffs' statements that their "allegations state without qualification, doubt or hedging that the misconduct that is the core of the Plaintiffs' Complaints occurred through 2004" and that "the scope allegations identified above are not qualified as statements of belief" (Pl. Reply at 7) are highly disingenuous. A review of the two complaints demonstrates that every allegation that similar statements were made before and after the end of 1998 was made "on information and belief." For example:

- *Upon information and belief*, similar statements were made at all events presented by the Off-Label Promotion Enterprise that discussed Neurontin's use for pain indications. Class Comp. ¶ 129. <u>See</u> <u>also</u> Coord. Comp. ¶ 102.

- *Upon information and belief*, review of recent verbatim reports will demonstrate that similar statements were regularly made by the defendants' sales forces from 1999 through 2004. Class Comp. ¶ 134. <u>See</u> <u>also</u> Coord. Comp. ¶ 106.

---

addressed whether the Relator had come forward with any evidence of false and misleading statements to Medicaid providers. <u>Franklin II</u>, 2003 WL 22048255.

- *Upon information and belief,* similar statements were made at all events presented by the Off-Label Promotion Enterprise that discussed Neurontin's use as a treatment for diabetic peripheral neuropathy. Class Comp.¶ 135. See also Coord. Comp. ¶ 107.

- *Upon information and belief,* at each of these events participating physicians expressly stated or implied that Neurontin was effective for the treatment of social phobia. Class Comp. ¶ 157. See also Coord. Comp. ¶ 126.

Accordingly, plaintiffs continue – just as they did in the Franklin case – to allege the existence of misconduct after 1998 in wholly conclusory fashion and upon information and belief. In light of the foregoing, as well as plaintiffs' own acknowledgment that such allegations are "tentative," the allegations do not justify broad discovery in this case.

Plaintiffs cite to two allegations relating to the period after 1998 that plaintiffs claim were not based on information and belief. The first is the allegation that "events" (or meetings) occurred after 1998. (Pl. Reply at 7.) There is no allegation, however, that false and misleading statements were made at such meetings. The second is the vague assertion that the "conduct and patterns of conduct alleged herein occurred and continued to occur after the consummation of the merger between Pfizer, Inc. and Warner-Lambert Co. in June 2000." (Pl. Reply at 7.) Plaintiffs do not plead any facts to support this conclusory assertion. Instead, their Reply purports to find support for this allegation in the Greene Affidavit, which discusses a review of certain third-party documents during the pendency of the Franklin litigation. (Pl. Reply at 7-8.) Plaintiffs state that these documents demonstrate that there were dozens of events held by vendors between 1999 and 2002 or 2003. (Id. at 8.)

As an initial matter, the fact that educational events continued after the merger is irrelevant. Without the ability to point to a single false or misleading statement that was made at one of these post-1998 meetings, plaintiffs have alleged nothing more than that Pfizer held meetings related to

Neurontin.

The Greene Affidavit does not overcome this weakness. Plaintiffs assert that Mr. Greene's review of documents in the Franklin case allowed them to state as fact in this case what was only tentatively stated in Franklin. (Pl. Reply at 8.) Apparently, however, there was no evidence of false or misleading statements of any kind contained within the documents Relator's counsel reviewed, given that plaintiffs were unable to identify a single such statement in their complaints and instead simply listed the dates and locations of certain meetings that took place after 1998.

In fact, great care appears to have been taken in wording the Greene Affidavit so as to *avoid* stating that Relator's counsel actually learned of false or misleading statements in any of the documents reviewed on any trip to the U.S. Attorney's Office. Despite the careful drafting within the affidavit, plaintiffs' reply memorandum states that "Relators' attorneys did view transcripts of off-label events that indicated that misleading information regarding Neurontin was provided." (Pl. Reply at 8 n.4.) Mr. Greene's affidavit says no such thing. Not once in paragraphs 9 or 10 or anywhere else in that affidavit does he state under penalty of perjury that those post-1998 documents contained evidence of false or misleading statements.

**D.      Defendants' Budget Does Not
         Demonstrate Fraudulent Conduct**

After weeks of briefing on this issue, the most plaintiffs are able to come up with relating to post-1998 conduct appears to be that a lot of Neurontin was sold and a lot of meetings about Neurontin were held. To these allegations, plaintiffs have added the not-so-startling fact that defendants spent money on meetings. (Pl. Reply at 8.) Line items on financial statements, however, are no substitute for allegations of fraud. The argument that fraud can be inferred from

dollar amounts of spending on advertising and/or promotion is no better than the claim that fraud can be inferred from an increase in sales over time.

Plaintiffs dedicate over three pages of their brief to the implications and inferences to be drawn from a single line item in a year's profit and loss statement relating to Neurontin. They calculate percentages, concoct ratios, and extrapolate from these numbers, all in order to argue that, because defendants sponsored medical education seminars, plaintiffs have alleged fraud after 1998. This is not a proper inference. The fact that a company sponsors a medical education seminar does not mean that fraud occurred.[4]

### E.    Rule 26(b) Supports the Discovery Cut-Off Date of December 31, 1998

The Reply also argues that the 2000 Amendments to Rule 26(b) actually "confirm" plaintiffs' entitlement to "the post 1998 discovery that they seek." Backtracking on their contention that the 2000 Amendments effected no change in the law, plaintiffs now say that even under the new rule, they are entitled to the mass of materials they seek. Plaintiffs, however, fail to cite to a single case that supports their claim – which the reader is apparently meant to take on faith – that the 2000 amendments to Rule 26(b) confirm that plaintiffs are entitled to the post-1998 discovery that they seek. (Pl. Reply at 12.) The 2000 amendments to Rule 26 were meant to narrow the scope of discovery and prevent abusive discovery tactics. (See Def. Mem. In Support of Motion for Prot. Order, , Docket # 162, at 13-15; Def. Opp. to Pl. Motion to Compel, Docket # 184 at 13-14.) They apply here because plaintiffs are not seeking discovery to support their claims in this case. Those claims allege fraud in the period prior to 1999.

---

[4] Nor does plaintiffs' comparison between the sizes of the research and development expenditures and that of the advertising expenditures (Pl. Reply at 11), add anything to this discovery dispute. Defendants' cost mix is not at issue in this case. Plaintiffs completely ignore the research and development costs incurred prior to approval by the FDA.

Plaintiffs also argue that the five factors under Rule 26(b)(2)(iii) support their request for sales and marketing documents from the period after 1998. Defendants obviously disagree with plaintiffs' "spin" on these factors, which in fact support defendants' position:

- **The needs of the case:** Plaintiffs have failed to establish the need for discovery relating to sales and marketing after 1998, because they have failed to allege that fraud occurred after 1998.

- **The amount in controversy:** Defendants disagree that the Rules of Civil Procedure seek to reward plaintiffs for concocting extravagant claims of damages.

- **The parties' resources:** Plaintiffs rather cavalierly argue that Pfizer can bear the burden associated with their discovery demands, completely discounting the fact that such discovery is not only time consuming, but is extremely disruptive to the business. Moreover, this factor considers the resources of *all* parties. Plaintiffs represent some of the largest insurers in the country. If plaintiffs feel that the burden related to producing discovery from the period 1999 – 2004 is "not particularly onerous" (Pl. Reply at 14), then plaintiffs should have offered to assume the costs of such production, which exceed $10 million.

- **The importance of the issues at stake in the litigation:** Defendants do not disagree that there are important issues at stake in this litigation, but this factor is not meant to assume the plaintiffs' point of view of the case.

- **The importance of the proposed discovery in resolving the issues:** Post-1998 discovery is only important if plaintiffs have alleged fraud in the complaints. Because they have not and cannot allege such fraud, discovery into the post-1998 sales and marketing practices is not important.

In conclusion, the Sales and Marketing Plaintiffs, after drafting two complaints, two briefs in connection with defendants' motion to dismiss, and two briefs in connection with this discovery dispute, still fail to come forward with any allegations that would justify the massive burden of producing sales and marketing documents from after 1998.

## II. RESPONSE TO PERSONAL INJURY PLAINTIFFS

**A.    Personal Injury Plaintiffs Have Not Pled
Allegations of Fraud or Misleading Statements After 1998**

Personal Injury Plaintiffs try to support their argument that they have pled fraud in the

post-1998 period by pointing to eight complaints recently filed in the Southern District of New

York that are not yet a part of this proceeding.  (Personal Injury Plaintiffs' Memorandum in

Opposition to Defendants' Motion for a Protective Order Concerning the Scope of Discovery

("Personal Injury Plaintiffs' Memo") at 12-13.)  As an initial matter, this argument is an implicit

admission that there are no allegations of fraud after 1998 in any of the complaints before this

Court.  Even assuming that the eight complaints were before this Court, however, the allegations

contained therein regarding FDA warning letters in 2001 and 2002 do not warrant broad discovery

of sales and marketing documents from the post-1998 era.  (Id. at 13.)  The warning letters are

neither evidence of -- nor can they provide a good faith basis for alleging -- the type of conduct

alleged in the complaints for the pre-1999 period.  Further, the letters merit the type of targeted

discovery that defendants have been imploring plaintiffs to utilize, as opposed to the

breathtakingly broad discovery requests that have forced defendants to seek the instant protective

order.  In fact, defendants have already agreed to produce the files that contain the warning letters

and the defendants' responses.

**B.    Defendants Have Already Agreed to Provide the
Relevant Safety and Efficacy Information
Contained in Sales and Marketing Materials**

Plaintiffs argue that they need sales and marketing materials from the post-1998 period in

order to pursue their claims because these materials contain safety and efficacy information.

(Personal Injury Plaintiffs' Memo at 2-3.) This argument is moot. Defendants have already agreed to produce safety and efficacy information, including safety and efficacy information contained in the sales databases described by plaintiffs. The Personal Injury Plaintiffs either have or will be getting the safety and efficacy materials they seek.

In a similar attempt to justify their request for extraordinary additional discovery, plaintiffs contend that they need sales and marketing materials after 1998 in order to procure data on all Neurontin samples provided to physicians by defendants' salespeople in order to perform their own risk calculations. (Personal Injury Plaintiffs' Memo at 4.) This need can be satisfied by the production of documents sufficient to show the total samples of Neurontin provided. It does not justify the broad discovery of all sales and marketing information.

Personal Injury Plaintiffs also contend that because defendants addressed the issue of suicidality in documents that are used to respond to inquiries from doctors about Neurontin, plaintiffs should be entitled to the production of sales and marketing materials from the post-1998 period. (Id. at 7-9.) This argument too is moot. Defendants have agreed to produce these communications with doctors regarding suicidality which are contained in the databases that defendants have already produced or intend to produce. Moreover, as demonstrated by Personal Injury Plaintiffs' usage of quotes from such documents, they already have many if not all of these documents. (Id. at 8.)[5]

---

[5] Personal Injury Plaintiffs also suggest that because defendants provided the names of six employees with sales and marketing positions that span the post-1998 period in their Rule 26(a) disclosure they have assented to producing sales and marketing materials from after 1998. (Id. at 9.) Defendants included the sales and marketing employees' names in their Rule 26(a) disclosure because they may have discoverable information for the pre-1999 period or other discoverable information to which defendants have not objected to producing – not because they may have sales and marketing materials for the post-1999 period. Discovery from these individuals is subject to defendants' objections, notably defendants' time and geographic scope objections.

C.    **The Learned Intermediary Defense Does Not
      Entitle Plaintiffs to Unlimited Post-1998 Discovery**

The Personal Injury Plaintiffs contend that they are entitled to all of defendants' sales and

marketing documents, even if unconnected with the claims actually pled, in order to rebut

defendants' learned intermediary defense.  They assert that the defense would fail were they to

establish "overpromotion" of Neurontin and that they need all of the sales and marketing

documents to explore the possibility of overpromotion.  Plaintiffs are incorrect.

As an initial matter, these plaintiffs do not even allege overpromotion, which is not to be

confused with off-label promotion.  Moreover, the plaintiffs' argument is based on case law that is

not only dated and unpersuasive, see In re Meridia Products Liability Litigation, 328 F.Supp.2d

791, 814 (N.D. Ohio 2004) (noting that the Whitley case, decided in 1974, is "so stale that [its]

legitimacy as legal authority is questionable"), but also tends to support the tailored approach

defendants propose, under which the scope of discovery would be focused on sales and marketing

efforts directed to the individual plaintiffs' prescribing physicians.  See, e.g., Salmon v. Parke,

David and Co., 520 F.2d 1359, 1363 (4th Cir. 1975) ("though the evidence is slight," a form of

overpromotion could be inferred where the plaintiff's physician received a calendar advertising a

potent, broad-spectrum antibiotic that did not contain a printed warning about the drug on the

calendar); Whitley v. Cubberly, 24 N.C.App. 204, 207-08, 210 S.E.2d 289, 292 (1974) (since

plaintiff must establish that defendant's alleged negligence was the proximate cause of the harm,

the alleged overpromotion must have induced "in this case Dr. Cubberly in particular, to fail

adequately to heed the warnings given"); see also Motus v. Pfizer, Inc., 196 F. Supp. 2d 984, 999

(C.D. Calif. 2001) (it is significant that evidence failed to show that prescribing physician relied on

15

the alleged overpromotion of the drug).

**D.    Judge Rakoff's April 25, 2005 Order Applies Only to the Production of Databases, Not to All Sales and Marketing Documents**

Personal Injury Plaintiffs imply that Judge Rakoff's April 25, 2005 Order applies to all documents, not just to databases. (Personal Injury Plaintiffs' Memo at 10.) This strained reading of Judge Rakoff's Order is wrong. The April 25 Order specifically provides that it addresses only the production of certain "*databases* related to defendants' sales and marketing efforts and communications with doctors," and not, as plaintiff argues, *all* of defendants' documents concerning their marketing efforts for Neurontin. (See Poate Aff., Ex. H (April 25, 2005 Order) at 1 (emphasis added).) Judge Rakoff's silence as to plaintiffs' request for non-database sales and marketing documents speaks volumes. The only conclusion that can be drawn from the absence of any ruling as to documents is that Judge Rakoff either denied the request or simply failed to rule on it. Either way, no reasonable reading of the April 25 Order would lead one to conclude that Judge Rakoff – through his silence – ordered defendants to produce all non-database sales and marketing documents.

In addition, Personal Injury Plaintiffs erroneously contend that "[w]hether discoverable information is in database or traditional document format should be of no moment to the Court." (Personal Injury Plaintiffs' Memo at 10.) This is also wrong as a legal matter. The burden that defendants will have to bear from having to produce documents for an additional six years bears no relation to the burden of producing information from a database. (See Docket # 162, at 9-11.) There are limits on discovery, and the burden that plaintiffs' request would impose on defendants runs afoul of those limits. See Gill v. Gulfstream Park Racing Ass'n, 399 F.3d 391, 400 & n.5 (1st

16

Cir. 2005) (emphasizing the need for active judicial use of Rule 26(b)(2) to control excessive

discovery and reiterating that discovery should be limited if "the burden or expense of the proposed

discovery outweighs its likely benefit"); see also In re Microcrystalline Cellulose Antitrust

Litigation, 221 F.R.D. 428, 430 (E.D. Pa. 2004) (limiting temporal scope of discovery demanded

by plaintiffs because requiring defendants to produce materials from several years after the

relevant time period would provide minimal benefit to plaintiffs while imposing a significant

burden on defendants).

**E.      Laura Kibbe's Declaration Accurately Portrays the Burden
         That Defendants Would Suffer Should They Have to
         Produce Sales and Marketing Documents from Post-1998**

Personal Injury Plaintiffs submit an affidavit by Keith Altman, a consultant employed by

plaintiffs' counsel, in an attempt to discredit defendants' argument that the production of an

additional six years of sales and marketing material will impose a large drain on their resources and

will considerably slow the pace of discovery. Specifically, Mr. Altman questions the Declaration

of Laura Kibbe – an employee of Pfizer with personal knowledge of Pfizer's systems and discovery

efforts – which addresses the burden of gathering, reviewing, and producing six more years of sales

and marketing documents. Mr. Altman's attacks on Ms. Kibbe's Declaration are unfounded and

flawed.

Mr. Altman has no basis for judging the accuracy of Ms. Kibbe's declaration. Mr. Altman

has never worked for Pfizer and for him to attest to how document collection, review and

production occurs at Pfizer is inappropriate. Ms. Kibbe's estimates are based on her personal

knowledge and experience in managing and coordinating large scale document productions for

Pfizer and its predecessor companies. (See Declaration of Laura Kibbe ("Kibbe Decl."), dated June 17, 2005, ¶ 2, attached hereto as Exhibit A.)[6]

Personal Injury Plaintiffs contend that Ms. Kibbe over-estimates the number of custodians from whom documents would need to be collected because it is inconsistent with defendants' Rule 26 disclosure. (See Personal Injury Plaintiffs' Memo at 11.) There is no inconsistency. The Rule 26 disclosure is defendants' estimate of who may have discoverable information that defendants may use to support their defenses. Whereas Ms. Kibbe's estimate of over 100 custodians (not including sales personnel in the field), on the other hand, takes into consideration plaintiffs' expansive request for all post-1998 sales and marketing documents. Further, Ms. Kibbe's estimate that there will be 10 million pages of reviewable information from the custodians' electronic data is based on historical Pfizer collection efforts that encompass far more litigations than the two Mr. Altman was apparently involved in with Pfizer.

Mr. Altman also attempts to discredit Ms. Kibbe's estimates for this case by citing data from other cases he has worked on involving Pfizer. In the Provera litigation, as the collection is complete, the actual size of the average custodians' non-system files is far less than what is expected in this litigation. This number reflects the fact that unlike Neurontin, Provera has not been actively promoted for years. (See Second Declaration of Laura Kibbe, dated July 28, 2005,

---

[6] As to Personal Injury Plaintiffs' demand that defendants "identify with particularity the approximate pages that correspond to particular custodians" (Personal Injury Plaintiffs' Memo at 11), the effort that defendants would have to undertake to satisfy this demand is part of the reason why defendants have maintained that the production of the post-1998 sales and marketing documents from the relevant custodians is unduly burdensome. As Ms. Kibbe stated in her Declaration, it would take hundreds of hours just to collect his material, and almost 10 months for 40 temporary workers reviewing documents full time to complete the initial review. (Kibbe Decl. ¶ 5.) This request is an obvious ploy to get defendants to perform a substantial amount of the work that would be necessary to produce the documents so that plaintiffs can argue later that any remaining burden to complete the task would not be undue.

("Kibbe Decl. II") ¶ 5, attached as Exhibit B.)   In fact, many custodians in that case had virtually no responsive documents.  (<u>Id.</u>)

Regarding the Rezulin litigation from 2000, that was an entirely different situation than what defendants face here.  The volume of information for that product was far less than what one would expect to find for sales and marketing of Neurontin after 1998 because Rezulin was only on the market for three years (March 1997 through March 2000).  (<u>Id.</u> ¶ 6.)  In addition, with advances in technology, electronic document collection efforts in 2005 are more complex and costly – and yield far greater volumes of electronic documents – than electronic document collection efforts as recently as 2000, when the Rezulin collection was conducted.  (<u>Id.</u>)

<b><u>CONCLUSION</u></b>

For the foregoing reasons, and the reasons previously stated, defendants respectfully request that the Court deny plaintiffs' motion to compel and enter a protective order that plaintiffs are not entitled to discovery concerning the sales and marketing of Neurontin after 1998.

Dated: July 29, 2005

PFIZER INC., et uno,
By their attorneys,

s/James P. Rouhandeh
James P. Rouhandeh
James E. Murray
Deborah L. MacGregor
DAVIS POLK & WARDWELL
450 Lexington Avenue
New York, New York 10017
(212) 450-4000

s/David B. Chaffin
David B. Chaffin (BBO # 549245)
HARE & CHAFFIN
160 Federal Street
Boston, Massachusetts 02110
(617) 330-5000

# Exhibit A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                          :
In re:  NEURONTIN MARKETING AND                           :
         SALES PRACTICES LITIGATION                       :
                                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x   MDL Docket No. 1629
                                                          :
THIS DOCUMENT RELATES TO:                                 :   Master File No. 04-10981
                                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x   Judge Patti B. Saris
                                                          :
HARDEN MANUFACTURING CORPORATION;                         :
LOUISIANA HEALTH SERVICE INDEMNITY COMPANY,               :
dba BLUECROSS/BLUESHIELD OF LOUISIANA; UNION              :
OF OPERATING, LOCAL NO. 68 WELFARE FUND;                  :
ASEA/AFSCME LOCAL 52 HEALTH BENEFITS TRUST;               :
GERALD SMITH; and LORRAINE KOPA, on behalf of             :
themselves and all others similarly situated, v. PFIZER INC. and :
WARNER-LAMBERT COMPANY.                                   :
                                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                          :
THE GUARDIAN LIFE INSURANCE COMPANY OF                    :
AMERICA v. PFIZER INC. and                                :
                                                          :
AETNA, INC. v. PFIZER INC.                                :
                                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
```

## DECLARATION OF LAURA KIBBE

I, Laura Kibbe, hereby declare as follows:

1.    I am a Senior Corporate Counsel at Pfizer Inc ("Pfizer"), one of the defendants in the above-captioned matter.

2.    As part of my responsibilities, I coordinate discovery protocols and procedures, as well as respond to discovery requests. I have been responsible for managing and coordinating large scale document productions since the early 1990s.

3.       The information contained in this declaration is based on my general knowledge of Pfizer's business operations, and the magnitude of the efforts that would be necessary to locate and review information sought by the Plaintiffs in their discovery requests.

4.       After reviewing Plaintiffs' requests for post December 31, 1998 documents from Warner-Lambert and Pfizer-era custodians, I estimate that the documents from a minimum of well over 100 custodians would need to be collected in order to provide those documents. This number does not include personnel based in the field, as addressed below. I further estimate that it would take tens of thousands of hours to collect and review for responsiveness, confidentiality and privilege all documents necessary, including millions of e-mails, to respond to Plaintiffs' requests. In addition, Pfizer would incur costs for lost productivity and other business costs, such as training and contracting non-Pfizer personnel to conduct such a review.

5.       Based upon my experience conducting Pfizer discovery, I also estimate that the majority of the more than 100 potential custodians of documents will have multiple gigabytes of electronic data to be searched and culled, resulting in "reviewable" information in excess of 10 million pages in total. I also estimate that the cost for processing the electronic information, which excludes the cost for reviewing documents, would exceed $1.7 million dollars. When the costs of review are added, I estimate that it would take approximately 40 temporary workers, working 40 hours per week, almost 10 months to review 10 million pages. At the estimated hourly rates of $40 -$60 per hour for temporary workers, which is at the low end of the range of the likely cost, the magnitude of that review would require Pfizer to spend anywhere between $2.9 and $4.3 million in review costs, for a total of $4.6 to $6 million when the processing and initial review of documents for responsiveness is completed, excluding the costs of second

2

review by Pfizer's attorneys for privileged, confidentiality, and responsiveness. This estimate does not include the costs that would be incurred if documents needed to be collected from field sales personnel and field medical liaisons, of which there are hundreds.

6.    This estimate also does not include time and expense for review of documents by Pfizer's firm attorneys for responsiveness, privilege and confidentiality. Even assuming merely 25% of the documents initially reviewed for responsiveness, or approximately 2.5 million pages, are deemed responsive and in need of second review, the completion of this review by Pfizer's firm attorneys would add another one to two months to the total review time. The privilege and confidentiality check would also result in substantial additional costs, which would likely equal or exceed the expense incurred in conducting the initial review. The combined expense incurred in the search, collection, and production of documents in response to Plaintiffs' requests for documents after Dec. 31 1998 is therefore likely to exceed $10 million.

I declare under penalty of perjury under the law of the state of New York that the foregoing is true and correct, and that this declaration executed on 17ᵗʰ day of June 2005 at _Waterbury, Connecticut_.

Laura M. Kibbe

Exhibit B

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                :
In re:  NEURONTIN MARKETING,                    :
        SALES PRACTICES AND                     :  MDL Docket No. 1629
        PRODUCTS LIABILITY LITIGATION           :
                                                :  Master File No. 04-10981
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                :  Judge Patti B. Saris
THIS DOCUMENT RELATES TO:                       :  Magistrate Judge Leo T. Sorokin
                                                :
ALL ACTIONS                                     :
                                                :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
```

## SECOND DECLARATION OF LAURA KIBBE

I, Laura Kibbe, hereby declare as follows:

1.      I am a Senior Corporate Counsel at Pfizer Inc. ("Pfizer"), one of the defendants in the above-captioned matter.

2.      As part of my responsibilities, I coordinate discovery protocols and procedures, as well as respond to discovery requests. I have been responsible for managing and coordinating large scale document productions since the early 1990s.

3.      The information contained in this declaration is based on my knowledge of Pfizer's business operations, and the magnitude of the efforts that would be necessary to locate and review information sought by the Plaintiffs in their discovery requests.

4.      Historically, Pfizer collects 7.5 gigabytes of non-system files for each custodian during the course of a litigation. Non-system files are the actual data pulled from the laptops and the company's network, not program data such as Microsoft Word, Excel, or other word processing files. 7.5 gigabytes equals roughly 675,000 pages or 7500 megabytes. Pfizer's vendor charges $2 per megabyte to index and search.

Therefore, the processing costs alone are on average $15,000 per custodian. Notably, this does not take into consideration the paper documents that the custodians are likely to have. After removing all duplicates and filtering out documents that do not contain certain carefully crafted key works, Pfizer historically ends up with a reviewable set of documents reflecting 15% of the overall collected documents. Further, because of the redaction needs and the unproven nature of the technology for redacting native files, that 15% must be converted to a tiff images. Pfizer pays approximately 8 cents per page to convert native files into tiff images. That is on average $8100 per custodian for the tiff process. Accordingly, with 100 custodians, in addition to the processing costs, the "reviewable" number of pages in electronic form would equal just over 10 million pages.

5.    In the Provera litigation, as the collection is complete, the actual size of the average custodians' non-system files is far less than 7.5 gigabytes. This number reflects the fact that unlike Neurontin, Provera has not been actively promoted for years. Therefore, in the Provera litigation many custodians had virtually no responsive documents.

6.    In the Rezulin litigation in 2000, the volume of information for that product was far less than what one would expect to find for sales and marketing of Neurontin post-1998 because Rezulin was only on the market for three years (March 1997 through 2000). In addition, with advances in technology, electronic document collection efforts in 2005 are more complex and costly – and yield far greater volumes of electronic documents – than electronic document collection efforts in even as recently as 2000, when the Rezulin collection was conducted.

2

I declare under penalty of perjury under the law of the state of New York that the foregoing is true and correct, and that this declaration executed on 28TH day of July 2005 at _New York, New York._

_Laura M. Kibbe_

Laura Kibbe

3