UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ ) | |
| IN RE NEURONTIN MARKETING, SALES ) | |
| PRACTICES, AND PRODUCTS LIABILITY ) | |
| LITIGATION ) | |
| _____ ) | |
| ) | MDL Docket No. 1629 |
| THIS DOCUMENT RELATES TO: ) | Master File No. 04-10981 |
| ) | Judge Patti B. Saris |
| ALL MARKETING AND ) | Mag. Judge Leo T. Sorokin |
| SALES PRACTICES ACTIONS ) | |
| ) | |
| _____ ) | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION**

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ........................................................................................................1

II.     PLAINTIFFS' ALLEGATIONS ................................................................................3

III.    THE CLASS AND SUBCLASSES SATISFY THE REQUIREMENTS FOR
        CERTIFICATION UNDER RULE 23(b)(3)................................................................9

        A.    The Class, Subclasses, Class Representatives, and Claims ....................................9

        B.    Standard For Applying Rule 23 ........................................................................10

        C.    The Requirements of Rule 23(a) Are Satisfied...................................................12

              1.    The Class and Subclasses Are So Numerous That Joinder Of All
                    Members Is Impracticable. ......................................................................12

              2.    There Questions Of Law And Fact Common to the Class and
                    Subclasses. ..........................................................................................13

              3.    Plaintiffs' Claims Are Typical of the Claims of the Class and
                    Subclasses. ..........................................................................................14

              4.    Plaintiffs Will Fairly and Adequately Protect the Interests of the
                    Class and Subclasses...............................................................................16

                    a.    Plaintiffs' Counsel Are Well Qualified. .......................................17

                    b.    Plaintiffs' Interests Do Not Conflict With The Interests Of
                          The Class or Their Respective Subclasses....................................18

        D.    Questions of Law or Fact Common to the Class and Subclasses
              Predominate Over Any Questions Affecting Only Individual Members. ............18

              1.    Common Questions Predominate Over Individual Questions In
                    Connection With Plaintiffs' RICO Claims. ..............................................20

              2.    Common Questions Predominate Over Individual Questions In
                    Connection With Plaintiffs' New Jersey Consumer Fraud Act
                    Claim....................................................................................................25

                    a.    New Jersey Substantive Law Applies to Plaintiffs' State
                          Law Claims. ............................................................................25

                    b.    Common Questions Predominate on Plaintiffs' NJCFA
                          Claim.......................................................................................31

              3.    Common Questions Predominate Over Individual Questions In
                    Connection With Plaintiffs' Common Law Fraud Claim. ........................34

              4.    Common Questions Predominate Over Individual Questions In
                    Connection With Plaintiffs' Unjust Enrichment Claim. ..........................36

## <u>TABLE OF CONTENTS</u>
(continued)

<u>Page</u>

E.  A Class Action Is Superior To The Adjudication Of Thousands Of Individual Cases..................................................................................37

IV.  CONCLUSION............................................................................................40

# TABLE OF AUTHORITIES

**Page**

## CASES

*Abelson v. Strong*,
   1987 U.S. Dist. LEXIS 7515 (D. Mass. July 30, 1987)....................................................15, 27

*Amchem Prods. v Windsor*,
   521 U.S. 591 (1997).........................................................................................................19

*Avery v. Heckler*,
   584 F.Supp. 312 (D.Mass. 1984) ....................................................................................11

*Banco Popular North America v. Gandi*,
   2005 WL 1498504 (N.J. S.Ct  2005) ...............................................................................34

*Bond v. Fleet Bank (RI), N.A.*,
   2002 U.S. Dist. LEXIS 22324 (D.R.I. Oct. 10, 2002) ..........................................................12

*Brown v. Philip Morris Inc.*,
   228 F.Supp.2d 506 (D. N.J. 2002) ...................................................................................35

*Burstein v. Applied Extrusion Technologies*,
   153 F.R.D. 488 (D. Mass. 1994)......................................................................................14

*Castro v. NYT Television*,
   370 N.J. Super. 282, 851 A.2d 88 (N.J. Super. A.D. 2004) ...............................................36

*Cochran v. Quest Software, Inc.*,
   328 F.3d 1 (1st Cir. 2003).................................................................................................25

*Computer Systems Engineering, Inc. v. Qantel Corp.*,
   571 F. Supp. 1365 (D. Mass. 1983) ..................................................................................30

*Computer Systems Engineering, Inc. v. Qantel Corporation*,
   740 F.2d 59 (1st Cir. 1984)...............................................................................................29

*County of Essex v. First Union Nat'l Bank*,
   373 N.J. Super. 543, 862 A.2d 1168 (N.J. Super. A.D. 2004) ...........................................37

*Curtis v. Commissioner, Maine Dept. of Human Services*,
   159 F.R.D. 339 (D. Me. 1994)..........................................................................................16

*Desiano v. Warner-Lambert*,
   326 F.3d 339 (2d Cir. 2003) .............................................................................................22

*Desiderio v. D'Ambrosio*,
   190 N.J. Super. 424, 463 A.2d 986 (1983) .......................................................................36

*Duhaime v. John Hancock Mut. Life Ins. Co.*,
   177 F.R.D. 54 (D. Mass. 1997)...........................................................................13, 14, 15, 16

*Eisen v. Carlisle & Jacquelin*,
   417 U.S. 156 (1974)...........................................................................................3, 11, 39

*Eisenberg v. Gagnon*,
   766 F.2d 770 (3d Cir. 1985) .............................................................................................11

## TABLE OF AUTHORITIES
### (continued)

Page

*Feinstein v. Resolution Trust Corp.*,
   942 F.3d 34 (1st Cir. 1991) ............................................................................21

*Fenwick v. Kay American Jeep, Inc.*,
   371 A.2d 13 (N.J. 1977) .................................................................................32

*Fraser v. Major League Soccer, L.L.C.*,
   180 F.R.D. 178 (D. Mass. 1998) ...............................................................12, 14

*Gennari v. Weichert Co. Realtors*,
   672 A.2d 1190 (N.J. Super. App. Div. 1996) ................................................33

*George Lussier Enters. v. Subaru of New Eng., Inc.*,
   Civil No. 99-109-B, 2001 U.S. Dist. LEXIS 12054 (D.N.H. Aug. 3, 2001) ..............13, 20, 39

*Holton v. Rothschild*,
   118 F.R.D. 280 (D. Mass. 1987) ....................................................................12

*In re American Honda Motor Co., Dealership Realtors Litig.*,
   941 F. Supp. 528 (D. Md. 1996) ....................................................................23

*In re Brand Name Prescription Drugs Antitrust Litig.*,
   1994 WL 663590 (N.D. Ill. 1994) ..................................................................39

*In re Bridgestone/Firestone, Inc.*,
   288 F.3d 1012 (7th Cir. 2002) .......................................................................26

*In re NASDAQ Market-Makers Antitrust Litig.*,
   169 F.R.D. 493 (S.D.N.Y. 1996) ...................................................................19

*In re Neurontin Marketing and Sales Practices Litigation*,
   342 F. Supp. 2d 1350 (Jud. Pan. Mult. Lit. 2004) .........................................38

*In re New England Mut. Life Ins. Co. Sales Practices Litig.*,
   183 F.R.D. 33 (D. Mass. 1998) ........................................................13, 14, 15, 16

*In re Oxford Health Plans, Inc. Sec. Litig.*,
   191 F.R.D. 369 (S.D.N.Y. 2000) ...................................................................15

*In re Pizza Time Theatre Sec. Litig.*,
   112 F.R.D. 15 (N.D. Cal. 1986) .....................................................................37

*In re Prudential Ins. Co. of Am. Sales Practice Litig.*,
   962 F. Supp. 450 (D.N.J. 1997) .....................................................................39

*In re Screws Antitrust Litigation*,
   91 F.R.D. 52 (D. Mass. 1981) ...................................................................11, 19

*In re Sumitomo Copper Litig.*,
   182 F.R.D. 85 (S.D.N.Y. 1998) .....................................................................15

*In re Visa Check/MasterMoney Antitrust Litig.*,
   2001 WL 1242717 (2d Cir. 2001) ........................................................15, 19, 39

*International Union of Operating Engineers Local #68 Welfare Fund v. Merck &
   Co., Inc.*, No. ATL-L-3015-03-MT (July 29, 2005) ........................27, 28, 29, 30

**TABLE OF AUTHORITIES**
(continued)

Page

*Klaxon v. Stentor Elec. Mfg. Co.*,
   313 U.S. 487 (1941)..................................................................................................25

*Lessard v. Metropolitan Life Ins. Co.*,
   103 F.R.D. 608 (D. Me. 1984)..........................................................................11, 15

*Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach*,
   523 U.S. 26 (1998)..................................................................................................26

*Libertad v. Welch*,
   53 F.3d 428 (1st Cir. 1995)..............................................................................21, 22

*M. Berenson Co. v. Faneuil Hall Marketplace, Inc.*,
   100 F.R.D. 468 (D. Mass. 1984)......................................................................12, 15

*Margaret Hall Found. v. Atlantic Fin. Management*,
   1987 U.S. Dist. LEXIS 7528 (D. Mass. July 30, 1987)...............................15, 19, 39

*Massachusetts Asso. of Older Americans v. Spirito*,
   92 F.R.D. 129 (D. Mass. 1981).............................................................................14

*McCuin v. Secretary of Health & Human Services*,
   817 F.2d 161 (1st Cir. 1987)................................................................................12

*McMahon Books, Inc. v. Willow Grove Associates*,
   108 F.R.D. 32 (E.D. Pa. 1985).............................................................................20

*Meshinksy v. Nichols Yacht Sales, Inc.*,
   110 N.J. 464 (1988) .............................................................................................32

*Mowbray v. Waste Mgmt. Holdings, Inc.*,
   189 F.R.D. 194 (D. Mass. 1999)..........................................................................10

*Neder v. United States*,
   527 U.S. 1 (1999)..........................................................................................21, 22

*Phillips Petroleum Co. v. Shutts*,
   472 U.S. 797 (1985).............................................................................................38

*Priest v. Zayre Corp*, 118 F.R.D. 522 (D. Mass. 1988)................................................14

*Randle v. SpecTran*,
   129 F.R.D. 386 (D. Mass. 1988).....................................................................14, 37

*Reicher v. Berkshire life Ins. Co. of America*,
   360 F.3d 1 (1st Cir. 2004)....................................................................................29

*Schultz v. Rhode Island Hosp. Trust Nat'l Bank, N.A.*,
   94 F.3d 721 (1st Cir. 1996)..................................................................................22

*Sedima, S.P. R. L. v. Imrex Co.*,
   473 U.S. 479 (1985).............................................................................................20

*Shannon-Vail Five Inc. v. Bunch*,
   270 F.3d 1207 (9th Cir. 2001) .............................................................................25

**TABLE OF AUTHORITIES**
(continued)

Page

*Smilow v. Southwestern Bell Mobile Sys.*,
   323 F.3d 32 (1st Cir. 2003)........................................................................10, 11, 19, 38

*Sosna v. Iowa*,
   419 U.S. 393 (1975)............................................................................................16

*Tingley Systems, Inc. v. CSC Consulting, Inc.*,
   152 F. Supp. 2d 95 (D.Mass. 2001)......................................................................28

*Van Dusen v. Barrack*,
   376 U.S. 612, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964).............................................25

*Varacallo v. Mass. Mutual Life Ins. Co.*,
   752 A.2d 807 (N.J. Super. App. Div. 2000) .........................................................33, 34, 35

*Vasquez v. Superior Court of San Joaquin County*,
   4 Cal.3d 800, 94 Cal.Rptr. 796 (1971) ................................................................35

*VRG Corp. v. GKN Realty Corp.*,
   135 N.J. 539, 641 A.2d 519 (1994) ......................................................................36

*Waste Mgmt. Holdings, Inc. v. Mowbray*,
   208 F.3d 288 (1st Cir. 2000)................................................................................11, 12, 19

*Wilner v. Sunset Life Ins. Co.*,
   78 Cal.App.4th 952, 93 Cal.Rptr. 2d 413 (2000) ................................................35

*Zuccarin v. Hoechst* (*In re Cardizem CD Antitrust Litig.*),
   200 F.R.D. 326 (E.D. Mich. 2001).......................................................................15

**STATUTES**

18 U.S.C.
   § 1962 .................................................................................................................10

28 U.S.C.
   § 1331 .................................................................................................................25

28 U.S.C.
   § 1332 .................................................................................................................25

28 U.S.C.
   § 1407 .................................................................................................................21, 25, 26

**RULES**

Fed. R. Civ. P. 23.....................................................................................................*passim*

**TREATISES**

1 Newberg
   § 4.25 .................................................................................................................35

1 *Newberg on Class Actions*

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

§ 3.13 (4th 2002)................................................................................................14

Federal Judicial Center, *Manual for Complex Litigation, Fourth*
§ 21.23 (2004)................................................................................................11

*Restatement (Second) of Conflict of Laws* (1971)
§ 6 ................................................................................................................29

*Restatement (Second) of Conflict of Laws* (1971)
§ 148 .................................................................................................29, 30, 34

*Restatement of the Law, Second, Restitution* (Tentative Draft No. 1, April 1983)
§ 1 ................................................................................................................36

Plaintiffs Louisiana Health Service Indemnity Company dba BlueCross/BlueShield of Louisiana ("BCBSLA"); Union of Operating Engineers, Local No. 68 Welfare Fund ("Local 68"); ASEA/AFSCME Local 52 Health Benefits Trust ("ASEA"); Harden Manufacturing Corporation ("Harden"); Gerald Smith; and Lorraine Kopa (collectively, "Plaintiffs") respectfully submit this memorandum of law in support of their motion for class certification.

## I.    <u>INTRODUCTION</u>

Plaintiffs' Amended Class Action Complaint ("Complaint") sets forth in detail how defendant Warner-Lambert carefully developed and orchestrated a complex, multi-faceted scheme to promote Neurontin as a medically effective treatment for conditions for which it had not been approved, and for which there was no credible scientific evidence it was effective. Study after study – most of them sponsored by Defendants -- either failed to show that Neurontin was effective in treating these conditions, or concluded that it was *in*effective.

Notwithstanding this succession of scientific failures, Defendants -- through their "front men," medical marketing firms masquerading as independent medical educators -- sponsored hundreds (and possibly thousands) of "educational" seminars and "consultant's meetings" with groups of prescribing physicians, with the sole purpose of persuading them that Neurontin was the treatment of choice for a variety of unapproved and unproven uses. Defendants hand-picked the physicians who spoke at these meetings, whom they rewarded with grants, honoraria, and luxury travel, to ensure that they would not deviate from Defendants' desired message. Any physicians who had the audacity to present any negative scientific information regarding Neurontin were promptly "hooked" off the stage.[1]

---

[1] *See* Complaint ¶ 63.

464653.1

Perhaps most striking is the transcript, revealed in discovery, of a March 2000 private meeting in New York City of presenting physicians planning new "educational" programs promoting Neurontin for off-label uses, at which one psychiatrist lamented to his equally-compromised colleagues that:

> [A]lmost everything I'm talking about (reports of successful offlabel Neurontin usage) appears in the form of letters to the editor or open case series. The amount of controlled trials, the evidence base for this, is not very good. And there is a sense of feeling awkward—Elizabeth [a Parke-Davis employee], this is something we should address—there's a sense of getting up there and talking about these things (off-label Neurontin usage) when, maybe, at best, there might be one or two controlled trials that support a given use.
>
> So, clinical use is running way ahead of what research is giving us. I mean, I can't remember, in psychiatry, anything like this, where there's such extensive use of drugs, without there necessarily being an indication or the data we would consider gold standard.
>
> So, one of the questions that I have for you to think about is, can we really say with any certainty that these drugs really work in the way that we're reporting? How confident are you, individually or as a group, that even without the clinical trials, that we can get up in front of clinicians and say, look, trust us that these things do work.

Complaint ¶ 102.

Defendants deliberately concealed their role in orchestrating these promotional affairs from the attendees, in order to lull them into the false belief that they were receiving full and unbiased presentations. Defendants undertook this clandestine marketing campaign in flagrant violation of federal laws designed to safeguard the public health by ensuring that physicians prescribing drugs for unapproved uses receive only complete, accurate, and unbiased information, from unbiased sources.

Defendants reaped billions of dollars in profits as a result of their unlawful and fraudulent scheme. If this motion is not granted, they will get to keep it.

## II.     PLAINTIFFS' ALLEGATIONS[2]

    Shortly after receiving FDA approval to market its anti-epileptic drug, Neurontin, Parke-Davis, the pharmaceutical drug division of Defendant Warner-Lambert, predicted lifetime sales of only $500 million for the drug, which had only been approved for treating epilepsy in combination with more established medications.  *See* Complaint ¶ 17-19.  While company officials recognized the market for Neurontin's approved use was limited, its marketing department realized that if Neurontin could be expanded into other, more lucrative markets, such as a pain or psychiatric indications, its potential sales would be substantially greater.  *See* Complaint ¶ 20-31.  There were two obstacles to achieving such a sales expansion.  First, Neurontin was not approved for these uses, and Parke-Davis could not legally promote use of Neurontin for unapproved indications.  *See* Complaint ¶ 31-39.  Second, as Parke-Davis's market assessments bluntly recognized, there was no scientific rationale for Neurontin to be effective for these uses (and indeed, an early clinical trial in Europe had demonstrated that Neurontin was not effective for migraine patients).  *See* Complaint ¶ 28, 31, 126, 130, 143-44, 149, 152, 167, 174-75.  This lawsuit arises out of the unlawful and deceptive conduct Defendants engaged in to overcome these obstacles.

    In 1995, Parke-Davis executives deliberately decided not to perform clinical trials that would have determined whether Neurontin had any utility for off-label uses in favor of publicizing Neurontin's potential for off-label usage through a publication strategy.  *See* Complaint ¶ 24-31.  Thereafter, its annual marketing plans for Neurontin contained elaborate

---

[2] Plaintiffs' factual allegations, summarized below, are common for all class members.  On this motion for class certification, as on a motion to dismiss, these allegations must be presumed true.  *See Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177-78 (1974).  Any trial (whether for a class or an individual claim) would likely require litigation of most of the factual and legal issues embraced therein, demonstrating the predominance of common issues, and the superiority of the class action vehicle.

464653.1

strategies and tactics to publicize the drug's "emerging uses." *See* Complaint ¶ 50-54. Parke-Davis could not openly promote Neurontin for these indications. Instead, it paid for numerous events – such as "consultants'" meetings, continuing medical "education" seminars and "advisory" boards – that to outward appearances looked like the type of independent programs where non-approved uses of pharmaceutical drugs could legitimately be discussed. *See* Complaint ¶ 53-55, 60-104. However, working closely with medical marketing firms and cooperating physicians, Defendants carefully controlled the content of these events, ensuring that Neurontin was depicted favorably and as a drug of choice for its unapproved uses. *See, e.g.,* Complaint ¶ 63, 74, 85.

Defendants' depiction of Neurontin's efficacy for unapproved uses was false and misleading in several respects. Defendants ensured that the programs omitted references to the negative clinical trials that determined that Neurontin does not work for numerous off-label uses featured in these events; misrepresented the nature of the evidence that supported the uses advocated; refused to present negative anecdotal evidence or the views of physicians who opposed Neurontin's off-label use; failed to disclose that almost all publications and studies that supported off-label use had been financed or subsidized by Defendants and initiated pursuant to a marketing plan designed to expand sales; failed to disclose unfavorable studies that Defendants had financed but then buried if the results were unfavorable; and misrepresented the financial connection between the Defendants and the alleged sponsors of the event. *See* Complaint ¶ 56; 60-104. While the physicians attending these events were told that they were receiving scientific information delivered by objective experts, they were being presented an infomercial.

Defendants created "scientific" publications in much the same way they created "scientific" programs. *See* Complaint ¶ 105-08; 109-23. Working with marketing firms, they

hired technical writers to ghostwrite medical articles and paid physicians to loan the ir names to the publications. *See id.* The publications were then circulated pursuant to the Publication Strategy as "independent" authority in support of the off-label use of Neurontin. *See* Complaint ¶ 105.

Defendants' marketing plans also relied upon inducing physicians to prescribe Neurontin off-label through the use of kickbacks. *See* Complaint ¶ 210-33. For the highest prescribing physicians, Defendants held lavish conferences in resorts, paying all of the physicians' expenses so the invitees could hear about the latest uses of Neurontin for unapproved indications. *See* Complaint ¶ 213, 216, 219. While not all physicians received the "high roller" treatment reserved for the highest prescribers, there were numerous dinner meetings at lavish restaurants, and physicians were often paid honoria of $200 for doing nothing more than showing up. *See* Complaint ¶ 222. Doctors who might be willing to put their names on case reports or articles, or otherwise champion Neurontin, were given substantial grants. *See* Complaint ¶ 226-32. Parke-Davis funded numerous "studies" by Neurontin champions that it knew had virtually no scientific merit. *See id.* The object of Defendants' largesse was to induce physicians to ignore their fiduciary duties to their patients by prescribing Neurontin for an unproven use. *See* Complaint ¶ 216, 219, 220. Such conduct amounts to commercial bribery under state statutes.

The prohibition against directly promoting Neurontin for off-label uses required Defendants to work with medical marketing firms and cooperating doctors (identified as participating vendors and participating physicians, respectively, in Plaintiffs' complaints) in order to publicize Neurontin to the medical community. *See* Complaint ¶ 44-104. Defendants formed one enterprise, with several sub-enterprises, for this purpose. *See* Complaint ¶ 266-78.

464653.1

As described in the Complaints, Defendants, with the assistance of participating vendors, promulgated marketing strategies and tactics designed to publicize Neurontin's "emerging uses." *See* Complaint ¶ 44-49. Pursuant to these plans, the enterprise hosted events and created articles in which the Defendants' participation was hidden from view. *See* Complaint ¶ 50-104. Nonetheless, Defendants, through their control over the money flow to the other members of the conspiracy, effectively controlled the content of the presentations and publications. *See* Complaint ¶ 48, 44-103. The participating physicians were formally retained by the participating vendors to deliver Defendants' message, and were paid with funds received from Defendants. *See* Complaint ¶ 96-104. A relatively small stable of these physicians made numerous appearances for the various vendors, giving essentially the same misleading pro-Neurontin presentations at each event. *See id.* The common purpose of all participants in the enterprise was to promote the off-label use of Neurontin, an objective all participants knew could not be legally accomplished by Defendants. *See* Complaint ¶ 47. Because there was, and still is, no scientific evidence to support the use of Neurontin for almost all of the off-label uses it was being touted for, such one-sided presentations were, by their very nature, highly misleading. *See* Complaint ¶ 124-205.

     The participating vendors were well aware that their final product was biased and one-sided; they intentionally created their programs *not* to be fair and balanced. *See* Complaint ¶ 56. The participating physicians also were aware that the clinical evidence was insufficient to support the claims that Neurontin was effective for most of the off-label indications, and shared among themselves (but concealed from attendees) their own significant doubts that Neurontin really worked for those uses. *See* Complaint ¶ 102.

     The crux of Plaintiffs' allegations – detailed in over 100 pages – is that

Defendants engaged in an all-out campaign to distort, manipulate, and misrepresent information concerning Neurontin's safety and efficacy for off-label uses to mislead and deceive the medical community. At the same time Defendants knew about studies and data establishing or suggesting that Neurontin was ineffective for off-label uses – or, in some cases, that there was simply no scientific basis for suggesting that Neurontin *was* effective for those uses – Defendants deliberately and systematically force-fed incomplete, inaccurate and misleading information to the medical community regarding those uses, knowing and intending that this would create the impression that Neurontin was effective for such indications. The Complaint overflows with truly shocking examples of these affirmative misrepresentations, half-truths and omissions, which created a false and misleading impression of the available information concerning the safety and efficacy of Neurontin for various off-label indications.[3] Defendants also fraudulently

---

[3] *See* Complaint ¶ 135-39 (after study sponsored by Parke-Davis concluded that Neurontin was ineffective for treatment of diabetic peripheral neuropathy, Parke-Davis misrepresented conclusion to Drugdex, obtaining citation omitting authors' conclusion and falsely stating that authors suggested higher doses may be effective; company continued to promote Neurontin for this use at numerous events, at which conclusion of study was not disclosed); Complaint ¶¶ 140-48 (despite unpublished study sponsored by Parke-Davis which demonstrated Neurontin was ineffective for treatment of Restless Leg Syndrome, at numerous events, speakers routinely stated that Neurontin was effective for this use, and results of study were not disclosed; Parke-Davis medical liaisons routinely and falsely told physicians that researcher's patients had 90% favorable response rate; sales representatives regularly and falsely told doctors Neurontin was effective for this use); Complaint ¶ 149-56 (despite clinical trial showing Neurontin was no more effective than a placebo in treating bipolar disorder, speakers at events routinely stated that Neurontin was effective for this use, and presented only favorable case reports; sales representatives regularly and falsely told physicians Neurontin was effective for this use); Complaint ¶ 157-60 (speakers at events routinely stated that Neurontin was effective for treatment of social phobia, despite study sponsored by Parke-Davis which was unable to conclude it was effective); Complaint ¶ 162-65 (despite clinical trial sponsored by Parke-Davis concluding that Neurontin was no more effective than a placebo in treating panic disorder, speakers at events routinely stated that Neurontin was effective for this use, without informing attendees of negative trial); Complaint ¶ 166-72 (despite two clinical trials concluding that Neurontin was not effective as monotherapy for the treatment of epilepsy, and FDA rejection of application for that use, speakers at events asserted that Neurontin was effective for that use, and attendees were not informed of negative trials or FDA rejection; sales representatives routinely

induced physicians to prescribe ever higher doses of Neurontin – as high as 266% of the maximum dose Defendants were lawfully permitted to recommend for its *approved* uses – notwithstanding that their own unpublished studies showed that increased doses were no more effective, and without disclosing the fact that the FDA had *denied* Defendants' application to increase the maximum recommended dose because there was no evidence Neurontin was *safe* at higher doses, and no evidence that higher doses were any more effective. Complaint ¶¶ 183-197.

   The promotional enterprise succeeded beyond even Defendants' expectations. By 2003, Neurontin was generating more than $2.2 billion in annual revenue for Defendants, more than four times the revenue Parke-Davis had estimated for the entire life-cycle of the drug. *See* Complaint ¶ 235. More than 90% of this revenue was for off-label uses promoted by the Defendants. *See id.* Given the paucity of evidence to support off-label uses of the drug, and the unprecedented campaign to unlawfully promote those uses, there is little doubt that these riches were the proverbial "fruit of the poisonous tree."

   Defendants' scheme affected Class members in the same way, by causing them to pay for Neurontin prescriptions which would not have been written had Defendants not engaged in unlawful and deceptive promotional activities.

---

and falsely told physicians Neurontin was effective as a monotherapy, and would soon be approved for monotherapy); Complaint ¶ 173-81 (despite study conducted by Parke-Davis concluding that Neurontin was no more effective than a placebo in migraine headache prophylaxis, and negative reports from its own advisory board physicians, speakers at events regularly touted Neurontin as effective for the treatment of migraine, and attendees were not informed of the negative clinical trial or reports; sales representatives routinely and falsely told physicians Neurontin was effective in controlling migraines); Complaint ¶ 198-205 (despite study and reports showing that Neurontin could cause serious behavioral side effects, weight gain, and withdrawal syndrome, and that the prevalence of side effects increased with dosage, at numerous events, speakers routinely stated that Neurontin had a low side effect profile and that high dosages did not cause side effects).

### III.  THE CLASS AND SUBCLASSES SATISFY THE REQUIREMENTS FOR CERTIFICATION UNDER RULE 23(B)(3).

#### A.  The Class, Subclasses, Class Representatives, and Claims

The proposed Class is defined as:

> All individuals and entities in the United States and its territories who, for purposes other than resale, purchased, reimbursed and/or paid for Neurontin for indications not approved by the FDA during the period from January 1, 1994, through the present.  For purposes of the Class definition, individuals and entities "purchased" Neurontin if they paid some or all of the purchase price.

Complaint, ¶ 255.[4]

Plaintiffs also seek certification of two subclasses, which together comprise the Class.  The first is a Third Party Payer Subclass ("TPP Subclass"), defined as:

> All private, non-governmental entities in the United States and its territories that are at risk, pursuant to a contract, policy, or plan, to pay or reimburse all or part of the cost of Neurontin prescribed, provided, or administered to natural persons covered by such contract, policy, or plan for indications not approved by the FDA during the period from January 1, 1994 to the present.  Such entities include, but are not limited to, insurance companies, union health and welfare benefit plans, entities with self-funded plans that contract with a health insurance company or other entity to serve as a third-party claims administrator to administer their prescription drug benefits, private entities paid by any governmental entity (including a state Medicaid program), and other organizations that paid for all or part of a Neurontin prescription since January 1, 1994.

Complaint, ¶ 256.[5]  The named third party payer Plaintiffs (BCBSLA, Local 68, ASEA, and Harden) all paid for Neurontin prescribed for their members for off-label conditions.  Complaint, ¶¶ 5-8.

The second subclass is a Consumer Subclass (together with the TPP Subclass, the

---

[4] In addition to its initial approval in December 1993 as an adjunctive treatment for epilepsy, in May 2003, Neurontin was approved by the FDA for the treatment of postherpetic neuralgia. Complaint, ¶ 17.  The proposed Class and Subclasses (defined below) do *not* include individuals or entities who purchased, reimbursed and/or paid for Neurontin prescribed for the treatment of either of these conditions.

[5] Governmental entities, which are expressly excluded from the TPP Subclass, are likewise

"Subclasses") defined as:

> All individuals in the United States and its territories who, for
> purposes other than resale, purchased, reimbursed, or paid for
> some or all of the price of Neurontin, for indications not approved
> by the FDA during the period from January 1, 1994 to the present.

Complaint ¶ 257.[6]  The named individual Plaintiffs (Smith and Kopa) were prescribed and paid

for Neurontin for off-label uses.  Complaint, ¶¶ 9-10.

Plaintiffs seek certification of their First and Second Claims for Relief, for

violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962

("RICO"); their Third Claim for Relief, for violation of the New Jersey Consumer Fraud Act,

N.J.S.A. 56:8-1 et seq. ("NJCFA"); their Fourth Claim for Relief, for Common Law Fraud; and

their Fifth Claim for Relief, for Unjust Enrichment.

**B.**     **Standard For Applying Rule 23**

Rule 23(a) of the Federal Rules of Civil Procedure requires a party seeking class

certification to satisfy four prerequisites:  (i) numerosity; (ii) commonality; (iii) typicality; and

(iv) adequacy of representation.  *Smilow v. Southwestern Bell Mobile Sys.*, 323 F.3d 32, 38 (1st

Cir. 2003).

Plaintiffs must also show that they satisfy at least one of the prerequisites of

Rule 23(b).  Fed. R. Civ. P. 23(b).  Plaintiffs seek certification of a damages class under

Rule 23(b)(3), which requires:  (i) that common questions of law or fact predominate over

questions affecting only individual class members; and (ii) that class treatment is superior to

other methods available for adjudicating the controversy.  *Mowbray v. Waste Mgmt. Holdings,

Inc.*, 189 F.R.D. 194, 196-97 (D. Mass. 1999), *aff'd*, 208 F.3d 288 (1st Cir. 2000); *In re Screws*

---

intended to be excluded from the Class.

[6] Plaintiffs propose to exclude from the Class and the Consumer Subclass any individuals (or
their estates) who have filed actions for personal injuries resulting from taking Neurontin, as

*Antitrust Litig.*, 91 F.R.D. 52, 55 (D. Mass. 1981). Where, as here, subclasses are proposed for certification, they must likewise satisfy the requirements of Rule 23. *See* Fed. R. Civ. P. 23(c)(4)(B); *Avery v. Heckler*, 584 F.Supp. 312, 323 (D.Mass. 1984); Federal Judicial Center, *Manual for Complex Litigation, Fourth* § 21.23 (2004).

Class actions have long been recognized by the courts as an essential tool for the adjudication of cases involving multiple claims that are susceptible of similar factual and/or legal inquiries, and for which individual recovery might be too modest to warrant prosecution of the case on an individual basis. The policies underlying the need for class action litigation require that Rule 23 be "liberally construed" in favor of certification. *Lessard v. Metropolitan Life Ins. Co.*, 103 F.R.D. 608, 610 (D. Me. 1984) ("Rule 23(a) should be liberally construed in order not to undermine the policies underlying the class action rule."); *see also Smilow*, 323 F.3d at 41-42 (classes of consumers "are especially likely to satisfy the predominance requirement"); *Eisenberg v. Gagnon*, 766 F.2d 770, 785 (3d Cir. 1985), *cert. denied*, 474 U.S. 946 (1985) (citations omitted) ("The interests of justice require that in a doubtful case, any error, if there is to be one, should be committed in favor of allowing a class action.").

In *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974), the Supreme Court explained that "[i]n determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." *Eisen*, 417 U.S. at 178. However, *Eisen* "does not foreclose consideration of the probable course of the litigation at the class certification stage." *Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 298 (1st Cir. 2000). "[A]

---

such individuals clearly have an interest in controlling any such litigation.

district court must formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate in a given case." *Id.*

In this case, the primary legal and factual issues – the formation and operation of the off-label marketing scheme; the evidence concerning Neurontin's efficacy or inefficacy in treating the off-label conditions for which it was unlawfully promoted by Defendants and their co-conspirators; the aggregate effect of Defendants' misleading promotional activities on physician prescribing behavior; and Defendants' resulting liability to the Class and Subclasses under RICO, the NJCFA, and Plaintiffs' common law claims – will "play out" on a common basis.

**C.    The Requirements of Rule 23(a) Are Satisfied.**

**1.    The Class and Subclasses Are So Numerous That Joinder Of All Members Is Impracticable.**

Rule 23(a)(1) requires that the proposed class be so numerous that joinder of all members is impracticable. Joinder need not be impossible; the rule only requires that the difficulty or inconvenience of joining all members makes use of the class action appropriate. *Bond v. Fleet Bank (RI), N.A.*, 2002 WL 31500393 at *4 (D.R.I. Oct. 10, 2002) ("Impracticability of joinder means only that it is difficult or inconvenient to join all class members, not that it is impossible to do so."). Precise quantification of class members is not necessary, and a court may make common sense assumptions to support a finding of numerosity. *McCuin v. Secretary of Health & Human Services*, 817 F.2d 161, 167 (1st Cir. 1987). Classes numbering in the hundreds are universally held to satisfy the numerosity requirement.[7]

---

[7] *See, e.g., Holton v. Rothschild,* 118 F.R.D. 280, 282 (D. Mass. 1987) (50 or 60 members "is sufficiently large" to warrant class certification); *M. Berenson Co. v. Faneuil Hall Marketplace, Inc.,* 100 F.R.D. 468, 470 (D. Mass. 1984) (class of 160 met numerosity requirement); *Fraser v. Major League Soccer, L.L.C.*, 180 F.R.D. 178, 180 (D. Mass. 1998), *cert. denied*, 537 U.S. 885 (2002) (class of 200 met numerosity requirement).

Numerosity of the Class and Subclasses cannot reasonably be contested here. There are many thousands of Consumer Subclass members, as shown by Neurontin sales of $2.4 billion in 2003 alone, making Neurontin tenth in U.S. drug sales. *See* NDC Health Sales Table for 2003, http:www.rxlist.com/top200_sales_2003.htm. While Plaintiffs believe the percentage may be higher, according to an expert identified by Pfizer in the *Franklin* litigation, 83% of Neurontin sales were for off-label uses. *See* Academy Health 2004 Annual Research Meeting presentation given by Ian Cockburn, dated June 6-8, 2004. Similarly, there are thousands of Third Party Payers in the United States. *See, e.g.*, *In re Lupron Marketing and Sales Practices Litig.*, 228 F.R.D. 75 (D. Mass. 2005) ("the class includes thousands of TPPS"). Since Neurontin was the tenth-ranked drug in the U.S., it is reasonable to assume that nearly all of them paid or reimbursed the cost of Neurontin prescriptions for off-label uses. Accordingly, the numerosity requirement is easily satisfied.

### 2.    There Are Questions Of Law And Fact Common to the Class and Subclasses.

Rule 23(a)(2) requires that there be questions of law or fact common to the class. The "commonality" requirement of Rule 23(a)(2) "is a 'low hurdle' easily surmounted." *Duhaime v. John Hancock Mut. Life Ins. Co.*, 177 F.R.D. 54, 63 (D. Mass. 1997) (citations omitted). It requires only that there be a single question of law or fact that is common to all class members. *George Lussier Enters. v. Subaru of New Eng., Inc.*, Civil No. 99-109-B, 2001 WL 920060 at *4 (D.N.H. Aug. 3, 2001).

In determining the existence of common questions of law and fact, this district has found dispositive the existence of a common course of fraudulent conduct by the defendant directed toward the proposed class. *See In re New England Mut. Life Ins. Co. Sales Practices Litig.*, 183 F.R.D. 33, 39 (D. Mass. 1998) (finding commonality based on defendant's alleged

deceptive practices in the sale of life insurance policies where "claims of the class members are

based on allegations of a common course of allegedly fraudulent conduct"); *Duhaime,*

177 F.R.D. at 63 (same); *see also Massachusetts Assoc. of Older Americans v. Spirito*, 92 F.R.D.

129, 131 (D. Mass. 1981) (finding commonality among proposed class of Medicare recipients

who were allegedly subjected to illegal delays and harassment because even though "there may

be differences in the facts relating to the alleged delays for individual applicants, the pattern of

conduct of defendant is at issue" and "[t]he existence of common questions of law alone" is

sufficient to satisfy the requirements of subdivision (a)(2)).[8]  The focus of this case is on the

existence, scope, and efficacy of Defendants' scheme, readily satisfying the commonality test.[9]

### 3.    Plaintiffs' Claims Are Typical of the Claims of the Class and Subclasses.

Rule 23(a)(3) requires that the "claims or defenses of the representative parties

[be] typical of the claims or defenses of the class."  The typicality requirement of Rule 23(a)(3)

is satisfied when the claims of the representative plaintiffs arise from the same course of conduct

that gives rise to the claims of the absent class members, and where the claims are based upon

similar legal theories.  *Priest v. Zayre Corp*, 118 F.R.D. 552, 555 (D. Mass. 1988) (quoting *In re*

*Elscint, Ltd. Secs. Litig.*, Civ. No. 85-2622-K, slip op. at 18 (D. Mass. June 22, 1987)); *Randle v.*

*SpecTran*, 129 F.R.D. 386, 391 (D. Mass. 1988); *Duhaime*, 177 F.R.D. at 63; *In re New England*,

183 F.R.D. at 39;  *Fraser*, 180 F.R.D. at 181; *Burstein v. Applied Extrusion Technologies*,

153 F.R.D. 488, 491 (D. Mass. 1994); *see also* 1 *Newberg on Class Actions* § 3.13 (4th ed. 2002)

(the typicality requirement is usually met "when it is alleged that the same unlawful conduct was

---

[8] Indeed, in their motion to dismiss, Defendants have posited a number of "questions of law common to the members of the class" (Fed. R. Civ. P. 23(b)(3)), which Defendants themselves urge are dispositive of the claims of all Class members.  This alone is sufficient to establish the existence of common questions.  *Spirito*, 92 F.R.D. at 131.

directed at or affected both the named Plaintiffs and the class sought to be represented."). As this

Court has noted, "the burden on plaintiffs in proving typicality is not 'very substantial.'" *Abelson v.*

*Strong*, 1987 WL 15872, at *2 (D. Mass. July 30, 1987).

"Typicality does not require that the situations of the named representatives and

the class members be identical." *In re Oxford Health Plans, Inc. Sec. Litig.*, 191 F.R.D. 369, 375

(S.D.N.Y. 2000); *In re Visa Check/MasterMoney Antitrust Litig.*, 2001 WL 1242717 at *15 (2d

Cir. 2001). It is sufficient if the claims of the class representatives arise from the same course of

conduct as those of the absent class members. As this Court has noted, "[t]ypicality refers to the

nature of the claim of the class representatives, and not to the specific facts from which the claim

arose or relief is sought." *M. Berenson*, 100 F.R.D. at 470 (citation omitted); *see also Duhaime*,

177 F.R.D. 54; *In re New England*, 183 F.R.D. 33 (same).[10] Allegations that a defendant

deliberately provided misleading information to the class is "the same course of conduct" for

---

[9] A partial list of specific common questions appears at Paragraph 261 of the Complaint.

[10] Likewise, this district has consistently refused to deny class certification on typicality grounds
where the named plaintiffs may have been subject to unique defenses such as lack of reliance,
statute of limitations, or compulsory counterclaims. *See, e.g.*, *Margaret Hall Found. v. Atlantic Fin.
Management*, 1987 WL 15884 at *3 (D. Mass. July 30, 1987) ("possible statute of limitations
defenses, like possible nonreliance defenses, do not vitiate typicality"); *Lessard*, 103 F.R.D. at 611
(holding that named plaintiff was not atypical because she may be subject to compulsory
counterclaims). Neither is disparity in damages a factor that courts consider in analyzing typicality.
*Id.* ("mere disparity in damage awards will not destroy" typicality). Indeed, it is well settled that
"factual differences in the . . . size or manner of purchase . . . and other such concerns will not defeat
class action certification when plaintiffs allege that the same unlawful course of conduct affected all
members of the proposed class." *In re Sumitomo Copper Litig.*, 182 F.R.D. 85, 92 (S.D.N.Y. 1998)
(citing *Green v. Wolf Corp.*, 406 F.2d 291, 299-301 (2d Cir. 1968)); *see also In re Lorazepam &
Clorazepate Antitrust Litig.*, 202 F.R.D. 12, 28 (D.D.C. 2001); *Zuccarin v. Hoechst* (*In re
Cardizem CD Antitrust Litig.*), 200 F.R.D. 326, 336-37 (E.D. Mich. 2001). In particular, claims
involving the purchase of prescription drugs "generally satisfy Rule 23(a)(3)'s typicality
requirement, even if members purchase different quantities and pay different prices." *In re
Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 304 (E.D. Mich. 2001) (antitrust conspiracy to delay
entry of generic drug onto the market) (citing cases); *see also In re Warfarin Sodium Antitrust Litig.*,
212 F.R.D. 231, 248 (D.Del. 2002) ("Several other courts have recently certified nationwide or
multi state classes under federal or state law in actions alleging overpayment for prescription

purposes of typicality. *See, e.g.*, *Duhaime*, 177 F.R.D. at 63 (finding typicality where the "named plaintiffs were subjected to the same deceptive sales techniques allegedly used by [the defendant] against other class members"); *In re New England*, 183 F.R.D. at 39 (finding typicality where "high-level decision-makers provided allegedly misleading materials to [defendant's] sales agents, and that presentations based on these materials led the named plaintiffs and other class members to purchase life-insurance policies they otherwise would not have purchased," regardless of variety in materials or presentations, because "[a]ll of the named plaintiffs in this case claim that [the defendant] engaged in a single course of high-level decision-making").

Thus, the crux of the typicality analysis remains whether the named plaintiffs' claims arise out of the same course of conduct and are based on the same legal theories as those of the absent class members. Plaintiffs' claims arise out of the same course of conduct and are based on the same legal theories as those of the absent Class and Subclass members. Accordingly, the typicality requirement of Rule 23(a)(3) is satisfied.

### 4.  Plaintiffs Will Fairly and Adequately Protect the Interests of the Class and Subclasses.

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." This requirement is satisfied when (1) the class representative's attorneys are qualified, and (2) the class representative has no interests conflicting with the class. *Sosna v. Iowa*, 419 U.S. 393, 403 (1975); *Curtis v. Commissioner, Maine Dept. of Human Services*, 159 F.R.D. 339, 341 (D. Me. 1994).

---

drugs." (citing cases)).

### a.     Plaintiffs' Counsel Are Well Qualified.

Rule 23(g)(1)(C)(i) provides that "in appointing class counsel, the court . . . must consider:

- The work counsel has done in identifying or investigating potential claims in the action;
- Counsel's experience in handling class actions, other complex litigation and claims of the type asserted in the action;
- Counsel's knowledge of the applicable law; and
- The resources counsel will commit to representing the class.

*Id.*

Pursuant to Rule 23(g)(2)(A), the Court previously designated six attorneys and law firms to act as interim class counsel.  *See* Corrected Case Management Order (Dec. 16, 2004), at 7-8 [Docket Entry No. 15]; Electronic Order dated Dec. 17, 2004 (granting motion to appoint counsel).[11]  In connection with Plaintiffs' Motion for Appointment of Counsel to Plaintiffs' Steering Committee [Docket Entry No. 12], declarations from each of these attorneys were submitted, detailing their relevant experience and the experience of their law firms.[12]

Mr. Greene and his firm pioneered this litigation, and are indispensable to its success.  The other attorneys seeking to represent the Class in this case include some of the most qualified and experienced lawyers and law firms in the United States in the successful prosecution of class actions.  Interim class counsel have already devoted a tremendous amount of

---

[11] These attorneys and law firms are:  Thomas Greene, Greene & Hoffman; Thomas M. Sobol, Hagens Berman Sobol Shapiro LLP; Barry Himmelstein, Lieff, Cabraser, Heimann & Bernstein, LLP; Don Barrett, Barrett Law Office; Daniel Becnel, Law Offices of Daniel Becnel, Jr.; and James Dugan, Dugan & Browne.  Messrs. Sobol, Himmelstein, and Dugan represent Plaintiffs Harden, ASEA, and BCBSLA, respectively.  Accordingly, these attorneys and law firms respectfully request appointment as counsel for the TPP Subclass, while Messrs. Greene, Barrett, and Becnel respectfully request appointment as counsel for the Consumer Subclass, in addition to confirming the appointment of all six attorneys, pursuant to Rule 23(g)(1), as counsel for the Class.

[12] As these declarations are already in the Court's electronic files, they are not being re-filed in

---

17

time and resources to this litigation, and have become intimately familiar with the facts and legal issues involved in the case. They have worked together harmoniously for over eight months, dividing responsibilities among themselves and the many other law firms involved in the case to leverage their combined experience, talents, and resources for the benefit of the Class. They have demonstrated that they have the abilities, resources, and determination to see this litigation through to its conclusion, whether by favorable settlement or trial, judgment, and appeal. They respectfully request appointment as counsel for a certified Class.

### b.    Plaintiffs' Interests Do Not Conflict With The Interests Of The Class or Their Respective Subclasses.

Neither the proposed class representatives nor their counsel have any interests that are antagonistic to those of the absent Class members. The central issues in this case – the existence, unlawfulness and effect of Defendants' scheme to promote the off-label use of Neurontin – are common to the claims of Plaintiffs and the other members of the Class and Subclasses. Each representative plaintiff, like each absent Class member, has a strong interest in proving the existence of Defendants' scheme, establishing its unlawfulness, and the damages caused thereby. As there are no conflicts between Plaintiffs and the absent Class members, between the TPP Plaintiffs and the TPP Subclass, or between the consumer Plaintiffs and the Consumer Subclass, the requirements of Rule 23(a)(4) are satisfied.

### D.    Questions of Law or Fact Common to the Class and Subclasses Predominate Over Any Questions Affecting Only Individual Members.

To certify a class under Rule 23(b)(3), Plaintiffs must show that common issues of law or fact predominate over individual issues, and that a single class action is superior to hundreds or thousands of individual cases. *See Amchem Prods. v Windsor*, 521 U.S. 591, 615

---

connection with this motion.

464653.1

(1997); *Visa Check/MasterMoney*, 2001 WL 124717 at *6. The standard is simply whether "resolution of one issue or a small group of them will so advance the litigation that they may fairly be said to predominate." *In re Inter-Op Hip Prosthesis Liab. Litig.*, 204 F.R.D. 330, 345 (N.D. Ohio 2001).

   The Supreme Court has stated that the predominance requirement "is a test readily met in certain cases alleging consumer or securities fraud. . . ." *Amchem,* 521 U.S. at 625; *see also Smilow*, 323 F.3d 32 at 42. Consistent with the Supreme Court's statement, the predominance test is readily met in this RICO and consumer fraud case. There is no mechanical test to determine whether common issues predominate. *Waste Mgmt.*, 208 F.3d 288 at 296 (predominance cannot be reduced to a mechanical, single-issue test); *Margaret Hall,* 1987 WL 15872 at *3 (predominance not determined by any rote formula). Instead, as the court concluded in *Margaret Hall*, "a determination of predominance requires a common sense judgment regarding what the case is really about, and whether it would be more efficient to try the case as a class suit." *Id.* "The predominance requirement is satisfied unless it is clear that individual issues will overwhelm the common questions and render the class action valueless." *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 517 (S.D.N.Y. 1996).

   If issues common to the class arise with respect to Defendants' liability, common questions predominate over individual issues. *In re Screws Antitrust Litig.*, 91 F.R.D. at 56-57. At this stage, Plaintiffs need only show that for each of their claims (RICO, consumer fraud, common law fraud, and unjust enrichment), Plaintiffs can prove their elements primarily through evidence that is common to the class, and not specific to individual class members. *Id.*; *see also NASDAQ*, 169 F.R.D. at 517. As discussed below, Plaintiffs can and will prove their claims exclusively or predominantly with evidence common to the Class.

### 1.    Common Questions Predominate Over Individual Questions In Connection With Plaintiffs' RICO Claims.

Courts regularly certify classes in cases alleging RICO violations, and find that common issues predominate over individual issues. *See, e.g.*, *In re Synthroid Mktg. Litig.*, 188 F.R.D. 295 (N.D. Ill. 1999) (certifying class in case alleging RICO and consumer fraud claims); *George Lussier Enters.*, 2001 WL 920060; *McMahon Books, Inc. v. Willow Grove Associates*, 108 F.R.D. 32, 38-39 (E.D. Pa. 1985). The facts in *Synthroid* are very similar to those in this case. *Synthroid* was a RICO and consumer fraud case in which Plaintiffs alleged that Defendants engaged in mail and wire fraud by concealing information as part of a scheme to dissuade physicians from prescribing cheaper, generic alternatives to Synthroid, a brand name thyroid drug. Defendants argued – as Defendants likely will argue here – that individual issues predominated over common issues, because "to prove their claims, the plaintiffs must make "individualized inquiries into the decisions of consumers, physicians and pharmacists to purchase, prescribe and dispense Synthroid. . ."

*Id*. at 299. In granting class certification, the court pointed out that:

> The question of liability, therefore, will turn on whether the defendants engaged in the alleged conduct, consisting primarily of the uniform suppression of material information, *not on the individual decisions and circumstances of countless people along the chain of distribution of Synthroid.*

*Id*. at 299-300 (emphasis added). As detailed below, liability in this case similarly will turn on whether the Defendants and their co-conspirators engaged in a widespread effort to mislead the medical community about the efficacy of Neurontin for unapproved uses, and, consistent with *Synthroid*, this Court should certify the Class.

To prove their RICO claims, Plaintiffs must show that Defendants: (1) conducted (2) an enterprise (3) through a pattern (4) of racketeering activity. *Sedima, S.P. R. L. v. Imrex Co.*, 473 U.S. 479, 496 (1985). Plaintiffs also must show that the racketeering activity (*i.e.*, the

464653.1

predicate acts) was the proximate cause of an injury to Plaintiffs' business or property.

*Libertad v. Welch*, 53 F.3d 428, 436 (1st Cir. 1995). In the First Circuit, reliance is not an

element of a civil RICO claim premised on mail or wire fraud.[13] *Systems Mgmt. v. Loiselle*,

303 F.3d 100, 104 (1st Cir. 2002); *see also Neder v. United States*, 527 U.S. 1, 24-25 (1999)

("The common-law requirements of 'justifiable reliance' and 'damages' . . . plainly have no

place in the federal [mail and wire] fraud statutes.").[14] Common questions predominate as to all

these elements.

To prevail on their RICO claims, Plaintiffs first must prove that Defendants

conducted an enterprise. Plaintiffs have pleaded that Defendants conducted one overarching

enterprise, the Off-Label Promotion Enterprise, and a number of sub-enterprises, including the

Peer Selling Sub-Enterprise and the Publication Sub-Enterprise, associations in fact composed of

Defendants, medical marketing companies, and participating physicians. Plaintiffs devote over

thirty pages of the Complaint to describing the formation and operation of these enterprises,

which were necessary to conceal Defendants' involvement from regulators and unsuspecting

physicians, who were led to believe that they were attending educational seminars sponsored by

bona fide independent providers. *See* Complaint ¶¶ 43-124. Defendants' conduct of these

enterprises raises no individual issues of law or fact, as the inquiry focuses entirely on the actions

of Defendants and their co-conspirators.

---

[13] In actions transferred under 28 U.S.C. § 1407, the transferee court applies its own circuit's (*i.e.*, the First Circuit's) interpretation of federal law. *Menowitz v. Brown*, 991 F.2d 36, 40 (2d Cir. 1993).

[14] Plaintiffs also allege a RICO conspiracy claim, which requires proof of the existence of an enterprise that the Defendants knowingly joined, and that Defendants participated in the conduct of the enterprise through a pattern of racketeering activity by agreeing to commit or in fact committing two or more predicate offenses. *Feinstein v. Resolution Trust Corp.*, 942 F.2d 34, 41 (1st Cir. 1991). As detailed below, all of these elements focus on Defendants' behavior, not the behavior or characteristics of individual Plaintiffs.

Second, to prove a "pattern of racketeering activity," plaintiffs must show that a defendant commited at least two related acts of racketeering activity within the applicable time period. *Schultz v. Rhode Island Hosp. Trust Nat'l Bank, N.A.*, 94 F.3d 721, 731-32 (1st Cir. 1996). Plaintiffs have alleged predicate acts of mail and wire fraud, specifically, that Defendants disseminated fraudulent information to physicians in furtherance of their scheme to sell more Neurontin. Common issues generally predominate over individual issues in mail and wire fraud cases, because the elements of mail and wire fraud focus on Defendants' – not Plaintiffs' – conduct.[15] "[A] RICO claim based on mail and wire fraud 'focuses on the defendant's conduct in devising or intending to devise a scheme to defraud, not the individual experiences of each defrauded person.'" *In re Synthroid*, 188 F.R.D. at 300 (citations omitted).

Finally, to prove their RICO claim, Plaintiffs must show that they were injured, and that Defendants' mail and wire fraud was the proximate cause of those injuries. *Libertad v. Welch*, 53 F.3d at 436; *Holmes v. Security Investor Protection Corp.*, 503 U.S. 258, 266 n.11 (1992). Common issues predominate here as well. Plaintiffs have alleged that they were directly targeted by Defendants' scheme, and that, as a result of Defendants' misconduct, sales of Neurontin soared from $97.5 million in 1995 to nearly $2.7 billion in 2003, with 90% of the increased sales for off-label uses. *See, e.g.*, Complaint ¶¶ 27-29, 46, 249-313. As in *Desiano v. Warner-Lambert*, 326 F.3d 339, 349 (2d Cir. 2003), "[p]laintiffs' claim is that Defendants' wrongful action was their misrepresentation of [Neurontin's efficacy], and that this fraud directly caused economic loss to them as purchasers, since they would not have bought Defendants'

---

[15] "Mail and wire fraud require proof that (1) Defendants knowingly devised or participated in a scheme to defraud, (2) to obtain money or property by means of false or fraudulent pretenses, representations and promises, and (3) that the mails or interstate wire facilities were used in carrying out the scheme." *Lupron*, 295 F.Supp.2d 148, 165 (D.Mass. 2003)(citing *Neder*,

product . . . had they not been misled by Defendants' misrepresentations."

Plaintiffs have proffered the testimony of both Professor Meredith Rosenthal, an expert health care economist, and Raymond Hartman, an expert economist specializing in microeconomics and econometrics, to show that it is possible and appropriate to prove causation and damages with evidence common to the Class. As detailed below, the effect of Defendants' misconduct at a class-wide level can be shown through standard economic methodologies. *See* Declaration of Meredith Rosenthal, The Economics of Off-Label Promotion and Estimation of Impact on the Class of Neurontin Endpayers ("Rosenthal Decl."), filed under seal herewith; *see also* Declaration of Raymond S. Hartman, Estimation of Class-wide Damages ("Hartman Decl."), also filed under seal herewith.[16]

Professor Rosenthal's testimony is proffered to demonstrate that the causal effect of Defendants' unlawful off-label promotional activities can be proven on a class-wide basis. Professor Rosenthal concludes that well-accepted methodologies exist to estimate the causal effect of the promotional activity, and that the data exists to implement these standard methodologies. *See* Rosenthal Decl., at page 1. Furthermore, she concludes that, based on the allegations of Plaintiffs, the Class paid for many more prescriptions of Neurontin for off-label uses than it would have absent the off-label promotional activities, and for all clinical

---

527 U.S. at 20).

[16] The only individual issue which may arise is the allocation of the aggregate amount of class recovery among individual Class members. That is an issue in every case, and courts unanimously have held that it is not an impediment to class certification. *See In re American Honda Motor Co., Dealership Realtors Litig.*, 941 F. Supp. 528, 544 (D. Md. 1996). The damages will be determined as follows. First, an expert will calculate the aggregate damages to the Class, and Plaintiffs will ask the jury to award that sum against Defendants. After judgment is entered and the jury discharged, an administrative claims process will be established to allocate the judgment amount among the Class members. Thus, individual damages will be determined in the administrative claims process, as they are in every class action.

indications, the Class paid for greater dosing of Neurontin than it would have absent Parke-Davis' promotional activities. *See id.* at ¶ 9. Based on information concerning the economics of pharmaceutical promotion and advertising, Professor Rosenthal found that the observed importance of promotional activities upon physician opinion and behavior, the economics of promotional spending and profit-maximization generally, and the finding of more focused quantitative analyses of physician surveys and experiments together provide strong evidence of a causal link between pharmaceutical promotion and drug sales. *See id.* at ¶ 29. Furthermore, Professor Rosenthal states that using a type of observational study called a time-series regression analysis would provide a specific estimate of the causal effect of off-label promotion. *See id.* ¶ 23.

Using the measures of Class-wide impact developed and described in the Rosenthal Declaration, Raymond Hartman -- an expert economist specializing in microeconomics, econometrics and the study of industrial organization -- describes standard economic models and formulaic methodologies to monetize the damages incurred by the Class and Subclasses. *See* Hartman Decl. Based on this formula, Hartman concludes that Class-wide monetary damages can be readily calculated using formulaic methodologies and readily available data standard to analysis of pharmaceutical markets. *See id.* at ¶ 19. Furthermore, Hartman concludes that the magnitude of Class-wide damages will be substantial, based on the magnitude of annual sales of Neurontin over the Class period; the fact that the preponderance of those sales were related to off-label prescriptions; the fact that the preponderance of the off-label sales were induced by the unlawful promotional activities; and the fact that the Class Period starts in 1994. *See id.*

The Class' RICO claims present entirely common questions of federal law. For

that reason alone, common questions of law, as well as fact, predominate over individual issues in the case.

### 2. Common Questions Predominate Over Individual Questions In Connection With Plaintiffs' New Jersey Consumer Fraud Act Claim.

#### a. New Jersey Substantive Law Applies to Plaintiffs' State Law Claims.

Plaintiffs' federal RICO and state law claims share common issues of fact. In order to determine whether common questions of *law* predominate in connection with Plaintiffs' state law claims, the Court must first determine which state's law to apply. In order to determine which state's law to apply, the Court must first determine which *choice of law rule* to apply. Where, as here, actions are transferred by the Judicial Panel on Multidistrict Litigation pursuant to 28 U.S.C. § 1407, the transferee Court must apply the choice of law rules of the transfer*or* district. *See Menowitz*, 991 F.2d at 40 ("[U]nder the rule of *Van Dusen v. Barrack*, 376 U.S. 612, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964), a transferee court [under 28 U.S.C. § 1407] applies the substantive state law, including choice-of-law rules, of the jurisdiction in which the action was filed."). Each transferor district, in turn, must apply the choice of law rules of the state in which it is located.[17] This does *not* mean that the transferee court must apply the *substantive* law of the state in which the transferor district is located. Application of the transferor state's choice of law rules may well lead to application of the substantive law of the transferor state, the transferee state, or a different state altogether. *Ferens v. John Deere Co.*, 494 U.S. 516 (1990).

---

[17] *See Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941) ("The conflict of laws rules to be applied by the federal court in Delaware must conform to those prevailing in Delaware's state courts."); *Cochran v. Quest Software, Inc.*, 328 F.3d 1, 6 (1st Cir. 2003) (federal court sitting in diversity must apply forum state's choice of law rules); *Shannon-Vail Five Inc. v. Bunch*, 270 F.3d 1207, 1210 (9th Cir. 2001) ("A federal district court must apply the state law that would be applied by the state court of the state in which it sits. This is true whether the basis for subject matter jurisdiction is diversity of citizenship under 28 U.S.C. § 1332 or federal question under 28 U.S.C. § 1331.").

Accordingly, the Court should apply the choice of law rules of the state in which the action proposed for certification was filed. Because Plaintiffs may freely choose any of the many class actions transferred to (or filed in) this Court in which to seek certification, they may effectively select which state's choice of law rules they wish the Court to apply.[18] *See Ferens*, 494 U.S. at 523-32 (1990) (transferee court must apply transferor court's choice of law rules, even where transfer was initiated by plaintiff, rejecting "forum shopping" arguments); *Corrected Case Management Order* (Dec. 16, 2004), at 10 ("Any consolidated class action complaint in the Class Action Cases shall apply to all pending class action cases and to any other cases subsequently filed, removed, or transferred to the Court as part of this proceeding.").

In recent years, the battle for class certification has turned largely into a battle over whether the court can apply a single state's law to the claims of a national class, or must apply the laws of all 50 states, which a number of federal courts have held undermines the requirements that common questions predominate and/or that the class action must be manageable for trial. *See, e.g.*, *In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012 (7th Cir. 2002) (reversing certification; holding that under Indiana's *lex loci delicti* choice of law rule, the law of

---

[18] Indeed, if the choice of law rules of *any* of the transferee districts would lead to the application of a single state's law, the Court may certify a class in that action and apply that law, rather than denying certification on the ground that the law of all 50 states must be applied. Defendants will doubtless cry "unfair," that plaintiffs should be required to "roll the dice" and apply the choice of law rules of the transferee forum. The Supreme Court has held otherwise. *Menowitz*, 99 F.2d at 40. Just as a plaintiff is free to select any proper venue in which to file a lawsuit, he or she is free to select the corresponding choice of law rule. MDL transfer does not vitiate a plaintiff's original choice of forum, or render unavailable its choice of law rules. *See Ferens*, 494 U.S. at 528 ("Applying the transferor [choice of] law [rule] would not give a plaintiff an opportunity to use a transfer to obtain a law that he could not obtain through his initial forum selection. . . . [I]t does no more than recognize a forum shopping choice that already exists. This fact does not require us to apply the transferee law."). Indeed, the Supreme Court has held that actions transferred pursuant to 28 U.S.C. § 1407 must be remanded to their respective transferor districts for trial. *Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26 (1998).

all 50 states must be applied, rendering the action unmanageable).[19]  Indeed, it has become

standard fare for defense counsel to argue (1) that the law of all 50 states must be applied,

ostensibly to protect the interests of all class members in invoking the benefits and protections of

their own state's laws; and (2) that certification must therefore be denied, because application of

all 50 states' laws would be unmanageable and undermine the predominance of common

questions.  Such efforts by the fox to guard the henhouse should be seen for what they are:  a

transparent effort to deny class members any relief whatsoever on the pretext of protecting their

theoretical rights.  As this Court noted many years ago, "[a] court . . . must be suspicious of

defendants' efforts to protect unnamed plaintiffs when that protection will, as a practical matter,

leave them without a remedy." *Abelson*, 1987 WL 15872 at *3.

Since certification may depend on which choice of law rule is applied, interim

class counsel would be remiss in their duties if they did not select for proposed certification an

action filed in a district with a choice of law rule that would permit application of a single state's

law to the claims of a national class.  Ten days ago, the New Jersey state court judge presiding

over the Vioxx litigation, the Hon. Carol E. Higbee, J.S.C., issued a 70-page opinion certifying a

national class of third party payors under the NJCFA.  *See* Memorandum Decision on Plaintiff's

Motion for Class Certification, *International Union of Operating Engineers Local #68 Welfare*

*Fund v. Merck & Co., Inc.*, No. ATL-L-3015-03-MT (July 29, 2005) ("*Vioxx*") (attached to

Plaintiffs' Notice of Supplemental Authority, filed Aug. 3, 2005 [docket entry #199]).  The *Vioxx*

opinion is noteworthy both for the similarity of the facts alleged – that the defendant, a New

---

[19] Indeed, at the very first status conference in this MDL proceeding, the Court cautioned
Plaintiffs' counsel not to attempt to certify a class under all 50 state laws, but rather to "come up
with a state law that you think is appropriate," and, more specifically, to "[p]ick their [Warner-
Lambert's] home state," New Jersey.  Reporter's Transcript, Nov. 23, 2004, at 33:23-34:24.
Plaintiffs have done so.

Jersey-based pharmaceutical manufacturer, misrepresented the safety and efficacy of Vioxx to increase sales of the drug – and for the unusually thorough, state-by-state choice of law analysis it contains. *Id.* at 28-64.

As discussed below, Massachusetts follows the same choice of law rules applied by Judge Higbee, which should lead to the same result, as the grounds for applying New Jersey law nationally in *Vioxx* are fully present here – that the alleged scheme to defraud was hatched and carefully orchestrated by the defendant from its New Jersey headquarters. *See Vioxx*, at 33; Complaint ¶ 12, 19-31 (describing development of scheme by Parke-Davis/Warner-Lambert's New Jersey headquarters). Accordingly, Plaintiffs move for certification in the *Harden Manufacturing* case, which was filed in this district. In the alternative, should the Court find that a different result would obtain under Massachusetts' choice of law rules, Plaintiffs move for certification in *ASEA/AFSCME Local 52 Health Benefits Trust and Brian Krah v. Pfizer, Inc., et al.*, D. N.J. C.A. No. 04-02577, which was transferred here from the District of New Jersey, and as to which the *Vioxx* choice of law analysis is directly applicable.

Massachusetts, like New Jersey, generally follows the *Restatement (Second) of Conflict of Laws* (1971) ("*Restatement*") in deciding choice of law issues. As summarized by this Court:

> In tort actions, Massachusetts has abandoned strict adherence to the rule of *lex loci delicti* and adopted a more flexible approach. The SJC, however, "has refused to bind itself to a single choice of law doctrine" applicable to torts. *Reisch v. McGuigan*, 745 F.Supp. 56, 59 (D.Mass.1990). In analyzing the pertinent choice influencing considerations, state and federal courts in Massachusetts nevertheless increasingly rely on the *Restatement (Second) of Conflict of Laws* (1971).

*Tingley Systems, Inc. v. CSC Consulting, Inc.*, 152 F. Supp. 2d 95 (D.Mass. 2001) (citations omitted).

The First Circuit recently summarized Massachusetts' approach to choice of law

questions as follows:

> Massachusetts state courts apply "a functional choice of law approach that responds to the interests of the parties, the States involved, and the interstate system as a whole." *Bushkin Assocs., Inc. v. Raytheon Co.*, 393 Mass. 622, 473 N.E.2d 662, 668 (1985). In doing so, Massachusetts courts consider a variety of factors in choosing the applicable state law, including:
>
>> (a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability, and uniformity of result, and (g) ease in the determination and application of the law to be applied.
>
> *Bushkin Assocs.*, 473 N.E.2d at 669 (quoting *Restatement (Second) Conflict of Laws* § 6 (1971)). Courts also may take into account five parallel considerations:
>
>> (A) Predictability of results; (B) Maintenance of interstate and international order; (C) Simplification of the judicial task; (D) Advancement of the forum's governmental interests; [and] (E) Application of the better rule of law.
>
> *Id.* Moreover, the Massachusetts Supreme Judicial Court has stated that it "feel[s] free ... to borrow from any of the various lists to help focus ... attention on the considerations particularly relevant to the case." *Millipore*, 115 F.3d at 30 (quoting *Bushkin Assocs.*, 473 N.E.2d at 670).

*Reicher v. Berkshire life Ins. Co. of America*, 360 F.3d 1, 5 (1st Cir. 2004) (citations omitted).

New Jersey courts likewise look to the general factors set forth in the *Restatement* § 6, in deciding which state has a stronger interest in seeing its law applied in a particular case. *See Vioxx*, at 29-30.

In cases alleging common law fraud and statutory consumer fraud, the First Circuit has expressly held that "a Massachusetts court would apply a test not materially different from that of the *Restatement (Second) of Conflict of Laws* § 148[(2)] in determining the law applicable". *Computer Systems Engineering, Inc. v. Qantel Corporation*, 740 F.2d 59, 70 (1st Cir. 1984).[20] This is the same test applied by the court in *Vioxx*. *See Vioxx*, at 30.

---

[20] In so holding, the First Circuit stated that the district judge's analysis was "cogent and

*Restatement* § 148(2), which "applies to actions brought to recover pecuniary damages suffered on account of false representations, whether fraudulent, negligent, or innocent" (*Restatement* § 148, com. a), provides that:

> When the plaintiff's action in reliance took place in whole or in part in a state other than that where the false representations were made, the forum will consider such of the following contacts, among others, as may be present in the particular case in determining the state which, with respect to the particular issue, has the most significant relationship to the occurrence and the parties:
>
> (a) the place, or places, where the plaintiff acted in reliance upon the defendant's representations,
>
> (b) the place where the plaintiff received the representations,
>
> (c) the place where the defendant made the representations,
>
> (d) the domicil, residence, nationality, place of incorporation and place of business of the parties,
>
> (e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and
>
> (f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant.

*Restatement* § 148(2). As the court noted in *Vioxx*:

> [T]he place of loss does not play so important a role in the determination of the law governing actions for fraud and misrepresentation as does the place of injury in the case of injuries to persons or to tangible things. [¶] The place where the defendant made his false representations, on the other hand, is as important a contact in the selection of the law governing actions for fraud and misrepresentation as is the place of the defendant's conduct in the case of injuries to persons or to tangible things.

*Restatement* § 148, com. c. *Accord Vioxx*, at 30-31 (quoting comment).

---

complete," and "affirm[ed] his resolution of the choice of law question on the basis of his opinion." 740 F.2d at 70. In that opinion, the district court explained that the operative provision was Subsection 2, because "Subsection (1) of [§ 148] is limited to the situation where a plaintiff's action in reliance occurs exclusively in the state in which the misrepresentations were made and received. . . . Subsection (2) applies to circumstances in which a plaintiff's action in reliance takes place in two or more states . . . ." *Computer Systems Engineering, Inc. v. Qantel Corp.*, 571 F. Supp. 1365, 1368-69 (D. Mass. 1983).

The *Vioxx* court's analysis is cogent, concise, and equally applicable here.  In sum, the policies underlying the NJCFA, to compensate the victims of fraud and punish the wrongdoer, strongly militate in favor of the application of New Jersey law to its corporate citizens accused of perpetrating a nationwide scheme to defraud.  *Vioxx*, at 31-32.  Application of New Jersey law would not frustrate the policies of other states, because

> [A]ll consumer fraud statutes are intended to discourage fraud and provide some level of protection to consumers. . . . To the extent that some sates provide less protection for consumers than others, the rationale is generally to encourage business and other commercial transactions to take place within that particular state's borders.  Thus, these state's policies will not be frustrated by imposing New Jersey law onto a corporation residing in New Jersey.  Any deterrence to transactions being done within any particular state's borders by a New Jersey entity would be, at most, minimal because that New Jersey entity has already consented to be subject to the more stringent New Jersey law.

*Vioxx*, at 32-33.  Massachusetts' choice of law jurisprudence is fully in accord.[21]  Accordingly, Plaintiffs' state law claims may proceed under New Jersey substantive law.

### b.    Common Questions Predominate on Plaintiffs' NJCFA Claim.

In *Lupron*, this Court noted that "[m]ail and wire fraud, the predicate acts underlying Plaintiffs' RICO claims, are by definition unfair and deceptive acts.  If Plaintiffs are able to prove any one or more of their RICO claims, their ability to satisfy the elements of a consumer protection act claim under any [consumer fraud] statute[] will follow almost as a matter of course."  *Lupron*, 295 F. Supp. 2d at 181.  Plaintiffs have explained above how they will prove their RICO claims with evidence that is common to all Class members, and their

---

[21] *See Grace v. Perception Technology Corp.*, 128 F.R.D. 165, 171 (D. Mass. 1989) (certifying common law fraud and negligent misrepresentation claims of national class under Massachusetts law, where corporation was headquarterd in and misrepresentations emanated from Massachusetts); *Adair v. Sorenson*, 13 F.R.D. 13, 20 (D. Mass. 1991); Randle, 129 F.R.D. at 393-94 (finding "high likelihood" that Massachusetts law would apply to pendent state law fraud claims of national class, where defendant was headquartered there and "[d]ecisions regarding the timing and content of corporate disclosures were made in Massachusetts").

ability to prove their consumer protection claims on a class-wide basis "will follow almost as a matter of course."

Even putting aside the relationship between Plaintiffs' RICO claims and their consumer protection claim, Plaintiffs will prove the elements of their NJCFA claim with evidence that is the same for every member of the Class.  In order to prevail under the NJCFA, a plaintiff must prove a violation of the Act as well as an "ascertainable loss . . . as a result of the unlawful conduct."  *Meshinksy v. Nichols Yacht Sales, Inc.*, 110 N.J. 464, (1988).  The NJCFA broadly proscribes: "any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise . . . ." N.J.S.A. 56:8-2.  The Act's prohibitions are thus said to fall into two general categories of unlawful practices:  affirmative acts and knowing omissions.  Under the NJCFA, it is the "capacity to deceive," and not whether any person was in fact misled, that makes these practices deceptive.  N.J.S.A. 56:8-2; *Cox* v. *Sears Roebuck Co*., 138 N.J. 2 (N.J. 1994) ("A practice can be unlawful even if no person was in fact misled or deceived thereby"); *Fenwick v. Kay American Jeep, Inc*., 371 A.2d 13, 16 (N.J. 1977) ("The capacity to mislead is the prime ingredient of deception or an unconscionable commercial practice.").

As stated above, Plaintiffs have alleged that Defendants knowingly failed to disclose and affirmatively misrepresented the available evidence regarding the efficacy of Neurontin for off-label uses, and did so under false pretenses, masquerading as independent educational providers to deliver their deceptive marketing messages to captive audiences of unsuspecting physicians.  Plaintiffs have also alleged that Defendants deliberately

misrepresented the safety and efficacy of Neurontin at dosages in excess of the approved

maximum, and consciously withheld from physicians the fact that the FDA rejected its

application to increase the allowable dosage because there was no evidence it was either safe or

effective.  These allegations will be proven with evidence common to all members of the Class.

To recover on their NJCFA, Plaintiffs need not establish that Class members

individually relied on the omitted or misrepresented facts.  It is sufficient that they establish that

material facts were withheld from them:

> If liability is found upon a violation of our Consumer Fraud Act,
> we reiterate that the Act requires only a causal nexus between the
> "method, act or practice declared unlawful" and the consumer's
> "ascertainable loss."  N.J.S.A. 56:8-19. . . A defendant who
> violates the Act because of an unlawful "method, act, or practice"
> that results from an omission of a material fact with the "intent that
> others rely upon such concealment, suppression, or omission,"
> N.J.S.A. 56:8-2, is "liable for such misrepresentations whether
> 'any person has in fact been misled, deceived or damaged
> thereby.'"  The distinction between proof of reliance and proof of
> causation can best be explained in the context of this case.  If
> plaintiffs succeed in proving that Mass Mutual withheld material
> information with the intent that consumers would rely on it in
> purchasing Mass Mutual's policy, the purchase of the policy by a
> person who was shown the literature would be sufficient to
> establish prima facie proof of causation.

*Varacallo v. Mass. Mutual Life Ins. Co.*, 752 A.2d 807, 817 (N.J. Super. App. Div. 2000),

quoting *Gennari v. Weichert Co. Realtors*, 672 A.2d 1190 (N.J. Super. App. Div. 1996) (quoting

N.J.S.A. 56:8-2).

Similarly, in this case, Defendants deluged prescribing physicians with

misleading and incomplete information concerning Neurontin's efficacy for off-label uses, and

Class members' purchases of Neurontin for off-label indications will be sufficient to establish

prima facie proof that they sustained an "ascertainable loss" as a result.  As explained above,

these damages are susceptible of proof on a class-wide basis.  Thus, Plaintiffs satisfy the

predominance requirement of Rule 23(b)(3).

464653.1

### 3.    Common Questions Predominate Over Individual Questions In Connection With Plaintiffs' Common Law Fraud Claim.

Under New Jersey law,[22] to establish common law fraud, a plaintiff traditionally must prove: "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely upon it; (4) reasonable reliance thereon by the other person; and (5) resulting damages." *Banco Popular North America v. Gandi*, 2005 WL 1498504 (N.J. S.Ct 2005). Plaintiffs' common law fraud claim differs from their NJCFA claim only insofar as the common law fraud claim requires a showing of "reliance," that is, a causal link between the Defendants' fraud and the acts resulting in Plaintiffs' damages. In the case of fraudulent conduct, including suppression and concealment of material fact such as occurred here, the question is whether a reasonable person would have considered the concealed or omitted facts important. *See Mango v. Pierce-Coombs*, 370 N.J. Super. 239, 251, 851 A.2d 62 (App. Div. 2004) ("[a] statement is material if . . .a reasonable person would attach importance to its existence in determining a choice of action" (citations omitted)). That is inherently a common inquiry, based on an objective, reasonable person standard.

Thus, under New Jersey law, "where omissions of material fact are common to the class," both reliance and causation will be presumed in favor of the class, and "class certification is favored" of common law fraud claims. *Varacallo*, 752 A.2d at 817-18. As one court explained:

> Where the theory of recovery is common law fraud, in which reliance is required, our analysis of the predominance issue requires resolution of this question: For purposes of certifying a

---

[22] The choice of law analysis conducted above applies equally to Plaintiffs' common law claims, which likewise sound in fraud. *See Restatement* § 148, com. a (*Restatement* § 148 "applies to actions brought to recover pecuniary damages suffered on account of false representations, whether fraudulent, negligent, or innocent").

464653.1

> class, must the plaintiffs offer direct proof that the entire class
> relied on defendant's representation that omitted material facts,
> where the plaintiffs have established that the defendant withheld
> these material facts for the purpose of inducing the very action the
> plaintiffs pursued?  We think not.
>
> *     *     *
>
> The presumption or inference of reliance and causation, where
> omissions of material fact are common to the class, has been
> extended both in the context of both common law and statutory
> fraud.  The Supreme Court has broadened this concept to include
> all material misrepresentations, whether facts are not disclosed or
> falsely represented . . . Of course, the inference may be rebutted,
> but it is the burden of the defendant to come forward with
> sufficient evidence to do so . . . Where the omission of fact is
> common to the entire class, class certification is favored.

*Id.* at 817-18 (citations omitted).[23]

Plaintiffs allege that Defendants created and implemented a national scheme to

unlawfully promote Neurontin for off-label uses by misrepresenting and fraudulently concealing

information in their possession with regard to Neurontin's efficacy for such uses.  Because these

misrepresentations and omissions were highly material to physicians' decisions to prescribe

Neurontin for these conditions, a presumption of reliance applies.  *Id.*  Plaintiffs' fraud claim is

therefore susceptible to class wide proof, and may properly be certified under Rule 23(b)(3).[24]

---

[23] Other jurisdictions also permit a presumption or inference of reliance and causation, where undisclosed fraudulent conduct, concealment, or omissions of material fact are common to the class, in the context of common law fraud.  *See Vasquez v. Superior Court of San Joaquin County*, 4 Cal.3d 800, 94 Cal.Rptr. 796 (1971); *also Wilner v. Sunset Life Ins. Co.*, 78 Cal.App.4th 952, 93 Cal.Rptr. 2d 413, 420 (2000) (applying *Vasquez*).  Defendants will likely argue that *Varacallo* is no longer good law, based on *Brown v. Philip Morris Inc.*, 228 F.Supp.2d 506 (D. N.J. 2002).  Such an argument is without merit for a number of reasons.  Most importantly, the district court there stated that the *Varacallo* court was only addressing the narrow question of whether "for purposes of certifying a class, must the plaintiffs offer direct proof that the entire class relied on defendant's representation that omitted material facts, where the plaintiffs have established that the defendant withheld these material facts for the purpose of inducing the very action the plaintiffs pursued" and therefore was inapplicable to the facts in *Brown*.  Here, the *Varacallo* set of circumstances is precisely that confronted by this court.  Therefore, the district court's criticism of *Varacallo* does not apply.

[24] Moreover, even without such a presumption, potential individual questions of reliance should not preclude a finding of predominance at this stage.  *See, e.g.,* 1 Newberg 4.25 at 4-104

35

4.      **Common Questions Predominate Over Individual Questions In Connection With Plaintiffs' Unjust Enrichment Claim.**

As this Court observed in *Lupron*, "[u]nder the doctrine of unjust enrichment, a plaintiff seeks restitution of a benefit conferred on another whose retention of the benefit at plaintiff's expense would be unconscionable." 295 F. Supp. 2d at 182. Under New Jersey law, this common law doctrine (which varies little by jurisdiction) similarly requires a plaintiff to "show both that defendant received a benefit and that retention of the benefit would be unjust." *Castro v. NYT Television*, 370 N.J. Super. 282, 299, 851 A.2d 88 (N.J. Super. A.D. 2004); *VRG Corp. v. GKN Realty Corp.*, 135 N.J. 539, 554, 641 A.2d 519, 526 (1994). "As noted in Restatement of the Law, Second, Restitution (Tentative Draft No. 1, April 1983) § 1: 'A person who received a benefit by reason of an infringement of another person's interest, or of loss suffered by the other, owes restitution to him in the manner and amount to prevent *unjust* enrichment.'" *Desiderio v. D'Ambrosio*, 190 N.J. Super. 424, 431-32, 463 A.2d 986 (1983) (emphasis added). *See also Restatement (Third) of Restitution & Unjust Enrichment* § 1 ("A person who is unjustly enriched at the expense of another is liable in restitution to the other.").

Again, Plaintiffs' unjust enrichment claims are appropriate for class certification, because evidence supporting these claims is susceptible of class wide proof. Plaintiffs have alleged that Defendants were enriched by billions of dollars at their expense, by engaging in a deceptive campaign of off-label promotion in violation of federal laws that do not provide Plaintiffs with a private right of action. The fundamental, class wide issue to be considered for this claim is whether Defendants created and implemented a deceptive scheme to unlawfully

---

("Challenges based on . . . reliance have usually been rejected and will not bar predominance satisfaction because [reliance pertains] to the right of a class member to recover in contrast to the underlying common issues of defendant's liability."). The Third Circuit's predominance analysis in *Prudential* is instructive on this point. There, the Third Circuit affirmed the trial court's finding that an insurance company's national sales scheme presented predominating common issues. The class comprised several million life insurance policyholders in 51 jurisdictions. *See* 148 F.3d at 289. The plaintiffs alleged common law fraud, unjust enrichment and other claims, all based on Prudential's deceptive sales practices.

market and promote Neurontin for off-label indications, and were thereby unjustly enriched. Proof of the unjust enrichment claim will be straightforward and common to all Class members, because the focus is on Defendants' conduct, which was uniform toward all Class members.

Unlike an action for damages, restitution focuses on defendant's gain rather than plaintiff's loss. *See County of Essex v. First Union Nat'l Bank*, 373 N.J. Super. 543, 553, 862 A.2d 1168 (N.J. Super. A.D. 2004) ("The remedy in restitution rests on the ancient principle of disgorgement. Beneath the cloak of restitution lies the dagger that compels the conscious wrongdoer to 'disgorge' his gains. Disgorgement is designed to deprive the wrongdoer of all gains flowing from the wrong rather than to compensate the victim of the fraud."); *see also In re Cardizem CD Antitrust Litig.*, 200 F.R.D.326 (E.D. Mich. 2001) (granting class certification under Michigan law); *see also* Randle, 129 F.R.D. 386, 394 (D. Mass. 1998) (certifying nationwide class under Massachusetts law); *In re Pizza Time Theatre Sec. Litig.*, 112 F.R.D. 15, 20 (N.D. Cal. 1986) (certifying nationwide class under California law). Defendants' unlawful conduct, and the illicit profits derived therefrom, are susceptible of common proof. Accordingly, common factual and legal issues predominate on Plaintiffs' unjust enrichment claim.

E.     **A Class Action Is Superior To The Adjudication Of Thousands Of Individual Cases.**

Rule 23(b)(3) requires that the Court find that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). The factors a court must consider in making this determination include:

> (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Fed. R. Civ. P. 23(b)(3). All of these factors favor class treatment in this case.

Despite the extensive publicity surrounding the *Franklin* settlement, and the large number of class action cases filed by both consumers and third party payors, over a year later,

only a relative handful of third party payers – and virtually *no* consumers – have filed individual

actions to recoup amounts paid for Neurontin, evidencing a profound *dis*interest of Class

members in pursuing this litigation on a non-class basis.  Indeed, for all but the largest third party

payers, the expense of litigating this action on an individual basis would likely eclipse any

possible recovery.  *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985) ("[c]lass

actions also may permit the Plaintiffs to pool claims which would be uneconomical to litigate

individually. . . .  [M]ost of the Plaintiffs would have no realistic day in court if a class action

were not available."); *Smilow*, 323 F.3d 32 at 22-23 (the "core purpose of Rule 23(b)(3) is to

vindicate the claims of consumers and other groups of people whose individual claims would be

too small to warrant litigation").  Accordingly, the first and second "superiority" factors strongly

militate in favor of class certification.

   Concentrating the litigation in this forum is not only "desirable," it has been

*ordered* by the Judicial Panel on Multidistrict Litigation.  *See In re Neurontin Marketing and*

*Sales Practices Litigation*, 342 F. Supp. 2d 1350 (Jud. Pan. Mult. Lit. 2004).  Accordingly, as a

practical matter, the choice is not between this Court handling the litigation on a classwide basis,

or other district courts handling the litigation on a classwide or individual basis; it is between this

Court handling the litigation on a classwide basis, or attempting to manage thousands (or tens of

thousands) of individual, non-class actions.  Clearly, a class action is not only a superior method

of providing redress to the Class members, it is the *only* administratively practical method.

Concentration of the litigation in this Court is desirable for the reasons found by the JPML:

> In concluding that the District of Massachusetts is an appropriate
> forum for this docket, we note that i) the district is where a False
> Claims Act *qui tam* action predicated on the same facts as those at
> issue in the MDL-1629 actions had been pending for eight years
> and had proceeded to a very advanced stage before being settled;
> and ii) the judge assigned to the constituent MDL-1629
> Massachusetts actions is the same judge who presided over the qui
> tam action and is thus already thoroughly familiar with the issues

of fact and law raised in the MDL-1629 actions.

*Id*. at 1351-52.  *See also George Lussier Enters.*, 2001 WL 920060 at *7 ("Given the court's familiarity with the legal issues raised by this case, it is desirable to concentrate the litigation of Plaintiffs' claims in this court.").

　　　　The final superiority factor – manageability – focuses on the "practical problems that may render the class action format inappropriate for a particular suit."  *Eisen*, 417 U.S. at 164.  The question is whether multiple individual lawsuits would be more manageable than a class action.  *In re Prudential Ins. Co. of Am. Sales Practice Litig.*, 962 F. Supp. 450, 524-25 (D.N.J. 1997), *aff'd,* 148 F.3d 283 (3d Cir. 1998).  Refusal to certify a class solely on grounds of manageability is disfavored and "should be the exception rather than the rule."  *Visa Check/MasterMoney,* 2001 WL 1242717 at *10 (citing cases).  Here, Plaintiffs cannot foresee any manageability problems.  In fact, the manageability problems would be far greater with multiple individual lawsuits, prosecuting the same claims against the same Defendants based on the same marketing practices.  That "would be grossly inefficient as the parties, witnesses, and [this] court[] would be forced to endure duplicative litigation."  *Margaret Hall*, 1987 U.S. Dist. LEXIS 7528, at *19.  Moreover, "[i]ndividual litigation would be costly, time consuming, and could potentially result in inconsistent judgments."  *Id.*; *see also In re Brand Name Prescription Drugs Antitrust Litig.*, 1994 WL 663590 at *5 (N.D. Ill. 1994) ("we fail to see the logic in defendants' contention that 50,000 individual actions are less complex than a single class action").  Accordingly, class treatment of Plaintiffs' claims is "superior to other available methods for the fair and efficient adjudication of the controversy."  Fed. R. Civ. P. 23(b)(3).

464653.1

## IV.     <u>CONCLUSION</u>

For all of the foregoing reasons, Plaintiffs respectfully request that the Court

certify the Class and Subclasses pursuant to Fed. R. Civ. P. 23(b)(3), appoint Plaintiffs the

representatives of the Class and Subclasses, and appoint interim class counsel to represent the

interests of the certified Class and Subclasses.

Respectfully submitted,

**For the Class:**

Dated:  August 8, 2005

   */s/ Barry Himmelstein*

**LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP**
Barry Himmelstein, Esq.
275 Battery Street, 30th Floor
San Francisco, CA  94111-3339

**GREENE & HOFFMAN**
Thomas Greene, Esq.
125 Summer Street
Boston, MA  02110

**HAGENS BERMAN LLP**
Thomas M. Sobol, Esq.
One Main Street, 4th Floor
Cambridge, MA  02142

**DUGAN & BROWNE**
James Dugan, Esq.
650 Poydras Street, Suite 2150
New Orleans, LA  70130

**BARRETT LAW OFFICE**
Don Barrett, Esq.
404 Court Square North
P.O. Box 987
Lexington, MS  39095

464653.1

**LAW OFFICES OF DANIEL BECNEL, JR.**
Daniel Becnel, Jr., Esq.
106 W. Seventh Street
P.O. Drawer H
Reserve, LA  70084

**Attorneys for Plaintiffs and the Class**

41