EXHIBIT E

## COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT

LAURA ALLEN, ADMINISTRATIX )
OF THE ESTATE OF THE LATE )
DANIEL ALLEN, TIMOTHY BRIDGES, )
and ALFRED MORABITO, individually )
and on behalf of themselves and all others )
similarly situated, )
                                       ) CIVIL ACTION NO. <u>04-5600 BLS</u>
                Plaintiffs, )
                                )
v. )
                                )
PFIZER, INC. and PARKE-DAVIS, )
a division of Warner-Lambert Company )
                                )
                  Defendants. )

## <u>FIRST AMENDED CLASS ACTION COMPLAINT</u>

### I. NATURE OF THE ACTION

1.     Plaintiffs by and through their undersigned attorneys, bring this strictly state law cause of action on behalf of themselves and all similarly situated consumers as a result of Defendants' ~~illegal marketing~~unfair and deceptive scheme designed to push and promote ~~"off-label" uses of~~ the prescription drug Neurontin <u>for fraudulently devised uses that were not scientifically proven to be safe, efficacious, effective or useful</u>.

2.     Defendants' scheme involved a ~~calculated~~<u>deliberate</u> and deceitful marketing <u>and sales</u> campaign, ~~which~~ultimately ~~duped physicians and~~<u>designed to dupe</u> <u>Massachusetts</u> consumers into believing that ~~prescribing and taking Neurontin for the~~ ~~"off-label" uses that Defendants promoted~~<u>taking Neurontin for Bipolar Disorder;</u> <u>Perhipheral Neuropathy, Diabetic Neuropathy and other pains syndromes; Epilepsy</u> <u>Monotherapy; Reflex Sympathetic Dystrophy; Attention Deficit Disorder; Restless Leg</u>

Syndrome; Trigeminal Neuralgia; Essential Tremor Periodic Limb Movement Disorder;
migraines; Amyotrophic Lateral Sclerosis (Lou Gehrig's Disease); and drug and alcohol
withdrawal seizures (herein collectively referred to as "unproven uses" or "scientifically
unproven uses") was appropriate even though the Defendants knew ~~FDA approval had
not been granted, and that little if any,~~that no scientific evidence existed to suggest that
Neurontin was safe and effective.

3.      The ~~Defendants~~sole purpose of the scheme was to increase the sales of
Neurontin and unfairly reap profits at the expense of Massachusetts consumers.

4.      The Defendants' scheme included a coordinated and focused "target
marketing campaign" directly on the mentally and terminally ill, as well as on persons
suffering from chronic pain.

~~4.~~ 5. Although Defendants knew their representations as to the ~~"off-label"~~ uses of
Neurontin were false, they willfully and knowingly marketed and sold Neurontin
throughout the Class Period to consumers within the Commonwealth of Massachusetts.~~5.~~

~~        This putative class action is brought pursuant to M.G.L. c. 93A, § 9(2) on behalf
of a similarly situated class of consumer purchasers of Neurontin who suffered similar
economic injury as a direct result of the Defendants' unfair or deceptive acts or practices
(herein also referred to as "wrongful conduct" or "wrongfully").~~

6.      ~~Each member of this consumer class is entitled to economic damages~~This
putative class action is brought pursuant to G.L. c. 93A, § 9(2) on behalf of a similarly
situated class of consumer purchasers of Neurontin who suffered similar economic injury
as a direct result of the Defendants' unfair or deceptive acts or practices.

7.    Each member of this consumer Class is entitled to economic relief against the defendant pharmaceutical companies who engaged in the ~~illegal~~intentionally false representation, promotion and sale of the drug Neurontin for ~~"off-label"~~ uses that were misrepresented to the public as being safe, effective and scientifically supported.

~~7.~~ 8. Defendants' knowing and willful unfair or deceptive acts or practices referred to herein constitute violations of the Massachusetts Consumer Protection Act, ~~M.~~G.L. c. 93A, §§ 1, *et. seq*.; ("Chapter 93A").

## II. PARTIES

~~8.    Plaintiff and proposed class representative, Laura Allen, Aministratrix of the Estate of the late Daniel Allen, is a resident of the Commonwealth of Massachusetts whose late husband was prescribed Neurontin during the Class Period for the treatment of migraine headaches, loss of energy and Amyotrophic Lateral Sclerosis (Lou Gehrig's Disease).~~

9.    Plaintiff and proposed class representative, ~~Timothy Bridges~~Laura Allen, Administratrix of the Estate of the late Daniel Allen, is a resident of the Commonwealth of Massachusetts ~~who~~whose late husband was prescribed Neurontin during the Class Period for ~~treatment of pain syndromes, nerve pain and stroke-like symptoms~~the treatment of pain, migraine headaches, loss of strength and energy and Amyotrophic Lateral Sclerosis. As a result of Defendants' unfair and deceptive acts, Plaintiff has been injured and has suffered actual damages.

10.    Plaintiff and proposed class representative, ~~Alfred Morabito~~Timothy Bridges, is a resident of the Commonwealth of Massachusetts who was prescribed Neurontin during the Class Period for treatment ~~of arthritis, tremors and fibromyalgia~~after two back surgeries for among other uses: pain syndrome and nerve

pain. As a result of Defendants' unfair and deceptive acts, Plaintiff has been injured and has suffered actual damages.

11.     Plaintiff and proposed class representative, Alfred Morabito, is a resident of the Commonwealth of Massachusetts who was prescribed Neurontin during the Class Period for treatment after a shoulder injury for among other uses: pain, arthritis, tremors and fibromyalgia. As a result of Defendants' unfair and deceptive acts, Plaintiff has been injured and has suffered actual damages.

12.     Each Plaintiff and proposed class representative is a natural person and resident of the Commonwealth of Massachusetts who was prescribed Neurontin for ~~an~~ ~~"off-label" use wrongfully~~a scientifically unproven use unfairly and deceptively promoted by the Defendants.

13.     Each Plaintiff purchased the drug for their own use and not for resale and thereby suffered economic loss as described herein. ~~At the same time, they suffered~~Each Plaintiff and Class member has been injured and is entitled to actual and/or statutory damages recognized by ~~M.~~G.L. c. 93A as a direct result of Defendants' willful and knowing unfair or deceptive acts or practices.

~~12.~~14.  Each putative class representative and class member was subjected to the same unfair or deceptive acts or practices of the Defendants in that ~~they were prescribed the drug Neurontin for treatment of an "off-label" use wrongfully promoted by the Defendants~~the Defendants misrepresented material scientific, medical and clinical information related to the safety, medical efficacy, effectiveness and usefulness of Neurontin during the Class Period ~~and suffered similar economic injury in purchasing same as more fully detailed herein.~~

13.15.  Defendant Pfizer, Inc. ("Pfizer") is a Delaware corporation with a principal place of business in New York, New York. Pfizer is principally engaged in the manufacture and sale of pharmaceuticals and is one of the largest pharmaceutical companies in the United States. Pfizer maintains facilities and offices throughout the United States, including a research technology center inlocated at 620 Memorial Drive, Cambridge, Massachusetts.

14.16.  Defendant Parke-Davis, a division of Warner-Lambert Company, ("Parke-Davis") is headquartered in Ann Arbor, Michigan. In 2000, Pfizer acquired Warner-Lambert Company ("Warner-Lambert") including Warner-Lambert's Parke-Davis division. As a result of the acquisition, Pfizer is responsible for all liabilities that result from any acts or omissions of Parke-Davis or Warner-Lambert that occurred prior to the Warner-Lambert acquisition. At times throughout this Complaint, Parke-Davis and Pfizer may be referred to collectively as "Pfizer" or "Defendants."

### III. JURISDICTION AND VENUE

15.17.  Without limiting the generality of the foregoing, Defendants (directly or through agents who at the time were acting with actual and/or apparent authority and within the scope of such authority) have:

a)    Transacted business in this Commonwealth;

b)    Contracted to supply and/or obtain services and/or goods in this Commonwealth;

c)    Intentionally availed themselves of the benefits of doing business in this Commonwealth;

d)    Produced, promoted, sold, marketed and/or distributed their products and/or services in this Commonwealth and, thereby, have purposefully profited from their access to this Commonwealth's markets;

e)    Caused tortious damage by act or omission in this Commonwealth;

    f)       Caused tortious damage in this Commonwealth by act or omission committed outside this Commonwealth while: (i) regularly doing or soliciting business in this Commonwealth; and/or, (ii) engaging in other persistent courses of conduct within this Commonwealth; and/or, (iii) deriving substantial revenue from goods used or consumed or services rendered in this Commonwealth;

    g)       Committed acts and omissions which Defendants knew or should have known would cause damage (and, in fact, did cause damage) in this Commonwealth to Plaintiffs and members of the Class (as defined herein) while: (i) regularly doing or soliciting business in this Commonwealth; and/or, (ii) engaging in other persistent courses of conduct within this Commonwealth; and/or (iii) deriving substantial revenue from goods used or consumed or services rendered in this Commonwealth; and/or,

    h)       Otherwise had the requisite minimum contacts with this Commonwealth, such that under the circumstances it is fair and reasonable to require Defendants to come to this Court to defend this action.

    18.    Venue is proper because at least one Plaintiff resides in this County and Defendants conduct business in this County, including the marketing, advertising and sales directed at Massachusetts residents.

    16.19.  Neither the putative class representatives nor any member of the Class has damages exceeding $75,000 each even when trebled. Named plaintiffs expressly disclaim any individual recovery equal to or in excess of $75,000. Attorneys' fees on a pro-rata basis will not exceed $75,000 for each class member.

    17.    Plaintiffs20.   Plaintiff state and intend to state, a cause of action solely under the laws of Massachusetts and specifically deny any attempt to state a federal question and/or cause of action under the laws of the United States of America. Moreover, Plaintiffs' state law claim is not federally preempted. The claim is purely based on state law (G.L. c. 93A) and relies exclusively on state law. The claim advanced mandates that this action be heard in a Massachusetts state forum.

## IV. CLASS ACTION ALLEGATIONS

~~18.~~21.  Plaintiffs bring this action on their own behalf and, pursuant to ~~M.~~G.L. c.

93A, §9(2) and/or Rule 23 of the Massachusetts Rules of Civil Procedure on behalf of all

members of the following class (the "Class") defined as:

> All Massachusetts residents who, within the Commonwealth of
> Massachusetts purchased for ~~noncommercial~~non-commercial and/or
> consumer purposes the prescription medication, Neurontin, after being
> prescribed said medication for ~~medical conditions other than those~~
> ~~conditions for which Neurontin was approved by the U.S. Food and Drug~~
> ~~Administration~~Bipolar Disorder; Perhiphera1 Neuropathy, Diabetic
> Neuropathy and other pains syndromes; Epilepsy Monotherapy; Reflex
> Sympathetic Dystrophy; Attention Deficit Disorder; Restless Leg
> Syndrome; Trigeminal Neuralgia; Essential Tremor Periodic Limb
> Movement Disorder, migraines; Amyotrophic Lateral Sclerosis; and drug
> and alcohol withdrawal seizures during the period from January 1, 1994 to
> the present (the "Class Period").

~~19.~~22.  Excluded from the Class are all claims for personal injury or wrongful

death.

23.     Excluded from the Class are employees of governmental entities,

defendants, subsidiaries and affiliates of defendants.

~~20.~~24.  The total number of Class members is in the tens of thousands, and

therefore joinder of all members of the Class would be impracticable. The disposition of

the claims of the Class members in a single class action will provide substantial benefits

to all parties and to the Court.

~~21.~~25.  There are questions of law and fact common to the Class which

predominate over questions affecting only individual class members, including, but not

limited to:

> a)     Whether Defendants knew or should have known that Neurontin was not
>        safe, efficacious, effective and useful for certain scientifically unsupported
>        uses;

b)      Whether Defendants intentionally misrepresented the scientific, medical, and clinical data related to the safety, efficacy, effectiveness and usefulness of Neurontin for unproven medical conditions in violation of G.L. c. 93A;

c)      Whether Defendants intentionally misrepresented the scientific, medical, and clinical data related to the safety, efficacy, effectiveness and usefulness of Neurontin in greater doses than scientifically proven in violation of G.L. c. 93A;

d)      Whether Defendants developed and carried out a uniform pattern of conduct ~~whereby physicians and~~ultimately designed to dupe consumers ~~were duped~~ into believing the ~~"off-label"~~scientifically unproven uses promoted by Defendants were ~~approved by the FDA;~~

~~b)      Whether Defendants knew or should have known that Neurontin was not approved by the FDA for purposes other than as a secondary drug for the treatment of epilepsy;~~

~~c)      Whether Defendants intentionally misrepresented the intended and approved uses of Neurontin through employees and "medical liaisons" employed to promote "off-label" uses for Neurontin;~~d)      Whether Defendants knew or were reckless in not knowing the nature and condition ~~of the products sold to the consuming public~~safe, efficacious, effective and useful in violation of G.L. c. 93A;

~~c)      Whether Defendants embarked on an illegal scheme to provide kickbacks to physicians prescribing large amounts of Neurontin for "off-label" purposes to Plaintiffs and members of the Class;~~

e)      Whether Defendants knowingly created, publicized and disseminated articles, reports and studies misrepresenting the scientific credibility of data and authors of such articles, reports and studies in violation of G.L. c. 93A;

f)      Whether Defendants ~~negligently, recklessly, or~~deliberately misrepresented the credentials and qualifications of certain employees as purported specialists, researchers or physicians in order to market and sell Neurontin for scientifically unproven uses in violation of G.L. c. 93A;

g)      Whether Defendants organized seminars and encouraged physicians to prescribe Neurontin for uses not proven to be safe, efficacious, effective or useful in violation of G.L. c. 93A;

h)      Whether Defendants intentionally misrepresented and concealed their role and participation in the creation and sponsorship of seminars, events, articles and publications aimed at selling Neurontin for medical conditions in violation of G.L. c. 93A;

i)      Whether Defendants intentionally made false statements to physicians and pharmacists concerning the safety, efficacy, effectiveness and safetyusefulness of Neurontin for "off-label" usesin violation of G.L. c. 93A;

gj)     Whether the Plaintiffs and the other members of the Class were injured by Defendants' course of conduct and, if so, the appropriate class-wide measure of damages;

h)      Whether Defendants' violations of M.G.L. c. 93A, § 2 as alleged herein, were knowing and/or willful, entitling Plaintiffs and members of the Class to double or treble damages;

ik)     Whether Defendants intended to deceivewillfully and knowingly deceived the members of the Class as described herein:

jl)     Whether Defendants knew the representations they made as alleged herein were false at the time they made them;

km)    Whether Defendants' acts or practices in marketing Neurontin for "off-label" usesto treat a variety of symptoms for which Neurontin was not proven to be safe, efficacious, effective or useful were unfair or deceptive;

ln)     Whether Defendants' wrongful actsunfair or deceptive acts or practices in marketing Neurontin for "off-label"scientifically unproven uses were knowing and willful violations of M.G.L. c. 93A. entitling Plaintiffs and members of the Class to double or treble damages; and

o)      Whether Defendants' failure to tender a reasonable settlement offer to a Class of persons that suffered monetary losses and other injury as a result of conduct that they had reason to know violated G.L. c. 93A supports a claim for treble damages.

22.26.  These and other questions of Massachusetts law and fact are common to the Class and predominate over any question affecting only individual members of the Class.

23.27. The claims of the representative Plaintiffs' claims are typical of the claims of the Class because they, like all members of the Class in that Plaintiffs were purchasers of Neurontin for an "off-label" use wrongfully promoted for the product and each suffered similar economic injury in paying more for the product than its true worth.Class members, have purchased Neurontin in Massachusetts for scientifically unproven uses

and have been harmed by Defendants' misconduct because they would not have purchased Neurontin had they known the truth.

~~24.    The Plaintiffs and members of the Class were deceived and injured by the same unlawful conduct of Defendants as alleged herein, and the relief sought is common to~~

28.    The factual and legal bases of Defendants' misconduct are common to all Class members and represent a common thread of deception and other misconduct resulting in injury to Plaintiffs and all members of the Class.

~~25.~~29.  The Plaintiffs are members of the Class and will fairly and adequately represent the interests of the Class.

~~26.~~30.  The Plaintiffs have no conflicts with, or interests antagonistic to, other members of the Class.

~~27.~~31.  The Plaintiffs have retained counsel with substantial experience in prosecuting class action and consumer protection litigation.

32.    The Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Class, and have the financial resources to do so.

33.    Defendants have acted and failed to act on grounds generally applicable to Plaintiffs and the Massachusetts Class and require Court imposition of relief as to the Class as a whole.

~~28.~~34.  This class action is superior to any alternatives for the fair and efficient adjudication of this controversy because:

a) It will avoid a multiplicity of suits and consequent burden on the courts and parties;

b) It would be virtually impossible for all Class members to intervene as parties —Plaintiffs in this action;

c) It will allow numerous individuals ~~or entities~~ with claims too small to adjudicate on an individual basis because of the prohibitive cost of this litigation, to obtain redress for their economic injuries;

d) A class action is appropriate for treatment on a fluid recovery basis, which will obviate any manageability problems; and

e) It will provide court oversight of the claims process, once Defendants' liability is adjudicated.

## V. FACTUAL ALLEGATIONS

A. ~~FDA Overview~~<u>**Defendants Knew That Market For Neurontin Was Limited**</u>

~~29.    Drug companies must apply to the U.S. Food and Drug Administration ("FDA") for approval to sell a new drug.~~

~~30.    Drug companies spend billions of dollars each year trying to persuade doctors to prescribe their drugs. Defendant Pfizer spends billions of dollars promoting its drugs.~~

~~31.    There are strict federal regulations about what form that promotion can take. There are strict federal regulations about what form promoting "off-label" uses can take. These regulations are meant to ensure that drug companies provide doctors trustworthy information, so that medications are prescribed appropriately.~~

~~32.    The Food and Drug Administration Act of 1997 (herein the "FDAMA"), 21 U.S.C. § 360aaa *et seq*., specifically authorizes a manufacturer to disseminate "written information concerning the safety, effectiveness, or benefit of a use not described in the approved labeling of a drug or device," 21 U.S.C. § §360 (a), if it complies with several requirements:~~

~~a)    The manufacturer must submit an application to the FDA seeking approval of the drug for the "off-label" use;~~

~~b)    the manufacturer must provide the materials to the FDA prior to dissemination;~~

~~c)    the materials themselves must be in unabridged form; and~~

d)      the manufacturer must include disclosures that the materials pertain to an
         unapproved use of the drug, and, if the FDA deems it appropriate,
         "additional objective and scientifically sound information ... necessary to
         provide objectivity and balance."

21 U.S.C. § 360aaa(b)(l)-(6); *id.* at 360aaa(c); *id.* at 360aaa-1.

33.      Manufacturers are permitted to provide only "authorized information" in

the form of unabridged peer-reviewed articles or qualified reference publications.

34.      The FDAMA also requires Defendants to furnish federal regulators with

advance copies of the information they plan to disseminate:

Sixty days prior to disseminating the information, the manufacturer must
furnish the Secretary of Health and Human Services (Secretary) a copy of
the information it plans to distribute, as well as clinical trial information
the manufacturer has regarding the "off-label" use's safety and
effectiveness. The manufacturer also must forward to the Secretary any
reports it has concerning the safety and effectiveness of the "off-label"
use.

B.      Neurontin "Off-Label" Marketing Scheme

35.      At all times during the Class Period, Parke-Davis was principally engaged

in the manufacture and sale of pharmaceuticals.

36.      Pfizer acquired Warner-Lambert including its Parke-Davis Division in

2000.

37.      In December 1993, the FDA approved Neurontin as "adjunctive therapy"

for the treatment of certain types of seizures in adult patients suffering from epilepsy.

37.      Pfizer currently markets and sells Neurontin, a brand name prescription

drug composed of the chemical compound (1-aminomethyl)-1-cyclohexaneacetic acid,

generically known as gabapentin.

38.      The term "adjunctive therapy" meant that Neurontin could not be

prescribed by itself for the treatment of epilepsyIn 1993, Defendants knew that the

market for adjunctive therapy for epilepsy was small with a population potential of
approximately two million patients.

39.     ~~The term "adjunctive therapy" meant that Neurontin could only be
prescribed as an add-on drug in the event that a primary anti-epilepsy drug was not
successful~~In May 1994, Defendants estimated that Neurontin's ultimate sales potential
was only $500 million over the lifetime of the drug.

40.     The ~~FDA-approved labeling~~market for the other uses of Neurontin ~~in 1993
stated that the drug is only effective at 900 to 1800 mg/day.~~

~~41.     Throughout the Class Period, the FDA-approved labeling of Neurontin
stated that the drug is only effective at 900 to 1800 mg/day.~~

~~42.     At the time Neurontin was approved, Defendants' original patent on
Neurontin was set to expire in December 1998.~~

~~43.     It was the position of Defendants that 5 years was only a small window of
exclusivity for this drug~~

~~44.     At the expiration of the Neurontin patent, Defendants would be forced to
share the market for Neurontin with generic drug manufacturers. Generally, competition
by generic drug manufacturers substantially reduces related profits. Generally,
competition by generic drug manufacturers, substantially reduces a drug manufacturers
ability to keep related retail prices high.~~

~~45.     At the time Defendants filed their NDA (New Drug Application) with the
FDA, Defendants intended Neurontin to be used for other indications besides epilepsy
adjunctive therapy.~~

~~46.     In the early and mid 1990s, Defendants filed patents for Neurontin
claiming it to be effective in the treatment of depression, neurogenerative disease, mania,
bipolar disease, anxiety and panic.~~

~~47.     Defendants *never* sought FDA approval for the use of Neurontin to treat
the conditions described in the patent applications referenced above.~~

48.   ~~Defendants made claims in their patent applications that they sought FDA approval for the use of Neurontin to treat the conditions described in the patent applications referenced above.~~

49.   ~~In 1993, the market for the only approved use for Neurontin — adjunctive therapy for epilepsy patients — was limited to a potential population of two million epilepsy patients.~~

50.   ~~At all times during the Class Period, the market for the only approved use for Neurontin — adjunctive therapy for epilepsy patients — was limited to a potential population of two million epilepsy patients.~~

51.   ~~The market for the only approved use for Neurontin — adjunctive therapy for epilepsy patients — is still limited to a potential population of two million epilepsy patients.~~~~52.~~   ~~The market for the other "off-label" uses of Neurontin~~ as alleged herein (pain management, psychiatric disorders, anxiety and depression, etc<u>.</u>) represented considerably larger markets individually and jointly.

~~53.~~ <u>41.</u> Defendants had knowledge prior to making ~~the~~<u>scientifically unproven and unsupported</u> representations as to ~~"off-label"~~<u>Neurontin's safety,</u> efficacy<u>, effectiveness and usefulness as</u> set forth herein, that if these markets could be tapped, they could enjoy enormous profits from Neurontin.

54.   ~~Initially, Defendants intended to file supplemental NDAs in order to expand Neurontin's approved indications, including applications for monotherapy. Such an approval would permit Neurontin to be prescribed by itself for epilepsy treatment.~~

55.   ~~Parke-Davis also intended to file supplemental NDAs in order to expand Neurontin's approved indications, including applications for other various psychiatric and neurological indications.~~

**B.**   **<u>Defendants Intentionally Decided to Promote Neurontin For Unproven Uses Through Publication of False and Misleading Scientific, Medical and Clinical Data</u>**

42.     In January 1995, Parke-Davis's Marketing and Planning Department presented a preliminary Market analysis to the Neurontin Development Team for Neurontin's use for psychiatric indications.

43.     Without considering whether Neurontin could be proven to be safe, efficacious, effective or useful, the report indicated that such a market for Neurontin would be profitable.

44.     The possibility of unfairly and deceptively expanding the market for Neurontin's use for pain syndromes, another market larger than epilepsy, was also discussed.

45.     In February 1995, despite lacking scientific and medical data, the New Product Committee informed the Neurontin Development Team that it supported the development of Neurontin for other uses.

46.     A market feasibility analyses of potential new uses, including bipolar disorder, generalized anxiety disorder, social phobia, neuropathic pain and migraine prophylaxis was prepared.

~~56.~~ 47. By March 1995, Parke-Davis recognized it would be uneconomical to assume the expense and time necessary to conduct clinical trials to prove that Neurontin was safe and effective for these uses.

~~57.     Parke-Davis had no scientifically valid proof in 1995 that Neurontin was in fact safe and effective for any "off-label" use.~~

~~58.     Under applicable statutes and regulations, the manufacturer of a prescription drug regulated by the FDA may not promote or market the use of the drug for purposes or in dosages other than those approved by the FDA. Uses of a prescription~~

~~drug for purposes other than those approved by the FDA are referred to as "off-label"~~
~~uses.~~

~~59.     Promotion by a drug manufacturer of "off-label" uses of prescription~~
~~drugs is strictly illegal.~~60.     ~~After performing extensive economic analysis, senior~~
~~officials for Defendants determined that it~~48.     The difficulty and expense in
conducting medical and clinical studies in order to demonstrate whether the drug was
safe and effective for these uses was not sufficiently profitable ~~for Defendants to obtain~~
~~FDA approval for Neurontin's alternative uses~~.

~~61.~~ 49. Instead, Defendants' officials developed a strategy that would allow
Defendants to avoid the costs of proving that Neurontin was safe and effective for these
~~other uses, while allowing Parke-Davis to compete in the lucrative "off-label"~~
~~markets~~uses.

~~62.~~ 50. As one aspect of the scheme, Defendants knowingly and willfully chose to
employ a "publication strategy".

**C.     Unfair and Deceptive "Publication Strategy"**

51.     With a short period of patent protection for Neurontin, Parke-Davis chose
to immediately implement unfair and deceptive practices to persuade consumers to use
Neurontin for scientifically unproven uses.

52.     On March 22, 1995, the Parke-Davis Marketing Council met in Lyons,
France and recommended that Parke-Davis pursue a "publication strategy" with regard to
psychiatric indications for Neurontin.

~~63.~~53. The "publication strategy" promoted Neurontin though the massive
distribution of related publications.

~~64.~~ 54. The publications were ~~put forward~~misrepresented as written by
independent researchers.

65. 55. The publications were ~~put forward~~misrepresented as describing ~~the scientific evaluation~~scientifically valid evaluations of Neurontin.

66. 56. This unfair and deceptive strategy was advantageous to Defendants, because it could be employed immediately.

67. 57. By publishing non-scientifically valid studies, ~~there was no need to wait for~~Defendants unfairly and deceptively avoided the cost and time delay necessary to obtain the results of scientifically conducted clinical trials to determine if Neurontin was actually effective in the treatment of the subject conditions.

68. 58. The ~~wrongful~~unfair and deceptive marketing scheme also consisted of an elaborate and clandestine promotion of ~~"off-label" uses of Neurontin including representations Defendants knew were false and intended to deceive the Class~~Neurontin for scientifically unproven uses such as bipolar disorder, neuropathic pain, monotheraphy for seizures, bipolar disorders and attention deficit disorder.

69. ~~In particular,~~59. The representations about the ~~"off-label"~~ uses of Neurontin for pain control, monotherapy for seizures using extremely high doses, control of bipolar disorder, and attention deficit disorder, were known to be false to the Defendants and were intended to deceive the members of the Class.

~~70. Minutes of meetings held in 1995 showed that marketing and clinical employees of Defendants decided that clinical trials were too expensive.~~

~~71. Minutes of meetings held in 1995 showed that marketing and clinical employees of Defendants decided that clinical trials were too long.~~

~~72. Minutes of meetings held in 1995 showed that marketing and clinical employees of Defendants decided that that by the time the company got the results of the clinical trials, the patent on Neurontin would be close to running out.~~

73.    Minutes of meetings held in 1995 showed that marketing and clinical employees of Defendants decided that that by the time the company got the results of the clinical trials, the market would be flooded with cheap copies of Neurontin.

74.    As a result, a group of executives called the "New Products Committee" approved an alternative strategy.

75.    A group of Defendants executives called the "New Products Committee" knowingly and willfully decided against the strategy that would have involved going to the FDA, and chose instead an alternative strategy to generate additional "off-label" uses of Neurontin.

76.    A group of Defendants' executives called the "New Products Committee" knowingly and willfully decided that Defendants would pay for clinical trials in a range of uses – bipolar disorder, social phobia, migraine, and chronic pain – and then publicize the results of those trials through medical journals and medical conventions.

77.    The head of the "New Products Committee" was the then-president of the company, Tony Wild.

78.    These promotions knowingly and willfully were caused to occur despite evidence showing that the drug would not work for these conditions. The Defendants thus knew representations being made were false.

79. 60. A Parke-Davis internal memo dated May 5, 1997 posed the central question: "Did Whether it make made sense for Parke-Davis do to do rigorous and expensive clinical trials to prove to the FDA that Neurontin worked for the burning, tingling pain of diabetic neuropathy?" The memo's answer: "It did not."

80.    According to the memo, there was a study that showed Neurontin worked better than a placebo, but more studies would be needed, and the arithmetic did not add up.

81. ~~Neurontin's patent was two and one-half years away from expiring and, when that happened, makers of cheap generic copies would get most of the Neurontin patients.~~

~~82.~~ 61. The Parke-Davis memo further pointed out there were up to 16 million diabetics in the country while the market for Neurontin ~~approved~~'s use for epileptic seizures, had a market of two million.

83. ~~The memo also noted that diabetics had used drugs worth at least $15 million to treat pain, and Neurontin already had most of those patients.~~

~~84.~~62. The ~~epilepsy~~Epilepsy marketing team recommended that Defendants skip the ~~studies and~~clinical studies (that would show whether or not Neurontin was safe, efficacious, effective or useful) and immediately promote Neurontin for pain ~~directly to doctors through educational seminars and other meetings.~~.

85. ~~Although federal regulations did not permit Defendants to promote unapproved uses of Neurontin, Defendants were permitted to distribute publications created by "third parties" that described results of "off-label" uses of Neurontin, if such material was distributed in response to non-solicited requests from physicians.~~

86. ~~Defendants knowingly and willfully decided to create events and programs that would allow special Defendants' employees and independent contractors under Defendants control to promote "off-label" usage.~~

87. ~~The events were held under circumstances that would allow Defendants to deny that they had solicited "off-label" usage. The intent of the Defendants was to exploit a narrow regulatory exception. The Defendants carried out its wrongful plan by engaging in unfair or deceptive acts or practices.~~

88. ~~Significant ingenuity and resourcefulness was necessary in order to execute this unlawful scheme without detection.~~

~~89.    The "publication strategy" required publications from independent~~
~~physicians when no such publications existed.~~

**D.    Creation of Elaborate Plan to Implement Publication Strategy**

63.    In order to implement the publication strategy, Parke-Davis created an elaborate marketing and sales plan. The deceptive plan included, *inter alia*: (a) deliberately misrepresenting the scientific, medical and clinical date that related to the safety, medical efficacy, effectiveness and usefulness of Neurontin for scientifically unproven uses; (b) deliberately misrepresenting the credentials and qualifications of certain of Defendants' employees as purported specialists, medical researchers, physicians and scientific employees in order to market and sell Neurontin for scientifically unproven uses; (c) knowingly publishing articles, studies and reports misrepresenting the scientific credibility of data and the authors of articles, studies and reports; (d) organizing seminars and events designed to encourage unsuspecting physicians to prescribe Neurontin for uses knowing such uses were not proven to be safe, medically efficacious, effective or useful and (e) intentionally misrepresenting and concealing Defendants' role and participation in the creation and sponsorship of a variety of seminars, events, articles and publications aimed to sell Neurontin for unproven uses.

64.    The unfair and deceptive plan required the cooperation of a number of marketing firms ("vendor participants") and several dozen physicians ("physician participants").

65.    The acts of the plan centered on the vendor participants such as Cline, Davis & Mann, Inc. (Proworx); Thompson Physicians World; Sudler & Hennessey; MEDED; MES Healthcare Communications Group; and AMM/Adelphi, organizing and