hosting numerous seminars and events over the course of several years that were falsely represented to be neutral, educational forums.

66.    At these events, Defendants paid participants to provide misleading and deceptive information to physicians on scientifically unproven uses of Neurontin. The participants were not independent, but received coaching and remuneration from the vendor participants and Defendants.

67.    Defendants also caused numerous articles and promotional pieces to be published in medical literature disseminated in Massachusetts misrepresenting the safety, efficacy, effectiveness and usefulness of Neurontin to treat conditions that lacked scientific, medical and clinical data.

90. 68. Defendants unfairly and deceptively hired and directed non-physician technical writers to ~~create articles for medical journals.~~write purported medical articles, with input and direction from Defendants and the vendor participants.

91.    ~~Defendants then paid actual specialists to be the articles' "authors."~~

92.    ~~Defendants' normal marketing force could not deliver the "off-label" message.~~

93.    ~~Defendants trained its medical liaisons to sell "off-label".~~

94.    ~~Defendants trained its medical liaisons to solicit interest in "off-label" uses.~~

95.    ~~Defendants held out its technical employees as providing balanced scientific information.~~

96.    ~~In order for its "publication strategy" to increase usage of Neurontin, Defendants required a large group of doctors interested in experimenting on patients.~~

97. ~~In order for its "publication strategy" to increase usage of Neurontin, Defendants required an even larger group of doctors who were interested in receiving information about those experiments.~~

98. ~~During the Class Period, Defendants generated both groups.~~

99. ~~The related marketing plan included but was not limited to distributing payments to both groups of physicians through consultants, meetings, speakers bureaus, medical education seminars, grants, studies, advisory boards, and teleconferences.~~

69.     Neither Defendants nor the vendor participants wanted their names on the articles so they secretly paid physician participants for use of their names as authors; otherwise known as ghostwriting.

70.     The use of physician signators gave the false impression that the articles were unbiased and not sponsored by Defendants and written by medical doctors according to medically accepted practices and protocols.

71.     In order to monitor and coordinate the ghostwriting plan, Defendants hired marketing firms.

72.     Defendants deceptively trained so called medical liaisons — unqualified technical employees of Defendants who were supposed to provide balanced scientific evidence to physicians.

73.     Defendants trained the medical liaisons to unfairly and deceptively engage in full scale promotion of Neurontin's unproven uses, with the use of non-scientific, anecdotal information designed to convince physicians to prescribe Neurontin for unproven uses.

74.     The medical liaisons misrepresented themselves as medical researchers and specialists even though they never conducted medical research nor analyzed medical research performed by others.

~~100.~~ 75. Defendants had knowledge that it ~~could not~~was unfair and deceptive to promote Neurontin ~~lawfully for non-approved~~for scientifically unproven uses.

101. 76. Despite actual knowledge that they could not promote Neurontin lawfully for non-approvedscientifically unproven uses, marketing executives at Defendants' headquarters in Morris Plains, New Jersey, and in its five regional customer business units (CBUs), knowingly and willfully chose a marketing strategy that by design would lead to increased "off-label" usage of Neurontin for scientifically unproven uses.

77.    Throughout the Class Period, the Defendants' executives had actual knowledge that Defendants' creation of the contents of communications that would be distributed pursuant to the "publication strategy" were unfair and deceptive.

102. 78.    Throughout the Class Period, Defendants' executives had actual knowledge that Defendants were not supposed to createdesign the contents of the communications that would be distributed pursuant to the "publication strategy"."

103.    Defendants' executives had actual knowledge that Defendants were not supposed to design the contents of the communications that would be distributed pursuant to the "publication strategy."

104. 79.    Throughout the Class Period, Defendants' executives had actual knowledge that Defendants were not supposed to do anything to generate the practicing physicians' interest in receiving such communications.

105. 80.    Instead, Defendants ignored these legal requirements and, instead, put into effect the pervasive pattern of illegal, unfair or deceptive conduct described below.

106. 81. While the Defendants actively carried out the wrongfulunfair and deceptive marketing plan from at least 1994 through 2000, the effects of their wrongful activity continue through to the present time as doctors continue to prescribe Neurontin for "off-label" uses.scientifically unproven uses lacking any scientific or medical data.

107.    The Defendants' wrongful marketing plan included but was not limited to:
a)    payment of illegal kickbacks to physicians who prescribed large amounts of Neurontin for "off-label" purposes to patients;

b)      the formation of a nationwide network of employees wrongfully referred to as "medical liaisons". Their actual assigned duties consisted entirely of conventional direct sales activities and did not include any legitimate scientific activity;

c)      the wrongful and illegal direct solicitation of physicians for "off-label" uses;

d)      the wrongful making of false statements to physicians and pharmacists concerning the efficacy and safety of Neurontin for "off-label" uses;

e)      the wrongful payment or offering of gratuities to Defendants' employees in order to procure their silence; and

f)      the wrongful active training of Defendants' employees in methods of avoiding detection of their activities by the FDA.

C.      Defendants' Systematic Payments to Doctors for the Purpose of Increasing Neurontin Prescriptions

108.    Defendants' wrongful "publication strategy" required physicians (and its medical liaisons) to perform the work normally performed by the company's salesmen in order to promote Neurontin.

109.    As part of this strategy, Defendants made tens of thousands of payments to the physicians who acted as a surrogate sales force.

110.    As part of this strategy, Defendants made tens of thousands of payments to practicing physicians who received the related materials.

111.    Defendants made tens of thousands of payments to physicians for the purpose of having those doctors either recommend the prescription of Neurontin or to order Neurontin. The following describes the various programs Defendants used to make these payments to physicians.

1.      "Consultants" Meetings

112.    Defendants wrongfully funneled illegal payments to physicians to encourage them to prescribe, "off-label" through "consultants" meetings.

113.    Defendants recruited physicians to attend dinners or conferences and paid them to hear presentations about "off-label" uses of Neurontin.

114.    Under the guise that these doctors were acting as "consultants," Defendants sometimes had the doctors sign sham "consulting agreements."

115.    At these meetings, Defendants would give these doctors lengthy presentations relating to Neurontin, particularly regarding "off-label" usage.

116.    Defendants' employees or physician speakers hired by Defendants for the purpose of promoting Neurontin would make presentations.

117.    Attendees' questions relating to the administration of Neurontin use would be solicited and answered.

118.    At some conferences, the sponsoring organization or Defendants intentionally posed questions to the speakers about "off-label" uses to insure that the attendees were exposed to such information.

119.    At some "consultants" meetings, a few questions would be posed to the "consultants" regarding Defendants' marketing of Neurontin or how the Defendants' sales force could provide better service to the doctors.

120.    The "consultants" meetings were not held (and the "consultants" were not paid) for the purpose of providing Defendants with expert, independent advice.

121.    In many cases, Defendants did not even record the "advice" provided by its "consultants," and whatever advice was collected was never acted upon or reviewed.

122.    Defendants routinely reviewed, evaluated and/or analyzed whether the "consultants" meetings were successful in getting the attendees to change their prescription writing practices.

123. At some meetings, the "consultants" were directly asked if they would write more Neurontin prescriptions as a result of the meeting.

124. Defendants also routinely tracked consultants' Neurontin prescription writing practices after these meetings.

125. Using market data purchased from third parties, Defendants analyzed whether the doctors they had paid had, in fact, written more Neurontin prescriptions after the meeting. Such data was relevant to the real purpose of the payments, influencing the participating doctors to order more Neurontin.

126. A typical consultants' meeting was held in Jupiter Beach, Florida, for neurologists from the North East CBU during the weekend of April 19-21, 1996.

127. The "consultants" selected for this meeting were chosen on the basis of their potential to write Neurontin prescriptions.

128. In a memorandum announcing the event to Defendants' personnel, the Neurontin Marketing Team acknowledged that in order to target neurologists with the greatest potential for writing Neurontin prescriptions, sales personnel must select potential attendees from a list of the top prescription writers for anti-epileptic drugs in the Northeast.

129. Only the doctors who fell within this targeted demographic were authorized to be invited.

130. The Jupiter Beach "consultants" meeting included two one-half days of presentations by Parke-Davis relating to Neurontin, including extensive presentations relating to "off-label" uses.

131. Although the presentations were represented to be provided by Proworx, an independent company, all aspects of the presentation were designed, monitored and approved by Defendants.

132. Defendants selected the speakers, picked the presentation topics and previewed the content of the presentations to make sure that they were acceptable.

133. Defendants paid all expenses relating to the "consultants" meeting, including all payments to the attendees and the presenters, all travel, accommodation, meals and entertainment expenses, all presentation expenses, all expenses and fees incurred by Proworx, and the substantial fees paid to the presenting physicians.

134. In violation of the FDA's prohibition regarding the provision of promotional materials on "off-label" uses, Defendants wrongfully provided written abstracts of the presentations that detailed "off-label" use of Neurontin to each of its "consultants."

135. No effort was made to obtain professional advice at Jupiter Beach from the "consultants".

136. Rather, Defendants wined, dined and entertained during the weekend and otherwise wrongfully attempted to bribe the attending physicians.

137. A follow-up memorandum to Defendants' marketing officials noted that "the participants were delivered a hard hitting message about Neurontin".

138. The memo emphasized the fact that the participants were encouraged to use Neurontin at higher doses. This knowing misrepresentation was known to be false at the time it was made.

139.   After the conference, Defendants generated "trending worksheets" listing the doctors who attended the "consultants" meeting. These worksheets enabled Defendants to track Neurontin prescription habits of the attendees before and after the "consultants" meetings in order to determine if these "high writing" prescribers wrote more Neurontin prescription after the conference.

140.   Persuading these heavy prescribers to order more Neurontin for their patients was a purpose of the Jupiter Beach junket.

141.   Persuading these heavy prescribers to order more Neurontin for their patients was the sole purpose of the Jupiter Beach junket.

142.   Defendants hosted dozens of "consultants" meetings between late 1995 and 1997 in which the "consultants" received payments and gratuities as well as well as presentations on "off-label" Neurontin use designed to change the physicians' prescription writing habits.

143.   Jupiter Beach was not unique. Comparable consultants' meetings included, but were not limited to, the following:

| Topic | Location | Dates |
|---|---|---|
| Mastering Epilepsy | La Costa Resort, CA | July 20-23,1995 |
| Mastering Epilepsy | Santa Fe, NM | November 16-19, 1995 |
| Neurontin Consultants Conference | Marco Island, FL | February 2-4, 1996 |
| Pediatric Epilepsy | Hutchinson Island, FL | February 9-11,1996 |
| Mastering Epilepsy Science | Walt Disney World, FL | February 22-25, 1996 |
| Pediatric Epilepsy | Hutchinson Island, FL | March 8-10,1996 |
| Mastering Epilepsy | Ritz Carlton, Aspen, CO | April 18-21, 1996 |
| Affective Disorders in Psychiatry | Marco Island, FL | April 20, 1996 |
| Affective Disorder Consultants Conference | Southern Pines, NC | April 27, 1996 |
| Naturopathic Pain Conference | Palm Beach, FL | May 11, 1996 |

| Topic | Location | Dates |
|-------|----------|-------|
| Regional Consultants Conference | Ritz Carlton, Boston, MA | May 10-11, 1996 |
| Epilepsy Management Advisors Meeting | Sheraton Grande Torrey Pines, La Jolla, CA | June 21-23, 1996 |
| Epilepsy Management | Rancho Bernardo, CA | June 28-30,1996 |
| Use of Anti-Convulsants in Psychiatric Disorders | Short Hills, NJ | October 18-19, 1996 |
| Non-epileptic Uses of Neurontin | Longboat Key, FL | November 6, 1996 |
| Neurological Conditions Conference | Ritz Carlton, Atlanta, GA | September 27-28,1997 |

Other "consultants" meetings took place in Charleston, SC, Coconut Grove, FL, Naples, FL, Memphis, TN, Louisville, KY, Washington, DC, Aspen, CO, and other places. Hundreds (if not thousands) of physicians received kickbacks to attend these events.

144. Many "consultants" meetings consisted of lavish dinners at local restaurants.

145. The emphasis on these meetings was also on "off-label" uses, and $200 "honorariums" were paid to the physicians who did nothing for the payment except show up.

146. The Defendants have no documentary records that show the "consultants" provided legitimate consultation to Defendants at a single event.

147. At the same time, at every such event the "consultants" were encouraged to increase their Neurontin prescription writing.

2. Medical Education Seminars

148. Another format where Defendants paid kickbacks to physicians to hear "off-label" promotion of Neurontin were programs billed as Continuing Medical Education seminars ("CME").

149.    These conferences and seminars were set up to appear to qualify for an exception to the FDA's "off-label" marketing restrictions which permits physicians to learn about "off-label" uses of pharmaceuticals at independent seminars.

150.    Such seminars, however, must be truly independent of the drug companies.

151.    The drug companies may make "unrestricted grants" for the purpose of a seminar, but may not be involved in formulating the content of the presentations, picking the speakers or selecting the attendees.

152.    None of these requirements were observed with regard to the CME seminars sponsored by Defendants for the promotion of "off-label" uses of Neurontin.

153.    While Defendants retained third-party organizations, such as Proworx and MES, to present the event seminars, they had control of virtually every aspect of these events.

154.    Proworx and MES obtained Defendants' approval for all content presented at the seminars.

155.    Defendants also paid all expenses, including all the seminar companies' fees.

156.    Although the seminar companies acted as the conduit for the payments and gratuities given to the physician attendees, like the Jupiter Beach consultants' meetings, Defendants controlled every aspect of the CME programs.

157.    As to the CME Neurontin programs:

a)    Defendants designed and approved the programs;

b)    Defendants hand-picked the speakers for the seminars;

c)    Defendants approved the seminar presentations of the seminars;

d)    Defendants previewed, in most cases, the contents of the seminars prior to delivery;

e)    Defendants selected the attendees based on their ability and willingness to prescribe high quantities of Neurontin;

f)    Defendants evaluated the presentations to make sure their "message" was appropriately delivered;

g)    Defendants black-listed presenters whose presentations were not sufficiently pro-Neurontin; and

h)    Defendants monitored the prescribing patterns of the physicians who attended these conferences to insure the purpose of the conference - increased writing of Neurontin prescriptions - was achieved.

158.    Follow-up reports to marketing executives for Defendants highlighted that the attendees received presentations regarding "off-label" marketing and recommendations for dosages larger than those labeled effective by the FDA.

159.    These memoranda also reported to senior executives the pledges made by attendees to order more Neurontin for their patients.

160.    For some seminars, high prescription writing physicians were selected to receive junkets comparable to those Defendants provided to the attendees of the Jupiter Beach "consultants" meetings described above. Others were less lavish, but physicians received free tuition, free accommodations, free meals and cash.

161.    Frequently, the Defendants' CME seminars were accredited by continuing medical education organizations, which meant that the physicians taking advantage of Defendants' junkets did not have to pay tuition or spend additional time to fulfill their continuing medical education licensure requirements by attending truly independent medical education programs.

162.    Representative CME programs in Massachusetts sponsored by Defendants included, but are not limited to, the following:

a)  Diabetic Neuropathy - Ritz Carlton, Boston, MA - June 22-24, 1997

b)  Merritt-Putnam Symposium - Boston, MA - December 5, 1997

**3.  Grants and "Studies"**

163.  Defendants also wrongfully made outright payments, in the form of grants, to reward demonstrated Neurontin believers and advocates.

164.  Defendants' sales managers identified key doctors who actively prescribed Neurontin or programs that were willing to host Neurontin speakers and encouraged such persons or programs to obtain "educational grants" from Defendants.

165.  Under this program Defendants paid:

• $2,000.00 to Berge Ninmpolan, MD, "a great Neurontin believer," to attend a neurology seminar in San Francisco in March 1996;

• $1,000.00 to the University of Texas at Houston, Department of Neurology, to host a symposium where presentations would be made regarding successful "off-label" treatment with Neurontin;

• $3,000.00 to the University of Texas Medical School to host a conference in August 1996 at which a well-known specialist in epilepsy, who prescribed Neurontin, would attend;

• $4,000.00 to pay for a neurologist from the University of Texas at San Antonio to attend the American Epilepsy Society Conference in December 1996, a conference at which Defendants were presenting extensive documentation on "off-label" uses for Neurontin;

• $2,500.00 to the University of Texas at Houston to bring Dr. B. J. Wilder to the campus to hold a seminar. Dr. Wilder was one of Neurontin's biggest boosters for

"off-label" indications and had been paid tens of thousands of dollars to promote Neurontin's "off-label" uses for Defendants across the country;

- $2,500.00 in June 1996 to pay for representatives from the University of Pennsylvania Medical Center to attend a conference in Saint Petersburg, Russia, on the utilization of anti-epileptic drugs, including Neurontin;

- $5,000.00 to Dr. Alan B. Ettinger, of Stony Brook, NY, in December 1996, a physician who had informed Defendants that he was interested in possibly doing research in Neurontin and maintained a database of patients who were treated with Neurontin;

- $500.00 to Bruce Ehrenberg, of Boston, MA, a leading speaker for Defendants regarding "off-label" uses of Neurontin, to attend a conference in China;

- $1,000.00 to Israel Abrams, M.D., Paul C. Marshall, M.D., Beth Rosen, M.D. and Spencer G. Weig, M.D., of Worcester, MA, for educational programs in February 1996. According to the Defendants' local representative requesting the grant, "much of the Neurontin success in Worcester has been attributed to ... the 4 pediepileptologists ....";

- $1,400.00 to Dr. Ahmad Beydoun of Ann Arbor, MI, for post-graduate training in March 1996. This grant was processed on a quick turnaround, the Defendants' representative noting, "I realize that this is a very short time line; however, Dr. Beydoun is a very important customer";

- $1,500.00 to Jim McAuley, R.Ph, Ph.D. for educational materials relating to epilepsy. Defendants decided to provide the funds because McAuley was an advocate

of Neurontin and he was important in getting another drug, Cerebyx, accepted on the formulary for Ohio State University; and

- A grant in an unknown amount to University Hospital in Cleveland in exchange for hosting programs regarding Neurontin's use in treating neuropathic pain at conferences specifically devoted to obtaining referrals from other doctors.

166.   These grants, and others, were charged to the Neurontin marketing budget.

167.   Each of these grants was made solely because the individual who would receive the money was a large Neurontin supporter or would host a program where a well-known Neurontin supporter would recommend that other physicians increase their prescriptions of Neurontin.

168.   Each of these grant awards constituted a reward or kickback for the recipient's advocacy of Neurontin.

169.   Defendants' medical liaisons informed leading Neurontin subscribers that significant advocacy for Neurontin would result in the payment of large grants.

170.   These studies did not involve significant work for the physicians. Often times they required little more than collating and writing up office notes or records.

171.   fendants frequently hired technical writers to write the articles for which the "authors" had been given grants. Defendants knew that these articles and studies provided minimal scientific benefit.

172.   In a letter to the FDA written in June 1997, Defendants submitted a list of "studies relating to pain, pain syndromes, and psychiatric disorders" which failed to include any of these numerous studies, purportedly funded by Defendants.

173. Defendants intentionally did not report these "studies" to the FDA because they knew the funded "research" had no scientific value and would not be deemed to be studies by the FDA.

174. Payments Defendants made for "studies" included, but were not limited to, the following:

| Funded Project | Payee | Payment |
|---|---|---|
| Statistical Analysis of Patients Treated With Neurontin For Pain | Hans Hansen, M.D.; Statesville, NC | $7,000.00 |
| Reduction of Sympathetically Medicated Pain and Sudomotor Function | David R. Longmire, M.D.; Russellville, AL | $7,000.00 |
| Data entry for Neurontin and Pain Analysis | Travis Jackson, M.D., David Meyer, M.D.; Winston-Salem,NC | |
| Trial of Neurontin for distal symmetric polyneuropathy associated with AIDS | Joseph Weissman, M.D. Atlanta, GA | $20,000.00 |
| Neurontin for neuropathic pain in chronic pain syndromes | Lavern Brett, M.D. Washington, D.C. | $25,000.00 |
| Retrospective chart analysis of Neurontin use with bipolar disorder patients | Ralph S. Rybeck, M.D. | $5,000.00 |
| Retrospective Analysis of Neurontin in the treatment of pain | David R. Longmire, M.D.; Russellville, AL | $2,000.00 |
| Retrospective Analysis of Neurontin in the treatment of chronic pain | Don Schanz, D.O. Traverse City, MI | $8,000.00 |
| Case histories relating to use of Neurontin as an adjuvant analgesic | Elizabeth J. Narcessian, M.D; W. Orange, NJ | $4,000.00 |

175. Other payments were made to physicians for other "studies" of questionable scientific credibility.

176. One particularly large study conducted by Defendants served as yet another engine to financially reward physicians for prescribing Neurontin.

177. In 1995 and 1996, Defendants conducted an enormous Phase IV trial known as STEPS.

178. Although STEPS took the form of a research clinical trial, it was, in fact, a marketing ploy designed to induce neurologists to become comfortable prescribing Neurontin at a far higher dose than indicated in the FDA approved labeling.

179. While most scientifically valid clinical studies have a limited number of investigators treating a number of patients qualified for the study, the STEPS protocol called for over 1,200 "investigators" to enroll only a few patients each.

180. The participating physicians were instructed to titrate their patients to higher than labeled dosages of Neurontin to demonstrate that patients could tolerate high dosages of the drug.

181. Rewarding physicians for prescribing high doses on Neurontin was another wrongful act or practice willfully and knowingly used by the Defendants to increase Neurontin sales. Higher per patient dosages obviously had the synergistic affect of increasing the amount of Neurontin sold.

182. The STEPS study was also designed to habituate physicians to place non-study patients on Neurontin on doses higher than found effective in the clinical trials that had been monitored by the FDA.

183. Physicians enrolling in the STEPS study were paid for agreeing to participate in the study and for every patient enrolled.

184. At the conclusion of the study, Defendants offered each of the 1,200 "investigators" additional cash for each patient the doctor kept on Neurontin after the study ended.

185.    This wrongful conduct was tantamount to bribery or "payola".

**4.    Payments to Authors of Ghost Written Articles**

186.    Another method of rewarding doctors who prescribe Neurontin for "off-label" uses, was to pay them honorarium for lending their names to scientific articles that were actually prepared and written by third parties retained by Defendants.

187.    In 1996, Defendants retained AMM/ADELPHI, Ltd. and Medical Education Systems, Inc. to prepare no less than twenty (20) articles for publication in various neurology and psychiatry journals.

188.    Most of these articles concerned "off-label" usage of Neurontin.

189.    These articles were generated in a way that resulted in Defendants retaining complete control over publications they could distribute pursuant to their "publication strategy."

190.    The content of these articles were actually written by non-physician technical writers retained by Defendants.

191.    Defendants paid all expenses in connection with the creation of these publications.

192.    Defendants had the right to control the content of all the articles.

193.    Once Defendants and the technical writers conceived the articles, Defendants and its outside firms attempted to find recognized Neurontin prescribers whose names could be used as the authors of these articles.

194.    In some cases, drafts of the articles were completed even before an author agreed to place his or her name on the article.

195.    This occurred in connection with case histories that purported to describe the author's personal treatment of actual patients.

196.    The authors were each paid an honorarium of $1,000.00 to lend their names to these articles.

197.    The authors were each able to claim publication credit on their curriculum vitae.

198.    After the technical writers completed their work, Defendants and its outside firms found journals that would publish the articles.

199.    Defendants' role in creating, approving and sponsoring the articles was wrongfully hidden from the public, the medical community and from the FDA.

200.    Defendants never disclosed their role in creating, approving and sponsoring the articles to the public, the medical community, or to the FDA.

201.    While the articles might reference that the author received an honorarium from the outside firm, the articles failed to state that the honorarium was paid with money provided by Defendants.

202.    While the articles might reference that the author received an honorarium from the outside firm, the articles failed to state that Defendants had approved the content and hired the actual authors.

203.    For example, an article created by Medical Education Systems (MES), *Gabapentin and Lamotrignine: Novel Treatments for Mood and Anxiety Disorders*, published in CNS Spectrums noted that "an honorarium was received from Medical Education Systems for preparation of this article," but never revealed Defendants retention and payment of MES.

204.    The article created by Medical Education Systems (MES), *Gabapentin and Lamotrignine: Novel Treatments for Mood and Anxiety Disorders*, published in CNS

Spectrums noted that "an honorarium was received from Medical Education Systems for preparation of this article," but never revealed the fact that MES personnel, while under contract to Defendants, wrote the article.

205.    Defendants used these publications as part of their wrongful marketing campaign and "publication strategy" by presenting the articles as evidence of independent research conducted by persons with no monetary interest in Neurontin.

206.    This conduct was intended to deceive and known by the Defendants to be false.

207.    Defendants wrongfully created the articles to promote "off-label" uses for Neurontin on the basis of scientifically invalid facts and premises they otherwise knew to be false.

208.    Defendants wrongfully purchased the names and reputations of the authors with kickbacks.

209.    Defendants wrongfully controlled the content of the articles.

####     5.    Speakers' Bureau

210.    Defendants also founded the Speakers' Bureau, another method to make large and numerous payments to physicians who recommended Neurontin at teleconferences, dinner meetings, consultants meetings, educational seminars and other events.

211.    These speakers repeatedly gave short presentations relating to Neurontin which they were paid anywhere from $250.00 to $3,000.00 per event.

212.    Speakers such as Steven Schachter, B.J. Wilder, Ilo Leppik, Gary Mellick, David Longmire, Gregory Bergey, Michael Merren, David Treiman, Michael Sperling, Martha Morreli, R. Eugene Ramsay, John Pellock, Ahmad Beydoun, Thomas Browne,

John Gates, Jeffrey Gelblum, Dennis Nit/, Robert Knobler and others received tens of thousands of dollars annually in exchange for recommending to fellow physicians that Neurontin be prescribed, particularly for "off-label" uses.

213.    The payments that these doctors received were far in excess of the fair value of the work they performed for Defendants.

214.    Speakers who most zealously advocated Neurontin were hired most frequently for speaking events, notwithstanding the fact that many of these events purported to be independent medical education seminars where independent information was supposed to be delivered.

215.    The identity of the doctors in the Speaker's Bureau who received kickbacks through excessive compensation is presently in the exclusive custody of the Defendants.

216.    Defendants' marketing personnel, including its medical liaison staff, informed physicians of the lucrative rewards of joining the Neurontin Speaker's Bureau.

217.    Physicians were informed that if they prescribed enough Neurontin, they, too, could also be eligible for receiving substantial payments just for describing their clinical experience to peers at events dedicated to promoting Neurontin's "off-label" uses.

218.    Defendants marketing personnel made clear that the only way the doctors could receive such cash payments was if they prescribed substantial amounts of "off-label" uses Neurontin.

219.    Defendants knew that the payments described above constituted kickbacks.

220.    Defendants willfully and knowingly made the payments described above to increase its profits all at the economic expense of the members of the class.

221.    Defendants had actual knowledge that its payments did not comply with the guidelines of the American Medical Association for payments to physicians.

222.    Defendants had actual knowledge that the payments had been made for the express purpose of encouraging the physicians to order Neurontin for their patients.

223.    Defendants had actual knowledge of the Inspector General's Special Fraud Alert, which raised particular concerns about drug marketing.

224.    Nonetheless, Defendants did nothing to curb their kickback payments to physicians because they could not have marketed Neurontin's "off-label" uses without such patients.

225.    In 1997, in the wake of an investigation by the FDA, Defendants conducted a review of its marketing practices.

226.    As a result of that review, Defendants determined that *none* of the programs described above should have been conducted in the manner previously conducted by Defendants.

227.    Defendants knowingly and willfully continued to make payments to physicians for the "off-label" marketing of Neurontin, did not cease to knowingly making false statements, and continued the programs at least until 1998.

228.    Defendants' payments of inappropriate kickbacks to doctors continued through the merger of Parke-Davis's parent, Warner-Lambert, with Defendant Pfizer in 2000.