E. **Unfair And Deceptive Representations as To Safety, Efficacy, Effectiveness And Usefulness of Neurontin**

82. Extensive willful and knowing misrepresentations designed to deceive consumers were made about the scientific information supporting uses of Neurontin.

83. The following knowing and willful misrepresentations designed to deceive relating to unproven uses of Neurontin were ultimately made to consumers with the knowledge and consent of Defendants' marketing personnel, and continued to be made after the 2000 merger with Pfizer:

> a) *Bipolar Disorder*. Medical liaisons informed psychiatrists that early results from clinical trials evaluating Neurontin for the treatment of bipolar disorder indicated a ninety percent (90%) response rate when Neurontin was started at 900 mg/day dosage and increased to a dosage of 4800 mg/day. No such results existed. Nor was any type of clinical trial being conducted other than a pilot study. There were no clinical trials or studies indicating that Neurontin was safe or effective up to 4800 mg/day. Indeed, defendants were in possession of clinical trial evidence, which showed that there was no dose response difference between patients who received 600 mg/day, 1200 mg/day and 2400 mg/day. Any data relating to the use of Neurontin in bipolar disorder was strictly anecdotal and of nominal scientific value. Indeed, most of the published reports on this topic had been written and commercially sponsored by Defendants, although this fact was hidden. Medical liaisons were trained to inform psychiatrists that there were 110 reports of adverse effects for Neurontin when used for psychiatric purposes. In fact, such reports had been reported to Defendants' personnel, but Defendants attempted to hide such reports from Massachusetts physicians.

> b) *Peripheral Neuropathy, Diabetic Neuropathy, and Other Pain Syndromes*. Medical liaisons were trained and instructed to report that "leaks" from clinical trials demonstrated that Neurontin was highly effective in the treatment of various pain syndromes and that a ninety percent (90%) response rate in the treatment of pain was being reported. No such body of evidence existed. Nor was there any legitimate pool of data from which a response rate, much less a ninety percent (90%) response rate, could be calculated. Medical liaisons were trained to claim support for these findings as a result of inside information about clinical trials where no such information existed. The only support for these claims was anecdotal evidence with no scientific value. Many of the published case reports had been created and/or sponsored by Defendants in articles which frequently hid Defendants' involvement in the creation of the

article. Defendants' payment for the creation of these case reports were also hidden from Massachusetts physicians.

c) *Epilepsy Monotherapy*. Medical liaisons were strongly encouraged to push Massachusetts neurologists to prescribe Neurontin as the sole medication to treat epilepsy, even though studies only found it safe and effective as adjunctive therapy. Medical liaisons were trained to inform neurologists that substantial evidence supported Defendants' claim that Neurontin was effective as monotherapy. In fact, at this time, Defendants knew that clinical trials regarding Neurontin's efficacy as a monotherapy were inconclusive. One of Defendants' clinical trials, 945-82, demonstrated that Neurontin was not an effective monotherapy agent; the vast majority of patients in the study taking Neurontin were unable to continue with Neurontin alone. The same study showed that there was no effective difference between administrations of Neurontin at 600, 1200 or 2400 mg. Notwithstanding this data, Defendants continued to claim that physicians should use Neurontin at substantially higher doses than indicated by the labeling.

d)   *Reflex Sympathetic Dystrophy ("RSD")*. Medical liaisons informed Massachusetts physicians that extensive evidence demonstrated the efficacy of Neurontin in the treatment of RSD. The only such evidence that existed was anecdotal reports with no scientific value. Medical liaisons were trained to refer to case reports, most of which had been created or sponsored by Defendants, as "studies."

e)   *Attention Deficit Disorder ("ADD")*. Medical liaisons were instructed to inform Massachusetts pediatricians that Neurontin was effective for the treatment of ADD. No data, other than occasional anecdotal evidence, supported this claim. Nonetheless, the medical liaisons were trained to report that large number of physicians had success-treating ADD with Neurontin, when no such case reports existed.

f)   *Restless Leg Syndrome ("RLS")*. RLS was another condition where Defendants' "medical liaisons" were trained to refer to a growing body of data relating to the condition, when no scientific data existed. The only reports were anecdotal, most of which had been created and/or controlled by Defendants.

g)   *Trigeminal Neuralgia*. Although medical liaisons represented that Neurontin could treat Trigeminal Neuralgia, once again no scientific data supported this claim with the exception of occasional anecdotal reports. No data demonstrated that Neurontin was as effective as currently available painkillers, most of which were inexpensive.

h)   *Essential Tremor Periodic Limb Movement Disorder ("ETPLMD")*. Medical liaisons were trained to allege that Neurontin was

<u>effective in the treatment of these conditions. Any data relating to the treatment of ETPLMD was purely anecdotal and with no scientific value.</u>

<u>i) *Migraine*. Claims that Neurontin was effective in the treatment of migraine headaches were made by the medical liaisons and were supposedly based on early results from clinical trials. Although pilot studies had been suggested and undertaken, no early results of clinical trials existed to support these claims. Once again, any data relating to treatment of migraines was purely anecdotal and with no scientific value. Most of the case reports were either created or controlled by Defendants.</u>

<u>j) *Amyotrophic Lateral Sclerosis*. Claims that Neurontin was effective for treatment of Amyotrophic Lateral Sclerosis were made by the medical liaisons. Once again, no scientific data supported such claims.</u>

<u>k) *Drug and Alcohol Withdrawal Seizures.* Medical liaisons suggested that Neurontin be used in the treatment of drug and alcohol withdrawals despite the lack of any data supporting Neurontin as an effective treatment for these conditions.</u>

109.   <u>The knowing and willful misrepresentations were made to promote and market Neurontin for scientifically unproven uses so that Defendants could achieve significant market expansion in Massachusetts for Neurontin.</u>

~~D~~<u>F</u>.   **Defendants' Use of "Medical Liaisons" to Promote ~~"Off-Label"~~<u>Unproven</u> Uses**

~~229.   Defendants' normal sales force was not permitted to promote "off-label" uses of Neurontin to its physician customers~~<u>III.230.</u>   During the Class Period, ~~the FDA permitted drug company~~<u>Defendants'</u> representatives <u>unfairly and deceptively failed</u> to provide balanced, truthful information regarding ~~"off-label" usage, only if specifically requested by a physician, and only if there was no attempt to solicit such information by the drug company.~~<u>scientifically unproven uses for Neurontin.</u>

~~231.   Commencing in 1995, Defendants increasingly hired "medical liaisons" and wrongfully trained them to aggressively solicit requests for "off-label" information from physicians.~~

~~232. Defendants also trained the "medical liaisons" to engage in full-scale promotion of Neurontin's "off-label" uses.~~ 112. <u>Defendants hired and trained "medical liaisons" to engage in full-scale promotion of Neurontin's unproven uses.</u>

~~233.~~ <u>113.</u> Defendants also trained the "medical liaisons" to ~~wrongfully~~<u>deceptively</u> engage in full-scale promotion of Neurontin's ~~"off-label"~~<u>unproven</u> uses including repetitive distribution of non-scientific information.

~~234.~~ <u>114.</u> Defendants also trained the "medical liaisons" to ~~wrongfully~~<u>deceptively</u> engage in full-scale promotion of Neurontin's ~~"off-label"~~<u>unproven</u> uses including repetitive distribution of anecdotal information.

~~235.~~ <u>115.</u> Defendants also trained the "medical liaisons" to ~~wrongfully~~<u>deceptively</u> engage in full-scale promotion of Neurontin's ~~"off-label"~~<u>unproven</u> uses including repetitive distribution of information designed to <u>ultimately</u> convince ~~physicians~~<u>consumers</u> that ~~"off-label" usage~~<u>unproven uses</u> of Neurontin was safe and effective.

~~236. Defendants wrongfully used the "medical liaisons" as a surrogate sales force that had liberty to solicit physicians regarding "off-label" uses.~~

~~237.~~ <u>116.</u> The "medical liaisons" were selected and promoted based on their ability to sell.

~~238. Sales training for the "medical liaisons" was encouraged.~~

117. <u>"Medical liaisons" were solicited to learn unfair or deceptive sales methods.</u>

~~239.~~<u>118.</u>    On April 16, 1996, at a training session for medical liaisons, Defendants' in-house lawyers stopped the videotaping of a medical liaison training session to teach/advise the liaisons that notwithstanding formal policies to the contrary,

~~liaisons could "cold call" on physicians so long as they had executed request forms (forms that supposedly verified that the physician had initiated the meeting) at the end of the call.~~

~~240.   The "medical liaisons" were also trained that Defendants' sales representatives, instead of the doctors could fill out the request forms. 241.   Company lawyers also trained the "liaisons-in-training" that~~ there was no need to present balanced information to the customers and that liaisons should always remember that sales were necessary in order to keep the company profitable.

~~242.   The liaisons were also advised off camera, that there really was no definition of "solicitation" and that there were methods to induce the physicians to inquire about "off-label" uses.~~

~~243.~~ 119.   The liaisons were also advised that once the medical liaison got a meeting with a doctor, there were ways to get the information about ~~"off-label"~~ unproven Neurontin uses to the doctor ~~even if the physician had not requested "off-label" information~~.

~~244.~~ 120.   The liaisons were advised by the Defendants' lawyers that under no circumstances should any information about ~~"off-label"~~ unproven uses be put in writing.

~~245.~~ 121.   "Medical liaisons" were instructed in the clearest possible terms that they were to market and sell Neurontin based on its ~~"off-label"~~ unproven uses. Defendants had actual knowledge of the complete lack of scientifically valid data that supported such uses.

~~246.~~ 122.   During a teleconference on May 24, 1996, John Ford ("Ford"), a senior, marketing executive at Defendants' Morris Plains headquarters, directly informed the "medical liaisons" that in order to market Neurontin effectively, Neurontin had to be marketed for monotherapy, pain, bipolar disorder and other psychiatric uses, all of which ~~were "off-label"~~ lacked scientific and medical data.

~~247.~~ 123.   Ford conceded that such marketing had to be primarily performed by the "medical liaisons"~~, because they were the only ones who could discuss these matters~~.

~~248.~~ 124.   At another meeting with the "medical liaisons", Ford was even more blunt:
> "I want you out there every day selling Neurontin. Look this isn't just me, it's come down from Morris Plains that Neurontin is more profitable. We all know Neurontin's not growing as an adjunctive therapy, beside that is not where the money is. Pain management, now that's money. Monotherapy, that's money. We don't want to share these patients with everybody; we want them on Neurontin only. We want their whole drug budget, not a quarter, not half, the whole thing. . . .We can't wait for them to ask, we need to get out there and tell them up front . . . That's where we need to be holding their hand and whispering in their ear Neurontin for pain, Neurontin for monotherapy, Neurontin for bipolar, Neurontin for everything~~.~~ . . . I don't want to see a single patient coming off Neurontin until they have been up to at least 4800 mg/day, I don't want to hear that safety crap either, have you tried Neurontin, every one of you should take one just to see there is nothing, it's a great drug."

~~249.   Thus, "medical~~ 125.   "Medical liaisons" were trained to cold call high-volume physicians (those who saw the most patients in a given specialty), and sell them on the ~~"off-label"~~ benefits of Neurontin for unproven uses.

~~250.~~ 126.   A key aspect of this selling was willful and knowing misrepresentations willfully and knowingly made with the intent to deceive.

**H.   Misrepresentation of Credentials and Qualifications**

~~251.~~ 127.   The first misrepresentation was usually the status of the "medical liaisons."

~~252.~~ 128.   With the full approval of Defendants' marketing officials such as John Ford, Phil Magistro and John Krukar, "medical liaisons" were routinely introduced as specialists in the specific drug they were presenting at a particular meeting.

~~253.~~ 129.    Starting out with this false fact, "medical liaisons" could be "experts" in anti-epileptic drugs at one moment and an hour later be an "expert" in cardiac medication.

~~254.~~ 130.    "Medical liaisons" were also encouraged to represent themselves as medical researchers, even though they neither conducted medical research nor analyzed medical research performed by others.

~~255.~~ 131.    It was not uncommon for "medical liaisons" to be introduced as physicians, even though they had no such qualifications.

~~256.~~ 132.    Sales personnel were instructed to introduce "medical liaisons" as scientific employees who were given momentary leave of their academic duties to make an individual presentation to the physician; the fact that the liaisons were part of Defendants' standard marketing detail was intentionally hidden.

~~257.~~ 133.    Defendants' employees instructed "medical liaisons" on the procedure that should be followed when presenting ~~"The~~ Neurontin ~~Cold-Call Story"~~ to a neurologist, general practitioner, or psychiatrist who was a target for ~~"off-label" use~~ unproven uses:

- Mention that you are the eyes and ears of Defendants' research and that you are gathering clinical info;

- ~~Then ask~~Ask general questions about the nature of the practice;

- ~~Mention Neurontin and its approved uses, but dismiss them as old;~~

- ~~Then ask~~Ask leading questions about the number of pain patients that the practice sees;

- ~~Then ask~~Ask a series of questions that determine the practice profile ~~for all of the potential "off-label" uses~~;

- ~~Next reveal~~Reveal that Defendants have "a great deal of information about the fantastic response rate of patients on Neurontin in all of these disease states";

- Move into a discussion of the clinical trials that this information is demanding and the "90-95% response rate that we are seeing in more than 80% of patients";

- Present the doctor with any publications that are available and point out that many common drugs for pain treatment are in few if any publications;

- Ask the physician to place some patients on Neurontin and tell them that the "medical liaison" will stay in touch to help develop case reports;

- Mention that case reports can be lucrative and can lead to clinical trials;

- Offer to do a presentation and luncheon for the entire practice or a group of his friends that will detail all of the "data" we have;

- Invite the physician to consultant meetings in the future and point out that they pay $250 plus a nice trip or meal in the city; and

- If a sales representative is present they should close the sale by asking that the next patient he sees should be put on Neurontin.

~~258.    It was during the training in Parsippany, NJ, that a whistleblower, who is now a Plaintiffs in a *qui tam* action in federal court in Boston, Dr. Paul Franklin, first witnessed the scope of the "off-label" claims that Defendants intended its "medical liaisons" to market.~~

~~259.~~134.    The "medical liaisons" were provided with new company slides that detailed the "method" to use to increase the use of Neurontin in several different ~~"off-label"~~ practice types.

~~260.~~135.    The slide show contained a slide that showed the "Anecdotal Uses of Neurontin." The list included the following scientifically unproven uses:

- Reflex sympathetic dystrophy (RSD)
- Peripheral neuropathy

- Diabetic neuropathy
- Trigeminal neuralgia
- ~~Post-Herpetic neuralgia~~
- Essential tremor

~~261.     It was during the training in Parsippany, NJ, that a whistleblower, who is now a Plaintiff in a *qui tam* action in federal court in Boston, Dr. Paul Franklin, first witnessed the scope of the "off-label" claims that Defendants intended its medical liaisons to market.~~ 136._____The medical liaisons were provided with new company slides

- Restless leg syndrome (RLS)
- Attention deficit disorder (ADD)
- Periodic limb movement disorder
- Migraine
- Bipolar disorder
- Amyotrophic lateral sclerosis (ALS) [Lou Gehrig's Disease]
- Drug or alcohol withdrawal seizures

~~262.~~ 137.     Executives explained that "this list was very important to the company but that it makes Neurontin look like snake oil, so preempt the laughter by telling your physicians that 'I'm embarrassed to show you the next slide because it makes Neurontin look like snake oil, but the fact is, we are seeing extra-ordinary results, in some cases up to 90% response in all of these conditions,' that will get their attention."

~~263.~~ 138.     This executive went on to say that, "[n]otice all the studies we talk about, nothing gets a doc more interested in a drug than a study."

264.139.    Richard Grady, a medical liaison, asked if "we have any money to lace studies without big docs." He was instructed to "use the potential of a study to get in the door, even get protocols, but don't waste too much time and don't say you can get them a study, we don't have much money left."

265.140.    He was then told that "if anyone asks for back-up data say we are putting it together, then suggest that the doc put some of his patients on Neurontin and we will help him publish case reports that could help place a study in his practice. Everybody wins."

266.141.    None of the "off-label" claims made in the slide show have been scientifically substantiated.

267.    The FDA had approved none

142.    None of the "off-label" claims indications made in the slide have been scientifically supported.

268.143.    The "off-label" deceptive claims made in the slide show were a cornerstone component of the Defendants' scheme to increase "off-label" sales of Neurontin for unproven uses.

269.    Extensive willful and knowing misrepresentations designed to deceive were also made about the scientific information concerning "off-label" usage of Neurontin.

270.    The following knowing and willful misrepresentations designed to deceive relating to "off-label" usage of Neurontin were routinely made to physicians with the knowledge and consent of Defendants' marketing personnel, and continued to be made to doctors after the 2000 merger with Pfizer:
    a.    *Bipolar Disorder.* Medical liaisons informed psychiatrists that early results from clinical trials evaluating Neurontin for the treatment of bipolar disorder indicated a ninety percent (90%) response rate when Neurontin was started at 900 mg/day dosage and increased to a dosage of

~~4800 mg/day. No such results existed. Nor was any type of clinical trial being conducted other than a pilot study. There were no clinical trials or studies indicating that Neurontin was safe or effective up to 4800 mg/day. Indeed, Defendants were in possession of clinical trial evidence, which showed that there was no dose response difference between patients who received 600 mg/day, 1200 mg/day and 2400 mg/day. Any data relating to the use of Neurontin in bipolar disorder was strictly anecdotal and of nominal scientific value. Indeed, most of the published reports on this topic had been written and commercially sponsored by Defendants, although this fact was hidden. Medical liaisons were trained to inform psychiatrists that there were 110 reports of adverse effects for Neurontin when used for psychiatric purposes. In fact, such reports had been reported to Defendants' personnel, but Defendants attempted to hide such reports from physicians.~~

~~b.     *Peripheral Neuropathy, Diabetic Neuropathy, and Other Pain Syndromes.* Medical liaisons were trained and instructed to report that "leaks" from clinical trials demonstrated that Neurontin was highly effective in the treatment of various pain syndromes and that a ninety percent (90%) response rate in the treatment of pain was being reported. No such body of evidence existed. Nor was there any legitimate pool of data from which a response rate, much less a ninety percent (90%) response rate, could be calculated. Medical liaisons were trained to claim support for these findings as a result of inside information about clinical trials where no such information existed. The only support for these claims was anecdotal evidence of nominal scientific value. Many of the published case reports had been created and/or sponsored by Defendants in articles which frequently hid Defendants' involvement in the creation of the article. Defendants' payment for the creation of these case reports were also hidden from physicians.~~

~~c.     *Epilepsy Monotherapy.* Medical liaisons were strongly encouraged to push neurologists to prescribe Neurontin as the sole medication to treat epilepsy, even though studies only found it safe and effective as adjunctive therapy. Medical liaisons were trained to inform neurologists that substantial evidence supported Defendants claim that Neurontin was effective as monotherapy. In fact, at this time, Defendants knew that clinical trials regarding Neurontin's efficacy as a monotherapy were inconclusive. One of Defendants' clinical trials, 945-82, demonstrated that Neurontin was not an effective monotherapy agent; the vast majority of patients in the study taking Neurontin were unable to continue with Neurontin alone. The same study showed that there was no effective difference between administrations of Neurontin at 600, 1200 or 2400 mg. Notwithstanding this data, Defendants continued to claim that physicians should use Neurontin at substantially higher doses than indicated by the labeling. Indeed, although medical liaisons routinely claimed Neurontin to~~

~~be effective as monotherapy, in 1997 the FDA refused to find Neurontin a safe and effective monotherapy.~~

~~d.    *Reflex Sympathetic Dystrophy ("RSD")*. Medical liaisons informed physicians that extensive evidence demonstrated the efficacy of Neurontin in the treatment of RSD. The only such evidence that existed was anecdotal reports of nominal scientific value. Medical liaisons were trained to refer to case reports, most of which had been created or sponsored by Defendants, as "studies."~~

~~e.    *Attention Deficit Disorder ("ADD")*. Medical liaisons were instructed to inform pediatricians that Neurontin was effective for the treatment of ADD. No data, other than occasional anecdotal evidence, supported this claim. Nonetheless, the medical liaisons were trained to report that large number of physicians had success treating ADD with Neurontin, when no such case reports existed.~~

~~f.    *Restless Leg Syndrome ("RLS")*. RLS was another condition where Defendants' "medical liaisons" were trained to refer to a growing body of data relating to the condition, when no scientific data existed. The only reports were anecdotal, most of which had been created and/or sponsored by Defendants.~~

~~g.    *Trigeminal Neuralgia*. Although medical liaisons represented that Neurontin could treat Trigeminal Neuralgia, once again no scientific data supported this claim with the exception of occasional anecdotal reports. No data demonstrated that Neurontin was as effective as currently available painkillers, most of which were inexpensive.~~

~~h.    *Post-Herpatic Neuralgia ("PHN")*. Medical liaisons were trained to tell physicians that seventy-five percent (75%) to eighty percent (80%) of all PHN patients were successfully treated with Neurontin. Once again, no clinical trial data supported such a claim.~~

~~i.    *Essential Tremor Periodic Limb Movement Disorder ("ETPLMD")*. Medical liaisons were trained to allege that Neurontin was effective in the treatment of these conditions. No scientific data supported such claims with the exception of anecdotal reports of nominal scientific value.~~

~~j.    *Migraine*. Claims that Neurontin was effective in the treatment of migraine headaches were made by the medical liaisons and were supposedly based on early results from clinical trials. Although pilot studies had been suggested and undertaken, no early results of clinical trials existed to support these claims. Once again, any data relating to treatment of migraines was purely anecdotal and of nominal scientific~~

~~value. Most of the case reports were either created or sponsored by Defendants.~~

~~k.    *Drug and Alcohol Withdrawal Seizures.* Medical liaisons suggested that Neurontin be used in the treatment of drug and alcohol withdrawals despite the lack of any data supporting Neurontin as an effective treatment for these conditions.~~

~~271.~~144.    Misrepresentations by Defendants were not limited to presentations by "medical liaisons." As noted above, publications that Defendants distributed as part of their "publication strategy" intentionally misrepresented Defendants' role in the creation and sponsorship of the publications.

~~272.    Physicians were led to believe that the publications were the independent, unbiased research of the authors of the articles. In fact, many of the publications distributed to physicians~~145.  Many of the publications were created by Defendants and written by third parties retained by Defendants and who were under Defendants' control.

~~273.~~146.    The fact that these articles were authored by ghost writers retained by Defendants was ~~intentionally~~willfully and knowingly hidden, and the fact that the authors had financial ties to Defendants was also ~~intentionally~~willfully and knowingly undisclosed.

~~274.~~147.    For example, an article widely circulated by Defendants concerning the use of Neurontin in the treatment of Restless Leg Syndrome asserted that the authors Gary A. Mellick and Larry B. Mellick, had not and never would receive financial benefit from anyone with an interest in Neurontin, yet the Mellick brothers had received tens of thousands of dollars for acting as speakers at Defendants' events.

~~275.~~148.    This financial connection was deceptively hidden from the persons who received copies of the Mellick brothers' articles.

~~276.~~149.    ~~Defendants' strategy included paying doctors to appear as authors of journal articles on "off-label" uses of Neurontin, articles that were actually written by nonphysicians working under the direction of the company's marketers.~~

~~277.    Defendants then paid hundreds of doctors to attend expensive dinners and weekend retreats, where they were urged to prescribe Neurontin.~~

~~278.    Other doctors, often-frequent prescribers of Neurontin, were paid to speak to other physicians about Neurontin's benefits.~~~~279.    Finally, Defendants paid doctors to prescribe Neurontin and~~ deceptively paid doctors to prescribe Neurontin by falsely representing they would include those patients in clinical trials, which were actually designed ~~mainly~~ for marketing purposes.

~~280.    Defendants adopted the marketing strategy, after deciding not to perform the clinical trials needed to gain approval of new uses for Neurontin because they believed that the drug would soon lose patent protection.~~

~~281.    In fact,~~ 150.    Defendants engaged in an extensive and far-reaching campaign to use false statements to promote increased prescriptions of Neurontin.

~~282.~~151.    The scheme used a team of "medical liaisons." While "medical liaisons" are ordinarily connected to the research divisions of the manufacturer, Defendants' "medical liaisons" were exclusively employed as sales and promotion personnel.

~~283.~~152.    Defendants' "medical liaisons" were instructed to make exaggerated or false claims concerning the safety and efficacy of Defendants drugs for ~~"off-label" uses. They were also~~ unproven uses.

153. For instance, the "medical liaisons" were trained to convey that Neurontin could be prescribed for its various ~~"off-label"~~ uses in amounts of up to 4800 mg/day — far above the maximum dosage ~~of 1800 mg per day approved by the FDA~~ supported by any scientific data.

~~284. To bolster their representations to physicians, "medical~~ 154. "Medical liaisons" were encouraged to misrepresent their scientific credentials and to pose as research personnel, rather than as sales representatives. This practice continued in the years 2000, 2001 and may still be continuing.

~~285. Doctors were rewarded with kickbacks for prescribing large quantities of Defendants' drugs.~~

~~286. These alleged kickbacks took various forms. For instance, some doctors were paid sums of money that were ostensibly compensation for drug studies. However, these studies were shams and had no scientific value.~~

~~287. Other doctors were paid sums of money under the guise of being compensated for their services as "consultants" or "preceptors" or for participating in a "speaker's bureau."~~

~~288. Doctors were also allegedly given cash payments for small record-keeping tasks, such as allowing Defendants access to information about the doctors' patients who were receiving Neurontin.~~

~~289. Other doctors prescribing large amounts of Defendants' drugs were given gifts such as travel tickets and tickets to the Olympics.~~

~~290.    When questions arose concerning the availability of reimbursement for prescriptions for "off-label" uses of Defendants drugs, "medical liaisons" were instructed to coach doctors on how to conceal the "off-label" nature of the prescription.~~

~~291.    Defendants took numerous actions to conceal its activities from the FDA, including shredding documents, falsifying documents, and encouraging "medical liaisons" to conduct their marketing activities without leaving a "paper trail" that might be discovered by the FDA.~~

~~292.    As part of the scheme and as set forth in a *qui tam* action filed by Dr. Paul Franklin, a former Parke-Davis employee:~~

- ~~Upon order of the company and as a result of training of medical liaisons, Dr. Franklin "deliberately contrived reports to mislead physicians into believing that a body of data existed that demonstrated the effectiveness of Neurontin in the treatment of bipolar disease." In fact, no data existed at all to support the use of Neurontin in bipolar disorder.~~

- ~~Dr. Franklin was trained and instructed to actively deceive physicians with contrived data, falsified "leaks" from clinical trials, scientifically flawed reports, or "success stories" that stated that Neurontin was highly effective in the treatment of a variety of pain syndromes. No such body of evidence existed.~~

- ~~He was instructed to advise physicians that Defendants had developed a large body of data to support the use of Neurontin as monotherapy. This was an "outright lie" and left patients unknowingly without good seizure context.~~

- ~~Medical liaisons were instructed to tell physicians that a great deal of data existed that supported the safe use of Neurontin at levels that exceed 4800 mg/day. However, clinically significant safety data existed at dosing levels at only 1800 mg/day.~~

- ~~Defendants provided medical liaisons with slides that stated that Neurontin was effective for the treatment of Attention Deficit Disorders but no data existed to support that claim.~~

293.  The strategy was a success. 155. In 2000, Warner-Lambert reported that more than 78% of Neurontin prescriptions had been written for indications other than epilepsy.

294. 156.    Sales of Neurontin that year were $1.3 billion, and they rose to $1.7 billon, according to IMS Health (news/quote), a health care information company.

**I. Payments to Authors of Ghost Written Articles**

157.    Another unfair and deceptive practice included the secret payment to some doctors for lending their names to scientific articles that were actually prepared and written by third parties retained by Defendants.

158.    In 1996, Defendants retained AMM/Adelphi, Ltd. and Medical Education Systems, Inc. to prepare no less than twenty (20) articles for publication.

159. Most of these articles concerned unproven uses of Neurontin.

160.    These articles were generated in a way that resulted in Defendants retaining complete control over publications they could distribute pursuant to their "publication strategy."

161.    The content of these articles were actually written by non-physician technical writers retained, and directed by Defendants.

162.    Defend its paid all expenses in connection with the creation of these publications.

163.    Defendants had the right to control the content of all the articles.

164.    Once Defendants and the technical writers conceived the articles, Defendants and their outside firms attempted to find recognized Neurontin prescribers whose names could be used as the authors of these articles.

165. In some cases, drafts of the articles were completed even before an author was identified and agreed to place his or her name on the article.

166. This occurred in connection with case histories that purported to describe the author's personal treatment of actual patients.

167. The authors were each paid an honorarium to lend their names to these articles.

168. The authors were each able to claim publication credit on their curriculum vitae.

169. After the technical writers completed their work, Defendants and their outside firms found journals that would publish the articles.

170. Defendants' role in creating, approving and sponsoring the articles was unfairly and deceptively hidden from the public and the medical community.

171. Defendants intentionally failed to disclose their role in creating, approving and sponsoring the articles to the public and the medical community.

172. While the articles might reference that the author received an honorarium, the articles deceptively failed to state that the honorarium was paid with money provided by Defendants.

173. While the articles might reference that the author received an honorarium, the articles failed to state that Defendants had approved the content and hired the actual authors.

174. For example, an article created by the Defendants through the Medical Education Systems (MES), *Gabapentin and Lamotrignine: Novel Treatments for Mood and Anxiety Disorders*, published in CNS Spectrums noted that "an honorarium was

received from Medical Education Systems for preparation of this article," but never revealed Defendants' retention and payment of MES.

175. The article created by the Defendants through Medical Education Systems (MES), *Gabapentin and Lamotrignine: Novel Treatments for Mood and Anxiety Disorders*, published in CNS Spectrums noted that "an honorarium was received from Medical Education Systems for preparation of this article," but never revealed the fact that MES personnel, while under contract to Defendants, wrote the article.

176. Defendants used these publications as part of their unfair and deceptive marketing campaign and "publication strategy" by presenting the articles as evidence of independent research conducted by persons with no monetary interest in Neurontin.

177. This conduct was intended to deceive and was known by the Defendants to be false.

178. Defendants deceptively created the articles to promote unproven uses for Neurontin on the basis of scientifically invalid facts and premises they otherwise knew to be false.

179. Defendants deceptively purchased the names and reputations of the authors with kickbacks.

180. Defendants deceptively controlled the content of the articles.

**J.    Defendants' Systematic Payments to Doctors for the Purpose of Increasing Neurontin Prescriptions**

181. Defendants' unfair and deceptive "publication strategy" called upon certain paid physicians (and their medical liaisons) to perform the work normally performed by the company's salesmen in order to promote Neurontin.

182. As part of this strategy, Defendants deceptively paid these physicians who acted as a surrogate sales force. The following describes the various programs Defendants used to make these payments to physicians.

### 1. "Consultants" Meetings

183. Defendants paid certain physicians to deceptively misrepresent the safety, efficacy, effectiveness and usefulness of Neurontin for scientifically unproven uses through "consultants" meetings with the ultimate goal of increasing their profits all at the economic expense of the members of the Class.

184. At these meetings, Defendants and their paid physicians would give unsuspecting doctors lengthy presentations relating to Neurontin, particularly regarding unproven uses.

185. Defendants' employees or physician speakers hired by Defendants for the purpose of promoting Neurontin would make presentations.

186. At some conferences, the sponsoring organization or Defendants intentionally posed questions to the speakers about unproven uses to insure that the attendees were exposed to such information.

187. A typical consultants' meeting was held in Jupiter Beach, Florida, for neurologists from the North East CBU including Massachusetts during the weekend of April 19-21, 1996.

188. In a memorandum announcing the event to Defendants' personnel, the Neurontin Marketing Team acknowledged that in order to target neurologists with the greatest potential for writing Neurontin prescriptions, sales personnel must select potential attendees from a list of the top prescription writers for anti-epileptic drugs in the Northeast.