189. Only the doctors who fell within this targeted demographic were authorized to be invited.

190. The Jupiter Beach "consultants" meeting included two one-half days of presentations by Parke-Davis relating to Neurontin, including extensive presentations relating to scientifically unproven uses.

191. Although the presentations were represented to be provided by Proworx, an independent company, all aspects of the presentation were deceptively designed, monitored and approved by Defendants.

192. Defendants selected the speakers, picked the presentation topics and previewed the content of the presentations to make sure that they were acceptable.

193. Defendants hosted dozens of "consultants" meetings between late 1995 and 1997 in which presentations were made on unproven Neurontin uses designed to change the physicians' prescription writing habits.

194. Another such "consultants" meeting occurred at the Ritz Canton, Boston, MA on May 10-11, 1996.

195. At the Boston meeting in May 1996, Defendants' representative made false and misleading statements that Neurontin was effective for trigeminal neuralgia at unusually high doses, but failed to disclose the side-effects, the absence of toxicology data or that Defendants' owns clinical trials questioned the existence of the dose relationship.

196. Defendants' representative also falsely stated at the Boston meeting that adverse reactions tend to be idiosyncratic, and that they did not seem to be dose-dependent despite having medical evidence that side effects were indeed dose responsive.

197. During the Class Period, Defendants had actual knowledge of the Inspector General's Special Fraud Alert, which raised particular concerns about drug marketing.

198. Nonetheless, Defendants did nothing to curb their marketing practices knowing that they could not have profited so greatly without unfairly and deceptively marketing Neurontin for unproven uses.

199. In 1997, Defendants conducted a review of their marketing practices.

200. As a result of that review, Defendants determined that *none* of their Neurontin related sales programs described above should have been conducted in the manner previously conducted by Defendants.

**K. Medical Education Seminars**

201. Another forum where Defendants unfairly and deceptively promoted Neurontin for unproven uses was through Continuing Medical Education seminars ("CME").

202. While Defendants retained third-party organizations, such as Proworx and MES, to present the event seminars, they had control of virtually every aspect of these events.

203. Proworx and MES obtained Defendants' approval for all content presented at the seminars. This fact was kept secret and the information was misrepresented as being independent.

204. Defendants also secretly paid all expenses, including all the seminar companies' fees.

205. Although the seminar companies acted as the conduit, Defendants controlled every aspect of the CME programs.

<u>206. As to the CME Neurontin programs:</u>

<u>a)    Defendants unfairly and deceptively designed and approved the programs;</u>

<u>b)    Defendants unfairly and deceptively hand-picked the speakers for the seminars;</u>

<u>c)    Defendants unfairly and deceptively approved the seminar presentations of the seminars;</u>

<u>d)    Defendants previewed, in most cases, the contents of the seminars prior to delivery;</u>

<u>e)    Defendants selected the attendees;</u>

<u>f)    Defendants evaluated the presentations to make sure their "message" was appropriately delivered;</u>

<u>g)    Defendants black-listed presenters whose presentations were not sufficiently pro-Neurontin; and</u>

<u>h)    Defendants monitored the prescribing patterns of the physicians who attended these conferences to insure the purpose of the conference - increased writing of Neurontin prescriptions - was achieved.</u>

<u>207.    Representative CME programs in Massachusetts sponsored by Defendants</u> included, but are not limited to, the following:

<u>a)    Diabetic Neuropathy - Ritz Carlton, Boston, MA - June 22-24, 1997</u>

<u>b)    Merritt-Putnam Symposium - Boston, MA - December 5, 1997</u>

**~~E~~L.    Defendants' ~~"Off-Label" Promotion~~<u>Unfair and Deceptive Promotions</u> Has Continued as Has the Continuing Impact of the Earlier Misconduct**

~~295.~~<u>208.</u>    As a result of the activities described above, many of which continue ~~to occur after Dr. Franklin filed his whistleblower suit, physicians~~<u>today, Massachusetts consumers</u> were inundated with false <u>and misleading</u> information about Neurontin. As a result, they continue to ~~prescribe~~<u>take</u> Neurontin for ~~"off-label"~~ uses for which there is no reliable scientific support.

296. ~~On information and belief, Pfizer has a company-wide practice of marketing "off-label" indications regardless of FDA limitations on the designated use of the product.~~

~~297.~~209.  This continuing course of conduct is evidenced in part by the staggering growth of Neurontin sales for ~~non-approved FDA use~~<u>scientifically unproven uses</u>.

~~298.~~<u>210.</u>  Because there are no valid scientific studies supporting ~~such use~~<u>Neurontin use for Bipolar Disorder; Peripheral Neuropathy, Diabetic Neuropathy and other pains syndromes; Epilepsy Monotherapy; Reflex Sympathetic Dystrophy; Attention Deficit Disorder; Restless Leg Syndrome; Trigeminal Neuralgia; Essential Tremor Periodic Limb Movement Disorder; migraines; Amyotrophic Lateral Sclerosis; and drug and alcohol withdrawal seizures</u>, a reasonable inference can be drawn that ~~"off-label" use results~~<u>Neurontin prescriptions for unproven uses are caused</u> from past and continuing promotional efforts by Defendants.

~~299.~~<u>211.</u>  First, from the perspective of overall Neurontin sales, ~~"off-label"~~ usage of Neurontin <u>for scientifically unproven uses</u> has actually *increased* during the years since 1999; in recent years, ~~"off-label"~~ prescriptions for <u>unproven</u> Neurontin <u>uses</u> have exceeded 90% of all sales~~ and, in some months, it appears that approved indication usage is negligible~~.

~~300.~~<u>212.</u>  Second, although Neurontin is prescribed for scores of ~~"off-label"~~<u>scientifically unproven</u> indications, since 1999 the types of ~~"off-label"~~<u>unproven</u> usage continue to be weighted in the precise areas where Defendants focused their unlawful marketing efforts: bipolar disorder, peripheral neuropathy, migraine, etc.

~~301.~~213.   Third, these focus treatment areas of continuing ~~unapproved usage~~unproven uses are subject to very intense competition between therapeutic substitutes (other drugs or treatments).

~~302.~~214.   Fourth, Defendants, like most branded drug companies, monitor the relationship of their sales to their promotional efforts in a very short timeframe.

~~303.~~215.   The persistent maintenance of high Neurontin sales within multiple, targeted areas ~~for "off-label" promotion~~lacking any scientific basis over a period of years defies the conclusion that any significant backing away on the marketing, sales or promotion on Neurontin to each of those ~~unapproved~~unproven therapeutic areas.

~~304.~~216.   For example, sales of Neurontin for the treatment of bipolar disorder have steadily increased since its introduction. This increase is a direct result of Defendants' sales representatives recommending to doctors its use for this purpose and their distribution of ~~unapproved~~ promotional materials.

~~305.~~217.   There are no valid scientific studies that support Neurontin's use for bipolar disorders.

218.   In fact, a scientifically valid study conducted by Harvard Bipolar Research Program found that patients **did worse on Neurontin than those who were on a sugar pill**. Parke-Davis failed to publish the results for two years.

~~306.~~219.   Dr. C. Seth Landefeld has submitted an expert opinion in ~~the Franklin litigation~~a *qui tam* lawsuit against the Defendants stating that a review of Drugdex for Neurontin, as of the end of August 2002, reveals "no published scientific studies to support "Neurontin's use for ... bipolar disorder."

~~307.~~220.    As a result, tens of thousands of patients who need help and could use other drugs whose effectiveness ~~has~~have been established, were given and are being given Neurontin.

~~308.~~221.    These prescriptions for this purpose are still being written and are a direct result of Defendants' pre-2000 illegal promotional activities and post-2000 illegal promotional activities.

~~309.~~222.    Likewise, sales of Neurontin for pain, ALS, attention deficit disorder, and depression ~~and dosages in excess of 1800 mg per day,~~ are also increasing without any scientific evidence supporting use of Neurontin for such indications.

~~310.~~223.    Again, as noted by Dr. Landefeld, as of the end of the third quarter of 2002 "there were no published scientific studies to support Neurontin's use for ~~"~~ any of these indications or in an increased dose.~~"~~

~~311.~~224.    In fact, through this date there are no published scientific studies to support Neurontin's use for " any of these indications or in an increased dose.~~"~~

~~312.~~225.    Overall, ~~"off-label"~~ sales of Neurontin scientifically unproven uses have steadily increased since 1998, and from 2000 to the present have consistently remained at 93% to 94% of all sales.

~~313.   Actual sales for approved uses of Neurontin has declined.~~

~~314.~~226.    Given the absence of scientific support for such uses, the genesis for those sales can only be past and continuing efforts by Defendants to unfairly and deceptively promote ~~"off-label" use~~the uses.

~~315.~~227.    These continuing ~~"off-label"~~ promotional efforts are evidenced in part by a July 1, 2002 letter from Dr. Lisa Stockbridge of the Department of Health & Human Services ("~~HHS~~HITS") to Pfizer, in which HHS notified Pfizer that certain of its

promotional and marketing practices are "in ~~violation of the Federal Food, Drug and Cosmetic Act ... because it makes representations about Neurontin which are false and~~concerning Neurontin were false arid misleading."

~~316.~~228.    In particular, HHS had the following objections about Pfizer's ~~"off-label"~~ promotional activities:

> The presentation on the model of illustrations of cellular activity resulting from the administration of Neurontin ("Mechanism of Action"), in conjunction with the presentation of the human brain, and the prominent display of the name Neurontin makes representations about how Neurontin acts in the human brain. This presentation along with the depiction of the human brain and the prominent display of the name "Neurontin" suggest that the mechanism of action of Neurontin has been established in the human brain. This suggestion of proof of the mechanism of action is false. ~~Specifically, if is contrary to the language in the approved product labeling that states that [t]he mechanism by which gabapentin [Neurontin] exerts its anticonvulsant action is unknown.~~
>
> ~~Furthermore, the full presentation of the aforementioned areas of the human brain accompanied by purported "Mechanism of Action" and the prominent display of the name "Neurontin" is misleading because it suggests that Neurontin is useful for a broader range of CNS conditions than has been demonstrated by substantial evidence (i.e., it can be used for the treatment of any specific or non-specific brain disorder through to involve the GABA-ergic neurotransmitted system that can originate in these parts of the brain). Most obviously, the solo and prominent mention of the name Neurontin suggests that Neurontin can be used as monotherapy for various CNS disorders, notwithstanding that with respect to brain disorders, Neurontin is only indicated as "adjunctive therapy in the treatment of partial seizures with or 'without secondary generalization in patients 12 over 12 years of age with epilepsy" and as "adjunctive therapy in the treatment of partial seizures in pediatric patients age 3-12 years."~~

229.    To address these objections, ~~DDMAC recommends~~recommendation was made that Pfizer do the following:

> ~~1.~~    Immediately discontinue the use of this model and any other promotional material with the same or similar issues.

~~317.    Defendants' employees used the foregoing promotional materials to promote "off-label" use of Neurontin.~~

318.230.  These continuing efforts to illegally promote ~~"off-label" use of~~ Neurontin <u>for scientifically unproven uses</u> are also evidenced in part by a letter from HHS dated June 6, 2001, in which HHS found Pfizer to have again ~~violated applicable law~~<u>deceptively promoted Neurontin</u>.

319.231.  HHS sent this letter in response to Pfizer's promotional advertising sent to doctors in 2001 claiming that a study had indicated "Quality of Life Improvements" with use of Neurontin.

320.232.  HHS found this promotional material to be misleading ~~as set forth in its letter to Pfizer:~~

~~Ms. Andrea Garrity~~
~~Director, Regulatory Affairs~~
~~Pfizer, Inc.~~
~~235 East 42nd Street~~
~~New York, New York 100 17-5755~~

~~Re: NDA #s 20-235, 20-882~~
~~Neurontin (gabapentin)~~
~~MACMIS #10174~~

~~Dear Ms. Garrity:Through routine monitoring and surveillance, the Division of Drug Marketing, Advertising, and Communications 9DDMAC) has identified a slim jim (DD #NSJ5095A1) for Neurontin that is misleading and in violation of the Federal Food, Drug, and Cosmetic Act and applicable regulations.~~

> Specifically, this slim jim ~~misleadingly~~<u>misleading</u> claims improvements in quality of life (QOJ-) parameters based on the Neurontin Evaluation of Outcomes in Neurological Practice (NEON) study. Among other QOL parameters, the misleading presentation includes improvement in social limitations, memory difficulties, energy level, and work limitations. The NEON study is not considered to be substantial evidence for claims of QOL improvements because it is not a controlled study.

<u>308.  To address the false and misleading promotion, a recommendation was made to:</u>

> ~~1. To address these objections, DDMAC recommends that Pfizer do the following;~~ <u>1)</u>  Immediately discontinue the use of this slim jim and any

other promotional material and practices with the same or similar messages.

2.2) Respond to this letter within ten days. Your response should include a statement of your intent to comply with the above, a list of all promotional materials with the same or similar issues, and your methods for discontinuing these promotional materials.

321.309. Defendants' employees had been using the foregoing promotional materials to promote "off-label" uses such uses of Neurontin to consumers up until this letter of June 6, 2001. 6, 2001.

322.310. Defendants have sent disseminated promotional material to physicians suggesting that Neurontin was "well tolerated" with "proven efficacy" at doses "up to 2400 mg/day" and that doses of 3600 mg/day were also "well tolerated."

323.311. There was no scientific evidence that would have met with FDA criteria supporting a claim for dosages in excess of 1800 mg/day for such representations.

324.312. These promotional efforts are illegal unfair and deceptive attempts to encourage "off-label" scientifically unproven uses.

325. The promotional materials referred to above, as well as other promotional activities cited herein, were not submitted to the FDA for approval.

326. The above-cited examples where HHS cited Pfizer, the violations were discovered as a result of HHS's "routine monitoring and surveillance" activities and not because Pfizer had submitted the materials as required by law.

F.M. Defendants' "Off-label" Promotion Lacks Scientific Support False and Misleading Promotions Were Profit Driven

327.313. The "off-label" uses of Neurontin which were and are actively being promoted by Defendants are uses which are not recognized as accepted uses by the medical community.

328. The citations in Drugdex for Neurontin, as of August 1997, indicate that the published scientific literature did not support the use of Neurontin for the following conditions: alcohol detoxification/alcohol withdrawal syndrome, ALS, antidepressant-induced bruxism, anxiety disorder, attention deficit disorder/attention deficit and hyperactivity disorder, behavior problems-dementia related, behavior dyscontrol, dipolar disorder, brachioradial pruritis, back pain, Charles Bonnet syndrome, ciguatera poisoning, cluster headache, cocaine dependency, diabetic peripheral neuropathy, depression, dosages in excess of 1800 mg per day, dystonia, essential tremor, failed back surgery syndrome, headache (SUNCT), headache, hemifacial spasm, hiccups, Lesch-Nyhan syndrome, mania, migraine prophylaxis, menopausal hot flashes, mood stabilization, multiple sclerosis complications, myalgias taxane induced neuropathic pain syndromes, neuropathic cancer pain, HIV-related neuropathy, nicotine withdrawal, nystagmus, obsessive-compulsive disorder, orthostatis tremor, pain-post poliomyelitis pain, pain-RSD, pain disorder, partial seizures-mono therapy, partial seizures-pediatric, partial seizures-refractory, phantom limb syndrome, post herpetic neuralgia, restless leg syndrome, trigeminal neuralgia, seizures - acute intermittent prophyria, seizures - brain tumor-induced, seizures - clozapine-induced, seizures - generalized, seizures - status epilepticus, schizophrenia, social phobia, spasticity, or any other indication other than seizures - adjunctive therapy.

329. The citations in Drugdex for Neurontin as of the third quarter of 2002, indicate that there were no published scientific studies to support Neurontin's use for the following indications: alcohol detoxification/alcohol withdrawal syndrome, ALS, antidepressant-induced bruxism, anxiety disorder, attention deficit disorder/attention

~~deficit and hyperactivity disorder, behavior problems-dementia related, behavior dyscontrol, dipolar disorder, brachioradial pruritus, back pain, Charles Bonnet syndrome, ciguatera poisoning, cluster headache, cocaine dependency, diabetic peripheral neuropathy, depression, dosages in excess of 1800 mg per day, dystonia, essential tremor, failed back surgery syndrome, headache (SUNCT), headache, hemifacial spasm, hiccups, Lesch-Nyhan syndrome, mania, migraine prophylaxis, menopausal hot flashes, mood stabilization, multiple sclerosis complications, myalgias taxane induced neuropathic pain syndromes, neuropathic cancer pain, HIV-related neuropathy, nicotine withdrawal, nystagmus, obsessive-compulsive disorder, orthostatis tremor, pain-post poliomyelitis pain, pain-RSD, pain disorder, partial seizures-monotherapy, partial seizures-pediatric, partial seizures-refractory, phantom limb syndrome, post herpetic neuralgia, restless les syndrome, trigeminal neuralgia, seizures – acute intermittent prophyria, seizures – brain tumor-induced, seizures – clozapine-induced, seizures-generalized, seizures – status epilepticus, schizophrenia, social phobia, spasticity, or any other indication other than the partial seizures-adjunctive therapy, partial seizures – pediatric, post herpetic neuralgia, and diabetic peripheral neuropathy.~~

~~330.    As set forth above, despite the lack of scientific support, Defendants engaged in promotional activities for the purpose of having doctors use Neurontin to treat these diseases. Such conduct constitutes unfair or deceptive acts or practices.~~

<u>314.    Despite the lack of scientific support, Defendants engaged in promotional activities for the purpose of having Massachusetts consumers take Neurontin for such uses. Such conduct constitutes unfair or deceptive acts or practices.</u>

331.315.  With the complete absence of scientific support for ~~treatment of these diseases~~such uses, sales growth that occurred for the unproven use of Neurontin ~~for these diseases~~ was the result of Defendants' continuing promotional activities.

316.  In 1995, Defendants' revenue from the sale of Neurontin was $97.5 million; by 1997, sales increased to $292 million; by 1999, sales increased to $913 million; by 2000, sales increased to $1.3 billion; and by 2003, sales were nearly $2.7 billion.

### N. Criminal Liability

317.  In 1996, Dr. Franklin filed a *qui tam* action on behalf of the United States against Warner-Lambert, alleging false claims caused by the knowing promotion of prescription sales of Neurontin ineligible for Medicaid reimbursement. In April 2003, Dr. Franklin filed an opposition to summary judgment in the *qui tam* action which unsealed numerous documents revealing the existence and operation of Defendants' fraudulent marketing practices.

318.  Based upon the conduct alleged in the *qui tam* action, the U.S. Department of Justice filed a criminal information against Warner-Lambert.

319.  On May 13, 2004, Warner-Lambert announced that it agreed to plead guilty and pay more than $430 million to resolve the criminal charges in connection with Parke-Davis's fraudulent promotion of Neurontin.

### ~~G~~O. Fraudulent Concealment

~~332.  Defendants have and continue to conceal their "off-label" promotional activities.~~

333.320.  Throughout the Class Period, Defendants effectively, affirmatively and fraudulently concealed their ~~wrongful~~unfair and deceptive conduct.

334.321.    Because of the self-concealing nature of Defendants' actions, and their affirmative acts of concealment, Plaintiffs could not have reasonably discovered Defendants' ~~wrongful~~unfair and deceptive conduct alleged herein until at the earliest, May ~~2002 when the federal court file~~2003 when certain documents revealing the existence and operation of Defendants' fraudulent marketing practices were unsealed in the Franklin *qui tam* case ~~was completely unsealed~~.

322.    Defendants' unfair and deceptive conduct as alleged in this Complaint was carried out through means and methods which were designed and intended to avoid detection, and which in fact successfully precluded detection for a substantial period of time.

323.    As described above, Defendants created and implemented an unfair and deceptive marketing and sales scheme using facially plausible consultant meetings, education seminars and journal articles. In addition, Defendants hid their involvement and financial connections with the physician participants and intermediaries.

324.    These practices of secrecy included, *inter alia*:

a)    deliberately misrepresenting the safety, medical efficacy, effectiveness and usefulness of Neurontin for a variety of unproven uses;

b)    knowingly misrepresenting the existence and findings of scientific data, studies, reports and clinical trials;

c)    deliberately concealing negative findings or the absence of positive findings;

d)    misrepresenting the credentials and qualifications of certain of Defendants' employees as specialists, medical researchers, physicians and scientific employees in order to market and sell Neurontin;

e)    knowingly publishing articles, studies and reports misrepresenting the scientific credibility of data regarding Neurontin;

> f) intentionally misrepresenting and concealing Defendants' role and participation in the creation and sponsorship of a variety of events, articles and publications used to sell Neurontin;
>
> g) intentionally misrepresenting and concealing the financial ties between the Defendants and certain firms and physicians; and
>
> i) fraudulently using "medical liaisons" to directly solicit, market and promote Neurontin for unproven uses to physicians.

~~335.~~325. Although Plaintiffs exercised due diligence during the Class Period by promptly investigating the facts giving rise to the claims asserted herein, Plaintiffs did not discover the Defendants' ~~wrongful~~unfair and deceptive conduct until at the earliest, May ~~2002.~~2003.

326. To this day, Defendants have and continue to conceal much of their promotional activities.

~~336.~~327. By virtue of the fraudulent concealment of their ~~wrongful~~unfair and deceptive conduct, the running of any statute of limitations has been tolled and suspended with respect to any claims and rights of action that Plaintiffs and the other Class members have as a result of Defendants' unfair or deceptive acts or practices.

**~~II~~P. Impact in the Commonwealth of Massachusetts**

~~337.~~328. Defendants' ~~"off-label"~~ marketing scheme was directed in part to increase ~~"off-label"~~ sales and profits of Neurontin in the Commonwealth of Massachusetts ~~and has accomplished its objectives~~.

~~338.~~329. As part of this scheme, Defendants sent promotional materials to doctors in the Commonwealth of Massachusetts in an effort to increase ~~"off-label"~~the sales ~~and interacted with doctors~~ in the Commonwealth of Massachusetts of Neurontin for uses not proven to be safe, efficacious, effective or useful.

339. 330.    The Defendants' secretly funded "studies" regarding the effectiveness of Neurontin were disseminated to doctors in the Commonwealth of Massachusetts.

340. 331.    Tens of thousands of Massachusetts residents have taken Neurontin as a direct, intended and foreseeable result of Defendants' scheme to treat conditions for which the drug is not medically safe, efficacious, effective or necessary.

### COUNT ONE

### ~~Violation of Massachusetts Consumer Protection Act – M.~~Unfair and Deceptive Practices - G.L. c. 93A, §2 and §9

341. 332.    Plaintiffs incorporates the preceding paragraphs as if fully set forth herein.

342. 333.    Defendants were engaged in trade or commerce as defined by ~~M.~~G.L. c. 93A.

343. 334.    Defendants' actions, as complained of herein, constitute unfair, or deceptive ~~and/~~acts or ~~unlawful~~ practices committed in violation of G.L. c. 93A, § 2.

344. 335.    Defendants engaged in unfair or deceptive acts or practices, undertaken willfully and knowingly in ~~knowing~~ violation of G.L. c. 93A, § 2 when:

   a)    Defendants caused third parties to publish and make factual representations and statements designed to promote Neurontin ~~"off-label" uses~~ that were false, misleading and/or deceptive;

   b)    Defendants unfairly and deceptively sold Neurontin to Plaintiffs and the ~~public~~Class based upon statements made by a third party that Defendants hired or improperly influenced, that were deceptive;

   c)    Defendants omitted material information known to them ~~that would have disclosed materially adverse facts to doctors~~ in order to induce ~~doctors to prescribe~~Plaintiffs and the Class to use Neurontin;

   d)    Defendants knew that published studies promoting Neurontin ~~for nonapproved users~~ lacked the scientific integrity that was expected of such

studies and acted to conceal adverse studies and a balanced statement of the facts;

e) Defendants sent ~~to doctors~~ promotional literature regarding ~~"off-label"~~ uses of Neurontin that were false and misleading;

f) Defendants distributed false and misleading information ~~to doctors~~ for the purpose of causing ~~those~~Massachusetts doctors to ~~use~~prescribe Neurontin for ~~"off-label" uses~~scientifically unproven conditions and to deceive Plaintiffs and members of the ~~public~~Class into believing that such ~~use was~~uses were appropriate;

g) Defendants' used grants or other forms of compensation to influence doctors to author "studies" that were not scientifically supported but which showed favorable results using Neurontin;

h) Defendants issued payments ~~to doctors,~~ honorariums, consultant fees and the like, all for the purpose of encouraging ~~the "off-label" uses~~scientifically unproven uses of Neurontin;

i) Defendants embarked on a marketing scheme with the purpose to deceive Plaintiffs and the ~~public;~~Class; and

j) Defendants falsely and deceptively marketed Neurontin for uses for which no valid scientific data existed~~; and k) Defendants did not seek FDA approval for the majority of "off-label" uses Neurontin was promoted for; the materials were not provided to the FDA prior to their use; the materials were not peer-reviewed or qualified reference publications, and Defendants did not provide the FDA with all reports they possess on safety and efficacy~~.

~~345.~~336.    All of the conduct alleged herein occurs and continues to occur in Defendants' business. Defendants' ~~wrongful~~unfair and deceptive conduct is part of a pattern or generalized course of conduct repeated on thousands of occasions daily.

~~346.~~337.    Further, each of the above acts constitutes an unfair and/or deceptive act or practice in violation of ~~M.~~G.L. c. 93A, § 2, and is a distinct and independent violation of Massachusetts law.

~~347.~~338.    As a direct and proximate result of Defendants unfair or deceptive acts or practices, ~~Plaintiff~~Plaintiffs and the Class have suffered actual economic damage

by paying for Neurontin to treat conditions ~~for which the drug is not FDA approved and is not medically necessary~~ that lacked scientific, medical and clinical data concerning safety, efficacy, effectiveness or usefulness.

~~348.~~ 339.  Plaintiffs and the Class were injured by reason of unlawful acts of Defendants as alleged herein and are therefore entitled to actual damages or, in the alternative statutory damages.

~~349.~~ 340.  Each of the Defendants has been served with a demand letter in accordance with G.L. c. ~~93A, § 9.~~ 93A, § 9. (Attached as Exhibit 1 is the most recent demand letter sent by Plaintiffs).

~~350.~~ 341. More than thirty days has passed since such demand letters were served, and each Defendant has failed to ~~make~~ tender a settlement offer despite exclusive possession and control of information that reasonably establishes a reason to know that the conduct of which Plaintiffs complain violates G.L. c. 93A, § 9.

342.  Defendants' violations of G.L. c. 93A were knowing or willful, entitling Plaintiffs and the Class to double or treble damages.

343.  Defendants' refusal to tender a reasonable offer of settlement to a Class of persons that suffered monetary losses and other injury as a result of conduct that they had reason to know violated G.L. c. 93A, §9(3) also supports a claim for treble damages, attorneys' fees, interest, costs and other relief provided for in G.L. c. 93A, §9.

344.  As persons injured by Defendants unlawful conduct, Plaintiffs and the Class are entitled additionally to recover interest on damages, attorneys' fees and costs.

## COUNT TWO

### Unfair and Deceptive Practices — False Advertising
### (G.L. c. 93A. et seq. and 940 CMR § 3.02, as promulgated thereunder)

345. Plaintiffs incorporates the preceding paragraphs as if fully set forth herein.

346. Defendants' actions, as complained of herein, constitute false advertising in violation of 940 CMR § 3.02, as promulgated pursuant to G.L. c. 93A § 2(a) for purposed of determining whether conduct, terminology or representations involve unfair methods of competition or unfair or deceptive acts or practices.

347. 940 CMR § 3.02 provides that "No statement or illustration shall be used in any advertising which creates a false impression of the ... quality, make ... usability or origin of the product offered, or which may otherwise misrepresent the product in such a manner that later, on disclosure of the true facts, there is a likelihood that the buyer may be switched from the advertised product to another."

348. Defendants falsely marketed, advertised and sold Neurontin to treat conditions that lacked scientific, medical and clinical data concerning safety, efficacy, effectiveness or usefulness.

349. As a result of the violations of 940 CMR § 3.02 described above, Massachusetts consumers have purchased Neurontin, which was advertised, promoted, marketed and sold in the Commonwealth of Massachusetts through advertising and marketing materials that misrepresented the safety, efficacy, effectiveness and usefulness of the product.

350. Plaintiffs and the Class would not have purchased Neurontin had they known the true facts; that Defendants misrepresented the scientific, medical and clinical

data related to the safety, medical efficacy, effectiveness and usefulness of Neurontin for conditions other than the treatment of epilepsy and post-herpetic neuralgia.

351. ~~Defendants' violations of Chapter 93A were knowing or willful, entitling Plaintiffs and the Class to double or treble damages.~~ Plaintiff and the Class were injured by reason of unlawful acts of Defendants as alleged herein and are therefore entitled to actual damages or, in the alternative statutory damages.

352. Defendants' violations of 940 CMR § 3.02 and G.L. c. 93A were knowing and willful, entitling Plaintiffs and the Class to double or treble damages.

353. As persons injured by Defendants unlawful conduct, Plaintiffs and the Class are entitled additionally to recover interest on damages, attorneys' fees and costs.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray:

A.) That the Court determine that this action may be maintained as a class action pursuant to G.L. c. 93A, §§§ 9(2) and/or Rule 23 of the Massachusetts Rules of Civil Procedure and direct that reasonable notice be given to members of the Class;

B.) That the acts and practices alleged herein be adjudged and decreed to be a violation of G.L. c. 93A, § 2.

C.) That Plaintiffs and the Class be awarded their actual damages determined at trial or, in the alternative, statutory damages pursuant to ~~M.~~G.L. c. 93A, §9(3);

D.) That Plaintiffs and the Class be awarded double or treble damages pursuant to G.L. c. 93A, § 9(3);

E.) That Plaintiffs and the Class recover interest on the damages awarded;

F.) That Plaintiffs and the Class be awarded reasonable attorneys' fees and costs of suit, pursuant to G.L. c. 93A, § 9(4); and

G.)   The Court grant such other relief as it may deem just and equitable.

DATED: March 21, 2005                Respectfully submitted,


~~Robert J. Bonsignore, BBO #547880~~
~~Robin E Brewer~~
~~BONSIGNORE & BREWER~~
~~23 Forest Street~~
~~Medford, MA 02155~~
~~(781) 391-9400~~