IN THE CIRCUIT COURT OF THE 11TH
JUDICIAL CIRCUIT IN AND FOR
DADE COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO.:    04-17021 CA 32



ANA MEDERO AND SHIRLEY LEVIN
on behalf of themselves and
all persons similarly situated,

Plaintiff,

v

PFIZER, INC., WARNER-LAMBERT COMPANY, LLC
AND PARKE-DAVIS, a division of Warner-Lambert Company,

Defendants.

---

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, on behalf of themselves and a class of all persons similarly situated, alleges upon personal knowledge and belief as to their own acts, and upon information and belief (based on the investigation of counsel and other public filings) as to all other matters, as to which allegations Plaintiffs believe substantial evidentiary support will exist after a reasonable opportunity for further investigation and discovery, on behalf of the class, as follows:

## I. NATURE OF THE ACTION

1.    As detailed in this Complaint, defendant Pfizer, Inc. ("Pfizer") currently markets and sells the drug Neurontin. Prior to its acquisition of Warner-Lambert, Neurontin was

1



FREIDIN & BROWN, P.A., *One Biscayne Tower, Suite 3100, 2 South Biscayne Blvd., Miami, FL 33131, Phone: 305.371.3666, fax: 305.371.6725*

marketed and sold by Parke-Davis, a division of Warner-Lambert Parke-Davis").

2. Drug companies spend billions of dollars each year trying to persuade doctors to prescribe their drugs. There are strict federal regulations about what form that promotion can take. The rules are meant to ensure that drug companies give doctors trustworthy information, so that medications are prescribed appropriately. But drug makers can get around the rules and this case arises from one company's widespread scheme designed to unlawfully promote the sale of the anti-epilepsy drug Neurontin for non-FDA approved uses.

3. The Parke-Davis Division of Warner-Lambert Company, now owned by Pfizer, received FDA approval to market and sell Neurontin for the treatment of epilepsy. There are two million epileptics in the United States, a number that is not considered to be a large market for a major pharmaceutical company. Starting in 1995, Parke-Davis executives embarked on a scheme the purpose of which was to increase Neurontin sales for diseases with respect to which Neurontin had not received FDA approval. Parke-Davis' sales department recognized a significant profit potential in the "off-label" promotion of Neurontin for other diseases and at higher doses. The decision was made to completely avoid the normal regulatory process of the FDA pertaining to the marketing of a new use of a drug and to proceed in an illegal fashion. The decision was also made to actively conceal the illegal means which would be used to market the drug. The principal component of the scheme was the hiring and

2

deployment in the field of approximately 60 "medical liaisons," whose real function was to actively solicit physicians to promote "off-label" uses of Neurontin, using cash payments as a reward and incentive.

4.    In the pharmaceutical industry, medical liaisons are individuals with scientific training who are available at physicians' requests to provide balanced scientific information about a company's products. They have no role as sales people.

5.    At Parke-Davis, many of the "medical liaisons" were hired directly out of the sales department. They were all trained in sales techniques, and compensated, in part, on the basis of sales. They had no discernable scientific or medical functions. They had no communication or interaction with Parke-Davis' actual medical research divisions. The medical liaisons were assigned to act as teams with the regular sales representatives and were given lists of doctors for "cold calls," based on the size of the doctors' practices and their ability to prescribe Neurontin. They were provided with a package of monetary incentives to offer to physicians who got involved in the Parke-Davis program.

6.    Parke-Davis created a complex array of monetary incentives for physicians who wrote prescriptions for Neurontin. None of these incentives had anything to do with true scientific or medical research. These incentives included cash payments to "consultants" and "preceptors," cash payments for a "speakers bureau" and for participation in teleconferences, the award of money for scientifically irrelevant "studies," miscellaneous cash payments for access to records of patients who are taking Neurontin, travel and Olympics tickets, and

3

other benefits. The recipients of these awards and benefits were selected by the sales department based on their ability to prescribe Neurontin and to influence other doctors to do so.

7.     The medical liaisons were trained to use knowingly false information to persuade physicians to use Neurontin for "off-label" uses. Parke-Davis' sales line in this regard, despite the fact that any drug has side effects, was that since Neurontin is safe at very high doses and produced no very significant side effects, there is no problem using it for "off-label" indications. Medical liaisons were trained to tell doctors that evidence exists that Neurontin, in high doses, is effective for control of bipolar mental disorder, migraine, drug and alcohol withdrawal seizures, restless leg syndrome, and several other diseases. At the time these statements were made, there was no competent scientific evidence that Neurontin was safe and effective for any of these conditions. The only "evidence" that existed was gossip, case reports from physicians paid by Parke-Davis, self-referential studies, and rumor. The medical liaisons were also trained to misrepresent their own credentials to the physicians in order to elevate their own credibility, by saying they were "involved in research." In fact, they were purely involved in sales.

8.     Parke-Davis medical liaisons, using a variety of misrepresentations and cash incentives, encouraged many physicians to experiment with their own patients by prescribing higher levels of Neurontin than was approved by the FDA for use in the treatment of epilepsy and for a variety of "off-label" indications. Parke-Davis did this with the combined motives of increasing sales, generating a body of "medical practice," and generating case reports which could later be used for further "off-label" promotion with other physicians. Parke-Davis'

4

sales employees expressed callous disregard for the possibility of adverse reactions occurring during these informal, non-FDA sanctioned, illegal experiments. The Parke-Davis scheme focused in particular on the market for bipolar disorders and obsessive-compulsive disorder. It did so by a variety of methods, including sponsoring false, unscientific and unreliable studies, later published in scientific journals, which purported to show favorable results in using Neurontin for non-approved uses. These studies were published by doctors who had received money from Parke-Davis, either in the form of educational grants or some other form of monetary compensation as described below.

9.      An example of how the scheme works is contained in a Proposal to Parke-Davis from a Philadelphia company called Medical Education Systems ("MES"). In the proposal, which was submitted in December 1996, MES requested $160,000 to develop a series of 12 scientific articles to, quote, "support epilepsy education". In fact, three of the articles MES proposed were related to Neurontin and bipolar disorder. Parke-Davis made sure the articles said exactly what it wanted them to. It approved the authors and topics; it cleared the journals in which the articles were printed; its executives vetted drafts. In some cases, it approved articles that appear to have been written almost entirely by ghostwriters of the medical education company.

10.     The articles on Neurontin and bipolar disorder reported that some doctors were having success with using Neurontin for their bipolar patients and that Neurontin was a safe drug that was easily tolerated, so doctors could quickly increase the doses they gave their patients. As part of the "off-label" marketing scheme, this message was then reinforced by Parke-Davis salesmen when they called on doctors to tell them about the latest research on

5

Neurontin and at teleconferences, lavish dinner meetings and medical seminars where Parke-Davis paid leading doctors to speak to other doctors who were also paid a fee to listen.

11.    Based on these articles, as well as other illegal promotional activity described herein, tens of thousands of bipolar disorder patients are now treated with Neurontin. However, a scientifically valid study conducted at the Harvard Bipolar Research Program found that patients <u>did worse on Neurontin than those who were on a sugar pill.</u> Parke-Davis sponsored this 1998 study, was aware of the results, but did not publish the results until two years later. By that time, Neurontin accounted for $1.3 billion in sales, with over 80% of its sales coming from non-approved uses, such as treatment of bipolar disorder.

12.    Plaintiffs seek declaratory relief and restitution from Defendants as a result of their unlawful, unfair, or deceptive practices.

## II. PARTIES

13.    **(a) Ana Medero** is a resident of Dade County, Florida. She was prescribed Neurontin for <u>Neuropathy pain,</u> a unapproved use. The doctor who prescribed the Neurontin and the pharmacies that filled the prescriptions are located in Dade County. The payment for the prescriptions were made in Dade County; **(b) Shirley S. Levin**, is a Palm Beach County, Florida resident. She was prescribed Neurontin for <u>Peripheral Neuropathy</u>, an unapproved use. The doctor who prescribed the Neurontin and the

6

pharmacies that filled the prescriptions are located in Palm Beach County. The payment for the prescriptions were made in Palm Beach County.

14.    The class sought would consist of persons who were prescribed Neurontin for conditions other than epilepsy (as adjunctive therapy), or for management of post-herpetic neuralgia (pain associated with herpes zoster skin rash outbreaks) from 1995 to the present. During the class period, Class members purchased Neurontin, manufactured by Defendant, and were injured by the illegal conduct alleged herein.

15.    Defendant **Pfizer, Inc.,** is a Delaware corporation with a principal place of business in New York, New York.  Pfizer is principally engaged in the manufacture and sale of pharmaceuticals.   In 2000, Pfizer acquired Warner-Lambert Company ("Warner-Lambert") including Warner-Lambert's Parke-Davis division. As a result of the acquisition, Pfizer is responsible for all liabilities which result from any acts or omissions of Parke-Davis or Warner Lambert which occurred prior to the Warner-Lambert acquisition. Defendant **Warner Lambert, LLC** is a Delaware corporation with a principal place of business in Morris Plains, New Jersey.  Warner-Lambert is principally engaged in the manufacture and sale of pharmaceuticals.  **Parke-Davis** is a division of Warner-Lambert. At times throughout this Complaint, Parke-Davis, Warner-Lambert and Pfizer may be referred to collectively as "Defendants."

FREIDIN & BROWN, P.A., *One Biscayne Tower, Suite 3100, 2 South Biscayne Blvd., Miami, FL 33131, Phone: 305.371.3666, fax: 305.371.6725*

## III. JURISDICTION AND VENUE

16.     This court has subject matter jurisdiction over this class action and the Defendants action because certain Plaintiffs and members of the Class were prescribed and indeed paid for Neurontin in Dade County, Florida. Moreover, Defendants systematically and continually conducted business in Dade County, Florida.

17.     Venue is proper in this Court because Defendants conduct business in Dade County, including marketing, advertising, and sales directed to Florida residents. Further, at all times mentioned in this Complaint, Defendants made misrepresentations and material omissions to residents of Dade County and the State of Florida. Neurontin was prescribed and paid for by certain class plaintiffs in Dade County.

18.     Federal court subject matter jurisdiction over this class action and representative action does not exist. Plaintiffs and the Class members do not assert any federal claims in the prosecution of this litigation. Plaintiffs and the Class members seek relief as provided by Florida only.  Plaintiffs and each member of the Class have individually incurred damages under the laws of Florida in an amount less than $75,000. Neither the Plaintiffs, nor any member of the Class, seeks damages exceeding $75,000, nor do their damages individually exceed $75,000, inclusive of interest and attorneys' fees and all relief of any nature sought hereunder. Neither Plaintiffs, nor any of the Class members, seeks any form of "common" recovery, but rather individual recoveries not to exceed $75,000 for any Class member, inclusive of interest and attorneys' fees and all relief of any nature sought hereunder. Plaintiffs and

FREIDIN & BROWN, P.A., *One Biscayne Tower, Suite 3100, 2 South Biscayne Blvd., Miami, FL 33131, Phone: 305.371.3666, fax: 305.371.6725*

the Class members voluntarily limit their claims to less than $75,000 each. Under applicable federal law, counterclaims, damages, punitive damages, attorneys' fees and costs cannot be aggregated to meet the minimum jurisdictional amount for federal court subject matter jurisdiction. Plaintiff asserts no federal question and/or violations of federal law.

## IV. STATEMENT OF FACTS

A.      **Parke-Davis' Decision to Avoid FDA Approval For Its "Off-Label" Marketing Scheme**

19.     Parke-Davis was principally engaged in the manufacture and sale of pharmaceuticals including prescription pharmaceuticals falling under the jurisdiction and regulation of the U.S. Food and Drug Administration. Pfizer acquired Warner-Lambert in 2000.

20.     In December 1993, the FDA approved Neurontin as "adjunctive therapy" for the treatment of certain types of seizures in adult patients suffering from epilepsy. "Adjunctive therapy" meant that the drug could not be prescribed by itself for the treatment of epilepsy, but as an add-on drug in the event that a primary anti-epilepsy drug was not successful. The FDA-approved labeling of Neurontin stated that the drug is only effective at 900 to 1800 mg/day.

21.     At the time Neurontin was approved, Parke-Davis' original patent on Neurontin was set to expire in December 1998. This left Parke-Davis with only a small window of exclusivity for this drug; after the expiration of the Neurontin patent Parke-Davis

FREIDIN & BROWN, P.A., *One Biscayne Tower, Suite 3100, 2 South Biscayne Blvd., Miami, FL 33131, Phone: 305.371.3666, fax: 305.371.6725*

would be forced to share the market for Neurontin with generic drug manufacturers, substantially reducing its profits and its ability to keep Neurontin' s retail price high.

22.   At the time Parke-Davis filed its NDA (New Drug Application) with the FDA, Parke-Davis intended Neurontin to be used for other indications besides epilepsy adjunctive therapy. In October 1990, it filed another patent application for Neurontin claiming it to be effective for the treatment of neurogenerative disease. In 1995, additional patent applications were filed by Parke-Davis for mania and bipolar disease and for anxiety and panic. Notwithstanding the claims made in its patent applications, neither Parke-Davis nor Pfizer ever sought FDA approval for the use of Neurontin to treat the conditions described in the four patent applications referenced above.

23.   The market for the only approved use of Neurontin, adjunctive therapy for epilepsy patients, is and was limited to a potential population of two million epilepsy patients. On the other hand, the market for the other uses of Neurontin, such as pain management, psychiatric disorders, anxiety and depression, were huge. Parke-Davis knew that if these markets could be tapped, Parke-Davis could enjoy enormous profits from Neurontin.

24.   Initially, Parke-Davis intended to file supplemental NDAs in order to expand Neurontin's approved indications, including applications for monotherapy (which would permit Neurontin to be prescribed by itself for epilepsy treatment) and for various psychiatric and neurological indications. However, by 1995 Parke-Davis recognized it would be uneconomical to assume the expense and time necessary to

10

conduct the clinical trials necessary to prove that Neurontin was safe and effective for these uses. Assuming Neurontin could be proven to be safe and effective, the near term expiration of the patent meant that generic manufacturers of Neurontin would reap much of the reward that comes with proving Neurontin could be safely used for other indications.

25.    Under applicable statutes and regulations, the manufacturer of a prescription drug regulated by the FDA may not promote or market the use of the drug for purposes or in doses other than those approved by the FDA. Uses of a prescription drug for purposes other than those approved by the FDA are referred to as "off-label" uses. Promotion by a drug manufacturer of "off-label" uses of prescription drugs is strictly illegal and contrary to the explicit policies and regulations of the United States Government.

26.    After performing extensive economic analyses, senior officials at Parke-Davis determined that it was not sufficiently profitable for Parke-Davis to obtain FDA approval for Neurontin's alternative uses. Instead, Parke-Davis officials developed a strategy that would allow Parke-Davis to avoid the costs of proving that Neurontin was safe and effective for these other uses while allowing Parke-Davis to compete in the lucrative "off-label" markets. As one aspect of the scheme, Parke-Davis decided to employ a "publication strategy" that would allow it to promote Neurontin through a massive distribution of publications supposedly written by independent researchers that purportedly described the scientific evaluation of Neurontin. Another advantage of this strategy, from Parke-Davis's perspective, was that it could be employed

11

immediately. There was no need to wait for the results of scientifically conducted clinical trials to determine if Neurontin was actually effective in the treatment of these conditions.

27.    The Parke-Davis scheme consisted of an elaborate and clandestine promotion of "off-label" uses of Neurontin for pain control, monotherapy for seizures using extremely high doses, control of bipolar disorder, attention deficit disorder, and other diseases and conditions.

28.    Minutes of meetings held in 1995 show that marketing and clinical employees of Parke-Davis decided that clinical trials were too expensive and would take too long. By the time the company got the results, the patent on Neurontin would be close to running out and the market would be flooded with cheaper generic forms of Neurontin.

29.    As a result, a group of Parke-Davis executives called the "New Products Committee" approved an alternative strategy that did not involve going to the FDA for approval of Neurontin for alternative uses.  Instead, Parke-Davis' strategy was to pay for clinical trials for a range of uses:  bipolar disorder, social phobia, migraine, and chronic pain, and then publicize the results of those trials through medical journals and medical conventions. The head of this committee was then-president of the company, Tony Wild.

30.    These promotions were undertaken in spite of evidence showing that the drug would

12

not work for these conditions. An internal memo, dated May 5, 1997, and written on Parke-Davis stationery, poses the central question: "Did it make sense for Parke-Davis to do rigorous and expensive clinical trials to prove to the FDA that Neurontin worked for the burning, tingling pain of diabetic neuropathy?" The memo's answer: "It did not." According to the memo, there was a study that showed Neurontin worked better than a placebo, but more studies would be needed. However, Neurontin's patent was two and a half years away from expiring, and when that happened, makers of cheap generic versions would get most of the Neurontin patients. Still, the pain market was tempting. The memo points out there were up to 16 million diabetics in the country. Neurontin, with its sole approved use for epileptic seizures, had a market of only two million. The memo also notes that diabetics had used drugs worth at least $15 million to treat pain, and Neurontin already had most of those patients. So the epilepsy marketing team recommended that Parke-Davis skip the studies and promote Neurontin for pain directly to doctors through educational seminars and other meetings.

31.    Although federal regulations did not permit Parke-Davis to promote unapproved uses of Neurontin, Parke-Davis was permitted to distribute publications created by "third Parties" that described results of off-label uses of Neurontin, and so long as such material was only distributed in response to unsolicited requests from physicians. Parke-Davis decided to exploit this narrow exception by creating events and programs that would allow special Parke-Davis employees and independent contractors under Parke-Davis' control to promote "off-label" usage under circumstances that would allow the company to deny, wrongfully, that it had solicited "off-label'" usage.

FREIDIN & BROWN, P.A., One Biscayne Tower, Suite 3100, 2 South Biscayne Blvd., Miami, FL 33131, Phone: 305.371.3666, fax: 305.371.6725

32.   Significant ingenuity and resourcefulness was necessary in order to execute this unlawful scheme without detection. Faced with the fact that its "publication strategy" required publications from independent physicians, Parke-Davis hired non-physician technical writers to create articles for medical journals and then paid actual specialists to be the articles' "authors." Faced with the fact that its normal marketing force could not deliver the "off-label" message, Parke-Davis trained its medical liaisons, technical employees who were supposed to provide balanced scientific information to doctors, to sell "off-label" and solicit interest in "off-label" uses. And faced with the fact that in order for a "publication strategy" to actually increase usage of a drug, Parke-Davis required a large group of doctors interested in experimenting on patients, and an even larger group of doctors who were interested in receiving information about those experiments. Parke-Davis generated both groups by liberally distributing payments to both groups of physicians through "consultants" meetings, speakers' bureaus, medical education seminars, "grants," "studies," advisory boards and teleconferences. Further details of these programs are described below.

33.   Notwithstanding their knowledge that they could not promote Neurontin lawfully for non-approved uses, marketing executives at Parke-Davis' headquarters in Morris Plains, New Jersey, and in its five regional customer business units (CBUs) selected a marketing strategy which would deliberately lead to increased "off-label" usage of Neurontin. These executives knew that Parke-Davis was not supposed to create or design the contents of the communications that would be distributed pursuant to the "publication strategy" or do anything to generate the practicing physicians' interest in receiving such communications. As demonstrated below, Parke-Davis ignored these

14

legal requirements and, instead, put into effect a pervasive pattern of illegal conduct described below, lasting from at least 1995 through 1998 and, Plaintiff believes, through at least 2000.

34.    The Parke-Davis scheme was carried out by employing, among others, the strategies described below:

a.     Defendants gave kickbacks to physicians who prescribed large amounts of Neurontin for "off-label" purposes to patients;

b.     Defendants caused the formation of a nationwide network of employees they falsely referred to as "medical liaisons" whose actual assigned duties consisted entirely of conventional direct sales activities and which did not include any legitimate scientific activity;

c.     Defendants engaged in illegal direct solicitation of physicians for "off-label" uses;

d.     Defendants made or caused the making of false statements to physicians and pharmacists concerning the efficacy and safety of Neurontin for "off-label" uses;

e.     Defendants made or caused the making of such false statements directly to physicians concerning the safety and efficacy of Neurontin for "off-label" uses;

f.     Defendants charged or caused the charging of full price for drugs actually being used in experimental trials and thus subject to federal price restriction, thereby causing higher prices to be charged in the market than would otherwise have been the case;

15

g.    Defendants engaged in or caused the systematic avoidance of filing requirements with the FDA;

h.    Defendants engaged in or caused the deliberate avoidance of the FDA's classification of Neurontin as to its therapeutic equivalency;

i.    Defendants used or caused the use of active concealment to avoid the FDA's enforcement mechanisms;

j.    Defendants used or caused the use of active concealment to avoid the "formulary" policies of various state agencies;

k.    Defendants paid or caused the payment or offering of gratuities to Parke-Davis employees in order to procure their silence; and

l.    Defendants did or caused the active training of Parke-Davis employees in methods of avoiding detection of their activities by the FDA.

**B.    Parke-Davis's Systematic Payments to Doctors Increase Neurontin Prescriptions**

35.    Parke-Davis' "publication strategy" required physicians (and its medical liaisons) to perform the work normally performed by the company's salesmen in order to promote Neurontin. Parke-Davis made tens of thousands of payments to physicians who acted as a surrogate sales force for Parke-Davis' "off-label" promotion of Neurontin. In other words, Parke-Davis to made thousands of payments to physicians for the purpose of having those doctors either recommend the prescription of Neurontin or order Neurontin, in violation of the Medicaid kickback regulations. Parke-Davis was aware that these regulations were violated routinely. A description of the various

16

programs Parke-Davis used to make these payments to physicians is as follows:

### 1. Consultants' Meetings

36.    A common ploy used by Parke-Davis to funnel illegal payments to physicians was to encourage the recruited physicians to dinners or conferences and pay them to hear presentations about "off-label" uses of Neurontin. Under the fiction that these doctors were acting as "consultants", Parke-Davis sometimes (but not always) had the doctors sign sham consulting agreements. At these meetings, Parke-Davis would give these doctors lengthy presentations relating to Neurontin, particularly regarding "off-label" usage. Presentations would be made by Parke-Davis employees or other speakers hired by Parke-Davis for the purpose of promoting Neurontin. At some conferences, the sponsoring organization or Parke-Davis intentionally posed questions to the speakers about "off-label" use to insure that the attendees were exposed to such information.

37.    At some, but not all, "consultants" meetings, a few questions would be posed to the "consultants" regarding Parke-Davis marketing of Neurontin or how Parke-Davis' sales force could provide better service to doctors. The "consultants'" meetings, however, were not held (and the "consultants" were not paid) for the purpose of providing Parke-Davis with expert, independent advice. Parke-Davis in many cases did not even record the "advice" provided by its "consultants" and what advice was collected was never acted upon or reviewed.

38.    Parke-Davis did, however, routinely analyze whether the "consultants" meetings were successful in getting the attendees to change their prescription writing practices. At

FREIDIN & BROWN, P.A., One Biscayne Tower, Suite 3100, 2 South Biscayne Blvd., Miami, FL 33131, Phone: 305.371.3666, fax: 305.371.6725

some meetings, the "consultants'" were directly asked if they would write more Neurontin prescriptions as a result of the meeting. Such a question would have been irrelevant if the actual purpose of the meeting was to receive the "consultants" advice. Parke-Davis also routinely tracked "consultants" Neurontin prescription writing practices after these meetings. Using market data purchased from third parties, Parke-Davis analyzed whether the doctors they had paid had in fact written more Neurontin prescriptions after the meeting. Again, such data would only have been relevant if the real purpose of the payments was to influence the doctors to order more Neurontin.

39.     A typical "consultants'" meeting was held in Jupiter Beach, Florida for neurologists from the North East CBU during the weekend of April 19-21, 1996. The "consultants" selected for this meeting were not chosen on the basis of their consulting acumen, but because of their potential to write Neurontin prescriptions. In a memorandum announcing the event to Parke-Davis personnel, the Neurontin Marketing Team acknowledged that in order to target neurologists with the greatest potential for writing Neurontin prescriptions, sales personnel must select potential attendees from a list of the top prescription writers for anti-epileptic drugs in the Northeast; only persons who fell within this desirable demographic were allowed to be invited.

40.     Qualifying physicians were given round-trip airfare to Florida (worth $800.00), two nights accommodations (worth $340.00), free meals and entertainment, ground transportation and a "consultant's fee" of $250.00. Ample time was provided so that the Parke-Davis "consultants" could enjoy the beach resort. The value of the junket

FREIDIN & BROWN, P.A., One Biscayne Tower, Suite 3100, 2 South Biscayne Blvd., Miami, FL 33131, Phone: 305.371.3666, fax: 305.371.6725

was approximately $2,000.00 per physician.

41.   The Jupiter Beach "consultants" meeting included two half days of presentations by Parke-Davis relating to Neurontin, including extensive presentations relating to "off-label" use. Although technically the presentations were provided by an independent company, Proworx, all aspects of the presentation were designed, monitored, and approved by Parke-Davis. It selected the speakers, picked the presentation topics, and previewed the content of the presentations to make sure that they were acceptable. Parke-Davis paid all expenses relating to the "consultants" meeting including all payments to the attendees and the presenters, all travel, accommodation, meals and entertainment expenses, all presentation expenses, all expenses and fees incurred by Proworx, and the substantial fees paid to the presenting physicians. Parke-Davis conducted itself in this fashion, notwithstanding the FDA's prohibition regarding the provision of promotional materials on "off-label" use of Neurontin.

42.   At Jupiter Beach, no effort was made to obtain professional advice from the "consultants" Parke-Davis had wined, dined, and entertained during the weekend. A follow-up memorandum to Parke-Davis marketing officials noted that "the participants were delivered a hard-hitting message about Neurontin" and emphasized that the participants were encouraged to use Neurontin at higher doses. More importantly, after the conference, Parke-Davis generated "trending worksheets" listing the doctors who attended the "consultants'" meeting. These worksheets enabled Parke-Davis to determine if these "high writing" prescribers wrote more Neurontin scripts after the conference. Persuading these heavy prescribers to order more

19

Neurontin for their patients was, in fact, the sole purpose of the Jupiter Beach junket.

43.     Jupiter Beach was not unique. Parke-Davis hosted dozens of "consultants" meetings between late 1995 and 1997 in which the "consultants" received payments and gratuities as well as presentations on "off-label" Neurontin use designed to change the physicians' prescription writing habits.

44.     Not all payments to "consultants" were made at conferences as elaborate as Jupiter Beach. Many "consultants" meetings consisted of lavish dinners at local restaurants. The emphasis of these meetings was also on "off-label" uses of Neurontin, and $200 "honorariums" were paid to the physicians just for showing up. "Consultants" never provided legitimate consultation to Parke-Davis and were constantly encouraged to increase their Neurontin prescription writing.

### 2.     Medical Education Seminars

45.     Another format where Parke-Davis paid kickbacks to physicians to hear "off-label" promotion of Neurontin were programs billed as Continuing Medical Education seminars ("CME"). These conferences and seminars were set up to appear to qualify for an exception to the FDA's "off-label" marketing restrictions which permits physicians to learn about "off-label" uses of pharmaceuticals at independent seminars. Such seminars, however, must be truly independent of the drug companies. The drug companies are prohibited from formulating the content of the presentations, picking the speakers, or selecting the attendees. None of these requirements were observed with regard to the CME seminars sponsored by Parke-Davis for the promotion of

20

"off-label" uses of Neurontin. While Parke-Davis retained third-party organizations, such as Proworx and MES, to present the event seminars, it had control of approval for all content presented at the seminars. Parke-Davis also paid all expenses, including all the fees of seminar companies.

46.    Although the seminar companies acted as the conduit for the payments and gratuities given to the physician attendees, Parke-Davis controlled every aspect of the CME programs. It designed and approved the programs; hand-picked the speakers for the seminars; approved the seminar presentations; previewed, in most cases, the contents of the seminars prior to delivery; selected the attendees based on their ability and willingness to prescribe high quantities of Neurontin; evaluated the presentations to make sure Parke-Davis' "message" was appropriately delivered; black-listed presenters whose presentations were not sufficiently pro-Neurontin; and, monitored the prescribing patterns of the physicians who attended these conferences to ensure the purpose of the conference--increased writing of Neurontin prescriptions--was achieved. Follow-up reports to marketing executives at Parke-Davis highlighted that the attendees received presentations regarding "off-label" marketing and recommendations for dosages larger than those labeled effective by the FDA. These memoranda also reported to senior executives the pledges made by attendees to order more Neurontin for their patients.

47.    For some seminars, high prescription writing physicians were selected to participate in junkets comparable to those Parke-Davis provided to the attendees of the Jupiter Beach "consultants" meetings. Others were less lavish, but physicians received free

FREIDIN & BROWN, P.A., *One Biscayne Tower, Suite 3100, 2 South Biscayne Blvd., Miami, FL 33131, Phone: 305.371.3666, fax: 305.371.6725*

tuition, free accommodations, free meals, and cash. Frequently, the Parke-Davis CME seminars were accredited by continuing medical education organizations, which meant that the physicians taking advantage of Parke-Davis' junkets did not have to pay tuition or spend additional time to fulfil their continuing medical education licensure requirements by attending a truly independent medical education program.

### 3.    Grants and "Studies"

48.    Parke-Davis also made outright payments, in the form of grants, to reward demonstrated Neurontin believers and advocates. Parke-Davis' sales managers identified key doctors who actively prescribed Neurontin or programs which were willing to host Neurontin speakers and encouraged such persons or programs to obtain "educational grants" from Parke-Davis. Under this program of kickbacks, Parke-Davis paid:

- $2,000.00 to Berge Ninmpolan, M.D. "A great Neurontin believer," to attend a neurology seminar in San Francisco in March, 1996;

- $1,000.00 to the University of Texas at Houston, Department of Neurology to host a symposium where presentations would be made regarding successful "off-label" treatment with Neurontin;

- $3,000.00 to the University of Texas Medical School to host a conference in August, 1996 at which a well-known specialist in epilepsy, who prescribed Neurontin, would attend;

- $4,000.00 to pay for a neurologist from the University of Texas at San Antonio to attend the American Epilepsy Society Conference in December 1996 a conference at which Parke-Davis was presenting extensive

documentation on "off-label" uses for Neurontin;

- $2,500.00 to the University of Texas at Houston to bring Dr. B. J. Wilder to the campus to hold a seminar. Dr. Wilder was one of Neurontin's biggest "off-label" proponents and had been paid tens of thousands of dollars to promote Neurontin's "off-label" uses for Parke-Davis across the country;

- $2,500.00 in June, 1996 to pay for representatives from the University of Pennsylvania Medical Center to attend a conference in St. Petersburg, Russia, on the utilization of anti-epileptic drugs, including Neurontin;

- $5,000.00 to Dr. Alan B. Ettinger, Stony Brook, NY, in December, 1996, a physician who had informed Parke-Davis that he was interested in possibly doing research in Neurontin and maintained a database of patients who were treated with Neurontin;

- $500.00 to Bruce Ehrenberg, Boston, MA, a leading speaker for Parke-Davis regarding "off-label" uses of Neurontin, to attend a conference in China;

- $1,000.00 to Israel Abrams, M.D., Paul C. Marshall, M.D., Beth Rosten, M.D., and Spencer G. Weig, M.D., Worcester, MA, for educational programs in February, 1996. According to the local Parke-Davis representative requesting the grant, "much of the Neurontin success in Worcester has been attributed to the 4 pediepileptologists below."

- $1,400.00 to Dr Ahmad Beydoun of Ann Arbor, MI, for post-graduate training in March, 1996. This grant was processed on a quick turn-around, the Parke-Davis representative noting, "I realize that this is a very short time line; however, Dr. Beydoun is a very important customer.

- $1,500.00 to Jim McAuley, R.Ph., Ph.D., for educational materials relating to

23

epilepsy. Parke-Davis decided to provide the funds because McAuley was an advocate of Neurontin, and he was important in getting another Parke-Davis drug, Cerebyx, accepted on the formulary for Ohio State University; and,

- A grant in an unknown amount to the University Hospital in Cleveland in exchange for the hosting programs regarding Neurontin's use in treating neuropathic pain at conferences specifically devoted to obtaining referrals from other doctors.

49.  These grants, and others, were charged to the Neurontin marketing budget. Each of these grants was made solely because an individual who would receive the money was a large Neurontin supporter, or would host a program where a well-known Neurontin supporter would recommend that other physicians increase their prescriptions of Neurontin. Each of these grant awards constituted a reward or kickback for the recipient's advocacy of Neurontin.

50.  Parke-Davis' medical liaisons informed leading Neurontin subscribers that significant advocacy for Neurontin would result in the payment of large grants. These studies did not involve significant work for the physicians. Often times they required little more than collating and writing up office notes or records. Indeed, as noted below, Parke-Davis frequently hired technical writers to write the articles for which the "authors" had been given grants.

51.  Parke-Davis was aware that these articles and studies provided minimal scientific benefit. In a letter to the FDA in June, 1997, Parke-Davis submitted a list of "studies

24

relating to pain, pain syndromes, and psychiatric disorders" which failed to include any of these numerous studies, purportedly funded by Parke-Davis. Parke-Davis intentionally neglected to report these "studies" to the FDA because they knew the funded "research" had no scientific value.

52.     One particularly large study conducted by Parke-Davis served as yet another engine to financially reward physicians for prescribing Neurontin. In 1995 and 1996, Parke-Davis conducted an enormous Phase IV trial known as STEPS.  Although STEPS took the form of a research clinical trial, it was, in fact, a marketing ploy designed to induce neurologists to become comfortable prescribing Neurontin at a far higher dose than indicated in the FDA approved labeling. While most clinical studies have a limited number of investigators treating a number of patients qualified for the study, the STEPS protocol called for over 1,200 "investigators" to enroll only a few patients each. The participating physicians were instructed to titrate their patients to higher than labeled doses of Neurontin to demonstrate that patients could tolerate high doses of the drug. Rewarding physicians for prescribing high doses of Neurontin was another way to increase Neurontin sales because higher per patient dosages increased the amount of Neurontin sold. Additionally, the STEPS study was also designed to persuade physicians to place non-study patients on higher doses of Neurontin than found effective in the clinical trials monitored by the FDA.

54.     Physicians enrolling in the STEPS study were paid for agreeing to participate in the study and for every patient enrolled. At the conclusion of the study, Parke-Davis offered each of the 1,200 "investigators" additional cash for each patient the doctor

FREIDIN & BROWN, P.A., *One Biscayne Tower, Suite 3100, 2 South Biscayne Blvd., Miami, FL 33131, Phone: 305.371.3666, fax: 305.371.6725*

kept on Neurontin after the study ended. These payments were unquestionably kickbacks; each participating doctor was expressly paid for writing Neurontin prescriptions for their patients. The number of "investigators" who received such payments are too many for Plaintiff to list. Additionally, Parke-Davis has exclusive control of the information regarding who received such payments at the conclusion of the STEPS trial.

### 4.    Payments to "Authors" of Ghost Written Articles

54.    Yet another method of rewarding doctors for their advocacy of Neurontin was to pay them an honorarium for lending their names to scientific articles which were actually prepared and written by third parties retained by Parke-Davis. In 1996, Parke-Davis retained AMM/ADELPHI, Ltd. and Medical Education Systems, Inc., to prepare no less than twenty (20) articles for publication in various neurology and psychiatry journals. Most of these articles concerned "off-label" usage of Neurontin and were generated so that Parke-Davis would have completely controlled publications it could distribute pursuant to its "publication strategy ." The content of these articles were actually written by non-physician technical writers retained by Parke-Davis, and Parke-Davis had the right to control the content of all the articles. Parke-Davis paid all expenses in connection with the creation of these publications.

55.    After Parke-Davis and its technical writers conceived an articles content, Parke-Davis and its outside firms attempted to find recognized Neurontin prescribers whose names could be used as the authors of these articles. In some cases, drafts of the articles were completed even before an "author" agreed to place his or her name on the article. This

FREIDIN & BROWN, P.A., *One Biscayne Tower, Suite 3100, 2 South Biscayne Blvd., Miami, FL 33131, Phone: 305.371.3666, fax: 305.371.6725*

even occurred in connection with case histories that purported to describe the "author's" personal treatment of actual patients. The "authors" were paid an honorarium of $1,000.00 to lend their names to these articles, and also were able to claim publication credit on their curriculum vitae.

56.    After the technical writers completed their work, Parke-Davis and its outside firms found journals that would publish the articles. Parke-Davis' role in creating, approving and sponsoring the articles was hidden from the public. While the articles might reference that the author received an honorarium from the outside firm, the articles failed to state that the honorarium was paid with money provided by Parke-Davis and that Parke-Davis had approved the content and hired the actual authors. For example, an article created by Medical Education Systems (MES), *Gabapentin and Lamotrignine: Novel Treatments for mood and Anxiety Disorders,* published in CNS Spectrums noted that "an honorarium was received from Medical Education Systems for preparation of this article," but never revealed Parke-Davis's retention and payment of MES or the fact that MES personnel, while under contract to Parke-Davis, wrote the article.

57.    Parke-Davis used these publications as part of their "publication strategy" by presenting the articles as evidence of independent research conducted by persons with no monetary interest in Neurontin. This impression, of course, was false. Parke-Davis created the articles to promote "off label" uses for Neurontin, purchased the names and reputations of the authors with kickbacks and controlled the content of the articles.

FREIDIN & BROWN, P.A., *One Biscayne Tower, Suite 3100, 2 South Biscayne Blvd., Miami, FL 33131, Phone: 305.371.3666, fax: 305.371.6725*

### 5.    Speakers' Bureau

59.    Parke-Davis also founded the Speakers' Bureau, another method to make large and numerous payments to physicians who recommended Neurontin at teleconferences, dinner meetings, consultants meetings, educational seminars, and other events. These speakers repeatedly gave short presentations relating to Neurontin for which they were paid anywhere from $250.00 to $3,000.00 per event. Speakers such as Steven Schachter, B. Wilder, Ilo Leppik, Gary Mellick, David Longmire, Gregory Bergey, Michael Merren, David Treiman, Michael Sperling, Martha Morrell, R. Eugene Ramsay, John Pellock, Ahmad Beydoun, Thomas Browne, John Gates, Jeffrey Gelblum, Dennis Nitz, Robert Knobler and others received tens of thousands of dollars annually in exchange for recommending to fellow physicians that Neurontin be prescribed, particularly for "off-label" uses. The payments that these doctors received were far in excess of the fair value of the work they performed for Parke-Davis. Speakers who most zealously advocated Neurontin were hired most frequently for speaking events, notwithstanding the fact that many of these events purported to be independent medical education seminars where independent information was supposed to be delivered. The identity of the doctors in the Speaker's Bureau who received kickbacks through excessive compensation can only be determined after review of the records in the exclusive custody of the Defendant.

60.    Parke-Davis's marketing personnel, including its medical liaison staff, informed physicians of the lucrative rewards of joining the Neurontin Speaker's Bureau. Physicians were informed that if they prescribed enough Neurontin, they, too, could also be eligible for receiving substantial payments just for describing their clinical

FREIDIN & BROWN, P.A., *One Biscayne Tower, Suite 3100, 2 South Biscayne Blvd., Miami, FL 33131, Phone: 305.371.3666, fax: 305.371.6725*

experience to peers at events dedicated to promoting Neurontin's "off-label" uses. Parke-Davis marketing personnel, however, made it clear that the only way the doctors could receive such cash payments was if they prescribed substantial amounts of Neurontin to their patients, preferably for "off-label" uses.

61.    Parke-Davis either knew that the payments described above constituted kickbacks or acted in reckless disregard of laws and regulations of which it was aware. Parke-Davis was well aware of the Medicare and Medicaid Fraud and Abuse laws, which included the Medicaid anti-kickback statute. It was further aware that the safe harbors established by the Department of Health and Human Services did not cover the extensive payments it made to doctors. Parke-Davis was aware that its payments did not comply with the AMA' s guidelines for payments to physicians. It also knew that the payments had been made for the express purpose of encouraging the physicians to order Neurontin for their patients. Parke-Davis was also aware of the Inspector General's Special Fraud Alert which raised particular concerns about drug marketing. Nonetheless, Parke-Davis did nothing to curb its kickback payments to physicians and could not have marketed Neurontin's "off-label" uses without such payments.

62.    In 1997, in the wake of an investigation by the FDA, Parke-Davis conducted a review of its marketing practices in light of existing Medicaid kickback regulations. As a result of that review, Parke-Davis determined that none of the programs described above should have been conducted in the manner previously conducted by Parke-Davis. Parke-Davis issued guidelines to comply with Federal Regulations which essentially prohibited each of the programs described above. Nonetheless, the

payments to physicians for the "off-label" marketing of Neurontin did not cease and the programs continued at least until 1998. Given that Parke-Davis's records demonstrate payments of inappropriate kickbacks to doctors through 1998. Plaintiff believes that such payments continued through the merger of Parke-Davis's parent, Warner-Lambert, with Defendant Pfizer, or perhaps even through the calling of a grand jury regarding Parke-Davis's marketing practices relating to Neurontin.

### C.    Parke-Davis's Use of Medical Liaisons to Promote Neurontin "Off-Label"

63.    Parke-Davis's normal sales force was not permitted to promote "off-label" uses of Neurontin to its physician customers. The FDA, however, permitted drug company representatives to provide balanced, truthful information regarding "off-label" usage if specifically requested by a physician and if there was no attempt to solicit such information by the drug company. Commencing in 1995, Parke-Davis increasingly hired medical liaisons and trained them to aggressively solicit requests for "off-label" information from physicians. Once this door was open, Parke-Davis trained the medical liaisons to engage in full scale promotion of Neurontin's "off-label" uses, including repetitive distribution of non-scientific, anecdotal information designed to convince physicians that "off-label" usage of Neurontin was safe and effective. In effect, Parke-Davis used the medical liaisons as a surrogate sales force who had liberty to solicit physicians regarding "off-label" uses. Indeed, medical liaisons were selected and promoted based on their ability to sell and sales training was encouraged.

FREIDIN & BROWN, P.A., One Biscayne Tower, Suite 3100, 2 South Biscayne Blvd., Miami, FL 33131, Phone: 305.371.3666, fax: 305.371.6725

64. On April 16, 1996, Parke-Davis' in-house lawyers stopped the videotaping of a medical liaison training session in order to advise the liaisons that, notwithstanding formal policies to the contrary, liaisons could cold call on physicians so long as they executed request forms (forms that supposedly verified that the physician had initiated the meeting) at the end of the call. Moreover, the liaisons were informed that the request forms could be filled out by Parke-Davis sales representatives instead of the doctors. Company lawyers also informed the liaisons in training that there was no need to present balanced information to the customers and that liaisons should always remember that sales were necessary in order to keep the company profitable. The liaisons were also informed by the lawyers, off-camera, that there was no clear definition of "solicitation" and that there were methods to induce the physicians to inquire about "off-label" uses. The lawyers also warned the liaisons that under no circumstances should any information about "off-label" uses be put in writing.

65. Medical liaisons were instructed in the clearest possible terms that they were to market and sell Neurontin based on its "off-label" uses. On a teleconference on May 24, 1996, John Ford ("Ford"), a senior marketing executive at Parke-Davis' Morris Plains headquarters directly informed the medical liaisons that in order to market Neurontin effectively. Neurontin had to be marketed for monotherapy, pain, bipolar disorder, and other psychiatric uses, all of which were "off-label." Ford conceded that such marketing had to be primarily performed by the medical liaisons, because they were the only ones who could discuss these matters. At another meeting with the medical liaisons, Ford was even more blunt:

31

"I want you out there every day selling
Neurontin. Look this isn't just me, it's come
down from Morris Plains that Neurontin is more
profitable. . . We all know Neurontin' s not
growing adjunctive therapy, beside that is not
where the money is. Plain management, now
that's money. Monotherapy, that's money. We
don't want to share these patients with
everybody, we want them on Neurontin only.
We want their whole drug budget, not a quarter,
not half, the whole thing. . . We can't wait for
them to ask, we need to get out there and tell
them up front. . . That's where we need to be
holding their hand and whispering in their ear.
Neurontin for pain, Neurontin for monotherapy,
Neurontin for bipolar, Neurontin for everything.
. . I don't want to see a single patient coming off
Neurontin until they have been up to at lease
4800 mg/day. I don't want to hear that safety
crap either. Have you tried Neurontin? Every
one of you should take one just to see there is
nothing, it's a great drug."

66.    Thus medical liaisons were trained to cold call high decile physicians (those who saw

the most patients in a given specialty), and sell them on the "off-label" benefits of

Neurontin. A key aspect of this selling was misrepresentation. The first

misrepresentation was usually the status of the medical liaisons. With the full

approval of marketing officials at Parke-Davis such as John Ford, Phil Magistro, and

John Krukar, medical liaisons were routinely introduced as specialists in the specific

drug they were presenting at a particular meeting. Thus, medical liaisons could be

experts in anti-epileptic drugs at one moment and an hour later be an expert in cardiac

medication. Medical liaisons were also encouraged to represent themselves as

medical researchers, even though they neither conducted medical research nor

32

analyzed medical research performed by others. It was not uncommon for medical liaisons to be introduced as physicians, even though they had no such qualifications. Sales personnel were instructed to introduce medical liaisons as scientific employees who were given momentary leave of their academic duties to make an individual presentation to the physician; the fact that the liaisons were part of Parke-Davis' standard marketing detail was intentionally hidden.

67.   Parke-Davis employees instructed medical liaisons on the procedure that should be followed when presenting "The Neurontin Cold-Call Story" to a neurologist, general practitioner, or psychiatrist who was a target for off-label use:

- Mention that you are the eyes and ears of Parke Davis research and that you are gathering clinical info;

- Then ask general questions about the nature of the practice;

- Mention Neurontin and its approved uses, but dismiss them as old news;

- Then ask leading questions about the number of pain patients that the practice sees;

- Then ask a series of questions that determine the practice profile for all of the potential "off-label" uses;

- Next reveal that Parke-Davis "has a great deal of information about the fantastic response rate of patients on Neurontin in all of these disease states";

- Move into a discussion of the clinical trials that this information is demanding;

- and the "90-95% response rate that we are seeing in more than 80% of patients";

33

- Present the doctor with any publications that are available and point out that many common drugs for pain treatment are in few if any publications;

- Ask the physician to place some patients on Neurontin and tell them that the medical liaison will stay in touch to help develop any case reports;

- Mention that case reports can be lucrative and lead to clinical trials;

- Offer to do a presentation and luncheon for the entire practice or a group of his friends that will detail all of the "data" we have;

- Invite the physician to consultant meetings in the future and point out that they get paid $250 plus a nice trip or meal in the city; and

- If a sales representative is present they should close the sale by asking that the next patient he sees be put on Neurontin.

68.    It was during a Parsipanny, New Jersey training session that a whistleblower, Dr. Paul Franklin first witnessed the scope of the "off-label" claims that Parke-Davis intended its medical liaisons to market. The medical liaisons were provided with new company slides that detailed the way to increase the use of Neurontin in several different "off-label" practice types. The slide show contained a slide that showed the "Anecdotal Uses of Neurontin." The list included the following:

- Peripheral neuropathy

- Diabetic neuropathy

- Trigeminal neuralgia

- Post-herpetic neuralgia

- Essential tremor

- Restless leg syndrome (RLS)

34

- Attention deficit disorder (ADD)
- Periodic limb movement disorder
- Migraine
- Bipolar disorder
- Amyotrophic lateral sclerosis (ALS) [Lou Gehrig's Disease]
- Drug or alcohol withdrawal seizures

69.   Executives explained that "this list was very important to the company but that it makes Neurontin look like snake oil, so preempt the laughter by telling your physicians: 'I'm embarrassed to show you the next slide because it makes Neurontin look like snake oil, but the fact is we are seeing extra-ordinary results, in some cases up to 90% response in all of these conditions,' that will get their attention." This executive went on to say that, "[n]otice all the studies we talk about, nothing gets a doc more interested in a drug than a study." Richard Grady, a medical liaison, asked if "we have any money to lace studies without big docs." He was instructed to "use the potential of a study to get in the door, even get protocols, but don't waste too much time and don't say you can get them a study, we don't have much money left." He was then told that "if anyone asks for back-up data say we are putting it together, then suggest that the doc put some of his patients on Neurontin and we will help him publish case reports that could help place a study in his practice. Everybody wins."

70.   None of the "off-label" claims made in the slide had been substantiated, let alone approved, by the FDA. Yet these claims were a cornerstone of the Parke-Davis scheme to increase sales of Neurontin.

FREIDIN & BROWN, P.A., One Biscayne Tower, Suite 3100, 2 South Biscayne Blvd., Miami, FL 33131, Phone: 305.371.3666, fax: 305.371.6725

71.     Thus, extensive misrepresentations were also made regarding the scientific information concerning "off-label" usage of Neurontin. The following misrepresentations relating to "off-label" usage of Neurontin were routinely made to physicians with the knowledge and consent of marketing personnel at Parke-Davis:

1.    *Bipolar Disorder.*

Medical liaisons informed psychiatrists that early results from clinical trials evaluating Neurontin for the treatment of bipolar disorder indicated a ninety percent (90%) response rate when Neurontin was started at 900 mg/day dosage and increased to a dosage of 4800 mg/day. No such results existed. Nor was any type of clinical trial being conducted other than a pilot study. There were no clinical trials or studies indicating that Neurontin was safe or effective up to 4800 mg/day. Indeed at this time, Parke-Davis was in possession of clinical trial evidence which showed that there was no dose response difference between patients who received 600 mg/day, 1200 mg/day and 2400mg/day. Any data relating to the use of Neurontin for bipolar disorder was strictly anecdotal and of nominal scientific value. Indeed, most of the published reports on this topic had been written and commercially sponsored by Parke-Davis, although this fact was hidden. Medical liaisons were trained to inform psychiatrists that there were only 110 reports of adverse effects for Neurontin when used for psychiatric purposes.

2.    *Peripheral Neuropathy, Diabetic Neuropathy, and Other Pain Syndromes.*

Medical liaisons were trained and instructed to report that "leaks" from clinical trials demonstrated that Neurontin was highly effective in the treatment of various pain

36

FREIDIN & BROWN, P.A., *One Biscayne Tower, Suite 3100, 2 South Biscayne Blvd., Miami, FL 33131, Phone: 305.371.3666, fax: 305.371.6725*

syndromes and that a ninety percent (90%) response rate in the treatment of pain was being reported. No such body of evidence existed, nor was there any legitimate pool of data from which a response rate, much less a ninety percent (90%) response rate, could be calculated. Medical liaisons were trained to claim support for these findings as a result of inside information about clinical trials where no such information existed. The only support for these claims was anecdotal evidence of nominal scientific value.

Many of the published case reports had been created and/or sponsored by Parke-Davis in articles which frequently hid Parke-Davis's involvement in the creation of the article. Parke-Davis's payment for the creation of these case reports was also hidden from physicians.

3.     Epilepsy Monotherapy.

Medical liaisons were strongly encouraged to push neurologists to prescribe Neurontin as the sole medication to treat epilepsy, even though studies only found it safe and effective as adjunctive therapy. Medical liaisons were trained to inform neurologists that substantial evidence supported Parke-Davis' claim that Neurontin was effective as monotherapy. In fact, at this time, Parke-Davis knew that clinical trials regarding Neurontin's efficacy as a monotherapy were inconclusive.

One of Parke-Davis's clinical trials, 945-82, demonstrated that Neurontin was not an effective monotherapy agent; the vast majority of patients in the study taking Neurontin were unable to continue with Neurontin alone. The same study showed that there was no effective differences between administration of Neurontin at 600, 1200

37

FREIDIN & BROWN, P.A., *One Biscayne Tower, Suite 3100, 2 South Biscayne Blvd., Miami, FL 33131, Phone: 305.371.3666, fax: 305.371.6725*

or 2400 mg. Notwithstanding this data, Parke-Davis continued to claim that physicians should prescribe Neurontin at substantially higher doses than indicated by the labeling. Indeed, although medical liaisons routinely claimed Neurontin to be effective as monotherapy, in 1997 the Food and Drug Administration refused to find Neurontin a safe and effective monotherapy.

4.    *Reflex Sympathetic Dystrophy ("RSD ").*

Medical liaisons informed physicians that extensive evidence demonstrated the efficacy of Neurontin in the treatment of RSD. The only such evidence that existed was anecdotal reports of nominal scientific value. Medical liaisons were trained to refer to case reports, most of which had been created or sponsored by Parke-Davis, as "studies."

5.    *Attention Deficit Disorder ("ADD")*

Medical liaisons were instructed to inform pediatricians that Neurontin was effective for the treatment of ADD. No data, other than occasional anecdotal evidence, supported this claim. Nonetheless, the medical liaisons were trained to report that large number of physicians had success treating ADD with Neurontin, when no such case reports existed.

6.    *Restless Leg Syndrome ("RLS")*

RLS was another condition where Parke-Davis's medical liaisons were trained to refer to a growing body of data relating to the condition, when no scientific data existed.

FREIDIN & BROWN, P.A., *One Biscayne Tower, Suite 3100, 2 South Biscayne Blvd., Miami, FL 33131, Phone: 305.371.3666, fax: 305.371.6725*

The only reports were anecdotal, most of which had been created and/or sponsored by Parke-Davis.

7. *Trigeminal Neuralgia.*

Although medical liaisons represented that Neurontin could treat Trigeminal Neuralgia, again no scientific data supported this claim with the exception of occasional anecdotal reports. No data demonstrated that Neurontin was as effective as currently available pain killers, most of which were inexpensive.

8. *Post-Herpatic Neuralgia ("PHN")*

Medical liaisons were trained to tell physicians that seventy-five percent (75%) to eighty percent (80%) of all PHN patients were successfully treated with Neurontin. Once again, no clinical trial data supported such a claim,

9. *Essential Tremor Periodic Limb Movement Disorder ("ETPLMD")*

Medical liaisons were trained to allege that Neurontin was effective in the treatment of these conditions. No scientific data supported such claims with the exception of anecdotal reports of nominal scientific value.

10. *Migraine.*

Claims that Neurontin was effective in the treatment of migraine headaches were made by the medical liaisons and were supposedly based on early results from clinical trials. Although pilot studies had been suggested and undertaken, no early results of clinical trials existed to support these claims at the time made. Once again, any data

FREIDIN & BROWN, P.A., *One Biscayne Tower, Suite 3100, 2 South Biscayne Blvd., Miami, FL 33131, Phone: 305.371.3666, fax: 305.371.6725*

relating to treatment of Migraines was purely anecdotal and of nominal scientific value. Most of the case reports were either created or sponsored by Parke-Davis.

11.    *Drug and Alcohol Withdrawal Seizures.*

Medical liaisons suggested that Neurontin be used in the treatment of drug and alcohol withdrawals despite the lack of any data supporting Neurontin as an effective treatment for these conditions.

72.    Misrepresentations by Parke-Davis were not limited to presentations by medical liaisons. As noted above, publications Parke-Davis distributed as part of its 'publication strategy' intentionally misrepresented Parke-Davis' role in the creation and sponsorship of the publications. Physicians were led to believe that the publications were the independent, unbiased research of the authors of the articles. In fact, many of the publications distributed to physicians were created by Parke-Davis and written by third parties retained by Parke-Davis who were under Parke-Davis' control. The fact that these articles were authored by ghost writers retained by Parke-Davis was intentionally hidden, and the fact that the authors had financial ties to Parke-Davis was also intentionally undisclosed. For example, an article widely circulated by Parke-Davis concerning the use of Neurontin in the treatment of Restless Leg Syndrome asserted that the authors Gary A. Mellick and Larry B. Mellick, had not and never would receive financial benefit from anyone with an interest in Neurontin, yet the Mellick brothers had received tens of thousands of dollars for acting as speakers at Parke-Davis events. This financial connection was hidden from the persons who received copies of the Mellick brothers' articles.

40

73.  Defendants' strategy included paying doctors to appear as authors of journal articles on "off-label" uses of Neurontin, articles that were actually written by non-physicians working under the direction of the company's marketers. The company then paid hundreds of doctors to attend expensive dinners and weekend retreats, where they were urged to prescribe Neurontin.

74.  Other doctors, often frequent prescribers of Neurontin, were paid to speak to other physicians about Neurontin's benefits. Finally, the company paid doctors to prescribe Neurontin and include those patients in clinical trials, which were designed mainly for marketing purposes.

75.  The company adopted the marketing strategy, after deciding not to perform the clinical trials needed to gain approval for new uses for Neurontin, because it believed that the drug would soon lose patent protection.

76.  In fact, Parke-Davis engaged in an extensive and far-reaching campaign to use false statements to promote increased prescriptions of Neurontin.

77.  The scheme used a team of "medical liaisons". While medical liaisons are ordinarily connected to the research divisions of the manufacturer, Parke-Davis' medical liaisons were exclusively employed as sales and promotion personnel.

78.  Parke-Davis's medical liaisons were instructed to make exaggerated or false claims concerning the safety and efficacy of Parke-Davis drugs for "off-label" uses. They

41

were also trained to convey that Neurontin could be prescribed for its various "off-label" uses in amounts of up to 4800 mg/day; far above the maximum dosage of 1800 mg per day approved by the FDA.  To bolster their representations to physicians, medical liaisons were encouraged to misrepresent their scientific credentials and to pose as research personnel, rather than as sales representatives.

79.     Doctors were rewarded with kickbacks for prescribing large quantities of Parke-Davis drugs. These alleged kickbacks took various forms. For instance, some doctors were paid sums of money which were ostensibly compensation for drug studies. However, these studies were shams and had no scientific value. Other doctors were paid sums of money under the guise of being compensated for their services as "consultants" or "preceptors" or for participating in a "speaker's bureau." Doctors were also allegedly given cash payments for small record-keeping tasks, such as allowing Parke-Davis access to information about the doctors' patients who were receiving Neurontin. Other doctors prescribing large amounts of Parke- Davis drugs were given gifts such as travel tickets and tickets to the Olympics.

80.     When questions arose concerning the availability of reimbursement for prescriptions for "off-label" uses of Parke-Davis drugs, medical liaisons were instructed to coach doctors on how to conceal the "off-label" nature of the prescription.

81.     Parke-Davis took numerous actions to conceal its activities from the FDA, including shredding documents, falsifying documents, and encouraging medical liaisons to

42

conduct their marketing activities without leaving a "paper trail" that might be discovered by the FDA.

82.     As part of the scheme and as set forth in a *qui tam* action filed by Dr. Paul Franklin, a former Parke-Davis employee:

- Upon order of the company and as a result of training of medical liaisons, Dr. Franklin of Parke-Davis "deliberately contrived reports to mislead physicians into believing that a body of data existed that demonstrated the effectiveness of Neurontin in the treatment of bipolar disease. " In fact, no data existed at all to support the use of Neurontin in bipolar disorder.

- Dr. Franklin was trained and instructed to actively deceive physicians with contrived data, falsified "leaks" from clinical trials, scientifically flawed reports, or "success stories" that stated that Neurontin was highly effective in the treatment of a variety of pain syndromes. No such body of evidence existed.

- He was instructed to advise physicians that Parke-Davis had developed a large body of data to support the use of Neurontin as monotherapy. This was an "outright lie" and left patients unknowingly without good seizure control.

- Medical liaisons were instructed to tell physicians that a great deal of data existed that supported that safe use of Neurontin at levels that exceed 4800 mg/day. However, clinically significant safety data existed at dosing levels of only 1800 mg/day.

FREIDIN & BROWN, P.A., *One Biscayne Tower, Suite 3100, 2 South Biscayne Blvd., Miami, FL 33131, Phone: 305.371.3666, fax: 305.371.6725*

- Parke-Davis provided medical liaisons with slides that stated that Neurontin was effective for the treatment of Attention Deficit Disorders but no data existed to support that claim.

83.  The strategy was a success. In 2000, Warner-Lambert reported more than 78% of Neurontin prescriptions had been written for indications other than epilepsy. Sales of Neurontin that year were $1.3 billion, and rose to $1.7 billion, according to IMS Health, a health care information company.

84.  The "off-label" uses of Neurontin which are actively being promoted by Parke-Davis are uses which are not recognized as medically-accepted uses by the American Medical Association or by any peer-reviewed medical literature.

85.  There is no valid scientific evidence to support the contention that Neurontin is safe and effective for pain, for monotherapy for seizures, for bipolar disorder, for attention deficit disorder, for reflex sympathetic dystrophy, for post-herpetic neuropathy, or for diabetic neuropathy. There is no valid scientific evidence concerning the therapeutic equivalence of Neurontin in any of these diseases. Parke-Davis is currently conducting actual legitimate trials investigating the use of Neurontin for relief of certain types of pain, however, these trials are not complete, and the actual results of these trials have not been made available to any of Parke-Davis' medical liaison employees.

44

86.    As part of the nationwide program of "off-label" promotion of Neurontin, Parke-Davis established a system of kickbacks to physicians who are prescribers of large amounts of Neurontin. These kickbacks were administered by the Parke-Davis sales department, and frequently disguised as consultantships although unrelated to any specific or educational activity. The kickbacks took the form of cash payments, travel benefits, entertainment, Olympics tickets, and other benefits. Parke-Davis established formal internal guidelines for the award of these benefits to physicians which are based entirely on the amount of prescriptions written by the physicians and the ability of the physician to influence other physicians to begin prescribing Neurontin for "off-label" uses.

87.    These kickbacks are strictly illegal and have had the effect of greatly increasing the amount of Neurontin prescriptions and indirectly the amount of money spent by the government for reimbursement of prescriptions covered by Medicare.

88.    As part of its illegal off-market promotion of Neurontin, Parke-Davis has instructed and caused its sales personnel and its medical liaison employees to make false statements to physicians, and to provide physicians with written materials containing false statements concerning the safety and efficacy of Neurontin for "off-label" uses. These statements were made with the intent of, and had the effect of, inducing physicians to increase their "off-label" prescription of Neurontin.

89.    The false statements made by Parke-Davis employees to physicians have included representations that scientific evidence exists that Neurontin is an effective remedy

45

FREIDIN & BROWN, P.A., *One Biscayne Tower, Suite 3100, 2 South Biscayne Blvd., Miami, FL 33131, Phone: 305.371.3666, fax: 305.371.6725*

for pain, bipolar disorder, reflex sympathetic dystrophy, post-herpetic neuralgia, and monotherapy for seizures. The false statements also include representations that Neurontin is known to be safe and effective in doses of up to 4800 mg/day in all populations. The false statements include representations that clinical trials are ongoing or planned with respect to each of the above off-label uses. Each of these statements is unsupported by any legitimate scientific evidence.

90.     Defendants actively and fraudulently concealed the wrongdoing described herein.

91.     In May 2004, news media reported that defendants had entered into a criminal plea agreement with the U.S. government, and a civil settlement agreement with the attorneys general of different states, in which defendants admitted the wrongdoing described herein.

92.     Plaintiff and the class members, in the exercise of reasonable diligence, could not have discovered defendants' wrongdoing before this announcement. Many members of the class may not have been exposed to these media revelations, and therefore may still be unaware of defendants' wrongdoing.

93.     As a direct and proximate result of the foregoing marketing and promotional schemes, plaintiff and the class members sustained injuries, including ascertainable economic losses, by purchasing Neurontin, a drug not indicated for their ailments and not legally established to be effective for treatment of their ailments.

46

## CLASS ACTION ALLEGATIONS

94.   Plaintiffs incorporates by reference the allegations in paragraphs 1 through 93, as though fully set forth herein.

95.   Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Rule 1.220(b)(2) and (3) of the Florida Rules of Civil Procedure, on behalf of an opt-out class defined as follows:

   (a)   All persons and entities in Florida that have purchased the prescription medication Neurontin after being prescribed said medication for medical conditions other than those approved by the Food and Drug Administration, i.e., other than for the treatment of partial seizures associated with epilepsy (as an adjunctive therapy), or for management of post-herpetic neuralgia (pain associated with herpes zoster skin rash outbreaks), from 1995 to the present ("Class Period").

   (b)   Excluded from the definitions are any persons who have already settled or otherwise compromised their claims against defendants.

   (c)   Also excluded from the class definitions are officers and employees of defendants.

   (d)   Class member may opt out of the putative class at any time within a six month period after the conclusion of the initial notice program. All class members who have not affirmatively elected to opt out of the putative class by the specified date will be bound by the class action resolution.

47

96.    This action is properly brought as a class action pursuant to Rule 1.220 of the Florida Rules of Civil Procedure.

97.    Plaintiffs are members of the Class they seeks to represent. The Plaintiffs' interests coincide with, and are not antagonistic to, those of the other Class members. Plaintiffs, like all Class members, purchased Neurontin for an off-label use not approved by the FDA. Plaintiffs' claims are typical of the claims of other Class members, and Plaintiffs will fairly and adequately represent and protect the interest of the Class as a whole.

98.    The proposed Class is sufficiently definite so that it is administratively feasible to determine whether a particular individual is a member. Also, the proposed Class consists of tens of thousands of members, and therefore, is so numerous that joinder is impractical.

99.    A class action will provide a fair and efficient method of adjudicating this controversy, in that:

(a)    The representative Plaintiffs have no conflicts of interest with absent Class members in the maintenance of this action and pursues this action for the benefit of the plaintiff Class. Plaintiffs have no present relationship with defendants in any official or unofficial capacity.

(b)    The representative plaintiffs have adequate financial resources to conduct this litigation in a manner that assures that the interests of the plaintiff Class will not be harmed.

48

(c)    Plaintiffs are represented by experienced counsel, experienced in handling cases of this nature. Plaintiffs' counsel has the financial resources to prosecute and maintain this action. Plaintiffs' counsel will adequately represent the interests of the Class.

100.    Questions of law and fact common to all Class members. More specifically, and without limitation, the following questions of law and fact are common to all Class members:

(a)    Whether Defendants gave kickbacks to physicians who prescribed large amounts of Neurontin for "off-label" purposes to patients;

(b)    Whether Defendants caused the formation of a nationwide network of employees they falsely referred to as "medical liaisons" whose actual assigned duties consisted entirely of conventional direct sales activities and which did not include any legitimate scientific activity;

(c)    Whether Defendants engaged in illegal direct solicitation of physicians for "off-label" uses;

(d)    Whether Defendants made or caused the making of false statements to physicians and pharmacists concerning the efficacy and safety of Neurontin for "off-label" uses;

(e)    Whether Defendants made or caused the making of such false statements directly to physicians concerning the safety and efficacy of Neurontin for "off-label" uses;

(f)    Whether Defendants charged or caused the charging of full price for drugs actually being used in experimental trials and thus subject to price restriction,

FREIDIN & BROWN, P.A., *One Biscayne Tower, Suite 3100, 2 South Biscayne Blvd., Miami, FL 33131, Phone: 305.371.3666, fax: 305.371.6725*

thereby causing higher prices to be charged in the market than would otherwise have been the case;

(g)     Whether Defendants engaged in or caused the systematic avoidance of filing requirements with the FDA;

(h)     Whether Defendants engaged in or caused the deliberate avoidance of the FDA's classification of Neurontin as to its therapeutic equivalency;

(i)     Whether Defendants used or caused the use of active concealment to avoid the FDA's enforcement mechanisms;

(j)     Whether Defendants used or caused the use of active concealment to avoid the "formulary" policies of various state agencies, including Florida regulatory authorities;

(h)     Whether the Defendants paid or caused the payment or offering of gratuities to Parke-Davis employees in order to procure their silence; and

(l)     Whether the Defendants did or caused the active training of Parke-Davis employee in methods of avoiding detection of their activities by the FDA.

(m)     Whether the Defendants knew or should have known that there was a lack of supporting evidence that Neurontin would be effective to treat the unapproved uses for which it was prescribed;

(n)     Whether the Defendants failed to disclose to Plaintiff and members of the class material facts regarding the efficacy of Neurontin when used for unapproved purposes;

(o)     Whether Defendants acted negligently at the expense of Plaintiff and the Class;

50

FREIDIN & BROWN, P.A., *One Biscayne Tower, Suite 3100, 2 South Biscayne Blvd., Miami, FL 33131, Phone: 305.371.3666, fax: 305.371.6725*

(p)   Whether Defendants' conduct resulted in unjust enrichment at the expense of Plaintiff and the Class;

(q)   Whether Defendants' conduct constitutes equitable tolling of Class members claims;

(r)   Whether Defendant's conduct constitutes a violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.02, *et seq.*;

(s)   Whether Defendant's conduct constitutes breach of the implied warranty of merchantability and implied warranty of fitness for a particular purpose;

(t)   Whether Plaintiff and Class members are entitled to compensatory and punitive damages, and the amount of such damages; and

(u)   Whether Plaintiff and Class members are entitled to equitable, declaratory and injunctive relief.

101.   These common issues of law and fact predominate over any questions affecting individual Class members.

102.   The Class, believed to be in the tens of thousands, is so numerous as to make joinder impractical.

103.   Plaintiffs will fairly and adequately represent the interests of the Class. Plaintiff's counsel are experienced in class action litigation, including consumer fraud class actions, and can carry out the responsibility of class counsel in class action litigation. Plaintiffs are committed to vigorously protecting the rights of the Class.

51

104.    A class action is an appropriate method for the fair and efficient adjudication of this controversy. The damages suffered by each Class member, in comparison to the expenses of bringing a lawsuit, are small. Thus without a class action, members of the Class will receive no redress at all for defendant's wrongs against them. Even if Class members themselves could afford such individual litigation, the court system could not, given the size of the Class. In addition, individualized litigation increases the delay and expense to all parties and to the court system. Individualized litigation also presents a potential for inconsistent or contradictory judgments. By contrast, class litigation presents far fewer difficulties, allows adjudication of claims that might otherwise go unaddressed because of the expense of bringing individual litigation, and provides the benefits of uniform adjudication, economies of scale, and comprehensive supervision by a single court.

## COUNT I

### VIOLATIONS OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT

105.    Plaintiffs incorporate the allegations contained in paragraphs 1 through 93, as if fully set forth herein.

106.    Plaintiffs are consumers within the meaning of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA.")

52

107.   At all relevant times herein, the uniform and common course of conduct described above constitutes unfair or deceptive business practices predominately and substantially affecting trade and commerce in the State of Florida.

108.   Defendants through their marketing program fraudulently represented that Neurontin, as sold, contained medicine that was effective in the treatment of at least 13 medical conditions other than epilepsy without any scientific basis recognized by the medical community and without FDA approval.  In making such representations, Defendants misled Plaintiffs and the Class members into believing that Neurontin had uses, benefits and efficacy characteristics for which they had no recognized scientific basis, thereby engaging in unfair or deceptive acts or practices.

109.   Defendants' unfair or deceptive acts or practices concerned representation of efficacy, material uses, benefits and/or characteristics of Neurontin.

110.   Defendants' unfair or deceptive acts or practices were undertaken with the intent that consumers and physicians would rely on them.

111.   Defendants' unfair and deceptive acts or practices occurred in the course of conduct involving trade and commerce within Dade County, Florida and throughout the nation.

53

112.    As a result of Defendants' unfair or deceptive acts or practices, Plaintiffs' and Class
members' purchases and use of Neurontin, without recognized scientific basis and
without FDA approval, were tainted with fraud and deception.

113.    As a result of Defendants' deceptive actions and violations of the FDUTPA, Plaintiffs
and the Class members have been damaged and continue to suffer injury in that they
have paid money for off-label uses of Neurontin. Plaintiffs and Class members would
not have done so but for Defendants' conduct.

114.    Defendants unfair or deceptive acts or practices proximately caused damage to
Plaintiffs and the Class members as described above.

115.    The foregoing conduct of Defendant predominates and substantially affects the state
of Florida.

116.    Defendants' conduct affects the public interest in that Defendants' wrongful conduct
has the capacity to injure a substantial portion of the public.

**WHEREFORE,** Plaintiffs demand judgment against Defendants in an amount in
excess of Fifteen Thousand ($15,000.00) Dollars, exclusive of interest and costs, and further
demands trial by jury on all issues so triable.

54

## COUNT II

## UNJUST ENRICHMENT

117.  Plaintiffs incorporate the allegations contained in paragraphs 1 through 93, as if fully set forth herein.

118.  Defendants have knowingly received, and continue to receive, a substantial benefit at the expense of Plaintiffs and Class members.

119.  It would be unjust and unconscionable to permit Defendants to enrich themselves at the expense of Plaintiffs and Class members and to retain the funds that Defendants wrongfully obtained from Plaintiffs and Class members.

**WHEREFORE**, Plaintiffs demand judgment against Defendants, in an amount in excess of Fifteen Thousand ($15,000.00) Dollars, exclusive of interest and costs, and further demands trial by jury on all issues so triable.

## COUNT III

## NEGLIGENCE

120.  Plaintiffs incorporate the allegations contained in paragraphs 1 through 93, as if fully set forth herein.

FREIDIN & BROWN, P.A., One Biscayne Tower, Suite 3100, 2 South Biscayne Blvd., Miami, FL 33131, Phone: 305.371.3666, fax: 305.371.6725

121.    Defendants have a duty to exercise the degree of care expected and required of manufacturers and sellers of pharmaceuticals and health care products. Defendants deviated from that duty by intentionally and recklessly promoting the off-label uses of Neurontin even though Defendants were aware that the FDA had not approved such off-label uses.

122.    As a result of Defendants' negligence, Plaintiffs and Class members have been injured. These damages are the actual and proximate result of Defendants' breach of their duty of care.

   **WHEREFORE,** Plaintiffs demand judgment against Defendants, in an amount in excess of Fifteen Thousand ($15,000.00) Dollars, exclusive of interest and costs, and further demands trial by jury on all issues so triable.

### COUNT IV

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

123.    Plaintiffs incorporates the allegations contained in paragraphs 1 through 93, as if fully set forth herein.

124.    Defendants, in the manufacture, marketing and/or sale of Neurontin, impliedly warranted to Plaintiffs and Class members that Neurontin was fit for its ordinary purpose.

56

125.    Neurontin is a prescription drug approved only for the treatment of partial seizures associated with epilepsy (as adjunctive therapy), and the management of post-herpetic neuralgia (pain associated with herpes zoster skin rash outbreaks). It is not approved for the uses for which it was promoted and sold to Plaintiffs and the Class members. Accordingly, Neurontin is not suitable for the purpose for which it was marketed and promoted to Plaintiffs and the Class members, and was not merchantable. Defendants have breached the implied warranty of fitness for a particular purpose. Neurontin is not reasonably fit for the specific of label purposes for which Defendants knowingly sold it and for which the Plaintiffs and Class members bought Neurontin in reliance on Defendants.

126.    As a direct and proximate result of Defendants' conduct, Plaintiffs and Class members have suffered actual damages.

**WHEREFORE,** Plaintiffs demand judgment against Defendants, in an amount in excess of Fifteen Thousand ($15,000.00) Dollars, exclusive of interest and costs, and further demands trial by jury on all issues so triable.

## COUNT V

### BREACH OF IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE

127.    Plaintiffs incorporates the allegations contained in paragraphs 1 through 93, as if fully set forth herein.

57

128.   Defendants, in the manufacture, marketing and/or sale of Neurontin, impliedly warranted to Plaintiffs and Class members that Neurontin was fit for a particular purpose.

129.   Defendants had reason to know that Plaintiffs and Class members were relying on defendants skill and judgement in order to select or furnish suitable goods for Plaintiffs' and Class members particular purpose.

130.   Neurontin is a prescription drug approved only for the treatment of partial seizures associated with epilepsy (as adjunctive therapy), and the management of post-herpetic neuralgia (pain associated with herpes zoster skin rash outbreaks). It is not approved for the uses for which it was promoted and sold to Plaintiffs and the Class members. Accordingly, Neurontin is not suitable for the purpose for which it was marketed and promoted to Plaintiffs and Class members, and was not merchantable. Defendants have breached the implied warranty of fitness for a particular purpose. Neurontin is not reasonably fit for the specific off label purposes for which Defendants knowingly sold it and for which the Plaintiffs and Class members bought Neurontin in reliance on Defendants.

131.   In fact, no evidence had been legally established at the time which justified the promotion of Neurontin for unapproved uses, and this was known to Defendants.

132.   As a direct and proximate result of Defendants' conduct, Plaintiffs and Class members have suffered actual damages.

58

**WHEREFORE,** Plaintiffs demand judgment against Defendants, in an amount in excess of Fifteen Thousand ($15,000.00) Dollars, exclusive of interest and costs, and further demands trial by jury on all issues so triable.

## EQUITABLE TOLLING OF STATUTE OF LIMITATIONS

133.    Any applicable statutes of limitation have been tolled by Defendants' affirmative acts of deliberate and fraudulent concealment. Through such acts, Defendants' practice of falsely representing the approved uses of Neurontin tolls the running of the applicable statutes of limitation.

134.    Plaintiffs and the Class members could not reasonably have discovered Defendants' wrongful conduct as alleged herein.

135.    Defendants are estopped from relying on any statute of limitations defense because of their unfair and deceptive conduct.

136.    Until shortly before the filing of this Complaint, Plaintiffs and Class members had no knowledge that Defendants were engaged in the wrongful conduct alleged herein.

137.    Because of the self-concealing nature of Defendants' actions, and its affirmative acts of concealment, Plaintiffs asserts the tolling of any applicable statutes of limitations affecting her claims.

FREIDIN & BROWN, P.A., *One Biscayne Tower, Suite 3100, 2 South Biscayne Blvd., Miami, FL 33131, Phone: 305.371.3666, fax: 305.371.6725*

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs on behalf of themselves and all other similarly-situated consumers, requests this Court to grant Plaintiffs and Class members the following relief:

(a)     Enter an order certifying this action as a class action with Plaintiff as class representative and Plaintiff's counsel as class counsel;

(b)     Enter a declaratory judgement that Defendants have violated the provisions of the Florida Deceptive and Unfair Trade Practices Act; that the economic loss sustained by Plaintiff and the Class members is the direct and proximate result of such violation; that Defendants are liable, jointly and severally, for three times the actual damages which Plaintiff and each Class member may prove; and to award Plaintiff and the Class members reasonable attorneys' fees;

(c)     Compensatory and punitive damages for Plaintiff and Class members;

(d)     For attorneys' fees and costs incurred in the pursuit of this action; and

(e)     For an order awarding such other and further relief as this Court deems just and proper.

FREIDIN & BROWN, P.A., *One Biscayne Tower, Suite 3100, 2 South Biscayne Blvd., Miami, FL 33131, Phone: 305.371.3666, fax: 305.371.6725*

WE HEREBY CERTIFY that a true and correct copy of the foregoing was mailed this

_____ day of August, 2004 to Pfizer Incorporated, Warner-Lambert, LLC and Parke-Davis,

c/o CT Corporation System, 1200 South Pine Island Road, Plantation, Florida 33324.

Respectfully submitted,

**FREIDIN & BROWN, P.A.**
One Biscayne Tower, Suite 3100
2 South Biscayne Boulevard
Miami, FL 33131
(305) 371-3666

BY: _____
PHILIP FREIDIN, ESQ.
Fla. Bar No. 118519
OMAR MALONE, ESQ.
Fla. Bar No. 796697

CO-COUNSEL

**ROSENBLUM & ROSENBLUM, P.A.**
700 South Andrews Avenue, Suite 200
Fort Lauderdale, Florida 33316
Telephone: 954.524.9944

61