1    Reserve, Louisiana.

 2            THE COURT:  Good morning.

 3            MR. ROUHANDEH:  Your Honor, James Rouhandeh, Davis &

 4    Polk for the defendant.

 5            THE COURT:  You're back.

 6            MR. CHAFFIN:  Good morning, your Honor, David Chaffin.

 7            THE COURT:  Good morning.

 8            MS. MacGREGOR:  Good morning, your Honor, Debbie

 9    MacGregor, Davis, Polk for the defense.

10            MR. BERNSTEIN:  Lou Bernstein, in-house counsel with

11    Pfizer, your Honor.

12            THE COURT:  Okay.  Terrific.  Is there anyone

13    here from -- I kept hearing some of those southern accents and

14    wasn't sure whether I hear it from someone from Tennessee?

15            Is there anyone here from Tennessee?

16            Did they not get notice of this?

17            This is what I'm trying to figure out, but I don't

18    know if you have seen that there was a motion to join in as

19    lead counsel, which was opposed, and I didn't know whether that

20    was something that people were considering whether I should

21    hear that today.  Is anyone -- I'm not a hundred percent sure

22    they got notice of this; and if not, I hate to pull people in

23    for nothing.

24            MR. SOBOL:  I don't know whether Mr. Ball -- I'm not

25    aware that my office got notice whether you were going to hold

6

1    a hearing on Mr. Ball's motion or not.

2              THE COURT:  I didn't separately notice it.

3              MR. SOBOL:  Right.

4              THE COURT:  So I just didn't know whether or not we

5    would be hearing it today.

6              MR. SOBOL:  Right.

7              THE COURT:  I will not obviously hear it --

8              MR. SOBOL:  Right.

9              THE COURT:  -- if they're not here.  What we can do is

10   either do it on the papers, or I can give them the option of

11   flying up here, if they wanted to be heard.

12             MR. SOBOL:  So why don't I, as liaison counsel, send

13   them a note to that effect, copy all counsel --

14             THE COURT:  Yeah, and they can call Robert if they

15   want to be heard, or if they want to be on the papers.

16             MR. SOBOL:  Fine.  All right.

17             THE COURT:  That is fine.  Okay.  So that will not be

18   addressed today.

19             Now, just moving on, the basic scheduling, and I don't

20   view myself as handling anything substantive today, other than

21   the dates on which everything is filed and setting up hearing

22   dates.

23             So does anybody want to say some preliminary things?

24   I mean you're not so radically different.  I was surprised you

25   didn't work out agreements.

1    MR. HIMMELSTEIN:  Your Honor, Barry Himmelstein for

2    the plaintiffs.  We thought we had an agreement on most of the

3    dates, which kind of broke down at the end of the day Friday,

4    and then there are a few areas of, I guess, philosophical

5    difference, which drive the difference in the dates.  The first

6    is when discovery commences.  We'd like it to begin on

7    March 1st very promptly.  Your Honor at the last status

8    conference said that the Court was not inclined to stay

9    discovery pending motions to dismiss.  The defendants wanted to

10   defer initiation of discovery until after briefing on the

11   motions to dismiss is completed.  We respectfully submit that

12   in a case like this you need to be able to walk and chew gum at

13   the same time.  We have got a lot of lawyers here on the

14   plaintiffs' side.  I am sure they have ample legal artillery on

15   their side, and there's no reason that --

16   THE COURT:  Suppose we did it partly; in other words,

17   defer the depositions so that people could focus on the

18   briefing, but jump start the document productions and those

19   kinds of things.

20   MR. ROUHANDEH:  Your Honor, on that point, discovery

21   has already commenced, because they now have in their

22   possession all of the Franklin documents.  All of the

23   plaintiffs have those documents.

24   THE COURT:  It's good to send out the requests to

25   start scheduling, noticing the depositions.  Maybe we will just

1    do a stay of the actual taking of depositions.

2            MR. ROUHANDEH: Well, certainly we would be in favor

3    of that, but our position is that they had proposed that we do

4    initial disclosures in the middle of the period at which we've

5    prepared our motion to dismiss, and we're simply saying let's

6    have initial disclosures of the last day of that briefing it is

7    commenced.  It's not very involved --

8            THE COURT:  I don't have a problem with this.  This is

9    an unusual case, because so much has been done already; and why

10   don't we start discovery right away, defer the actual

11   depositions until the determination of the briefing on the

12   motion to dismiss, but we will get it all going.  You'll

13   send out your document requests; you'll send -- you know, send

14   out your 30(b)(6) notices, you'll just get it all going, but

15   you won't actually schedule the stuff until the briefing is

16   over.

17           MR. HIMMELSTEIN:  I think that will be acceptable to

18   the plaintiffs, your Honor.

19           MR. ROUHANDEH:  Yeah, with one amendment, and that

20   would be we would like to be able to do our initial disclosures

21   on the date that we suggested, May 16th, and they certainly

22   under any schedule --

23           THE COURT:  That's fine, because you've

24   already -- it's a different kind of case, I mean in the sense

25   that so much has happened already.

1          MR. ROUHANDEH:  Thank you.

2          MR. HIMMELSTEIN:  We did suggest the March 31st date

3    for financial disclosures, which would be the response date for

4    any document request served on March 1st to eliminate, you

5    know, duplication of effort basically.  So it wouldn't be

6    producing documents in response to our document requests and

7    then later to deal with initial disclosures.

8          MR. ROUHANDEH:  Well, this is an interest in

9    duplication on our effort.  We would be more comfortable with

10   allowing them to go ahead and serve their requests, but have

11   our initial disclosures occur on May 16th.

12         THE COURT:  Well, let me -- let me just do this.

13   Let's -- all right.  Let me ask some questions.  On the motion

14   for class certification, these are things that I don't know how

15   to schedule, because I don't know enough about them.  I'm in

16   the middle of a big case, a AWP case, class discovery, and

17   actually that was a big deal.  I don't know whether this is a

18   similar kind of situation, the kinds of issues that are likely

19   to arise, or how long discovery is appropriate for.

20         MR. HIMMELSTEIN:  We do have a disagreement on that,

21   your Honor.  We think this is a much simpler case than AWP.  We

22   have one defendant, not dozens.  We have one drug, not

23   hundreds; and as your Honor knows, a bunch of discovery has

24   already been done in the action.  We don't think we need a

25   whole lot.

1          THE COURT:  What are you proposing as a class?

2          MR. HIMMELSTEIN:  The class would be everyone who paid

3   for a Neurontin prescription for an unaccrued use, an off-label

4   use, and we divided that into two subclasses:  One, basically

5   third-party payers; and the others, consumers, and we would

6   propose to go to work with those class and subclass definitions

7   when we do the class certification.

8          THE COURT:  And what is the cause of action?

9          MR. HIMMELSTEIN:  We have RICO, a federal RICO claim,

10  New Jersey Consumer Fraud Act.

11         THE COURT:  That's on the theory that you go with the

12  defendant state?

13         MR. HIMMELSTEIN:  We're -- we -- we're, in our view,

14  the conduct that is at issue here was directed from not just

15  the place of incorporation or the principal place of business,

16  but where, you know, this top down marketing scheme was

17  conceived and basically executed.

18         THE COURT:  Do you have any consumers who are named

19  plaintiffs?

20         MR. HIMMELSTEIN:  Yes, we do, your Honor.

21         THE COURT:  The question is, as always, commonality

22  and typicality --

23         MR. HIMMELSTEIN:  Yeah.

24         THE COURT:  -- and predominance.  So the question is:

25  What kind of discovery do you all think you need to take?

1          MR. ROUHANDEH:  In terms of --

2          THE COURT:  You've asked for a pretty extended class

3    discovery period, and I -- I know you generally like to take

4    the name of plaintiffs.  In my AWP case, I sort of made an

5    exception to my rule of no class discovery simply because I

6    didn't understand enough of the players, or what was typical

7    and what wasn't.  I don't know enough about this case to know

8    whether it's similar or whether this is a very different case.

9          MR. ROUHANDEH:  Well, this may end up being less

10   complex, but our schedule is quite a bit more truncated than

11   the schedule of the AWP case.  We think it is going to be

12   bigger.  These are hugely important issues to class cert

13   issues.  They're trying to certify class to all consumers in

14   the United States who took Neurontin for an off-label use and

15   separate subclass of every third-party payer whoever paid for

16   an off-label use of Neurontin.  I think there are going to be

17   huge issues.  We're going to need the depositions of the

18   consumer class reps, but equally important, the depositions of

19   the entities that are named as --

20         THE COURT:  The named class reps.

21         MR. ROUHANDEH:  Yes, the named class reps.

22         THE COURT:  So how many are we talking about?

23         MR. ROUHANDEH:  I'm not sure how many they have.

24         MR. HIMMELSTEIN:  Six in total, your Honor,

25   including --

1      THE COURT:  It doesn't take that long, a couple of

2   months.

3      MR. ROUHANDEH:  Well, your Honor, what we -- what we

4   propose is we took -- we actually looked at the AWP case, and

5   there the initial -- the initial round, the initial round was

6   five months from the time that motions to dismiss ended

7   until -- until briefing was due.

8      THE COURT:  That is so complicated.

9      MR. ROUHANDEH:  In fact -- in fact, it is, that's

10  right, and it doubled.  It more than doubled.  So we're -- we're

11  shooting for that, what was originally intended there, which

12  was to try and do it fairly quickly; and we think that if you

13  set a discovery cutoff in terms of class certification, as

14  they're suggesting, you know, over the summer, it's just not

15  going to get done.  I mean it's easy for them to stand here and

16  say, Oh, fine, we'll do that, but when their witnesses say, I

17  want to take a vacation in August or July --

18     THE COURT:  Right.

19     MR. ROUHANDEH:  -- and we're not able to schedule

20  that.  So part of our thinking is we just need to put it after

21  the summer ends, and we're saying mid-October, because,

22  frankly, I think that's when a lot of the discovery is going to

23  go forward.  And -- and we think -- that is a huge issue in

24  this case, class certification.  And under our schedule we get

25  done before they get done.  So I think we can allow enough time

1    for class discovery.  It doesn't link them the schedule

2    overall, and as to --

3            THE COURT:  So you're proposing you don't have a start

4    factored?

5            MR. ROUHANDEH:  That's correct, because I think your

6    Honor said that fact discovery is not stayed, and they already

7    have discovery.  They have -- the bulk of the relevant

8    documents in this case, they already have, and they could

9    be -- in fact, I think they have used them in terms of

10   their -- of their complaints.  So they've already started of

11   their review of those documents, and it's getting going.  So

12   that's getting going, and what we -- what we would like to do

13   is have a set period of time for class discovery.  It's not

14   saying no fact discovery can take forward -- can go forward,

15   but we would like to have an ample period there, because we

16   think these are going to be really very, very important issues.

17           MR. HIMMELSTEIN:  If I could respond briefly, your

18   Honor.

19           THE COURT:  I'm going to give them some class

20   discovery.

21           MR. HIMMELSTEIN:  Yes, of course.

22           THE COURT:  A couple months seems reasonable.

23           MR. HIMMELSTEIN:  Some class discovery.  Your Honor

24   had it -- had it rightly said.  The issues are the same, as

25   always, are their predominance of common issues, et cetera.

1  They know what they have got to do.  There's no reason they

2  can't start doing it right away.

3       THE COURT:  The devil is in the details.  So I mean

4  it's -- it's just understanding the industry I found so

5  difficult, and I'm sort of actually much further along now than

6  I was originally, and -- but -- I think if there's six people

7  over the summer, 60 days seems reasonable.

8       MR. HIMMELSTEIN:  And I don't think -- I mean Mr.

9  Rouhandeh is presuming people will be unavailable for vacations

10 and things.  We will have our witnesses available promptly for

11 deposition.  We will produce documents promptly.  Their

12 schedule proposes a total of five months for them to conduct

13 class discovery from the first day they can send out a document

14 request to the last day they can complete a deposition.  Our

15 schedule proposes four and a half months that they can complete

16 that same discovery.  They just don't want to start it soon.

17 They know what they've got to do.  There's no reason they can't

18 start doing it.

19      THE COURT:  Okay.  I understand -- I understand the

20 issues.  So --

21      MR. ROUHANDEH:  Your Honor, just on the issue whether

22 there is six depositions.  As to the -- as to the plaintiffs

23 themselves, I don't believe these plaintiffs are going to come

24 in and say that anybody ever talked to them from the drug

25 companies.  It's clear that it's going to implicate the

15

1    depositions of their physicians, and that we're going to need

2    medical records from them for class cert, and that's going to

3    add on -- and who knows, maybe it's one physician for each of

4    the class reps, but that's going to add on some discovery that

5    we think we could show you would be extremely important on the

6    class certification issues.

7        So it's not the matter of just six depositions and we

8    can get them done in the next six months.  We are going to want

9    documents from them, and our experience is it will take more

10   than two months to get the medical records from the plaintiffs.

11       THE COURT:  Let me just ask this.  Is there -- let me

12   understand in my heart what the claims are here.

13       Have you stuck with the claim of fraudulent research

14   to support it?

15       MR. HIMMELSTEIN:  Well --

16       THE COURT:  That was the easiest one in terms of

17   simplicity of claims.

18       MR. HIMMELSTEIN:  Yeah, it's --

19       THE COURT:  It came up in the first whistleblower that

20   Mr. Greene filed, but then it has been dropped by the wayside

21   to inform an off label kind of argument.

22       MR. HIMMELSTEIN:  That is -- we're not claiming that

23   Neurontin should never have been approved for the conditions

24   for which it was approved, if that's your Honor's question.  We

25   have got, you know, a 100-page complaint.  Most of it is facts,

16

1  and --

2          THE COURT:  I know, but the complaints are always so

3  long these days --

4          MR. HIMMELSTEIN:  Yeah.

5          THE COURT:  -- and actually I have to admit I didn't

6  even read it.  I want to know what's your core?  I mean they go

7  hundreds of pages.  I don't even know that I read the -- well,

8  and then there are three different complaints, which you are

9  going to explain to me at this point.

10          MR. HIMMELSTEIN:  Two -- two at this point.  There is

11  one for the class consumers and third-party payers, and one

12  filed by Aetna and Guardian, who are litigating in an

13  individual capacity.

14          THE COURT:  Once called amended class complaint and

15  one called the amended coordinated class complaint.

16          MR. HIMMELSTEIN:  Not coordinated class complaint,

17  because just coordinated complaint, because Aetna and Guardian

18  are going to litigate together, but as individuals, not as

19  class reps or class members.

20          THE COURT:  Right.

21          MR. HIMMELSTEIN:  They're effectively opting out of

22  the outset of the litigation.

23          THE COURT:  Let me just understand.  So it's the

24  claim.  I understand you're not claiming there was any fraud

25  upon the approval for the epilepsy.  I understand.  Are

1    you -- in fact, that maybe precluded by the Supreme Court case.

2         Is there a claim that there was fraudulent research

3    used to sell it to doctors?  That's what Mr. Greene started off

4    with, which is that basically Pfizer conducted research and

5    then got doctors to put their names on it.

6         MR. HIMMELSTEIN:  Yes, your Honor, that is part of the

7    case.

8         THE COURT:  That is on your claim, on the pain and

9    other off-label uses?

10        MR. HIMMELSTEIN:  Yes, your Honor.

11        THE COURT:  And the second issue was on the federal

12   level of whether or not just selling off label was a fraud with

13   respect to the government.

14        MR. HIMMELSTEIN:  Yes.  And we would claim that

15   these -- the off-label promotion that they did was fraud with

16   respect to consumers and third-party payers as well.

17        THE COURT:  All right.  So those are the two -- the

18   two primary frauds you're claiming?

19        Are there any others?

20        MR. HIMMELSTEIN:  Many different types of activities

21   would fall under those umbrellas, I think, yeah.  That is

22   mainly the umbrella categories.  We have two RICO enterprises.

23   We have an off-label promotions enterprise.  We have a

24   publication enterprise, and we also have a combination of the

25   two overarching enterprise.  The publication enterprise, in



1  which your Honor referred to initially, where they did research

2  and got doctors to put their name on it, and got things in

3  journals, which distorted the findings that were -- that

4  actually --

5          THE COURT:  Right.  I just want to understand.

6          MR. HIMMELSTEIN:  Yeah.

7          THE COURT:  That's one of those.  That's more

8  straightforward, whether or not there is actually a

9  misstatement.  The off label occurred, right?

10         Did they ever misrepresent that it's on label?

11         MR. HIMMELSTEIN:  No, but they violated the federal

12  regulations against promoting off label.  They conducted an

13  elaborate scheme to be able to do that.

14         THE COURT:  I understand that's the argument.  That's

15  fine.  I just want to understand it.  It's a different argument

16  than with the federal government.

17         MR. HIMMELSTEIN:  It's a different cause of action,

18  yes.

19         THE COURT:  All right.  I understand.

20         MR. ROUHANDEH:  Yes, your Honor.  And I think because

21  of those issues to the present it clearly is alleged to be a

22  fraud on physicians.  There's no over the count -- there's no

23  direct to consumer advertising here; therefore, that the

24  depositions of the physicians are going to be very important

25  here as are the medical records of the particular doctors here

1    in terms of discovery, and our experience is it is going to

2    take a fair amount of time to do that.  They say, well, you

3    know, let's get that done; let's get the class certification

4    issues done, but --

5         THE COURT:  Well, you better send out the document

6    requests right away.  I mean if this is -- I've got a sense of

7    what I'm going to do with this, so...

8         MR. ROUHANDEH:  Now, the rest of their schedule is a

9    very leisurely schedule when it comes to their finding experts

10   for themselves and their doing expert discovery, but they want

11   to crunch the period related to class discovery, even though

12   it's their burden.  It's not our burden.  It's their burden to

13   show that a class is appropriate.  They want to really, we

14   think, unduly compress that period of time that class discovery

15   would go forward when it's a very enormous legal issue here

16   that we think is going to take time, maybe not on the scale of

17   the AWP case, but we're not proposing anything nearly on the

18   scale of the AWP case.

19        THE COURT:  This is what I'm thinking of with your

20   schedules back there, all right.  So write it down, and then

21   I'll issue a formal order.  Fact discovery commences forthwith;

22   in fact, it probably already has, except depositions are stayed

23   pending the briefing schedule for motions to dismiss.  So both

24   sides, with respect to class discovery and with respect to fact

25   discovery, should be sending out all the stuff over the next

1   few months.  Just get it all going scheduling the depositions,

2   get it all primed and pumped, you know, to get going.  Then, as

3   you agreed, the filing of motions to dismiss both agreed and I

4   think I ordered it, it's March 17; oppositions, April 15th;

5   replies, May 2nd; sur-replies, May 16th; service of initial

6   disclosures and depositions again, both for class and liability

7   on May -- why don't we say May 17th just to make it one day

8   afterwards.

9           Now, the hearing on a motion to dismiss should now be

10  set in June.  So, Robert, if we could pick a pretty -- I think

11  we'll probably need an afternoon in June, and I know June is

12  hard for people.  You know, they've got their kids' graduations

13  and vacations when their kids get out of school.  So don't be

14  shy, and I'm thinking something along the lines of the first

15  week in June.

16          MR. ROUHANDEH:  That would be fine with us, your

17  Honor.

18          MR. HIMMELSTEIN:  That would be fine with us as well,

19  your Honor.

20          THE CLERK:  We could do June 1st, if you want.

21          THE COURT:  June 1st.

22          MR. SOBOL:  What day of the week is that?

23          THE CLERK:  Wednesday.

24          MR. SOBOL:  Some people said Friday afternoons in

25  Boston, my friends from down the southeast.

21

```
 1            THE COURT:  Either you do or you don't want Fridays.
 2            MR. SOBOL:  They don't.  They would prefer not.
 3            THE COURT:  I should try and coordinate it with a Red
 4      Sox game.
 5            (Laughter.)
 6            MR. SOBOL:  You should.
 7            THE COURT:  Okay.  If I can do that, and you find the
 8      schedule, I will be happy to do that.  I don't know the
 9      schedule now.  So if I can do that, I would be happy to do that
10      for you all.
11            I notice that the Davis, Polk people are giving me
12      this bad look.  I can't quite time it with a Yankees' game
13      though.
14            MR. ROUHANDEH:  One of -- one of my partners that you
15      may be familiar with, Bob Fisk, you know, he's a die hard
16      Red Sox fan.  He doesn't let us forget what happened, so...
17            THE COURT:  In any event, I'll do it the 1st.  If you
18      find out that there is a date you prefer, I'll give it to you
19      all in Fenway.  I would be happy to do that.  Why don't we
20      start that with June 1st, and then...
21            MR. SHAPIRO:  Is that 2:00 p.m., your Honor?
22            THE COURT:  Yes.
23            THE CLERK:  2:00 p.m., yes.
24            THE COURT:  The filing of motions for class cert on
25      August 1st; and similarly, that will be the beginning of the
```

1    class certification depositions.  So hopefully a lot of the

2    paperwork will have been jumped started at that point.

3         MR. HIMMELSTEIN:  Your Honor, if I could speak to that

4    for a minute.  Normally, one -- the defendants complete class

5    discovery beforehand, not -- they don't start it once we file

6    our motion.  They know what they have got to do.  The issues

7    that are pertaining to class certification, they're going to

8    invent.  There is not going to be something in our papers

9    that's going to say, oh -- it's going to say to them, oh, now

10   we have to do discovery on this.

11        THE COURT:  Well, I'm having them do the paper

12   discovery all beforehand.  This is just when the depositions

13   begin.

14        MR. HIMMELSTEIN:  Of the class representatives?

15        THE COURT:  Yes.

16        MR. HIMMELSTEIN:  We just didn't see any reason --

17        THE COURT:  I mean I don't care if they start before

18   then.  I am going to give a couple of months afterwards so that

19   they can explore the issues that you raise.  My experience is

20   not the same as yours.  I mean I have allowed discovery after

21   the filing.  I mean I --

22        MR. HIMMELSTEIN:  All right.

23        THE COURT:  -- I'm happy to have it go in tandem, but

24   I'll give them a couple of months afterwards as well, but they

25   can't say I can't get all the paperwork and stuff.  You're

1  right, it all has to get going.  So why don't I just

2  say -- I'll say the beginning of depositions for class and

3  liability on May 17th, and I won't say the beginning of class

4  then, so that there will be no issues there.  But the end of

5  class discovery will be October 1st, 2005; filing of the

6  opposition is November 1st; filing of the reply, November 15th;

7  filing a sur-reply, December 1st; hearing on motion for class

8  certification, this -- sometime, and I'm going to ask Robert in

9  the middle of December, 2005, not too close to Christmas,

10 because everyone has all their holiday parties.  Besides it's

11 not so nice here then.

12         MR. BECNEL:  And the airfare, we can't get the

13 flights.

14         MR. HIMMELSTEIN:  If we can propose a slight

15 adjustment.  We tried to fast track the briefing dates, and our

16 proposed, or where the court isn't adopting that, if they're

17 going to have September, October, November, three months to

18 prepare an opposition request, or a brief, we would request 30

19 days for a reply.

20         THE COURT:  Why shouldn't they respond -- oh, I see

21 what you're saying.  That's fine.

22         When would you like the reply?

23         MR. HIMMELSTEIN:  December 1, assuming that doesn't

24 fall on a weekday --

25         THE COURT:  That's fine.

24

1          MR. HIMMELSTEIN:  -- on the weekend.

2          THE COURT:  Sur-reply, December 15, but just get it

3     done, the sur-reply.

4          MR. ROUHANDEH:  That would be fine, your Honor, but I

5     think that would dictate probably putting the hearing into

6     January.

7          THE COURT:  Yes.  Yeah, we'll put the hearing in

8     January.  Sometime in early January.

9          THE CLERK:  Yeah, January 5th at 2:00 p.m.

10          THE COURT:  Okay.  The hearing on the motion for class

11     certification.  All right.  So then that means that provision

12     of plaintiffs' expert reports -- now, I -- so this is moving me

13     back.  I have here January 15th for the end of fact discovery.

14          Is that jamming you too much; in other words --

15          MR. HIMMELSTEIN:  I think so.

16          THE COURT:  When would you like the end of fact

17     discovery if we have the hearing -- January 30th?

18          MR. HIMMELSTEIN:  Yeah.

19          MR. SOBOL:  Yes.

20          THE COURT:  January 30th, the end of fact discovery.

21     Provision of plaintiffs' expert reports, February 15th; does

22     that make sense?

23          MR. HIMMELSTEIN:  We would like a month after the end

24     of fact discovery, if we could get it.

25          THE COURT:  This gives you -- this gives you 45 days.

25

1    Is that too much?

2           My basic fear is that you all will adjust schedules

3    given personal things, and that this gives you a leeway

4    internally so you don't have to come to me every time.

5           MR. HIMMELSTEIN:  And January 30th to February 15th is

6    15 days so...

7           THE COURT:  No, I'm sorry.  You're right.

8           MR. HIMMELSTEIN:  The end of February or the beginning

9    of March.

10          THE COURT:  You are right.  So what don't we do

11   February 30th -- February 28th.

12          MR. HIMMELSTEIN:  The 28th, yeah.

13          THE COURT:  Okay.  And then March 30th, obviously if

14   I'm hitting the weekends, because I'm not looking at a calendar

15   right now, defendants' reports; rebuttal reports would be

16   April 15th.  That's -- I'll let you do your taxes -- April 16th;

17   and then end of expert discovery, June 1st.

18          Is that going to be enough?

19          MR. HIMMELSTEIN:  We think so, your Honor.

20          THE COURT:  Okay.  And then filing motions for summary

21   judgment, July 1st; oppositions, August 1st; replies, August

22   17th; sur-replies, September 8th, 2006, we're talking about

23   now; and then early October for a hearing on motions for

24   summary judgment.

25          Now, to some extent, let me say this, I'm not -- I

1   haven't had enough experience with this.  Let me ask you this.

2   I'm assuming in the AWP case, and I guess I am going to have to

3   assume here too whatever I do on class certification will have

4   a likelihood of being appealed by one side or the other.  I

5   don't know how many of you have been through that.

6           Does that effectively stay the rest of the case?

7           MR. HIMMELSTEIN:  No.  No, your Honor.

8           THE COURT:  It doesn't.  So that we should continue

9   with the expert even if both sides are appealing these, because

10  I just didn't know how much that defines the character so that

11  you're worried about doing the expert discovery wrong.

12          MR. SOBOL:  Yeah, our experience is that it doesn't

13  really define things at all, your Honor.  I'll give you a

14  couple of examples, in a case we have before Judge Young, he

15  certified a class as soon as it was going to be taken up on

16  appeal.  He was completely indifferent as to whether or not

17  opposing what was going to happen with respect to the appeal

18  during the course of the case.  And some of the other cases as

19  well.  Essentially what happens, because you have got these

20  long schedules that are going on, essentially during another

21  year anyway, people are moving on two tracks, the defendants or

22  the plaintiffs pursue their 23(f) rights, and either the

23  Circuit Court does or doesn't take it; in the meantime, the

24  case is moving ahead, and --

25          THE COURT:  Well, I'm going to set the whole schedule

1   up; and if, in fact, the Circuit doesn't take it, we can all

2   decide what we want to do.

3          MR. ROUHANDEH:  All right.  I think that's fine, your

4   Honor, because it could come back in a slightly different form,

5   which --

6          THE COURT:  A completely different form.

7          MR. ROUHANDEH:  Right.  One or both sides might want

8   different discovery.  So as long as that's still a possibility

9   at that point.

10         THE COURT:  Yes, that's fine.  I think it is in some

11  ways good, as I have a sneak peak.  The ones I've looked at, at

12  one point I gave a lecture on this, and I actually sat and

13  started reading the circuit cases on it, and while many

14  circuits say that merits aren't part of the class discovery

15  process, you know, you often get a little bit of a preview of

16  what they're thinking about it.  So I think we'll see where

17  that goes.

18         Anyway, the hearing in September or October, why don't

19  we say October on the motion for summary judgment.

20         THE CLERK:  October 5th at 2:00 p.m.

21         THE COURT:  Now, I don't know anything about the

22  economics of this case.

23         Is -- is -- Eric Green, is he involved in this case as

24  well?

25         MR. SOBOL:  Not yet.

1          THE COURT:  Not yet.  Is settlement something -- when

2      do I factor that in?

3          MR. SOBOL:  In the -- in my experience with the cases

4      that we've had in this court, your Honor, that are somewhat

5      similar, it's during the briefing part of the class

6      certification that the parties are really sort of joining the

7      issues.  That 12(b)(6) doesn't make an awful lot of sense.

8      People are really sort of butting -- you know, butting heads at

9      class certification.

10          THE COURT:  You sort of need the triage of the issues

11     and then --

12          MR. SOBOL:  Right.

13          THE COURT:  -- and then it makes sense.

14          MR. ROUHANDEH:  Yeah, I'm not sure that I would say

15     it's necessarily to make sense or not, but I would think after

16     class -- if the parties are going to confer and have some sort

17     of mediation, I think it makes sense after you get through the

18     motion to dismiss and after the class cert issues.

19          THE COURT:  Would you discuss amongst yourselves

20     whether you want someone like Eric Green, or whether you -- we

21     have magistrate judges who do it, but I'm going to use up one

22     of them for discovery battles and so they don't like to be the

23     same judge deciding the things and do the mediation.  So this

24     isn't something you can just like a little admiralty case that

25     you can just walk in and do.  I would be reluctant to sort of

1    commit a whole magistrate judge's time, unless you wanted that

2    person.  So would you let me know.

3         Would a week be doable, or do you want maybe a couple

4    weeks to discuss possible mediators and schedule something for

5    the class certification time frame?

6         MR. HIMMELSTEIN:  I think two weeks should be

7    sufficient time to discuss it.

8         MR. ROUHANDEH:  A couple of weeks.

9         THE COURT:  Okay.  That would be good.  Now, there are

10   all these other issues that I didn't have time to impanel.  I

11   don't know how strongly you feel about them, like, I don't

12   know, like preserving the evidence and that sort of thing.

13        MR. ROUHANDEH:  Well, your Honor, there are a number

14   that I'll tell you in one simple way.  Our problem with them is

15   that many of them we think are suggestions by the plaintiffs

16   that don't quite look the same as the federal rule that governs

17   the issue, and we're a little reluctant to have a rule that

18   might be, for example, on privileges, on authenticity that

19   departs from the Federal Rules of Civil Procedure such that,

20   you know, we could comply with the federal rules, and they can

21   come back to us and say, ah, but the judge ordered in February

22   that you have to do X, Y, and Z.  So things like preservation,

23   there is -- and I believe this comes from the AWP order.  We

24   said, you know, the parties should comply with the laws

25   regarding preservation.  They proposed something very specific