1    and detailed on preservation.  We don't think that's necessary.

2           THE COURT:  Nowadays the preferred practice in the

3    area of computer-stored information is many of these

4    companies -- maybe yours does, too -- routinely deletes,

5    whatever that means, information, and so I think that's the

6    kind of stuff that needs to be preserved.

7           MR. ROUHANDEH:  Yeah, I'm not sure, and there are laws

8    and cases and rules that have to do with all of that.  Theirs

9    doesn't even address that.  It's just a general preservation

10   doc.

11          THE COURT:  Do you think you can all work through it

12   rather than rather than --

13          MR. ROUHANDEH:  We would prefer that, as opposed to --

14          THE COURT:  No, no, no.  No.  No.  I'm talking about

15   in terms of an order.

16          MR. HIMMELSTEIN:  In terms of an order.

17          THE COURT:  We're trying to see their issue, which is,

18   you know, they don't want me to prejudge on these issues, or

19   prejudge it for the magistrate judge, and say, ah-ha, it's

20   here.

21          Can you work through some of the language together?

22          MR. HIMMELSTEIN:  Well, we would be prepared to try.

23          MR. ROUHANDEH:  Yes, sure, we would be prepared to

24   try.

25          THE COURT:  And just simply do this:  If you put your

1     language in brackets, and you put yours in brackets, and

2     whoever is the most reasonable, I will cross out the other one.

3                MR. ROUHANDEH:  Okay.

4                THE COURT:  So it's an incentive to be reasonable.

5                MR. ROUHANDEH:  That's fine with us, your Honor.

6                MR. BECNEL:  May it please the Court, Daniel Becnel.

7     I would like to ask the Court maybe to look at the language

8     issue this week in the Vioxx litigation by Judge Fallon, who

9     previously handled the Propulsid MDL.  In his pretrial order

10    number one, he only got the case last Friday.  He issued an

11    order on his own volition with, because of his experience in

12    Propulsid, that is, the Court entered an order that does

13    everything everybody would want to negotiate, and I think it

14    would be a good model for you.

15               THE COURT:  I could take the AWP one and adjust it.  I

16    mean I don't know if you've taken a look at it.  Why don't

17    you -- could you send that to me?

18               MR. BECNEL:  I think it's -- the Court could pull it

19    right off of PACER right on the website.  It's right there,

20    PPO, double one.

21               MR. HIMMELSTEIN:  We will send it to you, your Honor.

22               MR. BECNEL:  But we can send it to you, but --

23               THE COURT:  Yeah, that would be useful to send that to

24    me, and also to send me --

25               MR. SOBOL:  AWP.

1          THE COURT:  Yeah, well, I have the AWP.  That one, I

2   can get -- I could just -- you could take that as a template

3   and work through it.

4          MR. BECNEL:  That's all I was suggesting that this was

5   not even parties doing it.  This is --

6          THE COURT:  Yeah.

7          MR. BECNEL:  -- kind of the court doing it on its own

8   volition.

9          THE COURT:  I don't know.  The AWP thing is so complex

10  and extensive.  This will just -- this will be hard, too.  I'm

11  not trying to demean legal issues here.  I'm just simply saying

12  it's not of the same mass.  That's all I can say.  So that may

13  be a good plan to start with protective orders and what we did

14  on all of these issues, and then sort of work from there.

15          Are any of you on that case or not?

16          MR. ROUHANDEH:  Others, Judge, from my firm are.  In

17  fact, we did look at that, and we've looked at it all the way

18  through, and that's why we moved for class discovery

19  maintenance of documents.  I think our proposal comes straight

20  out of the AWP.

21          THE COURT:  I will be inclined when in doubt to come

22  right out of the AWP case.

23          MR. ROUHANDEH:  I think that's what we've tried to do.

24          THE COURT:  Yes.

25          MR. SOBOL:  May I address two points, your Honor?

1          THE COURT:  Yeah.

2          MR. SOBOL:  The first is I know in my experience doing

3      it, your Honor, that in a case of this size we typically don't

4      set a trial date at this stage.

5          THE COURT:  No.

6          MR. SOBOL:  There are some reasons that you might want

7      to consider doing that here.  First, there is separate nonclass

8      cases that are before you, and so the Guardian and the Aetna

9      matter will be going forward regardless of what happens with

10     class.  There is also some substantial third-party payer

11     entities that have brought cases as well, who are in the class

12     case; and even if there is no class that's certified, they

13     nevertheless will also be proceeding forward with the case as

14     well.  And so we would, you know, ask that we be able to set at

15     least some notion about when a trial date might be.

16         THE COURT:  Let me turn to the third-party payers.

17     Did you want me just to adopt the schedule for you all as well?

18     This is coordinated with you?

19         MR. SHAPIRO:  Yes, your Honor.

20         THE COURT:  And which -- is there any chance that we

21     might get to a trial on your stuff before we might get to trial

22     on the class?

23         MR. SHAPIRO:  I think the only way we might is

24     depending on what happens with the 23(f) petition on class

25     certification.  That would go on and on and on, because we

1    don't have that issue.

2           THE COURT:  Which -- that's right.

3           MR. SHAPIRO:  We intend to do our own discovery.  We

4    expect it to be coordinated with class discovery.

5           THE COURT:  Sure.

6           MR. SHAPIRO:  You know, it might be easier to get that

7    case to trial rather than the class case.  It may be a simpler

8    case to try.  I think that issue could be addressed when we get

9    closer to that time.

10          THE COURT:  Yeah, my big concern is that I never had

11   to deal with the motion for summary judgment in the whistle

12   blower case, if I'm remembering correctly.  It was resolved

13   before that, but I do remember that there were -- it was -- it

14   was huge -- I mean I just don't remember the boxes.

15          MR. GREENE:  You decided that.

16          THE COURT:  What?

17          MR. GREENE:  You -- no, you wrote an opinion on it.

18          THE COURT:  Some of it.  There were whole issues.

19          MR. ROUHANDEH:  Right, there were issues that were

20   still remained outstanding after.

21          THE COURT:  There were huge, huge like off-label uses

22   were permitted under state Medicaid.  I was thinking of writing

23   to Tommy Thompson, the Secretary of Defense saying, You tell

24   me.  And then those are the kinds of issues that may or may

25   not -- that were just so big.

1        MR. GREENE:  You were concerned, as I remember, that

2    you and I might grow old together --

3        THE COURT:  Right.

4        MR. GREENE:  -- on that case.

5        THE COURT:  I mean it was huge.  It was just massive.

6    There were pieces of it that I thought were trial ready, but

7    there were huge pieces of it that I just wasn't sure about, and

8    so I -- I'm just worried that it could take me three to six

9    months to write it.  If you want me to just set a trial three

10   to six months down the line without prejudice to Mr. Shapiro

11   and crew coming in and saying please decide it --

12       MR. SOBOL:  Well, I think that that's what we -- here

13   is what we are trying to avoid, your Honor, that we end up in a

14   situation where we have a hearing in October of 2006 on summary

15   judgment; and then if there is a case to proceed forward to

16   trial at that point, and we're looking at a trial that might

17   last about a month, then trying to figure out when in 2007 that

18   that that trial might --

19       THE COURT:  That is realistically what it is.

20       MR. SOBOL:  That's right, but we wouldn't start

21   figuring out when to schedule the time.

22       THE COURT:  You want a trial in January 2007?  You've

23   got it.

24       MR. SOBOL:  Thank you.

25       THE COURT:  Without prejudice to moving to continue

1  it.

2          MR. SOBOL:  Absolutely.

3          MR. ROUHANDEH:  One -- one clarification point.  I

4  would take it that for by asking for the trial date, the

5  plaintiffs, meaning all the plaintiffs who are plaintiffs in

6  this case, not simply the named reps, but everybody who is

7  signed on to that consolidated class action complaint wants

8  your Honor to try those cases in the District of Massachusetts

9  they're not looking to go back to the transferrer order.

10          THE COURT:  Is one of them mine?

11          MR. ROUHANDEH:  Yeah.

12          MR. SOBOL:  Yes.  Part of it's yours, and that's what

13  had to be tried.  I am not sure if the others had a choice,

14  frankly, as to whether they want to go first.

15          THE COURT:  I haven't actually ever gotten to that

16  multidistrict litigation.  I think they do have a choice.

17          MR. ROUHANDEH:  Yeah.

18          THE COURT:  What's that case?  What is the name of the

19  big MDL case?

20          MR. HIMMELSTEIN:  Lexicon.

21          THE COURT:  That you said you just get it -- excuse

22  me.

23          MR. HIMMELSTEIN:  Lexicon.  Lexicon.

24          THE COURT:  Lexicon, right.

25          MR. ROUHANDEH:  My point of clarification is just I

1    think I hear the plaintiffs saying they would like those cases

2    to be tried here.

3            THE COURT:  I think you're quite right.  They have a

4    choice to go back.

5            MR. SOBOL:  Right.  They do have a choice to go back,

6    and the trial date we're asking for, the cases that are

7    obviously are here before this court, and dealing with who it

8    is, you know, we have got two and a half years to be able to

9    figure that out, or two years to figure that out.  But if we

10   could have the January 2000 [sic] trial date, I can put that on

11   my calendar, and I can make sure I don't schedule a skiing trip

12   for that month.

13           I had one other issue I wanted to address, your Honor.

14           THE COURT:  So you want it before Martin Luther King

15   weekend?

16           MR. SOBOL:  Yes, absolutely.  I much prefer trying

17   cases.

18           THE COURT:  So let's just say sometime in mid-January,

19   2007, as a tentative pencil-it-in date.

20           MR. SOBOL:  The other thing I just wanted to raise.

21   This is a --

22           THE COURT:  Wait a minute.  Let's just get it.

23           MR. SOBOL:  Sorry.

24           THE CLERK:  I need the calendar.

25           THE COURT:  Mr. Alba doesn't have the 2007 schedule

38

1    here.

2            THE CLERK:  Did you say in January?

3            THE COURT:  Just the beginning, just not the first

4    week in January.  The second week in January.

5            THE CLERK:  January 8th, 9:00 a.m.

6            MR. SOBOL:  Is that a Monday or a Tuesday?

7            THE COURT:  We only impanel on Mondays.

8            Okay.

9            MR. SOBOL:  The other thing is, as this court knows,

10   your a MDL court in this particular situation; and although

11   it's not in the case management order, the Court might want to

12   consider the kind of language we have in the AWP case regarding

13   settlement discussions and other state court proceedings and

14   that --

15           THE COURT:  Propose it to me.  Right now I have given

16   you the schedule.  In two weeks why don't you send me who you

17   want as a mediator, and propose either alternative language or

18   agreed-upon language that basically includes stuff like that.

19           MR. SOBOL:  Sure.  All right.

20           THE COURT:  Because I know that came up in the Lupron

21   litigation --

22           MR. SOBOL:  Right.

23           THE COURT:  -- with some of the issues with the

24   various state cases and state judges, and I know we had some

25   protests in the AWP, but I think everyone was satisfied with

39

1    the way we left it.

2          MR. SOBOL:  Right, it was essentially people will tell

3    one another.

4          THE COURT:  People talk.

5          MR. SOBOL:  Right.

6          THE COURT:  There's the saying, We talk.

7          MR. SOBOL:  Right.

8          THE COURT:  So...

9          MR. SHAPIRO:  Your Honor, if I can just say on the

10   guardian case, the nonclass case was filed in this district

11   before your Honor.

12         THE COURT:  Okay.  There will be a trial here in front

13   of me if it gets past summary judgment, at least the

14   third-party payer case and the -- my class case.

15         MR. SHAPIRO:  Right.

16         THE COURT:  I was wondering -- I haven't had a chance.

17   I just printed it off the printer this morning.  Does the Class

18   Action Fairness Act affect us at all?

19         MR. ROUHANDEH:  Yes, I think it does, your Honor, to

20   the extent future cases are brought in state courts under that

21   statute.

22         THE COURT:  Is it effective immediately?  That's what

23   I was trying to figure out.

24         MR. ROUHANDEH:  Well, yes, it's for cases filed

25   thereafter.  I believe that it means your Honor may get more

cases, because we will remove them and bring them here, if they're filed.

THE COURT:  Okay.  But it does not affect retroactive cases filed internally to the state?

MR. HIMMELSTEIN:  That is correct.  That only applies to cases filed on or after the effective date.

THE COURT:  And who decides?  Does that come to me when I decide that all the little benchmarks are met, you know, primarily of the state and that sort of thing?

MR. ROUHANDEH:  Well, I think it would make sense, because if we remove the cases, we would probably bring them to your Honor so that we don't have multiple judges deciding those issues.  We bring those to your Honor to decide are the benchmarks met.

MR. HIMMELSTEIN:  It would be the same as it is now --

MR. ROUHANDEH:  Under a removal.

MR. HIMMELSTEIN:  -- if a transferrer judge wanted to decide to remand before the MDL panel effects a transfer, they would be free to do that, or they could stay their hand, wait for the transfer, and let your Honor make those decisions.

THE COURT:  Did you have --

MR. BECNEL:  He made the argument.  I just wanted to make sure.

THE COURT:  Thank you.

MR. GREENE:  I have one point I want to bring to your

41

1    attention, and it maybe refreshed your memory in response to

2    what Mr. Rouhandeh said that the bulk of the documents have

3    been produced in this case.  If you will recall, Judge, in the

4    Franklin case that you limited --

5              THE COURT:  Yes.

6              MR. GREENE:  You limited discovery from '94 to '98 and

7    to the Northeast CDU and headquarters.

8              THE COURT:  Right.

9              MR. GREENE:  This is a national class action.  There

10   are five other CDUs.  This marketing went on around and across

11   the country.

12             THE COURT:  I agree.

13             MR. GREENE:  And it was --

14             THE COURT:  I don't know that the years will make that

15   big a difference, but the regional areas might.

16             MR. GREENE:  Well, we've alleged in the complaint that

17   this conduct has continued beyond '98, beyond the merger date

18   with Pfizer, which was June 2000.  We allege it right up to the

19   date of the global settlement in May of 2004.  So the

20   geographic scope that we're going to be looking for in this

21   case is nationwide, all the CDUs, and the time period is up to

22   and including May of 2004.

23             THE COURT:  Well, that's fine.  I'm hoping you put in

24   your document requests right away, you put in your oppositions,

25   and then I can get it to a magistrate judge to resolve this

1    stuff right away.  So if I remember correctly, some of your

2    whistleblowers got hung up a long time on some of this.

3         MR. GREENE:  Yeah, more than 14 months, several

4    issues.  Magistrate Cohen --

5         THE COURT:  No, he did a fine job.

6         MR. GREENE:  No.  No.

7         THE COURT:  It's just it went back and forth on the

8    discovery.

9         MR. GREENE:  That's who it was referred to.

10        And did you have a magistrate in mind, Judge, or --

11        THE COURT:  I do, actually, but I have to ask

12   permission, first so...

13        MR. ROUHANDEH:  Your Honor, I don't think we need to

14   argue the discovery issue right now.  It's positive to say that

15   they do have documents from other CDUs besides the northeast

16   CDUs, through at least a portion of the relevant period, if not

17   all of the relevant period, but we will hash that out when we

18   get the requests, and we'll communicate with them and see if we

19   can't resolve this.

20        THE COURT:  It's absolutely preserved.

21        MR. ROUHANDEH:  Yeah, absolutely, they are preserved.

22        THE COURT:  Aren't all CDUs, all those requested

23   years, are those parsed out appropriately?

24        MR. ROUHANDEH:  They have been preserved.  They are

25   growing, but they have been there since the beginning.

43

```
1            THE COURT:  Aren't they all sitting in some warehouses
2    like out of Raiders of the Lost Ark?
3            MR. ROUHANDEH:  There's not quite that many.
4            MR. GREENE:  They're on the second floor of
5    Pfizer's -- one of Pfizer's buildings in New York, and they
6    have a full-time consultant that they hired that's in charge of
7    those documents.  At least that was the status when I deposed
8    one of -- actually, it was Mr. Murray, one of the associates.
9            THE COURT:  That's only, as you said, partially,
10   right?
11           MR. GREENE:  Well, we got partials.  I don't know -- I
12   was never allowed to go into that floor to see what's there,
13   but the approximate 80 boxes that we have is just partial.
14   When Mr. Rouhandeh says that there are some documents from the
15   other CDUs, Judge, like the southeast or the north central,
16   well, sure there are, because those memos would have come
17   through Morris Plains, but every single CDU had its own
18   marketing department, and they were following national
19   marketing strategies issued out of Morris Plains.  So it's
20   those documents that we need from the CDUs.  We didn't get
21   them, frankly.
22           MR. ROUHANDEH:  I would disagree with that frankly,
23   but we can talk about it.
24           THE COURT:  Are you all happy?
25           MR. ROUHANDEH:  We're fine.
```

1          THE COURT:  Are you all happy?

2          MR. HIMMELSTEIN:  Your Honor, of all the other issues

3    we've raised, and I heard your Honor doesn't want to decide a

4    lot of other stuff today, there is one that I think bears

5    mentioning, which is the issue of authentication of documents.

6    This is a very document-intensive case.  It does not make sense

7    for both sides to spend months of deposition time confirming

8    the authenticity of documents and that their business records

9    when I think we all know that probably all are going to fall

10   into that category, but if we don't have some protocol for

11   authentication, we are either going to have to do that --

12         THE COURT:  See what you can agree on.  The problem is

13   that I can't force them to do something that the Rules of

14   Evidence don't provide.  Even though I think it makes a lot of

15   sense.  So see if you can agree on it.

16         MR. HIMMELSTEIN:  Okay.

17         THE COURT:  The other issue that drives me nuts, and

18   fortunately I have been through this before in the last case is

19   overdesignation of confidentiality.  So if there is -- if there

20   is a confidential pricing data, which there may well be, recent

21   data, not so much the old stuff, I don't think that is

22   confidential for the old stuff, but the recent stuff may well

23   be.  That stuff is obviously confidential, but it doesn't mean

24   that the whole document becomes confidential.  It just means

25   that you redact those pieces.

1           MR. ROUHANDEH:  Your Honor, I continue to believe that

2     there was a complete misunderstanding about overdesignation.

3     That was a tag we put on for other purposes when your Honor

4     said give them all the documents for attorney's eyes only.  We

5     stamped them all confidential.

6           THE COURT:  We're starting -- we're starting fresh,

7     because everything was filed under seal.  Absolutely everything

8     in the last one, and the truth is we have CM/ECF now, and you

9     do have to be careful if some pricing data goes on the web, you

10    are in trouble; on the other hand, it means that it's worse

11    than it was in the olden days, because it means that the public

12    has access to nothing if you seal the entire document.  So the

13    way I have been trying to do it is -- and it's more work for

14    you, I understand that.  For that I'm saying sorry, but

15    basically all that gets redacted out, for example, the

16    confidential pricing information, but the rest of the document

17    is public, and then so it means the filing of two documents.

18           All of you are on CM/ECF, right?

19           MR. ROUHANDEH:  Yes.

20           THE COURT:  It's going to be mandatory, if you haven't

21    already.  People won't be getting notices, unless they are on

22    it.  And then if there is a debate over confidentiality, we can

23    have a debate over a snippet.

24           Do you know if the newspapers are interested in this

25    one, or they have moved on to greener pastures?

1           MR. ROUHANDEH:  I have given up my ability to predict

2    what they might be interested in, but I think it's probably

3    beating a dead horse.

4           THE COURT:  Have you heard any press interest?

5           MR. GREENE:  I periodically get calls.

6           THE COURT:  Actually, there is surprisingly little

7    interest in all this in terms of litigation.

8           MR. GREEN:  Well, I would say in response to your

9    question everyone is interested in whether Pfizer is engaged in

10   off-label promotion; and you know that they limited their plea

11   in the Franklin case to what Warner Lambert did to June 1998,

12   and that's why this discovery period beyond '98 is so -- so

13   critical.

14          THE COURT:  I see.

15          MR. GREENE:  And we do have evidence that Pfizer has

16   engaged in off-label promotion.

17          MR. ROUHANDEH:  I think we would vehemently disagree

18   with that in terms that they have what we didn't have, we are

19   anxious to see that.

20          THE COURT:  I just want to -- let me put it this way.

21   I think the way I have parsed it that even the New York Times

22   or the Wall Street Journal will be able to get access to most

23   of what should be fairly in the public domain on pricing data.

24   I don't even know if that's relevant here, is it?  My guess is

25   it isn't.

1          MR. ROUHANDEH:  It may or may not.

2          THE COURT:  Maybe customers' lists or something like

3    that, but that kind of stuff will stay confidential.  You put

4    the classic stuff that you put in, but not just every memo that

5    came out of central headquarters.

6          MR. GREENE:  Well, most of this evidence, Judge, is

7    marketing, marketing documents.  It's not really the price of

8    the drug.  We all know what the price of Neurontin was.  It's

9    not a pricing case in that sense.

10         THE COURT:  Well, most of that should be public.

11         MR. GREENE:  Sure.

12         THE COURT:  But there may be something like a customer

13   list, which has been protected in a business setting.

14         MR. GREENE:  Yeah, anything the rule applies around.

15         THE COURT:  What?

16         MR. GREENE:  Anything that the federal rule would

17   define, but I don't see it in this case.

18         THE COURT:  Well, I think the rule is to protect

19   confidential business information, but not necessarily every

20   marketing memo that went out.  Maybe that is what we will have,

21   disputes over gray areas.

22         Okay.  Well, have a wonderful weekend.  Thank you for

23   coming up.  If ever these timings are inconvenient for shuttles

24   back and forth to New York or from Mississippi, let me know.

25   We'll try and adjust what's around a little more convenient for

48

1    all of you.

2            MR. ROUHANDEH:  Thank you, your Honor.

3            MR. BECNEL:  Something that just came up this morning,

4    a number of the PI cases have now been removed, I believe,

5    through the MDL process.

6            THE COURT:  By PI you mean?

7            MR. BECNEL:  Personal injury cases, suicide cases.  I

8    think may be coming to you.  I just learned of this this

9    morning.

10           THE COURT:  No, really?

11           MR. GREENE:  There is a conditional transfer order for

12   five suicide cases that I saw a copy of the other day, your

13   Honor, and I think they're headed this way.

14           MR. BECNEL:  I think they're headed this way, and the

15   only reason I'm --

16           THE COURT:  I think I'm heading down there.

17           So that is a little different, right?  I didn't know

18   anything about -- when he said PI, I'm thinking preliminary

19   injunction.

20           So I'm getting some personal injury suits arising out

21   of the Neurontins?

22           MR. ROUHANDEH:  Yes.  Well, your Honor, I understand

23   that the plaintiffs in those cases are going to object to those

24   cases coming to the MDL, but that's --

25           THE COURT:  So that's up to them.

1          MR. ROUHANDEH:  The panel will have to decide what the

2     cases will be.

3          MR. BECNEL:  The only reason I was bringing it up at

4     this time is because I have a rather large inventory of those

5     cases also.  I have not filed them yet; and if they do send the

6     first five here, and you have them, one of the procedures we've

7     used in the Propulsid and others is allowing them to be filed

8     directly here rather than filing them in each and every state

9     and then spending two and three months with the MDL panel

10    transferring them to you.  It just makes more sense for you to

11    get them automatically.

12         THE COURT:  You know what the key here, I think, if

13    they make the decision to transfer them here, you call Robert

14    up immediately, and we'll get in here and talk about it,

15    because I'm not even sure we should put it on a completely

16    different discovery track, and that's just like a different

17    case.

18         MR. BECNEL:  There is no question about it, but that

19    is why I brought it up, because I've never found the MDL panel

20    when a MDL judge usually has something that they don't shove

21    everything to him or her.

22         THE COURT:  Right.  I'm not saying that there isn't

23    some overlap.  I don't want to prejudge it for the MDL, but

24    there are all separate issues of causation that I don't have to

25    address here.  I mean if someone committed suicide, what an

1    unfortunate thing, but my guess is that they have all sorts of

2    other things going on.  So that it either enhances or doesn't

3    enhance, but it's just a different set of issues, damages,

4    causation.  So you'll all help me.

5            MR. BECNEL:  I just wanted to bring it to the Court's

6    attention.

7            THE COURT:  I still have another MDL floating out

8    there in Bankruptcy Court, so if that comes in, on asbestos.

9            MR. SOBOL:  Hopefully we'll get it back to you.

10           THE COURT:  Anybody hear the asbestos?

11           MR. SOBOL:  Mr. Granger and myself have been

12   appointed.

13           THE COURT:  Can I ask you is there any chance that is

14   going resurrect itself in the next few months?

15           MR. SOBOL:  No.  No.

16           THE COURT:  Because I don't know if I could handle it

17   all.  I just might have to actually check on them.  All right.

18   That's going stay dormant?

19           MR. SOBOL:  It's probably not ever going to come back

20   to your Honor, because the plan of reorganization in the W.R.

21   Grace bankruptcy that resolves those claims.

22           THE COURT:  Thank you very much.

23           ATTORNEYS:  Thank you, your Honor.

24           THE CLERK:  Court is in recess.

25           (At 12:10 p.m., the Court was adjourned.)

51

<u>C E R T I F I C A T E</u>

1

2

3       I, Marianne Kusa-Ryll, Certified Realtime

4 Reporter, do hereby certify that the foregoing transcript,

5 consisting of 50 pages inclusive, is a true and accurate

6 transcription of my stenographic notes in Case No. MDL 1629,

7 Neurontin Marketing and Sales Practices Litigation before the

8 Honorable Patti Saris, USDJ, on February 24, 2005, to the best

9 of my skill, knowledge, and ability.

10

11

12

13              Marianne Kusa-Ryll, RMR, CRR

14              Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 4



**HAGENS BERMAN**
SOBOL SHAPIRO LLP

EDWARD NOTARGIACOMO
(617) 482-3700 Ext. 1960
ed@hbsslaw.com

July 1, 2005

**VIA Hand Delivery**

David B. Chaffin
Hare & Chaffin
160 Federal Street
Boston, MA 02110

Re:  *In re Neurontin Marketing and Sales Practices Litigation*; MDL No. 1629

Dear Counsel,

Enclosed herewith please find the following discovery materials produced in the above-referenced litigation:

1.  Documents bates-stamped KAIS-000001-001753 produced by Plaintiffs Kaiser Foundation Health Plan Inc., and Kaiser Foundation Hospitals;

2.  Documents bates-stamped GRDN0001-GRDN0158 produced by Plaintiff Guardian Life;

3.  A CD containing ASC II and Tiff. images bates-stamped KOPA0001-0064 produced by Plaintiff Rolaine Kopa; and

4.  A CD containing ASC II and Tiff images bates-stamped SW00001-SW00220 produced by Plaintiff International Union of Operating Engineer's Local No. 68 Welfare Fund.

Please note that these materials include documents marked "CONFIDENTIAL" pursuant to the Stipulated Protective Order in place in this case.

This is the beginning of a rolling production of documents by Class and Non-Class Plaintiffs in the above-referenced matter. I anticipate providing Defendants with initial materials from each of the other Class Plaintiffs, as well as additional materials from some of the Plaintiffs from whom we are producing documents today, sometime next week.

RECEIVED
JUL 5 2005

ATTORNEYS AT LAW     SEATTLE   LOS ANGELES   CAMBRIDGE   PHOENIX   CHICAGO
T 617.482.3700     F 617.482.3003
ONE MAIN STREET · FOURTH FLOOR · CAMBRIDGE MASSACHUSETTS 02142     www.hbsslaw.com

July 1, 2005
Page 2

If you have any questions concerning the above, please do not hesitate to contact me.

Sincerely,

Edward Notargiacomo

EN/hcm
Enclosures

cc: James P. Rouhandeh w/o enclosures
    Plaintiffs' Counsel w/o enclosures