# BERNSTEIN LIEBHARD & LIFSHITZ, LLP

ATTORNEYS AT LAW

IO EAST 40TH STREET

NEW YORK, NEW YORK 10016

(212) 779-1414

FAX: (212) 779-3218

www.bernlieb.com

STANLEY D. BERNSTEIN
SANDY A. LIEBHARD
MEL E. LIFSHITZ
KEITH M. FLEISCHMAN
JEFFREY M. HABER
ROBERT J. BERG*
FRANCIS P. KARAM*
REBECCA M. KATZ
U. SETH OTTENSOSER

SENIOR COUNSEL
WILLIAM A. K. TITELMAN▲

OF COUNSEL
TIMOTHY J. MacFALL
MARK T. MILLKEY

ABRAHAM I. KATSMAN*
MICHAEL S. EGAN*
MARY U. HOOVER
ANNE W. SALISBURY
FELECIA L. STERN
RONALD J. ARANOFF
DANIELLE MAZZINI-DALY
BRIAN S. COHEN
GREGORY M. EGLESTON
JOSEPH R. SEIDMAN, JR.
ALDEN W. VEDDER
MICHAEL S. BIGIN
STEPHANIE M. BEIGE
ANDREA H. WILLIAMS*
JESSICA L. FRANCISCO
THERESA A. VITELLO***
BRETT M. LOGAN
RUSSELL M. IGER

*ALSO ADMITTED IN NJ
▼ALSO ADMITTED IN PA
▲ADMITTED ONLY IN PA
***ADMITTED ONLY IN NJ & PA

August 26, 2005

<u>VIA FACSIMILE</u>

Patrick J. Murray, Esq.
Davis Polk & Wardwell
450 Lexington Avenue
New York, NY 10017

RE:    *In re Neurontin Marketing & Sales Practices Litigation*; MDL No. 1629

Dear Patrick:

As promised, I am writing in response to your August 12, 2005 letter regarding your perceived deficiencies in Lorraine Kopa's responses to defendants' interrogatories in the above-referenced matter. As a preliminary matter, Ms. Kopa continues to stand on plaintiffs' global objections. Therefore, Ms. Kopa will not provide any information with regard to any drugs other than Neurontin. Additionally, Ms. Kopa will only provide information regarding events that took place after the accident which was the impetus for her eventually being prescribed Neurontin, except for in a limited number of circumstances where we feel that such pre-accident information is warranted.

In addition, as you know, at the July 22, 2005 meet and confer we agreed to consider whether the Individual Plaintiffs would supplement their responses to Defendants' document requests and interrogatories. After considering the matter carefully, we are supplementing Plaintiff Lorraine Kopa's Responses to Defendants' Document Requests and Interrogatories as follows. By supplementing her responses, however, Ms. Kopa in no way waives, or intends to waive, any objections as set forth in her Objections and Responses to Defendants' First Set of Document Requests and Interrogatories.

<u>Interrogatory No. 2</u>

As stated in her Responses to Defendants' Document Requests and Interrogatories, Ms. Kopa objects to defendants' request for her social security number on the grounds that it seeks information which is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. In this age of identity theft, an individual's social security number is

BERNSTEIN LIEBHARD & LIFSHITZ, LLP

Patrick J. Murray, Esq.
August 26, 2005
Page 2

sacrosanct and must be protected vigilantly. Furthermore, defendants have not provided a good reason why they need Ms. Kopa's social security number. Therefore, absent a court order, Ms. Kopa will not disclose her social security number. With respect to whether Ms. Kopa was ever married, the information regarding such marriages, and the birth date and address of her son, we continue to maintain that this information is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. As such, Ms. Kopa will not disclose this information absent a court order.

Interrogatory No. 3

Ms. Kopa states that she resided alone during the entire ten year period prior to the matters alleged in the Complaint.

Interrogatory No. 5

As stated in her Responses to Defendants' Document Requests and Interrogatories, Ms. Kopa objects to defendants' request for the names of her immediate supervisors on the grounds that it seeks information which is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. Additionally, defendants have not provided a valid reason why this information is needed. Based on these objections, Ms. Kopa will not disclose the names of her immediate supervisors absent a court order. Furthermore, Ms. Kopa objects to defendants' request to disclose her "entire" employment history on the grounds that it is overly broad, unduly burdensome, and seeks information which is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. Based on these objections, Ms. Kopa will disclose information regarding her employment history during the past ten years only. Ms. Kopa supplements her response to Interrogatory No. 5 as follows:

1. Moses Taylor Hospital, 700 Quincy Avenue, Scranton, Pennsylvania 18510;
   a. Emergency Room Nurse;
   b. Objection;
   c. 1998 to present;
   d. Not applicable.
2. Allied Services, 100 Abington Executive Park, Clarks Summit, Pennsylvania 18411;
   a. Nurse;
   b. Objection;
   c. 1995 to 1998;
   d. Ms. Kopa left Allied Services because she was the only nurse working on her floor treating mentally retarded patients and the job became exceedingly demanding and burdensome for one nurse to handle.
3. Lackawanna Health Care Center, Sturges Road, Olyphant, Pennsylvania 18447;
   a. Nurse;

BERNSTEIN LIEBHARD & LIFSHITZ, LLP

Patrick J. Murray, Esq.
August 26, 2005
Page 3

        b.    Objection;

        c.    1992 to 1995;

        d.    Ms. Kopa left Lackawanna Health Care Center because she wanted a full-time position and comprehensive healthcare coverage, which were not available to her in this position.

Interrogatory No. 8

Contrary to your understanding that Ms. Kopa is "refusing to produce information regarding other physicians or healthcare professionals who may have treated or examined her in connection with the accident that caused her pain before she started taking Neurontin," Ms. Kopa provided information in response to part (b) of this Interrogatory regarding where she was treated for her injuries immediately following her accident. Ms. Kopa supplements her response to this Interrogatory as follows:

        a.    Dr. Dhaduk was the specialist who prescribed Neurontin for Ms. Kopa. Dr. Craparo was Ms. Kopa's primary care physician at the time of the accident and throughout the time period during which Ms. Kopa took Neurontin.

        b.    Other than Moses Taylor Hospital, Ms. Kopa was not admitted to any other hospital or medical facility after her car accident or during the period of time when she took Neurontin.

Interrogatory No. 9

Ms. Kopa restates her objections to this request on the grounds that it seeks information which is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. In the interest of cooperation, however, Ms. Kopa states that she has never consulted a psychiatrist, psychologist or other mental healthcare professional.

Interrogatory No. 10

Ms. Kopa supplements her response to this Interrogatory as follows:

        d.    Ms. Kopa suffered the following side effects caused by taking Neurontin: dizziness, nausea, sleeplessness, headaches, dry mouth, diarrhea, fatigue, weight fluctuation.

        e.    Yes.

        i.    No.

BERNSTEIN LIEBHARD & LIFSHITZ, LLP

Patrick J. Murray, Esq.
August 26, 2005
Page 4


Interrogatory No. 11

Ms. Kopa, in response to this Interrogatory, directed defendants to documents she produced.
Therefore, her response was not deficient.[1] Specifically, both the nature of Ms. Kopa's pain and
the medical care she received to treat her pain are described in detail in KOPA 0003, KOPA
0008, KOPA 0010, and KOPA 0019, among others. Ms. Kopa supplements her response to this
Interrogatory as follows:

    a.    Ms. Kopa first learned that she suffered from pain after she was involved in a car
        accident on approximately April 22, 2003.
    b.    Ms. Kopa received treatment for her pain from Moses Taylor Hospital, Dr.
        Craparo, and Dr. Dhaduk. In addition, Ms. Kopa received physical therapy at
        Allied Services Rehabilitation Hospital, 475 Morgan Highway, Scranton,
        Pennsylvania 18501.
    c.    See documents produced.
    d.    See documents produced.


Interrogatory No. 12

We object to your characterization of Ms. Kopa's objections as "improper." That is a legal
conclusion, and neither you nor any of your colleagues, are the judge in this action. We
recognize that you *believe* her objections to be improper, but such editorial comments have no
place in trying to resolve a discovery dispute. Ms. Kopa supplements her response to this
Interrogatory as follows:

    a.    Ms. Kopa took Neurontin from approximately November 11, 2003 to
        approximately May 25, 2004.
    b.    300 mg.
    c.    No.
    d.    Yes.
    e.    Approximately May 25, 2004.
    f.    Ms. Kopa stopped taking Neurontin because it did not relieve her pain and
        because it caused the following side effects: dizziness, nausea, sleeplessness,
        headaches, dry mouth, diarrhea, fatigue, and weight fluctuation.


Interrogatory No. 13

Ms. Kopa reasserts her objections to this Interrogatory, specifically on the grounds that it calls
for a legal conclusion. Subject to and without waiving the foregoing objections, Ms. Kopa states

---

[1] Plaintiffs note that the overwhelming majority of defendants' responses to plaintiffs' interrogatories (e.g.
Responses to Interrogatories Nos. 4-12) were in the nature of: "Defendants will produce documents from which the
response to this interrogatory may be derived."

BERNSTEIN LIEBHARD & LIFSHITZ, LLP

Patrick J. Murray, Esq.
August 26, 2005
Page 5

that she took Neurontin for the off-label use of relieving pain.  At the time she was prescribed
Neurontin, and throughout the period of time during which she took Neurontin, Ms. Kopa was
not aware that she was taking Neurontin for an off-label use.  She does not recall how or when
she became aware that she was taking Neurontin for an off-label use.

Interrogatory No. 15

Ms. Kopa confirms that her response to this Interrogatory is complete.

Interrogatory No. 16

Ms. Kopa does not remember what, if any, information was provided to her by her physician
when he prescribed Neurontin for her.

Interrogatory No. 17

Ms. Kopa states that Neurontin did not relieve her pain.  She is not in a position to opine on what
other people believed.

Interrogatory No. 19

Ms. Kopa does not know whether a representative of defendants ever made any statement about
Neurontin to her physician.

Interrogatory No. 20

Ms. Kopa stands on her objections that this information is protected by the attorney-client
privilege.

Interrogatory No. 21

Ms. Kopa does not know whether her physician attended any seminars or events at which the use
of Neurontin to treat pain was discussed.

Interrogatory No. 23

Ms. Kopa's response to this Interrogatory directs defendants to documents she produced.
Therefore, her response is not deficient.[2]  Specifically, Ms. Kopa's documents contain
information regarding money spent by Ms. Kopa on Neurontin.  Furthermore, see Ms. Kopa's

---

[2] Again, the overwhelming majority of defendants' responses to plaintiffs' interrogatories (e.g. Responses to
Interrogatories Nos. 4-12) were in the nature of: "Defendants will produce documents from which the response to
this interrogatory may be derived."

BERNSTEIN LIEBHARD & LIFSHITZ, LLP

Patrick J. Murray, Esq.
August 26, 2005
Page 6

response to Interrogatory No. 24 for an estimate of Ms. Kopa's out-of-pocket expenses. With
respect to treatments for pain as alleged in the Complaint, Ms. Kopa states that she is no longer
receiving such treatments.

Interrogatory No. 24

Ms. Kopa's response to this Interrogatory is complete. She is only seeking to recover for
economic injury she incurred as a result of purchasing defendants' drug, which was a mere
placebo.

Interrogatory No. 25

Ms. Kopa supplements her response to this Interrogatory as follows:

      a.     Ms. Kopa paid approximately $130.93 for Neurontin. Ms. Kopa's medical
            insurer paid approximately $269.87 for Ms. Kopa's Neurontin prescriptions.
      b.     To the extent that the requested information is available from documents within
            Ms. Kopa's possession and control, such documents will be produced.

In addition to the foregoing supplemental interrogatory responses, Ms. Kopa supplements
her responses to defendants' document requests as follows:

Document Request No. 2

Ms. Kopa is in the process of searching her records to see if she has diplomas or other records of
the schools she attended and the degrees she obtained. To the extent they exist, responsive
documents will be produced.

Document Request No. 3

Ms. Kopa will produce paycheck stubs sufficient to show her current employment, if she has
any.

Document Request No. 4

Ms. Kopa will produce non-privileged documents concerning the personal injury lawsuit in
which she was involved in 2003.

BERNSTEIN LIEBHARD & LIFSHITZ, LLP

Patrick J. Murray, Esq.
August 26, 2005
Page 7

Document Request No. 6

Ms. Kopa will produce non-privileged documents concerning the personal injury lawsuit in which she was involved in 2003.

Document Request No. 13

Ms. Kopa will produce documents, to the extent such documents exist, concerning her current medical insurance.

Very truly yours,

Ronald J. Aranoff

cc:    Thomas Greene, Esq.
       Richard Shevitz, Esq.

**EXHIBIT 39**



# COHEN & MALAD, LLP
## ATTORNEYS

Louis F. Cohen (1936-1992)
Richard M. Malad
Irwin B. Levin
Richard N. Bell
David J. Cutshow
Gregory L. Laker
Thomas L. Blackburn
Richard E. Shevitz
Donald D. Levenhagen
Arend J. Abel
Shakrina Radpour Beering
Brian K. Zoeller*

*Certified Family Law
Specialist

Michael C. Adley
Laura C. Jeffs
Scott D. Gilchrist
Eric S. Pavlack
Jeff S. Gibson
Elizabeth J. Doepken
Julie Andrews
Phillp D. Sever**
Katherine A. Harmon

**also admitted in Ohio

August 26, 2005

## VIA FACSIMILE

Patrick J. Murray, Esq.
Davis Polk & Wardwell
450 Lexington Avenue
New York, NY 10017

RE:   *In re Neurontin Marketing & Sales Practices Litigation*; MDL No. 1629

Dear Patrick:

We are writing in response to your August 12, 2005 letter regarding what you deem deficiencies in the responses to defendants' interrogatories of plaintiff Gerald Smith.

Before addressing the specific issues you raised in your letter, we want to reiterate our objections to the scope of discovery sought by defendants. Information concerning medications other than Neurontin or health care issue that do not relate to the condition for which Neurontin was prescribed to Mr. Smith are not relevant to the claims raised in this action.

For ease of reference, responses to the comments concerning the alleged deficiencies in Mr. Smith's discovery responses are set forth below in a format that mirrors your August 12, 2005 letter.

Interrogatory No. 2

Mr. Smith objects to defendants' request for his social security number on the grounds that it is overly broad and seeks information which is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. In this age of identity theft, an individual's social security number is sacrosanct and should be protected vigilantly. Furthermore, defendants have not provided any reason why they need Mr. Smith's social security number. Therefore, absent a court order, Mr. Smith will not disclose his social security number. With respect to your

Patrick J. Murray, Esq.
August 26, 2005
Page 2

inquiry regarding Mr. Smith's marital history and spousal information, such information is
irrelevant. Mr. Smith also objects to providing any additional information about his children, as
that information likewise is irrelevant.

Interrogatory No. 3

Mr. Smith has lived at the address provided in response to interrogatory number 3 for the
last ten years. Mr. Smith objects to providing additional information about who resided with him
at that address for the last ten years.

Interrogatory No. 5

As you requested, Mr. Smith provides the following addition information about his
employment history. From April 2004 to present Mr. Smith has been self employed as a
carpenter; from 2000 to April 2004 Mr. Smith worked for Abe Hodgen of Hodgen Farms; from
April 1999 to September 1999 Mr. Smith worked for Nucor Steel; from 1992-1999 Mr. Smith
worked in construction and carpentry for McFarland Construction, Roachdale Building Supplies
and was self employed.

Interrogatory No. 7

Mr. Smith has never been convicted of a criminal offense.

Interrogatory No. 8

Your understanding of limits Mr. Smith has placed on his answers is mistaken. As set
forth above, Mr. Smith has not and will not produce information about drugs other than
Neurontin, but will and has produced information about treatment he received for injuries
sustained in a March 1999 car accident. Subject to this clarification, the information requested in
interrogatory number 8 is available from documents previously produced by plaintiff to
defendants. In addition, Mr. Smith received chiropractic treatment from Dr. Gary Fuller of
Brownsburg, Indiana, whose records Mr. Smith is in the process of obtaining. Mr. Smith will
immediately provide such documents to defendants upon his receipt of the same.

Interrogatory No. 9

Mr. Smith reiterates his objection to this interrogatory on the grounds that it is overly
broad, unduly burdensome and seeks information that is not relevant and not reasonably
calculated to lead to the discovery of admissible evidence. Accordingly, Mr. Smith provides no
additional information in response to this interrogatory.

Interrogatory No. 10

Mr. Smith provides additional information in response to the following subsections:

Patrick J. Murray, Esq.
August 26, 2005
Page 3

(d) Mr. Smith was not aware of any reactions or side effects of taking Neurontin.

(e) Mr. Smith took Neurontin according to a prescription by a licensed physician, namely Dr. Huler, though he stopped taking it on his own initiative in approximately April 2001 because he did not think it was ineffective for treating his condition.

(i) While Dr. Huler prescribed Mr. Smith Neurontin for an indication not approved by the FDA, Dr. Huler did not inform Mr. Smith that Neurontin was for an indication not approved by the FDA.

Interrogatory No. 11

Turning first to the scope of Mr. Smith's discovery responses, your stated understanding that Dr. Huler was the only health care professional from whom Mr. Smith received treatment for headaches and pain is inaccurate. Mr. Smith received treatment for the injuries he sustained in the March 1999 car accident from several other health care professionals, the records of whom have previously been produced to defendants.

Addressing your specific requests about details of Mr. Smith's condition and treatment, Mr. Smith previously indicated that he suffered severe headaches and pain as a result of an auto accident in March 15, 1999. The details of treatment Mr. Smith received for these injuries are contained in the medical records Mr. Smith previously produced to defendants.

Interrogatory No. 12

Mr. Smith took Neurontin in compliance with instructions prescribed by Dr. Huler, until he decided on his own accord to cease taking that drug altogether in approximately April 2001. Moreover, as indicated *supra*, Mr. Smith was unaware of any side effects of taking Neurontin.

Interrogatory No. 13

Mr. Smith took Neurontin for an off-label use. Mr. Smith was not aware that he was taking Neurontin for an off-label use at the time he was taking it. He first became aware of the issue of Neurontin illegally being prescribed for off-label uses when he saw a news report on television about defendants' guilty plea in or about May 2004. Based on that news report, Mr. Smith contacted his lawyer, and subsequently learned that he indeed had been prescribed Neurontin for an off-label use.

Interrogatory No. 15

Other than what may be contained in the medical records Mr. Smith already produced to defendants, Mr. Smith does not recall any other instructions, directions or warnings given to him concerning the proper use of Neurontin, other than his non-specific and general recollection that Dr. Huler told him to take it on a regular basis and that if he missed a dose he should not try to make it up.

Patrick J. Murray, Esq.
August 26, 2005
Page 4

Interrogatory No. 16

In addition to information contained in response to other interrogatories and/or responsive information that may be contained in the medical records Mr. Smith already produced to defendants, Mr. Smith further indicates that Dr. Huler told him she was prescribing Neurontin to him for the following conditions suffered as a result of the March 1999 automobile accident: disorientation, motion sickness, headaches, and lack of concentration. She also told him, in words or substance, that Neurontin was supposed to straighten out his brain signals.

Interrogatory No. 17

Mr. Smith states that Neurontin did not relieve his headaches or neuropathic pain. He is not in a position to opine on what other people believed.

Interrogatory No. 20

Please see Mr. Smith supplemental response to interrogatory number 13 above.

Interrogatory No. 21

Mr. Smith does not know whether Dr. Huler attended any seminars or events at which the use of Neurontin was discussed.

Interrogatory No. 23

To clarify, the documents Mr. Smith previously produced contain information regarding money spent he spent on Neurontin.

Interrogatory No. 24

Mr. Smith seeks to recover the economic injury he incurred as a result of purchasing defendants' drug, which was a mere placebo.

Interrogatory No. 25

The amount of money that was contributed by Mr. Smith's insurer is indicated in the pharmacy documents he previously produced to defendants. Mr. Smith supplements his response to provide that the total amount he personally paid for Neurontin was $196 and that his insurer paid was $1,737.16.

This letter will also serve to confirm that Mr. Smith's answers to interrogatories numbers 18, 19, and 20 are "no."

In addition, enclosed please find the signature page from Mr. Smith's earlier Answers and Objections to Defendants' First Set of Interrogatories to Plaintiff Gerald Smith.

Patrick J. Murray, Esq.
August 26, 2005
Page 5

   Finally, this letter will confirm that during our conversations earlier today regarding the
scheduling of Dr. Huler's and Mr. Smith's depositions, we agreed to follow up with you no later
than this coming Tuesday.

                                        Very truly yours,

                                        Richard E. Shevitz
                                        Eric S. Pavlack

ESP/smb

whether the coverage is provided by or through your employer, former employer, a labor organization, or otherwise.

## ANSWER TO INTERROGATORY NO. 25:

Plaintiff objects to this interrogatory on the grounds that it is overbroad, unduly burdensome and seeks information that is not relevant and not reasonably calculated to lead to the discovery of admissible evidence, and on the additional grounds that it seeks information that is not in the possession or control of the Plaintiff.

Subject to, and as limited by, and without prejudice to the foregoing objections, and to the extent this request relates to treatment for Plaintiff's medical condition as set forth in the Complaint, Plaintiff further responds that to the extent that the requested information is available from documents within Plaintiffs' possession and control, such documents, as they relate to treatment for Plaintiff's medical condition as set forth in the Complaint, will be produced to Defendants. Plaintiff further responds: see Answers to Interrogatories 8, 10, 11 and 15. Plaintiff further responds that Plaintiff expended approximately $194.00 to purchase Neurontin.

I affirm under penalties for perjury that the foregoing statements are true and correct to the best of my knowledge and belief:

_Gerald Smith_
Gerald Smith


As to objections:

COHEN & MALAD, LLP


By:    /s/ Irqin B. Levin
Irwin B. Levin
Richard E. Shevitz


21

**EXHIBIT 40**

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| IN RE NEURONTIN MARKETING AND SALES PRACTICES LITIGATION | ) ) ) ) | MDL Docket No. 1629 |
| THIS DOCUMENT RELATES TO: ALL CLASS ACTIONS | ) ) ) ) | Master File No. 04-10981 |
|  |  | Judge Patti B. Saris |

**DEFENDANTS' FIRST REQUEST FOR PRODUCTION OF DOCUMENTS TO PLAINTIFF LOUISIANA HEALTH SERVICE INDEMNITY COMPANY dba BLUECROSS/BLUESHIELD OF LOUISIANA**

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, Defendants Pfizer

Inc. and Warner Lambert Company (hereinafter "Defendants"), hereby demand that in

accordance with the Definitions and Instructions set forth below, Plaintiff Louisiana

Health Service Indemnity Company dba BlueCross/BlueShield of Louisiana

("BCBSLA") produce all documents requested herein for inspection and copying at the

offices of Davis Polk & Wardwell, 450 Lexington Avenue, New York, New York 10017,

within thirty (30) days of the date of service hereof.

**DEFINITIONS**

1.     The definitions contained in Rule 26.5 of the Local Rules of the United

States District Court for the District of Massachusetts are incorporated herein by

reference.  Additionally, the following definitions apply.

2.     "Plaintiff" or "BCBSLA" shall mean Louisiana Health Service Indemnity

Company dba BlueCross/BlueShield of Louisiana and any of its past or present trustees,

officials, officers, fiduciaries, third-party administrators, representatives, assigns,

employees, divisions, departments, directors, executives, predecessors or successors in interest, offices, subsidiaries, and affiliates.

    3.    "You" or "your" means BCBSLA.

    4.    "Pfizer" shall mean defendant Pfizer Inc. and any of its predecessors, divisions, offices, subsidiaries, affiliates, and any present or former directors, officers, executives, trustees, or employees, including, but not limited to, Warner-Lambert and Parke-Davis, as a division of Warner-Lambert Company.

    5.    "Warner-Lambert" shall mean defendant Warner-Lambert Company LLC and any of its predecessors or successors in interest, divisions, offices, subsidiaries, affiliates, and any present or former directors, officers, executives, trustees, or employees, including, but not limited to, Parke-Davis, as a division of Warner-Lambert Company.

    6.    "Parke-Davis" shall mean Parke-Davis, a division of Warner-Lambert Company, and any of its predecessors or successors in interest, divisions, offices, subsidiaries, affiliates, and any present or former directors, officers, executives, trustees, or employees.

    7.    "Complaint" shall mean the Amended Class Action Complaint, filed on February 1, 2005 in connection with MDL Docket No. 1629, Civil Action No. 04-10981-PBS, in the United States District Court for the District of Massachusetts.

    8.    "Action" shall mean the proceeding pending in the United States District Court for the District of Massachusetts captioned *In re: Neurontin Marketing and Sales Practices Litigation*, 04-10981-PBS.

2

9.     The term "Member" shall include the terms "participant," "beneficiary'"
and "policy holder," and means persons for whom the Plaintiff provides health care
benefits, health insurance coverage and/or provides prescription drug benefits, including
the dependents of such persons.

10.     The term "provider" shall mean any physician, hospital, medical or health
professional, pharmacy, or other person or entity that provides medical care.

11.     The term "Plan" shall mean the legal document detailing a Member or
group's insurance or benefit coverage, and shall include the terms "certificate of
coverage," "certificate of insurance," "evidence of coverage," and "summary plan
description."

12.     The term "drug," unless otherwise indicated, shall mean a substance used
in the diagnosis, treatment, or prevention or a disease or as a component of a medication,
and shall include both prescription and non-prescription drugs.

13.     The term "off-label" shall mean the prescription or use of a drug for
indications or at dosages different from those set forth in a drug's labeling.

14.     "DRUGDEX" shall mean the proprietary reference service or product sold,
licensed, or marketed by MICROMEDIX under the name DRUGDEX®.

15.     "Third-party payor" shall mean a non-governmental entity that is at risk,
pursuant to a contract, policy, or plan providing prescription drug coverage to natural
persons, to pay or reimburse the amount or some part of the amount associated with the
cost of prescription drugs to those natural persons covered by such contract, policy, or
plan.

3

16.    The term "policy" shall mean the written document issued by an insurance company or a third party payor to the policy owner, representing the written contract between the insurance company or third party payor and the policy owner, and describing the term, coverage, premiums and deductibles.

17.    The term "claim" shall mean notification to an insurance company or third party payor requesting payment of an amount due under the terms of the policy.

18.    The term "formulary" shall mean the list of preferred generic and brand-name drugs covered under Plaintiff's Plan.

19.    "And" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the request any information that might otherwise be construed to be outside its scope.

20.    "Any" includes the word "all" and vice-versa.

21.    "Communication" shall have the meaning set forth in Local Rule 26.5

22.    "Concerning" shall have the meaning set forth in Local Rule 26.5.

23.    "Document" shall have the meaning set forth in Rule 34(a) of the Federal Rules of Civil Procedure and Local Rule 26.5, and includes all forms of writings as defined in Rule 1001(1) of the Federal Rules of Evidence.

24.    "Meeting" shall mean any formal or informal assembly, convocation, encounter or contemporaneous presence of two or more Persons for any purpose and shall include telephone conferences and calls.

4

25.    "Person" or "Persons" shall mean any individual, corporation, organization, association, partnership, limited partnership, firm, joint venture, trustee, governmental body, agency, governing board, department or division, or any other entity.

26.    "Relating to" shall mean concerning.

## INSTRUCTIONS

1.    The singular form of a noun or pronoun shall include within its meaning the plural form of the noun or pronoun and vice versa; the masculine form of a pronoun shall include within its meaning the feminine form of the pronoun and vice versa; and the use of any tense of any verb shall include within its meaning all other tenses of the verb.

2.    This request is intended to cover all documents in your possession or subject to your custody or control.  This request is also intended to cover any and all documents you are authorized to retrieve.

3.    Each request for a document contemplates production of the document in its entirety, without abbreviation or expurgation.

4.    If any requested documents cannot be produced in full, produce them to the extent possible, specifying each reason for your inability to produce the remainder thereof and stating whatever information, knowledge, or belief you have concerning the unproduced portion.

5.    If any document is no longer in your possession, custody, or control and cannot be retrieved by you, identify the document in detail and state with specificity the location(s) of the document.

5

6.     This request is of continuing effect, and to the extent that any time after the production of documents called for by this request, you become aware of or acquire additional documents responsive to this request, such documents shall be produced promptly.

7.     If Plaintiff knows of information responsive to any of these requests that is in the custody, possession or control of a third person, identify the information and the person(s) possessing it.

8.     If Plaintiff claims that any document to be produced is privileged or constitutes attorneys' work product, Plaintiff is requested to submit a written statement that describes the nature of the documents not produced as required under the Federal Rules of Civil Procedure.

9.     In the event that any information is redacted from a Document produced pursuant to this Document Request, that information is to be identified and the basis upon which such information is redacted should be fully stated.

10.     Documents shall be produced as they are or have been kept in the ordinary course, including the original file folder and label or other similar identification devices, or shall be organized and labeled to identify any file number, file name, or any other file identification system utilized by the responding party, as well as the location and custodian of such records.

11.     When a request calls for the production of an electronic database file or Data File, this file must be produced in a form compatible with Microsoft Access, or in any other format agreed to by the parties.

6

12.    To the extent that you view any document request as vague or imprecise, counsel for Defendants offer to confer with counsel for Plaintiff as to the intended scope of such document request.

## DOCUMENT REQUESTS

Request No. 1

Provide all documents concerning the number of prescriptions for off-label uses for which Plaintiff paid or reimbursed Members, providers, pharmacies, or any other person or entity, and the dollar amounts of all such payments or reimbursements for off-label prescriptions.

Request No. 2

Provide all documents concerning the number of prescriptions for Neurontin for which Plaintiff paid or reimbursed Members, providers, pharmacies, or any other person or entity, and the dollar amounts of all such payments or reimbursements, broken down into (a) off-label prescriptions for Neurontin; and (b) prescriptions of Neurontin for approved indications.

Request No. 3

All marketing materials, marketing information, and related documents received from any manufacturer or supplier of prescription drugs or prescription drug benefits concerning Neurontin.

Request No. 4

All documents concerning any communication between Plaintiff, any third-party Plan Administrator or Preferred Provider, including insurance companies, Plaintiff's Members or anyone acting on their behalf, and any provider or pharmacy relating to

7

Neurontin, including but not limited to payments, prior authorizations, pre-approvals, or coverage of claims.

Request No. 5

All invoices, advertisements, catalogs or industry publications concerning Neurontin.

Request No. 6

All documents concerning claims, coverage, benefits, pricing, or reimbursement for Neurontin.

Request No. 7

All formulary documents concerning Neurontin.

Request No. 8

All documents from any formulary committee, or any other committee with similar functions, concerning Neurontin, including but not limited to presentations, meeting minutes, and evaluations of Neurontin.

Request No. 9

All documents concerning Neurontin from any committee, team, council, or other group of employees, that discussed, recommended, approved, denied, or otherwise considered the inclusion of Neurontin in Plaintiff's formulary, the payment or denial of Neurontin claims, the payment of denial of off-label uses of Neurontin, or otherwise addressed Neurontin.

8

Request No. 10

All documents concerning any communication or interaction between Plaintiff,

any third-party Plan Administrator or Preferred Provider, including insurance companies,

Plaintiff's Members or anyone acting on their behalf, and any Defendant.

Request No. 11

All documents concerning any statements obtained by the Plaintiff from any

person having, or purporting to have, knowledge or information pertaining to Neurontin.

Request No. 12:

All documents concerning any opinion by any person with an M.D., Ph.D., D.O.,

M.P.H., or D. Sc., pharmacy degree, or by any similarly trained or educated health care

professional or scientist, concerning Neurontin.

Request No. 13

Copies of all newspaper, magazine or medical journal articles which discuss, refer

or relate to the use of Neurontin for off-label uses.

Request No. 14:

Copies of all promotional or marketing materials or other documents regarding

the use of Neurontin.

Request No. 15

Copies of all promotional or marketing materials or other documents regarding

the use of Neurontin that Plaintiff alleges were provided by Defendants to any physician

who prescribed Neurontin to Plaintiff's Members.

9

Request No. 16:

Copies of each medical article, treatise, research study, publication, or other document regarding the use of Neurontin for the treatment of off-label uses.

Request No. 17

Copies of all documents that provide information about the approved indications for Neurontin or that indicate that Neurontin was not approved by the FDA for certain uses.

Request No. 18

All records showing the dollar amounts for reimbursements or payments of prescriptions or costs of drugs prescribed for off-label uses from the period 1994 through the present, and the percentage the off-label payments represent of total reimbursements and costs for all claims during that period.

Request No. 19

One representative copy of each document sent to Members, physicians, pharmacies, medical centers, hospitals, the government, or any other entities in which Plaintiff expresses its policy towards or information about payment for off-label prescriptions.

Request No. 20

One representative copy of each document sent to Members, physicians, pharmacies, medical centers, hospitals, the government, or any other entities in which Plaintiff expresses its policy towards or information about payment for anti-epileptic drugs, whether for on-label or off-label indications.

10