21

in it.[76]

Here, of course, ES and LBC gained no rights in the drugs. They did not take title to or possess them. They never had any right to obtain or use the drugs in any way.[77] Indeed, the HBPs had no relationship to the drugs at all other than indirectly funding their purchase. If a pharmacy's or warehouse's supply of medications were destroyed, the HBPs would have sustained no loss. All of the incidents of ownership, including the right to use and dispose and the risk of loss, lay with Medco or the retail pharmacies before dispensation and with the patients themselves afterward.

Paying for part of the cost of something is not the same as buying it. To be sure, a few cases have treated the lessor in a commercial leasing arrangement – a party that buys a good from a supplier and then leases it to the party that actually uses it, and who may have the option to "buy" it for nominal consideration at the end of the lease term – as a buyer for UCC purposes.[78] In those cases, the lessor's role in substance is that of financier. The lessor advances to the lessee the funds needed to acquire the good from the supplier. And yet, even in such a situation, the lessor has certain rights in the goods – at least some kind of security or reversionary interest – that are relinquished only when the lessee has paid the lessor the full purchase price of the good, plus

---

[76]

The plaintiffs make much of the fact that the UCC itself states that UCC provisions apply irrespective of title unless a provision specifically indicates otherwise. *See* U.C.C. § 2-401. The plaintiffs may be right, but it does not affect the main point here, which is that being a buyer depends on acquiring some kind of ownership rights, even if those do not amount to title in a technical sense.

[77]

*See* Tr. (May 12, 2005) ("Tr.") at 26-27.

[78]

*See Midwest Precision Servs., Inc. v. PTM Indus. Corp.*, 887 F.2d 1128, 1131-34 (1st Cir. 1989); *Evco Distributing, Inc. v. Commercial Credit Equip. Corp.*, 6 Kan. App. 205, 627 P.2d 374 (Ct. App. 1981).

interest. Here, of course, the HBPs did not even have such rights. The plaintiffs have cited no cases, and the Court is aware of none, allowing a party with no residual rights in, or risk in relation to, a good to assert claims under the UCC as a buyer of it.

Nor is this outcome a result of empty formalism. Warranty remedies are based on the theory that anyone who acquires a good in exchange for consideration has a right to recover where the good acquired is worth less than it would have been worth absent a breach of warranty.

That theory is inapplicable here. The HBPs cannot argue that they did not get what they bargained for because the respects in which Rezulin is said to have fallen short of the warranties – safety and efficacy – pertain, for purposes of this lawsuit, only to the patients who consumed the drug. To be sure, Rezulin's alleged deficiencies might cause the HBPs to pay for treatment in connection with catastrophic liver failure or future medical monitoring of past Rezulin users. Any such expenses, however, would have been derivative of injuries suffered by patients. In any case, the HBPs are not asserting derivative injuries in this lawsuit.[79] Rather, the HBPs assert only that they paid more for diabetes therapy than they would have absent WL's alleged misconduct, both because they paid for more Rezulin prescriptions in aggregate and because each individual prescription cost more than it otherwise would have cost. That is injury to be sure, but it is not the sort of injury that

---

[79] The HBPs had to pay as well for substitutes for Rezulin that was dispensed prior to its withdrawal in March 2000 and that subsequently went unused. These so-called "medicine cabinet" costs are a direct, non-derivative injury because the HBPs presumably had to pay for two therapies per patient for the relevant time periods. The claims in relation to "medicine cabinet" injury, however, are separate from the warranty claims and are taken up below.

23

warranty claims are designed to remedy.[80]

Finally, there may be good policy reasons to give HBPs remedies where pharmaceutical manufacturers make misrepresentations about their products. The UCC, however, is a statute, and the Court presumes that it means what it says. So far, none of the legislatures in any of the 25 UCC jurisdictions identified in the complaint has modified the code to permit recovery on a warranty theory by an HBP against a pharmaceutical manufacturer where the HBP was not a buyer of the drugs. For this Court to achieve the same result under the guise of interpretation would be an arrogation of a power conferred in our system solely upon the legislative branch.

---

[80]    Indeed, when the Second Circuit pointed out that an HBP could suffer injury even if its beneficiaries did not, it spoke of fraud, not warranty:

> "Consider . . . a hypothetical in which a defendant drug company markets a 'new,' much more expensive drug claiming it is a great advancement (safer, more effective, etc. than metformin–the standard diabetes drug) when in fact the company is simply replicating the metformin formula and putting a new label on it. In other words, the only difference between metformin and the 'new' drug is the new name and the higher prescription price (paid almost entirely by the insurance company). In that case, the 'new' drug would be *exactly* as safe and effective as metformin, and thus there could be no injury to any of the insurance company's insured. Nevertheless, the insurance companies would be able to claim–precisely as they do here–that the defendants engaged in a scheme to defraud it, and that the company suffered direct economic losses as a result." 326 F.3d at 349-350.

More importantly, though, the Circuit's discussion assumed – because the complaint alleged – the very proposition in question here – that the HBPs were purchasers or buyers. *See id.* at 349. Indeed, this necessary assumption, and not the federal antitrust cases that the court cited in *dicta*, was dispositive. *See id.* at 350-51.

24

*B.     Louisiana*

The result is the same in Louisiana. The Louisiana's Civil Code creates a cause of

action for redhibition, which is analogous to breach of warranty.[81] The plain terms of the redhibition

statute give the cause of action to a buyer. Louisiana courts have noted that a plaintiff asserting a

redhibition claim must prove, among other things, that "the seller sold the thing to him."[82] Louisiana

defines a "sale" as "a contract whereby a person transfers ownership of a thing to another for a price

in money."[83] Ownership in turn is defined as "the right that confers on a person direct, immediate,

_____

[81]

The relevant provision is as follows:

"The seller warrants the buyer against redhibitory defects, or vices, in the thing
sold.

"A defect is redhibitory when it renders the thing useless, or its use so inconvenient
that it must be presumed that a buyer would not have bought the thing had he
known of the defect. The existence of such a defect gives a buyer the right to obtain
rescission of the sale.

"A defect is redhibitory also when, without rendering the thing totally useless, it
diminishes its usefulness or its value so that it must be presumed that a buyer
would still have bought it but for a lesser price. The existence of such a defect
limits the right of a buyer to a reduction of the price." LA. CIV. CODE ANN. art.
2520.

*See also McNeeley v. Ford Motor Co.*, 98-2139 (La. App. 1 Cir. 12/28/99), 763 So.2d 659,
669 ("Redhibition is the avoidance of a sale on account of some vice or defect in the thing
sold that renders it either absolutely useless, or its use so inconvenient and imperfect, that
it must be supposed that the buyer would not have purchased it, had he known of the vice.
A buyer may bring an action against all sellers in the chain of sales back to the primary
manufacturer to rescind the sale for breach of an implied warranty." (citation omitted)).

[82]

*Id.*

[83]

LA. CIV. CODE ANN. art. 2439.

and exclusive authority over a thing."[84] Here, as discussed above, the HBPs did not gain ownership of the drug within the meaning of the Louisiana Civil Code. The plaintiffs cite no authority for the proposition that in Louisiana, one who supplies part of the payment for a good thereby becomes a buyer of it. For these reasons and the others discussed above in connection with the UCC, the Court concludes that LBC was not a buyer of Rezulin within the meaning of Article 2520 of the Louisiana Civil Code.

## VI.   Claims under Consumer Protection Statutes

### A.      Choice of Law

The plaintiff has asserted claims under the consumer protection and deceptive trade practices statutes of 26 states. These regimes are quite varied. Furthermore, Louisiana has no consumer protection or deceptive trade practices statute conferring a private right of action. It therefore is necessary to make choice of law determinations.

### 1.      ES's Claims

The potentially relevant states are (1) New York, the state in which ES is based and in which it suffered injury, and (2) New Jersey, the state in which WL and Medco are based and in which WL made the alleged misrepresentations to Medco.[85]

---

[84]      *Id.* art. 477.

[85]      The claims asserted under the consumer protection and deceptive trade practices statutes of the other 25 states are immaterial. Rezulin was dispensed to ES's members in a number of states, but ES is not suing derivatively for injury to its members. The only injury asserted here – namely the loss ES allegedly suffered when it overpaid for diabetes drugs – occurred in New York. Likewise, the conduct at issue – for the most part, communications made by WL and received by Medco – occurred between two New Jersey-based corporations. There

26

In tort cases, New York aims to give "controlling effect to the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issue raised in the litigation."[86] Under this "interest analysis," "[i]f conflicting conduct-regulating laws are at issue, the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders."[87] In this case, that is New York because that is where ES allegedly suffered injury.[88] While New Jersey has an interest in regulating a corporation with its principal of business there, New York's interest in protecting its citizens against injury from deceptive practices is at least as great as New Jersey's interest in preventing its citizens from committing such practices. The Court therefore applies New York law and proceeds to examine ES's claim under Section 349 of the New York General Business Law. The claims under the consumer protection and deceptive trade practices

---

is nothing in the record to suggest that activities in connection with the misrepresentations occurred anywhere other than New Jersey and, perhaps, New York.

[86]

*Cooney v. Osgood Mach., Inc.*, 81 N.Y.2d 66, 72, 595 N.Y.S.2d 919, 922 (1993) (quoting *Babcock v. Jackson*, 12 N.Y.2d 473, 481, 240 N.Y.S.2d 743, 749 (1963)); *see also Miller v. Miller*, 22 N.Y.2d 12, 15-16, 290 N.Y.S.2d 734, 736-37 (1968).

[87]

*Cooney*, 81 N.Y.2d at 72, 595 N.Y.S.2d at 922; *accord Padula v. Lilarn Props. Corp.*, 84 N.Y.2d 519, 521-22, 620 N.Y.S.2d 310, 311 (1994) ("a distinction must be made between a choice-of-law analysis involving standards of conduct and one involving the allocation of losses. In the former case the law of the place of the tort governs." (citation omitted)).

[88]

*See Schultz v. Boy Scouts of America, Inc.*, 65 N.Y.2d 189, 195, 491 N.Y.S.2d 90, 93-94 (1985) ("when the defendant's negligent conduct occurs in one jurisdiction and the plaintiff's injuries are suffered in another, the place of the wrong is considered to be the place where the last event necessary to make the actor liable occurred. Thus, the locus in this case is determined by where the plaintiffs' injuries occurred." (citation omitted)); *accord Ackerman v. Price Waterhouse*, 252 A.D.2d 179, 192-93, 683 N.Y.S.2d 179, 189 (1st Dep't 1998) ("The place of occurrence of the tort will be where the plaintiff suffered the injury sued upon.").

27

statutes of all other states, insofar as they are asserted by ES, are dismissed.

### 2.    LBC's Claims

Louisiana's choice of law statute provides:

"Except as otherwise provided in this Book, an issue in a case having contacts with other states is governed by the law of the state whose policies would be most seriously impaired if its law were not applied to that issue.

"That state is determined by evaluating the strength and pertinence of the relevant policies of all involved states in the light of: (1) the relationship of each state to the parties and the dispute; and (2) the policies and needs of the interstate and international systems, including the policies of upholding the justified expectations of parties and of minimizing the adverse consequences that might follow from subjecting a party to the law of more than one state."[89]

Louisiana has no statute creating a private right of action for consumer fraud or deceptive trade practices. New Jersey has such a statute.[90] The question therefore is which state's policies would be impaired more seriously by application of the laws of the other.

If Louisiana's law were applied here, New Jersey's policies would be impaired in that a New Jersey-based company that marketed its products in New Jersey and elsewhere could escape the application to it of New Jersey's statute. On the other hand, if New Jersey's law were applied here, it is difficult to see how any policy of Louisiana's would be impaired.[91] No one suggests that

---

[89]

LA. CIV. CODE ANN. art. 3515; *accord Champagne v. Ward*, 2003-3211, p.22 (La. 1/19/05), 893 So. 2d 773, 786.

[90]

*See* N.J. STAT. ANN. §§ 56:8-2, 56:8-2.11, 56:8-2.12 (West 2005).

[91]

One might stretch to say that the absence of the relevant type of statute could be regarded as a policy against chilling corporations from conducting consumer-related business in Louisiana. However, because the plaintiff here is a Louisiana entity, and the defendant is a national pharmaceutical corporation whose marketing activities presumably were similar in most states, there seems to be little concern that the application of New Jersey law to this

28

Louisiana affirmatively decided not to afford protection against deceptive trade practices.  It simply

has not enacted a comparable statute.  Given the relationships of the parties and Medco to New

Jersey and the strong New Jersey policies at issue, the Court concludes that Louisiana would

examine LBC's claim under New Jersey's Consumer Fraud Act. The claims under the consumer

protection and deceptive trade practices statutes of all other states, insofar as they are asserted by

LBC, are dismissed.

B.     *ES's Claim: Section 349 of New York's General Business Law*

        Section 349 of New York's General Business Law provides as relevant here:

        "(a) Deceptive acts or practices in the conduct of any business, trade or commerce
        or in the furnishing of any service in this state are hereby declared unlawful.

                                        *    *    *

        "(h) . . . any person who has been injured by reason of any violation of this section
        may bring an action . . . to recover his actual damages . . . ."

        A plaintiff asserting a Section 349 claim "must prove three elements: first, that the

challenged act or practice was consumer-oriented; second, that it was misleading in a material way;

and third, that the plaintiff suffered injury as a result of the deceptive act."[92]

        WL makes four arguments regarding ES's Section 349 claim: (1) ES, as a third-party

payer, lacks standing, (2) the causation requirement is not met here, (3) ES does not challenge

"consumer-oriented" conduct, and (4) WL benefits from a safe harbor in the statute for conduct in

---

        dispute would contravene a hypothetical Louisiana policy of avoiding the chilling of any
        business activities.

[92]

        *Stutman v. Chem. Bank*, 95 N.Y.2d 24, 29, 709 N.Y.S.2d 892, 895 (2000).

compliance with federal regulations.[93] The Court finds it necessary to consider only the third of these arguments.

> The New York Court of Appeals has explained:

> "As shown by its language and background, section 349 is directed at wrongs against the consuming public. General Business Law article 22-A, of which section 349 is a part, is entitled 'Consumer Protection from Deceptive Acts and Practices.' The structure of the law, with the Attorney-General initially wielding sole enforcement power in the name of the State, speaks to its public focus. Finally, the Governor's Memorandum approving the bill (L.1970, ch. 43) lauds its consumer-protective purpose . . . . Thus, as a threshold matter, plaintiffs claiming the benefit of section 349– whether individuals or entities such as the plaintiffs now before us–must charge conduct of the defendant that is consumer-oriented."[94]

Furthermore, in the same decision, the Court of Appeals, in order to avoid "a tidal wave of litigation against businesses that was not intended by the Legislature," adopted "an objective definition of deceptive acts and practices" as "those likely to mislead a reasonable consumer acting reasonably under the circumstances."[95]

> This authoritative construction of Section 349 controls the disposition of ES's claim. The conduct for which ES seeks to hold WL liable was directed at Medco, not at diabetes patients. It consisted of WL's efforts to persuade Medco, a large and sophisticated business, to include Rezulin in its formularies. The nature of this marketing effort – communication from one

---

[93]
    *See* N.Y. GEN. BUS. LAW § 349(d) (McKinney 2005).

[94]
    *Oswego Laborers' Local 214 Pension Fund*, 85 N.Y.2d at 24-25, 623 N.Y.S.2d at 532; *accord Gaidon v. Guardian Life Ins. Co. of America*, 94 N.Y.2d 330, 343, 704 N.Y.S.2d 177, 182 (1999) ("General Business Law § 349 was enacted initially to give the Attorney General enforcement power to curtail deceptive acts and practices–willful or otherwise– directed at the consuming public.").

[95]
    *Oswego Laborers' Local 214 Pension Fund*, 85 N.Y.2d at 26, 623 N.Y.S.2d at 533; *accord Gaidon*, 94 N.Y.2d at 344, 704 N.Y.S.2d at 183.

30

sophisticated business to another – was quite different from that of any promotion aimed directly at diabetes patients.[96]

A closely analogous case is *St. Patrick's Home for the Aged and Infirm v. Laticrete International, Inc.*[97] There the plaintiff nursing home sued the defendant manufacturer for damage sustained when the construction and installation of the home's exterior wall, which had been manufactured by Laticrete, proved to be defective. The nursing home sought to recover on the theory that Laticrete had made misrepresentations about its products to the firm that St. Patrick's had hired to install the panels. The Appellate Division dismissed the Section 349 claim because:

> "Laticrete's sale of the [panels] to [the installer] did not constitute consumer-oriented conduct. The transaction in this case was a sizable one between two companies in the building construction and supply industry. It did not involve any direct solicitation by Laticrete, which had no contact with the plaintiff, the ultimate consumer. Significantly, sophisticated business entities such as [the construction manager], [the project architect] and [the installer] acted in an intermediary role in the transaction, thereby reducing any potential that a customer in an inferior bargaining position would be deceived."[98]

The same is true of this case. The inclusion of Rezulin in Medco's formularies had sizeable economic consequences and occurred as a result of communications made and received by two large companies in the pharmaceutical industry. The representations that WL made to Medco were not intended for diabetes patients, the ultimate consumers. A sophisticated business entity –

---

[96] As anyone who watches television nowadays knows, some prescription drugs are promoted directly to potential users. The record is silent as to whether that occurred with respect to Rezulin. But that is immaterial. The injury complained of in this case is that caused by WL's alleged deception of Medco, another large and sophisticated business entity.

[97] 264 A.D.2d 652, 696 N.Y.S.2d 117 (1st Dep't 1999).

[98] 264 A.D.2d at 655, 696 N.Y.S.2d at 122 (citations omitted).

31

Medco – acted in an intermediary role, thus reducing the potential that parties in an inferior

bargaining position – diabetes patients or even, arguably, ES – would be deceived.

    To be sure, some of the cases, albeit perhaps speaking more broadly than their facts

warranted, have defined "consumer oriented" as referring to conduct having "a broad impact on

consumers at large."[99] And it is undeniable that WL's motive for persuading Medco to include

Rezulin in its formulary was to increase consumption of the drug. Even such a broad definition of

"consumer oriented," however, would not save ES's claim. The alleged misconduct at issue here

did not have any broad impact relevant to this case on diabetes patients at large.[100] It had a broad

impact, if any, on the HBPs. It was they who allegedly overpaid for diabetes treatment. Indeed, the

plaintiffs' position is that whenever WL promoted Rezulin to Medco, the true targets were the HBPs.

But HBPs are not consumers.[101] Accordingly, even under a broad definition, WL's representations

---

[99] *See, e.g., U.W. Marx, Inc. v. Bonded Concrete, Inc.*, 7 A.D.3d 856, 858, 776 N.Y.S.2d 617, 619 (3d Dep't 2004); *Scott v. Bell Atlantic Corp.*, 282 A.D.2d 180, 183, 726 N.Y.S.2d 60, 63 (1st Dep't 1999); *see also In re Pharm. Ind. Average Wholesale Price Litig.*, 339 F. Supp. 2d 165, 181-83 (D. Mass. 2004).

[100] The parties have not pointed to any evidence that diabetes patients paid higher copayments for Rezulin than they would have paid for an alternative. Even if there were such evidence, it is not clear that it would be material, given the prohibition discussed above on claims for derivative injury.

[101] "'Consumers' are 'those who purchase goods and services for personal, family or household use.'" *Med. Soc'y of State of New York v. Oxford Health Plans, Inc.*, 15 A.D.3d 206, 790 N.Y.S.2d 79, 79 (1st Dep't 2005) (quoting *Sheth v. New York Life Ins. Co.*, 273 A.D.2d 72, 73, 709 N.Y.S.2d 74, 75 (1st Dep't 2000) (citing *Cruz v. NYNEX Info. Res.*, 263 A.D.2d 285, 289, 703 N.Y.S.2d 103, 106 (1st Dep't 2000))); *see also Black Radio Network, Inc. v. NYNEX Corp.*, 44 F. Supp. 2d 565, 583 (S.D.N.Y. 1999) (rejecting § 349 claim because "[a]lthough plaintiffs claim that they were acting as consumers and thus should be protected by the statute, in fact this case involves businesses engaged in arm's length transactions for services that are not available to the general public. Nor, of course, does the fact that consumers were the ultimate end-users convert the transaction into a consumer transaction.").

32

to Medco were not "consumer oriented" for purposes of Section 349. ES's Section 349 claim is dismissed.

C.    *LBC's Claim: New Jersey's Consumer Fraud Act*

As relevant here, New Jersey's Consumer Fraud Act authorizes a private action to gain a "refund" of moneys acquired by means of:

> "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby[.]"[102]

"Advertisement" in turn is defined to "include the attempt directly or indirectly by publication, dissemination, solicitation, indorsement or circulation or in any other way to induce directly or indirectly any person to enter or not enter into any obligation or acquire any title or interest in any merchandise or to increase the consumption thereof . . . ."[103] WL argues that LBC's claim fails, among other reasons, because LBC is not a "consumer."

As the New Jersey Supreme Court has explained, "[t]he Consumer Fraud Act . . . is aimed basically at unlawful sales and advertising practices designed to induce consumers to purchase merchandise or real estate."[104] The New Jersey courts have construed the statute to permit only a

---

[102]    N.J. STAT. ANN. §§ 56:8-2, 56:8-2.11, 56:8-2.12 (West 2005).

[103]    *Id.* § 56:8-1.

[104]    *Daaleman v. Elizabethtown Gas Co.*, 77 N.J. 267, 270, 390 A.2d 566, 568 (1978).

"consumer" to sue.[105] Although the courts are not in uniform agreement, a frequently used definition

of "consumer" in New Jersey is "one who uses (economic) goods, and so diminishes or destroys their

utilities."[106] Under this definition, LBC was not a consumer of prescription drugs. Cases declining

to adopt categorically this definition of "consumer" also do not avail the plaintiffs because even

those decisions appear to take it for granted that the plaintiff must in some sense be the one who

benefits from the use of the good or service in question.[107] LBC was no such thing. Accordingly,

---

[105]     *See Furst v. Einstein Moomjy, Inc.*, 182 N.J. 1, 12, 860 A.2d 435, 441 (2004) ("In furtherance of the Act's overarching remedial purpose, a *consumer* may file a private cause of action against an offending merchant whenever that *consumer* suffers an ascertainable loss as a result of a violation of the Act." (emphasis added)); *Weinberg v. Sprint Corp.*, 173 N.J. 233, 248, 801 A.2d 281, 290 (2002) ("More than a decade after the Act was passed, it was amended to permit *individual consumers* to bring private actions to recover refunds." (emphasis added)); *Med. Soc'y of N.J. v. AmeriHealth HMO, Inc.*, 376 N.J. Super. 48, 57, 868 A.2d 1162, 1168 (App. Div. 2005); *City Check Cashing, Inc. v. Nat'l State Bank*, 244 N.J. Super. 304, 309, 582 A.2d 809, 811 (N.J. Super. Ct. App. Div. 1990).

    The Court recognizes that one court has allowed a union health plan to sue a pharmaceutical manufacturer under the Consumer Fraud Act on the same grounds advanced here. *Int'l Union of Operating Eng'rs Local No. 68 Welfare Fund v. Merck & Co.*, No. ATL-L-3015-04, slip op. at 7-11 (N.J. Super. Ct. Law. Div. July 8, 2004). The decision, however, is of a trial court. To the extent that it is inconsistent with the state appellate authorities allowing only a consumer to sue, the Court declines to follow it.

[106]     *City Check Cashing*, 244 N.J. Super. at 309, 582 A.2d at 811; *accord Lithuanian Commerce Corp. v. Sara Lee Hosiery*, 179 F.R.D. 450, 469 (D.N.J. 1998); *Conte Bros. Auto, Inc. v. Quaker State-Slick 50, Inc.*, 992 F. Supp. 709, 716 (D.N.J. 1998); *Windsor Card Shops, Inc. v. Hallmark Cards, Inc.*, 957 F. Supp. 562, 567 n.6 (D.N.J. 1997); *cf. Kavky v. Herbalife Int'l of America*, 359 N.J. Super. 497, 502-06, 820 A.2d 677, 680-83 (App. Div. 2003) (rejecting the *City Check* definition of 'consumer' and noting that "the Act is concerned, not so much with the specific nature of the property, but rather with whether the property is generally made available to the public"); *Neveroski v. Blair*, 141 N.J. Super. 365, 378, 358 A.2d 473, 480 (App. Div. 1976) (observing that the statute reflects "an intent to protect the consumer in the context of the ordinary meaning of that term in the market place"); *J&R Ice Cream Corp. v. California Smoothie Licensing Corp.*, 31 F.3d 1259, 1273 (3d Cir. 1994) (same).

[107]     *See Kavky*, 359 N.J. Super. at 502-06, 820 A.2d at 680-83; *Neveroski*, 141 N.J. Super. at 378, 358 A.2d at 480; *J&R Ice Cream Corp.*, 31 F.3d at 1273-74 & n.14.

34

LBC's claim under New Jersey's Consumer Fraud Act is dismissed.

### VII.   Unjust Enrichment and Restitution

The unjust enrichment claim is based on the theory that WL's misrepresentations caused the plaintiffs to overpay for diabetes drugs and that WL's retention of the benefit from sales of Rezulin would be unjust.

At the outset, it may be worthwhile to clarify the relationship between restitution and unjust enrichment. "Restitution" sometimes is used to refer to a remedy in which the defendant relinquishes a benefit conferred upon it. As a general matter, however, the term perhaps is best used as referring to the set of substantive legal doctrines designed to avoid unjust enrichment.[108] The consequence of liability in restitution is the defendant's relinquishment of the benefit in question.[109]

It is worth noting as well that the complaint in this case includes a separate claim for

---

[108]  See RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 1, cmts. a, b, h. (Discussion Draft 2000) ("RESTATEMENT").

[109]  See, e.g., id. § 1 cmt. a.

Many jurisdictions use these terms interchangeably or only use one of them. New York courts, for example, recognize a cause of action for unjust enrichment: "The essence of unjust enrichment is that one party has received money or a benefit at the expense of another which, in good conscience, ought to be returned." Carriafielio-Diehl & Assocs., Inc. v. D & M Elec. Contracting, Inc., 12 A.D.3d 478, 479, 784 N.Y.S.2d 617, 618 (2d Dep't 2004); accord Citibank, N.A. v. Walker, 12 A.D.3d 480, 481, 787 N.Y.S.2d 48, 49 (2d Dep't 2004) (citing Paramount Film Distrib. Corp. v. State of N.Y., 30 N.Y.2d 415, 421, 334 N.Y.S.2d 388, 393 (1972) (citing, among other authorities, the RESTATEMENT (FIRST) OF RESTITUTION for the proposition that "[t]he essential inquiry in any action for unjust enrichment or restitution is whether it is against equity and good conscience to permit the defendant to retain what is sought to be recovered[.]"). "Unjust enrichment" often is equated with quasi-contract or a contract implied in law, but the latter actually are remedies imposed to avoid unjust enrichment in specific circumstances. A claim sounding in restitution or unjust enrichment need not be based on or otherwise implicate the quasi contract remedy.

35

"equitable restitution" of amounts received[110] for unused Rezulin – the so-called "medicine cabinet

damages" – but neither side mentions this claim in its briefs. At oral argument, plaintiffs' counsel

treated "medicine cabinet damages" as a category of damage cognizable on other claims rather than

as an independent cause of action.[111]

That is a sensible approach. Where there is no unjust enrichment, there can be no

liability in restitution.[112] If WL's retention of the benefit of sales of unused Rezulin would not

constitute unjust enrichment, then WL is not liable in restitution for the restoration of those benefits.

Accordingly, the Court will treat the plaintiffs' claim for equitable restitution based on their

payments for unused Rezulin as a subset of their claim of unjust enrichment or restitution based on

all of their payments for Rezulin.

---

[110]

The complaint actually claims restitution for amounts *paid* by the plaintiff HBPs. Am. Cpt
¶ 164. This is a contradiction in terms. Where there is liability in restitution, the measure
of damages is benefits received, not costs incurred. *See, e.g.*, RESTATEMENT § 1 cmt. a.

[111]

Tr. 32 ("The easiest damage category that we have to understand, to conceptualize, is what
we call the medicine cabinet damages.").

[112]

*See, e.g.*, RESTATEMENT § 1 cmt. a-b ("The source of a liability in restitution is the receipt
of an economic benefit under circumstances such that its retention without payment would
result in the unjust enrichment of the defendant at the expense of the plaintiff. . . . The law
of restitution is the law of unjust enrichment . . . .The substantive part of the law of
restitution is concerned with identifying those forms of enrichment that the law treats as
'unjust' for purposes of imposing liability."); 66 AM. JUR. 2d *Restitution and Implied
Contracts* § 10 ("Unjust enrichment is usually a prerequisite for the enforcement of the
doctrine of restitution; if there is no basis for unjust enrichment, there is no basis for
restitution." (footnotes omitted)).

*A.     ES' Claim for Unjust Enrichment*

      *1.     Choice of Law*

A choice of law is necessary because different states have different doctrines respecting unjust enrichment and restitution.

According to the RESTATEMENT (SECOND) OF CONFLICT OF LAWS,[113] the law governing a claim for restitution to recover for unjust enrichment is that of the state which, with respect to each issue, "has the most significant relationship to the occurrence and the parties." Factors to be taken into account in this grouping of contacts approach, as relevant here, include "the place where the benefit or enrichment was received," "the place where the act conferring the benefit or enrichment was done," and the domicile and place of business of the parties.[114] The RESTATEMENT notes as well that where, as here, the claim for restitution does not stem from any relationship between the parties, the place where the benefit or enrichment was received "will usually be [the contact] of greatest importance with respect to most issues." Particular weight will be given to the state in which the act conferring the benefit or enrichment was done if the place where the

---

[113]
    The New York courts have not spoken to the precise question of the choice of law rules applicable to a claim of restitution or unjust enrichment, which, at least in the form presented here, does not clearly resemble a contract or a tort. The New York Court of Appeals, however, has adopted the approach of the RESTATEMENT and relied heavily on it as persuasive authority in most of its major conflict of laws decisions. *See Zurich Ins. Co. v. Shearson Lehman Hutton, Inc.*, 84 N.Y.2d 309, 618 N.Y.S.2d 609 (1994); *Cooney v. Osgood Mach., Inc.*, 81 N.Y.2d 66, 595 N.Y.S.2d 919, 922 (1993); *In re Allstate Ins. Co.*, 81 N.Y.2d 219, 597 N.Y.S.2d 904 (1993); *Schultz v. Boy Scouts of America, Inc.*, 65 N.Y.2d 189, 491 N.Y.S.2d 90 (1985); *Neumeier v. Kuehner*, 31 N.Y.2d 121, 335 N.Y.S.2d 64 (1972); *Miller v. Miller*, 22 N.Y.2d 12, 290 N.Y.S.2d 734 (1968); *Babcock v. Jackson*, 12 N.Y.2d 473, 240 N.Y.S.2d 743 (1963). This Court sees no reason why the Court of Appeals would not follow the RESTATEMENT approach were it presented with this case.

[114]
    RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 221.

37

benefit or enrichment was received cannot be identified or differs from the place where the act

conferring the benefit was done and bears little relation to the occurrence and the parties. Finally,

the importance of the geographic location of the parties "depends largely upon the extent to which

they are grouped with other contacts."[115]

In this case, the benefit or enrichment was received in New Jersey because that is

where WL was based. The allegedly deceptive promotional material was created by New Jersey-

based WL and received by New Jersey-based Medco. The record reflects at least one exchange of

correspondence concerning Rezulin's clinical features between representatives of the two companies,

both of them located in New Jersey.[116] Accordingly, the alleged inequitable conduct occurred in or

at least had the most significant relationship to New Jersey.

The acts conferring the benefit occurred in a variety of locations. Those benefits

resulted from, at the very least, (1) payments from the wholesalers (the locations of which are not

revealed by the record) to New Jersey-based WL, (2) payments from New Jersey-based Medco to

the wholesalers, and (3) payments from New York-based ES to New Jersey-based Medco. The

RESTATEMENT does not give particular weight to the state in which the act conferring the benefit was

done – in this case, New York and potentially a number of other states not revealed definitively by

the record – where, as here, the place where the enrichment was received can be identified and bears

a strong relationship to the occurrence and the parties. For all of these reasons, New Jersey law

---

[115]
        *Id.* cmt. d.

[116]
        *See* St. Phillip Decl. Ex. 8 at MEDCO 2235-68.

should govern ES's claim for unjust enrichment.[117]

2.    *Merits*

The New Jersey Supreme Court has explained that to establish unjust enrichment, "a plaintiff must show both that defendant received a benefit and that the retention of that benefit without payment would be unjust."[118] The benefit at issue must have been conferred on the defendant by the plaintiff, not by some third party.[119] Further, the plaintiff must show "that it expected remuneration from the defendant at the time it performed or conferred a benefit on the defendant."[120]

---

[117]    *Cf. Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, N.A.*, 731 F.2d 112, 121 (2d Cir. 1984).

[118]    *VRG Corp. v. GKN Realty Corp.*, 135 N.J. 539, 554, 641 A.2d 519, 526 (1994); *see also Wanaque Borough Sewerage Auth. v. Twp. of W. Milford*, 144 N.J. 564, 575, 677 A.2d 747, 752-53 (1996) (observing that "the key element" of a restitution claim "is that one party has been unjustly enriched at the expense of another.").

[119]    *Eli Lilly & Co. v. Roussel Corp.*, 23 F. Supp.2d 460, 496 (D.N.J. 1998) ("[I]t is the plaintiff's (as opposed to a third party's) conferral of a benefit on defendant which forms the basis of an unjust enrichment claim.") (applying New Jersey law); *In re Lead Paint Litig.*, No. A-1946-02T3, 2005 WL 1994172, at *14 (N.J. Super. A.D. Aug. 17, 2005) (same). The Court recognizes that *In re Lead Paint* is an unpublished opinion and thus not a binding precedent. N.J. COURT RULES 1:36-3 (2005). Nevertheless, this Court considers it as persuasive authority in seeking to understand the parameters of unjust enrichment claims under New Jersey law. *See CPC Int'l, Inc. v. Northbrook Excess & Surplus Ins. Co.*, 962 F.2d 77, 96-97 (1st Cir. 1992) (considering an unpublished New Jersey Superior Court case despite its lack of "formal precedential weight"). Furthermore, as the Third Circuit explained in citing another unpublished opinion, "[t]he New Jersey rules are, of course, binding only on the New Jersey courts." *Craig v. Lake Asbestos of Quebec, Ltd.*, 843 F.2d 145, 152 (3d Cir. 1988).

[120]    *VRG Corp.*, 135 N.J. at 554, 641 A.2d at 526; *see also Castro v. NYT Television*, 370 N.J. Super. 282, 300, 851 A.2d 88, 99 (App. Div. 2004) (hospital patients who were filmed in the emergency room for a reality television show could not recover on a theory of unjust enrichment against the media companies who filmed them because the patients could not

39

In order to state a claim for unjust enrichment, then, ES had to show that it – rather than a third party – conferred a benefit on WL and that it expected remuneration from WL. ES has not met this burden. ES contracted with Medco, not WL, to provide prescription drug benefits to its members. It paid Medco, not WL, and expected Medco, not WL, to provide services in exchange for that payment. There is no evidence that ES had any direct contact with WL at all, much less that it conferred a benefit directly on WL or expected remuneration directly from WL. Accordingly, ES cannot recover against WL under a theory of unjust enrichment.

The fact that ES may have conferred a benefit on WL indirectly does not alter this conclusion. It is true that ES paid Medco in exchange for the provision of prescription drug benefits to its members, that Medco in turn paid various drug wholesalers to purchase Rezulin to dispense to ES's members, and that these wholesalers in turn paid WL by purchasing Rezulin for resale to Medco and other PBMs.

This chain is too attenuated to give rise to a claim for unjust enrichment by ES. Under New Jersey law, absent a mistake by the person conferring the benefit, unjust enrichment claims require "some direct relationship between the parties."[121] Based on this principle, New Jersey courts have rejected unjust enrichment claims arising out of relationships more direct than the one

---

have reasonably expected that they would receive remuneration for their participation in the show); *Fasching v. Kallinger,* 211 N.J. Super. 26, 35-36, 510 A.2d 694, 699-700 (App. Div. 1986) (surviving next of kin of murder victim could not recover on a theory of unjust enrichment against the author and publisher of a book about the murder because plaintiffs had no direct relationship with the author and publisher and expected no remuneration from them).

[121]

*Callano v. Oakwood Park Homes Corp.,* 91 N.J. Super. 105, 109, 219 A.2d 332, 335 (App. Div. 1965); *see also Fasching,* 211 N.J. Super. at 35-36, 510 A.2d at 699-700 (unjust enrichment claim dismissed because plaintiffs and defendants had no direct relationship).

40

at issue here. For example, in *Insulation Contracting & Supply v. Kravco, Inc.,*[122] the court held that a subcontractor could not recover against a property owner on a theory of unjust enrichment because the subcontractor contracted with and expected remuneration from the general contractor only, not from the property owner.[123]  The court in *Callano v. Oakwood Park Homes Corp.,*[124] reached a similar conclusion.  The plaintiffs there, two nursery owners, had planted shrubbery on defendant's property based on a contract with the intended buyer of that property, who died before taking possession of the property and before paying plaintiffs for their services.  Although the addition of the shrubbery had increased the value of defendant's property, the court held that plaintiffs could not recover on a theory of unjust enrichment because they had "no dealings with defendant, and did not expect remuneration from it when they provided the shrubbery."[125]

Accordingly, ES's claim for unjust enrichment is dismissed.

B.    *LBC's Claims*

Louisiana's choice of law statute requires application of "the law of the state whose

---

[122]

209 N.J. Super. 367, 379, 507 A.2d 754, 761 (App. Div. 1986); *see also, e.g., F. Bender, Inc. v. Jos. L. Muscarelle, Inc.,* 304 N.J. Super. 282, 284-85, 700 A.2d 374, 376 (App. Div. 1997) (sub-subcontractor could not recover against owner or general contractor on a theory of unjust enrichment).

[123]

New York courts have taken the same position. *Metro. Elec. Mfg. Co. v. Herbert Constr. Co., Inc.,* 183 A.D.2d 758, 758, 583 N.Y.S.2d 497, 498 (2d Dept. 1992) (sub-subcontractor was not in privity with general contractor or property owner and therefore could not recover against them on a theory of unjust enrichment); *Redtail Leasing, Inc. v. Bellezza,* No. 95 Civ. 5191, 1997 WL 603496 (S.D.N.Y. Sept. 30, 1997) (under New York law, "an unjust enrichment claim . . . requires some type of direct dealing or actual, substantive relationship with a defendant").

[124]

91 N.J. Super. 105, 109, 219 A.2d 332, 335 (App. Div. 1965).

[125]

*Id.*

41

policies would be most seriously impaired if its law were not applied to that issue." That state is determined with reference to "the strength and pertinence of the relevant policies of all involved states in the light of: (1) the relationship of each state to the parties and the dispute; and (2) the policies and needs of the interstate and international systems, including the policies of upholding the justified expectations of parties and of minimizing the adverse consequences that might follow from subjecting a party to the law of more than one state."[126]

In this case, New Jersey has a far stronger relationship than Louisiana to the occurrences that form the basis of the unjust enrichment claim. Its policies therefore are most pertinent. The parties' justified expectations and the interest in not subjecting a party to the law of more than one state do not point in a different direction. Accordingly, the Court applies New Jersey law. The defendant therefore is entitled to summary judgment dismissing LBC's claim of unjust enrichment.

\*   \*   \*

If, as plaintiffs contend, WL misled Medco and other PBMs with the consequence that the PBMs either overpaid for Rezulin or bought it rather than cheaper drugs that they otherwise would have bought, WL may have obtained an economic benefit that, in justice and good conscience, it did not deserve. This Court, however, is duty-bound to apply the law of the states in question. Its proper functions do not include creation of remedies that neither the legislatures nor the courts of those states have seen fit to create.

---

[126] LA. CIV. CODE ANN. art. 3515.

42

*VIII.   Conclusion*

The defendant's motion for summary judgment dismissing the action [00 Civ. 2843,

docket item 2751] is granted.

SO ORDERED.

Dated: September 21, 2005

Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)