UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | ) ) ) ) |
| | ) |
| THIS DOCUMENT RELATES TO: | ) ) |
| | ) |
| HARDEN MANUFACTURING CORPORATION; LOUISIANA HEALTH SERVICE INDEMNITY COMPANY, dba BLUECROSS/BLUESHIELD OF LOUISIANA;  INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL NO. 68 WELFARE FUND; ASEA/AFSCME LOCAL 52 HEALTH BENEFITS TRUST;  GERALD SMITH; and LORRAINE KOPA, on behalf of themselves and all others similarly situated, v. PFIZER INC. and WARNER-LAMBERT COMPANY. | ) ) ) ) ) ) ) ) ) ) ) ) ) |

MDL Docket No. 1629
Master File No. 04-10981
Judge Patti B. Saris
Mag. Judge Leo T. Sorokin

**CLASS PLAINTIFFS' OPPOSITION TO DEFENDANTS' EMERGENCY
MOTION TO EXTEND CLASS DISCOVERY SCHEDULE**

I.    INTRODUCTION AND ARGUMENT

The Federal Rules of Civil Procedure provide that "the court must — at an *early practicable time* — determine by order whether to certify the action as a class action."  Fed. R. Civ. P. 23(c)(1)(A)(emphasis added).  These cases were filed nearly a year and a half ago. Discovery has been open for approximately seven months.  During that time, the Class Plaintiffs have participated fully in an extremely arduous meet and confer process; have produced nearly all of the documents requested of them by Defendants that are within Class Plaintiffs' possession, custody, or control; and have made clear the very limited categories of documents they object to producing.  Class Plaintiffs have provided Defendants with dates for depositions, and have agreed to produce the requested witnesses for deposition after the October 11, 2005 class discovery cutoff, if necessary to accommodate scheduling difficulties.  Defendants have rejected this proposed compromise, so that they can belatedly pursue discovery directed to third parties, and hold open the possibility of commencing an entirely new round of discovery, which may include harassing depositions of the consumer Class Representatives' spouses, ex-spouses, children, and employers.

During these same seven months, Defendants have produced virtually *none* of the documents requested by Plaintiffs pertaining to their unlawful off-label marketing activities, and have flatly refused to even begin searching for those marketing documents they have *agreed* to produce until the Court decides the pending cross-motions regarding the scope of discovery.  The present dispute vividly illustrates why Defendants should be required to produce documents relating to their unlawful sales and marketing of Neurontin created after 1998.

The depositions of the consumer Class Representatives' physicians who prescribed them Neurontin will be among the most important taken in this case.  The parties will

ask what they knew about off-label uses of Neurontin; when, where, and from whom they learned it; and whether they were paid (in cash or in kind) to hear a sales pitch for Neurontin, or even to deliver one.

There are two consumer class representatives, Gerald Smith and Lorraine Kopa. Mr. Smith did not begin taking Neurontin until October 1999, nearly a year after the creation of the last document Defendants produced in the Franklin Litigation. Ms. Kopa did not begin taking Neurontin until November 2003, nearly *five years* after the creation of the last document Defendants produced in the Franklin Litigation.

The documents produced in Franklin show that both of the class representatives' prescribing physicians were paid by Defendants to attend a number of Neurontin "events" prior to the end of 1998. Indeed, one of these physicians was trained by Defendants to speak at such events. Accordingly, there is a reasonable and good faith basis to believe that these physicians attended (and were paid to attend) Neurontin events in the nearly six years since 1998.

There are actual *transcripts* of many if not all of the Neurontin "events" sponsored by Defendants, as well as presentation materials. Plaintiffs know this, because Mr. Greene and Mr. Rona *saw* them at the U.S. Attorneys' office, dated long after 1998. These transcripts and materials; the lists of attendees and presenters; their communications with Defendants, the medical marketing firms, and one another; and the flow of funds between them, lie at the very heart of this case.

To be fully prepared to take the prescribing physicians' depositions, Plaintiffs insisted that Defendants produce all documents related to Neurontin "events" they attended, regardless of whether those documents were created after 1998. Plaintiffs requested these documents in their initial document requests, served over six months ago. Defendants *concede*

that these documents are highly relevant to these key depositions, but have flatly refused to produce them, claiming that it would be like "looking for a needle in a haystack," an exercise they refuse to undertake.  Defendants have also frustrated Plaintiffs' efforts to obtain documents concerning post-1998 Neurontin events directly from the medical marketing firms Plaintiffs have subpoenaed, even though these firms, who previously produced post-1998 documents to the U.S. Attorney, have not established *any burden at all* in connection with the production of the documents requested.

The proverbial "haystack" of off-label marketing documents should not and would not exist, but for Defendants' pervasive scheme to violate federal laws prohibiting the off-label marketing of Neurontin.  If Defendants must search the haystack anyway, looking for the "needles" that pertain to the consumer Class Plaintiffs' physicians, they might as well turn over the hay.

Defendants' proposed 120-day extension of the class discovery cutoff does nothing to address Plaintiffs' concerns regarding the depositions of Plaintiffs' treating physicians, as Defendants refuse to even begin looking for these documents until ordered by the Court to do so, and contend that once they begin reviewing these documents, their production will take months.  In the interim, Class Plaintiffs have agreed to provide witnesses for deposition, even if scheduling difficulties prevent those depositions from being taken until after October 11, 2005.  Defendants' proposal to extend the class discovery cutoff for four months without limitation, so that they can conduct additional discovery they have not pursued over the last seven months, is unnecessary, unwarranted, and fundamentally unfair.

II.    STATEMENT OF FACTS

A.    Plaintiffs Have Engaged in Extraordinarily Lengthy and Detailed Meet and Confers And Have Produced Documents Swiftly After

Those Discussions

In their emergency motion, Defendants attempt to portray the Plaintiffs as delinquent with regard to every aspect of their response to discovery requests. In doing so, they paint an inaccurate picture of the meet and confer process, the pace at which documents have been produced by the Plaintiffs in this case, and the volume of documents produced.

To begin with, Defendants point out that Plaintiffs did not begin production of documents until one month after the original responses and objections were served. *See* Motion at 4 (stating that "defendants served disclosure demands on May 2, 2005" and plaintiffs began producing documents on July 1, 2005), and that production of documents was supplemented from that point on. What Defendants fail to point out is that the main reason for the quite reasonable month-long delay in producing actual documents is because the parties were in the midst of meeting and conferring with regard to Defendants' discovery responses and did not begin meeting to discuss Plaintiffs' responses until the end of June. *See* Declaration of Edward Notargiacomo dated September 30, 2005 ("Notargiacomo Decl."), filed concurrently herewith, at ¶ 3. The parties collectively agreed that they would finish discussing Defendants' responses to Plaintiffs' discovery requests before they began discussions of Plaintiffs' responses. *Id.* These meet and confer sessions concerning Defendants' responses occurred on May 17, 2005, May 24, 2005, June 6, 2005, and June 16, 2005. *Id.* Approximately two weeks later, on June 29, 2005, when all counsel could convene again, the parties began discussing Plaintiffs' responses. *Id.* at ¶ 4.

Despite Defendants' best attempts to characterize the Plaintiffs' participation in the meet and confer process as delinquent, it was in fact quite the opposite. The meeting and conferring that occurred was nothing short of extraordinary, in terms of the length of the

meetings and the detail covered.  During these meetings, Defendants' counsel insisted on going over every single objection to every discovery request (106 Requests for Production and 25 Interrogatories) with regard to every plaintiff individually, an utterly inefficient and time-consuming method.  *See* Notargiacomo Decl. at ¶ 4.  Because of this method, all Plaintiffs' counsel had to attend each lengthy meet and confer session.  *See id.* This required coordinating the schedules of multiple counsel for half-day sessions.  *See id.*  Plaintiffs' counsel made every effort to be accommodating and, in fact, was able to meet with defense counsel four times in the space of a month, to discuss the entirety of their discovery requests and Plaintiffs' responses. Those meetings occurred as follows:

| | |
|---|---|
| June 29, 2005: | five-hour meeting |
| July 6, 2005: | six-hour meeting |
| July 15, 2005: | six-hour meeting |
| July 22, 2005: | three-hour meeting |
| July 29, 2005: | five-hour meeting.  *See id.* at ¶ 4. |

In the end, these meetings totaled over twenty-five hours of meeting and conferring.   Therefore, Defendants' insinuation that Plaintiffs have not been adequately discussing these issues with them is quite simply absurd.   Furthermore, after the global meet and confer sessions  concerning overarching objections were concluded, these discussions then continued with individual TPPs with regard to their document productions.

While these discussions were going on or shortly thereafter, *all* plaintiffs began producing documents.   As Defendants note, two of the Plaintiffs produced documents on July l, 2005, at the very beginning of the meet-and-confer process.  *See* Declaration of Jeffrey Lerner dated September 30, 2005 ("Lerner Decl."), filed concurrently herewith, at ¶ 3;  Declaration of

Michael Farkas dated September 30, 2005 ("Farkas Decl."), filed concurrently herewith, at ¶ 3. Furthermore, out of the six Class Plaintiffs, five out of the six produced documents while the global meet and confer sessions were ongoing.[1]  *See* Notargiacomo Decl. at ¶ 5;  Declaration of Nancy Pacharzina dated September 30, 2005 ("Pacharzina Decl."), filed concurrently herewith, at ¶ 3; Declaration of Eric Pavlack dated September 30, 2005 ("Pavlack Decl."), filed concurrently herewith, at ¶ 3.  Although slightly later, the remaining Class Plaintiff, Louisiana Health, made a very substantial initial production of 1312 pages of material, as well as Neurontin claim data, on August 18, 2005.  *See* Declaration of Douglas Plymale dated September 30, 2005 ("Plymale Decl."), filed concurrently herewith, at ¶ 3.

       Defendants point to the schedule of production and the supposed small amount of pages received for each Plaintiff as evidence that the document productions are somehow insufficient.  However, what they fail to mention is that, for many of the Class Plaintiffs, the documents produced constitute the entirety of the documents they have and to which they have not objected and refused to produce such documents.  For example, for the individual Class Plaintiffs, Defendants suggest that the production of 141 pages of documents for Mr. Smith and 64 pages for Ms. Kopa was insufficient.  However, it is not unusual for individual Class Plaintiffs not to have a great number of documents.  Such is the case here.  For Ms. Kopa, not only was the document production done on time, but this document production constituted her complete medical history as it pertains to treatment for the pain for which she was prescribed Neurontin.  *See* Lerner Decl. at ¶ 3.  With regard to Mr. Smith's document production, it also

---

[1]  Defendants repeatedly refer to the document productions and discovery responses of individual Plaintiffs Aetna, Guardian Life, and Kaiser, and the meet and confer discussions that occurred with them.  These entities are not Class Plaintiffs, and therefore their production (or lack thereof) is simply irrelevant to the issue of whether or not to extend the class certification discovery schedule.

included Mr. Smith's complete medical records related to the auto accident and the resulting injuries for which he was prescribed Neurontin, except for records from his chiropractor which were produced on September 26, 2005.  *See* Pavlack Decl. at ¶ 3.

As for many of the TPPs, the production of documents that are in the possession of each Class Plaintiff is virtually complete at this time and has been for weeks.  First, with regard to Harden Manufacturing Corporation ("Harden"), Harden's counsel repeatedly explained to defense counsel that Harden is a manufacturer of furniture whose main purpose is to manufacture and sell furniture, not to monitor drugs and reimbursements of drugs for their employees.  *See* Notargiacomo Decl. at ¶ 5.  Therefore, the amount of relevant documents to be produced would be small, not because Harden was withholding documents, but simply because no other documents exist.  *See id.*  Moreover, the document production has been complete since September 6, 2005 (over a month before the cutoff of class certification discovery), when a supplemental production occurred.  *See id.*

Second, with regard to ASEA/AFSCME Local 52 Health Benefits Trust ("ASEA"),  ASEA has produced all documents that are in its possession, which it is not withholding on grounds of burdensomeness.  *See* Pacharzina Decl. at ¶ 3.  ASEA produced virtually all of these documents by early August.  *See id.*  However, recently, Defendants requested that ASEA supplement its production to include various types of documents for which ASEA had originally provided exemplars.  *See id.*  ASEA supplemented its production on September 30, 2005.  *See id.*  At this time, ASEA's production of documents (not including documents withheld based on burden, which are explained below) is complete.  *See id.*  Although Defendants express incredulity about the small volume of documents produced, the explanation is simple and has been repeatedly stated to defense counsel:  ASEA simply does not have a

wealth of documents relating to off-label use of prescription drugs in general and Neurontin specifically. *See id.*

Third, with regard to Louisiana Health Service Indemnity Company ("Louisiana Health"), they also completed their document production with a supplemental production of over 23,000 pages that occurred on August 25, 2005 (over one month prior to the discovery cutoff). *See* Plymale Decl. at ¶ 3.  Louisiana Health encountered some difficulties with regard to the Bates numbering of the supplemental production which delayed it by approximately a week.  *See id.*  Because of formatting problems, the documents had to be printed off of a disc and rescanned, prior to production.  *See id.*  This took an extra seven days to complete.  *See id.*  However, Defendants were kept apprised of the problems and knew the schedule that Louisiana Health was operating under.  *See id.*  Also, despite Defendants' indications to the contrary, Louisiana Health did in fact send a letter on August 26, 2005, which indicated to Defendants that its production was complete.[2]  *See id.* (with attached letter as Exhibit A to Plymale Decl.).   Included were also an index of Requests for Production of Documents to which the documents produced are responsive, an index of field codes for both claims databases, and a list of provider names and addresses, and a summary of whether Louisiana Health is withholding or limiting the search for documents based on an objection.  *See id.*

Fourth, International Union of Operating Engineers, Local No. 68 Welfare Fund ("Local 68") has produced all the documents that it has in its possession.  *See* Farkas Decl. at ¶ 3.  Defendants complain about the size of the production, but this is simply because Local 68 does

---

[2] Since that time, Louisiana Health and its counsel- both of whom are located in the greater New Orleans and Baton Rouge area- have been severly impacted (and its counsel displaced) by the two recent hurricanes which have devastated the region.  Because of this, they have not received some correspondence and have lost many files.  Since then, they have been understandably behind in their communication with Defendants with regard to all discovery issues.

not manage their own plan and does not have a great amount of information concerning Neurontin or its prescription plan. *See id.*

Defendants attempt to shift the focus from what they do actually have at this time and have had for weeks, to when the production actually began and how big the production ended up being. Respectfully, both issues are red herrings. Defendants now have these documents and therefore have not been materially prejudiced in opposing class certification.

Defendants also mischaracterize plaintiffs' explanation of their burdensomeness objection. Defendants specifically reference five plaintiffs, two of whom (Guardian Life and Aetna) are not class representatives. For the remaining three, Defendants again misstate the facts. For example, Harden repeatedly informed the Defendants orally during the meet and confer sessions that it would not be standing on its objection regarding the burden of production. *See* Notargiacomo Decl. at ¶ 6. The letter of August 26 merely confirmed Harden's long-held stance concerning burdensomeness. *See id.* As for Louisiana Health, despite Plaintiffs' assertions to the contrary, in a letter faxed on August 26, 2005, Louisiana Health explained that it was not withholding documents based on the burdensome nature of the Request, but that they would be limiting their search to the files of decision makers in response to a mere five out of 106 Requests. *See* Plymale Decl. at ¶ 4. Therefore, although Defendants do their best to make it seem as if Plaintiffs have been stonewalling on this issue, and that they still do not have this information for some Plaintiffs, the truth of the matter is quite different. Defendants have known for at least a month that these Plaintiffs were not refusing to produce documents based on the burden they face. As for Louisiana Health, they have known since late August that they are limiting their search in response to 5 document requests. Defendants have simply not acted in the face of this knowledge. However, simply because Defendants have done nothing is not a

reason to delay the cut-off of class certification discovery.

Finally, Defendants complain about their inability to obtain documents and information from nonparty pharmacy benefit managers ("PBMs") and third-party administrators. As conceded by Defendants, they have known who the overwhelming majority of these nonparty entities are since July 2005, approximately two and a half months prior to the cut-off of class certification discovery. And Defendants have known about some of the PBMs and third-party administrators since initial disclosures: Harden and ASEA disclosed the identity of these third parties in their initial disclosures on June 3, 2005. *See* Notargiacomo Decl. at ¶ 7; Pacharzina Decl. at ¶ 5. At that point, it was up to the Defendants to pursue discovery through subpoena. With regard to ASEA's PBM, it was not subpoenaed until July. *See* Pacharzina Decl. at ¶ 5. Whether or not they have been able to obtain documents, including claims data, from those entities is not under the control of the Class Plaintiffs. *See id.* In fact, even when Plaintiffs have offered to produce at least some information in the possession of its PBMs or third-party administrators, Defendants have taken such an unreasonable position that Plaintiffs were unable to provide any information. For example, ASEA originally offered to facilitate production of a Neurontin claims report from Caremark. *See id.* However, Defendants insisted the claims report include more data fields than originally generated by Caremark for ASEA. *See id.* ASEA offered to negotiate adding more data fields, if Defendants would let ASEA know which further fields they needed. *See id.* Instead, Defendants demanded that they see Caremark's entire data dictionary. *See id.* As ASEA could not force Caremark to turn over its data dictionary, ASEA left the issue to be worked out between Caremark and Defendants. *See id.* Caremark is represented by its own counsel. *See id.*

Perhaps what is most shocking about Defendants' motion is it incorrectly and

unfairly implies that the Defendants have met their obligations to confer in good faith and have not withheld production of any relevant documents. This is certainly not the case.

As the Court is aware, some of the issues in this litigation are similar to those litigated in the *Franklin* case. In that case, Defendants produced over 200,000 pages of documents relating to the sales and marketing of Neurontin through 1998. *See* Declaration of Michael Tabb dated September 30, 2005 ("Tabb Decl."), filed concurrently herewith, at ¶ 4. There, the District Court imposed a geographical limitation, requiring only that Defendants produce sales and marketing documents that were present in its Northeast Central Business Unit (or CBU). *See id.* Here, as Defendants have acknowledged, no such geographical limitation exists. *See id.*

In April 2005, Plaintiffs in this case served an extensive document request on Pfizer, seeking numerous categories of documents that were never produced in *Franklin*. *See id.* at ¶ 5. Defendants objected to almost every request, resulting in numerous meet-and-confer sessions. *See id.* Shortly after the first meet and confer session, Defendants began to produce documents. *See id.* Despite the fact that the vast majority of documents requested by the Plaintiffs concerned Defendants' sales and marketing practices relating to Neurontin, Defendants failed to produce anything more than a smattering of sales and marketing documents that the Class Plaintiffs did not already possess at the outset of the litigation. *See id.* at ¶ 6. In response to this request for production of document, the Defendants have so far only produced the following documents that might be considered sales and marketing documents:[3]

---

[3] Defendants have also produced documents relating to the scientific issues raised in this action, including a copy of Neurontin's NDA, research reports concerning clinical trials conducted by Defendants, trial master files and case report forms, and a bibliography of third party literature on Neurontin. We understand that Defendants agreed, or were ordered, to produce most of these documents for the plaintiffs who had brought product liability claims against Defendants relating

(a) Documents purportedly representing marketing documents from Defendants' customer business units ("CBUs") outside of the Northeast CBU;

(b) Redacted copies of the Merlin and Phoenix databases (databases recording communications between third parties, including physicians, and the Defendants regarding clinical use of Neurontin); and

(c) 4 Pages of profit and loss statements covering 1997 – 2000.  *See id.*

Even these limited productions have been so thoroughly deficient as to be virtually meaningless.  *See id.*  at ¶ 7.  With respect to the clinical databases, Merlin and Phoenix, the databases originally produced were defective.  *See id.*  When Pfizer produced a working database, physicians' names were redacted, rendering them completely useless to the Class Plaintiffs' investigation of this case.  *See id.*

With respect to the documents from other CBUs,  the Defendants have so far only produced a total of 8711 pages from the other five CBUs.  *See id.*  at ¶ 8.  Given that Defendants produced 200,000 pages in *Franklin*, and Judge Saris only ordered Defendants to produce documents for one of the six CBUs, it is difficult to believe that the production of pre-1998 documents is complete. *See id.*  Moreover, these 8711 pages overwhelmingly contain duplicative copies of journal article reprints, as opposed to documents relating to actual CBU marketing. *See id.*  Only a handful of CBU documents reference a CBU-specific marketing event or activity. *See id.*  From the documents produced in *Franklin*, Plaintiffs can identify specific off-label marketing events that occurred in CBUs other than the Northeast CBU and were funded by Defendants.  *See id.*  But when Plaintiffs examined the newly produced documents for information relating to specific known events, there were no documents relating to them.  *See id.* In *Franklin*, Plaintiffs also observed that the planning and execution of Neurontin marketing events in the Northeast CBU generated a significant amount of paper relating to organization,

_____

to Neurontin.

selection of attendees and speakers, compensation, logistics, content, and similar matters. *See id.*
For the most part, such documents are missing from the production, even though the *Franklin*
documents confirm that such events occurred in the other CBUs.  Nor is there any records of
actual payments to a physician in these other CBUs, even though the Class Plaintiffs have
evidence that millions of dollars in such payments were made to thousands of physicians around
the country through all of the regional CBUs. *See id.*

      To further illustrate the type of relevant documents that have not been produced,
documents produced in *Franklin* indicate Class Plaintiff Smith's prescribing physician attended
(and was paid by Defendants to attend) at least two Neurontin marketing events, at least one of
which discussed off-label use of Neurontin. *See id.*  at ¶ 10.   Indeed, Defendants appear to have
paid this physician to travel from Indianapolis to Pasadena in May 1997.  *See id.*  Plaintiffs are
also aware that the professional colleagues who worked with this physician on a day to day basis
also attended numerous off-label Neurontin marketing events prior to 1998.  But no documents
relating to any of these events are contained in the documents produced by Defendants in this
litigation. *See id.*[4]

      Another obvious failure to produce promised documents relates to the separate
CBU, known as the Managed Care CBU, that Defendants created for dealing with entities such
as the Third Party Payors Plaintiffs in this litigation.  Not a single document relating to the

---

[4] Documents also show that the treating physician for Class Plaintiff Kopa attended a half-dozen
events during 1995 to 1997, and that he was paid over $3,500 for speaking and attending these
events.  *See* Tabb Decl. at ¶ 10 n.2.  Of course, Plaintiffs have also not received copies of
documents relating to Neurontin events either of the class representatives' prescribing physicians
attended post-1998.  Given that both physicians had attended such events prior to 1998 (and one
was even trained by Parke-Davis to be a speaker in support of Neurontin), it is vital Plaintiffs
receive discovery relating to the Neurontin programs and marketing these doctors were exposed
to prior to the taking of their depositions.

Managed Care CBU has been produced by Defendants, notwithstanding Defendants' promises that such documents shall be produced.[5]  *See id.*  at ¶ 11.

Correspondence between Plaintiffs' counsel and Defendants' counsel documents unfulfilled commitments by Defendants to provide documents or necessary information relating to discovery.  On July 8, 2005, Plaintiffs' Counsel, Tom Greene, sent Defendants a letter identifying at least 25 discovery issues that were unresolved after the meet and confer meetings held on May 17th, May 24th, June 6th and June 16th.  *See id.*  at ¶ 13 (attaching letter as Exhibit A).  On July 19, 2005, James Murray, one of the attorneys for the Defendants responded to that letter, a true and correct copy of which is attached as Exhibit B to this declaration.  *See id.* (attaching letter as Exhibit B).  Among other things, Mr. Murray committed to produce the following documents,  or information regarding the existence of the following documents and Defendants' position regarding production:

The "Gideon" database, which contains information regarding payments to physicians in connection with clinical studies;

Database records which reflect medical liaison contacts with physicians;

Communications with Micromedex, a company that publishes purportedly unbiased information relating to off-label uses of drugs;

Documents relating to public statements made by Defendants concerning Neurontin's failure to be approved for monotherapy;

Marketing documents generated or in the possession of Defendants' Finance Department;

---

[5] There are many other examples of categories of documents that defendants promised months ago to produce, but which have not been produced.  For example, shortly after the meet and confers began, in May 2005, Defendants promised to produce a working copy of their sales call database, which would identify when Parke-Davis sales reps met with physicians and summarize what was discussed at their meeting.  *See id.*  at ¶ 13.  Defendants have still not produced this database and have refused to inform us when they expect to be able to produce the database.  *See id.*

Pfizer's due diligence files relating to Neurontin generated in connection the merger between Warner-Lambert and Pfizer. *See id*.; Exh. B.

For each of these items and others, counsel for the Defendants indicated that they would either produce such documents or get back to Plaintiffs with more information. *See id.* at ¶ 15. Michael Tabb, Co-Lead Counsel for Plaintiffs, spoke to Mr. Murray on the phone in early August to confirm that Plaintiffs would receive further information on each of these items. *See id.* Mr. Murray informed Mr. Tabb that although Defendants were willing in principle to produce many of the documents they had promised, including many of the documents referenced in the letters, in practice he anticipated few documents would in fact be produced until Defendants knew whether they would have to produce documents subsequent to 1998. *See id.* at ¶ 16. Mr. Murray informed Mr. Tabb that it was Defendants' position that it was burdensome to have to search for pre-1998 documents and then have to make a subsequent search for post-1998 documents if the Court ruled that Defendants were required to produce them. *See id.* He informed him that with regard to marketing documents, it was likely Defendants would not search for responsive documents until it knew the scope of discovery. *See id.*

Defendants have been true to their word. Since that phone conversation, with the exception of approximately 4,000 pages of CBU documents produced on August 17, 2005, we have received no sales and marketing documents from Defendants or any further information regarding when, or if, we will receive more. *See id.* at ¶ 17.

B.    Not Only Have Plaintiffs Offered to Stipulate to Class Plaintiffs' Depositions Occurring After the Class Discovery Cut-Off, These Plaintiffs Have All Offered to Make Themselves Available For Deposition In the Near Future

Defendants once again distort Class Plaintiffs' position and its actions with regard to scheduling depositions of class representatives. First and foremost, as mentioned above,

Plaintiffs have continually offered to waive the discovery cutoff with respect to the depositions of the class representatives and those of the consumer class representatives' physicians. Defendants have refused this offer. *See* Declaration of Barry Himmelstein dated September 30, 2005 ("Himmelstein Decl."), filed concurrently herewith, at ¶ 3 (attaching letter written by Himmelstein to James Rouhandeh dated September 14, 2005 as Exhibit A to Himmelstein Decl.).

Class Plaintiffs have attempted to engage in discussions with Defendants concerning scheduling depositions. For example, Harden has offered to make their representative available on October 13 and 14, 2005, at which time—according to Harden's TPP-- all claims data and other materials relating to Harden will have been produced. *See* Notargiacomo Decl. at ¶ 9. Harden made this offer in a letter dated September 16, 2005, and heard nothing from Defendants until September 29, 2005, when defense counsel wrote to insist that the Rule 30(b)(6) deposition of Harden must take place in Boston, rather than in Harden's home state of Alabama and requesting dates on which Harden's representative could be made available in Boston. *See id.* Also, in response to Defendants' request for dates for a Rule 30(b)(6) deposition of ASEA, ASEA offered dates in mid-September and the first week of October. *See* Pacharzina Decl. at ¶ 8 (attaching email correspondence with regard to this issue as Exhibit B). ASEA also offered to facilitate the production of third-party witnesses (e.g. a representative from ASI). *See id.* Defendants delayed responding and then chose to assert its right to take the deposition in New Jersey, thus precluding the inclusion of an ASIA deposition at the same time. *See id.* As of September 30, 2005, no dates have been confirmed by defense counsel. *See id.* Finally, as for Louisiana Health, counsel for Louisiana Health has explained to Defendants that they did not receive the Rule 30(b)(6) notice for its client due to the hurricanes

and would not be able to produce Louisiana Health for deposition on October 3, 2005, as Louisiana Health itself has been displaced by the hurricane and is dealing with more immediate issues. *See* Plymale Decl. at ¶ 6.

As for the individual Class Plaintiffs, they have been equally as forthcoming. With respect to Ms. Kopa's deposition, Plaintiffs have offered to make Ms. Kopa available on October 11, 2005, and Defendants have indicated that they are unable to attend a deposition on that date. The parties are currently in the process of negotiating further dates. *See* Lerner Decl. at ¶ 4. As for Mr. Smith, counsel for Mr. Smith originally suggested scheduling that deposition for October 10, 2005, the final day of the class discovery period. However, Defendants refused to accept that date. Since that time, the parties have been discussing the date and location for that deposition, and the parties have agreed upon October 6, 2005 for Mr. Smith's deposition, which will take place in Indianapolis. *See* Pavlak Decl. at ¶ 6.

      C.     **Defendants Refuse to Produce Documents Necessary for the Class Plaintiffs' Doctors' Depositions to Go Forward**

With respect to class plaintiffs' doctors' depositions, Defendants' accusations are disingenuous to say the least. It is Defendants' conduct that is preventing these depositions from occurring, not the Plaintiffs. From the beginning of discussions regarding the treating doctors' depositions, Plaintiffs have made it clear that they cannot go forward until the defendants have produced portions of the sales call database and the medical communications database relating to certain physicians, as well as all documents pertaining to Neurontin "events" sponsored by Defendants that these doctors attended. *See* Pavlak Decl. at ¶ 7; *see also* Himmelstein Decl. at ¶ 3 and letter attached as Exhibit A to Himmelstein Decl. This information is clearly relevant and was requested by the Plaintiffs in March, almost six months ago. The only way for a fair and meaningful deposition to be taken, and taken only once, would be if it occurred after those

documents were produced.   The Plaintiffs offered to waive the class discovery cutoff with respect to the depositions of these treating physicians to help achieve this goal, so that the documents could be produced.  *See* Himmelstein Decl. at ¶ 3; Exh. A.

However, the Defendants have refused to produce any post-1998 documents relating to events attended by these physicians, on the grounds that it will require them to collect and search the files of numerous sales and marketing employees to identify events that these physicians attended after 1998.  *See* Himmelstein Decl. at ¶ 3 and letter by James Rouhandeh to Barry Himmelstein dated September 16, 2005 and attached as Exhibit B to Himmelstein Decl. According to the defendants, until this Court rules on the discovery motion concerning the scope of discovery after 1998, it will not conduct any search.  *See id.* at ¶ 3;  Exh. B.  As this Court has not yet ruled, the Defendants have essentially refused to produce any information at all.   Instead, the Defendants insist that the appropriate course of action is to proceed with the depositions of the doctors now, and simply allow the Plaintiffs inquire at the deposition whether the doctors recall attending any events.  Only then, *after* the deposition has occurred, will the Defendants look for any such information, concerning only those specific events that the treating physicians identify.  However, Plaintiffs are entitled to more than simply that information before they go forward.

The Defendants' position on this subject illustrates its general obstructionist approach to discovery.  They refuse to produce any documents beyond those few listed above, much of which are relatively useless.  And they hide behind the pending motion for a protective order, as the reason for all delays and obstructionist behavior.  However, at the same time, they continue to demand that Plaintiffs produce everything relevant to the entire litigation- and also documents and information that Plaintiffs believe is irrelevant to the litigation- before the class

certification discovery deadline is over.

      D.      **Defendants Misstate Plaintiffs' Position With Regard to a Number of Document Requests**

The Defendants claim that TPP Plaintiffs are refusing to produce documents concerning the policies and practices for payment of claims for drug prescriptions for off-label uses, regardless of whether they are for Neurontin. *See* Motion at 13. This is incorrect. TPP Plaintiffs have refused only to produce claims data or other utilization information concerning other drugs that did not pertain to Neurontin. TPP Plaintiffs have not refused to produce generalized information concerning off-label policies, if such information existed. For many TPP Plaintiffs, such as Harden, they simply do not exist. *See* Notargiacomo Decl. at ¶ 9. For those that have this information, they have explained their stance on production, and it does not require withholding any information that has any remote relevance to this case. For example, ASEA has engaged in extensive discussion with Defendants concerning this particular issue, and has explained that it will provide information and documents concerning global policies that pertain to Neurontin as well as other prescription drugs. *See* Pacharzina Decl. at ¶ 4. However, if a policy only applies to a particular drug (such as birth control pills) and has no applicability to Neurontin, it will not be produced.

Much more importantly, as Defendants concede in their motion, the issue of the validity of Plaintiffs' articulated refusal to produce any documents is irrelevant in the context of this motion. *See* Motion at 15. The appropriate response to a plaintiff withholding documents based on an objection is for the defendant to file a motion to compel. For example, ASEA is in fact refusing to produce certain individual claim forms that were processed by ASI, and they have explained the nature of the burden in detail. *See* Pacharzina Decl. at ¶ 8 (attaching emails and correspondence as Exhibit A). Defendants admit that any perceived deficiency in plaintiffs'

production will require defendants to move to compel, and that they have not done so. *See*

Motion at 15. And Defendants admit that the relief they request at this time does not extend to

these subjects. Therefore, all such discussion is irrelevant and should be disregarded.

> E.     Defendants' Discovery Is An Attempt To Go Way Beyond Issues
>        Relevant To Class Certification and Instead to Harass Plaintiffs

The interrogatories propounded to the individual Class Plaintiffs provide a

glimpse of Defendants' motivation in extending the deadline for class certification discovery. In

the interrogatories, they have asked for the names and addresses of spouses, ex-spouses,

children, and current and former employment supervisors. *See* Declaration of Barry

Himmelstein at ¶ 6 (attaching as Exhibit C relevant pages of interrogatories). Such information

is irrelevant and is simply included to discourage Plaintiffs from pursuing this litigation. If the

discovery cutoff is continued, Defendants will no doubt subpoena these individuals.

Dated: September 30, 2005                  Respectfully Submitted,

By:   /s/ Barry Himmelstein
      Barry Himmelstein, Esquire
      Lieff Cabraser Heimann &
      Bernstein, LLP
      Embarcadero Center West
      275 Battery Street, 30th Floor
      San Francisco, CA 94111-3339

By:   /s/ Thomas Greene
      Thomas Greene Esquire
      Greene & Hoffman
      125 Summer Street
      Boston, MA 02110

By:   /s/ Don Barrett
      Don Barrett, Esquire
      Barrett Law Office
      404 Court Square North

P.O. Box 987
Lexington, MS 39095

By:    /s/ Daniel Becnel
       Daniel Becnel, Jr., Esquire
       Law Offices of Daniel Becnel, Jr.
       106 W. Seventh Street
       P.O. Drawer H
       Reserve, LA 70084

By:    /s/ James Dugan
       James Dugan, Esquire
       Dugan & Browne
       650 Poydras St., Suite 2150
       New Orleans, LA 70130

***Members of the Class Plaintiffs'***
***Steering Committee***

By:    /s/ Thomas M. Sobol
       Hagens Berman Sobol Shapiro LLP
       One Main Street, 4th Floor
       Cambridge, MA  02142
       Boston, MA 02110

***Plaintiffs' Liaison Counsel and Member of***
***the Class Plaintiffs' Steering Committee***

477100.2