UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---------------------------------- x
:
In re:  NEURONTIN MARKETING AND :
SALES PRACTICES LITIGATION :
:
---------------------------------- x
:
THIS DOCUMENT RELATES TO: : MDL Docket No. 1629
---------------------------------- x
: Master File No. 04-10981
HARDEN MANUFACTURING :
CORPORATION; LOUISIANA HEALTH :
SERVICE INDEMNITY COMPANY, dba : Judge Patti B. Saris
BLUECROSS/BLUESHIELD OF :
LOUISIANA; INTERNATIONAL UNION : Magistrate Judge Leo T. Sorokin
OF OPERATING ENGINEERS, LOCAL NO. :
68 WELFARE FUND; ASEA/AFSCME :
LOCAL 52 HEALTH BENEFITS TRUST; :
GERALD SMITH; and LORRAINE KOPA, :
on behalf of themselves and all others similarly :
situated, v. PFIZER INC. and WARNER- :
LAMBERT COMPANY. :
---------------------------------- x
:
THE GUARDIAN LIFE INSURANCE :
COMPANY OF AMERICA v. PFIZER INC. :
:
and :
:
AETNA, INC. v. PFIZER INC. :
---------------------------------- x

## DEFENDANTS' NOTICE OF SUPPLEMENTAL AUTHORITY

In connection with this Court's deliberation concerning Defendants' Motions to Dismiss the Amended Class Action Complaint and the First Amended Coordinated Complaint, Defendants submit for the Court's consideration a copy of the opinion in *Santullo v. Pfizer, Inc.*, No. D-0101-CV-200301377 (N.M. First Jud. Dist. Ct. Dec. 9, 2005). A true and correct copy of the opinion is attached hereto as Exhibit A.

Defendants believe the attached opinion is relevant to many of the issues briefed and argued concerning Defendants' pending Motions to Dismiss the Amended Class Action Complaint and the First Amended Coordinated Complaint. A true and correct copy of the opinion is attached hereto as Exhibit A.

Dated: December 13, 2005

                              DAVIS POLK & WARDWELL

                              By:  /s/ James P. Rouhandeh
                                    James P. Rouhandeh

                              450 Lexington Avenue
                              New York, New York 10017
                              (212) 450-4000

                                    - and -

                              HARE & CHAFFIN

                              By:  /s/ David B. Chaffin
                                    David B. Chaffin

                              160 Federal Street
                              Boston, Massachusetts 02110
                              (617) 330-5000

                              *Attorneys for Defendants Pfizer Inc. and Warner-Lambert Company*

FIRST JUDICIAL DISTRICT COURT
STATE OF NEW MEXICO
COUNTY OF SANTA FE

**ENDORSED**
First Judicial District Court

DEC 0 9 2005

Santa Fe, Rio Arriba &
Los Alamos Counties
PO Box 2268
Santa Fe

NO. D-0101-CV-200301377

**MICHAEL SANTULLO, On His Own Behalf
and On Behalf of All Similar Situated
Individuals,**

    Plaintiff,

v.

**PFIZER, INC. and PARKE-DAVIS, a division
of Warner-Lambert Company,**

    Defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This matter having come before the Court for hearing on Plaintiff's Motion for Class Certification; and the Court having considered the pleadings and evidence submitted and arguments of counsel; hereby makes the following Findings of Fact and Conclusions of Law:

### FINDINGS OF FACT[1]

#### Parties/Claims

1. Plaintiff raises individual and classwide claims of fraud, violations of the New Mexico Unfair Practices Act (UPA) and unjust enrichment.

---

[1] Because this matter has not proceeded to trial, many of the Findings of Fact herein are based on allegations of the Plaintiff and not on a factual determination by the Court or by a jury. The New Mexico Court of Appeals has determined that a trial court should enter written Findings of Fact and Conclusions of Law in deciding Motions for Class Certification. The Court enters these Findings of Fact solely for the purpose of deciding the Motion for Class Certification and not for any binding effect in this or other litigation.

2. Plaintiff seeks to represent a class of plaintiffs consisting of, "All New Mexico residents who have been prescribed and/or purchased Neurontin for *any* off-label use from June 1, 1995, when Defendants commenced their unlawful promotion of Neurontin for off-label uses, to May 13, 2004, when Defendants pleaded guilty to federal charges arising out of these activities."

3. Plaintiff's counsel alleges they have created a current list of putative class members consisting of a database of 500 New Mexico residents "who have indicated they wish to take part in this litigation."

4. All putative class members seek damages calculated as the cost of the Neurontin they purchased, alleged to be the amount wrongfully taken by Defendants from each putative class member. These damages are claimed irrespective of whether Plaintiffs realized a medical benefit from the use of Neurontin.

5. Defendant Pfizer currently markets and sells the drug Neurontin. Defendant Parke-Davis, a division of Warner-Lambert, marketed and sold Neurontin before Warner-Lambert was acquired by Pfizer in 2000.

### Off-label Uses of Neurontin

6. In 1993, the Food and Drug Administration (FDA) approved Warner-Lambert's application for the labeling and use of Neurontin (chemical name gabapentin) as safe and effective for use with other medications in the treatment of adults with epilepsy in doses up to 1800 mg/day.

7. Once Neurontin was approved by the FDA, physicians could legally prescribe it for any purpose he or she deems appropriate, regardless of whether it had been approved for that use by the FDA.

8. Under the Food, Drug and Cosmetic Act (FDCA) and regulations promulgated pursuant

to it, it was illegal for Warner-Lambert to label or promote Neurontin for uses different from those specified in FDA-approved labeling without filing a new application, or amending an existing application. Notwithstanding, Warner-Lambert legally could communicate with physicians about off-label (i.e., unapproved) uses of Neurontin, for example, by distributing third party publications.

7. Under a May 13, 2004, plea agreement with the United States Government, Warner-Lambert admitted it illegally promoted Neurontin from June 1995 through August 1996 for uses for which it had determined not to apply for FDA approval.

8. The illegal promotion of Neurontin by Warner-Lambert does not require a showing of intent to defraud or mislead.

9. The plea agreement resulted in the assessment of a criminal fine of $240 million (based on Warner-Lambert's pecuniary gain of $150 million, to which an agreed-upon multiplier of 1.6 had been applied) for the distribution of an unapproved new drug and the distribution of a drug that is misbranded for lack of adequate directions for use in violation of the FDCA (21 U.S.C. §§ 331(a), 331(d), 333(a)(2), 352(f)(1) and 355(a)).

10. The plea agreement also resulted in civil fines of $190 million, consisting of $152 million payable to the United States and State Medicaid Programs (based on Warner-Lambert causing "false and/or fraudulent claims to be submitted to the Medicaid Programs for Neurontin that had been dispensed to Medicaid beneficiaries for off-label uses and conditions that were not medically accepted indications for its use under 42 U.S.C. § 1396r-8"), and $38 million, payable to States (based on violations of their consumer protection statutes) for conduct engaged in during the period of July 1995 and June 2001.

11. Further, the plea agreement required Warner-Lambert to enter into a Corporate Integrity

-3-

Agreement with the Office of the Inspector General of the U.S. Department of Health and Human Services providing, among other things, for the training and auditing of Warner-Lambert employees with respect to marketing practices and related activities of employees specifically with respect to the promotion of drugs for off-label uses.

12. None of the conduct to which Defendants pled guilty occurred in or near New Mexico.

13. There is no evidence or allegation that patients were targets of the illegal promotional activities undertaken by Defendants.

**Specific Promotional Activities by Defendants in Support of Off-label Uses of Neurontin**

14. The off-label uses of Neurontin referenced in court documents associated with Warner-Lambert's plea agreement included post-herpetic neuralgia, painful diabetic neuralgia, anxiety disorder, social phobias, bipolar disorder, alcohol withdrawal syndrome, amyotrophic lateral sclerosis (ALS), spinal cord injury, essential tremor, restless leg syndrome, reflex sympathetic dystrophy (RSD), and migraine headaches. (The FDA approved the labeling and use of Neurontin in the treatment of post-herpetic neuralgia in 2002.)

15. Warner-Lambert's strategy for promoting the sale and use of Neurontin for off-label uses included market studies, strategic plans, and the establishment of annual goals, objectives, strategies and tactics for increasing sales.

16. Warner-Lambert's sales representatives detailed off-label uses of Neurontin to doctors verbally, at lunch programs and in written sales materials explaining that approximately 35 percent of all Neurontin use was not seizure-related.

17. Warner-Lambert hired, trained and deployed a nationwide network of "medical liaisons"

that were falsely presented to physicians as employees of the company's Medical and Scientific Affairs Department. These medical liaisons, alone and in conjunction with sales representatives, promoted off-label uses of Neurontin as safe and effective, for example, through presentations at local medical society meetings.

18. Warner-Lambert organized "consultants' meetings," speakers' bureaus and advisory boards for which it paid honorariums and expenses for participating physicians in order to promote off-label uses of Neurontin.

19. Warner-Lambert hired non-physician technical writers to create articles for medical journals and then paid physician specialists to be the "authors" of the articles.

20. Defendant Parke-Davis provided kickbacks in the form of "educational grants" to physicians actively prescribing Neurontin, identifying programs willing to host Neurontin speakers or expressing an interest in conducting Neurontin research.

21. Defendant Parke-Davis provided educational grants to organizations willing to host or sponsor programs at which off-label uses of Neurontin could be raised by sponsored attendees.

22. Defendants profited from these illegal activities promoting Neurontin for off-label uses.

### Plaintiff's Use of Neurontin

23. Neurontin was initially prescribed for Plaintiff by Dr. Gwenn Robinson, his primary care physician, in February 2002 for the treatment of the numbness, tingling and burning sensation associated with peripheral neuropathy (peripheral neuropathy is variously defined as a disease or disturbance of the non-central nervous system). The initial dosage was 300 mg/day. When Plaintiff's symptoms persisted, Dr. Robinson increased the dosage of Neurontin to 900 mg/day, and

referred Plaintiff to Dr. Douglas Barrett, a neurologist.

24. Beginning in August 2002, Plaintiff's use of Neurontin was prescribed by Dr. Barrett at a dosage of 1800 mg/day. Plaintiff continued to take Neurontin for the treatment of neuropathy until July 2003. The highest dosage of Neurontin prescribed to Plaintiff was 1800 mg/day.

25. Dr. Robinson's knowledge of Neurontin was derived from her professional judgment and experience in prescribing Neurontin for other patients. Before prescribing Neurontin to treat Plaintiff's neuropathy, Dr. Robinson had prescribed Neurontin for use by a couple dozen other patients.

26. Dr. Barrett began prescribing Neurontin for off-label uses as early as 1995 and prescribed Neurontin to approximately 20-30 percent of his patients experiencing neuropathy; he sees about one neuropathy patient a week, 48 weeks per year.

27. Doctors Robinson and Barrett initially had the impression from the general medical community that Neurontin can be effective for the treatment of pain. Dr. Robinson learned about Neurontin for off-label uses at medical conferences. Dr. Barrett believes he learned about off-label uses of Neurontin through medical meetings, medical literature, word of mouth and trial and error. Both doctors considered Neurontin to be the standard of care for treatment of neuropathy at the time of Plaintiff's treatment.

28. Neither Dr. Robinson nor Dr. Barrett was exposed to or attended any of the promotional programs sponsored by the Defendant.

29. Plaintiff reported "some improvement" in his symptoms after taking Neurontin. Plaintiff alleges no physical harm from taking Neurontin for the treatment of his neuropathy.

30. Plaintiff's knowledge of Neurontin was limited to what his physicians told him and what

he learned from a July 11, 2003, NBC broadcast of *Dateline*. Before seeing the broadcast, Plaintiff believed Neurontin had been tested and proven safe and effective for the treatment of neuropathy. After seeing the broadcast and learning that Neurontin had not been tested and proven safe and effective for the treatment of neuropathy, Plaintiff felt "cheated" and "defrauded" and asked Dr. Barrett to take him off Neurontin.

31. After his use of Neurontin for treatment of his neuropathy was discontinued, Plaintiff was treated by Dr. Barrett with two other drugs (Amitriptyline and Carbatrol), for which neuropathy was an off-label use.

32. There is no evidence of misstatements by Defendants regarding off-label use of Neurontin to any patient or doctor in New Mexico.

33. Neither Dr. Robinson nor Dr. Barrett conducted independent study of the use of Neurontin for off-label uses and neither participated in a clinical trial of Neurontin. Most doctors do not get involved in day-to-day scientific studies.

34. Doctors Robinson and Barrett are not the only physicians in New Mexico to prescribe Neurontin for off-label uses. It is likely that physicians in New Mexico have prescribed Neurontin for off-label uses other than neuropathy.

### Plaintiff's Claim as Representative of a Class

35. The amount of individual damages suffered by members of the putative class is relatively small.

36. Plaintiff's counsel alleges to have established a database of 500 New Mexico residents who fall within the class and who have indicated a desire to take part in the litigation.

37. The data base allegedly includes individuals who benefitted from the use of Neurontin, individuals who were prescribed Neurontin for an off-label use based on the independent medical judgment and prior positive treatment experiences of their doctors, individuals who were prescribed Neurontin for off-label uses for which Defendants did not allegedly promote the drug, individuals whose exposure to Neurontin was limited to free samples from their doctors, and individuals who were prescribed the drug but never filled the prescription or who filled prescriptions but never took Neurontin.

38. Named Plaintiff is dedicated to meeting the obligations of class representative.

39. Plaintiff's counsel is qualified and experienced in class action cases.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over the parties and subject matter of the case.

2. Venue is proper in Santa Fe County.

3. Pfizer is liable for the actions of its predecessor in business.

### Legal Issues Related to Plaintiff's Claims

4. In order to prove fraud, Plaintiff must provide evidence of misrepresentation of a material fact relating to Neurontin, that Plaintiff or his physician relied upon such misrepresentation, and that he was damaged by the misrepresentation. Plaintiffs cannot state a common law claim for fraud by making allegations of misconduct without also alleging that he was injured by that conduct. Fraud must be pled with particularity under Rule 1-009(B).

5. In order to sustain a claim under the Unfair Practices Act, a party must show that

Defendants' actions were "[u]nfair or deceptive trade practices . . . [or] unconscionable trade practices in the conduct of any trade or commerce." NMSA 1978 § 57-12-3 (2000).

6. An "unfair or deceptive trade practice" is "a false or misleading oral or written statement, visual description or other representation of any kind knowingly made in connection with the sale . . . of goods . . . which may, tends to or does deceive or mislead any person . . ." NMSA 1978 § 57-12-2(D) (2004).

7. An "unconscionable trade practice" is "an act or practice in connection with the sale . . . or in connection with the offering for sale . . . of any goods . . . which to a person's detriment: (1) takes advantage of the lack of knowledge, ability, experience or capacity of a person to a grossly unfair degree; or (2) results in a gross disparity between the value received by a person and the price paid." NMSA 1978 § 57-12-2(E) (2004).

8. In establishing a claim under the UPA, reliance need not be shown. *Smoot v. Physicians Life Ins. Co.*, 2004-NMCA-027, ¶ 22, 87 P.3d 545, 551.

9. In order to prevail in a cause of action for unjust enrichment, a party must show that (a) another has knowingly benefitted at party's expense and (b) allowing the other party to retain the benefit would be unjust.

### Rule 1-023(A)(1) – Numerosity.

10. Plaintiff has relied solely on his own contention to meet the requirement of numerosity. Although satisfaction of the numerosity requirement is not established in the record, the Court recognizes that the Plaintiff likely would be able to meet the numerosity requirement by supplementing the record with additional evidence.

### Rule 1-023(A)(2) – Commonality

11. Although only a single issue common to the class is required, the Court concludes that the requirement of commonality among class members has not been met. The lack of common issues is described more fully in the Court's consideration of predominance under Rule 1-023(B)(3).

### Rule 1-023(A)(3) – Typicality

12. The Court concludes that the requirement of typicality of the Plaintiff's claims has not been met.

13. Mr. Santullo's claims are not typical of the putative class because he suffered no physical harm from being prescribed Neurontin for an off-label use, he realized at least a temporary benefit from taking Neurontin, his doctors based their prescribing decision on independent knowledge gained from favorable experiences in treating other patients with Neurontin, he was not prescribed a dosage of Neurontin that exceeded the FDA-approved level, his doctors were not exposed to the illegal promotional activities undertaken by Defendants, and he was prescribed Neurontin only after the illegal activities ceased.

14. Because of these facts, Mr. Santullo's situation could compromise or jeopardize the claims of other class members who suffered a more direct harm as a result of the off-label marketing activities of the Defendants.

### Rule 23(A)(4) – Adequacy

15. Based on the record, the Court concludes that the Plaintiff has satisfied the adequacy requirement. Plaintiff has demonstrated his willingness to act as class representative and has

-10-

demonstrated that counsel can adequately perform the duties of class counsel.

### Rule 1-023(B)(3) – Predominance

16. The Court concludes that the requirement of predominance has not been met. As set forth below, individual issues would predominate over any common issues of the class.

17. Those who received a benefit from taking Neurontin suffered no loss and would not be able to recover under the legal theories advanced by the Plaintiff.

18. The amount of harm and the nature of the injury will depend on a variety of factors, including, whether class members' physicians were exposed to the illegal promotional activities undertaken by Defendants, the basis on which the class members' physicians prescribed Neurontin for an off-label use, whether class members were informed by their physicians that they were being prescribed Neurontin for an off-label use, and whether a class member for whom Neurontin was prescribed ultimately paid the purchase price of the prescription.

19. The establishment of both overall and individual class damages would require analysis of the circumstances surrounding each purchase of Neurontin to determine whether it flowed from an approved or off-label prescription. It would require information as to whether the purchasers' physicians had explained that the Neurontin was being prescribed for its potential value in an off-label use (i.e., if the patient was aware that the prescription was being written for an off-label purpose, it would be difficult to establish the presence of fraud), whether Plaintiffs' physicians were exposed to the illegal promotion of Neurontin by Defendants and whether Neurontin was prescribed based on those representations.

19. Doctors Robinson and Barrett's awareness from the "general medical community" that

-11-

Neurontin was being prescribed for off-label uses is not synonymous with their being affected by the illegal promotional activities undertaken by Defendants and does not outweigh or negate the fact they relied upon their independent expertise and their personal experience in treating patients for off-label uses of Neurontin.

20. Further, because purchases of prescription drugs are particularized to the reason why the purchaser's physician prescribed the medication, generalizations of injury and damages may not be possible as they would be in class action cases involving anti-trust or failure to disclose. Additionally, physicians exercise professional discretion when they prescribe drugs to their patients based on several factors, including personal experience, direct communications from pharmaceutical manufacturers, the experience of other physicians with whom they are acquainted, and specific knowledge relating to each individual patient. These unique factors distinguish the case from class actions in cases of insurance modal payments (where individual agents do not have the authority or discretion to modify payment schedules or amounts that are dictated by insurance companies and all payment information is provided direct to the consumer by the insurance company).

21. In sum, individual issues relating to causation, reliance and injury will dominate proceedings.

### Rule 23(B)(3) – Superiority

22. The Plaintiff has failed to submit a plan for managing the proceedings of its case.

23. The Court concludes that with the submission of a suitable plan for managing the case, the superiority requirement would be met at least as to the claims for fraud and unjust enrichment.

24. Given the potentially small value of individual claims, class members would likely not

pursue the claims in the absence of a class action.

25. UPA claims by class are not necessarily superior because of UPA's damage and attorney fee provisions; however, it seems unrealistic in the real world to conclude that any counsel would be willing to pursue this type of complex litigation on behalf of an individual plaintiff in the hopes of recovering attorney fees under the UPA.

## Conclusion

26. Because the Plaintiff has failed to satisfy the requirements of commonality, typicality and predominance, the Motion for Class Certification will be denied.

Counsel for the Defendant is hereby directed to prepare an Order Denying Motion for Class Certification, submit it to opposing counsel for approval, and then to the Court for signature.

JAMES A. HALL
DISTRICT JUDGE


xc:
Turner Branch, The Branch Law Firm, 2024 Rio Grande Blvd. NW, Albuquerque, NM 87104
James P. Lyle, 1116 Second Street NW, Albuqerque, NM 87102
Tom Outler, Rodey Law Firm, P.O. Box 1888, Albuquerque, NM 87103
James P. Rouhandeh, Davis, Polk & Wardwell, 450 Lexington, NY 10017