Request No. 26

Each and every document or record that demonstrates the dosage of Neurontin prescribed to Plaintiff and the dosage actually ingested by Plaintiff.

Request No. 27

Documents sufficient to identify each and every health or medical practitioner who prescribed Neurontin to Plaintiff to help treat Plaintiff's pain.

Request No. 28

All package inserts, labels, or other materials containing information about Neurontin received or obtained by Plaintiff.

Request No. 29:

All documents that state, describe, or refer to any benefit, efficacy, physical or chemical property, indication, contraindication, "side effect," adverse reaction, warning, precaution, or recommendation of or for Neurontin that Plaintiff read, viewed, received, or obtained.

Request No. 30

All documents that state, describe, or refer to Plaintiff's physician's reasons for prescribing Neurontin to Plaintiff.

Request No. 31

All documents concerning any communication by Plaintiff or any other person, included but not limited to Plaintiff's physician, about whether Neurontin was or appeared to be effective or ineffective for treating Plaintiff's pain.

Request No. 32

All documents concerning any communication by Plaintiff or any other person, included but not limited to Plaintiff's physician, about whether Plaintiff complained of any possible side effects while taking Neurontin.

Request No. 33

All documents concerning any communications to Plaintiff from any person having, or purporting to have, knowledge or information pertaining to Neurontin.

Request No. 34:

All documents concerning any opinion by any person with an M.D., Ph.D., D.O., M.P.H., D. Sc., pharmacy degree, or by any similarly trained or educated health care professional or scientist concerning Neurontin.

Request No. 35:

All documents concerning any communication by any person, including your attorneys, to or from the Food and Drug Administration ("FDA"), including but not limited to online, phoned, mailed or faxed communications to the FDA's MedWatch program, regarding Neurontin, including the dates of any such communications.

Request No. 36:

All documents concerning any communication by any person about reporting adverse reactions to Neurontin to the FDA or to Pfizer.

Request No. 37:

All documents proposing, recommending, or in anyway suggesting that Defendants should add to or change the warnings and instructions provided to physicians or consumers about Neurontin.

12

Request No. 38:

All documents in which Plaintiff or any other person described or referred to Plaintiff's use of Neurontin, described or referred to any adverse event or "side effect" experienced by Plaintiff that occurred while Plaintiff was ingesting Neurontin, or described or referred to any injury, damage, or harm that allegedly resulted from Plaintiff ingesting Neurontin.

Request No. 39

All documents concerning any communication between Plaintiff, or anyone acting on Plaintiff's behalf, and any health care provider, pharmacy, or insurer relating to treatment with Neurontin or any other treatment for pain.

Request No. 40:

All newspaper, magazine or medical journal articles concerning the use of Neurontin for the treatment of pain.

Request No. 41:

All promotional or marketing materials or other documents concerning the use of Neurontin in the treatment of pain that Plaintiff alleges were provided by Defendants to Plaintiff's physician.

Request No. 42:

All medical articles, treatises, research studies, publications, or other documents concerning the use of Neurontin for the treatment of pain that were reviewed or relied upon by Plaintiff's physician.

13

Request No. 43

All documents concerning any statements made by Defendant to the physician who prescribed Neurontin to Plaintiff.

Request No. 44

All documents showing that the physician who prescribed Neurontin to Plaintiff attended any of the events referred to in Paragraphs 65, 75, 81, 86, 90, 91, 129, 150, 157, 162, 179, 189-192, 197, 220, and 225 of the Complaint.

Request No. 45

All documents indicating that the physician who prescribed Neurontin to Plaintiff received a payment such as those referenced in Paragraphs 104, 226 and 229 of the Complaint, or participated in a study like those described in Paragraph 229 of the Complaint.

Request No. 46

All documents concerning any advertisement Plaintiff saw regarding Neurontin.

Request No. 47

All documents containing information about the approved indications for Neurontin or that indicate that Neurontin was not approved by the FDA for the treatment of pain.

Request No. 48

All documents concerning whether Plaintiff is taking or has taken at any time any drugs besides Neurontin for an off-label use.

14

Request No. 49

All documents concerning any statements made by Defendants to Plaintiff about Neurontin.

Request No. 50

All documents concerning any alleged misrepresentation(s) or any allegedly false, fraudulent, misleading, or deceptive statements made by Defendants concerning Neurontin.

Request No. 51:

All documents that state, record, list, or refer to any fee, expense, cost, or item of pecuniary expense or loss of any kind for which Plaintiff seeks to recover compensatory damages in this action, including medical, legal, counseling, administrative, travel, and other costs, damages, or expenses.

Request No. 52

All documents concerning any payment made by Plaintiff or on Plaintiff's behalf for the receipt or administration of Neurontin, including but not limited to, statements, invoices, bills, receipts, cancelled checks, credit card statements, or other proof of payment.

Request No. 53

All forms submitted to insurance carriers, company health plans, or any other entity concerning Neurontin, including but not limited to documents seeking pre-approval to use Neurontin and documents seeking reimbursement of any amount for the costs of Neurontin.

<u>Request No. 54</u>

All records showing whether Plaintiff was reimbursed in any amount for the costs of Neurontin and showing the amount of the reimbursement.

<u>Request No. 55</u>

All documents in the possession of Plaintiff or Plaintiff's attorneys concerning Neurontin that were provided by non-parties to any of the parties in the civil action *United States of America ex rel. David Franklin v. Parke-Davis, et al.*, C.A. No. 96-11651-PBS (D. Mass.).

<u>Request No. 56</u>

All documents reviewed by any expert retained by Plaintiff to testify at trial in this Action, or any expert whom Plaintiff intends to call as a witness at trial.

<u>Request No. 57</u>

All documents prepared by any expert retained by Plaintiff to testify at trial in this Action.

<u>Request No. 58</u>

The complete file and/or working papers of any expert whom Plaintiff intends to call as a witness at trial.

<u>Request No. 59</u>

The current resume or curriculum vitae of any expert whom Plaintiff intends to call as a witness at trial.

<u>Request No. 60</u>

All reports of any expert whom Plaintiff intends to call as a witness at trial.

Request No. 61

All drafts of all reports of any expert whom Plaintiff intends to call as a witness at trial.

Request No. 62

All notes prepared by any expert whom Plaintiff intends to call as a witness at trial.

Request No. 63

All documents that you provided to any expert whom Plaintiff intends to call as a witness at trial.

Request No. 64

All documents concerning communications between Plaintiff and any expert whom Plaintiff intends to call as a witness at trial.

Request No. 65

All documents relied upon by any expert whom Plaintiffs intend to call as a witness at trial.

Request No. 66

All documents that you contend provide support or evidence of the allegation in paragraph 22 of the Complaint that "Parke-Davis knew there was no scientific rationale for Neurontin being effective for bipolar disorder, acute mania, social phobia and panic disorder."

Request No. 67

All documents that you contend provide support or evidence of the allegation in
paragraph 29 of the Complaint that "Parke-Davis only intended to publish studies that
generated positive results."

Request No. 68

All documents that you contend provide support or evidence of the allegation in
paragraph 31 of the Complaint that "the marketing enterprises Parke-Davis conducted
routinely engaged in acts of mail fraud, wire fraud, commercial bribery, unfair and
deceptive trade practices and other unlawful conduct."

Request No. 69

All documents that you contend provide support or evidence of the allegation in
paragraph 42 of the Complaint that "Defendants hid their involvement in the promotion
of off-label information and mislead physicians into believing that the physicians who
promoted Neurontin were independent or not otherwise part of the enterprise Parke-Davis
created to market Neurontin off-label."

Request No. 70:

All documents that you contend provide support or evidence of the allegation in
paragraph 44 of the Complaint that "physicians who attended these events were deceived
into thinking that the events were educational in nature and independent from the control
of the Defendants."

Request No. 71

All documents that you contend provide support or evidence of the allegations in
paragraph 45 of the Complaint that Defendants engaged in practices of "(a) deliberately

18

misrepresenting the safety and medical efficacy of Neurontin for a variety of off-label

uses; (b) knowingly misrepresenting the existence and findings of scientific data, studies,

reports and clinical trials concerning the safety and medical efficacy of Neurontin for a

variety of off-label uses; (c) deliberately concealing negative findings or the absence of

positive findings ... (d) misrepresenting the credentials and qualifications of certain of

Defendants' employees ... (e) wrongfully and illegally compensating physicians for

prescribing Neurontin for various off-label uses; (f) knowingly publishing articles,

studies and reports misrepresenting the scientific credibility of data and touting the

medical efficacy of Neurontin for off-label uses; (i) intentionally misrepresenting and

concealing Defendants' role and participation [in various events and publications]; and (j)

intentionally misrepresenting and concealing the financial ties between the Defendants

and other participants in the Enterprise."

Request No. 72

　　　All documents that you contend provide support or evidence of the allegation in

paragraph 53 of the Complaint that unrestricted grants in support of medical education

events "were expressly provided for the purpose of obtaining a program that extolled the

use of Neurontin for unapproved indications."

Request No. 73

　　　All documents that you contend provide support or evidence of the allegation in

paragraph 55 of the Complaint that "the real purpose of [Consultants' Meetings] was to

expose the attendees to Neurontin's uses for non-epilepsy treatment."

19

Request No. 74

All documents that you contend provide support or evidence of the allegation in paragraph 56 of the Complaint that "the vendor participants (with the assistance of the participating physicians and the Defendants) intentionally designed the programs so that the attendee physicians would not receive fair and balanced information."

Request No. 75

All documents identifying each study Plaintiff claims contains "negative clinical trial results that demonstrated that Neurontin was no more effective than a placebo for several off-label conditions," as referenced in paragraph 56 of the Complaint; and for each such study provide all documents showing the date the study was undertaken, whether it was sponsored by Defendants, and the date the results of the study were released.

Request No. 76

All documents that you contend provide support or evidence of the allegation in paragraph 115 of the Complaint that "Publications that Defendants distributed as part of their 'publication strategy' intentionally misrepresented Defendants' role in the creation and sponsorship of the publications."

Request No. 77

All documents that you contend provide support or evidence of the allegation in paragraph 128 of the Complaint that "the Off-Label Promotion Enterprise routinely and knowingly provided false, inaccurate, misleading, distorted, unfair and unbalanced information about Neurontin's use for unapproved indications."

Request No. 78

All documents that you contend provide support or evidence of the allegation in paragraph 132 of the Complaint that "Defendants ... deliberately suppressed negative studies" about pain.

Request No. 79

All documents that you contend provide support or evidence of the allegation in paragraph 210 of the Complaint that "Defendants elected to pay kickbacks and otherwise provide participant and attendee physicians with items of substantial value to induce them to listen to the off-label marketing pitch, to prescribe Neurontin, and to recommend Neurontin to other physicians."

Request No. 80

All documents that you contend provide support or evidence of the allegation in paragraph 235 of the Complaint that "Pfizer has routinely marketed Neurontin for off-label indications up until May of 2004."

Request No. 81

All documents supporting, rebutting, or otherwise relating in any way to the allegations of the Complaint, including but not limited to all documents reviewed in advance of, or relied on in, drafting the Complaint.

Request No. 82

All documents concerning Neurontin that have not been provided in response to any other Request.

21

Request No. 83

All documents concerning communications between Plaintiff and Pfizer, Warner-Lambert, or Parke-Davis that have not been provided in response to any other Request.

Dated:   New York, New York
         May 2, 2005

DAVIS POLK & WARDWELL

By:  _____
     James P. Rouhandeh
     James E. Murray

450 Lexington Avenue
New York, New York  10017
(212) 450-4000


HARE & CHAFFIN

By:  _____
     David B. Chaffin
     BBO No. 549245

160 Federal Street
Boston, Massachusetts 02110
(617) 330-5000


Attorneys For Defendants Pfizer Inc. and
Warner-Lambert Company

### AUTHORIZATION FOR RELEASE OF HEALTH INFORMATION PURSUANT TO HIPAA

| Patient Name | Date of Birth | Social Security Number |
|---|---|---|
| Patient Address | | |

I, or my authorized representative, request that health information regarding my care and treatment be released as set forth on this form:

In accordance with the Privacy Rule of the Health Insurance Portability and Accountability Act of 1996 (HIPAA), I understand that:

1. This authorization may include disclosure of information relating to **ALCOHOL** and **DRUG ABUSE, MENTAL HEALTH TREATMENT**, to include psychotherapy notes, and **CONFIDENTIAL HIV\* RELATED INFORMATION** only if I place my initials on the appropriate line in Item 9(a). In the event the health information described below includes any of these types of information, and I initial the line on the box in Item 9(a), I specifically authorize release of such information to the person(s) indicated in Item 8.

2. If I am authorizing the release of HIV-related, alcohol or drug treatment, or mental health treatment information, the recipient is prohibited from redisclosing such information without my authorization unless permitted to do so under federal or state law. I understand that I have the right to request a list of people who may receive or use my HIV-related information without authorization. If I experience discrimination because of the release or disclosure of HIV-related information, I may contact the appropriate State Division of Human Rights or City Commission of Human Rights, as these agencies are responsible for protecting my rights.

3. I have the right to revoke this authorization at any time by writing to the health care provider listed below. I understand that I may revoke this authorization except to the extent that action has already been taken based on this authorization.

4. I understand that signing this authorization is voluntary. My treatment, payment, enrollment in a health plan, or eligibility for benefits will not be conditioned upon my authorization of this disclosure.

5. Information disclosed under this authorization might be redisclosed by the recipient (except as noted above in Item 2), and this redisclosure may no longer be protected by federal or state law.

6. **THIS AUTHORIZATION DOES NOT AUTHORIZE YOU TO DISCUSS MY HEALTH INFORMATION OR MEDICAL CARE WITH ANYONE OTHER THAN THE ATTORNEY OR GOVERNMENTAL AGENCY SPECIFIED IN ITEM 9(b).**

7. Name and address of health provider or entity to release this information:


8. Name and address of person(s) or category of person to whom this information will be sent:
**Debbie MacGregor, Esq., DAVIS POLK & WARDWELL, 450 Lexington Avenue, New York, NY 10017**

9(a). Specific information to be released:

□ Medical Record from (insert date) _____ to (insert date) _____.

□ Entire Medical Record, including patient histories, office notes (to include psychotherapy notes), test results, radiology studies, films, referrals, consults, billing records, insurance records, and records sent to you by other health care providers.

□ Other: _____          Include: *(Indicate by Initialing)*

_____          _____ **Alcohol/Drug Treatment**

_____ **Mental Health Information**

_____ **HIV-Related Information**

**Authorization to Discuss Health Information**

(b) □ By initialing here _____ I authorize _____

             Initials              Name of individual health care provider

to discuss my health information with my attorney, or a governmental agency, listed here:

_____

(Attorney/Firm Name or Governmental Agency Name)

| 10. Reason for release of information:<br>□ At request of individual<br>□ Other: | 11. Date or event on which this authorization will expire: |
|---|---|
| 12. If not the patient, name of person signing form: | 13. Authority to sign on behalf of patient: |

All items on this form have been completed and my questions about this form have been answered. In addition, I have been provided a copy of this form.

_____          Date: _____

Signature of patient or representative authorized by law.

\* Human Immunodeficiency Virus that causes AIDS.

# EXHIBIT 11

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| IN RE NEURONTIN MARKETING AND SALES PRACTICES LITIGATION | ) ) ) ) | MDL Docket No. 1629 |
| THIS DOCUMENT RELATES TO: ALL CLASS ACTIONS | ) ) ) | Master File No. 04-10981 |
| | ) | Judge Patti B. Saris |

### DEFENDANTS' FIRST SET OF INTERROGATORIES
### TO PLAINTIFF LORRAINE KOPA

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Defendants Pfizer

Inc. and Warner-Lambert Company (hereinafter "Defendants"), hereby request that in

accordance with the Definitions and Instructions set forth, Plaintiff Lorraine Kopa answer the

interrogatories listed below within thirty (30) days of the date of service hereof.

### DEFINITIONS

1.      The definitions contained in Rule 26.5 of the Local Rules of the United States

District Court for the District of Massachusetts are incorporated herein by reference.

Additionally, the following definitions apply.

2.      "Plaintiff" shall mean the Plaintiff Lorraine Kopa.

3.      "You" or "your" means Lorraine Kopa.

4.      "Pfizer" shall mean defendant Pfizer Inc. and any of its predecessors, divisions,

offices, subsidiaries, affiliates, and any present or former directors, officers, executives, trustees,

and employees, including, but not limited to, Warner-Lambert Company and Parke-Davis, as a

division of Warner-Lambert Company.

5.    "Warner-Lambert" shall mean defendant Warner-Lambert Company LLC and any

of its predecessors or successors in interest, divisions, offices, subsidiaries, affiliates, and any

present or former directors, officers, executives, trustees, and employees, including, but not

limited to, Parke-Davis, as a division of Warner-Lambert Company.

6.    "Parke-Davis" shall mean Parke-Davis, a division of Warner-Lambert Company,

and any of its predecessors or successors in interest, divisions, offices, subsidiaries, affiliates,

and any present or former directors, officers, executives, trustees, and employees.

7.    "Complaint" shall mean the Amended Class Action Complaint, filed on February

1, 2005 in connection with MDL Docket No. 1629, Civil Action No. 04-10981-PBS, in the

United States District Court for the District of Massachusetts.

8.    "Action" shall mean the proceeding pending in the United States District Court

for the District of Massachusetts captioned *In re: Neurontin Marketing and Sales Practices

Litigation*, 04-10981-PBS.

9.    The term "drug, " unless otherwise indicated, shall mean a substance used in the

diagnosis, treatment, or prevention or a disease or as a component of a medication, and shall

include both prescription and non-prescription drugs.

10.    The term "off-label" shall mean the prescription or use of a drug for indications or

at dosages different than those set forth in a drug's labeling.

11.    "Pain," unless otherwise indicated, shall refer to all pain that is similar to that for

which Plaintiff was prescribed Neurontin, including but not limited to pain that is similar in type,

intensity, cause, or treatment.

2

12.    "And" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the request any information that might otherwise be construed to be outside its scope.

13.    "Any" includes the word "all" and vice-versa:

14.    "Communication" shall have the meaning set forth in Local Rule 26.5

15.    "Concerning" shall have the meaning set forth in Local Rule 26.5.

16.    "Identify," as defined in Local Rule 26.5,

(a)    When used with reference to an individual person, means to state his full name, present or last known address, and present or last known place of employment;

(b)    When used with reference to an entity, means to state the entity's full name, present and last known address and telephone number(s), and organizational form (e.g., corporation, sole proprietorship, partnership, joint venture, etc.); and

(c)    When used with reference to a document, means to state the type of document (e.g., memorandum, letter, notes, etc.), its general subject matter, date of the document, and its author(s), addressess(s), and recipient(s).

17.    "State the basis," as defined in Local Rule 26.5, means:

(a)    Identify each and every document (and, where pertinent, the section, article, or subparagraph thereof), which forms any part of the source of the party's information regarding the alleged facts or legal conclusions referred to by the interrogatory;

(b)    Identify each and every communication which forms any part of the source of the party's information regarding the allged facts or legal conclusions referred to by the interrogatory;

(c)    State separately the acts or omissions to act on the part of any person (identifying the acts or omissions to act by stating their nature, time, and place and identifying the persons involved) which form any part of the party's information regarding the alleged facts or legal conclusions referred to in the interrogatory;

(d)    State separately any other fact which forms the basis of the party's information regarding the alleged facts or conclusions referred to in the interrogatory.

3

18.    "Person" or "Persons" shall mean any individual, corporation, organization, association, partnership, limited partnership, firm, joint venture, trustee, governmental body, agency, governing board, department or division, or any other entity.

19.    "Relating to" shall have the same meaning as concerning.

## INSTRUCTIONS

1.    The singular form of a noun or pronoun shall include within its meaning the plural form of the noun or pronoun and vice versa; the masculine form of a pronoun shall include within its meaning the feminine form of the pronoun and vice versa; and the use of any tense of any verb shall include within its meaning all other tenses of the verb.

2.    These interrogatories are continuing in nature and require you to provide prompt supplements or revisions to your answers whenever additional information becomes available.

3.    In the event you assert any form of objection or privilege as a ground for refusing to answer an interrogatory or any part of an interrogatory, set forth the legal grounds for the objection or privilege and the facts upon which the objection or privilege is based.  If the objection or privilege relates to only part of an interrogatory, the balance of the interrogatory must be answered in full.

4.    With respect to any conversation for which a privilege is being asserted, provide the following information:

(a)    When and where the conversation occurred;

(b)    The name, title, and job or position or each person who was present at or during the conversation, whether or not such conversation was in person or by telephone;

(c)    A brief description of the conversation's subject matter;

(d)    The statute, rule, or decision that is claimed to give rise to the privilege; and

4

(e)    The name, title, and job or position of all persons on whose behalf the privilege is asserted.

5.    If the answer to all or any part of an interrogatory is not presently known or available, include a statement to that effect.

6.    To the extent that you view any interrogatory as vague or imprecise, counsel for defendants offers to confer with counsel for Plaintiff as to the intended scope of such interrogatory.

## INTERROGATORIES

Interrogatory No. 1:

Provide the identity and title of all persons who participated in the preparation of these Interrogatory responses, excluding counsel.

Interrogatory No. 2:

State Plaintiff's full name and any nicknames or aliases by which Plaintiff has ever been known; Plaintiff's present address, date of birth, and social security number; whether Plaintiff has ever been married, and, if so, the date of each marriage and the name and address of each spouse; and the name, address and birth dates of any children.

Interrogatory No. 3:

List the address(es) that Plaintiff resided at during the ten years prior to the matters alleged in the Complaint. As to each, state (a) the dates when Plaintiff resided at the address; and (b) the name and present address of each individual that resided with Plaintiff.

Interrogatory No. 4:

List the schools Plaintiff has attended, the years attended, and indicate for each school (a) whether Plaintiff graduated; and (b) whether Plaintiff obtained any degrees, and if so, the name of each degree obtained and the year in which it was obtained.

5

Interrogatory No. 5:

State the name and address of each of Plaintiff's employers. As to each job Plaintiff has held, state: (a) a description of the job; (b) Plaintiff's immediate supervisor; (c) the dates each employment commenced and ended; and (d) the reasons the employment ended.

Interrogatory No. 6:

If Plaintiff has ever been involved in any other legal action, state: (a) the nature of the action; (b) the date, place and court in which it was filed; (c) the names of the parties involved; (d) the nature of Plaintiff's involvement; (e) the result of any judgment or award; and (f) if the action was a class action, also state whether the class was certified and whether Plaintiff was and remained the named Plaintiff or class representative.

Interrogatory No. 7:

If Plaintiff has ever been convicted of a criminal offense, state: (a) the nature of the offense; (b) the name of the court in which each such matter or proceeding was filed or prosecuted; (c) each judgment or plea entered in connection with each such offense; (d) the sentence or other punishment imposed for each such offense; and (e) the name and address of each institution in which Plaintiff was confined or referred for treatment or counseling in connection with each such offense.

Interrogatory No. 8:

State, through the date of answering these interrogatories, (a) the name and address of each physician or other health care professional who has treated or examined Plaintiff and set forth the purpose or purposes of such treatment or examination; and (b) the name and address of any hospital or other medical facility to which Plaintiff was admitted, the date of admission and date of discharge, the reasons for admission, and the nature of treatment rendered.

6

Interrogatory No. 9:

If Plaintiff has ever consulted a psychiatrist, psychologist or other mental health professional, including, but not limited to, an individual with a Masters of Social Work ("MSW"), or undergone psychiatric or psychological examination or treatment, state: (a) the date(s) upon which the consultation, examination or treatment was given; (b) the name, address and specialty of the person performing the consultation, examination or treatment; and (c) the reason for the consultation, examination or treatment.

Interrogatory No. 10:

Identify any and all medications (whether prescription or not) or drugs (whether prescription or not) which Plaintiff took orally, by injection, through ingestion, by suppository or by external application, at any time prior to the service of the response to these interrogatories. As to each, state: (a) the brand or generic name; (b) the date or dates taken; (c) the dosage taken; (d) the nature of any reaction or side effect; (e) whether Plaintiff took the medication according to a prescription by a licensed physician or other health care professional or not; (f) the name, address and occupation of the person who prescribed the substance if applicable; (g) the reason or reasons for which the substance was prescribed or taken; (h) whether the medication was prescribed for an indication not approved by the United States Food and Drug Administration ("FDA"); and (i) if any of the medications identified were prescribed for an indication not approved by the FDA, state whether the person who prescribed the substance informed the Plaintiff that the drug was for an indication not approved by the FDA.

Interrogatory No. 11:

Describe in detail the nature of Plaintiff's pain and the medical care that she has received from any physician, psychiatrist, psychologist or other mental health professional to treat her pain, including, but not limited to: (a) the date on which Plaintiff first learned that she suffered

7

from pain; (b) the name and current address of each physician, psychiatrist, psychologist or other mental health professional from whom she has received treatment; (c) the date of each treatment; and (d) a description of the treatment (whether it be through surgery, prescription drug, or otherwise).

Interrogatory No. 12

Identify each medication or drug prescribed or ingested by Plaintiff to treat her pain, and for each describe in detail: (a) the dates the medication was taken; (b) the dosage taken; (c) whether the medication was effective for treating Plaintiff's pain; (d) whether Plaintiff experienced any side effects while taking the medication; (e) when Plaintiff stopped taking the medication; and (f) why Plaintiff stopped taking the medication.

Interrogatory No. 13

Identify which, if any, of the medications identified in the response to Interrogatory No. 12 were taken by Plaintiff for an off-label use, and for those medicines state (a) whether Plaintiff was aware that she was taking the drug for an off-label use; (b) how Plaintiff became aware she was taking a drug for an off-label use; and (c) when Plaintiff became aware she was taking the drug for an off-label use.

Interrogatory No. 14:

State whether Plaintiff ingested Neurontin, and if so identify: (a) the date on which Plaintiff started using Neurontin; (b) the date on which Plaintiff stopped using Neurontin; (c) the name of the individual(s) who prescribed the Neurontin to you, including the individual(s) current and known past business addresses and any hospital or medical group affiliation(s); (d) the date or dates on which Neurontin was prescribed to Plaintiff; (e) the indication for which the individual(s) prescribed Neurontin to Plaintiff; (f) the dosage(s) at which Neurontin was prescribed; (g) the individual(s) who dispensed Neurontin to you, including the name and

8

address of each pharmacy, clinic or other source from which Plaintiff obtained Neurontin; (h) the dosage of Neurontin dispensed by these individual(s); and (i) the dates on which the Neurontin was dispensed to Plaintiff. The answer to this interrogatory should reflect all uses for which Plaintiff has ever been prescribed or ingested Neurontin.

Interrogatory No. 15:

If there were any directions, instructions or warnings concerning proper use of Neurontin provided to Plaintiff at any time, state: (a) the exact contents of such instructions or warning; (b) the place and manner in which such directions, instructions or warnings were given to Plaintiff; and (c) the person or person who provided such directions, instructions or warnings.

Interrogatory No. 16:

Describe in detail (a) any reasons expressed by the physician who prescribed Neurontin to Plaintiff for writing the prescription; and (b) the information, if any, the Plaintiff's physician gave to Plaintiff when he or she prescribed Neurontin to Plaintiff, whether delivered orally or in writing, including but not limited to the package insert for Neurontin.

Interrogatory No. 17:

State whether Plaintiff or anyone Plaintiff knew, including but not limited to Plaintiff's physician(s), believed Neurontin was effective in treating Plaintiff's pain at any time, and if so, describe in detail how Neurontin was perceived to have helped, who believed Neurontin was helping, and when the person or persons had this belief.

Interrogatory No. 18:

State whether you received or viewed any advertising regarding Neurontin, and if so, describe the type and content of the advertising, the name of the advertiser, and the dates that you viewed or heard the advertising.

Interrogatory No. 19

State whether a representative of Defendant ever made any statement about Neurontin to Plaintiff or to the physician who prescribed Neurontin to Plaintiff, and if so, describe in detail the content of those statements, when they were made, who made them, and the circumstances under which they were made.

Interrogatory No. 20

Describe in detail Plaintiff's knowledge that she was taking Neurontin for an off-label use, including (a) when Plaintiff first learned the use of Neurontin for pain was an off-label use; (b) how Plaintiff learned this fact; (c) who told Plaintiff this fact; (d) what, if anything, Plaintiff did upon learning this fact; and (e) whether Plaintiff identified Neurontin as being used for an off-label use on any forms or in any correspondence with any entity or person who reimbursed or was requested to reimburse Plaintiff for any costs associated with Plaintiff's ingestion of Neurontin.

Interrogatory No. 21

State whether the physician who prescribed Neurontin to Plaintiff (a) ever attended any seminars or events at which the use of Neurontin to treat pain, or any other off-label use, was discussed; and if so, state the date(s) of the event(s), the location of the event(s), the title of the event(s), and the subject matter discussed; and (b) ever received a grant or participated in a study whose purpose was to explore the use of Neurontin to treat pain, or any other off-label use; and if so, describe the amount of the grant, the entity who gave the grant or sponsored the study, the purpose of the grant or study, the name of the person who received the grant or took part in the study, and the results of the grant or study.

10

Interrogatory No. 22:

State whether there have been any communications between Plaintiff and Parke-Davis, Warner-Lambert, or Pfizer, including but not limited to online, phoned, mailed or faxed communications, including the dates of any such communications.

Interrogatory No. 23

Identify with specificity each injury that you contend or allege Defendants caused in any way and, if Plaintiff is still receiving treatment for injuries arising out of the matters alleged in the Complaint, state (a) the nature of such treatments; (b) the frequency of such treatments; and (c) each physician and/or health care professional who is conducting or prescribing such treatments.

Interrogatory No. 24:

Itemize all damages you claim to have incurred, directly or indirectly, as a result of the allegations in your Complaint, including, but not limited to, (a) any time from work that is alleged to have been lost as a result of the matters alleged in the Complaint (and if so, each date on which time was lost and the amount of time lost; Plaintiff's wage on each such date; and the total amount of wages allegedly lost); and (b) all medical and pharmaceutical expenses, nursing expenses, and therapy and counseling expenses, including the name and address of each person who provided goods or services in connection with each such expense, the nature of the goods or services provided, the dates of all services rendered to you or provision of goods to you, the monetary amount of each such expense or item of damages, and the name and address of the person or entity paying such obligation.

Interrogatory No. 25

Describe in detail (a) the amount of money you paid for Neurontin, and describe any reimbursements by insurers, health care plans, or any other entity made to Plaintiff or directly to

11

the physician and / or pharmacy for the costs of Neurontin; and (b) any health, medical, or other policy or policies of insurance under which you are currently covered or were covered at the time that you received Neurontin, including the nature and type of the policy; the name, address, and telephone number of the entity or plan that sponsors the policy; the amount and type of coverage provided by each policy (including information related to co-pays, coinsurance, and deductibles); the entity providing the coverage and the policy number; the effective period of the policy; and whether the coverage is provided by or through your employer, former employer, a labor organization, or otherwise.

12

Dated:  New York, New York
         May 2, 2005

                   DAVIS POLK & WARDWELL

                   By:

                       James P. Rouhandeh
                       James E. Murray

                   450 Lexington Avenue
                   New York, New York  10017
                   (212) 450-4000

                   HARE & CHAFFIN

                   By:

                       David B. Chaffin
                       BBO No. 549245

                   160 Federal Street
                   Boston, Massachusetts 02110
                   (617) 330-5000

                   Attorneys For Defendants Pfizer Inc. and
                   Warner-Lambert Company.

# EXHIBIT 12

X-BrightmailFiltered: true
X-Brightmail-Tracker: AAAAAA==
X-IronPort-AV: i="3.97,173,1125892800";
   d="scan'208,217"; a="6777587:sNHT62832424"
Subject: Neurontin
Date: Tue, 4 Oct 2005 09:44:31 -0500
X-MS-Has-Attach:
X-MS-TNEF-Correlator:
Thread-Topic: Neurontin
thread-index: AcXl8iFoZ53ki8juQdSw447ERrMs1Q==
From: "Eric Pavlack" <epavlack@cohenandmalad.com>
To: <patrick.murray@dpw.com>

xmlns:ns0="urn:schemas-microsoft-com:office:smarttags">
Patrick:

Following up on our conversation earlier this morning, I am writing to clarify that from the time of his car accident
in March 1999 until the time that he ceased taking Neurontin in the Spring of 2001, Mr. Smith did not receive any
medical treatment for which we have not already provided medical records, other than the counseling that we
have already disclosed.  It is my understanding that he did have a couple of medical procedures completely
unrelated to the injuries he sustained in the car accident, which took place after he had ceased taking Neurontin.
We maintain that such information is completely irrelevant to this case and object to producing the same.


**Eric S. Pavlack**
COHEN & MALAD, LLP
One Indiana Square, Suite 1400
Indianapolis, IN 46204
Telephone: 317-636-6481
Facsimile: 317-636-2593

CONFIDENTIALITY NOTE: THIS MESSAGE IS INTENDED ONLY FOR THE USE OF THE ADDRESSEE AND MAY CONTAIN
INFORMATION THAT IS PRIVILEGED AND CONFIDENTIAL AND/OR ATTORNEY WORK PRODUCT. IF YOU ARE NOT THE INTENDED
RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU
HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE DELETE ALL ELECTRONIC COPIES OF THE MESSAGE AND ITS
ATTACHMENTS, DESTROY ANY HARD COPIES YOU MAY HAVE CREATED, AND NOTIFY US IMMEDIATELY. THANK YOU.

# EXHIBIT 13

Gerald E. Smith - #74675
3/30/99

Here for a recheck.

He's doing some better regarding his depression. He still hasn't driven yet. Has not gone back to work. Headaches are decreased. He does have some occasional pain in the back of the neck which is muscular.

Gait is normal. Heel to toe is normal. Finger to nose is normal. Romberg is negative. Cranial nerves are all normal.

I think he's really doing fine. Encouraged him to start taking some short drives toward the end of the week. If he's doing better at that point, the go back to work on Monday.

Wt. 184. B/P 124/80.

Dr. Poe
TMP/jl

6-11-99 ov c Dr Poc

Smith_0000113



**Comprehensive Neurologic**
**Services, p.c.**
Prestwick Pointe • Suite 210
5250 E. U.S. 36 • Avon, IN 46123-1942
(317)718-1355
Fax(317)718-1358



Thaddaeus M. Poe, M.D.                                        March 20, 2000
100 Meadow Drive
Danville, Indiana   46122

RE:  Gerald Smith

Dear Dr. Poe:

Gerald Smith returns for follow-up today.  He is a 33 year old man whom I have been treating for post concussive syndrome, with many secondary complications which include chronic headaches, vertigo, depression, disequilibrium, etc.

The patient states that from a physical standpoint, he has been doing much better, but still has some problems concentrating on multiple tasks.  I therefore sent him for neuropsychological testing with Dr. David Karaken, and the results are pending.  As well, the patient notes that he has been battling with signs of depression, and one week ago Friday, he overdosed on Zanaflex.  He then went to Hendricks Community Hospital and went through activated charcoal treatment.  He was not consulted by a psychiatrist and was discharged.  He is not in any type of counseling, but stated that his wife got fed up with him and left him.

Current medications include Neurontin 300 mg at 600 mg qAM, 300 mg q midday, and 600 mg qHS; Zanaflex 4 mg at a ½ pill prn cervical strain; Zoloft 25 mg q day; and Antivert 25 mg TID.

On examination today, blood pressure is 136/100, pulse 86, respirations are even and unlabored, and weight is 205 lbs.  In general, he is appearing somewhat slowed in his overall cognition with a mildly blunted affect.  He is cognitively intact.  Neck is supple.  He notes distinct pain over the left posterior auricular nerve, which is quite irritating and bothersome to him today.  Cranial nerves II-XII are without deficits.  On motor exam, he has normal bulk, tone, and strength to all four extremities.  Coordination is intact.  No cerebellar dysmetria is noted and no lateralizing sensory deficits are noted.  Gait is fully normotaxic and reflexes are symmetric throughout.

IMPRESSION:
33 year old man with post concussive syndrome with multiple complicating issues including psychological stress and depression.  His neurologic exam is nonrevealing and I await the results of his neuropsychological testing.

RECOMMENDATIONS:
1.  I will halt his low dose Zoloft and immediately start Celexa 20 mg q day and titrate him upwards.
2.  He has signed a written suicide pact promising not to attempt to harm himself in any way, shape, or form.
3.  He has been referred to a counselor for marital and family counseling.
4.  He will otherwise remain on his current medications.

I appreciate participating in the care of this patient and will keep you informed.  He will be seen back in the office in about four weeks time.

Sincerely,

Kylene K. Huler, M.D.

KKH/TPW/teg

INDIANA UNIVERSITY



March 21, 2000

**CONFIDENTIAL: NEUROPSYCHOLOGICAL EXAMINATION**
re: Smith, Gerald E., MRN #71928674
CPT 96117(7)
Referring Diagnosis: Concussion without Loss of Consciousness (850.0)

Kylene Huler, M.D.
5250 East US 36, Ste. 610
Avon, IN 46123

SCHOOL OF MEDICINE   Dear Dr. Huler:

    I had the pleasure of examining Gerald Smith on March 7, 2000. As you know this is a 33 year old right handed gentleman involved in a motor vehicle accident who now presents with complaints of memory loss.

    On March 15, 1999 the patient was the restrained driver of a pickup truck in Crawfordsville. He began a left hand turn onto their construction job site and remembers his boss yelling "that SOB". The patient turned around and saw the girl in the truck that impacted his vehicle on the left rear corner. He has no memory of the actual impact, but remembers being in a field and trying to get out of the truck; he doubts any loss of consciousness. His seat was reclining and apparently broken. The passenger compartment was otherwise intact. His head may have hit the center back window, but he denied having any injury to his cranium other than a "knot" in his left parietal area. He remembers trying to pick up tools that had been scattered in the field, bending over and feeling dizzy and nearly collapsing. He was then taken to the Culver Emergency Room, but he was not admitted to the hospital. He remembers the ambulance ride and the ER clearly. He returned home and over the next few days had a bad headache. During this time he had a job interview and reported feeling "weird" and unable to relate his entire job history. He nearly passed out at this point and was taken home by his family. Over the ensuing 3 weeks he had a headache, but then returned to work. Except for a stiff neck for 5 or 6 months he had no other symptoms and apparently did very well on his job.

    On September 18, 1999 he was working a new job for approximately 6 months, after which he had the onset of new symptoms after working several 12 hour shifts. This included tingling hands, feeling of lightheadedness, dizziness, shakiness, weakness and 7 to 8 nose bleeds in the past 2 weeks. He went to the hospital where they cauterized his nose. He was interested in a second opinion and consulted his family physician, in whose office he again had severe headache and dizziness. Work-up was apparently normal. He was then referred to Dr. Kylene Huler.

    By the first of the year headaches were resolving and becoming tolerable. He felt less dizzy. He had nonetheless been off of work from September to January. When attempting to return to work for 4 days in early January, he had some difficulty remembering how to properly operate a crane and pressed the wrong button. All night long he forgot what he was doing and was discharged from work for health reasons.

DEPARTMENT OF NEUROLOGY

SECTION OF NEUROPSYCHOLOGY

James Whitcomb Riley
Hospital for Children 5999C
702 Barnhill Drive
Indianapolis, Indiana
46202-5200

317-274-7327
Fax: 317-274-1337

    He now describes his memory as "back and forth". The other day he put his overalls on backwards. His wife indicates that his response time is slower and he cannot remember simple things like an address, when to pick up their children, conversations or other tasks. He and his wife share household financial management and there have been no apparent problems with his calculations. He reads well but cannot remember what he has read. He has become irritable and impatient and seems a more needy of his wife's presence. He and his wife agree that cognitive symptoms were largely absent until January 2000.

    He also described "depression" beginning in late January from being unable to work. His appetite has increased and he gained approximately 10 to 15 pounds. Sleep is poor and marked by restlessness and intermittent waking. He frequently ruminates about his circumstances. Additional physical complaints include continued headaches and dizziness.

Re: Smith, Gerald E., MRN #71928674
March 21, 2000
Page 2

MRI of the cervical spine and brain in December and September, respectively, have been normal. Neurological exam has been normal. EEG awake and asleep in January 2000 was normal. A course of physical therapy apparently helped some of his symptoms and Neurontin has improved the headaches.

**Medical History** is otherwise remarkable for head injury resulting in a shattered jaw. He denied sustaining loss of consciousness and did not complain of any residual cognitive symptoms. The bones in his jaw, however did go through his ear canal and he apparently needed surgery. He did not complain of any residual dizziness from this. Medications include Neurontin 600 mg q am, 300 mg at noon and 600 mg qhs, Zoloft 50 mg, Zanaflex, Meclizine and Alieve.

**Psychiatric History** is unremarkable. There is no history of drug or alcohol abuse.

**Social History** includes a high school education plus 2 years active service in the Air Force and 4 years in the Reserve. He was a bomb loader. He has since worked in construction. There are some resulting financial stressors from being out of work. He has 2 children ages 12 and 18, both of whom are healthy and active. He is currently suing Workman's Compensation and the driver's insurance company.

**Examination** revealed an awake, alert and well oriented gentleman who provided his own history in reasonable detail. His wife, however, disagreed with some details of various accounts. Mood appeared generally euthymic and affect was reactive. Thoughts were logical and goal oriented. Fund of general knowledge and sight reading are both average, consistent with average intellectual endowment.

Digit span was normal forwards and backwards. Mental arithmetic was high average, and he mentally sequenced randomly ordered numbers and letters well. Paced mental arithmetic was average. Digit-to-symbol transcription speed was slow, but visuomotor scanning speed was normal and did not decline with the added requirement of mental set alternation. Abstract verbal reasoning with similarities was above average. He was able to solve an abstract and ambiguous novel problem with extremely little error or perseveration.

Short-term recall of narrative prose was average but with marked forgetting and impaired long-term retrieval. He nonetheless learned all of a 15-item word list with rehearsal. There was proactive interference, in that subsequent new learning was impaired immediately after having learned the previous 15 words. Long-term retrieval of the list was nonetheless normal after new learning and 30 minutes. Short-term retrieval of geometric figures was low average, but again with forgetting over time and impaired long-term retrieval and recognition. Forced choice recognition memory was within broad normal limits and did not suggest feigned impairment. Letter fluency was mildly impaired but semantic fluency was normal. Visual confrontation naming was intact. Constructional praxis in assembling blocks to match a template was low average and remarkable only for occasional mild inefficiency.

The Personality Assessment Inventory was administered and the results are valid. The clinical scales did not suggest exaggerated somatic complaints for medical patients, although there is some evidence of frequent rumination about health. Mild vegetative symptoms of depression, irritability, mood instability and occasional verbal outbursts were noted. He complained of significant environmental stress.

**IMPRESSION:**
1. Mild forgetfulness evidenced only on some tests.
2. Mild symptoms of depression, stress, and rumination about health.

**COMMENT:** There are signs of very mild memory inefficiency, but I doubt that they are related to concussion. He also did rather well on one particularly difficult test of anterograde memory (list learning). Statistically, an accident with no loss of consciousness is unlikely to leave residual cognitive impairments one year later. Furthermore, he and his wife agree that cognitive symptoms did not truly appear until January 2000, again suggesting that they are not secondary to the injury itself.



Re: Smith, Gerald E.,  MRN #71928674
March 21, 2000
Page 3

    When the patient returned on March 16th to take the personality test, he described having impulsively taken a handful of muscle relaxers the previous week after arguing with his wife.  This impulsive gesture is consistent with the stress and mild depression that emerged on his personality test.  By the 16th, he denied suicidal ideation, but I suspect that accumulated stress and depression is leading to forgetfulness.

    I gave Mr. Smith my impression that he has not suffered long-term cognitive impairment as a result of the injury; rather I emphasized the need for him to pursue psychotherapy, especially in light of his recent suicidal gesture.  I provided him with referrals for this.  I also cautioned him against over interpreting common instances of daily forgetfulness that appear to lead only in frustration, and which worsen daily cognitive function.

    Thank you for your kind referral of this pleasant gentleman. If I can be of further assistance to you or your patient please do not hesitate to call.

Sincerely yours,

David A. Kareken, Ph.D.
Board Certified Neuropsychologist (ABPP/ABCN)
Assistant Professor & Director
Section of Neuropsychology

DAK/ll

Smith_0000015

# EXHIBIT 14

*2994/1.59*

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| IN RE NEURONTIN MARKETING AND SALES PRACTICES LITIGATION | ) ) ) | MDL Docket No. 1629 |
|  | ) | Master File No. 04-10981 |
| THIS DOCUMENT RELATES TO: ALL CLASS ACTIONS | ) ) ) ) | Judge Patti B. Saris |

### DEFENDANTS' FIRST REQUEST FOR PRODUCTION OF DOCUMENTS TO PLAINTIFF ASEA/AFSCME LOCAL 52 HEALTH BENEFITS TRUST

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, Defendants Pfizer Inc. and Warner Lambert Company (hereinafter "Defendants"), hereby demand that in accordance with the Definitions and Instructions set forth below, Plaintiff ASEA/AFSCME Local 52 Health Benefits Trust ("ASEA") produce all documents requested herein for inspection and copying at the offices of Davis Polk & Wardwell, 450 Lexington Avenue, New York, New York 10017, within thirty (30) days of the date of service hereof.

### DEFINITIONS

1.     The definitions contained in Rule 26.5 of the Local Rules of the United States District Court for the District of Massachusetts are incorporated herein by reference. Additionally, the following definitions apply.

2.     "Plaintiff" or "ASEA" shall mean ASEA/AFSCME Local 52 Health Benefits Trust and any of its past or present trustees, officials, officers, fiduciaries, third-party administrators, representatives, assigns, employees, divisions, departments,

directors, executives, predecessors or successors in interest, offices, subsidiaries, and affiliates.

3.      "You" or "your" means ASEA.

4.      "Pfizer" shall mean defendant Pfizer Inc. and any of its predecessors, divisions, offices, subsidiaries, affiliates, and any present or former directors, officers, executives, trustees, or employees, including, but not limited to, Warner-Lambert and Parke-Davis, as a division of Warner-Lambert Company.

5.      "Warner-Lambert" shall mean defendant Warner-Lambert Company LLC and any of its predecessors or successors in interest, divisions, offices, subsidiaries, affiliates, and any present or former directors, officers, executives, trustees, or employees, including, but not limited to, Parke-Davis, as a division of Warner-Lambert Company.

6.      "Parke-Davis" shall mean Parke-Davis, a division of Warner-Lambert Company, and any of its predecessors or successors in interest, divisions, offices, subsidiaries, affiliates, and any present or former directors, officers, executives, trustees, or employees.

7.      "Complaint" shall mean the Amended Class Action Complaint, filed on February 1, 2005 in connection with MDL Docket No. 1629, Civil Action No. 04-10981-PBS, in the United States District Court for the District of Massachusetts.

8.      "Action" shall mean the proceeding pending in the United States District Court for the District of Massachusetts captioned *In re: Neurontin Marketing and Sales Practices Litigation*, 04-10981-PBS.

2

9.    The term "Member" shall include the terms "participant," "beneficiary'" and "policy holder," and means persons for whom the Plaintiff provides health care benefits, health insurance coverage and/or provides prescription drug benefits, including the dependents of such persons.

10.    The term "provider" shall mean any physician, hospital, medical or health professional, pharmacy, or other person or entity that provides medical care.

11.    The term "Plan" shall mean the legal document detailing a Member or group's insurance or benefit coverage, and shall include the terms "certificate of coverage," "certificate of insurance," "evidence of coverage," and "summary plan description."

12.    The term "drug, " unless otherwise indicated, shall mean a substance used in the diagnosis, treatment, or prevention or a disease or as a component of a medication, and shall include both prescription and non-prescription drugs.

13.    The term "off-label" shall mean the prescription or use of a drug for indications or at dosages different from those set forth in a drug's labeling.

14.    "DRUGDEX" shall mean the proprietary reference service or product sold, licensed, or marketed by MICROMEDIX under the name DRUGDEX®.

15.    "Third-party payor" shall mean a non-governmental entity that is at risk, pursuant to a contract, policy, or plan providing prescription drug coverage to natural persons, to pay or reimburse the amount or some part of the amount associated with the cost of prescription drugs to those natural persons covered by such contract, policy, or plan.

3

16.    The term "policy" shall mean the written document issued by an insurance company or a third party payor to the policy owner, representing the written contract between the insurance company or third party payor and the policy owner, and describing the term, coverage, premiums and deductibles.

17.    The term "claim" shall mean notification to an insurance company or third party payor requesting payment of an amount due under the terms of the policy.

18.    The term "formulary" shall mean the list of preferred generic and brand-name drugs covered under Plaintiff's Plan.

19.    "And" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the request any information that might otherwise be construed to be outside its scope.

20.    "Any" includes the word "all" and vice-versa.

21.    "Communication" shall have the meaning set forth in Local Rule 26.5

22.    "Concerning" shall have the meaning set forth in Local Rule 26.5.

23.    "Document" shall have the meaning set forth in Rule 34(a) of the Federal Rules of Civil Procedure and Local Rule 26.5, and includes all forms of writings as defined in Rule 1001(1) of the Federal Rules of Evidence.

24.    "Meeting" shall mean any formal or informal assembly, convocation, encounter or contemporaneous presence of two or more Persons for any purpose and shall include telephone conferences and calls.

4

25.    "Person" or "Persons" shall mean any individual, corporation, organization, association, partnership, limited partnership, firm, joint venture, trustee, governmental body, agency, governing board, department or division, or any other entity.

26.    "Relating to" shall mean concerning.

## INSTRUCTIONS

1.    The singular form of a noun or pronoun shall include within its meaning the plural form of the noun or pronoun and vice versa; the masculine form of a pronoun shall include within its meaning the feminine form of the pronoun and vice versa; and the use of any tense of any verb shall include within its meaning all other tenses of the verb.

2.    This request is intended to cover all documents in your possession or subject to your custody or control. This request is also intended to cover any and all documents you are authorized to retrieve.

3.    Each request for a document contemplates production of the document in its entirety, without abbreviation or expurgation.

4.    If any requested documents cannot be produced in full, produce them to the extent possible, specifying each reason for your inability to produce the remainder thereof and stating whatever information, knowledge, or belief you have concerning the unproduced portion.

5.    If any document is no longer in your possession, custody, or control and cannot be retrieved by you, identify the document in detail and state with specificity the location(s) of the document.

5

6.      This request is of continuing effect, and to the extent that any time after the production of documents called for by this request, you become aware of or acquire additional documents responsive to this request, such documents shall be produced promptly.

7.      If Plaintiff knows of information responsive to any of these requests that is in the custody, possession or control of a third person, identify the information and the person(s) possessing it.

8.      If Plaintiff claims that any document to be produced is privileged or constitutes attorneys' work product, Plaintiff is requested to submit a written statement that describes the nature of the documents not produced as required under the Federal Rules of Civil Procedure.

9.      In the event that any information is redacted from a Document produced pursuant to this Document Request, that information is to be identified and the basis upon which such information is redacted should be fully stated.

10.     Documents shall be produced as they are or have been kept in the ordinary course, including the original file folder and label or other similar identification devices, or shall be organized and labeled to identify any file number, file name, or any other file identification system utilized by the responding party, as well as the location and custodian of such records.

11.     When a request calls for the production of an electronic database file or Data File, this file must be produced in a form compatible with Microsoft Access, or in any other format agreed to by the parties.

6

12.    To the extent that you view any document request as vague or imprecise, counsel for Defendants offers to confer with counsel for Plaintiff as to the intended scope of such document request.

## DOCUMENT REQUESTS

Request No. 1

Provide all documents concerning the number of prescriptions for off-label uses for which Plaintiff paid or reimbursed Members, providers, pharmacies, or any other person or entity, and the dollar amounts of all such payments or reimbursements for off-label prescriptions.

Request No. 2

Provide all documents concerning the number of prescriptions for Neurontin for which Plaintiff paid or reimbursed Members, providers, pharmacies, or any other person or entity, and the dollar amounts of all such payments or reimbursements, broken down into (a) off-label prescriptions for Neurontin; and (b) prescriptions of Neurontin for approved indications.

Request No. 3

All marketing materials, marketing information, and related documents received from any manufacturer or supplier of prescription drugs or prescription drug benefits concerning Neurontin.

Request No. 4

All documents concerning any communication between Plaintiff, any third-party Plan Administrator or Preferred Provider, including insurance companies, Plaintiff's Members or anyone acting on their behalf, and any provider or pharmacy relating to

7

Neurontin, including but not limited to payments, prior authorizations, pre-approvals, or coverage of claims.

Request No. 5

All invoices, advertisements, catalogs or industry publications concerning Neurontin.

Request No. 6

All documents concerning claims, coverage, benefits, pricing, or reimbursement for Neurontin.

Request No. 7

All formulary documents concerning Neurontin.

Request No. 8

All documents from any formulary committee, or any other committee with similar functions, concerning Neurontin, including but not limited to presentations, meeting minutes, and evaluations of Neurontin.

Request No. 9

All documents concerning Neurontin from any committee, team, council, or other group of employees, that discussed, recommended, approved, denied, or otherwise considered the inclusion of Neurontin in Plaintiff's formulary, the payment or denial of Neurontin claims, the payment of denial of off-label uses of Neurontin, or otherwise addressed Neurontin.

Request No. 10

All documents concerning any communication or interaction between Plaintiff, any third-party Plan Administrator or Preferred Provider, including insurance companies, Plaintiff's Members or anyone acting on their behalf, and any Defendant.

Request No. 11

All documents concerning any statements obtained by the Plaintiff from any person having, or purporting to have, knowledge or information pertaining to Neurontin.

Request No. 12:

All documents concerning any opinion by any person with an M.D., Ph.D., D.O., M.P.H., or D. Sc., pharmacy degree, or by any similarly trained or educated health care professional or scientist, concerning Neurontin.

Request No. 13

Copies of all newspaper, magazine or medical journal articles which discuss, refer or relate to the use of Neurontin for off-label uses.

Request No. 14:

Copies of all promotional or marketing materials or other documents regarding the use of Neurontin.

Request No. 15

Copies of all promotional or marketing materials or other documents regarding the use of Neurontin that Plaintiff alleges were provided by Defendants to any physician who prescribed Neurontin to Plaintiff's Members.

9

Request No. 16:

Copies of each medical article, treatise, research study, publication, or other document regarding the use of Neurontin for the treatment of off-label uses.

Request No. 17

Copies of all documents that provide information about the approved indications for Neurontin or that indicate that Neurontin was not approved by the FDA for certain uses.

Request No. 18

All records showing the dollar amounts for reimbursements or payments of prescriptions or costs of drugs prescribed for off-label uses from the period 1994 through the present, and the percentage the off-label payments represent of total reimbursements and costs for all claims during that period.

Request No. 19

One representative copy of each document sent to Members, physicians, pharmacies, medical centers, hospitals, the government, or any other entities in which Plaintiff expresses its policy towards or information about payment for off-label prescriptions.

Request No. 20

One representative copy of each document sent to Members, physicians, pharmacies, medical centers, hospitals, the government, or any other entities in which Plaintiff expresses its policy towards or information about payment for anti-epileptic drugs, whether for on-label or off-label indications.

10

Request No. 21

One representative copy of each document sent to Members, providers, pharmacies, medical centers, hospitals, the government, or any other entities in which Plaintiff expresses its policy towards or information about payment for Neurontin, whether for on-label or off-label indications.

Request No. 22

All newspaper articles, magazine articles, articles from the internet, reimbursement newsletters, or other published or printed material concerning the off-label use of Neurontin.

Request No. 23

All statements or other documents disseminated by or on behalf of any Defendant to Plaintiff and/or the public concerning Neurontin.

Request No. 24

All correspondence or communications with any federal or state government entity or agency regarding Neurontin, reimbursement for off-label uses of medications, and/or any of the claims raised in the Complaint.

Request No. 25

All documents concerning medical compendia, listings, or other similar types of documents, including but not limited to DRUGDEX, that include information about off-label uses of drugs.

Request No. 26

All documents referring to any investigation, lawsuit, or other examination into the off-label use of Neurontin.

11