Request No. 27

All information received from any source about the use of Neurontin off-label.

Request No. 28

All documents concerning the efficacy or inefficacy of Neurontin for off-label uses.

Request No. 29

All documents concerning any budgetary plans and/or budgetary discussions about the costs and issues surrounding coverage of off-label uses for medications.

Request No. 30

All documents concerning the benefits, risks, safety, efficacy or cost or benefits of Neurontin.

Request No. 31

Records of all claims or requests for payment or reimbursement received concerning Neurontin.

Request No. 32

All documents addressing claims for reimbursement or provision of Neurontin that identify the indications for which Neurontin was prescribed or reflect Neurontin prescriptions by indication or use.

Request No. 33

All records, emails, correspondence, memorandum and documents of any kind in which the indications of Neurontin are discussed.

Request No. 34

All documents concerning Neurontin's package insert, Neurontin's label, and the indications for which Neurontin was approved.

Request No. 35

All documents in which Plaintiff addresses, questions, identifies or analyzes the level, cost, type or number of Neurontin claims received by Plaintiff.

Request No. 36

All documents comparing the level, cost, type or number of Neurontin claims to those of other anti-epileptic drugs or other drugs in general.

Request No. 37

All protocols, procedures, or requirements – whether formal or informal – for the processing of Neurontin claims.

Request No. 38

All documents related to any analysis of potential, expected or actual costs of paying for or reimbursing Members for Neurontin for any use other than as an adjunctive therapy in the treatment of epilepsy.

Request No. 39

Copies of organization charts which reflect the structure and composition of any department within Plaintiff whose responsibilities included the assessment, payment, rejection of payment, or tracking of Neurontin claims.

Request No. 40

Documents sufficient to identify all person who had responsibilities concerning the review, consideration, analysis, recommendations, or approval of any aspect of the reimbursement of costs of Neurontin.

Request No. 41

All documents or records in Plaintiff's databases that concern requests for reimbursement of the costs of Neurontin. The response to this request should include all fields of any database whose records are produced.

Request No. 42

All documents concerning any efforts by Plaintiff to track the off-label prescriptions of medications, including but not limited to Neurontin.

Request No. 43

All documents which discuss or reflect the dollar amount, numeric amount, or rate of change of Neurontin prescriptions to Members.

Request No. 44

All documents concerning any disapproval of coverage or reimbursement by Plaintiff for any Neurontin prescription for an off-label use.

Request No. 45

All documents concerning any contract or agreement between any pharmacy, provider, or other entity regarding Neurontin or payment or reimbursement of the cost of prescribing Neurontin.

14

Request No. 46

Each document concerning the payment, pass-on or reimbursement of costs associated with Neurontin by any pharmacy, employer, company, sponsor, insurer, or third party payor.

Request No. 47

Each document concerning rebates or other payments requested by or paid to Plaintiff regarding Neurontin.

Request No. 48

Documents sufficient to show, by month, year, and state, the number and dollar amount of payments made by Plaintiff concerning Neurontin on behalf of Members.

Request No. 49:

All documents that state, record, list, or refer to any fee, expense, cost, or item of pecuniary expense or loss of any kind for which you seek to recover compensatory damages in this action, including administrative, travel, and other costs, damages, or expenses.

Request No. 50

All documents, including any in an electronic data format, showing individual claims submitted to and payments made by Plaintiff for Neurontin to Members or to providers or other parties on behalf of any Member. For each transaction, data should include information regarding the type of contract and funding methodology between the parties. These documents or databases should include all information or all fields necessary to adjudicate claims, including but not limited to the following: encrypted member i.d., member age, date of service, date of payment, amount billed, amount paid

15

by plan, co-pay, deductible, coinsurance, third party liability, ICD-9 code, CPT, HCPCS, NDC or local code used by the plan, physician i.d., and claim status/adjudication code. If fields containing confidential information (e.g., member name, social security number) are encrypted, they should be encrypted so as to allow the tracking of an individual Member over time.

<u>Request No. 51</u>

For each Member's claim or payment identified in Plaintiff's response to Request No. 50, provide documents, including any in an electronic data format, showing all individual claims submitted to and payments made by Plaintiff for any prescription drug to those Members or to providers or other parties on behalf of those Members. For each transaction, data should include all information necessary to adjudicate claims, including but not limited to the following: encrypted member i.d., member age, name of drug, reason drug was prescribed to Member, date of service, date of payment, amount billed, amount paid by plan, co-pay, deductible, coinsurance, third party liability, ICD-9 code, CPT, HCPCS, NDC or local code used by the plan, physician i.d., and claim status/adjudication code. If fields containing confidential information (e.g., member name, social security number) are encrypted, they should be encrypted so as to allow the tracking of an individual Member over time (including tracking the Member against the information provided in response to Request No. 50).

<u>Request No. 52</u>

All documents concerning Plaintiff's payment of all or part of the purchase price for Neurontin, including co-payment or deductible amounts, on behalf of any Member of Plaintiff. This request includes, but is not limited to, documents sufficient to identify the

16

date the payment was made; the person or entity to whom the payment was made; the

name of the Member on whose behalf the payment was made and whether the Member is

covered by Medicare or eligible for Medicare benefits; the dosage of Neurontin

purchased; the name, address, and telephone number of the health care provider or

pharmacy providing Neurontin; and the dollar amount of the payment, as well as

statements, invoices, bills, receipts, cancelled checks, credit card statements, or other

proof of payment.

Request No. 53

All documents concerning any damages that Plaintiff contends were sustained

from Defendants' alleged conduct or otherwise supporting Plaintiffs' claim for damages

or other relief in this case.

Request No. 54

All documents, including medical records, concerning Plaintiff's Members'

treatment with Neurontin.

Request No. 55

All documents in the possession of Plaintiff or Plaintiff's attorneys related to

Neurontin that were provided by non-parties to any of the parties in the civil action

*United States of America ex rel. David Franklin v. Parke-Davis, et al.*, C.A. No. 96-

11651-PBS (D. Mass.).

Request No. 56

All of Plaintiff's summary annual reports, annual reports, and state and federal tax

filings for the years 1994 through the present.

Request No. 57

All documents filed with any federal or state government entity, including the Department of Health and Human Services, Centers for Medicare and Medicaid Services, and any State Department of Insurance, relating to medical benefits concerning Neurontin or concerning the off-label use of any drug.

Request No. 58

Copies of all articles of incorporation, by-laws, charters, agreements, or other documents under which Plaintiff was created or organized, which describe Plaintiff's corporate governance, organizational structure, and/or which identify Plaintiff's purposes or operations.

Request No. 59

Copies of organization charts which reflect Plaintiff's structure.

Request No. 60

All documents submitted to any government entity or agency since January 1, 1994 relating to Plaintiff which discussed or addressed the off-label use of medications.

Request No. 61

All minutes of meetings of Plaintiff's trustees, fiduciaries, or officers, notices regarding such meetings, and all documents distributed before, during, or as result of such meetings, including all documents reflecting a decision of the trustees, fiduciaries, or officers in lieu of a meeting, in which the off-label use of medications was discussed.

Request No. 62

Documents sufficient to identify the names and addresses of Plaintiff's trustees, fiduciaries, and officers since January 1, 1994.

18

Request No. 63

Documents sufficient to identify the names and addresses of all individuals and entities providing administrative services to Plaintiff, including the Plan Administrator(s), since January 1, 1994.

Request No. 64

Plaintiff's Plan and trust documents and documents reflecting amendments thereto since January 1, 1994.

Request No. 65

Adoption agreements and documents reflecting amendments thereto since January 1, 1994.

Request No. 66

One representative copy of all communications since January 1, 1994 with Plaintiff's Members and providers relating to anti-epileptic drugs or to off-label uses, including, but not limited to, summary plan descriptions and summaries of material modifications.

Request No. 67

Participation agreements and documents reflecting amendments thereto since January 1, 1994.

Request No. 68

All documents concerning communications between Plaintiff, any third-party plan administrator or Preferred Provider, including insurance companies, and/or consultant of any type since January 1, 1994 relating to coverage for drugs, payment for drugs, drug

formularies, off-label usage of drugs, and methodologies for reimbursing third-parties or Members for drugs.

Request No. 69

All documents concerning the type and terms of all health benefits Plaintiff provides that relate in any way to pharmaceutical drugs including, but not limited to, documents concerning prescription drug benefits, hospital benefits, physician services benefits, medical testing benefits, and any other benefits related to medical care, as well as documents reflecting premiums paid and the methodology used for calculating premiums.

Request No. 70

All documents concerning pricing and marketing of prescription drugs and pharmaceutical benefits, including pricing and underwriting guidelines, pricing and underwriting policies and procedures, marketing guidelines, and marketing policies and procedures. Produce separately, or identify within this production, those documents responsive to Request No. 70 that relate to off-label uses of drugs.

Request No. 71

Documents sufficient to show (a) all drugs for which Plaintiff provides coverage; (b) the amount Plaintiff has paid for each drug, both brand name and generics, for each year since January 1, 1994, including but not limited to any pricing lists and contracts with pharmaceutical manufacturers; and (c) the amount, if applicable, Plaintiff charges to its Members for Neurontin.

20

Request No. 72:

All documents regarding Plaintiff's policies and procedures since 1994 with respect to the reimbursement of, or payment for, the costs of medications prescribed to Plaintiff's Members.

Request No. 73:

All documents regarding Plaintiff's policies and procedures since 1994 with respect to the off-label use of medications, including but not limited to documents addressing policies for reimbursing Members for off-label medications.

Request No. 74

All documents concerning Plaintiff's standard operating procedures or claims handling practices and procedures regarding payment of claims related to off-label uses.

Request No. 75:

All documents relating or referring to, or embodying, minutes of meetings, agendas, dossiers, internal memoranda regarding strategies and issues, Questions and Answers, scheduling, or any other documents concerning meetings at which off-label prescribing of medicines was discussed.

Request No. 76:

Copies of all presentations, internal memoranda, or other documents that include any reference to off-label prescribing of medicines, including but not limited to references about Plaintiff's practices with respect to off-label prescriptions.

Request No. 77

Copies of any industry newsletters or publications, trade publications, articles, or similar documents addressing in any way how insurance companies or third party payors

21

are to handle claims for off-label prescriptions, including but not limited to documents discussing company approaches or best practices, government or industry regulations or requirements, and evolutions in the industry with respect to off-label prescriptions and off-label use of medications.

Request No. 78

Copies of any federal, state or local laws or regulations addressing the reimbursement by insurers of off-label prescriptions.

Request No. 79

All documents concerning Plaintiff's obligation, or lack of obligation, under any internal or external policy, rule, regulation, or case law to pay for, reimburse, or cover the costs – in full or in part – of off-label uses of drugs and medications.

Request No. 80

All documents referencing Plaintiff's compliance (or lack of compliance) with internal or external rules, regulations, and policies pertaining to reimbursement for off-label prescriptions.

Request No. 81

All records reflecting the resolution of claims related to an off-label prescription.

Request No. 82

All documents addressing how Plaintiff determines whether a claim is for a medication used for an off-label use.

Request No. 83

      All documents showing that Plaintiff refused payment, either in whole or in part, for a claim involving an off-label prescription, and all documents related to, discussing or analyzing that refusal.

Request No. 84

      Any correspondence to or from Members, providers, hospitals, pharmacies, or any other individual, organization, or institution addressing a claim involving an off-label prescription.

Request No. 85

      All documents concerning any review, consideration, analysis, recommendation or approval of payment for or reimbursement of some or all of the costs of medications prescribed for an off-label use.

Request No. 86

      All documents concerning any requirement (or lack of requirement) that Members, pharmacies, providers, or any other person or entity identify the indication for which a drug was prescribed when submitting a claim to Plaintiff for reimbursement of the costs of that drug.

Request No. 87

      All documents concerning any requirement (or lack of requirement) that Members, pharmacies, providers, or any other person or entity identify whether a drug was prescribed for an off-label use when submitting a claim to Plaintiff for reimbursement of the costs of that drug.

Request No. 88

All documents concerning any discussion about or decision by Plaintiff to inform Members that it would not pay for the off-label uses of drugs.

Request No. 89

All documents concerning communications by Plaintiff to pharmaceutical manufacturers, including but not limited to Parke Davis, Warner Lambert, and Pfizer Inc., concerning the off-label use of drugs.

Request No. 90

All documents concerning communications by Plaintiff to pharmaceutical manufacturers, including but not limited to Parke Davis, Warner Lambert, and Pfizer Inc., not provided in response to Request No. 89.

Request No. 91

All documents concerning Plaintiff's internal communications concerning the review, design, analysis, write up, or proposal for reimbursement of medications for off-label uses.

Request No. 92

All requests, letters, inquiries, disputes, clarifications, emails, or logs of telephone calls from Members or providers referencing Plaintiff's policies, requirements, or treatment of off-label prescriptions.

Request No. 93

All records in any database maintained by Plaintiff or documents which contain information regarding claims for reimbursement for off-label uses of medications, whether such records were generated by Plaintiff or purchased from third parties. The

24

response to this request should include for any database all fields of the database for every record produced.

Request No. 94

All documents in the possession of Plaintiff or Plaintiff's attorneys concerning, concerning, or discussing the civil action *United States of America ex rel. David Franklin v. Parke-Davis, et al.*, C.A. No. 96-11651-PBS (D. Mass.).

Request No. 95

All documents reviewed by any expert retained by Plaintiff to testify at trial in this Action.

Request No. 96

All documents prepared by any expert retained by Plaintiff to testify at trial in this Action.

Request No. 97

The complete file and/or working papers of any expert whom Plaintiff intends to call as a witness at trial.

Request No. 98

The current resume or curriculum vitae of any expert whom Plaintiff intends to call as a witness at trial.

Request No. 99

All reports of any expert whom Plaintiff intends to call as a witness at trial.

Request No. 100

All drafts of all reports of any expert whom Plaintiff intends to call as a witness at trial.

25

Request No. 101

All notes prepared by any expert whom Plaintiff intends to call as a witness at trial.

Request No. 102

All documents that you provided to any expert whom Plaintiff intends to call as a witness at trial.

Request No. 103

All documents concerning communications between Plaintiff and any expert whom Plaintiff intends to call as a witness at trial.

Request No. 104

All documents reviewed by any expert whom Plaintiff intends to call as a witness at trial.

Request No. 105

All documents relied upon by any expert whom Plaintiffs intend to call as a witness at trial.

Request No. 106

All documents supporting, rebutting, or otherwise relating in any way to the allegations of the Complaint, including but not limited to all documents reviewed in advance of, or relied on in, drafting the Complaint.

Request No. 107

All documents Plaintiff intends to introduce or rely upon at any hearing, trial, or in connection with any dispositive motion.

26

Request No. 108

      All internal investigations or reports performed or prepared by Plaintiff, or on its behalf, concerning the allegations in the Complaint.

Request No. 109

      All documents concerning any alleged misrepresentation(s) or any false, fraudulent, misleading, or deceptive statements allegedly made by or on behalf of any Defendant concerning Neurontin.

Request No. 110

      All documents that you contend provide support or evidence of the allegation in paragraph 22 of the Complaint that "Parke-Davis knew there was no scientific rationale for Neurontin being effective for bipolar disorder, acute mania, social phobia and panic disorder."

Request No. 111

      All documents that you contend provide support or evidence of the allegation in paragraph 29 of the Complaint that "Parke-Davis only intended to publish studies that generated positive results."

Request No. 112

      All documents that you contend provide support or evidence of the allegation in paragraph 31 of the Complaint that "the marketing enterprises Parke-Davis conducted routinely engaged in acts of mail fraud, wire fraud, commercial bribery, unfair and deceptive trade practices and other unlawful conduct."

27

Request No. 113

All documents that you contend provide support or evidence of the allegation in paragraph 42 of the Complaint that "Defendants hid their involvement in the promotion of off-label information and mislead physicians into believing that the physicians who promoted Neurontin were independent or not otherwise part of the enterprise Parke-Davis created to market Neurontin off-label."

Request No. 114:

All documents that you contend provide support or evidence of the allegation in paragraph 44 of the Complaint that "physicians who attended these events were deceived into thinking that the events were educational in nature and independent from the control of the Defendants."

Request No. 115

All documents that you contend provide support or evidence of the allegations in paragraph 45 of the Complaint that Defendants engaged in practices of "(a) deliberately misrepresenting the safety and medical efficacy of Neurontin for a variety of off-label uses; (b) knowingly misrepresenting the existence and findings of scientific data, studies, reports and clinical trials concerning the safety and medical efficacy of Neurontin for a variety of off-label uses; (c) deliberately concealing negative findings or the absence of positive findings ... (d) misrepresenting the credentials and qualifications of certain of Defendants' employees ... (e) wrongfully and illegally compensating physicians for prescribing Neurontin for various off-label uses; (f) knowingly publishing articles, studies and reports misrepresenting the scientific credibility of data and touting the medical efficacy of Neurontin for off-label uses; (i) intentionally misrepresenting and

28

concealing Defendants' role and participation [in various events and publications]; and (j)

intentionally misrepresenting and concealing the financial ties between the Defendants

and other participants in the Enterprise."

Request No. 116

All documents that you contend provide support or evidence of the allegation in

paragraph 53 of the Complaint that unrestricted grants in support of medical education

events "were expressly provided for the purpose of obtaining a program that extolled the

use of Neurontin for unapproved indications."

Request No. 117

All documents that you contend provide support or evidence of the allegation in

paragraph 55 of the Complaint that "the real purpose of [Consultants' Meetings] was to

expose the attendees to Neurontin's uses for non-epilepsy treatment."

Request No. 118

All documents that you contend provide support or evidence of the allegation in

paragraph 56 of the Complaint that "the vendor participants (with the assistance of the

participating physicians and the Defendants) intentionally designed the programs so that

the attendee physicians would not receive fair and balanced information."

Request No. 119

All documents identifying each study Plaintiff claims contains "negative clinical

trial results that demonstrated that Neurontin was no more effective than a placebo for

several off-label conditions," as referenced in paragraph 56 of the Complaint; and for

each such study provide all documents showing the date the study was undertaken,

29

whether it was sponsored by Defendants, and the date the results of the study were
released.

Request No. 120

   All documents that you contend provide support or evidence of the allegation in
paragraph 115 of the Complaint that "Publications that Defendants distributed as part of
their 'publication strategy' intentionally misrepresented Defendants' role in the creation
and sponsorship of the publications."

Request No. 121

   All documents that you contend provide support or evidence of the allegation in
paragraph 128 of the Complaint that "the Off-Label Promotion Enterprise routinely and
knowingly provided false, inaccurate, misleading, distorted, unfair and unbalanced
information about Neurontin's use for unapproved indications."

Request No. 122

   All documents that you contend provide support or evidence of the allegation in
paragraph 132 of the Complaint that "Defendants ... deliberately suppressed negative
studies" about pain.

Request No. 123

   All documents that you contend provide support or evidence of the allegation in
paragraph 210 of the Complaint that "Defendants elected to pay kickbacks and otherwise
provide participant and attendee physicians with items of substantial value to induce them
to listen to the off-label marketing pitch, to prescribe Neurontin, and to recommend
Neurontin to other physicians."

Request No. 124

All documents that you contend provide support or evidence of the allegation in paragraph 235 of the Complaint that "Pfizer has routinely marketed Neurontin for off-label indications up until May of 2004."

Request No. 125

All documents that reflect Plaintiff's total revenues, income and/or profit generated directly or indirectly from Plaintiff's provision of prescription drug coverage, including without limitation financial statements, internal reports, memoranda and correspondence by year for the period from January 1, 1994 through the present.

Request No. 126

All documents reflecting the total volume of premiums received for prescription drug coverage (in dollars and in terms of numbers of policyholders) by year for the period from January 1, 1994 through the present.

Request No. 127

All contracts and documents concerning such contracts between Plaintiff and Defendants for the period from January 1, 1994 through the present.

Request No. 128

All documents concerning Neurontin that have not been provided in response to any other Request.

Request No. 129

All documents concerning communications between Plaintiff and Pfizer, Warner-Lambert-Company, or Parke-Davis that have not been provided in response to any other Request.

31

Dated:   New York, New York
         May 2, 2005

                DAVIS POLK & WARDWELL

                By:   _____

                    James P. Rouhandeh
                    James E. Murray

                450 Lexington Avenue
                New York, New York  10017
                (212) 450-4000

                HARE & CHAFFIN

                By:   _____

                    David B. Chaffin
                    BBO No. 549245

                160 Federal Street
                Boston, Massachusetts 02110
                (617) 330-5000

                Attorneys For Defendants Pfizer Inc. and
                Warner-Lambert Company.

# EXHIBIT 15

## Reema S. Abdelhamid

**From:**   Nancy Pacharzina [NPacharzina@Tousley.com]
**Sent:**   Monday, September 12, 2005 9:14 PM
**To:**   'abdelham@dpw.com'
**Subject:** FW: Subpoenas/Neurontin Litigation

Dear Reema,

I have additional information from ASI regarding the burden associated with producing claims documents for the pharmacy claims processed by ASI instead of Caremark. ASI can generate a list of claims that are pharmacy claims instead of medical claims.  . It turns out there are approximately 136,000 such claims. The documentation is contained in 309 boxes stored in a warehouse. The claims processed on any given day by a single person are stored in a manilla envelope. The boxes contain many manilla envelopes. The list will identify in which box the envelop containing the drug claim is located. A reviewer would then have to go to that envelope and extract the claim documentation and determine if the claim was for Neurontin. ASI estimates it would take 1138 hours to review the claims at a rate of two claims per minute. At $50.00/hr that translates into a $56,900charge to the Trust plus $1,500 to retrieve the 309 boxes. ASEA stands on it objection.

Regards,

*Nancy A. Pacharzina*
*Attorney*
*Tousley Brain Stephens PLLC*
*1700 Seventh Avenue, Suite 2200*
*Seattle, WA 98101-1332*
*(206) 682-5600*
*(206) 682-2992 (fax)*
*npacharzina@tousley.com*

*The information contained in this email is confidential and may be attorney-client privileged or attorney work product. It is intended for the addressee only. Unauthorized use, review or disclosure is prohibited. If you received this email in error, please notify the sender at the above address and permanently delete the original message as well as any copy or printout.*

**From:** Nancy Pacharzina
**Sent:** Wednesday, September 07, 2005 3:38 PM
**To:** 'Reema Abdelhamid'
**Cc:** bhimmelstein@lchb.com; Kim Stephens; Chris Brain
**Subject:** RE: Subpoenas/Neurontin Litigation

Dear Reema,

Regarding the items you asked about in your email below:

(1)   Marketing information – I spoke with Valera Kingsley at ASI again on this subject. She stated again, ASI does not receive any pharmaceutical marketing materials, relevant magazines or journals on a regular basis. They periodically receive pharmacy updates but they are not retained. When ASI was processing pharmacy claims they subscribed to Medispan but they no longer subscribe. They did not retain old copies. She also stated, as head of the claims department she would know if anyone at ASI who processed claims for ASEA received any such items. As such, we consider both ASI's and ASEA's response on this issue complete.

(2)   Pharmacy Claims processed by ASI instead of Caremark – ASI/ASEA stand on their overly burdensome objection regarding production of pharmacy claims processed by ASI.  ASEA is NOT, however, forgoing its claim for damages regarding such claims as there are alternative methods by which ASEA can prove the number and amount of the claims that were for Neurontin to the appropriate legal standard (e.g. extrapolation).   Defendants have as much information as ASEA does regarding those methods and will be free to argue their adequacy to the court.   ASI is collecting additional information regarding the burden associated with trying to determine which of these 44,000 claims are for Neurontin.

In addition, I will produce on CD the additional documents we have discussed (that you do not already have) by early next week. These include: An exemplar of a Caremark invoice to ASI, the AdvancePCS (aka Caremark) "Standard Covered Drugs List," an exemplar of a quarterly rebate report, and the portions of ASEA Board of Trustee Meeting Minutes in which Caremark made annual reports on drug utilization.

I apologize for not getting you this last week.  I was shepherding denial of a preliminary injunction through the emergency appeals process.  Thank you again for your patience.

Regards,
*Nancy A. Pacharzina*
*Attorney*
*Tousley Brain Stephens PLLC*
*1700 Seventh Avenue, Suite 2200*
*Seattle, WA 98101-1332*
*(206) 682-5600*
*(206) 682-2992 (fax)*
**npacharzina@tousley.com**
*The information contained in this email is confidential and may be attorney-client privileged or attorney work product.  It is intended for the addressee only.  Unauthorized use, review or disclosure is prohibited.  If you received this email in error, please notify the sender at the above address and permanently delete the original message as well as any copy or printout.*

**From:** Reema Abdelhamid [mailto:abdelham@dpw.com]
**Sent:** Tuesday, September 06, 2005 11:24 AM
**To:** Nancy Pacharzina
**Subject:** RE: Subpoenas/Neurontin Litigation

Thanks.

At 10:40 AM 9/6/2005 -0700, you wrote:

Thanks for your patience Reema.  I will let you know something tomorrow, if not today.

Nancy A. Pacharzina
Attorney
Tousley Brain Stephens PLLC
1700 Seventh Avenue, Suite 2200
Seattle, WA 98101-1332
(206) 682-5600
(206) 682-2992 (fax)
npacharzina@tousley.com

The information contained in this email is confidential and may be attorney-client privileged or attorney work product.  It is intended for the addressee only.  Unauthorized use, review or disclosure is prohibited.  If you received this email in error, please notify the sender at the above address and permanently delete the original message as well as any copy or printout.

1/6/2006

-----Original Message-----
From: Reema Abdelhamid [mailto:abdelham@dpw.com]
Sent: Tuesday, September 06, 2005 7:42 AM
To: Nancy Pacharzina
Subject: Subpoenas/Neurontin Litigation

Hi. Hope you had a good labor day weekend. I know that when we spoke a couple of weeks ago we agreed that you would be getting back to us by the end of last week regarding 1) marketing information - specifically the scope of the search that could be done for such information and 2) Request #4 in the ASI subpoena - specifically, whether your client is foregoing damages claims for the period covered by materials for which ASI is asserting its burdensomeness objection.

Please let us know whether you have responses on these issues or, if not, by when you anticipate responding.


Regards,
Reema

# EXHIBIT 16

 KAISER PERMANENTE.

☐ Change your region: California - Southern

Health plans    Decision help    About us    Locate our services    Your health

 **Structure of Kaiser Permanente**

▫ Who we are

▫ Fast facts



Organized to best
serve our members

**About us**

Kaiser Permanente is the largest nonprofit health plan* in the l
States, serving 8.2 million members in 9 states and the District
Columbia. We are an integrated health delivery system, which
that we provide and coordinate the entire scope of care for our
members, including:

- preventive care
- well-baby and prenatal care
- immunizations
- emergency care
- screening diagnostics
- hospital and medical services
- pharmacy services

As a nonprofit health plan, we are driven by the needs of our
members rather than the needs of shareholders. We also believ
we have a responsibility to serve the communities in which we
operate. Some of our community activities include:

- providing assistance to the uninsured and special popul
- training new health professionals
- introducing new delivery methods into the health care f
- developing and sharing better ways of caring for patien

Learn more about our organization's core values.

---

\* Kaiser Permanente is composed of Kaiser Foundation Health Plans (nonµ
public-benefit corporations), Kaiser Foundation Hospitals (a nonprofit, p
benefit corporation), and the Permanente Medical Groups (for-profit
professional organizations).

▲ Back to top

Terms & conditions    Privacy practices    Site policies    About us
Contact Web manager    Web awards & accreditations    Careers
Technical information    Home kp.org

# EXHIBIT 17

# In The Matter Of:

## IN RE: NEURONTIN MARKETING AND SALES PRACTICES LITIGATION, et al.

---

### WALTER EUGENE MATTHEWS
### December 15, 2005

---

### ELISA DREIER REPORTING CORP.
### 780 THIRD AVENUE
### NEW YORK, NY USA   10017
### (212) 557-5558

Original File 1214NEUR.TXT, 303 Pages
Min-U-Script® File ID: 2838196040

## Word Index included with this Min-U-Script®

IN RE: NEURONTIN MARKETING AND SALES
PRACTICES LITIGATION, et al.

Case 1:04-cv-10981-PBS    Document 263-15    Filed 01/09/2006    Page 31 of 39

WALTER EUGENE MATTHEWS
December 15, 2005

Page 1

[1]
[2] UNITED STATES DISTRICT COURT
[3] DISTRICT OF MASSACHUSETTS
[4] In re: NEURONTIN MARKETING AND
      SALES PRACTICES LITIGATION
[5] ————————————————x Master File
      THIS DOCUMENT RELATES TO:        No. 04-10981
[6]
      HARDEN MANUFACTURING CORPORATION;
[7] LOUISIANA HEALTH SERVICE INDEMNITY
      COMPANY, dba BLUECROSS/BLUESHIELD
[8] OF LOUISIANA; INTERNATIONAL UNION
      OF OPERATING ENGINEERS, LOCAL NO. 68
[9] WELFARE FUND; ASEA/AFSCME LOCAL 52
      HEALTH BENEFITS TRUST; GERALD SMITH;
[10] and LORRAINE KOPA, on behalf of
      themselves and all others similarly
[11] situated V. PFIZER INC. and
      WARNER-LAMBERT COMPANY.
[12]
      THE GUARDIAN LIFE INSURANCE COMPANY OF
[13] AMERICA V. PFIZER INC. and
      AETNA, INC. V. PFIZER INC.
[14]
[15]
[16]
      DEPOSITION OF WALTER EUGENE MATTHEWS
[17]     New York, New York
      Thursday, December 15, 2005
[18]
[19]
[20]
[21]
[22]
[23]
[24] Reported by:
      AMY KLEIN
[25]

Page 2

[1]
[2]         December 14, 2005
               8:31 a.m.
[3]
[4]         Deposition of WALTER EUGENE MATTHEWS,
[5] taken by Defendants, held at the offices of
[6] Bernstein Liebhard & Lifshitz, LLP, 10 East 40th
[7] Street, New York, New York, before Amy Klein, a
[8] Shorthand Reporter and Notary Public within and for
[9] the State of New York.
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 3

[1]
[2] APPEARANCES:
[3]
[4]   HAGENS BERMAN SOBOL SHAPIRO, LLP
     Attorneys for Class Plaintiffs
[5]     One Main Street, Fourth Floor
      Cambridge, Massachusetts 02142
[6]
   BY: EDWARD NOTARGIACOMO, ESQ.
[7]
[8] LOWE, MOBLEY & LOWE
    Attorneys for Harden Manufacturing Corp.
[9]    and the Witness
      1210-21st Street, P.O. Box 576
[10]     Haleyville, Alabama 35565
    BY: JONATHAN B. LOWE, ESQ.
[11]
[12] BERNSTEIN LIEBHARD & LIFSHITZ, LLP
    Attorneys for Class Plaintiffs
[13]    10 East 40th Street
     New York, New York 10016
[14]
   BY: JEFFREY D. LERNER, ESQ.
[15]
[16]
   DAVIS POLK & WARDWELL
[17]    Attorneys for Defendants
     450 Lexington Avenue
[18]     New York, New York 10017
[19]   BY: PATRICK J. MURRAY, ESQ.
      -and-
[20]     REEMA S. ABDELHAMID, ESQ.
[21] ALSO PRESENT:
    DOUGLAS PLAYMALE, ESQ.
[22]
   (Via Telephone)
[23]
[24]
[25]

Page 4

-Matthews-

[1]
[2] WALTER EUGENE MATTHEWS,
[3] having been first duly sworn by the Notary Public
[4] (Amy Klein), was examined and testified as follows:
[5]        **EXAMINATION BY**
[6]        **MR. MURRAY:**
[7]    **Q:** Hello, Mr. Matthews, I'm Patrick Murray
[8] from the law firm of Davis Polk & Wardwell and we
[9] represent the defendants in this action. The
[10] defendants are Pfizer and Warner-Lambert but I'm
[11] going to refer to them as defendants throughout
[12] this.
[13]     During the deposition I'm also going to
[14] refer to the plaintiff Harden Manufacturing Corp.
[15] as Harden. Do you understand both of these
[16] definitions?
[17]    **A:** Yes.
[18]    **Q:** What's your position with Harden?
[19]    **A:** I am vice president and chief financial
[20] officer.
[21]    **Q:** Are you an officer or an employee of the
[22] company?
[23]    **A:** I'm an employee.
[24]    **Q:** Have you ever been deposed before?
[25]    **A:** Yes.

Page 5

-Matthews-

[1]
[2]    **Q:** So you're familiar with the rules of
[3] depositions? Generally procedures on how they go
[4] forward?
[5]    **A:** General procedures.
[6]    **Q:** While you're familiar I'll remind you
[7] now and if you have any questions, one is because
[8] there's a court reporter here taking down
[9] everything we're saying and we need all answers to
[10] be verbal answers, so instead of nodding your head,
[11] if you can speak your assent or say no to the
[12] answers or give any other answers that are
[13] appropriate that would be appreciated.
[14]     In addition because there's a court
[15] reporter, if we're speaking at the same time it's
[16] very difficult for the court reporter to take down
[17] what's being said. I'm going to do my utmost to
[18] wait until you're finish speaking and you do the
[19] same courtesy.
[20]     And finally, if you want to take a break
[21] at any time, we're going to have a full day, but if
[22] however you want to take a break and the question
[23] is pending, I'm going to ask that you answer the
[24] question before you take a break and then we can
[25] take a break. Do you understand those rules?

WALTER EUGENE MATTHEWS
December 15, 2005

Case 1:04-cv-10981-PBS    Document 263-15    IN RE: NEURONTIN MARKETING AND SALES
Filed 04/04/2006    Page 1 of 1    PRACTICES LITIGATION, et al.

---

Page 66

-Matthews-

[1]
[2] **A:** I do not.
[3] **Q:** Does the company have any contact
[4] information for him?
[5] **A:** If they do, I don't know of any.
[6] **Q:** Who would have the contact information
[7] if the company had it?
[8] **A:** Possibly Kimeral Wilson may. But I
[9] don't know whether she does.
[10] **Q:** Jerry Howell, were his responsibilities
[11] the same as or similar to Mr. Trousedale's and
[12] Ms. Wilson's?
[13] **A:** Yes.
[14] **Q:** Do you know where he is now?
[15] **A:** He's in Haleyville.
[16] **Q:** Does the company have his contact
[17] information?
[18] **A:** We could get it. It's in Haleyville,
[19] Alabama.
[20] **Q:** How many employees does Harden have?
[21] **A:** Approximately 600.
[22] **Q:** Has that grown over the time period
[23] since you have been at the company?
[24] **A:** It's gone up and down. It's been as
[25] high as 800 and low as probably 550.

---

Page 67

-Matthews-

[1]
[2] **Q:** Does Harden have different departments?
[3] **A:** Different departments?
[4] **Q:** Or divisions.
[5] **A:** No. Don't have different divisions.
[6] **Q:** Does it have different departments
[7] within the company?
[8] **A:** Within each plant there are different
[9] departments.
[10] **Q:** How many different plants are there?
[11] **A:** There are four manufacturing facilities
[12] in Alabama, one manufacturing facility in Virginia,
[13] there is three warehouses in Alabama, and two
[14] warehouses in Virginia.
[15] **Q:** Is there a central office as well?
[16] **A:** And there's a central office in Alabama.
[17] **Q:** Are there divisions at each of those
[18] locations or are the divisions spread across the
[19] company in various locations?
[20] **A:** There's no divisions.
[21] **Q:** Are the departments at those various
[22] locations, are they independent or are those
[23] departments cut across the company?
[24] **A:** There are departments at each plant.
[25] **Q:** What are the departments in the company

---

Page 68

-Matthews-

[1]
[2] that deal with the health insurance or the
[3] administration of health plans at any of its
[4] locations?
[5] **A:** Other than Virginia having the one lady
[6] there, everything in Alabama is handled by the one
[7] HR department.
[8] **Q:** Is it correct that finance is also
[9] involved in the administration of health benefits
[10] to the extent that you are involved in the
[11] decision-making regarding the renewal process?
[12] **A:** That's correct.
[13] **Q:** Is there any other departments at Harden
[14] that are involved in the provision of health
[15] benefits to its employees and their dependents?
[16] **A:** Other than accounts payable, paying the
[17] claims.
[18] **Q:** How does Harden provide benefits to its
[19] participants, through self-insured health plans or
[20] through insurance?
[21] **A:** It's a self-insured plan.
[22] **Q:** Does Harden provide any health benefits
[23] through insurance?
[24] **A:** Any health benefits?
[25] **Q:** Yes.

---

Page 69

-Matthews-

[1]
[2] **A:** No.
[3] **Q:** Has this always been the case?
[4] **A:** No.
[5] **Q:** When was it different?
[6] **A:** In the early nineties it was
[7] self-insured. Then they went to — around '95 or
[8] '96 they went to a BlueCross BlueShield
[9] underwritten policy. And in 2000 — it was either
[10] July of 2001 or July of 2002 — I believe it was
[11] July of 2002 we went to a self-insured policy — or
[12] self-insured coverage.
[13] **Q:** With respect to the first period in the
[14] early nineties, is that the period from 1990 until
[15] at some point in '95/'96 that the company was
[16] self-insured?
[17] **A:** To my knowledge, that was during the
[18] period when they were covered — self-insured with
[19] a company called JRH.
[20] **Q:** Do you know first regarding JRH, was the
[21] company contracting with JRH when you were working
[22] at Harden?
[23] **A:** No.
[24] **Q:** What type of company is JRH?
[25] **A:** It was — my understanding, it was a

---

IN RE: NEURONTIN MARKETING AND SALES
PRACTICES LITIGATION, et al.

Case 1:04-cv-10981-PBS   Document 263-15   Filed 01/09/2006

WALTER EUGENE MATTHEWS
December 15, 2005

Page 70

-Matthews-

[1]
[2] third-party administrator processing claims.
[3]   Q: Do you know if that entity still exists?
[4]   A: To my knowledge, it does not.
[5]   Q: Did you have any interaction with JRH
[6] when you were hired by the company?
[7]   A: I did not.
[8]   Q: Do you know who at the company had
[9] interaction with JRH?
[10]   A: I would as — I do not.
[11]   THE WITNESS: I don't want to make
[12] assumptions.
[13]   Q: Do you know who at the company would
[14] know who had an interaction with JRH?
[15]   A: Possibly Ken Smith — Ken Smith, Craig
[16] Smith or Joe Mack Smith. One of those possibly
[17] three people.
[18]   Q: You had mentioned that there was a
[19] controller whose responsibilities you took over
[20] for. Would you have expected that he would have
[21] interacted with JRH?
[22]   A: I don't know. Because I don't know what
[23] his duties totally entailed.
[24]   Q: Ron Trousedale, the HR manager, would
[25] you have expected that he would have interacted

Page 71

-Matthews-

[1]
[2] with JRH?
[3]   A: Would I have expected it?
[4]   Q: Yes.
[5]   A: Possibly.
[6]   Q: You don't know whether or not —
[7]   A: I don't know if he did but...
[8]   Q: I understand that. You had mentioned
[9] JRH Services. Do you know why the company moved
[10] from JRH Services to coverage by BlueCross
[11] BlueShield of Alabama?
[12]   A: I have been told that — by Craig
[13] earlier that they did not do a good job of
[14] processing claims.
[15]   Q: Do you know in what respects they did
[16] not do their job well?
[17]   A: No, sir.
[18]   Q: Do you know if or do you know whether
[19] Harden was contracting with Alabama BlueCross
[20] BlueShield before 1995/1996 when Alabama BlueCross
[21] BlueShield began to underwrite its health benefits
[22] program?
[23]   A: Are you saying prior to...?
[24]   Q: Prior to 1995/1996.
[25]   A: I thought that was the period that JRH

Page 72

-Matthews-

[1]
[2] was doing the business.
[3]   Q: You had indicated that in about 1995/'96
[4] Alabama BlueCross began to underwrite the health
[5] benefits provided by Harden; is that correct?
[6]   A: That's correct.
[7]   Q: Before that period in time, was there a
[8] business relationship between Harden and Alabama
[9] BlueCross?
[10]   A: I believe there was a business
[11] relationship before JRH that did use BlueCross
[12] BlueShield.
[13]   Q: At some point in time before 1995 Harden
[14] was using Alabama BlueCross BlueShield, then it
[15] fully switched over to JRH and then subsequently
[16] began using Alabama BlueCross BlueShield again; is
[17] that correct?
[18]   A: That's correct.
[19]   Q: Do you know when the company
[20] approximately started using JRH?
[21]   A: I do not.
[22]   Q: During the time that the company was
[23] using JRH was it also maintaining a business
[24] relationship for other services with BlueCross
[25] BlueShield of Alabama?

Page 73

-Matthews-

[1]
[2]   A: I do not know.
[3]   Q: Do you know who would know?
[4]   A: Possibly Craig Smith.
[5]   Q: You mentioned that the company had
[6] returned to being self-insured in either 2000 or
[7] 2001 —
[8]   A: Excuse me. Correct me, it was either
[9] 2001 or 2002.
[10]   Q: Thank you for the correction. Do you
[11] know why that change had occurred?
[12]   A: Based on the evaluation of the quotes
[13] for a fully underwritten policy and costs were
[14] anticipated for self-insured, we felt it was better
[15] to go self-insured.
[16]   Q: What was the difference between the cost
[17] that you were incurring for the fully underwritten
[18] policy versus the estimates for the self-insured
[19] policy?
[20]   A: I don't remember those numbers.
[21]   Q: Do you have an approximate idea of the
[22] difference? I understand you may not recall the
[23] exact figures —
[24]   A: I do not.
[25]   Q: What was the manner of savings the

WALTER EUGENE MATTHEWS
December 15, 2005

Case 2:04-cv-09981-PBS    Document 263-15    IN RE NEURONTIN MARKETING AND SALES
PRACTICES LITIGATION, et al.

Page 74

[1]                              -Matthews-
[2] company was expecting to get?
[3]     **A:** I don't remember the numbers.
[4]     **Q:** Where was the analysis conducted? Was
[5] it all verbal, or were there any documents
[6] generated laying out the numbers and the
[7] differences?
[8]     **A:** I would have done an analysis of it.
[9]     **Q:** Did you receive information from Alabama
[10] BlueCross BlueShield that helped you do the
[11] analysis?
[12]    **A:** We received their quote for the
[13] underwritten policy. And we would have looked at
[14] our claims — how much claims had been paid. So,
[15] yes, we would have gotten that.
[16]    **Q:** The input from Alabama BlueCross
[17] BlueShield was the quote for the underwritten
[18] policy going forward; is that correct?
[19]    **A:** Yes.
[20]    **Q:** And, then, you compared that to the cost
[21] that Harden's employees were incurring for health
[22] benefits?
[23]    **A:** We did that based — yes, an estimated
[24] going forward what that would be.
[25]    **Q:** What documents were generated in

Page 75

[1]                              -Matthews-
[2] connection with that?
[3]     **A:** We would have gotten a quote from
[4] BlueCross BlueShield. We would have looked at how
[5] much claims they said — had been paid in the prior
[6] years — prior year, and I would have worked up
[7] some estimates based on some assumptions.
[8]     **Q:** Do you have any of those documents?
[9]     **A:** They possibly are there. I would have
[10] to look for those.
[11]    **REQ MR. MURRAY:** Ed, I don't know whether it
[12] makes sense to continue any longer regarding this,
[13] I guess we request that those documents be produced
[14] to the extent they discuss the cost of the health
[15] benefits under the two different systems.
[16]    **MR. NOTARGIACOMO:** I'll look at the
[17] request, think about it. It's not clear to me, and
[18] I don't have the request in front of me, that they
[19] would fall under one of the document requests or
[20] how they are possibly relevant to the claims but we
[21] can talk about that after the deposition.
[22]    **MR. MURRAY:** Because as a general
[23] matter, and what's not clear from the documents
[24] that's been produced, I think it's quite relevant
[25] that the Alabama BlueCross BlueShield was

Page 76

[1]                              -Matthews-
[2] underwritten. It's not abundantly clear to me that
[3] this is the case. Figuring out what periods they
[4] were self-insured and what periods the company was
[5] underwritten are extremely important obviously to
[6] the amount of damages and what changes were made.
[7] Why those changes were made we think are also
[8] relevant. So we think that the documents would be
[9] responsive and are relevant for those reasons. I
[10] believe I said Alabama was underwritten, I meant
[11] Harden was underwritten by Alabama.
[12]    **MR. NOTARGIACOMO:** Not conceding
[13] anything, we can discuss it.
[14]    **MR. MURRAY:** Okay.
[15]                    **BY MR. MURRAY:**
[16]    **Q:** Just to ease things along hopefully, do
[17] you know which of your files you would search to
[18] look for those documents?
[19]    **A:** Which files?
[20]    **Q:** Yes.
[21]    **A:** Probably in my Excel spreadsheet type
[22] files.
[23]    **Q:** On your computer?
[24]    **A:** Correct.
[25]    **Q:** Would there be any hard copy document

Page 77

[1]                              -Matthews-
[2] files that you would be looking at for those as
[3] well?
[4]     **A:** More than likely there would be. I may
[5] have printed it off, don't know. Because, again, I
[6] keep most of the stuff on a computer. I try to cut
[7] down on paperwork.
[8]     **Q:** In connection with the document request
[9] that was served by defendants, did you review the
[10] files on your computer to look for responsive
[11] documents?
[12]    **A:** Yes. To the best — as I interpreted
[13] what I was supposed to be pulling together, yes.
[14]    **Q:** Was anyone else involved, anyone else at
[15] Harden involved in the analysis that we were just
[16] talking about?
[17]    **A:** No.
[18]    **Q:** After you conducted the analysis, did
[19] you discuss your findings with anybody?
[20]    **A:** I would have discussed them with the
[21] president, at that time would have been Craig
[22] Smith.
[23]    **Q:** Did you provide him with any documents
[24] or were all of your communications about this topic
[25] verbal?

IN RE: NEURONTIN MARKETING AND SALES
PRACTICES LITIGATION, et al.
Case 1:04-cv-10981-PBS    Document 263-15    Filed 01/09/2006    Page 36 of 39

WALTER EUGENE MATTHEWS
December 15, 2005

Page 78

-Matthews-

[1]
[2] **A:** I would have went over my documents with
[3] him. He doesn't keep paper.
[4] **Q:** Did he agree with your conclusions?
[5] **A:** He did.
[6] **Q:** What was the course of action that the
[7] company decided to take?
[8] **A:** We decided to go self-insured.
[9] **Q:** How did the company go about switching
[10] from an underwritten health benefits to
[11] self-insured health benefits?
[12] **A:** We continued to use BlueCross BlueShield
[13] as a third-party administrator and by paying —
[14] having them process the claims.
[15] **Q:** Was there any additional paperwork to
[16] switch from one type of program providing health
[17] benefits to another type?
[18] **A:** I think there's a service agreement
[19] which was produced.
[20] **Q:** Who would have signed the service
[21] agreement or did sign the service agreement?
[22] **A:** Look — I'd have to look back. I may
[23] have or may have had Craig sign it.
[24] **Q:** Is that the service agreement that you
[25] said you had looked at during your preparation this

Page 79

-Matthews-

[1]
[2] morning?
[3] **A:** That's correct.
[4] **MR. MURRAY:** Ed, to speed things along
[5] if you know the Bates numbers or you can describe
[6] it, I'm not familiar with this document.
[7]    (Discussion off the record.)
[8] **MR. NOTARGIACOMO:** Unfortunately, I
[9] don't have a Bates set with me other than what I
[10] have on disk. So I would have to pop it in to look
[11] for it by Bates number.
[12] **MR. MURRAY:** Let's go off the record
[13] very quickly.
[14]    (Discussion off the record.)
[15] **MR. MURRAY:** Back on the record, please.
[16] **BY MR. MURRAY:**
[17] **Q:** So was there a period of time from 1994
[18] to the present in which Harden was not at risk for
[19] the health benefit claims of its employees and
[20] their dependents?
[21] **A:** Yes.
[22] **Q:** What period of time was that?
[23] **A:** From 199 — I believe from 1994 till
[24] 2001. If I'm correct, when we switched over to
[25] self-insured. It's either 2001 or 2002.

Page 80

-Matthews-

[1]
[2] **Q:** Did you say 1994, did you say 1994 or
[3] did you say another year?
[4] **A:** Well, I believe that's when we switched
[5] from JRH back to BlueCross BlueShield. And when I
[6] came we were under a full underwritten policy in
[7] '96.
[8] **Q:** So you believe that the switch from JRH
[9] to full underwritten policy by BlueCross BlueShield
[10] of Alabama was in 1994?
[11] **A:** I believe.
[12] **Q:** Does the company have any record of when
[13] that switch occurred?
[14] **A:** I could not find any. I could go
[15] back — we're getting information — our counsel is
[16] requesting information from BlueCross BlueShield.
[17] It's possible it could be there.
[18] REQ Q. We request if there's any further
[19] searching to be done, you look to find it. But my
[20] understanding is that, based upon the documents you
[21] produced, that the company has been unable to find
[22] any record as to when it switched from JRH to
[23] BlueCross BlueShield of Alabama.
[24] **A:** That's correct.
[25] **Q:** I will show it to you later but I will

Page 81

-Matthews-

[1]
[2] represent to you that there is a plan description
[3] dated 1994 that appears to have been provided or
[4] created by BlueCross BlueShield of Alabama.
[5]    If there was a plan description from
[6] 1994 created by BlueCross BlueShield of Alabama,
[7] would that mean that at that time BlueCross
[8] BlueShield of Alabama was fully underwriting
[9] Harden's health benefits plan?
[10] **A:** I assume so.
[11] **Q:** So you weren't at the company and no
[12] one's told you that's the case so you're making an
[13] assumption here. Who at the company would know
[14] that fact?
[15] **A:** Craig Smith.
[16] **Q:** Would anyone else?
[17] **A:** I'm not sure.
[18] **Q:** Have Mr. Smith's files been searched in
[19] connection with looking for documents about when
[20] the company switched from JRH to BlueCross
[21] BlueShield of Alabama?
[22] **A:** I asked him if he had any files and he
[23] said he didn't keep that kind of stuff so I did not
[24] go through his individual records.
[25] **Q:** You mentioned that the company switched

WALTER EUGENE MATTHEWS
December 15, 2005

Case 4:04-cv-10981-PBS    Document 263-15    IN RE: NEURONTIN MARKETING AND SALES
PRACTICES LITIGATION, et al.

Page 82

[1]                      -Matthews-

[2] in 2001 to 2002 to a self-insured policy. Does the
[3] company have any records of when that occurred?
[4]    A: Again, we would — I would look back at
[5] my analysis or look at how we were paying at that
[6] time.
[7]    Q: And that analysis should indicate what
[8] period of time the analysis was done, and soon
[9] thereafter there was a switch to a self-insured
[10] policy?
[11]    A: Correct.
[12]    Q: How soon after your analysis did the
[13] switch occur?
[14]    A: It would have probably have been within
[15] 30 to 45 days.
[16]    Q: Did it occur at year-end or at business
[17] year-end or was it in the middle of a calendar year
[18] or fiscal year?
[19]    A: It would have been — the change would
[20] have been on a July 1st date.
[21]    Q: How do you remember that?
[22]    A: That is our renewal date.
[23]    Q: So the change either occurred in July
[24] 2001 or July 2002?
[25]    A: That is correct.

Page 83

[1]                      -Matthews-

[2]    Q: I'm going to repeat some of the
[3] questions that I had posed and received answers for
[4] off the record now for the record.
[5]    When there was a switch from the
[6] policies, did the plan descriptions that were
[7] applicable to the health benefits coverage for
[8] Harden employees changed substantively at all?
[9]    A: I don't remember.
[10]    Q: You don't recall any restructuring of
[11] the benefits that were being provided Harden
[12] employees, do you?
[13]    A: No major restructuring. If it would
[14] have been a change it might have been a deductible
[15] change or something of that nature. But no major
[16] restructuring.
[17]    Q: You mentioned that the switch would have
[18] occurred in July of either 2001 or 2002. When
[19] would the decision have been made to switch, 30 or
[20] 45 days before that July 1st of those years?
[21]    A: Most likely. Because, again, we would
[22] be doing our analysis and decision-making prior to
[23] the renewal date.
[24]    Q: After you made the decision to make the
[25] switch from the fully underwritten policy to

Page 84

[1]                      -Matthews-

[2] self-insured, how was that decision implemented?
[3]    A: Again, we signed a service agreement —
[4] we would have signed an agreement with — that
[5] service agreement with BlueCross and we started
[6] from that point.
[7]    Q: After talking with Craig Smith to make
[8] this decision, did somebody contact BlueCross
[9] BlueShield to tell them that you wanted to change
[10] the arrangement?
[11]    A: Yes.
[12]    Q: Who made that call or contact?
[13]    A: I feel likely that it would have been
[14] me.
[15]    Q: Do you recall the content of the
[16] communication?
[17]    A: Other than, again, that we made the
[18] decision to go to a self-insured program and for
[19] BlueCross BlueShield to be the third-party
[20] administrator.
[21]    Q: Do you recall who you contacted?
[22]    A: I believe it would be Lee Dorrill.
[23]    Q: Do you recall in that time frame any
[24] communication with anyone else on BlueCross
[25] BlueShield of Alabama?

Page 85

[1]                      -Matthews-

[2]    A: The only reason I hesitated to say Lee
[3] Dorrill, I believe there was a predecessor for his
[4] position. But I believe he left at that point. It
[5] could have been him. It was Lee's boss and Lee
[6] took his position when he left. I'm just not sure.
[7]    Q: During that communication you had
[8] informed him that the company wanted to be to
[9] self-insured, what did he say in response to that?
[10]    A: That's fine.
[11]    Q: Did he say you had to do anything to
[12] make that occur?
[13]    A: Other than, again, we would probably
[14] have already talked — I have already reviewed this
[15] with him prior and we would have signed a service
[16] agreement.
[17]    Q: Your prior conversations about this
[18] possibly occurring, and then you made the decision
[19] to do it with Craig Smith and you were just letting
[20] him know what that final decision was?
[21]    A: That's correct.
[22]    Q: The prior conversations that you had,
[23] how many were there approximately?
[24]    A: I don't remember.
[25]    Q: More than one?

IN RE: NEURONTIN MARKETING AND SALES
PRACTICES LITIGATION, et al.
Case 1:04-cv-10981-PBS    Document 263-15    Filed 01/09/2006    Page 38 of 39
WALTER EUGENE MATTHEWS
December 15, 2005

Page 86

[1]                    -Matthews-

[2]    **A:** Possible. I don't remember.

[3]    **Q:** I don't ask these questions to be

[4] difficult with you.

[5]    **A:** Yes.

[6]    **Q:** Asking questions in different ways

[7] sometimes but not always stimulates memories but

[8] just let me know.

[9]    **A:** I really just don't remember.

[10]    **Q:** Do you remember the content in any of

[11] the communications that you had before you told him

[12] your final decision?

[13]    **A:** I would have talked to Lee concerning

[14] the cost, his quote, why he couldn't cut it, why it

[15] had to be so damn high. Also, why does he have to

[16] charge so much for the administrative fee. We

[17] would have had all those conversations. That would

[18] be the types of conversations I would have had with

[19] him. I would have gotten on him as far as

[20] projecting future costs, what was Alabama looking

[21] for in future cost increases. That would have all

[22] gone into the analysis.

[23]    **Q:** In connection with these communications,

[24] besides the verbal telephone conversations, did you

[25] receive any documents from him, either e-mails or

Page 87

[1]                    -Matthews-

[2] other letters or other written communications?

[3]    **A:** The only thing I would have gotten from

[4] him was the annual — I say it's an annual review

[5] that prior to your review they put together a

[6] booklet showing our costs, which you have copies

[7] of. That would have been the only thing I would

[8] have had, that would have been the start of the

[9] process.

[10]    **Q:** When you received it you would have had

[11] a number of conversations with them concerning

[12] these cost issues?

[13]    **A:** We would have started discussing it at

[14] that time, yes.

[15]    **Q:** After the decision was made you had

[16] indicated that the plan descriptions remained the

[17] same or similar. Are you aware of any other

[18] documentation or contracts that were created by

[19] BlueCross BlueShield of Alabama or Harden to

[20] reflect the different arrangement going forward,

[21] moving from underwritten to self-insured?

[22]    **A:** The only document I can remember, that

[23] you have a copy of, is that service-type agreement,

[24] that I could find in my documents. If there were

[25] others, I could not find it in my documents.

Page 88

[1]                    -Matthews-

[2]    **Q:** We're going to try to locate it and see

[3] if you can identify it.

[4]    **MR. MURRAY:** We can go off the record

[5] for this. We'll take a break, please.

[6]    (A recess was taken.)

[7]    **MR. MURRAY:** Back on the record.

[8]            **BY MR. MURRAY:**

[9]    **Q:** We were talking about the agreements

[10] that might have recorded the change from

[11] underwritten to self-insured.

[12]    While we were off the record,

[13] Mr. Notargiacomo explained to me that the

[14] agreements that he has don't appear to be about

[15] personal health information and the treatment of

[16] that information, not the terms of switching from

[17] underwritten to self-insured.

[18]    Is that your understanding of the

[19] documents that you reviewed during the break?

[20]    **A:** That's correct.

[21]    **Q:** Are those the documents, the service

[22] agreements, that you had reviewed this morning?

[23]    **A:** That's correct.

[24]    **Q:** During the break were you able to

[25] identify any documents or any contracts or

Page 89

[1]                    -Matthews-

[2] agreements that would reflect a change from the

[3] underwritten policy to the self-insured plan?

[4]    **A:** I was not.

[5]    **Q:** Do you recall at the time of the

[6] switching of the arrangement from underwritten to

[7] self-insured receiving any documents or the

[8] execution of any documents that set forth the

[9] change of the arrangement?

[10]    **A:** I don't remember any. And evidently,

[11] when I went through my files, I did not find any.

[12]    **Q:** Do you know who else would know whether

[13] or not there are such documents?

[14]    **A:** If there were such documents, BlueCross

[15] BlueShield would have them, of Alabama.

[16]    **Q:** Would anyone at Harden have those

[17] documents besides yourself?

[18]    **A:** No.

[19]    **Q:** Would Ms. Wilson?

[20]    **A:** No.

[21]    **Q:** Is Harden seeking damages from the

[22] defendants for the period before it became

[23] self-insured in 2001 or 2002?

[24]    **A:** The total damages I will rely on counsel

[25] to help us determine what those are, and what

Page 90

-Matthews-

[2] period they cover.

[3]     **Q:** Do you know whether or not they cover

[4] that earlier period, the damages that are being

[5] sought?

[6]     **A:** I do not.

[7]     **Q:** Do you know whether Harden was at risk

[8] of paying for Neurontin claims when its health

[9] benefits were underwritten by BlueCross BlueShield

[10] of Alabama?

[11]     **A:** Harden was not — only was at risk for

[12] the premiums we had to pay for the coverage.

[13]     **Q:** So to the extent that there were

[14] premiums owed they were constant and Harden would

[15] not be responsible for paying any more or any less

[16] than those premiums?

[17]     **A:** That's correct.

[18]     **Q:** If one year there were no Neurontin

[19] payments that would not affect the amount that

[20] Harden had to pay?

[21]     **A:** That's correct.

[22]     **Q:** And if there were four times as much as

[23] all previous years that would not affect the amount

[24] that Harden would have to pay?

[25]     **A:** That's correct.

Page 91

-Matthews-

[2]     **Q:** Do you know whether or not Harden is

[3] seeking to be a class representative with respect

[4] to the period that it was not at risk for paying

[5] Neurontin payments?

[6]     **A:** I do not and I will rely on counsel to

[7] determine what we're part — being part of.

[8]     **MR. MURRAY:** Ed, this is for the

[9] deposition going forward, maybe it will affect the

[10] level of detail I need to go into things. Will the

[11] company be seeking damages for that period in which

[12] its health benefits are underwritten?

[13]     **MR. NOTARGIACOMO:** I'm not prepared to

[14] give you a definitive answer. I would assume not

[15] since they are not responsible for those payments.

[16] It's still not clear to me, as we've determined in

[17] this deposition, when that period started. They

[18] may have been at risk for some portion of the

[19] beginning of the class period in '94 and not at

[20] risk and then at risk again. We're going to have

[21] to iron all of that out.

[22]     **MR. MURRAY:** Okay. Is it the company's

[23] position to the extent that it was fully

[24] underwritten and it was not at risk in paying for

[25] Neurontin that it's not going to be seeking to

Page 92

-Matthews-

[2] recover for those Neurontin's payments?

[3]     **MR. NOTARGIACOMO:** We have yet to and

[4] will at the appropriate time provide defendants

[5] with a damages analysis and at that point we'll

[6] make a determination as to what periods will be

[7] appropriate to seek damages for. But that's not

[8] now.

[9]     **MR. MURRAY:** Okay.

[10]     **Q:** Is Harden still self-insured?

[11]     **A:** They are.

[12]     **Q:** Do you know whether or not Harden is

[13] seeking damages for payments of Neurontin

[14] continuing to the present?

[15]     **A:** I do not but we're allowing counsel to

[16] determine what damages or what period of time it

[17] will cover.

[18]     **MR. MURRAY:** This question goes to you,

[19] again this goes to the scope of my questioning. Is

[20] Harden's claim for damages stopping at the time of

[21] filing a complaint or is it seeking damages for

[22] Neurontin payments after the filing of the

[23] complaint?

[24]     **MR. NOTARGIACOMO:** Class action

[25] allegations in the complaint paragraph 255, the

Page 93

-Matthews-

[2] class period is January 1, '94 throughout present.

[3] So...

[4]     **MR. MURRAY:** "Present" obviously can

[5] have two meanings. Present at the time of the

[6] filing or now?

[7]     **MR. NOTARGIACOMO:** I believe it means

[8] now.

[9]     **MR. MURRAY:** Okay.

[10]     **MR. NOTARGIACOMO:** But with the caveat

[11] that at the appropriate time in this litigation

[12] we'll provide defendants with the damage analysis

[13] and it will have a cutoff point.

[14]     **MR. MURRAY:** Okay. To the extent that

[15] that's now an open issue, it sounds like you

[16] understand we are, then, certainly within our

[17] rights to seek discovery through that entire period

[18] of time and expect documents to be produced to that

[19] period of time and supplemented since it is not

[20] clear whether or not damages are being sought for

[21] that period and it sounds as if they are.

[22]     **BY MR. MURRAY:**

[23]     **Q:** Mr. Matthews, does Harden have a

[24] website?

[25]     **A:** It does.