UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| IN RE NEURONTIN MARKETING AND SALES PRACTICES LITIGATION | ) ) ) | MDL Docket No. 1629 |
|  | ) | Master File No. 04-10981 |
| THIS DOCUMENT RELATES TO: | ) ) | Judge Patti B. Saris |
| ALL ACTIONS | ) ) ) | Magistrate Leo T. Sorokin |

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO COMPEL DISCOVERY

Plaintiffs in the above-referenced matter hereby respond in opposition to Defendants'

Motion to Compel Discovery from Plaintiffs [Docket # 261] ("Defendants' Motion").

## I. INTRODUCTION

Defendants' Motion should be denied for both procedural and substantive reasons.

Defendants' Motion is procedurally deficient and should be denied because Defendants have

failed meet the requirements of Local Rule 37.1 concerning discovery disputes. First, despite

their certification to the contrary, Defendants failed to meet and confer with Plaintiffs prior to the

filing of their motion. If Defendants had consulted with Plaintiffs prior to the filing of their

Motion the issues addressed in the motion could have been substantially narrowed, which is the

very purpose of Local Rule 37.1. Defendants' Memorandum in Support of Defendant's Motion

("Defendants' Memo") also fails to set forth for the Court each of the document requests raising

an issue to be decided by the Court and Plaintiffs' response thereto, as required by Local Rule

37.1(B)(4).

Substantively, there is no disagreement with Defendants concerning two of the six areas of discovery sought by Defendants. Plaintiff Third Party Payors ("TPP Plaintiffs") are not refusing to produce information concerning their policies and practices related to reimbursement for pharmaceuticals prescribed off-label. Defendants' Memo at p. 5-8. Additionally, Plaintiff Harden has produced the invoices requested by Defendants in their Motion. Defendants' Memo at 14.

The remaining four issues raised by Defendants' Memo should be denied on substantive grounds. First, non-Neurontin prescription and medical claims data for insureds who have been prescribed Neurontin are irrelevant to the issues in this litigation and Defendants have failed to establish any reasonable basis for requiring the production of this data. Second, individual Plaintiffs Kopa and Smith have already produced the majority of medical records called for in Defendants' Memo. Further production of medical records is not relevant or necessary, especially given the fact that Defendants have noticed and scheduled the deposition of the physicians who prescribed Neurontin to these Kopa and Smith. Third, the production of "out of network" claims data by Plaintiff ASEA is unduly burdensome and would require culling in detail through over 1 million pages of paper claims files in over 300 boxes of documents. This burden far outweighs any benefit to Defendants. Finally, the burden imposed by requiring Kaiser to conduct an exhaustive search of its regional facilities and the files of individual physician providers would not be justified by any minimally relevant information that might be found.

2

## II. **ARGUMENT**

A. Defendants Failed to Adhere to Local Rule 37.1

Although Defendants claim they conferred with Plaintiffs pursuant to Local Rule 37.1(A) before filing their motion (Defendants' Memo at 16) they did not. Each of the issues raised by Defendants' Motion, and many others, were the subject of conversations between counsel at some point since July, 2005 when the parties first began discussions regarding Plaintiffs' document production. However, at no point did Defendants contact anyone on the Class Plaintiffs' Steering Committee to indicate they would be seeking to compel any category of documents or information. Declaration of Edward Notargiacomo ("Notargiacomo Decl.") at ¶ 4. If Defendants had properly met and conferred with Plaintiffs prior to filing their motion, the parties would have substantially narrowed the issues involved.

Defendants' Memo also fails to conform to the requirements of Local Rule. 37.1(b)(4). Defendants do not "state with particularity" the document requests at issue and the responses thereto. Instead, Defendants attach lengthy copies of document requests and correspondence. Local Rule 37.1(b)(4) was meant to relieve the Court from searching through the voluminous record to identify the portions relevant to the discovery dispute.

For the reasons set forth above, Defendants' Motion should be denied, and Defendants should be required both to conduct the proper conference with Plaintiffs pursuant to Local Rule 37.1 and to re-file their memorandum in a form consistent with Local Rule 37.1(b)(4).

B. Third Party Payors' Production of Policies Related to Off-Label Reimbursement

Defendants' motion to compel TPP Plaintiffs to produce policies relating to reimbursement for off-label uses of drugs, Defendants' Memo at 5-8, is a textbook example of why Local Rule 37.1 requires the parties to meet and confer prior to the filing of a discovery

motion. Defendants claim that the TPP Plaintiffs are refusing to produce their policies related to reimbursement for off-label prescriptions and cite as support for that proposition some of the responses to document requests served by TPP Plaintiffs in July 2005. Subsequent to the service of these formal responses, TPP Plaintiffs each agreed not to stand on these objections and to produce documents that relate to reimbursement for off-label prescriptions, if they exist. To the extent this position was unclear or ambiguous, a conference under Local Rule 37.1 would have avoided unnecessary motion practice on this issue.

C. Harden Has Produced the Invoices At Issue

As of January 24, 2006 Harden has produced copies of each of the invoices called for by Defendants' Motion. Defendants' Memo at 14-15. As Defendants concede in their motion, the purpose for which Defendants sought copies of these invoices was to establish the dates when Harden began underwriting the cost of the health benefits it provides to its employees. In conversations with defense counsel, Harden's counsel offered to produce the first such invoice, thus establishing the date of interest to Defendants. Notargiacomo Decl. at ¶ 6. Defense counsel indicated they would consider this suggestion but expressed a preference for all of the invoices. No other conversations were initiated with Harden's counsel prior to the filing of Defendants Motion. *Id.* at ¶ 7. In order to remove this issue as a source of contention between the parties, Harden produced electronic copies of each of the invoices in question to Defendants on January 24, 2006. *Id.* at ¶ 8.

D. Non-Neurontin and Medical Claims Data of the Third Party Payor Plaintiffs' Insureds Are Irrelevant

Defendants contend they are entitled to the production of claims data for all pharmaceutical and medical (non-pharmaceutical) claims paid by TPP Plaintiffs on behalf of those insureds who were prescribed Neurontin. Defendants' Memo at pp. 8-9. In addition, they

also seek all "medical records" of these insureds from TPP Plaintiffs. *Id.* at p. 9.   However, Defendants have failed to establish their need for or the relevancy of this information.

As to the claims data, Defendants provide no support for their assertions that this data will allow them to determine why each insured were prescribed Neurontin, whether it was effective, whether it was prescribed for an off-label use, or whether it will show whether or not insureds were prescribed other drugs off-label.  Defendants have provided this Court with no methodology that might be reliably applied to this data to draw such conclusions about the insureds, their medical conditions or the reasons for which they may have been prescribed Neurontin or any other drug.  Instead Defendants simply assume, and expect this Court to assume, that the data they seek will provide them the ability to answer these questions with respect to each insured.  Most importantly Defendants simply assume, and expect the Court to assume, that answers to these questions with respect to each of the TPP Plaintiffs' thousands of insureds are relevant and crucial to the prosecution and defense of this case.  They are not.

Given the data they seek in they have moved to compel, Defendants apparently seek to argue that the purported class cannot be certified, and that even if certified Plaintiffs cannot prove their case, without an individualized inquiry into the circumstances surrounding every prescription of Neurontin, including an inquiry into whether it was effective for each insured of the TPP Plaintiffs.[1]  In so doing Defendants' goal is turn the focus of the case away from the fraudulent conduct alleged in the Class and Coordinated Complaints to the minutia of each transaction involving the prescription of and payment for Neurontin.  These individualized inquiries are entirely besides the point.

---

[1] Although the question of whether Neurontin was "effective" could have numerous meanings in this context (*e.g.*, Is Neurontin significantly better than placebo (or no better than placebo) for specific indications? Was Neurontin significantly better than placebo (or no better than placebo) for individual insureds of TPP Plaintiffs?), it appears that Defendants have used the term in only  the very limited sense of whether Neurontin "worked" for the insureds or for the individual Consumer Plaintiffs.

The crux of Plaintiffs' allegations is that Defendants engaged in a pervasive campaign to distort, manipulate, and misrepresent information concerning Neurontin's safety and efficacy for off-label uses in order to mislead and deceive the medical community *as a whole*. Defendants deliberately and systematically force-fed incomplete, inaccurate and misleading information to the medical community regarding Neurontin's off-label uses, knowing and intending that this would create the impression that Neurontin was effective for unapproved indications and with the knowledge that this would cause TPPs to pay additional monies to cover their insureds' off-label use of Neurontin.

Plaintiffs seek to represent the class of purchasers of Neurontin as a whole. They do not complain simply of the effect of Defendants' marketing scheme on themselves individually, but on the class generally. Proof of causation does not hinge on the individualized circumstances of each TPP insured.

As the Ohio Supreme Court has observed:

> Courts generally find that the existence of common misrepresentations obviates the need to elicit individual testimony as to each element of a fraud or misrepresentation claim, especially where written misrepresentations or omissions are involved. They recognize that when a common fraud is perpetrated on a class of persons, those persons should be able to pursue an avenue of proof that does not focus on questions affecting only individual members. If a fraud was accomplished on a common basis, there is no valid reason why those affected should be foreclosed from proving it on that basis."

*Baughman v. State Farm Mut. Auto. Ins. Co.*, 727 N.E.2d 1265, 1274 (Ohio 2000). *See also Newberg on Class Actions*, § 9.51. Courts have followed the same logic in drug marketing and pricing cases. *In re Lupron Mktg. & Sales Practices Litig.*, 228 F.R.D. 75, 91 (D. Mass. 2005); *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 326, 345 (D. Mich. 2001); *In re Terazosin*

*Hydrochloride Antitrust Litig.*, 220 F.R.D. 672, 694-700 (D. Fla. 2004); *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 528-29 (3d Cir. 2004).

To sustain a claim for fraud a plaintiff must prove unlawful conduct by the defendant, a loss by the plaintiff and a causal relationship between the defendant's unlawful conduct and the plaintiff's loss.[2] In a class case such as this, the parties need to approach these proofs on behalf of the members of the class as a whole, not with respect to each class member, or in this case, with respect to each insured of each TPP Plaintiff. The overriding issue is the effect of Defendants' scheme on the class of purchasers of Neurontin - not whether each insured believed he or she obtained some benefit from Neurontin, or whether each was prescribed other off-label drugs, or what alternative treatments may or may not have been available to each based on their individual medical condition.

Plaintiffs allege that Defendant engaged in a campaign of omissions and misrepresentations common to all purchasers. The New Jersey Superior Court recently recognized, in a case involving third-party payors, that the alleged misconduct by the manufacturer of VIOXX involved a uniform, overarching scheme:

> [P]laintiff in this matter has alleged that Merck has engaged in a long-term, widespread, uniform pattern of deception to cover up known adverse side effects of VIOXX® in order to gain a profit. Plaintiff alleges that this was accomplished by various methods, including avoiding studies that would highlight the drug's adverse effects . . . . These allegations suggest that elements of fraud pervaded every aspect of Merck's actions in developing and marketing VIOXX®.

---

[2] These are the basic elements of fraud under the New Jersey Consumer Fraud Act. *See Meshinsky v. Nichols Yacht Sales, Inc.*, 541 A.2d 1063, 1067 (N.J. 1988). See also New Jersey Citizen Action v. Schering-Plough Corp., 842 A.2d 174, 176-77 (N.J. Super. Ct. App. Div. 2003), certif. denied, 837 A.2d 1092 (N.J. 2003); Furst v. Einstein Moomjy, Inc., 860 A.2d 435, 441 (N.J. 2004).

*International Union of Operating Engineers Local No. 68 Welfare Fund v. Merck & Co., Inc.*,

Docket No. ATL-L-3015-03-MT (N.J. Super. L. June 30, 2005).  Similarly, evidence of

Defendants' deception in this case will not vary among the members of the class; the proof will

focus exclusively on the uniform conduct and overarching scheme of Defendants.  *See In re*

*Prudential Ins. Co. of Am. Sales Practices Litig.*, 148 F.3d 283, 311 (3d Cir. 1998).

　　　Plaintiffs intend to show, principally through Defendants' own documents and data, a

uniform course of conduct to misrepresent and conceal the truth about the effectiveness of

Neurontin for off-label purposes.  This course of conduct was directed principally at physicians

in order to create the impression of efficacy for off-label uses and thereby increase prescriptions

for and sales of Neurontin.  The common evidence is likely to include: 1) Defendants' internal

communications which will demonstrate their scheme to market Neurontin for off-label uses; 2)

Defendants' studies, reports, planning documents and analyses of Neurontin's effectiveness for

off-label uses; 3) Defendants' marketing plans to promote Neurontin for off-label uses where

Neurontin's efficacy had not been established or had been flatly contradicted; 4) evidence from

Defendants and third-party sources demonstrating Defendant's suppression of studies and

publications that would have revealed the lack of effectiveness of Neurontin for various off-label

uses; 5) materials demonstrating that Defendants, through use of ghost written articles and

medical educational seminars, created, controlled and disseminated a message to doctors and

health care professionals that omitted and misrepresented the material facts about Neurontin's

appropriate use for off-label conditions; and 6) expert testimony from the fields of epidemiology,

neurology and other medical fields, marketing and advertising, health care economics and other

fields demonstrating various aspects of the wrongfulness and intended effect of Defendants'

misrepresentations and omissions.  All of this evidence can and will be presented on a class wide

basis and to support the claims of the Coordinated Plaintiffs.

Similarly, Plaintiffs can meet the causation requirement by showing, for example, that

Defendants' overarching scheme or pattern of omissions and misrepresentations regarding

Neurontin enabled Defendants to make sales they otherwise would not have.  An overarching

scheme - or a long-term, widespread, uniform pattern of deception - is sufficient to establish a

casual nexus between Defendants' omissions and misrepresentations, and the resulting harm to

the class.  *See Delgozzo v. Kenny*, 266 N.J. Super. 169, 185 (App. Div. 2000); *In re Prudential*

*Ins. Co. of Am. Sales Practices Litig.*, 148 F.3d 283, 311 (3d Cir. 1998); *In re Synthroid Mktg.*

*Litig.*, 188 F.R.D. 295, 300 (D. Ill. 1999) (uniform scheme to conceal material informative

establishes predominance and determines liability in RICO case).  Neither proof of causation

class wide, nor challenge to these proofs by Defendants, hinge on the individual circumstances of

each TPP insured.

The class wide proofs establishing Defendants' underlying wrongful conduct also show

the widespread effect of this conduct on the prescribing behavior relating to Neurontin.  For

instance, Dr. Meredith Rosenthal's report, submitted in support of class certification, delineates a

defined methodology for determining the effect of Defendants' conduct on prescribing behavior

related to Neurontin.  Dr. Rosenthal concludes:

> [B]oth economic theory and empirical studies in the economics,
> marketing and health services research literature offer broad
> support for the notion that Park-Davis' alleged promotional
> strategy increased off label uses of Neurontin . . . There exist
> standard research methods that may be applied to readily available
> data to compute the quantity of Neurontin purchased that was
> directly induced by the illegal marketing scheme.

Rosenthal Declaration, p. 1.

Finally, as to damages, Plaintiffs will also prove loss to the class through the commonly accepted method in mass consumer (and antitrust, and RICO) claim cases -- an aggregate determination of the damages to the class as a whole. Individual inquiries concerning alternative treatments available to each insured and the cost of those alternatives for each individual insured are irrelevant to the determination of damages to the class of purchasers as a whole.

Having established an impact or ascertainable loss of at least some amount to the members of the class generally, an aggregate determination of damages estimates the overall effect of Defendants' wrongdoing on the class as a whole. To be sure, there will be differences within the class itself as to the amount or extent to which each member was damaged, but these differences are routine in the area of healthcare economics when quantifying the effects of a defined behavior as a whole across a predefined population. All that is important from the point of view of the Court or Defendants is that the total postulated provides a reasonable estimate as to the total amount of damages sustained by the whole of the class during the applicable period.[3]

Dr. Hartman's report, also submitted in support of class certification, demonstrates that damages can be determined on a class-wide basis. Expert testimony from Dr. Raymond Hartman will establish that Defendants' deceptive scheme injured all class members and that an acceptable methodology exists using readily available data to quantify the damage to the class as a whole.[4] See Declaration of Raymond Hartman in Support of Class Certification at p. 5.

---

[3] By doing so, the overall liability of the Defendant may be established within the appropriate limitations of the Due Process Clause. Issues as to the allocations among members of the class is deferred until the allocation process overseen by the Court.

[4] Dr. Hartman's approach to calculating aggregate damages is consistent with how other courts in pharmaceutical litigation have approached the issue. Courts that have dealt with damages-related issues in pharmaceutical litigation have found that the industry is particularly suited to damages calculations that can be computed "according to some formula, statistical analysis, or other easy or essentially mechanical methods." *Klay v. Humana, Inc.*, 382 F.3d 1241, 1259-60 (11th Cir. 2004) *See In re Terazosin Hydrochloride Antitrust Litig.*, 203 F.R.D. 551, 559-60 (S.D. Fla. 2001) (certifying class of direct purchasers of prescription drugs, finding that "defendants' assertions concerning the complexity of their pricing practices and other data used in the pharmaceutical industry do not persuade the Court that 'individual damage calculations will overwhelm the proceedings.'... Complex industries,

10

In short, proof of Defendants' wrongdoing, the causal nexus between that wrongdoing and the injury to Plaintiffs and the measure of damages do not hinge on an analysis of the medical records or claims data of each individual TPP insured. By seeking this data, Defendants do not seek relevant information, but only to burden Plaintiffs with an onerous search and to distract the Court.

For these reasons, Defendants' claim that the production of non-Neurontin claims data or the complete medical claims or medical file[5] of each individual insured is crucial to this case presumes a type of analysis and proof that is not required. The burden of producing this information far outweighs any benefit Defendants may gain from their production.

E.    Individual Plaintiffs Kopa and Smith Have Produced All Relevant Medical Records and Any Further Production is Irrelevant and Unnecessary

The proposed consumer Plaintiff class representatives Gerald Smith ("Smith") and Lorraine Kopa ("Kopa") (collectively "Consumer Plaintiffs") previously provided Defendants with all of their medical records that are relevant or that might reasonably lead to the discovery of admissible evidence. Each Consumer Plaintiff produced his or her complete medical records for treatments received for injuries sustained in auto accidents that led to their being prescribed Neurontin for off-label uses. See Declaration of Richard E. Shevitz ("Shevitz Decl.") at ¶ 3 and

---

practices, or data are often examined in the course of class actions."); *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 326, 345 (E.D. Mich. 2001)  (certifying class and commenting that "[d]efendants' attempt to characterize the market as too complex for common proof of injury is not unique"); *In re Brand Name Prescription Drugs Antitrust Litig.*, 1994 U.S. Dist. Lexis 16658, at *11-12 (N.D. Ill. Nov. 15, 1994) (certifying class over defendants' objections that "the heterogeneous nature of 'brand name prescription drugs' presents an 'insuperable impediment' to a common proof of impact").
[5] Defendants also fail to mention that most of the TPP Plaintiffs do not possess the "medical records" of their insured. For instance, Defendants decry Harden's refusal to produce the medical claims data and medical records of the less than 50 employees, past and present, who were prescribed Neurontin. However, Harden is a self-insured employer in the business of manufacturing furniture. Harden possesses neither the medical claims data Defendant's seek nor does it have a right or access to the medical records of its past or present employees. Notargiacomo Decl. at ¶ 9.

Declaration of Ronald J. Aranoff ("Aranoff Decl.") at ¶ 3.    In fact, both Smith and Kopa have already produced medical records that pre-date their use of Neurontin by approximately seven months.  Shevitz and Aranoff Decls. at ¶4.  Smith produced all medical records starting with his March 1999 car accident, even though he was not prescribed Neurontin until October 1999.  Shevitz Decl. at ¶4.  Smith also produced all chiropractic records of treatments received long after he discontinued his use of Neurontin because it did not "work" for him.  Shevitz Decl. at ¶5.  Similarly, Kopa produced medical records from the time period beginning with her April 2003 car accident, though she was not prescribed Neurontin until November 2003.  Aranoff Decl. at ¶4.  Thus, Plaintiffs have already produced a majority of the documents Defendants presently seek in their motion to compel.

Defendants seek to compel production of additional medical records and, for the very first time in this litigation, Defendants limit their request to records dated *one year prior* and *one year after* the date when the Consumer Plaintiffs started taking Neurontin.  Defendants' Memo, pp. 10-12.  This request is a significant departure from the hard line taken by Defendants in their Requests for Production, during conversations with Plaintiffs' counsel over document production, and in numerous letters sent to counsel for Consumer Plaintiffs wherein Defendants insisted on the production of *all* medical records of the Consumer Plaintiffs, without qualification as to time.  Shevitz and Aranoff Decls. at ¶6 and ¶5.  In doing so, Defendants implicitly concede that their previous requests for Plaintiffs' complete medical histories were overreaching. [6]

---

[6] As noted in their Motion to Compel, Defendants have also requested that Plaintiffs provide medical authorizations so that Defendants may independently seek medical records from the Plaintiffs' health care providers.  Motion to Compel, p. 10, n. 11.  There is no basis for such a request, and it was completely proper for the Consumer Plaintiffs to produce medical records in lieu of providing Defendants with authorizations.

Additional medical records that pre-date or post-date the injuries for which the Consumer Plaintiffs were prescribed Neurontin are completely irrelevant and Defendants have offered no compelling evidence or argument to the contrary. In fact, Defendants concede as much in their Motion to Compel when they claim that they are entitled to "learn why their physicians prescribed Neurontin and whether it was effective." Defendants' Motion at 10. Defendants have failed to cite any evidence from the record indicating that something noteworthy or unique about Consumer Plaintiffs' medical histories caused them to be prescribed Neurontin instead of another drug. Rather, Defendants simply speculate that the Consumer Plaintiffs' medical records from before or after they sustained the injuries for which they were prescribed Neurontin are somehow relevant.

Notably, Defendants have sought to depose the Consumer Plaintiffs' physicians who prescribed Neurontin, as well as other physicians that treated those Plaintiffs for their injuries. See Subpeona to Dr. Kylene Huler, Dr. Thaddaeus M. Poe, Dr. Thomas Craparo and Dr. V.D. Dhaduk, Notargiacomo Decl., Exhibit F. If Defendants' objective is to determine "why their physicians prescribed Neurontin and whether it was effective," these depositions are the most effective vehicle for making this determination and should dispense with any need to dig through the Plaintiffs' pre-injury medical records.

Contrary to Defendants' suggestion, it is also irrelevant whether the Consumer Plaintiffs took off-label prescription drugs other than Neurontin. Defendants' Motion at 11. Nonetheless, the Consumer Plaintiffs each previously indicated in their respective answers to Defendants' interrogatories that they were unaware whether any of the other drugs they were prescribed for their respective injuries were taken for off-label uses. *See* Plaintiffs Kopa and Smith's Answer to Defendants' First Set of Interrogatories at p. 12. (Notargiacomo Decl., Exhbits G and H) If they

were prescribed other drugs for off-label uses without their knowledge in the past, it would be completely irrelevant to the present case.

For all of the foregoing reasons, the Consumer Plaintiffs respectfully request that the Court deny Defendants' request to compel the production of additional medical records or to execute medical authorizations for Defendants' use.

F.   The Production of "Out of Network" Claims Data by Plaintiff ASEA is Unduly Burdensome

From the inception of ASEA's health benefits plan (the "Plan"), the majority of prescription drug claims have been processed by the Plan's Prescription Benefits Manager, Caremark. Declaration of Valera Kingsley ("Kingsley Decl.") at ¶ 4. Both ASEA and Caremark have produced to Defendants information on all Neurontin claims processed by Caremark.

For a time, however, a subset of drug claims was processed by the Plan's medical claims payer, Administrative Services, Inc. ("ASI"). ASI processed "out-of-network" drug claims. These are claims for prescriptions filled by pharmacies out of Caremark's network, *e.g.,* Indian service facilities, military hospitals and remote locations. From the Plan's inception to July 2004 ASI processed approximately 136,000 such claims in the same manner it processed medical claims. In July 2004 Caremark began administering these claims as well. *Id.* at ¶¶ 5-6.

The electronic record created when out-of-network claims were processed by ASI does not include the name of the drug. It only identifies whether the prescription was for a generic or a brand name drug. Thus, the only way to determine if an out-of-network drug claim is for Neurontin is to retrieve the underlying paper work for all 136,000 out of network claims. *Id.* at ¶¶ 7-8.

The paper record of these claims is stored by date in the "day batches" of medical and drug claims processed by each of 12 claims adjudicators. In other words, these 136,000 drug

claims are randomly interspersed among the records of one million medical claims warehoused in over 300 boxes of claim files. To find all the drug claims, ASEA, through ASI, would have to hand search all of these boxes and then review the documentation of all 136,000 claims to determine which of them were for Neurontin. Maintaining the integrity of these files is important to both ASI and ASEA as they represent the audit trail for claims processed. *Id.* at ¶¶ 8-9.

Plaintiffs ASEA and ASI stand on their objection that production of "out-of-network" claims records is too burdensome given the small benefit Defendants could gain from these records. The Court should not compel production of this subset of claims data for two reasons.

First, the burden associated with identifying this subset of Neurontin claims is great. It requires a hand search through over 300 boxes containing the documentation for over a million individual medical claims to find 136,000 pharmacy claims. Kingsley Decl. at ¶ 8. Each of the 136,000 claims must then be reviewed to determine if the claim was for Neurontin (or its generic equivalent). Once the Neurontin claims are identified, then the documentation must be redacted and anonymized to comply with HIPPA.

Second, as discussed above, all the representative plaintiffs, including ASEA, are entitled to rely on class-wide proofs of liability and damages. Therefore it is unnecessary for ASEA to produce all of its individual claims data. The data it has already produced is sufficient to determine its adequacy as a class representative. The additional claims data may become relevant (if ever) only during a claims allocation process that will be determined only after Plaintiffs prevail. Thus, ASEA does not have to waive its right to recover for those claims just because the particular documentation is too burdensome to produce when it is also completely unnecessary to a determination of class-wide liability and aggregate damages.

15

G. Issues Raised Related to Coordinated Plaintiff Kaiser

### 1.    Documents Outside of California

Defendants' assertion that Kaiser has "unreasonably refused to . . . search . . . outside of California" is both incorrect and misguided. Kaiser has made a good faith effort to search for responsive documents and has concentrated its search to maximize the production of those documents. To date, Kaiser and its counsel have spent hundreds of manpower hours, and Kaiser has produced over 36,000 pages of documents. These documents contain exhaustive, substantive information regarding Kaiser's claims in response to Defendants' demands. Kaiser has reasonably focused its efforts in California because that is the location most likely to contain the information Defendants seek. Kaiser is headquartered in California, and most of its members and drug utilization are in California.[7] Therefore, the most logical way to proceed with discovery is for Kaiser to focus its search and production where the bulk of relevant information is located—not in Kaiser's six other regional divisions, where the likelihood is that additional documents would be cumulative.

Defendants' request for an exhaustive regional search is particularly unreasonable here, as Defendants faced similar burden issues in the underlying *qui tam* action and focused its production on documents from its Northeast Business Customer Unit. This Court noted that "[a]t least at this point, a request for all documents in the possession, custody and control of each business or regional unit in every state . . . seems overbroad." Discovery Order ¶ 2 (Feb. 6, 2002) in *United States ex rel. David Franklin v. Parke-Davis*, No. 96 Civ. 11651 (PBS) (D. Mass.). Thus, Defendants in both the underlying qui tam action and this action have produced documents based on a narrower search than the one demanded of Kaiser.

---

[7]    As of December 2004, Kaiser had 8.2 million members in nine states and the District of Columbia, with over 6 million of those members in California.

Contrary to Defendants' representations, Kaiser *has* searched for documents in regions other than California and has produced responsive documents to Defendants. Kaiser's counsel has contacted and requested documents from the regional Continuing Medical Education ("CME") Coordinators, the regional Directors of Pharmacy, and the chairs of the regional Pharmacy and Therapeutics Committees. *See* Declaration of Justine J. Kaiser ("Kaiser Decl.") ¶¶ 5-6. These are the Kaiser document custodians most likely to possess any responsive and relevant documents because they are the individuals who coordinated physician education, pharmacy operations, and drug formulary decisions as part of their duties. Conducting a more exhaustive search in the regions other than California is extremely burdensome because Kaiser would need to divert resources and reach out to individuals who may have only had minimal experience with Neurontin. In addition, it is unlikely that such burdensome, expensive, and exhaustive search would yield any relevant or non-cumulative information. *See In re Priceline.com Inc. Secs. Litig.*, No. 3:00CV01884, 2005 WL 3160351, at *4 (D. Conn. Nov. 23, 2005) ("The slim chance that plaintiffs would discover relevant information . . . does not justify the efforts necessary to provide this information."); *Congnex Corp. v. Electro Scientific Indus., Inc.*, No. Civ. A 01CV10287RCL, 2002 WL 32309413, at *3 (D. Mass. Feb. 14, 2001) (where a party has already conducted an extensive search for relevant documents, the adversary system must at some point say "that the cost of seeking *every* relevant piece of discovery is not feasible") (emphasis in original).

Defendants' motion is also misleading. It implies that Kaiser has refused to give Defendants *any* information outside of California when, in fact, Kaiser has also agreed to produce relevant claims data from its other, much smaller regions once counsel finalizes the fields to be produced in the claims data report. The claims data is the information that would be

most useful to Defendants—not the few documents, if any, that might be recovered from an unnecessarily extensive regional search.

### 2.    Documents from Kaiser's Physicians

This Court should also deny Defendants' motion to compel the production of documents from all of Kaiser's physicians who prescribed Neurontin. The burden and expense of Defendants' proposed discovery highly outweighs its likely benefit, and raises possible patient privacy concerns. *See United States v. Clean Harbors*, No. C-89-109-L, 1995 WL 155007, at *4 (D.N.H. Feb. 21, 1995) (citing *Bridge C.A.T. Scans Assocs. v. Technicare Corp.*, 710 F.2d 940, 944-45 (2d Cir. 1983)) (it is a well "recognized maxim that discovery is properly limited in instances where the burden or expense of the proposed discovery outweighs its likely benefit" and that therefore courts are empowered to "'impose conditions on discovery in order to prevent injury, harassment, or abuse of the court's processes'")); Fed. R. Civ. P. 26(b)(2).

Kaiser is an integrated health care delivery organization that owns or operates 29 medical centers and 423 medical offices. It contracts exclusively with regional Permanente Medical Groups for the services of 11,000 physicians. The physicians are not employees of Kaiser. For this Court to require Kaiser, as well as each prescribing physician member of Permanente Medical Groups, to search their individual files would be extremely costly, burdensome, and unlikely to produce relevant information.

Defendants' request is particularly unreasonable as Defendants in this litigation have thus far objected to searching the files of only 75 physicians—considerably fewer than Kaiser's 11,000 physician providers. Moreover, in the underlying qui tam litigation, Defendants objected to searching for documents relating to 3,200 physicians, less than a third of the number they are now trying to force upon Kaiser. *See* Discovery Order ¶ 2 (Feb. 6, 2002) in *United States ex rel.*

*David Franklin v. Parke-Davis*, No. 96-CV-11651 (PBS) (D. Mass) (finding that a request "for documents relating to 3200 doctors seems overbroad") Notargiacomo Decl., Exhibit I *See also In re Priceline.com*, 2005 WL 3160351 at *4 (denying interrogatory request, which required party "to canvass each employee" in order to determine whether such employees knew about the "the decision in question," as vague, overly broad, and unduly burdensome).

Contrary to Defendants' assertion, Kaiser has *not* agreed to produce documents from individual doctors. Although certain relevant physicians' documents have been produced, information was gathered from those physicians based solely on their leadership and/or decision-making roles within Kaiser. As part of the information gathering process, Kaiser systematically contacted those individuals most likely to possess relevant documents. This group of people necessarily included physicians, and to the extent these physicians had responsive documents, Kaiser produced them to Defendants. *See* Kaiser Decl. ¶¶ 7-8. That production in no way suggests Kaiser's willingness to undertake the burden of contacting individual prescribers of Neurontin, which raises concerns as to relevancy, burdensomeness, patient privacy, and cumulative and duplicative efforts.

### 3.    Kaiser's Physician Names

Defendants have not sufficiently demonstrated their need for prescribing physicians' names. Defendants' Memo at pp. 10-12. They argue only that Kaiser should be compelled to produce them because doing so would not be burdensome. However, lack of burden is an insufficient reason to compel discovery. Kaiser has objected to Defendants' request for physicians' names due to potential abuse of that information. As alleged in the complaint and in the underlying qui tam actions (which Defendants have already resolved with the government and others), this is a case involving Defendants' illegal marketing of a drug for off-label uses.

19

Defendants' conduct caused Kaiser to suffer enormous damages.  Given Defendants' past conduct, Kaiser has a legitimate concern that Defendants will misuse Kaiser's proprietary information to market drugs directly to their physicians. Accordingly, this Court should refrain from compelling the production of physicians' names from Kaiser.

III.    CONCLUSION

For the reasons set forth above, Defendants' Motion to Compel Discovery from Plaintiffs should be denied in its entirety.

Dated:  January 27, 2006

Respectfully submitted,

**For the Class:**

HAGENS BERMAN SOBOL SHAPIRO LLP

Thomas M. Sobol, Esq. (BBO #471770)
Ed Notargiacomo, Esq. (BBO#567636)
One Main Street, 4th Floor
Cambridge, MA 02142

Barry Himmelstein
**LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP**
Barry Himmelstein, Esq.
275 Battery Street, 30th Floor
San Francisco, CA 94111-3339

**GREENE & HOFFMAN**
Thomas Greene, Esq.
125 Summer Street
Boston, MA 02110

**DUGAN & BROWNE**
James Dugan, Esq.
650 Poydras Street, Suite 2150
New Orleans, LA 70130

**BARRETT LAW OFFICE**
Don Barrett, Esq.
404 Court Square North
P.O. Box 987
Lexington, MS 39095


**LAW OFFICES OF DANIEL BECNEL, JR.**
Daniel Becnel, Jr., Esq.
106 W. Seventh Street
P.O. Drawer H
Reserve, LA 70084

**Attorneys for Plaintiffs and the Class**

**For Plaintiff Guardian Life Insurance Co. Of America:**


 */s/ Thomas G. Shapiro*
Thomas G. Shapiro, Esq. (BBO #454680)
**SHAPIRO HABER & URMY LLP**
53 State Street
Boston, MA 02109


**Of Counsel:**

**COHEN, MILSTEIN, HAUSFELD & TOLL, PLLC**
Linda P. Nussbaum, Esq.
150 East 52nd Street, 30th Floor
New York, NY 10022

-and-

**COHEN, MILSTEIN, HAUSFELD & TOLL, PLLC**
Michael D. Hausfeld, Esq.
Marlene F. Gibbons, Esq.
1100 New York Avenue, N.W.
West Tower, Suite 500
Washington, DC 20005

**RAWLINGS & ASSOCIATES, PLLC**
Mark D. Fischer, Esq.
Mark Sandmann, Esq.
325 W. Main Street

Louisville, KY 40202

**JOEL Z. EIGERMAN, ESQ.**
50 Congress Street, Suite 200
Boston, MA 02109

**For Plaintiffs Kaiser Foundation Health Plan, Inc. and Kaiser Foundation Hospitals:**

**SHAPIRO HABER & URMY LLP**
Thomas G. Shapiro, Esq. (BBO #454680)
Theodore Hess-Mahan, Esq. (BBO #557109)
53 State Street
Boston, MA 02109

**Of Counsel:**

**COHEN, MILSTEIN, HAUSFELD & TOLL, PLLC**
Linda P. Nussbaum, Esq.
150 East 52nd Street, 30th Floor
New York, NY 10022

-and-

**COHEN, MILSTEIN, HAUSFELD & TOLL, PLLC**
Michael D. Hausfeld, Esq.
1100 New York Avenue, N.W.
West Tower, Suite 500
Washington, DC 20005

**JOEL Z. EIGERMAN, ESQ.**
50 Congress Street, Suite 200
Boston, MA 02109

**For Plaintiff Aetna, Inc.:**

*/s/ Peter A. Pease*
Peter A. Pease, Esq. (BBO #392880)
**BERMAN DEVALERIO PEASE TABACCO BURT & PUCILLO**
One Liberty Square

22

Boston, MA 02109

**Of Counsel:**

**LOWEY DANNENBERG BEMPORAD & SELINGER, PC**
Richard Bemporad, Esq.
Richard W. Cohen, Esq.
Peter St. Phillip, Jr., Esq.
Todd S. Garber, Esq.
The Gateway – 11th Floor
One North Lexington Avenue
White Plains, NY 10601-1714

**BERMAN DEVALERIO PEASE TABACCO BURT & PUCILLO**
Joseph J. Tobacco, Jr., Esq.
425 California Street, Suite 2025
San Francisco, CA 94104-2205

**JOHN F. INNELLI, LLC**
John F. Innelli, Esq.
1818 Market Street, Suite 3620
Philadelphia, PA 19103