# EXHIBIT E



**NOT FOR PUBLICATION WITHOUT THE APPROVAL OF THE COMMITTEE ON OPINIONS**

# SUPERIOR COURT OF NEW JERSEY
COUNTIES OF
ATLANTIC AND CAPE MAY

CAROL E. HIGBEE, J.S.C.

1201 Bacharach Boulevard
Atlantic City, NJ 08401-4527
(609) 343-2190

## MEMORANDUM OF DECISION ON MOTION
Pursuant to Rule 1:6-2(f)

| | |
|---|---|
| *CASE:* | **International Union of Operating Engineers Local #68 Welfare Fund v. Merck & Co., Inc.** |
| *DOCKET #:* | **ATL-L-3015-03-MT** |
| *RETURN DATE:* | **June 30, 2005** |
| *MOTION:* | **Plaintiff's Motion for Class Certification** |
| *ATTORNEYS:* | **Plaintiffs –**  Christopher A. Seeger; David R. Buchanan<br>**Defendants –** Diane P. Sullivan; John H. Beisner;<br>Richard B. Goetz; Jeffrey M. Judd<br>**Amicus Curiae –** Theodore M. Lieverman; David J. Cohen |

Having carefully reviewed the papers submitted and any response filed, I have ruled on the above Motion as follows:

Plaintiff International Union of Operating Engineers Local No. 68 Welfare Fund

("Plaintiff", "the Fund" or "Local 68"), individually and on behalf of all others similarly situated

brings this motion for class certification. Plaintiff seeks to certify a nationwide class of third-

party non-government payors who have paid any person or entity for the purchase of the

prescription anti-inflammatory arthritis and acute pain medication Refocoxib that was

manufactured and marketed by Defendant Merck & Company, Inc. ("Merck" or "Defendant")

under the brand-name VIOXX®. Merck opposes this motion.

⑤ *"The Judiciary of New Jersey is an equal Opportunity/Affirmative Action Employer"* ⚖

## BACKGROUND

VIOXX® belongs to a class of pain relievers called non-steroidal anti-inflammatory drugs ("NSAIDs"). Other NSAIDs include prescription medications such as oxaprozin (Daypro®) and diclofenac (Volaren®) as well as over-the-counter pain medications such as ibuprofen (Advil® or Motrin®), acetaminophen (Tylenol®) and naproxen (Alleve®). NSAIDs are supposed to relieve pain and inflammation by inhibiting the body's production of an enzyme called prostaglandin G/H synthase. There are two forms of this enzyme, cyclooxygenase-1 ("COX-1") and cyclooxygenase-2 ("COX-2"). Traditional NSAIDs, such as naproxen block both COX-1 and COX-2 enzymes. These traditional NSAIDs have been associated with adverse gastrointestinal side effects. Such side effects are believed to include injuries and deaths from gastrointestinal perforations, ulcers and bleeds ("PUBs") that occur in significant numbers every year in the United States alone.

Merck began developing VIOXX® in the early 1990s to address the adverse gastrointestinal side effects of traditional NSAIDs. Merck proceeded on the theory that COX-1 protects the lining of the stomach, whereas COX-2 facilitates inflammation. VIOXX® and other NSAIDs such as Celebrex®, known as COX-2 inhibitors have been developed to block only COX-2 in order to reduce pain and inflammation without having the gastrointestinal PUBs associated with traditional NSAIDs.

On December 16, 1994, Merck filed an Investigational New Drug Application ("IND") for VIOXX® with the Food and Drug Administration ("FDA"). This IND included data and analyses from approximately two years worth of pre-clinical testing. The IND was filed to demonstrate that Merck could safely test VIOXX® in healthy human patients. The FDA granted

2

approval to allow Merck to proceed with clinical studies. Consequently, Merck conducted 55 studies over the next four years comparing VIOXX® to other NSAIDs and placebo.

In October 1997, Merck sponsored one of these studies lead by Dr. Garrett FitzGerald, of the University of Pennsylvania, known as Protocol 023 a.k.a. the FitzGerald Study. During this study, Dr. FitzGerald observed that patients taking VIOXX® had significantly lower levels of prostacyclin metabolites in their urine than patients taking placebo. Scientists believe that prostacyclin in the bloodstream inhibits platelet aggregation – i.e. blood clotting. Dr. FitzGerald hypothesized that if VIOXX®, as a COX-2 inhibitor was causing reduced prostacyclin levels in blood vessels, as well as urine, then it was possible that COX-2 inhibitors might result in increased blood clots and associated cardiovascular events.

Plaintiff contends that the Merck Board of Scientific Advisors, an independent group of scientists, in response to the FitzGerald hypothesis, recommended that Merck implement a procedure in all future VIOXX® studies that would enable the company to develop data on a pooled basis to better understand future cardiovascular events during the clinical trials.

Local 68 also contends that Merck never engaged in the studies recommended by the FDA to properly evaluate the efficacy of VIOXX®. Local 68 claims that Merck cancelled a study that would compare the safety of VIOXX® to Tylenol because such a study would highlight the benefits of Tylenol. Plaintiff further contends that Merck simply avoided conducting other Outcomes studies to determine if VIOXX® had improved gastrointestinal ("GI") benefits because of the fear of demonstrating the possibility of increased cardiovascular ("CV") events.

3

Local 68 maintains it can prove by using internal documents from Merck that Merck scientists knew that the use of VIOXX® caused pro-thrombotic effects and that taking VIOXX® would increase the risk of heart attack and strokes.

The plaintiff has presented to the court documents they maintain will prove that Merck intentionally misrepresented the problem with VIOXX® and misrepresented its safety and efficacy from 1997 to when they took it off the market. Local 68 further contends it can prove at trial that Merck intimidated and attempted to silence scientists who were concerned about the cardiovascular risks of VIOXX®. The plaintiffs have provided the court with internal e-mails from 1997 and 1998 which they allege demonstrate an attempt by Merck employees to manipulate studies and conceal safety information on VIOXX®. The court has been supplied evidence that creates a factual issue as to whether Merck attempted to intimidate and silence scientists and doctors who questioned the safety of VIOXX®. Merck claims they did not make intentional omissions or affirmative misrepresentations and that in fact they acted responsibly. They claim they conducted all appropriate studies and that all scientific issues as to safety of VIOXX® were revealed to the scientific community. Merck claims the statements in documents relied upon by plaintiffs are taken out of context out of millions of documents produced. The court cannot and should not make a determination as to the merits of plaintiffs' claims here but the court is very familiar with plaintiffs' allegations and Merck's defenses.

In January of 1999, Merck began the VIOXX® Gastrointestinal Outcomes Research ("VIGOR") trial to determine whether VIOXX® reduced the risk of PUBs relative to naproxen. The VIGOR trial had approximately 8,100 patients and the "unblended" results of the study were released in March of 2000. Patients requiring aspirin for cardiac reasons were excluded from the trial. The results showed that there were fewer adverse GI events in participants taking

VIOXX® as opposed to naproxen, however, the plaintiff maintains it did not decrease deaths from gastrointestinal events. There were fewer CV thrombotic events in patients taking naproxen than in patients taking VIOXX®. The results, according to Local 68, also showed that patients taking VIOXX® suffered more than twice as many serious CV events and five times as many heart attacks than patients taking the drug naproxen.

Merck's position is that because VIGOR did not compare VIOXX® against a placebo, the results could not explain whether the increased CV events were associated with pro-thrombotic effects of VIOXX®, or a cardio-protective effect associated with naproxen, or just chance. Merck claims that after receiving the VIGOR results, it expedited studies where VIOXX® was being compared to placebo in patients seeking prevention or being treated for Alzheimer's disease. Merck also contends that the analysis of these studies indicated that there was no statistically significant difference in the CV rate between patients receiving VIOXX® and those receiving placebo.

In September 2001, the FDA issued a Warning Letter to Merck's then Chief Executive Officer, Raymond V. Gilmartin. The letter stated Merck's promotional activities in relation to VIOXX® were "false, lacking in fair balance, or otherwise misleading." The letter suggests that Merck's promotional activities for VIOXX® minimized the potentially serious adverse findings of the drug, made unfounded claims of the drug's superiority compared to other NSAIDs, and promoted VIOXX® for unapproved uses and in unapproved doses. On April 11, 2002, the FDA approved revised labeling for VIOXX® incorporating the VIGOR results and indicating the number and breakdown of serious CV thrombotic events in the groups of the VIGOR study. The meaning of the VIGOR results are disputed by the parties. Plaintiff points to various documents they state are evidence that the results were purposely misstated by Merck. Merck denies this

5

and claims the statements that the plaintiff relies on are taken out of context and all studies were properly done and all results disclosed.

After learning of the VIGOR results, Merck began to design a large study of VIOXX®. In 2001, Merck began a study involving three long-term trials in patients at risk of colon or prostate cancer. One of these trials was a three-year study to determine if VIOXX® could prevent recurrent colon polyps and was known as APPROVe. The preliminary results of APPROVe showed an increased rate of adverse CV events in study participants taking 25mg VIOXX® as compared to patients receiving a placebo. On September 23, 2004, the External Safety Monitoring Board for APPROVe delivered preliminary results and recommended that Merck stop the study because of the number of adverse cardiovascular events. On September 30, 2004, Merck voluntarily withdrew VIOXX® from the worldwide market.

Prior to its withdrawal, VIOXX® was one of Merck's best selling drugs. VIOXX® had been widely prescribed and generated billions of dollars in revenue each year for Merck. Plaintiff argues the success of VIOXX® depended upon false representations concerning the drug to third party payors.

Local 68 is a joint union-employer Taft-Hartley trust fund, organized and operating in New Jersey. Local 68 provides health care benefits to its members, including a prescription drug plan. Horizon Blue Cross/Blue Shield of New Jersey ("BCBS-NJ") administered the healthcare benefits plan for Local 68, including their prescription plan. Companies known as prescription benefit managers ("PBMs") often manage the prescription drug benefit programs of most healthcare plans under contracts with managed care organizations and healthcare plan administrators. A PBM, either Pain Prescriptions, Inc. or Advance PCS, managed Local 68's

prescription benefit program under contract with BCBS-NJ during the time period relevant to this matter.

Additionally, third-party payors often have Pharmacy and Therapeutics Committees ("P&T Committees"), made up of independent healthcare professionals, that advise healthcare plans on which prescription drugs should be provided to plan participants and recommending the conditions that must be met before a prescription will be filled. P&T Committees generally consist of practicing physicians, pharmacists, and other health care professionals. Virtually every healthcare plan that provides prescription drug benefits by today's industry standards has a drug "formulary," i.e. a list of prescription and non-prescription drugs that the plan's prescription drug benefit will provide coverage for. Healthcare plans generally engage P&T Committees to make recommendations or decisions about which drugs to include on their formularies. P&T Committee members assess the clinical efficacy and safety of new drugs, on an on-going basis, from many different sources of information in rendering a decision to include or to recommend inclusion of a drug onto a formulary. Such information includes clinical data provided to the FDA by the drug's manufacturer, peer-reviewed medical literature, media publications, leading physicians and scientists' statements, alternative treatments and economic issues. The result of the P&T Committee's findings usually determine the level of preferential treatment a drug will get on the formulary. The level of preference a drug is assigned corresponds with the amount a plan participant must contribute as a co-payment to receive that drug.

Each P&T Committee is different and as a result, different healthcare plans may provide varying amounts of benefit coverage for different drugs. The P&T Committee for BCBS-NJ, and thus for Local 68, determined that VIOXX® should be listed on its formulary as a preferred brand drug that required plan participants to contribute a mid-level co-payment. The status of

VIOXX® on the formularies of other health plans and plan administrators will have varied based upon the types of benefits that each plan offered and on the recommendations made by each individual P&T Committee. However, as previously stated P & T committees all rely on data that is distributed nationally, such as clinical data, medical literature, media publications and opinions of leading physicians and scientists. Plaintiff alleges Merck engaged in a nationwide campaign to get VIOXX® on the third party payors' formularies.

BCBS-NJ and its P&T Committee, as the plan administrator for Local 68, were responsible for making the decision as to VIOXX® being included in the formulary that its members were able to access for their prescriptions benefits.

Here, the proposed class would consist of third-party payors, similar to Local 68, that oversee the authorization and processing of medical claims and prescription purchases sought by their members and pay for the prescription benefit portion of the drug's costs. The proposed class of third-party payors does include a variety of entities such as insurance companies, health maintenance organizations ("HMOs"), large employers, managed care organizations ("MCOs") and Taft-Hartley groups. While BCBS-NJ acts as a plan administrator for Local 68 and other similar entities that provide medical benefits, it can also function as a third-party payor under the proposed class.

In the case of <u>Desiano v. Warner-Lambert</u>, 326 <u>F.3d</u> 339 (2dCir. 2003), the Court reversed a dismissal for failure to state a claim of a similar third party payors class action. In that case, Louisiana Health Service Indemnity d/b/a Blue Cross/Blue Shield of Louisiana and Eastern States Health & Welfare Fund brought an action on behalf of all similar third party payors based on claimed misrepresentations by the pharmaceutical company that manufactured and marketed Rezulin, a diabetes medication. The class action asserted a claim under New Jersey law because

8

the manufacturer was a New Jersey corporation. The Desiano Court viewed the motion under
New Jersey law. The motion to dismiss was based primarily on the health benefit companies not
being the direct buyers and therefore having no standing. The Circuit Court described the claim
as follows:

> The Plaintiff insurers assert that, had they not been deceived by the Defendants'
> misrepresentations about the safety of Rezulin, they would have taken steps so as
> not to purchase Rezulin at the prices set by Warner-Lambert. Among the steps
> Plaintiffs might have taken were to exclude it altogether from their approved
> schedules, set a low scheduled value, set a high copay obligation, and otherwise
> dissuade doctors from prescribing it. Taking account of these allegations, the
> harm to the insurers was not indirectly caused as a result of the Defendants'
> misleading of others; the insurers were directly harmed by the deception practiced
> on them. Id. at 349 n.9.

In reversing the dismissal by the U.S. District Court the 2nd Circuit held "[T]his and
other courts have long recognized the right of HBPs to recover from drug companies amounts
that were overpaid due to illegal or deceptive marketing practices." Id. at 350.

Plaintiff filed a complaint in this matter alleging that as a result of Merck's marketing,
advertising, promotion, and sale of VIOXX®, third-party payors paid approximately 800% more
than they should and/or would have for the prescription drug. Plaintiff alleges that Merck knew
of the harmful effects of VIOXX® years prior to its withdrawal from the market and that it
suppressed this information and continued to aggressively market the drug without properly
disclosing the information to the FDA and to the public. Plaintiff alleges that at the time
VIOXX® was being developed, the patents on some of Merck's most successful drugs were
about to expire and the company needed a successful "blockbuster" drug to offset the loss of
these revenue sources. Plaintiff alleges that the need to develop a blockbuster drug was
compounded by the competition of Pfizer, another drug company, that was developing Celebrex
and scheduled to have it hit the market a few months ahead of VIOXX®. The complaint initially

consisted of two counts, claiming common law fraudulent misrepresentation and/or suppression as well as violations of the New Jersey Consumer Fraud Act ("CFA") (N.J.S.A. § 56:8-1, *et seq.*). The plaintiff now seeks class certification only under the CFA and is not pursuing a common law fraud claim.

Plaintiff's complaint alleges that most purchases of prescription drugs in this country are paid for by third-party payors. According to Plaintiff's complaint, if a prescription drug is not on a given third-party payor's formulary, that third-party payor will not contribute any money to the purchase of the drug and the cost would be borne entirely by the member. When this happens, the member usually chooses a substitute drug of the same class that is on the formulary and paid for by the third-party payor.

It is the Plaintiff's contention that due to the large number of prescriptions that are purchased through third-party payors, it is very important for a drug manufacturer to have their product listed on the formularies of as many third-party payors as possible. The Plaintiff alleges that Merck provided false and misleading information regarding the safety and benefits of VIOXX® to third-party payors and to the public through direct-to-consumer advertising in order to have VIOXX® listed on their formularies. As a result of these actions, Plaintiff alleges that Merck was able to gain significant market share compared to other drugs of the same class made by Merck's competitors.

More specifically, according to Plaintiff's complaint, a 30-day supply of VIOXX® sold for approximately $72.00 while traditional NSAIDs sold at $9.00 or less for the same quantity. Plaintiff contends that as a result of Merck's fraudulent and unconscionable commercial practices for marketing and selling VIOXX®, it was able to induce third-party payors into including the drug on their formularies at a favorable tier thus paying much more than they

otherwise would have for other NSAIDs that were available. Plaintiff asserts that if it and other

third party payors knew of the negative information concerning the safety, efficacy, and benefits

of VIOXX®, they would not have agreed to provide coverage for the drug, or at least not on the

terms that were approved. Plaintiff claims that because Merck misrepresented and concealed

information about VIOXX®, third-party payors paid vast amounts of money over what they

should have and otherwise would have, had accurate information about the drug been disclosed.

Plaintiff has brought the present motion seeking a certification for the class described as

follows:

> All third-party payors in the United States of America, who have paid any
> person or entity for the purchase of the prescription drug VIOXX® (rofecoxib)
> since May 1, 1999. Third-party payors include any non-governmental entity
> that is (i) a party to a contract, issuer of a policy, or sponsor of a plan, which
> contract, policy, or plan provides prescription drug coverage to natural persons,
> and is also (ii) at risk, pursuant to such contract, policy, or plan, to purchase or
> pay for all or part of the cost of prescription drugs dispensed to natural persons
> covered by such contract, policy or plan. Excluded from the Class are (1)
> employees of defendant, including its officers or directors; (2) Plaintiff's
> counsel; and (3) the Judge of the Court to which this case is assigned.
> (Plaintiff Complaint ¶ 37).

Plaintiff argues that this proposed class satisfies the requirements of R. 4:32-1(a) and R. 4:32-

1(b)(3)[1]. The class does not include individual consumers, any government payors nor any

personal injury claims.

Merck opposes this motion arguing that a multi-state class action is inappropriate; that

the case would be unmanageable as a class action due to predominating individual issues; and

that Local 68 is not an adequate class representative. Merck asserts that a class action would be

inappropriate because New Jersey's choice of law rules would require that the consumer fraud

---

[1] As stated, Plaintiff is only seeking certification for only economic claims under the CFA.
Plaintiff is not seeking certification for its common law fraud claim. There are no other claims
for negligence or products liability.

11

law of the home state of each putative class member would apply, making the proposed class unmanageable. *This is a key issue in the decision on class certification. There is no controlling Supreme Court or Appellate Division level decision as to whether New Jersey Consumer Fraud Act can be applied to a class action involving out of state plaintiffs and a New Jersey defendant.* Defendant claims that individual issues such as demonstrating an ascertainable economic loss from Merck's alleged wrongdoings and proving that Merck's alleged misrepresentations or omissions caused a putative class member's loss would predominate this litigation and make a class action unmanageable. Finally, Merck contends that Local 68 is not an adequate class representative because its claims and defenses are not typical of the other proposed class members and because potential conflicts of interest as well as a lack of decision-making control make Local 68 an inadequate representative for the proposed class.

## ANALYSIS

As a preliminary issue, it should be noted that the Complaint in this matter was filed on October 30, 2003, prior to the passage of the Class Action Fairness Act of 2005. The provisions of the Class Action Fairness Act apply only to civil actions commenced on or after the date the Act was enacted, February 18, 2005. Pub.L. 109-2, § 9. Thus the provisions of the Class Action Fairness Act do not apply to the matter at hand and this court has the authority to certify a nationwide class provided that procedural due process is complied with, under Phillips Petroleum v. Shutts, 472 U.S. 797, 811-812 (1985). The Class Action Fairness Act of 2005 has the effect of allowing removal of nationwide class actions filed in State court for cases filed after February 18, 2005. See 28 U.S.C.A. § 1332. However, Congress specifically narrowed the Class Action Fairness Act to exclude lawsuits that were pending at the time the legislation was enacted regardless of whether class certification had been granted yet.

12

<u>Pritchett v. Office Depot, Inc.</u>, 404 <u>F.3d</u> 1232, 1236 (10th Cir. 2005) (finding that for purposes of the Class Action Fairness Act, an action is considered commenced at the time it is filed in the state court). Thus, as this matter was filed prior to the Class Action Fairness Act being enacted, this VIOXX® related class action against Merck is unaffected by it. <u>See Id.</u> (citing the statement of a Congressional Representative that the Class Action Fairness Act would not effect the numerous class actions pending against Merck due to its withdrawal of VIOXX®).

**Class Actions In General**

    <u>R.</u> 4:32-1 governs the requirements for maintaining a class action under New Jersey law. Part (a) of the Rule provides for certain prerequisites that a proposed class must demonstrate if it is even to be considered for class status. It provides:

> (a) General Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

    In addition to these prerequisites, part (b) of the Rule provides that the class must satisfy one of the three following requirements:

> (1) the prosecution of separate actions by or against individual members of the class would create a risk either of (A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or (B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or

> (2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The factors pertinent to the findings include: first, the interest of members of the class in individually controlling the prosecution or defense of separate actions; second, the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; third, the difficulties likely to be encountered in the management of a class action.

"[T]he class action rule should be construed liberally in a case involving allegations of consumer fraud." In re Cadillac, 93 N.J. 412, 435 (1983) (certifying a state-wide class of purchasers of automobiles with certain defects). A New Jersey court should consider equitable principles that would allow class actions where consumers with a common injury are seeking redress that would be uneconomical to pursue individually. Varacallo v. Massachusetts Mutual Life Insurance, Co., 332 N.J. Super. 31, 45 (App. Div. 2000). However, certification of a class action may only be done after a court has undergone a "rigorous analysis" and determined that the requirements of R. 4:23-1 have been satisfied. Carroll v. Cellco Partnership, 313 N.J. Super. 488, 495 (App. Div. 1998) (quoting General Telephone Co. v. Falcon, 457 U.S. 147, 161 (1982)).

The burden of establishing that class status is appropriate is on the plaintiff. Id. at 494. A motion for class certification must be determined upon the criteria for maintaining a class action and not upon the plaintiff's chances of prevailing on the merits. Delgozzo v. Kenny, 266 N.J. Super. 169, 180-181 (App. Div. 1993). "The court is bound to take the substantive allegations of the complaint as true, thus necessarily making the class order speculative in the sense that the plaintiff may be altogether unable to prove his allegations." Id. (quoting Blackie v. Barrack, 524 F.2d 891, 901 n. 17 (9th Cir. 1975), cert. den., 429 U.S. 816 (1976)). "Nonetheless, even the identification of the issues to determine the suitability of an action for certification

14

requires some preliminary analysis." In re Cadillac, supra, 93 N.J. at 426.  This preliminary

analysis of matters outside the pleadings is necessary because in order to make a proper decision

regarding class certification, "a court must understand the claims, defenses, relevant facts, and

applicable substantive law…" Carroll, supra, 313 N.J. Super. at 495 (quoting Castano v.

American Tobacco Co., 84 F.3d 734, 744 (5th Cir. 1996)).

A general summary of the claims, defenses and relevant facts has been provided thus far.

A brief discussion of the substantive law underlying Plaintiff's complaint is appropriate prior to

determining the outcome of this motion.

**The New Jersey Consumer Fraud Act**

The Plaintiff's complaint alleges that Merck violated the New Jersey CFA.  One

provision of the CFA, N.J.S.A. 56:8-2, pertains to the unlawful use of fraud in connection with

the sale or advertisement of merchandise.  The statute provides in relevant part:

> The act, use or employment by any person of any unconscionable commercial
> practice, deception, fraud, false pretense, false promise, misrepresentation, or
> the knowing, concealment, suppression, or omission of any material fact with
> intent that others rely upon such concealment, suppression or omission, in
> connection with the sale or advertisement of any merchandise or real estate, or
> with the subsequent performance of such person as aforesaid, whether or not
> any person has in fact been misled, deceived or damaged thereby, is declared
> to be an unlawful practice…

This provision can be violated by an affirmative act, omission, or violation of an administrative

regulation. Gennari v. Weichert Co. Realtors, 148 N.J. 582, 605 (1997).  "While the element of

traditional reliance required in a fraud case need not be proven in order to recover damages under

the CFA, a private plaintiff must still 'prove a causal nexus between the alleged

[misrepresentation]' and his or her damages." Dabush v. Mercedes Benz USA, LLC, 378 N.J.

Super. 105, (App. Div. 2005) (internal citations omitted).

15

Consumer fraud violations can be divided, broadly, into three categories: affirmative acts, knowing omissions and regulatory violations. Cox v. Sears Roebuck & Co., 138 N.J. 2, 17, 647 A.2d 454 (1994). If a plaintiff demonstrates that a defendant committed a consumer fraud that is an affirmative act, "intent is not an essential element." Ibid. If, however, the alleged consumer fraud is the result of a defendant's omission, "plaintiff must show that the defendant acted with knowledge, and intent is an essential element of the fraud." Id. at 18. In the final category, regulatory violations, "intent is not an element of the unlawful practice, and the regulations impose strict liability for such violations." Ibid.

Feinberg v. Red Bank Volvo, Inc., 331 N.J. Super. 506, 510 (App. Div. 2000).

Additionally, N.J.S.A. 56:8-19 of the CFA details the relief available to claimants. The statute provides:

Any person who suffers any ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful under this act or the act hereby amended and supplemented may bring an action or assert a counterclaim therefore in any court of competent jurisdiction. In any action under this section the court shall, in addition to any other appropriate legal or equitable relief, award threefold the damages sustained by any person in interest. In all actions under this section, including those brought by the Attorney General, the court shall also award reasonable attorneys' fees, filing fees and reasonable costs of suit.

"Thus, to state a claim under the CFA, a plaintiff must allege each of three elements: (1) unlawful conduct by the defendants; (2) an ascertainable loss on the part of the plaintiff; and (3) a causal relationship between the defendants' unlawful conduct and the plaintiff's ascertainable loss." New Jersey Citizen Action v. Schering-Plough Corp. 367 N.J. Super. 8, 12-13 (App. Div.), certif. denied 178 N.J. 249 (2003).

A cause of action under the CFA differs from a claim of common law fraud, "in that common law fraud requires proof of reliance while consumer fraud requires only proof of a causal nexus between the concealment of the material fact and the loss." Varacallo, supra, 332 N.J. Super. at 43.

16

In other words, Local 68 must prove Merck misrepresented or omitted material information with the intent that third party payors' decision on formulary placement would be affected and prove there was a causal relationship between the formulary decisions and the misrepresentations. It is not necessary to prove that the third party payors decisions were based solely on misrepresentations and/or omissions, but only that the misrepresentation and/or omissions were a substantial factor in the formulary decision that resulted in payments by third party payors.

Merck maintains plaintiffs' claims are based on a "fraud on the market" or "price inflation" theory but this court finds this is not the nature of the claim. In the case of Kaufman v. I-Stat Corporation, 324 N.J. Super. 344 (App.Div.1999), the Appellate Division reversed a dismissal by the trial court of a claim that the defendant corporation had made false statements to the general market that caused an artificial inflation of the defendant's stock price. The plaintiff in that case bought the stock at the inflated price but had never even heard the false statements. The New Jersey Supreme Court in Kaufman v. I-Stat Corporation, 165 N.J. 94 (2000) reversed the Appellate Division and found that the reliance element of common law fraud may not be satisfied through a "fraud on the market" or "price inflation" theory. This was a common law fraud case but the same rationales for rejecting a fraud on market/price inflation also apply to the CFA. See New Jersey Citizens Action v. Schering-Plough Corp., 267 N.J.Super. 8 (App.Div.2003), Fink v. Ricoh Corp., 365 N.J.Super. 520 (Law Div.2003).

However, in those cases, the plaintiffs were simply attempting to sidestep the need for either reliance in common law fraud or causal link under the CFA. Here, plaintiffs allege they can prove Merck orchestrated a fraud on a national level that was directly targeted at the third party payors. Plaintiff claims they can prove misrepresentations and omissions by Merck were

17

part of the decision making process in the formulary decisions made by third party payors. The fact that the price was so much higher than other older medications on the market goes to the damages claimed, not to proof of causal link. The complaint alleges that Merck provided false and misleading information to the decision makers used by third-party payors in a deliberate attempt to get VIOXX® listed on the formularies of health care providers, and based on this fraudulent information decisions were made that resulted in damages. Regardless of the veracity of such claims, they are distinct from the fraud on the market/price inflation theory.

FINDINGS

**A. The Requirements of Rule 4:32-1(a)**

Before determining if the class action is maintainable, the court must determine that the proposed class meets all of the prerequisites of R. 4:32-1(a).

    **1. Numerosity**

In order to meet the first prerequisite of a certifiable class, the class must be so numerous that joinder of all members is impracticable. R. 4:32-1(a)(1). There is no predetermined number to establish when numerosity has been achieved and further, a plaintiff does not need to know the exact size of the proposed class in order to satisfy this requirement of the rule. Fink v. Ricoh Corp., 365 N.J. Super. 520, 557 (Law Div. 2003); see also Delgozzo, supra, 266 N.J. Super at 184-185.

In the matter at hand, Plaintiff does not know the exact number of third-party payors that may qualify as class members and has not even provided an estimate. Third-party payor funds, such as Plaintiff, are fairly common in New Jersey and throughout the United States. While Plaintiff has not provided figures relating to the estimated size of the overall proposed class, "it can be presumed at this point that such a class would … be sufficiently numerous to meet this

18

criterion." <u>Delgozzo</u>, <u>supra</u>, 266 <u>N.J. Super.</u> at 184-185. Numerosity in this matter can be inferred primarily because of the prevalence of third-party payors in providing prescription benefits and also because of the overall success of VIOXX® while it was on the market. Indeed, Merck's has basically conceded the proposed class meets this requirement.

### 2. Commonality

The second prerequisite for certification is that "there are questions of law or fact common to the class." <u>R.</u> 4:32-1(a)(2). Not every question needs to be common throughout the class, and indeed a single common question may be sufficient to satisfy this requirement. <u>Fink</u>, <u>supra</u>, 365 <u>N.J. Super.</u> at 558, <u>citing</u> <u>Delgozzo</u>, <u>supra</u>, 266 <u>N.J. Super.</u> at 185. "The existence of questions concerning individual representations made to a plaintiff, or relating to proof of damages, should not be a bar to upholding a class action where there are significant common questions as to liability." <u>Delgozzo</u>, <u>supra</u>, 266 <u>N.J. Super.</u> at 185.

Here, there are clearly questions of fact and law common to all members of the proposed class. The complaint in this matter alleges fraudulent misrepresentation and violations of the CFA. While the matter at hand is not based on physical injury from consumption of VIOXX®, the outcome of the case does hinge on the conduct of Merck in making representations about its drug. This issue will be relevant to all third-party payors that could potentially be members of this class.

Local 68 has provided the court with a list of questions that they assert would be common to all members of the proposed class. The list includes:

- Whether Merck concealed or suppressed material information regarding the safety and efficacy of VIOXX®;

- Whether Merck misrepresented the safety and efficacy of VIOXX®;

19

- Whether Merck engaged in deceptive or misleading promotional campaigns designed to induce class members to add VIOXX® to their formularies, or to authorize the purchase of VIOXX® by their plan participants;

- Whether Merck violated the CFA; and

- Whether, as a result of Merck's misrepresentations and failure to disclose material information regarding the safety and efficacy of VIOXX®, class members were damaged.

The court finds that these questions are common to the members of the class. Merck is a large, global corporation. Many of the alleged wrongdoings Plaintiff alleges Merck to have committed are claimed to have been done high within the corporate structure in order to have a uniform message regarding the efficacy and safety of VIOXX® distributed throughout the marketplace. In order for any individual plaintiff to establish that Merck committed fraud in violation of the CFA, they would have to establish the same activities as other plaintiffs alleging fraud related to VIOXX®.

There are of course, individual issues that will pertain to each class member. While these issues may indeed be significant, there has been a sufficient showing of common issues of law and fact to satisfy the commonality prerequisite of R. 4:32-1(a)(2).[2]

### 3. Typicality

The third prerequisite for class certification is that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." R. 4:32-1(a)(3). According to the New Jersey Supreme Court, this means that "[t]he claims of the representatives must 'have the essential characteristics common to the claims of the class.'" In re Cadillac,

---

[2] The court will discuss whether these common questions meet the "predominance" element of R. 4:32-1(b)(3) *infra*.

supra, 93 N.J. at 425 (quoting 3B Moore's Federal Practice, para. 23.06-2 (1982)). "A plaintiff's

claim is typical of the claims of the class if it arises from the same event or course of conduct

which has given rise to the claims of the other class members." Gross v. Johnson & Johnson-

Merck Consumer Pharmaceuticals Co., 303 N.J. Super. 336, 342 (Law Div. 1997).

      Merck argues that certification cannot be granted because Local 68 is not an adequate

class representative.  Merck claims that Plaintiff cannot represent the proposed class because: (1)

the Plaintiff is not typical of most-third party payors because plaintiff had no role in deciding

whether its plan would or would not cover VIOXX®; (2) because of reason #1, Plaintiff cannot

prove that Merck's alleged misrepresentations caused it to incur any obligation to pay for

VIOXX®; and (3) Local 68 may have a claim against BCBS-NJ, also a putative class member,

as the healthcare plan administrator that Local 68 retained to manage its healthcare plan.

      Merck argues that Local 68 is atypical of the proposed class members because it retained

BCBS-NJ to manage its healthcare plan and because it was BCBS-NJ that received all the

information regarding VIOXX® and made the ultimate decision to list the drug on its formulary.

Local 68 contends that whose role in deciding whether VIOXX® would be covered under their

prescription plan is irrelevant because the third-party payor ultimately bore the responsibility of

paying for the drug.

      Plaintiff's complaint alleges that the members of the proposed class were damaged when

they paid more money than they otherwise would have for VIOXX® because of fraud

perpetuated by Merck.  The court finds that whether the representations were made to an

employee of Local 68 or to an agent or administrator that it retained does not appear to affect the

end result that Plaintiff did ultimately pay for its members to receive VIOXX®.  New Jersey law

has established that a principal is deemed to have the knowledge or notice provided to an agent

while the agent is acting within the scope of his or her duties. Benjamin v. Corcoran, 268 N.J. Super. 517, 529 (App. Div. 1993). Additionally, there is no indication that Local 68 is less typical than other proposed class members merely because it retained an agent to manage its healthcare program. Merck's own witness, Dr. Kolassa, has testified that it is common for companies like BCBS-NJ to administer the healthcare plans for third-party payors.

In Kaufman v. I-Stat Corp., supra, the Supreme Court of New Jersey stated:

New Jersey already allows proof of indirect reliance to satisfy this element. Id. at 349,735 A.2d 606. Indirect reliance has also been adopted by the Restatement (Second of Torts for situations involving reliance by party B on a false representation initially made to party A who the maker knew or had reason to expect would communicate the information to party B such that the information would influence party B's conduct in a transaction. Ibid. (citing Restatement (Second) of Torts § 533 (1977)).
165 N.J. at 101.

Thus, if the third party payors can prove fraudulent misrepresentation and/or omissions caused them to act, then it doesn't matter if the misrepresentations were made to intermediaries or administrators of the plan. A causal relationship is what is required.

Merck also argues that Local 68 is not a typical class member because Merck's disclosures about VIOXX® changed over time as new information developed. Defendant consequently asserts, that for this reason there is no typical representative who can advance the claims of the proposed class. The court finds that while the disclosures may have changed over time, the plaintiffs claim is that the omissions and misrepresentations about VIOXX® remained essentially the same for all third-party payors and continued until the drug was taken off the market.

Plaintiff's complaint sets forth allegations that Merck realized VIOXX® caused adverse side effects that were not properly disclosed to the FDA or the public years before the drug was pulled off the market. Plaintiff contends that this realization occurred prior to VIOXX® gaining

FDA approval and that despite its awareness of the potential harmful effects of the drug, Merck omitted or misrepresented information in order to improve sales of the drug and increase its profits. The underlying theme of Plaintiff's cause of action is that Merck, from at least the time of the FitzGerald hypothesis, to the time of the drug's withdrawal, misrepresented or omitted essential information about VIOXX®. The fact that some of the marketing varied over the years that VIOXX® was on the market does not indicate that the alleged misrepresentations were inconsistent, nor does it indicate that Local 68 is an atypical class member. The court has reviewed documents the plaintiff relies upon and Merck's response but it is not necessary to discuss the proposed proofs here. There are clearly issues of fact but Local 68 appears to be a typical member of the class as far as how it obtained information and on what information it relied to place and keep VIOXX® on it formulary.

With regards to typicality, Merck finally contends that it has a unique defense against the claims brought by Local 68 and the need to respond to this defense will affect it's ability to represent the proposed class. Merck asserts that it can rebut the existence of a causal nexus between Merck's conduct and Plaintiff's alleged loss because Plaintiff continued to pay for VIOXX® after it knew of Merck's alleged misrepresentations and omissions. Plaintiffs claim that once a drug is on a formulary and a number of members of a payor's organization have been receiving the drug, it is very difficult to remove a drug and this would be true for all third party payors.

The court does not believe this is a "unique" defense. It may in fact be a defense but one common to most third party payors. As the identities of purported class members are as yet unknown, it is impossible to determine whether Merck's rebuttal of a causal nexus is actually a unique defense but it will probably apply to most, if not all, class members. Similarly, at this

point in the litigation, there is no support for Merck's contention that this defense will usurp a significant portion of Local 68's time and energy. See In re CBC Co. Collection Letter Litig., 181 F.R.D. 380, 385 (N.D. Ill. 1998) (granting class certification, but noting that if a defense unique to the class representative became unduly burdensome for the representative, typicality would be destroyed). Merck has not provided sufficient evidence to refute the assertions made by Plaintiff that the typicality prong of R. 4:32-1(a)(3) has been met.

### 4. Adequacy of Representation

The fourth prerequisite for class certification is that "the representative parties will fairly and adequately protect the interests of the class." R. 4:32-1(a)(4). In order to meet this requirement: "(a) the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation, and (b) the plaintiff must not have interests antagonistic to those of the class." Delgozzo, supra, 266 N.J. Super. at 188 (quoting In re Asbestos School Litigation, 104 F.R.D. 422, 430 (D.C.Pa. 1984)). "The defendant bears the burden of demonstrating that the proposed representation will be inadequate." Id.

In its opposition to this motion, Merck attempts to meet this burden by arguing that Local 68 may have interests adverse to a potential class member, namely BCBS-NJ. Local 68 filed its complaint in this matter in October 2003 claiming that it would not have paid such a high price for VIOXX® had Merck not misrepresented or omitted information about the drug. Merck asserts that the plaintiff has a potential claim against BCBS as Local 68's administrator for retaining VIOXX® on its formulary. the simple answer to this is that plaintiff has not asserted any claim against BCBS and does not intend to assert any claim against BCBS. Plaintiff alleges Merck made misrepresentation that resulted in BCBS and Local 68 and all other class members

24

paying for an expensive product under the misconception it was safer than the products on the market.

Merck also argues that Plaintiff cannot adequately represent putative class members because it had no control over whether it would purchase VIOXX® because it left such matters up to BCBS-NJ. This issue was similarly addressed in the discussion of the typicality prong. The submissions of the parties in relation to this motion show that it is common for a third-party payor to hire an administrator such as BCBS-NJ to handle its healthcare program. Local 68 admittedly delegated the choice of what drugs were listed on the formulary to BCBS-NJ. However, Local 68 was the payor in the relevant transactions and therefore constitutes an adequate class representative. Local 68 collected funds for its members, retained BCBS-NJ, and paid for the health care benefits provided to its members. The mere fact that BCBS-NJ, acting as an agent for Local 68, decided how to place the drug to be on the formulary of Local 68 does not destroy the causal link.

With regards to the qualifications of counsel for Local 68, Merck has not contested their qualifications and the court is satisfied that the attorneys are qualified and sufficiently experienced to conduct this litigation. In fact, there is probably no other law firm as knowledgeable about VIOXX®. Christopher Seeger is both liaison counsel in New Jersey where the largest number of VIOXX® cases are filed, and also on the Plaintiff's Steering Committee in the MDL. He and his firm have lead the discovery process in VIOXX® litigation. They are well respected among the mass tort bar. The seven million documents already produced in the VIOXX® litigation are maintained in a depository at Seeger Weiss's offices.

**B. The Requirements of Rule 4:32-1(b)(3)**

25

The only one of the three alternative requirements necessary for class certification under R. 4:32-1(b) that is relevant to this case is R. 4:32-1(b)(3). In order to determine if the proposed class meets this requirement, the court must decide two issues: "(1) whether plaintiffs have met the burden of proving that common questions of law and fact predominate over individual claims and (2) whether a class action is superior to other methods of adjudication." In re Cadillac, supra, 93 N.J. at 426. In deciding these issues, the court must identify the relevant issues of fact and law but not to the extent that would be required in a summary judgment motion or at trial. Id.

> In determining predominance and superiority, R. 4:32-1(b)(3) dictates consideration of three factors: (1) "the interest of members of the class in individually controlling the prosecution or defense of separate actions;" (2) "the extent and nature of any litigation concerning the controversy already commenced by or against members of the class;" and (3) "the difficulties likely to be encountered in the management of a class action."
> Carroll, supra, 313 N.J. Super. at 495 (internal citations omitted).

### 1. Predominance of Common Issues

The predominance requirement is more difficult to establish than the commonality prerequisite. See Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 623-624 (1997). The plaintiff bears the burden of showing that "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members." R. 4:32-1(b)(3); Fink, supra, 365 N.J. Super. at 567. This means that a plaintiff must demonstrate that "issues common to the class outweigh those that are not." Id. at 568. It is the significance of the issues, not the number that determines whether a class will predominate over individuals. Id. "A conclusion on the issue of predominance requires an evaluation of the legal issues and the proof needed to establish them." In re Cadillac, supra, 93 N.J. at 430.

> Although plaintiffs' causes of action embrace common legal and factual elements, the critical question remains whether the benefit from the

> determination in a class action of the existence of a common defect and a
> common pattern of fraud outweighs the problems of individual actions
> involving such other issues as causation, reliance, and damages.
> Id.

"If a common nucleus of operative facts is present, predominance may be found.  From another

perspective, the basic question is whether the potential class, including absent members seeks 'to

remedy a common legal grievance.'" Id. at 431 (internal citations omitted).

For certification of a nationwide class, a predominance inquiry must include an analysis

of variations in state law.  Carroll, supra, 313 N.J. Super. at 496.  This is because variations in

state law and how the court would deal with such variations could overwhelm common issues

and negate predominance.  Id.  A court must also consider "whether any individual class member

expressed an interest in controlling this litigation, or whether there was any pending litigation

that might have already been commenced by or against the members of the class." Id. at 497.  In

Carroll, the court was faced with whether to affirm a nationwide class.  With regards to the issue

of conflict of laws, the court stated:

> This court has determined that conflict of law issues do not per se foreclose
> certification of a multistate class. Delgozzo v. Kenny, 266 N.J.Super. 169, 190,
> 628 A.2d 1080 (App.Div.1993). However, this does not imply that an analysis
> of the different state laws and the effect on the predominance of common legal
> issues is not necessary. A thorough analysis of state laws is particularly
> important in circumstances where… there is a possibility that common issues
> could be subsumed by substantive conflicts in state laws... Of course,
> depending on variations in state laws, the members of the class in different
> states may be grouped into subclasses. See id. at 188, 628 A.2d 1080. But there
> may be differences in how each state defines common law fraud, negligent
> misrepresentation, or consumer fraud, thus making a trial judge's task of
> instructing a jury on relevant law impossible.
> Carroll, supra, 313 N.J. Super. at 497 (reversing and remanding class
> certification in part for a more thorough analysis of choice of law issues).

For purposes of this motion a choice of law analysis is necessary.  Should the laws of

every state apply, a nationwide certification would be much less manageable.  Additionally, the

27

court must determine whether individual issues pertaining to proofs, causation, and damages outweigh issues common to all proposed class members.

### a. Choice of Law

Because Plaintiff has brought this action in New Jersey, New Jersey's choice of law rules will govern this decision. See Gantes v. Kason Corp., 145 N.J. 478, 484 (1996). To decide a choice-of-law issue, New Jersey Courts apply a flexible "governmental-interest" analysis that consists of a two-pronged test to determine which state has the greatest interest in having its law apply to the particular issue being litigated. Fu v. Fu, 160 N.J. 108, 118 (1999); see also, Erny v. Estate of Merola, 171 N.J. 86, 94 (2002). Whether a conflict exists must be determined for each specific issue being litigated. Erny, supra, 171 N.J. at 94-95.

In order to determine which state has the greatest interest in applying its law to the specific issue being litigated, a court must first decide "that an actual conflict exists between the laws of" New Jersey and other states that have an interest in applying their laws to this litigation. Fu, supra, 160 N.J. at 118. As Plaintiff is seeking a nationwide class, there is a potential that a citizen of every state in the nation will participate in this litigation. In addition to having residents of these states, there are other contacts that this litigation has with states outside of New Jersey that give those states an interest in applying their laws. VIOXX® was sold throughout the United States. The transactions between third-party payors and their members regarding VIOXX® occurred in multiple states. As there exists a potential for every state to have an interest in applying their law to this action, the laws of every state must be reviewed to determine which state laws present a conflict with the NJ CFA.

As both parties correctly point out in their moving papers, and as a cursory review of other state laws involving consumer fraud indicates, there are sufficient variations between the

28

laws of the varying states and the CFA to constitute an actual conflict. The provisions of the various consumer fraud laws, the policies behind them, and case law interpretations all show variations between other states and New Jersey. See Fink, supra, 365 N.J. Super. at 570-584 (detailing various conflicts between the CFA and the consumer fraud statutes of other states). Both parties agree that the CFA conflicts in some ways with the consumer fraud laws of the other states. Thus, the first prong of the governmental-interest analysis has been met.[3]

"The second prong of the governmental-interest analysis requires the Court to determine which state has the most significant relationship to the occurrence and the parties with respect to the issue ..." before the court. Fu, supra, 160 N.J. at 119. In deciding the second prong, a court must first "identify the governmental policies underlying the law of each state and how those policies are affected by each state's contacts to the litigation and to the parties." Veazey v. Doremus, 103 N.J. 244, 247 (1986).

After reviewing the competing states' policies on the issue in dispute, if it is found that either state's contacts to the litigation do not further the asserted policies, then that state's law should not apply. Erny, supra, 171 N.J. at 101. For resolving governmental interests involving tort law, there are five main factors the court should use to guide its decision: "(1) the interests of interstate comity; (2) the interests of the parties; (3) the interests underlying the field of tort law; (4) the interests of judicial administration; and (5) the competing interests of the states." Fu,

---

[3] In determining that there is an actual conflict for the choice-of-law analysis, the court only acknowledges that none of the consumer fraud laws of other states is identical to the CFA. Some states have statutes that are similar enough to the CFA as to create a question as to whether there is truly a conflict at all while others provide sharply contrasting remedies and requirements. As the parties concur that there is an actual conflict, the court will provide a state by state analysis of the consumer fraud statutes to determine which states have the strongest relationship to the litigation.

supra, 160 N.J. at 122 (summarizing factors set forth in the Restatement (Second) of Conflict of Laws § 6). The fifth factor is the most important. Erny, supra, 171 N.J. at 101.

To evaluate the competing interests of the States, the courts must consider "what policies the legislature or court intended to protect by having that law apply to wholly domestic concerns, and then, whether those concerns will be furthered by applying that law to the multi-state situation." Fu, supra, 160 N.J. at 125 quoting Pfizer, Inc. v. Employers Ins. of Wausau, 154 N.J. 187, 198 (1998). In other words, a state only has an interest in applying its law if the state's contacts with the litigation are related to the policies for the applicable law. Id. The court should consider the qualitative contacts that the litigation has with the state's policies and not the quantitative contacts. Id. The contacts that are most significant to the analysis are: "the place where the injury occurred; the place where the conduct causing the injury occurred; the domicile, residence, nationality, place of incorporation and place of business of the parties; and the place where the relationship, if any, between the parties is centered." Id.

The Restatement (Second) of Conflict of Laws § 148 details a list of factors to consider when determining the appropriate law to apply to a claim of fraud where the plaintiff's alleged actions in reliance occurred in a state other than where the representations were made. The factors to consider are as follows:

> (a) the place, or places, where the plaintiff acted upon the defendant's representations,
> (b) the place where the plaintiff received the representations,
> (c) the place where the defendant made the representations,
> (d) the domicile, residence, nationality, place of incorporation and place of business of the parties,
> (e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time and,
> (f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant.
> Restatement (Second) of Conflict of Laws § 148.

30

In cases where pecuniary loss is said to have occurred due to fraud, the place of loss is often difficult to determine and thus, less important for determining the governing law than does the place of injury in cases of physical personal injury. Id. comment (c). "The place where the defendant made his false representations, on the other hand, is as important a contact in the selection of the law governing actions for fraud and misrepresentation as is the place of the defendant's conduct in the case of injuries to persons or to tangible things." Id.

Evaluating the interests of interstate comity "require[s] courts to consider whether application of a competing state's laws would frustrate the policies of other interested states." Fu, supra, 160 N.J. at 122. A state should only impose its law on a particular issue if it has a strong state policy that will be fostered by the application its law. Id. At 122-123. In assessing the interests underlying the field of tort law, the courts are required "to consider the degree to which deterrence and compensation, the fundamental goals of tort law, would be furthered by the application of a state's local law." Fu, supra, 160 N.J. at 123. The interests of the parties and the interests of judicial administration are "less significant for the purpose of making choice-of-law determinations in tort actions." Erny, 171 N.J. at 102.

In the matter at hand, in order to determine which state has the strongest interest in this litigation, first, New Jersey's policies and intentions underlying the CFA must be discussed.

> The CFA was enacted to "protect [the consumer] against fraudulent and unconscionable practices in the sale of goods and services." Marascio v. Campanella, 298 N.J.Super. 491, 500, 689 A.2d 852 (App.Div.1997). The purposes of the Act are: (1) to compensate the victim for his or her actual loss; (2) to punish the wrongdoer through the award of treble damages; and (3) to attract competent counsel to counteract the "community scourge" of fraud by providing an incentive for an attorney to take a case involving a minor loss to the individual. Lettenmaier v. Lube Connection, Inc., 162 N.J. 134, 139 (1999). The Act is "remedial legislation and should be liberally construed to accomplish its dual objectives of deterrence and protection." Joe D'Egidio

> Landscaping v. Apicella, 337 N.J.Super. 252, 258, 766 A.2d 1164
> (App.Div.2001) (citing Lettenmaier, supra, 162 N.J. at 139).
> Sprenger v. Trout, 375 N.J. Super. 120, 135-136 (App. Div. Feb. 14, 2005);
> see also, Wanetick v. Gateway Mistubishi, 163 N.J. 484 (2000).

"The available legislative history demonstrates that the [CFA] was intended to be 'one of the strongest consumer protection laws in the nation.'" New Mea Constr. Corp. v. Harper, 203 N.J. Super. 486, 501-502 (App. Div. 1985) (internal citations omitted).

The policy rationales for the CFA clearly indicate that New Jersey has a strong interest in preventing fraud by its corporate citizens. The CFA has implemented strong measures to protect consumers and deter fraudulent behavior. N.J.S.A. 56:8-19 allows recovery for "any person who suffers any ascertainable loss" and there is no language in the CFA to indicate that the law was to be limited to New Jersey residents. See Boyes v. Greenwich Boat Works, Inc., 27 F.Supp.2d 543 (D.N.J. 1998). Indeed, the CFA is intended to promote "truth and fair dealing in the market place." Feinberg, supra, 331 N.J. Super. at 512. In order to achieve this stated goal, the CFA has been interpreted liberally to cover a broad range of practices. Laelledo v. Beneficial Mgmt. Corp. of America, 150 N.J. 255, 264 (1997). More specifically, "[f]or nearly thirty years, [the New Jersey Supreme Court] has instructed trial courts to liberally allow class actions involving allegations of consumer fraud." Varacallo, supra, 332 N.J. Super. at 44.

Logic, in addition to an analysis of other state laws, shows that all consumer fraud statutes are intended to discourage fraud and provide some level of protection to consumers. In this respect, there is no conflict between the laws of varying jurisdictions. The conflicts between state laws arise only in the extent of protection provided and the level of deterrence sought. To the extent that some states provide less protection for consumers than others, the rationale is generally to encourage business and other commercial transactions to take place within that particular state's borders. Thus, these state's policies will not be frustrated by imposing New

Jersey law onto a corporation residing in New Jersey. Any deterrence to transactions being done within any particular state's borders by a New Jersey entity would be, at most, minimal because that New Jersey entity has already consented to be subject to the more stringent New Jersey law. Unless a particular state specifically enunciates a policy behind its consumer fraud laws that varies significantly from New Jersey's policy behind the CFA, that state will have to have very strong factual ties to this litigation in order to justify applying its law to this matter rather than the CFA.

Having reviewed the extensive submissions by the parties and having heard oral arguments on this motion, there does not appear to be any state with stronger ties to this litigation than New Jersey. The putative class representative is organized and operating in New Jersey. The Defendant is a New Jersey corporation that is headquartered in Whitehouse Station, New Jersey. Development of VIOXX® originally began at Merck Frosst in Canada but was "largely completed" at Merck's facility in Rahway, New Jersey. (Merck's 2000 Annual Report, p. 8). Merck has a Human Health Product Approval Committee ("HHPAC") that oversees broad development of all Merck's products and gives final approval on plans and activities related to the product, including VIOXX®. HHPAC would meet on a monthly basis, and at least some of these meetings took place in New Jersey, including one on March 20, 2001 wherein the VIOXX® Program Review was discussed. Merck also issued press releases from its New Jersey headquarters about VIOXX®-related developments. Much of the decision making about the marketing and testing of VIOXX® was done in New Jersey. Communications regarding the labeling of VIOXX® took place between the FDA and Merck employees based in New Jersey.

Unlike the numerous and substantial fact-based contacts that New Jersey has with this litigation, there has been little evidence presented to establish contacts between this litigation and

the home state of a putative class member. The proposed class may consist of a vast number of entities that vary significantly in size and capacity. However, they all are influenced, according to plaintiffs, by the nationwide marketing plan of Merck. As noted by Merck, there is a multitude of literature regarding NSAIDs, COX-2 inhibitors, and VIOXX® in particular. Some or all of this literature was at the very least considered by the various plan administrators or P&T Committees in every State in making their decision to include VIOXX® on their respective formularies. These publications came from a variety of sources and plaintiff maintains they can prove scientists opinions, the literature, the studies were all manipulated by Merck. The marketing of VIOXX® was a national effort that was planned or executed through New Jersey offices and plaintiffs may be able to prove any misrepresentations made were made to a national audience of all third party payors.

As these facts indicate, factors (a) and (b) of Restatement (Second) of Conflict of Laws § 148, the place where a plaintiff acted in reliance of the representations and the place where the representations were received, are very difficult to determine. Thus, where the decisions were made to provide coverage for VIOXX® is not as important a contact as where the alleged fraudulent representations were made. See Restatement (Second) of Conflict of Laws § 148, comment (c). Although there is evidence to indicate that Merck sent sales representatives or "detailers" to individual P&T Committees to promote VIOXX®, this does not provide greater contacts than New Jersey because information provided by a detailer would only be one factor of the many that even Merck acknowledges would go into the decision making process of including a particular drug on a formulary and not likely the most significant. Thus, the court finds that no individual state has stronger factual connection to this litigation than New Jersey.

As noted above, New Jersey has very strong policy interests behind the CFA, especially in a litigation such as this where a New Jersey corporation conducted the alleged fraud. The key questions are does New Jersey have a compelling public policy interest in applying New Jersey very strict consumer fraud law under the circumstances that exist in this case? The answer clearly is, yes. Merck is a New Jersey corporation and New Jersey has the most interest in policing and protecting its own corporations. Does New Jersey have any reason not to protect consumers (third party payors) from other states from fraud committed by a New Jersey corporation? The answer is clearly, no. The statute itself does not limit protection to New Jersey residents. Do other states have any interest in denying their citizens the protection of New Jersey law if it offers them more protection than the law of plaintiff's state? The answer is, no. In Gantes v. Kason Corp., 145 N.J. 478, the Supreme Court did a conflict of law analysis that resulted in New Jersey statutes of limitations, not Georgia statutes of repose, being applied to a case brought by a Georgia plaintiff in New Jersey against a New Jersey manufacturer. The Court stated in that case at 145 N.J. 478, at 489:

> The interest in deterrence has been recognized as a relevant factor to be considered in choice-of-law decisions. See, e.g., Pfau v. Trent Aluminum Co., 55 N.J. 511, 524, 263 A.2d 129 (1970) (noting "We are not certain that a defendant's domicile lacks an interest in seeing that its domiciliaries are held to the full measure of damages or the standard of care which that state's law provide[s] for."); Mueller v. Parke Davis, 252 N.J.Super. 347, 354-55, 599 A.2d 950 (App. Div. 1991); Seals v. Langston Co., 206 N.J.Super. 408, 412, 502 A.2d 1185 (App. Div.), certif. denied, 104 N.J. 386, 517 A.2d 392 (1986); Pine v. Eli Lilly & Co., 201 N.J.Super. 186, 192, 492 A.2d 1079 (App.Div. 1985); Deemer v. Silk City Textile Mach.Co., 193 N.J.Super. 643, 650, 475 A.2d 648 (App.Div. 1984). The goal of deterrence, acknowledged generally to be part of tort law, is especially important in the field of products-liability law.

The interest in deterrence cited by the Supreme Court is important, if not more, in consumer fraud litigation. It must be remembered that any member of class that does not wish to litigate their claims in New Jersey can opt out of the litigation. Defendant points out that Gantes,

supra, addressed only the statute issue and not substantive law. In fact, the issue of what

substantive law applies was not really addressed, but just mentioned in passing as apparently it

was not contested. The logic of New Jersey's interest in deterrence clearly applies to the CFA on

every level.

The strongest language on point is found in <u>Boyes v. Greenwich Boat Works Inc.</u>, 27

<u>F.Supp.2d.</u> 543. In this case, the Pennsylvania plaintiffs purchased a boat they first saw at a

Philadelphia boat show sold by a New Jersey defendant after being constructed in North

Carolina. The United States District Court Judge found the New Jersey consumer fraud law

applied to the action filed in New Jersey in the U.S. District Court stating:

> This court has little doubt that the New Jersey Legislature intended its Consumer
> Fraud statute to apply to sales made by New Jersey sellers even if the buyer is an
> out-of-state resident and some aspect of the transaction took place outside New
> Jersey. Courts have declared that the Consumer Fraud Act "should be construed
> liberally in favor of protecting consumers." <u>Levin v. Lewis,</u> 179 N.J.Super. 193,
> 200, 431 A.2d 157, 161 (App.Div. 1981); <u>State v. Hudson Furniture Company,</u>
> 165 N.J.Super. 516, 520, 398 A.2d 900, 902 (App.Div. 1979) (noting the
> "perceived need to liberally construe the act in favor of protecting consumers").
> Plainly, the "act is broadly designed to protect the public." <u>Skeer v. EMK
> Motors, Inc.,</u> 187 N.J.Super. 465, 470, 455 A.2d 508, 512 (App.Div. 1982). "The
> available legislative history demonstrates that the Act was intended to be one of
> the strongest consumer protection laws in the nation." <u>Huffmaster v. Robinson,</u>
> 221 N.J.Super. 315, 319, 534 A.2d 435, 437 (Law Div. 1986) (citing <u>New Mea
> Construction Corp. v. Harper,</u> 203 N.J.Super. 486, 497 A.2d 534
> (App.Div.1985)).
> While there can be no doubt that the New Jersey legislature desired to protect its
> own residents, it is equally clear that this state has a powerful incentive to insure
> that local merchants deal fairly with citizens of other states and countries.
> <u>Boyes</u>, supra, 27 <u>F.Supp.2d.</u> 543, at 547.

This court agrees that the Legislature would certainly want to afford the protections of the

CFA to anyone defrauded by a New Jersey seller of a product in violation of the Act. Some

states have chosen to apply the CFA when one of the parties had sufficient contacts with New

Jersey. See <u>Peterson v. BASF Corp.</u>, 675 <u>N.W.2d</u> 57, 60-61 (Minn. 2004) (affirming a

nationwide class action for violation of the CFA against a defendant with its principal office in New Jersey) cert. granted and judgment vacated on other grounds 125 S.Ct. 1968 (2005); Fresh Start Industries, Inc. v. ATX Telecommunications Services, 295 F.Supp.2d 521, 527 (E.D.Pa. 2003) (finding that applying the CFA would not impair the Pennsylvania's governmental interest in protecting consumers from deceptive business practices where the plaintiff was a New Jersey corporation with its principal place of business in New Jersey). Other states have found that their consumer fraud laws are similar in purpose to the CFA. E.g. Western Star Trucks, Inc. v. Big Iron Equipment Service, Inc., 101 P.3d 1047, 1052 (Alaska 2004) (relying on the CFA to interpret the Alaskan Unfair Trade Practices and Consumer Protection Act); Elder v. Fischer, 717 N.E.2d 730, 737 (Ohio App. 1998) (stating "Ohio's CSPA, like New Jersey's consumer-protection statute, is a remedial statute and, thus, should be broadly construed to effectuate its purpose of protecting consumers").

    To ensure that no other state has a stronger or significantly different policy than New Jersey and concurrently a stronger interest in applying its law to this litigation, an analysis of each state law on consumer fraud is necessary. See Carroll, supra, 313 N.J. Super. at 496.

## ALABAMA

    The Alabama law most comparable to the CFA is the Alabama Deceptive Trade Practices Act ("ADTPA"). The stated legislative intent of the ADTPA, Ala. Code 1975 § 8-19-1 et seq. is to "protect the interest of both the consuming public and the legitimate businessperson" because "the public health, welfare and interest require a strong and effective consumer protection program." Ala. Code 1975 § 8-19-2. The legislation was "adopted to exercise the police powers of [Alabama]." Johnson Mobile Homes of Alabama, Inc., 855 So.2d 1064, 1069 (Ala. 2003).

The ADTPA creates a private right of action and gives the court discretion to impose treble damages but precludes class actions by private individuals. Ala. Code 1975 § 8-19-10. Thus, the policies underlying the ADTPA are similar to the CFA but the remedies are somewhat different. Having reviewed the ADTPA and case law interpreting the Act, this court finds that applying the CFA to the instant matter would not frustrate the policies or intentions of Alabama law.

## ALASKA

The Alaska Unfair Trade Practices and Consumer Protection Act ("UTPCPA"), makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce." Ak. St. § 45.50.471(a). Neither intent to deceive nor actual injury as a result of the deception are necessary to prove a claim under the UTPCPA. State v. O'Neill Investigations, Inc., 609 P.2d 520 (Alaska 1980). Alaskan courts are to give great weight to the interpretations of section 5(a)(1) of the FTCA (15 U.S.C.A. § 45(a)(1)) in determining whether a practice is deceptive or unfair. Id. at 523-524. The UTPCPA allows for private actions and also allows for the recovery of treble damages. Ak. St. § 45.50.531(a). There is also a two year statute of limitations in which to bring an action against a defendant. Ak. St. § 45.50.531(b).

Having reviewed the UTPCPA and case law interpreting the Act, this court finds that applying the CFA to the instant matter would not frustrate the policies or intentions of Alaska law.

## ARIZONA

The Arizona Consumer Fraud Act ("AZCFA"), A.R.S. § 44-1521 et seq., makes unlawful:

> The act, use or employment by any person of any deception, deceptive act or practice, fraud, false pretense, false promise, misrepresentation, or

38

> concealment, suppression or omission of any material fact with intent that
> others rely upon such concealment, suppression or omission, in connection
> with the sale or advertisement of any merchandise whether or not any person
> has in fact been misled, deceived or damaged thereby…
> A.R.S. § 44-1522(a).

Reliance is a required element under the AZCFA. Kuehn v. Stanley, 208 Ariz. 124, 129 (Az.

App. Div. 2004). The AZCFA allows for the recovery of actual damages and also allows for

punitive damages where the defendant's conduct "was wanton or reckless, shows spite or ill will

or where the conduct demonstrates a reckless indifference to the interests of others." Holeman v.

Neils, 803 F.Supp. 237,242-243 (D.Az. 1992). The purpose of the AZCFA is to "eliminate

unlawful practices in merchant-consumer transactions." Enyart v. Transamerica Ins. Co., 195

Ariz. 71, 78 (Az. App. Div. 1998).

The policies underlying the AZCFA are similar to the CFA but the remedies and proof

requirements are somewhat different. Having reviewed the AZCFA and case law interpreting

the Act, this court finds that applying the CFA to the instant matter would not frustrate the

policies or intentions of Arizona law.

## ARKANSAS

The Arkansas Deceptive Trade Practices Act ("ADTPA"), A.C.A. § 4-88-101, et seq.,

makes it unlawful to use deception, fraud, or false pretense to sell or advertise goods and also

make unlawful the "concealment, suppression, or omission of any material fact with intent that

others rely upon the concealment, suppression, or omission." A.C.A. § 4-88-108. The Arkansas

Legislature passed the ADTPA with "the intent to protect consumers." State v. R&A Inv. Co.,

Inc., 336 Ark. 289, 296 (Ark. 1999). The ADTPA allows for the recovery of actual damages in a

private cause of action and, when appropriate, attorney's fees. A.C.A. § 4-88-113.

Having reviewed the ADTPA and case law interpreting the Act, this court finds that applying the CFA to the instant matter would not frustrate the policies or intentions of Arkansas law.

## CALIFORNIA

The Unfair Competition law ("UCL"), Cal Bus. & Prof Code § 17200, et seq., prohibits unfair or fraudulent business practices and false or misleading advertising. Id. "The UCL is intended to proscribe unfair or fraudulent business acts or practices and unfair, deceptive, untrue or misleading advertising." In re Firearm Cases, 126 Cal.App.4th 959, 977 (Cal.App. 2005).

The intent of California's Consumer's Legal Remedies Act (CLRA), Cal. Civ. Code § 1760, is to "protect consumers against unfair and deceptive business practices and to provide efficient and economical procedures to secure such protection." The purpose of the CLRA is to alleviate the social and economic problems that arise from deceptive business practices. See America Online, Inc. v. Superior Court, 108 Cal.Rptr.2d 699 (App.1Dis. 2001).

The UCL and CLRA provide remedies that vary slightly from the CFA, however the policies underlying the California laws are very similar to those underlying the CFA. Consequently, applying the CFA to the instant matter would not frustrate the policies or intentions of California law.

## COLORADO

The Colorado Consumer Protection Act ("CCPA"), C.R.S.A. § 6-1-101, et seq., "is a remedial statute intended to deter and punish deceptive trade practices committed by businesses in dealing with the public." Loughridge v. Goodyear Tire and Rubber Co., 192 F.Supp.2d 1175, 1185 (D.Colo. 2002). The purpose of the CCPA is "to provide prompt, economical, and readily available remedies against consumer fraud." Id. (quoting W. Food Plan, Inc. v. Dist. Court, 198

P.2d 1038, 1041 (1979)).  The CCPA allows plaintiffs to recover treble damages and attorney

fees.

The policies underlying the CCPA are almost identical to those underlying the CFA,

however, the remedies provided vary slightly from those in New Jersey.  Having reviewed the

CCPA and case law interpreting the Act, this court finds that applying the CCPA to the instant

matter would not frustrate the policies or intentions of Colorado law.

## CONNECTICUT

The Connecticut Unfair Trade Practices Act ("CUTPA"), C.G.S.A. § 42-110, et seq.,

provides that "no person shall engage in unfair methods of competition and unfair or deceptive

acts or practices in the conduct of any trade or commerce."  C.G.S.A. § 42-110b(a).  It is the

purpose of CUTPA "to protect the public from unfair practices in the conduct of any trade or

commerce … The entire act is remedial in character and must be liberally construed in favor of

those whom the legislature intended to benefit."  American Car Rental, Inc. v. Commissioner of

Consumer Protection, 869 A.2d 1198, 1207-1208 (Conn. 2005) (internal citations omitted).

Having reviewed the CUTPA and case law interpreting the Act, this court finds that

applying the CFA to the instant matter would not frustrate the policies or intentions of

Connecticut law.

## DELAWARE

The purpose of the Delaware Consumer Fraud Act ("DCFA"), 6 Del. C. § 2511, et seq. is

to "protect consumers and legitimate business enterprises from unfair or deceptive

merchandising practices in the conduct of any trade or commerce in part or wholly within this

State." 6 Del. C. § 2512.  The Delaware General Assembly intended for the DCFA to swiftly

achieve this purpose and therefore the Act is liberally construed.  Id.  A plaintiff may recover

41

punitive damages under the DCFA "[i]f the fraud is gross, oppressive, or aggravated, or where it involves breach of trust or confidence." Stephenson v. Capano Development, Inc., 462 A.2d 1069, 1076-1077 (Del. 1983). Attorney's fees however, are not allowed. Id. at 1078.

Having reviewed the DCFA and case law interpreting the Act, this court finds that applying the CFA to the instant matter would not frustrate the policies or intentions of Delaware law.

## THE DISTRICT OF COLUMBIA

The District of Columbia Consumer Protection Procedures Act ("DCCPPA"), D.C.S.T. § 28-3901, et seq. "was designed to police trade practices arising only out of consumer-merchant relationships." Howard v. Riggs National Bank, 432 A.2d 701, 709 (D.C. App. 1981) (applying a narrow construction to the DCCPPA). The purpose of the DCCPPA is to provide a remedy for improper trade practices, deter the continued use of such practices, promote fair business practices, and to educate consumers. D.C.S.T. § 28-3901(b).

Having reviewed the DCCPPA and case law interpreting the Act, this court finds that applying the CFA to the instant matter would not frustrate the policies or intentions of the law of the District of Columbia.

## FLORIDA

The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), F.S.A. § 501.201, et seq., was enacted and is to be liberally interpreted for the following purposes:

> (1) To simplify, clarify, and modernize the law governing consumer protection, unfair methods of competition, and unconscionable, deceptive, and unfair trade practices.
> (2) To protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce.
> (3) To make state consumer protection and enforcement consistent with established policies of federal law relating to consumer protection.

F.S.A. § 501.202

The Florida legislature intended the FDUTPA to allow additional substantive remedies on Florida citizens "to recover economic damages related solely to a product or service purchased in a consumer transaction infected with unfair or deceptive trade practices or acts." Delgado v. J.W. Courtesy Pontiac GMC-Truck, Inc., 693 So.2d 602, 606 (Fl.App. 2 Dist. 1997).

Having reviewed the FDUTPA and case law interpreting the Act, this court finds that applying the CFA to the instant matter would not frustrate the policies or intentions of Florida law.

## GEORGIA

Georgia's tort law provides "[f]raud, accompanied by damage to the party defrauded, always gives a right of action to the injured party." Ga. Code. Ann., § 51-6-1. Additionally, Georgia has the Georgia Fair Business Practices Act ("GFBPA"), Ga. Code. Ann., § 10-1-390, et seq.

The purpose of the GFBPA is "to protect consumers and legitimate business enterprises from unfair or deceptive practices in the conduct of any trade or commerce in part or wholly in the state." Ga. Code. Ann., § 10-1-391(a). The law is supposed to be given liberal interpretation. Id. The Georgia General Assembly intended the GFBPA to be given similar interpretation to the FTCA. Id. The GFBPA is "intended to protect consumers and legitimate business enterprises from unfair or deceptive practices in the conduct of any trade or commerce. The [GFBPA] forbids and declares unlawful any unfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce." Henderson v. Gandy, 608 S.E.2d 248, 252 (Ga.App. 2004).

43

Having reviewed the GFBPA and case law interpreting the Act, this court finds that applying the CFA to the instant matter would not frustrate the policies or intentions of Georgia law.

## HAWAII

The law in Hawaii most comparable to the CFA is H.R.S. § 480, et seq. Specifically, H.R.S. § 480-2 provides a cause of action for any consumer who is injured by any unfair or deceptive act or forbidden practice. The Hawaiian Unfair Competition Laws are to be given a similar interpretation as that of the FTCA. H.R.S. § 480-2(b).

> [T]he plain language of the statute reflects that the legislature intended not only to protect persons who actually purchased goods or services as a result of unfair or deceptive acts and practices, but also those who attempted or were solicited to do so. It would be most strange if the legislature had sought to protect such persons but failed to provide them with any remedy. Zanakis-Pico v. Cutter Dodge, Inc., 47 P.3d 1222, 1229 (Hawaii 2002) (interpreting the language of the Hawaiian Unfair Competition Laws).

Having reviewed the relevant Hawaiian laws and the associated case law interpreting those statutes, this court finds that applying the CFA to the instant matter would not frustrate the policies or intentions of Hawaii law.

## IDAHO

The purpose of the Idaho Consumer Protection Act ("ICPA"), I.C. § 48-601, et seq. is to "protect both consumers and businesses against unfair methods of competition and unfair or deceptive acts and practices in the conduct of trade or commerce, and to provide efficient and economical procedures to secure such protection." The statute is intended to be remedial in nature. Id. The ICPA is to be given similar interpretation to that of the FTCA. In re Western Acceptance Corp., Inc., 788 P.2d 214, 216 (Idaho 1990). The ICPA is to be "liberally construed

to effect the legislative intent to deter deceptive or unfair trade practices and to provide relief for consumers exposed to proscribed practices." Id. (internal quotations and citations omitted).

Having reviewed the ICPA and case law interpreting the Act, this court finds that applying the CFA to the instant matter would not frustrate the policies or intentions of Idaho law.

## ILLINOIS

The Illinois Consumer Fraud and Deceptive Business Practices Act, ("ICFDBPA"), 815 I.C.L.S. 505/1, et seq., is intended to be given a similar construction to that of the FTCA. 815 I.C.L.S. 505/2. "The purpose of the Consumer Fraud Act is to protect consumers, borrowers and businessmen against fraud and unfair or deceptive acts or practices in the conduct of any trade or commerce." Lyne v. Arthur Andersen & Co., 772 F.Supp. 1064,1067-1068 (N.D.Ill. 1991).

Having reviewed the ICFDBPA and case law interpreting the Act, this court finds that applying the CFA to the instant matter would not frustrate the policies or intentions of Illinois law.

## INDIANA

The Indiana Deceptive Consumer Sales Act ("IDCSA"), I.C. § 24-5-0.5-1, et seq., was enacted for the purposes of improving the law on deceptive and unconscionable sales practices; protecting consumers; and "encouraging the development of fair consumer sales practices." Id. the IDCSA is to be liberally construed. Id. A plaintiff may bring a class action under the IDCSA and may recover actual damages as well as reasonable attorney fees. I.C. § 24-5-0.5-4. The IDCSA "provides remedies to consumers and the attorney general for practices that the [Indiana] General Assembly deemed deceptive in consumer transactions." McKinney v. State, 693 N.E.2d 65, 67 (Ind. 1998).

Having reviewed the IDCSA and case law interpreting the Act, this court finds that applying the CFA to the instant matter would not frustrate the policies or intentions of Indiana law.

## IOWA

The Idaho Consumer Fraud Act ("ICFA"), I.C.A. § 714.16, "was enacted in 1965 in order to protect the public from unfair and deceptive business practices." 436 N.W.2d 617, 620 (Iowa 1989). The ICFA was enacted when large scale marketing and manufacturing reached a point where common law remedies to consumers for common-law fraud became inadequate. Id. The law is remedial in nature and expands consumer's rights beyond what was available at common law, in part by eliminating the reliance requirement. Id. at 621-622.

Having reviewed the ICFA and case law interpreting the Act, this court finds that applying the CFA to the instant matter would not frustrate the policies or intentions of Iowa law.

## KANSAS

The liberally construed Kansas Consumer Protection Act ("KCPA"), KS ST § 50-623, et seq., was enacted for the following purposes:

> (a) To simplify, clarify and modernize the law governing consumer transactions;
> (b) to protect consumers from suppliers who commit deceptive and unconscionable practices;
> (c) to protect consumers from unbargained for warranty disclaimers; and
> (d) to provide consumers with a three-day cancellation period for door-to-door sales.
> Id.

Prior knowledge or intent to violate the KCPA is not a requirement that must be proven to establish a cause of action and liability may attach even though there was no intent to injure the consumer. Willman v. Ewen, 634 P.2d 1061, 1065 (Kan. 1981).

Having reviewed the KCPA and case law interpreting the Act, this court finds that applying the CFA to the instant matter would not frustrate the policies or intentions of Kansas law.

## KENTUCKY

The Kentucky Consumer Protection Act ("KYCPA"), KRS § 367.170, et seq., makes "unfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce" unlawful. KRS § 367.170. The KYCPA is to be broadly construed to effectuate its purpose to "curtail unfair, false, misleading or deceptive practices in the conduct of commerce." Com. ex rel. Chandler v. Anthem Ins. Companies, Inc., 8 S.W.3d 48, 54 (Ky. App. 1999) (internal citations omitted).

Having reviewed the KYCPA and case law interpreting the Act, this court finds that applying the CFA to the instant matter would not frustrate the policies or intentions of Kentucky law.

## LOUISIANA

The Louisiana Unfair Trade Practices and Consumer Protection Act ("LUTPA"), LSA-R.S. 51:1401, et seq., makes "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce" unlawful. LSA-R.S. 51:1405. "The purpose of LUTPA is to protect consumers and business competitors only, and to deter injury to competition." Landreneau v. Fleet Financial Group, 197 F.Supp.2d 551, 557 (M.D.La. 2002).

Having reviewed the LUTPA and case law interpreting the Act, this court finds that applying the CFA to the instant matter would not frustrate the policies or intentions of Louisiana law.

47

## MAINE

In Maine, consumer fraud is governed by the Maine Unfair Trade Practices Act

("MUTPA"), 5 M.R.S.A. § 205-A, et seq. The MUTPA:

> provides protection for consumers against unfair and deceptive trade practices.
> It declares unlawful "unfair methods of competition and unfair or deceptive
> acts or practices in the conduct of any trade or commerce." 5 M.R.S.A. § 207.
> In enacting the UTPA in 1969, the Legislature intended "to bring into Maine
> law the federal interpretations of 'unfair methods of competition and unfair or
> deceptive acts or practices[,]' " as set forth in the Federal Trade Commission
> Act.
> State v. Weinschenk, 868 A.2d 200, 205 (Me. 2005) (citations omitted).

Having reviewed the MUTPA and case law interpreting the Act, this court finds that

applying the CFA to the instant matter would not frustrate the policies or intentions of Maine

law.

## MARYLAND

The Maryland Consumer Protection Act ("MDCPA"), MD Code, Commercial Law, § 13-

101, et seq. was adopted by the Maryland General Assembly so that it could take "strong

protective and preventive steps to investigate unlawful consumer practices, to assist the public in

obtaining relief from these practices, and to prevent these practices from occurring in Maryland."

Additionally, "[i]t is the purpose of this title to accomplish these ends and thereby maintain the

health and welfare of the citizens of the State. MD Code, Commercial Law, § 13-102. Maryland

courts have noted that "the purpose of the Consumer Protection Act is to protect the consumer,

by setting minimum standards, and to restore an 'undermined' public confidence in merchants."

Klein v. State, 452 A.2d 173, 176 (Md.App. 1982) (internal citations omitted).

Having reviewed the MDCPA and case law interpreting the Act, this court finds that

applying the CFA to the instant matter would not frustrate the policies or intentions of Maryland

law.

48

## MASSACHUSETTS

The Massachusetts Consumer Protection Act ("MASSCPA"), M.G.L.A. 93A § 1, et seq.

generally proscribes "unfair or deceptive acts or practices in the conduct of any trade or

commerce." M.G.L.A. 93A § 2. MASSCPA "is a statute of broad impact whose basic policy is

to ensure an equitable relationship between consumers and persons engaged in business."

Veranda Beach Club Ltd. Partnership v. Western Sur. Co., 936 F.2d 1364, 1385 (1st Cir. 1991).

The MASSCPA serves a deterrence function by imposing liability on entities that engage in

unfair practices for the purposes of obtaining a profit. Poznik v. Massachusetts Medical

Professional Ins. Ass'n, 628 N.E.2d 1, 4 (Mass. 1994).

Having reviewed the MASSCPA and case law interpreting the Act, this court finds that

applying the CFA to the instant matter would not frustrate the policies or intentions of

Massachusetts law.

## MICHIGAN

The Michigan Consumers Protection Act ("MICPA"), MCL 445.901, et seq., makes

unlawful "unfair, unconscionable, or deceptive methods, acts or practices in the conduct of trade

or commerce." MCL 445.903. The MICPA serves a remedial purpose and is given a liberal

construction in order to achieve its goals. Dressel v. Ameribank, 635 N.W.2d 328, 334

(Mich.App. 2001) rev'd on other grounds, 664 N.W.2d 151 (Mich. 2003). "The intent of the

[MICPA] is 'to protect consumers in their purchases of goods which are primarily used for

personal, family or household purposes.'" Florists' Transworld Delivery, Inc. v. Fleurop-

Interflora, 261 F.Supp.2d 837, 847 (E.D.Mich. 2003).

Having reviewed the MICPA and case law interpreting the Act, this court finds that applying the CFA to the instant matter would not frustrate the policies or intentions of Michigan law.

## MINNESOTA

The Minnesota Consumer Fraud Act ("MNCFA"), M.S.A. § 325F.68-70, addresses issues similar to the CFA. The MNCFA abandoned the common law fraud requirement of reliance and the legislature intended to make it easier for a plaintiff to sue for consumer fraud than under common law. Wiegand v. Walser Automotive Groups, Inc., 670 N.W.2d 449, 453 (Minn.App. 2003) rev'd on other grounds, 683 N.W.2d 807 (Minn. 2004). Additionally, the MNCFA is to be broadly construed to enhance consumer protection. Popp Telecom, Inc. v. American Sharecom, Inc., 361 F.3d (8th Cir. 2004).

Having reviewed the MNCFA and case law interpreting the Act, this court finds that applying the CFA to the instant matter would not frustrate the policies or intentions of Minnesota law.

## MISSISSIPPI

The Mississippi Consumer Protection Act ("MCPA"), Miss. Code. Ann. § 75-24-1, et seq., prohibits "unfair methods of competition affecting commerce and unfair or deceptive trade practices in or affecting commerce." Miss. Code. Ann. § 75-24-5. The courts are to follow the interpretations of the FTCA in construing the MCPA. Miss. Code. Ann. § 75-24-3.

Having reviewed the MCPA and case law interpreting the Act, this court finds that applying the CFA to the instant matter would not frustrate the policies or intentions of Mississippi law.

## MISSOURI

50

The Missouri Merchandising Practices Act ("MMPA"), V.A.M.S. §§ 407.020 et seq., like the CFA is an attempt to reduce consumer fraud. The purpose of the MMPA is "to preserve fundamental honesty, fair play and right dealings in public transactions." State ex rel. Nixon v. Beer Nuts, Ltd., 29 S.W.3d 828, 837 (Mo.App. E.D. 2000). The MMPA eliminates the need for proof of intent or reliance in a consumer fraud action. Id.

Having reviewed the MMPA and case law interpreting the Act, this court finds that applying the CFA to the instant matter would not frustrate the policies or intentions of Missouri law.

### MONTANA

The Montana Consumer Protection Act ("MCPA"), MCA §§ 30-14-101, et seq. was enacted to "protect people from unfair or deceptive practices..." Plath v. Schonrock, 64 P.3d 984, 990 (Mont. 2003). The MCPA gives the court the discretion to enter treble damages and attorneys fees in appropriate cases. MCA § 30-14-133. These provisions are not punitive in nature, but rather compensatory or remedial. Plath, supra, 64 P.3d at 990. "The purpose of the trebling provision of the [MCPA] is to promote or encourage private individuals to pursue violations of [the MCPA] by making it more economically feasible to pursue those claims where actual damages are minimal." Id.

Having reviewed the MCPA and case law interpreting the Act, this court finds that applying the CFA to the instant matter would not frustrate the policies or intentions of Montana law.

### NEBRASKA

The Nebraska Consumer Protection Act ("NCPA"), Neb.Rev.St. § 59-1601, et seq., makes unlawful, "[u]nfair methods of competition and unfair or deceptive acts or practices in the

conduct of any trade or commerce…" <u>Neb.Rev.St.</u> § 59-1602. "The purpose of the [NCPA] is to provide consumers with protection against unlawful practices in the conduct of any trade or commerce which directly or indirectly affects the people of Nebraska." <u>Arthur v. Microsoft Corp.</u>, 676 <u>N.W.2d</u> 29, 31 (Neb. 2004). The NCPA was intended to protect Nebraska consumers from conspiracies involving monopolies and price-fixing. <u>Id.</u>

Having reviewed the NCPA and case law interpreting the Act, this court finds that applying the CFA to the instant matter would not frustrate the policies or intentions of Nebraska law.

## NEVADA

The Nevada Deceptive Trade Practice Act ("NDTPA"), <u>N.R.S.</u> §§ 598-0903, <u>et seq.</u> is the Nevada law most similar to the CFA. It provides additional protection to Nevada consumers that already existed in the Nevada Unfair Trade Practices Act ("NUTPA"), <u>N.R.S.</u> § 598A.010, <u>et seq.</u> <u>N.R.S.</u> § 598.0953. The purposes of the NUTPA are to prohibit acts that restrain trade or commerce, protect and preserve the free market, and penalize all persons engaged in anticompetitive practices to the full extent of the law. <u>N.R.S.</u> 598A.030(2). The NUTPA is to be construed in a manner consistent with this legislative policy. <u>See</u> <u>Valley Bank of Nevada v. Plus System, Inc.</u>, 914 <u>F.2d</u> 1186, 1195 (9th Cir. 1990).

Having reviewed the NDTPA and NUTPA and case law interpreting these Acts, this court finds that applying the CFA to the instant matter would not frustrate the policies or intentions of Nevada law.

## NEW HAMPSHIRE

The New Hampshire Consumer Protection Act ("NHCPA"), <u>N.H. Rev. Stat.</u> § 358-A:1, <u>et seq.</u>, prohibits "any unfair method of competition or any unfair or deceptive act or practice in

the conduct of any trade or commerce within this state." N.H. Rev. Stat. § 358-A:2.  The

purpose of the NHCPA "is to ensure an equitable relationship between consumers and persons

engaged in business." Hughes v. DiSalvo, 729 A.2d 422, 578 (N.H. 1999) (citation omitted).

Having reviewed the NHCPA and case law interpreting the Act, this court finds that

applying the CFA to the instant matter would not frustrate the policies or intentions of New

Hampshire law.

## NEW MEXICO

The New Mexico Unfair Practices Act ("NMUPA"), N.M.S.A. 1978 §§ 57-12-1 to 24,

makes it unlawful to make a "false or misleading oral or written statement, ... or other

representation of any kind knowingly made in connection with the sale, lease, rental or loan of

goods or services ... which may, tends to or does deceive or mislead any person." §§ 57-12-2(D),

-3.  The NMUPA allows for treble damages to be granted under the court's discretion. Bogle v.

Summit Investment Co., LLC, 107 P.3d 520, 532 (N.M.App. 2005). "Generally, the Unfair

Practices Act is intended to provide a private remedy for individuals who suffer pecuniary harm

for conduct involving either misleading identification of a business or goods, or false or

deceptive advertising." Parker v. E.I. DuPont de Nemours & Co., Inc., 909 P.2d 1, 14

(N.M.App. 1995).

Having reviewed the NMUPA and case law interpreting the Act, this court finds that

applying the CFA to the instant matter would not frustrate the policies or intentions of New

Mexico law.

## NEW YORK

New York's Consumer Protection Act ("NYCPA") is General Business Law ("GBL"), §

349 and it prohibits "deceptive acts or practices in the conduct of any business, trade or

commerce or in the furnishing of any service" in New York. §349(a). The NYCPA "was

enacted to provide consumers with a means of redress for injuries cause by unlawfully deceptive

acts and practices." Goshen v. Mutual Life Ins. Co. of New York, 774 N.E.2d 1190, 1194-1195

(N.Y. 2002). The NYCPA is intentionally broad, like the FTCA, and applies to all economic

activity. Id. at 1195. "The statute seeks to secure an 'honest market place' where 'trust,' and not

deception, prevails." Id. (internal citations omitted).

Having reviewed the NYCPA and case law interpreting the Act, this court finds that

applying the CFA to the instant matter would not frustrate the policies or intentions of New York

law.

### NORTH CAROLINA

North Carolina's Unfair and Deceptive Trade Practices Act ("NCUTPA"), N.C.G.S.A. §

75-1.1, prohibits "unfair methods of competition in or affecting commerce, and unfair or

deceptive acts or practices in or affecting commerce..." The primary purpose of NCUTPA is to

protect the public consumers by giving a private cause of action to consumers injured by unfair

or deceptive practices. Food Lion, Inc. v. Capital Cities/ABC, Inc., 194 F.3d 505, 519-520 (4th

Cir. 1999). The NCUTPA's "fundamental purpose ... is to protect the consumer, and courts

invariably look to that purpose in deciding whether the Act applies." Id.

Having reviewed the NCUTPA and case law interpreting the Act, this court finds that

applying the CFA to the instant matter would not frustrate the policies or intentions of North

Carolina law.

### NORTH DAKOTA

Both the North Dakota Consumer Fraud Act ("NDCFA"), N.D.Cent. Code Ch. 51-15 and

the North Dakota Unfair Trade Practices Law ("NDUTPA"), N.D.Cent. Code Ch. 51-10 provide

relief to consumers similar to the CFA. The NDCFA is remedial in nature and is to be liberally construe to further the purpose of providing "a remedy for injured consumers who need such protection to counteract the disproportionate bargaining power which is typically present in consumer transaction." State ex rel. Spaeth v. Eddy Furniture Co., 386 N.W.2d 901, 903 (N.D. 1986) (adopting the policy behind an Arizona Consumer Fraud Act). The NDCFA was intended to provide easier remedies for consumer fraud than were available at common law. Id. Similarly, the purpose of the NDUTPA "is the protection of the public from the effects of anticompetitive business practices." Trade 'N Post, LLC v. World Duty Free Americas, 628 N.W.2d 707, 712 (N.D. 2001).

Having reviewed the NDCFA and NDUTPA and case law interpreting these Acts, this court finds that applying the CFA to the instant matter would not frustrate the policies or intentions of North Dakota law.

## OHIO

The Ohio Consumer Sales Practices Act ("OCSPA"), R.C. § 1345.01, et seq., prohibits a supplier from committing an unfair or deceptive act or practice related to a consumer transaction. R.C. § 1345.02(a). The purpose of the OCSPA is to prevent merchants from enforcing unfair, deceptive, or unconscionable sales contracts. Parker v. I&F Insulation Co., 730 N.E.2d 972, 975 n.1 (Ohio 2000). The OCSPA allows an award of attorneys fees, inter alia, because it may generally benefit the community by discouraging other violations of the Act by others. Id.

Having reviewed the OCSPA and case law interpreting the Act, this court finds that applying the CFA to the instant matter would not frustrate the policies or intentions of Ohio law.

## OKLAHOMA

55

The Oklahoma Consumer Protection Act ("OKCPA"), 15 O.S.2001 § 751 et seq., was adopted to protect Oklahoma citizens from unfair trade practices. Patterson v. Beall, 19 P.3d 839, 846 (Okla. 2000). It is given a similar interpretation to the FTCA. Id. The OKCPA creates a private right of action to consumers for acts of consumer fraud. Id.

Having reviewed the OKCPA and case law interpreting the Act, this court finds that applying the CFA to the instant matter would not frustrate the policies or intentions of Oklahoma law.

## OREGON

Under the Oregon Unlawful Trade Practice's Act ("OUTPA"), ORS §§ 646.605 – 646.656, provides for both private and public enforcement of unlawful trade practices. "The civil action authorized by [OUTPA] is designed to encourage private enforcement of the prescribed standards of trade and commerce in aid of the act's public policies as much as to provide relief to the injured party." Weigel v. Ron Tonkin Chevrolet Co., 690 P.2d 488, 493-494 (Or. 1984). OUTPA has a one year statute of limitation, the purpose of which is "to encourage private actions when the financial injury is too small to justify the expense of an ordinary lawsuit, provided that the action is timely initiated while the unlawful practice may be continuing and that the state is given an opportunity to investigate the practice for possible wider enforcement action." Id.

Having reviewed the OUTPA and case law interpreting the Act, this court finds that applying the CFA to the instant matter would not frustrate the policies or intentions of Oregon law.

## PENNSYLVANIA

The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 P.S. §§ 201-1 to 9.3, prohibits certain acts that are deemed to be unfair or deceptive with regards to the conduct of any trade or commerce. "The purpose of the Unfair Trade Practices and Consumer Protection Law (UTPCPL) is to protect the public from--and indeed to eradicate—'unfair or deceptive business practices.'" Agliori v. Metropolitan Life Ins. Co., ___ A.2d ___, 2005 WL 1594855 p. 3.

Having reviewed the UTPCPL and case law interpreting the Act, this court finds that applying the CFA to the instant matter would not frustrate the policies or intentions of Pennsylvania law.

## RHODE ISLAND

The Rhode Island Deceptive Trade Practices Act ("RIDTPA"), G.L. 1956 § 6-13.1-1, et seq., prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce..." The Act is to be given very similar interpretation to that of the FTCA. G.L. 1956 § 6-13.1-3. Additionally, the RIDTPA was intended to "provide a remedy to consumers who have sustained financial losses as a result of [unfair or deceptive activities]. Park v. Ford Motor Co., 844 A.2d 687, 692 (R.I. 2004).

Having reviewed the RIDTPA and case law interpreting the Act, this court finds that applying the CFA to the instant matter would not frustrate the policies or intentions of Rhode Island law.

## SOUTH CAROLINA

The South Carolina Unfair Trade Practices Act ("SCUTPA"), S.C.Code Ann. § 3-97-5-10, et seq., makes it unlawful to engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce, an act is "unfair" when it is offensive

to public policy or when it is immoral, unethical, or oppressive; a practice is "deceptive" when it has a tendency to deceive. <u>Johnson v. Collins Entertainment Co., Inc.</u>, 564 <u>S.E.2d</u> 653, 665 (S.C. 2002). SCUTPA allows private causes of action that can provide treble damages for willful violations of the Act. SCUTPA was intended to provide "additional protection to victims of unfair trade practices." <u>Reynolds v. Ryland Group, Inc.</u>, 531 <u>S.E.2d</u> 917, 920 (S.C. 2000).

Having reviewed the SCUTPA and case law interpreting the Act, this court finds that applying the CFA to the instant matter would not frustrate the policies or intentions of South Carolina law.

**SOUTH DAKOTA**

The South Dakota Deceptive Trade Practices Law ("SDDTPL"), <u>S.D.C.L.</u> § 37-24-1, <u>et seq.</u>, "assists consumers seeking relief as victims of deceptive trade practices." <u>Moss v. Guttormson</u>, 551 <u>N.W.2d</u> 14, 17 (S.D. 1996).

Having reviewed the SDDTPL and case law interpreting the Act, this court finds that applying the CFA to the instant matter would not frustrate the policies or intentions of South Dakota law.

**TENNESSEE**

The Tennessee Consumer Protection Act ("TCPA"), <u>T.C.A.</u> §§ 47-18-101 to 125, is to be liberally construed in order to promote the following policies:

> (1) To simplify, clarify, and modernize state law governing the protection of the consuming public and to conform these laws with existing consumer protection policies;
> (2) To protect consumers and legitimate business enterprises from those who engage in unfair or deceptive acts or practices in the conduct of any trade or commerce in part or wholly within this state;
> (3) To encourage and promote the development of fair consumer practices;
> (4) To declare and to provide for civil legal means for maintaining ethical standards of dealing between persons engaged in business and the consuming public to the end that good faith dealings between buyers and sellers at all

58

levels of commerce be had in this state; and
(5) To promote statewide consumer education.
<u>T.C.A.</u> § 47-18-102

"The TCPA was not intended to be a codification of the common law. To the contrary, one of the express purposes of the TCPA is to provide additional, supplementary state law remedies to consumers victimized by unfair or deceptive business acts or practices that were committed in Tennessee in whole or in part." <u>Tucker v. Sierra Builders</u>, Slip Copy, 2005 WL 1021675 (Tenn.App. 2005).

Having reviewed the TCPA and case law interpreting the Act, this court finds that applying the CFA to the instant matter would not frustrate the policies or intentions of Tennessee law.

**TEXAS**

The Texas Deceptive Trade Practices Act ("TDTPA"), <u>V.T.C.A., Bus. & C.</u>, § 17.41 <u>et seq.</u>, was enacted for the purposes of "protect[ing] consumers against false, misleading, and deceptive business practices, unconscionable actions and breaches of warranty and to provide efficient and economical procedures to secure such protection." <u>V.T.C.A., Bus. & C.</u>, § 17.44. The TDTPA is to be given "the most liberal construction and comprehensive application possible without, doing violence to its terms." <u>First Title Co. of Corpus Christi, Inc. v. Cook</u>, 625 <u>S.W.2d</u> 814, 817 (Tex.App. 1981).

Having reviewed the TDTPA and case law interpreting the Act, this court finds that applying the CFA to the instant matter would not frustrate the policies or intentions of Texas law.

**UTAH**

59

The Utah Consumer Sales Practices Act ("UCSPA"), U.C.A. 1953 §§ 13-11-1 to -23, is

intended to be liberally construed to promote the stated policies of the Act which are:

> (1) To simplify, clarify, and modernize the law governing consumer sales practices;
> (2) To protect consumers from suppliers who commit deceptive and unconscionable sales practices;
> (3) To encourage the development of fair consumer sales practices;
> (4) To make state regulation of consumer sales practices not inconsistent with the policies of the Federal Trade Commission Act [FN2] relating to consumer protection;
> (5) To make uniform the law, including the administrative rules, with respect to the subject of this act among those states which enact similar laws; and
> (6) To recognize and protect suppliers who in good faith comply with the provisions of this act.
> U.C.A. 1953 § 13-11-2.

"The [UCSPA] provides for consumer actions against suppliers who commit deceptive or

unconscionable acts as defined and provides relief in the form of court costs and damages."

Woodhaven Apartments v. Washington, 942 P.2d 918, 923 (Utah 1997).

Having reviewed the UCSPA and case law interpreting the Act, this court finds that

applying the CFA to the instant matter would not frustrate the policies or intentions of Utah law.

## VERMONT

The Vermont Consumer Fraud Act, ("VCFA"), 9 V.S.A. §§ 2451-2480g, was enacted to

"complement the enforcement of federal statutes and decisions governing unfair methods of

competition and unfair or deceptive acts or practices in order to protect the public, and to

encourage fair and honest competition." 9 V.S.A. § 2451. Because of this purpose, the VCFA is

considered to be a remedial statute and should be construed liberally. Elkins v. Microsoft Corp.,

817 A.2d 9, 13 (Vt. 2002).

Having reviewed the VCFA and case law interpreting the Act, this court finds that applying the CFA to the instant matter would not frustrate the policies or intentions of Vermont law.

## VIRGINIA

The Virginia Consumer Protection Act ("VCPA"), Va. Code Ann. § 59.1-196, et seq. prohibits certain enumerated fraudulent acts by suppliers in connection to consumer transactions. The VCPA is intended as "remedial legislation to promote fair and ethical standard of dealings between suppliers and the consuming public." Va. Code Ann. § 59.1-197. The VCPA, specifically, Va. Code Ann. § 59.1-204(A) allows for a private cause of action for the purpose of providing "a penalty for intentional violations of the VCPA in addition to restitution for damages incurred." Holmes v. LG Marion Corp., 521 S.E.2d 528, 532 (Va. 1999).

Having reviewed the VCPA and case law interpreting the Act, this court finds that applying the CFA to the instant matter would not frustrate the policies or intentions of Virginia law.

## WASHINGTON

The Washington Consumer Protection Act ("WCPA"), RCWA 19.86.010, et seq., prohibits "unfair methods of competition and unfair deceptive acts or practices in the conduct of any trade or commerce..." RCWA 19.86.020. The WCPA creates a private cause of action and allows for discretionary treble damages. RCWA 19.86.090. It stated purpose is to complement the FTCA and it is to be given liberal construction. RCWA 19.86.920. The WCPA was enacted for, inter alia, protecting Washington citizens from unfair and deceptive trade and commercial practices. In re Charter First Mortgage, Inc., 42 B.R. 380 (Bkrtcy.Or. 1984). However, the

WCPA does not prohibit reasonable business practices that are not injurious to public interest. Travis v. Washington Horse Breeders Ass'n, Inc., 759 P.2d 418, 424 (Wash. 1988).

Having reviewed the WCPA and case law interpreting the Act, this court finds that applying the CFA to the instant matter would not frustrate the policies or intentions of Washington law.

### WEST VIRGINIA

The West Virginia Consumer Credit and Protection Act ("WVCPA"), W.Va. Code, § 46A-6-101, et seq., make unlawful "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce…" W.Va. Code, § 46A-6-104. The purpose of the WVCPA is to complement the FTCA and to be liberally construed. W.Va. Code, § 46A-6-101(1). The WVCPA is intended to, inter alia:

> protect consumers who purchase goods or services on credit or through consumer loans from deceptive selling techniques, unconscionable contract terms, and undesirable debt recovery and collection practices; and … protect consumers who purchase goods or services for cash or credit from, and to give them remedies for, defective or shoddy goods and services and unfair and deceptive selling practices.
> State ex rel. McGraw v. Bear, Stearns & Co., Inc., __ S.E.2d ___, 2005 WL 1571749 (W.Va. 2005).

Having reviewed the WVCPA and case law interpreting the Act, this court finds that applying the CFA to the instant matter would not frustrate the policies or intentions of West Virginia law.

### WISCONSIN

The purpose of the Wisconsin Consumer Act ("WCA"), W.S.A. 421.101 et seq. is to, inter alia, protect customers against consumer fraud and to encourage fair business practices. W.S.A. 421.102. Additionally, the purpose of the Wisconsin Deceptive Trade Practices Act ("WDTPA"), W.S.A. 100.18, et seq. is to "protect the public from all untrue, deceptive or

misleading representations made in sales promotions." <u>Tietsworth v. Harley-Davidson, Inc.</u>, 661

<u>N.W.2d</u> 450, 455 (Wis.App. 2003) (internal citation omitted), <u>rev'd on other grounds</u>, 677

<u>N.W.2d</u> 233 (Wis. 2004).

Having reviewed the WCA and the WDTPA as well as the case law interpreting these

Acts, this court finds that applying the CFA to the instant matter would not frustrate the policies

or intentions of Wisconsin law.

**WYOMING**

The Wyoming Consumer Protection Act ("WYCPA"), <u>Wyo.Stat.</u> §§ 40-12-101 to -112,

makes it unlawful for a person to engage in certain enumerated deceptive trade practices. "The

[WCPA] was drafted primarily to protect consumers from unscrupulous and fraudulent

marketing practices." <u>Herrig v. Herrig</u>, 844 <u>P.2d</u> 487, 495 (Wyo. 1992).

Having reviewed the WYCPA and case law interpreting the Act, this court finds that

applying the CFA to the instant matter would not frustrate the policies or intentions of Wyoming

law.

<u>CONCLUSION – CONFLICT OF LAW</u>

Based upon the foregoing analysis all of the state laws regarding consumer fraud, the

court finds that New Jersey has the strongest interest in applying its law to this litigation.

Applying New Jersey law to the instant litigation would not frustrate the policies of other state

laws. Further, the facts of this matter indicate that New Jersey has the strongest connection to

the litigation, thereby making its law the most appropriate for this action.

The court notes that an analysis was done of state by state consumer fraud law in the case

of <u>Fink</u>, <u>supra</u>, 365 <u>N.J.Super.</u> at 570-597. That analysis put the emphasis on differences

between the states as to allowing jury trials, penalties, attorneys fees, requiring reliance and

63

availability in class actions. It is true there are differences but these differences only establish there is a conflict which is only the first step in the required analysis. The second step is the review of the policy and purpose of each State's laws. If plaintiffs from other states are better protected by New Jersey state law from New Jersey defendant's fraudulent conduct, why would plaintiff's home state want to deprive them of that protection? As long as no out-of-state plaintiff gets less protection than their own statutes offer and the New Jersey defendant is subject to New Jersey law, there is little reason for any objections. Certainly New Jersey law doesn't really conflict with any "interest" another state has in the litigation. The <u>Fink</u> decision points out that if a state's policies will not be frustrated by not applying its law nor advanced by applying it, that the state has no real interest in the application of its law to a particular issue. Under the government analysis test, New Jersey has a stronger consumer protection policy than most states and applying New Jersey law does not frustrate other states policies that provide some but less protection.

### b. Individual versus Common Issues Under the CFA

Having determined that New Jersey law would apply to this litigation, the court must now determine whether the ability to prove the asserted cause of action under the CFA is possible for the proposed class or will individual issues specific to each class member render the class action unmanageable. Merck argues that in order to establish the requisite causal nexus between Merck's alleged misrepresentations and Plaintiff's alleged loss, individual inquiries would have to be conducted that would preclude proper adjudication in a class action. Merck asserts that Plaintiff must establish that Merck's alleged misrepresentations and omissions caused both individual doctors to prescribe VIOXX® *and* individual P&T Committees to include VIOXX® on health plan formularies. Finally, Merck claims that proving each class member

suffered an ascertainable loss will require a fact intensive inquiry to determine that the benefits

its members received from taking VIOXX® did not exceed the associated costs and that such a

showing cannot be made on a class-wide basis.

Plaintiff's complaint seeks to recover funds that it would not have otherwise spent had

Merck fully and properly disclosed all information about VIOXX®. Plaintiff relies on the fact

that it can prove the third party payors make their decisions primarily based on things Merck

represented or failed to disclose in a national marketing strategy. Once the decision to include

VIOXX® in its prescription plan was made, and the level of payment was set, the third-party

payor would be contractually obligated to pay for the drug if a plan participant received a

prescription for it. Thus, the individual physician prescribing VIOXX® is not what caused

Plaintiff to incur an ascertainable loss. The number of prescriptions filled will rather be an issue

in resolving actual damages. Such an issue can be resolved by records kept by the individual

class member and would not be so unduly burdensome as to predominate over common

questions of law and fact in this litigation. See Delgozzo, supra, 266 N.J. Super. at 190. In fact,

due to the nature of health care plans the damages will be largely based on mathematical

formulas based on records maintained by the parties. Probably no class membership have more

detailed records of economic data from which damages can be calculated than health benefit

plans which must keep detailed records.

Although Plaintiff indicates that there is a considerably uniform process applied by P&T

Committees in selecting drugs for formularies, the court acknowledges that each Committee acts

individually and makes its determinations from sources of information selected by the individual

members of those Committees. However, plaintiff in this matter has alleged that Merck has

engaged in a long-term, widespread, uniform pattern of deception to cover up known adverse

side effects of VIOXX® in order to gain a profit.  Plaintiff alleges that this was accomplished by

various methods, including avoiding studies that would highlight the drug's adverse effects,

heavy-handed negotiating tactics with the FDA in order to get approval for VIOXX®, and even

using threats and intimidation tactics to silence critics in the medical profession.  These

allegations suggest that elements of fraud pervaded every aspect of Merck's actions in

developing and marketing VIOXX®.  Taking these substantive allegations as true for purposes

of this motion, plaintiff could prove that Merck's alleged misrepresentations and/or omissions

were a causal factor in all the third-party payors including VIOXX® as a part of their medical

benefits programs without a detailed analysis of each decision made by each member of the

class.

      The court finds that Merck's actions regarding VIOXX® from the time the drug was first

conceived until the time it was withdrawn from the market constitutes "a common core of

operative facts."  Varacallo, supra, 332 N.J. Super. at 45.    Thus, the predominance factor has

been met, irrespective of whether the court may be required to deal with some individual issues.

Local 68 has met its burden of showing that common questions of law and fact predominate over

any questions affecting only individual members.

     **2. Superiority**

      The New Jersey Supreme Court summarized the superiority requirement for class

certification as follows:

> a class action should be viewed not only as a procedural device that enables
> plaintiffs with small claims to band together against a common adversary, but
> also as a means of providing a procedure that is fair to all parties and promotes
> judicial efficiency. The relevant considerations include, therefore, not only the
> interests of class members and other parties but also the effect of class
> certification on efficient judicial management. R. 4:32-1(b)(3).
> By definition, "superior" implies a comparison with alternative procedures
> such as a test case or joinder of claims. That comparison requires: "(1) an

66

> informed consideration of alternative available methods of adjudication of each
> issue, (2) a comparison of the fairness to all whose interests may be involved
> between such alternative methods and a class action, and (3) a comparison of
> the efficiency of adjudication of each method."
> In re Cadillac, supra, 93 N.J. at 435-436 (internal citations omitted).

New Jersey courts generally consider a class action the superior method for adjudicating claims

involving consumer fraud. Strawn v. Canuso, 140 N.J. 43, 68 (1995).

While Merck has vigorously contested various aspects of the prerequisites of R. 4:32-1(a)

as well as the predominance requirement of R. 4:32-1(b), it has not provided opposition to the

superiority of handling this matter in a class action as opposed to individual matters. As

demonstrated by the commonality prerequisite and the predominance requirement, there are

significant factual and legal issues common to all class members to make adjudication through

class action fair and efficient. Having each individual class member attempt to litigate their

claims in individual class action would result in needless duplicative discovery, undue expense to

the parties as well as an undue burden on judicial economy. Having determined that New Jersey

law will apply to this litigation, a class action in New Jersey clearly becomes the superior

method of resolving this controversy. For example, Merck will not have to reproduce millions of

pages of documents in numerous individual third payor action. In addition, attorney fees will be

awarded in one action instead of duplicate attorney fee costs being awarded in multiple third

party payor actions if plaintiff prevails.

The court would be remiss if it failed to address the defense argument that class actions

are no longer favored for mass torts. In fact, mass tort personal injury class actions have been

rejected as unmanageable in many cases and have fallen into disfavor in legal literature.

However, this reasoning applies primarily to personal injury claims in mass torts because each

personal injury claim presents many more case specific issues than claims for economic damages

67

only  Economic damages can be determined largely by mathematical formulas based on accounting and financial records.  Personal injury claims vary as much as every individual person varies from each other person.  The medical history, the age, the family responsibilities, the severity of the injury, the very nature of each person is brought into play in personal injury claims.  This is why several courts have found that nationwide class actions could not be certified because they were unmanageable.  See for example, Castano v. American Tobacco Co., 84 F.3d 734, 741-744 (5th Cir. 1996); In re Rhone-Poulenc Rorer, Inc., 51 F.3d 1293,1302 (7th Cir. 1995).  It is believed that the preferred way to manage personal injury claims in mass torts is by the use of "bell weather" representative individual trials.  This does not apply to a case such as this where damages are economic only.

## OTHER PENDING CLASS ACTIONS

The last issue to be addressed is the superiority of the matter proceeding in this jurisdictions over similar action pending in the MDL.  The largest number of personal injury actions in the VIOXX® litigation are filed in New Jersey and the New Jersey Supreme Court has ordered them coordinated in Atlantic County since May 20, 2003.  This class action complaint was filed here on October 30, 2003.  It is one of over 2,200 complaints coordinated in New Jersey.

There are a little over 100 class action complaints filed in the Federal MDL for VIOXX® which was created in February 2005 in the Federal District Court of Louisiana.  There are 15 third party payor actions, ten of which were just filed in 2005.  Five were filed in 2004.  The earliest in October 2004 was filed over one year five months after this action.  Thus this case is clearly the oldest and is the only case that is ready for a decision on certification.  Three of the

MDL actions were filed in New Jersey U. S. District Court first and one in New Jersey state court.

It seems the Federal Court would probably have to find the laws of 50 states apply, making the case unmanageable or apply New Jersey law to any class action it certified. If New Jersey law is applied, it makes sense to proceed in New Jersey. In this case, the Federal MDL Judge has met with the State Court Judges from Alabama, Texas and New Jersey where VIOXX® actions were all pending prior to the creation of the MDL and assured the State Court Judges that the Federal Court has no desire to interfere in the proceedings that were already much more advanced in the State Courts. In fact, the first VIOXX® trial is being conducted now in Texas, the second will be in New Jersey in September and probably the third in the Federal MDL by the end of the year. However, a nationwide class does limit other similar class actions. The representative parties who have filed in other courts and been moved to the MDL can always opt out of this class litigation and pursue their own claim in Federal Court if they prefer.

This is probably a unique case where the class action attorneys here have already participated in over 50 depositions of Merck corporate employees, reviewed over 7 million documents and prepared several personal injury cases for trial and moved for class certification before discovery on the class certification process has even taken place in Federal Court.

This case is also unusual in that the discovery and mass filing were started here long before the Federal MDL was formed and before the CAFA was passed. Under the facts of this case with the Merck corporation being located in New Jersey and New Jersey being applicable, the location of the third party payors class action belongs in the jurisdiction of the New Jersey State court system. The Federal and State Courts involved in VIOXX® litigation can and will hopefully continue to coordinate their efforts in this litigation as much as possible.

<u>CONCLUSION</u>

For all of the foregoing reasons, Plaintiff has met all of the requirements of <u>R.</u> 4:32-1 and

shown that class certification is appropriate in this matter.

Motion GRANTED.

CAROL E. HIGBEE, P.J.Cv.

<u>XXXX</u>    Order is attached.

This decision will be posted on the judiciary website and can be viewed at
http://www.judiciary.state.nj.us/decisions.htm for a period of six weeks from the
motion return period.