UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| IN RE NEURONTIN MARKETING AND SALES PRACTICES LITIGATION | ) ) ) ) | MDL Docket No. 1629<br><br>Master File No. 04-10981 |
| THIS DOCUMENT RELATES TO: | ) ) | Judge Patti B. Saris |
| ALL ACTIONS | ) ) ) | Magistrate Leo T. Sorokin |

**MEMORANDUM OF LAW IN SUPPORT OF CLASS PLAINTIFFS'
EMERGENCY MOTION FOR PROTECTIVE ORDER CONCERNING DEPOSITIONS
OF CONSUMER CLASS REPRESENTATIVES' TREATING PHYSICIANS**

513548.1

## I.     INTRODUCTION

It has been a full six months since the Court heard oral argument, on August 1, 2005, on the parties' cross-motions concerning the scope of discovery in this case.  To recap, Defendants have refused to produce any marketing documents generated after December 31, 1998 — over five years before any of these cases were even filed — complaining that it would be burdensome to do so.  The Class Plaintiffs — including two individuals who were not even prescribed Neurontin until well after 1998 — argue that the burden is coextensive with the scope and duration of Defendants' misconduct, which continued well after this completely arbitrary date.  If Defendants were not engaging in unlawful off-label marketing after 1998, there would be no burden, because there would be nothing to produce.

Two months later, with no decision on the cross-motions forthcoming, the Court was again invited to decide this fundamental issue, in the context of Defendants' emergency motion to extend the class certification discovery cutoff.  Class Plaintiffs opposed the motion, inter alia, on the grounds that the depositions of the Consumer Class Representatives' treating physicians could not go forward unless and until Defendants had produced the documents in their possession relating to their communications with these physicians and the Neurontin "events" they attended, irrespective of whether they were created before or after 1998.  On October 7, 2005, the Court granted Defendants a four month extension of the class discovery cutoff, until February 10, 2005, "because the discovery is incomplete and the parties have been working to pursue the class discovery," without resolving the dispute over the physician depositions.  Order Extending Class Discovery Period (Oct. 7, 2005).

Those four months have now all but elapsed, and the parties remain at an impasse over this issue.  Defendants have re-noticed the depositions of the Consumer Class Representatives'

1

513548.1

treating physicians for February 7th, 8th, and 12th, but have steadfastly refused to even begin

searching for documents reflecting both their communications with these physicians concerning

off-label uses of Neurontin and, more importantly, the Neurontin events these physicians

attended.  The issue can await resolution no longer.[1]

## II.     STATEMENT OF FACTS

### A.     Background

In one decade, Neurontin went from being a drug with a narrow FDA-approved

indication and expected lifetime sales of $500 million, to a blockbuster drug with annual U.S.

sales exceeding $2 billion.  Despite its narrow FDA-approved indication, by 2003 Neurontin

ranked in the top ten in annual U.S. sales, rivaling (or exceeding) those of drugs with much

broader indications and with high-profile multimillion dollar direct-to-consumer advertising

campaigns, such as Lipitor, Zocor, Prevacid, Nexium, Zyprexa, Celebrex, Vioxx, Allegra and

Viagra.  In 2004, Neurontin's sales hit the $2.5 billion mark, meaning that in one year alone, the

original lifetime sales potential was exceeded by 400%.  This sales growth is made even more

astonishing when the following two facts are considered: (1) Neurontin has achieved this

massive growth based almost exclusively on its overwhelming use for off-label indications, the

vast majority of which are either ineffective or unsupported by scientific evidence; and (2) there

was no direct-to-consumer advertising for Neurontin.

So, if Neurontin was not marketed directly to consumers, how did it become a

blockbuster drug?  And how did off-label uses, which were based on half-baked or non-existent

science, grow to dominate the Neurontin market? The answer to both questions is simple:

---

[1] Case Management Order No. 3, entered on March 22, 2005, provides, with respect to depositions, that [a]ny
motion for a protective order shall be filed at least five working days before the scheduled deposition; any response
shall be filed within two working days. Id. at 5. Defendants have noticed the first of the physician depositions for
February 7, 2006, one week from today.

Defendants used physician-attended marketing events to deliver their message directly to doctors.  In the aftermath of the Franklin litigation, it is now well settled that Defendants paid thousands of physicians tens of millions of dollars to fly around the country and attend marketing events where, under the guise of medical education and phony consultant agreements, doctors were exposed to aggressive, off-label marketing replete — Class Plaintiffs contend — with false statements and material omissions.  Since 1996, physician-attended marketing events, known euphemistically as "medical education," have been the dominant marketing strategy for Neurontin.  As early as 1995, Parke-Davis recognized that its "*most effective*" promotional tool for marketing Neurontin had been "medical education" programs.  See Declaration of Barry Himmelstein in Support of Class Plaintiffs' Emergency Motion for a Protective Order Concerning Depositions of Consumer Class Representatives' Treating Physicians ("Himmelstein Decl."), Exh. A. at V058136.  So successful was "medical education" as a marketing tool that in 1996, Parke-Davis decided to "expand" the use of physician-attended events, including "local peer influence programs." See Himmelstein Decl., Exh. A. at V058137.  The stated goal of "medical education" events was to drive up off-label use, which presented a "significant growth opportunity."  Id.  Defendants did not deviate from this strategy; in 1997 and again 1998, the number one marketing strategy for Neurontin continued to be the promotion of off-label uses through various medical education courses.

As set forth below, the Consumer Class Representatives in this case, Plaintiff Gerald Smith, and Plaintiff Lorraine Kopa, both received Neurontin prescriptions from physicians who were well-oiled cogs in the multimillion-dollar Neurontin marketing machine.  From 1994 to 2004, both had been detailed on Neurontin by Defendants' sales representatives a combined total of 480 times (that's nearly twice a month for both physicians).  Both had also attended a number

513548.1

3

of Neurontin marketing events.  Given the importance that Defendants placed on such events, and their primacy as a marketing tool over other tactics such as detailing, the Class Plaintiffs are entitled to know the full extent of events these physicians attended prior to their depositions.

### B.    Dr. Huler

Plaintiff Gerald Smith, an Indiana resident, was prescribed and purchased Neurontin from October 1999 until February 2001 for the treatment of headaches and neuropathic pain — off-label uses for which Neurontin was and is not approved.  Amended Class Action Complaint, ¶ 9. Mr. Smith was prescribed Neurontin by Dr. Kylene Huler.  Defendants have noticed Dr. Huler's deposition for February 8, 2005.

Dr. Huler was no stranger to Pfizer.  Defendants' sales call database (contained in a "Sherlock" Excel file), reveals that she was detailed more than 180 times over a 10-year period. See Himmelstein Decl., Exh. B. Documents produced in the Franklin litigation also show that Dr. Huler attended a number of marketing events, including a Merritt-Putnam Epilepsy Update at the Ritz-Carlton Huntington Hotel in Pasadena, California on May 15-18, 1997 and a Neurontin promotional event at the Circle Theater in Indianapolis on May 25 (year unknown).  See Himmelstein Decl., Exh. C. at WLC_FRANKLIN_0000040769.

Notes from Defendants' "Sherlock" sales call database state that Dr. Huler "is the Pfizer Queen (Zoloft, Neurontin) and she said as much."  See Himmelstein Decl., Exh. B.  The database contains entries showing that, after 1998, Dr. Huler attended at least the following events sponsored by Defendants:

- 3-09-01 Neuroimaging Conference - Adam's Mark Downtown

- 3-8 (2001) She attended Indianapolis Orthopedic Society Dinner with her husband at Columbia Club

- 6-19-01 Lunch

513548.1

- Alonso roundtable at Morton's on 8-30 (2001)

- dinner  F- MSAD 5-12 (2004)

Id.

### C.    Dr. Dhaduk

Plaintiff Lorraine Kopa, a Pennsylvania resident, was prescribed and purchased

Neurontin from November 2003 until April 2004 for the treatment of pain, an off-label use for

which Neurontin was and is not approved.  Amended Class Action Complaint, ¶ 10.  Ms. Kopa,

a registered nurse, was prescribed Neurontin by Dr. V.D. Dhaduk.  Defendants have noticed Dr.

Dhaduk's deposition for February 12, 2005.[2]

Like Dr. Huler, Dr. Dhaduk has been bombarded with Pfizer's off-label marketing

messages.  Over the same 10-year period, he was detailed a jaw dropping 300 times. See

Himmelstein Decl., Exh. D.  Moreover, Dr. Dhaduk attended numerous events, both as a speaker

and as an attendee.  Documents produced in the *Franklin* litigation show that Dr. Dhaduk

attended at least one STEPS investigator meeting, held in Naples, Florida on August 1-3, 1997.

See Himmelstein Decl., Exh. E at V083606, X001823)[3]  During this meeting, Dr. Dhaduk and

dozens of other physicians in the northeast region presumably listened to presentations on

Neurontin's safety and efficacy at doses far higher than those approved by the FDA, but

Defendants have not produced any course materials.

Notes from Defendants' sales call database (contained in a "Sherlock" Excel file) show

that, after 1998, Dr. Dhaduk attended at least the following events:

---

[2] Defendants have also noticed the deposition of Ms. Kopa's original treating physician, Dr. Thomas Craparo, for February 7, 2005, despite the fact that Dr. Craparo never prescribed Ms. Kopa Neurontin.

[3] As alleged by Class Plaintiffs, STEPS was a phase IV trial which purported to determine Neurontin's efficacy and safety at higher doses.  In reality, STEPS was a marketing scheme to get doctors to prescribe Neurontin for their own patients at higher doses to increase Neurontin sales, with built-in kickbacks of $300 for each patient enrolled plus an additional $50 for each patient that remained on Neurontin after one year. *See* Amended Class Action Complaint, ¶¶ 230-31.

- "christen program at Goodfello's" in 2001

- a "program" (apparently an MS dinner with Dr. Mitchell of the U. of Pittsburgh) on 7/16/03 (for Rebif, which is a different Pfizer drug for MS)

- "a preceptorship" on 7/21/03 with Dave Fantini, who is the RON district manager for Pfizer

- "an MS community program" in 2003

(Himmelstein Decl., Exh. D.)

An email message from Mr. Fantini produced by Pfizer in related litigation pending in Pennsylvania[4] shows that in or about August 2002, Dr. Dhadhuk was registered for "the Neurontin Speaker training." See Himmelstein Decl., Exh. F at Clark PFIZER 0002493-94. The content of Dr. Dhaduk instructing on Neurontin off-label uses and how he was trained to convince other physicians to adopt those uses could not be more relevant and vital to Dr. Dhaduk's deposition. However, what Dr. Dhaduk was trained to say, when he said it, and to whom, has never been produced. Given that this training occurred before Dr. Dhaduk prescribed Neurontin to Lorraine Kopa, this is a deficiency that simply cannot be countenanced.

## III.  PFIZER SHOULD BE REQUIRED TO PRODUCE THE DOCUMENTS IN ITS POSSESSION PERTAINING TO THE CONSUMER CLASS REPRESENTATIVES' PHYSICIANS BEFORE THEIR DEPOSITIONS ARE TAKEN

The depositions of the Consumer Class Representatives' treating physicians will likely be among the most important taken in this case. In these depositions, Pfizer will attempt to establish that these physicians did not prescribe Neurontin for their patients, the consumer class representatives, as a result of exposure to Defendants' off-label marketing efforts, and/or that Defendants did not present them with any false or misleading information concerning off-label

---

[4] In that litigation, *Clark, et al. v. Pfizer, Inc., et al., Pennsylvania Court of Common Pleas, First Judicial District*, June Term 2004 No. 01819, Pfizer was ordered to produce the sales call data pertaining to Pennsylvania physicians, which, coincidentally, includes Dr. Dhadhuk.

513548.1

uses of Neurontin.  It would be fundamentally unfair to permit these depositions to go forward until Pfizer has produced all — or substantially all — of the documents in its possession that constitute or reflect its communications with these physicians concerning off-label uses of Neurontin.  This includes the carefully choreographed marketing messages that Drs. Dhaduk and Huler received at the various marketing events they attended.

Pfizer does not dispute this fact, but nonetheless continues to refuse to search for any such documents, instead challenging Class Plaintiffs to identify the Neurontin events these physicians attended, following which Pfizer proposes to engage in a limited, half-hearted search for related documents.  See Himmelstein Decl., Exh. G (January 10, 2006 letter from Richard Shevitz to Neal Potischman).  Defendants, who organized, sponsored, and funded these off-label marketing events are in a far better position than Class Plaintiffs to identify the events attended by their prescribing physicians.

For example, discovery obtained in the Franklin litigation revealed that Defendants maintained databases showing the payments, such as honoraria, that were made to physicians for either attending or speaking at Neurontin events, and carefully kept track of which physicians attended each event and who spoke at the event.  Defendants did so in large part so that they could then monitor the subsequent Neurontin prescriptions of the speakers and attendees that were generated by the event.  If prescriptions went up, the event would be hailed a success and serve as a model for future events.  If prescriptions stayed flat, or worse, declined, Defendants would know to go back to the drawing board.  By searching these databases, Pfizer should be able to determine with a few keystrokes the events that the Class Plaintiffs' physicians attended.  That would then direct Defendants to the numerous other documents that each event generates.  These include: speaker rosters, meeting agendas and topics, slides and handouts that were

513548.1

presented, a transcript of each talk, and feedback forms, where physicians could comment on anything from whether the room was too cold or whether the lectures seemed too one-sided in favor of Pfizer.

The handful of documents produced by Pfizer fortuitously in another case clearly show that Dr. Dhaduk was trained by Pfizer as a "Neurontin Speaker" in 2002, well before he prescribed Neurontin for Ms. Kopa.  However, none of the documents produced by Pfizer indicate what events Dr. Dhaduk spoke at, or when.  Defendants could clearly put their hands on this information, if they would only stop sitting on them.  Worse, the Consumer Class Representatives have no idea how Dr. Dhaduk was trained or what he was instructed to say to other physicians in order to induce them to prescribe Neurontin off-label.

In addition, Pfizer previously agreed to produce its complete and unredacted sales call and medical communications databases, including most importantly, call notes, for these physicians, without date restriction.  Instead, Pfizer produced data with call notes only *beginning in January 1999* and produced *no* call note entries prior to that date, even though the random handful of other documents in Class Plaintiffs' possession clearly show that both Drs. Huler and Dhaduk had been detailed since 1995/1996 and had been invited to attend Neurontin events beginning no later than 1997.  Given Pfizer's position on the proper temporal scope of document discovery, this is as indefensible as it is ironic.[5]

## IV.    CONCLUSION

For the foregoing reasons, the Court should grant Class Plaintiffs' motion for a protective

---

[5] Class Plaintiffs brought this glaring deficiency to Pfizer's attention in a letter to Pfizer dated January 23, 2006, stating that if they did not respond within two business days, we will consider this issue to be ripe for inclusion in a motion for protective order along with the other issues we have previously raised.  (See Himmelstein Decl., Exh. H (letter from Ilyas Rona to Patrick Murray dated January 20, 2005.)  Class Plaintiffs are still waiting to receive a written  response to this letter, which has been promised by the end of this week.  Given the imminence of the physician depositions, Class Plaintiffs can wait no longer to bring the matter before the Court.

513548.1

order, preventing the depositions of Consumer Class Representatives' physicians from going

forward until Defendants have produced all documents concerning their communications with

these physicians and the Neurontin events they attended.

Dated: January 31, 2006                                    Respectfully Submitted,

                                        By:    /s/ Barry Himmelstein
                                               Barry Himmelstein, Esquire
                                               Lieff Cabraser Heimann &
                                               Bernstein, LLP
                                               Embarcadero Center West
                                               275 Battery Street, 30th Floor
                                               San Francisco, CA 94111-3339

                                        By:    /s/ Thomas Greene
                                               Thomas Greene Esquire
                                               Greene & Hoffman
                                               125 Summer Street
                                               Boston, MA 02110

                                        By:    /s/ Don Barrett
                                               Don Barrett, Esquire
                                               Barrett Law Office
                                               404 Court Square North
                                               P.O. Box 987
                                               Lexington, MS 39095

                                        By:    /s/ Daniel Becnel
                                               Daniel Becnel, Jr., Esquire
                                               Law Offices of Daniel Becnel, Jr.
                                               106 W. Seventh Street
                                               P.O. Drawer H
                                               Reserve, LA 70084

                                        By:    /s/ James Dugan
                                               James Dugan, Esquire
                                               Dugan & Browne
                                               650 Poydras St., Suite 2150
                                               New Orleans, LA 70130

                                        *Members of the Class Plaintiffs'*
                                        *Steering Committee*

                                        By:    /s/ Thomas M. Sobol

A

Hagens Berman Sobol Shapiro LLP
One Main Street, 4th Floor
Cambridge, MA  02142
Boston, MA 02110

***Plaintiffs' Liaison Counsel and Member of
the Class Plaintiffs' Steering Committee***

513548.1