**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

I.   PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  COORDINATED PLAINTIFFS HAVE
     APPROPRIATELY ALLEGED COGNIZABLE INJURY . . . . . . . . . . . . . . . . . . . . . . . . 3

III. COORDINATED PLAINTIFFS HAVE APPROPRIATELY
     PLED CLAIMS UNDER CALIFORNIA'S UNFAIR
     COMPETITION LAW, THE PENNSYLVANIA INSURANCE
     FRAUD STATUTE AND STATE DECEPTIVE PRACTICE LAWS . . . . . . . . . . . . . . 10

     A.   The UCL Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

     B.   The Pennsylvania Insurance Fraud Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

     C.   The Other State Deceptive Practices Statutes . . . . . . . . . . . . . . . . . . . . . . . . . . 15

IV.  IF NECESSARY, LEAVE TO AMEND SHOULD BE GRANTED . . . . . . . . . . . . . . . 16

V.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

# TABLE OF AUTHORITIES

## CASES                                                                        Page

*American Philatelic Soc. v. Claibourne*,
    3 Cal. 2d 689 (1935) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Ariz. Cartridge Remanufacturers Ass'n v. Lexmark Int'l, Inc.*,
    421 F.3d 981 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*,
    65 F.3d 1406 (7th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Cel-Tech Communications v. Los Angeles Cellular Telephone Co.*,
    20 Cal. 4th 163 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

*Committee on Children's Television, Inc. v. General Foods Corp.*,
    35 Cal. 3d 197 (Cal. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 13

*Commonwealth v. Monumental Properties, Inc.*,
    459 Pa. 450, 329 A.2d 812 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Day v. AT&T Corp.*,
    63 Cal. App. 4th 325, 74 Cal. Rptr. 2d 55 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Desiano v. Warner-Lambert Co.*,
    326 F.3d 339 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Fletcher v. Security Pacific National Bank*,
    23 Cal. 3d 442 (Cal. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Hartford Hosp. v. Chas. Pfizer & Co.*,
    52 F.R.D. 131 (S.D.N.Y. 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*In re Lorazepam & Clorazepate Antitrust Litig.*,
    295 F. Supp. 2d 30 (D.D.C. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*In re Lupron Marketing & Sales Practices Litig.*,
    295 F. Supp. 2d 148 (D. Mass. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 8, 15

*In re Lupron Marketing & Sales Practices, Litig.*,
    2004 WL 2070883 (D. Mass. Sept. 16, 2004) (attached as Exhibit 1) . . . . . . . . . . . 3, 15

*In re Pharm. Indus. Average Wholesale Price Litig.*,
    339 F. Supp. 2d 165 (D. Mass. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*In re Rezulin Prods. Liab. Litig.*,
    210 F.R.D. 61 (S.D.N.Y. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*In re Warfarin Sodium Antitrust Litig.*,
    391 F.3d 516 (3d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*United States ex rel. Franklin v. Parke-Davis*,
    2003 WL 22048255 (D. Mass. Aug. 22, 2003) (attached as Exhibit 3) . . . . . . . . . . . . 14

*United States v. Warner-Lambert Co., LLC*,
    1:04 CR10150 (D. Mass. 2004) (attached as Exhibit 2) . . . . . . . . . . . . . . . . . . . . . . . . 6

*Vess v. Ciba-Geigy Corp. USA* ,
    317 F.3d 1097 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Web Press Servs. Corp. v. New London Motors, Inc.*,
    203 Conn. 342, 525 A.2d 57 (Conn. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Williams v. Purdue Pharma Co.*,
    297 F. Supp. 2d 171 (D.D.C. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

## STATUTES AND RULES

Cal. Bus. & Prof. Code § 17200 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

Cal. Bus. & Prof. Code § 17203 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Cal. Bus. & Prof. Code § 17500 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

18 Pa. C.S. § 4117(a)(2) (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Fed. R. Civ. Proc. 15(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____ )
In re:  NEURONTIN MARKETING AND SALES ) MDL Docket No. 1629
PRACTICES LITIGATION )
_____ )
) 
THIS DOCUMENT RELATES TO: ) Master File No. 04-10981
_____ ) Judge Patti B. Saris
) 
THE GUARDIAN LIFE INSURANCE )
COMPANY OF AMERICA v. PFIZER INC., et al., )
04 CV 10739 (PBS) and )
) 
AETNA, INC. v. PFIZER INC., et al., )
04 CV 10958 (PBS) )
_____ )

**COORDINATED PLAINTIFFS' OBJECTIONS TO
REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE**

## I.    PRELIMINARY STATEMENT

Coordinated Plaintiffs[1] respectfully object to the Report and Recommendation of

Magistrate Judge Sorokin, dated January 31, 2006 (the "Report") recommending dismissal of

twelve of the thirteen Counts in Coordinated Plaintiffs' First Coordinated Amended Complaint,

dated February 1, 2005 (the "FCAC").  Coordinated Plaintiffs join in the arguments made by

Class Plaintiffs objecting to the rulings by the Magistrate Judge recommending dismissal of all

plaintiffs' claims under RICO.  This supplemental brief sets forth Coordinated Plaintiffs'

objections to the Magistrate Judge's recommendations concerning the sufficiency of Coordinated

Plaintiffs' allegations of "cognizable injury" and their claims under the California Unfair

Competition Law (the "UCL"), Pennsylvania Insurance Fraud Statute and state deceptive

practices statutes, all of which provide redress for the wrongdoing at issue.

Coordinated Plaintiffs are large health insurers that paid tens of millions of dollars for

unapproved uses of Neurontin and were the principal victims of Defendants' wrongful scheme to

deceptively promote and market Neurontin.  FCAC ¶¶ 5-8.  As detailed in the FCAC, Neurontin

was a drug with limited sales potential for Defendants -- as an adjunctive therapy for the

treatment of partial seizures in adults with epilepsy and, later, as a treatment for shingles in

adults.  Report at 3 & n.5-6.  FCAC ¶¶ 10, 16-17.  Defendants initially projected that their *total*

sales of the drug would approximate $500 million over its life span.  FCAC ¶¶ 10, 17.

In order to increase their sales of Neurontin, Defendants embarked on an all-out campaign

to promote Neurontin for unapproved uses through a fraudulent and deceptive marketing

program.  Defendants (i) deliberately misrepresented the scientific, medical and clinical data

concerning the safety, effectiveness and usefulness of Neurontin; (ii) suppressed or

---

[1]      The Guardian Life Insurance Company of America, Kaiser Foundation Health Plan, Inc.,
Kaiser Foundation Hospitals and Aetna, Inc.

mischaracterized negative studies of the drug; and (iii) caused misleading presentations to be made to Coordinated Plaintiffs and physicians concerning Neurontin, its recommended dosages, efficacious uses and lack of purported side effects. All of these facts are pleaded in detail in the FCAC. *E.g.*, FCAC ¶¶ 1-4 and 30-168.

Defendants' unlawful scheme to inflate sales of Neurontin was extraordinarily successful, with sales soaring from $97.5 million in 1995 to more than $2.7 billion in 2003. FCAC ¶¶ 1-4, 15-17. Notably, by 2003, *90%* of *all* Neurontin prescriptions were for off-label uses. *Id.* ¶ 4.[2]

Third party payors ("TPPs") such as Coordinated Plaintiffs paid the majority of the purchase price of Neurontin and suffered the "largest direct economic injury" from the wrongdoing. *See, e.g., Desiano v. Warner-Lambert Co.*, 326 F.3d 339, 350 & n.10 (2d Cir. 2003). Yet, the Report recommended dismissal of all of Coordinated Plaintiffs' damages claims[3] for failure to allege "cognizable injury," which Defendants had argued required pleading and proof that "Neurontin was ineffective for the conditions for which it was prescribed." Report at 21. As explained in Point II, *infra*, the FCAC contains detailed allegations showing that for each off-label use at issue, Neurontin was ineffective or not more effective than cheaper drugs which were approved for such uses. Coordinated Plaintiffs allege additional well-recognized forms of cognizable economic injury resulting from Defendants touting Neurontin at dosages exceeding recommended and effective levels and for medical conditions for which Neurontin was no better than a placebo. *See, e.g.*, FCAC ¶¶ 107-11, 120-25, 130-40 and 148-62.

---

[2]    Thus, in a single year (2003), Defendants were able to achieve more than *five times* their *total projected sales* of Neurontin. FCAC ¶¶ 4, 17.

[3]    The Magistrate Judge recommended denial of the motion to dismiss Count XIII (FCAC ¶¶ 323-26), the claim for unjust enrichment. Report at 57.

The Report also recommended dismissal of Coordinated Plaintiffs' claims under the California UCL (the state where the Kaiser Plaintiffs are headquartered), Pennsylvania Insurance Fraud Statute (the state where Aetna is incorporated) and state deceptive practices laws. As explained in Point III, *infra,* these broad remedial statutes have lower pleading thresholds than fraud-based statutes such as RICO. For example, a claimant under the California UCL may seek restitution *without* having to prove that the product was ineffective. And, in *In re Lupron Marketing & Sales Practices, Litig.*, 2004 WL 2070883 (D. Mass. Sept. 16, 2004) (attached as Ex. 1), Judge Stearns sustained a similar claim by Aetna for recovery under the Pennsylvania Insurance Fraud Statute. As all claims are appropriately pled in the FCAC, Defendants' motion to dismiss should be denied in its entirety.

## II.    COORDINATED PLAINTIFFS HAVE APPROPRIATELY ALLEGED COGNIZABLE INJURY

The FCAC is replete with concrete factual allegations showing payment of many millions of dollars for *excessive* purchases of Neurontin directly as a result of Defendants' unlawful conduct. *E.g.,* FCAC ¶¶ 1-8. This direct economic loss to Coordinated Plaintiffs is a "cognizable injury" well-recognized at law. *See, e.g., Desiano*, 326 F.3d at 349-50; *In re Lupron Marketing & Sales Practices Litig.,* 295 F. Supp. 2d 148, 175 (D. Mass. 2003) (Stearns, J.) (allegations that wrongful drug marketing scheme caused many millions of dollars in excess payments for drug "more than sufficient" to state claim).

Among the wrongful acts alleged with particularity in the FCAC are that Defendants disseminated the following false information, suppressed negative studies, and caused misleading statements to be made to Coordinated Plaintiffs and physicians concerning Neurontin, its recommended dosages, efficacious uses, and purported lack of side effects:

(a)     <u>Pain Treatment</u>:  Parke-Davis repeatedly touted Neurontin as effective for the treatment of pain, without disclosing unfavorable evidence known to Parke-Davis contradicting the claims or the lack of clinical evidence to support these claims.  FCAC ¶¶ 102-06.

(b)     <u>Diabetic Peripheral Neuropathy</u>:  After a study sponsored by Parke-Davis concluded that Neurontin was ineffective for the treatment of diabetic peripheral neuropathy, Parke-Davis misrepresented the conclusion of the study, including rewriting the conclusion and providing a widely used computer database company with a summary representing falsely that Neurontin may be effective for treatment of the condition.  *Id.* ¶¶ 107-11.

(c)     <u>Restless Leg Syndrome</u>:  Defendants represented that Neurontin was effective for Restless Leg Syndrome, but did not disclose the results of an unpublished study sponsored by Parke-Davis demonstrating that Neurontin was ineffective; Parke-Davis medical liaisons routinely and falsely told physicians that the researcher's patients had a 90% favorable response rate.  *Id.* ¶¶ 112-19.

(d)     <u>Bipolar Disorder</u>:  Defendants touted Neurontin as effective for bipolar disorder, despite knowing of a clinical trial showing that Neurontin was no more effective than a placebo.  *Id.* ¶¶120-25.

(e)     <u>Social Phobia</u>:  Parke-Davis promoted Neurontin as effective for social phobia despite a lack of clinical evidence to support the claims.  *Id*. ¶¶ 126-29.

(f)     <u>Panic Disorder</u>:  Parke-Davis touted Neurontin for treatment of panic disorder, despite a clinical trial sponsored by Parke-Davis concluding that Neurontin was no more effective than a placebo.  *Id.* ¶¶ 130-32.

(g)   <u>Migraine</u>:  Parke-Davis claimed Neurontin was effective for the treatment of migraine headaches, despite a study conducted by Parke-Davis concluding that Neurontin was no more effective than a placebo.  *Id.* ¶¶ 133-40.

(h)   <u>Monotherapy for Epilepsy</u>:  Parke-Davis touted Neurontin as a monotherapy for epilepsy despite two clinical trials conducted by or known to Parke-Davis concluding that Neurontin was not effective, and the FDA's rejection of an application for that use; Parke-Davis sales representatives falsely represented that Neurontin was effective as monotherapy and would soon be approved for that use.  *Id.* ¶¶ 142-47.

(i)   <u>Excessive Dosages and Purported Lack of Side Effects</u>:  Parke-Davis falsely claimed that Neurontin had a low side effect profile and that high dosages were beneficial to patients and did not cause side effects, despite studies and reports conducted by or known to Parke-Davis showing that Neurontin could cause serious behavioral side effects, weight gain, and withdrawal syndrome; prevalence of side effects increased with dosage; and increased dosages did not increase Neurontin's effectiveness.  *Id.* ¶¶ 148-68.

Perhaps the most damning description of Defendants' deceptive marketing scheme is contained in paragraph 33 of the FCAC, recounting instructions from a senior Parke-Davis marketing executive to his medical liaisons to tout Neurontin for "everything," irrespective of efficacy, dosage limitations or "that safety crap":

> "We all know Neurontin's not growing adjunctive therapy, besides that is not where the money is.  Pain management, now that's money.  Monotherapy, that's money.  We don't want to share these patients with everybody, we want them on Neurontin only. . . . [W]e need to be holding their hand and whispering in their ear Neurontin for pain, Neurontin for monotherapy, Neurontin for bipolar, Neurontin for everything. . . .  I don't want to see a single

patient coming off Neurontin until they have been up to at least
4800mg/day.  I don't want to hear that safety crap either. . . ."

As noted, Defendants' fraudulent and deceptive marketing program was a stellar success,
with sales of Neurontin (a drug with extremely limited approved use) exceeding $2.7 billion in
2003.  FCAC ¶¶ 1-4, 10, 15-17.  By that year, 90% of *all* Neurontin prescriptions were for off-
label uses.  FCAC ¶ 4.[4]

Coordinated Plaintiffs, which paid tens of millions of dollars for off-label prescriptions of
Neurontin,[5] directly suffered economic injury from Defendants' misconduct.  *See, e.g.,* FCAC ¶¶
1-8, 17-39, 102-68, 199, 212, 225, 238, 251, 264, 277, 290, 298, 304 and 312.

However, the Report concluded that Coordinated Plaintiffs had failed to plead a
cognizable injury by insufficiently alleging that "Neurontin was ineffective for the conditions for
which it was prescribed."  Report at 21.  In fact, the FCAC does allege that Neurontin was
ineffective for many conditions, such as diabetic peripheral neuropathy, Restless Leg Syndrome,
bipolar disorder and panic disorder.  *E.g.,* FCAC ¶¶ 107-25 and 130-32.  With respect to each of
the other off-label uses, Coordinated Plaintiffs overpaid for Neurontin when cheaper approved
drugs would have treated the conditions more safely and/or more effectively.  *E.g., id.* and ¶¶
133-68.[6]

_____

[4]     *See also* Judgment in a Criminal Case, *United States v. Warner-Lambert Co., LLC*, 1:04
CR 10150 (D. Mass. 2004) (Stearns, J.) (plea of guilty to Counts 1 and 2 of
Information)(attached as Ex. 2); FCAC ¶¶ 176-78 (summarizing results of Government and State
AG enforcement proceedings).

[5]     For this reason, Defendants had a "Health Care Management" Division employing a staff
of about 100 "National Account Managers" whose *sole* responsibility was to market Neurontin
and other pharmaceutical products to TPPs.  Plaintiffs' Joint Surreply Br., dated June 3, 2005, at
9 n.7.

[6]     "Among the steps [Coordinated] Plaintiffs might have taken were to exclude [Neurontin]
from their approved schedules, set a low scheduled value, set a high copay obligation, and
otherwise dissuade doctors from prescribing it."  *Desiano*, 326 F.3d at 349 n.9.  If amendment is

The Report cited *Desiano* with approval (Report at 21), but read it for a proposition which was rejected:  that Coordinated Plaintiffs must allege and prove that Neurontin was actually ineffective.  In *Desiano*, the plaintiff TPPs alleged they had been harmed by paying for prescriptions for Rezulin that would not have been written absent defendant Warner-Lambert's fraudulent misrepresentations concerning the safety and efficacy of the drug.  The district court granted Warner-Lambert's motion to dismiss, in part based on "'common ground that [Rezulin] did not harm, and indeed benefitted, a great many'" users.  *See Desiano*, 326 F.3d at 347 (citation omitted).  On appeal, a unanimous Second Circuit panel reversed, holding that the TPPs had sufficiently pled injury -- *regardless* of whether Rezulin was effective for the insured:

> In the instant case . . . Plaintiffs allege an injury directly to themselves; an injury, moreover, that is unaffected by whether any given patient who ingested Rezulin became ill.  *Plaintiffs' claim is that the Defendants' wrongful action was their misrepresentation of Rezulin's safety, and that this fraud directly caused economic loss to them as purchasers, since they would not have bought Defendants' product, rather than available cheaper alternatives, had they not been misled by Defendants' misrepresentations.*  Thus the damages -- the excess money Plaintiffs paid Defendants for the Rezulin that they claim they would not have purchased "but for" Defendants' fraud -- were in no way "derivative of damage to a third party."

*Id.* at 349 (emphasis added).[7]  *See also Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*, 65 F.3d 1406, 1413 (7th Cir. 1995) (Posner, C.J.) (sustaining claims by TPP

---

necessary to cure any deficiencies in the FCAC, Coordinated Plaintiffs could and would allege that they have taken steps to limit their payments for excessive prescriptions for Neurontin, including dosage restrictions and requirements that other epilepsy treatments be tried before the patient is prescribed Neurontin.

[7]    The Second Circuit noted that "this and other courts have long recognized the right of [TPPs] to recover from drug companies amounts that were overpaid due to illegal or deceptive marketing practices."  *Desiano*, 326 F.3d at 350 (citing, as example, *Hartford Hosp. v. Chas. Pfizer & Co.*, 52 F.R.D. 131, 133 (S.D.N.Y.  1971)).

suing medical clinic for alleged overcharges for medical services); *Lupron*, 295 F.2d at 175
(sustaining claims that drug manufacturer's deceptive marketing scheme induced TPPs to make
excessive payments for drug).

Similarly, Coordinated Plaintiffs sue to recover the "excess money" they paid for their
purchases of Neurontin that would not have been made absent Defendants' deceptive
promotional activities.[8]  *See, e.g.*,  FCAC ¶¶ 1-8, 15-17, 30-168, 199, 212, 225, 238, 251, 264,
277, 290, 298, 304 and 312.  Defendants pushed Neurontin for unwarranted uses, at inflated
dosages *and* without disclosing serious side effects.  *E.g., id.*,  ¶¶ 148-68.  This caused direct
economic injury to Coordinated Plaintiffs:  payment for excessive Neurontin prescriptions.  The
pleading threshold urged by Defendants and accepted by the Magistrate Judge -- the need to
allege and disprove the effectiveness of Neurontin -- would sharply diminish the protections
afforded to consumers and TPPs deceived by drug companies into purchasing costly drugs
through fraud, lies, half-truths or even bribery.

Notably, *Desiano* provides an example of a situation in which TPPs, such as Coordinated
Plaintiffs, would be injured by a drug company's fraudulent scheme, even if *every* prescription
resulting from the scheme was "safe and effective" for the patients.  In *Desiano*, these very
Defendants argued, as they do here, that TPPs must prove that the drug was ineffective.  The
Second Circuit soundly rejected this argument, for reasons equally applicable here:

> But it is easy to see how Defendants' reasoning is flawed.
> Consider, for example, a hypothetical in which a defendant drug
> company markets a "new" much more expensive drug claiming it
> is a great advancement (safer, more effective, etc. than metformin

---

[8]      The absence of scientific evidence that Neurontin was effective for unapproved uses
rendered Defendants' claims of effectiveness patently false or misleading *when made*.  *See, e.g.*,
*Lupron*, 295 F. Supp. 2d at 165-66.  Scientific evidence later discovered to support efficacy
would not make the prior claims truthful.

-- the standard diabetes drug) when in fact the company is simply replicating the metformin formula and putting a new label on it. In other words, the only difference between metformin and the "new" drug is the new name and the higher prescription price (paid almost entirely by the insurance company). In that case the "new" drug would be *exactly* as safe and effective as metformin, and thus there could be no injury to any of the insurance company's insured. **Nevertheless, the insurance companies would be able to claim -- precisely as they do here -- that the defendants engaged in a scheme to defraud it, and that the company suffered direct economic losses as a result.**

*Desiano*, 326 F.3d at 349-50 (emphasis in bold added).

Defendants argued, and the Report held, citing *Williams v. Purdue Pharma Co.*, 297 F. Supp. 2d 171 (D.D.C. 2003), that Coordinated Plaintiffs could not sue for payments caused by Defendants' fraudulent scheme absent a showing that Neurontin was ineffective. Report at 21. *Williams*, however, is readily distinguishable. In *Williams*, a class of *consumers, specifically excluding those injured by the drug*, sued under the District of Columbia Consumer Protection Procedures Act to recover for defendant's alleged "deceptive advertising" and "over-promotion" of OxyContin. 297 F. Supp. 2d at 172. Not surprisingly, the *Williams* Court dismissed the complaint because those consumers, unlike Coordinated Plaintiffs, "fail[ed] to allege *any* particularized and specific injury-in-fact suffered by these plaintiffs." *Id*. at 177 (emphasis added). *Compare In re Lorazepam & Clorazepate Antitrust Litig.*, 295 F. Supp. 30, 39-40 (D.D.C. 2003) (sustaining claims by TPPs against drug manufacturer for excessive drug payments).

In moving to dismiss, Defendants also relied on a decision regarding class certification in a product liability case brought by consumers of Rezulin. *See* Defs' Reply Mem at 14 (citing *In re Rezulin Prods. Liab. Litig.*, 210 F.R.D. 61, 63-64 (S.D.N.Y. 2002)). As *Desiano* explains, such cases are irrelevant to Coordinated Plaintiffs' direct claims to recover their many millions of

dollars in unwarranted payments for Neurontin.  *Accord, In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 531 (3d Cir. 2004); *Lorazepam*, 295 F. Supp. 2d at 40 (distinguishing *Rezulin* on ground that the "crux" of that case "was the marketing of a defective pharmaceutical product that caused injury or threat of physical injury to consumers"); *Lupron*, 295 F.2d at 165-66.

Defendants sought to distinguish *Desiano* on the sole ground that "plaintiffs here have not pled that there was a cheaper alternative to Neurontin."  Defs' Reply Mem at 14.  The central question under *Desiano, 326 F.3d at 349,* is whether, *as alleged*, Coordinated Plaintiffs paid "excess money" for Neurontin as a result of Defendants' misconduct.

Moreover, as noted at 3-5, *supra*, Coordinated Plaintiffs have alleged *numerous* examples of "cheaper alternative[s]."  For example, it is alleged that Defendants falsely convinced physicians to prescribe Neurontin at higher dosages than necessary.  *See, e.g.,* FCAC ¶¶ 148-62 (dosages as high as 266% of recommended levels marketed by Defendants).  Lower dosages, of course, cost less.  Similarly, for some uses Defendants' own studies had shown that Neurontin was no more effective than a placebo, a "cheaper alternative" *not* covered at all by Coordinated Plaintiffs' formularies.  *E.g.,* FCAC ¶¶ 107-11, 120-25, 130-32 and 133-40.  Coordinated Plaintiffs' FCAC adequately alleges cognizable injuries, and should be sustained by this Court in its entirety.

**III.    COORDINATED PLAINTIFFS HAVE APPROPRIATELY
PLED CLAIMS UNDER CALIFORNIA'S UNFAIR
COMPETITION LAW, THE PENNSYLVANIA INSURANCE
FRAUD STATUTE AND STATE DECEPTIVE PRACTICE LAWS**

The Report (at 57 & n.26) recommended dismissal of Counts X through XII of the Coordinated Complaint, claims for breach of California's Unfair Competition Law, the Pennsylvania Insurance Fraud Statute and the consumer protection statutes of all states, the District of Columbia  and the Commonwealth of Puerto Rico, for failure to allege a cognizable

injury.[9]  As discussed in Section II, *supra*, Coordinated Plaintiffs have, in fact, pleaded well-recognized, direct economic injuries under *any* applicable standard.  Moreover, the Report's analysis of injury under RICO does not, and should not, apply to Coordinated Plaintiffs' claims under the UCL, Pennsylvania Insurance Fraud Statute and deceptive practice laws, which are broader than RICO and appropriately pled by Coordinated Plaintiffs.[10]

### A.    The UCL Claim

In Count X, Coordinated Plaintiffs allege that Defendants violated California's Unfair Competition Law ("UCL") (California Business & Professions Code § 17200 *et seq.*), by engaging in, and profiting from, a deceptive and misleading promotional campaign regarding Neurontin.  FCAC  ¶¶ 301-07.  Coordinated Plaintiff Kaiser is headquartered in California, with over six million members in the state.  It and the other Coordinated Plaintiffs expended vast sums of money in California attributable to Defendants' deceptive campaign and are entitled under California law to pursue claims for restitution under the UCL.  FCAC ¶¶ 5-8.

The UCL claim is appropriately alleged because the California Supreme Court has determined those paying for a product that is the subject of a deceptive promotional campaign may seek restitution for their payments under the UCL -- *without* having to plead and prove that the product was ineffective or worthless.  *See, e.g., Committee on Children's Television, Inc. v. General Foods Corp.*, 35 Cal. 3d 197, 211 (Cal. 1983).

---

[9]     The Report noted that Defendants had not specifically addressed Counts X through XII of the Coordinated Complaint, yet recommended dismissal of all these claims without citing or discussing the applicable laws.  *See* Report at 57 & n.26.

[10]     These deceptive practices laws were asserted by the State Attorneys General in their lawsuit charging Defendants with the deceptive marketing of Neurontin.  That lawsuit and the Government lawsuit were settled for more than $430 million and entry by Warner Lambert into an Assurance of Voluntary Compliance.  FCAC ¶¶ 176-78.

California's UCL is broad and covers the conduct challenged here.   "[T]he court may make such orders or judgments . . . as may be necessary to restore any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition."  Cal. Bus. & Prof. Code § 17203 (2006).  "[U]nfair competition" includes "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by" Section 17500 of the Code, which prohibits deceptive or misleading advertising.  Cal. Bus. & Prof. Code § 17200 (2006).  As the Ninth Circuit recently explained:

> The law encompasses not just false statements but those statements "which may be accurate on some level, but will nonetheless tend to mislead or deceive. . . .  *A perfectly true statement couched in such a manner is likely to mislead or deceive the consumer, such as by failure to disclose other relevant information, is actionable under these sections*."

*Ariz. Cartridge Remanufacturers Ass'n v. Lexmark Int'l, Inc.*, 421 F.3d 981, 985 (9th Cir. 2005) (emphasis added) (quoting *Day v. AT&T Corp.*, 74 Cal. Rptr.2d 55, 60 (Cal. Ct. App. 1998)).[11]

The California Legislature deliberately enacted the UCL to afford the courts a broad equitable weapon against any form of unscrupulous business conduct.  As explained by the California Supreme Court in *Cel-Tech Communications v. Los Angeles Cellular Telephone Co.,* 20 Cal. 4th 163, 181 (1999) (citations omitted):

> "The unfair competition law . . . has a broader scope for a reason. . . .  [T]he section was intentionally framed in its broad, sweeping language, precisely to enable judicial tribunals to deal with the innumerable 'new schemes which the fertility of man's invention would contrive.' (*American Philatelic Soc. v. Claibourne* (1935) 3 Cal. 2d 689,698 [46 P.2d 135].)  As the

---

[11]    Defendants relied on *Day v. AT&T* in seeking dismissal, but this case favors Coordinated Plaintiffs' position.  There, the California Court of Appeal allowed plaintiffs to proceed on a deceptive advertising claim, but noted that plaintiffs were limited to injunctive relief *solely because of the federal filed rate doctrine.  See Day,* 74 Cal. Rptr. 2d at 59.

> *Claibourne* court observed: 'When a scheme is evolved which on its face violates the fundamental rules of honesty and fair dealing, a court of equity is not impotent to frustrate its consummation because the scheme is an original one. . . .'"

The Report determined that UCL claims require pleading and proof that Neurontin was completely ineffective; as noted (at 3-5, *supra*), Coordinated Plaintiffs so allege with respect to certain conditions. However, no such showing is required under binding California authority.[12]

In *Children's Television*, *supra*, the California Supreme Court sustained claims alleging that a cereal promotional campaign was "misleading and deceptive" because of misleading implications (*e.g.*, "Eating candy breakfasts is a 'fun' thing for children to do") and the omission of relevant information (*e.g.*, "Children should brush their teeth soon after eating sugary foods"). *See* 35 Cal.3d at 205-07, n.3 & n.4. The Court did not require plaintiffs to allege and prove that every element of the deceptive campaign was affirmatively false (*e.g.*, that eating sugary cereal was not fun), that the children eating the cereal were unsatisfied or that the cereal was worthless. The Court held that the adult plaintiffs could "clearly" seek "restitution of the money spent to purchase the sugared cereals" because the purchases arose from a deceptive promotional campaign. *Id.* at 220.[13]

Similarly, Coordinated Plaintiffs seek restitution of the vast sums spent on purchases of Neurontin attributable to Defendants' deceptive campaign, which consisted of alleged

---

[12]    Coordinated Plaintiffs' claims are not governed by Rule 9(b) to the extent they do not sound in fraud. *See, e.g., Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1105-06 (9th Cir. 2003) (reversing dismissal of claims for illegal acts resulting in increase in sales of Ritalin not grounded in fraud).

[13]    Under the UCL, "[a]llegations of actual deception, reasonable reliance, and damage are unnecessary." *Committee on Children's Television, Inc. v. General Foods Corp.*, 35 Cal. 3d 197, 211 (Cal. 1983). "The court may also order restitution without individualized proof of deception, reliance, and injury. . . .'" *Id.* (citing *Fletcher v. Security Pacific National Bank*, 23 Cal. 3d 442, 453 (Cal. 1979)).

misrepresentations, misleading implications, and material omissions far more serious than those at issue in *Children's Television*. Under *Children's Television*, those claims for restitution do *not* require proof that Neurontin was ineffective. Consequently, Coordinated Plaintiffs' UCL claim (Count X) is appropriately pled under California law and should be sustained.

### B.    The Pennsylvania Insurance Fraud Claim

Similarly misplaced is the recommendation that Count XII of the Coordinated Complaint, a claim under the Pennsylvania Insurance Fraud Statute, 18 Pa. C.S. § 4117(a)(2) (2006), be dismissed. Report at 57 & n.26. Under that statute, a plaintiff must allege that defendant: (1) knowingly and with the intent to defraud any insurer; (2) presents or *causes to be presented* to any insurer; (3) any statement forming a part of, or in support of a claim; (4) that contains any false, incomplete or misleading information concerning any fact or thing material to the claim. 18 Pa. C.S. § 4117(a)(2) (emphasis added).

Coordinated Plaintiffs have alleged all of the required elements, including cognizable injury. FCAC ¶¶ 313-22. Indeed, it is hard to imagine a clearer case of insurance fraud: Defendants' admittedly fraudulent conduct caused Coordinated Plaintiffs to pay millions of dollars worth of unwarranted claims for Neurontin. FCAC ¶¶ 5-8. *Cf. United States ex rel. Franklin v. Parke-Davis,* 2003 WL 22048255 at *16 (D. Mass. Aug. 22, 2003) (Saris, J.) (denying summary judgment because evidence showed that "Parke-Davis's actions . . . played a key role in setting in motion a chain of events that led to false claims") (citation and footnote omitted)(attached as Ex. 3).

Notably, a similar claim by Aetna, a Pennsylvania corporation that provided health payment benefits to more than 13 million people across the United States (FCAC ¶ 8), was sustained by Judge Stearns in *In re Lupron Marketing & Sales Practices Litig.*, 2004 WL

2070883 (D. Mass. Sept. 16, 2004), another drug overcharge case.  The *Lupron* Court noted that

the Pennsylvania Insurance Fraud Statute is a broad remedial measure designed to protect

insurance carriers from fraud.  *Id.* at *2.  Judge Stearns further reasoned that "the intent of the

Insurance Fraud Statute is to protect insurers from all fraudulent claims, whether directly

submitted by an insured, or submitted at the instigation of a third party not directly involved in

the claims process."  *Id.*

This Court should also sustain Coordinated Plaintiffs' claim under the Pennsylvania

Insurance Fraud Statute.  All elements, including injury, have been appropriately alleged and the

Statute is specifically designed and intended to remedy insurance fraud, the very conduct at issue.

*Lupron*, 2004 WL 2070883 at *2.  *See also Commonwealth v. Monumental Properties, Inc.*, 459

Pa. 450, 479-80, 329 A.2d 812 (1974) (consumer fraud statute should be broadly construed).

### C.    The Other State Deceptive Practices Statutes

Aetna paid for Neurontin for members in every state, the District of Columbia and the

Commonwealth of Puerto Rico.  FCAC ¶ 8.  As Judge Stearns aptly noted in *Lupron, supra*:  "If

plaintiffs are able to prove any one or more of their RICO claims, their ability to satisfy the

elements of a consumer protection act claim under any of the referenced statutes will follow

almost as a matter of course."  295 F. Supp. 2d at 181 & n.35-37.  Coordinated Plaintiffs have

appropriately pled their RICO claims, so the deceptive practice claims (Count XI) should be

sustained as well.  *See* FCAC ¶¶ 308-12.

Moreover, as implicitly noted in *Lupron, supra*, the state deceptive practice statutes

provide a significantly wider range of protections than RICO or common law fraud.  *Cf. In re*

*Pharm. Indus. Average Wholesale Price Litig.*, 339 F. Supp. 2d 165, 181-82 (D. Mass. 2004)

(Saris, J.) (noting that reliance not element and sustaining claim for drug overcharges under New

York deceptive practices law); *Web Press Servs. Corp. v. New London Motors, Inc.,* 203 Conn. 342, 363, 525 A.2d 57, 68 (Conn. 1987) (knowledge of falsity of statement not required for claim under Connecticut Unfair Trade Practices Act). *See also Desiano*, 326 F.3d at 348-49 (Court "inclined to agree with Plaintiffs" that New Jersey deceptive practices law provides broader protection to defrauded TPPs than federal law). As Coordinated Plaintiffs have pled all essential elements of their deceptive practice claims, Count XI should be sustained in its entirety.

## IV.    IF NECESSARY, LEAVE TO AMEND SHOULD BE GRANTED

The Magistrate Judge recommended that "all plaintiffs be allowed sixty days from the date of the Court's decision on this Report and Recommendation to file amended complaints." Report at 3, 58. Coordinated Plaintiffs respectfully request leave to amend in the event this Court concludes there are any deficiencies in the FCAC. *See* Fed. R. Civ. Proc. 15(a) (leave to amend "shall be freely given when justice so requires").

## V.     CONCLUSION

The FCAC details Defendants' misrepresentations, half-truths and non-disclosures that caused Coordinated Plaintiffs many millions of dollars in damages, and unjustly enriched Defendants. Coordinated Plaintiffs' damages claims are appropriately alleged and should be sustained in their entirety. The motion to dismiss the FCAC should be denied.

Dated: March 3, 2006                          Respectfully submitted,

**For Plaintiff Aetna, Inc.:**

 

                                     /s/ Peter A. Pease

Peter A. Pease  (BBO # 392880)
**BERMAN DEVALERIO PEASE**
** TABACCO BURT & PUCILLO**
One Liberty Square
Boston, MA  02109
Telephone:  617-542-8300
Facsimile:  617-542-1194

**OF COUNSEL:**

**LOWEY DANNENBERG BEMPORAD
    & SELINGER, P.C.**
Richard Bemporad
Richard W. Cohen
Gerald Lawrence
Peter St. Phillip Jr.
The Gateway - 11th Floor
One North Lexington Avenue
White Plains, NY  10601-1714
Telephone:  (914) 997-0500
Facsimile:  (914) 997-0035

**BERMAN DEVALERIO PEASE
    TABACCO BURT & PUCILLO**
Joseph J. Tabacco, Jr.
425 California Street, Suite 2025
San Francisco, CA  94104-2205
Telephone:  (415) 433-3200
Facsimile:   (415) 433-6382

**JOHN F. INNELLI, LLC**
John F. Innelli
1818 Market Street, Suite 3620
Philadelphia, PA  19103
Telephone:  (215) 5612-1011
Facsimile:  (215) 561-0012

**For Plaintiffs Guardian Life Insurance Co. of America, Kaiser Foundation Health Plan,
Inc. and Kaiser Foundation Hospitals:**

/s/ Thomas G. Shapiro
Thomas G.  Shapiro (BBO #454680)
Theodore Hess-Mahan (BBO #557109)
**SHAPIRO HABER & URMY LLP**
53 State Street
Boston, MA 02109
Telephone: 617-439-3939
Facsimile: 617-439-0134

**OF COUNSEL:**

**COHEN, MILSTEIN, HAUSFELD & TOLL,**
  **P.L.L.C.**
Linda P. Nussbaum
Steig D. Olson
150 East 52nd Street, 30th Floor
New York, NY  10022
Telephone:  (212) 838-7797
Facsimile:  (212) 838-7745

- and -

**COHEN, MILSTEIN, HAUSFELD & TOLL,**
  **P.L.L.C.**
Michael D. Hausfeld
1100 New York Avenue, N.W
West Tower, Suite 500
Washington, DC  20005
Telephone:  (202) 408-4600
Facsimile:  (202) 408-4699

**RAWLINGS & ASSOCIATES, PLLC**
Mark D. Fischer
Mark Sandmann
325 W. Main Street
Louisville, KY  40202
Telephone:  (502) 587-1279
Facsimile:  (502) 584-8580

**JOEL Z. EIGERMAN**
50 Congress Street, Suite 200
Boston, MA  02109
Telephone:  (617) 367-0014
Facsimile:   (617) 523-5612