EXHIBIT 1

Westlaw.

Not Reported in F.Supp.2d                                                    Page 1
Not Reported in F.Supp.2d, 2004 WL 2070883 (D.Mass.), RICO Bus.Disp.Guide 10,757
(Cite as: Not Reported in F.Supp.2d)

United States District Court,D. Massachusetts.
In re: LUPRON® MARKETING AND SALES
PRACTICES LITIGATION
No. MDL 1430, 01-CV-10861-RGS.

Sept. 16, 2004.

*MEMORANDUM AND ORDER ON DEFENDANT
TAP PHARMACEUTICAL PRODUCTS, INC.'S
MOTION TO DISMISS AETNA HEALTH, INC.'S
FIRST AMENDED COMPLAINT*

STEARNS, J.

**\*1** On October 2, 2003, Aetna Health, Inc. (Aetna), a major medical insurer, filed this lawsuit against TAP Pharmaceutical Products, Inc .(TAP), in the federal district court for the Eastern District of Pennsylvania. Federal jurisdiction was premised on diversity of citizenship, TAP being an Illinois corporation, while Aetna is incorporated in the Commonwealth of Pennsylvania. The Complaint, which was framed exclusively on Pennsylvania state law, accused TAP of "defrauding and misleading Aetna with respect to the actual cost of TAP's prostate cancer drug Lupron® ." Shortly after the Complaint was filed, the case was transferred to this court by the Judicial Panel on Multi-District Litigation (MDL) to be consolidated with Lupron® -related complaints brought by various other plaintiffs against TAP and its parent companies, Abbott Laboratories (Abbott) and Takeda Chemical Industries, Ltd. (Takeda). After the transfer, Aetna amended the Complaint to add three counts under the civil provisions of the federal Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962. [FN1] TAP then moved to dismiss the Amended Complaint, contending that Counts II and V were identical to causes of action that were previously dismissed by the court in the main MDL proceeding, and that the remaining claims are either not plead with the particularity required by Fed.R.Civ.P. 9(b), or limn causes of action that are not recognized under Pennsylvania law. [FN2]

FN1. As amended, the Complaint set out the following claims in ten counts: Counts I and II-RICO (separate enterprise theories); Count III-RICO conspiracy; Count IV-

insurance fraud, 18 Pa.C.S.A. § 4117; Count V-common-law fraud; Count VI-negligent misrepresentation; Count VII-civil conspiracy; Count VIII-directing tortious conduct; Count IX-aiding and abetting tortious conduct; and Count X-negligence *per se.*

FN2. In its Memorandum, TAP refers the court to portions of a Joint Memorandum that it filed with Abbott and Takeda in support of the motion to dismiss the MDL Consolidated Class Action Complaint (specifically pages 2-3 and 5-14). Relying on *Watterson v. Page,* 987 F.2d 1, 3-4 (1st Cir.1993), Aetna asks that the court not consider the referenced arguments as the Joint Memorandum appends "an extensive collection of exhibits and outside sources not attached to the subject complaint nor expressly incorporated therein ." Aetna Opposition, at 2 n. 1. TAP points to the exceptions to the "outside document" rule for documents "the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiff's claim; or for documents sufficiently referred to in the complaint." *Watterson,* 987 F.2d at 3-4. It would appear that under the rule only the Joint Memorandum (and not the attached exhibits) qualifies for the court's consideration. *See Davidson v. Cao,* 211 F.Supp.2d 264, 267-268 n. 2 (D.Mass.2002).

Immediately prior to the August 4, 2004 hearing on TAP's motion to dismiss, Aetna waived Count VI (negligent misrepresentation) and Count X (negligence *per se* ) of the Amended Complaint. During oral argument, in response to a question by the court, Aetna's counsel agreed that Count VIII (directing tortious conduct) sets out a legal theory that is not (as yet) recognized by the courts of Pennsylvania. Consequently, Aetna agreed to waive that count as well. *Cf. Ryan v. Royal Ins. Co. of America,* 916 F.2d 731, 744 (1st Cir.1990).

*The RICO Claims*

Count I of the Amended Complaint alleges an

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 2
Not Reported in F.Supp.2d, 2004 WL 2070883 (D.Mass.),   RICO Bus.Disp.Guide 10,757
**(Cite as: Not Reported in F.Supp.2d)**

"association-in-fact" enterprise consisting of TAP, Abbott, and Takeda, with TAP as the RICO "person," 18 U.S.C. § 1961(3). In the main MDL proceeding, the court addressed a nearly identical theory of RICO pleading, finding that factual allegations similar to those set out in Aetna's Amended Complaint were sufficiently detailed to satisfy Rule 9(b). [FN3] The court also explained that while a defendant cannot share dual RICO identities as a "person" and an "enterprise," an association-in-fact is a distinct conceptual entity for RICO purposes. As there are no material differences between the structure of the enterprise set out in the MDL Consolidated Class Action Complaint and the enterprise described in Count I of Aetna's Amended Complaint, the motion to dismiss will be denied as to Count I and Count III (the RICO conspiracy count), for the reasons stated in the earlier action. [FN4] *See Lupron Marketing and Sales Practices Litigation,* 295 F.Supp.2d 148 (D.Mass.2003). Consistent, however, with this prior ruling, the court will dismiss Count II, which pleads an association-in-fact consisting of TAP and every medical provider in the United States who dispensed Lupron® . As was the case with the MDL Consolidated Class Action Complaint, there are no "command and control" allegations sufficient to satisfy the "continuing unit" element of a RICO enterprise. *See United States v. Turkette,* 452 U.S. 576, 583 (1981).

> FN3. The factual allegations in Aetna's Amended Complaint appear to have been largely borrowed from the Consolidated Class Action Complaint filed by the MDL plaintiffs.

> FN4. TAP acknowledges that its arguments with respect to these two RICO counts have been previously rejected by the court, but raises them again by reference to preserve its rights of appeal. *See* footnote 2, *supra.*

*The Pennsylvania Insurance Fraud Statute*

*2 Count IV of the Complaint alleges violations of Pennsylvania's Insurance Fraud Statute, 18 Pa.C.S.A. § 4117(a)(2). [FN5] Under this statute "[a] person commits an offense if the person ...

> FN5. The Statute as originally enacted applied only to fraudulent motor vehicle insurance claims. It was amended in 1990 to extend its coverage to all fraudulent insurance claims.

(2) [k]nowingly and with the intent to defraud any insurer or self-insured, presents or causes to be presented to any insurer or self-insured any statement forming a part of, or in support of, a claim that contains any false, incomplete or misleading information concerning any fact or thing material to the claim."

Aetna alleges that by causing the publication of an inflated AWP for Lupron® , and by encouraging medical providers (some complicitous, others apparently not) to submit claims on behalf of (innocent) patients based on the inflated AWP, TAP "caused many thousands of materially false reimbursement requests to be submitted to third party payors (sic) like Aetna." Aetna Opposition, at 15.

TAP, for its part, argues that the Insurance Fraud Statute "has never been used to create [civil] liability against a third party who was not directly involved with submitting claims to insurance companies." [FN6] TAP Memorandum, at 11. Aetna, while not disputing TAP's summary of the reported cases, nonetheless maintains that the plain language of the statute reaches indirect as well as direct conduct.

> FN6. *See, e.g., Allstate Ins. Co. v. American Rehab and Physical Therapy, Inc.,* 330 F.Supp.2d 506 2004 WL 1774572 *4 (E.D.Pa. Aug. 9, 2004) (provider fraud); *Valenti v. Allstate Ins. Co.,* 243 F.Supp.2d 200, 203 (M.D.Pa.2003) (fraudulent fire damage claim); *Hepps v. General American Life Ins .,* 1998 WL 564497 *3 (E.D.Pa.) (fraudulent disability claim); *Parasco v. Pacific Indemnity Co.,* 920 F.Supp. 647, 657 (E.D.Pa.1996) (same).

The legislature's decision to include the "causes to be presented" clause signals an intent to penalize the submission of fraudulent statements to insurers, whether the defrauder submits the information itself, or causes its submission through an intermediary.... Interpreting the insurance fraud statute to include TAP's conduct within its sweep is in keeping with Pennsylvania's policy of broad interpretation of fraud statutes.

Aetna Opposition, at 16-17. Pennsylvania, not atypically, tends to be very protective of its citizens (including corporate citizens like Aetna) who are exposed to marketplace fraud, and its courts are consequently enjoined to construe fraud statutes broadly. *Commonwealth v. Monumental Properties,*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 3
Not Reported in F.Supp.2d, 2004 WL 2070883 (D.Mass.), RICO Bus.Disp.Guide 10,757
**(Cite as: Not Reported in F.Supp.2d)**

459 Pa. 450, 479-480 (1974). As evidenced by the phrase "causes to be presented," the intent of the Insurance Fraud Statute is to protect insurers from all fraudulent claims, whether directly submitted by an insured, or submitted at the instigation of a third party not directly involved in the claims process. [FN7] *Cf. Commonwealth v. Sanchez,* 848 A.2d 977, 982-83 (Pa.Super.Ct.2004) (affirming the criminal conviction of a defendant who aided and abetted a fraudulent claim, where the defendant knew of the intended fraud and signed an odometer statement and a power of attorney authorizing the filing of the claim).

> FN7. As constructed, the Insurance Fraud Statute is penal in nature and most of its provisions relate to criminal prosecutions. Subsection (g), however, authorizes an insurer that is injured as a result of a violation of the statute's criminal provisions to bring a civil action to recover compensatory damages, investigative costs, and attorneys' fees. Treble damages may also be awarded where a defendant "has engaged in a pattern of violating this section." Under Pennsylvania law, non-penal provisions of a penal statute are liberally construed. *See Monumental Properties,* 459 Pa. at 460. *See also Masland v. Bachman,* 374 A.2d 517, 523-524 (Pa.1977) ("Laws enacted for the preventing of fraud, for the suppression of a public wrong, or to effect a public good, are not in the strict sense, penal acts, although they may inflict a penalty for violating them.") (quoting *Taylor v. United States,* 44 U.S. 197, 210 (1844)).

Statutory construction begins and ends with the express wording of an unambiguous statute. *Estate of Cowart v. Nicklos Drilling Co .,* 505 U.S. 469, 475 (1992) ("[W]hen a statute speaks with clarity to an issue judicial inquiry into the statute's meaning, in all but the most extraordinary circumstance, is finished."). "In other words, the court need not consult legislative history and other aids to statutory construction when the words of the statute neither create an ambiguity nor lead to an unreasonable interpretation." *Riva v. Commonwealth of Massachusetts,* 61 F.3d 1003, 1007 (1st Cir.1995). Such is the case here.

*Common-Law Fraud (Intentional Misrepresentation)*

**\*3** To state a claim of intentional misrepresentation under Pennsylvania law, a plaintiff must allege (1) a material representation, (2) made either with knowledge of its falsity or with reckless disregard for its truth, and with the intent to induce another into relying on its truth, (3) justifiable reliance, (4) and a resulting injury. *See Bortz v. Noon,* 556 Pa. 489, 499, 729 A.2d 555, 560 (1999). *See also Blumenstock v. Gibson,* 811 A.2d 1029, 1034 (Pa.Super.2002) ("Fraud is a generic term used to describe anything calculated to deceive, whether by single act or combination, or by suppression of truth, or suggestion of what is false, whether it be by direct falsehood or by innuendo, by speech or silence, word of mouth, or look or gesture."). "To be actionable, a misrepresentation need not be in the form of a positive assertion but is any artifice by which a person is deceived to his disadvantage and may be by false or misleading allegations or by concealment of that which should have been disclosed, which deceives or is intended to deceive another to act upon it to his detriment." *Wilson v. Donegal Mutual Insurance Co.,* 410 Pa.Super. 31, 41, 598 A.2d 1310, 1315 (1991), (*citing Delahanty v. First Pennsylvania Bank, N.A.,* 318 Pa.Super. 90, 108, 464 A.2d 1243, 1252 (1983)). However, where the gravamen of the alleged fraud rests on a defendant's omissions (rather than its affirmative misrepresentations), the fraud is actionable only where the defendant has a duty to speak. *See e.g., In re Estate of Evasew,* 526 Pa. 98, 105, 584 A.2d 910, 913 (1990) ("[A]n omission is actionable as fraud only where there is an independent duty to disclose the omitted information; and that such an independent duty exists where the party who is alleged to be under an obligation to disclose stands in a fiduciary relationship to the party seeking disclosure...."); *Wilson,* 410 Pa.Super. at 41, 598 A.2d at 1316 (same). *Cf. Smith v. Renaut,* 387 Pa.Super. 299, 306, 564 A.2d 188, 192 (1989).

TAP maintains that Aetna's Complaint fails to allege "that TAP made a false representation, that TAP owed Aetna any duty, that TAP intended to deceive Aetna, that Aetna justifiably relied on any alleged misrepresentation or omission, or that Aetna's alleged injuries are the proximate result of any alleged misrepresentations or omissions." TAP Memorandum, at 12-13. The elements that merit discussion are those of duty and reliance. As the court stated in its prior opinion, while there is no duty incumbent on a manufacturer to disclose the prices that it charges intermediate suppliers for its products, the rule is different in cases like this one, where the allegation is one of affirmative misrepresentation by TAP of the actual cost of Lupron® . *In re Lupron,*

Not Reported in F.Supp.2d                                                                                           Page 4
Not Reported in F.Supp.2d, 2004 WL 2070883 (D.Mass.),  RICO Bus.Disp.Guide 10,757
**(Cite as: Not Reported in F.Supp.2d)**

295 F.Supp.2d at 167-168. Hence, the fact that TAP owed no duty to Aetna to disclose the "true" price of Lupron® , while an accurate statement of law, is of no consequence. [FN8] Count V, however, fails for the same reasons that the court dismissed the common-law fraud claims in the MDL Consolidated Class Action Complaint.

> FN8. While Aetna generically pleads "omissions" on the part of TAP, the factual allegations of the Amended Complaint make clear that Aetna's grievance is directed to what TAP said and did, and not to what it failed to disclose.

**\*4** Common-law fraud is no more exempt than is statutory fraud from Rule 9(b)'s requirement that "the circumstances constituting fraud or mistake shall be stated with particularity." Count XVI (the common-law fraud Count), generically incorporates all of the preceding paragraphs of the Amended Complaint, and in that respect, sufficiently identifies the alleged false statements of fact. The Count, however, does not allege that the defendants intended that the individual plaintiffs be deceived by these statements, or that any plaintiff actually relied on the defendants' misrepresentations. (It is not enough to simply aver that plaintiffs "reasonably relied upon the veracity of [d]efendants regarding the AWP."). Consequently, this Count will be dismissed. See Manning v. Utilities Mut. Ins. Co., 254 F.3d 387, 401 (2d Cir.2001).
In re Lupron, 265 F.Supp.2d at 181-182. While Aetna's Amended Complaint ritually recites "reasonable reliance" and a purpose on the part of TAP "to induce Aetna to make higher payments," no concrete facts are plead in support of these generic allegations. [FN9]

> FN9. While it seems clear enough from the body of the Amended Complaint that the statements on which Aetna purports to have relied are the reported AWPs for Lupron® that TAP caused to be published, there are no factual allegations explaining how Aetna came to rely on these statements or the extent to which they influenced the actual payment of claims.

*Civil Conspiracy*

Unlike the RICO conspiracy set out in Count III, which alleges an agreement among TAP, Abbott, and Takeda to engage in a pattern of racketeering activity,

Count VII broadly alleges that TAP conspired with "Abbott, Takeda, and various health care providers, in an effort to fraudulently induce Aetna into overpaying for Lupron® , to misrepresent or conceal material facts from Aetna, or to remain silent when it knew that Aetna was being misled by its misrepresentations and/or omissions...." First Amended Complaint ¶ 145. Under Pennsylvania law, a claim of civil conspiracy requires proof of the following elements: "(1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act done in pursuance of the common purpose; and (3) actual legal damage.... Proof of malice or an intent to injure is essential to the proof of a conspiracy." Strickland v. University of Scranton, 700 A.2d 979, 987-988 (1997).

I agree with TAP that Aetna has failed to allege sufficient facts to support the civil conspiracy claim. The Amended Complaint fails to identify any of the health care providers who are alleged to have been part of the conspiracy. See Fresh Made, Inc. v. Lifeway Foods, Inc., 2002 WL 31246922, at *10 (E.D.Pa.). There are no factual allegations suggesting that the alleged conspirators acted pursuant to a common purpose (as opposed to individual self-interest). And finally, no facts are plead to support a specific intent on the part of TAP to injure Aetna. See Jeter v. Brown & Williamson Tobacco Corp., 294 F.Supp.2d 681, 688 (W.D.Pa.2003) ("To maintain a conspiracy claim, plaintiff also must make a showing that [the defendant] exhibited malice. Malice exists only 'where the sole purpose of the conspiracy is to cause harm to the party who claims to be injured.' ").

*Aiding and Abetting Tortious Conduct*

**\*5** Count IX of the Amended Complaint alleges that Aetna "aided and abetted health care providers in making multiple fraudulent and negligent misrepresentations to Aetna including setting a wholesale price at which it actually sold Lupron® ; listing the AWP of Lupron® in publications at an amount materially greater that the actual average wholesale price; contacting publications for the purpose of falsely setting and controlling the listed AWP; sending the AWP to health care providers; creating and disseminating marketing materials inducing health care providers to exploit Lupron® 's inflated AWP." First Amended Complaint ¶ 160.

According to Restatement (Second) of Torts §

Not Reported in F.Supp.2d                                                                                                    Page 5
Not Reported in F.Supp.2d, 2004 WL 2070883 (D.Mass.),  RICO Bus.Disp.Guide 10,757
**(Cite as: Not Reported in F.Supp.2d)**

876(b), "[f]or harm resulting to a third person from the tortious conduct of another, one is subject to liability if he (a) does a tortious act in concert with the other or pursuant to a common design with him, or (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person." Aiding and abetting is not an independent and freestanding tort. What is missing in Count IX as plead is any specification of the underlying tort that TAP is alleged to have aided and abetted. (While the count alludes to negligent and intentional misrepresentation, Aetna has waived the negligent misrepresentation claim, and the court has dismissed the common-law fraud claim.) [FN10]

> FN10. While TAP originally questioned whether an aiding and abetting claim is viable under Pennsylvania law, Aetna cites *Burnside v. Abbott Laboratories,* 351 Pa.Super. 264, 281, 505 A.2d 973, 982 (1985), as persuasive authority that there are circumstances, however limited, in which Pennsylvania would recognize a cause of action under section 876.

### Statute of Limitations

TAP argues that all of Aetna's claims are precluded by the statute of limitations. This case was filed in October of 2003. The parties agree that Counts I and IIII (the surviving RICO claims) are governed by a four-year statute of limitations. TAP maintains that the Pennsylvania Insurance Fraud Statute is governed by a two-year statute of limitations. *Cf. State Farm Mut. Auto. Ins. Co. v. Makris,* 2002 WL 826431, at *4 (E.D.Pa.) (so stating in *dicta* ). *See also* 42 Pa.C.S.A. § 5524(7) (a two-year statute of limitations applies to actions based on fraud and deceit unless another limitations period is specified). Aetna, for its part, argues that the six-year "catch-all" limitations period of the Judicial Code, 42 P.C.S. § 5527(6), which governs private actions under Pennsylvania's Unfair Trade Practices and Consumer Protection Law, applies. *See Gabriel v. O'Hara,* 368 Pa.Super. 383, 395, 534 A.2d 488, 494 (1987). Whichever limitations period does apply, Aetna's fundamental defense is one of fraudulent concealment. *See* 2 *Standard Pennsylvania Practice 2d* § 13:148 (June 2003) (in an action for fraud, "the statute of limitations generally runs from the date of

the fraud complained of, unless such fraud has been actively concealed by the defendant"). TAP, in response, argues that Aetna has failed to allege fraudulent concealment with the requisite specificity.

*6 Given the intensely factual nature of a fraudulent concealment claim, the court will defer a decision as to which limitations period applies to the summary judgment phase of the case (or perhaps during the interval entertain a motion by the parties to certify the issue to the Supreme Court of Pennsylvania). As the court observed in addressing defendants' challenge to the alleged failure of the plaintiffs in the main MDL action to adequately plead fraudulent concealment: [w]hether a plaintiff knew or should have known of an injury so as to trigger the running of a statute of limitations is, with rare exception, a jury issue. *See Santiago Hodge v. Parke Davis & Co.,* 909 F.2d 628, 633 (1st Cir.1990) ( "The determination of when appellees had knowledge of 'both the injury and its connection with the act of defendant,' is a question of fact."). *Cf. Young v. Lepone,* 305 F.3d 1, 8-9 (1st Cir.2002) (in a securities law context, factual questions as to whether "storm warnings" were sufficient to put an investor on inquiry notice are only to be determined as a matter of law when the underlying facts are either admitted or undisputed). *Compare Jablon v. Dean Witter & Co.,* 614 F.2d 677, 682 (9th Cir.1980) (affirming a dismissal on limitations grounds where the running of the statute was apparent on the face of the complaint). While it can be fairly argued that the plaintiffs have but weakly plead facts sufficient to invoke the fraudulent concealment doctrine, they have plead enough to preclude a resolution of this issue as a matter of law at this preliminary stage of the proceedings.

*In re Lupron,* 295 F.Supp.2d at 183-184.

### ORDER

For the foregoing reasons, TAP's motion to dismiss is *DENIED* as to Counts I, III, and IV of Aetna's First Amended Complaint, and *ALLOWED* as to Counts II, V, VII, and IX. The remaining Counts have been *WAIVED.*
SO ORDERED.

D.Mass.,2004.
In re Lupron Marketing and Sales Practices Litigation
Not Reported in F.Supp.2d, 2004 WL 2070883 (D.Mass.),  RICO Bus.Disp.Guide 10,757

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 6
Not Reported in F.Supp.2d, 2004 WL 2070883 (D.Mass.),   RICO Bus.Disp.Guide 10,757
**(Cite as: Not Reported in F.Supp.2d)**


END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT 2



U.S. Department of Justice

**Michael J. Sullivan**
*United States Attorney*
*District of Massachusetts*

---

*Main Reception: (617) 748-3100*

*John Joseph Moakley United States Courthouse*
*Suite 9200*
*1 Courthouse Way*
*Boston, Massachusetts 02210*

May 13, 2004

Robert B. Fiske, Jr., Esq.          *04-10150-RGS*
James P. Rouhandeh, Esq.
Davis Polk & Wardwell
450 Lexington Avenue
New York, NY 10017

Re: Warner-Lambert Company LLC

Dear Messrs. Fiske and Rouhandeh:

This letter sets forth the Agreement between the United States Attorney for the District of Massachusetts ("the U.S. Attorney") and your client, Warner-Lambert Company LLC, a Delaware company ("Warner-Lambert")(collectively, "the Parties"), in the above-captioned case. The Agreement is as follows:

    1.    <u>Change of Plea</u>

On or before May 13, 2004, or such other date as the Court may set, Warner-Lambert shall waive indictment and plead guilty to all counts in the Information, a copy of which is attached hereto as Exhibit A, which Information charges Warner-Lambert with violations of Title 21 United States Code Sections 331(a), 331(d), 333(a), 352(f)(1) and 355. Warner-Lambert expressly waives any statute of limitations defense that it may have in connection with these crimes. Warner-Lambert expressly and unequivocally admits that it committed the crimes charged in the Information. Warner-Lambert agrees that the facts set forth in the Information are true.

    2.    <u>Sentencing Guidelines</u>

The United States and Warner-Lambert agree that the following provisions of the United States Sentencing Guidelines ("U.S.S.G.") will govern sentencing of Warner-Lambert with respect to the Information:



(a)     as indicated at the end of this section on the Sentencing Guidelines, pursuant to U.S.S.G. § 8C2.4(a)(2) and 18 U.S.C. § 3571(d) the parties agree that the pecuniary gain to Warner-Lambert derived from this offense for criminal sentencing purposes is $150,000,000;

(b)     pursuant to U.S.S.G. § 8C2.6, the parties agree that the appropriate multiplier to be applied as to Warner-Lambert is 1.6, reaching that figure through the following means:

    i.     pursuant to U.S.S.G. § 8C2.5, the culpability score is calculated as follows:

        (A)     the parties agree that the base score is 5 pursuant to § 8C2.5(a);

        (B)     the parties agree that 2 points should be dedeucted pursuant to § 8C2.5(g)(2); and

        (C)     the United States  contends that 5 points should be added pursuant to U.S.S.G. § 8C2.5(b)(1)(A)(i) and/or (ii); but Warner-Lambert contends that 3 points should be added pursuant to § 8C2.5(b)(3)(B)(i).

    ii.     pursuant to § 8C2.6, the applicable range for a multiplier is 1.6 to 3.2 according to the United States  and 1.2 to 2.4 according to Warner-Lambert.  The parties agree that the appropriate multiplier to be applied as to Warner-Lambert is 1.6.

(c)     the Parties agree that there is no basis for a departure under the Sentencing Guidelines, either upward or downward.

The United States represents and for purposes of this Plea Agreement, Warner-Lambert does not object that, pursuant to U.S.S.G. § 8C2.4(a) and 18 U.S.C. § 3571(d), the gain to Warner-Lambert from this offense for criminal sentencing purposes is $150,000,000.  Warner-Lambert and the United States both acknowledge that the gain figure cannot be determined with precision and that the gain figure of $150,000,000 for criminal sentencing purposes is an estimate.  The United States and Warner-Lambert further agree that calculation of the criminal fine under U.S.S.G. §8C2.4(a)(2) is appropriate under the circumstances of this case.

3.     Agreed Disposition

The United States and Warner-Lambert agree pursuant to Fed. R. Crim. P. 11(c)(1)(C) that the following sentence is the appropriate disposition of the Information:

(a)      a criminal fine in the amount of two hundred forty million dollars, ($240,000,000), to be paid within fourteen days of sentencing; and

(b)      a mandatory special assessment of $800 pursuant to 18 U.S.C. § 3013, which shall be paid to the Clerk of Court on or before the date of sentencing.

In light of the pending civil action, <u>United States ex rel. David Franklin v. Parke-Davis, Division of Warner-Lambert and Pfizer Inc</u>, Civil Action No. 96-11651-PBS (D. Mass.), and the Civil Settlement Agreement between Warner-Lambert and others and the United States relating to the civil action which is being signed contemporaneous with this Plea Agreement (the "Civil Settlement Agreement," a copy of which is attached hereto as Exhibit B), the parties agree that the appropriate disposition of this case does not include a restitution order because the losses suffered here, if any, will be recompensed fully from amounts paid as part of the Civil Settlement Agreement, and because the process of fashioning a restitution order would unduly complicate and prolong the sentencing process. <u>See</u> 18 U.S.C. § 3663(a)(1)(B)(ii). Therefore, the United States agrees that it will not seek a separate restitution order as to Warner-Lambert as part of the resolution of the Information and the Parties agree that the appropriate disposition of this case does not include a restitution order.

4.      <u>No Further Prosecution of Warner-Lambert</u>

Except as set forth below and other than as set forth in the Information, a copy of which is attached hereto as Exhibit A, the United States agrees that it shall not further prosecute Warner-Lambert or Pfizer Inc for: (i) any conduct within the scope of the grand jury investigation by the United States Attorney for the District of Massachusetts related to Warner-Lambert's product Neurontin; and (ii) any conduct related to Neurontin which is presently known to the United States Attorney for the District of Massachusetts.

The United States does not decline criminal prosecution of Warner-Lambert, Pfizer Inc, Pharmacia, or any related entity for conduct relating to products other than Neurontin.

The U.S. Attorney expressly reserves the right to prosecute any individual, including but not limited to present and former officers, directors, employees and agents of Warner-Lambert, in connection with the conduct encompassed by this Plea Agreement or within the scope of the grand jury investigation.

This declination is contingent upon: (1) the guilty plea of Warner-Lambert to the Information, attached hereto as Exhibit A, being accepted by the Court and not withdrawn; (2) Warner-Lambert entering into, simultaneously with this agreement, and completing its obligations under, the Civil Settlement Agreement between Warner-Lambert and the United States, Exhibit B hereto; and (3) the completion of Warner-Lambert's obligations under this Agreement.

3

5.    Corporate Integrity Agreement

Contemporaneous with the execution of this agreement, Warner-Lambert shall enter into a Corporate Integrity Agreement ("CIA") with the Office of Inspector General ("Inspector General") for the United States Department of Health and Human Services. A breach of the Corporate Integrity Agreement, incorporated by reference in the Civil Settlement Agreement, does not constitute a breach of this Plea Agreement, and any disputes arising under the CIA shall be resolved exclusively through the dispute resolution provisions of the CIA.

6.    Sentencing

Warner-Lambert acknowledges that it has been previously convicted under Title 21 United States Code section 333. As a result of this prior conviction, Warner-Lambert acknowledges and agrees that, pursuant to Title 21 United States Code Section 333(a)(2), Warner-Lambert is pleading to charges which constitute felony offenses.

The U.S. Attorney specifically may, at his sole option, be released from his commitments under this Agreement, including, but not limited to, his agreement that paragraph 4 constitutes the appropriate disposition of this case, if at any time between his execution of this Agreement and sentencing, Warner-Lambert:

(a)    Fails to admit a complete factual basis for the plea;

(b)    Fails to truthfully admit its conduct in the offenses of conviction;

(c)    Falsely denies, or frivolously contests, relevant conduct for which Warner-Lambert is accountable under U.S.S.G. § 1B1.3;

(d)    Gives false or misleading testimony in any proceeding relating to the criminal conduct charged in this case and any relevant conduct for which Warner-Lambert is accountable under U.S.S.G. § 1B1.3; or

(e)    Engages in acts which form a basis for finding that Warner-Lambert has obstructed or impeded the administration of justice under U.S.S.G. § 3C1.1.

Warner-Lambert expressly understands that it may not withdraw its plea of guilty, unless the Court rejects this Agreement under Fed. R. Crim. P. 11(c)(5). If the sentencing judge rejects this Agreement, this Agreement shall be null and void at the option of either the United States or Warner-Lambert. In this regard, Warner-Lambert hereby waives any defense to any charges which it might otherwise have under the Speedy Trial Act and tolls any applicable statute of limitations until 60 days after this Agreement is no longer in full force and effect.

4

7.    <u>Payment of Mandatory Special Assessment</u>

Warner-Lambert agrees to pay the mandatory special assessment to the Clerk of the Court on or before the date of sentencing.

8.    <u>Cooperation</u>

Warner-Lambert agrees to cooperate completely and truthfully with the U.S. Attorney in connection with his on-going investigation and prosecution of others for alleged violations of federal criminal law arising out of his investigation. Warner-Lambert understands and agrees that such cooperation shall include the following, if requested by the U.S. Attorney:

(a)    prompt production to the U.S. Attorney of any document or record in the possession, custody or control of Warner-Lambert relating to the subject matter of the investigation;

(b)    taking all reasonable measures available to Warner-Lambert to ensure that present and former officers, directors, agents and employees of Warner-Lambert cooperate truthfully and completely with the U.S. Attorney in connection with his on-going investigation and prosecutions; and

(c)    taking all reasonable measures available to Warner-Lambert to make all present and former officers and employees of Warner-Lambert or Pfizer Inc available for interviews by federal law enforcement personnel, upon reasonable notice.

Provided, however, notwithstanding any provision of this agreement, that: (1) Warner-Lambert is not required to request of its present or former officers, directors, employees or agents that they forego seeking the advice of an attorney nor that they act contrary to that advice; (2) Warner-Lambert is not required to take any action against their officers, directors, employees, or agents for following their attorney's advice; and (3) Warner-Lambert is not required to waive any privilege or claim of work product.

9.    <u>Probation Department Not Bound By Agreement</u>

The sentencing disposition agreed upon by the parties and their respective calculations under the Sentencing Guidelines are not binding upon the United States Probation Office.

Warner-Lambert and the United States Attorney's Office agree to seek a sentencing by the District Court immediately following the Rule 11 plea hearing and do not object to the Court proceeding to sentence Warner-Lambert in the absence of a Presentence Report in this case. Warner-Lambert understands that the decision whether to proceed immediately following the plea hearing with the sentencing proceeding, and to do so without a Presentence Report, is exclusively that of the United States District Court.

10.    Civil Liability

Warner-Lambert's alleged civil liability to the United States in connection with the matters under investigation by the United States, as set forth in paragraph 4 of this agreement, is resolved as set forth in the Civil Settlement Agreement, attached hereto as Exhibit B, according to the terms set forth in that agreement.

11.    Breach of Agreement

If the U.S. Attorney for the District of Massachusetts determines that Warner-Lambert has failed to comply with any material provision of this Agreement, the United States may, at its sole option, be released from its commitments under this Agreement in their entirety by notifying Warner-Lambert, through counsel or otherwise, in writing. The United States may also pursue all remedies available to it under the law, irrespective of whether it elects to be released from its commitments under this Agreement. Warner-Lambert recognizes that no such breach by it of an obligation under this Agreement shall give rise to grounds for withdrawal of its guilty plea. Warner-Lambert understands that, should it breach any material provision of this agreement, the U.S. Attorney will have the right to use against Warner-Lambert before any grand jury, at any trial or hearing, or for sentencing purposes, any statements which may be made by it and any information, materials, documents or objects which may be provided by it to the government subsequent to this Agreement, without any limitation.

Warner-Lambert understands and agrees that this 11(c)(1)(C) plea agreement and its agreed upon criminal disposition:

(1)    are wholly dependent upon Warner-Lambert's entering into, simultaneously with this agreement, and completing its obligations under, the attached Civil Settlement Agreement, including the requirement in that agreement that Warner-Lambert pay to the United States and to Medicaid Participating States and Consumer Participating States the amount of one hundred ninety million dollars ($190,000,000) in accordance with the terms of the Civil Settlement Agreement; and that

(2)    failure by Warner-Lambert to comply with the material terms of either this agreement or the attached Civil Settlement Agreement will constitute a breach of this plea agreement.

In the event that Warner-Lambert at any time hereafter breaches any material provision of this plea agreement, Warner-Lambert understands that (1) the United States will as of the date of that breach be relieved of any obligations it may have in this agreement and the attached Civil Settlement Agreement, including but not limited to the promise not to further prosecute Warner-Lambert, as set forth in paragraph 4 of this plea agreement; and (2) Warner-Lambert will not be relieved of its obligations to make the payments set forth in this plea agreement and in the attached Civil Settlement Agreement, nor will it be entitled to any return of any monies already paid. Nothing in

6

this Agreement would preclude Warner-Lambert from contesting whether a breach had occurred if a subsequent Indictment were brought.

12.    Corporate Authorization

Warner-Lambert shall provide to the U.S. Attorney and the Court a certified copy of a resolution of the Board of Directors of Warner-Lambert, affirming that the Board of Directors of Warner-Lambert has authority to enter into the Plea Agreement and has (1) reviewed the Information in this case and the proposed Plea Agreement; (2) consulted with legal counsel in connection with the matter; (3) voted to enter into the proposed Plea Agreement; (4) voted to authorize Warner-Lambert to plead guilty to the charges specified in the Plea Agreement; and (5) voted to authorize the individual identified below to execute the Plea Agreement and all other documents necessary to carry out the provisions of the Plea Agreement.

Warner-Lambert agrees that a duly authorized corporate officer or member of the board of directors will appear on behalf of Warner-Lambert and will enter the guilty plea and will also appear for the imposition of sentence.

13.    Who is Bound by Agreement

This Agreement is binding upon the Attorney General of the United States, the Department of Justice, and all United States Attorneys on the matters as set forth in paragraph 4 but cannot and does not bind the Tax Division of the U.S. Department of Justice or the Internal Revenue Service of the U.S. Department of the Treasury. Warner-Lambert also understands that this agreement does not bind any state or local prosecutive authorities.

14.    Complete Agreement

This letter, together with the attached Information, Civil Settlement Agreement and the United States Attorney's Side Letter to Warner-Lambert of May 12, 2004, set forth the complete and only agreement between the parties relating to the disposition of this case. No promises, representations or agreements have been made other than those set forth in this letter, and the three attached and referenced documents. This Agreement supersedes prior understandings, if any, of the parties, whether written or oral, with the exception of those promises and representations set forth in the attached documents. This Agreement can be modified or supplemented only in a written memorandum signed by the parties or on the record in court.

If this letter accurately reflects the Agreement between the U.S. Attorney and Warner-Lambert, please have Warner-Lambert sign the Acknowledgment of Agreement below. Please also sign below as Witness. Return the original of this letter to Assistant U.S. Attorney Thomas E. Kanwit of the District of Massachusetts.

Very truly yours,


MICHAEL J. SULLIVAN
United States Attorney


THOMAS E. KANWIT
Assistant U.S. Attorney


<u>Corporate Acknowledgment of Plea Agreement</u>

The Board of Directors has authorized me to execute this Plea Agreement and the attached Civil Settlement Agreement on behalf of Warner-Lambert Company. The Board has been well informed regarding these documents in their entirety and has discussed them fully with Warner-Lambert's attorneys. The Board acknowledges that these documents fully set forth Warner-Lambert's agreements with the United States. The Board further states that no additional promises or representations have been made to the Board by any officials of the United States in connection with this matter, other than those set forth in this plea agreement and in the attached Civil Settlement Agreement.


Dated: 5/11/04


MARTIN TEICHER
Vice President
Warner-Lambert Company LLC


Dated: 5/11/04


ROBERT B. FISKE, JR. ESQUIRE
Davis Polk & Wardwell


Dated: 5/11/04


JAMES P. ROUHANDEH, ESQUIRE
Davis Polk & Wardwell


8

EXHIBIT 3

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22048255 (D.Mass.)
(Cite as: Not Reported in F.Supp.2d)

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,D. Massachusetts.
UNITED STATES OF AMERICA ex rel. David
Franklin, Plaintiff,
v.
PARKE-DAVIS, DIVISION OF WARNER-
LAMBERT COMPANY and Pfizer, Inc., Defendant.
No. Civ.A. 96-11651PBS.

Aug. 22, 2003.

Robert A. Bertsche, Prince, Lobel Glovsky & Tye
LLP, Boston, MA, Stuart G. Svonkin, Torys LLP,
Toronto, ON, for Movant.
David B. Chaffin, Hare & Chaffin, Boston, MA,
Barbara D. Diggs, Robert B. Fiske, Jr., James E.
Murray, James P. Rouhandeh, Davis Polk &
Wardwell, New York, NY, for Defendant.
Thomas M. Greene, Thomas G. Hoffman, Greene &
Hoffman, P.C., Boston, MA, for Plaintiff.
Thomas E. Kanwit, United States Attorney's Office,
Boston, MA, for Interested Party.

*MEMORANDUM AND ORDER*

SARIS, J.

## I. INTRODUCTION

*1 In this *qui tam* action, Relator Dr. David Franklin
brings a claim under the False Claims Act, 31 U.S.C.
§ § 3729 *et seq.,* alleging that Defendant Parke-
Davis (Franklin's former employer) promoted the
drug Neurontin for uses not approved by the Food
and Drug Administration, resulting in federal
reimbursement payments for Neurontin prescriptions
that were ineligible under Medicaid. Parke-Davis
moves for summary judgment. The government,
which has not intervened, has filed a Statement of
Interest. After hearing, Parke-Davis's motion is
*DENIED.*

## II. DISCUSSION

In its earlier opinion on Parke-Davis's motion to
dismiss, the Court canvassed the history of this suit,
the complaint's factual allegations, and the relevant

law. *United States v. Parke-Davis,* 147 F.Supp.2d 39
(D.Mass.2001). Presuming familiarity with that
opinion, the Court here will limit the discussion to
the select legal and factual issues upon which
summary judgment turns.

### 1. Double-Falsehood Requirement under the FCA?

The False Claims Act ("FCA") imposes liability on
any person who, *inter alia:*
(1) knowingly presents, or causes to be presented, to
an officer or employee of the United States
Government or a member of the Armed Forces of the
United States a false or fraudulent claim for payment
or approval; [or]
(2) knowingly makes, uses, or causes to be made or
used, a false record or statement to get a false or
fraudulent claim paid or approved by the Government

31 U.S.C. § 3729(a).

Parke-Davis argues that it can only be held liable
under the FCA if Relator proves that Parke-Davis
intentionally made a material false statement that led
to the filing of a false claim. Under Parke-Davis's
interpretation, the FCA contains a double falsehood
requirement: An FCA plaintiff must prove a false
statement that led to a false claim. Parke-Davis
contends that Relator has failed to show that Parke-
Davis made any material false statements.

Parke-Davis's legal argument is inconsistent with the
text of the FCA. While § 3729(a)(2) contains a
double-falsehood requirement ("knowingly makes,
uses, or causes to be made or used, *a false record or
statement* to get *a false or fraudulent claim* paid or
approved by the Government") (emphasis added),
FCA liability under § 3729(a)(1) arises when a
defendant "knowingly presents, or causes to be
presented ... *a false or fraudulent claim*" (emphasis
added). Thus, there is no double falsehood
requirement under § 3729(a)(1): One will suffice.
*See Shaw v. AAA Eng'g & Drafting, Inc.,* 213 F.3d
519, 531 (10th Cir.2000) ("Section 3729(a)(1) ...
requires only the presentation of a 'false or fraudulent
claim for payment or approval' without the additional
element of a 'false record or statement." '); *United
States ex rel. Fallon v. Accudyne Corp.,* 921 F.Supp.
611, 627 (W.D.Wis.1995) ("The primary distinction
between a claim under section 2 and a claim under

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22048255 (D.Mass.)
(Cite as: Not Reported in F.Supp.2d)

Page 2

section 1 is that section 2 requires an affirmative false statement. To provide any distinct meaning to section 1 it is clear that no such express false statement is required.").

**\*2** Because Relator has not limited his FCA claim to § 3729(a)(2), he need not show two falsehoods to prevail. Under § 3729(a)(1), Relator is not required to present evidence that Parke-Davis lied to physicians about Neurontin's off-label efficacy or safety to induce them to prescribe Neurontin for uses ineligible under Medicaid. Though such evidence would be probative as to whether Parke-Davis caused to be presented false Medicaid claims, truthful off-label marketing (ineligible for federal safe harbors) and financial incentives like kickbacks would suffice.

To be sure, the Court's earlier opinion on Parke-Davis's motion to dismiss focused on allegations of false statements under § 3729(a)(2):

Defendant argues that an impermissible off-label promotion [*i.e.,* a promotion that violates the Food and Drug Administration's ("FDA's") strictures on off-label marketing] does not necessarily include a false statement or fraudulent conduct. For example, it points out, off-label promotion of a drug might simply consist of a representative of a pharmaceutical company distributing the finding of one doctor's experience with an off-label use of a particular drug to other physicians. However, Relator alleges more than a mere technical violation of the FDA's prohibition on off-label marketing. The gravamen of Relator's claim is that Parke-Davis engaged in an unlawful course of collusive fraudulent conduct including knowingly making false statements to doctors that caused them to submit claims that were not eligible for payment by the government under Medicaid. Thus, the alleged FCA violation arises-not from unlawful off-label marketing activity itself-but from the submission of Medicaid claims for uncovered off-label uses induced by Defendant's fraudulent conduct. Cf. *United States ex rel. Marcus v. Hess,* 317 U.S. 537, 543-44, 63 S.Ct. 379, 87 L.Ed. 443 (1943) (payments under government contract that was executed as a result of collusive bid constituted actionable false claims). *A much closer question would be presented if the allegations involved only the unlawful-yet truthful-promotion of off-label uses to physicians who provide services to patients who are covered by Medicaid, as well patients who are not, without any fraudulent representations by the manufacturer.*

*Parke-Davis,* 147 F.Supp.2d at 52 (emphasis added). With the benefit of a more fulsome factual record, it is now apparent that the "much closer question" can no longer be ducked. Under § 3729(a)(1), the only issue is whether Parke-Davis "caused to be presented" a false claim, and § 3729 does not require that the "cause" be fraudulent or otherwise independently unlawful.

### 2. Existence of a False Claim

Parke-Davis contends that Relator cannot prove the *sine qua non* of a False Claims Act violation: the existence of a false claim. In the early phases of this litigation, "Defendant d[id] not dispute that an off-label prescription submitted for reimbursement by Medicaid is a false claim within the meaning of the FCA." *Parke-Davis,* 147 F.Supp.2d at 51. Now Parke-Davis argues that forty-two state Medicaid programs permit reimbursement for off-label, non-compendium drug prescriptions, and that therefore claims for Medicaid reimbursement for off-label Neurontin prescriptions in those states were not false claims. Parke-Davis contends that the Medicaid statute gives states the discretion to provide reimbursement for such prescriptions; in particular, Parke-Davis points to 42 U.S.C. § 1396r-8(d)(1)(B): "A state may exclude or otherwise restrict coverage of a covered outpatient drug if-(i) the prescribed use is not for a medically accepted indication...." Parke-Davis argues that the language "may exclude or otherwise restrict" indicates that states have the option not to exclude (*i.e.,* may provide) coverage for drugs for which the prescribed use is not for a medically accepted indication.

**\*3** Relator contends that Parke-Davis is wrong as to the scope of Medicaid coverage in the forty-two states. Indeed, Relator argues that the Medicaid statute does not authorize states to provide such broad coverage. Relator emphasizes that the Medicaid statute allows states to "exclude or otherwise restrict coverage *of a covered outpatient drug,*" 42 U.S.C. § 1396r-8(d)(1)(B) (emphasis added), implying that states are given discretion only within the category of "covered outpatient drugs." The Medicaid statute defines this category to exclude drugs for which the prescribed use is not a medically accepted indication. *Parke-Davis,* 147 F.Supp.2d at 45 ("Covered outpatient drugs do not include drugs that are 'used for a medical indication which is not a medically accepted indication.'") (quoting 42 U.S.C. § 1396r-8(k)(3)). Thus, in Relator's view, § 1396r-8(d)(1)(B)(i) is simply superfluous, giving states the discretion to exclude drugs that are not covered by Medicaid to begin with. Basic rules of statutory

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                          Page 3
Not Reported in F.Supp.2d, 2003 WL 22048255 (D.Mass.)
**(Cite as: Not Reported in F.Supp.2d)**

construction, however, disfavor this interpretation. *See, e.g., United States v. Flores,* 968 F.2d 1366, 1371 (1st Cir.1992) ("Courts should not lightly read entire clauses out of statutes, but should, to the exact contrary, attempt to give meaning to each word and phrase.").

It is not clear which side gets the better of the statutory-tail-chases-cat debate. The Court would appreciate an amicus brief from federal officials, providing the federal government's understanding of the extent to which the Medicaid statute empowers states to provide coverage of off-label, non-compendium prescriptions. *Cf. Meyer v. Holley,* 537 U.S. 280, 123 S.Ct. 824, 830, 154 L.Ed.2d 753 (2003) ("[W]e ordinarily defer to an administering agency's reasonable interpretation of a statute.") (citing *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 842-45, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)).

The debate may be immaterial. If the Medicaid statute gives states the discretion to cover off-label, non-compendium prescriptions, and a state exercised its discretion to cover such prescriptions, then an off-label Neurontin prescription in that state would not be a false claim. On the other hand, if the Medicaid statute does *not* give states the discretion to cover off-label, non-compendium prescriptions, but a state misconstrued the statute and authorized coverage of such prescriptions, an FCA action against Parke-Davis in that state would likely fail, as it would be difficult to establish Parke-Davis's scienter.

In any event, even Parke-Davis concedes that eight states do not provide reimbursement for off-label drug prescriptions not included in a medical compendium, and in those states, a Medicaid-reimbursement request for an off-label, non-compendium prescription constitutes a false claim. Thus, at best Parke-Davis's argument goes to the amount of damages, and does not provide a basis for summary judgment of no liability under the FCA. At this juncture, the Court declines to do a state-by-state analysis of Medicaid coverage.

**\*4** Parke-Davis also raises a factual argument about why Relator cannot show a false claim: Parke-Davis points out that the Medicaid reimbursement claim forms for prescription drugs do not require the claimant to list the indication for which the drug is being prescribed. Thus, Parke-Davis argues, Relator cannot show that any Medicaid claim sought reimbursement for an off-label, non-compendium use. But the Relator has provided analysis linking patients' treatment histories to Neurontin prescriptions that generated reimbursement claims; Relator contends this analysis demonstrates that many reimbursement claims must have been for off-label, non-compendium indications, given the patients' treatment histories. Parke-Davis has submitted expert testimony contesting the reliability of comparing data from pharmacy claim forms with diagnosis data from patient medical-services claim forms. Relator's expert evidence suffices to survive summary judgment.

### 3. Causation

The text of § 3729(a)(1) requires a causal connection between Parke-Davis's actions and the false claims at issue. Parke-Davis contends that the Relator must show that Parke-Davis "either exerted 'control over' or otherwise directly influenced, the submission of a false claim." (Mem. of Law in Supp. of Defs.' Mot. for Summ. J., Docket No. 297, at 18.) Parke-Davis argues that Relator cannot meet this standard, as the causal chain includes several links: Parke-Davis markets Neurontin to doctors, who prescribe it for their patients, who take the prescriptions to their pharmacists, who file claims for Medicaid reimbursement.

But Parke-Davis misstates the legal standard for causation. The FCA does not provide a special definition for causation, and neither the Supreme Court nor any Circuit Court of Appeals has grafted such a special definition on the FCA. Absent an FCA-specific definition of causation, the Court will apply common-law tort causation concepts, which Judge Campbell of the First Circuit has summarized: Causation in tort law is generally divided into two concepts: causation in fact, or actual causation, and proximate or legal causation. *See* W. Page Keeton et al., *Prosser & Keeton on Torts* § § 41-42 (5th ed.1984). The terms for these two concepts are sometimes confused, as are the concepts themselves. Regardless of the terminology, however, there are two questions that must be answered to determine if a defendant's conduct "caused" a plaintiff's injury. The first question is whether there was in fact some causal relationship between the conduct and the outcome. The *Restatement* expresses this test as whether the defendant's conduct was a "substantial factor" in producing the harm. *Id.* The second question is whether the circumstances and causal relationship are such that the law will impose liability on the defendant. Sometimes this is expressed as a foreseeability test, *see* Keeton, *supra,* § 42, at 273.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                Page 4
Not Reported in F.Supp.2d, 2003 WL 22048255 (D.Mass.)
**(Cite as: Not Reported in F.Supp.2d)**

*Cf. Restatement (Second) of Torts, § 431(b)(1965)* (different terminology).

**\*5** *Rodriguez-Cirilo v. Garcia,* 115 F.3d 50, 54 (1st Cir.1997) (Campbell, J., concurring).

Whether Parke-Davis's conduct was a substantial factor in causing the presentation of false Medicaid claims is a question of fact. Relator has produced enough evidence on this score to create at least a genuine issue of material fact. In particular, Relator has produced circumstantial evidence (*e.g.,* the rates of off-label prescriptions before and after physician conferences hosted by Parke-Davis) and direct evidence (the "Verbatim" market-research reports recording doctors' state of mind after marketing meetings).

Parke-Davis also disputes that Relator can reliably extrapolate the prescription activities of a small sample of ten doctors to the off-label prescription rates of over 3000 physicians in fifty states, and, as discussed above, Parke-Davis challenges the reliability of the underlying data used to determine whether a prescription is for off-label uses. But the Court will defer the daunting task of determining whether a reliable statistical method exists for measuring nation-wide damages.

As for proximate or legal causation, the Court has already held that Parke-Davis could have foreseen false Medicaid claims being filed, even with the intervening links in the causal chain: Defendant argues that Relator has not stated a claim because he has not accounted for the independent actions of the physicians who wrote the off-label prescriptions and the pharmacists who accepted and filled the off-label prescriptions. In other words, Defendant argues that-as a matter of law-Relator's allegations cannot establish the causation requirement of the FCA because the actions of these professionals were an intervening force that breaks the chain of legal causation. *See [United States ex rel.] Cantekin [v. Univ. of Pittsburgh ],* 192 F.3d [402], 416 [ (3rd Cir.1999) ] (applying intervening cause analysis to claim under the FCA). Under black letter law, however, such an intervening force only breaks the causal connection when it is unforeseeable. *See id.* Accord D. Dobbs, et al., *Prosser and Keeton on Torts* § 44, at 303-04 (5th ed. 1984) ("The courts are quite generally agreed that [foreseeable intervening forces] will not supercede the defendant's responsibility."); Restatement (Second) of Torts § 443 (1965) ("The intervention of a force which is a normal consequence of a situation created by the actor's ...

conduct is not a superseding cause of harm which such conduct has been a substantial factor in bringing about."). In this case, when all reasonable inferences are drawn in favor of the Relator, the participation of doctors and pharmacists in the submission of false Medicaid claims was not only foreseeable, it was an intended consequence of the alleged scheme of fraud.

*Parke-Davis,* 147 F.Supp.2d at 52-53.

While it is now clear that Relator's theory of the case is not limited to a "scheme of fraud," the Court holds that Relator has presented evidence showing that it was foreseeable that Parke-Davis's conduct (including non-fraudulent promotion of off-label Neurontin uses) would ineluctably result in false Medicaid claims. *Cf. United States ex rel. Cantekin v. Univ. of Pittsburgh,* 192 F.3d 402, 416 (3rd Cir.1999) ("It is a basic principle of tort law that once a defendant sets in motion a tort, the defendant is generally liable for the damages ultimately caused, unless there are intervening causes.").

**\*6** Parke-Davis places heavy reliance on *United States ex rel. Kinney v. Hennepin County Medical Center,* Civ. Action. No. 971680 (RHK/JMM), 2001 WL 964011 (D. Minn. Aug 22, 2001). *Kinney* dealt with "claims to Medicare and Medicaid for the payment of ambulance services that [the realtor] allege[d] were false because the ambulance transports were not 'medically necessary." '*Id.*, at \*1. One of the defendants, a group of doctors that provided services to the defendant ambulance service, was alleged to have caused the false claims by "having its physicians falsely certify [the] ambulance runs as 'medically necessary' when they did not meet the either the Medicare or Medicaid criteria for medically necessary." *Id.* at \*8. The court rejected this causation argument. *See id.* at \*10. A critical factor was that the ambulance service's computerized accounting system *automatically* coded ambulance runs as "medically necessary," and that the physicians' determinations were irrelevant. *See id.* Here, in contrast, Relator has provided evidence that Parke-Davis's actions are not irrelevant, but rather played a key role in setting in motion a chain of events that led to false claims.

The instant case is closer to *United States ex rel. Pogue v. Diabetes Treatment Centers of America,* 238 F.Supp.2d 258 (D.D.C.2002). In that case, The Fourth Amended complaint describe[d] a twelve year fraudulent scheme in which [defendant] DTCA ran diabetes centers in various hospitals, and appointed doctors to serve as medical directors.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                  Page 5
Not Reported in F.Supp.2d, 2003 WL 22048255 (D.Mass.)
**(Cite as: Not Reported in F.Supp.2d)**

Relator alleges the doctors were paid not for their nominal services as medical directors, but on a per-patient basis for referring their patients to the DTCA centers, in violation of the Stark laws' prohibition of self-referral. See 42 U.S.C. § 1395nn. The hospitals in which the centers were housed paid DTCA a per-patient fee, which Relator alleges was a kickback of the type prohibited by the Anti-Kickback laws. See 42 U.S.C. § 1320a-7b(b). Then the hospitals submitted reimbursement claims to Medicare for the care provided to the patients.

_Pogue,_ 238 F.Supp.2d at 267. According to the relator, the reimbursement claims were false because they impliedly certified compliance with the Anti-Kickback and Stark laws. _Id._ at 261. Defendant DTCA "argue[d] that even if implied certification is a legitimate basis for Relator's claims, it cannot be held liable because it did not submit claims for Medicare reimbursement and did not certify compliance with healthcare statutes and regulations." _Id._ at 266. The court rejected this argument, stating, "An argument that the presentation of the claims was the work of another is unavailing as a means to avoid liability under the False Claims Act." _Id. Cf. United States v. Mackby,_ 261 F.3d 821, 824-26, 828 (9th Cir.2001) (affirming FCA liability of owner/managing director of physical-therapy clinic who instructed the clinic's billing company to use an improper code on Medicare reimbursement claim forms; stating, "[A] person need not be the one who actually submitted the claim forms in order to be liable"); _United v. Krizek,_ 111 F.3d 934, 935-37, 942 (D.C.Cir.1997) (where psychiatrist's wife submitted invalid Medicare and Medicaid reimbursement claims, stating, "[W]e note that [the psychiatrist] is no less liable than his wife for these false submissions.... Dr. Krizek delegated to his wife authority to submit claims on his behalf. In failing 'utterly' to review the false submissions, he acted with reckless disregard."); _see generally United States v. Neifert-White Co.,_ 390 U.S. 228, 233, 88 S.Ct. 959, 19 L.Ed.2d 1061 (1968) (holding that because the FCA is a remedial statute, it should not be given a cramped reading).

### 4. FCA Claim Based on Anti-Kickback Violations

**\*7** The government attempts to resuscitate a claim the Court dismissed, namely, that Parke-Davis's alleged violation of the Medicaid Anti-Kickback provision, 42 U.S.C. § 1320a-7b(b), caused false claims, because Medicaid claimants impliedly certify that their claims have not been tainted by kickbacks.

The Court agrees with the government that recent caselaw supports implied-certification FCA claims in the healthcare context, including kickback-based claims. _See, e.g., United States ex rel. Augustine v. Century Health Servs., Inc.,_ 289 F.3d 409, 415 (6th Cir.2002) (in Medicare-reimbursement context, stating, "[A] number of courts have held that a false implied certification may constitute a false or fraudulent claim even if the claim was not expressly false when it was filed. Instead, liability can attach if the claimant violates its continuing duty to comply with the regulations on which payment is conditioned. We adopt this theory of liability...."); _Mikes v. Straus,_ 274 F.3d 687, 700 (2nd Cir.2001) (holding that claimants of Medicare reimbursement implicitly certify that they have complied with statutes or regulations that expressly require compliance as a prerequisite to Medicare payments); _Pogue,_ 238 F.Supp.2d at 266 (affirming earlier holding that Medicare claimants impliedly certify compliance with Anti-Kickback laws, stating that "the developing law has supported [the court's] finding that violations of the Anti-Kickback and Stark laws can support a claim under the False Claims Act").

But while the Government's brief was persuasive on several points, the Government is (still) not a party to this suit, and the Court declines to use the Government's brief to revive Relator's claim. Evidence of kickbacks is relevant, however, to Relator's more clear-cut claim under § 3729(a)(1): Parke-Davis "caused to be presented" claims for reimbursement for off-label prescriptions that were ineligible for coverage under Medicaid.

### ORDER

Defendant Parke-Davis's Motion for Summary Judgment (Docket No. 292) is _DENIED._

D.Mass.,2003.
U.S. ex rel. Franklin v. Parke-Davis, Div. of Warner-Lambert Co.
Not Reported in F.Supp.2d, 2003 WL 22048255 (D.Mass.)

Briefs and Other Related Documents (Back to top)

• 2003 WL 22331142 (Trial Motion, Memorandum and Affidavit) United States' Statement of Interest in Opposition to Defendant Parke-Davis' Motion for Summary Judgment (May. 23, 2003)
• 1996 WL 33578368 (Trial Pleading) Complaint

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 6
Not Reported in F.Supp.2d, 2003 WL 22048255 (D.Mass.)
**(Cite as: Not Reported in F.Supp.2d)**

(Aug. 13, 1996)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.