UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re:  NEURONTIN MARKETING AND
        SALES PRACTICES LITIGATION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

THIS DOCUMENT RELATES TO:

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

HARDEN MANUFACTURING CORPORATION;
LOUISIANA HEALTH SERVICE INDEMNITY COMPANY,
dba BLUECROSS/BLUESHIELD OF LOUISIANA;
INTERNATIONAL UNION OF OPERATING ENGINEERS,
LOCAL NO. 68 WELFARE FUND; ASEA/AFSCME LOCAL
52 HEALTH BENEFITS TRUST; GERALD SMITH; and
LORRAINE KOPA, on behalf of themselves and all others
similarly situated, v. PFIZER INC. and WARNER-LAMBERT
COMPANY.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

THE GUARDIAN LIFE INSURANCE COMPANY OF
AMERICA v. PFIZER INC. and

AETNA, INC. v. PFIZER INC.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MDL Docket No. 1629

Master File No. 04-10981

Judge Patti B. Saris

Magistrate Judge Leo T. Sorokin

**MEMORANDUM OF LAW OF PFIZER INC. AND WARNER-LAMBERT COMPANY
IN SUPPORT OF THEIR OBJECTIONS TO REPORT AND RECOMMENDATION OF
MAGISTRATE JUDGE LEO T. SOROKIN DATED JANUARY 31, 2006**

DAVIS POLK & WARDWELL
450 Lexington Avenue
New York, NY 10017
(212) 450-4000

*Attorneys for Defendants Pfizer Inc.
and Warner-Lambert Company*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ........................................................................................................ii

PRELIMINARY STATEMENT ................................................................................................ 1

ARGUMENT ............................................................................................................................. 3

I.    THE CLAIM FOR UNJUST ENRICHMENT IN THE COORDINATED
      COMPLAINT SHOULD BE DISMISSED FOR FAILURE TO ALLEGE A LOSS .......... 3

II.   THE NEW JERSEY CONSUMER FRAUD ACT CLAIM
      IN THE CLASS COMPLAINT SHOULD BE DISMISSED ............................................... 4

      A.    The New Jersey Consumer Fraud Act Does Not Apply to Non-Residents ............ 5

      B.    The Third-Party Payors Are Not "Consumers" Under the Act ............................. 10

III.  THE COMMON LAW FRAUD CLAIM IN THE CLASS COMPLAINT
      SHOULD BE DISMISSED FOR FAILURE TO ALLEGE RELIANCE .......................... 12

IV.   THE CLASS COMPLAINT DOES NOT ADEQUATELY ALLEGE FRAUD ............... 14

      A.    Fraud Claims Regarding Monotherapy Should Be Dismissed ............................. 15

      B.    Fraud Claims Regarding Diabetic Neuropathy Should Be Dismissed ................. 18

      C.    Fraud Claims Regarding Bipolar Disorder Should Be Dismissed ........................ 21

      D.    Fraud Claims Regarding Panic Disorder Should Be Dismissed .......................... 23

      E.    Fraud Claims Regarding Migraine Should Be Dismissed ................................... 24

CONCLUSION ........................................................................................................................ 28

i

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

<u>Page</u>

In re Adelphia Communications Corp., 325 B.R. 89
(Bankr. S.D.N.Y.), <u>aff'd</u>, 331 B.R. 93 (S.D.N.Y. 2005)............................................................ 7, 9

In re Alkermes Sec. Litig., Civil No. 03-12091-RCL,
2005 U.S. Dist. LEXIS 25826 (D. Mass. Oct. 6, 2005) ............................................................... 18

Arc Networks, Inc., v. Gold Phone Card Co., 756 A.2d 636
(N.J. Super. Ct. Law Div. 2000)...................................................................................................... 10

Associated Builders, Inc. v. Ala. Power Co., 505 F.2d 97
(5th Cir. 1974)...................................................................................................................................... 27

BOC Group v. Lummus Crest, Inc., 597 A.2d 1109
(N.J. Super. Ct. Law Div. 1990)...................................................................................................... 10

Barrett Assocs. v. Aronson, 346 Mass. 150 (1963)........................................................................ 12

Beddall v. State St. Bank & Trust Co., 137 F.3d 12 (1st Cir. 1998)........................................... 15

Boyes v. Greenwich Boat Works, Inc., 27 F. Supp. 2d 543 (D.N.J. 1998).................................... 9

In re Buspirone Patent Litig., 185 F. Supp. 2d 363 (S.D.N.Y. 2002) ........................................... 4

In re Cabletron Sys., Inc., 311 F.3d 11 (1st Cir. 2002) ....................................................... passim

Chongris v. Bd. of Appeal, 811 F.2d 36 (1st Cir. 1987)................................................... 15, 16, 20

Coyne v. Somerville, 972 F.2d 440 (1st Cir. 1992) ............................................................... 22, 24

Evans v. Pearsons Enters., 434 F.3d 839 (6th Cir. 2006) ........................................................... 12

Fairview Mach. & Tool Co. v. Oakbrook Int'l, Inc.,
77 F. Supp. 2d 199 (D. Mass. 1999) ................................................................................................. 3

Gantes v. Kason Corp., 679 A.2d 106 (N.J. 1996) ......................................................................... 9

Goshen v. Mut. Life Ins. Co. of N.Y., 774 N.E.2d 1190 (N.Y. 2002)............................................ 7

Hundred E. Credit Corp. v. Eric Schuster Corp., 515 A.2d 246
(N.J. Super. Ct. App. Div. 1986)...................................................................................................... 10

**Page**

Int'l Union of Operating Eng'rs Local No. 68 Welfare Fund v. Merck & Co.,
No. ATL-L-3015-04 (N.J. Super. Ct. Law. Div. July 8, 2004).....................................................11

Island Mortgages of N.J. v. 3M, 860 A.2d. 1013
(N.J. Super. Ct. Law Div. 2004).........................................................................................................5

Kavky v. Herbalife Int'l of Am., 820 A.2d 677
(N.J. Super. Ct. App. Div. 2003).....................................................................................................11

Lewis Tree Serv., Inc. v. Lucent Techs. Inc., 211 F.R.D. 228
(S.D.N.Y. 2002) ....................................................................................................................................7

In re Lupron Mktg. & Sales Practices Litig., 295 F. Supp. 2d 148
(D. Mass. 2003)...............................................................................................................................3, 12

In re Lupron Mktg. & Sales Practices Litig., No. 01-CV-10861-RGS,
2004 U.S. Dist. LEXIS 18512 (D. Mass. Sept. 16, 2004)...........................................................13

Lyon v. Caterpillar, Inc., 194 F.R.D. 206 (E.D. Pa. 2000) ......................................................6, 9

In re Managed Care Litig., 298 F. Supp. 2d 1259 (S.D. Fla. 2003)...........................................10

Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.,
412 F. 3d 215 (1st Cir. 2005) ..............................................................................................................3

Med. Soc'y of N.J. v. AmeriHealth HMO, Inc., 868 A.2d 1162
(N.J. Super. Ct. App. Div. 2005).....................................................................................................10

Med. Soc'y of N.J. v. Oxford Health Plans, Inc., No. A-1485-03T1
(N.J. Super. Ct. App. Div. Feb. 14, 2005).....................................................................................10

Montgomery v. New Piper Aircraft, Inc., 209 F.R.D. 221 (S.D. Fla. 2002)...........................6, 8

In re No. Nine Visual Tech. Corp. Sec. Litig., 51 F. Supp. 2d 1
(D. Mass. 1999).................................................................................................................................17

Payne v. Goodyear Tire & Rubber Co., 216 F.R.D. 21
(D. Mass. 2003)...................................................................................................................................4

Peterson v. BASF Corp., 618 N.W.2d 821 (Minn. Ct. App. 2000) .............................................9

In re Pharma. Indus. Average Wholesale Price Litig.,
230 F.R.D. 61 (D. Mass. 2005) ..........................................................................................................8

**Page**

In re Relafen Antitrust Litig., 221 F.R.D. 260 (D. Mass. 2004) ...................................................... 4

In re Rezulin Prod. Liab. Litig., 392 F. Supp. 2d 597 (S.D.N.Y. 2005) .................................. 11, 12

Rivera v. Wyeth-Ayerst Labs., 283 F.3d 315 (5th Cir. 2002) ........................................................ 4

Rogers v. Cisco Sys., 268 F. Supp. 2d 1305 (N.D. Fla. 2003) ...................................................... 14

Sandberg v. McDonald, 248 U.S. 185 (1918) ................................................................................ 6

Shaw v. Digital Equip. Corp., 82 F.3d 1194 (1st Cir. 1996) ............................................. 15, 16, 27

Shaw v. Hyatt Int'l Corp., No. 05-C-5022,
2005 U.S. Dist. LEXIS 28250 (N.D. Ill. Nov. 15, 2005) ............................................................. 7

Small v. Fritz Co., 65 P.3d 1255 (Cal. 2003) ............................................................................... 14

Smith v. Mitlof, 198 F. Supp. 2d 492 (S.D.N.Y. 2002) ................................................................ 13

United States ex rel. Karvelas v. Melrose-Wakefield Hosp.,
360 F.3d 220 (1st Cir.), cert. denied, 543 U.S. 820 (2004) ................................................... 21, 22

In the Matter of Wade, 969 F.2d 241 (7th Cir. 1992) ................................................................... 20

Zouras v. Hallman, Civil No. 03-240-SM,
2004 U.S. Dist. LEXIS 19684 (D.N.H. Sept. 30, 2004) ....................................................... 17, 18

**Statutes & Rules**

Fed. R. Civ. P. 9(b)................................................................................................................... passim

Fed. R. Civ. P. 12(b)(6)............................................................................................................ 1, 15

**Other Authorities**

73 Am. Jur. 2d Statutes § 250 ....................................................................................................... 6

Manual for Complex Litigation, Fourth, § 21.133 (2004) ............................................................. 5

Moore's Manual:  Federal Practice and Procedures § 11.24 (2005)............................................. 10

Defendants Pfizer Inc. and Warner-Lambert Company respectfully submit this memorandum of law in support of certain of their objections to Magistrate Judge Leo T. Sorokin's Report and Recommendation dated January 31, 2006 (the "Report"), which made recommendations regarding defendants' motions to dismiss the Amended Class Action Complaint (the "Class Complaint") and the First Coordinated Amended Complaint (the "Coordinated Complaint") pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b). Defendants have raised other objections to the Report in the filing that accompanies this memorandum.

## PRELIMINARY STATEMENT

The Report correctly recommended dismissal of the majority of plaintiffs' claims, but it incorrectly would permit a minority of their claims to go forward, albeit in substantially limited form. The Class Complaint and the Coordinated Complaint should be dismissed in their entireties for the following reasons.

The Report recommended that all of the claims in the Coordinated Complaint except the claim for unjust enrichment be dismissed. The unjust enrichment claim should be dismissed as well because injury or loss is an essential element of unjust enrichment and Magistrate Sorokin found that the Coordinated Plaintiffs failed to allege any injury or loss.

The Report also recommended that limited versions of two of the claims in the Class Complaint – the New Jersey Consumer Fraud Act (the "NJCFA") and common law fraud claims – should survive dismissal. These fraud claims should be dismissed for several reasons.

First, the Report erred by not deciding whether plaintiffs have standing under the NJCFA. This issue should be decided now and in defendants' favor. None of the class representatives has alleged a nexus with New Jersey sufficient to warrant the protection of the NJCFA. And as a

matter of law, the four third-party payor class representatives – all sophisticated businesses – are not "consumers" within the meaning of the NJCFA and thus cannot bring suit under that statute.

Second, this Court should dismiss the common law fraud claim in the Class Complaint for failure to plead reliance. The Federal Rules of Civil Procedure require that this integral element of common law fraud be alleged with specificity. The Class Complaint alleges reliance only in the most conclusory way, stating merely that plaintiffs "reasonably relied upon Defendants' misrepresentations and omissions of material fact." None of the class representatives has identified any statement that they or their physicians relied upon, much less alleged why that statement was false or misleading, and therefore their common law fraud claim must be dismissed under Rule 9(b).

Finally, this Court should dismiss the NJCFA and common law fraud claims even in the limited form approved by the Report. According to Magistrate Judge Sorokin, the Class Complaint properly stated a claim of fraud as to two theories: that defendants misrepresented the results of scientific studies about Neurontin and that defendants fraudulently omitted contrary scientific evidence regarding Neurontin. These theories of fraud relate to five off-label uses: monotherapy, diabetic neuropathy, bipolar disorder, panic disorder, and migraine. What few details plaintiffs have alleged under these theories are flatly contradicted by the very documents that have been incorporated by reference in the complaint. Those documents demonstrate that there is no factual basis for any of these fraud allegations and raise serious questions regarding the propriety of plaintiffs' pleading. Furthermore, the purported misrepresentations upon which these theories are based have not been alleged with the particularity required by Rule 9(b). Accordingly, the Class Complaint should also be dismissed in its entirety.

**ARGUMENT**

**I.     THE CLAIM FOR UNJUST ENRICHMENT
IN THE COORDINATED COMPLAINT SHOULD
BE DISMISSED FOR FAILURE TO ALLEGE A LOSS**

The Report recommended that the Coordinated Plaintiffs' claim for unjust enrichment

should survive dismissal.  If the Court accepts this recommendation without modification, this

claim would be the sole surviving claim from the Coordinated Complaint.  Report at 57.

Because the Coordinated Plaintiffs failed to allege that they suffered an injury, however, their

claim for unjust enrichment must also be dismissed.

Magistrate Judge Sorokin properly stated the elements of unjust enrichment:  "(1) an

enrichment, (2) an impoverishment, (3) a relation between the enrichment and the

impoverishment, (4) the absence of justification and (5) the absence of a remedy provided by

law."  Id. at 53-54 (quoting In re Lupron Mktg. & Sales Practices Litig., 295 F. Supp. 2d 148,

182 (D. Mass. 2003)).  To plead the second element, impoverishment, plaintiffs must allege that

they suffered some loss.  See Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc., 412 F.

3d 215, 234 n.7 (1st Cir. 2005); Fairview Mach. & Tool Co. v. Oakbrook Int'l, Inc., 77 F. Supp.

2d 199, 204 (D. Mass. 1999).  Magistrate Judge Sorokin concluded that while the Class

Complaint alleged injury, Report at 21, the Coordinated Complaint did not, id. at 22 (stating that

the Coordinated Plaintiffs "have failed to allege a cognizable injury"); see id. at 54 (stating that

the Coordinated Plaintiffs "have no adequate remedy at law due to their failure to allege

cognizable injury").  The magistrate judge reached this conclusion because the Coordinated

Plaintiffs did not allege that Neurontin was ineffective for its off-label uses.  Id. at 21-22.

Having failed to allege any injury or loss, the Coordinated Complaint has likewise failed to

allege an impoverishment.  This failure to allege an essential element of the claim requires

dismissal even if plaintiffs can allege the fifth and final element involving the availability of an

adequate legal remedy.  The Coordinated Plaintiffs' claim for unjust enrichment should therefore be dismissed.

## II.    THE NEW JERSEY CONSUMER FRAUD ACT CLAIM IN THE CLASS COMPLAINT SHOULD BE DISMISSED

The class plaintiffs have brought their consumer fraud claim under *one* statute:  the NJCFA.  None of them, however, states a claim under the NJCFA or alleges facts to show that he, she, or it has standing under the statute.  Specifically, none of the class representatives alleges a nexus with New Jersey sufficient to warrant the protection of the NJCFA, and the third-party payor plaintiffs have no standing under the NJCFA for the additional reason that they are not "consumers" within the meaning of the statute.  These two pleading failures are basic and fatal defects that require dismissal of the NJCFA claim.  Such dismissal should not be postponed.

Seeking to delay the inevitable, plaintiffs attempted in prior filings to characterize one of defendants' two grounds for dismissal of the NJCFA claim as a choice-of-law issue that should be deferred to class certification or summary judgment.[1]  This characterization is a red herring, which the Report erroneously accepted and applied to both grounds.  Report at 53.[2]  The class has not alleged consumer fraud claims under the statutes of the multiple states, which would

---

[1] Plaintiffs cited three decisions for the proposition that choice-of-law issues are more appropriately addressed at the class certification or summary judgment stage.  Joint Memorandum of Law of the Class and Coordinated Plaintiffs in Opposition to Defendants' Motions To Dismiss, dated Apr. 29, 2005 ("Pls.' Opp'n") at 26-27 (citing In re Relafen Antitrust Litig., 221 F.R.D. 260 (D. Mass. 2004), Payne v. Goodyear Tire & Rubber Co., 216 F.R.D. 21, 27 (D. Mass. 2003), and In re Buspirone Patent Litig., 185 F. Supp. 2d 363, 377 (S.D.N.Y. 2002)).  All three of these decisions are distinguishable because they all involve class plaintiffs that brought claims under multiple state statutes, making a choice-of-law analysis necessary.  Relafen recognized that where "the standing question would exist whether [the class representative] filed her claim alone or as part of the class," the court must decide standing before addressing class certification.  221 F.R.D. at 268 (quoting Rivera v. Wyeth-Ayerst Labs., 283 F.3d 315, 319 & n.6 (5th Cir. 2002)).

[2] Plaintiffs argued that consideration of extraterritorial application of the NJCFA should be deferred to the class certification or summary judgment stage, but even they did not suggest that the additional standing issue under the NJCFA — whether the third-party payors are consumers under the act — should not be resolved now.  Pls.' Opp'n at 24-27; Joint Surreply Memorandum of Law of the Class and Coordinated Plaintiffs in Opposition to Defendants' Motions To Dismiss, dated June 3, 2005 ("Pls.' Surreply") at 16-19.

potentially require a choice-of-law analysis.  It has chosen to bring a single claim under the law

of one state: New Jersey.  Because the class has chosen the law, there is no need for the Court to

do so.  The problem for the class representatives is that none of them has alleged a valid claim

under the statute that they have invoked.  This failure requires dismissal of their NJCFA claim –

without any choice of law analysis.

### A.    The New Jersey Consumer Fraud Act Does Not Apply to Non-Residents

This Court should dismiss the NJCFA claim because all of the class representatives

(except International Union of Operating Engineers, Local No. 68 Welfare Fund ("Local 68"))

are non-residents of New Jersey, and none of them (including Local 68) has alleged any nexus

with the state sufficient to permit his, her, or its NJCFA claim to proceed.  The Report declined

to decide whether the NJCFA could be applied to the claims of non-residents, explaining that this

should be considered at a later stage, "when the laws of the fifty states will be applied to discrete

groups of plaintiffs based upon their domicile."  Report at 53.  The class, however, did not assert

consumer fraud claims under the laws of every state; after ample reflection, they selected the law

of a single state, New Jersey.  Therefore, the premise for the Report's recommendation on this

point was incorrect; there will be no subsequent application of "the [consumer fraud] laws of the

fifty states."  Id.

There are several additional reasons why the viability of the NJCFA claim should be

determined now.  First, New Jersey courts regularly dismiss claims where the plaintiff fails to

plead facts to support a finding that it has standing.  See, e.g., Island Mortgages of N.J. v. 3M,

860 A.2d 1013, 1016-18 (N.J. Super. Ct. Law Div. 2004) (dismissing a class action NJCFA

claim for lack of standing).  Second, judicial economy would best be served by deciding now

whether a cause of action has been stated under the NJCFA.  See Manual for Complex

Litigation, Fourth, § 21.133 (2004).  Finally, defendants should not be required to take class

discovery from class representatives who cannot even allege, much less prove, a claim under the

NJCFA.  See id.

 As defendants explained in their moving briefs, non-residents without sufficient

connection to New Jersey cannot bring claims under the NJCFA.[3]  As an initial matter, there is a

general presumption against application of a state statute to non-residents because a state's laws

are "presumptively territorial and confined to limits over which the law-making power has

jurisdiction."  Sandberg v. McDonald, 248 U.S. 185, 195 (1918); see 73 Am. Jur. 2d Statutes §

250 ("[U]nless the intention . . . is clearly expressed or indicated by its language, purpose,

subject matter, or history, no legislation is presumed to be intended to operate outside the

territorial jurisdiction of the state or country enacting it.").  This is particularly true in the case of

consumer protection statutes, which are "designed to either protect state residents or protect

consumers engaged in transactions within the state."  See Lyon v. Caterpillar, Inc., 194 F.R.D.

206, 215 (E.D. Pa. 2000).  Indeed, extraterritorial application of state consumer protection laws

infringes on other states' regulatory regimes, in contravention of the Commerce Clause.  See

Defs.' Mem. at 24-25; Defs.' Reply at 23; Montgomery v. New Piper Aircraft, Inc., 209 F.R.D.

221, 228 (S.D. Fla. 2002) (accepting report and recommendation, which found that the

Commerce Clause prevents application of the Florida consumer protection statute to non-

residents).

---

[3] Memorandum of Law of Pfizer Inc. and Warner-Lambert Company in Support of Their Motions To Dismiss the Amended Class Action Complaint and the First Coordinated Amended Complaint, dated Mar. 17, 2005 ("Defs.' Mem.") at 24-25; Reply Memorandum of Law of Pfizer Inc. and Warner-Lambert Company in Further Support of Their Motions To Dismiss the Amended Class Action Complaint and the First Coordinated Amended Complaint, dated May 16, 2005 ("Defs.' Reply") at 23-25.

The NJCFA claims of the non-resident plaintiffs should be dismissed because that statute provides no cause of action for non-residents whose claims are otherwise unconnected to the state. The one court that has specifically considered the issue of whether non-resident class members could bring an action under the NJCFA held that they had no basis upon which to assert such a claim where they had not alleged "sufficient connections with New Jersey." See Lewis Tree Serv., Inc. v. Lucent Techs. Inc., 211 F.R.D. 228, 233 (S.D.N.Y. 2002) ("There is no basis from which to conclude that sales made by the defendants, to class members who are scattered throughout the country would provide a basis for those individuals or entities to bring claims under the NJCFA."). A number of other courts have also found it appropriate to dismiss consumer protection claims at this stage of the litigation where non-residents had not alleged a sufficient nexus to the state. See, e.g., Goshen v. Mut. Life Ins. Co. of N.Y., 774 N.E.2d 1190 (N.Y. 2002); Shaw v. Hyatt Int'l Corp., No. 05-C-5022, 2005 U.S. Dist. LEXIS 28250, at *5-8 (N.D. Ill. Nov. 15, 2005); In re Adelphia Communications Corp., 325 B.R. 89, 99-105 (Bankr. S.D.N.Y.) (refusing to apply Pennsylvania's consumer protection statute to non-residents based in part on a survey of case law, which found that these "decisions overwhelming [sic] require a denial of standing here"), aff'd, 331 B.R. 93 (S.D.N.Y. 2005).

To rebut this standing argument, plaintiffs must allege facts to show that they have claims under the NJCFA. None has. None of the class representatives has alleged that he, she, or it heard or read any misrepresentations in New Jersey. None has alleged that his, her, or its covered individuals' physicians heard or read any misrepresentations in New Jersey. The individual plaintiffs did not reside in New Jersey. Amended Class Action Complaint ("ACC") ¶¶ 9-10. Only one of the class representatives, Local 68, is located in New Jersey, and even it has not identified any misrepresentations or other misconduct in New Jersey that violated the

statute or caused its alleged loss.  Accordingly, the class representatives have utterly failed to plead a claim under the NJCFA.

Plaintiffs make much of the fact that Warner-Lambert Company was headquartered in New Jersey[4] and allege that a fraudulent marketing scheme emanated from there.  As defendants have previously explained, however, the location of a company's headquarters provides no basis for applying the consumer protection statute of that state to plaintiffs in other jurisdictions. Defs.' Mem. at 25 n.11; Defs.' Reply at 24; see New Piper Aircraft, 209 F.R.D. at 229.  In fact, this Court has held that even when an alleged misrepresentation was devised at and emanated from a pharmaceutical drug manufacturer's headquarters, there still could be no nationwide claim based on that state's law.  See In re Pharm. Indus. Average Wholesale Price Litig., 230 F.R.D. 61, 83 (D. Mass. 2005) ("Courts have generally rejected application of the law of a defendant's principal place of business to a nationwide class.").

Moreover, none of the conduct relating to the two remaining theories of fraud occurred in New Jersey.  As analyzed by Magistrate Judge Sorokin, the only actionable allegations involve alleged misrepresentations regarding Neurontin's treatment of monotherapy, bipolar disorder, panic disorder, diabetic neuropathy, and migraine.  Report at 46-47, 49-50.  When these allegations are examined, it is evident that none involve conduct that allegedly occurred in New Jersey.  See ACC ¶¶ 135-39, 149-56, 162-81.  Thus, there is no basis for allowing the class representatives' NJCFA claim to survive dismissal, especially where these plaintiffs have had access to extensive discovery from defendants and years to investigate their claims.

---

[4] The Report erroneously stated that defendant Pfizer Inc. is headquartered in New Jersey.  Report at 3. Plaintiffs allege, ACC ¶ 11, and defendants acknowledge, that Pfizer is headquartered in New York.

While plaintiffs have not denied that state consumer protection statutes should generally be limited to the claims of resident consumers, they cite examples where a court, making a choice-of-law decision, selected New Jersey law. Pls.' Surreply at 19 n.12. As an initial matter, these cases are irrelevant because they did not involve a question of whether plaintiff had stated a claim under the statute. Moreover, in all of these choice-of-law decisions, there was a nexus between the state and the defendants that is markedly absent in this action because the cases involved conduct *that occurred within the state of New Jersey*. For example, <u>Boyes v. Greenwich Boat Works, Inc.</u>, 27 F. Supp. 2d 543 (D.N.J. 1998), which has been determined to be inapplicable to nationwide class actions by a New Jersey court, Defs.' Reply at 25, is distinguishable as:

> just another example of the cases that hold that a state's consumer protection law can protect nonresidents when they visit the state that enacted the law, and are defrauded on their visit. . . . [I]t most assuredly was not an expression of views as to whether the [NJCFA] . . . would be construed as to make it applicable to individuals around the country.

<u>Adelphia</u>, 325 B.R. at 105; <u>see also</u> <u>Lyon</u>, 194 F.R.D. at 218 (interpreting <u>Boyes</u> as indicating that a single state's law cannot be applied to a nationwide class of consumers).[5] In fact, the cases cited by plaintiffs demonstrate the opposite of the proposition for which they are cited: namely, that the class representatives have not adequately alleged their NJCFA claim because they have not alleged a nexus with the state of New Jersey.

---

[5] Another decision cited by plaintiffs, <u>Peterson v. BASF Corp.</u>, 618 N.W.2d 821 (Minn. Ct. App. 2000), did not analyze the issue of whether the NJCFA should be applied extraterritorially, and thus the decision has no value as a precedent. Plaintiffs also cite <u>Gantes v. Kason Corp.</u>, in which the New Jersey Supreme Court recognized that extraterritorial application of New Jersey law risks forum-shopping when there are only "slender ties" to the state, but held that this was not the case in an individual products liability action where the product was manufactured in New Jersey. 679 A.2d 106, 112-13 (N.J. 1996). Here the product was not manufactured in New Jersey and this is a class action, not an individual products liability action.

**B.** **The Third-Party Payors Are Not "Consumers" Under the Act**

Similarly, this Court should dismiss the NJCFA claim of the third-party payors because these plaintiffs are not consumers within the meaning of the statute. As stated above, it is appropriate to dismiss a claim if "the allegations of the complaint fail to show that the plaintiff has standing to bring the claim for relief." Moore's Manual: Federal Practice and Procedure § 11.24 (2005). Recognizing this, various New Jersey courts have dismissed NJCFA claims by sophisticated corporate entities for lack of standing. See, e.g., Arc Networks, Inc. v. Gold Phone Card Co., 756 A.2d 636 (N.J. Super. Ct. Law Div. 2000); BOC Group v. Lummus Crest, Inc., 597 A.2d 1109 (N.J. Super. Ct. Law Div. 1990). No choice-of-law analysis was required.

As defendants explained in their moving papers, the NJCFA was designed to protect consumers within the traditional meaning of the word, and its protections were never meant to extend to sophisticated institutions engaging in business transactions, like the third-party payors. Defs.' Mem. at 23; Defs.' Reply at 21-23. Under the NJCFA, a consumer is defined as "one who uses (economic) goods, and so diminishes or destroys their utilities." Hundred E. Credit Corp. v. Eric Schuster Corp., 515 A.2d 246, 248 (N.J. Super. Ct. App. Div. 1986). The third-party payors do not allege that they consumed or otherwise made use of Neurontin in the manner contemplated by the NJCFA. Rather, the Class Complaint makes clear that the third-party payors paid or reimbursed for the use of Neurontin by others. ACC ¶¶ 5-8. Such third-party payors do not themselves qualify as consumers under the NJCFA and thus, lack standing. See Med. Soc'y of N.J. v. AmeriHealth HMO, Inc., 868 A.2d 1162, 1167-68 (N.J. Super. Ct. App. Div. 2005) (refusing to apply the NJCFA to a third-party payor); Med. Soc'y of N.J. v. Oxford Health Plans, Inc., No. A-1485-03T1 (N.J. Super. Ct. App. Div. Feb. 14, 2005) (see Declaration of Patrick J. Murray, dated Mar. 3, 2006 ("Murray Decl."), Ex. 1); cf. In re Managed Care Litig., 298 F. Supp. 2d 1259, 1303-04 (S.D. Fla. 2003) (finding physician providers are not consumers

10

within the meaning of the NJCFA).  Accordingly, the NJCFA claim of the third-party payors should be dismissed.

In opposition, plaintiffs have argued that the definition of "consumer" is not limited to entities that use the goods in question.  Pls.' Opp'n at 24-25; Pls.' Surreply at 16-17.  In support of this argument, plaintiffs rely upon two decisions:  Kavky v. Herbalife International of America, 820 A.2d 677 (N.J. Super. Ct. App. Div. 2003), and International Union of Operating Engineers Local No. 68 Welfare Fund v. Merck & Co., No. ATL-L-3015-04 (N.J. Super. Ct. Law. Div. July 8, 2004) (see Murray Decl. Ex. 2).  As defendants have explained, however, Kavky does not assist plaintiffs for two reasons.  First, although the Kavky court noted that some goods, such as franchise licenses, are not capable of being diminished, Kavky did not modify the Hundred East definition of consumer in any way that is meaningful here because Neurontin is certainly capable of being diminished.  Defs.' Reply at 21-22.  Second, Kavky did not expand the definition of a consumer to encompass third-party payors that did not engage in a consumer transaction.  Id. at 22.  Rather, the Kavky court found that the acquisition of a vitamin distributorship by individuals who answered an Internet advertisement and paid $85 to be a vitamin distributor was a consumer transaction because the franchises were made widely available to the public and hence, involved the same type of mass-market transaction issues to which the NJCFA was intended to apply.  820 A.2d at 684.

Plaintiffs' reliance on International Union is similarly unavailing.  Defs.' Reply at 22-23. A New York district court has recently declined to follow that decision in a case involving the same third-party payors in this case.  See In re Rezulin Prod. Liab. Litig., 392 F. Supp. 2d 597, 617 n.109 (S.D.N.Y. 2005) (declining to follow International Union because it is a trial court decision that is "inconsistent with the [New Jersey] appellate authorities allowing only a

11

consumer to sue"). Based on a survey of New Jersey law, the <u>Rezulin</u> court provided a thorough

explanation for why a third-party payor cannot bring a claim under the NJCFA:

> The New Jersey courts have construed the [NJCFA] to permit only a "consumer"
> to sue. Although the courts are not in uniform agreement, a frequently used
> definition of "consumer" in New Jersey is "one who uses (economic) goods, and
> so diminishes or destroys their utilities." Under this definition, [the third party-
> payor] was not a consumer of prescription drugs. Cases declining to adopt
> categorically this definition of "consumer" also do not avail the plaintiffs because
> even those appear to take for granted that the plaintiff must be the one who
> in some sense benefits from the use of the good or service in question. [The third
> party-payor] was no such thing. Accordingly, [the third-party payor] could not
> recover under the CFA.

<u>Id.</u> at 616-17. The entity at issue in <u>Rezulin</u> was Louisiana Blue Cross, one of the class

representatives here. This Court should find, for the same reasons, that Louisiana Blue Cross

and the other third-party payors have no standing to assert a claim under the NJCFA.

## III.  THE COMMON LAW FRAUD CLAIM IN THE CLASS COMPLAINT SHOULD BE DISMISSED FOR FAILURE TO ALLEGE RELIANCE

The class claim for common law fraud should be dismissed for failure to plead reliance.

As Magistrate Judge Sorokin explained, to succeed on a common law fraud claim, a plaintiff

must show that (i) defendant falsely represented a material fact, (ii) for the purpose of inducing

the victim to act thereon, and (iii) that the victim did rely upon the representation to his

detriment. Report at 53 (citing <u>Barrett Assocs. v. Aronson</u>, 346 Mass. 150, 152 (1963)); <u>see</u> <u>In re</u>

<u>Lupron Mktg. & Sales Practices Litig.</u>, 295 F. Supp. 2d 148, 181 (D. Mass. 2003). The Report

assessed whether the plaintiffs alleged the first two elements of this claim. Report at 53. It did

not, however, determine whether they alleged the third element: reliance. <u>Id.</u>

The Federal Rules of Civil Procedure require that the elements of a claim sounding in

fraud be alleged with particularity. Fed. R. Civ. P. 9(b). This requirement applies to the element

of reliance. <u>See, e.g.</u>, <u>Evans v. Pearsons Enters.</u>, 434 F.3d 839, at *33-34 (6th Cir. 2006)

(holding that "[c]onclusory statements of reliance are not sufficient to explain with particularity

how [plaintiff] detrimentally relied on the alleged fraud"); <u>Smith v. Mitlof</u>, 198 F. Supp. 2d 492,

504-05 (S.D.N.Y. 2002) (ruling that the complaint's allegation that the plaintiffs reasonably

relied on the fraudulent representations was insufficient to meet the heightened pleading

requirements of Rule 9(b)).  Review of the Class Complaint demonstrates that reliance has not

been alleged with anything approaching particularity.[6]  The Class Complaint nowhere alleges

that any of the class representatives relied upon any alleged statements made by defendants.  In

fact, the Class Complaint does not even allege that the physicians who prescribed Neurontin to

the individual plaintiffs and the third-party payors' covered individuals relied upon any such

representations when deciding to prescribe Neurontin.  All that the class representatives have

alleged is that they "reasonably relied upon Defendants' misrepresentations and omissions of

material fact."  ACC ¶ 314.  This conclusory allegation is insufficient as a matter of law.

Plaintiffs must plead actual reliance on specific misstatements.  <u>See</u> <u>In re Lupron Mktg.</u>

<u>& Sales Practices Litig.</u>, No. 01-CV-10861-RGS, 2004 U.S. Dist. LEXIS 18512, at *14-15 (D.

Mass. Sept. 16, 2004) ("Lupron II").  The <u>Lupron II</u> court dismissed the plaintiff's common law

fraud action where plaintiff "ritually recite[d] 'reasonable reliance' and a purpose on the part of

[the defendant] to induce [plaintiff] to make higher payments," but pled no concrete facts in

support of these generic allegations.  <u>Id.</u>  As the court held in <u>Lupron II</u>, to survive a motion to

dismiss, the plaintiffs must plead factual allegations explaining how they came to rely on the

alleged statements or the extent to which they influenced the plaintiffs' behavior.  <u>See id.</u> at *15.

As another court has explained:  "The plaintiff must allege actions, as distinguished from

unspoken and unrecorded thoughts and decisions, that would indicate that the plaintiff actually

---

[6] Defendants do not address here the Coordinated Complaint's identical failure to allege reliance with particularity because the Report has recommended dismissal of the Coordinated Plaintiffs' claim for common law fraud on other grounds.

relied upon the misrepresentations." Small v. Fritz Co., 65 P.3d 1255, 1265 (Cal. 2003); see

Rogers v. Cisco Sys., 268 F. Supp. 2d 1305, 1314 (N.D. Fla. 2003). General averments of

reliance are not sufficient.

The class representatives Smith and Kopa do not allege which statements their physicians

relied upon, or even that they were exposed to any statements. Likewise, the third-party payors

do not identify any of their covered individuals whose physicians relied upon or were exposed to

allegedly fraudulent statements. Without even alleging exposure to fraudulent statements, it is

incomprehensible how plaintiffs could have relied on such statements. Accordingly, all of the

claims sounding in fraud should be dismissed for failure to plead the element of reliance with the

requisite particularity.

## IV.    THE CLASS COMPLAINT DOES NOT ADEQUATELY ALLEGE FRAUD

The NJCFA and common law fraud claims in the Class Complaint should also be

dismissed for the separate and independent reason that plaintiffs fail to allege any instances of

fraud. Magistrate Judge Sorokin properly concluded that most of the fraud allegations should be

dismissed. Report at 30-53, 56-57. The Report, however, recommended that this Court decline

to dismiss the fraud allegations based on two theories of fraud: (i) that defendants

misrepresented the results of scientific studies; and (ii) that defendants fraudulently omitted

contrary scientific evidence. Id. at 46-47, 49-50, 56-57. These theories relate to five off-label

uses, each of which is discussed below. Because the class has failed to allege any instances of

fraud under these two limited theories outlined by the magistrate judge, the common law fraud

and NJCFA claims should be dismissed in their entirety.[7]

---

[7] Defendants do not concede that these two theories are legally viable even if plaintiffs were to allege
instances of fraud with particularity under these theories.

**A.     Fraud Claims Regarding Monotherapy Should Be Dismissed**

The fraud claims based on allegations regarding monotherapy must be dismissed because these allegations are directly contrary to, and mischaracterize, the documents upon which the plaintiffs rely and which have been incorporated by reference into the Class Complaint.  The Report concluded that plaintiffs sufficiently alleged fraud regarding monotherapy by alleging that two physicians – Drs. Harden and LeRoy – misrepresented the results of defendants' monotherapy study at a consultants' meeting.  Report at 46.  The Report relied upon plaintiffs' allegations that these doctors (i) "falsely claimed that the [defendants'] study did not evidence a failure of Neurontin's efficacy," (ii) "misrepresented the lack of a dose response" in the study, and (iii) made misrepresentations regarding the success of an Eastern European study.  Id. (citing ACC ¶ 167).  Although the Class Complaint does in fact make such allegations, those allegations are flatly contradicted by the documents from which they are drawn and which are the only support for these allegations.

On a motion to dismiss pursuant to Rule 12(b)(6), a court may consider documents beyond the complaint where those documents have been incorporated by reference.  See Beddall v. State St. Bank & Trust Co., 137 F.3d 12, 17 (1st Cir. 1998) (explaining that "the court's inquiry into the viability of those allegations should not be hamstrung simply because the plaintiff fails to append to the complaint the very document upon which by her own admission the allegations rest").  Equally important, the Court need not accept allegations that are directly negated by documents incorporated in the complaint.  See Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1220-21 (1st Cir. 1996); Chongris v. Bd. of Appeal, 811 F.2d 36, 37 (1st Cir. 1987) (dismissing plaintiffs' allegation where plainly contradicted by attachments to the complaint).

A simple reading of the meeting transcript relied upon by plaintiffs reveals that the allegations regarding monotherapy are patently false.  First, Drs. Harden and LeRoy did not state

that defendants' monotherapy study evidenced Neurontin's efficacy, as plaintiffs allege.  ACC ¶

167.  Rather, Dr. LeRoy clearly acknowledged that this study "was *unsuccessful in showing*

*efficacy*."  Murray Decl. Ex. 3 at WL 04391 (emphasis added).  Second, although plaintiffs

allege that these physicians misrepresented the lack of a dose response to Neurontin

monotherapy, ACC ¶ 167, the transcript of the meeting reveals that Dr. Harden conceded that the

monotherapy study did not show a dose response.  Murray Decl. Ex. 4 at X000379 ("Other

people have been demonstrating that higher doses seem to have more effect.  *I don't think this*

*[monotherapy] study really demonstrated that*." (emphasis added)).  Third, Drs. Harden and

LeRoy did not misrepresent that an Eastern Europe clinical trial of monotherapy was successful.

ACC ¶ 167.  In fact, neither of them ever discussed an "Eastern" European study at this

consultants' meeting.  Dr. LeRoy referred to unspecified European studies, but nothing in the

transcript suggests that by this statement, he was referencing an *Eastern* European study.

Murray Decl. Ex. 3 at WL 04391.  Thus, because plaintiffs' allegations regarding

misrepresentations by Drs. Harden and LeRoy are flatly contradicted by the transcript of their

actual statements, these allegations must be dismissed.  See Shaw, 82 F.3d at 1220; Chongris,

811 F.2d at 37.

    In addition, the allegations regarding Drs. Harden and LeRoy should be dismissed

because plaintiffs have failed to plead, with Rule 9(b) specificity, facts that would permit these

physicians' statements to be imputed to defendants.  Having dismissed plaintiffs' RICO claims

and thus, their allegations of a culpable RICO enterprise, Magistrate Judge Sorokin properly

recognized that there is an issue regarding whether plaintiffs pled sufficient facts such that

defendants may be held liable for statements made by certain physicians "who are neither parties

16

to the instant matter, nor employees of the defendants." Report at 29, 38. The Report incorrectly concluded, however, that plaintiffs have pled sufficient facts. Id. at 39.

The First Circuit has held, in the securities fraud context, that liability may attach for third-party statements where "the defendants have . . . entangled themselves with the [third party] to a significant degree." In re Cabletron Sys., Inc., 311 F.3d 11, 37-38 (1st Cir. 2002).[8] The Cabletron court also made clear that an entanglement claim "will be rejected if it merely suggests or assumes that company insiders provided the information on which [third parties] based their [statements]." Id. at 38. As the Report recognized, entanglement must be alleged with Rule 9(b) particularity. Report at 39 (citing In re No. Nine Visual Tech. Corp. Sec. Litig., 51 F. Supp. 2d 1, 31 (D. Mass. 1999)).

Plaintiffs have not pled any specific facts to suggest that defendants were entangled with the alleged statements by Drs. Harden and LeRoy. Instead, plaintiffs merely assert that these physicians "could have only received information" about the status of defendants' unpublished monotherapy studies from defendants. ACC ¶ 167. This is just the type of assumption regarding entanglement that must be rejected. See Cabletron, 311 F.3d at 38. Nowhere does the complaint allege that defendants were in any way involved with the statements allegedly made by these physicians.

In the First Circuit, the doctrine of entanglement has been applied in securities fraud cases where company insiders have communicated with analysts or other outsiders regarding the defendant company. See, e.g., Cabletron, 311 F.3d at 38; Zouras v. Hallman, Civil No. 03-240-SM, 2004 U.S. Dist. LEXIS 19684, at *11-15 (D.N.H. Sept. 30, 2004). In these cases, the

_____

[8] The Report examined the relevant third-party statements here under this liberal imputation standard developed in the securities fraud context. Report at 38-39. While defendants do not concede that this is the appropriate standard under which third-party statements could be imputed to them, plaintiffs' allegations based on these statements should be dismissed because they fail to satisfy even this relaxed standard.

plaintiffs must allege specific details regarding the alleged communications with analysts to plead entanglement.  See, e.g., Cabletron, 311 F.3d 38; In re Alkermes Sec. Litig., Civil No. 03-12091-RCL, 2005 U.S. Dist. LEXIS 25826, at *40-42 (D. Mass. Oct. 6, 2005) (recommending dismissal of allegations regarding analyst statements because plaintiffs failed to "specify the time, place, speaker, and content of what was said to the [analysts] by the defendants"); Zouras, 2004 U.S. Dist. LEXIS 19684, at *14 (dismissing claim where plaintiff failed to identify the source at defendant company who communicated with the third-party).  As the Report has recognized, plaintiffs have pled no such facts here.  Report at 39 (noting "[t]he lack of any allegations that Defendants told the doctors what to say in advance").  Thus, the claim based on allegations regarding Drs. Harden and LeRoy should be dismissed on this separate ground. Because the Class Complaint does not allege any other statements regarding Neurontin's use for monotherapy, the NJCFA and common law fraud claims should be dismissed insofar as they are based on allegations regarding monotherapy.

### B.    Fraud Claims Regarding Diabetic Neuropathy Should Be Dismissed

The fraud claims based on allegations regarding statements about diabetic neuropathy should be dismissed for similar reasons.  The Report recommended that the fraud claims based on such allegations be permitted to proceed.  The basis for this recommendation was the allegation that defendants misrepresented the results of a clinical trial regarding diabetic neuropathy.  Report at 46-47.  This allegation, however, is flatly contradicted by the documents upon which plaintiffs rely.

The Class Complaint alleges that Dr. Kenneth Gorson conducted a clinical trial regarding Neurontin's use for diabetic neuropathy and prepared a draft paper describing his findings, which he provided to defendants.  ACC ¶¶ 118, 137.  According to plaintiffs, defendants attempted to revise the paper, but Dr. Gorson resisted defendants' attempt to change his conclusion and

18

published his findings in a letter to the editor of *Journal of Neurology, Neurosurgery & Psychiatry* in February 1999.  Id. ¶¶ 119-20, 137.  The complaint alleges that defendants nonetheless submitted a different, false version of Gorson's paper to Drugdex.[9]  Id. ¶¶ 119-21, 138.  Thus, the complaint does not allege that the published report of the Gorson study was false; rather, it alleges that the description of that study in Drugdex was false because it was based on false information from defendants.

The first alleged misstatement in Drugdex is that it includes the statement that "the authors suggest that higher does of [Neurontin] are needed."  Id. ¶ 121; see Murray Decl. Ex. 5 at 45.  Plaintiffs allege that this was a misrepresentation because they say that Dr. Gorson did not reach this conclusion.  This allegation is demonstrably false because, in fact, both Dr. Gorson's draft paper and his published letter include this statement.  See Murray Decl. Ex. 6 at W06834-35 (stating that "higher doses might produce greater analgesia" and that Neurontin "may be effective in higher doses"); id. Ex. 7 at 252 (stating that "the dosage of [Neurontin] may have been too low to induce analgesia").

Plaintiffs also allege that defendants are responsible for Drugdex's statement that Neurontin is "minimally effective" rather than "probably ineffective."  ACC ¶ 121.  As an initial matter, Dr. Gorson's draft paper and his published letter did not categorically state that Neurontin is "probably ineffective" for treating diabetic neuropathy as plaintiffs imply.  Rather, both his draft paper and the published letter stated that the trial results suggest that Neurontin "is probably ineffective *or* is only minimally effective" for this condition at this dosage.  Murray

---

[9] Drugdex is a commercial service, published by Thomson Micromedex, that provides summaries of information regarding pharmaceutical drugs by independently reviewing data gathered from the medical literature.

Decl. Ex. 6 at W06833; see id. Ex. 7 at 252.  Thus, the Drugdex summary is based on what Dr.

Gorson concluded, not on any statement by defendants.[10]

In fact, the documents themselves confirm that defendants are not responsible for the

language in Drugdex.  Drugdex's bibliography for its Neurontin summary cites the published

letter itself, not any draft submitted by defendants.  Id. Ex. 5 at 78 (citing "Gorson KC, Schott C,

Herman R et al.:  Gabapentin in the treatment of painful diabetic neuropathy:  a placebo-

controlled, double blind, crossover trial (letter).  J Neurol Neurosurg Psychiatry 1999; 66(1):251-

252").[11]  In light of these facts, it is clear that plaintiffs have not alleged any facts to support the

assertion that the defendants are responsible for any purported mischaracterization of Dr.

Gorson's conclusions by Drugdex.  As a result, claims based on alleged misrepresentations

regarding diabetic neuropathy must be dismissed.  See Chongris, 811 F.2d at 37 (dismissing

claim because allegations were based on "bald assertions" and "unsupportable conclusions"); In

the Matter of Wade, 969 F.2d 241, 249-50 & n.12 (7th Cir. 1992) (dismissing claim that

defendant's employee made statements inconsistent with defendant's letter where comparison of

the letter to a transcript of the statements proffered by plaintiffs, both incorporated by reference,

showed no such inconsistency).

The Report concluded that the plaintiffs had advanced a second actionable theory

regarding diabetic neuropathy:  that defendants made fraudulent and misleading statements

regarding diabetic neuropathy in that they hired physicians to relate positive anecdotal

experiences despite knowing contrary scientific evidence.  Report at 49.  This theory should be

---

[10] Plaintiffs also mischaracterize Dr. Gorson's original conclusion.  Dr. Gorson did not state that Neurontin as a general matter "is probably no more effective than placebo in the treatment of painful diabetic neuropathy." ACC ¶¶ 118.  Instead, he limited his conclusion to the dosage of Neurontin that he had studied:  900 mg/day. Murray Decl. Ex. 5 at W06828.

[11] Gabapentin is the generic name of Neurontin.

rejected for failure to plead with particularity.  Not only have plaintiffs failed in their attempt to allege the existence of such contrary scientific evidence, as explained above, but they have also failed to allege, with Rule 9(b) specificity, any anecdotal experiences that were relayed by hired physicians.  See United States ex rel. Karvelas v. Melrose-Wakefield Hosp., 360 F.3d 220, 226 (1st Cir.), cert. denied, 543 U.S. 820 (2004).  The Report does not identify any such statements. Report at 49.  Nor does the Class Complaint.  ACC ¶¶ 135-39.  The reference in the complaint to two meetings fails to identify any speakers or what they said.  Id.  Further, plaintiffs have not alleged facts to support a claim of entanglement.  See Cabletron, 311 F.3d at 38.  Thus, the allegations based upon this theory should be dismissed for failure to plead fraud with particularity.  Because the complaint's allegations regarding diabetic neuropathy are not alleged with particularity, all fraud allegations regarding this condition should be dismissed.

**C.     Fraud Claims Regarding Bipolar Disorder Should Be Dismissed**

The fraud claims based on allegations regarding bipolar disorder represent a third category of allegations that have not been alleged with particularity.  The Report concluded that plaintiffs sufficiently alleged the fraudulent omission of contrary scientific evidence regarding bipolar disorder by alleging that defendants "suppressed" the negative results of their own bipolar disorder trial and failed to disclose information about that trial to physicians who they hired to share positive anecdotal experiences with other physicians.  Report at 49 (citing ACC ¶ 152).  The complaint, however, fails to plead either suppression or fraudulent omission.

First, the Class Complaint fails to plead any facts to support its bald assertion that defendants suppressed the negative results of the bipolar trial, which was conducted by Parke-Davis investigators in 1997 and 1998.  ACC ¶ 153.  The complaint alleges that defendants knew about the negative results of the trial by the third quarter of 1997, yet did not publish those results until 2000.  Id.  Vague allegations of "suppression" cannot be credited where plaintiffs

21

fail to allege that the publication was intentionally delayed, let alone that the length of time between completion of the trial and publication was atypical.  See Coyne v. Somerville, 972 F.2d 440, 444-45 (1st Cir. 1992) ("A plaintiff 'may not . . . rest on 'subjective characterizations' or conclusory descriptions of 'a general scenario which could be dominated by unpleaded facts.'" (citation omitted)).  Merely alleging that the trial was completed on one date and published on another subsequent date is not sufficient to support an allegation of suppression.  In fact, this bipolar study was published more quickly than the study (referenced in the complaint) by the National Institute of Mental Health ("NIMH").  Although it took place after the NIMH study, the results of the defendants' study were published three months earlier.  Compare Murray Decl. Ex. 8 at 249, with Ex. 9 at 607.

In addition, plaintiffs do not allege that the physician speakers or their audience were in fact unaware of the negative results of the defendants' trial.  And they affirmatively allege that the negative NIMH study was presented in May 1997 at a meeting of the American Psychiatric Association.  Accordingly, none of the facts alleged by plaintiffs suffice to support an assertion of suppression.

The complaint also does not allege any misrepresentations regarding bipolar disorder with the requisite particularity.  See Karvelas, 360 F.3d at 226.  Plaintiffs allege that defendants fraudulently failed to inform physicians of their negative study results when promoting Neurontin for use with patients suffering from bipolar disorder.  ACC ¶ 154.  The only omission identified by plaintiffs was allegedly made at a series of dinner meetings for psychiatrists in March 1998.  Id.  Plaintiffs allege that at these meetings, psychiatrists were informed that Neurontin was indicated for bipolar disorder, that early evidence suggests that it had anti-depressant and mood stabilizing effects, and that "data are increasing but currently limited to

favorable case reports and open trials." Id. Plaintiffs have not alleged any facts regarding who made these statements and whether defendants were sufficiently entangled with the creation and dissemination of these statements such that they could be imputed to defendants. See Cabletron, 311 F.3d at 37-38.[12] Because plaintiffs have failed to plead with particularity any instances of fraudulent omission by defendants, their claims based on misrepresentations at psychiatry dinner meetings must be dismissed.

### D.    Fraud Claims Regarding Panic Disorder Should Be Dismissed

Plaintiffs' fraud allegations regarding panic disorder should also be dismissed for failure to plead suppression and fraudulent omission with particularity. The Report recommended that claims based on allegations relating to panic disorder survive dismissal for the same reasons as allegations regarding bipolar disorder. Report at 49 (citing ACC ¶ 164). The Report apparently relied upon plaintiffs' allegation that Parke-Davis' clinical trial found that Neurontin was no more efficacious than placebo in treating panic disorder, ACC ¶ 164, and that defendants did not disclose this information during meetings where positive anecdotal evidence was shared, id. ¶¶ 164-65.

Again, plaintiffs have failed to plead any facts regarding suppression. They allege that in October 1997 defendants received results of a clinical trial showing that Neurontin was no more efficacious than placebo in treating panic disorder. ACC ¶ 164. They further allege that these results were not published until 2000. Id. Plaintiffs fail to allege, however, any facts other than the date that they claim the trial was completed and the date that the resulting article regarding

---

[12] The Report mistakenly assumed that defendants have transcripts of the events set forth in the complaints such that they can identify the statements and speakers in question. Report at 41. Plaintiffs do not even imply as much, but instead allege that these dinner meetings were "created and sponsored" by the Off-Label Promotion Enterprise, ACC ¶ 154, which Magistrate Judge Sorokin concluded plaintiffs had failed to plead under the RICO statute. Report at 22-26. Thus, plaintiffs should not be excused from satisfying Rule 9(b)'s pleading requirements with respect to these statements.

this trial was published.  As noted above in the discussion of bipolar disorder, such vague allegations of suppression should not be accepted.  See Coyne, 972 F.2d at 444-45.

Furthermore, as with bipolar disorder, plaintiffs have failed to plead with particularity the fraudulent omission of contrary scientific evidence.  They do not identify any specific statements made regarding Neurontin's efficacy for the treatment of panic disorder.  ACC ¶¶ 162-65. Rather, plaintiffs allege only that "the Off-Label Promotion Enterprise continued to make presentations to physician attendees where Neurontin was promoted for use with panic disorder patients" after defendants learned the results of the clinical study and "at every presentation concerning Neurontin's *bipolar use*, anecdotal evidence was presented to support Neurontin's use."  ACC ¶¶ 164-65 (emphasis added).  Moreover, plaintiffs have not alleged a basis for imputing statements regarding panic disorder to defendants.  See Cabletron, 311 F.3d at 37-38. For the reasons stated in the previous sections, this vague pleading is insufficient under Rule 9(b).

### E.    Fraud Claims Regarding Migraine Should Be Dismissed

The fraud claims regarding migraine should be dismissed for a number of reasons.  The Report concluded that plaintiffs stated a claim for fraudulent omission of contrary scientific evidence regarding migraine by alleging that defendants knew about a negative study regarding Neurontin's treatment of migraine as well as several reports of negative study results, yet hired physicians to relate positive anecdotal experiences regarding Neurontin's use for this condition. Report at 49 (citing ACC ¶¶ 174-75).  These allegations should be dismissed because plaintiffs mischaracterize the only specific statements alleged and fail to allege any other statements with particularity.

The Report never addressed whether plaintiffs alleged false statements regarding migraine with particularity pursuant to Rule 9(b).  Id. at 39-42.  The only two statements

regarding Neurontin's use for migraine that were pled with any particularity were those made by Dr. Leslie Magnus-Miller and Edda Guerrero at an advisory board meeting held by Parke-Davis to discuss "Gabapentin in the Management of Migraine." ACC ¶ 178. The complaint claims that at this meeting these individuals were asked whether they had any data relating to migraine and in response failed to disclose supposedly negative data from studies done a decade earlier. Specifically, plaintiffs assert that Dr. Magnus-Miller was asked, "But do you have any data [relating to Neurontin and migraine]?" and replied "We didn't…No, not really, because we didn't capture headache baseline." Id. They then allege that Ms. Guerrero said: "Unfortunately we did not, even in monotherapy I think. Right?" Id. Plaintiffs complain that another Parke-Davis employee did not "correct" these statements. Id.

Review of the transcript of this advisory board meeting, which has been incorporated by reference into plaintiffs' complaint, shows that no misstatement was made. The transcript reveals that the question posed was quite different from what plaintiffs indicate. The question did not relate to any data regarding Neurontin's use in migraine (as plaintiffs' misleading bracketed insertion states); rather, it pertained to data regarding headaches in patients who took part in the clinical trials of Neurontin as a treatment for epilepsy:

> Dr. Moskowitz: I have a rather naïve question. And it may be there's no answer to this. But there is an intricate, Richard I think has nicely shown and told me that there's a high comorbidity between epilepsy and migraine. And you've got these wonderful studies demonstrating efficacy in that population of people. In your clinical trials, was there any attempt to address the issue of headache either as a potential side effect or headache as a potential therapeutic action for the gabapentin?

Murray Decl. Ex. 10 at X010715. This excerpt makes clear that Dr. Magnus-Miller was asked specifically about headache data in epilepsy studies. Plaintiffs also mischaracterize Dr. Magnus-Miller's and Ms. Guerrero's responses. Rather than claiming that Parke-Davis did not have any data relating to this issue (i.e., Neurontin's effect on headaches during epilepsy trials), they stated

that the failure to capture a headache baseline, even in monotherapy trials, made it impossible to see a *trend* in the data:

> Dr. Moskowitz:  But do you have any data?  It might be hard to sort it out, but at least you, …
>
> Dr. Magnus-Miller:  We didn't …
>
> Dr. Moskowitz:  … you know you might see a trend that would be …
>
> Dr. Magnus-Miller:  No, not really, because we didn't capture headache baseline.
>
> Ms. Guerrero:  Unfortunately we did not, even in monotherapy I think.  Right?

Id. at X010716.

Examining these two allegedly fraudulent statements in context shows that they are in fact truthful and fully responsive to the questions asked.  This transcript demonstrates that plaintiffs' allegations that defendants suppressed negative scientific evidence are based on a mischaracterization of the documents upon which they rely.  This misleading pleading regarding migraine also led Magistrate Judge Sorokin to misinterpret the allegation that defendants "knew of several reports of negative results," including reports from Drs. Solomon, Rothrock, Welch, and Cutrer.  ACC ¶ 175.  Magistrate Sorokin understood this allegation to relate to suppression of "several other reports of negative *study* results."  Report at 49 (citing ACC ¶ 175) (emphasis added).  Examination of the advisory board transcript, however, reveals that these individuals actually disclosed negative anecdotal experiences during the meeting.  Murray Decl. Ex. 10 at X010757, X010759-61.  For instance, Dr. Solomon stated:  "I've treated six or seven patients with gabapentin and I must say that in only one was I convinced of an improvement.  But it was not a fair test because every patient had been tried on everything else."  Id. at X010757.

Magistrate Judge Sorokin was not aware of these mischaracterizations when he recommended that plaintiffs' allegations regarding migraine survive dismissal.  Report at 49

(citing ACC ¶ 174).  In light of this, his recommendation, which was based on a mischaracterization of the document, should be disregarded.  See Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1220-21 (1st Cir. 1996); Associated Builders, Inc. v. Ala. Power Co., 505 F.2d 97, 100 (5th Cir. 1974) ("We do not, however, accept [plaintiffs'] conclusory allegation that the prospectus was materially misleading . . . especially when such conclusions are contradicted by facts disclosed by [the appended prospectus].").

Plaintiffs also fail to allege, with Rule 9(b) particularity, any other misrepresentations regarding Neurontin's treatment of migraine.  Although the Class Complaint alleges generally that the Off-Label Promotion Enterprise regularly presented programs in which physician participants "touted Neurontin as effective for the treatment of migraine," plaintiffs fail to identify any specific statements regarding Neurontin's efficacy for the treatment of migraine.  ACC ¶¶ 178-79.  They certainly do not allege a basis for imputing such statements to defendants.  See Cabletron, 311 F.3d at 37-38.  Because no other statements regarding migraine were alleged with any specificity, the plaintiffs' fraud claims regarding Neurontin's treatment of migraine should be dismissed.

## CONCLUSION

For all of the foregoing reasons, the Class Complaint and the Coordinated Complaint should be dismissed with prejudice.

Dated: March 3, 2006

DAVIS POLK & WARDWELL

By:   /s/ James P. Rouhandeh
      James P. Rouhandeh

450 Lexington Avenue
New York, New York 10017
(212) 450-4000

- and -

HARE & CHAFFIN

By:   /s/ David B. Chaffin
      David B. Chaffin

160 Federal Street
Boston, Massachusetts 02110
(617) 330-5000

*Attorneys for Defendants Pfizer Inc. and
Warner-Lambert Company*
