UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL Docket No. 1629<br>Master File No. 04-10981<br>Judge Patti B. Saris<br>Mag. Judge Leo T. Sorokin |
| THIS DOCUMENT RELATES TO:<br><br>HARDEN MANUFACTURING CORPORATION; LOUISIANA HEALTH SERVICE INDEMNITY COMPANY, dba BLUECROSS/BLUESHIELD OF LOUISIANA; INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL NO. 68 WELFARE FUND; ASEA/AFSCME LOCAL 52 HEALTH BENEFITS TRUST; GERALD SMITH; and LORRAINE KOPA, on behalf of themselves and all others similarly situated, v. PFIZER INC. and WARNER-LAMBERT COMPANY | |
| THE GUARDIAN LIFE INSURANCE CO. OF AMERICA v. PFIZER, INC. and AETNA, INC. v. PFIZER, INC. | |

**PLAINTIFFS' JOINT OBJECTIONS TO REPORT AND RECOMMENDATION ON DEFENDANTS' MOTIONS TO DISMISS THE AMENDED CLASS COMPLAINT AND THE FIRST COORDINATED AMENDED COMPLAINT**

## TABLE OF CONTENTS

**Page**

REQUEST FOR ORAL ARGUMENT ............................................................................ 1

I.      INTRODUCTION ......................................................................................... 1

II.     THE RECOMMENDATIONS ARE SUBJECT TO DE NOVO REVIEW ......... 5

III.    The Complaints Adequately Allege RICO Enterprises ......................................... 6

        A.      Scienter and the RICO "Associations-in-Fact".................................... 6

        B.      Plaintiffs' Adequately Plead Facts Sufficient to Establish
                Associations In Fact For RICO Enterprise Purposes............................... 12

        C.      Plaintiffs Have Alleged RICO Conspiracy Claims.................................. 18

IV.     THE "STRUCTURE OF THE OFF-LABEL MARKETING
        CAMPAIGN" IS AN INTEGRAL PART OF DEFENDANTS'
        FRAUDULENT SCHEME, AND IS NOT PREEMPTED................................. 18

V.      Plaintiffs Have Pleaded Fraud With Sufficient Particularity............................... 21

        A.      There Are No Claims Based Solely on Verbatim Reports ..................... 21

        B.      Plaintiffs' Allegations With Respect To Restless Leg Syndrome
                Are Sufficient.............................................................................. 24

VI.     DISMISSAL OF CLASS PLAINTIFFS' UNJUST ENRICHMENT
        CLAIM IS PREMATURE................................................................................. 26

VII.    THE CHOICE OF LAW ISSUE, AND THE METHOD OF PROVING
        CAUSATION, SHOULD NOT BE PRE-JUDGED........................................... 27

VIII.   IF NECESSARY, LEAVE TO AMEND SHOULD BE GRANTED ................ 28

<u>**TABLE OF AUTHORITIES**</u>

<u>**Page**</u>

**Cases**

*AIU Insurance Co. et al. v. Lomecs Medical Supply, Inc., et al.*,
   2005 U.S. Dist. LEXIS 29666 (E.D.N.Y. 2005) ...................................... 15

*Blue Cross v. SmithKline Beecham Clinical Labs., Inc.*,
   62 F. Supp. 2d 544 (D. Conn. 1998) ..................................................... 11

*Bonilla v. Volvo Car Corp.*,
   150 F.3d 62 (1st Cir. 1998) ................................................... 10, 11, 20

*Davis v. Cox*,
   356 F.3d 76 (1st Cir. 2004) ...................................................... 5, 22, 27

*Eve v. Sandoz Pharm Corp.*,
   2002 WL 181972 (S.D. Ind. Jan. 28, 2002) ......................................... 20

*Gentle Wind Proj. v. Garvey*,
   407 F. Supp. 2d 282 (D. Me. 2006) ..................................................... 17

*In Re Lupron Marketing and Sales Pracitces Litig.*,
   295 F.Supp.2d 148 (D. Mass. 2003) .............................................. 14, 26

*In re Pharm. Indus. Average Wholesale Price Litig.*,
   307 F. Supp. 2d 196 (D. Mass. 2004) ..................................... 7, 11, 13, 23

*In re Pharmaceutical Industry Avg. Wholesale Price Litig.*,
   263 F. Supp. 2d 172 (D. Mass. 2003) .......................................... passim

In *United States v. London*,
   66 F.3d 1227 (1st Cir. 1995) ............................................................. 11

Libertad v. Welch,
   53 F.3d 428 (1st Cir. 1995) ............................................................... 9

*Liberty Mut. Ins. Co. v. Diamante*,
   138 F. Supp.2d 47 (D. Mass. 2003) ..................................................... 7

*Massachusetts v. Mylan Laboratories*,
   357 F. Supp. 2d 314 (D. Mass. 2005) ................................................. 26

*Nat'l Org. for Women, Inc. v. Scheidler*,
   510 U.S. 249 (1994) ......................................................................... 7

*O'Ferrol v. Trebol Motors Corp.*,
   45 F.3d 561 (1st Cir. 1995) ............................................................... 8

ReSource N.E. of Long Island, Inc. v. Town of Babylon,
   80 F. Supp. 2d 52 (E.D.N.Y. 2000) ..................................................... 9

*Reynolds v. Condon*,
   908 F. Supp. 1494 (N.D. Iowa 1995) ................................................... 9

# TABLE OF AUTHORITIES

**Page**

*Rodriguez v. Banco Central*,
    777 F. Supp. 1043 (D.P.R. 1991)................................................................. 9

*Scheuer v. Rhodes*,
    416 U.S. 232, 94 S. Ct. 1683,
    40 L. Ed.2d 90 (1974) .................................................................... 24

*Schultz v. Rhode Island Hospital Trust National Bank*,
    94 F.3d 721 (1st Cir. 1996)........................................................... 8

*Steiner v. Unitrode Corp.*,
    834 F. Supp. 40 (D. Mass.1993) .................................................. 24

*U.S. v. Console*,
    13 F.3d 641 (3d Cir. 1993) ........................................................... 16

*U.S. v. DeFries*,
    129 F.3d 1293 (D.C. Cir. 1997) ................................................... 16

*U.S. v. Irizarry*,
    341 F.3d 273 (3d Cir. 2003) ......................................................... 16

*U.S. v. Sanders*,
    928 F.2d 940 (10th Cir. 1991) ..................................................... 17

*United States ex rel. Franklin, v. Parke-Davis*,
    C.A. No. 96-11651, 2003 U.S. Dist. LEXIS 15754 (D. Mass. Aug. 22, 2003). 5, 22, 23,
    28

*United States v. Cianci*,
    378 F.3d 71 (1st Cir. 2004)........................................... 7, 8, 11, 16

*United States v. Turkette*,
    452 U.S. 576 (1981)........................................................................ 7

VNA Plus, Inc. v. Apria Healthcare Group, Inc.,
    29 F. Supp. 2d 1253 (D. Kan. 1998).............................................. 9

Weil v. Long Island Sav. Bank, FSB,
    77 F. Supp. 2d 313 (E.D.N.Y. 1999) ............................................ 9

**Statutes**
18 U.S.C.
    § 1962(c) ......................................................................................... 7
    § 1962(d)...................................................................................... 18

**Rules**
Federal Rules of Civil Procedure
    Rule 72(b) ................................................................................. 1, 5

Local Rules for United States Magistrates Judges
    Rule 3(a)(9)................................................................................... 6
    Rule 3(c) ................................................................................... 1, 6

Pursuant to Rule 72(b) of the Federal Rules of Civil Procedure, and Rule 3(c) of

the Local Rules for United States Magistrates Judges, Class Plaintiffs (*Harden*

*Manufacturing Corp., et al.* v. *Pfizer, Inc., et al.*) and the Coordinated Plaintiffs (*The*

*Guardian Life Insurance Company of America* v. *Pfizer, Inc.* and *Aetna, Inc.* v. *Pfizer,*

*Inc.*) (collectively, "Plaintiffs") respectfully submit these objections on the common

issues presented by Magistrate Judge Leo T. Sorokin's January 31, 2006 Report and

Recommendation on Defendants' Motions to Dismiss the Amended Class Complaint and

the First Coordinated Amended Complaint (the "Report").[1]

## REQUEST FOR ORAL ARGUMENT

Plaintiffs respectfully request oral argument, pursuant to Local Rule 7.1(d), due to

the complexity of a number of the issues presented by the pending motions.

## I.    INTRODUCTION

For the most part, the Report does an admirable job of summarizing Plaintiffs'

---

[1] The Coordinated Plaintiffs are concurrently filing the Coordinated Plaintiffs' Objections to Report and Recommendation of Magistrate Judge ("Coordinated Plaintiffs' Objections"), to address the Report's conclusion that the Coordinated Plaintiffs "failed to allege a cognizable injury," (Report at 22), and that their state law claims under the California Unfair Competition Law, Pennsylvania Insurance Fraud Statute, and state deceptive practices acts should be dismissed (*id.* at 57 & n.20).  While the Report concludes that "the Class Plaintiffs have sufficiently alleged injury as they claim that Neurontin was ineffective for the [off-label] conditions for which it was prescribed" (Report at 21), Class Plaintiffs agree with the Coordinated Plaintiffs that their claims remain viable in the event of a "failure of proof" as to whether or not Neurontin is effective for these conditions.  Accordingly, Class Plaintiffs join in Part II of the Coordinated Plaintiffs' Objections.

The Court's February 8, 2006 Electronic Order granting Plaintiffs' Motion for Extension of Time to Object to Report and Recommendation and to Respond to Objections provides that "[t]here shall be no replies, etc."  Plaintiffs interpret this Order as precluding the parties from filing replies in support of their objections, rather than depriving the parties of their right to respond to one another's objections.  *See, e.g.*, Fed. R. Civ. P. 72(b) ("A party may respond to another party's objections [to a Magistrate Judge's recommendation] within 10 days after being served with a copy thereof."); Local Rules for United States Magistrates Judges 3(c) (same).

1

allegations, and setting forth and resolving the legal issues presented by the motions to dismiss. Plaintiffs respectfully submit that the Report makes a few "wrong turns" in its legal analysis (in some cases due to the parties' failure to sufficiently clarify the issues). First, the Report confuses the requirement that a RICO enterprise have a "common purpose" with the requirement that a RICO *defendant* accused of *operating* that enterprise through a pattern and practice of racketeering activity possess sufficient scienter to be held liable for the predicate acts of mail and wire fraud. Case law firmly establishes that a RICO enterprise may be wholly innocent, so long as the participants in the enterprise share a sufficiently common purpose. The Report acknowledges that the alleged participants in the RICO enterprise all shared the common purpose to market Neurontin for unapproved uses, and that in doing so, "the medical marketing firms intended to evade FDA regulations" and "intentionally created their programs so as not to be fair and balanced." Report at 16. Notwithstanding this common purpose, which animated hundreds or thousands of medical "education" seminars and other carefully disguised promotional activities, the Report finds that Plaintiffs have not adequately alleged the existence of a RICO enterprise, because Plaintiffs have not alleged that either the medical marketing firms or the presenting physicians "knew or intended that fraudulent statements were made in the campaign." *Id*.

Next, the Report mistakes six *factors* to be taken into account in determining whether a RICO association-in-fact enterprise exists for six *requirements*, and finds one of them, "systematic linkages," lacking, except as between Defendants and one of the medical marketing firms, Physician's World. As a threshold matter, the presence or absence of a single one of these six factors is "not dispositive." *In re Pharmaceutical*

*Industry Avg. Wholesale Price Litig.*, 263 F. Supp. 2d 172, 182 (D. Mass. 2003) ("*AWP I*"). Ordinarily, the existence or non-existence of a RICO enterprise presents a question of fact for the jury, not a question of law for the court. Fairly read, the complaints allege a sophisticated, multi-layered scheme in which the medical marketing firms and identified physicians were willing and active participants, with the same physicians making similar presentations at similar events hosted by the different medical marketing firms, coordinating their activities under the careful supervision of Defendants. For pleading purposes, no more is or should be required.

The Report concludes that Defendants' concealment of their involvement in the promotion of Neurontin for off-label uses is not actionable because it is prohibited by FDA regulations, which only the FDA may enforce. As the Report acknowledges, Plaintiffs allege that "[i]n essence, physician attendees received an 'infomercial' rather than scientific information" the attendees were led to believe they were receiving. Report at 30. Defendants' use of "shills" to present testimonials at their traveling "medicine show" was an integral part of their fraudulent scheme, and remains actionable as part of that scheme, regardless of whether it is also proscribed by federal regulation. For example, at a March 2000 meeting of presenting physicians planning new "educational" programs promoting Neurontin for off-label uses, one psychiatrist lamented to his equally-compromised colleagues that:

> [A]lmost everything I'm talking about (reports of successful off-label Neurontin usage) appears in the form of letters to the editor or open case series. The amount of controlled trials, the evidence base for this, is not very good. And there is a sense of feeling awkward—Elizabeth, this is something we should address—there's a sense of getting up there and talking about these things (off-label

>Neurontin usage) when, maybe, at best, there might be one
>or two controlled trials that support a given use.
>
>So, clinical use is running way ahead of what research is
>giving us.  I mean, I can't remember, in psychiatry,
>anything like this, where there's such extensive use of
>drugs, without there necessarily being an indication or the
>data we would consider gold standard.
>
>So, one of the questions that I have for you to think about
>is, can we really say with any certainty that these drugs
>really work in the way that we're reporting?  How
>confident are you, individually or as a group, that even
>without the clinical trials, that we can get up in front of
>clinicians and say, look, trust us that these things do work.

Amended Class Complaint ("ACC") ¶ 102.  Defendants' use of "shills" to present

testimonials at a traveling "medicine show" is a classic form of fraud, and remains

actionable regardless of whether it is also prohibited by federal regulation.

Overall, the Report (i) analyzes statements or omissions in isolation, even though

the complaints allege them as part and parcel of a broader, on-going scheme to defraud

that had cumulative impact, (ii) assumes that the context of the omissions and misleading

statements may be likened to commercial sales pitches (such as car dealership

discussions) such that recipients would naturally have their "guard up," even though the

complaints allege them to be made in settings where physicians justifiably expected to

receive complete, unbiased, and reliable scientific information, and (iii) fails to consider

that the systematic and deliberate violation of FDA restrictions on off-label marketing

might itself constitute evidence of an intent to defraud.  When the context and cumulative

impact alleged in the complaints is taken into account, all of the alleged

misrepresentations and omissions should be treated as actionable at this time.

The Report finds that Plaintiffs' claims based on Verbatim Reports should be

dismissed, because Plaintiffs do not allege the "when" and "where" of the statements they

contain. Elsewhere, the Report finds that Plaintiffs have stated viable fraud claims with respect to each of the off-label conditions mentioned in the Verbatim Reports alleged. Accordingly, there is nothing to dismiss, because Plaintiffs do not allege any claims based solely on the Verbatim Reports. Rather, as this Court expressly found in the *Franklin* litigation, the Verbatim Reports are *evidence* of the successful execution of Defendants' fraudulent scheme. *See United States ex rel. Franklin, v. Parke-Davis*, C.A. No. 96-11651, 2003 U.S. Dist. LEXIS 15754, *13 (D. Mass. Aug. 22, 2003).

The Report finds Plaintiffs' allegations with respect to Restless Leg Syndrome insufficient, even though Plaintiffs allege that Defendants failed to disclose a negative study they sponsored on Periodic Limb Movement Disorder, which the complaints describe as a "closely related" condition. Plaintiffs respectfully submit that these allegations are sufficient, but will amend, if necessary, to set forth the factual and scientific basis for the similarity.

Finally, the Report recommends dismissal of the Class Plaintiffs' unjust enrichment claim, because it "recommends that the Class Plaintiffs' state law fraud claims survive in some respects" (Report at 54), providing them with an adequate remedy at law. This Court has repeatedly held that under such circumstances, an unjust enrichment claim should *not* be dismissed at the pleading stage, and the plaintiff should be permitted an election of remedies at trial.

## II.     THE RECOMMENDATIONS ARE SUBJECT TO *DE NOVO* REVIEW

The recommendations contained in the Report are subject to *de novo* review. *See* Fed. R. Civ. P. 72(b) (with respect to dispositive matters, "[t]he district judge to whom the case is assigned must make a de novo determination upon the record, or after additional evidence, of any portion of the magistrate judge's recommended disposition to

which specific written objection has been made in accordance with this Rule"); Local

Rules for United States Magistrates Judges, Rules 3(c) (same), 3(a)(9)  (listing a motion

to dismiss as a dispositive motion).

### III.     THE COMPLAINTS ADEQUATELY ALLEGE RICO ENTERPRISES

The Report recommends dismissal of all RICO claims (Claims I and II of the

Amended Class Complaint and Claims I through IX of the First Coordinated Amended

Complaint) for essentially two reasons:  (i) that the complaints fail to allege that the non-

defendant participants in the association-in-fact enterprises (named medical marketing

firms and an identifiable number of physicians) "knew of the fraudulent nature of the

statements" about the lack of effectiveness of Neurontin for off-label uses, and (ii) that

the alleged facts do not show the participants as "working together as part of a cohesive

group."  Report at 24-25.

#### A.      Scienter and the RICO "Associations-in-Fact"

The Report concludes that in order to allege adequately a RICO "association-in-

fact," the members of the association must not only share a common purpose, but they

must share a common purpose "to promote Neurontin for off-label uses *through the use

of making false and misleading statements*."  Report at 24 (emphasis in original).  The

Report holds that to plead any RICO association-in-fact enterprise, the pleading must

claim that each participant in an association, *whether or not the participant is a defendant

in the case*, shared the illegal purpose and scienter of the defendants, *i.e.*, that the

"common purpose" required for a RICO enterprise must always be a common *illegal*

purpose by every member of the association.

Plaintiffs respectfully suggest that this is incorrect as a matter of law, and that the

reasoning improperly conflates the scienter required to hold *a defendant* liable under

RICO, with the "common purpose" guideline used for determining whether *participants* in an association-in-fact (whether they are defendants or not) constitute a larger unit, over and above their separate structures and operations, to be a RICO enterprise.

*United States v. Turkette,* 452 U.S. 576 (1981) held that an enterprise under RICO could be a legal *or* illegal entity, making it clear that the "enterprise" is not the "pattern of racketeering activity," but is instead "an entity separate and apart from the pattern of activity in which it engages." *Id.* at 583. The enterprise is the "vehicle" through which the racketeering activity is conducted; it is not the racketeering activity itself. *Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 259 (1994).[2]

A RICO enterprise can include participants unaware of the way the organization or enterprise is being illegally used. This would be typical of infiltrated organizations, RICO's original intended target. "It is not a *sine qua non* of liability that an employee of the innocent enterprise be a knowing participant in the racketeering activity." *Liberty Mut. Ins. Co. v. Diamante,* 138 F. Supp.2d 47, 61 (D. Mass. 2003).

In *United States v. Cianci*, 378 F.3d 71 (1st Cir. 2004), the First Circuit Court of Appeals addressed the issue of the scienter required for liability as a defendant under RICO, as opposed to the knowledge of the illegal activities and the illegal intent on the part of each member of an alleged RICO enterprise.[3] On appeal, the *Cianci* defendants

---

[2] As Judge Saris noted in *AWP I*, the First Circuit "has declined to define a criminal enterprise under 18 U.S.C. § 1962(c) as requiring an ascertainable structure. Instead, to establish an association in fact enterprise, plaintiff must show that the associated groups constitute a larger unit, over and above their separate structures and operations." *In re Pharmaceutical Industry Avg. Wholesale Price Litig.*, 263 F. Supp. 2d 172, 182 (D. Mass. 2003) (internal quotations and citations omitted).

[3] The decision in *Cianci* was issued on August 10, 2004, more than four months after this Court's decision in *In Re Pharmaceutical Industry Average Wholesale Price Litigation*,

argued that the indictment's RICO allegations charged a "legal impossibility" in that they alleged municipal entities were part of the RICO association-in-fact charged in the indictment.  Defendants' argument was based on the notion that the municipal entities could not share a common unlawful purpose and on cases holding that municipalities "cannot be found to have acted with unlawful intent."  *Id.* at 82 (citations omitted).  The First Circuit distinguished the intent required to be proven *against a defendant* from that required *of a member* of the "association in fact" RICO enterprise:

> Defendants' legal impossibility argument holds water only had the government sought prosecution of the City itself.  The City and its component agencies are not the defendants in this case; they were deemed members of the enterprise because without them, [Defendants] would not have been able to even attempt to perpetrate the charged racketeering schemes.

*Id.* at 83.  The Court acknowledged that scienter is required by a Defendant, but not by all the members of the alleged enterprise.  The First Circuit went on to uphold the jury instructions given in *Cianci* on the issue of proof of a RICO enterprise, which stated:

> the Government must prove that the alleged enterprise had an ongoing organization . . . and that its various associates functioned together as a continuing unit to achieve common goals . . . It is not necessary in proving the existence of an enterprise to show that each member of the enterprise participated in or even knew of all of its activities, but it is necessary to show that all members of the alleged enterprise shared a common purpose.

*Id.* at 83-84 (internal quotations omitted).

To be liable for RICO wire and mail fraud, there must be adequate evidence of intent to defraud.  *See e.g.*, *Schultz v. Rhode Island Hospital Trust National Bank*, 94 F.3d 721 (1st Cir. 1996); *O'Ferrol v. Trebol Motors Corp.*, 45 F.3d 561 (1st Cir. 1995).  However, fraudulent intent is not required of each of the members of a proper

---

307 F. Supp. 2d 196 (D. Mass. 2004) which addressed these issues and was relied upon in the Report.

association-in-fact-under RICO. *See e.g. Libertad v. Welch,* 53 F.3d 428, 443 (1st Cir. 1995) (individuals and organizations making up anti-abortion coalition that planned clinic blockades, which the Court held could be called an "enterprise," used both unlawful and "lawful… or even constitutionally protected" methods to achieve their goals); *ReSource N.E. of Long Island, Inc. v. Town of Babylon*, 80 F. Supp. 2d 52, 63 (E.D.N.Y. 2000) (plaintiffs alleged an enterprise in which common purpose involved buying and selling commercial refuse hauling service); *Weil v. Long Island Sav. Bank, FSB,* 77 F. Supp. 2d 313, 320-21 (E.D.N.Y. 1999) (plaintiffs alleged an association-in-fact between a law firm and bank whose purpose was to facilitate the bank's mortgage business); *VNA Plus, Inc. v. Apria Healthcare Group, Inc.,* 29 F. Supp. 2d 1253, 1259 (D. Kan. 1998) (holding that "even a commercial contract can serve as the basis of a RICO enterprise," and that an enterprise was alleged with "the common or shared purpose to provide home health care products and related services to patients in such patients' homes for profit").

The Court in *Rodriguez v. Banco Central*, 777 F. Supp. 1043, 1055 (D.P.R. 1991), explained that the illegal activity and the illegal intent may be shared by the members of the association-in-fact, but it is not a necessary pre-requisite to the formation of a valid RICO enterprise. "While the predicate illegalities may often overlap with the common purpose for which the associates came together in the first place, they need not. A plaintiff could conceivably prove an association-in-fact that is completely legitimate except for the fact that one of its associates is using the entity, *even perhaps without the knowledge of any of the other associates*, for the purpose of engaging in the RICO predicate act pattern . . ." *Id*. (emphasis added). *See also Reynolds v. Condon*, 908 F. Supp. 1494 (N.D. Iowa 1995) ("[T]here is no requirement that the common or shared

purpose of the "RICO enterprise" in fact be the criminal or injurious scheme of which the plaintiff complains, or even that the common or shared purpose be illegal activity aimed at this or other victims").

So too in this case, Plaintiffs need not plead that each of the members of the association-in-fact shared an illegal common purpose and a fraudulent intent in order to adequately plead an association-in-fact RICO enterprise. Neither the medical marketing firms nor the physicians are named as defendants in these cases, thus they need not share the scienter required of a defendant.[4]

The Report relies for authority, in part, on *Bonilla v. Volvo Car Corp*., 150 F.3d 62, 73 (1st Cir. 1998), wherein the First Circuit rejected any inference of intention to defraud absent any indication that Volvo knew of the fraud of the other members of the RICO enterprise. However, the issue in *Bonilla* was whether the Swedish car manufacturer had been shown to have intent to defraud sufficient to hold it liable *as a defendant* in a RICO case. *Id.* ("Plaintiffs have not shown analogous knowledge on Volvo's side that Trebol was engaging in fraudulent activity"). The issue was not whether intent to defraud is a necessary prerequisite to be a member of an association-in-fact. In this case, Magistrate Sorokin expressly noted that as to Pfizer, Plaintiffs adequate pled the requisite fraudulent intent to sustain claims against it as a defendant. Report

---

[4] Even if it *were* necessary to plead some degree of scienter on the part of the medical marketing firms and/or participating physicians, Plaintiffs respectfully submit that they have done so. The Report itself acknowledges that the medical marketing firms "knew that their final products were biased, and that they *intentionally* created their programs to as not to be fair and balanced." Report at 16 (emphasis added). Similarly, the transcript from a meeting of participating physicians quoted in the Introduction, *supra*, is *direct evidence* that at least some of them knew they were misleading their colleagues as to the efficacy of Neurontin for off-label conditions. ACC ¶ 102.

at 15-16.  As such, *Bonilla* is not applicable.[5]

The Report also relies upon this Court's decision in *In re Pharm. Indus. Average Wholesale Price Litig.*, 307 F. Supp. 2d 196, 204 (D. Mass. 2004) ("*AWP II*").  The reliance is understandable, but ultimately misplaced.  First, *AWP II* was decided before the First Circuit's decision in *Cianci*, and accordingly it should not be read broadly to be inconsistent with the *Cianci* holding that an association-in-fact can be comprised of members that did not share the criminal intent of the defendant.  Second, in *AWP II* the type of association pled was one which appeared to the Court to be simple descriptions of existing commercial relationships,[6] and thus the only thing in that case that might bind the participants together in an enterprise was knowledge of an ongoing fraud.  Thus, *AWP II* simply decides that the association-in-fact alleged in that case failed in achieving the only kind of bind alleged in that case, common fraudulent intent; it does not stand for a much larger proposition, that in every case all participants to an enterprise must share the defendants' criminal purposes.[7]

---

[5] Thus, *Bonilla* does not stand for the broad proposition ascribed to it in the Report:  "The lack of a common purpose with intent to defraud is fatal to Plaintiffs' claims of enterprise."  Report at 24.

[6] "The participants . . . do not share a common purpose more specific than that common to many human endeavors, the reaping of a profit. The publishers are indifferent as to whether the AWP spread exists or not; their financial interest lies in earning money through selling books listing numbers. The spread is irrelevant to their financial well being."  *AWP II* at 204.

[7] *AWP II* relies on two decisions, neither of which should be read for this broad proposition.  In *United States v. London*, 66 F.3d 1227, 1244 (1st Cir. 1995), the court simply concluded that the defendant had a fraudulent purpose:  "The jury could have found that there was a common or shared purpose animating both the enterprise and London: doing commerce with (and thereby profiting from) bookmakers engaged in illegal gambling."  *Blue Cross v. SmithKline Beecham Clinical Labs., Inc.,* 62 F. Supp. 2d 544, 553 (D. Conn. 1998) seems more akin to the *AWP II* situation – an alleged association-in-fact where the only binding agent for the participants was the fraudulent activity itself.

**B.**     **Plaintiffs' Adequately Plead Facts Sufficient to Establish Associations In Fact For RICO Enterprise Purposes**

The Report also concludes that the complaints fail to allege associations-in-fact for RICO enterprise purposes because the alleged facts do not show the medical marketing firms and participating physicians as participants "working together as part of a cohesive group" and because they are of the "hub & spoke" variety.  Report at 25-26. Plaintiffs respectfully disagree.

The Report acknowledges that the complaints are replete with allegations that both the medical marketing firms and the identified physicians knowingly participated in off-label promotional activities on behalf of Defendants.  Report at 16.  By definition, off-label promotional activities by Defendants are, with only few and minor exceptions, illegal.  Thus, any fair reading of the complaints is that all participants of the associations-in-fact were involved in the common purpose of unlawful off-label promotions with a drug company, and that each participant knew that other, similar activities were being undertaken by others (if they did not in fact know the exact nature of those other activities).[8]

_____

[8] As Plaintiffs stated in their brief in opposition to the 12(b)(6) motions:

> Plaintiffs meet this test because the allegations claim that each Enterprise constituent actively participated in Defendants' scheme and was aware of, and interacted with, other participants in the scheme.  Cal. Comp. ¶¶ 56, 78, 99, 102, 114; Coord. Comp. ¶¶ 30-98, 102-168.  The non-physician technical writers *knowingly ghost-wrote* articles based on inaccurate, and in some cases no, scientific evidence concerning the safety and efficacy of Neurontin to treat off-label symptoms; the physicians *knowingly lent* their names as "authors" to the articles, misrepresenting the authorship and objectivity of the articles and their content; the physicians *relinquished control* to Defendants of information relayed to the public in such articles, as well as

But the Report then draws a distinction that cuts things too finely, and at the wrong place. The Report concludes that simple unlawfulness of off-label promotion as the common purpose is not enough to bind the association-in-fact participants; according to the Report, the unlawfulness must be doubly wrongful, both for unlawful off-label promotions, *and* for unlawful acts "through the making of false and misleading statements." Report at 24.

The correct application of the guidelines set forth in *AWP I* and *II* [9] yields a conclusion that the allegations fairly state claims of associations-in-fact at this stage. It is no trifling matter for medical marketing firms and named physicians to knowingly participate in the unlawful promotion of a pharmaceutical product. Such conduct is not (hopefully) business as usual such that the plea of unknowing complicity with others would ring true. The other detailed allegations in the Complaints, fairly read, show a cohesiveness reasonably satisfying virtually every factor of the guidelines.

---

in various seminars and presentations; the physicians *accepted payments* from Defendants in return for agreeing to "author" and have published articles containing misrepresentations; and the Vendors *knowingly published* articles in a variety of medical journals throughout the country. Defendants' assertion . . . that the Complaints do not allege the participants' knowledge of the fraudulent nature of the Enterprises is incorrect.

Joint Memorandum of Law of the Class and Coordinated Plaintiffs In Opposition to Defendants' Motions to Dismiss, at 20 (filed April 29, 2005).

[9] "(1) whether the associates have a common purpose, (2) whether there is systematic linkage, such as overlapping leadership, structured or financial ties or continuing coordination, (3) whether there is a common communication network for sharing information on a regular basis, (4) whether the associates hold meetings and sessions where important discussions take place, (5) whether the associates wear common colors, signs or insignia to make the group identifiable, and (6) whether the group conducted common training and instruction. None of these factors is dispositive." *AWP I*, at 182.

The Report relies heavily on this Court's decision in *AWP I* for its conclusion that the "hub and spoke" enterprise, without an accompanying "outer rim" to connect the non-defendant participants, is not viable. However, the facts pled by Plaintiffs in the Complaints in this matter are more detailed and, because of the way in which the fraud was carried out, readily distinguishable from the enterprises analyzed in *AWP I*. In *AWP I*, as in *In Re Lupron Marketing and Sales Pracitces Litig.*, 295 F.Supp.2d 148, 175 (D. Mass. 2003), Plaintiffs had alleged an enterprise consisting of each defendant pharmaceutical manufacturer and the various thousands of medical providers who prescribed the drugs at issue in that case. This Court struck down the alleged enterprise for lack of a "rim to connect the spokes," stating "[t]he allegation that each provider was aware that there were likely other providers engaged in parallel schemes is insufficient to establish an association-in-fact RICO enterprise." *AWP I* at 40.

Unlike in *AWP I*, Defendants in these cases employed a small and identifiable "stable of physicians" who were engaged, each through multiple medical marketing firms, to disseminate Defendants' carefully crafted message about the effectiveness of Neurontin for off-label uses. ACC ¶ 98, First Coordinated Amended Complaint ("FCAC") ¶ 89. These physicians and the marketing firms were not just aware of each other's existence; they interacted with one another and with Defendants regularly to coordinate the dissemination of the Neurontin off-label message. Unlike in *AWP I*, where the physicians were unconnected to one another except through their individual dealings with Defendants' sales representatives and their subsequent billing for reimbursement based on the AWP scheme, the relatively small group of physicians in the Neurontin off-label enterprise were not mere spokes connected only through Defendants

or even through a single marketing firm. These "participating physicians would give the same presentation (or a substantially equivalent presentation) at different participating vendor's events." ACC ¶ 57, FCAC ¶¶ 94-95. "Thus a physician participant might speak at a resort for an educational event held by Sudley & Hennessey one week, give an almost identical presentation at a different resort hundreds of miles away for Physicians World the next weekend, and provide the same information (and misrepresentations) at a dinner meeting in between for MEDED at a third location." ACC ¶ 103, FCAC ¶ 94. These physicians, many of whom are named specifically in the Complaints, also "had personal relationships with employees of the Defendants, (sic) frequently Defendants recommended specific individual participants for events." *Id.*

Not only were the participating physicians in communication and coordination with multiple medical marketing firms and with Defendants, but the marketing firms themselves coordinated the various events amongst themselves to "ensure the off-label message reached the most physicians in the most effective manner." ACC ¶ 53, FCAC ¶¶ 41-42. To the extent the enterprises pled here at all approximate the "hub and spoke" variety, the wheel has two interconnected "rims" - one created by the interaction of the marketing firms among themselves to coordinate the dissemination of the fraudulent message and one created by the physicians' interaction and coordination with each other at these events as well as the medical marketing firms and Defendants. *See AIU Insurance Co. et al. v. Lomecs Medical Supply, Inc., et al.*, 2005 U.S. Dist. LEXIS 29666, 21-22 (E.D.N.Y. 2005) (Court rejected argument that a false insurance claim scheme involving an association-in-fact RICO enterprise consisting of doctors, retailers and wholesalers of medical equipment failed as a hub-and-spokes conspiracy because "the

Prescribing Doctors in the case are alleged to work at the same clinics, and . . . to prescribe Supplies to the same patients at different stages of treatment.").

The Report is also quick to dismiss without analysis the alternative enterprises pled in the Complaints consisting of smaller enterprises, holding each smaller enterprise would suffer from the same deficiencies as the larger enterprises. Report at 24, n.15. However, even the Report acknowledges that as to at least one medical marketing firm, Pysician's World, Plaintiffs have pled sufficient facts to establish "systematic linkages" between them and Defendants. Report at 26. This Court, in analyzing the AWP Enterprises pled in *AWP I*, itself acknowledged that although the larger enterprise failed for lack of a "rim," there could exist "multiple and separate enterprises of like character." *AWP I* at 40. Such a concept was unworkable in the context of the thousands of physicians at issue in that case, but not here, where there are a relatively small number of marketing firms and physicians.

Finally, the allegations are of sufficient detail that the claims have been adequately pled. The Report should have permitted the allegations to suffice, permitted discovery to continue, and allow a reanalysis of these issues at the summary judgment and/or trial phase. In ruling on the sufficiency of Plaintiffs' allegations, it is important to bear in mind that the existence of a RICO enterprise, like the other elements of a RICO claim, is ultimately a question of fact for the jury, guided by the applicable factors.[10] It is

---

[10] *See Cianci*, 378 F.3d at 85 (affirming jury's finding of the existence of an enterprise); *U.S. v. Irizarry*, 341 F.3d 273, 286 (3d Cir. 2003) (stating that elements of an enterprise "are questions of fact which, in the first instance, must be resolved by the jury") (internal quotation omitted); *U.S. v. Console*, 13 F.3d 641, 650 (3d Cir. 1993) ("The existence *vel non* of racketeering enterprise is question of fact for the jury."); *U.S. v. DeFries*, 129 F.3d 1293, 1310 n.9 (D.C. Cir. 1997) ("To the extent that the government argues that whether the two unions constituted a single enterprise is a matter of law, it is mistaken."); *U.S. v.*

equally important to bear in mind that "none of these factors is dispositive" of the question as a matter of law.  *AWP I*, at 182.  Plaintiffs respectfully submit that they have sufficiently alleged what can be straightforwardly described as an "association-in-fact" enterprise, and that the ultimate question of whether such an enterprise exists should be left for the trier of fact to decide, on a full record.[11]

---

*Sanders*, 928 F.2d 940, 943 (10th Cir. 1991) (citations omitted) ("The issues of ongoing organization, continuing membership and an enterprise existing apart from the underlying pattern of racketeering are factual questions for the jury.")*; Gentle Wind Proj. v. Garvey*, 407 F. Supp. 2d 282, 288 (D. Me. 2006) (discussing jury's finding of an association-in-fact enterprise); *see also* Kevin F. O'Malley, Jay E. Grenig, Hon. William C. Lee, 3B *Fed. Jury Practice & Instructions Civil* § 161.20 (2001) (in sample jury instruction for RICO claim, instructing jury to determine whether Defendant was associated with an enterprise as alleged); *Eleventh Circuit Pattern Jury Instructions (Civil Cases)* 5.1 (2005); *Fifth Circuit Pattern Jury Instructions (Civil Cases)* 8.1 (2005).

[11] Plaintiffs are confident in the sufficiency of their allegations regarding "systematic linkages" between the RICO enterprise participants.  However, should the Court find these allegations insufficient, Plaintiffs agree with the Report's recommendation that leave to amend be given. Report at 58.  This would allow the Plaintiffs to amend to allege, among other things, that Pfizer, after the merger with Warner-Lambert, contracted with Medical Action Communications, Inc. ("MAC"), a New Jersey medical marketing firm, to write and edit manuscripts and to manage Pfizer's global publication strategy that was larger and more centralized than Warner-Lambert's strategy ever was.  Between 2001 and 2004, MAC developed a significant number of publications on Neurontin for off-label uses, either by ghostwriting the manuscript or editing an author's manuscript based on strict instruction from Pfizer.  MAC policed the content of these journal articles to ensure that they contained false and misleading "key messages" of Neurontin's efficacy for off-label uses. These "key messages" were developed collaboratively by Pfizer and MAC and were designed to be misleading distortions of Neurontin's efficacy in off-label uses.  The goal of this program, which was successfully achieved, was to create a massive proliferation in the literature about Neurontin's off-label uses and the appearance of efficacy.

There were numerous systematic linkages between MAC, Pfizer, and Pfizer's stable of doctors who were willing to lend their names to journal articles.  Numerous MAC employees regularly sat in on monthly meetings dedicated solely to managing Neurontin publications.  MAC kept minutes of the meetings and distributed the results to Pfizer in an "action memorandum" shortly after.  In June 2002, MAC and Pfizer agreed to more fully integrate MAC into Pfizer's publication strategy.  With Pfizer's permission, MAC developed an "action memorandum" format that used Pfizer's letterhead so that MAC could communicate with Pfizer offices around the world.  MAC also was granted

### C.    Plaintiffs Have Alleged RICO Conspiracy Claims

The Report recommends dismissal of Plaintiffs' RICO conspiracy claims, brought under 18 U.S.C. § 1962(d),[12] solely "[b]ecause I have already found that Plaintiffs have failed to establish the existence of an enterprise . . . ." Report at 29. As set forth above, Plaintiffs have sufficiently alleged the existence of multiple RICO enterprises. *See* Part III.B, *supra*. Accordingly, Plaintiffs' RICO conspiracy claims should not be dismissed.

### IV.    THE "STRUCTURE OF THE OFF-LABEL MARKETING CAMPAIGN" IS AN INTEGRAL PART OF DEFENDANTS' FRAUDULENT SCHEME, AND IS NOT PREEMPTED

The Report concludes that "the fraud claims based upon the structure of the off-label marketing campaign 'exist *solely by virtue* of the FDCA disclosure requirements,' and accordingly are preempted." Report at 33-34 (quoting *Buckman*, 531 U.S. at 353 (emphasis in Report). Plaintiffs do not assert any claims based solely on the "structure of the off-label marketing campaign," as that phrase is used in the Report.

The Report summarizes the allegations at issue as follows:

> Plaintiffs contend that Defendants designed the structure of the off-label marketing campaign in such a way as to conceal their involvement in the promotion of Neurontin. Along a similar vein, Plaintiffs claim that Defendants failed to disclose that virtually all publications and studies that supported off-label uses had been financed or subsidized by

---

access to a Pfizer email account so that MAC could directly send emails to Pfizer employees around the world, rather than using a Pfizer liaison.

MAC was aware of the misleading nature of the publications strategy. Not only would MAC devise and enforce the publication misleading "key messages," MAC also helped brainstorm ways to spin negative data as positive by lowering the threshold for claimed efficacy.

These new allegations are derived from the handful of custodial files produced by Defendants in this post-*Franklin* litigation, and may well be only the tip of the proverbial iceberg.

[12] *See* ACC (Second Claim); FCAC (Ninth Claim).

> Defendants. In essence, physician attendees received an
> "infomercial" rather than scientific information. ACC, ¶
> 99. According to Plaintiffs, actions taken to hide
> Defendants' control of the content of the program and
> misrepresent their financial support as an "unrestricted"
> grant were materially false statements. ACC, ¶ 206.
> Plaintiffs reason that had the attending physicians known
> that the programs were "outright promotion," they would
> have viewed the presentations with greater skepticism and
> doubted the claims of the participating physicians that
> Neurontin was effective for the off-label indications. *Id*.

Report at 30. To further summarize, Plaintiffs allege that Defendants designed and

implemented a complex, multi-layered scheme to fraudulently lull physicians into

believing they would receive complete and unbiased information, from independent and

unbiased sources, when they would receive instead only biased and misleading

information, from hand-picked and/or tainted sources.

Plaintiffs' fraud claims are not based on these allegations alone, but on the *further*

allegations that Defendants did *in fact* present biased information, rather than the

complete and unbiased information that physicians justifiably expected. There is, and

should be, a considerable difference between the weight accorded by a physician to the

scientific pronouncements of a pharmaceutical company salesman who lacks a medical

degree, and the considered opinions of colleagues, including "thought leaders" in their

respective fields, presented at a medical education conference hosted by an independent

organization with no apparent agenda and a natural tendency to seek out and present

opposing views. The concealment of a biased source may not be actionable fraud in and

of itself, but presenting biased information to an audience which has a legitimate

expectation of receiving only "fair and balanced" information greatly magnifies its effect,

regardless of whether that expectation is a consequence of, or merely consistent with,

federal regulation. The use of "shills" to provide apparently independent testimonials at a

traveling "medicine show" is a time-honored form of fraud. *See Wikipedia, The Free Encyclopedia*, at http://en.wikipedia.org/wiki/Shill ("A shill is an associate of a person selling goods or services, who pretends no association to the seller and assumes the air of an enthusiastic customer. The intention of the shill is, using crowd psychology, to encourage other potential customers, unaware of the set-up, to purchase said goods or services. Shills are often employed by confidence artists").

Defendants' fraudulent scheme was highly sophisticated, as was its target audience, and the scheme cannot be carved into inactionable pieces with the knife of preemption. Plaintiffs' claims remain claims for fraud, though the fraud was carried out in violation of federal regulations.[13] Accordingly, no part of the claim is preempted. *See Eve v. Sandoz Pharm Corp.*, 2002 WL 181972 at *2 (S.D. Ind. Jan. 28, 2002) (finding no preemption under *Buckman*, because "[n]otwithstanding that information may have [been] misrepresented to or concealed from the FDA, once defendant undertook to misrepresent those facts to plaintiff, or to conceal from plaintiff facts it was bound to disclose, the plaintiff's claim no longer rests simply on the assertion that the agency was defrauded but on the additional fact that she was defrauded.") (quoted in Report at 36).[14]

---

[13] Defendants' violation of federal regulations is directly relevant in at least one respect. Under controlling First Circuit law, "even where there is no falsehood or half-truth: '[T]he failure to disclose information may also constitute a fraudulent representation if the defendant was under a legal, professional or contractual duty to make such a disclosure. . . .'" *Bonilla*, 150 F.3d at 69-70 (citations omitted). The FDA regulations create such a "legal" duty on the part of Defendants.

[14] At page 19 n.14, the Report states that:

> Plaintiffs also allege that the deceptive nature of the campaign, in violation of various FDA regulations, also caused the increase in sales. Because I find that Plaintiffs' attempts to enforce the FDA regulations are preempted, I do not recommend relying upon the foregoing assertion for the causation analysis.

## V.    PLAINTIFFS HAVE PLEADED FRAUD WITH SUFFICIENT PARTICULARITY

### A.    There Are No Claims Based Solely on Verbatim Reports

The Report explains that "a Verbatim Report is an industry publication used to gauge and record physician's responses and impressions of a drug following a continuing medical education conference or seminar. Thus, doctor-attendees fill out the reports to record 'verbatim' their thoughts and impressions of the drugs."  Report at 13.[15]

As stated in the Report, based on a limited number of Verbatim Reports to which Plaintiffs have had access, Plaintiffs allege that Defendants' sales representatives or medical liaisons made misrepresentations concerning Neurontin's effectiveness for pain, restless leg syndrome, bipolar disorder, migraine, and epilepsy monotherapy.  *See* Report at 13-14; *see also* ACC ¶ 148 (epilepsy monotherapy).  Plaintiffs do not ground any of their fraud claims solely on these allegations, and the Report specifically finds that Plaintiffs have sufficiently alleged fraud claims with respect to each of these conditions.[16]

---

As stated above, Plaintiffs allege that their damages were caused by Defendants' fraudulent scheme, irrespective of whether the scheme ran afoul of FDA regulations.

[15] This explanation overlooks one key component. Verbatim Reports are surveys completed by physicians who are hired to provide anonymous feedback following contact with a pharmaceutical company's sales representatives or medical liaisons, much of which is then sold back to the pharmaceutical company.  One of the physician's responsibilities is to record the primary "messages" received from the sales representative, which is to be recorded "verbatim."  The statements reflected in the Verbatim Reports are then sold to drug companies so that they can monitor whether their sales representatives are communicating the proper sales message and staying within FDA rules and regulations.

[16] *See* Report at 39 ("The allegations involving statements about pain, dose dependency, diabetic neuropathy, and monotherapy satisfy Rule 9(b)'s pleading requirements."), 40-41 ("The allegations involving statements made about restless leg syndrome, bipolar, and panic disorder also survive Defendants' Rule 9(b) objection."), 49 ("Defendants allegedly had similar results of a study of Neurontin's utility for migraine and, regarding migraine, they allegedly knew of several other reports of negative study results.  For these

Nonetheless, the Report complains, with respect to the Verbatim Reports, that

Plaintiffs:

> fail to assert the identity of the speaker, and where and precisely when the statement was made. Rule 9(b) requires more than merely alleging that at sometime, or even during a given month, an unidentified medical liaison made a fraudulent statement about Neurontin or that, upon information and belief, the liaisons made fraudulent statements routinely. If the Verbatim Reports sufficiently identified the "when" and "where" of the statement, Plaintiffs could overcome this problem. As the Complaints stand presently, that connection has not been made. Claims based upon the Verbatim Reports should therefore be dismissed for failure to meet Rule 9(b)'s pleading standards.

Report at 42 (citation omitted).

As stated above, Plaintiffs have not alleged any claims based solely on the

Verbatim Reports for the Court to dismiss. Rather, the Verbatim Reports are *evidence* of

Defendants' fraudulent scheme. *See Franklin,* 2003 U.S. Dist. LEXIS 15754, *13

(plaintiff produced sufficient evidence that Defendants' conduct was a substantial factor

in causing the presentation of false Medicaid claims, including "direct evidence" in the

form of "'Verbatim' market-research reports recording doctors' state of mind after

marketing meetings"). At this juncture, Plaintiffs are required only to plead a claim for

fraud, not prove it in all its particulars. *See United States of America ex rel. David

Franklin v. Parke-Davis,* 147 F. Supp. 2d 39, 46-47 (D. Mass. 2001) (while plaintiff is

required to "allege the circumstances of the fraud, he is not required to plead all of the

evidence or facts supporting it"). Moreover, even if Plaintiffs' claims *were* grounded

solely on misleading statements reflected in the Verbatim Reports, Plaintiffs would not

---

conditions, Plaintiffs have stated a claim of fraud that survives Defendants' challenges under 12(b)(6)").

be able, at this point, to identify the physician and the sales representative (the "who") involved in a specific sales call because this information is confidential and Verispan, LLC has refused thus far to produce this information, even if subject to a protective order. Thus, the missing particulars regarding the "who," "when," and "where" of the statements are uniquely in control of Defendants, and will likely be revealed only through discovery.[17] Accordingly, Plaintiffs are excused from pleading those particulars at this juncture. *See Franklin*, 147 F. Supp. 2d at 47 ("strict application of requirements of Rule 9(b) may be relaxed in certain circumstances. For instance, where facts underlying the fraud are 'peculiarly within the defendants' control,' a plaintiff may be excused from pleading the circumstances of the fraud with a high degree of precision" (citations omitted)). *Accord In re Pharmaceutical Indus. Avg. Wholesale Price Litig.*, 307 F. Supp. 2d 196, 206 (D. Mass. 2004) ("It is true that Plaintiffs have not alleged specific communications for each enterprise, but courts have recognized that relaxation of pleading requirements is permitted where information is in a defendant's sole possession" (citations omitted)).

---

[17] There is a simple methodology that would permit the "who," "when," and "where" of the marketing events and sales calls contained in the Verbatim Reports to be determined. All that is needed is for Pfizer to produce its entire electronic sales call database and documents relating to all Neurontin marketing events. From the limited documents Plaintiffs already possess, this methodology can be successfully demonstrated. For example, Plaintiffs can demonstrate that on May 4, 1998, Dr. "618947," a Florida psychiatrist, attended a dinner program on "Emerging Uses of Anticonvulsants" at Patrick's Bayside Bistro in St. Petersburg Beach, Florida. According to Dr. 618947's Verbatim Report, the main theme of the program was Neurontin's "uses in bipolar disorders." From the documents produced in the *Franklin* litigation, it is known that Dr. "618947" was exposed to false statements about Neurontin, including that there was only "favorable" data relating to Neurontin and bipolar disorder. This methodology can be employed for thousands of other physicians exposed to the marketing of Neurontin.

**B.**    **Plaintiffs' Allegations With Respect To Restless Leg Syndrome Are Sufficient**

The Report finds Plaintiffs' allegations concerning Restless Leg Syndrome ("RLS") insufficient, ostensibly because "Plaintiffs fail to allege the existence of a negative study." *See* Report at 51. This is an overly crabbed reading of Plaintiffs' complaints.

As the Report itself acknowledges, the complaints specifically allege that Defendants themselves sponsored a negative study conducted by Dr. Ehrenberg for "'periodic limb movement, a sleep disorder closely related to [but not the same as] restless leg syndrome.'" *Id.* (quoting ACC, ¶ 144 (bracketed language *not* in ACC)); *see also* FACC, ¶ 114 (same). The Report rejects the sufficiency of this allegation, because:

> Plaintiffs fail to plead with particularity the connection between periodic limb movement and restless leg syndrome. Without this connection, it is not plausible that Plaintiffs can prove a set of facts that renders false and misleading statements about Neurontin's effectiveness for one syndrome based upon the negative results of a study pertaining to another syndrome.

Report at 51.

In refusing to accept the sufficiency of Plaintiffs' allegation that the two disorders are "closely related," the Report would require that Plaintiffs plead evidence rather than facts. It is well established that "for purposes of surviving a motion to dismiss under Rules 12(b)(6) and 9(b), plaintiff need only plead specific facts giving rise to an inference of fraud; plaintiff need not prove his case at this early stage." *See Steiner v. Unitrode Corp.*, 834 F. Supp. 40, 45 (D. Mass.1993) (citing *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S. Ct. 1683, 1686, 40 L. Ed.2d 90 (1974)).

Here, there is more than an *inference* that there is a connection between RLS and

periodic limb movement disorder -- Plaintiffs have made a direct assertion.  In fact, the

*title* of Dr. Ehrenberg's study was "to assess the efficacy of gabapentin (Neurontin) in the

treatment of restless legs syndrome/periodic limb movements."[18]  A detailed presentation

of scientific *evidence* of the close connection between the two conditions is not

necessary.[19]  *Id.*  Plaintiffs' allegations concerning suppression of the negative Ehrenberg

trial are sufficient.[20]

---

[18] The allegation that Dr. Ehrenberg's study addressed RLS in addition to Periodic Limb
Movement Disorder ("PLMD") was inadvertently omitted from the complaints, and can
be supplied, if necessary, by amendment.

[19] Should the Court disagree, Plaintiffs can amend their complaints to specifically
describe evidence of the close connection between RLS and PLMD.  *See, e.g.*, National
Institute of Neurological Disorders and Stroke, National Institutes of Health, *Restless
Legs Syndrome Fact Sheet*, available at
http://www.ninds.nih.gov/disorders/restless_legs/detail_restless_legs.htm  (last modified
January 25, 2006).  RLS and PLMD are both referred to as nocturnal myoclunus and
often occur together.  80% of patients with RLS are found to have PLMD.  *Id.*  RLS and
PLMD produce similar symptoms of frequent or involuntary limb movements that
interfere with the quality and duration of sleep.  *See* Rotary Club of Santa Monica and
Center for Healthy Aging, *Restless Legs Syndrome (RLS) and Periodic Limb Movements
in Sleep (PLMS): Symptoms, Causes, Diagnosis, and Treatment*, available at
http://www.helpguide.org/life/restless_leg_syndrome_rls.htm (last modified May 2,
2005).  Most importantly, RLS and PLMD are both treated with the same types of drugs,
including dopaminergics and benzodiazepines.  *See* National Institute of Neurological
Disorders and Stroke, National Institutes of Health, *Restless Legs Syndrome Fact Sheet*,
available at http://www.ninds.nih.gov/disorders/restless_legs/detail_restless_legs.htm
(last modified January 25, 2006).

[20] The Report also rejects as insufficient Plaintiffs' allegation that an article on RLS
widely circulated by Defendants falsely stated that the authors had not received any
money from Defendants, when Defendants had paid them tens of thousands of dollars to
speak at Neurontin off-label promotional events (likely including discussion of their own
"unbiased" study), and one of the authors was a consultant assisting the Defendants in
developing the market for off-label uses of Neurontin.  Report at 52.  As with "the
structure of the off-label marketing campaign" (*see* Part IV, *supra*), the presentation of
information from biased sources masquerading as independent was an integral part of
Defendants' fraudulent scheme.

## VI.  DISMISSAL OF CLASS PLAINTIFFS' UNJUST ENRICHMENT CLAIM IS PREMATURE

The Report correctly finds that Plaintiffs have stated claims for unjust enrichment, except that:

> Unjust enrichment is an equitable claim, and is not available to Plaintiffs who have an adequate remedy at law. Because I recommend that the Class Plaintiffs' state law fraud claims survive *in some respects*, Class Plaintiffs have an adequate remedy at law. Accordingly, I recommend that the Court ALLOW the Motion to Dismiss the Class Plaintiffs' Unjust Enrichment claim.

Report at 54 (citation omitted, emphasis added).

At this stage of the litigation, this Court has repeatedly denied motions to dismiss claims for unjust enrichment on the ground that the plaintiff has an adequate remedy at law:

> Courts have been flexible regarding when in the trial they require the plaintiff to choose its avenue of recovery. *See In re Lupron*, 295 F.Supp.2d at 182 n. 39 (dismissing unjust enrichment claim where plaintiffs had adequate RICO remedy, but noting that it was open to plaintiffs to elect to proceed under unjust enrichment theory); *Sentinel Prods. Corp. v. Mobile Chem. Co.*, 2001 WL 92272, at *22 n. 15 (D.Mass. Jan. 17, 2001) (allowing plaintiff to choose avenue of recovery at the trial stage). [¶] . . . [S]ince Massachusetts may have to elect only one theory of recovery eventually, *[the Court] will not force Plaintiff to choose its remedy at this stage of the litigation*.

*Massachusetts v. Mylan Laboratories*, 357 F. Supp. 2d 314, 324 (D. Mass. 2005) (Saris, J.) (emphasis added). *Accord Sentinel Prods. Corp. v. Mobile Chem. Co.*, 2001 WL 92272, at *22 n.15 (D.Mass. Jan. 17, 2001) (Saris, J.) ("It may be that the existence of an action at law will render the unjust enrichment claim duplicitous at the trial stage.

However, the plaintiff should have the option under which theory to proceed").[21]

Accordingly, dismissal of Class Plaintiffs' unjust enrichment claims is premature.[22]

## VII.    THE CHOICE OF LAW ISSUE, AND THE METHOD OF PROVING CAUSATION, SHOULD NOT BE PRE-JUDGED

Plaintiffs agree with the Report's conclusion that the issues of whether the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1, *et seq.* (the "NJCFA"), protects non-residents, and whether TPPs have standing to assert claims under the NJCFA, are "more appropriately left for resolution at either the class certification or summary judgment stage . . . " Report at 53.  *See also* Report at 53 n.23.  However, the remainder of that sentence – "when the laws of the fifty states will be applied to discrete groups of plaintiffs based upon their domicile" – appears to prejudge the choice of law issue. Accordingly, Class Plaintiffs object to this statement in the Report, which is mere *dicta*, but will not burden the Court with a complicated choice of law argument unnecessary to resolution of this motion to dismiss.

Similarly, the Report concludes that "Plaintiffs have sufficiently established

---

[21] In support of dismissal, the Report cites only a dissenting opinion in *Davis v. Cox*, 356 F.3d 76, 95 (1st Cir. 2004), for the uncontroversial proposition that."[u]njust enrichment is an equitable claim, and is not available to Plaintiffs who have an adequate remedy at law."  Report at 54.  Davis involved an ex-wife's effort to enforce the property division components of a divorce decree against her ex-husband in bankruptcy court.  In *disagreeing* with the majority's holding allowing imposition of a constructive trust on the ex-husband's IRA, the dissent argued that "[n]ormally, we may resort to equitable remedies, such as unjust enrichment and its concomitant remedy of constructive trust, only after concluding that the complainant has or will have no 'adequate' remedy at law." 356 F.3d at 95.  The case is irrelevant to the issue presented here.

[22] For the same reason, the Coordinated Plaintiffs' unjust enrichment claims should not be dismissed in favor of their legal claims, assuming the Court agrees that the Coordinated Plaintiffs have stated a cognizable injury.  *See* Report at 54 ("I recommend that the Court DENY the Motion to Dismiss the Coordinated Plaintiffs' Unjust Enrichment claim because they have no adequate remedy at law due to their failure to allege cognizable injury.").

causation for present purposes of the motion to dismiss," Report at 18, but goes on to characterize Class Plaintiffs' burden of proof of causation at later stages of the case, commenting that "[t]he named plaintiffs, for example, will need to establish that their physicians prescribed Neurontin as a result of Defendants' fraudulent or misleading statements." Report at 19. Once again, this is mere *dicta*, and the method of proving causation should not be pre-judged, but more appropriately addressed at later stages of the case. *See Franklin,* 2003 U.S. Dist. LEXIS 15754, *12-*13 ("Whether Parke-Davis's conduct was a substantial factor in causing the presentation of false Medicaid claims is a question of fact. Relator has produced enough evidence on this score to create at least a genuine issue of material fact. In particular, Relator has produced circumstantial evidence (e.g., the rates of off-label prescriptions before and after physician conferences hosted by Parke-Davis) and direct evidence (the 'Verbatim' market-research reports recording doctors' state of mind after marketing meetings). . . . [T]he Court will defer the daunting task of determining whether a reliable statistical method exists for measuring nation-wide damages.").

## VIII.   IF NECESSARY, LEAVE TO AMEND SHOULD BE GRANTED

Plaintiffs believe that the existing allegations of their complaints are sufficient to support their objections to the Report.[23] However, to the extent the Court finds these allegations insufficient, Plaintiffs concur with the Report's recommendation "that the Court allow Plaintiffs to file amended complaints within sixty (60) days from the date of the Court's ruling on this Report and Recommendation." Report at 58.

---

[23] Plaintiffs *do* request leave to amend to correct the perceived deficiencies in their allegations concerning Defendants' promotion of Neurontin for the treatment of social phobia. *See* Report at 41, 51.

Dated:  March 3, 2006                    Respectfully submitted,

                                         **For the Class:**

                                          */s/ Barry Himmelstein* _____
                                         **LIEFF, CABRASER, HEIMANN & BERNSTEIN,
                                         LLP**
                                         Barry Himmelstein, Esq.
                                         275 Battery Street, 30th Floor
                                         San Francisco, CA  94111-3339

                                         **GREENE & HOFFMAN**
                                         Thomas Greene, Esq.
                                         125 Summer Street
                                         Boston, MA  02110


                                         Thomas M. Sobol, Esq.
                                         **HAGENS BERMAN LLP**
                                         One Main Street, 4th Floor
                                         Cambridge, MA  02142

                                         **DUGAN & BROWNE**
                                         James Dugan, Esq.
                                         650 Poydras Street, Suite 2150
                                         New Orleans, LA  70130


                                         **BARRETT LAW OFFICE**
                                         Don Barrett, Esq.
                                         404 Court Square North
                                         P.O. Box 987
                                         Lexington, MS  39095
                                         **LAW OFFICES OF DANIEL BECNEL, JR.**
                                         Daniel Becnel, Jr., Esq.
                                         106 W. Seventh Street
                                         P.O. Drawer H
                                         Reserve, LA  70084

                                         **Co-Lead Counsel for Plaintiffs and the Class**

**For Plaintiff Aetna, Inc.:**


*/s/  Peter A. Pease*
    Peter A. Pease, Esq. (BBO #392880)

**BERMAN DEVALERIO PEASE
TABACCO BURT & PUCILLO**
One Liberty Square
Boston, MA  02109
Telephone:  (617) 542-8300
Facsimile:  (617) 542-1194

**OF COUNSEL:**

**LOWEY DANNENBERG
BEMPORAD & SELINGER, P.C.**
Richard Bemporad, Esq.
Richard W. Cohen, Esq.
Gerald Lawrence, Esq.
Peter St. Phillip, Jr., Esq.
The Gateway – 11th Floor
One North Lexington Avenue
White Plains, NY  10601 – 1714
Telephone:  (914) 997-0500
Facsimile:  (914) 997-0035

**BERMAN DEVALERIO PEASE
TABACCO BURT & PUCILLO**
Joseph J. Tabacco, Jr., Esq.
425 California Street, Suite 2025
San Francisco, CA  94104-2205
Telephone:  (415) 433-3200
Fcsimile:  (415) 433-6382

**JOHN F. INNELLI, LLC**
John F. Innelli, Esq.
1818 Market Street, Suite 3620
Philadelphia, PA  19103
Telephone:  (215) 561-1011
Facsimile:  (215) 561-0012

**For Plaintiffs Guardian Life Insurance Co. of America, Kaiser Foundation Health Plan, Inc. and Kaiser Foundation Hospitals:**


*/s/ Thomas G. Shapiro*
   Thomas G. Shapiro (BBO #454680)

Theodore Hess-Mahan (BBO #557109)
**SHAPIRO HABER & URMY LLP**
53 State Street
Boston, MA  02109
Telephone:  (617) 439-3939
Facsimile:  (617) 439-0134

**OF COUNSEL:**
**COHEN, MILSTEIN, HAUSFELD & TOLL, P.L.L.C.**
Linda P. Nussbaum, Esq.
150 East 52nd Street, 30th Floor
New York, NY  10022
Telephone:  (212) 838-7797
Facsimile:  (212) 8383-7745


               -and-


**COHEN, MILSTEIN, HAUSFELD & TOLL, P.L.L.C.**
Michael D. Hausfeld, Esq.
Marlene F. Gibbons, Esq.
Justine J. Kaiser, Esq.
1100 New York Avenue, NW
West Tower, Suite 500
Washington, DC  20005
Telephone:  (202) 408-4600
Facsimile:  (202) 408-4699


**RAWLINGS & ASSOCIATES, PLLC**
Mark D. Fischer, Esq.
Mark Sandmann, Esq.
325 W. Main Street
Louisville, KY  40202
Telephone:   (502) 587-1279
Facsimile:  (502) 584-8580

**JOEL Z. EIGERMAN, ESQ.**
50 Congress Street, Suite 200
Boston, MA  012109
Telephone:  (617) 367-0014
Facsimile:  (617) 523-5612