UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL Docket No. 1629<br>Master File No. 04-10981<br>Judge Patti B. Saris<br>Mag. Judge Leo T. Sorokin |
| THIS DOCUMENT RELATES TO:<br><br>HARDEN MANUFACTURING CORPORATION; LOUISIANA HEALTH SERVICE INDEMNITY COMPANY, dba BLUECROSS/BLUESHIELD OF LOUISIANA; INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL NO. 68 WELFARE FUND; ASEA/AFSCME LOCAL 52 HEALTH BENEFITS TRUST; GERALD SMITH; and LORRAINE KOPA, on behalf of themselves and all others similarly situated, v. PFIZER INC. and WARNER-LAMBERT COMPANY | |
| THE GUARDIAN LIFE INSURANCE CO. OF AMERICA v. PFIZER, INC. and AETNA, INC. v. PFIZER, INC. | |

**PLAINTIFFS' JOINT RESPONSE TO DEFENDANTS' MEMORANDUM
OF LAW IN SUPPORT OF THEIR OBJECTIONS TO REPORT
AND RECOMMENDATION OF MAGISTRATE JUDGE
LEO T. SOROKIN DATED JANUARY 31, 2006**

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ............................................................................................ 1

II.   THE COORDINATED PLAINTIFFS HAVE APPROPRIATELY
      ALLEGED INJURY IN THEIR CLAIM FOR UNJUST ENRICHMENT ......... 3

III.  PLAINTIFFS' NJCFA CLAIMS SHOULD NOT BE DISMISSED ................... 5

      A.    The Report Properly Defers Consideration of the Choice of Law
            Issue ................................................................................................ 5

      B.    The NJCFA May Be Applied to the Claims of Non-Residents ................ 7

      C.    TPPs Are "Persons" Entitled to the Protections of the NJCFA ............... 10

IV.   CLASS PLAINTIFFS' COMMON LAW FRAUD CLAIM SHOULD
      NOT BE DISMISSED ....................................................................................... 15

      A.    Defendants' Argument Is Procedurally Improper ................................... 15

      B.    A Presumption of Reliance Applies ........................................................ 16

V.    THE CLASS COMPLANT ADEQUATELY ALLEGES FRAUD ................... 18

      A.    Defendants' Factual Arguments Are Procedurally Improper ................. 18

      B.    The Extrinsic Documents Submitted By Defendants Should Not Be
            Considered on a Motion to Dismiss ....................................................... 19

      C.    The "Evidence" Submitted by Defendants Confirms That They
            Committed Fraud .................................................................................... 20

            1.    Epilepsy Monotherapy ................................................................ 20

            2.    Diabetic Peripheral Neuropathy ................................................. 25

            3.    Bipolar Disorder .......................................................................... 27

            4.    Panic Disorder ............................................................................ 29

            5.    Migraine ....................................................................................... 29

## TABLE OF AUTHORITIES

**Page**

### Cases

*Alternative Energy, Inc. v. St. Paul Fire & Marine Ins. Co.*,
  267 F.3d 30 (1st Cir. 2001) ........................................................................ 20

*Arc Networks, Inc. v. Gold Phone Card Co.*,
  756 A.2d 636 (N.J. Super. Ct. Law. Div. 2000) ........................................ 13

*Beddall v. State St. Bank & Trust Co.*,
  137 F.3d 12 (1st Cir. 1998) ........................................................................ 19

*BOC Group v. Lummus Crest, Inc.*,
  597 A.2d. 1109 (N.J. Super Ct. Law Div. 1990) ........................................ 13

*Borden v. Sec'y of Health and Human Svcs.*,
  836 F.2d 4 (1st Cir. 1987) .................................................................... 16, 19

*Boyes v. Greenwich Boat Works*,
  27 F. Supp. 2d 543 (D. N.J. 1998) ............................................................ 10

*Cochran v. Quest Software, Inc.*,
  328 F.3d 1 (1st Cir. 2003) ............................................................................ 8

*Computer Systems Engineering, Inc. v. Qantel Corp.*,
  740 F.2d 59 (1st Cir. 1984) .......................................................................... 9

*Cope v. Metropolitan Life Ins. Co.*,
  82 Oh. St.3d 426, 696 N.E.2d 1001 (1998) ............................................... 17

*Desiano v. Warner-Lambert Co.*,
  326 F.3d 339 (2d Cir. 2003) ........................................................... 4, 12, 14

*Fairview Mach. & Tool Co. v. Oakbrook Int'l*,
  77 F. Supp. 2d 199 (D. Mass. 1999) ............................................................ 5

*Ferens v. John Deere Co.*,
  494 U.S. 516 (1990) ...................................................................................... 9

*Fudge v. Penthouse Int'l, Ltd.*,
  840 F.2d 1012 (1st Cir. 1988) .................................................................... 20

*Gantes v. Kason Corp.*,
  679 A.2d 106 (N.J. 1996) ........................................................................... 10

*Goodman v. Pres. and Trustees of Bowdoin Coll.*,
  135 F. Supp. 2d 40 (D. Me. 2001) ............................................................. 19

*Grace v. Perception Technology Corp.*,
  128 F.R.D. 165 (D. Mass. 1989) ................................................................ 10

*Greene v. Rhode Island*,
  398 F.3d 45 (1st Cir. 2005) ........................................................................ 20

*Hundred East Credit Corp. v. Eric Schuster Corp.*,
  212 N.J. Super. 350, 515 A.2d 246 (N.J. Super. Ct. App. Div. 1986) ......... 12

## TABLE OF AUTHORITIES

**Page**

*In re Buspirone Patent Litig.*,
  185 F. Supp. 2d 363 (S.D.N.Y. 2002) ........................................................... 6

*In re Cabletron Systems, Inc.*,
  311 F.3d 11 (1st Cir. 2002) ....................................................................... 25

*In re Managed Care Litig.*,
  298 F. Supp. 2d 1259 (S.D. Fla. 2003) ................................................. 14, 15

*In re Pharmaceutical Industry Average Wholesale Price Litigation*,
  230 F.R.D. 61 (D. Mass. 2005) ................................................................... 7

*In re Relafen Antitrust Litig.*,
  221 F.R.D. 260 (D. Mass. 2004) ................................................................. 6

*In re Rezulin Prod. Liab. Litig.*,
  392 F. Supp. 2d 597 (S.D.N.Y. 2005) ....................................................... 14

*Int'l Union of Op. Eng'rs Local 68 Welfare Fund v. Merck & Co., Inc.*,
  No. ATL-L-3015-04 (N.J. Super. Ct. Atl. Cty. July 8, 2004) ................. 12, 14

*International Union of Operating
  Engineers Local No. 68 Welfare
  Fund v. Merck & Co.*,
  2005 WL 2205341 (N.J. Super. Law Div., Jul. 29, 2005) ....................... 9, 10

*International Union of Operating Engineers Local #68 Welfare Fund*,
  ____ A.2d ____, 2006 WL 827285 (N.J. Super. A.D., Mar. 31, 2006) ............ 9, 10, 11

*Kavky v. Herbalife Int'l of Am.*,
  359 N.J. Super. 497, 820 A.2d 677 (N.J. Super. Ct. App. Div. 2003)................... 13, 14

*Klaxon v. Stentor Elec. Mfg. Co.*,
  313 U.S. 487 (1941)................................................................................... 8

*Latman v. Costa Cruise Lines, N.V.*,
  758 So.2d 699 (Fla. Dist. Ct. App. 2000) ................................................. 18

*Mass. Eye & Ear Infirmary v. QLT Phototherapies, Inc.*,
  412 F.3d 215 (1st Cir. 2005)..................................................................... 5

*Massachusetts v. Mylan Laboratories*,
  357 F. Supp. 2d 314 (D. Mass. 2005) ..................................................... 3, 4

*Med. Soc'y of N.J. v. AmeriHealth HMO, Inc.*,
  868 A.2d 1162 (N.J. Super. Ct. App. Div. 2005) ....................................... 14

*Med. Soc'y of N.J. v. Oxford Health
  Plans, Inc.*,
  No. A-1485-03T1 (N.J. Super. Ct. App. Div. Feb. 14, 2005) ..................... 14

*Menowitz v. Brown*,
  991 F.2d 36 (2d Cir. 1993) ....................................................................... 8

## TABLE OF AUTHORITIES

**Page**

*Paterson-Leitch Co. v. Mass. Munic. Wholesale Elec. Co.*,
840 F.2d 985 (1st Cir. 1988).................................................................. 15, 19

*Payne v. Goodyear Tire & Rubber Co.*,
216 F.R.D. 21 (D. Mass. 2003)..................................................................... 6

*Peterson v. BASF Corp.*,
618 N.W.2d 821 (Minn. Ct. App. 2001)...................................................... 10

*Phillips v. Ford Motor Co.*,
No. 99-L-1041, 2003 WL 23353492 (Ill Cir., Sept. 15, 2003).................... 17

*Sentinel Prods. Corp. v. Mobile Chem. Co.*,
2001 WL 92272 (D. Mass. Jan. 17, 2001).................................................... 3

*Shannon-Vail Five Inc. v. Bunch*,
270 F.3d 1207 (9th Cir. 2001) ...................................................................... 8

*Sharp v. Coopers & Lybrand*,
649 F.2d 175 (3d Cir. 1981) ....................................................................... 17

*Singh v. Superintending School Comm.*,
593 F. Supp. 1315 (D. Me. 1984) .............................................................. 16

*Spark v. MBNA Corp.*,
178 F.R.D. 431 (D. Del. 1998) .................................................................. 17

*Suna v. Bailey Corp.*,
107 F.3d 64 (1st Cir. 1997)......................................................................... 25

*Varacallo v. Mass. Mut. Life Ins. Co.*,
332 N.J. Super. 31, 752 A.2d 807 (N.J. Super. A.D. 2000)................... 17, 18

*Vasquez v. Superior Court of San Joaquin County*,
4 Cal.3d 800, 94 Cal.Rptr. 796 (1971)....................................................... 17

*Velazquez-Arroyo v. MCS Life Ins. Co.*,
2006 WL 533753 (D.P.R., Mar. 6, 2006) .............................................. 20, 21

*Watterson v. Page*,
987 F.3d 1 (1st Cir. 1993).......................................................................... 19

*Wilner v. Sunset Life Ins. Co.*,
78 Cal.App.4th 952, 93 Cal.Rptr. 2d 413 (2000)........................................ 17

**Statutes**
28 U.S.C.
§ 1331 .......................................................................................................... 9

28 U.S.C.
§ 1332 .......................................................................................................... 9

28 U.S.C.
§ 1407 .......................................................................................................... 8

## TABLE OF AUTHORITIES

**Page**

New Jersey Statutes Annotated
§ 56:8-1 ..................................................................................................... 1, 11

New Jersey Statutes Annotated
§ 56:8-19 ........................................................................................................ 8

**Rules**
Federal Rules of Civil Procedure
Rule 72 ............................................................................................................ 1

Local Rules for United States
Magistrates Judges
Rule 3 ............................................................................................................. 1

**Treatises**
*Restatement (Second) of Conflict of Laws*
§ 148 ...................................................................................................... 10, 16

Pursuant to Rule 72(b) of the Federal Rules of Civil Procedure, and Rule 3(c) of the Local Rules for United States Magistrates Judges, Class Plaintiffs (*Harden Manufacturing Corp., et al.* v. *Pfizer, Inc., et al.*) and the Coordinated Plaintiffs (*The Guardian Life Insurance Company of America* v. *Pfizer, Inc.* and *Aetna, Inc.* v. *Pfizer, Inc.*) (collectively, "Plaintiffs") respectfully submit this joint response to the Memorandum of Law of Pfizer Inc. and Warner-Lambert Company In Support of Their Objections to the Report and Recommendation of Magistrate Judge Leo T. Sorokin dated January 31, 2006 ("Defs. Obj. Br." and the "Report," respectively).[1]

## I.    **INTRODUCTION**

First, Defendants argue that the Coordinated Plaintiffs' unjust enrichment claim should be dismissed, because they have failed to plead an "impoverishment."  The Coordinated Plaintiffs have lost tens of millions of dollars as a result of Defendants' fraudulent scheme, which is more than sufficient to satisfy this pleading requirement.

Second, Defendants argue that the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1, *et seq.* (the "NJCFA"), cannot be applied to benefit non-residents.  This choice of law argument is both untimely and incorrect, as New Jersey courts have repeatedly allowed non-residents to sue under the NJCFA, and a published New Jersey appellate decision issued only ten days ago confirms that under the fact pattern alleged by Class

---

[1] Defendants have filed not one, but two sets of objections, and Plaintiffs respond to each of them separately.  In this document, Plaintiffs respond to the Memorandum of Law of Pfizer Inc. and Warner-Lambert Company In Support of Their Objections to the Report and Recommendation of Magistrate Judge Leo T. Sorokin dated January 31, 2006 (docket entry no. 287).  In the accompanying Plaintiffs' Response to Defendants' Objections to Report and Recommendation of Magistrate Judge Leo T. Sorokin Dated January 31, 2006, Plaintiffs respond to the Objections of Defendants Pfizer Inc. and Warner-Lambert Company to Report and Recommendation of Magistrate Judge Leo T. Sorokin Dated January 31, 2006 (docket entry no. 286).

1

Plaintiffs, a national class can and should be certified under the NJCFA.

Third, Defendants argue that third-party payers ("TPPs") are not "consumers" with standing to sue under the NJCFA, because Neurontin is not consumed by them, but by their beneficiaries or insureds. The NJCFA expressly provides that it may be invoked by any "person" who has suffered an ascertainable loss as a result of a violation thereof; it does not even use the word "consumers." Defendants' argument has been rejected by the New Jersey courts, which require only that the violation involve a *consumer product*, such as Neurontin.

The remainder of Defendants' brief is devoted to arguments they never raised before the Magistrate Judge, based on extrinsic evidence Defendants never presented to the Magistrate Judge. These arguments should be disregarded.

Specifically, Defendants argue that Class Plaintiffs' common law fraud claim should be dismissed for failure to allege reliance. In 80 pages of briefing on their motions to dismiss, Defendants never once advanced this argument. They may not advance it now, in the guise of objections to the absence of findings they never asked the Magistrate Judge to make, based on arguments they never asked him to consider. In any event, should the Court reach the argument, Plaintiffs have alleged reliance, and are entitled to a *presumption* of reliance, based on Defendants' material misrepresentations and omissions.

Finally, fully half of Defendants' brief (Part IV) is devoted to detailed factual and legal arguments never presented to the Magistrate Judge. These arguments, based on selected excerpts from extrinsic evidence, are procedurally improper, and the documents submitted by Defendants are not the type of extrinsic evidence that may properly be

considered on a motion to dismiss.  Should the Court decide to consider these arguments, it will see that the evidence proffered by Defendants confirms the trickery of which they stand accused.

## II.     THE COORDINATED PLAINTIFFS HAVE APPROPRIATELY ALLEGED INJURY IN THEIR CLAIM FOR UNJUST ENRICHMENT

The Report (at 57) correctly recommends that Coordinated Plaintiffs' claim for unjust enrichment (Count XIII of the First Coordinated Amended Complaint ("FCAC")) be sustained.  As explained in Section VI (pages 26-27) of Plaintiffs' Joint Objections to Report and Recommendation on Defendants' Motions to Dismiss the Amended Class Complaint and the First Coordinated Amended Complaint ("Plaintiffs' Joint Objections," docket entry no. 288), dismissal of *any* plaintiff's unjust enrichment claim would be unwarranted at this early stage of the litigation.  *See, e.g., Massachusetts v. Mylan Laboratories*, 357 F. Supp. 2d 314, 324 (D. Mass. 2005) (Saris, J.); *Sentinel Prods. Corp. v. Mobile Chem. Co.*, 2001 WL 92272, at *22 n.15 (D. Mass. Jan. 17, 2001) (Saris, J.) (allowing plaintiff to defer choice of recovery until trial stage).

Dismissal would be particularly unjust for Coordinated Plaintiffs. As detailed in the FCAC and Section II (pages 3-10) of Coordinated Plaintiffs' Objections to the Report ("Coord. Br.," docket entry no. 283), Coordinated Plaintiffs and other TPPs were the principal financial victims of Defendants' fraudulent conduct.  The Report quotes the FCAC for verbatim instructions by Defendants to their medical liaisons to palm off Neurontin (a drug with extremely limited approved uses) for "everything," irrespective of efficacy, dosage limitations "or that safety crap."  Report at 12-13, quoting FCAC ¶ 33. As further alleged and noted in the Report, Defendants profited handsomely from their promotional scheme:  Neurontin sales soared from $97.5 million in 1995 to more than

$2.7 billion in 2003.  FCAC ¶¶ 1-8, 17; Report at 14.  By 2003, 90% of all Neurontin sales were for off-label uses.  FCAC ¶ 4.

Coordinated Plaintiffs (and other TPPs) paid the vast majority of the purchase price of Neurontin and suffered the "largest direct economic injury" from the wrongdoing.  *See, e.g., Desiano v. Warner-Lambert Co.*, 326 F.3d 339, 350 & n.10 (2d Cir. 2003).  As a result, Defendants were enriched by tens of millions of dollars at Coordinated Plaintiffs' expense.  *See, e.g.,* FCAC ¶¶ 1-8, 15-17, 30-168, 323-26.  Yet, the Report recommends dismissal of all of Coordinated Plaintiffs' claims other than the claim for unjust enrichment.  Report at 57 & n.26.[2]

In *Massachusetts v. Mylan Laboratories, supra*, this Court denied a motion to dismiss a claim for unjust enrichment on grounds applicable here:  "'A suit in equity will lie where the remedy at law is not clear or as adequate and complete as that which equity can afford.'"  357 F. Supp. 2d at 324 (quotation omitted).

Defendants' sole objection to the recommendation is that Coordinated Plaintiffs have failed to allege "an impoverishment," *i.e.*, an injury.  *See* Defs. Obj. Br. at 3.  A fair reading of the FCAC confirms that Coordinated Plaintiffs have alleged injury —

---

[2] If greater particularity is required, Coordinated Plaintiffs can and will plead additional facts evidencing their direct economic injuries, including the following:  (a) Neurontin was a relatively expensive drug for which Coordinated Plaintiffs paid, on average, more than $100 per prescription; (b) Coordinated Plaintiffs paid more than *85%* of the cost of the Neurontin prescriptions written for their insureds; (c) Coordinated Plaintiffs paid millions of dollars in excessive costs for Neurontin prescriptions written for off-label uses at excessive dosages or for which Neurontin was no more effective than a placebo or where other less costly alternatives were available; and (d) the measures available to or taken by Coordinated Plaintiffs to reduce their economic harm when they became aware of Defendants' wrongdoing, including instituting dosage limitations on the drug and mandating that the patient be prescribed other epilepsy treatments before Neurontin is prescribed.  Similarly, Coordinated Plaintiffs can and will, if necessary, provide greater particularity that Neurontin was ineffective for certain conditions, or that other available treatments were safer.  *See also* Coord. Br. at 3-5, 10.

excessive payments to Defendants aggregating tens of millions of dollars directly attributable to Defendants' misrepresentations and omissions concerning Neurontin's uses, recommended dosages, safety and efficacy.  *See, e.g.*, FCAC ¶¶ 1-8, 15-17, 30-168, 323-26.

The two decisions cited by Defendants on this issue confirm that Coordinated Plaintiffs' claim for unjust enrichment should be sustained.  In *Mass. Eye & Ear Infirmary v. QLT Phototherapies, Inc.*, 412 F.3d 215, 234 & n.7 (1st Cir. 2005), the First Circuit reversed the grant of summary judgment dismissing a claim for unjust enrichment because, as here, the claim might provide an "equitable stopgap" for inadequacies in the remedies available at law.  In *Fairview Mach. & Tool Co. v. Oakbrook Int'l*, 77 F. Supp. 2d 199, 204-05 (D. Mass. 1999), the Court granted plaintiff a preliminary injunction on an equitable claim where, as here, plaintiff paid for goods without receiving fair value in return.

The Report correctly recommends that Coordinated Plaintiffs' claim for unjust enrichment be sustained.  Coordinated Plaintiffs have appropriately alleged all elements, including tens of millions of dollars in "impoverishments."  *See, e.g.*,  FCAC ¶¶ 1-8, 15-17, 30-168, 323-26.  The motion to dismiss Count XIII of the FCAC should be denied.

## III.    PLAINTIFFS' NJCFA CLAIMS SHOULD NOT BE DISMISSED

### A.    The Report Properly Defers Consideration of the Choice of Law Issue

At the first case management conference in this MDL proceeding, the Court informed the parties — repeatedly and unequivocally — that it would *not* decide choice of law issues on motions to dismiss,[3] in conformity with the prevailing practice,

---

[3] *See* Partial Transcript of Nov. 23, 2004 Status Conference Lodged in Support of Plaintiffs' Opposition to Motions to Dismiss, Plaintiffs' Opposition to Defendants'

especially in this district.  *See In re Relafen Antitrust Litig.*, 221 F.R.D. 260 (D. Mass.

2004) (considering choice of law issues at the class certification stage); *Payne v.*

*Goodyear Tire & Rubber Co.*, 216 F.R.D. 21, 27 (D. Mass. 2003) (same); *In re*

*Buspirone Patent Litig.*, 185 F. Supp. 2d 363, 377 (S.D.N.Y. 2002) (finding defendant's

arguments regarding standing and choice of law matters premature in the motion to

dismiss context and deferring such issues until class certification).  In conformity with the

Court's direction and the prevailing practice, the Report concludes that "this issue is more

appropriately left for resolution at either the class certification or summary judgment

stage . . . ."  Report at 53.

     Refusing to accept the Court's direction, Defendants seize on the Report's

continued statement, "when the laws of the fifty states will be applied to discrete groups

of plaintiffs based upon their domicile,"[4] and argue that because Class Plaintiffs have

only asserted claims under New Jersey law, and have not asserted claims under the laws

of all 50 states,[5] no choice of law analysis need ever take place.  This argument is pure

sophistry.  The Court must engage in a choice of law analysis to determine whether it

---

Motion for Protective Order Concerning Scope of Discovery, and Plaintiffs' Motion to
Compel Production Of Documents Created After December 31, 1998 (docket entry no.
216), Exh. A ("Nov. 23, 2004 Transcript") at 27:18-30:6  ("I won't decide that on a
motion to dismiss;" "I won't resolve that issue now.").

[4] Class Plaintiffs have objected to *this* statement in the Report, to the extent it implies that
the Court *must* apply the laws of all 50 states, which would constitute a premature choice
of law ruling.  *See* Plaintiffs' Joint Objections, at 27.

[5] At the initial case management conference, the Court expressly cautioned Class
Plaintiffs' counsel *not* to plead a class under all 50 state laws, but rather to "come up with
a [single] state law that you think is appropriate," and, more specifically, to "[p]ick their
[Warner-Lambert's] home state," New Jersey.  Nov. 23, 2004 Transcript, at 33:23-34:24.
Class Plaintiffs did so.  Should the Court decline to apply New Jersey (or another State's
law) to the claims of a national class, Class Plaintiffs will alternatively seek certification
under the laws of all 50 states.

may apply New Jersey law (or the law of another State), *or* must instead apply the law of all 50 states, to the claims of the Class.  *See, e.g., In re Pharmaceutical Industry Average Wholesale Price Litigation*, 230 F.R.D. 61, 82-85 (D. Mass. 2005) (on motion for class certification, engaging in choice of law analysis to determine whether to apply law of a single state or the law of all 50 states).  Class Plaintiffs have briefed the choice of law issue in their motion for class certification (filed over eight months ago),[6] and the issue should be decided in connection with that motion, as recommended by the Magistrate Judge, and as previously stated by the Court.

### B.    The NJCFA May Be Applied to the Claims of Non-Residents

Remarkably, Defendants assert that even Class Plaintiff International Union of Operating Engineers, Local No. 68 Welfare Fund ("Local 68"), a labor union welfare fund headquartered in New Jersey (*see* Amended Class Action Complaint ("ACC") ¶ 6), lacks standing to assert claims under the NJCFA.  Defs. Obj. Br. at 7-8.  Defendants also argue, inconsistently, that "state consumer protection statutes should generally be limited to the claims of resident consumers."  Defs. Obj. Br. at 9.  In sum, Defendants argue that they are *not subject to any state law at all*.  To state this argument is to refute it.  Even assuming, *arguendo*, that Defendants were correct that residents of each State may only sue under the laws of that State, then Local 68 may sue under New Jersey law, and Class Plaintiffs' NJCFA claim may not be dismissed on choice of law grounds, however that issue is ultimately resolved.

Defendants do not argue that the NJCFA contains an express territorial limitation

---

[6] *See* Memorandum of Law In Support of Plaintiffs' Motion for Class Certification (docket entry no. 206), Part III.D.2.a. at 25-31.

on its application — it has none[7] — or that the Act *cannot* be applied to benefit non-residents; Defendants argue that the NJCFA *should* not be applied to benefit nonresidents *in this case*, based on choice of law considerations.  That is a choice of law argument in substance, despite the camouflage.  Should the Court reach the choice of law issue on this motion, despite its prior guidance to the contrary, recent authority virtually *compels* the conclusion that the Court may apply the NJCFA to claims of nonresidents, and certify a national class under the NJCFA.

As set forth in Class Plaintiffs' motion for class certification, in order to determine which state's law to apply, the Court must first determine which *choice of law rule* to apply.  Where, as here, actions are transferred by the Judicial Panel on Multidistrict Litigation pursuant to 28 U.S.C. § 1407, the transferee court (*i.e.*, this Court) must apply the choice of law rules of the *transferor* district.  *See Menowitz v. Brown*, 991 F.2d 36, 40 (2d Cir. 1993) ("a transferee court [under 28 U.S.C. § 1407] applies the substantive state law, including choice-of-law rules, of the jurisdiction in which the action was filed").  Each transferor district, in turn, must apply the choice of law rules of the state in which it is located.[8]  Application of the transferor state's choice of law rules may lead to application of the *substantive* law of the transferor state, the transferee state, or a different state altogether.  *Ferens v. John Deere Co.*, 494 U.S. 516 (1990).

---

[7] The NJCFA provides that "*any person* . . . may bring an action" for its violation "in any court of competent jurisdiction."  N.J.S.A. 56:8-19 (emphasis added).

[8] *See Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941) ("The conflict of laws rules to be applied by the federal court in Delaware must conform to those prevailing in Delaware's state courts."); *Cochran v. Quest Software, Inc.*, 328 F.3d 1, 6 (1st Cir. 2003) (federal court sitting in diversity must apply forum state's choice of law rules); *Shannon-Vail Five Inc. v. Bunch*, 270 F.3d 1207, 1210 (9th Cir. 2001) ("A federal district court must apply the state law that would be applied by the state court of the state in which it sits.  This is true whether the basis for subject matter jurisdiction is diversity of citizenship under 28 U.S.C. § 1332 or federal question under 28 U.S.C. § 1331.").

Accordingly, the Court should apply the choice of law rules of the state in which the action proposed for certification was filed. Because Class Plaintiffs may freely choose any of the many class actions transferred to (or filed in) this district in which to seek certification, they may effectively select which state's choice of law rules they wish the Court to apply. *See Ferens*, 494 U.S. at 523-32 (1990) (transferee court must apply transferor court's choice of law rules, even where transfer was initiated by plaintiff, rejecting "forum shopping" arguments); *Corrected Case Management Order* (Dec. 16, 2004), at 10 ("Any consolidated class action complaint in the Class Action Cases shall apply to all pending class action cases and to any other cases subsequently filed, removed, or transferred to the Court as part of this proceeding.").

Ten days ago, in a published opinion, the Appellate Division of the Superior Court of New Jersey unanimously affirmed the trial court's certification of a national class under the NJCFA in the Vioxx consumer fraud litigation,[9] applying New Jersey's choice of law rules. *International Union of Operating Engineers Local #68 Welfare Fund*, ____ A.2d ____, 2006 WL 827285 (N.J. Super. Ct. App. Div., Mar. 31, 2006) ("*Vioxx III*"). As discussed more fully in Class Plaintiffs' motion for class certification, Massachusetts follows the same choice of law rules applied in *Vioxx II* and *III*.[10] Application of those principles should lead to the same result here. As in *Vioxx*, the alleged scheme to defraud was hatched and orchestrated by the defendant pharmaceutical

---

[9] *International Union of Operating Engineers Local No. 68 Welfare Fund v. Merck & Co.*, 2005 WL 2205341 (N.J. Super. Law Div., Jul. 29, 2005) ("*Vioxx II*").

[10] *See Computer Systems Engineering, Inc. v. Qantel Corp.*, 740 F.2d 59, 70 (1st Cir. 1984) (in cases alleging common law fraud and statutory consumer fraud, "a Massachusetts court would apply a test not materially different from that of the *Restatement (Second) of Conflict of Laws* § 148 in determining the law applicable"). This is the same test applied by the court and affirmed on appeal in *Vioxx II* and *III*. *See Vioxx II*, at *18-21; *Vioxx III* at *10-11.

company from its New Jersey headquarters. *See Vioxx II*, at \*20-\*21; *Vioxx III* at 11;

ACC ¶¶ 12, 19-31 (describing development of scheme by Parke-Davis/Warner-Lambert's

New Jersey headquarters).

Accordingly, Class Plaintiffs have moved for certification in the *Harden*

*Manufacturing* case, which was filed in this district.  In the alternative, should the Court

find that a different result would obtain under Massachusetts' choice of law rules, Class

Plaintiffs have moved for certification in *ASEA/AFSCME Local 52 Health Benefits Trust*

*and Brian Krah v. Pfizer, Inc., et al.*, D.N.J. C.A. No. 04-02577, a case transferred here

from the District of New Jersey, and as to which the *Vioxx II* and *III* choice of law

analysis is directly applicable, if not controlling.[11]

### C.    TPPs Are "Persons" Entitled to the Protections of the NJCFA

Defendants argue that the TPPs lack standing to sue for violations of the NJCFA

because (a) the TPPs are large, sophisticated entities not within the class of "consumers"

the NJCFA is intended to protect; and (b) the business entity must "use" the goods in

question and therefore the NJCFA does not apply to TPPs in this context.  Defendants are

wrong on both counts.

---

[11] *See also Boyes v. Greenwich Boat Works*, 27 F. Supp. 2d 543, 547 (D. N.J. 1998)
(applying NJCFA to claim brought by Pennsylvania resident, because "this state has a
powerful incentive to insure that local merchants deal fairly with citizens of other
states"); *Gantes v. Kason Corp.*, 679 A.2d 106, 111-112 (N.J. 1996) (holding that there
was a substantial state interest in deterring unlawful conduct and  protecting the public
against the distribution of unsafe products manufactured in New Jersey, even though the
product was not purchased in New Jersey and the injury did not occur in New Jersey);
*Peterson v. BASF Corp.*, 618 N.W.2d 821 (Minn. Ct. App. 2001) (affirming certification
under NJCFA of nationwide class of farmers allegedly misled by defendant's conduct);
*Grace v. Perception Technology Corp.,* 128 F.R.D. 165, 171 (D. Mass. 1989) (applying
Massachusetts choice of law rules, finding Massachusetts substantive law applicable to
claims of national class, because defendant was headquartered in Massachusetts and
misrepresentations emanated from Massachusetts).

As the New Jersey appellate court recently reaffirmed, the NJCFA:

> is intended to be applied liberally, and "has three main
> purposes: to compensate the victim ...; to punish the
> wrongdoer through the award of treble damages ...; and, by
> way of the counsel provision, to attract competent counsel
> to counteract the community scourge of fraud [.]"  Thus,
> the Act seeks "not only to make whole the victim's loss,
> but also to punish the wrongdoer and to deter others from
> engaging in similar fraudulent practices."  "The available
> legislative history demonstrates that the Act was intended
> to be one of the strongest consumer protection laws in the
> nation."

*Vioxx III*, 2006 WL 827285, at *5 (citations omitted).

Obviously, the deterrent and remedial purposes of the NJCFA would be completely frustrated eviscerated if the manufacturer and distributor of a $2.7 billion a year consumer product — Neurontin — could escape liability for its fraudulent marketing practices merely because most of the cost of the product is paid by third parties. Defendants are accused of committing fraud in connection with the sale of a *consumer product*; it is immaterial that many of the "persons" injured thereby are not the actual "consumers."

Consistent with the mandate that the NJCFA "is intended to be applied liberally" (*id.*), the NJCFA does not use the term "consumers," but expressly applies to "persons," and defines "person" as "any" partnership, corporation, company, trust, business entity or association, in addition to natural persons and their legal representatives.  N.J.S.A. 56:8-1 (d).   In considering whether the protection of the NJCFA should be limited to personal, family or household use of goods and services, and thereby exclude businesses, the New Jersey Appellate Division held:

> Even the most world-wise business entity can be
> inexperienced and uninformed in a given consumer
> transaction.  Unlawful practices thus can victimize business

> entities as well as individual consumers....  [T]o exclude
> business entities from any protection of the Act would
> contravene its manifest purpose as well as its unambiguous
> language.

*Hundred East Credit Corp. v. Eric Schuster Corp.*, 212 N.J. Super. 350, 356-57,

515 A.2d 246, 249 (N.J. Super. Ct. App. Div. 1986).

In the *Vioxx* litigation, a New Jersey trial court upheld similar third-party payer

claims in the face of virtually identical arguments.  *See Int'l Union of Op. Eng'rs*

*Local 68 Welfare Fund v. Merck & Co., Inc.*, No. ATL-L-3015-04 (N.J. Super. Ct. Atl.

Cty. July 8, 2004) ("*Vioxx I*," attached as Exhibit 2 to the Declaration of Patrick J.

Murray submitted with Defendants' objections ("Murray Decl."), at 7-11).  As the Court

observed in rejecting the same arguments advanced by Defendants here:  (a) the NJCFA

"uses the word 'person' not 'consumer'" (*id.* at 7), a distinction Defendants repeatedly

ignore; (b) "the word 'person' is not limited to ... those who purchase personal or

household items" (*id.*); and (c) unlike the NJCFA, some consumer-oriented Acts in the

State expressly "limit the definition of a 'consumer' to an individual" (*id.* at 7-8).  *Each*

of these reasons confirms that the third-party payers are "persons" entitled to redress

under the NJCFA.  *Desiano*, *supra*, cited with approval in *Vioxx I* (at 9-10), likewise held

that TPPs had claims under the NJCFA against these same Defendants in connection with

the deceptive marketing of another drug, Rezulin.

The cases relied upon by Defendants on this point are easily distinguishable.

They involve the dismissal of NJCFA claims brought by corporate entities, but not

*because* they were brought by corporate entities.  Defendants' authorities on this point

did not involve the type of product or services that were made available to the public and

therefore fell outside the protection of the NJCFA.  *See Arc Networks, Inc. v. Gold Phone*

*Card Co.*, 756 A.2d. 636, 638 (N.J. Super. Ct. Law. Div. 2000) ("The bulk telephone and computer services that Gold Phone purchased from Arc were not available to the general public"); *BOC Group v. Lummus Crest, Inc.*, 597 A.2d. 1109, 1112 (N.J. Super Ct. Law Div. 1990) ("Even if the court were to find that this new experimental process was a service sold to plaintiff, the process was certainly not the type of service contemplated by the Act, nor was it sold or capable of being sold 'to the public.'").  Unlike the services or ideas sold in these cases, Neurontin was a product indisputably sold to the public.

Defendants also argue that TPPs do not have standing under the NJCFA because they do not "consume" Neurontin, but instead paid for the drug for the benefit of their insureds.  Once again, Defendants are incorrect.  In *Kavky v. Herbalife Int'l of Am.*, 359 N.J. Super. 497, 820 A.2d 677 (N.J. Super. Ct. App. Div. 2003), the appellate court held that the NJCFA applied to the sale of a franchise, which was obviously not "consumed" by the plaintiff franchisee.  *Kavky* expressly rejected the narrow interpretation of the NJCFA relied upon by Defendants:

> Although we have occasionally referred to a dictionary definition of a consumer as "one who uses (economic) goods, and so diminishes or destroys their utilities," *City Check Cashing, Inc. v. Nat. State Bank*, 244 N.J. Super. 304, 309, 582 A.2d 809 (App. Div.) (quoting *Hundred East Credit Corp.*, *supra*, 212 N.J. Super. at 355, 515 A.2d 246, *cert. denied*, 122 N.J. 389, 585 A.2d 391 (1990) ... "some consumer goods may not be diminished or destroyed through use...."  31 F.3d at 1274, n. 14.  Consequently, we agree ... that the result should not turn on "the acceptance of [that] definition."

359 N.J. Super. at 505, 820 A.2d at 582.

In *Vioxx I*, the court carefully considered the issue and expressly rejected Defendants' narrow interpretation of the NJCFA:

> The court finds that the limit placed by defendants that a
> "person" under the Act must be the one who actually takes
> the medication or uses the product is too simplistic. The
> focus should be on a misrepresentation causing a "person"
> to pay for something they otherwise would not have been
> willing to pay for because of the higher cost. This fits the
> purpose of the Act. If for example, a "person" buys a gift
> for a third party based on false advertising, it does not
> matter that the person who is duped into making the
> purchase does not personally use the product.

*Vioxx I* at 10-11.[12]

Again, the precedents relied upon by Defendants are inapplicable. Each of *Med.
Soc'y of N.J. v. AmeriHealth HMO, Inc.,* 868 A.2d 1162 (N.J. Super. Ct. App. Div.
2005), *Med. Soc'y of N.J. v. Oxford Health Plans, Inc.*, No. A-1485-03T1 (N.J. Super. Ct.
App. Div. Feb. 14, 2005), and *In re Managed Care Litig.*, 298 F. Supp. 2d 1259 (S.D.
Fla. 2003) were cases in which physicians, or physician advocacy organizations, brought
claims under the NJCFA against insurers, claiming they were not properly reimbursed for
the medical services provided to insureds.[13] Physicians in those cases occupy a
completely different position with respect to the "product" at issue in those cases than
here. Physicians are not consumers, in any sense, of the insurance products offered by
the defendants in those cases, but merely provided a service to their patients for which
they received reimbursement. In addition, as one court pointed out, a "[physician's]

---

[12] As Defendants point out, the district court in *In re Rezulin Prod. Liab. Litig.*, 392 F.
Supp. 2d 597, 616-17 (S.D.N.Y. 2005), declined to follow *Vioxx I* and its reading of
*Kavky* in favor of the narrow interpretation of the NJCFA advanced by Defendants. The
*Rezulin* decision is currently on appeal, and an earlier decision in that case has already
been reversed by the Second Circuit for taking an overly restrictive view of the NJCFA.
*Desiano*, 326 F.3d at 348-51. Plaintiffs respectfully submit that this later decision suffers
from similar infirmities, and that it would be more prudent to follow the decisions of New
Jersey state courts in *Kavky* and *Vioxx I* on questions of New Jersey state law.

[13] *In re Managed Care Litig.*, *supra*, relies on the same overly restrictive interpretation of
the NJCFA rejected in *Kavky* and *Vioxx I*. 298 F. Supp. 2d at 1303-04.

provision of medical services to Defendants' insureds does not constitute the 'sale' of 'merchandise' under the New Jersey Act." *In Re Managed Care*, 298 F. Supp. 2d at 1304.

### IV.    CLASS PLAINTIFFS' COMMON LAW FRAUD CLAIM SHOULD NOT BE DISMISSED

#### A.    Defendants' Argument Is Procedurally Improper

Defendants argue that the 58-page Report does not determine whether Class Plaintiffs have alleged the "reliance" element of their common law fraud claim.  The reason for this is simple:  in two full rounds of briefing, filling 80 pages, Defendants *never once argued that Plaintiffs had not alleged reliance*.[14]  The closest Defendants came was their argument that Plaintiffs had not sufficiently alleged *causation* – an argument dealt with definitively and at length in the Report.  *See* Report at 17-20.

Having neglected to raise the issue before the Magistrate Judge, Defendants may not raise it for the first time in their objections.  *See Paterson-Leitch Co. v. Mass. Munic. Wholesale Elec. Co*., 840 F.2d 985, 989-991 (1st Cir. 1988) ("We hold categorically that an unsuccessful party is not entitled as of right to de novo review by the judge of an argument never seasonably raised before the magistrate.").  As the First Circuit has explained:

> "The purpose of the Federal Magistrate's Act is to relieve courts of unnecessary work."  *Park Motor Mart, Inc. v.*

---

[14] *See* Memorandum of Law of Pfizer Inc. and Warner-Lambert Company In Support of Their Motions to Dismiss the Amended Class Action Complaint and the First Coordinated Amended Complaint ("Def. Dismissal Br.," docket entry no. 60); Reply Memorandum of Law of Pfizer Inc. and Warner-Lambert Company In Further Support of Their Motions to Dismiss the Amended Class Action Complaint and the First Coordinated Amended Complaint ("Def. Reply Dismissal Br.," docket entry no. 122).  A review of the tables of contents and a word search of both of these documents for "reliance" quickly reveals that no such argument was ever made by Defendants.

> *Ford Motor Co.*, 616 F.2d 603, 605 (1st Cir.1980). It would defeat this purpose if the district court was required to hear matters anew on issues never presented to the magistrate. Parties must take before the magistrate, "not only their 'best shot' but all of their shots." *Singh*, 593 F.Supp. at 1318. This concept is premised on the same basis as the rule that an appellate court will not consider arguments not raised below except in the most compelling circumstances. Thus, here the district court judge properly refused to consider an argument which could have been, but inexplicably was not, presented to the magistrate in the first instance.

*Borden v. Sec'y of Health and Human Svcs.*, 836 F.2d 4, 6 (1st Cir. 1987) (quoting

*Singh v. Superintending School Comm.*, 593 F. Supp. 1315, 1318 (D. Me. 1984)).

Defendants offer no excuse for their failure to raise their "reliance" argument before the Magistrate Judge, or any compelling reason the Court should depart from the general rule and consider this new argument now. Defendants will not suffer any real prejudice from their failure to secure a reviewable recommendation on this issue, as the pendency of Class Plaintiffs' common law fraud claim will not enlarge the scope of discovery, and the sufficiency of the claim can be revisited on summary judgment.

## B.    <u>A Presumption of Reliance Applies</u>

Assuming, *arguendo*, that the Court wishes to address the issue despite Defendants' failure to timely raise it, under New Jersey law,[15] "where [as here] omissions of material fact are common to the class," both reliance and causation will be *presumed* in favor of the class, and "class certification is favored" of common law fraud claims.

---

[15] The choice of law analysis set forth above applies equally to Class Plaintiffs' common law fraud claims. *See* n.10, *supra*; *Restatement (Second) of Conflict of Laws* § 148, com. a (§ 148 "applies to actions brought to recover pecuniary damages suffered on account of false representations, whether fraudulent, negligent, or innocent").

*Varacallo v. Mass. Mut. Life Ins. Co.*, 332 N.J. Super. 31, 49-50, 752 A.2d 807, 817-18

(N.J. Super. Ct. App.Div. 2000). As the court explained in *Varacallo*:

> Where the theory of recovery is common law fraud, in
> which reliance is required, our analysis of the
> predominance issue requires resolution of this question:
> For purposes of certifying a class, must the plaintiffs offer
> direct proof that the entire class relied on defendant's
> representation that omitted material facts, where the
> plaintiffs have established that the defendant withheld these
> material facts for the purpose of inducing the very action
> the plaintiffs pursued? We think not.

> \*       \*       \*

> The presumption or inference of reliance and causation,
> where omissions of material fact are common to the class,
> has been extended both in the context of both common law
> and statutory fraud. The Supreme Court has broadened this
> concept to include *all material misrepresentations, whether
> facts are not disclosed or falsely represented* . . . Of course,
> the inference may be rebutted, but it is the burden of the
> defendant to come forward with sufficient evidence to do
> so . . . Where the omission of fact is common to the entire
> class, class certification is favored.

*Id.* at 817-18 (citations omitted, emphasis added).[16]

---

[16] Other jurisdictions also permit a presumption or inference of reliance and causation,
where undisclosed fraudulent conduct, concealment, or omissions of material fact are
common to the class. *See, e.g., Vasquez v. Superior Court of San Joaquin County*,
4 Cal.3d 800, 94 Cal. Rptr. 796 (1971); *Wilner v. Sunset Life Ins. Co.*, 78 Cal. App. 4th
952, 93 Cal. Rptr. 2d 413, 420 (2000) (applying *Vasquez*); *Spark v. MBNA Corp.*,
178 F.R.D. 431, 435-36 (D. Del. 1998) (holding that reliance may be presumed "where it
is logical to do so") (quoting *Sharp v. Coopers & Lybrand*, 649 F.2d 175, 188 (3d Cir.
1981)); *Phillips v. Ford Motor Co.*, No. 99-L-1041, 2003 WL 23353492, at \*6 (Ill. Cir.,
Sept. 15, 2003) ("Ford's position that reliance (and proximate cause for that matter)
cannot be proved on a class-wide basis is irreconcilable with" Illinois Supreme Court
authority); *Cope v. Metropolitan Life Ins. Co.*, 82 Oh. St.3d 426, 430, 696 N.E.2d 1001,
1004 (1998) ("[I]t is not necessary to establish inducement and reliance upon material
omissions by direct evidence. When there is nondisclosure of a material fact, courts
permit inferences or presumptions of inducement and reliance."); *Latman v. Costa Cruise
Lines, N.V.*, 758 So.2d 699, 703 (Fla. Dist. Ct. App. 2000) (holding that class members
"need not individually prove reliance on the alleged misrepresentation," and that it was

Plaintiffs allege that Defendants created and implemented a national scheme to unlawfully promote Neurontin for off-label uses by misrepresenting and fraudulently concealing information in their possession with regard to Neurontin's efficacy for such uses. Plaintiffs have expressly pled reliance on these misrepresentations and omissions.[17] Because these misrepresentations and omissions were material, a presumption of reliance applies. *Id*.

## V. THE CLASS COMPLANT ADEQUATELY ALLEGES FRAUD

### A. Defendants' Factual Arguments Are Procedurally Improper

Fully half of Defendants' objection brief is devoted to detailed factual arguments concerning the sufficiency of Class Plaintiffs' fraud allegations never raised by Defendants in their multiple briefs to the Magistrate Judge, despite Class Plaintiffs' clear identification of the specific statements at issue. *Compare* Defs. Obj. Br., Part IV, at 14-27; Joint Memorandum of Law of The Class and Coordinated Plaintiffs In Opposition to Defendants' Motions to Dismiss (docket entry no. 101) at 6-7 & n.3 (listing alleged fraudulent statements and omissions, with citations to complaints); Def. Dismissal Br. (making none of the arguments advanced in Part IV of Defendants' objections); Def.

---

sufficient to establish on a classwide basis that a "reasonable person would have relied on the representations").

[17] *See* ACC ¶¶ 283 ("Defendants' fraudulent scheme consisted of, inter alia: . . . (b) providing or publishing or causing to have provided or published presentations and materials containing false and/or misleading information upon which physicians, Plaintiffs, and members of the Class relied upon when choosing to prescribe or pay for Neurontin"), 308 ("Physicians relied upon Defendants' misrepresentations and omissions in prescribing Neurontin for 'off-label' uses."), 313 ("Defendants were aware that plaintiff's fiduciaries and agents, their physicians, would rely on these misrepresentations, and that such representations were material in the decision to prescribe or purchase Neurontin."), 314 ("Plaintiffs and the Class reasonably relied upon Defendants' misrepresentations and omissions of material fact.").

Reply Dismissal Br. (same). *Not a single one of the documents submitted with Defendants' objections to the Report were ever presented to the Magistrate Judge. See id.* Presumably, the Court's intention in referring this matter to the Magistrate Judge was to lessen its workload, not increase it. *Borden*, 836 F.2d at 6. The Court should not permit Defendants to bring what is essentially an entirely new motion to dismiss, a year after the filing deadline, in the guise of an objection to the absence of findings they never asked the Magistrate Judge to make, based on arguments and extrinsic evidence they never asked him to consider. *Id.*; *Paterson-Leitch,* 840 F.2d at 989-91.

**B.     The Extrinsic Documents Submitted By Defendants Should Not Be Considered on a Motion to Dismiss**

Not only are Defendants' arguments procedurally improper, they are based on documents that should not be considered by the Court on a motion to dismiss. "Ordinarily… any consideration of documents not attached to the complaint, or not expressly incorporated therein, is forbidden, unless the proceeding is properly converted into one for summary judgment under Rule 56." *Watterson v. Page*, 987 F.3d 1, 3-4 (1st Cir. 1993). There is a narrow exception where the "complaint's factual allegations are expressly linked to--and admittedly dependent upon--a document (the authenticity of which is not challenged)," such as a written agreement between the parties that is the subject of the litigation. *Beddall v. State St. Bank & Trust Co.*, 137 F.3d 12, 17 (1st Cir. 1998). However, "[a] plaintiff's mere reference to a document or limited quotation from a document in a complaint does not render the document incorporated by reference." *Goodman v. Pres. and Trustees of Bowdoin Coll.*, 135 F. Supp. 2d 40, 47 (D. Me. 2001).

The documents appended to Defendants' objections are not within the narrow exception carved out by courts in this Circuit. First, Defendants' selective excerpting of

these documents raises factual questions about precisely what documents the Court is being asked to consider. *Compare Greene v. Rhode Island*, 398 F.3d 45, 48-49 (1st Cir. 2005) (electing to consider a federal statute); *Alternative Energy, Inc. v. St. Paul Fire & Marine Ins. Co.*, 267 F.3d 30, 34 (1st Cir. 2001) (considering a settlement agreement).

Second, as Plaintiffs demonstrate below, Defendants' excerpting necessitates a fact-intensive discussion of the documents' contents. External documents should not be considered on a motion to dismiss in such cases. *See Velazquez-Arroyo v. MCS Life Ins. Co.*, 2006 WL 533753, at *2 (D.P.R., Mar. 6, 2006) (declining to consider external documents because "the assumptions that could be drawn from reading the scant segments that the parties have offered into evidence could lead to different conclusions, giving rise to an issue of material fact," and thus, the subject should be left for discovery and resolution upon motion for summary judgment); *cf. Fudge v. Penthouse Int'l, Ltd.*, 840 F.2d 1012, 1015 (1st Cir. 1988) (allowing article to be considered where "nothing [plaintiffs] could have introduced could have affected the disposition of the purely legal questions that the motion to dismiss raised about the article itself").

### C.    The "Evidence" Submitted by Defendants Confirms That They Committed Fraud

Should the Court elect to address Defendants' newly minted factual arguments, based on matters outside the pleadings which are not properly considered on a motion to dismiss, Class Plaintiffs respond as follows, condition-by-condition.

#### 1.    Epilepsy Monotherapy

Defendants' first argument obscures the substantial difference between *evidence of efficacy* and *lack of evidence of inefficacy*. The ACC alleges Drs. Harden and LeRoy "*misrepresented* the results of Clinical Study 945-82, both by claiming that the study *did*

*not evidence a failure of Neurontin efficacy* and by misrepresenting the lack of a dose

response." ACC ¶ 167 (emphasis added).  Nowhere does the Amended Complaint allege,

as Defendants falsely assert, that Drs. Harden and LeRoy stated "that [Clinical Study

945-82] *evidenced* Neurontin's *efficacy*."  Defs. Obj. Br. at 16 (emphasis added).  As

shown below, Drs. Harden and LeRoy each misrepresented the results of the clinical trial

in precisely the manner alleged in the ACC.

      As an initial matter, the transcripts attached by Defendants are incomplete.  Dr.

Harden's comments began on an earlier tape that Defendants did not attach.  Similarly,

Dr. LeRoy's comments began on an earlier tape,[18] and concluded on a subsequent tape.

It is wholly improper for Defendants to seek dismissal based on extraneous documents

that are, on their face, incomplete.  *See Velazquez-Arroyo*, 2006 WL 533753, at *2

(declining to consider external documents because "the assumptions that could be drawn

from reading the scant segments that the parties have offered into evidence could lead to

different conclusions, giving rise to an issue of material fact," and thus, the subject

should be left for discovery).

      To facilitate the Court's understanding of the statements and the context in which

they were made, Class Plaintiffs have attached additional portions of the transcripts

where possible.  Read in their entirety — rather than selectively, as the Defendants ask

the Court to do — the transcripts from the Jupiter Beach conference confirm that Drs.

LeRoy and Harden materially misrepresented the results of Clinical Study 945-82.

      As alleged in the ACC, "Clinical Study 945-82, a double blind, placebo-

---

[18] Unfortunately, Defendants have never produced the earlier tape, and have thus far
refused to produce documents in their possession that were returned to them by the
United States Attorney's Office after the conclusion of *United States of America ex rel.
David Franklin v. Parke-Davis, et al.*, C.A. No. 96-11651-PBS (D. Mass.).

controlled study, was designed to be a pivotal study in support of monotherapy. But the results were negative, and failed to demonstrate that Neurontin was effective in treating seizures at doses up to 2400 mg/day." ACC ¶ 168. Because the results of the study indisputably failed to show efficacy,[19] Parke-Davis needed to convince physicians that the study was flawed and should be ignored. Parke-Davis strove to achieve this goal through a three-pronged series of misrepresentations: (1) convince physicians that Clinical Study 945 was actually favorable evidence of efficacy; (2) if that failed, convince physicians that the study was flawed and therefore should be ignored; and (3) convince physicians that all of the other clinical trials on monotherapy demonstrated efficacy, such that an independent finding of efficacy could be determined without regard to Clinical Study 945-82. Both Drs. Harden and LeRoy furthered these objectives.

Defendants highlight only one statement — by Dr. LeRoy — as evidence that *both* Drs. Harden and LeRoy spoke truthfully. Defendants' silence with respect to Dr. Harden is not surprising, as a careful reading of the entire transcript of Dr. Harden's talk, even the portion attached by Defendants to their papers, clearly shows that Dr. Harden, who spoke before Dr. LeRoy, (1) never mentioned that the results of Clinical Study 945-82 were negative; and (2) tried repeatedly to spin the results as positive. This was all part of Defendants' first strategy, to spin the results of the study as favorable. For example, Dr. Harden stated that "I think this survival graph is really…is really the most revealing at a glance, of this study. In that 60% of patients overall were able to taper off their previous one or two antiepileptic drugs and achieve monotherapy." Declaration of Ilyas

---

[19] As alleged in the ACC, the FDA "determined the application [for the monotherapy indication] to be non-approvable on August 26, 1997 because of insufficiency of evidence of Neurontin's effectiveness. The FDA noted that Clinical Study 945-82 failed to yield evidence of effectiveness." ACC ¶ 170.

Rona in Support of Plaintiffs' Joint Response to Defendants' Objections ("Rona Decl."),

Exh. A at X000330.  This statement, along with the rest of Dr. Harden's summary of

Clinical Study 945-82, is not attached to Defendants' papers.  Dr. Harden never once

conceded that the results of Clinical Trial 945-82 failed to provide evidence of efficacy,

let alone that the results were in fact negative.  *Compare* Murray Decl., Exh. 4 to Rona

Decl., Exh. A at X000327 *et seq*.

     One astute member of the audience picked up on this omission and cornered Dr.

Harden:

> I'm a little confused about a couple of things in your
> study…So my questions are:  One, is 2400 milligrams of
> Neurontin no better than placebo.  Or is in fact 600
> milligrams a good dose?  Although that flies in the face of
> other evidence.

*Id*. at X000343.  The truthful answer would have been that Neurontin is no better than

placebo.  Instead, Dr. Harden responded:

> Well, I think those are good questions and they're
> definitely brought up by the study.  I think that the 600
> milligram dose, it was thought that it would have no
> efficacy when the study was designed.  But it turns out to
> be as efficacious as 2400 milligrams.  And the reasons for
> that are not particularly clear… My impression is that 600
> milligrams is more of an effective dose than placebo.  And
> therefore, 2400 is also more of an effective dose than a
> placebo.

*Id*. at X000343–344.[20]  Simply put, Dr. Harden argued that the clinical trial showed that

Neurontin monotherapy was more effective than placebo even though Defendants knew,

and the FDA subsequently agreed, that it did not.

---

[20] The above exchange was transcribed differently in the text offered to the Court by
Defendants.  *See* Murray Decl., Exh. 4 at X000378.  This discrepancy further underscores
the impropriety of considering such extrinsic evidence on a motion to dismiss.

Dr. Harden also employed the other two strategies outlined above. Dr. Harden suggested that the study should be given no weight due to certain flaws, including "the highly refractory nature of the patients and the doses chosen for the study," and the "withdrawal phenomenon from the previous antiepileptic drug." *Id*. at X000337. Dr. Harden also argued at great length that the other clinical studies showed beyond doubt that Neurontin was effective for monotherapy. *Id*. at X000336 ("Suggesting or implying Neurontin efficacy in monotherapy, and clearly demonstrating efficacy of 3600 over 300 milligrams").

While Dr. LeRoy made no attempt to spin 945-82 as a *favorable* trial, he nevertheless misrepresented the results of 945-82 by attacking its weight and suggesting that other trials independently supported efficacy. Immediately after the quote highlighted by Defendants, Dr. LeRoy stated that Clinical Study 945-82 had "an inherent design flaw in it." Murray Decl., Exh. 3 at WL 04382. As with Dr. Harden, Dr. LeRoy conveniently blamed the design flaw on a different epilepsy medication, which he claimed has a "withdrawal syndrome" causing Neurontin study patients to be "bumped out of the study as a failure." *Id*. Dr. LeRoy then added that "[t]here are European studies, however, that are being used in a different design that shows *definite monotherapy efficacy* for Neurontin." *Id*. (emphasis added).

If "the proof of the pudding is in the eating," then the proof that physicians were given a hard sell on the efficacy of Neurontin for monotherapy is reflected in the preface of the question to which Dr. LeRoy was responding:

> (Inaudible) nine months ago, I attended one of these
> meetings in California. And there was a clear emphasis at
> that time that Neurontin was to be a secondary line

medication, only used *adjunctively*. This morning, I hear a
*distinct difference* in how this is being presented.

Murray Decl., Exh. 3 at WL 04390 (emphasis added).[21]

## 2.    <u>Diabetic Peripheral Neuropathy</u>

The ACC alleges that

> in 1996, Parke-Davis funded a placebo-controlled clinical
> trial conducted by Dr. Kenneth Gorson, a doctor at St.
> Elizabeth's Hospital in Boston, Massachusetts. On August
> 23, 1997, Gorson submitted a draft of his study to Parke-
> Davis, accompanied by an abstract. The results of
> Gorson's study were negative… Its conclusion stated that
> gabapentin "is *probably no more effective than placebo* in
> the treatment of painful diabetic neuropathy."

ACC ¶ 118 (emphasis added). While Dr. Gorson found a "statistical trend toward

improvement" in one of the pain scores, he noted that this improvement was "*not

statistically different from placebo*." *See* Murray Decl., Exh. 6 at W06833–34 (emphasis

added).

The ACC alleges that Parke-Davis attempted to induce Dr. Gorson to alter his

---

[21] Defendants incorrectly argue that Plaintiffs did not plead specific facts suggesting
Defendants' entanglement with the alleged statements of Drs. Harden and LeRoy. Defs.
Obj. Br. at 17. As the Report stated, "Plaintiffs have set forth a series of allegations to
support the allegation that Defendants 'controlled the content' of the statements." Report
at 39. Plaintiffs alleged more than that the Defendants "provided the information on
which" the physicians based their statements. *See In re Cabletron Systems, Inc.*, 311
F.3d 11, 38 (1st Cir. 2002) (citing *Suna v. Bailey Corp.*, 107 F.3d 64, 73-74 (1st Cir.
1997)). As the Report stated, Plaintiffs alleged Defendants "controlled the content" of
physician statements, allegations that in fact exceed those required under the
"entanglement" standard. *See id.* (holding that there is no requirement to establish
defendants' control of third-party statements). As the Report correctly noted,
"[e]ntanglement also includes situations when company officials 'intentionally foster a
mistaken belief'" *Id.* Plaintiffs' allegations that Defendants withheld the results of
negative studies is more than sufficient to establish that Defendants "intentionally
foster[ed] a mistaken belief," which is all that is required to establish entanglement. *Id.*
If necessary, Plaintiffs can amend their complants to include additional allegations of
entanglement, including that Drs. Harden and LeRoy were paid approximately $50,000
and $25,000, respectively, between 1994 and 1998.

negative findings to make them sound favorable, by circulating a "different abstract" with a "revised conclusion," stating that "Gabapentin *may be effective* in the treatment of painful diabetic neuropathy." ACC ¶ 119 (emphasis added). *Defendants do not attach this doctored abstract to their papers.* Nowhere in the doctored abstract does the phrase "probably ineffective" appear. Instead, the manuscript doctored by Parke-Davis claims a "statistically significant improvement" in multiple pain scores (when Dr. Gorson had found only a *statistically insignificant trend* toward improvement in one of the scores), and that the improvement in one of the pain scores was "a significant improvement…compared to placebo," when Dr. Gorson had found precisely the opposite. *See* Rona Decl., Exh. B at V089887.

Dr. Gorson refused to adopt this revision. Not surprisingly, Parke-Davis withdrew support for the publication, and Dr. Gorson was forced to publish his results as a letter to the editor that concluded: "The results of this study suggest that gabapentin is *probably ineffective* or only minimally effective for the treatment of painful diabetic neuropathy at a dosage of 900 mg/day." ACC ¶ 120 (emphasis added). Dr. Gorson found no statistically significant improvement in any of the pain scores compared to placebo. Murray Decl., Exh. 7 at M 0422.

Undaunted, Parke-Davis submitted its doctored article and abstract to the Drugdex Drug Information System ("Drugdex"), a widely used computer database that contains drug information and article citations. ACC ¶ 121. Drugdex published a citation to the Gorson article that omitted the conclusion that Neurontin is "probably ineffective." Murray Decl., Exh. 5 at 44. Adopting Parke-Davis' (not Dr. Gorson's) draft of the article, Drugdex states that a "*significant difference* in pain relief with

gabapentin over placebo was seen" in one of the pain scores. *Id.* at 44-45 (emphasis added).

In sum, Drugdex's citation to Dr. Gorson's article contains a finding of statistical significance not contained in his article, and omits his primary conclusion that Neurontin is "*probably ineffective*." Both of these alterations were in the Parke-Davis version of the article, and the ACC alleges that Parke-Davis caused this version to be submitted to and published by Drugdex. The Magistrate Judge properly found Class Plaintiffs' allegations of false statements regarding Dr. Gorson's findings actionable.[22]

### 3.    Bipolar Disorder

The ACC alleges:

> Although Parke-Davis knew the results of its negative bipolar disorder clinical trial as early as 1997, it did not publish the results until 2000. Nor did it halt the sponsorship of events that promoted Neurontin as an effective treatment of bipolar disorder and other psychiatric conditions. Further, although Parke-Davis contends it informs Drugdex of all articles concerning Neurontin that are not contained in Drugdex's monograph on Neurontin, Drugdex has never included citations to either of the articles that document the negative clinical trials for bipolar disorder.

ACC ¶ 153. This paragraph alleges both a delayed publication and also an active

---

[22] Defendants' other complaints with the Magistrate Judge's findings do not warrant a lengthy response. Drugdex claims that Dr. Gorson "suggests that higher doses of [Neurontin] *are needed.*" *Id.* at 45 (emphasis added). Dr. Gorson never suggested that higher doses are needed. He merely noted the theoretical possibility that his study dose "*may* have been too low to induce analgesia in patients with painful diabetic neuropathy." Murray Decl., Exh. 7 at M 0422 (emphasis added). Thus, Defendants transmuted an unproven possibility of why the study may have failed into a seemingly proven requirement that "higher doses *are needed.*" These are very different conclusions, and part and parcel of what the Class Plaintiffs have sufficiently alleged was a scheme to pollute the scientific literature with false and misleading statements concerning the use of Neurontin for off-label indications.

suppression, both in Defendants' day-to-day promotional activities and in their failure to

submit the article to Drugdex.  Defendants' memorandum only addresses the delayed

publication, as if that were the sole theory for Plaintiffs' cause of action.  Defendants do

not address why the results of their own internal clinical trial on bipolar disorder, which

showed that Neurontin is "less effective than placebo," have *never* appeared in Drugdex.

ACC ¶¶ 152-53.  Thus, Defendants have chosen not to convey the results of the their

internal, double-blind, placebo-controlled bipolar trial to Drugdex, even though they

regularly sent favorable case reports to Drugdex,[23] and have never bothered to rectify this

glaring deficiency in Drugdex's listing for Neurontin and bipolar.  Consequently,

Drugdex does not list *any* double-blind, placebo-controlled studies of Neurontin and

bipolar, and does not include any negative information suggesting that Neurontin is

known to be ineffective for treating bipolar disorder.

The ACC alleges that this pattern of suppressing full-blown negative clinical trial

data while trumpeting small, open-label studies and positive anecdotal data (from which

no scientifically valid conclusions can be drawn) is precisely the form of fraud that

Defendants employed:

> [T]he Off-Label Promotion Enterprise continued to make
> presentations to physician attendees where Neurontin was
> promoted for use with bipolar disorder patients.  In most of
> these presentations, *the attendee physicians were not
> informed of the negative clinical trial evidence*.  For
> example, the Off-Label Promotion Enterprise created and
> sponsored a series of dinner meetings for psychiatrists
> entitled "Closing the Psychiatry-Neurology Divide:
> Emerging Uses of Anticonvulsants."  This program was

---

[23] The Drugdex entry for bipolar shows only 4 entries, one of which is a case report
involving a single woman, and none of which are placebo-controlled double blind
studies.  All of these small, open-label studies were published in 1999 or earlier.  Not
surprisingly, they all purport to be favorable.  Murray Decl., Exh. 5 at 38-39.

presented dozens of times in 1998, including one in St. Petersburg, Florida at Patrick's Bayside Inn.  As part of the program, psychiatrists were informed Neurontin was indicated for bipolar disorder, that early evidence suggested that it had anti-depressive and mood stabilizing effects, and that "data are increasing but *currently limited to favorable case reports and open trials*." The program did not inform attendees of the unfavorable clinical trials that found that Neurontin was not effective for bipolar disorder and that it was less effective than a placebo.

ACC ¶ 154 (emphasis added).

### 4.     Panic Disorder

As was the case with bipolar disorder, Defendants funded an internal clinical study that found that "Neurontin was no more efficacious than placebo in treating panic disorder."  ACC ¶ 164.  Again, Class Plaintiffs allege that notwithstanding the negative findings:

the Off-Label Promotion Enterprise continued to make presentations to physician attendees where Neurontin was promoted for use with panic disorder patients.  In most of these presentations, the attendee physicians were not informed of the negative clinical trial evidence.

*Id*.  The ACC identifies 16 specific events at which physicians received sales pitches that suppressed the negative data.  ACC ¶ 162.[24]  Nothing more is or should be required.[25]

### 5.     Migraine

Defendants are also mistaken in their assertion that Class Plaintiffs have insufficiently alleged material omissions concerning Neurontin's effectiveness for migraine headaches.  Class Plaintiffs have adequately alleged a fraudulent omission – the

---

[24] Undoubtedly, Class Plaintiffs will be able to identify many more such events if permitted to take discovery beyond 1998, which Defendants have thus far refused to provide.

[25] Should the Court find that additional allegations are necessary, Class Plaintiffs request leave to amend the ACC to insert more particularized allegations of suppression.

failure to disclose a failed clinical trial. Nowhere in the 179-page transcript of the May 26, 1996 Advisory Board Meeting does Parke-Davis disclose the existence of the failed trial (*see* Murray Decl., Exh. 10), despite the fact that a number of Parke-Davis employees in attendance were well aware of it. ACC ¶ 177. As Defendants neither dispute the significance of the failed trial, nor contend that it was disclosed, their objections should be overruled.[26]

Dated: April 10, 2006                    Respectfully submitted,

                                         **For the Class:**

                                         _/s/ Barry Himmelstein_____
                                         **LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP**
                                         Barry Himmelstein, Esq.
                                         275 Battery Street, 30th Floor
                                         San Francisco, CA 94111-3339

                                         **GREENE & HOFFMAN**
                                         Thomas Greene, Esq.
                                         125 Summer Street
                                         Boston, MA 02110

---

[26] Defendants focus instead on specific comments alleged in the ACC about whether headache data had ever been recorded, even in epilepsy studies. Defendants present these comments out of context. The question from Dr. Moskowitz as to whether Parke-Davis had any "in house" data on migraine would never have been asked if Parke-Davis had disclosed that it had actually conducted a *clinical trial* to study migraine directly. *See* Murray Decl., Exh. 10 at X010715. Deprived of this most-relevant information, Dr. Moskowitz tried to determine instead whether there was migraine data from *any* source, including the epilepsy trials. *Id*. Dr. Magnus-Miller responded that migraine data was not captured in "[t]he studies we've done so far on Neurontin." *Id*. at X010715-16. Dr. Moskowitz then asked, point blank: "But do you have any data?" This question was neither qualified nor limited to epilepsy studies as Defendants claim. The answers – which were flat out lies — were "no, not really" and "not even in monotherapy." *Id*. at X010716.

**HAGENS BERMAN SOBOL SHAPIRO LLP**
Thomas M. Sobol, Esq.
One Main Street, 4th Floor
Cambridge, MA  02142

**DUGAN & BROWNE**
James Dugan, Esq.
650 Poydras Street, Suite 2150
New Orleans, LA  70130

**BARRETT LAW OFFICE**
Don Barrett, Esq.
404 Court Square North
P.O. Box 987
Lexington, MS  39095

**LAW OFFICES OF DANIEL BECNEL, JR.**
Daniel Becnel, Jr., Esq.
106 W. Seventh Street
P.O. Drawer H
Reserve, LA  70084

**Co-Lead Counsel for Plaintiffs and the Class**


**For Plaintiff Aetna, Inc.:**


*/s/  Peter A. Pease*
    Peter A. Pease, Esq. (BBO #392880)

**BERMAN DEVALERIO PEASE
TABACCO BURT & PUCILLO**
One Liberty Square
Boston, MA  02109
Telephone:  (617) 542-8300
Facsimile:  (617) 542-1194

**OF COUNSEL:**

**LOWEY DANNENBERG**
**BEMPORAD & SELINGER, P.C.**
Richard Bemporad, Esq.
Richard W. Cohen, Esq.
Gerald Lawrence, Esq.
Peter St. Phillip, Jr., Esq.
The Gateway – 11th Floor
One North Lexington Avenue
White Plains, NY  10601 – 1714
Telephone:  (914) 997-0500
Facsimile:  (914) 997-0035

**BERMAN DEVALERIO PEASE**
**TABACCO BURT & PUCILLO**
Joseph J. Tabacco, Jr., Esq.
425 California Street, Suite 2025
San Francisco, CA  94104-2205
Telephone:  (415) 433-3200
Facsimile:  (415) 433-6382

**JOHN F. INNELLI, LLC**
John F. Innelli, Esq.
1818 Market Street, Suite 3620
Philadelphia, PA  19103
Telephone:  (215) 561-1011
Facsimile:  (215) 561-0012

**For Plaintiffs Guardian Life Insurance**
**Co. of America, Kaiser Foundation**
**Health Plan, Inc. and Kaiser Foundation**
**Hospitals:**

*/s/ Thomas G. Shapiro*
    Thomas G. Shapiro (BBO #454680)

Theodore Hess-Mahan (BBO #557109)
**SHAPIRO HABER & URMY LLP**
53 State Street
Boston, MA  02109
Telephone:  (617) 439-3939
Facsimile:  (617) 439-0134

**OF COUNSEL:**

**COHEN, MILSTEIN, HAUSFELD &
TOLL, P.L.L.C.**
Linda P. Nussbaum, Esq.
150 East 52nd Street, 30th Floor
New York, NY  10022
Telephone:  (212) 838-7797
Facsimile:  (212) 8383-7745

-and-

**COHEN, MILSTEIN, HAUSFELD &
TOLL, P.L.L.C.**
Michael D. Hausfeld, Esq.
1100 New York Avenue, NW
West Tower, Suite 500
Washington, DC  20005
Telephone:  (202) 408-4600
Facsimile:  (202) 408-4699

**RAWLINGS & ASSOCIATES, PLLC**
Mark D. Fischer, Esq.
Mark Sandmann, Esq.
325 W. Main Street
Louisville, KY  40202
Telephone:   (502) 587-1279
Facsimile:  (502) 584-8580

**JOEL Z. EIGERMAN, ESQ.**
50 Congress Street, Suite 200
Boston, MA  012109
Telephone:  (617) 367-0014
Facsimile:  (617) 523-5612