UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re:  NEURONTIN MARKETING AND
SALES PRACTICES LITIGATION

MDL Docket No. 1629

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

THIS DOCUMENT RELATES TO:

Master File No. 04-10981

Judge Patti B. Saris

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

HARDEN MANUFACTURING CORPORATION;
LOUISIANA HEALTH SERVICE INDEMNITY COMPANY,
dba BLUECROSS/BLUESHIELD OF LOUISIANA;
INTERNATIONAL UNION OF OPERATING ENGINEERS,
LOCAL NO. 68 WELFARE FUND; ASEA/AFSCME LOCAL
52 HEALTH BENEFITS TRUST; GERALD SMITH; and
LORRAINE KOPA, on behalf of themselves and all others
similarly situated, v. PFIZER INC. and WARNER-LAMBERT
COMPANY.

Magistrate Judge Leo T.
Sorokin

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

THE GUARDIAN LIFE INSURANCE COMPANY OF
AMERICA v. PFIZER INC. and

AETNA, INC. v. PFIZER INC.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DECLARATION OF PATRICK J. MURRAY

PATRICK J. MURRAY declares upon penalty of perjury in accordance with 28 U.S.C. §

1746 as follows:

1.       I am an attorney associated with the law firm Davis Polk & Wardwell, counsel for

Defendants Pfizer Inc. and Warner-Lambert Company in this action.

2.      I submit this declaration in support of Defendants' Memorandum of Law in

Opposition to Plaintiffs' Joint Objections and Coordinated Plaintiffs' Objections to Report and

Recommendation of Magistrate Judge Leo T. Sorokin Dated January 31, 2006.

3.      Attached at Exhibit A is a true and correct copy of excerpts from the transcript of

the deposition of David P. Franklin, taken on September 12 and 13, 2000, in <u>United States ex rel.

Franklin v. Parke-Davis</u>, Civ. A. No. 96-11651 (D. Mass.).

4.      Attached at Exhibit B is a true and correct copy of an excerpt from Exhibit 3 to

the deposition of David P. Franklin referenced above.

5.      Attached at Exhibit C is a true and correct copy of <u>In re Rezulin Litigation,</u>

Judicial Council Coordination Proceeding No. 4122 (Cal. Sup. Ct. filed Apr. 29, 2003).

Dated:  New York, New York
        April 10, 2006

_____
Patrick J. Murray

## CERTIFICATE OF SERVICE

I hereby certify that this document(s) filed through the ECF system will be sent
electronically to the registered participants as identified on the Notice of Electronic Filing
(NEF) and paper copies will be sent to those indicated as non-registered participants on
April 10, 2006.

/s/David B. Chaffin

# EXHIBIT A

**9/12/2000  Franklin, David Peter**

```
1                  UNITED STATES DISTRICT COURT

2                   DISTRICT OF MASSACHUSETTS

3

4    - - - - - - - - - - - - - -x

5    UNITED STATES OF AMERICA      )

6    ex rel. DAVID FRANKLIN,       )

7                    Plaintiff, )  Civil Action

8       v.                       )  No. 96-11651-PBS

9    PARKE-DAVIS, DIVISION OF     )

10   WARNER-LAMBERT COMPANY,      )

11                    Defendant. )

12   - - - - - - - - - - - - - -x

13   VOLUME I                        Pages 1 - 347

14

15

16            DEPOSITION of DAVID PETER FRANKLIN,

17   Ph.D., a witness called by counsel for the

18   Defendant, taken under the provisions of the

19   Federal Rules of Civil Procedure before Jane M.

20   Borrowman, Registered Professional Reporter and

21   Notary Public, at the offices of Hare & Chaffin,

22   160 Federal Street, Boston, Massachusetts, taken on

23   Tuesday, September 12, 2000, commencing at 9:11

24   a.m., pursuant to Notice.
```

9/12/2000  Franklin, David Peter

```
1    APPEARANCES:

2

3         GREENE & HOFFMAN, PC

4         By Thomas M. Greene, Esq.

5         125 Summer Street, Suite 1410

6         Boston, Massachusetts  02110

7         (617) 261-0040

8         For the Plaintiff.

9

10

11        DAVIS, POLK & WARDWELL

12        By James P. Rouhandeh, Esq.

13        Barbara D. Diggs, Esq.

14        James E. Murray, Esq.

15        450 Lexington Avenue

16        New York, New York  10017

17        (212) 450-4000

18        For the Defendant.

19

20

21

22

23

24
```

```
 1                    I N D E X

 2   WITNESS:  DAVID PETER FRANKLIN, Ph.D.

 3   Examination by Mr. Rouhandeh ................... 4

 4

 5

 6                  E X H I B I T S

 7   NO.  DESCRIPTION                        PAGE

 8   1    7/3/00 First Request for Production of     Documents ........................

 9   2    8/13/96 Complaint ........................ 25

10   3    Disclosure of Information by Relator,

11        David P. Franklin, Pursuant to 31 USC     Section 3730 b(2) with Attachments

12   4    Handwritten Notes / Bate Stamped F 0843 .. 176

13   5    Northeast CBU Roster - Updated 4/19/96

14        Bate Stamped F 0978 - F 0995 ............. 306

15   6    Northeast CBU Roster - Updated 5/15/96     Bate Stamped F 1003 - F 1020 ......

16   7    Letters to Mr. Franklin from

17        Mr. Johnson / Bate Stamped F 0151 -     F 0156 ..............................

18

19

20

21

22

23

24
```

### 9/12/2000  Franklin, David Peter

```
 1              (Witness sworn.)
 2              MR. ROUHANDEH:  Good morning.  My
 3         name is Jim Rouhandeh from the law firm Davis,
 4         Polk & Wardwell.  We represent Parke-Davis
 5         Company in this action.
 6              MR. GREENE:  Excuse me, Jim.  Are we
 7         going to do this by the regular stipulations?
 8              MR. ROUHANDEH:  What do you mean by
 9         regular stipulations?
10              MR. GREENE:  All objections, except
11         as to form and motions to strike, reserved
12         until the time of trial.
13              MR. ROUHANDEH:  Yes.
14              MR. GREENE:  He'll read and sign
15         under the pains and penalties of perjury.
16              MR. ROUHANDEH:  Yes.  Those are
17         fine.
18              DAVID PETER FRANKLIN, Ph.D.,
19         a witness called for examination by counsel
20         for the Defendants, being first duly sworn,
21         was examined and testified as follows:
22              EXAMINATION
23    BY MR. ROUHANDEH:
24    Q.   Could you please state your name for the
```

**9/12/2000  Franklin, David Peter**

```
1        provided your documents to your counsel?
2   A.   I may have thrown stuff that had accumulated
3        out.
4   Q.   Okay.  Just so the question's clear, after you
5        left your employment at Parke-Davis, did you
6        discard any Parke-Davis -- any documents
7        provided to you while you were an employee of
8        Parke-Davis?
9   A.   Probably, yes.
10  Q.   Do you know what those documents are?
11  A.   No.
12  Q.   Can you generally describe them?
13  A.   Sales stuff, that sort of thing.  I was
14       inundated with sales stuff.
15  Q.   Anything else?
16  A.   Not that I can recall.
17  Q.   Okay.  When you say sales stuff, what are you
18       referring to?
19  A.   I would get sales stuff, everything from
20       selling skills magazines to faxes from
21       contractors, third-party contractors.  They
22       would fax me all hours of the night, actually.
23  Q.   I'm going to ask the court reporter to mark as
24       Exhibit 3 a document that contains
```

```
1          attachments.  The document is entitled:
2          "Disclosure of Information by Relator David
3          Franklin Pursuant to 31 USC Section 3730
4          b(2)."   And the attachments are -- the first
5          attachment is Exhibit A and the second is
6          Exhibits B through T.
7                   (The document was thereupon marked
8          as Franklin Exhibit No. 3 for identification.)
9                   (Brief pause.)
10    Q.   Do you recognize Exhibit 3?
11    A.   Yes.
12    Q.   What is it?
13    A.   It's a disclosure and both of the exhibits --
14         or all of the exhibits.
15    Q.   Is the disclosure -- when you say the
16         disclosure, it's the statement that you made,
17         initially, at the outset of this lawsuit --
18    A.   Yeah.
19    Q.   -- filed with the government?
20    A.   Yeah.
21    Q.   Who was the author of the disclosure?
22    A.   Combination of myself and my attorneys.
23    Q.   Did you review it before it was filed?
24    A.   Yeah.
```

**9/12/2000  Franklin, David Peter**

```
 1    Q.   And do you believe that it is accurate?

 2    A.   Yes.

 3    Q.   And you believed at the time that it was

 4         accurate, and you believe today it is

 5         accurate?

 6    A.   Yes.

 7    Q.   Do you believe that it is complete?

 8    A.   No.

 9    Q.   In what way is it not complete?

10    A.   I couldn't possibly capture my entire

11         experience at Warner-Lambert.

12    Q.   So, it doesn't include -- it doesn't purport

13         to describe everything that happened while you

14         were an employee there, is that correct?

15    A.   Right.  It also doesn't address everything

16         that's in the exhibits.

17    Q.   Did you omit any facts that you were aware of

18         regarding any allegedly improper or illegal

19         activity, did you omit that from the

20         disclosure?

21    A.   I don't believe so, no.

22    Q.   So, if there was something that you thought

23         was improper or illegal happening at

24         Warner-Lambert or Parke-Davis, you included it
```

9/13/2000 Franklin, David P.

```
1                UNITED STATES DISTRICT COURT

2                  DISTRICT OF MASSACHUSETTS

3         ---------------------------------------x

4    UNITED STATES OF AMERICA AND

5    DAVID FRANKLIN,

6                        Plaintiffs,

7    v.                        No. 96-11651-PBS

8    PARKE-DAVIS, DIVISION

9    OF WARNER-LAMBERT COMPANY,

10                       Defendant.

11        ---------------------------------------x

12   Volume: II                Pages: 1-342

13

14        CONTINUATION DEPOSITION OF DAVID P.

15   FRANKLIN, a witness called on behalf of the

16   Plaintiff, taken pursuant to the provisions

17   of the Massachusetts Rules of Civil

18   Procedure, before Linda Bernis, a Registered

19   Professional Reporter and Notary Public in

20   and for the Commonwealth of Massachusetts,

21   at the offices of Hare & Chaffin, 160

22   Federal Street, Boston, Massachusetts, on

23   Wednesday, September 13, 2000, commencing at

24   9:15 a.m.
```

**9/13/2000  Franklin, David P.**

```
1          APPEARANCES:

2

3          DAVIS, POLK & WARDWELL

4               By James Rouhandeh, Esq.

5               By James Murray, Esq.

6               450 Lexington Street

7               New York, New York 10017

8               212-450-4000

9               Counsel for the Defendant

10

11         GREENE & HOFFMAN

12              By Thomas Greene, Esq.

13              125 Summer Street

14              Boston, Massachusetts 02110

15              617-261-0040

16              Counsel for the Plaintiff

17

18

19

20

21

22

23

24
```

**9/13/2000  Franklin, David P.**

```
1                    I N D E X

2       Deposition of:                Direct

3       DAVID P. FRANKLIN

4       By Mr. Rouhandeh                   5

5

6

7                    E X H I B I T S

8

9       No.                          Page

10      8     Expense Report          201

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

**9/13/2000  Franklin, David P.**

```
 1                   STIPULATIONS
 2          It is stipulated by and between
 3     counsel for the respective parties that the
 4     deponent will read and sign the deposition
 5     transcript within 30 days and the sealing
 6     and filing thereof are waived; and that all
 7     objections, except as to the form of the
 8     question and motions to strike will be
 9     reserved until the time of trial.
10
11               DAVID P. FRANKLIN
12     a witness called for examination by counsel
13     for the Defendant, being first duly sworn,
14     was examined and testified as follows:
15
16          MR. ROUHANDEH:  On the record.
17          Good morning, Mr. Franklin.  If you
18     note, on the record, the time that we are
19     starting at 9:15 a.m.  I think we agreed to
20     start at 9:00 and got a call from your
21     office saying that you were going to be
22     late.
23          THE WITNESS:  There was an accident
24     on the Turnpike.
```

**9/13/2000 Franklin, David P.**

```
1          Parke-Davis program."
2                  Do you see that?
3     A.   Yes.
4     Q.   When you refer to package of monetary
5          incentives, can you list for me what the
6          package was?
7     A.   Speakers Bureau, preceptorships, which were
8          often referred to as shadowing programs,
9          consultantships, record reviews.
10    Q.   Anything else?
11    A.   That's it.
12    Q.   Did you ever provide any of these monetary
13         incentives to any physicians?
14    A.   I did not, no.
15    Q.   None of them, no speakers?
16    A.   No, I hadn't been there long enough.
17    Q.   Are you aware of -- strike that.
18    A.   I'm sorry.  There were also Olympic tickets.
19    Q.   Now, including Olympic tickets, did you
20         provide those to anyone?
21    A.   No.
22    Q.   If you could turn to page 11 of Exhibit 3.
23         You refer to a meeting of the Northeast CBU
24         that you attended in Farmington, Connecticut
```

**9/13/2000  Franklin, David P.**

```
1           on April 22, 1996.  Do you see that?

2      A.   Yes.

3      Q.   Do you recall that meeting?

4      A.   Yes.

5      Q.   Did you take notes of that meeting?

6      A.   I don't recall.

7      Q.   Did you tape-record that meeting?

8      A.   No.

9      Q.   You attribute some language here to Ford.

10          You're referring to John Ford?

11     A.   Yes.

12     Q.   And, again, this is not based on notes and

13          it is not based on the recorded

14          conversations, it is based on your

15          recollection of what he said?

16     A.   Yes.

17     Q.   The third from the last line refers to, "I

18          don't want to hear that safety crap."

19     A.   Yes.

20     Q.   What did you understand -- first, do you

21          believe he used those words?

22     A.   Yes.

23     Q.   What do you understand him to be referring

24          to?
```

**9/13/2000  Franklin, David P.**

1    A.    That dosing -- this was in reference to

2          greatly escalating the dose.  Asking

3          physicians to experiment with their patients

4          using extremely high doses of Neurontin.

5          These high doses were not shown to be safe

6          at this point.  And he was referring to the

7          fact that some people may have reservations

8          about doing that because of the lack of

9          safety data at these extremely high levels

10         of drug.

11   Q.    The next paragraph you begin in the

12         pharmaceutical industry and you go on to

13         talk about medical liaisons.  What was your

14         understanding of the practices in the

15         pharmaceutical industry?  Let me restate

16         that.

17               What was the basis, when you

18         prepared this document, for stating what you

19         believe to be the pharmaceutical industry

20         practice?

21   A.    Discussions on-the-job with the people that

22         I worked with as to what other groups were

23         doing.  I think we previously talked about a

24         voice mail that or a conference call in

# EXHIBIT B

DISCLOSURE OF INFORMATION BY
RELATOR DAVID P. FRANKLIN
PURSUANT TO 31 U.S.C. § 3730 b(2)

I    SUMMARY OF DISCLOSURE

This disclosure details the relator's personal knowledge of a widespread pattern of illegal activity by the Parke-Davis division of Warner Lambert in the marketing and promotion of several of its prescription drug products. This illegal pattern of activity has resulted, directly and indirectly, in financial harm to the United States Government in the form of fraudulent inducement of payments for prescription drugs through the Medicare and Medicaid programs as well as direct purchases by the Veterans Administration. As a result of Parke-Davis' illegal conduct and fraud, the United States has, in some cases, paid for drug that it never intended to pay for, and in other cases, overpaid for prescription drugs. The estimated damage to the United States is presently occurring at a rate of $30 to 40 million per year.

Parke-Davis' illegal conduct has consisted of deliberate avoidance of the provisions of the Food and Drug Act as well as the regulations of the U.S. Food and Drug Administration ("FDA") applying to the promotion of "off-label" uses of its prescription drug products. Parke-Davis has also been guilty of conventional fraud in the sale of its prescription drug products, by making claims of safety and effectiveness for off-label uses where no evidence exists of safety and effectiveness. Parke-Davis has sanctioned, encouraged and organized an illegal, informal non-FDA approved program of human experimentation, financed to a substantial degree, unbeknownst to the federal government, through Medicare, Medicaid and Veterans Administration payments. This use of fraud, illegality, and avoidance of federal regulation in the promotion of its products is a deliberate, nationwide program in which Parke-Davis has invested millions of dollars over the past two years and which has substantially increased the sales of its drugs.

Parke-Davis' illegal activity has consisted of, among other things, the direct solicitation of physicians to prescribe its prescription drugs for off-label uses, the payment of illegal kick-backs to physicians who prescribe Parke-Davis products to patients who are on Medicare and Medicaid, the illegal use of "medical liaisons" in direct sales functions, the encouragement and financing of human experimentation without permission from the FDA and without proper protocols, the avoidance of federal price controls, the avoidance of state formulary restrictions, and the use of direct fraud in the sales of their products. Parke-Davis has also trained its employees in methods of avoiding detection by the FDA, and established a policy of creating false documents,

2

calls, but the idea is you're supposed to be pushing on
Neurontin. I think some people have lost that message and I
think a lot -- may be somewhat ineffectual in that regard.
So, what we need to do is focus on Neurontin. When we get out
there, we want to kick some ass on Neurontin, we want to sell
Neurontin on pain. All right? And monotherapy and everything
that we can talk about, that's what we want to do. Cuz, I'm
embarrassed. I don't know if you guys are embarrassed. But
I'm embarrassed about where we are with Neurontin. We've got
to take it into our own hands and really kick some ass on it,
All right? Let's do it up. Talk to you soon, bye." (Exhibit
A, Page 1-2)

Another example comes from John Ford, who works at company
headquarters in Morris Plains, NJ. During a meeting Dr. Franklin
attended of the NECBU in Farmington, CT on April 22, 1996, Ford
said,

"I want you out there every day selling Neurontin. Look, this
isn't just me, it's come down from Morris Plains that
Neurontin is more profitable than Accupril so we need to focus
on Neurontin... We all know Neurontin's not growing for
adjunctive therapy, besides that's not where the money is.
Pain management, now that's money. Monotherapy, that's money.
We don't want to share these patients with everybody, we want
them on Neurontin only. We want their whole drug budget, not
a quarter, not half, the whole thing... We can't wait for them
to ask, we need get out there and tell them up front. Dinner
programs, CME programs, consultantships all work great but
don't forget the one-on-one. That's where we need to be,
holding their hand and whispering in their ear, Neurontin for
pain, Neurontin for monotherapy, Neurontin for bipolar,
Neurontin for everything...I don't want to see a single
patient coming off Neurontin before they've been up to at
least 4800mg/day. I don't want to hear that safety crap
either, have you tried Neurontin, every one of you should take
one just to see there is nothing, it's a great drug."

In the pharmaceutical industry, individuals with scientific
training, and in many cases, advanced graduate degrees, are
intended to be the facilitators of the exchange of fair and
balanced scientific information. This concept of "fair and
balanced" is at the core of the medical liaison function. The
ultimate goal of the medical liaison-physician interaction is to
increase the quality of patient care. No one, including medical
liaisons, are allowed to commercially promote off-label uses of
prescription medications.

Dr. Franklin accepted the position of medical liaison with
Parke-Davis believing that the position being offered met all of
the requirements set forth above. He was interested in the
position for the opportunities he saw to increase the quality of
medicine through information exchange and to be instrumental in the

11

# EXHIBIT C

**FILED**
LOS ANGELES SUPERIOR COURT

APR 2 9 2003

JOHN A. CLARKE, CLERK
BY DOMINIC ELIAS, DEPUTY

## SUPERIOR COURT OF CALIFORNIA

## COUNTY OF LOS ANGELES

IN RE REZULIN LITIGATION

*Intervention, Inc. v. Warner-Lambert Company, et al.* (Contra Costa County Case No. C-01-0977)

and

*California Disability Rights, Inc. v. Warner-Lambert Company* (Los Angeles County Case No. SC055268)

JUDICIAL COUNCIL COORDINATION PROCEEDING NO.: 4122

STATEMENT OF DECISION RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT IN UCL CASES



LOUIS B. BERNSTEIN

LOUIS B. BERNST

I.

### BACKGROUND

These representative actions are part of the coordinated JCCP Rezulin proceeding. Plaintiffs, public interest groups suing on behalf of the general public under California's Unfair Competition Law, California Business and Professions Code § 17200, et seq. ("UCL"), seek restitution against Defendants Warner-Lambert Company and Pfizer, Inc. ("WL", collectively) on behalf of individuals who were prescribed Rezulin by their doctors to treat diabetes, based on alleged unfair and deceptive practices, consisting of an alleged failure to adequately warn of

1  risks associated with Rezulin treatment.

2  WL has filed two motions for summary judgment. In the first motion, WL moves on
3  grounds that: 1) the Court should decline to exercise its equitable power in these cases under
4  *Kraus v. Trinity Mgmt. Services, Inc.* (2000) 23 Cal.4th 116, 138 and its progeny; and 2) that
5  the UCL, as Plaintiffs would apply the statute in this case, violates the due process clauses of
6  the state and federal constitutions.

7  In the second motion, WL seeks an order dismissing the complaints on the following
8  grounds: 1) there is no precedent to assert 17200 or 17500 claims based on allegations
9  concerning the approval process for a prescription medication or based on allegations that the
10  warning label was misleading; 2) California Disability Rights' complaint should be dismissed
11  based on the holding in *Cel-Tech Comms., Inc. v. Los Angeles Cellular Tel. Co.* (1999) 20
12  Cal.4th 163, 185-186 (the "safe harbor" argument); and 3) Plaintiffs' claims are preempted by
13  federal law.

14  **II.**

15  **DISCUSSION**

16  **A. Preliminary rulings**

17  Plaintiffs' objections to late filed evidence accompanying Defendants' Reply Memorandum
18  are sustained.

19

20  The Court grants Plaintiffs' Objections to, and Motions to Strike Portions of, the
21  Declaration of James A. Parker, Jr.. The Court finds that there is no foundation for Mr. Parker's
22  statements regarding the internal conduct of the FDA.

23  Plaintiffs' request for continuance for purpose of pursuing discovery is denied. The
24  requested deposition of James A. Parker, Jr., will not produce facts essential to support the
25  opposition. CCP 437c(h).

26
27  [1] The underlying allegations of unfair competition, and the prayer for relief in both complaints, are substantially similar, and the Court treats the complaints the same for purposes of ruling on Warner-Lambert's motions. The Court
28  has referenced, *infra*, in its Statement of Decision, those portions of Intervention, Inc.'s Complaint for Unfair Competition which parallel the allegations of CDR's First Amended Complaint (FAC).

- 2 -

1    **B. Motion #1 re: Court's Equitable Powers and Due Process**

2         **1. Court's Equitable Powers**

3         Under Business and Professions Code § 17200, "unfair competition shall mean and include

4    any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or

5    misleading advertising."

6         "A court cannot properly exercise an equitable power without consideration of the equities

7    on both sides of a dispute." *Cortez v. Purolator Air Filtration Products Co.* (2000) 23 Cal.4th 163,

8    180. Additionally, a UCL action is equitable in nature, and the Court may consider equitable

9    factors in deciding which, if any, remedies authorized by the UCL should be awarded. *Id.* at 179-

10   181. *Kraus v. Trinity Management Services, Inc.* (2000) 23 Cal.4th 116, 138 allows the Court "to

11   decline to entertain the action as a representative action" "*in any case in which a defendant can*

12   *demonstrate a potential for harm or show that the action is not one brought by a competent*

13   *plaintiff for the benefit of injured parties.*" *See also Rosenbluth International, Inc. v. Superior*

14   *Court* (2002) 101 Cal.App.4th 1073, 1079 (holding in part that Fortune 1000 companies on whose

15   behalf the plaintiff brought his 17200 claims were not members of the "general public" under the

16   UCL).

17        Defendant WL urges the Court to decline to exercise its equitable powers in this case under

18   the *Kraus* factors set forth above.

19             **a. Were actions brought for the benefit of injured parties, and**
                **can Plaintiffs obtain disgorgement or injunctive relief?**

20   Business and Professions Code § 17203 provides as follows:

21        Any person who engages, has engaged, or proposes to engage in unfair competition
22        may be enjoined in any court of competent jurisdiction. The court may make such
         orders or judgments, including the appointment of a receiver, as may be necessary to
23        prevent the use or employment by any person of any practice which constitutes unfair
         competition, as defined in this chapter, or as may be necessary to restore to any
24        person in interest any money or property, real or personal, which may have been
         acquired by means of such unfair competition.
25

26        Restitutionary relief can be sought by anyone authorized to sue under sections 17200 or

27   17500. The purpose is for the Court to "exercise the full range of its inherent powers in order to

28   accomplish complete justice between the parties, restoring if necessary the status quo ante as nearly

- 3 -

1   as may be achieved." *People v. Superior Court (Jayhill Corp.)* (1973) 9 Cal.3d 283. Damages are

2   not allowed under sections 17200 or 17500. *Cel-Tech Communications, Inc. v. Los Angeles*

3   *Cellular Telephone Co.* (1999) 20 Cal.4th 163, 179; *Bank of the West v. Superior Court* (1992) 2

4   Cal.4th 1252; *Chern v. Bank of America* (1976) 15 Cal.3d 866, 875.

5       Neither reliance nor actual damage need be proven to obtain restitutionary relief. *Fletcher*

6   *v. Security Pacific National Bank* (1979) 23 Cal.3d 442. Remedies under § 17200 are cumulative

7   to each other (*People v. Bestline Products, Inc.* (1976) 61 Cal.App.3d 879) as well as to other

8   laws' remedies. *People v. Los Angeles Palm, Inc.* (1981) 121 Cal.App.3d 25, 32-33.

9       Rezulin has been voluntarily withdrawn from the market by Warner-Lambert. There is no

10  allegation in the CDR First Amended Complaint seeking an injunction. The real issue is whether

11  the Court can award restitution or disgorgement, and whether these actions were brought for the

12  benefit of injured parties, under the facts alleged in these cases. For the reasons discussed below,

13  *Kraus, Day v. AT&T Corp.* (1998) 63 Cal.App.4th 325, and *Korea Supply Co. v. Lockheed Martin*

14  *Corp.* (2003) 29 Cal.4th 1134, 1148 mandate a finding that the relief Plaintiffs seek is not available

15  under the UCL.

16      *Day, supra,* 63 Cal.App.4th 325 dealt with a 17200 representative claim on behalf of

17  persons who purchased telephone calling cards. The plaintiffs had alleged that the calls made with

18  the cards were charged by rounding up to the next full minute. In affirming the trial court's order

19  sustaining the demurrer without leave to amend, the Court of Appeal stated:

20          [T]he notion of restoring something to a victim of unfair competition includes two
            separate components. The offending party must have obtained something to which
21          it was not entitled *and* the victim must have given up something which he or she was
            entitled to keep. *Because the filed rates charged by respondents are presumptively*
22          *correct, a consumer who uses a prepaid phone card obtains the full value of what*
            *was paid for and therefore has given up nothing, regardless of whether he or she was*
23          *improperly induced to purchase the card in the first place.* Any attempt to calculate
            a monetary amount to be paid on behalf of those who purchased the cards would
24          necessarily result in a refund or rebate of properly collected fees for services. This
            would enmesh the court in the rate-setting process and directly contravene the filed
25          rate doctrine. Appellants are not entitled to seek restoration of any money under
            section 17203. *Day* at 340. (Emphasis added.)
26

27      *Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134 rejected the plaintiff's

28  attempt to obtain nonrestitutionary disgorgement. In *Korea Supply,* the Republic of Korea

- 4 -

1    solicited bids to purchase a radar system. The plaintiff represented an entity which stood to gain

2    $30 million in commissions if it won the contract. The defendant's predecessor ultimately won

3    the contract. The plaintiff alleged the reason the defendant's predecessor won the contract was due

4    to alleged bribes to the Korean government. Plaintiff filed a 17200 action against the defendant,

5    seeking an order disgorging the defendant's profits obtained by means of an unfair business

6    practice. The Court considered "whether disgorgement of profits that is not restitutionary in nature

7    is an available remedy for an individual private plaintiff under the UCL." *Korea Supply* at 1144.

8        The Court rejected the plaintiff's attempt to pursue such relief under § 17200. The Court

9    first noted that "[W]e held in *Kraus* that while restitution was an available remedy under the UCL,

10    *disgorgement* of money obtained through an unfair business practice is an available remedy in a

11    representative action *only to the extent that it constitutes restitution*. We reaffirm this holding here

12    in the context of an individual action under the UCL." *Korea Supply*, 29 Cal.4th at 1145

13    (emphasis added). The *Korea Supply* court referenced the definition of "restitution" set forth in

14    *Kraus* - an order "'compelling a UCL defendant to return money obtained through an unfair

15    business practice *to those persons in interest from whom the property was taken*, that is, to persons

16    who had an ownership interest in the property or those claiming through that person.'" *Korea*

17    *Supply* at 1144-145 (citing *Kraus*, 23 Cal.4th at pp. 126-127.)) (Emphasis added.)   The Court

18    further noted that "[u]nder the UCL, an individual may recover profits unfairly obtained to the

19    extent that these profits represent monies given to the defendant or benefits *in which the plaintiff*

20    *has an ownership interest*." *Id.* at 1148 (emphasis added). In other words, "[t]he object of

21    restitution is to restore the status quo by returning to the plaintiff funds in which he or she has an

22    ownership interest." *Id.*

23        The Court applied its analysis of the concepts of "restitution" and "disgorgement" as

24    follows:

25      In an attempt to fit its claim within the statutory authorization for relief, and as an
      implicit acknowledgement that nonrestitutionary disgorgement is not an available

26      remedy in an individual action under the UCL, plaintiff describes its requested
      remedy as "restitution." This term does not accurately describe the relief sought by

27      plaintiff. As defined in *Kraus*, an order for restitution is one "compelling a UCL
      defendant to return money obtained through an unfair business practice to those

28      persons in interest from whom the property was taken, that is, to persons who had an

1    ownership interest in the property or those claiming through that person." ( *Kraus,*
2    *supra,* 23 Cal.4th at pp. 126-127.

3    The remedy sought by plaintiff in this case is not restitutionary because plaintiff *does*
     *not have an ownership interest in the money it seeks to recover from defendants.*
4    First, it is clear that plaintiff is not seeking the return of money or property that was
     once in its possession. KSC has not given any money to Lockheed Martin: instead.
5    it was from the Republic of Korea that Lockheed Martin received its profits. Any
     award that plaintiff would recover from defendants would not be restitutionary as it
6    would not replace any money or property that defendants took directly from plaintiff.

7    Further, the relief sought by plaintiff is not restitutionary under an alternative theory
     because plaintiff *has no vested interest* in the money it seeks to recover. We have
8    stated that "the concept of restoration or restitution, as used in the UCL, is not limited
     only to the return of money or property that was once in the possession of that
9    person." (*Cortez, supra,* 23 Cal.4th at p. 178.) Instead, restitution is broad enough to
     allow a plaintiff to recover money or property in which he or she has a *vested*
10   *interest.* In *Cortez,* we determined that "earned wages that are due and payable
     pursuant to section 200 et seq. of the Labor Code are as much the property of the
11   employee who has given his or her labor to the employer in exchange for that
     property as is property a person surrenders through an unfair business practice."
12   (*Ibid.*) Therefore, we concluded that such wages could be recovered as restitution
     under the UCL. We reached this result because "equity regards that which ought to
13   have been done as done [citation], and thus recognizes equitable conversion."
     (*Cortez, supra,* at p. 178.)

14       In its First Amended Complaint, Plaintiff California Disability Rights (CDR) alleges that

15   Warner Lambert, in marketing Rezulin, "engaged in conduct which (1) suppressed and concealed

16   from the FDA and the public the information about the drug it derived from clinical trials and

17   otherwise which showed significant risk of liver damage and cardiovascular problems and other

18   adverse side effects, and (2) advertised Rezulin as being safe and having side effects 'comparable

19   to a placebo.'"[2] CDR's FAC sets forth in further detail allegations of Warner-Lambert's purported

20   suppression of information on the true nature of Rezulin.   Ultimately, "following FDA

21   proceedings, media reports, and a request for a congressional investigation as to why the FDA had

22   approved Rezulin, W-L acceded to the FDA's request that Rezulin be voluntarily withdrawn from

23

24

25

26   ───────────────
     [2] FAC in *CDR v. Warner-Lambert* at ¶13.  *See also* ¶17 of Intervention's Complaint for Unfair Competition.
27   ("Dr. [Randall] Whitcomb [Warner-Lambert's Vice-President] told an FDA advisory committee on December 11, 1996
     that occurrences of liver injury among Rezulin patients were 'comparable to placebo' in the clinical studies" and ¶13
28   ("Warner-Lambert intentionally, fraudulently misrepresented to the FDA that the risk of liver damage from Rezulin was
     trivial.")

- 6 -

1 the market."[3]

2       In CDR's first cause of action for the 17200 violation, ¶108 alleges that "[i]n making the

3 aforementioned representations and statements, the Defendants engaged in a systematic marketing

4 campaign that was false, unfair, unlawful, and likely to deceive California diabetic consumers as

5 to the safety, efficacy and uniqueness of Rezulin. As a result, Defendants' conduct violated

6 Business and Professions Code §§ 17200 and 17500."[4] ¶109 alleges that "[a]s a result of this

7 likelihood of deception, members of the public are all considered to have purchased Rezulin as a

8 result of Defendants' false, unfair, unlawful and deceptive and misleading advertising and

9 promotion of Rezulin without the need for individualized proof of reliance, causation and damage

10 or injury."

11       Disgorgement, as noted in *Korea Supply*, is available to Plaintiffs in these representative

12 UCL actions only to the extent the disgorgement sought encompasses restitution. In other words,

13 disgorgement would be available if it restored the "status quo." The parties have stipulated that

14 the Plaintiffs are not seeking relief on behalf of those members of the general public who were

15 *physically injured* from taking Rezulin.[5] It is further undisputed that Rezulin is not currently, and

16 has not been, available to members of the general public or marketed to members of the general

17 public since it was withdrawn from the market and that Plaintiffs seek no injunctive relief in these

18 actions. The basis for the complaints is essentially that Warner-Lambert deceived the public into

19 purchasing Rezulin, and Plaintiff seeks "an order requiring Defendants to disgorge, restore and or

20 make restitution of any money which may have been acquired by means of unfair competition ..."

21

22    [3] FAC in *CDR v. Warner-Lambert*, ¶83. *See also* ¶21 of Intervention's Complaint ("Rezulin was withdrawn in approximately March, 2000.")

23

24    [4] *See generally* ¶39 in Intervention's Complaint, alleging that "Defendants' conduct constitutes unfair competition within the meaning of Business and Professions Code section 17200."

25    [5] See Exhibit J to Declaration of Robert Barnes; Plaintiffs' Separate Statement of Disputed Material Facts, Fact

26 2.

27    [6] CDR's FAC, Prayer, ¶1. *See also* Intervention, Inc.'s Prayer, ¶¶1, 2 ("For these reasons, plaintiff asks: 1. That defendants refund all monies obtained through the sale of Rezulin; [and] 2. That defendants refund to pre-merger Pfizer shareholders the incremental benefit which Warner-Lambert obtained from them through its unfair competition."

28

1        However, Plaintiffs have offered no evidence suggesting that members of the general public

2   for whose benefit these cases are prosecuted (persons who sustained no physical injury) did not

3   benefit from the use of Rezulin. There is nothing in the complaints, for instance, claiming that

4   Rezulin was ineffective. In the absence of such allegations, there is no "property" in which the

5   general public has an "ownership interest" which Warner-Lambert must "restore" under *Korea*

6   *Supply.* There is no "vested interest" the general public would have in such property.

7   Consequently, as mandated by the result in *Day* and *Korea Supply.* Plaintiffs. under the facts

8   alleged in the complaints, have nothing to recover as disgorgement or restitution as a matter of law.

9        Plaintiffs contend that they "have limited their claims to those for economic injuries

10  relating to the marketing of Rezulin."[7] However, there is no admissible evidence in the record

11  establishing a triable issue of material fact that the general public has in fact suffered such

12  economic injury. To the extent that members of the general public paid for, and used, the

13  prescription drug Rezulin without harm to them, there is no means of determining that any portion

14  of the amounts paid for the drug were wrongfully obtained by the defendants or that, in equity, any

15  moneys should be returned to members of the general public.

16       To the extent that Plaintiffs argue that one purpose of the UCL is to prevent those who

17  engage in wrongful conduct from profiting from that conduct, their suggestion that disgorgement

18  of all monies received by Defendants for the sale of Rezulin is neither supported by the cases cited,

19  nor appropriate. The Court notes that in these coordinated cases there are claims for punitive

20  damages based on the same facts and evidence alleged by the UCL Plaintiffs in the cases now

21  before the Court. To the extent the conduct alleged by the UCL plaintiffs is proved in the personal

22  injury cases, Defendants will be exposed to punitive damages that will both punish Defendants'

23  past conduct and deter similar conduct in the future. Thus, the goal of the UCL to insure that one

24  does not profit from wrongful conduct will be achieved not through the UCL claims, but rather

25  through the award of punitive damages, if appropriate, in the injury cases.

26       In sum, the Court finds that neither restitution nor disgorgement of profits is available to

27

28         [7] Plaintiffs' Separate Statement of Disputed Material Facts, Fact 2.

1  the Plaintiffs as is sought under the complaints. In the absence of triable issues of material fact,

2  and in light of *Kraus, Cortez, Day,* and *Korea Supply,* the Court finds there is no basis upon which

3  it can order either disgorgement or restitution. Consequently, the Court finds that Plaintiffs are not

4  entitled to any remedy as a matter of law. For these reasons, the motion for summary judgment

5  is granted.

6      Given the Court's order granting summary judgment, it declines to address WL's argument

7  that the suit violates WL's due process rights under the state and/or federal constitutions.

8      **C. Motion #2 re: Safe Harbor and Preemption**

9      In view of the Court's determination that the absence of an available remedy supports the

10  granting of summary judgment for the Defendants, the Court declines to rule on the issues relating

11  to the doctrines of abstention or preemption. In this regard, it is the view of the Court that

12  notwithstanding the decision in *Buckman v. Plaintiffs' Legal Committee* (2001) 531 U.S. 341, all

13  UCL cases involving FDA approved products are not necessarily preempted. Specifically, in this

14  case, where the FDA has no continuing involvement, and the drug has been withdrawn from the

15  market, independent state law claims may survive absent a showing that prosecution of such claims

16  would interfere with the FDA's ongoing regulatory powers. With respect to the doctrine of

17  abstention, the Court does not have sufficient relevant and admissible evidence on which to rule.

18  With respect to Defendant's reliance on the doctrine of abstention, it is this Court's view that

19  abstention based on the existence of a regulatory scheme administered by a public agency such as

20  the FDA requires an evidentiary showing either by a party, or by the regulatory agency, of the

21  conflict between a plaintiff's claims and the work of the regulatory agency, or of the advantages

22  of permitting the regulatory agency to adjudicate a plaintiff's claims. Such a showing has not been

23  made in this case.

24      **III.**

25      **CONCLUSION AND ORDER**

26      The motion for summary judgment based on the Court's equitable powers is granted

27  pursuant to *Korea Supply Co. v. Lockheed Martin Corp.,* (2003) 29 Cal.4th 1134; *Kraus v. Trinity*

28  *Mgmt. Servs., Inc.,* (2000) 24 Cal.4th 116; *Cortez v. Purolator Air Filtration Prods. Co.,* (2000)

1   23 Cal.4th 163; and *Day v. AT&T Corp.*, (1998) 63 Cal.App.4th 325. Defendants have met their

2   burden under CCP § 437c(p)(2) of demonstrating that neither restitution nor disgorgement are

3   available remedies under Plaintiffs' UCL claims, as a matter of law. Plaintiffs have not met their

4   burden under CCP § 437c(p)(2) of showing one or more triable issues of material facts exists with

5   respect to the availability of relief under their UCL claims.

6           In light of the Court's order granting the motion for summary judgment based on *Korea*

7   *Supply Co., Kraus, Cortez,* and *Day*, the Court declines to rule on the issues in Defendants'

8   concurrent motion for summary judgment relating to the doctrines of abstention or preemption.

9

10  Dated: April 29, 2003

11

12

13                                          Car J. West

14                                          Judge of the Superior Court

15

16

17

18

19

20

21

22

23

24

25

26

27

28