*In re Neurontin Marketing, Sales Practices and Products Liability Litigation—MDL 1629*

## CLASS AND COORDINATED PLAINTIFFS' SPECIFIC ALLEGATIONS OF FALSE, MISLEADING OR DECEPTIVE STATEMENTS

|  | OFF-LABEL USE | THE FALSE STATEMENT (OR MATERIAL OMISSION) | DATE | WHY IT IS FALSE OR MISLEADING |
|---|---|---|---|---|
| #1. ☐ | Bipolar Disorder | "data are increasing but currently limited to favorable case reports and open trials."<br><br>- *Displayed on a set of slides entitled "Gabapentin: Indications Summary—Bipolar disorder" presented to attendees of a series of dinner meetings[1] for psychiatrists entitled "Closing the Psychiatry-Neurology Divide: Emerging Uses of Anticonvulsants," held at the erstwhile Maison Robert in Boston, Patrick's Bayside Bistro in St. Petersburg, FL, the Downtown Club in Philadelphia, Ristorante DeGrezia in New York, and other fine restaurants around the country.*<br><br>**Amended Class Action Complaint ("AC") ¶ 154; First Coordinated Amended Complaint ("FCAC") ¶ 123.** | Mar. 16, 1998<br>Mar. 17, 1998<br>Mar. 18, 1998<br>Mar. 19, 1998 | This statement was patently false because Defendants knew in 1997 of two negative clinical trials (rather than "favorable" evidence from "case reports" and "open trials") establishing that Neurontin was not significantly superior to placebo in treating bipolar disorder. In fact, Parke-Davis knew that the results of its own clinical trial of Neurontin showed that Neurontin was *less* effective than placebo in treating bipolar disorder. Although Defendants were aware of these two negative studies, they never submitted them to Drugdex[2]; consequently, Drugdex has never included citations to either of the articles.<br><br>**AC ¶¶ 152 – 54; FCAC ¶¶ 121 – 22, 125.** |

---

[1] Dinner meetings were a marketing tactic used by the Defendants to lure physicians to fine restaurants around the country. *See* AC ¶¶ 53, 103, 222; FCAC ¶¶ 41, 94, 123. At these restaurants, physicians were wined and dined and then subjected to a carefully scripted sales pitch on Neurontin's off-label uses under the guise of relaxed, informal and spontaneous dinner conversation with peers.

[2] The Drugdex Drug Information System is a widely used online computer database that contains drug information and journal article citations. *See* AC ¶ 121; FCAC ¶ 110. Many practitioners use it as a research tool in *lieu* of or in addition to traditional methods of reviewing journal articles or performing Medline searches. The dissemination by the Defendants of Neurontin abstracts to Drugdex was part of the overall publication strategy, which is described in AC ¶¶ 25 – 31 and FCAC ¶¶ 23 – 29.

|     | OFF-LABEL USE | THE FALSE STATEMENT (OR MATERIAL OMISSION) | DATE | WHY IT IS FALSE OR MISLEADING |
|-----|---------------|--------------------------------------------|------|-------------------------------|
| #2. ☐ | Bipolar Disorder | Neurontin was "Innovative and effective esp. for bipolar II."<br><br>- *Said by a Parke-Davis speaker at a medical education conference[3] to various attendees, including "Physician 604980,"[4] at the Marriott San Francisco Airport in San Francisco, CA.*<br><br>**AC ¶ 156; FCAC ¶ 124.** | Aug. 8, 1998 | These statements were patently false because Defendants knew as early as 1997 of negative clinical trial evidence establishing that Neurontin was not significantly superior to placebo in treating bipolar disorder. One study showed Neurontin to be no better than placebo and inferior to a competitor's drug. Parke-Davis's own clinical trial showed that Neurontin was *less* effective than placebo in treating bipolar disorder. Although Defendants were aware of these two negative studies, they never submitted them to Drugdex; consequently, Drugdex has never included citations to either of the articles.<br><br>**AC ¶¶ 152 – 54; FCAC ¶¶ 121 – 22, 125.** |
| #3. ☐ | Bipolar Disorder | Neurontin was an "…effective treatment of bipolar disorder..."<br><br>- *Said by a Parke-Davis sales representative to "Physician 011623"[5] during a sales call (detail)[6] at the physician's office.*<br><br>**AC ¶ 156; FCAC ¶ 124.** | Aug. 31, 1998 | |

---

[3] Medical education conferences, also known as CMEs (continuing medical education), were marketing tactics in which physicians were incorrectly led to believe they were receiving unbiased, scientifically sound information about diseases and treatments. While doctors are aware that CMEs are supported by the drug industry, physicians believe that accreditation standards are followed, meaning that the financial support is through an unrestricted educational grant to an accredited institution and that the content of the CME is independent of the sponsor's control. With respect to Neurontin, Defendants, through the use of various medical marketing firms, exposed physicians to CMEs that were biased, scientifically unsound, and not independent. AC ¶¶ 223 – 25; FCAC ¶¶ 49, 53, 59 – 60.

[4] *See* endnote (4), *infra* at page 10.

[5] *See* endnote (4), *infra* at page 10.

[6] A sales call or "detail" refers to situations where an employee of Defendants, usually a sales representative, approaches a physician at his or her place of practice, usually armed with free samples, notepads, pens, and lunches, and seeks to gain audience with the physician to deliver a scripted sales pitch. *See* AC ¶ 33, 99; FCAC ¶¶ 32 – 33. Pfizer maintains various elaborate databases, which record the name and location of the physician detailed, the date of the sales call, and the notes of the discussion. So far, Defendants have refused to produce complete and unredacted copies of all of the sales call databases.

| | OFF-LABEL USE | THE FALSE STATEMENT (OR MATERIAL OMISSION) | DATE | WHY IT IS FALSE OR MISLEADING |
|---|---|---|---|---|
| #4. ☐ | Bipolar Disorder | Defendants affirmatively suppressed the results of at least two failed clinical trials for Neurontin concerning bipolar disorder and thus made material omissions in statements to prescribing physicians at the following events:<br>• Speakers Bureau Meeting the Fairmont Scottsdale Princess in Scottsdale, AZ (Jan. 21-23, 2000);<br>• Speakers Bureau: Current Perspectives in the Understanding of Neurobehavioral Disorders at the Four Seasons Regent Beverly Wilshire in Beverly Hills, CA (March 24-26, 2000);<br>• Advisory Board Meeting at Hyatt Regency Hotel in San Antonio, TX (March 29, 2000);<br>• Speakers Bureau at the Wyndham New Orleans at Canal Place in New Orleans, LA (April 7-9, 2000); and<br>• Speakers Training Advanced Perspectives in the Management of Neurological and Mood Disorders at the Enchantment Resort in Sedona, AZ (April 28-30, 2000).<br>Moreover, Parke-Davis never submitted the results of the two failed clinical trials to Drugdex.<br><br>**AC ¶¶ 150, 153; FCAC ¶¶ 125 – 26.** | Jan. 21, 2000<br>Jan. 22, 2000<br>Jan. 23, 2000<br>Mar. 24, 2000<br>Mar. 25, 2000<br>Mar. 26, 2000<br>Mar 29, 2000<br>Apr. 7, 2000<br>Apr. 8, 2000<br>Apr. 9, 2000<br>Apr. 28, 2000<br>Apr. 29, 2000<br>Apr. 30, 2000<br>(Drugdex omissions are continuous from 2000 to the present) | Defendants knew in 1997 that there was negative clinical trial evidence that established that Neurontin was not significantly superior to placebo in treating bipolar disorder and was inferior to a competitor's drug. In fact, Parke-Davis knew that the results of its own clinical trial of Neurontin had shown that Neurontin was *less* effective than placebo in treating bipolar disorder.<br><br>**AC ¶¶ 152 – 54; FCAC ¶¶ 121 – 22.** |

| | OFF-LABEL USE | THE FALSE STATEMENT (OR MATERIAL OMISSION) | DATE | WHY IT IS FALSE OR MISLEADING |
|---|---|---|---|---|
| #5. ☐ | Diabetic Peripheral Neuropathy | Defendants submitted to Drugdex a falsified abstract of the results of a Parke-Davis-funded clinical trial, which omitted the author's conclusion that Neurontin is "probably ineffective " for the treatment of diabetic peripheral neuropathy and falsely stated: "the authors suggest that higher doses of gabapentin are needed."<br><br>**AC ¶ 121; FCAC ¶¶ 108 – 11.**[7] | Continuously from 1999 to the present | The Drugdex abstract was false and misleading because: (1) it omitted the main conclusion of the author, Dr. Kenneth Gorson from St. Elizabeth's Hospital, who had conducted the clinical trial, that Neurontin "is probably *no more effective than placebo* in the treatment of painful diabetic neuropathy"; and (2) it falsely stated that Dr. Gorson had concluded that "higher doses of gabapentin are needed" when in fact no such suggestion appeared in Dr. Gorson's final publication (which was belatedly published in the form of a letter to the editor because Parke-Davis had withdrawn publication support after Dr. Gorson refused to falsify his negative findings about Neurontin).<br><br>**AC ¶¶ 118 – 20; FCAC ¶¶ 108 - 11.** |

---

[7] The sufficiency of this allegation has already been extensively briefed by the parties in Memorandum of Law of Pfizer Inc. and Warner-Lambert Company In Support of Their Objections to Report and Recommendation of Magistrate Judge Leo T. Sorokin Dated January 31, 2006 (Docket No. 287) at 18 – 21 and Plaintiffs' Joint Response to Defendants' Memorandum of Law In Support of Their Objections to Report and Recommendation of Magistrate Judge Leo T. Sorokin Dated January 31, 2006 (Docket No. 303) at 25 – 27.

| | OFF-LABEL USE | THE FALSE STATEMENT (OR MATERIAL OMISSION) | DATE | WHY IT IS FALSE OR MISLEADING |
|---|---|---|---|---|
| #6. ☐ | Doses exceeding approved maximum of 1800 mg/day | "we found that clinical usage requires [daily dosages of] 2200, 3200, 3600, up to what I think … again, as I said earlier, a limit of about 4800 mgs."<br><br>- *Said by Dr. Robert Leroy, a speaker hired by Parke-Davis through the medical marketing firm Cline Davis & Mann, to the attendees of Ritz-Carlton Consultants Meeting[8] in Boston, MA. Parke-Davis paid Dr. Leroy a total of more than $25,000 to tout Neurontin at numerous marketing events. The notion that a physician is required to increase a patient's daily intake above 1800 mg per day—and as high as 4800 mg/day—before discontinuing the drug for lack of efficacy is directly in line with a Parke-Davis marketing executive's explicit instructions: "I don't want to see a single patient coming off Neurontin until they have been up to at least 4800mg/day."*<br><br>**AC ¶ 191; FCAC ¶¶ 33, 157.** | Apr. 20, 1996 | This statement is misleading because: (1) it falsely implies that Neurontin's efficacy is dose-related and that dosages of 2200 – 3600 mg per day are *more effective* than the FDA-approved dosage of 1800 mg per day, (2) it omits reference to the results of Parke-Davis's own internal clinical trials, which failed to establish dose-related efficacy; (3) the FDA rejected Defendants efforts to increase the approved recommended dosage beyond 1800 mg per day, finding that "evidence from controlled trials fails to provide evidence that higher dose [sic] of Neurontin are more effective than those recommended"; and (4) the statement fails to disclose that excess amounts of the drug are disproportionately excreted from the body and cannot be absorbed, a fact undermining the rationale for taking higher than approved doses.<br><br>**AC ¶¶ 184 – 85, 195 – 97; FCAC ¶¶ 149 – 50, 154 – 61.** |

---

[8] A consultants meeting was a marketing tactic where Defendants "hired" physicians as "consultants" by paying them honoraria and sending them on all-expenses-paid trips to exclusive hotels and resorts. Under the guise of giving physicians accurate, scientific knowledge about Neurontin in order to obtain their feedback and insight, Defendants actually delivered inaccurate, unscientific, off-label information about Neurontin that would not withstand FDA scrutiny had the event been an educational seminar or an overtly promotional meeting. No meaningful feedback from the physicians was ever sought or used by Defendants. *See* AC 213 – 222. A consultants meeting differs from an advisory board meeting, where a select number of experts in the field are retained to give advice. *See* AC ¶ 55. In order to give useful advice, these experts ask for and have an expectation that they are receiving the most accurate and up-to-date information. Because the Defendants would continue to use the experts as thought-leaders and future speakers, they knew that any false statement or suppression of evidence would be repeated by these thought-leaders to their peers. Thus lies at an advisory board ultimately reached far more physicians that the actual attendees.

| | OFF-LABEL USE | THE FALSE STATEMENT (OR MATERIAL OMISSION) | DATE | WHY IT IS FALSE OR MISLEADING |
|---|---|---|---|---|
| #7. ☐ | Migraine | Neurontin was "Effective in controlling …migraine headache."<br><br>- *Said by a Parke-Davis sales representative to "Physician 019311"[9] during a Neurontin sales call (detail) at the physician's office.*<br><br>**AC ¶ 181; FCAC ¶ 140.** | Aug. 16, 1996 | These statements were false and misleading because they omitted the following facts: (1) Parke-Davis knew that there was no pre-clinical rationale that would support the use of Neurontin in migraine prophylaxis; and (2) Parke-Davis had conducted a 12-week migraine prophylaxis study in Europe during the late 1980s that revealed no statistically significant difference in migraine attack frequency between placebo and 900 mg of Neurontin therapy.  Contrary to Defendants' assertions at the hearing on May 3, 2006 that the results of all trials, good or bad, get published, the results of the failed Migraine trial have never been published or disclosed.<br><br>**AC ¶¶ 173 – 74; FCAC ¶¶ 133 – 40.** |
| #8. ☐ | Migraine | Question: "But do you have any data [relating to Neurontin and migraine]?"<br><br>Answer: "We didn't…No, not really, because we didn't capture headache baseline."<br><br>- *Said by Leslie Magnus-Miller, Senior Director of Medical Affairs employed by Parke-Davis to members of the Parke-Davis Migraine Advisory Board,[10] in response to a question from a physician questioning the need for additional research on Neurontin and migraine if Parke-Davis had "that data already in house."*<br><br>**AC ¶ 178; FCAC ¶ 138.**[11] | May 25, 1996 | |

---

[9] *See* endnote (4), *infra* at page 10.

[10] See footnote 8, *supra*.

[11] The sufficiency of this allegation has already been extensively briefed by the parties in Memorandum of Law of Pfizer Inc. and Warner-Lambert Company In Support of Their Objections to Report and Recommendation of Magistrate Judge Leo T. Sorokin Dated January 31, 2006 (Docket No. 287) at 24 – 27 and Plaintiffs' Joint Response to Defendants' Memorandum of Law In Support of Their Objections to Report and Recommendation of Magistrate Judge Leo T. Sorokin Dated January 31, 2006 (Docket No. 303) at 29 – 30.

| | OFF-LABEL USE | THE FALSE STATEMENT (OR MATERIAL OMISSION) | DATE | WHY IT IS FALSE OR MISLEADING |
|---|---|---|---|---|
| #9. ☐ | Migraine | Defendants suppressed the results of a failed clinical trial on migraine prophylaxis and thus made material omissions to prescribing physicians at various events where Neurontin was marketed for migraine, including: Gabapentin in the Management of Migraine in Short Hills, NJ [not NY as alleged] on May 25, 1996 and the Advisory Board Meeting at the Hyatt Regency Hotel San Antonio, TX on March 29, 2000.<br><br>**AC ¶ 179; FCAC ¶ 139.** | May 25, 1996<br>Mar. 29, 2000 | These statements were false and misleading because they omitted the following facts: (1) Parke-Davis knew that there was no pre-clinical rationale that would support the use of Neurontin in migraine prophylaxis; and (2) Parke-Davis had conducted a 12-week migraine prophylaxis study in Europe during the late 1980s that revealed no statistically significant difference in migraine attack frequency between placebo and 900 mg of Neurontin therapy. Contrary to Defendants' assertions at the hearing on May 3, 2006 that the results of all trials, good or bad, get published, the results of the failed Migraine trial have never been published or disclosed.<br><br>**AC ¶¶ 173 – 74; FCAC ¶¶ 133 – 40.** |

|      | OFF-LABEL USE | THE FALSE STATEMENT (OR MATERIAL OMISSION) | DATE | WHY IT IS FALSE OR MISLEADING |
|------|---------------|---------------------------------------------|------|-------------------------------|
| #10. ☐ | Monotherapy treatment for epilepsy[12] | "Now approved as monotherapy for seizures"<br><br>- *Said by a moderator hired by Parke-Davis to "Physician 608932"[13] during a teleconference[14] to discuss Neurontin's off-label uses.*<br><br>**AC ¶ 172; FCAC ¶ 147.** | Sept. 1997 [not 1998 as alleged] | These statements were patently false because: (1) Neurontin has never been "approved" for monotherapy for seizures; (2) the FDA specifically rejected Parke-Davis's application for monotherapy approval in August 1997 because of a lack of proven efficacy; and (3) Parke-Davis knew as early as 1995 that its own internal clinical trials had failed to establish efficacy.<br><br>**AC ¶¶ 166 – 69; FCAC ¶ 142 – 45.** |
| #11. ☐ | Monotherapy treatment for epilepsy | "Is effective as monotherapy or as add-on."<br><br>- *Said by a moderator hired by Parke-Davis to "Physician 602425"[15] during a teleconference to discuss Neurontin's off-label uses.*<br><br>**AC ¶ 171; FCAC ¶ 147.** | Feb. 1998 | |

---

[12] Neurontin was only approved to treat epilepsy as an adjunctive treatment—meaning that it had to be used in conjunction with another anti-epileptic medication that is approved as a mainline treatment. *See* AC ¶ 17; FCAC ¶ 16. Monotherapy refers to the use of a drug as the sole treatment.

[13] *See* endnote (4), *infra* at page 10.

[14] Neurontin Teleconferences were marketing events where physicians who had been given a telephone number by a Parke-Davis sales representative could call in from their homes or offices and hear information concerning off-label uses of Neurontin.

[15] *See* endnote (4), *infra* at page 10.

| | OFF-LABEL USE | THE FALSE STATEMENT (OR MATERIAL OMISSION) | DATE | WHY IT IS FALSE OR MISLEADING |
|---|---|---|---|---|
| #12. ☐ | Restless Leg Syndrome (RLS)/ Periodic Limb Movement Syndrome (PLMS) | "Dr. Ehrenberg's patients had a 90% response rate to Neurontin."<br><br>- *Said by Parke-Davis Medical Liaisons to physicians, referring to Dr. Bruce Ehrenberg of the New England Medical Center, who had conducted a study on RLS and PLMS. This allegation was confirmed by the sworn testimony in the Franklin case of Lisa Kellett, a former Parke-Davis Medical Liaison.*<br><br>**AC ¶ 145; FCAC ¶ 116.**[16] | Continuous | Statements concerning a 90% response rate were patently false because Dr. Ehrenberg's study was negative and there was no "90% response rate." In the study, Neurontin did not affect *any* of the participants' limb movements during sleep. Contrary to Defendants' assertions at the hearing on May 3, 2006 that the results of all trials, good or bad, get published, the results of Dr. Ehrenberg's study have never been published or disclosed. The negative results were also routinely omitted in all sales pitches where Neurontin was claimed to be "effective" for RLS and PLMS.<br><br>**AC ¶¶ 142 – 46; FCAC ¶¶ 112 – 17.** |
| #13. ☐ | Restless Leg Syndrome (RLS)/ Periodic Limb Movement Syndrome (PLMS) | Neurontin was "Effective in controlling…restless leg syndrome..."<br><br>- *A Parke-Davis sales representative to "Physician 019311"*[17] *during a sales call (detail) at the physician's office.*<br><br>**AC ¶ 148; FCAC ¶ 119.** | Aug. 16, 1996 | |

---

[16] The sufficiency of this allegation has already been extensively briefed by the parties in Plaintiffs' Joint Objections to Report and Recommendation on Defendants' Motions to Dismiss the Amended Class Complaint and the First Coordinated Amended Complaint (Docket No. 288) at 24 – 25 and Memorandum of Law of Pfizer Inc. and Warner-Lambert Company in Opposition to Plaintiffs Joint Objections and Coordinated Objections to Report and Recommendation of Magistrate Judge Leo T. Sorokin Dated January 31, 2006 (Docket No. 304) at 29.

[17] *See* endnote (4), *infra* at page 10.

**Endnotes**

(1) This chart was jointly prepared by the Class Plaintiffs and Coordinated Plaintiffs in response to the Court's request for representative examples of false, misleading or deceptive statements and is not intended to be an exhaustive compilation of all such statements made by or on behalf of Defendants.

(2) Plaintiffs' access to evidence of Defendants' false, misleading and deceptive statements is at present very circumscribed. In the earlier *Franklin* litigation, Defendants were only ordered to produce documents from 1994 – 1998, less than half of the time period during which Plaintiffs allege the fraudulent scheme took place. Moreover, Defendants were only required to produce documents from one of the six customer business units (the NECBU) and documents that were located in Warner-Lambert's corporate headquarters in New Jersey. Thus, Defendants were not required to produce documents from the other five CBUs of Warner-Lambert, including the Managed Care CBU, which was specifically charged with targeting third-party payors.

(3) In addition to the quantitative limitations described above, the documents produced in the *Franklin* case have an important qualitative limitation: Defendants in the Franklin case only produced transcripts for 5 of the roughly 500 – 1000 events that occurred from 1994 – 1998 (i.e. roughly 1% of transcripts), and no audiotapes. Counsel from Greene & Hoffman is aware that there are audiotapes and transcripts for dozens or even hundreds of other events in the possession of Pfizer (documents that were produced to the United States Attorney's Office in the *Franklin* case); Defendants have refused to produce those documents to Plaintiffs.

(4) The identities of "Physician 011623," "Physician 019311," "Physician 602425," "Physician 604980," and "Physician 608932" are uniquely in the possession of Defendants, various medical marketing firms that managed the events, and Verispan, LLC. Verispan monitors the specific sales message delivered by drug companies to individual physicians and sells the information—known as "verbatims"—to the drug industry. Because Verispan treats the identities of the "verbatim" physicians as confidential, Plaintiffs cannot obtain the identities of the physicians absent a court order. However, because Defendants record all of their interactions with physicians, especially through various elaborate databases that record the dates of interaction and subjects discussed, the "verbatim" information is sufficient to put Defendants on notice of the alleged false statements. Defendants have thus far refused to produce complete and unredacted copies of all databases that recorded their interaction with physicians concerning Neurontin.