UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| )<br>**IN RE: NEURONTIN MARKETING, SALES** )<br>**PRACTICES, AND PRODUCTS LIABILITY** )<br>**LITIGATION** )<br>                                 )<br>**THIS DOCUMENT RELATES TO:** )<br>             )<br>HARDEN MANUFACTURING CORP., et al. v. )<br>PFIZER INC. and WARNER-LAMBERT CO. )<br>           )<br>THE GUARDIAN LIFE INSURANCE CO. OF )<br>AMERICA v. PFIZER INC. and AETNA, INC. )<br>v. PFIZER INC. )<br>           )<br>           ) | **MDL NO. 1629**<br>**CIVIL ACTION NO.**<br>**04-10981-PBS** |

**MEMORANDUM AND ORDER**

June 12, 2006

Saris, U.S.D.J.

## I.    INTRODUCTION

Plaintiffs claim they were injured by the defendant drug manufacturers' multifaceted and fraudulent scheme to market the drug Neurontin for a variety of "off-label uses," or uses for which the drug had not been approved by the Food and Drug Administration ("FDA").  Defendants have moved to dismiss the Amended Class Complaint[1] ("ACC") and the First Coordinated Amended Complaint ("FCAC").  (Docket Nos. 58, 59.)  Coordinated

---

[1] The named plaintiffs in the class action are Harden Manufacturing Corporation; Louisiana Health Service Indemnity Group d/b/a/ Blue Cross/Blue Shield of Louisiana; Union of Operating Engineers, Local No. 68 Welfare Fund; ASEA/AFSCME Local 52 Health Benefits Trust; and two individuals, Gerald Smith and Lorraine Kopa.

Plaintiffs are Guardian Life Insurance Co. of America; Kaiser Foundation Health Plan, Inc.; Kaiser Foundation Hospitals; and Aetna, Inc.  The motion was referred to Magistrate Judge Sorokin, who held a hearing on July 14, 2005, and issued an extensive and thoughtful fifty-eight page Report and Recommendation ("Report") on January 31, 2006 allowing the motion in part and denying the motion in part.  (Docket No. 269.)  All parties filed objections to the Report, and this Court held a hearing on those objections on May 3, 2006.  Except as outlined in this opinion, I agree with and adopt the Report, including the statement of facts.  After hearing and review of the briefs, the Court **ALLOWS IN PART** and **DENIES IN PART** the motion to dismiss.

## II.  STANDARD OF REVIEW

As this motion to dismiss is dispositive, this Court must review the Report de novo.  Fed. R. Civ. P. 72(b).  The Court will not consider any objections which raise new issues not put before the Magistrate Judge in the original briefing on the motion to dismiss.  See Borden v. Sec'y of Health & Human Servs., 836 F.2d 4, 6 (1st Cir. 1988).

## III.  DISCUSSION

### A.  RICO Enterprise

#### 1.  RICO

Plaintiffs allege that Defendants engaged in a pattern of racketeering activity by accomplishing the fraudulent promotion

2

of Neurontin for off-label uses through the use of interstate mails and wire communications in violation of 18 U.S.C. § 1962(c).[2]  Defendants argue that Plaintiffs have not adequately alleged the existence of an "enterprise" as required by the statute.

To state a claim under § 1962(c), a plaintiff must allege four elements: "(1) conduct; (2) of an enterprise; (3) through a pattern; (4) of racketeering activity."  See Libertad v. Welch, 53 F.3d 428, 441 (1st Cir. 1995) (citing Sedima, S.P.R.L. v. Imrex, Co., Inc., 473 U.S. 479, 496 (1985)).  The statute defines the term "enterprise" to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).  Both Congress and the Supreme Court have directed that the statute "be liberally construed to effectuate its remedial purposes."  Pub. L. 91-452, § 904(a), 84 Stat. 947; see also Sedima, 473 U.S. at 497-98; United States v. Cianci, 378 F.3d 71, 79 (1st Cir. 2004) ("It is important to

---

[2] 18 U.S.C. § 1962(c) provides:

    It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . .

stress that the Supreme Court has admonished that RICO and the
term 'enterprise' be construed expansively.").

In interpreting the RICO "enterprise" requirement, the
Supreme Court has explained that "there is no restriction upon
the associations embraced by the definition: an enterprise
includes any union or group of individuals associated in fact."
United States v. Turkette, 452 U.S. 576, 580 (1981).  The
enterprise concept is not unbounded, however, because an
enterprise must be "an entity for present purposes a group of
persons associated together for a common purpose of engaging in a
course of conduct."  Id. at 583.  An enterprise is "proved by
evidence of an ongoing organization, formal or informal, and by
evidence that the various associates function as a continuing
unit." Id.  The Turkette Court stressed that the existence of an
enterprise and the pattern of racketeering activity in which the
enterprise engages are separate and distinct elements of a RICO
claim that must be proven independently.  Id. ("The 'enterprise'
is not the 'pattern of racketeering activity'; it is an entity
separate and apart from the pattern of activity in which it
engages.  The existence of an enterprise at all times remains a
separate element which must be proved . . . ."); Libertad, 53
F.3d at 441.  However, "[w]hile 'enterprise' and 'pattern of
racketeering activity' are separate elements of a RICO offense,
proof of these two elements need not be separate or distinct but
may in fact 'coalesce.'"  United States v. Patrick, 248 F.3d 11,

4

19 (1st Cir. 2001) (citing <u>Turkette</u>, 452 U.S. at 583).

    **2.**   **The Alleged Enterprises**

Both complaints allege that Defendants created a large association-in-fact enterprise consisting of numerous medical marketing firms and physicians to illegally promote off-label uses of Neurontin. (ACC ¶ 41; FCAC ¶ 30.) Alternatively, Class Plaintiffs allege that Defendants created two smaller sub-enterprises, one devoted to peer-to-peer selling of Neurontin (ACC ¶ 47) and the other devoted to publishing ghost-written articles touting off-label uses (ACC ¶ 105). As yet another alternative, Class Plaintiffs argue that Defendants created a series of smaller enterprises with fewer players: that Defendants created an enterprise with each of the involved medical marketing firms and with (or without) the physicians touting the drug (ACC ¶ 275-76). The Coordinated Plaintiffs argue that Defendants created several smaller enterprises, each consisting of the Defendant, one medical marketing firm, and the physicians (FCAC ¶ 169).

Plaintiffs allege that the common purpose of each of these enterprises was to illegally market Neurontin for off-label uses in contravention of FDA regulations. (ACC ¶¶ 47, 105, 271; FCAC ¶¶ 38, 192.) In order to do this, Defendants would join together with the medical marketing firms to host events designed to promote Neurontin and publish articles touting Neurontin's

effectiveness for a series of off-label uses.  (<u>See, e.g.</u>, ACC ¶ 270; FCAC ¶¶ 28, 30.)  With regard to peer-to-peer selling, the complaints allege that Defendants and medical marketing firms organized events designed to tout Neurontin, but appear independent.  (ACC ¶¶ 44-46; FCAC ¶¶ 30, 34, 37.)  Defendants and medical marketing firms would pay doctors to give presentations about their positive experiences prescribing Neurontin for off-label uses at these seminars.  (ACC ¶ 99; FCAC ¶¶ 34, 37.)  With respect to publications, Defendants would select the content of various articles about Neurontin, the medical marketing firms would hire technical writers to draft them, and sometime later, a physician would be paid to lend his or her name as the purported author.  (<u>See, e.g.</u>, ACC ¶ 106; FCAC ¶ 31.)

### 3.  **Common Purpose**

The Report found that neither complaint had adequately alleged the existence of a RICO enterprise.  (Report at 23-26.) In particular, the Report found Plaintiffs' allegations wanting in two respects: (1) that the members of the enterprises lacked a necessary common purpose to defraud; and (2) that the enterprises were not cohesive enough.  (<u>Id.</u>)  The Court will address each issue in turn.

The Report rejected all of the alleged enterprises on the grounds that they lacked a common purpose to defraud. Acknowledging that the members of the alleged enterprises may

have shared a common purpose to promote off-label uses of
Neurontin, the Report nonetheless finds the enterprises wanting
because Plaintiffs did not allege that the medical marketing
firms and physicians knew of the fraudulent nature of the
statements they made.  (Report at 24.)  Thus, there was no
allegation of a common purpose to defraud.  As such, the
interesting, novel and close legal issue is whether RICO
liability encompasses an association-in-fact enterprise with an
illegal shared common purpose which is not the basis for the
alleged predicate acts against the defendant, here mail and wire
fraud.

In this case, Plaintiffs have alleged the existence of
enterprises with the shared common purpose of promoting off-label
uses of Neurontin in violation of federal law.  However, the
federal law which the enterprise members shared a common intent
to violate does not create a private right of action.  The
private right of action under RICO arises out of the allegations
of mail and wire fraud perpetrated only by the defendants through
the vehicle of the enterprises defendants created.  See Nat'l
Org. for Women v. Scheidler, 510 U.S. 249, 259 (1994) (noting
that the enterprise is "generally the vehicle through which the
pattern of unlawful activity is committed").

7

Although the First Circuit has outlined numerous factors which aid a court in determining whether a complaint has sufficiently alleged an association-in-fact under RICO,[3] one thing is certain: the members of an association-in-fact must share a common purpose.  See <u>Cianci</u>, 378 F.3d at 83 (affirming jury instruction stating that "it is necessary to show that all members of the alleged enterprise shared a common purpose"); <u>Ryan v. Clemente</u>, 901 F.2d 177, 180 (1st Cir. 1990) (Breyer, J.) (noting that "although much about the RICO statute is not clear, it is very clear that those who are 'associates' . . . of a criminal enterprise must share a 'common purpose'").

There has been considerable confusion as to whether that common purpose needs to be illegal.  See <u>Lockheed Martin Corp. v. Boeing Co.</u>, 357 F. Supp. 2d 1350, 1362 n.7 (M.D. Fla. 2005) (noting that "there is a question as to whether there is, or should be, a requirement that the purpose binding together an association-in-fact be an illegitimate or criminal one").  The

---

[3] The six factors are: (1) whether the associates have a common purpose; (2) whether there is systematic linkage, such as overlapping leadership, structured or financial ties or continuing coordination; (3) whether there is a common communication network for sharing information on a regular basis; (4) whether the associates hold meetings and sessions where important discussions take place; (5) whether the associates wear common colors, signs or insignia to make the group identifiable; and (6) whether the group conducted common training and instruction.  <u>In re Pharm Indus. Avg. Wholesale Price Litig.</u>, 263 F. Supp. 2d 172, 182 (D. Mass. 2003) ("<u>AWP I</u>") (citations omitted).

Second Circuit has held that "'for an association of individuals to constitute an enterprise, the individuals must share a common purpose to engage in a particular fraudulent common course of conduct and work together to achieve such purposes.'" <u>First Capital Asset Mgmt. v. Satinwood, Inc.</u>, 385 F.3d 159, 174 (2d Cir. 2004) (citing <u>First Nationwide Bank v. Gelt Funding Corp.</u>, 820 F. Supp. 89, 98 (S.D.N.Y. 1993)).  While courts have stated that a RICO enterprise's shared common purpose may be making a profit, those cases involved enterprises that made money from criminal activities.  <u>See, e.g.</u>, <u>United States v. Johnson</u>, 440 F.3d 832, 840 (6th Cir. 2006) ("The common purpose of making money can support the enterprise element of a RICO conviction."); <u>Williams v. Mohawk Indus.</u>, 411 F.3d 1252, 1258 (11th Cir. 2005), <u>cert. dismissed</u>, <u>vacated on other grounds</u>, 2006 U.S. LEXIS 4507 (June 5, 2006) (noting that "the common purpose of making money was sufficient under RICO").  However, an association-in-fact does not have to be "purely criminal in nature." <u>United States v. Church</u>, 955 F.2d 688, 698 n.9 (11th Cir. 1992)); <u>Crowe v. Henry</u>, 43 F.3d 198, 205 (5th Cir. 1995) (finding adequate the common purpose to "operate a farming venture").

    The First Circuit has not yet squarely addressed the question of whether the shared common purpose of an association-in-fact must be illegal.  Elliptically, the First Circuit has suggested an affirmative answer to that question.  <u>Compare Cianci</u>, 378 F.3d at 82 (referring to "the requirement that

members of such an enterprise share a common unlawful purpose"),
with id. at 88 n.9 ("It is true that members of an association-
in-fact enterprise, such as is now charged, must be connected by
a common thread of purpose and one might often expect such a
purpose to be of a criminal nature.  But the ultimate question is
whether an association-in-fact exists.  For this it is not
required that each participant have a separate mens rea so long
as each can reasonably be said to share in the common purpose.")
(citations omitted).

    And, in this case, this Court need not address precisely
that question either.  Rather, both complaints adequately allege
an unlawful common purpose for each of the alleged enterprises,
namely, to illegally promote off-label uses of Neurontin.  (See,
e.g., ACC ¶ 47; FCAC ¶ 38.)  Instead, the question is whether
this shared common purpose suffices under RICO.  The Report
stated that such a common purpose "is not actionable," (Report at
24), understandably citing this Court's opinion in In re Pharm.
Indus. Avg. Wholesale Price Litig., 307 F. Supp. 2d 196, 204 (D.
Mass. 2004) ("AWP II").  In AWP II, this Court held that the
common purpose of making a profit "without a shared illegal
purpose to defraud . . . would not support a claim of RICO
enterprise."  Id.  Although it is analogous, AWP II, does not
dictate the outcome of this case.  In that case, the plaintiffs
alleged an enterprise consisting of drug manufacturers and
publishers of prescription drug prices.  The drug manufacturers

allegedly fraudulently inflated the average wholesale prices (AWP's) of drugs, and then transmitted those prices to publishers who simply printed them in compendia.  As portrayed, these publications were akin to drug phone books which simply contain lists of prices.  The Court rejected the allegations of an enterprise on grounds that the publishers were indifferent to the success or failure of the manufacturers' fraudulent scheme to obtain a larger market share by jacking up the AWP's; the fraud was irrelevant to their desire to make a profit from publishing books.[4]  In other words, the publishers would make the same profit even if the AWP's were accurate.  Id.  The only possible common purpose of the publishers and manufacturers in AWP II was the innocent economic desire to make money.  Here, however, there is something more.  Plaintiffs have adequately alleged that the members of the enterprise joined together to unlawfully promote off-label uses of Neurontin.

Defendants contend that this common purpose is insufficient because the complaints allege that only the defendants possessed the requisite intent to commit the predicate acts of mail and wire fraud.  To begin, a RICO enterprise's common purpose need not be fraudulent in all cases.  The Supreme Court has made clear that a RICO enterprise need not have an economic motive for

_____

    [4] As discovery continued, this allegation turned out not to be true as at least one publishing house played a proactive role in drug pricing.

engaging in a pattern of racketeering activity, <u>Scheidler</u>, 510
U.S. at 259, and the statutory definition of racketeering
activity includes numerous crimes not of a fraudulent nature,
such as murder, kidnaping, arson, and dealing in a controlled
substance.  18 U.S.C. § 1961(1); <u>see also</u> <u>Patrick</u>, 248 F.3d at
18-19 (affirming that a street gang organized for the common
purpose of selling drugs is an enterprise).  As such, Defendants'
argument is not so much that the enterprise's common purpose must
be fraudulent, but that all of the enterprise's members must
share the common purpose to commit the predicate acts of mail and
wire fraud included in the complaint.

    Defendants' contention, however, comes dangerously close to
conflating the elements of a pattern of racketeering activity and
the existence of an enterprise, something both the Supreme Court
and the First Circuit have admonished courts not to do.  <u>Turkette</u>
held explicitly that the enterprise must exist separate and apart
from the pattern of racketeering activity in which it engages,
even though the evidence of both "may coalesce."  452 U.S. at
583; <u>Patrick</u>, 248 F.3d at 19.  It would flout the language in
<u>Turkette</u> for the Court to hold that proof of the enterprise's
common purpose must be proof of shared intent to commit the
predicate acts.  <u>See</u> <u>Turkette</u>, 452 U.S. at 583 (noting that the
enterprise is at all times "separate and apart from the pattern
of racketeering activity in which it engages"); <u>accord</u> <u>Libertad</u>,
53 F.3d at 441 (noting that the enterprise is "apart and distinct

from the pattern of activity in which it engages"). Moreover,
"members of an enterprise do not have to share all objectives so
long as they have one in common." <u>AWP II</u>, 307 F. Supp. 2d at
205. The Court need not weigh in on whether a RICO enterprise's
common purpose must be illegal, because in this case, the alleged
common purpose of promoting off-label uses of Neurontin violated
the law, which is adequate under the RICO statute, as construed
expansively.

### 4. <u>Ongoing Organization and Continuing Unit</u>

To recognize that the common purpose alleged in the
complaints is adequate under the RICO statute does not get the
plaintiffs all the way home. A common purpose is a necessary but
not a sufficient condition for pleading a RICO enterprise, for
"something more must be found – something that distinguishes RICO
enterprises from ad hoc one-time criminal ventures." <u>Cianci</u>, 378
F.3d at 82. While there has been some difficulty in deciding
where to draw the line, courts have agreed that all conspiracies
are not RICO enterprises. <u>Id.</u>, <u>see also</u> <u>Libertad</u>, 53 F.3d at
442; <u>Fitzgerald v. Rindal</u>, 116 F.3d 225, 228 (7th Cir. 1997)
(Posner, J.) ("RICO, however, is not a conspiracy statute. Its

draconian penalties are not triggered just by proving conspiracy.
'Enterprise' connotes more.").

The First Circuit has held that "similarity of goals and
methods does not suffice to show that an enterprise exists; what
is necessary is evidence of systematic linkage, such as
overlapping leadership, structural or financial ties, or
continuing coordination." Libertad, 53 F.3d at 443.  The
enterprise must "constitute an ongoing organization that
functions as a continuing unit." Id. at 442; Cianci, 378 F.3d at
82 (stating that "we have read Turkette to impose a requirement
that those associated in fact 'function as an ongoing unit' and
constitute an 'ongoing organization'" (citing Patrick, 248 F.3d
at 19)).  Even if all the members of the alleged enterprise
shared a common purpose of promoting off-label uses of Neurontin,
the Court must find that the enterprise was an ongoing
organization, not a set of smaller ad-hoc conspiracies engaged in
the same activities independent of one another.

The Report finds the alleged enterprises lacking in this
respect.  (Report at 25-26.)  The Report rejects the proposed
large enterprise consisting of Defendant, the medical marketing
firms, and the physicians because "[t]here is no allegation of a
global agreement," and "Plaintiffs have offered no facts to
indicate that any of these people were working together as part
of a cohesive group." (Id. at 25.)  Rather, the large enterprise
alleged was "a 'hub-and-spoke' assemblage of a conspiracy, which

14

is disfavored." (Id. at 25.)  Although the Report states that
Plaintiffs have arguably alleged systematic linkage between
Defendants and one medical marketing firm, Physicians World, it
did not find that they alone constituted an enterprise because of
the lack of common purpose to defraud.  (Id. at 25-26.)

Having already found that the complaints have adequately
alleged common purpose, this Court must decide whether the
enterprises described in the complaints constitute ongoing
organizations that function as continuing units.  The plaintiffs
have alleged numerous alternative enterprises, ranging from the
maximal, an enterprise including all of the involved medical
marketing firms and physicians, to the minimal, a series of
enterprises involving Defendant and each involved medical
marketing firm.  The Court will briefly assess each.

a.   **The Global Enterprise**

Both complaints allege the existence of a large enterprise
including Defendants, all of the medical marketing firms, and all
of the physicians involved in making presentations and writing
articles promoting off-label uses of Neurontin.  (ACC ¶¶ 43, 266;
FCAC ¶¶ 30, 191.)  There are no allegations that the medical
marketing firms and physicians all worked together with
Defendants as a cohesive unit, rather, this was a hub-and-spoke
model with Defendant at the center managing several independent
relationships.  At best, Plaintiffs have alleged that several

15

doctors worked with a couple of different medical marketing firms which were working with Defendants.  (ACC ¶ 103; FCAC ¶ 94.) This alone is not enough to establish a RICO enterprise between all the doctors and medical marketing firms because there is no "rim" to connect the spokes of the wheel.  See In re Lupron Mktg. & Sales Practices Litig., 295 F. Supp. 2d 148, 174 n.29 (D. Mass. 2003) (finding that without a "general agreement" a "hub-and-spoke" RICO enterprise could not be maintained); AWP I, 263 F. Supp. 2d at 183 (collecting cases and rejecting RICO claim that did "not allege a network among all the members of these alleged enterprises" because "there was no rim to connect the spokes"). As such, I agree with the Report's conclusion that any allegation of a global enterprise must fail.

The ACC also alleges "sub-enterprises" devoted to peer-to-peer selling of Neurontin and publication of favorable articles about the drug.  (ACC ¶ 273.)  These enterprises must be rejected for the same reason as the global enterprise.  These enterprises have the same collection of parties as the global enterprise, but no allegation that there was a general agreement between all parties or a cohesive network to accomplish their common goals. As such, the alleged "sub-enterprises" do not cure the defect of the global enterprise.

### b.  Smaller enterprises

Perhaps acknowledging the weaknesses of the alleged global enterprise and the sub-enterprises, Plaintiffs also allege a series of smaller enterprises consisting of Defendants, physicians, and individual medical marketing firms, essentially making each hub-and-spoke a separate RICO enterprise.  (ACC ¶ 276; FCAC ¶ 169.)  Class plaintiffs also allege enterprises comprised only of Defendants and each medical marketing firm.  (ACC ¶ 276.)  Obviously, making each spoke its own separate conspiracy solves the problem of a lack of a global agreement, and two legal entities can form an association-in-fact enterprise.  United States v. London, 66 F.3d 1227, 1243 (1st Cir. 1995) (noting that "two or more legal entities can form or be part of an association-in-fact RICO enterprise").  The Court has already decided that the plaintiffs have sufficiently alleged that all of the purported members of these enterprises shared the common illegal purpose of promoting Neurontin for off-label uses. The remaining question, then, is whether Plaintiffs have pleaded enough in each instance to show that the alleged associations were more than ad hoc criminal conspiracies.

I find that, as to the medical marketing firms named in the complaints, Plaintiffs have adequately alleged systematic linkages that constitute ongoing units sufficient to sustain allegations of RICO enterprises.  Both complaints allege that

17

Defendants formulated "tactical plans" with the marketing firms to promote Neurontin on an ongoing basis (ACC ¶ 52; FCAC ¶ 41), and that there was regular communication between the marketing firms and Defendants (ACC ¶ 57).  Furthermore, there were financial ties between the marketing firms and Defendants, as Defendants paid the firms, and funneled payments through the firms to physicians for presentations and articles.  (See, e.g., ACC ¶¶ 48, 270; FCAC ¶ 89.)  Furthermore, with respect to each enterprise, Plaintiffs have adequately alleged continued coordination, meaning that these relationships were ongoing, rather than ad hoc.  To be sure, the systematic linkages alleged are greater with respect to some firms, such as Cline Davis (ACC ¶¶ 60-65; FCAC ¶¶ 45-51) and Physicians World (ACC ¶¶ 66-75; FCAC ¶¶ 52-62), than others, but in each case, the plaintiffs have alleged enough continued interaction with a common purpose to sustain a claim.

The somewhat harder question is whether the physicians are members of these enterprises.  The Court must resolve this question because, while the ACC alleges enterprises consisting of only Defendants and the individual medical marketing firms (ACC ¶ 276), the FCAC does not.  Plaintiffs have both alleged that Defendants recruited a small and identifiable "stable" or "cadre" of physicians to serve as promoters of Neurontin at presentations or as authors of ghost-written articles, even though the complaints do not identify them all.  (ACC ¶ 98; FCAC 89, 95.)

18

There is no allegation that the physicians knew they were part of a "stable" or that they were acting with other physicians in a coordinated effort to promote Neurontin.  However, the complaints do allege that some physicians had ongoing financial relationships with both the medical marketing firms and Defendants.  (ACC ¶ 103; FCAC ¶ 94.)  Plaintiffs also allege that the participation of the physicians was critical to the success of the enterprise.  (ACC ¶ 99; FCAC ¶ 91.)  However, Plaintiffs fail to allege continuing relationships between specific physicians and specific medical marketing firms such that the physicians could be considered members of a RICO enterprise.  Alleging that a stable exists is not the same as identifying the jockeys wearing the silks.  As such, the claim of specific RICO enterprises that include physicians fails unless repleaded.

**B.    RICO Conspiracy**

The Report dismisses the RICO conspiracy claims brought under 18 U.S.C. § 1962(d) because the complaints failed to establish the existence of a RICO enterprise.  (Report at 29 (citing Efron v. Embassy Suites (P.R.), Inc., 223 F.3d 12, 20 (1st Cir. 2000).)  Because I have found that the complaints sufficiently allege the existence of RICO enterprises, the RICO conspiracy claims will not be dismissed.[5]

---

[5] I also accept the Report's recommendation that Plaintiffs be allowed to plead the particulars of Defendant's use of interstate mails and wires after discovery.  (Report at 29.)

19

C.   **State Law Fraud Claims**

The Report made a series of rulings with respect to the
state law fraud claims: (1) any state law claims based on the
structure of the off-label marketing campaign are preempted by
the federal Food and Drug Administration and Modernization Act
(FDAMA), 21 U.S.C. § 630aaa *et seq.*, and regulations (Report at
34-35); (2) federal law does not preempt any state law claims
based on actual statements regarding Neurontin's effectiveness
(Id. at 37); (3) Plaintiffs have met Fed. R. Civ. P. 9(b)'s
requirement of pleading fraud with particularity with respect to
statements made by physicians about pain, dose dependency,
diabetic neuropathy, and monotherapy, restless leg syndrome,
bipolar, and panic disorder, but not with respect to statements
about social phobia and other unspecified conditions (Id. at 37-
42); (4) Plaintiffs have not pled with sufficient particularity
claims based on statements by Defendant's representatives
reported in so-called "Verbatim Reports" (Id. at 42); (5) that
Plaintiffs failed to state a claim with respect to any fraud
theories based on Defendant's statements implying that scientific
evidence supported Neurontin's effectiveness by calling it
"effective" or referring to anecdotal evidence, or based on
Defendant's failure to disclose the absence of evidence
supporting Neurontin's effectiveness (Id. at 43-46, 50-52); and,
(6) that Plaintiffs have stated a claim with respect to any

20

theory based on Defendant's misrepresentation of the results of scientific studies or omission of existing negative studies (Id. at 46-47, 49-50).  I agree with the Report except as follows.

### 1.  **Verbatim Reports**

I find that Plaintiffs' claims based on statements in Verbatim Reports have been pled with the requisite particularity under Fed. R. Civ. P. 9(b).  Verbatim Reports are anonymous surveys filled out by physicians after they have been in contact with a pharmaceutical company's sales representatives which the pharmaceutical company later reviews to see if they are effectively communicating their sales message and remaining within the FDA guidelines.  The Report rejected these claims on grounds that they failed to assert the identity of the speaker and exactly where and when the statement was made, and therefore failed to pass muster under rule 9(b).  (Report at 42.)  However, with respect to some statements culled from Verbatim Reports in Plaintiffs' possession, the claims do include the specific location, month, and year of the statement.  (See, e.g., ACC ¶ 156 (describing statement made at San Francisco Marriott in August 1998).)  At this stage of the litigation, these allegations suffice to serve the purposes of rule 9(b).  See New England Data Servs., Inc. v. Becher, 829 F.2d 286, 289 (1st Cir. 1987) (noting three purposes of rule 9(b): "(1) to place the defendants on notice and enable them to prepare meaningful

21

responses; (2) to preclude the use of a groundless fraud claim as
a pretext to discovering a wrong or as a "strike suit"; and (3)
to safeguard defendants from frivolous charges which might damage
their reputations.").

2. **Looking at Additional Documents to Assess Fraud Claims**

Defendants urge the Court to look at several documents and
transcripts from which Plaintiffs draw the factual basis for
their fraud claims. Defendants claim that a full examination of
these documents disprove Plaintiffs' allegations. See Beddall v.
State St. Bank & Trust Co., 137 F.3d 12, 17 (1st Cir. 1998)
("When, as now, a complaint's factual allegations are expressly
linked to -- and admittedly dependent upon -- a document (the
authenticity of which is not challenged), that document
effectively merges into the pleadings and the trial court can
review it in deciding a motion to dismiss under Rule 12(b)(6)."). 
However, Defendants raised none of these arguments before the
Magistrate Judge, and they may not raise them for the first time
as objections to the Report and Recommendation. Borden, 836 F.2d
at 6.

Furthermore, the questions Defendants raise in their
objections regarding some of the documents on which Plaintiffs
base their claims are not so easily answered on a motion to
dismiss. Resolution of such factual disputes are better left for
summary judgment. See Watterson v. Page, 987 F.2d 1, 3 (1st Cir.

22

1993) ("Ordinarily, of course, any consideration of documents not attached to the complaint, or not expressly incorporated therein, is forbidden, unless the proceeding is properly converted into one for summary judgment under Rule 56.").

**D.    Cognizable Injury in First Coordinated Amended Complaint**

The Report recommended dismissal of Coordinated Plaintiffs' claims on grounds that they did not allege a cognizable injury. According to the Report, the FCAC's fatal flaw is that it does not allege Neurontin was ineffective, only that Coordinated Plaintiffs paid for a drug that was *not proven* to be effective. (Report at 21-22.)  The Class Plaintiffs avoid this fate because they adequately alleged that Neurontin was ineffective, and, as such, paid for a drug that didn't work as promised.  (Id. at 21.) Because the FCAC does not allege that Neurontin failed to perform as advertised, the Report concluded that the FCAC does not allege a cognizable injury.  (Id.)

The FCAC does, in one paragraph, make a conclusory allegation that Neurontin was ineffective for insured patients as part of its claim under the consumer protection statutes of Puerto Rico, the District of Columbia, and all other states except for California.

> As a direct and proximate result of Defendants' unfair methods of competition and unfair or deceptive acts or practices, Plaintiffs have suffered damages in an amount to be proved at trial by paying for Neurontin to treat conditions for which the drug was not medically safe, efficacious, effective, and useful.

(FCAC ¶ 312.)  However, a direct allegation that Neurontin was not effective for Coordinated Plaintiffs' insured patients does not appear anywhere else in the complaint, nor is one associated with any other causes of action.

In their objections to the Report, Coordinated Plaintiffs argue, however, that they sustained an economic injury because Defendants' fraudulent activities caused Plaintiffs to pay for Neurontin prescriptions at excessive doses and instead of cheaper alternatives, citing Desiano v. Warner-Lambert Co., 326 F.3d 339, 349-50 (2d Cir. 2003).  Unlike Desiano, nowhere in the FCAC do the Coordinated Plaintiffs make any allegations that cheaper alternatives were available and that Plaintiffs are seeking any difference in price.  Cf. id. at 349 (describing damages sought as "the excess money Plaintiffs paid").

With regard to excessive dosage, however, the FCAC does allege that Defendant knew the drug was not effective at the higher dosages it was touting.  (FCAC ¶¶ 149-151.)  As such, even without an allegation that the drug was ineffective overall, Plaintiffs have adequately made out a claim that they paid for too much Neurontin as a result of the alleged fraud.

The Court allows leave for the Coordinated Plaintiffs to amend the complaint to address these issues.

**E.   Unjust Enrichment**

The Report recommended dismissal of Class Plaintiffs' unjust enrichment claims on grounds that, because the fraud claims survive the motion to dismiss, there is an adequate remedy at law.  (Report at 54.)  Class plaintiffs object that this ruling is premature.  While Plaintiffs may have to choose a theory of recovery at a later stage, that choice need not occur now.  See Massachusetts v. Mylan Labs., 357 F. Supp. 2d 314, 324 (D. Mass. 2005) (declining to allow motion to dismiss unjust enrichment claim when legal remedy was available on grounds that "[Plaintiff] may have to elect only one theory of recovery eventually, and [the Court] not force Plaintiff to choose its remedy at this stage of the litigation").  The motion to dismiss the unjust enrichment claims is **DENIED**.

ORDER

Except as outlined in this opinion, the Court **ADOPTS** the Report and Recommendations.  Therefore, consistent with the Report and this opinion, the motions to dismiss (Docket Nos. 58, 59) are **ALLOWED IN PART** and **DENIED IN PART**.  The Court allows Plaintiffs to file amended complaints within twenty days of this opinion.  Any renewed motions to dismiss and supporting memoranda shall be filed within 20 days, and any opposition within 14 days

25

thereafter.  The briefs are limited to twenty pages.  The Court
is likely to resolve any disputes without further hearing.  All
discovery issues and case management shall be handled by the
magistrate judge.

/s/ Patti B. Saris

_____

PATTI B. SARIS
United States District Judge