UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                              :
In re:   NEURONTIN MARKETING, SALES PRACTICES                 :
         AND PRODUCTS LIABILITY LITIGATION                    :
                                                              :
                                                              :   MDL Docket No. 1629
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                              :   Master File No. 04-10981
THIS DOCUMENT RELATES TO:                                     :
                                                              :   Judge Patti B. Saris
                                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                              :   Magistrate Judge Leo T.
HARDEN MANUFACTURING CORPORATION;                             :   Sorokin
LOUISIANA HEALTH SERVICE INDEMNITY COMPANY,                   :
dba BLUECROSS/BLUESHIELD OF LOUISIANA;                        :
INTERNATIONAL UNION OF OPERATING ENGINEERS,                   :
LOCAL NO. 68 WELFARE FUND; ASEA/AFSCME LOCAL                  :
52 HEALTH BENEFITS TRUST; GERALD SMITH; and                   :
LORRAINE KOPA, on behalf of themselves and all others         :
similarly situated, v. PFIZER INC. and WARNER-LAMBERT         :
COMPANY.                                                      :
                                                              :
                                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                              :
THE GUARDIAN LIFE INSURANCE COMPANY OF                        :
AMERICA v. PFIZER INC. and                                    :
                                                              :
AETNA, INC. v. PFIZER INC.                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM IN SUPPORT OF MOTION FOR**
**PROTECTIVE ORDER CONCERNING SCOPE OF DISCOVERY**

Defendants Pfizer Inc. and Warner-Lambert Company submit this memorandum

in support of their motion for a protective order concerning the scope of discovery.

**PRELIMINARY STATEMENT**

Defendants' discovery obligations should be tailored to the well-pleaded allegations in the Amended Class Action Complaint and the First Coordinated Amended Complaint. This is consistent with the position that defendants have taken throughout this litigation. In support of this position, and in response to the consumer protection plaintiffs' extremely broad discovery demands, on June 17, 2005 defendants filed a motion for a protective order seeking a December 31, 1998 cut-off date for discovery of materials and information related to the sales and marketing of Neurontin. This motion was based upon (i) plaintiffs' failure to plead allegations of fraud during the period after 1998 and (ii) the undue burden that the review and production of materials from after 1998 would impose on defendants given the lack of specific allegations related to this time period.

In the wake of the Court's recent decision regarding defendants' motions to dismiss the consumer protection complaints, it is now more clear than ever that the proper scope of sales and marketing discovery should be determined by the claims and allegations that remain in this case. The Court has held that plaintiffs may proceed under two theories of fraud: (i) defendants allegedly misrepresented the results of certain scientific studies relating to monotherapy and diabetic peripheral neuropathy ("DPN"), and (ii) defendants allegedly suppressed certain negative scientific evidence while encouraging physicians to relate positive anecdotal experiences regarding DPN, bipolar disorder, panic disorder, and migraine prophylaxis to other physicians at certain meetings. As a result of this ruling, defendants now seek a protective order that discovery in this

case be tailored to the allegations by the consumer protection plaintiffs that have, for now, survived defendants' motions to dismiss.[1]

Plaintiffs brought sweeping and largely unsupported allegations of a fraudulent scheme in their complaints. Their existing discovery requests exceed the breadth of the complaints, as they existed prior to defendants' motions to dismiss, and seek virtually every piece of paper relating to the sales and marketing of Neurontin over the span of a decade. The Court, however, has now limited the claims and allegations of the complaints. For example, the Court rejected plaintiffs' claims based on allegations that defendants made, or encouraged others to make, statements regarding Neurontin's efficacy for off-label uses that were alleged to be false and misleading because clinical studies did not exist that would support such statements. The Court also ruled, among other things, that the Food Drug & Cosmetic Act (the "FDCA") preempts state law claims based solely on violations of the FDCA, so plaintiffs' claims based on alleged off-label promotion are insufficient to state an actionable claim in the absence of false or misleading statements by defendants.

As a result of the Court's ruling on the motions to dismiss, plaintiffs may not place on defendants the burden associated with collecting, reviewing and producing all Neurontin sales and marketing documents from the 1994 to 2004. That burden would be substantial and costly, consisting of at least $10 million in fees and expenses and

---

[1] This motion applies to the discovery sought by the plaintiffs in the consumer protection cases. This motion does not apply to discovery requests by the Product Liability Plaintiffs, as issues of scope related to the Product Liability Plaintiffs' cases are being resolved separately by the parties and the Court. See May 19, 2006 Order (denying Defendants' Motion for a Protective Order insofar as it applies to the Products Liability Plaintiffs and noting that specific disputes relating to the scope or breadth of discovery for the product liability cases will be addressed in the course of monthly discovery hearings).

consuming at least the next twelve months.  Such a heavy burden is not justified by Rule

26 of the Federal Rules of Civil Procedure, which has been amended to make clear that

discovery should proceed only in relation to the claims and defenses of the parties.  Here,

the scope of discovery should be tailored to the claims and allegations that survived the

motions to dismiss.

**FACTUAL AND PROCEDURAL BACKGROUND**

**Rulings on Motions To Dismiss**

On June 12, 2006, Judge Saris issued a Memorandum and Order (the "Order")

resolving defendants' motions to dismiss, which limited the scope of plaintiffs' claims.

This Order adopted in substantial part Magistrate Judge Sorokin's January 31, 2006

Report and Recommendation regarding defendants' motions to dismiss (the "Report"),

including the recommendation limiting plaintiffs' surviving fraud claims.  Order at 20-22

(adopting Report at 30-52 (except as to verbatim reports)).  Judge Saris' ruling

significantly narrows plaintiffs' original, sweeping allegations of a wide-ranging

fraudulent scheme and holds that two specific theories of fraud survive: (i) defendants'

alleged misrepresentation of the results of certain scientific studies and (ii) defendants'

alleged fraudulent omission of negative scientific evidence during certain meetings at

which positive anecdotal experiences were related.  Order at 20-21 (adopting Report at

46-47, 49-50).

Under the first theory, two instances of fraud have been alleged.  First, plaintiffs

bring allegations regarding presentations given by Drs. Harden and LeRoy relating to the

efficacy of Neurontin as monotherapy for epilepsy.  Class Compl. ¶ 167; Coor. Compl. ¶

4

144. These presentations were given at a consultants' meeting sponsored by defendants in August 1996. Id. Drs. Harden and LeRoy allegedly misrepresented the results of one or more clinical studies conducted by defendants. Id. Second, plaintiffs allege that misrepresentations were made in connection with a study conducted by Dr. Kenneth Gorson regarding the use of Neurontin for the treatment of DPN. Class Compl. ¶¶ 121, 138; Coor. Compl. ¶ 110. Plaintiffs allege that defendants caused the Drugdex Information System to describe the results of Dr. Gorson's study falsely and inaccurately in its discussion of Neurontin's utility in the treatment of DPN. Id.

The second remaining theory of fraud is the alleged fraudulent omission of negative scientific evidence at meetings during which doctors hired by defendants related positive anecdotal experiences about four off-label uses: DPN, bipolar disorder, panic disorder, and migraine prophylaxis. Id. First, regarding DPN, plaintiffs allege that defendants sponsored an October 1998 event during which physicians discussed the use of Neurontin for DPN without disclosing the negative results of the Gorson study discussed above. Class Compl. ¶¶ 135, 139; Coor. Compl. ¶¶ 107, 111. Second, as to bipolar disorder, plaintiffs allege that defendants knew of the negative results of their own studies of Neurontin's efficacy for the treatment of this condition by the third quarter of 1997, but suppressed those results until 2000. Class Compl. ¶¶ 152-53; Coor. Compl. ¶¶ 122, 125. At the same time, plaintiffs allege that defendants sponsored events in March 1998, October 1998, and early 2000 during which physicians hired by defendants described their own positive anecdotal experiences in treating bipolar patients with Neurontin without informing attendees "at most of these presentations" of the negative

trial. Class Compl. ¶¶ 150, 153-54; Coor. Compl. ¶¶ 120, 123. Third, with respect to panic disorder, plaintiffs allege that defendants' own clinical trial in October 1997 found that Neurontin was no more efficacious than placebo in treating this condition, but suppressed these results until 2000. Class Compl. ¶ 164; Coor. Compl. ¶ 132. They allege that defendants held meetings in 1998 and 2000 where Neurontin's effectiveness in panic disorder patients was described without disclosing the negative clinical trial. Class Compl. ¶¶ 162, 164; Coor. Compl. ¶¶ 130, 132. Fourth, with respect to the use of Neurontin for migraine prophylaxis, plaintiffs allege that defendants conducted a clinical study in the late 1980s that revealed no statistically significant difference in migraine frequency between placebo and 900 mg of Neurontin therapy. Class Compl. ¶ 174; Coor. Compl. ¶ 134. They further allege that defendants were aware of several anecdotal reports of negative results regarding the use of Neurontin for the prevention of migraines. Class Compl. ¶ 175; Coor. Compl. ¶ 135. Plaintiffs allege that defendants never published the results of the negative study or disclosed them to anyone outside of the company. Class Compl. ¶ 176; Coor. Compl. ¶ 136. Plaintiffs also allege that defendants held an advisory board meeting in May 1996 at which employees of defendants failed to disclose the negative study and the negative anecdotal experiences. Class Compl. ¶¶ 177-78; Coor. Compl. ¶¶ 137-38. Plaintiffs further allege that defendants held a meeting in March 2000 where physicians claimed that Neurontin was effective for use in the treatment of migraine but failed to inform physicians in attendance of either the negative clinical study or the negative anecdotal evidence. Class Compl. ¶¶ 179-80; Coor. Compl. ¶ 139.

**Discovery Process**

Plaintiffs served their initial document requests on March 11, 2005. The Class and Non-Class Plaintiffs' First Request for Production of Documents (the "requests") consists of 252 individual document requests, almost all of which are extremely broad. Taken as a whole, the requests seek basically every document relating to the sales and marketing of Neurontin from the period of January 1, 1994 through May 2004. Plaintiffs' document requests seek, among many other items, all documents pertaining to Vendors[2] concerning the marketing of Neurontin, see, e.g., Request Nos. 64, 69-71, 75, all documents relating in any way to any Events[3] at which off-label uses of Neurontin were discussed, see, e.g., Request Nos. 57-63, 65-66, 76-79, 81-87, all documents relating to the publication of articles and the communication of information between and among physicians, see, e.g., Request Nos. 117-26, all documents relating to payments to physicians or Vendors and all communications about payments, see, e.g., Request Nos. 37-49, 61-63, all documents relating to market analysis, forecasts, budgets, and projections concerning off-label uses of Neurontin, see, e.g., Request Nos. 18-20, 28, all documents relating to the medical liaison budgets and describing or "refer[ing] to" the

---

[2] The term "Vendors" is defined in the requests to include "an entity which, in the ordinary course of its business, provides one or more of the following services to healthcare or pharmaceutical entities: (a) assistance in organizing, coordinating, planning or managing meetings or events; (b) assistance in writing, editing, placing, publishing or distributing medical articles or medical publications; or (c) assistance or consultation with marketing."

[3] The term "Events" is defined in the requests to include "any conference, seminar, gathering, dinner meeting, dinner, meal, advisory board meeting, consultant meeting, speaker event, speaker training, CME, conference call, teleconference, trip, vacation, or weekend getaway attended by physicians, funded, sponsored, or paid for in whole or in part by Defendants, whether directly or through a third party which received money from Defendants which was intended to be applied to any of the costs of the Event."

role of medical liaisons in the marketing, promotion and sales of any of defendants'

drugs, see, e.g., Request Nos. 218-20, and all data which reports on physicians who

prescribe Neurontin, and all documents relating to any reports or analysis of such data,

see, e.g., Request Nos. 151-152, 178.

Defendants served their Responses and Objections to Class and Non-Class

Plaintiffs' First Request for Production of Documents (the "responses") on April 11,

2005. Defendants objected to a number of the 252 requests on various grounds, including

overbreadth, inclusion of vague and ambiguous terms, failure to identify the documents

sought with reasonable particularity, and lack of relevance (due, for example, to a failure

to confine the request to documents relating to the off-label uses of Neurontin at issue in

the complaints). One over-arching and critical objection related to the time period for

which plaintiffs seek discovery. Defendants objected to producing sales and marketing

materials relating to the entire period from 1994 through 2004 on the grounds that this

time period is overly broad. Defendants stated these requests seek documents that are not

relevant to this action because they are from a time period that is not grounded in the

actual allegations contained in the complaints. Defendants also objected to the time

period on the grounds that it would be unduly burdensome to produce documents for the

entire ten-year period.

The parties sought to meet and confer regarding defendants' responses, and due to

the breadth of plaintiffs' requests it was necessary to conduct multiple meet and confer

sessions. It has been clear since the first of these sessions in May 2005, and despite the

extensive meet-and-confer process, that the parties have irreconcilable differences

8

concerning the appropriate scope of discovery. Differences relating to the issue of the time period for discovery of sales and marketing documents led defendants to file a motion for a protective order on June 17, 2005, seeking a judicial determination regarding this issue. See Docket ##161-62. After defendants filed their motion for a protective order, the parties engaged in extensive briefing regarding this issue during the summer of 2005. See Docket ##161-62, 170-72, 184, 186, 189-91, 196. On August 1, 2005, oral argument was held on the issue of the appropriate time scope for discovery.[4]       In light of the Court's recent ruling on the motions to dismiss, the crushing additional burden that would be imposed upon defendants from having to produce the sales and marketing documents requested by plaintiffs is even less justifiable now. As discussed further below, defendants estimate that this production would require the collection, review, and production of documents from over 100 people, even if all sales representatives and medical liaisons were excluded. See Declaration of Laura Kibbe dated June 17, 2005 ("June 2005 Kibbe Decl.") (attached hereto as Exhibit A) ¶ 4; see also Declaration of Laura Kibbe dated July 28, 2005 ("July 2005 Kibbe Decl.") (attached hereto as Exhibit B). The scope of the review that would be required is such that defendants could not complete the production in less than a year, even assuming that they hired scores of temporary workers to handle substantial portions of this task.[5] Moreover, based on the

_____

[4] We note that in the wake of the August 1, 2005 hearing, defendants continued to produce documents to plaintiffs. To date, defendants have produced over 1.5 million pages of documents from 28 custodian files and numerous company sources; more than 350,000 pages from the Neurontin Investigational New Drug Application, New Drug Application, Supplemental New Drug Applications and their foreign equivalents; electronic copies of four large databases; hundreds of thousands of pages of research reports; and over 500 boxes containing back-up materials to Neurontin related clinical trials.

[5] Were the obligation to collect and produce documents to extend to all sales representatives and

9

attached declarations of Laura Kibbe, it is estimated that the collection, review, and production of these documents, if limited to 100 individuals, would cost more than $10 million.

## ARGUMENT

### A.     The Standard for a Protective Order

Rule 26(c) of the Federal Rules of Civil Procedure provides that "upon motion by a party or by the person from whom discovery is sought . . . the Court may make any order which justice requires to protect a party from annoyance, embarrassment, oppression, or undue burden or expense."  Fed. R. Civ. P. 26(c).  In the First Circuit's decision in Mack v. Great Atl. & Pac. Tea Co., Inc., Judge Selya wrote that although "there are no barbed-wire fences marking the precise boundaries of pretrial discovery," litigants "ought not to be permitted to use broadswords where scalpels will suffice, nor to undertake wholly exploratory operations in the vague hope that something helpful will turn up."  871 F.2d 179, 187 (1st Cir. 1989); see also Hickman v. Taylor, 329 U.S. 495, 507 (1947) (explaining that "discovery, like all matters of procedure, has ultimate and necessary boundaries"); United States v. Medtronic, Inc., No. 95-1236-MLB, 2000 WL 1478476, at *3 (D. Kan. July 13, 2000) (stating that "[l]itigants have an obligation to tailor discovery to suit the particular exigencies of the litigation").  Thus, in deciding whether to grant a litigant's motion for a protective order to limit the scope of discovery,

---

medical liaisons, the number of custodians would increase to well over 1000 people, which would obviously require even longer to complete.  Even the addition to the total of only those sales representatives who called on the prescribing physicians for the Products Liability Plaintiffs increases the likely total number of custodians to more than 200 people.

a court must "balance the inquirer's right to know against the responder's right to be free

from unwarranted intrusions," to make a "reasonable reconciliation of the centrifugal and

centripetal forces at work in the discovery process." Mack, 871 F.2d at 187.

**B.      Under the 2000 Amendment to Rule 26, the Scope of Discovery
         Should Be Limited to the Remaining Claims in These Cases**

Courts can, and regularly do, limit the scope of discovery, temporally and

topically.  This is particularly true in the wake of the 2000 amendment to Rule 26 of the

Federal Rules of Civil Procedure.  Before the amendment, Rule 26 permitted discovery as

to matters "relevant to the *subject matter* involved in the pending action." Fed. R. Civ. P.

26(b)(1) (1999) (emphasis added).  The rule now permits discovery only as to matters

"relevant to the *claim or defense* of any party." Fed. R. Civ. P. 26(b)(1) (emphasis

added).  The Advisory Committee Note to the 2000 amendment indicates that the purpose

of the change was to ensure that the focus of discovery is the actual claims and defenses

in an action and to avoid the use of discovery to develop new claims or defenses.

Advisory Committee Note to 2000 Amendment to Rule 26(b)(1).  Thus, discovery should

only be provided into matters regarding adequately alleged claims and defenses.

Where, as here, the claims in the case have been limited through motion practice,

courts can and should limit discovery to those claims that remain in the case. See, e.g., In

re Ashworth, Inc. Sec. Litig., No. 99-CV-121, 2002 WL 33009225 (S.D. Cal. May 10,

2002).  In In re Ashworth, plaintiffs filed an amended complaint alleging certain

fraudulent acts by defendants.  Id. at *1.  The district court granted in part defendants'

motion to dismiss, dismissing two defendants and striking some of the allegations in the

complaint because plaintiffs had failed to plead them with sufficient particularity.  Id. After the ruling on the motion to dismiss was entered, plaintiffs served a number of subpoenas on third parties and defendants moved to quash the subpoenas as overly broad.  Id.  The defendants' motion was based in large part on the fact that the court's ruling on the motion to dismiss had limited the claims that remained in the case.  Id. at *3.  In considering the issues, the court noted that the amendment to Rule 26 was "significant" and that "the focus of discovery has shifted to a more narrow 'claim or defense' standard unless good cause is shown to broaden the scope of discovery to the former 'subject matter' standard."  Id. at *2.  The court held that plaintiffs' requests were overly broad because they failed to meet the "claim or defense" standard of Rule 26.  Id. at *4.  In doing so, the court rejected plaintiffs' attempt to equate a broad theory of the case to a "claim" for discovery purposes.  Id.; see also Hart v. Verizon Commc'ns Inc., No. Civ. A. 02-11483-RWZ, 2003 WL 1798184, *1 (D. Mass. Apr. 4, 2003) (limiting deposition discovery to matters relevant to claim that survived a motion to dismiss and not into matters unrelated to that claim).

Numerous courts, following the amendment's intent to "involve the courts more actively in managing discovery," have utilized their authority to rein in discovery where it is overbroad, unduly burdensome, or sought in an effort to develop new claims and defenses not set forth in the pleadings.  Advisory Committee Notes to 2000 Amendment to Rule 26(b)(2).; see, e.g., BG Real Estate Servs., Inc. v. Am. Equity Ins. Co., No. Civ. A. 04-3408, 2005 WL 1309048, at *1 (E.D. Pa. May 18, 2005) (ruling that the defendants carried their burden of establishing the tremendous burden and expense that they faced if

required to respond to requests and explaining that "[t]he new standard concerning the scope of discovery is *narrower* than the old, pre-2000, broader standard"); Guidry v. United States, No. Civ. A. 03-2647, 2004 WL 2984808, at *1 (E.D. La. Dec. 22, 2004) (limiting government's broad discovery requests under amendment); Conboy v. Edward D. Jones & Co., No. 303-CV-2352P, 2004 WL 1792372, at *4 (N.D. Tex. Aug. 10, 2004) (stating that under amendment, courts "should not allow parties to 'roam in the shadow zones of relevancy to explore matter which does not presently appear germane on the theory that it might conceivably become so'" (internal citation omitted)); Williams v. Ehlenz, No. Civ. 02-978, 2004 WL 742076, at *2 (D. Minn. Mar. 30, 2004) (ruling that "parties are not entitled to use the discovery process to develop new claims or defenses not reasonably identified in the pleadings"); Collens v. City of New York, 222 F.R.D. 249, 253 (S.D.N.Y. 2004) (limiting "fishing expedition" discovery not related to claims or defenses); Johnson v. Mundy Indus. Contractors, Inc., No. 7:01-CV-99-BO3, 2002 WL 31464984, at *3 (E.D.N.C. Mar. 15, 2002) (noting that "2000 amendments 'mandate greater scrutiny of Plaintiff's [discovery] request'").

Courts also regularly reject attempts to allege fraud and then to search for a basis for the allegation through discovery. See, e.g., Hayduk v. Lanna, 775 F.2d 441 (1st Cir. 1985). As the First Circuit explained in Hayduk, "[i]n cases in which fraud lies at the core of the action, the rule does not permit a complainant to file suit first, and subsequently to search for a cause of action." Id. at 443 (internal quotations omitted); see also Shamsi v. Dean Witter Reynolds, Inc., 743 F. Supp. 87, 90 (D. Mass. 1990) (fishing expeditions impermissible).

**C.     Plaintiffs' Discovery Requests Are Not Justified by the Claims Remaining in the Case and Would Unduly Burden Defendants**

The claims of the complaints have been substantially narrowed.  Discovery in this case should be tailored to the claims that remain in the case.  Because the burden of producing the documents requested by plaintiffs is so great and because the Court has limited the scope of plaintiffs' claims, defendants should not be required to produce those documents unrelated to the relevant meetings allegedly sponsored by the defendants regarding monotherapy, DPN, bipolar disorder, panic disorder, and migraine studies, as well as documents unrelated to the relevant clinical studies regarding these conditions.

In other words, the Court should require that plaintiffs put down their "broadsword" and pick up a "scalpel."  In addition to the huge volume of Neurontin-related documents from 1995 through 1998 that have already been produced, plaintiffs demand all sales and marketing documents from six more years.  The demand for six more years of documents is unjustified by the claims that remain in the case.

Significantly, the Court adopted the Report's recommendation that a statement that Neurontin is "effective" for an off-label use does not imply that "clinical" or "scientific" evidence exists to support the off-label use of the product.  Order at 20 (adopting Report at 43-46, 50-52).  This holding forecloses one of plaintiffs' primary theories of liability -- that defendants' alleged statements regarding Neurontin's efficacy for off-label uses constituted a representation that a certain type of scientific evidence existed that would support such uses.  The Court also ruled that the FDCA preempts state law claims based solely on violations of the FDAC, but not claims based on fraud.  Order

at 20 (adopting Report at 34-35). This ruling precludes plaintiffs from making any claims based solely on off-label promotion and requires them to plead and prove that defendants made false statements regarding off-label uses of Neurontin. As a result of these rulings, plaintiffs are no longer entitled to discovery regarding any and every alleged statement regarding off-label use. Plaintiffs' discovery requests should therefore be tailored to those claims in the complaints that here survive, for now, the motions to dismiss.

If discovery were allowed to proceed without regard for the narrowed claims of the case, defendants would incur a tremendous and undue additional burden. Rule 26 requires balance; a discovery demand may not impose "undue" burden and expense. See, e.g., Gill v. Gulfstream Park Racing Ass'n, 399 F.3d 391, 400 & n.5 (1st Cir. 2005). The task of gathering, reviewing, and producing all Neurontin sales and marketing documents, untethered to the remaining claims in the complaints, would require many thousands of hours of attorney time, would cost millions of dollars, and would disrupt defendants' operations. Defendants estimate, conservatively, that they would need to collect documents from over a hundred people to respond to plaintiffs' overly broad sales and marketing requests. See June 2005 Kibbe Decl. ¶ 4. It would take hundreds of hours simply to collect this material, and almost 10 months for 40 temporary workers reviewing documents full time to complete the initial review alone. See id. ¶ 5. The costs associated with collection, processing, and this initial review would be $5 million or more, and these costs do not even include the necessary second review by Pfizer's attorneys for responsiveness, privilege, and confidentiality. See id. ¶¶ 5-6; see also July 2005 Kibbe Decl. (explaining vendor costs and likely volume of materials per custodian).

15

The review for confidentiality will be particularly time consuming for Pfizer-era documents due to the fact that more recent materials are more likely to require designation as "Confidential" pursuant to the protective order in these cases.

The entire process, including initial collection, first and second review, and production, would last well over a year and cost over $10 million. See June 2005 Kibbe Decl. ¶ 6. Moreover, these estimates assume that defendants will not be required to collect documents from field-level employees. If such a collection has to be made, the costs and time that would be incurred to collect and review documents would substantially increase, as there are likely hundreds of such field personnel. In short, plaintiffs' demands seeking virtually all Neurontin sales and marketing documents would impose an extraordinary and undue burden and expense on defendants.

The authorities discussed above teach that a limitation on discovery is appropriate where there is a disconnect between a complaint's allegations and the scope of discovery being pursued. Here, in a nearly ten-year old controversy, the Court has decided which of plaintiffs' claims have been sufficiently alleged. Discovery should be tailored to those claims and allegations.[6]

---

[6] In briefing during the summer of 2005, the parties raised certain other arguments relating to discovery in this case, including arguments relating to the scope of discovery in the Franklin action and arguments based upon discovery orders entered in other Neurontin litigation. In light of the briefing page limits and the Court's order to avoid duplicative briefing, defendants do not address these arguments in detail here. It should be noted, however, that regardless of one's view as to the reason Judge Saris held that the end of 1998 was the cut-off date for discovery in Franklin, it has now become the case that discovery here should be treated differently than in Franklin. Here, plaintiffs' claims have been limited to specific allegations based on certain theories of fraud, and claims based on mere off-label promotion alone will not lie. Accordingly, only discovery related to the claims and allegations that survived defendants' motions to dismiss should go forward.

Moreover, the orders by judges in other Neurontin litigation to which plaintiffs cite in their 2005

## CONCLUSION

For the foregoing reasons, defendants respectfully request that the Court enter a protective order that defendants are required to produce only those Neurontin sales and marketing documents related to plaintiffs' surviving claims and allegations regarding the relevant meetings sponsored by the defendants relating to monotherapy, DPN, bipolar disorder, panic disorder, and migraine, as well as documents relating to the relevant clinical studies regarding Neurontin's use in those conditions.

Dated:   June 23, 2006                    PFIZER INC., et uno,

                                          By their attorneys,


                                          s/ James P. Rouhandeh
                                          _____
                                          James P. Rouhandeh

                                          DAVIS POLK & WARDWELL
                                          450 Lexington Avenue
                                          New York, New York  10017
                                          (212) 450-4000

                                          -and-

                                          s/ David B. Chaffin
                                          _____
                                          David B. Chaffin
                                          BBO # 549245
                                          HARE & CHAFFIN
                                          160 Federal Street
                                          Boston, Massachusetts 02110
                                          (617) 330-5000

---

briefing are not relevant to this motion for a protective order.  As an initial matter, Judge Rakoff's order in Neurontin litigation in the Southern District of New York dealt only with databases, while Judge Rosenwasser's order in a Neurontin case in Orange County, New York State Court was confined to a single-plaintiff litigation that has since been transferred to a different court and coordinated with several hundred other cases.  Moreover, those orders did not address discovery in the situation where, as here, plaintiffs' claims have been narrowed through motion practice.

17

EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                                :
In re:  NEURONTIN MARKETING AND                                 :
        SALES PRACTICES LITIGATION                              :
                                                                :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x   MDL Docket No. 1629
                                                                :
THIS DOCUMENT RELATES TO:                                       :   Master File No. 04-10981
                                                                :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x   Judge Patti B. Saris
                                                                :
HARDEN MANUFACTURING CORPORATION;                               :
LOUISIANA HEALTH SERVICE INDEMNITY COMPANY,                     :
dba BLUECROSS/BLUESHIELD OF LOUISIANA; UNION                    :
OF OPERATING, LOCAL NO. 68 WELFARE FUND;                        :
ASEA/AFSCME LOCAL 52 HEALTH BENEFITS TRUST;                     :
GERALD SMITH; and LORRAINE KOPA, on behalf of                   :
themselves and all others similarly situated, v. PFIZER INC. and:
WARNER-LAMBERT COMPANY.                                         :
                                                                :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                                :
THE GUARDIAN LIFE INSURANCE COMPANY OF                          :
AMERICA v. PFIZER INC. and                                      :
                                                                :
AETNA, INC. v. PFIZER INC.                                      :
                                                                :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
```

## DECLARATION OF LAURA KIBBE

I, Laura Kibbe, hereby declare as follows:

1.     I am a Senior Corporate Counsel at Pfizer Inc ("Pfizer"), one of the defendants in the above-captioned matter.

2.     As part of my responsibilities, I coordinate discovery protocols and procedures, as well as respond to discovery requests. I have been responsible for managing and coordinating large scale document productions since the early 1990s.

3.    The information contained in this declaration is based on my general knowledge of Pfizer's business operations, and the magnitude of the efforts that would be necessary to locate and review information sought by the Plaintiffs in their discovery requests.

4.    After reviewing Plaintiffs' requests for post December 31, 1998 documents from Warner-Lambert and Pfizer-era custodians, I estimate that the documents from a minimum of well over 100 custodians would need to be collected in order to provide those documents. This number does not include personnel based in the field, as addressed below. I further estimate that it would take tens of thousands of hours to collect and review for responsiveness, confidentiality and privilege all documents necessary, including millions of e-mails, to respond to Plaintiffs' requests. In addition, Pfizer would incur costs for lost productivity and other business costs, such as training and contracting non-Pfizer personnel to conduct such a review.

5.    Based upon my experience conducting Pfizer discovery, I also estimate that the majority of the more than 100 potential custodians of documents will have multiple gigabytes of electronic data to be searched and culled, resulting in "reviewable" information in excess of 10 million pages in total. I also estimate that the cost for processing the electronic information, which excludes the cost for reviewing documents, would exceed $1.7 million dollars. When the costs of review are added, I estimate that it would take approximately 40 temporary workers, working 40 hours per week, almost 10 months to review 10 million pages. At the estimated hourly rates of $40 -$60 per hour for temporary workers, which is at the low end of the range of the likely cost, the magnitude of that review would require Pfizer to spend anywhere between $2.9 and $4.3 million in review costs, for a total of $4.6 to $6 million when the processing and initial review of documents for responsiveness is completed, excluding the costs of second

2

review by Pfizer's attorneys for privileged, confidentiality, and responsiveness. This estimate does not include the costs that would be incurred if documents needed to be collected from field sales personnel and field medical liaisons, of which there are hundreds.

6.    This estimate also does not include time and expense for review of documents by Pfizer's firm attorneys for responsiveness, privilege and confidentiality. Even assuming merely 25% of the documents initially reviewed for responsiveness, or approximately 2.5 million pages, are deemed responsive and in need of second review, the completion of this review by Pfizer's firm attorneys would add another one to two months to the total review time. The privilege and confidentiality check would also result in substantial additional costs, which would likely equal or exceed the expense incurred in conducting the initial review. The combined expense incurred in the search, collection, and production of documents in response to Plaintiffs' requests for documents after Dec. 31 1998 is therefore likely to exceed $10 million.

I declare under penalty of perjury under the law of the state of New York that the foregoing is true and correct, and that this declaration executed on 17th day of June 2005 at Waterbury, Connecticut.

Laura M. Kibbe

Laura Kibbe

3

EXHIBIT B

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                              :
In re:  NEURONTIN MARKETING,                  :
        SALES PRACTICES AND                   :  MDL Docket No. 1629
        PRODUCTS LIABILITY LITIGATION         :
                                              :  Master File No. 04-10981
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                              :  Judge Patti B. Saris
THIS DOCUMENT RELATES TO:                     :  Magistrate Judge Leo T. Sorokin
                                              :
ALL ACTIONS                                   :
                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
```

## SECOND DECLARATION OF LAURA KIBBE

I, Laura Kibbe, hereby declare as follows:

1.      I am a Senior Corporate Counsel at Pfizer Inc. ("Pfizer"), one of the defendants in the above-captioned matter.

2.      As part of my responsibilities, I coordinate discovery protocols and procedures, as well as respond to discovery requests. I have been responsible for managing and coordinating large scale document productions since the early 1990s.

3.      The information contained in this declaration is based on my knowledge of Pfizer's business operations, and the magnitude of the efforts that would be necessary to locate and review information sought by the Plaintiffs in their discovery requests.

4.      Historically, Pfizer collects 7.5 gigabytes of non-system files for each custodian during the course of a litigation. Non-system files are the actual data pulled from the laptops and the company's network, not program data such as Microsoft Word, Excel, or other word processing files. 7.5 gigabytes equals roughly 675,000 pages or 7500 megabytes. Pfizer's vendor charges $2 per megabyte to index and search.

Therefore, the processing costs alone are on average $15,000 per custodian. Notably, this does not take into consideration the paper documents that the custodians are likely to have. After removing all duplicates and filtering out documents that do not contain certain carefully crafted key works, Pfizer historically ends up with a reviewable set of documents reflecting 15% of the overall collected documents. Further, because of the redaction needs and the unproven nature of the technology for redacting native files, that 15% must be converted to a tiff images. Pfizer pays approximately 8 cents per page to convert native files into tiff images. That is on average $8100 per custodian for the tiff process. Accordingly, with 100 custodians, in addition to the processing costs, the "reviewable" number of pages in electronic form would equal just over 10 million pages.

     5.     In the Provera litigation, as the collection is complete, the actual size of the average custodians' non-system files is far less than 7.5 gigabytes. This number reflects the fact that unlike Neurontin, Provera has not been actively promoted for years. Therefore, in the Provera litigation many custodians had virtually no responsive documents.

     6.     In the Rezulin litigation in 2000, the volume of information for that product was far less than what one would expect to find for sales and marketing of Neurontin post-1998 because Rezulin was only on the market for three years (March 1997 through 2000). In addition, with advances in technology, electronic document collection efforts in 2005 are more complex and costly – and yield far greater volumes of electronic documents – than electronic document collection efforts in even as recently as 2000, when the Rezulin collection was conducted.

2

I declare under penalty of perjury under the law of the state of New York that the foregoing is true and correct, and that this declaration executed on 28th day of July 2005 at _New York, New York._

*Laura M. Kibbe*

Laura Kibbe