UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In Re: NEURONTIN MARKETING AND SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION | MDL Docket No. 1629<br><br>Master File No. 04-10981 |
| THIS DOCUMENT RELATES TO:<br><br>ALL MARKETING AND SALES PRACTICES ACTIONS | Judge Patti B. Saris |

**MARKETING AND SALES PRACTICES PLAINTIFFS'
SUPPLEMENTAL MEMORANDUM IN SUPPORT OF THEIR
MOTION TO COMPEL PRODUCTION OF DOCUMENTS CREATED AFTER
DECEMBER 31, 1998 AND IN OPPOSITION TO DEFENDANTS'
<u>MOTION FOR PROTECTIVE ORDER CONCERNING SCOPE OF DISCOVERY</u>**

At the June 15, 2006 status conference and in Discovery Order No. 2, this Court granted the parties in the *Marketing and Sales Practices Actions* leave to file supplemental memoranda in support of their respective positions regarding the temporal scope of discovery in those cases, in light of events since the matter was initially briefed and argued. The Court explicitly cautioned the parties, however, not to repeat arguments previously briefed in the extensive papers relating to the cross motions. Accordingly, Class Plaintiffs and Coordinated Plaintiffs respectfully submit this memorandum to demonstrate that the Court's recent rulings and events subsequent to the original oral argument on these motions last August support Plaintiffs'[1] position that Defendants should be required to produce all relevant documents relating to Parke-Davis' and Pfizer's off-label promotion of Neurontin subsequent to 1998.

Review of Judge Saris's June 12, 2006 Memorandum and Order (the "Order") and the portions of the January 31, 2006 Report and Recommendation On Defendants' Motions to Dismiss the Amended Class Complaint and The First Coordinated Amended Complaint (the "Report") that Judge Saris adopted make it plain that Defendants' recent Memorandum In Support of Protective Order Concerning Scope of Discovery grossly understates the claims remaining in the litigation. While the Court did narrow some of Plaintiffs' causes of action, Judge Saris recognized that the Plaintiffs have presented cognizable claims arising out of Defendants' extensive off-label marketing campaign for Neurontin which lasted well beyond Defendants' artificial cut-off date of December 31, 1998. Plaintiffs are entitled to discovery commensurate with the broad claims the Court has recognized. Further, new allegations in the Second Amended Class Complaint and the Second Coordinated Amended Complaint also make

---

[1] Unless otherwise stated, references herein to "Plaintiffs" shall refer to the class and non-class Plaintiffs in the Marketing and Sales Practices cases. Plaintiffs shall refer to the plaintiffs in the products liability cases as the "Products Liability Plaintiffs."

it clear that the events relevant to the Plaintiffs' claims did not cease in December 1998, but continued through at least 2004. And discovery rulings in the *Products Liability* cases also support Plaintiffs' contention that they are entitled to receive post-1998 marketing documents.

Defendants have implicitly *abandoned* their argument that Plaintiffs are not entitled to post-1998 documents in favor of a completely *different* argument that Plaintiffs should be limited to discovery concerning the specific fraudulent statements and omissions identified in their complaints. The sole basis for this argument is Defendants' myopic reading of the Amended Complaints, the Report, and the Order to artificially limit the scope of the claims Plaintiffs have asserted and the Court has recognized.

I. **PLAINTIFFS' CLAIMS ARE NOT LIMITED TO THE INDIVIDUAL TRANSACTIONS SPECIFICALLY IDENTIFIED IN THEIR COMPLAINTS.**

    A. **The Order And The Report Refute Defendants' Assertions That A 1998 Time Limit Should Be Applied To Plaintiffs' Discovery Requests Or That Discovery Is Limited To Those Meetings Or Occasions Specifically Identified In The Complaints.**

The core argument in Defendants' most recent memorandum is that the Order and Report have narrowed Plaintiff's claims, and such narrowing justifies imposition of a protective order which will limit the Plaintiffs to the marketing documents the Defendants produced in *Franklin*. However, even though they refuse to explicitly admit it, Defendants implicitly recognize that the Order and Report do not support the relief they requested. In their original motion for protective order, Defendants asked the Court to "enter a protective order that Plaintiffs are not entitled to discovery concerning the sales and marketing of Neurontin that post-date 1998." Motion for Protective Order Concerning Scope of Discovery at 2. Defendants, however, recognize that they are not entitled to a bright line protective order that prohibits production of marketing documents that bear a date subsequent to December 31, 1998; their recent memo only calls for limiting the production of documents "to the claims and allegations

that survived the motions to dismiss." Memorandum In Support of Motion For Protective Order Concerning Scope of Discovery, at 3. Indeed, Defendants, in their attempt to characterize Plaintiffs' allegations, freely admit there are surviving claims that involve events that took place subsequent to 1998. Id. at 5-7.

According to Defendants, as a result of the Order, only two types of fraud claims remain in the case: misrepresentation of the results of specific scientific studies, and Defendants' failure to inform physicians of negative scientific information during specific meetings with regard to specific off-label indications of Neurontin. Disregarding Plaintiffs' allegations that the specific instances of misrepresentation specified in the Amended Class Complaint or the First Coordinated Amended Complaint were representative of misrepresentations repeated on numerous occasions in numerous places which were not specifically identified, Defendants claim that the Court has only allowed the case to go forward on the specific misrepresentations made on the specific occasions identified in the Amended Complaints. Accordingly, they seek to limit discovery to these relatively few occurrences.

The Report and Order both explicitly refused to limit the Plaintiffs' claims to the specific occasions identified in the Amended Complaints. On page 40 of the Report, the Court addressed Plaintiffs' allegations about "similar statements" that were alleged to have been made on other unspecified occasions, based on Plaintiffs' information and belief. The Court acknowledged that ordinarily, statements made on information and belief do not survive Rule 9(b) scrutiny, but here, "Plaintiffs have set forth sufficient fact to support their belief." The complaints adequately described why the Plaintiffs believed the statements were repeated on numerous other occasions, and the Court found that allegations that the misrepresentations were part of an organized marketing campaign that intentionally repeated the statements in numerous

locations provided the Defendants with sufficient particularity. The Court rejected Defendants' exhortation to dismiss the fraud claims relating to the misrepresentations that were not specifically identified in the complaints. Judge Saris fully adopted this part of the Report. Order at 20-21.

Moreover, Defendants wholly ignore Plaintiffs' RICO claims, which have survived intact.[2] In the discussion of Plaintiffs' RICO claims, the Report and Order also explicitly rejected Defendants' argument that Plaintiff could only pursue claims based on alleged misconduct specifically identified in the complaint. The relevant discussion is the Report's analysis of whether the Plaintiffs complied with Rule 9(b)'s specificity requirements for the pleading of predicate acts of wire fraud and mail fraud. The Report acknowledged that the Plaintiffs did not meet the First Circuit's usual specificity requirements for pleading mail fraud or wire fraud in RICO cases. Report at 28. However, the Report also recognized that it was appropriate to not require such specificity at the pleading stage when the necessary information was likely in the exclusive control of the Defendants, and that if the Plaintiff were otherwise able to plead RICO sufficiently, the Report recommended the Plaintiffs should not be required to provide the specific information until *after discovery was taken.* Report at 29. The Order explicitly endorsed this approach:

---

[2] Although Judge Saris found that the Plaintiffs failed to adequately plead a "global" RICO enterprise that comprised all the Defendants, all of the medical marketing firms and the participating physicians, she found that the complaint adequately pled that Defendants participated in a series of smaller enterprises which consisted of each of the medical marketing firms and themselves. Order at 15-17. For discovery purposes, this does not change the scope of the RICO claims. All of the misconduct attributed to the global enterprise can collectively be attributed to several smaller enterprises that survived the motions to dismiss. Any discovery that would have been relevant to the claims against a single large enterprise is still relevant to the claims against the smaller enterprises.

>I also accept the Report's recommendation that Plaintiffs be
>allowed to plead the particulars of Defendant's use of interstate
>mails and wires after discovery.

Order at 19, n.5.

Plainly, if the Court explicitly stated that Plaintiffs could provide the details of the predicate acts after discovery had been conducted, Defendants cannot prevent Plaintiffs from discovering the communications with the members of the enterprises because the Plaintiffs did not specifically identify such communications in the Amended Complaints. Similarly, where the Court consciously rejected Defendants' attempts to narrow the claims to the misrepresentations explicitly identified in the Amended Complaints, the Defendants cannot refuse to produce discovery relating to the "organized marketing campaign" that caused such statements to be repeated on the ground that the specific occasions when similar statements were repeated were not specifically identified. The Court has made it clear that such other occasions — although not specifically known to the Plaintiffs at the moment — are part and parcel of Plaintiffs' claims. Plaintiffs are entitled to discovery relating to the relevant off-label marketing campaigns that led to such representations as a matter of right. *See, e.g.*, Fed. R. Civ. Proc. 26, Advisory Committee Notes, 2000 Amendments to Rule 26(b)(1) ("other incidents of the same type, or involving the same product, could be properly discoverable under the revised standard")[3]

The analysis that the Court applied to determine whether the unspecified "similar misrepresentations" were part of Plaintiffs' claims, can also be applied to determine whether a temporal deadline for discovery should be imposed. Although the complaints do not specify particular events that took place in 2004, they do allege the following: (i) the peer to peer, off-label marketing scheme that depended upon misrepresentation of the benefits of Neurontin,

---

[3] *See also* Memorandum in Opposition to Motion for Protective Order Concerning Scope of Discovery and in Support of Motion to Compel Production of Documents Created After December 31, 1998 (Docket Number 170) at 14-17.

hosted hundreds of events through 2004, Amended Class Complaint, ¶ 44[4]; Coordinated Complaint, ¶ 48; (ii) the events sponsored by the RICO enterprises at which misrepresentations about off-label Neurontin uses were made did not cease until Pfizer signed a corporate integrity agreement, Amended Class Complaint, ¶¶ 59, 104; Coordinated Complaint ¶ 95; (iii) Pfizer's sponsorship and control of Neurontin off-label marketing programs did not cease until 2004 when Parke-Davis plead guilty to off-label marketing, Amended Class Complaint, ¶¶ 233 & 235; Coordinated Complaint ¶ 171, 177, & 187; and (iv) that Defendants' sales representatives routinely repeated through 2004 the false statements regarding Neurontin that are reflected in the Verbatims, Amended Class Complaint, ¶¶ 134, 148, 156, 171 - 72 & 181; Coordinated Complaint, ¶¶ 106, 119, 124, 140 & 147.  Similar to the "similar misrepresentation" claims the Court allowed to proceed, these allegations establish a basis for Plaintiffs' information that the conduct continued (*i.e.*, they were presented pursuant to the same marketing campaign, which did not cease until Pfizer reached an accord with the United States); the same persons who were involved in the identified misrepresentations created, sponsored and controlled the non-specified events, and the information that would allow Plaintiffs to identify those events is in the possession of the Defendants.  There is simply no basis to conclude that some non-specified misrepresentations are in the case and worthy of discovery while others, which occurred after an arbitrary date but were part of the same marketing campaign, should be excluded.  There is simply no basis for a temporal limit on discovery other that the one specifically alleged by the

---

[4] The Amended Class Complaint mistakenly alleged that Defendants funded hundreds of peer marketing events for the purpose of marketing Neurontin's off-label uses through only 2003. This allegation has been amended to allege such funding through 2004 in the Second Amended Class Complaint, ¶ 45.  The change makes this allegation consistent with other allegations in the Amended Class Complaint that the improper off-label Neurontin marketing occurred until Pfizer's execution of a corporate integrity agreement in 2004.

Plaintiffs — 2004.[5]

### B. The Claims Dismissed By The Court Should Not Affect The Scope Of Discovery.

Plaintiffs, of course, cannot deny that their claims were narrowed in accordance with the Order. But while Plaintiffs can no longer pursue certain theories of recovery, the universe of facts relevant to Plaintiffs' claims and Defendants' defenses has not been significantly altered. None of the Plaintiffs' causes of action were tossed out in their entirety. Only claims relating two off-label indications, restless leg syndrome and social phobia, were dismissed, and Plaintiffs believe the pleading deficiencies with regard to both of those conditions have been corrected. *See* Section II, *infra*. Although Plaintiffs cannot pursue claims based solely on off-label promotion where Defendants failed to identify clinical studies that supported claims of efficacy, Plaintiffs *can* pursue claims based on Defendants' misrepresentations and/or failure to inform physicians of negative clinical evidence of which they were aware. For the most part, however, the same presentations where the Defendants caused claims of efficacy to be made without supporting evidence are the *same* presentations where misrepresentations were made and/or negative clinical evidence was not disclosed. Even if the former theory is no longer actionable, because actionable misrepresentations and/or omissions were made at the same presentations, discovery relating to such marketing will still have to be produced. In short, Plaintiffs are entitled to discover for *themselves* the events at which misleading statements and omissions occurred, and the specifics of those misrepresentations and omissions; they are *not* required to simply accept Defendants' self-serving conclusions that no such misrepresentations

---

[5] It has to be noted that refusing to establish an arbitrary temporal discovery cutoff date makes Defendants production of documents far *less* burdensome. Defendants will no longer have to conduct a document–by–document review of all of their off-label marketing materials to cull those generated subsequent to an arbitrary date from those generated before. Being required to produce all off-label marketing materials makes Defendants' production obligation substantially easier, not more difficult.

or omissions took place, in the form of a refusal to produce documents concerning those events as outside the permissible scope of discovery.

Moreover, even assuming Defendants can identify off-label marketing documents that do not touch upon any of the indications that are still at issue or the misrepresentations remaining in the case, such documents are relevant to Plaintiffs' discovery of defenses. Defendants claim that they did not control the content of off-label presentations and there were no "associations in fact" with the medical marketers. Off-label marketing documents that are not directly relevant to specific misrepresentations at issue would still be relevant to the defenses of lack of control and lack of enterprise, which Defendants have consistently advanced in this case. Defendants' entanglement in off-label marketing that does not contain actionable misrepresentations may be highly relevant to their entanglement in those presentations where false or misleading information was presented. Such evidence is also highly relevant to Defendants' causation defense — in order to respond to Defendants' argument that Neurontin's off-label sales were not caused by improper marketing, Plaintiffs need to be able to determine how much, if any, of Defendants' marketing for off-label uses did *not* contain false or misleading representations or omissions.

In short, the Order does not provide a basis for immunizing Defendants' off-label marketing documents from discovery, a fact that should be obvious from Defendants' inability to articulate which types of Neurontin marketing documents are no longer relevant to this litigation. While the Order plainly affects the legal theories Plaintiffs can present, it does not alter the facts and circumstances that are at issue.

### II.     THE ALLEGATIONS IN THE REVISED AMENDED COMPLAINTS DO NOT SUPPORT TEMPORAL OR INDICATION-BASED DISCOVERY LIMITATIONS.

If the Court is considering discovery limitations, those limitations must be based

on the current allegations in the Plaintiffs' complaints. The Order (like the Report before it) permitted Plaintiffs to amend their complaints to correct pleading deficiencies that resulted in certain counts being dismissed. Plaintiffs have amended their allegations relating to the dismissed claims, and since the original bases for dismissal have been ameliorated, there is no basis for restricting discovery relating to such claims.

For example, Defendants claim that they should not have to respond to discovery relating to their marketing of Neurontin for restless leg syndrome and social phobia because Plaintiffs' misrepresentation claims relating to those conditions have been dismissed. But the Report did not dismiss all potential claims regarding these two indications; it merely held that Plaintiffs' allegations in the Amended Complaints were insufficient. For example, at page 51 of the Report, the Court found that Plaintiffs insufficiently described the connection between Restless Leg Syndrome and Periodic Limb Movement Disorder so that there was insufficient information to understand why repressing information about a negative clinical study of Periodic Limb Movement Disorder would make misleading any off-label promotion of Neurontin for Restless Leg Syndrome. In the Second Amended Class Complaint, Plaintiffs supply the missing information, and Plaintiffs have stated valid claims for suppressing vital information about Neurontin's efficacy in treating both Periodic Limb Movement Disorder and Restless Leg Syndrome.[6] Similarly, Plaintiffs have amended their allegations regarding the close relationship between social phobia, panic disorders and general anxiety — it is often difficult to tell which

---

[6] The Second Amended Class Complaint now clearly sets forth that restless leg syndrome and periodic limb movement disorder are related disorders, both being forms of nocturnal myoclonus. Second Amended Class Complaint, ¶ 159. In fact, as the Second Amended Class Complaint now clearly states, the suppressed article authored by Dr. Ehrenberg related to "the treatment of restless legs syndrome/periodic limb movements." Second Amended Class Complaint, ¶ 164. Thus, suppressing of Dr. Ehrenberg's negative study constitutes suppression of material information regarding both closely-related indications.

condition a patient is suffering from and there is extensive co-morbidity — so there is a basis to state that publicizing Neurontin for those conditions while repressing negative studies about Neurontin's effectiveness on the related conditions does mislead physicians regarding Neurontin's usefulness for anxiety disorders. Second Amended Class Complaint, ¶¶ 177 – 81.

        Defendants also appear to argue that Plaintiffs' claims regarding misrepresentation of Neurontin's efficacy for pain have been eliminated, and accordingly argue that discovery concerning off-label promotion of Neurontin for pain should be eliminated or drastically restricted.[7] The basis for this position is that some of Plaintiffs' fraud claims were based on Defendants' failure to support their promotion of Neurontin for pain with scientific evidence, and such claims have been dismissed by the Order. While the Amended Complaints did not contain extensive allegations of negative pain studies the Defendants failed to disclose, the Second Amended Class Action Complaint does contain such allegations. Second Amended Class Complaint, ¶¶ 146 – 52. The Plaintiffs now allege that the Defendants extensively promoted Neurontin for all types of pain, when they knew that Neurontin could only be properly used on patients who suffered from a very specific type of neuropathic pain. Specifically, the Plaintiffs allege that Defendants repressed information in their own research reports that indicated Neurontin's efficacy for neuropathies other than postherpetic neuralgia was poor. At the same time they knowingly pooled data from a number of disparate trials in such a way as to make the consolidated trial results appear positive across a broad array of neuropathic pain indications, and misleadingly promoted the drug for all types of neuropathic pain. *Id.* at ¶ 150 – 51. Plaintiffs state that these misrepresentations were repeatedly made at presentations for

---

[7] Defendants, of course, cannot seriously argue that claims relating to Neurontin's use for pain have been eliminated. The Order and the Report specifically found that the Plaintiffs' complaints satisfied Rule 9(b) with regard to their allegations regarding Neurontin's efficacy for pain. Order at 20, Report at 39-40.

Neurontin on pain. *Id.* at ¶¶ 150 & 153. Regardless of whether Plaintiffs' prior pain allegations were flawed, the allegations in the most recent version of the complaint alleges actionable claims of fraud with regard to promotions for pain and entitle Plaintiffs to discovery of Defendants' efforts to promote Neurontin for pain.

Other changes in the complaint further support Plaintiffs' claim that no arbitrary date limitation should be imposed on discovery, much less a December 1998 cutoff. Among the new allegations that require discovery beyond 1998 are the following:

1. Defendants' off-label marketing of Neurontin was closely tied to their pre-marketing Neurontin's planned successor, pregabalin (Lyrica), which Pfizer intended to introduce as a new and better version of Neurontin. Pfizer's marketing plan for Neurontin, including the use of misrepresentations regarding Neurontin's use for the indications Defendants intended to market pregabalin, was intended to continue through 2004, when it was expected that pregabalin would be approved for marketing. (Second Amended Class Action Complaint, ¶ 44).

2. In addition to the eight medical marketing firms previously identified in the Amended Complaints, the Second Amended Class Action Complaint adds a ninth firm, CoMed, which planned a series of consultants' meetings where Neurontin's use for neuropathic pain would be discussed and negative clinical evidence relating to Neurontin's use for pain would be supressed. These promotional meetings were held in late 1998 and 1999. (Second Amended Class Action Complaint, ¶¶ 97 – 101).

3. The new allegations identify another vendor, Medical Actions Communications, Inc. ("MAC"), who assisted Pfizer to publicize and promote off-label Neurontin through the creation of articles that misrepresented clinical evidence relating to Neurontin. These were another series of articles which also misrepresented the identity of the

author as a practicing physician as opposed to a Pfizer contractor. MAC created and published the false articles between 2001 and 2005. (Second Amended Class Action Complaint, ¶¶ 121 – 129).

        4.       The Second Amended Class Action Complaint identifies additional events where false representations about off-label Neurontin were presented. These events occurred in 2000 and 2001. (Second Amended Class Action Complaint, ¶¶ 184 & 186 ).

If it was not obvious before, these new allegations make it clear that the Court should not impose a temporal limitation on Plaintiffs' discovery of Defendants' off-label marketing of Neurontin.

### III. THE ORDER LEAVES NO DOUBT THAT THE SUDLER & HENNESSEY AND CLINE DAVIS & MANN DOCUMENTS IN DEFENDANTS' COUNSEL'S POSSESSION SHOULD BE TURNED OVER IMMEDIATELY.

The Court may recall that one of the discovery controversies between the parties is the production of approximately 40 boxes of documents already produced in related litigation by two of Pfizer's medical marketing vendors, Sudler & Hennessey and Cline Davis & Mann, Inc. The documents were originally produced by the vendors in connection with a civil subpoena in the U.S. Government's civil case against Parke-Davis, and were then deemed responsive to subpoenas served by the Plaintiff in the Franklin litigation. Mr. Franklin's attorneys had access to the documents for a very short time before Franklin settled, and the documents revealed numerous off-label marketing events conducted well beyond 1998. However, Franklin was resolved before Mr. Franklin's counsel received copies of most of the documents, and the documents were returned to the vendors. Pfizer's counsel has admitted in this litigation that it has retained a full set of the vendor documents, but has refused to produce them contending that many of the documents are irrelevant because they deal with off-label marketing that occurred subsequent to 1998.

The Order now makes it clear that Plaintiffs have viable RICO claims concerning the associations in fact between the Defendants and these two vendors. Accordingly, the vendor documents that set forth the off-label marketing performed for the Defendants are obviously relevant to the nature (and existence) of the enterprises that conducted off-label marketing for the Defendants, Defendants' participation in and control of such enterprises, and the representations and misrepresentations the marketer made regarding off-label Neurontin use. Further, the Order and Report make it clear that the case concerns the specific events described in the Amended Complaints as well as any "similar" presentations where such representations were made, regardless of whether such events were held before or after 1998.

In other words, the Order leaves no doubt that the vendors' documents which Pfizer possesses should be made available to the Plaintiffs. These documents are clearly relevant to the key issues in the case and Pfizer has no argument such a production is burdensome. Defendants already have a set of copies and do not have to do anything more than turn that set of copies over to their copying vendor. Nor is there any need for culling or vetting. First, these are not Pfizer's documents, so it has no right to withhold or assert a third party's privileges. More importantly, the documents were previously produced to Neurontin litigants. The original owners of the documents (and Pfizer) waived whatever rights they had when production occurred in <u>Franklin</u>. There is no reason immediate production should not occur in this case.

### IV. PLAINTIFFS ARE ENTITLED TO THE SAME SCOPE OF DISCOVERY WITH REGARD TO MARKETING DOCUMENTS AS THE PRODUCTS LIABILITY PLAINTIFFS.

Defendants' assertion that there should be a temporal limitation on the Plaintiffs' discovery of Defendants' off-label marketing of Neurontin is absurd when the Court has refused to impose such a limitation on the Products Liability Plaintiffs. The Court there has permitted discovery of marketing materials from Neurontin's approval to the date of the last prescription to

a Products Liability Plaintiff (which Plaintiffs here understand to be no earlier than 2004).  Why the Products Liability Plaintiffs should receive a broader scope of discovery relating to Neurontin marketing than the Plaintiffs whose claims are wholly based on alleged improper marketing is impossible to articulate.  Not surprisingly, Defendants do not refer to the scope of discovery granted in the other half of the litigation.

The fact that marketing discovery in the *Products Liability Actions* is not restricted by date significantly undermines Defendants' burdensomeness argument.  Defendants, of course, contend that if a protective order is not granted, they will incur crippling expense.  But Defendants are going to incur such expense in responding to the Products Liability Plaintiffs' discovery demands.  Moreover, to date, the parade of horribles prophesied in Defendants' motion has not occurred when the Court has allowed comparable discovery in the other litigation.

If anything, Plaintiffs here have a greater need, and a greater entitlement, to the off-label marketing documents than the Products Liability Plaintiffs.  If Defendants were not entitled to a temporal limitation in the personal injury cases, they are plainly not entitled to such an order here.

WHEREFORE, for the reasons set forth above, the Court should deny Defendants' Motion For A Protective Order Concerning Discovery, and enter an order compelling Defendants to produce all Documents relating to Defendants' off-label marketing of Neurontin subsequent to 1998, commencing within 10 days of this Court's entry of an order.

Dated: July 5, 2006                By their attorneys,

*Members of the Class Plaintiffs' Steering Committee*

By: **/s/ Thomas M. Greene**

Thomas Greene, Esquire, BBO # 210020
Greene & Hoffman
125 Summer Street
Boston, MA 02110

By: **/s/ Don Barrett**

Don Barrett, Esquire
Barrett Law Office
404 Court Square North
P.O. Box 987
Lexington, MS 39095

By: **/s/ Daniel Becnel, Jr.**

Daniel Becnel, Jr., Esquire
Law Offices of Daniel Becnel, Jr.
106 W. Seventh Street
P.O. Drawer H
Reserve, LA 70084

By: **/s/ James Dugan**

James Dugan, Esquire
Dugan & Browne
650 Poydras St., Suite 2150
New Orleans, LA 70130

By: **/s/ Barry Himmelstein**

Barry Himmelstein, Esquire
Lieff Cabraser Heimann & Bernstein
275 Battery Street, 30th Floor
San Francisco, CA 94111-3339

By: **/s/ Thomas M. Sobol**

Thomas M. Sobol
Hagens Berman Sobol Shapiro LLP
One Main Street, 4th Floor
Cambridge, MA 02142

*Members of the Plaintiffs' Non-Class Steering Committee*

By: **/s/ Richard Bemporad**

Richard Bemporad, Esquire
Lowey Dannenberg Bemporad & Selinger, P.C.
The Gateway
One North Lexington Avenue
White Plains, NY  10601

By: **/s/ Linda P. Nussbaum**

Linda P. Nussbaum, Esquire
Cohen Milstein Hausfeld & Toll
150 East 52nd Street, 13th Floor
New York, NY 10022