# EXHIBIT A

STATE OF NEW YORK
SUPREME COURT : COUNTY OF ORANGE
------------------------------------------------------------------x
WILLIAM T. YOUNG,

|  |  |
|---|---|
| Plaintiff, | PLAINTIFF'S |
|  | REQUEST TO |
| -against- | PRODUCE |
| PFIZER INC., PARKE-DAVIS, a division | INDEX No.: 2004-1062 |
| of Warner-Lambert Company and |  |
| WARNER-LAMBERT COMPANY, |  |
| Defendants. |  |

------------------------------------------------------------------x
SIRS:

PLEASE TAKE NOTICE, that pursuant to CPLR Section 3120, you are hereby demanded to serve within twenty (20) days the following information and material for discovery and inspection at the offices of FINKELSTEIN & PARTNERS, LLP. These Requests shall be deemed continuing, to the full extent required or permitted under the CPLR, so as to require supplementary production when Defendant obtains access, custody, possession or control of any document not previously produced, which is responsive to any of these Requests.

## DEFINITIONS

1.    When used in these requests, the term "defendant[s]," "you," or "your," or any synonym thereof, whether singular or plural, is intended to and shall embrace and include counsel for defendants, all agents, servants, employees, representatives and others who are in possession of or may have obtained information for or on behalf of defendants, and shall include all present and former subsidiaries, divisions, affiliates, and predecessor entities.

2.    The term "Neurontin" refers to gabapentin, marketed as Neurontin by the defendants.

3.    "FDA" means the United States Food & Drug Administration, any committee, subcommittee or advisory committee thereto, and any person, employee or agent acting as a representative thereof.

4.    "Government Regulatory Authority" means any agency, committee, subcommittee or advisory committee of any government other than the United States of America, which bears responsibility or exercises authority over the manufacture, distribution, labeling, sale and/or marketing of pharmaceutical products in any jurisdiction, and any employee or agent acting as a representative thereof.

5.    The terms "adverse effects," "adverse medical events," "adverse events," "adverse reactions," and "product problems" are used interchangeably and refer to both serious and non-serious life threatening events, including, but not limited to, death, hospitalizations, disability, required intervention to prevent permanent impairment or damage, therapeutic failure, drug interactions poor packaging or labeling, suspected contamination, questionable stability and defective components.

6.    As used throughout this Request for Production of Documents, the term "document" or any similar term is used in its broadest possible sense and shall include, but not be limited to any original, reproduction or copy, and non-identical copy (i.e., copy with marginal notes, deletions, etc.) of any kind of written, printed, typed, electronically created or stored, or other graphic matter of

any type, documentary material, or drafts thereof, including, but not limited to, any correspondence, memoranda, interoffice or intra-office communications, notes, diaries, journals, calendars, contract documents, publications, calculations, estimates, vouchers, minutes of meetings, invoices, reports, studies, computer tapes, computer disks, computer cards, computer files, e-mails, photographs, negatives, slides, dictation belts, voice tapes, telegrams, notes of telephone conversations and notes of any oral communications.

**DOCUMENT REQUESTS**

**A.    CORPORATE DATA**

1.    Produce:

a.    Each and every general liability, comprehensive general liability, advertising liability or product liability insurance policy (and any other insurance policy which you believe may provide coverage for the claims asserted in this litigation) that you purchased or on which you are a named insured including policies purchased by related corporate entities), including all excess layers, for the years 1994 through to the present inclusive;

b.    Any charts or schedules of layers of insurance or self-insured retention for any of the respective years of coverage; and

c.    Any documents relating or referring to any disputes or reservations of rights as to coverage.

2.    Produce all documents relating or referring to, or embodying any indemnity agreements, agreements to assume liability, agreements to assume the defense and joint defense agreements made by defendants, insurers for

defendants, or any other entities that may be financially affected by any of the claims asserted in this litigation.

3.      Produce all documents relating or referring to, or embodying all licenses, contracts, patents, royalty arrangements or other agreements made by defendants and any other entity related to the transfer of responsibility for the sale, marketing, manufacturing, testing or compliance with FDA regulations for Neurontin.

4.      Produce all documents relating or referring to any companies purchased by defendants.

5.      Produce:

a.      All documents reflecting your year end financial statements for the years 1994 to the present;

b.      Quarterly reports for the current fiscal year [this includes 10-Ks and 10-Qs for publicly traded companies]; and

c.      All of your filings with the National Association of Securities Dealers for the years 1994 to the present.

6.      Produce your annual reports for the years 1994 to the present.

7.      Produce all of your document retention or document destruction policies in effect for the years 1983 to the present and all documents, which discuss or refer thereto.

8.      Produce defendants' articles of incorporation, by-laws, and any amendments thereto.

9.      Procedures and protocols for integrating computer data from

Warner Lambert to Pfizer.

10.     Procedures and protocols for integrating computer equipment from Warner Lambert to Pfizer.

11.     Procedures and protocols for converting data from Warner Lambert systems to Pfizer systems.

12.     Procedures and protocols for archiving data from Warner Lambert that was not transferred over to Pfizer.

13.     Procedures and protocols for integrating computer data from Parke Davis to Warner Lambert.

14.     Procedures and protocols for integrating computer equipment from Parke Davis to Warner Lambert.

15.     Procedures and protocols for converting data from Parke Davis systems to Warner Lambert systems.

16.     Procedures and protocols for archiving data from Parke Davis that was not transferred over to Warner Lambert.

17.     Documents reflecting whether Neurontin was marketed in Europe under a different name[s], and if, yes, the name[s] of the product, the countr[ies] in which the product was marketed and when same was marketed.

18.     For each year between 1983 to the present in which defendants designed, tested, purchased, manufactured, sold, marketed, licensed or distributed Neurontin, produce all documents relating or referring to, or embodying:

        a.     General corporate organizational charts;

b.     Sales department organizational charts;

c.      Marketing department organizational charts;

d.      Research and development department organizational charts;

e.      Medical services organizational charts;

f.     Regulatory Affairs organizational charts;

g.     Safety Surveillance organizational charts;

h.     Preclinical (Nonclinical) organizational charts;

i.     Pharmacokinetic and Pharmacodynamic organizational charts;

j.     Manufacturing, Quality Assurance, and Quality Control organizational charts.

19.     Produce any documents reflecting:

a.     All corporate officers for the last ten years;

b.     All members of the Board of Directors for the last ten years;

c.     All persons or entities which owned 5% or more of defendants' common stock for the last five years;

d.     Annual organization charts for any entity that owned more than 5% of defendants' common stock during the last five years.

20.     As to any entity with which you are affiliated through common ownership and control that is involved in the manufacture, testing, marketing, licensing, sale or distribution of Neurontin, produce all documents which describe in any way the responsibilities that each such entity has in regard to said product.

21.     Produce all documents, including but not limited to computer

print-outs, listing the name, case caption, attorney and/or status of any lawsuit filed against defendants regarding Neurontin, including cases which have been dismissed, settled, withdrawn or tried to verdict, and produce documents reflecting the plaintiff's attorneys' names, address, fax and telephone numbers.

22.    Produce all non-privileged documents regarding any lawsuit filed against defendants regarding Neurontin.

23.    Produce all documents relating or referring to, or embodying minutes of all Board of Directors meetings which in any way refer to the risk or adverse effects with the use of Neurontin.

24.    Produce any documents relating or referring to or embodying notice of claims, claims projections, loss estimates or risk management related to Neurontin.

25.    Produce all documents relating or referring to, or embodying any correspondence, communications, contracts or other discussions of any kind between defendants, their agents or any party acting on defendants' behalf, and any other drug or biological company concerning the risk of adverse effects with the use of Neurontin.

26.    Produce all internal standard operating procedures for the ongoing assessment of product safety and adequacy of product labeling with respect to Neurontin.

27.    Produce all documents relating or referring to, or embodying

any codes of conduct or ethical standards promulgated, adopted or followed by defendants between 1994 to the present with respect to the marketing or labeling of biological products.

28.    Produce all documents relating or referring to, or embodying any codes of conduct or ethical standards with respect to the marketing or labeling of biological products that were promulgated or adopted by any trade organization of which defendants were a member between 1994 to the present.


**B.    FDA AND GOVERNMENT REGULATORY DOCUMENTS**

29.    Produce all regulatory applications and correspondence associated with Neurontin, including its Investigational New Drug Applications, its Biological Licensing Application, its post approval NDA Supplements and all related FDA inspection reports and BLA Annual reports.

30.    Produce all regulatory documents and data pertaining to Phase IV Studies, including all pharmacoepidemiology-related studies.

31.    Produce all documents relating or referring to, or embodying communications between defendants or any agent or consultant of defendants, and the FDA, regarding the risk of adverse effects with the use of Neurontin.

32.    Produce all documents concerning any internal FDA meetings, FDA Advisory Panel meetings, meetings between FDA and any manufacturers of biological products and meetings between FDA and any trade organization regarding the risk of adverse effects with the use of Neurontin, including but not limited to:

a.      All documents relating or referring to any communications between defendants (or any agent or consultant of defendants), and the FDA or any Advisory Panel Member regarding the risk of adverse effects with the use of Neurontin.

b.      All documents relating or referring to any financial contributions or other items of value provided to Panel Members or their institutions/organizations; and

c.      All documents relating or referring to, or embodying minutes of meetings, agendas, dossiers, submissions, test summaries, internal memoranda regarding strategies and issues, Questions and Answers, scheduling, or any other documents concerning such meetings, the submissions thereto, or the topic(s) discussed.

33.    Produce:

a.      Complete files for all adverse event reports and adverse event databases concerning the occurrence of adverse effects with the use of Neurontin in the United States.

b.      All summaries (including but not limited to computerized data), analysis or interpretations of any such adverse event report(s); and

c.      All documents and databases which discuss or refer to any adverse event report, or any summary, analysis or interpretation thereof.

34.    Produce:

a.    All documents relating to or referring to adverse event reports or alleged adverse event reports with the use of Neurontin which occurred in any country other than the United States;

b.    All documents relating or referring to, or embodying summaries, computerized data, analysis, or interpretation of said reports;

c.    All documents relating, referring or embodying the submission of said reports to any Government Regulatory Authority, whether domestic or foreign;

d.    All documents relating or referring to the failure to submit such reports to any Government Regulatory Authority, whether domestic or foreign; and

e.    Produce all documents that relate or refer to, or embody any such incidents or reports.

35.    Produce all documents relating or referring to, or embodying any communication with or submissions to the FDA or any Government Regulatory Authorities whether domestic or foreign, regarding the regulation, approval, safety or testing of Neurontin and the assessment of benefit-risk ratios.

36.    Produce all documents relating or referring to, or embodying any communication with or submissions to the FDA or any Government Regulatory Authority, whether domestic or foreign, regarding the recall of Neurontin, or the removal of Neurontin due to the risk of adverse effects.

37.    Produce:

a.    All documents relating or referring to, or embodying any communications between defendants and any physician, pharmacist, health care provider or consumer regarding Neurontin, including but not limited to all documents, including drafts, of any Dear Health Care Provider, Dear Pharmacist or Dear Consumer letters concerning Neurontin; and

b.    All documents and regulatory chronologies relating or referring to, or embodying any communications with the FDA or any Government Regulatory Authority, whether domestic or foreign, regarding the content, dissemination or approval of such communications.

38.    Produce all documents relating or referring to, or embodying any information received by defendants from any physician or other prescriber regarding the risk or occurrence of adverse effects with the use of Neurontin.

39.    Produce all documents relating or referring to, or embodying any discussions, negotiations or contracts to engage any third party to represent defendants' interests before the FDA or any Government Regulatory Authority, whether domestic or foreign, or any committee or subcommittee thereof, in regard to the risk or occurrence of adverse effects with the use of Neurontin, including but not limited to, retainer agreements or consultant agreements.

40.    Produce all documents relating or referring to, or embodying any discussion or submission between defendants and any Institutional Review Boards, Pharmacy and Therapeutic Committees, state government regulatory agency or any state medical society concerning the risk of adverse effects with the use of Neurontin.

## C.    PRODUCT TESTING

41.    Produce all correspondence and regulatory documents pertaining to the application and approval processes for Neurontin, including all FDA comment letters, FDA action letters, FDA inspection reports and all manufacturing, biological/pharmaceutical/chemical/statistical/toxicological/clinical studies, medical reviews, correspondence and other documentation.

42.    Produce all documents relating or referring to, or embodying any pre-clinical studies or testing of Neurontin, to assess the risk or occurrence of adverse effects with the use of Neurontin, including but not limited to, test protocols, data compilations, laboratory notebooks, summaries of results, drafts of reports, interim reports, final reports, published articles, financial remuneration, engagement of consultants/investigators, internal memoranda and submissions of data to the FDA or any Government Regulatory Authorities, whether domestic or foreign.

43.    Produce all documents and studies relating to the safety and/or effectiveness of Neurontin (laboratory, preclinical, clinical) which were not submitted to the FDA.

44.    Produce all documents relating or referring to, or embodying any clinical studies or testing to assess the risk or occurrence of adverse effects with the use of Neurontin, including but not limited to, test protocols, data compilations, laboratory notebooks, summaries of results, drafts of reports, interim reports, final reports, published articles, financial remuneration,

engagement of investigators, internal memoranda and submissions of data to the FDA or Government Regulatory Authorities, whether domestic or foreign.

45.     Produce all documents relating or referring to, or embodying any epidemiology studies assessing the risk or occurrence of adverse effects with Neurontin, including but not limited to, test protocols, data compilations, summaries of results, drafts of reports, interim reports, final reports, published articles, financial remuneration, engagement of investigators, internal memoranda and submissions of data to the FDA or any Government Regulatory Authorities, whether domestic or foreign.

46.     Produce all documents concerning any receipt, discussion, studies, analysis or review of clinical experience reports for Neurontin to assess the risk or occurrence of adverse effects with the use of Neurontin, including but not limited to formally submitted adverse event reports, product problem reports, communications (whether written or oral) concerning case reports, published clinical experience reports, or any other such report made known to defendants.

47.     Produce all documents:

a.     Relating or referring to, or embodying studies assessing the risk or occurrence of adverse effects with Neurontin, conducted by any third parties, including but not limited to, those funded by trade groups or associations;

b.     Relating or referring to, or embodying defendants' review, analysis, investigation or interpretation of said results;

c.    Relating or referring to, or embodying any attempts by defendants to submit said data to the FDA or any other Government Regulatory Authority, whether domestic or foreign.

48.    Produce all documents relating or referring to, or embodying any financial support by defendants to any other person or entity conducting any study or analysis of the risk of adverse effects with the use of Neurontin.

49.    Produce all documents relating or referring to studies concerning Neurontin that were discontinued for any reason.

50.    Produce all documents relating or referring to, or embodying any decision on the part of defendants not to provide any financial support for any studies or analyses of the risk of adverse effects with the use of Neurontin.

51.    Produce all documents relating or referring to, or embodying any testing of Neurontin to assess the risk or occurrence of adverse effects which defendants did not complete, did not publish, or did not submit to the FDA or any other Government Regulatory Authority, whether domestic or foreign.

52.    As to any clinical, animal or other study currently sponsored by, financed by, undertaken by, or suggested by defendants to assess the risk or occurrence of adverse effects with Neurontin, provide all documents concerning said study, including but not limited to engagement letters, contracts, protocols, status reports, raw data, summary of findings, internal memorandum, drafts of reports, interim reports, final reports, manuscripts, submissions to publishers, submissions to FDA or any Government Regulatory Authority, whether domestic

or foreign, or discussions, communications or analysis of the current or final results.

53.     Produce:

a.     All documents relating or referring to, or embodying a bibliography of studies, articles or reports concerning the risk or occurrence of adverse effects with Neurontin, including but not limited to, monographs, presentations, letters to the editor, abstracts, and any other published reports; and

b.     Copies of each such article or report in defendants' possession.

54.     Produce all documents relating or referring to, or embodying any unpublished reports, speeches, data compilations, clinical observations or other communications concerning the risk or occurrence of adverse effects with Neurontin.

55.     Produce all documents relating or referring to, or embodying any preclinical laboratory testing and/or studies regarding the pharmacology, pharmacodynamics, pharmacokinetics and/or biochemical properties of Neurontin that were undertaken to assess the risk or occurrence of adverse effects with the use of such product.

56.     Produce all documents relating or referring to, or embodying any communications by defendants with any publisher, editor, author, reporter or employee of or for any lay, scientific, medical or news publication or any free lance writer concerning the risk or occurrence of adverse effects with Neurontin.

57.     Produce all documents relating or referring to, or embodying any

efforts by defendants to study, estimate, monitor or test for the risk or occurrence of adverse effects with the use of Neurontin, either alone or in combination with any other drug.

58.     Produce all documents that relate or refer to, or embody any communication, report or inquiry between defendants and the Centers for Disease Control in regard to the risk of adverse effects with the use of Neurontin.

59.     Produce all documents that relate or refer to, or embody any communication, report or inquiry between defendants and the National Institutes of Health in regard to the risk of adverse effects with the use of Neurontin.

60.     Produce all documents that relate or refer to, or embody any communication, report or inquiry between defendants and the Medicines Control Agency or the World Health Organization in regard to the risk of adverse effects with the use of Neurontin.

61.     Produce all documents that relate or refer to, or embody any communication, report or inquiry between defendants and the Drug Enforcement Agency (DEA) in regard to the risk or occurrence of adverse effects with the use of Neurontin.

**D.     PRODUCT RECALL**

62.     Produce all documents relating or referring to, or embodying any communications with the FDA or any other Government Regulatory Authority, whether domestic or foreign, regarding any discussion or suggestion that defendants eliminate or withdraw Neurontin from the market.

63.     Produce all documents relating or referring to any discussion,

suggestion or study of whether Neurontin should be withdrawn temporarily or permanently from the market, or whether its design, or labeling should be changed, including but not limited to internal memorandum, notes of conversations, communications with the FDA or any other Government Regulatory Authority, whether domestic or foreign, and communications with other manufacturers, licensors, licensees, distributors, or marketers.

64.    Produce all documents regarding any discussion, suggestion or study of whether any current or pending, approved or unapproved application for review, study or approval for Neurontin should be withdrawn or suspended temporarily or permanently due to safety concerns, including but not limited to internal memorandum, notes of conversations, communications with the FDA or other Government Regulatory Authority, whether domestic or foreign, and communications with other manufacturers, licensors, licensees, distributors, or marketers.

65.    Produce all documents relating or referring to, or embodying the hiring or retention by defendants or by any other person or entity acting on defendants' behalf, of any public relations firm to participate in, orchestrate, organize or otherwise direct the marketing of Neurontin, and produce all documents regarding said engagement.

66.    Produce all documents relating or referring to, or embodying the retention of persons in any medical discipline to study, assess or analyze the risk of adverse effects with the use of Neurontin by or on behalf of defendants, whether retained directly by defendants or otherwise.

67.     Produce all documents relating or referring to any discussions with regulatory authorities relating to questions associated with the quality, purity and/or strength of Neurontin and whether market recalls should be effected

## E.     LABELING

68.     Produce all documents relating or referring to, or embodying any labeling, including drafts and revisions thereto, ever generated with respect to Neurontin.

69.     As to each change in the Neurontin labeling, produce all documents relating or referring to, or embodying said label change.

70.     Produce all documents relating or referring to, or embodying communications by defendants or other materials distributed by defendants to physicians, pharmacists or consumers regarding any change in the labeling or recommendations for use of Neurontin, including but not limited to "Dear Health Care Provider," "Dear Pharmacists" and "Dear Consumer" letters.

71.     Produce all documents relating or referring to, or embodying any communications with the FDA or any other Government Regulatory Authority, whether domestic or foreign, regarding changes in the label or recommendations for use of Neurontin.

72.     Produce all documents, including but not limited to internal memorandum, minutes of meetings, and draft proposals, regarding any consideration, discussion, decision or attempt to revise any label or recommendations for use of Neurontin.

73.    Produce all documents relating or referring to, or embodying information published in any PDR concerning Neurontin, for each year Neurontin has been available and produce all documents relating or referring to, or embodying revisions, alterations or discussions of PDR data regarding Neurontin.

74.    Produce all documents relating or referring to, or embodying materials provided to consumers upon purchase of Neurontin, such as package inserts, instructions or warnings included within the packaging and produce all documents relating or referring to, or embodying drafts of said documents, discussions of said documents or revisions or alterations thereto.

75.    Produce all documents and procedures relating to the routine audit of the adequacy of the Neurontin professional labeling upon receipt of new information and adverse medical event reports.

## F.    MARKETING

76.    Produce:

a.    A color copy of each marketing piece directed to physicians, pharmacists, or other health care providers from any source, including detail persons and direct mailings regarding Neurontin;

b.    All documents relating or referring to the issue of whether a warning about the risk or occurrence of any adverse effects should be mentioned in any such advertisements; and

c.    All scientific articles distributed to physicians by defendants.

77.    Produce:

a.    All documents relating or referring to, or embodying any press releases or public relations material for Neurontin that relate or refer to the risk or occurrence of adverse effects with the use of Neurontin; and

b.    All documents relating or referring to, or embodying any drafts, discussions, FDA approvals or revisions of said information.

78.    Produce:

a.    Any videotapes or other visual aids created by defendants to advertise and promote the use of Neurontin; and

b.    All documents relating or referring to, or embodying any drafts, discussions, FDA approvals, rejections or revisions of said information.

c.    All documents relating or referring to the issue of whether a warning about the risk or occurrence of adverse effects should be mentioned in any such videotapes or visual aids.

79.    Produce all documents relating or referring to, or embodying sponsorship, financial support, contribution of product, consultation agreements, or other items of value provided to or for any person studying the risk or occurrence of adverse effects with the use of Neurontin, either alone or in combination with another biological product or drug.

80.    Produce all documents relating or referring to, or embodying any minutes, agendas, brochures, memoranda or correspondence relating to meetings of any trade group or of any other group or association regarding the risk or occurrence of adverse effects with the use of Neurontin.

81.     Produce:

a.     All documents relating or referring to medical seminars, conferences or lectures, conducted by or sponsored in whole or in part by defendants, or in which defendants or any of their agents participated regarding Neurontin;

b.     All materials displayed, relied upon or distributed by defendants at any of the above-referenced medical seminars, conferences or lectures.

82.     Produce all documents relating or referring to any data purchased by third party vendors containing sales of Neurontin. This would include, but is not limited to, prescription dispensing data, reimbursement data, product sales by territory, sales of competitive products.

83.     Produce all documents and data described in the preceding section.

84.     Produce all documents and data relating or referring to any sales call tracking regarding the promotion of Neurontin.

## G.     PHYSICIANS AND SCIENTISTS

85.     Produce every document relating or referring to, or embodying any opinion by a physician, a scientist, or a medical or scientific expert, regarding the risk or occurrence of adverse effects with the use of Neurontin, including but not limited to reports prepared in legal proceedings, opinions expressed in depositions or trial, reports submitted to scientific journals, opinions expressed at medical conferences, and opinions provided as testimony, reports or statements

to the FDA or any Government Regulatory Authority, or any advisory committee thereof.

86.    Produce all documents relating or referring to, or embodying any financial payments, contributions or support provided by defendants to any physician, scientist, medical or scientific expert, or medical facility, which is the subject of the preceding request, or any institution, agency or entity with which said individual is affiliated.

87.    Produce every document relating or referring to, or embodying any attempt by defendants to retain, engage or otherwise provide financial support or item of value to any person engaged in scientific or medical study of the risk or occurrence of adverse effects with the use of Neurontin.

88.    Produce every document regarding or relating to studies of Neurontin, whether performed or proposed, which included bipolar individuals.

89.    Produce every adverse event report in which the user of Neurontin was bipolar and documents related thereto.

**H.    DOCUMENTS CONCERNING LITIGATION**

90.    Produce all documents upon which defendants rely to support each and every Affirmative Defense asserted in the Answer filed to the Complaint of plaintiff.

91.    Produce all documents and Standard Operating Procedures Manuals for the following areas:

a.    records retention policy manual;

b.    records retention compliance audits;

  c. documents relating to use of outside documents storage facilities;

  d. records retention training manuals;

  e. all documents relating to computer infrastructure of the company;

  f. all documents relating to e-mail systems in use by the company;

  g. all documents related to backup procedures for the company;

  h. all documents concerning location of backups;

  i. all documents related to systems upgrade;

  j. all documents related to server upgrade;

  k. all documents related to document imaging systems in the company;

  l. policy and procedures manual for sales call reporting;

  m. documents relating to purchase and usage of prescription sales data;

  n. software manuals for any sales force automation software;

  o. all documents concerning use of computer data bases to track ADE's;

  p. all documents concerning policies and procedures for the intake, reporting, and follow-up of ADE reports;

  q. all documents concerning auditing of the ADE tracking process to ensure compliance.

  92. Produce a list of all software applications in use by the defendant containing any information relating to Neurontin.

93.   Produce a list of all databases in use by the defendant containing any information relating to Neurontin.

94.   Produce a list of all software applications that are generally available to most employees of the defendants.  This would include, but is not limited to, e-mail software, spreadsheet software, word processing software.

I.   **OTHER DISCOVERY REQUESTS**

95.   Records setting forth compensation (including but not limited to free attendance at seminars, free meals, free hotel accommodations, free travel arrangements, free entertainment) and/or payments made to physicians, including the compensation/payments made and the identity of the physicians to whom the compensation/payments were made:

(a) as an incentive to attend seminars, dinners, conferences and or consultants' meetings wherein any or all of the topics were related to off label uses of Neurontin;

(b) in return for allowing pharmaceutical sales representatives into their examining rooms to watch as they examined patients, to meet with patients, to review medical charts and/or to recommend what medicines to prescribe;

(c) to reward and/or compensate them for being a high-volume prescriber of Neurontin;

(d) to pay them as speakers at seminars, dinner meetings, consultants' meetings, or other events and/or for participation in teleconferences wherein any or all of the topics were related to Neurontin;

(e) to pay them as consultants;

(f) to pay them to enter patients in clinical trials regarding Neurontin;

(g) to pay them to write medical journal articles about Neurontin;

(h) in return for speaking about Neurontin to their peers;

(i) to publish studies or to utilize their names as the authors of studies which purported to show favorable results in using Neurontin for non-approved uses;

(j) in return for agreeing to prescribe Neurontin to patients for off label uses and/or to receive information concerning the results of the administration of Neurontin for off label uses.

96.    Records wherein defendants tracked whether, and the degree to which, doctors prescribed Neurontin.

97.    Records regarding hiring of marketing companies to write drafts of medical journal articles about Neurontin that where thereafter published under a physician's name.

98.    Notes, records, e-mails or other recordings of conversations between sales representatives and physicians wherein patients and therapeutic options were discussed.

99.    Notes, records, e-mails or other recordings of conversations between sales representatives and physicians wherein the off-label uses of

Neurontin were discussed, including but not limited to, conversations wherein physicians were encouraged to prescribe Neurontin for off-label uses.

100.    Records of Neurontin prescriptions for off-label uses.

101.    Records of sales growth.

102.    Internal documents regarding the decision to avoid or not participate in the usual regulatory process of the FDA pertaining to the marketing of a new use of a drug prior to the promotion and marketing of Neurontin for non-FDA approved uses and dosages, including but not limited to, the decision not to conduct clinical trials to prove that Neurontin was safe and effective for other indications.

103.    Internal documents regarding the decision to hire and utilize medical liaisons to solicit and/or induce physicians to promote the off-label use of Neurontin

104.    Internal documents regarding the promotion of Neurontin for off-label uses.

105.    Internal documents encouraging sales representative to encourage physicians to prescribe Neurontin in higher doses that the dosage approved by the FDA.

106.    Internal documents generated as a result of the FDA warning letters.

107.    Internal memo[s] listing doctors whom defendants considered to be "movers and shakers".

108.    Internal memo[s] dealing with the hiring by defendants of marketing firms, including but not limited to Medical Education Systems, and/or non-physician technical writers  to write articles about the unapproved uses of Neurontin, difficulties in finding an author for such articles, and/or the review and/or approval by defendants of such articles before they were sent to medical journals for publication.

109.    A listing of all articles produced by Medical Education Systems for the defendants which discuss the off-label use of Neurontin, including full title, author, journal[s] in which the article was published, volume number, month and year of publication.

110.    Documents reflecting the package of monetary incentives provided to the medical liaisons to offer to physicians with respect to the promotion of and/or prescription of Neurontin for off-label uses.

111.    Lists of doctors given to medical liaisons for "cold calls" with respect to the promotion of and/or prescription of Neurontin for off-label uses.

112.    Documents regarding the training, including but not limited to, training materials, provided to medical liaisons to persuade or induce physicians to use Neurontin at higher than FDA-approved levels and/or for off-label uses, including but not limited to, bipolar mental disorder, monotherapy for seizures, control of various pain states, attention deficit disorder, migraine, drug and alcohol withdrawal seizures, restless leg syndrome.

113.     Records regarding the training of medical liaisons to misrepresent their own credentials by saying they were "involved in research" or words to that effect.

114.     Documents with discuss conducting studies of the use of Neurontin for non-approved uses.

115.     Studies sponsored by or commissioned by defendants that involved use of Neurontin for non-approved uses.

116.     Any contracts between defendants and Medical Education Systems that relate to Neurontin.

117.     Any proposals made to Medical Education Systems regarding the development of articles related to the use of Neurontin for off-label uses.

118.     Documents reflecting defendants' involvement in the content of articles developed by Medical Education Systems, defendants' approval of authors and/or topics, defendants' clearance of the journals in which the articles were printed, and/or defendants' review of the draft articles.

119.     Records of seminars, dinner meetings, programs, promotional literature, wherein the articles developed by Medical Education Systems were utilized.

120.     Documents regarding the commissioning of the study conducted at the Harvard Bipolar Research Program.

121.     Contract between defendants and persons on behalf of the Harvard Bipolar Research Program regarding the 1998 study conducted at the Harvard Bipolar Research Program.

122.    Correspondence and/or other forms of communication between defendants and the Harvard Bipolar Research Program, from the time the Program was commissioned to conduct the 1998 study until the study was completed.

123.    Correspondence and/or other forms of communication between defendants and the Harvard Bipolar Research Program, from the time the study was completed until defendants published the results of the study.

124.    The 1998 Harvard Bipolar Research Program study.

125.    Internal documents generated in response or discussing or commenting upon the study from the time the study was commissioned until the results of the study were published by defendants.

126.    The patent filed by Parke-Davis in October 1990 wherein defendants claimed Neurontin to be effective in the treatment of depression.

127.    The patent filed by Parke-Davis in November 1990 wherein defendants claimed Neurontin to be effective in the treatment of neurogenerative disease.

128.    The patent filed by Parke-Davis in 1995 wherein defendants claimed Neurontin to be effective in the treatment of mania and bipolar and for anxiety and panic.

129.    Economic and/or other analyses conducted by defendants in reaching the decision in or around 1995 that it would not be sufficiently profitable for defendant to obtain FDA approval for Neurontin's alternative, off-label uses.

130.    Records regarding defendants' publication strategy concerning the promotion of Neurontin by the large-scale distribution of publications purportedly written by independent researchers that purportedly described the scientific evaluation of Neurontin, including but not limited to, the publications distributed by the defendants.

131.    Minutes of meetings held in 1995 wherein promotion of Neurontin for off-label was discussed, including but not limited to, meetings wherein marketing and clinical employees of defendants reached the conclusion that clinical trials were too expensive and that they would take too long.

132.    Documents setting forth the full name and title of the executives/employees on the "New Products Committee" and documents indicating whether such executives/employees are still in the employ of the defendant.

133.    Internal documents generated by the "New Product Committee" with respect to the development and/or approval of defendants' course of action regarding the promotion of Neurontin for alternative uses, including but not limited to, the decision to pay for clinical trials for a range of alternative uses such as bipolar disorder, social phobia, migraine and chronic pain, and to then publicize the results of those trials through medical journals and medical conventions.

134.    The internal memo dated May 5, 1997 concerning the effectiveness of Neurontin for the pain of diabetic neuropathy, among other things.

135.    Internal records of defendants' epilepsy marketing team's recommendations that defendants not conduct clinical studies regarding the effectiveness of Neurontin for pain, but rather promote Neurontin for pain directly to doctors through educational seminars and other meetings.

136.    Publications created by third parties and distributed by defendants describing results of off-label uses of Neurontin.

137.    Documents which set forth questions compiled by defendants to be asked of speakers at presentations for doctors wherein any or all of the topics were related to off-label uses of Neurontin.

138.    A listing of consultants and of the compensation paid to the consultants hired by defendants regarding the marketing of Neurontin.

139.    Consultants' agreements entered into between defendants and doctors regarding the marketing of Neurontin.

140.    Records regarding the review and/or analyses as to whether the consultants' meetings were successful in getting the attendees to change their prescription writing practices regarding the prescribing of Neurontin.

141.    Records reflecting the tracking by defendants of the attendees' Neurontin prescription writing practices after attending consultants' meetings.

142.    Records regarding the provision of Neurontin samples by detailmen to physicians, including any memos or other documents instructing detail persons regarding the provision of Neurontin samples to physicians, or otherwise referring to this practice, as well as any records of samples that were provided to physicians including:

   (a)   the name and address of the physician to whom the samples were provided;

   (b) the identity of the detail person who provided the samples;

   (c) the quantity of samples provided, including strength; and

   (d) the date that such samples were provided.

143.    Market data purchased from third parties utilized by defendants in analyzing whether doctors had written more Neurontin prescriptions after attending consultants' meetings.

144.    The memorandum announcing the consultants' meeting held in Jupiter Beach, Florida during the weekend of April 18-21, 1996.

145.    Internal documents generated by the Neurontin Marketing Team wherein the manner of selecting which neurologists would be invited to the Jupiter Beach, Florida was addressed and/or discussed.

146.    The agenda of the Jupiter Beach, Florida meeting.

147.    Any written materials distributed to attendees of the Jupiter Beach, Florida meeting, including but not limited to, written abstracts of the presentations, papers, studies, promotional materials and/or outlines.

148.    Records setting forth compensation (including but not limited to free attendance at seminars, free meals, free hotel accommodations, free travel arrangements, free entertainment) and/or payments made to the neurologists or other doctors who attended the Jupiter Beach, Florida meeting during the weekend of April 18-21, 1996.

149.    Records setting forth compensation (including but not limited to free meals, free hotel accommodations, free travel arrangements, free entertainment) and/or payments made to the presenters at the Jupiter Beach, Florida meeting during the weekend of April 18-21, 1996.

150.    Any contracts between defendants and Proworx that relate to Neurontin.

151.    Any proposals made to Proworx regarding the development of articles related to the use of Neurontin for off-label uses.

152.    Documents reflecting defendants' involvement in the selection of speakers,  the selection of presentation topics and the content of the presentations that were provided by Proworx for the consultants' meeting held in Jupiter Beach, Florida during the weekend of April 18-21, 1996.

153.    A listing of all articles produced by Proworx for the defendants which discuss the off-label use of Neurontin, including full title, author, journal[s] in which the article was published, volume number, month and year of publication.

154.    Records of seminars, dinner meetings, programs, promotional literature, wherein the materials developed by Proworx were utilized.

155.    Records of all expenses and fees incurred by Proworx in conjunction with the preparation for and the presentation of the consultants' meeting held in Jupiter Beach, Florida during the weekend of April 18-21, 1996, and records indicating payment of such expenses and fees by defendants.

156.    Any follow-up memorandum to defendants' marketing officials or other employees regarding the Jupiter Beach, Florida meeting.

157.    "Trending worksheets" generated by defendants listing the doctors who attended the consultants' meeting in Jupiter Beach, Florida.

158.    Programs held out to be Continuing Medical Education seminars wherein off-label uses of Neurontin were addressed and/or discussed.

159.    Documents reflecting defendants' involvement in the selection of attendees, the selection of speakers,  the selection of presentation topics and the content of the presentations made at such Continuing Medical Education seminars.

160.    Records regarding the evaluation the presentations to be made at such Continuing Medical Education seminars.

161.    Records regarding the "black-listing" of or decision not to utilize presenters who were not sufficiently pro-Neurontin.

162.    Records reflecting the tracking by defendants of the consultants' Neurontin prescription writing practices after attending Continuing Medical Education seminars.

163.    Market data purchased from third parties utilized by defendants in analyzing whether attendees had written more Neurontin prescriptions after attending Continuing Medical Education seminars.

164.    Any follow-up memorandum and/or reports to defendants' marketing officials or other employees regarding the content of the presentations

with respect to the promotion of off-label uses of Neurontin and the pledges made by attendees to order more Neurontin for their patients.

165.    Records of free tuition provided to attendees of Continuing Medical Education seminars wherein off-label uses of Neurontin were addressed and/or discussed.

166.    Letter from defendants to FDA in June, 1997 listing studies relating to pain, pain syndromes and psychiatric disorders.

167.    A copy of the Phase IV trial known as STEPS.

168.    A copy of the STEPS protocol.

169.    A listing of the physicians who enrolled or participated in STEPS.

170.    A listing of payments made to physicians who enrolled or participated in STEPS.

171.    Any contracts entered into in or around 1996 between defendants and AMM/ADELPHI that relate to Neurontin.

172.    Any proposals made to AMM/ADELPHI regarding the development of articles related to the use of Neurontin for off-label uses.

173.    Documents reflecting defendants' involvement in the selection of authors, and/or the selection of the content of the articles that were produced by AMM/ADELPHI.

174.    A listing of all articles produced by Proworx for the defendants which discuss the off-label use of Neurontin, including full title,

author, journal[s] in which the article was published, volume number, month and
year of publication.

175.    Copies of the articles produced by AMM/ADELPHI.

176.    A listing of the speakers who comprised the Speaker's
Bureau from 1994 through 2004, including full name and address.

177.    Records setting forth compensation (including but not limited
to free attendance at seminars, free meals, free hotel accommodations, free
travel arrangements, free entertainment) and/or payments made to physicians
who comprised the Speaker's Bureau from 1994 through 2004, including the
compensation given and the identity of the physicians to whom the compensation
was given.

178.    Records regarding the review by defendants in or around
1997 of their marketing practices in light of existing Medicaid kickback
regulations.

179.    Records regarding the April 16, 1996 training session for
medical liaisons, including but not limited to, internal documents generated in
planning said meeting; materials distributed to the medical liaisons who attended
the meeting; videotapes, outlines, or other materials utilized by the persons
conducting the meeting; documents reflecting who conducted the meeting and
the identity of the medical liaisons who attended the meeting.

180.    Records regarding the May 24, 1996 teleconference,
including but not limited to, internal documents generated in planning said
teleconference; materials distributed to the medical liaisons in conjunction with

the teleconference, before, after or during same; outlines, or other materials utilized by the persons conducting the teleconference; documents reflecting who conducted the teleconference and the identity of the medical liaisons who participated in the teleconference.

181.    Internal documents that relate to the procedures defendants recommended to be utilized by medical liaisons when making "cold calls" to physicians regarding off-label use of Neurontin, including but not limited to, the suggested content of the statements to be made by medical liaisons when placing such calls.

182.    Listing of doctors to whom such calls were made, setting forth the size of the doctor's practice and his/her ability to prescribe Neurontin.

183.    The slides provided to the medical liaisons that related to off label uses of Neurontin.

184.    The clinical trials and/or studies regarding the use and effectiveness of Neurontin in the treatment of bipolar disorder.

185.    The article authored by Gary A. Mellick and Larry B. Mellick regarding the use of Neurontin in the treatment of Restless Leg Syndrome.

186.    Records stating the compensation paid to Gary A. Mellick and Larry B. Mellick by defendants.

187.    Clinical trials, studies and or data developed by defendants to support the use of Neurontin as monotherapy.

188.    Pre-launch marketing studies with respect to Neurontin.

April 28, 2004

FINKELSTEIN & PARTNERS, LLP

_Eleanor L. Polimeni_

ELEANOR L. POLIMENI, ESQ.
Attorneys for Plaintiff
436 Robinson Avenue
Newburgh, N.Y. 12550

TO: DAVIS POLK & WARDWELL
    Attorneys for Defendants
    450 Lexington Avenue
    New York, N.Y. 10017

- 38 -

CERTIFICATE OF SERVICE

I, Eleanor L. Polimeni, an attorney at law of the State of New York admitted to practice in the State and Federal Courts of the State of New York, hereby certifies under penalty of perjury, that on April 28, 2004, I caused a copy of Plaintiff's Request for Production to be served by depositing same in a depository of the United States Postal Service via first class delivery upon:

Davis Polk & Wardwell
450 Lexington Avenue
New York, N.Y. 10017

ELEANOR L. POLIMENI, ESQ.

**EXHIBIT B**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
MARK MINISQUERO,

                          Plaintiff,           PLAINTIFF'S
                                               REQUEST FOR
        -against-                              PRODUCTION

PFIZER INC., PARKE-DAVIS, a division of        04-CV-7297 (JSR)
 Warner-Lambert Company and Warner-Lambert
Company LLC, WARNER-LAMBERT COMPANY,
and WARNER-LAMBERT COMPANY. LLC,

                          Defendants.
------------------------------------------------------------X
SIRS:

        PLEASE TAKE NOTICE, that pursuant to the FRCP 34, defendant,

PFIZER INC., PARKE-DAVIS, a division of Warner-Lambert Company and

Warner-Lambert Company LLC, WARNER-LAMBERT COMPANY, and

WARNER-LAMBERT COMPANY LLC, is hereby demanded to serve within thirty

(30) days the following information and material for discovery and inspection at

the offices of FINKELSTEIN & PARTNERS, LLP, 436 Robinson Avenue,

Newburgh, NY:

**DEFINITIONS**

        1.      When used in these requests, the term "defendant[s]," "you," or

"your," or any synonym thereof, whether singular or plural, is intended to and

shall embrace and include counsel for defendants, all agents, servants,

employees, representatives and others who are in possession of or may have

obtained information for or on behalf of defendants, and shall include all present

and former subsidiaries, divisions, affiliates, and predecessor entities.

2.    The term "Neurontin" refers to gabapentin, marketed as Neurontin by the defendants.

3.    "FDA" means the United States Food & Drug Administration, any committee, subcommittee or advisory committee thereto, and any person, employee or agent acting as a representative thereof.

4.    "Government Regulatory Authority" means any agency, committee, subcommittee or advisory committee of any government other than the United States of America, which bears responsibility or exercises authority over the manufacture, distribution, labeling, sale and/or marketing of pharmaceutical products in any jurisdiction, and any employee or agent acting as a representative thereof.

5.    The terms "adverse effects," "adverse medical events," "adverse events," "adverse reactions," and "product problems" are used interchangeably and refer to both serious and non-serious life threatening events, including, but not limited to, death, hospitalizations, disability, required intervention to prevent permanent impairment or damage, therapeutic failure, drug interactions poor packaging or labeling, suspected contamination, questionable stability and defective components.

6.    As used throughout this Request for Production of Documents, the term "document" or any similar term is used in its broadest possible sense and shall include, but not be limited to any original, reproduction or copy, and non-identical copy (i.e., copy with marginal notes, deletions, etc.) of any kind of written, printed, typed, electronically created or stored, or other graphic matter of

any type, documentary material, or drafts thereof, including, but not limited to, any correspondence, memoranda, interoffice or intra-office communications, notes, diaries, journals, calendars, contract documents, publications, calculations, estimates, vouchers, minutes of meetings, invoices, reports, studies, computer tapes, computer disks, computer cards, computer files, e-mails, photographs, negatives, slides, dictation belts, voice tapes, telegrams, notes of telephone conversations and notes of any oral communications.

## DOCUMENT REQUESTS

1.  Provide documents stating the full business or corporate name of Defendants, any name under which Defendants do business, date and place of incorporation and the complete corporate identity and full name of any division, subsidiary or business affiliated with Defendants which is (was) responsible for the design or marketing of Neurontin.

2.  Provide the identity and title of all persons who participated in the preparation of these responses, excluding counsel.

3.  Provide documents that state the names, NDC codes, name brand or generic identifiers and all dosages of Neurontin formulated and marketed by you and include the dates that the various dosages were marketed and if any dosages have been withdrawn from the market or discontinued, the reasons for withdrawal and the name of the persons responsible for this withdrawal.

4.  Provide a listing of all tests done using Neurontin, in human beings, for any purpose, which were conducted for or under your direction, or reported to you, whether conducted by clinical investigators or others, and include in your answer the name, identifier and date of the test and a description sufficient to distinguish it from all other tests performed.  Include in this answer any research that you have performed or had others perform on the effects on humans from Neurontin, as well as the title or name of such research, the names and addresses of the researchers, the date of the research and provide a copy of any reports or documents in your possession summarizing this research.

5.  Provide a listing of any animal tests performed by you, or on your behalf, on Neurontin, whether done for the purpose of safety testing, efficacy or otherwise, and include in your answer, the name, identifier and date of each test and a description sufficient to distinguish it from all other tests performed.

6.  Provide the name, address and phone number of each individual, group or entity who has expressed any findings, opinions or belief that the labeling, instructions for use, advertising or promotional literature Neurontin was inaccurate, or incomplete in informing or warning the public and the medical profession on potential, severity, scope or frequency of harmful side effects, adverse events,  efficacy or its ability to perform as advertised and promoted.  Provide a copy of any documents associated with these findings or opinions.

7. Provide a copy of all labels and literature accompanying Neurontin upon distribution and sale since its approval.

8. Provide all records of Neurontin sold and/or provided to Plaintiff's treating physician[s].

9. Identify all sales representatives that have called upon or had communication with Plaintiff's treating physician[s].

10. Provide a copy of any correspondence or other documents between Plaintiff's treating physician[s] and defendants since 1993.

11. Provide a listing of all tests that were performed by you to insure the safety and efficacy of Neurontin, and state in detail the tests that were performed and identify all documents pertaining to said tests.

12. Provide the name, address and position of all persons in your employ who had or have as their duty or part of their duties:

- The evaluation or review of evaluation of the safety and efficacy of Neurontin.

- The accumulation of reports of harmful effects and/or adverse events for Neurontin and the tabulation and evaluation thereof;

- Any failures of Neurontin to perform as advertised or promoted;

- The preparation and review of all labels, labeling, advertising and promotional material used by defendant in connection with Neurontin.

13. Describe the method whereby you receive, collate, analyze, report, follow-up, investigate and then disseminate or make available to members of the medical profession reports of precautions, adverse reactions, adverse events and contraindications regarding the use of Neurontin.

14. Provide all Medwatch reports or adverse event reports in your possession with respect to Neurontin.

15. State whether or not any changes have been made in the labels, labeling or other printed matter accompanying Neurontin since its introduction on the market, and if so:

- Explain in detail when and why each change, addition, deletion or alteration was made;
- State who, if anyone, required each such change to be made;
- State the purpose, or intended purpose, to be accomplished by each such change.
- Provide a copy of each label or other printed matter accompanying Neurontin.

16. State whether or not you have ever mailed to physicians a "Dear Doctor" or "Dear Healthcare Professional" letter or warning letter or any type of direct letter to doctors other than promotional pieces, regarding Neurontin, and if so state:

- The dates when each such letter or report was prepared;
- The dates when such letters were mailed;
- The content of such correspondence: and
- The reason for such communication.
- Provide a copy of any such documents mailed since 1983.

17. State whether any representative, employee or person associated with your company has made any statements, reports, recordings, interviews or contacts with the news press or other public broadcasting media pertaining to adverse health indications from the use of Neurontin. If so, please state the following:

- The date of the contact;
- The name, address, telephone number and position of the person from your corporation involved in the contact;
- The name, address and telephone number of the person in the media involved in the contact;
- Whether you are in possession of a copy of the statement, report, interview, news cast, etc.

18. Provide the name and address of any persons with personal knowledge of the matters alleged by the Plaintiff in this proceeding or substantially similar

matters with respect to the use of Neurontin allegedly resulting in suicide attempts and/or suicide.

19.  Provide documentation as to whether Neurontin is or was marketed outside of the United States. If so,  state:

    a.    The location(s) outside of the United States where it was marketed;

    b.    The period of time when each such product was marketed, sold and/or distributed in each such location outside of the United States;

    c.    The indications, contraindications, warnings, and risks reflected in the labeling which accompanied the product when it was marketed in each such location outside of the United States (in English); and

    d.    Whether any foreign government regulatory authority took any action to prohibit or limit the manufacture, sale, distribution or use of Neurontin, identifying the agency involved and the action taken.

19.  Provide all notes, memorandum, reports, minutes or other documents relating to Neurontin from 1983 to the present from the following committees or divisions:

    1.    Research and Development
    2.    Drug Safety and Metabolism
    3.    Clinical Research and Development
    4.    Regulatory Affairs
    5.    Global Regulatory Records
    6.    Labeling
    7.    Global Labeling
    8.    Labeling Executive Committee

9.    Medical Affairs
10.    Global Medical Affairs
11.    WHC Group for Surveillance
12.    Medical Communications
13.    Medical Scientific Liaisons
14.    Post-Approval Surveillance
15.    Global Safety Surveillance and Epidemiology
16.    Marketing
17.    Strategic Marketing
18.    Copy Clearance Committee
19.    Copy Clearance Executive Committee
20.    Market Research
21.    Sales Training and Management Development
22.    Public Relations
23.    Global Strategic Marketing
24.    GAER Division

October 12, 2004

FINKELSTEIN & PARTNERS, LLP

*Eleanor L. Polimeni*

ELEANOR L. POLIMENI, ESQ.
Attorneys for Plaintiff
436 Robinson Avenue
Newburgh, N.Y. 12550

TO: DAVIS POLK & WARDWELL
     Attorneys for Defendants
     450 Lexington Avenue
     New York, NY. 10017

**EXHIBIT C**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------X
                                         :
                                         :
In re NEURONTIN                          :      04 Civ. 6704 (JSR)
                                         :
                                         :
-----------------------------------------X           ORDER

JED S. RAKOFF, U.S.D.J.

     Plaintiffs allege that a series of suicides and attempted
suicides were caused by the defendants' marketing their drug
Neurontin for purposes for which it was not approved (so-called
"off-label" uses) and for which defendants had reason to know it
was not safe.  The Court previously ruled that the defendant drug
companies must produce records of adverse events associated with
the use of this drug.  See Order 2/20/05.  Before the Court now
is plaintiffs' motion to compel production of various databases
related to defendants' sales and marketing efforts and
communications with doctors.  Defendants, while conceding the
discoverability of parts of these databases, seek to limit
discovery to events occurring in 1997 and before.[1]  For the
reasons stated below, the defendants' proposed temporal boundary
is modified and plaintiffs' motion granted, subject to some
limitations.

---

   [1]While defendants' brief is limited to this issue,
plaintiffs' brief argues other points that appear not to be
contested by defendants, in particular that discovery of this
marketing information should not be restricted geographically.
Because it is unclear whether an actual controversy exists in
this regard, this Order does not address any issues beyond the
proposed temporal limitation on discovery.

Much of plaintiffs' complaint[2] consists of generalized allegations that do not refer to specific dates or incidents. However, the complaint does allege specific incidents, all taking place by 1997, of improper marketing of Neurontin for off-label purposes. <u>See</u> Complaint ¶¶ 151-183. It appears that these specific allegations are largely derived from a criminal information to which defendants pleaded guilty on June 7, 2004. <u>See</u> Information, attached to Complaint as Exhibit A; Complaint ¶¶ 117-18. The information contains no allegations subsequent to 1996.

Defendants argue that, because the complaint contains no specific allegations of wrongdoing subsequent to 1997, it need only turn over marketing materials prior to that time. However, the complaint does contain explicit (if generalized) allegations of wrongdoing continuing until at least June 2001. <u>See</u> Complaint ¶ 183. Moreover, plaintiffs' legal theory -- that the suicides and suicide attempts were caused by Neurontin that was prescribed because of defendants' wrongful actions -- implicitly requires that defendants' alleged deceptions, or at least the effects thereof, have continued at least until the last point in time when doctors could have chosen a different course of action had

_____

[2]While this case now covers many plaintiffs, plaintiffs' counsel has filed a virtually identical complaint for each. For convenience, this decision refers to a single "complaint," and paragraph references are to the complaint and answer in <u>Lyman v. Pfizer</u>, the lead case.

2

they been properly informed.  This is particularly true because
defendants have interposed a learned intermediary defense, <u>see</u>
Answer at 19, and thereby have explicitly put at issue the
effects of defendants' marketing efforts on the prescribing
doctors' ability to adequately counsel their patients as to
Neurontin's benefits and risks.

    The fact that in some places the complaint includes more
particularized allegations, mostly taken from the information,
does not render the remainder of the complaint, which the
defendants do not claim fails to satisfy the minimal standards of
notice pleading,[3] insufficiently detailed to obtain discovery of
evidence relevant to the claims and defenses pleaded, <u>see</u> Fed. R.
Civ. P. 26(b)(1).  It does, perhaps, indicate that plaintiffs
have a lesser chance of finding evidence bearing out those
allegations, but this is not a consideration the Court may take
into account in determining whether "the burden or expense of the
proposed discovery outweighs its likely benefit," <u>see</u> Fed R. Civ.
P. 26(b)(2) (court should consider "the needs of the case, the
amount in controversy, the parties' resources, the importance of

     [3]While defendants' brief implies that the lack of
specificity indicates that plaintiffs lack a good-faith basis for
their generalized allegations, <u>see</u> Defendants' Brief at 3
(stating that plaintiffs "allege only generally and without any
factual support that off-label promotion occurred in the years
following 1997"), defendants do not move to strike any portion of
the complaint for this reason or for vagueness, and so the Court
cannot ignore the less specific allegations for these purposes.

3

the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues"). The Court's power to impose limits on discovery of potentially relevant material is meant to prevent parties from using redundant requests to turn discovery into a "war of attrition." Fed. R. Civ. P. 26 advisory committee's note. It is not a license for the Court to "deprive a party of discovery that is reasonably necessary to afford a fair opportunity to develop and prepare the case" because it harbors doubts about that party's ability to find evidence that bears out its allegations. Id.

Accordingly, plaintiffs are permitted to discover evidence of defendants' marketing efforts as of the last day such marketing could be relevant to the claims and defenses pleaded -- i.e., the last Neurontin prescription issued to a plaintiff or plaintiff's decedent in this case. See Incollingo v. Ewing, 282 A.2d 206, 221-23 (Pa. 1971) (upholding introduction of evidence of drug manufacturer's national marketing efforts to show influence on prescribing doctor, but permitting evidence of marketing efforts after the prescription only to show feasibility of warning, not to show negligence).[4] Applying this rule to an

---

[4]Plaintiffs argue that conduct subsequent to the suicides and suicide attempts could be relevant because it furthers plaintiffs' request for punitive damages. Defendants argue that discovery strictly for purposes of punitive damages is limited to a defendant's net worth and finances. The Court need not resolve this issue yet, because for now it finds relatively limited potential use of this material, given the burden on defendants to

4

individual case is simple.  For example, decedent in the lead

case, <u>Lyman v. Pfizer</u>, committed suicide on July 23, 2002.

Complaint ¶ 4.  Because the pleadings provide no further details

as to any dates on which Neurontin was prescribed, if <u>Lyman</u> were

an individual case, the Court would cut off discovery of

marketing efforts at July 23, 2002, the last date at which they

could be relevant.

Complicating matters somewhat is the fact that this case now

includes many plaintiffs with different incident dates.  Because

the cases have been consolidated for all purposes, it would be

pointless as well as impractical to impose separate discovery

cut-off dates.  The Court therefore instructs the parties to

determine the last date on which marketing efforts could be

relevant to any of the cases in this action; that date will be

the latest alleged suicide or suicide attempt, unless there is

evidence that the prescription allegedly leading to that event

---

produce it.  <u>See</u> Affidavit of Laura M. Kibbe, sworn to 4/21/05.
While courts in this circuit usually order punitive-damages
discovery to take place concurrently with liability discovery,
this is not a hard-and-fast rule, and concurrent discovery can be
denied where, as here, the hardship to defendant substantially
outweighs the potential benefit to the plaintiff, at least as
seen from this stage of the case.  <u>See</u> <u>Tu'Shan Hamm v. Potamkin</u>,
1999 U.S. Dist. LEXIS 5948, at *5-*8 (S.D.N.Y. 1999).  Should it
appear as this case progresses that plaintiffs have a substantial
chance to win punitive damages and that this information is
important to such a claim, the Court can order separate discovery
of material specific to punitive damages.  <u>See</u> <u>Davis v. Ross</u>, 107
F.R.D. 326, 327 (S.D.N.Y. 1985).

5

took place significantly earlier.[5]  Such date will be the cut-off
date for discovery of defendants' marketing efforts.  Should the
parties fail to reach agreement on this date, they are instructed
to jointly call chambers immediately for resolution.

    SO ORDERED.

                                                       JED S. RAKOFF, U.S.D.J.

Dated:      New York, New York
            April 25, 2005

---

    [5]If plaintiffs' counsel files additional cases with later
event dates that are consolidated into this action's discovery
schedule, defendants are expected to update any disclosures
already made to conform to such later discovery cut-off dates.
Given this possibility, the parties are encouraged to set a cut-
off date that accommodates any filings plaintiff expects to make
in the near future.

6

# EXHIBIT D



Howard S. Finkelstein, P.C.
Andrew G. Finkelstein, P.C. (NY & NJ)
George M. Levy
Kenneth L. Oliver, P.D.
Joel S. Finkelstein, P.C. (PA, NJ, MA & FL)
Duncan W. Clark
Ronald Rosenkranz
Robert J. Camera (NY & NJ)
Joseph P. Rones (NY & FL)
Steven Lim
George A. Kohl, 2nd (NY & MA)
Eleanor L. Polimeni
Steven H. Cohen
Francis Navarra

Andrew J. Genna (NY & PA)
Thomas C. Yatto
Elyssa M. Fried-DeRosa
Mary Ellen Wright
Kenneth B. Fromson (NY & NJ)
Joel Bossom
Nancy Y. Morgan (NY & PA)
Andrew L. Spitz
James W. Shuttleworth, III
Lawrence D. Lissauer

David E. Gross (NY & NJ)
Bonna L. Horovitz (NY, NJ & MA)
Terry D. Horner

Robert F. Mason
Debra J. Reisenman
Michael T. McGarry
Steven P. Shultz (NY & MA)
Julio E. Urrutia
Victoria Lloß Lightcap (NY & MA)
Ann R. Johnson (NY & CT)
Marshall P. Richer
Thomas J. Pronti
Kristina M. Cahill (NY & CT)
Kara L. Campbell (NY & CT)
Arieh Mazoff
Christopher T. Millman

Silvia Fermanian
Karen M. Creeman (NY & CT)
Marie M. DuSault
Andrew L. Falk

Of Counsel
Jules P. Levine, P.C. (NY & FL)
Michael O. Gittelsohn, P.C.
Joel A. Reback (NY & Israel)
Sheila Rosenrauch
Kenneth G. Bartlett (CT)
Asi Kresch (NY & NJ)

A Limited Liability Partnership

(800) 634-1212
REFER TO OUR FILE #
                200599

April 22, 2005

Mr. James Rouhandeh
Davis Polk & Wardwell
450 Lexington Avenue
New York, N.Y. 10017

     Re: In Re Neurontin
         04-CV-6704

Dear Mr. Rouhandeh:

     Enclosed please find Plaintiffs' Request to Produce in the above-referenced
matter.

                         Very truly yours,

                         FINKELSTEIN & PARTNERS, LLP

                         ELEANOR L. POLIMENI, ESQ.

Encl.

NEWBURGH • ALBANY • SYRACUSE • POUGHKEEPSIE • UTICA • TROY • BINGHAMTON • MIDDLETOWN • NYACK
NEWARK • NEW WINDSOR • GOSHEN • NEW HAVEN • CINCINNATI
Accredited CLE Provider          www.lawampm.com          www.sickligationlaw.com
send ALL correspondence to our operations center: 436 Robinson Avenue, Newburgh, NY 12550 • (800)634-1212 • Fax (845)562-3492

∩-P

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
In re Neurontin

PLAINTIFFS'
REQUEST FOR
PRODUCTION

04-CV-7374 (JSR)

--------------------------------------------------------------x
SIRS:

PLEASE TAKE NOTICE, that pursuant to the FRCP 34, defendant,

PFIZER INC., PARKE-DAVIS, a division of Warner-Lambert Company and

Warner-Lambert Company LLC, WARNER-LAMBERT COMPANY, and

WARNER-LAMBERT COMPANY LLC, is hereby demanded to serve within thirty

(30) days the following information and material, to the extent that same pertains

to discoverable information about Neurontin, for discovery and inspection at

the offices of FINKELSTEIN & PARTNERS, LLP, 436 Robinson Avenue,

Newburgh, NY:

**DEFINITIIONS**

1.    As used throughout this Request for Production of Documents, the

term "document" or any similar term is used in its broadest possible sense and

shall include, but not be limited to any original, reproduction or copy, and

non-identical copy (i.e., copy with marginal notes, deletions, etc.) of any kind of

written, printed, typed, electronically created or stored, or other graphic matter of

any type, documentary material, or drafts thereof, including, but not limited to,

any correspondence, memoranda, interoffice or intra-office communications,

notes, diaries, journals, calendars, contract documents, publications, calculations, estimates, vouchers, minutes of meetings, invoices, reports, studies, computer tapes, computer disks, computer cards, computer files, e-mails, photographs, negatives, slides, dictation belts, voice tapes, telegrams, notes of telephone conversations and notes of any oral communications.

## DOCUMENT REQUESTS

1.   All documents authored by, created by, edited by, received by, reviewed, read, copied on, or in the custodial files of any current or former employee, consultant or agent of Defendants, including all emails and electronic communications relating to Neurontin.  This request specifically requests (but is not limited to) the custodial files for the following individuals:

Repp, Kim
Jankowsklass, Jyoti
Windom, tim
Black, James
Slater, Lee
Bal, Adrian
Reichenburger, Patrick
Rubenstein, Allen
Long, Dave
Renshaw, Maurice
Ek, Carol
Saltel, Doug
Kohler, Nancy
Milke, Margaret
Montgomery, John
Murphy, David
Weiss, Richard
William, Sigmund
Rose-Igatt, Andrea
Gorga, tom
Martin, Tammy
Albright, Tom
Atlas-Yon, Beth

Natallochlo, Terri
Saunders, Bernie
Becker, Bill
Fitzhenry, Paul
Haskins, Bryant

2. To the extent any individual referenced in Request Number 1 is no longer employed by Defendants, provide documents that state the individual's complete name, last known address and telephone number.

3. Documents reflecting "Pfizer's policies and procedures" as described by Suzanne Doft during her examination under oath on March 29, 2005. Your attention is referenced in part to her testimony:

   *Q. Have you seen any other documents, or reviewed any other documents besides that? A. I reviewed Pfizer's policies and procedures. (p.22).*

4. Documents reflecting the full name and last known address of any individuals who have or continue to be members of the "Review Committee" at any time that Pfizer sponsored a promotional talk involving Neurontin. Your attention is referenced to the testimony of Suzanne Doft on March 29, 2005:

   *A. Pfizer – the – the promotional talk is approved by the Review Committee, . . . – Pfizer would author and then approve through Review Committee. (p.125.).*

5. The database that maintains the listing of approved speakers that a respresentative can use for a promotional talk, as described by Suzanne Doft during her examination under oath on March 29, 2005:

> A. For speakers bureau participants, there is an approved database of speakers that a representative can use." (p.127).

6. Documents reflecting the full name and last known address of any individuals who have or continue to be members of the "Grants Review Committee" at any time that Pfizer has approved a grant to be funded for any issues relating to Neurontin. Your attention is referenced to the testimony of Suzanne Doft on March 29, 2005:

> Q. Is there any kind of a CME Review Committee? A. There is a Grants Review Committee.... Q. What is the purpose of that Committee? ... A. They approve whether a grant can be funded or not. (p.138-9).

7. The database known as KOL Connect which keeps track of key opinion leaders, and articles they have written, to the extent that any such information pertains to Neurontin, as identified by Suzanne Doft during her examination under oath on March 29, 2005.

> Q. Do you make use of databases in Marketing? A. I make use of our internal databases. ....A. The one that would think of is something called KOL Connect. A. It keeps track of our key opinion leaders, and articles they have written. (p.174).

8. The IMS data used by the Marketing Analytics Department, to the extent it involves Neurontin, as described by Suzanne Doft during her examination under oath on March 29, 2005.

> *A. Marketing Analytics would use most of our databases to generate data. . . .A. IMS . . . What do they utilize that for? A. To track product, new prescriptions, total prescriptions. (p.174-5).*

9. The sales database known as the "Sherlock System", to the extent it pertains to Neurontin sales, as identified by Suzanne Doft during her examination under oath on March 29, 2005, at page 176.

10. Documents reflecting clinical study funding, if any, pertaining to Neurontin, as described by Suzanne Doft during her examination under oath on March 29, 2005:

> *Q. Is it normal procedure for money from the Marketing budget to be utilized to pay for clinical studies? . . . A. Clinical study funding comes from the Medical budget. (p.185)*

11. Documents reflecting the "processes and procedures book" as described by Suzanne Doft during her examination under oath on March 29, 2005:

> *A. We receive guidelines on the specific FDA regulations. Q. From whom do you receive those guidelines? A. From our processes*

*and procedures book. Q. There's a book that gives or lays out those portions or those parts of the FDA rules and regulations that you feel you need to utilize in the Marketing Department? A. Yes, (p.214-5).*

12. Documents, if any exist, authored by, created by, edited by, received by, reviewed, read, copied on, or in the custodial file of Pfizer spokesman Paul Fitzhenry that formed the basis for his statement published in the U.S.A. Today on April 21, 2005:

*"Pfizer spokesman Paul Fitzhenry says Neurontin adverse event reports over the past decade 'show no link between Neurontin and suicidal thoughts or behavior.'"*

13. Documents, if any exist, authored by, created by, edited by, received by, reviewed, read, copied on, or in the custodial file of Pfizer spokesman, Bryant Haskins that formed the basis for his statement published in the San Francisco Chronicle on on April 21, 2005:

*"Pfizer maintains an extensive program for tracking and reporting medical events associated with the use of Neurontin, as we do for all our medicines.... The comprehensive data --- including clinical trial results--- that we've submitted to the FDA over the past decade refute any suggestion that Neurontin causes depression, suicidal thoughts or suicidal behavior.... Haskins, the company spokesman, said the data don't support Finkelstein's demand for a prominent 'black box' warning on Neurontin's label --the FDA's most stringent enforcement*

action short of banning a drug. 'It's simply irresponsible to promote the false impression that a causal link exists between the use of Neurontin and suicide,' said Haskins.'"

14. Documents, if any, reflecting the subject matter of the consulting assignment for Pfizer performed by Dr. Cynthia McCormick as described in the San Francisco Chronicle on April 21, 2005: "'This is not an unexpected event in the population it was approved for,' said McCormick, who did a brief consulting assignment for Pfizer about a year ago."

April 22, 2005

FINKELSTEIN & PARTNERS, LLP

Kenneth B. Fromson (KF 8086)
Attorneys for Plaintiff
436 Robinson Avenue
Newburgh, N.Y. 12550

TO: DAVIS POLK & WARDWELL
    Attorneys for Defendants
    450 Lexington Avenue
    New York, NY. 10017