# EXHIBIT E

204805

# DAVIS POLK & WARDWELL

450 LEXINGTON AVENUE
NEW YORK, N.Y. 10017
212 450 4000
FAX 212 450 3800

1300 I STREET, N.W.
WASHINGTON, D.C. 20005

1600 EL CAMINO REAL
MENLO PARK, CA 94025

99 GRESHAM STREET
LONDON EC2V 7NG

15, AVENUE MATIGNON
75008 PARIS

MESSETURM
60308 FRANKFURT AM MAIN

MARQUÉS DE LA ENSENADA, 2
28004 MADRID

1-6-1 ROPPONGI
MINATO-KU, TOKYO 106-6033

3A CHATER ROAD
HONG KONG

JAMES P. ROUHANDEH
212 450 4835
james.rouhandeh@dpw.com

May 11, 2005

Re:   **In re Neurontin, 04 CV 6704**

Ronald Rosenkranz, Esq.
Finkelstein & Partners
436 Robinson Avenue
Newburgh, New York 12550

Dear Ron:

As we discussed, I write to memorialize our telephone conversation of May 9, 2005 which followed up on our letters dated April 29 and May 3, 2005 and your letters dated May 3 and May 5, 2005.

- First, the parties agreed that the production of documents from employee and departmental files would commence on May 30, 2005. The parties agreed that the schedule for the production of such documents provided in Judge Rosenwasser's Order dated April 28, 2005, is unmanageable and would not be enforced. Plaintiffs agreed that production would continue on a rolling basis after May 30, and that they would not oppose an application to Judge Rosenwasser with respect to this issue. With respect to the production of such documents, Defendants agreed to withdraw their objection based on geographic scope.

- Second, Defendants agreed to answer Plaintiffs' Interrogatory No. 5 regarding samples.

- Third, Defendants agreed to produce the gabapentin label(s) from the United Kingdom from 2000 onward, as those are accessible and are located in the United States. The parties agreed to confer

Ronald Rosenkranz, Esq.                    2                         May 11, 2005

further with regard to Plaintiff's ability to compel discovery of earlier versions of the label located in the United Kingdom, and Defendants agreed to get back to Plaintiffs regarding the burden in obtaining such documents.

- Fourth, Defendants agreed to produce databases, if any, relating to the visitors speakers bureau.

- Fifth, Defendants agreed to provide dates and names for the remaining 30(b)(6) witnesses so that they can be deposed before July 15, 2005.

- Sixth, instead of producing all MedWatch forms, Defendants agreed to provide six sample MedWatch forms.

- Seventh, Defendants agreed to schedule a "meet and confer" with Laura Kibbe, which has now been set for May 18, 2005 at 2:00 pm.

Please let us know if this does not conform to your understanding of our conversation.

Sincerely yours,

James P. Rouhandeh

By Facsimile and First Class Mail

# EXHIBIT F

# Finkelstein & PARTNERS
*Counselors At Law*

A Limited Liability Partnership

(800) 634-1212
Fax: (845) 562-3492
www.lawampm.com

Howard S. Finkelstein, P.C. (NY)
Andrew G. Finkelstein, P.C. (NY & NJ)
George M. Levy (NY)
Kenneth L. Oliver, P.C. (NY)
Joel S. Finkelstein, P.C. (NY, NJ, MA & FL)
Duncan W. Clark (NY)
Ronald Rosenkranz (NY)
Robert J. Camera (NY & NJ)
Joseph P. Ranes (NY & FL)
Steven Lim (NY)
George A. Kohl, 2nd (NY & MA)
Eleanor L. Polimeni (NY)
Steven H. Cohen (NY)
Francis Navarra (NY)
Andrew J. Genna, LLM (NY & PA)
Thomas C. Yatto (NY)

Elyssa M. Fried-DeRosa (NY)
Mary Ellen Wright (NY)
Kenneth B. Fromson (NY & NJ)
Joel Bossom (NY)
Nancy Y. Morgan (NY, NJ & PA)
Andrew L. Spitz (NY)
James W. Shuttleworth, III (NY)
Lawrence D. Lissauer (NY)
David E. Gross (NY & NJ)
Terry D. Horner (NY)
Robert F. Mason (NY)
Julio E. Urrutia (NY)

Debra J. Reisenman (NY)
Michael T. McGarry (NY)
Steven P. Shultz (NY & MA)

Victoria Lieb Lightcap (NY & MA)
Ann R. Johnson (NY & CT)
Marshall P. Richer (NY)
Thomas J. Pronti (NY)
Kristine M. Cahill (NY & CT)
Kara L. Campbell (NY & CT)
Arieh Mezoff (NY)
Christopher T. Milliman (NY)
Silvia Fermanian (NY)
Edward M. Steves (NY)
Karen M. Queenan (NY & CT)
Marie M. DuSault (NY)
Andrew I. Falk (NY)
Glenn W. Kelleher (NY)
Melody A. Gregory (NY & CT)
Gail Schlanger (NY)

Elizabeth A. Wolff (NY & MA)

Of Counsel
Jules P. Levine, P.C. (NY & FL)
Michael O. Gittelsohn, P.C. (NY)
Joel A. Reback (NY & Israel)
Sheila Rosenzweich (NY)
Kenneth Cohen (NJ)
Cynthia M. Maurer (NY & NJ)
Raye D. Futerfan (NJ)
Frances M. Bova (NY & NJ)
Kenneth G. Bartlett (CT & NJ)
Ari Kresch (NY & MI)
Gustavo W. Alzugaray (NY & NJ)

*Accredited CLE Provider*

REFER TO OUR FILE #: 200599

July 1, 2006

**Kathryn Carney Cole, Esq.**
Davis Polk & Wardwell
450 Lexington Avenue
New York, NY 10017

Re:  Neurontin MDL

Dear Kathryn,

As you know, the parties have been trying to schedule a conference call to discuss many outstanding issues relative to discovery. Unfortunately, conflicting schedules prevented the parties from having a conference this week.  In particular, I think its important that parties confer on the scope of generic discovery that Defendants are willing to provide in this case given the Court's rejection of Defendants' application for a protective order.

Prior to the last conference before Judge Sorokin, Products Liability Plaintiffs proposed template discovery agreements regarding the generic scope of discovery. Defense counsel did not propose a similar document, but rather sought to strike Plaintiffs' document from the docket.  Since that time, the parties have still not conferred on the issue.

The next conference before Judge Sorokin is fast approaching, Defendants have not formally represented that they will honor agreements between the parties in the <u>Young</u> action or from the Southern District of New York. Consequently, I am providing to you formal discovery demands for documents and things in an attempt to narrowly tailor the discovery so that Judge Sorokin can address these issues without any concerns that the parties are arguing over "abstract" issues.

Meanwhile, I look forward to hearing from you as to whether we can confer on Thursday afternoon.

Very truly,

Kenneth B. Fromson

Newburgh • Albany • Binghamton • Goshen • Kingston • Middletown • Monroe • New Windsor • Newark • Poughkeepsie • Spring Valley • Syracuse • Troy • Utica

438 ROBINSON AVENUE
NEWBURGH, NY 12550

50 PARK PLACE, 10th FLOOR
NEWARK, NJ 07102

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE NEURONTIN MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION | )MDL Docket No. 1629 )<br>)<br>)Judge Patti B. Saris )Magistrate Judge Leo T. Sorokin )<br>) |
| THIS DOCUMENT RELATES TO: PRODUCT LIABILITY LITIGATION | )<br>)Civil Action No. 04-10981 )<br>) |

**PRODUCT LIABILITY PLAINTIFFS' REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS TO DEFENDANTS PFIZER, INC., WARNER LAMBERT COMPANY LLC, PARKE-DAVIS, A Division of Warner Lambert Company, and WARNER LAMBERT COMPANY**

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, the Plaintiffs hereby request Defendants Pfizer, Inc and Warner-Lambert Company produce for inspection and copying the documents and materials described below at the offices of Finkelstein & Partners, 436 Robinson Avenue, Newburgh, NY 12550 within thirty days of the date of the service of this request. Plaintiffs further request that such production be made in accordance with the Definitions and Instructions set forth below.

### Definitions and Instructions

#### Definitions

The definitions contained in Rule 26.5 of the Local Rules of the United States District Court for the District of Massachusetts are incorporated herein by reference.

Additionally, the following definitions apply to this Document Request:

"And" includes the word "or" and vice-versa.

"Any" includes the and encompasses "all" and vice-versa.

"Communication" shall include oral, written or electronic communications.

"Defendants" shall mean "Pfizer" and "Warner-Lambert" and any of their predecessors or successors in interest, divisions, offices, subsidiaries, affiliates, and any present or former directors, officers, executives, trustees, employees, agents, attorneys, representatives and any other Person acting or purporting to act on its behalf, including, but not limited to, Parke-Davis.

"Document" shall have the meaning set forth in Rule 34(a) of the Federal Rules of Civil Procedure, and Local Rule 26.5, and includes all forms of writings as defined in Rule 1001(1) of the Federal Rules of Evidence, and includes any reduction to tangible form, whether written, recorded, taped, filmed, videotaped or in computer, digital or magnetic memory or storage, of communication, information, or data, including any graphic matter of any kind or nature, however produced or reproduced, and also includes originals, drafts, and non-identical copies, wherever located. "Document" shall include, but not be limited to, books, contracts, agreements, correspondence, electronic mail (email), computer tapes, discs, magnetic memory, printouts and keypunch cards, memoranda, diaries, notes reports, bulletins, printed forms, telegraphic communications, pleadings and other legal papers, notes, telexes, telegrams, telecopies, facsimile reproductions, or "faxes," factual compilations, data compilations, statistical compilations, plans, diagrams, journals, change orders, studies, surveys, sketches, art work, graphics, checks, ledgers, catalogues, brochures, pamphlets, press releases, advertisements, invoices, minutes, photographs, microfilms, microfiche, films, personnel files, quotes, stenographic notes, computer disks, telephone records, schedules, bids,

voice recordings, and transcriptions. This definition shall apply to all Documents in the possession, custody or control of the Defendants herein, or that of their attorneys, agents, employees, officers, directors, or representatives, irrespective of who generated, prepared or signed the Documents.

Unless otherwise stated, the time period for this Document Request shall be from January 1, 1994 to June 30, 2006. A request to provide documents or materials "at any time" is unlimited in temporal scope.

As used throughout these requests, the term "internal", which will be found preceding the term document(s) correspondence, refers to communications by and between employees, agents or representatives of Defendants.

## REQUESTS

1. Produce the custodial files of the following individuals, to include all documents pertaining to the safety, efficacy, sales and marketing of Neurontin (including emails and electronic communications) authored by, created by, edited by, received by, reviewed, read, or copied on by the following individuals:

      Attias-Yon, Elizabeth
      Batesko, Susan
      Blanckmeister, Carolyn
      Brody, Bob
      Brown, Judy
      Campbell, Michael
      Crespo, Angela
      Dickens, Annette
      Doft Suzanne
      Fannon, Allison
      Fogleman, LeeAnne
      Gasparella, Doreen
      Glanzman, Robert
      Gracon, Stephen
      Hauben, Manfred
      Holley, Preston
      Hylan, Tim

Johansen, Joel
Kerrick-Walker, Jill
Marino, John
Magnus-Miller, Leslie
Pacella, Chris
Panek, Diana
Parsons, Bruce
Patel, Manini
Perlow, Larry
Pomerantz, Steve
Pritts, Jill
Probert, David
Reich, Lester
Rocchi, John
Sigmund, William
Teicher, Martin
Vega, Adrian
Williams, Barbara
Womer, Dan
Yoder, Meg

2. The database that maintains the listing of approved speakers that a representative can use for a promotional talk, as described by Suzanne Doft during her examination under oath on March 29, 2005:

> A. *For speakers bureau participants, there is an approved database of speakers that a representative can use." (p.127).*

4. Documents reflecting Neurontin-related meetings held in all states in the United States and Neurontin-related payments to physicians, institutions, or investigators, including, but not limited to the following: physicians who attended Neurontin meetings, physicians who spoke at speakers' bureau meetings.

5. All documents relating to marketing, sales or prescribing data regarding Neurontin Defendants have received from IMS Health.

6. All documents relating to any review, analysis or critique of data Defendants received from IMS Health relating to Neurontin.

7. The IMS data used by the Marketing Analytics Department, to the extent it involves Neurontin, as described by Suzanne Doft during her examination under oath on March 29, 2005.

*A. Marketing Analytics would use most of our databases to generate data.
. . .A. IMS . . . What do they utilize that for?  A. To track product, new
prescriptions, total prescriptions. (p.174-5).*

8. Documents, if any exist, authored by, created by, edited by, received by,
   reviewed, read, copied on, or in the custodial file of Pfizer spokesman Paul
   Fitzhenry that formed the basis for his statement published in the U.S.A. Today
   on April 21, 2005:

   *"Pfizer spokesman Paul Fitzhenry says Neurontin adverse event reports over the
   past decade 'show no link between Neurontin and suicidal thoughts or
   behavior.'"*

9. Documents, if any exist, authored by, created by, edited by, received by,
   reviewed, read, copied on, or in the custodial file of Pfizer spokesman, Bryant
   Haskins that formed the basis for his statement published in the San Francisco
   Chronicle on April 21, 2005:

   *"'Pfizer maintains an extensive program for tracking and reporting medical
   events associated with the use of Neurontin, as we do for all our medicines.... The
   comprehensive data --- including clinical trial results--- that we've submitted to
   the FDA over the past decade refute any suggestion that Neurontin causes
   depression, suicidal thoughts or suicidal behavior.... Haskins, the company
   spokesman, said the data don't support Finkelstein's demand for a prominent
   'black box' warning on Neurontin's label –the FDA's most stringent enforcement
   action short of banning a drug. 'It's simply irresponsible to promote the false
   impression that a causal link exists between  the use of Neurontin and suicide,'
   said Haskins.'"*

10. Documents, if any, reflecting the subject matter of the consulting assignment for
    Pfizer performed by Dr. Cynthia McCormick as described in the San Francisco
    Chronicle on April 21, 2005:  *"This is not an unexpected event in the population it
    was approved for,' said McCormick, who did a brief consulting assignment for
    Pfizer about a year ago."*

11. Copies of each Label and Summary of Product Characteristics pertaining to
    Defendants' Neurontin in the United Kingdom for each year that Neurontin has
    been approved for distribution in the United Kingdom.

12. Copies of each Label and Summary of Product Characteristics pertaining to
    Defendants' Neurontin in Ireland for each year that Neurontin has been approved
    for distribution in Ireland.

13. Produce all internal documents relating to Neurontin that identify or discuss the
    following language, as set forth in Defendants' labeling or Summary of Product
    Characteristics in Ireland:

*"Patients with epilepsy can be the subject of mood and behavioural disturbances. Such reports have been noted in patients on Neurontin although a causal link has not been established."*

11. Produce all documents pertaining to Neurontin, whether internal or otherwise, that reflect the basis of Defendants' decision to utilize the following language in Defendants' labeling or Summary of Product Characteristics in Ireland:

*"Patients with epilepsy can be the subject of mood and behavioural disturbances. Such reports have been noted in patients on Neurontin although a causal link has not been established."*

12. Produce all internal documents relating to Neurontin that identify or discuss the following language, as set forth in Defendants' labeling or Summary of Product Characteristics in the United Kingdom:

*"Patients taking Neurontin can be the subject of mood and behavioural disturbances. Such reports have been noted in patients on Neurontin although a causal link has not been established. . . . Caution is recommended in patients with a history of psychotic illness. On commencing Neurontin therapy, psychotic episodes have been reported in some patients with, and rarely without, a history of psychotic illness. Most of these events resolved when Neurontin was discontinued or the dosage was reduced."*

13. Produce all documents pertaining to Neurontin, whether internal or otherwise, that reflect the basis of Defendants' decision to utilize the following language in Defendants' labeling or Summary of Product Characteristics in the United Kingdom:

*"Patients taking Neurontin can be the subject of mood and behavioural disturbances. Such reports have been noted in patients on Neurontin although a causal link has not been established. . . . Caution is recommended in patients with a history of psychotic illness. On commencing Neurontin therapy, psychotic episodes have been reported in some patients with, and rarely without, a history of psychotic illness. Most of these events resolved when Neurontin was discontinued or the dosage was reduced."*

14. Produce all internal documents pertaining to Neurontin that identify or discuss whether the United States labeling or package insert should include language, either specifically, or in sum and substance, that caution is recommended in patients with a history of depression or psychotic illness.

15. CMMS Database: Produce an electronic copy of sales tracking data from Defendants' database (with all data inputted pertaining to Neurontin) relating to Defendants' Neurontin from January 1, 1994 through June 30, 2006.

16. All correspondence, e-mails, memorandum, minutes of meetings, documents or materials reflecting contact or communication between any employee or agent of the Defendants pertaining to Neurontin, as to the following:

   a. Teleconferences in which a physician or scientist who was identified by members of the Parke-Davis Department of Medical and Scientific Affairs as being knowledgeable about Neurontin could answer questions regarding Neurontin.

   b. The prohibition by Defendant Parke-Davis of members of the Department of Medical and Scientific Affairs from organizing or participating in group meetings or teleconferences held to respond to questions concerning off-label uses of products marketed by Parke-Davis.

   c. The selection of physicians and scientists who would respond to questions posed by participants.

17. For the time period since Neurontin's introduction to the market through June 30, 2006, Plaintiff requests production (in electronic, searchable format) of information from Defendants' electronic database used by Defendants to collect all information, names, addresses, dates, locations, details, budgets, money spent or other information on any presentation, lecture, continuing medical education program made by any physician on behalf of Defendants or (as a member of Defendants' Speakers Bureau or expert group) regarding Defendants' Neurontin.

18. Based upon Defendants' correspondence to the FDA, Center for Drug Evaluation and Research, dated June 9, 1997, attached hereto as EXHIBIT A, Plaintiff requests the following production with respect to Defendants' Neurontin, and limited to the safety, efficacy, sale and marketing of Neurontin:

   a. All documents produced by Defendants to the FDA referenced in the abovementioned correspondence, dated June 9, 1997;

   b. All documents (including all emails and electronic communications) created by, edited by, received by, reviewed, read, copied on, or in the custodial files of the Area Business Manager (ABM), relating to the implementing of Defendants' sales plan, hiring, training, conducting performance reviews, making salary and promotion recommendations of Defendants' territory managers and sales representatives.

19. With respect to correspondence, dated July 19, 1996, from the FDA Department of Health and Human Services, attached hereto as EXHIBIT B, Plaintiff requests production of the following:

   a. All correspondence, e-mails, memorandum, minutes of meetings, documents or materials reflecting contact or communication between any employee or agent of the Defendants pertaining to Neurontin and the

subject matter set forth in the above referenced correspondence, dated July 19, 1996, from the FDA Department of Health and Human Services, attached hereto as EXHIBIT B.

   b.  All documents submitted to the FDA in response to said correspondence, dated July 19, 1996.

   c.  A copy of all non-privileged drafts of any document submitted to the FDA in response to said correspondence, dated July 19, 1996.

20. With respect to correspondence, dated March 16, 2005, from the FDA Department of Health and Human Services, attached hereto as EXHIBIT C, Plaintiffs request production of the following:

   a.  All correspondence, e-mails, memorandum, minutes of meetings, documents or materials reflecting contact or communication between any employee or agent of the Defendants pertaining to Neurontin and the subject matter set forth in the above referenced correspondence, dated March 16, 2005, from the FDA Department of Health and Human Services, attached hereto as EXHIBIT C.

   b.  All documents submitted to the FDA in response to said correspondence, dated March 16, 2005.

   c.  A copy of all non-privileged drafts of any document submitted to the FDA in response to said correspondence, dated March 16, 2005.

   d.  all documents reflecting research that formed the basis of Defendants' response to the FDA's correspondence.

21. With respect to documents, dated December 21, 2005, submitted by Defendants to the FDA as a "Changes Being Effected" supplemental new drug application, pertaining to Neurontin, in which Defendants' Neurontin label added the terms suicide attempt and suicide in the label section entitled "Other Adverse Events Observed During All Clinical Trials", Plaintiffs request production of the following:

   a.  All correspondence, e-mails, memorandum, minutes of meetings, documents or materials reflecting contact or communication between any employee or agent of the Defendants pertaining to Neurontin and the subject matter set forth in the above referenced documents, dated December 21, 2005.

   b.  All documents submitted to the FDA pertaining to said documents, dated December 21, 2005.

c. A copy of all non-privileged drafts of any document submitted to the FDA pertaining to the above referenced "Changes Being Effected" supplemental new drug application.

d. All documents reflecting research that formed the basis of Defendants' response to the FDA's correspondence.

22. With respect to correspondence, dated May 3, 2006, from the FDA Department of Health and Human Services, attached hereto as EXHIBIT D, Plaintiffs request production of the following:

a. All correspondence, e-mails, memorandum, minutes of meetings, documents or materials reflecting contact or communication between any employee or agent of the Defendants pertaining to Neurontin and the subject matter set forth in the above referenced correspondence, dated May 3, 2006, from the FDA Department of Health and Human Services, attached hereto as EXHIBIT D.

23. Sales Data:  Documents sufficient to identify and reflect gross and net sales information for Defendants' Neurontin,  for each year of sales since entry of Defendants' Neurontin to the market through June 30, 2006.

24. All records, emails, drafts, proposals, databases, and documents of every kind and character regarding clinical trial 945-209, including but not limited to all reports, studies, letters, anecdotes, file reviews, case reviews, retrospective reviews, announcements, solicitations, protocols, budget allocations, invitations to physicians to participate, patient evaluations, tests, measurements, observations, conclusions, articles, publications, drafts, and announcements regarding clinical trial 945-209.

Dated: July 1, 2006

FINKELSTEIN & PARTNERS

By:    /s/Kenneth B. Fromson
       /s/Andrew G. Finkelstein
    Kenneth B. Fromson
    Andrew G. Finkelstein

    436 Robinson Avenue
    Newburgh, NY 12550
    (845) 562-0203

    Attorneys for Product Liability Plaintiffs

By: Electronic Mail and U.S. Mail

Warner-Lambert Company                          Legal Division
201 Tabor Road
Morris Plains, New Jersey 07950
201 540-2000
Fax: 201 540-3927
      201 540-3117

**WARNER
LAMBERT**

June 9, 1997

*Via Federal Express*

Lesley R. Frank, Ph.D., J.D.
Special Assistant to the Director
Division of Drug Marketing, Advertising and Communications
Center for Drug Evaluation and Research
HFD-40, Room 17B-20
5600 Fishers Lane
Rockville, MD  20857

### MACMIS File ID #4162
### NDA-20-235, Neurontin® (gabapentin capsules)

Dear Dr. Frank:

    Enclosed is the sixth and final supplement to Warner-Lambert Company's response to your July 19, 1996 letter regarding the promotion of Neurontin® capsules. In addition, we have attached to this letter Parke-Davis's written responses to the seven questions posed in your July 19, 1996 letter, and to the requests for information included in three of the specifications.

    The enclosed documents have been collected from Morris Plains and the Northcentral and West Customer Business Units. The documents have been stamped on each page (0024927 - 0041830) and are contained in eight boxes.

    For your convenience, the production is organized by specification number taken from your July 19, 1996 letter. The references to specifications in your July 19, 1996 letter may be found in the upper right-hand corner of each redweld. We note that our designation of particular specifications in relation to the enclosed documents is based on our current knowledge; we reserve the right to revise those designations if we subsequently determine them to be incorrect. In addition, we note that some documents may relate to more than one specification; in those cases, we have produced one copy of the relevant document.

sk11k408.doc

X022545

Please note that the enclosed documents and information, and all other documents or information produced or to be produced in response to the July 19, 1996 request, constitute trade secrets and/or confidential or other proprietary information exempt from disclosure under 21 C.F.R. § 20.61. Should the Agency determine that any document (or any portion of any document) produced herewith is or may be disclosable in response to a request under the Freedom of Information Act, we request an opportunity for prior consultation in accordance with 21 C.F.R. § 20.45. Please also note that the production of these or any other documents or information is not an admission that such documents reflect the promotion of Neurontin for off-label uses or that such documents are responsive to any particular specification in your July 19, 1996 letter.

If you have any follow-up questions regarding this matter, please call me at 201-540-3299.

Sincerely,

Stuart Kolinski

SAK:js
Enc.

cc: D. Long
    J. Haggerty

sk11k408.doc

X022546

WARNER-LAMBERT COMPANY RESPONSES TO QUESTIONS 1 - 7
AND SPECIFICATIONS 12, 13 AND 14

### Questions 1 and 2

In Questions 1 and 2, FDA inquired about clinical trials involving the effect of Neurontin® on pain, pain syndromes and psychiatric disorders. Since the development of gabapentin, the active drug substance in Neurontin, this drug has been the subject of numerous clinical research trials and studies. Warner-Lambert Company has conducted and/or sponsored a number of these research projects. Exhibit A, attached hereto, is a list of Neurontin studies relating to pain, pain syndromes and psychiatric disorders that Warner-Lambert Company has funded or sponsored, together with the investigators involved in such studies. Documents relating to such clinical research trials and studies have been produced by the Company in response to Specification No. 17.

### Question 3

In Question 3, FDA inquired about the functions of an "ABM." An Area Business Manager, or ABM, is a member of the Parke-Davis sales force, and is responsible for implementing the Company's sales plan for a specific geographical district within a Parke-Davis Customer Business Unit ("CBU"). The Company has five CBU's divided by geographic regions in the United States. In addition, there are two national CBU's covering managed healthcare and women's healthcare. An ABM is responsible for, among other things, managing and supervising the Territory Managers (sales representatives) in his or her area, which includes hiring, training, conducting performance reviews, and making salary and promotion recommendations.

### Questions 4 and 5

In Questions 4 and 5, FDA requested information about teleconferences involving Neurontin, specifically relating to the "moderators," participants, and the design and format of the teleconferences. Teleconferences were organized by employees of Parke-Davis in response to the large number of unsolicited questions asked by physicians and other health care providers about off-label uses of Neurontin. Consistent with the introduction of some anti-convulsants introduced by other companies, anecdotal evidence of the use of Neurontin for treatment of disorders and conditions other than as an adjunct treatment for epilepsy had begun to circulate widely among the medical and scientific community soon after the drug's approval. The

X022547

resulting volume of inquiries relating to Neurontin imposed a greater burden than expected on the Parke-Davis Department of Medical and Scientific Affairs, the department responsible for responding to off-label inquiries about Parke-Davis products. At the same time, physicians and scientists had begun contacting Parke-Davis to relate their experiences with Neurontin, which led to exchanges of information with some of these physicians and scientists. Thus, Parke-Davis employees organized teleconferences as a way to answer the large number of unsolicited questions of the medical and scientific community more efficiently than in one-to-one communications, and to allow the physicians and scientists with the actual experience with Neurontin to answer those questions directly.

Parke-Davis employees were involved in scheduling these teleconferences, which included coordinating the teleconference with a physician or scientist who was identified by members of the Parke-Davis Department of Medical and Scientific Affairs as being knowledgeable about Neurontin and who could answer the questions asked by the participants. These employees were also often involved in retaining a provider of teleconferencing services to handle the logistical details.

The format of these teleconferences typically was as follows: a Company representative, often from the Department of Medical and Scientific Affairs, would introduce an independent physician or scientist knowledgeable about Neurontin, who would address the questions that had been posed by participants through a brief presentation at the beginning of the teleconference. The participants could then ask the Company representative or presenting physician or scientist follow-up questions as desired.

For business reasons, the Company now prohibits members of the Department of Medical and Scientific Affairs from organizing or participating in group meetings or teleconferences held to respond to questions concerning off-label uses of products marketed by Parke-Davis.

Additional information in response to Questions 4 and 5 is included in documents submitted in response to Specifications 9, 10 and 15. These include documents that relate to teleconferences generally, teleconference moderators and participants, and the interaction between the participants and members of the Company's sales force.

Question 6

In Question 6, FDA requested information specifically about the "selection" of teleconference moderators and participants. Teleconference moderators (those persons who responded to the questions by the participants) typically were selected from among the physicians and scientists who had contacted Parke-Davis to relate their experience with Neurontin, or who were recognized by the Company as experienced and highly respected in the medical and scientific community.

X022548

The participants in the teleconferences were physicians and other health care providers who had posed questions about the use of Neurontin to one or more Parke-Davis employees, including Territory Managers and other members of the sales force, and/or members of the Department of Medical and Scientific Affairs. As stated above, the purpose of the teleconferences was to provide answers to unsolicited questions about Neurontin that had already been asked by physicians and other health care providers.

Additional information in response to Question 6 is included in documents submitted to FDA in response to Specifications 9, 10 and 15.

Question 7

In Question 7, FDA requested information about how participants were notified about the teleconferences, or how the teleconferences were otherwise "publicized." Physicians or health care providers who had asked questions about Neurontin were generally notified of the existence of teleconferences by either Territory Managers or members of the Department of Medical and Scientific Affairs.

FDA also inquired about the provision of food, gifts or other forms of remuneration to participants in teleconferences. The Company prohibited employees from providing gifts, compensation, or other forms of remuneration to participants in any teleconference. Occasionally, lunch was provided to teleconference participants.

Finally, with respect to FDA's questions about compensation for teleconference moderators, the physicians or scientists who made presentations and answered questions regarding Neurontin in such teleconferences were paid approximately $250 to $500 per teleconference.

Additional information in response to Question 7 is included in documents submitted to FDA in response to Specifications 9, 10 and 15.

Specifications 12, 13 and 14

In Specifications 12 and 13, FDA requested information about a number of individuals. We note as an initial matter that three of the individuals are employees of the Company. LeeAnne Fogleman is employed by Parke-Davis as a Medical Liaison within the Department of Medical and Scientific Affairs, assigned to the Southeast CBU. Barbara Williams is employed by Parke-Davis as the Business Director for the Southeast CBU. At the time of your inquiry, Elizabeth Attias-Yon was employed by Parke-Davis as an Associate Director of Medical Affairs within the Department of Medical and Scientific Affairs, assigned to the Southeast CBU.

sk11k408.doc

X022549

Apart from these three Parke-Davis employees, all of the remaining individuals referenced in Specification No. 12 are independent physicians and/or scientists who have been retained by Parke-Davis in one or more of the following capacities: (1) as members of the Company's Speakers Bureau, retained to speak about their on-label experiences with Neurontin; (2) as teleconference moderators discussing Neurontin with physicians or other health care providers via teleconferences organized by employees of Parke-Davis; and/or (3) as consultants on advisory boards relating to Neurontin. In addition, six of these individuals have received grants from Parke-Davis to conduct clinical research studies relating to Neurontin -- Drs. Longmire, Jackson, Marcotte, Mann, Cochran and Hansen.

Additional information relating to these individuals can be found in the documents produced by Parke-Davis in response to Specification Nos. 9, 10, 13, 15 and 17.

Finally, in Specification No. 14, FDA requested information about "Intercall." Intercall is a dial-in telephone conferencing service that was hired by the Southeast CBU and other CBUs as an independent contractor to provide facilities for teleconferences relating to Neurontin and other Parke-Davis products. Intercall's role was limited to the provision of such teleconferencing services, and Intercall itself played no role in the dissemination of information regarding Neurontin. Parke-Davis has produced documents relating to Intercall in its response to FDA's July 19, 1996 letter.

sk11k408.doc

X022550

EXHIBIT A

NEURONTIN STUDIES

| Subject Matter | Investigator(s) | |
|---|---|---|
| "Placebo-Controlled Trial of Gabapentin in Social Phobia" | John Greist<br>James Jefferson<br>Dean Foundation for Health,<br>   Research & Education<br>Middleton WI | Jonathan Davidson<br>Duke Univ. Medical Center<br>Durham NC |
| "Placebo-Controlled Trial of Gabapentin in Patients with Panic Disorder" | Thomas Shiovitz<br>Neal Cutler<br>California Clinical Trials<br>Beverly Hills CA<br><br>Stephen Dager<br>David Dunner<br>Univ. of Washington Medical Center<br>Seattle WA<br><br>Bruce Lydiard<br>Clinical Research Section<br>Charleston SC | Barr Taylor<br>Stanford School of Medicine<br>Stanford CA<br><br>Guy Chouinard<br>Centre de Recherch Fernand-eguin<br>Monetreal, (Quebec) Canada<br><br>Mark Pollack<br>Massachusetts General Hospital<br>Boston MA |
| "Gabapentin Adjunctive Treatment in Patients with Bipolar Disorder"<br>(involving patients with bipolar disorder who are experiencing manic/hypomanic symptoms in spite of treatment with lithium or valproate) | Lori Alshuler<br>VAMC-W.Los Angeles<br>Los Angeles CA<br><br>Gary Kaplan<br>Providence VA Medical Center<br>Providence RI<br><br>Charles Bowden<br>Univ. of Texas Health Science Center<br>San Antonia TX<br><br>Bruce Lydiard<br>Clinical Research Section<br>Charleston SC<br><br>Joseph Calabrese<br>Mood Disorder Program<br>Cleveland OH<br><br>David Dunner<br>Helen Hendrickson<br>Univ. of Washington Medical Center<br>Seattle WA<br><br>Laszlo Gyulai<br>Univ. of Pennsylvania<br>Philadelphia PA | Susan McElroy<br>Paul Keck<br>College of Medicine<br>Cincinnati OH<br><br>Terry Ketter<br>Stanford School of Medicine<br>Stanford CA<br><br>Gary Sachs<br>Massachusetts General Hospital<br>Boston MA<br><br>Patricia Suppes<br>UT Southwestern Medical Center<br>Dallas TX<br><br>Carlos Zarate<br>McLean Hospital<br>Belmont MA<br><br>John Zajecka<br>Woman's Board Depression<br>Treatment and<br>   Research Center<br>Chicago IL |

X022551

| Subject Matter | Investigator(s) | |
|---|---|---|
| | Robert Hirschfeld<br>University of Texas Medical Center<br>Galveston TX | |
| "Double-Blind, Placebo-Controlled Trial of Gabapentin for the Treatment of Painful Diabetic Peripheral Neuropathy" | John Arnett<br>Universtiy of Manitoba<br>Winnipeg, (Manitoba) Canada | John Douglas Mann<br>Univ. of North Carolina<br>Chapel Hill, NC |
| | David Bell<br>Univ. of Alabama - Birmingham<br>Birmingham AL | Michael Merchut<br>Loyola Univ. Chicago<br>Maywood IL |
| | Amhad Beydoun<br>Univ. of Michigan Medical Center<br>Ann Arbor, MI | Pauline Newlon<br>Dr. Vinik<br>Eastern Virginia Medical School<br>Norfolk VA |
| | Enrique Carrazana<br>Joslin Diabetes Clinic<br>Miami FL | Michael Pfiefer<br>Southern Illinois Univ.<br>Springfield IL |
| | David DePaolo<br>Dr. Sterjholm<br>Boulder Clinical Research<br>Boulder CO | Neelan Pillay<br>MS-793 Health Sciences Centre<br>Winnipeg, (Manitoba) Canada |
| | Keith Edwards<br>Neurological Consultants<br>Bennington VT | Ron Prigeon<br>Dr. Porte<br>VA Medical Center (151)<br>Seattle WA |
| | Jerome Fischer<br>Dr. Schwartz<br>Diabetes and Glandular Disease Clinic, PA<br>San Antonio TX | Julio Rosenstock<br>Dallas Diabetes and Endocrinology Center<br>Dallas TX |
| | Jeffrey Fitzthum<br>Dr. Backonja<br>Univ. of Wisconsin<br>Madison WI | John Smith<br>Mayo Laboratories<br>Rochester MN |
| | Vivian Fonseca<br>Univ. of Arkansas for Medical Sciences<br>Little Rock, AK | Donald Studney<br>University of British Columbia<br>VHHSC<br>Vancouver, (British Columbia) Canada |
| | Richard Guthrie<br>Ochsner Clinic<br>New Orleans, Louisiana | Peter Svensson<br>Dr. Casey<br>VAMC Ann Arbor<br>Ann Arbor MI |
| | Bruce Henson<br>Research Medical Center<br>Kansas City MO | Albert Tahmoush<br>Thomas Jefferson University<br>Philadelphia PA |
| | Jonathan Jaspan<br>Tulane Univ. Medical Center<br>New Orleans LA | |

ak11k424.doc

2

X022552

| Subject Matter | Investigator(s) | |
|---|---|---|
| "Double-Blind, Randomized, Placebo-Controlled, Parallel Groups, Multi-Center Trial to determine the efficacy and safety of Neurontin (gabapentin) in subjects with Peripheral Neuropathy (Post-Herpetic Neuralgia)" | Daniel Carr<br>New England Medical Center<br>Boston MA<br><br>Michael de Rosayro<br>Univ. of Michigan<br>Ann Arbor MI<br><br>Edwin Dunteman<br>Washington Univ.<br>St. Louis MO<br><br>Norman Harden<br>Rehabilitation Institute of Chicago<br>Chicago IL<br><br>John Douglas Mann<br>Univ. of North Carolina<br>Chapel Hill NC<br><br>Eugenie Obbens<br>Barrow Neurological Institute<br>Phoenix AZ | Elyse Singer<br>UCLA School of Medicine<br>Los Angeles CA<br><br>Gary Paul Thomas<br>Dr. Kreitzer<br>Mount Sinai Hospital<br>New York NY<br><br>Kyle Tipton<br>Dr. Stacey<br>Univ. of Pittsburgh<br>Pittsburgh PA<br><br>Maureen Wooten<br>Dr. Stewart<br>Neurology Specialists of Dallas<br>Dallas TX<br><br>Jerome Yokiel<br>Dr. Ross<br>Meridia Center for Rehabilitation<br>Warrensville Heights OH |
| "Double-Blind, Randomized, Placebo-Controlled, Multi-Center Trial to determine the efficacy and safety of Neurontin (gabapentin) in Migraine Prophylaxis" | James Couch<br>OUHSC<br>Oklahoma City OK<br><br>Jerome Goldstein<br>Brad Wrubel<br>San Francisco Headache Clinic<br>San Francisco CA<br><br>Barry Hendin<br>Phoenix Neurological Associates, LTD<br>Phoenix AZ<br><br>David Kudrow<br>California Medical Clinic for Headache<br>Encino CA | Larry Newman<br>Montefiore Headache Unit<br>Albert Einstein College of Medicine<br>Bronx NY<br><br>Carl Sadowski<br>Palm Beach Neurological Group<br>West Palm Beach FL<br><br>Stephen Silberstein<br>Germantown Neurology Associates<br>Philadelphia PA<br><br>Glen Solomon<br>Cleveland Clinic Foundation, A50<br>Cleveland OH |
| "Double-Blind, Randomized, Placebo-Controlled, Multi-Center Trial to determine the efficacy and safety of Neurontin (gabapentin) in Migraine Prophylaxis administered in doses divided three times a day (TID)" | Jack Klapper<br>Colorado Neurologic Headache Ctr.<br>Denver CO<br><br>Ninan Mathew<br>Houston Headache Clinic<br>Houston TX<br><br>Nabah Ramadan<br>Cincinnati H/A Center<br>Dept. of Neurology<br>Cincinnati OH | Alan Rapoport<br>New England Headache Center<br>Stamford CT<br><br>Joel Saper<br>Michigan Head Pain & Neuologic Institute<br>Ann Arbor MI<br><br>Brett Stacey<br>Oregon Health Sciences University<br>Portland OR |

X022553

| Subject Matter | Investigator(s) |
|---|---|
|  | Stewart Tepper<br>Polyclinic<br>Seattle WA |
| "Prospective evaluation of gabapentin (Neurontin) in the treatment of painful diabetic polyneuropathy." | Ken Gorson<br>Allan Ropper<br>St. Elizabeth's Medical Center of Boston<br>Boston MA |
| "A Randomized, Double-Blind, Placebo Controlled Study to Evaluate the Use of Neurontin (gabapentin) for Neurologic Pain in Multiple Sclerosis" | Joseph Herbert<br>Orthopaedic Institute<br>New York NY |
| "The Safety and Efficacy of Neurontin (gabapentin) in Treating Agitation Associated with Dementia" | Todd Feinberg<br>David Roane<br>Beth Israel Medical Center<br>New York NY |
| "A randomized controlled pilot study of gabapentin (Neurontin) in subjects with periodic limb movement disorder." | Bruce Ehrenberg<br>Anita Wagner<br>Kate Corbett<br>William Rogers<br>New England Medical Center<br>Boston MA |
| "Evaluation of the efficacy of Neurontin in the Treatment of Essential Tremor" | Joseph Jankovic<br>William Ondo<br>Baylor Univ.<br>Houston TX |
| "Evaluation of the efficacy of Neurontin in the treatment of Restless Leg Syndrome and Periodic Limb Movements" | Stephen Duntley<br>Washington University<br>St. Louis MO |
| "Gabapentin in Painful Muscle Spasms" | Martin Childers<br>Univ. of Missouri - Columbia<br>Columbia MO |
| "Efficacy of Gapapentin on Human Experimental Pain Models in Normal Subjects" | Amhad Beydoun<br>Univ. of Michigan Medical Center<br>Ann Arbor, MI |
| "Adjunctive Treament for Bipolar Disorder: An Open Study with Gabapentin"<br>(UNDER DISCUSSION) | Nassir Ghaemi<br>George Washington Univ.<br>Washington DC |
| "Neurontin in Treament of Alzheimer's, Organic Brain syndrome and Head Injury: A Retrospective Review"<br>(UNDER DISCUSSION) | Ralph Ryback<br>Assoc. Mental Health Professionals, Inc.<br>Gaithersburg MD |
| "Use of Gabapetin for Symptom Control in Children with Attention Deficit Hyperactivity Disorder - A Pilot Study" | Jack Pellock<br>Medical College of Virginia<br>Richmond VA |
| "Neurontin in Diabetic Neuropathy" | Karen Parks<br>Georgetown Univ. Medical Center<br>Washington DC |
| "Effects of Gabapentin on Periodic Limb Movements"<br>(UNDER DISCUSSION) | Leslie Williams<br>Alexandria VA |
| "Neurontin in Reflex Sympathetic Dystrophy" | Mandeep Powar<br>Loyola Univ.<br>Maywood IL |

X022554

| Subject Matter | Investigator(s) |
|---|---|
| "Neurontin in Restless Legs Syndrome" | Stephen Duntley<br>Washington Univ. Medical School<br>St. Louis MO |
| "A Blinded, Randomized Trial to Evaluate the Efficacy of Gabapentin Versus Ibuprofen in Patients with Chronic Pelvic Pain"<br>**(UNDER DISCUSSION)** | Randall Hines<br>The Univ. of Mississippi Medical Center<br>Jackson MS |

X022555

3

DEFINITION 4:    Neurontin means the prescription drug product having the established name "gabapentin," that is the subject of New Drug Application No. 20-235 and is manufactured and/or sold by the Company.

DEFINITION 5:    The term "employee" means each officer, director, agent, and every person employed by the Company, and each and every person performing services for the Company in exchange for consideration of any type.

DEFINITION 6:    "Grant" means the funding provided to any person or organization for research, educational, promotional, or other activities.

INSTRUCTIONS

INSTRUCTION 1:    Unless otherwise specified, this request calls for the submission of documents dated, generated, or received, or if a contract or agreement, in effect, at any time from December 30, 1993 until the date of final response to this request.

INSTRUCTION 2:    Each document that is responsive to this request should be produced in its entirety, including all attachments, even if only a portion of the document is related to the specified subject matter. This means that an uncut, unexpunged and unedited copy of a responsive document should be submitted, including all appendices, tables, or other attachments. If an appendix, table or other attachment is not presented with the original, but is attached to a copy thereof or is otherwise available, it should be submitted and clearly marked to indicate the document to which it corresponds. No document or portion thereof should be masked, redacted, or deleted in any manner.

INSTRUCTION 3:    This request calls for all responsive documents in the possession, custody, or control of the Company including, without limitation, those documents held by any of the officers, directors, employees, agents, or representatives of the Company, whether or not such documents are on the premises of the Company. If any such person is unwilling to have his or her files reviewed or is unwilling to produce responsive documents, the Company should provide the following with respect to each and every such person: his or her name, address, telephone number, and relationship to the Company, and each document which the Company believes may be in such person's possession, custody or control.

INSTRUCTION 4:    If documents responsive to a particular specification no longer exist, but are known or believed to have been in existence, state the circumstances under which they were lost or destroyed or the circumstances due to which they



DEPARTMENT OF HEALTH & HUMAN SERVICES                  Public Health Service

Food and Drug Administration
Rockville MD 20857

RECEIVED
JUL 22 1996
WORLDWIDE REGULATORY AFFAIRS

JUL 19 1996

DO NOT COPY

bcc:    Addressee
        I. Martin
        R. Moffitt (Central File & CBI)

TRANSMITTED VIA FACSIMILE

William M. Merino, Ph.D.
Senior Vice President
Worldwide Regulatory Affairs
Parke-Davis
2800 Plymouth Road
Ann Arbor, MI 48105

Re:    NDA 20-235
       Neurontin (gabapentin capsules)
       MACMIS File ID# 4162

Dear Dr. Merino:

The Food and Drug Administration ("FDA") is concerned that Parke-Davis may be promoting Neurontin for "off-label" uses, i.e., any use beyond the FDA-approved indications, in printed promotional materials, in detail or sales presentations to physicians, and through the use of company-solicited physician participation in a series of teleconferences. FDA is initiating an inquiry that will focus on these concerns. These promotions of Neurontin for off-label uses include, but are not limited to, its use in chronic pain, bipolar disorders, and other psychiatric conditions. As you are aware, Neurontin's only approved indication is as adjunctive therapy in the treatment of partial seizures with and without secondary generalization in adults with epilepsy.

The purpose of this letter is to request Parke-Davis' cooperation in this inquiry and to request that it voluntarily answer the questions posed below and submit the documents described below:

2

## REQUESTS

FDA has tried to make its request sufficiently comprehensive without being unduly burdensome. However, the request should not be considered all-inclusive. As in any inquiry, it is possible that FDA will find it necessary to seek access to additional records or pursue additional lines of inquiry.

FDA asks that you carefully follow the definitions, instructions, and specifications below:

### DEFINITIONS

The following definitions are not intended to apply generally. They are specific to the purposes of this inquiry.

DEFINITION 1:    "Company" means Parke-Davis, as well as its directors, officers, employees, agents and representatives, its parents, predecessors, divisions, subsidiaries, affiliates, partnerships and joint ventures. The words "subsidiary," "affiliate" and "joint venture" refer to each firm in which there is partial (10 percent or more) as well as total ownership or control between corporations.

DEFINITION 2:    The term "person" means any natural person, governmental entity, corporate entity, partnership, association, joint venture, trust, or other corporation, whether organized for profit or not.

DEFINITION 3:    The term "documents" means all written, printed, recorded, or graphic materials of every kind, prepared by any person, including, but not limited to, letters, telegrams, telexes, memoranda, reports, published articles, unpublished articles, newsletters, group mailings, educational materials, contracts, studies, plans, calendar or diary entries, minutes, pamphlets, "sales aids," typed or handwritten notes, charts, tabulations, records of meetings, conferences, peer influence dinners or other peer influence meetings, and telephone or other conversations or communications, as well as film, audio and video tapes, or slides and all other data compilations in the possession, custody, or control of the Company. The phrase "other data compilations" includes, but is not limited to, information stored in, or accessible through, computer or other information retrieval systems, together with instructions and all other material necessary to use or interpret such data compilations. The term "documents" includes all non-identical copies of each document, including copies upon which notes have been made and drafts, even if the originals are not in your possession, custody or control.

4

are otherwise no longer in existence, and identify and provide a summary of all such documents to the fullest extent possible. For each document, also provide the approximate date of its loss or destruction and identify all persons having knowledge of the contents of each such document.

**INSTRUCTION 5:**   The response to each specification should be identified by number and segregated from responses to other specifications. Each page or sheet produced should be marked in a corner with identification and consecutive document control numbers, with the exception of bound pamphlets or books, which may be marked with a single control number.

**INSTRUCTION 6:**   Identify the person(s) responsible for preparing, reviewing, revising or approving the response to this request, describe the role, authority and activities of such person(s) with respect to such response, and submit a copy of all instructions prepared by the Company relating to the steps taken to respond to this request. Where oral instructions were given, provide a verified statement from the person who gave such instructions, detailing the content of the instructions and the person(s) to whom the instructions were given.

**INSTRUCTION 7:**   FDA requests that the Company voluntarily provide all responsive documents. In the event the Company declines to provide any specific document or group of documents, for each such document or group of documents the Company should provide a brief description of the contents of the document(s), and a statement of the reason for withholding the document(s).

**SPECIFICATIONS**

In accordance with the definitions and instructions above, please submit the documents described in the following specifications:

**SPECIFICATION 1:**      Documents sufficient to show the Company's document retention policy or policies.

**SPECIFICATION 2:**      Documents sufficient to show the organizational structure of the Company, including organizational charts.

**SPECIFICATION 3:**      All documents related to the training or instructions to employee detail representatives, (including any contract detail representatives), territory managers and ABMs or any other agents regarding promotional activities, educational activities or informational activities concerning Neurontin for any use other than as an adjunctive therapy in adults with epilepsy.

5

SPECIFICATION 4:       All documents related to any contractual relationship between the Company and any other entity that is responsible for the distribution and/or promotion of Neurontin and all communications pursuant to such relationships. .

SPECIFICATION 5:       All documents in the possession, custody or control of any employee or agent of the Company that relates in any way to the promotion, marketing and/or public relations activities, responses to requests for information, or teleconferences on the subject of or otherwise concerning off-label use(s) for Neurontin. Your response should include, but is not limited to, all marketing plans and strategy documents; communications from the Vice President for Marketing and/or Sales to Field Managers or Representatives; and field visit follow-up memoranda from either the Vice President for Sales and/or Marketing, the Regional Managers, and/or the District Managers.

SPECIFICATION 6:       Documents sufficient to show the identity of each of the Company's Product Managers with any responsibilities related to Neurontin, and the specific responsibilities of each such Product Manager.

SPECIFICATION 7:       Documents sufficient to show the identity of each and every employee or agent of the Company involved in planning and/or implementing marketing, public relations, sales, or any other promotional, educational or informational programs or activities related to the use of Neurontin, and the name of and type of activity or program involved.

SPECIFICATION 8:       Documents sufficient to show the identity, address and business position (title) of each and every Company district, regional, branch, or area manager or supervisor responsible for the supervision and/or training of employees engaged in the promotion of Neurontin.

SPECIFICATION 9:       All records, slides, prepared scripts, handouts, "sales aids," and any other documents (including audiotapes) that relate in any way to the Company's participation in any and all scientific meetings -- including teleconferences -- where Neurontin was promoted or discussed.

SPECIFICATION 10:       All records, information, "sales aids," audiotapes, prepared scripts or agendas or outlines, or handouts that relate in any way to participation in teleconferences with physicians or other healthcare practitioners during which Neurontin was promoted or discussed.

SPECIFICATION 11:       Documents sufficient to show the identity and address of each healthcare professional known to have received copies of promotional or educational materials on off-label uses for Neurontin from the Company or who

6

participated in teleconferences that discussed off-label uses of Neurontin, the dates of participation in any of said teleconferences, the discussion topics of said teleconferences, and copies of the healthcare professional's dated requests for such information. You are also requested to provide labeled copies of the audiotapes of said teleconferences.

SPECIFICATION 12:    Documents sufficient to identify the following persons (explaining their respective titles, responsibilities and relationships vis-a-vis Parke-Davis in the context of the drug Neurontin (e.g., employee, independent contractor, clinical investigator, grantee, recipient of funds, compensated spokesperson, conference call moderator, etc.)): LeeAnne Fogleman, Barbara Williams, Beth Attias-Yon, David Longmire, M.D., David Meyer, M.D., Travis Jackson, M.D., Jeffrey Gelblum, M.D., David Marcotte, M.D., Gary Mellick, D.O., Micheal McLean, M.D., Ph.D., Douglas Mann, M.D., Dr. Cochran, Dr. Hansen, and Dr. Stein.

SPECIFICATION 13:    With respect to each of the individuals identified in Specification 12, identify and describe any contracts, grants, or other arrangements between the Company and such individual, at any time during the past three years; describe fully the nature of such arrangement; identify any payments, grants, honoraria, gratuities, compensation, bonuses, awards, or other items of value provided by the Company to such individual during the past three years, and all research or other services provided by such individual for, on behalf of, or to the Company; and provide all documents memorializing or relating to any such agreement, payment or services.

SPECIFICATION 14:    Documents sufficient to show who or what is "Intercall," Intercall's relationship with the Company and Intercall's relationship with the marketing, public relations, sales, or any other promotional or educational programs or activities related to the use of Neurontin.

SPECIFICATION 15:    All documents pertaining to the recruitment of conference call moderators and investigators for clinical studies for off-label uses of Neurontin, including symposia or teleconferences, and a comprehensive listing of any and all support provided to these persons. For each document responsive to this request that is a publication sponsored (in any manner) by the Company, your response should include a detailed statement defining the relationship between the authors, editors and the Company.

SPECIFICATION 16:    All documents and information, including articles and other publications, that have been authored or edited by any person affiliated with or sponsored by the Company that discuss any off-label use(s) for Neurontin. These documents would include, but are not limited to, newsletters, sole sponsored

7

journals, educational materials, data derived from "peer influence dinners" or other peer influence meetings, and physician programs -- including teleconferences.

SPECIFICATION 17:    All documents related to the Company's policy regarding the issuing of any and all types of grants (including, but not limited to, unrestricted educational grants), funding for post-approval research, funding for any type of foundation or research center, or any other similar program. Your response should include, but is not limited to, a comprehensive and complete listing of all grants or post-approval research funding that have been issued relating in any way to Neurontin. The listing should include the name of the recipient, the address of the recipient, the name of the person approving the grant, the date of the award, the amount of the award and a summary of the project or endeavor including any actual and/or anticipated outcome.

SPECIFICATION 18:    All documents to, from, or between the Company and any health care practitioner, including any clinical investigator, regarding off-label use(s) of Neurontin. Your response should include, but is not limited to, any documents related to any on-going investigation, study or other mechanisms that may be employed to track or influence the utilization of the product(s).

QUESTIONS

1.    Is the Company currently aware of, involved with or currently sponsoring any clinical trial(s) involving the administration of Neurontin in patients suffering from: cervical pain, trigeminal neuralgia, epilepsy with co-morbid pain syndromes, bipolar disorder or other psychiatric conditions, reflex sympathetic dystrophy ("RSD"), diabetic neuropathy, or various other neuropathic pain syndromes?

2.    If the Company's response to question one is affirmative, please identify the trial(s) and investigator(s), describe the Company's involvement in sponsorship, design, and analysis of the trial, and provide FDA with a copy of all data from such studies that is currently in the Company's possession. FDA encourages the Company to include, as part of its response, any descriptive statement as to possible limitations of such data.

3.    What is an "ABM"? What are the duties of an ABM?

4.    Is the Company currently aware of, involved with, currently sponsoring, or has it sponsored in the past any teleconferences (including, but not limited to, those held in one or more of the following months:   January 1996, February 1996, March 1996, April 1996, May 1996, June 1996) involving the administration of Neurontin to patients suffering from: cervical pain,

8

trigeminal neuralgia, epilepsy with co-morbid pain syndromes, bipolar disorder or other psychiatric conditions, reflex sympathetic dystrophy ("RSD"), diabetic neuropathy, or various other neuropathic pain syndromes?

5.   If the Company's response to question four is affirmative, please identify the conference call moderators and all other participants (e.g., physicians) and describe the Company's involvement in the sponsorship, design, and format of the teleconference, and provide FDA with a copy of all documents (including any audiotapes) pertaining to such teleconferences that are currently in the Company's possession.

6.   If the Company's response to question four is affirmative, please explain the circumstances surrounding the selection of the conference call moderators and all other participants.  Why and how were these individuals selected for their respective roles?   Please include documents sufficient to show the respective individual's relationship with the Company.

7.   If the Company's response to question four is affirmative, please explain the interactions between Company representatives (e.g., "drug or sales" "reps") and all physicians (and other participants) who took part in the teleconferences.
       a) For example, did the reps notify the participants (e.g., physicians) of the existence of the teleconference?
       b) If the reps did not notify the participants of the existence of the teleconference, how was the existence of the teleconference publicized?
       c) Did the "reps" provide food (e.g., lunch), gifts, or any form of remuneration to any of the participants?
       d) Were the conference call moderators compensated by the Company for their time, etc?
Please include any documents that will support or relate to your answer .

FDA would be pleased to discuss this request with the Company and encourages Parke-Davis to contact the undersigned or Lisa Stockbridge, Ph.D.  If it has questions about these requests.   If Parke-Davis has information that will enable us to limit the scope of this request in a manner consistent with our regulatory responsibilities, please bring such information to our attention as soon as possible by contacting the undersigned at (301) 827-2831.

Please address your response to Lesley R. Frank, Ph.D., J.D., at the Food and Drug Administration, Division of Drug Marketing, Advertising and Communications, HFD-40, Rm 17-B-20, 5600 Fishers Lane, Rockville, Maryland 20857.  Within ten

9

business days of receiving this correspondence, please provide written notice of
your intention to comply with this request. In addition, your response, including
requested documents, should be received by September 3, 1996.


Sincerely,

Lesley R. Frank, Ph.D., J.D.
Special Assistant to the Director
Division of Drug Marketing,
Advertising and Communications
Center for Drug
Evaluation and Research



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Public Health Service

Food and Drug Administration
Rockville, MD 20857

1-3128

NDA 20-235
NDA 20-882
NDA 21-129

Pfizer, Inc.
Attention: Manini Patel
          Director, Worldwide Regulatory Affairs
235 E. 42nd Street   150/7/6
New York, NY 10017

Dear Ms. Patel:

Please refer to your new drug application (NDA) submitted under section 505(b) of the Federal Food, Drug, and Cosmetic Act for Neurontin (gabapentin) Capsules, Neurontin (gabapentin) Tablets, and Neurontin (gabapentin) Oral Solution.

There is evidence that patients with epilepsy are at an elevated risk for suicidality (suicidal thinking and behavior) and completed suicide. Despite this elevated population risk, the concern has been raised that some anti-epileptic drugs (AEDs) may be associated with an increased risk of suicidality. Given the recent observation of suicidality as a drug-induced adverse effect in pediatric patients exposed to various antidepressants in placebo-controlled trials, there is interest in examining data from placebo-controlled trials of AEDs to assess for a similar effect. Based on our experience with the pediatric antidepressant trials, the Division of Neuropharmacological Drug Products (DNDP) has developed a standard approach for evaluating drug-induced suicidality. Thus, we ask that you utilize the approach we have outlined in this letter for evaluating "possibly suicide related" adverse events occurring in placebo-controlled trials for gabapentin.

We request that you identify the trials from your development program (regardless of whether the indication is approved or not) that meet the following criteria: placebo-controlled; parallel arm; short-term (up to six months); at least 30 patients total. Some trials in epilepsy may have utilized a subtherapeutic dose of a standard AED as a comparator arm. Those trials should be included (if they meet the other criteria described above) and the subtherapeutic comparator arm should be coded as a "low dose-placebo" (see variable list below).

Once we have agreed upon the list of trials upon which to focus this exploration, we ask that you utilize the following approach to identifying and further evaluating "possibly suicide related" adverse events occurring in these trials.

NDA 20-235
NDA 20-882
NDA 21-129
Page 2

## Search for "Possibly Suicide-Related" Adverse Events and Preparation of Narrative Summaries

### Time Frame for "Possibly Suicide-Related" Adverse Events

This search should be strictly limited to adverse events that occurred during the double-blind phase of treatment, or within 1 day of stopping randomized treatment. Adverse events should not be included if they occurred prior to randomization or more than 1 day after discontinuing from randomized treatment. The end of trials with a tapering period should be set to be at the beginning of the tapering period. Events occurring more than 1 day after discontinuing from randomized treatment should be excluded even if discontinuation occurred before the nominal endpoint of the trial. For example, if a patient either discontinued of his own volition or was asked to discontinue by the investigator after 2 weeks of randomized treatment in a trial of 8 weeks duration, and the patient then experienced a "possibly suicide related" adverse event 2 days after stopping, that event should not be included.

### Search Strategies for "Possibly Suicide-Related" Adverse Events

The following search strategies should be employed to identify adverse events of possible interest:

- Any events coded to preferred terms that include the text strings "suic" or "overdos," including all events coded as "accidental overdose" should be included.

- Regardless of the preferred term to which the verbatim term is mapped, all verbatim terms should be searched for the following text strings: "attempt", "cut", "gas", "hang", "hung", "jump", "mutilat-", "overdos-", "self damag-", "self harm", "self inflict", "self injur-", "shoot", "slash", "suic-", "poison", "asphyxiation", "suffocation", "firearm" should be included.

    Note: Any terms identified by this search because the text string was a substring of an unrelated word should be excluded (for example, the text string "cut" might identify the word "acute"). These terms might be characterized as "false positives" in the sense that the verbatim term was selected because one of the text strings occurred within that term but the term had no relevance to suicidality. Although we request that such terms be excluded, we ask that you prepare a table listing all such false positives, as follows:

    | Study # | Patient # | Treatment Assignment | Term in Which Text String Occurred |
    |---------|-----------|----------------------|------------------------------------|

    The patients in this table will have as many rows as they have potential events.

- All deaths and other serious adverse events (SAEs) should be included.

- All adverse events coded as "accidental injury" should be included.

NDA 20-235
NDA 20-882
NDA 21-129
Page 3

## Preparation of Narrative Summaries for "Possibly Suicide-Related" Adverse Events

A complete set of narrative summaries should be prepared and collected for all "possibly suicide-related" adverse events. In some cases, narratives will have already been prepared, e.g., deaths and SAEs. In other cases, however, you will need to prepare narrative summaries by searching CRFs for any information that might be considered possibly relevant to suicidality. You should also utilize other relevant sources of information, e.g., hospital records, results of consults, questionnaire responses, etc, in preparing these narrative summaries. Depending on how much information is available, narrative summaries may be longer than 1 page, however, in no case, should more than 1 narrative summary be included on a single page. Following is the type of information that should be included in the original narrative summaries:

- Patient ID number
- Trial number
- Treatment group
- Dose at time of event (mg)
- Recent dose change – elaborate on timing and amount of dose change
- Sex
- Age
- Diagnosis
- History of suicidal thoughts
- History of suicide attempt
- History of self harm
- Adverse event Preferred term
- Adverse event Verbatim term
- Serious adverse event (y/n)
- Number of days on drug at time of event
- Treatment was discontinued following event (y/n)
- Patient had an emergency department visit and was discharged (y/n)
- Patient was hospitalized (y/n)
- Patient died (y/n) – if yes, elaborate on cause of death
- Associated treatment emergent adverse events
- Concurrent psychosocial stressors
- Psychiatric comorbidities
- Concomitant medications
  - Other pertinent information (e.g., family history of psychiatric disorders)-

Other relevant information for preparing narrative summaries:

-Patients may be identified as having events of interest in one or more of the above searches, and they may have more than one event of interest. In no case, however, should there be more than one narrative summary per patient. In cases where there is more than one event for a given patient, each different event should be clearly demarcated in the narrative.

NDA 20-235
NDA 20-882
NDA 21-129
Page 4

-Only events occurring during the "exposure window" defined as during the double-blind phase (including the first day after abrupt discontinuation or the first day of taper if tapering is utilized) should be included in the narrative summary, i.e., do not include any prerandomization events or events occurring more than 1 day after stopping randomized treatment or during the tapering period.

-Do not exclude events of interest on the basis of your judgment that they might not represent "treatment-emergent" events; we feel this judgment is too difficult to make and we prefer to simply include all potentially relevant events, regardless of whether or not similar thoughts or behaviors may have occurred prior to treatment.

## Classification of "Possibly Suicide-Related" Adverse Events

Once the narrative summaries for "possibly suicide-related" adverse events are prepared and collected, we ask that you accomplish a rational classification of these events using the approach that was well-characterized by the Columbia group for the pediatric suicidality narratives. This approach was described in detail by Dr. Kelly Posner at the September 13 and 14, 2004 advisory committee meeting. The details are provided in her slides for that meeting (available on FDA's website), in the transcript for that meeting, and in other reviews, etc. pertinent to pediatric suicidality and available on FDA's website at the following URLs:

- Slides
  http://www.fda.gov/ohrms/dockets/ac/04/slides/2004-4065S1_06_FDA-Posner.ppt
- Briefing Document, transcripts, etc.
  http://www.fda.gov/ohrms/dockets/ac/cder04.html#PsychopharmacologicDrugs

The categories of interest from FDA's standpoint are as follows:

Suicide attempt (code 1)
Preparatory acts toward imminent suicidal behavior (code 2)
Self-injurious behavior, intent unknown (code 3)
Suicidal ideation (code 4)
Not enough information (code 5)
Self-injurious behavior, no suicidal intent (code 6)
Other: accident; psychiatric; medical (code 7)

Those individuals who classify the narratives must have the appropriate expertise and training to accomplish this task.

Prior to their rational classification, the narratives must be blinded to details that might bias their assessments. The details of appropriate blinding of the narratives can also be obtained in the transcript from the advisory committee meeting referred to above, and the materials available on FDA's website pertinent to that meeting. We request that you block out the following information that could reveal treatment assignment:

- Identifying patient information, identity of study drug, and patient's randomized drug assignment

NDA 20-235
NDA 20-882
NDA 21-129
Page 5

- All identifying information regarding the sponsor, the clinical trial number, and the location of the trial
- All years with the exception of years in remote history
- Study drug start and stop dates (month, day, and year)
- All medications, both prescription and non-prescription, whether taken before, during, or after the study; non-pharmaceutical substances (e.g., alcohol, tobacco) should not be blocked out
- Names of medications involved in overdoses; the number of pills consumed should not be blocked out
- Indications for medications started during or after the study
- Indications for study drug

Once you have decided on an approach to accomplishing the task of blinding and classifying the narratives, we would be happy to review and comment on your plan.

**Data Submission to DNDP**

In order to perform additional analyses investigating the relationship between exposure to AEDs and "suicide-related" adverse events in adults and the pediatric population, we would appreciate your submitting the following variables as outlined in the next table. Note that we are requesting information from placebo (and "low dose placebo") controlled trials only. We would expect that you will provide us with a completed JMP dataset within 6 months from the date of this letter.

| Variable name | Type | Description | Coding notes |
|---|---|---|---|
| SOURCE | Character | First few letters of your drug name | |
| INDICATION | Character | Disease being studied in trial | E.g., epilepsy- adjunctive, epilepsy- monotherapy, bipolar disorder, migraine, etc. |
| TRIAL | Character | Trial ID | |
| CTPID | Character | Patient ID within each trial | |
| UNIQUEID | Character | A unique ID for every patient | Composed of "TRIAL" and "CTPID" joined in that order with no intervening punctuation or dashes |
| AGE | Numeric | Patient age | In years |
| AGECAT | Numeric | Age category | 1=5-11<br>2=12-17<br>3=18-24 y<br>4=25-64 y<br>5=65 y or more |
| GENDER | Numeric | Patient gender | 1=female<br>2=male |

NDA 20-235
NDA 20-882
NDA 21-129
Page 6

| Variable name | Type | Description | Coding notes | |
|---|---|---|---|---|
| RACE | Numeric | Patient race | 1=White Caucasian<br>2=African-American<br>3=Hispanic<br>4=Asian<br>5=Other<br>.=Missing | |
| SETTING | Numeric | Setting of trial | 1=inpatient<br>2=outpatient<br>3=both | |
| LOCATION | Numeric | Location of trial | 1=North America<br>2=Non-North America | |
| TXARM | Numeric | Randomized treatment | 1=drug<br>2=placebo<br>3=active control<br>4=low dose-placebo<br><br>No missing values are allowed in this variable. | |
| TXLOW | Character | Name of drug used as low dose-placebo | Leave patients in other treatment arms blank | |
| TXACTIVE | Character | Name of drug used as active control | Leave patients in other treatment arms blank | |
| EVENT | Numeric | This variable contains the code for the first suicidality event. If a patient had more than one event in the desired "exposure window", then the most severe event should be listed. Severity is decided based on the following order of codes 1>2>4>3>5 | 0=no event<br>1=suicide attempt<br>2=preparatory acts toward imminent suicidal behavior<br>3=self-injurious behavior, intent unknown<br>4=suicidal ideation<br>5=not enough information<br><br>No missing values are allowed in this variable. | |
| EVENTDAY | Numeric | The number of days to the first suicidal event counting from the day of the first dose. | for patients without events, this variable should contain days until end of trial or until premature discontinuation<br><br>for patients with more than one event, this variable should contain days until the most severe event that is listed under the variable "EVENT" | |

NDA 20-235
NDA 20-882
NDA 21-129
Page 7

| Variable name | Type | Description | Coding notes | |
|---|---|---|---|---|
| | | | No missing values are allowed in this variable. | |
| DISCONT | Numeric | The patient discontinued before the end of the controlled portion of the trial | 0=No 1=Yes No missing values are allowed in this variable | |

If you have questions, call Jacqueline H. Ware, Pharm.D., Senior Regulatory Project Manager, at (301) 594-5533.

Sincerely,

{See appended electronic signature page}

Russell Katz, M.D.
Director
Division of Neuropharmacological Drug Products
Office of Drug Evaluation I
Center for Drug Evaluation and Research

This is a representation of an electronic record that was signed electronically and this page is the manifestation of the electronic signature.

/s/

Russell Katz
3/16/05 07:04:49 AM



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Public Health Service
_____
Food and Drug Administration
Rockville, MD 20857

NDA 20-235/S-035
NDA 20-882/S-021
NDA 21-129/S-020

Pfizer Inc
Attention: Mary Ann C. Evertsz, Regulatory Affairs
235 E 42nd Street
New York, NY 10017

Dear Ms. Evertsz:

Please refer to your supplemental new drug applications dated December 21, 2005, received December 22, 2005, submitted under section 505(b) of the Federal Food, Drug, and Cosmetic Act for Neurontin (gabapentin) capsules, tablets, and oral solution.

These "Changes Being Effected" supplemental new drug applications provide for revisions of suicide-related adverse event terms under the subheading **Other Adverse Events Observed During All Clinical Trials** and an update to the number of patients exposed to Neurontin in add-on epilepsy trials.

We have completed our review of these applications. These applications are approved, effective on the date of this letter, for use as recommended in the agreed-upon labeling text.

The final printed labeling (FPL) must be identical to the submitted labeling (package insert submitted December 21, 2005).

Please submit an electronic version of the FPL according to the guidance for industry titled *Providing Regulatory Submissions in Electronic Format - NDA*. Alternatively, you may submit 20 paper copies of the FPL as soon as it is available but no more than 30 days after it is printed. Individually mount 15 of the copies on heavy-weight paper or similar material. For administrative purposes, designate these submissions "FPL for approved supplement NDA 20-235/S-035, NDA 20-882/S-021, NDA 21-129/S-020." Approval of these submissions by FDA is not required before the labeling is used.

In addition, submit three copies of the introductory promotional materials that you propose to use for these products. Submit all proposed materials in draft or mock-up form, not final print. Send one copy to this division and two copies of both the promotional materials and the package inserts directly to:

   Food and Drug Administration
   Center for Drug Evaluation and Research
   Division of Drug Marketing, Advertising, and Communications
   5901-B Ammendale Road
   Beltsville, MD 20705-1266

NDA 20-235/S-035
NDA 20-882/S-021
NDA 21-129/S-020

Page 2

If you issue a letter communicating important information about this drug product (i.e., a "Dear Health Care Professional" letter), we request that you submit a copy of the letter to this NDA and a copy to the following address:

> MEDWATCH
> Food and Drug Administration
> WO 22, Room 4447
> 10903 New Hampshire Avenue
> Silver Spring, MD 20993-0002

We remind you that you must comply with reporting requirements for an approved NDA (21 CFR 314.80 and 314.81).

If you have any questions, call Courtney Calder, Pharm.D, Regulatory Project Manager, at (301) 796-1050.

Sincerely,

*{See appended electronic signature page}*

Russell Katz, MD
Director
Division of Neurology Products
Office of Drug Evaluation I
Center for Drug Evaluation and Research

This is a representation of an electronic record that was signed electronically and this page is the manifestation of the electronic signature.

```
/s/
--------------------
Russell Katz
5/3/2006 07:47:25 AM
```

# EXHIBIT G



**DEPARTMENT OF HEALTH & HUMAN SERVICES**                          Public Health Service

Food and Drug Administration
Rockville, MD  20857

NDA 20-235
NDA 20-882
NDA 21-129

*1-3128*

Pfizer, Inc.
Attention: Manini Patel
        Director, Worldwide Regulatory Affairs
235 E. 42nd Street  150/7/6
New York, NY 10017

Dear Ms. Patel:

Please refer to your new drug application (NDA) submitted under section 505(b) of the Federal
Food, Drug, and Cosmetic Act for Neurontin (gabapentin) Capsules, Neurontin (gabapentin)
Tablets, and Neurontin (gabapentin) Oral Solution.

There is evidence that patients with epilepsy are at an elevated risk for suicidality (suicidal
thinking and behavior) and completed suicide. Despite this elevated population risk, the concern
has been raised that some anti-epileptic drugs (AEDs) may be associated with an increased risk
of suicidality. Given the recent observation of suicidality as a drug-induced adverse effect in
pediatric patients exposed to various antidepressants in placebo-controlled trials, there is interest
in examining data from placebo-controlled trials of AEDs to assess for a similar effect. Based on
our experience with the pediatric antidepressant trials, the Division of Neuropharmacological
Drug Products (DNDP) has developed a standard approach for evaluating drug-induced
suicidality. Thus, we ask that you utilize the approach we have outlined in this letter for
evaluating "possibly suicide related" adverse events occurring in placebo-controlled trials for
gabapentin.

We request that you identify the trials from your development program (regardless of whether
the indication is approved or not) that meet the following criteria: placebo-controlled; parallel
arm; short-term (up to six months); at least 30 patients total.  Some trials in epilepsy may have
utilized a subtherapeutic dose of a standard AED as a comparator arm. Those trials should be
included (if they meet the other criteria described above) and the subtherapeutic comparator arm
should be coded as a "low dose-placebo" (see variable list below).

Once we have agreed upon the list of trials upon which to focus this exploration, we ask that you
utilize the following approach to identifying and further evaluating "possibly suicide related"
adverse events occurring in these trials.

NDA 20-235
NDA 20-882
NDA 21-129
Page 2

**Search for "Possibly Suicide-Related" Adverse Events and Preparation of Narrative Summaries**

<u>Time Frame for "Possibly Suicide-Related" Adverse Events</u>

This search should be strictly limited to adverse events that occurred during the double-blind phase of treatment, or within 1 day of stopping randomized treatment. Adverse events should not be included if they occurred prior to randomization or more than 1 day after discontinuing from randomized treatment. The end of trials with a tapering period should be set to be at the beginning of the tapering period. Events occurring more than 1 day after discontinuing from randomized treatment should be excluded even if discontinuation occurred before the nominal endpoint of the trial. For example, if a patient either discontinued of his own volition or was asked to discontinue by the investigator after 2 weeks of randomized treatment in a trial of 8 weeks duration, and the patient then experienced a "possibly suicide related" adverse event 2 days after stopping, that event should not be included.

<u>Search Strategies for "Possibly Suicide-Related" Adverse Events</u>

The following search strategies should be employed to identify adverse events of possible interest:

- Any events coded to preferred terms that include the text strings "suic" or "overdos," including all events coded as "accidental overdose" should be included.

- Regardless of the preferred term to which the verbatim term is mapped, all verbatim terms should be searched for the following text strings: "attempt", "cut", "gas", "hang", "hung", "jump", "mutilat-", "overdos-", "self damag-", "self harm", "self inflict", "self injur-", "shoot", "slash", "suic-", "poison", "asphyxiation", "suffocation", "firearm" should be included.

  <u>Note</u>: Any terms identified by this search because the text string was a substring of an unrelated word should be excluded (for example, the text string "cut" might identify the word "acute"). These terms might be characterized as "false positives" in the sense that the verbatim term was selected because one of the text strings occurred within that term but the term had no relevance to suicidality. Although we request that such terms be excluded, we ask that you prepare a table listing all such false positives, as follows:

  | <u>Study #</u> | <u>Patient #</u> | <u>Treatment Assignment</u> | <u>Term in Which Text String Occurred</u> |
  |---|---|---|---|

  The patients in this table will have as many rows as they have potential events.

- All deaths and other serious adverse events (SAEs) should be included.

- All adverse events coded as "accidental injury" should be included.

NDA 20-235
NDA 20-882
NDA 21-129
Page 3

## Preparation of Narrative Summaries for "Possibly Suicide-Related" Adverse Events

A complete set of narrative summaries should be prepared and collected for all "possibly suicide-related" adverse events. In some cases, narratives will have already been prepared, e.g., deaths and SAEs. In other cases, however, you will need to prepare narrative summaries by searching CRFs for any information that might be considered possibly relevant to suicidality. You should also utilize other relevant sources of information, e.g., hospital records, results of consults, questionnaire responses, etc, in preparing these narrative summaries. Depending on how much information is available, narrative summaries may be longer than 1 page, however, in no case, should more than 1 narrative summary be included on a single page. Following is the type of information that should be included in the original narrative summaries:

- Patient ID number
- Trial number
- Treatment group
- Dose at time of event (mg)
- Recent dose change – elaborate on timing and amount of dose change
- Sex
- Age
- Diagnosis
- History of suicidal thoughts
- History of suicide attempt
- History of self harm
- Adverse event Preferred term
- Adverse event Verbatim term
- Serious adverse event (y/n)
- Number of days on drug at time of event
- Treatment was discontinued following event (y/n)
- Patient had an emergency department visit and was discharged (y/n)
- Patient was hospitalized (y/n)
- Patient died (y/n) – if yes, elaborate on cause of death
- Associated treatment emergent adverse events
- Concurrent psychosocial stressors
- Psychiatric comorbidities
- Concomitant medications
  - Other pertinent information (e.g., family history of psychiatric disorders)-

Other relevant information for preparing narrative summaries:

-Patients may be identified as having events of interest in one or more of the above searches, and they may have more than one event of interest. In no case, however, should there be more than one narrative summary per patient. In cases where there is more than one event for a given patient, each different event should be clearly demarcated in the narrative.

NDA 20-235
NDA 20-882
NDA 21-129
Page 4

-Only events occurring during the "exposure window" defined as during the double-blind phase (including the first day after abrupt discontinuation or the first day of taper if tapering is utilized) should be included in the narrative summary, i.e., do not include any prerandomization events or events occurring more than 1 day after stopping randomized treatment or during the tapering period.

-Do not exclude events of interest on the basis of your judgment that they might not represent "treatment-emergent" events; we feel this judgment is too difficult to make and we prefer to simply include all potentially relevant events, regardless of whether or not similar thoughts or behaviors may have occurred prior to treatment.

## Classification of "Possibly Suicide-Related" Adverse Events

Once the narrative summaries for "possibly suicide-related" adverse events are prepared and collected, we ask that you accomplish a rational classification of these events using the approach that was well-characterized by the Columbia group for the pediatric suicidality narratives. This approach was described in detail by Dr. Kelly Posner at the September 13 and 14, 2004 advisory committee meeting. The details are provided in her slides for that meeting (available on FDA's website), in the transcript for that meeting, and in other reviews, etc. pertinent to pediatric suicidality and available on FDA's website at the following URLs:

- Slides
  http://www.fda.gov/ohrms/dockets/ac/04/slides/2004-4065S1_06_FDA-Posner.ppt
- Briefing Document, transcripts, etc.
  http://www.fda.gov/ohrms/dockets/ac/cder04.html#PsychopharmacologicDrugs

The categories of interest from FDA's standpoint are as follows:

Suicide attempt (code 1)
Preparatory acts toward imminent suicidal behavior (code 2)
Self-injurious behavior, intent unknown (code 3)
Suicidal ideation (code 4)
Not enough information (code 5)
Self-injurious behavior, no suicidal intent (code 6)
Other: accident; psychiatric; medical  (code 7)

Those individuals who classify the narratives must have the appropriate expertise and training to accomplish this task.

Prior to their rational classification, the narratives must be blinded to details that might bias their assessments. The details of appropriate blinding of the narratives can also be obtained in the transcript from the advisory committee meeting referred to above, and the materials available on FDA's website pertinent to that meeting. We request that you block out the following information that could reveal treatment assignment:

- Identifying patient information, identity of study drug, and patient's randomized drug assignment

NDA 20-235
NDA 20-882
NDA 21-129
Page 5

- All identifying information regarding the sponsor, the clinical trial number, and the location of the trial
- All years with the exception of years in remote history
- Study drug start and stop dates (month, day, and year)
- All medications, both prescription and non-prescription, whether taken before, during, or after the study; non-pharmaceutical substances (e.g., alcohol, tobacco) should not be blocked out
- Names of medications involved in overdoses; the number of pills consumed should not be blocked out
- Indications for medications started during or after the study
- Indications for study drug

Once you have decided on an approach to accomplishing the task of blinding and classifying the narratives, we would be happy to review and comment on your plan.

**Data Submission to DNDP**

In order to perform additional analyses investigating the relationship between exposure to AEDs and "suicide-related" adverse events in adults and the pediatric population, we would appreciate your submitting the following variables as outlined in the next table. Note that we are requesting information from placebo (and "low dose-placebo") controlled trials only. We would expect that you will provide us with a completed JMP dataset within 6 months from the date of this letter.

| Variable name | Type | Description | Coding notes |
|---|---|---|---|
| SOURCE | Character | First few letters of your drug name | |
| INDICATION | Character | Disease being studied in trial | E.g., epilepsy- adjunctive, epilepsy- monotherapy, bipolar disorder, migraine, etc. |
| TRIAL | Character | Trial ID | |
| CTPID | Character | Patient ID within each trial | |
| UNIQUEID | Character | A unique ID for every patient | Composed of "TRIAL" and "CTPID" joined in that order with no intervening punctuation or dashes |
| AGE | Numeric | Patient age | In years |
| AGECAT | Numeric | Age category | 1=5-11<br>2=12-17<br>3=18-24 y<br>4=25-64 y<br>5=65 y or more |
| GENDER | Numeric | Patient gender | 1=female<br>2=male |

NDA 20-235
NDA 20-882
NDA 21-129
Page 6

| Variable name | Type | Description | Coding notes |
|---|---|---|---|
| RACE | Numeric | Patient race | 1=White Caucasian<br>2=African-American<br>3=Hispanic<br>4=Asian<br>5=Other<br>. = Missing |
| SETTING | Numeric | Setting of trial | 1=inpatient<br>2=outpatient<br>3=both |
| LOCATION | Numeric | Location of trial | 1=North America<br>2=Non-North America |
| TXARM | Numeric | Randomized treatment | 1=drug<br>2=placebo<br>3=active control<br>4=low dose-placebo<br><br>No missing values are allowed in this variable |
| TXLOW | Character | Name of drug used as low dose-placebo | Leave patients in other treatment arms blank |
| TXACTIVE | Character | Name of drug used as active control | Leave patients in other treatment arms blank |
| EVENT | Numeric | This variable contains the code for the first suicidality event. If a patient had more than one event in the desired "exposure window.", then the most severe event should be listed. Severity is decided based on the following order of codes 1>2>4>3>5 | 0=no event<br>1=suicide attempt<br>2=preparatory acts toward imminent suicidal behavior<br>3=self-injurious behavior, intent unknown<br>4=suicidal ideation<br>5=not enough information<br><br>No missing values are allowed in this variable |
| EVENTDAY | Numeric | The number of days to the first suicidal event counting from the day of the first dose. | for patients without events, this variable should contain days until end of trial or until premature discontinuation<br><br>for patients with more than one event, this variable should contain days until the most severe event that is listed under the variable "EVENT" |

NDA 20-235
NDA 20-882
NDA 21-129
Page 7

| Variable name | Type | Description | Coding notes |
|---|---|---|---|
| | | | No missing values are allowed in this variable. |
| DISCONT | Numeric | The patient discontinued before the end of the controlled portion of the trial | 0=No<br>1=Yes<br><br>No missing values are allowed in this variable |

If you have questions, call Jacqueline H. Ware, Pharm.D., Senior Regulatory Project Manager, at (301) 594-5533.

Sincerely,

{See appended electronic signature page}

Russell Katz, M.D.
Director
Division of Neuropharmacological Drug Products
Office of Drug Evaluation I
Center for Drug Evaluation and Research

This is a representation of an electronic record that was signed electronically and this page is the manifestation of the electronic signature.

/s/
---------------------------
Russell Katz
3/16/05 07:04:49 AM

# EXHIBIT H

 **DEPARTMENT OF HEALTH & HUMAN SERVICES**

Public Health Service

Food and Drug Administration
Rockville, MD  20857

NDA 20-235/S-035
NDA 20-882/S-021
NDA 21-129/S-020

Pfizer Inc
Attention:  Mary Ann C. Evertsz, Regulatory Affairs
235 E 42nd Street
New York, NY  10017

Dear Ms. Evertsz:

Please refer to your supplemental new drug applications dated December 21, 2005, received December 22, 2005, submitted under section 505(b) of the Federal Food, Drug, and Cosmetic Act for Neurontin (gabapentin) capsules, tablets, and oral solution.

These "Changes Being Effected" supplemental new drug applications provide for revisions of suicide-related adverse event terms under the subheading **Other Adverse Events Observed During All Clinical Trials** and an update to the number of patients exposed to Neurontin in add-on epilepsy trials.

We have completed our review of these applications.  These applications are approved, effective on the date of this letter, for use as recommended in the agreed-upon labeling text.

The final printed labeling (FPL) must be identical to the submitted labeling (package insert submitted December 21, 2005).

Please submit an electronic version of the FPL according to the guidance for industry titled *Providing Regulatory Submissions in Electronic Format - NDA*.  Alternatively, you may submit 20 paper copies of the FPL as soon as it is available but no more than 30 days after it is printed.  Individually mount 15 of the copies on heavy-weight paper or similar material. For administrative purposes, designate these submissions **"FPL for approved supplement NDA 20-235/S-035, NDA 20-882/S-021, NDA 21-129/S-020."**  Approval of these submissions by FDA is not required before the labeling is used.

In addition, submit three copies of the introductory promotional materials that you propose to use for these products.  Submit all proposed materials in draft or mock-up form, not final print.  Send one copy to this division and two copies of both the promotional materials and the package inserts directly to:

Food and Drug Administration
Center for Drug Evaluation and Research
Division of Drug Marketing, Advertising, and Communications
5901-B Ammendale Road
Beltsville, MD 20705-1266

NDA 20-235/S-035
NDA 20-882/S-021
NDA 21-129/S-020

Page 2

If you issue a letter communicating important information about this drug product (i.e., a "Dear Health Care Professional" letter), we request that you submit a copy of the letter to this NDA and a copy to the following address:

> MEDWATCH
> Food and Drug Administration
> WO 22, Room 4447
> 10903 New Hampshire Avenue
> Silver Spring, MD 20993-0002

We remind you that you must comply with reporting requirements for an approved NDA (21 CFR 314.80 and 314.81).

If you have any questions, call Courtney Calder, Pharm.D, Regulatory Project Manager, at (301) 796-1050.

> Sincerely,
>
> {See appended electronic signature page}
>
> Russell Katz, MD
> Director
> Division of Neurology Products
> Office of Drug Evaluation I
> Center for Drug Evaluation and Research

**This is a representation of an electronic record that was signed electronically and this page is the manifestation of the electronic signature.**

```
 /s/
--------------------
Russell Katz
5/3/2006 07:47:25 AM
```