UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                                  :
In re:  NEURONTIN MARKETING, SALES PRACTICES,                     :
        AND PRODUCTS LIABILITY LITIGATION                         :
                                                                  :       MDL Docket No. 1629
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x :
                                                                  :       Master File No. 04-10981
THIS DOCUMENT RELATES TO:                                         :
                                                                  :       Judge Patti B. Saris
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x :
                                                                  :       Magistrate Judge Leo T.
HARDEN MANUFACTURING CORPORATION;                                 :       Sorokin
LOUISIANA HEALTH SERVICE INDEMNITY COMPANY,                       :
dba BLUECROSS/BLUESHIELD OF LOUISIANA;                            :
INTERNATIONAL UNION OF OPERATING ENGINEERS,                       :
LOCAL NO. 68 WELFARE FUND; ASEA/AFSCME LOCAL                      :
52 HEALTH BENEFITS TRUST; GERALD SMITH; and                       :
LORRAINE KOPA, on behalf of themselves and all others             :
similarly situated, v. PFIZER INC. and WARNER-LAMBERT             :
COMPANY.                                                          :
                                                                  :
                                                                  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x :
                                                                  :
THE GUARDIAN LIFE INSURANCE COMPANY OF                            :
AMERICA v. PFIZER INC. and                                        :
                                                                  :
AETNA, INC. v. PFIZER INC.                                        :
                                                                  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DECLARATION OF PATRICK J. MURRAY

PATRICK J. MURRAY declares upon penalty of perjury in accordance with 28 U.S.C. §
1746 as follows:

1.      I am an attorney associated with the law firm Davis Polk & Wardwell, counsel for

Defendants Pfizer Inc. and Warner-Lambert Company in this action.

2.    I submit this declaration in support of Defendants' Memorandum of Law in Support of Motion To Dismiss the Second Amended Class Action Complaint and the Second Coordinated Amended Complaint.

3.    Attached at Exhibit A is a true and correct copy of the transcript of oral argument on the parties' objections to Magistrate Judge Leo T. Sorokin's January 31, 2006 Report and Recommendation, which occurred on May 3, 2006.

4.    Attached at Exhibit B is a true and correct copy of an article by Dr. Michael Serpell et al., titled "Gabapentin in Neuropathic Pain Syndromes:  a Randomised, Double-Blind, Placebo-Controlled Trial," which was published in the October 2002 edition of *Pain*.

5.    Attached at Exhibit C is a true and correct copy of Brief of Plaintiffs-Appellants, In re Rezulin Products, Docket No. 01-9318 (2d Cir. Apr. 23, 2002).

Dated: New York, New York
      July 27, 2006

                                        Patrick J. Murray

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3 on July 27, 2006.

                                      /s/David Chaffin

2

# EXHIBIT A

```
          0001
1                        IN THE UNITED STATES DISTRICT COURT
                         FOR THE DISTRICT OF MASSACHUSETTS
2
3
4         IN RE:                    )
          NEURONTIN MARKETING AND   )  CA No. 04-10981-PBS
5         SALES PRACTICES LITIGATION )
6
7
8
                    OBJECTIONS TO REPORT AND RECOMMENDATION
9
                    BEFORE THE HONORABLE PATTI B. SARIS
10                       UNITED STATES DISTRICT JUDGE
11
12
13
14                                  United States District Court
                                    1 Courthouse Way, Courtroom 19
15                                  Boston, Massachusetts
                                    May 3, 2006, 2:30 p.m.
16
17
18
19
20
21
22
                              LEE A. MARZILLI
23                         OFFICIAL COURT REPORTER
                        United States District Court
24                      1 Courthouse Way, Room 3205
                            Boston, MA  02210
25                           (617)345-6787
```

**5/3/2006  Hearing on Objections to Report & Recommendation**

```
 1      A P P E A R A N C E S:
 2      FOR THE PLAINTIFFS:
 3          ANDREW G. FINKELSTEIN, ESQ., Finkelstein & Partners,
        LLP, 436 Robinson Avenue, Newburgh, New York, 12550.
 4
            THOMAS M. GREENE, ESQ., Greene & Hoffman, P.C.,
 5      125 Summer Street, Suite 1410, Boston, Massachusetts, 02110.
 6          THOMAS M. SOBOL, ESQ., Hagens, Berman, Sobol & Shapiro,
        LLP, One Main Street, Cambridge, Massachusetts, 01923.
 7
            RICHARD BEMPORAD, ESQ., Lowey, Dannenberg, Bemporad &
 8      Selinger, P.C., The Gateway, One North Lexington Avenue,
        White Plains, New York, 10501-1714.
 9
            JAMES R. DUGAN, II, ESQ., Dugan & Browne,
10      650 Poydras Street, Suite 2150, New Orleans, Louisiana.
11          BARRY R. HIMMELSTEIN, ESQ., Lieff, Gabraser, Heimann &
        Bernstein, LLP, Embarcadero Center West, 275 Battery Street,
12      30th Floor, San Francisco, California, 94111-3339.
13          LINDA P. NUSSBAUM, ESQ., Cohen, Milstein, Hausfeld &
        Toll, P.L.L.C., 150 East 52nd Street, Thirtieth Floor,
14      New York, New York, 10022.
15          DON BARRETT, ESQ., Barrett Law Office,
        404 Court Square North, P.O. Box 987, Lexington,
16      Mississippi, 39095.
17
        FOR THE DEFENDANTS:
18
            DAVID B. CHAFFIN, ESQ., Hare & Chaffin,
19      160 Federal Street, 23rd Floor, Boston, Massachusetts,
        02110-1701.
20
            JAMES P. ROUHANDEH, ESQ. and PATRICK MURRAY, ESQ.,
21      Davis, Polk & Wardwell, 450 Lexington Avenue, New York,
        New York, 10017.
22
23
24
25
```

**5/3/2006  Hearing on Objections to Report & Recommendation**

```
 1                    P R O C E E D I N G S
 2              THE CLERK:  In re:  Neurontin Marketing and Sales
 3    Practices Litigation, Civil Across No. 04-10981, will now be
 4    heard before this Court.  Will counsel please identify
 5    themselves for the record.
 6              MR. SOBOL:  Good afternoon, your Honor.  Tom Sobol
 7    for plaintiffs.
 8              MR. BEMPORAD:  Good afternoon, your Honor.  Richard
 9    Bemporad from Lowey, Dannenberg, Bemporad & Selinger.  We're
10    counsel for Aetna, which is one of the coordinated
11    plaintiffs.
12              MR. HIMMELSTEIN:  Good afternoon, your Honor.
13    Barry Himmelstein, co-lead counsel for the class plaintiffs.
14              MR. GREENE:  Good afternoon, your Honor.  Thomas
15    Greene for the class plaintiffs.
16              MR. NUSSBAUM:  Good afternoon, your Honor.  I'm
17    Linda Nussbaum for the coordinated plaintiffs.
18              MR. FINKELSTEIN:  Andrew Finkelstein for the
19    product liability plaintiffs.
20              MR. BARRETT:  Don Barrett for the plaintiffs.
21              MR. DUGAN:  Good afternoon, your Honor.  James
22    Dugan on behalf of class counsel.
23              MR. ROUHANDEH:  Good afternoon, your Honor.  Jim
24    Rouhandeh from Davis, Polk & Wardwell for Pfizer and
25    Warner-Lambert.
```

**5/3/2006  Hearing on Objections to Report & Recommendation**

```
 1            MR. MURRAY:  Patrick Murray, also for the

 2     defendants.

 3            MR. CHAFFIN:  Good afternoon, your Honor.  David

 4     Chaffin for the defendants.

 5            THE COURT:  Good.  All right, so we have what,

 6     objections from basically everybody, is that right?  So

 7     everyone needs to be heard at some level.  There's a little

 8     bit of a difference between coordinated plaintiffs and class

 9     plaintiffs, but there's a lot of overlap.

10            MR. SOBOL:  Correct.  And between ourselves, we

11     generally have that allocated.  We just didn't know if there

12     was an approach that your Honor was going to prefer, if you

13     have your own sense of which arguments you want covered

14     first.

15            THE COURT:  Well, let me just ask because I don't

16     have as much of a familiarity with the dynamics of this case

17     as I do on AWP, and so I'm not sure I'm as familiar with what

18     to do with the product liability plaintiffs.  Is there a

19     separate stake in the --

20            MR. SOBOL:  There is, your Honor.  Actually, in

21     this situation, you have two steering committees, one for the

22     purchase claims or the economic claims, if you will, and you

23     have a second steering committee on the personal injury

24     side.  And there's a separate leadership, and so they're

25     here --
```

**5/3/2006  Hearing on Objections to Report & Recommendation**

```
 1            THE COURT:  You know, I'm sorry, I focused on the
 2     coordinated plaintiffs and the class plaintiffs in terms of
 3     more of the ERISA claims, not the product liability claims.
 4     Did you file objections as well?
 5            MR. FINKELSTEIN:  We did.
 6            THE COURT:  Good, all right, so --
 7            MR. FINKELSTEIN:  We filed objections, but, your
 8     Honor, this was not set down for a hearing today, but we
 9     wanted to attend.  We thought maybe there was an issue with
10     calling this our objection because we filed under a separate
11     objection.
12            THE COURT:  So you do or do not want to be heard?
13            MR. FINKELSTEIN:  I do want to be heard.
14            THE COURT:  Do you want to be heard or not?
15            MR. FINKELSTEIN:  Absolutely.
16            THE COURT:  All right.  Are you all prepared on
17     that?
18            MR. ROUHANDEH:  Well, your Honor, we'll address
19     anything your Honor would like, but just to be clear, what
20     they objected to was the Magistrate's stay of discovery.  It
21     has nothing to do with the Magistrate's report and
22     recommendations on the merits.
23            THE COURT:  That's right, that's why I'm feeling
24     confused, because I didn't read a separate set of objections
25     on the merits.
```

```
 1            MR. FINKELSTEIN:  No.  It's as it relates to the
 2     stay of discovery.
 3            THE COURT:  Fine, why don't we address that one
 4     when we get going through this whole thing.  But now I know
 5     what you're talking about, because I'm sitting here thinking,
 6     is this a whole other pile like this?
 7            MR. FINKELSTEIN:  No, just this stack.
 8            THE COURT:  Okay, fair enough, fair enough.  So I
 9     would like to start with your objections from the plaintiffs'
10     side because essentially what you're asking me to do out of
11     the get-go is reconsider how I wrote up AWP with respect to
12     common purpose, whether it has to be a common unlawful
13     purpose.
14            MR. SOBOL:  Well, that's one way of looking at it,
15     your Honor, but there's another way of looking at it.
16            THE COURT:  Oh, yes, I know, you were very artful,
17     which is I didn't have the benefit of the Cianci case.  I
18     actually think both sides have briefed this issue well, and
19     we have not been able to find any case law directly on
20     point.  As I understand, your main point out of the box is
21     that it can be a common innocent purpose for an
22     association-in-fact as long as one of the players has a
23     fraudulent intent.
24            MR. SOBOL:  That's correct, but let me also put the
25     argument in context.  There's both the legal argument, the
```

**5/3/2006  Hearing on Objections to Report & Recommendation**

```
1    position.  There's also an, as applied to the allegations in

2    this 12(b)(6) context, what is a fair reading of the

3    complaint, and does that meet your initial or at least the

4    defendant's interpretation of your initial AWP II decision,

5    if you will?

6              THE COURT:  Can I just ask you.  I mean, you've all

7    briefed the cases, many of which I'm familiar with.

8              MR. SOBOL:  Sure.

9              THE COURT:  Are there any cases that you can point

10   me to where there was an association-in-fact -- that's how

11   you get into the RICO enterprise -- and only one of the

12   players has a fraudulent intent?

13             MR. SOBOL:  Right, we haven't been able to find

14   that case yet, although we're looking because in the

15   defendants' --

16             THE COURT:  I didn't find it.

17             MR. SOBOL:  Sure.  But the legal argument and one

18   of the reasons one spends a lot of time looking for it is

19   because if you look at the statute, which has enterprise and

20   broadly defines enterprise, and then if you look at the test

21   for an association-in-fact, which has a series of criteria,

22   no one of which is dispositive and no one of which says that

23   all the participants have to have the same criminal intent,

24   right, and then if you look at the cases that even describe a

25   common purpose, like in the Supreme Court's decision in
```

**5/3/2006  Hearing on Objections to Report & Recommendation**

```
1       Turkette where they describe a common purpose in broad terms
2       and again fail to say that each member of the
3       association-in-fact has to have a criminal intent --
4               THE COURT:  But you're pushing me too far.  I've
5       never said every member had to.  In AWP, of course, we only
6       had two players, so that was -- but suppose here you have
7       three potential players, right, the physicians, the medical
8       planning companies, and the pharmaceutical defendant?
9               MR. SOBOL:  Right.
10              THE COURT:  So you're saying that the other two can
11      be completely innocent, and only the pharmaceutical have the
12      fraudulent intent.  And that's really farther than I've seen
13      the case law go.
14              MR. SOBOL:  Well, actually that's not what we're
15      saying, though.  Let me put it in context.  What we're saying
16      is this.
17              THE COURT:  What's your argument here?
18              MR. SOBOL:  Yes, the argument here is this:  In
19      order to be able to take a series of otherwise disaggregated
20      entities, like a drug company and a medical marketing
21      company, and a defined set of, even by name, physicians, and
22      pull them together in an association-in-fact, the law
23      requires that we prove a common purpose.  So then what is a
24      common purpose in this association-in-fact enough to bind
25      them together?
```

**5/3/2006  Hearing on Objections to Report & Recommendation**

1              Now, we don't think that it's such a world where
2    they're either completely unrelated to one another or they're
3    all complicitous like criminals, such as they can be made a
4    defendant in the case.  Instead, here what we say is, the
5    common purpose that binds them together is their knowing
6    participation in off-label promotion through a drug company
7    which they know is in violation of federal law.
8              Now, that in and of itself, knowing participation
9    in an off-label campaign through a drug company that they're
10   in violation of federal law, may or may not be enough to
11   bring them in as a defendant in a RICO case.  But what it
12   does do is, it in fact, with the association, it's enough to
13   be able to bind them together for the following reasons:
14             First, it's not just that they're all making money
15   out of the same unlawful off-label promotion thing, but they
16   are.  Second, it's the fact that by definition, in order for
17   this scheme and this common purpose to unfold, in order for a
18   drug company to get away with or try to get away with
19   off-label promotion, it has to create this conduit in order
20   for there to be no direct activities by the drug company.
21   And we allege that all the participants, the medical
22   marketing firms, the physicians, and the drug company, know
23   that the reason that they are being bound together is to get
24   around the federal scheme, okay.
25             In addition, in this context I think it's fair --

**5/3/2006  Hearing on Objections to Report & Recommendation**

```
 1              THE COURT:  Wait.  All right, so you're even taking
 2      it further than --
 3              MR. SOBOL:  Well, okay, so what I'm saying is
 4      this:  Your decisions haven't gone so far as to say that
 5      every member of an association-in-fact enterprise has to be a
 6      criminal, okay.
 7              THE COURT:  Right.
 8              MR. SOBOL:  And we're not saying that's correct.
 9      I'm also not saying, though, at least on the facts in this
10      case, all the members of the association-in-fact can be
11      innocent of anything.  We're saying that they are knowing
12      members here of an unlawful enterprise, even though they may
13      not know something else.
14              THE COURT:  But the enterprise is the aggregation
15      of the three of them, right?
16              MR. SOBOL:  Correct.
17              THE COURT:  Not the pharmaceutical company?  The
18      pharmaceutical company is one player, medical marketing is
19      the second, and the doctors are the third.  You're not saying
20      that the enterprise is the pharmaceutical company?
21              MR. SOBOL:  Well, actually we're saying we have two
22      enterprises.  One enterprises is a peer-selling enterprise
23      where the physicians and the medical marketing firms and the
24      drug company are a part of the enterprise.  And we say
25      there's also a publication enterprise, meaning publicizing
```

**5/3/2006  Hearing on Objections to Report & Recommendation**

```
1    false or misleading scientific information, where the
2    participants there are the marketing firms that are doing the
3    publications, the authors that are writing and knowing that
4    the information is false, along with the drug company who is
5    facilitating that.  Those are the two enterprises.
6              THE COURT:  So you're conceding there has to at
7    least be some commonality of unlawful purpose, but you're
8    saying that some can be innocent?
9              MR. SOBOL:  Well, what we're saying is essentially
10   this:  When one alleges that the association-in-fact is
11   combining and tries to argue what the basis is for their
12   combination, in this situation we are arguing that the basis
13   for the combination is unlawful off-label promotion.  So our
14   allegations would have to say that they all knew that this
15   was unlawful off-label promotion.  And the allegations do say
16   that repeatedly throughout the complaint.
17             Now, what we think we have alleged, although Judge
18   Sorokin commented that he didn't think we had gone so far as
19   to say, was that the physicians and the medical marketing
20   firms had the same level of criminal intent and knowledge
21   about the untruthfulness of the enterprise.
22             Now, we think that our allegations are sufficient
23   that the medical marketing firms and the doctors also knew
24   that these things were untruthful.  I think the allegations
25   go that far.  But, in fairness to Judge Sorokin, we do not
```

**5/3/2006  Hearing on Objections to Report & Recommendation**

```
 1    bold as brass say that as strongly in the complaint as we say
 2    it obviously in Pfizer.
 3             THE COURT:  Well, could you say it under the
 4    strictures of Rule 11 that they knew --
 5             MR. SOBOL:  I don't think we could, and I think we
 6    even conceded that to Judge Sorokin.  But what we said is,
 7    they all knew that they were participating in unlawful
 8    off-label promotion.  And that's enough for purposes of RICO
 9    enterprise for them to be a participant, not a defendant but
10    a participant in the enterprise.  And I think that that's
11    squarely on board with the fact that you said, and I think
12    the cases don't say, that every participant in the enterprise
13    has to be a defendant or a criminal.  We don't have to go
14    that far, and we haven't gone that far, and we're not
15    required to.
16             But there certainly must be -- where the plaintiffs
17    in this situation have come forward and we've named -- we've
18    literally named the eight marketing firms.  Just like in
19    AWP I, we named the four large PPMs that were complicitous
20    with, you know, the eighteen or whatever it was drug
21    companies, okay, here we've named the eight medical marketing
22    firms that were complicitous with Warner-Lambert and Pfizer.
23    We have named a bunch.  I mean, I don't remember how many,
24    but, you know, almost two dozen I think or a dozen and a half
25    of the physicians who were complicitous in knowing two
```

**5/3/2006  Hearing on Objections to Report & Recommendation**

```
 1    things:  knowing that they were involved in unlawful
 2    off-label promotion activity.  And there's also allegations
 3    in the complaint, by the way, where -- we also allege that
 4    they knew that Pfizer or Warner-Lambert were controlling the
 5    information that was coming out of the unlawful promotion
 6    enterprise.  We haven't gone so far as to say that they all
 7    knew that the controlled information from Pfizer was
 8    untruthful completely for everybody because we haven't done
 9    that, okay.  But certainly there must be enough when we say
10    that they're all involved in an unlawful scheme anyway of
11    off-label promotion, and they also know that the drug company
12    is controlling the information flow, that's going to be
13    enough to bind them together.
14            It's also enough because there's a discrete number
15    of medical marketing firms.  They know of their existence.
16    They're competitors with one another.  The complaint can't
17    fairly be read that these medical marketing firms, each one
18    of them thinks that they're in isolation, you know.
19            THE COURT:  One of the predicate crimes, if you
20    will, or the predicate acts are mail fraud, right?
21            MR. SOBOL:  Yes, it's mail fraud.  It's going to be
22    false and deceptive statements, you know, false and
23    misleading statements regarding the product.
24            THE COURT:  And that's what you say.  You're
25    contending legally you don't have to have commonality with
```

**5/3/2006  Hearing on Objections to Report & Recommendation**

1    respect to the predicate acts?

2         MR. SOBOL:  Correct, because otherwise one would be

3    saying that every participant in an enterprise was also

4    involved in the underlying criminality.

5         THE COURT:  But what if there's no one else other

6    than pharmaceutical companies that's complicit in the alleged

7    fraudulent acts?

8         MR. SOBOL:  Well, then the question would be, what

9    binds them together in a common purpose?

10         THE COURT:  But what if it's not the fraud; it's

11    the off-label marketing?

12         MR. SOBOL:  Then that should be enough because

13    here --

14         THE COURT:  Well, I'm working through that.  Why

15    should it be enough?

16         MR. SOBOL:  Because you take a step back and you

17    say, what's the common purpose of the enterprise?  Or what

18    are the indicia of all of this enterprise that's going to be

19    enough that they know that they're acting together,

20    regardless of whether it's going to be for a criminal purpose

21    or some other purpose?  Which is valid, I think, under the

22    law.  And here what binds them together, they all know that

23    they're acting together, is that they're all hunched down

24    because they all know that they're doing something unlawful

25    anyway, even though it's what we're not suing them for,

**5/3/2006  Hearing on Objections to Report & Recommendation**

1    because they're all hunched over knowing that they're doing

2    unlawful off-label promotion.  They're trying to have people

3    prescribe this medication for purposes that the FDA hasn't

4    allowed it to be done and that that's being done at the

5    instigation of a drug company, so --

6              THE COURT:  Which is not a lawful predicate act, so

7    that's the problem.

8              MR. SOBOL:  Right, that's not what we're suing on,

9    but it's enough to be able to have them together in a common

10   purpose now.  It turns out that we sued them here not just

11   merely because it's off-label, but then also because it's

12   false and deceptive statements about what's actually coming

13   out of the product of that.

14             Take a look at it this way:  You could have this

15   as -- this is an enterprise marketing pharmaceuticals.

16   Whether what they were doing was lawful or unlawful, if you

17   have a real entity that's bound together in some way, a drug

18   company comes along and infiltrates it and causes the product

19   of that medical marketing activities, unknownst to the truly

20   bound entity -- let's say you have like a joint venture of

21   two bound medical companies that no one would dispute they're

22   in a common purpose together.  I get together with Mr. Dugan,

23   and we go into medical marketing, and we have our own joint

24   venture together, so we're an enterprise.  Somebody,

25   unknownst to us, comes along, infiltrates us, uses us,

**5/3/2006  Hearing on Objections to Report & Recommendation**

```
 1    unknown to us, so that it makes it look like Sobol and
 2    Dugan's medical marketing firm is doing this information.  It
 3    turns out the information is false, it's misleading.  We were
 4    infiltrated, okay.  No one would dispute that in that
 5    situation, that's a RICO enterprise.  Why?  Because the drug
 6    company can't do it on their own.  They had to do it through
 7    some other independent entity or through some enterprise, so
 8    they infiltrate Sobol and Dugan.  Sobol and Dugan then,
 9    unbeknownst to them, we have nothing to do with it
10    whatsoever, we cause the negative effect to occur.  That's a
11    RICO enterprise.
12            So here what I'm saying is, the binding effect is
13    independent of the illegality, and here the binding effect is
14    the reality that they're all involved in something that
15    ultimately really is unlawful.  When entities are involved in
16    something that's unlawful, they know that the only reason for
17    them to be together is to accomplish this unlawful act --
18            THE COURT:  Okay, so moving to part two, assume I
19    buy that, and a common unlawful purpose for off-label
20    marketing is going to be enough to create the enterprise, and
21    then the pharmaceutical industry uses that to disseminate
22    fraud.  That's what you're arguing?
23            MR. SOBOL:  Correct.
24            THE COURT:  All right, let's assume that happens.
25    Then what specifically is the fraud you're alleging?  Because
```

**5/3/2006  Hearing on Objections to Report & Recommendation**

1    it can't be off-label marketing.

2         MR. SOBOL:  That's right, it's not per se off-label

3    marketing.

4         THE COURT:  I mean, it's part of it all, the

5    number, but the bottom line is, it's got to be a specifically

6    fraudulent statement.

7         MR. SOBOL:  Sure.  And the fraudulent statements,

8    or omissions in this case, depending upon the indication, go

9    to either the effectiveness of the drug, the existence of the

10   state of the science regarding whether or not the science,

11   you know, was conclusive on an issue or not.

12        THE COURT:  I've got the complaint here.  So what's

13   the specific statement that you say is fraudulent?

14        MR. SOBOL:  Well, I mean, really the complaint is

15   rife with them, but, you know, the one that I had tabbed is

16   on Page 50, "False and misleading statements about pain."

17        "In each of the presentations known to the

18   plaintiffs concerning Neurontin on pain, at least one of the

19   presenters expressly stated or implied that Neurontin was

20   effective for the treatment of pain."  And then we go on, and

21   we detail all of this kind of thing.  And then on the next

22   page we say at Paragraph 130, "The speakers who made these

23   statements did not have any clinical evidence to support such

24   claims.  The statements implied the clinical evidence was

25   sufficient.  However, no clinical trial evidence exists that

**5/3/2006  Hearing on Objections to Report & Recommendation**

1        supports the claim."

2            I mean, it's pretty straightforward fraud, you

3        know.  And you create a situation where there's this

4        ostensible objective information exchange in a purported

5        scientific setting fostered by the defendant through a

6        conduit of an enterprise.

7            THE COURT:  What's the false statement?  Did they

8        actually say it was supported by objective clinical

9        evidence?

10           MR. SOBOL:  Yes.  Well, we say that the statements

11       imply.

12           THE COURT:  What does that mean?  Do you have the

13       statements?  I'm just trying to get at what are the actual

14       words used.  Do we know?  Is there a circulated --

15           MR. SOBOL:  The most knowledgeable person on that

16       would be Mr. Greene, and on this one, I'm not exactly sure

17       what the words were.  I know what the allegations were in the

18       complaint.

19           THE COURT:  Do you happen to -- I'm pushing him

20       hard on it because is it just the mere fact that they're at a

21       conference that they implied it, or were there words used?

22           MR. SOBOL:  No, no.  No, there were words used.

23       No, it wasn't just that they were all sitting around at --

24       the allegations in the complaint are that the presenters here

25       are even trained by Pfizer or Warner-Lambert to make

**5/3/2006  Hearing on Objections to Report & Recommendation**

```
1     statements and to encourage the use of Neurontin, and to have

2     people believe, through statements and through implications,

3     through anecdotal evidence --

4             THE COURT:  Don't sit down.  So what are the

5     statements?

6             MR. GREENE:  Well, the statements are for various

7     indications.  Take migraine, promoting it for migraine,

8     promoting it as effective for migraine; and suppressing, not

9     disclosing, concealing that they had a negative clinical

10    trial for that.

11            THE COURT:  But what are the actual words?  Did

12    they say, "We have medical evidence to support the use of

13    Neurontin for migraine headaches"?

14            MR. GREENE:  Well, I would want to have the

15    transcript of the presentation in front of me, but it's

16    saying it's effective for migraine, it works for migraine,

17    and not telling the doctors that are gathered there that "We

18    conducted a clinical trial that found a placebo was more

19    effective for migraine."

20            THE COURT:  When it says here, "Dr. Stephen

21    Schacter made a similar statement at the May, 1996 meeting

22    when he said that pain specialists are finding that low

23    dosages of Neurontin are effective," why is that

24    misrepresenting?

25            MR. GREENE:  That low dosages of Neurontin are
```

**5/3/2006  Hearing on Objections to Report & Recommendation**

```
 1    effective?  Well, they had --
 2            THE COURT:  No, that pain specialists are finding
 3    that low dosages -- that's what you just read me, right?
 4            MR. SOBOL:  Right.
 5            MR. GREENE:  It's misleading because they're not
 6    giving the full picture of all the information they had about
 7    its effectiveness for pain.
 8            THE COURT:  Like what?
 9            MR. SOBOL:  Like the study that Mr. Greene just
10    indicated, that they had done their own internal study, and
11    they had found out that a sugar pill was better.
12            THE COURT:  For pain?
13            MR. SOBOL:  For pain.
14            MR. GREENE:  That's true with regard to migraine.
15    It's true with regard --
16            THE COURT:  In May, 1996?
17            MR. GREENE:  They had the negative study from the
18    late '80s, your Honor, and they never disclosed it.  And you
19    might recall from the Franklin case --
20            THE COURT:  Here's the problem.  Assuming that
21    you're right -- I mean, the association-in-fact kind of
22    enterprise is a very difficult, amorphous concept anyway.
23    Assume that you can get past this by saying, yes, it's an
24    unlawful purpose, it binds them together even if it's not the
25    predicate act unlawful purpose, now you've then got to get to
```

**5/3/2006  Hearing on Objections to Report & Recommendation**

```
1     fraud.  So I'm just trying to find one statement in here
2     where it specifically alleges what the fraudulent statement
3     is and why it's fraudulent.  That doesn't talk about sugar
4     studies.  Is that in here?
5          MR. SOBOL:  The reason for that -- yes, now I
6     understand what you're trying to say, your Honor, but the
7     problem is this.  The complaint alleges something like this.
8     You have a group of people, doctors, who go into one of these
9     meetings, and they're trying to find out information that
10    they think is an ostensibly fair and balanced display of the
11    information regarding, for instance, this indication for
12    pain.  And then they start hearing statements about, "Oh,
13    well, you know what?  Certain kinds of specialists are
14    finding out that small dosages are Neurontin are effective
15    for pain."  And then the whole setting of the situation is
16    one where people are starting to believe --
17         THE COURT:  So it is the setting that, in your
18    opinion, makes it --
19         MR. SOBOL:  Absolutely, by definition.  And the
20    setting is created by the drug company to make it look like
21    it's not fostered by the drug company.
22         THE COURT:  There's nothing here that's literally
23    untrue, is that right?  What you're saying is, the setting
24    makes them think it's based on science, when in fact it's
25    based on anecdotal physician evidence?
```

**5/3/2006  Hearing on Objections to Report & Recommendation**

1          MR. SOBOL:  Well, in fairness, your Honor, in the

2     example that I've pointed to, the answer is "yes."  I have

3     not gone through the complaint to show the literal statements

4     you've asked for.  But as you know, even if something is

5     literally true, if it's said in a way or in a context that is

6     intended to mislead and has the effect of misleading, it's

7     also actionable.

8          THE COURT:  All right, so this is a context case.

9     There's nothing in here that's specifically false.  It's that

10    it was put in a setting where -- like, if I was really not a

11    judge and I'm wearing a black robe, I'm not saying anything

12    false; it's just I'm giving the wrong impression.  Is that

13    what you're saying?

14         MR. SOBOL:  For Paragraph 129, I am, but --

15         THE COURT:  All right.  They're dying over here.

16    Do you have something that's literally false that's alleged?

17         MR. SOBOL:  Ms. Nussbaum has handed me -- they have

18    a PowerPoint that they have gone through some of the false

19    statements which we didn't anticipate we'd go through, so --

20         THE COURT:  Ms. Nussbaum, I forget, you're with the

21    coordinator?

22         MR. NUSSBAUM:  Yes.  The complaints are

23    substantially similar, your Honor.

24         THE COURT:  So what page am I supposed to look at?

25         MS. SOBOL:  Page 3, your Honor.

**5/3/2006  Hearing on Objections to Report & Recommendation**

```
1              THE COURT:  Have you all seen this stuff?  Is this
2       the first time you've seen it?
3              MR. ROUHANDEH:  This is the first time I'm looking
4       at it.
5              MR. SOBOL:  These are paragraphs in the complaint,
6       your Honor.
7              THE COURT:  I know, but it's nice to coordinate
8       it.  Do you want to take a few seconds and look at it?
9              MR. ROUHANDEH:  Yes, that's fine, we can go ahead.
10             MR. SOBOL:  Just as an example, your Honor, the
11      first example is one -- it's in both of the complaints --
12      that the enterprises were used in order to tout very high
13      dosages of Neurontin as the appropriate dosage regimen,
14      thereby causing increased expenditures, even though they had
15      concealed the fact that there was a lack of scientific
16      evidence to actually show that there was increased
17      effectiveness and side effects associated with the increased
18      dosages.  And that's something that actually would probably
19      be a literal misstatement.
20             Also, though, in fairness to both the complaints,
21      these are also statements that are made in contextual
22      situations that are similar to that of Paragraph 129 that we
23      talked about.  Monotherapy they described as being effective,
24      excellent, and approved, but they concealed clinical studies
25      showing the opposite and the fact that the FDA had rejected
```

**5/3/2006  Hearing on Objections to Report & Recommendation**

```
1    that indication.
2              THE COURT:  So this is primarily an omission case?
3              MR. SOBOL:  It's really hard answering your
4    questions when they're so, frankly, general, but --
5              THE COURT:  Can I tell you something?  Just in most
6    fraud cases, you have a statement, and then they say, "This
7    is false, deceptive, and misleading.  This is just false."
8              MR. SOBOL:  Right.  Well, I think the fair way to
9    characterize it this is, the way to answer the question:  No
10   drug company, particularly a company like Warner-Lambert or
11   Pfizer, is going to go out into the community and say
12   explicitly, you know, wrongful, false statements that would
13   be in their literal sense, at least not for a long period of
14   time, because that's not how you can cleverly go about the
15   business of effectuating what they wanted to and did
16   effectuate here, which is widespread oversales.  So instead,
17   yes, you're right.
18             What's the general flavor of the case?  Well, the
19   general flavor of the case ultimately is, you have a drug
20   company here that's committing false and deceptive statements
21   largely through omissions, or by innuendo, or by the context
22   of creating situations where things look like they're more
23   objective, you know, in terms of factual presentations than
24   they really are, and people believe they're getting the whole
25   story, and they're not.  That's more of the feel of the case,
```

**5/3/2006  Hearing on Objections to Report & Recommendation**

```
1    to be sure.
2            THE COURT:  Do they ever represent that there are
3    studies to support this, and there aren't any?
4            MR. SOBOL:  Yes.  There are some indications where
5    we say that they represent that the evidence is clear or that
6    the things have been approved, that the scientific evidence
7    is such and such, when in fact the opposite, we say, was not
8    true.  And it really depends in part on when you're talking
9    about and the indication you're talking about.  But it's not
10   as if there's one particular single message that they say.
11   There is a series of messages they say for particular
12   indications.  But the feel of the case ends up being, when
13   all is said and done, that rather than having a drug that
14   ends up being sold at, you know, several score million for
15   its appropriate use, you end up with a drug that's being sold
16   at billions of dollars a year annually by reason of this kind
17   of detailing and medical marketing activities.  So that's
18   more the feel of the case, to be sure.
19           And probably in there, by the way, as Ms. Nussbaum
20   has found, has been able to demonstrate, we'll probably also
21   have some literal misstatements, you know, literal false
22   statements, okay, but, then, those probably are going to be
23   comparatively, you know, in between.
24           This also deals with an issue that we think, you
25   know, in all fairness, that we have to say, with all due
```

**5/3/2006  Hearing on Objections to Report & Recommendation**

```
1    respect to Judge Sorokin's decision, he used an analogy or
2    drew to a case -- I can't remember the name of it -- but it
3    was a situation where he was scrutinizing the statements that
4    we were saying were false and deceptive as if they were
5    statements that were made in the complete without any context
6    at all, as if they were just being shed in a courtroom right
7    now, for instance, unvarnished by the situation; and that we
8    should look at the statements being made by these physicians
9    the same way you'd look at a statement being made by an
10   automobile dealer:  Oh, well, if an automobile dealer said
11   something, you would have a second wonder about what they're
12   saying.  In these situations, people make these
13   presentations, they think they're getting unbiased, complete
14   information about the product, and it turns out they weren't.
15            THE COURT:  So why would they think that?
16            MR. SOBOL:  Because these are scientific
17   discussions in consultants' meetings on the product.  It's
18   not as if -- and these are things that are being done not
19   under the -- these aren't being done directly by the drug
20   companies.  They're being done by the medical marketing firms
21   that are apparently not under the auspices of a drug company.
22            THE COURT:  Are these advertised as
23   Pfizer-sponsored seminars, or are they being advertised as
24   objective scientific --
25            MR. SOBOL:  The allegations of the complaint are
```

**5/3/2006  Hearing on Objections to Report & Recommendation**

1    that they're being held in the context where they're being

2    treated like they are scientific meetings.  And the

3    literature that was being distributed, the puppeteer hands,

4    if you will, of Pfizer or Warner-Lambert behind them was not

5    disclosed either.  So the way that this --

6          THE COURT:  So they didn't know Pfizer was

7    sponsoring them?

8          MR. SOBOL:  Right.  Why would you have ghost

9    writers?  You don't have a ghost writer if you're going to

10    say who the writer is anyway.  And the complaint has, you

11    know, who the ghost writers are.  There's a whole -- one of

12    the two sub-enterprises that we have is that the whole

13    publishing enterprise is a system that's set up in order to

14    disguise the fact that the information is coming from the

15    drug company and is instead coming from other sources.

16          And that's the sense of the general way that I

17    would think you could characterize the whole of the

18    complaint, is that they are contextual but still misleading;

19    that there are omissions; that in these contexts, that's

20    particularly egregious to omit information when people think

21    they're getting the whole story.

22          THE COURT:  And you're not relying on the fact that

23    they omitted that this was being marketed off-label?  In

24    other words, some of your discussion in the briefs were, one

25    of the omissions was the fact that Pfizer didn't disclose

**5/3/2006  Hearing on Objections to Report & Recommendation**

```
1    these were off-label uses.
2              MR. SOBOL:  Well, sometimes, if the allegation is
3    that it is for an approved purpose and they fail to disclose
4    the fact that they tried to get it for an indication and the
5    FDA said no --
6              THE COURT:  So it's only where they said it was for
7    an approved purpose that you're saying that's a fraud?
8              MR. SOBOL:  Correct.  Now, the fact that there were
9    promotions going on off-label is an additional fact that
10   helps in terms of the consumer fraud claims that we have in
11   the case too, and gets into the notion of whether or not
12   their activities were false and misleading, that kind of
13   thing, but we still need the statements or the omissions in
14   the case.  The case is not, you know, purely off-label;
15   regardless of whether things were true or false, we just want
16   to sue for off-label.  That's not what it's about.
17             THE COURT:  All right, it's got to be false.
18             MR. SOBOL:  Right.
19             THE COURT:  All right, thank you.
20             MR. SOBOL:  Or misleading.
21             THE COURT:  Or misleading.
22             MR. ROUHANDEH:  Your Honor, I'm not sure, but I
23   think Mr. Himmelstein is going to go on to new areas.  Would
24   it make sense for me to address --
25             THE COURT:  I leave that actually to you.  I
```

**5/3/2006  Hearing on Objections to Report & Recommendation**

```
1    assume, is yours going to be brand-new?  Does it make sense
2    for him to address both of them together?
3             MR. HIMMELSTEIN:  Well, new and just a little bit
4    of follow-up, if I could, to Mr. Sobol.
5             THE COURT:  Why don't we just wait, and then I'll
6    let you address them both in the aggregate.
7             MR. ROUHANDEH:  Sure.  That's fine, your Honor.
8             MR. HIMMELSTEIN:  We have waited a long time for
9    this hearing, and, unfortunately, your Honor does not have
10   the benefit of the briefing we did on the actual motion.
11   Your Honor has the objections.  In our briefing on the actual
12   motion, we laid out, I think very well, the entirety of our
13   case, the false statements, how it all fits together.  But
14   the report and recommendation, you know, cuts it into such
15   fine slivers that the briefs and our objections are just
16   attacking slivers, and so your Honor doesn't have the benefit
17   of that prior briefing and the big picture.
18             There are a full 28 pages in the class complaint
19   and an equivalent amount in the coordinated complaint that go
20   through the various misrepresentations and material
21   nondisclosures that the defendants made here.  They created
22   this enterprise.  This didn't preexist.  They created this
23   enterprise, which needed to have the medical marketing firms
24   as intermediaries and the physicians to do the peer-to-peer
25   selling for the sole and express purpose of promoting these
```

```
1    drugs for off-label uses, for that unlawful purpose.  And --
2              THE COURT:  Well, let me ask you this:  Do you
3    agree also with Mr. Sobol, though, that you don't have enough
4    information to allege that either the marketing firm or the
5    physicians shared the unlawful fraudulent purpose?
6              MR. HIMMELSTEIN:  We don't have complete
7    information, but we certainly have some.  And the
8    Magistrate's report itself in fact found at Page 16 that the
9    marketing firms, quote, "knew that their final products were
10   biased and that they intentionally created their programs so
11   as not to be fair and balanced."  In the next sentence,
12   inexplicably, in my view, he finds that that does not
13   constitute scienter, but that is at the heart of this case.
14             What you have here is a situation where a
15   pharmaceutical company carefully concealed its involvement
16   from the target audience, the prescribing physicians, in all
17   of this.  So that the prescribing physicians would arrive at
18   these continuing medical education conferences thinking that
19   they were about to receive the truth, the whole truth, and
20   nothing but the truth from the "thought leaders,"
21   quote/unquote, the best and the brightest in their fields
22   about the state-of-the-art knowledge, that these speakers and
23   the medical education conferences providers had no ulterior
24   motives and would have a natural self-interest in presenting
25   opposing views and educating these physicians, as opposed to
```

```
1     a visit from a pharmaceutical sales rep where the guy doesn't
2     even have a medical degree, starts telling the doctor, "Oh,
3     the drug does this, the drug does that."  The doctor goes
4     "Yeah, yeah," and ten minutes later there's another knock on
5     the door, and it's a salesman from the next pharmaceutical
6     company telling you, "Oh, that other guy, he's all full of
7     you know what.  Don't listen to him."  Doctors don't place a
8     lot of weight in those sorts of visits.  They go to these
9     sort of conferences to learn, to be told what to do by people
10    who supposedly know better than them.  And they created this
11    enterprise to facilitate that, and then they presented not
12    complete, truthful, unvarnished information, but a biased
13    one-sided presentation, which the Magistrate adopts our
14    terminology as an "infomercial."
15            And, obviously, in any fraud, you take into account
16    not only the words spoken but the context and what the
17    recipient of the fraudulent statements has a reasonable and
18    legitimate expectation of receiving.  These are doctors in
19    their most vulnerable state just waiting to be told what to
20    do, without their guard up, and instead they're given an
21    infomercial disguised as the unvarnished truth, disguised as
22    complete disclosure.
23            And there's a truly shocking litany of things that
24    they did.  In our opening brief, we summarize this at
25    Footnote 3, our opening brief on the motion to dismiss, and I
```

**5/3/2006 Hearing on Objections to Report & Recommendation**

1     can run through this quickly.  I'd like to just give your

2     Honor a sense of the egregious conduct that's been alleged

3     here.  After they sponsored a study themselves, they

4     concluded that Neurontin was ineffective, quote,

5     "ineffective" or probably ineffective for the treatment of

6     diabetic peripheral neuropathy.  They misrepresented that

7     conclusion.  And we did brief this with the defendants in the

8     last two briefs that your Honor got.  They provided their own

9     falsified version of that study to DrugDex, got DrugDex to

10    adopt instead the conclusion that, "Oh, you just need to

11    prescribe more of it for it to be effective," when the doctor

12    who did the study concluded it was ineffective.  That's one

13    thing they did.

14          Another thing they did, they had an unpublished

15    study, again sponsored by them themselves, which concluded

16    that Neurontin was ineffective for the treatment of restless

17    leg syndrome and periodic limb movement disorder.  And we

18    omitted the title of the study from our complaint, but it

19    addressed both.  Not a single patient in that study had any

20    significant reduction in restless leg movement.  They told

21    people over and over again that it had a 90 percent

22    effectiveness rate in treating restless leg syndrome, and we

23    have that specifically alleged and a list of conferences

24    alleged.

25          There was another clinical trial showing that

**5/3/2006  Hearing on Objections to Report & Recommendation**

1    Neurontin was no more effective than a placebo in treating

2    bipolar disorder, and there was tons of this stuff, treatment

3    for bipolar.  My father, who died of cancer, his psychiatrist

4    gave him Neurontin for his depression before he died.  It did

5    not help.

6          Speakers at events routinely stated that it was

7    effective for bipolar and presented, instead of the clinical

8    science which shows you the overall picture and you can

9    measure statistical significance or the absence thereof, they

10    present case reports.  These conditions that Neurontin was

11    prescribed for are all very subjective things, pain,

12    depression.

13          THE COURT:  So in the complaint, maybe you could

14    get me a chart -- just, like, this was fabulous, those three

15    statements.  I go to the paragraph of what you allege was

16    false, on what date, and why you think it was false and

17    misleading, so I can just -- I don't need a brief, just,

18    like, if you gave me your five best examples.

19          MR. HIMMELSTEIN:  I've got a whole other page full

20    of things I can give you right now, but, sure, we can do

21    that.  But that sort of specificity your Honor found, I

22    think, in the motion to dismiss ruling in the Franklin case,

23    that when you're dealing with such a large-scale operation --

24    I mean, we're talking about -- we know of hundreds of

25    conferences.  There were thousands.  We don't have the

**5/3/2006  Hearing on Objections to Report & Recommendation**

```
1    transcripts.

2            THE COURT:  I just want some.  I want some

3    statements, five statements, ten statements, three

4    statements, where you say, "This was false because," or

5    "misleading," to make Mr. Sobol's point, "because," and then

6    specific relation -- are all these examples you have in

7    Footnote 3 in the complaint?

8            MR. HIMMELSTEIN:  Yes, they are.  We have 28 pages.

9            THE COURT:  And it says why they're false, why

10   they're false?

11           MR. HIMMELSTEIN:  It's all there.  We can bring in

12   a chart, but it will basically be cutting up our complaint

13   and pasting it into chart form.

14           THE COURT:  So tell me the exact paragraphs, and if

15   they're not there, then you're toast; in other words,

16   explaining --

17           MR. SOBOL:  We'll give you the chart, your Honor.

18           MR. NUSSBAUM:  Although, your Honor, each of the

19   complaints has the table of contents, which does --

20           THE COURT:  I know, but they're massive.  One

21   chart, I'll go to the paragraph.  It's very simple.  And it

22   would have to be explicit in there, what is the false

23   statement; and if it's not, you can just amend it and put it

24   in.  But that's what you've got to do in fraud:  What's the

25   statement, what is false and misleading, statement by
```

**5/3/2006  Hearing on Objections to Report & Recommendation**

```
 1    statement?  And it may be an omissions case, but why is the
 2    omission false and misleading?
 3          I understand the context, the color argument, which
 4    is, this is in the context of a conference which looks as if
 5    it's scientific, where it's really just a sales pitch.  And I
 6    think that's helpful for color.  You just need, though, the
 7    specific statement that's false, unless you're alleging, and
 8    maybe you are, that the mere fact of having one of these
 9    conferences is the fraud.
10          MR. HIMMELSTEIN:  Well, I think it is.  I mean, if
11    you have a conference on using Neurontin in bipolar disorder,
12    you invite a hundred people and you're paying for it, you're
13    obviously telling them something you think is going to
14    convince them to prescribe Neurontin for bipolar, and you're
15    holding a study in your hand saying a placebo is better.
16          THE COURT:  Then I need a statement that was made
17    that would say to doctors, who are pretty smart people --
18    they made it through medical school -- none of us did -- that
19    they knew that they didn't know that this was a Pfizer event,
20    and they thought it was something run by Harvard.  You know,
21    I don't mean -- you know what I'm saying, some
22    objective scientific seminar.
23          MR. HIMMELSTEIN:  You're honor is asking us to
24    prove our case in a motion to dismiss.
25          THE COURT:  For a fraud case, yes.  For a fraud
```

**5/3/2006  Hearing on Objections to Report & Recommendation**

```
 1    case, what is the statement?  Maybe there was a circulation
 2    brochure that says this was an objective scientific
 3    conference, and nowhere does it say Pfizer is paying for it
 4    and running the research.  That may be enough, but I need
 5    something.
 6             MR. HIMMELSTEIN:  Your Honor, with all due respect
 7    to the Court, I think we have sufficiently alleged that -- I
 8    mean, the whole purpose of this thing was to conceal their
 9    involvement.  We've alleged that the medical marketing firms
10    put on these conferences, you know, under their own names.  I
11    mean, it's all there in detail.  It sounds like, you know, we
12    have to have a mini-trial with, you know, putting in 100,000
13    pages of evidence to get over a motion to dismiss.
14             THE COURT:  All I want is if there is a chart of
15    exactly what's false and exactly why it says it's false.
16             MR. HIMMELSTEIN:  Okay.
17             THE COURT:  Maybe it's the method of marketing the
18    seminar, but then tell me what the method of marketing is
19    that's false.  And if I see that, then there's like a little
20    checkoff list.  Fine, I don't need a ton of them, but it
21    would be useful because at this point, if I went back and
22    read all the material before Judge Sorokin, all the
23    objections from two sets of plaintiffs and a defendant and
24    these mega amended complaints, it's easier for me; I just sit
25    and I go through the chart.
```

**5/3/2006  Hearing on Objections to Report & Recommendation**

1           MR. HIMMELSTEIN:  Yes, your Honor.

2           MR. SOBOL:  Do you want a checkoff box?

3           THE COURT:  Yes.  Yes, enough, yes, enough.  Okay,

4     so you'll give me that.

5           MR. HIMMELSTEIN:  Yes, your Honor.

6           THE COURT:  So apart from that, what's the -- like,

7     this is really helpful, this thing.  You know, you gave me

8     three statements.  I've got the paragraph.  I go look, bingo

9     or not bingo.  And then I'll check Mr. Sobol's box, okay?

10          So you had another point apart from the --

11          MR. HIMMELSTEIN:  Well, I was just following up on

12    Mr. Sobol's argument on the enterprise, that this was an

13    enterprise created out of nothing for a singular purpose, an

14    unlawful purpose, and it was very effective, as measured by

15    the sales.  Your Honor found, you know, in ruling on the

16    motion for summary judgment in Franklin, they had come up

17    with enough evidence that this activity resulted in these

18    billions of dollars of prescriptions.  Most drugs, you know,

19    the off-label usage is a percentage of the on-label usage.

20    Here it's, you know, exactly the reverse.

21          THE COURT:  You know, it's interesting, though.

22    The whistleblower suit was a little different -- and

23    Mr. Greene probably remembers -- because there, there was a

24    very interesting question about whether or not failing to

25    disclose it was off-label was a material omission for

**5/3/2006  Hearing on Objections to Report & Recommendation**

1    purposes of reimbursement from a state Medicaid agency.  Then

2    we got into this mess -- do you remember this? -- where some

3    of the agencies were reimbursed for off-label and others

4    wouldn't, and where was it material and where wasn't it

5    material?  But that's a little different here because it's

6    not state agencies, right?  These are the ERISA plans, for

7    you anyway.

8         MR. HIMMELSTEIN:  But the third-party payors would

9    largely be ERISA plans, but I don't think ERISA is an issue

10   in the case.

11        THE COURT:  Right, it was the ERISA plans, though.

12        MR. HIMMELSTEIN:  Yes.

13        THE COURT:  So it's not a question of -- well, let

14   me ask you.  Maybe I don't know the answer to this.  Do ERISA

15   plans reimburse for off-label?

16        MR. HIMMELSTEIN:  The third-party payors do, or we

17   wouldn't be here.  I mean, they did reimburse for these

18   prescriptions.

19        THE COURT:  But knowing they were off-label?

20        MR. HIMMELSTEIN:  I think most of them, if not all

21   of them, did not know at the time exactly what each

22   individual prescription was written for, but I can't speak

23   for all third-party payors in that regard.  I know some of

24   them, or at least the ones I'm familiar with, they just get a

25   record of what is prescribed and how much it costs, not --

**5/3/2006  Hearing on Objections to Report & Recommendation**

```
 1            THE COURT:  Because, of course, it's lawful for a
 2     physician to prescribe off-label.  What is not lawful is to
 3     market off-label.
 4            MR. HIMMELSTEIN:  Yes, your Honor.  There's no
 5     debate about that.
 6            THE COURT:  So I'm assuming the ERISA plans know
 7     that some of the stuff they're reimbursing for are being
 8     prescribed off-label.
 9            MR. HIMMELSTEIN:  Yes, your Honor.  There's no
10     dispute about that.
11            As far as the medical marketing firm scienter,
12     there is other evidence of it in the record, and, again,
13     unfortunately, more of it in the briefing before the
14     Magistrate, where there was one physician who they had not
15     prescreened to see what he was likely to say.  And, you know,
16     when the physician started talking about his own study which
17     came out negative for Neurontin, they planted, the medical
18     marketing firm, a shill in the audience to try and discredit
19     the physician, and then immediately removed him from their
20     speakers list, and sent Warner-Lambert an apology saying,
21     "We're sorry.  We'll never let this happen again.  We'll
22     always make sure that physicians deliver only positive
23     Neurontin messages regardless of anything."
24            THE COURT:  So do you think there's enough alleged
25     to have a shared fraudulent scienter with the medical
```

**5/3/2006  Hearing on Objections to Report & Recommendation**

```
1    marketing firms?
2           MR. HIMMELSTEIN:  I think there is.  I don't think
3    it's required, but I do think it is there.  There is also
4    some good evidence at least as to some physicians.  And,
5    remember, there's much we don't have here in terms of these
6    transcripts.  We quoted in our brief an actual transcript of
7    a meeting of presenting physicians.  These are the physicians
8    trained by Warner-Lambert.  And, again, this is part of the
9    scheme.  They had these what they called "speakers bureaus"
10   where they would train people to speak in favor of
11   Neurontin.  And at a meeting of physicians speaking about
12   psychiatric conditions, you know, one of them gets up and
13   says, you know, "I really don't think -- we're telling
14   doctors this, but I really don't believe it.  There's just
15   really not the evidence here.  The evidence is very bad.
16   Should we really be telling doctors that this stuff works for
17   these things?"
18          I mean, in their own minds, if they didn't know
19   that what they were saying was misleading, they certainly had
20   doubts which they expressed privately to one another.  But
21   when it came time for the conference, you know, it's all
22   "Go, go, go Neurontin," or you get hooked off the stage and
23   you don't come back and present again.
24          Now, that's the control exercised by the medical
25   marketing firms, which I think --
```

**5/3/2006  Hearing on Objections to Report & Recommendation**

```
 1              THE COURT:  So, I mean, just, it's a long answer.
 2    So you do think there's enough alleged for shared fraudulent
 3    scienter on the medical marketing firms?
 4              MR. HIMMELSTEIN:  I do, although, again, I agree
 5    with Mr. Sobol that it is not required.
 6              THE COURT:  Forget whether it's required.  You
 7    know, you're pushing me to the limits on enterprise law,
 8    which I'm not sure.  The question is, on plain old fraud law,
 9    do you think there's enough -- I know you think it isn't
10    required, but do you think there is enough alleged for shared
11    scienter on the medical marketing firms with respect to the
12    fraud?
13              MR. HIMMELSTEIN:  Yes, your Honor.
14              THE COURT:  The predicate mail fraud?
15              MR. HIMMELSTEIN:  Yes.
16              THE COURT:  So I should look for that.
17              MR. HIMMELSTEIN:  I think it's there.
18              THE COURT:  All right, are you done?
19              MR. HIMMELSTEIN:  With the enterprise element, I
20    am.
21              THE COURT:  Well, no, we're not doing this
22    piecemeal.  Is there anything else you want to --
23              MR. HIMMELSTEIN:  Then I'll just proceed to the
24    other plaintiffs' remaining objections.
25              On the preemption question, we have two issues, one
```

**5/3/2006  Hearing on Objections to Report & Recommendation**

```
 1        raised by the plaintiffs, one raised by the defendants.  I'll
 2        deal with them both.  We objected to the Magistrate's finding
 3        that our claims based on the structure of the off-label
 4        marketing enterprise are preempted, and the reason is, we
 5        have no claims based solely on the structure of the off-label
 6        marketing enterprise.
 7               As I explained earlier, the context in which the
 8        physicians received this half-baked misinformation is
 9        relevant.  It was an integral part of the scheme.  This is a
10        whole scheme that was designed to accomplish the purpose:
11        First, lure the physicians into what they think is an
12        educational environment, where they're going to be receiving
13        complete and truthful information with nothing held back, and
14        then give them biased information.  That was the scheme.  And
15        so that's not preempted.  That would be like saying that --
16               THE COURT:  Okay, I understand that argument.  So
17        what's the next one?
18               MR. HIMMELSTEIN:  Okay.  And they argue that our
19        entire state law claims should be preempted under Buckman,
20        and one of the things they cite is the new FDA rule that was
21        promulgated.  And in fact that rule expressly states the
22        opposite, and I'd like to call the Court's attention to that
23        because it's very helpful.  What this rule is about is the
24        labeling, and we're not talking about that in sort of the
25        metaphorical legalistic way, but the actual label that goes
```

**5/3/2006  Hearing on Objections to Report & Recommendation**

```
 1      in a bottle of pills, the package insert, what's on a label,
 2      where the warning should be, et cetera.  And this 71 Federal
 3      Register 3922, they say that state law claims based on
 4      inadequate disclosures of risks on the label or
 5      misrepresentations on the label should be preempted because
 6      the FDA has the sole authority over that.  We don't quarrel
 7      with that, but that's as far as this goes.
 8              What it says, though, at Page 3969, it has a
 9      separate section construing Executive Order 13132, and I'll
10      quote.  It says --
11              THE COURT:  Do I have this?
12              MR. HIMMELSTEIN:  Your Honor, this came up in their
13      brief filed on April 10, so we have not responded to it other
14      than me standing here, and so there's nothing in writing.
15      And I will be as brief and as quick as I can with it.
16              THE COURT:  You know, I haven't even heard from
17      them yet, so you do need to move on.  Why don't you finish
18      within five minutes on everything.
19              MR. HIMMELSTEIN:  All right, it says that that
20      executive order instructs us to "Restrict any federal
21      preemption of state law to the minimum level necessary to
22      achieve the objective of the statute pursuant to which the
23      regulations are promulgated."  And what they say above is
24      that, quote, "If state authorities, including judges and
25      juries applying state law, were permitted to reach
```

1    conclusions about the safety and effectiveness information

2    disseminated with respect to drugs for which FDA has already

3    made a series of regulatory determinations based on its

4    considerable institutional expertise and comprehensive

5    statutory authority --"

6          THE COURT:  You know what, this is just not going

7    to work.  You probably know it by heart.  You know what

8    you'll do is, you'll submit it to me.  Does that make sense?

9          MR. HIMMELSTEIN:  Yes, your Honor.  Bottom line, it

10   says:  Where the FDA has not already determined a drug's

11   effectiveness for a particular condition, which is the case

12   with off-label, there is no preemption because we're not

13   conflicting with any decisions the FDA has made.  So it's an

14   express statement of no preemption.

15         With respect to the verbatim reports, the

16   Magistrate found our claims, based on the verbatim reports,

17   failed to satisfy Rule 9(b).  We have no claims based solely

18   on the verbatim reports.  As your Honor found in ruling on

19   the motion for summary judgment in Franklin, the verbatim

20   reports are merely evidence of what the doctors were told and

21   what they heard.  And the only conditions we have offered

22   verbatim reports on in the complaints are conditions that the

23   Magistrate found we have satisfied the requirements of

24   Rule 9(b) on apart from the verbatim reports, so that ruling

25   is meaningless.

**5/3/2006  Hearing on Objections to Report & Recommendation**

```
1              THE COURT:  I've read these, yes.

2              MR. HIMMELSTEIN:  All right, with respect to

3    restless leg syndrome, as I've already said, the study was

4    titled that it was about restless leg and periodic limb

5    movement disorder.  We can amend the complaint to clarify

6    that, if that would help.

7              With respect to the dismissal of the unjust

8    enrichment claim --

9              THE COURT:  You don't need to address that.

10             MR. HIMMELSTEIN:  Okay.  With respect to

11   third-party payor standing, we've briefed this quite

12   extensively.  The recent Vioxx opinion, what we've called

13   Vioxx 1 in our brief, I think is the best treatment of this

14   issue and the closest on its facts.  That case, which is a

15   New Jersey court interpreting New Jersey law, and Kavky,

16   which is a New Jersey appellate decision interpreting

17   New Jersey law, basically say that as long as it's a consumer

18   product, it doesn't really matter -- well, in Vioxx, that it

19   doesn't really matter that an insurance company is paying for

20   part of it.  The decisions say that the New Jersey consumer

21   Fraud Act is to be interpreted expansively to effectuate its

22   purposes, and the purposes being deterrence and

23   compensation.  If the third-party payors, who paid for

24   85 percent of this consumer product, are unable to recover,

25   it would completely defeat and eviscerate the purpose of the
```

**5/3/2006  Hearing on Objections to Report & Recommendation**

```
 1     statute because it means that a manufacturer of the consumer
 2     product could lie till the cows come home about it, but they
 3     get to keep at least 85 percent of the money.  And the Vioxx
 4     opinion, which is the closest on its facts, walks through the
 5     analysis and rejects their attempt to narrowly define a
 6     consumer product as something which must be consumed by the
 7     person who pays for it.  It says, for example --
 8              THE COURT:  All right, you know, I think I've got
 9     the gist of it.
10              MR. HIMMELSTEIN:  Okay.
11              THE COURT:  Okay.  You know what, I just can't go
12     through all these.  I know you've written them all down.  I
13     think you've hit your big points, right?  I can't go through
14     every one of these.
15              MR. HIMMELSTEIN:  Okay.
16              THE COURT:  Excuse me?
17              MR. HIMMELSTEIN:  Will we get a chance to respond
18     to Mr. Rouhandeh?
19              THE COURT:  Maybe.  They haven't even stood up yet,
20     all right?  Go.  Thank you.
21              MR. ROUHANDEH:  Thank you, your Honor.  Just
22     responding to Mr. Sobol's first point, with respect to this
23     issue of whether an association-in-fact needs to have a
24     common fraudulent purpose, there is no case law to support
25     the idea that you don't need a common fraudulent purpose, and
```

**5/3/2006  Hearing on Objections to Report & Recommendation**

```
 1    for a very simple reason:  That is, the case law that deals

 2    with a situation where a legal entity is infiltrated from the

 3    outside, that's the only situation where you don't need a

 4    fraudulent purpose, but that's not an association-in-fact

 5    case.

 6            An association-in-fact case, to say that only one

 7    party need to have a fraudulent purpose, and the others can

 8    just simply do ministerial things to carry out the

 9    defendant's fraudulent purpose, would violate two fundamental

10    tenets of RICO law.  The first would be, you're essentially

11    making the defendant and the RICO person the same, you're

12    equating the two.  And the second is, you can basically take

13    any fraud, any common law fraud, and turn it into a RICO case

14    by simply saying, "Innocent parties, unbeknownst to them,

15    they unwittingly helped this fraudster commit a fraud, and

16    therefore I'm going to call it RICO."  That's why you don't

17    see anybody doing what the plaintiffs are asking this Court

18    to do, and that is say that only one party to an enterprise

19    or to an association-in-fact need to have a common fraudulent

20    purpose.

21            THE COURT:  You know, that's what I thought they

22    were arguing, but they've sort of recast it a little here

23    today.  And what they're arguing is, they all had a common

24    unlawful purpose, which is off-label marketing.  And they're

25    saying, but you don't need to have a common fraudulent
```