**5/3/2006  Hearing on Objections to Report & Recommendation**

1    purpose.  So that essentially Parke-Davis had a second

2    unlawful purpose which was the fraud.  They're using the

3    unlawful enterprise for the off-label for purposes of

4    perpetrating a fraud.  What do you think -- that's just a

5    new, a different cast than I thought of before.

6            MR. ROUHANDEH:  Well, I do think it's a moving

7    target.  That's not how the complaints were pled.  But even

8    if they were pled that way, we don't think that that would be

9    a sustainable claim because, first of all, those doctors,

10   those medical vendors, aren't engaging in illegal or unlawful

11   activity.  They would concede as much.  There's nothing wrong

12   with a doctor talking about an off-label use of a product.

13           THE COURT:  There is something wrong with the

14   marketing company doing it.

15           MR. ROUHANDEH:  Yes, there is something, and they

16   don't have a single instance of a marketing company here

17   saying anything false or fraudulent.  The marketing company

18   can't, but if you're talking about knowing participation in

19   an unlawful scheme, well, those doctors are free to say

20   whatever they want, and they freely do say whatever they want

21   at meetings to this day.  Currently, right now, all over the

22   country doctors are talking about off-label uses with one

23   another.  It can't simply be the law that you could go back

24   and say:  Well, this doctor has been paid some stipend to do

25   some research, and therefore he's a shill for the company,

**5/3/2006  Hearing on Objections to Report & Recommendation**

1    and he can't be talking freely with another doctor.

2           I mean, I wasn't going to get into the First

3    Amendment argument, but here it confronts it most severely,

4    to basically say:  We're going to set out a situation where

5    we're going to say doctors can't talk to one another about

6    off-label uses if one of those doctors has been paid

7    something by the drug company.  Well, nobody else pays those

8    doctors to go to meetings.  There won't be any discussion of

9    off-label uses.  And everybody agrees, including the FDA,

10   that off-label use is legally permitted, and in some cases

11   actually required by medical malpractice laws, the standard

12   of care.  As it is, we would submit with respect to Neurontin

13   and pain, it is the standard of care.  So I don't think you

14   can have this unlawful activity promotion actionable, in

15   addition because it's preempted, and essentially what you're

16   saying is that you can bring a claim and argue --

17           THE COURT:  If the doctor aids and abets the

18   pharmaceutical company by marketing the off-label?

19           MR. ROUHANDEH:  By making entirely truthful

20   statements because that's what you have here, entirely

21   truthful statements about off-label uses of the product.

22           THE COURT:  As part of a marketing campaign?

23           MR. ROUHANDEH:  As part of a marketing campaign.

24           THE COURT:  I don't know.  I wouldn't want to stand

25   up -- I don't know if I would give that one.

**5/3/2006  Hearing on Objections to Report & Recommendation**

```
1              MR. ROUHANDEH:  That is not -- what we would say
2      is, that's not a RICO enterprise.  We're not saying if that
3      occurred, that that's -- I mean, there is a plea here, as
4      your Honor is well aware, that there was some off-label
5      marketing.  We're not saying you can simply freely market
6      off-label.  What we're saying is, they're trying to take a
7      regulatory violation that was nonfraud and an opportunity
8      here to take that nonfraud regulatory violation and turn it
9      into a multibillion-dollar fraud.  It's a square peg in a
10     round hole, and it doesn't work.  They're entitled to try.
11     Of course they can try, and they can bring their complaint,
12     but what they can't do is get around the very stringent
13     requirements of 9(b), which is, where is the fraud?  Where is
14     the false statement?
15             There's no scienter on the part of the medical
16     marketing firms or the doctors.  The Magistrate looked at
17     that and said there wasn't anything to support any allegation
18     that those guys knew anything that they were doing was
19     wrong.  And to say that they were engaged in unlawful
20     off-label promotion we think would be simply engaging in
21     activity that may be improper, but it's probably preempted as
22     a matter of law because otherwise you're getting into a
23     situation of saying:  Well, this conduct violates the Food,
24     Drug and Cosmetic Act, and that one doesn't.  That's up to
25     the FDA to decide, not the courts to decide, at least in the
```

**5/3/2006  Hearing on Objections to Report & Recommendation**

```
 1    first instance.

 2           But, in any event, they're taking this fraud claim

 3    and they're trying to turn it into a RICO claim by alleging

 4    that one party to the event had a fraudulent intent.  But

 5    even there, they haven't pled that with specificity because

 6    they don't have any fraudulent statements by the company, and

 7    the Magistrate found as much.  There wasn't anything, when he

 8    got done looking at it, there wasn't any statement by the

 9    company that was improper or was specifically pled as false

10    and misleading.

11           And we went through every single statement in the

12    complaint regarding efficacy; you know, this person or that

13    person claimed it was efficacious.  In the first round in

14    front of the Magistrate, we went through every one, and we

15    said:  You haven't alleged any contrary facts to show that

16    what was said was untrue, and you haven't alleged that the

17    person who made the statement knew any of those contrary

18    facts, or even that the drug company had contrary facts that

19    they had some duty to disclose.  And in response, they

20    essentially abandoned that, and they tried to turn it into a

21    pure omissions case.

22           And in terms of an omissions case, the Magistrate I

23    think correctly found there's no general duty to disclose

24    your clinical results.  So what the Magistrate said was that

25    the only theories of fraud could be where you suppressed the
```

**5/3/2006  Hearing on Objections to Report & Recommendation**

1    study and encouraged doctors to go out and make statements

2    that were just related to their anecdotal information,

3    anecdotal experiences.  We went through each one of those and

4    have looked at those, and again there's no pleading with

5    particularity as to those, and more --

6            THE COURT:  So then I just let them amend it and do

7    it?

8            MR. ROUHANDEH:  I don't think they can, actually,

9    not consistent with the rules that govern their amending,

10   because they cite to a bunch of docket transcripts.  They

11   wanted the transcripts.  They have the transcripts of these

12   meetings.  And they come in and they say in the complaint

13   that, you know, two doctors -- first they came out and they

14   said two doctors claimed that the drug was effective for

15   monotherapy at a meeting down in Florida.  They abandoned

16   that claim.  The Magistrate threw out any claims based on the

17   assertion that the company or anybody else went out there and

18   said this product was effective.  They abandoned that claim.

19   They said, well, those two doctors didn't tell the audience

20   that the study was negative and failed to show efficacy.  And

21   we say in our briefs, this is an exact quote from one of the

22   doctors:  "The U.S. monotherapy study was unsuccessful in

23   showing efficacy."

24           I mean, I've never seen anything like this where

25   you go in and you say, here's what the doctors at the behest

**5/3/2006  Hearing on Objections to Report & Recommendation**

```
1     of the company said at a meeting and they lied, when you look
2     at that transcript and it says the exact opposite.
3     Dr. Harden, she says -- she did the study.  I mean, I would
4     encourage the Court to read one of these transcripts or just
5     the excerpts of the transcripts.  These are not promotional
6     sales.  This is a doctor, head of the Cornell Epilepsy
7     Center, describing a study that she was involved in.  She was
8     one of the investigators, and she comes in and she says,
9     "What I take away from the monotherapy study is that it's
10    difficult in refractory epilepsy patients to produce an
11    improvement in their epilepsy by changing them to
12    monotherapy.  I also learned from this study that refractory
13    patients often need polytherapy.  Highly intractable patients
14    may need polytherapy unless you can find that magic bullet
15    drug."
16          That's not somebody saying it works for
17    monotherapy.  That's somebody saying, this study shows that
18    you need polytherapy, meaning the opposite of monotherapy;
19    you need multiple drugs.  That was the best they could do.
20          After they got through with the Magistrate and he
21    looked at all of the allegedly false statements, he came up
22    with a handful relating to a handful of conditions.  And we
23    took a look at those and said, you know, now that this issue
24    has been narrowed to a handful of issues, we took a look at
25    it and we said, it's just flatly contradicted by the actual
```

**5/3/2006  Hearing on Objections to Report & Recommendation**

```
1    underlying document that they quote from.  And their answer
2    is, "Judge, don't look at those, don't look at those
3    transcripts.  We're entitled to quote from them and to use
4    them in our complaint, but they're not incorporated by
5    reference.  You don't have to look at those."  But I would
6    submit that the Court should look at them.  But even without
7    them, they haven't pled with particularity any false
8    statements.
9            And, really, it goes on and on.  I mean, they got
10   up here and they said:  Well, you know, there's a diabetic
11   neuropathy study, and it was a study, and it showed it's no
12   better than a sugar pill.  I think those were Mr. Sobol's
13   words.  Well, DrugDex, which they freely quote from, the
14   quote from the bottom of the DrugDex section where they talk
15   about this Gorsin study, two paragraphs above that is the
16   full-blown clinical trial that they're looking for that
17   concludes that it's effective in treating pain for diabetic
18   neuropathy.
19           THE COURT:  So how am I going to do this on a
20   motion to dismiss?
21           MR. ROUHANDEH:  You can do it on a motion to
22   dismiss simply on the basis of looking at the allegations of
23   the complaint.  You don't need to go behind and look at the
24   documents they incorporated by reference, because you can
25   look at them and you can say, well, look -- as to each one of
```

**5/3/2006  Hearing on Objections to Report & Recommendation**

```
1    these, you can say:  Look, they haven't alleged the facts
2    they need to say that the company knew these statements were
3    false.  They haven't alleged whether the company told these
4    doctors to say anything.  They don't allege that we
5    controlled the presentation of Drs. Harden and Laroy relating
6    to monotherapy.  You don't need to look at those.
7            But what we're saying is, it's, frankly, shocking
8    when you do look at the underlying documents that they quote
9    from.  And we think on a motion to dismiss you can look at
10   those.  It's a simple situation of, if they quote half the
11   document and they leave out the rest of the document, the
12   Court can go behind and look at the entirety of the
13   document.  And so we put those in, and we said the Court
14   could and should look at those.  But even if not, there's
15   nothing to allege that the company itself told these doctors
16   to make false statements, and they can't allege that.  And
17   what we say is, if you look at the document, the statements
18   aren't false; they're absolutely truthful.  And that's
19   something that the Magistrate didn't have in front of him at
20   the time with respect to those.
21           So we would welcome this.  Let's see the five
22   examples they have, because every time they've had an example
23   of a false statement, we've gone through and shown that it
24   hasn't been pled with specificity, and in many cases that
25   it's actually flatly contradicted by the documents that they
```

**5/3/2006 Hearing on Objections to Report & Recommendation**

```
 1    rely on, every single one.  They can't.
 2            And this isn't some case where, oh, well, maybe
 3    they've pled one, and they ought to be able to go out and get
 4    some discovery and do it.  They had all the Franklin
 5    documents, all the documents from the Franklin case, at the
 6    time they amended their complaint.  They had the deposition
 7    transcripts.  And Mr. Greene knows that case.  And they can't
 8    come up with a single false statement out of those documents,
 9    nothing that's false.  Their whole allegation started with,
10    well, we claimed that it was effective; that a claim that a
11    drug was effective implied that there was a double-blind
12    placebo-controlled study demonstrating it was effective.
13    And, quite rightly, the Magistrate threw that claim out.
14            So we think both that they cannot plead the RICO
15    enterprise and they cannot also come forward with a single
16    identifiable false statement.  And if they are going to put
17    something in, give five examples, we would like to just
18    respond to those five examples to show what they failed to
19    plead, what they would need to plead and what they failed to
20    plead, because I think what they'll do is, they'll have
21    these -- they always are in generalities.  You know, this
22    document: "Defendants represented Neurontin as effective,
23    excellent, and approved as monotherapy, concealed that it
24    failed clinical trial, FDA rejection."  They don't tell you,
25    by the way, in the letter that they quote from the FDA that
```

**5/3/2006  Hearing on Objections to Report & Recommendation**

```
 1    there was a positive monotherapy study that the FDA said
 2    would support the claim, you just need another one.
 3              THE COURT:  But do they actually allege that?
 4              MR. ROUHANDEH:  They do allege.  They --
 5              THE COURT:  That there were two failed clinical
 6    trials and an FDA rejection?
 7              MR. ROUHANDEH:  I thought they alleged one but --
 8    that they alleged it was one, but maybe they've alleged two.
 9    But the FDA rejection which they quote from actually says
10    that there's a positive study that shows that it's effective
11    in monotherapy.  I mean, this is not a case where -- and
12    there's no support, there's no factual support whatsoever
13    that the defendants represented Neurontin as effective,
14    excellent, and approved as monotherapy.  I would like to see
15    that with respect to this --
16              THE COURT:  Well, this is just a motion to
17    dismiss.  I just want specific, particularized allegations of
18    fraud.  And if it's not an actual misleading statement, which
19    I think many of these are not actually literally true --
20    they're saying they're misleading because of the omission --
21    specifically what the omission is that makes it fraudulent.
22              Would you agree, by the way, that these conferences
23    look like they're independent medical scientific conferences
24    as opposed to something sponsored by Pfizer?
25              MR. ROUHANDEH:  No.  It's not -- even on the face
```

```
1      of their allegations, on the face of their complaint, they
2      have not; that they have said, here's a meeting where the
3      Parke-Davis people were there, if you look at the
4      transcripts, and also the Parke-Davis people are there.
5      It's not as if this is some subjective meeting.  The
6      Parke-Davis people are there.  They invite them down, they
7      pay them.  Every doctor goes down to one of these meetings
8      knowing that it's a Parke-Davis/Warner-Lambert sponsored
9      event.
10          THE COURT:  They know that they're being paid for
11     by Parke-Davis and Warner-Lambert?
12          MR. ROUHANDEH:  Absolutely.  Absolutely they know
13     that.  And they cannot, they cannot allege to the contrary,
14     that these consultant meetings were something that wasn't --
15     I mean, where did they get the money from?  I mean, the check
16     came from somebody to say, "Go to this meeting.  We'll pay
17     your travel expenses."  It came from Warner-Lambert.  They
18     knew what -- and it's as if this learned intermedia
19     doctor -- and I don't know if your Honor is familiar with
20     it -- simply doesn't exist.  I mean, it sounds like they were
21     thinking this is about selling cars to the uninitiated.
22     These are doctors who were required by law to make their own
23     independent medical judgment and go to years of law school to
24     listen to what's said, filter it out, and make their own
25     decision.  This isn't a dupe who just takes the information
```

**5/3/2006  Hearing on Objections to Report & Recommendation**

```
1     in and says, "Okay, well, that doctor said it."  I think
2     Mr. Himmelstein just, "Oh, these are at their most vulnerable
3     state, these doctors."  These doctors are not at their most
4     vulnerable state.  They've always had to take all the
5     information in and make a clinical decision.
6             THE COURT:  But you're saying it was fairly
7     represented at these meetings that this was all sponsored and
8     paid for by, back then, Parke-Davis?
9             MR. ROUHANDEH:  Yes, and, more importantly, I'm
10    saying they haven't alleged it to the contrary, nor can they
11    allege it to the contrary, but just putting it in the words
12    of 9(b) in a motion to dismiss.
13            By the way, they mentioned Dr. Longmire making
14    this -- well, that was the first example that was given of
15    Dr. Longmire making a statement about pain.  The Magistrate
16    on Page 43 of his report looked at that and said, you know,
17    it's not false, it's not false and misleading, it doesn't
18    represent that scientific evidence supports the
19    effectiveness, and, you know, therefore it's not actionable,
20    and they didn't appeal from that issue.  So that's why I'm
21    eager to see what their specific examples are and eager to
22    respond to those specific examples.
23            Mr. Himmelstein also, I think, talked in
24    generalities about misrepresentations and didn't go through
25    any specific ones, but he says that there was this
```

**5/3/2006  Hearing on Objections to Report & Recommendation**

```
1      fraudulent -- that the company engaged in fraudulent
2      off-label promotion by not -- by these presentations not
3      being fair and balanced.  The Magistrate looked at that issue
4      also.  "Fair and balanced" is an FDCA regulatory term.  And
5      what the Magistrate did is, he said:  Look, the plaintiffs
6      had plenty time to brief this, and they've come up with
7      nothing to suggest that there's any duty to be fair and
8      balanced other than a duty that is found in the Food, Drug
9      and Cosmetic Act; and any claim that basically says you
10     weren't fair and balanced, if that's the basis for the claim,
11     that claim is preempted.  What you have to have is fraud.
12     Everybody knows that this case is about fraud.  It's not
13     about truthful off-label promotion, and it's not about not
14     being fair and balanced.  They have to allege actual false
15     statements and scienter.
16             Your Honor also mentioned this issue of the
17     Franklin case and how that Franklin case was different.  We
18     obviously believe that it is a different case.  It dealt with
19     an entirely different set of issues.  And there's actually
20     now a case decided by -- I think it's in the Southern
21     District of Florida, a magistrate decided the case, that
22     actually says that the state agency, state medicaid, has to
23     reimburse for all 54 off-label uses that are listed in
24     DrugDex, that they're required, and permanently enjoined
25     Florida Medicaid from trying to not -- to avoid reimbursing
```

**5/3/2006  Hearing on Objections to Report & Recommendation**

1    for those 54 --

2            THE COURT:  Well, I imagine it's just going to be

3    state by state.

4            MR. ROUHANDEH:  And I think we actually argued

5    before --

6            THE COURT:  Remember, didn't you have like -- was

7    it you?

8            MR. ROUHANDEH:  Yes.

9            THE COURT:  You must have hired a consultant who

10   went out and looked at all --

11           MR. ROUHANDEH:  State by state, yes.

12           THE COURT:  It was different.

13           MR. ROUHANDEH:  It is different, it is a different

14   issue.  And here there's no argument even that these insurers

15   can refuse to pay for these products, and they certainly

16   can't refuse to pay for the products just simply on the basis

17   that they're off-label.

18           THE COURT:  It depends on how they (Overlapping

19   speech), right?

20           MR. ROUHANDEH:  Right.  They haven't come forward

21   with anything that says, "We're seeking to recover these

22   because we didn't know they were off-label.  We only pay for

23   on-label."  That's not the theory of their complaint.  The

24   theory of their complaint is that -- at least the theory of

25   the class complaint is that it's ineffective, that the drug

**5/3/2006  Hearing on Objections to Report & Recommendation**

1    didn't work, and they shouldn't have to pay for it.  What we

2    say is, the reason all of the claims of the coordinated

3    plaintiffs should be thrown out is that they failed to allege

4    that it was ineffective.  And they're still struggling with

5    that, and they're still trying to --

6            THE COURT:  Well, they're going to give me their

7    five best cases from each of the complaints, and I'm going to

8    go through it.  And then the question is -- I would probably

9    let them amend it if I didn't think it was good enough, and

10   then you'll come back and respond.

11           But let me come back to the threshold question,

12   which I find an intellectually difficult one.  One of the

13   First Circuit cases involved an unlawful gambling RICO

14   enterprise, and then somebody used it for loan-sharking.  So

15   the question is:  If you're there for some unlawful purpose,

16   and then one of the members uses it for a second purpose that

17   isn't common, is that going to be enough?  I mean, that's

18   sort of what we're talking about here.

19           MR. ROUHANDEH:  No, I think that case is

20   distinguishable because, first of all, it's criminal RICO,

21   and I think the law is different with respect to criminal

22   RICO and conspiracy and is different in the criminal context,

23   as opposed to here where you basically have as a civil matter

24   an association-in-fact where you have to have a common

25   purpose that's fraudulent.  Your Honor is not the only one

**5/3/2006  Hearing on Objections to Report & Recommendation**

1    that's held that.  Judge Stearns held that in Lupron.  The

2    Second Circuit has held it.  They don't have any cases that

3    go the other way that say you don't have to have a common

4    fraudulent purpose.  So now they say, "Hhm, we don't have a

5    case.  Let's call it an unlawful purpose because one person

6    was manipulating it."

7         Well, the conduct of all the other members is

8    completely legal and permissible.  None of the other members

9    did anything that's unlawful.  They're not defendants here.

10    They're not accused of violating --

11         THE COURT:  For sure, they did something unlawful.

12    They just didn't do something perhaps that's fraudulent.  For

13    sure, the medical marketing firms were engaged in unlawful

14    off-label marketing.

15         MR. ROUHANDEH:  But there's nothing that says that

16    the medical marketing firm or that the doctor can't -- that

17    the medical marketing firm can't prepare or the medical firm

18    can't prepare --

19         THE COURT:  Sure, aiders and abetters of a crime.

20    You probably don't do much criminal, but if they knew that it

21    was unlawful, I mean, maybe they weren't prosecuted but --

22         MR. ROUHANDEH:  No, I do.  Well, they weren't

23    prosecuted, which is a very telling point, that certainly you

24    didn't see the government in this case -- and that was a case

25    that I was very intimately involved in -- you didn't see them

**5/3/2006  Hearing on Objections to Report & Recommendation**

```
1    looking at those medical vendors and saying they were aiding
2    and abetting any --
3              THE COURT:  Sure, maybe they didn't want to.  But
4    I'm just simply saying, if they shared the intent to
5    off-label market, they're guilty as aiders and abetters.
6    Now, that may not be the same as fraud, but they would be on
7    the hook.  And I guess the real issue is here, where you have
8    a non-RICO predicate act with the underlying unlawful
9    purpose, can you then use that enterprise for the fraud, you
10   know, if there's no shared purpose to do that?  That's a very
11   interesting question.
12             MR. ROUHANDEH:  Right, and it's one that I think no
13   court has answered that, yes, you can.  But just going back
14   to the issue --
15             THE COURT:  Or, no, you can't.  I mean, no one's
16   really addressed where the purpose is a non-RICO purpose but
17   it creates the binding agent, if you will.  I just don't have
18   a case one way or another on that.
19             MR. ROUHANDEH:  Well, I think the cases are pretty
20   much right down the middle, which is, where you have the
21   legal entity that is the sort of object for RICO, it's a
22   legal entity that is the enterprise, that there, there
23   doesn't have to be an illegal or unlawful or fraudulent
24   purpose.  But where it's an association-in-fact, everybody in
25   that association-in-fact has to share a common purpose, and
```

**5/3/2006  Hearing on Objections to Report & Recommendation**

```
1     it has to be a fraudulent one, an illegal one, and an

2     unlawful one.

3            THE COURT:  I understand your position.  It's just

4     it's hard to identify.  I think you should probably jump at

5     this point to your objections.

6            MR. ROUHANDEH:  Okay.  Yes, with respect to our

7     objections, he essentially left three claims in.  He

8     recommended dismissal of fifteen of the eighteen claims,

9     including all the RICO claims, and left in ununjust

10    enrichment, the New Jersey Consumer Fraud Act, and the common

11    law fraud claim.  And just briefly with respect to the New

12    Jersey consumer fraud and the common law fraud, those claims

13    he very carefully circumscribed and said:  Look, the

14    complaint is full of all sorts of different fraud theories,

15    and we've talked about many of them now.  He essentially said

16    that there's only two that are left:  One is that the company

17    misrepresented the results of studies, and, two, that they

18    engaged in fraud by encouraging doctors to relate positive

19    anecdotes while the company had negative clinical studies in

20    their back pocket.  And we submit that they have not alleged,

21    consistent with 9(b), either of those points.  And they

22    relate in effect to five uses, and I won't go over the ones

23    that we already discussed, but the monotherapy one was the

24    first one.  And with respect to monotherapy, the Magistrate,

25    in addition to saying, look, you alleged that these two
```

**5/3/2006  Hearing on Objections to Report & Recommendation**

1     doctors, Harden and Laroy, went out and made a statement, and

2     we say the documents are completely inconsistent with that

3     statement.  They also said, you know, these doctors

4     misrepresented the lack of a dose response.  And as we say in

5     the brief, it's there in the document that they quote from

6     that says there was little dose effect demonstrated in the

7     study.  So we don't think that they can allege, consistently

8     with Rule 11, that those allegations can stand up.

9            THE COURT:  You want me to transform it into a

10    summary judgment motion essentially.  You want me to use the

11    transcripts that were quoted and --

12           MR. ROUHANDEH:  I don't think it actually converts

13    it into summary judgment because I think there is law that

14    would say, look, if one party quotes in the complaint from a

15    document, that it's therefore incorporated by reference, and

16    you can consider or could consider converting it into summary

17    judgment, but could simply treat it as a motion to dismiss

18    and treat the entirety of the document essentially as an

19    allegation of the plaintiff and find that it hasn't been pled

20    with particularity.  They have to plead that there was a

21    misstatement made regarding monotherapy, and what we're

22    saying is, they haven't stated that.

23           And even if you accept everything that they say as

24    true and you don't look at those studies at all, push them

25    off, don't look at those transcripts at all, there's nothing

**5/3/2006  Hearing on Objections to Report & Recommendation**

1     in there that says what the company -- that the company ever

2     said anything to Harden and Laroy, these doctors who made

3     statements; that we controlled the content, that we told them

4     what to say, that we told them to lie, that we somehow

5     influenced their discussion of that study.  So we would say

6     they don't meet 9(b) with respect to that.

7            The next one is this diabetic neuropathy, and,

8     again, they say, just flatly untrue, that DrugDex said the

9     author never suggested that higher doses of Neurontin are

10    needed.  And we put in the document.  Basically the doctor's

11    very first draft says that, and the published letter that

12    DrugDex relied on said that.  Both are just absolutely

13    contradicted.  So we don't think that they can plead any of

14    those theories.

15           It's the same thing with migraine.  They

16    misleadingly quote from the document.  This is just an

17    example.  On a motion to dismiss, where they take a quote and

18    they add in little brackets some language that says that the

19    doctor asked about migraine, when it's clear if you look at

20    the entirety of the exchange -- that's just one page -- that

21    the doctor was asking about headache and not asking about

22    migraine.  Why should this Court have to accept as true the

23    bracketed insertion into the quote, the plaintiffs' assertion

24    that the doctor was asking about migraine, and therefore that

25    gave rise to a duty on the behalf of the company to say, "Oh,

**5/3/2006  Hearing on Objections to Report & Recommendation**

1   here's everything we know about migraine"?  He wasn't asked

2   about migraine.  They were asked about headache.  And anybody

3   who's had a migraine knows it's not the same thing as a

4   headache.  So I don't think that you would need to convert

5   this to summary judgment.

6          The other ones are even weaker.  I mean, for

7   example, on panic disorder, they simply say the company had a

8   negative study, and they told -- and there were two meetings

9   where people went out and said something inconsistent with

10   that study, no more need be alleged.  I think more does need

11   to be alleged.  9(b) requires more than that:  Who said it?

12   What did they say?  How is the company responsible for what

13   was said?  Did the company control what was said?  I mean, I

14   think they're inaccurately representing the nature of the

15   study.  But if you don't even go there and don't look at

16   DrugDex and what it says about the study and what these other

17   documents say about the study, you can still look at it and

18   say:  There's nothing that says we had a meeting, that we

19   discussed this with the speakers, that we conferred on the

20   presentations --

21          THE COURT:  So you're really, just to dig beneath

22   this, you're sort of conceding they've alleged enough, but

23   you're saying that I should go into the documents that are

24   quoted, that the motion to dismiss is broad enough for me to

25   pick up any documents quoted, and I can see that they quoted

**5/3/2006  Hearing on Objections to Report & Recommendation**

```
 1    it out of context or incorrectly?
 2           MR. ROUHANDEH:  Well, I'm saying that the
 3    Magistrate found that they had pled it adequately.  I don't
 4    agree that they pled actual false statements.  I don't agree
 5    with that, but what I'm saying is that they didn't plead it
 6    with particularity.  He had too relaxed of a standard with
 7    respect to particularity.  He accepted the notion that if
 8    they just simply alleged that there was a negative study, and
 9    on two occasions -- and this is all they allege -- there's no
10    more detail than this -- there's a negative study that the
11    company knew about, and on such and such occasion doctors at
12    the behest of the company went out and described positive
13    anecdotal experiences that they had, that that's fraud.  We
14    don't agree that that's fraud.  We don't think they have
15    stated it.
16           THE COURT:  Well, that's the whole complexity of an
17    omissions case.  Sometimes it is, and sometimes it isn't.
18           MR. ROUHANDEH:  Well, first of all, there's no --
19    the Magistrate looked at it and said, you know -- without
20    actually deciding it, he never said, and I think was correct
21    in essentially assuming that there is no general duty to
22    disclose.  And they haven't come forward with any general
23    duty to disclose every bit of scientific information, every
24    study that you have at every meeting.  And plus -- and so
25    they have no general duty to disclose.  And so what they're
```

**5/3/2006  Hearing on Objections to Report & Recommendation**

```
 1      saying is, a doctor at a meeting making a statement gave rise
 2      to the company's obligation --
 3              THE COURT:  So that it's the company's meeting, and
 4      now you've said everyone knew it was the company's meeting.
 5      And the company puts the doctor up, and the doctor says,
 6      "I've had some good subjective experiences with Neurontin in
 7      restless leg syndrome," let's say, for example.  And you know
 8      in your back pocket are two clinical trials that show it has
 9      no effect at all, and it's the company's seminar -- I'll take
10      your word for that, it's the company's seminar -- you don't
11      think that at least gives rise to a claim?
12              MR. ROUHANDEH:  I think it gives rise to a claim if
13      you plead it with particularity, which they don't.  And I
14      think you need to say, here is what -- you need to say
15      something about the communications between the doctors and
16      the company at that point.  You have to plead something about
17      that.
18              THE COURT:  Let's say the doctor is being fully
19      truthful.  At this point both of you are sort of agreeing,
20      you know:  Some doctor gets up and said, "I prescribed this
21      off-label.  I had a perfectly good experience with it.  My
22      guy had restless leg syndrome, and it was great."  Okay?  He
23      says that.  But the company knows they've had two clinical
24      trials where it didn't prove up.  Do you think that there's
25      an obligation to say that?  That's not so easy.
```

**5/3/2006  Hearing on Objections to Report & Recommendation**

```
 1              MR. ROUHANDEH:  Well, I do not think that the
 2    company has an obligation at that meeting to go and disclose
 3    those statements.  In every one of these cases, the studies
 4    were published.  They allege it themselves, these studies
 5    were published.  What they're complaining about is, it took
 6    too long to get those studies published.  So what they're
 7    basically saying, without any facts or any details, is:  If
 8    you've got a study in the works and it doesn't look like it's
 9    going well, you know, you've got to go tell that to everybody
10    before you actually analyze the study, submit it for
11    publication.
12              These are all studies that are published.  They
13    don't have a situation where these studies are not published.
14              THE COURT:  But they were published after the
15    meeting, is that it?
16              MR. ROUHANDEH:  Well, in the case of these
17    meetings, I think that they were published around the time of
18    one meeting and after one meeting, after one of the meetings
19    but around the time of the second meeting.
20              THE COURT:  All right, I understand your position.
21    Is there anything else?  It's really getting late now.  We
22    were on trial morning, Lee and I, so --
23              MR. ROUHANDEH:  I would say that in addition, on
24    the RICO claim, that even if they were to get past this
25    issue, this interesting legal issue, that they have not pled
```

**5/3/2006  Hearing on Objections to Report & Recommendation**

1      the other elements that they need; that there are a number of

2      factors that have to be pled, as your Honor has set forth.

3      They haven't alleged any meetings between any of these

4      people, any connections between the vendors.  They've alleged

5      what is a disfavored type of association-in-fact of a hub and

6      a spoke and nothing to connect those spokes, and they're

7      completely out on that independent argument.

8              THE COURT:  Let me just turn to a new issue, at

9      least new for me, that you've raised, and I know there's a

10     new Supreme Judicial Court opinion on these allegations.

11     So suppose there were fraudulent statements or misleading

12     statements in terms of they didn't disclose some clinical

13     study or whatever, your position is that the plaintiffs have

14     the burden of proving that drugs were actually ineffective

15     even if there was a misleading statement?

16             MR. ROUHANDEH:  Yes, because otherwise they have no

17     injury.  And there are many, many cases under the consumer

18     protection law and under common law fraud that require that.

19     There's the Rezulin case, there's the Williams V. Purdue

20     Pharma case, many, many cases that say:  Look, if the drug

21     performed and was effective, there's no loss.  The insurer

22     has to pay for that.

23             THE COURT:  And then their counter-argument was,

24     "Yeah, but I could have bought a generic or some other

25     alternative."