**5/3/2006  Hearing on Objections to Report & Recommendation**

```
 1          MR. ROUHANDEH:  They never alleged that.  When they
 2     saw the handwriting was on the wall with respect to the
 3     failure to allege ineffectiveness, they've now come and said:
 4     Well, there was some cheaper alternative.  They didn't plead
 5     what the cheaper alternative was that was available that
 6     would have been prescribed that would have been effective,
 7     nor do I think they'll be able to.  They certainly won't
 8     allege it was on-label because many of these drugs are
 9     used -- many, many of them are used off-label.  The patient
10     would have gotten another off-label drug.  That's what would
11     have happened, they would have gotten another off-label drug
12     for pain.  So I don't think that they've pled that theory at
13     all.  They haven't pled this price inflation or that there
14     was maybe a cheaper alternative available.  That was sort of,
15     well, if we can't -- because they don't want to have to plead
16     that it was ineffective.  As much as they come in here and
17     they say there was a negative study here and there, the
18     insurers are resisting, resisting, resisting.  The class
19     plaintiffs have taken it on.  They said, "Yes, we will plead,
20     we have pled, and we will prove that it was ineffective for
21     these uses."  The coordinated plaintiffs won't do that.
22     They're saying, "Oh, we don't have to," and, you know, "We
23     can plead this other theory."  They should have to because
24     there's a long line of cases in the consumer context that say
25     you're not injured if you paid for a drug that works.
```

**5/3/2006  Hearing on Objections to Report & Recommendation**

```
 1            THE COURT:  Okay, we need to wrap this up.  So I
 2     think we pretty much hit the highlights and --
 3            MR. ROUHANDEH:  Well, yes.  There was one
 4     additional point, and I don't really need to argue it, and
 5     that was the issue of causation.  I just want to hand up to
 6     your Honor a case because it was decided yesterday.
 7            THE COURT:  That's timely.
 8            MR. ROUHANDEH:  It's one of these -- your Honor has
 9     most of these cases but not all of them.
10            THE COURT:  Yes, how did I end up --
11            MR. ROUHANDEH:  Well, New York --
12            THE COURT:  I just got another one.
13            MR. ROUHANDEH:  May I approach?  There's no cite.
14     It's a slip opinion.  This is a case in New York State
15     Court.  It's a New York class.  It alleged all the same
16     things.  The court threw it out.  It didn't allege RICO.  It
17     alleged the New York state consumer protection statute,
18     common law fraud.  The court threw it out, said basically,
19     you know, "You haven't pled this stuff adequately, and you
20     haven't pled that you, the plaintiff, can connect yourself in
21     any way to any of this so-called deceptive conduct that
22     you've alleged out there."
23            And we've said that is true here too.  There's a
24     complete disconnect.  They plead, we think inadequately, the
25     sort of fraud case out there in the air, but they never
```

**5/3/2006  Hearing on Objections to Report & Recommendation**

```
1     connect it to any of the plaintiffs.  Why don't they come

2     forward and allege that?  We think they should at this stage

3     of the game.

4               THE COURT:  Thank you.

5               (Discussion off the record.)

6               THE COURT:  Let's take a fifteen-minute break

7     because it's probably going to go till 5:00.

8               (A recess was taken, 4:00 p.m.)

9               (Resumed, 4:25 p.m.)

10              THE COURT:  Just off the record for a minute.

11              (Discussion off the record.)

12              MR. BEMPORAD:  Your Honor, thank you for indulging

13    me at this late hour.  As you mentioned, the coordinated

14    plaintiffs have filed objections to that portion of the

15    Magistrate Judge's decision that recommended dismissal of the

16    coordinated plaintiffs' claims on the grounds that we didn't

17    have one paragraph in our complaint specifically alleging

18    that Neurontin was ineffective for all the alleged

19    conditions.  Just to put this whole -- the reason for that,

20    which I'll get to shortly, is the Desiano case and its

21    prodigy, but to put this all in context, May, 1994,

22    defendants forecast Neurontin's sales over the lifetime of

23    the drug, $500 million.  And if you look at Paragraphs 1 to 4

24    of the coordinated complaint, you'll see a progression of

25    what the results were.  By 2003, the sales of Neurontin were
```

**5/3/2006  Hearing on Objections to Report & Recommendation**

```
1     $2.7 billion, 90 percent of the prescriptions for off-label
2     use.
3            At the time it was approved, it was approved as an
4     adjunctive therapy for epilepsy; in May of 2002, an adult
5     shingles treatment.  What brought about this skyrocketing
6     result?  That's also set forth in the coordinated complaint,
7     and it's in fact quoted in part in the Magistrate Judge's
8     report.  We've referenced the statement by one of the senior
9     executives from Warner-Lambert stating, in words or
10    substance, "I want you out there every day selling Neurontin,
11    pain management, monotherapy, at dosages up to at least 4,800
12    milligrams per day.  I don't want to hear that safety crap."
13           We submit, your Honor, that what we have to prove
14    is that the defendants made false or misleading statements
15    that were deceptive that caused the coordinated plaintiffs'
16    damages.  We think, by turning to this chart, the reason I
17    prepared this and the reason we put adjunctive therapy as our
18    first example -- and, frankly, we morphed two concepts there,
19    one of which has only gotten mentioned in passing -- is what
20    the Magistrate judge calls dosage dependency, and we
21    reference dosage dependency in the Paragraphs 148 to 168 of
22    our complaint.  There is no dispute that Neurontin was
23    approved by the FDA and allowed to be used as an adjunctive
24    therapy for epilepsy, but the approved levels were dosages of
25    900 milligrams to 1,800 milligrams.
```

**5/3/2006  Hearing on Objections to Report & Recommendation**

```
 1              When Warner-Lambert started pushing this drug at
 2      dosages not just for adjunctive therapy, as this chart
 3      suggests, but for everything, in their own words, the cost of
 4      those excessive prescriptions were borne principally by the
 5      third-party payors, who paid, as Mr. Himmelstein pointed out,
 6      about 85 percent of the costs, and each script cost the
 7      insurers in excess of $100, with the consumers picking up the
 8      balance on the copay.  So what we are saying is, under the
 9      Desiano case, what we are seeking to recover is the excessive
10      payments that we were caused to pay as a result of
11      defendants' wrongful conduct.
12              With regard to adjunctive therapy, to the extent
13      they were pushing this drug at dosages far exceeding
14      recommended levels -- and as we allege specifically in
15      Paragraph 159, they sought FDA approval to market the drug at
16      higher dosages, and it was turned down by the FDA -- they
17      then concealed that and still went out, and in the words
18      we've set forth, "touted it for everything."
19              In terms of the dollars, the dollars are enormous
20      here.
21              THE COURT:  When you say "tout," what is the actual
22      fraudulent statement?
23              MR. BEMPORAD:  The actual fraudulent statement with
24      regard to -- well --
25              THE COURT:  The 4,800 milligrams a day.
```

**5/3/2006  Hearing on Objections to Report & Recommendation**

```
1              MR. BEMPORAD:  Okay.  Well, what they were saying
2    is that they want you out there selling it and urging doctors
3    to prescribe it at 4,800 milligrams.  In fact, they knew from
4    their own internal studies that the body couldn't absorb it
5    and it was ineffective.  That's all laid out, frankly, in
6    about twenty paragraphs in --
7              THE COURT:  All right, so you have in there that
8    they stated that you need 4,800 to be effective?
9              MR. BEMPORAD:  Or that you'll get more beneficial
10   results by prescribing higher dosages of this drug.
11             THE COURT:  So there are actually statements saying
12   you'll get more beneficial results by using higher dosages?
13             MR. BEMPORAD:  Yes, your Honor.  That is in our
14   complaint, which is the coordinated complaint.  You'll see
15   that in a section entitled "False and misleading statements
16   regarding dosages above the FDA approved maximum," which
17   starts on Paragraph 148 on Page 61 and continues through --
18             THE COURT:  To 68, that's what you have in the
19   chart, right?
20             MR. BEMPORAD:  Yes.  Well, 1 to 68 also dovetails
21   with the side effects which they concealed, because one of
22   the downsides they concealed which we allege is that as the
23   dosages increased, there were side effects that they
24   concealed from doctors and patients:  weight gain, behavioral
25   side effects, and also dosage dependency.
```

**5/3/2006  Hearing on Objections to Report & Recommendation**

1              THE COURT:  Do you allege that there's an actual

2       misstatement in connection with the 4,800-milligram-a-day

3       recommendation?

4              MR. BEMPORAD:  Yes, along with materially

5       incomplete statements.  But, yes, in Paragraph 154 we allege

6       that in one of the programs, they had a doctor stand up who

7       was within their control who said, "The antiepileptic

8       activity of gabapentin is quite dose-dependent, oh, yeah."

9       And in fact they had a study showing that that was not the

10      case, which is referenced in the next sentence,

11      Paragraph 155.  Also statements made saying that we have

12      people on 5,400 with no side effects.  Well, no side effects

13      is not the same thing as saying that you're getting any

14      benefit from the drug.  But the bottom line is:  They were

15      touting this drug, in the words of their own marketing

16      executive, "for everything."

17             They questioned -- and the case law, because I know

18      your Honor has heard an enormous amount, in Desiano the

19      Second Circuit reversed a dismissal of a complaint involving

20      another Warner-Lambert product, the diabetes drug Rezulin.

21      And the Second Circuit said basically that the third-party

22      payors are entitled to seek, in their words, "the excess

23      payments" made for the cost of this drug.  In that case

24      Rezulin was three times more expensive than another drug that

25      would treat the diabetes.  In this case, the same defendants

**5/3/2006  Hearing on Objections to Report & Recommendation**

```
1    were getting to the same result on dosage dependency by
2    touting the drug at almost triple the strength that was
3    effective and that was approved by the FDA.  In addition,
4    they were touting it for conditions for which it was
5    ineffective or concealing adverse information.
6            THE COURT:  Okay, thank you.  Is there any point
7    that you want to make that's different from what was made
8    before?
9            MR. BEMPORAD:  Yes, two points in 30 seconds each,
10   your Honor.  We've referenced a California unfair competition
11   law, which is Count 10 of the coordinated complaint.  Kaiser,
12   which has six million members, is headquartered in
13   California.  Aetna and Guardian also have members there.
14   We've cited to your Honor in the brief a California Supreme
15   Court decision that basically holds that the unfair
16   competition law is a restitutionary statute and does not
17   require the type of affirmative proof of ineffectiveness that
18   the defendants argued to the Magistrate Judge should be
19   required of us.  So we think -- and in fairness to the
20   Magistrate Judge, he had long complaints, lots of claims, and
21   imported an element into that claim that is contrary to the
22   highest decision of the California Supreme Court.
23           The final point I would make is that there is also
24   a claim, since Aetna is incorporated in Pennsylvania, under
25   the Pennsylvania insurance fraud statute.  Again, that's on
```

**5/3/2006  Hearing on Objections to Report & Recommendation**

```
1       Page 11 of the chart that I handed you.  Judge Stearns in a
2       decision in the Lupron case, which is another overpayment
3       case, sustained a claim by Aetna and talked about the broad
4       protections of that statute.  And we believe, again, that the
5       Magistrate Judge overlooked this in the totality of what was
6       involved.
7                 THE COURT:  Thank you.
8                 MR. BEMPORAD:  Thank you for your patience.
9                 THE COURT:  Did you want the opportunity, or would
10      you do it -- your complaints are somewhat different --
11                MR. BEMPORAD:  A little bit.
12                THE COURT:  Like the top five, or do you think this
13      is enough for you?
14                MR. BEMPORAD:  Your Honor, I think the best thing
15      for us to do is to put one composite document together so you
16      have one piece of paper that just -- and we can probably do
17      it since the conditions are --
18                THE COURT:  I don't need every single one.  I just
19      need like your top five that you think are the best winners
20      for me.
21                MR. BEMPORAD:  We will do that.
22                MR. NUSSBAUM:  Yes, we discussed that with
23      Mr. Sobol, your Honor, during the break, and we will be doing
24      that and giving you one chart.
25                THE COURT:  Good, thank you.
```

5/3/2006  **Hearing on Objections to Report & Recommendation**

1           MR. BEMPORAD:  And we thought it would be easier

2   for the Court to have one piece of paper rather than two,

3   your Honor.

4           THE COURT:  Okay, thank you.

5           MR. FINKELSTEIN:  Judge, I'm here on behalf of the

6   product liability plaintiffs.  I'm not dealing with these

7   amorphus concepts of enterprises.  I'm not dealing with

8   RICO.  I'm getting an education sitting here.  I'm dealing

9   with American families.  There are 99 cases currently in this

10  court.  At least 52 are completed suicides.  There's been no

11  motion related to dismissing any of our actions.  But the

12  Magistrate, what we object to is, he stayed our cases, and we

13  don't understand why.  We were transferred here in May of

14  '05.  At that time we were transferred, several of our

15  cases, from Judge Rackoff in the Southern District, with the

16  discovery deadline at that point of January, '06.  We came

17  before your Honor --

18          THE COURT:  I wasn't even sure why you were coming

19  here except that the Multidistrict Litigation Panel seemed to

20  think that there was an overlapping science or set of issues;

21  and when I read the complaint, I could understand why they

22  did it.  But what do you want to happen with this, with your

23  cases?

24          MR. FINKELSTEIN:  Lift our stay, let us move

25  forward.  Let us go forward and have a meet-and-confer, which

**5/3/2006  Hearing on Objections to Report & Recommendation**

```
 1    we've had several already, and let our cases move.  I'm

 2    sitting here, I'm listening that they're going to propound

 3    five of their best fact patterns.  They're going to respond,

 4    and then --

 5            THE COURT:  So the gist of your case is what, that

 6    they misrepresented what?

 7            MR. FINKELSTEIN:  In our cases?  Our cases are

 8    straight product liability/personal injury cases, negligence,

 9    failure to warn.

10            THE COURT:  So your people were prescribed -- were

11    they depressed?

12            MR. FINKELSTEIN:  They were all prescribed

13    off-label.

14            THE COURT:  They were depressed, and they were

15    prescribed --

16            MR. FINKELSTEIN:  No, no, no.  I don't mean --

17            THE COURT:  Okay.

18            MR. FINKELSTEIN:  All of the off-label indications

19    they were prescribed for, half of them were for pain-related

20    indications, half of them were psychiatric-related

21    indications.  A combination of both of those resulted in

22    negative reactions to mood and behavior that resulted in

23    self-injurious behavior; they attempted suicide or committed

24    suicide.  We allege Warner-Lambert, Parke-Davis, and Pfizer

25    all knew of that adverse event.  They failed to warn
```

```
1    appropriately, strict product liability, fraudulent

2    misrepresentation, every negligence, and we just want to move

3    forward on our cases.

4           THE COURT:  So there are no pending motions to

5    dismiss?

6           MR. FINKELSTEIN:  No.  There's nothing.

7           THE COURT:  Have they been answered?

8           MR. FINKELSTEIN:  Yes.

9           THE COURT:  So why don't we get that going?

10          MR. ROUHANDEH:  Your Honor, the Magistrate stayed

11   discovery in that case for a very good reason, which is, the

12   discovery here is extremely overlapping.  Otherwise the Joint

13   Panel wouldn't have sent these cases to your Honor.  And the

14   problem we would have is, we don't want them going ahead with

15   depositions and document discovery while these guys are not.

16   So I think that the Magistrate stayed it because he wants the

17   discovery to go forward uniformly, but that was an issue that

18   the Magistrate sua sponte addressed.

19          THE COURT:  Yes, and he and I talked about that.

20   You know, we were trying to get a handle on all the case

21   management and see where the theories played out.  But it

22   sounds really quite different.  There's some overlap, for

23   sure, and that's why I'm sure the Multidistrict Litigation

24   Panel sent it here, but why don't we get it going?

25          MR. ROUHANDEH:  Well, your Honor, actually, if you
```

**5/3/2006  Hearing on Objections to Report & Recommendation**

```
1     read one of the complaints, it reads like their complaints.

2     It's 50-80 pages of all this stuff about off-label

3     marketing.  Then at the end, they have some claims where they

4     say, you know, strict liability --

5             THE COURT:  You've answered it, right?

6             MR. ROUHANDEH:  The allegations are all about

7     off-label promotion to doctors.

8             THE COURT:  But you've answered it?  There's no

9     motion to dismiss, right?

10            MR. ROUHANDEH:  That's correct.

11            THE COURT:  All right, so let's just get going.

12            MR. FINKELSTEIN:  That's all we want.

13            MR. GREENE:  Judge, may I be heard?

14            THE COURT:  Yes.

15            MR. GREENE:  We would like to get going with our

16    discovery too.  And Pfizer filed a motion last June for a

17    protective order to limit the discovery to the end of '98,

18    and we filed a motion to compel on July 1 to get discovery

19    from '98 in the Franklin documents, get through the '98, the

20    '98 up to May, 2004, the date of the plea.  We argued that

21    those motions were fully briefed.  We argued that motion in

22    front of Magistrate Sorokin in August, and then we didn't get

23    any decision, and we got an order in January staying

24    discovery.  Now, a lot of the discovery --

25            THE COURT:  But that's different because yours may
```

**5/3/2006  Hearing on Objections to Report & Recommendation**

1    be quite different depending on what I do with all of this.

2    And it's been very helpful today, but theirs just turns out

3    to be a different situation.

4              MR. GREENE:  But a lot of the sales and marketing

5    information that Mr. Finkelstein is looking for we're looking

6    for.  A lot of the sales call data that he is looking for

7    for the medical liaison sales rep we're looking for.

8              THE COURT:  So?  You'll be able to look at it.

9              MR. GREENE:  So if they're going to produce it for

10   them, why can't we see it?

11             THE COURT:  I'm not saying you can't.  I'm saying,

12   let's just get going on discovery on this.  And then to the

13   extent that -- I'm not going to have you redo it because that

14   would be too expensive.  They'll just have to jump right into

15   whatever your discovery is.

16             MR. FINKELSTEIN:  It's all electronic.  There will

17   be no burden.

18             THE COURT:  The truth is that most of it has been

19   done, at least up to a certain period of time.  I had the

20   first case dealing with the Neurontin whistleblower, so a

21   huge amount has been done, huge, but not all.  So, anyway,

22   how long would you like for fact discovery?

23             MR. FINKELSTEIN:  As soon as they can produce it.

24   We're ready to -- it's not -- how long would I like it?  If

25   they tell me it will take 30 days to produce, I want 30 days

**5/3/2006  Hearing on Objections to Report & Recommendation**

```
1    to review it.  You're asking the wrong party here, Judge.
2    I'm ready to move forward.
3           THE COURT:  Right, we're going to move forward.
4    You got that, you won.  I just want to know how long you
5    need.  Fact discovery all together, how long to produce all
6    the documents you did in the Neurontin whistleblower case?
7           MR. ROUHANDEH:  They already have that.  They're
8    just coming in here and suggesting that no discovery has
9    occurred.  They have a massive quantity of documents
10   produced.
11          THE COURT:  All right, so what do you want?  Do you
12   want depositions?
13          MR. FINKELSTEIN:  Yes, absolutely we want
14   depositions.
15          THE COURT:  How long do you want for the
16   depositions?
17          MR. FINKELSTEIN:  We want through the end of the
18   year.
19          THE COURT:  Okay.  It's a big case.  It seems
20   fair.  December 31, New Year's Eve you can be there looking
21   at the documents, okay?  So fact discovery through
22   December 31, all right.  And then what we're going to do
23   is -- expert discovery is going to be big in this case,
24   right?  So when do you want as far as plaintiffs' expert
25   reports?
```

**5/3/2006  Hearing on Objections to Report & Recommendation**

```
 1              MR. FINKELSTEIN:  January 31.

 2              THE COURT:  Good.  Defense expert reports?

 3              MR. ROUHANDEH:  I would say I need 45 days for

 4      mine.

 5              THE COURT:  Fine.  It will be a Valentine's Day

 6      gift, February 14, okay?  Motion for summary judgment, when?

 7              MR. ROUHANDEH:  Well, your Honor, we may not wait

 8      for motion for summary judgment.

 9              THE COURT:  All right, just give me -- this is the

10      drop-dead date.  You know, either you're going to file it or

11      not.  So when would that be?

12              MR. ROUHANDEH:  Probably 60 days after that.

13              THE COURT:  February 15, let's say tax day.  All

14      right, tax day you've got it.  What do you want, a month

15      later?

16              MR. FINKELSTEIN:  Sure.

17              THE COURT:  Okay.  And then why don't we have a

18      hearing sometime in the end of May, early June.  And at some

19      point you're going to jump on this, and we're going to have

20      to rule on this.  This does not have to be -- you've done

21      most of this discovery.

22              MR. GREENE:  Well, you say that, but I want to

23      refresh your memory, Judge.  In Franklin we were limited to

24      one year of discovery by the Magistrate.  You said:  No, the

25      amended complaint has claims in it through '98.  You get
```

**5/3/2006  Hearing on Objections to Report & Recommendation**

1    discovery through '98.

2         Our amended complaint here has claims through 2004,

3    May, 2004.  Mr. Rouhandeh is sitting on documents that he

4    won't give us from the '98 to 2004 period.  We can't get it

5    from any of the medical marketing firms.  They've been in

6    touch with Pfizer's counsel.  We've subpoenaed from them --

7         THE COURT:  I'm not saying you've done it all, but

8    you've gone a huge way.  You know a lot about this case.  So

9    at some point I'll rule in the next month or so on all of

10   this, and then you'll just get going on this.  And if you

11   need another month or two, you will.

12        MR. GREENE:  Just remember, Judge, in Franklin we

13   had documents from one CBS, customer business unit.  There

14   are six of them, and we had documents through the home office

15   up through '94 through '98.

16        THE COURT:  But let me just get through your motion

17   to dismiss.  To the extent there are any depositions, you can

18   come in and participate so we don't start anew, all right?

19   But at this point, I want to get through your motion to

20   dismiss before I figure out how much discovery is necessary

21   or whether you need to amend a complaint or what's left,

22   okay?  It's huge, this is huge, it's another huge one.  And

23   so theirs is different.  I have been persuaded of that.

24   There's been no motions to dismiss.  You're going to get

25   going.  To the extent documents are available, through a

**5/3/2006  Hearing on Objections to Report & Recommendation**

1    protective order, you can see them, okay?

2         MR. FINKELSTEIN:  Judge, what is outstanding is a

3    motion that they have seeking protection for post-'98

4    documents which we need.

5         MR. ROUHANDEH:  Which is fully briefed before the

6    Magistrate.  I guess they want your Honor, having not seen

7    those briefs, to decide that issue now.

8         THE COURT:  Say it again?

9         MR. ROUHANDEH:  It's been fully briefed.  It's in

10   front of the Magistrate for a decision.  He hasn't ruled on

11   it.  I don't know what they're asking your Honor to do, to

12   decide that motion?

13        MR. FINKELSTEIN:  No, no, no, I'm not asking your

14   Honor to decide that motion.  It seems that the Magistrate is

15   simply not deciding at all until you resolve this.

16        THE COURT:  Right, and so we've talked about this,

17   and I've got a feel for it.  I've heard from you.  I

18   understand the issues.  So you're going to get going on

19   discovery on the personal issues.

20        I also want you, and here's the big piece for you:

21   Don't you have to take depositions of all the plaintiffs?

22   Have you started all that process?

23        MR. ROUHANDEH:  No, we haven't.

24        THE COURT:  That's huge, and I think there's a huge

25   Daubert issue which is even apart from all of this, which is,

**5/3/2006  Hearing on Objections to Report & Recommendation**

```
1    did it cause any problems, or were there other problems that
2    caused them to commit suicide?  Does it have a suicidal side
3    effect?  I don't know.  That's new for me.
4            MR. FINKELSTEIN:  We're happy to brief it and
5    present it all.
6            THE COURT:  Not yet.
7            MR. FINKELSTEIN:  Of course, but --
8            THE COURT:  And then I ship it back, right?  I ship
9    it back to the home state, right?
10           MR. FINKELSTEIN:  After you decide Daubert.
11           THE COURT:  Right, or summary judgment, right.
12           MR. FINKELSTEIN:  And may I indulge the Court?
13           THE COURT:  Yes.
14           MR. FINKELSTEIN:  Can we have something like a
15   30-day status conference so that we know these are moving,
16   even call-in conferences?
17           THE COURT:  No.  I love you all but not 30.  When
18   you need to see me, pull me in, okay?  I can't see you all
19   every 30 days.  Yours is getting going.  We've got a schedule
20   for it.  You can piggyback on it.  You can see whatever
21   they've got.  But at this point I don't know about your
22   case.  I'm intrigued with this intellectual issue, the
23   threshold issue.  I'm not quite sure what to do with it, as
24   you can tell from the questions.  I'm assuming I can get
25   through -- I do fraud cases every day of the week -- about
```

**5/3/2006  Hearing on Objections to Report & Recommendation**

1    whether it's particularized or not.  I mean, that is not so

2    hard.  What's hard for me is, it's different from AWP, and I

3    need to understand it a little better about whether there's a

4    threshold enterprise, and that makes a big difference.

5            MR. ROUHANDEH:  Your Honor, with respect to the

6    schedule, I think they wanted experts on January 31, and we

7    said 45 days, and you said February 14.

8            THE COURT:  I thought you were -- all right.

9            MR. ROUHANDEH:  So I think it should be March 14.

10           THE COURT:  We'll adjust it.  March 14, that's

11   fine.  Anything else?

12           MR. GREENE:  Judge, as he gets the post-'98

13   documents --

14           THE COURT:  You can see them.

15           MR. GREENE:  We can see them?

16           THE COURT:  Yes.

17           MR. BARRETT:  We don't have a decision from the

18   Magistrate on that issue yet.

19           THE COURT:  Well, what do you want me to do?  Go

20   back and tell him that, you know, that at this point we've

21   all had a discussion, and it makes sense to move forward on

22   the personal injury.

23           MR. BARRETT:  Will that mean he'll make a

24   decision?

25           THE COURT:  I don't know.  I'm assuming he'll make

**5/3/2006  Hearing on Objections to Report & Recommendation**

```
1    a decision.  He's a very honorable -- look at that great

2    decision he did.  Just call up his session and say that it's

3    moving forward.  I'll have Mr. Alba call his courtroom deputy

4    as well.

5           THE CLERK:  His clerk is right here.

6           THE COURT:  His clerk is right here.

7           FROM THE FLOOR:  I wrote it down.

8           MR. FINKELSTEIN:  Do you want to give us a date

9    right now to come in?

10          FROM THE FLOOR:  I think he's going to deny it.

11   I'm joking.

12          THE COURT:  Moussaoui gets life in prison.  In any

13   event, you're all from New York, right?  That's close to all

14   of you in particular, but we're from Boston where the planes

15   took off, so it's a big case.

16          All right, so that's what you're going to do.

17   You'll go back to Judge -- I understand why he did it.  He

18   talked to me first until I got a handle on it and you all

19   did.  I am not going to start discovery yet on the big

20   Neurontin case, but I don't want them to have to redo

21   everything.  So under a protective order, they can see

22   everything that you receive, and they can be involved in any

23   depositions that you do.

24          MR. FINKELSTEIN:  Okay, super.

25          THE COURT:  And I am just sort of -- I said to my
```

**5/3/2006  Hearing on Objections to Report & Recommendation**

```
1      law clerk as we were walking down, I said, "I'm struggling

2      with this RICO issue," and I am.  It's not as straightforward

3      as the last one.  And I know that Judge Sorokin struggled

4      with it, and so that one might take me some time.  And I have

5      this really big trial starting in September, right,

6   Mr. Sobol?

7              MR. SOBOL:  Yes, you do.  Well, the first of

8   several at this point.

9              THE COURT:  Yes.

10             MR. SOBOL:  But we're working on it.

11             THE COURT:  Thank you.

12             THE CLERK:  All rise.  Court is in recess.

13             (Adjourned, 4:50 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25
```

**5/3/2006  Hearing on Objections to Report & Recommendation**

```
 1                    C E R T I F I C A T E

 2

 3

     UNITED STATES DISTRICT COURT )

 4   DISTRICT OF MASSACHUSETTS    ) ss.

     CITY OF BOSTON               )

 5

 6

 7

 8           I, Lee A. Marzilli, Official Federal Court

 9   Reporter, do hereby certify that the foregoing transcript,

10   Pages 1 through 94 inclusive, was recorded by me

11   stenographically at the time and place aforesaid in Civil

12   Action No. 04-10981-PBS, In Re:  Neurontin Marketing and

13   Sales Practices Litigation, and thereafter by me reduced to

14   typewriting and is a true and accurate record of the

15   proceedings.

16         .   In witness whereof I have hereunto set my hand this

17   19th day of May, 2005.

18

19

20

21

22

23         _____

           LEE A. MARZILLI, CRR

24         OFFICIAL FEDERAL COURT REPORTER

25
```

# EXHIBIT B



Pain 99 (2002) 557–566

**PAIN**

www.elsevier.com/locate/pain

# Gabapentin in neuropathic pain syndromes: a randomised, double-blind, placebo-controlled trial

M.G. Serpell[a,*], Neuropathic Pain Study Group[1b]

[a]University Department of Anaesthesia and Pain Management, Gartnavel General Hospital, 30 Shelly Court, Glasgow G12 0YN, Scotland, UK
[b]UK and Republic of Ireland participating investigators, UK

Received 10 April 2001; received in revised form 28 June 2002; accepted 8 July 2002

## Abstract

A double-blind, randomised, placebo-controlled 8-week study was conducted to evaluate the efficacy and safety of gabapentin in the treatment of neuropathic pain, using doses up to 2400 mg/day. The study used a novel design that was symptom- rather than syndrome-based; an approach that aimed to reflect the realities of clinical practice. Participants had a wide range of neuropathic pain syndromes, with at least two of the following symptoms: allodynia, burning pain, shooting pain, or hyperalgesia. Patients were randomised to gabapentin ($n = 153$) or placebo ($n = 152$). Gabapentin was given in three divided doses, initially titrated to 900 mg/day over 3 days, followed by two further increases, to a maximum of 2400 mg/day if required by the end of week 5. The primary outcome measure was changed in average daily pain diary score (baseline versus final week). Over the 8 week study, this score decreased (i.e. improved) by 1.5 (21%) in gabapentin treated patients and by 1.0 (14%) in placebo treated patients ($P = 0.048$, rank-based analysis of covariance). Significant differences were shown in favour of gabapentin ($P < 0.05$) for the Clinician and Patient Global Impression of Change, and some domains of the Short Form-McGill Pain Questionnaire. Improvements were also shown in patient-reported outcomes in quality of life, as seen by significant differences in favour of gabapentin in several domains of the Short-Form-36 Health Survey. Gabapentin was well tolerated and the majority of patients completed the study (79 versus 73% for placebo). The most common adverse events were mild to moderate dizziness and somnolence, most of which were transient and occurred during the titration phase. This study shows that gabapentin reduces pain and improves some quality-of-life measures in patients with a wide range of neuropathic pain syndromes. © 2002 International Association for the Study of Pain. Published by Elsevier Science B.V. All rights reserved.

*Keywords:* Antiepileptic; Neuropathies; Neuropathic pain; Neuralgia; Neurontin/gabapentin; Quality of life/patient outcomes

## 1. Introduction

Neuropathic pain affects approximately 1% of the population of the UK, and is one of the most difficult types of pain to treat (Karlsten and Gordh, 1997). It can arise from a wide variety of causes, such as trauma, disease, infection, or it may be idiopathic in origin. Common examples of neuropathic pain include diabetic neuropathy, postherpetic neuralgia (PHN), nerve root pain due to degenerative spine disease, phantom limb pain following amputation, and neuropathic pain subsequent to severe trauma or surgery. Neuropathic pain is typically severe, slow to resolve, and extremely distressing. Like other forms of chronic pain, it can have a devastating impact on patients' psychological health, social functioning, and other aspects of health-related quality of life (Guerje et al., 1998).

Neuropathic pain usually responds poorly to the standard treatments described in the World Health Organization's analgesics ladder, such as non-steroidal antiinflammatory drugs (NSAIDs) and opioids (Karlsten and Gordh, 1997). Antidepressants have been shown to be of benefit in diabetic neuropathy, with the best effects achieved with tricyclic antidepressants (TCAs) (McQuay and Moore, 1998). However, the adverse events of TCAs are frequently severe enough to lead to drug withdrawal (Karlsten and Gordh, 1997), and no antidepressant is currently licensed for the treatment of neuropathic pain in the UK.

Antiepileptics have also demonstrated efficacy in some types of neuropathic pain. Systematic reviews have reported carbamazepine to be of significant benefit in trigeminal neuralgia, diabetic neuropathy, and central neuropathic pain (McQuay et al., 1995; Sindrup and Jensen, 1999). In March 2000, the antiepileptic gabapentin became the first

---
[1] See full listing under acknowledgements.
* Corresponding author. Tel.: +44-141-211-2069; fax: +44-141-211-1806.
*E-mail address:* mgserpell@altavista.net (M.G. Serpell).

0304-3959/02/$20.00 © 2002 International Association for the Study of Pain. Published by Elsevier Science B.V. All rights reserved.