89]. Alternatively, the court held that if *Laborers Local 17* were not controlling,

dismissal would be required by *Holmes*. [A-89]. The memorandum opinion is

reported as *In re Rezulin Prods. Liab. Litig.*, 171 F. Supp. 2d 299 (S.D.N.Y. 2001).

[A-88-90]. This Court reviews all issues raised in this appeal *de novo*. *Strougo v.*

*Bassini*, 282 F.3d 162, 167 (2d Cir. 2002) (citation omitted).

## STATEMENT OF THE FACTS

Warner-Lambert, a pharmaceutical manufacturer headquartered in New

Jersey, began selling Rezulin in the United States in February of 1997. [A-42; A-

44]. Rezulin was prescribed for treatment of Type II (adult onset) diabetes. [A-

44]. Prior to the introduction of Rezulin in the United States, the most prevalent

oral drug therapy for Type II diabetes was metformin, which had a typical retail

price for a one-month prescription of approximately $55. [A-44]. Health benefit

providers such as plaintiffs Louisiana Blue Cross and Eastern States typically paid

approximately $50 of the monthly retail price for alternative Type II diabetes

therapy such as metformin and the patient typically co-paid approximately $5. [A-

44].

Prior to March 21, 2000, Warner-Lambert aggressively promoted Rezulin to

health benefit providers, including Louisiana Blue Cross and Eastern States, as a

safe and more effective oral medication to treat Type II diabetes than existing drug

therapies. [A-44]. Warner-Lambert consistently claimed that Rezulin had "side effects comparable to placebo." [A-57].

Warner-Lambert's marketing campaign for Rezulin was successful. From February 1997 to March 2000, total sales of Rezulin were approximately $2.1 billion, of which HBPs paid approximately $1.4 billion. [A-44]. Louisiana Blue Cross and Eastern States paid in excess of $2.5 million for Rezulin. [A-42; A-43].

The typical retail cost of a one-month prescription for Rezulin was approximately $150. [A-44]. HBPs' typical monthly co-payment for prescription drug therapy for insureds who took Rezulin increased from $50 to $135. [A-44].

On March 21, 2000, Warner-Lambert stopped selling Rezulin in the United States at the demand of the FDA, which had determined that Rezulin "poses an unacceptable risk to patients." [A-44-45]. This determination followed published reports of numerous deaths attributable to Rezulin use. [A-66-68]. Contrary to its promotion of Rezulin as "safe as a placebo," Warner-Lambert possessed detailed information from clinical trials and aftermarket use which demonstrated that Rezulin caused far more frequent and severe, often fatal, side effects of liver and heart damage than Warner-Lambert had disclosed. [A-53-54, 57-58, 60, 62]. Warner-Lambert concealed this information from the entire health care

community, including HBPs, trivialized Rezulin's risks, and continually represented that Rezulin was "safe as a placebo." [A-44-45].

The overwhelming majority of the purchase price of prescription drugs, including Rezulin, is paid directly by health benefit providers to retail and mail order pharmacies, pursuant to contracts that exist between virtually every U.S. pharmacy and HBPs. [A-46-47]. The use of Rezulin increased the out-of-pocket costs for HBPs by hundreds of millions of dollars relative to the costs of alternative drug treatments which were replaced or supplemented by Rezulin. [A-46].

Warner-Lambert was keenly aware that HPBs' payment for Rezulin was essential to Rezulin's commercial success, and marketed the drug directly to HBPs in order to gain their acceptance. [A-47-48]. Warner-Lambert recognized HBPs as purchasers of Rezulin and offered to pay rebates directly to HBPs based upon such HBPs' aggregate purchases of Rezulin. [A-48].

No HBP would pay for a prescription drug which "poses an unacceptable risk" to the health of a plan member. [A-67]. HBPs purchased Rezulin, and as a result, suffered ascertainable losses in the nature of overpayments for a defective product that cost more than twice the price of safer, alternative drugs. [A-73-74].

## SUMMARY OF ARGUMENT

The district court's judgment dismissing the Complaint was based upon a strained interpretation and mis-application of this Court's holding in *Laborer's Local 17*. Although the district court described the claims in *Laborers Local 17* as "closely analogous" to the claims in this case, the only analogy between the two cases is that the plaintiffs in both cases are HBPs. The district court "mixed apples with oranges" by likening tobacco to prescription drugs.

The crucial factual differences between *Laborers Local 17* and this case make any analogy between the claims in the two cases meaningless. HBPs do not buy or pay for tobacco. HBPs did buy and pay for Rezulin. In *Laborers Local 17*, HBPs did not sue the tobacco manufacturers to recover the amounts they paid for tobacco -- they paid nothing -- but sued instead only to recover the consequential expenses they incurred for treating illnesses suffered by tobacco users. In this case, HBPs have sued Rezulin's manufacturer to recover what the HBPs paid to purchase Rezulin.

The district court wrote, "[p]utting aside the question whether the HBPs 'bought' Rezulin . . . absent the alleged misconduct vis-a-vis the insureds and their health care providers, the HBPs would not have been injured. Accordingly, *Laborers Local 17* controls here, and the complaint must be dismissed." (emphasis

added).  [A-89].  This was clear error.  The district court is not free on a Rule 12(b)(6) motion to "put aside" the HBPs' well-pleaded allegation that they bought Rezulin.

The district court substituted other factual premises which contradicted the allegations of the Complaint, namely: (1) that Rezulin "did not harm, and indeed benefitted a great many"; [A-89] and (2) that HBPs "doubtless passed on all or much" of their costs for Rezulin to non-parties.  [A-90].

The district court refused to accept the facts as alleged in the Complaint and relied instead upon these contradictory factual assumptions to arrive at its conclusion that the health benefit providers could not demonstrate that any injuries were proximately caused by Warner-Lambert.  This error alone merits reversal and reinstatement of the health benefit providers' claims.

The district court's proximate cause analysis was also misplaced, because proximate cause is not an element of the warranty, restitution and state statutory claims asserted by the health benefit providers.  However, even if proximate causation were an element of any claim for relief, the allegations of the Complaint would have satisfied that requirement.

If the district court's decision were allowed to stand, the implications of the erroneous ruling would be far-reaching.  Health benefit providers have prosecuted

claims for damages against pharmaceutical manufacturers in federal courts throughout the country for more than 30 years, on the grounds that illegal marketing practices inflated the prices HBPs paid for such manufacturers' prescription drugs. The district court's decision here threatens the ability of those that pay the majority of the purchase price for prescription drugs to recover overpayments attributable to such illegal or deceptive marketing practices. This Court should reverse the judgment, reaffirm the ability of HBPs to seek redress for illegal marketing practices of pharmaceutical manufacturers, and remand this case for further proceedings below.

## ARGUMENT

### I.    THE DISTRICT COURT ERRED IN DISMISSING HEALTH BENEFIT PROVIDERS' DIRECT CLAIMS FOR THEIR ECONOMIC INJURIES.

#### A.    The District Court's Reliance On *Laborers Local 17* and *Holmes* Is Misplaced.

The district court based its decision to dismiss the Complaint on the premise that the case is controlled by this Court's decision in *Laborers Local 17* or, alternatively, the Supreme Court's decision in *Holmes*. Both decisions are inapposite to the claims in this case.

In *Laborers Local 17*, the plaintiff labor funds sought compensation from tobacco manufacturers for payments plaintiffs made to treat illness of subscribers who smoked cigarettes. The Court determined that under RICO, the plaintiffs' claims of injury were too remote from the defendants' product to establish proximate cause. In *Laborers Local 17*, the plaintiffs never alleged, nor could they have, that: (1) they paid to purchase cigarettes; or (2) the tobacco companies marketed cigarettes to them.

Here, it is irrelevant whether any patient who ingested Rezulin became ill. The well-pleaded allegations of the Complaint, which must be taken as true, assert that HBPs paid to purchase Rezulin and that Warner-Lambert marketed Rezulin to the HBPs. If Rezulin was not, as Warner-Lambert claimed, "safe as a placebo," but rather, as the Complaint alleges, so dangerous that the FDA made Warner-Lambert stop selling it, HBPs have a claim to recover payments they made for Rezulin (which cost them approximately $85 per month more than safer alternative drugs), irrespective of whether any particular patient was injured by Rezulin. The HBPs' overpayment is not (as the district court held) "derivative of damage to a third party," but rather "direct." *See Laborers Local 17*, 191 F.3d at 237 (citation omitted).

The Third Circuit, in a case that is truly analogous to *Laborers Local 17*,

*Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris*, 171 F.3d 912,

927-28 (3d Cir. 1999), *cert. denied*, 528 U.S. 1105 (2000), expressly distinguished

from a *Laborers Local 17*-style derivative claim, a hypothetical direct claim in

which, as here, a health benefit fund paid to purchase a defendant's dangerous

medical treatment:

> [I]n the hypothethical case, the defendant fraudulently induced the
> plaintiffs to spend money that redounded directly to the defendant's
> benefit (i.e., the funds paid for the procedure that the defendant
> invented). In a sense, this is no different than a garden-variety fraud
> case in which the defendant hoodwinks the plaintiff into giving him
> "money for nothing." In the present case, plaintiffs' direct-injury
> claim is that the tobacco companies fraudulently induced the Funds
> not to spend money (on safer-smoking or smoking-cessation
> products) that, if spent, would have diminished a separate revenue
> stream (i.e., smoker's purchase of tobacco products) for the
> defendants. We view this as an indirect connection.

The present case is a real life example of the garden-variety "money-for-

nothing" hypothetical posited by the Third Circuit in *Steamfitters*. Before

Warner-Lambert marketed Rezulin, the HBPs were paying for safer, cheaper and

effective Type II diabetes drug treatments. Warner-Lambert then touted the more

expensive Rezulin, concealing that it was unsafe and, therefore, inferior to other

drug treatments, with the intention of inducing the HBPs to pay for Rezulin

prescriptions. Claims by purchasers of a drug, against the drug's manufacturer,

-12-

are not "remote" when the claimed injury is having overpaid for that drug. *See In re Warfarin Sodium Antitrust Litig.*, 214 F.3d 395, 402 (3d Cir. 2000) ("In this case, the purchasers of Coumadin are akin to the smokers in *Steamfitters*").

*Holmes* is also inapposite. In *Holmes,* the Plaintiff was SIPC, a non-profit corporation comprised of broker-dealer members, established to insure the accounts of its members' customers. 15 U.S.C. § 78aaa-78*lll*. SIPC paid $13 million to customers of two insolvent SIPC members and then sued Holmes under RICO, alleging that Holmes had engaged in stock manipulation that had caused the insolvencies. SIPC sued as subrogee to its members' customers to recover their account losses allegedly caused by the manipulation. The customers represented by SIPC did not purchase the manipulated securities.

Under the circumstances, the Supreme Court held that "even assuming, *arguendo,* that SIPC may stand in the shoes of non-purchasing customers, the link is too remote between the stock manipulation alleged" and the [nonpurchasing] customers' harm, being purely contingent on the harm suffered by the broker-dealers. 503 U.S. at 271. That is, the conspirators had allegedly injured the nonpurchasing "customers only insofar as [they] first injured the broker-dealers and left them without the wherewithal to pay customers' claims'." *Id.* (emphasis added). In short, the Court held that the parties to whom SIPC claimed to be

-13-

subrogated (*nonpurchasers* of the manipulated securities) could not recover, because their injury was too far removed from the defendants' conduct, making it impossible to establish proximate cause between the defendant's alleged RICO violation and the plaintiff's injury.

Assuming, *arguendo*, that the decision in *Holmes* were germane to the viability of the Complaint in this case, the Complaint would satisfy the *Holmes* standards. *Holmes* set forth a three-part test for RICO standing:

> "[First] the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent factors. Second ... recognizing claims of the indirectly injured would force courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risks of multiple recoveries. And, finally, the need to grapple with these problems is simply unjustified by the general interest in deterring injurious conduct, since directly injured victims can generally be counted on to vindicate the law ...."

*Id.* at 269 (citations omitted).

The first prong is met here. The HBPs' Complaint claims direct injury. Warner-Lambert sold Rezulin. HBPs overpaid to purchase Rezulin. No consequential injury is at issue.

-14-

The complaint also satisfies *Holmes*' second prong. There is no need for the Court to apportion damages among plaintiffs at different levels of distance from the violation. Each HBP and its patient co-payer has its own, segregable, claim for economic harm, to the extent of their respective co-payments. The Complaint alleges the existence of detailed data kept by HBPs, pharmacies, Warner-Lambert and private data services, which demonstrate exactly how much money was spent by whom in each retail purchase of Rezulin. [A-48].

The district court, however, found that apportionment would be difficult because it presumed HBPs "passed on" any damages they may have had to employers and consumers. [A-90]. This was double error. First, it was inappropriate for the district court to consider this unpleaded factual assumption which contradicts the allegations of the Complaint. Second, this was a mis-application of the "apportionment" focus of *Holmes*. HBPs and patients are retail co-payers, at the same level of economic injury relative to the illegal act. The *Holmes* test speaks in terms of apportionment "among plaintiffs removed at different levels of injury from the violative acts." 503 U.S. at 269 (emphasis supplied).

Further, the notion that HBPs, like utility monopolies, "pass along" their losses through increased prospective premium rates, is both archaic -- it ignores

-15-

modern economic reality of the competitive marketplace for health benefits coverage (as pleaded in the complaint) -- and immaterial -- a wrongdoer can not assert a "pass along" defense to avoid liability.[5] *E.g., State by Humphrey v. Philip Morris, Inc.*, 551 N.W.2d 490, 496 (Minn. 1996) (sustaining Blue Cross' consumer fraud and antitrust claim against tobacco companies and rejecting "pass on" defense as having been "uniformly rejected in the courts, primarily on the theory that the injury is sustained as soon as the price, artificially raised for whatever reason, has been paid.").

As identified by the district court, individual patients who co-paid for Rezulin may have their own claims for economic loss. These claims co-exist with, but do not overlap, the claims of the HBPs. HBPs' plan members who did not pay for Rezulin would not have any claims against Warner-Lambert to recover the price of the drug. Co-paying patients would have claims to the extent of their co-payments. No risk looms of duplicative recovery between HBPs and consumers.

---

[5]If recovery were barred any time a plaintiff could be said, in a theoretical macroeconomic sense, to have "passed on" potential economic damages, no plaintiff could ever recover. *See Steamfitters,* 171 F.3d at 921 n.4 (expressing "serious doubts" that the same "pass on" reasoning was "an appropriate basis for dismissing the complaint" as HBPs "clearly could not go at will to the employers who funded their health plans for a replenishment any time they needed more money").

-16-