UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---------------------------------------------------------------x
In re:  NEURONTIN MARKETING,          :   MDL Docket No. 1629
        SALES PRACTICES AND           :
        PRODUCTS LIABILITY LITIGATION :   Master File No. 04-10981
                                      :
                                      :   Judge Patti B. Saris
---------------------------------------------------------------x
                                      :   Magistrate Judge Leo T. Sorokin
THIS DOCUMENT RELATES TO:             :
                                      :
    PRODUCTS LIABILITY ACTIONS        :
                                      :
                                      :
---------------------------------------------------------------x

### MEMORANDUM OF LAW IN SUPPORT OF PRODUCTS LIABILITY PLAINTIFFS' MOTION TO COMPEL DISCOVERY

Products Liability Plaintiffs hereby move, pursuant to Rule 37 of the Federal Rules of Civil Procedure, for an Order compelling disclosure of information and documents from Defendants that has been duly demanded yet remains outstanding.

### FACTUAL BACKGROUND

Prior to the June 6, 2006 conference before the Court, Product Liability Plaintiffs (hereinafter referred to as "Plaintiffs") filed a document entitled "Products Liability Plaintiffs' Positions as to Outstanding Discovery: Agreements and Disputes" (ECF Document # 330). Document # 330 encompasses various issues of disclosure pertaining to sales, marketing, safety and efficacy of Neurontin. The document sets forth with particularity previous Plaintiffs' positions as to discovery requests stemming from both the New York Federal court litigation (In re Neurontin, S.D.N.Y. Docket No. 04-CV-6704), and the New York State court litigation (Young v Pfizer Inc., Orange Co. Sup. Ct.

Index No. 1062-04), in which the parties attempted to coordinate discovery efforts. Importantly, the document reflects Plaintiffs' pursuit of "generic" sales and marketing information, whether in document or database format, that is, documents that may <u>not</u> pertain to a particular sales representative's contact with an individual plaintiff's physician, but instead reflect Defendants' alleged national campaign to market and sell Neurontin for "off-label" uses.

The majority of issues to which Document # 330 refers pertain to sales/marketing information that was previously the subject of motion practice before the Honorable Stewart A. Rosenwasser, A.J.S.C., in the New York State court action, <u>Young v. Pfizer Inc.</u>, and the Honorable Jed S. Rakoff, U.S.D.J., in the New York Federal court action, <u>In re Neurontin</u>, as to which Plaintiffs had submitted a memorandum to this Court last year entitled "Products Liability Plaintiffs' Memorandum in Opposition to Defendants' Motion for Protective Order Concerning Scope of Discovery as to Production of Documents Created After December 31, 1998" and exhibits annexed thereto (ECF Document # 186), filed on July 25, 2005.

Plaintiffs filed Document # 330 based upon the Court's suggestion that the parties raise specific issues for resolution at monthly discovery hearings in lieu of addressing disputes in an "abstract" form. At the time Plaintiffs filed Document # 330, Defendants' counsel was not prepared to file a joint template with the Court. The parties were completing a joint template regarding "individual discovery", and Defendants therefore did not participate in filing a joint template regarding "generic discovery".

Since the time of this earlier filing, the parties have continued to confer concerning the discovery issues set forth in Document # 330. To date, however,

Defendants have yet to provide a written template of their positions in regard to each of these discovery issues. Plaintiffs now seek to have these outstanding discovery issues resolved by the Court at the next scheduled discovery hearing.

In addition to the issues set forth in the Document # 330 template that have not been resolved, there are several additional outstanding discovery issues which, as noted above, were initially raised in discovery demands in the New York State court or New York Federal court litigation and have not yet been resolved. Plaintiffs are requesting that these issues, set forth with specificity below, also be addressed by this Court at the next conference on August 15, 2006.

Plaintiffs respectfully request that this Court (a) order Defendants to produce the information and/or documentation sought in each particular request, as outlined in Document # 330, and (b) order Defendants to produce the discovery duly demanded in New York State court and New York Federal court Neurontin actions, as set forth with specifically below, which is equally applicable to the cases before this Court.

## ARGUMENT

Pursuant to Rule 37 of the Federal Rules of Civil Procedure, where a party "fails to make a disclosure required by Rule 26(a), any other party may move to compel disclosure and for appropriate sanctions." Fed. R. Civ. P. 37. Plaintiffs respectfully request that this Court order that Defendants be compelled to produce *generic* marketing documents — that is, documents that may not pertain to a particular sales representative's contact with an individual plaintiff's physician. Set forth below are specific discovery requests for which Plaintiffs seek substantive responses, and which provide the Court an opportunity to avoid "abstract" issues.

3

## I. CMMS MARKETING DATABASE

Of utmost importance is Plaintiffs' demand for sales/marketing databases; in particular, Plaintiffs seek the CMMS database. The CMMS database includes sales tracking data and records concerning the sales call notes which are input by sales representatives based upon their detailing of physicians. The Court's attention is referenced to page 8 of Document # 330 relating to Plaintiffs' position regarding the CMMS database.

Defendants' production of the CMMS database is encompassed by Plaintiffs' previous requests for production, to wit, Plaintiffs' Request to Produce, dated April 28, 2004 (attached hereto as Exhibit "A"), which demanded the following:

> 84. Produce all documents and data relating or referring to any sales call tracking regarding the promotion of Neurontin.

The production of the CMMS database is also encompassed within Plaintiffs' Request for Production, dated October 12, 2004 (attached hereto as Exhibit "B"):

> 19. Provide all notes, memorandum, reports, minutes or other documents relating to Neurontin from 1983 to the present from the following committees or divisions: . . . 16. Marketing, 17. Strategic Marketing . . . 20. Market Research, 21. Sales Training and Management Development . . . 23. Global Strategic Marketing.

The parties already have argued before the Court as to Plaintiffs' need for marketing discovery, particularly databases in Defendants' possession. Specifically, the Court's attention is referred to Plaintiffs' Memorandum of Law (ECF Document # 186) filed on July 25, 2005, after Plaintiffs were confronted by Defendants' request for a protective Order limiting discovery to a time period pre-1998, a request rejected by the Court, and Plaintiffs explained the need for such marketing discovery.

4

Moreover, Judge Rakoff in the New York Federal court In re Neurontin litigation previously granted Plaintiffs disclosure of <u>databases</u> reflecting Defendants' sales and marketing efforts. (See Order, dated April 25, 2005 attached hereto as Exhibit "C"). Indeed, Defendants have admitted same in their previous writings to this Court where they argued that Judge Rakoff's decision was in fact limited to discovery of databases and did not include documents. In this regard, the Court's attention is referred to Defendants' memorandum submission (ECF Document # 196, at p. 16):

> "D. **Judge Rakoff's April 25, 2005 Order Applies Only to the Production of Databases, Not to All Sales and Marketing Documents.**
>
> Personal Injury Plaintiffs imply that Judge Rakoff's April 25, 2005 Order applies to all documents, not just to databases . . . The April 25 Order specifically provides that it addresses only the production of certain '*databases* related to defendants' sales and marketing efforts . . .[N]o reasonable reading of the April 25 Order would lead one to conclude that Judge Rakoff --- through his silence --- ordered defendants to produce all non-database sales and marketing documents."

Importantly, Plaintiffs have not received any portion of the CMMS database whatsoever from Defendants, despite the fact that Defendants "have already agreed to produce safety and efficacy information, including safety and efficacy information contained in the sales databases described by plaintiffs." (ECF Document # 196, at p.14).

Furthermore, Plaintiffs are willing to compromise on "how" or "where" Defendants will seek to obtain the discoverable information that comprises the CMMS database. Plaintiffs are not seeking every piece of paper. As an example, it is not necessary that Defendants obtain information from the laptops of all of their sales representatives regarding information concerning their detailing of physicians; producing the required information within the CMMS database would be acceptable as satisfying

5

Plaintiffs' demand for the database. Defendants should provide the database reflecting their marketing practices through the date of the last suicide or attempt as alleged by a Plaintiff in the MDL.

## II. VISITORS SPEAKER BUREAU

Plaintiffs have repeatedly sought via discovery requests and numerous discussions with Defendants information related to Defendants' Visitors Speakers Bureau, whether in <u>document</u> or <u>database</u> format. To date, Defendants have not provided such discovery, except for the *Franklin* litigation materials.

### A. Production of Visitors Speaker Bureau Database

Defendants' production of the Visitors Speaker Bureau database is encompassed by Plaintiffs' previous requests for production, dated April 22, 2005 (attached hereto as Exhibit "D"):

> 5. The database that maintains the listing of approved speakers that a representative can use for a promotional talk, as described by Suzanne Doft during her examination under oath on March 29, 2005:
>
>> A. *"For speakers bureau participants, there is an approved database of speakers that a representative can use."* (p.127).

Arguably, the demand for the Visitor Speaker Bureau database, marketing information, was also encompassed by Plaintiffs' aforementioned Plaintiffs' Request for Production (annexed hereto as Exhibit "B"), served on October 12, 2004, in the New York Federal court litigation before Judge Rakoff, at Request No. 19.

Importantly, it should be noted that Defendants' counsel agreed in writing, by letter dated May 11, 2005, to "produce databases, if any relating to the visitors speakers bureau" (attached to Document # 330 as Exhibit "A", and annexed hereto as Exhibit "E"). Plaintiffs have yet to receive a written response from Defendants concerning the

6

databases. It is Plaintiffs' contention that this Court should recognize that Defendants agreed to produce said databases and order the production of same forthwith.

### B. Production of Visitors Speaker Bureau Documents

Plaintiffs' pursuit of generic marketing discovery is not limited to databases. Indeed, Plaintiffs request that this Court order Defendants to produce the following documents pursuant to previous requests for production in both the New York State court and New York Federal court litigations. Plaintiffs' Request to Produce, dated April 28, 2004 (annexed hereto as Exhibit "A"), sets forth with specificity the documents sought. Again, these documents are arguably encompassed by Plaintiffs' general request for production, dated October 12, 2004 (annexed hereto as Exhibit "B"), at Request No. 19. The Court's attention is referred to the following demands for production outstanding since April 28, 2004:

    81.    Produce:

a. All documents relating or referring to medical seminars, conferences or lectures, conducted by or sponsored in whole or in part by Defendants, or in which Defendants or any of their agents participated regarding Neurontin;

b. All materials displayed, relied upon or distributed by Defendants at any of the above-referenced medical seminars, conferences or lectures.

    85.    Produce every document relating or referring to, or embodying any opinion by a physician, a scientist, or a medical or scientific expert, regarding the risk or occurrence of adverse effects with the use of Neurontin, including but not limited to reports prepared in legal proceedings, opinions expressed in depositions or trial, reports submitted to scientific journals, opinions expressed at medical conferences, and opinions provided as testimony, reports or statements to the FDA or any Government Regulatory Authority, or any advisory committee thereof.

    86.    Produce all documents relating or referring to, or embodying any financial payments, contributions or support provided by Defendants to any physician, scientist, medical or scientific expert, or medical facility, which is the

subject of the preceding request, or any institution, agency or entity with which said individual is affiliated.

95. Records setting forth compensation (including but not limited to free attendance at seminars, free meals, free hotel accommodations, free travel arrangements, free entertainment) and/or payments made to physicians, including the compensation/payments made and the identity of the physicians to whom the compensation/payments were made:

(a) as an incentive to attend seminars, dinners, conferences and or consultants' meetings wherein any or all of the topics were related to off label uses of Neurontin;
(b) in return for allowing pharmaceutical sales representatives into their examining rooms to watch as they examined patients, to meet with patients, to review medical charts and/or to recommend what medicines to prescribe;
(c) to reward and/or compensate them for being a high-volume prescriber of Neurontin;
(d) to pay them as speakers at seminars, dinner meetings, consultants' meetings, or other events and/or for participation in teleconferences wherein any or all of the topics were related to Neurontin;
(e) to pay them as consultants;
(f) topics were related to Neurontin;
(g) to pay them as consultants;
(h) to pay them to enter patients in clinical trials regarding Neurontin;
(i) to pay them to write medical journal articles about Neurontin;
(j) in return for speaking about Neurontin to their peers;
(k) to publish studies or to utilize their names as the authors of studies which purported to show favorable results in using Neurontin for non-approved uses;
(l) in return for agreeing to prescribe Neurontin to patients for off label uses and/or to receive information concerning the results of the administration of Neurontin for off label uses.

176. A listing of the speakers who comprised the Speaker's Bureau from 1994 through 2004, including full name and address.

177. Records setting forth compensation (including but not limited to free attendance at seminars, free meals, free hotel accommodations, free travel arrangements, free entertainment) and/or payments made to physicians who comprised the Speaker's Bureau from 1994 through 2004, including the compensation given and the identity of the physicians to whom the compensation was given.

## III. IMS HEALTH DATA

Plaintiffs request that this Court compel Defendants to produce IMS health data in response to our demands in Plaintiffs' Request for Production, dated April 22, 2005 (annexed hereto as Exhibit "D"), Request No. 8:

> 8. The IMS data used by the Marketing Analytics Department, to the extent it involves Neurontin, as described by Suzanne Doft during her examination under oath on March 29, 2005.
>
> *A. Marketing Analytics would use most of our databases to generate data. ...A. IMS ... What do they utilize that for? A. To track product, new prescriptions, total prescriptions.* (p.174-5).

Moreover, Plaintiffs also served more general demands for documents which would necessarily include that the Defendants produce such IMS data in the following item numbers of our demands served on April 28, 2004 (annexed hereto as Exhibit "A"):

> 162. Records reflecting the tracking by Defendants of the consultants' Neurontin prescription writing practices after attending Continuing Medical Education seminars.
>
> 163. Market data purchased from third parties utilized by Defendants in analyzing whether attendees had written more Neurontin prescriptions after attending Continuing Medical Education seminars.

## IV. STATEMENTS TO THE MEDIA: PUBLIC RELATIONS

Plaintiffs further submit that Defendants have failed to comply with Plaintiffs' discovery demands which were duly demanded by a Notice dated April 22, 2005 (annexed hereto as Exhibit "D"). The particular discovery demands that remain outstanding are indicated below:

> 12. Documents, if any exist, authored by, created by, edited by, received by, reviewed, read, copied on, or in the custodial file of Pfizer spokesman Paul Fitzhenry that formed the basis for his statement published in the U.S.A. Today on April 21, 2005:

9

"Pfizer spokesman Paul Fitzhenry says Neurontin adverse event reports over the past decade 'show no link between Neurontin and suicidal thoughts or behavior.'"

13. Documents, if any exist, authored by, created by, edited by, received by, reviewed, read, copied on, or in the custodial file of Pfizer spokesman, Bryant Haskins that formed the basis for his statement published in the San Francisco Chronicle on April 21, 2005:

"'Pfizer maintains an extensive program for tracking and reporting medical events associated with the use of Neurontin, as we do for all our medicines.... The comprehensive data --- including clinical trial results--- that we've submitted to the FDA over the past decade refute any suggestion that Neurontin causes depression, suicidal thoughts or suicidal behavior....Haskins, the company spokesman, said the data don't support Finkelstein's demand for a prominent 'black box' warning on Neurontin's label –the FDA's most stringent enforcement action short of banning a drug. 'It's simply irresponsible to promote the false impression that a causal link exists between the use of Neurontin and suicide,' said Haskins.'"

The production of said information is also encompassed within Plaintiffs' Request for Production, dated October 12, 2004:

"19. Provide all notes, memorandum, reports, minutes or other documents relating to Neurontin from 1983 to the present from the following committees or divisions: . . . 15. Global Safety Surveillance and Epidemiology . . .22. Public Relations . . .

## V. LABELING

Plaintiffs' requests in both the New York State and Federal court litigations clearly demanded that labels and their accompanying literature, if any, be provided for all of the years for which Neurontin was approved. Although Defendants partially responded to the demands by providing Plaintiffs with limited documents including the labels from the U.S. within their NDA, as well as pertinent drafts, they failed to produce a complete history of the United Kingdom or other foreign labels. At the very least,

Plaintiffs require a complete labeling history pertaining to the U.K. and Ireland, given that the label includes language about mood and behavioural disturbances.[1]

The Court is respectfully referenced to Plaintiffs' requests, dated October 12, 2004, attached hereto as Exhibit "B", as follows:

> 7. Provide a copy of all labels and literature accompanying Neurontin upon distribution and sale since its approval. (See Request for Production, October 12, 2004, attached hereto as Exhibit "B").

The Court is respectfully referenced to Plaintiffs' requests, dated April 28, 2004, attached hereto as Exhibit "A":

> 35. Produce all documents relating or referring to, or embodying any communication with or submissions to the FDA or any Government Regulatory Authorities whether domestic or foreign, regarding the regulation, approval, safety or testing of Neurontin and the assessment of benefit-risk ratios.
>
> 54. Produce all documents relating or referring to, or embodying any unpublished reports, speeches, data compilations, clinical observations or other communications concerning the risk or occurrence of adverse effects with Neurontin.
>
> 68. Produce all documents relating or referring to, or embodying any labeling, including drafts and revisions thereto, ever generated with respect to Neurontin.
>
> 69. As to each change in the Neurontin labeling, produce all documents relating to or referring to, or embodying said label change.

Based on Plaintiffs' review of the Neurontin labeling discovery produced by Defendants thus far, we are presently amenable concentrating on Defendants' production of, at a minimum, the following documents:

> A) Copies of each Label and Summary of Product Characteristics pertaining to Defendants' Neurontin in the United Kingdom for each year that Neurontin has been approved for distribution in the United Kingdom.

---

[1] In an effort to further emphasize the deficiencies in Defendants' labeling productions, Plaintiffs served an additional specific Notice to Produce on July 1, 2006 (annexed hereto as Exhibit "F").

11

B) Copies of each Label and Summary of Product Characteristics pertaining to Defendants' Neurontin in the United Kingdom and Ireland for each year that Neurontin has been approved for distribution in the United Kingdom and Ireland.

C) Produce all <u>internal</u> documents relating to Neurontin that identify or discuss the following language, as set forth in Defendants' labeling or Summary of Product Characteristics in Ireland:

> "Patients with epilepsy can be the subject of mood and behavioural disturbances. Such reports have been noted in patients on Neurontin although a causal link has not been established."

D) Produce all documents pertaining to Neurontin, whether internal or otherwise, that reflect the <u>basis</u> of Defendants' decision to utilize the following language in Defendants' labeling or Summary of Product Characteristics in Ireland:

> "Patients with epilepsy can be the subject of mood and behavioural disturbances. Such reports have been noted in patients on Neurontin although a causal link has not been established."

E) Produce all <u>internal</u> documents relating to Neurontin that identify or discuss the following language, as set forth in Defendants' labeling or Summary of Product Characteristics in the United Kingdom:

> "Patients taking Neurontin can be the subject of mood and behavioural disturbances. Such reports have been noted in patients on Neurontin although a causal link has not been established . . . . Caution is recommended in patients with a history of psychotic illness. On commencing Neurontin therapy, psychotic episodes have been reported in some patients with, and rarely without, a history of psychotic illness. Most of these events resolved when Neurontin was discontinued or the dosage was reduced."

F) Produce all documents pertaining to Neurontin, whether internal or otherwise, that reflect the <u>basis</u> of Defendants' decision to utilize the following language in Defendants' labeling or Summary of Product Characteristics in the United Kingdom:

"Patients taking Neurontin can be the subject of mood and behavioural disturbances. Such reports have been noted in patients on Neurontin although a causal link has not been established . . . . Caution is recommended in patients with a history of psychotic illness. On commencing Neurontin therapy, psychotic episodes have been reported in some patients with, and rarely without, a history of psychotic illness. Most of these events resolved when Neurontin was discontinued or the dosage was reduced."

Defendants have an ongoing duty to supplement their discovery responses which are pertinent to their NDA or SNDAs. Since at least 2004, Defendants have been requested by the FDA to evaluate Neurontin and any relationship to suicide. Defendants have yet to provide Plaintiffs with a complete response regarding the regulatory documents provided to the FDA or the internal documents that culminated in their responses to the FDA. Defendants also received correspondence from the FDA on March 16, 2005, regarding the safety of Neurontin (annexed hereto as Exhibit "G"). Where are Defendants' internal documents associated with this letter? By December 2005, the Defendants actually applied for a label change to include "suicide" and "suicide attempt" in the label! Where are the documents? The FDA, on May 3, 2006, submitted a letter (annexed hereto as Exhibit "H"), approving the label change: where are the Defendants internal documents? The above are several examples where Defendants are obligated to supplement the discovery already produced to Plaintiffs, and Defendants have failed to meet theses obligations. Plaintiffs respectfully request that this Court clearly order Defendants to comply with their continuing obligations to supplement discovery on a timely basis.

## CONCLUSION

In view of the above, Plaintiffs respectfully request that this Court grant Plaintiffs' motion and order Defendants to comply with the disclosure demanded by Plaintiffs in

13

accordance with Document # 330, produce the CMMS Database, IMS health data, complete Neurontin labeling history as noted above and other information and documents duly demanded by Plaintiffs, and comply forthwith with Judge Rakoff's April 25, 2005 Order and Defendants' continuing discovery obligation to supplement their responses to Plaintiffs' demands.

Dated:  July 27, 2006                    Respectfully submitted,

*Members of Products Liability
Plaintiffs' Steering Committee*


By:    /s/ **Andrew G. Finkelstein**
       Andrew G. Finkelstein, Esquire
       Finkelstein & Partners, LLP
       436 Robinson Avenue
       Newburgh, NY  12550


By:    /s/ **Jack W. London**
       Jack W. London, Esquire
       Law Offices of Jack W. London
         & Associates
       106 E. 6th Street, Suite 700
       Austin, TX  78701


## CERTIFICATE OF SERVICE

I certify that this document, including the attached Exhibits, filed through the ECF system has been served pursuant to Case Management Order No. 3 on July 27, 2006.

Dated:  July 27, 2006

       /s/ **Kenneth B. Fromson**
       Kenneth B. Fromson

14