UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | ) ) ) ) ) |
| THIS DOCUMENT RELATES TO: | ) ) ) |
| ALL MARKETING AND SALES PRACTICES ACTIONS | ) ) ) ) |

MDL Docket No. 1629
Master File No. 04-10981
Judge Patti B. Saris
Mag. Judge Leo T. Sorokin

## PLAINTIFFS' OBJECTIONS TO DISCOVERY ORDER NO. 3

## TABLE OF CONTENTS

**Page**

OBJECTIONS ................................................................................................................. 1

STANDARD OF REVIEW ............................................................................................. 1

REQUEST FOR ORAL ARGUMENT .......................................................................... 1

I.      INTRODUCTION ............................................................................................... 1

II.     PROCEDURAL HISTORY ................................................................................ 3

III.    PLAINTIFFS SHOULD BE PERMITTED DISCOVERY INTO
        DEFENDANTS' OFF-LABEL PROMOTION OF NEURONTIN THROUGH 2004 .... 6

        A.      Plaintiffs Allege That Defendants' Misconduct Continued Through 2004 .......... 7

        B.      Plaintiffs Have Alleged Specific Acts of Misconduct Occurring After May
                2001 ...................................................................................................................... 12

        C.      Two Other Courts Have Rejected Defendants' Attempts to Impose
                Temporal Limits on Discovery .......................................................................... 15

        D.      Recently Obtained Documents Identify Specific Off-Label Marketing
                Events Through December 2004 ........................................................................ 17

                1.      False and Misleading Presentations at Events ........................................ 17

                2.      Suppression and Non-Publication of Unfavorable Information ............. 17

                3.      Publication of False and Misleading Information in Journal
                        Articles .................................................................................................... 17

IV.     CONCLUSION ................................................................................................... 18

## TABLE OF AUTHORITIES

**Page**

### CASES

*Carlson Companies v. Sperry & Hutchinson Co.*, 374 F. Supp. 1080 (D. Minn. 1973) ................................................................................................................. 10

*Jackson v. Harvard Univ.*, 111 F.R.D. 472  (D. Mass. 1986) ........................................ 9

*Robco Distributors, Inc. v. General Glass Intern. Corp.*, 101 F.R.D. 547 (E.D. N.Y. 1984) .......................................................................................................... 10

*Roesburg v. Johns-Manville Corp.*, 85 F.R.D. 292 (E.D. Pa. 1980) .............................. 9

*Tavoulareas v. Piro*, 93 F.R.D. 24 (D.D.C. 1981) ...................................................... 10

*United States v. Capitol Services, Inc.*, 89 F.R.D. 578 (E.D. Wis. 1981) .................... 10

-ii-

Pursuant to Rule 72(a) of the Federal Rules of Civil Procedure and Rule 2(b) of the Local Rules for United States Magistrates Judges, Class Plaintiffs (*Harden Manufacturing Corp., et al.* v. *Pfizer, Inc., et al.*) and the Coordinated Plaintiffs (*The Guardian Life Insurance Company of America* v. *Pfizer, Inc.* and *Aetna, Inc.* v. *Pfizer, Inc.*) (collectively, "Plaintiffs") respectfully submit these objections to Discovery Order No. 3, entered by Magistrate Judge Leo T. Sorokin on July 18, 2006 (the "Order").

## OBJECTIONS

Plaintiffs object to the first full paragraph on page 3 of the Order, including its conclusion that "marketing discovery may [only] run through May 31, 2001."

## STANDARD OF REVIEW

With respect to orders on non-dispositive matters such as the instant discovery dispute, Rule 72(a) of the Federal Rules of Civil Procedure directs that "[t]he district judge . . . shall consider such objections and shall modify or set aside any portion of the magistrate judge's order found to be clearly erroneous or contrary to law."

## REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 7.1(d), Plaintiffs respectfully request oral argument on their objection, due to the serious impact the arbitrary and unfair discovery limitation imposed by the Order would have on this litigation. Plaintiffs respectfully suggest that oral argument is appropriate, as neither side will have an opportunity to address the other side's objections in writing. *See* Fed. R. Civ. P. 72(a) (making no provision for responses to objections on non-dispositive matters).

## I.    INTRODUCTION

In considering and ruling on the instant objections, the Court may well experience a sense of déjà vu. In *United States ex rel. Franklin v. Parke Davis, et al.*, No. 96-CV-11651-PBS

("*Franklin*"), the magistrate judge limited document discovery by the relator to the time period

he was employed by defendants, which ended on October 31, 1996, on the theory that "his

allegations, to the extent he could plead them with any specificity, are limited to that period of

time . . . ." Order at 2-3 (Dec. 12, 2001).[1]  On the relator's motion for reconsideration, the Court

reversed this arbitrary limitation on discovery, finding that:

> The Amended Complaint alleges claims for the period 1994 through 1998.  That
> is the time frame for discovery.

Discovery Order at 1 (Feb. 6, 2002) (attached as Exh. D to Poate Decl., Dkt. No. 171).

In this case, even though the operative, second amended complaints[2] clearly allege that

Defendants' misconduct continued through 2004, the Order would limit discovery to the month

of the last specific meeting identified in the complaints, May 2001.  This portion of the Order

should be modified for the same reason the Court reversed the temporal limitation in *Franklin* –

the operative complaints allege that Defendants' misconduct continued through a later date, in

this case, 2004.

The Order's conclusion that the operative complaints contain no specific allegations of

misconduct occurring after May 2001 is also clearly erroneous.  The SACC specifically alleges

that Pfizer and one of its vendors continued to ghostwrite, publish, and disseminate misleading

articles concerning Neurontin's efficacy for off-label conditions through 2004.

Finally, based on documents obtained by Plaintiffs too recently to be included in the

second amended complaints, Plaintiffs could further amend their complaints to allege specific

---

[1] This document was submitted as Exhibit C to the Declaration of Rebecca J. Poate in Support of Plaintiffs' Memorandum in Opposition to Motion for Protective Order Concerning Scope of Discovery and in Support of Motion to Compel Production of Documents Created After December 31, 1998 (Dkt. No. 171, "Poate Decl.").

[2] The Second Amended Class Action Complaint (filed June 30, 2006) (Dkt. No. 379, "SACC") and the Second Coordinated Amended Complaint (filed June 30, 2006) (Dkt. No. 380, "SCAC").

off-label marketing events through December 2004. Such amendment should not be necessary, however, as the Court has already held that Plaintiffs have sufficiently alleged their claims.

## II.    PROCEDURAL HISTORY

In responding to Plaintiffs' First Request for Production of Documents, Defendants objected to the production of any documents concerning the sales and marketing of Neurontin generated after December 31, 1998. The parties met and conferred, but were unable to reach agreement on the temporal scope of discovery.

On June 17, 2005, Defendants moved for "a protective order limiting the scope of Plaintiffs' discovery regarding the sales and marketing of Neurontin to the period ending December 31, 1998,"[3] ostensibly because Plaintiffs were unable to allege specific misrepresentations and omissions occurring after that date, due to the temporal limitation on discovery imposed in *Franklin*.[4] *See* Memorandum in Support of Motion for Protective Order Concerning Scope of Discovery at 1-3 (Dkt. No. 162). Plaintiffs opposed the motion, and filed a cross-motion to compel the production of documents created after December 31, 1998.[5] The

---

[3] Defendants took a contrary (and inconsistent) position with respect to documents pertaining to safety and efficacy. *See* Memorandum in Support of Motion for Protective Order Concerning Scope of Discovery at 8 n.4 (Dkt. No. 162) ("Defendants do not seek to limit the responsive time period for the requests related to safety and efficacy . . . .").

[4] At the first status conference in this MDL proceeding, the Court did not recall having imposed any such limitation on discovery. *See* Partial Transcript of Nov. 23, 2004 Status Conference, Etc. (Dkt. No. 216), Exh. A at 13:8-9 ("I don't remember stopping you in 1998, but I'll take your word for it. I just don't remember that.").

[5] *See* Motion to Compel Production of Documents Created After December 31, 1998 (Dkt. No. 172); Plaintiffs' Memorandum of Law in Opposition to Motion for Protective Order Concerning Scope of Discovery and in Support of Motion to Compel Production of Documents Created After December 31, 1998 (Dkt. No. 170); Declaration of Rebecca J. Poate in Support of Plaintiffs' Memorandum in Opposition to Motion for Protective Order Concerning Scope of Discovery and in Support of Motion to Compel Production of Documents Created After December 31, 1998 (Dkt. No. 171); Plaintiffs' Reply to Defendants' Opposition to Motion to Compel Production of Documents Created After December 31, 1998 (filed under seal, Dkt. No. 189); Sealed Affidavit of Thomas Greene in Support of Plaintiffs' Reply to Defendants' Opposition to Motion to

cross-motions were argued exactly a year ago today, on August 1, 2005. *See* Electronic Clerk's Notes (Aug. 2, 2005).

The cross-motions remained under submission for six months. On January 31, 2006, Magistrate Judge Sorokin issued his Report and Recommendation on Defendants' Motions to Dismiss the Amended Class Complaint and the First Coordinated Amended Complaint (Dkt. No. 269). On that same date, Magistrate Judge Sorokin *sua sponte* issued an Order Staying Discovery (Dkt. No. 270), staying "all discovery . . . pending Judge Saris' ruling on the Motion to Dismiss," and denying as "moot" the pending cross-motions. *Id*. at 1-2.

On June 12, 2006, the Court issued its Memorandum and Order on the motions to dismiss (Dkt. No. 356). On June 19, 2006, Magistrate Judge Sorokin issued Discovery Order No. 2 (Dkt. No. 372), lifting the stay on discovery, and providing, with respect to the cross-motions, that:

> The parties may revive these motions by filing a new motion without an accompanying memorandum. The motion should simply indicate that counsel intends to rely upon the papers previously filed in relation to the original motion. If counsel believe that new briefing is warranted, they may file new motions with supporting memoranda in compliance with the schedule set forth above. With regard to the time period dispute, counsel are reminded that the Court does not invite duplicate briefing.

*Id*. at 2-3.

Defendants did *not* revive their previously filed motion for a protective order. Instead, they filed a *new* Motion for Protective Order Concerning Scope of Discovery (Dkt. No. 375). Neither the motion nor the supporting memorandum (Dkt. No. 376) made any mention of the temporal limitation on discovery previously urged by Defendants, except to note the earlier filing. *See* Dkt. No. 376 at 2. Defendants' new motion did not urge *any temporal limitation on discovery whatsoever*. Instead, Defendants moved

---

Compel Production of Documents Created After December 31, 1998 (filed under seal, Dkt. No. 191).

> to limit the scope of discovery to encompass only (1) the two alleged
> misrepresentations made by Doctors Harden and LeRoy; (2) the Defendants'
> alleged misrepresentations with regard to Dr. Gorson's study; and (3) those
> specific meetings at which doctors related positive anecdotal experiences with
> Neurontin despite the existence of negative clinical studies. In other words,
> *defendants seek to limit discovery to the specific facts alleged in the complaints in
> support of the specific theories of fraud surviving the motion to dismiss.*

Discovery Order No. 3, at 2 (emphasis added). Plaintiffs opposed the new motion, specifically

noting that:

> Defendants have implicitly *abandoned* their argument that Plaintiffs are not
> entitled to post-1998 documents in favor of a completely *different* argument that
> Plaintiffs should be limited to discovery concerning the specific fraudulent
> statements and omissions identified in their complaints.

Marketing and Sales Practices Plaintiffs' Supplemental Memorandum In Support of Their

Motion to Compel Production of Documents Created After December 31, 1998 and In

Opposition to Defendants' Motion for Protective Order Concerning Scope of Discovery (Dkt.

No. 384) at 2. Out of an abundance of caution, Plaintiffs also renewed their previously filed

motion. *See* Motion to Compel Production of Documents Created After December 31, 1998

(Dkt. No. 383).

In their reply, Defendants *did not take issue* with Plaintiffs' assertion that Defendants had

abandoned their motion for a temporal limitation on discovery, and merely repeated their

argument that discovery should be limited to a handful of specific misrepresentations and

omissions, *without temporal limitation*. *See* Reply Memorandum in Further Support of Motion

for Protective Order Concerning Scope of Discovery (Dkt. No. 386).

In denying Defendants' motion, Magistrate Judge Sorokin correctly found that:

> Federal Rule of Civil Procedure 26 allows, as a matter of right, discovery not only
> into the facts alleged in the complaints, but also allows discovery into the claims
> and defenses of the parties. Fed. R. Civ. P. 26(b)(2). Under that standard, the
> proper scope of discovery is not as narrow as Defendants suggest. The
> complaints allege an organized ongoing campaign to market Neurontin by way of
> RICO enterprises committing mail and wire fraud in connection with fraudulent,

false and deceptive statements. The complaints support the foregoing allegations with some specific allegedly fraudulent statements and some specific allegations that similar statements were made at other specified meetings or during other specified time periods. In addition, the Report [Dkt. No. 269] relied upon the allegations that similar statements were made at other meetings, Report at 40, a point adopted by Judge Saris, Order [Dkt. No. 356] at 21. Accordingly, *Plaintiffs are entitled to discovery related to the indications for which they have sufficiently pled fraud. That discovery is not limited to the specific meetings and misrepresentations cited by Defendants.*

Order at 1-2 (emphasis added).

However, in ruling on Plaintiffs' cross-motion, the Order embraced the "narrow"

approach to discovery it had only just rejected:

Defendants are correct that the allegations in the Complaints, i.e. the claims and defenses, are the touchstone for determining the scope of discovery under Rule 26. The claims in the complaints arise out of meetings or conferences promoting Neurontin fraudulently, according to plaintiffs. The last meeting identified in the Complaints occurred on May 19, 2001. Thus, as a temporal matter, marketing discovery may run through May 31, 2001.

Order at 2. The Order imposed the same temporal limitation on the production of 47 boxes of

documents that Defendants had already produced to the U.S. Attorney in the *Franklin* litigation,

even though the documents are highly relevant and their production would impose no burden at

all on Defendants. Order at 3 n.2. These temporal limitations are clearly erroneous and contrary

to law, and the Order should be modified to permit discovery into Defendants' off-label

promotion of Neurontin through 2004.

### III. PLAINTIFFS SHOULD BE PERMITTED DISCOVERY INTO DEFENDANTS' OFF-LABEL PROMOTION OF NEURONTIN THROUGH 2004

In denying Defendants' motion to restrict discovery to the specific misrepresentations

and omissions alleged in the complaints, the Order correctly holds that Rule 26 "allows, as a

matter of right, discovery not only into the facts alleged in the complaints, but also . . . into the

claims and defenses of the parties"; that "the complaints allege an organized ongoing campaign

to market Neurontin by way of . . . fraudulent, false and deceptive statements"; and that

"[a]ccordingly, Plaintiffs are entitled to discovery related to the indications for which they have

sufficiently pled fraud.  *That discovery is not limited to the specific meetings and*

*misrepresentations cited by Defendants*."  Order at 2-3 (emphasis added).

In the next paragraph, the Order inexplicably *abandons* the distinction just drawn

between the *claims* alleged and the *specific facts* alleged in support of those claims (*i.e.*, the

detailed facts *already* in Plaintiffs' possession), and holds that even though "Defendants appear

to *agree* that there should not be an arbitrary cut off date for discovery," because "[t]he last

meeting identified in the Complaints occurred on May 19, 2001", "marketing discovery may

[only] run through May 31, 2001."  Order at 2-3 (emphasis added).  This attempt to "split the

baby" is internally inconsistent, clearly erroneous, and contrary to law.

### A.    Plaintiffs Allege That Defendants' Misconduct Continued Through 2004

The complaints repeatedly and specifically allege that Defendants' misconduct continued

through 2004.[6]  Defendants have never denied that the same types of unlawful off-label

---

[6] *See* SACC  ¶¶ 44 ("Pfizer intended the off-label marketing campaigns described below to
continue through the introduction of pregabalin at the end of 2004."), 45 ("Defendants funded
hundreds of such events between 1996 and 2004."), 60 ("similar events were held across the
country and . . . such events did not cease until Pfizer signed a Corporate Integrity Agreement
with the United States and various states in 2004"), 110 ("The Off-Label Promotion Enterprise
sponsored hundreds of events across the country between 1996 and 2004 and the Plaintiffs have
only had an opportunity to review the records of a small subgroup of these events."), 158
("review of recent verbatim reports will demonstrate that similar statements [regarding
Neurontin's utility in treating pain, an off-label use] were regularly made by the Defendants'
sales forces from 1999 through 2004"), 168 ("review of recent verbatim reports will demonstrate
that similar statements [regarding Neurontin's utility in treating Restless Leg Syndrome/Periodic
Limb Movement Syndrome, an off-label use] were regularly made by the Defendants' sales
forces from 1999 through 2004"), 176 ("review of recent verbatim reports will demonstrate that
similar statements [regarding Neurontin's utility in treating bipolar disorder, an off-label use]
were regularly made by the Defendants' sales forces from 1999 through 2004"), 192 ("review of
recent verbatim reports will demonstrate that similar statements [regarding Neurontin's utility as
an epilepsy monotherapy, an off-label use] were regularly made by the Defendants' sales forces
from 1999 through 2004"), 202 ("review of recent verbatim reports will demonstrate that similar
statements [regarding Neurontin's utility in treating migraine, an off-label use] were regularly
made by the Defendants' sales forces from 1999 through 2004"), 255 ("such payments [to

promotional activities alleged by Plaintiffs continued well after 1998, but argued, in substance, that Plaintiffs should not be permitted to discover the details of those activities because they do not already have them. To state the argument is to refute it.

Plaintiffs' document requests sweep no more broadly than their case, and the discovery burden on Defendants is fully commensurate with the scope of their misconduct. If Defendants have generated millions of pages of documents engaging in the unlawful activities of which Plaintiffs complain, it is not unduly burdensome to require their production. Conversely, if, by sheer coincidence, Defendants ceased their unlawful promotion of Neurontin for off-label uses on May 31, 2001 (a date they have never suggested), Defendants should have generated relatively few responsive documents after that date, and there should be no great burden in requiring their production. As Defendants generated billions of dollars in revenue from off-label sales of Neurontin since May 2001 (*see* SACC ¶ 3, SCAC ¶¶ 3, 18), it would be surprising indeed if there were not a considerable volume of documents reflecting that massive and successful sales effort.

Plaintiffs' 136-page class complaint 117-page coordinated complaint contain far more numerous and detailed factual allegations than those concerning the time period of 1996 through 1998 in the *Franklin* amended complaint, relied upon by the Court to allow discovery through 1998. *See Franklin* Amended Complaint at ¶¶ 31, 36, 37, 45, 47, 50 (attached as Exhibit A to Sealed Affidavit of Thomas Greene in Support of Plaintiffs' Reply to Defendants' Opposition to Motion to Compel Production of Documents Created After December 31, 1998, Dkt. No. 191).

---

physicians for off-label marketing of Neurontin] continued up until Warner-Lambert's guilty plea on May 13, 2004, and its execution of a corporate integrity agreement with the United States"), 257 ("Pfizer has routinely marketed Neurontin for off-label indications up until May of 2004"). *See also* SCAC ¶¶ 178-81 (summarizing facts demonstrating continuing impact of Defendants' wrongful conduct).

The *Franklin* amended complaint alleged, without any detail, that the conduct lasted through at least 1998. *See id.* ¶ 13, 22. The additional detail regarding various events and payments for off-label promotion consisted solely of five specific events in 1996 and 1997. *See id.* at ¶¶ 31, 36, 37, 45, 47, 50. Notwithstanding the absence of *any* specific factual allegations past 1997, and only a general allegation that the conduct continued through 1998, the Court overruled the magistrate judge's temporal limitation on discovery, and held that: "The Amended Complaint alleges claims for the period 1994 through 1998. That is the time frame for discovery." Discovery Order at 1 (Feb. 6, 2002) (attached as Exh. D to Poate Decl., Dkt. No. 171). Applying that same standard here, Plaintiffs are entitled to discovery through 2004.

As this Court held in *Franklin*, courts routinely permit discovery beyond the time of specific acts of misconduct alleged in the complaint, because it may lead to admissible evidence. *See, e.g.. Roesburg v. Johns-Manville Corp*., 85 F.R.D. 292, 296 (E.D. Pa. 1980) (the time period for a discovery request is permissible where "the selected time frame is not wholly unreasonable or irrelevant"). In *Jackson v. Harvard University*, an employment discrimination case, this Court reversed a magistrate judge's restriction of plaintiff's discovery to a three-year time period prior to the termination of her employment relationship. The court found that discovery over a *ten* year time period was necessary to enable plaintiff to show a pattern of discrimination that, in turn, would permit the inference that the decision to deny the plaintiff tenure was based on sex. *See Jackson v. Harvard Univ.*, 111 F.R.D. 472, 475 (D. Mass. 1986). And in *Tavoulareas v. Piro*, a libel action brought against a newspaper, the district court set a cut-off date for document production at one year after the date of publication of the last newspaper article which was allegedly defamatory, because documents relevant to the issues, or likely to lead to admissible evidence, might have been generated for some time after date of publication of the last of the

articles. *See Tavoulareas v. Piro*, 93 F.R.D. 24 (D.D.C. 1981).

By definition, events that occur subsequent to the filing of a complaint cannot be specifically alleged therein, yet courts routinely permit such post-complaint discovery in cases alleging a continuing course of misconduct. *See Carlson Companies v. Sperry & Hutchinson Co.*, 374 F. Supp. 1080 (D. Minn. 1973). In *Carlson*, the court explained that "where documents requested are relevant to the subject matter involved in the pending litigation, any documents coming into existence after the filing of the complaint and which are requested in supplemental requests are discoverable. This is especially true where various counts in the complaint allege continuing violations." *Id.* at 1102. *See also Robco Distributors, Inc. v. General Glass Intern. Corp.*, 101 F.R.D. 547 (E.D. N.Y. 1984) (holding that Rule 26(b)(1) does not limit discovery to precomplaint events in cases in which the complaint alleges that a conspiracy was continuing as of the date the complaint was filed); *United States v. Capitol Services, Inc.*, 89 F.R.D. 578 (E.D. Wis. 1981) (holding that relevant discovery sought from defendant through the present date would be ordered in case alleged continuing violation of the Sherman Antitrust Act, notwithstanding objection to producing any discovery for period after filing of complaint).

Therefore, when determining the applicable discovery period, the appropriate question is whether the discovery sought may be relevant to the claims asserted, not whether the materials were generated within a time period tied to specific allegations in the complaint.

Were it not for the discovery ordered by the Court in *Franklin*, Plaintiffs' factual allegations would be far less detailed. This is the ordinary and intended consequence of discovery – the *discovery* of facts, *not* previously known to the discovering party, that are relevant to its claim or defense. Defendants would turn this principle on its head, and require that Plaintiffs already know and plead virtually every relevant detail about every Neurontin off-

-10-

label marketing event before Defendants are obliged to produce documents relating to those events. Defendants' frustration with the ordinary consequences of discovery was exhibited most vividly at the hearing on this issue in *Franklin*, at which defense counsel complained that:

> The only reason they've made allegations related to 1997 and 1998 is because we produced to them the documents. They were picking out documents and they're making new allegations based on that. They wouldn't have had that because David Franklin has no knowledge, the relator has absolutely no knowledge of anything that occurred after 1997. So, they're coming up with new allegations based on the documents we produced.

*See* Reporter's Transcript of Motion Hearing at 13 (January 9, 2002) (attached as Exhibit E to Poate Decl., Dkt. No. 171). The experience in *Franklin*, as well as in this case, confirms that Plaintiffs are not on a wasteful "fishing expedition," and that Defendants' true concern in resisting additional discovery is avoiding exposure of the full measure of their misconduct.

Notwithstanding the temporal limitation on discovery imposed in *Franklin*, Plaintiffs have been able to allege a substantial number of specific Neurontin off-label marketing events occurring after December 31, 1998. *See, e.g.*, SACC ¶¶ 82 (identifying 16 events), 153 (identifying 17 events). The manner in which the relator came into possession of information concerning Defendants' post-1998 off-label marketing activities is highly revealing.

In October 2001, the relator subpoenaed two of the medical marketing firms heavily involved in the off-label promotion enterprise, Sudler & Hennessey and Cline Davis & Mann, Inc. (*see* Cl. Comp. ¶¶ 60-65 and 76-81), who together produced only one banker's box of responsive documents. *See* Affidavit of Ilyas J. Rona ("Rona Aff.," attached as Exhibit K to Poate Decl., Dkt. No. 171) ¶¶ 2-3, 9-12. In April 2003, the U.S. Attorney's Office informed counsel for the relator that it had received 47 boxes of documents from these same firms in response to its civil investigative demands, and that much of this production concerned the 1994 through 1998 time period. *Id*. ¶ 13. Even though these documents were clearly responsive to the

relator's subpoenas, they had been withheld from production. *Id.* ¶¶ 4, 13, 22.

Relator's counsel had the opportunity to review about 10 of the 47 boxes produced to the U.S. Attorney (*id.* ¶ 20), and, on one occasion, was permitted to make a number of copies. Most of the information concerning post-1998 promotional activities contained in the complaints comes from this small number of copies, which were only a small fraction of the documents produced to the U.S. Attorney.[7] *See* Sealed Affidavit of Thomas Greene in Support of Plaintiffs' Reply to Defendants' Opposition to Motion to Compel Production of Documents Created After December 31, 1998 (Dkt. No. 191) ¶¶ 7-10. Notwithstanding the fact that Defendants could easily produce these documents, Magistrate Judge Sorokin has ordered that "[t]hese documents are subject to the scope of discovery set forth in this Order" (Order at 3 n.2), *i.e.*, that Defendants may withhold from production any such documents generated after May 31, 2001. This ruling would deprive Plaintiffs of demonstrably relevant and readily accessible evidence in support of their claims, solely because Plaintiffs do not already know (and therefore cannot allege) the specific facts that these documents contain. This standard – denying discovery of *any* facts except the *specific* facts the discovering party already knows – would doom most cases at the outset.

**B.**     **Plaintiffs Have Alleged Specific Acts of Misconduct Occurring After May 2001**

Even the small quantity Pfizer-era sales and marketing documents that Plaintiffs have been able to obtain outside the *Franklin* litigation further confirm the unfairness of an arbitrary May 2001 limitation on discovery. These documents, produced by Pfizer in the related case of *Young v. Pfizer, Inc. and Parke-Davis*, N.Y. Super. Ct., County of Orange, Index No. 1062/2004

---

[7] As the *qui tam* action has been settled, relator's counsel no longer have access to these documents.

("*Young*") pending in state court (and shared with Plaintiffs with Defendants' permission), show

a continuation and expansion of one of the primary fraudulent marketing tactics developed by

Parke-Davis.  Although the Order's analysis focuses on one tactic -- marketing "events" at which

the Plaintiffs allege false or misleading information about off-label Neurontin was disseminated,

the complaints allege that Defendants' marketing campaign also relied upon the dissemination

and distribution of publications which contained misleading information regarding off-label

usage.  *See, e.g.*, SACC ¶ 43.  The complaints specifically allege that the off-label promotion of

Neurontin derived from a "publication strategy," and that from the commencement of off-label

promotion, top officials at Parke-Davis intended to publish only favorable articles regarding the

off-label use of Neurontin and to suppress studies and investigations that did not support

off-label Neurontin use.  *See e.g.*, SACC ¶ 29-30.  The complaints also allege that one of the

principal methods Defendants used to control published information regarding Neurontin was to

only publish articles that contained favorable information regarding Neurontin and to suppress,

deliberately, publication of information known to the Defendants which indicated that Neurontin

did not work for the off-label uses promoted by the Defendants.  *See, e.g.*, SACC ¶¶ 136-37.

This Court, of course, has ruled that deliberate suppression of negative information regarding

off-label uses of Neurontin may constitute fraudulent marketing.

　　　　Plaintiffs allege many specific details regarding this cornerstone of the misleading off-

label marketing campaign that took place subsequent to May 2001.  After Pfizer acquired

Parke-Davis in June 2000, it expanded the Neurontin publication strategy through retention of a

medical marketing firm named Medical Action Communications, Inc. ("MAC").  MAC and

Pfizer worked together to create and distribute publications with "key messages" regarding

off-label usage, messages which "were designed to be false and misleading distortions of

Neurontin's efficacy in off-label uses." SACC ¶ 122. Plaintiffs describe MAC and Pfizer's activities to increase the number of off-label publications in 2002 and 2003. In April 2002, for example, MAC and Pfizer officials met to figure out how to "spin" a series of negative Neurontin studies so that they appeared to be positive. They decided to "move the goalposts" regarding one study of neuropathic pain; when the study failed using the metrics originally established by the study's authors, MAC and Pfizer reduced the efficacy threshold so that subjects originally classified as having no response to Neurontin were redefined to have responded favorably. SACC ¶ 126.

Plaintiffs identify other misleading articles created by Pfizer and MAC, including articles which falsely proclaim that Neurontin is a fast and effective monotherapy agent, and that doses of Neurontin in excess of 1800 mg per day are effective. SACC ¶ 123. These articles were published and disseminated in 2002 and 2003. SACC ¶ 127. Not surprisingly, these false statements regarding monotherapy and high dosages parallel the false or misleading statements that Plaintiffs allege were repeated in the presentations made to physicians in the marketing events identified by Plaintiffs. *See, e.g.*, SACC ¶¶ 187-193, 204-227. This is because Pfizer coordinated its "publication strategy" and the presentation of published articles at medical seminars so that the same key messages would be publicized; the publication campaign MAC and Pfizer developed between 2001 and 2005 was part of Pfizer's "global strategy" for the promotion of Neurontin. SACC ¶ 128.

Thus, even if the Order's holding that Plaintiffs are not entitled to any discovery beyond the date of the last specific wrongful act alleged was correct (it is not), the imposition of a May 2001 discovery limitation is clearly erroneous, as the complaints specifically allege that Pfizer and its medical marketing vendors intended to disseminate false and misleading information

regarding off-label Neurontin usage through 2003, and created articles that articulated this message through 2005.

### C. Two Other Courts Have Rejected Defendants' Attempts to Impose Temporal Limits on Discovery

Prior to abandoning their motion for a temporal limit on discovery, Defendants litigated and lost the issue twice, before two different judges. In the subsequently transferred cases *In re Neurontin*, Case No. 04 Civ. 6704 (S.D.N.Y.), Judge Rakoff rejected Defendants' argument that discovery of Neurontin sales and marketing materials should be limited to those in existence prior to 1997, because the plaintiffs were unable to allege specific acts of misconduct occurring after that time:

> Defendants argue that, because the complaint contains no specific allegations of wrongdoing subsequent to 1997, it need only turn over marketing materials prior to that time. However, the complaint does contain explicit (if generalized) allegations of wrongdoing continuing until at least June 2001. See Complaint ¶ 183. Moreover, plaintiffs' legal theory—that the suicides and suicide attempts were caused by Neurontin that was prescribed because of defendants' wrongful actions—implicitly requires that defendants' alleged deceptions, or at least the effects thereof, have continued at least until the last period of time when doctors could have chosen a different course of action had they been properly informed. . . The fact that in some places the complaint includes more particularized allegations, mostly taken from the information does not render the remainder of the complaint . . . insufficiently detailed to obtain discovery of evidence relevant to the claims and defenses pleaded, see Fed. R. Civ. P. 26(b)(1). It does, perhaps, indicate that plaintiffs have a lesser chance of finding evidence bearing out those allegations, but this is not a consideration the Court may take into account in determining whether 'the burden or expense of the proposed discovery outweighs its likely benefit,' see Fed. R. Civ. P. 26(b)(2) (court should consider 'the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues'). The Court's power to impose limits on discovery of potentially relevant material is meant to prevent parties from using redundant requests to turn discovery into a 'war of attrition.' Fed. R. Civ. P. 26 advisory committee's note. It is not a license for the Court to 'deprive a party of discovery that is reasonably necessary to afford a fair opportunity to develop and prepare the case' because it harbors doubts about that party's ability to find evidence that bears out its allegations.' Accordingly, plaintiffs are permitted to discover evidence of defendants' marketing efforts as of the last day such marketing could be relevant to the claims and defenses pleaded—i.e., the last Neurontin

prescription issued to a plaintiff or a plaintiff's decedent in the case.  See Incollingo v. Ewing, 282 A.2d 206, 221-23 (Pa. 1971) (upholding introduction of evidence of drug manufacturer's national marketing efforts to show influence on prescribing doctor, but permitting evidence of marketing efforts after the prescription only to show feasibility of warning, not to show negligence). Applying this rule to an individual case is simple. . . .Complicating matters somewhat is the fact that this case now includes many plaintiffs with different incident dates. . . The Court therefore instructs the parties to determine the last date on which marketing efforts could be relevant to any of the cases in this action;  that date will be the latest alleged suicide or suicide attempt, unless there is evidence that the prescription allegedly leading to that event took place significantly earlier.  Such date will be the cut-off date for discovery of defendants' marketing efforts.

In re Neurontin, Order at 2-5 (Apr. 25, 2005) (attached as Exh. H to Poate Decl., Dkt. No. 171).

This Court expressed the view that Judge Rakoff's order, which the Court has inherited along

with the transferred cases in which it was issued, "seemed reasonable."  Transcript at 28:15

(attached as Exh. N to Poate Decl., Dkt. No. 171).

Applying the same rule here, Plaintiffs are entitled to discovery of Defendants' off-label

marketing activities until "the last day such marketing could be relevant to the claims and

defenses pleaded," which, in this case, is through 2004.  Indeed, one of the named plaintiffs,

Lorraine Kopa, did not even begin taking Neurontin until November 2003, two and a half years

after the arbitrary cutoff date of May 31, 2001.  See SCAC ¶ 10 ("She was prescribed and

purchased Neurontin from in or about November 2003 until in or about April 2004 for the

treatment of pain, an off-label use for which Neurontin was and is not approved.").  Similarly, in

Young, a New York state court ordered the production of Defendants' Neurontin Medical

Communications, Sales/Marketing, and Visitors' Speakers Bureau databases, without geographic

or time limitation.  See Order dated April 28, 2005 (attached as Exh. I to Poate Decl., Dkt. No.

171).

**D.**    **Recently Obtained Documents Identify Specific Off-Label Marketing Events Through December 2004**

Additional documents recently obtained by Plaintiffs – which could not be reviewed in time for inclusion in the second amended complaints – further confirm that Defendants' document production should not be limited to documents created before June 1, 2001.  On a rolling basis, Defendants have been producing and continue to produce custodial files to the plaintiff in *Young* which shed new light on the ways that Pfizer attempted to promote off-label uses   Plaintiffs have not sought leave to amend their complaints to include these additional allegations, because it would needlessly delay the progress of this lawsuit -- it would be a waste of time to require Plaintiffs to amend their complaints every time they discover additional relevant facts in support of claims which the Court has already held are sufficiently pled.[8]  This newly discovered, post-May 2001 misconduct can be divided into three categories:  false and misleading presentations at marketing events, suppression of unfavorable information, and publication of misleading information.[9]

      **1.**    **False and Misleading Presentations at Events**

                **REDACTED – FILED UNDER SEAL**

      **2.**    **Suppression and Non-Publication of Unfavorable Information**

                **REDACTED – FILED UNDER SEAL**

      **3.**    **Publication of False and Misleading Information in Journal Articles**

                **REDACTED – FILED UNDER SEAL**

---

[8] As noted in the Order, "Plaintiffs appear to have corrected their pleading deficiencies with regard to restless leg syndrome (RLS) and pain. . . . For present purposes . . . it is assumed that they [the social phobia allegations] can proceed."  Order at 2 n.1.

[9] Plaintiffs acknowledge that these additional facts were not brought to Magistrate Judge Sorokin's attention.  Plaintiffs had no reason to do so, because Defendants had abandoned their motion for a protective order seeking to impose a temporal limit on discovery.

IV.     **CONCLUSION**

It is hardly surprising that Defendants would resist discovery into their more recent off-label promotional activities, because sales of Neurontin for off-label uses continued to skyrocket after May 2001.  *See, e.g.*, SACC ¶ 47 (alleging $2.7 billion in Neurontin sales in 2003, 90% for off-label uses); SCAC ¶ 3 (same).  To curtail Plaintiffs' ability to prove their claims for the period during which much, if not most, of the wrongdoing and corresponding damage occurred would be manifestly unfair to Plaintiffs, and contrary to both the letter and spirit of the liberal rules governing discovery.

For the foregoing reasons, Discovery Order No. 3 should be modified to permit Plaintiffs to undertake discovery into Defendants' promotion of Neurontin for off-label uses through 2004, and to require Defendants to produce to Plaintiffs forthwith the 47 boxes of documents previously provided to the U.S. Attorney.

Dated:  August 1, 2006          By their attorneys,

*Members of the Class Plaintiffs' Steering Committee*

By:  **/s/ Thomas M. Greene**

Thomas Greene, Esquire, BBO # 210020
Greene & Hoffman
125 Summer Street
Boston, MA 02110

By:  **/s/ Don Barrett**

Don Barrett, Esquire
Barrett Law Office
404 Court Square North
P.O. Box 987
Lexington, MS 39095

554625.1

By: **/s/ Daniel Becnel, Jr.**

Daniel Becnel, Jr., Esquire
Law Offices of Daniel Becnel, Jr.
106 W. Seventh Street
P.O. Drawer H
Reserve, LA 70084

By: **/s/ James Dugan**

James Dugan, Esquire
Dugan & Browne
650 Poydras St., Suite 2150
New Orleans, LA 70130

By: **/s/ Barry Himmelstein**

Barry Himmelstein, Esquire
Lieff, Cabraser, Heimann & Bernstein, LLP
275 Battery Street, 30th Floor
San Francisco, CA 94111-3339

By: **/s/ Thomas M. Sobol**

Thomas M. Sobol, Esquire
Hagens Berman Sobol Shapiro LLP
One Main Street, 4th Floor
Cambridge, MA 02142

***Members of the Plaintiffs' Non-Class Steering Committee***

By: **/s/ Richard Bemporad**

Richard Bemporad, Esquire
Lowey Dannenberg Bemporad & Selinger, P.C.
The Gateway
One North Lexington Avenue
White Plains, NY  10601

By: **/s/ Linda P. Nussbaum**

Linda P. Nussbaum, Esquire
Cohen Milstein Hausfeld & Toll
150 East 52nd Street, 13th Floor
New York, NY 10022