# EXHIBIT B

LAW OFFICES
**DECHERT LLP**
A PENNSYLVANIA LIMITED LIABILITY PARTNERSHIP
PRINCETON PIKE CORPORATE CENTER
(MAIL TO)      P.O. BOX 5218, PRINCETON, NEW JERSEY 08543-5218
(DELIVER TO) 997 LENOX DRIVE, BUILDING THREE, SUITE 210
                    LAWRENCEVILLE,  NEW JERSEY 08648

(609) 620-3200
EDR-0058
TK-0043
MT-4807

ATTORNEYS FOR DEFENDANTS

---

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| JOSEPH CASCIO, | : | |
| Plaintiff, | : | Civil Action No.: 06-58 (DMC) |
| vs. | : | |
| PFIZER INC., PARKE-DAVIS, a division of Warner-Lambert Company and Warner-Lambert Company LLC, WARNER-LAMBERT COMPANY, and WARNER-LAMBERT COMPANY LLC, | : | **ANSWER OF DEFENDANTS PFIZER, INC., PARKE-DAVIS, WARNER LAMBERT COMPANY, AND WARNER LAMBERT COMPANY LLC** |
| Defendants. | : | |

Defendants Pfizer Inc. ("Pfizer"), Parke-Davis, a division of Warner-Lambert

Company and Warner-Lambert Company LLC ("Parke-Davis"), Warner-Lambert

Company ("Warner-Lambert"), and Warner-Lambert Company LLC ("Warner-Lambert

LLC" and collectively, "Defendants"), by their undersigned counsel, answer Plaintiff's

Verified Complaint in the above-captioned action (the "Complaint") as follows:

## STATEMENT OF THE CASE

1.    Deny the allegations in paragraph 1, except admit that the United States Food and Drug Administration ("FDA") has not approved Neurontin® ("Neurontin"), the brand name for gabapentin, for labeling as safe and effective for the treatment of bipolar disorder.

## PARTIES AND JURISDICTION

2.    Deny the allegations in paragraph 2, except admit that Pfizer is a foreign corporation organized under the laws of Delaware whose headquarters are in New York; admit that Warner-Lambert Company was a Delaware corporation until December 31, 2002, when it was converted into a Delaware limited liability company, known as Warner-Lambert Company LLC; admit that from December 31, 2002 to the present Warner-Lambert Company LLC has been a Delaware limited liability company; and admit that Pfizer is and has been the sole member of Warner-Lambert Company LLC since December 31, 2002.

3.    Admit the allegations in paragraph 3.

4.    Admit the allegations in paragraph 4.

5.    Admit the allegations in paragraph 5.

6.    Deny the allegations in paragraph 6, except admit that Parke-Davis was a division of Warner-Lambert Company from approximately 1978 until approximately June 2000.

7.    Deny the allegations in paragraph 7.

8.    Deny the allegations in paragraph 8.

2

9.      Deny the allegations in paragraph 9, except admit that Warner-Lambert
Company was a Delaware corporation until December 31, 2002, when it was converted
into a Delaware limited liability company, known as Warner-Lambert Company LLC.

10.     Deny the allegations in paragraph 10, except admit that Warner-Lambert
Company was authorized to do business in the State of New Jersey until December 31,
2002.

11.     Deny the allegations in paragraph 11, except admit that Warner-Lambert
Company was a business entity actually doing business in the State of New Jersey until
December 31, 2002.

12.     Deny the allegations in paragraph 12, except admit that Parke-Davis was a
division of Warner-Lambert Company from approximately 1978 until approximately
June 2000.

13.     Deny the allegations in paragraph 13.

14.     Deny the allegations in paragraph 14, except admit that from December
31, 2002 to the present Warner-Lambert Company LLC has been a Delaware limited
liability company.

15.     Deny the allegations in paragraph 15, except admit that Warner-Lambert
Company LLC is a Delaware limited liability company authorized to do business in the
State of New Jersey since December 31, 2002.

16.     Deny the allegations in paragraph 16, except admit that Warner-Lambert
Company LLC has been a business entity actually doing business in the State of New
Jersey since December 31, 2002.

3

17.     Deny the allegations in paragraph 17, except admit that Pfizer is and has been the sole member of Warner-Lambert Company LLC since December 31, 2002.

18.     Deny the allegations in paragraph 18.

19.     Deny the allegations in paragraph 19.

20.     Deny the allegations in paragraph 20.

21.     Deny the allegations in paragraph 21, except admit that Warner-Lambert Company was a wholly-owned subsidiary of Pfizer from June 2000 through December 31, 2002.

22.     Paragraph 22 asserts a legal conclusion to which no response is required, and Defendants therefore deny the allegations in paragraph 22.

23.     Deny the allegations in paragraph 23.

24.     Deny the allegations in paragraph 24, except admit that Warner-Lambert Company LLC has been a wholly-owned subsidiary of Pfizer since December 31, 2002.

25.     Paragraph 25 asserts a legal conclusion to which no response is required, and Defendants therefore deny the allegations in paragraph 25.

26.     Paragraph 26 asserts a legal conclusion to which no response is required, and Defendants therefore deny the allegations in paragraph 26.

27.     Paragraph 27 asserts a legal conclusion to which no response is required, and Defendants therefore deny the allegations in paragraph 27.

28.     Paragraph 28 asserts a legal conclusion to which no response is required, and Defendants therefore deny the allegations in paragraph 28.

29.     Paragraph 29 asserts a legal conclusion to which no response is required, and Defendants therefore deny the allegations in paragraph 29.

30.    Paragraph 30 asserts a legal conclusion to which no response is required, and Defendants therefore deny the allegations in paragraph 30.

31.    Paragraph 31 asserts a legal conclusion to which no response is required, and Defendants therefore deny the allegations in paragraph 31.

32.    Paragraph 32 asserts a legal conclusion to which no response is required, and Defendants therefore deny the allegations in paragraph 32.

33.    Paragraph 33 asserts a legal conclusion to which no response is required, and Defendants therefore deny the allegations in paragraph 33.

34.    Paragraph 34 asserts a legal conclusion to which no response is required, and Defendants therefore deny the allegations in paragraph 34.

35.    Paragraph 35 asserts a legal conclusion to which no response is required, and Defendants therefore deny the allegations in paragraph 35.

36.    Paragraph 36 asserts a legal conclusion to which no response is required, and Defendants therefore deny the allegations in paragraph 36.

37.    Paragraph 37 asserts a legal conclusion to which no response is required, and Defendants therefore deny the allegations in paragraph 37.

38.    Paragraph 38 asserts a legal conclusion to which no response is required, and Defendants therefore deny the allegations in paragraph 38.

39.    Paragraph 39 asserts a legal conclusion to which no response is required, and Defendants therefore deny the allegations in paragraph 39.

40.    Paragraph 40 asserts a legal conclusion to which no response is required, and Defendants therefore deny the allegations in paragraph 40.

41.     Paragraph 41 asserts a legal conclusion to which no response is required, and Defendants therefore deny the allegations in paragraph 41.

42.     Paragraph 42 asserts a legal conclusion to which no response is required, and Defendants therefore deny the allegations in paragraph 42.

43.     Paragraph 43 asserts a legal conclusion to which no response is required, and Defendants therefore deny the allegations in paragraph 43.

44.     Paragraph 44 asserts a legal conclusion to which no response is required, and Defendants therefore deny the allegations in paragraph 44.

45.     Paragraph 45 asserts a legal conclusion to which no response is required, and Defendants therefore deny the allegations in paragraph 45.

46.     Paragraph 46 asserts a legal conclusion to which no response is required, and Defendants therefore deny the allegations in paragraph 46.

47.     Paragraph 47 asserts a legal conclusion to which no response is required, and Defendants therefore deny the allegations in paragraph 47.

48.     Paragraph 48 asserts a legal conclusion to which no response is required, and Defendants therefore deny the allegations in paragraph 48.

49.     Paragraph 49 asserts a legal conclusion to which no response is required, and Defendants therefore deny the allegations in paragraph 49.

50.     Paragraph 50 asserts a legal conclusion to which no response is required, and Defendants therefore deny the allegations in paragraph 50.

51.     Paragraph 51 asserts a legal conclusion to which no response is required, and Defendants therefore deny the allegations in paragraph 51.

52.     Paragraph 52 asserts a legal conclusion to which no response is required, and Defendants therefore deny the allegations in paragraph 52.

53.     Paragraph 53 asserts a legal conclusion to which no response is required, and Defendants therefore deny the allegations in paragraph 53.

54.     Paragraph 54 asserts a legal conclusion to which no response is required, and Defendants therefore deny the allegations in paragraph 54.

55.     Paragraph 55 asserts a legal conclusion to which no response is required, and Defendants therefore deny the allegations in paragraph 55.

56.     Paragraph 56 asserts a legal conclusion to which no response is required, and Defendants therefore deny the allegations in paragraph 56.

57.     Paragraph 57 asserts a legal conclusion to which no response is required, and Defendants therefore deny the allegations in paragraph 57.

58.     Paragraph 58 asserts a legal conclusion to which no response is required, and Defendants therefore deny the allegations in paragraph 58.

59.     Paragraph 59 asserts a legal conclusion to which no response is required, and Defendants therefore deny the allegations in paragraph 59.

60.     Paragraph 60 asserts a legal conclusion to which no response is required, and Defendants therefore deny the allegations in paragraph 60.

61.     Paragraph 61 asserts a legal conclusion to which no response is required, and Defendants therefore deny the allegations in paragraph 61.

62.     Paragraph 62 asserts a legal conclusion to which no response is required, and Defendants therefore deny the allegations in paragraph 62.

63.    Paragraph 63 asserts a legal conclusion to which no response is required, and Defendants therefore deny the allegations in paragraph 63.

64.    Paragraph 64 asserts a legal conclusion to which no response is required, and Defendants therefore deny the allegations in paragraph 64.

65.    Paragraph 65 asserts a legal conclusion to which no response is required, and Defendants therefore deny the allegations in paragraph 65.

66.    Deny the allegations in paragraph 66, except admit that Pfizer's headquarters are in New York.

67.    Paragraph 67 asserts a legal conclusion to which no response is required, and Defendants therefore deny the allegations in paragraph 67.

68.    Paragraph 68 asserts a legal conclusion to which no response is required, and Defendants therefore deny the allegations in paragraph 68.

69.    Paragraph 69 asserts a legal conclusion to which no response is required, and Defendants therefore deny the allegations in paragraph 69.

70.    Deny the allegations in paragraph 70, except admit that since June 2000, Pfizer, directly and/or indirectly through its subsidiaries, has marketed and sold Neurontin.

71.    Deny the allegations in paragraph 71, except admit that Pfizer, directly and/or indirectly through its subsidiaries, has marketed and sold Neurontin since June 2000.

72.    Deny the allegations in paragraph 72, except admit that Pfizer is engaged, directly and/or indirectly through its subsidiaries, in the business of designing, manufacturing, advertising, marketing and selling pharmaceutical drugs, and transacts

business within the State of New Jersey and contracts to provide goods in the State of New Jersey.

73.    Deny the allegations in paragraph 73.

74.    Deny the allegations in paragraph 74.

75.    Admit the allegations in paragraph 75.

76.    Deny the allegations in paragraph 76.

77.    Deny the allegations in paragraph 77.

78.    Deny the allegations in paragraph 78, except admit that Parke-Davis marketed Neurontin on a date prior to January 18, 2001.

79.    Deny the allegations in paragraph 79, except admit that Parke-Davis was a division of Warner-Lambert Company from approximately 1978 until approximately June 2000, and that until approximately June 2000, Parke-Davis directly and/or indirectly engaged in the business of marketing pharmaceutical drugs, including Neurontin, and transacted business within the State of New Jersey and contracted to provide goods in the State of New Jersey.

80.    Deny the allegations in paragraph 80.

81.    Deny the allegations in paragraph 81.

82.    Deny the allegations in paragraph 82, except admit that Parke-Davis was a division of Warner-Lambert Company from approximately 1978 until June 2000 and that until June 2000, Parke-Davis directly or indirectly did and solicited business and engaged in a persistent course of conduct in the State of New Jersey, deriving substantial revenue from goods and products consumed in the State of New Jersey.

83.    Deny the allegations in paragraph 83.

9

84.     Deny the allegations in paragraph 84.

85.     Deny the allegations in paragraph 85, except admit that Warner-Lambert

Company marketed and sold Neurontin until June 2000.

86.     Deny the allegations in paragraph 86, except admit that until December

31, 2002, Warner-Lambert Company was, directly and/or indirectly, engaged in the

business of designing, manufacturing, advertising, marketing, and selling pharmaceutical

drugs and transacted business within the State of New Jersey and contracted to provide

goods and services in the State of New Jersey.

87.     Deny the allegations in paragraph 87.

88.     Deny the allegations in paragraph 88.

89.     Deny the allegations in paragraph 89, except admit that until June 2000,

Warner-Lambert Company, directly and/or indirectly, did and solicited business and

engaged in a persistent course of conduct in the State of New Jersey, deriving substantial

revenue from goods and products consumed in the State of New Jersey.

90.     Deny the allegations in paragraph 90.

91.     Deny the allegations in paragraph 91.

92.     Deny the allegations in paragraph 92.

93.     Deny the allegations in paragraph 93.

94.     Deny the allegations in paragraph 94.

95.     Deny the allegations in paragraph 95.

96.     Deny the allegations in paragraph 96, except admit that since December

31, 2002, Warner-Lambert Company LLC has done and solicited business and engaged

in a persistent course of conduct in the State of New Jersey, deriving substantial revenue from goods and products consumed in the State of New Jersey.

97.    Deny the allegations in paragraph 97, except admit that since December 31, 2002, Warner-Lambert Company LLC has done and solicited business and engaged in a persistent course of conduct in the State of New Jersey, deriving substantial revenue from interstate commerce.

## BACKGROUND

98.    Paragraph 98 does not allege facts to which a response is required, and Defendants therefore deny the allegations in paragraph 98.

99.    Paragraph 99 does not allege facts to which a response is required, but to the extent that a response might be deemed required, Defendants admit the allegations in paragraph 99.

100.    Paragraph 100 does not allege facts to which a response is required, and Defendants therefore deny the allegations in paragraph 100.

101.    Paragraph 101 does not allege facts to which a response is required, and Defendants therefore deny the allegations in paragraph 101.

102.    Paragraph 102 does not allege facts to which a response is required, and Defendants therefore deny the allegations in paragraph 102.

103.    Paragraph 103 does not allege facts to which a response is required, and Defendants therefore deny the allegations in paragraph 103.

104.    Deny the allegations in paragraph 104, except admit that, in 1993, the FDA approved Neurontin for labeling as safe and effective for adjunctive therapy in the

treatment of partial seizures in patients with epilepsy at dosages of 900 to 1800 milligrams per day.

105.    Deny the allegations in paragraph 105, except admit that the FDA has not approved Neurontin for the treatment of bipolar disorder.

106.    Deny the allegations in paragraph 106.

107.    Deny the allegations in paragraph 107.

108.    Deny the allegations in paragraph 108.

109.    Deny the allegations in paragraph 109.

110.    Deny the allegations in paragraph 110.

111.    Deny the allegations in paragraph 111.

112.    Deny the allegations in paragraph 112, except admit that Neurontin was approved as adjunctive therapy for the treatment of epilepsy.

113.    Deny the allegations in paragraph 113.

114.    Deny the allegations in paragraph 114.

115.    Deny the allegations in paragraph 115, except admit that on May 13, 2004, an Information was filed against Warner-Lambert Company LLC in the United States District Court for the District of Massachusetts.

116.    Deny the allegations in paragraph 116.

117.    Deny the allegations in paragraph 117.

118.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 118, and therefore deny same.

119.    Deny the allegations in paragraph 119, except deny knowledge or information sufficient to form a belief as to the truth of the allegations that plaintiff's

physician prescribed Neurontin to treat plaintiff's bipolar disorder, and therefore deny
same.

120.    Deny the allegations in paragraph 120 except deny knowledge or
information sufficient to form a belief as to the truth of the allegations that plaintiff's
physician prescribed Neurontin to treat plaintiff's bipolar disorder, and therefore deny
same.

121.    Deny the allegations in paragraph 121.

122.    Deny the allegations in paragraph 122.

123.    Deny the allegations in paragraph 123.

124.    Deny the allegations in paragraph 124.

## FIRST CAUSE OF ACTION

125.    Repeat each and every response to the allegations in paragraphs 1 through
124.

126.    Deny the allegations in paragraph 126.

127.    Deny the allegations in paragraph 127.

128.    Deny the allegations in paragraph 128.

129.    Deny the allegations in paragraph 129.

130.    Deny the allegations in paragraph 130.

131.    Deny the allegations in paragraph 131.

132.    Deny the allegations in paragraph 132.

133.    Deny the allegations in paragraph 133.

13

## SECOND CAUSE OF ACTION

134.    Repeat each and every response to the allegations in paragraphs 1 through 133.

135.    Deny the allegations in paragraph 135.

136.    Deny the allegations in paragraph 136.

137.    Deny the allegations in paragraph 137.

138.    Deny the allegations in paragraph 138.

139.    Deny the allegations in paragraph 139.

140.    Deny the allegations in paragraph 140.

141.    Deny the allegations in paragraph 141.

## THIRD CAUSE OF ACTION

142.    Repeat each and every response to the allegations in paragraphs 1 through 141.

143.    Deny the allegations in paragraph 143.

144.    Deny the allegations in paragraph 144.

145.    Deny the allegations in paragraph 145.

146.    Deny the allegations in paragraph 146.

## FOURTH CAUSE OF ACTION

147.    Repeat each and every response to the allegations in paragraphs 1 through

146.

148.    Deny the allegations in paragraph 148.

149.    Deny the allegations in paragraph 149.

150.    Deny the allegations in paragraph 150, except refer to the Information for

its contents.

151.    Deny the allegations in paragraph 151, except refer to the Information for

its contents.

152.    Deny the allegations in paragraph 152, except refer to the Information for

its contents.

153.    Deny the allegations in paragraph 153, except refer to the Information for

its contents.

154.    Deny the allegations in paragraph 154, except refer to the Information for

its contents.

155.    Deny the allegations in paragraph 155, except refer to the Information for

its contents.

156.    Deny the allegations in paragraph 156, except refer to the Information for

its contents.

157.    Deny the allegations in paragraph 157, except refer to the Information for

its contents.

158.    Deny the allegations in paragraph 158, except refer to the Information for

its contents.

159.    Deny the allegations in paragraph 159, except refer to the Information for its contents.

160.    Deny the allegations in paragraph 160, except refer to the Information for its contents.

161.    Deny the allegations in paragraph 161, except refer to the Information for its contents.

162.    Deny the allegations in paragraph 162, except refer to the Information for its contents.

163.    Deny the allegations in paragraph 163, except refer to the Information for its contents.

164.    Deny the allegations in paragraph 164, except refer to the Information for its contents.

165.    Deny the allegations in paragraph 165, except refer to the Information for its contents.

166.    Deny the allegations in paragraph 166, except refer to the Information for its contents.

167.    Deny the allegations in paragraph 167, except refer to the Information for its contents.

168.    Deny the allegations in paragraph 168, except refer to the Information for its contents.

169.    Deny the allegations in paragraph 169, except refer to the Information for its contents.

16

170.    Deny the allegations in paragraph 170, except refer to the Information for its contents.

171.    Deny the allegations in paragraph 171, except refer to the Information for its contents.

172.    Deny the allegations in paragraph 172, except refer to the Information for its contents.

173.    Deny the allegations in paragraph 173, except refer to the Information for its contents.

174.    Deny the allegations in paragraph 174, except refer to the Information for its contents.

175.    Deny the allegations in paragraph 175, except refer to the Information for its contents.

176.    Deny the allegations in paragraph 176.

177.    Deny the allegations in paragraph 177.

178.    Deny the allegations in paragraph 178.

179.    Deny the allegations in paragraph 179.

180.    Deny the allegations in paragraph 180.

181.    Deny the allegations in paragraph 181.

182.    Deny the allegations in paragraph 182.

183.    Deny the allegations in paragraph 183.

184.    Deny the allegations in paragraph 184.

185.    Deny the allegations in paragraph 185.

186.    Deny the allegations in paragraph 186.

17

187.   Deny the allegations in paragraph 187.

188.   Deny the allegations in paragraph 188.

189.   Deny the allegations in paragraph 189.

190.   Deny the allegations in paragraph 190.

191.   Deny the allegations in paragraph 191, except refer to the letter dated June 29, 2001 for its contents.

192.   Deny the allegations in paragraph 192, except refer to the letter dated July 1, 2002 for its contents.

193.   Deny the allegations in paragraph 193.

194.   Deny the allegations in paragraph 194.

195.   Deny the allegations in paragraph 195.

196.   Deny the allegations in paragraph 196.

197.   Deny the allegations in paragraph 197.

198.   Deny the allegations in paragraph 198, except refer to the article referenced in paragraph 198 for its contents.

199.   Deny the allegations in paragraph 199.

200.   Deny the allegations in paragraph 200.

201.   Deny the allegations in paragraph 201.

202.   Deny the allegations in paragraph 202, except admit that sales of Neurontin have increased since 1999 and deny knowledge or information sufficient to form a belief as to the percentage of Neurontin prescribed for off-label uses.

203.   Deny the allegations in paragraph 203.

204.   Deny the allegations in paragraph 204.

205.    Deny the allegations in paragraph 205.

206.    Deny the allegations in paragraph 206.

207.    Deny the allegations in paragraph 207.

208.    Deny the allegations in paragraph 208, except admit that sales of

Neurontin have increased since 1998, and deny knowledge or information sufficient to

form a belief as to the percentage of Neurontin prescribed for off-label uses.

209.    Deny the allegations in paragraph 209.

210.    Deny the allegations in paragraph 210.

211.    Deny the allegations in paragraph 211.

212.    Deny the allegations in paragraph 212.

213.    Deny the allegations in paragraph 213.

214.    Deny the allegations in paragraph 214.

215.    Deny the allegations in paragraph 215.

216.    Deny the allegations in paragraph 216.

## FIFTH CAUSE OF ACTION

217.    Repeat each and every response to the allegations in paragraphs 1 through

216.

218.    Deny the allegations in paragraph 218.

219.    Deny the allegations in paragraph 219.

220.    Deny the allegations in paragraph 220.

## AFFIRMATIVE DEFENSES

Without assuming the burden of proof of such defenses that they would not

otherwise have, Defendants affirmatively assert the following defenses:

19

### FIRST AFFIRMATIVE DEFENSE

The Complaint fails to state a claim upon which relief may be granted.

### SECOND AFFIRMATIVE DEFENSE

All of the claims in the Complaint that are brought for harm caused by a product, irrespective of the theory underlying the claim, except for harm caused by breach of an express warranty, are not actionable unless brought under the New Jersey Products Liability Act, N.J.S.A. 2A:58C, et seq.

### THIRD AFFIRMATIVE DEFENSE

Neurontin was neither defective nor unreasonably dangerous, unsuitable, or unfit for its intended purpose when used according to label instructions; therefore, Plaintiff's claims are barred by the provisions of the New Jersey Products Liability Act, N.J.S.A. 2A:58C-2.

### FOURTH AFFIRMATIVE DEFENSE

The claims set forth in the Complaint are barred by the provisions of the New Jersey Products Liability Act, N.J.S.A. 2A:58C-3, because the methods, standards and techniques used in formulating Neurontin and in issuing warnings and instructions about its use conformed to the generally recognized, reasonably available and reliable state of knowledge in the field at the time Neurontin was manufactured.

### FIFTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred because Defendants complied with the applicable statutes; since the warnings and instructions given in connection with Neurontin were approved or prescribed by the United States Food and Drug Administration ("FDA"), Plaintiff's claims are barred, in whole or in part, or are otherwise limited by the and

pursuant to the provisions of the New Jersey Products Liability Act, N.J.S.A. 2A:58C-4,

and the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301, et seq.

## SIXTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or part, or are otherwise limited by and

pursuant to the provisions of the New Jersey Products Liability Act, N.J.S.A. 2A:58C, et

seq., including all of the defenses set forth herein.

## SEVENTH AFFIRMATIVE DEFENSE

Plaintiff's are barred from recovery and/or plaintiff's recovery is limited pursuant

to the Comparative Negligence Act, N.J.S.A. 2A:15-5.1, et seq.

## EIGHTH AFFIRMATIVE DEFENSE

Pursuant to the Supremacy Clause of the United States Constitution, the claims

set forth in the Complaint are preempted by federal statutes and regulations having the

force of law.

## NINTH AFFIRMATIVE DEFENSE

The claims set forth in the Complaint are barred because Plaintiff's alleged

injuries and damages, if any, were actually or proximately caused by the intervening or

superseding conduct of persons or entities over which or whom Defendants had no

control.

## TENTH AFFIRMATIVE DEFENSE

Plaintiff's injuries and damages, if any, were due to idiosyncratic reactions to Neurontin for which Defendants cannot be held responsible.

## ELEVENTH AFFIRMATIVE DEFENSE

The claims set forth in the Complaint are barred because the alleged injuries and damages, if any, were caused by medical conditions or processes (whether pre-existing or contemporaneous) unrelated to Neurontin.

## TWELFTH AFFIRMATIVE DEFENSE

The claims set forth in the Complaint are barred by the learned intermediary doctrine.

## THIRTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred under the Restatement (Second) of Torts: Products Liability §402A and comments thereto, including but not limited to comments j and k, and/or the Restatement (Third) of Torts: Products Liability §§ 2, 4, and 6 and comments thereto.

## FOURTEENTH AFFIRMATIVE DEFENSE

The claims set forth in the Complaint are barred because Plaintiff's alleged injuries and damages, if any, were caused by his misuse of Neurontin.

## FIFTEENTH AFFIRMATIVE DEFENSE

The claims set forth in the Complaint are barred because the foreseeable therapeutic benefits of Neurontin outweighed any foreseeable risks of harm.

## SIXTEENTH AFFIRMATIVE DEFENSE

The claims set forth in the Complaint are barred by the doctrine of informed consent and assumption of risk.

### SEVENTEENTH AFFIRMATIVE DEFENSE

The claims set forth in the Complaint are barred because Defendants breached no warranty, express or implied, to Plaintiff.

### EIGHTEENTH AFFIRMATIVE DEFENSE

The claims set forth in the Complaint are barred by the applicable statutes of limitation and/or repose.

### NINETEENTH AFFIRMATIVE DEFENSE

The claims set forth in the Complaint are barred under the doctrines of estoppel, waiver, ratification, laches and unclean hands and other related doctrines and principles, or any one of them, and by Plaintiff's inequitable conduct, lack of diligence, delay and inattention in pursuing such claims.

### TWENTIETH AFFIRMATIVE DEFENSE

To the extent applicable, Plaintiff's claims for damages are barred, in whole or part, by his failure to mitigate damages.

### TWENTY-FIRST AFFIRMATIVE DEFENSE

To the extent applicable, Defendants specifically assert the defenses of comparative negligence and comparative assumption of risk.

### TWENTY-SECOND AFFIRMATIVE DEFENSE

To the extent applicable, Defendants' liability for non-economic damages is several rather than joint and should be prorated.

### TWENTY-THIRD AFFIRMATIVE DEFENSE

To the extent applicable, Defendants are entitled to contribution from any person and/or entity whose negligence or other fault contributed to Plaintiff's alleged injuries and damages.

### TWENTY-FOURTH AFFIRMATIVE DEFENSE

The Complaint fails to state facts sufficient to sustain a claim for, or recovery of,

punitive or exemplary damages.

### TWENTY-FIFTH AFFIRMATIVE DEFENSE

Plaintiff lacks standing to bring this action.

### TWENTY-SIXTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred in whole or in part by the First Amendment to the

United States Constitution.

### TWENTY-SEVENTH AFFIRMATIVE DEFENSE

Plaintiff's claims of fraud are barred by reason of the Complaint's failure to allege

the factual circumstances constituting that specific claim with particularity.

### TWENTY-EIGHTH AFFIRMATIVE DEFENSE

Plaintiff's claims for punitive and exemplary damages are barred by the Fifth,

Eighth, and Fourteenth Amendments to the United States Constitution.

### TWENTY-NINTH AFFIRMATIVE DEFENSE

With respect to Plaintiffs' demand for punitive and exemplary damages,

Defendants specifically incorporate by reference any and all standards or limitations

regarding the determination and enforceability of punitive and exemplary damage awards

which arose in the decisions of BMW of North America Inc. v. Gore, 517 U.S. 559

(1996), Cooper Industries, Inc. v. Leatherman Tool Group, 532 U.S. 424 (2001), and

State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408 (2003).

## THIRTIETH AFFIRMATIVE DEFENSE

To the extent plaintiffs' claims are based on alleged misrepresentations or omissions made to the FDA, such claims are barred pursuant to Buckman Co. v. Plaintiff's Legal Committee, 531 U.S. 341 (2001).

**WHEREFORE**, Defendants respectfully request that the Court:

1.    Enter judgment in their favor on all claims alleged in the Verified Complaint;

2.    Award Defendants the costs, disbursements and reasonable attorneys' fees associated with these proceedings; and

3.    Grant Defendants such other and further relief as the Court may deem just and proper.

Dated:  March 8, 2006                    Respectfully submitted,


                                         s/ Thomas Kane
                                         Ezra D. Rosenberg
                                         Thomas Kane
                                         Michelangelo Troisi
                                         DECHERT LLP
                                         A Pennsylvania Limited Liability
                                         Partnership
                                         Princeton Pike Corporate Center
                                         P.O. Box 5218
                                         Princeton, NJ  08543-5218

                                         Attorneys for Defendants Pfizer Inc.; Parke-
                                         Davis, a division of Warner-Lambert
                                         Company and Warner-Lambert Company
                                         LLC; Warner-Lambert Company; and
                                         Warner-Lambert Company LLC

## CERTIFICATION OF SERVICE

I hereby certify that on this date I caused a true and complete copy of the attached

Answer of Defendants Pfizer, Inc., Parke-Davis, Warner Lambert Company, and Warner

Lambert Company LLC and Rule 7.1 Statement to be electronically filed with the United

States District Court for the District of New Jersey and to be served, via electronic filing,

upon:

        Finkelstein & Partners, LLP
        50 Park Place, 10th Floor
        Newark, New Jersey  07102
        Attorneys for Plaintiff
        Joseph Cascio


Dated:  March 8, 2006           s/ Thomas Kane
                              Thomas Kane

EXHIBIT C

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-----------------------------------------------------------------x

JOSHUA DELANEY,

                       Plaintiff,

          -against-

PFIZER INC., PARKE-DAVIS, a division of
Warner-Lambert Company and Warner-Lambert
Company LLC, WARNER-LAMBERT COMPANY
and WARNER-LAMBERT COMPANY LLC,

                       Defendants.

-----------------------------------------------------------------x

Index No. 04/117852

Hon. Marcy S. Friedman

**AFFIRMATION OF**
**SYLVAIN NAKKAB, M.D.**

      I, SYLVAIN NAKKAB, M.D., a physician duly authorized by law to practice in the State of New York, am not a party to the above-entitled action, and hereby affirm the following under the penalty of perjury:

1.     I am fully, actively and without restrictions licensed as a medical physician in the State of New York.  A copy of my Curriculum Vitae is annexed hereto.

2.     I received my medical degree from New York Medical College, Valhalla, New York, with honors in Psychiatry, in June 1997.

3.     I completed a Psychiatric Residency at Albert Einstein College of Medicine, Bronx, New York, in June 1991; a First Year Child Psychiatry Fellowship at Mount Sinai Hospital, New York, New York, in June 1992; and a Second Year Child Psychiatry Fellowship at Albert Einstein College of Medicine, Bronx, New York, in June 1993.

4.     I received board certification in Adult Psychiatry and Neurology in November 1992; and in Child and Adolescent Psychiatry in April 1994.

5.    I received academic appointments as Instructor of Psychiatry at Albert Einstein College of Medicine from July 1993 to June 1994; and as Clinical Assistant Professor of Psychiatry at New York Medical College from August 1995 to August 2005.

6.    Since May 1995, I have worked as a full-time solo practitioner in Westchester and Orange Counties, providing assessment, psychotherapeutic, psychopharmacological and family treatment to adults, adolescents, and children.  I also provide acute crisis stabilization and agency collaboration with psychiatric nurse practitioners. My expertise is in post-traumatic stress disorder, mood and anxiety disorders.

7.    I have also worked at Craig House Center, Howland Avenue, Beacon, New York, from 1994 through 1997, providing psychiatric care to patients and families in various Director capacities, from Director for Adolescent Services to Medical Director of Organization.

8.    From February 2001 to April 2002, I treated William Young, who is the Plaintiff in a personal injury/products liability action against Defendants Pfizer Inc., et al., filed in New York State Supreme Court.  In the course of the treatment, I prescribed Neurontin to Mr. Young to treat his bipolar disorder.

9.    As a practicing psychiatrist, I rely upon various sources to remain current on standards of medical care and to assist in the treatment and care of my patients. These sources include (a) medical literature; (b) discussions with my peers; (c) physician desk references; (d) continuing medical education seminars; (e) product labeling; and (f) communication with pharmaceutical company representatives about the products they manufacture and promote.

10.    I began to prescribe Neurontin for off-label uses based primarily upon an article I

had read, entitled "Gabapentin and Lamotrigine:  Alternative Agent for the

Treatment of Bipolar Disorder," by Norman Sussman, M.D., published in the

Primary Psychiatry Journal, August 1997.  The article referred to several papers

presented at the American Psychiatric Association annual meeting earlier that

year in San Diego, California, concerning the results of Gabapentin studies in

bipolar patients, and further stated that "Gabapentin is not thus far been shown to

have any life threatening adverse events or significant drug interactions".

11.    I had not personally met the author; however, the article identified Dr. Sussman as

Clinical Associate Professor of Psychiatry at New York University School of

Medicine, Director of Psychopharmacology Research and Consultation Service at

Bellevue Hospital, New York, New York, and Editor of the Primary Psychiatry

Journal.

12.    I relied upon the credibility of Dr. Sussman's article and the purported objective

opinions in the article, and I believed upon reading the article that Dr. Sussman

was without bias or conflict in that I reasonably assumed he did not have any

relationship to the manufacturer and seller of Neurontin.

13.    Dr. Sussman's article is silent as to any relationship between Dr. Sussman and the

manufacturer of Neurontin.  Indeed, there is no acknowledgement of any grants,

payments, or participation in the authorship of the article by the pharmaceutical

company responsible for the manufacture, promotion and sale of Neurontin.

14.    I relied upon Dr. Sussman's article as the primary basis for my practice of

prescribing Neurontin for off-label use in the treatment of patients suffering from

bipolar disorder, and my reliance on the article was a significant factor in prescribing Neurontin to my patient, William Young, to treat his bipolar disorder.

15.  On December 5, 2005, I was examined under oath by attorneys for both William Young and the Defendants in Mr. Young's lawsuit. At that time, I was provided with certain exhibits concerning safety and adverse events associated with Neurontin. Since that time, I have made myself available to consult with Mr. Young's counsel regarding Neurontin. I have reviewed pertinent documents disclosed by the Defendants during the pendency of this litigation. My review of these documents has brought to light certain facts and circumstances regarding Dr. Sussman's involvement and/or relationship with Parke-Davis, the manufacturer and seller of Neurontin, that were omitted or otherwise not disclosed in Dr. Sussman's article.

16.  At the time I prescribed Neurontin to William Young, I was not aware that the manufacturer and seller of Neurontin, Parke-Davis, had a copy of Dr. Sussman's article prior to publication..

17.  At the time I prescribed Neurontin to William Young, I was not aware that Parke-Davis sought to select physicians, including Dr. Sussman, to present anecdotal information on the use of Neurontin for psychiatric off-label uses.

18.  At the time I prescribed Neurontin to William Young, I was not aware that Parke-Davis sought to have psychiatrists participate in an advisory board meeting at the Ritz Carlton in Dana Point, California, to present anecdotal information on the use of Neurontin for off-label psychiatric uses. I was not aware that Dr. Sussman

4

participated in the event. Further, I was not aware that Dr. Sussman received compensation for his participation.

19.     At the time that I relied on the article as a basis for prescribing Neurontin for off-label use in treating bipolar disorder, I was not aware that Dr. Sussman was invited to speak directly with Parke-Davis's Neurontin product manager, Allen Crook, regarding future studies of Neurontin, or that he was paid by Parke-Davis or an agent of Parke-Davis to speak at various symposiums which included the topic of using Neurontin off-label for the treatment of bipolar disorder.

20.     Had I known of Dr. Sussman's involvement with the manufacturer of Neurontin, I would not have relied on the article as the foundation for my prescribing Neurontin for the off-label treatment of bipolar disorder.

21.     Further, as of the time I treated William Young, I do not recall learning about off-label use of Neurontin for psychiatric treatment from any source other than Dr. Sussman's article. It is therefore unlikely that I would have prescribed Neurontin to Mr. Young if I had known of Dr. Sussman's involvement or relationship to Parke-Davis.


Dated:    July 27, 2006


SYLVAIN NAKKAB, M.D.
3651 Hill Boulevard
Jefferson Valley, NY  10535
914-962-0688


5

EXHIBIT D

SUPREME COURT, STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| JOSHUA DELANEY, | : |
| Plaintiff, | : |
| -against- | :   Index No. 04/117852 |
| | :   Hon. Marci Friedman |
| PFIZER, INC., PARKE-DAVIS, a division of Warner-Lambert Company and Warner-Lambert Company, LLC, WARNER-LAMBERT COMPANY and WARNER-LAMBERT COMPANY, LLC,: | : |
| Defendants. | : |

**AFFIDAVIT OF CHARLES KING III**

STATE OF NEW YORK )

) ss.:

COUNTY OF ORANGE )

I, Charles King III, being duly sworn, depose and say:

1.  I am a Special Consultant of Greylock McKinnon Associates, a consulting and litigation support firm located in Cambridge, Massachusetts. As a consultant, I specialize in marketing, microeconomics, industrial organization, and econometrics.

2.  I have taught marketing, economics, and statistical methods in economics; conducted economic and marketing research; and provided economic and marketing consulting in my areas of specialization. As an Assistant Professor in the Marketing Department of the Harvard Business School from 1997 to 2003, I taught courses in marketing, information and network economics, and organizational economics in the Masters and Doctoral programs. I have also taught in the Harvard Business School Executive Education program for pharmaceutical companies and in the IBM Premier program on competitive strategy.

3.      I am the author of various refereed journal articles, working papers, business school cases, and consulting reports.[1]

4.      Since 2001, I have served as a member of the Editorial Review Board for *Journal of Public Policy & Marketing*. I have been and continue to be a research referee for a variety of academic journals, and I am a program reviewer for the Robert Wood Johnson Foundation.

5.      My research activities include issues concerning health care and the pharmaceutical industry. For example, I have examined marketing, product differentiation and competition in a major pharmaceutical drug market in a working paper[2] and analyzed Pepcid's race to enter the over-the-counter market in a published case study.[3]

6.      I have experience in applying economic and marketing theories to the pharmaceutical industry. I have submitted testimony and consulted in litigation involving health care and pharmaceutical markets and industries.[4]

---

[1] *See* my *curriculum vitae* in Attachment A.

[2] C. King, Marketing, "Product Differentiation and Competition in the Market for Antiulcer Drugs," Harvard Business School, Working Paper No. 0-014, September 2000, http://papers.ssrn.com/sol3/papers.cfm?abstract_id=891128 (accessed 7/31/06).

[3] E.R. Berndt, C. King, L. Klein and A.J. Silk, "Pepcid AC: The Race to Enter the OTC Market," (9-500-073), Harvard Business School. Also published in *Problems and Cases in Health Care Marketing*, edited by John T. Gourville, John A. Quelch and V. Kasturi Rangan, McGraw-Hill Irwin, 2003.

[4] *See* Attachment A.

---

7.       I received a bachelor's degree in astronomy (*magna cum laude*) from Harvard University in 1974. I received a *juris doctor* degree in law from the Yale Law School in 1979 and a Ph.D. in economics from M.I.T. in 1997.

8.       A more complete description of my qualifications, research and publications is included in my *curriculum vitae* in Attachment A to this Affidavit.

### Reliance of Dr. Sylvain Nakkab on Sussman Article in Prescribing Neurotin for Off-Label Uses

9.       I have reviewed the Affirmation of Sylvain Nakkab, M.D., a practicing psychiatrist licensed in the State of New York.[5] Dr. Nakkab avers that he "began to prescribe Neurontin for off-label uses based primarily upon an article [he] had read entitled 'Gabapentin and Lamotrigine: Alternative Agent[s] for the Treatment of Bipolar Disorder,' by Norman Sussman, M.D., published in Primary Psychiatry Journal, August 1997. The article referred to several papers presented at the American Psychiatric Association meeting in San Diego, California, concerning the results of Gabapentin studies in bipolar patients, and further stated that 'Gabapentin is (*sic*) not thus far been shown to have any life threatening adverse events or significant drug interactions.'"[6]

---

[5] *Affirmation of Sylvain Nakkab, M.D.*, Supreme Court, State of New York, Index No. 04/117852 (hereafter *Affirmation of Sylvain Nakkab, M.D.*)

[6] *Affirmation of Sylvain Nakkab, M.D.*, ¶ 11.

---

10.    Dr. Nakkab asserts that he "relied upon the credibility of the above-mentioned article, the purported objective opinions within said article, and [he] believed upon reading the article that Dr. Sussman was without bias or conflict." Dr. Nakkab believed that Dr. Sussman "did not have any relationship to the manufacturer and seller of Neurontin."[7]

### Relationship of Dr. Norman Sussman with Parke-Davis

11.    I have reviewed documents that indicate that Parke-Davis recruited Dr. Sussman to participate in its continuing medical education events[8] and compensated him for his services.[9]

12.    These facts were not disclosed in Dr. Sussman's article, "Gabapentin and Lamotrigine: Alternative Agents for the Treatment of Bipolar Disorder," published in *Primary Psychiatry*.[10]

---

[7] *Affirmation of Sylvain Nakkab, M.D.,* ¶14.

[8] Letter from Bina O'Brien and Jane Byun at Proworx to Norman Sussman, MD, May 28, 1997 (WL19542), Memo from Bina O'Brien to Allen Crook and Vic Delimata, June 11, 1997 (V040388), Memo from Jennifer Kleinman and Bina O'Brien to Vic Delimata, Product Manager, January 15, 1998 (WL 38346-52), Attendee List for "The Use of Anticonvulsants in Psychiatry" Conference, October 23-25, Barcelona, Spain (WL09024-33).

[9] WL19542, *op. cit.,* WL 38346-52, *op. cit.*

[10] N. Sussman, "Gabapentin and Lamotrigine: Alternative Agents for the Treatment of Bipolar Disorder," *Primary Psychiatry,* August 1997.

---

**Authors' Financial Relationships and Associations with Pharmaceutical Companies Affect the Interpretation of Scientific Evidence**

13.    In treating and caring for their patients, doctors rely on diverse sources of information to keep abreast with evolving standards of medical practice. Among these sources are (a) published medical literature, (b) discussions with peers, (c) physician desk references, (d) continuing medical education seminars, (e) product labeling, and (f) communications with pharmaceutical company representatives about the products they manufacture and promote.[11]

14.    Physicians rely upon the published medical literature as "the ultimate basis for most treatment decisions."[12] Dr. Nakkab's decision to prescribe Neurontin off-label based on Dr. Sussman's article serves as but one example.

15.    Whether an author of a published article has a financial relationship or other association with a pharmaceutical company affects a physician's evaluation

---

[11] L. J. Parsons and P. V. Abeele, "Analysis of Sales Call Effectiveness," *Journal of Marketing Research*, Volume 18(1), February 1981, 107-113. ("Marketing instruments available to the ethical pharmaceutical industry for making persuasive communications include medical representatives, journal advertising, direct mail, samples, educational handouts, and conventions.")

[12] F. Davidoff, C.D. DeAngelis, J.M. Drazen, M.G. Nicholls, J. Hoey, L. Hojgaard, *et al.* "Sponsorship, Authorship, and Accountability," *The New England Journal of Medicine*, Volume 345(11), September 2001, 825-82 and *The Journal of the American Medical Association*, Volume 286(10), September 2001, 1232-1234. An editorial in *The American Journal of Psychiatry* notes: "[s]urveys of physicians find that over 90% of us look to original articles in medical journals as our most preferred source of new information for help in treating patients." (D.A. Lewis, R. Michels, D.S. Pine, S.K. Schultz, C.A. Tamminga, R. Freedman, "Conflict of Interest," *The American Journal of Psychiatry*, Volume 163(4), April 2006, 571-3.)

---

of that research, in particular the credibility and weight that the physician attaches to its results.[13] As noted in a recent editorial in *British Medical Journal*, "conflicts of interest ... have a strong influence on the interpretation of evidence." [14]

---

[13] A recent study published in *British Medical Journal* concludes that "[d]eclaration of competing interests may have a significant effect on readers' perceptions of the scientific credibility of published medical research." (S. Chaudhry, S. Schroter, R. Smith, J. Morris, "Does declaration of competing interests affect readers' perceptions? A randomised trial." *British Medical Journal*, Volume 325, December 2002, 1391-1392.) A 1998 editorial in *British Medical Journal* similarly finds that "conflict of interest has an impact on the conclusions reached by papers in medical journals." (R. Smith, "Beyond conflict of interest," *British Medical Journal*, Volume 317, August 1998, 291-292.) Dr. Nakkab states that he would not have prescribed Neurontin for off-label treatment of bipolar disorder if he had known of Dr. Sussman's relationships with Parke-Davis: "Had I known of Dr. Sussman's involvement with the manufacturer of Neurontin, I would not have relied on the article as the foundation for my prescribing Neurontin for the off-label treatment of bipolar disorder. Consequently, the article would not have influenced me to prescribe [N]eurontin" (¶23, *Affirmation of Sylvain Nakkab, M.D.*)

[14] R. Smith, "Making progress with competing interests." *British Medical Journal*, Volume 325, December 2002, 1375-6. This editorial also notes:

> A study of authors from many journals showed that people with financial relationships with manufacturers of calcium channel antagonists were much more likely to be supportive of the drugs. [H.T. Stelfox, G. Chua, K. O'Rourke, and A. S. Detsky, "Conflict of interest in the debate over calcium channel antagonists" *The New England Journal of Medicine*, Volume 338(2), January 1998, 101-5.] Yet they rarely declared those conflicts. The major determinant of whether reviews of passive smoking concluded it was harmful was whether the authors had financial ties with tobacco manufacturers. [D.E. Barnes and L. A. Bero, "Why review articles on the health effects of passive smoking reach different conclusions," *The Journal of the American Medical Association*, Volume 279(19), May 1998, 1566-1570.] In the disputed topic of whether third generation contraceptive pills cause an increase in thromboembolic disease, studies funded by the pharmaceutical industry find that they don't, and studies funded by public money find that they do. [J.P. Vandenbroucke, "Competing interests and controversy about third generation oral contraceptives," *British Medical Journal*, Volume 320(7231), February 2000, 381.] A recent strange decision of the American Heart Association to declare alteplase a class I (definitely recommended) intervention for stroke despite controversy about its safety and efficacy seemed less strange when we learnt that the manufacturers of the drug

---

16.    Major medical and scientific journals therefore require authors to disclose

their financial and other relationships with pharmaceutical companies.[15]

17.    The failure of an author to disclose financial compensation or association

with a pharmaceutical company misrepresents an important fact,[16] impugns the

---

had donated $11m (£7m; €11m) to the association and that six of the nine members on the panel making the decision had undeclared financial ties to the manufacturers. [J. Lenzer, "Alteplase for stroke: money and optimistic claims buttress the 'brain attack' campaign" *British Medical Journal*, Volume 324(7339), March 2002, 723-729.]

[15] An editorial in *The Journal of the American Medical Association* states: "[u]nlike many of the other potential conflicts of interest, financial conflicts of interest usually are not apparent unless they are specifically disclosed. Full disclosure is considered an important method for reporting and managing conflicts of interest and serves to highlight the potential for bias, but cannot and does not eliminate the conflicts."(C.D. DeAngelis, P.B. Fontanarosa, A. Flanagin "Reporting Financial Conflicts of Interest and Relationships Between Investigators and Research Sponsors." *The Journal of the American Medical Association*, Volume 286(1), July 2001, 89-91.) As early as 1993, the International Committee of Medical Journal Editors recognized that "[p]articipants in peer review and publication should disclose their conflicting interests, and the information should be made available, so that others can judge their effects for themselves." (International Committee of Medical Journal Editors, "Conflict of Interest," *Lancet*, Volume 341(8847), March 1993.)

*See also:*

"Information for Authors," *The American Journal of Psychiatry*,

    http://ajp.psychiatryonline.org/misc/ifora.shtml;

"Instructions to the Authors," *Psychiatry*,

    http://www.guilford.com/periodicals/jnpsinst.pdf, which conforms to the Uniform Requirements for Manuscripts to Biomedical Journals, http://www.icmje.org/#conflicts;

"Instructions for Authors," *Archives of General Psychiatry*,

    http://archpsyc.ama-assn.org/misc/ifora.dtl#ConflictofInterest;

"Pyschosomatic Medicine Instructions for Authors," *Psychosomatic Medicine*,

    http://www.psychosomaticmedicine.org/misc/ifora.shtml (all accessed 7/27/06).

[16] Medical journals recognize financial conflicts of interest as an important fact. An editorial in *The Journal of the American Medical Association* acknowledges this importance, stating "[e]ditors also have an obligation to present pertinent information related to the financial aspects of the articles they publish so readers can interpret the findings in light of this information ... For

---

integrity of scientific research,[17] and adversely affects the ability of the medical and scientific community to evaluate published medical literature.[18]

18.     Dr. Sussman's failure to disclose his associations and financial relationships with Parke-Davis therefore misrepresented a fact important to the medical community and adversely affected its ability to evaluate his work.

---

articles [in *The Journal of the American Medical Association*] in which a financial disclosure statement is not included, readers should infer that the authors have reported to the editors that they have no relevant financial interests that require disclosure." ("Reporting Financial Conflicts of Interest and Relationships Between Investigators and Research Sponsors," *op. cit.*)

[17] Editorials in *The Journal of the American Medical Association* and *The New England Journal of Medicine* support this conclusion. The editors of *The Journal of the American Medical Association* explicitly state that "failure to prospectively disclose relevant financial interests violates the public's trust, and if such information is revealed subsequently, the credibility of the investigators and of the journal that publishes the work may be seriously damaged." ("Reporting Financial Conflicts of Interest and Relationships Between Investigators and Research Sponsors," *ibid*) An editorial appearing both in *The New England Journal of Medicine* and *The Journal of the American Medical Association* asserts that "the use of clinical trials primarily for marketing, in our view, makes a mockery of clinical investigation." ("Sponsorship, Authorship, and Accountability," *op. cit.*)

[18] The International Committee of Medical Journal Editors recognized that conflicts of interest can damage the credibility of published research in their 1993 statement: "[p]ublic trust in the peer review process and the credibility of published articles depend in part on how well conflict of interest is handled during writing, peer review, and editorial decision making." ("Conflict of Interest," *Lancet, op. cit.*) Similarly, an editorial in *The Journal of the American Medical Association* argues that "transparency in reporting the financial conflicts of interest of authors and the relationships between investigators and funding sources ... is essential to help maintain confidence and trust in the scientific integrity of medical research articles." (P.B. Fontanarosa, A. Flanagin, C.D. DeAngelis, "Reporting Conflicts of Interest, Financial Aspects of Research, and Role of Sponsors in Funded Studies," *The Journal of the American Medical Association*, Volume 294(1), July 2005, 110-111.)

---

Dated: July 31, 2006

_Charles King III_

Charles King III
Greylock McKinnon Associates
One Memorial Drive, Suite 1410
Cambridge, MA 02142

Sworn to before me this

31st day of July, 2006

_Andw P. Bechtel_

Notary Public

ANDREW P. BECHTEL
Notary Public
Commonwealth of Massachusetts
My Commission Expires
November 19, 2010

---

# ATTACHMENT A

March 2005

# CHARLES ("KIP") KING III

Greylock McKinnon Associates
One Memorial Drive
Cambridge, Massachusetts  02142
(617) 871-6900 (office)
(617) 871-6949 (fax)
cking@gma-us.com

## *EDUCATION*

Ph.D. (Economics), Massachusetts Institute of Technology, 1997. Dissertation: *Empirical Studies of Marketing, Product Differentiation, Pricing and Competition.* Thesis advisors: Prof. Ernst R. Berndt and Prof. Glenn Ellison.

J.D., Yale Law School, 1979.

A.B. (*magna cum laude*), Harvard College, 1974.

## *EMPLOYMENT*

| | |
|---|---|
| 2003 – *present* | Director, Greylock McKinnon Associates. |
| 1997 – 2003 | Assistant Professor, Harvard Business School. |
| 1992 – 1997 | Graduate Student, Research Assistant and Teaching Fellow, MIT. |
| 1981 – *present* | Principal, Pleiades Consulting Group. |
| 1988 – 1989 | President, InterNos, Incorporated. |
| 1987 – 1989 | Manager, The Nelson Companies. |
| 1985 – 1987 | Vice President, Aox Incorporated. |
| 1984 – 1985 | President, ICM Technology Talent, Inc. |
| 1981 – 1983 | President, Xerxes Corporation. |
| 1979 – 1981 | Corporate Attorney, Ropes & Gray. |

## *RESEARCH*

**Papers**

Conley, Carey Thomson, Laurie B. Fisher, Jonathan P. Winickoff, Graham A. Colditz, Carlos A. Camargo, Jr., Charles King and Lindsay Frazier (2004). "State Tobacco Excise Taxes and Adolescent Smoking Behaviors in the United States," *Journal of Public Health Management Practice*, 10(6), 490-496.

King, Charles, Alvin J. Silk, and Niels Ketelhöhn (2003). "Knowledge Spillovers and Growth in the Disagglomeration of the U.S. Advertising Agency Industry," *Journal of Economics & Management Strategy*, 12(3), Fall 2003: 327-362.

King, Charles, and Michael Siegel (2001). "The Master Settlement Agreement with the Tobacco Industry and Cigarette Advertising in Magazines," *New England Journal of Medicine*, 345(7):504-511. In condensed form in "Statistics in the News: Chapter 13 Hypothesis Testing: The Classical Technique – Tobacco Advertising Targeting Youth," *Statistics for Business and Economics*, by Heinz Kohler, South-Western, 2003. (http://www.swlearning.com/quant/kohler/stat/resources/stats/ch13.html)

Cutler, David M., Arnold M. Epstein, Richard G. Frank, Raymond S. Hartman, Charles King, Joseph P. Newhouse, Elizabeth Richardson, and Meredith B. Rosenthal (2000). "How Good a Deal was the Tobacco Settlement? Assessing Payments to Massachusetts," *Journal of Risk and Uncertainty*, 21(2/3):235-261.

King, Charles, Michael Siegel, and Linda G. Pucci (2000). "Exposure of Black Youths to Cigarette Advertising in Magazines," *Tobacco Control*, 9(1):64-70.

King, Charles, and Michael Siegel (1999). "Brand-Specific Advertising in Magazines in Relation to Youth and Young Adult Readership, 1986-1994," *Nicotine & Tobacco Research* (1999) 1:331-340.

King, Charles, Michael Siegel, Carolyn Celebucki, and Greg N. Connolly (1998). "Adolescent Exposure to Cigarette Advertising in Magazines: An Evaluation of Brand-Specific Advertising in Relation to Youth Readership," *Journal of the American Medical Association* 279:516-520 (February 18, 1998).

King, Charles (1978). "Exceptions to Liability Under Section 16(b): A Systematic Approach," 87 *Yale Law Journal* 1430. Section 16(b) is the insider trading statute.

Peterson, Floyd W., and Charles King (1975), "A Model for Simultaneous Synchrotron and Inverse Compton Fluxes," *The Astrophysical Journal*, 195, 753. Models quasars and their energy requirements.

**Working Papers**

Gandal, Neil, Charles King and Marshall van Alstyne (2004), "Information Technology Use and Productivity at the Individual Level".

Fleming, Lee, Charles King and Adam Juda (2004). "Small Worlds and Innovation," HBS Working Paper 04-008.

King, Charles (2002). "Marketing, Product Differentiation, and Competition in the Market for Antiulcer Drugs," HBS Working Paper 01-014.

King, Charles (2001). "Estimating the Elasticity of Demand and Cross-Border Effect for Cigarette Consumption in the New England States".

**Work in Progress**

Silk, Alvin J. and Charles King, *The Evolution of Advertising Agency Concentration.*

**Cases**

King, Charles and Das Narayandas, *Coca-Cola's New Vending Machine (A): Pricing To Capture Value, or Not? (9-500-068)*, Harvard Business School. *HBS Best Seller.*

Berndt, Ernst R., Charles King, Lisa Klein, and Alvin J. Silk, *Pepcid AC: The Race to Enter the OTC Market (9-500-073)*, Harvard Business School. Also published in *Problems and Cases in Health Care Marketing*, edited by John T. Gourville, John A. Quelch and V. Kasturi Rangan. McGraw-Hill Irwin, 2003.

## EXPERT TESTIMONY

King, Charles (2004). *Stop & Shop Supermarket Co. et al. v. SmithKline Beecham Corp.*, United States District Court for the District of Eastern Pennsylvania. Defendants allegedly excluded competition in the market for the popular antidepressant Paxil® and its generic equivalents through sham litigation and fraudulent patent applications.

King, Charles (2003). *In Re Relafen Antitrust Litigation*, United States District Court for the District of Massachusetts. Defendants allegedly violated antitrust laws by extending and abusing their monopoly power through sham patent litigation against generic manufacturers to delay the introduction of generic versions of Relafen®, a drug used to treat arthritis.

King, Charles (2003). *Heindel et al. v. Pfizer et al.*, United States District Court for the District of New Jersey. Defendants allegedly advertised and marketed Celebrex® and Vioxx® as providing safe and effective pain relief without disclosing their health risks, which may include serious cardiovascular problems.

King, Charles (2002). "The Effect of the Master Settlement Agreement on the Exposure of Young People to Tobacco Marketing," Testimony Before the Senate Committee on Governmental Affairs Subcommittee on Oversight of Government Management, Restructuring, and the District of Columbia, United States Senate, May 14, 2002. (http://govt-aff.senate.gov/051302king.pdf)

King, Charles (2001). "Youth Exposure and Targeting by Cigarette Companies," *Daniels v. Philip Morris et al.*

Cutler, David M., Arnold M. Epstein, Richard G. Frank, Raymond S. Hartman, Charles King, Joseph P. Newhouse (1998). "The Impact of Smoking on Medicaid Spending in Massachusetts: 1970-1998 – Report on Methods, June 15, 1998," *The Commonwealth of Massachusetts v. Philip Morris, et. al.*

Cutler, David M., Arnold M. Epstein, Richard G. Frank, Raymond S. Hartman, Charles King, Joseph P. Newhouse (1998). "The Impact of Smoking on Medicaid Spending in Massachusetts: 1970-1998 – Results from the Inclusive Approach for Adults, July 1, 1998," *The Commonwealth of Massachusetts v. Philip Morris, et. al.*

Cutler, David M., Arnold M. Epstein, Richard G. Frank, Raymond S. Hartman, Charles King, Joseph P. Newhouse (1998). "The Impact of Smoking on Medicaid Spending in Massachusetts: 1970-1998 – Results for the Disease-Specific Approach for Adults and Overall Summary, July 11, 1998," *The Commonwealth of Massachusetts v. Philip Morris, et. al.*

King - 5.

## *TEACHING*

### New Course Development

*Harvard Business School, Ph.D. Program, Boston, Massachusetts.*

Information and Network Economics, First year Ph.D. course. Spring 2001, 2002 and 2003.

Management and Markets: Organizational Economics and Strategy, First year Ph.D. course. Spring 2002 and 2003.

### Additional Teaching Experience

*Harvard Business School, Boston, Massachusetts.*

First Year Marketing, MBA Course, Fall 1997, 1998; Spring 2000.

Doctoral Marketing, Ph.D. Course, Summer 1998.

Merck Harvard Executive Business Program, Spring 1998.

*IBM Premier Program, Faculty Group, Cambridge, Massachusetts.*

Competition and Strategy, 1998 – 2003.

*Massachusetts Institute of Technology, Cambridge, Massachusetts, Teaching Assistantships.*

14.30: Introduction to Statistical Methods in Economics, Spring 1997. (Prof. Jushan Bai)

14.01: Principles of Microeconomics, Fall 1994. (Prof. Franklin Fisher)

*Dartmouth College, Hanover, New Hampshire. Visiting Assistant Professor.*

Environmental Law and Policy Seminar, 1982. (with Prof. Douglas Ryan)

King - 6.

## AWARDS AND FELLOWSHIPS

Best Reviewer Award, *Journal of Public Policy and Marketing*, 2003.
Faculty Research Fellow, National Bureau of Economic Research 2003-2004.
IBM Premier Executive Education Program, 2003.
Massachusetts Department of Public Health Grant, 1997.
Industrial Performance Center Doctoral Fellowship, 1995.
SHSS Tuition Fellowship Awards, 1993, 1994.
World Economy Laboratory Summer Fellowships, 1993, 1994.
Olin Foundation Fellowship, 1992.
*Sigma Xi*, Scientific Research Society of North America, 1974.
Harvard College Scholarship, 1972, 1973.
John Harvard Scholarship, 1971.
National Merit Finalist, 1970.
Bausch & Lomb Science Award, 1970.
*Scientific American* First Prize, 1970.

## PROFESSIONAL ACTIVITIES

### Editorial & Professional Service

Alumni Advisory Board Member, *Yale Law Journal*, 2004-2007.

Program Reviewer, *The Robert Wood Johnson Foundation*, Substance Abuse Research
   Program. 2002 - present.

Editorial Review Board Member, *Journal of Public Policy & Marketing*. 2001 - present.

Member, *Harvard Tobacco Control Working Group*. 1998 - present.

### Ad Hoc Referee

*American Economic Review*
*Journal of Economics and Management Strategy*
*Journal of Health Economics*
*Journal of Industrial Economics*
*Journal of Public Policy & Marketing*
*Tobacco Control*

**Thesis Committee**

Niels Ketelhöhn, Ph.D., Harvard Business School (Competition and Strategy 2003).

**Professional Affiliations**

American Economics Association
American Marketing Association
American Association for the Advancement of Science