UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____ )
                                             )
IN RE NEURONTIN MARKETING, SALES             )
PRACTICES, AND PRODUCTS LIABILITY            )
LITIGATION                                   )
_____ )
                                             )        MDL Docket No. 1629
                                             )
THIS REPORT AND RECOMMENDATION               )
RELATES TO:                                  )        Master File No. 04-10981
                                             )        Judge Patti B. Saris
ASSURANT HEALTH, INC. et al. v. PFIZER       )        Mag. Judge Leo T. Sorokin
INC., et al., No. 05-cv-10535-PBS            )
_____ )

MEMORANDUM AND ORDER ON ASSURANT'S REMAND MOTION

August 4, 2006

SOROKIN, M.J.

     Before the Court is the Assurant plaintiffs' Motion to Remand originally filed in the

District of New Jersey (Docket # 125-2 in this district's docket) and Motion for Suggestion of

Remand (Docket # 126).

ALLEGATIONS IN THE COMPLAINT

     Plaintiffs are a number of third party health care providers suing Pfizer, the maker of

Neurontin, Cline, Davis & Mann, a medical marketing firm allegedly hired by Pfizer to assist

with the marketing of Neurontin, Lodewijk De Vink, former CEO of Warner-Lambert, and

Anthony Wild, former Executive Vice President of Warner-Lambert.  Warner-Lambert made

Neurontin until it was acquired by Pfizer.  Plaintiffs' complaint alleges three categories of

claims. Counts 1-24 allege unlawful restraint of trade or monopolization claims under the laws of 24 different states. Counts 25-43 allege unfair and deceptive trade practices claims under the laws of different states. Count 44 alleges tortious interference with business relations and Count 45 alleges unjust enrichment. The plaintiffs seek recovery for the costs they incurred in paying for Neurontin taken by persons insured by the plaintiffs, a declaration that defendants committed the alleged violations, an injunction barring a continuing of the illegal activities alleged and other penalties or monetary relief such as punitive damages. The complaint asserts no causes of action under federal law. While the complaint is similar to the two Sales and Marketing Complaints in this MDL in seeking recovery for the costs of Neurontin prescriptions because of the nature of Pfizer's marketing campaign, it also differs materially from these complaints in that it asserts different claims and some different factual allegations.

Pfizer began marketing Neurontin (the brand name for the drug gabapentin) in 1993; demand was low because the product was approved only as an adjunctive treatment for seizures for adults with epilepsy and only in doses up to 1800 mg/day. ¶ 29. The patent period was short, expiring in 1998 for gabapentin and in 2000 for the use of gabapentin to treat epilepsy resulting in much lower prices for the drug after the expiration of the patent period. ¶ 30. Generic bioequivalents could and would begin competing with Neurontin upon the expiration of the patent protection in 2000. ¶ 32. During the patent period and until late 2004, Pfizer controlled the market in the United States for gabapentin that is not lactam-free resulting in it setting artificially high or supra-competitive prices. ¶ 31.

In 1994 or 1995, defendants met and devised an illegal scheme to expand and extend market share and power through a false, deceptive, and misleading marketing campaign and

misuse of the legal and regulatory system. Specifically, Defendants decided to increase demand for Neurontin and interfere with potential generic competitors by illegally marketing Neurontin for certain uses that were not safe and effective in conjunction with acquiring and using other patents on other forms and methods of using gabapentin for anticompetitive purposes. ¶ 32. Defendants also believed that their scheme would minimize the negative impact generic bioequivalents of Neurontin might have on potential sales of another drug Pfizer had been developing.

To increase demand for Neurontin, defendants implemented a false, deceptive and misleading marketing program designed to convince the public, including plaintiffs, that Neurontin was safe and effective for certain uses that were, in fact, not safe and effective. ¶ 35. These representations included that Neurontin was safe and effective, "as those terms are commonly understood," at higher than approved doses, as monotherapy for epilepsy and seizures and for the treatment of a myriad of disorders or diseases including but not limited to, psychiatric disorders like anxiety, Attention Deficit Disorder, depression, and bipolar; restless leg syndrome; migraine headaches; alcohol withdrawal; spinal cord injury; tremors; Amyotrophic Lateral Sclerosis ("ALS"), otherwise known as Lou Gehrig's disease; painful diabetic and peripheral neuropathy; reflex sympathetic dystrophy; and general pain management. ¶ 36.

Defendants represented that Neurontin was safe and effective by using various deceptive business practices including: misrepresenting the independence, role and credentials of medical liaisons; misrepresenting the independence, scientific validity, results or existence of medical studies or clinical trials; concealing studies; creating and publishing false, deceptive and misleading ads or articles misrepresenting the identity and independence of the author of articles;

or the article's scientific validity; misrepresenting the purpose and independence of Continuing Medical Education Seminars; paying doctors to prescribe Neurontin for unproven or possibly dangerous uses under the guise of consulting or speaking fees, or to participate in purported medical studies lacking scientific validity; and misrepresenting that Neurontin has been proven safe and effective for certain treatments. ¶ 37.

Pfizer entered into agreements with doctors, providers, marketing firms and other independent entities to unreasonably restrain trade, further anticompetitive goals and improperly expand and maintain market share and power. Pursuant to these agreements, Pfizer paid for false and misleading promotion of Neurontin described above (see ¶ 37). These agreements were entered into by Pfizer's partners with the full knowledge of Pfizer's anticompetitive goals and of the effect of the agreements on competition. ¶ 38. Pursuant to these agreements, defendants made false and deceptive statements about Neurontin and its competitive products.[1] ¶ 40. Defendants' false representations induced reliance and were not readily susceptible of neutralization or otherwise offset by rivals. ¶ 41. As a result of the foregoing, Neurontin sales grew "dramatically," as did Pfizer's market share and power, thereby directly causing economic loss to the Plaintiffs. ¶ 42-43. Absent their deception by defendants' misrepresentations,

---

[1] ¶ 40 states that "Under the direction or control of Defendants Lodewijk de Vink and Anthony Wild and pursuant to an agreement and in partnership with Defendant Pfizer, Defendant Cline, Davis & Mann: A) Developed and wrote Continuing Medical Education seminars and other presentations that were, in fact, Neurontin sales presentations and that contained false, deceptive, and misleading information related to Neurontin and competitors' products; B) Actively participated in the creation and implementation of Neurontin's false, deceptive and misleading marketing plans and tactics, as outlined above; and C) At all times was privy to and aware of the anticompetitive goals and purpose of the Neurontin marketing program, and substantially assisted in illegally expanding, continuing, and maximizing Defendant's Pfizer's market share and power through false, deceptive and misleading representations and business practices."

Plaintiffs would have taken steps so as not to allow or to discourage the purchase of Neurontin at the prices set by Pfizer such as changing reimbursement rates, block adjudication of national drug code numbers, exclude the drug from the formulary or dissuade doctors from prescribing Neurontin. ¶ 44.

In addition to the illegal marketing campaign, the Complaint alleges defendants further sought to restrain competition and prevent generic drugs from entering the market by misusing the legal and regulatory system to harass, intimidate and interfere with competitors. ¶ 45. Allegedly, defendants did so intentionally, in bad faith, and as a method to use the legal and regulatory system as an anti-competitive weapon. ¶ 45. Defendants sued manufacturers and distributors of Neurontin generics or those intending to make the same. ¶ 46. The lawsuits were knowingly and intentionally filed for the purpose of harassment without regard to the merits. Id. The lawsuits were "objectively baseless" because defendants knew at the time each suit was filed that the generic bioequivalents of Neurontin would not infringe upon any valid and enforceable patent for Neurontin or each such suit became objectively baseless and defendant continued to litigate despite this knowledge. ¶47.

Pfizer also made intentionally false representations to the Food and Drug Administration in listing patents in the Orange Book. Specifically, Defendants represented that its patents claim a drug or drug product or method of using a drug or drug product that the patents do not claim. ¶ 48. They also represented that a claim of patent infringement could be reasonably asserted when in fact it could not. ¶¶ 48- 49. Defendant made these representations to harass and to intimidate competitors and to delay competition. They knew these representations would provide at least a 30-month stay and misused the legal and regulatory system to obtain the stay. ¶ 50.

Upon information and belief, the Complaint alleges that defendants intentionally manipulated and delayed its acquisition of patents and the timing of interactions with the FDA to extend the automatic stay of generics by, at least, 23 months. ¶ 51.

All of the foregoing interfered with and prevented generic bioequivalents of Neurontin from entering the market. As a result, plaintiffs paid more for drugs than they otherwise would have had to pay. That is so because generics are substantially less expensive than name brand drugs and plaintiffs' plans require the use of generics absent a doctor's prescription restricting the pharmacy to a name brand. By preventing competition upon which plaintiffs' rely, defendants thwarted plaintiffs' efforts to reduce drug costs. ¶¶ 52-55.

Based upon these allegations, plaintiffs advance 44 separate claims. Counts 1-24 allege unlawful restraint of trade or monopolization claims under the laws of 24 different states. Counts 25-43 allege unfair and deceptive trade practices claims under the laws of different states. Count 44 alleges tortious interference with business relations and Count 45 alleges unjust enrichment.

## PROCEDURAL HISTORY

Plaintiffs filed the case in the New Jersey state courts. Defendants removed the action to the United States District Court for the District of New Jersey on January 5, 2005. Plaintiffs filed a Motion to Remand. Docket # 125-2. Prior to resolution of that Motion, the case was transferred to this district by the Joint Panel on Multi-District Litigation. Plaintiffs filed a suggestion of remand essentially reiterating their earlier motion to remand. (Docket # 126).

Pursuant to an Order of Reference (Docket # 127), a hearing was held on August 19, 2005. While the matter was under advisement, this and other remand motions were stayed.

(Docket # 279). The stay was subsequently lifted as to these plaintiffs' remand motion (Docket # 372), in response to a motion filed by these plaintiffs (Docket #318).

DISCUSSION

In support of the Motion to Remand, plaintiffs advance both procedural and substantive arguments. The procedural arguments are without merit. However, regarding their substantive arguments, the plaintiffs have established the presence of a non-federal theory of relief as to each claim in the Complaint. Thus, I recommend that the Court ALLOW the Motion.

I. Plaintiffs' Procedural Arguments

Assurant plaintiffs assert that defendants' removal papers failed to comply with 28 U.S.C. §§1441, 1446 (2006). Section 1441(a) authorizes remand of actions filed in state court to federal court. To actually remove a case from state court, within thirty days of service, defendants must file:

> [A] notice of removal signed pursuant to Rule 11 of the Federal Rules of Civil Procedure and containing a short and plain statement of the grounds for removal, together with a copy of all process, pleadings, and orders served upon such defendant or defendants in such action. 28 U.S.C.§ 1446(a-b)(2002).

Rule 11, in turn, requires that "Every pleading, written motion, and other paper shall be signed by at least one attorney of record in the attorney's individual name, or, if the party is not represented by an attorney, shall be signed by the party." Fed. R. Civ. P. 11(a) (2004). Defendants removed Assurant's case to the United States District Court for the District of New Jersey. That court has a local rule which states: "In each case, the attorney of record who is a member of the bar of this Court shall personally sign all papers submitted to the Court or filed with the Clerk." U. S. Dist. Ct. Rules D.N.J., L.Civ.R. 11.1 (2004).

7

First, plaintiffs claim the removal petition was untimely in that defendants "failed to submit the relevant state court pleadings with their Notice of Removal by the deadline . . ." Plaintiff's Memorandum in Support of Remand ("Pls.' Memo") at 7.   All parties agree that the thirty day removal period under § 1446 expired on January 5, 2005. Id.; Defendant's Memorandum in Opposition to Remand ("Def.s Memo"), at 11-12.   The docket from the District of New Jersey reflects the filing of the Notice of Removal and four attachments (a Notice of Filing and Exhibits A-C) on January 5, 2005.  Docket # 125-4 (Exh. A) at 6. The docket further reflects that "additional attachment(s)" were entered, after the deadline, on January 11, 2005.  Id. The docket does not detail the content of the additional attachment(s).  Defendants state that the additional attachment, Exhibit D, was the complaint, (see Certification of Richard G. Placey ("Placey Aff."), Docket # 125-12 at 2); plaintiffs refer to the additional attachments as unspecified state court pleadings (Pls.' Memo at 5).  According to plaintiffs, the late submission of an additional attachment violated the removal statute.  Pls.' Memo at 7.  Defendants, however, contend that the Notice of Removal and all accompanying documents, including the complaint, were submitted together and in a timely manner on January 5.  Def.'s Memo at 12.

Ordinarily, the docket would establish the date of filing of a pleading.  In this case, however, defendants submitted an affidavit from the attorney filing the removal petition. The attorney attests, under oath, that (1) the complaint was filed with the Notice of Removal on January 5, 2005; and (2) no further filings of the complaint (Exhibit D) or any other additional exhibits related to the Motion to Remand occurred after January 5, 2005.  Docket # 125-12, Placey Aff. at 2.  In addition, the true copy of the date stamped filing letter, submitted under oath by counsel, states the filed disk contained the complaint. Based on this uncontradicted affidavit, I

8

conclude that the defendants filed all necessary documents (including the relevant state court complaint) with the Notice of Removal on January 5, 2005 notwithstanding the reference to additional attachments filed later appearing in the text of the docket note.  Thus, the filing was timely.

Next, the Assurant plaintiffs complain that the codefendants' Notice of Joinders filed with defendant Pfizer's removal petition were signed by lawyers not authorized to practice before the District of New Jersey.  Pls.' Memo at 8.  Ten days or so after the initial Jan. 5 filing, the codefendants filed amended notices signed by members of the bar of that court. Docket # 125-4 (Exh. A) at 6. That these codefendants, at all relevant times, consented to join in the Notice of Removal is undisputed.  An attorney authorized to practice in the District of New Jersey signed Pfizer's removal petition and in that petition Pfizer stated the codefendants consented to the removal.  Docket # 125-12 at 26 (Notice of Removal at 11).  The notices of joinders from the codefendants were attached as exhibits to the Notice of Removal. Docket # 125-12, Placey Aff. at 2.  In short, all defendants joined in the removal and defendant Pfizer submitted written evidence of the same.  Certainly § 1447 requires that the filing of a notice of removal be "signed pursuant to Rule 11" which in turn requires the signature of "at least one attorney of record" appear on every "pleading, written motion, and other paper."  Defendant Pfizer complied with this requirement.  That the lawyers signing the exhibits evidencing the consent of the codefendants are not members of the District of New Jersey bar does not necessarily transgress the foregoing requirements even as amplified by the District of New Jersey's Local Rule requiring the signature of a member of its bar.  In any event, any conceivable violation of Rule 11 is immaterial under the principles embodied in the last sentence of Rule 11(a) which states that

"An unsigned paper shall be stricken unless omission of the signature is corrected promptly after being called to the attention of the attorney or party." FRCP 11.  On January 14, 2005, the co-defendants submitted notices of joinder signed by members of the District of New Jersey's bar. Docket # 125-4 (Exh. A) at 6.

Accordingly, I recommend rejection of  plaintiffs' procedural arguments.

II.  Substantive Arguments

The removal statute should be strictly construed and any doubts about the propriety of removal should be resolved against the removal of an action.  In re Pharmaceutical Industry Average Wholesale Price Litigation, —F.Supp.2d— 2006 WL 704473 (D.Mass. Mar. 13, 2006) , (Saris, J.) (citing Danca v. Private Health Care Sys. Inc., 185 F.3d 1, 4 (1st Cir.1999)).  In the present case, the plaintiffs plead only state law causes of action.  The Supreme Court considered such a circumstance in Grable & Sons Metal Products, Inc., v. Darue Engineering & Mfg., 545 U.S. 308, 125 S.Ct. 2363 (2005).   Resolving a split within the Courts of Appeals on whether Merrell Dow Pharmaceuticals, Inc. v. Thompson, 478 U.S. 804, (1986) "always requires a federal cause of action as a condition for exercising federal-question jurisdiction," Grable found that " Merrell Dow should be read in its entirety as treating the absence of a federal private right of action as evidence relevant to, but not dispositive of, the 'sensitive judgments about congressional intent' that § 1331 requires." Grable, 125 S.Ct. at 2366, 2370.  Rejecting the bright-line rule adopted by several Courts of Appeals, including the First Circuit, Grable set forth a three-part test: (1) the state action must disclose a contested federal question that, (2)  is substantial, "indicating a serious federal interest in claiming the advantages thought to be inherent in a federal forum" and (3), that qualifies "for a federal forum only if federal jurisdiction

10

is consistent with congressional judgment about the sound division of labor between state and

federal courts governing the application of § 1331." Id. at 2367.  The question then is whether,

under the well-pleaded complaint rule, the "plaintiff's right to relief necessarily depends on

resolution of a substantial question of federal law" in that "federal law is a necessary element of

one of the well-pleaded . . . claims." Christianson v. Colt Indus. Operating Corp., 486 U.S. 800,

808 (1988).

Defendant bears the burden of establishing jurisdiction.  Dukes v. U.S. Healthcare, Inc.,

57 F.3d 350, 359 (3d Cir. 1995)[2]; see BIW Deceived, et al., v. Local S6, Industrial Union of

Marine and Shipbuilding Workers of America, IAMAW District Lodge 4, 132 F.3d 824, 831 (1st

Cir. 1997).  Nonetheless, the plaintiff must articulate a theory or theories of relief at least one of

which is applicable to each claim that do not raise a substantial federal question under a well-

pleaded complaint.  Christianson, 486 U.S. at 808-809.  On the other hand, if as to one claim,

every applicable theory necessarily requires adjudication of a substantial federal question, then

this Court may exercise jurisdiction over the complaint.  Id. at 810.


A.     Unlawful Monopolization Claims

As to the unlawful monopolization claims, Counts 1 to 24,[3] plaintiffs contend that they

have pled alternative theories of liability that do not necessarily require adjudication of a

substantial federal question.  Because one of plaintiffs' lesser theories does not require resolution

---

[2]  Because this particular action was filed in the District of New Jersey, the parties' papers cited Third Circuit caselaw.

[3]  The Assurant plaintiffs agree that the Court should treat all the claims within a category as one.  Transcript of August 18, 2005 hearing ("Tr.") at 21.

of a substantial and necessary federal question, I recommend that these claims do not support this Court's jurisdiction. Each of plaintiffs' theories are discussed below.

Plaintiffs do advance one non-federal theory: that defendants paid doctors, in the guise of speaking or consulting fees, to prescribe Neurontin for off-label purposes. Complaint ¶ 37(E). The Complaint makes plain that this is an allegation in support of a theory of anticompetitive conduct as follows. Plaintiffs allege Pfizer entered into "agreements with doctors . . . to unreasonably restrain trade, further anticompetitive goals, and improperly expand and maintain market share and power." Id. at ¶ 38. Pursuant to these agreements, Pfizer paid the doctors "for the false, deceptive, and misleading promotion of Neurontin." Id. One type of deceptive business practice plaintiffs allege is paying doctors to prescribe Neurontin for off-label uses. Id. at ¶ 37. Finally, plaintiffs allege the foregoing conduct "necessarily and directly restrained and affected trade or commerce" and "proximately resulted in increased payments" by plaintiffs for Neurontin or generic bioequivalents of Neurontin. Complaint ¶¶ 61, 64.

As noted earlier, the parties agreed that the court could treat all of the unlawful monopolization claims together. The Court looked at New Jersey law. This theory sufficiently alleges an unlawful monopolization claim by alleging an agreement aimed at restraining competition through fraudulent actions which injured plaintiffs. Pursuant to New Jersey's antitrust statute, "Every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce, in this State, shall be unlawful." N.J.S.A. 56:9-3. Under this provision, a plaintiff must prove: (1) the existence of a conspiracy in restraint of trade; and (2) either an unlawful purpose, *or* an anti-competitive effect. See Patel v. Soriano, 369 N.J.Super. 192, 234 (A.D. 2004), *certification denied* 182 N.J. 141. In addition, a plaintiff must establish "a

unity of purpose, a common design and understanding, or a meeting of the minds in an unlawful arrangement between, at minimum, two independent, self-interested economic entities." Id., citing Urdinaran v. Aarons, 115 F.Supp.2d 484, 488 (D.N.J. 2000).

Importantly, this theory (which was specifically argued by plaintiffs in their memo at page 21) raises no substantial or necessary federal questions.  Notably, defendants oppose by simply asserting that this theory does not support anti-competition damages.  Def.'s Memo at 25-26.  As evidence of their assertion, defendants point out that the theory only supports recovery for purchasers of Neurontin for off-label uses.  Id.  Nonetheless, paying doctors to prescribe Neurontin pursuant to the above-described agreements could support a finding of anticompetitive conduct, at least regarding off-label Neurontin prescriptions, and anticompetitive injury in the form of higher prices.   That the theory might support recovery for only some, rather than all, of the Neurontin that plaintiffs purchased, i.e. that it supports recovery for only some rather than all of plaintiffs' possible damages, does not mean the theory fails to support the unlawful monopolization claims.

Defendants also point out that Judge Lifland, in the course of denying a remand motion, determined that "allegations concerning promotion of off-label use are qualitatively distinct so as not to create an alternate theory of recovery for Plaintiffs' claims relating to generic competition."  In re Neurontin Antitrust Litigation, Memorandum and Order at 18,  MDL Dkt# 1479, C.A. Nos. 02-3988 & 02-2741 (D.N.J. January 7, 2005)(copy appearing in this court's docket at #125-10, Exhibit K).  Plaintiffs do not, however, contend that their allegations of off-label marketing support the unlawful monopolization claims.  See infra.  Moreover, the complaints before Judge Lifland did not contain either the payment or agreement allegations set

forth in the plaintiffs' complaint and the decision contains no further discussion of the issue.

I note that this non-federal theory is not plaintiffs' primary theory. Additionally, numerous practical considerations suggest adjudicating this case either in this court or in the Neurontin patent MDL pending in the District of New Jersey before Judge Lifland; however, these practical considerations do not govern the pending Motion in the face of a non-federal theory. See Christianson, 486 U.S. at 810 ("a claim supported by alternative theories in the complaint may not form the basis for § 1338(a) jurisdiction unless patent law is essential to each of those theories.") Thus, I recommend that, as to the monopolization claims, plaintiffs have advanced at least one non-federal theory of relief supporting remand. For the sake of completeness, I proceed to address the remaining theories applicable to those claims; all of these theories raise a substantial federal question.

At the hearing, plaintiffs' counsel seemed to recognize that plaintiffs' primary theory - the misuse of the legal regulatory system - does involve a federal question. Tr. at 28. In any event, it does. Adjudicating plaintiffs' theory of monopolization arising from alleged sham bad faith patent litigation and improper Orange Book filings with the FDA necessarily turns on substantial federal questions regarding the scope and validity of defendants' patent(s).

One need look no further than the Complaint to identify the substantial and necessary federal questions presented by this theory. Plaintiffs plead affirmatively that defendants filed or pursued objectively baseless patent litigation as well as made false representations to the FDA regarding the nature or scope of patent claims defendants could reasonably assert. Complaint ¶¶ 47-48. Nonetheless, plaintiffs cite a series of cases in some way involving patents in which at least one theory of relief involved an alleged agreement to restrain competition between

14

competitors, or some other non-federal theory, thereby resulting in remand. <u>See</u> Plaintiffs'

Memorandum in Support of Motion to Remand at 18-20. These decisions are of no assistance to

Plaintiffs' misuse of the legal system theory because the plaintiffs in those cases relied upon

evidence of anticompetitive conduct which did not require an adjudication of the validity or

scope of the defendant's patent, specifically an improper agreement between competitors. <u>See,</u>

<u>e.g</u>. <u>McGrew v. Schering-Plough Corp.</u>, No. 01-2311-GTV, 2001 WL 950790 at *4 (D. Kan.

Aug. 6, 2001) ("Plaintiff's claims do not require the court to determine whether Schering-

Plough's patent on K-Dur 20 is valid, and if so, whether Upsher-Smith and/or ESI infringed . . .

[i]nstead, plaintiff's claims require the court to determine whether defendants entered into one or

more conspiracies with the intent to prevent or restrain competition . . ."). Thus, while

Assurant's cases concerned patents or patent litigation, the focus of the complaints were on

agreements to restrain trade between the defendant and other putative competitors or other

anticompetitive conduct. <u>See</u> <u>In re Cardizem CD Antitrust Litig</u>., 90 F.Supp. 2d at 839 (E.D.

Mich. 1999) (focusing allegations on the agreements made between defendant pharmaceutical

companies to prevent generic version of prescription heart medication from entering marketplace

and stating that "while federal law may be implicated in an examination of [defendant's]

motives, it is hardly a substantial or necessary part of plaintiff's claim"); <u>Christianson</u>, 486 U.S.

800 (finding various non-federal theories unrelated to patents). In contrast, here, the plaintiffs'

theory requires a determination of the validity or scope of the defendants' patents and/or the

legality of its interactions with the FDA.[4] Plaintiffs cannot recover, on this theory, without

---

[4] While plaintiffs do allege an agreement among the defendants – Pfizer, two executives from Warner-Lambert which is now part of Pfizer and a medical marketing firm – as well as agreements with "doctors, providers, marketing firms, and other independent entities"

establishing that under federal patent law the patent suits were baseless or that, under patent law, no such claim could reasonably be asserted.  Resolution of these complex federal questions necessarily lies at the heart of this theory of recovery.

These federal questions are not only substantial, but the exercise of federal jurisdiction is consistent with Congressional judgments.  Congress has expressed substantial interest in providing a federal forum for these types of federal questions. See 28 U.S.C. §1338 (conferring original jurisdiction of any civil action arising under any Act of Congress relating to patents upon district courts); 28 U.S.C. §1295(a) (consolidating all patent appeals in the Federal Circuit); see also Christianson, 486 U.S. 800 (stating necessary patent law question supports federal question jurisdiction even absent the assertion of a cause of action under federal law).  In addition, at least one other court has reached a similar conclusion.  Memorandum and Order in In re Neurontin Antitrust Litigation, M.D.L. Docket No. 1479, in Sall v. Pfizer Inc. and Warner-Lambert Company,  Civil Action No. 02-3988 and Zafarana v. Pfizer Inc. and Warner-Lambert Company, Civil Action No. 02-2741 at 15, 18 (D.N.J. January 7, 2005 ).  The legality of the defendants' interactions with the FDA also implicates important federal interests.  Cf. Buckman v. Plaintiffs' Legal Committee, 531 U.S. 341, 21 S.Ct. 1012, 1014 (2001) ("the relationship between a federal agency and the entity it regulates is inherently federal in character because the relationship originates from, is governed by and terminates according to federal law.").  For these same reasons, plaintiffs second theory – that defendants' manipulation and delay in acquiring patents and interacting with the FDA – also necessarily involves substantial federal questions of law.

---

(Complaint at ¶ 38), these were agreements resulting in the marketing campaign discussed elsewhere; they were not agreements among competitors to restrain competition.

Plaintiffs' third theory is the so-called "marketing-plus theory." In the complaint, plaintiffs allege that defendants entered into agreements with doctors, providers, marketing firms, and other independent entities to unreasonably restrain trade, further anti-competitive goals and improperly expand and maintain market share and power. The Complaint alleges that defendants engaged in false and deceptive marketing campaign to promote Neurontin for off-label uses through these agreements. Complaint ¶¶ 35-41. Plaintiffs concede that they cannot prevail on the monopolization claims on the "marketing theory alone in terms of the agreement." Tr. at 14, 56.[5] Rather, their theory is that defendants deliberately "decided not to go for FDA approval [for the off-label uses] for the purposes of keeping the generics out of the market"[6] (Tr. at 19), a market that defendants developed by engaging in an illegal and deceptive marketing campaign implemented through the aforementioned agreements.

Unfortunately for plaintiffs, they have not advanced this theory anywhere in the complaint. Nowhere in their complaint do plaintiffs allege specifically anything about defendants' decision not to seek FDA approval for the off-label uses of Neurontin. Nowhere in the complaint do the plaintiffs advance any general allegations regarding the FDA approval

---

[5] Any doubt about the concession created by plaintiff's counsel's statement on page 27 of the hearing transcript was resolved by the clarification confirmed by the Court later in the hearing. See Tr. at 56, lines 1-6. I understand plaintiffs to have conceded only that off-label marketing and/or marketing involving false or fraudulent statements of Neurontin's effectiveness does not alone support the unlawful monopolization claims.

[6] Manufacturers of generic drugs may file for FDA authorization to sell a generic only for the uses for which the brand name drug is approved. Thus, defendants' failure to seek and to obtain FDA approval for the off-label uses effectively precluded any Neurontin generics from obtaining FDA approval for the off-label uses.

process or even any interactions with the FDA generally other than as to patent issues.[7]

When pressed at the hearing on where the allegations supporting the marketing plus theory are in the Complaint, counsel referred the court to paragraph 32 for allegations "about that decision to engage in the false marketing campaign to interfere with generic competition. We make allegations elsewhere, your Honor, that they engaged in misconduct to interfere with generic competition." Tr. at 53. But all of the allegations describing efforts to interfere with competition involved the patent questions that pose substantial federal questions; no other harassing or interfering conduct has been alleged by plaintiffs in the complaint. At most, plaintiffs are left with the assertion in paragraph 32 that "[d]efendants met and devised an illegal scheme to expand and extend market share and power through a false, deceptive, and misleading marketing campaign and misuse of the legal and regulatory system." Complaint ¶ 32. The Complaint amplifies upon the misuse of the legal system with allegations regarding wrongful patent litigation and wrongful filings with the FDA. Complaint ¶¶ 32, 45-51. Therefore, I do not read this general phrase, especially in light of the other allegations in the complaint, as encompassing the decision not to seek FDA approval for other uses. That Plaintiffs'

---

[7] The Orange Book or patent related allegations do not address or encompass the approval by the FDA of Neurontin for a particular use. Certainly, Plaintiffs make many allegations regarding a false and deceptive marketing campaign directed by defendants to promote Neurontin for various uses for which it was not approved. See Complaint at ¶ 37. As part of this campaign, as already noted, they allege defendants entered into anticompetitive agreements with various other entities. And, they specifically allege that the marketing efforts aimed at "improperly expand[ing] and grow[ing] Defendant Pfizer's market share and power," Complaint ¶ 39, and "were in conjunction with . . . excluding and harassing competitors." Id. But, the excluding and harassing actions alleged in the complaint all involved either baseless patent litigation filed by defendants or improper Orange Book filings resulting in stays preventing generics from entering the market. In short, the substantial federal questions already discussed.

Memorandum in Support of Remand (Docket # 125-3) fails to argue this marketing plus theory confirms the point.

Fourth, plaintiffs argue that defendants leveraged, improperly, the monopoly power they possessed with Neurontin to expand market share and power related to other products, such as Lyrica or pregabalin.  Tr. at 59-63.  As plaintiffs explain this theory in their memorandum, however (Pls.' Memo. at 20-21), it depends upon the allegations, already discussed, that defendants filed objectively baseless patent litigation which allegations raise a substantial and necessary federal question.  See pg. 13-14, supra.  Thus, I recommend that this theory fails to support federal jurisdiction.

For the foregoing reasons, I recommend finding that plaintiffs have advanced one non-federal theory in support of their monopolization claims.

B.  Unfair and Deceptive Trade Practices Claims

Plaintiffs assert defendants made false statements in the course of the marketing campaign regarding Neurontin.  This theory raises no federal question, but rather seeks to enforce state law duties of honesty.  See Order on Motion to Dismiss (Docket #356) at 20 adopting Report & Recommendation on Motion to Dismiss (Docket #269) at 37 (stating that claims based on allegedly false statements made by defendants' in the course of marketing Neurontin arise from state anti-fraud statutes and thus are not preempted by federal law.)

C. Other Claims

Defendant makes no argument that these additional claims necessarily raise a substantial federal question.

19

CONCLUSION

For the foregoing reasons, I recommend that the Court ALLOW the Assurant Plaintiffs'

Motion to Remand (Docket # 125-2) and its Motion for Suggestion of Remand (Docket #126).[8]


/s/ Leo T. Sorokin
LEO T. SOROKIN
United States Magistrate Judge

---

[8]  The parties are hereby advised that under the provisions of Fed. R. Civ. P. 72, any party who objects to these proposed findings and recommendations must file specific written objections thereto with the Clerk of this Court within 10 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation. See Keating v. Secretary of Health and Human Services, 848 F.2d 271 (1st Cir.1988); United States v. Emiliano Valencia-Copete, 792 F.2d 4 (1st Cir.1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603 (1st Cir.1980); United States v. Vega, 678 F.2d 376, 378-379 (1st Cir.1982); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir.1983); see also, Thomas v. Arn, 474 U.S. 140, 106 S.Ct. 466 (1985).