UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ) | MDL Docket No. 1629 |
| IN RE NEURONTIN MARKETING, SALES ) | |
| PRACTICES, AND PRODUCTS LIABILITY ) | Master File No. 04-10981 |
| LITIGATION ) | |
| ) | |
| ) | |
| THIS DOCUMENT RELATES TO: ) | Judge Patti B. Saris |
| ) | |
| ) | |
| HARDEN MANUFACTURING CORPORATION; ) | Magistrate Leo T. Sorokin |
| LOUISIANA HEALTH SERVICE INDEMNITY ) | |
| COMPANY, dba BLUECROSS/BLUESHIELD OF ) | |
| LOUISIANA; INTERNATIONAL UNION OF ) | |
| OPERATING ENGINEERS, LOCAL NO. 68 ) | |
| WELFARE FUND; ASEA/AFSCME LOCAL 52 ) | |
| HEALTH BENEFITS TRUST; GERALD SMITH; ) | |
| and LORRAINE KOPA, on behalf of themselves ) | |
| and all others similarly situated, ) | |
| ) | |
| v. ) | |
| ) | |
| PFIZER INC. and WARNER LAMBERT ) | |
| COMPANY. ) | |
| ) | |
| ) | |
| THE GUARDIAN LIFE INSURANCE ) | |
| COMPANY OF AMERICA v. PFIZER ) | |
| INC. and AETNA, INC. ) | |
| ) | |
| v. ) | |
| ) | |
| PFIZER INC. ) | |

**PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTION TO COMPEL DISCOVERY**

Plaintiffs in the above-referenced cases submit this memorandum in opposition to

Defendants' Motion to Compel Discovery from Plaintiffs [Docket # 402] ("Defendants'

Motion").

By their Motion to Compel, Defendants seek the production of hundreds of thousands of pages of deeply private individual medical records that have no relevance to the issues in this litigation.  It is hard to imagine more sensitive personal information than the medical records of thousands of patients, all but two of which are not parties to this action.  And given the fact that neither the Class nor Consolidated Plaintiffs have possession or custody of the vast bulk of these records, the burden of locating, compiling, reviewing and redacting (in order to assure compliance with HIPAA) the documents cannot be overstated.  These objections to the Defendants' requests would be sufficient to deny the motion, but the requested records' complete lack of relevance to the issues before the Court confirms that these documents should not be produced.  Unless this Court intends the trial of this action to last decades, this action will not be concerned with the individual records of the beneficiaries of the Third Party Payors ("TPPs") or even the individual class representatives.  The pharmaco-economic and pharmacology issues raised in this case are properly resolved by analyzing composite economic data routinely relied upon in the industry or properly designed and controlled clinical studies; random individual data is meaningless.

The Defendants' other requests—to obtain "out of network" claims data for one of the TPP class representatives and to obtain additional regional information from one of the Coordinated Plaintiffs—also requires the Plaintiffs to expend extensive effort to retrieve marginally relevant information.  As demonstrated below, the burden of production far exceeds any perceived need by Defendants to obtain this information.

## ARGUMENT

**I.    Defendants' Request For non-Neurontin Patient Claims Data and Medical Records Should Be Denied.**

In an extraordinarily broad fishing expedition, Defendants seek to compel the Third Party Payors, including the Coordinated Plaintiffs, to produce *all* medical records for their insured Neurontin takers and *all* medical claims and prescription drug claims data (representing millions of transactions) for those insureds for one year before they started taking Neurontin and one year after they ceased doing so.  Defendants' request for this information is designed to burden and harass TPPs, not to obtain relevant information.  Defendants' request should be denied because the information requested is irrelevant, highly sensitive medical information[1] that would be burdensome to produce.

Defendants' claim that the information is relevant to "causation, loss, damages, and predominance" (Defendants' Memo at 5) is baseless.  Defendants' main argument is that "the non-Neurontin prescription drugs that individuals were taking *may* indicate why they were prescribed Neurontin and whether it was effective" (*Id.* (emphasis added)).  Defendants, however, fail to explain how they will deduce from non-Neurontin prescription claims data why individual patients were prescribed Neurontin.  Nor do they explain how they will use this information to determine whether Neurontin was effective for individual patients.

In fact, Neurontin's efficacy will not be demonstrated – or contested – in this case by an after-the-fact analysis of the prescription drug and medical records of individual patients.  Defendants cannot seriously want this information for this purpose.  Attempting to establish

---

[1]  As noted below, significant concerns are raised when TPPs are asked to produce the medical and claims records of their insureds, without patient permission.

efficacy based on a retrospective review of the sensitive patient data and records – without properly screening patients, ensuring that all relevant information was collected, ensuring patients took the medication regularly and properly, and controlling for a host of significant variables – would be a pointless exercise.[2]

Nor will the requested information be used to show cheaper alternatives to Neurontin were available. *See* Judge Saris' Memorandum and Order, dated June 12, 2006, at p.24 and *Desiano v. Warner-Lambert Co.,* 326 F.3d 339, 349-50 (2d Cir. 2003). There were numerous FDA-approved alternatives to Neurontin for off-label uses, and there is nothing to be gained by plowing through millions of claims data files on the issue. Information on alternative drugs, including their costs, is readily available through conventional sources, including the medical literature.

Defendants also speculate that "[i]nformation regarding non-Neurontin prescription drugs *may* also show" whether the TPPs' insureds were prescribed any other drugs off-label or were "candidates for drugs other than Neurontin" (Defendants' Memo at 5 (emphasis added)). But they do not explain how this would occur. Defendants do not explain, for example, how non-Neurontin prescription drug information would allow them to determine whether a patient was a "candidate" for drugs other than Neurontin. Moreover, this information is irrelevant. Whether the insured were prescribed other drugs off-label might indicate that the TPPs have potential claims against Pfizer or other pharmaceutical manufacturers for other off-label marketing schemes. But it would be no defense to Defendants' unlawful conduct in this case.

Nor is the requested information relevant to damages. Plaintiffs, including the Coordinated Plaintiffs, will prove their case through well-recognized damage models, rather than

---

[2] *See, e.g.*, U.S. Dept. of Health and Human Services, Food and Drug Administration, Guidance for Industry, *E 10 Choice of Control Group and Related Issues in Clinical Trials* (May 2001) §§ 1.2, 1.4, 1.41, 1.4.3.2, 2.1.6, 3 (available at http://www.fda.gov/cber/gdlns/clincontr0501.pdf).

a transaction-by-transaction analysis and compilation of the millions of Neurontin prescriptions filled and an analysis of the individual medical records of insured during the relevant period. Nothing is to be gained by combing through individual medical files attempting to determine whether each individual prescription was for an off-label use. As in similar cases, this can be determined on an aggregate basis.[3]

The requested information is also irrelevant to the "predominance" inquiry of class certification. The crux of Plaintiffs' allegations is that Defendants engaged in a pervasive campaign to distort, manipulate, and misrepresent information concerning Neurontin's safety, efficacy, and appropriate uses and dosages to mislead and deceive the medical community *as a whole*. Class Plaintiffs seek to represent a class of purchasers of Neurontin as a whole. They do not complain simply of the effect of Defendants' marketing scheme on themselves individually, but on the class generally.

Proof of causation does not hinge on the individualized circumstances of each TPP insured. In *In re Synthroid Mktg. Litig.*, 188 F.R.D. 295 (N.D. Ill. 1999), a RICO and consumer fraud case alleging that a pharmaceutical manufacturer concealed information as part of a scheme to dissuade physicians from prescribing cheaper, generic alternatives, defendants similarly argued that the plaintiffs must make "individualized inquiries into the

---

[3] For instance, Dr. Meredith Rosenthal's report, submitted in support of class certification, delineates a methodology for determining the effect of Defendants' conduct on prescribing behavior related to Neurontin. Dr. Rosenthal concludes:

> [B]oth economic theory and empirical studies in the economics, marketing and health services research literature offer broad support for the notion that Park-Davis' alleged promotional strategy increased off label uses of Neurontin . . . There exist standard research methods that may be applied to readily available data to compute the quantity of Neurontin purchased that was directly induced by the illegal marketing scheme.

Rosenthal Declaration, p. 1.

decisions of consumers, physicians and pharmacists to purchase, prescribe and dispense

Synthroid. . . ." *Id*. at 299. The court rejected this argument, finding that:

> The question of liability, therefore, will turn on whether the
> defendants engaged in the alleged conduct, consisting primarily of
> the uniform suppression of material information, *not on the
> individual decisions and circumstances of countless people along
> the chain of distribution of Synthroid.*

*Id.* at 299-300 (emphasis added). *See also International Union of Operating Engineers Local
#68 Welfare Fund v. Merck & Co., Inc.,* 384 N.J. Super. 275, 288, 894 A.2d 1136 (N.J. Super.
A.D. 2006) (rejecting defendant's claim that "each plaintiff 'would have to establish that Merck's
alleged misrepresentations and omissions caused individual doctors to prescribe Vioxx and
individual P & T Committees to include Vioxx on health plan formularies'"); *Newberg on Class
Actions*, § 9.51 (4th ed. 2006). Courts have followed the same logic in drug marketing and
pricing cases. *In re Lupron Mktg. & Sales Practices Litig.*, 228 F.R.D. 75, 91 (D. Mass. 2005);
*In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 326, 345 (D. Mich. 2001); *In re Terazosin
Hydrochloride Antitrust Litig.*, 220 F.R.D. 672, 694-700 (D. Fla. 2004); *In re Warfarin Sodium
Antitrust Litig.*, 391 F.3d 516, 528-29 (3d Cir. 2004).

Similarly, Class Plaintiffs can meet the causation requirement on a class-wide basis by
showing, for example, that Defendants' overarching scheme or pattern of omissions and
misrepresentations regarding Neurontin enabled Defendants to make sales they otherwise would
not have made. Expert testimony from Dr. Raymond Hartman, whose declaration was
submitted to the Court in support of Class Plaintiffs' Motion for Class Certification, will
establish that Defendants' deceptive scheme injured all class members and that an acceptable
methodology exists using readily available data to quantify the damage to the class as a whole.[4]

---

[4] Dr. Hartman's approach to calculating aggregate damages is consistent with how other courts in pharmaceutical
litigation have approached the issue. Courts that have dealt with damages-related issues in pharmaceutical litigation

6

See Declaration of Raymond Hartman in Support of Class Certification at p. 5. As with damages, it is neither necessary nor helpful to comb through hundreds of thousands of individual medical records to prove the proposed classes of Neurontin purchasers were harmed by Defendants' deceptive marketing.

Against this minimal and purely speculative showing of relevance, the Court must balance the substantial privacy concerns raised by the mass production of the prescription and medical records of tens (or hundreds) of thousands of Americans to the world's largest pharmaceutical company. Indeed, Plaintiffs' counsel – many of whom are routinely engaged in large scale consumer fraud litigation against pharmaceutical companies – are unaware of *any* case in which a court has ordered anything remotely approaching the mass disclosure of individual health records requested by Defendants. This Court should not be the first to cross that Rubicon.

Recognizing the extreme sensitivity of individual medical records, Congress enacted the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), Pub.L. 104-191, 110 Stat. 1936. Section 264 of HIPAA, 42 U.S.C. § 1320d-2 Note, directs the Secretary of Health and Human Services to promulgate regulations to protect the privacy of medical records, but provides in subsection (c)(2) that such a regulation "shall not supercede a contrary provision of State law, if the provision of State law imposes requirements, standards, or implementation

---

have found that the industry is particularly suited to damages calculations that can be computed "according to some formula, statistical analysis, or other easy or essentially mechanical methods." *Klay v. Humana, Inc.*, 382 F.3d 1241, 1259-60 (11th Cir. 2004). *See In re Terazosin Hydrochloride Antitrust Litig.*, 203 F.R.D. 551, 559-60 (S.D. Fla. 2001) (certifying class of direct purchasers of prescription drugs, finding that "defendants' assertions concerning the complexity of their pricing practices and other data used in the pharmaceutical industry do not persuade the Court that 'individual damage calculations will overwhelm the proceedings.'… Complex industries, practices, or data are often examined in the course of class actions."); *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 326, 345 (E.D. Mich. 2001) (certifying class and commenting that "[d]efendants' attempt to characterize the market as too complex for common proof of injury is not unique"); *In re Brand Name Prescription Drugs Antitrust Litig.*, 1994 U.S. Dist. Lexis 16658, at *11-12 (N.D. Ill. Nov. 15, 1994) (certifying class over defendants' objections that "the heterogeneous nature of 'brand name prescription drugs' presents an 'insuperable impediment' to a common proof of impact").

specifications that are more stringent than the requirements, standards, or implementation specifications imposed under the regulation." *See also* 45 C.F.R. § 160.203(b). Some states (*e.g.*, Illinois) prohibit the disclosure of even *redacted* medical records in judicial proceedings. *See* 735 ILCS 5/8-802; *Department of Professional Regulation v. Manos*, 326 Ill.App.3d 698, 260 Ill.Dec. 364, 761 N.E.2d 208, 216-17 (2001); *Parkson v. Central DuPage Hospital*, 105 Ill.App.3d 850, 61 Ill.Dec. 651, 435 N.E.2d 140, 143-44 (1982).[5]

As the Seventh Circuit explained in denying the government's request for production of the redacted medical records of 45 patients with questionable probative value:

> As the court pointed out in *Parkson v. Central DuPage Hospital, supra*, 61 Ill.Dec. 651, 435 N.E.2d at 144, "whether the patients' identities would remain confidential by the exclusion of their names and identifying numbers is questionable at best. The patients' admit and discharge summaries arguably contain histories of the patients' prior and present medical conditions, information that in the cumulative can make the possibility of recognition very high."
>
> * * *
>
> Even if there were no possibility that a patient's identity might be learned from a redacted medical record, there would be an invasion of privacy. Imagine if nude pictures of a woman, uploaded to the Internet without her consent though without identifying her by name, were downloaded in a foreign country by people who will never meet her. She would still feel that her privacy had been invaded.

*Northwestern Memorial Hosp.*, 362 F.3d at 929. The invasion of privacy rejected in

*Northwestern* pales in comparison to the unprecedented foraging through personal medical and

---

[5] While most federal courts addressing the issue have held that federal privilege law applies in cases involving both state and federal claims, "the issue is not free from doubt" (*Northwestern Memorial Hosp. v. Ashcroft*, 362 F.3d 923, 925 (7th Cir. 2004)), and has never been addressed by the First Circuit. *See Blake v. Southcoast Health System, Inc*., 206 F. Supp. 2d 174, 182 (D. Mass. 2002) ("Resolution of this knotty problem is not adequately resolved by the Federal Rules of Evidence and has not been addressed by the First Circuit. *See generally* Patti B. Saris, Massachusetts Rules of Evidence in the Federal Courts, *Massachusetts Evidence* § 2.1 (MCLE) (1999)."), *rev'd on other grounds sub nom*, *Blake v. Pellegrino*, 329 F.3d 43, 46 (1st Cir. 2003) ("Although this is an interesting pedagogical debate, we do not resolve it here.").

psychiatric[6] records proposed by Defendants.  Many insureds of the TPP Plaintiffs would

doubtless be outraged to learn that their personal medical files had been handed over to Pfizer,

whether or not those records are redacted.

Defendants' request to compel disclosure of this information should be denied.

## II.    Individual Plaintiffs Kopa and Smith Have Produced All Relevant Medical Records and Any Further Production is Irrelevant and Unnecessary.

The proposed consumer Plaintiff class representatives Gerald Smith ("Smith") and

Lorraine Kopa ("Kopa") (collectively "Consumer Plaintiffs") previously provided Defendants

with all of their medical records that are relevant or that might reasonably lead to the discovery

of admissible evidence.  Specifically, each Consumer Plaintiff produced his or her complete

medical records for treatments received for injuries sustained in auto accidents that led to their

being prescribed Neurontin for off-label uses.  *See* Declaration of Richard E. Shevitz ("Shevitz

Decl."), Ex. A hereto, at ¶ 3 and Declaration of Ronald J. Aranoff ("Aranoff Decl."), Ex. B

hereto, at ¶ 3.

Defendants seek to compel production of additional medical records that have nothing to

do with the discreet injuries for which Neurontin was prescribed.  To be clear, prior to the car

accidents in which each of the Consumer Plaintiffs were injured, the conditions for which they

were eventually prescribed Neurontin did not exist.  It is not as if the Plaintiffs suffered from

some preexisting, chronic condition such as epilepsy, which might warrant review of Plaintiffs'

pre-Neurontin treatments.  Instead, each of the Plaintiffs sustained injuries in car accidents for

which they were eventually prescribed Neurontin.  The Plaintiffs have already produced all of

---

[6] Despite the absence of any evidence of efficacy, and the existence of studies demonstrating *in*efficacy, one of the most prevalent off-label uses of Neurontin was for bipolar depression.

the medical records related to their treatment with Neurontin for those injuries. Any other medical records are completely irrelevant.

Moreover, Ms. Kopa has already been deposed by Defendants, and Mr. Smith was literally on the eve of being deposed when the Court stayed discovery in this matter, which deposition is expected to be rescheduled in due course. Defendants have also sought to depose the Consumer Plaintiffs' physicians who prescribed Neurontin, as well as other physicians that treated those Plaintiffs for their injuries. *See* Subpoena to Dr. Kylene Huler, Dr. Thaddaeus M. Poe, Dr. Thomas Craparo and Dr. V.D. Dhaduk (Shevitz Decl., Ex. 1). Thus, Defendant have had and will have ample opportunity to chase down rabbit trails such as whether "some factor unique to the individual plaintiffs, such as a condition that was resistant to other approved medical treatments, might explain Neurontin's alleged lack of efficacy in their individual cases." Defendants' Memo, p. 8. The depositions of the treating physicians will be more than adequate to allow Defendants to explore these non-issues; they should not also be allowed to engage in a fishing expedition for irrelevant medical records that predate the injuries for which the Consumer Plaintiffs were prescribed Neurontin.

In addition, both Smith and Kopa have already produced medical records that pre-date their use of Neurontin by approximately seven months. Shevitz and Aranoff Decls. at ¶ 4. Smith produced all medical records starting with his March 1999 car accident, even though he was not prescribed Neurontin until October 1999. Shevitz Decl. at ¶ 4. Smith also produced all chiropractic records of treatments received long after he discontinued his use of Neurontin because it did not "work" for him. Shevitz Decl. at ¶ 5. Similarly, Kopa produced medical records from the time period beginning with her April 2003 car accident, though she was not

prescribed Neurontin until November 2003. Aranoff Decl. at ¶ 4. Thus, Plaintiffs have already produced a majority of the documents Defendants presently seek in their motion to compel.

The Court should reject Defendants' attempt to temporally define the permissible scope of discoverable medical records. The range of relevant medical records in this instance is clearly circumscribed by the discreet injuries each of the Consumer Plaintiffs sustained in their respective car accidents—not by some calendar date of one or ten years prior to those accidents. Simply put: both of the Plaintiffs sustained injuries and were prescribed Neurontin, and both Plaintiffs eventually discontinued use of Neurontin. The only relevant medical records are those that relate to those treatments. Defendants' request for forced production of additional documents of a personal and private nature amounts to an attempt to harass Ms. Kopa and Mr. Smith and to frustrate their efforts to serve as class representatives.[7]

Defendants seek to compel production of additional medical records and, for the very first time in this litigation, Defendants limit their request to records dated *one year prior* and *one year after* the date when the Consumer Plaintiffs started taking Neurontin. Defendants' Memo, pp. 10-12. This request is a significant departure from the hard line taken by Defendants in their Requests for Production, during conversations with Plaintiffs' counsel over document production, and in numerous letters sent to counsel for Consumer Plaintiffs wherein Defendants insisted on the production of *all* medical records of the Consumer Plaintiffs, without qualification as to time. Shevitz and Aranoff Decls. at ¶ 6 and ¶ 5. In doing so, Defendants

---

[7] The harassing nature and irrelevance of the documents Defendants seek is perfectly illustrated by their specific request for Mr. Smith's counseling records related to depression he suffered as a result of being injured and his temporary inability to work due to his injuries. There is nothing in the Neurontin label indicating that it should not be used if one suffers from depression. If this were a relevant consideration when prescribing the drug, it should have been included in the label—it was not.

implicitly concede that their previous requests for Plaintiffs' complete medical histories were overreaching.[8]

Additional medical records that pre-date or post-date the injuries for which the Consumer Plaintiffs were prescribed Neurontin are completely irrelevant, and Defendants have offered no compelling evidence or argument to the contrary. Defendants have failed to cite any evidence from the record indicating that something noteworthy or unique about Consumer Plaintiffs' medical histories caused them to be prescribed Neurontin instead of another drug. Rather, Defendants simply speculate that the Consumer Plaintiffs' medical records from before or after they sustained the injuries for which they were prescribed Neurontin are somehow relevant.

Contrary to Defendants' suggestion, it is also irrelevant whether the Consumer Plaintiffs took off-label prescription drugs other than Neurontin. Defendants' Motion at 8. Nonetheless, the Consumer Plaintiffs each previously indicated in their respective answers to Defendants' interrogatories that they were unaware whether any of the other drugs they were prescribed for their respective injuries were taken for off-label uses. *See* Plaintiffs Kopa and Smith's Answer to Defendants' First Set of Interrogatories at p. 12. (Shevitz Decl., Exs. 2 and 3). If they were prescribed other drugs for off-label uses without their knowledge in the past, it would be completely irrelevant to the present case.

For all of the foregoing reasons, the Consumer Plaintiffs respectfully request that the Court deny Defendants' request to compel the production of additional medical records or to execute medical authorizations for Defendants' use.

---

[8] As noted in their Motion to Compel, Defendants have also requested that Plaintiffs provide medical authorizations so that Defendants may independently seek medical records from the Plaintiffs' health care providers. Motion to Compel, p. 7, n. 8. There is no basis for such a request, and it was completely proper for the Consumer Plaintiffs to produce medical records in lieu of providing Defendants with authorizations. Defendants are no more entitled to force Plaintiffs to sign blanket authorizations enabling Defendants to poke unsupervised through their medical records than Plaintiffs are entitled to the keys to Defendants' office to search for relevant documents.

III.    **The Production of "Out of Network" Claims Data by Plaintiff ASEA
        is Unduly Burdensome.**

From the inception of ASEA's health benefits plan (the "Plan"), the majority of

prescription drug claims have been processed by the Plan's Prescription Benefits Manager,

Caremark.  Declaration of Valera Kingsley ("Kingsley Decl."), Ex. C hereto, at ¶ 4.  Both ASEA

and Caremark have produced to Defendants information on all Neurontin claims processed by

Caremark.

For a time, however, a subset of drug claims was processed by the Plan's medical claims

payer, Administrative Services, Inc. ("ASI").  ASI processed "out-of-network" drug claims.

These are claims for prescriptions filled by pharmacies out of Caremark's network, *e.g.,* Indian

service facilities, military hospitals and remote locations.  From the Plan's inception to July 2004

ASI processed approximately 136,000 such claims in the same manner it processed medical

claims.  In July 2004 Caremark began administering these claims as well. *Id.* at ¶¶ 5-6.

The electronic record created when out-of-network claims were processed by ASI does

not include the name of the drug.  It only identifies whether the prescription was for a generic or

a brand name drug.  Thus, the only way to determine if an out-of-network drug claim is for

Neurontin is to retrieve the underlying paper work for all 136,000 out of network claims. *Id.* at

¶¶ 7-8.

The paper record of these claims is stored by date in the "day batches" of medical and

drug claims processed by each of 12 claims adjudicators.  In other words, these 136,000 drug

claims are randomly interspersed among the records of one million medical claims warehoused

in over 300 boxes of claim files.  To find all the drug claims, ASEA, through ASI, would have to

hand-search all of these boxes and then review the documentation of all 136,000 claims to

determine which of them were for Neurontin.  Maintaining the integrity of these files is

important to both ASI and ASEA as they represent the audit trail for claims processed. *Id.* at ¶¶ 8-9.

Plaintiffs ASEA and ASI stand on their objection that production of "out-of-network" claims records is too burdensome given the small benefit Defendants could gain from these records. The Court should not compel production of this subset of claims data for two reasons.

First, the burden associated with identifying this subset of Neurontin claims is great. It requires a hand search through over 300 boxes containing the documentation for over a million individual medical claims to find 136,000 pharmacy claims. Kingsley Decl. at ¶ 8. Each of the 136,000 claims must then be reviewed to determine if the claim was for Neurontin (or its generic equivalent). Once the Neurontin claims are identified, then the documentation must be redacted and anonymized to comply with HIPAA.

Second, as discussed above, all the representative plaintiffs, including ASEA, are entitled to rely on class-wide proofs of liability and damages. Therefore it is unnecessary for ASEA to produce all of its individual claims data. The data it has already produced is sufficient to determine its adequacy as a class representative. The additional claims data may become relevant (if ever) only during a claims allocation process that will be determined only after Plaintiffs prevail. Thus, ASEA does not have to waive its right to recover for those claims just because the particular documentation is too burdensome to produce when it is also completely unnecessary to a determination of class-wide liability and aggregate damages.

## IV.    Issues Raised Related to Coordinated Plaintiff Kaiser

### A.    Documents Outside of California

Defendants' assertion that Kaiser has "unreasonably refused to . . . search . . . outside of California" is incorrect and misguided. Kaiser has made a reasonable, good faith effort to search

for responsive documents and has concentrated its search to maximize the production of those documents. To date, Kaiser and its counsel have spent hundreds of manpower hours, and Kaiser has produced over 36,000 pages of documents. These documents contain exhaustive, substantive information regarding Kaiser's claims in response to Defendants' discovery requests. Kaiser has reasonably focused its efforts in California because that is the location most likely to contain the information Defendants seek. Kaiser is headquartered in California, and the vast majority of its members and drug utilization are in California.[9] Therefore, the most reasonable way to proceed with discovery is for Kaiser to focus its search and production where the bulk of relevant information is located—not in Kaiser's six other regional divisions, where the likelihood is that any additional documents would be cumulative.

Moreover, Kaiser *has* searched for documents in regions other than California and has produced responsive documents to Defendants. Kaiser's counsel has contacted and requested documents from the regional Continuing Medical Education ("CME") Coordinators, the regional Directors of Pharmacy, and the chairs of the regional Pharmacy and Therapeutics Committees. *See* Declaration of Justine J. Kaiser ("Kaiser Decl."), Ex. D. hereto, ¶¶ 5-6. These are the Kaiser document custodians most likely to possess responsive and relevant documents because they are the individuals who coordinated physician education, pharmacy operations, and drug formulary decisions as part of their duties. Conducting a more unfocused search in the regions other than California would be extremely burdensome and require Kaiser to expend resources to identify and search files of individuals who may have had only minimal experience with Neurontin. It is unlikely that such a search would yield significant, if any, relevant, non-cumulative information. *See In re Priceline.com Inc. Secs. Litig.*, 233 F.R.D. 83, 87 (D. Conn. 2005) ("The slim chance

---

[9] As of December 2004, Kaiser had 8.2 million members in nine states and the District of Columbia, with over 6 million of those members in California.

that plaintiffs would discover relevant information . . . does not justify the efforts necessary to provide this information."); *Cognex Corp. v. Electro Scientific Indus., Inc.*, No. Civ. A 01CV10287RCL, 2002 WL 32309413, at *3 (D. Mass. Feb. 14, 2001) (where a party has already conducted extensive search for relevant documents, the adversary system must at some point say "that the cost of seeking *every* relevant piece of discovery is not feasible") (emphasis in original).

Defendants' motion is misleading. It suggests that Kaiser has refused to give Defendants *any* information outside of California when, in fact, besides the documents discussed above, Kaiser has also agreed to produce relevant claims data from its other, much smaller regions once counsel finalizes the fields to be produced in the claims data report. The claims data is the information that would be most useful to Defendants—not the few documents, if any, that might be recovered from an unnecessarily extensive regional search.

### B.    Documents from Kaiser's Physicians

This Court should also deny Defendants' motion to compel the production of documents from all of Kaiser's physicians who prescribed Neurontin. The burden and expense of Defendants' proposed discovery highly outweighs its likely benefit, and raises possible patient privacy concerns. *See United States v. Clean Harbors*, No. C-89-109-L, 1995 WL 155007, at *4 (D.N.H. Feb. 21, 1995) (citing *Bridge C.A.T. Scans Assocs. v. Technicare Corp.*, 710 F.2d 940, 944-45 (2d Cir. 1983)) (it is a well "recognized maxim that discovery is properly limited in instances where the burden or expense of the proposed discovery outweighs its likely benefit" and that therefore courts are empowered to "'impose conditions on discovery in order to prevent injury, harassment, or abuse of the court's processes'")); Fed. R. Civ. P. 26(b)(2).

Kaiser is an integrated health care delivery organization that owns or operates 29 medical centers and 423 medical offices. It contracts exclusively with regional Permanente Medical

Groups for the services of 11,000 physicians. The physicians are not employees of Kaiser. For this Court to require Kaiser, as well as each prescribing physician member of Permanente Medical Groups, to search their individual files would be extremely costly, burdensome, and unlikely to produce relevant information.[10]  *See Priceline.com*, 233 F.R.D. at 87 (denying interrogatory request that required party "to canvass each employee" to determine whether such employees knew about "the decisions in question," as overly broad and unduly burdensome).

Contrary to Defendants' assertion, Kaiser has *not* conceded the relevance of producing documents from all individual doctors. Although certain relevant physicians' documents have been produced, information was gathered from those physicians based solely on their leadership and/or decision-making roles within Kaiser. As part of the information gathering process, Kaiser systematically contacted those individuals most likely to possess relevant documents. This group of people necessarily included physicians, and to the extent these physicians had responsive documents, Kaiser produced them. *See* Kaiser Decl. ¶¶ 7-8. That production in no way implies Kaiser's agreement of the propriety of contacting every individual prescriber of Neurontin, which raises concerns as to relevancy, burdensomeness, patient privacy, and cumulative and duplicative efforts. Instead, it shows that Kaiser's discovery efforts have been appropriately targeted at obtaining responsive information.[11]

## CONCLUSION

For the reasons set forth above, Defendants' Motion to Compel Discovery from Plaintiffs should be denied in its entirety.

---

[10] Defendants' request is particularly unreasonable as Defendants in this litigation have objected to searching the files of only 75 physicians—considerably fewer than Kaiser's 11,000 physician providers.

[11] Defendants assert in passing that Kaiser should be required to identify all prescribing physicians' names, but they have not sufficiently demonstrated their need for this information. Defendants argue only that Kaiser should be compelled to provide these names because doing so would not be burdensome. However, lack of burden is an insufficient reason to compel discovery.

Dated:  August 7, 2006

Respectfully submitted,

**For the Class:**

**COHEN & MALAD, LLP**

s/ Richard E. Shevitz
Richard E. Shevitz
Irwin B. Levin
One Indiana Square, Suite 1400
Indianapolis, IN 46204

**HAGENS BERMAN SOBOL SHAPIRO LLP**
Thomas M. Sobol, Esq. (BBO #471770)
Ed Notargiacomo, Esq. (BBO#567636)
One Main Street, 4th Floor
Cambridge, MA 02142

**LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP**
Barry Himmelstein, Esq.
275 Battery Street, 30th Floor
San Francisco, CA 94111-3339

**GREENE & HOFFMAN**
Thomas Greene, Esq.
125 Summer Street
Boston, MA 02110

**DUGAN & BROWNE**
James Dugan, Esq.
650 Poydras Street, Suite 2150
New Orleans, LA 70130

**BARRETT LAW OFFICE**
Don Barrett, Esq.
404 Court Square North
P.O. Box 987
Lexington, MS 39095

**LAW OFFICES OF DANIEL BECNEL, JR.**
Daniel Becnel, Jr., Esq.
106 W. Seventh Street

P.O. Drawer H
Reserve, LA 70084

**Attorneys for Plaintiffs and the Class**

**For Plaintiff Guardian Life Insurance Co. Of America:**


 _/s/ Thomas G. Shapiro_
Thomas G. Shapiro, Esq. (BBO #454680)
**SHAPIRO HABER & URMY LLP**
53 State Street
Boston, MA 02109


**Of Counsel:**

**COHEN, MILSTEIN, HAUSFELD & TOLL, PLLC**
Linda P. Nussbaum, Esq.
150 East 52nd Street, 30th Floor
New York, NY 10022

-and-

**COHEN, MILSTEIN, HAUSFELD & TOLL, PLLC**
Michael D. Hausfeld, Esq.
1100 New York Avenue, N.W.
West Tower, Suite 500
Washington, DC 20005

**RAWLINGS & ASSOCIATES, PLLC**
Mark D. Fischer, Esq.
Mark Sandmann, Esq.
325 W. Main Street
Louisville, KY 40202

**JOEL Z. EIGERMAN, ESQ.**
50 Congress Street, Suite 200
Boston, MA 02109


**For Plaintiffs Kaiser Foundation Health Plan, Inc. and Kaiser Foundation Hospitals:**

**SHAPIRO HABER & URMY LLP**
Thomas G. Shapiro, Esq. (BBO #454680)
Theodore Hess-Mahan, Esq. (BBO #557109)
53 State Street
Boston, MA 02109


**Of Counsel:**

**COHEN, MILSTEIN, HAUSFELD & TOLL, PLLC**
Linda P. Nussbaum, Esq.
150 East 52nd Street, 30th Floor
New York, NY 10022

-and-

**COHEN, MILSTEIN, HAUSFELD & TOLL, PLLC**
Michael D. Hausfeld, Esq.
1100 New York Avenue, N.W.
West Tower, Suite 500
Washington, DC 20005

**JOEL Z. EIGERMAN, ESQ.**
50 Congress Street, Suite 200
Boston, MA 02109


**For Plaintiff Aetna, Inc.:**


 _/s/ Peter A. Pease_
Peter A. Pease, Esq. (BBO #392880)
**BERMAN DEVALERIO PEASE TABACCO BURT & PUCILLO**
One Liberty Square
Boston, MA 02109


**Of Counsel:**

**LOWEY DANNENBERG BEMPORAD & SELINGER, PC**
Richard Bemporad, Esq.
Richard W. Cohen, Esq.
Peter St. Phillip, Jr., Esq.
Todd S. Garber, Esq.

The Gateway – 11th Floor
One North Lexington Avenue
White Plains, NY 10601-1714

**BERMAN DEVALERIO PEASE TABACCO BURT &
PUCILLO**
Joseph J. Tobacco, Jr., Esq.
425 California Street, Suite 2025
San Francisco, CA 94104-2205

**JOHN F. INNELLI, LLC**
John F. Innelli, Esq.
1818 Market Street, Suite 3620
Philadelphia, PA 19103