UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re: NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL Docket No. 1629 |
| THIS DOCUMENT RELATES TO: | Master File No. 04-10981 |
| | Judge Patti B. Saris |
| HARDEN MANUFACTURING CORPORATION; LOUISIANA HEALTH SERVICE INDEMNITY COMPANY, dba BLUECROSS/BLUESHIELD OF LOUISIANA; INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL NO. 68 WELFARE FUND; ASEA/AFSCME LOCAL 52 HEALTH BENEFITS TRUST; GERALD SMITH; and LORRAINE KOPA, on behalf of themselves and all others similarly situated, v. PFIZER INC. and WARNER-LAMBERT COMPANY. | Magistrate Judge Leo T. Sorokin |
| THE GUARDIAN LIFE INSURANCE COMPANY OF AMERICA v. PFIZER INC. and | |
| AETNA, INC. v. PFIZER INC. | |

### DECLARATION OF KEITH E. ARGENBRIGHT, M.D.

KEITH E. ARGENBRIGHT declares upon penalty of perjury in accordance with 28 U.S.C. § 1746 as follows:

1. I am a senior partner of m21 partners, a healthcare consulting firm. I have been retained by Defendants Pfizer Inc. and Warner-Lambert Company to provide expert testimony regarding certain documents that defendants are seeking from plaintiffs.

## QUALIFICATIONS

2.  After graduating from the University of Oklahoma with honors, I attended medical school at Tulane University Medical School.

3.  I received my medical doctorate from Tulane in 1984 and then completed in a three-year residency in family practice at John Peter Smith Hospital in Fort Worth, Texas. I also pursued post-graduate studies at the Wharton School of Business and the UCLA Anderson School of Executive Education.

4.  In 1985, during my residency, I received a license to practice medicine in Texas.

5.  I practiced as a physician in Texas privately from 1987 to 1999. From 1987 to 1997, I worked with a physicians' group called Southwest Medical Associates, where I became the physician lead. From 1997 to 1999, I served as the Chief Medical Officer of All Saints Health System, which owned and operated a 350-bed hospital. During this time, I also served as physician lead in a 35-physician group called All Saints Medical Associates, which was affiliated with All Saints Health System.

6.  I was certified by the American Board of Family Practice in 1987 and was re-certified in 1994.

7.  In 1999, I co-founded MyDoc Online, an Internet-based company designed to facilitate communications between patients and physicians. This company was acquired by Aventis Pharmaceuticals in 2000, at which time I became Vice President of Clinical Development at Aventis. I worked for Aventis until 2003.

8.  In 2004, I became Chief Executive Officer of Cardea Partners, a technology solutions firm based in Texas that offered innovative and cutting-edge solutions to large health institutions, pharmaceutical firms, biotech companies, and governmental agencies.

9. In 2004, I also became Senior Advisor for HealthTech, a nonprofit research and education organization that provides strategic information about the impact of technology in healthcare, a position in which I still serve.

10. I joined m21 partners as a senior partner in 2005. m21 partners provides consulting services for healthcare clients in the areas of strategic planning, technology assessment, and operations improvement.

11. I am a member of the American College of Physician Executives and the Texas Medical Association. I have served on the faculty of the American College of Physician Executives since 2004.

12. I have had extensive experience with medical records throughout my career. As a practicing physician from 1984 to 1999, I prepared and reviewed countless medical records. As part of these reviews, I routinely engaged in the analysis described below.

13. I have also had significant experience with medical and prescription drug claims data. For instance, while serving as the physician lead for two practice groups, I was frequently called upon to review claims data to determine whether the treatments were medically necessary and clinically appropriate. To do this, I regularly conducted the type of analysis described below.

**TESTIMONY**

14. I have been informed that in this multidistrict litigation, certain plaintiffs have sued defendants to recover for payments that plaintiffs made for off-label prescriptions of Neurontin. I have also been informed that the Court has ruled that these plaintiffs can only recover with respect to particular off-label uses of Neurontin. Further, I have been informed that plaintiffs must demonstrate that Neurontin was ineffective for these uses.

3

15.   I understand that in connection with this litigation, defendants are seeking an order compelling the production of various categories of documents and electronic data from plaintiffs. Below I have provided information regarding how documents and data in these categories may be used in this litigation.

**A.    Medical Records**

16.   Medical records are the official documentation of the patient's visits to his or her physician or healthcare provider. These documents contain the most accurate information regarding why a drug such as Neurontin was prescribed by the physician.

17.   Medical records include physicians' notes from the patient's visits, laboratory data, and correspondence from consulting physicians. These documents record the physician's thought process that leads to a particular therapy. For instance, the medical records normally describe the patient's symptoms, the physician's diagnosis, and the prescribed course of treatment. As part of this process, a physician records not just what he did, but what he did not do (and why) and what he considered. By consulting such documents that precede or coincide with a prescription, a physician or other qualified individual can tell, with a reasonable degree of medical certainty, what the drug was prescribed for.

18.   In fact, physicians conduct such analysis of medical records frequently. For example, physicians must perform this analysis every time they treat patients who were prescribed drugs by other physicians but where the physician is not completely aware of all of the circumstances of the prescription. Indeed, specialists such as neurologists (who often prescribed Neurontin) routinely review records created by other physicians to understand the patient's medical history.

19. Consequently, analysis of patients' medical records is the most reliable means to determine what indications Neurontin was being prescribed for.

20. Medical records may also indicate why Neurontin rather than another drug was prescribed. These reasons may be explicitly stated or might be deduced from other information in a patient's medical records. For instance, a patient's medical records may indicate that another drug therapy was tried and failed, demonstrating that one or more drugs were prescribed prior to Neurontin. In addition, these documents will show if the patient was prescribed Neurontin because the patient is allergic to or unable to tolerate an alternate drug or because the use of an alternate drug was otherwise contraindicated.

21. Moreover, medical records will contain the best evidence of whether Neurontin was effective for each patient who took Neurontin. For example, the physician's notes throughout the course of treatment will record the patient's responses to questions regarding the drug's efficacy. This is particularly relevant for most of the conditions at issue in this litigation (such as pain and bipolar disorder) since these conditions cannot be assessed through empirical testing. In fact, even medical records from visits after the patient stopped using Neurontin will show how the patient reacted to the change in treatment.

22. Finally, medical records may show that a perceived lack of efficacy was due to a factor unique to a patient, such as the patient's noncompliance with his or her drug treatment plan or the fact that the patient's condition was refractory (i.e., not responsive to treatment) with respect to multiple drugs. It is important to note that individual patients can react to a prescription drug such as Neurontin in different ways, and the best way to evaluate a particular patient's response to a course of therapy is to review the patient's medical records. This

evaluation is important because physicians recognize that no prescription drug works for every patient.

**B.     Medical Claims Data**

23.     Medical claims data is a record of the medical claims bills that a third-party payor processes for payment on behalf of their covered individuals.  This data (unlike prescription drug data) normally contains diagnosis codes, which set forth the physician's diagnosis of the patient's condition.

24.     Medical claims data with diagnosis information that is contemporaneous with a patient's Neurontin prescriptions can be linked with prescription drug data to determine why Neurontin was prescribed.

25.     Medical claims data is commonly linked to prescription drug data in this way within the healthcare industry.  For example, disease management companies and other healthcare entities (including third-party payors such as the plaintiffs in this litigation) perform similar analysis in order to examine prescription drug utilization.  These entities link the medical claims to prescriptions, establish diagnosis profiles for patients in order to review their drug therapy, and compare it to best practices for the patient's condition.

**C.     Non-Neurontin Prescription Drug Data**

26.     Non-Neurontin prescription drug data is a record of the prescription drug claims submitted to the patients' third-party payors for drugs other than Neurontin.  This data could be used by defendants to identify relevant changes in a patient's therapy.

27.     For example, if a patient was prescribed a bipolar drug for two months and was subsequently prescribed Neurontin for four years, this would tend to show that Neurontin was an effective alternative treatment for the patient.

28. This data also can show (i) what alternatives to Neurontin were taken, if any; (ii) whether the condition for which a patient was prescribed Neurontin was refractory to treatment; or (iii) whether Neurontin might have been prescribed because alternate treatments would have resulted in adverse drug-drug interactions.

D. **Medical Records of the Individual Plaintiffs**

29. The medical records of the individual plaintiffs in this action from a reasonable period prior to when they were first prescribed Neurontin to the present are relevant to various issues in this litigation.

30. These plaintiffs' medical records from a reasonable period before they were prescribed Neurontin will show whether Neurontin's alleged inefficacy was due to a factor unique to the individual plaintiff.

31. For instance, the produced medical records of one individual plaintiffs (Gerald Smith and Lorraine Kopa), which I have reviewed, show that plaintiffs Smith sustained a head injury several years prior to his auto accident, which resulted in head pain. Full medical records regarding this injury and any other injuries that this plaintiff suffered are relevant to whether he has a medical condition that Neurontin could not relieve.

32. Moreover, all of the individual plaintiffs' medical records from the time that they were prescribed Neurontin are necessary to provide a full picture of their medical treatment. This includes these plaintiffs' psychiatric records, which would show whether their pain was associated with mental illness such as depression (a common occurrence), as opposed to resulting from the failure of Neurontin to treat a physical injury.

33. Finally, the individual plaintiffs' medical records from after they were prescribed Neurontin will show, among other things, whether Neurontin's perceived inefficacy was due to the drug or the plaintiff's refractory pain.

## CONCLUSION

34. Obtaining comprehensive medical records in these circumstances is essential because one never knows where the relevant information will appear. Defendants' request for this information is not unusual. Physicians and healthcare facilities frequently are called upon to gather and produce such information for litigation.

35. Although medical records are certainly the best source of information needed for this litigation, the medical and prescription claims data that defendants are seeking are also useful sources of data that would facilitate analysis of Neurontin prescriptions that are potentially at issue in this litigation.

Dated: August 11, 2006

/s/ Keith E. Argenbright

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3 on August 11, 2006.

/s/ David B. Chaffin