UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
: 
In re: NEURONTIN MARKETING, SALES : 
PRACTICES AND PRODUCTS LIABILITY : 
LITIGATION : 
: 
: MDL Docket No. 1629
THIS DOCUMENT RELATES TO: : Master File No. 04-10981
: Judge Patti B. Saris
ASSURANT HEALTH, INC., et al. v. PFIZER : Mag. Judge Leo T. Sorokin
INC., et al., : 
: 
: 
Docket No. 05-10535-PBS : 
: 
: 
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM OF LAW OF PFIZER INC. AND WARNER-LAMBERT COMPANY
IN SUPPORT OF THEIR OBJECTIONS TO REPORT AND RECOMMENDATION OF
MAGISTRATE JUDGE LEO T. SOROKIN DATED AUGUST 4, 2006
RECOMMENDING THAT THE *ASSURANT* CASE
BE REMANDED TO STATE COURT**

DAVIS POLK & WARDWELL
450 Lexington Avenue
New York, NY 10017
(212) 450-4000

*Attorneys for Defendants Pfizer Inc.
and Warner-Lambert Company*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND ........................................................................................................ 2

STANDARD OF REVIEW ....................................................................................... 5

ARGUMENT ............................................................................................................ 6

I.      PLAINTIFFS' ANTITRUST CLAIMS NECESSARILY INVOLVE
SUBSTANTIAL ISSUES OF FEDERAL PATENT LAW BECAUSE THEY
ARE INEXTRICABLY TIED TO THE EXCLUSION OF GENERICS
FROM THE MARKET FOR GABAPENTIN, WHICH ITSELF DEPENDS
ON DEFENDANTS' RIGHTS UNDER FEDERAL PATENT LAW ......................... 8

II.    AS JUDGE LIFLAND CORRECTLY RECOGNIZED IN THE
NEURONTIN ANTITRUST MDL, PLAINTIFFS' OFF-LABEL
PROMOTION THEORY IS NOT AN ALTERNATIVE THEORY OF
RECOVERY FOR THEIR ANTITRUST CLAIMS BUT INSTEAD IS A
DIFFERENT CLAIM ENTIRELY AND THEREFORE CANNOT
SUPPORT REMAND ............................................................................... 12

III.   PLAINTIFFS EXPRESSLY ABANDONED ANY STAND-ALONE,
ANTITRUST THEORY BASED ON ALLEGED AGREEMENTS TO
PROMOTE OR PRESCRIBE NEURONTIN FOR OFF-LABEL PURPOSES
AT THE AUGUST 2005 HEARING .......................................................... 14

IV.   NUMEROUS PRACTICAL CONSIDERATIONS SUPPORT EXERCISING
FEDERAL JURISDICTION OVER THIS CASE AND IT IS
APPROPRIATE TO TAKE INTO ACCOUNT THESE CONSIDERATIONS
IN DECIDING WHETHER TO EXERCISE JURISDICTION HERE .................... 18

CONCLUSION ........................................................................................................ 20

## TABLE OF AUTHORITIES

### Cases

<u>Page</u>

Christianson v. Colt Indus. Operating Corp., 486 U.S. 797 (1988) ...................................... *passim*

Franchise Tax Board of Cal. v. Construction Laborers Vacation Trust for S. Cal., 464 U.S. 1 (1983) ............................................................................................................................. 6

Gully v. First Nat'l Bank, 299 U.S. 109 (1936) .......................................................................... 18

Quackenbush v. Allstate Ins. Co., 517 U.S. 706 (1996) ............................................................... 6

Rivert v. Regions Bank of La., 522 U.S. 470 (1998) ..................................................................... 6

First Union Mortgage Corp. v. Smith, 229 F.3d 992 (10th Cir. 2000) ........................................ 6

Greenberg v. Bear, Stearns & Co., 220 F.3d 22 (2d Cir. 2000) .................................................. 20

In re Ivy, 901 F.2d 7 (2d Cir. 1990) ............................................................................................ 19

In re Taxmoxifen Citrate Antitrust Litig., 429 F.3d 370 (2d Cir. 2005) .................................... 10

In re U.S. Healthcare, 159 F.3d 142 (3d Cir. 1998) ..................................................................... 6

Ocelot Oil Corp. v. Sparrow Indus., 847 F.2d 1458 (10th Cir. 1988) ......................................... 6

Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985 (1st Cir. 1988) ............ 14

Stone & Webster Engineering Corp. v. Ilsley, 690 F.2d 323 (2d Cir. 1982) ............................... 19

Taubenfeld v. Aon Corp., 415 F.3d 597 (7th Cir. 2005) .............................................................. 14

Unauthorized Practice of Law Comm. V. Gordon, 979 F.2d 11 (1st Cir. 1992) ........................... 6

Vaughn v. Mobil Oil Exploration & Producing Se., Inc., 891 F.2d 1195 (5th Cir. 1990) .......... 14

Vogel v. U.S. Office Prods. Co., 258 F.3d 509 (6th Cir. 2001) ..................................................... 6

Coral Gables Federal Sav. & Loan Assoc. v. Harbert, 527 F. Supp. 284 (D. Fla. 1981) ........... 19

Johnson v. Smith, 630 F. Supp. 1 (D. Cal. 1986) ......................................................................... 18

In re Neurontin Antitrust MDL: Sall/Zafarana Decision Denying Remand, MDL Docket No. 1479 (Jan. 7, 2005) ..................................................................................................... *passim*

Stanley Works v. Globemaster, Inc., 400 F. Supp. 1325 (D. Mass. 1975) ................................. 20

Stuart v. Pfizer, No. 02-2511-Ma/Bre (W.D. Tenn. Oct. 1, 2002) ................................. 9

## Statutes & Rules

28 U.S.C. § 636 .................................................................................................................. 5

28 U.S.C. § 1331 ................................................................................................................ 4

28 U.S.C. § 1338 ................................................................................................................ 4

Fed. R. Civ. P. 72(a) .......................................................................................................... 5

## Other Authorities

10 J. von Kalinowski, Antitrust Laws and Trade Regulation § 24.01 ............................. 8

13B Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Fed. Prac. & Proc. § 35628 .... 18

William Cohen, The Broken Compass: The Requirement That a Case Arise "Directly" Under
    Federal Law, 115 U. PA. L. REV. 890 (1967) ................................................... 19

Kenneth Lee Marshall, Understanding Merrell Dow: Federal Question Jurisdiction For State-
    Federal Question Jurisdiction For State-Federal Hybrid Cases, 77 WASH. U. L. Q. 219
    (1999) ......................................................................................................... 19

## PRELIMINARY STATEMENT

Defendants Pfizer Inc. and Warner-Lambert Company submit this memorandum of law in support of their objection to Magistrate Judge Leo T. Sorokin's Memorandum and Order dated August 4, 2006 (the "Order") recommending that the Assurant case be remanded to New Jersey state court. Defendants respectfully submit that the Magistrate Judge's recommendation is erroneous as a matter of law. Under Christianson v. Colt Indus. Operating Corp., 486 U.S. 797, 808-810 (1988), plaintiffs must supply a viable, alternative, state-law theory for the entire relief sought in each of the antitrust claims in their complaint. However, any theory based on the antitrust claims in plaintiffs' complaint necessarily involves substantial questions of federal patent law because plaintiffs' antitrust claims depend on the exclusion of generic competition from the market for gabapentin, a market for which defendants' patents gave them exclusive control. This Court clearly has jurisdiction over these antitrust claims. Plaintiffs' purported alternative theory based on agreements related to off-label marketing relates to a separate and distinct antitrust claim that is not pleaded in their complaint and not even a viable claim.

The Magistrate Judge's recommendation is also directly contrary to a ruling by the federal judge presiding over all patent and antitrust claims related to Neurontin. In the Neurontin Antitrust MDL, Judge Lifland specifically held that alternative theories based on "allegations concerning promotion of off-label use are qualitatively distinct" from antitrust claims and thus do "not . . . create an alternate theory of recovery for . . . claims relating to generic competition." In re Neurontin Antitrust MDL: Sall/Zafarana Decision Denying Remand, MDL Docket No. 1479, at 18 (Jan. 7, 2005) ("Sall/Zafarana") (attached as Exhibit A). Plaintiffs' theory here regarding payments to doctors for off-label prescriptions and off-label promotion of Neurontin does not provide an *alternative* theory for relief for the antitrust claims in plaintiffs' complaint.

Instead, the theory is plaintiffs' unfair practices claims dressed up in antitrust law and provides a *different* theory of relief for a *different* cause of action based on *different* factual allegations for *different* plaintiffs and for *different* damages.

Moreover, plaintiffs expressly and unambiguously abandoned the purported alternative theory on which the Magistrate Judge based his recommendation. On two separate occasions during the August 2005 hearing on plaintiffs' motion, plaintiffs affirmatively stated that they could not defeat federal jurisdiction over their antitrust claims solely on the basis of agreements to prescribe or market Neurontin for off-label uses. Transcript of Aug. 18, 2005 Hr'g ("Tr.") at 14, 59 (attached as Exhibit B). This abandoned theory cannot defeat jurisdiction here.

For these reasons, and in light of the overwhelming practical considerations that favor exercising federal jurisdiction over this case, defendants respectfully request that this Court deny plaintiffs' motion.

## BACKGROUND

Plaintiffs here are a varied collection of third-party payors ("TPPs"), only one of which – Wellchoice Insurance – is a New Jersey corporation. In November 2004, plaintiffs sued Pfizer and Warner-Lambert Company, along with Cline, Davis & Mann (a medical marketing firm) and two former executives at Warner-Lambert, who also happen to be residents of New Jersey. Plaintiffs filed their complaint in New Jersey state court.

Plaintiffs' complaint – as the Magistrate Judge recognized – is not the standard, run-of-the-mill, TPP complaint involving consumer-protection claims for the costs of off-label prescriptions of Neurontin with which this Court is well familiar.[1] Instead, the gist of plaintiffs'

---

[1] The Magistrate Judge correctly noted that plaintiffs' complaint "differs materially from these [other TPP] complaints in that it asserts different claims and some different factual allegations." Order at 2.

complaint here is not consumer-protection but antitrust law: plaintiffs contend that defendants "engaged in a continuing and on-going scheme to illegally increase market share and power by restraining generic bioequivalents of its popular anticonvulsant drug Neurontin from competing or otherwise entering the market." Compl. at ¶ 1. Thus, plaintiffs here raise a different set of claims against defendants under a collection of state antitrust laws. For purposes of these claims, plaintiffs define the "relevant geographic market" as the entire United States and contend that the "relevant product market is Neurontin and its generic bioequivalent." Id. at ¶ 31.

In their complaint, plaintiffs generally allege that defendants engaged in this anti-competitive scheme against generic manufacturers in two different ways: (1) "through a false, deceptive, and misleading marketing campaign;" and (2) by "misusing the legal and regulatory system" supporting their monopoly over gabapentin via their patent for Neurontin. Compl. at ¶ 1; see id. at ¶ 32 (alleging that defendants "increase[d] demand for Neurontin and interfere[d] with potential generic competitors" "by illegally marketing Neurontin for certain uses that were not safe and effective" and by "acquiring and using other patents on other forms and methods of using gabapentin for anticompetitive purposes."). In support of the alleged improper marketing – and in contrast to the usual litany of alleged misconduct appearing in the other complaints in the MDL – plaintiffs here rely on cursory allegations about the off-label promotion of Neurontin. See id. at ¶¶ 33-37. However, plaintiffs are much more specific when it comes to the alleged misuse of the legal and regulatory system related to defendants' patents. Among other things, plaintiffs contend that defendants filed "objectively baseless" "lawsuits against manufacturers and distributors of a generic bioequivalent of Neurontin" and made "false representations to the Food and Drug Administration ('FDA') in listing patents in the Orange Book." Id. at ¶¶ 47-49; see id. at ¶¶ 38-54. Based on these allegations, plaintiffs raise 45 claims against defendants that

3

can be grouped into three basic categories: (1) unlawful monopolization claims under a variety

of state laws; (2) unfair and deceptive trade practices claims under a variety of state laws; and

(3) an unjust enrichment claim. See Tr. at 21.

In January 2005, defendants invoked both federal question and patent jurisdiction and

timely and properly removed the case to federal court. 28 U.S.C. §§ 1331 & 1338. Plaintiffs

then moved to remand the case, claiming that defendants had failed to comply with the statutory

requirements for removal and that the federal issues raised in their complaint were not substantial

or essential to an assortment of purported alternative theories of relief under their state-law

claims. See Pls.' Mem. in Supp. of Mot. to Remand ("Pls.' Mem.") at 6-23. Defendants

opposed plaintiffs' motion and asked the federal court in New Jersey to defer ruling on plaintiffs'

motion pending transfer of the case to the MDL. See Mem. of Law of Defs.' Pfizer Inc. and

Warner-Lambert Co. in Opp. to Pls.' Mot. to Remand and in Supp. of Cross Mot. to Defer

Ruling on Remand Pending MDL Transfer ("Defs.' Mem."). In their opposition, defendants

demonstrated that removal of plaintiffs' complaint was both procedurally and substantively

proper, id. at 11-36; and explained how plaintiffs' purported alternative theories supporting their

antitrust claims either necessarily implicated substantial questions of federal patent law or else

were wholly unrelated to their alleged antitrust injury – i.e., a lack of competition from generic

manufacturers. Id. at 18-26.

On February 8, 2005, the Judicial Panel on Multidistrict Litigation transferred the case to

this district, and the case became part of the Neurontin MDL on April 25, 2005.[2] On August 18,

---

[2] The Judicial Panel on Multidistrict Litigation transferred this case here because of the factual allegations and consumer-protection claims related to the off-label promotion of Neurontin. Although the Court and the parties previously discussed the possibility of severing plaintiffs' antitrust claims, this memorandum does not discuss the various ways in which this Court could choose to address plaintiffs' claims.

2005, the Magistrate Judge held a hearing on plaintiffs' remand motion; however, on February 17, 2006, the court stayed all pending remand motions until after any ruling on class certification in the Neurontin MDL. The Magistrate Judge lifted that stay here on June 19, 2006, and on August 4, 2006, issued the Order recommending that the case be remanded to New Jersey state court.

In the Order, Magistrate Judge Sorokin correctly concluded that plaintiffs' procedural objections to defendants' removal were "without merit." Order at 7-10. The Order likewise recognized that "plaintiffs' primary theory" for their antitrust claims – "the misuse of the legal regulatory system" – and the bulk of their remaining theories for those claims all relate to competition with generic competitors and thus the status of defendants' patents. Indeed, the Magistrate Judge observed that "<u>all of the allegations describing efforts to interfere with competition involve[] the patent questions that pose substantial federal questions</u>." <u>Id.</u> at 18 (emphasis added). Nevertheless, and after acknowledging that "numerous practical considerations suggest adjudicating this case in this [C]ourt," <u>id.</u> at 14, the Order recommends that this Court allow plaintiffs' remand motion. The Magistrate Judge did so because he found that "one of plaintiffs' *lesser* theories" for their antitrust claims does not implicate federal law simply by alleging that "defendants paid doctors . . . to prescribe Neurontin for off-label purpose." <u>Id.</u> at 12. Defendants respectfully submit that this conclusion – which supplies the only basis for the Magistrate Judge's recommendation to grant plaintiffs' motion – is incorrect as a matter of law and that plaintiffs' motion should be denied.

## STANDARD OF REVIEW

This Court must exercise *de novo* review of the Magistrate Judge's Order. <u>See</u> 28 U.S.C. § 636(b)(1)(C) (2006); Fed. R. Civ. P. 72(a). A magistrate judge's recommendation on a motion

to remand is subject to *de novo* review because a remand motion is equivalent to a dispositive motion. Vogel v. U.S. Office Prods. Co., 258 F.3d 509, 515-16 (6th Cir. 2001); First Union Mortgage Corp. v. Smith, 229 F.3d 992, 997 (10th Cir. 2000); In re U.S. Healthcare, 159 F.3d 142, 145-46 (3d Cir. 1998); see Unauthorized Practice of Law Comm. v. Gordon, 979 F.2d 11, 12-13 (1st Cir. 1992) (noting split in authority among district courts, but not deciding issue because the appellant failed object to the magistrate's report); see also Quackenbush v. Allstate Ins. Co., 517 U.S. 706, 713-14 (1996) (holding that an abstention-based remand motion is "functionally indistinguishable" from a dispositive motion because it is "final decision" that puts the litigants in the case "effectively out of court"). Because a decision to remand a case to state court conclusively terminates the matter in federal court, the Constitution requires that an Article III judge exercise this type of final decision-making authority. In re U.S. Healthcare, 159 F.3d at 145; see Ocelot Oil Corp. v. Sparrow Indus., 847 F.2d 1458, 1461 (10th Cir. 1988).[3]

## ARGUMENT

This Court has jurisdiction over this case because "patent law is essential to each of th[e] theories" underlying the antitrust claims in plaintiffs' complaint. Christianson v. Colt Indus. Operating Corp., 486 U.S. 797, 810 (1988); see Rivert v. Regions Bank of La., 522 U.S. 470, 475 (1998) (stating that "'a plaintiff may not defeat removal by omitting to plead necessary federal questions'" and that "[i]f a court concludes that a plaintiff has 'artfully pleaded' claims in this fashion, it may uphold removal even though no federal question appears on the face of the plaintiff's complaint") (quoting Franchise Tax Board of Cal. v. Construction Laborers Vacation Trust for So. Cal., 463 U.S. 1, 22 (1983)). The Magistrate Judge's Order correctly concluded

---

[3] Though styled as a "Memorandum and Order," the Order is actually a report and recommendation that "recommend[s] that the Court ALLOW the Assurant Plaintiffs' Motion to Remand." Order at 20; see also id. at 10, 19.

that "plaintiffs' primary theory" for their antitrust claims involved substantial questions under federal patent law and recognized that "all of the allegations describing efforts to interfere with competition involve[] the patent questions that pose substantial federal questions." Order at 14, 18. Nevertheless, the Order incorrectly recommends that this Court grant plaintiffs' motion because plaintiffs stated an alternative theory for their antitrust claims simply by alleging that "defendants paid doctors . . . to prescribe Neurontin for off-label purposes." Id. at 12.

Defendants respectfully submit that the Magistrate Judge's conclusion here is incorrect. As defendants explained in their opposition to remand, and the Magistrate Judge apparently recognized at the hearing, any theory based on plaintiffs' antitrust claims necessarily involves substantial questions of federal patent law because these claims are grounded in the viability and scope of defendants' exclusive right to sell and market gabapentin – in other words, "patent questions that pose substantial federal questions." Defs' Mem. at 18-27; Order at 18. Additionally, plaintiffs themselves expressly disavowed at the August 2005 hearing any stand-alone, antitrust theory based on alleged payments or agreements between defendants and doctors to write off-label prescriptions of Neurontin and instead conceded that they must connect their allegations of improper marketing to some interference with the entry into the Neurontin market by generic competitors, something which the Order correctly observes that plaintiffs had failed to do. Order at 17. In the end, it is this fundamental disconnect between allegations involving off-label promotion (a consumer-protection claim) and generic competition as a whole (an antitrust claim) that led Judge Lifland to reject similar arguments in the Neurontin Antitrust MDL because "allegations concerning promotion of off-label use are qualitatively distinct" from antitrust claims "so as not to create an alternate theory of recovery for . . . claims relating to generic competition." Sall/Zafarana at 18. Based on the foregoing, and in light of the "numerous

7

practical considerations" that the Magistrate Judge himself cited in favor of exercising federal

jurisdiction over plaintiffs' case, Order at 14, defendants respectfully submit that this Court

should deny plaintiffs' remand motion.

I.     PLAINTIFFS' ANTITRUST CLAIMS NECESSARILY INVOLVE SUBSTANTIAL
ISSUES OF FEDERAL PATENT LAW BECAUSE THEY ARE INEXTRICABLY
TIED TO THE EXCLUSION OF GENERICS FROM THE MARKET FOR
GABAPENTIN, WHICH ITSELF DEPENDS ON DEFENDANTS' RIGHTS UNDER
FEDERAL PATENT LAW

Plaintiffs consigned their case to federal court when their complaint pegged all of their

antitrust claims to the *entry* of generic competitors into the market for gabapentin.  As the

Magistrate Judge recognized, Order at 14- 19, the federal nature of plaintiffs' purported,

alternative antitrust theories based on defendants' patent infringement lawsuits, id. at ¶ 45-47;

representations to the Food and Drug Administration, id. at ¶ 48-51; or improper leveraging of its

Neurontin patent, see Order at 19, are apparent on the face of the allegations themselves (to the

extent that they appeared in plaintiffs' complaint).[4]  However, by choosing to define the

"relevant product market" for their antitrust claims as "anhydrous gabapentin that is not lactam

free" – or in plain English, "Neurontin and its generic bioequivalent," id. at ¶ 31 – and by staking

their claim to defendants' alleged unlawful "prevent[ion] and eliminat[ion]" of "competition in

the market for Neurontin or generic bioequivalents of Neurontin," plaintiffs have necessarily

infused substantial issues of federal patent law into all of their antitrust claims.  "The relevant

market is a fundamental concept in antitrust analysis" and is an "essential element" of any

---

[4] Defendants respectfully note that the Order contains a mistake when it states that plaintiffs' leveraging
"theory fails to support federal jurisdiction." Order at 19.  In the preceding sentence, the Order correctly explains
that "this theory . . . depends on the allegations, already discussed, that defendants filed objectively baseless patent
litigation which allegations raise a substantial and necessary federal question." Id.  Moreover, as defendants
explained, plaintiffs' complaint does not contain any allegations related to this purported leverage theory.  See
Defs.' Mem. at 24-25.

unlawful monopolization claim.  2 J. von Kalinowski, Antitrust Laws and Trade Regulation §

24.01[1] & [3][a].  Federal jurisdiction is proper here because a court cannot decide whether

defendants have unlawfully precluded potential competitors from marketing generic versions of

gabapentin without first deciding the propriety of defendants' patents for Neurontin.

Up until the fall of 2004, defendants at all times had multiple, valid, federal patents

granting defendants the exclusive right to market Neurontin, and Neurontin alone, in the market

for gabapentin.  Neurontin was the market for gabapentin.  To the extent that plaintiffs contend

that defendants impermissibly prevented competition in *that* market, plaintiffs necessarily force a

court to address issues related to the validity, enforceability, and scope and breadth of

defendants' federal patents for the entire gabapentin market.  Thus, it is not without some irony

that plaintiffs complain that "[d]efendants *unreasonably* prevented and eliminated competition in

the market for Neurontin or generic bioequivalents of Neurontin," when defendants were granted

the exclusive right to that market by federal law, or that defendants were "*illegally* increasing

and maintaining market share and power" in the market for gabapentin, when defendants' federal

patents already granted them 100% market share and absolute power in that market.  Id. at ¶ 2

(emphasis added).  For this reason, courts have held that the ability to "raise, fix, maintain and

stabilize Neurontin prices at artificial and supracompetitive levels . . . would not in and of itself

demonstrate an unlawful monopoly if Defendants owned a valid and enforceable patent for

Neurontin, Stuart v. Pfizer, No. 02-2511-Ma/Bre, at 16 (W.D. Tenn. Oct. 1, 2002) (attached as

Exhibit C); and "'a [valid] patent holder is permitted to maintain his patent monopoly through

conduct permissible under the patent laws' and, therefore, plaintiffs were required to show that

the defendants' conduct was impermissible under the patent laws." Sall/Zafarana at 13 (citations

omitted).

In this regard, plaintiffs' purported antitrust theory based on alleged agreements to promote Neurontin for off-label uses is no different. Plaintiffs allege that "[a]s a direct and proximate cause [sic] of Defendant's Pfizer's agreements with third parties, sales of Neurontin grew dramatically and Defendant Pfizer's market share and power similarly grew." Compl. at ¶ 42; see id. at ¶ 41(C) (contending that these agreements "substantially assisted in illegally expanding, continuing, and maximizing Defendant's Pfizer's market share and power"). By the terms of its federal patents, however, Pfizer's "market share and power" in the relevant product market were already absolute, and as plaintiffs' complaint openly confesses, it would remain so unless and until generic competition was permitted. Id. at ¶ 56 ("But for Defendants' illegal acts, Plaintiffs could not encourage and/or mandate the use of generic bioequivalent of Neurontin to achieve significant savings."); see id. at ¶¶ 52-56. Unlike other cases in which plaintiffs advanced alternative theories based on allegedly improper agreements with competitors that extended or manipulated the scope of a defendant's patent, see, e.g., In re Tamoxifen Citrate Antitrust Litig., 429 F.3d 370, 384 (2d Cir. 2005), plaintiffs here have tied their antitrust claims to defendants' own conduct related to the entry of competitors into the market for gabapentin, a market which was expressly closed to generic competition unless defendants' patents were improper. Federal jurisdiction is therefore proper under Christianson here because any theory for these antitrust claims necessarily raise substantial issues related to Pfizer's exclusive rights to that market according to its federal patents.

To the extent that the Magistrate Judge's recommendation is tied to "one non-federal" antitrust "theory" based on a single allegation that "defendants paid doctors . . . to prescribe Neurontin for off-label purposes," Order at 12, that theory cannot deprive this Court of jurisdiction over the antitrust claims advanced in plaintiffs' complaint. At best, that theory

supports a wholly distinct cause of action and is not a viable theory for relief for all of plaintiffs'

antitrust claims.  See infra at II.  Indeed, the theory itself does not appear in any coherent fashion

in plaintiffs' complaint.  The reference to payments to doctors for off-label prescriptions appears

only once in plaintiffs' complaint among other allegations supporting plaintiffs' unfair trade

practices claims.  Compl. at ¶ 37(E).  The Magistrate Judge himself had to cobble together the

argument in his Order.  See Order at 12.

Moreover, the theory makes no sense in the context of the antitrust claims in plaintiffs'

complaint – which no doubt explains why plaintiffs specifically abandoned this stand-alone

theory at the August 2005 hearing.  See infra at III.  If plaintiffs contend that defendants entered

into agreements to promote Neurontin for other off-label uses – i.e., "Neurontin for pain,"

Compl. at ¶ 34 – defendants actually would have contributed to competition in other product

markets – i.e., the market for prescription medications prescribed to treat pain (and not the

relevant product market pleaded in the complaint).  Plaintiffs also do not contend that

defendants' purported payments to doctors to prescribe Neurontin for off-label uses were

exclusive or that doctors themselves were aware that the payments were in connection with any

agreement to prescribe Neurontin for off-label uses.  See id. at ¶ 37(E).  Instead, plaintiffs

suggest that doctors had no knowledge of defendants' alleged scheme by alleging that defendants

paid doctors "under the guise of consulting or speaking fees, or to participate in purported

medical studies that had little, if any, scientific value."  Id. (emphasis added).  This distinct,

unpleaded, unworkable antitrust theory cannot deprive this Court of federal jurisdiction over the

antitrust claims that appear on the face of plaintiffs' complaint and unquestionably involve

substantial issues related to defendants' patents.

II.    AS JUDGE LIFLAND CORRECTLY RECOGNIZED IN THE NEURONTIN
ANTITRUST MDL, PLAINTIFFS' OFF-LABEL PROMOTION THEORY IS NOT AN
ALTERNATIVE THEORY OF RECOVERY FOR THEIR ANTITRUST CLAIMS BUT
INSTEAD IS A DIFFERENT CLAIM ENTIRELY AND THEREFORE CANNOT
SUPPORT REMAND

A further indication that the Magistrate Judge's conclusion here is erroneous as a matter

of law is the fact that the court presiding over the <u>Neurontin Antitrust MDL</u> explicitly recognized

that any antitrust theory that is grounded in defendants' promotion of Neurontin for unapproved

uses is "qualitatively distinct" from antitrust claims "relating to generic competition" and thus

does "not . . . create an alternative theory of recovery" for those claims. <u>Sall/Zafarana</u> at 18.

Defendants respectfully submit that this Court, although not legally bound by Judge Lifland's

decision, should give substantial weight to the Neurontin Antitrust MDL judge who was assigned

to address all of the underlying patent cases as well as the antitrust complaints by the Judicial

Panel on Multidistrict Litigation and whose decision denying remand in <u>Sall/Zafarana</u> is clearly

on point.

As noted above, the antitrust claims in plaintiffs' complaint are tied to the market for

gabapentin and defendants' alleged efforts to exclude generic competition from that market. <u>See</u>

Compl. at ¶ 52-55. Indeed, plaintiffs expressly describe their alleged antitrust injury when they

explain that "[b]y interfering with or preventing a generic bioequivalent of Neurontin from

entering the market, Defendants injured Plaintiffs in their business or property by causing them

to pay more than they otherwise would have paid" for gabapentin. Compl. at ¶ 52.

As Judge Lifland recognized, however, a theory associated with off-label marketing

cannot defeat federal jurisdiction over these antitrust claims because it does not provide an

*alternative* theory for the relief plaintiffs seek in their antitrust claims. In truth, and as the

Magistrate Judge recognized at the hearing, it is plaintiffs' unfair practices claims dressed up in

antitrust law. Tr. at 14; see also Compl. at ¶ 37 (including the allegation about "payments to

doctors" – the only allegation about such payments in the complaint – as an example of one of

defendants' "various deceptive business practices"). It is a *different* theory of relief for a

*different* cause of action based on *different* factual allegations for *different* plaintiffs for *different*

damages. See Christianson, 486 U.S. at 810 (noting that plaintiffs must provide "reasons

completely unrelated to the provisions and purposes of the patent laws *why the plaintiff[s] may*

*or may not be entitled to the relief [they] seek*") (emphasis added but internal alterations and

citations omitted). Any antitrust theory based on agreements to prescribe or promote Neurontin

for off-label uses is based on factual allegations related to off-label marketing as opposed to

interference with generic competition and can only provide relief to a subset of plaintiffs (those

who paid for off-label prescriptions of Neurontin), and only for a subset of their alleged antitrust

injury (those who purchased Neurontin for off-label uses based on improper off-label

promotion). And like the claims by TPPs in the Neurontin MDL, this theory seeks relief for the

full purchase price of off-label prescriptions of Neurontin as opposed to some price differential

between Neurontin and generic gabapentin. Plaintiffs' theory cannot defeat federal jurisdiction

over their antitrust claims.

In the Order, the Magistrate Judge recognized that this purported theory based on off-

label promotion applied to only a subset of plaintiffs' antitrust claims when he noted that the

theory "might support recovery for only some, rather than all, of the Neurontin that plaintiffs

purchased" and "could support a finding of anticompetitive conduct, at least regarding off-label

Neurontin prescription." Order at 13. But the Magistrate Judge misunderstood the import of

these limitations when he found that it "does not mean the theory fails to support the unlawful

monopolization claims." Id. Christianson requires a viable, alternative, state-law theory for the

entire relief sought by plaintiffs for each one of their antitrust claims, 486 U.S. at 808-810, not a different theory that might support some distinct subset of those claims.

III.    PLAINTIFFS EXPRESSLY ABANDONED ANY STAND-ALONE, ANTITRUST THEORY BASED ON ALLEGED AGREEMENTS TO PROMOTE OR PRESCRIBE NEURONTIN FOR OFF-LABEL PURPOSES AT THE AUGUST 2005 HEARING

The Magistrate Judge's conclusion that plaintiffs advanced a non-federal theory for their antitrust claims based on alleged agreements with doctors is surprising because plaintiffs expressly abandoned this theory at the August 2005 hearing. A party abandons or waives an argument when it fails to "spell out its argument squarely and distinctly" at a hearing before a magistrate judge. Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985, 990 (1st Cir. 1988); see also Taubenfeld v. Aon Corp., 415 F.3d 597, 599 (7th Cir. 2005); Vaughn v. Mobil Oil Exploration & Producing Se., Inc., 891 F.2d 1195, 1199 (5th Cir. 1990). As the First Circuit has explained, to permit a party to "feint and weave" by pressing certain of its arguments at a hearing "would be fundamentally unfair" as it would "permit a litigant to set its case in motion before the magistrate, [and] wait to see which way the wind was blowing." Paterson-Leitch Co., 840 F.2d at 991. This is precisely what plaintiffs did here.

In their remand motion, plaintiffs advanced a total of five purported theories for their antitrust claims for which, plaintiffs claimed, the viability of defendants' patents were irrelevant. These theories included that defendants:

> (1) manipulated and delayed the acquisition of Neurontin patents;
>
> (2) engaged in "bad-faith litigation" involving its Neurontin patents;
>
> (3) "leverag[ed] its monopoly power" gained from its Neurontin patents into other product market such as Lyrica or pregabalin;
>
> (4) made "improper agreements [with] and payments to doctors to prescribe Neurontin for off-label uses; and

14

> (5) engaged in a "false, deceptive, and misleading advertising and marketing campaign" to encourage off-label prescriptions of Neurontin.

Pls.' Mem. at 17-23.

At the August 2005 hearing on plaintiffs' motion, plaintiffs did not even bother to press the first two theories and, at the direction of the Magistrate Judge, conceded that these theories "necessarily involve[] the federal question of the validity and scope of the federal patents."  Tr. at 28.  As for the third, plaintiffs argued that this theory was akin to an improper tying arrangement related to other prescription drugs, id. at 59-60, but as defendants argued, Defs.' Mem. at 24, and the Magistrate Judge ultimately recognized, plaintiffs had "not advanced this theory anywhere in the complaint."  Order at 17.

The bulk of the hearing was thus spent on plaintiffs' remaining alternative theories – the alleged agreements to prescribe or promote Neurontin off-label, and the off-label marketing of Neurontin generally.  However, as the Magistrate Judge immediately recognized – and plaintiffs themselves acknowledged – the two theories were in reality the same.

> Magistrate Judge :   So the agreement is basically the agreement through which, under the allegations, the marketing campaign was effectuated?
>
> Plaintiffs' Counsel:   Correct, your Honor.

Tr. at 12.  In light of plaintiffs' concession, the Magistrate (and defendants) then focused on this unitary, alternative theory for the remainder of the hearing and pursued the disconnect between plaintiffs' consumer-protection and anti-competition claims:

> Magistrate Judge :   You say [defendants] entered into an agreement, fair enough. . . . And through that agreement they engaged in a false marketing campaign. . . . And I . . . see how that at this stage supports the unfair – the second category of claims, the unfair – not the monopolization claims, but the other ones, the unfair and deceptive trade practices. . . .   But I don't see how that prevents a generic – that marketing campaign prevents a generic from coming out."

Tr. at 14. Indeed, the court directly asked plaintiffs if their alternative theory based on agreements or off-label marketing, standing alone, could support their antitrust claims. Here plaintiffs' specifically and directly conceded that it could not:

> Magistrate Judge :    Do you think you can win on the monopolization claims on a marketing theory alone?
>
> Plaintiffs' Counsel:    <u>On the marketing theory alone in terms of the agreement, no.</u>

<u>Id.</u> (emphasis added).

Faced with the court's analysis and in response to its questions, plaintiffs strategically decided to jettison any stand-alone theory based on agreements or off-label promotion and instead tried to conjure up a connection between defendants' marketing campaign (with or without any agreements) and some anti-competitive harm. In doing so, plaintiffs relied on either defendants' patents for new medications like Lyrica or interference with generic competitors for Neurontin. <u>Id.</u> at 14-18. These purported connections became plaintiffs' position and the focus of defendants' arguments and the Magistrate Judge's attention at the hearing.[5]

Plaintiffs expressly confirmed that they were abandoning any stand-alone alternative theory for state jurisdiction based on these agreements during their rebuttal argument. There the Magistrate Judge gave plaintiffs one last opportunity to resurrect this purported alternative theory, but plaintiffs again declined.

> Magistrate Judge :    Let me see if I have anything else to ask.
>
>                        As I understand it, your position basically is that you have two theories on the unlawful monopolization. One is the one that we talked a lot about, which is the marketing plus the decision to not seek approval for off-label, and the other is the leveraging theory, right?
>
> Plaintiffs' Counsel:    And then the agreements as well, your Honor.

---

[5] With respect to these arguments, the Magistrate Judge adopted defendants' position. Order at 17-19.

| | |
|---|---|
| Magistrate Judge: | The agreements are part of marketing, right? |
| Plaintiffs' Counsel: | Actually -- |
| Magistrate Judge: | <u>But as to the monopolization claim, the agreements are not enough</u>. |
| Plaintiffs' Counsel: | Well, because – <u>the monopolization claim, your Honor, yes, correct</u>. |

<u>Id.</u> at 59 (emphasis added).

Despite the express abandonment by plaintiffs of any stand-alone theory, and nearly one year after the oral argument, the Magistrate Judge returned to this abandoned theory in his Order as the sole basis for remanding plaintiffs' case. Order at 12; <u>see</u> <u>id.</u> at 17 n.5. Ironically, the Order here ignores any reference to the transcript of the hearing but notes that this point was "specifically argued by plaintiffs in their memo at page 21." <u>Id.</u> at 13. That the theory itself is inconsistent with the Magistrate Judge's finding that "all of the allegations describing efforts to interfere with competition involved the patent questions that pose substantial federal questions; no other harassing or interfering conduct has been alleged by plaintiffs in the complaint" also goes unmentioned. <u>Id.</u> at 18. Defendants respectfully submit that the errors here are precisely the result of plaintiffs' abandonment of this theory at the hearing. Plaintiffs failed to articulate this theory as a basis for rejecting federal jurisdiction and instead expressly disavowed the theory at the hearing in an attempt to direct the court's and defendants' attention to other arguments in support of their motion. Because it was expressly abandoned by plaintiffs, it now cannot sustain their motion for remand.

IV.    NUMEROUS PRACTICAL CONSIDERATIONS SUPPORT EXERCISING FEDERAL
       JURISDICTION OVER THIS CASE AND IT IS APPROPRIATE TO TAKE INTO
       ACCOUNT THESE CONSIDERATIONS IN DECIDING WHETHER TO EXERCISE
       JURISDICTION OVER THIS CASE

In his Order, the Magistrate Judge expressly stated that "plaintiffs' primary theory" of

relief under their antitrust claims raised substantial issues under federal law and (apparently with

hint of regret) noted that "numerous practical considerations" favored exercising federal

jurisdiction over this case. Id. at 14-19. Defendants respectfully submit that the Magistrate

Judge did not properly weigh the relevance of these factors in his Order and that these factors

themselves weigh in favor of exercising federal jurisdiction over this case.

The most venerable treatise on federal practice and procedure candidly states that the law

governing federal question jurisdiction is "neither analytical nor logical" and that "in the unusual

case in which there is a debatable issue about federal question jurisdiction, pragmatic

considerations must be taken into account" in deciding whether federal jurisdiction is

appropriate. 13B Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Fed. Prac. & Proc.

§ 3562 at 47 (1984). Following Wright & Miller's cue, federal courts have chosen to consider

practical considerations in deciding whether to exercise jurisdiction. See, e.g., Johnson v. Smith,

630 F. Supp. 1, 3 (D. Cal. 1986) ("Although such practical considerations should not take on a

life of their own, they may contribute to an understanding of Congress' intent in enacting § 1331,

by providing the backdrop of the coordinate state and federal court systems in which § 1331 was

designed to operate"); see also Gully v. First Nat'l Bank, 299 U.S. 109, 117 (1936) (Cardozo, J.)

("To define broadly and in the abstract 'a case arising under the Constitution or laws of the

United States' has hazards of a kindred order. What is needed is something of that common-

sense accommodation of judgment to kaleidoscopic situations which characterizes the law in its

18

treatment of problems of causation."); Stone & Webster Engineering Corp. v. Ilsley, 690 F.2d

323, 328 (2d Cir. 1982) (recognizing "pragmatic considerations make it eminently logical and

sensible that the forum for such a dispute be the federal district court"); Kenneth Lee Marshall,

Understanding Merrell Dow: Federal Question Jurisdiction For State-Federal Question

Jurisdiction For State-Federal Hybrid Cases, 77 WASH. U. L. Q. 219, 245 (1999).  In such cases,

courts have considered practical factors like "caseload," whether federal law provid[es] the rule

of decision," and whether there is a "necessity for an expert and sympathetic federal

jurisdiction."  Coral Gables Federal Sav. & Loan Assoc. v. Harbert, 527 F. Supp. 284, 289 (D.

Fla. 1981); see also William Cohen, The Broken Compass: The Requirement That a Case Arise

"Directly" Under Federal Law, 115 U. PA. L. REV. 890, 916 (1967).

     Here, practical considerations overwhelmingly favor exercising jurisdiction over this case

and denying plaintiffs' motion.  Most importantly, retaining federal jurisdiction over this case

will not affect the Court's caseload in any respect and will actually promote efficiency and

judicial economy.  This case is now part of the Neurontin MDL, the goal of which is to provide

for "the convenience of parties and witnesses" and "to promote the just and efficient conduct of

such actions" involving "one or more common issues of fact."  28 U.S.C. § 1407; see also In re

Ivy, 901 F.2d 7, 9 (2d Cir. 1990).  Moreover, even plaintiffs admit that their principal theory for

their antitrust claims involve substantial issues under federal patent law.  Order at 14.  Title 28

U.S.C. § 1338 grants original jurisdiction to federal district courts to hear cases arising under and

Act of Congress relating to patents.  As the Magistrate Judge noted, "Congress has expressed

substantial interest in providing a federal forum for these types of federal questions" and

"exercise of federal jurisdiction is consistent with Congressional judgments."  Order at 16.  By

enacting § 1338, Congress specifically invested federal courts with authority to serve as the

expert tribunal for issues of patent law.  See Stanley Works v. Globemaster, Inc., 400 F. Supp. 1325, 1329 (D. Mass. 1975).  Additionally, the Magistrate Judge recognized that "[r]esolution of these complex federal question necessarily lies at the heart of [the primary] theory of recovery" and that "[t]he legality of the defendants' interactions with the FDA also implicates important federal interests."  Order at 16.  The resulting necessity for an expert federal tribunal to handle issues of federal law is a significant factor in favor of federal jurisdiction here.  See Greenberg v. Bear, Stearns & Co., 220 F.3d 22, 27 (2d Cir. 2000) (finding federal jurisdiction where the process the court must undertake "so immerses the federal court in questions of federal law and their proper application that federal question subject matter jurisdiction is present").  Finally, the presence of an ongoing Neurontin Antitrust MDL, which encompasses the previous New Jersey state court complaint alleging the same antitrust claims involving Neurontin, makes plaintiffs' antitrust claims particularly appropriate for federal jurisdiction.  All of these practical considerations weigh overwhelmingly in favor of this Court exercising jurisdiction over plaintiffs' case.

## CONCLUSION

For all of the foregoing reasons, and for the reasons stated in defendants' opposition to plaintiffs' motion, defendants respectfully request that plaintiffs' remand motion be denied.

Dated: August 18, 2006

20

DAVIS POLK & WARDWELL

By:    /s/ James P. Rouhandeh
      James P. Rouhandeh
      Carter H. Burwell
450 Lexington Avenue
New York, New York 10017
(212) 450-4000

- and -

HARE & CHAFFIN

By:    /s/ David B. Chaffin
      David B. Chaffin

160 Federal Street
Boston, Massachusetts 02110
(617) 330-5000

*Attorneys for Defendants Pfizer Inc. and*
*Warner-Lambert Company*

## CERTIFICATE OF SERVICE

     I hereby certify that this document has been served pursuant to Case Management Order No. 3.

/s/David B. Chaffin