EXHIBIT A

1              UNITED STATES DISTRICT COURT
               DISTRICT OF MASSACHUSETTS
2

3

4    * * * * * * * * * * * * * * * * *
     *In Re: NEURONTIN MARKETING and      *
5     SALES PRACTICES LITIGATION          *
                                          *    MDL DOCKET No. 1629
6                                         *    Civil Action
                                          *    No. 04-10981-PBS
7    * * * * * * * * * * * * * * * * *

8

9

10

11

12           BEFORE THE HONORABLE LEO T. SOROKIN
              UNITED STATES MAGISTRATE JUDGE
13                      HEARING
                   August 18, 2005
14

15

16

17

18

19                              Courtroom No. 14
                                1 Courthouse Way
20                              Boston, Massachusetts 02109

21

22

23              JAMES P. GIBBONS, RPR/RMR
                  Official Court Reporter
24            1 Courthouse Way, Suite 7205
              Boston, Massachusetts  02210
25                  (617) 428-0402

1    APPEARANCES:

2

3          GREENE & HOFFMAN, PC, (By Thomas M. Greene, Esq.)
     125 Summer Street, Boston, Massachusetts  02110, on
     behalf of Plaintiffs

4

5          ROBINS, KAPLAN, MILLER & CIRESI, LLP, (By Annamarie
     A. Daley, Esq.) 2800 LaSalle Plaza, 800 LaSalle Avenue,
     Minneapolis, Minnesota 55401-2015, on behalf of Assurant

6    Health, Inc., et al

7

8          HALE & CHAFFIN, (By David B. Chaffin, Esq.) 160
     Federal Street, Boston, Massachusetts  02110, on behalf

9    of Pfizer, Inc./Warner-Lambert Company

10         DAVIS POLK & WARDELL, (By James Rouhandeh, Esq.)
     450 Lexington Avenue, New York, New York  10017, on

11   behalf of Pfizer, Inc./Warner-Lambert Company

12         DAVIS & GILBERT, LLP, (By Scott Walker, Esq.) 1740
     Broadway, New York, New York  10019, on behalf of

13   Cline, Davis & Mann

14         HANNIFY & KING, (By Daniel J. Dwyer, Esq.) One
     Beacon Street, Boston, Massachusetts 02108, on behalf of

15   Anthony Wild and Lodewijk de Vink

16         BONSIGNORE & BREWER, (By Robert J. Bonsignore,
     Esq.) 23 Forest Street, Medford, Massachusetts

17   02155-3820, on behalf of the Allen Plaintiffs

18

19

20

21

22              JAMES P. GIBBONS, RPR/RMR
                 Official Court Reporter

23            1 Courthouse Way, Suite 7205
              Boston, Massachusetts  02210

24                 (617) 428-0402

25

```
 1                    P R O C E E D I N G S

 2              THE CLERK:  The case of In re: Neurontin,

 3    Civil Action 04-10981 will now be heard before this Court.

 4              Will counsel please identify themselves for the

 5    record.

 6              MR. GREENE:  Good afternoon, your Honor.

 7    Thomas Greene on behalf of the class plaintiffs.

 8              THE COURT:  Good afternoon, Mr. Greene.

 9              MS. DALEY:  Good afternoon, your Honor.

10    Annamarie Daley for the Assurant plaintiffs.

11              THE COURT:  Good afternoon, Ms. Daley.

12              MS. DALEY:  Thank you.

13              MR. ROUHANDEH:  Good afternoon, your Honor.

14    James Rouhandeh, Davis Polk & Wardwell, for the defendants.

15              THE COURT:  All right.

16              MR. CHAFFIN:  Good afternoon, your Honor.

17    David Chaffin from Hare & Chaffin for the defendants.

18              THE COURT:  Good afternoon, Mr. Chaffin.

19              MR. WALKER:  Good afternoon, your Honor.

20    Scott Walker of Davis & Gilbert for Cline, Davis & Mann.

21              THE COURT:  Good afternoon, Mr. Walker.

22              MR. DWYER:  Good afternoon, your Honor.

23    Daniel Dwyer from Hanify & King, for individual defendants

24    Wild and de Vink in the Assurant matter.

25              THE COURT:  Good afternoon, Mr. Dwyer.
```

1          So I am clear, I think I have sorted the two sets

2     of papers, with the motion to remand papers that were filed

3     in New Jersey but then found their way here eventually, and

4     then sort of a suggestion for remand, basically.

5          Ms. Daley, I guess this is your motion, right?

6          Basically there is one question here, one motion,

7     which is remand or not, or is the suggestion something else,

8     some other alternative?  I know there is sort of seeking

9     alternative relief but, first, you want to get remanded,

10    right?

11         MS. DALEY:  Correct, your Honor.

12         THE COURT:  And if you don't get remanded, is

13    there something else you want, other than staying in our

14    fine place?

15         MS. DALEY:  I would love to stay here if I

16    don't get remanded, but it seems as if everyone doesn't want

17    us here, at least doesn't want our case here.  So that's why

18    we have a proposal, an alternative suggestion, back to the

19    JP to remand us back to the New Jersey Federal Court from

20    whence we came.

21         THE COURT:  So you want to first be remanded

22    to New Jersey State Court?

23         MS. DALEY:  Yes.

24         THE COURT:  And if you're not sent to the New

25    Jersey State Court, then what you want is to go by way of

1    the Multidistrict Committee back to the other Neurontin --

2    go to the other Neurontin multidistrict cases?

3                    MS. DALEY:  Not to the other Neurontin

4    multidistrict cases, but to the New Jersey Federal District

5    Court from which we came.

6                    THE COURT:  Originally.

7           Just to be transferred.  If your case doesn't fit

8    here, send you to there?

9                    MS. DALEY:  Right.

10                    THE COURT:  Okay.

11          And then the third alternative would be simply to

12   stay here.

13                    MS. DALEY:  Correct.

14                    THE COURT:  The papers you filed here in May,

15   is there any -- that's just sort of advising the Court

16   basically, Hey, our motion is still pending and it's alive

17   and we want to be heard and a further briefing on it?

18                    MS. DALEY:  Correct.

19                    THE COURT:  It's not like some other motion --

20                    MS. DALEY:  No.

21                    THE COURT:  I wanted to make sure, because the

22   papers seem quite similar for both sides between those two

23   filings, and I wanted to make sure there wasn't some other

24   relief you were seeking.

25                    MS. DALEY:  There is not, your Honor.

1                    **THE COURT:**  Okay.

2           I'll hear you.

3                    **MS. DALEY:**  Thank you, your Honor.

4                    **THE COURT:**  I should tell you at the outset,

5    and this, I suppose, applies to everybody else, too, there

6    seems to be two general issues.  One is procedural and one

7    is substantive.

8           As to the procedural issue, I'll hear you if you

9    have something you want to say, but I will tell you,

10   Ms. Daley, that I'm not persuaded, based on the state of the

11   record, it seems to me that in the face of the affidavit

12   from, I think it's Attorney Placey, in which he states not

13   only the circumstances under which he filed the notice of

14   removal on January 5th with these date-stamped copies, but,

15   in addition, states under the pains and penalties of perjury

16   that no other -- that nothing else further was filed

17   pertaining to the notice of removal thereafter; that in the

18   face of that, it seems to me I would conclude that unless

19   you can tell me something more or something otherwise, it

20   seems to me that that pretty clearly establishes that they

21   filed it on January 5th, and while notwithstanding the

22   Court's docket, you suggest it indicates that the complaint

23   was filed on the 11th or the 10th, untimely in a sense, that

24   it was filed on the 5th, and whatever that date issue is, is

25   just a mistake in the Clerk's office.  In light of the two

1    parts of his affidavit, there's no other factual evidence as

2    to the date of filing.

3           So I'm not -- basically, what I am telling you is

4    that tentatively my view is they've won on that issue.  If

5    you've got something more, I'll hear you about it, but I

6    think that pretty much resolves that issue, and that leaves

7    the question of the signature of the two lawyers.  But

8    unless you've got something really good on that, that just

9    strikes me that they filed something from lawyers who had,

10   based on the record before me, some form of representation

11   of those parties.  And albeit they may not have been lawyers

12   of record admitted to the bar of the Federal Court in New

13   Jersey, but the question on that point is, Did they consent,

14   and is the consent manifested in a form other than a

15   representation from the lawyer of the moving party, and it

16   was.  There is no question, there is no dispute, that they

17   did consent.  It's not as if now they're saying, Hey, wait,

18   we didn't do it, we didn't consent.

19          So I'd be inclined to reject your motion on that

20   and proceed to the merits.

21          If you've got something more on that, tell me, but

22   I'll just tell you that's my tentative thinking about it so

23   you know.

24          **MS. DALEY:**  I understand, your Honor.

25          The two issues there, we had received first

1    information from the Clerk's Office saying it wasn't, and

2    then we received Mr. Placey's affidavit.

3              THE COURT:  I understand why you made the

4    argument, and that's fine; but I'm more telling you you

5    don't need to spend any time, unless you think you've got

6    something that is going to persuade me otherwise.

7              MS. DALEY:  The only other reason, and this

8    will go to the substantive issue as well, that the removal

9    statute requirements are to be strictly construed and any

10   doubts are to be resolved against removal.  And that is not

11   only Supreme Court law, First Circuit law, and Judge Saris

12   would honor that when she decided in the Montana v. Abbott

13   case that an attempt to cure against a late-filed consent by

14   all defendants to the removal was insufficient and found no

15   federal jurisdiction.

16             THE COURT:  What was the -- in that case, that

17   would go to the signature question of the other two lawyers.

18             MS. DALEY:  Right.

19             THE COURT:  What was the issue in Montana v.

20   Abbott on that point?

21             MS. DALEY:  Montana v. Abbott there was no

22   filing at all within the time restrictions.  There was a

23   filing by remaining defendants who wanted to join in the

24   removal after the 30-day deadline, and I will concede, your

25   Honor, that in this case there was a paper filed by some of

1    the other defendants on January 5th.  Our point certainly

2    was, as you have indicated, whether or not it complied with

3    the local rules regarding only filings could be done by

4    lawyers --

5                    THE COURT:  Was there a lawyer of record?  Had

6    a lawyer made an appearance on behalf of those defendants at

7    that time?

8                    MS. DALEY:  No, your Honor.

9            And, actually, it was our belief that they

10    acknowledged their own problem when Mr. Placey himself

11    subsequently filed a consent to the removal -- or a joinder

12    to the removal, on behalf of the other defendants, Cline,

13    Davis, the individual defendants, about ten days after the

14    January 5th deadline.

15                    THE COURT:  Well, that shows that they

16    recognized that if at least you had had an argument, that

17    they were going to do everything in their power to mitigate,

18    but I don't know that I could infer -- I mean, I infer from

19    that they realized that there was at least a theoretical

20    issue, maybe more, but at least a theoretical issue, and

21    that they were going to do everything to remedy it.

22            I don't know that I can infer from that an

23    admission that there was a jurisdictional defect in the

24    filing, because they might just be trying to -- you know,

25    they are entitled to attempt to protect the record while not

1   conceding that they necessarily did anything wrong.

2             **MS. DALEY:**  I understand that, your Honor.

3   Again, these were the arguments we made given the fact --

4             **THE COURT:**  I understand that.

5        Why don't you go to the other arguments.

6             **MS. DALEY:**  Let me move on to the substantive

7   issues, because we really -- I come before you with what I

8   consider to be a rare situation.

9        I have two Supreme Court cases virtually on point

10  which say that there should be no federal jurisdiction in

11  this case.

12            **THE COURT:**  Which two?

13            **MS. DALEY:**  The Christianson v. Colt and the

14  Merrell Dow cases, your Honor.

15       In this case, it's clear that my clients have only

16  state law claims.  We have not asserted one federal claim in

17  this case, and there are a number of different theories that

18  support those different claims.

19            **THE COURT:**  Let me ask you this.

20       It seems like in your complaint that there are two

21  categories of claims.  One are the ones labeled "unlawful

22  restraint" or "unlawful monopolization," which are one to

23  twenty-four, I think, and the second category are the unfair

24  and deceptive trade practices.

25       It seems like they divide into roughly two

1    categories of claims.  Is that fair?

2                    MS. DALEY:  And the unjust enrichment, which

3    may arise from either type of --

4                    THE COURT:  So then there's a third category

5    which is one claim, right, which is the unjust enrichment.

6                    MS. DALEY:  And the issue there, your Honor,

7    is that the conduct which gives rise to either the

8    anticompetitive claims, Section 1 and Section 2 claims under

9    various state causes of action, or the conduct which gives

10   rise to the unlawful or unfair and deceptive trade practices

11   or consumer fraud, can be the same.  And contrary to what

12   Pfizer has attempted to do by parsing out the conduct and

13   saying only allegations regarding patents can give rise to

14   the anticompetitive --

15                   THE COURT:  What's the theory of liability you

16   could win on in the first set of claims that wouldn't

17   involved a federal question?

18                   MS. DALEY:  Well, first of all, it has to do

19   with the additional defendants who are represented in this

20   courtroom, and that has to do with the anticompetitive

21   agreement we've alleged exists between -- existed between

22   the defendants to engage in this restraint of trade, and

23   that is including the deceptive and false advertising

24   campaign that they engaged in, your Honor.

25                   THE COURT:  That anticompetitive agreement, is

1    that just between the defendants, as in the Pfizer

2    defendants that Mr. Rouhandeh represents, and the Cline,

3    Davis Marketing firm of Mr. Walker, and the two individual

4    defendants that Mr. Dwyer represents?  Is the agreement just

5    them, or does the agreement also encompass other actors who

6    aren't defendants?

7                    MS. DALEY:  It could and, in reality, we have

8    allegations that include the unnamed doctors and medical

9    liaisons as well, and those are alleged in numerous places,

10   including Paragraphs 38, 39 and 42 of the complaint, your

11   Honor.

12                   THE COURT:  Thirty-eight and 39, among other

13   places?

14                   MS. DALEY:  Forty-two and other places, your

15   Honor.

16                   THE COURT:  So that agreement is basically the

17   agreement through which, under the allegations, the

18   marketing campaign was effectuated?

19                   MS. DALEY:  Correct, your Honor.

20                   THE COURT:  How does the marketing campaign,

21   assuming that -- how does the marketing campaign restrain

22   the entry of the generic equivalents?

23                   MS. DALEY:  Well, in several different ways,

24   your Honor.

25              In this situation, one of the efforts that we

1    believe Pfizer engaged in was an attempt to increase the

2    demand for Neurontin without going to the FDA and getting

3    FDA approval, and that's the whole off-label marketing

4    scheme.

5          Additionally, it was through that false

6    information, saying that Neurontin was safe and effective

7    for various uses and getting that information out to doctors

8    who would then prescribe Neurontin, that also led to an

9    increased demand for Neurontin in a situation where generics

10   to Neurontin would not be able to use the ANDA procedure in

11   order to get quick approval from the FDA.

12          Again, no generics of Neurontin could come out

13   until the ANDAs has been approved?

14              THE COURT:  But here's what I'm -- there's a

15   step maybe I am just missing here.

16          You say they entered into an agreement, fair

17   enough.  That's the allegation in the complaint.  And

18   through that agreement they engaged in a false marketing

19   campaign, and they represented the drug to work for various

20   things, which allegedly it didn't work for, and they allege

21   that it was really good and safe, or what have you.  And I

22   follow that out to see how that at this stage supports the

23   unfair -- the second category of claims, the unfair -- not

24   the monopolization claims, but the other ones, the unfair

25   and deceptive trade practices.

1       And I see how that could lead to higher prices or

2   induce people to purchase who wouldn't otherwise purchase

3   it, and the like, but I don't see how that prevents a

4   generic -- that marketing campaign prevents a generic from

5   coming out.  It does what you say.  It potentially jacks up

6   the demand.  But the way I read defendants' argument is that

7   you need to prove the restraint of the generics from coming

8   into the marketplace, and you're going to be touching upon

9   what they say are substantial federal questions.  And what

10  I'm wondering is how do you either prevail on your unfair

11  monopolization claims without the patent questions, or why

12  aren't the patent questions substantial, because that theory

13  that you've just illuminated, do you think you can win on

14  the monopolization claims on a marketing theory alone?

15          **MS. DALEY:**  On the marketing theory alone in

16  terms of the agreement, no.

17          On the other hand, your Honor, both Paragraph 33

18  and Paragraph 34 of our complaint -- one of the other

19  theories we have that underlies the monopolization claim is

20  that Pfizer was attempting through this false and deceptive

21  marketing campaign to increase the demand for Neurontin and

22  then to be able to transfer that demand for Neurontin to its

23  new product it was working on, which we now know as

24  Prelyrica [sic].

25          **THE COURT:**  How do you spell that?

1      **MS. DALEY:**  Prelyrica is not mentioned -- I

2    think it's spelled P-R-E-L-Y-R-I-C-A.

3          And while Paragraph 33 does not specifically

4    identify Prelyrica by name, it does mention that -- it does

5    allege that Pfizer was attempting to increase demand through

6    this false and deceptive marketing campaign for purposes of

7    expanding its market share into Prelyrica, which has now

8    come out and which has FDA approval, and which the generics

9    were not able to, because of their failure -- because of

10   Pfizer's failure to file for FDA approval on those other

11   uses, ANDAs could not be filed for those other uses for

12   Neurontin --

13         **THE COURT:**  Just explain that so I understand

14   a little more clearly.

15         How does the scheme to say that Neurontin works for

16   various off-label uses or that it's particularly useful for

17   them, and the like, enable them to leverage -- to prevent

18   the generics from getting into the market that Prelyrica is

19   coming in.

20         **MS. DALEY:**  This goes back -- this does not

21   depend upon the resolution of this federal question, but it

22   goes back to how generics get approval for their drugs.

23         And in this situation, like in every situation,

24   generics can get approval through an ANDA -- and you've

25   heard about ANDAs more often then you care to hear about,

1    I'm sure, in connection with this case -- but the generics

2    weren't able to submit ANDAs because Pfizer intentionally

3    decided not to seek FDA approval for these other uses for

4    Neurontin.  And so they were able to leverage then the

5    demand that they had developed in the Neurontin market, and

6    then for the purpose of transferring and leveraging that

7    demand, those patients, into its new drug it was developing,

8    the Prelyrica drug, and that's the leveraging theory again.

9                THE COURT:  Say that I again.  I am not sure I

10   follow it.

11               MS. DALEY:  Sure.

12          In this situation, let's just say Pfizer had gone

13   to the FDA when it was thinking about using Neurontin for --

14               THE COURT:  Off-label purposes.

15               MS. DALEY:  -- off-label purposes and asked

16   the FDA for approval.  If it had done that, then it would

17   have been able -- the generics would have been able to file

18   ANDAs based upon the new drug application.

19               THE COURT:  Because the generics can only file

20   an ANDA with respect to a use that's been approved by the

21   FDA?

22               MS. DALEY:  Right.

23          And that's one of the reasons why Pfizer decided to

24   engage in this off-label campaign rather than going to the

25   FDA and obtaining approval.

```
 1              Now, again, that doesn't rely upon the resolution

 2      of a federal question.  That goes to the intent of Pfizer

 3      and why it was deciding to engage in this off-label

 4      marketing campaign, and there is no resolution of a federal

 5      question there at all.

 6              But that way then they were able the keep the

 7      generics out of the Neurontin marketplace for these other

 8      uses, and then also to leverage that increased demand into

 9      the demand for their new product, the Prelyrica product,

10      which has just come onto the market in the last year or so,

11      your Honor.

12              THE COURT:  But at that point in time, they

13      had a patent on Neurontin, right?

14              MS. DALEY:  Well, the patent on Neurontin

15      expired in 2000.

16              THE COURT:  So with respect to the period

17      before 2000, they had a patent, and whether or not they had

18      filed for these uses, the generics couldn't get in the

19      market at that point, right?

20              MS. DALEY:  Well, there was a patent that

21      expired, if I recall correctly, also in 1998.  So just --

22      there are a number of different patents in connection with

23      this, and it's our belief one the generics could have come

24      on the market as early as 1998.

25              THE COURT:  I see.
```

1          MS. DALEY:  So that's the point --

2          THE COURT:  So the theory is the off-marketing

3     campaign was sort of augmented by the intentional decision

4     on the part of the defendant not to seek off-label approval,

5     or not to seek FDA approval, for other uses in order to

6     prevent a generic from filing -- making the appropriate

7     filings to sell.  They had to make those filings even after

8     the patent has expired, or is it something they can do

9     whenever they want?

10          MS. DALEY:  It's my understanding, your Honor,

11     that they can.

12          THE COURT:  They have to file because it's

13     FDA-approved.  They can't sell it for another use.

14          MS. DALEY:  It has nothing to do with the

15     patent, your Honor.  It has to do with the FDA approval.

16          THE COURT:  Go ahead.

17          MS. DALEY:  On that theory alone, where there

18     is no resolution -- no necessary resolution of a federal

19     question, that we would not have federal question

20     jurisdiction here, your Honor.

21          THE COURT:  The theory being they could never

22     get into the off-label market because they can't get into

23     that market unless defendants filed with the FDA for

24     approval to use Neurontin in the off-label market, because

25     otherwise whatever generic they have is only going to be

1    authorized for whatever Neurontin is authorized for.

2             **MS. DALEY:**  Well, the theory is, really, they

3    decided not to go for FDA approval for the purpose of

4    keeping the generics out of the market.

5             **THE COURT:**  Right, and the way it keeps them

6    out is because they can only get into whatever market

7    Neurontin is in.

8             **MS. DALEY:**  Right, if they wanted FDA

9    approval.  They didn't want to violate the off-label

10   marketing --

11            **THE COURT:**  I understand.

12            **MS. DALEY:**  I mean, otherwise you would have

13   everybody violating the off-label rules that were out there,

14   your Honor.

15            **THE COURT:**  Okay.

16            **MS. DALEY:**  Additionally, your Honor, I think

17   if you read the Merrell Dow case, and which the Supreme

18   Court just recently affirmed again in the Grable decision we

19   filed yesterday, it is very clear that the defendants'

20   arguments about the -- their arguments that there should be

21   federal jurisdiction because we have made allegations

22   regarding FDA labeling requirements is insufficient for

23   federal jurisdiction.  The Grable court affirmed the whole

24   Merrell Dow analysis there.

25            And if you look at Christianson Colt, as well, your

1    Honor -- in <u>Christianson Colt</u>, the -- in that case,

2    actually, the Supreme Court was looking at the whole issue

3    of federal question jurisdiction after the resolution had

4    already been reached, and the plaintiffs in that case, or at

5    least the prevailing parties, had prevailed on a patent

6    theory.  And the U.S. Supreme Court still said that there

7    wasn't federal jurisdiction because there was at least one

8    theory upon which they could have prevailed, if you looked

9    at the well-pleaded complaint, even though the case was

10    tried as a patent case.

11           And the Supreme Court even went so far as to talk

12    about the fact that even if you assumed that the invalidity

13    defense was an essential element, the invalidity -- proving

14    the patent was invalid was an essential element of their

15    monopolization claim, there still wasn't federal

16    jurisdiction.

17                    **THE COURT:**  Because it was an alternative

18    theory.

19                    **MS. DALEY:**  Right, your Honor.

20           So the defendants in this case talk a lot about the

21    patents, and we plead the patents.  There is no question

22    about that.  We don't have to prove that the patents are

23    invalid and infringed.  That would not be necessary for us

24    to prevail on those issues.  But you have to look at all of

25    our theories that are available.

1          And, also, your Honor, I do want to point out,

2     because each of those causes of actions, and we've gone

3     through and alleged state by state because we have a number

4     of different plaintiffs, each of those counts, as is

5     typical, incorporates everything that we said before.  And

6     so what is important is you just can't be limited at looking

7     at the allegations that are in those specific counts, but,

8     in particular, you have to look at all the facts that --

9               THE COURT:  I understand that.

10              MS. DALEY:  -- we've alleged in 29 through 58.

11              THE COURT:  The way I understood the complaint

12    is there's basically a set of facts, and then there is

13    however many legal causes of action which, as best I can

14    tell, divide into three categories; and I think for at least

15    these purposes, each category is pretty much the same.  I

16    don't need to analyze all of the different causes of action

17    within each category, and they need to establish one cause

18    of action in which all theories under that cause of action

19    have a substantial federal question, and, if so, they win,

20    and if they don't --

21              MS. DALEY:  That's right.

22              THE COURT:  -- you win.

23              MS. DALEY:  They have the burden of proof.  It

24    is their burden to prove that federal jurisdiction is

25    appropriate, and Judge Saris cited Federal Circuit law in

1    her Montana decision as well.

2         You know, your Honor, one other issue I want to

3    point out, and I think this has to do with where the

4    defendants really -- how strong the defendants really think

5    their opposition is.

6         We filed a protective -- we signed the protective

7    order in this case back in either March or April.

8              THE COURT:  What's the protective order?

9              MS. DALEY:  Governing the exchange of

10   confidential documents.

11             THE COURT:  Okay.

12             MS. DALEY:  The defendants have routinely and

13   consistently refused to let us see any of the confidential

14   standard documents in this case, even though they're the

15   ones who made us a part of this case and even though we're

16   here, although we still think we shouldn't be here.  And

17   ultimately we're going to be litigating this, whether it's

18   here or New Jersey State Court or New Jersey Federal Court.

19   So we think it goes to just how strongly they really think

20   their argument is, because they have continually refused to

21   let us see those documents.

22        I do want to point out one other issue, and that

23   the defendants rely upon Judge Lifland's decision in his

24   case, and our complaint is different than the complaints

25   before Judge Lifland.

1         We have the off-labeling -- I shouldn't say

2    "off-labeling" -- all the false and misleading advertising

3    and marketing campaign allegations in our complaint, your

4    Honor.  Those complaints were filed years ago, and they were

5    strictly relying upon the patent claims; and we believe it

6    is for that reason that Judge Lifland issued the decision he

7    issued.

8         Most importantly, your Honor, we did not get to

9    decide which MDL we should be sent to.  The defendants

10   themselves decided that our case and our complaint was more

11   like the allegations in the MDL which had been set up here

12   in Boston, the sales and marketing allegations.  The

13   defendants chose to notify the JPML that this was the MDL

14   that they thought we should belong to, and I think their

15   attempt after the fact to suggest that Judge Lifland's

16   decision governs our complaint is not well taken.  It's

17   contrary to their original analysis of the allegations in

18   our complaint.

19        We believe that we should be remanded to New Jersey

20   State Court.

21        If you would like me to address the JPML suggestion

22   right now, I can.

23             **THE COURT:**  To send it to New Jersey's Federal

24   District Court?

25             **MS. DALEY:**  Right.

```
 1              THE COURT:  All right.
 2           So you're saying if I don't agree with you, and I'm
 3    not going to allow the motion to remand, then why should you
 4    go there instead of here?
 5              MS. DALEY:  Do you want me to address that
 6    right now?
 7              THE COURT:  Yes.
 8              MS. DALEY:  All right.
 9           Here's the reason why we made this suggestion, your
10    Honor.  When we had our first hearing before Judge Saris,
11    she suggested that our case was -- our antitrust claims, in
12    particular, were different than the rest of the antitrust --
13    were different from the rest of the claims that existed in
14    this MDL, and asked us to either sever or state our
15    antitrust claims.
16           Well, frankly, your Honor, if we're litigating, we
17    need to litigate our entire case, and our clients are
18    interested in pursuing everything, and they certainly
19    weren't interested in litigating in two fora as well.  So
20    that is why we scratched our heads and finally came up with
21    the idea, nobody wants us and our claims here in this Court,
22    then maybe we should just go back to the federal New Jersey
23    court that originally had this case.
24              THE COURT:  So that's basically just an
25    argument that your claims don't fit here and that there's
```

1    not sufficient commonality to warrant, for efficiency

2    purposes, having you here.

3                    MS. DALEY:  Right.

4                    THE COURT:  And if you're going to be in

5    federal court, you would rather be all by yourselves and do

6    your own bidding and then just be in the New Jersey Federal

7    District Court.

8                    MS. DALEY:  Right, but otherwise there really

9    are due process concerns, your Honor, if we don't have a

10   chance to litigate the case and the claims that our clients

11   believe they have.

12                   THE COURT:  Let me just come back to the

13   theories.

14       One theory that you say doesn't involve any federal

15   question is the sales and marketing agreement with the sales

16   and marketing campaign, coupled with an intentional decision

17   not to seek approval for off-label uses from the FDA in

18   order for the purpose of keeping the generics out of the

19   Neurontin marketplace.  So, building the demand while

20   declining to seek approval so that they stay out.

21                   MS. DALEY:  Right.

22                   THE COURT:  And you say you can win on that,

23   basically on those facts, on all the theories in the

24   complaint, I take it, or all the causes of action.

25                   MS. DALEY:  That was more focussed to the

1     anticompetitive, because it was --

2              THE COURT:  All right.

3         So that -- you say you would prevail on the

4     anticompetitive.  So that's one theory you say you have that

5     has no federal question.

6         Do you have any other theories that you say don't

7     involve any federal question?

8              MS. DALEY:  With respect to the

9     anticompetitive or with --

10             THE COURT:  First to the anticompetitive

11             MS. DALEY:  Okay.

12        There's a consumer fraud in the anticompetitive.

13    If they make false statements; they make false statements.

14    I don't care whether they violate a federal statute, a

15    federal standard.  If they knew that Neurontin wasn't safe

16    for restless leg syndrome, and they --

17             THE COURT:  I understand that.  On the

18    consumer fraud, your theory, or at least one of your

19    theories, is they went out and misrepresented its safety for

20    uses for which they advertised and uses which had no FDA

21    approval, the FDA wasn't involved in, and that's

22    misrepresentation, deceptive consumer fraud.

23             MS. DALEY:  It doesn't matter whether the FDA

24    had any approval.  If they knew at the time they were

25    telling people that it was not safe and effective, that's a

1    falsehood.  And that's, you know, your state tort law kind

2    of claims that -- you know, it doesn't matter.

3                THE COURT:  There's no federal question.

4                MS. DALEY:  There's no federal question.  A

5    lie is a lie.  You don't need a resolution of a federal

6    question to decide if someone's telling the truth or not.

7            And with respect to the anticompetitive conduct

8    then, if the defendants here engaged in this false campaign

9    for the purpose of increasing -- for the purpose of

10   increasing demand, restraining trade, then we would also

11   argue that we should have an anti-Sherman I or Sherman II

12   claim as well.  But the mere fact that they were out to

13   restrain trade by saying Neurontin was false -- or, excuse

14   me, Neurontin was safe and effective for various uses, and

15   they knew those statements were false, if that was done for

16   the purpose of restraining trade, then that would also be an

17   anticompetitive violation.

18                THE COURT:  All right.

19                MS. DALEY:  We have a pretty good -- not

20   pretty good, an amazing example of that.  If you look at the

21   quote that's contained in Paragraph 34.  "Go out and sell

22   Neurontin."

23                THE COURT:  You like that quote.

24                MS. DALEY:  Yes, yes.

25                THE COURT:  What's the date on that quote?

1          **MS. DALEY:**  You know, your Honor, I'm not sure

2    of the exact date, but I bet Mr. Greene would know.

3          **THE COURT:**  I'm just curious.  Do you know?

4          **MR. GREENE:**  Your Honor, I would say it was

5    1996, spring time-frame.

6          **THE COURT:**  Okay.

7      Go ahead.

8          **MS. DALEY:**  That's it, your Honor.

9          **THE COURT:**  So to the extent that ¬r so are

10    you not -- this whole sham patent litigation, I mean, there

11    is the allegation in the complaint that the defendants used

12    the legal regulatory system to restrain the generics, and

13    you cite to a whole bunch of cases, and the defendants say,

14    well, that necessarily involves the federal question of the

15    validity and scope of the federal patents.  And you're not

16    arguing that you have -- that they're wrong about that, at

17    least for these purposes today.  You're relying on other

18    theories as alternatives and then saying you can do that

19    under Colt.

20          **MS. DALEY:**  That's correct, your Honor.

21          **THE COURT:**  Okay.

22      All right.  Mr. Rouhandeh.

23          **MR. ROUHANDEH:**  Thank you, your Honor.  Jim

24    Rouhandeh, Davis Polk, for the defendants,

25    Pfizer/Warner-Lambert.

1          Just as an initial matter, I will not address the

2    procedural issues because --

3              THE COURT:  I don't think you need to.

4              MR. ROUHANDEH:  I think the first point here

5    is that their allegations that an anticompetitive

6    agreement -- or anticompetitive injury flows from marketing

7    conduct, which I think is not only patently absurd, but it's

8    one that's been rejected by other courts.

9          Just stepping back for a minute, if what they're

10   saying is every time a party lies about their product and

11   makes a claim and exaggerates the attributes of its claim,

12   therefore, to sell more, that an anticompetitive injury has

13   resulted, that would obviously open the flood gates to

14   antitrust claims, and I don't think there is any support in

15   the law for that.

16         In fact, I think probably the most important

17   question is the question the Court asked when it asked how

18   does the marketing allegations -- how does that restrain

19   entry of generic equivalents?

20         That question was also asked by Judge Lifland and

21   answered in the Sall/Zafarana case where he said that, in

22   fact -- that the allegations of marketing which were, in

23   fact, made in that case did not restrain entry of generics

24   or restrain generic competition.

25             THE COURT:  I think Ms. Daley's saying it

1    isn't merely the agreement.  She's saying it's the agreement

2    plus an intentional decision not to seek approval from the

3    FDA that has -- and that decision -- for the other uses, and

4    that that decision was made for the purpose of excluding the

5    generics from the market for these off-label uses.

6              MR. ROUHANDEH:  Yes, and I will answer and

7    address that issue.

8          My point was to make sure that we had covered

9    adequately the ground in terms of whether or not the

10   marketing conduct restrained entry of a generic equivalent,

11   and I would just point to page 11 of this Sall/Zafarana case

12   in which Judge Lifland said that this is not an alternative

13   theory that would allow the Court to award the recovery the

14   plaintiffs were seeking without having to come to grips with

15   issues of patent law, and that the courts -- that was

16   actually the argument made by Warner-Lambert in the case.

17         The Court came to the conclusion on page 18 that,

18   "The Court concludes that allegations concerning promotion

19   of off-label use are qualitatively distinct so as not to

20   create an alternative theory of recovery for plaintiffs'

21   claims relating to generic competition."

22         And, in fact, I believe that counsel conceded that

23   that was not an alternative theory of liability from which

24   they could obtain the recovery that they were seeking.

25         So the second question is, well, is there an

```
 1     independent alternative theory?  Is the second point raised
 2     by plaintiffs, is there an alternative theory upon which
 3     they say that there could be an anticompetitive injury.  And
 4     that argument, I take it, is, they say, based on the
 5     complaint, which they've acknowledged they never mention
 6     Lyrica -- the brand name of the product is Lyrica.  The
 7     scientific name is Pre-Gabalin.
 8              I believe that's the drugs --
 9              THE COURT:  Why don't you spell those for the
10     court reporter.
11              MR. ROUHANDEH:  Lyrica is L-Y-R-I-C-A, and the
12     scientific name, Pre-Gabalin, is P-R-E - G-A-B-A-L-I-N.
13              And that is, indeed, not mentioned anywhere in the
14     complaint.
15              I believe what the plaintiffs are talking about is
16     one paragraph in the complaint, which I don't think pleads
17     an alternative theory, and remand is obviously decided at
18     the time that the complaint is prepared; and no matter --
19     the plaintiffs are not able to add new theories during the
20     course of the litigation in an attempt to get around federal
21     jurisdiction.
22              I think what they're referring to is contained in
23     one paragraph of the complaint, it's Paragraph 33, in which
24     they say, Defendants also believed that their scheme would
25     minimize the negative impact generic bioequivalents of
```

1    Neurontin might have on potential sales of another drug that

2    Defendant Pfizer had been developing which would be

3    exclusively sold and priced by Defendant Pfizer.

4            From that allegation they're saying they've alleged

5    an alternative theory, and that that alternative theory is

6    one that doesn't turn on questions of federal law.

7            First, as I mentioned, we don't believe that this

8    is an alternative theory that was certainly adequately

9    stated as an alternative theory; nor do we think that it

10   would entitle plaintiffs to any of these damages they're

11   seeking from some anticompetitive injury.  But, even if it

12   would, the fact of not having approval for Neurontin for

13   certain off-label uses does not, in fact, restrain a generic

14   from coming onto the market.  A generic can come on to the

15   market as a bioequivalent of Neurontin and then can be

16   prescribed for any use that a doctor wants to prescribe

17   Neurontin for.  It does not restrain entry of the generics,

18   and the generics, if they didn't have a patent issue, could

19   come in.  In fact, that's what happens every day that a

20   generic comes on the market.  It comes on as showing it's

21   bioequivalent to another drug that's on the market.  It

22   doesn't --

23            THE COURT:  What you're saying is that

24   assuming that, since it's a motion, that we just had the

25   complaint, that your client was out there marketing like mad

1    all these off-label uses.  Assuming there were no patent

2    impediments to a generic equivalent, a generic equivalent

3    could come in and say, hey, we're the same thing as those

4    guys, we're the generic equivalent of Neurontin.  And they

5    could not only compete for the approved uses, which is all

6    they could file for, but, in effect, they could also

7    piggyback on doctors saying that Neurontin is good for some

8    off-label uses, and they could, instead, prescribe this

9    other drug.

10            MR. ROUHANDEH:  Right, and they're certainly

11   not saying that they -- those generics would not be arguing

12   that they are able to promote it off-label for those other

13   uses, just like the company would say it's not permitted to

14   promote it off-label for those same uses.

15            But in terms of the injury flows from the generic

16   not coming on the market, the generic can come on the

17   market.  And, in any event, that issue is going to turn on

18   the patent questions and the FDCA issue, because that patent

19   issue, I think is -- you know, it doesn't restrain generic

20   equivalents, as I've said, but also the FDCA issue comes

21   into play as well.  Because what they're really arguing is,

22   look, the company had some obligation to seek approval for

23   the off-label uses.  That's a question of federal law under

24   the FDCA.  We think that's nonsense.  It's not required to,

25   but I don't know how their theory would work, this

1    alternative theory, without determining, first, whether or

2    not the company was obligated; whether, in light of its

3    conduct even as alleged, whether it had an obligation to

4    seek FDA approval for those other off-label uses.

5            We think there is no such obligation.  We think

6    that would be an up-front issue that would have to be

7    determined in addition to the validity of the patent.

8            In any event, I think that this is not an

9    alternative theory in the complaint.  It's, essentially, a

10   moving target that we see them add in the course of their

11   briefs; but, in any event, we think that adjudicating that

12   alternative theory, if it were perceived as an alternative

13   theory, would require resolution of patent law and FDCA

14   issues.

15           With respect to the argument about consenting to

16   the MDL, the plaintiff --

17                  THE COURT:  You mean the argument that since

18   you've selected here, you're suggesting that their case is

19   more like this than the antitrust ones?  Is that what you're

20   referring to?

21                  MR. ROUHANDEH:  Yes.

22                  THE COURT:  Okay.

23                  MR. ROUHANDEH:  As to that argument, that

24   certainly is not a concession and, if anything, that

25   argument could, obviously, turn around on them and equally

be used against them because they failed to object -- well,
they objected and withdrew their objection to come into this
court.

Frankly, I think they withdrew their objection to
come into this court because Judge Lifland had a very
similar case, the Sall/Zafarana case, and perhaps they're
looking for a different result in this court.  And I think
that is a crucial issue, because one of the whole principles
here is that we don't have federal courts at war with one
another.  That's one of the concepts behind an MDL in the
first place, and what the plaintiffs are saying here, and
they've said quite clearly, they don't want to be in either
MDL.

They --

THE COURT:  What do you think?  Your first
choice is I deny the motion to remand and they stay here?

MR. ROUHANDEH:  That's correct.

THE COURT:  And do you have a second choice or
not?  It is your view that I either allow the motion to
remand and you go to New Jersey State Court, or I deny the
notion to remand and they stay here?

MR. ROUHANDEH:  Well, no.  I think -- we
think, bottom line, that the motion to remand should be
denied.

THE COURT:  I understand.

1          MR. ROUHANDEH:  What then happens with the

2     case, I think -- there is a serious question as to what

3     should happen with the case, and I think Judge Saris stated

4     pretty clearly up front that she didn't intend to, given all

5     the other MDLs she has, that she doesn't plan to litigate

6     issues that are in the antitrust MDL.  So that set off a

7     conversation about, well, what should happen --

8          THE COURT:  But, practically, you think I

9     should deny the -- I should recommend -- I don't know if

10    it's a recommendation or decision, but, either way, that the

11    motion to remand should be denied.  Then do you think that

12    Ms. Daley and her clients should stay here?  Do you think

13    they should go to -- it's Judge Lifland who runs the

14    antitrust MDL, right?

15         MR. ROUHANDEH:  Correct.

16         THE COURT:  That they should go there, or do

17    you think there should be some other approach?

18         MR. ROUHANDEH:  Actually, it may surprise you,

19    but I actually agree with the Steering Committee plaintiffs

20    on that point, which is that the case stay here and be

21    stayed pending the resolution of the motion to dismiss here

22    and the summary judgment motions in the other MDL.  It makes

23    no sense to have this case running off freely in this court

24    or the other court.  If they -- and I believe this was in

25    their papers in response to the suggestion of remand where

1    they said, well, if you deny the remand then just leave it

2    here and stay the case and let those issues be determined.

3         Now, I do think that plaintiffs have a fair point,

4    which is they want to litigate all of their claims together.

5    If they want to litigate all their claims together, they

6    need to do that in this court, in federal court, not in

7    Judge Pisano's court, the US District Court.  I think that

8    is not any viable option here.  I don't think a plaintiff

9    gets to say, I've got a claim from one MDL, and I've got a

10   claim from another MDL.  So I get the opportunity to burden

11   yet a third federal judge with my claims.  I don't think

12   that is a viable alternative.  I think that's the point of

13   that suggested remand.  I think the claims either have to go

14   in this court or they have to go in Judge Lifland's court.

15        They're here.  We tagged it to this MDL.  They

16   withdrew their objection.  So I think it's pretty clear to

17   me they should stay here and the whole case shouldn't go to

18   Judge Lifland's MDL.

19        I think it should stay here, and then the question

20   is what happens to it?  I believe that my recollection is

21   that Judge Saris floated the concept of, well, maybe --

22   would you want to sever your claims and take them down to --

23   the antitrust claims down to the other MDL?  I think it is

24   within this Court's power to force that result.

25        And, frankly, I think that in many ways this would

1   be the right result.

2                   THE COURT:  To force them to sever?

3                   MR. ROUHANDEH:  To actually just sever them.

4                   THE COURT:  If they weren't severed and they

5   stayed here and were stayed the way all the other cases in

6   effect in this Court are stayed, then the sales and

7   marketing piece goes forward and reaches some ultimate

8   resolution, whatever that resolution is, then at that point

9   what happens to their antitrust claims?

10          Are they -- they're not going to be done here.

11   They would then -- would they then go back to Judge Pisano

12   in the Federal District Court in New Jersey, or do you think

13   they're simply bound by what happened in the antitrust

14   resolution in New Jersey, in the MDL, or what happens?

15                   MR. ROUHANDEH:  Well, I think they could go

16   back to either the MDL or to Judge Pisano.  There's a

17   rational way they could.

18          I think if they go to Judge Pisano's court, they're

19   going to be tagged to go to the MDL.  My client, represented

20   by separate counsel in that MDL, is going to tag that case

21   if it goes to Judge Pisano, and I believe that the joint

22   panel will send it to Judge Lifland if it went back.

23          But typically -- I mean, there is this issue of

24   what happens to cases when they're ready for trial, if

25   you're ever at that point, and/or there is some resolution

```
1    that would require them to go back to the jurisdiction they

2    came from.  Arguably, all the case could go back in some

3    form --

4              THE COURT:  It seems a little bit more

5    complicated with respect to this one, because as to the

6    others, they go back to trial.  That seems -- if all of you

7    ever get that far and actually tried the case, if it goes

8    that far, but with respect to Ms. Daley's client, they have

9    claims that at that point wouldn't be ripe for trial, having

10   been stayed here.

11             MR. ROUHANDEH:  I think in that --

12             THE COURT:  So you think the answer is?

13             MR. ROUHANDEH:  They would go to the MDL with

14   respect to the antitrust cases, and they will either have an

15   opportunity to relitigate whatever Judge Lifland decided or

16   not or perhaps they won't have to relitigate that because he

17   will decide it in the plaintiffs' favor and they'll go

18   forward along with the other plaintiffs in their case.  But

19   that's where those claims ultimately should go.  If they

20   don't want to sever them now, then they need to stay here.

21             But I just want to make one other point for the

22   record.

23             I'm not sure that -- and I certainly want to be

24   clear on the record that I'm not conceding, and I think that

25   case has some different attributes in which I am not sure
```