1    what happens to a case, if there ever is a trial in terms of

2    what cases, if any, goes back to another federal court.

3    That's just for the record.  So that nobody later will

4    suggest that I conceded that point.  I don't think that that

5    is clear, and I think there are a lot of issues, complicated

6    issues, with respect to that.

7            **THE COURT:**  You're confident they will never

8    reach trial anyway, right?

9            (Laughter.)

10           **MR. ROUHANDEH:**  That's correct.

11           Hopefully a lot of issues we'll never have to get

12   to.

13           With respect to the -- the next issue was this

14   consumer fraud theory and whether or not there is a -- it

15   was just a misrepresentation claim and, therefore, if you

16   misrepresent something, that's a state law theory.  You

17   don't need to resolve any federal question.

18           Two points I would make on that.

19           One is you have to look at how the complaint is

20   pled, not, again, an alternative theory that's pled.  And we

21   think it's pretty clear from the pleading that what they are

22   pleading is a violation of the Food, Drug & Cosmetic Act,

23   and we think the proof is a really in the pudding here.

24           When we had lengthy arguments on the motion to

25   dismiss in this court with theories that were quite

```
 1     identical, at the end of the day we heard plaintiffs

 2     arguing, when they were looking for a duty to disclose,

 3     which was the basis for one of their

 4     misrepresentation/omission claims, they started looking at

 5     federal duties and saying, what about the fair and balanced

 6     regulations under the Food, Drug & Cosmetic Act?  Maybe that

 7     creates a duty under state law to make a disclosure.

 8          So at the end of the day it's very easy for a

 9     plaintiff to say, I've got an alternative theory.  But what

10     ultimately happens, we think, in a case like this, and what

11     ultimately would happen down the road, is clearly an

12     emphasis on this case upon the pleadings and trying to rely

13     on the Food, Drug & Cosmetic Act violations to allege that

14     there is some sort of fraud.

15          So --

16          THE COURT:  But if they've got a theory on the

17     complaint, even if I think that I really know, so to speak,

18     that they're going to focus on an FDA-based theory, if

19     they've got a theory in the complaint, the Supreme Court

20     says that's good enough; isn't that right?

21          I mean, both of you cited Christianson for

22     basically the same proposition, which is that if there is a

23     theory that doesn't involve substantial federal question,

24     then the claim does not arise under federal law.

25          MR. ROUHANDEH:  Right.
```

1          Well, what I think the way we would interpret that,

2    not to create a hole that you could drive a truck through,

3    because -- in other words, what you could do in every case

4    is you could defeat federal jurisdiction by just simply

5    saying in one line of your complaint, we also could prevail

6    based on such and such.

7          That's clearly not what's going on, and a lot of

8    federal courts have said, if you're really resting on that

9    theory and you're not going to solely rely on the federal

10   theory, then you ought to be willing to stand in court and

11   make a representation or stipulate that we will not rely

12   solely on a federal violation to establish any of our state

13   law claims.

14         A lot of courts have resolved that issue that way

15   because they see the ease with which a plaintiff can say,

16   Hey, I've got one alternative theory, never, ever intending

17   to be pursue that, but that's a way to avoid federal court

18   is to say, here's an alternative theory.

19         So what frequently happens in cases is a request by

20   the court for the plaintiff to enter some stipulation, at

21   least, because otherwise the case just comes.  The case will

22   come back as it gets, you know, further down the road and

23   that alternative theory is knocked out of the complaint or

24   falls away, you can remand -- I mean remove again and say,

25   look, now what's left is clearly a federal theory.

1          THE COURT:  Do you get another 30-day window

2     every time the complaint changes?

3          MR. ROUHANDEH:  Yes.  From any paper, really.

4     They could make an argument in a brief, and you could have

5     another 30 days.  They could make a request for a jury

6     instruction, and you could get another 30 days that could

7     run.  Now, there, that's more difficult for a Court to say,

8     okay, I'm going to take this case away now for trial, but

9     that's the problem; and it can lead to what I think are --

10    taking the Christianson case and that concept to its

11    extreme, really can defeat federal jurisdiction with an ease

12    that I don't think is intended.

13         And I think that there is another important point

14    on that, and that is, we've heard a couple of times that,

15    you know, this sort of -- there's a presumption sort of

16    against -- I'm not sure those were the exact words, but sort

17    of a presumption against the federal jurisdiction and

18    reliance on the Christianson case and on the Merrell Dow

19    case.

20         Well, there are two recent Supreme Court cases, one

21    of which is before your Honor in the Allen case -- we

22    referenced it, although the Allen argument has been put

23    off -- that is the Exxon case, and a recent decision by the

24    Supreme Court in Exxon in which they're interpreting the

25    jurisdictional statute and saying that we must not give

1    jurisdictional statutes a more expansive interpretation than

2    the text warrants.  It is just as important not to adopt an

3    artificial construction that is narrower than what the text

4    provides.

5         And in that case they did not recognize any

6    presumption against removal jurisdiction, and I think the

7    only conclusion you really can draw is that jurisdiction

8    that flows from having removed the case is really no

9    different than, it's not narrower than, original federal

10   court jurisdiction.

11        So I think this whole concept -- and it's in a lot

12   of cases --

13             **THE COURT:**  But I think the issue is that

14   we're in this narrow subset of federal question

15   jurisdiction, when you don't have a federal cause of action,

16   and that that's a more difficult kind of issue to wrestle

17   with.  And one thing that -- it seems to me you have a

18   better case on the unlawful -- that the monopolization-type

19   claims certainly provide a stronger theory for you.  I'm not

20   saying you don't have an argument.  You have an argument on

21   the others, too, but the relative weight of them is better.

22        My understanding of this is that if there is one

23   claim that there is federal jurisdiction on, I'm done and

24   you stay.  And that seems to me your stronger one, and there

25   seems to be a continuum between, if you look at the Grable

1    case, where there was clearly a question of, not

2    transcendental, but certainly significant implications for

3    the government and for the interpretation and application of

4    a federal statute, that is unlikely to arise frequently in

5    the kind of state cause of action that was at issue in that

6    case.

7        And Merrell Dow is sort of another kind of case

8    where the federal legal significance issue is not merely so

9    great, and the likelihood of its recurrence was greater.

10        So there seems to be sort of judgmental weighing

11   about how significant -- it's not enough just that there is

12   something federal in the case.

13        Patents strike me as more significant because they

14   are federal in nature and that there is broad federal

15   jurisdiction to address them, and they seem more intertwined

16   here.

17        MR. ROUHANDEH:  I agree with that, your Honor.

18        I guess the only other point I would add, though,

19   is I'm not sure if we're in a narrower field.  I guess my

20   point is I don't think it's a narrower field.  I think it's

21   a more difficult field, as your Honor suggested, because as

22   Merrell Dow has said, it's a fact-specific sort of inquiry.

23   There's a kaleidoscope of types of issues, and you have to

24   have a more searching inquiry in this type of area.  But I

25   think here that's been clarified a lot by Grable, which is

1    the other Supreme Court case that I wanted to mention.

2            In the Grable case, I think it's clear that the

3    argument that the plaintiffs principally relied on, almost

4    exclusively, but certainly principally relied on, as to why

5    this is no federal question jurisdiction with respect to the

6    Food, Drug & Cosmetic Act federal question, was that there's

7    no private right of action.

8            THE COURT:  The Merrell Dow/Montana Abbott

9    argument.

10           MR. ROUHANDEH:  And that argument -- I think

11   Grable has undercut and overturned that ruling, that

12   hard-and-fast ruling, that a number of circuits, Sixth

13   Circuit, Seventh Circuit, had adopted.  In fact, they cite

14   to a number of cases where remand went the other way with

15   respect to Pfizer and Neurontin --

16           THE COURT:  It certainly suggests, I think,

17   that it's a more fact-specific, case-specific inquiry.  On

18   the other hand, I don't think you have the level of federal

19   significance that was at play in Grable in your case.

20           MR. ROUHANDEH:  Right.  I do think they're

21   different.  Although the fact that it's not to that level, I

22   think, obviously just means that that case doesn't really

23   control the result here, but I would argue that we have a

24   sufficient level.

25           But I would also agree with your Honor that the

1    much straighter path here to federal question jurisdiction

2    is the patent issue, and, in fact, I think the Court never

3    even needs to reach this issue as to whether there's a

4    federal question under the Food, Drug & Cosmetic Act that

5    gives federal jurisdiction over the state consumer

6    protection claims. I don't think it needs to be reached

7    because I think it's absolutely crystal clear under the

8    patent issues. It's been the trend in the law, and I would

9    agree, for that reason alone, the fact that there are all

10   these other cases sort of directly on point here makes that

11   argument a lot stronger, the Tamoxifen case, a couple of

12   decisions from Judge Lifland, and there are others that

13   basically say here that when your argument, the

14   anticompetitive argument, is, you know, you were excluding

15   generic competition through, as in Sall/Zafarana, whether it

16   is through your improper patent filings in the Orange Book

17   or through off-label -- through this off-label marketing,

18   that those are all going to turn on patent law issues.

19        And I think those cases are directly on point, and

20   that that issue and what Judge Lifland decided is the same.

21   It's the same issue here, and I think his decision is quite

22   clear, that he was not -- that he had in front of him at the

23   time these allegations of off-label marketing, and could

24   those lead -- were those -- did those present an alternative

25   theory under which you didn't have to look at the patent

 1    law?  He rejected that argument, and I think there is a much

 2    cleaner, clearer path here, that the patent law issues

 3    clearly create federal jurisdiction.

 4              THE COURT:  On the decision not to seek the

 5    approval for these other uses, you say, in part, the problem

 6    with that theory is that that would impose -- it would, in a

 7    sense, find an obligation upon your client to seek approval

 8    for off-label uses, an obligation which you say doesn't

 9    exist, and certainly nobody has cited anything affirmative

10    in any form establishing such an obligation.

11              But would it be enough that if, assuming that

12    you're correct, that it's purely a discretionary decision;

13    that is, Pfizer could make its own decision -- we want to

14    seek approval for those uses or we don't want to seek

15    approval depending upon whatever they decide is in their own

16    best interest in evaluating whatever they do with their

17    business -- but if they make the decision solely or

18    primarily for the purpose of trying to restrain a

19    competition or exclude generics from the marketplace, is

20    that then enough for them, even though there is no

21    obligation for your client to have done anything or not done

22    anything?

23              MR. ROUHANDEH:  No.  I think even if they were

24    to prove that allegation --

25              THE COURT:  -- as a matter of fact.

1           **MR. ROUHANDEH:**  -- as a matter of fact, or

2    assume it to be true for purposes of this motion, there

3    still would be federal question jurisdiction.

4           But what we're really talking about is

5    anticompetitive injury that flowed from generics not coming

6    on the market.  If we look at their damages and their

7    injunction as something that hasn't been touched on yet, but

8    if you look at the damages that they're seeking and look to

9    the injunction that they're seeking, which basically says

10   enjoin future violations or ongoing violations of law, both

11   those types of relief are turning on the federal patent

12   issue, and we think also, to some extent, on the Food, Drug

13   and Cosmetic Act issues, because what they're trying to do

14   here is to get recompensed or compensated for the fact that

15   the generics didn't come onto the market.

16           **THE COURT:**  But not every prayer for relief

17   has to be -- I mean they could have multiple prayers for

18   relief and multiple theories, and some of their prayers for

19   relief they might not be entitled to at the end of the day

20   depending on what theories they've prevailed upon.

21           So to sort of look at the theories of relief and

22   then say the only way you get this theory of relief is if

23   any one of your particular theories was, say, a patent-kind

24   of theory, well, that may be true; that if they don't have a

25   patent theory at the end of the day, they won't get that --

1   that prayer for relief won't be available for them.

2        But I guess what I'm asking more is why can't

3   they -- why wouldn't they be able to prevail on a theory

4   that the marketing plus decision not to seek approval, if

5   they can prove that those decisions were made to restrain,

6   to keep people out, and, in fact, did keep people out, why

7   isn't that theory enough to support the unlawful

8   monopolization claims, and why does that raise a federal

9   question?

10       MR. ROUHANDEH:  Well, I think that it is both.

11       Our first argument was we didn't think that was an

12  alternative theory that was pled, but putting that aside for

13  the sake of discussion -- we don't think it was pled.  Even

14  if it were pled, we think there is a federal question there

15  because what they're really talking about is the ability of

16  those generics to come onto the market, right, and we would

17  say there was no restriction to come onto the market once

18  the patent is --

19       THE COURT:  The only restriction flows from

20  the patent.

21       MR. ROUHANDEH:  That's right.

22       So what they're really saying is we weren't able to

23  sell it for as many uses.  They're really kind of saying

24  that the anticompetitive injury is for one party to

25  allegedly violate the law and seek a bigger market by

1   promoting off-label when, if they get the same approval and

2   come on the market, they can't do that.  That's really what

3   the heart of their claim is, and we think it's not an issue

4   of -- it's an issue you divorce from the patent law issue,

5   because the patent law issue would govern.

6   You would have to first determine whether can they

7   come onto the market or not?  Could the generics have come

8   on the market, and what would have come on the market?

9   That's a patent law issue, a federal patent law issue, that

10   would have to be decided under this alternative theory.

11   And then, second, we think an additional federal

12   question that would have to be resolved is whether there was

13   any obligation under the Food, Drug and Cosmetic Act to seek

14   approval for those additional uses.

15   Those are two federal questions that would be

16   intertwined with that alternative theory.

17   And my point about the injury was if you look at

18   all the forms of relief that they actually seek, and the

19   only way they can get there is through establishing federal

20   violation, that sort of corroborates this point that there

21   isn't an alternative theory.

22   **THE COURT:**  I understand that.

23   **MR. ROUHANDEH:**  But that's why that

24   alternative theory, we think, would turn on the patent law

25   issues, and we think that is, essentially, the same thing

1    that was being tried in the Sall/Zafarana case.

2                   THE COURT:  Okay.

3                   MR. ROUHANDEH:  Thank you, your Honor.

4                   THE COURT:  Thank you.

5         Ms. Daley, do you have anything else you want to

6    say?

7                   MS. DALEY:  I do.  I didn't know if any of the

8    other defendants were going to say anything.

9                   THE COURT:  I'm sorry.  You're right.  They

10   may want to.  I didn't mean to cut you off, if there is

11   something you want to say.

12                  MR. WALKER:  Your Honor, Cline, Davis would

13   join in the arguments of Pfizer.

14                  THE COURT:  Mr. Dwyer?

15                  MR. DWYER:  The individual defendants as well,

16   your Honor.

17        If you don't mind if I stand in the back, it's only

18   because I have a little back pain.

19                  THE COURT:  No, no.  That's fine.

20        All right.  Go ahead, Ms. Daley.

21        First of all, this theory about the unlawful

22   monopolization claims were supported by the marketing plus

23   the decision not to seek approval for other uses, where is

24   that pled in the complaint?

25                  MS. DALEY:  Well, if you go to Paragraph 32,

1    we talk about that decision to engage in the false marketing

2    campaign to interfere with generic competition.  We make

3    allegations elsewhere, your Honor, that they engaged in

4    misconduct to interfere with generic competition.

5         What I think is important, your Honor, is we are

6    not saying that they were obligated to go get FDA approval.

7    That's not even an allegation we make in this complaint.  I

8    don't think it's anything we have to prove at all.

9         What we're saying is they chose not to seek FDA

10   approval.

11                THE COURT:  Because.

12                MS. DALEY:  Because.

13         That's what we're saying.  We don't say that

14   they're obligated to seek FDA approval.  So they're trying

15   to create a strawman argument about a federal question issue

16   that we've not pled in this case.

17         And I couldn't quite follow Mr. Rouhandeh's claim

18   about the heart of our theory, but I certainly did not agree

19   with it.

20         The notion that somehow whether the generics could

21   come onto the market requires resolution of patent

22   questions, that's an erroneous notion there, your Honor.

23         Whether their -- whether Pfizer had a patent or

24   not, the generics could have come onto the marketplace if

25   they chose to do so.  They would have, obviously, been at

1    risk if there was a patent that governed their product, or

2    applied to their product, or, at the end, the patent was

3    valid, enforceable and that their product infringed, but we

4    don't say that that's an issue.  Again, they're trying to

5    misconstrue the allegation that we've made in the complaint

6    in order to argue that there's somehow some federal question

7    jurisdiction here.

8         You know, I'm also stunned that somehow, your

9    Honor, courts would frequently demand a stipulation that you

10   would not rely upon a federal violation to establish any

11   theories.  I've never seen a case that says that, and that

12   would run afoul of what Christianson v. Colt is about.  And

13   in Christianson v. Colt, the relief that was granted in that

14   case, the summary judgment, was on the basis of a theory

15   that the patent was invalid, and the proof that the patent

16   was invalid under the best mode and enablement defenses.  So

17   to suggest somehow that it would be appropriate for a court

18   to demand a party to stipulate and say you'll never rely

19   upon any federal violation flies in the face of Christianson

20   v. Colt, your Honor.

21        Let me address a couple of other issues.  One has

22   to do with Judge Lifland's decision.

23        And, first of all, your Honor, it's interesting

24   here that the defendants suggest somehow we withdrew our

25   objections because of Judge Lifland's decision, when, in

1    actuality, your Honor, Judge Lifland's decision was issued

2    on January 7.  Our case was not sent to the defendants until

3    at least five days after Judge Lifland had issued his

4    decision.  So they chose to send us to this court in spite

5    of Judge Lifland's decision.

6              THE COURT:  I'm not ruling on a motion by

7    inferring people's positions based on those kinds of

8    litigation tactics.  People engage in all sorts of

9    litigation tactics for all sorts of reasons.  And it seems

10   to me that if the complaint has a federal question within

11   it, in which case you lose, or it doesn't, and that's

12   determined based on the complaint and the case law.

13             MS. DALEY:  With respect to Judge Lifland's

14   decision, if you look at it, it's clear that he's saying

15   that he -- he gives it a very cursory review of the

16   allegations about off-label promotion.  He doesn't say

17   anything about any leveraging theory.  He simply says their

18   allegations regarding off-label promotion don't save their

19   amended complaint from staying in federal Court.  That's all

20   he says, your Honor.  So it's different than our situation

21   as well.

22             And I did not get to write this down.  I am not

23   sure what concession I supposedly made early on about the

24   false marketing not supporting antitrust.  I didn't mean

25   to --

1          THE COURT:  I think his point was that you

2     were saying that false marketing alone would not support the

3     antitrust theories.

4          What I understood you to say is the false marketing

5     plus the decision to not seek the off-labeling.

6          MS. DALEY:  Correct.

7          I just wanted to make sure there wasn't some

8     argument that somehow I conceded something that I didn't

9     certainly intend to concede there.

10         Let me also then -- so I think, your Honor, under

11    Christianson v. Colt and Merrell Dow, we prevail.

12         I have not read the Exxon case.  So if it is to

13    be -- if the Court's going to rely upon it, I guess I would

14    ask for permission to review it, and --

15         THE COURT:  Well, you certainly can read

16    whatever you want.

17         (Laughter.)

18         MS. DALEY:  -- to file something on it, your

19    Honor.  I have not read it.

20         THE COURT:  My memory of Exxon, which I did

21    not read in connection with this hearing but I reviewed

22    briefly with respect to another motion somewhere else, is

23    that it talked about -- much the way Mr. Rouhandeh quoted

24    it -- about sort of you have to read -- it's a statute.  You

25    read the statute.  You have to give it the meaning that it

1    has.

2         I do believe that the case law also is that the

3    removal statute should be construed strictly.  I'm not sure

4    that -- I'm not inviting further briefing on this.  I don't

5    really see that the central issue in this is that.  If, in

6    going over this, I really find that Exxon is the crystal

7    turning point in the case, then maybe I'll give you the

8    chance to file something, but there's been plenty of

9    briefing, and I don't really think --

10              MS. DALEY:  I would be surprised if it was,

11   given Merrell Dow and --

12              THE COURT:  I understand.  So right now I

13   don't want any more.

14              MS. DALEY:  That's fine with me, your Honor.

15         The last issue is this notion about what should

16   happen to us if we don't get remanded to state court.

17         What I'm hearing Mr. Rouhandeh say is that, first

18   of all --

19              THE COURT:  Let me tell you what I'm thinking

20   a little bit about that.  Not to cut you off; but to cut you

21   off.

22              MS. DALEY:  That's all right.

23              THE COURT:  My inclination I think right now

24   is to decide the motion.  If you prevail, you go to New

25   Jersey State Court; if you lose, you're here.  And the

1    questions about what to do if you are remaining in federal

2    court, the questions about what to do about it, are

3    certainly not raised in the original remand motion in New

4    Jersey.  They're touched upon more so in the papers you

5    filed here, but I think I would -- maybe what I would do if

6    you stay here, is just have a hearing, maybe without any

7    more briefing, because it strikes me it's more of a

8    practical than a legal resolution at that point.  And

9    there's just sort of considerations, and have you come in

10   and we could talk about it.  And if you guys reached an

11   agreement that everybody thought the sensible thing to do,

12   including you, is sever, fine.  There are a number of

13   different options that, if everyone agreed, would be

14   probably permissible.  And if everyone doesn't agree, then

15   we can talk about it, and it may be something I could work

16   out in discussion with you without briefing, and if it

17   didn't lend itself to that, then at that point we could talk

18   about whether we really needed to brief the issue.

19           **MS. DALEY:**  Completely acceptable to us, your

20   Honor.

21           **THE COURT:**  Let me see if I have anything else

22   to ask.

23           As I understand it, your position basically is that

24   you have two theories on the unlawful monopolization.  One

25   is the one we talked a lot about, which is the marketing

1    plus the decision to not seek approval for off-label, and

2    the other is the leveraging theory, right?

3              MS. DALEY:  And then the agreements as well,

4    your Honor.

5              THE COURT:  The agreements are part of

6    marketing, right?

7              MS. DALEY:  Actually --

8              THE COURT:  But as to the monopolization

9    claim, the agreements are not enough.

10             MS. DALEY:  Well, because -- the

11   monopolization claim, your Honor, yes, correct.

12             THE COURT:  So it's really as to the

13   monopolization claim, two theories, one is the -- I want to

14   make sure I've got it right.

15        One theory we talked about is the marketing, with

16   or without the agreement, plus the decision, and the other

17   is the leveraging?

18             MS. DALEY:  Correct, your Honor.

19             THE COURT:  Now, explain to me the leveraging,

20   just briefly.

21             MS. DALEY:  The leveraging, to a certain

22   extent is -- I mean, it's not quite a timing claim, but a

23   timing claim --

24             THE COURT:  Explain that, please.

25             MS. DALEY:  Sure.

1          A timing claim is a situation where you have market

2     power in one market.

3                    THE COURT:  I understand that.  That's the

4     whole Microsoft business.

5                    MS. DALEY:  It's like a Microsoft claim.

6                    THE COURT:  How does that apply here?

7                    MS. DALEY:  It took the demand that they had

8     created in the Neurontin market, and, then again, I'm saying

9     it's a timing claim; but I don't think -- I can't prove a

10    timing claim, and I'm not saying that I can, but it's

11    something like this -- and taking that demand then, at the

12    end of whatever the period when the generics finally do show

13    on the marketplace and transferring -- well, increasing your

14    demand for the product through the off-label to the false --

15    let's say off-label, but I don't want to say the false and

16    deceptive trade practices, but the marketing, the

17    advertisements, they knew were false.

18          Also, you know, the market demand would also

19    increase with the off-label marketing.  There's a lot of

20    different ways.

21          And then at the end, assuming they had this Lyrica

22    product ready to come onto the market, being able to

23    transfer all those prescriptions that were previously

24    written for Neurontin into prescriptions for the new and

25    improved Neurontin.

```
 1              THE COURT:  In other words, they're jacking up
 2    the demand.  I understand that.
 3              MS. DALEY:  Right.
 4         Going back.  They were unable -- the generics, as
 5    they weren't engaging in the false and deceptive marketing,
 6    they weren't out there increasing the demand for
 7    Neurontin -- or essentially the generic version of
 8    Neurontin -- and they couldn't get FDA approval through an
 9    ANDA process.
10         Now, could they have gone and gotten an FDA
11    approval on their own?  Yes, I think.  I don't know the
12    answer to that question, to be honest, because I'm not
13    familiar with all of the --
14              THE COURT:  But as to the -- okay.
15         They have the Neurontin, and they've engaged in all
16    these overt efforts, legal or otherwise, to increase the
17    demand.  How does that -- how do they -- how do you allege
18    that they are unlawfully or improperly using that to exclude
19    generics from the market for this other product?
20              MS. DALEY:  Because they were interfering with
21    the generic competition --
22              THE COURT:  By the first --
23              MS. DALEY:  Sorry.
24              THE COURT:  -- theory.
25         How were they interfering with the generic
```

```
1    competition?
2              MS. DALEY:  Because the generics would not be
3    able to also be approved for those uses.
4              THE COURT:  Okay.  That's the first theory;
5    that is, they can't get into these other indications, Lou
6    Gehrig disease, or what have you, because the defendants
7    haven't filed for FDA approval for that?
8              MS. DALEY:  Correct.
9              THE COURT:  Okay.
10        So then how is leveraging a separate theory?
11             MS. DALEY:  To the extent --
12             THE COURT:  To the extent it relies upon the
13   first theory.  Maybe I'm --
14             MS. DALEY:  I think I lost you.  I apologize,
15   your Honor.
16             THE COURT:  That's all right.
17             MS. DALEY:  The leveraging --
18             THE COURT:  How, as part of the leveraging
19   theory, are they restraining or excluding the generics?
20             MS. DALEY:  Because the generics were not out
21   there selling for these other uses for Neurontin, which
22   Lyrica, the generic version is.
23        I stand corrected.  Somehow I combined both part of
24   the generic name and part of the brand name together.
25        They were able to then move that demand over even
```

1    though the generics weren't in that market for Neurontin.

2          THE COURT:  Because they've been excluded from

3    the off-label market for Neurontin, then when the other drug

4    came along, they couldn't benefit from the natural transfer

5    that took place in the marketplace?

6          MS. DALEY:  Correct.

7          THE COURT:  Isn't that essentially, though,

8    another version of, effectively, the first theory, though?

9    The reason they're not in that market is because as

10    explained by the first theory, not by the leveraging theory.

11          MS. DALEY:  I think they are two separate

12    theories, your Honor.

13          THE COURT:  Okay.

14      Anything else?

15          MS. DALEY:  Nothing else, your Honor.

16          THE COURT:  Anything, Mr. Greene?  Do you have

17    something?

18          MR. GREENE:  May I be heard very briefly?

19          THE COURT:  Sure.

20          MR. GREENE:  I want to say on the record that

21    the class plaintiffs take no position on this jurisdiction

22    argument, but we did file some papers in response to

23    Assurant's asking the Court for a suggestion on remand to

24    the panel.  The points we wanted to make are in the papers,

25    and it sounds --

1          THE COURT:  That's why it ends up in New

2    Jersey Federal Court?

3               MR. GREENE:  Correct.

4          THE COURT:  But not Judge Lifland's session.

5               MR. GREENE:  That's what I heard today, not

6    Judge Lifland's session.  I think I heard your Honor say

7    that if they were to remain here in this court, then another

8    day we would ask, or maybe have a conference, on what to

9    do --

10          THE COURT:  I think that's what my inclination

11   is on this motion.  It's here or not here, and I'll decide

12   here or not here.  And if they're here, it seems to me

13   they're here because they got sent here, and the decision

14   was not to send them back to the New Jersey State Court.

15        And I am not inviting further briefing.  I will be

16   honest with you, Ms. Daley, if you're here, or at least you

17   are in federal court, it does seem like a lot of your claims

18   sound in the nature of claims that are already here, and a

19   lot of discovery, which is more to the point, would be

20   common.  I mean, a big part of your case, not all of your

21   case, is the sales and marketing, and that's here.  And

22   there's going to be discovery.

23        And your position is if they are in a court, you

24   want them here; is that right, Mr. Greene; or, in any event,

25   by themselves in the New Jersey Federal Court?

1              **MR. GREENE:**  I think if this Court were to

2     wait -- there are two dispositive motions.  One before this

3     court in this MDL, and the other one being Judge Lifland's

4     In re: Gabapentin litigation.  The summary judgment decision

5     will be coming out.  I know that's been under consideration

6     for, I think, more than two years now.  But once those

7     decisions come from both those courts, it might be a little

8     bit clearer what to do with Assurant's case, and we made the

9     point in our papers --

10             **THE COURT:**  I think that's sensible.  I think

11    what I would be guided by, the things that I would be

12    considering, to the extent it's my decision, would be,

13    first, the practicality of discovery -- it seems to me the

14    sales and marketing discovery -- and it would make sense for

15    that to be here.

16             I am not as familiar with the case in New Jersey,

17    other than I'm aware that it's an MDL Neurontin antitrust

18    issue, and we have antitrust issues, and that case is

19    further along than this one.  And I'm getting the impression

20    from you that you don't really want to be there.  And since

21    you are here, and the defendants sought to put you here, I

22    would be inclined to leave you here.

23             That leaves then on the other side of the equation

24    the fact that you have these other claims and what to do

25    about that.

1        This is somewhat different than staying the claims

2   of a personal injury plaintiff, where the claims more

3   directly flow out of the sales and marketing.

4        So I'm going to decide the motion to remand.  I'm

5   not going to send them on this decision to the MDL in New

6   Jersey, and I'm not going to send them to New Jersey Federal

7   Court separate from the MDL.  They're either going to state

8   court or they are staying here.  And if there's something

9   else to be done, I think we can talk about it.

10       I guess I would say to you, Ms. Daley, if you lose

11  the motion, in light of what I am thinking about, if you

12  think you've got some place you want to go other than the

13  federal system -- that you think you've got a colorable

14  argument for or you can persuade them, talk to them, or set

15  up a conference.  But if you really don't have much of

16  anything, wait until these two decisions Mr. Greene refers

17  to come down, because maybe that does clarify the landscape.

18       **MR. GREENE:**  Judge, just to refresh your

19  memory, there are two MDLs, both before Judge Lifland:  In

20  re: Gabapentin litigation, and the Neurontin antitrust

21  litigation is the second.

22       Now, he has stayed everything in the Neurontin

23  antitrust litigation, and he has under consideration summary

24  judgment in the  In re: Gabapentin litigation.

25       **THE COURT:**  What is the Gabapentin litigation

1    about?

2              MR. GREENE:  Well, I think it's about 17

3    different cases that have been collected, and I think the

4    majority of them are patent infringement suits brought by

5    Warner-Lambert or Pfizer, with counterclaims for antitrust

6    causes of action that the generics have brought against --

7              THE COURT:  So it's a litigation between

8    pharmaceutical companies, rather than the defendants here?

9              MR. GREENE:  No, it's between Pfizer, the

10   defendant here, and its predecessor, Warner-Lambert, and the

11   generic manufacturers.

12             THE COURT:  Right.

13        Neither you or your clients or the third-party

14   payors, generally, are in that litigation?

15             MR. GREENE:  To my knowledge they are not.

16        What they are in is the Neurontin antitrust

17   litigation, but there's also an MDL before Judge Lifland,

18   and there has been no discovery in that.

19             THE COURT:  Your point is if she goes to that,

20   she's stayed anyway.

21             MR. GREENE:  Exactly.

22        Discovery is a well under way here.  We have had

23   the structure in effect for almost a year now, and if we're

24   back before you, we can talk about what we do with them if

25   they are here.

1        **THE COURT:**  Right.  That would be, I think,

2   the sensible way to go.

3        **MS. DALEY:**  Your Honor, if I could just

4   respond real quickly.

5        Those summary judgment motions in the <u>Gabapentin</u>

6   patent litigation have been pending for over three years,

7   actually, and I think you have hit it on the head, that our

8   complaint, really, including our antitrust claims, is

9   dependent upon the sales and marketing activities.

10       It seems to us to that if we were going to be in an

11   MDL proceeding, that we would be here.  Otherwise, I don't

12   know how you parse out some of the discovery that gets done.

13       **THE COURT:**  All right, so --

14       **MS. DALEY:**  It's my understanding discovery is

15   just starting, from all the discovery motions.  There are

16   lot of documents that haven't been produced, and there's a

17   whole issue about the scope of time.  So it would seem

18   appropriate to have a case management discussion about how

19   we proceed forward with our claims.

20       **THE COURT:**  Right.  And that's what I am

21   really suggesting, that it would seem to me you likely would

22   stay here, unless there is some -- if you're in federal

23   court.

24       **MS. DALEY:**  That was our original thought,

25   your Honor, until everybody said we don't want you.

1          THE COURT:  So I am going to decide the motion

2     to remand.  You're here or you're in the New Jersey State

3     Court, and if you're here, then we'll address at some point

4     how to deal with the somewhat different nature of your

5     claims if it requires anything.

6          Yes?

7          MR. BONSIGNORE:  Good afternoon, your Honor.

8     My name is Robert Bonsignore.  I am here with Dan D'Angelo

9     from my office, and I'm the counsel in the Allen matter,

10    which was put off today.  We received word of that, but I

11    did also hear that your Honor was curious whether we were

12    present at a prior motion to compel and had asked if we were

13    here.

14         We didn't --

15         THE COURT:  I only asked because I knew this

16    remand motion was kicking around, and I was going to have to

17    deal with it.  So I thought if you were here, I could talk

18    to you about it as to when to do it, or what have you.

19         MR. BONSIGNORE:  At that point in time I was

20    fairly certain that I would be back in state court, and I

21    didn't think that another suit in the courtroom would be

22    necessary, that there would be enough air being expelled.

23         But at this point in time we now have a completely

24    different set of circumstances, and I understand in the

25    totality of it, that your most recent suggestion today would

1    make a lot of sense.  And so now that I'm here and I'm

2    saying hello, I would like to take up this common sense

3    practical approach to have a conference, and this conference

4    would involve my case, and I think there is one other out

5    there, and the MDL case.

6          And the reason for that is this, your Honor.  Our

7    case is now stayed.  We are in limbo and that's not --

8          THE COURT:  A conference to talk about what?

9          MR. BONSIGNORE:  Talk about how we can do

10   something.  We can, in the interim, while the appeals court

11   is reviewing Judge Young's decision, which was in our favor,

12   but while it's -- that's beside the point.

13         THE COURT:  Well, there is one issue not

14   resolved, I think, by Judge Young's opinion with respect to

15   your case.

16         MR. BONSIGNORE:  We're in limbo.

17         So what we would like to do is to participate and

18   contribute in the discovery that's about to take place.  It

19   doesn't make sense to keep us in limbo.

20         THE COURT:  What are you asking for?

21         MR. BONSIGNORE:  Well, I think that the first

22   thing to do is to talk to the plaintiffs, rather than to put

23   this sort of a burden, you know, in such a quick fashion on

24   your Honor; although we'd be perfectly willing to decide it

25   now.  It's just basically to -- while the case is on appeal,

1    what we're going to be seeking is to plug into the discovery

2    and to work cooperatively with the --

3                THE COURT:  I guess --

4                MR. BONSIGNORE:  -- MDL.

5                THE COURT:  Unless I am misunderstanding, this

6    is what I tell you.  I think at this moment you stand in the

7    same shoes as all the other plaintiffs' lawyers for all the

8    other plaintiffs that have cases before the Court, and that

9    is that the two Steering Committees we have -- it is my

10   understanding the way this is working from what I've said

11   and from generally the structure that the lawyers have

12   suggested -- is they're controlling the discovery.  And that

13   encompasses everything and everybody.  You can -- I don't

14   see any reason why lawyers who represent plaintiffs whose

15   cases are -- lawyers who are not on the Steering Committee

16   can go to the depositions, I suppose, if they want to.

17   There is some issue about making them -- it becomes unwieldy

18   if one hundred lawyers want to ask questions, but I would

19   assume that the Steering Committees would work out those

20   issues with the other plaintiffs' lawyers.  So you can talk

21   to with them and participate however you want.  I don't

22   think you're precluded -- I mean, nobody is saying that

23   people who are stayed are precluded from looking at the

24   documents that are produced, are they?

25                Actually, how is that working?  I'm not really

1    sure.

2              MR. GREENE:  Are you addressing that to

3    Mr. Bonsignore?

4              THE COURT:  Let's start with you, Mr. Greene.

5              MR. GREENE:  Well, there's several CMOs that

6    are in effect now that govern how discovery will be

7    conducted in this case --

8              THE COURT:  Right.

9              MR. GREENE:  -- which include the taking of

10   depositions and, I believe, who can attend depositions.  In

11   every MDL there are a number of tag-along cases that come

12   along, and that's what happened here.

13             THE COURT:  The answer is, in the first

14   instance, you've got to abide by the CMOs.  You can do

15   whatever you want to do that's provided by the CMOs, and

16   Mr. Greene or Mr. Rouhandeh are probably more expert in the

17   provisions.

18        If you have looked at those --

19             MR. BONSIGNORE:  Yes, I have.

20             THE COURT:  -- and what you're basically

21   saying is that there is something you want to do that's not

22   permitted by the CMOs, then, in the first instance, what you

23   ought to do is talk to the Steering Committees and/or --

24   probably first the Steering Committees, and if you get them

25   on board with what you want to do, then they can talk to

1    Mr. Rouhandeh on behalf of the defendants, and if all of you

2    agree, you're probably not going to hear me squawk.

3          I am inferring that probably what you want to do

4    everybody is not going to agree to.  You ought to talk to

5    them first anyway and see if you can't narrow, in terms of

6    disagreement, and then potentially you can come before me

7    with a motion.

8          I'm not going to hear you now about it.  I want to

9    see something in writing, not necessarily that long, but

10    something explaining what it is you want and why you should

11    get it.

12          And I will tell you that my -- and I don't remember

13    honestly what the claims are in your complaint, and to the

14    extent that they overlap or differ from the claims that are

15    being pursued, but my general view in this case is that we

16    need to make the trains run on time.

17          There are two Steering Committees controlling the

18    litigation for the plaintiffs, and there is a reason for

19    that.  So, you know, I'm not inclined to make 100 other

20    copilots.

21          I don't know exactly what you are looking for, but

22    I'm just telling you at the outset --

23                **MR. BONSIGNORE:**  Right now, your Honor, it can

24    be summarized in less than a sentence.

25                **THE COURT:**  Go ahead.

1          **MR. BONSIGNORE:**  Right now there is a stay in

2     effect on all cases like mine, and we're not allowed to do

3     anything, period.

4          Now, the second sentence, which would say what I

5     would want -- I mean, I did that one.  Now I will do the

6     next one.

7          What I would want would be one representative from

8     the groups like mine and my case, which are the state cases

9     that are stayed, to serve as a liaison or representative and

10    be able to participate --

11         **THE COURT:**  Be on the Steering Committee --

12         **MR. BONSIGNORE:**  -- and coordinate it.

13         Well, yes, just coordinate with them.

14         We understand the Steering Committee makes the most

15    sense, and this is what they do in all other case, all the

16    other MDLs.

17         **THE COURT:**  So if what you're saying is you,

18    you or somebody who stands in similar shoes with respect to

19    one of those category of cases, want to get on the Steering

20    Committee, then you ought to talk to Mr. Greene.  I don't

21    think the defendants are likely to have much to say.  They

22    can, if they want to, but I haven't gotten the impression

23    they really care that much about who is on the Steering

24    Committee; but if they do, they'll say so.  They're not shy.

25         Talk to Mr. Greene, and if you want to get on the

1    Steering Committee and they won't let you, then you can

2    apply to get on the Steering Committee; and, Mr. Greene, you

3    can tell me why he shouldn't be, and I will look at it.

4         But I have in the back of my mind that, you know, I

5    want this to run sensibly. So think about that. And I

6    guess one thing that would give me pause with respect to

7    putting you on the Steering Committee is that the viability

8    of your case remaining here is at least in question. I

9    mean, Judge Young's opinion resolved many of the issues that

10    the motion raises in your favor, and had the First Circuit

11    not taken the case, there's a strong likelihood I would have

12    followed what Judge Young would say. He spent a lot of time

13    with what I think is a pretty thoughtful opinion, and so

14    there is a good chance I would follow that.

15         On the other hand, it seems to me there is an

16    issue, if I recall, in your case that he only talked about

17    in a footnote, which is this question about the relation

18    back. I don't think it was presented in his case. So I

19    have no doubt -- I already know from the defendants' papers

20    that they were making much, before Judge Young ruled, about

21    that part of your filings, and I think that is a meaningful

22    issue; and I don't know what the answer to that is, and now

23    I can, fortunately, wait for higher minds than mine to

24    resolve it, maybe. But I don't know that it's presented in

25    the First Circuit.

1        But all of that's to say there is a real issue

2   about whether you're here or not, and I would be hesitant to

3   put people on the Steering Committee who might get dinged

4   later.

5        Frankly, that was an issue with Mr. London, whether

6   he was going to be or not until I waded through the MDL

7   docket and figured out that, you know, he is going to be

8   here and wants to be here.  So I think you should just be

9   cognizant of that.

10            MR. BONSIGNORE:  I'll talk with Mr. Greene,

11  who I know previously, and it's amazing that you just made

12  the argument that I made in San Francisco.  We share that

13  same belief, and the judge out there said, no, there's no

14  problem with that, and I was scratching my head.

15            THE COURT:  No problem with what?

16            MR. BONSIGNORE:  With someone being in a

17  leadership role but then also with pending remand and about

18  to go back, and I still can't understand that.  I don't get

19  it, but it's amazing --

20            THE COURT:  I'm sure there was a very good

21  reason for that judge to have that opinion.

22            MR. BONSIGNORE:  In one place it's one thing.

23            THE COURT:  In any event, that's where I am

24  going to leave it with that, and since I don't think there's

25  anything else, this matter is adjourned.

1    **THE CLERK:**  All rise.  Court is in recess.

2    (Proceedings adjourned.)

3

4

5

6    C E R T I F I C A T E

7

8

9

10    I, James P. Gibbons, Official Court Reporter for

11    the United States District Court for the District of

12    Massachusetts, do hereby certify that the foregoing pages

13    are a true and accurate transcription of my shorthand notes

14    taken in the aforementioned matter to the best of my skill

15    and ability.

16

17

18

19

20    JAMES P. GIBBONS, CSR, RPR, RMR
       Official Court Reporter
21    1 Courthouse Way, Suite 7205
       Boston, Massachusetts 02210
22    (617) 428-0402

23

24

25