# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

FILED ... D.C.
02 OCT -1 PM 5: 15

---

BONNA STUART, on behalf of themselves )
and all others similarly situated )
)
Plaintiffs, )
)
v. ) No. 02-2511-Ma/Bre
)
PFIZER INC. AND WARNER-LAMBERT )
COMPANY, )
)
Defendants. )
)

---

### ORDER DENYING PLAINTIFFS' MOTION TO REMAND

---

Before the court is Plaintiffs' motion to remand pursuant to 28 U.S.C. § 1447(c), filed on July 16, 2002. For the following reasons, this motion is DENIED.

I. Background

This is a class action suit. Plaintiff Bonna Stuart is a citizen and resident of the State of Mississippi. (Compl. ¶ 10.) She is representative of a class of consumers of Neurontin,[1] an epilepsy drug. Id. ¶ 1. Defendant Pfizer Incorporated ("Pfizer") is a Delaware corporation with its principal place of business in New York, New York. Id. ¶ 11. Defendant Warner-Lambert Company

---

[1] Neurontin is a brand name for the drug Gabapentin. (Compl. ¶ 2.) Gabapentin is anti-convulsant approved by the United States Food and Drug Administration (the "FDA") for the treatment of epilepsy. Id.

-1-

This document entered on the docket sheet in compliance with Rule 58 and/or 79(a) FRCP on __10/1/02__



("Warner") was a Delaware corporation that maintained its principal place of business in Morris Plains, New Jersey. Id. ¶ 12. In June 2000, Pfizer acquired Warner and Warner is now a wholly-owned subsidiary of Pfizer. Id.

The Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 301 et seq., provides that the United States Food and Drug Administration (the "FDA") must approve of new drugs that a company intends to sell in the United States. Id. ¶ 16. Furthermore, Congress passed the Drug Price Competition and Patent Term Restoration Act of 1984, 21 U.S.C. § 355 ("the "Hatch-Waxman Act") to encourage entry of generic drugs into the market while preserving the incentives for companies to continue creating new drugs. Id. ¶ 23. FDA approval for a generic drug is usually sought by filing an Abbreviated New Drug Application ("ANDA") with the FDA. Id. The ANDA applicant must show that the generic drug is the bioequivalent version of the brand name drug that it refers to and must certify in the ANDA (1) that the generic bioequivalent does not infringe the patents of brand name drugs or (2) that the present patents on the brand name drug are invalid. Id. ¶¶ 24-25. Usually, to prevent this, current patent holders protect their patents for brand name drugs by submitting them to the FDA's Approved Drug Products with Therapeutic Equivalence Evaluations (the "Orange Book"). Id. ¶ 3.

The ANDA filer must notify the patent holder of the brand name drug that it has filed with the FDA. Id. ¶ 26. If the patent holder brings a patent infringement suit against the ANDA applicant within 45 days of receiving such notification, the FDA must stay its final approval of the ANDA for the generic drug until one of the following occurs: (1) the patent expires, (2) the patent infringement dispute is resolved, or (3) a 30-month waiting period expires. Id.

This case arises from Plaintiffs' allegations that Pfizer and Warner engaged in anti-competitive conduct. Id. Plaintiffs allege that in order to preserve their monopoly, Defendants extended their Neurontin patent beyond the expiration date of January 2000, thus preventing generic manufacturers from competing with Neurontin. Id. Plaintiffs further allege that Defendants extended their monopoly in the United States' Gabapentin product market (1) by purportedly submitting patents for formulas not equivalent to Neurontin for inclusion in the FDA's Orange Book and (2) by filing frivolous patent infringement lawsuits against potential competitors. Id.

Plaintiffs aver that Defendants knew that these generic formulas produced by potential competitors did not infringe on any patent that Defendants owned. Id. Plaintiffs further contend that Defendants' alleged acts have allowed them to improperly support and extend their monopoly for Neurontin. Id. As a result,

-3-

Plaintiffs believe that they have been denied a chance to choose between Neurontin and lower priced generic alternatives, which denial has caused economic injury to their business and property. Id. ¶ 4.

Plaintiffs raise four claims for relief. Id. ¶¶ 104-33. They allege that Defendants (1) violated the Tennessee Unfair Trade Practices Act, Tenn. Code Ann. § 47-25-101 et seq., (2) violated the Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-101 et seq., (3) committed common law monopolization of the market for Neurontin, and (4) were unjustly enriched as a result of their anti-competitive conduct. Id. As relief from Defendants' purported wrongdoing, Plaintiffs individually seek damages less than $75,000, including attorney's fees. Id. ¶ 8.

On May 29, 2002, this case was filed in the Circuit Court of Tennessee for the Thirteenth Judicial District at Memphis. Id. at 1. On June 24, 2002, Defendants filed a notice of removal, asserting that this court had federal question and diversity jurisdiction over Plaintiffs' claims for relief. (Notice of Removal at 2-3.) More specifically, Defendants argue that the claims against them require resolving substantial questions of federal patent law and that complete diversity of citizenship exists with an amount in controversy over $75,000. Id. at 3.

II. Standard For Remand

A civil action is removable only if Plaintiff could have originally brought the action in federal court. 28 U.S.C. § 1441(a). The court is required to remand "[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction." 28 U.S.C. § 1447(c). The removal statutes, 28 U.S.C. § 1441, et. seq. are subject to strict construction, Shamrock Oil & Gas Corp. v. Sheets, 313 U.S. 100, 108-09 (1941) and are "to be construed strictly, narrowly and against removal." Tech Hills II Assocs. v. Phoenix Home Life Mut. Ins., Co., 5 F.3d 963, 968 (6th Cir. 1993). Furthermore, Defendants seeking to remove a case to federal courts bear the burden of proving subject matter jurisdiction. See Ahearn v. Charter Township of Bloomfield, 100 F.3d 451, 453-54 (6th Cir. 1996).

III. Analysis

A. Deferred Judgment

As a preliminary matter, Defendants ask this court to defer Plaintiffs' motion to remand until the Joint Panel on Multidistrict Litigation ("JPMDL") decides to transfer this case. (Defs.' Resp. Mem. Opp'n Remand at 8-9.) Defendants argue that judicial economy and uniformity will best be served if the court defers Plaintiffs' motion to remand. Id. However, Plaintiffs assert that the court should not postpone its decision on this jurisdictional issue because a pending decision by the JPMDL does not create subject

-5-

matter jurisdiction. The court agrees.

The Sixth Circuit has held that jurisdictional issues should be decided as soon as practicable. Franzel v. Kerr Mfg. Co., 959 F.2d 628, 629 (6th Cir. 1992). See 28 U.S.C. § 1447(c) ("[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded."). Furthermore, this Circuit has warned that despite the consolidation of multiple similar actions across the country, a district court's first obligation is to determine whether the court has subject matter jurisdiction because without such jurisdiction, no action exists to transfer. BancOhio Corp. v. Fox, 516 F.2d 29, 31-32 (6th Cir. 1975).

The law is clear in this Circuit that in a removal context, "[t]he forum for suit ought to be settled at some time early in the litigation." Brierly v. Alusswisse Flexible Packaging, Inc., 184 F.3d 527, 533 (6th Cir. 1999), see also Sherwood v. Microsoft Corp., 91 F.Supp.2d 1196, 1199 (M.D. Tenn. 2000). Therefore, this court now entertains Plaintiffs' motion to remand.

B. Federal Question Jurisdiction

Plaintiffs contend that remand is appropriate because Defendants cannot overcome their burden of proving that either federal question or diversity jurisdiction warrant removal of this case to federal court. (Pl.'s Reply Mem. Supp. Remand at 1.)

-6-

Plaintiffs assert that federal question jurisdiction is lacking because they allege only state law claims that do not require resolution of substantial issues of federal patent law. Id. Plaintiffs further assert that federal diversity jurisdiction is lacking because they allege in good faith that the amount in controversy is less than $75,000 and that Defendants cannot aggregate class members' claims to meet the requisite amount. (Pl.'s Mem. Supp. Remand at 11-13.)

Defendants dispute both of Plaintiffs' contentions. First, Defendants aver that this court has proper diversity jurisdiction because the requisite amount in controversy is satisfied when the claims of these multiple Plaintiffs are aggregated pursuant to 28 U.S.C. § 1332.[2] (Defs.' Resp. Mem. Opp'n Remand at 14-19.) Defendants rely on Plaintiffs' relief claim and prayer for a constructive trust, injunctive relief, and damages allowed by law to support its theory that the amount in controversy in this case meets or exceeds $75,000. Id. Defendants further aver that this court has proper federal question jurisdiction over this case

---

[2] 28 U.S.C. § 1332 grants original jurisdiction to district courts in "all civil action where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs . . . ."

pursuant to 28 U.S.C. §§ 1331[3] and 1338.[4] Id. at 10. Specifically, Defendants argue that this case was properly removed because all four of Plaintiffs' claims necessarily rely on federal patent law. Id. at 14.

An analysis of whether a claim "arises under" federal law should be guided by the "well-pleaded complaint rule." Rivet v. Regions Bank of La., 522 U.S. 470, 475 (1998). The "'well-pleaded complaint rule . . . provides that federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint.'" Id. at 475 (quoting Caterpillar Inc., v. Williams, 482 U.S. 386, 392 (1987)). However, "'a plaintiff may not defeat removal [to federal court] by omitting to plead necessary federal questions.'" Id. (quoting Franchise Tax Bd. Of Cal. v. Constr. Laborers Vacation Trust for S. Cal., 463 U.S. 1, 22 (1983)). Thus, "[i]f a court concludes that a plaintiff has 'artfully pleaded' claims in this fashion, it may uphold removal even though no federal question appears on the face of the plaintiff's complaint." Id.

---

[3] 28 U.S.C. § 1331 grants original jurisdiction to district courts in "all civil actions arising under the Constiution, laws, or treaties of the United States."

[4] 28 U.S.C. § 1338(a) provides in part that "[t]he district court[ ] shall have original jurisdiction of any civil action arising under any Act of Congress relating to patents . . . ," and § 1338(b) further provides in part that "[t]he district courts shall have original jurisdiction of any civil action asserting a claim of unfair competition when joined with a substantial and related claim under . . . patent . . . law[ ]."

-8-

The Supreme Court has given guidance to determine whether a case "arises under" federal patent law pursuant to § 1338(a). According to the Supreme Court:

> [j]urisdiction . . . extend[s] only to those cases in which a well-pleaded complaint establishes either that federal patent law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal patent law, in that patent law is a necessary element of one of the well-pleaded claims.

Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 808-09. Further, the Court clearly held that "a claim supported by alternative theories in the complaint may not form the basis for § 1338(a) jurisdiction unless patent law is essential to each of those theories." Id. at 810. Therefore, § 1338(a) jurisdiction is not implicated if a claim is based on alternative theories of law, one of which does not require resolution of a question of patent law. Id.

Defendants acknowledge that Plaintiffs did not plead a federal cause of action. (Defs.' Resp. Mem. Opp'n Remand at 10.) They instead argue that none of Plaintiffs' four claims for relief may be resolved without first determining a question of federal patent law. Id. at 14. According to Defendants, Plaintiffs' entire theory of liability depends on the federal law of patent infringement. Id. However, Plaintiffs assert that their claims are based on Defendants' attempt to continue the unlawful

-9-

monopolization of the relevant Neurontin market and that the resolution of patent law is totally irrelevant to Defendants' price-fixing activities. (Pl.'s Mem. Supp. Remand at 9.) They further aver that they are not required to prove or disprove the validity of Defendants' patent infringement suits in order to prevail. Id.

Recently, in In re Tamoxifen Citrate Antitrust Litigation, ___ F.Supp.2d ___ (E.D.N.Y. 2002), No. MDL 1408(ILG), 2002 WL 1962125, at *4 (E.D.N.Y. Aug. 26, 2002)("Tamoxifen"), the United States District Court for the Eastern District of New York pointed out that the majority of district courts to consider jurisdictional questions similar to the one at bar, have held in favor of remand. See e.g., Ciprofloxacin Hydrochloride Antitrust Litig., 166 F.Supp.2d 740 (E.D.N.Y. 2001)("Cipro"); McGrew v. Schering-Plough Corp., No. 01-2311-GTV, 2001 WL 950790 (D. Kan. Aug. 6, 2001); Altman v. Bayer Corp., 125 F.Supp.2d 666 (S.D.N.Y. 2000); Drug Mart Pharmacy Corp. v. Abbot Labs., No. 00-631-CV, slip op. (E.D.N.Y. Aug. 28, 2000)("Drug Mart"); In re Cardizem CD Antitrust Litig., 90 F.Supp.2d 819 (E.D. Mich. 1999)("Cardizem"); Aetna United States Healthcare v. Hoechst Aktiengesellschaft, 54 F.Supp.2d 1042 (D. Kan. 1999). After noting the difficulty in resolving such jurisdictional questions under Christianson, the Tamoxifen court decided to follow the lone court that denied remand on a similar

-10-

question of federal jurisdiction, Koonan v. Barr Labs., No. C-01-0779, slip op. at 8 (N.D. Cal. June 21, 2001). See 2002 WL 1962125, at *7.

In Tamoxifen, Zeneca Inc. ("Zeneca"), acquired a license from Imperial Chemical Industries, PLC ("ICI") to exclusively manufacture, market and license Tamoxifen, an important drug for breast cancer treatment. Id. at *1. Eventually, Barr Laboratories Inc. ("Barr") filed an ANDA with the FDA requesting approval to market a generic equivalent of Tamoxifen. Id. Soon after receiving notice of Barr's filing with the FDA, ICI brought a patent infringement suit against Barr in the United States District Court for the Southern District of New York. Id. The court held that ICI's patent for Tamoxifen was invalid as a result of inequitable conduct, and ICI appealed the decision to the Federal Circuit. Id. at *2.

While the Federal Circuit considered ICI's appeal, ICI and Zeneca entered into a settlement agreement with Barr. Id. at *2. In the agreement, Barr agreed to drop its challenge to ICI and Zeneca's patent and to amend its ANDA application to the FDA to assure ICI and Zeneca that it would not seek to sell its generic equivalent of Tamoxifen until their patent expired. Id. The agreement further stipulated that Zeneca would grant Barr a license to market Zeneca's Tamoxifen under a generic label and would pay

Barr $21 million. Id.

After the settlement agreement went into effect, a class of Plaintiffs brought suit against Zeneca and Barr for (1) reviving a patent that was ruled invalid and unenforceable by the district court, (2) licensing the entire Unites States market for Tamoxifen to one company, Zeneca, (3) sharing Zeneca's profits from its monopoly of tamoxifen, (4) controlling price competition and perpetuating inflated market prices for Tamoxifen, and (5) excluding from competition other generic manufacturers of Tamoxifen. Id. The Tamoxifen court noted that "[t]he holder of a lawfully obtained patent maintains a monopoly over his product," and "'may assign to another his patent, in whole or in part, and may license others to practice his invention.'" Id. at *5; SCM Corp., v. Xerox Corp., 645 F.2d 1195, 1204 (2d Cir. 1981) (quoting Zenith Radio Corp., v. Hazeltime Research, Inc., 395 U.S. 100, 135 (1969)). The court further noted that "'a [valid] patent holder is permitted to maintain his patent monopoly through conduct permissible under the patent laws[,]'" and that Plaintiffs in Tamoxifen had to prove that ICI, Zeneca and Barr violated federal patent law with their agreement. Tamoxifen, 2002 WL 1962125, at *5; SCM Corp., 654 F.2d at 1204 (quoting Zenith Radio Corp., 395 U.S. at 135).

In denying Plaintiffs' motion to remand the case to state

Barr $21 million. Id.

After the settlement agreement went into effect, a class of Plaintiffs brought suit against Zeneca and Barr for (1) reviving a patent that was ruled invalid and unenforceable by the district court, (2) licensing the entire Unites States market for Tamoxifen to one company, Zeneca, (3) sharing Zeneca's profits from its monopoly of tamoxifen, (4) controlling price competition and perpetuating inflated market prices for Tamoxifen, and (5) excluding from competition other generic manufacturers of Tamoxifen. Id. The Tamoxifen court noted that "[t]he holder of a lawfully obtained patent maintains a monopoly over his product," and "'may assign to another his patent, in whole or in part, and may license others to practice his invention.'" Id. at *5; SCM Corp., v. Xerox Corp., 645 F.2d 1195, 1204 (2d Cir. 1981) (quoting Zenith Radio Corp., v. Hazeltime Research, Inc., 395 U.S. 100, 135 (1969)). The court further noted that "'a [valid] patent holder is permitted to maintain his patent monopoly through conduct permissible under the patent laws[,]'" and that Plaintiffs in Tamoxifen had to prove that ICI, Zeneca and Barr violated federal patent law with their agreement. Tamoxifen, 2002 WL 1962125, at *5; SCM Corp., 654 F.2d at 1204 (quoting Zenith Radio Corp., 395 U.S. at 135).

In denying Plaintiffs' motion to remand the case to state

court, the Tamoxifen court stated that "[t]he specific references in the complaints to the enforceability of the [Tamoxifen] [p]atent preclude avoiding the conclusion that the validity of the patent is the sine qua non of the Settlement Agreement which, in turn, goes to the heart of the plaintiffs' grievance." Tamoxifen, 2002 WL 1962125, at *6. The Tamoxifen court further wrote in dicta:

> While the owner of a valid patent does not have cart blanche to engage in any conduct it wishes and cannot assume that its patent will always immunize it from antitrust liability, this is not a situation, for example, where defendants are alleged to have engaged in sham patent infringement litigation for the purpose of delaying generic drug competition. Proof of sham litigation would certainly seem to be outside the scope of protected activity under a valid patent.

2002 WL 192125, at *5.

In the majority cases that decided in favor of remand, Plaintiffs alleged that Defendants engaged in something more than sham litigation, for example, anti-competitive acts such as executing an agreement with an ANDA applicant to preserve and perpetuate the monopoly of a questionable patent. See eg. Cipro, 166 F.Supp.2d at 747, 48 (holding that Plaintiffs could prove their state antitrust claim without resolving federal patent law by proving their allegations that Defendants had entered into an anti-competitive agreement to restrict the sale of Ciproflaxin); McGrew, 2001 WL 950790, at *4 (holding that the settlement agreements in that case "form[ed] part of the factual basis of Plaintiff's

-13-

claims" and that the agreements demonstrated how Defendants engaged in a conspiracy to monopolize the market for K-Dur 20); Altman, 125 F.Supp.2d at 674-75 (holding that Plaintiffs could point to Defendants' use of sham litigation and a stipulation agreement to prove their state law claims); Drug Mart, No. 00-631-CV (holding that Defendants' sham litigation and illegal agreements unlawfully restrained trade and that neither of Plaintiff's claims depended upon resolution of federal patent law); Cardizem, 90 F.Supp.2d at 839 (holding that Defendants' collective acts of instituting sham litigation with an "impure heart" and executing a stipulation agreement could be proven regardless of whether Defendants' patent was valid or not); Aetna, 54 F.Supp.2d at 1054-55 (holding also that Defendants' collective acts of engaging in sham litigation with an "impure heart" and executing a stipulation agreement evidenced unfair anti-competitive acts and that "[a]ny discussion of patent law [was] merely tangential to plaintiffs' claim").

None of the majority cases considered the issue of whether purported sham litigation was by itself sufficient for remand to state court. In Tamoxifen, the court decided that an agreement between two Defendant drug companies to perpetuate an unlawful monopoly was not enough to remand without more, in Tamoxifen, an allegation of sham litigation. See 2002 WL 1952125, *5. Thus, no authority supports the proposition that remand is appropriate in the

-14-

absence of alternative theories that do not require resolution of federal questions.

The claim of sham litigation alone in the case at bar cannot justify remand without some other theory of anti-competitive conduct. Even if the patent holder files an infringement suit with an "impure heart", a determination that the patent at issue is valid undermines such a claim of fraudulent litigation and legitimizes the patent holder's efforts to manufacture and market the patented drug. See Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc., 505 U.S. 49, 59 1993)(holding that "evidence of anticompetitive intent or purpose alone cannot transform otherwise legitimate activity into a sham"). The sole reason sham litigation is "outside the scope of protected activity under a valid patent" is that the patent is valid. See 21 U.S.C. § 355(j)(5)(B)(iii); 35 U.S.C. § 271. A determination of sham litigation requires first and foremost resolution of an essential question of federal patent law.

In the case at bar, Plaintiffs' four claims for relief, (1) violation of the Tennessee Unfair Trade Practices Act, (2) violation of the Tennessee Consumer Protection Act, (3) common law monopolization of the market for Neurontin, and (4) unjust enrichment are all premised upon Defendants' submitting purported invalid patents to the FDA and Defendants' alleged filing of frivolous and sham patent infringement lawsuits against potential

competitors in the Neurontin market. Thus, if the patents filed with the FDA are determined valid and Defendants instigated legitimate patent infringement lawsuits, Plaintiffs' claims cannot stand.[5] Plaintiffs argue that Defendants were able to raise, fix, maintain, and stabilize Neurontin prices at artificial and supercompetitive levels. This activity would not in and of itself demonstrate an unlawful monopoly if Defendants owned a valid and enforceable patent for Neurontin. Unlike Plaintiffs in Cipro, McGrew, Altman, Drug Mart, Cardizem, and Aetna, Plaintiffs in this case fail to offer an alternative theory to support its claims, such as an agreement, stipulation, or consent judgment evidencing a conspiratorial scheme to maintain an unlawful monopoly, which would not require resolution of federal patent law.

Given a federal question, this court has subject matter jurisdiction. The question of diversity jurisdiction is moot. Plaintiffs' motion to remand is DENIED.

---

[5] The court is aware that the United District Court for the Northern District of Illinois granted summary judgment against Warner on one of the infringement lawsuits that it filed over a Gabapentin patent. (Compl. ¶ 50.) This ruling is not inconsistent with the court's view that the resolution of federal patent law issues is necessary to the determination of this case.

So ORDERED this **1st** day of October 2002.

*[signature]*

SAMUEL H. MAYS, JR.
UNITED STATES DISTRICT JUDGE