UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE NEURONTIN MARKETING, SALES ) PRACTICES, AND PRODUCTS ) LIABILITY LITIGATION ) ) | MDL Docket No. 1629 Master File No. 04-10981 Judge Patti B. Saris Mag. Judge Leo T. Sorokin |
| THIS DOCUMENT RELATES TO: ) ) HARDEN MANUFACTURING ) CORPORATION; LOUISIANA HEALTH ) SERVICE INDEMNITY COMPANY, dba ) BLUECROSS/BLUESHIELD OF ) LOUISIANA; INTERNATIONAL UNION ) OF OPERATING ENGINEERS, LOCAL ) NO. 68 WELFARE FUND; ASEA/AFSCME ) LOCAL 52 HEALTH BENEFITS TRUST; ) GERALD SMITH; and LORRAINE KOPA, ) on behalf of themselves and all others ) similarly situated, v. PFIZER INC. and ) WARNER-LAMBERT COMPANY ) | |
| THE GUARDIAN LIFE INSURANCE CO. ) OF AMERICA v. PFIZER, INC. and ) AETNA, INC. v. PFIZER, INC. ) ) | |

**PLAINTIFFS' JOINT MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS PFIZER INC. AND WARNER-LAMBERT COMPANY'S
MOTION TO DISMISS THE SECOND AMENDED CLASS ACTION
COMPLAINT AND THE SECOND COORDINATED AMENDED COMPLAINT**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.      MOST OF DEFENDANTS' ARGUMENTS ARE PROCEDURALLY
        IMPROPER............................................................................................................ 1

        A.      Successive Motions to Dismiss May Not Be Brought on Rejected
                or Previously Available But Unasserted Grounds ..................................... 1

        B.      The Court Has Already Sustained Plaintiffs' RICO Allegations
                Concerning HCC, Boron LePore, MES, Physicians World, and
                CME ........................................................................................................... 3

        C.      Defendants' Reliance Argument Was Equally Available But
                Omitted From Their Prior Motion to Dismiss ........................................... 4

        D.      Defendants Have Already Litigated and Lost the Issue of Potential
                Liability for Physician Misrepresentations ................................................ 5

        E.      The Court Has Already Found Plaintiffs' Allegations Concerning
                Pain, Bipolar Disorder, and Panic Disorder Sufficient ............................. 5

II.     CLASS PLAINTIFFS HAVE SUFFICIENTLY ALLEGED A RICO
        ENTERPRISE INVOLVING MEDICAL ACTION
        COMMUNICATIONS .......................................................................................... 6

III.    CLASS PLAINTIFFS' HAVE SUFFICIENTLY ALLEGED RELIANCE ......... 9

IV.     DEFENDANTS MAY BE HELD LIABLE FOR
        MISREPRESENTATIONS MADE BY THEIR STABLE OF
        "NEURONTIN SPEAKER" PHYSICIANS ........................................................ 10

V.      PLAINTIFFS' ALLEGATIONS REGARDING OFF-LABEL USES ARE
        SUFFICIENT ...................................................................................................... 12

        A.      Plaintiffs' Allegations Regarding Pain Are Sufficient............................ 12

        B.      Plaintiffs' Allegations Regarding Bipolar And Other Mood
                Disorders Are Sufficient ......................................................................... 14

        C.      Plaintiffs' Allegations Regarding Anxiety Disorders Are Sufficient ...... 15

VI.     COORDINATED PLAINTIFFS HAVE ADEQUATELY ALLEGED
        THEIR LOSSES ................................................................................................. 16

VII.    COORDINATED PLAINTIFFS HAVE APPROPRIATELY STATED A
        CLAIM UNDER THE PENNSYLVANIA INSURANCE FRAUD
        STATUTE........................................................................................................... 19

## TABLE OF AUTHORITIES

**Page**

**Cases**

*766347 Ontario Ltd. v. Zurich Capital Mkts., Inc.*,
  274 F. Supp. 2d 926 (N.D. Ill. 2003) ............................................................ 2

*Borden v. Sec'y of Health & Human Servs.*,
  836 F.2d 4 (1st Cir. 1988) ............................................................................. 5

*Commonwealth v. Monumental Properties, Inc.*,
  329 A.2d 812 (Pa. 1974) ............................................................................ 20

*Desiano v. Warner-Lambert Co.*,
  326 F.3d 339 (2d Cir. 2003) ................................................................ 16, 18

*Federal Express Corp. v. United States Postal Service*,
  40 F. Supp. 2d 943 (W.D. Tenn. 1999) ......................................................... 1

*Federal Savings and Loan Insurance Corporation v. Shearson-American Express, Inc.*,
  658 F. Supp. 1331 (D.P.R. 1987).............................................................. 11

*FRA S.p.A. v. Surg-o-Flex of America, Inc.*,
  415 F. Supp. 421 (S.D.N.Y. 1976) .............................................................. 2

*In re Lupron Marketing & Sales Practices Litig.*,
  MDL 1430, 2004 WL 2070883 (D. Mass. Sept. 16, 2004) ......................... 20

*Keefe v. Derounian*,
  6 F.R.D. 11 (N.D. Ill. 1946)......................................................................... 2

*Lewis v. Rosenfeld*,
  138 F. Supp. 2d 466 (S.D.N.Y. 2001) ....................................................... 12

*Manchester Knitted Fashions, Inc. v. Amalgamated Cotton Garment & Allied Indus.
  Fund*,
  967 F.2d 688 (1st Cir. 1992)........................................................................ 1

*Miranda v. Ponce Federal Bank*,
  948 F.2d 41 (1st Cir. 1991) ....................................................................... 11

*Schofield v. First Commodity Corp. of Boston*,
  793 F.2d 28 (1st Cir. 1986)........................................................................ 11

*Sears Petroleum & Transport Corp. v. Ice Ban America, Inc.*,
  217 F.R.D. 305 (N.D.N.Y. 2003) ................................................................. 1

*Seippel v. Jenkens & Gilchrist, P.C.*,
  341 F. Supp. 2d 363 (S.D.N.Y. 2004) ....................................................... 11

*Wafra Leasing Corp. 1999-A-1 v. Prime Capital Corp.*,
  247 F. Supp. 2d 987 (N.D. Ill. 2003) .......................................................... 2

**Statutes**

18 Pa. C.S. § 4117(a)(2)....................................................................... 19, 20

## TABLE OF AUTHORITIES

**Page**

**Other Authorities**

5 Wright & Miller, *Federal Practice & Procedure* § 1384 ................................................ 2

# I.    MOST OF DEFENDANTS' ARGUMENTS ARE PROCEDURALLY IMPROPER

## A.    Successive Motions to Dismiss May Not Be Brought on Rejected or Previously Available But Unasserted Grounds

Rule 12(g) of the Federal Rules of Civil Procedure expressly provides that if a party makes a motion under Rule 12 "but omits therefrom any defense or objection then available to the party . . . , the party shall not thereafter make a motion based on the defense or objection so omitted . . . ."[1]  The purpose of this rule "is to eliminate unnecessary delays in the early pleading stages of a suit so that all available Rule 12 defenses are advanced before consideration of the merits."  *Manchester Knitted Fashions, Inc. v. Amalgamated Cotton Garment & Allied Indus. Fund*, 967 F.2d 688, 691 (1st Cir. 1992).  The filing of an amended complaint is not an opportunity for Defendants to raise new arguments that were previously available to them, or to better litigate issues they previously raised unsuccessfully before the Court.  As one court summarized:

> [I]f the amended complaint also contains new matter, the defendant may bring a second motion under Rule 12 to object to *the new allegations only*. . . . [T]he amended complaint does not automatically revive all the defenses and objections the defendant may have waived in a first motion to dismiss or [permit the defendant] to challenge the sufficiency of the amended complaint with arguments that were *previously considered and decided by the court in the first motion to dismiss.  Nor may defendant advance arguments that could have been made in the first motion to dismiss but neglected to do so.*

*Sears Petroleum & Transport Corp. v. Ice Ban America, Inc.*, 217 F.R.D. 305, 307 (N.D.N.Y. 2003) (citations omitted, emphasis added).[2]

---

[1] Although Rule 12(h)(2) allows a defendant to later assert the defense of failure to state a claim where it was omitted from the original motion to dismiss, the rule does not allow for successive Rule 12(b)(6) motions attacking the same claims with either previously rejected arguments or arguments that could have been raised in the first motion.

[2] *See also Federal Express Corp. v. United States Postal Service*, 40 F. Supp. 2d 943, 948 (W.D. Tenn. 1999) (denying successive motion to dismiss and stating that defendant "has not offered any explanation for why this failure to state a claim argument was not raised in its initial pre-answer motion"); *FRA S.p.A.*

Despite these clear and simple rules, Defendants advance several arguments that (1) have nothing whatever to do with the new allegations in Plaintiffs' complaints,[3] and either (2) have already been litigated and lost by Defendants in their first motion to dismiss, or (3) were equally available to Defendants but not asserted by them in their prior motion. Specifically, Defendants argue that Plaintiffs' allegations concerning the involvement of the medical marketing firms HCC, Boron LePore, MES, Physicians World, and CME are insufficient, despite the fact that Plaintiffs have not amended these allegations, which the Court has ruled sufficient after two full rounds of litigation. Next, Defendants argue that Class Plaintiffs' common law fraud claim should be dismissed for failure to sufficiently plead reliance, when this argument was equally available to Defendants but omitted from their first motion to dismiss, as the Court found in declining to consider the argument, which Defendants raised for the first time in their objections to Magistrate Judge Sorokin's January 31, 2006 Report and Recommendation. Next, Defendants argue that they cannot be held liable for any misrepresentations or omissions made by their stable of company-trained "Neurontin Speaker" physicians, even though

---

*v. Surg-o-Flex of America, Inc.*, 415 F. Supp. 421, 427-28 (S.D.N.Y. 1976) ("'Any defense that is available at the time of the original motion but is not included, may not be the basis of a second pre-answer motion.' . . . Although Rules 12(g) and 12(h)(2) appear to preserve the timeliness of a 12(b)(6) objection for failure to state a claim, the purpose of that very Rule is undermined when the court's precious time and resources are squandered on successive motions which were available at an earlier time.") (*quoting* 5 Wright & Miller, *Federal Practice & Procedure* § 1384, at p. 837); *766347 Ontario Ltd. v. Zurich Capital Mkts., Inc.*, 274 F. Supp. 2d 926, 930 (N.D. Ill. 2003) ("Rule 12(g) generally precludes a defendant from bringing successive motions to dismiss raising arguments that the defendant failed to raise at the first available opportunity."); *Wafra Leasing Corp. 1999-A-1 v. Prime Capital Corp.*, 247 F. Supp. 2d 987, 999 (N.D. Ill. 2003) ("Because Smithburg and Walter did not raise before the arguments they make now regarding counts one and two, Smithburg and Walter are precluded from raising these arguments in this their third motion to dismiss."); *Keefe v. Derounian*, 6 F.R.D. 11, 13 (N.D. Ill. 1946) (holding that an amended complaint "does not revive the defendant's right to challenge the sufficiency of the complaint, which motion made to the original complaint had already been denied").

[3] For the Court's convenience, a redlined comparison of the First and Second Amended Class Action complaint is attached as Exhibit Z to the Declaration of Ilyas Rona in Support of Plaintiffs' Joint Opposition ("Rona Decl.").

the Court has already ruled otherwise. Finally, Defendants argue that Plaintiffs'

allegations regarding pain, bipolar disorder, and panic disorder are insufficient, even

though the Court has already ruled otherwise. Each of these arguments is procedurally

improper, and should not be further considered by the Court.

### B. The Court Has Already Sustained Plaintiffs' RICO Allegations Concerning HCC, Boron LePore, MES, Physicians World, and CME

In its June 12, 2006 Memorandum and Order ruling on Defendants' first motion

to dismiss (Dkt. No. 356, "MTD Order"), the Court found that:

> [A]s to the medical marketing firms named in the complaints, Plaintiffs
> have adequately alleged systematic linkages that constitute ongoing units
> sufficient to sustain allegations of RICO enterprises. . . . To be sure, the
> systematic linkages alleged are greater with respect to some firms . . . than
> others, but in each case, the plaintiffs have alleged enough continued
> interaction with a common purpose to sustain a claim.

*Id*. at 17-18. The Court reached this conclusion after exhaustive briefing on the issue,

both on the original motion to dismiss and the objections to Magistrate Judge Sorokin's

Report and Recommendation dated January 31, 2006 (Dkt. No. 269, the "Report and

Rec."). *See* Defs. Mem. of Law in Supp. of Mot. to Dismiss Am. Cl. Action Compl. and

First Am. Coord. Compl. (Dkt. No. 60, "Defs. 1st MTD") at 19 (arguing that "Plaintiffs'

allegations of systematic linkage are entirely cursory and insufficient"); Defs. Mem. of

Law in Opp. to Pls.' Joint Obj. to Report and Rec. (Dkt. No. 304, "Defs. Opp. Pls. Obj.")

at 10 (arguing that Plaintiffs have alleged only a hub-and-spoke structure).)

Impervious to the Court's carefully considered ruling, Defendants persist in

arguing that "Plaintiffs have failed to allege… that there is any connection between the

alleged fraud and six of the eleven Vendor Enterprises alleged in the Second Class

Complaint" and "three of the seven Vendor Enterprises alleged in the Second

Coordinated Complaint," specifically, HCC, Boron Lepore, MES, Physicians World,

CME, and MAC.  Defs. Mem. of Law in Supp. of Mot. to Dismiss Sec. Am. Cl. Action

Compl. and Sec. Coord. Am. Compl. (Dkt. No. 400, "Defs. 2d MTD") at 4.  Plaintiffs'

substantive allegations as to the first five of these vendors are *unchanged*, except to note

a change in the ownership of MES (*see* Second Amended Class Action Complaint ("Sec.

Cl. Comp.", and, together with the Second Coordinated Amended Complaint ("Sec.

Coord. Comp.", the "Complaints") ¶ 88) and Boron Lepore (*id*. ¶ 95) immaterial to

Defendants' argument.  Defendants' improper attempt to relitigate the sufficiency of

Plaintiffs' pleading as to these vendor participants in the RICO enterprises should be

rejected.[4]

**C.    Defendants' Reliance Argument Was Equally Available But Omitted From Their Prior Motion to Dismiss**

Next, Defendants renew their argument that Class Plaintiffs' common law fraud

claim should be dismissed for failure to plead reliance.  Defs. 2d MTD at 7.  Defendants

have simply pasted, nearly verbatim, their argument regarding reliance from their

objections to the Report and Rec. into their new motion.  *Compare* Defs. Mem. of Law In

Supp. of Obj. to Report and Rec. (Dkt. No. 287, "Defs. Obj.") at 12-13 with Defs. 2d

MTD at 7-8.  Defendants did *not* advance this argument in their first motion to dismiss,[5]

and the Court has already declined to consider it on this ground.  *See* MTD Order at 2

("The Court will not consider any objections which raise new issues not put before the

---

[4] Conversely, to the extent Defendants attempt to draw some fine distinction between their past and present arguments, the "new" argument is barred because it was *not* raised but was equally available to Defendants on their prior motion, inasmuch as Plaintiffs' allegations concerning these medical marketing firms are unchanged.  The class complaint *was* amended to add five pages of detailed factual allegations concerning Medical Action Communicuations, Inc. ("MAC"), a vendor identified in documents only recently produced to Plaintiffs.  *See* Sec. Cl. Comp. ¶¶ 121-29.  The sufficiency of these allegations is discussed *infra*.

[5] *See* Defs. 1st MTD; Defs. Reply Mem. of Law In Further Supp. of Mot. to Dismiss Am. Cl. Action Comp. and.First Coord. Amended Comp. (Dkt. No. 122, "Defs. 1st MTD Reply").  A review of the tables of contents and a word search of both of these documents for "reliance" confirms that no such argument was made by Defendants.

Magistrate Judge in the original briefing on the motion to dismiss.  *See Borden v. Sec'y of Health & Human Servs.*, 836 F.2d 4, 6 (1st Cir. 1988).").  Defendants' argument is even more tardy the second time around.

> **D.    Defendants Have Already Litigated and Lost the Issue of Potential Liability for Physician Misrepresentations**

Defendants have previously argued that alleged misrepresentations made by physicians should not be imputed to them.  Defendants first argued in their original motion to dismiss that Plaintiffs had not made sufficient allegations of control over the alleged enterprises.  *See* Defs. 1st MTD at 21-22.  The Magistrate Judge expressly concluded that "the allegations appear sufficient at this stage to allow Plaintiffs to proceed on the theory that Defendants are responsible for the doctors' statements." Report and Rec. at 39.  Defendants repeatedly disputed such imputation in their objections to the Report and Rec.  *See* Defs. Obj. at 16-18, 21, 23-24, and 27; Pls.' Joint Resp. to Defs. Obj. (Dkt. No. 303) at 25, n.21.  The Court adopted the Magistrate Judge's ruling on this issue.  MTD Order at 20, 25.  This issue has already been briefed and decided, and should not be revisited.

> **E.    The Court Has Already Found Plaintiffs' Allegations Concerning Pain, Bipolar Disorder, and Panic Disorder Sufficient**

The Report and Rec. expressly found that Plaintiffs' "allegations involving statements made about pain . . . [and] diabetic neuropathy . . . satisfy Rule 9(b)'s pleading requirements," and that "Plaintiffs' allegations involving statements made about . . . bipolar, and panic disorder also survive Defendants' Rule 9(b) objection."  *Id*. at 39, 40-41.  After receiving considerable briefing on these issues — and requesting and receiving *supplemental* briefing — the Court expressly held that "Plaintiffs have met Fed. R. Civ. P. 9(b)'s requirement of pleading fraud with particularity with respect to statements made

by physicians about pain, diabetic neuropathy, . . . bipolar, and panic disorder . . . ."
MTD Order at 20-21.

Ignoring the Court's ruling, Defendants again argue that Plaintiffs' allegations
concerning pain, bipolar disorder, and panic disorder are insufficient to satisfy Rule 9(b).
*See* Defs. 2d MTD at 12-16.  Incredibly, Defendants contend that "Class Plaintiffs'
original allegations regarding general pain were dismissed," and that only "[a]llegations
regarding diabetic peripheral neuropathy ("DPN"), a specific type of pain, survived
dismissal."  Defs. 2d MTD at 12.  Defendants are grossly mistaken, as both the Report
and Rec. and the MTD Order (quoted *supra*) expressly found Plaintiffs' allegations as to
*both* pain and DPN sufficient.  The fact that Class Plaintiffs have supplemented their
already sufficient allegations regarding pain with *additional* factual detail (see Sec. Cl.
Comp. ¶¶ 143-53) does not re-open the issue, or render the pre-existing allegations
insufficient.  The sufficiency of Plaintiffs' allegations concerning pain, bipolar disorder,
and panic disorder has been *thoroughly* litigated, and should not be revisited.[6]

## II.     CLASS PLAINTIFFS HAVE SUFFICIENTLY ALLEGED A RICO ENTERPRISE INVOLVING MEDICAL ACTION COMMUNICATIONS

As noted above, the Sec. Cl. Comp. was amended to add five pages of detailed
factual allegations concerning MAC, a medical marketing firm whose role in Defendants'
off-label marketing scheme was only recently disclosed in documents ordered produced
in related litigation (and *not* produced in *Franklin*).[7]  Based on these documents, Class

---

[6] Having had to devote 6 of their 20 pages to the procedural impropriety of most of Defendants' arguments, Plaintiffs are unable to respond fully to their substance in the pages remaining.  Accordingly, should the Court be inclined to entertain any of these rejected or dilatory arguments, Plaintiffs request an additional six pages in which to brief them further.

[7] These documents were produced by Pfizer in a related personal injury case, *Young v. Pfizer, Inc. and Parke-Davis*, N.Y. Super. Ct., County of Orange, Index No. 1062/2004, and shared with Plaintiffs with Defendants' permission.

Plaintiffs have alleged that after Pfizer acquired Parke-Davis in June 2000, it retained MAC to expand the Neurontin publication strategy, and that MAC and Pfizer worked closely together to create and distribute publications with "key messages" regarding off-label usage, messages which "were designed to be false and misleading distortions of Neurontin's efficacy in off-label uses." Sec. Cl. Comp. ¶ 122. For example, in April 2002, MAC and Pfizer officials met to decide how to "spin" a series of negative Neurontin studies so that they appeared to be positive. They decided to "move the goalposts" regarding one study of neuropathic pain; when the study failed using the metrics originally established by the study's authors, MAC and Pfizer reduced the efficacy threshold so that subjects originally classified as having no response to Neurontin were redefined to have responded favorably. *Id.* ¶ 126.

Class Plaintiffs identify other misleading "key messages" disseminated by MAC, including that Neurontin had "proven efficacy" in epilepsy monotherapy, and that "Neurontin needed to be titrated up to 3600 mg per day [twice the FDA-approved limit] to determine efficacy." *Id.* ¶ 123. The Sec. Cl. Comp. specifically identifies numerous such articles prepared by MAC. *Id.* ¶ 127.[8]

---

[8] Although the specific false statements in each article are not identified in the Sec. Cl. Comp., Class Plaintiffs could further amend the complaint to allege the following:

| Article | False Statements |
|---|---|
| Brodie et al., Epilepsia (September 2002): study | "GBP [gabapentin] also has been shown to be effective as monotherapy in adults with partial seizures" [*citing trials which did not support efficacy*] |
| Guttuso, Obstet Gynecol (February 2003): study | "gabapentin has shown efficacy in controlled studies for neuropathic pain, migraine headache, essential tremor, panic disorder, and social phobia" [*omitting reference of negative studies in neuropathic pain, migraine headache, essential tremor, and falsely citing panic disorder trial as supporting efficacy*] |

Against these allegations, Defendants argue that "Class Plaintiffs do not allege facts indicating that this enterprise has any connection to the alleged fraud." Mem. at 7. The "systematic linkages" between Pfizer and MAC alleged in the Sec. Cl. Comp. easily fall into the "greater" category of allegations the Court has already found "sufficient to sustain allegations of RICO enterprises." MTD Order at 17. Class Plaintiffs allege that:

> Pfizer integrated MAC into its internal communication and decision-making structures. Numerous MAC employees regularly sat in on meetings of the Pfizer Publications Sub-Committee, which were held monthly. MAC kept minutes of the meetings and distributed the results to Pfizer in an "action memorandum" shortly after. At these meetings, Pfizer disclosed to MAC highly confidential information, including information relating to drugs that had not yet received FDA approval.

> . . . With Pfizer's permission, MAC developed an "action memorandum" format that used Pfizer's letterhead so that MAC could communicate with Pfizer offices around the world. MAC also requested and obtained a Pfizer email account so that MAC could directly send emails to Pfizer employees using Pfizer's internal email system, rather than funneling all emails through a Pfizer liaison. MAC also was entrusted by Pfizer to help it internally manage the large and rapidly growing number of journal articles that had been created on Neurontin's off-label uses by creating a bibliography to be used by Pfizer sales representatives and Pfizer medical information employees.

Sec. Cl. Comp. ¶¶ 128-29. Based on the Court's prior rulings, Class Plaintiffs' allegations are more than sufficient to allege a RICO claim involving a RICO enterprise

| Guttuso, J Pain Symptom Manage (March 2004): case report | "[Gabapentin was approved] in 2002 as a treatment for neuropathic pain." [*Falsely claiming that Neurontin was approved for neuropathic pain when the FDA actually informed Pfizer that it would not issue such an approval*] |
|---|---|
| Spira et al., Neurology (December 2003) | [*omitting reference to negative study in migraine headache*] |
| Gidal et al., Clinical Therapeutics (May 2003): review article | misrepresenting the negative results of the various trials that failed to establish a dose response and falsely suggested that these trials established Neurontin's greater efficacy at doses beyond 1800 mg per day |

composed of Pfizer and MAC.[9]

### III.    CLASS PLAINTIFFS' HAVE SUFFICIENTLY ALLEGED RELIANCE

As set forth above, Defendants' argument that Class Plaintiffs have not

sufficiently alleged reliance is untimely.  Moreover, the Report and Rec. specifically

finds that:

> Plaintiffs have alleged enough detail to establish at this stage that
> Defendants' challenged conduct was a substantial cause of prescriptions
> written by physicians and paid for by Plaintiffs.  Specifically, Plaintiffs
> allege that physicians relied upon the statements, that Defendants targeted
> prescribers of Neurontin; and that Defendants monitored and measured the
> effects of the successful campaign.  This is sufficient for present purposes
> . . . .

Report and Rec. at 19 (citing *United States ex rel. Franklin*, 2003 WL 22048255 at *11

(D. Mass. Aug. 22, 2003)).  The Court left this finding undisturbed.  MTD Order at 25.

Just last month, *in Dellinger v. Pfizer, Inc.*, 2006 WL 2057654 (W.D.N.C. July

19, 2006), Defendants lost a nearly identical argument on summary judgment in a case

alleging that "the illegal promotion of Neurontin as an 'off-label' drug resulted in

Plaintifff's illness and subsequent hospitalization."  *Id*. at *3.  Even though the plaintiff

could offer no evidence that the prescribing physician was directly exposed to

Defendants' off-label marketing efforts, the Court concluded that:

> [V]iewing the evidence in the light most favorable to Plaintiff, Dr. Miller
> could have been influenced by the professional opinion of one or more of
> his colleagues, who had been influenced by Defendants' alleged unfair and
> deceptive trade practices.  Notably, Dr. Miller admits that sources are
> fairly limited concerning drug studies and findings.  In fact, Dr. Miller

---

[9] Plaintiffs continue to identify additional articles generated through MAC that contain false statements.
*See* Rona Decl., ¶¶ 21-22.  Additional facts concerning the roles of HCC, Boron Lepore, MES, Physicians
World, and CME in Defendants' promotional scheme — and the recently produced documents containing
them — are set forth in paragraphs 7-20 of the Rona Decl.  If necessary, Plaintiffs can amend their
complaints to set forth these additional allegations.  However, Plaintiffs respectfully submit that it would
waste a great deal of  time and effort to require Plaintiffs to amend their complaints every time they identify
another misleading statement or participant in Defendants' decade long, multi-billion dollar promotional
scheme.

also concedes that his colleagues would have likely learned about the "off-label" usage of drugs through some study or report.  Therefore, based on the extensive misrepresentations made regarding scientific information of the "off-label" usage of Neurontin, there is a genuine issue as to whether the Defendants' conduct indirectly caused Dr. Miller to prescribe Neurontin for an "off-label" use.

*Id.* at *7 (record citations omitted).

The same is true here.  Defendants so saturated the market with disinformation regarding Neurontin's effectiveness for off-label uses that Plaintiffs should be given an opportunity to prove that sales of Neurontin skyrocketed because prescribing physicians directly or indirectly relied on Defendants' misleading claims.

## IV.     DEFENDANTS MAY BE HELD LIABLE FOR MISREPRESENTATIONS MADE BY THEIR STABLE OF "NEURONTIN SPEAKER" PHYSICIANS

As set forth above, Defendants have already litigated and lost the issue of whether misrepresentations made by their stable of company selected, trained, and paid "Neurontin Speaker" physicians can be imputed to them.  Defendants effectively concede that they cannot prevail under the "entanglement" test applied by the Magistrate Judge, as they dispute only its applicability, not the result of its application.  *See* Defs. 2d MTD at 9-10.  Defendants thoroughly briefed the "entanglement" issue in their objections to the Report and Rec. (*see* Defs.' Obj. at 17-18, 21, 23; Pls.' Joint Resp. to Defs. Obj. at 25, n.21), and the Court left undisturbed the Magistrate Judge's conclusion that Plaintiffs may "proceed on the theory that Defendants are responsible for the doctors' statements." Report and Rec. at 39; MTD Order at 20, 25.  Defendants' belated observation that the "entanglement" test was adopted by the First Circuit in a securities fraud case — a fact duly noted at page 38 of the Report and Rec. — provides no basis to even revisit the issue, much less reverse the Court's ruling.

Ignoring the Court's ruling, Defendants set up a straw man, arguing that agency

principles, not the "entanglement" test, should determine whether Defendants may be held liable for physician misrepresentations.  However, Defendants cite no authority establishing that a plaintiff must show that a RICO principal controlled a third party to the extent contemplated by the agency test they put forth.  Instead, Defendants cite facially distinguishable cases dealing with the distinct concept of an employer's liability for the acts of its employee under RICO.  For example, *Miranda v. Ponce Federal Bank*, 948 F.2d 41, 45 (1st Cir. 1991), discusses vicarious liability under RICO in order to emphasize that the enterprise and RICO defendant must be separate, and thus, that a plaintiff may not use vicarious liability to circumvent this requirement.  *See also Schofield v. First Commodity Corp. of Boston*, 793 F.2d 28, 32 (1st Cir. 1986).  Plaintiffs are seeking to do no such thing here.  Similarly, *Federal Savings and Loan Insurance Corporation v. Shearson-American Express, Inc.*, 658 F. Supp. 1331, 1338 (D.P.R. 1987), addresses the liability of a corporation for the acts of one of its employees, not the acts of, more generally, a "non-participant" in a RICO enterprise, as Defendants suggest. Further, none of the other cases cited by Defendants discussing the control element of agency law involved claims arising under RICO.

The Magistrate Judge recognized, and the Court affirmed, that the "framework established by the First Circuit…  identifies relevant factors" to evaluate whether a defendant can be held liable for third-party statements.  Report and Rec. at 38-39; *see also* MTD Order at 20.  Applying those factors, Plaintiffs' allegations are sufficient.  *Id*. Other courts have similarly articulated standards for control over third-party statements far less rigid than the one offered by Defendants.  For example, in *Seippel v. Jenkens & Gilchrist, P.C.*, 341 F. Supp. 2d 363, 378-79 (S.D.N.Y. 2004), the Court held that

defendants could be held liable for third-party statements where the third party allegedly made the statements "acting at the behest and with the knowledge and authority of" defendants. *See also Lewis v. Rosenfeld*, 138 F. Supp. 2d 466, 478 (S.D.N.Y. 2001) (third-party statements imputed to defendant where third party was "parroting" defendant and defendant was "telling [the third party] what to say"). Plaintiffs' allegations of control, as the Magistrate Judge held and the Court affirmed, are more than sufficient under this test.

## V.   PLAINTIFFS' ALLEGATIONS REGARDING OFF-LABEL USES ARE SUFFICIENT

As set forth above, the Court has already ruled that Plaintiffs' allegations regarding pain, bipolar disorder, and panic disorder are sufficient.

### A.   Plaintiffs' Allegations Regarding Pain Are Sufficient

The pain market, whether neuropathic (such as diabetic peripheral neuropathy) or nociceptive (such as post-surgical pain), was the single most lucrative market for Neurontin.  As a result, pain was the dominant off-label use promoted by Parke-Davis and Pfizer from as early as 1995 through 2004.  *See* Sec. Cl. Comp. ¶ 31.  In those 10 years, most of Defendants' $10 billion in Neurontin revenue was derived from pain. Pfizer reaped the bulk of its pain bonanza after clinical trials had been concluded which showed that, which the exception of one narrow neuropathic pain indication, shingles pain, Neurontin was either ineffective or inconclusive.  *See id*. ¶¶ 143 – 52.

In addition to finding Plaintiffs' existing allegations regarding pain sufficient (*see* Part I-E, *infra*), the Court found that: "Plaintiffs have stated a claim with respect to *any theory* based on Defendant's misrepresentation of the results of scientific studies or omission of existing negative studies."  MTD Order at 20–21 (emphasis added).  Class

Plaintiffs' new allegations relating to pain fall squarely assert this pre-approved "theory."

For example, Defendants misrepresented the findings of Dr. Gorson by submitting a doctored abstract of his article to Drugdex, a leading online source of journal article information. *See* Sec. Cl. Comp. ¶ 146. Defendants also misrepresented the results of their own mixed neuropathy trial, which they claimed supported Neurontin's broad use in all neuropathic pain states, even though they knew that the results, when shingles pain patients were removed, did not support Neurontin's efficacy for *any* of the other types of neuropathic pain. *Id.* ¶ 150. Plaintiffs also allege a clear pattern of suppression of negative clinical data, from Defendants' efforts to block publication of the Gorson and Reckless failed trials (*id.* ¶¶ 146-49), to their failure to disclose the results of those trials or the results of the negative nociceptive pain trials at marketing events (*id.* ¶¶ 147, 149, 152).[10]

Defendants claim that Plaintiffs have not sufficiently alleged a connection between the various types of pain to justify their inclusion in one section of the Complaints. As set forth in the Complaints, the nexus for the various pain indications is the *Defendants' marketing campaign itself*:

> Defendants were aware that individual pain conditions—regardless of whether they are nociceptive or neuropathic—differ in their etiology, pathophysiology, diagnosis and treatment from other pain conditions. In other words, the fact that a treatment may be effective for one pain condition does not suggest that it will be effective for other pain conditions, even in the same category of pain. Thus a treatment for one particular type of neuropathic pain will not necessarily be effective for any other type of neuropathic pain.

---

[10] As with the medical marketing firms, documents recently produced by Defendants continue to reveal additional misrepresentations and omissions regarding pain, bipolar disorder, and other off-label uses. *See* Rona Decl. ¶¶ 23-28; Pltfs. Obj. to Discovery Order No. 3 (Dkt. No. 416, Filed Under Seal) at 20. If necessary, Plaintiffs can amend their complaints to make these additional allegations, but respectfully submit that such an endless document production—amendment—motion cycle would be a colossal waste of time and resources.

> Despite knowing these facts, Defendants intentionally *blurred the lines* between different pain conditions by making representations to physicians that data relating to very narrow pain indications *applied to all other pain indications*.  Defendants used the indications for postherpetic neuralgia, a very narrow form of neuropathic pain limited to people with shingles pain, as well as anecdotal evidence from other equally limited conditions, to convince physicians that Neurontin was a miracle drug that worked for all pain conditions.

*Id.* ¶¶ 144-45 (emphasis added).  When it suited their purpose, Defendants marketed Neurontin as a drug broadly effective for neuropathic pain and chronic pain.  The scheme began in July 1995, when the Parke-Davis Marketing and Planning department issued a final Marketing Assessment on Neuropathic Pain, which covered all neuropathic pain, not just postherpetic neuralgia and diabetic peripheral neuropathy.  *Id.* ¶ 29.  More than five years later, Pfizer applied to the FDA for a neuropathic pain indication, not limited to postherpetic neuralgia or diabetic peripheral neuropathy.  *Id.* ¶ 151. Verbatim reports confirm that Defendants pitched Neurontin to doctors as "[e]ffective for many types of chronic pain," "[g]ood for back pain; neuropathic pains," and in at least one case misrepresenting that it had received a "[n]ew indication [*i.e.*, FDA approval] for chronic pain."  *Id.* ¶ 158.

Now, because it suits their litigation strategy, Defendants attempt to balkanize the pain market that they worked so tirelessly (and successfully) to agglomerate.[11]  Plaintiffs' allegations sweep no more broadly than Defendants' misleading marketing messages.

**B.      Plaintiffs' Allegations Regarding Bipolar And Other Mood Disorders Are Sufficient**

As the Court has already found, contrary to Defendants' argument, Plaintiffs' allegations that Defendants suppressed the results of their own negative studies on bipolar

---

[11] Defendants have recently produced documents reflecting the success of this endeavor, but have designated them confidential, precluding their discussion in this publicly-filed memorandum.  Rona Decl. ¶ 26.

disorder – allegations which remain unchanged – are sufficient to state a claim.  With respect to the internal trial, which found Neurontin to be less effective than a placebo, Plaintiffs allege that "the publication of results was delayed until the patent life was set to expire, and even then, Defendants *never forwarded a copy of the article to DRUGDEX*." *Id.* ¶ 136 (emphasis added).  Plaintiffs also allege that Defendants never forwarded the other failed clinical trial to Drugdex.  *Id.* ¶ 174.  In version 2.0 of their failed argument, Defendants neglect to address their deliberate failure to forward these articles to Drugdex, in contravention of their official policy to forward all articles, whether favorable or unfavorable, to Drugdex.  *Id.* ¶ 173.  Unlike the hundreds of favorable case reports and articles Defendants did send to Drugdex, Defendants never forwarded the *only two clinical trials* on bipolar disorder — both negative — and to this day, neither article is listed in Drugdex.  This is not mere delay, but suppression.[12]

C.    **Plaintiffs' Allegations Regarding Anxiety Disorders Are Sufficient**

As noted above, the Court has already held Plaintiffs' allegations regarding panic disorder sufficient.  In the Sec. Cl. Comp., Class Plaintiffs allege the close connection between panic disorder, social phobia, and other anxiety disorders (citing the leading reference work on the subject, the American Psychiatry Association's DSM-IV), and that "[p]atients suffering from these disorders exhibit symptoms and reactions that may be similar; what distinguishes the disorders from each other, primarily, are the cues, triggers, and situations that cause them to occur."  Sec. Cl. Comp. ¶¶ 177-78.  Plaintiffs further

---

[12] Class Plaintiffs also allege that Defendants misleadingly promoted Neurontin as effective for the treatment of related mood disorders, identifying numerous specific events at which such representations were made.  *See* Sec. Cl. Comp. ¶¶ 169-70, 173-74, 176.  Should the Court find these allegations insufficient, documents recently produced by Defendants establish that as with pain, Defendants blurred the distinction between bipolar and related mood disorders to facilitate their unlawful marketing efforts.  *See* Rona Decl. ¶¶ 27-28.

allege that given these similarities, and the frequent difficulty in determining which anxiety disorder a patient is suffering from, Defendants were aware that "treating physicians would be likely to prescribe the same medication for these conditions, absent knowledge that it was ineffective for one of them," and that "clinicians would consider a favorable study on any one anxiety disorder to be sufficient cause to try Neurontin in the other anxiety disorders." *Id*. ¶¶ 179-80.  Plaintiffs allege that Defendants misleadingly failed to disclose the results of their own failed clinical trial on panic disorder, while affirmatively promoting Neurontin for the full panoply of related anxiety disorders.[13]  *Id*. ¶¶ 181-85.

Contrary to Defendants' argument, Plaintiffs have alleged the following specific false statements:

> On April 1, 2001, at a CME event held at Hyatt Regency in Milwaukee, WI, a speaker told the attendees of Neurontin's "Value in treatment of anxiety / pain."

> On May 20, 1998, at a dinner meeting at the Heathman Lodge in Vancouver, WA, a speaker told the physician-attendees that Neurontin "May be helpful in panic [disorder]."

Sec. Cl. Comp. ¶ 186.  Plaintiffs' allegations regarding anxiety disorders are sufficient.

## VI.    COORDINATED PLAINTIFFS HAVE ADEQUATELY ALLEGED THEIR LOSSES

Defendants' challenge to the sufficiency of Coordinated Plaintiffs' loss allegations (Defs. 2d MTD at 16-18) misstates the Court's rulings on the matter and ignores *Desiano v. Warner-Lambert Co.*, 326 F.3d 339 (2d Cir. 2003), on which the Court relied.  On page 24 of the MTD Order, the Court held that "[Coordinated] Plaintiffs

---

[13] Defendants complain that Plaintiffs "allege only one act of suppression" (Defs. 2d MTD at 15) relating to the delayed publication of their failed trial on panic disorder.  Defendants cite no authority in support of their implicit argument that suppression of a single study is not actionable.

have adequately made out a claim that they paid for too much Neurontin as a result of the alleged fraud" and, citing *Desiano* with approval, required additional allegations "that cheaper alternatives were available and that Plaintiffs are seeking [the] difference in price."

Coordinated Plaintiffs amended their complaint to allege the additional facts required by the Court.[14]  The Sec. Coord. Comp. contains particularized facts showing "that cheaper alternatives were available," and that Coordinated Plaintiffs are seeking the difference in price.  Those allegations are contained or cross-referenced on pages 65-66 in a section entitled "Alternative Treatments Cheaper than Neurontin."  That Section identifies *17* FDA-approved alternative medications that "were cheaper and more optimal than Neurontin," a relatively expensive medication that cost approximately $126 for a 30-day supply.  *Id.* ¶¶ 173-76.  Unlike Neurontin, *each* of these alternative medications is FDA-approved for one or more of the relevant indications.  *Id.* ¶ 173.  Certain of those alternatives, such as aspirin and ibuprofen (which are widely used to treat pain or inflammation) are not ordinarily covered benefits.  *Id.*  Coordinated Plaintiffs would thus have paid *nothing* had patients used those over-the-counter medications.

Plaintiffs are not required to allege or prove "that Neurontin was ineffective for their insured patients" or  that "alternative treatments . . . were as safe as (or safer than) or as effective as (or more effective than) Neurontin."  *Compare* MTD Order at 23-24 *with*

---

[14] The Sec. Coord. Comp. also supplies more particularity to the loss allegations that were expressly sustained by the Court (MTD Order at 24), pleading additional facts showing that Defendants increased TPP costs by inducing physicians to prescribe Neurontin "for everything" at dosages far exceeding its recommended, safe or effective levels.  *See* Sec. Coord. Comp. ¶¶ 37, 175 and the paragraphs cross-referenced therein.

Defs. 2d MTD at 16-18. *See also Desiano*, 326 F.3d at 347-50.[15] Coordinated Plaintiffs'

members would have been prescribed or taken less expensive medications had

Defendants complied with the law. *E.g.*, Sec. Coord. Comp. ¶¶ 173-76. As a result,

Coordinated Plaintiffs suffered economic losses from Defendants' misconduct.

Notably, *Desiano* provides an example of a situation in which Coordinated

Plaintiffs (and other TPPs) would be injured by a drug company's deceptive marketing

scheme, even if *every* prescription resulting from the scheme was "safe and effective" for

the patients. In *Desiano*, these very Defendants argued, as they do here, that TPPs must

prove that their drug was ineffective. The Second Circuit rejected this argument, for

reasons equally applicable here:

> But it is easy to see how Defendants' reasoning is flawed. Consider, for
> example, a hypothetical in which a defendant drug company markets a
> "new" much more expensive drug claiming it is a great advancement
> (safer, more effective, etc. than metformin -- the standard diabetes drug)
> when in fact the company is simply replicating the metformin formula and
> putting a new label on it. In other words, the only difference between
> metformin and the "new" drug is the new name and the higher prescription
> price (paid almost entirely by the insurance company). In that case the
> "new" drug would be *exactly* as safe and effective as metformin, and thus
> there could be no injury to any of the insurance company's insured.
> **Nevertheless, the insurance companies would be able to claim --
> precisely as they do here -- that the defendants engaged in a scheme to
> defraud it, and that the company suffered direct economic losses as a
> result.**

*Desiano*, 326 F.3d at 349-50 (emphasis in bold added).

Coordinated Plaintiffs have adequately alleged that they suffered millions of

dollars in direct economic losses resulting from Defendants' misconduct. *See, e.g.*, Sec.

---

[15] This is an extremely peculiar argument, given that Defendants were prohibited by law from claiming that Neurontin was safe or effective for any of the off-label indications at issue in this lawsuit. This is the result of Defendants' failure to obtain FDA approval of Neurontin for such indications. Coordinated Plaintiffs, as masters of their complaint, are not required to rebut a claim that Defendants themselves cannot make, and wonder whether Defendants will even put such claims in issue by pleading as an affirmative defense that Neurontin was safe and effective for the off-label uses Defendants illegally promoted.

Coord. Comp. ¶¶ 173-76.[16]  The loss allegations in the Sec. Coord. Comp. should be

sustained.

## VII.  COORDINATED PLAINTIFFS HAVE APPROPRIATELY STATED A CLAIM UNDER THE PENNSYLVANIA INSURANCE FRAUD STATUTE

Defendants' argument (Defs. 2d MTD at 18-19) that Coordinated Plaintiffs have

not appropriately alleged a claim under the Pennsylvania Insurance Fraud Statute, 18 Pa.

C.S. § 4117(a)(2) (2006) (the "PIFS") is wrong.  The PIFS is a broad remedial statute

designed to combat insurance fraud.  That statute permits redress where the defendant:

(1) knowingly and with the intent to defraud any insurer; (2) presents or *causes to be*

*presented* to any insurer; (3) any statement forming a part of, or in support of a claim;

(4) that contains *any false, incomplete or misleading information concerning any fact or*

*thing material to the claim*.  18 Pa. C.S. § 4117(a)(2) (emphasis added).

Coordinated Plaintiffs have alleged all of the required elements.  Sec. Coord.

Comp. ¶¶ 333-42.  Indeed, it is hard to imagine a clearer case of insurance fraud:

Defendants' admittedly unlawful marketing of Neurontin (*id.* ¶¶ 182-85) "cause[d]"

insureds and pharmacies to "present []," and Coordinated Plaintiffs to pay, millions of

dollars worth of unwarranted or excessive "claim[s]" for Neurontin.  *E.g., id.* ¶¶ 6-9, 335-

37; *cf. United States ex rel. Franklin v. Parke-Davis*, No. Civ. A. 96-11651 PBS, 2003

WL 22048255, at *6 (D. Mass. Aug. 22, 2003) (denying summary judgment because

evidence showed that "Parke-Davis's actions . . . played a key role in setting in motion a

chain of events that led to false claims") (citation and footnote omitted).[17]

---

[16] As Defendants are well aware from their guilty plea (Sec. Coord. Comp. ¶¶ 15, 185), they are precluded by federal law from touting Neurontin as safe or effective for indications for which the drug has not received FDA approval.

[17] Defendants' effort to distinguish this Court's *Franklin* decision on the ground that the PIFS is "much narrower" than the False Claims Act (Sec. Coord. Comp. at 19) is baseless.  The PIFS is extraordinarily

As Defendants acknowledge (Br. at 18-19), a similar claim by Aetna[18] under the PIFS was sustained by Judge Stearns in *In re Lupron Marketing & Sales Practices Litig*., MDL 1430, 2004 WL 2070883 (D. Mass. Sept. 16, 2004), another case alleging the fraudulent marketing of a prescription drug to increase its sales to Aetna and other TPPs. The *Lupron* Court noted the breadth of the statute and reasoned that "the intent of the Insurance Fraud Statute is to protect insurers from all fraudulent claims, whether directly submitted by an insured, or submitted at the instigation of a third party not directly involved in the claims process." *Id.* at *2, citing *Commonwealth v. Monumental Properties, Inc.*, 329 A.2d 812, 826-27 (Pa. 1974) (fraud statutes should be broadly construed).

Defendants attempt to distinguish *Lupron* on the ground that Aetna alleged that false information was presented to it in *Lupron*, but did not make this allegation in the Sec. Coord. Comp. *See* Defs. 2d MTD at 18-19. In fact, the Sec. Coord. Comp. specifically alleges and details the manner in which Defendants "caused" the submission of false and incomplete insurance claims to be presented to Coordinated Plaintiffs. *See, e.g.*, Sec. Coord. Comp. ¶¶ 335-37. These allegations are *more* particularized than the allegations sustained in *Lupron*. *Compare* Sec. Coord. Comp. ¶¶ 335-37 with *Lupron, supra*, at *2 ("Aetna alleges that . . . TAP 'caused many thousands of materially false reimbursement requests to be submitted to third party payors (sic) like Aetna'"). As in *Lupron*, the false and misleading statements made here were not made directly to the insurer, but were made in support of insurance claims. As all elements have been

---

broad, covering "any false, incomplete or misleading information concerning any fact or thing material to the claim." 18 Pa. C.S. § 4117(a)(2).

[18] Aetna, the largest of the Coordinated Plaintiffs, is a Pennsylvania corporation that provided health payment benefits to more than 13 million people across the United States. Sec. Coord. Comp. ¶ 8.

appropriately alleged, Coordinated Plaintiffs' claim under the PIFS should be sustained.


Dated:  August 25, 2006                    Respectfully submitted,

                                           **For the Class:**

                                            */s/ Barry Himmelstein*
                                           **LIEFF, CABRASER, HEIMANN & BERNSTEIN,
                                           LLP**
                                           Barry Himmelstein, Esq.
                                           275 Battery Street, 30th Floor
                                           San Francisco, CA  94111-3339

                                           **GREENE & HOFFMAN**
                                           Thomas Greene, Esq.
                                           125 Summer Street
                                           Boston, MA  02110

                                           **HAGENS BERMAN SOBOL SHAPIRO LLP**
                                           Thomas M. Sobol, Esq.
                                           One Main Street, 4th Floor
                                           Cambridge, MA  02142

                                           **DUGAN & BROWNE**
                                           James Dugan, Esq.
                                           650 Poydras Street, Suite 2150
                                           New Orleans, LA  70130

                                           **BARRETT LAW OFFICE**
                                           Don Barrett, Esq.
                                           404 Court Square North
                                           P.O. Box 987
                                           Lexington, MS  39095

                                           **LAW OFFICES OF DANIEL BECNEL, JR.**
                                           Daniel Becnel, Jr., Esq.
                                           106 W. Seventh Street
                                           P.O. Drawer H
                                           Reserve, LA  70084

                                           **Co-Lead Counsel for Plaintiffs and the Class**

**For Plaintiff Aetna, Inc.:**

*/s/  Peter A. Pease*
    Peter A. Pease, Esq. (BBO #392880)

**BERMAN DEVALERIO PEASE
TABACCO BURT & PUCILLO**
One Liberty Square
Boston, MA  02109
Telephone:  (617) 542-8300
Facsimile:  (617) 542-1194

**OF COUNSEL:**

**LOWEY DANNENBERG
BEMPORAD & SELINGER, P.C.**
Richard Bemporad, Esq.
Richard W. Cohen, Esq.
Gerald Lawrence, Esq.
Peter St. Phillip, Jr., Esq.
The Gateway – 11th Floor
One North Lexington Avenue
White Plains, NY  10601 – 1714
Telephone:  (914) 997-0500
Facsimile:  (914) 997-0035

**BERMAN DEVALERIO PEASE
TABACCO BURT & PUCILLO**
Joseph J. Tabacco, Jr., Esq.
425 California Street, Suite 2025
San Francisco, CA  94104-2205
Telephone:  (415) 433-3200
Facsimile:  (415) 433-6382

**JOHN F. INNELLI, LLC**
John F. Innelli, Esq.
1818 Market Street, Suite 3620
Philadelphia, PA  19103
Telephone:  (215) 561-1011
Facsimile:  (215) 561-0012

**For Plaintiffs Guardian Life Insurance Co. of America, Kaiser Foundation Health Plan, Inc. and Kaiser Foundation Hospitals:**


*/s/ Thomas G. Shapiro*
   Thomas G. Shapiro (BBO #454680)

Theodore Hess-Mahan (BBO #557109)
**SHAPIRO HABER & URMY LLP**
53 State Street
Boston, MA  02109
Telephone:  (617) 439-3939
Facsimile:  (617) 439-0134

**OF COUNSEL:**

**COHEN, MILSTEIN, HAUSFELD & TOLL, P.L.L.C.**
Linda P. Nussbaum, Esq.
150 East 52nd Street, 30th Floor
New York, NY  10022
Telephone:  (212) 838-7797
Facsimile:  (212) 8383-7745

-and-

**COHEN, MILSTEIN, HAUSFELD & TOLL, P.L.L.C.**
Michael D. Hausfeld, Esq.
1100 New York Avenue, NW
West Tower, Suite 500
Washington, DC  20005
Telephone:  (202) 408-4600
Facsimile:  (202) 408-4699

**RAWLINGS & ASSOCIATES, PLLC**
Mark D. Fischer, Esq.
Mark Sandmann, Esq.
325 W. Main Street
Louisville, KY  40202
Telephone:   (502) 587-1279
Facsimile:  (502) 584-8580

**JOEL Z. EIGERMAN, ESQ.**
50 Congress Street, Suite 200
Boston, MA  012109
Telephone:  (617) 367-0014
Facsimile:  (617) 523-5612