UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | ) MDL Docket No. 1629<br>) Master File No. 04-10981<br>) Judge Patti B. Saris<br>) Mag. Judge Leo T. Sorokin |
| THIS DOCUMENT RELATES TO:<br><br>HARDEN MANUFACTURING CORPORATION; LOUISIANA HEALTH SERVICE INDEMNITY COMPANY, dba BLUECROSS/BLUESHIELD OF LOUISIANA; INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL NO. 68 WELFARE FUND; ASEA/AFSCME LOCAL 52 HEALTH BENEFITS TRUST; GERALD SMITH; and LORRAINE KOPA, on behalf of themselves and all others similarly situated, v. PFIZER INC. and WARNER-LAMBERT COMPANY | |
| THE GUARDIAN LIFE INSURANCE CO. OF AMERICA v. PFIZER, INC. and AETNA, INC. v. PFIZER, INC. | |

DECLARATION OF ILYAS J. RONA, ESQ. IN SUPPORT OF
PLAINTIFFS' OPPOSITION TO DEFENDANTS PFIZER INC. AND WARNER-LAMBERT
COMPANY'S MOTION TO DISMISS THE SECOND AMENDED CLASS ACTION
COMPLAINT AND <u>THE SECOND COORDINATED AMENDED COMPLAINT</u>

I, Ilyas J. Rona, do hereby state and depose, the following:

1.   I am an associate at the law firm Greene & Hoffman, P.C., and I am an attorney duly admitted to practice law in the Commonwealth of Massachusetts and to appear before the United States District Court for the District of Massachusetts. All statements made herein are based on facts personally known or represented to me, and if called upon, I could testify competently thereto.

2. I am submitting this Declaration in support of Plaintiffs' Opposition to Defendants Pfizer Inc. and Warner-Lambert Company's Motion to Dismiss the Second Amended Class Action Complaint and The Second Coordinated Amended Complaint.

3. Since May 2000, I have been actively involved in Neurontin-related litigation, including *United States ex rel. Franklin v. Pfizer et al.* and the instant action. Since 2001, I have personally reviewed and am familiar with a large portion of the documents that Pfizer produced in both actions. Pfizer's major document productions include, but are not limited to:

- roughly 60 boxes of Warner-Lambert documents that were first produced to the government and then to the Relator in the *Franklin* case in 2001.

- another roughly 20 boxes of Warner-Lambert documents that were produced to the Relator to supplement the previous production in the *Franklin* case.

- electronic files containing additional Warner-Lambert documents from various CBUs outside of the NECBU, produced in 2005.

- electronic files containing custodial files of certain Pfizer employees that were produced to attorneys for the products liability plaintiffs and then forwarded to attorneys for the consumer plaintiffs between December 2005 and July 2006.

- electronic files containing various Neurontin journal articles published through 2002, produced in 2005.

- electronic files containing various other documents including the Neurontin NDA, internal research reports, limited sales call information for California, New York, and Pennsylvania, mostly produced in 2005.

4. I was also involved in drafting the First Coordinated Class Complaint and the Second Amended Class Action Complaint. The Second Amended Class Action Complaint includes new allegations that were derived, in large part, on documents received in 2005 and 2006.

5. This includes documents from the custodial file of Leslie Tive, the bulk of which were received by consumer plaintiffs in July 2006. The Leslie Tive custodial file as well as other

2

documents produced by Pfizer since 2005 have only been partially reviewed, and the review process is still ongoing.

## MEDICAL MARKETING VENDORS

6.  If given leave to further amend the complaint with respect to the allegations relating to certain medical marketing vendors, I believe that Class Plaintiffs and Coordinated Plaintiffs have a reasonable, good faith basis—based on the partial review referenced above, as well as a re-review of the documents produced in the *Franklin* litigation—to assert the additional allegations described below:

### A.   New Allegations Relating to HCC

7.  With respect to medical marketing vendor Healthcare Communications, Inc. ("HCC"), Class Plaintiffs and Coordinated Plaintiffs can allege the following:

> In 1996, Healthcare Communications, Inc. ("HCC") held a series of marketing events for Parke-Davis disguised as "consultants" meetings. HCC knew that these meetings were sham consultant meetings designed to thwart FDA regulations since the meetings were too frequent and because HCC collected little or no bona fide information of value from the "consultants."
>
> At each of these consultants meetings, HCC displayed slides stating that Neurontin had a myriad of off-label uses. Neurontin was cited as an effective treatment offering 50 – 100% relief for numerous chronic and neuropathic pain conditions, including neuropathy, neuralgia, causalgia, phantom limb pain, sensory motor neuropathies (diabetic, hereditary, and idiopathic), radiculopathies (sensory and sensory motor), spinal stenosis, compression fracture, trigeminal neuralgia, focal neuropathies, phantom pain, post stroke (thalamic), myelopathic, multiple sclerosis, RSD, and arachnoiditis. Neurontin was also touted as having "excellent results" for restless legs syndrome (RLS) and periodic leg movement syndrome (PLMS).
>
> Furthermore, Neurontin was also promised to provide "mild to excellent improvements" in the frequency, duration, and severity of migraine headaches.

> Such statements were false as such efficacy rates have never been shown.
>
> In order to make these claims believable, HCC also presented information that falsely suggested a scientifically known mechanism of action with respect to neuropathic pain, when in fact Neurontin's mechanism of action with respect to pain (and every other condition) was, and is still to this day, unknown. At each sham consultant event, attendees were told that that Neurontin was known to "block," "inhibit," or "decrease" pain signals for various nerve systems, including the trigeminal nerve, the thalamus, and the spinal chord.
>
> The above misrepresentations were delivered by various speakers, including Joseph Bruni on September 26, 1996 at the Park Hyatt in Chicago, IL, Michael Merren on September 28, 1996 at the Marquette Hotel, in Minneapolis, MN, B.J. Wilder on October 5, 1996, at the Hyatt Regency in Dearborn, MI. As alleged in the Second Amended Complaint, B.J. Wilder received over $300,000 to deliver false and misleading information to drum up Neurontin's off-label uses. *See* Second Amended Complaint, ¶ 110. Drs. Merren and Bruni each received roughly $50,000 for their roles in the fraudulent marketing scheme. *Id.*

8.  The allegations in the preceding paragraph are derived, in large part, from the following documents:

- *See* Management of Challenging Patients in the Primary Care Environment, Chicago, IL (WLC_FRANKLIN_0000024145), at WLC_FRANKLIN_0000024165 – 71, a true and accurate copy of which is attached as Exhibit A;

- *See* Management of Challenging Patients in the Primary Care Environment, Minneapolis, MN (WLC_FRANKLIN_0000024198), at WLC_FRANKLIN_0000024218 – 21, a true and accurate copy of which is attached as Exhibit B;

- *See* Management of Challenging Patients in the Primary Care Environment, Dearborn, MI (WLC_FRANKLIN_0000024170), at WLC_FRANKLIN_0000024171, WLC_FRANKLIN_0000024193 – 95, a true and accurate copy of which is attached as Exhibit C.

9. With respect to HCC, Class Plaintiffs and Coordinated Plaintiffs can further allege the following:

> HCC was aware of the falsity of the information that was to be presented. In fact, HCC had a "full-time HCC staff member on-site to work with the faculty (i.e., review content, etc.)." HCC also made it clear to Parke-Davis that: "In performance of its services, HCC will keep very close contact with Parke-Davis … Sales and Marketing staff."
>
> HCC accomplished the fraudulent conduct set forth above with heavy reliance on the interstate mail system and telephone calls. A typical meeting had a budget of roughly $500 to $1700 to cover postage and phone charges. These charges covered such things as invitation of attendees (who would receive the misrepresentations), recruitment of faculty (who would deliver the misrepresentations), and development of content (which contained the misrepresentations).
>
> Thus, it is clear that HCC was knowingly involved in the delivery of misrepresentations at its events, and that such conduct was achieved in large part through the use of interstate mails and wires.

10. The allegations in the preceding paragraph are derived, in large part, from the following documents:

- *See* Letter from Geoffrey Kalish dated July 31, 1996 (WLC_FRANKLIN_0000073965) WLC_FRANKLIN_0000073968, WLC_FRANKLIN_0000073969 – 70, a true and accurate copy of which is attached as <u>Exhibit D</u>;

- *See* Letter from Susan Duplak dated August 14, 1996 (WLC_FRANKLIN_0000072365, at WLC_FRANKLIN_0000072366 – 67, a true and accurate copy of which is attached as <u>Exhibit E</u>;

**B.   New Allegations Relating to Boron LePore**

11. With respect to medical marketing vendor Boron LePore & Associates ("Boron LePore"), Class Plaintiffs and Coordinated Plaintiffs can allege the following:

> As the Second Amended Complaint alleges: "As early as November 1995, Parke-Davis knew that clinical trial evidence

5

demonstrated that Neurontin was not an effective monotherapy treatment [i.e. alone, rather than as an adjunct to a more effective antiepileptic drug]." *See* Second Amended Complaint, ¶ 187. As Parke-Davis conceded:

> Few promotional claims can be made from [monotherapy] clinical trials. However, approval for monotherapy from the FDA is sufficient reason for most physicians to believe Neurontin is efficacious as monotherapy.

Accordingly, Parke-Davis applied for FDA approval for monotherapy and expected to receive the FDA's decision in September 1997. Boron LePore was retained by Parke-Davis to hold teleconferences to promote Neurontin's use as monotherapy to immediately following the FDA's approval. These teleconferences were part of the "Monotherapy Launch," which was the promotional blitz to market the new indication. The "Monotherapy Launch" was expected to be very lucrative, with added sales of $137 million expected in the first year alone. Parke-Davis budgeted more than $1 million on the teleconferences, roughly 20% of its overall monotherapy launch budget.

Unfortunately for Parke-Davis, the FDA informed the company on August 26, 1996 that it would reject the application for monotherapy. This meant that the planned promotional campaign could not be held because it would be illegal, off-label marketing. Of course, it should come as no surprise that Parke-Davis held the teleconferences anyway, with little change to the program content. In fact, the company immediately began to "[d]evelop a monotherapy contingency promotional campaign…" by bringing together the marketing department, and advertising review committee, and Cline Davis & Mann "to agree on the level of promotional aggressiveness that will be developed."

12. The allegations in the preceding paragraph are derived, in large part, from the following documents:

- *See* Monotherapy Launch Rationale (WLC_FRANKLIN_00000112893), at WLC_FRANKLIN_00000112893, WLC_FRANKLIN_00000112895, a true and accurate copy of which is attached as <u>Exhibit F</u>;

- *See* 1997 Expense Summary—1997 Monotherapy Launch Expenses (WLC_FRANKLIN_00000068490), a true and accurate copy of which is attached as <u>Exhibit G</u>;

- *See* Neurontin Third Quarter Goals – 1997 (WLC_FRANKLIN_00000068484), at WLC_FRANKLIN_00000068484 – 85, a true and accurate copy of which is attached as <u>Exhibit H</u>;

13.   With respect to Boron LePore, Class Plaintiffs and Coordinated Plaintiffs can further allege the following:

> As the primary teleconference vendor for Parke-Davis (and the sole beneficiary of Parke-Davis's budgetary largesse in the area of monotherapy teleconferences), Boron LePore knew that it was participating in an illegal and fraudulent campaign.
>
> First, it was aware because of the FDA rejection that it would be aiding and abetting Parke-Davis in illegal, off-label "peer selling teleconference program" that was promotional, not informational. Boron LePore also gave participants up to $100 in gifts, an illegal kickback. Initially, the Parke-Davis advertising review committee rejected the West CBU's program because it was too "promotional." However, Jerry LePore, one of the principals of Boron LePore, successfully convinced Parke-Davis to hold the teleconference series since "other CBU programs have done this same project" and the "5 CBUs are planning to this same program again in October."
>
> Second, and more importantly, Boron LePore knew that a central purpose of the teleconference was to falsely convince doctors that the FDA had in fact approved or was about to approve Neurontin's use in monotherapy, when in fact the company knew that it would not be able to successfully appeal the FDA's decision reject the monotherapy indication.
>
> Accordingly, one of the main messages delivered to physicians at the teleconferences was that Neurontin was "now approved as monotherapy for seizures." *See* Second Amended Complaint, ¶ 193. Physicians were falsely told that Neurontin was approved or about to be approved for monotherapy and the FDA's rejection was suppressed.

7

>Thus it is clear that Boron LePore knowingly caused false statements to be made during the teleconferences it moderated.

14. The allegations in the preceding paragraph are derived, in large part, from the following documents:

- *See* Memorandum from Laura Johnson dated October 8, 1997 (WLC_FRANKLIN_00000196116), a true and accurate copy of which is attached as <u>Exhibit I</u>;

- *See* Letter from Jerry LePore dated August 5, 1997 (WLC_FRANKLIN_00000108507), a true and accurate copy of which is attached as <u>Exhibit J</u>;

- *See* 35 Neurontin Clinical Experience Teleconferences (WLC_FRANKLIN_00000076073), a true and accurate copy of which is attached as <u>Exhibit K</u>;

- *See* Verbatim Record (S-L09730), at S-L09730 – 31, a true and accurate copy of which is attached as <u>Exhibit L</u>.

    **C.**    <u>**New Allegations Relating to MES**</u>

15. With respect to medical marketing vendor Medical Education Systems, Inc, ("MES"), Class Plaintiffs and Coordinated Plaintiffs can allege the following:

>As alleged in the Second Amended Complaint, MES convened a Consultants Conference held on February 2 – 4, 1996 at Marco Island, FL.
>
>The main "selling message" for the Marco Island meeting and other meetings held by the Southeast CBU was that Neurontin had to be "titrated to effect." This slogan meant that Neurontin was supposedly more efficacious the higher the dose, which was used to urge doctors to prescribe more than the 1800 mg per day approved by the FDA. Under the "titrate to effect" sales message, "1800 mg is the first reference point;" the dose was continually raised beyond 1800 mg until the desired outcome was reached, if ever. This message, of course, was false, as Parke-Davis's own clinical trials failed to establish a dose response and showed no added efficacy beyond 1800 mg.

8

> That the main message of the MES event at Marco Island event was to convince physicians to hike their prescriptions of Neurontin to doses that would double or even triple Parke-Davis's per-patient-profit can be confirmed by reviewing the feedback that MES received from the attendees. The following are representative examples of the views of physician-attendees after the event:
>
> > "At doses 3600+ for seizures, pain syndromes."
> >
> > "I will try using higher doses."
> >
> > "May need to initiate prescriptions at higher doses…"
> >
> > "In higher than approved doses for epilepsy I will be using it more in the treatment of pain."
> >
> > "Efficacious, however only at dose 2700 to 2600 [*sic*] milligrams."
> >
> > "Most effective in higher daily doses (1800-3600 mg)."
> >
> > "Need high dose."
>
> Just at that one event alone, MES knowingly caused 81 physician-attendees to receive false statements, mostly relating to Neurontin and excessive doses. Plaintiffs are aware that MES convened other events and believe that misrepresentations relating to dosage and other off-label uses were made in those events as well.

16. The allegations in the preceding paragraph are derived, in large part, from the following documents:

- *See* Neurontin 1996 SE CBU Plan (WLC_FRANKLIN_00000197936 – 37), at WLC_FRANKLIN_00000197936 – 37, a true and accurate copy of which is attached as <u>Exhibit M</u>;

- *See* Evaluation Form (WLC_FRANKLIN_00000011090), WLC_FRANKLIN_00000011096 – 98, a true and accurate copy of which is attached as <u>Exhibit N</u>.

   D.    **<u>New Allegations Relating to Physicians World</u>**

9

17. With respect to Thompson Physicians World, Class Plaintiffs and Coordinated Plaintiffs can allege the following:

> The Second Amended Complaint alleges that Parke-Davis and Thompson Physicians World ("Physicians World") formed a "strategic partnership" in order to give Parke-Davis greater control over the contents of its marketing events. *See* Second Amended Complaint, ¶ 70. Under their "strategic partnership," Physicians World would handle the overtly promotional events, i.e. speakers bureaus, advisory boards, and consultants' meetings, whereas Physicians World's wholly owned subsidiary, Professional Postgraduate Services ("PPS") division, would manage and coordinate educational events which were not supposed to be promotional.
>
> The Second Amended Complaint and the preceding complaint both make clear that PPS was a straw man designed to thwart ACCME guidelines. The Second Amended Complaint alleges that:
>
>> In practice, Physicians World and Parke-Davis actively, knowingly, and with full support of the other, circumvented or directly violated both of the above policies. In fact, the distinction between promotional and education events was rendered meaningless since Physicians World owned and controlled PPS, which was the "accredited institution" for Physicians World's CME events. Regardless of the nature of the event, Physicians World selected physician-speakers and attendees, and controlled the content.
>
> Second Amended Complaint, ¶ 75. The events set forth in paragraph 76 are just a smattering of the sham educational events that were arranged by Physicians World through PPS. Thus, the very fact that these events were promotional events masquerading as educational events places Physicians World at the center of Defendants' fraudulent marketing campaign. Physicians were led, falsely, to believe that they were receiving unbiased, independent, and scientifically rigorous information. Instead, what they received was a carefully scripted program that was designed to create the appearance of a body of "clinical experiences that demonstrate the use of anticonvulsants in the treatment of pain." This is the essence of fraud.

>Moreover, a review of Physicians World's written curriculum that accompanied the series of pain "study group meetings" identified in paragraph 76 of the Second Amended Complaint shows that migraine was clearly one of the "chronic pain" topics, and that despite the supposedly scientific nature of the meetings, no mention was made of the negative clinical trial conducted in Freiburg, Germany in the late 1980s—the only scientific evidence relating to Neurontin and migraine at the time.
>
>Thus, the Physicians World was misleading not only in the way it presented promotional information disguised as an independent, scientific discussion, but also by virtue of the fact that the information presented was false and misleading.

18.  The allegations in the preceding paragraph are derived, in large part, from the following documents:

- *See* Memorandum from Lisa Moore and Kim Repp dated July 8, 1996 (WLC_FRANKLIIN_0000017236), a true and accurate copy of which is attached as <u>Exhibit O</u>;

- *See* Emerging Applications for Anticonvulsants: Study Group Program/Faculty Guide (WLC_FRANKLIIN_0000068798), at WLC_FRANKLIIN_0000068798 – 99, WLC_FRANKLIIN_0000068804, WLC_FRANKLIIN_0000068818, WLC_FRANKLIIN_0000068820 – 24, a true and accurate copy of which is attached as <u>Exhibit P</u>.

    **E.**    **<u>New Allegations Relating to CME, Inc.</u>**

19.  With respect to CME, Inc., Class Plaintiffs and Coordinated Plaintiffs can allege the following:

>CME, Inc. caused misleading and omissive presentations on the subject of Neurontin and bipolar. As the Second Amended Complaint alleges, Parke-Davis knew by May 20, 1997, that clinical trial evidence established that Neurontin was not significantly superior to placebo in treating bipolar disorder. By the third quarter of 1997, Parke-Davis knew that the results of its own clinical trial of Neurontin showed that a sugar pill was more effective than Neurontin in treating bipolar disorder. Second Amended Complaint, ¶ 172. Defendants suppressed the results of both trials.

> CME, Inc. was retained to host events promoting Neurontin for psychiatric conditions disguised as educational CMEs. The Second Amended Complaint alleges that:
>
>> CME, Inc. managed and coordinated various marketing events for the Defendants, including a program entitled New Frontiers in Social Phobia and Bipolar Disorder, which promoted the use of Neurontin for psychiatric uses though a series of seminars held across the country and a workbook.
>
> Second Amended Complaint, ¶ 94. One such event in the New Frontiers in Social Phobia and Bipolar Disorder series was held in Orlando, FL on November 15, 1997, after Parke-Davis knew of both failed clinical trials on Neurontin and bipolar. As the program slides make clear, no mention is made of either failed trial. Thus, the presentations during the New Frontiers in Social Phobia and Bipolar Disorder series were omissive of the negative clinical data on bipolar.
>
> CME, Inc. was retained to conduct additional marketing events to promote psychiatric uses disguised as CMEs for 1998 and beyond. In order to fund one series alone, Parke-Davis had to pay CME, Inc. $1.6 million. Upon information and belief, at each meeting, the same or similar slides were presented, all of them omitting the negative bipolar data.

20. The allegations in the preceding paragraph are derived, in large part, from the following documents:

- *See* New Frontiers in Social Phobia and Bipolar Disorders (WLC_FRANKLIN_0000080341), a true and accurate copy of which is attached as <u>Exhibit Q</u>;

- *See* Letter from John Schwartz dated October 6, 1997 (WLC_FRANKLIN_0000082430), at WLC_FRANKLIN_0000082432, a true and accurate copy of which is attached as <u>Exhibit R</u>.

**F.    <u>New Allegations Relating to MAC</u>**

21.     With respect to Medical Action Communications, Inc. ("MAC"), Class Plaintiffs and Coordinated Plaintiffs can allege the following:

> Articles prepared by or written by MAC based on data supplied to it by Pfizer contained numerous false and misleading "key messages."
>
> For example, the article by Brodie et al., published in Epilepsia (September 2002), falsely stated that: "GBP [gabapentin] also has been shown to be effective as monotherapy in adults with partial seizures," when in fact that trials it cited did not support efficacy.
>
> The article by Guttuso, published in Obstetrics and Gynecology (February 2003), falsely stated: "gabapentin has shown efficacy in controlled studies for neuropathic pain, migraine headache, essential tremor, panic disorder, and social phobia." The article misleading omitted any reference to negative studies in those areas, and falsely cited the panic disorder trial as supporting efficacy, when in fact did not.
>
> Another article by Guttuso, published in the Journal of Pain Symptom Management (March 2004), falsely stated that: "[Gabapentin was approved] in 2002 as a treatment for neuropathic pain," when in fact the FDA had informed Pfizer that its application for neuropathic pain was non-approvable.
>
> The article by Spira et al. relating to chronic daily headache and migraine, published in Neurology (December 2003), misleadingly omitted any reference to the negative study in migraine headache.
>
> The article by Gidal et al., a review article discussing Neurontin and excessive doses published in Clinical Therapeutics (May 2003), misrepresented the negative results of the various trials that failed to establish a dose response and falsely suggested that these trials established Neurontin's greater efficacy at doses beyond 1800 mg per day.
>
> Pfizer and MAC developed several additional publications not referenced in the Second Amended Complaint, including Garcia-Borreguero et al., "Treatment of restless legs syndrome with gabapentin: a double-blind, cross-over study," published in the November 2002 issue of Neurology. This article contained numerous false statements. For example, the article claims that Neurontin had demonstrated therapeutic activity as a treatment for diabetic peripheral neuropathy but omits any reference to the

13

negative findings in the Gorson and Reckless studies. Similarly, the suggestion that Neurontin's efficacy in RLS and PLMS had not been directly studied in any formal clinical trials and that the Garcia-Borreguero study was in fact the first to do so failed to mention that Neurontin's efficacy in RLS and PLMS was directly studied by Dr. Ehrenberg in 1996 and the results of that study were negative. In that study, Dr. Ehrenberg found that Neurontin did not affect any of the participants' limb movements during sleep.

Thus, it is clear that articles generated by MAC were replete with false statements, which MAC and Pfizer had agreed were "key messages."

22. The allegations in the preceding paragraph are derived, in large part, from the following documents:

- *See* Brodie, et al, "Gabapentin versus Lamotrigine Monotherapy: A Double-blind Comparison in Newly Diagnosed Epilepsy," Epilepsia (September 2002), at 997, a true and accurate copy of which is attached as Exhibit S;

- *See* Guttuso, "Gabapentin's Effects on Hot Flashes in Postmenopausal Women: A Randomized Controlled Trial," Obstetrics and Gynecology (February 2003), at 337, a true and accurate copy of which is attached as Exhibit T;

- *See* Guttuso, "Hot Flashes Refractory to HRT and SSRI Therapy But Responsive to Gabapentin Therapy," Journal of Pain Symptom Management (March 2004), at 275, a true and accurate copy of which is attached as Exhibit U;

- Spira et al. "Gabapentin in the prophylaxis of chronic daily headache: a randomized, placebo-controlled study," Neurology (December 2003), a true and accurate copy of which is attached as Exhibit V;

- Gidal et al., "Gabapentin Dosing in the Treatment of Epilepsy," Clinical Therapeutics (May 2003), a true and accurate copy of which is attached as Exhibit W;

- Garcia-Borreguero et al., "Treatment of restless legs syndrome with gabapentin: a double-blind, cross-over study," Neurology (November 2002), a true and accurate copy of which is attached as Exhibit X.

14

## VARIOUS INDICATIONS

23.   Moreover, if given leave to further amend the complaint with respect to the fraud allegations concerning Neurontin and various different indications, I believe that Class Plaintiffs and Coordinated Plaintiffs have a reasonable, good faith basis—based on the partial review referenced above, as well as a re-review of the documents produced in the *Franklin* litigation—to assert the additional allegations described below:

### A.   New Allegations Relating to Pain

24.   With respect to pain, Class Plaintiffs and Coordinated Plaintiffs can allege the following:

> Defendants marketed Neurontin broadly for various types of pain, including neuropathic pain through the use of false and misleading statements.
>
> For example, the MAC-generated article by Guttuso, published in Obstetrics and Gynecology (February 2003), falsely stated: "gabapentin has shown efficacy in controlled studies for neuropathic pain, migraine headache, essential tremor, panic disorder, and social phobia." The article misleading omitted any reference to negative studies in those areas, and falsely cited the panic disorder trial as supporting efficacy, when in fact did not.
>
> Another article MAC-generated by Guttuso, published in the Journal of Pain Symptom Management (March 2004), falsely stated that: "[Gabapentin was approved] in 2002 as a treatment for neuropathic pain," when in fact the FDA had informed Pfizer that its application for neuropathic pain was non-approvable.

25.   The allegations in the preceding paragraph are derived, in large part, from the following documents:

15

- *See* Guttuso, "Gabapentin's Effects on Hot Flashes in Postmenopausal Women: A Randomized Controlled Trial," Obstetrics and Gynecology (February 2003), at 337, a true and accurate copy of which is attached as <u>Exhibit T</u>;

- *See* Guttuso, "Hot Flashes Refractory to HRT and SSRI Therapy But Responsive to Gabapentin Therapy," Journal of Pain Symptom Management (March 2004), at 275, a true and accurate copy of which is attached as <u>Exhibit U</u>;

26.    Moreover, Defendants have recently produced documents reflecting the success of their effort to market Neurontin to physicians as effective for all types of Neuropathic pain through the use of false information, but Defendants have designated these documents "confidential." As this Court has already determined that Plaintiffs' pain allegations are sufficient, and recently it denied Plaintiffs' motion to file similar documents under seal (see Electronic Order dated 08/11/2006), Plaintiffs are unable to provide this information to the Court in a streamlined fashion.

   **B.** **<u>New Allegations Relating to Bipolar and Other Mood Disorders</u>**

27.    With respect to bipolar and other mood disorders, Class Plaintiffs and Coordinated Plaintiffs can allege the following:

> Bipolar disorder is closely related to various other mood disorders, and Defendants recognized and even sought to take advantage of the close relation in their marketing efforts. In fact, when members of the public requested information for either bipolar or mood, they received the same letter, which purported to provided the most up-to-date information on "bipolar and mood elevation." This letter listed seven citations, all case reports or retrospective reviews, three of which related to non-bipolar mood disorders, and only two of which related to strictly to bipolar disorder.

28. The allegations in the preceding paragraph are derived, in large part, from the following documents:

- *See* Dear Doctor Letter (WLC_CBU_000808), at WLC_CBU_000808 – 11, a true and accurate copy of which is attached as <u>Exhibit Y</u>.

**<u>REDLINED COMPARISON OF COMPLAINTS</u>**

29. Attached, as <u>Exhibit Z</u>, is a redlined comparison of the First and Second Amended Class Action Complaints.

Signed under the pains and penalties of perjury, this 25th day of August 2006.

/s/ Ilyas J. Rona  
Ilyas J. Rona