UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | ) ) ) ) ) |
| THIS DOCUMENT RELATES TO: | ) MDL Docket No. 1629 ) Master File No. 04-10981 ) Judge Patti B. Saris |
| ALL MARKETING AND SALES PRACTICES ACTIONS | ) Mag. Judge Leo T. Sorokin ) ) ) |

## PLAINTIFFS' OBJECTIONS TO DISCOVERY ORDER NO. 4

Pursuant to Rule 72(a) of the Federal Rules of Civil Procedure and Rule 2(b) of the Local Rules for United States Magistrates Judges, Class Plaintiffs (*Harden Manufacturing Corp., et al.* v. *Pfizer, Inc., et al.*) and the Coordinated Plaintiffs (*The Guardian Life Insurance Company of America* v. *Pfizer, Inc.* and *Aetna, Inc.* v. *Pfizer, Inc.*) (collectively, "Plaintiffs") respectfully submit these objections to Discovery Order No. 4, entered by Magistrate Judge Leo T. Sorokin on August 25, 2006 (Dkt. No. 445, the "Order").[1]

## I.   **INTRODUCTION**

The third party payor plaintiffs ("TPPs") have already produced – or agreed to produce – the records of all Neurontin prescriptions written for their members or subscribers.  Not satisfied with the production of all *relevant* prescription records, Defendants moved to compel the production of (1) all *non*-Neurontin prescription records for these individuals, as well as (2) all medical claims data for these persons (*i.e.*, the data submitted to the TPPs by the subscribers' physicians and other medical service providers seeking payment), and (3) the underlying medical records for these persons (*e.g.*, the handwritten notes of prescribing physicians, lab test results, etc.), for a time period beginning one year before the first Neurontin prescription and ending one year after the last Neurontin prescription for each individual.  *See* Dkt. No. 402 (Defendants' motion).  In sum, Defendants sought the production of the medical and pharmaceutical records of

---

[1] Although the Order is dated August 17, 2006, as shown on the docket, it was not entered or served on the parties until August 25, 2006.  Rule 72(a) provides that a party may file objections "[w]ithin 10 days after being *served* with a copy of the magistrate judge's order" (emphasis added).  Rule 5(b)(2)(D) governs service via the Court's CM/ECF e-filing system.  Effective December 1, 2005, Rule 6(e) was amended to provide that "[w]henever a party must act within a prescribed period after service and service is made under Rule 5(b)(2)(B), (C), or (D), 3 days are added *after* the prescribed period which would otherwise expire under subdivision (a)."  Rule 6(a) provides that "when the period of time prescribed or allowed is less than 11 days, intermediate Saturdays, Sundays, and legal holidays shall be excluded in the computation."  Applying these rules, the 10 day period allowed by Rule 72(a) would have expired on September 11, 2006, due to the exclusion of Labor Day; adding three days to that period, objections to the Order must be filed by September 14, 2006.  Accordingly, Plaintiffs' objections are timely.

every one of the TPPs' thousands of members or subscribers who were prescribed Neurontin.

Defendants argued that this unprecedented intrusion into the private medical and psychiatric records of thousands of non-parties to this litigation is justified because the records are necessary to determine: (1) the condition each Neurontin prescription was written for (*i.e.*, an approved use -- adjunctive epilepsy therapy or postherpetic neuralgia -- or one of many unapproved, "off-label" uses), which is necessary to calculate the TPPs' recoverable damages; (2) whether Neurontin was effective in treating the individual for the "off-label" condition for which it was prescribed, rendering the cost of those prescriptions unrecoverable by the TPPs; and (3) what cheaper, alternative drugs would have been prescribed for each individual in lieu of Neurontin, an alternative measure of damages advanced by the Coordinated Plaintiffs. *See* Dkt. Nos. 403 (memorandum of law in support of motion), 429 (reply memorandum of law in further support of motion).

In response, Plaintiffs established that each of these propositions is untrue. *See* Dkt. Nos. 422 (Plaintiffs' opposition to motion), 461 (transcript of Aug. 15, 2006 hearing on motion) ("Transcript"). First, it is not necessary to examine individual patient records to determine the number and cost of Neurontin prescriptions written for each specific off-label condition and paid for by the TPPs. There is an entire sub-industry devoted to the collection and analysis of this data, which Defendants receive on a monthly or quarterly basis and routinely rely upon in managing their business.

Second, it is impossible to determine from individual patient records whether Neurontin was effective in treating the off-label conditions for which it was prescribed, either in general or for that particular patient. As Defendants successfully argued in a related case, causation (or in this case, efficacy) can only be proven through properly designed and controlled studies, not a

post-hoc analysis of individual case files.

Finally, attempting to divine what alternative drugs would have been prescribed for each patient based on their individual medical records is pure speculation.

Notwithstanding the near-complete lack of relevance of the discovery sought, the serious privacy concerns implicated by the production of the medical records of thousands of non-parties, and the extraordinary burden imposed on the TPPs in gathering and redacting these records, the Magistrate Judge ordered that each TPP produce the non-Neurontin prescription drug claims and medical claims data requested by Defendants, as well as the medical records of the prescribing physician for the greater of 2% or 100 of the TPPs' members or subscribers who were prescribed Neurontin, for the same time period. *See* Order at 2-3. Plaintiffs object to each of these rulings.[2]

The Order attempts to straddle the parties' "diametrically opposing positions at the edges of the continuum of approaches" to the issues presented. Order at 2. However, like the proverbial "splitting the baby," this "compromise" would have serious unintended consequences for this litigation. Left standing, the Order (1) would have the Court sanction an unprecedented intrusion into the personal privacy of thousands of individuals by causing the production of their medical and psychiatric treatment records to a major pharmaceutical company without their knowledge or consent, (2) turns basic science on its head by endorsing the concept that valid conclusions about medical efficacy can be drawn from a random collection of anecdotal case reports with no control group or controls for variables – ironically, the very fraud that

---

[2] Plaintiffs do not challenge the Order's ruling that the named individual plaintiffs must produce all of their medical records for the same time period; the ruling that "Kaiser's obligation to produce documents is not limited to documents located in California"; or the requirement that Kaiser provide Defendants with a list of its physicians who prescribed Neurontin for off-label uses. *See* Order at 3-4.

Defendants are accused of perpetrating in this case, and (3) imposes an enormous burden on the

TPPs to identify, redact, and produce thousands of individual medical files located in hundreds if

not thousands of doctors' offices and medical facilities, ensuring that this litigation will proceed

at such a pace as to make the intractable suit depicted in Dickens' Bleak House seem like a mere

flash in the pan.

## II.    STANDARD OF REVIEW

With respect to orders on non-dispositive matters such as the instant discovery dispute,

Rule 72(a) of the Federal Rules of Civil Procedure directs that "[t]he district judge . . . shall

consider such objections and shall modify or set aside any portion of the magistrate judge's order

found to be clearly erroneous or contrary to law."

## III.    ORDERING PRODUCTION OF THE RECORDS WAS CLEARLY ERRONEOUS

### A.    The Court Should Balance the Serious Privacy Interests at Stake, and the Heavy Burden of Producing the Requested Records, Against Their Minimal and Speculative Relevance

Courts should apply a balancing test when evaluating discovery requests that are

burdensome, raise privacy issues, and/or seek evidence that is of questionable admissibility at

trial.  As the First Circuit has held, "Rule 26(c) is highly flexible, having been designed to

accommodate all relevant interests as they arise… The good cause standard in the Rule is a

flexible one that requires an individualized balancing of the many interests that may be present in

a particular case," including the need for confidentiality and privacy interests.  *Gill v. Gulfstream*

*Park Racing Ass'n,* 399 F.3d 391, 402 (1st Cir. 2005) (internal quotation omitted).

"When a discovery request approaches the outer bounds of relevance and the information

requested may only marginally enhance the objectives of providing information to the parties or

narrowing the issues, the court must then weigh that request with the hardship to the party from

whom the discovery is sought."  *Fritsch v. City of Chula Vista*, 187 F.R.D. 614, 634 (S.D. Cal.

1999) (internal quotation omitted; denying discovery of plaintiff's medical records).  *See also* 23 AM. JUR. 2D DEPOSITIONS AND DISCOVERY § 22 (2006) ("Even when confidential information is directly relevant to litigation, its discovery will not be permitted until a balancing of the compelling need for discovery against the fundamental right of privacy determines that disclosure is appropriate."); 10 FED. PROC. L. ED. § 26.70 (2006) ("Practical considerations dictate that parties should not be permitted to roam in the shadow zones of relevancy and to explore matters which do not presently appear germane on the theory that they might conceivably become so.").

### B.    The Records Sought Implicate Serious Privacy Concerns

Against a minimal and purely speculative showing of relevance, discussed *infra*, the Court must balance the substantial privacy concerns raised by the mass production to the world's largest pharmaceutical company of the prescription and medical records of thousands of non-parties.  Indeed, Plaintiffs' counsel – most of whom are routinely engaged in large scale consumer fraud litigation against pharmaceutical companies – are unaware of *any* case in which a court has ordered anything remotely approaching the mass disclosure of individual health records requested by Defendants and granted in the Order.  This Court should not become the first to do so.

As the Seventh Circuit explained in denying the government's request for production of the redacted medical records of only 45 patients with questionable probative value:

> As the court pointed out in *Parkson v. Central DuPage Hospital,
> supra*, 61 Ill.Dec. 651, 435 N.E.2d at 144, "whether the patients'
> identities would remain confidential by the exclusion of their
> names and identifying numbers is questionable at best.  The
> patients' admit and discharge summaries arguably contain histories
> of the patients' prior and present medical conditions, information
> that in the cumulative can make the possibility of recognition very
> high."

* * *

> Even if there were no possibility that a patient's identity might be
> learned from a redacted medical record, there would be an invasion
> of privacy. Imagine if nude pictures of a woman, uploaded to the
> Internet without her consent though without identifying her by
> name, were downloaded in a foreign country by people who will
> never meet her. She would still feel that her privacy had been
> invaded.

*Northwestern Memorial Hosp. v. Ashcroft*, 362 F.3d 923, 929 (7th Cir. 2004). The invasion of

privacy rejected in *Northwestern* pales in comparison to the unprecedented foraging through

personal medical and psychiatric[3] records proposed by Defendants. Many, if not most of the

TPPs' subscribers would doubtless be horrified and/or outraged to learn that their personal

medical and/or psychiatric records had been handed over to the world's largest pharmaceutical

company without even notifying them, seeking their permission, or offering them an opportunity

to object.

    C.    **The Production of Individual Medical Records Would Be Extremely
Burdensome**

    The Order requires each TPP to produce "the medical records in its possession, custody

or control for a random selection of two percent of all persons for whom the TPP Plaintiff paid

for Neurontin prescriptions for off-label uses at issue in this case, or for one hundred such

persons, whichever number is greater." Order at 3. Evidently, the Magistrate Judge selected

these arbitrary figures – neither of which were suggested by the parties – as a compromise

between the parties' "diametrically opposing positions at the edges of the continuum of

approaches to this issue . . . ." Order at 3-4.

    While the TPPs have not completed their calculations, Plaintiff Kaiser estimates that

---

[3] Due to Defendants' aggressive but scientifically baseless marketing efforts, Neurontin was
commonly prescribed "off-label" to treat bipolar depression and anxiety disorders. *See, e.g.*,
Second Amended Class Action Complant ¶¶ 169-76.

from 1998 until July 2006, approximately 200,000 of its members were prescribed Neurontin. *See* Declaration of Elizabeth F. Villaluz ¶ 5.  Accordingly, the Order would require Kaiser to retrieve and redact the medical records of approximately 4,000 persons.[4]  These records are not maintained in any centralized location (physically or electronically), but are scattered among some 400 facilities across the country.  *Id*. ¶ 6.  So far, Aetna "estimate[s] that between 14,854 and 40,848 unique users submitted prescription claims for Neurontin to Aetna during 1999, and that between 23,573 and 64,827 unique users submitted prescription claims for Neurontin to Aetna during 2000; and, that between 30,493 and 83,856 unique users submitted prescription claims for Neurontin to Aetna during 2001."  Declaration of JoBeth Levy ("Levy Decl.") ¶ 8. This is less than half of the time period at issue.[5]  Accordingly, the Order would probably also require Aetna to produce thousands of sets of redacted medical records, assuming, *arguendo*, that those records are within its control.[6]

---

[4] At the time of the hearing, the TPPs had not made these calculations.  Plaintiffs had only seven business days to prepare their opposition to Defendants' motion.

[5] Aetna also believes these estimates to be low, as they "assume a constant population refilling Neurontin prescriptions.  Logic dictates that while some persons will have used Neurontin as a maintenance drug for the entire time period, others will have migrated on and off Neurontin thus increasing the number of unique users."  Levy Decl. ¶ 9.

[6] At the hearing, the Magistrate Judge noted that the TPPs are under no obligation to obtain and produce medical records that are *not* in their possession, custody, or control.  With the exception of Kaiser, a "true" HMO that employs most of the physicians who provide services to its members, none of the TPPs have *possession* or *custody* of these records, which are in the hands of treating physicians.  At the hearing, the Magistrate Judge inquired whether the other TPPs have "control" over these records, because their contracts with treating physicians give them the right to obtain them.  *But see Clark v. Vega Wholesale Inc.*, 181 F.R.D. 470 (D. Nev. 1998) (holding that court could not order plaintiff-patient to produce medical records in custody of her physician because the records were not under her "control").  As Plaintiffs noted at the hearing, without examining each of the innumerable contracts between the TPPs and the prescribing physicians, the TPPs cannot determine whether they have an unconditional right to obtain their subscribers' medical records, or whether they may only obtain them for limited purposes, such as resolution of billing disputes with the provider or adjudicating the claim.  *See* Transcript at 13:22-19:21.  The TPPs did not undertake this exercise in the seven business days between the filing of Defendants' motion and the filing of their opposition, nor have they been able to

Merely *obtaining* this quantity of records would pose a logistical and practical nightmare, as the Magistrate Judge observed at the hearing:

> [G]etting medical records even in a single-plaintiff/single-defendant case for a period of time where there's more than one treating physician, or even where there's one treating physician, is burdensome. It may not be too burdensome to require, but the fact of the matter is it's -- as we all know, it's difficult. And, I mean, we don't need to recall where we were a month or two ago where you [counsel for Defendants] basically don't want to get the medical records as to 285 or 225 people and Mr. Fromson only wants you to get them.
>
> And we had that issue back and forth. And that's because it's a burden to get them. I mean, let's be real. We all know it's incredibly hard to get medical records because doctors' offices have other things to do and are already besieged by all sorts of other paper demands upon them.

Transcript at 47:13-48:2.

Not only would *obtaining* these medical records be extraordinarily burdensome, the TPPs would be required to redact tens of thousands (or more likely hundreds of thousands) of pages of these records to comply with the Health Insurance Portability and Accountability Act of 1996, Pub. L. 104-191, 110 Stat. 1936 ("HIPAA"), which requires the removal of all individually identifiable information. *See* Order at 1 ("the party producing the document must redact it to achieve HIPPA [sic] compliance"); 45 C.F.R. § 164.514 (setting forth HIPAA's extensive redaction requirements). Since every page of these records will be unique, and most will likely contain physicians' famously illegible handwriting, this task is daunting, to say the least.

With respect to the medical and non-Neurontin prescription claims data, the TPPs have not yet determined whether it is even *possible* to comply with the Order. At least one TPP, Aetna, reports that its medical and pharmaceutical claims systems are independent (as is typically the case), and that it "would be required to create special computer programming and

---

complete it in the month since the hearing, but a preliminary review by two of the TPPs indicates that they only have a right to obtain records from physicians for limited purposes, none of them applicable here.

coding to attempt to integrate the various pharmacy claims and medical claims systems" as required by the Order. Even if it were possible for the TPPs to generate electronic reports reflecting the medical and prescription claims data of their subscribers who were prescribed Neurontin for *a specific time period*, the Order requires that the TPPs provide this information for a *different time period for each subscriber, i.e.*, one year before each subscriber's first Neurontin prescription, and one year after each subscriber's last Neurontin prescription, greatly complicating the matter. At least one TPP, Aetna, estimates that it will take "several hundred programming hours on both the pharmacy claims and medical claims systems, and an estimated completion time of 5 months" to overcome these hurdles, if they can be overcome at all. Levy Decl. ¶¶ 13-18. Given the fact that there are multiple, more easily accessible, and more reliable sources for the information sought by Defendants (*see* Part III.D.1., *infra*), there is no good reason to require the TPPs to undertake these efforts.

### D.    The Records Are Unnecessary and/or Irrelevant

Defendants argued that this unprecedented intrusion into the private medical and psychiatric records of thousands of non-parties to this litigation is justified because the records are necessary to determine: (1) the condition each individual Neurontin prescription was written for (*i.e.*, an approved use – adjunctive epilepsy therapy or postherpetic neuralgia – or an unapproved, "off-label" use, and, if so, which one), which is necessary to calculate the TPPs' damages; (2) whether Neurontin was effective in treating the individual for that "off-label" condition; and (3) what alternative drugs would have been prescribed each individual in lieu of Neurontin. Each of these propositions is demonstrably false.

### 1.    The Records Are Not Necessary to Determine The Number or Cost of Neurontin Prescriptions Written for Each Off-Label Condition

Defendants argued that the production of individual medical records and medical claims

data is necessary to determine the specific condition for which each individual Neurontin prescription was written, and hence, the TPPs' recoverable damages. There are far more accurate, and far less burdensome and intrusive, ways to obtain this information in the aggregate.

Indeed, there is an entire sub-industry – composed of companies such as IMS Health and Verispan – that track and analyze prescription activity by patient diagnosis for Pfizer and the other pharmaceutical manufacturers. *See* Declaration of Meredith Rosenthal ("Rosenthal Decl.") ¶¶ 7-8 & n.5-8. In the *Franklin* litigation, Pfizer produced a number of these reports, which show on a monthly or quarterly basis the number of Neurontin prescriptions written for each diagnosis, the average size and cost of those prescriptions, and how much of that cost was paid for by third party payors. *Id.* ¶ 8; Declaration of Barry Himmelstein ("Himmelstein Decl."), Exh. A.[7] In the *Franklin* litigation, Defendants testified that they routinely rely on this information to conduct their business. *See* Transcript at 31:24-32:2.

Using this data, the prestigious, peer-reviewed journal *Annals of Internal Medicine* recently published an article that quantifies, on a quarterly basis, the total number of Neurontin prescriptions filled for each diagnostic category from 1994 through early 2000. *See* M. Steinman, L. Bero, *et al.*, *Narrative Review: The Promotion of Gabapentin: An Analysis of Internal Industry Documents,* Ann. Intern. Med. 2006; 145:284-293, Fig. 1 (Himmelstein Decl., Exh. B).[8] Accordingly, there is no need to engage in the laborious and ultimately futile exercise of obtaining, redacting, reviewing, and analyzing the records of thousands of individual patients to determine the number or cost of Neurontin prescriptions written for the off-label conditions at

---

[7] This report, which is merely an exemplar of the many similar reports produced by Defendants in the *Franklin* litigation, was presented to the Magistrate Judge at the hearing. *See* Transcript at 29:18-30:25.

[8] This article, which was published on the day of the hearing, was also presented to the Magistrate Judge. *See* Transcript at 30:7-15, 31:8-23.

issue in this case.

### 2.    Individual Medical Records Cannot Be Used To Determine Whether Neurontin Was Effective in Treating "Off-Label" Conditions

Next, Defendants argued that individual medical and pharmaceutical records are necessary to determine whether Neurontin was effective in treating the off-label conditions for which it was prescribed.  In their moving papers, Defendants submitted no evidence – and an insufficient explanation – as to *how* they proposed to make these determinations from these records.  *See* Dkt. No. 403.  In their reply papers – filed only two business days before the hearing – Defendants submitted the Declaration of Keith E. Argenbright, M.D. ("Argenbright Decl.," Dkt. No. 430), purporting to provide support for this assertion.[9]  At the hearing, Plaintiffs complained that they had "not had a chance to respond to [the declaration] in writing," but were rebuffed by the Magistrate Judge.  Transcript at 27:20-23.[10]

As Plaintiffs argued, it is simply *not possible* to determine from individual medical records whether Neurontin was effective in treating a particular patient for the off-label condition the drug was prescribed for.  As Dr. Argenbright himself notes in his declaration, "most of the conditions at issue in this litigation (such as pain and bipolar disorder) . . . cannot be assessed

---

[9] Dr. Argenbright, an M.D.who is now in the healthcare technology field, establishes that he is familiar with reviewing medical records, but he possesses no apparent qualifications that would enable him to opine on generally accepted methods of determining pharmacological efficacy. *See* Argenbright Decl. ¶¶ 2-13.  Indeed, his approach to the question so contravenes the most basic and universally accepted principles in the field as to be inadmissible under Federal Rule of Evidence 702.  *See* Rosenthal Decl.at 1 ("His reasoning . . . ignores basic principles of research design and standards of clinical evidence that are widely accepted in the pharmaceutical industry."), ¶ 6 ("Dr. Argenbright's repeated assertion that examination of medical records can yield information on the effectiveness of Neurontin is entirely unscientific."), ¶ 15 ("Dr. Argenbright demonstrates his complete disregard for the scientific method in asserting that Plaintiffs' claims data can similarly produce valid information about Neurontin's effectiveness").

[10] While Plaintiffs were not given an opportunity to rebut the Argenbright Declaration in writing, the points made by Plaintiffs in Part III-D of these objections, and in the Rosenthal Declaration, were also made at the hearing.  *See* Transcript at 19:24-20:14, 22:23-32:14.

through empirical testing." Argenbright Decl. ¶ 21. In other words, while the efficacy of a cholesterol-lowering drug, or a blood pressure medication, may be determined by objective measures (*i.e.*, lower cholesterol or blood pressure), there is no purely objective measure for the efficacy of treatments for the off-label conditions Neurontin was prescribed for, such as chronic pain, mood and anxiety disorders. Instead, "success" in treating these conditions is highly subjective, and treating physicians are forced to rely primarily on self-reporting by the patient.

The placebo response rates for these conditions – *i.e.*, the percentage of patients who report a significant improvement in their condition when treated with a *sugar pill* – can be as high as 67% for anxiety disorders, and 60% for major depressive disorders. *See* Rosenthal Del. at 6 n.11. Indeed, Defendants' *own* study of Neurontin and neuropathic pain showed placebo response rates of 22%. *Id.* Accordingly, the most that can be determined from individual medical records is whether the patient *reported* feeling better after taking Neurontin, not whether Neurontin was *actually effective* in treating the condition. Without a proper control group, it is impossible to determine whether a patient reported feeling better because Neurontin "worked" for them, or because of the placebo effect, spontaneous remission, or for some other reason. *See* Rosenthal Decl. ¶¶ 10-13.[11]

Less than two months ago, in *Dellinger v. Pfizer, Inc.*, 2006 WL 2057654 (W.D.N.C. July 19, 2006), Pfizer, represented by the same counsel, prevailed in a *Daubert* motion to exclude as scientifically unsound the very type of anecdotal evidence they seek to discover here. In that case, the plaintiff, who was prescribed Neurontin for pain, an off-label use, argued that it caused his pancreatitis, supported by an expert who based his causation opinion on individual case reports and anecdotal data instead of properly designed and controlled trials or studies.

---

[11] Dr. Rosenthal explains the flaws in Dr. Argenbright's approach in detail at paragraphs 9-18 of her declaration.

Pfizer successfully argued, as numerous courts have held, that anecdotal data and individual case histories do *not* provide scientific evidence of causation admissible under *Daubert*:

> Keeys' opinion is based primarily on eleven (11) abstract cases which deem gabapentin as the principle cause of injury. However, Keeys himself concedes that case reports are not scientific proof of causation. . . . Furthermore, courts have found case reports to be merely anecdotal accounts of observations in particular individuals which are not controlled tests, frequently lack analyses and often make little attempt to screen out alternative causes for a patient's condition.

> \* \* \*

> Likewise, Keeys' opinion regarding the temporal relationship between the Plaintiff taking Neurontin and becoming ill was never tested independently or by objective sources. Courts have found that a causation opinion based solely on a temporal relationship is not derived from the scientific method and is therefore insufficient to satisfy the *Daubert* standards.

> . . . The abstract cases relied upon by Keeys have not been tested or subject to peer review and lack a known potential rate of error. The abstract reports simply describe reported drug cases without comparing them to the general population or a control group. Moreover, the reports fail to isolate potential alternative causes and neglect to investigate or explain the mechanism of causation.

> \* \* \*

> In conclusion, without objective sources such as clinical studies or medical literature that are subject to factors set out in *Daubert* such as testing, peer review, and publication, Keeys' opinion fails to offer reliable methodologies that support the hypothesis that Neurontin is generally capable of causing Plaintifffs injuries. Furthermore, adverse case reports, along with other sources included in Keeys' report, neglect to prove a general level of acceptance among the relevant professional community. In fact, none of Keeys' sources, independently or collectively, establish a causal link between Neurontin and pneumonia or pancreatitis. As a result, Keeys' expert opinion fails to satisfy the four factors of reliability set out in *Daubert*.

*Id*. at \*9-\*11 (citations omitted).[12]

---

[12] In support of its argument, Pfizer cited – and the court credited – a raft of cases for the proposition that individual case reports do not provide admissible evidence of causation:

> *See Soldo*, 244 F. Supp. 2d at 537 ("the great weight of authority -- and the most current authority -- squarely rejects the use of [adverse drug events] and case reports for the purpose of establishing general causation"); *Nelson*, 92 F. Supp. 2d at 969 ("reports themselves do not contain a testable and systemic inquiry into the

The same is true here.  Defendants cannot prove that Neurontin was effective in treating an off-label condition without a properly designed and controlled clinical trial or study, and the analysis of individual case histories they propose to perform will not even be admissible under *Daubert*.

The Magistrate Judge found no fault with this argument, but brushed it aside, finding that "[w]hether or not these documents are ultimately relevant and admissible, the 'discovery appears reasonably calculated to lead to the discovery of admissible evidence.'"  Order at 3 (citation omitted).  It is not, and this finding was both clearly erroneous and contrary to law.

---

mechanism of causation ... they do not demonstrate a causal link sufficient for admission to a finder of fact in court"). . . . *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1250 (11th Cir. 2005) ("Uncontrolled anecdotal information offers one of the least reliable sources to justify opinions about both general and individual causation"); Rider, 295 F.3d at 1199 (case reports "reflect only reported data, not scientific methodology"); *Glastetter v. Novartis Pharms. Corp.*, 107 F. Supp. 2d 1015, 1030 (E.D. Mo. 2000) ("a number of courts have concluded that case reports are not a scientifically reliable basis for a causation opinion .... Such case reports are not reliable, because normally, such reports 'record nothing more than a temporal association between an exposure and a particular occurrence'"); *Brumbaugh v. Sandoz Pharm. Corp.*, 77 F. Supp. 2d 1153, 1157 (D. Mont. 1999) ("anecdotal reports are not generally accepted as reliable scientific evidence to establish causation"); *Jones v. United States*, 933 F. Supp. 894, 899 (N.D. Cal. 1996) ("anecdotal case reports ... are not derived through the scientific method"), *aff'd*, 127 F.3d 1154 (9th Cir. 1997), cert. denied, 524 U.S. 946 (1998); *Casey v. Ohio Med. Prods.*, 877 F. Supp. 1380, 1385 (N.D. Cal. 1995) ("case reports are not reliable scientific evidence of causation, because they simply describe reported phenomena without comparison to the rate at which the phenomena occur in the general population or in a defined control group; do not isolate and exclude potentially alternative causes; and do not investigate or explain the mechanism of causation").

Defendants' Memorandum of Law in Support of Defendants' Motion to Exclude Testimony By Christopher Keeys, *Dellinger v. Pfizer Inc.*, 2006 WL 826302, 8-9 (W.D.N.C. Feb. 14, 2006). This document was presented to the Magistrate Judge at the hearing, along with the court's opinion in *Dellinger*.  *See* Transcript at 22:25-27:3.

### 3. Defendants Cannot Determine from An Examination of Individual Medical Records What Alternative Medications Would Have Been Prescribed in Lieu of Neurontin

Finally, Defendants argue that they will be able to determine from individual medical records which of the available alternative medications would have been prescribed for each patient in lieu of Neurontin.  This is pure speculation, and an awfully thin reed upon which to support such intrusive and burdensome discovery.  As with efficacy and the conditions Neurontin was prescribed for, this can be determined with far greater precision at the macro level than by examining a disparate sampling of medical records.

## IV.    CONCLUSION

The unprecedented foraging through the medical records of thousands of individuals proposed by Defendants, and required by the Order, would serve no useful purpose.  The gathering, production, and redaction of these records would, however, impose a tremendous burden on the TPPs, and unfairly deprive thousands of non-parties to the litigation of their privacy, for no corresponding benefit.  Accordingly, the portions of the Order requiring the production of this information should be set aside.

Dated:  September 14, 2006          By their attorneys,

*Members of the Class Plaintiffs' Steering Committee*

By: **/s/ Thomas M. Greene**

Thomas Greene, Esquire, BBO # 210020
Greene & Hoffman
125 Summer Street
Boston, MA 02110

By:  **/s/ Don Barrett**

Don Barrett, Esquire
Barrett Law Office
404 Court Square North
P.O. Box 987
Lexington, MS 39095

By:  **/s/ Daniel Becnel, Jr.**

Daniel Becnel, Jr., Esquire
Law Offices of Daniel Becnel, Jr.
106 W. Seventh Street
P.O. Drawer H
Reserve, LA 70084

By:  **/s/ James Dugan**

James Dugan, Esquire
Dugan & Browne
650 Poydras St., Suite 2150
New Orleans, LA 70130

By:  **/s/ Barry Himmelstein**

Barry Himmelstein, Esquire
Lieff, Cabraser, Heimann & Bernstein, LLP
275 Battery Street, 30th Floor
San Francisco, CA 94111-3339

By:  **/s/ Thomas M. Sobol**

Thomas M. Sobol, Esquire
Hagens Berman Sobol Shapiro LLP
One Main Street, 4th Floor
Cambridge, MA 02142

***Members of the Plaintiffs' Non-Class Steering Committee***

-16-

By: **/s/ Richard Bemporad**

Richard Bemporad, Esquire
Lowey Dannenberg Bemporad & Selinger, P.C.
The Gateway
One North Lexington Avenue
White Plains, NY  10601

By: **/s/ Linda P. Nussbaum**

Linda P. Nussbaum, Esquire
Cohen Milstein Hausfeld & Toll
150 East 52nd Street, 13th Floor
New York, NY 10022

563558.1

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    INTRODUCTION ................................................................................................ 1

II.   STANDARD OF REVIEW .................................................................................. 4

III.  ORDERING PRODUCTION OF THE RECORDS WAS CLEARLY
      ERRONEOUS ....................................................................................................... 4

      A.    The Court Should Balance the Serious Privacy Interests at Stake, and the
            Heavy Burden of Producing the Requested Records, Against Their
            Minimal and Speculative Relevance ........................................................... 4

      B.    The Records Sought Implicate Serious Privacy Concerns ...................... 5

      C.    The Production of Individual Medical Records Would Be Extremely
            Burdensome ................................................................................................... 6

      D.    The Records Are Unnecessary and/or Irrelevant ................................... 9

            1.    The Records Are Not Necessary to Determine The Number or Cost
                  of Neurontin Prescriptions Written for Each Off-Label Condition ........... 9

            2.    Individual Medical Records Cannot Be Used To Determine
                  Whether Neurontin Was Effective in Treating "Off-Label"
                  Conditions .................................................................................... 11

            3.    Defendants Cannot Determine from An Examination of Individual
                  Medical Records What Alternative Medications Would Have Been
                  Prescribed in Lieu of Neurontin ......................................................... 15

IV.   CONCLUSION ................................................................................................... 15

## TABLE OF AUTHORITIES

**Page**

### CASES

*Clark v. Vega Wholesale Inc.*,
    181 F.R.D. 470 (D. Nev. 1998)............................................................... 7

*Dellinger v. Pfizer, Inc.*,
    2006 WL 2057654 (W.D.N.C. July 19, 2006)........................................ 12, 13, 14

*Fritsch v. City of Chula Vista*,
    187 F.R.D. 614 (S.D. Cal. 1999) ........................................................... 5

*Gill v. Gulfstream Park Racing Ass'n*,
    399 F.3d 391 (1st Cir. 2005)................................................................... 4

*Northwestern Memorial Hosp. v. Ashcroft*,
    362 F.3d 923 (7th Cir. 2004) ................................................................. 6

### STATUTES AND REGULATIONS

45 C.F.R. § 164.514 ...................................................................................... 8

Health Insurance Portability and Accountability Act of 1996,
    Pub. L. 104-191, 110 Stat. 1936 ........................................................... 8

### RULES

Fed. R. Civ. P. 72(a) ................................................................................. 1, 4

Fed. R. Civ. P. 5(b) .................................................................................... 1

Fed. R. Civ. P. 6(a) .................................................................................... 1

### TREATISES AND OTHER AUTHORITIES

10 FED. PROC. L. ED. § 26.70 (2006) ........................................................... 5

23 AM. JUR. 2D DEPOSITIONS AND DISCOVERY § 22 (2006)............................ 5

M. Steinman, L. Bero, *et al.*, *Narrative Review:*
    *The Promotion of Gabapentin:  An Analysis of Internal Industry Documents,*
    Ann. Intern. Med. 2006.......................................................................... 10

563558.1