UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | )<br>)<br>)<br>)<br>) |
| THIS DOCUMENT RELATES TO:<br><br>ALL MARKETING AND<br>SALES PRACTICES ACTIONS | )<br>)<br>)<br>)<br>)<br>) MDL Docket No. 1629<br>Master File No. 04-10981<br>Judge Patti B. Saris<br>Mag. Judge Leo T. Sorokin |

# DECLARATION OF MEREDITH ROSENTHAL

## IN RESPONSE TO DEFENDANTS' EXPERT KEITH E. ARGENBRIGHT, M.D.

I have reviewed the report put forward by Defendants' expert Dr. Argenbright[1] in support of Defendants' motion to compel the production of medical records and claims data by Plaintiffs. Dr. Argenbright argues that medical records and medical/pharmaceutical claims data are essential for establishing the reasons for which Neurontin was prescribed and the therapeutic effectiveness of Neurontin. His reasoning, however, ignores basic principles of research design and standards of clinical evidence that are widely accepted in the pharmaceutical industry. In addition, he ignores alternative sources of data that are available to document the conditions for which Neurontin was prescribed that will produce more reliable estimates of utilization by the proposed Class.

---

[1] Declaration of Keith E. Argenbright, M.D., *In re: Neurontin Marketing, Sales Practices, and Products Liability Litigation*, MDL Docket No. 1629, Master File No. 04-10981, August 11, 2006 (Docket No. 430) (hereafter *Argenbright Declaration*).

I conclude that Dr. Argenbright's arguments in support of the motion to compel production of medical records and claims data are without merit.

I.    **Qualifications**

1.   My name is Meredith Rosenthal. I am an Associate Professor of Health Economics and Policy at the Harvard School of Public Health and an Academic Affiliate of Greylock McKinnon Associates, a consulting and litigation support firm located in Cambridge, Massachusetts. Since I have presented my qualifications in testimony previously submitted to this Court,[2] I will not repeat those qualifications here.

2.   In conducting the analysis reported herein, I have reviewed materials additional to those identified in my Declaration in support of Class certification of August 8, 2005. These materials are identified in Attachment A of this Declaration.

II.   **Overview**

3.   I have been asked by Plaintiffs' Counsel to respond to the August 11, 2006 Declaration of Keith E. Argenbright in support of Defendants' motion to compel the production of medical records and claims data by Plaintiffs.

4.   Dr. Argenbright argues in favor of Defendants' motion to compel based on two theories about the role medical charts and claims data might play in establishing liability and impact in this matter. First, he suggests that medical record review is needed to determine why individual patients received Neurontin. Second, he asserts that medical records will contain "the best

---

[2] See "The Economics of Off-Label Promotion and Estimation of Impact on the Class of Neurontin Endpayers", *In re: Neurontin Marketing and Sales Practices Litigation*, MDL Docket No. 1629, Master File No. 04-10981, August 8, 2005 (Docket No. 202) (Filed Under Seal).

evidence of whether Neurontin was effective for each patient who took Neurontin."[3] Similarly, he asserts that evidence of Neurontin's effectiveness could be gleaned from Plaintiffs' prescription drug claims data.[4]

5. There are two important flaws in his logic. First, while medical records and claims data can be used to document the reasons for which Neurontin was prescribed, there are other data sources available to establish the aggregate numbers of Neurontin prescriptions by diagnosis. Moreover, these alternative data sources are better suited to addressing the relevant questions of liability and impact than Plaintiffs' medical records and claims data.

6. More importantly, Dr. Argenbright's repeated assertion that examination of medical records can yield information on the effectiveness of Neurontin is entirely unscientific. Inferences about the causal effects of a drug cannot be made patient-by-patient. Evidence of a drug's effectiveness is generally derived from randomized controlled trials; the FDA requires evidence from at least one controlled trial to prove effectiveness because other methods are biased. Furthermore, the suggestion that claims data might be informative as to the effectiveness of Neurontin is even more untenable because of the additional limitations of billing data as compared to medical charts.

### III. Individual Medical Records Are Not Required to Quantify Off-label Prescribing of Neurontin

7. Analysis of the conditions for which Neurontin was prescribed does not require inquiry into individual medical records. There are at least two[5] national databases available to compute

---

[3] *Argenbright Declaration*, ¶ 21.

[4] *Ibid.*, in particular, ¶¶ 27-28.

[5] It appears that Verispan, another private consulting company that competes with IMS Health, maintains a similar database called the Physician Drug and Diagnosis Audit, which also describes patterns of pharmaceutical therapy by

the share of Neurontin prescriptions by patient diagnosis: the National Disease and Therapeutic Index (NDTI)[6] and the National Ambulatory Medical Care Survey (NAMCS).[7] Both of these data sets report patterns of prescribing by diagnosis through a national sample survey of office-based visits to U.S. physicians. These databases are widely used in peer-reviewed research and for strategic and competitive purposes by the pharmaceutical industry.[8] Because the NDTI and NAMCS are sample surveys, they can be used to calculate representative estimates of prescriptions by diagnoses.

8. In addition, national surveys such as NTDI and NAMCS have a number of other advantages for the analyses that will be required in this case. For example, the NAMCS data would permit quantification of the shares of prescriptions paid for by Class members versus non-Class members such as Medicaid. Medical records from selected Plaintiffs, in contrast, cannot provide information on the use of Neurontin outside of the Class.

## IV. Neither Medical Records nor Claims Data Can Demonstrate Effectiveness of Neurontin

9. Dr. Argenbright devotes considerable attention to the notion that scrutiny of medical charts and claims data for patients who received Neurontin will yield evidence as to the

---

condition. See http://www.verispan.com/products/product_details.php?id=38j2rzrc6s&hl=Therapy, as accessed September 14, 2006.

[6] The NDTI is produced by the independent data and consulting firm, IMS Health, and provides information about the patterns and treatment of disease encountered in office-based physician practices. Since 1958, NDTI has drawn from a universe of more than 350,000 physicians to provide "information regarding patients, physicians, diagnoses, and drug characteristics representing 93 primary specialties and 28 reporting specialty groups." Roughly 2,000 physicians per month are surveyed for the NDTI. The NDTI data can be used to understand how and why physicians use certain products and to profile characteristics of diagnoses and patient populations. See http://www.ndti.org/About.aspx?About=NDTI as accessed September 13, 2006.

[7] The NAMCS is conducted by the National Center for Health Statistics and the Centers for Disease Control and Prevention. It is a survey of office-based physicians and the services provided to patients during office visits. "Every year 3,000 physicians are randomly selected to provide data on approximately 30 patient visits over a 1-week period." See http://www.cdc.gov/namcs as accessed September 13, 2006.

[8] The CDC maintains a bibliography of articles using the NAMCS at http://www.cdc.gov/nchs/data/ahcd/publist-04-05-06.pdf.

effectiveness of Neurontin for Class members (and Class members' enrollees). There are a host of reasons why this assertion is unsupportable for medical records. Furthermore, for claims data the idea is simply absurd because the vast majority of relevant effectiveness measures (e.g., relief from pain, functioning) are not present in claims data.

10.     The overarching issue that derails Dr. Argenbright's theory of the value of the data in question relates to causal inference. Examination of individual patient medical records, outside of a controlled trial, will not allow for identification of the effect of Neurontin as distinct from other influences. As summarized by one of the seminal references in research design, inference about a cause and effect relationship requires the following three conditions: (1) covariation: that is, a change in the cause must relate to a change in the effect; (2) temporal precedence of the cause relative to the effect; and (3) no plausible alternative explanations.[9] In this instance, the third condition for valid causal inference is highly problematic.

11.     Examining individual patient records, where treatment with Neurontin has been given by the physician purposively (as opposed to assigned randomly), allows no way to exclude alternative explanations for improvement or lack of improvement in symptoms or functioning. If a patient improves or worsens, how can Neurontin's role be distinguished from the effects of:

- patient characteristics, in particular, those that led a physician to prescribe Neurontin (i.e., selection effects),
- the natural process of the underlying condition,
- over-the-counter medications,
- comorbid conditions, or
- entirely unrelated factors, such as environmental irritants?

---

[9] Thomas D. Cook and Donald T. Campbell, "Quasi-Experimentation: Design and Analysis Issues for Field Settings," 1979 Boston, MA: Houghton Mifflin.

12. The standard of clinical evidence generally required to prove a drug's effectiveness is a randomized controlled trial. The FDA requires at least one, and generally two, such trials of sufficient size for a New Drug Application.[10] Randomized controlled trials allow researchers to isolate the causal effect of a drug by comparing health outcomes and functional status between two homogeneous groups of patients that are statistically comparable in terms of characteristics other than treatment with the drug in question (due to randomization).

13. Other biases that would result from examining a population of patients who received Neurontin in routine clinical practice settings (i.e., from examining Plaintiffs' medical records) are those that are typically addressed in clinical trials by blinding both patients and physicians to the treatment. Blinding patients allows for the identification of placebo effects which may bias upwards estimates of effectiveness.[11] Blinding physicians, who in the case of Dr. Argenbright's

---

[10] See "Guidance for Industry: Providing Clinical Evidence of Effectiveness for Human Drug and Biological Products," U.S. Department of Health and Human Services, Food and Drug Administration, Center for Drug Evaluation and Research, Center for Biologics Evaluation and Research, May 1998.

"[S]ince 1999 the FDA has approved three medications for postherpetic neuralgia (gabapentin, lidocaine patch 5%, pregabalin) and two for painful diabetic neuropathy (duloxetine, pregabalin). These approvals have typically required randomized, parallel group, double-blind, placebo-controlled clinical trials. For the foreseeable future, this approach to establishing the efficacy of treatments for neuropathic pain is likely to remain not only the research design required by the FDA for approval and used by the pharmaceutical industry but also the preferred model for government-supported academic studies" (Robert H. Dworkin, Jennifer Katz and Michael Gitlin, "Placebo Response in Clinical Trials of Depression and Its Implications for Research on Chronic Neuropathic Pain," *Neurology*, 2005, 65:S7-S19).

[11] Placebo effects are widespread in clinical research and practices. A significant body of literature has been dedicated to analyzing why placebo effects are so prevalent. See, for example, Fabrizio Benedetti and Martina Amanzio, "The Neurobiology of Placebo Analgesia: From Endogenous Opioids to Cholecystokinin," *Progress in Neurology*, Vol. 51, pp. 109-125, 1997 and Frederic M. Quitkin, "Placebos, Drug Effects, and Study Design: A Clinician's Guide," *American Journal of Psychiatry*, 156:6, June 1999. Quitkin notes that placebo response rates vary from 25 to 60% for groups of patients with major depressive disorders. A review of clinical trials in which patients were randomly assigned to either a placebo or no treatment found that the 27 studies reviewed that involved the treatment of pain "showed a significant effect of placebo as compared with no treatment" (See Asbjorn Hrobjartsson and Peter Gotzche, "Is the Placebo Powerless? An Analysis of Clinical Trials Comparing Placebo with No Treatment," *The New England Journal of Medicine*, Vol. 344, No. 21, May 24, 2001). A 1996 review article (Marlena A. Piercy, John J. Sramek, Neal M. Kurtz and Neal R. Cutler, "Placebo Response in Anxiety Disorders," *The Annals of Pharmacotherapy*, Vol. 30, No. 9, 1996, pp. 1013-1019) summarizes the range of placebo response rates as follows: for generalized anxiety, 18-67%; for panic disorders, 20-134%; for social phobia, 7-43%; for obsessive-compulsive disorder, 7-19%.

Indeed, Pfizer's own designed, analyzed and funded studies for the effectiveness of pain reduction by Neurontin have shown significant placebo response rates. For example Serpell reports a 14% rate and Backonja reports a 22%

proposed effectiveness analysis take the role of researchers in evaluating and recording symptoms and function, addresses potential biases that physicians may have about the effectiveness of Neurontin.

14.     Judging the effectiveness of Neurontin from medical records for individual patients is also inferior to using clinical trial evidence because the medical record is not designed to be a systematic record of patient outcomes measured at regular intervals, as clinical trial protocols would require.  Physicians may not use standardized symptom scales – limiting the inter-patient and inter-physician comparability of effectiveness data.  In addition, physicians may not record the same categories of information at all visits and patients may see a physician infrequently or fail to follow up altogether after a prescription is written, resulting in missing information.

15.     Finally, Dr. Argenbright demonstrates his complete disregard for the scientific method in asserting that Plaintiffs' claims data can similarly produce valid information about Neurontin's effectiveness, as in his ¶ 27: "For example, if a patient was prescribed a bipolar drug for two months and was subsequently prescribed Neurontin for four years, this would tend to show that Neurontin was an effective alternative treatment for the patient."

16.     He goes on to suggest (in ¶ 28) that billing data would allow a researcher to identify treatment-refractory patients (that is patients who do not respond to treatment because of some underlying feature of their condition).  But this could only be done by applying the tautological

---

rate. See M. G. Serpell, "Gabapentin in Neuropathic Pain Syndromes: A Randomised, Double-Blind, Placebo-Controlled Trial," *Pain*, 99, 2002, 557–566.and M. Backonja *et al.*, "Gabapentin for the Symptomatic Treatment of Painful Neuropathy in Patients with Diabetes Mellitus: A Randomized controlled Trial," *Journal of the American Medical Association*, 280, 1998, 1831–1836.  See also Pande who found that "patients receiving placebo showed a robust response."  See A.C. Pande, *et al.*, "Gabapentin in Bipolar Disorder;: A Placebo-Controlled Trial of Adjunctive Therapy," *Bipolar Disorders,* 2, 2000, 249-255.)

Given the importance of placebo effects relative to true therapeutic effects for the off-label uses of Neurontin at issue, simply observing that a patient treated with Neurontin showed improvement will not provide evidence of effectiveness.

assumption that patients who switch medications or stop treatment are untreatable, when in fact it may simply be that the treatments are inherently ineffective.

17.   Using claims data in the manner suggested in Dr. Argenbright's ¶¶ 27-28 would never stand up to peer review in a clinical journal; such analyses would never constitute clinical evidence in the context of FDA approval.

18.   In general, claims data capture therapeutic and diagnostic services but do not record patient outcomes of any kind and thus are generally silent on questions of effectiveness. This is particularly the case for the types of chronic conditions for which Neurontin is generally prescribed where the key outcomes of interest to patients and physicians relate to reduced symptoms (e.g., pain) and improved function (e.g., activities of daily living).

## V.   Conclusion

19.   Dr. Argenbright's assertion that Plaintiffs' medical records and claims data are useful sources of information is based on a flawed application of research principles. For estimates of Neurontin use by the Class, nationally representative survey data provide a number of advantages and are readily available. For establishing the effectiveness of Neurontin, analysis of data from treated patients using medical records or claims data suffers from numerous important biases and would fall well short of scientific standards of valid clinical research.

20.   In summary, I conclude that the Defendants' expert provides no valid support for the motion to compel Plaintiffs to produce medical charts and claims data.

**/s/ Meredith Rosenthal**
_____
Meredith B. Rosenthal
September 14, 2006

Attachment A

Additional Documents Reviewed

Backonja M, A. Beydoun, K.R. Edwards, S.L. Schwartz, V. Fonseca, M. Hes, L. LaMoreaux, E. Garofalo, "Gabapentin for the Symptomatic Treatment of Painful Neuropathy in Patients with Diabetes Mellitus: A Randomized Controlled Trial. *Journal of the American Medical Association*,280, 1998,1831–1836.

Benedetti, Fabrizio and Martina Amanzio, "The Neurobiology of Placebo Analgesia: From Endogenous Opiods to Cholechystokinin," *Progress in Neurology*, Vol. 51, pp. 109-125, 1997.

CDC, http://www.cdc.gov/nchs/data/ahcd/publist-04-05-06.pdf.

CDC, http://www.cdc.gov/namcs.

Cook, Thomas D. and Donald T. Campbell, "Quasi-Experimentation: Design and Analysis Issues for Field Settings" 1979 Boston, MA: Houghton Mifflin.

Declaration of Keith E. Argenbright, M.D., *In re: Neurontin Marketing, Sales Practices, and Products Liability Litigation*, MDL Docket No. 1629, Master File No. 04-10981, August 11, 2006.

Dworkin, Robert H., Jennifer Katz and Michael Gitlin, "Placebo Response in Clinical Trials of Depression and its Implications for Research on Chronic Neuropathic Pain," *Neurology*, 65, 2005, S7-S19.

Hrobjartsson, Asbjorn and Peter Gotzche, "Is the Placebo Powerless? An Analysis of Clinical Trials Comparing Placebo with No Treatment," *The New England Journal of Medicine*, Vol. 344, No. 21, May 24, 2001.

IMS Health, http://www.ndti.org/About.aspx?About=NDTI.

Pande, Atul C., Jerri G. Crockatt, Carol A. Janney, John L. Werth, Georgia Tsaroucha and Gabapentin Bipolar Disorder Study Group, "Gabapentin in Bipolar Disorder: A Placebo-controlled Trial of Adjunctive Therapy," *Biopolar Disorders*, 2, 2000, 249-255.

Piercy, Marlena A., John .J. Sramek, Neil M. Kurtz and Neal R. Cutler, "Placebo Response in Anxiety Disorders," *Annals of Pharmacotherapy*, Vol.30, No. 9, 1996, pp. 1013-1019.

Serpell M.G., "Gabapentin in Neuropathic Pain Syndromes: A Randomised, Double-Blind, Placebo-Controlled Trial," *Pain*, 99, 2002, :557–566.

Quitkin, Frederic M., "Placebos, Drug Effects, and Study Design: A Clinician's Guide," *American Journal of Psychiatry*, 156:6, June 1999.

U.S. Department of Health and Human Services, Food and Drug Administration, Center for Drug Evaluation and Research, Center for Biologics Evaluation and Research, "Guidance for Industry: Providing Clinical Evidence of Effectiveness for Human Drug and Biological Products," May 1998.

Verispan, http://www.verispan.com/products/product_details.php?id=38j2rzrc6s&hl=Therapy.