**Annals of Internal Medicine**                                                     Review

# Narrative Review: The Promotion of Gabapentin: An Analysis of Internal Industry Documents

Michael A. Steinman, MD; Lisa A. Bero, PhD; Mary-Margaret Chren, MD; and C. Seth Landefeld, MD

**Background:** Internal documents from the pharmaceutical industry provide a unique window for understanding the structure and methods of pharmaceutical promotion. Such documents have become available through litigation concerning the promotion of gabapentin (Neurontin, Pfizer, Inc., New York, New York) for off-label uses.

**Purpose:** To describe how gabapentin was promoted, focusing on the use of medical education, research, and publication.

**Data Sources:** Court documents available to the public from *United States ex. rel David Franklin vs. Pfizer, Inc., and Parke-Davis, Division of Warner-Lambert Company*, mostly from 1994–1998.

**Data Extraction:** All documents were reviewed by 1 author, with selected review by coauthors. Marketing strategies and tactics were identified by using an iterative process of review, discussion, and re-review of selected documents.

**Data Synthesis:** The promotion of gabapentin was a comprehensive and multifaceted process. Advisory boards, consultants meetings, and accredited continuing medical education events organized by third-party vendors were used to deliver promotional messages. These tactics were augmented by the recruitment of local champions and engagement of thought leaders, who could be used to communicate favorable messages about gabapentin to their physician colleagues. Research and scholarship were also used for marketing by encouraging "key customers" to participate in research, using a large study to advance promotional themes and build market share, paying medical communication companies to develop and publish articles about gabapentin for the medical literature, and planning to suppress unfavorable study results.

**Limitations:** Most available documents were submitted by the plaintiff and may not represent a complete picture of marketing practices.

**Conclusion:** Activities traditionally considered independent of promotional intent, including continuing medical education and research, were extensively used to promote gabapentin. New strategies are needed to ensure a clear separation between scientific and commercial activity.

*Ann Intern Med.* 2006;145:284-293.    www.annals.org
For author affiliations, see end of text.

Recent litigation and congressional inquiry have provided access to pharmaceutical industry documents that shed light on the marketing strategies used to promote drugs (1). One example is the case of gabapentin (Neurontin, Pfizer, Inc., New York, New York). First approved by the U.S. Food and Drug Administration (FDA) in late 1993 for adjunctive treatment of partial complex seizures, by the mid- and late 1990s gabapentin was being widely used for the off-label treatment of pain syndromes and psychiatric conditions (**Figure 1**) (2–4). Although gabapentin was later approved for the treatment of postherpetic neuralgia, in 2004 the Pfizer subsidiary Warner-Lambert settled litigation and admitted guilt in connection to charges that during the 1990s it violated federal regulations by promoting the drug for pain, psychiatric conditions, migraine, and other unapproved uses (**Table 1**) (5–7).

Although news articles have described some practices used to market gabapentin (8, 9), to our knowledge there has been little systematic investigation of the overall structure of promotion for this drug. In this paper, we use public documents obtained through litigation to describe how marketing strategies and tactics for gabapentin were developed and used in the mid- and late 1990s. First, we describe the overall organization of marketing efforts, and how certain groups of physicians were targeted as recipients of and vehicles for promotion. Next, we describe specific marketing activities, focusing on how education, research, and other activities not typically considered promotional were used to achieve marketing goals.

## Methods

We reviewed approximately 8000 pages of publicly available documents regarding the case of *United States of America ex. rel David Franklin vs. Pfizer, Inc., and Parke-Davis, Division of Warner-Lambert Company*. Among documents pertinent to this research, two thirds were created between 1994 and 1998 and comprised a mix of internal correspondence and reports; programs, presentations, and transcripts from activities sponsored by Parke-Davis; and correspondence between the drug company and outside vendors and physicians. The remaining pertinent documents included excerpted depositions of Parke-Davis employees and court documents. These documents are now available in a digital archive at http://dida.library.ucsf.edu.

We reviewed documents using the principles of grounded theory, an inductive approach in which source

> **See also:**
>
> **Print**
> Key Summary Points . . . . . . . . . . . . . . . . . . . . . . . . 285
> Editorial comment . . . . . . . . . . . . . . . . . . . . . . . . . . . 305
>
> **Web-Only**
> Appendices
> CME quiz
> Conversion of figures and tables into slides

> **Key Summary Points**
>
> Industry promoted gabapentin for on- and off-label uses as part of a comprehensive marketing plan.
>
> Frequent prescribers of anticonvulsant agents, opinion leaders, and local champions of gabapentin were specially targeted for promotion.
>
> Gabapentin was promoted by using education and research, activities not typically recognized as promotional. "Independent" continuing medical education, "peer-to-peer selling" by physician speakers, industry-funded studies, and publications in the medical literature were used to advance marketing goals for the drug.

material was used to generate ideas rather than to test a preestablished hypothesis (10). All documents underwent primary review by 1 author, with selected review by the coauthors. First, we cataloged marketing techniques and identified broad themes about marketing strategy for gabapentin. Next, we discussed initial findings and re-reviewed pertinent documents in an iterative process to arrive at the final description and interpretation of marketing techniques and themes. To better understand the role of individuals and organizations discussed in the documents, we obtained supplemental information from the court and through Internet and PubMed searches.

Most data on payments to physicians and organizations were obtained from a payment register compiled by the plaintiff's attorneys from documents supplied by Parke-Davis (4, 11) and augmented with additional information provided to us by those attorneys (for additional detail on analyses of the payment register, see Appendix 1, available at www.annals.org). We also used budget planning documents from 1998 and other years to estimate expenditures for different forms of marketing (12–14).

During the period under review, gabapentin was approved only for the adjunctive treatment of partial seizures in persons older than 12 years of age at dosages up to 1800 mg/d. Thus, for this review, we considered any other indication to be unapproved. In quotations of documents, items in brackets are our addition and represent our best interpretation of abbreviations, phrases, and other data.

This research was approved by the Research and Development Committee of the San Francisco Veterans Affairs Medical Center and the Committee on Human Research at the University of California, San Francisco. The aforementioned archive paid the cost of obtaining and photocopying documents used in this research. No outside source had a role in the mechanisms of document review, presentation of results, or decision to submit the manuscript for publication.

## DATA SYNTHESIS

### Marketing Strategy

Each year, corporate leadership established broad goals ("strategies") for the marketing of gabapentin. Specific programs ("tactics") were then designed to achieve that year's strategic goals (15, 16). For example, planning documents for 1998 show a projected $40 million advertising and promotion budget for gabapentin organized under 4 "top-line strategies," further divided into a variety of tactical categories (**Table 2**) (12, 13). Professional education accounted for half to two thirds of the projected promotional budgets for 1996 through 1998 (12–14).

Parke-Davis identified several groups of physicians for targeted marketing. One such group was physicians who frequently prescribed anticonvulsant agents, categorized by the dollar value of anticonvulsant prescriptions they had the potential to generate (>$300 000 for the highest tier of prescribers) (14, 15, 17–23). Another key group was physicians who had the potential to influence gabapentin use among their colleagues. This included local champions of the drug, who were recruited and trained to serve as speakers in "peer-to-peer selling" programs (19, 24–26), which were noted to be "one of the most effective ways to communicate our message" (19). Another important segment was "thought leaders," "key influencers," and "movers and shakers," influential physicians identified in part by their affiliation with major academic medical centers (12, 13, 18–20, 24, 26–28). For example, in 2 documents Parke-Davis identified 40 potential thought leaders in the northeastern United States, including 26 current or future department chairs, vice chairs, and directors of academic clinical programs or divisions (24, 27). Of these 40 leaders, 35 participated in at least 1 Parke-Davis–sponsored activity, including 14 who requested or were allocated $10 250

*Table 1.* **Timeline***

| Month and Year | Event |
| --- | --- |
| May 1977 | U.S. patent for gabapentin granted to Warner-Lambert. |
| December 1993 | FDA approves gabapentin for adjunctive treatment of partial complex seizures in patients age >12 y at dosages ≤1800 mg/d. Marketing exclusivity granted to Parke-Davis, a division of Warner-Lambert. |
| August 1996 | Lawsuit filed by former Parke-Davis employee David Franklin alleging illegal marketing of gabapentin for off-label uses; case put under seal (action deferred pending government review). |
| December 1999 | Seal on lawsuit lifted, litigation resumes. |
| June 2000 | Warner-Lambert acquired by Pfizer. |
| October 2000 | FDA approves gabapentin for adjunctive treatment of partial seizures in children age 3–12 y. |
| May 2002 | FDA approves gabapentin for postherpetic neuralgia (in adults). |
| May 2004 | Warner-Lambert admits guilt and agrees to pay $430 million in relation to criminal and civil liability regarding the promotion of gabapentin for uses not approved by the FDA. |

* FDA = U.S. Food and Drug Administration.



Figure 1. Prescriptions for gabapentin, by diagnostic category.

Estimates of diagnosis-linked prescribing provided by Pfizer, Inc. (2–4). Each diagnosis was assigned to a diagnostic category by the authors. *Adjunctive treatment of epilepsy in adults older than age 12 years was the only U.S. Food and Drug Administration–approved use of gabapentin during the time period shown.

to $158 250 in honoraria, research grants, or educational grants between 1993 and 1997 (11).

Parke-Davis also targeted residents; planning documents for the 1998 advertising and promotion budget show allocations of $195 000 to $330 000 for "resident programs," a video case series, and a "CNS [central nervous system] residents course" (13). As described in one report, efforts with residents could be used "to influence physicians from the bottom up" and "to solidify Parke-Davis' role in the resident's mind as he/she evolves into a practicing physician" (24).

### Tactics

#### Continuing Medical Education

"Medical education drives this market!!" noted the author of a Parke-Davis business plan (29). Accordingly, educational activities were used to implement strategic goals for gabapentin (12, 30–32), often through events at which physician speakers could communicate messages about gabapentin directly to their colleagues. Teleconferences linking paid physician moderators with small groups of physicians were a method for reaching prescribers. Although these teleconferences were titled as educational events (33), an internal memo about 1 set of 143 teleconferences on epilepsy management noted that "the key goal of the teleconferences was to increase Neurontin new prescriptions by convincing non-prescribers to begin prescribing and current prescribers to increase their new prescription behavior" (34). In some cases, Parke-Davis helped establish the agenda and was able to surreptitiously monitor teleconferences in progress. In 1 set of 39 calls organized through a medical education and communications company to discuss unapproved uses of gabapentin, an agenda was prepared for physician moderators directing them to discuss such topics as "how Neurontin evolved into a first line therapy option in your practice" (35, 36). In another series of "psychiatry" teleconferences organized through a third-party vendor, senior Parke-Davis employees were invited to participate but told to "instruct the teleconference operator that you should be in LISTEN ONLY mode and your name should NOT be announced during introductions" (capital letters in original) (37). Documents suggest that in some cases moderators were paid $250 to $500 per call and had other financial ties to Parke-Davis (11). For example, each of the 10 moderators from 1 series of calls requested or was allocated between $14 800 to $176 100 for participation in various Parke-Davis–sponsored activities between 1993 and 1997 (11, 33).

Speakers bureaus and related programs were other physician-to-physician activities developed to promote gabapentin (25, 26, 28, 38). Sales employees were encouraged to "expand the speaker base—identify and train strong Neurontin advocates and users to speak locally for Neurontin" (19). Parke-Davis also organized the Merritt-Putnam lecture series to improve "public relations within the neurology community, etc., as well as [to impact] the volume of Neurontin new prescriptions" (26, 28, 38). The speakers bureau for this lecture series included chairs of neurology departments and directors of clinical programs

at major teaching hospitals (11, 39). Members of the speakers bureau were invited to special meetings, where, in addition to lectures on the clinical use of gabapentin, they were updated on promotional strategies for the drug (39, 40).

Many educational events appear to have been sponsored directly by Parke-Davis. However, the company also funded educational programs through "unrestricted educational grants" to medical education and communications companies (hereafter termed "medical education companies"), for-profit businesses that specialize in producing conferences for physicians on behalf of pharmaceutical manufacturers and are often subsidiaries of marketing firms (41–44). Under this "unrestricted" arrangement, Parke-Davis officially relinquished control over program speakers and content. This allowed programs organized by medical education companies to discuss unapproved uses of gabapentin and to grant continuing medical education credit from the Accreditation Council of Continuing Medical Education (ACCME), neither of which is permissible for events directly sponsored by drug companies (45–48).

However, these same medical education companies also worked for Parke-Davis in several other roles, such as organizing teleconferences, coordinating advisory boards and consultants meetings, and conducting tactical planning to promote gabapentin (15, 17, 39, 47, 49–55). Because of these relationships, medical education companies had incentive to develop educational programs that were consistent with Parke-Davis's marketing goals and to control content in a way that reflected favorably on the sponsor (Appendix 2, available at www.annals.org) (56). For example, in 1996, one medical education company prepared a marketing proposal for Parke-Davis outlining 24 tactics to increase gabapentin use shortly after using an unrestricted grant from the drug company to organize a series of study programs on the use of antiepileptic agents for chronic pain (49, 57–59). Although the educational program prepared by this company was accredited by ACCME, Parke-Davis representatives were invited to a curricular development meeting (59), recruited physicians to participate in the course (60), and followed attendance counts at each program meeting (57). These actions were consistent with a Parke-Davis report that described the program as a tactic to support "growth opportunity" in off-label use (32). In another case, another medical education company that organized consultants meetings for Parke-Davis received a grant to assemble and train speakers to deliver grand rounds lectures on anticonvulsant use in nonepileptic conditions at approximately 70 community and teaching hos-

*Table 2.* Draft Advertising and Promotion Budget for Gabapentin for 1998, by Strategy and Tactical Category*

| Tactical Categories, with Examples† | Budget, in Thousands of Dollars‡ | | | | Total Budget in Thousands of Dollars |
|---|---|---|---|---|---|
| | Expand Neurontin Use in Epilepsy Monotherapy | Conduct Targeted Promotional/CME Efforts on High-Prescribing Physicians | Develop and Leverage Thought Leader Support | Maximize Opportunities in "Emerging [Unapproved] Uses" | |
| CBU/SPE | 5300 | 1500 | 1600 | 0 | 8400 |
| Professional education (e.g., speakers bureau, advisory boards, dinner meetings) | 6229 | 0 | 1842 | 11 039 | 19 110 |
| National speaker (e.g., physician honoraria and travel, speaker programs) | 2110 | 500 | 550 | 0 | 3160 |
| Direct mail | 900 | 0 | 0 | 0 | 900 |
| Professional promotional literature (e.g., convention giveaways, patient brochures) | 2240 | 100 | 620 | 0 | 2960 |
| Medical journal (e.g., journal advertising) | 1200 | 0 | 0 | 0 | 1200 |
| Gratis merchandise (e.g., patient assistance programs) | 700 | 100 | 50 | 0 | 850 |
| Samples | 800 | 300 | 100 | 0 | 1200 |
| Displays, agency fees, pack/ship, miscellaneous (e.g., convention displays) | 1570 | 150 | 0 | 0 | 1720 |
| Market research | 400 | 0 | 0 | 100 | 500 |
| Total | 21 449 | 2650 | 4762 | 11 139 | 40 000 |

* The meaning of the term "CBU/SPE" is unclear, although "CBU" typically refers to "customer business unit," regional divisions of Parke-Davis. CME = continuing medical education.
† Tactical categories are listed as they appear in the source document (12). Examples were taken from line items in budget planning documents assigned to each category, although no specific examples were available for certain categories.
‡ Strategies were listed in budget planning documents as follows (12, 13): 1) "Expand Neurontin use in epilepsy through the introduction of monotherapy"—Parke-Davis had expected U.S. Food and Drug Administration approval for gabapentin as monotherapy for epilepsy, but the application was rejected; 2) "Conduct targeted promotional/CME efforts on high decile Neurologists & PCPs [primary care physicians] to increase their overall Neurontin usage"; 3) "Continue to develop and leverage thought leader support throughout the community to maintain our leadership position and achieve our business potential"; 4) "To maximize opportunities in the 'emerging [unapproved] uses' through clinical trials, publications, and educational events."

pitals across the northeastern United States (51, 61). Parke-Davis also sought to provide unrestricted educational grants to locally organized symposia at which it expected gabapentin to be favorably discussed (62). One memo recommended the following: "Assist in the organization of a [major university hospital's] pain symposium . . . . We will probably write them an unrestricted educational grant to help fund the project. In return, they will discuss the role of Neurontin in neuropathic pain, among other topics. They do have a very favorable outlook toward Neurontin" (63).

Unrestricted grants were used to underwrite other forms of education, including payments to physicians to cover the cost of attending conferences (64). Another grant exceeding $300 000 funded the production, printing, and distribution of 75 000 copies of an epilepsy handbook, with half of this budget allocated to soliciting interest among and delivering books to high prescribers of anticonvulsant agents (65).

*Advisory Boards and Consultants Meetings*

The stated purpose of advisory boards and consultants meetings was to solicit feedback from physician participants (47, 66). This objective was met at meetings where feedback was requested on clinical trial design (53, 67, 68), educational curriculum development (50, 67), and marketing strategies for gabapentin (14, 54, 67–69). However, other aspects of meetings were conducted in a manner more suggestive of promotional intent. For example, attendees at one consultants meeting were invited largely because of their high rates of anticonvulsant prescribing (17), and sales representatives were given "trending worksheets" to track prescribing behavior before and after the event (70); at the meeting, "participants were delivered a hard-hitting message about Neurontin" (71). Some meetings resembled educational conferences, with dozens of participants and an agenda dominated by lectures from physician "faculty" (17, 52, 71–73). Other meetings seemed to focus on cultivating relationships with thought leaders (26, 69), as in one meeting at which lecture notes for the regional business director notified attendees that "we would like to develop a close business relationship with you" (69).

Participants in advisory boards and consultants meetings received honoraria in addition to paid travel, lodging, and amenities at the resorts and luxury hotels at which such events were held (51, 52, 71–76). In addition, a number of faculty at these events received thousands of dollars in honoraria and grants from participating in these and other Parke-Davis activities (11, 52, 71, 73). These faculty may have been carefully vetted. As described by a medical education company that organized meetings, "it is [our] policy to complete a literature search to determine who authors favorable articles on the topics outlined" (56). In addition, the company reserved the right in nonaccredited programs "to probe the faculty further to definitively establish presentation content and make the appropriate changes and/or recruit an alternate speaker" (56).

*Research Strategy and Publication*

Research and publications on gabapentin served as key elements in the marketing strategy for the drug (26). For some clinical uses, such as monotherapy for epilepsy, research was used to support the company's attempt to obtain FDA approval for a new "on-label" indication. However, in other cases Parke-Davis employed a "publication strategy," the goal of which was to use research not as a means to gain FDA approval for new indications but "to disseminate the information as widely as possible through the world's medical literature" (77), generating excitement in the market and stimulating off-label prescribing despite the lack of FDA approval (78, 79). This strategy focused primarily on expanding gabapentin use in neuropathic pain and bipolar disorders, for which detailed decision analyses projected the greatest revenue potential (80–83).

The success of this strategy depended in part on publications being favorable to gabapentin. Some employees of Parke-Davis felt an obligation to publish studies with unfavorable results (80, 84), and in a number of instances such results were published (85–87). However, management expressed concern that negative results could harm promotional efforts (88), and several documents indicate the intention to publish and publicize results only if they reflected favorably on gabapentin (78, 79). As stated in a marketing assessment, "The results of the recommended exploratory trials in neuropathic pain, *if positive*, will be publicized in medical congresses and published" (italics added) (78). Similarly, in discussing 2 nearly identical trials that yielded conflicting results on gabapentin as seizure monotherapy, the "core marketing team" concluded that "the results of [the negative trial] will not be published" (89). (The positive trial was published [90], but we could not locate the negative trial on a PubMed search.)

Beyond publishing its own clinical trials, Parke-Davis expanded the literature on gabapentin by contracting with medical education companies to develop review papers, original articles, and letters to the editor about gabapentin for $13 375 to $18 000 per article, including a $1000 honorarium for the physician or pharmacist author (91–98). For example, one "grant request" from a medical education company to Parke-Davis proposed a series of 12 articles, each with a prespecified topic, target journal, title, and list of potential authors (to be "chosen at the discretion of Parke-Davis") (96). This proposal noted that "all articles submitted will include a consistent message . . . with particular interest in proper dosing and titration as well as emerging [off-label] uses," mirroring Parke-Davis promotional goals for the drug (96). In this case Parke-Davis requested that authors prepare articles and submit them for peer review (92, 96). However, in another instance the medical education company offered substantial assistance in the development of manuscripts, reporting in a status

report that "at [the author's] request, we did an extensive literature search and submitted selected articles to him for reference.... We have offered him help in identifying and collecting his appropriate cases, analyzing data, writing a manuscript, or whatever he needs" (91). Among 7 published articles that we matched to sponsorship by a medical education company, 4 had favorable conclusions about gabapentin (99–102), and the other 3 adopted a neutral tone (103–105). Article sponsorship was often not disclosed, with 6 of 7 articles not acknowledging receipt of an honorarium from the medical education company (although 1 of these acknowledged support from Parke-Davis) (99–105). In 5 of 7 articles, the author identified by the medical education company had received funds from Parke-Davis for speaking engagements, consultants meetings, or other activities (11).

Engaging physicians in the research process had potential benefits for Parke-Davis beyond the publications themselves, providing an opportunity to engage thought leaders, reward key physician customers, or influence prescribing (20, 50, 67, 106–108). Marketing strategy documents stated that "the list of key influencers should be... kept aware of the availability of research opportunities in clinical trials" (24) and recommended the "funding of smaller studies... with our key customers for investigation of Neurontin and pain" (29). Among the 40 thought leaders described, 5 requested or were allocated research funding ranging from $32 000 to $75 000 per person (11, 24, 27).

One notable example of the confluence between promotion and research was STEPS (Study of Neurontin: Titration to Effectiveness and Profile of Safety), an uncontrolled open-label study in which physicians were in-



*Figure 2.* **Framework for gabapentin marketing.**

In this model, marketing strategy and tactical planning allocate resources to different types of activities. Activities are divided into 3 categories according to the extent to which their promotional intent is generally known to physicians (for example, in directly sponsored continuing medical education [*CME*], the pharmaceutical company is known to be the direct source of funding, but because the event is framed as an educational program, its promotional intent may be obscured). Each of these activities can directly influence prescribing by practicing physicians. In addition, activities in the lower half of the figure can also influence prescribing through physician-to-physician communication, in which opinion leaders and local gabapentin champions are directly or indirectly engaged to communicate favorable messages about gabapentin to their colleagues. Physician prescribing patterns and other outcomes are then monitored to assess the effectiveness of marketing tactics, which influences future marketing planning decisions. For the sake of simplicity, other relationships are not shown in this diagram. For example, many marketing tactics can work synergistically, such as the use of research findings to promote gabapentin in CME settings.

structed to begin adjunctive gabapentin therapy in their patients with epilepsy and to keep increasing the dose until their patients were seizure-free, or until a maximum dosage of 3600 mg/d (twice the maximum FDA-approved limit) was achieved (109). More than 700 physicians were enlisted to participate, enrolling an average of 3 patients each (with a $300 payment for each patient enrolled) (109–111). The published report of the study stated that it "examined the effectiveness of gabapentin" in this dose range (109). However, company documents described the goal of the study as to "teach physicians to titrate Neurontin to clinical effect" (112) and "to give neurologists the opportunity to titrate to higher doses (>1800 mg) when needed" (16), central promotional goals at the time (30, 69). Described as a "key activity" for the implementation and support of marketing goals, "indicators of success" for the study included increases in market share and use of higher doses of gabapentin (16, 30). At least 6 of 9 authors of the published report had substantial financial relationships with Parke-Davis; they had participated in a total of 263 activities sponsored by Parke-Davis between 1993 and 1997, with requested or allocated payments ranging from $11 450 to $69 000 per author (11, 109).

## DISCUSSION

During the mid- to late 1990s, Parke-Davis used a comprehensive campaign to promote prescribing of gabapentin. Research, publications, and educational programs (including "independent" events) were used as marketing opportunities, augmented by opinion leaders and local physician champions to engage their physician colleagues. Since the promotional intent of these activities may not have been widely recognized, their impact on physicians was probably greater than interactions with known commercial intent, which are typically approached with greater skepticism (42, 43, 113–115).

While the limited nature of our source material precludes a definitive understanding of marketing practices, we hypothesize a model for the marketing of gabapentin that incorporates our findings (**Figure 2**). In this model, activities with clear promotional intent are known to originate from a pharmaceutical manufacturer and to serve a commercial purpose (thereby disclosing potential commercial bias). In other activities, the promotional underpinnings may be partially obscured (for example, where funding is known to originate from a drug company, but where the stated purpose of the event is education) or largely obscured (for example, "independent" activities delivered through a third party, or funding for research and publication). Many such activities rely on physician-to-physician communication, in which opinion leaders and local advocates are engaged with speaking, research, and educational opportunities and in turn may communicate favorable messages about the drug to their colleagues.

Our work has several limitations. First, our research was limited to publicly available documents, many of which were submitted by the plaintiff to support allegations of off-label marketing; as a result the view of company practices and decision making is incomplete. Second, we could not determine the frequency of specific activities, nor in most cases confirm that planned activities and payments were executed. Third, this report is based on primary document review by 1 investigator and collaborative interpretation of the authors, 3 of whom were unpaid expert witnesses in the litigation that yielded the documents. The reproducibility of our findings has not been established. Fourth, we reviewed the marketing practices for a single drug made by a single company, and we do not know the extent to which these techniques were used in the marketing of other products made by Parke-Davis or by other pharmaceutical firms. Finally, the litigation focused not on marketing activities themselves but on whether these activities were used to promote unapproved uses (5, 6). Thus, although certain activities, such as ghostwriting, violated prevailing ethical norms, many appear to have been legal (or in a broad "gray zone" of legality) when or if used solely to promote FDA-approved indications for gabapentin (48, 116, 117).

There is widespread agreement that commercial interests should not influence the clinical decisions that physicians make on behalf of their patients. As a result, a complex system has evolved to help manage these conflicts, focused primarily on disclosure and self-regulation by physicians, professional organizations, and the pharmaceutical industry. These efforts have been largely ineffective (118, 119), and the techniques used to promote gabapentin illustrate how commercial interests can intrude into the practice of medicine in both visible and hidden ways. Incremental efforts to strengthen the existing patchwork of guidelines are unlikely to be sufficient in an environment where marketing is so deeply embedded and where the borders between research, education, and promotion are more porous than is commonly recognized. New strategies are needed, including rigorous regulatory oversight, strict sequestration of commercial and scientific activities, and a fundamental internal reevaluation of the interactions between individual physicians, professional organizations, and industry (42, 120–124).

From San Francisco Veterans Affairs Medical Center and University of California, San Francisco, San Francisco, California.

**Acknowledgment:** The authors thank Elizabeth Boyd, PhD, for her careful review of the manuscript.

**Grant Support:** By a Veterans Affairs Health Services Research & Development Research Career Development Award (Dr. Steinman); by grants from the California Tobacco-Related Disease Research Programs (13RT-0108) (Dr. Bero), the National Institute of Arthritis and Musculoskeletal and Skin Disease (AR02203) (Dr. Chren), the National Institute on Aging (AG00912), and the John A. Hartford Foundation (2003–0244) (Dr. Landefeld); and by the Health Services Research Enhancement Award Program at the San Francisco Veterans Affairs Medical Center.

**Potential Financial Conflicts of Interest:** Drs. Steinman, Chren, and Landefeld served as unpaid expert witnesses for the plaintiff in the lawsuit that generated these documents (*United States of America ex. rel. David Franklin vs. Pfizer, Inc., and Parke-Davis, Division of Warner-Lambert Company*). Dr. Bero was not involved in this or any other legal action involving Pfizer or Parke-Davis. Seed funding for an online searchable archive of documents from the gabapentin litigation (http://dida.library.ucsf.edu) was provided by a gift from Thomas Greene, lawyer for the whistleblower plaintiff in this litigation, to the University of California Board of Regents. Drs. Steinman and Landefeld participated in the creation and development of the archive, including solicitation of start-up funding from Mr. Greene. The cost of obtaining and photocopying documents used in this research was paid by the archive, which incorporated these documents into the collection.

**Requests for Single Reprints:** Michael A. Steinman, MD, San Francisco Veterans Affairs Medical Center, 4150 Clement Street, Box 181G, San Francisco, CA 94121; e-mail, mike.steinman@ucsf.edu.

Current author addresses are available at www.annals.org.

## References

1. **Waxman HA.** Memorandum to Democratic Members of House Government Reform Committee: The Marketing of Vioxx to Physicians. 5 May 2005. Accessed at www.democrats.reform.house.gov/documents/20050505114932-41272.pdf on 5 May 2005.
2. *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001), Exhibit 136. [Estimates of gabapentin uses, by diagnosis.]
3. *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001), Exhibit 134. Responses and Objections of Defendant Pfizer Inc to Relator David Franklin's Second Set of Interrogatories [and attachments]; 11 October 2002:WL38831-WL39121.
4. *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001), Affidavit of Ilyas J. Rona in Support of Relator's Opposition to Defendant's Motion for Summary Judgment. 21 May 2003.
5. U.S. Department of Justice. Warner-Lambert to pay $430 million to resolve criminal & civil health care liability relating to off-label promotion. Accessed at www.usdoj.gov/opa/pr/2004/May/04_civ_322.htm on 3 February 2005.
6. *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001), Memorandum and Order [by presiding judge Patti B. Saris]; 25 June 2001.
7. Federal Food, Drug, and Cosmetic Act. 21 USC §§ 301-397; 1997 (as amended by FDA Modernization Act of 1997).
8. **Petersen M.** Memos cast shadow on drug's promotion. The New York Times. 20 December 2002:C2.
9. **Kowalczyk L.** Use of drugs soars despite controversy. Boston Globe. 25 November 2002:A1
10. **Pope C, Ziebland S, Mays N.** Qualitative research in health care. Analysing qualitative data. BMJ. 2000;320:114-6. [PMID: 10625273]
11. *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001), Exhibit 61. Payment Register.
12. *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001), Exhibit 46. [Parke-Davis memo from Vic Delimata to "Distribution," re: "1998 Neurontin A&P Allocation"]; 11 August 1997:V084079-V084091.
13. *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001), Exhibit 47. 1998 Strategic Plan and A&P Allocation Grid—Neurontin; 27 August 1997:V063423-V063435.
14. *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001), Exhibit 57. Neurontin 1998 Situation Analysis; 30 June 1997:V084264-V084294.
15. *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001), Exhibit 2. Transcript of deposition of John M. Knoop; 25 September 2002:9-11, 15-18, 32-33, 35-36, 42-45, 47-61, 97, 115-116, 118-120, 133-134, 137-142, 147, 149-150, 193-196, 202-210, 225-255, 297-303, 319-321.
16. *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001), Exhibit 72. [Agenda and related documents for meeting in Parke-Davis Executive Conf. Room]; 26 June 1995:V056548-V056597.
17. *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001), Exhibit 49. [Parke-Davis memo from Neurontin Marketing Team to Area Business Managers, re: "Advances in Anticonvulsants Meeting"]; 7 March 1996:V066089-V066090.
18. *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001), Exhibit 141. 1998 Strategic Plan and A&P Allocation Grid—Neurontin; 27 August 1997:V063423-V063435.
19. *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001), Exhibit 144. Northeast CBU 1997 Situation Analysis; 31 May 1996:V058083-V058095.
20. *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001), Affidavit of David Franklin—Exhibit A (transcripts). 19 May 2003.
21. *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001), Disclosure of Information by Relator David P. Franklin Pursuant to 31 USC § 3730 b(2)— Exhibits E and F. [Lists of physicians with anticonvulsant decile and market share by physician]; March–April 1996.
22. *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001), Exhibit 35. [Parke-Davis memo from R. Gavin to A. Crook, re: "Epilepsy/Convulsions and Neurontin Data"]; 12 June 1997:V084322-V084331, V063506-V063507, X010331-X010340.
23. *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001), Exhibit 133. AntiConvulsant Market—Deciles [and breakdown of antiepileptic drug use]:V084332-V084336.
24. *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001), Exhibit 34. Business Strategies to Penetrate the Hospital Segment of the Northeast Customer Business Unit:X003630-X003658.
25. *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001), Exhibit 45. 1998 Neurontin Tactics [prepared by Cline, Davis & Mann]; 30 July 1997:X005926-X005950.
26. *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001), Exhibit 40. Neurontin Northeast CBU [customer business unit] 1997: X001884-X001900.
27. *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001), Exhibit 82. [Parke-Davis memo from Richard Grady to Neurontin Marketing Team, re: "movers and shakers" for off-label use in Northeast Customer Business Unit]; 9 July 1996.
28. *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001), Exhibit 81. [Parke-Davis memo from Doug Saltel to John Knoop, re: "4Q97 Goals", and related memos]; 6 October 1997:V069786-V069812.
29. *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001), Exhibit 50. Neurontin 1996 SE CBU [customer business unit] Plan: W003095-W003109.
30. *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001), Exhibit 39. Neurontin 1997 Situation Analysis [and cover memo]; 29 May 1996:W002190-W002208.
31. *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001), Exhibit 44. [Cline, Davis & Mann memo from Clare Cheng to A. Crook, re: "Neurontin 1997 Tactical Plan"]; 13 September 1996:X006003-X006032.
32. *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001), Exhibit 38. South Central CBU [customer business unit] 1997 Situation Analysis; 31 May 1996:V058120-V058138.
33. *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001), Exhibit 74. [Parke-Davis memo from R.J. Banchansky to Northeast CBU [customer business unit] colleagues, re: "Teleconference—Epilepsy Update", and related other memo]; 23 August 1994:V066473-V066478.
34. *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001), Exhibit 79. [Parke-Davis memo from Carol Ek to Edda Guerrero re: "Promotrak Analysis" for "Neurontin Educational Teleconferences"]; 12 January 1995:V040172-V040194.
35. *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001), Exhibit 156. [Letter from Stuart Kolinski (Warner-Lambert) to Lesley Frank (FDA), re: FDA inquiries about promotion of gabapentin]; 9 June 1997: X022545-X022555.
36. *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001), Exhibit 174. [Series of memos re: teleconferences]; 5 October 1995–15 January 1996:0002193-0002216.
37. *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001), Exhibit 78. [Parke-Davis memo from Vic Delimata to "Distribution", re: "CME Psychiatry Dinners and Teleconferences", and related documents]; 10 March 1998:WL15542-WL15569.
38. *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001), Exhibit 62. [Draft memo re: "1994 Merritt Putnam Lectures—Topline Promotrak Analysis"]; 24 June 1995:V034481-V034486.

39. *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001), Exhibit 128. Parke-Davis Northeast/Southeast Regional Epilepsy Speakers Bureau [agenda and related documents]; 24 October 1997:WL14391-WL14398.
40. *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001), Exhibit 167. [Parke-Davis memo from Allen Crook to John Knoop, re: "Neurontin Goals"]; 21 March 1997:V057547-V057548.
41. *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001), Relator's Conditional Rule 56(f) Motion to Delay Final Determination of Summary Judgment. 13 June 2003.
42. **Relman AS.** Separating continuing medical education from pharmaceutical marketing. JAMA. 2001;285:2009-12. [PMID: 11308441]
43. **Relman AS.** Defending professional independence: ACCME's proposed new guidelines for commercial support of CME. JAMA. 2003;289:2418-20. [PMID: 12746367]
44. **Steinbrook R.** Commercial support and continuing medical education. N Engl J Med. 2005;352:534-5. [PMID: 15703417]
45. *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001), Exhibit 55. Questions and Answers Asked about Speakers Bureau (Promotional) Programs vs. Independent Activities:X022625-X022630.
46. *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001), Exhibit 56. Responsibilities & Definitions [re: independent and promotional programs]:X022641.
47. *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001), Exhibit 177. Advisory Boards—Responsibility of Physicians World Communications Group [and related documents]:X022631-X022640.
48. **Studdert DM, Mello MM, Brennan TA.** Financial conflicts of interest in physicians' relationships with the pharmaceutical industry—self-regulation in the shadow of federal prosecution. N Engl J Med. 2004;351:1891-900. [PMID: 15509824]
49. *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001), Exhibit 43. Emerging Applications in the Uses of AEDs [antiepileptic drugs]: An Educational Proposal [prepared by Professional Postgraduate Services for Parke-Davis]; 6 September 1996:V057651-V057692.
50. *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001), Exhibit 51. [Parke-Davis memo from Les Lang to Managers, Product Development, re: "Neurontin Consultants Meetings," and proposal from Professional Postgraduate Services]; 27 March 1996:0027155-0027184.
51. *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001), Exhibit 52. [Letter from Timothy Lynch (Medical Education Programs, Ltd—MEDED) to Elizabeth Attias-Yon (Parke-Davis), re: neuropathic pain consultants meetings]; 20 August 1996:V074812, V074793-V074811.
52. *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001), Exhibit 100. Neurology Update: Anticonvulsants—A Regional Consultant's Meeting, Boston [agenda and related documents]; 11 May 1996:V064153-V064170.
53. *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001), Exhibit 124. [Memo from Teresa Sham (AMM/Adelphi, LLC) to John Boris (Parke-Davis), re: "Migraine Advisory Board Summary"]; 3 October 1996:V090783-V090807.
54. *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001), Exhibit 139. [Memo from Bina O'Brien (Proworx) to Allen Crook and Vic Delimata (Parke-Davis), re: "APA Advisory Board Meeting Summary"]; 11 June 1997:WL19529-WL19532.
55. *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001), Exhibit 173. [Memo from Clare Cheng (Cline, Davis & Mann) to T. Albright et al. (Parke-Davis), re: "Atlanta Meeting", and related documents]; 18 July 1996:V043182-V043187.
56. *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001), Exhibit 60. [Memo from Bina O'Brien and Jennifer Guilmette (Proworx) to Allen Crook and Vic Delimata (Parke-Davis), re: "Situation Analysis for the ADA Satellite Symposium"]; 24 June 1997:V081238-V081243.
57. *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001), Exhibit 182. [Fax from Beth Epstein (Professional Postgraduate Services) to Laura Johnson (Parke-Davis), re: "Pain Study Group Meeting—Update"]; 21 June 1996:0008132-0008135.
58. *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001), Exhibit 175. Emerging Applications for Anticonvulsant Therapy: Study Group Program Faculty Guide:V070120-V070153.
59. *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001), Exhibit 59. Emerging Applications for Anticonvulsant Therapy [proposal by Professional Postgraduate Services re: home/group study program]; 9 November 1995:X018499-X018530.
60. *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001), Exhibit 183. [Parke-Davis memo from Neurontin Marketing Team to Field Sales Colleagues, re: "Chronic Pain Syndromes CME Program"]; 7 May 1996:V070038.
61. *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001), Exhibit 102. [Parke-Davis memo from Laura Johnson to CNS Team re: "Grand Rounds Program"]; 3 October 1997:Y021750-Y021755, WL015795-WL015847.
62. *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001), Exhibit 87. Independent Contract Form [for unrestricted grant to Vanderbilt University Medical Center for 19th Annual Clinical Neurology Symposium, and related documents]:Y020761-Y020785.
63. *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001), Exhibit 83. [Memo from Chris Miller to Les Lang and Jyoti Jankowski, re: "Ohio priorities"]; 12 March 1996:0027097.
64. *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001), Exhibit 89. [Resume of A. Cheville, MD, and handwritten notes]: V064228-V064230.
65. *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001), Exhibit 90. Independent Contract Form [for "Leppik Textbook"; and related documents]; 1997:Y018559-Y018587.
66. *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001), Exhibit 30. Transcript of deposition of James Parker Jr.; 17 May 2002.
67. *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001), Exhibit 99. [Transcript of "Neurology Update: Anticonvulsants—A Regional Consultants Meeting" in Boston]; 11 May 1996:X000879-X0001154.
68. *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001), Exhibit 63. [Parke-Davis memo from L. Hayes to B. Garofalo, re: "Gabapentin for Treatment of Pain Consultants Meeting, Sept. 28 1995: Boston, MA"]; 29 May 1995:V088789-V088798.
69. *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001), Exhibit 3. AED [antiepileptic drug] Advisory Board Presentations [lecture outline]; 8 November 1995:0008597-0008608.
70. *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001), Exhibit 54. [Parke-Davis memo from Neurontin Marketing Team to Area Business Managers, re: "Jupiter Beach Trending Worksheet"]; 21 May 1996: 0008583-0008594.
71. *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001), Exhibit 53. [Parke-Davis memo from Neurontin Marketing Team to Field Sales Colleagues, re: "Jupiter Beach Consultants Program", and agenda and program materials]; 8 May 1996:0007400-0007425.
72. *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001), Exhibit 97. [Transcript of "Advances in Anticonvulsants—A Regional Consultants Meeting" in Jupiter Beach, FL]; 19 April 1996–21 April 1996: V065515-V065647, X000282-X000878.
73. *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001), Exhibit 103. Anticonvulsants: Current Applications in Neurological Conditions—Consultants Meeting [agenda and meeting reviews for multiple meetings]:WL15712-WL15723, WL15740-WL15792.
74. *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001), Exhibit 48. [Consultant's agreements between Parke-Davis and Stuart Lestch, Richard Selbst]; 19 April 1996:0008394-0008495.
75. *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001), Exhibit 170. Atlanta Consultants Meeting—August 1-5, 1996 [agenda and resort description]:V043218-V043237.
76. *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001), Exhibit 171. Atlanta Consultants Meeting—Evaluation Overview: V043190-V043197.
77. *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001), Exhibit 21. [Interoffice memorandum from Atul Pande to John Boris, re: "Gabapentin Approvals", and handwritten response]; 28 March 1995:X029227.
78. *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001), Exhibit 26. Marketing Assessments—Neurontin in Neuropathic Pain and Spasticity [and cover letter]; 24 July 1995:WL07520-WL07547.
79. *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001), Exhibit 31. [Parke-Davis memo from John Boris to "Distribution," re: "Marketing Assessment—Neurontin in Migraine," and cover letter]; 31 July 1996:V082736-V082761.

80. *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001), Exhibit 27. [Parke-Davis memo from Francie Kivel to "Distribution," re: "Minutes from August 29, 1995 Neurontin Indications Decision Analysis Group Meeting"]; 29 August 1995:V049269-V049274.

81. *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001), Exhibit 29. [Parke-Davis memo from Francie Kivel to "Distribution," re: "Neurontin Indications Publication Analysis Report"]; 26 October 1995:V053848-V053877.

82. *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001), Exhibit 28. Transcript of deposition of Frances J. Kivel; 20 September 2002:15-17, 92-93, 113-114, 120, 312-318, 337, 338.

83. *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001), Exhibit 130. 12th Core Marketing Team Meeting—Neurontin [agenda, minutes]; 19-20 March 1996:V045404-V045418.

84. *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001), Exhibit 1. Transcript of deposition of John Boris; 16 September 2002: 11-21, 26, 29-30, 35, 79-80, 81, 86-87, 96-97, 155-160, 171, 195, 198, 219-221, 328, and 346.

85. **Pande AC, Crockatt JG, Janney CA, Werth JL, Tsaroucha G.** Gabapentin in bipolar disorder: a placebo-controlled trial of adjunctive therapy. Gabapentin Bipolar Disorder Study Group. Bipolar Disord. 2000;2:249-55. [PMID: 11249802]

86. **Gorson KC, Schott C, Herman R, Ropper AH, Rand WM.** Gabapentin in the treatment of painful diabetic neuropathy: a placebo controlled, double blind, crossover trial [Letter]. J Neurol Neurosurg Psychiatry. 1999;66:251-2. [PMID: 10071116]

87. *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001), Exhibit 94. Transcript of deposition of Philip Magistro; 4 September 2002:72-73, 75-79, 85-86, 134, 153-154.

88. *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001), Exhibit 129. 18th Neurontin Marketing Power Hour—Minutes [and agenda for "14th Core Marketing Team Meeting," plus cover memo]; 6 March 1997:V042365-V042371.

89. *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001), Exhibit 120. Neurontin 14th Core Marketing Team Meeting [agenda, conclusions, action items]; 8-9 April 1997:V047116-V047129.

90. **Chadwick DW, Anhut H, Greiner MJ, Alexander J, Murray GH, Garofalo EA, et al.** A double-blind trial of gabapentin monotherapy for newly diagnosed partial seizures. International Gabapentin Monotherapy Study Group 945-77. Neurology. 1998;51:1282-8. [PMID: 9818846]

91. *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001), Exhibit 64. [Letter from Jacki Gordon (AMM/Adelphi, Ltd) to Phil Magistro (Parke-Davis), re: development of manuscripts for Parke-Davis Northeast Customer Business Unit]; 8 November 1996:X005102-X005110.

92. *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001), Exhibit 65. [Grant request and response letter for "Scientific Article Series in Support of Epilepsy Education," prepared by Medical Education Systems, Inc.]; 1996:W09816-W09821, X005729-X005730.

93. *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001), Exhibit 66. [Letter from Leigh Beck (Medical Education Systems, Inc.) to Nancy Kohler (Parke-Davis), re: grant request to develop series of journal articles]; 18 June 1997:W09814-W09815.

94. *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001), Exhibit 67. [Fax from Joan Bradley (Medical Education Systems, Inc.) to Allen Crook and Vic Delimata (Parke-Davis) re: "Update on AED articles" under development by Medical Education Systems]; 8 January 1998:X005255-X005262.

95. *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001), Exhibit 110. Status Report [on articles under development by AMM/Adelphi, Ltd]; 5 June 1997:V039185-V039186.

96. *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001), Exhibit 181. Grant request—Scientific Article Series in Support of Epilepsy Education [from Medical Education Systems, Inc]; 12 December 1996: X005719-X005723.

97. *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001), Exhibit 105. [Letter from Kenneth Gorson (St. Elizabeth's Medical Center) to Phil Magistro (Parke-Davis), re: draft of research article on gabapentin, and attached draft]; 23 August 1997:W06826-W06839.

98. *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001), Exhibit 109. Neurontin Publication Status Report [prepared by AMM/Adelphi, Ltd for Parke-Davis]; 22 January 1997:X005039-X005041.

99. **Merren MD.** Gabapentin for treatment of pain and tremor: a large case series. South Med J. 1998;91:739-44. [PMID: 9715219]

100. **Pollack MH, Scott EL.** Gabapentin and lamotrigine: novel treatments for mood and anxiety disorders. CNS Spectrums. 1997:55-61.

101. **Knoll J, Stegman K, Suppes T.** Clinical experience using gabapentin adjunctively in patients with a history of mania or hypomania. J Affect Disord. 1998;49:229-33. [PMID: 9629953]

102. **Hansen HC.** Treatment of chronic pain with antiepileptic drugs: a new era. South Med J. 1999;92:642-9. [PMID: 10414471]

103. **Gidal B, Anderson G.** Epilepsy in the elderly: special pharmacotherapeutic considerations. Consultant Pharmacist. 1998;1:62-74.

104. **Armstrong EP, Cone C.** The cost of treating seizure patients in a managed care organization. Journal of Managed Care Pharmacy. 1999;5:351-6.

105. **Anderson GD.** A mechanistic approach to antiepileptic drug interactions. Ann Pharmacother. 1998;32:554-63. [PMID: 9606477]

106. *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001), Exhibit 73. [Letter from David Davis to Rick Banchansky re: "STEPS Hospital Sites"]; 26 January 1995:V070680-V070682.

107. *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001), Exhibit 85. Study Proposal: Approval Request [for funding of research on "Gabapentin and methylphenidate in the treatment of fibromyalgia", and related documents]; 27 April 1997:V058857-V058859.

108. *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001), Disclosure of Information by Relator David P. Franklin Pursuant to 31 USC § 3730 b(2)—Exhibit Q. [List of small research studies]; 1996.

109. **Morrell MJ, McLean MJ, Willmore LJ, Privitera MD, Faught RE, Holmes GL, et al.** Efficacy of gabapentin as adjunctive therapy in a large, multicenter study. The STEPS Study Group. Seizure. 2000;9:241-8. [PMID: 10880282]

110. *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001), Exhibit 70. STEPS Statement of Agreement; 1995:W000003-W000006.

111. *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001), Exhibit 71. [Parke-Davis memo from Laura Johnson to CNS Team, re: "STEPS Investigators Meeting"]; 7 August 1997:Y021763.

112. *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001), Exhibit 69. Epilepsy Awareness & Support Exchange [and related documents]:V042508-V042556.

113. **Calfee J, Ringold D.** The 70% majority: enduring consumer beliefs about advertising. Journal of Public Policy & Marketing. 1994;13:228-38.

114. **Hovland C, Weiss W.** The influence of source credibility on communication effectiveness. Public Opinion Quarterly. 1951;15:635-50.

115. *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001), Exhibit 165. [Letter from Minnie Baylor-Henry (FDA) to Richard Kogan (Schering Corporation), re: "Warning Letter" about promotion of Vancenase nasal spray, Vancenase AQ nasal spray, Vanceril inhaler]; 1997.

116. **Chimonas S, Rothman DJ.** New federal guidelines for physician-pharmaceutical industry relations: the politics of policy formation. Health Aff (Millwood). 2005;24:949-60. [PMID: 16136634]

117. U.S. Food and Drug Administration Office of Policy. Guidance for industry. Industry-supported scientific and educational activities. Fed Regist. 1997;62: 64093-100.

118. **Krimsky S.** Science in the Private Interest. Has the Lure of Profits Corrupted Biomedical Research? Lanham, MD: Rowman & Littlefield; 2003.

119. **Bero LA.** Accepting commercial sponsorship. Disclosure helps—but is not a panacea [Editorial]. BMJ. 1999;319:653-4. [PMID: 10480803]

120. **Kassirer J.** On the Take: How America's Complicity with Big Business Can Endanger Your Health. New York: Oxford Univ Pr; 2005.

121. **Angell M.** The Truth about the Drug Companies: How They Deceive Us and What To Do about It. New York: Random House; 2004.

122. **Furberg CD, Hall MA, Sevick MA.** Balancing commercial and public interests [Editorial]. Curr Control Trials Cardiovasc Med. 2004;5:6. [PMID: 15239846]

123. **Schafer A.** Biomedical conflicts of interest: a defence of the sequestration thesis-learning from the cases of Nancy Olivieri and David Healy. J Med Ethics. 2004;30:8-24. [PMID: 14872066]

124. **Brennan TA, Rothman DJ, Blank L, Blumenthal D, Chimonas SC, Cohen JJ, et al.** Health industry practices that create conflicts of interest: a policy proposal for academic medical centers. JAMA. 2006;295:429-33. [PMID: 16434633]

**Annals of Internal Medicine**

**Current Author Addresses:** Drs. Steinman and Landefeld: San Francisco Veterans Affairs Medical Center, 4150 Clement Street, Box 181G, San Francisco, CA 94121.
Dr. Bero: University of California, San Francisco, 3333 California Street, Suite 420, Box 0613, San Francisco, CA 94143.
Dr. Chren: San Francisco Veterans Affairs Medical Center, 4150 Clement Street, Box 151R, San Francisco, CA 94121.

## APPENDIX 1: ANALYSIS OF THE PAYMENT REGISTER

The payment register was assembled by the plaintiff's attorneys by using data from documents provided by Parke-Davis, in most cases covering 1993–1997. It was organized by individual physicians or institutions, with each payment to that individual, or activity attended by that individual without evidence of payment, appearing as a separate line in the spreadsheet. We used this register to assess payments to physicians of interest whom we identified by name in other court documents, such as physicians targeted as "thought leaders," or physicians who moderated teleconferences on behalf of Parke-Davis. For each physician of interest, 1 of the authors reviewed all line-item entries for that physician to eliminate duplicate entries. Then, on the basis of limited descriptive information for each line item, funds were classified as "requested" (for example, a letter from a physician requesting grant support) or "allocated" (for example, an agenda for an upcoming event with a notation of expected payment). In the absence of contrary evidence, most payments under $2000 were considered "allocated" since they usually appeared to be honoraria. However, in most cases we could not definitively confirm that physicians participated in or received payment for the listed activity.

## APPENDIX 2: CONTROL OF CONTENT IN AN "INDEPENDENT" PROGRAM: A CASE STUDY

In a letter from the medical education and communications company Proworx to Parke-Davis (56), the author describes working with Parke-Davis on an upcoming satellite symposium at the American Diabetes Association annual meeting. When employees at Proworx became concerned about possible "negative" content at their program, they took corrective action (surnames have been removed in the reproduction of this letter):

> When Proworx finally received each of the abstracts [for talks by two speakers] within the week prior to the actual program, they were immediately forwarded to both Vic and Allen [Parke-Davis marketing employees] for their comments. Upon receipt of Dr. B's abstract, Vic called Bina [a project director at Proworx] to express his concerns. However, Bina had already contacted [the accrediting institution] to establish what could be done, within the accreditation guidelines, to address these concerns. At that point, Dr. B. was contacted and told that the accrediting institution had asked that she revise her abstract to remove any specific product information that she could not provide references for. She then revised her abstract and faxed it back again for our review. Lisa, the copy writer for the Parke-Davis account, was then contacted and asked to make any further revisions.
>
> Although the abstract had been revised, there were still concerns on Proworx's and Vic's part in regard to Dr. B's presentation. Her abstract illustrated that [she] was clearly not planning on presenting what had originally been agreed upon. Therefore, Proworx immediately looked at what possible options were available, aside from canceling her talk, to counteract a possible 'negative' presentation. [The accrediting institution] was contacted to address accreditation issues and the CDM [Cline, Davis & Mann, an advertising firm that was the corporate parent of Proworx] account team met with Bina to identify what key issues needed to be presented to give attendees a 'positive message' to go away with.
>
> At this point, Proworx requested that Dr. B. forward a copy of her slides for our review. Upon review, we determined that the slides did not include any specific negative information in regard to Neurontin or anticonvulsants as a whole, and that we should concentrate on creating a setting in which she would have no choice but to address the issue she had originally agreed to present. Therefore, when meeting with the CDM account team, pre-written questions were developed to address any issues that were not mentioned in Dr. B's presentation, as well as questions countering negative comments . . . .
>
> It was then decided that the best option, while not crossing over [American Council of Graduate Medical Education] guidelines, was to present questions at the Q & A session, which would take place immediately following her presentation. This did indeed lead Dr. B. to address some of the positive aspects of anticonvulsants and of Neurontin . . . .
>
> If this had not been an accredited program, Proworx would have been able to probe the faculty further to definitively establish program content and make the appropriate changes and/or recruit an alternative speaker.