UNITED STATES DISTRICT COURT
OF MASSACHUTTES

-------------------------------------x

MARTHA ACCETTULLO, et al

             Plaintiffs[1],    COMPLAINT

                                          C.A. No. 04-10981-PBS

     v.               Plaintiffs Demands
                           Trial by Jury

PFIZER INC., PARKE-DAVIS,
a division of Warner-Lambert Company
and Warner-Lambert Company LLC,
WARNER-LAMBERT COMPANY and
WARNER-LAMBERT COMPANY LLC,

             Defendants.

-------------------------------------x

## PLAINTIFFS FIRST AMENDED COMPLAINT[2]

      Plaintiffs, by attorneys, Law Offices of Newton B. Schwartz, Sr., Jack W. Harang and Sacks & Weston as and for the Verified Complaint herein alleges upon information and belief the following:

### STATEMENT OF THE CASE

1.     This is an action to recover damages for personal injuries and/or death sustained by the Plaintiffs, MARTHA ACCETTULLO, et al, as the direct and proximate result of defendants' wrongful conduct in connection with the designing, developing, manufacturing, distributing, labeling, advertising, marketing,

---

[1] Plantiffs are listed on Ex. A attached hereto and incorporated by relevance herein. Its shows stated residence of each Plaintiff. Defendant(s) are being furnished with Ex. A.

[2] Per FR CIV.P 15(a) by leave of Court pending, per certificate with opposing counsel on September 8, 2006 Allow by written consent if not opposed by Defendants. This Amended pleading reverts back to date of the original filing prior to tranfer to the MDL above, per F.R. CIV.P 15(c)(1)(2).

promoting and selling of the prescription drug Neurontin, especially for such "off-label" uses as the treatment of peripheral neuropathy, diabetic neuropathy, trigeminal neuralgia, attention deficit disorder (ADD), periodic limb movement disorder, post-herpetic neuralgia, painful diabetic neuralgia, anxiety disorder, social phobias, bipolar disorder, alcohol withdrawal syndrome, amyotrophic lateral sclerosis (ALS), spinal cord injury, essential tremor, restless leg syndrome, reflex sympathetic dystrophy (RSD), and migraine headaches, among other "off-label" uses, herein after the "17 conditions", a purpose for which Neurontin had not received FDA approval, and at dosages higher than had been approved by the FDA and had been properly tested on humans, even though the drug had not been tested and studied for that purpose and had not been found to be safe and effective at any dosage for the treatment of above "off-label" uses.

## PARTIES AND JURISDICTION

2.    Jurisdiction exists as against the defendants, PFIZER INC., PARKE-DAVIS, a division of Warner-Lambert Company and Warner-Lambert Company LLC (hereinafter "PARKE-DAVIS"), WARNER-LAMBERT COMPANY and WARNER-LAMBERT COMPANY LLC, pursuant to:

   a. 28 U.S.C. Section 1332, in that the plaintiffs, MARTHA ACCETTULLO, et al are citizens and residents of the States shown on Ex. A, the defendant, PFIZER INC., is incorporated in business in the State of

Delaware and maintains its principal place of business in the State of New York, the defendant, PARKE-DAVIS, is incorporated in the State of Michigan, and maintains its principal place of business in the State of New Jersey, the defendant, WARNER-LAMBERT COMPANY, is incorporated in the State of Delaware and maintains its principal place of business in the State of New Jersey, the defendant, WARNER-LAMBERT COMPANY LLC, is a limited liability company organized under the laws of the State of Delaware, whose sole shareholder and member is the defendant, PFIZER INC., and the amount in controversy exceeds the sum of $75,000.00 exclusive of interest and costs.

b. 28 U.S.C. Section 1391(a) et seq., in that jurisdiction is founded only on diversity of citizenship, and a substantial part of the events or omissions giving rise to these claims occurred in the Judicial Districts in the states as alleged herein after.

3.     That at all times hereinafter mentioned, upon information and belief, the defendant, PFIZER, INC., was and still is a foreign corporation organized under the laws of the Sate of Delaware.

4.     That at all times hereinafter mentioned, upon information and belief, the defendant, PFIZER INC., was and still is a foreign corporation authorized to do business in the State of New York.

5.     That at all times hereinafter mentioned, upon information and belief, the defendant, PFIZER INC., was and still is a business entity actually doing business in the State of New York.

6.     That at all times hereinafter mentioned, upon information and belief, the defendant, PARKE-DAVIS, a division of Warner-Lambert Company and Warner-Lambert Company LLC (hereinafter "PARKE-DAVIS"), was and still is a foreign corporation organized under the laws of the State of Michigan.

7.     That at all times hereinafter mentioned, upon information and belief, the defendant, PARKE-DAVIS, was and still is a foreign corporation authorized to do business in the State of New York.

8.     That at all times hereinafter mentioned, upon information and belief, the defendant, PARKE-DAVIS, was and still is a business entity actually doing business in the State of New York.

9.     That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY was and still is a foreign corporation organized under the laws of the State of Delaware.

10.     That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY, was and still is a foreign corporation authorized to do business in the State of New York.

11.    That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY, was and still is a business entity actually doing business in the State of New York.

12.    That at all times hereinafter mentioned, upon information and belief, the defendant, PARKE-DAVIS, is a division of the defendant, WARNER-LAMBERT COMPANY.

13.    That at all times hereinafter mentioned, upon information and belief, the defendant, PARKE-DAVIS, is a subsidiary of the defendant, WARNER-LAMBERT COMPANY.

14.    That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY LLC, was and still is a foreign limited liability company organized under the laws of the State of Delaware.

15.    That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY LLC, was and still is a foreign limited liability company authorized to do business in the State of New York.

16.    That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY LLC, was and still is a business entity actually doing business in the State of New York.

17.    That at all times hereinafter mentioned, upon information and belief, the defendant, PFIZER INC., is the sole shareholder and member of the defendant, WARNER-LAMBERT COMPANY LLC.

18.    That at all times hereinafter mentioned, upon information and belief, the defendant, PARKE-DAVIS, is a division of the defendant, WARNER-LAMBERT COMPANY LLC.

19.    That at all times hereinafter mentioned, upon information and belief, the defendant, PARKE-DAVIS, is a subsidiary of the defendant, WARNER-LAMBERT COMPANY LLC.

20.    That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY, is a division of the defendant, PFIZER INC.

21.    That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY, is a subsidiary of the defendant, PFIZER INC.

22.    That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY, is a successor in interest to the defendant, PARKE-DAVIS.

23. That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY LLC, is a division of the defendant, PFIZER INC.

24. That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY LLC, is a subsidiary of the defendant, PFIZER INC.

25. That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY LLC, is a successor in interest to the defendant, PARKE-DAVIS.

26. That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY, is a successor in interest to the defendant, PARKE-DAVIS.

27. That on a date prior to June 4, 2004, the defendant, WARNER-LAMBERT COMPANY, assumed the assets and liabilities of the defendant, PARKE-DAVIS.

28. That on a date prior to June 4, 2004, the defendant, WARNER-LAMBERT COMPANY, expressly assumed all liabilities and obligations of the defendant, PARKE-DAVIS.

29. That on a date prior to June 4, 2004, the defendant, WARNER-LAMBERT COMPANY, impliedly assumed all liabilities and obligations of the defendant, PARKE-DAVIS.

30.    That on a date prior to June 4, 2004, the defendant, PARKE-DAVIS, and the defendant, WARNER-LAMBERT COMPANY, merged with each other.

31.    That on a date prior to June 4, 2004, the defendant, PARKE-DAVIS, merged with the defendant, WARNER-LAMBERT COMPANY, and the defendant, PARKE-DAVIS, became a part of the defendant, WARNER-LAMBERT COMPANY.

32.    That on a date prior to June 4, 2004, the defendant, PARKE-DAVIS, and the defendant, WARNER-LAMBERT COMPANY, consolidated with each other.

33.    That on or about December 31, 2002, the defendant, WARNER-LAMBERT COMPANY LLC, assumed the assets and liabilities of the defendant, PARKE-DAVIS.

34.    That on or about December 31, 2002, the defendant, WARNER-LAMBERT COMPANY LLC, expressly assumed all liabilities and obligations of the defendant, PARKE-DAVIS.

35.    That on or about December 31, 2002, the defendant, WARNER-LAMBERT COMPANY LLC, impliedly assumed all liabilities and obligations of the defendant, PARKE-DAVIS.

36.    That on or about December 31, 2002, the defendant, PARKE-DAVIS, and the defendant, WARNER-LAMBERT COMPANY LLC, merged with each other.

37.    That on or about December 31, 2002, the defendant, PARKE-DAVIS, merged with the defendant, WARNER-LAMBERT COMPANY LLC, and the defendant, PARKE-DAVIS, became a part of the defendant, WARNER-LAMBERT COMPANY LLC.

38.    That on or prior to December 31, 2002, the defendant, PARKE-DAVIS, and the defendant, WARNER-LAMBERT COMPANY LLC, consolidated with each other.

39.    That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY LLC, is a successor in interest to the defendant, WARNER-LAMBERT COMPANY.

40.    That on or prior to December 31, 2002, the defendant, WARNER-LAMBERT COMPANY LLC, assumed the assets and liabilities of the defendant, WARNER-LAMBERT COMPANY.

41.    That on or prior to December 31, 2002, the defendant, WARNER-LAMBERT COMPANY LLC, expressly assumed all liabilities and obligations of the defendant, WARNER-LAMBERT COMPANY.

42.    That on or prior to December 31, 2002, the defendant, WARNER-LAMBERT COMPANY LLC, impliedly assumed all liabilities and obligations of the defendant, WARNER-LAMBERT COMPANY.

43.    That on or prior to December 31, 2002, the defendant, WARNER-LAMBERT COMPANY, and the defendant, WARNER-LAMBERT COMPANY LLC, merged with each other.

44.    That on or prior to December 31, 2002, the defendant, WARNER-LAMBERT COMPANY, merged with the defendant, WARNER-LAMBERT COMPANY LLC, and the defendant, WARNER-LAMBERT COMPANY, became a part of the defendant, WARNER-LAMBERT COMPANY LLC.

45.    That on or prior to December 31, 2002, the defendant, WARNER-LAMBERT COMPANY, and the defendant, WARNER-LAMBERT COMPANY LLC, consolidated with each other.

46.    That at all times hereinafter mentioned, upon information and belief, the defendant, PFIZER INC., is a successor in interest to the defendant, PARKE-DAVIS.

47.    That at all times hereinafter mentioned, upon information and belief, the defendant, PFIZER INC., is a successor in interest to the defendant, WARNER-LAMBERT COMPANY.

48.    That at all times hereinafter mentioned, upon information and belief, the defendant, PFIZER INC., is a successor in interest to the defendant, WARNER-LAMBERT COMPANY LLC.

49.    That on a date prior to June 4, 2004, the defendant, PFIZER INC., assumed the assets and liabilities of the defendant, PARKE-DAVIS.

50.    That on a date prior to June 4, 2004, the defendant, PFIZER INC., assumed the assets and liabilities of the defendant, WARNER-LAMBERT COMPANY.

51.    That on a date prior to June 4, 2004, the defendant, PFIZER INC., expressly assumed all liabilities and obligations of the defendant, PARKE-DAVIS.

52.    That on a date prior to June 4, 2004, the defendant, PFIZER INC., impliedly assumed all liabilities and obligations of the defendant, PARKE-DAVIS.

53.    That on a date prior to June 4, 2004, the defendant, PFIZER INC., expressly assumed all liabilities and obligations of the defendant, WARNER-LAMBERT COMPANY.

54.    That on a date prior to June 4, 2004, the defendant, PFIZER INC., impliedly assumed all liabilities and obligations of the defendant, WARNER-LAMBERT COMPANY.

55.    That on or prior to December 31, 2002, the defendant, PFIZER INC., assumed the assets and liabilities of the defendant, WARNER-LAMBERT COMPANY LLC.

56.    That on or prior to December 31, 2002, the defendant, PFIZER INC., expressly assumed all liabilities and obligations of the defendant, WARNER-LAMBERT COMPANY LLC.

57. That on or prior to December 31, 2002, the defendant, PFIZER INC., impliedly assumed all liabilities and obligations of the defendant WARNER-LAMBERT COMPANY LLC.

58. That on a date prior to June 4, 2004, the defendant, PFIZER INC., and the defendant, PARKE-DAVIS, merged with each other.

59. That on a date prior to June 4, 2004, the defendant, PFIZER INC., and the defendant, WARNER-LAMBERT COMPANY, merged with each other.

60. That on or before June 4, 2004, the defendant, PFIZER INC., and the defendant, WARNER-LAMBERT COMPANY LLC, merged with each other.

61. That on a date prior to June 4, 2004, the defendant, PFIZER INC., and the defendant, PARKE-DAVIS, merged with each other and the defendant, PARKE-DAVIS, became a part of the defendant, PFIZER INC.

62. That on a date prior to June 4, 2004, the defendant, PFIZER INC., and the defendant, WARNER-LAMBERT COMPANY, merged with each other and the defendant, WARNER-LAMBERT COMPANY, became a part of the defendant, PFIZER INC.

63. That on or prior to December 31, 2002, the defendant, PFIZER INC., and the defendant, WARNER-LAMBERT COMPANY LLC, merged with each other and the defendant, WARNER-LAMBERT COMPANY LLC, became a part of the defendant, PFIZER INC.

64.     That on a date prior to June 4, 2004, the defendant, PFIZER INC., and the defendant, PARKE-DAVIS, consolidated with each other.

65.     That on a date prior to June 4, 2004, the defendant, PFIZER INC., and the defendant, WARNER-LAMBERT COMPANY, consolidated with each other.

66.     That at all times hereinafter mentioned, upon information and belief, the defendant, PFIZER INC., has its principal place of business in the State of New York.

67.     In the year 2000, the defendant, PFIZER INC., acquired the defendant, WARNER-LAMBERT COMPANY, and as the result of that acquisition, the defendant, PFIZER INC., is responsible for all liabilities resulting from the acts or omissions of the defendant, WARNER-LAMBERT COMPANY, which occurred prior to such acquisition.

68.     In the year 2000, the defendant, PFIZER INC., acquired the defendant, PARKE-DAVIS, a division of Warner-Lambert Company, and as the result of that acquisition, the defendant, PFIZER INC., is responsible for all liabilities resulting from the acts or omissions of the defendant, PARKE-DAVIS, which occurred prior to such acquisition.

69.     On or prior to December 31, 2002, defendant, PFIZER INC., acquired the defendant, WARNER-LAMBERT COMPANY LLC, and pursuant to the terms of and conditions of that acquisition, the defendant, PFIZER INC., is responsible for

all acts or omissions of the defendant, WARNER LAMBERT-COMPANY, LLC, occurring prior to such acquisition.

70.    That at all times hereinafter mentioned, upon information and belief, the defendant, PFIZER INC., presently markets and sells the drug Neurontin.

71.    That on a date prior to June 4, 2004, the defendant, PFIZER INC., marketed and sold the drug Neurontin.

72.    That at all times hereinafter mentioned, upon information and belief, the defendant, PFIZER INC., is engaged in the business of designing, manufacturing, advertising, marketing, and selling pharmaceutical drugs, including Neurontin, and in pursuance of this business, transacts business within the State of New York and contracts to provide goods and services in the State of New York.

73.    That at all times hereinafter mentioned, upon information and belief, the defendant, PFIZER INC., committed a tortuous act inside the State of New York, which caused injury to plaintiffs.

74.    That at all times hereinafter mentioned, upon information and belief, the defendant, PFIZER INC., committed a tortuous act outside the State of New York, which caused injury to plaintiffs.

75.    That at all times hereinafter mentioned, upon information and belief, the defendant, PFIZER INC., regularly does and solicits business and engages in a

persistent course of conduct in the State of New York, deriving substantial revenue from goods and products consumed in the State of New York.

76.     That at all times hereinafter mentioned, upon information and belief, the defendant, PFIZER INC., expects or should reasonably expect its acts to have consequences in the State of New York, and derives substantial revenue from interstate or international commerce.

77.     That at all times hereinafter mentioned, upon information and belief, the defendant, PARKE-DAVIS, presently markets and sells the drug Neurontin.

78.     That on a date prior to June 4, 2004, the defendant, PARKE-DAVIS, marketed and sold the drug Neurontin.

79.     That at all times hereinafter mentioned, upon information and belief, the defendant, PARKE-DAVIS, is engaged in the business of designing, manufacturing, advertising, marketing, and selling pharmaceutical drugs, including Neurontin, and in pursuance of this business, transacts business within the State of New York and contracts to provide goods and services in the State of New York.

80.     That at all times hereinafter mentioned, upon information and belief, the defendant, PARKE-DAVIS, committed a tortuous act inside the State of New York, which caused injury to plaintiffs.

81.    That at all times hereinafter mentioned, upon information and belief, the defendant, PARKE-DAVIS, committed a tortuous act outside the State of New York, which caused injury to plaintiffs.

82.    That at all times hereinafter mentioned, upon information and belief, the defendant, PARKE-DAVIS, regularly does and solicits business and engages in a persistent course of conduct in the State of New York, deriving substantial revenue from goods and products consumed in the State of New York.

83.    That at all times hereinafter mentioned, upon information and belief, the defendant, PARKE-DAVIS, expects or should reasonably expect its acts to have consequences in the State of New York, and derives substantial revenue from interstate or international commerce.

84.    That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY, presently markets and sells the drug Neurontin.

85.    That on a date prior to June 4, 2004, the defendant, WARNER-LAMBERT COMPANY, marketed and sold the drug Neurontin.

86.    That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY, is engaged in the business of designing, manufacturing, advertising, marketing, and selling pharmaceutical drugs, including Neurontin, and in pursuance of this business, transacts business

within the State of New York and contracts to provide goods and services in the State of New York.

87.    That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY, committed a tortuous act inside the State of New York, which caused injury to plaintiffs.

88.    That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY, committed a tortuous act outside the State of New York, which caused injury to plaintiffs.

89.    That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY, regularly does and solicits business and engages in a persistent course of conduct in the State of New York, deriving substantial revenue from goods and products consumed in State of New York.

90.    That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY, expects or should reasonably expect its acts to have consequences in the State of New York, and derives substantial revenue from interstate or international commerce.

91.    That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY LLC, presently markets and sells the drug Neurontin.

92.    That on a date prior to June 4, 2004, the defendant, WARNER-LAMBERT COMPANY LLC, marketed and sold the drug Neurontin.

93.    That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY LLC, is engaged in the business of designing, manufacturing, advertising, marketing, and selling pharmaceutical drugs, including Neurontin, and in pursuance of this business, transacts business within the State of New York.

94.    That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY LLC, committed a tortuous act inside the State of New York, which caused injury to plaintiffs.

95.    That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY LLC, committed a tortuous act outside the State of New York, which caused injury to plaintiffs.

96.    That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY LLC, regularly does and solicits business and engages in a persistent course of conduct in the State of New York, deriving substantial revenue from good and products consumed in the State of New York.

97.    That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY LLC, regularly does and solicits

business and engages in a persistent course of conduct in the State of New York,

deriving substantial revenue from interstate commerce.

## BACKGROUND

## STATEMENT OF THE CASE

98.    Pursuant to the Food, Drug, and Cosmetic Act ("FDCA") 21 U.S.C. §§ 301

et seq., new pharmaceutical drugs cannot be distributed in interstate commerce

unless the sponsor of the drug demonstrates to the satisfaction of the Food and

Drug Administration ("FDA") that the drug is safe and effective for each of its

intended uses. 21 U.S.C. § 355(a) and (d).

99.    However, the FDCA does not prevent doctors from prescribing a drug

approved for a particular use for other uses that are different than those approved

by the FDA ("off-label" usage).

100.   Nonetheless, even though physicians may prescribe drugs for "off-label"

usage, the FDCA prohibits drug manufacturers themselves from marketing and

promoting a drug for a use that the FDA has not approved. 21 U.S.C. § 331(d).

101.   A manufacturer illegally "misbrands" a drug if the drug's labeling includes

information about unapproved uses or if the manufacturer engages directly or

indirectly in marketing or promoting the drug for unapproved uses.

102.   Instead, if a manufacturer desires to market and promote the drug for new

uses in addition to those already approved, the materials on "off-label" usage must

meet certain stringent requirements and the manufacturer must resubmit the drug to the FDA testing and approval process for the proposed new use.

103.   The above-described statutory and regulatory system and process is designed to protect the public, including plaintiffs, from the dangers arising from drugs which, although approved for a certain specific condition, disease or purpose, could cause injury and harm if used for an "off-label" purpose without adequate study and testing of the drug for such "off-label" usage and to protect the public, including plaintiffs herein, from the dangers arising from deceptive, misleading, and inaccurate advertising, marketing, and promotional materials issued directly or indirectly by the manufacturer to encourage the "off-label" usage of the drug without adequate testing and study of that drug for such "off-label" usage.

104.   PARKE-DAVIS, now owned by PFIZER INC., applied for, and in December, 1993, received FDA approval to market and sell Neurontin solely for "adjunctive therapy" in the treatment of certain types of seizures in adult patients suffering from epilepsy, and the FDA approved labeling of Neurontin for that purpose and stated that the drug is only effective at 900 to 1800 milligrams per day.

105.   Defendants did not receive FDA approval for any other use of Neurontin except for the above-described treatment of epilepsy or for higher dosages for any

purpose, and the FDA never approved the usage of Neurontin at any dosage for the treatment of the "17 conditions".

106. Commencing in 1995, defendants, as the manufacturer of Neurontin, began to directly and indirectly advertise, market and promote Neurontin for additional "off-label" uses for which FDA approval had not been obtained, including treatment for the "17 conditions" at higher dosages than had been tested and approved, in violation of the above-described statutory and regulatory system and process, including the FDCA, which prohibits manufacturers from directly or indirectly advertising, marketing and promoting a drug for "off-label" usage, and instead requires that the manufacturer resubmit the drug to the FDA testing and approval process for the proposed new use and that the materials issued by the manufacturer relating to the proposed new use meet certain stringent requirements.

107. Defendants, as the manufacturer of Neurontin, directly and indirectly advertised, marketed and promoted Neurontin for the treatment of the "17 conditions", and encouraged that higher dosages than those tested be prescribed, even though defendants knew or should have known that there were not adequate tests and studies establishing and confirming that Neurontin was safe and effective for the treatment of above "17 conditions", and even though defendants knew or should have known that there were no adequate studies showing that Neurontin was safe when prescribed at dosages higher than those approved by the FDA.

108.   At all times hereinafter mentioned, upon information and belief, defendants marketed and promoted Neurontin for the treatment of the "17 conditions" even though defendants knew or should have known that Neurontin caused many symptoms or related risk factors associated with suicidal behavior by persons suffering from above "17 conditions".

109.   At all times hereinafter mentioned, upon information and belief, defendants marketed and promoted Neurontin for the treatment of the "17 conditions" even though defendants knew or should have known that Neurontin had no effect in relieving or correcting the conditions or causes of above uses.

110.   Defendants' conduct in promoting "off-label" uses of Neurontin for treatment of the "17 conditions" constituted a wanton, callous and reckless disregard of the safety of the public.

111.   In promoting "off-label" uses of Neurontin, and at higher dosages than approved by the FDA, including treatment of the "17 conditions", defendants acted without regard to the potential danger and harm to persons for whom the drug was prescribed for the treatment of above "17 conditions" hereinafter, "conditions".

112.   Defendants actively distributed, sold and placed Neurontin into the stream of commerce and directly and indirectly advertised, marketed and promoted Neurontin as being safe and effective for the treatment of pain and in dosages higher than those approved by the FDA, even though the only approved use of

Neurontin at that time was as "adjunctive therapy" for the treatment of epilepsy and even though the FDA had specified a maximum recommended dosage.

113.  Neurontin is not reasonably safe and effective for the treatment of persons suffering from the "conditions" and is not reasonably safe when consumed in higher dosages than those approved by the FDA, and defendants' conduct of illegally advertising, marketing and promoting Neurontin for "off-label" uses was unlawful, deceptive and misleading and was in violation of the FDCA.

114.  By reason of defendants' conduct of directly and indirectly advertising, marketing and promoting Neurontin for the treatment of pain in an unlawful manner, physicians commenced prescribing Neurontin to their patients diagnosed as suffering from the "conditions", frequently at dosages higher than those approved by the FDA.

115.  Upon information and belief, the defendant, WARNER-LAMBERT COMPANY LLC, was indicted in the United States District Court for the District of Massachusetts for violations of 21 U.S.C. §§ 331(a), 331(d), 333(a), 352(f)(1) and 355, and a copy of such criminal Information is annexed hereto as Exhibit "B" and incorporated into this complaint by reference.

116.  Upon information and belief, on or about the 7th day of June, 2004, the defendant, WARNER-LAMBERT COMPANY LLC, formally pled guilty to all charges contained in the Information.

117.   The drug Neurontin was ineffective in the treatment of the causes and symptoms of each plaintiffs conditions of the "conditions" as set forth in each Plaintiffs individual medical records being provided contemporaneously been and incorporated by relevance herein for all purposes the plaintiffs sustained injury and harm by reason of this reliance upon Neurontin to be effective in the treatment as prescribed by physicians of such "conditions".

118.   That at all times hereinafter mentioned, plaintiffs were diagnosed by their physician as suffering from the "conditions" and were being treated by their physicians for such conditions, as shown on each of their medical and hospital records being contemporaneously furnished to Defendants with the filing of this First Amended Original Complaint, including again for those transferred from the WD AR previously furnished a disk of 14,000 plaintiffs and containing all of their medical records of treatment.  This was by agreement of counsel and the court there prior to transfer to the MDL.

119.   That at all times hereinafter mentioned, upon information and belief, in reliance upon defendants' direct and indirect advertising, marketing and promoting of Neurontin as being safe and effective for the treatment of the "conditions", plaintiffs physician prescribed Neurontin to treat plaintiffs "conditions".

120.   That at all times hereinafter mentioned, plaintiffs purchased and consumed Neurontin, as recommended and prescribed by their physicians and in the dosages prescribed, in an effort to control the effects of their conditions.

121.   -The drug Neurontin was not safe and effective for the treatment of plaintiffs' "conditions". Plaintiffs' sustained personal injury and harm by reason of their consumption of Neurontin as prescribed by their physicians in an effort to treat their conditions.

122.   The drug Neurontin was ineffective in the treatment of the causes and symptoms of plaintiffs' "conditions". Plaintiffs' sustained personal injury and harm by reason of this reliance upon Neurontin to be effective in the treatment as prescribed by their physicians of the "conditions".

123.   By reason of plaintiffs' consumption of Neurontin in a manner and at a dosage prescribed by their physicians in an effort to treat the "conditions", plaintiffs' successfully and unsuccessfully attempted to commit suicide, thereby sustained severe personal injuries.

124.   The injuries and/or death sustained by each plaintiff was caused by or was contributed to by each plaintiff's consumption of Neurontin at a dosage prescribed each by their physicians for the treatment of the "conditions", in a manner consistent with the direct and indirect advertising, marketing and promoting of this drug for such "off-label" use by defendants.

## AS AND FOR A FIRST CAUSE OF
## ACTION AGAINST THE DEFENDANTS

125.  Plaintiffs repeat and reiterate the allegations previously set forth herein.

126.  That at all times hereinafter mentioned, defendants were under a duty to exercise reasonable care in the design and development of Neurontin and, in particular, in the advertising, marketing and promoting of Neurontin, both directly and indirectly, to ensure that Neurontin was not used in the treatment of conditions such as the "conditions", for which it was not effective and to ensure that Neurontin was not used in a manner or to treat conditions where defendants knew or should have known that the user could sustain injuries and harm from the drug.

127.  That defendants negligently, recklessly, grossly negligently, wantonly and willfully displayed a morally culpable and conscious disregard of the rights of others in that they failed to exercise reasonable care and failed to fulfill the above-stated duty by the manner that defendants, directly and indirectly, advertised, marketed and promoted Neurontin for the treatment of the "conditions", even though Neurontin had not been scientifically determined to be safe for the treatment of such above conditions and even though Neurontin was, in fact, not reasonably safe for the treatment of such above conditions and furthermore, defendants failed to adequately warn of the risk of suicide or aggressive, self-destructive behavior of which defendants knew or should have known about.

128.   That defendants were further negligent, reckless, grossly negligent, wanton and willfully displayed a morally culpable and conscious disregard of the rights of others by manufacturing, distributing, selling, advertising, marketing and promoting Neurontin even though such drug was not safe or effective for any purpose because it caused or influenced persons using the drug for any purpose to engage in self-destructive behavior including committing suicide and by failing to adequately warn the public of such risks.

129.   The aforesaid incident and the injuries sustained by plaintiffs were caused by or was contributed to by the negligence, recklessness, gross negligence, wantonness, willfulness, and conscious and callous disregard of the safety of the public, including plaintiffs, on the part of defendants in the design, manufacture, distribution, advertising, marketing and promoting of Neurontin as being safe and effective treatment of the "conditions" and by inducing the public, including plaintiffs, to believe that Neurontin was effective in the treatment and of the causes and symptoms of above conditions.

130.   That at all times hereinafter mentioned, upon information and belief, the above-described culpable conduct by defendants was a proximate cause of injuries sustained by plaintiffs.

131.   That at all times hereinafter mentioned, plaintiffs did not contribute to their injuries and/or death by reason of any negligence or culpable conduct on their part.

132.   That by reason of the foregoing, plaintiffs were caused to sustain severe and serious personal injuries to their mind and body, some of which, upon information and belief, are permanent with permanent effects of pain, disability, disfigurement and loss of body function.  Further, plaintiffs were caused to expend and become obligated for diverse sums of money for the purpose of obtaining medical care and/or cure in an effort to alleviate the suffering and ills sustained as a result of these occurrences.  Plaintiffs further were caused to lose substantial periods of time from their normal vocation, and upon information and belief, may continue to be restricted in that manner into the future and suffer similar losses.   In addition, plaintiffs are deprived of a chance for effective and/or successful treatment.

133.   By reason of the foregoing, plaintiffs were each damaged in a sum which exceeds the jurisdictional limits of all lower courts which would have jurisdiction of this matter, and in addition, each plaintiff seeks punitive and exemplary damages severally against defendants in an amount to be determined upon the trial of this matter.

**AS AND FOR A SECOND CAUSE OF**
**ACTION AGAINST THE DEFENDANTS**

134.   Plaintiffs repeat and reiterate the allegations previously set forth herein.

135.   That at all times hereinafter mentioned, upon information and belief, defendants, by directly and indirectly advertising, marketing and promoting

28

Neurontin for the "conditions" by placing this drug in the stream of commerce knowing that Neurontin would be prescribed for the treatment of above conditions in reliance upon the representations of defendants, expressly warranted to all foreseeable users of this drug, including plaintiffs, that Neurontin was safe and effective for the treatment of above conditions.

136.   That defendants impliedly warranted in manufacturing, distributing, selling, advertising, marketing and promoting Neurontin to all foreseeable users, including plaintiffs, that Neurontin was safe and effective for the purposes for which it had been placed in the stream of commerce by defendants, including the "conditions" that Neurontin was reasonably safe, proper, merchantable and fit for the intended purposes, including for the treatment of the "conditions".

137.   That at all times hereinafter mentioned, plaintiffs each relied upon the aforesaid express and implied warranties by defendants.

138.   That at all times hereinafter mentioned, plaintiffs use of Neurontin prior to and up to the time of the above-described incident was consistent with the purposes for which defendants directly and indirectly advertised, marketed and promoted Neurontin, and plaintiffs use of Neurontin was reasonably contemplated, intended and foreseen by defendants at the time of the distribution and sale of Neurontin by defendants, and, therefore, plaintiffs use of Neurontin was within the scope of the above-described express and implied warranties.

139. Defendants breached the aforesaid express and implied warranties because Neurontin was not safe and effective for the treatment of the "conditions" and because plaintiffs use of Neurontin for the treatment of above conditions caused or contributed to the incidents described herein.

140. Plaintiffs each gave appropriate notice to defendants of the breach of the aforesaid express and implied warranties or such notice was otherwise excused.

141. By reason of the foregoing, plaintiffs' each sustained damages in a sum which exceeds the jurisdictional limits of all lower courts which would have jurisdiction of this matter, and in addition, plaintiffs seeks punitive and exemplary damages against defendants severally in an amount to be determined upon the trial of this matter.

## AS AND FOR A THIRD CAUSE OF ACTION AGAINST THE DEFENDANTS

142. Plaintiffs each repeat and reiterate the allegations previously set forth herein.

143. That at all times hereinafter mentioned, the drug Neurontin was not suited for the treatment of the "conditions" and was not safe and effective for the treatment of above conditions even though defendants directly and indirectly advertised, marketed and promoted Neurontin for these "off-label" purposes.

144. That at all times hereinafter mentioned, the drug Neurontin was not safe and was not suited for the purposes for which defendants, directly and indirectly,

advertised, marketed and promoted the drug at the time defendants designed, manufactured, distributed and sold the drug and placed the drug in the stream of commerce.

145.  That at all times hereinafter mentioned, upon information and belief, defendants assumed a strict products liability to users and to persons using Neurontin, including plaintiffs, who each sustained injuries, harm and damages by reason of the use of Neurontin for purposes directly and indirectly advertised, marketed, and promoted by defendants, including for the treatment of the "conditions".

146.  By reason of the foregoing, each plaintiff was damaged in a sum which exceeds the jurisdictional limits of all lower courts which would have jurisdiction of this matter, and in addition, plaintiffs seeks punitive and exemplary damages against defendants severally in an amount to be determined upon the trial of this matter.

## AS AND FOR A FOURTH CAUSE OF ACTION AGAINST THE DEFENDANTS

147.  Plaintiffs repeat and reiterate the allegations previously set forth herein.

148.  Defendants materially misrepresented material facts concerning the safety and effectiveness of Neurontin in the treatment of the "conditions".

149.   Defendants' affirmative misrepresentations include but are not limited to the acts set forth in the following paragraphs.

150.   In or about 1993, defendants submitted a new drug application (NDA) for approval of a drug called Neurontin (also known by the chemical name "Gabapentin"), which was a new drug within the meaning of 21 U.S.C. § 321(p) and 21 C.F.R. § 310.3(h)(4) and (5).   In that application, defendants sought to demonstrate the drug's safety and efficacy for, and sought approval for, use only as adjunctive therapy in the treatment of partial seizures with and without secondary generalization in adults with epilepsy.   On or about December 30, 1993, the FDA approved Neurontin for that specific use only.   Because defendants had not sought approval of any other uses nor submitted information in its NDA which demonstrated the safety and efficacy of Neurontin for any such uses, Neurontin was not approved for any use or condition other than that approved use.

151.   Commencing in at least June of 1995 and continuing through at least the date of this incident, unapproved uses for Neurontin included the "conditions".

152.   Defendants did not file a new NDA seeking FDA approval for any of these unapproved uses at any time prior to the dates of these incidents.

153.   Defendants conducted evaluations of the market potential for certain of the unapproved uses for Neurontin, including but not limited to the "conditions".

154.   In or about the fall of 1995, defendants' Southeast Customer Business Unit ("SECBU") created a planning document regarding Neurontin, which included a page titled: "SECBU RIGHT ON THE MARK WITH NEURONTIN AND PAIN" over a picture of a target and listed "Neurontin for Pain Strategies" including plans for conference calls on pain and a pain consultant meeting.

155.   Certain defendants' annual strategic plans and other marketing planning documents for Neurontin included quarterly and annual goals, objectives, strategies and tactics for increasing sales of the unapproved uses of the drug.  The marketing plans budgeted for and funded these tactics.

156.   Commencing in early 1995 and continuing at least through the date of these incidents, defendants determined not to seek FDA approval for certain unapproved uses.

157.   In or about April and May of 1995, defendants performed a marketing assessment of proposed psychiatric indications for Neurontin.  In that marketing assessment, defendants forecast potential revenue from Neurontin for bipolar disorder and anxiety treatment under two scenarios: with and without FDA approval.   Defendants' Neurontin Development Team and New Product Committee reviewed the potential psychiatric uses and concluded that the defendants would not seek approval to promote and sell the drug for these unapproved uses.

158.   In or about July of 1995, defendants' assessment of Neurontin's market potential for neuropathic pain was distributed to defendants' Neurontin Development Team and to defendants' Vice President for marketing.   That assessment stated that "there is no intention to fully develop the indication at this point."   Full development would have required submission of an NDA to the FDA for approval.

159.   One of the principal factors defendants considered in determining whether to seek approval for Neurontin for the other above "conditions" and uses was the short patent protection available for Neurontin.   Another factor was the negative impact such approval might generate on potential sales of another drug that defendants were developing.   Defendants expected this new drug would be approved by the FDA not only for epilepsy but also for a variety of uses beyond Neurontin's approved use.

160.   Once Neurontin's patent expired, other companies could seek approval to distribute generic equivalents of Neurontin.   Such approval, however, would be limited to the approved therapeutic use for Neurontin set forth in defendants' original NDA approval for Neurontin.   If defendants sought and obtained approval for any of the unapproved uses, then upon expiration of the patent, generic equivalents of Neurontin could also be sold for those unapproved uses.   Defendants

were concerned that under those circumstances the generic equivalents would undermine sales of the new drug that was under development.

161.  Commencing about June of 1995 until at least the date of this incident, by certain conduct described in greater detail below, defendants promoted the sale and use of Neurontin for certain conditions other than the approved use.

162.  In October 1995, a member of defendants' Epilepsy Disease Team circulated a memorandum to a group including other senior members of defendants' Epilepsy Disease Team noting that data purchased from an outside vendor showed that doctors had reported that the main message of certain sales pitches (known as "details"), given by 10 of 50 of defendants' sales representatives for whom data was available in a two-month period, was for off-label use of Neurontin.  Nine were for pain and one was for reflex sympathetic dystrophy, a painful nerve damage syndrome.

163.  On or about July 10, 1996, defendants' sales representative met with a doctor in Monroe, Louisiana, and detailed a doctor on Neurontin for the treatment of pain.

164.  Also in 1996, a sales representative created a document that stated that sales representatives could ask doctors during a Neurontin detail if they ever used other anti-epileptic drugs for painful neuropathies and could mention that approximately 35% of all Neurontin use is non-seizure.  This same document, entitled "Neurontin

Can Do/Can't Do," stated that sales representatives could present lunch programs on Neurontin and pain. The document indicated that it was to be forwarded to the Northcentral Customer Business Unit.

165. Defendants employed "medical liaisons" who were presented to physicians as employees of the company's Medical and Scientific Affairs Department. On the following occasions, which are not all-inclusive, defendants' medical liaisons promoted Neurontin for unapproved uses:

a. In or about June of 1996 defendants' sales representative requested that defendants' medical liaison make a presentation at Longwood Gardens in Kennett Square, Pennsylvania, to a group of physicians who were members of a local medical society.

b. The sales representative and the medical liaison selected the topic for the presentation to the local medical society. After deciding in consultation with the sales representative that Neurontin would be the topic of the presentation, the medical liaison prepared the presentation.

c. Among the topics of the presentation was the use of Neurontin for unapproved uses.

d. During the presentation, in the presence of the sales representative, the medical liaison promoted the use of Neurontin in the treatment of a number of unapproved uses.

e.  After the presentation, defendants' Medical Director praised the event as "another great example of use of the medical liaisons" and an area business manager called it an "outstanding utilization of…one of the medical affairs liaisons."

166.  Defendants organized a consultant meeting at the Jupiter Beach Resort in Palm Beach, Florida, on April 19-21, 1996.  Approximately 42 physicians attended the meeting, including nine physicians who made presentations relating to unapproved uses of Neurontin.

167.  Defendants invited certain doctors to this meeting based upon their history of writing a large number of prescriptions for Neurontin or similar drugs.  As part of this event, defendants paid for accommodations and meals for the invited doctors and their spouse or guest, and paid an honorarium to each of the doctor attendees.

168.  Among the presentations made to the physicians in attendance was one relating to unapproved uses entitled "Reduction of Pain Symptoms During Treatment with Gabapentin." In the meeting's agenda, this presentation was listed as "Anticonvulsant Advances."  During this presentation, Neurontin was promoted for use in the treatment of pain.

169.  Another presentation made at the Jupiter Beach conference was entitled "Anticonvulsant Advances: Nonepileptic Uses of Anti Epileptic Drugs."  During

this presentation, Neurontin was promoted for use in the treatment of essential tremor, episodic dyscontrol and pain.

170.  On or about May 8, 1996, following the Jupiter Beach conference, defendants circulated to employees in the Northeast region the agenda to the meeting, specifying the off-label topics, the faculty list, the attendee list and presentation abstracts discussing the off-label content of the presentations.

171.  From August 1-5, 1996, defendants organized an "advisory board meeting," in Atlanta, Georgia, in conjunction with the 1996 Summer Olympics.  Defendants expressly instructed several of the physician speakers to address some of the unapproved uses.

172.  During that meeting, defendants hosted doctors at the Chateau Elan Winery and Resort, in Atlanta, Georgia, and paid all the expenses for eighteen "consultants" and their spouses to attend the Olympics, including tickets to the closing ceremonies.  Defendants already had numerous opportunities to consult with the doctors and, in fact, many of them had spoken on defendants' behalf at prior meetings.

173.  Certain of the physician speakers promoted Neurontin for unapproved uses in their presentations.

174. On or about March 1, 1996, defendants sponsored a teleconference moderated by defendants' employee with a pain specialist as a speaker on

Neurontin.  The speaker promoted Neurontin for the treatment of pain to doctors participating in the teleconference.

175.  In or about May, 1996, defendants' Medical Director held such a teleconference entitled "Neurontin, A Clinical Update" in which the Medical Director promoted off-label uses of Neurontin to the doctors participating in the teleconference.

176.  Defendants hosted dozens of "consultants" meetings between late 1995 and 1997 in which the "consultants" received payments and gratuities as well as presentations on "off-label" Neurontin use designed to change the physicians' prescription writing habits.  Such consultants' meetings included, but were not limited to the following:

| TOPIC | LOCATION | DATE |
|---|---|---|
|  |  |  |
| Mastering Epilepsy | Las Costa Resort, CA | July 20-23, 1995 |
| Mastering Epilepsy | Santa Fe, NM | November 16-19, 1995 |
| Neurontin Consultants Conference | Marco Island, FL | February 2-4, 1996 |
| Pediatric Epilepsy | Hutchinson Island, FL | February 9-11, 1996 |
| Mastering Epilepsy Science | Walt Disney World, FL | February 22-25, 1996 |
| Pediatric Epilepsy | Hutchinson Island, FL | March 8-10, 1996 |
| Mastering Epilepsy | Ritz Carlton Aspen, CO | April 18-21, 1996 |
| Neurological Consultants (discussed previously) | Jupiter Beach, FL | April 19-21, 1996 |
| Affective Disorders in Psychiatry | Marco Island, FL | April 20, 1996 |
| Affective Disorder Consultants | Southern Pines, NC | April 27, 1996 |

| Conference | | |
|---|---|---|
| Neuropathic Pain Conference | Palm Beach, FL | May 11, 1996 |
| Regional Consultants Conference | Ritz Carlton<br>Boston, MA | May 10-11, 1996 |
| Epilepsy Management Advisors Meeting | Sheraton Grande Torrey Pines<br>La Jolla, CA | June 21-23, 1996 |
| Epilepsy Management | Rancho Bernardo, CA | June 28-30, 1996 |
| Use of Anti-Convulsants in Psychiatric Disorders | Short Hills, NJ | October 18-19, 1996 |
| Non-epileptic Uses of Neurontin | Longboat Key, FL | November 6, 1996 |
| Neurological Conditions Conference | Ritz Carlton<br>Atlanta, GA | September 27-28, 1997 |

Other "consultants" meetings took place at Charleston, SC, Coconut Grove, FL, Naples, FL, Memphis, TN, Louisville, KY, Washington, DC, Aspen, CO, and other places. Hundreds, if not thousands, of physicians received kickbacks to attend these events.

177. Defendants rewarded doctors for their advocacy of Neurontin by paying those honoraria for lending their names to scientific articles which were actually prepared and written by third parties retained by defendants. In 1996, defendants retained AMM/ADELPHI, Ltd. and Medical Education Systems, Inc., to prepare no less than twenty (20) articles for publication in various neurology and psychiatry journals. Most of these articles concerned "off-label" usage of Neurontin and were generated so that defendants could completely control the publications distributed pursuant to its "publications strategy." The content of these articles were actually written by non-physician technical writers retained by

defendants and defendants had the right to control the content of all the articles. Defendants paid all expenses in connection with the creation of these publications.

178.  Defendants also founded a speakers' bureau, another method of making large and numerous payments to physicians who recommended Neurontin for "off-label" uses, together with teleconferences, dinner meetings, consultants meetings, educational seminars, and other events.

179.  Defendants utilized medical liaisons who were provided with new company slides that detailed methods to increase "off-label" use of Neurontin, including the following:

- Reflex sympathetic dystrophy (RSD)

- Peripheral neuropathy

- Diabetic neuropathy

- Trigeminal neuralgia

- Post-herpetic neuralgia

- Essential tremor

- Restless leg syndrome (RLS)

- Attention deficit disorder (ADD)

- Periodic limb movement disorder

- Migraine

- Bipolar disorder

- Amyotrophic lateral sclerosis (ALS/Lou Gehrig's Disease)

- Drug or alcohol withdrawal seizures

180.   The following enumerated misrepresentations which are not intended to be all-inclusive, relating to "off-label" usage of Neurontin were routinely made to physicians with the knowledge and consent of marketing personnel of defendants:

a. *Bipolar Disorder*.   Medical liaisons informed psychiatrists that early results from clinical trials evaluating Neurontin for the treatment of bipolar disorder indicated ninety percent (90%) response rate when Neurontin was started at 900 mg/day dosage and increased to a dosage of 4800 mg/day. No such results existed.

b. *Peripheral Neuropathy, Diabetic Neuropathy, and Other Pain Syndromes*.   Medical liaisons stated that clinical trials demonstrated that Neurontin was highly effective in the treatment of various pain syndromes and that a ninety percent (90%) response rate in the treatment of pain was being reported.   No such body of evidence existed.   Defendants continued to claim that physicians should use Neurontin at substantially higher doses than indicated by the labeling.   Indeed, although medical liaisons routinely claimed Neurontin to be effective as monotherapy, in 1997 the FDA refused to find Neurontin as a safe and effective monotherapy.

c. *Reflex Sympathetic Dystrophy ("RSD")*. Medical liaisons informed physicians that extensive evidence demonstrated the efficacy of Neurontin in the treatment of RSD. The only such evidence that existed was anecdotal reports of nominal scientific value.

d. *Attention Deficit Disorder ("ADD")*. Medical liaisons were instructed to inform pediatricians that Neurontin was effective for the treatment of ADD. No data, other than occasional anecdotal evidence, supported this claim.

e. *Restless Leg Syndrome ("RLS")*. RLS was another condition where defendants' medical liaisons were trained to refer to a growing body of date relating to the condition, when no scientific date existed.

f. *Trigeminal Neuralgia*. Although medical liaisons represented that Neurontin could treat trigeminal neuralgia, again no scientific data supported this claim with the exception of occasional anecdotal reports. No data demonstrated that Neurontin was as effective as currently available pain killers, most of which were inexpensive.

g. *Post-Herpetic Neuralgia ("PHN")*. Medical liaisons were trained to tell physicians that seventy-five percent (75%) to eighty percent (80%) of all PHN patients were successfully treated with Neurontin. Once again, no clinical trial data supported such a claim.

h. *Essential Tremor Periodic Limb Movement Disorder ("ETPLMD")*. Medical liaisons were trained to allege that Neurontin was effective in the treatment of these conditions. No scientific data supported such claims with the exception of anecdotal reports of nominal scientific value.

i. *Migraine*. Claims that Neurontin was effective in the treatment of migraine headaches were made by the medical liaisons and were supposedly based on early results from clinical trials. Although pilot studies had been such suggested and undertaken, no early results of clinical trials existed to support these claims. Once again, any data relating to treatment of migraines was purely anecdotal and of nominal scientific value. Most of the case reports were either created or sponsored by defendants.

j. *Drug and Alcohol Withdrawal Seizures*. Medical liaisons suggested that Neurontin be used in the treatment of drug and alcohol withdrawals despite the lack of any data supporting Neurontin as an effective treatment for these conditions.

181. Defendants sponsored a 1998 study, which was scientifically valid, conducted at the Harvard Bipolar Research Program, which concluded that patients receiving Neurontin did worse than those on sugar pills, but even though defendants were fully aware of these results from the tests which they sponsored, defendants did not publish the results until two years later after a substantial

number of physicians had already been induced to prescribe Neurontin and a substantial number of patients had already been induced to take Neurontin.

182.   At each of the presentations known to the plaintiffs concerning Neurontin on pain, at least one of the presenters expressly stated or implied that Neurontin was effective for the treatment of pain.  A representative statement was made by Dr. David Longmire, a participating physician, at the Jupiter Beach Consultants Meeting in April 1996 when he stated that Neurontin was effective for the treatment of pain.   Dr. Longmire repeated that statement at a May 1996 Consultants Meeting at the Ritz Carlton in Boston.  Another physician participant, Dr. Steven Schacter, made a similar statement at the May 1996 meeting when he stated that "pain specialists are finding that low dosages of Neurontin are effective."  Comparable statements were made by another physician participant, Dr. Bruce Nicholson, in April 1996 at the Jupiter Beach Consultants Meeting, in May 1996 at the Boston Ritz Carlton Consultants Meeting, and in June 1996 at a Philadelphia Consultants Meeting.   Upon information and belief, similar statements were made at all events presented by defendants that discussed Neurontin's use for pain indications.  These events include, but are not limited to the following events:

| TOPIC | LOCATION | DATE |
|---|---|---|
|  |  |  |
| Neurontin Consultants Meeting | Jupiter Beach, FL | April 19-21, 1996 |

| | | |
|---|---|---|
| Neurontin Consultants Meeting | Philadelphia, PA | May 3-4, 1996 |
| Neurontin Consultants Meeting | Boston, MA | May 10-11, 1996 |
| New Directions in the Treatment of Neuropathic Pain | Madeira, Portugal | October 9-11, 1998 |
| Advisory Board Meeting | Grand Wailea Resort Hotel & Spa<br>Maui, HI | April 14-16, 2000 |
| Merritt-Putnam Speakers Training Advanced Perspectives in the Management of Neurological and Mood Disorders | Enchantment Resort<br>Sedona, AZ | April 28-30, 2000 |
| New Treatment Options for the Management of Pain: The Role of Anticonvulsants | Four Seasons<br>Irving, TX | April 2000 |
| Advisory Board Meeting | Disney Yacht Club<br>Orlando, FL | May 26, 2000 |
| Advisory Board Meeting | Westin Resort<br>Hilton Head, SC | June 16-18, 2000 |
| New Directions in the Understanding and Treatment of Pain | Hilton Novi<br>Detroit, MI | March 2-3, 2001 |
| New Directions in the Understanding and Treatment of Pain | Fairmont Kansas City<br>Kansas City, MO | March 9-10, 2001 |
| New Directions in the Understanding and Treatment of Pain | Fairmont San Francisco<br>San Francisco, CA | March 16-17, 2001 |
| New Directions in the Understanding and Treatment of Pain | Ritz Carlton New Orleans<br>New Orleans, LA | March 23-24, 2001 |
| New Directions in the Understanding and Treatment of Pain | Sheraton Music City<br>Nashville, TN | March 23-24, 2001 |
| New Directions in the Understanding and Treatment of Pain | Plaza Hotel<br>New York, NY | March 24, 2001 |
| New Directions in the | Ritz Carlton St. Louis | March 30-31, |

| Understanding and Treatment of Pain | St. Louis, MO | 2001 |
|---|---|---|
| New Directions in the Understanding and Treatment of Pain | Westin Galleria Houston, TX | May 4-5, 2001 |
| New Directions in the Understanding and Treatment of Pain | Peabody Memphis Memphis, TN | May 11-12, 2001 |
| New Directions in the Understanding and Treatment of Pain | Sheraton Universal City Universal City, CA | May 18-19, 2001 |
| New Directions in the Understanding and Treatment of Pain | Miami Biltmore Miami, FL | May 18-19, 2001 |

183.  At events produced by defendants, physician participants routinely stated that Neurontin was effective for the treatment of restless leg syndrome or RSD. Events presented by defendants that discussed Neurontin's use as a treatment for restless leg syndrome or RSD include, but are not limited to, the following event:

| TOPIC | LOCATION | DATE |
|---|---|---|
| | | |
| Advisory Board Meeting | Hyatt Regency Hotel San Antonio, TX | March 29, 2000 |

184.  At events produced by defendants, physician participants routinely stated that Neurontin was effective for the treatment of bipolar disorder presented by defendants that discussed Neurontin's use as a treatment for bipolar disorder include, but are not limited to, the following events:

| TOPIC | LOCATION | DATE |
|---|---|---|

| | | |
|---|---|---|
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Maison Robert Boston, MA | March 16, 1998 |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Sunset Grill Nashville, TN | March 16, 1998 |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Pescatore Fish Café Seattle, WA | March 16, 1998 |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Patrick's Bayside Bistro St. Pete Beach, FL | March 17, 1998 |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Heathman Hotel Portland, OR | March 17, 1998 |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Downtown Club Philadelphia, PA | March 18, 1998 |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Morton's of Chicago Buckhead, Atlanta, GA | March 18, 1998 |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Huntington Hotel San Francisco, CA | March 18, 1998 |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Brass Elephant Baltimore, MD | March 19, 1998 |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Ristorante DeGrezia New York, NY | March 19, 1998 |
| The Use of Anticonvulsants in Psychiatry | Barcelona, Spain | October 23-25, 1998 |
| Parke-Davis Speakers Bureau Meeting | Fairmont Scottsdale Princess, Scottsdale, AZ | January 21-23, 2000 |
| Merritt-Putnam Speakers Bureau Current Perspectives in the Understanding of Neurobehavioral Disorders | Four Seasons Regent Beverly Wilshire Beverly Hills, CA | March 24-26, 2000 |

| Advisory Board Meeting | Hyatt Regency Hotel<br>San Antonio, TX | March 29, 2000 |
| Merritt-Putnam Speakers Bureau Meeting | Wyndham New Orleans, Canal Place<br>New Orleans, LA | April 7-9, 2000 |
| Merritt-Putnam Speakers Training Advanced Perspectives in the Management of Neurological and Mood Disorders | Enchantment Resort<br>Sedona, AZ | April 28-30, 2000 |

185.  At events produced by defendants, physician participants routinely stated that Neurontin was effective for the treatment of social phobia.  Events presented by defendants that discussed Neurontin's use as a treatment for social phobia include, but are not limited to, the above events.

186.  Without favorable results from a well-designed panic disorder clinical trial that established Neurontin's efficacy for that condition, Parke-Davis had no reasonable scientific basis for claiming that Neurontin was effective in treating panic disorder.    Nonetheless, at events produced by defendants, physician participants routinely stated that Neurontin was effective for the treatment of panic disorder.  Events presented by defendants that discussed Neurontin's use as a treatment for panic disorder include, but are not limited to, the above events.

187.  On September 13, 1996, Parke-Davis submitted a supplemental NDA to approve Neurontin as monotherapy for partial seizures.  The FDA determined the application to be non-approvable on August 26, 1997, because of insufficiency of

evidence of Neurontin's effectiveness.  The FDA noted that Clinical Study 945-82 failed to yield evidence of effectiveness.  Parke-Davis did not make public that its application for monotherapy had been denied.  Representative events at which defendants continued to make presentations that Neurontin was effective for monotherapy without disclosing that the FDA had denied its application for a monotherapy indication include, but are not limited to, the following events:

| TOPIC | LOCATION | DATE |
|---|---|---|
| | | |
| Monotherapy Speakers Bureau Meeting | La Quinta Resort Palm Springs, CA | September 1997 |
| Advisory Board Meeting | Hyatt Regency Hotel San Antonio, TX | March 29, 2000 |

188.   Thereafter, pursuant to marketing strategies and tactics developed by Parke-Davis and defendants, defendants regularly presented programs in which physician participants touted Neurontin as being effective for the treatment of migraine. Events where such presentations were made include, but are not limited to, the following events:

| TOPIC | LOCATION | DATE |
|---|---|---|
|  |  |  |
| Gabapentin in the Management of Migraine | Short Hills, NJ | May 25, 1996 |
| Advisory Board Meeting | Hyatt Regency Hotel San Antonio, TX | March 29, 2000 |

189.  Notwithstanding the FDA's refusal to increase the maximum approved dosage of Neurontin and its finding that no clinical evidence supported Neurontin's efficacy at dosages greater than 1800 mg per day, defendants presented numerous programs where physician participants asserted that Neurontin was effective and safe at dosages above 1800 mg.  All such representations were false and misleading.  Additionally, at these presentations the physician participants did not disclose the clinical trial evidence that demonstrated that there was no dose response above 1800 mg per day.  Defendants' failure to provide this information was a violation of defendants' duties to provide fair and balanced information, and made any prior representations about use of Neurontin at dosages greater than 1800 mg per day false and misleading.  In addition to the events identified above, other events where these false and misleading statements were made include, but are not limited to, the following events:

| TOPIC | LOCATION | DATE |
|---|---|---|
|  |  |  |
| Advisory Board Meeting | Royal Sonesta New Orleans, LA | February 4-6, 2000 |
| Merritt-Putnam Speakers Bureau | Four Seasons Regent | March 24-26, |

| Current Perspectives in the Understanding of Neurobehavioral Disorders | Beverly Wilshire Beverly Hills, CA | 2000 |
| Advisory Board Meeting | Hyatt Regency Hotel San Antonio, TX | March 29, 2000 |

190.  On or about June 29, 2001, the FDA Division of Drug Marketing, Advertising and Communications (DDMAC) advised defendants that through routine monitoring and surveillance, the DDMAC has identified a slim jim (ID #NSJ5095A1) for Neurontin that is misleading and in violation of the FDCA and applicable regulations, in that this slim jim misleadingly claims improvement in quality of life (QOL) parameters based on the Neurontin Evaluation of Outcomes in Neurological Practice (NEON) study, that among other QOL parameters, the misleading presentation includes improvement in social limitations, memory difficulties, energy level, and work limitations, and that the NEON study is not considered to be substantial evidence for claims of QOL improvements because it is not a controlled study.

191.  On or about July 1, 2002, the DDMAC advised defendants that through routine monitoring and surveillance, the DDMAC has identified a model (#NE 102254) for Neurontin (gabapentin) that is in violation of the FDCA and applicable regulations because it makes representations about Neurontin which are false or misleading, in that this suggestion of proof of the mechanism of action is false and contrary to the language in the approved product labeling that states "[t]he

mechanism by which gabapentin [Neurontin] exerts its anticonvulsant action is unknown," and that, furthermore, the full presentation of the areas of the human brain accompanied by purported "Mechanism of Action" and the prominent display of the name "Neurontin" is misleading because it suggests that Neurontin is useful for a broader range of central nervous system conditions than has been demonstrated by substantial evidence.

192.  From July 1995 through at least August 5, 2002, defendants engaged in a marketing program to promote the use of Neurontin, and to induce physicians to prescribe Neurontin, for medical conditions for which the FDA had not approved Neurontin to be used (i.e., "unapproved" or "off-label" uses).  That program included:

a. illegally promoting the sale and use of Neurontin for a variety of conditions other than the one condition for which its use was approved by the FDA and for which defendants had not performed the required FDA testing or established safety and efficacy, in violation of the Federal Food Drug and Cosmetic Act, 21 U.S.C. § 331, et seq.;

b. offering and paying illegal remuneration to doctors, either directly or through third parties, to induce them to promote and prescribe Neurontin for off-label uses, in violation of the federal Anti-kickback Statute, 42 U.S.C. § 1320a-7b(b); and;

c. making and/or disseminating false statements in presentations and marketing literature sales personnel provided to doctors concerning, among other things, the uses for which the FDA had approved Neurontin, the conditions for which the use of Neurontin was otherwise medically accepted and/or the existence of adequate evidence of the safety and efficacy for such use.

193. In order to avoid sanction and regulation by the FDA, defendants' off-label marketing scheme depended on their concealment of their involvement in off-label promotion of Neurontin, and to make it appear to the public that defendants did not have any hand in any discussions of off-label use. In addition, defendants performed off-label promotion in the semblance of legitimate consultants' meetings, continuing education seminars, journal articles and medical education events. Also, defendants' involvement was hidden because defendants hid their financial connections between the participating physicians and used the vendor participants as payment intermediaries. These activities and others described herein concealed defendants' off-label promotional activities, and plaintiffs could not have discovered the scheme alleged herein earlier in the exercise of reasonable diligence. Much of the scheme to this day remains concealed by defendants.

194. The earliest plaintiffs could have reasonably become aware of the off-label promotion scheme was in May 2003, when the details of defendants' interactions

with the other participants were disclosed through the filing by a former medical liaison, Dr. David Franklin, of previously sealed materials in opposition to defendants' motion for summary judgment in the qui tam action.  Alternatively, plaintiffs in the exercise of reasonable diligence could not have learned of the "off-label" promotion scheme until some of the details were disclosed when the Court unsealed Dr. Franklin's Amended Complaint in the qui tam case by in April or May 2002.

195.  In addition, defendants fraudulently concealed information and documents concerning the safety and efficacy of Neurontin, in particular, information and documents indicating that the ingestion of Neurontin for off-label uses and/or at high dosages may cause suicidal ideations, gestures and acts.

196.  Any applicable statutes of limitation have been tolled by defendants' knowing and active concealment and denial of the facts alleged herein.  Plaintiffs and other members of the public who were prescribed and ingested Neurontin for off-label uses have been kept in ignorance of vital information essential to the pursuit of these claims, without any fault or lack of diligence on their part, and could not reasonably have discovered the fraudulent nature of defendants' conduct, and information and documents concerning the safety and efficacy of Neurontin, in particular, information and documents indicating that the ingestion of Neurontin for off-label uses and/or at high dosages, may cause suicidal ideations, gestures

and acts. Accordingly, defendants are stopped from relying on any statute of limitations to defeat any of plaintiffs' claims.

197. On information and belief, defendants' "off-label" promotion scheme continued after the filing of Dr. Franklin's whistleblower complaint and still continues. For example, through the third quarter of 2002, there were no published scientific studies to support Neurontin's use for a wide variety of diseases that it is being prescribed for including anxiety disorder, attention deficit disorder, bipolar disorder, cluster headache, depression, dosages in excess of 1800 mg per day and many other disorders that physicians are now prescribing Neurontin for that are "off-label." Despite this lack of scientific evidence, Neurontin sales for these and other "off-label" uses have steadily increased, to the point that, according to an article published in the December 1, 2003 issue of Medical Marketing & Media, 90% of Neurontin sales are for "off-label" use. No other drug in the United States has such a high percentage of "off-label" use. The same article estimates that $1.8 billion worth of Neurontin has been sold for "off-label" uses. This increase in sales, and the repeated and increased prescription of Neurontin for "off-label" uses, without any supporting scientific studies that would be prompting such use, cannot be a random event and could not occur without continuing "off-label" promotion by defendants' sales force.

198.   As a result of the activities described above, many of which continue to occur after Dr. Franklin filed his whistleblower suit, physicians were inundated with false information about Neurontin.  As a result, they continue to prescribe Neurontin for "off-label" uses for which there is no reliable scientific support.

199.   On information and belief, Pfizer has a company-wide practice of marketing "off-label" indications.  "Off-label" marketing plans exist for Cox 2 inhibitors and, on information and belief, also exist for Neurontin.

200.   This continuing course of conduct is evidenced in part by the staggering growth of Neurontin sales for "off-label" uses.  Because there are no valid scientific studies supporting such use, a reasonable inference is that the use results from past and continuing promotional efforts by defendants.  This clear and unavoidable conclusion follows from observations regarding the ongoing extent of prescriptions written for "off-label" Neurontin use.

201.   First, from the perspective of overall Neurontin sales, "off-label" usage of Neurontin has actually increased during the years since 1999; in recent years, "off-label" prescriptions for Neurontin have exceeded 90% of all sales and, in some months, it appears that approved indication usage is negligible.

202.   Second, although Neurontin is prescribed for scores of "off-label" indications, since 1999 the types of "off-label" usage continue to be weighted in

the precise areas where defendants focused their illegal marketing efforts: bipolar disorder, peripheral neuropathy, migraine, etc.

203.  Third, these focus treatment areas of continuing unapproved usage are subject to very intense competition between therapeutic substitutes (other drugs or treatments).  Indeed, because manufacturers' incremental cost for drugs in these areas is very small (e.g., only pennies to manufacture an additional pill), manufacturers compete aggressively for market share by spending huge amounts of money for marketing, promotional and sales activities.  If any company was to simply pack its tent and discontinue programmatic promotional effort in any therapeutic arena, significant loss of overall sales within that diagnosis regime would certainly occur.  For Neurontin, no such dip in overall sales, let alone any significant drop, has occurred.

204.  Fourth, Pfizer, like most branded drug companies, monitors the relationship of its sales to its promotional efforts in very short timeframe; Pfizer would be concerned about a drop in sales within a certain therapeutic regime not after a year look-back, or even a quarterly look-back, but over just weeks.  The persistent maintenance of high Neurontin sales within multiple, targeted areas for "off-label" promotion over a period of years defies the conclusion that any significant backing away on the marketing, sales or promotion of Neurontin to each of those approved therapeutic areas.

205.  For example, sales of Neurontin for the treatment of bipolar disorder have steadily increased since its introduction.  This increase is a direct result of defendants' sales representatives recommending to doctors its use for this purpose and their distribution of unapproved promotional materials.  These promotional efforts did not stop in 1999, but continued thereafter.  There are no valid scientific studies that support Neurontin's use for bipolar disorders.  Dr. C. Seth Landefeld has submitted an expert opinion in the <u>Franklin</u> litigation that a review of Drugdex for Neurontin, as of the end of August 2002, reveals "no published scientific studies to support Neurontin's use for…bipolar disorder."  As a result, tens of thousands of patients who need help and could use other drugs whose effectiveness has been established were given and are being given Neurontin.  These prescriptions for this purpose are still being written and as a direct result of defendants' pre-2000 illegal promotional activities and post-2000 illegal promotional activities.

206.  Likewise, sales of Neurontin for pain, ALS, attention deficit disorder, depression and dosages in excess of 1800 mg per day, are also increasing without any scientific evidence supporting use of Neurontin for such indications.  Again, as noted by Dr. Landefeld, as of the end of the third quarter of 2002 "there were no published scientific studies to support Neurontin's use for" any of these indications or in an increased dose.

207.   Overall, "off-label" sales of Neurontin have steadily increased since 1998, and from 2000 to the present have consistently remained at 93% to 94% of all sales.   Actual sales for approved uses have declined.   Given the absence of scientific support for such uses, the genesis for those sales can only be past and continuing efforts by defendants to promote "off-label" use.

208.   Defendants made additional fraudulent misrepresentations as to the safety and effectiveness of Neurontin, which are not detailed herein but will be determined in discovery.

209.   Defendants affirmatively and fraudulently misrepresented that Neurontin was safe and effective in the treatment of the "conditions" when, in actuality, Neurontin was ineffective in treating such conditions and instead influenced users to engage in self-destructive behavior.

210.   Defendants affirmatively and fraudulently misrepresented that Neurontin was safe for human consumption in general, when in actuality; Neurontin influenced users to engage in self-destructive behavior.

211.   Defendants knew that Neurontin was not safe and effective in the treatment of the "conditions" and that Neurontin was not safe for human consumption in general because such drug influenced users to engage in self-destructive behavior.

212.   Defendants knew that physicians, health care providers, and mental health care providers would justifiably rely upon defendants' misrepresentations in

prescribing Neurontin in the treatment of pain and in prescribing Neurontin for human consumption in general for the treatment of illnesses and medical and mental conditions and that the public, including persons such as plaintiffs, would justifiably rely upon defendants' misrepresentations in using Neurontin as prescribed by physicians, health care providers and mental health care providers in the treatment of the "conditions".

213. Plaintiffs justifiably relied upon defendants' misrepresentations and, accordingly, consumed Neurontin as prescribed by their physicians in the treatment of the "conditions".

214. By reason of plaintiffs' consumption of Neurontin in justifiable reliance upon defendants' fraudulent misrepresentations, some of these plaintiffs successfully and some unsuccessfully attempted suicide and sustained severe personal injuries, their individual medical records are being provided now. HIPAA authorizations will be provided upon request.

215. By reason of the foregoing, plaintiffs were severely damages in a sum which exceeds the jurisdictional limits of all lower courts which would have jurisdiction of this matter, and in addition, each plaintiff seeks punitive and exemplary damages against defendants in an amount to be determined upon the trial of this matter.

## AS AND FOR A FIFTH CAUSE OF ACTION AGAINST THE DEFENDANTS

216.  Each plaintiff repeats and reiterates the allegations previously set forth herein.

217.  Defendants knowingly and willfully engaged in unfair, deceptive and unconscionable acts and practices and disseminated information that was deceptive, misleading and false in a material way, in connection with the promotion and sale of Neurontin, in violation of N.J.S.A. § 56:8-2, for the purpose of influencing and inducing physicians and medical providers to prescribe Neurontin, at excessively high dosages, for unapproved "off-label" uses, including the "conditions" to disabled patients/consumers such as plaintiffs, and knowingly took advantage of the inability of disabled patients/consumers such as plaintiffs reasonably to protect their interests because of their physical and mental impairments and causing such disabled patients/consumers to purchase, acquire and use Neurontin, at high dosages, for unapproved "off-label" uses, including the "conditions", as prescribed by their physicians and medical providers.

218.  By reason of defendants' unconscionable, deceptive and unfair acts and practices and dissemination of deceptive misleading and false information, reasonable patients/consumers acting reasonably, such as plaintiffs, were caused to successfully and unsuccessfully commit suicide and to sustain actual damages and injuries.

219.  By reason of the foregoing, each plaintiff sustained actual damages in a sum which exceeds the jurisdictional limits of all lower courts which would have jurisdiction of this matter, and in addition, plaintiffs seek punitive and exemplary damages against defendants in an amount to be determined upon the trial of this matter, costs and reasonable attorney fees.

WHEREFORE, each plaintiff above demand judgment against the defendants as follows:

a.  The sum of $100,000,000.00 each on the First Cause of Action, together with punitive damages and exemplary damages in an amount to be determined upon the trial of this Action; not exceeding 9-1 per *State Farm Mutual Auto Insurance Co. v. Campbell,* 123 S.Ct. 1513 (2003)

b.  The sum of $100,000,000.00 each on the Second Cause of Action, together with punitive damages and exemplary damages in an amount to be determined upon the trial of this Action;

c.  The sum of $100,000,000.00 each on the Third Cause of Action, together with punitive damages and exemplary damages in an amount to be determined upon the trial of this Action;

d.  The sum of $100,000,000.00 each on the Fourth Cause of Action, together with punitive damages and exemplary damages in an amount to be determined upon the trial of this Action;

e.  A sum which exceeds the jurisdictional limits of all lower courts which the jury would find to be fair, adequate and just on the Fifth Cause of Action, together with punitive damages and exemplary damages in an amount to be determined upon the trial of this Action, and reasonable attorney's fees, as may be found by the Court upon the trail of this Action, together with the interest, costs and disbursements of this Action.


Respectfully submitted,


/s/Newton B. Schwartz, Sr.
NEWTON B. SCHWARTZ, SR.
*Law Offices of Newton B. Schwartz, Sr.*
Texas State Bar No.17869000
1911 Southwest Freeway
Houston, Texas 77098
Telephone:  (713) 630-0708
Facsimile:   (713) 630-0789

JACK W. HARANG
*Law Offices Jack W. Harang, APLC*
Louisiana State Bar No.15083
3500 North Hullen Street
Metairie, Louisiana 70002
Telephone:  (504) 456-8658
Facsimile:   (504) 456-8641

JULIE C. PARKER (Atty. No. 91418)
ANDREW B. SACKS (Atty. No. 41393)
JOHN K. WESTON (Atty. No. 26314)
*Sacks & Weston*
114 Old York Rd.
Jenkintown, Pennsylvania 19046

Telephone:  (215) 925-8200
Facsimile:   (215) 925-0508