UNITED STATES DISTRICT COURT
OF MASSACHUTTES

-------------------------------------x

MARTHA ACCETTULLO, et al

              Plaintiffs[1],   COMPLAINT

                                            C.A. No. 04-10981-PBS

     v.               Plaintiffs Demands
                        Trial by Jury

PFIZER INC., PARKE-DAVIS,
a division of Warner-Lambert Company
and Warner-Lambert Company LLC,
WARNER-LAMBERT COMPANY and
WARNER-LAMBERT COMPANY LLC,

              Defendants.

-------------------------------------x

### MEMORANDUM OF LAW OF PRODUCTS LIABILITY PLAINTIFFS' IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE PERSONAL INJURY PLAINTIFFS' CLAIMS BASED UPON ALLEGEDLY IMPROPER MARKETING PRACTICES

NEWTON B. SCHWARTZ, SR.
*Law Offices of Newton B. Schwartz, Sr.*
Texas State Bar No.17869000
1911 Southwest Freeway
Houston, Texas 77098
Telephone:(713) 630-0708
Facsimile: (713) 630-0789

JACK W. HARANG
*Law Offices Jack W. Harang, APLC*
Louisiana State Bar No.15083
3500 North Hullen Street
Metairie, Louisiana 70002
Telephone:(504) 456-8658
Facsimile: (504) 456-8641

JULIE C. PARKER (Atty. No. 91418)
ANDREW B. SACKS (Atty. No. 41393)
JOHN K. WESTON (Atty. No. 26314)
*Sacks & Weston*
114 Old York Rd.
Jenkintown, Pennsylvania 19046
Telephone:(215) 925-8200
Facsimile: (215) 925-0508

---

[1] Plaintiffs are listed on Ex. A attached hereto and incorporated by relevance herein. Its shows stated residence of each Plaintiff. Defendant(s) are being furnished with Ex. A.

## PRELIMINARY STATEMENT

This memorandum of law is submitted on behalf of the personal injury plaintiffs ("plaintiffs" on its attached Amended Complaint), in opposition to the motion by defendants Pfizer Inc. and Warner-Lambert Company ("defendants") to dismiss plaintiffs' claims based on allegedly improper marketing practices pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure.[2]

As discussed below, the complaint adequately states with particularity the disputed claims upon which relief can be granted, and if the complaint is found to have been inadequately pled, plaintiffs should be granted leave to amend the complaint to plead additional particular allegations that plaintiffs can only plead after further pretrial discovery from the defendants and plaintiffs prescribing physician. As set forth more fully at pages 10-11 paragraphs have in the interest of uniformity and consistence, had largely adopted and conformed their Amended Complaint(s) leave to which is sought. This avoids multitudinous nothings and is in the interest a judicial economy.

## STATEMENT OF FACTS

Plaintiffs seek to recover damages for personal injuries sustained as the result of defendants' wrongful conduct in connection with the designing, developing, manufacturing,

---

[2] Defendants have chosen these Plaintiffs on Ex. A. prior now superceded original Complaints prior to or agreed to transfer to this MDL complaint and to in <u>Cascio v. Pfizer Inc</u>., D.N.J.Case No. 2:06-cv-00058-DMC-MF, D. Mass. Case No. 1:06-cv-10536-PBS (ECF Doc. # 10, Attach. ## 2, 3), as representative of the personal injury plaintiffs' complaints. (<u>See also</u> Answer, ECF Doc. # 10, Attach. # 5.) Defendants' citations in their memorandum of law refer to the <u>Cascio</u> case, and <u>Cascio</u> plaintiffs' citations below refer to the <u>Accettullo, Girard, Brewster and Anderson</u> complaints. For the convenience of the Court, copies of the <u>Accettullo, Girard, Brewster and Anderson</u> pleadings are submitted herewith. (<u>See</u> Complaint, annexed to Newton B. Schwartz, Sr. Declaration as Exhibit "B"; Answer, annexed to Newton B. Schwartz, Sr. Declaration as Exhibit "C".) All allegations in <u>Cascio</u> above are realleged in Plaintiffs first amended complaint being filed contemporaneously. In the interests of judicial economy these Plaintiffs conditions include seven or more of the seventeen medical complaints enumerated <u>Cascio</u>, complied above. These Plaintiffs conditions include of the most of the seventeen implied complaints setforth in <u>Cascio.</u> These Plaintiffs freely track and adopt <u>Cascio's</u> opposition to Defendants Motions to Dismiss.

distributing, labeling, advertising, marketing, promoting, and selling of the prescription drug Neurontin.[3]  (Compl. ¶1.)  The complaint alleges causes of action sounding in (1) negligence, (2) breach of warranty, (3) strict products liability, (4) fraud and (5) violation of the consumer protection law of the plaintiffs' home states.  The complaint alleges that by reason of defendants' wrongful conduct, plaintiffs were prescribed and ingested Neurontin and were caused to attempt to commit suicide.[4]  Plaintiffs seek compensatory and punitive damages.

The allegations in the complaint concerning improper marketing practices provide an overview of the new drug approval process, and describe how promotion of unapproved or off-label uses for a drug is prohibited by the Food, Drug, and Cosmetic Act (Compl. ¶¶ 98-103). The complaint states that defendants received FDA approval to market and sell Neurontin solely for "adjunctive therapy" in the treatment of certain types of seizures in adult patients suffering from epilepsy, and that the FDA approved labeling of Neurontin for that purpose and stated that the drug is only effective at 900 to 1800 milligrams per day (¶ 104); and that at no time prior to plaintiffs being prescribed Neurontin did defendants receive FDA approval for usage of Neurontin at any dosage for the treatment of bipolar disorder (¶ 105).

The complaint describes how, commencing in 1995, defendants began to directly and indirectly advertise, market and promote Neurontin for additional "off-label" uses for which FDA approval had not been obtained, including treatment for bipolar disorder, and at higher dosages than had been tested and approved (Compl. ¶¶ 106-109, 112).

---

[3] Bipolar disorder, mood disorder or depression afflicts plaintiffs.  The most common medical condition afflicting the plaintiffs is pain.  Compare defendants' Appendix, with ECF Document # 338, listing each products liability action and the condition for which Neurontin was prescribed.

[4] The more recently filed above mentioned complaints also allege that by reason of defendants' wrongful conduct, plaintiffs or plaintiffs decedent were, in addition, deprived of a chance for effective and/or successful treatment.

The complaint further alleges that Neurontin is not reasonably safe and effective for the treatment of persons suffering from bipolar disorder, and is not reasonably safe when consumed in higher dosages than those approved by the FDA, and that defendants' conduct of illegally advertising, marketing and promoting Neurontin for this "off-label" use was unlawful, deceptive and misleading and was violative of the FDCA (¶ 113); and that by reason of defendants' conduct of directly and indirectly advertising, marketing and promoting Neurontin for the treatment of bipolar disorder in an unlawful manner, physicians commenced prescribing Neurontin to their patients diagnosed as suffering from bipolar disorder, frequently at dosages higher than those approved by the FDA (¶ 114).

The Information in the criminal action brought by the United States against Warner-Lambert Company LLC, is incorporated in and attached to the Accettullo, Girard, Brewster and Anderson complaints, as with all the Harang, Sacks and Schwartz, Sr. complaints.  (Compl. ¶ 115, Information, annexed to Complaint as Exhibit "B".)  The Information describes Warner-Lambert's strategy for Neurontin, which included conducting evaluations of the market potential for certain unapproved uses for Neurontin, including bipolar disorder (¶ 11; see also Compl. ¶ 153); and how in or about April and May of 1995, Warner-Lambert performed a marketing assessment of proposed psychiatric assessment of proposed psychiatric indications for Neurontin, where Warner-Lambert forecast potential revenue from Neurontin for bipolar and anxiety treatment under two scenarios: with and without FDA approval (¶ 15; see also Compl. ¶ 157).   The Information goes on to detail Warner-Lambert's promotion of Neurontin for unapproved uses, including through sales representatives, medical liaisons, consultants' meetings and advisory boards, and teleconferences, and sets forth the criminal violations in Counts I and II.

The complaint continues with specific allegations concerning plaintiffs' physicians prescribing of Neurontin to plaintiffs for the treatment of peripheral neuropathy, diabetic neuropathy, trigeminal neuralgia, attention deficit disorder (ADD), periodic limb movement disorder, post-herpetic neuralgia, painful diabetic neuralgia, anxiety disorder, social phobias, bipolar disorder, alcohol withdrawal syndrome, amyotrophic lateral sclerosis (ALS), spinal cord injury, essential tremor, restless leg syndrome, reflex sympathetic dystrophy (RSD), and migraine headaches, among other "off-label" uses, herein after the "17 conditions", including allegations that Neurontin was ineffective in the treatment of plaintiffs' "17 conditions" and plaintiffs sustained injuries by reason of this reliance upon Neurontin to be effective in the treatment as prescribed by their physicians of such "17 conditions"(Compl. ¶ 117); that "upon information and belief, in reliance upon defendants' direct and indirect advertising, marketing and promoting of Neurontin as being safe and effective for the treatment of the "17 conditions", plaintiffs' physicians prescribed Neurontin to treat plaintiffs "17 conditions" (¶ 119); that Neurontin was ineffective in the treatment of plaintiffs "17 conditions" and plaintiffs sustained injuries by reason of this reliance upon Neurontin to be effective in the treatment as prescribed by their physicians of such "17 conditions" (¶122); that by reason of plaintiffs consumption of Neurontin in a manner and at a dosage prescribed by their physicians in an effort to treat their "17 conditions", thereby sustaining severe personal injuries (¶ 123); and that "The injuries sustained by plaintiffs were caused by or were contributed to by plaintiffs consumption of Neurontin at a dosage prescribed by their physicians for the treatment of the "17 conditions" in a manner consistent with the direct and indirect advertising, marketing and promoting of this drug for such "off-label" use by defendants" (¶ 124).

The First Cause of Action in the complaint, which sounds in negligence, includes allegations that defendants' improper advertising, marketing and promoting of Neurontin for the treatment of plaintiffs "17 conditions" was a proximate cause of injuries sustained by plaintiffs Compl. ¶¶ 126-130).  The Second Cause of Action, sounding in express and implied warranty, similarly includes allegations that plaintiffs' use of Neurontin was consistent with the purposes for which defendants directly and indirectly advertised, marketed and promoted Neurontin (¶¶ 135-141).  The Third Cause of Action, which sounds in strict products liability, similarly alleges that by reason of defendants' conduct in advertising, marketing and promoting Neurontin for the treatment of plaintiffs' "17 conditions", plaintiffs were damaged (¶¶ 143-146).

The Fourth Cause of Action states allegations concerning defendants' assessment of Neurontin's market potential and the improper marketing and promotional strategy and efforts to maximize that market potential by various means with the goal of inducing physicians to prescribe Neurontin to their patients for off-label uses, and thereby inducing patients to purchase and ingest Neurontin as prescribed by their physicians (Compl. ¶¶ 151-192).  The Fourth Cause of Action sets forth specific dates and locations of numerous consultants' meetings, conferences, seminars and presentations designed to induce physicians to prescribe Neurontin for off-label uses (¶¶ 162-189).  While most of these events involved off-label uses other than for "17 conditions", the widespread employment of such events for promoting many different "off-label" uses as alleged in the complaint evidences defendants' broad strategy to promote many unapproved and off-label uses of Neurontin, including for treatment of the "17 conditions".

In addition to describing defendants' general strategy for increasing sales of Neurontin for off-label uses, the complaint also identifies, by date and place, various events where defendants

promoted the prescribing of Neurontin for unspecified off-label uses, which would include, for treatment of bipolar disorder (Compl. ¶¶ 151, 161, 165,-167, 170-173, 175, 177-178).

The complaint also identifies by date and place various consultants meetings hosted by defendants between late 1995 and 1997 in which the consultants received payments and gratuities as well as presentations on "off-label" Neurontin use designed to change the physicians' prescription writing habits (Compl. ¶ 176). Other various meetings were held where defendants promoted the prescribing of Neurontin specifically for the treatment of bipolar disorder (¶ 184).[5]

The complaint alleges in particular with respect to promoting of Neurontin for bipolar disorder that in or about April and May of 1995, defendants performed a marketing assessment of proposed psychiatric indications for Neurontin in which defendants forecast potential revenue from Neurontin for bipolar disorder and anxiety treatment under two scenarios: with and without FDA approval; and that defendants' Neurontin Development Team and New Product Committee reviewed the potential psychiatric uses and concluded that defendants would not seek approval to promote and sell the drug for these unapproved uses (Compl. ¶ 157).

The complaint also specifically alleges that medical liaisons informed psychiatrists that early results from clinical trials evaluating Neurontin for the treatment of bipolar disorder indicated ninety percent (90%) response rate when Neurontin was started at 90 mg/day dosage and increased to a dosage of 4800 mg/day even though no such results existed (Compl. ¶ 180(a)).

---

[5] The complaint also identifies, by date and place, various events where defendants promoted the prescribing of Neurontin for specific off-label uses other than for the treatment of bipolar disorder, especially for treatment of various forms of pain (Compl. ¶¶ 154, 158, 162-164, 168-169, 176, 183). It is not surprising that defendants appear to have targeted patients suffering from bipolar disorder/depression and pain. See n2 (43/105 plaintiffs suffered from bipolar disorder/depression and 58/105 plaintiffs suffered from pain) in Cascio response.

In addition, the complaint alleges that defendants sponsored a 1998 study, which was scientifically valid, conducted at the Harvard Bipolar Research Program, which concluded that patients receiving Neurontin did worse than those on sugar pills, but that even though defendants were fully aware of these results from the tests which they sponsored, defendants did not publish the results until two years later after a substantial number of physicians had already been induced to prescribe Neurontin and a substantial number of patients had already been induced to take Neurontin (Compl. ¶ 181).

The complaint also alleges that from July 1995 through at least August 5, 2002, defendants engaged in a marketing program to promote the use of Neurontin and to induce physicians to prescribe Neurontin for off-label uses (Compl. ¶ 192); that defendants fraudulently concealed their improper off-label marketing scheme and fraudulently concealed information and documents concerning the safety and efficacy of Neurontin, in particular, information and documents indicating that the ingestion of Neurontin for off-label uses and/or at high dosages, may cause suicidal ideations, gestures and acts (Compl. ¶¶ 193, 195).

The complaint alleges that defendants' off-label promotion scheme continued after the filing of Dr. Franklin's whistleblower complaint and still continues, as evidenced by the steady and staggering growth in sales of Neurontin for off-label uses notwithstanding the lack of any published scientific studies to support Neurontin's off-label use, including for bipolar disorder (Compl. ¶¶ 197, 200-201, 203-207); that it has been reported that 90% of Neurontin sales are for off-label use (¶ 197);[6] that as a result of defendants' off-label promotional scheme, physicians were inundated with false information about Neurontin, causing physicians to continue to

---

[6] A recent University of Georgia study found that 98% of Georgia Medicaid patients/recipients received Neurontin off-label in 2001.
http://www.uga.edu/news/artman/publish/printer_060725_OffLabelPrescriptions.shtml.

prescribe Neurontin for off-label uses for which there is no reliable scientific support (¶ 198); that although Neurontin is prescribed for scores of off-label indications, since 1999 the types of off-label usage continue to be weighted in the precise areas where defendants focused their illegal marketing efforts:  bipolar disorder, peripheral neuropathy, migraine, etc. (¶ 202; <u>see also</u> n2); and that Dr. C. Seth Landefeld has submitted an expert opinion in the <u>Franklin</u> litigation that a review of Drugdex for Neurontin, as of the end of August 2002, reveals "no published scientific studies to support Neurontin's use for . . . bipolar disorder" (¶ 205).  Plaintiffs allege that defendants made additional fraudulent misrepresentations as to the safety and effectiveness of Neurontin, which are not detailed in the complaint, will be determined in discovery (¶ 208).

Plaintiffs then allege the basic elements of his claim of fraudulent misrepresentation by defendants (Compl. ¶¶ 209-215).

In the Fifth Cause of Action of the complaint, plaintiffs repeats and reiterates the allegations previously set forth therein, and alleges the elements of his claim under the New Jersey Consumer Fraud Act, N.J.S.A. § 56:8-2.

Also submitted herewith are copies of the Affirmation of Sylvain Nakkab, M.D. (annexed to Finkelstein Declaration as Exhibit "C" and adopted here in the interests of uniformity and consistency), and the Affidavit of Charles King III (annexed to Finkelstein Declaration as Exhibit "D" and adopted here also).[7]  Dr. Nakkaab states that from February 2001 to April 2002,

---

[7] The original Nakkab Affirmation and King Affidavit have been filed with the Finkelstein counsel papers submitted in opposition to defendants' similar motion to dismiss claims based upon allegedly improper marketing practices, and in support of plaintiff William T. Young's cross-motion for leave to file a further amended complaint,  filed in the related New York Neurontin Coordinated Litigation pending before the Honorable Marcy S. Friedman, J.S.C., in the newly formed Center for Complex Litigation, established in the Supreme Court of the State of New York, County of New York, to handle complex litigation.  The lead case is Joshua C. Delaney v. Pfizer Inc., New York County Index No. 117852/04.  Because of the similarity between the motions to dismiss in the two courts, Justice Friedman has directed that the briefing schedule for the motion to dismiss in the state court litigation track the briefing schedule for the motion to dismiss in the federal litigation in this Court. These Plaintiffs had conference with Defense counsel Matt Rolland September 8, 2006. No response has been received as of the date of this leaves to amend or freely granted, as here, in the absence of surprise of prejudice to Plaintiffs.

he treated William Young, a plaintiff in the New York State court coordinated litigation, and in the course of the treatment, Dr. Nakkab prescribed Neurontin to Mr. Young to treat his bipolar disorder (Nakkab Aff. ¶ 8). As a practicing psychiatrist, Dr. Nakkab relies upon various sources to remain current on standards of medical care and to assist in the treatment and care of my patients, including, among other things, medical literature (¶ 9).

Dr. Nakkab began to prescribe Neurontin for off-label uses based primarily upon an article he had read, entitled "Gabapentin and Lamotrigine: Alternative Agent for the Treatment of Bipolar Disorder," by Norman Sussman, M.D., published in the Primary Psychiatry Journal, August 1997, which referred to several papers presented at the American Psychiatric Association annual meeting earlier that year in San Diego, California, concerning the results of Gabapentin studies in bipolar patients, and further stated that "Gabapentin is not thus far been shown to have any life threatening adverse events or significant drug interactions" (¶11). Dr. Nakkab relied upon the credibility of Dr. Sussman's article and the purported objective opinions in the article, and he believed upon reading the article that Dr. Sussman was without bias or conflict in that he reasonably assumed he did not have any relationship to the manufacturer and seller of Neurontin (¶ 12). Dr. Sussman's article is silent as to any relationship between Dr. Sussman and the manufacturer of Neurontin (¶ 13). Dr. Nakkab relied upon Dr. Sussman's article as the primary basis for his practice of prescribing Neurontin for off-label use in the treatment of patients suffering from bipolar disorder, and his reliance on the article was a significant factor in prescribing Neurontin to his patient, William Young, to treat his bipolar disorder (¶ 14). Dr. Nakkab's review of pertinent documents disclosed by the Defendants during the pendency of this litigation has brought to light certain facts and circumstances regarding Dr. Sussman's

involvement and/or relationship with Parke-Davis, the manufacturer and seller of Neurontin that were omitted or otherwise not disclosed in Dr. Sussman's article (¶ 15).

At the time Dr. Nakkab prescribed Neurontin to William Young, he was not aware that the manufacturer and seller of Neurontin, Parke-Davis, had a copy of Dr. Sussman's article prior to publication (¶ 16); that Parke-Davis sought to select physicians, including Dr. Sussman, to present anecdotal information on the use of Neurontin for psychiatric off-label uses (¶ 17); that Parke-Davis sought to have psychiatrists participate in an advisory board meeting at the Ritz Carlton in Dana Point, California, to present anecdotal information on the use of Neurontin for off-label psychiatric uses, he was not aware that Dr. Sussman participated in the event; that Dr. Sussman received compensation for his participation (¶ 18); and that Dr. Sussman was invited to speak directly with Parke-Davis's Neurontin product manager regarding future studies of Neurontin, or that he was paid by Parke-Davis or an agent of Parke-Davis to speak at various symposiums which included the topic of using Neurontin off-label for the treatment of bipolar disorder (¶ 19).

Dr. Nakkab concludes that had he known of Dr. Sussman's involvement with the manufacturer of Neurontin, he would not have relied on the article as the foundation for his prescribing Neurontin for the off-label treatment of bipolar disorder (¶ 20); and that as of the time he treated William Young, he does not recall learning about off-label use of Neurontin for psychiatric treatment from any source other than Dr. Sussman's article, and it is therefore unlikely that he would have prescribed Neurontin to Mr. Young if he had known of Dr. Sussman's involvement or relationship to Parke-Davis (¶ 21).

Mr. King, a marketing expert, states that he has reviewed Dr. Nakkab's Affidavit (King Aff. ¶¶ 9-10), and documents that indicate that Parke-Davis recruited Dr. Sussman to participate

in its continuing medical events and compensated him for his services, (¶ 11) which was not disclosed in Dr. Sussman's article (¶ 12). Mr. King discusses how authors' financial relationships and associations with pharmaceutical companies adversely affect the interpretation of scientific evidence (¶¶ 13-17). Mr. King concludes that Dr. Sussman's failure to disclose his associations and financial relationships with Parke-Davis therefore misrepresented a fact important to the medical community and adversely affected its ability to evaluate his work (¶ 18).

## ARGUMENT

At the outset, it should be noted that defendants improperly seek to dismiss plaintiffs' claims pursuant to Fed. R. Civ. P. 12(b)(6), even though defendants have already served answers to the Cascio and these Plaintiffs listed on Ex. A. and their First Amended Complaint largely tracks Cascio, but enlarger the scope of the allegations to cover all Plaintiffs complaints. (See, e.g., Answer in Cascio v. Pfizer Inc., C.A. No. 06-58 (DMC) (D.N.J. filed Feb. 15, 2006) (D. Mass. Case No. 1:06-cv-10536-PBS, Doc. # 10, Attach. # 5, annexed to Finkelstein Declaration as Exhibit "B".) Where an answer has been served, the motion to dismiss under Rule 12(b)(6) may be treated as one for judgment on the pleadings under Rule 12(c). Aponte-Torres v. University of Puerto Rico, 445 F.3d 50, 54 (1st Cir. 2006).

Such a conversion does not affect the Court's analysis inasmuch as the two motions are ordinarily accorded much the same treatment, id.; see also Collier v. City of Chicopee, 158 F.3d 601, 602 (1st Cir. 1998). Facts contained in the pleadings are viewed in the light most flattering to the nonmovants, all reasonable inferences therefrom are drawn in their favor, and "[l]ike Rule 12(b)(6), Rule 12(c) does not allow for any resolution of contested facts; rather a court may enter judgment on the pleadings only if the uncontested and properly considered facts conclusively establish the movant's entitlement to a favorable judgment." Aponte-Torres, 445 F.3d at 54.

Further, "[b]oth of these rules go on to provide, in identical language, that if 'matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56.'  This is an important distinction because the summary judgment standard is considerably more stringent."  <u>Collier</u>, 158 F.3d at 602-03.  Treating the motion as one for summary judgment allows the nonmoving party to invoke Rule 56(f), which provides that should a party opposing the motion demonstrate that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had.  Fed. R. Civ. P. 56(f).  However, a motion to dismiss, or for judgment on the pleadings, is not converted to a motion for summary judgment, unless the court actually takes cognizance of supplementary materials, or invokes Rule 56, in arriving at its decision.  <u>Grand Hotel Ltd. P'ship v. Ponce Fed. Bank, F.S.B.</u>, 958 F.2d 15, 18-19 (1st Cir. 1992).

Plaintiffs request that defendants' motion be denied, or, if the Court treats the motion as one for summary judgment, plaintiffs request that the Court refuse the application for judgment.  In either event, as discussed below, plaintiffs must be granted further discovery and an opportunity to amend the complaints after such discovery before the Court considers dismissing the cases or granting summary judgment to defendants.

## A.     <u>Plaintiffs Have Stated a Common Law Fraud Claim</u>

"Although state law governs the burden of proving fraud at trial, the procedure for pleading fraud in federal courts in diversity suits is governed by the special pleading requirements of Federal Rule of Civil Procedure 9(b)."  <u>Hayduk v. Lanna</u>, 775 F.2d 441, 443 (1st Cir. 1985).

To recover for common-law fraud under Massachusetts law, plaintiffs "must allege and prove that the defendant made a false representation of a material fact, with knowledge of its falsity, for the purpose of inducing the plaintiff to act thereon, and that the plaintiff relied upon the representation as true and acted upon the representation as true and acted upon it to his damage." Barrett Assocs., Inc. v. Aronson, 346 Mass. 150, 152 (1963). Rule 9(b) specifically provides, however, that knowledge of a person, i.e., scienter, may be averred generally. Fed. R. Civ. P. 9(b).

Defendants contend that plaintiffs do not allege the fraud claims with particularity as required under Rule 9(b). However, as detailed above, in the Cascio and these Plaintiffs First Amended Complaint, does allege extensive facts demonstrating a widespread strategy by defendants to increase sales of defendants' prescription drug Neurontin by sponsoring events and publications wherein false representations were made concerning the safety and effectiveness of Neurontin for many off-label uses, including specifically for treatment of bipolar disorder, through sales representatives, medical liaisons, consultants' meetings, advisory boards, teleconferences and publications, for the purpose of inducing physicians to prescribe Neurontin to their patients for such off-label uses, including specifically for treatment of bipolar disorder, that plaintiffs physicians relied on such false representations in prescribing Neurontin to plaintiffs for off-label use in the treatment of his bipolar disorder, that plaintiffs relied on their physicians in purchasing and ingesting Neurontin, and that as a result thereof he was caused to attempt to commit suicide and suffer personal injuries thereby, and to sustain "actual damages" and injuries (for purposes of the Consumer Fraud claim).[8]

---

[8] As stated above in n3, the more recently filed Finkelstein complaints also allege that by reason of defendants' wrongful conduct, plaintiff or plaintiff's decedent was, in addition, deprived of a chance for effective and/or successful treatment.

Defendants argue, however, that plaintiffs have failed to identify any untrue or misleading misrepresentations made specifically to plaintiffs or their physicians, that plaintiffs have not alleged that their physicians relied on particular statements, and how plaintiffs and their physicians came to rely on alleged misrepresentations or the extent to which those misrepresentations influenced their behavior. Thus, the essence of defendants' arguments with respect to pleading the fraud claim with particularity is that plaintiffs fail to allege the specific circumstances that led plaintiffs' physicians to prescribe Neurontin off-label for treatment of the plaintiffs' medical or psychiatric condition.[9]

Plaintiff Cascio, like most every other plaintiff except Mr. Young, cannot, at this time, allege exactly what false representations or omissions were specifically made by defendants that plaintiffs' physicians relied upon to induce the physicians to prescribe Neurontin off-label for treatment of plaintiffs' medical condition, without further pretrial discovery from defendants and without taking the deposition of plaintiffs prescribing physician. See, e.g., Thomas v. Hoffman-LaRoche, Inc., 949 F.2d 806, 813 n28 (5th Cir. 1992) ("The term 'consumer' refers to the person making the decision whether a product should be used or purchased. In the context of a prescription drug, the term includes the learned intermediary who almost invariably makes the decision whether to prescribe the drug").

The reason why Mr. Young can allege such facts with particularity at this time is because his case was the first action commenced by the Finkelstein firm, filed on February 18, 2004,[10]

_____

[9] Defendants also contend that Mr. Cascio's claim, like all of the others, does not include specific allegations concerning how he came to be prescribed Neurontin, when he was prescribed Neurontin, who prescribed Neurontin for him, how long he took Neurontin, or even if he was on Neurontin at the time of his alleged injury, a suicide attempt. (See Defs.' Mem., p. 9.) However, these specific facts can readily be obtained from each plaintiff's medical and pharmacy records (which have already been provided to defendants) and alleged in an amended complaint.

[10] See Complaint in Young v. Pfizer Inc., S.D.N.Y. Case No. 1:04-cv-06609-JSR (annexed to Notice of Removal, ECF Document # 1). Mr. Young's complaint was filed in the Supreme Court of the State of New York, County of Orange, and was improperly removed by defendants to the U.S. District Court for the Southern District of New

alleging that ingestion of Neurontin caused the plaintiffs to attempt to commit suicide.  In his Affirmation, discussed above, Dr. Nakkab describes with particularity the article by Dr. Sussman that he relied on, which induced Dr. Nakkab to prescribe Neurontin to his patients suffering from bipolar disorder, such as Mr. Young; how he reviewed further documents disclosed by defendants during the pendency of the Young litigation, demonstrating Dr. Sussman's involvement and/or relationship with Parke-Davis, the manufacturer of Neurontin, that were omitted or otherwise not disclosed in the article; and how, had he known of Dr. Sussman's involvement with Parke-Davis, he would not have relied on the article as the foundation for his prescribing Neurontin for the off-label treatment of bipolar disorder.

Further, Mr. Young's marketing expert, Charles King III, concludes in his Affidavit that authors' financial relationships and associations with pharmaceutical companies adversely affect the interpretation of scientific evidence, in that the failure of an author to disclose financial compensation or association with a pharmaceutical company misrepresents an important fact, impugns the integrity of scientific research, and adversely affects the ability of the medical and scientific community to evaluate published medical literature; and that, in particular, Dr. Sussman's failure to disclose his associations and financial relationships with Parke-Davis therefore misrepresented a fact important to the scientific community and adversely affected its ability to evaluate his work.  See Thomas v. Hoffman-LaRoche, Inc., 949 F.2d at 812 (applying Mississippi law, Court noted that:  "To satisfy the burden of establishing warning causation, a plaintiff may introduce either objective evidence of how a reasonable physician would have

---

York, before being remanded to New York state court, see Young v. Pfizer Inc., 2004 U.S. Dist. LEXIS 25964 (S.D.N.Y. 2004), and later consolidated with 224 other Neurontin personal injury cases in the New York State Coordinated Litigation of which leave to all was sought from Defendants' counsel on September 8, 2006.

responded to an adequate warning, [footnote omitted] or subjective evidence of how the treating physician would have responded").

The circumstances in <u>Young</u> demonstrate why it is patently unfair to expect plaintiffs in these cases to plead with particularity how their physicians came to rely on defendants' alleged false representations in deciding to prescribe Neurontin off-label to treat plaintiffs' medical and psychiatric conditions, and why defendants' motion should be denied, and plaintiffs should be granted leave to amend their complaints following further discovery from defendants and the deposition of plaintiffs' prescribing physicians.  <u>See, e.g.</u>, <u>Eastern Food Servs., Inc. v. Pontifical Catholic Univ. Servs. Ass'n, Inc.</u>, 357 F.3d 1, 8 (1st Cir. 2004) (leave to amend complaint is liberally granted after a dismissal for failure to state a claim).

For instance, in <u>In re Eli Lilly & Co., Prozac Prods. Liab. Litig.</u>, 789 F. Supp. 18 (S.D. Ind. 1992), the plaintiffs alleged that they, or their decedents, were harmed when they took the prescription anti-depressant drug Prozac.  In at least one case, the plaintiff's decedent committed suicide, and the complaint claimed that Prozac caused the injuries and death of the decedent. Lilly sought dismissal of the plaintiffs' fraud claims on the ground that they fail to satisfy the particular-pleading requirement of Rule 9(b).  In finding that the fraud claim in two of the complaints states all the elements required of a fraud claim, the Court explained:

> These allegations satisfy the requirements of FRCP 9(b) under the circumstances of the present cases. Whatever further detail might otherwise be demanded is not required in these cases, in which the reliance was incurred principally by third parties (the doctors), rather than by the plaintiffs themselves, and in which the representations are alleged to have occurred over a period of several years. Under these circumstances, the plaintiffs cannot be expected to provide all details concerning the time and place of the alleged misrepresentations. Moreover, we find that Count V in both cases is sufficiently specific to apprise Lilly fairly of the charge and permit it to defend against the charge, which are principal considerations underlying FRCP 9(b).  [<u>Id.</u> at 1457.]

Similarly, in <u>Bhandari v. Bittner</u>, 2004 U.S. Dist. LEXIS 29356 (W.D.N.Y. 2004), the plaintiff alleged that as a result of taking the prescription drug Arava, his wife sustained grievous injuries which led to her death. The district court initially granted defendant's motion pursuant to Rules 9(b) and 12(b)(6) to dismiss the claims for fraudulent misrepresentation and fraudulent concealment without prejudice and granted plaintiff leave to file an amended complaint. The defendants moved again pursuant to Rules 9(b) and 12(b)(6) to dismiss the repleaded claims for fraudulent misrepresentation and fraudulent concealment in the amended complaint. The district court rejected defendants' contention that the plaintiff still had not identified which defendant, or defendants, made the alleged misrepresentations, noting that "this is an instance where FRCvP 9(b) must be relaxed because plaintiff does not have access to all the facts necessary to identify which defendants are responsible for which misrepresentation." <u>Id.</u> at *9. In denying defendants' motion to dismiss the fraud claims, the Court stated:

> Therefore, plaintiff has met the requirements of FRCvP 9 to the best of his present ability and pled the fraud claims with particularity to the extent the specified information was within his control. Although plaintiff did not plead with particularity those facts that are exclusively within defendants' knowledge, he did so plead those facts that are within his control, which is all that FRCvP 9(b) can require of a plaintiff. . . [<u>Id.</u> at *13-14.]

Likewise, in <u>New England Data Servs., Inc. v. Becher</u>, 829 F.2d 286, 291 (1st Cir. 1987), the Court observed:

> Where there were multiple defendants and the plaintiff was not directly involved in the alleged transaction, the burden of the plaintiff to know exactly when the defendants called each other or corresponded with each other, and the contents thereof, is not realistic. Plaintiff here provided an outline of the general scheme to defraud and established an inference that the mail or wires was used to transact this scheme; requiring plaintiff to plead the time, place and contents of communications between the defendants, without allowing some discovery, in addition to interrogatories, seems unreasonable. [Citations omitted.]

Recently, this Court found that the Class and Coordinated Plaintiffs' claims in the instant litigation, based on statements in Verbatim Reports, have been pled with the requisite particularity under Fed. R. Civ. P. 9(b), noting that at this stage in the litigation, the disputed allegations suffice to serve the purposes of Rule 9(b), namely: (1) to place the defendants on notice and enable them to prepare meaningful responses; (2) to preclude the use of a groundless fraud claim as a pretext to discovering a wrong or as a "strike suit"; and (3) to safeguard defendants from frivolous charges which might damage their reputations. In re Neurontin Marketing, Sales Practices, and Prods. Liab. Litig., 2006 U.S. Dist. LEXIS 38485 (D. Mass. 2006); see also United States ex rel. Franklin v. Parke-Davis, 147 F. Supp. 2d 39 (D. Mass. 2001) (where this Court found that although Franklin did not identify specific prescriptions for Medicaid patients for off-label uses made by doctors in reliance on the fraudulent representations, he did not reasonably have pre-discovery access to that patient-specific information, and that when considered alongside the disclosure, the complaint amply detailed both a general framework of the purported Medicaid fraud and provided more specific information on the individuals, locations, the precise statements alleged to be false and the time-frames involved, and therefore satisfied the requirements of Rule 9(b) with respect to the off-label sale of Neurontin for Medicaid reimbursement).

Similarly, here, there is substantial evidence that defendants caused false representations and omissions concerning the safety and effectiveness of Neurontin to be communicated to third-party medical providers, rather than to plaintiffs themselves, for the purpose of inducing such medical providers to prescribe Neurontin off-label to their patients, including for treatment of bipolar disorder, and a high probability and reasonable inference that plaintiffs' physicians were exposed to, and relied upon such false representations and omissions, which are alleged to have

occurred over a period of several years.  Plaintiffs plead the fraud claims, and, in particular, the causal connection between defendants' false representations and omissions and plaintiffs' injuries, to the best of their present ability and with particularity to the extent the specified information is within their control, although plaintiffs have not pleaded with particularity those facts that are exclusively within defendants' knowledge, and/or the knowledge of the third-party physicians.  That is all that Rule 9(b) can expect of the plaintiffs at this time.  Accordingly, defendants' motion should be denied, and plaintiffs should be allowed continued pre-trial discovery from the defendants and permitted the opportunity to depose their prescribing physicians.

### B.    Plaintiffs Have Stated a Negligent Misrepresentation Claim

For the same reasons stated above with regard to the common-law fraud claim, plaintiffs have sufficiently stated a negligent misrepresentation claim, which is similar to the common-law fraud claim and requires plaintiffs to establish that (1) negligently made a false statement of material fact, (ii) to induce action by the plaintiffs, (iii) on which the plaintiffs relied to their detriment." Rogers v. NSTAR Elec., 389 F. Supp. 2d 100, 110 (D. Mass. 2005).

### C.    Plaintiffs Have Stated a Consumer Protection Claim

Plaintiffs' consumer protection claims should not be subjected to the Rule 9(b) heightened pleading standard.  In Lawson v. Affirmative Equities Co., 341 F. Supp. 2d 51, 67 (D. Mass. 2004), Judge Stearns held that even while a Consumer Protection Act claim under Chapter 93A sounds in fraud ("unsafe and deceptive act"), there is no heightened pleading standard imposed under Rule 9(b) for such a claim.  While defendants contend that Lawson was wrongly decided, courts in other states have likewise held that the heightened pleading standard under Rule 9(b) does not apply to their state consumer protection laws.  See, e.g., Pelman v.

McDonald's Corp., 396 F.3d 508, 511, 511-12 (2d Cir. 2005) (New York General Business Law § 349); CBP Resources, Inc. v. SGS Control Servs. Inc., 394 F. Supp. 2d 733, 739 (M.D.N.C. 2005) (North Carolina Chapter 75).

Defendants concede that state consumer protection statutes vary widely from state to state and make no attempt to argue that plaintiffs has failed to state a claim under a particular state's consumer protection law, but argue generally that all plaintiffs have failed to plead with particularity the causal link between alleged deceptive practices and plaintiffs injuries.

For the same reasons stated above, it is submitted that the complaints adequately state claims under consumer protection law of each plaintiffs home state and in particular, that the complaint sufficiently alleges that by reason of defendants' alleged deceptive and unfair acts and practices, and dissemination of deceptive misleading and false information, reasonable patients/consumers acting reasonably, such as plaintiffs, were caused to attempt to commit suicide and to sustain actual damages and injuries.

## CONCLUSION

In view of the above, Products Liability Plaintiffs respectfully request that the Court deny Defendants' motion to dismiss the personal injury plaintiffs' claims based upon allegedly improper marketing practices.

Respectfully submitted,

/s/Newton B. Schwartz, Sr.
NEWTON B. SCHWARTZ, SR.
*Law Offices of Newton B. Schwartz, Sr.*
Texas State Bar No.17869000
1911 Southwest Freeway
Houston, Texas 77098
Telephone:     (713) 630-0708
Facsimile:     (713) 630-0789

JACK W. HARANG
*Law Offices Jack W. Harang, APLC*
Louisiana State Bar No.15083
3500 North Hullen Street
Metairie, Louisiana 70002
Telephone:     (504) 456-8658
Facsimile:     (504) 456-8641

JULIE C. PARKER (Atty. No. 91418)
ANDREW B. SACKS (Atty. No. 41393)
JOHN K. WESTON (Atty. No. 26314)
*Sacks & Weston*
114 Old York Rd.
Jenkintown, Pennsylvania 19046
Telephone:     (215) 925-8200
Facsimile:     (215) 925-0508

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order No. 3 on September 16, 2006.

/s/Newton B. Schwartz, Sr.
Newton B. Schwartz, Sr.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
-----------------------------------------------------------x
                                              :   MDL Docket No. 1629
In re:  NEURONTIN MARKETING,                  :
        SALES PRACTICES AND                   :   Master File No.
        PRODUCTS LIABILITY LITIGATION         :
                                              :   Judge Patti B. Saris
-----------------------------------------------------------x
                                              :   Magistrate Judge Leo T.  Sorokin
THIS DOCUMENT RELATES TO:                     :
                                              :
        PRODUCTS LIABILITY ACTIONS            :
                                              :
-----------------------------------------------------------x
```

**MEMORANDUM OF LAW OF PRODUCTS LIABILITY PLAINTIFFS'
IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
THE PERSONAL INJURY PLAINTIFFS' CLAIMS BASED
UPON ALLEGEDLY IMPROPER MARKETING PRACTICES**

/s/Newton B. Schwartz, Sr.
NEWTON B. SCHWARTZ, SR.
*Law Offices of Newton B. Schwartz, Sr.*
Texas State Bar No.17869000
1911 Southwest Freeway
Houston, Texas 77098
Telephone:      (713) 630-0708
Facsimile:      (713) 630-0789

JACK W. HARANG
*Law Offices Jack W. Harang, APLC*
Louisiana State Bar No.15083
3500 North Hullen Street
Metairie, Louisiana 70002
Telephone:      (504) 456-8658
Facsimile:      (504) 456-8641

JULIE C. PARKER (Atty. No. 91418)
ANDREW B. SACKS (Atty. No. 41393)
JOHN K. WESTON (Atty. No. 26314)
*Sacks & Weston*
114 Old York Rd.
Jenkintown, Pennsylvania 19046
Telephone:    (215) 925-8200
Facsimile:    (215) 925-0508