# EXHIBIT 1

SUPREME COURT OF STATE OF NEW YORK
COUNTY OF ALBANY

------------------------------------------------------------x

STEPHANIE BARON, on behalf of herself and all other similarly situated New York residents,

        Plaintiff,

  -against-

PFIZER, INC.,
C T Corp. System
111 Eighth Ave
NY, NY. 10011

        Defendant.

------------------------------------------------------------x

Albany County Clerk
Document Number 9350788
Rcvd 10/14/2004 11:39:59 AM

**SUMMONS**

Index No.: 6429-04

Date Filed: 10/14/04

TO THE ABOVE NAMED DEFENDANT:

  **YOU ARE HEREBY SUMMONED** to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiffs' Attorneys within twenty (20) days after the service of this summons, exclusive of the day of service (or within thirty (30) days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded herein.

Dated: Mamaroneck, New York
   October 8, 2004

                DILLON & DILLON, LLC
                Attorneys for Plaintiffs

                John M. Dillon
                100 Mamaroneck Avenue
                Mamaroneck, NY 10543
                (914)698-6392

  Plaintiff designates Albany County as the place of trial.
  The basis of the venue is Plaintiff's residence in Albany County, New York

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ALBANY
------------------------------------------------------------------x
STEPHANIE BARON, on behalf of herself and all other
similarly situated New York residents,

                                     Plaintiff,                        Index No.

       -against-

PFIZER, INC.,

                                     Defendant.
------------------------------------------------------------------x

## CLASS ACTION COMPLAINT

Plaintiff brings this action in her individual capacity and on behalf of the class defined below, and for her complaint alleges, pursuant to her investigation and upon knowledge as to herself and her own acts and otherwise upon information and belief, as follows:

### INTRODUCTION

1. As detailed in this Complaint, Defendant Pfizer, Inc. ("Pfizer") currently markets and sells the drug Neurontin. Prior to its acquisition of Warner-Lambert, Neurontin was marketed and sold by Parke-Davis, a division of Warner-Lambert ("Parke-Davis").

2. Drug companies spend billions of dollars each year trying to persuade doctors to prescribe their drugs. There are strict federal regulations about what form that promotion can take. The rules are meant to ensure that drug companies give doctors trustworthy information, so that medications are prescribed appropriately. But drug makers can get around the rules and this case arises from one company's widespread scheme designed to unlawfully promote the sale of the anti-epilepsy drug Neurontin for non-FDA approved uses.

1

3. The Parke-Davis Division of Warner-Lambert Company, now owned by Pfizer, received FDA approval to market and sell Neurontin for the treatment of epilepsy. There are two million epileptics in the United States, a number that is not considered to be a large market to a major pharmaceutical company. Starting in 1995, Parke-Davis executives embarked on a scheme intended to increase Neurontin sales for diseases with respect to which Neurontin had not received FDA approval. Parke-Davis's sales department recognized a significant profit potential in the "off-label" promotion of Neurontin for other diseases and at higher doses. The decision was made to completely avoid the normal regulatory process of the FDA pertaining to the marketing of a new use of a drug and to proceed in an illegal fashion. The decision was also made to actively conceal the illegal means which would be used to market the drug. The principal component of the scheme was the hiring and deployment in the field of approximately 60 "medical liaisons," whose real function was to actively solicit physicians to promote "off-label" uses of Neurontin, using cash payments as a reward and incentive.

4. In the pharmaceutical industry, medical liaisons are individuals with scientific training who are available at physicians' requests to provide balanced scientific information about a company's products. They have no role as sales people.

5. At Parke-Davis, many of the "medical liaisons" were hired directly out of the sales department. They were all trained in sales techniques, and compensated, in part, on the basis of sales. They had no discernable scientific or medical functions. They had no communication or interaction with Parke-Davis's actual medical research divisions. The medical liaisons were assigned to act as teams with the regular sales representatives. They were given lists of doctors for "cold calls," based on the size of the doctors' practices and

2

their ability to prescribe Neurontin. They were provided with a package of monetary incentives to offer to physicians who got involved in the Parke-Davis program.

6. Parke-Davis created a complex array of monetary incentives for physicians who wrote prescriptions for Neurontin. None of these incentives have anything to do with true scientific or medical research. These incentives include cash payments to "consultants" and "preceptors," cash payments for a "speakers bureau" and for participation in teleconferences, the award of money for scientifically irrelevant "studies," miscellaneous cash payments for access to records of patients who are taking Neurontin, travel and Olympics tickets, and other benefits. The recipients of these awards and benefits were selected by the sales department based on their ability to prescribe Neurontin and to influence other doctors to do so.

7. The medical liaisons were trained to use knowingly false information to persuade physicians to use Neurontin for "off-label" uses. Parke-Davis's official sales line in this regard was that since Neurontin is safe at very high doses and produced no significant side effects, there is no problem using it for "off-label" indications. Medical liaisons were trained to tell doctors that evidence exists that Neurontin, in high dose, is effective for control of bipolar mental disorder, monotherapy for seizures, for control of a variety of pain states, for attention deficit disorder, for migraine, for drug and alcohol withdrawal seizures, for restless leg syndrome, and for several other diseases. At the time these statements were made, there was no competent scientific evidence that Neurontin was safe and effective for any of these conditions. The only "evidence" that existed was gossip, case reports from physicians paid by Parke-Davis, self-referential studies, and rumor. The medical liaisons were also trained to misrepresent their own credentials to the physicians in order to elevate their own credibility,

3

by saying they were "involved in research." In fact, they were purely involved in sales.

8. Parke-Davis medical liaisons, using a combination of misrepresentations and cash incentives, encouraged many physicians to experiment with their own patients by prescribing very high levels of Neurontin for a variety of "off-label" indications. Parke-Davis did this with the combined motives of increasing sales, generating a body of "medical practice," and generating case reports which could later be used for further "off-label" promotion with other physicians. Parke-Davis's sales employees expressed callous disregard for the possibility of adverse reactions occurring during these informal, non-FDA sanctioned, illegal experiments. The Parke-Davis scheme focused in particular on the market for bipolar disorders. It did so by a variety of methods, including sponsoring inexpensive studies, later published in scientific journals, which purported to show favorable results in using Neurontin for non-approved uses. These studies were published by doctors who had received money from Parke-Davis, either in the form of educational grants or some other form of monetary pass-through as described below.

9. An example of how the scheme works is contained in a proposal to Parke-Davis from a Philadelphia company called Medical Education Systems ("MES"). In the proposal, which was submitted in December 1996, MES requested $160,000 to develop a series of 12 scientific articles to, quote, "support epilepsy education." In fact, three of the articles MES proposed related to Neurontin and bipolar disorder. Park-Davis made sure the articles said what it wanted them to. It approved the authors and topics; it cleared the journals in which the articles were printed; its executives vetted drafts. In some cases, it approved articles that appear to have been written almost entirely by ghostwriters of the medical education

4

company.

10. The articles on Neurontin and bipolar disorder reported that some doctors were having success with using Neurontin for their bipolar patient and that Neurontin was a safe drug that was easily tolerated, so doctors could quickly increase the doses they gave their patients. As part of the "off-label" marketing scheme, this message was then reinforced by Parke-Davis salesmen when they called on doctors to tell them about the latest research on Neurontin and at teleconferences, lavish dinner meetings and medical seminars where Parke-Davis paid leading doctors to speak to other doctors who were also paid a fee to listen.

11. Based on these articles, as well as other illegal promotional activity described herein, tens of thousands of bipolar disorder patients are now treated with Neurontin. However, a scientifically valid study conducted at the Harvard Bipolar Research Program found that patients <u>did worse on Neurontin than those who were on a sugar pill</u>. Parke-Davis sponsored this 1998 study, was aware of the results, but did not publish the results until two years later. By that time, Neurontin accounted for $1.3 billion in sales, with over 80% of its use coming from non-approved uses, such as treatment of bipolar disorder.

## PARTIES

12. Defendant Pfizer, Inc. is a Delaware corporation with a principal place of business in New York, New York. Pfizer is principally engaged in the manufacture and sale of pharmaceuticals. In 2000, Pfizer acquired Warner-Lambert Company ("Warner-Lambert") including Warner-Lambert's Parke-Davis division. As a result of the acquisition, Pfizer is responsible for all liabilities which result from any acts or omissions of Parke-Davis or Warner-Lambert which occurred prior to the Warner-Lambert acquisition. At times

throughout this Complaint, Parke-Davis and Pfizer may be referred to collectively at "Defendants."

13. Plaintiff Stephanie Baron is a resident of the County of Albany and State of New York. She was prescribed and purchased Neurontin for the treatment of severe neck pain, an off-label use for which Neurontin is not approved.

## CLASS ALLEGATIONS

14. Plaintiffs bring this action on behalf of themselves and a class of all other persons similarly situated, pursuant to CPLR §901.

15. Membership in the Class is so numerous as to make it impractical to bring all Class Members before the Court. The exact number of Class Members is unknown, but will be determined during the course of discovery. Plaintiffs believe that there are thousands of persons in the Class.

16. The named Plaintiffs are members of the class of victims described herein. Plaintiffs were subjected to Defendant's unfair and deceptive practices and other common courses of conduct by Defendant. Plaintiffs have purchased and used unnecessary and potentially harmful prescriptions of Neurontin as a result of a calculated, manipulative scheme by Defendant to market Neurontin for "off-label" uses.

17. The Class consists of all individuals residing in the State of New York who have purchased Neurontin for an "off-label" use. As it is presently unknown how long this practice has continued, the class period is not definable at present. Discovery will, however, provide the time parameters of this suit. This action is properly brought as a class action under CPLR §901 for the following reasons:

6

a) This Class consists of thousands of persons so numerous that joinder of all members, whether otherwise required or permitted, is impractical.

b) There are questions of law and fact which are common to all Class Members, which questions predominate over any question affecting only individual Class Members. These include the following questions of law and fact:

1. Whether Defendant routinely engaged in a wrongful common course of conduct that included but was not limited to deceptive acts and practices in the attempt to market the drug Neurontin for a variety of "off-label" uses;

2. Whether Defendant has engaged in a practice or has a policy of marketing Neurontin for "off-label" uses;

3. Whether Defendant's practice of marketing Neurontin for "off-label" uses is illegal, and/or an unfair and deceptive trade practice;

4. Whether Defendant has been unjustly enriched as a result of its wrongful and illegal conduct;

5. Whether Defendant has wrongfully retained money as a result of its wrongful and illegal conduct;

6. The measure and amount of damages Defendant should be required to pay as a result of its wrongful and illegal conduct; and,

7. Whether Plaintiffs and Class Members are entitled to attorneys' fees.

21. Defendant has acted or refused to act on grounds generally applicable to the Class in that:

a) Defendant marketed Neurontin to the doctors and the general public for various "off-label" uses;

7

    b) As a result of Defendant's misleading marketing of Neurontin, Class Members purchased prescriptions that they would not otherwise need; and,

    c) Defendant has retained a monetary benefit as a result of its illegal, misleading and deceptive conduct.

22. Plaintiffs' claims are typical of the claims of the Class, and Plaintiffs have no interest adverse to the interests of other Class Members.

23. Plaintiffs will fairly and adequately protect the interests of the Class and have retained counsel experienced and competent in prosecution of class actions and complex litigation.

24. A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

    a) Given the size of individual Class Members' claims, few, if any, Class Members could afford to seek legal redress individually for the wrongs committed by Defendants against them;

    b) When the liability of Defendant has been adjudicated, claims of all Class Members can be determined by the Court;

    c) This action will cause an orderly and expeditious administration of the Class claims; economies of time, effort and expense will be fostered and uniformity of decisions will be insured;

    d) Other available means of adjudicating the claims of Plaintiffs and Class Members -- such as thousands of individual actions brought separately and pursued independently in courts across the country -- are impracticable and inefficient;

    e) Without a class action, Class Members will continue to suffer damages and

8

Defendants' violations of law will proceed without remedy while Defendant continues to retain and reap the proceeds of its wrongful conduct; and

f) This action presents no difficulties that would impede their management by the Court as a class action.

25. Plaintiffs seek equitable relief on behalf of the entire Class, on grounds generally applicable to the entire Class, to rescind any and all improper payments to Defendant for prescriptions of Neurontin that were purchased for "off-label" uses of Neurontin and to disgorge all such monies paid by Plaintiffs and the Class.

26. Because Plaintiffs seek equitable relief for the entire Class, the prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. Further, adjudications with respect to individual Class Members would, as a practical matter, be dispositive of the interests of other Class Members who are not parties to the adjudication and may impair and impede their ability to protect their interests.

## AS AND FOR A FIRST CAUSE OF ACTION
(Violation of New York General Business Law ["GBL"] § 349, et seq.)

27. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through and including 26 with equal force and effect as if set forth in full herein.

28. As described above, Defendant engaged in deceptive acts and practices in violation of New York General Business Law §349 et seq.

29. As a result of Defendant's deceptive acts and practices, Plaintiff and Class Members suffered

damages in an amount to be determined at trial.

30. As a further result of Defendant's deceptive acts and practices, defendant is liable to Plaintiff and Class members for their costs of suit, including attorneys' fees and experts' fees.

### AS AND FOR A SECOND CAUSE OF ACTION
(Common Law Fraud)

31. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through and including 30 with equal force and effect as if set forth in full herein.

32. Defendant made misrepresentations and omissions of facts material to Plaintiff's and Class members' decisions to purchase Neurontin by, *inter alia*:

   (a)   causing providers to misrepresent the off-label use(s) for which Neurontin was being prescribed so that Plaintiff and members of the Class were unaware that contrary to their plain language they were purchasing Neurontin for off-label uses;

   (b)   deliberately misrepresenting the uses for which Neurontin was safe and effective so that Plaintiff and members of the Class paid for this drug to treat symptoms for which it was not scientifically proven to be safe and effective;

   (c)   publishing or causing to have published materials containing false information upon which physicians, Plaintiff, and members of the Class relied upon when choosing to prescribe or pay for Neurontin to treat off-label uses for which the drug is not scientifically proven to be safe or medically efficacious; and

   (d)   actively concealing, and causing others to conceal, information about the true safety and efficacy of Neurontin to treat conditions for which it had not been approved by the FDA.

10

33. Defendant knew at the time that they made these misrepresentations that they were false.

34. Defendant intended that Plaintiff and the Class members would rely through their physicians on these misrepresentations, so that Plaintiff and the Class would purchase Neurontin for off-label uses.

35. Plaintiff and the Class reasonably relied upon Defendant's misrepresentations and omissions of material fact. Plaintiff and the Class had no reason to doubt the veracity or scientific validity of the information Defendant promoted through their marketing and sales strategies.

36. Defendant's misrepresentations and omissions of material fact directly and proximately caused Plaintiff's and the Class' damages.

37. By virtue of the fraud it perpetrated on Plaintiff and the Class, Defendant is liable to Plaintiff and the Class for all damages Plaintiff and the Class have sustained, including punitive damages, attorney's fees, and cost of this suit.

### AS AND FOR A THIRD CAUSE OF ACTION
(Unjust Enrichment)

38. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 37 above, as if fully set forth herein.

39. Defendant did not have a contractual or other right to charge or collect from Plaintiff and other Class Members an amount for Neurontin prescriptions that Plaintiff and Class Members did not need or require to cure their "off-label" ailments.

40. Plaintiff and Class Members do not have an adequate remedy at law.

41. This is an action for equitable relief in the form of unjust enrichment.

42. A substantial benefit in the form of money has been conferred upon Defendant. Defendant

has knowledge of this benefit, and has voluntarily accepted and retained the benefit conferred upon it by Plaintiff and Class Members.

43. The money collected by Defendant is due to be paid to Plaintiff and Class Members and should be paid to Plaintiff and Class Members.

44. Under the circumstances, it would be inequitable for Defendant to retain this substantial benefit.

45. As a direct and proximate result of the wrongful acts of Defendant, Plaintiff and Class Members have suffered damages.

**WHEREFORE**, Plaintiff demands judgment against Defendant for herself and Class Members as follows:

    a.    Declaring this action to be a proper class action;

    b.    Awarding Plaintiff and Class members damages as proven at trial;

    c.    Awarding Plaintiff and Class members punitive damages, as applicable;

    d.    Awarding Plaintiff and Class members interest on all damages at the legal rate from the date of loss;

    e.    Awarding Plaintiff and Class members full restitution of all monies acquired by means of any act or practice declared by this Court to be unlawful or fraudulent;

    f.    Requiring Defendant to disgorge their ill-gotten profits;

    g.    Awarding Plaintiff her attorneys' fees, costs and experts' fees; and

    h.    Granting such other and further relief as the Court deems just and proper.

Dated: Mamaroneck, New York
        October 8, 2004

DILLON & DILLON, L.L.C.

*/s/ John M. Dillon*

John M. Dillon
Alan E. Dillon
100 Mamaroneck Avenue
Mamaroneck, New York 10543
(914) 698-6392

JAMES, HOYER, NEWCOMER,
   & SMILJANICH, P.A.
John A. Yanchunis
Jill Bowman
One Urban Centre, Suite 550
4830 W. Kennedy Blvd.
Tampa, Florida 33609
(813) 286-4100

ATTORNEYS FOR PLAINTIFF
AND THE CLASS

13

INDEX NO.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ALBANY

---

STEPHANIE BARON, on behalf of herself and all other
similarly situated New York residents,

                        Plaintiff,

-against-

PFIZER, INC.,

                        Defendant.

---

## SUMMONS and CLASS ACTION COMPLAINT

---

DILLON & DILLON, L.L.C.
100 Mamaroneck Avenue
Mamaroneck, New York 10543
(914)698-6392

JAMES, HOYER, NEWCOMER, & SMILJANICH, P.A.
One Urban Centre, Suite 550
4830 W. Kennedy Blvd.
Tampa, Florida 33609
(813) 286-4100

*ATTORNEYS FOR PLAINTIFF AND THE CLASS*