UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

---

IN RE:

**NEURONTIN MARKETING AND SALES PRACTICES LITIGATION**

---

This Document Relates To:

ALL ACTIONS

---

**DECLARATION OF MATTHEW BAER**

I.       I am an associate with Siskinds LLP ("Siskinds"), a 70 lawyer law firm located in London, Ontario, Canada, and one of the plaintiffs' counsel in Neurontin litigation commenced in Ontario. The statement of claim which was commenced in Ontario on August 5, 2004, and amended in May, 2006, alleges *inter alia* that the defendants embarked upon an aggressive marketing campaign to promote Neurontin as a treatment with respect to conditions for which Neurontin was not only not approved, but also not efficacious. Furthermore, the plaintiffs alleged that the defendants knew or ought to have known of the serious health related complications associated with ingesting Neurontin, and that their marketing and labeling practices were inconsistent with this knowledge and were a breach of their duty to warn. See Fresh as Amended Statement of Claim *Rhonda Gayle Goodridge et al. v. Pfizer Canada Inc. et al.*, Superior Court of Justice (Ont.) Court File No. 06-CV-307728CP, Exhibit A hereto. There is currently a certification motion pending before the Ontario court which is scheduled to be heard January 17 – 19, 2007.

II.    The plaintiffs in the Ontario action seek damages, including interest and costs, for individuals who were adversely affected by the negligence of the defendants.  Through the Ontario action, the plaintiffs seek to resolve common issues relative to all Canadians who used Neurontin.

III.    Discovery has not yet taken place in the Ontario action.  Rule 30 of the Ontario *Rules of Civil Procedure* outlines the documentary discovery which will be mandated in the Ontario action.  See Exhibit B hereto.  Under the rule, the plaintiffs will be entitled to obtain production of "[e]very document relating to any matter in issue in [the] action that is in the possession, control, or power of a party to the action" unless a privilege is claimed with respect to the document. The definition of document is broad and includes a "sound recording, videotape, film, photograph, chart, graph, map, plan, survey, book of account and data and information recorded or stored by means of any device".  If a party claims that a particular document is privileged, that party is required to list the existence of the document and state the basis for the claim of privilege in an affidavit.

IV.    Rule 31 of the Ontario *Rules of Civil Procedure*  permits the plaintiff to take an oral examination of each defendant for discovery purposes, once the defendant has delivered its statement of defence.  See Exhibit C hereto.  The testifying person must answer, to the best of his or her knowledge, information, and belief, "any proper question relating to any matter in issue in the action," including the names and locations of other potential witnesses.

V.    In order to assist in the pursuit of our Ontario action, we seek to be able to use the evidence available in the U.S. litigation, including documentary discovery and depositions that have already taken place, and that will take place, and that may be available.  Pursuant to consulting agreements entered into with Finkelstein & Partners, Michael J. Peerless, also of Siskinds, and myself have had the opportunity review and have access to the confidential documents pursuant to paragraph 6(c) of the protective order.  See Exhibit D hereto.  Some of

these documents are relevant to our Ontario action and we seek the ability to use them in the Ontario action subject to the protective order. In an effort to obtain the confidential documents for use in the Ontario action, counsel from Finkelstein & Partners wrote to Davis Polk & Wardwell, counsel for the defendants, on May 30, 2006, advising of their intention to disclose the documents to us pursuant to the confidentiality agreement. See Exhibit E hereto. On June 9, 2006, counsel for the defendants objected to Finkelstein & Partners disclosing the documents to us. See Exhibit F hereto. On June 12, 2006, counsel from Finkelstein & Partners responded to counsel from Davis Polk & Wardwell, asking to confer on the issue prior to any motion practice. See Exhibit G hereto. On June 21, 2006, Michael Peerless spoke with Glenn Zakaib from Cassels Brock, Canadian counsel for the defendants. Mr. Peerless and Mr. Zakaib discussed the possibility of having the defendants consent to our firm using the confidential documents in the Ontario proceeding subject to the protective order. On July 11, 2006, Mr. Zakaib responded to Mr. Peerless indicating that the defendants would not consent to our firm using the confidential documents in the Ontario proceeding subject to the protective order and advised that we should accordingly bring the within motion to this Court. See Exhibit H hereto.

VI.     We have reviewed the protective order entered in the U.S. litigation, *In Re: Neurontin Marketing and Sales Practices Litigation*, and we agree to abide by the terms of the order with respect to any materials or testimony we may obtain. Upon grant of our motion to intervene in *In Re: Neurontin Marketing and Sales Practices Litigation*, we submit to the personal jurisdiction of the U.S. District Court for the District of Massachusetts for the purpose of enforcing the protective order.

VII.    Our firm sought similar relief to that sought in the within motion, from the U.S. District Court, District of Columbia in the case titled *In re: Vitamins Antitrust Litig.* MDL 1285. In that case, some of the defendants opposed the plaintiffs' motion and sought to enjoin the plaintiffs from proceeding with their motion. Three courts in Ontario, Superior Court of Justice, Divisional

Court and the Court of Appeal of Ontario, refused to grant the relief sought by the defendants. Leave to appeal to the Supreme Court of Canada from the decision of the Ontario Court of Appeal was denied.  See the decisions rendered in *Vitapharm* v. *F. Hoffmann-LaRoche Ltd*. See Exhibit I hereto.

VIII.    Our firm also sought similar relief to that sought in the within motion, from the U.S. District Court, Eastern District of Pennsylvania in the case titled *In Re: Linerboard Antitrust Litigation*.  In that case, despite the defendants' opposition to the motion, the court granted our motion to intervene, and modified the protective order to allow us access to evidence available through the U.S. litigation.  After receiving the order from the U.S. court, we received access to the U.S. documentary productions, including depositions, and we were able to utilize those productions in the Ontario litigation.  The Ontario Superior Court of Justice granted a sealing order in the Ontario litigation in order to preserve the confidentiality of U.S. documents which were referenced and included in the plaintiff's motion for certification.  See the decision rendered in *In Re: Linerboard Antitrust Litigation* attached hereto as Exhibit J.  See also the decision rendered by the Ontario Superior Court of Justice in *La Cie McCormick Canada Co. v. Stone Container Corp. et al.* attached hereto as Exhibit K.

Sworn to before me this 31st day of August, 2006.

_____
MATTHEW BAER

_____
ANDREA DEKAY



Court File No. 06-CV-307728CP

# *ONTARIO*
# SUPERIOR COURT OF JUSTICE

B E T W E E N :

Rhonda Gayle Goodridge, Susan Dudley, and Mark Dudley

Plaintiffs

- and -

Pfizer Canada Inc  and Pfizer Inc.

Defendants

Proceeding under the *Class Proceedings Act, 1992*

### FRESH AS AMENDED STATEMENT OF CLAIM

TO THE DEFENDANTS

**A LEGAL PROCEEDING HAS BEEN COMMENCED AGAINST YOU** by the Plaintiffs.  The claim made against you is set out in the following pages.

**IF YOU WISH TO DEFEND THIS PROCEEDING,** you or an Ontario lawyer acting for you must prepare a statement of defence in Form 18A prescribed by the Rules of Civil Procedure, serve it on the Plaintiffs' lawyer or, where the Plaintiffs do not have a lawyer, serve it on the Plaintiffs, and file it, with proof of service, in this court office, WITHIN TWENTY DAYS after this statement of claim is served on you, if you are served in Ontario.

If you are served in another province or territory of Canada or in the United States of America, the period for serving and filing your statement of defence is forty days.  If you are served outside Canada and the United States of America, the period is sixty days.

Instead of serving and filing a statement of defence, you may serve and file a notice of intent to defend in Form 18B prescribed by the Rules of Civil Procedure.  This will entitle you to ten more days within which to serve and file your statement of defence.

- 2 -

**IF YOU FAIL TO DEFEND THIS PROCEEDING, JUDGMENT MAY BE GIVEN AGAINST YOU IN YOUR ABSENCE AND WITHOUT FURTHER NOTICE TO YOU.** IF YOU WISH TO DEFEND THIS PROCEEDING BUT ARE UNABLE TO PAY LEGAL FEES, LEGAL AID MAY BE AVAILABLE TO YOU BY CONTACTING A LOCAL LEGAL AID OFFICE.

Date        August 5, 2004                    Issued by _____

                                                               Local registrar

                                                   Address of court office:

                                                   393 University Avenue
                                                   10th Floor
                                                   Toronto, Ontario
                                                   M5G 1E6

TO:          **Pfizer Canada Inc.**
             17300 Trans-Canada Highway
             Kirkland, QC  H9J 2M5

AND TO:      **Pfizer Inc.**
             235 East 42nd Street
             New York, NY  10017
             U.S.A.

- 3 -

# CLAIM

1.   The Plaintiffs, Rhonda Gayle Goodridge and Susan Dudley, claim on behalf of

themselves and others similarly situated in Canada:

    (a)   general damages in the amount of $1,000,000 for each;

    (b)   special damages for, *inter alia,* refund of the purchase price of the prescription

            drug Gabapentin, sold under the trade name "Neurontin", prescribed for "off

            label" use, as well as medical and other expenses related to testing, treatment

            and monitoring in an amount to be determined;

    (c)   in the alternative to the claim for damages, payment of the revenues realized

            by the Defendants from their sales of Neurontin prescribed for "off label" use;

    (d)   punitive, aggravated, and exemplary damages in the amount of $20,000,000;

    (e)   prejudgement interest in the amount of 10% compounded annually or as

            otherwise awarded by this Honourable Court;

    (f)   costs on a substantial indemnity basis, including G.S.T.; and

    (g)   such further and other relief as this Honourable Court may deem just.

- 4 -

**THE PARTIES**

2.    The Plaintiff, Rhonda Gayle Goodridge, is an individual residing in Keewatin, Ontario.

3.    The Plaintiffs, Susan Dudley and Mark Dudley, are individuals residing in Hanover, Ontario.  Mark is the husband of Susan Dudley and is pursuing his claim in that capacity.

4.    The Plaintiff, Mark Dudley, claims on behalf of himself and other similarly situated in Canada, damages in the amount of $100,000 for each pursuant to the *Family Law Act*, R.S.O. 1990, c.F.3 s.61 and all similar provincial legislation.

5.    The Defendant, Pfizer Canada Inc., is a corporation with its headquarters in Kirkland, Quebec.  Pfizer also has three facilities in Ontario located in Toronto, Arnprior, and Orangeville.  Pfizer Canada Inc. is currently involved in and/or responsible for the research, development, manufacturing, sales, distribution and marketing of Neurontin.  At all material times, Pfizer Canada Inc. was an affiliate of Pfizer Inc.

6.    The Defendant, Pfizer Inc., is a U.S. company with its headquarters in New York, New York.  Pfizer Inc. is currently involved in and/or responsible for the research, development, manufacturing, sales, distribution and/or marketing of Neurontin in Canada.  In June 2000, Pfizer Inc. acquired Warner-Lambert, including Warner-Lambert's Parke-Davis division.  As a result of the acquisition, Pfizer Inc. is responsible for all liabilities which result from any acts or omissions of Parke-Davis or Warner-Lambert which occurred prior to the Warner-Lambert acquisition.  Prior to being acquired by Pfizer Inc., Neurontin was marketed and sold by Parke-Davis.  At all material times, Neurontin was manufactured, marketed, sold and/or distributed in Canada directly or indirectly through an agent, affiliate or subsidiary of Warner-Lambert or Pfizer Inc.

- 5 -

7. The business of each of Pfizer Canada Inc. and Pfizer Inc. (collectively "Pfizer") is inextricably interwoven with that of the other and each is the agent of the other for the purposes of the manufacture, marketing, sale and/or distribution of Neurontin in Canada.

8. At all material times, Pfizer, or Warner-Lambert up until the time it was acquired by Pfizer, was carrying on business as, *inter alia,* the manufacturer and distributor of Neurontin in Canada.

## BACKGROUND

9. Neurontin is a prescription anticonvulsant medication approved by relevant regulatory authorities solely for use as a therapeutic antiepileptic agent, specifically as an adjunctive therapy for seizures. For the vast majority of Neurontin sales, however, it is prescribed for "off label" use. Neurontin is regularly prescribed to treat bipolar disorder, epilepsy alone (monotherapy), neuropathic pain, reflex sympathetic dystrophy, attention deficit disorder, restless leg syndrome, migraine and a host of other illnesses. Neurontin was never specifically approved by the relevant regulatory authorities for any of these "off label" uses.

10. Neurontin was approved by Health Canada, for sale in Canada, in May 1994 and has a Notice of Compliance only for the management of patients with epilepsy whose seizures remained uncontrolled with conventional therapy. Health Canada, operating out of Ottawa, Ontario, is the federal department responsible for helping Canadians maintain and improve their health. The Plaintiffs claim that Parke-Davis embarked on a deceptive marketing scheme to market Neurontin for "off label" uses.

- 6 -

11.    Recognizing a significant profit potential in "off label" promotion of Neurontin for other diseases and at higher dosages, Parke-Davis designed a scheme to promote the sale of Neurontin for uses other than that for which it was approved. Parke-Davis actively solicited physicians to promote "off label" uses of Neurontin, using incentives including cash payments.

12.    Parke-Davis hired "medical liaisons", individuals who would in other cases have scientific training to provide scientific information to physicians, directly out of the sales department. These "medical liaisons" were trained in sales techniques and compensated, in part, on the basis of sales. They had no discernable scientific or medical function and no communication or interaction with Parke-Davis' actual medical research division. The "medical liaisons" were assigned to act in teams with the regular sales representatives. They were given lists of doctors to call, based on the size of the doctors practices and their ability to prescribe Neurontin. They were provided with a package of monetary incentives to offer physicians who got involved in the Parke-Davis Neurontin program.

13.    Parke-Davis created a complex array of monetary incentives for physicians who wrote prescriptions for Neurontin, none of which related to true medical or scientific research. Incentives included cash payments to consultants and speakers and the award of money for scientifically irrelevant studies. Money was also paid to physicians for access to records of patients taking Neurontin. Physicians receiving incentives were selected by the sales department based on their ability to prescribe Neurontin as well as their ability to influence other doctors to do so.

- 7 -

14.    The "medical liaisons" were trained to use false information to persuade physicians to use Neurontin for "off label" uses. "Medical liaisons" were trained to tell doctors that evidence exists that Neurontin, in high doses, is effective for control of bipolar disorder, monotherapy for seizures, for control of a variety of pain states, for migraine, and for numerous other diseases. At the time these statements were made, there was no genuine scientific evidence that Neurontin was safe and effective for any of these conditions. The "medical liaisons" were also trained to misrepresent their own credentials to the physicians in order to elevate their own credibility, by saying they were involved in research, while in fact they were purely involved in sales.

15.    The Defendants promoted the sale of Neurontin for "off label" uses through control of Continuing Medical Education ("CME") curriculum. The Defendants formed a partnership with Physicians World Magazine, called Professional Post Graduate Services ("PPGS"), that provided CMEs through itself and its subsidiaries to physicians around the world. The CMEs were purported to be independent of any support or affiliation with suppliers including the Defendants. PPGS claimed that the CMEs offered met the guidelines of the American College of Continuing Medical Education by disclosing all financial contributions of affiliations. Neither PPGS nor Physician's World disclosed the gift of office space, secondment of staff or the partnership between Physician's World and the Defendants in any way. The Defendants paid the speakers, seconded staff to Physician's World and PPGS, wrote speeches, provided office space and office equipment, wrote curriculum, recruited speakers and paid speakers for topics like "Uses of Antiepileptic Drugs in the Treatment of Chronic Pain Syndromes".

- 8 -

16.   The Defendants hired Medical Education Systems, a Delaware company with offices
      in Philadelphia, to ghost write professional articles advocating the efficacy of
      Neurontin for "off label" uses.

17.   Parke-Davis' "medical liaisons", using a combination of misrepresentations and cash
      incentives, encouraged many physicians to experiment with their own patients by
      prescribing very high levels of Neurontin for a variety of "off label" indications.  Parke-
      Davis did this not only to increase sales, but to generate case reports which could
      later be used for further "off label" promotion of Neurontin with other physicians.

18.   The Defendants' deceptive marketing scheme was quite successful.  In 1995,
      Defendants' revenue from the sale of Neurontin was U.S. $97.5 million; by 1997,
      sales increased to U.S. $292 million; by 1999, sales increased to U.S. $913 million;
      by 2000, sales increased to more than U.S. $1 billion; and by 2003, worldwide sales
      of Neurontin reached nearly U.S. $2.7 billion.  This dramatic increase in sales
      (approximately 50% per year) was fuelled almost entirely by prescriptions for off label
      uses and was a direct result of Defendants' deceptive marketing scheme.  In 1996,
      50% of Neurontin's sales were attributable to "off label" uses, in 2000, more than 78%
      of the Neurontin prescriptions written were for "off label" uses, and by 2003, 90% of
      all Neurontin prescriptions were for "off label "uses.

19.   A similarly dramatic increase in Neurontin sales was seen in Canada.  In 1995, there
      were approximately 16,000 prescriptions for Neurontin in Canada; by 1997, the
      number of prescriptions increased to approximately 57,000; by 1999, the number of
      prescriptions increased to approximately 223,000; and by 2001, the number of
      Neurontin prescriptions in Canada was approximately 461,000 making it the 128th
      most prescribed drug in Canada with sales of approximately $44 million.

- 9 -

20.    On May 13, 2004, it was announced that Pfizer had plead guilty in the United States to criminal charges involving the illegal and fraudulent promotion of unapproved uses of Neurontin resulting in fines in excess of U.S. $430 million.

21.    Neurontin has been associated with an increased risk of suicidal behaviour in the medical literature.  The Plaintiffs did not receive any warning from Pfizer of the potential for suicidal thoughts or tendencies as a consequence of taking Neurontin. The Defendants provided false and misleading information to Canadians with respect to the adverse event incidence of depression in clinical trials of Neurontin.

22.    In or about April, 2005, Health Canada requested safety data from Pfizer relating to Neurontin and increased risk of suicide.  Health Canada indicated it would take approximately six months to perform the safety analysis, and that after that time "Health Canada will take appropriate action if deemed necessary".

23.    On August 3, 2005, Pfizer amended the product monograph for Neurontin to include reference to suicide.

24.    By actively promoting the use of Neurontin for "off label" use, not only did the Defendants cause individuals suffering from health problems to receive unproven and ineffective treatment, but these individuals were also exposed to life-threatening risks for which no warning was given, and were not taking other medication which may have effectively treated their condition.

## THE PLAINTIFFS' EXPERIENCES

### Deceived

25.    The Plaintiff, Rhonda Gayle Goodridge, was prescribed and began taking Neurontin on or about April 12, 2001 to treat neuropathic pain to her right arm.  Ms. Goodridge

is not epileptic and has never suffered from seizures.  Ms. Goodridge thereafter ingested Neurontin according to the prescription, taking 18 pills per day, until approximately June 28, 2001, whereupon she ceased taking Neurontin.

26.    Use of Neurontin was not effective in treating with Ms. Goodridge's pain.

27.    Ms. Goodridge subsequently learned that Neurontin had no demonstrated medical efficacy for the treatment of her condition or other "off label" uses.  Had Ms. Goodridge been aware that Neurontin was not approved to treat the health problems she was suffering from, she would not have taken the drug.

**Deceived and Experienced Suicidal Behaviour**

28.    The Plaintiff, Susan Dudley, was prescribed and began taking Neurontin in or about May 2002 to treat nerve pain in her leg.  Mrs. Dudley is not epileptic and has never suffered from seizures.  Mrs. Dudley thereafter used Neurontin for approximately 6 or 7 weeks.

29.    Mrs. Dudley used Neurontin as directed.  Use of Neurontin was not effective in treating Mrs. Dudley's pain and as a result, the dosage of Neurontin prescribed was increased.

30.    While using Neurontin, Mrs. Dudley was taken to the emergency room of the Grey Bruce Regional Health Centre in Owen Sound because she was suffering from suicidal and harmful thoughts.  The doctor in the emergency room immediately discontinued Mrs. Dudley's use of Neurontin.

31.    Had Mrs. Dudley been aware that Neurontin was not approved to treat the health problems she was suffering from and/or of the increased risk of experiencing suicidal behaviour from ingesting Neurontin, she would not have taken the drug.

- 11 -

## CAUSES OF ACTION

32.    The Defendants at all material times owed a duty of care to the Plaintiffs to:

    (a)    ensure that Neurontin was fit for its intended or reasonably foreseeable use;

    (b)    market Neurontin for approved uses only;

    (c)    ensure that Neurontin was an effective treatment for the types of uses for which it was being marketed;

    (d)    conduct appropriate testing to determine whether and to what extent ingestion of Neurontin posed serious health risks, including the increased risk of suicidal behaviour; and

    (e)    warn the Plaintiffs and their physicians that ingestion of Neurontin carries the increased risk of suicidal behaviour.

33.    The Defendants negligently breached their duty of care and the Plaintiffs state that their damages were caused by the negligence of the Defendants.  Such negligence includes but is not limited to the following:

    (a)    actively marketing Neurontin for "off label" uses despite having no genuine scientific evidence to support such use, or in some cases evidence showing the drug was completely ineffective for these conditions;

    (b)    actively soliciting and misleading physicians about the effectiveness of Neurontin in treating "off label" health complications, including:

        (i)    giving payments to physicians who prescribed large amounts of Neurontin for "off label" purposes; and

- 12 -

      (ii)    using a network of employees, referred to as "medical liaisons", whose actual duties consisted entirely of conventional direct sales activities and which did not include any legitimate scientific activity;

(c)    failing to publish the results of adverse studies in a timely fashion in order to continue to induce physicians to prescribe Neurontin for "off label" uses;

(d)    failing to ensure that Neurontin was not dangerous to recipients during the course of its use;

(e)    failing to adequately test Neurontin in a manner that would fully disclose the magnitude of the risks associated with its use, including but not limited to the risk of suicidal behaviour;

(f)    failing to give Health Canada complete and accurate information;

(g)    failing to conduct adequate follow-up studies on the efficacy and safety of Neurontin;

(h)    failing to provide the Plaintiffs and their physicians with adequate warning of the risks associated with ingesting Neurontin, including but not limited to the risk of suicidal behaviour; and

(i)    breaching other duties of care to the Plaintiffs and the class of Plaintiffs, details of which breaches are known only to the Defendants.

34.    As a result of the Defendants' negligence, including negligent misrepresentations, the Plaintiffs and the class of Plaintiffs have suffered financial, physical and emotional harm.

- 13 -

**DAMAGES**

35. As a result of the conduct of the Defendants, the Plaintiffs and other class members suffered and continue to suffer expenses and special damages, of a nature and amount to be particularized prior to trial.

36. Some of the expenses related to the medical treatment that the Plaintiffs and class members have undergone, and will continue to undergo, have been borne by the various provincial health insurers including the Ontario Health Insurance Plan ("OHIP").  As a result of the negligence of the Defendants, the various provincial health insurers have suffered and will continue to suffer damages.

37. The subrogated interests of OHIP and all other provincial insurers for all past and future insured services are asserted for the Plaintiffs and the class of Plaintiffs.

38. The Plaintiffs and the class of Plaintiffs plead that the Defendants have been unjustly enriched as a result of the revenues generated by the sale of Neurontin.

39. The Plaintiffs and the class of Plaintiffs are entitled to elect, at the end of the trial of the common issues, to waive the tort and require the Defendants to account for all of the revenue they received from the sale of Neurontin in Canada.

40. The Plaintiffs plead that such an election may be appropriate for the following reasons, among others:

    (a)    such revenue was acquired in circumstances that the Defendants may not in good conscience retain it;

    (b)    the integrity of the pharmaceutical regulations and marketplace would be undermined if the court did not require an accounting;

- 14 -

    (c)     Neurontin could not have been marketed, and the Defendants would not have received any revenue from its sale in Canada, absent the Defendants' tortious conduct; and

    (d)     the Defendants engaged in wrongful conduct by putting into the marketplace, without warning, a pharmaceutical product which causes or has the potential to cause increased risk of suicidal behaviour, and marketing the product for unapproved use.

41.    As a result of the Defendants' negligence, Ms. Goodridge and Mrs. Dudley received medication which was unapproved for and ineffective in treating their respective medical conditions. In addition to being prescribed medication not approved to treat their respective medical conditions, Ms. Goodridge and Mrs. Dudley were unduly exposed to the possibility of experiencing suicidal behaviour, a risk associated with taking Neurontin which neither they nor their physicians were made aware of by the Defendants, and they were not taking other medication which may have effectively treated their conditions

42.    By misleading some physicians while giving incentives to others, patients' lives were put at risk. In addition, innocent people continued to suffer pain and illness while being prescribed medication which was unapproved and ineffective in treating their conditions. Not only did this lead to individuals wasting money on the ineffective drug, it stood in the way of more appropriate, approved treatments being put in place.

43.    Some of the cost of the purchase of Neurontin by the Plaintiffs and the class of Plaintiff was covered, in whole, or in part, by third parties, including health insurers, and drug benefit plans.

44.    To the extent that such third parties have a subrogated interest in these expenditures for Neurontin, those claims are asserted by the Plaintiffs and the class of Plaintiffs.

45.    The Plaintiffs claim punitive, aggravated and exemplary damages for the reckless and unlawful conduct of the Defendants.

## STATUTES

46    The Plaintiffs plead and rely upon the provisions of the *Class Proceedings Act, 1992*, S.O. 1992, c.6; the *Food and Drugs Act*, R.S.C. 1985, c. F 27 and regulations thereunder; the *Business Practices Act*, R.S.O. 1990, c. B.18; the *Consumer Protection Act, 2002*, S.O. 2002, c.30; and the *Competition Act*, R.S.C. 1985, c. C-34.

47.    The Plaintiffs plead and rely on section 17 (g), (h), (o) and (p) of the *Rules of Civil Procedure*, allowing for service *ex juris* of the foreign defendant. Specifically, this originating process may be served without court order outside Ontario in that the claim is:

(a)    in respect of a tort committed in Ontario (rule 17 02(g));

(b)    in respect of damages sustained in Ontario arising from a tort or breach of contract wherever committed (rule 17 02(h));

(c)    against a person outside Ontario who is a necessary and proper party to this proceeding properly brought against another person served in Ontario (rule 17 02(o)); and

(d)    against a person carrying on business in Ontario (rule 17 02(p))

- 16 -

**PLACE OF TRIAL**

48.    The Plaintiffs propose that this action be tried in Toronto, Ontario.

August 5, 2004                              **Siskind, Cromarty, Ivey & Dowler** LLP
                                           Barristers & Solicitors
                                           680 Waterloo Street
                                           London, ON  N6A 3V8

                                           Michael J. Peerless LSUC # 34127P
                                           Charles M. Wright LSUC # 36599Q
                                           Tel: (519) 672-2121
                                           Fax: (519) 672-6065

                                           **Hanson Wirsig Matheos**
                                           Barristers and Solicitors
                                           302-15225 104th Avenue
                                           Surrey, BC  V3R 6Y8

                                           James Hanson
                                           Tel: (604) 583-2200
                                           Fax: (604) 583-3469

                                           **Dunn & Company**
                                           Barristers & Solicitors
                                           903-700 West Pender St.
                                           Vancouver, BC  V6C 1G8

                                           Michael R. Dunn
                                           Tel: (604) 685-3595
                                           Fax: (604) 685-3565

                                           Solicitors for the Plaintiffs

Rhonda Gayle Goodridge et al.          Pfizer Canada Inc. et al.
Plaintiffs          and          Defendants

Court File No: 06-CV-3077728CP

*ONTARIO*
SUPERIOR COURT OF JUSTICE

Proceeding commenced at Ottawa

Proceeding under the *Class Proceedings Act, 1992*

FRESH AS AMENDED STATEMENT OF CLAIM

Siskind, Cromarty, Ivey & Dowler LLP
Barristers & Solicitors
680 Waterloo Street
London, ON N6A 3V8

Michael J. Peerless LSUC # 34127P
Charles M. Wright LSUC # 36599Q
Tel: (519) 672-2121
Fax: (519) 672-6065

Hanson Wirsig Matheos
Barristers and Solicitors
302-15225 104th Avenue
Surrey, BC V3R 6Y8

James Hanson
Tel: (604) 583-2200
Fax: (604) 583-3469

Dunn & Company
Barristers & Solicitors
903-700 West Pender St.
Vancouver, BC V6C 1G8

Michael R. Dunn
Tel: (604) 685-3595
Fax: (604) 685-3565

Solicitors for the Plaintiffs

Court File No: 06-CV-307728CP

Goodridge v. Pfizer Canada Inc. et al.

*ONTARIO*
SUPERIOR COURT OF JUSTICE

Proceeding commenced at Ottawa
(transferred to Toronto)

Proceeding under the *Class Proceedings Act, 1992*

ORDER

**Hanson Wirsig Matheos**
Barristers and Solicitors
302-15225 104th Avenue
Surrey, BC  V3R 6Y8

James Hanson
Tel: (604) 583-2200
Fax: (604) 583-3469

**Dunn & Company**
Barristers & Solicitors
903-700 West Pender St.
Vancouver, BC  V6C 1G8

Michael R. Dunn
Tel: (604) 685-3595
Fax: (604) 685-3565

Solicitors for the Plaintiff Rhonda Gayle
Goodridge

B

# Regulation 194 -- RULES OF CIVIL PROCEDURE

## RULE 30 DISCOVERY OF DOCUMENTS -- ss. 30.01 to 30.1.01

### INTERPRETATION -- s. 30.01

**30.01** (1) In rules 30.02 to 30.11,

(a) "document" includes a sound recording, videotape, film, photograph, chart, graph, map, plan, survey, book of account and data and information recorded or stored by means of any device; and

(b) a document shall be deemed to be in a party's power if that party is entitled to obtain the original document or a copy of it and the party seeking it is not so entitled.

O. Reg. 560/84, r. 30.01(1); O. Reg. 427/01, s. 12

(2) In subrule 30.02(4),

(a) a corporation is a subsidiary of another corporation where it is controlled directly or indirectly by the other corporation; and

(b) a corporation is affiliated with another corporation where,

(i) one corporation is the subsidiary of the other,

(ii) both corporations are subsidiaries of the same corporation, or

(iii) both corporations are controlled directly or indirectly by the same person or persons.

O. Reg. 560/84, r. 30.01(2).

### SCOPE OF DOCUMENTARY DISCOVERY -- s. 30.02

#### Disclosure

**30.02** (1) Every document relating to any matter in issue in an action that is or has been in the possession, control or power of a party to the action shall be disclosed as provided in rules 30.03 to 30.10, whether or not privilege is claimed in respect of the document.

#### Production for Inspection

(2) Every document relating to any matter in issue in an action that is in the possession, control or power of a party to the action shall be produced for inspection if requested, as provided in rules 30.03 to 30.10, unless privilege is claimed in respect of the document.

### Insurance Policy

(3) A party shall disclose and, if requested, produce for inspection any insurance policy under which an insurer may be liable,

　(a) to satisfy all or part of a judgment in the action; or

　(b) to indemnify or reimburse a party for money paid in satisfaction of all or part of the judgment,

but no information concerning the insurance policy is admissible in evidence unless it is relevant to an issue in the action.

### Subsidiary and Affiliated Corporations and Corporations Controlled by Party

(4) The court may order a party to disclose all relevant documents in the possession, control or power of the party's subsidiary or affiliated corporation or of a corporation controlled directly or indirectly by the party and to produce for inspection all such documents that are not privileged.

O. Reg. 560/84, r. 30.02.

### AFFIDAVIT OF DOCUMENTS -- s. 30.03

### Party to Serve Affidavit

**30.03** (1) A party to an action shall, within ten days after the close of pleadings, serve on every other party an affidavit of documents (Form 30A or 30B) disclosing to the full extent of the party's knowledge, information and belief all documents relating to any matter in issue in the action that are or have been in the party's possession, control or power.

### Contents

(2) The affidavit shall list and describe, in separate schedules, all documents relating to any matter in issue in the action,

　(a) that are in the party's possession, control or power and that the party does not object to producing;

　(b) that are or were in the party's possession, control or power and for which the

party claims privilege, and the grounds for the claim; and

(c) that were formerly in the party's possession, control or power, but are no longer in the party's possession, control or power, whether or not privilege is claimed for them, together with a statement of when and how the party lost possession or control of or power over them and their present location.

(3) The affidavit shall also contain a statement that the party has never had in the party's possession, control or power any document relating to any matter in issue in the action other than those listed in the affidavit. O. Reg. 560/84, r. 30.03(1-3).

### Lawyer's Certificate

(4) Where the party is represented by a lawyer, the lawyer shall certify on the affidavit that he or she has explained to the deponent,

(a) the necessity of making full disclosure of all documents relating to any matter in issue in the action; and

(b) what kinds of documents are likely to be relevant to the allegations made in the pleadings.

O. Reg. 560/84, r. 30.03(4); O. Reg. 653/00, s. 3.

### Affidavit not to be Filed

(5) An affidavit of documents shall not be filed unless it is relevant to an issue on a pending motion or at trial. O. Reg. 221/86, s. 1, para. 10.

### INSPECTION OF DOCUMENTS -- s. 30.04

### Request to Inspect

30.04 (1) A party who serves on another party a request to inspect documents (Form 30C) is entitled to inspect any document that is not privileged and that is referred to in the other party's affidavit of documents as being in that party's possession, control or power.

(2) A request to inspect documents may also be used to obtain the inspection of any document in another party's possession, control or power that is referred to in the originating process, pleadings or an affidavit served by the other party.

(3) A party on whom a request to inspect documents is served shall forthwith inform the party making the request of a date within five days after the service of the request to inspect documents and of a time between 9:30 a.m. and 4:30 p.m. when the documents may be inspected at the office of the solicitor of the party served, or at some other convenient place, and shall at the time and place named make the documents available for inspection.

Documents to be Taken to Examination and Trial

(4) Unless the parties agree otherwise, all documents listed in a party's affidavit of documents that are not privileged and all documents previously produced for inspection by the party shall, without notice, summons or order, be taken to and produced at,

    (a) the examination for discovery of the party or of a person on behalf or in place of or in addition to the party; and

    (b) the trial of the action.

Court may Order Production

(5) The court may at any time order production for inspection of documents that are not privileged and that are in the possession, control or power of a party.

Court may Inspect to Determine Claim of Privilege

(6) Where privilege is claimed for a document, the court may inspect the document to determine the validity of the claim.

Copying of Documents

(7) Where a document is produced for inspection, the party inspecting the document is entitled to make a copy of it at the party's own expense, if it can be reproduced, unless the person having possession or control of or power over the document agrees to make a copy, in which case the person shall be reimbursed for the cost of making the copy.

Divided Disclosure or Production

(8) Where a document may become relevant only after the determination of an issue in the action and disclosure or production for inspection of the document before the issue is determined would seriously prejudice a party, the court on the party's motion may grant leave to withhold disclosure or production until after the issue has been determined.

O. Reg. 560/84, r. 30.04.

DISCLOSURE OR PRODUCTION NOT ADMISSION OF RELEVANCE -- s. 30.05

30.05 The disclosure or production of a document for inspection shall not be taken as an admission of its relevance or admissibility. O. Reg. 560/84, r. 30.05.

WHERE AFFIDAVIT INCOMPLETE OR PRIVILEGE IMPROPERLY CLAIMED -- s. 30.06

**30.06** Where the court is satisfied by any evidence that a relevant document in a party's possession, control or power may have been omitted from the party's affidavit of documents, or that a claim of privilege may have been improperly made, the court may,

(a) order cross-examination on the affidavit of documents;

(b) order service of a further and better affidavit of documents;

(c) order the disclosure or production for inspection of the document, or a part of the document, if it is not privileged; and

(d) inspect the document for the purpose of determining its relevance or the validity of a claim of privilege.

O. Reg. 560/84, r. 30.06.

DOCUMENTS OR ERRORS SUBSEQUENTLY DISCOVERED -- s. 30.07

**30.07** Where a party, after serving an affidavit of documents,

(a) comes into possession or control of or obtains power over a document that relates to a matter in issue in the action and that is not privileged; or

(b) discovers that the affidavit is inaccurate or incomplete,

the party shall forthwith serve a supplementary affidavit specifying the extent to which the affidavit of documents requires modification and disclosing any additional documents. O. Reg. 560/84, r. 30.07.

EFFECT OF FAILURE TO DISCLOSE OR PRODUCE FOR INSPECTION -- s. 30.08

Failure to Disclose or Produce Document

**30.08** (1) Where a party fails to disclose a document in an affidavit of documents or a supplementary affidavit, or fails to produce a document for inspection in compliance with these rules, an order of the court or an undertaking,

(a) if the document is favourable to the party's case, the party may not use the document at the trial, except with leave of the trial judge; or

(b) if the document is not favourable to the party's case, the court may make such order as is just.

O. Reg. 560/84, r. 30.08(1); O. Reg. 504/00, s. 3.

Failure to Serve Affidavit or Produce Document

(2) Where a party fails to serve an affidavit of documents or produce a document for inspection in compliance with these rules or fails to comply with an order of the court under rules 30.02 to 30.11, the court may,

(a) revoke or suspend the party's right, if any, to initiate or continue an examination for discovery;

(b) dismiss the action, if the party is a plaintiff, or strike out the statement of defence, if the party is a defendant; and

(c) make such other order as is just.

O. Reg. 560/84, r. 30.08(2).

PRIVILEGED DOCUMENT NOT TO BE USED WITHOUT LEAVE -- s. 30.09

**30.09** Where a party has claimed privilege in respect of a document and does not abandon the claim by giving notice in writing and providing a copy of the document or producing it for inspection at least 90 days before the commencement of the trial, the party may not use the document at the trial, except to impeach the testimony of a witness or with leave of the trial judge. O. Reg. 560/84, r. 30.09; O. Reg. 19/03, s. 7.

PRODUCTION FROM NON-PARTIES WITH LEAVE -- s. 30.10

Order for Inspection

**30.10** (1) The court may, on motion by a party, order production for inspection of a document that is in the possession, control or power of a person not a party and is not privileged where the court is satisfied that,

(a) the document is relevant to a material issue in the action; and

(b) it would be unfair to require the moving party to proceed to trial without having discovery of the document.

Notice of Motion

(2) A motion for an order under subrule (1) shall be made on notice,

(a) to every other party; and

(b) to the person not a party, served personally or by an alternative to personal service under rule 16.03.

Court may Inspect Document