EXHIBIT A

Page 1

1                IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF MASSACHUSETTS
2

3

4     IN RE:                    )
      NEURONTIN MARKETING AND    )   CA No. 04-10981-PBS
5     SALES PRACTICES LITIGATION )

6

7

8

                         SCHEDULING CONFERENCE
9

                 BEFORE THE HONORABLE PATTI B. SARIS
10                   UNITED STATES DISTRICT JUDGE

11

12

13

14                                  United States District Court
                                    1 Courthouse Way, Courtroom 19
15                                  Boston, Massachusetts
                                    May 13, 2005, 2:00 p.m.

16

17

18

19

20

21

22

                           LEE A. MARZILLI
23                  CERTIFIED REALTIME REPORTER
                    United States District Court
24                  1 Courthouse Way, Room 3205
                       Boston, MA  02210
25                      (617)345-6787

Page 2

```
 1   A P P E A R A N C E S:
 2   FOR THE PLAINTIFFS:
 3        ANDREW G. FINKELSTEIN, ESQ. and KENNETH B. FROMSON, ESQ.,
     Finkelstein & Partners, LLP, 436 Robinson Avenue, Newburgh,
 4   New York, 12550.
 5        ANNAMARIE A. DALEY, ESQ. and MARK IRELAND, ESQ.,
     Robins, Kaplan, Miller & Ciresi, LLP, 2800 LaSalle Plaza,
 6   800 LaSalle Avenue, Minneapolis, Minnesota, 55402-2015.
 7        THOMAS M. GREENE, ESQ., Greene & Hoffman, P.C.,
     125 Summer Street, Suite 1410, Boston, Massachusetts, 02110.
 8
          THOMAS M. SOBOL, ESQ., Hagens, Berman, Sobol & Shapiro,
 9   LLP, One Main Street, Cambridge, Massachusetts, 01923.
10        THOMAS G. SHAPIRO, ESQ., Shapiro, Haber & Urmy, LLP,
     53 State Street, Boston, Massachusetts, 02108.
11
          CHARLES BARRETT, ESQ., Barrett Law Office, P.A.,
12   One Burton Hills Boulevard, Suite 330, Nashville, Tennessee,
     37215.
13
14   FOR THE DEFENDANTS:
15        DANIEL J. DWYER, ESQ., Hanify & King,
     One Beacon Street, Boston, Massachusetts, 02108.
16
          HUNG G. TA, ESQ., Millbank, Tweed, Hadley & McCloy, LLP,
17   One Chase Manhattan Plaza, New York, New York, 10005.
18        SCOTT WALKER, Davis & Gilbert, LLP,
     1740 Broadway, New York, New York, 10019.
19
          DAVID B. CHAFFIN, ESQ., Hare & Chaffin,
20   160 Federal Street, 23rd Floor, Boston, Massachusetts,
     02110-1701.
21
          JAMES P. ROUHANDEH, ESQ. and DEBORAH L. MacGREGOR, ESQ.,
22   Davis, Polk & Wardwell, 450 Lexington Avenue, New York,
     New York, 10017.
23
24
25
```

1              P R O C E E D I N G S

2              THE CLERK:  In re:  Neurontin Marketing and Sales

3    Practices Litigation, Civil Action No. 04-10981, will now be

4    heard before this Court.

5              Will counsel please identify themselves for the

6    record.

7              MR. SOBOL:  Good afternoon, your Honor.  Tom Sobol

8    for the plaintiffs.

9              MR. GREENE:  Good afternoon, your Honor.  Tom

10   Greene for the plaintiffs.

11             MS. DALEY:  Good afternoon, your Honor.  Annamarie

12   Daley and Mark Ireland for the Assurant group of plaintiffs,

13   your Honor, and Mark Ireland is in the back row.

14             THE COURT:  So you're for Assurant.  All right, go

15   ahead.

16             MR. FINKELSTEIN:  Andrew Finkelstein, Finkelstein &

17   Partners, for the personal injury plaintiffs/product

18   liability plaintiffs, for Young.

19             THE COURT:  For?

20             MR. FINKELSTEIN:  Young.

21             MR. FROMSON:  Kenneth Fromson, Finkelstein &

22   Partners, for the product liability plaintiffs.

23             MR. IRELAND:  Your Honor, Mark Ireland for the

24   Assurant plaintiffs.

25             MR. ROUHANDEH:  Your Honor, Jim Rouhandeh, Davis,

1    Polk & Wardwell, for defendants.

2            MR. CHAFFIN:  David Chaffin.

3            MS. MacGREGOR:  Debbie MacGregor, Davis, Polk &

4    Wardwell.

5            MR. WALKER:  Scott Walker for Cline, Davis & Mann,

6    defendant.

7            THE COURT:  For who?

8            MR. WALKER:  Defendant Cline, Davis & Mann in the

9    Assurant case.

10            MR. DWYER:  Daniel Dwyer, Hanify & King, for

11    individual defendants in the Assurant case.  With me is Hung

12    Ta.

13            THE COURT:  You know, you need to project out a

14    little so we all hear.

15            MR. DWYER:  Thank you, your Honor.  Daniel Dwyer,

16.    Hanify & King, for the individual defendants in the Assurant

17    matter.

18            MR. TA:  I'm Hung Ta.  I'm also for the individual

19    defendants.

20            THE COURT:  So I just received at one -- well,

21    actually I just received it ten seconds ago, but it was filed

22    at 1:10, the Assurant's proposed agenda for the May 13, 2005

23    hearing, and I have not had an opportunity to read it.  Let

24    me talk for a minute -- why doesn't Assurant -- is it you?

25            MS. DALEY:  Yes, it is, your Honor.

```
 1            THE COURT:  Why don't you give me a sense.  I know
 2    that the plaintiffs have proposed certain other items that
 3    they may want to discuss today.  I can't remember if
 4    defendant did as well, but I view you as my lead concern.  So
 5    what do I do about the fact that there's another antitrust
 6    case pending in -- is it New Jersey?
 7            MS. DALEY:  There is an MDL case pending in New
 8    Jersey on antitrust claims that in some ways there's some
 9    similarities to our cause of action, but there's also major
10    differences as well, your Honor.
11            THE COURT:  But I'm not going to do them, okay, so
12    we have to figure -- I've got so much on my plate right now.
13    I've got the sales and marketing cases.  Judge Hodge has
14    called me about the personal injury cases to at least figure
15    out whether I would be willing to take them and at least
16    figure out whether there's a substantial overlap or whether
17    it made sense to sever them out.  What I'm not going to do is
18    part three, which is antitrust, okay.  And plus I have the
19    average wholesale price litigation.  I've got a full plate.
20    So what do I do with your antitrust allegations?  Do you want
21    me to sever them and send them down?
22            MS. DALEY:  I think we're in agreement with
23    everyone that the first order of business is to address our
24    pending remand motion because that may take care of that
25    issue that you have right now as to what to do with our case.
```

1          THE COURT:  All right, well, let's assume for a

2    minute that I deal with that against you.  I haven't even

3    read it.  I didn't even know it existed because it doesn't

4    show up on our docket.  So one of the things we're going to

5    deal with today is to have everybody, as in the other case

6    that I have, give us monthly notices of pending things that I

7    need to deal with.  It's been exceptionally useful to me in

8    housekeeping, given the volume of the cases.  So I've learned

9    about your motion to remand, and I'm not prepared to address

10   it today, and we will set up a time to do that.

11          MS. DALEY:  Thank you.

12          THE COURT:  But apart from that, apart from that

13   issue, I will not deal with your antitrust allegation.  So

14   what will you want me to do with them?

15          MS. DALEY:  Well, the problem we have is that our

16   antitrust allegations depend in large part upon discovery of

17   the marketing and sales activities, which are part and parcel

18   of this case.  We did not choose to be before you, your

19   Honor.  Pfizer is the one who notified the Judicial Panel on

20   Multidistrict Litigation.  This was the MDL that they thought

21   we should be a part of, so that's why we're here, your Honor.

22          THE COURT:  Right, but it's possible to sever off

23   one set of claims and send it there and keep your similar

24   claims here and consolidate it into the master action.

25   Right?

1           MS. DALEY:  Theoretically, that's one way of

2    looking at it, yes.

3           THE COURT:  I think I have the discretion to just

4    do that, do the meat cleaver, if you will.  The issue for you

5    is going to be, do you want to be litigating in two forums,

6    or do you want to sort of make a choice between your two

7    theories, and I would stay the other one?  I wouldn't dismiss

8    it; I would just stay it.

9           MS. DALEY:  And I think, your Honor, I would have

10   to go back to my clients and talk to them about that

11   alternative.  I wish I had an answer for you on that one.  I

12   apologize, I'm not prepared to answer that one right today.

13          THE COURT:  Let me ask you this.  Your motion to

14   remand, I haven't read it yet.  I just have learned about

15   it.  So what is the grounds?

16          MS. DALEY:  The grounds are that we have really

17   state law causes of action, your Honor, and, secondly, that

18   there were defects in the removal papers that were filed.

19   Frankly, your Honor, the motion has been fully briefed.  It

20   was pending before the New Jersey judge before they were

21   transferred up to your court.  And in my reading of the

22   briefs, it seems that the parties are for the most part

23   citing two Supreme Court cases, have a different reading on

24   the cases as compared to the allegations in the complaint;

25   and it will take your Honor to read those cases and apply it

1    to the allegations in our complaint.

2              THE COURT:  Well, let me ask you, do you want a

3    hearing?  Why don't I just do it on the papers?

4              MS. DALEY:  We would be fine if you wanted to go

5    ahead and rule on the papers, your Honor.

6              THE COURT:  What do you all think?

7              MR. ROUHANDEH:  Your Honor, that's fine with us.  I

8    would just make two clarifications.  One is, they don't turn

9    just on the Supreme Court cases.  They turn on a decision by

10   Judge Liflin dealing with a very similar issue, in which he

11   denied a motion to remand much like the motion to remand that

12   they've made.  So at least in Judge Liflin's MDL, these types

13   of cases have stayed in Federal Court.  And the second is --

14             THE COURT:  Well, would it make sense to

15   essentially at this point -- well, let me ask.  I don't know

16   the cases well enough.  I will.  If I were to decide now that

17   the antitrust pieces of it should go down there and the

18   marketing should stay here, are the remand issues different

19   depending on which cluster of causes of action you're talking

20   about?

21             MS. DALEY:  There would still be the remand issue,

22   your Honor, and I think you can address the entire remand

23   issue, both on the antitrust and the deceptive trade

24   practices and consumer product claims, all at once.

25             MR. ROUHANDEH:  I think, if the cases were to be

1    severed, I think we would want an opportunity to address the

2    remaining remand issues for -- the federal jurisdiction issue

3    for the consumer protection claims.

4              THE COURT:  Well, let me put it this way.  All we

5    get is a notice of transfer, and we may have to address this

6    in our own CM/ECF rules, but all I've got on the docket is

7    basically the fact that it was transferred.  And I don't have

8    all of these motions, so we're going to have to go down --

9    and I don't even think it's all been scanned at this point --

10   and recreate -- it depends on which courts have the CM/ECF

11   and which ones don't.  I'm going to have to go back and look

12   through all those papers.  I'm going to take it on the

13   papers, and I will keep that in the back of my mind; and if I

14   think there's a separate set of arguments that would apply to

15   one kind of cause of action as opposed to another, I suppose

16   at that point you'd have to think about whether or not remand

17   is appropriate on one group and not on another group, how

18   we'll proceed with that.  Have you briefed it that way or

19   not?

20             MR. ROUHANDEH:  No, we haven't, your Honor, we

21   haven't approached it that way.

22             THE COURT:  Because it sounds as if that for the

23   antitrust claims, that Judge Liflin would have kept it.

24             MR. ROUHANDEH:  That's our understanding, your

25   Honor.

1          THE COURT:   I don't know enough about how it's been

2    briefed with respect to the sales and marketing fraud claims.

3          MS. DALEY:   Your Honor, we would disagree that

4    Judge Liflin would have kept the case because our antitrust

5    theories are different than the antitrust theories that were

6    in the cases pending before him.   But, of course, we don't

7    know because he didn't have our complaint before him.

8          THE COURT:   All right, well, I'll take that on the

9    papers.   I will rule on it.   All discovery will be stayed in

10   the case until I rule on it, with the exception that since

11   what's likely to happen if I deny the -- you're going to have

12   discovery in sales and marketing in one place or another

13   place -- is that you can be incorporated into whatever

14   discovery is happening here on sales and marketing.   And I'm

15   sure Judge Liflin -- maybe I'm not right -- maybe you could

16   seek to be included in the antitrust part of his case, but

17   certainly I'm not going to allow the antitrust discovery to

18   go forward here.

19         MR. ROUHANDEH:   One other issue, your Honor, is

20   that plaintiff's counsel said that they opposed coming here.

21   Actually, they withdrew their objection to this case coming

22   to your Honor, coming to this MDL.   So I'm not quite sure

23   what counsel meant when she said that we wanted it here and

24   they didn't.   They withdrew any objection to that and

25   consented that it come here.   And another option we would lay

1    out there, your Honor, is simply to stay the antitrust

2    claims.  If they want to go file them in another court, file

3    them in another court, and then we're off to the races.

4            THE COURT:  What do you think about that?

5            MS. DALEY:  I'm not sure what he's saying.  I think

6    it's pretty much the same thing that you were suggesting,

7    which is to go ahead and agree to a stay of the antitrust

8    claims, which, frankly, we're not interested in staying the

9    antitrust claims, but --

10           THE COURT:  Well, but I'm curious as to -- I know

11   I'm not going to pick up antitrust as a third big cluster of

12   issues, so I could either stay it, or I could sever it and

13   send it down, and tell you to create two separate complaints,

14   and I don't know what you want me to do.

15           MS. DALEY:  And as to that, I have to kind of speak

16   with my clients, your Honor.

17           THE COURT:  You want to get back to me when, a

18   couple of weeks?

19           MS. DALEY:  I can get back to you the end of next

20   week.

21           THE COURT:  It almost doesn't matter because I'll

22   deal with the remand, and then it's just a question of remedy

23   once I make a decision.  And if I remand the whole thing,

24   it's the headache of someone in New Jersey; but if it's my

25   concern, then I'll do something along the lines of what we

1    just talked about with those two options.

2        MS. DALEY:  We have one more issue, your Honor, and

3    that is that we would like to file a supplemental brief on

4    the defendants' motion to dismiss certain of the actions that

5    are currently pending.  There are common issues that have

6    been raised in those motions to dismiss that would affect our

7    case.

8        THE COURT:  You're talking about the sales and

9    marketing piece?

10        MS. DALEY:  Yes, yes.  And I've talked to the

11    plaintiff's counsel.  They have no objection to --

12        THE COURT:  Yes, but for me, it's a -- as I

13    understand it, we've had the motion to dismiss papers and the

14    opposition papers filed, right?  And I'm still waiting for a

15    reply?

16        MR. ROUHANDEH:  A reply is due Monday, your Honor.

17        THE COURT:  And then a surreply comes in.  And why

18    are your issues different?

19        MS. DALEY:  It's not that the issues are

20    different.  There are some common issues.  One of the

21    motions -- one of the causes of action that the defendants

22    have moved to dismiss on is, for instance, the plaintiff's

23    New Jersey Consumer Fraud Act Claim.  We also have a New

24    Jersey Consumer Fraud Act Claim in our lawsuit, and we would

25    like to either intervene to file a supplemental brief to

1   address that issue or file a brief as an amicus.  And there

2   are --

3              THE COURT:  Well, let me just tell you, there are

4   limits to how much I can read, and I've been grappling with

5   that particular issue in both sets of MDLs.  Some cases have

6   stayed separate.  I don't remember how many there have been.

7              Do you remember?  Yours is separate, right?

8              MR. SHAPIRO:  We're somewhat different, yes, your

9   Honor.

10             THE COURT:  How have you been treated in this --

11             MR. SOBOL:  We've done coordinated briefing for the

12   plaintiffs.

13             MR. SHAPIRO:  Our brief we filed separate.

14             THE COURT:  You did not file a separate brief?  I

15   don't know why I need a separate brief.

16             MR. SOBOL:  Your Honor, I might suggest that if

17   we're not going to do that, what we'll do is, we'll make sure

18   that we confer with counsel for Assurant when filing our

19   reply to make sure that we've accomplished any other

20   additional arguments that they would want to make sure that

21   we covered.

22             MS. DALEY:  That would be fine, your Honor.

23             MR. SOBOL:  A surreply rather, whatever.  It will

24   be a little more brief, so whatever we can call it.

25             THE COURT:  That's fine.

Page 14

1          MS. DALEY:  That would be acceptable.  Thank you.

2          THE COURT:  You know, I'm sure -- I'm sorry, I

3    should know this.  Are you New Jersey counsel?

4          MS. DALEY:  Actually, I'm counsel for the New

5    Jersey case but from Minnesota, your Honor.

6          THE COURT:  Really.  How did that happen?

7          MS. DALEY:  We filed it in New Jersey, so --

8          THE COURT:  Welcome.

9          MS. DALEY:  Thank you, thank you.

10         THE COURT:  Are there any other issues?  Assurant?

11         MR. SOBOL:  I think that I just want to make sure

12   that the MDL plaintiffs state our position, which I think the

13   Court has already articulated.  We have no desire to push

14   forward with the antitrust claims here.  We think the MDL

15   counsel actually already made that decision and sent

16   antitrust and New Jersey sales and marketing here, so we're

17   content to proceed the way that you've suggested.

18         THE COURT:  Thank you.  Now, I notice on some of

19   the other agenda items you've requested a magistrate judge to

20   be assigned, and that's going to be Magistrate Judge Sorokin,

21   who was sworn in two days ago, and he's got a lot of time,

22   and he's really smart, and so he's -- I just spoke to him

23   before I came down here, and he will be your designated

24   hitter.

25         Now, there were some other issues.  What I would

Page 15

1    like is, I don't know who would be responsible.  I forget how

2    it was done in the AWP litigation for giving me essentially a

3    monthly chart on -- essentially like a guilt chart on my part

4    on what are the things I still need to be doing.

5            MR. SOBOL:  We did file with the status report,

6    your Honor, a guilt chart.  It sounds like you haven't seen

7    it, so we'll get it to you again, but --

8            THE COURT:  Well, we do have it.

9            MR. SOBOL:  Okay.

10           THE COURT:  So just on what kind of regular basis?

11           MR. SOBOL:  We usually do it the first of the

12    month, and that way defense counsel and plaintiffs'

13    counsel --

14           THE COURT:  As long as you're continuing to do it,

15    that's fine.

16           MR. ROUHANDEH:  Yes, that's fine.

17           THE COURT:  All right, now, the second thing is,

18    how many cases do I have now?  How many of them are there?

19    Mr. Rouhandeh, you probably have them all counted.

20           MR. GREENE:  I think I can respond to that, Judge.

21    This is a report dated 10/26/04, so it's a bit dated.

22           MR. SOBOL:  It's really old.

23           THE COURT:  That's really old because I've had

24    personal injury cases just flowing in here.

25           MR. SOBOL:  Well, we can give you a list, your

1    Honor, but on the guilt chart, there are in terms of the

2    class cases -- I'm going to stop using that expression --

3    otherwise it's going to stick --

4              MR. ROUHANDEH:  As an order of magnitude, there are

5    eight product liability cases that have recently been

6    transferred to this court.  A number remaining are

7    conditionally transferred, in the twenties.  In addition to

8    that, there have been some recent cases that have been

9    removed or were filed in Federal Courts elsewhere and that we

10   have tagged, which are consumer protection, marketing and

11   sales practices cases; and I'd say there's an order of

12   magnitude of ten or so of those, not more than ten, I

13   believe.

14             THE COURT:  And how many are already here?

15             MR. ROUHANDEH:  Well, the ones that are here, I

16   think we started with -- I think it was -- well, they have

17   been consolidated.  Whatever the number was, they were

18   consolidated into those two complaints, so many of them have

19   been consolidated into the class complaint.  And I can't

20   remember the order of magnitude there, thirty or forty cases.

21             MR. SOBOL:  Right, but they're all organized --

22             MR. ROUHANDEH:  They're all now in one consolidated

23   complaint, plus there's a second consolidated complaint which

24   consists of Aetna, two Kaiser entities, and Guardian Life.

25   So we have those two operative complaints and then these

1   other cases that --

2          THE COURT:  Where would Assurant go?  What makes

3   sense for you?

4          MR. SOBOL:  Assurant is a group of third-party

5   payers, much like the other group of third-party payers that

6   are at this time working with the class lawyers and moving

7   forward on the sales and marketing.  So that's where they --

8          THE COURT:  You think they fall under your

9   consolidated?

10         MR. SOBOL:  Yes.  Now, just to finish up, in terms

11  of the number of cases, on the sales and marketing side, the

12  consumer fraud, the third-party payer consumer cases, that

13  area, that's all actually pretty well organized right now;

14  and we're moving forward with the briefing and that kind of

15  thing, and that's all set.  On the personal injury side, you

16  essentially have two waves.  You have eight cases that are

17  already before you.  Five of them Mr. Finkelstein is the

18  counsel for, and then there are three others that, having

19  conferred with counsel, we have to make sure that we speak

20  with the plaintiff lawyers in those three other cases.

21         The MDL plaintiffs' position with respect to the

22  personal injury cases is that we can work seamlessly together

23  on discovery by -- not by coincidence.  My understanding is

24  that counsel for the defendant and Mr. Finkelstein in those

25  five other cases, at least as to some of those five other

1   cases, already had a discovery date deadline that they've

2   matched to your discovery deadline in this case in the MDL.

3   If we can reach out to the three other counsel for the other

4   personal injury cases, get their assent to a structure on the

5   personal injury side so we know who the lawyers are who are

6   in charge there, we can update the case management order that

7   we've already sent to you, but we need to confer a little bit

8   more on it.

9           THE COURT:  What I'd like to do is hear from the

10  personal injury folks too as to what are the differences they

11  anticipate.  I mean, obviously there are the individual

12  damages of the individual people, and then there may be

13  causation issues that are unique to, well, did the Neurontin

14  cause the suicide?  So those are two areas I thought of that

15  were different.  But what are the overlaps, and what are the

16  differences?

17          MR. FINKELSTEIN:  You've struck on the two

18  differences, the direct causation, and the overlap is the

19  marketing and sales promotion.

20          THE COURT:  Well, that's what persuaded, I think,

21  the Multidistrict Litigation to send it all here.

22          MR. FINKELSTEIN:  It's primarily causation, and

23  damages is the difference.  The similarity is on the

24  liability side.

25          THE COURT:  What would you like me to do -- I still

1  have a manageable number, if the numbers are right.  What do

2  you want me to do about discovery on the individual issues?

3           MR. FINKELSTEIN:  Well, your Honor, with respect to

4  discovery on the individual issues, we have court orders in

5  place from the court that it came from, Judge Rackoff.  We

6  also have several state court pending actions where we have

7  orders in place where our discovery schedule is outlined, and

8  we've worked with defense counsel already, and we're working

9  through those issues.  Ultimately I'm sure defense counsel

10  will be making a Daubert motion, and that will be brought

11  before your Honor.

12           THE COURT:  Well, see, that's very useful just even

13  to hear that.  As a recipient of many of these cases, often

14  more often in the area of product liability or a plane crash,

15  let's say, it's always annoying to me when I get them back

16  and nothing has been done on the individual case, by which I

17  mean the medical records of the plaintiff, the actual, you

18  know, what happened to the person, because maybe you don't

19  have to be stuck in this whole morass if it's clear that

20  there's no individual causation, something could dispose of

21  it.  So you're not, for example -- from the point of view of

22  a personal injury lawyer, there's usually a contingency --

23  you're not stuck in this whole morass if you can't prove up

24  causation, for example.  Or, similarly, it's annoying if

25  you've gone through two years here only to the get back

1    there, which I've had happen, and have another full year of

2    discovery just on what happened to this person; you know,

3    what were his other psychological factors?  So can we run

4    individual discovery parallel to what I would call the

5    overlapping discovery?

6           MR. SOBOL:  That's essentially what we contemplate,

7    is that the marketing and sales lawyers along with the

8    product liability lawyers would move forward together in

9    dealing with discovery issues in tandem, side by side,

10   essentially along the same schedule.  I'd also comment, your

11   Honor, that even though there are differences on causation in

12   the sense that obviously in an individual case, there needs

13   to be causation to some extent as to the individual's

14   incurrence of a personal injury, on the marketing and sales

15   side, we still grapple with a similar causation issue, which

16   is whether or not the product in the aggregate has the

17   propensity to cause that within a larger population, if you

18   will.  So we've already addressed the fact that there's quite

19   extensive overlap and therefore the need to move the cases

20   along side by side.

21          THE COURT:  Should I be consolidating the personal

22   injury actions under a master complaint, or should I be

23   keeping them separate?

24          MR. ROUHANDEH:  Your Honor, at this point I don't

25   believe they should be consolidated.  And the point you

1    raised about causation is a very important issue because

2    that's really our discovery, and we have been trying to get

3    medical records now since these cases were brought.  And

4    we're not in any position in any of those cases that we have

5    all of the medical records, and in fact we would have thought

6    the plaintiffs would have gathered up these medical records

7    before bringing their case.  But we're in the throes right

8    now of trying to get all the medical records so that we can

9    be in a position to make our motions with respect to

10   causation.  That is really a threshold issue that perhaps

11   should get resolved.

12              THE COURT:  I don't know as much about all of this

13   as you do as far as the law in the MDL.  So the theory would

14   be, I've got this common core of facts, which is why it was

15   sent here, the overlap; and then there are going to be very

16   unique issues with respect to what happened to each

17   individual person; and then perhaps some overlapping Daubert

18   issues.  So I'm trying to figure out whether it's the

19   position of the parties here that I would do the Daubert

20   hearing or I would send it back to the individual trial

21   judges.

22              MR. ROUHANDEH:  Your Honor, it would be our

23   position that you should hear the Daubert and motions for

24   summary judgment that we would make on terms of causation

25   because we think --

Page 22

1          THE COURT:  Even if a very individualized one.

2          MR. ROUHANDEH:  Both on general causation, which we

3    don't believe the general causation, and on the specific

4    individual causation issues; and that for that reason, that

5    discovery really needs to be getting going on an expedited

6    basis.

7          THE COURT:  I agree.  I think both need to be

8    because, first, I want plaintiffs to be ready to go to trial

9    if I rule in their favor and not have another year behind

10   them; and, second, if I think there's not a prayer to get

11   past Daubert, that you're not stuck in all of this other

12   discovery that just is going to -- some of it may be

13   irrelevant to you if you can't prove up causation.  So I

14   would like to -- I don't know if you're all prepared now,

15   whether you want to confer and give me case management orders

16   that I will just keep issuing.  And I think probably you

17   might have to negotiate separately for each case.

18          How many cases do you have under your belt, five?

19          MR. FINKELSTEIN:  Currently with this work, five.

20   There's another sixteen coming, conditionally transferred,

21   and there's another several more coming too.

22          Your Honor, we are happy to run joint discovery on

23   generic causation and specific causation on our individual

24   cases.  We have been and are continuously providing medical

25   records.

1          THE COURT:  But I just need a scheduling order.  I

2    need something that's going to trigger this.  So since it

3    sounds as if you're in most of these cases -- right?

4          MR. FINKELSTEIN:  Right.

5          THE COURT:  -- could you two negotiate a schedule?

6    And I think the way we worked it before, so it's not so

7    expensive and you're coming back here, is where you disagree,

8    you know, one does a parentheses and one does a bracket with

9    the explanation of the differences, and I just sit up in my

10   office and cherry-pick.

11         MR. FINKELSTEIN:  Your Honor, we've already done

12   that.  We're well ahead down the road here.

13         THE COURT:  I haven't signed it.

14         MR. FINKELSTEIN:  No, no, no --

15         THE COURT:  I sign so much.  I just keep signing.

16   So when do you think you could submit it to me?

17         MR. ROUHANDEH:  I would think within a week or

18   two.  What's been done so far is, they have provided a draft

19   two days before this conference, and it doesn't address a lot

20   of the issues your Honor is addressing.  And we think we

21   should try to address all of those issues, come back in a

22   week or two.

23         THE COURT:  A couple of weeks sound good to you

24   all?

25         MR. ROUHANDEH:  Fine.

Page 24

```
 1              THE COURT:  Okay, so that I'll get you all in a way
 2    that -- I, of course, want to run you in sync with the class
 3    action and the individual insurers on the overlapping issues,
 4    but also to make sure we don't let the other stuff drop by
 5    the wayside.  And I don't know enough about Daubert to know
 6    whether -- well, is it just going to be whether this guy's
 7    problems, let's say, unfortunately a suicide, is related to
 8    Neurontin, or whether it's generically whether Neurontin has
 9    been shown clinically to cause suicide?  I don't know enough
10    about it to even bring that question yet.
11              MR. FINKELSTEIN:  It's a two-step analysis, your
12    Honor.  It's, first, generically does it have the capability
13    to?  And then, secondarily, did it do it in this case?
14              MR. ROUHANDEH:  That's correct, your Honor, and we
15    would ask that your Honor address those issues and that those
16    cases stay here.
17              And just one further point on that.  I thought I
18    heard Mr. Finkelstein say more cases are coming.  I wasn't
19    sure because they objected to the sixteen other cases coming,
20    and just to know, for all of us to know, are they withdrawing
21    that objection, and are these cases coming to your Honor or
22    not?
23              MR. FINKELSTEIN:  That already has been withdrawn,
24    and I'm surprised counsel -- we served it on him as well last
25    week.
```

1          THE COURT:  Well, there's so much paperwork flowing

2     that he didn't see it.

3          MR. ROUHANDEH:  I haven't seen it, no.

4          THE COURT:  As you know, for anyone who's new here,

5     we require CM/ECF.  It's the only way we have been able to

6     keep on top of the paperwork here.  So I hope you're all

7     signed up.  We just had a problem last week with the lead

8     counsel from Tennessee who said he never got it, and so in

9     that other case, that's coming.  So for those of you who

10    didn't know, we were going back and forth on whether that's

11    possible or not with the systems people, which I don't

12    understand, but there's some, shall we say, disagreement

13    between the systems people and their systems people.  With

14    that being said, I just want to make sure that you at least

15    know that you're supposed to sign up for it.

16         MR. ROUHANDEH:  Well, your Honor, on that point,

17    counsel perhaps not only didn't send a letter to your Honor

18    with a bunch of attachments, which I believe liaison counsel

19    for the plaintiffs has now attached, but just so it's clear,

20    your Honor, as I understand, doesn't really accept these

21    letters, and that, in any event, everything has to go through

22    the ECF file so that everybody can see that.

23         THE COURT:  Yes, so that everything needs to go

24    through CM/ECF.  And I know some judges across the country --

25    you know, one of the great things about being on one of these

1  Judicial Conference committees for the country, you see the

2  different styles, and I know some judges in different parts

3  of the country operate that way.  I don't like letters.  I

4  mean, I prefer a motion because then I can act on a motion,

5  and then there's an opposition period, and it's just more

6  formalized.  So if you need me to do something, deem it a

7  motion, okay?

8           MR. FINKELSTEIN:  My letter was simply procedural

9  to give the Court a background as to what's happened to

10 date.  That's all it was.  It was not a request of anything.

11          THE COURT:  It's just easier for me if it's a

12 status report.  Another thing is, when it's a letter, it

13 comes through my personal chambers, and it gets screened by

14 the marshals.  You just really want to call it a status

15 report, a motion, something that will get deemed an event on

16 the docket.

17          Are we done?

18          MR. ROUHANDEH:  Just one final issue, your Honor.

19 And I'm not sure that liaison counsel has responded yet, but

20 we would like, as we did in our first brief on the motion to

21 dismiss, we filed a single joint brief.  In response, they

22 filed a single joint brief, and we would like on reply to

23 file a single reply brief.  And I assume while we're here,

24 they might be asking for the same in terms of the surreply.

25 And that way your Honor will get one -- and we keep filing

1    these motions to ask for permission to file the joint brief,

2    but -- and we're happy to hand one up.

3              THE COURT:  Allowed.

4              MR. ROUHANDEH:  Thank you.

5              MR. GREENE:  Judge, can I bring up an issue related

6    to discovery?  And I'm asking for the Court's guidance.  The

7    last time I was before you and we asked for your guidance and

8    you provided it to Mr. Rouhandeh and I on the Franklin fee

9    issue, we were able to resolve our dispute without coming

10   back before you.  We have a meet-and-confer scheduled next

11   Tuesday at Mr. Rouhandeh's office, and there are a number of

12   attorneys that are coming from across the country for that

13   meeting, and it's in response to Pfizer's objections to our

14   document requests and our interrogatories.  Mr. Finkelstein's

15   cases that are now part of this MDL, or the five that are

16   part of this MDL, have orders from a Federal Court that have

17   ordered production of sales and marketing documents, clinical

18   trials and clinical data, with no time limitation and no

19   geographic limitation.  Mr. Rouhandeh has continued to raise

20   the time restriction in his responses to us to December 31,

21   1998, and I think we can save a lot of briefing time and a

22   lot of time before the magistrate if we could get some

23   guidance from you.  You know that the class action that's

24   before you is national in scope and contains allegations up

25   to the present date.

1           THE COURT:  I read Judge Rackoff's opinion, if

2    that's what you're referring to.

3           MR. GREENE:  Yes, I am.

4           THE COURT:  It seemed reasonable, but, you know,

5    let me put it this way:  It seemed like a reasonable

6    guidepost to start with, but if someone's going to challenge

7    it, they should do it, and I will refer it to a magistrate

8    judge.  I don't know that I could hear arguments.  When I

9    read it -- and I know judge Rackoff is a very reasonable

10   person -- when I read it, it sounded reasonable.  I haven't

11   thought through the issues, and I'd hate to do that without

12   hearing the point/counterpoint, which is always so helpful.

13   And if there's a challenge, I think you should go in there

14   with that as a starting point; but if there's a serious

15   disagreement, you'll just have to go to the magistrate judge.

16          MR. ROUHANDEH:  That's fine, your Honor.  We

17   haven't even had a conversation with Mr. Greene, and Tuesday

18   is the date for our meet-and-confer, and there will be a lot

19   of issues on that agenda, including the fact that we were

20   served yesterday with -- and this is an actual number --

21   42,000 plus requests to admit, and so there are going to be

22   some discovery issues in this case.

23          THE COURT:  That can't be.

24          MR. ROUHANDEH:  But I think we should discuss them

25   next Tuesday before we bring it to your Honor to ask for

1    advisory opinions with respect to --

2              THE COURT:  Is that just a request to admit

3    authenticity of documents?

4              MR. GREENE:  Authenticity.  And you might recall we

5    discussed this with you and we raised it with Mr. Rouhandeh

6    in a hearing, and what the Court said is that it couldn't

7    impose anything beyond what the rules would require regarding

8    authenticity of the Franklin documents document by document,

9    and --

10             MR. ROUHANDEH:  Every single document, whether

11   it's -- whatever it is they have asserted, not every document

12   that they might ever even ask a witness about but every

13   single document.

14             MR. GREENE:  I think we would be able to resolve

15   this.  We tried to raise it last time, and we said this is

16   what would happen if we were forced to --

17             THE COURT:  I didn't know you were talking about

18   42,000 requests to admit.

19             MR. GREENE:  Well, it's all the Franklin

20   documents.  I mean, he's produced them.  He knows they're

21   Pfizer documents.  I think we ought to be able to resolve

22   this, to reach a stipulation without requiring him to respond

23   to each one.  It's very simple if he'd sit down and discuss

24   it with us.

25             THE COURT:  That's what you're supposed to do next

Page 30

1    week.  I tell you what, why don't you go through it.  It does

2    strike me, if it's just a question of whether they're

3    authentic documents, it's worth doing.  Literally someone sat

4    and typed out 42,000 requests?

5                    MR. GREENE:  With the computer, it was easy.

6                    MR. ROUHANDEH:  A box.

7                    MR. GREENE:  Ten volumes.

8                    THE COURT:  Yes, maybe we can do it a simpler way.

9    But, anyway, I'm sure Judge Sorokin will love cutting his

10   teeth.  I'm going to call him and tell him there are 42,000

11   requests to admit.  I'm going to send it to him right now and

12   make his weekend.  Anything else?

13                   MR. ROUHANDEH:  No, your Honor.

14                   THE COURT:  Have a wonderful weekend.  Good to see

15   you.  I'll take the remand issues under advisement.  And one

16   thing I'm going to issue is an order so that for the new

17   cases coming in, if there are any pending motions, make sure

18   they're scanned, refile them, because otherwise it doesn't

19   come in that way from non-CM/ECF courts.  And that was one of

20   the issues, and it's not your problem because the courts do

21   it all on the same system.  You probably assumed it would be,

22   and it wasn't, so just make sure I know about them.

23                   MS. DALEY:  We've been trying to get ourselves

24   registered, your Honor, and we still haven't been able to do

25   so, we have been trying for about six weeks.

Page 31

1              THE COURT:  No one knows more about this than

2   Mr. Alba, so --

3              MS. DALEY:  Who would that person be again?  All

4   right, thank you.

5              THE COURT:  Have a nice weekend.

6              THE CLERK:  Court is in recess.

7              (Adjourned, 2:45 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                C E R T I F I C A T E

2

3

UNITED STATES DISTRICT COURT )

4  DISTRICT OF MASSACHUSETTS      ) ss.

   CITY OF BOSTON                 )

5

6

7

8           I, Lee A. Marzilli, Official Federal Court

9  Reporter, do hereby certify that the foregoing transcript,

10 Pages 1 through 31 inclusive, was recorded by me

11 stenographically at the time and place aforesaid in Civil

12 Action No. 04-10981-PBS, In Re:  Neurontin Marketing and

13 Sales Practices Litigation, and thereafter by me reduced to

14 typewriting and is a true and accurate record of the

15 proceedings.

16          In witness whereof I have hereunto set my hand this

17 20th day of May, 2005.

18

19

20

21

22

23    _____

      LEE A. MARZILLI, CRR

24    OFFICIAL FEDERAL COURT REPORTER

25