UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re:  NEURONTIN MARKETING,           :
        SALES PRACTICES AND            :      MDL Docket No. 1629
        PRODUCTS LIABILITY LITIGATION  :
                                       :      Master File No. 04-10981
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                       :
THIS DOCUMENT RELATES TO:              :      Judge Patti B. Saris
                                       :
        ALL MARKETING AND              :      Magistrate Judge Leo T.
        SALES PRACTICES ACTIONS        :      Sorokin
                                       :
                                       :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM IN OPPOSITION TO THIRD-PARTY PAYOR PLAINTIFFS'
(A) MOTION FOR RECONSIDERATION OF DISCOVERY ORDER NO. 4, OR,
IN THE ALTERNATIVE, MOTION TO SUPPLEMENT THE RECORD,
<u>AND (B) OBJECTIONS TO DISCOVERY ORDER NO. 4</u>**

DAVIS POLK & WARDWELL
450 Lexington Avenue
New York, NY 10017
(212) 450-4000

*Attorneys for Defendants Pfizer Inc.
and Warner-Lambert Company*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................................ii

PRELIMINARY STATEMENT..............................................................................................1

ARGUMENT ...........................................................................................................................2

I.    THIS COURT SHOULD REVIEW DISCOVERY ORDER NO. 4
      ONLY FOR ABUSE OF DISCRETION AND CONFINE ITS
      REVIEW TO THE EXISTING RECORD .................................................................2

II.   THE DISCOVERY SOUGHT IS ESSENTIAL TO ESTABLISHING
      THE PARTIES' CLAIMS AND DEFENSES ............................................................4

      A.    The Medical Records Requested Are Needed To Determine the
            Conditions for which Neurontin Was Prescribed to Plaintiffs' Insureds ........5

      B.    Medical Records and Claims Data Are Needed To Establish
            the Efficacy of Neurontin for Particular Patients .............................................8

      C.    Medical Records and Claims Data Are Needed To Ascertain
            the Availability of Alternative Drugs ..............................................................11

III.  ANY BURDEN ASSOCIATED WITH THE PRODUCTION
      OF THE CLAIMS AND MEDICAL RECORDS SOUGHT
      IS OUTWEIGHED BY THE OBVIOUS BENEFIT ...................................................12

IV.   PLAINTIFFS' PRIVACY CONCERNS ARE ADDRESSED ADEQUATELY
      BY THE PROTECTIVE ORDER IN EFFECT AND SUPPLY NO BASIS
      FOR BARRING DISCOVERY .........................................................................16

V.    PLAINTIFFS' ARGUMENT REGARDING CONTROL
      IS BOTH UNTIMELY AND BESIDE THE POINT .................................................18

CONCLUSION......................................................................................................................21

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

<u>Page</u>

Conetta v. Nat'l Hair Care Ctrs., Inc., 236 F.3d 67 (1st Cir. 2001) .................................................. 2

Dubin v. E.F. Hutton Group, Inc., 125 F.R.D. 372 (S.D.N.Y. 1989) ............................................ 3

During v. City Univ. of N.Y., No. 05 Civ. 6992 (RCC), 2006 U.S. Dist. LEXIS 53684
    (S.D.N.Y. Aug. 1, 2006) ............................................................................................................ 4

Ellison v. Am. Nat'l Red Cross, 151 F.R.D. 8 (D.N.H. 1993).................................................. 3, 14

Heindel v. Pfizer, Inc., 381 F. Supp. 2d 364 (D.N.J. 2004) ............................................................ 9

Holmes Prods. Corp. v. Dana Lighting, Inc., 926 F. Supp. 264 (D. Mass. 1996)........................... 2

Jack M. Gelb, D.D.S., P.C. v. Kuriansky, 118 Misc. 2d 960, 461 N.Y.S.2d 981 (N.Y.
    Sup. Ct. 1983) ......................................................................................................................... 15

Nat'l Abortion Fed'n v. Ashcroft, 03 Civ. 8695 (RCC), 2004 U.S. Dist. LEXIS 4530
    (S.D.N.Y. March 19, 2004), aff'd sub. nom. Nat'l Abortion Fed'n v. Gonzalez,
    437 F.3d 278 (2d Cir. 2006) .................................................................................................. 17

Northwestern Mem'l Hosp. v. Ashcroft, 362 F.3d 923 (7th Cir. 2004)........................................ 17

Quinby v. WestLB AG, No. 04 Civ. 7406 (WHP) (HBP), 2006 U.S. Dist. LEXIS 64531
    (S.D.N.Y. Sept. 5, 2006) ......................................................................................................... 14

In re Rezulin Litig., Judicial Council Coordination Proceeding No. 4122
    (Cal. Sup. Ct. filed Apr. 29, 2003) ............................................................................................ 9

In re Rezulin Prod. Liab. Litig., 178 F. Supp. 2d 412 (S.D.N.Y. 2001) ....................................... 18

Rivera v. Wyeth-Ayerst Labs., 283 F.3d 315 (5th Cir. 2002)........................................................ 9

Seattle Times Co. v. Rhinehart, 467 U.S. 20 (1984)....................................................................... 4

Sheppard v. River Valley Fitness One, L.P., 428 F.3d 1 (1st Cir. 2005)...................................... 16

Soldo v. Sandoz Pharms. Corp., 244 F. Supp. 2d 434 (W.D. Pa. 2003) ....................................... 10

United Parcel Serv. v. Chadwick's of Boston, Ltd., 900 F. Supp. 557 (D. Mass. 1995)............... 3

United States ex rel. Stewart v. La. Clinic, Civ. A. No. 99-1767,
    2002 U.S. Dist. LEXIS 24062 (E.D. La. Dec. 11, 2002) ...................................................... 17

**Page**

United States v. Gioia, 853 F. Supp. 21 (D. Mass. 1994) ................................................................ 3

United States v. W.R. Grace, 401 F. Supp. 2d 1093 (D. Mont. 2005) ........................................... 16

Williams v. Purdue Pharma Co., 297 F. Supp. 2d 171 (D.D.C. 2003) ........................................... 9


**Statutes and Rules**

Fed. R. Civ. P. 26(b)(1) ................................................................................................................. 4

Fed. R. Civ. P. 26(c) ...................................................................................................................... 4

Fed. R. Civ. P. 30(b)(6) ................................................................................................................. 10

45 C.F.R. § 164.512(e) ................................................................................................................... 16

45 C.F.R. § 164.514(a) ................................................................................................................... 18


**Other Authorities**

Elizabeth R. Zell, Linda F. McCaig, Benjamin A. Kupronis, Richard E. Besser & Anne
    Schuchat, Ctrs. for Disease Control & Prevention, A Comparison of the National
    Disease and Therapeutic Index and the National Ambulatory Medical Care Survey to
    Evaluate Antibiotic Usage, 2000 Am. Stat. Ass'n Sec. Surv. Res. Methods 840 .................... 6

Medical Research Consultants, http://www.mrchouston.com ...................................................... 15

Stedman's Medical Dictionary (27th ed. 2000) .......................................................................... 20

Susan M. Schappert, Ctrs. for Disease Control & Prevention, Understanding and Using
    NAMCS and NHAMCS Data (2006) ....................................................................................... 6

Defendants Pfizer Inc. and Warner-Lambert Company (collectively, "defendants") by and through their attorneys, submit this Opposition to third-party payor plaintiffs' Objections to Discovery Order No. 4 ("Objs.") and their Motion for Reconsideration of Discovery Order No. 4, or, in the Alternative, Motion to Supplement the Record.

## PRELIMINARY STATEMENT

Third-Party Payor Plaintiffs ("plaintiffs") are now fighting tooth-and-nail not to provide discovery that is central to numerous disputed issues in the case. Plaintiffs' position is remarkable for any of a number of reasons, not least the fact that their own corporate representatives already have provided sworn deposition testimony in this case that many of the materials defendants seek are critical to assessing the viability of plaintiffs' claims. Plaintiffs, a collection of some of the largest and most commercially sophisticated insurance companies in the world, are left trying to cast themselves as thoroughly overwhelmed in providing information that goes to the heart of the claims that they elected to assert when they initiated this lawsuit and when they alleged that Neurontin did not work for their insureds (a position that, incidentally, they are in no position to espouse having failed to review the requested documents). Nor is there sufficient space in these papers to address all of the defects in plaintiffs' position that they are the defenders of consumer rights and that Magistrate Judge Sorokin's decision requiring them to produce in redacted form a small percentage of their records that will be subject to a HIPAA-compliant protective order somehow constitutes a clear abuse of his discretion.

In support of their position, plaintiffs proffer evidence that is much more than a day late and a dollar short. Plaintiffs had months to procure evidence supporting their position and their failure to do so lies not with Magistrate Judge Sorokin's briefing schedule but with their own lack of diligence. Regardless, even if the Court were to consider the plaintiffs' belated

1

arguments—we note that defendants' position on the relevance of these materials is supported by a medical doctor whereas plaintiffs' is supported, if at all, by an economist who apparently considers herself competent to opine on medical issues. The medical records and medical and pharmaceutical claims data at issue provide the best, if not the only, means available for establishing matters crucial to the parties' claims and defenses, in particular: (1) the conditions for which physicians prescribed Neurontin for plaintiffs' insureds; (2) the benefit that these insureds derived from prescriptions of Neurontin; and (3) the availability of any alternative medications that were as safe as or safer than Neurontin and as effective as or more effective than Neurontin for these insureds.

Magistrate Judge Sorokin carefully weighed the burdens of discovery against its obvious relevance and required plaintiffs to produce at this stage only two percent of the medical records. This discretionary determination was manifestly reasonable. Defendants respectfully request that the Court not disturb it.

## ARGUMENT

## I. THIS COURT SHOULD REVIEW DISCOVERY ORDER NO. 4 ONLY FOR ABUSE OF DISCRETION AND CONFINE ITS REVIEW TO THE EXISTING RECORD

As a threshold matter, this Court should reject plaintiffs' efforts to supplement the record with affidavits and other materials they failed to present to Magistrate Judge Sorokin. It is well settled that a district court's review of a magistrate judge's order on a non-dispositive matter should be limited to the existing record. See, e.g., Holmes Prods. Corp. v. Dana Lighting, Inc., 926 F. Supp. 264, 266 (D. Mass. 1996); cf. Conetta v. Nat'l Hair Care Ctrs., Inc., 236 F.3d 67, 74 (1st Cir. 2001) (speculating that a district judge might have authority to consider new evidence in exceptional circumstances, but holding that "in ordinary cases, limited review on the existing

record should be the rule"). Plaintiffs' complaint that they had only two days to prepare affidavits in opposition to defendants' motion to compel discovery is entirely spurious. See Plaintiffs' Motion to Reconsider at 1. They in fact enjoyed a full seven months over which to do so: Defendants initially moved to compel discovery on January 9, 2006, see Dkt. No. 402, before the stay on discovery was entered; the hearing on defendants' motion was only held on August 15, 2006, see Dkt. No. 461, after the stay had been lifted. Plaintiffs' apparent failure to prepare any affidavits or other materials in the seven intervening months eviscerates any claim that they were somehow caught off-guard by the presentation of this issue to Magistrate Judge Sorokin. Nor do plaintiffs offer any legal authority addressing remotely analogous facts that would suggest that supplementation of the record is appropriate here. This Court should deny plaintiffs' request.

Ultimately, however, whether the Court considers plaintiffs' newly introduced affidavits is immaterial to the disposition of their objections; as plaintiffs admit, each of the factual assertions and arguments underlying these affidavits was presented to Magistrate Sorokin at the hearing, and he plainly evaluated each of these assertions and arguments in crafting his order. Accordingly, Discovery Order No. 4 should not be disturbed absent a finding that Magistrate Judge Sorokin abused his discretion. See United Parcel Serv. v. Chadwick's of Boston, Ltd., 900 F. Supp. 557, 561 (D. Mass. 1995); United States v. Gioia, 853 F. Supp. 21, 26 (D. Mass. 1994); Dubin v. E.F. Hutton Group, Inc., 125 F.R.D. 372, 373–74 (S.D.N.Y. 1989) (holding that a magistrate judge deciding discovery disputes is entitled to "broad discretion, which will be overruled only if abused"); cf. Ellison v. Am. Nat'l Red Cross, 151 F.R.D. 8, 10 (D.N.H. 1993) (holding that a district judge "may reconsider the magistrate judge's [discovery] order only if the magistrate judge abused his discretion").

## II. THE DISCOVERY SOUGHT IS ESSENTIAL TO ESTABLISHING THE PARTIES' CLAIMS AND DEFENSES

The Federal Rules of Civil Procedure establish a strong presumption that "[p]arties may obtain discovery regarding any matter, not privileged, that is relevant to the claims or defenses of any party." Fed. R. Civ. P. 26(b)(1). While plaintiffs elect to emphasize the privacy interests purportedly implicated by Discovery Order No. 4 and the putative burdens that compliance would entail, these concerns seldom warrant the extraordinary relief that plaintiffs seek: an absolute prohibition on the discovery sought. Issues of expense are commonly addressed through agreement of the parties. Likewise, "when valid privacy interests exist, the proper remedy tends to be the use of an appropriate protective order under Rule 26(c), not the barring of discovery altogether." During v. City Univ. of N.Y., No. 05 Civ. 6992 (RCC), 2006 U.S. Dist. LEXIS 53684 (S.D.N.Y. Aug. 1, 2006) (citing Seattle Times Co. v. Rhinehart, 467 U.S. 20, 32 (1984)).

Moreover, while plaintiffs repeatedly mischaracterize the claims data and medical records sought as "approach[ing] the outer bounds of relevance" (Objs. at 4), these data and records in fact go to the very core of the parties' claims and defenses. Plaintiffs provide absolutely no credible basis to disturb Magistrate Judge Sorokin's conclusions in this regard. In particular, the claims data and medical records sought are needed to determine (1) the condition for which each Neurontin prescription was written; (2) whether Neurontin was effective in treating the individuals for the condition for which it was prescribed; and (3) what less expensive, alternative drugs, if any, could have been prescribed for each individual in lieu of Neurontin.

A.    **The Medical Records Requested Are Needed To Determine the Conditions for which Neurontin Was Prescribed to Plaintiffs' Insureds**

Of obvious—indeed, critical—relevance to these actions are the conditions for which physicians prescribed Neurontin to individual patients.  As the plaintiffs acknowledge, they cannot recover for Neurontin prescriptions written for an FDA-approved use.  Likewise, this Court has previously held that plaintiffs can only recover for off-label uses for which plaintiffs can establish that Neurontin is ineffective and with respect to which Defendants made fraudulent misrepresentations.  (Dkt. No. 356 (June 12, 2006 Order) at 20 (adopting Dkt. No. 269 (Jan. 31, 2006 Rep. & Recommendation) at 37–42).)  Medical records, which contain the official documentation of the patient's visits to his or her physician or healthcare provider, will contain the most accurate information regarding why Neurontin was prescribed by the physician, including whether that prescription was for an off-label use.  (Dkt. No. 430 (Declaration of Keith E. Argenbright, M.D., dated Aug. 11, 2006 ("Argenbright Decl.")) ¶¶ 16–19.)

Plaintiffs nonetheless dismiss the "examin[ation of] individual patient records to determine the number and cost of Neurontin prescriptions written for each specific off-label condition and paid for by the plaintiffs" as "not necessary," (Objs. at 2), contending that "[t]here is an entire sub-industry . . . that track[s] and analyze[s] prescription activity by patient diagnosis" (Objs. at 10 (citing Declaration of Meredith Rosenthal ("Rosenthal Decl.") ¶¶ 7–8 & n.5–8)).  The "entire sub-industry" that plaintiffs reference, however, is apparently comprised in principal part of "two national databases," namely, the National Disease and Therapeutic Index ("NDTI") and the National Ambulatory Medical Care Survey ("NAMCS").  (Rosenthal Decl. ¶ 7.)  Neither of these databases provides even a remote substitute for the medical records and claims data that plaintiffs are fighting so mightily to keep defendants from reviewing.

5

First, both NAMCS and NDTI are based on limited survey samples, and neither can provide estimates of sufficient precision and reliability to render it a viable substitute for the medical records and claims data in plaintiffs' possession and control. The NAMCS is not a simple random sample, but is instead characterized by "[c]lustering effects of visits within the physician's practice, physician practices within PSUs, clinics within hospitals." Susan M. Schappert, Ctrs. for Disease Control & Prevention, Understanding and Using NAMCS and NHAMCS Data 40 (2006), available at www.cdc.gov/nchs/ppt/duc2006/Schappert_35.ppt. Accordingly, those utilizing NAMCS data must devise "some method to calculate standard errors for frequencies, percents, and rates." Id. As for NDTI, because "information on many of the key elements of the NDTI is proprietary, the validity and reliability of the data are unknown." Elizabeth R. Zell, Linda F. McCaig, Benjamin A. Kupronis, Richard E. Besser & Anne Schuchat, Ctrs. for Disease Control & Prevention, A Comparison of the National Disease and Therapeutic Index and the National Ambulatory Medical Care Survey to Evaluate Antibiotic Usage, 2000 Am. Stat. Ass'n Sec. Surv. Res. Methods 840, 842 [hereinafter Comparison of NDTI and NAMCS], available at http://www.amstat.org/sections/SRMS/proceedings/papers/2000_143.pdf.

An effort by the Centers for Disease Control and Prevention to estimate the number of occasions on which the antibiotic amoxicillin was prescribed for upper respiratory infection ("URI," i.e., the common cold) from NAMCS and NDTI underscores the inadequacy of these surveys as substitutes for medical records and claims data. Estimates of the number of patient encounters in 1996 in which URI was diagnosed varied from 20.9 million to 32.2 million using NAMCS data, and from 22.6 million to 27.8 million using NDTI data. Id. at 845. Although amoxicillin is "the most commonly prescribed antibiotic at physician office visits," id. at 840, the

NAMCS and NDTI estimates for the percentage of patient encounters in which amoxicillin was prescribed also varied widely: using NAMCS data, the estimate was between 20.57–34.69 percent; using NDTI data, the estimate was between 19.02–24.04 percent. Id. at 845. Notably, the midpoint derived from NAMCS data (27.63 percent) lies outside the range derived from NDTI data. Id. Given the magnitude of the damages that plaintiffs seek in this litigation, crude and conflicting estimates of the sort provided by NAMCS and NDTI are plainly no substitute for the actual medical records of the insureds for whose treatment plaintiffs seek recovery.

Second, even assuming, counterfactually, that the NDTI and NAMCS were capable of supplying precise and reliable estimates of "the aggregate numbers of Neurontin prescriptions by diagnosis" (Rosenthal Decl. ¶ 5), neither database supplies other information that is critical to the resolution of these actions. NAMCS, for instance, associates up to six medications and up to three diagnoses with each patient visit, but offers no reliable means of linking a particular medication to a particular diagnosis. See Comparison of NDTI and NAMCS, supra, at 842. Moreover, a prescription drug's efficacy for a particular condition will depend on dosage, administration, and regimen, but NAMCS does not supply this information. See id. Moreover, neither NDTI nor NAMCS provides any means of matching diagnoses with other information relevant to assessing efficacy, such as other medications particular patients were taking and whether patients and their doctors reported that Neurontin was effective for the purposes for which it was prescribed. Id. at 841–42. They also offer no means of linking diagnoses to the prescriptions at issue in this case and for which plaintiffs are attempting to recover damages.[1]

---

[1] While plaintiffs argue that defendants routinely rely on these reports in the course of their business, (Objs. at 10), and that peer-reviewed journals publish articles using this data, (id.), such arguments are specious as they ignore the fact that higher quality data, such as medical records, are frequently unavailable, but would be relied upon if available.

Plaintiffs, the largest insurance carriers in the United States, have initiated a suit alleging that defendants, over a period spanning more than a decade, misrepresented Neurontin's effectiveness for treating numerous medical and psychiatric conditions. By advancing these allegations, the plaintiffs put the medical records and claims data of their individual insureds squarely at issue, as only these records and data can establish, <u>inter alia</u>, the conditions for which these insureds were prescribed Neurontin. (Argenbright Decl. ¶¶ 16–19.) Nonetheless, plaintiffs now refuse to produce even two percent of the relevant records; instead, plaintiffs would have the defendants rely on demonstrably flawed, aggregate estimates constructed from limited surveys that do not contain vital information of limited samples of physicians' offices. Magistrate Judge Sorokin's decision not to wholly excuse plaintiffs from the inconvenience of proving their rights to recovery cannot be deemed an abuse of discretion.

**B.    Medical Records and Claims Data Are Needed To Establish
the Efficacy of Neurontin for Particular Patients**

The medical records sought are also critical because they are the only means available for establishing whether Neurontin was effective for each insured for whose treatment plaintiffs seek to recover.[2] Plaintiffs counter that individual medical records are irrelevant to Neurontin's efficacy, but in so doing, they conflate the concepts of general and specific causation.

Plaintiffs appropriately concede that in order to prove that Neurontin is generally ineffective in treating a particular condition, they will need to establish Neurontin's inefficacy for that condition through randomized, double-blind, placebo-controlled study results. (Objs. at 2–3 (conceding that, "[a]s Defendants successfully argued in a related case, causation (or in this

---

[2] As plaintiffs' have conceded, they must prove that Neurontin was ineffective for their insureds before they can recover. (*See* Dkt. No. 356 (June 12, 2006 Order) at 23 (adopting Dkt. No. 269 (Jan. 31, 2006 Rep. & Recommendation) at 21-22.)

case, efficacy) can only be proven through properly designed and controlled studies, not a post-hoc analysis of individual case files").)

Even if plaintiffs are able to prove Neurontin's general inefficacy for a particular condition through properly designed and controlled studies, however, plaintiffs can only recover to the extent Neurontin was ineffective in treating plaintiffs' individual insureds.  An individual who was "prescribed a drug for [a particular condition], and who personally suffered no ill effects or lack of efficacy, can[not] sue for damages . . . as [a] consumer[] injured by [a] drug manufacturer['s] allegedly-fraudulent advertising claims."  Williams v. Purdue Pharma Co., 297 F. Supp. 2d 171, 172 (D.D.C. 2003); see also Rivera v. Wyeth-Ayerst Labs., 283 F.3d 315, 320 (5th Cir. 2002); Heindel v. Pfizer, Inc., 381 F. Supp. 2d 364, 380–81  (D.N.J. 2004); In re Rezulin Litig., Judicial Council Coordination Proceeding No. 4122 (Cal. Sup. Ct. filed Apr. 29, 2003) (attached as Ex. C to Declaration of Patrick J. Murray, dated April 10, 2006 (Dkt. No. 305)).  See generally Williams, 297 F. Supp. 2d at 178 (explaining that such plaintiffs, "[w]ithout a particularized injury, . . . do not have standing to proceed in court").  If an individual who personally suffers no ill effects or lack of efficacy cannot sue for damages, it necessarily follows that that individual's insurer cannot sue to recover payments made on that individual's behalf. Hence, plaintiffs right to recovery depends both on establishing Neurontin's general inefficacy in treating a given condition (general causation) and in establishing that Neurontin was unsuccessful in treating the plaintiffs' individual insureds (specific causation).

Plaintiffs properly note that "'the great weight of authority—and the most current authority—squarely rejects the use of . . . case reports for the purpose of establishing *general causation*.'"  (Objs. at 14 n.12 (quoting Soldo v. Sandoz Pharms. Corp., 244 F. Supp. 2d 434, 537 (W.D. Pa. 2003))) (emphasis added).  Plaintiffs err—and turn both common sense and

9

standard medical practice on their heads—in arguing that examination of an individual patient's medical records is wholly irrelevant to determining whether Neurontin was effective in treating a particular condition "for that particular patient" (i.e., specific causation).  (Objs. at 3.  Cf. Argenbright Decl. ¶¶ 21–22 ("[M]edical records will contain the best evidence of whether Neurontin was effective for each patient who took Neurontin.").)  Notably, despite the obvious importance of this issue, plaintiffs have found no physician or pharmacist willing to attest to this improbable statement.  Indeed, witnesses designated by plaintiffs pursuant to Rule 30(b)(6) to testify on plaintiffs' behalves testified to the contrary.  Asked how Blue Cross and Blue Shield of Louisiana would go about finding "in which cases Neurontin was effective for its members," Milam W. Ford, director of pharmacy services for Louisiana Blue Cross testified that "the medical records that a prescribing physician might keep in their office, that would probably be the best written source."  (Deposition of Milam W. Ford, Jan. 20, 2006 (excerpts attached to the Declaration of Matthew B. Rowland, dated September 25, 2006 ("Rowland Decl."), Ex. A), at 439:3–441:4.)  Asked how one would go about finding "in which cases Neurontin was effective for ASEA's coverage for individuals," Colleen Savoie, a consultant who has advised plaintiff ASEA/AFSCME Local 52 Health Benefits Trust regarding prescription drug benefits, likewise testified, "Well, presumably, you would have to look at the medical records of the individual participants and have them reviewed by a medical expert."  (Deposition of Colleen Savoie, Jan. 16, 2006 (excerpts attached as Rowland Decl. Ex. B), at 221:21–222:15.)

Plaintiffs' contention that the benefit individuals derived from Neurontin may be attributable to a placebo effect in no way alters the relevance of the medical records at issue.  As a threshold matter, it is unclear how plaintiffs will prove that Neurontin is generally ineffective for a given off-label use and, additionally, prove that any benefit experienced by any insured was

attributable a placebo effect.  Moreover, physicians are aware of the placebo effect and are aware of how to form medical judgments accounting for the placebo effect.  Plaintiffs are free to argue that, in individual cases in which their insureds found Neurontin helpful for an off-label use, the improvement in their insureds' conditions was in fact attributable to the placebo effect, but the availability of that argument hardly supplies a basis for denying defendants' access to discovery.

Finally, even randomized, double-blind, placebo-controlled studies can only supply evidence of efficacy or inefficacy for particular conditions under the particular therapeutic regimen studied.[3]  Accordingly, even if plaintiffs were entitled to recover payments made on behalf of their insureds who found and continue to find Neurontin to be helpful in treating their conditions, review of medical records would be necessary to determine whether the therapeutic regimens followed by these insureds match the regimen studied during the course of a particular clinical trial.

C.     **Medical Records and Claims Data Are Needed To Ascertain the Availability of Alternative Drugs**

The Coordinated Plaintiffs advanced as a measure of their alleged damages the difference between the price of Neurontin and the cheaper, alternative drugs that supposedly could have been prescribed for each individual in lieu of Neurontin.  (See Second Coordinated Amended Complaint ¶¶ 173–74.)  Examination of individual records is obviously critical to determining what drugs, if any, had been prescribed for each patient before Neurontin and to assessing what other drugs, if any, may have been available in lieu of Neurontin.  (Argenbright Decl ¶ 20.)  In

---

[3] The Second Amended Class Action Complaint, for instance, alleges that the author of a clinical study regarding Neurontin's use for diabetic neuropathy concluded that Neurontin "is probably no more effective than a placebo in the treatment of painful diabetic neuropathy."  (Second Amended Class Action Complaint (Dkt. No. 379) ("SACAC") ¶¶ 133–135.  The clinical trial in question, however, only studied Neurontin's general efficacy at a particular dosage (900 mg/day), and the author limited his conclusions accordingly.  (See Declaration of Patrick J. Murray, dated Mar. 3, 2006 (Dkt. No. 285) ("Murray Decl."), Ex. 5 at W06828.)

11

their Objections, however, plaintiffs now dismiss "attempting to divine what alternative drugs would have been prescribed for each patient based on their individual medical records" as "pure speculation." (Objs. at 3.) If measuring Coordinated Plaintiffs' damages with respect to an individual patient is "pure speculation" even with access to that individual's medical records and medical and pharmaceutical claims data, it is unclear how Coordinated Plaintiffs can possibly prove their damages without such information.

### III.   ANY BURDEN ASSOCIATED WITH THE PRODUCTION OF THE CLAIMS AND MEDICAL RECORDS SOUGHT IS OUTWEIGHED BY THE OBVIOUS BENEFIT

Plaintiffs repeatedly complain of "the extraordinary burden imposed on the TPPs in gathering and redacting these [medical] records" and state that at least one plaintiff, Aetna, would be required to "create special computer programming" in order to produce non-Neurontin prescription drug claims data and medical claims data. (Objs. at 3, 8.) These are remarkable complaints for the massive corporations who have initiated this lawsuit and demanded far-reaching discovery from defendants. Moreover, these arguments supply no basis for disturbing Discovery No. 4.

The non-Neurontin prescription claims data, medical claims data, and medical records sought from the third-party payor plaintiffs are highly relevant and in fact crucial to the parties' claims and defense. See supra pp. 4–12. Plaintiffs' complaints ring especially hollow in these circumstances:

First, the Coordinated Plaintiffs, together with the putative class of third-party payor plaintiffs, comprise all insurance companies in the United States, and as large institutions, are well aware of the burdens of large-scale litigation. These highly sophisticated companies elected to initiate this lawsuit and should not be heard to complain when defendants seek access to the

12

facts that will allow them to defend it.  As set forth above, without reference to the medical records and claims data sought, the third-party payor plaintiffs cannot establish either (1) the conditions for which Neurontin was prescribed, (2) Neurontin's effectiveness in treating these conditions for particular patients, or (3) the availability of any less expensive alternatives to Neurontin for particular patients.  Simply put, defendants are entitled to discovery into the facts that the plaintiffs' complaints have put in issue.

Second, despite defendants' having filed their motion to compel seven months before its August 15, 2006 hearing, the third-party payor plaintiffs provided no evidence respecting burden to the Magistrate Judge.  The Magistrate Judge, however, nonetheless recognized the "burden and expense" of supplying medical records, (Discovery Order No. 4 at 2), and determined in his order to place the least amount of burden on the plaintiffs by requiring them to produce at this stage only a random two percent of the relevant medical records.  (Id. at 3.)  Despite plaintiffs' protests to the contrary, it is clear that the Magistrate Judge duly considered the burden imposed by the discovery ordered and found that it was outweighed by the likely benefit.  The Magistrate Judge's weighing of burdens and benefits could only be disturbed if plaintiffs established that he abused his discretion, Ellison v. Am. Nat'l Red Cross, 151 F.R.D. at 10, and Discovery Order No. 4—which requires plaintiffs to produce only a minute fraction of the records needed to substantiate their claims of inefficacy—can by no means be deemed such an abuse.

Third, the plaintiffs overstate the burdens of production.  The plaintiffs use the claims data sought in the course of their businesses.  And while plaintiffs make much of the fact that at least one of them "would be required to create special computer programming" to generate electronic reports reflecting the medical and prescriptions claims data of its subscribers who were prescribed Neurontin, (Objs. at 8–9), parties to litigation must frequently create computer

13

programs to extract information responsive to another party's discovery requests from their internal databases.[4]  Furthermore, plaintiffs obviously are sophisticated enough entities that, in launching this lawsuit, they must have anticipated that they might be required to produce medical records and claims data needed to substantiate their claims.  To the extent that plaintiffs, despite this knowledge, maintain their claims data in an inaccessible format, they should not be excused from their discovery obligations as a result.  Cf.  Quinby v. WestLB AG, No. 04 Civ. 7406 (WHP) (HBP), 2006 U.S. Dist. LEXIS 64531, at *30 (S.D.N.Y. Sept. 5, 2006) ("[I]f a party creates its own burden or expense by converting into an inaccessible format data that it should have reasonably foreseen would be discoverable material at a time when it should have anticipated litigation, then it should not be entitled to shift the costs of restoring and searching the data.").

Plaintiffs similarly overstate the burdens associated with producing the medical records at issue.  Cases involving "mass disclosure of individual health records," (Objs. at 5), are hardly unusual, see, e.g., Jack M. Gelb, D.D.S., P.C. v. Kuriansky, 118 Misc. 2d 960, 962, 461 N.Y.S.2d 981, 982 (N.Y. Sup. Ct. 1983) (denying corporate petitioner's motion to quash subpoena requiring it to produce medical records, billing records and related corporate records encompassing 250,000 patient files, and holding that parties "cannot complain of the magnitude of their own operation as a basis for resisting compliance with otherwise lawful subpoenas"); many such cases involve disputes between plaintiffs and hospitals or physician groups.  (Cf. Objs. at 7 n.6 (acknowledging that plaintiffs may obtain their insureds' medical records for

---

[4] Plaintiffs also complain of the difficulty of providing medical and prescription claims data for a different time period for each insured for whom Neurontin was prescribed.  (Objs. at 9.)  Plaintiffs can avoid this professed difficulty altogether, however, by producing all claims data for the insureds at issue from 1994 to the present.  Defendants would agree only to use the claims data from one year before a given insured's first Neurontin prescription until one year after the insured's last Neurontin prescription.

"billing disputes with the provider or adjudicating . . . claim[s]").)  Indeed, medical records for over a hundred individuals have been disclosed in the Neurontin products liability cases pending before this Court.  To the extent the volume of medical records ordered produced in this case exceeds the volume ordered in other cases, that simply reflects the unprecedented nature of the litigation that plaintiffs have initiated:  It is not often that the entire U.S. insurance industry seeks to recover damages for drugs that have been effective for the conditions for which they were prescribed.  Moreover, the burden associated with retrieving and reviewing medical records is significantly alleviated by the existence of numerous data providers, such as those employed by defendants in the products liability cases, that visit physicians' offices and collect and copy medical records.  See, e.g., Medical Research Consultants, http://www.mrchouston.com (last visited Sept. 23, 2006) (homepage of consulting firm offering litigation-related medical record retrieval, management, analysis and review services).

Finally, defendants are willing to discuss whether there are strategies to alleviate the burdens that producing the ordered discovery would entail.  For instance, defendants may be willing to share the cost of retrieving the medical records sought or to assist in creating any computer routines required to correlate plaintiffs' medical and pharmacy claims data if plaintiffs are willing to share the costs plaintiffs' discovery has imposed upon defendants.  Plaintiffs, notably, have never approached defendants about finding mutually agreeable solutions to mitigating discovery-related burdens.  Instead, plaintiffs have sought to exploit the burdens of discovery in order to deny defendants access to these records and claims data for fear of what these records and data will show.

**IV.     PLAINTIFFS' PRIVACY CONCERNS ARE ADDRESSED
        ADEQUATELY BY THE PROTECTIVE ORDER IN EFFECT
        AND SUPPLY NO BASIS FOR BARRING DISCOVERY**

Plaintiffs also mischaracterize Discovery Order No. 4 as sanctioning an "unprecedented intrusion into the private medical and psychiatric records of thousands of non-parties to this litigation."  (Objs. at 2; see also id. at 4 (citing "serious privacy concerns implicated by the production of the medical records of thousands of non-parties").)  Plaintiffs' argument that privacy concerns preclude the production of the claims data and medical records sought by defendants is nothing more than a red herring.  As previously explained, these records are crucial to defendants' ability to defend themselves successfully in this action, and the privacy concerns raised by plaintiffs should be alleviated by the HIPAA-compliant protective order that the Court already has entered in this case.[5]  45 C.F.R. § 164.512(e); see also United States v. W.R. Grace, 401 F. Supp. 2d 1093 (D. Mont. 2005) (allowing production of medical records in light of the qualified protective order in place); United States ex rel. Stewart v. La. Clinic, Civ. A. No. 99–1767, 2002 U.S. Dist. LEXIS 24062 (E.D. La. Dec. 11, 2002) (same).

Furthermore, and in spite of plaintiffs' counsel's profession of ignorance, courts have on a number of occasions required that individual medical records of non-parties be produced.  See, e.g., Nat'l Abortion Fed'n v. Ashcroft, 03 Civ. 8695 (RCC), 2004 U.S. Dist. LEXIS 4530 (S.D.N.Y. March 19, 2004) aff'd sub nom. Nat'l Abortion Fed'n v. Gonzalez, 437 F.3d 278 (2d Cir. 2006); Stewart, 2002 U.S. Dist. LEXIS 24062.  Indeed, the very insureds whose medical

---

[5] In their opposition to defendants' motion to compel, plaintiffs also asserted the argument that some states' statutes governing the use of medical records were more stringent than the requirements of HIPAA and could impose additional requirements on or forbid the use of the medical records at issue.  (Pls.' Opp'n (Dkt. No. 422) at 7-8.)  Notably, plaintiffs' do not raise this argument in their objections and so must be deemed to have waived it. See Sheppard v. River Valley Fitness One, L.P., 428 F.3d 1 (1st Cir. 2005) (holding failure to include a particular argument in objections to magistrate's order prevented the objecting party from challenging that portion of the ruling).

records have been sought are also members of the putative class of individual consumers and, should those claims survive, would need to produce these medical records in any event in order to establish any individual rights to recovery they may have.

The third-party payor plaintiffs also posit that their insureds would be "outraged to learn that their personal medical and/or psychiatric records had been disclosed in this litigation." (Objs. at 6.)  These plaintiffs' belated concern for their insureds' privacy interests is manifestly disingenuous given that the third-party payor plaintiffs themselves placed these records at issue by initiating this suit and alleging that Neurontin was ineffective in treating their insureds. (SACAC ¶ 271.)  The third-party payor plaintiffs cannot evade their burden to establish their respective rights to recovery by using the privacy interests of their insureds as a shield.

Plaintiffs' continued reliance on Northwestern Memorial Hospital v. Ashcroft is inapposite since that case involved the unique circumstances of a government third-party subpoena to a hospital for medical records of women who had undergone an abortion procedure that Congress had recently criminalized.  362 F.3d 923, 929 (7th Cir. 2004) ("This is hardly a typical case in which medical records get drawn into a lawsuit.").  Moreover, the decision turned on the fact that, unlike defendants here, the government, despite "repeated opportunities to articulate a use for the records that it [sought], . . . ha[d] failed to do so."  Id. at 930 (observing that even the amplified privacy interests at stake would "not necessarily justify withholding probative evidence").  Moreover, plaintiffs can de-identify the medical records by redacting any individually identifiable health information, thus alleviating any potential privacy issue.[6]  See 45

---

[6] Plaintiffs cite Discovery Order No. 4 in their objections for the proposition that redaction of the medical records sought is required to achieve HIPAA compliance.  (Objs. at 8.)  In fact, however, plaintiffs' quote is taken out of context and omits the first part of the quoted sentence, which states in full:  "All documents produced pursuant to this Order, or otherwise, must comply with all applicable [HIPAA] requirements and, if necessary, the party producing the document must redact it to achieve [HIPAA] compliance."  (Discovery Order No. 4 at 1.)

C.F.R. § 164.514(a); In re Rezulin Prod. Liab. Litig., 178 F. Supp. 2d 412, 416 (S.D.N.Y. 2001).

Notably, this is exactly the approach that defendants have taken in producing voluminous

documents and information containing patient information such as communications with the

FDA, adverse event reports, and clinical trial records.

## V.    PLAINTIFFS' ARGUMENT REGARDING CONTROL IS BOTH UNTIMELY AND BESIDE THE POINT

Plaintiffs note in an aside that they, with the exception of third-party payor plaintiff

Kaiser, do not admit that the medical records sought by defendants' motion to compel are even

within their control.  (Objs. at 7 & n.6.)  This, apparently, is a preview of plaintiffs' next

argument before this Court should their objections not be successful in overturning Discovery

Order No. 4.  Magistrate Judge Sorokin specifically inquired as to plaintiffs' control over the

medical records at the hearing on defendants' motion to compel held on August 15, 2006.  (Tr.

(Dkt. No. 461) at 13:22–19:21 (cited in Objs. at 7 n.6).)  Notwithstanding the fact that plaintiffs'

filed their objections brief one month later on September 14, 2006 they claim that "without

examining each of the innumerable contracts between the TPPs and the prescribing physicians,

the TPPs cannot determine whether they have an unconditional right to obtain their subscribers'

medical records, or whether they may only obtain them for limited purposes, such as resolution

of billing disputes with the provider or adjudicating the claim."  (Objs. at 7 n.6.)

Each of the third-party payor plaintiffs has the right to obtain the medical records

requested for the purposes of adjudicating claims, investigating fraud, and other reasons.  This

litigation was brought because the third-party payor plaintiffs claim that they were defrauded by

defendants; the medical records constitute necessary proof of their fraud claims, and so are

within their "control" for the purposes of discovery.  Perhaps these contracts are "innumerable,"

but an examination of those produced to defendants demonstrates that the contracts for a given

18

third-party payor contain almost identical provisions regarding the right to examine medical records.  For example, in both provider and member contracts third-party payor plaintiff Louisiana Health has inserted a provision governing access to records that states in relevant part: "Each Member receiving care under this Contract authorizes and directs any Provider to furnish to the Company, at any time upon its request, all information, records . . . relating to attendance, diagnosis, examination , or treatment.  . . . The Company will hold such information, records, or copies of records, as confidential except where in its discretion the same should be disclosed." (Rowland Decl. Ex. C at BCBSLA-000033; see also id. Ex. D at BCBSLA-000098; id. Ex. E at BCBSLA-003137–38.)  Coordinated Plaintiff Aetna has a similar provision in its contracts. (See Rowland Decl. Ex. F at Aetna 000911–12.)  Coordinated Plaintiff Kaiser does not even dispute that it has control over these medical records.  (See Plaintiffs Kaiser Foundation Health Plan, Inc. and Kaiser Foundation Hospitals Responses and Objections to Defendants' Second Request for Production of Documents (Rowland Decl. Ex. G) at 5.)  These plaintiffs obtain medical records for their own purposes regularly in the course of their business and also share them with third-party business associates such as utilization review providers.  See Stedman's Medical Dictionary (27th ed. 2000) (defining "managed care," stating:  "Managed care organizations typically employ const-containment measures such as . . . audits of medical records . . . .").  Self-serving and unsupported arguments claiming a lack of control should be disregarded and plaintiffs should be ordered to produce the requested medical records.

Furthermore, these plaintiffs have had not just one month to investigate this issue, as they claim, but at least ten months or arguably longer.  Defendants served the third-party payor plaintiffs with a First Request for the Production of Documents in May of 2005, each of which contained a request that sought "All documents, including medical records, concerning

Plaintiff's Members' treatment with Neurontin."  (See, e.g., Declaration of Patrick J. Murray, dated July 27, 2006 (Dkt. No. 404-1) ("Murray Decl.") Ex. 1, at Request No. 54.)  Then on November 15, 2005, defendants served a Second Request for Production on the third-party payor plaintiffs, which included only one request:  "All medical records from the prescribing provider for each of Plaintiff's covered persons who were prescribed Neurontin for an off-label use for which Plaintiff claims damages."[7]  (See, e.g., Murray Decl. Ex. 2.)  Thereafter, defendants conducted numerous conversations with plaintiffs as to their response to this request, including the issue of control.  Plaintiffs' suggestion that they still do not have an answer for defendants and this Court on the question of control despite having had more than ten months to analyze this issue speaks volumes about the merits of their position.

The failure to explore an argument which, if answered in the negative, as noted by the Magistrate, could clearly have saved all involved considerable time, effort, and money strongly suggests that plaintiffs have precisely the control over the documents that their contracts suggest.

---

[7] Only three of the seven third-party payor plaintiffs even responded to this Second Request, and the response of only one can arguably be read to have raised an issue regarding control over the medical records sought.

## CONCLUSION

For all of the foregoing reasons, plaintiffs' Objections to Discovery Order No. 4 and

Motion To Reconsider Discovery Order No. 4, or, in the Alternative, To Supplement the Record

should be denied.

Dated: September 25, 2006

                            DAVIS POLK & WARDWELL

                            By:    /s/ James P. Rouhandeh
                                   James P. Rouhandeh

                            450 Lexington Avenue
                            New York, New York 10017
                            (212) 450-4000

                                   - and -

                            HARE & CHAFFIN

                            By:    /s/ David B. Chaffin
                                   David B. Chaffin

                            160 Federal Street
                            Boston, Massachusetts 02110
                            (617) 330-5000

                            *Attorneys for Defendants Pfizer Inc. and*
                            *Warner-Lambert Company*


## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system has been served
pursuant to Case Management Order #3 on September 25, 2006.


                            /s/David B. Chaffin


21