UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                                        )
IN RE NEURONTIN MARKETING AND SALES      )
PRACTICES LITIGATION                                )          MDL Docket No. 1629
_____)
THIS DOCUMENT RELATES TO:                       )
                                                        )          Master File No. 04-10981
THE GUARDIAN LIFE INSURANCE               )
COMPANY OF AMERICA v. PFIZER INC., et al., )          Judge Patti B. Saris
04 CV 10739 (PBS) and                               )
                                                        )
AETNA, INC. v. PFIZER INC., et al.,                )
04 CV 10958  (PBS)                                   )
_____)

**THIRD COORDINATED AMENDED COMPLAINT**

# TABLE OF CONTENTS

**Page**

I.      NATURE OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

III.    JURISDICTION AND VENUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

IV.     FACTUAL ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        A.      Neurontin . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        B.      Defendants' Deliberate Decision to Avoid Seeking FDA Approval
                and Promote Off-Label Uses for Neurontin Through the Publication
                of False and Misleading Scientific, Medical and Clinical Data . . . . . . . . . . . . . 7

        C.      Implementation of the "Publication Strategy"
                and Creation of the Promotion Enterprise . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        D.      The Promotion Enterprise . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

                1.      The Role of Medical Marketing Firms -- The
                        Vendor Participants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

                        (a)     Cline Davis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

                        (b)     Thompson Physicians World . . . . . . . . . . . . . . . . . . . . . . . . . 21

                        (c)     Sudler & Hennessey . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

                        (d)     MEDED/MEDCON . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

                        (e)     MES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

                        (f)     HCC . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

                        (g)     AMM/Adelphi . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

                2.      The Role of Physicians -- The Physician Participants . . . . . . . . . . . . . . 34

                3.      Participation and Knowledge of the Vendor and
                        Physician Participants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

        E.      Defendants' Use of the Promotion Enterprise to Fraudulently
                Promote Neurontin -- The Misrepresentations . . . . . . . . . . . . . . . . . . . . . . . . . 40

1.    Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

2.    False and Misleading Statements Regarding Pain . . . . . . . . . . . . . . . . . 40

3.    False and Misleading Statements Regarding
      Diabetic Peripheral Neuropathy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

4.    False and Misleading Statements Regarding
      Restless Leg Syndrome . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

5.    False and Misleading Statements Regarding
      Bipolar Disorder . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

6.    False and Misleading Statements Regarding Social Phobia . . . . . . . . . 51

7.    False and Misleading Statements Regarding Panic Disorder . . . . . . . . 54

8.    False and Misleading Statements Regarding Migraine . . . . . . . . . . . . . 56

9.    False and Misleading Statements Regarding Monotherapy
      for Epilepsy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

10.   False and Misleading Statements Regarding
      Dosages Above the FDA-Approved Maximum . . . . . . . . . . . . . . . . . . . 61

11.   False and Misleading Statements Regarding
      the Lack of Side Effects . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

12.   False and Misleading Statements Regarding Other Indications . . . . . . . 66

F.    Alternative Treatments Cheaper than Neurontin . . . . . . . . . . . . . . . . . . . . . 66

G.    Alternative Sub-Enterprises . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

H.    The Unlawful Conduct Continues Following the Pfizer Merger
      With Warner-Lambert and Through At Least December 2004 . . . . . . . . . . . . 69

      1.    Articles Sponsored by Pfizer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

      2.    Presentations and Marketing Events Sponsored By Pfizer
            That Promoted the Same Misleading Key Messages as the
            MAC and Fallon Medica Articles . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

I.    The Continuing Impact of Defendants' Fraudulent
      Off-Label Promotion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

J.    Related Government Actions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

V.     FRAUDULENT CONCEALMENT AND
       TOLLING OF STATUTES OF LIMITATIONS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

VI.    DEFENDANTS' MOTIVE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

VII.   USE OF THE MAILS AND WIRES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

VIII.  SCOPE OF THE ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

       A.     Time . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

       B.     Geographic Scope . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

IX.    CLAIMS FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

       FIRST CLAIM FOR RELIEF
       Violation of 18 U.S.C. § 1962(c) (The Promotion Enterprise)  . . . . . . . . . . . . . . . . . . . 98

       SECOND CLAIM FOR RELIEF
       Violation of 18 U.S.C. § 1962(c) (The Cline Davis Sub-Enterprise)  . . . . . . . . . . . . . 101

       THIRD CLAIM FOR RELIEF
       Violation of 18 U.S.C. § 1962(c) (The Physicians World Sub-Enterprise) . . . . . . . . . 104

       FOURTH CLAIM FOR RELIEF
       Violation of 18 U.S.C. § 1962(c) (The Sudler & Hennessey Sub-Enterprise)  . . . . . . 108

       FIFTH CLAIM FOR RELIEF
       Violation of 18 U.S.C. § 1962(c) (The MEDED/MEDCON Sub-Enterprise)  . . . . . . 111

       SIXTH CLAIM FOR RELIEF
       Violation of 18 U.S.C. § 1962(c) (The MES Sub-Enterprise) . . . . . . . . . . . . . . . . . . 114

       SEVENTH CLAIM FOR RELIEF
       Violation of 18 U.S.C. § 1962(c) (The HCC Sub-Enterprise) . . . . . . . . . . . . . . . . . . 117

       EIGHTH CLAIM FOR RELIEF
       Violation of 18 U.S.C. § 1962(c) (The AMM/Adelphi Sub-Enterprise) . . . . . . . . . . . 120

       NINTH CLAIM FOR RELIEF
       Violation of 18 U.S.C. § 1962(c) (The Publication/Marketing Sub-Enterprise) . . . . . 123

       TENTH CLAIM FOR RELIEF
       Violation of 18 U.S.C. § 1962(d) by Conspiring to Violate 18 U.S.C. § 1962(c) . . . . . 127

       ELEVENTH CLAIM FOR RELIEF
       Violations of the California Unfair Competition Law

Cal. Bus. & Prof. Code § 17200 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 129

TWELFTH CLAIM FOR RELIEF
Violations of the Consumer Protection Statutes of the Remaining 49 States,
The District of Columbia and the Commonwealth of Puerto Rico . . . . . . . . . . . . . . . 130

THIRTEENTH CLAIM FOR RELIEF
Insurance Fraud - Violation of 18 Pa. C.S. § 4117 . . . . . . . . . . . . . . . . . . . . . . . . . 135

FOURTEENTH CLAIM FOR RELIEF
Restitution/Disgorgement for Unjust Enrichment . . . . . . . . . . . . . . . . . . . . . . . . . . . 137

X.    DEMAND FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 138

DEMAND FOR A JURY TRIAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 139

Plaintiffs, The Guardian Life Insurance Company of America ("Guardian"), Kaiser

Foundation Health Plan, Inc., Kaiser Foundation Hospitals, and Aetna, Inc. ("Aetna")

(collectively, "Plaintiffs"), bring this lawsuit against defendants Pfizer, Inc. ("Pfizer"), Warner-

Lambert Company ("Warner-Lambert") and Parke-Davis, a division of Warner-Lambert

(collectively referred to as "Parke-Davis" or "Defendants").  The facts and information averred

herein are based upon Plaintiffs' personal knowledge and beliefs and upon investigation of

counsel.  For their Third Coordinated Amended Complaint against Defendants, Plaintiffs allege

as follows:[1]

I.      **NATURE OF THE CASE**

1.      Plaintiffs are large health insurers that were among the principal victims of

Defendants' wrongful scheme to promote and market the prescription drug Neurontin®.

Neurontin was a drug with limited sales potential for Defendants – as an adjunctive therapy for

the treatment of partial seizures in adults with epilepsy and, later, as a treatment for shingles in

adults.  Based on the extremely limited utility of the drug, Defendants initially projected that

their total sales of Neurontin would approximate $500 million over its life span.

2.      To increase their sales of Neurontin, Defendants embarked on a comprehensive

campaign to promote Neurontin for unapproved and inappropriate uses through a fraudulent and

deceptive marketing program.  Defendants (a) deliberately misrepresented the scientific, medical

and clinical data concerning the safety, effectiveness and usefulness of Neurontin; (b) suppressed

or mischaracterized negative studies of the drug; and (c) caused misleading presentations to be

---

[1]Plaintiffs have included in this Second Amended Complaint certain facts and claims that
have been dismissed by the Court to preserve Plaintiffs' right to seek review on these matters.
See Kolling v. American Power Conversion Corp., 347 F.3d 11, 16 & n.10 (1st Cir. 2003).

made to Plaintiffs and physicians concerning Neurontin, its recommended and effective dosages, efficacious uses and lack of purported side effects.

3.    Defendants' unlawful scheme to inflate sales of Neurontin was extraordinarily successful, with sales soaring from $97.5 million in 1995 to more than $2.7 billion in 2003. Notably, by 2003, *90%* of all Neurontin prescriptions were for off-label uses.

4.    Plaintiffs and other third-party payors ("TPPs") paid the vast majority of the purchase price of Neurontin and thus suffered the largest direct economic injury from the wrongdoing.  Indeed, the financial success of Defendants' scheme depended upon targeting Plaintiffs, other health insurers, and doctors.  Neurontin was a relatively expensive medication that cost on average more than $125 for a prescription and of which Plaintiffs and other TPPs often paid more than $100 (80%) of the total cost.  Defendants thus knew that the substantial drug sales that Defendants sought were dependent upon TPPs, such as Plaintiffs, covering the cost of Neurontin or purchasing and dispensing the drug to plan members.  It was also essential that Plaintiffs and other TPPs not favor alternative treatments that were cheaper or more effective than Neurontin for the medical conditions for which it was being prescribed.  Plaintiffs paid for Neurontin in quantities far exceeding its warranted use, and these vast payments (and resulting revenues for Defendants) were the result of Defendants' fraudulent scheme.

5.    In 2004, Warner-Lambert pled guilty to violating the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 331, <u>et seq</u>., by distributing an unapproved new drug and distributing a misbranded drug; entered into a voluntary compliance agreement with the State Attorneys General; and paid $430 million in fines and penalties, as a result of Defendants' unlawful off-label promotion and sale of Neurontin.  By this action, Plaintiffs seek to recover their excessive payments for Neurontin and the amounts by which Defendants were unjustly enriched.

II.    **PARTIES**

6.      Guardian is a mutual life insurance company organized and existing under the laws of the state of New York.  Guardian provides health payment benefits to approximately 1.3 million people in all 50 states.  From 1994 to the present, Guardian has paid tens of millions of dollars to U.S. pharmacies for excessive payments for Neurontin caused by Defendants' wrongful acts.

7.      Kaiser Foundation Health Plan, Inc., a not-for-profit corporation with its headquarters in Oakland, California, is among the largest health maintenance organizations in the United States.  As of December 2004, Kaiser Foundation Health Plan, Inc. had 8.2 million members in nine states and the District of Columbia, with over 6 million members in California.  The remaining members are in Colorado, Georgia, Maryland, Virginia, Oregon, Washington, Hawaii, Ohio and the District of Columbia.  Kaiser Foundation Health Plan, Inc. offers its members pharmacy benefits that include coverage of Neurontin.  Kaiser Foundation Health Plan, Inc. owns and operates its own in-house pharmacies in the same nine states in which it has members and the District of Columbia.  These pharmacies purchase prescription drugs, including Neurontin, and dispense these drugs directly to Kaiser Foundation Health Plan, Inc. members.  A limited number of health plan members purchase their prescription drugs through a pharmacy benefit manager retained by Kaiser Foundation Health Plan, Inc.  From 1994 to the present, Kaiser Foundation Health Plan, Inc. has paid tens of millions of dollars for excessive prescriptions of Neurontin caused by Defendants' wrongful acts.

8.      Kaiser Foundation Hospitals is a not-for-profit California corporation which owns and operates thirty hospitals in California, Oregon and Hawaii and contracts with Kaiser Foundation Health Plan, Inc. to provide or arrange for hospital services for Kaiser Foundation Health Plan, Inc. members in each state in which Kaiser Foundation Health Plan, Inc. operates.

From 1994 to the present, Kaiser Foundation Hospitals has paid tens of millions of dollars for excessive prescriptions of Neurontin caused by Defendants' wrongful acts.

9.     Aetna is a Pennsylvania corporation with its principal place of business in Hartford, Connecticut. By and through its subsidiaries, Aetna provides health payment benefits to more than 13 million people in virtually every state and territory of the United States and have agreements with tens of thousands of participating pharmacies in the United States. From 1994 to the present, Aetna has paid tens of millions of dollars to U.S. pharmacies for excessive prescriptions of Neurontin for Aetna members in every state in the United States, the District of Columbia and the Commonwealth of Puerto Rico.

10.     Defendant Pfizer is a Delaware corporation with its principal place of business at 235 East 42nd Street, New York, New York. Pfizer is principally engaged in the manufacture and sale of pharmaceuticals and is one of the largest pharmaceutical companies in the world.

11.     Defendant Warner-Lambert was acquired in June 2000 by Pfizer. This acquisition included Warner-Lambert's Parke-Davis division. Prior to the acquisition, Warner-Lambert was a Delaware corporation with its principal place of business at 201 Tabor Road, Morris Plains, New Jersey. In 1993, Warner-Lambert received FDA approval to market Neurontin in the United States as an adjunct therapy for epilepsy and did so through its Parke-Davis division. After the acquisition, the marketing of Neurontin continued to be managed at the merged companies' Morris Plains, New Jersey location.

## III.     JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over all of the claims of Plaintiffs pursuant to 28 U.S.C. § 1331, because the claims in this action arise under the laws of the United States; pursuant to 18 U.S.C. § 1964, because this Court has jurisdiction to prevent and restrain violations of 18 U.S.C. § 1962 (RICO); pursuant to 28 U.S.C. § 1332, because there is complete

diversity of citizenship and the amount in controversy exceeds $75,000, exclusive of interest and

costs; and pursuant to 28 U.S.C. § 1367(a), because this Court has supplemental jurisdiction over

all non-federal clams in this action that form part of the same case or controversy as those within

the Court's original jurisdiction.

13.    This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the

violations of the Uniform Deceptive Trade Practices Act statutes, Pennsylvania Insurance Fraud

Statute, and Plaintiffs' allegation of unjust enrichment.

14.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and (c),

and 18 U.S.C. § 1965.

## IV.    FACTUAL ALLEGATIONS

### A.    Neurontin

15.    New pharmaceutical drugs may not be marketed in the United States until the

sponsor of the pharmaceutical has proven to the FDA that the drug is safe and effective for

specific indications at specified dosages.  21 U.S.C. § 355(b); 21 C.F.R. § 310.3(h)(f).  The

indication and dosages approved by the FDA are set forth in the drug's labeling, the content of

which is also approved by the FDA.  Although it is not unlawful for physicians to prescribe

approved drugs for indications or at dosages different than those set forth in a drug's labeling

(referred to as "off-label" use), the Food, Drug, and Cosmetic Act generally prohibits drug

companies from marketing or promoting approved drugs for uses other than those set forth in the

drug's approved labeling.  21 U.S.C. § 355(b).  Neurontin was not, pursuant to 21 U.S.C. §

355(i), exempt from the prohibition against commercializing off-label uses.  This regulatory

scheme protects patients and consumers by insuring that pharmaceutical companies do not

promote drugs for uses other than those found to be safe and effective by an independent,

scientific governmental body.

16.    Pfizer currently markets and sells Neurontin, a brand name prescription drug composed of the chemical compound (1-aminomethyl)-1-cyclohexaneacetic acid, generically known as gabapentin.  On December 30, 1993, Neurontin was approved by the FDA for use as an "adjunctive therapy" in the treatment of partial seizures with and without secondary generalization in adults with epilepsy in doses from 900 mg to 1800 mg per day.  Adjunctive therapy means that the drug cannot be prescribed by itself for the treatment of epilepsy -- it is to be used in combination with another front line epilepsy drug.  The FDA did not find Neurontin to be safe and effective as a "monotherapy" -- a single drug treatment for epilepsy.  The drug sponsor, Defendant Warner-Lambert, did not seek FDA approval in 1993 for any medical condition other than epilepsy.

17.    In May 2002, Pfizer obtained FDA approval for Neurontin to treat postherpetic neuralgia (pain resulting from shingles of herpes zoster) in adults, another limited market of consumers.  Again, the approved dosage was 900 mg to 1800 mg per day.  Adjunctive epilepsy therapy and postherpetic neuralgia are the only two conditions for which Neurontin has been approved by the FDA.

18.    Notwithstanding the limited market for Neurontin, Defendants reaped skyrocketing financial returns from the wrongful scheme.  In 1995, Defendants' revenue from the sale of Neurontin was $97.5 million; by 1997, sales increased to $292 million; by 1999, sales increased to $913 million; by 2000, sales increased to more than $1 billion; and by 2003, worldwide sales of Neurontin reached nearly $2.7 billion.  This dramatic increase in sales -- approximately 50% per year -- was fueled almost entirely by prescriptions for off-label uses and was the direct result of Defendants' fraudulent marketing scheme.  For example, in 1996, 50% of Neurontin's sales were attributable to off-label uses; in 2000, more than 78% of the Neurontin

prescriptions written were for off-label uses; and by 2003, 90% of all Neurontin prescriptions

were for off-label uses.

> **B.    Defendants' Deliberate Decision to Avoid Seeking FDA Approval
> and Promote Off-Label Uses for Neurontin Through the Publication
> of False and Misleading Scientific, Medical and Clinical Data**

19.    At the time Neurontin was approved by the FDA in 1993, Defendants knew that

the market for adjunctive therapy for epilepsy was relatively small with a population potential of

approximately two million patients.  In fact in May 1994, Defendants estimated that Neurontin's

ultimate sales potential was $500 million over the lifetime of the drug.  Defendants also knew

that the FDA prohibited drug manufacturers from promoting and marketing their drugs for uses

not approved by the FDA.  Accordingly, the fraudulent scheme devised by Defendants not only

misrepresented the scientific data regarding Neurontin, but also misrepresented the creator and

promoter of that information.

20.    Defendants also knew that causing Plaintiffs and other TPPs to list Neurontin on

their formularies (lists of approved drugs for which payment will be made) and without

restrictions (such as dosage limitations) was critical to their scheme, as Plaintiffs paid on average

about $84 of the $109 cost of a typical 100 pill (300 mg) prescription.

21.    In the late 1980s and early 1990s, Defendants considered other potential uses for

Neurontin besides epilepsy.  Defendants filed several patent applications for Neurontin as a

treatment for depression, neurodegenerative disease, mania, bipolar disease and anxiety.

Notwithstanding the claims made in their patent applications, however, Defendants chose not to

seek FDA approval for these indications or start the internal process within Parke-Davis to

obtain approval for these uses.  Senior product managers at Parke-Davis viewed Neurontin as a

niche drug and advised Warner-Lambert to lower its expectations regarding the ultimate sales

potential for Neurontin.

22.     Despite that earlier view, in October 1994, the Neurontin Development Team, a group of high-level officials at Parke-Davis in charge of clinical research, patents, regulatory, marketing and manufacturing issues, began to consider whether Parke-Davis should attempt to extend Neurontin's use to psychiatric disorders, a market significantly larger than epilepsy. Other anticonvulsant drugs had been used for (and FDA-approved for) psychiatric disorders, including bipolar disorder, panic disorder, post-traumatic stress disorder and possibly personality disorders.  Defendants knew, however, that there was no scientific rationale supporting Neurontin's safety or effectiveness for these psychiatric uses because Neurontin has a different mechanism of action from other anti-epileptic medications.

23.     In January 1995, Parke-Davis' Marketing and Planning Department presented a preliminary market analysis to the Neurontin Development Team for Neurontin's use for psychiatric indications.  Without considering whether the drug could be proven to be safe or effective for such uses, the report viewed the market as very favorable for Neurontin.  At the same Neurontin Development Team meeting, the possibility of expanding the market for Neurontin's use for pain syndromes, another market substantially larger than epilepsy, was also discussed.

24.     In February 1995, the New Product Committee ("NPC") informed the Neurontin Development Team that it supported the development of Neurontin for other indications and asked for a formal proposal.  John Boris was instructed to prepare market feasibility analyses of new potential indications, including bipolar disorder, generalized anxiety disorder,  social phobia, neuropathic pain and migraine prophylaxis.

25.     In March 1995, a senior scientist in Parke-Davis' Research Department informed the Neurontin Development Team that bipolar disorder may not be a good area to pursue for regulatory approval because of the short patent exclusivity period (the patent on Neurontin was

set to expire in December 1998) and the difficulty and expense in conducting the necessary clinical studies to demonstrate whether the drug was safe and effective to treat bipolar disorder. The Development Team, however, considered simply publishing scientific, medical and clinical data regarding the safety and medical effectiveness and usefulness of Neurontin for psychiatric uses including bipolar disorder. Certain members of Parke-Davis' Regulatory Department opposed the pursuit of a "publication strategy," stating that seeking FDA approval for bipolar disorder through appropriate clinical studies was the correct way to proceed. That recommendation was not followed.

26.    On March 22, 1995, the Parke-Davis Marketing Council met in Lyons, France, and recommended that Parke-Davis pursue a "publication strategy" instead of following the formal regulatory approval channels with regard to psychiatric indications for Neurontin. Thus, given the relatively short period of patent protection, Parke-Davis chose to avoid the costly and thorough process of seeking FDA approval, and instead, directly and immediately set out to persuade the healthcare field to use Neurontin to treat off-label conditions through a myriad of fraudulent acts. Members of the Marketing Council included the then-President of Parke-Davis, Tony Wild, and other senior management.

27.    Central to Parke-Davis' marketing effort were Plaintiffs and other TPPs, which paid the vast majority of the cost of Neurontin prescribed for patients. To facilitate those sales, Warner-Lambert had a "Health Care Management" division whose sole responsibility was to market pharmaceutical products, including Neurontin, to Plaintiffs and other TPPs. Headed by George Cavic, that division employed a staff of approximately 100 "National Account Mangers," or "NAMs."

**C.    Implementation of the "Publication Strategy"
and Creation of the Promotion Enterprise**

28.     In May 1995, a formal Parke-Davis Marketing Assessment report recommended that the company implement this publication strategy for various psychiatric indications. The report predicted that the revenues generated by sales for these indications would justify investment in the publication strategy. The report, however, specifically noted a lack of scientific rationale for Neurontin's use for bipolar disorder, since Neurontin has a different mechanism of action from other anti-epileptic drugs. This crucial distinction also made Neurontin suspect for treating acute mania and panic disorder, as its use for those conditions rested on the same rationale for using Neurontin to treat bipolar disorder.

29.     In July 1995, Parke-Davis' Marketing and Planning Department went beyond psychiatric conditions, and issued a Marketing Assessment on Neuropathic Pain and Spasticity. That report recommended that Parke-Davis pursue a similar publication strategy in the areas of neuropathic pain associated with peripheral nerve damage due to diabetes mellitus, trigeminal neuralgia, postherpetic pain, neuropathic facial pain, and reflex sympathetic dystrophy and disseminate the results of only "favorable" studies through publication in medical literature and key neurological and pain congresses. Parke-Davis approved these marketing assessments and adopted the recommendations regarding the publication strategy for the neuropathic pain market.

30.     Parke-Davis' New Product Committee also approved the decision to conduct publication studies for Neurontin in migraine prophylaxis, and again restricted publication to only "positive" study results. As a result, the negative results of a clinical trial conducted in the 1980s relating to Neurontin and migraine have never been published.

31.     Convincing physicians to prescribe Neurontin at doses far exceeding the FDA-approved level of 900 mg to 1800 mg per day was also an integral component of Defendants' wrongful scheme. Defendants aggressively urged doctors to increase their doses of Neurontin

despite the results of at least two clinical trials showing that increased doses did not achieve different results in patients.

32.     Thus, by late 1995, senior management at Parke-Davis had committed the company to promoting Neurontin through a publication strategy for a myriad of off-label uses rather than by seeking FDA approval.  The object of Defendants' publication strategy was to disseminate false and misleading information regarding these off-label uses for Neurontin as widely as possible through seminars, events, presentations and medical literature.

33.     Scientific data and evidence did not exist supporting such off-label uses, and Defendants made, and caused others to make, misrepresentations and false statements as part of their publication strategy in order to persuade doctors to prescribe Neurontin for off-label uses and Plaintiffs and other TPPs to pay for the drug.  No clinical trial showed that Neurontin was safe or effective for any of these conditions.

### D.     The Promotion Enterprise

34.     In order to implement the publication strategy, Parke-Davis created the Promotion Enterprise composed of the Defendants, half a dozen medical marketing firms (the "vendor participants") and several dozen physicians (the "physician participants").  These participants acted together in promoting Neurontin to the healthcare industry.  The acts of the Promotion Enterprise centered on the vendor participants organizing and hosting numerous seminars and events over the course of several years that were falsely represented to be neutral, educational forums.  At these events, the physician participants provided misleading and deceptive information to fellow physicians on the off-label uses of Neurontin (a/k/a peer-to-peer marketing events).  The physician participants were not independent, but received "behind the scenes" coaching and remuneration from the vendor participants and Defendants.

35.     The Promotion Enterprise also caused numerous articles and promotional pieces to be published in medical literature throughout the country misrepresenting the safety, efficacy, effectiveness and usefulness of Neurontin to treat a variety of off-label conditions.  As part of the written publication component of the Promotion Enterprise, Defendants hired non-physician technical writers to write the necessary articles, with input and direction from Defendants and the vendor participants.  Neither Defendants nor the vendor participants wanted their names on the articles so, in a practice known as "ghostwriting," Defendants paid physician participants for use of their names as the articles' "authors," giving the false impression that the article was unbiased and not sponsored by the drug manufacturer.  In order to monitor the status of these publications, and in order to coordinate and execute the ghostwriting plan, marketing firms such as Medical Education Systems ("MES") and AMM/Adelphi were necessary.  The role played by MES and AMM/Adelphi in assisting Defendants in creating publications was very similar to the role played by the marketing firms in the coordination of the peer-to-peer marketing events.

36.     Because Defendants' marketing personnel were not permitted to deliver the off-label message under FDA regulations, Defendants fraudulently circumvented this prohibition by training medical liaisons -- technical employees of Defendants who were supposed to provide balanced scientific information to doctors -- to market off-label and solicit interest in off-label uses.  Defendants trained the medical liaisons to unlawfully engage in full scale promotion of Neurontin's off-label uses, with the use of non-scientific, anecdotal information designed to convince physicians to prescribe Neurontin for off-label conditions.  The medical liaisons were trained to cold call physicians and sell them on the safety, efficacy and usefulness of Neurontin for off-label uses.  This sales effort involved numerous material misrepresentations, including the status of the medical liaisons.  With the full approval of Defendants' marketing officials, including John Ford, Phil Magistro and John Krukar, medical liaisons were routinely introduced

as specialists in the specific drug they were presenting at a particular meeting.  Thus, medical

liaisons were presented as experts in anti-epileptic drugs at one moment and later were touted as

experts in cardiac medication.  Medical liaisons also were encouraged to represent themselves as

medical researchers, even though they neither conducted medical research nor analyzed medical

research performed by others.  On occasion, medical liaisons were introduced as physicians,

even though they had no such qualifications.  Sales personnel were instructed to introduce

medical liaisons as scientific employees who had been given temporary leave from their

academic duties to make an individual presentation to the physician; the fact that the liaisons

were part of Defendants' marketing program was intentionally hidden.

   37.  Medical liaisons were instructed in clear terms that they were to market and sell

Neurontin for off-label uses and at dosages exceeding safe and effective levels.  During a

teleconference on May 24, 1996, John Ford, a senior marketing executive at Parke-Davis' Morris

Plains headquarters, directly informed the medical liaisons that Neurontin had to be marketed for

off-label uses, including monotherapy, pain, bipolar disease, and other psychiatric uses.  At

another meeting with the medical liaisons, Ford was even blunter, directing his medical liaisons

to tout Neurontin for "everything," irrespective of efficacy, dosage limitations or "that safety

crap":

> I want you out there every day selling Neurontin.  Look this isn't
> just me, it's come down from Morris Plains that Neurontin is more
> profitable....  We all know Neurontin's not growing adjunctive
> therapy, besides that is not where the money is.  Pain management,
> now that's money.  Monotherapy, that's money.  We don't want to
> share these patients with everybody, we want them on Neurontin
> only.  We want their whole drug budget, not a quarter, not half, the
> whole thing....  We can't wait for them to ask, we need to get out
> there and tell them up front....  That's where we need to be holding
> their hand and whispering in their ear Neurontin for pain,
> Neurontin for monotherapy, Neurontin for bipolar, Neurontin for
> everything....  I don't want to see a single patient coming off
> Neurontin until they have been up to at least 4800mg/day.  I don't

want to hear that safety crap either, have you tried Neurontin,
every one of you should take one just to see there is nothing, it's a
great drug.

38.    Defendants controlled the content of the messages delivered at the seminars,

meetings and other events and in the publications sponsored by the vendor and physician

participants, including the misinformation and false statements concerning the safety, efficacy,

effectiveness and usefulness of Neurontin for off-label uses.  Physicians in the audience were

deceived into thinking that the events were educational in nature and independent from control

of the pharmaceutical manufacturer.  Similarly, the physicians and other healthcare professionals

who read the articles put together and published by the Promotion Enterprise were deceived into

thinking these articles were unbiased and based on credible scientific data.  And, the physicians

who were contacted by Defendants' medical liaisons were deceived into thinking that these

employees were providing truthful balanced scientific information about Neurontin when in fact

they were fraudulently acting as Defendants' surrogate sales force.

39.    Defendants also paid purported "grants" to reward demonstrated Neurontin

prescribers to continue to advocate the prescription of Neurontin for off-label uses to colleagues.

Defendants' medical liaisons informed leading Neurontin prescribers that significant advocacy

for Neurontin through "studies" would result in the payment of large grants.  These studies did

not involve significant work for the physicians.  Oftentimes, the physicians contributed nothing

at all to the study because Defendants frequently hired technical writers to write the articles for

which the "authors" had been given grants.  Defendants accounted for and charged these grants

to the Neurontin marketing budget.

40.    Defendants were aware that these articles and studies provided minimal scientific

benefit.  In a letter to the FDA in June 1997, Defendants submitted a list of "studies relating to

pain, pain syndromes, and psychiatric disorders" but failed to include any of the studies

described below.  Defendants intentionally neglected to report these studies to the FDA because

Defendants knew the "research" had no scientific value and would not be deemed a scientific

trial by the FDA.  Payments Defendants made for these "studies" included the following:

| Funded Project | Payee | Payment |
| --- | --- | --- |
| Statistical Analysis of Patients Treated With Neurontin For Pain | Hans Hansen, M.D. Statesville, NC | $7,000 |
| Reduction of Sympathetically Medicated Pain and Sudomotor Function | David R. Longmire, M.D. Russellville, AL | $7,000 |
| Data Entry for Neurontin and Pain Analysis | David Meyer, M.D. | [amount unknown] |
| Trial of Neurontin for Distal Symmetric Polyneuropathy Associated with AIDS | Joseph Weissman, M.D. Atlanta, GA | $20,000 |
| Neurontin for Neuropathic Pain in Chronic Pain Syndromes | Lavern Brett, M.D. Washington, DC | $25,000 |
| Retrospective Chart Analysis of Neurontin use with Bipolar Disorder Patients | Ralph S. Rybeck, M.D. | $5,000 |
| Retrospective Analysis of Neurontin in the Treatment of Pain | David R. Longmire, M.D. Russellville, AL | $2,000 |
| Retrospective Analysis of Neurontin in the Treatment of Chronic Pain | Don Schanz, D.O. Traverse City, MI | $8,000 |
| Case Histories Relating to Use of Neurontin as an Adjuvant Analgesic | Elizabeth J. Narcessian, M.D. West Orange, NJ | $4,000 |

41.     To hide the lack of scientific support for the off-label uses, and Defendants' direct

involvement in the seminars and articles, the Promotion Enterprise employed improper and

unlawful sales and marketing practices that included:  (a) deliberately misrepresenting the safety,

medical efficacy, effectiveness, usefulness and effective dosages of Neurontin for a variety of

uses; (b) knowingly misrepresenting the existence and findings of scientific data, studies, reports

and clinical trials; (c) deliberately concealing negative findings or the absence of positive

findings; (d) misrepresenting the credentials and qualifications of certain of Defendants'

employees as specialists, medical researchers, physicians and scientific employees in order to

market and sell Neurontin; (e) wrongfully and illegally compensating physicians for prescribing

Neurontin for various off-label uses; (f) knowingly publishing articles, studies and reports

misrepresenting the scientific credibility of data regarding Neurontin; (g) intentionally

misrepresenting and concealing Defendants' role and participation in the creation and

sponsorship of a variety of events, articles and publications used to sell Neurontin; (h)

intentionally misrepresenting and concealing the financial ties between Defendants and other

participants in the Enterprise; (i) fraudulently using medical liaisons to directly solicit, market

and promote Neurontin for off-label uses to physicians; and (j) improperly financially inducing

physicians to prescribe Neurontin by providing grants for their advocacy of Neurontin through

"studies" which had minimal or no scientific value.

    42.    All of the participants in the Promotion Enterprise had the common purpose of

aiding Defendants in deceptively and fraudulently marketing Neurontin for off-label uses and

achieving significant "market expansion" for Neurontin.  Each participant received substantial

revenue from the scheme.  The more successful these marketing events, the more events there

would be in the future, and the more fees each participant would receive for organizing or

participating in the events.  For these reasons, the participants knowingly and willingly agreed to

assist Defendants in their fraudulent promotion of Neurontin, notwithstanding that such a

promotional campaign required the systematic repetition of false and misleading statements to

thousands of physicians throughout the United States.

    43.    Parke-Davis, and subsequent to Pfizer's acquisition of Warner-Lambert, Pfizer,

controlled and directed the overall Promotion Enterprise by (a) controlling the content of the

presentations, speeches, promotional events and articles that misrepresented off-label usage of

Neurontin; and (b) compensating the participants for their efforts on behalf of the Enterprise.

### 1.    The Role of Medical Marketing Firms -- The Vendor Participants

44.     Third party medical marketing firms were central to Parke-Davis' fraudulent marketing scheme.  Indeed, the tactical plans Parke-Davis used to implement its fraudulent publication strategy were proposed by advertising companies such as Cline, Davis & Mann, Inc. and Thompson Physicians World when representatives of those entities sat on Parke-Davis' Neurontin Extended Disease Team.

45.     Defendants' plans called for medical marketing firms to organize and host, and the Defendants to review and pay for, hundreds of events, including medical education seminars, consultant meetings, advisory boards, speakers bureaus, teleconferences and dinner meetings where the physician participants of the Promotion Enterprise would deceptively promote the off-label use of Neurontin to thousands of doctors who were not prescribing Neurontin for adjunct epilepsy treatment.  As detailed below, during each of these events, materially false and inaccurate information about Neurontin was given to the attendee physicians to induce them to prescribe Neurontin for off-label uses and at excessive dosages.

46.     As part of the Promotion Enterprise, the third party marketing firms MES and AMM/Adelphi worked directly with Defendants and the physician participants to write and publish numerous articles discussing the use of Neurontin to treat various off-label conditions for which there was little or no credible scientific support.

47.     The planning and coordination of these events and publications by the Promotion Enterprise required extensive use of the wires and mails, including mailing invitations to physicians, booking hotels and airplane tickets, arranging meals, scheduling teleconference calls, and coordinating the content of the presentations on Neurontin at the event and in the publications.

48.     The firms who participated in the Promotion Enterprise included Cline, Davis & Mann, Inc. (and its Proworx division), Thompson Physicians World (and its Professional

Postgraduate Services division), Sudler & Hennessey (and its Intramed division), MEDED, MES, Healthcare Communications Group and AMM/Adelphi. Plaintiffs' knowledge of the specific activities of these third-party marketing firms is limited because of the obstructive tactics by Defendants and the marketing firms. Plaintiffs have only had the opportunity to review limited records, mostly of events between 1994 and 1998, held for the Northeast Customer Business Unit ("CBU"). Plaintiffs are aware that similar events were held across the United States between 1994 until May 2004. Although Plaintiffs have not seen records of the vast majority of such events and cannot specify them because the records are in the possession, custody or control of Defendants or the other members of the Promotion Enterprise, even the limited information available reveals the illegal nature of Defendants' conduct.

### (a)  Cline Davis

49.     Cline, Davis & Mann, Inc. ("Cline Davis") is a New York, New York based advertising and marketing firm, which does significant business with the pharmaceutical industry. Beginning in either late 1995 or early 1996, Cline Davis provided, and continues to provide, Defendants with strategic management services, including advising Defendants on strategies and tactics to expand the on-label and off-label use of Neurontin. To this day, Cline Davis directs the advertising campaigns for various Pfizer products, including Neurontin and Viagra. Through its Proworx division, Cline Davis also managed and coordinated various marketing events, including consultant meetings and other peer-to-peer sales marketing events for Neurontin.

50.     Cline Davis shared with the Defendants the costs associated with the off-label marketing of Neurontin. For example, when Cline Davis exceeded the budgeted amounts under its strategic management services for Neurontin in 1996, Parke-Davis agreed to split the budget overrun with Cline Davis "in the spirit of partnership and a commitment to a long term

relationship." The sharing of costs is evidence that the relationship between Cline Davis and the Defendants was that of partners in an enterprise, not principal and agent.

51.     Cline Davis and the Defendants maintained systematic linkages between themselves, including continuing coordination between their respective marketing teams. For example, at all relevant times hereto, a Cline Davis employee was a member of Parke-Davis' Extended Neurontin Disease Team, which was a high-level, confidential, internal interdisciplinary group composed of members from the following departments: Strategic Planning/Information Management, Neurontin Marketing, Advertising and Promotion, Product Planning, Medical Affairs, Forecasting, Training and Development, Healthcare Management, Public Relations, as well as representatives of Parke-Davis' five regional offices (known as "CBUs").

52.     The Jupiter Beach, Florida consultants meeting held during the weekend of April 19-21, 1996 is one example of a meeting sponsored and produced by the Promotion Enterprise. Cline Davis' Proworx division worked with Defendants and physician participants to arrange this meeting to encourage neurologists from the Northeast CBU to increase their Neurontin prescriptions. Defendants' sales personnel were instructed by the Neurontin Marketing Team to select potential invitee neurologists from a list of the top prescription writers for antiepileptic drugs in the Northeast. During the meeting, attendees "were delivered a hard hitting message about Neurontin," and encouraged to prescribe Neurontin at higher doses for epilepsy. Technically the event was produced by Proworx, however, Defendants designed, monitored and approved all aspects of the presentation. Defendants selected the physician participant speakers, picked the presentation topics and previewed the content of the presentations to ensure they were acceptable. Defendants paid all expenses relating to the consultants meeting, including all payments for (i) the attending neurologists (valued at approximately $2,000 per attendee), (ii) the

presentation expenses, (iii) all expenses and fees incurred by Proworx, and (iv) the substantial fees paid to the participant physicians.

53.    Parke-Davis' control of the content of events produced by Cline Davis was further illustrated at a continuing medical education symposium coordinated by Cline Davis on behalf of the American Diabetes Association, held in Boston, Massachusetts, on June 23, 1997. At the eleventh hour, Cline Davis and Parke-Davis learned that one of the speakers, who had been previously recommended by Parke-Davis, was going to describe negative results in her study of Neurontin's use for an off-label indication.  Unable to cancel the presentation without grossly violating the rules for conducting accredited continuing medical education ("CME") seminars, Cline Davis, in its own words, took steps "to counteract a possible 'negative' presentation."  It planted a doctor in the audience to ask questions that would lead the presenter to make favorable statements during the question and answer period after her talk, and this plant "did indeed lead Dr. Bril to address some of the positive aspects of anticonvulsants and Neurontin."  In a memorandum written by Cline Davis to Parke-Davis a day after the event, Cline Davis acknowledged its responsibility for allowing a presentation by a physician with an independent view, reaffirmed its "policy to complete a literature search to determine who authors favorable articles on the topics outlined" and assured Parke-Davis that "guidelines have been to set to ensure that this type of [negative presentation] situation does not happen again."

54.    There was a common communication network for sharing information on a regular basis among Cline Davis, the Defendants and the physician participants.  Cline Davis and Defendants routinely exchanged letters, memoranda, emails and phone calls, as did Cline Davis and the physician participants.  There were also regular meetings among Cline Davis and Defendants, including high-level "face-to-face" meetings with the high-level marketing officials on both sides, where overall goals and strategies would be discussed.  There were also more

frequent, lower-level "Toolbox" meetings, where individual strategies and tactics were discussed and progress in various areas of the off-label marketing scheme was monitored.

55.     Some, but not all, of the events Cline Davis presented on behalf of the Promotion Enterprise included:

| Event | Date | Location |
|---|---|---|
| Neurontin Consultants Meeting | April 19-21, 1996 | Jupiter Beach, FL |
| Neurontin Consultants Meeting | May 3-4, 1996 | Philadelphia, PA |
| Neurontin Consultants Meeting | May 10-11,1996 | Boston, MA |

**(b)** **Thompson Physicians World**

56.     Thompson Physicians World ("Physicians World") is a New Jersey based marketing and medical education firm, which does considerable business with the pharmaceutical and healthcare industries.  Physicians World managed and coordinated various marketing events, including speakers bureaus, advisory boards and other peer-to-peer marketing events.

57.     Through its wholly owned and controlled Professional Postgraduate Services ("PPS") division, Physicians World also managed and coordinated various medical educational events.  PPS purported to be a properly accredited sponsor of CME events.

58.     Like Cline Davis, Physicians World began in 1995 to actively advise Parke-Davis on strategies and tactics to expand the on-label and off-label uses of Neurontin.

59.     On December 22, 1995, at about the same time that Defendants formed their partnership with Cline Davis, Larry Perlow, Parke-Davis' Vice President of Portfolio Management, announced that Parke-Davis and Physicians World had formed a "strategic partnership" to handle speakers bureaus, advisory boards and consultants meetings.  The memorandum indicates that services formerly handled internally by Parke-Davis' Marketing Support Services would be divided between Physicians World and Parke-Davis' Marketing

Logistics Department.  Under the strategic partnership, speakers bureaus, advisory boards and consultants meetings would be arranged by Physicians World; non-speaker medical education programs, grants and processing of all checks against advertising and promotion and departmental budgets would be handled by Marketing Logistics.

60.    The same December 22, 1995 memorandum also announced that Parke-Davis and Physicians World would commingle employees.  On January 1, 1996, Parke-Davis' Marketing Support staff joined Physicians World as full-time employees.  Even though the employees were based at Physician World's Secaucus, New Jersey office, the employees continued to use the same toll free (800) numbers that they used at Parke-Davis, continued to use Parke-Davis letterhead, and provided the same services to Parke-Davis employees who contacted them.

61.    To clarify marketing responsibilities in the wake of the strategic partnership and employee reassignments, Physicians World created various grids, which were circulated to marketing and sales colleagues in Parke-Davis and adopted as Parke-Davis policy.  These grids explained the procedures for Parke-Davis and Physicians World to follow depending on whether the event fell under Physicians World's jurisdiction or remained the responsibility of the Parke-Davis Marketing Logistics Department.

62.    The use of these grids by both Parke-Davis and Physicians World, as well as the sharing of the toll free (800) numbers by the employees reassigned from Parke-Davis to Physicians World, and the continued use by the reassigned employees of Parke-Davis letterhead, evidences the continuing coordination and overlap of leadership functions, as well as the establishment of a joint communications network between Physicians World and Parke-Davis.

63.    According to the written coordination policies jointly developed by Parke-Davis and Physicians World, if an event were non-promotional, i.e., a CME, then the "accredited institution" -- not Parke-Davis or Physicians World -- was  to pick the speakers and the content

of the presentations. The presentations were supposed to be fair and balanced, and were not supposed to pitch one drug product over another. According to the written policies, when the events were promotional, Parke-Davis and Physicians World were allowed to be "actively involved in speaker identification, recruitment as well as assistance with program content." However, the presentations of these handpicked speakers were supposed to be "strictly limited to approved indications," not off-label uses.

64.     In practice, however, Physicians World and Parke-Davis actively, knowingly, and with full support of one another, circumvented or directly violated both of the foregoing policies. In fact, the distinction between promotional and education events was rendered meaningless, as Physicians World owned and controlled PPS, which was the "accredited institution" for Physicians World's CME events. Regardless of the nature of the event, Physicians World, which was staffed by former Parke-Davis marketing employees and shared an address and an 800 telephone number with Parke-Davis, selected the physician-speakers and attendees, and controlled the content of the presentations. Among the off-label programs Physicians World marketed where Parke-Davis controlled the content was an accredited home study program on pain which was planned to be circulated to 10,500 neurologists and pain doctors, and "educational" programs on Neurontin's use for psychiatric conditions. In both cases the accrediting institution, which was supposed to be independent, was PPS, Physicians World's division.

65.     Parke-Davis and Physicians World circumvented their promotional/educational polices in other ways. Parke-Davis occasionally held advisory committee meetings and consultants meetings for the purpose of getting independent advice from experts regarding particular aspects of existing or planned drug products. When it came to Neurontin, however, Parke-Davis did not actually seek any input from the attendees and the real purpose of the

meetings was to misrepresent to the attendees Neurontin's safety, medical efficacy, effectiveness, usefulness and recommended dosages. The Neurontin meetings frequently were held at luxury resorts and the attendee's travel, room and board were paid by Parke-Davis.

66.     There was a common communication network for sharing information on a regular basis among Physicians World, Defendants and the physician participants. Physicians World and Defendants routinely exchanged letters, memoranda, emails and phone calls, as did Physicians World and the physician participants.

(c)    <u>Sudler & Hennessey</u>

67.     Sudler & Hennessey is a New York, New York based advertising and marketing firm, which does significant business with the pharmaceutical and healthcare industries. Since 1995, Sudler & Hennessey provided and continues to provide Defendants with strategic management services, advising them on strategies and tactics to expand the on-label and off-label use of Neurontin. Through its Intramed Educational Group division, Sudler & Hennessey also managed and coordinated various marketing events, including consultant meetings and other peer-to-peer marketing events.

68.     Sudler & Hennessey and Defendants maintained systematic linkages between themselves, including continuing coordination between their respective marketing teams. Sudler & Hennessey also maintained systemic linkages with the physician participants, including continuing coordination of seminars, events and presentations.

69.     Sudler & Hennessey recommended various unlawful ways for Parke-Davis to expand off-label uses for Neurontin. In fact, Sudler & Hennessey designed the blueprint for large off-label marketing junkets. In July 1995, Sudler & Hennessey held a multi-day consultants meeting at the La Costa Resort and Spa in Carlsbad, California. This event featured lectures about off-label uses from physicians who became regular and willing participants in the

Promotion Enterprise, including Drs. Schachter, Browne, Morrell, Morris, Pellock and Ritaccio. Collectively, these physicians have earned more than $500,000 (excluding travel, lodging and meals benefits) by participating in the Promotion Enterprise. The Carlsbad program even included a lecture that taught attendee physicians how to participate in the peer-to-peer marketing scheme as paid speakers and/or authors. This event served as the model for future large-scale marketing events.

70.    Sudler & Hennessey also helped to organize the Neurobehavioral Working Group. The Group appeared to be a committee of concerned physicians from various medical fields who sought better pharmacological treatment for patients suffering from migraine, epilepsy, neuropathic pain, psychological disorders and sleep disturbances. In reality it was a marketing tactic created by Sudler & Hennessey and funded by Parke-Davis to create publications and deliver lectures that informed other physicians of Neurontin's supposed off-label efficacy in the major off-label categories by creating the belief that these categories are interrelated. There was no scientific evidence for this claim and no clinical evidence showing that Neurontin was effective for any of these conditions other than adjunctive epilepsy therapy. The physician lecturers for the Neurobehavioral Working Group were physician participants of the Promotion Enterprise including Drs. Devinsky, Morrell and Schachter (who collectively received more than $200,000 for their participation in the Enterprise).

71.    Sudler & Hennessey has carried and continues to carry out many similar off-label marketing events all around the country. In those events, Sudler & Hennessey routinely recommends speakers who are favorable to Neurontin.

72.    Some, but not all, of the events Sudler & Hennessey presented on behalf of the Off-Label Promotion Enterprise included:

| Event | Date | Location |
|-------|------|----------|
| Neurontin Consultants Meeting | April 19-21, 1996 | Jupiter Beach, FL |
| Neurontin Consultants Meeting | May 3-4, 1996 | Philadelphia, PA |
| Neurontin Consultants Meeting | May 10-11,1996 | Boston, MA |
| Emerging Concepts on the Use of Anticonvulsants CME at Marriott Sawgrass Resort | April 1997 | Ponte Vedra, FL |
| Emerging Concepts on the Use of Anticonvulsants CME | May 1997 | Saratoga Springs, NY |
| Emerging Concepts on the Use of Anticonvulsants CME | June 1997 | Boston, MA |
| Emerging Concepts on the Use of Anticonvulsants CME | July 1997 | Saratoga Springs, NY |
| Emerging Concepts on the Use of Anticonvulsants CME | May 1998 | Hershey, PA |
| Consultants Conference:  Neuropathic Pain Syndrome | April 20, 1996 | Marco Island, FL |
| Current Applications in Neurological Conditions Grand Rounds at the Buckhead Resort | Sept. 27-28, 1997 | Atlanta, GA |
| Anticonvulsants, Current Applications in Neurological Conditions ("Weekend Pain Meeting") at the Four Seasons Hotel | July 1998 | Boston, MA |
| Anticonvulsants, Current Applications in Neurological Conditions | July 1998 | New York, NY |
| Consultants Conference | Feb. 2-4, 1996 | Marco Island, FL |
| Mastering Epilepsy Regional Consultants Meeting at the La Costa Resort and Spa | July 1995 | Carlsbad, CA |
| New Treatment Options for the Management of Pain: The Role of Anticonvulsants at the Four Seasons | April 2000 | Irving, TX |
| Advisory Board at the Disney Yacht Club | May 26, 2000 | Orlando, FL |
| New Directions in the Understanding and Treatment of Pain at the Plaza Hotel | March 24, 2001 | New York, NY |
| New Directions in the Understanding and Treatment of Pain at the Hilton Novi | March 2–3, 2001 | Detroit, MI |
| New Directions in the Understanding and Treatment of Pain at the Westin Galleria | May 4–5, 2001 | Houston, TX |
| New Directions in the Understanding and Treatment of Pain at the Harbor Court Hotel | February 9–10, 2001 | Baltimore, MD |
| New Directions in the Understanding and Treatment of Pain at the Fairmont Kansas City | March 9–10, 2001 | Kansas City, MO |
| New Directions in the Understanding and Treatment of Pain at the Peabody Memphis | May 11–12, 2001 | Memphis, TN |
| Advisory Board Meeting at the Grand Wailea Resort Hotel and Spa | April 14-16, 2000 | Maui, HI |

| Event | Date | Location |
|---|---|---|
| New Directions in the Understanding and Treatment of Pain at the Fairmont San Francisco | March 16–17, 2001 | San Francisco, CA |
| Advisory Board Meeting at the Westin Resort | June 16-18, 2000 | Hilton Head, SC |
| New Directions in the Understanding and Treatment of Pain at the Sheraton Universal City | May 18–19, 2001 | Universal City, CA |
| New Directions in the Understanding and Treatment of Pain at the Miami Biltmore | May 18–19, 2001 | Miami, FL |
| New Directions in the Understanding and Treatment of Pain at the Ritz Carlton New Orleans | March 23–24, 2001 | New Orleans, LA |
| New Directions in the Understanding and Treatment of Pain at the Sheraton Music City | March 23–24, 2001 | Nashville, TN |
| New Directions in the Understanding and Treatment of Pain at the Ritz Carlton St. Louis | March 30–31, 2001 | St. Louis, MO |

### (d)    MEDED/MEDCON

73.    Through at least 1997, Medical Education Programs, Ltd. ("MEDED") was a pharmaceutical marketing firm located in Danbury, Connecticut.  MEDED was dissolved in 1997, and its principals established a spin-off pharmaceutical marketing firm known as Medical Education Consultants, LLC ("MEDCON"), located in Danbury, Connecticut.  At all times relevant hereto, MEDED, and then subsequently MEDCON, provided and continues to provide Defendants with strategic management services, advising them on strategies and tactics to expand the on-label and off-label use of Neurontin.  MEDED/MEDCON also managed and coordinated various marketing events, including regional consultant meetings for Defendants' various CBUs.  MEDED/MEDCON was acquired by Wicks Medical Information, LLC, which is located in New York, New York.

74.    MEDED/MEDCON recommended various unlawful methods for the Defendants to expand off-label use and assisted in the implementation of those methods.  For example, MEDED/MEDCON coordinated a series of Neuropathic Pain Consultants Meetings held at various regional resorts during the Spring of 1996 on behalf of the Southeast CBU.  The

speakers at these events were handpicked by Parke-Davis to present only certain information regarding Neurontin and encourage its use for conditions other than epilepsy. The number of attendees was far too large for a bona fide consultant meeting. MEDED/MEDCON also coordinated an Advisory Board on Neurontin and psychiatric uses for the Southeast CBU at the Grand Cypress Hotel in Orlando, Florida on May 2–4, 1997.

75.     MEDED/MEDCON worked with Sudler & Hennessey and Defendants to provide services relating to the Neurobehavioral Work Group, including registering and organizing the Group's website.

76.     MEDED/MEDCON also assisted Defendants to create misleading articles about off-label Neurontin use pursuant to the publication strategy. Doctors Wilder, Schachter, Longmire, and Nicholson were retained as physician participants in the Promotion Enterprise and collectively received more than $400,000 for participating in the Enterprise. Upon information and belief, these physicians lent their names to articles they did not write regarding Neurontin's use in pain syndromes for inclusion in a supplement to the journal Pain Digest. The content of these articles was developed by MEDED. Although copies of the Neurontin pain supplement would be sent to the subscribers of Pain Digest, MEDED planned to distribute five times as many copies to physicians who attended the off-label Neurontin events MEDED produced for Parke-Davis.

77.     There was  a common communication network for sharing information on a regular basis among MEDED/MEDCON, Defendants and the physician participants. MEDED/MEDCON and Defendants routinely exchanged letters, memoranda, emails and phone calls, as did MEDED/MEDCON and the physician participants.

78.     Some, but not all, of the events MEDED/MEDCON presented on behalf of the Promotion Enterprise included:

| Event | Date | Location |
|---|---|---|
| Consultants Conference: Neuropathic Pain Syndrome | April 20, 1996 | Marco Island, FL |
| Current Applications in Neurological Conditions Grand Rounds at the Buckhead Resort | Sept. 27-28, 1997 | Atlanta, GA |
| Anticonvulsants, Current Applications in Neurological Conditions ("Weekend Pain Meeting") at the Four Seasons Hotel | July 1998 | Boston, MA |
| Anticonvulsants, Current Applications in Neurological Conditions | July 1998 | New York, NY |

(e)    **MES**

79.    Medical Educations Systems ("MES") is a marketing firm based in Philadelphia, Pennsylvania, which does significant business with the healthcare and pharmaceutical industries. MES specializes in coordinating CMEs, peer-to-peer sales events, and training pharmaceutical sales staffs. MES managed and coordinated various marketing events for the Defendants, including consultant meetings and other peer-to-peer marketing events concerning Neurontin. MES was acquired by Cardinal Health, Inc., a corporation based in Dublin, Ohio, which provides products, services and technologies supporting the healthcare industry.

80.    MES and Defendants maintained systematic linkages between themselves, including continuing coordination between their respective marketing teams. MES also maintained systemic linkages with the physician participants, including continuing coordination of seminars, events, presentations and articles.

81.    MES recommended various unlawful ways for Parke-Davis to expand off-label uses of Neurontin. For example, MES arranged a purported consultants meeting held in Chicago, Illinois on July 19-20, 1996. Although the topic was "Expanding the Paradigm of Antiepileptic Use," the meeting in reality was a marketing event meant to favorably misrepresent Neurontin for off-label uses, specifically pain and psychological uses. MES has carried and continues to carry out many similar off-label marketing events all around the country, all "in

support of Neurontin." In those events, MES routinely selected speakers known to be acceptable to Defendants and who limited the data provided to the audience to mislead the physicians as to the medical efficacy, effectiveness, usefulness and recommended dosages of Neurontin.

82.    MES also assisted Defendants in publishing a variety of misleading articles about Neurontin and off-label uses. Defendants decided the topics to be covered and paid all expenses in connection with the creation of these articles. Technical writers for MES drafted the articles, which were then submitted to a physician participant who "loaned" his or her name to the article in exchange for payment of an honorarium. Working with MES, Defendants approved the topics and contents of the articles and, to the extent possible, the selection of the journals where the articles were published.

83.    Between 1997 and 1998, MES prepared at least twelve different articles in this manner. Although its proposal claimed to seek funding for articles relating to epilepsy, the actual articles that were developed were in fact mostly for off-label uses which included pain, behavioral disorders, mania and hypomania, mood and anxiety disorders, migraine, bipolar disorder, refractory epilepsy and monotherapy. The intended articles were as follows:

| Credited Author | Subject |
|---|---|
| M. Afzal Choudhry | Mental retardation (Epilepsia) |
| Ahmad Beydoun | Monotherapy (Neurology; Pharmacotherapy) |
| Mark H. Pollack | Mood and anxiety disorders (CNS Spectrums; Am J Psychiatry) |
| Patricia (Tricia) Suppes | Mania and hypomania (J Affective Disorders) |
| Basim Uthman | Monotherapy (JAMA) |
| Barry Gidal | Elderly patients (The Consultant Pharmacist) |
| Martha Morrell | Female patients (Am J Obstet Gynecol) |
| John M. Pellock | Mental retardation (Epilepsia) |
| John M. Pellock | Pediatric patients (Pediatrics) |
| Michael Merren | Pain and tremor (Journal of Southern Medicine) |
| Gail Anderson | Elderly patients (The Consultant Pharmacist) |
| Gail Anderson | Pharmacokinetics (Pharmacotherapy) |

| Credited Author | Subject |
|---|---|
| Maurice Druzin | Female patients (Am J Obstet Gynecol) |
| Hans Hansen | Chronic pain and migraine (Ann Intern Med) |

84.    Defendants' role in creating, approving and sponsoring these articles was hidden from the public.  For example, one of the MES articles, supposedly written by Dr. Pollack entitled Gabapentin and Lamotrigine:  Novel Treatments for Mood and Anxiety Disorders, published in CNS Spectrums, noted that "an honorarium was received from Medical Education Systems for preparation of this article," but never revealed Parke-Davis' retention and payment of MES or the fact that the article was written by MES personnel, under contract to Parke-Davis.

85.    There was  a common communication network for sharing information on a regular basis among MES, Defendants and the physician participants.  MES and Defendants routinely exchanged letters, memoranda, emails and phone calls, as did MES and the physician participants.

### (f)    HCC

86.    Healthcare Communications Group ("HCC") was a pharmaceutical marketing firm located in New Jersey.  HCC managed and coordinated various marketing events for the Defendants, including consultant meetings and other peer-to-peer marketing events.  HCC carried out off-label marketing events for Defendants all around the country.  In those events, HCC selected speakers known to be acceptable to Defendants who support off-label use of Neurontin.  Some, but not all, of the events HCC presented on behalf of the Promotion Enterprise included:

| Event | Date | Location |
|---|---|---|
| Emerging Concepts on the Use of Anticonvulsants CME at Marriott Sawgrass Resort | April 1997 | Ponte Vedra, FL |
| Emerging Concepts on the Use of Anticonvulsants CME | May 1997 | Saratoga Springs, NY |
| Emerging Concepts on the Use of Anticonvulsants | June 1997 | Boston, MA |

| CME | | |
| Emerging Concepts on the Use of Anticonvulsants CME | July 1997 | Saratoga Springs, NY |
| Emerging Concepts on the Use of Anticonvulsants CME | May 1998 | Hershey, PA |

### (g)  AMM/Adelphi

87.     AMM/Adelphi is a marketing firm originally based in New York, New York that was acquired by Access Worldwide, based in Boca Raton, Florida.  AMM/Adelphi also assisted Defendants in publishing a variety of articles about Neurontin and off-label uses.  Similar to the tactics used with MES, Defendants decided the topics to be covered and paid all expenses in connection with the creation of these articles.

88.     AMM/Adelphi developed the articles using its own technical writers, with very little, or in some cases, no input from the authors.  This occurred even in connection with case histories that purported to describe the "author's" personal treatment of actual patients.  The "authors" that approved the final drafts were physician participants in the Promotion Enterprise and were each paid an honorarium of $1,000 to lend their names to these articles.

89.     AMM/Adelphi prepared at least eight different case history reports for the Northeast CBU alone in 1996.  Most of the articles that were developed by AMM/Adelphi related to off-label uses of Neurontin, including pain, neuropathic pain, RSD and restless leg syndrome.  The articles AMM/Adelphi was retained to prepare included the following:

| Credited Author | Subject |
|---|---|
| Smith | Neurontin for Treatment of Pain |
| Dwarkaneth | Neuropathic pain & RSD |
| Enrique Carrazana | Neuropathic pain (Journal of Pain and Symptom Management) |
| Steven Schachter | Neuropathic pain (Journal of Pain and Symptom Management) |
| Sutherland | Psychiatric uses |

90.     There was  a common communication network for sharing information on a regular basis among AMM/Adelphi, Defendants and the physician participants.  AMM/Adelphi

and Defendants routinely exchanged letters, memoranda, emails and phone calls, as did

AMM/Adelphi and the physician participants.

### 2.    The Role of Physicians -- The Physician Participants

91.    One of Parke-Davis' principal strategies for fraudulently marketing Neurontin

was to target key physicians, preferably within the major teaching hospitals, to serve as

"Neurontin champions."  These doctors promoted Neurontin to their peers through peer selling

programs by (i) misrepresenting Neurontin's safety, medical efficacy, effectiveness and

usefulness for off-label uses; (ii) claiming that Neurontin was being widely prescribed by other

physicians for off-label uses without disclosing the deception that drove those prescriptions; (iii)

suggesting possible mechanisms of action that could explain Neurontin's supposed efficacy in

off-label areas, even though they knew the mechanism of action was not and still is not

understood; and (iv) misrepresenting that they were privy to the latest clinical data that would

support off-label uses, but which had not yet been released.

92.    To lure physicians to participate in the Promotion Enterprise, Defendants

approached target doctors and informed them of Defendants' interest in funding research

opportunities and clinical trials at their institutions; doctors who were willing to "speak

favorably" about Neurontin could likely receive substantial funds in the form of research grants.

Parke-Davis instructed its sales departments to select doctors at the major teaching hospitals to

become "Neurontin experts," who in turn would be paid to deliver the Neurontin message to

other physicians to increase Neurontin sales.  This could be done formally to other physicians at

marketing events or informally to colleagues within the hospital or practice.

93.    Having recruited these physicians, the Promotion Enterprise created the false

perception that physicians were clinically using Neurontin and investigating its efficacy for off-

label uses on their own initiative, and not as a result of Defendants' illegal and fraudulent

marketing activities.  Defendants used a cadre of physicians (the physician participants) to create

this perception.  Defendants, principally through the vendor participants, paid these physicians

(in addition to providing free travel to resorts, free lodging and free meals) to induce them to

write journal articles and give talks at medical education seminars, advisory boards, consultant

meetings, speakers bureaus and similar events that favorably discussed the off-label use of

Neurontin.  The individual physician participants received tens of thousands of dollars to

promote Neurontin's off-label uses.  In fact, some individual physician participants received

more than $100,000 for their participation.

94.    Among other activities, the physician participants gave off-label Neurontin

presentations at national, regional and local marketing events set up by Defendants and the

vendor participants, and made favorable statements about Neurontin's off-label uses in

teleconferences.

95.    The physician participants were absolutely critical to the success of the Promotion

Enterprise and all of the marketing plans crafted by Defendants and the vendor participants.  The

participation of these select physicians allowed Defendants and vendor participants to disguise

promotional events as educational events or consultants meetings with purported neutral doctors,

when in fact the speakers were biased and the events were promotional.

96.    Some physicians participated in the Promotion Enterprise by publishing

misleading journal articles and letters to the editor about off-label use of Neurontin.  Defendants

paid large sums of money, often in the form of research grants, to the physician participants in

order to publish such articles.  In some cases, the physician was not required to perform any

research or even write the article.  Marketing firms, including MES and AMM/Adelphi, who

were financed by Defendants, ghostwrote articles under the physician participants' names.

Physicians merely had to "lend" their names to the articles, in exchange for a payment.

97.    Physicians who participated in the Promotion Enterprise, either as speakers or as authors, entered into a mutually advantageous relationship with Defendants.  The more favorable a physician's statements were, the more he or she received in the form of speaker fees or research grants.  Physicians who refused to deliver the favorable off-label message Defendants wanted were blackballed, and did not receive additional payments.

98.    Physician participants worked with, and were retained by, multiple vendor participants.  All of the physician participants had personal relationships with employees of Defendants, and it was frequently Defendants who recommended to the vendors specific individual physician participants for events.  Thus, a physician participant might speak at a resort for an educational event held by Sudler & Hennessey one weekend, give an almost identical presentation at a different resort hundreds of miles away for Physician World the next weekend, and provide the same information (and misrepresentations) at a dinner meeting sometime in between for MEDED at a third location.

99.    Plaintiffs do not at this time know the identity of all of the physician participants. The Promotion Enterprise sponsored hundreds of events across the country and numerous articles between 1996 and 2004 and Plaintiffs have only had an opportunity to review the records of a small subgroup of these events and articles.  Based on the records reviewed to date at least 28 physician participants, identified below, each received $25,000 or more for participating in the Promotion Enterprise's activities for the time period indicated.  Each of these physician participants appeared at multiple events and deceptively promoted off-label use of Neurontin at each event.

| Physician Participant | Amount | Physician Participant | Amount |
|---|---|---|---|
| Wilder, Joe (1/94-11/97) | $307,958 | Nitz, Dennis (5/95-5/96) | $58,187 |
| Ramsey, R. Eugene (2/94-12/97) | $163,446 | Yerby, Mark (3/94-12/97) | $57,741 |

| Physician Participant | Amount | Physician Participant | Amount |
|---|---|---|---|
| Browne, Thomas (9/93-12/97) | $142,364 | Wheless, James (1/95-11/97) | $54,829 |
| Ferrendelli, James (11/93-10/97) | $124,863 | Leppik, Ilo (12/93-11/97) | $49,250 |
| Beydoun, Ahmad (6/94-12/97) | $122,036 | Merren, Michael (3/94-11/97) | $47,606 |
| Pellock, John (3/94-10/97) | $119,940 | DeToledo, John (10/95-12/97) | $45,434 |
| Bergey, Gregory (9/93-12/97) | $106,987 | Ritaccio, Anthony (3/94-1/97) | $44,258 |
| Morrell, Martha (10/93-11/97) | $91,730 | Uthman, Basim (5/94-12/97) | $43,902 |
| McLean, Michael (7/93-11/97) | $83,343 | Smith, Michael (3/94-9/97) | $40,028 |
| Sachdeo, Rajesh (3/94-12/97) | $74,954 | Devinsky, Orrin (5/94-10/97) | $37,250 |
| Treiman, David (4/94-10/97) | $73,118 | Moshe, Solomon (4/94-12/97) | $34,250 |
| Morris, George (3/94-11/97) | $72,878 | Gelblum, Jefferey (1/96-12/97) | $28,978 |
| Schachter, Steven (5/94-9/97) | $71,477 | Longmire, David (11/95-5/97) | $28,469 |
| Bruni, Joseph (10/93-12/97) | $60,585 | Rosenfeld, William (3/94-2/97) | $26,730 |

### 3.     Participation and Knowledge of the Vendor and Physician Participants

100.    The vendor and physician participants were active participants in Defendants' publication strategy and were aware of Defendants' scheme to improperly market Neurontin for off-label uses and at excessive dosages.  Cline Davis, Physicians World, Sudler & Hennessey, MEDED/MEDCON, MES and AMM/Adelphi each worked with Defendants and the physician participants, for a common purpose, and as a continuing unit to perpetrate the fraudulent scheme relating to the creation of events, seminars, publications and articles promoting Neurontin for off-label uses for which it had not been proven to be safe and effective. The vendor and physician participants' knowledge, involvement and activity is evidenced by:

- the coordination of the numerous events, seminars and presentations across the country among Defendants, vendor participants and physician participants as to time, location and message content;

- the coordination of the numerous articles published as part of the Enterprise among Defendants, vendor participants and physician participants as to time, publication and message content;

- the failure of each vendor and physician participant to advise government regulators, patients and private insurers, including Plaintiffs, of the existence and spread of such misinformation concerning off-label uses of Neurontin;

- the acceptance by the vendor and physician participants of various types of incentives from Defendants in return for their agreement to host, coordinate and speak at events, and write, author, and have published articles containing misrepresentations, knowing that other physicians, consumers and healthcare professionals would use such information; and

- the agreement of the vendor and physician participants to permit Defendants to control the information relayed to the public in such presentations and articles.

101.    Further, Defendants, vendor participants and physician participants deliberately omitted from the events in which they were involved the following:

- the lack of clinical trial evidence to support Neurontin's off-label uses;

- negative clinical trial results demonstrating that Neurontin was no more effective than placebo for several off-label conditions;

- negative anecdotal evidence that Neurontin did not work for off-label conditions;

- that virtually all publications and studies that allegedly supported Neurontin's off-label use had been funded by Defendants;

- that virtually all publications and studies that allegedly supported Neurontin's off-label use had been initiated by Defendants pursuant to a corporate marketing plan designed to increase off-label sales and excessive prescriptions for Neurontin;

- that no scientific evidence explained Neurontin's mechanism of action, which meant there was no scientific explanation regarding why Neurontin might work for the off-label uses and at the excessive dosages for which Neurontin was being promoted;

- that Parke-Davis had deliberately decided not to publish or publicize any studies concluding that Neurontin was not effective for off-label uses or at the dosages being touted;

- that the participating doctors conducting the peer selling had been paid substantial sums to use Neurontin on their patients for off-label purposes or at the dosages being touted; and

- that the events were not funded, as advertised, by an unrestricted grant from Defendants, but were conditioned upon the participating vendors and sponsoring institutions putting on presentations that painted off-label use of Neurontin in the most favorable light.

**E.    Defendants' Use of the Promotion Enterprise to Fraudulently Promote Neurontin -- The Misrepresentations**

**1.    Introduction**

102.    Although Defendants have extensively promoted Neurontin for off-label purposes, few placebo-controlled, clinical studies have been conducted on off-label uses of Neurontin. Most of those that have been conducted produced negative or inconclusive results. Placebo-controlled clinical trials for Neurontin's use for bipolar disorder, unipolar disorder, essential tremor, spasticity, controlled diabetic pain and panic disorder all failed to show that Neurontin is effective for those conditions.

103.    Although Plaintiffs are aware of Defendants' policy of suppressing unfavorable studies because of the express terms of the corporate decisions implementing the publication strategy, most information regarding negative studies funded by Parke-Davis remains in the sole possession, custody or control of Parke-Davis and/or members of the Promotion Enterprise. Defendants have never produced the results of many of these studies to the public or to Plaintiffs or their attorneys.

## 2.    **False and Misleading Statements Regarding Pain**

104.    At each of the pain presentations known to Plaintiffs, presenters expressly stated, or implied, that Neurontin was medically safe, efficacious, effective and useful for the treatment of pain.  A representative statement was made by Dr. David Longmire at the Jupiter Beach consultants meeting in April 1996 when he stated that Neurontin was effective for the treatment of pain.  Dr. Longmire repeated that statement at a May 1996 consultants meeting at the Ritz Carlton in Boston, and another physician participant, Dr. Steven Schacter made a similar statement at the same meeting when he stated that "pain specialists are finding that low dosages of Neurontin are effective."  Plaintiffs are aware of comparable statements being made by another physician participant, Dr. Bruce Nicholson, in April 1996 at the Jupiter Beach consultants meeting in May 1996 at the Boston Ritz Carlton consultants meeting, and in June 1996 at a Philadelphia consultants meeting.

105.    Dr. Longmire has sued Defendants for fraud, claiming he was used by Defendants as "an unwitting pawn" in Defendants' unlawful  scheme to increase sales of Neurontin.  David R. Longmire, M.D. v. Pfizer, Inc., et al., CV-2006-120 (Cir. Ct., Franklin Co., Ala.).  In paragraph 30 of his Amended Complaint, dated May 15, 2006, Dr. Longmire alleges that he was hired by Defendants and their marketing firms and spoke at numerous conferences across the country organized by Defendants touting Neurontin for pain management:

30.     In 1996, Professional Post-Graduate Services, acting as Warner-Lambert's agent, hire Dr. Longmire to give presentations in Phoenix, Arizona, Buffalo, New York, and Dallas, Texas. Also in 1996, ProWorx, acting as Warner-Lambert's agent, hired Dr. Longmire to give presentations in Jupiter Beach, Florida, Philadelphia, Pennsylvania, Boston, Massachusetts, and New York, New York. The Parke-Davis Speakers Bureau hired Dr. Longmire to speak in Pittsburgh, Pennsylvania, and Long Island, New York in 1996 and in Fort Lauderdale, Florida in 1998. MEDED, acting as Warner-Lambert's agent, invited Dr. Longmire to speak in Newark, New Jersey in 1997 and in Franklin County, Alabama in 1998.

106.     Upon information and belief, similar statements were made at all events presented by the Promotion Enterprise that discussed Neurontin's use for pain, which included the following events:

| Event | Date | Location |
| --- | --- | --- |
| Neurontin Consultants Meeting | April 19-21, 1996 | Jupiter Beach, FL |
| Neurontin Consultants Meeting | May 3-4, 1996 | Philadelphia, PA |
| Neurontin Consultants Meeting | May 10-11,1996 | Boston, MA |
| Advisory Board Meeting at the Grand Wailea Resort Hotel and Spa | April 14-16, 2000 | Maui, HI |
| Merritt-Putnam Speakers Training Advanced Perspectives in the Management of Neurological and Mood Disorders at the Enchantment Resort | April 28-30, 2000 | Sedona, AZ |
| New Treatment Options for the Management of Pain: The Role of Anticonvulsants at the Four Seasons | April 2000 | Irving, TX |
| Advisory Board at the Disney Yacht Club | May 26, 2000 | Orlando, FL |
| New Directions in the Understanding and Treatment of Pain at the Plaza Hotel | March 24, 2001 | New York, NY |
| New Directions in the Understanding and Treatment of Pain at the Hilton Novi | March 2-3, 2001 | Detroit, MI |
| New Directions in the Understanding and Treatment of Pain at the Westin Galleria | May 4-5, 2001 | Houston, TX |
| New Directions in the Understanding and Treatment of Pain at the Harbor Court Hotel | February 9-10, 2001 | Baltimore, MD |
| New Directions in the Understanding and Treatment of Pain at the Fairmont Kansas City | March 9-10, 2001 | Kansas City, MO |
| New Directions in the Understanding and Treatment of Pain at the Peabody Memphis | May 11-12, 2001 | Memphis, TN |

| Event | Date | Location |
|-------|------|----------|
| Advisory Board Meeting at the Grand Wailea Resort Hotel and Spa | April 14-16, 2000 | Maui, HI |
| New Directions in the Understanding and Treatment of Pain at the Fairmont San Francisco | March 16-17, 2001 | San Francisco, CA |
| Advisory Board Meeting at the Westin Resort | June 16-18, 2000 | Hilton Head, SC |
| New Directions in the Understanding and Treatment of Pain at the Sheraton Universal City | May 18-19, 2001 | Universal City, CA |
| New Directions in the Understanding and Treatment of Pain at the Miami Biltmore | May 18-19, 2001 | Miami, FL |
| New Directions in the Understanding and Treatment of Pain at the Ritz Carlton New Orleans | March 23-24, 2001 | New Orleans, LA |
| New Directions in the Understanding and Treatment of Pain at the Sheraton Music City | March 23-24, 2001 | Nashville, TN |
| New Directions in the Understanding and Treatment of Pain at the Ritz Carlton St. Louis | March 30-31, 2001 | St. Louis, MO |
| New Advances in the Treatment of Neuropathic Pain | October 9-11, 1998 | Madeira, Portugal |

107.     The speakers who made these statements did not have any clinical evidence to support such claims.  The statements implied that clinical trial evidence sufficient to establish medical safety and efficacy, effectiveness and usefulness existed, but with the exception of Neurontin's use for postherpetic neuralgia, there is no clinical trial evidence supporting the claim that Neurontin is effective for the treatment of pain.

108.     In virtually all of the presentations in which Neurontin's use for pain was promoted, neither the physician participant nor any person connected to the Promotion Enterprise acknowledged that no clinical trial evidence supported a claim of efficacy. Defendants' failure to disclose this material information made any statement that Neurontin was effective for any pain syndrome, other than postherpetic neuralgia, false and misleading.

109.     At every presentation concerning Neurontin's use for pain, "favorable" anecdotal evidence was presented to support Neurontin's use.  Unfavorable anecdotal evidence was not disclosed even though Defendants were aware of such evidence.

110.    Although they were not supposed to discuss off-label indications with physicians, Parke-Davis sales representatives regularly made false statements to doctors about Neurontin's safety and medical efficacy, effectiveness and usefulness in treating pain.  The following are representative false statements by Defendants' sales force to doctors.  Plaintiffs were only able to obtain evidence of such statements for a limited time period between 1995 and 1997, but are aware of  "verbatim" reports -- anonymous surveys filled out by physicians after they have been in contact with a pharmaceutical company's sales representative which the pharmaceutical company later reviews to see if it is effectively communicating its sales message and remaining within FDA guidelines -- which exist for the last several years.  Upon information and belief, review of more recent verbatim reports will demonstrate that similar statements were regularly made by Defendants' sales forces from 1998 through 2004.

- In October 1995, a Parke-Davis sales representative stated that Neurontin had received a "New indication for chronic pain."

- In December 1995 a Parke-Davis sales representative stated that Neurontin was a "Good anticonvulsant for chronic pain and restless leg syndrome."

- In July 1996, a Parke-Davis sales representative stated that Neurontin was "Effective for many types of chronic pain."

- In December 1996, a Parke-Davis sales representative stated that Neurontin was "Good for back pain; neuropathic pains."

**3.     False and Misleading Statements Regarding
        Diabetic Peripheral Neuropathy**

111.    Prior to October 16, 1997, Parke-Davis had no reasonable basis to claim or suggest that Neurontin was safe or effective or could be possibly effective to treat diabetic peripheral neuropathy.  Nonetheless, at events produced by the Promotion Enterprise, physician

participants routinely falsely stated that Neurontin was safe and effective for this condition.  For

example, at the Jupiter Beach consultants meeting in April 1996, Dr. Nicholson stated that

diabetic neuropathy patients "will" have their burning sensations relieved with the use of

Neurontin.  No clinical trial support or comparable evidence existed when this statement was

made.  Upon information and belief, similar statements were made at all events presented by the

Promotion Enterprise that discussed Neurontin's use as a treatment for diabetic peripheral

neuropathy, which included the following events:

| Event | Date | Location |
|-------|------|----------|
| Neurontin Consultants Meeting | April 19-21, 1996 | Jupiter Beach, FL |
| New Advances in the Treatment of Neuropathic Pain | October 9-11, 1998 | Madeira, Portugal |

112.    In 1996, Parke-Davis funded a placebo-controlled clinical trial concerning the use

of Neurontin to treat diabetic peripheral neuropathy.  The trial was conducted by Dr. Kenneth

Gorson, a doctor at St. Elizabeth's Hospital in Boston, Massachusetts.  The results of Gorson's

study were negative.  On August 23, 1997, Gorson submitted a draft of his study to Parke-Davis,

accompanied by an abstract plainly stating that the study did not support Neurontin's use for

diabetic peripheral neuropathy.  Its conclusion stated that gabapentin "is probably no more

effective than a placebo in the treatment of painful diabetic neuropathy."

113.    Nonetheless, Parke-Davis wrote and circulated a revised abstract that hid and

misrepresented Dr. Gorson's negative findings and gave his study a more favorable conclusion.

In January 1998, Parke-Davis circulated this revised abstract of the Gorson article with a

conclusion stating, "Gabapentin may be effective in the treatment of painful diabetic neuropathy.

Our results suggest that further studies evaluating higher dosages of gabapentin are warranted."

Dr. Gorson refused to adopt this revision.  In February 1999, more than one year later and almost

two years after the study's completion, the results of Dr. Gorson's study were published in a

letter to the editor of the Journal of Neurology, Neurosurgery & Psychiatry, vol. 66, pages 251-52.  The article concluded, "The results of this study suggest that gabapentin is probably ineffective or only minimally effective for the treatment of painful diabetic neuropathy at a dosage of 900 mg/day."

114.     Parke-Davis also submitted to the Drugdex Drug Information System, a widely used computer database that contains pharmaceutical information and article citations, a draft of an article which contained language that is consistent with the false abstract of Dr. Gorson's study circulated by Parke-Davis but which is not contained in the actual article.  Drugdex published a citation to the Gorson article, which states, falsely, "the authors suggest that higher doses of gabapentin are needed."  No such language is in the article.  The Drugdex article omits the author's conclusion that gabapentin is "probably ineffective" for the treatment of painful diabetic neuropathy.

115.     After it received the results of the Gorson study, the Promotion Enterprise continued to promote Neurontin as effective for treating diabetic peripheral neuropathy at hundreds of presentations nationwide.  The physician participants did not describe the results and conclusions of Dr. Gorson's study, nor did Defendants' representatives provide such information.  Defendants' failure to describe the negative studies breached their obligation to provide fair and balanced information and made their representations regarding Neurontin's use for diabetic peripheral neuropathy false and misleading.

**4.     False and Misleading Statements Regarding
            Restless Leg Syndrome**

116.     At events produced by the Promotion Enterprise, physician participants routinely misrepresented that Neurontin was effective for the treatment of nocturnal myclonus, more commonly known as restless leg syndrome and/or periodic limb movement (collectively,

"restless leg syndrome").  Patients suffering from these conditions have frequent, involuntary limb movements interfering with the quality and duration of sleep.  Events presented by the Promotion Enterprise that discussed Neurontin's use as a treatment for restless leg syndrome included the Advisory Board Meeting held at the Hyatt Regency Hotel on March 29, 2000 in San Antonio, Texas.

117.    Upon information and belief, at every presentation concerning Neurontin's use for restless leg syndrome, neither the physician participants, the vendor participants, nor Defendants informed the attendee physicians that Defendants had deliberately suppressed negative studies pursuant to the publication strategy.  As described below, there was in fact at least one negative study that found that Neurontin was not effective for this condition, and upon information and belief, the results of this study were never disclosed when Neurontin's use for restless leg syndrome was discussed.

118.    Pursuant to its plan to reward doctors who used Neurontin for off-label indications, in 1996 Parke-Davis funded an open label study conducted by Dr. Bruce Ehrenberg of the New England Medical Center "to assess the efficacy of gabapentin [Neurontin] in the treatment of restless leg syndrome/periodic limb movements."

119.    Dr. Ehrenberg's study was negative, finding that sleep improved for less than half of the participants who took the drug.  Moreover, the drug did not affect any of the participants' limb movements during sleep, and the majority of participants experienced no improvement in quality of sleep.

120.    Despite these adverse results, Parke-Davis' medical liaisons falsely told physicians that Dr. Ehrenberg's patients had a 90% response rate to Neurontin.  Medical liaisons discussed making such assertions routinely in a June 1996 conference call taped by Dr. David

Franklin.  Neither the medical liaisons nor the physician participants amended their statements to physicians once the results of Dr. Ehrinberg's study were known.

121.     Former Parke-Davis officials have admitted that although the results were not favorable, the results of Dr. Ehrenberg's study should have been published and made known to doctors.  Indeed, Parke-Davis hired AMM/Adelphi to organize his data and to develop a manuscript for him.  After the negative results were received, however, Parke-Davis took no steps to publish an article based on Dr. Ehrenberg's results.  Parke-Davis' actions were consistent with its publication strategy, which intended to only publish studies with favorable results.  Parke-Davis' policy of only publishing and disclosing the results of favorable studies directly violated its obligation to disclose favorable and unfavorable results pursuant to its obligation to make only fair and balanced statements relating to its drug products.

122.     In addition, an article widely circulated by Defendants concerning the use of Neurontin in the treatment of restless leg syndrome asserted that the authors Gary A. Mellick and Larry B. Mellick had not and never would receive financial benefit from anyone with an interest in Neurontin.  The Mellick brothers had in fact received tens of thousands of dollars for acting as speakers at Defendants' events.  Moreover, Gary Mellick never disclosed that he was a consultant for Parke-Davis and was assisting the company in developing the market for off-label uses of Neurontin.

123.     Although they were not supposed to discuss off-label indications with physicians, Parke-Davis sales representatives regularly made false statements to doctors about Neurontin's safety, efficacy, effectiveness and usefulness in treating restless leg syndrome.  The following are representative false statements by the sales force to doctors.  Plaintiffs were only able to obtain evidence of such statements for a limited time period between 1995 and 1997, but are aware of  "verbatim" reports that exist for the last several years.  Upon information and belief,

review of recent verbatim reports will demonstrate that similar statements were regularly made by the Defendants' sales forces from 1998 through 2004.

- In August 1996, a Parke-Davis sales representative falsely stated that Neurontin was "Effective in controlling postherpetic pain; restless leg syndrome, peripheral neuropathy, migraine headache."

- In December 1996, a Parke-Davis sales representative stated that Neurontin was "Good for restless leg syndrome."

     **5.**     **False and Misleading Statements Regarding Bipolar Disorder**

124.     Parke-Davis knew when it created its original marketing assessment for the use of Neurontin to treat bipolar disorder (commonly called manic depression) in May 1995 that there was no scientific rationale for Neurontin being a safe and effective treatment for the condition. Nonetheless, Parke-Davis planned and intended the Promotion Enterprise to promote Neurontin heavily for bipolar disorder.  Events presented by the Promotion Enterprise that discussed Neurontin's use as a treatment for bipolar disorder included the following:

| Event | Date | Location |
|---|---|---|
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series: Dinner Meeting at Maison Robert | March 16, 1998 | Boston, MA |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series: Dinner Meeting at Sunset Grill | March 16, 1998 | Nashville, TN |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series: Dinner Meeting at the Pescatore Fish Café | March 16, 1998 | Seattle, WA |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series: Dinner Meeting at Patrick's Bayside Bistro | March 17, 1998 | St. Pete's Beach, FL |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series: Dinner Meeting at the Heathman Hotel | March 17, 1998 | Portland, OR |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series: Dinner Meeting at the | March 18, 1998 | Philadelphia, PA |

| Event | Date | Location |
|-------|------|----------|
| Downtown Club | | |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series: Dinner Meeting at Morton's of Chicago – Buckhead | March 18, 1998 | Atlanta, GA |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series: Dinner Meeting at the Huntington Hotel | March 18, 1998 | San Francisco, CA |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series: Dinner Meeting at the Brass Elephant | March 19, 1998 | Baltimore, MD |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series: Dinner Meeting at Ristorante DeGrezia | March 19, 1998 | New York, NY |
| The Use of Anticonvulsants in Psychiatry | October 23–25, 1998 | Barcelona, Spain |
| Parke-Davis Speakers Bureau Meeting at the Fairmont Scottsdale Princess | January 21-23, 2000 | Scottsdale, AZ |
| Merritt-Putnam Speakers Bureau Current Perspectives in the Understanding of Neurobehavioral Disorders at the Four Seasons Regent Beverly Wilshire | March 24-26, 2000 | Beverly Hills, CA |
| Advisory Board Meeting at the Hyatt Regency Hotel | March 29, 2000 | San Antonio, TX |
| Merritt-Putnam Speakers Bureau at the Wyndham New Orleans at Canal Place | April 7-9, 2000 | New Orleans, LA |
| Merritt-Putnam Speakers Training Advanced Perspectives in the Management of Neurological and Mood Disorders at the Enchantment Resort | April 28-30, 2000 | Sedona, AZ |

125.    The Promotion Enterprise falsely claimed that Neurontin was effective for the treatment of bipolar disorder to induce physicians to prescribe Neurontin to treat this condition. The Promotion Enterprise failed to inform the physicians of material information, and its statements were false and misleading, on every occasion in which the Enterprise gave a presentation on bipolar disorder without informing physicians that there was no scientific basis supporting this use.

126.    As early as May 20, 1997, Parke-Davis knew that clinical trial evidence established that Neurontin was not significantly superior to placebo in treating bipolar disorder.

At the 1997 annual meeting of the American Psychiatric Association in San Diego, California, investigators presented the results of a placebo-controlled clinical trial comparing placebo, lamotrigine and Neurontin on depression and bipolar patients. The results showed that Neurontin was not significantly more effective than placebo and considerably less effective than the competitor drug lamotrigine.

127.     Despite the results of the clinical trials, the Promotion Enterprise continued to make presentations to physicians promoting Neurontin to treat patients with bipolar disorder. For example, the Promotion Enterprise created and sponsored a series of dinner meetings for psychiatrists entitled "Closing the Psychiatry-Neurology Divide: Emerging Uses of Anticonvulsants." This program was presented dozens of times in 1998, including in St. Petersburg, Florida at Patrick's Bayside Inn. As part of the program, psychiatrists were informed that Neurontin was indicated for bipolar disorder, that early evidence suggested that it had anti-depressive and mood stabilizing effects, and that "data are increasing but currently limited to favorable case reports and open trials." The program did not inform attendees of the unfavorable clinical trials that found that Neurontin was not effective for bipolar disorder.

128.     Similarly, Parke Davis sales force regularly made false statements to physicians about Neurontin's utility in treating bipolar disorder. Plaintiffs were only able to obtain evidence of such statements for a limited time period between 1995 and 1997, but are aware of "verbatim" reports that exist for the last several years. Upon information and belief, recent verbatim reports will demonstrate that similar statements were regularly made by Defendants' sales force from 1998 through 2004. Representative statements made to physicians included:

- At a Parke-Davis marketing event in 1997, Parke-Davis falsely stated that Neurontin was "effective" for "bipolar."

- In December 1998, a Parke-Davis sales representative falsely stated to a physician that Neurontin was an "effective treatment of bipolar disorder."

- At a Parke-Davis marketing event in December 1998, Parke-Davis falsely stated that Neurontin was "Effective on bipolar."

- At a Parke-Davis marketing event at the airport Marriott in San Francisco in August 1998, Parke-Davis falsely stated that Neurontin was "Innovative and effective … for bipolar II."

129.    Parke-Davis did not publish the results of the negative bipolar disorder clinical trial until 2000.  Drugdex has never included citations to either of the articles that document the negative clinical trials for bipolar disorder in its compendium.

### 6.    False and Misleading Statements Regarding Social Phobia

130.    At events produced by the Promotion Enterprise, physician participants routinely stated that Neurontin was effective for the treatment of social phobia.  Events presented by the Promotion Enterprise which discussed Neurontin's use as a treatment for social phobia included the following:

| Event | Date | Location |
| --- | --- | --- |
| Advisory Board Meeting at the Hyatt Regency Hotel | March 29, 2000 | San Antonio, TX |
| Parke-Davis Speakers Bureau Meeting at the Fairmont Scottsdale Princess | January 21-23, 2000 | Scottsdale, AZ |
| Merritt-Putnam Speakers Bureau Current Perspectives in the Understanding of Neurobehavioral Disorders at the Four Seasons Regent Beverly Wilshire | March 24-26, 2000 | Beverly Hills, CA |
| Merritt-Putnam Speakers Bureau at the Wyndham New Orleans at Canal Place | April 7-9, 2000 | New Orleans, LA |
| Merritt-Putnam Speakers Training Advanced Perspectives in the Management of Neurological and Mood Disorders at the Enchantment Resort | April 28-30, 2000 | Sedona, AZ |
| 1998 CME Psychiatry Dinner Meeting and | March 16, 1998 | Boston, MA |

| Event | Date | Location |
|---|---|---|
| Teleconference Series: Dinner Meeting at Maison Robert | | |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series: Dinner Meeting at Sunset Grill | March 16, 1998 | Nashville, TN |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series: Dinner Meeting at the Pescatore Fish Café | March 16, 1998 | Seattle, WA |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series: Dinner Meeting at Patrick's Bayside Bistro | March 17, 1998 | St. Pete's Beach, FL |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series: Dinner Meeting at the Heathman Hotel | March 17, 1998 | Portland, OR |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series: Dinner Meeting at the Downtown Club | March 18, 1998 | Philadelphia, PA |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series: Dinner Meeting at Morton's of Chicago – Buckhead | March 18, 1998 | Atlanta, GA |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series: Dinner Meeting at the Huntington Hotel | March 18, 1998 | San Francisco, CA |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series: Dinner Meeting at the Brass Elephant | March 19, 1998 | Baltimore, MD |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series: Dinner Meeting at Ristorante DeGrezia | March 19, 1998 | New York, NY |
| The Use of Anticonvulsants in Psychiatry | October 23–25, 1998 | Barcelona, Spain |

Upon information and belief, at each of these events, participating physicians expressly stated, or implied, that Neurontin was effective for the treatment of social phobia.

131.     The speakers who made these statements did not have any clinical evidence to support such claims.  These statements implied that clinical trial evidence sufficient to establish causation existed, but as discussed below, the only clinical study conducted was inconclusive regarding Neurontin's effectiveness for the treatment of social phobia.  Prior to its receipt of results of its social phobia clinical trial on July 22, 1997, Parke-Davis had no reasonable

scientific basis for claiming that Neurontin was effective in treating social phobia, because no clinical trial data existed.

132.    Even after Parke-Davis received the results from its clinical study in July 1997, it could not state that the evidence unconditionally supported Neurontin's use for social phobia. The  authors of the study admitted that the data was limited.  They did not conclude that Neurontin was effective, and acknowledged that further studies were necessary to determine whether a dose-response relationship existed.  The authors of the study could not explain why there appeared to be wide ranges of effectiveness between male subjects and female subjects, and between individuals above age thirty-five compared to those below age thirty-five.

133.    Notwithstanding the lack of clinical trial evidence to support Neurontin's use for patients with social phobia, the Promotion Enterprise held numerous events where the physician participants informed physicians that Neurontin was effective for the treatment of social phobia, and failed to inform attendees of the limitations of the clinical trial evidence.  Such statements were false and misleading.

### 7.    False and Misleading Statements Regarding Panic Disorder

134.    Without favorable results from a well-designed panic disorder clinical trial that established Neurontin's efficacy for that condition, Parke-Davis had no reasonable scientific basis for claiming that Neurontin was effective in treating panic disorder.  Nonetheless at events produced by the Promotion Enterprise, physician participants routinely stated that Neurontin was effective for the treatment of panic disorder.  Events presented by the Promotion Enterprise which discussed Neurontin's use as a treatment for panic disorder included the following:

| Event | Date | Location |
|---|---|---|
| Advisory Board Meeting at the Hyatt Regency Hotel | March 29, 2000 | San Antonio, TX |

| Event | Date | Location |
|---|---|---|
| Parke-Davis Speakers Bureau Meeting at the Fairmont Scottsdale Princess | January 21-23, 2000 | Scottsdale, AZ |
| Merritt-Putnam Speakers Bureau Current Perspectives in the Understanding of Neurobehavioral Disorders at the Four Seasons Regent Beverly Wilshire | March 24-26, 2000 | Beverly Hills, CA |
| Merritt-Putnam Speakers Bureau at the Wyndham New Orleans at Canal Place | April 7-9, 2000 | New Orleans, LA |
| Merritt-Putnam Speakers Training Advanced Perspectives in the Management of Neurological and Mood Disorders at the Enchantment Resort | April 28-30, 2000 | Sedona, AZ |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series: Dinner Meeting at Maison Robert | March 16, 1998 | Boston, MA |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series: Dinner Meeting at Sunset Grill | March 16, 1998 | Nashville, TN |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series: Dinner Meeting at the Pescatore Fish Café | March 16, 1998 | Seattle, WA |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series: Dinner Meeting at Patrick's Bayside Bistro | March 17, 1998 | St. Pete's Beach, FL |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series: Dinner Meeting at the Heathman Hotel | March 17, 1998 | Portland, OR |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series: Dinner Meeting at the Downtown Club | March 18, 1998 | Philadelphia, PA |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series: Dinner Meeting at Morton's of Chicago – Buckhead | March 18, 1998 | Atlanta, GA |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series: Dinner Meeting at the Huntington Hotel | March 18, 1998 | San Francisco, CA |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series: Dinner Meeting at the Brass Elephant | March 19, 1998 | Baltimore, MD |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series: Dinner Meeting at Ristorante DeGrezia | March 19, 1998 | New York, NY |
| The Use of Anticonvulsants in Psychiatry | October 23–25, 1998 | Barcelona, Spain |

135.    The speakers who made these statements did not have any clinical evidence to support such claims.  These statements implied that clinical trial evidence sufficient to establish causation existed, but as discussed below, clinical studies that were conducted did not find Neurontin effective for the treatment of panic disorder.  On every occasion the Promotion Enterprise gave a presentation on the use of Neurontin for bipolar disorder without informing physicians that there was no scientific basis for using Neurontin, the Enterprise failed to inform the physician attendees of material information that was required to be presented for the statements on the use of Neurontin to not be misleading and false.

136.    Not until October 1997, did Parke-Davis receive results of its own clinical trial which found that Neurontin was no more efficacious than placebo in treating panic disorder. Parke-Davis did not publish the negative results of this clinical trial until 2000.  Despite the results of the clinical trial, the Promotion Enterprise continued to mislead physician attendees at various events and seminars sponsored by the Promotion Enterprise by failing to disclose the negative clinical trial evidence and representing that Neurontin was effective and useful to treat panic disorder.

### 8.    False and Misleading Statements Regarding Migraine

137.    Parke-Davis knew that there was no preclinical rationale supporting the use of Neurontin in migraine prophylaxis.

138.    Parke-Davis conducted a twelve-week migraine prophylaxis study in Europe during the late 1980s which revealed no statistically significant difference in migraine attack frequency between placebo and 900 mg per day of Neurontin therapy.

139.    In addition to the failed European migraine trial, Parke-Davis knew of several reports of negative results of Neurontin for migraine use, including reports from Dr. Seymour Solomon, Director of the Headache Unit at Montefiore Medical Center; Dr. John Rothrock,

Chairman of the Department of Neurology at University of Alabama; Dr. Kenneth Michael

Anthony Welch, Professor of Clinical Neurology at the University of Michigan; and Dr. Fred

Michael Cutrer, Department of Neurology at Massachusetts General Hospital.

140.    Parke-Davis never disclosed the negative European trial on migraine to any

persons outside of the company, and the negative results were never published.

141.    On May 25, 1996, Parke-Davis held an advisory board meeting to discuss

"Gabapentin in the Management of Migraine."  Parke-Davis' principal investigator for

Neurontin and migraine chaired the meeting, and there were several other physicians in

attendance.  There were also several Parke-Davis employees in attendance, including the author

of the marketing assessment, John Boris, who was aware of the failed European clinical trial.

Vendor participant AMM/Adelphi ran the meeting.  The purpose of the meeting was to discuss

Neurontin's possible utility in the area of migraine and to solicit feedback on the development of

clinical trials.

142.    At the advisory board meeting, Parke-Davis suppressed any reference to the failed

migraine study of the late 1980s.  Leslie Magnus-Miller, Parke-Davis' Medical Affairs Director,

was directly asked, "But do you have any data [relating to Neurontin and migraine]?"  Dr.

Magnus-Miller responded:  "We didn't…No, not really, because we didn't capture headache

baseline."  Edda Guerrero added:  "Unfortunately we did not, not even in monotherapy I think.

Right?"  John Boris did not correct this misstatement.  Parke-Davis also failed to mention that

there was "no established preclinical rationale that would support the use of Neurontin in

migraine prophylaxis."

143.    Thereafter, pursuant to marketing strategies and tactics developed by Parke-Davis

and the Promotion Enterprise, the Promotion Enterprise regularly presented programs in which

physician participants touted Neurontin as being effective for the treatment of migraine. Events where such presentations were made include the following:

| Event | Date | Location |
|---|---|---|
| Advisory Board Meeting at the Hyatt Regency Hotel | March 29, 2000 | San Antonio, TX |
| Gabapentin in the Management of Migraine | May 25, 1996 | Short Hills, NY |

Such statements were false and misleading. In these presentations, Parke-Davis failed to inform physician participants of the failed migraine trial or the negative anecdotal evidence it received from its own advisory board physicians. It also failed to inform physicians that there was no established rationale or clinical trial evidence that would support the use of Neurontin for migraine. Defendants' failure to provide this information made any prior statements about Neurontin's use for migraine false and misleading.

144. Parke-Davis sales representatives routinely made false statements regarding the safety, efficacy, effectiveness and usefulness of Neurontin in treating migraine. Plaintiffs were only able to obtain evidence of such statements for a limited time period between 1995 and 1997, but are aware of "verbatim" reports that exist for the last several years. Upon information and belief, recent verbatim reports will demonstrate that similar statements were regularly made by the Defendants' sales forces from 1998 through 2004. Representative statements made to physicians include a statement made by a Parke-Davis salesperson in August 1996 who stated "Effective in controlling … migraine headache."

9. **False and Misleading Statements Regarding Monotherapy for Epilepsy**

145. The Promotion Enterprise repeatedly fraudulently asserted that Neurontin was effective as a monotherapy treatment for epilepsy. Parke-Davis knew that proof of efficacy for monotherapy required successful completion of two clinical trials demonstrating Neurontin's

efficacy.  Clinical Study 945-82, a double-blind, placebo-controlled study, was designed to be a pivotal study in support of monotherapy.  But the results were negative, failing to demonstrate that Neurontin was effective in treating seizures at doses up to 2400 mg per day.  In addition to failing to establish monotherapy efficacy, clinical trial 945-82 failed to establish a dose-response at 600, 1200 and 2400 mg per day.  Thus, as early as November 1995, Parke-Davis knew that clinical trial 945-82 did not support a monotherapy indication.

146.    Parke-Davis also knew that another clinical trial concerning Neurontin's use as a monotherapy, the Eastern European pilot study 945-177, an extension of the 945-77 protocol, failed to establish dose differentiation and statistically significant efficacy.  Parke-Davis did not intend to publish the results of 945-177, nor did it intend to publish the combined results of 945-77 and 945-177.

147.    Despite these negative trial results, the Promotion Enterprise continued to assert that Neurontin was an effective monotherapy for the treatment of epilepsy.  For example, at the Jupiter Beach consultants meeting in August 1996, Dr. Harden and Dr. LeRoy gave presentations to attending physicians claiming that Neurontin was effective for monotherapy.  Drs. Harden and Leroy misrepresented the results of Clinical Study 945-82, claiming that the study did not evidence a failure of Neurontin's efficacy and the lack of a dose response.  Further, Dr. Leroy misrepresented that the Eastern European clinical trial was successful, when, in fact, the double blind codes of the study had not been broken, and patient recruitment had not been completed.  Drs. Harden and Leroy could have only received information about the status of these unpublished clinical trials from Parke-Davis.  Thus, while at the time of the Jupiter Beach meeting the only long-term clinical trials concerning Neurontin's use as monotherapy demonstrated that Neurontin was not effective for that use, physician attendees at Jupiter Beach came away with the message that Neurontin was effective as a monotherapy.

148.     On September 16, 1996, Parke-Davis submitted a supplemental NDA to the FDA

seeking approval of Neurontin as a monotherapy for partial seizures.  On August 26, 1997, the

FDA rejected Parke-Davis' application finding that the clinical trials performed did not establish

effectiveness.  Parke-Davis actively promoted Neurontin for monotherapy before it applied for

FDA approval, before it received the FDA's response, and defiantly, after the FDA rejected its

application for monotherapy.  The Enterprise never mentioned the material fact that the FDA had

rejected the application for monotherapy.

149.     Representative events at which the Promotion Enterprise continued to make

presentations that Neurontin was effective for monotherapy without disclosing that the FDA had

denied Parke-Davis' application for a monotherapy indication included the following:

| Event | Date | Location |
|---|---|---|
| Advisory Board Meeting at the Hyatt Regency Hotel | March 29, 2000 | San Antonio, TX |
| Monotherapy Speakers Bureau Meeting at the La Quinta Resort | September 1997 | Palm Springs, CA |

150.     Parke-Davis sales representatives routinely made false statements concerning

Neurontin's safety, efficacy, effectiveness and usefulness as a monotherapy agent.  Plaintiffs

were only able to obtain evidence of such statements for a limited time period between 1995 and

1997, but are aware of "verbatim" reports that exist for the last several years.  Upon information

and belief, recent verbatim reports will demonstrate that similar statements were regularly made

by Defendants' sales force from 1998 through 2004.  Representative statements made to

physicians included:

•     In January 1997, a Parke-Davis sales representative falsely stated that Neurontin

      was "Excellent first line [monotherapy] or add-on prescription for seizures."

•     In a 1998 event, Parke-Davis falsely stated that Neurontin "is effective as

      monotherapy."

- In October 1995, a Parke-Davis sales representative falsely stated that Neurontin's indicated use was "soon to be monotherapy."

- In June 1998, after the FDA had already rejected the monotherapy indication and Parke-Davis had abandoned pursuing approval for monotherapy, a Parke-Davis sales representative stated that Neurontin was "moving toward monotherapy indication in seizures."

- In a Parke-Davis marketing event later in 1998, Parke-Davis went so far as to state that Neurontin was "now approved as monotherapy for seizures."

**10.    False and Misleading Statements Regarding
        Dosages Above the FDA-Approved Maximum**

151.    A central part of Defendants' strategy to increase sales of Neurontin was to convince physicians to prescribe it for adjunctive therapy and other medical conditions at doses far exceeding the FDA-approved level, which was 900 to 1800 mg per day. At an advisory board meeting Parke-Davis admitted, "we therefore went on an aggressive campaign to try to convince the doctors to push the dose of Neurontin up into the 2400 to 3600 mg range."

152.    Yet, as early as December 30, 1994, Parke-Davis knew that an increased dosage of Neurontin does not mean that it is more effective because only a certain amount of the drug is actually absorbed by the body due to the manner in which it is excreted and the maximum levels that can accumulate.

153.    As of November 1995, Parke-Davis knew that clinical trial 945-82 did not show a dose-related response. Parke-Davis also knew that clinical trial 945-77 failed to establish dose differentiation and statistically significant efficacy. See ¶¶ 137-44, supra. Such results were at odds with Parke-Davis' assertion that the larger the dose, the better the effect.

154.    Despite these negative trial results, Defendants initiated a nationwide campaign to

convince physicians to increase dosing to 2400 mg per day, 33% greater than the maximum

dosage approved by the FDA as safe and effective.

155.    In 1995 and 1996 Parke-Davis conducted an enormous Phase IV trial known as

STEPS.  Although STEPS took the form of a research clinical trial, it was in fact, a marketing

ploy designed to induce neurologists to become comfortable prescribing Neurontin at a far

higher dose than indicated in the FDA-approved labeling.  While most clinical studies have a

limited number of investigators treating a number of patients qualified for the study, the STEPS

protocol called for over 1,200 physician "investigators" to enroll only a few patients each.  The

participating physicians were instructed to titrate their patients to higher-than-labeled dosages of

Neurontin to demonstrate that patients could tolerate high dosages of the drug.  The STEPs study

was designed to condition physicians to prescribe dosages for non-study patients higher than

those found effective in the clinical trials monitored by the FDA.  Physicians who enrolled in the

STEPS study were paid for agreeing to participate in the study and for every patient enrolled.  At

the conclusion of the study, Parke-Davis offered each of the 1,200 investigators additional cash

for each patient the doctor kept on Neurontin after the study ended.

156.    Although Parke-Davis was routinely sponsoring programs that recommended that

dosages be increased to as high as 4800 mg per day, Parke-Davis knew that it did not have

sufficient toxicology data to prove that Neurontin was safe at dosages as high as even 3600 mg

per day.

157.    Nonetheless, during programs presented by the Promotion Enterprise, physician

participants routinely stated that dosages above the maximum approved by the FDA increased

Neurontin's efficacy.  For example, during the migraine advisory board meeting, Dr. Rafferty, a

preclinical researcher from Parke-Davis, falsely stated:  "The antiepileptic activity of gabapentin

is quite dose dependent.  Oh yeah."   The negative findings of the monotherapy trial were not

disclosed to the advisory board members.

158.     At the consultants meeting in Jupiter Beach in April 1996, Dr. Longmire stated: "most [patients] do better as you raise [the dose] higher."  At the same presentation, and in other presentations, such as the consultants meeting at the Boston Ritz Carlton in May 1996, Dr. Longmire stated that the only reason a patient who was actually taking his medication and not malingering would not receive any benefit from Neurontin was if he was not receiving a high enough dose.  Neither Dr. Longmire nor the other Parke-Davis personnel present informed the physicians that Parke-Davis' own clinical trials established that there was no dose relationship.

159.     At the consultants meeting at the Boston Ritz, Dr. Longmire deceptively stated: "the problem with Neurontin in terms of real trigeminal neuralgia is that it has to be titrated upward.  And when I say 1500 mg, that's the target starting dose.  There are colleagues in the Huntsville area who, I have people on 5400 with no side effects."  This statement was misleading in that it (a) misrepresented that Neurontin was effective for trigeminal neuralgia at higher-than-approved doses, (b) did not disclose side effects reported to Parke-Davis at higher levels, (c) did not disclose the absence of toxicology data at these levels, (d) did not disclose there was no clinical data to support Neurontin's efficacy on trigeminal neuralgia, and (e) failed to disclose Parke-Davis' own clinical trials that questioned the existence of a dose relationship.

160.     At the same consultants meeting in Boston, Dr. LeRoy stated:  "we found that clinical usage requires [daily dosages of] 2200, 3200, 3600, up to what I think … again, as I said earlier, a limit of about 4800 milligrams."  This statement failed to disclose any contrary findings, including Parke-Davis' own outpatient study which had failed to identify a dose related response.  Nor did this statement  disclose that Parke-Davis had no toxicology data establishing safety at doses this high.

161.     Notwithstanding the lack of toxicology data and clinical trial data supporting

Neurontin's use at higher doses, physicians who attended these consultants meetings were persuaded that they should be prescribing Neurontin at dosages in excess of its FDA-approved levels. One physician noted "one of the main messages that I got out of the speakers [that doctors haven't been pushing the dose up high enough]. (Inaudible) 4800 mg (Inaudible). And I've sort of gone to 24 and maybe a little higher and then stopped. To me, that was an important point (Inaudible) I'm not really pushing the drug enough."

162.    As part of its monotherapy application to the FDA, Parke-Davis sought approval to increase the effective dose range to 3600 mg per day and to increase the maximum recommended dose to 4800 mg per day. On August 26, 1997, the FDA denied the application because there was no evidence that Neurontin was safe at such doses.

163.    The FDA also informed Parke-Davis that if it did provide safety data, Parke-Davis could only obtain the labeling change if it further disclosed that "evidence from controlled trials fails to provide evidence that higher dose of Neurontin are more effective than those recommended."

164.    Parke-Davis never disclosed that the FDA denied its request to increase the maximum approved dose of Neurontin, that the FDA had determined that Parke-Davis had not provided sufficient evidence of safety at higher doses, and that there was no clinical trial evidence that Neurontin was more effective at higher doses.

165.    Notwithstanding the FDA's refusal to increase the maximum approved dosage of Neurontin and its finding that no clinical evidence supported Neurontin's efficacy at dosages greater than 1800 mg per day, Parke-Davis continued to market Neurontin at higher doses without these disclosures. In addition to the events identified above, the Promotion Enterprise presented numerous programs where physician participants asserted that Neurontin was effective and safe at dosages exceeding 1800 mg per day. These events included the following:

| Event | Date | Location |
|---|---|---|
| Advisory Board on Neurontin at the Royal Sonesta | February 4-6, 2000 | New Orleans, LA |
| Merritt-Putnam Speakers Bureau<br>Current Perspectives in the Understanding of<br>Neurobehavioral Disorders at the Four Seasons<br>Regent Beverly Wilshire | March 24-26, 2000 | Beverly Hills, CA |
| Advisory Board Meeting at the Hyatt Regency Hotel | March 29, 2000 | San Antonio, TX |

## 11. False and Misleading Statements Regarding the Lack of Side Effects

166.    Parke-Davis knew that there was a dose relationship between Neurontin and side effects.  Clinical trial 945-77 demonstrated that patients were three times more likely to have side effects at 1800 mg per day than at 900 mg per day.

167.    Parke-Davis was aware that the January 1996 edition of Epilepsy reported behavioral side effects of gabapentin in seven children who received Neurontin as adjunctive therapy.  The most troublesome behaviors were tantrums, aggression towards others, hyperactivity and defiance.

168.    Parke-Davis knew as of November 19, 1996 that high doses of gabapentin (i.e., Neurontin) could lead to weight gain.

169.    Parke-Davis also knew that similar to other anti-epileptic drugs, patients on high doses of Neurontin had to be titrated down, or else they would suffer withdrawal symptom side effects.

170.    At numerous events presented by the Promotion Enterprise, physician participants informed physician attendees that Neurontin use at high-dose levels did not cause adverse side effects.  For example, at the Jupiter Beach consultants meeting in April 1996, Dr. Schachter stated:  "Well, I don't think there's any data suggesting that there's any withdrawal syndrome from Neurontin at this point."  Parke-Davis was aware, however, of at least anecdotal reports of withdrawal syndrome and that Neurontin patients had to be tapered off Neurontin in much the

same manner that they titrated up, but physician attendees were not informed of this information.

171.    Similarly, at the Boston Ritz Carlton consultants meeting in May 1996, Dr. Longmire falsely stated that adverse reactions tended to be idiosyncratic, and that they did not seem to be dose-dependent.  Again, the physician attendees were not informed of the medical evidence in Parke-Davis' possession that side effects were indeed dose responsive.  Defendants' failure to provide this information made any prior representations about Neurontin's propensity to induce side effects at dosages exceeding 1800 mg day false and misleading.

**12.    False and Misleading Statements Regarding Other Indications**

172.    Neurontin was prescribed for hundreds of additional off-label indications for which there is no scientific support as to its safety, efficacy, effectiveness or usefulness.  Pursuant to marketing strategies and tactics developed by Parke-Davis and the Promotion Enterprise, the Promotion Enterprise regularly presented programs in which physician participants misrepresented Neurontin as being effective for conditions other than those described above.  Such statements were false and misleading because there was no clinical trial evidence showing that Neurontin was safe and effective for the treatment of any conditions other than adjunct therapy for partial seizures and postherpetic neuralgia in adults.  In these presentations, Parke-Davis failed to inform physician attendees that there was no established rationale that would support the use of Neurontin for conditions other than adjunct therapy for partial seizures and postherpetic neuralgia.  Defendants' failure to provide this information rendered any prior statements about Neurontin's use for conditions other than adjunct therapy for partial seizures and postherpetic neuralgia in adults false and misleading.

**F.    Alternative Treatments Cheaper than Neurontin**

173.    There were numerous alternative medications that were cheaper and more optimal than Neurontin to treat the conditions for which Defendants were touting Neurontin, including

several medications (such as aspirin and ibuprofen) not ordinarily covered by Plaintiffs'

formularies.  These alternative cheaper or more desirable medications included:

### 2003 Average Discounted Price Before Member Cost-Share – FDA-approved Drugs for These Indications

|  | *cost/day* | *cost/30 days* |
|---|---|---|
| **attention deficit disorder** |  |  |
| amphetamine | $2.31 | $69 |
| clonidine | $0.35 | $10 |
| methylphenidate | $1.17 | $35 |
| **bipolar disorder** |  |  |
| carbamazepine | $0.61 | $18 |
| chlorpromazine | $1.22 | $37 |
| lithium | $0.45 | $14 |
| valproic acid | $1.52 | $46 |
| **social phobia** |  |  |
| paroxetine | $2.29 | $69 |
| sertraline (Zoloft) | $2.67 | $80 |
| venlafaxine (Effexor) | $2.54 | $76 |
| **panic disorder** |  |  |
| alprazolam | $0.31 | $9 |
| clonazepam | $0.66 | $20 |
| fluoxetine | $0.79 | $24 |
| **migraine prophylaxis** |  |  |
| propranolol | $0.28 | $8 |
| timolol | $0.88 | $27 |
|  |  |  |
| Neurontin | $4.21 | $126 |

174.    Defendants' unlawful scheme thus caused Plaintiffs to pay for Neurontin where

alternative treatments at a small fraction of the cost were readily available.

175.    Additionally (see paragraphs 1-4, 18, 37 and 151-165, supra), Defendants

increased Plaintiffs' costs by inducing physicians to prescribe Neurontin at dosages far

exceeding its recommended, safe or effective levels (of 900 mg to 1800 mg per day).  As also

noted previously (e.g., paragraphs 112, 119, 126 and 138, supra), clinical evidence known to

Parke-Davis established that Neurontin was not more efficient than placebo for certain conditions.

176.    Plaintiffs instituted a number of measures to reduce their economic harm once they became aware of Defendants' wrongdoing, including instituting in certain circumstances dosage limitations on Neurontin and mandating that their members or patients be prescribed other anti-epileptic or other appropriate treatments before Neurontin is prescribed.

### G.    Alternative Sub-Enterprises

177.    As part of their fraudulent marketing scheme, and alternatively to the Promotion Enterprise, Defendants established individual sub-enterprises consisting of Defendants and each individual vendor participant. These alternative sub-enterprises are as follows:

(a)    The Cline Davis Sub-Enterprise. Defendants and Cline Davis formed the Cline Davis Sub-Enterprise with the goal and purpose of promoting Neurontin for uses for which it was not proven to be safe, medically efficacious, effective or useful. The facts and allegations set forth in paragraphs 49 through 55, supra, are incorporated herein by reference.

(b)    The Physicians World Sub-Enterprise. Defendants and Physicians World formed the Physicians World Sub-Enterprise with the goal and purpose of promoting Neurontin for uses for which it was not proven to be safe, medically efficacious, effective or useful. The facts and allegations set forth in paragraphs 56 through 66, supra, are incorporated herein by reference.

(c)    The Sudler & Hennessey Sub-Enterprise. Defendants and Sudler & Hennessey formed the Sudler & Hennessey Sub-Enterprise with the goal and purpose of promoting Neurontin for uses for which it was not proven to be safe, medically efficacious, effective or useful. The facts and allegations set forth in paragraphs 67 through 72, supra, are incorporated herein by reference.

(d)     The MEDED/MEDCON Sub-Enterprise.  Defendants and MEDED/MEDCON formed the MEDED/MEDCON Sub-Enterprise with the goal and purpose of promoting Neurontin for uses and at dosages for which it was not proven to be safe, medically efficacious, effective or useful.  The facts and allegations set forth in paragraphs 73 through 78, supra, are incorporated herein by reference.

(e)     The MES Sub-Enterprise.  Defendants and MES formed the MES Sub-Enterprise with the goal and purpose of promoting Neurontin for uses and at dosages for which it was not proven to be safe, medically efficacious, effective or useful.  The facts and allegations set forth in paragraphs 79 through 85, supra, are incorporated herein by reference.

(f)     The HCC Enterprise.  Defendants and HCC formed the HHC Sub-Enterprise with the goal and purpose of promoting Neurontin for uses and at dosages for which it was not proven to be safe, medically efficacious, effective or useful.  The facts and allegations set forth in paragraph 86, supra, are incorporated herein by reference.

(g)     The AMM/Adelphi Sub-Enterprise.  Defendants and AMM/Adelphie formed the AMM/Adelphie Sub-Enterprise with the goal and purpose of promoting Neurontin for uses and at dosages for which it was not proven to be safe, medically efficacious, effective or useful.  The facts and allegations set forth in paragraphs 87 through 90, supra, are incorporated herein by reference.

### H.     The Unlawful Conduct Continues Following the Pfizer Merger With Warner-Lambert and Through at Least December 2004

178.     Following the merger in June 2000 (the "Merger") of Pfizer and Warner-Lambert, Parke-Davis' parent, Pfizer took control of the development and marketing of all Parke-Davis pharmaceutical products, including Neurontin.  Many of the Parke-Davis employees responsible for Neurontin's off-label promotion became employees of Pfizer and continued to work on

Neurontin's off-label marketing. Senior management of Pfizer began to evaluate Neurontin and had to decide if it wanted to continue the unlawful and misleading off-label marketing of Neurontin. After reviewing Neurontin, and its increasing sales generated by off-label use, Pfizer elected to continue the Publication Strategy and continue influencing physicians to prescribe Neurontin for non-approved uses by suppressing negative clinical information regarding Neurontin.

179.     Pfizer concluded, as had Parke-Davis, that Neurontin's most promising markets were for indications for which Neurontin had not been approved. Indeed, Pfizer knew that Neurontin would not be approved for its most promising market, generalized treatment for neuropathic pain, because of the failed pain trials conducted Drs. Reckless and Gorson. Pfizer further knew that the Neurontin was ineffective to treat the most common form of pain, nociceptive pain. Pfizer was also aware that the FDA had declined to approve Neurontin for epilepsy monotherapy, a much more lucrative market that the adjunctive therapy market, because of negative clinical data. Pfizer knew as well that it could dramatically increase profits for Neurontin if physicians could be convinced to prescribe Neurontin at daily dosages that far exceeded the dose range supported by clinical evidence. Finally, Pfizer was aware that sales for Neurontin's one approved use, adjunctive therapy for epilepsy, only represented a tiny fraction of overall sales revenue. In fact, adjunctive therapy sales had reached a plateau in 1995 and had subsequently been declining.

180.     Notwithstanding its knowledge that Neurontin was not effective for most pain indications and other potentially lucrative markets, Pfizer elected to expand the publication strategy (described in paragraphs 28-33, supra). Pfizer continued to pay for the creation of numerous articles favoring Neurontin therapy for unapproved uses, while deliberately failing to

disclose in the articles that clinical studies had shown that Neurontin was not effective for these uses.

181.    Pfizer's marketing plans also called for the promotion of these one-sided articles to practicing physicians at the hundreds of scientific conferences, meetings and CME seminars that occurred each year. Pfizer developed "key messages" that were false and misleading and were the same in both the articles and the presentations. For example, one key message touted Neurontin as a "fast and effective monotherapy agent" that had "proven efficacy" in monotherapy. This key message was false, as Neurontin's efficacy in monotherapy has never been established and the FDA has specifically rejected an application for Neurontin monotherapy based on inconclusive or unfavorable data. Another key message was to convince physicians that Neurontin's effectiveness increased at higher dosages, and that Neurontin needed to be titrated to 3600 mg per day to determine efficacy. This too was false, as the FDA has consistently found that there is no evidence of greater efficacy beyond 1800 mg per day. One marketing firm used by Pfizer, Medical Action Communications, Inc. ("MAC"), noted that journal discussions of Neurontin's dosing were "inconsistent and sporadic," and vowed to make sure future publications "consistently address proper dosing of Neurontin," even though the so-called "proper" message was false and misleading.

182.    The articles and the subsequent presentations publicizing these "key messages" in the articles were developed pursuant to the same marketing plans. Pfizer intended that the same misrepresentations and omissions that made the articles misleading would be repeated in the subsequent presentations to physicians at various conferences and CME seminars. Plaintiffs do not have transcripts of the presentations that publicized the key messages contained in the articles, but are aware such presentations took place (and the dates and locations of some of the presentations are set forth below), and upon information and belief, the vendors who organized

the presentations followed the plan and deliberately omitted the negative information regarding off-label Neurontin use that made the articles misleading.

183.    Pfizer also decided to continue suppressing and misrepresenting the results of negative clinical studies.  For example, after the Merger, Pfizer acquired the unpublished results of the failed diabetic peripheral neuropathy trial (study 945-224) conducted by Dr. Reckless in the United Kingdom.  Pfizer concluded, as had Parke-Davis, that the results of the Reckless study would have a damaging impact on the continuing effort to market Neurontin, both for diabetic peripheral neuropathy specifically, and for neuropathic pain generally.  Thus, Pfizer made a conscious and independent decision to suppress the Reckless study by delaying publication as long as possible, not allowing Dr. Reckless to write the article himself, hiring a technical writing firm to write the article in a manner Pfizer viewed as favorable, and ultimately revoking all editorial and financial support for the article.  Moreover, although Pfizer was aware that Parke-Davis had suppressed various negative studies, or had misrepresented the results to make negative studies positive, Pfizer never attempted to correct the record with accurate and complete information.

### 1.    Articles Sponsored by Pfizer

184.    After the Merger, Pfizer retained MAC, a marketing firm based in New Jersey that is a subsidiary of Quintiles Transnational Corp.; and Fallon Medica ("Fallon Medica"), a division of Cline Davis, based in Red Bank, New Jersey, as the primary vendors to write, edit, and manage publication of journal articles about Neurontin and its off-label uses.  Pfizer decided the topics the articles would cover and paid all expenses in connection with the creation of these articles.  Through its technical writers, MAC and Fallon Medica wrote and edited manuscripts on Neurontin's off-label uses, and actively managed the prompt and favorable publication of the articles.  The articles were then submitted to a physician who "loaned" his or her name to the

article in exchange for payment of an honorarium. Defendants approved the topics, content and, to the extent possible, the journal in which the article was published.

185.    Working with MAC and Fallon Medica, Pfizer created a publication strategy for Neurontin that was larger and more centralized than Warner-Lambert's misleading publication effort. The overwhelming majority of the articles that MAC and Fallon Medica developed, either by ghostwriting the manuscript or by editing an author's manuscript and discussing the edits with Pfizer, contained Pfizer's false and misleading "key messages." These "key messages" were designed to conceal Neurontin's lack of efficacy for specific off-label uses.

186.    One of MAC and Fallon Medica's duties was to ensure that all manuscripts submitted for publication contained the "correct" key message. MAC and Fallon Medica assumed the responsibility of reviewing abstracts forwarded from around the world to make sure that "they are inline with the current messages and do not contain errors or inconsistencies."

187.    MAC and Fallon Medica were also given the task of increasing the number of articles published concerning the off-label use of Neurontin. At a meeting of Pfizer and MAC representatives in 2002, MAC noted that only 12 MAC-drafted manuscripts had been published in 2001, 42% of which related to epilepsy. Only 4 of the publications related to neuropathic pain, and none related to psychiatric uses. In 2002, MAC planned to increase the number of manuscripts published or submitted to at least 17, with 7 relating to neuropathic pain, 3 to movement disorders, 1 to migraine, and 1 to hot flashes. Only 24% of the articles related to epilepsy. MAC identified one of the goals for 2002 and 2003 as continuing "to build on publications momentum." One way to meet this goal was to maximize the number of publications that resulted from individual studies. Whereas, typically one study results in one published article, MAC and Pfizer decided that each study could generate two, three or more published articles. This tactic was referred to as a "rollout of existing data." MAC and Fallon

Medica were successful in meeting the goal of increasing the number of publications, as the number of published journal articles touting Neurontin for off-label uses soared during their stewardship of the publication strategy.

188.    MAC and Fallon Medica were aware of the promotional nature of these publications, stating in one document that each publication on an off-label use had the potential for " promotional use."  This knowledge was not surprising as Pfizer had instructed the vendors of the need to "increase the number of publications and presentations, particularly in neuropathic pain."  Pfizer further directed MAC to contact Pfizer's investigators and company offices outside the United States to offer assistance with their preparation of manuscripts for publication.

189.    MAC and Fallon Medica were also aware of the misleading nature of the publications strategy.  At a Pfizer-MAC Publications Sub-Committee meeting held on April 17, 2002, a grid outlining various published articles relating to Neurontin's off-label uses was distributed.  The grid listed several articles that Pfizer conceded were negative but nevertheless intended to use by spinning them as being positive.  MAC and Pfizer routinely discussed the use of false and misleading "key messages" for Neurontin, as well as the drug's "weaknesses" and ways to address them.  MAC routinely helped develop ways to make negative data seem positive.  For example, in an email from MAC to Pfizer dated November 6, 2002, MAC recommended lowering the efficacy threshold for a trial relating to chronic pain to increase the number of patients who appeared to respond, a technique known in the pharmaceutical industry as "moving the goalposts."

190.    Between 2001 and 2005, MAC and Fallon Medica prepared, edited and managed the submission of dozens of different articles on Neurontin's off-label uses.  These articles included:

| **Credited Authors** | **Subject** | **Date (Journal)** |
|---|---|---|
| Brodie, Chadwick, Anhut, Otte, Messmer, Maton, Sauermann, Murray, and Elizabeth Garofalo | Monotherapy | September 2002 (Epilepsia) |
| Garcia-Borreguero | Restless legs syndrome | November 2002 (Neurology) |
| Miroslav Backonja | Neuropathic pain and excessive dose | January 2003 (Clinical Therapeutics) |
| Thomas Guttuso | Hot flashes | February 2003 (Obstet. Gynecol.) |
| Serpell | Neuropathic pain syndromes | May 2003 (Pain) |
| Barry Gidal and Michael McLean | Excessive dose | May 2003 (Clinical Therapeutics) |
| Spira, Beran | Chronic daily headache | December 2003 (Neurology) |
| Thomas Guttuso | Hot flashes | January 2004 (Breast Cancer Res. Treat.) |
| Thomas Guttuso | Hot flashes | March 2004 (J. Pain Symptom Manage.) |
| Formica, Verger, Sol, Morralla | Spasticity | January 2005 (Med Clin.) |

191.    The articles on off-label use of Neurontin prepared or written by MAC and Fallon Medica based on data supplied by Pfizer contained numerous false and misleading "key messages."  For example, the article by Brodie et al., published in Epilepsia (September 2002), falsely stated: "GBP [gabapentin] also has been shown to be effective as monotherapy in adults with partial seizures," when in fact the trials it cited did not support efficacy.   These were the same trials that Parke-Davis knew as early as 1995 did not support the monotherapy indication,

and the same trials that the FDA reviewed when it rejected the monotherapy application in August 1997.

192.    Similarly, the article Garcia-Borreguero et al., "Treatment of restless legs syndrome with gabapentin: a double-blind, cross-over study," published in the November 2002 issue of Neurology, contained false statements.  It claimed that Neurontin had demonstrated therapeutic activity as a treatment for diabetic peripheral neuropathy but omitted any reference to the negative findings in the Gorson and Reckless studies.   Similarly, the suggestion that Neurontin's efficacy in treatment of restless leg syndrome and periodic limb movement had not been directly studied in any formal clinical trials and that the Garcia-Borreguero study was the first to do so failed to mention the study by Dr. Ehrenberg in 1996 finding that Neurontin did not affect any of the participants' limb movements during sleep.  An internal Pfizer memorandum confirmed the promotional nature of the Garcia-Borreguero publication, which was used to support the detailing of physicians on the use of Neurontin to treat restless leg syndrom.  The publication was also presented at various events described in ¶ 212, infra.

193.    The article by Guttuso, published in Obstetrics and Gynecology (February 2003), falsely stated:  "gabapentin has shown efficacy in controlled studies for neuropathic pain, migraine headache, essential tremor, panic disorder, and social phobia." The article deceptively omitted any reference to negative studies in those areas, and falsely cited the panic disorder trial as supporting efficacy.

194.    Another article by Guttuso, published in the Journal of Pain Symptom Management (March 2004), falsely stated:  "[Gabapentin was approved] in 2002 as a treatment for neuropathic pain," when in fact the FDA had informed Pfizer that its application for neuropathic pain was non-approvable.

195.    The article by Spira et al. relating to chronic daily headache and migraine,

published in Neurology (December 2003), misleadingly omitted any reference to the negative

study in migraine headache conducted by Parke-Davis in the late 1980s.

196.    The article by Gidal et al., a review article discussing Neurontin and excessive

doses published in Clinical Therapeutics (May 2003), misrepresented the negative results of the

various trials that failed to establish a dose response and falsely suggested that these trials

established Neurontin's greater efficacy at doses exceeding 1800 mg per day.

> 2.    **Presentations and Marketing Events Sponsored By Pfizer That Promoted the Same Misleading Key Messages as the MAC and Fallon Medica Articles**

197.    As set forth above, Pfizer's marketing strategy was concentrated largely on:

(a) preparing journal articles, using false or misleading statements to suggest Neurontin is

effective for a variety of off-label uses, and (b) presenting the content of those journal articles to

thousands of physicians at scientific conferences and through the process of detailing.  Pfizer

was also able to control the content of the presentations through the use of various medical

marketing firms, such as Adelphi, Current Medical Directions, Embryon, Impact Group, PPSI,

Cline Davis and Sudler & Hennessey.  Pfizer continuing Parke-Davis' practice of using these

medical marketing firms to create the illusion that the information being presented was accurate,

objective and scientific, and that the content was not controlled by Pfizer.  This was not the case,

as Pfizer used the medical marketing firms to ensure that the false and misleading "key

messages" were faithfully communicated at the hundreds of scientific conferences, symposia,

CME seminars and other events.  In fact, Pfizer sought to infiltrate so many supposedly

educational meetings that it retained an additional medical marketing firm, Medical Education

Networks, simply to review the hundreds of scientific meetings and CME seminars held annually

and to target specific meetings for the presentation of false and misleading information about

Neurontin's off-label uses.

198.    Pfizer trained its sales representatives to repeat the false "key messages" that were prepared as part of the publication strategy.  At a sales training meeting held in Puerto Rico on April 4, 2001, senior Pfizer employees Angela Crespo, David Probert and Robert Glanzman delivered a presentation to Pfizer sales representatives indoctrinating them with Pfizer's "key messages" about Neurontin's off-label uses, which the sales representatives would then repeat to physicians being detailed.  The "key messages" were primarily in the areas of pain, epilepsy and dosing and omitted any mention of negative data relating to those areas, thus painting a false and misleading picture of Neurontin's off-label use.  First, the presentation omitted any reference to the failed Gorson and Reckless studies in diabetic peripheral neuropathy, thus causing the sales representatives to advise physicians that there was no negative data relating to Neurontin and diabetic peripheral neuropathy.  Second, the presentations omitted any reference to the failed monotherapy trials or to the FDA rejection of Parke-Davis' application for a monotherapy indication based on those failed trials, causing the sales representatives to advise physicians falsely that there was no negative data relating to Neurontin's off label use as a monotherapy for epilepsy.  Finally, the presentations falsely informed the sales representatives that physicians needed to "titrate up to 3600 mg/day for greater efficacy" notwithstanding the absence of evidence to support titration beyond 1800 mg for greater efficacy.  In fact, the FDA had twice rejected Defendants' efforts to increase the recommended dosage exceeding 1800 mg per day based on a lack of scientific support, yet another material fact that the Pfizer employees withheld from the company's sales representatives.

199.    These same false "key messages" were also prominently featured at scores of Pfizer-sponsored medical conferences, advisory boards and consultants meetings.  The "key message" for pain was Neurontin's "proven efficacy in neuropathic pain."  Pfizer delivered this key message without disclosing the Gorson and Reckless studies.  Pfizer also claimed that the

therapeutic dose was 3,600 mg per day, when such a dose had not been proven to be effective. Pfizer's "key message" for epilepsy was Neurontin was "an ideal monotherapy agent" without referencing the negative clinical studies or the FDA's rejection of the monotherapy indication. Moreover, 3,600 mg per day was touted as an "effective dose," even though studies had failed to establish this fact and the FDA had specifically rejected the Company's efforts to include the higher dosage in the approved labeling.

200.    As set forth below, Pfizer succeeded in having the false and misleading "key messages" presented at numerous physician-attended events held between 2001 and 2004.

201.    On September 21 and 22, 2001, at the Fourth International Conference on the Mechanisms and Treatment of Neuropathic Pain, held in San Francisco, California, Pfizer presented physicians with numerous presentations and posters that contained false and misleading information.  For example, on September 21st, Michael Rowbotham and Miroslav Backonja -- both paid speakers of Pfizer -- delivered a presentation review of clinical trial data on Neurontin and neuropathic pain where they falsely concluded:  "Gabapentin was effective and safe in reducing neuropathic pain in patients suffering with diabetic peripheral neuropathy, postherpetic neuralgia, or neuropathic pain resulting from various etiologies in 5 multicenter studies."  This conclusion was false as the data in Pfizer's possession failed to show efficacy for diabetic peripheral neuropathy or neuropathic pain apart from postherpetic neuralgia. Rowbotham made a separate presentation where he claimed that Neurontin "has efficacy in painful diabetic neuropathy ... and reflex sympathetic dystrophy."  This presentation failed to disclose the negative data on diabetic peripheral neuropathy and the evidence concluding that it was unclear whether Neurontin was more effective than placebo for treating reflex sympathetic dystrophy.  In a separate lecture, C. Peter Watson touted Neurontin as a treatment for diabetic peripheral neuropathy without mentioning the failed Gorson and Reckless studies.  In another

separate lecture, Bradley Galer misleadingly suggested that the effective dose for Neurontin in treating neuropathic pain syndromes was as high as 6,000 mg per day.  This contention was false and failed to disclose the scientific adverse evidence demonstrating no such correlation between efficacy and dose.   Finally, on September 22nd, Kenneth Schmader delivered a lecture about Neurontin and diabetic peripheral neuropathy that contained similarly deceptive statements.

202.    On March 3-4, 2002, Pfizer hosted a meeting of the Neuropathic Pain Management Advisory Board at the Disney BoardWalk Resort in Orlando, Florida.  The guests were senior managers and medical directors of various pharmacies and pharmacy benefits managers who had influence over formulary decision-making, i.e., the drugs covered by various health care plans and the uses for which those drugs are covered. The advisory board was coordinated and managed by Health Strategies Group, Inc., a New Jersey company that specializes in "increasing the manufacturer's value and influence on PBM product placement decisions."  The goal of this advisory board meeting was to secure Neurontin's formulary status for broad areas of neuropathic pain.  Specifically, the meeting was to "support Neurontin's use in neuropathic pain management with managed care customer," even though Pfizer was aware that Neurontin did not have the data to support a broad neuropathic pain indication, that different neuropathic pain conditions involved different models of pain and thus required different treatments, and that Pfizer's internal data did not support the granting of any indications in the area of neuropathic pain other than postherpetic neuralgia.

203.    On March 16-20, 2002, Pfizer presented information at the Clinical and Scientific Congress of the International Anesthesia Research Society in San Diego that misleadingly suggested that Neurontin was effective for restless leg syndrome, periodic limb movement syndrome, and related pain, without disclosing the negative clinical data from Dr. Ehrenberg's clinical trial on those conditions.

204.    On April 13-20, 2002, at the American Academy of Neurology Annual Meeting in Denver, Pfizer presented false and misleading information in the form of "posters/presentations" suggesting Neurontin's efficacy in various off-label uses including mood, tremor in patients with multiple sclerosis, and spinal muscular atrophy ("SMA").  Pfizer failed to disclose the ample negative clinical evidence demonstrating Neurontin was ineffective to treat those conditions. For example, Pfizer failed to disclose Neurontin had been demonstrated to be ineffective in treating mood disorders.  Moreover, Pfizer also failed to disclose the fact that "the results of [Pfizer's] clinical trial in SMA also show no benefit in SMA."

205.    On June 6-13, 2002, at the Associated Professional Sleep Societies conference in Seattle, Pfizer orally promoted Neurontin for use in treating restless leg syndrome without disclosing the negative results from the Ehrenberg study.

206.    On August 17-22, 2002, Pfizer funded an international congress for the International Association for the Study of Pain for 4,500 physicians from around the world, including the United States, which was held in San Diego, CA.  The meeting was coordinated by PPSI, a medical marketing firm. Through posters and presentations, Pfizer misleadingly presented information suggesting Neurontin's efficacy generally in neuropathic pain and specifically in chronic peripheral post-operative and post-traumatic neuropathic pain, as well as painful HIV neuropathy, without disclosing the ample negative clinical data in those areas. Pfizer also falsely presented information suggesting that larger doses of Neurontin were more efficacious, despite mounting clinical evidence that doses exceeding 1800 mg were not superior.

207.    On November 10, 2002, Pfizer presented information at the International Congress of Parkinson's Disease and Movement Disorders meeting held in Miami, FL.  Pfizer orally promoted Neurontin for use in treating restless leg syndrome without disclosing the negative results from the Ehrenberg study.

208.     On November 21, 2002, Pfizer presented information at the International Conference on the Mechanisms and Treatment of Neuropathic Pain annual meeting held in Bermuda.  The meeting was coordinated by Embryon, a medical marketing firm.  Pfizer, which was a platinum sponsor of the event, presented abstracts prepared by MAC containing false and misleading statements that Neurontin was "effective and safe and safe in reducing pain," including "phantom limb pain, complex regional pain syndrome, postmastectomy, postlaminectomy, or trigeminal neuralgia."  Pfizer commented that its presentation had been successful, "making it easier to form an overall impression of the broad effectiveness of gabapentin in neuropathic pain."  Pfizer knew that this impression was false, especially after the FDA's rejection of a such a broad indication.  Pfizer also presented unscientific information falsely suggesting that Neurontin was more effective with doses as high as 3,600 mg per day. According to Pfizer, this presentation "will help to reinforce the importance of individualizing gabapentin dose and not relying on the convenience of a fixed dose."  Dr. Rowbotham, a paid speaker for Pfizer, delivered a lecture designed to cause attendees to prescribe Neurontin broadly for neuropathic pain.  In the lecture, Rowbotham favorably touted Neurontin's clinical trial results in neuropathic pain, while misrepresenting or omitting the negative clinical data about Neurontin that had prevented Neurontin from receiving FDA approval for neuropathic pain areas other than postherpetic neuralgia.  Dr. Rowbotham further stressed the disadvantages of Neurontin's competitor products, characterizing them as "hard to use," having only "few studies," or having "large failed trials."

209.     On March 20-23, 2003, Pfizer presented false and misleading information at the American Pain Society annual meeting, held in Chicago.  The meeting was coordinated by Global Medical Information, a medical marketing firm hired by Pfizer.  Doctors Dworkin, Shapiro, Stacey, Berger, and Rowbatham --all regular, paid speakers for Pfizer -- presented

physicians with false and misleading information about Neurontin's efficacy in neuropathic pain,

migraines, lower back pain, and hot flashes.  Pfizer also falsely stated that Neurontin was

"shown to reduce postoperative pain," even though Pfizer was aware of at least two clinical trials

demonstrating a lack of efficacy.  Pfizer also misleadingly suggested Neurontin efficacy for hot

flashes, migraine headaches, lower back pain and related conditions, mood disorders, sleep

related movement disorders, anxiety-related disorders, and fibromyalgia, without disclosing the

negative scientific evidence demonstrating a lack of efficacy for these conditions.

210.     On May 6-9, 2004, during the annual meeting for the American Pain Society in

Vancouver, Canada, Pfizer presented information falsely suggesting that Neurontin was effective

to treat general pain, peri- and postoperative pain, chronic phantom, and residual limb pain.

Pfizer also presented false and misleading information about Neurontin's efficacy at excessive

doses. The false and misleading nature of the representations in areas beyond Neurontin's proven

efficacy is confirmed by subsequent requests for information by attendees for information

relating to "neuropathic pain conditions, perioperative use, use in diabetic peripheral neuropathy

... dosing to effectiveness, maximum dose, use in restless leg syndrome, [and] use in chronic

pain...."

211.     On June 5, 2004, Pfizer funded a lecture entitled "New Approaches to the

Treatment of Painful Diabetic Peripheral Neuropathy" during the American Diabetes

Association's 64th Scientific Sessions in Orlando, Florida.  Program content and product

information was developed with the approval of Pfizer by Current Medical Directions, Inc., a

subsidiary of Sudler & Hennessey.  The stated purpose of the lecture was to "address the current

understanding of painful diabetic peripheral neuropathy (DPN) and emerging treatment

options....  Presentations will shed new light on DPN, giving physicians new strategies to

manage neuropathic pain....  A neurologist will provide an overview based on data from recent

clinical trials testing promising new therapies." Not surprisingly, the information provided was false and misleading because the attendees were not advised of the failed Reckless 945-224 study or the negative results of the Gorson study. Rather, physician-attendees were given the false and misleading impression that Neurontin was efficacious for diabetic peripheral neuropathy and that favorable study results had been replicated.

212.    Upon information and belief, Pfizer repeated or caused to be repeated the same false and misleading "key messages" at all of its marketing events. The following is a representative and non-exclusive list of Pfizer-sponsored events held between 2001 and 2004:

| TITLE | DATE | LOCATION |
|---|---|---|
| Joslin Diabetes Center Symposium: Glucose Control, Neuropathic Complications and the Diabetic Foot: Impacting Outcomes | February 27, 2001 | San Francisco, CA |
| Joslin Diabetes Center Symposium: Glucose Control, Neuropathic Complications and the Diabetic Foot: Impacting Outcomes | February 28, 2001 | Beverly Hills, CA |
| American Academy of Pain Medicine ("AAPM") Directions in the Understanding & Treatment of Chronic Pain | March 2 –3, 2001 | Detroit, MI |
| Joslin Diabetes Center Symposium: Glucose Control, Neuropathic Complications and the Diabetic Foot: Impacting Outcomes | March 6, 2001 | New Orleans, LA |
| Joslin Diabetes Center Symposium: Glucose Control, Neuropathic Complications and the Diabetic Foot: Impacting Outcomes | March 7, 2001 | Memphis, TN |
| AAPM Directions in the Understanding & Treatment of Chronic Pain | March 9-10, 2001 | Cleveland, OH |
| AAPM Directions in the Understanding & Treatment of Chronic Pain | March 16-17, 2001 | Baltimore, MD |
| AAPM Directions in the Understanding & Treatment of Chronic Pain | March 16-17, 2001 | San Francisco, CA |

| **TITLE** | **DATE** | **LOCATION** |
| --- | --- | --- |
| Joslin Diabetes Center Symposium: Glucose Control, Neuropathic Complications and the Diabetic Foot: Impacting Outcomes | March 20, 2001 | Farmington, CT |
| Joslin Diabetes Center Symposium: Glucose Control, Neuropathic Complications and the Diabetic Foot: Impacting Outcomes | March 21, 2001 | Cincinnati, OH |
| Joslin Diabetes Center Symposium: Glucose Control, Neuropathic Complications and the Diabetic Foot: Impacting Outcomes | March 22, 2001 | St. Louis, MO |
| AAPM Directions in the Understanding & Treatment of Chronic Pain | March 23-24, 2001 | New Orleans, LA |
| Merritt-Putnam Lecture Series | March 24, 2001 | New York, NY |
| Joslin Diabetes Center Symposium: Glucose Control, Neuropathic Complications and the Diabetic Foot: Impacting Outcomes | March 28, 2001 | Denver, CO |
| AAPM Directions in the Understanding & Treatment of Chronic Pain | March 30-31, 2001 | St. Louis, MO |
| Joslin Diabetes Center Symposium: Glucose Control, Neuropathic Complications and the Diabetic Foot: Impacting Outcomes | April 3, 2001 | Norfolk, VA |
| Joslin Diabetes Center Symposium: Glucose Control, Neuropathic Complications and the Diabetic Foot: Impacting Outcomes | April 3, 2001 | Springfield, MA |
| Joslin Diabetes Center Symposium: Glucose Control, Neuropathic Complications and the Diabetic Foot: Impacting Outcomes | April 4, 2001 | Raleigh, NC |
| Joslin Diabetes Center Symposium: Glucose Control, Neuropathic Complications and the Diabetic Foot: Impacting Outcomes | April 10, 2001 | Kansas City, MO |
| Joslin Diabetes Center Symposium: Glucose Control, Neuropathic Complications and the Diabetic Foot: Impacting Outcomes | April 11, 2001 | San Diego, CA |

| TITLE | DATE | LOCATION |
|---|---|---|
| Joslin Diabetes Center Symposium: Glucose Control, Neuropathic Complications and the Diabetic Foot: Impacting Outcomes | April 11, 2001 | Milwaukee, WI |
| Joslin Diabetes Center Symposium: Glucose Control, Neuropathic Complications and the Diabetic Foot: Impacting Outcomes | April 12, 2001 | Portland, OR |
| Joslin Diabetes Center Symposium: Glucose Control, Neuropathic Complications and the Diabetic Foot: Impacting Outcomes | April 18, 2001 | Salt Lake City, UT |
| Joslin Diabetes Center Symposium: Glucose Control, Neuropathic Complications and the Diabetic Foot: Impacting Outcomes | April 19, 2001 | Phoenix, AZ |
| American Pain Society meeting | April 19-22, 2001 | Phoenix, AZ |
| Merritt-Putnam Speaker Training | April 20-22, 2001 | Las Vegas, NV |
| Joslin Diabetes Center Symposium: Glucose Control, Neuropathic Complications and the Diabetic Foot: Impacting Outcomes | April 26, 2001 | Philadelphia, PA |
| Joslin Diabetes Center Symposium: Glucose Control, Neuropathic Complications and the Diabetic Foot: Impacting Outcomes | May 1, 2001 | Dallas, TX |
| Joslin Diabetes Center Symposium: Glucose Control, Neuropathic Complications and the Diabetic Foot: Impacting Outcomes | May 2, 2001 | Miami, FL |
| Joslin Diabetes Center Symposium: Glucose Control, Neuropathic Complications and the Diabetic Foot: Impacting Outcomes | May 3, 2001 | Columbia, SC |
| AAPM Directions in the Understanding & Treatment of Chronic Pain | May 4-5, 2001 | Houston, TX |
| American Psychiatric Association | May 5-10, 2001 | New Orleans, LA |
| AAPM Directions in the Understanding & Treatment of Chronic Pain | May 11-12, 2001 | Memphis, TN |

| TITLE | DATE | LOCATION |
|---|---|---|
| Joslin Diabetes Center Symposium: Glucose Control, Neuropathic Complications and the Diabetic Foot: Impacting Outcomes | May 15, 2001 | Columbus, OH |
| Joslin Diabetes Center Symposium: Glucose Control, Neuropathic Complications and the Diabetic Foot: Impacting Outcomes | May 16, 2001 | Syracuse, NY |
| Joslin Diabetes Center Symposium: Glucose Control, Neuropathic Complications and the Diabetic Foot: Impacting Outcomes | May 16, 2001 | Nashville, TN |
| AAPM Directions in the Understanding & Treatment of Chronic Pain | May 18-19, 2001 | University City, CA |
| Joslin Diabetes Center Symposium: Glucose Control, Neuropathic Complications and the Diabetic Foot: Impacting Outcomes | May 24, 2001 | Westchester, NY |
| AAPM Directions in the Understanding & Treatment of Chronic Pain | June 1-2, 2001 | Miami, FL |
| Merritt-Putnam Regional Speaker Training | June 1-3, 2001 | Renaissance Stanford Court Hotel, San Francisco, CA |
| Joslin Diabetes Center Symposium: Glucose Control, Neuropathic Complications and the Diabetic Foot: Impacting Outcomes | June 7, 2001 | Louisville, KY |
| AAPM Directions in the Understanding & Treatment of Chronic Pain | June 8-9, 2001 | Nashville, TN |
| AAPM Directions in the Understanding & Treatment of Chronic Pain | June 8-9, 2001 | Kansas City, MO |
| Merritt-Putnam Regional Speaker Training | June 8-10, 2001 | Ritz-Carlton, Boston, MA |
| Joslin Diabetes Center Symposium: Glucose Control, Neuropathic Complications and the Diabetic Foot: Impacting Outcomes | June 12, 2001 | San Antonio, TX |

| TITLE | DATE | LOCATION |
|---|---|---|
| Joslin Diabetes Center Symposium: Glucose Control, Neuropathic Complications and the Diabetic Foot: Impacting Outcomes | June 21, 2001 | Baltimore, MD |
| Joslin Diabetes Center Symposium: Glucose Control, Neuropathic Complications and the Diabetic Foot: Impacting Outcomes | June 26, 2001 | Newark, NJ |
| Joslin Diabetes Center Symposium: Glucose Control, Neuropathic Complications and the Diabetic Foot: Impacting Outcomes | June 28, 2001 | Seattle, WA |
| Fourth International Conference on the Mechanisms and Treatment of Neuropathic Pain | September 21-22, 2001 | San Francisco, CA |
| Advisory Board: Use of GABA Analogues in Social Anxiety Disorder" at the Mark Hotel | October 30, 2001 | New York, NY |
| Neuropathic Pain in the Workplace Advisory Board at the Millennium Broadway Hotel | November 7-8, 2001 | New York, NY |
| Neuropathic Pain Management Advisory Board at the, Florida | March 3-4, 2002 | Disney BoardWalk Resort, Orlando, FL |
| Clinical and Scientific Congress of the International Anesthesia Research Society | March 16-20, 2002 | San Diego, CA |
| American Pain Society | March 24-27, 2002 | Baltimore, MD |
| American Academy of Neurology Annual Meeting | April 13 – 20, 2002 | Denver, CO |
| American College of Physicians | April 23-25, 2002 | Philadelphia, PA |
| American Psychiatric Association annual meeting | May 18-23, 2002 | Philadelphia, PA |
| Associated Professional Sleep Societies conference | June 6-13, 2002 | Seattle, WA |
| Satellite meeting | August 14, 2002 | Tijuana |

| TITLE | DATE | LOCATION |
|---|---|---|
| International Association for the Study of Pain International Congress | August 17-22, 2002 | San Diego, CA |
| American Neurological Association's Annual Meeting | October 13-16, 2002 | New York, NY |
| US Psychiatric and Mental Health Congress | October 28-31, 2002 | Las Vegas, NV |
| International Congress of Parkinson's Disease and movement Disorders meeting | November 10, 2002 | Miami, FL |
| International Conference on the Mechanisms and Treatment of Neuropathic Pain annual meeting | November 21, 2002 | Bermuda |
| American Epilepsy Society's annual meeting | December 6, 2002 | Seattle, WA. |
| Pre-Med South Regional Primary Care Congress | February 14-16, 2003 | Ft. Lauderdale, FL |
| American Academy of Pain Medicine: Annual Meeting | February 19-23, 2003 | New Orleans, LA |
| American Pain Society meeting | March 20-23, 2003 | Chicago, IL |
| Anxiety Disorders Association of America: National Conference | March 27-March 30, 2003 | Toronto |
| American Academy of Neurology | March 29-April 5, 2003 | Honolulu, HI |
| Pre-Med West Regional Primary Care Congress | April 3-5, 2003 | Long Beach, CA |
| Consortium of MS Centers meeting | May 28-31, 2003 | San Diego, CA |
| Associated Professional Sleep Societies Annual Meeting | June 3, 3003 | Chicago, IL |
| Pre-Med Mid-West Regional Primary Care Congress | June 19-21, 2003 | Chicago, IL |

| TITLE | DATE | LOCATION |
|---|---|---|
| 2002 Families of Spinal Muscular Atrophy Family and Professional Conference | June 21-23, 2002 | Schaumburg, IL |
| American Academy of Pain Management Annual Clinical Meeting | September 4-7, 2003 | Denver, CO |
| American Academy of Family Practitioners | October 1-5, 2003 | New Orleans, LA |
| American Osteopathic Association | October 12-14, 2003 | New Orleans, LA |
| Pre-Med Mid Atlantic Regional Primary Care Congress | October 16-18, 2003 | Washington, DC |
| American College of Rheumatology | October 25-27, 2003 | San Antonio, TX |
| Pre-Med East Regional Primary Care Congress | November 7-9, 2003 | Boston, MA |
| Pfizer Satellite Symposium to the 2003 Society for Neuroscience Meeting at the Sheraton New Orleans Hotel | November 10, 2003 | New Orleans, LA |
| American Epilepsy Society | December 5-12, 2003 | Boston, MA |
| American Academy of Dermatology | February 7-10, 2004 | Washington, DC |
| AAPM | March 3-7, 2004 | Orlando, FL |
| American Academy of Orthopedic Surgeons 2004 annual meeting | March 10-14, 2004 | San Francisco, CA |
| Anxiety Disorders Association of America | March 11-14, 2004 | Miami, FL |
| MAP Pain Advisory Boards | March 18, 2004 | New York, NY |
| Pri-Med South Regional Conference | April 1-4, 2004 | Ft. Lauderdale, FL |
| Neuropathic Pain HQ Preceptorship | April 19, 2004 | Boston, MA |
| American Academy of Neurology | April 24-May 1, 2004 | San Francisco, CA |
| Society of Biological Psychiatry | April 29-May 1, 2004 | New York, NY |

| TITLE | DATE | LOCATION |
|---|---|---|
| American Psychiatric Association | May 1-6, 2004 | New York, NY |
| Second Annual Joint Scientific Meeting of the America Pain Society and Canadian Pain Society | May 6-9, 2004 | Vancouver |
| American Pain Society Annual Scientific Meeting | May 8-9, 2004 | Vancouver |
| Pri-Med West Regional Conference | May 12-15, 2004 | Boston, MA |
| Associated Professional Sleep Societies | June 5-10, 2004 | Philadelphia, PA |
| American Diabetes Association's 64th Scientific Sessions | June 5, 2004 | Orlando, FL |
| Pri-Med West Regional Conference | June 16-19, 2004 | Rosemont, IL |
| National Pain Forum | October 1-3, 2004 | Philadelphia, PA |
| National Speaker Training | October 8-9, 2004 | Chicago, IL |
| American College of Nurse Practitioners conference | October 20-24, 2004 | Philadelphia, PA |
| International Society of Anaesthetic Pharmacology conference | October 22, 2004 | Las Vegas, NV |
| American Society of Anesthesiologists | October 23-27, 2004 | Las Vegas, NV |
| Pri-Med East Regional Conference | October 28-31, 2004 | Boston, MA |
| International Conference on the Mechanisms and Treatments of Neuropathic Pain conference | November 4-6, 2004 | Bermuda |
| Pri-Med Mid-Atlantic Regional Conference | November 17-20, 2004 | Boston, MA |
| US Psychiatric and Mental Health conference | November 18-21, 2004 | San Diego, CA |
| The American College of Neuropsychopharmacology 2004 conference | December 12-16, 2004 | Puerto Rico |

I.       **The Continuing Impact of Defendants' Fraudulent Off-Label Promotion**

213.     As a result of the intense and prolonged fraudulent scheme described above, the medical literature and usage practices relating to Neurontin have been severely contaminated by years of false and misleading information regarding the scientific, medical and clinical data relating to the safety, medical efficacy, effectiveness and usefulness of Neurontin for conditions other than as adjunctive therapy for epilepsy or shingles in adults and at specified dosages. Based on this false information, physicians continue to prescribe, and Plaintiffs continue to pay for, Neurontin to treat off-label uses for which there is no reliable scientific support and at excessive dosages.

214.     Upon information and belief, Pfizer routinely marketed Neurontin for off-label indications until at least December, 2004.  The staggering growth of Neurontin sales highlights this continuing course of conduct.  From 1995 to 2003, Neurontin's sales soared from $97.5 million to nearly $2.7 billion.  With no reliable scientific studies supporting off-label uses, and with at least 90% of all prescriptions for Neurontin written for such uses, it is reasonable to infer that the sharp increase in sales stems from illegal past and continuing promotional efforts by Defendants.  Physicians have and continue to prescribe Neurontin to tens of thousands of patients who are in need of effective treatments.

215.     Furthermore, although Neurontin is prescribed for many off-label indications, since 1999 the types of off-label usage continue to be weighted in the precise areas where Defendants focused their unlawful marketing efforts, i.e., as treatments for bipolar disorder, peripheral neuropathy and migraines.

216.     A July 1, 2002, letter from Dr. Lisa Stockbridge of the Department of Health & Human Services ("HHS") confirms that Defendants continued as of that date to engage in

wrongful off-label promotional efforts.  Dr. Stockbridge notified Pfizer that certain of its

marketing practices are "in violation of the Federal Food, Drug and Cosmetic Act ... because

[Pfizer] makes representations about Neurontin that are false and misleading."  In particular,

HHS determined that Pfizer's marketing materials suggested that the mechanism of action of

Neurontin had been established, when it was not appropriate to make such a claim.  The FDA

also stated that Pfizer materials suggested that Neurontin could be used as monotherapy, when it

was only appropriate to indicate Neurontin as adjunctive therapy in the treatment of partial

seizures.  HHS determined that Pfizer's marketing materials were misleading and ordered

immediate discontinuation of their use.  The marketing practices found to be misleading by HHS

in 2002 are similar to, or the same as, those routinely engaged in by the Promotion Enterprise

under Parke-Davis', and then Pfizer's, direction.

## J.     Related Government Actions

217.    As noted above, Dr. Franklin initiated a qui tam action on behalf of the United

States against Warner-Lambert in 1996.  He alleged two counts of false claims caused by the

knowing promotion of prescription sales of Neurontin ineligible for Medicaid reimbursement

and caused by the payment of kickbacks in violation of the Medicaid anti-kickback provisions,

31 U.S.C. § 3729.  The federal court unsealed the original complaint in the qui tam action in

January 2000.  In May 2002, the Court unsealed the qui tam amended complaint, which for the

first time, contained details of Defendants' off-label promotion and fraudulent marketing

scheme.  In April 2003, Dr. Franklin filed an opposition to a motion for summary judgment in

the qui tam action which unsealed numerous documents revealing the existence and operation of

Defendants' fraudulent marketing practices and the Promotion Enterprise.

218.    Based on the conduct alleged in the qui tam action, the State Attorneys' General

commenced a lawsuit against Warner-Lambert alleging violations of state consumer protection laws and the U.S. Department of Justice filed a criminal information against Warner-Lambert. On May 13, 2004, Warner-Lambert announced its agreement to plead guilty and pay more than $430 million to resolve the criminal charges and civil liabilities in connection with Parke-Davis' illegal and fraudulent promotion of unapproved uses for Neurontin. According to the Department of Justice Press Release, "[a]s a consequence of the unlawful promotion scheme, patients who received the drug for unapproved and unproven uses had no assurance that their doctors were exercising their independent and fully-informed medical judgment, or whether the doctor was instead influenced by misleading statements made by, or inducements provided by, Warner-Lambert." Dept. of Justice Press Release, May 13, 2004.

219.    The Assurance of Voluntary Compliance entered into between the State Attorneys General and Warner-Lambert explicitly provided that claims brought by individual consumers and entities were excluded from the settlement.

220.    On June 9, 2004, Warner-Lambert pled guilty to Counts I and II of the Information in the criminal case, United States v. Warner-Lambert Company LLC, 1:04 CR 10150 (Stearns, J.). Count I was distribution of an unapproved new drug in violation of 21 U.S.C. §§ 331(d), 333(a)(2) & 335(a), and Count II was distribution of a misbranded drug: inadequate directions for use, in violation of 21 U.S.C. §§ 331(a), 333(a)(2) & 352(f)(1). Both Counts specifically re-alleged and incorporated by reference allegations regarding Warner-Lambert's off-label promotion through its sales representatives, medical liaisons, consultants' meetings and advisory boards, and teleconferences.

V.     **FRAUDULENT CONCEALMENT AND**
       **TOLLING OF STATUTES OF LIMITATIONS**

221.    Defendants' fraudulent marketing scheme depended on concealing their

involvement in off-label promotion of Neurontin.  Indeed, the Promotion Enterprise was created

precisely to make it appear to the public that Defendants did not have a hand in any discussions

or promotion of off-label use.  Additionally, as described above, Defendants had the Promotion

Enterprise perform off-label promotion in the semblance of legitimate consultants' meetings,

continuing education seminars, journal articles and medical education events.  Also as described

above, Defendants' involvement was hidden because Defendants hid their financial connections

with the physician participants and used the vendor participants as payment intermediaries.

These activities and others described above concealed Defendants' fraudulent promotional

activities and Plaintiffs could not have discovered the scheme alleged herein earlier in the

exercise of reasonable diligence.  Indeed, much of the scheme to this day remains concealed by

Defendants.

222.    The earliest Plaintiffs could have reasonably become aware of the fraudulent

marketing scheme was May 2003, when the details of Defendants' interactions with the other

participants in the Promotion Enterprise were disclosed through the filing of previously sealed

materials in opposition to Defendants' motion for summary judgment in the qui tam action.

Alternatively, Plaintiffs in the exercise of reasonable diligence could not have learned of the

fraudulent marketing scheme until some of the details were disclosed when the amended

complaint was unsealed in the qui tam case in May 2002.

223.    Any applicable statutes of limitations have been tolled by Defendants' knowing

and active concealment and denial of the facts alleged herein.  Plaintiffs have been kept in

ignorance of vital information essential to the pursuit of these clams, without any fault or lack of

diligence on their part.  Plaintiffs could not reasonably have discovered the fraudulent nature of

Defendants' conduct.  Accordingly, Defendants are estopped from relying on any statute of

limitations to defeat any of Plaintiffs' claims.

**VI.    DEFENDANTS' MOTIVE**

224.    Defendants' motive in creating and operating the fraudulent scheme and RICO

Enterprises described herein was to fraudulently obtain significant additional revenues from the

marketing and sale of Neurontin.

225.    The fraudulent scheme was designed to, and did, cause Plaintiffs to pay for

Neurontin prescriptions to treat conditions for which the drug is not proven to be medically safe,

efficacious, effective or useful.  Plaintiffs paid millions of dollars for Neurontin that would not

have been paid absent the fraudulent scheme.

**VII.    USE OF THE MAILS AND WIRES**

226.    Defendants used thousands of mail and interstate wire communications to create

and manage their fraudulent scheme.  Defendants' scheme involved national marketing and sales

plans and programs, and encompassed physicians, medical marketing firms and victims across

the country.

227.    Defendants' use of the mails and wires to perpetrate their fraud involved

thousands of communications, including:

(a)    marketing and advertising materials about the off-label uses of Neurontin

for which the drug is not proven to be safe, medically efficacious, effective and useful, such

materials being sent to doctors across the country;

(b)    communications, including financial payments, with the vendor and

physician participants discussing and relating to the publication of articles misrepresenting off-

label uses of Neurontin;

(c)     communications with the vendor and physician participants that fraudulently misrepresented that Neurontin was scientifically proven to be safe, medically efficacious, effective and useful for off-label uses;

(d)     communications with health insurers and patients, including Plaintiffs, inducing payments for Neurontin to be made based on misrepresentations concerning the safety, efficacy, effectiveness and usefulness of Neurontin; and

(e)     receiving the proceeds of the Defendants' improper scheme.

228.     In addition, Defendants' corporate headquarters have communicated by United States mail, telephone and facsimile with various local district managers, medical liaisons and pharmaceutical representatives in furtherance of Defendants' scheme.

## VIII.  SCOPE OF THE ALLEGATIONS

### A.     Time

229.     The conduct and patterns of conduct alleged herein, relating to the sale and marketing of Neurontin, occurred between December 30, 1993, the date that the FDA approved the marketing of Neurontin, and the present day.  The conduct and patterns of conduct alleged herein occurred and continued to occur well after the consummation of the merger between Pfizer and Warner-Lambert in June 2000.

### B.     Geographic Scope

230.     The conduct and patterns of conduct alleged herein, relating to the sale and marketing of Neurontin, took place throughout the entire United States and District of Columbia, as well as various other territories and foreign countries.  Although Defendants' upper-level management has been based in Morris Plains, New Jersey or New York, New York, the actual

sales and marketing activities described herein were executed principally through Defendants'

CBU system, a network of regional sales division that covered the entire country.

## IX.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Violation of 18 U.S.C. § 1962(c) (The Promotion Enterprise)

231.    Plaintiffs incorporate by reference all preceding paragraphs, as if fully set forth

herein.

232.    Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3) who

conducted the affairs of the enterprise through a pattern of racketeering activity in violation of

18 U.S.C. § 1962(c).

233.    The enterprise is an association-in-fact within the meaning of 18 U.S.C. § 1961(4)

consisting of (i) Defendants, including their employees and agents, (ii) the vendor participants,

Cline Davis, Physicians World, Sudler & Hennessey, MEDED, MES, HCC and AMM/Adelphi,

and (iii) the physician participants as set forth in paragraph 99, supra ("Promotion Enterprise").

The Promotion Enterprise is an ongoing organization that functions as a continuing unit.  The

Promotion Enterprise was created and used as a tool to effectuate Defendants' pattern of

racketeering activity.  The Defendant "persons" are distinct from the Promotion Enterprise.

234.    The Promotion Enterprise falls within the meaning of 18 U.S.C. § 1961(4) and

consists of a group of "persons" associated together for the common purpose of promoting

Neurontin for off-label uses and earning profits therefrom.

235.    Defendants have conducted and participated in the affairs of the Promotion

Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1)

and 1961(5), which includes multiple instances of mail fraud in violation of 18 U.S.C. § 1341,

and multiple instances of wire fraud in violation of 18 U.S.C. § 1343, as described above.

236.    The Promotion Enterprise engaged in and affected interstate commerce, because, inter alia, it marketed, sold, purchased or provided Neurontin to thousands of entities and individuals throughout the United States.

237.    Defendants exerted control over the Promotion Enterprise, and Defendants participated in the operation or management of the affairs of the Promotion Enterprise, through a variety of actions including the following:

(a)    Defendants controlled the content of the messages being delivered by the Promotion Enterprise at each seminar, event and presentation, and in the publications by the vendor and physician participants, including the misinformation and false statements concerning the safety, efficacy, effectiveness and usefulness of Neurontin for off-label uses.

(b)    Defendants controlled the stream of information disseminated by the Promotion Enterprise concerning Neurontin by ensuring that only favorable results were published and disclosed and unfavorable results were suppressed.

(c)    Defendants selected and approved which physician participant(s) would deliver the off-label message at each seminar, event and presentation, and selected and approved each physician "author" for the published materials propounded by the Promotion Enterprise.

(d)    Defendants selected who attended each seminar, event and presentation sponsored by the Promotion Enterprise.

(e)    Defendants paid the vendor and the physician participants for their participation in the Promotion Enterprise.

(f)    Defendants placed their own employees and agents in positions of authority and control in the Promotion Enterprise.

238.    As detailed above, Defendants' fraudulent scheme consisted of, inter alia:

(a) deliberately misrepresenting, and causing others to misrepresent, the uses for which

Neurontin was safe and effective so that Plaintiffs paid for this drug to treat symptoms for which

it was not scientifically proven to be safe, efficacious, effective and useful; (b) presenting

seminars and events misrepresenting off-label uses for Neurontin for which Defendants' knew

were not proven to be scientifically safe, efficacious, effective and useful to physician attendees

and other healthcare providers; (c) publishing or causing to have published materials containing

false information upon which physicians and Plaintiffs relied upon when choosing to prescribe

or pay for Neurontin to treat off-label uses; (d) actively concealing, and causing others to

conceal, information about the true safety, efficacy, effectiveness and usefulness of Neurontin to

treat conditions for which it had not been approved by the FDA; and (e) misrepresenting the

appropriate and effective dosages for the drug.

239.    Defendants' scheme and the above described racketeering activities amounted to

a common course of conduct intended to cause Plaintiffs and others to pay for excessive amounts

of Neurontin.  Each such racketeering activity was related, had similar purposes, involved the

same or similar participants and methods of commission, and had similar results affecting similar

victims, including Plaintiffs.  Defendants' fraudulent activities are part of their ongoing business

and constitute a continuing threat to Plaintiffs' property.

240.    The pattern of racketeering activity alleged herein and the Promotion Enterprise

are separate and distinct from each other.  Defendants engaged in a pattern of racketeering

activity alleged herein for the purpose of conducting the affairs of the Promotion Enterprise.

241.    Plaintiffs have been injured in their property by reason of these violations in that

Plaintiffs have made millions of dollars in payments for Neurontin that they would not have

made had Defendants not engaged in their pattern of racketeering activity.

242.     Plaintiffs' injuries were directly and proximately caused by Defendants' racketeering activity, as described above.

243.     By virtue of these violations of 18 U.S.C. § 1962(c), Defendants are jointly and severally liable to Plaintiffs for three times the damages Plaintiffs have sustained, plus the cost of this suit, including reasonable attorneys' fees.

### SECOND CLAIM FOR RELIEF
### Violation of 18 U.S.C. § 1962(c) (The Cline Davis Sub-Enterprise)

244.     Plaintiffs incorporate by reference all preceding paragraphs, as if fully set forth herein.

245.     In the alternative, Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3) who conducted the affairs of the enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

246.     The enterprise is an association-in-fact within the meaning of 18 U.S.C. § 1961(4) consisting of (i) Defendants, including their employees and agents; and (ii) Cline Davis (collectively, the "Cline Davis Sub-Enterprise"). The Cline Davis Sub-Enterprise is an ongoing organization that functions as a continuing unit. The Cline Davis Sub-Enterprise was created and used as a tool to effectuate Defendants' pattern of racketeering activity. The Defendant "persons" are distinct from the Cline Davis Sub-Enterprise.

247.     The Cline Davis Sub-Enterprise falls within the meaning of 18 U.S.C. § 1961(4) and consists of a group of "persons" associated together for the common purpose of promoting Neurontin for off-label uses and earning profits therefrom.

248.     Defendants have conducted and participated in the affairs of the Cline Davis Sub-Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and 1961(5), which includes multiple instances of mail fraud in violation of 18 U.S.C. § 1341,

and multiple instances of wire fraud in violation of 18 U.S.C. § 1343, as described above.

249.    The Cline Davis Sub-Enterprise engaged in and affected interstate commerce, because, inter alia, it marketed, sold, purchased or provided Neurontin to thousands of entities and individuals throughout the United States.

250.    Defendants exerted control over the Cline Davis Sub-Enterprise, and Defendants participated in the operation or management of the affairs of the Cline Davis Sub-Enterprise, through a variety of actions including the following:

(a)    Defendants controlled the content of the messages being delivered by the physician participants at each seminar, event and presentation sponsored by Cline Davis, including the misinformation and false statements concerning the safety, efficacy, effectiveness and usefulness of Neurontin for off-label uses.

(b)    Defendants controlled the stream of information disseminated by the Cline Davis Sub-Enterprise concerning Neurontin by ensuring that only favorable results were published and disclosed and unfavorable results were suppressed.

(c)    Defendants selected and approved which physician participant(s) would deliver the off-label message at each seminar, event and presentation and selected and approved each physician "author" for the published materials propounded by the Cline Davis Sub-Enterprise.

(d)    Defendants selected who attended each seminar, event and presentation sponsored by the Cline Davis Sub-Enterprise.

(e)    Defendants paid Cline Davis for its participation in the Cline Davis Sub-Enterprise and split budget overruns with Cline Davis for activities furthering the Cline Davis Sub-Enterprise.

(f)    Defendants placed their own employees and agents in positions of authority and control in the Cline Davis Sub-Enterprise, and permitted Cline Davis to place its own employees on Defendants' Extended Neurontin Disease Team.

251.    As detailed above, Defendants' fraudulent scheme consisted of, inter alia: (a) deliberately misrepresenting, and causing others to misrepresent, the uses for which Neurontin was safe and effective so that Plaintiffs paid for this drug to treat symptoms for which it was not scientifically proven to be safe, efficacious, effective and useful; (b) presenting seminars and events misrepresenting off-label uses for Neurontin for which Defendants' knew were not proven to be scientifically safe, efficacious, effective and useful to physician attendees and other healthcare providers; (c) publishing or causing to have published materials containing false information upon which physicians and Plaintiffs relied upon when choosing to prescribe or pay for Neurontin to treat off-label uses; (d) actively concealing, and causing others to conceal, information about the true safety, efficacy, effectiveness and usefulness of Neurontin to treat conditions for which it had not been approved by the FDA; and (e) misrepresenting the appropriate and effective dosages for the drug.

252.    Defendants' scheme and the above described racketeering activities amounted to a common course of conduct intended to cause Plaintiffs and others to pay for excessive amounts of Neurontin.  Each such racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiffs.  Defendants' fraudulent activities are part of their ongoing business and constitute a continuing threat to Plaintiffs' property.

253.    The pattern of racketeering activity alleged herein and the Cline Davis Sub-Enterprise are separate and distinct from each other.  Defendants engaged in a pattern of

racketeering activity alleged herein for the purpose of conducting the affairs of the Cline Davis Sub-Enterprise.

254.    Plaintiffs have been injured in their property by reason of these violations in that Plaintiffs have made millions of dollars in payments for Neurontin that would not have made had Defendants not engaged in their pattern of racketeering activity.

255.    Plaintiffs' injuries were directly and proximately caused by Defendants' racketeering activity as described above.

256.    By virtue of these violations of 18 U.S.C. § 1962(c), Defendants are jointly and severally liable to Plaintiffs for three times the damages Plaintiffs have sustained, plus the cost of this suit, including reasonable attorneys' fees.

### THIRD CLAIM FOR RELIEF
**Violation of 18 U.S.C. § 1962(c) (The Physicians World Sub-Enterprise)**

257.    Plaintiffs incorporate by reference all preceding paragraphs, as if fully set forth herein.

258.    In the alternative, Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3) who conducted the affairs of the enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

259.    The enterprise is an association-in-fact within the meaning of 18 U.S.C. § 1961(4) consisting of (i) Defendants, including their employees and agents; (ii) Physicians World (collectively, the "Physicians World Sub-Enterprise"). The Physicians World Sub-Enterprise is an ongoing organization that functions as a continuing unit. The Physicians World Sub-Enterprise was created and used as a tool to effectuate Defendants' pattern of racketeering activity. The Defendant "persons" are distinct from the Physicians World Sub-Enterprise.

260.    The Physicians World Sub-Enterprise falls within the meaning of 18 U.S.C. §

1961(4) and consists of a group of "persons" associated together for the common purpose of

promoting Neurontin for off-label uses and earning profits therefrom.

261.    Defendants have conducted and participated in the affairs of the Physicians World

Sub-Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§

1961(1) and 1961(5), which includes multiple instances of mail fraud in violation of 18 U.S.C.

§ 1341, and multiple instances of wire fraud in violation of 18 U.S.C. § 1343, as described

above.

262.    The Physicians World Sub-Enterprise engaged in and affected interstate

commerce, because, inter alia, it marketed, sold, purchased or provided Neurontin to thousands

of entities and individuals throughout the United States.

263.    Defendants exerted control over the Physicians World Sub-Enterprise, and

Defendants participated in the operation or management of the affairs of the Physicians World

Sub-Enterprise, through a variety of actions including the following:

(a)    Defendants controlled the content of the messages being delivered by the

physician participants at each seminar, event and presentation sponsored by Physicians World,

including the misinformation and false statements concerning the safety, efficacy, effectiveness

and usefulness of Neurontin for off-label uses.

(b)    Defendants controlled the stream of information disseminated by the

Physicians World Sub-Enterprise concerning Neurontin by ensuring that only favorable results

were published and disclosed and unfavorable results were suppressed.

(c)    Defendants selected and approved which physician participant(s) would

deliver the off-label message at each seminar, event and presentation and selected and approved

each physician "author" for the published materials propounded by the Physicians World Sub-

Enterprise.

(d)     Defendants selected who attended each seminar, event and presentation sponsored by the Physicians World Sub-Enterprise.

(e)     Defendants paid Physicians World for its participation in the Physicians World Sub-Enterprise.

(f)     Defendants formed a strategic partnership with Physicians World in order to carry out the activities of the Physicians World Sub-Enterprise.  This partnership included the commingling of employees among Defendants and Physicians World.

(g)     Defendants placed their own employees and agents in positions of authority and control in the Physicians World Sub-Enterprise.

264.     As detailed above, Defendants' fraudulent scheme consisted of, inter alia: (a) deliberately misrepresenting, and causing others to misrepresent, the uses for which Neurontin was safe and effective so that Plaintiffs paid for this drug to treat symptoms for which it was not scientifically proven to be safe, efficacious, effective and useful; (b) presenting seminars and events misrepresenting off-label uses for Neurontin for which Defendants' knew were not proven to be scientifically safe, efficacious, effective and useful to physician attendees and other healthcare providers; (c) publishing or causing to have published materials containing false information upon which physicians and Plaintiffs relied upon when choosing to prescribe or pay for Neurontin to treat off-label uses; (d) actively concealing, and causing others to conceal, information about the true safety, efficacy, effectiveness and usefulness of Neurontin to treat conditions for which it had not been approved by the FDA; and (e) misrepresenting the appropriate and effective dosages for the drug.

265.     Defendants' scheme and the above described racketeering activities amounted to

a common course of conduct intended to cause Plaintiffs and others to pay for excessive amounts of Neurontin.  Each such racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiffs.  Defendants' fraudulent activities are part of their ongoing business and constitute a continuing threat to Plaintiffs' property.

266.    The pattern of racketeering activity alleged herein and the Physicians World Sub-Enterprise are separate and distinct from each other.  Defendants engaged in a pattern of racketeering activity alleged herein for the purpose of conducting the affairs of the Physicians World Sub-Enterprise.

267.    Plaintiffs have been injured in their property by reason of these violations in that Plaintiffs have made millions of dollars in payments for Neurontin that would not have made had Defendants not engaged in their pattern of racketeering activity.

268.    Plaintiffs' injuries were directly and proximately caused by Defendants' racketeering activity as described above.

269.    By virtue of these violations of 18 U.S.C. § 1962(c), Defendants are jointly and severally liable to Plaintiffs for three times the damages Plaintiffs have sustained, plus the cost of this suit, including reasonable attorneys' fees.

### FOURTH CLAIM FOR RELIEF
#### Violation of 18 U.S.C. § 1962(c) (The Sudler & Hennessey Sub-Enterprise)

270.    Plaintiffs incorporate by reference all preceding paragraphs, as if fully set forth herein.

271.    In the alternative, Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3) who conducted the affairs of the enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

272.    The enterprise is an association-in-fact within the meaning of 18 U.S.C. § 1961(4) consisting of (i) Defendants, including their employees and agents; and (ii) Sudler & Hennessey (collectively, the "Sudler & Hennessey Sub-Enterprise"). The Sudler & Hennessey Sub-Enterprise is an ongoing organization that functions as a continuing unit. The Sudler & Hennessey Sub-Enterprise was created and used as a tool to effectuate Defendants' pattern of racketeering activity. The Defendant "persons" are distinct from the Sudler & Hennessey Sub-Enterprise.

273.    The Sudler & Hennessey Sub-Enterprise falls within the meaning of 18 U.S.C. § 1961(4) and consists of a group of "persons" associated together for the common purpose of promoting Neurontin for off-label uses and earning profits therefrom.

274.    Defendants have conducted and participated in the affairs of the Sudler & Hennessey Sub-Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and 1961(5), that includes multiple instances of mail fraud in violation of 18 U.S.C. § 1341, and multiple instances of wire fraud in violation of 18 U.S.C. § 1343, as described above.

275.    The Sudler & Hennessey Sub-Enterprise engaged in and affected interstate commerce, because, inter alia, it marketed, sold, purchased or provided Neurontin to thousands of entities and individuals throughout the United States.

276.    Defendants exerted control over the Sudler & Hennessey Sub-Enterprise, and Defendants participated in the operation or management of the affairs of the Sudler & Hennessey Sub-Enterprise, through a variety of actions including the following:

(a)     Defendants controlled the content of the messages being delivered by the physician participants at each seminar, event and presentation sponsored by Sudler &

Hennessey, including the misinformation and false statements concerning the safety, efficacy,

effectiveness and usefulness of Neurontin for off-label uses.

(b)     Defendants controlled the stream of information disseminated by the

Sudler & Hennessey Sub-Enterprise concerning Neurontin by ensuring that only favorable

results were published and disclosed and unfavorable results were suppressed.

(c)     Defendants selected and approved which physician participant(s) would

deliver the off-label message at each seminar, event and presentation and selected and approved

each physician "author" for the published materials propounded by the Sudler & Hennessey Sub-

Enterprise.

(d)     Defendants selected who attended each seminar, event and presentation

sponsored by Sudler & Hennessey.

(e)     Defendants paid Sudler & Hennessey for its participation in the Sudler &

Hennessey Sub-Enterprise.

(f)     Defendants placed their own employees and agents in positions of

authority and control in the Sudler & Hennessey Sub-Enterprise.

277.     As detailed above, Defendants' fraudulent scheme consisted of, <u>inter alia</u>:

(a) deliberately misrepresenting, and causing others to misrepresent, the uses for which

Neurontin was safe and effective so that Plaintiffs paid for this drug to treat symptoms for which

it was not scientifically proven to be safe and efficacious, effective and useful; (b) presenting

seminars and events misrepresenting off-label uses for Neurontin for which Defendants' knew

were not proven to be scientifically safe, efficacious, effective and useful to physician attendees

and other healthcare providers; (c) publishing or causing to have published materials containing

false information upon which physicians and Plaintiffs relied upon when choosing to prescribe

or pay for Neurontin to treat off-label uses; (d) actively concealing, and causing others to conceal, information about the true safety, efficacy, effectiveness and usefulness of Neurontin to treat conditions for which it had not been approved by the FDA; and (e) misrepresenting the appropriate and effective dosages for the drug.

278.    Defendants' scheme and the above described racketeering activities amounted to a common course of conduct intended to cause Plaintiffs and others to pay for excessive amounts of Neurontin.  Each such racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiffs.  Defendants' fraudulent activities are part of their ongoing business and constitute a continuing threat to Plaintiffs' property.

279.    The pattern of racketeering activity alleged herein and the Sudler & Hennessey Sub-Enterprise are separate and distinct from each other.  Defendants engaged in a pattern of racketeering activity alleged herein for the purpose of conducting the affairs of the Sudler & Hennessey Sub-Enterprise.

280.    Plaintiffs have been injured in their property by reason of these violations in that Plaintiffs have made millions of dollars in payments for Neurontin that would not have made had Defendants not engaged in their pattern of racketeering activity.

281.    Plaintiffs' injuries were directly and proximately caused by Defendants' racketeering activity as described above.

282.    By virtue of these violations of 18 U.S.C. § 1962(c), Defendants are jointly and severally liable to Plaintiffs for three times the damages Plaintiffs have sustained, plus the cost of this suit, including reasonable attorneys' fees.

**FIFTH CLAIM FOR RELIEF**
**Violation of 18 U.S.C. § 1962(c) (The MEDED/MEDCON Sub-Enterprise)**

283.    Plaintiffs incorporate by reference all preceding paragraphs, as if fully set forth

herein.

284.    In the alternative, Defendants are "persons" within the meaning of 18 U.S.C.

§ 1961(3) who conducted the affairs of the enterprise through a pattern of racketeering activity in

violation of 18 U.S.C. § 1962(c).

285.    The enterprise is an association-in-fact within the meaning of 18 U.S.C. § 1961(4)

consisting of (i) Defendants, including their employees and agents; and (ii) MEDED/MEDCON

(collectively, the "MEDED/MEDCON Sub-Enterprise"). The MEDED/MEDCON Sub-

Enterprise is an ongoing organization that functions as a continuing unit. The

MEDED/MEDCON Sub-Enterprise was created and used as a tool to effectuate Defendants'

pattern of racketeering activity. The Defendant "persons" are distinct from the

MEDED/MEDCON Sub-Enterprise.

286.    The MEDED/MEDCON Sub-Enterprise falls within the meaning of 18 U.S.C. §

1961(4) and consists of a group of "persons" associated together for the common purpose of

promoting Neurontin for off-label uses and earning profits therefrom.

287.    Defendants have conducted and participated in the affairs of the

MEDED/MEDCON Sub-Enterprise through a pattern of racketeering activity within the

meaning of 18 U.S.C. §§ 1961(1) and 1961(5), that includes multiple instances of mail fraud in

violation of 18 U.S.C. § 1341, and multiple instances of wire fraud in violation of 18 U.S.C. §

1343, as described above.

288.    The MEDED/MEDCON Sub-Enterprise engaged in and affected interstate

commerce, because, _inter alia_, it marketed, sold, purchased or provided Neurontin to thousands

of entities and individuals throughout the United States.

289.    Defendants exerted control over the MEDED/MEDCON Sub-Enterprise, and Defendants participated in the operation or management of the affairs of the MEDED/MEDCON Sub-Enterprise, through a variety of actions including the following:

(a)    Defendants controlled the content of the messages being delivered by the physician participants at each seminar, event and presentation sponsored by MEDED/MEDCON, including the misinformation and false statements concerning the safety, efficacy, effectiveness and usefulness of Neurontin for off-label uses.

(b)    Defendants controlled the stream of information disseminated by the MEDED/MEDCON Sub-Enterprise concerning Neurontin by ensuring that only favorable results were published and disclosed and unfavorable results were suppressed.

(c)    Defendants selected and approved which physician participant(s) would deliver the off-label message at each seminar, event and presentation and selected and approved each physician "author" for the published materials propounded by the MEDED/MEDCON Sub-Enterprise.

(d)    Defendants selected who attended each seminar, event and presentation sponsored by the MEDED/MEDCON Sub-Enterprise.

(e)    Defendants paid MEDED/MEDCON for its participation in the MEDED/MEDCON Sub-Enterprise.

(f)    Defendants placed their own employees and agents in positions of authority and control in the MEDED/MEDCON Sub-Enterprise.

290.    As detailed above, Defendants' fraudulent scheme consisted of, inter alia: (a) deliberately misrepresenting, and causing others to misrepresent, the uses for which

Neurontin was safe and effective so that Plaintiffs paid for this drug to treat symptoms for which it was not scientifically proven to be safe, efficacious, effective and useful; (b) presenting seminars and events misrepresenting off-label uses for Neurontin for which Defendants' knew were not proven to be scientifically safe, efficacious, effective and useful to physician attendees and other healthcare providers; (c) publishing or causing to have published materials containing false information upon which physicians and Plaintiffs relied upon when choosing to prescribe or pay for Neurontin to treat off-label uses; (d) actively concealing, and causing others to conceal, information about the true safety, efficacy, effectiveness and usefulness of Neurontin to treat conditions for which it had not been approved by the FDA; and (e) misrepresenting the appropriate and effective dosages for the drug.

291.     Defendants' scheme and the above described racketeering activities amounted to a common course of conduct intended to cause Plaintiffs and others to pay for excessive amounts of Neurontin.  Each such racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiffs.  Defendants' fraudulent activities are part of their ongoing business and constitute a continuing threat to Plaintiffs' property.

292.     The pattern of racketeering activity alleged herein and the MEDED/MEDCON Sub-Enterprise are separate and distinct from each other.  Defendants engaged in a pattern of racketeering activity alleged herein for the purpose of conducting the affairs of the MEDED/MEDCON Sub-Enterprise.

293.     Plaintiffs have been injured in their property by reason of these violations in that Plaintiffs have made millions of dollars in payments for Neurontin that would not have made had Defendants not engaged in their pattern of racketeering activity.

294.    Plaintiffs' injuries were directly and proximately caused by Defendants'

racketeering activity as described above.

295.    By virtue of these violations of 18 U.S.C. § 1962(c), Defendants are jointly and

severally liable to Plaintiffs for three times the damages Plaintiffs have sustained, plus the cost of

this suit, including reasonable attorneys' fees.

### SIXTH CLAIM FOR RELIEF
### Violation of 18 U.S.C. § 1962(c) (The MES Sub-Enterprise)

296.    Plaintiffs incorporate by reference all preceding paragraphs, as if fully set forth

herein.

297.    In the alternative, Defendants are "persons" within the meaning of 18 U.S.C.

§ 1961(3) who conducted the affairs of the enterprise through a pattern of racketeering activity in

violation of 18 U.S.C. § 1962(c).

298.    The enterprise is an association-in-fact within the meaning of 18 U.S.C. § 1961(4)

consisting of (i) Defendants, including their employees and agents; and (ii) MES (collectively,

the "MES Sub-Enterprise"). The MES Sub-Enterprise is an ongoing organization that functions

as a continuing unit. The MES Sub-Enterprise was created and used as a tool to effectuate

Defendants' pattern of racketeering activity. The Defendant "persons" are distinct from the

MES Sub-Enterprise.

299.    The MES Sub-Enterprise falls within the meaning of 18 U.S.C. § 1961(4) and

consists of a group of "persons" associated together for the common purpose of promoting

Neurontin for off-label uses and earning profits therefrom.

300.    Defendants have conducted and participated in the affairs of the MES Sub-

Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1)

and 1961(5), that includes multiple instances of mail fraud in violation of 18 U.S.C. § 1341, and

multiple instances of wire fraud in violation of 18 U.S.C. § 1343, as described above.

301.    The MES Sub-Enterprise engaged in and affected interstate commerce, because, inter alia, it marketed, sold, purchased or provided Neurontin to thousands of entities and individuals throughout the United States.

302.    Defendants exerted control over the MES Sub-Enterprise, and Defendants participated in the operation or management of the affairs of the MES Sub-Enterprise, through a variety of actions including the following:

(a)    Defendants controlled the content of the messages being delivered by the physician participants at each seminar, event and presentation sponsored by MES, including the misinformation and false statements concerning the safety, efficacy, effectiveness and usefulness of Neurontin for off-label uses.

(b)    Defendants controlled the stream of information disseminated by the MES Sub-Enterprise concerning Neurontin by ensuring that only favorable results were published and disclosed and unfavorable results were suppressed.

(c)    Defendants selected and approved which physician participant(s) would deliver the off-label message at each seminar, event and presentation and selected and approved each physician "author" for the published materials propounded by the MES Sub-Enterprise.

(d)    Defendants selected who attended each seminar, event and presentation sponsored by the MES Sub-Enterprise.

(e)    Defendants paid MES for its participation in the MES Sub-Enterprise.

(f)    Defendants placed their own employees and agents in positions of authority and control in the MES Sub-Enterprise.

303.    As detailed above, Defendants' fraudulent scheme consisted of, inter alia:

(a) deliberately misrepresenting, and causing others to misrepresent, the uses for which

Neurontin was safe and effective so that Plaintiffs paid for this drug to treat symptoms for which

it was not scientifically proven to be safe, efficacious, effective and useful; (b) presenting

seminars and events misrepresenting off-label uses for Neurontin for which Defendants' knew

were not proven to be scientifically safe, efficacious, effective and useful to physician attendees

and other healthcare providers; (c) publishing or causing to have published materials containing

false information upon which physicians and Plaintiffs relied upon when choosing to prescribe

or pay for Neurontin to treat off-label uses; (d) actively concealing, and causing others to

conceal, information about the true safety, efficacy, effectiveness and usefulness of Neurontin to

treat conditions for which it had not been approved by the FDA; and (e) misrepresenting the

appropriate and effective dosages for the drug.

304.    Defendants' scheme and the above described racketeering activities amounted to

a common course of conduct intended to cause Plaintiffs and others to pay for excessive amounts

of Neurontin.  Each such racketeering activity was related, had similar purposes, involved the

same or similar participants and methods of commission, and had similar results affecting similar

victims, including Plaintiffs.  Defendants' fraudulent activities are part of their ongoing business

and constitute a continuing threat to Plaintiffs' property.

305.    The pattern of racketeering activity alleged herein and the MES Sub-Enterprise

are separate and distinct from each other.  Defendants engaged in a pattern of racketeering

activity alleged herein for the purpose of conducting the affairs of the MES Sub-Enterprise.

306.    Plaintiffs have been injured in their property by reason of these violations in that

Plaintiffs have made millions of dollars in payments for Neurontin that would not have made had

Defendants not engaged in their pattern of racketeering activity.

307.    Plaintiffs' injuries were directly and proximately caused by Defendants' racketeering activity as described above.

308.    By virtue of these violations of 18 U.S.C. § 1962(c), Defendants are jointly and severally liable to Plaintiffs for three times the damages Plaintiffs have sustained, plus the cost of this suit, including reasonable attorneys' fees.

## SEVENTH CLAIM FOR RELIEF
### Violation of 18 U.S.C. § 1962(c) (The HCC Sub-Enterprise)

309.    Plaintiffs incorporate by reference all preceding paragraphs, as if fully set forth herein.

310.    In the alternative, Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3) who conducted the affairs of the enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

311.    The enterprise is an association-in-fact within the meaning of 18 U.S.C. § 1961(4) consisting of (i) Defendants, including their employees and agents; and (ii) HCC (collectively, the "HCC Sub-Enterprise"). The HCC Sub-Enterprise is an ongoing organization that functions as a continuing unit. The HCC Sub-Enterprise was created and used as a tool to effectuate Defendants' pattern of racketeering activity. The Defendant "persons" are distinct from the HCC Sub-Enterprise.

312.    The HCC Sub-Enterprise falls within the meaning of 18 U.S.C. § 1961(4) and consists of a group of "persons" associated together for the common purpose of promoting Neurontin for off-label uses and earning profits therefrom.

313.    Defendants have conducted and participated in the affairs of the HCC Sub-Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and 1961(5), that includes multiple instances of mail fraud in violation of 18 U.S.C. § 1341, and

multiple instances of wire fraud in violation of 18 U.S.C. § 1343, as described above.

314.    The HCC Sub-Enterprise engaged in and affected interstate commerce, because, inter alia, it marketed, sold, purchased or provided Neurontin to thousands of entities and individuals throughout the United States.

315.    Defendants exerted control over the HCC Sub-Enterprise, and Defendants participated in the operation or management of the affairs of the HCC Sub-Enterprise, through a variety of actions including the following:

(a)    Defendants controlled the content of the messages being delivered by the physician participants at each seminar, event and presentation sponsored by HCC, including the misinformation and false statements concerning the safety, efficacy, effectiveness and usefulness of Neurontin for off-label uses.

(b)    Defendants controlled the stream of information disseminated by the HCC Sub-Enterprise concerning Neurontin by ensuring that only favorable results were published and disclosed and unfavorable results were suppressed.

(c)    Defendants selected and approved which physician participant(s) would deliver the off-label message at each seminar, event and presentation and selected and approved each physician "author" for the published materials propounded by the HCC Sub-Enterprise.

(d)    Defendants selected who attended each seminar, event and presentation sponsored by the HCC Sub-Enterprise.

(e)    Defendants paid HCC for its participation in the HCC Sub-Enterprise.

(f)    Defendants placed their own employees and agents in positions of authority and control in the HCC Sub-Enterprise.

316.    As detailed above, Defendants' fraudulent scheme consisted of, inter alia:

(a) deliberately misrepresenting, and causing others to misrepresent, the uses for which

Neurontin was safe and effective so that Plaintiffs paid for this drug to treat symptoms for which

it was not scientifically proven to be safe, efficacious, effective and useful; (b) presenting

seminars and events misrepresenting off-label uses for Neurontin for which Defendants' knew

were not proven to be scientifically safe, efficacious, effective and useful to physician attendees

and other healthcare providers; (c) publishing or causing to have published materials containing

false information upon which physicians and Plaintiffs relied upon when choosing to prescribe

or pay for Neurontin to treat off-label uses; (d) actively concealing, and causing others to

conceal, information about the true safety, efficacy, effectiveness and usefulness of Neurontin to

treat conditions for which it had not been approved by the FDA; and (e) misrepresenting the

appropriate and effective dosages for the drug.

317.    Defendants' scheme and the above described racketeering activities amounted to

a common course of conduct intended to cause Plaintiffs and others to pay for excessive amounts

of Neurontin.  Each such racketeering activity was related, had similar purposes, involved the

same or similar participants and methods of commission, and had similar results affecting similar

victims, including Plaintiffs.  Defendants' fraudulent activities are part of their ongoing business

and constitute a continuing threat to Plaintiffs' property.

318.    The pattern of racketeering activity alleged herein and the HCC Sub-Enterprise

are separate and distinct from each other.  Defendants engaged in a pattern of racketeering

activity alleged herein for the purpose of conducting the affairs of the HCC Sub-Enterprise.

319.    Plaintiffs have been injured in their property by reason of these violations in that

Plaintiffs have made millions of dollars in payments for Neurontin that would not have made had

Defendants not engaged in their pattern of racketeering activity.

320.    Plaintiffs' injuries were directly and proximately caused by Defendants' racketeering activity as described above.

321.    By virtue of these violations of 18 U.S.C. § 1962(c), Defendants are jointly and severally liable to Plaintiffs for three times the damages Plaintiffs have sustained, plus the cost of this suit, including reasonable attorneys' fees.

## EIGHTH CLAIM FOR RELIEF
### Violation of 18 U.S.C. § 1962(c) (The AMM/Adelphi Sub-Enterprise)

322.    Plaintiffs incorporate by reference all preceding paragraphs, as if fully set forth herein.

323.    In the alternative, Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3) who conducted the affairs of the enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

324.    The enterprise is an association-in-fact within the meaning of 18 U.S.C. § 1961(4) consisting of (i) Defendants, including their employees and agents; and (ii) AMM/Adelphi (collectively, the "AMM/Adelphi Sub-Enterprise").  The AMM/Adelphi Sub-Enterprise is an ongoing organization that functions as a continuing unit.  The AMM/Adelphi Sub-Enterprise was created and used as a tool to effectuate Defendants' pattern of racketeering activity.  The Defendant "persons" are distinct from the AMM/Adelphi Sub-Enterprise.

325.    The AMM/Adelphi Sub-Enterprise falls within the meaning of 18 U.S.C. § 1961(4) and consists of a group of "persons" associated together for the common purpose of promoting Neurontin for off-label uses and earning profits therefrom.

326.    Defendants have conducted and participated in the affairs of the AMM/Adelphi Sub-Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and 1961(5), that includes multiple instances of mail fraud in violation of 18 U.S.C.

§ 1341, and multiple instances of wire fraud in violation of 18 U.S.C. § 1343, as described above.

327.    The AMM/Adelphi Sub-Enterprise engaged in and affected interstate commerce, because, inter alia, it marketed, sold, purchased or provided Neurontin to thousands of entities and individuals throughout the United States.

328.    Defendants exerted control over the AMM/Adelphi Sub-Enterprise, and Defendants participated in the operation or management of the affairs of the AMM/Adelphi Sub-Enterprise, through a variety of actions including the following:

(a)    Defendants controlled the content of the messages being delivered by the physician participants at each seminar, event and presentation sponsored by AMM/Adelphi, including the misinformation and false statements concerning the safety, efficacy, effectiveness and usefulness of Neurontin for off-label uses.

(b)    Defendants controlled the stream of information disseminated by the AMM/Adelphi Sub-Enterprise concerning Neurontin by ensuring that only favorable results were published and disclosed and unfavorable results were suppressed.

(c)    Defendants selected and approved which physician participant(s) would deliver the off-label message at each seminar, event and presentation and selected and approved each physician "author" for the published materials propounded by the AMM/Adelphi Sub-Enterprise.

(d)    Defendants selected who attended each seminar, event and presentation sponsored by the AMM/Adelphi Sub-Enterprise.

(e)    Defendants paid AMM/Adelphi for its participation in the AMM/Adelphi Sub-Enterprise.

(f)      Defendants placed their own employees and agents in positions of authority and control in the AMM/Adelphi Sub-Enterprise.

329.    As detailed above, Defendants' fraudulent scheme consisted of, <u>inter alia</u>: (a) deliberately misrepresenting, and causing others to misrepresent, the uses for which Neurontin was safe and effective so that Plaintiffs paid for this drug to treat symptoms for which it was not scientifically proven to be safe, efficacious, effective and useful; (b) presenting seminars and events misrepresenting off-label uses for Neurontin for which Defendants' knew were not proven to be scientifically safe, efficacious, effective and useful to physician attendees and other healthcare providers; (c) publishing or causing to have published materials containing false information upon which physicians and Plaintiffs relied upon when choosing to prescribe or pay for Neurontin to treat off-label uses; (d) actively concealing, and causing others to conceal, information about the true safety, efficacy, effectiveness and usefulness of Neurontin to treat conditions for which it had not been approved by the FDA; and (e) misrepresenting the appropriate and effective dosages for the drug.

330.    Defendants' scheme and the above described racketeering activities amounted to a common course of conduct intended to cause Plaintiffs and others to pay for excessive amounts of Neurontin.  Each such racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiffs.  Defendants' fraudulent activities are part of their ongoing business and constitute a continuing threat to Plaintiffs' property.

331.    The pattern of racketeering activity alleged herein and the AMM/Adelphi Sub-Enterprise are separate and distinct from each other.  Defendants engaged in a pattern of racketeering activity alleged herein for the purpose of conducting the affairs of the

AMM/Adelphi Sub-Enterprise.

332.    Plaintiffs have been injured in their property by reason of these violations in that Plaintiffs have made millions of dollars in payments for Neurontin that would not have made had Defendants not engaged in their pattern of racketeering activity.

333.    Plaintiffs' injuries were directly and proximately caused by Defendants' racketeering activity as described above.

334.    By virtue of these violations of 18 U.S.C. § 1962(c), Defendants are jointly and severally liable to Plaintiffs for three times the damages Plaintiffs have sustained, plus the cost of this suit, including reasonable attorneys' fees.

**NINTH CLAIM FOR RELIEF**
**Violation of 18 U.S.C. § 1962(c)**
**(The Publication/Marketing/Physician Sub-Enterprise)**

335.    Plaintiffs incorporate by reference all preceding paragraphs, as if fully set forth herein.

336.    In the alternative, Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3) who conducted the affairs of the enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

337.    The enterprises are associations-in-fact within the meaning of 18 U.S.C. § 1961(4) consisting of each of the following:  (a) the members of the Cline Davis Sub-Enterprise and the physician participants identified in paragraph 99, supra (the "Cline Davis/Physician Sub-Enterprise"); (b) the members of the Physicians World Sub-Enterprise and the physician participants identified in paragraph 99, supra (the "Physicians World/Physician Sub-Enterprise"); (c) the members of the Sudler & Hennessey Sub-Enterprise and the physician participants identified in paragraph 99, supra (the "Sudler & Hennessey/Physician Sub-

Enterprise"); (d) the members of the MEDED/MEDCON Sub-Enterprise and the physician

participants identified in paragraph 99, supra (the "MEDED/MEDCON/Physician Sub-

Enterprise"); (e) the members of the MES Sub-Enterprise and the physician participants

identified in paragraph 99, supra (the "MES/Physician Sub-Enterprise"); (f) the members of the

HCC Sub-Enterprise and the physician participants identified in paragraph 99, supra (the

"HCC/Physician Sub-Enterprise"); and (g) the members of the AMM/Adelphi Sub-Enterprise

and the physician participants identified in paragraph 99, supra (the "AMM/Adelphi/Physician

Sub-Enterprise").  The seven foregoing Sub-Enterprises are collectively referenced herein as the

"Publication/Marketing/Physician Sub-Enterprises."  Each of the

Publication/Marketing/Physician Sub-Enterprises is an ongoing organization that functions as a

continuing unit.  Each was created and used as a tool to effectuate Defendants' pattern of

racketeering activity.  The Defendant "persons" are distinct from each of the

Publication/Marketing/Physician Sub-Enterprises.

338.    Each of the Publication/Marketing/Physician Sub-Enterprises falls within the

meaning of 18 U.S.C. § 1961(4) and consists of a group of "persons" associated together for the

common purpose of promoting Neurontin for off-label uses and earning profits therefrom.

339.    Defendants have conducted and participated in the each of the

Publication/Marketing/Physician Sub-Enterprises through a pattern of racketeering activity

within the meaning of 18 U.S.C. §§ 1961(1) and 1961(5), that includes multiple instances of mail

fraud in violation of 18 U.S.C. § 1341, and multiple instances of wire fraud in violation of 18

U.S.C. § 1343, as described above.

340.    Each of the Publication/Marketing/Physician Sub-Enterprises engaged in and

affected interstate commerce, because, inter alia, it marketed, sold, purchased or provided

Neurontin to thousands of entities and individuals throughout the United States.

341.    Defendants exerted control over each of the Publication/Marketing/Physician Sub-Enterprises, and Defendants participated in the operation or management of each of the Publication/Marketing/Physician Sub-Enterprises, through a variety of actions including the following:

(a)    Defendants controlled the content of the messages being delivered by the physician participants at each seminar, event and presentation sponsored, including the misinformation and false statements concerning the safety, efficacy, effectiveness, usefulness and appropriate dosages of Neurontin;

(b)    Defendants controlled the stream of information disseminated by each of the Publication/Marketing/Physician Sub-Enterprises concerning Neurontin by ensuring that only favorable results were published and disclosed and unfavorable results were suppressed;

(c)    Defendants selected and approved which physician participant(s) would deliver the off-label message at each seminar, event and presentation and selected and approved each physician "author" for the published materials propounded by each of the Publication/Marketing/Physician Sub-Enterprises;

(d)    Defendants selected who attended each seminar, event and presentation sponsored by each of the Publication/Marketing/Physician Sub-Enterprises;

(e)    Defendants paid the other participants for their participation in each of the Publication/Marketing/Physician Sub-Enterprises; and

(f)    Defendants placed their own employees and agents in positions of authority and control in each of the Publication/Marketing/Physician Sub-Enterprises.

342.    As detailed above, Defendants' fraudulent scheme consisted of, inter alia:

(a) deliberately misrepresenting, and causing others to misrepresent, the uses for which

Neurontin was safe and effective so that Plaintiffs paid for this drug to treat symptoms for which

it was not scientifically proven to be safe and efficacious, effective and useful; (b) presenting

seminars and events misrepresenting off-label uses for Neurontin for which Defendants' knew

were not proven to be scientifically safe, efficacious, effective and useful to physician attendees

and other healthcare providers; (c) publishing or causing to have published materials containing

false information upon which physicians and Plaintiffs relied upon when choosing to prescribe

or pay for Neurontin to treat off-label uses; (d) actively concealing, and causing others to

conceal, information about the true safety, efficacy, effectiveness and usefulness of Neurontin to

treat conditions for which it had not been approved by the FDA; and (e) misrepresenting the

appropriate and effective dosages for the drug.

     343.    Defendants' scheme and the above described racketeering activities amounted to

a common course of conduct intended to cause Plaintiffs and others to pay for excessive amounts

of Neurontin.  Each such racketeering activity was related, had similar purposes, involved the

same or similar participants and methods of commission, and had similar results affecting similar

victims, including Plaintiffs.  Defendants' fraudulent activities are part of their ongoing business

and constitute a continuing threat to the Plaintiffs' property.

     344.    The patterns of racketeering activity alleged herein and for each of the

Publication/Marketing/Physician Sub-Enterprises are separate and distinct from each other.

Defendants engaged in a pattern of racketeering activity alleged herein for the purpose of

conducting the affairs of each of the Publication/Marketing/Physician Sub-Enterprises.

     345.    Plaintiffs have been injured in their property by reason of these violations in that

Plaintiffs have made millions of dollars in payments for Neurontin that they would not have

made had Defendants not engaged in their pattern of racketeering activity.

346.    Plaintiffs' injuries were directly and proximately caused by Defendants'
racketeering activity as described above.

347.    By virtue of these violations of 18 U.S.C. § 1962(c), Defendants are jointly and
severally liable to Plaintiffs for three times the damages Plaintiffs have sustained, plus the cost of
this suit, including reasonable attorneys' fees.

### TENTH CLAIM FOR RELIEF
### Violation of 18 U.S.C. § 1962(d) by Conspiring to Violate 18 U.S.C. § 1962(c)

348.    Plaintiffs incorporate by reference all preceding paragraphs, as if fully set forth
herein.

349.    Section 1962(d) of RICO provides that it "shall be unlawful for any person to
conspire to violate any of the provisions of subsection (a), (b) or (c) of this section."

350.    Defendants have violated section 1962(d) by conspiring to violate 18 U.S.C.
§ 1962(c).  The object of this conspiracy has been and is to conduct or participate in, directly or
indirectly, the conduct of the affairs of the section 1962(c) Enterprises described previously
through a pattern of racketeering activity.

351.    As demonstrated in detail above, Defendants' co-conspirators have engaged in
numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy,
including material misrepresentations and omissions designed to defraud Plaintiffs of money.

352.    The nature of the above-described Defendants' co-conspirators' acts, material
misrepresentations, and omissions in furtherance of the conspiracy gives rise to an inference that
they not only agreed to the objective of an 18 U.S.C. § 1962(d) violation of RICO by conspiring
to violate 18 U.S.C. § 1962(c), but they were aware that their ongoing fraudulent acts have been
and are part of an overall pattern of racketeering activity.

353.    As a direct and proximate result of Defendants' overt acts and predicate acts in furtherance of violating 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. §§ 1962(c), Plaintiffs have been and are continuing to be injured in their business or property, as set forth more fully above.

354.    Defendants have sought to and have engaged in the commission of and continue to commit overt acts, including the following unlawful racketeering predicate acts:

(a)    Multiple instances of mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1342;

(b)    Multiple instances of mail fraud in violation of 18 U.S.C. §§ 1341 and 1346; and

(c)    Multiple instances of wire fraud in violation of 18 U.S.C. §§ 1343 and 1346.

355.    Defendants have sought to and have engaged in the violations of the above federal laws and the effects thereof detailed above are continuing and will continue unless injunctive relief prohibiting Defendants' illegal acts constituting a pattern of racketeering activity is fashioned and imposed by the Court.

## ELEVENTH CLAIM FOR RELIEF
### Violations of the California Unfair Competition Law
### Cal. Bus. & Prof. Code § 17200

356.    Plaintiffs repeat and reallege each of the preceding paragraphs, as if fully set forth herein.

357.    Defendants engaged in unfair competition in knowing violation of the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, et seq., when Defendants knowingly and intentionally misrepresented the medical safety, efficacy, effectiveness and usefulness and

appropriate dosages of Neurontin.

358.   Defendants' unfair and deceptive acts were specifically designed to induce Plaintiffs to pay for excessive amounts of Neurontin.

359.   As a result of Defendants' violations of Business and Professions Code section 17200, Defendants have been unjustly enriched at the expense of Plaintiffs.  Absent Defendants' unlawful, fraudulent and deceptive conduct, Plaintiffs would not have paid for excessive amounts of Neurontin.

360.   The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted and constitute a continuous course of conduct of unfair competition by means of unfair, unconscionable, unlawful and/or fraudulent business acts or practices within the meaning of California Business and Professions Code section 17200, et seq., including, but not limited to the following:

(a)    violations of the RICO statute, 18 U.S.C. § 1962(c) and (d), as set forth above;

(b)    violations of the consumer protection statutes of the remaining forty-nine states, the District of Columbia and the Commonwealth of Puerto Rico, as set forth below;

(c)    Defendants' acts and business practices as described above are otherwise unfair, unconscionable, unlawful and fraudulent, whether or not in violation of the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, et seq., the RICO statute, 18 U.S.C. § 1962(c) and (d), or the consumer protection statutes of the remaining states, the District of Columbia and Puerto Rico; and

(d)    Defendants' acts and practices are fraudulent or deceptive within the meaning of California Business and Professions Code section 17200, et seq.

361. The unlawful and unfair business practices of Defendants have injured and present a continuing threat of injury to Plaintiffs in that Defendants' conduct has caused Plaintiffs to pay for excessive amounts of Neurontin.

362. As alleged herein, Defendants have been unjustly enriched as a result of their unfair competition. Plaintiffs are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits which may have been obtained by Defendants as a result of such business acts or practices, pursuant to California Business and Professions Code sections 17203 and 17204.

### TWELFTH CLAIM FOR RELIEF
**Violations of the Consumer Protection Statutes of the Remaining 49 States,
The District of Columbia and the Commonwealth of Puerto Rico**

363. Plaintiffs repeat and reallege each of the preceding paragraphs, as if fully set forth herein.

364. Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in knowing violation of any and all state consumer protection statutes when Defendants knowingly and intentionally misrepresented the medical safety, efficacy, effectiveness, usefulness and appropriate dosages of Neurontin.

365. Defendants' unfair or deceptive acts or practices were specifically designed to and did induce Plaintiffs to pay for excessive amounts of Neurontin.

366. Defendants have violated the consumer protection statutes of the remaining forty-nine states, the District of Columbia and the Commonwealth of Puerto Rico, as follows:

(a) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ala. Code § 8-19-1, et seq.;

(b) Defendants have engaged in unfair competition or unfair or deceptive acts

or practices in violation of Alaska Stat. § 45.50.471, et seq.;

(c)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ariz. Rev. Stat. § 44-1522, et seq.;

(d)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ark. Code § 4-88-101, et seq.;

(e)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices or has made false representations in violation of Colo. Rev. Stat. § 6-1-105, et seq.;

(f)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Conn. Gen. Stat. § 42-110b, et seq.;

(g)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 6 Del. Code § 2511, et seq.;

(h)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices or made false representations in violation of D.C. Code § 28-3901, et seq.;

(i)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Fla. Stat. § 501.201, et seq.;

(j)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ga. Stat. § 10-1-392, et seq.;

(k)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Haw. Rev. Stat. § 480, et seq.;

(l)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Idaho Code § 48-601, et seq.;

(m)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 815 ILCS § 50511, et seq.;

(n)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ind. Code Ann. § 24-5-0.5.1, et seq.;

(o)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Iowa Code § 714.1 b, et seq.;

(p)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Kan. Stat. § 50-623, et seq.;

(q)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ky. Rev. Stat. § 367.110, et seq.;

(r)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of La. Rev. Stat. § 51:1401, et seq.;

(s)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 5 Me. Rev. Stat. § 207, et seq.;

(t)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Md. Com. Law Code § 13-101, et seq.;

(u)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mass. Gen. L. Ch. 93A, et seq.;

(v)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mich. Stat. § 445.901, et seq.;

(w)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. § 325F.67, et seq.;

(x)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Miss. Code Ann. § 75-24-1, et seq.;

(y)     Defendants have engaged in unfair competition or unfair or deceptive acts

or practices in violation of Vernon's Mo. Rev. Stat. § 407.0 10, et seq.;

(z)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code § 30-14-101, et seq.;

(aa)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. § 59-1601, et seq.;

(bb)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Nev. Rev. Stat. § 598.0903, et seq.;

(cc)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. § 358-A: 1, et seq.;

(dd)    Defendants have engaged in unfair competition or unfair, unconscionable or deceptive acts or practices in violation of N.J. Stat. Ann. § 56:8-1, et seq.;

(ee)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.M. Stat. Ann. § 57-12-1, et seq.;

(ff)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices m violation of N.Y. Gen. Bus. Law § 349 et seq.;

(gg)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.C. Gen. Stat. § 75-1.1, et seq.;

(hh)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.D. Cent. Code § 51-15-01, et seq.;

(ii)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices m violation of Ohio Rev. Stat. § 1345.0 1, et seq.;

(jj)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices or made false representations in violation of Okla. Stat. tit. 15 § 751, et seq.;

(kk)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Or. Rev. Stat. § 646.605, <u>et seq</u>.;

(ll)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 73 Pa. Stat. § 201-1, <u>et seq</u>.;

(mm)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of R.I. Gen. Laws. § 6-13.1-1, <u>et seq</u>.;

(nn)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Laws § 39-5-10, <u>et seq</u>.;

(oo)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Code Laws § 37-24-1, <u>et seq</u>.;

(pp)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Tenn. Code § 47-18-101, <u>et seq</u>.;

(qq)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Tex. Bus. & Com. Code § 17.41, <u>et seq</u>.;

(rr)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Utah Code Ann. § 13-11-1, <u>et seq</u>.;

(ss)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Vt. Stat. Ann. tit. 9, § 2451, <u>et seq</u>.;

(tt)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Va. Code § 59.1-196, <u>et seq</u>.;

(uu)    Defendants have engaged in unfair competition or unfair, deceptive or fraudulent acts or practices in violation of Wash. Rev. Code. § 19.86.010, <u>et seq</u>.;

(vv)    Defendants have engaged in unfair competition or unfair or deceptive acts

or practices in violation of W. Va. Code § 46A-6-101, et seq.;

       (ww)   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wis. Stat. § 100.20, et seq.;

       (xx)   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wyo. Stat. § 40-12-100, et seq.; and

       (yy)   Defendants have engaged in unfair competition or unfair or deceptive acts or practice in violation of 23 L.P.R.A. § 1001, et seq., the applicable statute for the Commonwealth of Puerto Rico.

367.    As a direct and proximate result of Defendants' unfair methods of competition and unfair or deceptive acts or practices, Plaintiffs have suffered damages in an amount to be proved at trial by paying for excessive amounts of Neurontin.

**THIRTEENTH CLAIM FOR RELIEF**
**Insurance Fraud - Violation of 18 Pa. C.S. § 4117**

368.    Plaintiffs repeat and reallege each of the preceding paragraphs, as if fully set forth herein.

369.    The Pennsylvania Insurance Fraud Statute, 18 Pa. C.S. § 4117(a)(2), provides that a person commits an offense if he or she:

> Knowingly and with the intent to defraud any insurer or self-insured, presents or causes to be presented to any insurer or self-insured any statement forming a part of, or in support of a claim that contains any false, incomplete or misleading information concerning any fact or thing material to the claim.

370.    Defendants knowingly and with intent to defraud have engaged in a pattern of causing to be presented to Plaintiffs false, incomplete, and misleading insurance claim information.

371.    Defendants' fraudulent schemes consisted of:  (a) causing providers to

misrepresent the off-label use(s) for which Neurontin was being prescribed so that Plaintiffs and their members were unaware that they were paying Neurontin claims for off-label uses; (b) deliberately misrepresenting the uses for which Neurontin was safe and effective and useful so that Plaintiffs and their members unwittingly paid for the drug to treat symptoms for which it was not scientifically proven to be safe, effective or useful; (c) publishing or causing to have published materials containing false information upon which physicians, Plaintiffs and their members relied upon when choosing to prescribe or pay for Neurontin to treat off-label uses for which the drug was not scientifically proven to be safe or medically efficacious, effective or useful; (d) actively concealing, and causing others to conceal, information about the true safety and efficacy, effectiveness and usefulness of Neurontin to treat conditions for which it had not been approved by the FDA; and (e) misrepresenting the appropriate and effective dosages for the drug.

372.    Defendants' schemes discussed in the previous paragraphs were calculated to ensure that Plaintiffs would be over-billed for Neurontin.

373.    Each of the fraudulent acts detailed above constitutes "Insurance Fraud" within the meaning of 18 Pa. C.S. § 4117(a).  Collectively, these violations constitute a pattern of insurance fraud within the meaning of 18 Pa. C.S. § 4117(g).

374.    Much of the wrongful, deceptive and unfair conduct detailed in this Complaint took place in Pennsylvania and/or caused injury to Plaintiffs and others in Pennsylvania.

375.    The above-described pattern of insurance fraud amounted to a common course of conduct intended to deceive Plaintiffs.  Each such fraudulent act was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiffs.  Defendants' fraudulent activities were and

are part of its regular way of conducting its ongoing business, and constitute a present and continuing threat to the property of Plaintiffs.

376.    By reason of the foregoing, and as a proximate cause of said pattern of fraudulent activity and its acts committed in furtherance thereof, Plaintiffs have suffered grievous injury and have been damaged, as alleged herein.

377.    By virtue of these violations of 18 Pa. C.S. § 4117, Defendants are liable to each Plaintiff for three times the damages sustained, plus investigation expenses, costs of this suit, and reasonable attorneys' fees and expenses.

**FOURTEENTH CLAIM FOR RELIEF**
**Restitution/Disgorgement for Unjust Enrichment**

378.    Plaintiffs repeat and reallege each of the preceding paragraphs, as if fully set forth herein.

379.    Plaintiffs have conferred on Defendants' benefits in the form of payments for Neurontin that would not have been made had Defendants not engaged in the wrongful acts and practices alleged herein.

380.    Retention of the payments and other benefits by Defendants would be inequitable and unjust in this case because Defendants' deceptive conduct caused Plaintiffs to pay for Neurontin when they otherwise would not have had to do so.

381.    In fairness, under the equitable doctrine of unjust enrichment, Defendants should be required to disgorge to Plaintiffs the revenues or profits Defendants earned from their improper sales of Neurontin to Plaintiffs' members.

## X.    DEMAND FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants, jointly and severally, as follows:

(a)     On Plaintiffs' First through Ninth Claims for Relief, three times the damages each Plaintiff has sustained as a result of Defendants' conduct, plus Plaintiffs' costs in this suit, including reasonable attorneys' fees.

(b)     On Plaintiffs' Tenth Claim for Relief, an award to each Plaintiff of the disgorgement of all sums improperly received by Defendants, plus costs of this suit, and reasonable attorneys' fees and expenses;

(c)     On Plaintiffs' Eleventh Claim for Relief, an award to each Plaintiff of the maximum damages allowable under such statutes;

(d)     On Plaintiffs' Twelfth Claim for Relief, an award to each Plaintiff of three times the damages sustained as a result of Defendants' conduct, plus investigation expenses, costs of this suit, and reasonable attorneys' fees and expenses;

(e)     On Plaintiffs' Thirteenth Claim for Relief, an award to each Plaintiff of disgorgement of all sums improperly received by Defendants;

(f)     An award of prejudgment interest in the maximum amount allowable by law;

(g)     An award to Plaintiffs of their costs and expenses in this litigation and reasonable attorneys' and expert fees and expenses; and

(h)     An award to Plaintiffs of such other and further relief as may be just and proper under the circumstances.

## DEMAND FOR A JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), each Plaintiff demands a trial by jury

on all issues so triable.

Dated: November __, 2006

**For Plaintiff Guardian Life Insurance Co. Of America:**

  /s/ Thomas G. Shapiro
Thomas G.  Shapiro (BBO # 454680)
Theodore Hess-Mahan (BBO # 557109)
**SHAPIRO HABER & URMY LLP**
53 State Street
Boston, MA 02109
Telephone: (617) 439-3939
Facsimile: (617) 439-0134


**OF COUNSEL:**

**COHEN, MILSTEIN, HAUSFELD & TOLL, P.L.L.C.**
Linda P. Nussbaum, Esq.
150 East 52nd Street, 30th Floor
New York, NY  10022
Telephone:  (212) 838-7797
Facsimile:  (212) 838-7745


                    - and -

**COHEN, MILSTEIN, HAUSFELD & TOLL, P.L.L.C.**
Michael D. Hausfeld, Esq.
1100 New York Avenue, N.W
West Tower, Suite 500
Washington, DC  20005
Telephone:  (202) 408-4600
Facsimile:  (202) 408-4699

**RAWLINGS & ASSOCIATES, PLLC**
Mark D. Fischer, Esq.
Mark Sandmann, Esq.
325 W. Main Street
Louisville, KY  40202
Telephone:  (502) 587-1279
Facsimile:  (502) 584-8580

**For Plaintiffs Kaiser Foundation Health Plan, Inc. and
Kaiser Foundation Hospitals:**

  /s/ Thomas G. Shapiro
Thomas G.  Shapiro (BBO # 454680)
Theodore Hess-Mahan (BBO # 557109)
**SHAPIRO HABER & URMY LLP**
53 State Street
Boston, MA 02109
Telephone: 617-439-3939
Facsimile: 617-439-0134

**OF COUNSEL:**

**COHEN, MILSTEIN, HAUSFELD & TOLL, P.L.L.C.**
Linda P. Nussbaum, Esq.
150 East 52nd Street, 30th Floor
New York, NY  10022
Telephone:  (212) 838-7797
Facsimile:  (212) 838-7745

- and -

**COHEN, MILSTEIN, HAUSFELD & TOLL, P.L.L.C.**
Michael D. Hausfeld, Esq.
1100 New York Avenue, N.W
West Tower, Suite 500
Washington, DC  20005
Telephone:  (202) 408-4600
Facsimile:  (202) 408-4699

**For Plaintiff Aetna, Inc.:**

  /s/ Peter A. Pease
Peter A. Pease, Esq.
 (BBO # 392880)
**BERMAN DEVALERIO PEASE
  TABACCO BURT & PUCILLO**
One Liberty Square
Boston, MA  02109
Telephone:  (617) 542-8300
Facsimile:   (617) 542-1194

**OF COUNSEL:**

**LOWEY DANNENBERG BEMPORAD
    & SELINGER, P.C.**
Richard Bemporad, Esq.
Richard W. Cohen, Esq.
Gerald Lawrence, Esq.
Peter St. Phillip Jr., Esq.
Todd S. Garber, Esq.
The Gateway - 11th Floor
One North Lexington Avenue
White Plains, NY  10601-1714
Telephone:  (914) 997-0500
Facsimile:   (914) 997-0035

**BERMAN DEVALERIO PEASE
  TABACCO BURT & PUCILLO**
Joseph J. Tabacco, Jr., Esq.
425 California Street, Suite 2025
San Francisco, CA  94104-2205
Telephone:  (415) 433-3200
Facsimile:   (415) 433-6382

**JOHN F. INNELLI, LLC**
John F. Innelli, Esq.
1818 Market Street, Suite 3620
Philadelphia, PA  19103
Telephone:  (215) 5612-1011
Facsimile:   (215) 561-0012