UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL Docket No. 1629<br>Master File No. 04-10981<br>Judge Patti B. Saris<br>Mag. Judge Leo T. Sorokin |

THIS DOCUMENT RELATES TO:

HARDEN MANUFACTURING
CORPORATION; LOUISIANA HEALTH
SERVICE INDEMNITY COMPANY, dba
BLUECROSS/BLUESHIELD OF
LOUISIANA; INTERNATIONAL UNION
OF OPERATING ENGINEERS, LOCAL
NO. 68 WELFARE FUND; ASEA/AFSCME
LOCAL 52 HEALTH BENEFITS TRUST;
GERALD SMITH; and LORRAINE KOPA,
on behalf of themselves and all others
similarly situated, v. PFIZER INC. and
WARNER-LAMBERT COMPANY

THE GUARDIAN LIFE INSURANCE CO.
OF AMERICA v. PFIZER, INC. and
AETNA, INC. v. PFIZER, INC.

**DECLARATION OF BARRY HIMMELSTEIN IN SUPPORT OF PLAINTIFFS'
MOTION FOR LEAVE TO FILE THIRD AMENDED COMPLAINTS,
AND FOR RECONSIDERATION OF ORDER DENYING
PLAINTIFFS' OBJECTIONS TO DISCOVERY ORDER NO. 3**

I, BARRY R. HIMMELSTEIN, declare and state:

1.      I am a partner in the law firm of Lieff, Cabraser, Heimann & Bernstein, LLP, Co-Lead Counsel for the Class Plaintiffs in this action. I have personal knowledge of the matters set forth herein, and could and would testify competently thereto if called upon to do so.

3.      Attached hereto are true and correct copies of the following documents:

| | |
|---|---|
| Exhibit A | Corporate Integrity Agreement Between the Office of Inspector General of the Department of Health and Human Services and Pfizer Inc (May 11, 2004) |
| Exhibit B | Pfizer Investor News Release, *Pfizer Inc Fourth-Quarter 2004 Performance Report* |
| Exhibit C | Transcript of Deposition of Suzamnne Doft (Mar. 29, 2005), pages 1-11 |

I declare under penalty of perjury that the foregoing is true and correct. Executed this 2nd day of November 2006 at Oakland, California.

_____\s\ *Barry Himmelstein*_____
Barry Himmelstein

# Exhibit A

**CORPORATE INTEGRITY AGREEMENT**
BETWEEN THE
OFFICE OF INSPECTOR GENERAL
OF THE
DEPARTMENT OF HEALTH AND HUMAN SERVICES
AND
PFIZER INC

## I.    PREAMBLE

Pfizer Inc (Pfizer) hereby enters into this Corporate Integrity Agreement (CIA) with the Office of Inspector General (OIG) of the United States Department of Health and Human Services (HHS) to promote compliance by its officers, directors, employees, contractors, and agents with the statutes, regulations, and written directives of Medicare, Medicaid, and all other Federal health care programs (as defined in 42 U.S.C. § 1320a-7b(f)) (Federal health care program requirements) and the applicable statutes, regulations and written directives of the Food and Drug Administration (FDA requirements). Pfizer is a successor-in-interest to Warner-Lambert Company and its Parke-Davis Division. Contemporaneously with this CIA, Pfizer is entering into a Settlement Agreement with the United States, and this CIA is incorporated by reference into the Settlement Agreement. Pfizer also will enter into settlement agreements with various States, and Pfizer's agreement to this CIA is a condition precedent to those agreements.

Prior to the Effective Date (defined below), Pfizer initiated certain voluntary compliance measures, which include, among other actions, the appointment of a Compliance Officer and designated compliance agents, the appointment of a Compliance Committee, a Disclosure Program, screening measures for Ineligible Persons, and regular mandatory training for all employees concerning Pfizer's Code of Conduct. As represented by Pfizer, Pfizer also has in place strong review and disciplinary measures to ensure that its activities: (i) are in compliance with all Federal health care program requirements and FDA requirements, and (ii) meet Pfizer's goals of ensuring high ethical standards in all aspects of its business practices.

Prior to the Effective Date, Pfizer also entered a CIA with the OIG in October of 2002. The prior CIA incorporated voluntary compliance measures that Pfizer had initiated before that CIA. Pfizer has submitted its first annual report (including the

Corporate Integrity Agreement
Pfizer Inc

1

engagement report required by section III.D.6) to the OIG in accordance with the terms of the October 2002 CIA. The obligations of the earlier CIA have been incorporated into this document, and this document supercedes the earlier CIA.

Pfizer shall continue the operation of its compliance measures in accordance with the terms set forth below for the term of this CIA. Pfizer may modify its voluntary compliance measures as appropriate, but, at a minimum, Pfizer shall ensure that during the term of this CIA, it shall comply with the integrity obligations enumerated in this CIA.

## II.    TERM AND SCOPE OF THE CIA

A. The period of the compliance obligations assumed by Pfizer under this CIA shall be five years from the Effective Date of this CIA, unless otherwise specified. The Effective Date shall be the date on which the final signatory of this CIA executes this CIA. Each one-year period, beginning with the one-year period following the Effective Date, shall be referred to as a "Reporting Period." Section III.D sets forth the relevant Reporting Periods and time frame of the obligations relating to the Engagements to be conducted under this CIA.

B. Sections VII, VIII, IX, X, and XI shall expire no later than 120 days after OIG's receipt of: (1) Pfizer's final Annual Report; or (2) any additional materials submitted by Pfizer pursuant to OIG's request, whichever is later.

C. The scope of this CIA shall be governed by the following definitions:

1. "Covered Persons" includes:

a. all officers directly involved in Pfizer's US Pharmaceuticals operations;

b. all employees of Pfizer Global Pharmaceuticals, the Corporate Finance Division, and the Pfizer Legal Division located in the United States and engaged in or having responsibilities directly relating to the following functions (as defined below in Section II.C.2): a) Managed Care Contracting Related Functions; b) Medicaid Rebate

Related Functions; and c) Promotional and Product Services Related Functions; and

c. all contractors, subcontractors, agents, and other persons who perform Managed Care Contracting Related Functions, Medicaid Rebate Related Functions, or Promotional and Product Services Related Functions on behalf of Pfizer.

Notwithstanding the above, the term "Covered Persons" does not include part-time or per diem employees, contractors, subcontractors, agents, and other persons who are not reasonably expected to work more than 160 hours per calendar year, except that any such individuals shall become "Covered Persons" at the point when they work more than 160 hours during the calendar year. The term "Covered Persons" does not include any contractors or agents retained to provide consulting or business advice to Pfizer and who are not engaged directly in any Managed Care Contracting Related Functions, Medicaid Rebate Related Functions, or Promotional and Product Services Related Functions on behalf of Pfizer. Also specifically excluded from this definition of "Covered Persons" are the personnel of entities with which Pfizer has agreements to co-promote its products. Pfizer shall, however, in good faith seek to obtain assurances that such persons have received appropriate training on proper promotional activities.

2. Other Applicable Definitions:

a. <u>Managed Care Contracting Related Functions</u>:

Managed Care Contracting Related Functions are defined to be the promotion of prescription drug products to managed care entities. The individuals involved in these functions include:

1) the following employees of Pfizer Global Pharmaceuticals located in the United States: i) all employees of the National Accounts Group and the National Healthcare Operations Group within the Healthcare Cluster; ii) all employees who are members of the Managed Care Contracts Group (a sub-division of the Contracts Group); and iii) those managers within the United States

Pharmaceuticals (USP) Finance Group to whom the members of the Managed Care Contracts Group directly report;

2) those employees from the Pfizer Legal Division whose job responsibilities directly relate to managed care entities and/or Managed Care Contracting Related Functions, and all employees who are members of the Grants Committee; and

3) all contractors, subcontractors, agents, and other persons who perform Managed Care Contracting Related Functions on behalf of Pfizer.

b.  Medicaid Rebate Related Functions:

Medicaid Rebate Related Functions are defined to be the gathering, calculation, verification or reporting of information for purposes of the Medicaid Rebate Program (codified at 42 U.S.C. § 1396r-8, et seq.)  The individuals engaged in these functions include:

1) the following employees of Pfizer Global Pharmaceuticals: i) members of the Government Contracting Group (a sub-division of the Contracts Group); and ii) managers within the USP Finance Group and the Corporate Finance Group, if applicable, to whom the members of the Government Contracting Group directly report;

2) those employees from the Pfizer Legal Division whose job responsibilities directly relate to Medicaid Rebate Related Functions; and

3) all contractors, subcontractors, agents, and other persons who perform Medicaid Rebate Related Functions on behalf of Pfizer.

c.  Promotional and Product Services Related Functions:

Promotional and Product Services Related Functions are defined to be the sales, marketing, or promotion of Pfizer products or the

provision of information about or services relating to Pfizer's products. The individuals engaged in these functions are:

1) all non-overtime eligible employees of Pfizer's US Pharmaceuticals Division from the following sub-functions: i) USP Sales; ii) USP Product Marketing; iii) Customer and Market Development; iv) Global Market Analytics; and v) USP Medical and Regulatory Affairs, except those employees within USP Medical whose primary job responsibilities relate to management of clinical trials, including, without limitation, Clinical Study Managers, Clinical Directors, and members of the Clinical Operations group;

2) those employees from the Pfizer Legal Division whose job responsibilities directly relate to Promotional and Product Services Related Functions;

3) to the extent not already covered by Sections II.C.2.c.1-2 above, all employees of Pfizer Global Pharmaceuticals located in the United States who are members of any Review Committee for any Pfizer product; and

4) all contractors, subcontractors, agents, and other persons who perform Promotional and Product Services Related Functions on behalf of Pfizer.

## III. CORPORATE INTEGRITY OBLIGATIONS

Pfizer shall maintain a Compliance Program that includes the following elements:

A. Compliance Officer and Committee.

1. *Compliance Officer*. Pfizer presently has a Compliance Officer with responsibility for administering Pfizer's Compliance Program. Pfizer shall continue to employ an individual to serve as its Compliance Officer during the term of this CIA. The Compliance Officer shall be responsible for developing and implementing policies, procedures, and practices designed to ensure compliance with the requirements set forth in this CIA and with Federal health care program requirements and FDA requirements.

The Compliance Officer and the Deputy Compliance Officer shall be members of senior management of Pfizer. The Compliance Officer and the Deputy Compliance Officer shall make periodic (at least semi-annual) reports regarding compliance matters directly to the Board of Directors of Pfizer (or its designated subcommittee, in such form or manner as the Board of Directors determines), and both shall be authorized to report on such matters to the Board of Directors at any time[1]. The Compliance Officer and the Deputy Compliance Officer shall be authorized to request that the Audit Committee or the Board retain outside counsel in appropriate circumstances. The Compliance Officer and the Deputy Compliance Officer shall be responsible for monitoring the day-to-day compliance activities engaged in by Pfizer as well as for any reporting obligations created under this CIA.

Pfizer shall report to OIG, in writing, any changes in the identity of or any material changes in the position description of the Compliance Officer, or any material actions or changes that would affect the Compliance Officer's ability to perform the duties necessary to meet the obligations in this CIA, within 15 days after such a change.

2. *Compliance Committee*. Pfizer currently has and shall maintain a Compliance Committee during the term of this CIA. The Compliance Committee shall, at a minimum, include the Compliance Officer and other members of senior management necessary to meet the requirements of this CIA (e.g., senior executives of relevant departments, such as internal audit, regulatory affairs, sales, marketing, personnel and operations). The Compliance Officer shall chair the Compliance Committee and the Committee shall support the Compliance Officer in fulfilling his/her responsibilities (e.g., shall assist in the analysis of the organization's risk areas and shall oversee monitoring of internal and external audits and investigations).

Pfizer shall report to OIG, in writing, any material changes in the composition of the Compliance Committee, or any material actions or changes that would affect the Compliance Committee's ability to perform the duties necessary to meet the obligations in this CIA, within 15 days after such a change.

---

[1] In these periodic reports, the Directors shall be notified of Pfizer's continuing activities and obligations under the CIA. Also, the Directors have agreed to abide by a Code of Conduct which they adopted.

Corporate Integrity Agreement
Pfizer Inc

6

B. <u>Written Standards</u>.

1. *Code of Conduct*. Pfizer represents that, prior to the Effective Date, it developed, implemented, and distributed its written code of conduct (known as the Summary of Policies on Business Conduct or the "Blue Book") or other relevant compliance policies and procedures to all Covered Persons. Pfizer makes and shall continue to make the promotion of, and adherence to, the Blue Book, or other relevant compliance policies and procedures, an element in evaluating the performance of all employees. The Blue Book, or other similar compliance policies and procedures, set forth, at a minimum, the following:

> a. Pfizer's commitment to full compliance with all Federal health care program and FDA requirements, including its commitment to comply with all government contracting requirements and to market, sell, and promote its products in accordance with such requirements;

> b. Pfizer's requirement that all of its Covered Persons shall be expected to comply with all Federal health care program requirements and FDA requirements and with Pfizer's own Policies and Procedures as implemented pursuant to this Section III.B (including the requirements of this CIA);

> c. the requirement that all of Pfizer's Covered Persons shall be expected to report to the Compliance Officer or other appropriate individual designated by Pfizer (such as district managers or other supervisory personnel) suspected violations of any Federal health care program requirements or FDA requirements or of Pfizer's own Policies and Procedures;

> d. the possible consequences to both Pfizer and Covered Persons of failure to comply with Federal health care program requirements and FDA requirements and with Pfizer's own Policies and Procedures and the failure to report such noncompliance; and

> e. the right of all individuals to use the Disclosure Program described in Section III.E, and Pfizer's commitment to nonretaliation

and to maintain, as appropriate, confidentiality and anonymity with respect to such disclosures.

Pfizer represents that within the past 180 days, all Covered Persons have certified, in writing or electronically, that they have received, read, understood, and shall abide by Pfizer's Blue Book or other relevant compliance policies and procedures. New Covered Persons shall receive the Blue Book, or other relevant compliance policies and procedures, and shall complete the required certification within 30 days after becoming a Covered Person or within 120 days after the Effective Date, whichever is later.

Annually, Pfizer shall review the Blue Book and other compliance policies and procedures to determine if revisions are appropriate and shall make any necessary revisions based on such review. Any materially revised Blue Book or other compliance policies and procedures shall be distributed within 30 days after any such revisions are finalized. Each Covered Person shall certify, in writing or electronically, that he or she has received, read, understood, and shall abide by the revised Blue Book, or other compliance policies and procedures, within 30 days after the distribution of the revised Blue Book.

2. *Policies and Procedures.* Prior to the Effective Date, Pfizer implemented written Policies and Procedures regarding the operation of Pfizer's compliance program and its compliance with Federal health care program and FDA requirements (Policies and Procedures). At a minimum, the Policies and Procedures address and shall continue to address:

> a. the subjects relating to the Blue Book or other relevant compliance policies and procedures identified in Section III.B.1;

> b. the methods for gathering, calculating, verifying and reporting the data and information reported to the Centers for Medicare & Medicaid Services (CMS) and/or the State Medicaid programs in connection with the Medicaid Drug Rebate program;

> c. methods for selling, marketing, and promoting Pfizer products in compliance with all applicable Federal health care program requirements, including, but not limited to, the Federal anti-kickback statute, codified at 42 U.S.C. § 1320a-7b;

d. methods for selling, marketing, promoting, advertising, and disseminating information about off-label uses of Pfizer's products in compliance with all applicable FDA requirements;

e. the manner in which the Medical Information Department receives and responds to requests for information about off-label uses; the form and content of information disseminated by the Medical Information Department in response to such requests; and the internal review process for the information disseminated;

f. disciplinary sanctions in place for violations of Pfizer's Policies and Procedures, including policies relating to Federal health care program requirements and FDA requirements;

g. speaker meetings, advisory board meetings, and all other consultant arrangements (including those for speakers, mentors, or preceptors) or related events. The policies shall be designed to ensure that the consultant arrangements and related events are used for legitimate and lawful purposes in accordance with applicable Federal health care program requirements and with FDA requirements relating to the dissemination of information about off-label uses of products. The policies shall include requirements about the content and circumstances of such arrangements and events;

h. sponsorship or funding of continuing medical education (CME) programs that are designed to ensure that Pfizer's funding and/or sponsorship of such programs satisfies all applicable Federal health care program and FDA requirements. The policies and procedures shall require the disclosure of Pfizer's financial support of the CME program and any financial relationships with faculty, speakers, or participants at such CME program; shall require that the CME program have an educational focus; shall require that the CME program be independent; and shall require that the CME program be balanced;

i. sponsorship or funding of grants (including educational grants) that are designed to ensure that Pfizer's funding and/or sponsorship of such grants complies with all applicable Federal health care program requirements and FDA requirements; and

j. sponsorship or funding of research or related activities (including clinical trials, market research, or authorship of articles or other publications) that are designed to ensure that Pfizer's funding or sponsorship of such activities complies with all applicable Federal health care program requirements and FDA requirements.

Pfizer represents that it recently distributed the relevant portions of the Policies and Procedures to all Covered Persons whose job functions relate to the Policies and Procedures. Appropriate and knowledgeable staff were and shall continue to be available to explain the Policies and Procedures.

At least annually (and more frequently, if appropriate), Pfizer shall assess and update as necessary the Policies and Procedures. Within 30 days after the effective date of any material revisions, the relevant portions of any such revised Policies and Procedures shall be distributed to all Covered Persons whose job functions relate to those Policies and Procedures. Distribution may include publishing such Policies and Procedures on Pfizer's Intranet.

C. Training and Education.

1. *Training Requirements, General Description.* The training and education required under this Section III.C may be provided by supervisory employees, knowledgeable staff, or Pfizer trainers and/or outside consultant trainers selected by Pfizer. Persons providing the training must be knowledgeable about the subject areas of their training.

Pfizer may provide the training required under this CIA through appropriate computer-based approaches. In that event, all applicable references to "hours" in this Section III.C shall mean "normative hours" as that term is used in the computer-based training industry. If Pfizer chooses to provide computer-based training, it shall also make available appropriately qualified and knowledgeable staff or trainers to answer questions or provide additional information to the Covered Persons who are receiving such training.

New Covered Persons shall receive the training outlined below in Sections III.C.2 and III.C.3 within 30 days after the beginning of their employment or becoming Covered Persons, whichever is later. A Pfizer employee who has completed the training shall review a new Covered Person's work, to the extent that the work directly relates to Managed Care Contracting Related Functions, Medicaid Rebate Related Functions, or Promotional and Product Services Related Functions until such time as the new Covered Person completes the applicable training.

Annually, Pfizer shall review the training, and, where appropriate, update the training to reflect changes in Federal health care program requirements or FDA requirements, any issues discovered during internal audits or IRO audits, and any other relevant information.

2. *General Training Provided to Covered Persons.* Pfizer represents that within the last eight months, it provided approximately two hours of general training to each Covered Person. The OIG agrees to credit this training toward the general training requirements for the first annual Reporting Period. Pfizer's general training included a discussion of Pfizer's Compliance Program (including the Blue Book and Policies and Procedures as they pertain to general compliance issues). For the remaining term of the CIA, each Covered Person shall receive at least one hour of general training annually.

Pfizer shall notify its directors and all Covered Persons about the CIA and the obligations of Pfizer under the CIA within 120 days after the Effective Date. Pfizer shall include a description of this notification in its Annual Report.

3. *Specific Training Provided to Covered Persons.* Pfizer represents that it has provided certain specific training as outlined below to most Covered Persons within approximately the past six months, and Pfizer shall provide specific training to the remaining Covered Persons during the first Reporting Period. Thereafter, annually, except for Pfizer's officers who are not also otherwise Covered Persons, all Covered Persons shall receive at least two hours of specific training in addition to the general training required above. The specific training shall be tailored to the Covered Persons' job responsibilities and shall include a discussion of the topics outlined in Sections III.C.3.a-c below, as well as a discussion of Pfizer's CIA obligations.

a.  Specific Training for Covered Persons with Managed Care Contracting Related Functions

The specific training for Covered Persons performing Managed Care Contracting Related Functions shall include a discussion of:

> 1.  all applicable Federal health care program requirements (including the sanctions for violations) relating to Managed Care Contracting and Medicaid Rebate Related Functions (including, but not limited to, the Federal anti-kickback statute; the Civil Monetary Penalties law, 42 U.S.C. § 1320a-7a; the civil False Claims Act, 31 U.S.C. §§ 3729-3733; and the Medicaid Drug Rebate statute);

> 2.  the personal obligation of each individual to comply with the legal requirements outlined above in Section III.C.3.a.1; and

> 3.  examples of proper and improper Managed Care Contracting practices.

b.  Specific Training for Covered Persons with Medicaid Rebate Related Functions

The specific training for Covered Persons performing Medicaid Rebate Related Functions shall include a discussion of:

> 1.  in detail, Pfizer's systems for gathering relevant data and calculating, verifying and reporting information to CMS and/or the State Medicaid Programs for purposes of the Medicaid Rebate Program, including the Government Pricing System (GPS);

> 2.  all applicable Federal health care program requirements (including the sanctions for violations) relating to Medicaid Rebate Related Functions (including the Medicaid Drug Rebate statute);

> 3.  the personal obligation of each individual to comply with the applicable legal requirements outlined above in Section III.C.3.b.2 and to fully track any variations identified within the GPS; and

4.  examples of proper and improper practices related to Medicaid Rebate Related Functions.

c.  Specific Training for Covered Persons performing Promotional and Product Services Related Functions

The specific training for Covered Persons performing Promotional and Product Services Related Functions shall include a discussion of:

1.  all Federal health care program requirements regarding the proper methods for selling, marketing, and promoting Pfizer's products, including, but not limited to, the requirements of the Federal anti-kickback statute; the Civil Monetary Penalties law; the civil False Claims Act; and the Medicaid Drug Rebate statute;

2.  all applicable FDA requirements regarding the proper methods for selling, marketing, promoting, and advertising Pfizer's products, and disseminating information about off-label uses of Pfizer's products including, but not limited to, the requirements of the Federal Food, Drug, and Cosmetic Act and FDA regulations;

3.  the personal obligation of each Covered Person involved in the sales, marketing, promotion, advertising, or disseminating information about off-label uses of Pfizer's products to comply with all applicable legal requirements;

4.  the legal sanctions for violations of the Federal health care program requirements and FDA requirements; and

5.  examples of proper and improper sales, marketing, promotion, and dissemination of information about off-label uses practices.

4.  *Certification.* Each Covered Person who is required to attend training shall certify, in writing or in electronic form, that he or she has received the required training and shall agree to abide by the principles and Policies and Procedures covered in the training.  Pfizer agrees to maintain records specifying the type of training provided to

each Covered Person and the date provided.  The Compliance Officer (or designee) shall retain the certifications, the training tracking information, and all course materials.  These shall be made available to OIG, upon request.

D.  Engagement Procedures

1.  *General Description.*

a.  Retention of Independent Review Organization.  Within 90 days after the Effective Date, Pfizer shall retain an entity (or entities), such as an accounting, auditing, or consulting firm (hereinafter "Independent Review Organization" or "IRO"), to perform Engagements to assist Pfizer in assessing and evaluating its systems, processes, policies and practices related to the Medicaid Rebate Program, to Managed Care Contracting Related Functions and to Promotional and Product Services Related Functions.

Each IRO retained by Pfizer shall have expertise in the requirements of the Medicaid Rebate Program, in Federal health care program requirements, and in FDA requirements, as may be appropriate to the specific Engagement for which it is retained.  Each IRO shall assess, along with Pfizer, whether it can perform the Engagements in a professionally independent and/or objective fashion, as appropriate to the nature of the engagement, taking into account any other business relationships or engagements that may exist.

The IRO(s) shall conduct three types of engagements. One engagement shall address and analyze Pfizer's systems, processes, policies, and practices relating to the Medicaid Rebate Program (Medicaid Rebate Engagement).  The second engagement shall address and analyze Pfizer's systems, policies and practices with regard to managed care contracting (Managed Care Contracting Engagement).  The third engagement shall address and analyze Pfizer's systems, processes, policies, and practices relating to sales, marketing, and product services activities (Promotional and Product Services Engagement).  The Promotional and Product Services Engagement shall consist of two components - a Systems Review

and a Transactions Review. The IRO shall perform all components of each of the Engagements.

b. Frequency of Engagements.

*1. Medicaid Rebate Engagement.* If there are no material changes in Pfizer's Medicaid Rebate Program-related systems, processes, policies, and practices during the term of the CIA, the IRO shall perform the Medicaid Rebate Engagement for the third Reporting Period. If Pfizer materially changes its systems, processes, policies and practices relating to the Medicaid Rebate Program, then the IRO shall perform a Medicaid Rebate Engagement for the Reporting Period in which such changes were made in addition to conducting the Medicaid Rebate Engagement for the third Reporting Period.

*2. Managed Care Contracting Engagement.* The Managed Care Contracting Engagement shall be performed annually for the first four Reporting Periods[2] and shall cover each of the following periods (hereinafter "Managed Care Contracting Review Periods"):

1) October 24, 2003 through October 23, 2004
2) October 24, 2004 through October 23, 2005
3) October 24, 2005 through October 23, 2006
4) October 24, 2006 through October 23, 2007.

*3. Promotional and Product Services Systems Review Engagement.* The Promotional and Product Services Systems Review Engagement shall be performed for the periods

---

[2]Prior to the Effective Date, Pfizer performed and submitted a report for the Managed Care Contracting Engagement as required under the October 2002 CIA which, as explained in the Preamble, has been superceded.

covering the first and fourth Reporting Periods provided there are no material changes in Pfizer's systems, processes, policies, and practices relating to sales, marketing, and product services activities[3]. If Pfizer materially changes such systems, processes, policies, and practices, then the IRO shall perform a Systems Review for the Reporting Period in which such changes were made in addition to conducting the Systems Review Engagement for the first and fourth Reporting Periods.

4. *Promotional and Product Services Transactions Review Engagement.* Pfizer represents that it is modifying certain internal systems that will serve as the basis for the Promotional and Product Services Transactions Review Engagement. To allow for time for the modifications to be completed, the Promotional and Product Services Transactions Review shall be performed on an annual basis for the second through fifth Reporting Periods.

c. <u>Retention of Records</u>. The IRO and Pfizer shall retain and make available to OIG, upon request, all work papers, supporting documentation, correspondence, and draft reports (those exchanged between the IRO and Pfizer) related to the Engagements.

2. *Medicaid Rebate Engagement.* As more fully set forth in Attachment A, the Medicaid Rebate Engagement shall be an engagement that addresses Pfizer's systems, processes, policies, and practices associated with the tracking, gathering, and accounting for all relevant data for purposes of appropriately calculating the Best Prices reported under the Medicaid Rebate Program.

3. *Managed Care Contracting Engagement.* As set forth more fully in Attachment A, the Managed Care Contracting Engagement shall review the Managed

---

[3] The Promotional and Product Services Systems Review for the first Reporting Period shall only cover the last nine months of the first reporting Period to allow time for Pfizer to modify its internal systems relevant to this Review.

Care Related Expenditures paid to a sample of Managed Care Customers during the relevant Managed Care Contracting Review Period.

4. *Promotional and Product Services Systems Review Engagement*. As set forth more fully in Attachment C, as part of the Promotional and Product Services Engagement, the IRO shall perform a Promotional and Product Services Systems Review of Pfizer's systems, processes, policies, and practices relating to specified sales marketing, promotion, product information, contracting, funding, and compensation practices.

5. *Promotional and Product Services Transactions Review Engagement*. As set forth more fully in Attachment C, as part of the Promotional and Product Services Engagement, the IRO shall perform a Promotional and Product Services Transactions Review of identified sales, marketing, and product services related activities.

6. *Engagement Reports*. The IRO shall prepare a report (or reports) based upon each Medicaid Rebate Engagement, Managed Care Contracting Engagement, and Promotional and Product Services Engagement (including both the Systems and Transaction Reviews) performed (collectively "the Engagement Reports"). Information to be included in the Engagement Reports is detailed in Attachments A and C.

7. *Validation Review*. In the event OIG has reason to believe that: (a) Pfizer's Medicaid Rebate Engagement, Managed Care Contracting Engagement or Promotional and Product Services Engagement (collectively "the Engagements") fails to conform to the requirements of this CIA; or (b) the IRO's findings or the Engagement results are inaccurate, OIG may, at its sole discretion, conduct its own review to determine whether the Engagement complied with the requirements of the CIA and/or the findings or Engagement Review results are inaccurate (Validation Review). Pfizer shall pay for the reasonable cost of any such Validation Review performed by OIG or any of its designated agents. Any Validation Review of Reports submitted as part of Pfizer's final Annual Report must be initiated no later than one year after Pfizer's final submission (as described in Section II) is received by the OIG.

Prior to initiating a Validation Review, OIG shall notify Pfizer of its intent to do so and provide a written explanation of why OIG believes such a review is necessary. To resolve any concerns raised by OIG, Pfizer may request a meeting with OIG: (a) to discuss the results of any Engagement submissions or findings; (b) present any additional

or relevant information to clarify the results of any Engagement Review or to correct the inaccuracy of any Engagement; (c) propose alternatives to the proposed Validation Review. Pfizer shall provide any additional information as may be requested by OIG under this Section in an expedited manner. OIG will attempt in good faith to resolve any Engagement Review issue with Pfizer prior to conducting a Validation Review. However, the final determination as to whether or not to proceed with a Validation Review shall be made at the sole discretion of OIG.

8. *Independence/Objectivity Certification*. Pfizer shall undertake a good faith effort to obtain from each IRO a certification or sworn affidavit that it has evaluated its professional independence and/or objectivity, as appropriate to the nature of the engagement, with regard to the Engagement and that it has concluded that it is, in fact, independent and/or objective, and the IRO(s) shall include such certification in its report(s) to Pfizer. After undertaking good faith efforts to secure one, the failure to obtain an independence certification from the IRO(s) shall not constitute a breach of this CIA (whether a material breach or otherwise) and shall not constitute a basis upon which the OIG may impose Stipulated Penalties; however, such a failure shall constitute a basis upon which the OIG may initiate a Validation Review, as described in Section III.D.7 above, the costs of which shall be borne by Pfizer.

E. Disclosure Program.

Pfizer presently has a disclosure program designed to facilitate communications relating to compliance with Federal health care program requirements and FDA requirements and Pfizer's policies (the "Disclosure Program"). During the term of this CIA, Pfizer shall maintain its Disclosure Program that includes a mechanism (e.g., a toll-free compliance telephone line) to enable individuals to disclose, to the Compliance Officer or some other person who is not in the disclosing individual's chain of command, any identified issues or questions associated with Pfizer's policies, conduct, practices, or procedures with respect to a Federal health care program requirements or FDA requirements believed by the individual to be a potential violation of criminal, civil, or administrative law. Pfizer shall continue to appropriately publicize the existence of the disclosure mechanism (e.g., via periodic e-mails to employees or by posting the information in prominent common areas).

The Disclosure Program shall emphasize a nonretribution, nonretaliation policy, and shall include a reporting mechanism for anonymous communications for which

appropriate confidentiality shall be maintained.  Upon receipt of a disclosure, the Compliance Officer (or designee) shall gather all relevant information from the disclosing individual.  The Compliance Officer (or designee) shall make a preliminary, good faith inquiry into the allegations set forth in every disclosure to ensure that he or she has obtained all of the information necessary to determine whether a further review should be conducted.  For any disclosure that is sufficiently specific so that it reasonably:  (1) permits a determination of the appropriateness of the alleged improper practice; and (2) provides an opportunity for taking corrective action, Pfizer shall conduct an internal review of the allegations set forth in the disclosure and ensure that proper follow-up is conducted.

The Compliance Officer (or designee) shall maintain a disclosure log, which shall include a record and summary of each disclosure received (whether anonymous or not), the status of the respective internal reviews, and any corrective action taken in response to the internal reviews.  The disclosure log shall be made available to OIG, upon request.

F.  <u>Ineligible Persons</u>.

1. *Definitions*.  For purposes of this CIA:

a.  an "Ineligible Person" shall include an individual or entity who:

i.  is currently excluded, debarred, suspended, or otherwise ineligible to participate in the Federal health care programs or in Federal procurement or nonprocurement programs; or

ii.  has been convicted of a criminal offense that falls within the ambit of 42 U.S.C. § 1320a-7(a), but has not yet been excluded, debarred, suspended, or otherwise declared ineligible.

b.  "Exclusion Lists" include:

i. the HHS/OIG List of Excluded Individuals/Entities (available through the Internet at http://oig.hhs.gov); and

ii. the General Services Administration's List of Parties

Corporate Integrity Agreement
Pfizer Inc

Excluded from Federal Programs (available through the Internet at http://epls.arnet.gov).

2. *Screening Requirements.*  Pfizer shall ensure that all current Covered Persons are not Ineligible Persons, and that it will not hire or engage any prospective Covered Persons who are Ineligible Persons, by implementing the following screening requirements.

a.      For all prospective Covered Persons, Pfizer shall screen such individuals against the Exclusion Lists prior to engaging their services and, as part of the hiring or contracting process, shall require such persons to disclose whether they are an Ineligible Person.

b.      For all current Covered Persons, Pfizer shall screen all such persons against the Exclusion Lists within 90 days after the Effective Date and on an annual basis thereafter.

c.      Pfizer shall implement a policy requiring all Covered Persons to disclose immediately any debarment, exclusion, suspension, or other event that makes that person an Ineligible Person.

3. *Removal Requirement.*  If Pfizer has actual notice that a Covered Person has become an Ineligible Person, Pfizer shall remove such person from responsibility for, or involvement with, Pfizer's business operations related to the Federal health care programs and shall remove such person from any position for which the person's compensation or the items or services furnished, ordered, or prescribed by the person are paid in whole or part, directly or indirectly, by Federal health care programs or otherwise with Federal funds at least until such time as the person is reinstated into participation in the Federal health care programs.

4. *Pending Charges and Proposed Exclusions.*  If Pfizer has actual notice that a person identified in Section III.F.2 is charged with a criminal offense that falls within the ambit of 42 U.S.C. §§ 1320a-7(a), 1320a-7(b)(1)-(3), or is proposed for exclusion during his or her employment or contract term, Pfizer shall take all appropriate actions to ensure that the responsibilities of that person have not and shall not adversely affect the accuracy of any claims submitted to any Federal health care program.

Corporate Integrity Agreement
Pfizer Inc

20

G.  Notification of Government Investigation or Legal Proceedings.

Within 30 days after discovery by senior management at Pfizer's New York headquarters, Pfizer shall notify the OIG, in writing, of any ongoing U.S.-based investigation or legal proceeding known to Pfizer conducted or brought by a governmental entity or its agents involving an allegation that Pfizer has committed a crime or has engaged in fraudulent activities. This notification shall include a description of the allegation, the identity of the investigating or prosecuting agency, and the status of such investigation or legal proceeding. Pfizer shall also provide written notice to the OIG within 30 days after the resolution of the matter, and shall provide the OIG with a description of the findings and/or results of the investigation or proceedings, if any.

H.  Notification of Reportable Events.

1. *Definition of Reportable Event.* For purposes of this CIA, a "Reportable Event" means anything that involves a matter, brought to the attention of senior management at Pfizer's New York headquarters, that a reasonable person would consider a probable violation of criminal, civil, or administrative laws applicable to any Federal health care program, and/or applicable to any FDA requirements relating to the off-label promotion of drugs, for which penalties or exclusion may be authorized. A Reportable Event may be the result of an isolated event or a series of occurrences.

2. *Reporting of Reportable Events.* If Pfizer determines (after a reasonable opportunity to conduct an appropriate review or investigation of the allegations) through any means that there is a Reportable Event, Pfizer shall notify OIG, in writing, within 30 days after making the determination that the Reportable Event exists. The report to OIG shall include the following information:

a.  a complete description of the Reportable Event, including the relevant facts, persons involved, and legal and Federal health care program authorities implicated;

b. a description of Pfizer's actions taken to correct the Reportable Event; and

c. any further steps Pfizer plans to take to address the Reportable Event and prevent it from recurring.

Pfizer's submission to OIG of any Reportable Event pursuant to this CIA does not preclude Pfizer from making the same disclosure through the OIG's Self-Disclosure Protocol.

I. <u>Notification of Communications Regarding Off-Label Uses Issues</u>.

Within 30 days after the date of any written report, correspondence, or communication from Pfizer to the FDA in connection with Pfizer's or a Covered Person's promotion, discussion, or dissemination of information about off-label uses of Pfizer's products, Pfizer shall provide a copy of the report, correspondence, or communication to the OIG. Pfizer shall also provide written notice to the OIG within 30 days after the resolution of any such disclosed off-label matter, and shall provide the OIG with a description of the findings and/or results of the matter, if any.

J. <u>Review of Records Reflecting the Content of Detailing Sessions</u>

At least 90 days prior to the beginning of the second Reporting Period and each Reporting Period thereafter, Pfizer shall provide to OIG a list and explanation of all actively promoted Pfizer products and, if available from third parties, information about the estimated relative usage (*e.g.,* the percentage) of those products for off-label purposes. Prior to the start of the second Reporting Period and every Reporting Period thereafter, based on the information provided and other information known to it, and after consultation with Pfizer, the OIG shall select up to three Pfizer products to be the basis for a review of records reflecting the content of detailing sessions and shall notify Pfizer of the Pfizer products selected as the basis for the review. These identified products shall be known as the "Covered Products." The parties already have identified the Covered Products for the first Reporting Period.

Each Reporting Period, Pfizer shall obtain commercially available non-Pfizer records reflecting the purported content and subject matter of detailing interactions between sales representatives and HCPs for the Covered Products (*e.g.,* Verbatims or similar records). For each Covered Product, Pfizer shall randomly select one week within each of the first three quarters of the Reporting Period. For each Covered Product, Pfizer shall obtain records reflecting the purported content and subject matter of detailing

sessions that occurred during the identified week in all regions across the United States. Pfizer shall review the records obtained and shall identify any instances in which the records appear to indicate that Covered Persons may have discussed and/or disseminated information about off-label uses of the Covered Products. Pfizer shall make findings based on its review (Off-Label Findings) and shall take any responsive action it deems necessary. If necessary for purposes of its review, Pfizer shall endeavor to collect additional factual information about the circumstances relating to any Off-Label Findings. As part of each Annual Report, Pfizer shall provide the OIG with copies of the underlying records of the detailing interactions, a copy of Pfizer's Off-Label Findings, and a description of the action(s), if any, Pfizer took in response to the Off-Label Findings.

This Section III.J is subject to the availability of the records described above, and Pfizer shall make good faith efforts to obtain such records. If Pfizer is unable to obtain such records, Pfizer shall so notify the OIG and shall describe to the OIG the efforts undertaken to obtain the records for each Covered Product.

## IV.    NEW BUSINESS UNITS OR LOCATIONS

In the event that, after the Effective Date, Pfizer establishes or acquires new business units or locations engaged in Managed Care Contracting Related Functions, Medicaid Rebate Related Functions, or Promotional and Product Services Related Functions, Pfizer shall notify the OIG of this fact as soon as possible, but no later than within 30 days after the date of establishment or acquisition. This notification shall include the address of the new business unit or location, phone number, fax number, any Federal health care program provider and/or supplier number, and any corresponding contractor's name and address that has issued each provider or supplier number. Each new business unit or location shall be subject to all the requirements of this CIA. In the event that Pfizer acquires a pharmaceutical manufacturer within 120 days after the Effective Date, nothing in this CIA shall apply to any Managed Care Contracting, Medicaid Rebate, or Promotional and Product Services Related Function of the acquired company until 90 days after the closing date of such acquisition.

## V.    IRO SELECTION NOTIFICATION AND ANNUAL REPORTS

A.    IRO Selection Notification. Within 120 days after the Effective Date, Pfizer shall submit a written notification to OIG containing the following information regarding

Corporate Integrity Agreement
Pfizer Inc

the IRO: (i) the identity, address and phone number; (ii) a copy of the engagement letter(s); (iii) a summary and description of any and all current and prior engagements and agreements between Pfizer only and the IRO; (iv) the proposed start and completion dates of the Engagements identified in section III.D; and (v) a certification from the IRO regarding its professional independence and/or objectivity with respect to Pfizer.

B.  Annual Reports.  Pfizer shall submit to OIG annually a report with respect to the status of, and findings regarding, Pfizer's compliance activities for each of the five Reporting Periods (Annual Report).

Each Annual Report shall include, at a minimum:

> 1. to the extent any exist since Pfizer's most recent Annual Report to the OIG, a description of any change in the identity, position description, or other noncompliance job responsibilities of the Compliance Officer and any change in the membership of the Compliance Committee described in Section III.A;

> 2. to the extent there are material changes in the Blue Book or other compliance policies and procedures, a copy of Pfizer's Blue Book or the policies required by Section III.B.1;

> 3. for the first Reporting Period, a copy of all Policies and Procedures required by Section III.B.2, to the extent not previously provided; for subsequent Reporting Periods, a summary of any significant changes or amendments to the Policies and Procedures required by Section III.B and the reasons for such changes (e.g., change in contractor policy) and copies of any compliance-related Policies and Procedures. This requirement specifically includes, among other things, Policies and Procedures contained in Pfizer's "Rules and Regulations: Field Guide" (also referred to as the "Orange Book") and elsewhere relating to the promotion, discussion, or dissemination of information about off-label uses of Pfizer products;

> 4. the number of Covered Persons required to complete the Blue Book certification required by Section III.B.1, the percentage of Covered Persons who have completed such certification, and an explanation of any

exceptions (the documentation supporting this information shall be available to OIG, upon request);

5. the following information regarding each type of training required by Section III.C:

> a. a description of such training, including a summary of the topics covered, the length of sessions and a schedule of training sessions; and

> b. the number of Covered Persons required to be trained, percentage of Covered Persons actually trained, and an explanation of any exceptions.

A copy of all training materials and the documentation supporting this information shall be available to OIG, upon request.

6. a complete copy of all reports prepared pursuant to Section III.D, along with a copy of the IRO's engagement letter (if applicable);

7. Pfizer's response and corrective action plan(s) related to any issues raised by the reports prepared pursuant to Section III.D;

8. a summary/description of all current and prior engagements and agreements between Pfizer only and the IRO(s), if different from what was previously submitted;

9. a certification from the IRO(s) regarding its professional independence and/or objectivity with respect to Pfizer;

10. any changes to the process by which Pfizer fulfills the requirements of Section III.F regarding Ineligible Persons;

11. the name, title, and responsibilities of any person who is determined to be an Ineligible Person under Section III.F; and the actions taken by Pfizer in response to the screening and removal obligations set forth in Section III.F;

12. a summary of Reportable Events (as defined in Section III.H) identified during the Reporting Period and the status of any corrective and preventative action relating to all such Reportable Events;

13. a description of the notification to directors and all Covered Persons as required by Section III.C.2;

14. a summary of the disclosures in the disclosure log required by Section III.E that relate to Federal health care programs or the FDA issues addressed in this CIA;

15. a summary describing any ongoing investigation or legal proceeding required to have been reported pursuant to Section III.G. The summary shall include a description of the allegation, the identity of the investigating or prosecuting agency, and the status of such investigation or legal proceeding;

16. a summary describing any ongoing communication with the FDA required to have been reported pursuant to Section III.I. The summary shall include a description of any such matters, and the status of the matter with the FDA;

17. as required by Section III.J, a copy of Pfizer's Off-Label Findings and the underlying records reflecting the content of detailing sessions between HCPs and Covered Persons, and a description of responsive action, if any, taken by Pfizer in connection with its Off-Label Findings;

18. a description of all changes to the most recently provided list of Pfizer's locations (including addresses) that house Covered Persons, except for offices operated out of an individual's residence; the corresponding name under which each location is doing business; the corresponding phone numbers and fax numbers; each location's Federal health care program provider, and/or supplier number(s); and the name and address of each Federal health care program contractor to which Pfizer currently submits claims; and

19. to the extent not already furnished to the OIG, an overall description of Pfizer's corporate structure, including identification of any parent and sister companies, subsidiaries, and their respective lines of business; and a modified description of Pfizer's corporate structure, including identification of any parent and sister companies, subsidiaries, and their respective lines of business relevant to the requirements of the CIA; and

20. the certifications required by Section V.C.

The first Annual Report shall be received by OIG no later than 90 days after the end of the first Reporting Period. Subsequent Annual Reports shall be received by OIG no later than the anniversary date of the due date of the first Annual Report.

C. _Certifications_. Except as otherwise stated above, the Annual Reports shall include a certification by the Compliance Officer that:

1. Pfizer's: (i) Policies and Procedures as referenced in Section III.B.2 above; (ii) templates for standardized contracts and certifications associated with Promotional and Product Services Related Functions as set forth in Pfizer's Orange Book; and (iii) promotional materials that are reviewed by a Review Committee and are submitted to the FDA; have been reviewed by legal counsel for compliance with the requirements of the Federal anti-kickback statute and other Federal health care program requirements, and FDA requirements, as applicable;

2. to the best of his or her knowledge, except as otherwise described in the applicable report, Pfizer is in compliance with all of the requirements of this CIA;

3. the Compliance Officer has reviewed the Annual Report and has made reasonable inquiry regarding its content and believes that the information in the Annual Report is accurate and truthful; and

4. if applicable, Pfizer has complied with its obligations under the Settlement Agreement: (i) not to resubmit to any Federal health care program payors any previously denied claims related to the Covered Conduct addressed in the Settlement Agreement, and not to appeal any such

denials of claims; (ii) not to charge to or otherwise seek payment from Federal or State payors for unallowable costs (as defined in Settlement Agreement); and (iii) to identify and adjust any past charges or claims for unallowable costs.

Each Annual Report shall also include the certification set forth in Attachment B to this CIA.

D. <u>Designation of Information</u>. Pfizer shall clearly identify any portions of its submissions that it believes are trade secrets, or information that is commercial or financial and privileged or confidential, and therefore potentially exempt from disclosure under the Freedom of Information Act (FOIA), 5 U.S.C. § 552. Pfizer shall refrain from identifying any information as exempt from disclosure if that information does not meet the criteria for exemption from disclosure under FOIA.

## VI. NOTIFICATIONS AND SUBMISSION OF REPORTS

Unless otherwise stated in writing after the Effective Date, all notifications and reports required under this CIA shall be submitted to the following entities:

<u>OIG</u>:

> Administrative and Civil Remedies Branch
> Office of Counsel to the Inspector General
> Office of Inspector General
> U.S. Department of Health and Human Services
> Cohen Building, Room 5527
> 330 Independence Avenue, S.W.
> Washington, DC 20201
> Telephone: 202.619.2078
> Facsimile: 202.205.0604

<u>Pfizer</u>:

> Douglas M. Lankler, Esq., Deputy Compliance Officer
> Pfizer Inc
> 235 East 42nd Street (150/5/22)
> New York, NY 10017
> Phone: 212.733.3026
> Fax:   212.464.7736

Corporate Integrity Agreement
Pfizer Inc

With a copy to:

Lynn Shapiro Snyder, Esq.
Epstein, Becker & Green, P.C.
1227 25th Street, N.W.
Washington, D.C.  20037
Phone:  202.861.0900
Fax:  202.296.2882

Unless otherwise specified, all notifications and reports required by this CIA may be made by certified mail, overnight mail, hand delivery, or other means, provided that there is proof that such notification was received.  For purposes of this requirement, internal facsimile confirmation sheets do not constitute proof of receipt.

## VII.   OIG INSPECTION, AUDIT, AND REVIEW RIGHTS

In addition to any other rights OIG may have by statute, regulation, or contract, OIG or its duly authorized representative(s) may examine or request copies of Pfizer's books, records, and other documents and supporting materials (to the extent such items are not protected under appropriately asserted legal privilege) and/or conduct on-site reviews of any of Pfizer's locations for the purpose of verifying and evaluating:  (a) Pfizer's compliance with the terms of this CIA; and (b) Pfizer's compliance with the requirements of the Federal health care programs in which it participates and with applicable FDA requirements.  The documentation described above shall be made available by Pfizer to OIG or its duly authorized representative(s) at all reasonable times for inspection, audit, or reproduction.  Furthermore, for purposes of this provision, OIG or its duly authorized representative(s) may interview any of Pfizer's employees, contractors, or agents who consent to be interviewed at the individual's place of business during normal business hours or at such other place and time as may be mutually agreed upon between the individual and OIG.  Pfizer's employees shall have the right to be represented by counsel and any such employees may, at his or her option, be accompanied by counsel for Pfizer and/or their personal counsel at any interview by OIG.  Pfizer shall assist OIG or its duly authorized representative(s) in contacting and arranging interviews with such individuals upon OIG's request.  Pfizer's employees may elect to be interviewed with or without a representative of Pfizer present.  Notwithstanding such arrangement, the OIG recognizes that individuals have the right to refuse to submit to

Corporate Integrity Agreement
Pfizer Inc

29

interviews, and Pfizer shall not be obligated to require such individuals to submit to interviews. If any individual decides not to submit to an interview, such refusal shall not constitute a breach of this CIA.

## VIII.  DOCUMENT AND RECORD RETENTION

Pfizer shall maintain for inspection all documents and records relating to reimbursement from the Federal health care programs, or to compliance with this CIA, for six years (or longer if otherwise required by law).

## IX.  DISCLOSURES

Consistent with HHS's FOIA procedures, set forth in 45 C.F.R. Part 5, OIG shall make a reasonable effort to notify Pfizer prior to any release by OIG of information submitted by Pfizer pursuant to its obligations under this CIA and identified upon submission by Pfizer as trade secrets, or information that is commercial or financial and privileged or confidential, under the FOIA rules. With respect to such releases, Pfizer shall have the rights set forth at 45 C.F.R. § 5.65(d). The OIG shall provide the pre-disclosure notice required pursuant to 45 C.F.R. §5.65(d) to the Compliance Officer with a copy to Pfizer's legal representative at the address provided in Section VI. Nothing in this CIA or any communication or report made pursuant to this CIA shall constitute or be construed as a waiver by Pfizer of Pfizer's attorney-client, work product or other applicable privileges. Notwithstanding that fact, the existence of any such privilege does not affect Pfizer's obligation to comply with the provisions of the CIA.

## X.  BREACH AND DEFAULT PROVISIONS

Pfizer is expected to fully and timely comply with all of its CIA obligations. A breach of this CIA does not constitute a breach of the Settlement Agreement between Pfizer and the United States or the settlement agreements with the individual States referred to in the Preamble. Any breach of the terms of those agreements does not constitute a breach of this CIA, except to the extent that such a breach independently also constitutes a breach of this CIA. Section X of this CIA specifies all of the remedies available to the OIG if Pfizer fails to satisfy its obligations under this CIA. The remedies available to the OIG under this Section X do not preempt or limit any actions that individual States may take against Pfizer under appropriate authorities.

Corporate Integrity Agreement
Pfizer Inc

A. <u>Stipulated Penalties for Failure to Comply with Certain Obligations</u>. As a contractual remedy, Pfizer and OIG hereby agree that failure to comply with certain obligations as set forth in this CIA may lead to the imposition of the following monetary penalties (hereinafter referred to as "Stipulated Penalties") in accordance with the following provisions.

1. A Stipulated Penalty of $2,500 (which shall begin to accrue on the day after the date the obligation became due) for each day Pfizer fails to establish and implement any of the following obligations as described in Section III:

        a. a Compliance Officer;

        b. a Compliance Committee;

        c. a written Code of Conduct (<u>i.e.</u>, the Blue Book);

        d. written Policies and Procedures;

        e. the training of Covered Persons; and

        f. a Disclosure Program.

2. A Stipulated Penalty of $2,500 (which shall begin to accrue on the day after the date the obligation became due) for each day Pfizer fails to engage an IRO as required in Section III.D and Appendices A and C.

3. A Stipulated Penalty of $2,500 (which shall begin to accrue on the day after the date the obligation became due) for each day Pfizer fails to meet any deadlines for the submission of the IRO Selection Notification or the Annual Reports to OIG as described in Section V.

4. A Stipulated Penalty of $2,000 (which shall begin to accrue on the date the failure to comply began) for each day Pfizer hires or engages as a Covered Person an Ineligible Person and that person: (a) has responsibility for, or involvement with, Pfizer's business operations related to the Federal health care programs; or (b) is in a position for which the person's salary or the items or services furnished, ordered, or prescribed by the person are paid in whole or part, directly or indirectly, by Federal health care programs or

Corporate Integrity Agreement
Pfizer Inc

31

otherwise with Federal funds (the Stipulated Penalty described in this Subsection shall not be demanded for any time period during which Pfizer can demonstrate that it did not discover the person's exclusion or other ineligibility after making a reasonable inquiry (as described in Section III.F) as to the status of the person).

5. A Stipulated Penalty of $1,500 for each day Pfizer fails to grant access to the information or documentation as required in Section VII. (This Stipulated Penalty shall begin to accrue on the date Pfizer fails to grant access.)

6. A Stipulated Penalty of $5,000 for each false certification submitted by or on behalf of Pfizer as part of its IRO Selection Notification, Annual Report, additional documentation to a report (as requested by the OIG), or otherwise required by this CIA.

7. A Stipulated Penalty of $1,000 for each day Pfizer fails to comply fully and adequately with any obligation of this CIA. OIG shall provide notice to Pfizer, stating the specific grounds for its determination that Pfizer has failed to comply fully and adequately with the CIA obligation(s) at issue and steps Pfizer shall take to comply with the CIA. (This Stipulated Penalty shall begin to accrue 10 days after Pfizer receives this notice from OIG of the failure to comply.) A Stipulated Penalty as described in this Subsection shall not be demanded for any violation for which OIG has sought a Stipulated Penalty under Subsections 1-6 of this Section.

B. <u>Timely Written Requests for Extensions</u>. Pfizer may, in advance of the due date, submit a timely written request for an extension of time to perform any act or file any notification or report required by this CIA. Notwithstanding any other provision in this Section, if OIG grants the timely written request with respect to an act, notification, or report, Stipulated Penalties for failure to perform the act or file the notification or report shall not begin to accrue until one day after Pfizer fails to meet the revised deadline set by OIG. Notwithstanding any other provision in this Section, if OIG denies such a timely written request, Stipulated Penalties for failure to perform the act or file the notification or report shall not begin to accrue until three business days after Pfizer receives OIG's written denial of such request or the original due date, whichever is later. A "timely written request" is defined as a request in writing received by OIG at least five business days prior to the date by which any act is due to be performed or any notification or report is due to be filed.

C. Payment of Stipulated Penalties.

1. *Demand Letter*. Upon a finding that Pfizer has failed to comply with any of the obligations described in Section X.A and after determining that Stipulated Penalties are appropriate, OIG shall notify Pfizer of: (a) Pfizer's failure to comply; and (b) OIG's exercise of its contractual right to demand payment of the Stipulated Penalties (this notification is referred to as the "Demand Letter"). Such Demand Letter shall specifically state the conduct that the OIG contends constitutes the basis for imposing the Stipulated Penalty.

2. *Response to Demand Letter*. Within 10 days after the receipt of the Demand Letter, Pfizer shall either: (a) cure the breach to OIG's satisfaction and pay the applicable Stipulated Penalties; or (b) request a hearing before an HHS administrative law judge (ALJ) to dispute OIG's determination of noncompliance, pursuant to the agreed upon provisions set forth below in Section X.E. In the event Pfizer elects to request an ALJ hearing, the Stipulated Penalties shall continue to accrue until Pfizer cures, to OIG's satisfaction, the alleged breach in dispute. Failure to respond to the Demand Letter in one of these two manners within the allowed time period shall be considered a material breach of this CIA and shall be grounds for exclusion under Section X.D.

3. *Form of Payment*. Payment of the Stipulated Penalties shall be made by certified or cashier's check, payable to: "Secretary of the Department of Health and Human Services," and submitted to OIG at the address set forth in Section VI.

4. *Independence from Material Breach Determination*. Except as set forth in Section X.D.1.c, these provisions for payment of Stipulated Penalties shall not affect or otherwise set a standard for OIG's decision that Pfizer has materially breached this CIA, which decision shall be made at OIG's discretion and shall be governed by the provisions in Section X.D, below.

D. Exclusion for Material Breach of this CIA.

1. *Definition of Material Breach*. A material breach of this CIA means:

   a. a failure by Pfizer to report a Reportable Event and take corrective action, as required in Section III.H;

Corporate Integrity Agreement
Pfizer Inc

33

        b.  a repeated or flagrant violation of the obligations under this CIA, including, but not limited to, the obligations addressed in Section X.A;

        c.  a failure to respond to a Demand Letter concerning the payment of Stipulated Penalties in accordance with Section X.C; or

        d.  a failure to engage and use an IRO in accordance with Section III.D and Appendices A and C.

        2.  *Notice of Material Breach and Intent to Exclude*.  The parties agree that a material breach of this CIA by Pfizer constitutes an independent basis for Pfizer's exclusion from participation in the Federal health care programs.  Upon a determination by OIG that Pfizer has materially breached this CIA and that exclusion is the appropriate remedy, OIG shall notify Pfizer of:  (a) Pfizer's material breach; and (b) OIG's intent to exercise its contractual right to impose exclusion (this notification is hereinafter referred to as the "Notice of Material Breach and Intent to Exclude").

        3.  *Opportunity to Cure*.  Pfizer shall have 30 days after the date of receipt of the Notice of Material Breach and Intent to Exclude to demonstrate to OIG's satisfaction that:

        a.  Pfizer is in compliance with the obligations of the CIA cited by OIG as being the basis for the material breach;

        b.  the alleged material breach has been cured; or

        c.  the alleged material breach cannot be cured within the 30-day period, but that:  (i) Pfizer has begun to take action to cure the material breach; (ii) Pfizer is pursuing such action with due diligence; and (iii) Pfizer has provided to OIG a reasonable timetable for curing the material breach.

        4.  *Exclusion Letter*.  If, at the conclusion of the 30-day period, Pfizer fails to satisfy the requirements of Section X.D.3, OIG may exclude Pfizer from participation in the Federal health care programs.  OIG shall notify Pfizer in writing of its determination to exclude Pfizer (this letter shall be referred to hereinafter as the

Corporate Integrity Agreement
Pfizer Inc

34

"Exclusion Letter"). Subject to the Dispute Resolution provisions in Section X.E, below, the exclusion shall go into effect 30 days after the date of Pfizer's receipt of the Exclusion Letter. The exclusion shall have national effect and shall also apply to all other Federal procurement and nonprocurement programs. Reinstatement to program participation is not automatic. After the end of the period of exclusion, Pfizer may apply for reinstatement by submitting a written request for reinstatement in accordance with the provisions at 42 C.F.R. §§ 1001.3001-.3004.

E. Dispute Resolution

1. *Review Rights*. Upon OIG's delivery to Pfizer of its Demand Letter or of its Exclusion Letter, and as an agreed-upon contractual remedy for the resolution of disputes arising under this CIA, Pfizer shall be afforded certain review rights comparable to the ones that are provided in 42 U.S.C. § 1320a-7(f) and 42 C.F.R. Part 1005 as if they applied to the Stipulated Penalties or exclusion sought pursuant to this CIA. Specifically, OIG's determination to demand payment of Stipulated Penalties or to seek exclusion shall be subject to review by an HHS ALJ and, in the event of an appeal, the HHS Departmental Appeals Board (DAB), in a manner consistent with the provisions in 42 C.F.R. §§ 1005.2-1005.21. Notwithstanding the language in 42 C.F.R. § 1005.2(c), the request for a hearing involving Stipulated Penalties shall be made within 10 days after receipt of the Demand Letter and the request for a hearing involving exclusion shall be made within 25 days after receipt of the Exclusion Letter.

2. *Stipulated Penalties Review*. Notwithstanding any provision of Title 42 of the United States Code or Title 42 of the Code of Federal Regulations, the only issues in a proceeding for Stipulated Penalties under this CIA shall be: (a) whether Pfizer was in full and timely compliance with the obligations of this CIA for which OIG demands payment; and (b) the period of noncompliance. Pfizer shall have the burden of proving its full and timely compliance and the steps taken to cure the noncompliance, if any. OIG shall not have the right to appeal to the DAB an adverse ALJ decision related to Stipulated Penalties. If the ALJ agrees with OIG with regard to a finding of a breach of this CIA and orders Pfizer to pay Stipulated Penalties, such Stipulated Penalties shall become due and payable 20 days after the ALJ issues such a decision unless Pfizer requests review of the ALJ decision by the DAB. If the ALJ decision is properly appealed to the DAB and the DAB upholds the determination of OIG, the Stipulated Penalties shall become due and payable 20 days after the DAB issues its decision.

3. *Exclusion Review.* Notwithstanding any provision of Title 42 of the United States Code or Title 42 of the Code of Federal Regulations, the only issues in a proceeding for exclusion based on a material breach of this CIA shall be:

> a. whether Pfizer was in material breach of this CIA;
>
> b. whether such breach was continuing on the date of the Exclusion Letter; and
>
> c. whether the alleged material breach could not have been cured within the 30-day period, but that: (i) Pfizer had begun to take action to cure the material breach within that period; (ii) Pfizer has pursued and is pursuing such action with due diligence; and (iii) Pfizer provided to OIG within that period a reasonable timetable for curing the material breach and Pfizer has followed the timetable.

For purposes of the exclusion herein, exclusion shall take effect only after an ALJ decision favorable to OIG, or, if the ALJ rules for Pfizer, only after a DAB decision in favor of OIG. Pfizer's election of its contractual right to appeal to the DAB shall not abrogate OIG's authority to exclude Pfizer upon the issuance of an ALJ's decision in favor of OIG. If the ALJ sustains the determination of OIG and determines that exclusion is authorized, such exclusion shall take effect 20 days after the ALJ issues such a decision, notwithstanding that Pfizer may request review of the ALJ decision by the DAB. If the DAB finds in favor of OIG after an ALJ decision adverse to OIG, the exclusion shall take effect 20 days after the DAB decision. Pfizer shall waive its right to any notice of such an exclusion if a decision upholding the exclusion is rendered by the ALJ or DAB. If the DAB finds in favor of Pfizer, Pfizer shall be reinstated effective on the date of the original exclusion.

4. *Finality of Decision.* The review by an ALJ or DAB provided for above shall not be considered to be an appeal right arising under any statutes or regulations. Consequently, the parties to this CIA agree that the DAB's decision (or the ALJ's decision if not appealed) shall be considered final for all purposes under this CIA.

## XI.    EFFECTIVE AND BINDING AGREEMENT

Consistent with the provisions in the Settlement Agreement pursuant to which this CIA is entered, and into which this CIA is incorporated, Pfizer and OIG agree as follows:

A.  This CIA shall be binding on the successors, assigns, and transferees of Pfizer;

B.  This CIA shall become final and binding on the date the final signature is obtained on the CIA;

C.  Any modifications to this CIA shall be made with the prior written consent of the parties to this CIA and the CIA will be subject to modifications if so required by any change in Federal health care program requirements or FDA requirements as referenced in the Preamble to this CIA;

D.  The undersigned Pfizer signatories represent and warrant that they are authorized to execute this CIA.  The undersigned OIG signatory represents that he is signing this CIA in his official capacity and that he is authorized to execute this CIA.

E.  This CIA may be executed in counterparts, each of which constitutes an original and all of which constitute one and the same agreement.

Corporate Integrity Agreement
Pfizer Inc

ON BEHALF OF PFIZER INC

_____    5/11/04
Beth Levine, Esq.                  DATE
General Counsel
U.S. Pharmaceuticals
Pfizer Inc


_____    5/11/04
Douglas Lankler, Esq.              DATE
Deputy Compliance Officer
Pfizer Inc


_____    _____
Lynn Shapiro Snyder, Esq.          DATE
John Rah, Esq.
Epstein Becker & Green, P.C.


_____    _____
Stuart Gerson, Esq.                DATE
Epstein Becker & Green, P.C.

Corporate Integrity Agreement
Pfizer Inc

**ON BEHALF OF PFIZER INC**

_____
Beth Levine, Esq.
General Counsel
U.S. Pharmaceuticals
Pfizer Inc

_____
DATE

_____
Douglas Lankler, Esq.
Deputy Compliance Officer
Pfizer Inc

_____
DATE

_____
Lynn Shapiro Snyder, Esq.
John Rah, Esq.
Epstein Becker & Green, P.C.

5/11/04
_____
DATE

_____
Stuart Gerson, Esq.
Epstein Becker & Green, P.C.

5/11/04
_____
DATE

Corporate Integrity Agreement
Pfizer Inc

ON BEHALF OF THE OFFICE OF INSPECTOR GENERAL
OF THE DEPARTMENT OF HEALTH AND HUMAN SERVICES


_____
LARRY J. GOLDBERG
Assistant Inspector General for Legal Affairs
Office of Inspector General
U. S. Department of Health and Human Services

11 May 2004
_____
DATE

Corporate Integrity Agreement
Pfizer Inc

Exhibit B

Doft, Suzanne

1           UNITED STATES DISTRICT COURT           SOUTHERN DISTRICT OF NEW YORK
2           04-CV-6704 (JSR)
3
4  IN RE:           : VIDEOTAPE DEPOSITION OF:NEURONTIN           : SUZANNE DOFT
5           :           :
6  - - - - - - - - - - - -
7
8
9
10          TRANSCRIPT of the stenographic notes of
11  the proceedings in the above-entitled matter, as
12  taken by and before LINDA M. HOFFMANN, a Certified
13  Shorthand Reporter and Notary Public, and Registered
14  Professional Reporter, held at the office of DAVIS
15  POLK & WARDWELL, ESQS., 450 Lexington Avenue, New
16  York, New York, on Tuesday, March 29, 2005,
17  commencing at 10:30 in the forenoon.
18
19
20
21
22
23
24
25

page 1

Doft, Suzanne

```
 1   A P P E A R A N C E S:
 2
 3          FINKELSTEIN & PARTNERS, LLP        436 Robinson Avenue
 4          Newburgh, New York 12550       BY:  KENNETH B. FROMSON, ESQ.
 5          Attorneys for Plaintiff
 6          DAVIS, POLK & WARDWELL, P.L.L.C.        450 Lexington Avenue
 7          New York, New York  10017     BY:  RONALD ROSENKRANZ, ESQ.
 8             KENNETH B. FROMSON, ESQ.        Attorneys for Defendants, Pfizer
Inc.,
 9          Parke-Davis, a division of       Warner-Lambert Company
10
11           Also attending: Daniel McClutchy,
12                    Videographer
13
14
15
16
17
18
19
20
21
22
23
24
25
```

page 2

Doft, Suzanne

```
1                    INDEX
2  WITNESS          DIRECT  CROSS  REDIRECT  RECROSS
3  SUZANNE DOFT
4  BY MR. ROSENKRANZ    4
5
6
7          E X H I B I T S
8  NUMBER        DESCRIPTION          PAGE
9
10  P-1      Notice to take deposition    21
11  P-2      Corporate Integrity Agreement  198
12  P-3      Multi-page fax from Department        of Health & Human Service,
212
13              Rockville, MD
14  P-4      21-page article from New York   212        Law Journal
15
16
17
18
19
20
21
22
23
24
25
```

page 3

Doft, Suzanne

 1          THE VIDEOGRAPHER:  Good morning.  My
 2   name is Daniel McClutchy of Nationwide Video
 3   Productions located in Roseland, New Jersey.  The
 4   date today is March 29th, 2005.  The time is
 5   approximately 10:30 a.m.
 6          This deposition is being held in the
 7   office of Davis Polk, 450 Lexington Avenue, in New
 8   York, New York.
 9          The caption of this case is In Re
10   Neurontin, in the U.S. District Court, Southern
11   District of New York.  Case Number 04-CV-6704 (JSR.)
12          The name of the witness is Suzanne Doft.
13          At this time, the attorneys will
14   identify themselves and the parties they represent;
15   after which our court reporter, Linda Hoffmann, will
16   swear in the witness and we can proceed.
17          MR. ROSENKRANZ:  Ronald Rosenkranz,
18   Finkelstein and Partners, for the plaintiffs.
19          MR. MURRAY:  James Murray, from Davis,
20   Polk & Wardwell, for the witness and for the
21   defendants.
22   S U Z A N N E   D O F T, 1111 Park Avenue, New York
23   City, New York, having been duly sworn by the Notary,
24   testifies as follows:
25   DIRECT EXAMINATION BY MR. ROSENKRANZ:

page 4

Doft, Suzanne

```
 1          MR. ROSENKRANZ:  Before we begin, my
 2   apologies to any of the jurors that might be
 3   listening to my voice.  It's more nasal than even
 4   usual because I'm just getting over a cold, but we'll
 5   try to work with that.
 6      Q.    Ma'am, could I have your age and date of
 7   birth?
 8      A.    I will be 35 next week; April 5th, 1970.
 9      Q.    Okay.
10          Ma'am, I'm going to ask you some
11   questions concerning this litigation.  If there's
12   anything you do not hear, anything you do not
13   understand, anything that you need rephrased, please
14   advise your attorney or myself.  Okay?
15      A.    Sure.
16      Q.    Also verbalize your answers.  I see you
17   nodding your head.  Verbalize your answers as opposed
18   to nodding your head, and wait for me to complete the
19   question before you answer.
20      A.    Okay.
21      Q.    Is that acceptable?
22      A.    Yes.
23      Q.    Okay.
24          Can you tell me your current address,
25   business and residential?
```

page 5

Doft, Suzanne

1       A.      Business is 235 East 42nd Street, New
2    York City.  And residential, 1111 Park Avenue, New
3    York City.
4       Q.    And are you currently employed?
5       A.    I am.
6       Q.    By whom are you currently employed?
7       A.    By Pfizer.
8       Q.    Okay?
9             And in what capacity?  What is your
10   position with Pfizer?
11      A.    I am the director team leader of the
12   Lasofoxifene marketing team and of the Neurontin
13   team.
14      Q.    Okay.
15            There is a Neurontin team?
16      A.     The marketing team consists of me at
17   this point.
18      Q.    Okay.  All right.
19            When you say the marketing team consists
20   of you, are you part of a Marketing Department?
21      A.    I am.
22      Q.    Okay.
23            Could you describe that Marketing
24   Department for me?  How is it structured?
25      A.    I'm not exactly clear.

page 6

Doft, Suzanne

1    Q.    Okay.
2          Well, what is the makeup of the
3    Marketing Department, besides yourself?  Who else is
4    in the Marketing Department?
5    A.    There are vice presidents.
6    Q.    Okay.
7    A.    There are marketing directors.
8    Q.    Okay.
9          Who are the marketing directors?
10   A.    For all of Pfizer, or for a specific
11   product?  I'm not exactly clear.
12   Q.    Well, you are the only person that is
13   involved in the marketing of Neurontin right now?
14   A.    And there is a vice president who I
15   report to for that.
16   Q.    And who is that vice president?
17   A.    Terri Natalicchio.
18   Q.    How long have you been part of the
19   Neurontin marketing team yourself?
20   A.    I've been on the team since 2001.
21   Q.    Okay.
22          And the person to whom you report, how
23   long have they been involved in the -- in the
24   Neurontin marketing team?
25   A.    She has been involved since 2003.

page 7

Doft, Suzanne

1     Q.    Okay.
2            And what is the position -- what is your
3    title exactly?
4     A.    Currently?
5     Q.    Yes.
6     A.    I am the director/team leader.
7     Q.    Okay.  And was there a director/team
8    leader prior to you?
9     A.    Yes.
10    Q.    And who was that person?
11    A.    Meg Yoder.
12    Q.    Okay.
13            And how long was Meg Yoder the team
14    leader for Neurontin?
15    A.    Since -- from 2000 to 2003.
16    Q.    Okay.
17            Was there a team leader prior to her?
18    A.    That was prior to Pfizer time.
19    Q.    Okay.
20            I understand that was prior to Pfizer
21    time.  Do you know who the person was, if there was a
22    team leader?
23    A.    I do not know the structure.
24    Q.    Okay.
25            MR. MURRAY:  And I object, and say she's

page 8

Doft, Suzanne

1   designated for the Pfizer area.
2          MR. ROSENKRANZ:  I understand that.
3      Q.    You know, if you know a name.  Okay.
4          The vice president, you said she became
5   vice president for the Neurontin team in 2003?
6      A.    Correct.
7      Q.    And who was her predecessor?
8      A.    Her predecessor was John Krayacich.
9      Q.    Okay.
10         And when did he become the vice
11  president?
12     A.    In 2000.
13     Q.    Okay.
14         Is he still employed by Pfizer?
15     A.    He is not.
16     Q.    Okay.
17         And again, the same question I asked you
18  earlier, do you have any idea who the vice president
19  in charge of the Neurontin marketing team was prior
20  to 2000; understanding that it wasn't Pfizer at that
21  time.
22         MR. MURRAY:  Same objection.
23     A.    I do not.
24     Q.    Okay.
25         Do you have any persons that work under

page 9

Doft, Suzanne

1  you on this Neurontin marketing team?
2      A.    Not currently.
3      Q.    Okay.
4              Was there a time that there was somebody
5  that worked under you?
6      A.    Yes.
7      Q.    Was it one person, or more than one
8  person?
9      A.    More than one.
10     Q.    Okay.
11             And what time frame are we talking
12  about?
13     A.    From 2003 till the end of 2004.
14     Q.    Okay.
15             And how many persons are we talking
16  about?
17     A.    Three.
18     Q.    Okay.
19             Could you tell me who the three people
20  were?
21     A.    Yes.  Andrea Zeuscher Malone, David
22  Probert and Avanish Mishra.
23     Q.    Okay.
24             And what were their respective titles?
25     A.    David Probert, a manager; Avanish

page 10

Doft, Suzanne

1   Mishra, senior manager; Andrea Zeuscher Malone,
2   senior manager.
3       Q.    Okay.
4           And could you tell me, what does the
5   marketing team do, the Neurontin marketing team?
6   What do you do?
7       A.    I set strategies and direction for the
8   brand.
9       Q.    Okay.
10          Is there currently a strategy for the
11  brand?
12      A.    There is not.
13      Q.    Okay.
14          When was the last time there was a
15  strategy for the brand?
16          MR. MURRAY:  I'm just going to
17  interject.
18          We can allow the questioning here, but
19  she's not being designated to talk about specific
20  things about Neurontin, as consistent with all of our
21  30(b)(6) witnesses.  She going to talk about
22  marketing policies and procedures generally.
23          MR. ROSENKRANZ:  Okay.
24          MR. MURRAY:  But, you know, go ahead and
25  just do it.  With that objection, go ahead.

page 11

Doft, Suzanne

1    Q.    Well, are you familiar with marketing
2  policies in general?
3    A.    I am.
4    Q.    Okay.
5          What is marketing exactly?  What does it
6  involve?
7    A.    Again, I believe that it is setting the
8  strategy and direction for the brand, while
9  maintaining P & L responsibility for it.
10    Q.    Is Marketing responsible for packaging?
11    A.    Not directly.
12    Q.    Okay.
13          Is it responsible for advertising?
14    A.    Yes.
15    Q.    Is it responsible for promotion?
16    A.    Yes.
17    Q.    Sales?
18    A.    Not directly responsible.
19    Q.    Okay.  Labelling?
20    A.    Not directly responsible.
21    Q.    Okay.
22          Now, when you say "not directly
23  responsible," do you interact with all of these other
24  areas of Pfizer?
25          MR. MURRAY:  Objection to form.

Exhibit C



**PFIZER**

*Working for a healthier world*™

Site Map | Privacy

Search Pfizer.com

[              ] go

**Who We Are**

About Pfizer
News
Careers
▶ For Investors
  ■ Investor News
  ■ Historical Stock Chart
  ■ Historical Price Lookup
  ■ Financial Reports
  ■ CEO/CFO Certifications
  ■ SEC Filings by Pfizer
  ■ SEC Filings by Pfizer
    Directors and Officers
  ■ Presentations
  ■ Shareholder Services
  ■ Corporate Governance

**What We Do**

Medicines & Products
Health Resources
Animal Care
Business to Business

**How We Help**

Research &
Development
Patient Assistance
Programs
Caring For Community
Corporate Citizenship

Home

# For Investors

## Investor News Release

This Information is Intended for Investors        Advisory Information for
                                                              Investors

Home > Who We Are: For Investors > Investor News > **Investor News Release**

▶ **Pfizer Inc Fourth-Quarter 2004 Performance Report**

*PFIZER DELIVERS STRONG PERFORMANCE IN A
CHALLENGING BUSINESS ENVIRONMENT*

---

*Pfizer Responds Quickly and Significantly to Tsunami Disaster*

---

*Fourth-Quarter Reported Net Income of $2.825 Billion, Reported
Diluted EPS of $.38, Reflect Asset-Impairment Charge Relating to
Depo-Provera*

---

*Fourth-Quarter Adjusted Income\* Grows 16 Percent to $4.385 Billion;
Fourth-Quarter Adjusted Diluted EPS\* Up 16 Percent to $.58*

---

*Quarterly Revenues Increase 7 Percent to $14.924 Billion*

---

*Lipitor Becomes Pharmaceutical Industrys First Ten-Billion-Dollar
Product*

---

*Quarter Marked by U.S. Regulatory Approvals of Lyrica and
Macugen, U.S. Filings of Revatio and Parecoxib*

---

*Pfizer Remains On Track to Submit an Industry-Record 20 Major U.S.
Regulatory Filings in 2001-2006*

---

*Pfizer Well-Positioned to Meet Challenges Ahead*

**NEW YORK, January 19, 2005** -- Pfizer today reported financial
results for the fourth quarter of 2004.

"Pfizer delivered another strong performance during the fourth
quarter, despite a challenging business environment," said Hank
McKinnell, chairman and chief executive officer. "These results reflect
our unequaled operational capabilities and our industry-leading
product portfolio and pipeline. Among many solid product
performances, Lipitor continued to achieve strong double-digit
revenue growth and became the world's first ten-billion-dollar
pharmaceutical product.

"The numerous filings, approvals, and launches of major new Pfizer
products and product enhancements during 2004 demonstrated our
renewed R&D productivity," Dr. McKinnell continued. "We will
continue to make the investments necessary to serve patients' needs
and to generate long-term growth. Our pipeline of new-product
candidates is full at all stages, and the opportunities for improving
human health remain abundant."

Commenting on the impact of the catastrophic tsunami in Asia and
Africa, Dr. McKinnell said, "Our hearts go out to the families and loved
ones of those whose lives were lost and to the millions of people

▶ **Stock Quote**

Historical Stock Chart
Historical Price Lookup

Stock Symbol: PFE
Stock Exchange: NYSE

Stock Quote at:
4:00PM EST Nov 02, 2006

| **Last** | **Change** |
|----------|-----------|
| **26.69** | **+0.15** |

| % Change | **+0.57** |
|----------|-----------|
| Day High | **26.70** |
| Day Low | **26.43** |
| Open | **26.51** |
| Previous Close | **26.54** |
| Volume (000's) | **28864900** |
| 52 Week High | **28.60** |
| 52 Week Low | **20.27** |
| Market Cap (Bil) | **194.61** |

At least 20 minutes delayed

Stock Quote Disclaimer

affected by this disaster. As for so many others, the disaster has touched our company, with Pfizer colleagues—and their families—among the missing and injured.

"Our company has responded to the crisis in a caring and comprehensive manner. To date, we have donated more than $10 million in cash to international and local relief organizations operating in the region. We have also donated Pfizer medicines and consumer products to more than 30 relief organizations as part of our initial $25 million commitment in medicine relief. Our U.S. colleagues have personally contributed more than $350,000 to the relief effort, and our overseas colleagues have donation drives in progress. Pfizer is matching all of these colleague donations. We are also partnering with the United Nations to send Pfizer experts in supply-chain management to the affected area to support the U.N.-led relief efforts. We expect to send more colleagues to support these teams in areas of critical need, such as water purification. I am proud of the significant contributions being made to the relief effort by Pfizer colleagues in the affected area and around the world."

### Pfizer Delivers Strong 2004 Performance, Will Provide 2005 Guidance at Upcoming Analyst Meeting

David Shedlarz, executive vice president and chief financial officer, noted, "Pfizer achieved strong financial results in the fourth quarter of 2004 and for the full year. The company continues to use its strong operating cash flow to make the investments in its business necessary to sustain long-term growth, as well as to pay a strong, growing dividend to shareholders and to repurchase the company's common stock."

Pfizer revenues for the fourth quarter of 2004 grew 7 percent to $14.924 billion, compared to the fourth quarter of 2003. Revenue growth was driven by good performances by Lipitor and a number of other product lines and by the weakening of the U.S. dollar relative to a number of foreign currencies, offset in part by recent generic competition to Diflucan, Neurontin, and Accupril and other competitive challenges.

Pfizer revenues for full-year 2004 grew 17 percent to $52.516 billion, compared to 2003. Revenue growth was driven by strong performances across a broad range of products; the inclusion of results of legacy Pharmacia products for the full year compared to the prior year (subsequent to the April 16, 2003, acquisition); and the weakening of the U.S. dollar relative to a number of other foreign currencies; offset in part by recent generic competition and other competitive challenges.

The Company's Human Health business generated revenues of $13.101 billion, up 6 percent, in the fourth quarter. Quarterly revenues of Pfizer's Consumer Healthcare business were $992 million, up 13 percent. Pfizer's Animal Health revenues increased 11 percent in the quarter to $566 million.

Reported fourth-quarter net income of $2.825 billion and reported diluted earnings per share of $.38 included $831 million ($.10 per share) of significant impacts of purchase accounting for acquisitions (primarily non-cash charges attributable to the acquisition of Pharmacia); merger-related costs of $323 million ($.04 per share); certain significant items of $360 million ($.05 per share), which includes an impairment charge of $420 million relating to Depo-Provera resulting from diminished expectations of the product's future performance and $67 million of contingent income earned from a product in development that was sold in 2003; and a loss from discontinued operations of $46 million ($.01 per share), all on an after-tax basis. Excluding these items, adjusted income* in the fourth quarter grew 16 percent to $4.385 billion, and adjusted diluted EPS* in the quarter increased 16 percent to $.58, compared to the same

period in 2003.

Reported full-year 2004 net income of $11.361 billion and reported diluted earnings per share of $1.49 included $3.389 billion ($.45 per share) of significant impacts of purchase accounting for acquisitions (primarily non-cash charges attributable to the acquisition of Pharmacia); merger-related costs of $786 million ($.10 per share); certain significant items of $629 million ($.08 per share), which includes an impairment charge of $420 million relating to Depo-Provera, a charge of $229 million relating to the resolution, subject to court approval and approval by claimants, of certain asbestos-related litigation matters, and $67 million of contingent income earned from a product in development that was sold in 2003; and income from discontinued operations of $29 million, all on an after-tax basis. Excluding these items, adjusted income* for the full year grew 31 percent to $16.136 billion, and adjusted diluted EPS* for the full year increased 25 percent to $2.12, compared to full-year 2003.

"The U.S. Treasury recently issued guidance that appears to clarify some of the provisions of the American Jobs Creation Act of 2004," Mr. Shedlarz continued, "and management is now investigating whether the company might repatriate up to $29 billion in extraordinary dividends, as defined in the Act, during 2005 (subject to management and board approval). This amount could increase by $8.6 billion, the amount of Pharmacia's historical accumulated earnings, but is subject to further U.S. Treasury guidance. Since the U.S. Treasury has not yet completed the issuance of all of its guidance on the Act, the company can only make a good-faith estimate of the tax liability that would have to be recorded if these extraordinary dividends are paid. Accordingly, the company expects, based on the information presently available, that it would record a tax liability based on the 5.25-percent statutory rate in the Act. However, the actual cost to the company is dependent on a number of factors that are currently being analyzed, including the passage of the pending Technical Corrections Bill.

"While Pfizer's revenue and income growth will likely be tempered in the near term due to patent expirations and other factors, the Company will continue to make the investments necessary to sustain strong longer-term growth, the prospects for which remain excellent," Mr. Shedlarz concluded. "We will provide more specific information on Pfizer's financial expectations for 2005 and beyond at our analyst meeting planned for April 5, 2005. We remain confident that Pfizer has the organizational strength and resilience, as well as the financial depth and flexibility, to succeed in the long term."

### Human Health Continues Industry-Leading Performance

"2004—and especially the fourth quarter—was an extraordinary time for Pfizer in every respect," said Karen Katen, executive vice president of the company and president of Pfizer Global Pharmaceuticals. "We saw unprecedented challenges to some of our key products and unsurpassed performances by others. We were subject to significant patent expirations and intense generic competition. We published landmark clinical-trial data from several studies and gained enhanced labeling from worldwide regulatory authorities, while also managing challenges to the safety and value of our medicines. We experienced pricing challenges from governments and other payers at the same time that we enrolled our first uninsured American consumers in the Pfizer Pfriends discount card program.

"Amid this dynamic environment, our global pharmaceutical business delivered solid performance in 2004, extending our industry leadership and, more importantly, meeting patients' health needs with essential medicines and innovative programs. This performance is directly attributable to the scale of our pharmaceutical enterprise—an enterprise deep and broad enough in therapeutic scope, and diverse enough in global market presence, to successfully exploit business

News from Pfizer. Pfizer Inc Fourth-Quarter 2004 Performance Report

Case 1:04-cv-10981-PBS   Document 532   Filed 11/02/2006   Page 61 of 72   Page 4 of 13

opportunities and manage multiple environmental challenges," she said.

Fourth-quarter human health revenue growth was led by Lipitor (up 23 percent), Celebrex (up 24 percent), Bextra (up 57 percent), Zyvox (up 73 percent), Campto/Camptosar (up 129 percent), Detrol (up 22 percent), and Xalatan/Xalacom (up 23 percent), partially offset by sales declines for Neurontin, Diflucan, and Accupril due to generic competition and Zithromax due to weak respiratory-infection trends.

Full-year human health worldwide revenue growth of 17 percent was driven largely by Lipitor (up 18 percent), Zoloft (up 8 percent), Geodon (up 32 percent), Relpax (up 99 percent), Vfend (up 44 percent), and other key products—Celebrex, Bextra, Xalatan, Detrol, and Zyvox—partially offset by sales declines for Viagra, Diflucan, and Zithromax. Neurontin and Accupril were subject to generic competition in the fourth quarter, and Diflucan was subject to generic competition in the third and fourth quarters.

Fifteen products marketed by Pfizer are number one in their respective therapeutic categories. These include five of the world's 25 top-selling medicines and the most widely-prescribed medicine in the world—Lipitor. Ten Pfizer products each achieved more than $1 billion in 2004 revenues.

**Executing on Traditional Strengths.** In 2004, Pfizer demonstrated in a variety of ways how our increased scale enhances our traditional strengths and provides us with an unprecedented ability to support a large in-line portfolio with robust medical, marketing, and sales efforts and rigorous clinical programs and also file and launch new products in multiple markets around the globe. These proven capabilities have enhanced Pfizer's status as the pharmaceutical industry's "partner of choice."

**Continued Confidence in Celebrex and Bextra As Treatment Options.** Pfizer's commitment to doing what's best for patients has been the basis for our response to recent concerns regarding the cardiovascular safety of Celebrex and Bextra. This means helping to ensure that doctors have relevant data available on Celebrex and Bextra so that they can make appropriate prescribing decisions for their individual patients.

Celebrex and Bextra demonstrated solid performance in 2004. Worldwide sales of Celebrex topped $3.3 billion and Bextra sales totaled nearly $1.3 billion in 2004. Fourth-quarter revenues for Celebrex ($1 billion, up 24 percent) and Bextra ($417 million, up 57 percent) were strong in absolute and growth terms. Preliminary safety information from three long-term clinical trials of Celebrex, not in arthritis but in cancer and Alzheimer's disease prevention, became available in December 2004. The resulting media and public reaction apparently contributed to a decline of the overall anti-inflammatory market in the U.S. and other major markets.

For both Bextra and Celebrex, the cardiovascular safety review that is ongoing by the EMEA's Committee for Medicinal Products for Human Use (CHMP), as well as the FDA Advisory Committee hearing that is scheduled for February 16-18, 2005, will be appropriate settings for a thorough review of all available data evaluating the benefits and risks of these important medicines.

In the interim, we believe that physicians should follow FDA guidance issued in late December and evaluate all available information on selective COX-2 inhibitors as well as both OTC and prescription non-selective non-steroidal anti-inflammatory drugs (NSAIDs), when selecting arthritis and pain therapies for their patients in need.

**Portfolio Performance.** Pfizer's strong 2004 performance extended across all of our major therapeutic areas, particularly in our

cardiovascular/metabolic portfolio. Lipitor continues to be the best-selling medicine in any category, with fourth-quarter revenues of $3.264 billion, up 23 percent, and full-year 2004 revenues of $10.862 billion, up 18 percent. The success of Lipitor is the result of an unprecedented array of clinical data supporting both efficacy and safety, further enhanced by every new study that has been released. These clear benefits have enabled Lipitor to record 87 million patient years of experience globally.

Lipitor holds more than 40 percent of the worldwide lipid-lowering market and more than 42 percent of the U.S. market in total prescriptions and continues to post strong, double-digit growth around the world. In November 2004, Lipitor achieved 23-percent growth in U.S. new prescriptions, its strongest growth in more than two years. Based on this strong demand growth, Lipitor exceeded $2 billion in U.S. sales in the fourth quarter, representing 20-percent growth over 2003.

The performance of Lipitor is driven by the wealth of clinical evidence from such trials as ASCOT-LLA, REVERSAL, CARDS, and PROVE-IT, which are shaping cholesterol management. The novel data emerging from these trials are informing treatment guidelines, such as the National Cholesterol Education Program, which now recommend that cardiovascular risk factors be managed more aggressively and holistically than in the past and for more patients than were previously considered candidates for statin therapy. Based on this emerging evidence, the Lipitor label was revised in 2004 to include a new indication for the primary prevention of cardiovascular disease in patients with multiple risk factors. Pfizer also submitted a U.S. regulatory filing in the fourth quarter of 2004 based on favorable stroke data from the CARDS trial.

In addition to the proven benefits of aggressive LDL-cholesterol lowering, the abundance of emerging data indicates early and dramatic benefits associated with Lipitor therapy. The ASCOT-LLA and CARDS trials were both stopped approximately two years early because of compelling evidence that Lipitor use prevented first cardiovascular events in patients with hypertension and diabetes, respectively. In patients with acute coronary syndrome, the PROVE-IT trial showed that Lipitor therapy helped prevent heart attacks as early as 30 days after starting treatment. Pfizer is actively investing in clinical trials to gain further insights in these areas, with studies such as TNT and IDEAL. The results of these studies may help support Lipitor and also provide the clinical foundation for Caduet, the dual therapy of Lipitor and Norvasc, demonstrating how Pfizer can leverage data to support multiple products in a given therapeutic area.

Norvasc demonstrated solid performance throughout 2004. Fourth-quarter revenues totaled $1.253 billion worldwide (up 1 percent). Norvasc reached a 52-week high with a 6.1-percent share of total prescriptions of the U.S. cardiovascular market in November 2004.

After fourteen years on the market, Norvasc remains the leading agent for treating hypertension, with its safety and efficacy proven in more than 400 trials involving more than 400,000 patients. New clinical evidence in 2004 reinforced the significant benefits of Norvasc therapy. The ASCOT trial was halted early because the results so clearly showed that Norvasc provided significant cardiovascular benefits. This is the first time a hypertensive trial using an active control has been stopped because the benefits were so apparent. The CAMELOT study and its sub-study NORMALISE further demonstrated the cardiovascular benefits associated with adding Norvasc to the treatment regimens of patients already being treated aggressively for coronary artery disease.

The benefit associated with treating cardiovascular risk factors concurrently is supported by our evolving clinical-trial program

spanning Norvasc, Lipitor, and Caduet. We expect that the full results of the ASCOT study indicating early favorable outcomes associated with Lipitor and Norvasc should further validate the premise of our new and unique medicine Caduet. By building on Lipitor and Norvasc, the gold standards in their respective classes, Caduet is an ideal physician's tool for optimizing systemic care to patients.

Since its U.S. launch in May 2004, Caduet is gaining traction due to increased product awareness and acceptance. In the fourth quarter, Caduet generated a 65-percent increase in total prescriptions over its prescription levels in the first six months post-launch. Formulary acceptance of Caduet indicates its potential for future growth, with 80 percent of patients in managed care having unrestricted access to this medicine. A sizable proportion of the Caduet business is incremental to that provided by its component compounds, with approximately 50 percent of Caduet patients not previously having been prescribed either Norvasc or Lipitor.

Our oncology portfolio generated revenues of $1.232 billion in 2004, and new clinical data continue to affirm the value of our oncology agents. Campto/Camptosar, with fourth -quarter 2004 worldwide revenues of $189 million, anchors the portfolio and is a foundation treatment for metastatic colon cancer. Its total patient share for metastatic colorectal cancer in the U.S. market as of November 2004 was 30.6 percent, representing nearly 35-percent growth in patients since January 2004. Data published in *The New England Journal of Medicine* in June 2004 demonstrated a 25-month survival benefit with Campto/Camptosar in combination with Avastin, a Genentech product, the longest-recorded survival ever seen in the treatment of metastatic colorectal cancer. There is now clear evidence that using Campto/Camptosar as standard first-line treatment results in the best survival for patients with colorectal cancer, with the least neurotoxicity. In September 2004, Pfizer acquired rights to Campto for Europe and Asia, except Japan, making it a truly global brand for Pfizer and enabling us to explore new therapeutic uses of Campto/Camptosar.

Aromasin continues to be the fastest-growing aromatase inhibitor on the U.S. market, with new-prescription growth of 128 percent through November year-to-date. This performance is driven by growing support among oncologists for switching patients from tamoxifen to Aromasin. We anticipate this growth will be fueled by landmark data, first published in *The New England Journal of Medicine* in March 2004, showing that treatment with Aromasin results in a 32-percent reduction in the risk of recurrence of breast cancer for patients switching to it after two to four years of tamoxifen therapy. Pfizer filed Aromasin in the U.S. in December 2004 for use as adjuvant treatment of postmenopausal women with breast cancer.

In the neuroscience portfolio, Zoloft achieved worldwide revenues in the fourth quarter of $959 million. Zoloft remains the number-one antidepressant prescribed in the U.S. market. While recent proposed regulatory changes to antidepressant prescribing information and the resulting heightened media attention have slowed overall market growth, we remain confident that Zoloft will continue to grow, given its unmatched breadth of indications and 13 billion patient days of safety data.

Geodon continues to experience strong growth in the atypical antipsychotic market, with full-year 2004 global sales of $467 million, up 32 percent compared to 2003. In the fourth quarter, Geodon achieved its strongest quarterly growth ever in the U.S., with an all-time new-prescription share high of 5.5 percent, and 36-percent prescription growth year over year, compared with 6-percent market growth in the same period. In August 2004, Geodon received FDA approval for bipolar acute manic and mixed episodes, more than doubling the patient population that can now benefit from Geodon.

News from Pfizer. Pfizer Inc Fourth-Quarter 2004 Performance Report

Case 1:04-cv-10981-PBS   Document 532   Filed 11/02/2006   Page 64 of 72   Page 7 of 13

Pfizer filed for the bipolar mania indication in the E.U. in the fourth quarter of 2004.

Full-year worldwide revenues for Neurontin were $2.723 billion in 2004, up 1 percent, and were $481 million in the fourth quarter of 2004, down 39 percent. The decline in the fourth quarter is due to the at-risk launch of generic gabapentin by Ivax, Alpharma, and Teva in the U.S. Pfizer subsequently launched generic gabapentin through its Greenstone subsidiary. Pfizer has sued these and other companies for patent infringement, and if the court determines that these companies have infringed Pfizer's Neurontin patent, we will seek all available remedies and damages, including Pfizer's lost profits.

Since its 2004 launches in the U.K. and Germany, Lyrica sales have outpaced those of any other agent for neuropathic pain or epilepsy during the first three months after launch. This strong early performance indicates that physicians and patients are recognizing that Lyrica offers significant benefits over existing therapies for neuropathic pain and is an important add-on therapy for uncontrolled partial epilepsy.

The rapid and sustained pain relief provided by Lyrica will be extended to even more patients as it continues to be launched in other markets worldwide. With its approval by the FDA on December 30, 2004, Lyrica becomes the first FDA-approved treatment for the two most common forms of neuropathic pain—diabetic peripheral neuropathy and post-herpetic neuralgia.

Our urology portfolio is industry-leading, with $2.634 billion in 2004 global revenue. Viagra remains one of the world's most recognized pharmaceutical brands and maintains a strong leadership position in the erectile dysfunction (ED) category with a 71-percent worldwide market share among phosphodiesterase-5 inhibitors. In the U.S., which represents 53 percent of the worldwide ED market, Viagra generated strong fourth-quarter revenues of $248 million, representing a 14-percent increase over the third quarter. Outside the U.S., Viagra growth was even stronger, with 19-percent growth versus the previous quarter. The Viagra best-in-class clinical database, improved messaging to both physicians and consumers, and innovative programs, such as the Value Card for Viagra, position this medicine for solid results in 2005.

Worldwide sales of Detrol/Detrol LA totaled $285 million in the fourth quarter of 2004, reflecting growth of 22 percent compared to the same period in 2003. Its robust performance included launches of a once-daily formulation in Latin America and Asia. As part of Pfizer's ongoing overactive bladder (OAB) research worldwide, the first validated patient screener for OAB, called the OAB-V8 screener, has been recently launched and will help physicians identify the millions of patients currently suffering with this condition.

Our allergy and respiratory portfolio is becoming more diversified and increasingly important to the company. Spiriva, co-promoted with its discoverer Boehringer Ingelheim, is firmly established as a best-in-class product in the chronic obstructive pulmonary disease (COPD) market. It represents a significant medical advance that addresses the world's fourth-leading cause of death. Spiriva is already the number-one-selling COPD product in seven countries, including Germany and Australia, and is ranked number two worldwide. Spiriva has received outstanding formulary and opinion-leader acceptance since its U.S. launch last June, with a 15.4-percent share in the maintenance COPD market. This performance has established it as the number-three brand in the U.S. in its first few months since launch. Spiriva is poised to reach blockbuster status with continued strong growth in 2005.

The infectious-disease portfolio generated $4.715 billion in Pfizer sales in 2004, supporting our position as the number-two company in

News from Pfizer. Pfizer Inc Fourth-Quarter 2004 Performance Report    Page 8 of 13

Case 1:04-cv-10981-PBS    Document 532    Filed 11/02/2006    Page 65 of 72

the antibiotic, antifungal, and antiviral sectors. Zithromax remains the leading branded antibiotic in the community-acquired pneumonia market due to its proven track record of clinical efficacy, safety, and short course of therapy. A novel microsphere formulation that delivers a full course of Zithromax therapy in a single dose has been submitted to regulatory authorities in the U.S., Germany, and other countries. This is expected to further simplify treatment and facilitate patient compliance in completing their antibiotic regimen.

Zyvox has proven to be an important treatment option for infections known or suspected to be caused by methicillin-resistant *Staphylococcus aureus* (MRSA). The annual number of Zyvox therapy days worldwide has increased 50 percent since 2003, growth that has been fueled by recent publications reporting its efficacy in treating patients with hospital-acquired pneumonia and complicated skin and soft-tissue infections caused by MRSA.

Vfend is a new-generation antifungal that achieved strong 2004 global growth of 44 percent due to increased demand and new market launches. A new indication for candidemia in neutropenic patients received a positive opinion from the EMEA, while in December 2004 the FDA approved use of Vfend for candidemia in non-neutropenic patients as well as other specified disseminated *Candida* infections.

Pfizer's ophthalmology portfolio is building on the success of Xalatan and Xalacom, which continue to outpace the growth of the total glaucoma market. Full-year Xalatan sales surpassed $1 billion in 2004, and it has displaced beta blockers as the accepted gold standard in intraocular-pressure-lowering agents. Xalacom is a combination of Xalatan and the beta-blocker timolol that provides incremental efficacy for patients who have an insufficient response to monotherapy, with the simplicity of a single daily dose.

Macugen, which was recently approved by the FDA for neovascular (wet) age-related macular degeneration (AMD), builds on our best-in-class glaucoma franchise. Co-promoted with our partner Eyetech Pharmaceuticals, Inc., Macugen is a first-in-class agent that addresses an underlying cause of AMD by blocking vascular endothelial growth factor. AMD is the leading cause of irreversible severe vision loss in patients older than 50 years of age in developed countries. Because Macugen can be used to effectively treat all forms of wet AMD, it significantly expands the number of patients who can now be treated.

**Expanded Scale: Cornerstone of Future Performance.** Pfizer has the resilience to adapt to an ever-changing market environment and to sustain long-term growth. We have overall revenue stability that transcends the volatility of individual products or markets, as well as an unmatched ability to strategically allocate resources and drive operating efficiencies. Beyond immediate operating results, we continue to invest in redefining our industry. That move is anchored in our core belief that Pfizer can uniquely take advantage of our scale to extend the value we already offer patients and their providers, from the multiple perspectives of delivering an array of new medicines that fill unmet needs; expanding our geographic presence in communities and markets around the world to ensure patients have access to our products; and finding solutions to difficult problems in our healthcare systems.

Our financial strength enables us to conduct research on a scale that can help redefine medical practice. Pfizer has combined that ability with a fully integrated portfolio-planning approach that aligns our research, development, and marketing functions in the search for new medical opportunities. We have well over 200 novel concepts in development across multiple therapeutic areas, and we are leveraging our status as the industry's partner of choice to expand our licensing operations. This is enabling Pfizer to strengthen our core

cardiovascular and neuroscience portfolios, as well as to become a powerhouse in other therapeutic areas, including oncology and ophthalmology.

We have also conducted a concerted geographic effort to expand Pfizer's presence in emerging markets worldwide, notably China, one of the world's top-ten pharmaceutical markets and among the five fastest-growing markets. According to IMS data, China's pharmaceutical market is expected to reach nearly $13 billion by 2009, with a compound annual growth rate of 14 percent. Pfizer has achieved double-digit sales growth over the last three years to become China's largest multinational pharmaceutical company. We plan to launch up to 12 new products there in the next five years.

In the U.S., we have helped to address systemic healthcare problems by offering support to high-risk, vulnerable patient populations and showing how we can achieve better health outcomes through high-quality, affordable care. We had a major success with the *Florida: A Healthy State* program, in which we found that 52 percent of patients improved physical health scores and 39 percent improved medication compliance. On a financial basis, the $61 million in savings and investment we delivered to Florida far exceeded the $37 million that was originally guaranteed. This approach to nurturing good health is also being explored in the U.K. and Italy.

Based on the case we built in Florida, Pfizer and our partner Humana have been selected to develop one of ten pilot sites under the new Medicare Chronic Care Improvement Program. This three-year project, called "Green Ribbon Health," will cover some 20,000 Medicare fee-for-service beneficiaries with diabetes and congestive heart failure in Florida. The program will provide patients with access to coordinated services that improve health and reduce overall costs. We believe this program will ultimately provide a nationwide blueprint for high-quality, affordable healthcare management.

Our longstanding value proposition has been to prove that our medicines cure disease, and this will always be our core mission. But we have now expanded our value proposition to also show that our medicines can cure not only disease but also health systems, by reducing overall healthcare costs, improving societies' economic well-being, and increasing effective prevention and treatment of disease. We look forward to elaborating on this theme throughout the next few years as we continue Pfizer's proud tradition of industry leadership and financial performance.

### New Product Approvals and Filings and Expansion of Development Pipeline Highlight R&D Achievements in 2004

"The fourth quarter of 2004 completed an extraordinarily productive year for Pfizer research and development," said Dr. John LaMattina, President, Pfizer Global Research and Development (PGRD). "During the year, PGRD or our development partners submitted five New Drug Applications (NDAs) for important new drug candidates: Macugen, Oporia (lasofoxifene), Zithromax microspheres, parecoxib, and Revatio. Including these submissions, we have completed 11 of the 20 NDA filings we targeted for the five-year period through 2006, and we are on track to achieve this ambitious goal.

Specific accomplishments during the fourth quarter included approval of two important NDAs for new molecular entities and one key supplemental NDA:

- Macugen, an anti-angiogenic vascular endothelial growth factor inhibitor for treatment of neovascular (wet) age-related macular degeneration (AMD) that Pfizer developed in partnership with its discoverer Eyetech Pharmaceuticals, Inc., was approved by the FDA on December 20, 2004. Approval followed a priority review under the FDA's Pilot 1 rolling-

submission program based on data from the companies' Phase II/III pivotal clinical trials. Macugen has also been submitted for approval in the E.U., Canada, Australia, and Brazil.

- On December 30, 2004, Lyrica, the brand name for pregabalin, a new chemical entity discovered and developed by Pfizer for the treatment of neuropathic pain associated with diabetic peripheral neuropathy and post-herpetic neuralgia, was approved by the FDA.

- On December 28, 2004, the FDA granted a supplemental approval for Pfizer's extended-spectrum antifungal agent Vfend, to treat bloodstream infections caused by *Candida* in non-neutropenic patients.

The quarter's achievements also included submission of several important regulatory filings in the U.S and E.U.:

- Revatio, the brand name for sildenafil citrate as a novel oral treatment for pulmonary arterial hypertension (PAH), was submitted to European regulators and the FDA for approval in December 2004. PAH is a life-threatening disorder affecting about 200,000 patients in North America and Europe.

- A regulatory filing for parecoxib, the injectable prodrug of valdecoxib with potential opioid-sparing benefits currently marketed in Europe under the trade name Dynastat, was submitted to the FDA in December 2004.

- A filing for use of Oporia (lasofoxifene), a selective estrogen receptor modulator, for treatment of vaginal atrophy was submitted to the FDA in December 2004. The U.S. filing of Oporia for prevention of osteoporosis was submitted in August 2004, and the product is also being developed for treatment of osteoporosis. Osteoporosis is a disease that affects some 8 million American women, with 22 million more estimated to have low bone mass, placing them at increased risk of osteoporosis.

- A regulatory filing for the use of Geodon for treating manic bipolar disorder was submitted in Europe in December 2004. Geodon was approved for this indication in the U.S. in August 2004.

- Supplemental submissions were completed in both the U.S. and Europe in December 2004 for use of Aromasin for early breast-cancer treatment.

- Data from the Collaborative Atorvastatin Diabetes Study (CARDS) were submitted to the FDA in December 2004 for inclusion in the Lipitor prescribing information.

- Pfizer submitted a supplemental filing to the FDA in December 2004 for a pediatric oral-suspension dosage form of Vfend.

The Pfizer advanced development pipeline continues to progress. Pfizer currently has four candidates in registration in the U.S.:

- Oporia (lasofoxifene), a selective estrogen receptor modulator for osteoporosis prevention and vaginal atrophy;

- Zithromax microspheres, a sustained-release form of the antibiotic Zithromax;

- Revatio, the brand name for sildenafil for treatment of pulmonary arterial hypertension; and

- parecoxib, the injectable prodrug of valdecoxib, for treatment of acute pain.

Key drug candidates advancing in late-stage development include:

- Exubera, or inhalable insulin, for type 1 and type 2 diabetes;

- indiplon, a GABA receptor modulator in development with Neurocrine Biosciences, Inc. for treatment of insomnia;
- Sutent, or SU-11248, an angiogenesis inhibitor for treatment of gastrointestinal stromal tumors and renal carcinoma;
- varenicline, a nicotine-receptor partial agonist for smoking cessation;
- Daxas, a phosphodiesterase-4 inhibitor in co-development with Altana Pharma for chronic obstructive pulmonary disease and asthma, now under regulatory review in the E.U.;
- edotecarin, a topoisomerase-1 inhibitor for colorectal cancer;
- UK-427,857, a CCR-5 receptor antagonist for HIV;
- capravirine, a non-nucleoside reverse transcriptase inhibitor for HIV;
- torcetrapib/Lipitor, a combination CETP inhibitor/statin for heart disease;
- asenapine for schizophrenia and bipolar disorder, under co-development with Akzo Nobel's Organon healthcare unit; and
- Zithromax/chloroquine for treatment of malaria.

In exploratory development, 19 clinical development candidates entered Phase II proof-of-concept testing, and 23 compounds advanced into human testing, during 2004. In discovery research, 43 new drug candidates were delivered into preclinical development during the year.

"PGRD has the scale to go where others cannot in undertaking bold new therapeutic programs of considerable size, complexity, and commercial potential," Dr. LaMattina continued. "A good example is our torcetrapib/Lipitor program. Substantial evidence from epidemiologic and experimental studies shows the potential cardioprotective effect of raising HDL-cholesterol levels. Pfizer is investigating the potential of torcetrapib/Lipitor to optimize lipid profiles through a combination of robust HDL-cholesterol raising and simultaneous LDL-cholesterol lowering. Pfizer is making an $800-million investment in the torcetrapib/Lipitor clinical program.

"Our current high level of R&D productivity will be maintained in the years to come," Dr. LaMattina concluded. "As the number of fully functional pharmaceutical R&D organizations capable of turning ideas into medicines continues to shrink, Pfizer's ability to sustain innovation and R&D productivity will become increasingly valuable, both to Pfizer shareholders and to patients everywhere."

### Pfizer Expands Patient-Access and Corporate Citizenship Initiatives

Pfizer continues to make progress in its efforts to expand patient access to medicines and healthcare resources to help people obtain the care they need. During 2004, the company launched Pfizer Helpful Answers, a comprehensive initiative that provides all uninsured Americans, regardless of age or income, with access to Pfizer medicines free or at significant savings. Helpful Answers provides one-stop shopping for a number of Pfizer access programs, including Pfizer Pfriends, a program that offers Pfizer medicines free or at substantial savings regardless of age or income. Other Pfizer programs that operate under the Helpful Answers banner offer free Pfizer medicines to the uninsured with very low incomes. In addition, Pfizer has joined Together Rx Access, a collaboration of more than ten pharmaceutical companies offering savings on more than 275 medicines to uninsured Americans under age 65.

"We understand the concerns Americans have about healthcare costs, particularly the millions of people who do not have health insurance," Dr. McKinnell said. "We see our access programs as part of the solution to this problem. These programs offer patients and

doctors choice and simplicity, and we encourage Americans to take advantage of them."

### Pfizer Well-Positioned to Meet Challenges Ahead

"These are challenging times for our company and our industry, and the years 2005-2007 represent a critical period for Pfizer," Dr. McKinnell concluded. "At the same time, we see enormous opportunities based on our unmatched global scale, financial flexibility, and the skills and resilience of our colleagues. I am confident that we will be successful in taking advantage of these opportunities and positioning Pfizer for long-term success. We continue in our unwavering commitment to create value for patients, customers, colleagues, investors, business partners, and the communities in which we work."

For additional details, please see the financial schedules, product revenue tables, and Supplemental Information.

*DISCLOSURE NOTICE: The information contained in this document and the attachments is as of January 19, 2005. The Company assumes no obligation to update any forward-looking statements contained in this document and the attachments as a result of new information or future events or developments.*

*This document and the attachments contain forward-looking information about the Company's financial results and estimates, business prospects, and products in research that involve substantial risks and uncertainties. You can identify these statements by the fact that they use words such as "will," "anticipate," "estimate," "expect," "project," "intend," "plan," "believe," and other words and terms of similar meaning in connection with any discussion of future operating or financial performance. Among the factors that could cause actual results to differ materially are the following: the success of research and development activities; decisions by regulatory authorities regarding whether and when to approve our drug applications as well as their decisions regarding labeling and other matters that could affect the commercial potential of our products; actions relating to Celebrex and/or Bextra that may be taken by the FDA and/or the European Medicines Evaluation Agency in connection with their respective reviews of the benefits and risks of COX-2-specific inhibitor medicines and related agents; the speed with which regulatory authorizations, pricing approvals, and product launches may be achieved; competitive developments affecting our current growth products; the ability to successfully market both new and existing products domestically and internationally; difficulties or delays in manufacturing; trade buying patterns; the ability to meet generic and branded competition after the loss of patent protection for our products; trends toward managed care and healthcare cost containment; possible U.S. legislation or regulatory action affecting, among other things, pharmaceutical pricing and reimbursement, including Medicaid and Medicare, and involuntary approval of prescription medicines for over-the-counter use; the potential impact of the Medicare Prescription Drug, Improvement and Modernization Act of 2003; legislation or regulations in markets outside the U.S. affecting product pricing, reimbursement, or access; contingencies related to actual or alleged environmental contamination; claims and concerns that may arise regarding the safety or efficacy of in-line products and product candidates; legal defense costs, insurance expenses, settlement costs, and the risk of an adverse decision or settlement related to product liability, patent protection, governmental investigations, ongoing efforts to explore various means for resolving asbestos litigation, and other legal proceedings; the Company's ability to protect its patents and other intellectual property both domestically and internationally; interest-rate and foreign-currency exchange-rate fluctuations; governmental laws and regulations affecting domestic and foreign operations, including tax obligations; changes in generally*

*accepted accounting principles; any changes in business, political, and economic conditions due to the threat of future terrorist activity in the U.S. and other parts of the world, and related U.S. military action overseas; growth in costs and expenses; changes in our product mix; and the impact of acquisitions, divestitures, restructurings, product withdrawals, and other unusual items, including our ability to integrate and to obtain the anticipated results and synergies from our acquisition of Pharmacia. A further list and description of these risks, uncertainties, and other matters can be found in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2003, and in its periodic reports on Forms 10-Q and 8-K.*

# # # # #

\* "Adjusted income" and "adjusted diluted earnings per share (EPS)" are defined as reported net income and reported diluted earnings per share excluding discontinued operations, the cumulative effect of a change in accounting principle, significant impacts of purchase accounting for acquisitions, merger-related costs, and certain significant items. Reconciliations to reported net income and reported diluted EPS for both the fourth quarter and the full year are provided within this document.

▶ **Additional Information**

## Financial Data / Information

- Condensed Consolidated Statement of Income (Unaudited) (PDF)
- Reconciliation from Reported Income and Earnings Per Share to Adjusted Income and Earnings Per Share (Unaudited) (PDF)
- Segment/Product Revenues - Fourth Quarter 2004 (Unaudited) (PDF)
- Segment/Product Revenues - Twelve Months 2004 (Unaudited) (PDF)

## Supplemental Information

- Questions and Answers (PDF)

If you do not have Adobe® Acrobat® Reader, download it here. It is available without charge from Adobe®. This link is provided as a convenience. Pfizer is not responsible for the content of this linked page.

Copyright © 2002-2006 Pfizer Inc. All rights reserved | Terms of Use

The product information provided in this site is intended only for residents of the United States. The products discussed herein may have different product labeling in different countries.

**Stock Quote Disclaimer**
20 minute delayed data provided by CCBN. Charts are provided by MarketWatch. Pfizer makes no claims concerning the accuracy of the information provided on these pages, and will not be held liable for any use of this information. Note: Historical and current stock price performance data is not necessarily indicative of future performance.

Pfizer Inc is a pharmaceutical company committed to helping people improve their health by discovering and developing medicines.



# PFIZER INC
## SEGMENT/PRODUCT REVENUES
## FOURTH QUARTER 2004
### (UNAUDITED)
#### (millions of dollars)

### QUARTER-TO-DATE

| | WORLDWIDE | | | U.S. | | | INTERNATIONAL | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2004 | 2003 | % Change | 2004 | 2003 | % Change | 2004 | 2003 | % Change |
| **TOTAL REVENUES** | 14,924 | 13,981 | 7 | 8,417 | 8,319 | 1 | 6,507 | 5,662 | 15 |
| | | | | | | | | | |
| **HUMAN HEALTH** | 13,101 | 12,351 | 6 | 7,616 | 7,569 | 1 | 5,485 | 4,782 | 15 |
| - CARDIOVASCULAR AND METABOLIC DISEASES | 5,150 | 4,644 | 11 | 2,830 | 2,590 | 9 | 2,320 | 2,054 | 13 |
| LIPITOR | 3,264 | 2,648 | 23 | 2,023 | 1,684 | 20 | 1,241 | 964 | 29 |
| NORVASC | 1,253 | 1,245 | 1 | 619 | 585 | 6 | 634 | 660 | (4) |
| ACCUPRIL/ACCURETIC | 165 | 208 | (21) | 90 | 133 | (32) | 75 | 75 | - |
| CARDURA | 168 | 167 | 1 | 1 | 5 | (76) | 167 | 162 | 3 |
| CADUET | 15 | 0 | - | 15 | 0 | - | 0 | 0 | - |
| - CENTRAL NERVOUS SYSTEM DISORDERS | 2,020 | 2,197 | (8) | 1,364 | 1,603 | (15) | 656 | 594 | 10 |
| ZOLOFT | 959 | 898 | 7 | 768 | 726 | 6 | 191 | 172 | 11 |
| NEURONTIN | 481 | 788 | (39) | 352 | 642 | (45) | 129 | 146 | (12) |
| GEODON | 143 | 105 | 36 | 118 | 89 | 32 | 25 | 16 | 58 |
| XANAX / XR | 106 | 96 | 10 | 37 | 35 | 6 | 69 | 61 | 12 |
| ARICEPT* | 87 | 74 | 17 | 0 | 0 | - | 87 | 74 | 17 |
| RELPAX | 54 | 28 | 91 | 33 | 14 | 131 | 21 | 14 | 50 |
| -ARTHRITIS AND PAIN | 1,607 | 1,231 | 31 | 1,108 | 858 | 29 | 499 | 373 | 34 |
| CELEBREX | 1,008 | 810 | 24 | 719 | 587 | 22 | 289 | 223 | 30 |
| BEXTRA | 417 | 266 | 57 | 346 | 242 | 43 | 71 | 24 | 196 |
| - INFECTIOUS AND RESPIRATORY DISEASES | 1,339 | 1,594 | (16) | 776 | 1,091 | (29) | 563 | 503 | 12 |
| ZITHROMAX | 675 | 791 | (15) | 545 | 665 | (18) | 130 | 126 | 3 |
| DIFLUCAN | 139 | 319 | (56) | 1 | 188 | (99) | 138 | 131 | 5 |
| ZYVOX | 135 | 78 | 73 | 99 | 57 | 74 | 36 | 21 | 72 |
| VFEND | 83 | 62 | 35 | 33 | 28 | 18 | 50 | 34 | 49 |
| - UROLOGY | 769 | 757 | 1 | 461 | 483 | (5) | 308 | 274 | 12 |
| VIAGRA | 469 | 509 | (8) | 248 | 301 | (18) | 221 | 208 | 6 |
| DETROL/ DETROL LA | 285 | 234 | 22 | 207 | 176 | 17 | 78 | 58 | 35 |
| - ONCOLOGY | 380 | 252 | 51 | 162 | 100 | 62 | 218 | 152 | 43 |
| CAMPTOSAR | 189 | 83 | 129 | 123 | 69 | 78 | 66 | 14 | 377 |
| ELLENCE | 90 | 94 | (4) | 18 | 26 | (32) | 72 | 68 | 6 |
| - OPHTHALMOLOGY | 353 | 286 | 23 | 123 | 110 | 12 | 230 | 176 | 31 |
| XALATAN / XALCOM | 353 | 286 | 23 | 123 | 110 | 12 | 230 | 176 | 31 |
| - ENDOCRINE DISORDERS | 257 | 227 | 13 | 84 | 69 | 22 | 173 | 158 | 9 |
| GENOTROPIN | 200 | 205 | (2) | 57 | 67 | (15) | 143 | 138 | 4 |
| - ALL OTHER | 981 | 1,030 | (5) | 554 | 597 | (7) | 427 | 433 | (2) |
| ZYRTEC | 349 | 358 | (3) | 349 | 358 | (2) | 0 | 0 | - |
| - ALLIANCE REVENUE  (Aricept, Mirapex, Rebif and Spiriva) | 245 | 133 | 85 | 154 | 68 | 126 | 91 | 65 | 42 |
| **CONSUMER HEALTHCARE** | 992 | 878 | 13 | 490 | 442 | 11 | 502 | 436 | 15 |
| **ANIMAL HEALTH** | 566 | 508 | 11 | 231 | 211 | 9 | 335 | 297 | 13 |
| **OTHER \*\*** | 265 | 244 | 9 | 80 | 97 | (17) | 185 | 147 | 26 |

\*    -  Represents direct sales under license agreement with Eisai Co., Ltd.

\*\*   -  Includes Capsugel and PCS.

Certain amounts and percentages may reflect rounding adjustments.

Certain prior year data have been reclassified to conform to the current year presentation.

# PFIZER INC
## SEGMENT/PRODUCT REVENUES
## TWELVE MONTHS 2004
### (UNAUDITED)
**(millions of dollars)**

YEAR-TO-DATE

| | WORLDWIDE | | | U.S. | | | INTERNATIONAL | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2004 | 2003 | % Change | 2004 | 2003 | % Change | 2004 | 2003 | % Change |
| **TOTAL REVENUES** | **52,516** | **44,736** | **17** | **29,539** | **26,795** | **10** | **22,977** | **17,941** | **28** |
| | | | | | | | | | |
| **HUMAN HEALTH** | **46,133** | **39,425** | **17** | **26,583** | **24,100** | **10** | **19,550** | **15,325** | **28** |
| **- CARDIOVASCULAR AND METABOLIC DISEASES** | **17,682** | **16,008** | **10** | **9,331** | **8,835** | **6** | **8,351** | **7,173** | **16** |
| LIPITOR | 10,862 | 9,231 | 18 | 6,634 | 5,826 | 14 | 4,228 | 3,405 | 24 |
| NORVASC | 4,463 | 4,336 | 3 | 1,991 | 1,934 | 3 | 2,472 | 2,402 | 3 |
| ACCUPRIL/ACCURETIC | 665 | 706 | (6) | 387 | 444 | (13) | 278 | 262 | 7 |
| CARDURA | 628 | 594 | 6 | 6 | 18 | (64) | 622 | 576 | 8 |
| CADUET | 50 | 0 | - | 49 | 0 | - | 1 | 0 | - |
| **- CENTRAL NERVOUS SYSTEM DISORDERS** | **8,092** | **7,378** | **10** | **5,668** | **5,485** | **3** | **2,424** | **1,893** | **28** |
| ZOLOFT | 3,361 | 3,118 | 8 | 2,657 | 2,502 | 6 | 704 | 616 | 14 |
| NEURONTIN | 2,723 | 2,702 | 1 | 2,198 | 2,204 | - | 525 | 498 | 5 |
| GEODON | 467 | 353 | 32 | 385 | 303 | 27 | 82 | 50 | 65 |
| XANAX / XR | 378 | 238 | 59 | 123 | 94 | 30 | 255 | 144 | 78 |
| ARICEPT* | 308 | 254 | 22 | 0 | 0 | - | 308 | 254 | 22 |
| RELPAX | 169 | 85 | 99 | 100 | 43 | 134 | 69 | 42 | 63 |
| **-ARTHRITIS AND PAIN** | **5,203** | **3,046** | **71** | **3,608** | **2,037** | **77** | **1,595** | **1,009** | **58** |
| CELEBREX** | 3,302 | 1,883 | 75 | 2,363 | 1,323 | 79 | 939 | 560 | 68 |
| BEXTRA** | 1,286 | 687 | 87 | 1,116 | 641 | 74 | 170 | 46 | 271 |
| **- INFECTIOUS AND RESPIRATORY DISEASES** | **4,715** | **4,677** | **1** | **2,664** | **2,942** | **(9)** | **2,051** | **1,735** | **18** |
| ZITHROMAX | 1,851 | 2,010 | (8) | 1,393 | 1,577 | (12) | 458 | 433 | 6 |
| DIFLUCAN | 945 | 1,176 | (20) | 417 | 662 | (37) | 528 | 514 | 3 |
| ZYVOX | 463 | 181 | 156 | 339 | 130 | 160 | 124 | 51 | 145 |
| VFEND | 287 | 200 | 44 | 118 | 93 | 28 | 169 | 107 | 57 |
| **- UROLOGY** | **2,634** | **2,457** | **7** | **1,539** | **1,533** | **-** | **1,095** | **924** | **18** |
| VIAGRA | 1,678 | 1,879 | (11) | 886 | 1,103 | (20) | 792 | 776 | 2 |
| DETROL/ DETROL LA | 904 | 544 | 66 | 633 | 413 | 53 | 271 | 131 | 108 |
| **- ONCOLOGY** | **1,232** | **713** | **73** | **554** | **355** | **56** | **678** | **358** | **89** |
| CAMPTOSAR | 554 | 299 | 86 | 449 | 268 | 67 | 105 | 31 | 247 |
| ELLENCE | 344 | 216 | 59 | 66 | 56 | 18 | 278 | 160 | 74 |
| **- OPHTHALMOLOGY** | **1,227** | **668** | **84** | **419** | **258** | **63** | **808** | **410** | **97** |
| XALATAN / XALCOM | 1,227 | 668 | 84 | 419 | 258 | 63 | 808 | 410 | 97 |
| **- ENDOCRINE DISORDERS** | **925** | **550** | **68** | **298** | **187** | **59** | **627** | **363** | **72** |
| GENOTROPIN | 736 | 481 | 53 | 208 | 162 | 29 | 528 | 319 | 65 |
| **- ALL OTHER** | **3,702** | **3,169** | **17** | **2,090** | **1,983** | **5** | **1,612** | **1,186** | **36** |
| ZYRTEC | 1,287 | 1,338 | (4) | 1,287 | 1,338 | (4) | 0 | 0 | - |
| **- ALLIANCE REVENUE*** (Aricept, Bextra, Celebrex, Mirapex, Rebif and Spiriva)** | **721** | **759** | **(5)** | **412** | **485** | **(15)** | **309** | **274** | **13** |
| **CONSUMER HEALTHCARE** | **3,516** | **2,949** | **19** | **1,780** | **1,649** | **8** | **1,736** | **1,300** | **34** |
| **ANIMAL HEALTH** | **1,953** | **1,598** | **22** | **878** | **738** | **19** | **1,075** | **860** | **25** |
| **OTHER ****** | **914** | **764** | **20** | **298** | **308** | **(3)** | **616** | **456** | **35** |

On April 16, 2003, Pfizer completed its acquisition of Pharmacia Corporation ("Pharmacia") and Pfizer
and Pharmacia combined operations. The acquisition has been accounted for as a purchase under accounting principles
generally accepted in the United States of America. Reported results of operations of Pfizer issued after completion
of the acquisition have not been restated retroactively to reflect the historical results of operations of Pharmacia.

\*    -    Represents direct sales under license agreement with Eisai Co., Ltd.

\*\*    -    Includes direct sales under license agreement with Pharmacia in 2003 prior to merger.

\*\*\*    -    Includes alliance revenue for Bextra and Celebrex under copromotion agreements with Pharmacia in 2003 prior to merger.

\*\*\*\*    -    Includes Capsugel and PCS.

Certain amounts and percentages may reflect rounding adjustments.
Certain prior year data have been reclassified to conform to the current year presentation.