UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ ) | |
| **IN RE: NEURONTIN MARKETING, SALES** ) | |
| **PRACTICES, AND PRODUCTS LIABILITY** ) | |
| **LITIGATION** ) | |
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ ) | |
| **THIS DOCUMENT RELATES TO:** ) | |
| ) | **MDL NO. 1629** |
| ASSURANT HEALTH, INC. et al. v. ) | **CIVIL ACTION NO.** |
| PFIZER INC. et a., No. 05-cv-10535-PBS ) | **04-10981-PBS** |
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ ) | |

**MEMORANDUM AND ORDER**

November 9, 2006

Saris, U.S.D.J.

**I.  INTRODUCTION**

This case involves the sale, marketing and pricing of the drug Neurontin.  Plaintiff third party payors brought this action against the non-diverse drug manufacturer Pfizer, Inc., and others, in New Jersey state court asserting state causes of action,[1] and Defendants removed.  It was then transferred to this Court as part of the Neurontin Multi-district Litigation (MDL).  See In re Neurontin Mktg. & Sales Practices Litig., 342 F. Supp.

‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾

[1] Plaintiffs assert the following state law claims against Defendants: (1) unlawful restraint of trade involving the fraudulent promotion of the drug Neurontin (counts I-XII); (2) unlawful monopolization in violation of various state laws arising from a course of "sham" litigation directed against various manufacturers of generic Neurontin bioequivalents and other abuses of the legal and regulatory system (counts XIII-XXIV); (3) unfair and deceptive trade practices in violation of various state consumer protection laws (counts XXV-XLIII); (4) tortious interference with business relations (count XLIV); and (5) unjust enrichment (count XLV).

2d 1350 (J.P.M.L. 2004).

Pfizer's conduct in selling, marketing and pricing the drug Neurontin has now generated two separate MDLs. Claims arising out of the drug's off-label marketing and sales practices have been consolidated in this Court. Plaintiffs allege that Defendants aggressively marketed Neurontin for certain unapproved, "off-label" conditions, and that such efforts defrauded third party payors and consumers, and injured certain people who took the drug for unsafe "off-label" uses. See, e.g., Harden Mfg. Corp. v. Pfizer Inc.(In re Neurontin Mktg., Sales Practices & Prods. Liab. Litig.), 433 F. Supp. 2d 172 (D. Mass. 2006).

Lawsuits have also been filed on the basis of alleged anticompetitive behavior on the part of Defendants. These actions charge that Defendants unlawfully abused the legal and regulatory system to increase and expand market share by wrongfully excluding generic competitors and monopolizing the market for Neurontin. These suits have been consolidated in multi-district litigation before Judge Lifland in New Jersey. See, e.g., Sall v. Pfizer, Inc., Zafarana v. Pfizer, Inc. (In re Neurontin Antitrust Litig.), MDL Docket No. 1479, C.A. Nos. 02-3988, 02-2741 (D.N.J. 2006) [hereinafter, "Sall/Zafarana"]. Additionally, cases spawned by Defendants' patent enforcement claims against generic competitors have also been consolidated in Judge Lifland's court. See, e.g., In re Gabapentin Patent

2

Litigation, MDL Docket No. 1384, 2005 U.S. Dist. LEXIS 37655 (D.N.J. Aug. 25, 2005).  The claims alleged in the Complaint span the conduct at issue in these MDLs.

Plaintiffs have moved to remand to state court.  The motion was referred to Magistrate Judge Sorokin, who held a hearing on August 19, 2005, and issued a Report and Recommendation ("Report") in favor of remand on August 4, 2006.  (Docket No. 418.)  In a thoughtful and well-reasoned opinion, Judge Sorokin found that despite the many practical considerations weighing in favor of retaining federal jurisdiction over their claims, Plaintiffs had failed to pose a substantial federal question unsupported by alternative state law theories as required by Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 808-09 (1988).  Defendants objected on the ground that Plaintiffs' monopolization claims require resolution of substantial questions of patent law.  This Court heard arguments on September 27, 2006. After hearing and review of the briefs, Plaintiffs' motion to remand is **DENIED**.[2]

---

[2]Judge Sorokin ruled on various procedural issues as well. Those rulings have not been appealed and I adopt them.

## II.  FACTUAL BACKGROUND

**A.  Background**[3]

Defendants began marketing the drug gabapentin under the brand name Neurontin in 1993.  (Compl. at ¶ 29.)  Neurontin was approved by the Food and Drug Administration ("FDA") only in doses of up to 1800mg/day and only in adjunctive therapy for adults with epilepsy.  (<u>Id.</u>)  This limited approval significantly restricted the market for Neurontin, and therefore its sales potential.  Moreover, the drug's patent protection period was short, expiring in 1998 for gabapentin and in 2000 for the use of gabapentin to treat epilepsy.  (<u>Id.</u> ¶ 30.)  Pfizer knew that when this patent protection ended, prices would drop considerably as a result of competition between Neurontin and generic bioequivalents.  (<u>Id.</u>)  Competition of this sort can reduce a drug's sale price to below 80% of its initial, patented retail cost.  (<u>Id.</u>)  From 1993 until late 2004, Pfizer controlled the market in the United States for Neurontin, which allowed it to set artificially high or supra-competitive prices.  (<u>Id.</u> ¶ 31.)

Plaintiffs allege that in the mid-1990s, Defendants devised and executed an illegal scheme to expand and extend market share

---

[3]For a more detailed description of the circumstances surrounding Defendants promotion of Neurontin, see <u>Harden Mfg. Corp. v. Pfizer Inc. (In re Neurontin Mktg., Sales Practices & Prods. Liab. Litig.</u>), 433 F. Supp. 2d 172 (D. Mass. 2006); <u>see also United States ex rel. Franklin v. Parke-Davis</u>, 2003 U.S. Dist. LEXIS 15754 (D. Mass. 2003) (qui tam action).

and power through a false, deceptive, and misleading marketing campaign and misuse of the legal and regulatory system. (Id. ¶ 32.) Defendants sought to increase demand for Neurontin and to delay or prevent the entry of generic versions of the drug by, among other things, bringing sham infringement actions against potential competitors and abusing the patent system. (Id.)

### 1. Fraudulent Marketing

Plaintiffs allege that Defendants implemented a false, deceptive, and misleading marketing campaign to convince the public that Neurontin was safe for certain "off-label" uses that were, in fact, neither safe nor effective. (Id. ¶ 35.) Defendants represented through a concerted and fraudulent marketing campaign that Neurontin was effective at doses higher than the 1800mg/day approved by the FDA, and for a range of unapproved conditions including psychiatric disorders, like anxiety, Attention Deficit Disorder, depression, and bipolar; restless leg syndrome; migraines; alcohol withdrawal; spinal cord injury; tremors; Amytrophic Lateral Sclerosis (ALS); painful diabetic and peripheral neuropathy; reflex sympathetic dystrophy; and general pain management. (Id. ¶ 36.) These representations were false, deceptive and misleading, or lacked sufficient scientific support. (Id.)

In the course of this fraudulent campaign, Pfizer:

- misrepresented the independence, role, and credentials of its medical liaisons (Id. ¶ 37(A));

5

- misrepresented the independence, scientific validity, results, and existence of medical studies or clinical trials regarding Neurontin's lack of effectiveness for certain conditions (Id. ¶ 37(B));

- published false and misleading articles regarding the drug's efficacy (Id. ¶ 37(C));

- misrepresented the purpose and independence of educational presentations (Id. ¶ 37(D));

- paid doctors to prescribe Neurontin for unproven and potentially dangerous off-label uses under the guise of consulting or speaking fees, or to participate in purported studies of little or no scientific value (Id. ¶ 37(E); and

- developed and launched a false advertising campaign touting Neurontin's unproven off-label indications (Id. ¶ 37(E)).

This conduct was intended to, and did in fact, substantially increase the incidence of Neurontin prescriptions, such that sales of the drug reached approximately $1.7 billion in 2003. (Id. ¶ 42.)

As part of this campaign, Defendants entered into agreements with doctors, providers, marketing firms, and other independent entities to unreasonably restrain trade, further anticompetitive goals, and improperly expand and extend market share and power. (Id. ¶ 38.)  Defendants paid these entities to promote Neurontin with false, deceptive, and misleading representations and to prescribe the drug in place of alternative medications.  (Id.) As a result, Plaintiffs were forced to reimburse those insured under their plans for Neurontin; but for Defendants' false representations, Neurontin would not have been prescribed.  (Id.

¶ 44.)  Absent such promotion, Plaintiffs would have taken steps
to prevent or discourage the purchase of Neurontin at the prices
set by Defendants. (Id. ¶ 45.)

   **2.  Abuse of the Legal and Regulatory System**

   In addition to their alleged deceptive marketing practices,
Defendants sought to restrain competition and prevent producers
of generic bioequivalents from entering the market by misusing
the legal and regulatory system to harass, intimidate, and
interfere with competitors.  (Id. ¶ 45.)  Specifically,
Plaintiffs allege that Defendants engaged in a series of "sham"
lawsuits against manufacturers and distributors who intended to
make generic bioequivalents available to the public.  (Id. ¶ 46.)
These suits were "objectively baseless," and Defendants knew at
the time each suit was filed that the generic bioequivalents of
Neurontin would not infringe any valid and enforceable patent,
and that the lawsuits were objectively baseless.  These suits
were calculated to discourage or prevent competitors from
entering the market.  (Id. ¶ 47.)

   Plaintiffs also charge that Defendants intentionally made
false representations to the FDA when listing patents in the
"Orange Book" in an attempt to harass and intimidate generic
competitors and to delay or forestall competition.  (Id. ¶ 48.)[4]

_____

   [4] While the regulatory environment of the Orange Book is
complex, a brief overview of relevant aspects of the drug
approval process is helpful to understand the claims alleged

Plaintiffs allege that Defendants misrepresented the scope and validity of their patents in their Orange Book listings at the Food and Drug Administration ("FDA"), and represented that claims of patent infringement could reasonably be asserted against potential generic competitors when, in fact, they could not. (Id.)  Defendants knew that by making such representations, they could substantially delay generic competitors from entering the market.  (Id. ¶ 50.)  By gaming the regulatory system in these ways, Defendants unlawfully monopolized the market for gabapentin, causing Plaintiffs to pay substantially more for Neurontin than if there had been competition from producers of generic bioequivalents.  (Id. ¶ 53.)

### III.  STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 72, magistrate judge orders regarding "dispositive" motions are reviewed de novo, while orders ruling on non-dispositive matters are set aside only if "clearly erroneous" or "contrary to law."  There is a split of authority as to whether a magistrate's report granting a motion to remand qualifies as "dispositive" under Rule 72.  See Unauthorized Practice of Law Comm. v. Gordon, 979 F.2d 11, 13 (1st Cir. 1992) (noting the "conflicting caselaw on this issue" but declining to enter "the fray").  I agree with the caselaw

---

here.  For a more detailed look at the Orange Book and its regulatory backdrop, see Andrx Pharm., Inc. v. Biovail Corp., 276 F.3d 1368, 1370-1371 (Fed. Cir. 2002).

concluding that a motion to remand is a dispositive motion because it is akin to a dismissal for lack of subject matter jurisdiction.  See, e.g., Giangola v. Walt Disney World Co., 753 F. Supp. 148, 152 (D.N.J. 1990) ("Perhaps no issue is so accurately described as dispositive as a [remand] determination which will destroy or uphold the Court's jurisdiction.").  But see McDonough v. Blue Cross, 131 F.R.D. 467, 468 (D. Pa. 1990) ("Remand of a case to state court is a nondispositive action."). Therefore, this Court will review the Magistrate Judge's Report de novo.

## IV.   DISCUSSION

### A.   A Claim vs. a Theory

An action filed in state court may be removed to federal court "if it qualifies as a 'civil action . . . of which the district courts of the United States have original jurisdiction.'"  Rivet v. Regions Bank of La., 522 U.S. 470, 474 (1998) (quoting 28 U.S.C. § 1441).  However, "[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded."  28 U.S.C. § 1447(c).  The removal statute should be strictly construed, and defendants have the burden of showing the federal court's jurisdiction.  Danca v. Private Health Care Sys., 185 F.3d 1, 4 (1st Cir. 1999) (citations omitted).

Federal district courts have original jurisdiction over

claims "relating to patents."  28 U.S.C. § 1338(c).  The Supreme
Court has explained that federal question jurisdiction in this
context "extends over 'only those cases in which a well-pleaded
complaint establishes either [1] that federal law creates the
cause of action or [2] that the plaintiff's right to relief
necessarily depends on resolution of a substantial question of
federal law' in that 'federal law is a necessary element of one
of the well-pleaded . . . claims.'"  <u>Christianson</u>, 486 U.S. at
808 (quoting <u>Franchise Tax Bd. v. Const. Laborers Vac. Trust</u>, 463
U.S. 1, 13 (1983)).  A claim implicating a substantial federal
question but "supported by alternative [state law] theories in
the complaint may not form the basis for § 1338 jurisdiction
<u>unless patent law is essential to each of those theories</u>."
<u>Christianson</u>, 486 U.S. at 810 (emphasis added).

In order to determine whether federal jurisdiction exists
over Plaintiffs' claims, "[t]he question is whether at least one
federal aspect of [the] complaint is a logically separate claim,
rather than merely a separate theory that is part of the same
claim as a state-law theory."  <u>Broder v. Cablevision Sys. Corp.</u>,
418 F.3d 187, 195 (2d Cir. 2005) (citing <u>Christianson</u>, 486 U.S.
at 807-09).

"One of the key characteristics of a mere 'theory,' as
opposed to a distinct 'claim,' is that a plaintiff may obtain the
relief he seeks without prevailing on it."  <u>Broder</u> 418 F.3d at
195 (citing <u>Christianson</u>, 486 U.S. at 810-13).  "Even though

state law creates appellant's causes of action, its case might
still 'arise under' the laws of the United States if a well-
pleaded complaint established that <u>its right to relief</u> under
state law requires resolution of a substantial question of
federal law in dispute between the parties." <u>Franchise Tax Bd.</u>,
463 U.S. at 12 (emphasis added); <u>see, e.g.,</u> <u>Christianson</u>, 486
U.S. at 810 ("If 'on the face of a well-pleaded complaint there
are . . . reasons completely unrelated to the provisions and
purposes of [the patent laws] why the [plaintiff] <u>may or may not</u>
<u>be entitled to the relief it seeks</u>,' then the claim does not
'arise under' those laws.") (emphasis added) (quoting <u>Franchise</u>
<u>Tax Bd.</u>, 463 U.S. at 26 & n.29).  Thus, one critical benchmark
for the existence of a claim, as opposed to a theory, is the
relief it provides.

     In determining whether a claim arises under federal law in a
non-patent context, the Supreme Court recently held that where
federal law does not create the cause of action, "the question
is, does a state-law claim necessarily raise a stated federal
issue, actually disputed and substantial, which a federal forum
may entertain without disturbing any congressionally approved
balance of federal and state judicial responsibilities." <u>Grable</u>
<u>& Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.</u>, 545 U.S. 308,
314 (2005).  Because the question whether a claim arises under
§1338(c) is similar to the question whether a claim arises under

§1331, the policies underpinning the Grable opinion are
applicable here.  See Christianson, 486 U.S. at 808.

Mindful that artful pleadings cannot defeat jurisdiction,
this Court must (1) ascertain which portions of the Complaint
comprise distinct "claims," and which amount only to different
"theories" supporting those claims; (2) determine whether
resolution of a substantial and disputed question of patent law
is a necessary element of one of the well pleaded claims; and (3)
assess whether the federal forum may entertain the claim without
disturbing any congressionally approved balance of federal and
state responsibilities.  This area of the law is like quicksand.

The analysis must begin with the opinion of the magistrate
judge.  At the urging of Plaintiffs, the Magistrate Judge treated
Plaintiffs' unlawful restraint of trade counts (I-XII) and
monopolization counts (XIII-XXIV) as one category with
alternative theories of liability.  (See Report, Docket No. 418,
at 11 n.3 ("The Assurant Plaintiffs agree that the Court should
treat all the claims within a category as one.").)  Aggregating
all the monopolization claims (Counts I-XXIV) into a bundle, the
Magistrate Judge determined that Plaintiffs had advanced in
support of their antitrust allegations "one non-federal theory:
that defendants paid doctors, in the guise of speaking or
consulting fees, to prescribe Neurontin for off-label purposes."
(Report, Docket No. 418, at 12.)  He recognized that the
fraudulent marketing theory, on its own, "only supports recovery

12

for purchasers of Neurontin for off-label uses." Nonetheless, he held that because "the theory might support recovery for only some, rather than all, of the Neurontin that plaintiffs purchased, _i.e._, that it supports recovery for only some rather than all of plaintiffs possible damages, does not mean the theory fails to support the unlawful monopolization claims." (_Id._) Therefore, he found that plaintiffs had failed to state a claim unsupported by any state law theory and, under _Christianson_, recommended remand to the New Jersey state courts.

Defendants object, arguing that the Plaintiffs' unlawful monopolization allegations constitute independent claims which require resolution of a substantial question under the federal patent laws and are unsupported by any state law theory. As such, these allegations implicate "a _different_ theory of relief for a _different_ cause of action based on _different_ factual allegations for _different_ plaintiffs and for _different_ damages," and therefore survive in federal court under _Christianson_. (Defs. Objection Mem. at 13, Docket No. 436.)

Consistent with the position taken before the Magistrate
Judge, Plaintiffs counter that the Complaint alleges a single
"overarching scheme to increase Neurontin®'s sales by engaging in
a two-pronged, and overlapping, scheme to market its unapproved
uses while at the same time delaying generic competition."
(Plaintiff's Sur-Reply at 2, Docket No. 500.)  Through this
multi-faceted prism, the allegations of sham litigation and abuse
of the legal and regulatory system amount to nothing more than an
alternative "theory" for the anti-trust claims under <u>Christianson</u>
and do not support jurisdiction in this Court.

The key question, then, is whether Plaintiffs' unlawful
monopolization counts are separate claims or separate theories of
antitrust liability.  Plaintiffs charge unlawful monopolization:

> By interfering with or preventing a generic bioequivalent
> of Neurontin from entering the market, Defendants injured
> Plaintiffs . . . by causing them to pay more than they
> otherwise would have paid. . . . During the relevant
> period, <u>Plaintiffs did not have an opportunity to fully
> benefit from competition among generic bioequivalents of
> Neurontin and Neurontin</u>.

(Compl. at ¶ 52 (emphasis added); <u>see</u> <u>also</u> <u>id.</u> ¶ 31 ("[T]he
relevant product market is Neurontin and its generic
bioequivalents. . . .").)  As Plaintiffs explain:

> If a generic bioequivalent of a brand-name drug exists
> and the physician has not specifically restricted the
> prescription to the brand-name drug, then for patients
> covered by Plaintiffs' plans, the pharmacist will fill
> the prescription with the less expensive, but
> bioequivalent, generic drug. In fact, in some states . .
> . a pharmacist is statutorily required to fill a
> prescription with a generic bioequivalents of a brand-
> name drug where the physician has not restricted

14

substitution.

(Id. ¶ 54.)  Significantly, in the monopolization counts,
Plaintiffs specifically allege, "This course of conduct included
filing baseless patent infringement lawsuits against potential
competitors seeking to manufacture and market generic
bioequivalents of Neurontin."  (Id. ¶ 156.)  The relief sought
for this injury is the difference in price between Neurontin and
a generic bioequivalent.  (See Compl. at ¶¶ 52, 155-160; Hr'g Tr.
at 5:25, Sept. 27, 2006.)

Plaintiffs concede, as they must, that this recovery based
on on-label activities is unavailable under the fraudulent
marketing theories based on off-label activities.  As Judge
Lifland observed, even if Plaintiff's allegations about off-label
marketing enable certain class members to recover damages for
off-label sales, those allegations would not permit recovery of
damages for all sales of Neurontin attributable to the difference
in price between the branded product and a potential generic
competitor.  The latter is recoverable only if Plaintiffs can
show that Defendants' patent litigation was a sham.  See
Sall/Zafarana, C.A. 02-3988, at *16.  Therefore, because
Plaintiffs' right to relief depends on the resolution of a
substantial question of patent law -- was the patent valid and
infringed -- federal law is an essential element of the well-
pleaded monopolization claims.

15

**B.   Substantial-and-Disputed**

Plaintiffs argue that recourse to the federal patent laws is
not essential to succeed on their unlawful monopolization claims
under state law because they only need to prove anti-competitive
intent in the initiation of the patent infringement suits.  Some
courts have held that an allegation of an impure heart in
launching improper patent infringement actions does not
necessarily a federal question make.  See, e.g., In re Cardizem
CD Antitrust Litig., 90 F. Supp. 2d 819, 839 (E.D. Mich. 1999)
(allegations of "impure heart" when filing patent infringement
suit did not turn on validity of defendant's patent, and
therefore did not raise a substantial federal question); Aetna
U.S. Healthcare, Inc. v. Hoechst Aktiengesellschaft, 54 F. Supp.
2d 1042, 1053 (D. Kan. 1999) (where plaintiff's unfair
competition claims did not implicate the validity of defendants'
patents but turned on whether defendants initiated patent
litigation for the sole purpose of competing unfairly in
violation of state law, remand was proper).[5]  Cf. Williams v.

_____

[5]A number of decisions, like Cardizem and Aetna, have
remanded cases which raise claims of anticompetitive conduct
similar, at first glance, to those at issue in the present
litigation.  See, e.g., Ciproflaxin Hydrochloride Antitrust
Litigation, 166 F. Supp. 2d 740 (E.D.N.Y. 2001); McGrew v.
Schering-Plough Corp., No. 01-2311-GTV, 2001 WL 950790 (D. Kan.
Aug. 6, 2001); Altman v. Bayer Corp., 125 F. Supp. 2d 666
(S.D.N.Y. 2000); Drug Mart Pharmacy Corp. v. Abbot Labs., No. 00-
631-CV, slip op. (E.D.N.Y. Aug. 28, 2000).  But as one court
noted, "[i]n the majority of cases that decided in favor of
remand, Plaintiffs alleged that Defendants engaged in something

<u>Delmonte Fresh Produce Co.</u>, 325 F. Supp. 2d 855 (M. D. Tenn. 2004) (holding that remand may be appropriate where patent scope and validity are not substantial and actually disputed issues).

But in the context of this case, the scope and validity of the patents are critical to a determination of whether the litigation against the generics was a sham -- and that legal question has been hotly disputed. <u>See</u> <u>e.g.</u> <u>Warner-Lambert Co. v. Apotex, Inc.</u>, 316 F.3d 1348, 1353 (Fed. Cir. 2003). In the MDL in New Jersey, Judge Lifland rejected a similar argument:

> [T]he state law competition claims . . . cannot be resolved without deciding substantial issues of federal law, i.e., the validity, enforceability, and infringement of defendants' patents. Defendants' ability to stave off competition stands or falls on the scope of its patents and the rights flowing therefrom. A determination of the scope of Defendants' patents is a necessary part of Plaintiff's claims in the first instance and not . . . merely invoked as a defense. In short, the legitimacy of Defendants' conduct depends directly on the scope of the patents.

<u>Sall/Zafarana</u>, C.A. No. 02-3988, at *17-18. Similarly, in <u>Stuart v. Pfizer</u>, C.A. No. 2:02-2511, at *15-16 (W.D. Tenn. Oct. 2, 2002), the court rejected the argument that allegations of anti-competitive conduct arising out of Pfizer's sham litigation and improper Orange Book listings failed to raise a federal question sufficient to support jurisdiction in federal court. In that case, class action plaintiffs asserted that Pfizer abused the

---

more than sham litigation, for example, anti-competitive acts such as executing an agreement with an ANDA applicant to preserve and perpetuate the monopoly of a questionable patent." <u>Stuart v. Pfizer</u>, Civil Action No. 02-2511, at *13 (W.D. Tenn. 2002).

legal and regulatory system in the familiar ways to prevent
generic competition in the gabapentin market, though the
fraudulent marketing allegations present here were less fully
developed.  See id. at *3, 16.  Nonetheless, in response to the
assertion that recourse to federal law was not required, the
court concluded:

> [Plaintiffs' claims] are all premised upon Defendants'
> submitting purported invalid patents to the FDA and
> Defendants' alleged filing of frivolous and sham patent
> infringement lawsuits against potential competitors in
> the Neurontin market. Thus, if the patents filed with the
> FDA are determined valid and Defendants instigated
> legitimate patent infringement lawsuits, Plaintiffs'
> claims cannot stand.

Id. at *16; see also id. at *15 ("A determination of sham
litigation requires first and foremost resolution of an essential
question of federal patent law.").  Thus, the two courts to
confront issues largely identical to those at issue here
determined that the plaintiffs had posed a substantial federal
question sufficient to trigger Article III jurisdiction.  See
also In re Tamoxifen Citrate Antitrust Litig., 222 F. Supp. 2d
326, 331 (E.D.N.Y. 2002) (remand improper where patent scope and
validity at issue); Koonan v. Barr Labs., No. C-01-0779, slip op.
at *8 (N.D. Cal. June 21, 2001).

While Plaintiffs have offered some support for the
contention that Defendants' off-label marketing efforts and
litigation strategies shared a related, anti-competitive
objective, they have failed to demonstrate that this fact alone

18

removes the necessity of answering a substantial federal question.  The Supreme Court has made clear that a charge of sham litigation requires, as an initial matter, that "no reasonable litigant could realistically expect success on the merits." Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc., 508 U.S. 49, 60 (1993).  This standard requires an objective determination regarding the validity and scope of Defendants' patents.

Likewise, Plaintiffs' allegations that Defendants improperly listed patents in the Orange Book requires a determination of whether a claim of patent infringement could reasonably be asserted against the generic filer at the FDA under federal law. See Sall/Zafarana, C.A. No. 02-3988, at *17 (quoting 21 U.S.C. § 355(b)(1)); id. at *18 (holding that "[t]he propriety of listing patents in the Orange Book likewise depends directly on the scope of the claims of the patent" and that federal question jurisdiction over such claims was therefore proper); Stuart, C.A. No. 2:02-2511, at *15-16.

Thus Plaintiffs' claims for relief from the supra-competitive pricing caused by the sham patent infringement litigation alleged under the monopolization counts require the resolution of a substantial and disputed question of patent law.

**C.   The Balance of Federal and State Judicial Responsibilities**

Finally, retaining jurisdiction in federal court is consistent with congressional judgments regarding the need to provide a federal forum to resolve disputes under the patent laws.  See 28 U.S.C. § 1338 (conferring jurisdiction over laws "relating to patents" on federal district courts); see also 28 U.S.C. § 1295(a) (consolidating patent appeals in the Federal Circuit); Christianson, 486 U.S. at 813 (agreeing "that one of Congress' objectives in creating a Federal Circuit with exclusive jurisdiction over certain patent cases was 'to reduce the widespread lack of uniformity and uncertainty of legal doctrine that exist[ed] in the administration of patent law.'" quoting H. R. Rep. No. 97-312, p. 23 (1981)); see also Fla. Prepaid Postsecondary Educ. Expense Bd. v. College Sav. Bank, 527 U.S. 627, 645 (1999) (observing that "[t]he need for uniformity in the construction of patent law is undoubtedly important").

As a result, adjudication of Plaintiffs claims would not disturb "any congressionally approved balance of federal and state judicial responsibilities." Grable, 545 U.S. at 314.  To the contrary, the exercise of federal jurisdiction would be consistent with congressional judgment regarding the desirability of having claims relating to the patent laws in federal court.

**D.   Pragmatic Considerations**

While federal jurisdiction exists in the present case, Plaintiffs' monopolization claims raise issues more appropriate

to the Neurontin Antitrust MDL currently pending before Judge
Lifland.  "[I]t is apodictic that federal courts possess the
inherent power to stay proceedings for prudential reasons."
<u>Microfinancial, Inc. v. Premier Holidays Int'l., Inc.</u>, 385 F.3d
72, 77 (1st Cir. 2004) (Selya, J.) (citing <u>Landis v. N. American
Co.</u>, 299 U.S. 248 (1936)); <u>see also</u> <u>In re Columbia Univ. Patent
Litig.</u>, 330 F. Supp. 2d 12, 15 (D. Mass. 2004) (recognizing a
court's "inherent power" to stay proceedings).  Adjudication of
Plaintiffs' unlawful monopolization claims would raise a "serious
policy issue concerning the consistency of rulings between the
federal courts."  <u>Ass'n of Int'l Auto. Mfr., Inc. v. Comm'r,
Mass. Dep't of Envtl. Protection</u>, 196 F.3d 302, 305 (1st Cir.
1999) (recognizing that where "[m]ost if not all of the issues"
before a court are "at the heart" of claims pending before
another federal court, there is "a real risk of inconsistent or
even directly contradictory decisions between . . . two Courts;
therefore, "it is obviously sound judicial policy to avoid
[inter-court conflicts]").  This policy concern is particularly
acute where the potential inconsistency concerns a matter more
"properly before" the sister court.  <u>See id.</u>

     This Court could stay the unfair competition and
monopolization claims pending resolution of similar claims in the
Neurontin Antitrust MDL.  <u>See</u> <u>American Life Ins. Co. v. Stewart</u>,
300 U.S. 203, 215 (1937) ("In the exercise of a sound discretion
[a court] may hold one lawsuit in abeyance to abide the outcome

of another, especially where the parties and the issues are the same."); <u>Bechtel Corp. v. Laborers' Int'l Union</u>, 544 F.2d 1207, 1215 (3d Cir. 1976) (same).  Alternatively, Plaintiffs may seek severance of these counts (I-XXIV) and transfer back to the MDL Panel for retransfer back to New Jersey.  This Court will retain jurisdiction over the Plaintiffs' remaining allegations.[6]  28 U.S.C. § 1367(c)(3).

### ORDER

Plaintiffs' motion to remand is **DENIED** and Plaintiffs' counts (I-XXIV) are **STAYED** pending resolution in the Neurontin Antitrust MDL.

/s/ Patti B. Saris

_____

PATTI B. SARIS
United States District Judge

---

[6]Under 28 U.S.C. § 1367(C)(3), it is in the Court's discretion to retain jurisdiction over supplemental state law claims even after all federal claims have been stayed or dismissed.  <u>See</u> <u>Andresen v. Diorio</u>, 349 F.3d 8, 13 (1st Cir. 2003).