# EXHIBIT B

**Page 1**

```
                UNITED STATES DISTRICT COURT
                 DISTRICT OF MASSACHUSETTS

        In re: NEURONTIN MARKETING      )
        AND SALES PRACTICES             )
        LITIGATION                      )
        --------------------------      ) Master File No.
        THIS DOCUMENT RELATES TO:       ) 04-10981
        --------------------------      )
        HARDEN MANUFACTURING            )
        CORPORATION; LOUISIANA          )
        HEALTH SERVICE INDEMNITY        )
        COMPANY, dba                    )
        BLUECROSS/BLUESHIELD OF         )
        LOUISIANA; INTERNATIONAL        )
        UNION OF OPERATING              )
        ENGINEERS, LOCAL NO. 68         )
        WELFARE FUND; ASEA/AFSCME       )
        LOCAL 52 HEALTH BENEFITS        )
        TRUST; GERALD SMITH, and        )
        LORRAINE KOPA, on behalf        )
        of themselves and all           )
        others similarly situated       )
        v. PFIZER INC. and              )
        WARNER-LAMBERT COMPANY.         )
        --------------------------      )
        THE GUARDIAN LIFE               )
        INSURANCE COMPANY OF            )
        AMERICA v. PFIZER INC. and      )
        AETNA, INC. v. PFIZER INC.      )
                                        )

        --------------------------

          30(b)(6) DEPOSITION OF THERESA A. ROWAN
                     New York, New York
                 Thursday, January 12, 2006


        Reported by:
        PATRICIA A. BIDONDE, RPR
```

1

**Page 2**

1/12/2006 Rowan, Theresa A. (MDL)

```
                                January 12, 2006

                                   10:04 a.m.




                        Rule 30(b)(6) deposition of
        INTERNATIONAL UNION OF OPERATING ENGINEERS,
        LOCAL NO. 68 WELFARE FUND, through its
        representative, THERESA A. ROWAN, held at
        the offices of DAVIS POLK & WARDWELL, 450
        Lexington Avenue, New York, New York,
        before Patricia A. Bidonde, a Registered
        Professional Reporter and Notary Public of
        the State of New York.
```

2

**Page 3**

1/12/2006 Rowan, Theresa A. (MDL)

```
                A P P E A R A N C E S :


        SEEGER WEISS LLP
        Attorneys for Plaintiffs
                One William Street
                New York, New York 10004-2502
        BY:    MICHAEL S. FARKAS, ESQ.
               MICHAEL L. ROSENBERG, ESQ.


        DAVIS POLK & WARDWELL
        Attorneys for Defendants
                450 Lexington Avenue
                New York, New York 10017
        BY:    REEMA S. ABDELHAMID, ESQ.
               CHARLES S. DUGGAN, ESQ.
               NAHAL KAZEMI, ESQ.


        HARE & CHAFFIN
        Attorneys for Defendants Pfizer and
        Warner-Lambert
                160 Federal Street
                Boston, Massachusetts 02110-1700
        BY:    DAVID B. CHAFFIN, ESQ.
```

3

**Page 4**

1/12/2006 Rowan, Theresa A. (MDL)

```
                    IT IS HEREBY STIPULATED AND
        AGREED, by and between the attorneys for
        the respective parties herein, that filing
        and sealing be and the same are hereby
        waived.
                    IT IS FURTHER STIPULATED AND
        AGREED that all objections, except as to
        the form of the question, shall be reserved
        to the time of the trial.
                    IT IS FURTHER STIPULATED AND
        AGREED that the within deposition may be
        sworn to and signed before any officer
        authorized to administer an oath, with the
        same force and effect as if signed and
        sworn to before the Court.
```

4

**Page 5**

```
1            Rowan
2    T H E R E S A  A.  R O W A N, called as a
3        witness, having been duly sworn by a
4        Notary Public, was examined and
5            testified as follows:
6    EXAMINATION BY
7    MS. ABDELHAMID:
8        Q.    My name is Reema Abdelhamid.  And
9    these are my colleagues, Charles Duggan and
10   Nahal Kazemi.  We represent Pfizer and
11   Warner-Lambert, which I'll refer together
12   throughout this deposition as "the
13   defendants."
14            Please state your full name.
15       A.    Theresa A. Rowan.
16       Q.    Who are you employed by?
17       A.    Local 68 Operating Engineers.
18       Q.    Is the Local 68 Operating
19   Engineers and Local 68 Operating Engineers
20   Welfare Fund two separate entities?
21       A.    No.
22       Q.    Would you please explain briefly
23   the relationship between these two entities?
24       A.    Well, Local 68 Welfare Fund takes
25   care of the medical benefits for the
```

**Page 7**

```
1            Rowan
2    had a title.
3        Q.    But have the nature of your
4    responsibilities changed in those 29 years?
5        A.    No.
6        Q.    And what does your -- so you've
7    never held -- have you ever held any other
8    position, either simultaneously or prior to
9    this one, at the Union?
10       A.    No.
11       Q.    Have you been deposed before?
12       A.    No.
13       Q.    So I'm going to briefly explain
14   the rules of a deposition.  And just let me
15   know if you have any questions.
16            First, we need verbal answers to
17   all of the questions.  So nodding your head,
18   the court reporter can't record that.
19            Second, please wait until every
20   question is finished, and I'll wait until you
21   finish your answer to speak again.
22            Third, we can take breaks after
23   each question is answered.  If you realize an
24   answer is incomplete or incorrect, just let me
25   know, and we'll go back over it.
```

**Page 6**

```
1            Rowan
2    membership.  Local 68 Operating Engineers is
3    the actual union.
4        Q.    And we will delve into that more
5    later.  But briefly, you are authorized to
6    give answers on behalf of the Fund as well?
7        A.    Yes.
8        Q.    And throughout this deposition, I
9    will refer to the International Union of
10   Operating Engineers Local 68 as "the Union"
11   and the International Union of Operating
12   Engineers Welfare Fund as "the Fund."
13       A.    That's fine.
14       Q.    And when I refer to "you," I'm
15   referring to you as a designated
16   representative of the Fund.
17       A.    Fine.
18       Q.    What is your position at the
19   Union?
20       A.    Benefits coordinator.
21       Q.    Has this always been your
22   position at the Union?
23       A.    Pretty much.  I've been there 29
24   years.  I've done pretty much everything.  I'd
25   say probably since about 1990 that I actually
```

**Page 8**

```
1            Rowan
2            Finally, please let me know if
3    you don't understand a question, and we'll go
4    over it more fully.  If you answer, I'll
5    assume that you understood the question.
6        A.    Okay.
7        Q.    Please state your business
8    address.
9        A.    14 Fairfield Place, West
10   Caldwell, New Jersey.
11       Q.    Does the Union have any other
12   locations?
13       A.    Yes.  Atlantic City, New Jersey.
14       Q.    And do you ever work at that
15   location?
16       A.    No.
17       Q.    Could you briefly describe your
18   education and any additional training you may
19   have had.
20       A.    High school and college graduate.
21       Q.    And what was your college degree
22   in?
23       A.    Marketing.
24       Q.    You said you had been at the
25   Union for the past 29 years.
```

Rowan

1
2     A.    Right.
3     Q.    Was that your first job, or did
4  you have any other job experience before?
5     A.    No, I had other jobs.
6     Q.    Could you briefly describe your
7  other job experience.
8     A.    I worked for American Express in
9  the stolen credit card division.
10     Q.    And when was that?
11     A.    1970 to 1971.  And then I worked
12  for a supermarket chain in the personnel
13  department, and then I went to Local 68 in
14  June of 1976.
15     Q.    So you were at the supermarket
16  chain from approximately 1971 to 1976?
17     A.    Correct.
18     Q.    So neither of these -- did either
19  of these previous jobs involve health benefits
20  administration?
21     A.    The supermarket in the personnel
22  department, yes.
23     Q.    And what were the nature of your
24  duties there?
25     A.    Just enrollment into the Blue

9

Rowan

1
2  Cross.
3     Q.    Describe the exact nature of your
4  duties with the Union and how they may have
5  changed over the past 29 years.
6     A.    Well, I'm a liaison, really,
7  between the member and Blue Cross/Blue Shield.
8  I do the enrollments, terminations, deletions.
9  I review the medical claims data.  I take care
10  of any problems that the membership may have
11  with their coverage.
12     Q.    Do you perform any other duties
13  besides those?
14     A.    Yes.
15     Q.    What are those?
16     A.    I'm in charge of the pension
17  also.
18     Q.    And when you say you review the
19  medical claims, what exactly does that entail?
20     A.    I review them as far as whether
21  they're eligible, the people, the correct
22  eligibility.  That's pretty much what I do is
23  I just check the name and the dates of
24  service.
25     Q.    So is it your position, you

10

Rowan

1
2  determine if a medical claim is paid or not?
3     A.    No.  I get all the information
4  from Blue Cross after the claims have been
5  processed and paid.
6     Q.    So what exactly are you looking
7  for when you review the medical claims?
8     A.    Well, sometimes there's people
9  that will have services done after their
10  eligibility is terminated.
11     Q.    And you said you're the liaison.
12  When you refer to Blue Cross, are you
13  referring to Horizon?
14     A.    Yes.
15     Q.    Are you the sole contact between
16  Horizon and the Union?
17     A.    No, there's another woman in the
18  office.
19     Q.    Who is that?
20     A.    Patricia Dandola.
21     Q.    And how long has she been at --
22     A.    Thirteen years.
23     Q.    Let me know if this is an
24  accurate summary of your responsibilities at
25  the Union as the union benefit coordinator:

11

Rowan

1
2  You review medical claims; you're the liaison
3  between Horizon and the Union; you do
4  enrollments.  Is there anything else I'm
5  missing?
6     A.    Well, terminations, too.  I take
7  people off the coverage also.
8     Q.    Have you ever given prior
9  testimony on any matter?
10     A.    No.
11     Q.    And does this include
12  depositions, affidavits, or other legal
13  proceedings?
14     A.    Yes.
15     Q.    Now, I'm going to ask you a
16  little about bit how you prepared for this
17  deposition.
18         Did you prepare for this
19  deposition?
20     A.    Yes.
21     Q.    How did you do so?
22     A.    I just spoke with our counsel.
23     Q.    By your "counsel," you're
24  referring to Mr. Rosenberg and Mr. Farkas?
25     A.    Correct.

12

Rowan

```
 1                          Rowan
 2        Q.    Did you meet with any other
 3   attorneys for the purpose of this deposition?
 4        A.    No.
 5        Q.    How many meetings or
 6   conversations did you have?
 7        A.    Probably three.
 8        Q.    And approximately, what was the
 9   duration of these conversations or meetings?
10        A.    Like 15, 20 minutes each.
11        Q.    Who was present during those
12   meetings besides you, Mr. Farkas and
13   Mr. Rosenberg?
14        A.    Usually it was on the phone.
15        Q.    Who was on the phone?
16        A.    We were.
17        Q.    Was anybody else on the
18   telephone?
19        A.    Our counsel to the local, Michael
20   Scaraggi.
21        Q.    Anyone else besides him?
22        A.    No.
23        Q.    During those telephone
24   conversations, did you review any documents?
25        A.    No.
```

```
 1                          Rowan
 2        Q.    So you reviewed no documents in
 3   preparation for this deposition?
 4        A.    No.
 5        Q.    That was a little confusing.  So
 6   let me ask you this again.
 7              Did you review any documents in
 8   preparation for this deposition?
 9        A.    I was given the complaint to
10   read, but I never read it.
11        Q.    Were you given any other
12   documents?
13        A.    By the counsel, no.
14        Q.    Were you given any other
15   documents by anybody else to review for the
16   deposition?
17        A.    No.
18        Q.    Did you review any documents,
19   whether or not they were given to you by
20   somebody else, for this deposition, prior to
21   coming here?
22        A.    What do you mean?  I don't know--
23   what do you mean by "document"?
24        Q.    By "document," I mean -- a piece
25   of paper with information on it.
```

```
 1                          Rowan
 2        A.    No, I know.  I mean -- no.  I was
 3   given the complaint, like I said, but I never
 4   read it.
 5        Q.    So did you do any other
 6   preparation for this deposition besides the
 7   telephone conversations you had with your
 8   counsel?
 9        A.    No.
10              MS. ABDELHAMID:  I'm going to
11        mark as Exhibit 1 the Amended Rule
12        30(b)(6) Notice of Deposition of the
13        Fund.
14              (Rowan Exhibit 1, Amended Rule
15        30(b)(6) Notice of Deposition of the
16        Fund, marked for identification, as of
17        this date.)
18        Q.    Could you confirm that you're
19   providing answers on behalf of the Fund, who
20   is the plaintiff in this action, in response
21   to this notice?
22        A.    Yes.
23        Q.    Can you confirm that you've been
24   designated on all topics in this notice?
25        A.    Yes.
```

```
 1                          Rowan
 2        Q.    Have you ever seen this notice
 3   before?
 4        A.    No.
 5        Q.    Are you aware that this
 6   deposition is being taken in connection with a
 7   motion for a class certification filed by the
 8   plaintiffs?
 9        A.    Yes.
10        Q.    So now I'm going to go through
11   each topic and ask what you did to prepare to
12   testify regarding each topic.
13              Did you do anything to prepare to
14   testify on the Fund's behalf regarding topic
15   1?  And you can take a moment to read that, if
16   you'd like.
17        A.    (Reading.)  I just spoke with the
18   attorneys.
19        Q.    Did you talk to any other
20   employees at the Fund about this?
21        A.    No.
22        Q.    And any individuals at the Fund's
23   PBMs or the third-party administrator?
24        A.    The Horizon Blue Cross, I spoke
25   with someone.
```

Rowan

2    Q.    Who did you speak with at Horizon
3  Blue Cross?
4    A.    Edwin Hernandez.
5    Q.    What is his position at Horizon
6  Blue Cross?
7    A.    Account executive.
8    Q.    And is he somebody you've dealt
9  with before?
10    A.    Yeah, he's the account
11  representative for the Local 68.
12    Q.    How long has he been in that
13  position?
14    A.    We've had him for about ten
15  months.
16    Q.    What did he tell you in
17  preparation for testifying on this topic?
18    A.    I just asked him about the
19  utilization of Neurontin.
20    Q.    And what did he tell you?
21    A.    He sent a list, just of the
22  purchases.
23    Q.    When you say "a list of the
24  purchases," do you mean a list of Union
25  members who purchased Neurontin?

17

---

Rowan

2    A.    No.
3    Q.    What do you mean exactly?
4    A.    Well, there was no connection to
5  the Union members.  It was just purchases that
6  were reimbursed by Blue Cross.  There was no
7  membership identity.
8    Q.    Are you saying he provided you
9  with guidelines for the purchase of --
10    A.    No, actual purchases that had
11  been made over the last couple of years.
12    Q.    Purchases that had been made by
13  whom?
14    A.    The Union members.
15    Q.    But they were purchases of
16  Neurontin?
17    A.    Right.
18    Q.    When did this conversation take
19  place?
20    A.    I don't remember.
21    Q.    Have you produced this list of
22  purchases to us, or do you know if it's been
23  produced to us?
24    A.    I don't know.
25    MR. FARKAS:  That's exactly what

18

---

Rowan

2  is being faxed to us here.  So we'll be
3  producing that shortly.  We just learned
4  about this conversation and that
5  document today.
6    MS. ABDELHAMID:  And why hasn't
7  that been produced before?
8    MR. FARKAS:  We didn't realize
9  that Ms. Rowan had received it from Blue
10  Cross.
11    MS. ABDELHAMID:  Well, let me
12  just put on the record that we reserve
13  the right to continue the deposition at
14  another time if new documents should
15  arise out of that.
16    Q.    Ms. Rowan, do you remember when
17  you received this list?
18    A.    No, I don't.
19    Q.    Do you remember approximately if
20  it was in the past month or the past few
21  months?
22    A.    Probably in the past month.
23    Q.    And in your discussion with
24  counsel on topic 1, what did they tell you
25  about this topic?

19

---

Rowan

2    MR. FARKAS:  Objection.
3    Don't answer that question.
4    MS. ABDELHAMID:  I'm only asking
5  what facts were conveyed to her in that
6  conversation.
7    MR. FARKAS:  That's a
8  conversation between attorney and
9  client.
10    MS. ABDELHAMID:  So you're
11  asserting privilege even as to the facts
12  they were conveyed.
13    MR. FARKAS:  As to any
14  communications between Ms. Rowan and her
15  attorneys.
16    MS. ABDELHAMID:  I just want to
17  put on the record that I don't think
18  that the facts -- I think the legal
19  advice would be privileged, but I don't
20  think the facts conveyed in that
21  conversation would be privileged.
22    MR. FARKAS:  I think our
23  interpretation of the facts is
24  privileged.
25    MS. ABDELHAMID:  Let's move on.

20

```
 1                    Rowan
 2         Q.    Topic 2, how did you prepare to
 3   testify on topic 2?
 4         A.    I just spoke with our counsel.
 5         Q.    And did you speak with anybody
 6   else?
 7         A.    No.
 8         Q.    Did you review any documents to
 9   prepare yourself on this topic?
10         A.    No.
11         Q.    Moving on to topic 3.  Did you do
12   anything to prepare to testify regarding topic
13   3?
14         A.    No.
15         Q.    Just to clarify, when you say
16   "no," you're saying in addition to talking to
17   counsel?  Or are you saying you didn't talk to
18   counsel on topic 3?
19         A.    No, I didn't have to.
20         Q.    Did you talk to any other
21   employees at the Fund?
22         A.    No.
23         Q.    Just to be clear, and like I
24   said, we'll get more into this distinction
25   later, does the Fund have employees, or is
```

```
 1                    Rowan
 2   everybody a union employee?
 3         A.    The Fund has employees separate
 4   from the Union.  I work for the Fund.
 5         Q.    So did you talk to any other
 6   employees at the Union or the Fund then, on
 7   topic 3?
 8         A.    No.
 9         Q.    Did you review any documents to
10   prepare yourself on this topic?
11         A.    No.
12         Q.    Topic 4.  Did you do anything to
13   prepare yourself to testify on the Fund's
14   behalf regarding topic 4?
15         A.    No.
16         Q.    Did you have any discussions with
17   employees?
18         A.    No.
19         Q.    Did you do anything to prepare
20   yourself on the Fund's behalf regarding topic
21   5?
22         A.    No.
23         Q.    Did you do anything to prepare
24   yourself to testify on the Fund's behalf
25   regarding topic 6?
```

```
 1                    Rowan
 2         A.    No.
 3         Q.    Did you do anything to prepare
 4   yourself to testify on the Fund's behalf
 5   regarding topic 7?
 6         A.    No.
 7         Q.    Did you do anything to prepare
 8   yourself to testify on the Fund's behalf
 9   regarding topic 8?
10         A.    No.
11         Q.    Did you do anything to prepare
12   yourself to testify on the Fund's behalf
13   regarding topic 9?
14         A.    Yes.
15         Q.    What did you do?
16         A.    That was just the listing, the
17   request for listing of how many purchases of
18   the Neurontin we had.
19         Q.    Did you request that document, or
20   when you were talking he just said he would
21   send it to you?
22         A.    I asked him, "Could you send it
23   to me," and he did.
24         Q.    So you knew that document existed
25   prior to your talking to him?
```

```
 1                    Rowan
 2         A.    No, I knew there was capability
 3   of getting a listing.
 4         Q.    What prompted you to ask for this
 5   listing?
 6         A.    Because I knew I was going to --
 7   there was going to be questions about it.
 8         Q.    Did you do anything else besides
 9   talking to Edwin Hernandez and requesting that
10   list to prepare?
11         A.    No.
12         Q.    Did you do anything to prepare
13   yourself to testify on the Fund's behalf
14   regarding topic 10?
15         A.    No.
16         Q.    Did you do anything to prepare
17   yourself to testify on the Fund's behalf on
18   topic 11?
19         A.    No.
20         Q.    Did you do anything to prepare
21   yourself to testify on the Fund's behalf
22   regarding topic 12?
23         A.    No.
24         Q.    Did you do anything to prepare
25   yourself to testify on the Fund's behalf
```

```
 1                      Rowan
 2    regarding topic 13?
 3          A.    No.
 4          Q.    Did you do anything to prepare
 5    yourself to testify on the Fund's behalf
 6    regarding topic 14?
 7          A.    No.
 8          Q.    Did you do anything to prepare
 9    yourself to testify on the Fund's behalf
10    regarding topic 15?
11          A.    No.
12          Q.    Did you do anything to prepare
13    yourself to testify on the Fund's behalf
14    regarding topic 16?
15          A.    I don't understand that.
16          Q.    You don't understand the topic?
17          A.    No.
18          Q.    So is it your testimony that you
19    didn't, to your knowledge, undertake any
20    preparation on that topic?
21          A.    The class action complaint?  No.
22          Q.    Did you do anything to prepare
23    yourself, on the Fund's behalf, on topic 17?
24          A.    No.
25          Q.    Did you do anything to prepare
```

```
 1                      Rowan
 2          A.    No.
 3          Q.    And did you do anything to
 4    prepare yourself to testify on the Fund's
 5    behalf regarding topic 23?
 6          A.    Just that I spoke with the
 7    counsel, just with the attorneys.
 8          Q.    Now, I'm going to ask some
 9    general questions about the Fund's formation
10    and operations and the relationship between
11    the Fund and the Union.
12                You stated earlier that the Fund
13    and the Union are two separate entities; is
14    that correct?
15          A.    Correct.
16          Q.    What is the relationship between
17    these two entities?
18          A.    Well, the Union represents the
19    membership.  The Fund represents the people
20    who, in their collective bargaining agreement,
21    have medical coverage.
22          Q.    Is there a contractual
23    relationship between these two entities?
24          A.    No.
25          Q.    Do the entities have distinct
```

```
 1                      Rowan
 2    yourself to testify on the Fund's behalf
 3    regarding topic 18?
 4          A.    Just that I talked with the
 5    attorneys.
 6          Q.    On topic 18?
 7          A.    Right.
 8          Q.    Did you do anything else on topic
 9    18?
10          A.    Not outside of talking to them.
11          Q.    Did you do anything to prepare
12    yourself to testify on the Fund's behalf
13    regarding topic 19?
14          A.    No.
15          Q.    Did you do anything to prepare
16    yourself, on the Fund's behalf, regarding
17    topic 20?
18          A.    No.
19          Q.    Did you do anything to prepare
20    yourself to testify on the Fund's behalf
21    regarding topic 21?
22          A.    No.
23          Q.    Did you do anything to prepare
24    yourself to testify on the Fund's behalf
25    regarding topic 22?
```

```
 1                      Rowan
 2    leadership structures?
 3          A.    Yes.
 4          Q.    So they have different officers
 5    and directors?
 6          A.    Yes.
 7          Q.    So first I'm going to ask some
 8    questions about the Fund, and then I'm going
 9    to move on to asking some questions about the
10    Union.
11                How is the Fund organized?
12          A.    We have an administrative manager
13    and then we have a board of trustees.  And
14    they're made up of three management and three
15    Union people.
16          Q.    Is the Fund incorporated?
17          A.    I believe it is, the Welfare
18    Fund.
19          Q.    Do you know what's the corporate
20    form, whether it's a partnership or --
21          A.    No.
22          Q.    When was the Fund formed?
23          A.    I'm not sure.  I think it was
24    1950, 1948.
25          Q.    Is that after the Union was
```

```
                            Rowan
1
2      formed?
3           A.     Yes.
4           Q.     When was the Union formed?
5           A.     Oh, I think in the late 1800s.
6           Q.     Who formed the Fund?
7           A.     I guess it would have been the
8      leadership or the Union at the time.  I don't
9      know who that is.
10          Q.     Do you know why the Fund was
11     formed?
12          A.     To provide benefits for the
13     membership.
14          Q.     Up until that point, how were
15     health benefits being provided?
16          A.     I don't know.
17          Q.     What is the purpose of the Fund
18     now?
19          A.     To provide medical benefits for
20     the membership that are in the collective
21     bargaining agreement.
22          Q.     When you say "the membership in
23     the collective bargaining agreement," is this
24     the entire membership of the Union?
25          A.     No.  It depends upon which
```

```
                            Rowan
1
2      employer you are employed, what location that
3      you work, whether or not you're in the Welfare
4      Fund.
5           Q.     Was the Fund formed through any
6      documents?
7           A.     I'm sure -- there is a plan
8      document, yes.
9           Q.     When you say "plan document," are
10     you referring to the document setting out
11     health benefits, or are you actually talking
12     about the document that set up the Fund?
13          A.     The document that set up the
14     Fund.
15          Q.     Would the Fund likely be in
16     possession of such a document?
17          A.     Yes.
18          Q.     Who at the Fund do you think
19     would most likely possess a copy of such a
20     document?
21          A.     The Fund office.
22          Q.     Has this person's files been
23     searched in response to defendant's document
24     request?
25          A.     It isn't a person's files.  It's
```

```
                            Rowan
1
2      a file in the Fund office.
3           Q.     Do you know if this file has been
4      searched in response to defendant's document
5      request?
6           A.     No.
7           Q.     You don't know?
8           A.     No, it has not.
9           Q.     It has not been searched.
10                 Do you know why it has not been
11     searched?
12          A.     I don't think it would be
13     anything to do with the case.
14          Q.     Well, in our document request, we
15     requested organizational documents.
16          A.     I gave whatever our counsel asked
17     for.
18          Q.     Does the Fund have any of its own
19     employees?
20          A.     Yes.
21          Q.     About how many employees does it
22     have?
23          A.     I would say probably on the
24     welfare payroll would be about -- I'd have to
25     count if you want an exact number.  Probably
```

```
                            Rowan
1
2      about ten.
3           Q.     You said the administrative
4      manager is the head of the Fund, correct?
5           A.     Yes.
6           Q.     Who is that?
7           A.     Dennis J. Giblin.
8           Q.     And who is on the board of
9      trustees of the Fund?
10          A.     Well, Robert Masterson is the
11     chairman.
12          Q.     And to be clear, you said those
13     three on the Union side and three -- who are
14     the three on the other side?
15          A.     One is Delores Capetola.  The
16     second one is Jose Garcia.  And I think -- I'm
17     not sure -- I think there's a vacancy on the
18     management side.
19          Q.     And then on the Union side?
20          A.     There's been changes.  Let
21     me see.  Michael Favinger.  I don't remember
22     the other two names.
23          Q.     This is the administrative
24     manager plus three on each side is seven
25     people.  And you're saying there's three
```

Rowan

2  additional people?
3      A.   No, there's also a chairman of
4  the trustees is Robert Masterson.
5      Q.   He's the chairman of the board of
6  trustees?
7      A.   Right.
8      Q.   So he's a seventh individual?
9      A.   Yes.
10      Q.   And then aside -- so that's about
11  eight people.  So aside from those eight
12  people, are there about two more?
13      A.   Well, there are two Union people.
14      Q.   I just want to clarify this here.
15  Because you said there's the administrative
16  manager who is Dennis Giblin, Robert Masterson
17  is the chairman of the board of trustees.
18  Then you said the three management and three
19  Union people.  Is that the total?
20      A.   Yes.
21      Q.   And aside from that, is there
22  anybody else who works for the Fund?
23      A.   They don't work for the Fund.
24  The ten people are separate employees.
25      Q.   So the ten employees of the Fund,

33

Rowan

2  what are their positions?
3      A.   There's a person I mentioned
4  before, Patricia Dandola, she works with me.
5  And then there's the other people that take
6  care of the remittances that come into the
7  Fund for payment of the funds from the
8  employers.
9      Q.   Has Dennis Giblin always been the
10  Fund administrative over the class period?
11      A.   No.  Well, he started September
12  1, 2004.
13      Q.   And who was the Fund
14  administrative prior to that?
15      A.   Thomas P. Giblin.
16      Q.   And how long had he held that
17  position for?
18      A.   Probably from 1975.
19      Q.   Do the Fund and the Union have
20  the same employees?
21      A.   No.
22      Q.   About how many employees does the
23  Union have?
24      A.   Probably about a dozen, 12.
25      Q.   Do you know who at the Fund would

34

Rowan

2  be authorized to make the decision to bring a
3  lawsuit on behalf of the Fund?
4      A.   I would think Dennis Giblin.
5      Q.   Do you know if he was the one who
6  made the decision to bring this lawsuit?
7      A.   I don't know that.
8      Q.   Now, we're going to ask a few
9  questions about the finances of the Fund and
10  how that's set up.
11          Do you know if the Fund receives
12  money from the Union?
13      A.   Not from the Union, no.
14      Q.   Who or what does the Fund receive
15  money from?
16      A.   From the employers of the Union
17  members.
18      Q.   Would you describe how the Fund
19  is financed?
20      A.   Well, it's based on the hourly
21  contribution that the employer pays into the
22  Welfare Fund.
23      Q.   So certain employers can opt to
24  have coverage for the employees through the
25  Welfare Fund?

35

Rowan

2      A.   That's correct.
3      Q.   Do you have an impression of how
4  many of the Union's members are covered by the
5  Fund?
6      A.   2,100.
7      Q.   About how many members does the
8  Union have?
9      A.   About 5,000.
10      Q.   So it's almost half that are
11  covered.
12          Is the Fund self-insured?
13      A.   Yes.
14      Q.   So the Fund is at risk for the
15  health benefits claim of the covered
16  individuals?
17      A.   Yes.
18      Q.   Is any other entity bearing any
19  part of the risk for those covered
20  individuals?
21      A.   No.
22      Q.   How does the Fund administer
23  health benefits to its covered individuals?
24      A.   We pay an administrative fee to
25  Horizon Blue Cross and Blue Shield of New

36

Rowan

1    Rowan
2    Jersey, and they take care of the
3    administration of the payment of the claims.
4        Q.    And how long has the Fund used
5    Horizon for?
6        A.    Since the inception of the Fund.
7        Q.    I'm going to ask you about this
8    plan document.
9        MS. ABDELHAMID:  We want to mark
10       as Exhibit 2 the International Union of
11       Operating Engineers Local 68 Welfare
12       Plan.
13          (Rowan Exhibit 2, International
14       Union of Operating Engineers Local 68
15       Welfare Plan description of the benefits
16       for the membership, marked for
17       identification, as of this date.)
18       Q.    Do you recognize this document?
19       A.    Yes, I do.
20       Q.    What is it?
21       A.    It's the description of the
22   benefits for the membership that are in the
23   Local 68 Welfare Fund.
24       Q.    Is this document distributed to
25   covered individuals?

37

Rowan

1    Rowan
2        A.    I would have it.
3        Q.    Do you know if your files were
4    searched in response to our document requests?
5        A.    No.
6        Q.    You don't know, or they weren't
7    searched?
8        A.    They weren't searched.
9        Q.    Were you asked to collect
10   documents by your counsel in response to our
11   document requests?
12       A.    I was asked for the copy of the
13   Welfare Fund.
14       Q.    You were asked for a copy of the
15   current plan?
16       A.    Right.
17       Q.    But you were not asked for a copy
18   of any previous plans?
19       A.    Not that I remember.
20       Q.    Apart from the plan document,
21   were you asked by your counsel to collect any
22   other documents in connection with this
23   litigation?
24       A.    No, not that I remember.
25       Q.    So this plan document is the only

39

Rowan

1    Rowan
2        A.    Yes.
3        Q.    What years does this plan cover?
4        A.    This is from January 1, 1998, to
5    present.
6        Q.    Besides this plan, are there any
7    other health plans that the Fund administers?
8        A.    No.
9        Q.    You mentioned that this plan
10   covers from January 1998 to the present.  Are
11   there prior versions of this plan during
12   the --
13       A.    Prior to this, yes, there was.
14   There was, Blue Cross and Blue Shield took
15   care of our hospital medical, surgical; and
16   Local 68 did the major medical.
17       Q.    So there would have been a
18   different document prior to 1998?
19       A.    Correct.
20       Q.    Is the prior version of this plan
21   something the Fund would keep in the normal
22   course of its business?
23       A.    Yes.
24       Q.    Who at the Fund or where at the
25   Fund would the prior versions of this plan be?

38

Rowan

1    Rowan
2    one that you gave them?
3        A.    Yes.
4        Q.    Could you please turn to page 6
5    of the plan document.  It's the one Bates
6    numbered SW00010.
7        It states here that "The
8    prescription drug program is centrally
9    administered throughout the country by Paid
10   Prescriptions, Inc."
11       I'm reading the fourth paragraph
12   down.
13       A.    I don't see where it says --
14       Q.    Are you on the page that says
15   "Introduction," page 6?
16       A.    My pages are off.  Okay.
17       Q.    You see where it says, "The
18   prescription" --
19       A.    Yes.
20       Q.    Is that the case?  Is that
21   currently the case?
22       A.    Not now.  It was at the time, but
23   not now.
24       Q.    Your testimony is that this plan
25   document is up until the present time?

40

Rowan

A.    For the most part, yes.

Q.    When you say "for the most part," there are parts of the plan document that are not accurate as of the current time?

A.    Correct.

Q.    Do you know of any other parts of the plan document that wouldn't be accurate as of the current time?

A.    Well, there's changes in the co-payments for the prescription.

Q.    And those changes in the co-payments are not reflected in here?

A.    No.

Q.    Any other inaccuracies in the plan document?

A.    There would be changes in the trustees that are listed.

Q.    Anything else?

A.    I don't think so.  Not that I can recall.

MS. ABDELHAMID:  I want to mark as Exhibit 3 the blue card PPO prescription drug document.

(Rowan Exhibit 3, Blue card PPO

41

Rowan

prescription drug document, marked for identification, as of this date.)

Q.    Do you recognize this document?

A.    Yes.

Q.    What is it?

A.    It's the contract with the Blue Cross and Blue Shield for our medical benefits.

Q.    Is this the current contract for the medical benefits?

A.    Yes.

Q.    What period does this contract cover?

A.    Well, actually --

Q.    You can take a few minutes to look at it, if you'd like.

A.    It's really the description of the benefits through the Horizon Blue Cross and Blue Shield.  It's not actually the actual contract.

Q.    Is this the current description of benefits?

A.    Yes.

Q.    Is this a document that would be

42

Rowan

in the possession of the Fund?

A.    In our fund yes.

Q.    And where at the Fund would this document be found?

A.    My files.

Q.    And is this a document you were asked for, or is this a type of document you were asked for when you were asked to collect documents?

A.    I guess.  I don't remember.

Q.    Are there previous versions of this document that were in effect during the class period?

A.    No, this would be pretty much the whole benefit description.

Q.    And this has been the case since 1994?  There wouldn't have been a prior version of the document?

A.    Well, prior versions because we had the different coverage before 1998.

Q.    And would the Fund also retain possession of prior versions of the document?

A.    Yes.

Q.    And whose files would those be

43

Rowan

found in?

A.    Mine.

Q.    Were you asked for those in response to our document requests?

A.    No.

Q.    Does the Fund have a website?

A.    No, not on its own.

Q.    I'm just going to ask a few questions about the Union.

How is the Union organized?

A.    What do you mean?  By structure?  There's a business manager.  And then there's business agents and then office staff.

Q.    So the business manager is the head of the Union?

A.    Yes.

Q.    Who is the business manager of the Union?

A.    Thomas P. Giblin.

Q.    And he is the one who used to be the administrator of the Fund?

A.    Correct.

Q.    Have any other individuals besides Thomas Giblin overlapped between

44

**Page 45**

```
1                    Rowan
2    leadership of the Union and leadership of the
3    Fund?
4         A.    When you mean overlap --
5         Q.    Also held offices in the Fund.
6               Have any other individuals
7    besides Thomas Giblin held offices both in the
8    Fund and in the Union?
9         A.    No.
10        Q.    Prior to becoming involved with
11   the Union, was Thomas -- prior to becoming
12   involved with the Fund in 1975, was Thomas
13   Giblin in the union leadership?
14        A.    No, he was a staff member.
15        Q.    Staff member of the Fund or the
16   Union?
17        A.    Of the Fund.
18        Q.    Does the Union have directors?
19        A.    They have an executive board.
20        Q.    Who is on that executive board?
21        A.    I don't know.  There's about 20
22   people.
23        Q.    But none of them are the same
24   people that are on the Fund's board?
25        A.    No.
```

**Page 46**

```
1                    Rowan
2         Q.    The individuals who are on the
3    board of trustees of the Fund, were they hired
4    directly into that position, or were they
5    previously affiliated?
6         A.    They're not hired; they're
7    appointed.
8         Q.    Who are they appointed by?
9         A.    The administrative manager makes
10   the request if they want to be a trustee.
11        Q.    The administrative manager makes
12   the request to who to have them appointed?
13        A.    Well, he sends a letter out and
14   asks if they're interested in serving.
15        Q.    And is it the administrative
16   manager's sole discretion of who is on the
17   board of trustees, the administrative manager
18   of the Fund, that is?
19        A.    No, I really couldn't say.  I
20   think so, but I'm not really sure if it's his
21   sole discretion.
22        Q.    Let me ask it another way.
23              Do you know if the Union has any
24   oversight over the governance of the Fund?
25        A.    Not the Union, no.
```

**Page 47**

```
1                    Rowan
2         Q.    Who has management over the Fund?
3    Or who is the highest authority --
4         A.    The administrative manager.
5         Q.    And how does that person get his
6    position?  How did Dennis Giblin get his
7    position, and Thomas Giblin before that?
8         A.    Well, Tom Giblin, it was his
9    father that was the president and business
10   manager prior to him.  So they're appointed.
11        Q.    Thomas Giblin's father was the
12   president and business manager of the Union or
13   the Fund?
14        A.    Both.
15        Q.    So he was appointed to his
16   position as administrative manager of the
17   Fund?
18        A.    Thomas Giblin, yes.
19        Q.    And then did he appoint Dennis
20   Giblin to succeed him, or how did Dennis
21   begin --
22        A.    Yeah, I would think that's what
23   happened.  I really don't know.
24        Q.    Are all issues related to the
25   Fund handled solely within the administrative
```

**Page 48**

```
1                    Rowan
2    manager, board of trustees leadership
3    structure that you just described, or are any
4    of them handled by the overall Union?
5         A.    Not by the Union, just by the
6    Local 68 Welfare Fund trustees and
7    administrative manager.
8         Q.    So, to your knowledge, the Union
9    has no role in the day-to-day management of
10   the Fund or in the overall management of the
11   Fund?
12        A.    No.
13        Q.    Then what is the connection
14   between the two of them?
15        A.    Well, we, like I said before, we
16   cover the Union members who are entitled to
17   the medical coverage.
18        Q.    And the Fund subsists solely on
19   employer contributions?
20        A.    Correct.
21        Q.    Does the Union have a website?
22        A.    Yes.
23        Q.    Does this website contain any
24   information about the Fund?
25        A.    Yes.
```

```
 1                    Rowan
 2        Q.   Do you know what the content of
 3   that information is?
 4        A.   It highlights the benefits and it
 5   also would link you up with the Horizon Blue
 6   Cross and Blue Shield.
 7        Q.   Who is responsible -- is someone
 8   at the Fund responsible for maintaining that
 9   section of the website?
10        A.   Well, the ITT person at the Union
11   does it.
12        Q.   And who is that?
13        A.   Robert Adams.
14        Q.   Does someone supply him
15   information to put on the website?
16        A.   I would imagine the
17   administrative manager does.
18        Q.   Do you know how long the Fund
19   section of the website has been part of the
20   regular website?
21        A.   No.
22        Q.   Is there any part of that that's
23   password protected or only covered individuals
24   would have access to it, or is it all public?
25        A.   Well, it would be, you'd have to
```

49

```
 1                    Rowan
 2   be a Union member to access the Union website.
 3        Q.   Does the Union have a public
 4   website as well?
 5        A.   Just for general information.
 6        Q.   But you're saying there's a
 7   password-protected website?
 8        A.   Yes.
 9        Q.   And that has fund information on
10   it?
11        A.   Yes.
12        Q.   Do you know if documents related
13   to that website were collected?
14        A.   No.
15        Q.   You don't know?
16        A.   No, they were not.
17        Q.   Okay.  I'm going to ask you a
18   little more about the nature of your
19   involvement with both the Union and the Fund.
20            You said you work for the Fund;
21   is that correct?
22        A.   Correct.
23        Q.   Have you ever been employed by
24   the Union?
25        A.   No.
```

50

```
 1                    Rowan
 2        Q.   Do you have contact with anybody
 3   in the Union on a day-to-day basis?
 4        A.   Yes.
 5        Q.   With who?
 6        A.   It could be a business agent
 7   asking questions.
 8        Q.   What exactly is a business agent?
 9        A.   He would represent the membership
10   from day-to-day, for day-to-day union problems
11   or matters.
12        Q.   So what kind of issues would he
13   come to you with?
14        A.   It might be a problem with
15   coverage or eligibility or enrollment.
16        Q.   Other than any contact with the
17   business agent, would you have any other
18   contact with Union personnel?
19        A.   Maybe a union staff member if
20   someone passed away, a member died or
21   something.
22        Q.   What is the nature of your
23   contact, if any, with the board of trustees of
24   the Fund?
25        A.   My contact is very limited.
```

51

```
 1                    Rowan
 2        Q.   Would you please describe the
 3   nature of that contact.
 4        A.   Well, if we have items for
 5   discussion, I present those and answer any
 6   questions that the board of trustees may have.
 7        Q.   How often does the Fund board of
 8   trustees meet?
 9        A.   Four times a year.
10        Q.   Do you know if meeting minutes
11   are generated as a result of these board
12   meetings?
13        A.   Yes.
14        Q.   Do you know if the Fund would
15   retain copies of these minutes?
16        A.   Yes.
17        Q.   Who at the Fund would retain
18   them?
19        A.   We keep them in a binder.
20        Q.   Was that binder searched in
21   response to our document requests?
22        A.   No.
23        Q.   So, other than your limited
24   contact at the board of trustees meeting or
25   with business agents, you don't really have
```

52

Rowan

2    much contact with Union personnel?

3         A.    No.

4         Q.    Who do you report to?

5         A.    Dennis Giblin.

6         Q.    And who does he report to?

7         A.    The board of trustees.

8         Q.    Does anyone report to you?

9         A.    No.

10        Q.    So do all employees of the Fund

11   report directly to Dennis Giblin?

12        A.    Yes.

13        Q.    Do you have an e-mail account for

14   your work?

15        A.    Yes.

16        Q.    Do you use this, or any other

17   accounts, for fund business?

18        A.    Just my e-mail.

19        Q.    Do you know if this e-mail

20   account was ever searched in response to our

21   requests?

22        A.    No, it wasn't searched.

23        Q.    I'm going to ask a few questions

24   generally about the policies and practices by

25   which the Fund paid claims.

53

Rowan

2              Who does the Fund provide health

3    benefits to?

4         A.    The Union members who are

5    eligible for coverage through their collective

6    bargaining agreement.

7         Q.    Do employees have to opt in to be

8    covered by the Fund?

9         A.    No, it's automatic if it's in

10   their agreement, in the contract.

11        Q.    In the agreement with the

12   employer?

13        A.    Right.

14        Q.    And as a more general question,

15   what kind of employees does the Union

16   represent?

17        A.    Stationary engineers.  They take

18   care of the air conditioning, heating,

19   plumbing, and maintenance of buildings.

20        Q.    And those are all the types of

21   employees that it represents?

22        A.    Yes.

23        Q.    Are all employees who work for

24   certain employers automatically eligible to be

25   covered by the plan, by the welfare plan?

54

Rowan

2         A.    If it's in their contract.

3         Q.    If it's in the collective

4    bargaining contract, you mean?

5         A.    Right.

6         Q.    Do they have to meet any other

7    criteria?

8         A.    They have to have six months of

9    contributions to be eligible.

10        Q.    Do you know where these criteria

11   are set forth?

12        A.    It should be in this book here.

13        Q.    Just to be clear, by "this book,"

14   you're referring to Exhibit Number 2?

15        A.    Two.

16        Q.    Would you please turn to page 4

17   of this document.

18              MS. ABDELHAMID:  SW00008, just

19        for the record, that's the page Bates

20        numbered.

21        Q.    Do you know if the enrollment

22   eligibility criteria set forth on this page

23   are accurate?

24        A.    The first paragraph is.

25        Q.    How about the second paragraph

55

Rowan

2    and the third paragraph?

3         A.    On the second paragraph, we have

4    a student.  You have to be a full-time college

5    student to be covered now, from 19 to age 23.

6    The third paragraph is correct, as the fourth

7    and the fifth.

8         Q.    Okay.  So page 4 is accurate

9    except there is now an additional requirement

10   that from 19 to 23, you have to be a college

11   student to be covered?

12        A.    Correct.

13        Q.    Now, given that this requirement

14   is not in here, and we've spotted a couple of

15   other inaccuracies in the document, how would

16   members know about these things if they're not

17   in this document or covered individuals?

18        A.    They receive a letter from the

19   administrative manager.

20        Q.    Telling them of updates?

21        A.    Correct.

22        Q.    Do you know of any other

23   limitations on enrollment eligibility that are

24   not embodied in these five paragraphs?

25        A.    No, that's the only one that's

56

```
 1                    Rowan
 2    additional.
 3         Q.    How many employees are presently
 4    enrolled under the Fund's plans?
 5         A.    About 2,100.
 6         Q.    Has that number changed since the
 7    Fund was formed?
 8         A.    Oh, it's increased a great deal.
 9         It has steadily increased.  And
10    why is that?
11         A.    Because we add employers to the
12    collective bargaining agreements, and it's
13    increased that way.
14         Q.    And the Union is the one that
15    negotiates the collective bargaining agreement
16    with the employers?
17         A.    That's correct.
18         Q.    Do you know, even approximately,
19    how much the number has changed since the Fund
20    was formed in, you said, 1950?
21         A.    Oh, I don't know.  Probably by at
22    least 1,500 people.
23         Q.    Is the number of enrolled
24    employees recorded anywhere?
25         A.    Yes.
```

```
 1                    Rowan
 2         Q.    Where would that be?
 3         A.    We get a printout every month
 4    from the Horizon Blue Cross.
 5         Q.    And this printout, is this the
 6    only information it has on it, or does it have
 7    additional information?
 8         A.    No that's the information, people
 9    that are enrolled.
10         Q.    And would these documents be
11    retained by somebody at the Fund?
12         A.    Me.
13         Q.    Do you know what's the range of
14    ages of the Union members enrolled in the
15    Fund?
16         A.    Anywhere from 18 to, we have a
17    couple of people that are in their 70s.
18         Q.    Is this information recorded
19    anywhere?
20         A.    Well, we have it listed by birth
21    date on the Blue Cross enrollment listing.
22         Q.    Do you know if the Fund's age
23    demographics have changed since it was formed?
24         A.    I would say there's more older
25    members now than before.
```

```
 1                    Rowan
 2         Q.    Do you know, roughly, what's the
 3    breakdown between men and women in the Fund?
 4         A.    There's more men than women.  I
 5    don't know the number.
 6         Q.    And in what states do the Fund's
 7    covered individuals reside?
 8         A.    Well, we have mostly New Jersey,
 9    some Pennsylvania and some New York.
10         Q.    And there are no members outside
11    those three states?
12         A.    Not that I remember, no.
13         Q.    Do you have any idea what
14    percentage is in New Jersey?
15         A.    I would say at least 96 percent
16    reside in New Jersey.
17         Q.    And is there a reason for that?
18    Is there a reason the concentration is only in
19    those three states?
20         A.    Because Local 68 covers New
21    Jersey.  That's our jurisdiction.
22         Q.    And the individuals in New York
23    and Pennsylvania?
24         A.    That's where they reside.
25         Q.    And do you know if that goes for
```

```
 1                    Rowan
 2    the dependents as well?
 3         A.    Yes.
 4         Q.    Now, the 2,100 number you gave me
 5    before, does that include dependents?
 6         A.    No.
 7         Q.    Do you know how many people in
 8    total are covered?
 9         A.    The dependents is about 4,000.
10         Q.    So the total covered amount is
11    about 6,100?
12         A.    Correct.
13         Q.    And has the number of dependents
14    that are covered changed over time?
15         A.    Well, it's been reduced because
16    of the student eligibility now.
17         Q.    Please turn back to Exhibit 2,
18    the welfare plan.
19         You mentioned there was a
20    different plan before 1998?
21         A.    Correct.
22         Q.    Do you know, between 1994, which
23    is the beginning of our class period, and
24    1998, do you know how many plans were in
25    effect?
```

```
 1              Rowan
 2       A.    Just the one.
 3       Q.    So there's one plan from 1994 to
 4  1998 and then the one we have here?
 5       A.    Right.
 6       Q.    Okay.  Do you know what precise
 7  date this plan was issued on?
 8       A.    January 1, 1998.
 9       Q.    Do you know why the plan is not
10  dated?
11       A.    No.
12       Q.    Are the plans the Fund issues
13  usually undated?
14       A.    I don't know.
15       Q.    Who was involved with the
16  preparation of this plan?
17       A.    The Blue Cross and Blue Shield.
18       Q.    Did anyone at the Fund have any
19  input into this plan?
20       A.    Me.
21       Q.    And what was the nature of that
22  input?
23       A.    Well, I used to meet with the
24  Blue Cross just to go over what was -- you
25  know, the eligibility and the -- not so much
```

```
 1              Rowan
 2  what was going to be covered, but just to make
 3  sure everything that we had prior to this
 4  contract was included in this contract.
 5       Q.    And who at Blue Cross did you
 6  meet with?
 7       A.    Donna Fong-Hesse and Harry
 8  Cassidy.
 9       Q.    Were you the only person at the
10  Fund involved with the preparation of this
11  plan?
12       A.    For the most part, yes.
13       Q.    I just want to clarify.  You just
14  referred to this as a contract, but earlier
15  you referred to it as a plan; you said it
16  wasn't a contract.
17       A.    The correct name is the summary
18  plan description.
19       Q.    So this is not a contract?
20       A.    No.
21       Q.    So how long -- do you remember
22  how long your meetings with Donna and Harry
23  were over this plan?
24       A.    I really don't.  I would say
25  probably maybe a month, on and off.
```

```
 1              Rowan
 2       Q.    And when were these meetings
 3  taking place?
 4       A.    Prior to January 1, 1998.
 5       Q.    Okay.  But a few months before
 6  the new year?
 7       A.    Yes.
 8       Q.    Did anyone else besides Horizon
 9  and you have input into this plan?  For
10  example, pharmacy benefit managers?
11       A.    No.
12       Q.    Were there drafts of this plan?
13       A.    Yes.
14       Q.    Who prepared these drafts?
15       A.    It was a company.  I think it was
16  Zinn and Graves.  You mean who actually typed
17  it or prepared it for publication?
18       Q.    Well, who wrote it, who made the
19  drafts?
20       A.    Horizon Blue Cross.
21       Q.    And would Horizon send the drafts
22  to you?
23       A.    Yes.
24       Q.    Would Horizon send them to anyone
25  else at the Fund?
```

```
 1              Rowan
 2       A.    No.
 3       Q.    Would these drafts be something
 4  that the Fund retains?
 5       A.    I don't know if we have it still.
 6       Q.    If the Fund had it, who at the
 7  Fund would have it?
 8       A.    I would have it.
 9       Q.    Were you involved with the
10  preparation of the plan prior to this, the
11  plan that was in effect from '94 to '98?
12       A.    No.  It was already in effect
13  when I came to be employed at Local 68.
14       Q.    So the previous plan had been in
15  effect for over 20 years, then?
16       A.    Yes.
17       Q.    Do you know when that plan
18  started being in effect?
19       A.    I would say probably in the '50s.
20  But I'm not positive of the date.
21       Q.    So this is the first plan that
22  you had any input into?
23       A.    That's correct.
24       Q.    What prompted the change from the
25  plan that had been in effect for over 20 years
```

```
 1                  Rowan
 2    to this current plan?
 3         A.    They wanted to increase the
 4    benefit program.
 5         Q.    Did they just generally want to
 6    increase all benefits, or was it specific
 7    categories of benefits they were concerned
 8    about?
 9         A.    They wanted a more updated plan
10    that gave better benefits to the membership.
11         Q.    Did somebody at the Fund
12    spearhead this, or did somebody at the Fund
13    take up this initiative?
14         A.    I think it was probably the board
15    of trustees.  But I don't recall specifically
16    who it was.
17         Q.    Did the Fund provide a
18    description of the benefits plan to its
19    enrolled, to its covered members and their
20    dependents?
21         A.    Yes.
22         Q.    In what format did it do so?
23         A.    This is a regular booklet.  And a
24    summary plan description was sent.
25         Q.    What services -- I'm going to ask
```

```
 1                  Rowan
 2    you a few questions about what services this
 3    health plan covers.
 4               Does it cover medical services?
 5         A.    Yes.
 6         Q.    Dental services?
 7         A.    Yes.
 8         Q.    Vision?
 9         A.    Yes.
10         Q.    Does it cover claims for
11    prescription drugs?
12         A.    Yes.
13         Q.    What is the Fund's present
14    policy -- what is the Fund's present payment
15    structure for covering prescription drugs?
16         A.    There's a three-tier program.
17    It's $50 for brand, 25 for preferred, and $20
18    for generic.  I'm sorry, $10 for generic.
19         Q.    When did this three-tier system
20    of payment for prescription drugs begin?
21         A.    January 1, 1998.
22         Q.    Was January 1998 the date that
23    those rate quotations started to apply, or did
24    the rates change?
25         A.    Rates as far as, you mean the
```

```
 1                  Rowan
 2    co-payments?  The co-payments have increased
 3    over the years.
 4         Q.    But it's been three tiers since
 5    January 1, 1998?
 6         A.    Yes.
 7         Q.    Prior to January 1, 1998, what
 8    was the system of payment?
 9         A.    We had another prescription
10    company.  And I don't remember the exact
11    co-payment amounts.
12         Q.    Do you know if it was a
13    three-tiered system?
14         A.    I don't think it was.  I think it
15    was brand or generic.
16         Q.    Do you know why the switch to a
17    three-tier system was made?
18         A.    It was with the Blue Cross.  I
19    don't know why.
20         Q.    So this was just a change Horizon
21    instituted.
22         A.    Right.
23         Q.    I just want to state for the
24    record, and you can confirm this, when you say
25    "Blue Cross," you're referring to Horizon?
```

```
 1                  Rowan
 2         A.    Exactly.
 3               MS. ABDELHAMID:  I want to mark
 4         this letter from Vincent Giblin dated
 5         December 19, 2000, as Exhibit 4.
 6               (Rowan Exhibit 4, Letter from
 7         Vincent Giblin dated December 19, 2000,
 8         marked for identification, as of this
 9         date.)
10         Q.    Do you recognize this?
11         A.    Yes.
12         Q.    What is it?
13         A.    It's a letter to the membership.
14         Q.    Do you know if this letter was
15    actually mailed to all individuals?
16         A.    As far as I know.
17         Q.    Now, the letter states that
18    "Effective January 1, 2001, we are instituting
19    a three-tier co-pay system."
20               So is this the same co-pay system
21    you described, or is this just changing the
22    rate?
23         A.    I think this is just changing the
24    rate.  I have to look in the book and see.
25    (Reading.)
```

Rowan

I think this must have been new.
It looks to me in '98 there is a two-tier.

Q.   Okay.  So you think now, based on
seeing this letter, that actually the
three-tier system was just instituted in
January 2001?

A.   Right.

Q.   And again, this wouldn't have
been reflected in the plan document, and this
letter would be the only way the members would
find out about it?

A.   Correct.

Q.   Do you know if there were ever,
over the class period from '94 to the present,
was there ever any other system of payment
besides the two-tier and the three-tier
systems?

A.   Not that I know of, no.

Q.   Okay.  Let's turn back to the
plan document.  Turn to page 51 of the
document.

At the top it says, "There may be
some services not covered under the blue card
PPO program that might be paid under the

69

Rowan

prescription drug program."

How do these two programs
interact with each other?

A.   I don't know if I understand your
question.

Q.   It says up here, "There may be
some services not covered under the blue card
PPO program that might be paid under the
prescription drug program."

I'm just asking what that means
or what that's referring to.

A.   Unless it's like diabetes
supplies and things like that.  That might be
covered under the prescription, like syringes
and things, that wouldn't be covered under the
PPO.  That's the only thing I can think of.

Q.   But does this document generally
incorporate the PPO program?

A.   Correct.

Q.   And it incorporates the
prescription drug program as well?

A.   Correct.

Q.   So I was just trying to figure
out, there might be some services not covered

70

Rowan

under one that might be paid under the other.

So your testimony is that you're
not actually sure what kind of services that's
referring to?

A.   No.

Q.   In what documents is the coverage
policy for prescription drug located, besides
this plan document?

A.   Just in this.

Q.   It would be just in this
document?

A.   Right.

Q.   The blue card PPO document,
Exhibit 3, would that also embody the
prescription drug program?

A.   Yes, I believe it does.

Q.   So it's your testimony that it's
that document and this document?

A.   Correct.

MS. ABDELHAMID:  I'd like to mark
as Exhibit 5 Horizon Prescription Drug
Plan 2004.

(Rowan Exhibit 5, Horizon
Prescription Drug Plan guide for 2004,

71

Rowan

marked for identification, as of this
date.)

Q.   Do you recognize this document?

A.   Yes.

Q.   What is it?

A.   It's the prescription drug guide
for 2004, Horizon.

Q.   Who created this document?

A.   Horizon.

Q.   Does any other entity, besides
Horizon, have input into this document?

A.   No.

Q.   How often did Horizon generate
this type of document?

A.   I don't think this is -- I think
this is available online with Horizon.  I
think they do it annually.

Q.   Would they send it to the Fund
annually?

A.   No, not unless -- no, they
wouldn't.  It's not something that's
automatically sent out.

Q.   And is it because it's expected
to get it off the website?

72

                                    Rowan

1                              Rowan
2        A.    I would imagine so, yes.
3        Q.    Okay.  So the Fund produced this
4   document.  So where did this come from?
5        A.    No, the Fund didn't produce this.
6   Horizon produced this.
7              Oh, I see.
8        Q.    Well, Horizon created it, but the
9   Fund produced it to us.
10       A.    Oh.  We probably downloaded it
11  off the computer, off the system.
12       Q.    What is your understanding of how
13  this document functions relative to the
14  prescription drug claims that the Fund covers?
15       A.    Well, it would advise the
16  membership as to what tier their drug was on.
17       Q.    And would these tiers correspond
18  to the three tiers of the payment structure?
19       A.    Yes.
20       Q.    So was this document distributed
21  to covered individuals of the Fund?
22       A.    Not in a mass mailing, no.  If
23  someone requested it, we would tell them they
24  can get it off the Internet.
25       Q.    And who from the Fund would they

1                              Rowan
2   request it from -- you would tell them to get
3   it off the Internet.
4        A.    Yes.
5        Q.    And it's your testimony that you
6   think this document was printed off the
7   Internet?
8        A.    Yes.
9              MS. ABDELHAMID:  We're going to
10        mark as Exhibit 6 the undated Horizon
11        prescription drug guide.
12             (Rowan Exhibit 6, Undated Horizon
13        prescription drug guide, marked for
14        identification, as of this date.)
15       Q.    Do you recognize this document?
16       A.    I recognize it from seeing it on
17  the Internet.
18       Q.    What is it?
19       A.    It's a prescription drug guide
20  from Horizon.
21       Q.    Who created this document?
22       A.    I would assume Horizon did.
23       Q.    What is the relationship between
24  this and the document in Exhibit 5?
25       A.    This just -- I don't know what

1                              Rowan
2   this is.
3        Q.    So you recognize it from seeing
4   it on the Internet?
5        A.    I think so.  But then it says
6   "confidential subject to protective order."  I
7   don't know if I ever had this or not.
8        Q.    Do you know who else at the Fund
9   would have this in their files?
10       A.    You know what, it's hard to say.
11  I don't know.
12       Q.    Okay.  So your testimony is
13  you're not sure what Exhibit 6 is?
14       A.    Right.
15       Q.    So another question I have is:
16  You testified that the coverage policy for
17  prescription drugs is set forth in the plan
18  document that's Exhibit 2 and the blue card
19  PPO document that's Exhibit 3.  And also you
20  said since the plan is inaccurate in certain
21  spots, the letter serves as updates to the
22  policy?
23       A.    Correct.
24       Q.    Besides these three documents, is
25  there any other policy, is there any other

1                              Rowan
2   documents that were set forth --
3        A.    No.
4        Q.    Does the Fund pay all
5   prescription drug claims that are submitted to
6   it?
7        A.    Yes.
8        Q.    There are no exceptions?
9        A.    As long as Horizon -- Horizon
10  pays the drug claims, and then we reimburse
11  Horizon.
12       Q.    So you reimburse anything Horizon
13  pays?
14       A.    Correct.
15       Q.    Is any person or entity
16  responsible for making sure the Fund does not
17  pay for drugs that it's not obligated to pay
18  for?
19       A.    I would imagine that would be the
20  administrative manager.  But we use Horizon as
21  our -- you know, as the entity that pays the
22  drugs, so...
23       Q.    So it would be Horizon that you
24  would rely on to --
25       A.    Absolutely.

1                Rowan
2        Q.    -- to screen out any claims that
3    shouldn't be paid for?
4        A.    That's correct.
5        Q.    I'm just going to repeat the
6    question.
7              Is any person or entity
8    responsible for making sure that the Fund does
9    not pay for drugs that it's not obligated to?
10       A.    It would be Horizon.
11       Q.    How would Horizon do that?
12       A.    Well, the prescriptions are
13   submitted from the pharmacies, directly to
14   Horizon.  And then they reimburse the
15   pharmacies.
16       Q.    And we will delve a little more
17   into Horizon's role in the next section.
18             Who administers the prescription
19   drug claims of the Fund?
20       A.    Caremark.
21       Q.    Was this always the case over the
22   class period?
23       A.    No, there was different
24   companies.
25       Q.    Who were the other companies?

1                Rowan
2        A.    Well, I think we had paid
3    prescription.  I think they were all under
4    Horizon, but there was different --
5        Q.    When you say "they were all under
6    Horizon," do you mean the contracts were all
7    under them rather than --
8        A.    Correct.  We never had a
9    contract.
10       Q.    Did you ever directly contract
11   with a PBM?
12       A.    Yes, National Prescription
13   Administrators.
14       Q.    And what period was that over?
15       A.    It was probably in the '90s,
16   1990s.  I don't know specifically.
17       Q.    Do you know if it was early or
18   late '90s?
19       A.    I don't really know.
20       Q.    So, to your knowledge, Horizon
21   contracted with all pharmacy benefit managers,
22   other than National Prescription
23   Administrators, on your behalf?
24       A.    Correct.
25       Q.    The current pharmacy benefit

1                Rowan
2    manager is Caremark?
3        A.    Correct.
4        Q.    Who was it before that?
5        A.    I believe it was AdvancePCS.
6        Q.    But AdvancePCS was bought by
7    Caremark?
8        A.    Right.
9        Q.    But was it Advance PCS/Caremark
10   throughout the whole period?
11       A.    No, prior to that, it was Medco.
12       Q.    And do you know when the switch
13   took place?
14       A.    No, I don't remember.
15       Q.    I'm going to ask you some
16   questions about what information the Fund
17   distributed to its covered participants
18   regarding the coverage.
19             The plan description, you said
20   that was distributed?
21       A.    Correct.
22       Q.    And that was distributed through
23   the mail?
24       A.    Yes.
25       Q.    And then there is both a public

1                Rowan
2    website, but there's a password-protected
3    website.  Who gets passwords to that?
4        A.    It's the member.
5        Q.    The Union members, right?
6        A.    Yes.
7        Q.    And if you're covered under the
8    Fund, do you get an additional password?
9        A.    No, because the prescriber would
10   be a Union member.
11       Q.    And they would have access to all
12   parts of the site?
13       A.    Correct.
14       Q.    Then letters similar to Exhibit 4
15   would have been mailed to the members as well,
16   correct?
17       A.    Yes.
18       Q.    Did any other officers of the
19   Union, besides the business manager, send out
20   letters to the membership?
21       A.    Thomas P. Giblin.  No, I'm sorry.
22   He wasn't a union officer then.  He was
23   administrative manger.
24       Q.    You're saying that he would have
25   sent letters also?

```
1                    Rowan
2        A.    As administrative manager, yes.
3        Q.    Nobody else?
4        A.    No.
5        Q.    How often were letters like this
6   sent out?
7        A.    Usually about once a year.
8        Q.    And would they be sent out to all
9   members?
10       A.    No, just the insured members.
11       Q.    And were they mailed?
12       A.    Yes.
13       Q.    Besides these types of documents
14  that we just discussed, was any other
15  information distributed directly to members
16  from the Fund?
17       A.    Not that I recall.
18       Q.    Did members covered by the Fund
19  receive information about the coverage from
20  the Fund service providers?
21       A.    Yes.
22       Q.    Which service providers?
23       A.    Well, it would be us.
24       Q.    I meant -- let me ask it more
25  directly.
```

```
1                    Rowan
2              Did covered employees receive
3   information directly from Horizon or from Blue
4   Cross?
5        A.    No, it usually comes from Local
6   68.
7        Q.    How about from the pharmacy
8   benefit managers?
9        A.    No.
10             MS. ABDELHAMID:  Let's take a
11       break.
12             (Time noted:  11:34 a.m.)
13             (Recess taken.)
14             (Time noted:  11:42 a.m.)
15       Q.    I'm going to ask some questions
16  about Horizon Blue Cross/Blue Shield of New
17  Jersey.
18       A.    Okay.
19       Q.    First of all, did the Fund use
20  any other entity over the class period to
21  administer its health care coverage?
22       A.    No.
23       Q.    So Horizon has been the
24  third-party administrator since 1994?
25       A.    Yes.
```

```
1                    Rowan
2        Q.    What is Horizon's relationship
3   with the Fund?
4        A.    It's our -- we're self-insured.
5   It's our administrator of the payments of the
6   Fund.
7        Q.    When did the relationship with
8   Horizon begin?
9        A.    Probably in the '50s.
10       Q.    Do Horizon and the Fund have any
11  common leadership within their management
12  structures?
13       A.    No.
14       Q.    Do Horizon and the Union have any
15  common leadership between their management
16  structures?
17       A.    No.
18       Q.    So there's no common employees
19  between Horizon and the Union?
20       A.    No.
21       Q.    How did the Fund select Horizon
22  to be its third-party administrator?
23       A.    I don't know.
24       Q.    And you don't know because this
25  is prior to when you came?
```

```
1                    Rowan
2        A.    Right.
3        Q.    What type of services does
4   Horizon perform for the Fund?
5        A.    They process medical, surgical
6   claims, hospital claims, office visits, any
7   kind of medical services, prescription,
8   dental, and vision.
9              MS. ABDELHAMID:  I want to mark
10       the Administrative Services Agreement as
11       Exhibit 7.
12             (Rowan Exhibit 7, Administrative
13       Services Agreement with Blue Cross and
14       Blue Shield of New Jersey, marked for
15       identification, as of this date.)
16       Q.    Do you recognize this document?
17       A.    Yes.
18       Q.    What is it?
19       A.    It's the Administrative Services
20  Agreement with Blue Cross and Blue Shield of
21  New Jersey.
22       Q.    Do you know what period this
23  contract covered?
24       A.    It looks like November 1992
25  through October 31, 1993.
```

```
 1                 Rowan
 2      Q.   Is this the operative contract
 3 between the Fund and Horizon?
 4      A.   Yes.
 5      Q.   You are testifying it's the
 6 operative contract even though it says the
 7 initial term is '92 to '93?
 8      A.   Well, we have updated ones in the
 9 office, I'm sure.
10      Q.   Who at the Fund would be in
11 possession of updated contracts?
12      A.   Probably the administrative
13 manager.
14      Q.   So that would be Dennis Giblin?
15      A.   Correct.
16      Q.   Do you know if Dennis Giblin's
17 files were searched in response to our
18 document requests?
19      A.   I don't know.
20      Q.   And he would likely be the only
21 one who would have copies of this agreement?
22      A.   I might have a copy.  But I don't
23 know.
24      Q.   Would you please turn to page, I
25 guess it's SW00089.
```
85

```
 1                 Rowan
 2 care benefits.
 3      A.   Right.
 4      Q.   To what degree did the Fund
 5 supervise Horizon in performing these
 6 services?
 7      A.   I don't know if we would really
 8 say it would be supervising.  We did the
 9 eligibility as far as if people were eligible
10 for the services.  But we didn't actually
11 supervise what was paid and what wasn't paid.
12      Q.   When you say you did the
13 eligibility, what exactly did that entail?
14      A.   Well, we do the enrollments and
15 the terminations.
16      Q.   Just enrolling people in the plan
17 and taking them off?
18      A.   Correct.
19      Q.   But on a day-to-day basis, you
20 don't really -- your testimony is that you
21 don't supervise Horizon?
22      A.   No.
23      Q.   If you could turn to page
24 SW00084, Section 8.02.  This provides for
25 procedure to be followed in the event a claim
```
87

```
 1                 Rowan
 2      A.   Yes.
 3      Q.   You see where it says "Local 68
 4 Engineers" --
 5      A.   Right.
 6      Q.   Whose signature is that?
 7      A.   Thomas P. Giblin.
 8      Q.   And at that point, he was the
 9 chairman of the board of trustees of the Fund,
10 correct?
11      A.   Yes.
12      Q.   When Thomas Giblin left his
13 position at the Fund, do you know what
14 happened to his files?
15      A.   They just remained in the office.
16      Q.   So they would be in what's now
17 Dennis Giblin's office?
18      A.   Right.
19      Q.   This agreement refers to Schedule
20 A, as you can see on the very first page in
21 1.0.  It says Schedule A.  Do you know what
22 Schedule A is?
23      A.   No.
24      Q.   You testified that Horizon did
25 claims processing and administration of health
```
86

```
 1                 Rowan
 2 is disputed.
 3      A.   Right.
 4      Q.   Has the Fund ever disputed a
 5 claim with Horizon under this contract?
 6      A.   Yes.
 7      Q.   How often did this happen?
 8      A.   Rarely.
 9      Q.   Rarely as once a month, once a
10 year?
11      A.   No, maybe a few times over the --
12 like 20 years.
13      Q.   How often does Horizon send
14 invoices to --
15      A.   Once a month.
16      Q.   And is the invoice broken down?
17      A.   It's by social security number
18 and by amount paid.
19      Q.   And so you're saying you get
20 those every month, and you've maybe disputed a
21 claim once over 20 years?
22      A.   Well, a couple of times.
23      Q.   Over 20 years?
24      A.   Yeah.
25      Q.   What did those claims involve?
```
88

1/12/2006  Rowan, Theresa A. (MDL)

```
 1                      Rowan
 2        A.    Well, it was probably a matter of
 3   eligibility; that someone had left and should
 4   have been terminated and used the services
 5   after the termination date.
 6        Q.    If you can turn to the first
 7   page, under 2.0, it says the initial term is
 8   from '92 to '93, and it says, "Thereafter,
 9   this agreement will automatically review for
10   successive periods of 12 months."
11              Does that mean nothing more is
12   needed for the agreement to be renewed?
13        A.    I don't know.  There's a renewal
14   that's signed every year.
15        Q.    Do you know who at the Fund is
16   involved in that renewal?
17        A.    Dennis Giblin.
18        Q.    Or whoever is presumably the
19   administrative manager of the Fund?
20        A.    Correct.
21        Q.    Do you know the procedure that's
22   followed for renewal?
23        A.    Blue Cross would come for a
24   meeting, and they would go over the figures
25   and the renewal would be signed.
```

89

1/12/2006  Rowan, Theresa A. (MDL)

```
 1                      Rowan
 2        Q.    Was there ever any debate as to
 3   whether to renew?
 4        A.    I don't know.
 5              MS. ABDELHAMID:  I'm going to
 6        mark as Exhibit 8 a letter dated August
 7        31, 1995, from Harry Cassidy to Thomas
 8        Giblin.
 9              (Rowan Exhibit 8, Letter dated
10        August 31, 1995, from Harry Cassidy to
11        Thomas Giblin, marked for
12        identification, as of this date.)
13        Q.    Do you recognize this?
14        A.    No.
15        Q.    Have you ever seen any other
16   documents like this?
17        A.    No, not really.
18        Q.    Let's put that aside, then.
19              MS. ABDELHAMID:  I want to mark
20        as Exhibit 9 the Administrative Services
21        Agreement between Horizon and Local 68
22        Welfare Fund.
23              (Rowan Exhibit 9, Amended
24        Administrative Services Agreement
25        between Horizon and Local 68 Welfare
```

90

1/12/2006  Rowan, Theresa A. (MDL)

```
 1                      Rowan
 2        Fund, marked for identification, as of
 3        this date.)
 4        Q.    Do you recognize this document?
 5        A.    Yes.
 6        Q.    What is it?
 7        A.    It's the amendment to the
 8   Administrative Services Agreement between
 9   Horizon Blue Cross/Blue Shield of New Jersey
10   and the Local 68 Engineers Union Welfare Fund.
11        Q.    What's this document's
12   relationship to the Administrative Services
13   Agreement we previously looked at and marked
14   as Exhibit 7?
15        A.    I think this is a more detailed
16   version of it.
17        Q.    Is this generally the type of
18   document that the Fund would keep?
19        A.    Yes.
20        Q.    Whose files at the Fund would
21   this type of document be found in?
22        A.    I would say probably the
23   administrative manager's files.
24        Q.    Could you turn to page 47 of the
25   document.  I direct your attention to 4-A.
```

91

1/12/2006  Rowan, Theresa A. (MDL)

```
 1                      Rowan
 2        A.    Right.
 3        Q.    It states that "HMO Blue will
 4   apply the following five criteria in
 5   determining whether services or supplies are
 6   experimental or investigational."
 7              Then it says, "A, any medical
 8   device, drug, or biological product must have
 9   received final approval to market by the
10   United States Food and Drug Administration for
11   the particular diagnosis or condition."
12              Do you know if coverage was ever
13   denied for a drug on the basis that it did not
14   meet this criteria?
15        A.    I don't know that.
16        Q.    Did you ever discuss this
17   provision with anyone at Horizon?
18        A.    No.
19        Q.    Were you aware that this
20   provision was in this document prior to seeing
21   it today?
22        A.    I didn't know exactly that it was
23   in the document, but I knew drugs had to be
24   approved by the FDA.
25        Q.    Just to be clear, your testimony
```

92

```
                        Rowan
 1
 2    is that you're not aware of any case where a
 3    drug claim was denied on this basis?
 4         A.    No.
 5              MS. ABDELHAMID:  I'm going to
 6         mark as Exhibit 10 the HMO Blue evidence
 7         of coverage document.
 8              (Rowan Exhibit 10, HMO Blue
 9         evidence of coverage document, marked
10         for identification, as of this date.)
11         Q.    Do you recognize this document?
12         A.    Yes.
13         Q.    What is it?
14         A.    Local 68 Operating Engineers
15    Union Welfare Fund HMO Blue.
16         Q.    But what is this document?
17    Actually, what is the substance of it?
18         A.    It's a description of the HMO
19    Blue plan.
20         Q.    So this is yet another
21    description of the plan?
22         A.    This is the HMO plan that had
23    been offered also.
24         Q.    Is this something separate from
25    the welfare plan?
```

93

```
                        Rowan
 1
 2         A.    No.
 3         Q.    So that's incorporated into the
 4    welfare plan as well?
 5         A.    Correct.
 6         Q.    How is this document, which is
 7    Exhibit 10, different from Exhibit 3?
 8         A.    Just -- it's the co-payments for
 9    office visits.
10         Q.    So these were both different
11    descriptions of the plan?  I'm talking about
12    this document.
13         A.    That's the PPO; that's the HMO.
14         Q.    What is the date of this
15    document, Exhibit 10?
16         A.    It was effective January 1, 1998.
17         Q.    And how could you tell that?
18         A.    I just knew that.
19         Q.    Do you know if that document --
20    do you know if more than one version of this
21    document has been issued?
22         A.    No, there's only one version of
23    it.
24         Q.    So this was issued in conjunction
25    with the new welfare plan?
```

94

```
                        Rowan
 1
 2         A.    With the PPO, correct.
 3         Q.    So when you say HMO and PPO, the
 4    covered members of the Fund have two options?
 5         A.    They had two options.
 6         Q.    And that was prior to 1998?
 7         A.    No, that was as of 1998.
 8    Actually, 1998 there were three options.
 9    There was PPO, HMO, and to remain in the
10    traditional.
11         Q.    And when did those three options
12    cease to exist?
13         A.    January 1, 2005.
14         Q.    And as of January 1, 2005, what
15    are the options?
16         A.    Just the one, PPO.
17         Q.    So Exhibit 10, which is the
18    evidence of coverage under the HMO, is only
19    effective from '98 to 2005?
20         A.    Correct.
21         Q.    Prior to '98, were the three
22    options available, or was it only the
23    traditional?
24         A.    Traditional.
25         Q.    Do you know if this is the type
```

95

```
                        Rowan
 1
 2    of document that the Fund would have a copy
 3    of?
 4         A.    Yes.
 5         Q.    And who at the Fund would have a
 6    copy of it?
 7         A.    I would have it.
 8         Q.    So if you could turn to pages 16
 9    to 17 of this document.  If you could direct
10    your attention to the bottom of 16, it starts
11    to define experimental or investigational, and
12    at the top of -- it starts to define
13    experimental or investigational.
14              Do you know if this criteria was
15    ever used to deny coverage for a drug
16    prescribed for off-label use?
17         A.    I don't know.
18         Q.    Did the Fund receive any reports
19    from Horizon?
20         A.    What type of reports?
21         Q.    Well, that's what I was going to
22    ask.  I'm just establishing, you did receive
23    something from Horizon?
24         A.    Yes.
25         Q.    What type of reports did you
```

96

Rowan

1
2    receive from Horizon?
3         A.    We received medical and surgical
4    utilization, prescription utilization, visual
5    utilization, and dental utilization.
6         Q.    And these are three separate
7    reports?
8         A.    Actually -- three, yeah.  Three.
9         Q.    And how often do you receive the
10   medical reports?
11        A.    Once a month.
12        Q.    And you said the second was the
13   prescription?
14        A.    All of them come once a month.
15        Q.    And do they all come together?
16        A.    Yes.
17        Q.    Who at the Fund would receive
18   these reports?
19        A.    Dennis Giblin.
20        Q.    If you can turn your attention to
21   this Administrative Services Agreement which
22   is Exhibit 7.  This enumerated a series of
23   reports that the Fund could have received
24   under the agreement.  I want to establish if
25   the Fund did indeed receive them.

Rowan

1
2         Q.    So it's just the total amount
3    paid for a member?
4         A.    Right.
5         Q.    If you could direct your
6    attention to Section 12.01.  That refers to
7    paper copies of rate quotations.  What exactly
8    would that be?
9         A.    I don't know.
10             MS. ABDELHAMID:  For the record,
11        we've been joined by David Chaffin of
12        Hare & Chaffin, also representing
13        defendants Pfizer and Warner-Lambert.
14        Q.    Also in Section 12.01, it says,
15   "If you've requested we provide the service
16   cost utilization reports for benefit
17   management programs."
18             Didn't the Fund request this
19   service for Horizon?
20        A.    Not to my knowledge.
21        Q.    So it's your testimony that there
22   was no cost utilization being done by Horizon
23   for the Fund?
24        A.    No.
25        Q.    Besides the three types of

Rowan

1
2             If you could turn to page
3    SW00086.  12.0 says "monthly claims listing."
4    And then it says, "This claims listing will
5    include those claims we have paid and have
6    specified month and year itemized by
7    identification number, patient name, date of
8    service, claim number, and paid amounts."
9         A.    That's right.
10        Q.    Did the Fund receive this
11   information?
12        A.    Yes.
13        Q.    For what period of time did the
14   Fund receive this information?
15        A.    We always have received it.
16        Q.    And whose files would this be
17   found in?
18        A.    I have them.
19        Q.    Would these monthly claims be an
20   aggregate amount, or would it be itemized?
21        A.    Itemized.
22        Q.    How would it be itemized?
23        A.    By social security number.
24        Q.    Would it be by service or drug?
25        A.    No.

Rowan

1
2    reports you mentioned, the monthly claims
3    listing, was any other type of report provided
4    by Horizon for the Fund?
5         A.    On a monthly basis?
6         Q.    Or on any basis at all.
7         A.    Sometimes we request high-volume
8    claims reports.
9         Q.    Would you please describe what
10   those are?
11        A.    Well, it would be claims over
12   $100,000.
13        Q.    A single claim that was over --
14        A.    Right.
15        Q.    So other than high volume -- you
16   call them high-volume reports?
17        A.    Yes.
18        Q.    There's nothing else that you
19   would request specifically?
20        A.    No.
21        Q.    And to your knowledge, there's no
22   other kinds of reports that Horizon sent to
23   Local 68?
24        A.    No.
25             MS. ABDELHAMID:  I want to mark

```
 1              Rowan
 2     as Exhibit 11 a letter from Vincent
 3     Giblin dated March 16, 2004.
 4              (Rowan Exhibit 11, Letter from
 5     Vincent Giblin dated March 16, 2004,
 6     marked for identification, as of this
 7     date.)
 8          Q.   Do you recognize this letter?
 9          A.   Yes.
10          Q.   Do you recognize the document
11     attached to the letter?
12          A.   I recognize it, yes.
13          Q.   Do you know who provided the
14     "State of the Health Care Report" that is
15     attached to the letter?
16          A.   No, I don't.
17               MS. ABDELHAMID:  Let the record
18          reflect that the State of Health Care
19          Report is stamped Horizon in the corner.
20          Q.   Would it surprise you if Horizon
21     provided this material to the Fund?
22          A.   No.
23          Q.   Do you know if the Fund solicited
24     such material of Horizon or Horizon simply
25     sent this material?
```

101

```
 1              Rowan
 2          A.   I don't know.
 3          Q.   Do you know if this information
 4     was being provided pursuant to a specific
 5     provision in the contract between Horizon and
 6     the Fund?
 7          A.   No, I don't think it was.
 8               MS. ABDELHAMID:  Let's mark as
 9          Exhibit 12 Administrative Service
10          Contract Summary of Operations 1993 to
11          1994.
12               (Rowan Exhibit 12, Administrative
13          Service Contract Summary of Operations
14          1993 to 1994, marked for identification,
15          as of this date.)
16          Q.   Do you recognize this document?
17          A.   No, I don't.
18          Q.   Have you seen other documents
19     like this?
20          A.   Yeah.
21          Q.   Okay.  So you've seen other
22     summary of operations for other years?
23          A.   I believe I have, yes.
24          Q.   Who created this document?
25          A.   Horizon, I would imagine.
```

102

```
 1              Rowan
 2          Q.   Do you know if this information
 3     was being provided pursuant to a specific
 4     provision in the contract between Horizon and
 5     the Fund?
 6          A.   I don't know that.
 7          Q.   Would the Fund retain copies of
 8     this kind of document for each year during the
 9     class period?
10          A.   Yes.
11          Q.   Whose files would this document
12     be found in?
13          A.   Probably the administrative
14     manager.
15          Q.   And you had said earlier that you
16     don't know if his files were searched in your
17     response to requests --
18          A.   No.
19          Q.   You testified earlier that the
20     Fund received a monthly claims listing from
21     Horizon.
22          A.   Correct.
23          Q.   But it wasn't specific by drug or
24     by service; it was just by member?
25          A.   No.
```

103

```
 1              Rowan
 2          Q.   Is the Fund entitled to receive
 3     drug claims data broken down by drug?  For
 4     example, a list of all claims made for
 5     Neurontin during the class period.
 6          A.   I would imagine so.  I don't
 7     know.  By member, you mean?
 8          Q.   Yeah, by member or member ID or
 9     something like that.
10          A.   I don't know.
11          Q.   So it's your testimony that you
12     don't know if the Fund is entitled to get that
13     information?
14          A.   Not by member, I don't know.  But
15     by member's name and social security number, I
16     don't know if that would be under privacy or
17     not.
18          Q.   Okay.  How about just, you know,
19     by drug, if they redacted the member name
20     somehow?
21          A.   Probably, yes.
22          Q.   Do you know if you've ever
23     received such data from Horizon?
24          A.   On a specific drug?  Yes.
25          Q.   For what drug?
```

104

1      Rowan
2      A.    The Neurontin.
3      Q.    This is the document we discussed
4  earlier?
5      A.    Right.
6      Q.    Aside from that, have you ever
7  received any information like that for a
8  specific drug?
9      A.    No, we haven't requested it.
10     Q.    When you requested this
11 information from Horizon, that you're going to
12 give to us today, did they charge you for that
13 information, or did they just give it to you?
14     A.    No, there's no charge.
15     Q.    When you requested the
16 information, did you ask for certain fields as
17 in like date purchased or provider?
18     A.    I didn't request it, but it was
19 provided.
20     Q.    So Horizon automatically provided
21 a number --
22     A.    The date purchased and the amount
23 paid.
24     Q.    Do you know if the Fund is
25 entitled to get a greater degree of

1      Rowan
2      Q.    And, in fact, you didn't request
3  to find out the amounts the Fund was paying
4  for any drug?
5      A.    No.
6      Q.    Is the Fund entitled to receive
7  medical claims data from Horizon?
8      A.    We get that by social security
9  number and by amount we paid.
10     Q.    And you receive that once a month
11 from Horizon?
12     A.    Correct.
13     Q.    What level of detail does this
14 medical claims data contain?
15     A.    Just name, social security
16 number, the date of service, and the amount
17 paid.
18     Q.    And it does not specify what type
19 of service is provided?
20     A.    No.
21     Q.    Does the Fund receive this
22 information in hard copy?
23     A.    Yes.
24     Q.    Does it receive it
25 electronically?

1      Rowan
2  specificity as to each claim?
3      A.    I don't know.  I mean, I would
4  think so.  I don't know.
5      Q.    And why didn't you ask for the
6  data previously before today, or before, you
7  know, when you recently asked for it?
8      A.    I don't know.  Why would I need
9  it?
10     Q.    Were you asked to collect
11 documents in response to our document request?
12     A.    I believe so, yes.
13     Q.    And you didn't think such
14 information was responsive?
15     A.    I only responded to what I was
16 asked to by my counsel here.
17     Q.    And you didn't think that that
18 fell under the categories?
19     A.    No.  I just asked for what was
20 asked of me.
21     Q.    Apart from this litigation, you
22 never requested to know from Horizon the
23 amounts that you were paying, that the Fund
24 was paying, for Neurontin?
25     A.    No.

1      Rowan
2      A.    No.
3      Q.    Is the Fund entitled to receive
4  medical records from its members?
5      A.    I don't know.  We have never
6  requested them.
7      Q.    Is the Fund entitled to receive
8  medical records from Horizon?
9      A.    I'd have to check.  I don't know.
10     Q.    Has the Fund ever received
11 medical records from its members?
12     A.    No.
13     Q.    And that is either directly or
14 through Horizon?
15     A.    No.
16     Q.    Does the Fund have the right to
17 inspect the records and other documents that
18 Horizon uses to administer the claims of the
19 Fund's participants?
20     A.    I don't know.
21     Q.    Has the Fund ever asked to
22 inspect the records and documents Horizon uses
23 to administer these claims?
24     A.    Not to my knowledge.
25     Q.    Not since you've been on the job

```
 1                    Rowan
 2    for 20 years or so.  Okay.
 3                    How was Horizon paid by the Fund?
 4         A.    I believe it's in electronic
 5    wire.
 6         Q.    So you receive a monthly bill?
 7         A.    No, I think they do it weekly.
 8         Q.    And you testified earlier that
 9    the Fund never questioned the bills coming
10    from Horizon?
11         A.    Only if we felt that there was an
12    eligibility problem.
13         Q.    And the claim itself you would
14    never dispute, you never disputed in the
15    20-some years or so?
16         A.    Unless there was an eligibility
17    problem.
18                    MR. FARKAS:  I think we've gone
19         through this a couple of times.
20         Q.    I think we went through this a
21    little bit, but I don't think I got a complete
22    answer.
23                    Who at the Fund was responsible,
24    besides you, for communicating with Horizon?
25         A.    Well, the administrative manager,
```

```
 1                    Rowan
 2    whoever it was at the time.
 3         Q.    Now, it would be Dennis Giblin.
 4         A.    Right.
 5         Q.    Before, it would be Thomas
 6    Giblin.
 7         A.    Right.
 8         Q.    Anyone else communicate with
 9    Horizon?
10         A.    On a day-to-day basis?  Patricia
11    Dandola.
12         Q.    And what is her position at the
13    Fund?
14         A.    She works as a representative,
15    actually, with me.
16         Q.    And who are the contacts at
17    Horizon now that the Fund deals with?
18         A.    The account executives are Jared
19    Ferguson and Edwin Hernandez.
20         Q.    Do you know who these individuals
21    are?
22         A.    They're the account executives of
23    the firm.
24         Q.    I was about to list the people.
25    John Verga?
```

```
 1                    Rowan
 2         A.    John Verga was an account
 3    executive.
 4         Q.    Former account executive?
 5         A.    Former.
 6         Q.    Margaret Johnson?
 7         A.    I don't know who that is.
 8         Q.    Harry Cassidy?
 9         A.    Account executive.
10         Q.    And former also?
11         A.    Former.
12         Q.    Christopher Lepre?
13         A.    I don't know who that is.
14         Q.    What do the Fund and Horizon
15    communicate about?  What issues do the Fund
16    and Horizon have communication about?
17         A.    Eligibility, claim problems,
18    day-to-day issues maybe from membership.
19         Q.    Do the Fund and Horizon ever
20    communicate about prior authorization?
21         A.    What do you mean, "prior
22    authorization"?
23         Q.    You know, prior authorization
24    limits on a drug, such as certain requirements
25    that would have to be filled before a drug
```

```
 1                    Rowan
 2    claim could be filled.
 3         A.    No.  No.
 4                    MS. ABDELHAMID:  I'm going to
 5         mark as Exhibit 13 a letter from John
 6         Verga to Theresa Rowan.
 7                    (Rowan Exhibit 13, Letter from
 8         John Verga to Theresa Rowan, marked for
 9         identification, as of this date.)
10         Q.    Do you recognize this document?
11         A.    I guess so.  It was sent to me.
12    I guess I do.
13         Q.    What is it?
14         A.    It's a letter from John Verga
15    with regard to the drug Celebrex.
16         Q.    Do you have an understanding as
17    to what the letter says?
18         A.    I guess it's about the usage of
19    it.
20         Q.    Do you have a recollection of
21    this letter independent of seeing it here
22    today?
23         A.    No, I do not.
24         Q.    Did you know that Celebrex was
25    under a prior authorization program?
```

1/12/2006 Rowan, Theresa A. (MDL)

Rowan

2    A.    No.
3    Q.    Do you recall, aside from this
4  letter, other correspondence regarding prior
5  authorization with Horizon?
6    A.    No, I do not.
7    Q.    Did you have any -- let's put
8  this aside for now.
9          Did you have any communication
10 with Horizon regarding appeals?
11   A.    What type of appeal?
12   Q.    Like appeal of a claim denial?
13   A.    Yes.
14   Q.    And if a claim was denied, who
15 would the covered person appeal to?  Would it
16 be the Fund or Horizon?
17   A.    Well, it could be the Fund.  And
18 then we would send the appeal for the member.
19 Or the member could go to Horizon directly.
20   Q.    Do you recall any appeals being
21 related to prescription drug coverage, or
22 denial of prescription drug coverage?
23   A.    No, not that I recall.
24   Q.    Do you remember any appeal in any
25 way having to deal with off-label use of

113

1/12/2006 Rowan, Theresa A. (MDL)

Rowan

2  prescription drugs?
3    A.    No.
4    Q.    The appeals that you did have
5  discussions with Horizon regarding, do you
6  recall what those appeals were?
7    A.    I think it was for medical
8  services.
9    Q.    To your knowledge, did Horizon
10 ever communicate to the Fund's covered
11 individuals directly?
12   A.    Well, they do, yeah.  They do
13 after a claim is adjudicated, they send the
14 member a copy of what was paid to the doctor.
15   Q.    Oh, sure, but aside from that.
16   A.    Letters, you mean?
17   Q.    Yeah, letters or --
18   A.    If it was necessary, they could
19 contact the member directly.
20   Q.    Did the Fund ever direct Horizon
21 to send any particular literature to a member?
22   A.    No, not that I know of, no.
23   Q.    Did the Fund ever have any input
24 at all in what Horizon sent to the membership?
25   A.    Well, the Fund, if there was

114

1/12/2006 Rowan, Theresa A. (MDL)

Rowan

2  going to be a mailing, they would always check
3  with the administrative manager first.
4    Q.    How often did Horizon send
5  mailings to members, again, aside from the
6  routine?
7    A.    I don't know.  Again, not
8  frequently.
9    Q.    Do you recall ever communicating
10 with Horizon about off-label reimbursement?
11   A.    No.
12   Q.    Has the Fund generally been
13 pleased with the services that Horizon has
14 provided?
15   A.    Yes.
16   Q.    To your knowledge, did the Fund
17 ever consider switching third-party
18 administrators?
19   A.    Not to my knowledge.
20   Q.    And the disputes you can recall
21 with Horizon over the past 20 years or so,
22 those were solely about eligibility disputes?
23   A.    Yes.
24   Q.    I'm going to ask a little bit
25 about the Fund's relationship with the

115

1/12/2006 Rowan, Theresa A. (MDL)

Rowan

2  pharmacy benefit managers.  And I realize, of
3  course, that the contracting was done
4  primarily with Horizon.
5          You mentioned earlier that there
6  was an additional PBM, I think you said --
7    A.    National Prescription
8  Administrators.
9    Q.    And you couldn't remember what
10 time period that was over?
11   A.    No.
12   Q.    Did the Fund ever contract with
13 Express Scripts?
14   A.    Express Scripts bought National
15 Prescription Administrators.
16   Q.    So would it be accurate to say
17 the Fund's pharmacy benefit managers have been
18 AdvancePCS, later Caremark, Paid
19 Prescriptions, which is Medco affiliated, and
20 Express Scripts/National Prescription
21 Administrators?
22   A.    Correct.
23   Q.    Besides Express Scripts/National
24 Prescription Administrators, the relationship
25 with Caremark and Medco was solely through

116