Rowan

```
1                     Rowan
2    Horizon?
3         A.    That's correct.
4         Q.    Who was the PBM in 1994 at the
5    beginning of the class period?
6         A.    I don't know.  I would say
7    probably National Prescription Administrators.
8         Q.    Do you know why the Fund chose to
9    contract directly with NPA?
10        A.    No, I don't know why.
11        Q.    Did you have an understanding of
12   what services any of these PBMs were
13   performing for the Fund?
14        A.    Did I have an understanding of
15   the services?
16        Q.    Yes, that any of these PBMs were
17   performing.
18        A.    Yes.
19        Q.    So let's start with Paid
20   Prescriptions or Medco.
21              First, do you know what period
22   this PBM serviced?
23        A.    I think that Merck Medco were the
24   prescription carrier in '98 when we first went
25   over to Horizon completely.
```

```
1                     Rowan
2         Q.    And do you know how long they
3    remained?
4         A.    They remained for quite a while
5    until it turned into AdvancePCS.  But I don't
6    know the date of that changeover.
7         Q.    Did the Fund at any point become
8    involved in negotiations between Horizon and
9    Medco?
10        A.    No.
11        Q.    Did the Fund have any
12   knowledge -- was the switch made directly from
13   Medco to AdvancePCS, or do you know if
14   National Prescription Administrators was in
15   the middle of that?
16        A.    No, they never were involved with
17   Horizon, National Prescription Administrators.
18        Q.    So Horizon was involved with
19   Medco and then switched over to AdvancePCS,
20   which become Caremark?
21        A.    Right.
22        Q.    Did the Fund have any knowledge
23   of why Horizon switched from Paid
24   Prescriptions?
25        A.    Not that I know of.  I don't
```

Rowan

```
1                     Rowan
2    know.
3              MS. ABDELHAMID:  I'm going to
4         mark as Exhibit 14 the Integrated
5         Prescription Drug Program Master
6         Agreement between Horizon and Paid
7         Prescriptions.
8              (Rowan Exhibit 14, Integrated
9         Prescription Drug Program Master
10        Agreement between Horizon and Paid
11        Prescriptions, marked for
12        identification, as of this date.)
13        Q.    If you could just turn to the
14   first page of the Integrated Prescription Drug
15   Program Master Agreement.
16              Have you seen this document
17   before?
18        A.    No.
19        Q.    Have you seen documents like this
20   before?
21        A.    No.
22        Q.    Is the Fund generally privy to
23   the agreements between Horizon and the PBMs?
24        A.    I don't know.
25        Q.    But you don't recall ever having
```

```
1                     Rowan
2    seen anything like this?
3         A.    No.
4         Q.    And it's your testimony that the
5    Fund did not play any role in the negotiation
6    of these contracts?
7         A.    Not that I know of.
8         Q.    If you could turn to page 10 of
9    this agreement.  This provides for consulting
10   to be done regarding -- I'm on Section 8.1 at
11   the top of page 10.
12              This provides for consulting to
13   be done regarding the formulary between
14   Horizon representatives and representatives of
15   the Paid Pharmacy Therapeutics Committee.
16              Do you know if these formulary
17   consulting services were being done?
18        A.    I don't know.
19        Q.    Did you know if the Fund used a
20   Paid Prescriptions formulary?
21        A.    I don't know that either.
22        Q.    If you could turn to page 12.
23   Section 8.4 where it says "drug utilization
24   review."
25        A.    Right.
```

```
1                    Rowan
2        Q.    Do you know if Paid Prescriptions
3  was performing any drug utilization review?
4        A.    I don't know that.
5        Q.    We could put this aside for now.
6             So did you have an understanding
7  of the services that Paid Prescriptions was
8  providing for?
9        A.    Outside of payment of claims, no.
10  That's the only thing I was aware of.
11       Q.    So you don't know if Paid
12  Prescriptions was doing any DUR, prior
13  authorization, anything like that?
14       A.    I don't know that.
15       Q.    Did you ever have any discussions
16  with Horizon regarding its use of Paid
17  Prescriptions?
18       A.    No.
19       Q.    So your testimony is that you're
20  aware that Paid Prescriptions was working for
21  Horizon, and you knew that they were paying
22  the prescription drug claims, but that's it?
23       A.    Correct.
24       Q.    Did you ever have any direct
25  contact with anybody at Medco or at Paid
```

```
1                    Rowan
2  Prescriptions?
3        A.    No.
4        Q.    Do you know when the switch was
5  made to AdvancePCS?
6        A.    I'm not sure of the exact date.
7        Q.    Could you put it within a certain
8  period of time?
9        A.    I don't know.  I don't want to
10  guess.
11       Q.    But you do know that it was
12  subsequent to Paid Prescriptions?
13       A.    Correct.
14       Q.    Did you have any more knowledge
15  of the relationship with AdvancePCS than you
16  did with Paid Prescriptions?
17       A.    No.
18       Q.    So your understanding of these
19  services AdvancePCS/Caremark provided, again,
20  was just paying claims, and you knew they were
21  working for Horizon?
22       A.    Correct.
23       Q.    And you had no input into
24  negotiations or anything like that?
25       A.    No.
```

```
1                    Rowan
2        MS. ABDELHAMID:  I'm going to
3  mark as Exhibit 15 a letter from John
4  Verga to Theresa Rowan.
5        (Rowan Exhibit 15, Letter from
6  John Verga to Theresa Rowan, marked for
7  identification, as of this date.)
8        Q.    Do you recognize this document?
9        A.    As a letter from John Verga, yes,
10  I do.
11       Q.    What is it?
12       A.    It's an announcement that there's
13  a change from -- let me see now, agreement
14  with AdvancePCS from Merck Medco to
15  AdvancePCS.
16       Q.    Do you have any knowledge of this
17  document aside seeing it here today?
18       A.    I can say no, I really don't,
19  outside of seeing it here.
20       Q.    When you received this document,
21  do you know if you distributed either the
22  question-and-answer document or the letter to
23  members document to members of the Union?
24       A.    I don't know for sure.
25       Q.    And then other than this
```

```
1                    Rowan
2  document, do you know if there was any other
3  document that would have informed the Union
4  members of this change, or the covered
5  individuals of the Fund?
6        A.    It looks in the third paragraph
7  that we were going to send out new
8  identification cards that would identify the
9  change for the members.
10       Q.    Do you know if that was, in fact,
11  done?
12       A.    Yes.
13       Q.    Do you know what effect the
14  switch in PBMs had on prescription drug
15  coverage?
16       A.    I don't think it had any effect.
17       Q.    And you testified your role
18  with respect to the PBMs didn't change?
19       A.    No.
20       Q.    Did you ever have direct contact
21  with anyone at AdvancePCS or Caremark?
22       A.    No.
23       Q.    And, to your knowledge, Caremark
24  is the current PBM?
25       A.    Correct.
```

Rowan

2    Q.    Did you have any discussions with
3 Horizon regarding the reasons for the switch
4 from Medco --
5    A.    No.
6    Q.    I was going to move on to ask a
7 few questions about National Prescription
8 Administrators and Express Scripts unless we
9 want to break for lunch, unless you want to
10 keep going.
11         MR. FARKAS:  Let's break.
12    (Luncheon recess taken at  12:43 p.m.)
13    A F T E R N O O N   S E S S I O N
14         (Time noted:  1:27 p.m.)
15    T H E R E S A   A.   R O W A N, resumed
16         and testified as follows:
17 EXAMINATION BY (Cont'd.)
18 MS. ABDELHAMID:
19         MS. ABDELHAMID:  I want to mark
20         as Exhibit 16 the Express Scripts
21         documents.
22         (Rowan Exhibit 16, Express
23         Scripts documents, marked for
24         identification, as of this date.)
25    Q.    Are you aware that 12 pages of

Rowan

2 documents were produced to defendants the
3 evening before this deposition?
4    A.    I don't know, no.
5         MS. ABDELHAMID:  Let me just
6         state on the record, then, that the 12
7         pages of documents that we have just
8         marked as Exhibit 16 were produced to
9         defendants the evening before this
10         deposition.
11    Q.    Do you recognize these documents?
12    A.    Some of them I do, yes.
13    Q.    Which of these do you recognize?
14    A.    Actually, I should say that I
15 probably recognize them all because my name is
16 on it.  I hope I do.
17    Q.    What are these documents?
18    A.    I guess they were communications
19 from Express Scripts of different issues with
20 prescriptions.
21    Q.    When you say "communications,"
22 what kind of communications are these?
23    A.    I think these are e-mails.
24    Q.    Does this look like your e-mails
25 are printed out?

Rowan

2    A.    Yes.
3    Q.    And were these sent to your work
4 account?
5    A.    That's correct.
6    Q.    So these documents all originated
7 from your e-mail account?
8    A.    That's correct.
9    Q.    Was your e-mail account searched
10 in connection with defendants' document
11 requests?
12    A.    For this, yes.  For this case,
13 this particular case, it looks like it says
14 Vioxx on it.
15    Q.    So these were produced during the
16 Vioxx case when the e-mail box was searched in
17 connection with that case?
18    A.    Correct.
19    Q.    Has your e-mail box been searched
20 in connection with this case?
21    A.    No.
22    Q.    Do you know why that was not
23 done?
24    A.    Because there wasn't any headings
25 for the drug Neurontin.  I had no

Rowan

2 communications ever from Blue Cross and Blue
3 Shield about Neurontin.
4         If you see here on the e-mails,
5 it says "subject, Vioxx payment" on the other
6 communications.
7    Q.    Without a search of your e-mail
8 box, did you just remember that you never had
9 communications?
10    A.    Yeah, because when the Neurontin
11 drug came up, I didn't even know what it was.
12    Q.    So you saw no -- you felt no
13 reason to ever search your e-mail box?
14    A.    No.
15    Q.    How did these documents come to
16 be produced in this litigation, Exhibit 16?
17    A.    They were requested.
18    Q.    Your attorneys requested that you
19 give them to them?
20    A.    Yes.
21    Q.    Now, these e-mails all seem to be
22 from individuals at Express Scripts; is that
23 correct?
24    A.    That's correct.
25    Q.    And your testimony earlier was

                            Rowan

2    that National Prescription Administrators was

3    bought by Express Scripts?

4         A.    Yes.

5         Q.    And that's how the Fund came to

6    have a relationship with Express Scripts?

7         A.    Yes.

8         Q.    Did the Fund contract directly

9    with Express Scripts?

10        A.    I believe we did.

11        Q.    Is there a contract between the

12   Fund and Express Scripts?

13        A.    I believe there is.

14        Q.    Who would be in possession of

15   that contract?

16        A.    It would be in our fund office,

17   if we still have it.

18        Q.    And this fund office -- you

19   testified previously this was not searched in

20   response to our document requests?

21        A.    No, I said that some of the files

22   are in our fund office, my files.  And I --

23   whatever they asked me for, I found.

24        Q.    But you're saying you were not

25   asked for the contract with Express Scripts?

                                                    129

                            Rowan

2         A.    No.

3         Q.    Do you know if there's one or

4    multiple contracts?

5         A.    There's probably one.

6         Q.    Did you know what time period

7    Express Scripts --

8         A.    No, I'd have to check.

9         Q.    Now, these e-mails all seem to be

10   from October-November 2004.

11        A.    Right.

12        Q.    So does that indicate to you that

13   the relationship was in effect then, or not

14   necessarily?

15        A.    It was in effect then.

16        Q.    Do you know if it's in effect

17   now?

18        A.    No, it's not.

19        Q.    Do you know when it ended?

20        A.    12/31/04.

21        Q.    But you're not sure when they

22   started it?

23        A.    I'm not sure when they bought out

24   NPA, National Prescription Administrators.

25        Q.    Do you know when the NPA

                                                    130

                            Rowan

2    relationship began?

3         A.    I think, as I said before, I

4    think it was in the early '90s.  I don't have

5    a specific date.

6         Q.    And Horizon was not involved in

7    the contracts either with NPA or with Express

8    Scripts?

9         A.    That's correct.

10        Q.    Was there a contract with NPA?

11        A.    Yes.

12        Q.    Would that contract be in the

13   Fund office as well?

14        A.    I think it is.

15        Q.    Now, just to have this clear on

16   the record, the Fund office contains some of

17   your files but not all of them?

18        A.    No, it contains -- the Fund

19   office is my office, the Fund office, and then

20   there's also the administrative manager has

21   his own office.

22        Q.    Is that part of the Fund office?

23        A.    Yes, it is.  We're all in the

24   same location.  But I have privy to some

25   files, like a lot of the files.  But some of

                                                    131

                            Rowan

2    his files I wouldn't have any privy to.

3         Q.    So when you say some of this

4    material, like, the contract with Express, it

5    may only be in his files?

6         A.    It could be, yeah.

7         Q.    And you don't know if that was

8    searched?

9         A.    I don't know.

10        Q.    And you don't know if there's a

11   contract between NPA and the Fund?

12        A.    No, I said I think there is.

13        Q.    And where would that be?

14        A.    Probably in our office.

15        Q.    What services did National

16   Prescription Administrators perform for the

17   Fund?

18        A.    They supplied us with

19   prescription cards and processed the

20   prescription claims.

21        Q.    So at that point when National

22   Prescription Administrators were doing that,

23   was prescription drug coverage not under

24   Horizon's umbrella at all?  Like, how did the

25   two interact with each other?

                                                    132

Rowan

A.    Okay.  In the beginning, in the
early '90s, up until January 1, 1998, NPA was
the carrier.  January 1, 1998, subscribers
switched.  Some went with Horizon Blue
Cross/Blue Shield PPO, and that's when they
got the Paid Prescriptions, and some remained
under the traditional plan and they kept the
NPA.

Q.    So prior to January 1, 1998, the
Fund was using Horizon as its third-party
administrator but not to administer
prescription drug claims?

A.    That's correct.

Q.    Those were administered by
National Prescription Administrators?

A.    Correct.

Q.    Since January 1, 1998, the new
welfare plan comes into in effect, and at that
point the Fund is offering not only
traditional coverage, but the PPO and the HMO.

A.    Correct.

Q.    And at that point brings on
Horizon, who has a contract with Paid
Prescriptions?

Rowan

A.    Right.

Q.    So as of January 1, 1998, some
subscribers go through the Horizon PPO plan?

A.    Correct.

Q.    But then there are some that are
under National Prescription Administrators
still?

A.    Right, because they stayed with
the traditional.

Q.    So those who stay with the
traditional plan get serviced by the NPA?

A.    Yes.

MS. ABDELHAMID:  I just want to
take this opportunity to put on the
record, as it has been demonstrated this
morning, there are a number of documents
we weren't privy to.  We don't have any
documents about National Prescription
Administrators.

So we reserve the right to
continue this deposition once these
documents are produced at some later
point.

Q.    And you're saying that at some

Rowan

point between 1999 and now, Express Scripts
bought National Prescription Administrators?

A.    Correct.

Q.    And those under the traditional
plan would be serviced by Express Scripts, and
those under the HMO would be serviced by
Horizon's PPOs, whoever that might be?

A.    Correct.

Q.    And as of January 1, 2005, you
said there was no longer traditional; it's
only HMO or PPO?

A.    There's no HMO either.

Q.    There's only PPO?

A.    Correct.

Q.    That's why, as of 12/31/04, you
have no more relationship with Express
Scripts?

A.    Yes.

Q.    So Express Scripts -- back to
National Prescription Administrators.

Do you know if for the
traditional plan, National Prescription
Administrators -- what services was National
Prescription Administrators providing?

Rowan

A.    Well, I said, they provided the
prescription cards, and they processed the
claims.

Q.    Do you know if they were
providing any other services, such as DUR,
prior authorization, anything like that?

A.    I don't think so.

Q.    Do you know if when Express
Scripts bought National Prescription
Administrators, do you know if they began to
provide any other services?

A.    I don't really know.  I'd have to
look at the contract.  I don't know what the
services were.

Q.    And this is the contract that you
think the Fund might have?

A.    Yeah.

Q.    That hasn't been produced to us.

Did you have contact with any
individuals at National Prescription
Administrators?

A.    Yes.

Q.    Who are these individuals?

A.    I don't remember, to tell you the

                    Rowan

1                   Rowan
2    truth.
3        Q.    Did you have direct contact with
4    people at Express Scripts?
5        A.    I do.  But the name is in my
6    office.  Let me see if it's on this.  I think
7    Michelle Comerford, on page 3.
8        Q.    What was the nature of your
9    contact with National Prescription
10   Administrators?
11       A.    When I had to call them?  Well,
12   usually there might be a problem with a
13   prescription card, a correction.  Or people
14   had a question about the coverage.  I enrolled
15   and terminated under National Prescription
16   Administrators.
17       Q.    Did you ever have discussions
18   with anyone at National Prescription
19   Administrators regarding cost containment with
20   respect to drugs?
21       A.    No, I didn't personally, no.
22       Q.    Do you know if anyone else at --
23       A.    The administrative manager might
24   have.
25       Q.    Do you know if he had such

                                         137

1                   Rowan
2    conversations?
3        A.    I don't know.
4        Q.    Do you know if anyone else except
5    the administrative manager would have contact
6    with anyone at National Prescription
7    Administrators?
8        A.    No.
9        Q.    What would you say was the extent
10   of your supervision of National Prescription
11   Administrators in carrying out their duties?
12       A.    Just checking the enrollment and
13   the terminations to see if there's anything,
14   you know, purchased after, like, somebody that
15   wasn't eligible.
16       Q.    So you would say it was fairly
17   limited supervision?
18       A.    Yeah.
19       Q.    Was your contact with individuals
20   at Express Scripts to any greater degree?
21       A.    No.
22       Q.    Did the Fund's relationship with
23   National Prescription Administrators or, later
24   on, Express Scripts, play any role in
25   eliminating the traditional plan?

                                         138

1                   Rowan
2        A.    No.
3        Q.    Why did the Fund eliminate the
4    traditional and the HMO plans and decide only
5    to go with the PPO plan?
6        A.    Because the traditional plan only
7    had about 85 subscribers, and the HMO had
8    about 7.  So it wasn't cost effective.
9        Q.    Now, I'm going to discuss a
10   little bit about the processing and payment of
11   prescription drug claims.  And I think I'm
12   going to divide it in -- because apparently
13   there were three coverage schemes in effect
14   during the class period.
15             So the first one I want to
16   discuss is from '94 to '98 where, if my
17   understanding is correct, the three separate
18   plans were in effect, which is the -- between
19   '94 and '98, the traditional, the HMO, and the
20   PPO would have all been options?
21       A.    No, not between '94 and '98.
22       Q.    Only traditional?
23       A.    Correct.
24       Q.    So -- well, first my overall
25   question is:  Were prescription drug claims

                                         139

1                   Rowan
2    processed similarly in all three periods or
3    not?
4        A.    What do you mean, "similarly"?
5        Q.    Under the traditional plan which
6    was in effect from '94 to '99, I want to just
7    discuss how prescription drug claims were
8    covered.
9             Under the traditional plan, did
10   the process differ, the process of processing
11   and payment of prescription drug claims,
12   differ depending on whether the pharmacy use
13   was participating or nonparticipating?
14       A.    I don't know if they could have
15   used the card at a nonparticipating pharmacy.
16   I think they had to use a participating
17   pharmacy.
18       Q.    So National Prescription
19   Administrators did have a list that was a
20   network of participating pharmacies?
21       A.    Oh, yes.
22       Q.    And would this list be something
23   that the Fund retained?
24       A.    No.
25       Q.    And then under that plan, the

                                         140

Rowan

1
2    member had their card.  Then to obtain a
3    prescription, what would they do?
4         A.    They would just present the
5    prescription and then present the card, and it
6    would be presented as payment, you know, less
7    the co-payment.
8         Q.    And at this time, there was a
9    two-tiered system of co-payments?
10        A.    I believe that's so, yes.
11        Q.    Who established the network of
12   pharmacies that would be in effect at that
13   time?
14        A.    National Prescription
15   Administrators.
16        Q.    But it was Horizon administering
17   the plan?
18        A.    No, it wasn't Horizon.
19        Q.    Because the drug plan was
20   administered only through National
21   Prescription Administrators?
22        A.    Right.
23        Q.    And claims would be submitted,
24   for prescription drugs, would be submitted to
25   National Prescription Administrators during

Rowan

1
2    that time?
3         A.    Correct.
4         Q.    And from '94 to '98, it was
5    ultimately the Fund that paid the prescription
6    drug claims?
7         A.    Yes.
8         Q.    From '94 to '98 when the PBM was
9    National Prescription Administrators, did the
10   Fund know how much of its payment was for
11   particular drugs?
12        A.    I don't really know that.
13        Q.    Do you know how the Fund would
14   have figured it out for that period?
15        A.    Well, I think we received
16   billing, but I didn't have anything to do with
17   the billing part of it.
18        Q.    Who would have been responsible
19   for that?
20        A.    Probably the accounts receivable
21   person.
22        Q.    And who would that have been from
23   '94 to '98?
24        A.    I don't know.  I think maybe
25   Agnes Overbaugh.

Rowan

1
2         Q.    So your testimony is you don't
3    know, from '94 to '98, if the Fund knew how
4    much it was paying for particular drugs?
5         A.    They knew total.  I don't think
6    it was broken down drugwise as to how much was
7    paid for each drug.
8         Q.    Did the Fund receive rebate
9    payments from National Prescription
10   Administrators?
11        A.    As far as I know, they did.
12        Q.    Do you have any knowledge of what
13   National Prescription Administrators' rebate
14   strategy was with respect to the Fund?
15        A.    No, I don't know.
16        Q.    Did the Fund receive any
17   documents from National Prescription
18   Administrators regarding rebates?
19        A.    I don't know that either.
20        Q.    Is there anybody at the Fund that
21   would know more about this topic than you?
22        A.    As far as rebates?
23        Q.    Yes.
24        A.    Probably at that time, Thomas P.
25   Giblin was the administrate manager.

Rowan

1
2         Q.    Is he still at the Fund?
3         A.    No, he's the business manager on
4    the Union side now.
5         Q.    Did you talk to him in
6    preparation for this deposition?
7         A.    No, I did not.
8         Q.    For the period '94 to '95,
9    talking about National Prescription
10   Administrators, do you know what the
11   decision-making process, as to whether or not
12   a prescription was covered, was?
13        A.    No, it was if they were eligible,
14   then they would have paid on it.
15        Q.    And then you paid anything that
16   they submitted to you?
17        A.    Correct.
18        Q.    Okay.  How often did National
19   Prescription Administrators bill the Fund?
20        A.    I would say probably monthly, but
21   I don't know that for sure.
22        Q.    And to your knowledge, the Fund
23   paid every drug claim submitted by National
24   Prescription Administrators?
25        A.    Yes.

```
 1                     Rowan
 2        Q.    So now let's move on to the
 3   period from 1998 to 2005.  And if my
 4   understanding is correct, this was the period
 5   when there were the three different plans in
 6   effect.  There was the traditional --
 7        A.    Tell me the dates again.
 8        Q.    1998 to 2005 -- to January 1,
 9   2005.
10        A.    Correct.
11        Q.    And during this period, there
12   would have been the HMO plan under Horizon,
13   PPO plan under Horizon, and then there would
14   have been the traditional, and at some point
15   in that period, Express Scripts bought
16   National Prescription Administrators?
17        A.    Correct.
18        Q.    So for this period of time, did
19   the process differ depending on whether the
20   pharmacy used was participating or
21   nonparticipating?
22        A.    I don't think so.  I think they
23   just had to use a participating pharmacy.
24        Q.    And did -- so for those under the
25   traditional plan, National Prescription
```

145

```
 1                     Rowan
 2   Administrators would generate the list of
 3   participating pharmacies, correct?
 4        A.    That's correct.
 5        Q.    For those under Horizon's two
 6   plans, who would generate the list of
 7   participating pharmacies?
 8        A.    Horizon.
 9        Q.    For the HMO Blue and the Horizon
10   PPO plan, claims would be submitted to
11   Horizon; is that correct?
12        A.    That's correct.
13        Q.    And for the two Horizon plans,
14   the Fund also ultimately paid for the
15   prescription drug claims under those two
16   plans?
17        A.    Yes.
18        Q.    For the HMO Blue and the PPO
19   plan, did the Fund know how much of its
20   payment was for particular drugs?
21        A.    I don't know.
22        Q.    Did the Fund receive rebate
23   payments from Horizon during the period 1998
24   to 2005?
25        A.    I don't know that either.
```

146

```
 1                     Rowan
 2        Q.    Who would know that?
 3        A.    The administrative manager.
 4        Q.    And for part of that time, that
 5   person would have been Dennis Giblin, correct?
 6        A.    After September 1 of '04.
 7        Q.    And did you talk to him in
 8   preparation for this deposition?
 9        A.    No.
10        Q.    Did the Fund receive any
11   documents from Horizon, or either of its PBMs
12   during that period, regarding rebates?
13        A.    I don't know that.
14        Q.    Do you know what the
15   decision-making process was, on Horizon's end,
16   in deciding whether a prescription was
17   covered?
18        A.    No, I do not.
19        MS. ABDELHAMID:  I want to mark
20   as Exhibit 17 the AdvancePCS insert.
21        (Rowan Exhibit 17, AdvancePCS
22        insert, marked for identification, as of
23        this date.)
24        Q.    Do you recognize this document?
25        A.    I believe I do, yes.
```

147

```
 1                     Rowan
 2        Q.    What is it?
 3        A.    It's from AdvancePCS.
 4        Q.    And is this something that was
 5   provided directly to the Fund from AdvancePCS?
 6        A.    Yes.
 7        Q.    Was it provided by AdvancePCS or
 8   Horizon?
 9        A.    I think Horizon.
10        Q.    Was it distributed to members?
11        A.    I believe it was, yes.
12        Q.    And how would it have been
13   distributed?
14        A.    Probably by letter, through the
15   mail.
16        Q.    So now, talking about the period
17   post January 1, 2005, the only plan available
18   is the Horizon PPO plan, and Caremark is the
19   PBM for that, correct?
20        A.    Correct.
21        Q.    And then are prescription drug
22   claims handled the same way that they were
23   under the Horizon PPO plan from '98 to 2005?
24        A.    Yes.
25        Q.    I'm going to ask a little bit
```

148

1          Rowan
2   about process and practices relating to
3   off-label uses.
4           Are you familiar with the term
5   "off-label" when used to describe drug uses?
6       A.    Yes.
7       Q.    What does the term "off-label"
8   mean to you?
9       A.    It means that the drug can be
10  used for purposes other than what the drug was
11  manufactured for.
12      Q.    Is it also your understanding
13  that off-label means a use that the FDA has
14  not specifically approved the drug for?
15      A.    Yes, I believe so.
16      Q.    Do you recall the first time you
17  heard the term "off-label"?
18      A.    Probably like a week ago.
19      Q.    Okay.  So did you hear it in the
20  context of preparing for this deposition?
21      A.    Yes.
22      Q.    So prior to preparing for this
23  deposition, you had never heard that term from
24  someone at the Fund?
25      A.    Not describing it as off-label.

1          Rowan
2   I mean, I've known in the past that drugs were
3   used for other diagnoses except for what it
4   was manufactured for, but I never knew it was
5   called off-label.
6       Q.    And did you know that in your own
7   personal experience?
8       A.    Right.
9       Q.    But had you ever had discussions
10  regarding off-label use with individuals at
11  the Fund prior to preparing for this
12  deposition, even if the term "off-label"
13  wasn't used?
14      A.    I can't really say.
15      Q.    But you don't remember any?
16      A.    Not that I really recall.
17      Q.    Now, I'm going to try and
18  determine what the various policies the Fund
19  was paying for off-label drugs.  It's a little
20  bit difficult because I don't have the old
21  plan document.  But I'm still going to ask you
22  some questions about what you remember.
23          MS. ABDELHAMID:  And again, we
24      reserve our right to continue this once
25      we get the former plan document.

1          Rowan
2       Q.    So first, with regard to the
3   period 1994 to 1998 when only the traditional
4   plan was in effect, Horizon was the
5   administrator, and National Prescription
6   Administrators was the DPA, were prescription
7   drugs covered when prescribed for off-label
8   uses?
9       A.    I don't know.
10      Q.    Do you know if under that
11  traditional plan the Fund's covered
12  individuals were required to indicate whether
13  the prescription drug claims were for
14  off-label uses?
15      A.    Not that I know, no.  I don't
16  know that.
17      Q.    In the second period, from 1998
18  to 2005 when the three different plans were in
19  effect, were prescription drugs covered when
20  prescribed for off-label uses?
21      A.    I don't know.  We only paid
22  whatever the Blue Cross paid.  We reimbursed
23  the Blue Cross.
24      Q.    So your testimony is, throughout
25  the class period, you don't know whether

1          Rowan
2   prescription drugs were covered when
3   prescribed for off-label uses, in any of the
4   plans?
5       A.    I don't know that.
6       Q.    So that is your testimony?
7       A.    Yes.
8       Q.    Do you know if any of the plan
9   booklets distributed throughout the class
10  period had any sections that addressed payment
11  for prescription drugs prescribed for
12  off-label uses?
13      A.    I don't think so.
14      Q.    Do you know if, in practice, the
15  Fund paid for prescription drugs prescribed
16  for off-label uses?
17      A.    I don't know.
18      Q.    And you don't know the answer
19  under any of the plans?
20      A.    No.
21      Q.    Has the Fund ever taken any steps
22  to determine if it pays for prescription drugs
23  prescribed for off-label uses?
24      A.    Not that I know of.
25      Q.    I'm assuming your answers go for

```
1                 Rowan
2    all of the plans?
3         A.    Exactly.
4         Q.    Okay.  Has the Fund ever denied
5    or rejected any claims for off-label
6    prescription drugs?
7         A.    Not that I know of.
8         Q.    Do you know if any other entity
9    has ever done this on the Fund's behalf,
10   whether it be National Prescription
11   Administrators, Horizon, Medco?
12        A.    No, I don't know that.
13        Q.    Has the Fund ever tried to limit
14   its payment for off-label uses of prescription
15   drugs?
16        A.    Not that I know of.
17        Q.    At any point during the
18   administration of prescription drug claims
19   during the class period, did the Fund require
20   its covered individuals to submit information
21   regarding the use of a drug?
22        A.    No.
23        Q.    Did you know if any other third
24   party, such as Horizon, National Prescription
25   Administrators, et cetera, did this on the
```

153

```
1                 Rowan
2    Fund's behalf?
3         A.    I don't know.
4         Q.    So just to be clear, your
5    testimony has been that throughout the class
6    period from '94 to the present, you don't know
7    if prescription drugs are covered for
8    off-label uses under any of the plans; is that
9    correct?
10        A.    Yes.
11        Q.    And your testimony is also that
12   you don't know whether there was a policy on
13   coverage of off-label uses under any of the
14   plans?
15        A.    No, I don't.
16        Q.    And you don't know of any
17   other --
18        MR. FARKAS:  Objection.  Are we
19        going to ask --
20        MS. ABDELHAMID:  Let me just get
21        it out.
22        Q.    Is it your testimony that you
23   don't know if any other third party on behalf
24   of the Fund collected information regarding
25   use of a drug?
```

154

```
1                 Rowan
2         MR. FARKAS:  Objection.  Asked
3         and answered.
4         A.    No.
5         Q.    When you say "no," you agree with
6    my statement, right?  That is your testimony?
7         A.    Yes.
8         Q.    Was the Fund ever aware that it
9    was paying for prescription drugs prescribed
10   for off-label uses?
11        A.    I don't know.
12        Q.    Did anyone at the Fund ever
13   discuss off-label drug use?
14        A.    No.
15        Q.    Did payment for prescription
16   drugs for off-label uses ever become a concern
17   at the Fund?
18        A.    No.
19        MR. FARKAS:  Objection.  You're
20        asking the same question over and over
21        again.
22        Q.    Did the Fund ever communicate, in
23   any fashion, with its covered individual and
24   their dependents about off-label uses of
25   prescription drugs?
```

155

```
1                 Rowan
2         A.    No.
3         Q.    Did the Fund ever determine what
4    portion of the prescription drug claims it was
5    paying was for approved uses and what portion
6    was for off-label uses?
7         A.    Can you read that again?
8         Q.    Did the Fund ever determine what
9    portion of the prescription drug claims that
10   it was paying was for approved uses and what
11   portion was for off-label uses?
12        A.    I don't think so, no.
13        Q.    Did any person or entity do this
14   on the Fund's behalf?
15        A.    No.
16        Q.    Does the Fund have the ability to
17   determine which of the prescription drug
18   claims it paid were for approved uses and
19   which are for off-label uses?
20        A.    I don't know that.
21        Q.    Would you agree that one part of
22   administering any health benefits plan is to
23   contain costs?
24        A.    Yes.
25        Q.    Did the Fund ever discuss
```

156

**[Page 157]**

```
1                    Rowan
2     containing the cost of prescription drugs
3     prescribed for off-label uses as a way of
4     containing costs?
5          A.    I don't know.
6          Q.    Would you be the person with the
7     most knowledge about this topic?
8          A.    No.
9          Q.    Who would that be?
10         A.    The administrative manager.
11         Q.    So again, that would be Dennis
12    Giblin, and it used to be Thomas Giblin.
13               Do you know if any documents
14    would have been generated throughout the
15    course of these discussions?
16         A.    I don't know.
17               MR. FARKAS:  Objection.  No
18         foundation as well.
19         Q.    Are you familiar with the drug
20    Neurontin?
21         A.    Just what I learned from giving
22    out the documents.
23         Q.    When was the first time you heard
24    about the drug Neurontin?
25         A.    Whenever the counsel contacted
```

157

**[Page 158]**

```
1                    Rowan
2     me.
3          Q.    Do you know, when, roughly, was
4     that?  In the past few months, the past six
5     months?
6          A.    Yeah, the past few months.
7          Q.    Prior to that, you never even
8     heard the name of the drug?
9          A.    Never.
10         Q.    Had you heard of gabapentin?
11         A.    No.
12         Q.    Do you know what Neurontin's
13    approved uses are?
14         A.    I do now.
15         Q.    What is the basis for this
16    understanding?
17         A.    That's what I was told.
18         Q.    Who told you?
19         A.    Counsel.
20         Q.    What are the approved uses of
21    Neurontin as you understand them?
22         A.    I think it's just for epilepsy.
23         Q.    You think it's just for epilepsy?
24    That's your testimony?
25         A.    Right.
```

158

**[Page 159]**

```
1                    Rowan
2          Q.    When was Neurontin approved for
3     epilepsy?
4          A.    I don't know.
5          Q.    Is Neurontin ever effective as
6     adjunctive use for epilepsy?
7          A.    I don't know.
8          Q.    Is the Fund seeking damages for
9     claims submitted by its enrolled employees and
10    its dependents for Neurontin if the drug was
11    prescribed for epilepsy?
12         A.    I don't know that either.
13         Q.    To your knowledge, is there any
14    other approved use for Neurontin, other than
15    epilepsy?
16         A.    I don't know.
17         Q.    Is Neurontin ever effective if
18    prescribed for postherpetic neuralgia?
19         A.    I don't know.
20         Q.    Is the Fund seeking damages for
21    claims submitted by its enrolled employees and
22    its dependents for Neurontin if the drug was
23    prescribed for postherpetic neuralgia?
24         A.    I don't know.
25         Q.    Are you familiar with the
```

159

**[Page 160]**

```
1                    Rowan
2     off-label uses of Neurontin?
3          A.    No.
4          Q.    So you don't know what any of the
5     off-label uses of Neurontin are?
6          A.    No.
7          Q.    Is Neurontin ever effective for
8     any off-label uses?
9          A.    I don't know.
10         Q.    Did the Fund, either through its
11    agents or a third party, ever perform an
12    analysis regarding whether Neurontin provides
13    a medical benefit for patients who use it for
14    off-label uses?
15         A.    No.
16         Q.    No, you don't know, or no, you
17    didn't perform?
18         A.    No.
19         Q.    Did the Fund, either through its
20    agents or a third party, ever perform an
21    analysis regarding whether Neurontin provides
22    a medical benefit to patients who use it for
23    pain?
24         A.    No, they did not.
25         Q.    Did the Fund -- okay.  I'm going
```

160

**Page 161**

Rowan

2 to go through a list of off-label uses and --
3 I'll just ask the question every time.
4        Did the Fund, either through its
5 agents or through a third party, ever perform
6 an analysis regarding whether Neurontin
7 provides a medical benefit to patients who use
8 it for postherpetic neuralgia?
9    A.    No.
10   Q.    Did the Fund, either through its
11 agents or through a third party, ever perform
12 an analysis regarding whether Neurontin
13 provides a medical benefit to patients who use
14 it for restless leg syndrome?
15   A.    No.
16   Q.    Did the Fund, either through its
17 agents or through a third party, ever perform
18 an analysis regarding whether Neurontin
19 provides a medical benefit to patients who use
20 it for diabetic peripheral neuropathy?
21   A.    No.
22   Q.    When I say "agents," that
23 includes attorneys.
24   A.    Okay.
25   Q.    Did the Fund, either through its

161

**Page 162**

Rowan

2 agents or through a third party, ever perform
3 an analysis regarding whether Neurontin
4 provides a medical benefit to patients who use
5 it for social phobia?
6    A.    No.
7    Q.    Did the Fund, either through its
8 agents or through a third party, ever perform
9 an analysis regarding whether Neurontin
10 provides a medical benefit to patients who use
11 it for panic disorder?
12   A.    No.
13   Q.    Did the Fund, either through its
14 agents or through a third party, ever perform
15 an analysis regarding whether Neurontin
16 provides a medical benefit to patients who use
17 it for migraines?
18   A.    No.
19   Q.    Did the Fund, either through its
20 agents or through a third party, ever perform
21 an analysis regarding whether Neurontin
22 provides a medical benefit to patients who use
23 it for monotherapy for epilepsy?
24   A.    No.
25   Q.    Did the Fund, either through its

162

**Page 163**

Rowan

2 agents or through a third party, ever perform
3 an analysis regarding whether Neurontin
4 provides a medical benefit to patients who use
5 it for bipolar disorder?
6    A.    No.
7    Q.    Did the Fund, either through its
8 agents or through a third party, ever perform
9 an analysis regarding whether Neurontin
10 provides a medical benefit to patients who use
11 it for any other off-label use?
12   A.    No.
13   Q.    Do you know how the Fund, or its
14 agents, would go about conducting such an
15 analysis?
16   A.    They would have to contact
17 Horizon Blue Cross and Blue Shield.
18   Q.    But, to your knowledge -- I mean,
19 Horizon would be included in agents.  Has
20 Horizon ever done anything like that?
21   A.    No.
22   Q.    Did the Fund receive any
23 information regarding whether Neurontin was
24 effective for any of the enrolled employees
25 whose claims it paid?

163

**Page 164**

Rowan

2    A.    No.
3    Q.    Did the Fund ever receive any
4 information regarding whether Neurontin was
5 effective for any of the dependents whose
6 claims it paid?
7    A.    No.
8    Q.    Does the Fund know in which cases
9 Neurontin was effective for its enrolled
10 employees?
11   A.    No.
12   Q.    The dependents?
13   A.    No.
14   Q.    How would the Fund go about
15 finding this out?
16   A.    You have to contact Horizon.
17   Q.    Do you know how Horizon would go
18 about finding this out?
19   A.    I would imagine they would
20 contact Caremark.
21   Q.    And do you know how Caremark
22 would go about finding this out?
23   A.    No, I don't.
24   Q.    Do you know if Horizon has any
25 information regarding Neurontin's efficacy for

164

Rowan

1
2  the Fund's covered individuals?
3       A.    I don't know.
4       Q.    Do you know if anyone else has
5  such information?
6              MR. FARKAS:  Objection.  Calls
7       for speculation.
8              MS. ABDELHAMID:  I'm asking her
9       if she knows.
10      Q.    You can say you don't know.
11      A.    No, I don't know.
12      Q.    Did you have any internal
13  discussions at the Fund regarding the
14  off-label use of Neurontin?
15             MR. FARKAS:  Objection.  Asked
16      and answered.
17      A.    No.
18      Q.    Has anyone at the Fund discussed
19  the off-label use of Neurontin with
20  individuals at Horizon?
21      A.    No.
22      Q.    Has anyone from the Fund
23  discussed the off-label use of Neurontin with
24  individuals at the various PBMs that have been
25  used?

165

Rowan

1
2       A.    No.
3       Q.    Has anyone from the Fund
4  discussed the off-label use of Neurontin with
5  the Fund's covered individuals?
6              MR. FARKAS:  Objection.  Asked
7       and answered.
8              MS. ABDELHAMID:  I haven't asked
9       that.
10             MR. FARKAS:  You did a while ago.
11      Q.    Has anyone?
12      A.    No.
13      Q.    Would the Fund retain copies of
14  these types of discussions if they occurred?
15             MR. FARKAS:  Objection.
16      A.    I don't know.
17             MS. ABDELHAMID:  Can I just take
18      a break for two minutes.
19             (Time noted:  2:13 p.m.)
20             (Recess taken.)
21             (Time noted:  2:22 p.m.)
22             MS. ABDELHAMID:  So we're just
23      putting on the record that this reflects
24      discussions counsel just had.  We think
25      we're going to be able to wrap up what

166

Rowan

1
2  we have today.  But it's become clear
3       that there are many more documents that
4       haven't been produced.
5              Once those have been produced, we
6       reserve the right to do a second day of
7       depositions.  And plaintiff, Local 68
8       Welfare Fund, won't object if that
9       happens after the close of discovery
10      cutoff.
11      Q.    So, again, I'm going to go back
12  to dividing it into the three time periods.
13             From 1994 to 1998, what was the
14  Fund's coverage policy for Neurontin claims?
15      A.    Well, if it was an eligible drug,
16  it was paid.
17      Q.    What determined if it was an
18  eligible drug or not?
19      A.    I would imagine it would be
20  determined by Caremark or whoever the
21  prescription carrier was.
22      Q.    So '94 to '98, that would have
23  been National Prescription Administrators, so
24  it would have been them?
25      A.    Correct.

167

Rowan

1
2       Q.    Has that, has the coverage policy
3  for Neurontin always been the same since 1994,
4  regardless of what plan was in effect?  If it
5  was an eligible drug under whoever's plan,
6  then it was covered?
7       A.    Yes.
8       Q.    And there are no circumstances
9  that you knew of, under any of the plans,
10  where Neurontin would not be covered?
11      A.    Not that I know of.
12      Q.    Do you know if Neurontin was what
13  you would call an eligible drug under any of
14  the plans?
15      A.    I would assume it was.
16      Q.    You would assume it was under all
17  the plans?
18      A.    Yes.
19      Q.    What's the basis for that
20  assumption?
21      A.    It appears that it was always
22  paid on.  So it was an eligible drug.  If it
23  was not an eligible drug, there would have
24  been no payment made on it.
25      Q.    And what is your basis for saying

168

```
1                    Rowan
2    that it has been paid on?
3         A.    Based on that.
4              MS. ABDELHAMID:  So I want to
5         introduce as an exhibit, Exhibit 18, the
6         claims data that has just been provided
7         to us today from the Fund.
8              (Rowan Exhibit 18, Claims data
9         provided by the Fund, marked for
10         identification, as of this date.)
11        Q.    Do you recognize this document
12   that we've marked as Exhibit 18?
13        A.    Yes.
14        Q.    What is it?
15        A.    It's the Neurontin utilization
16   from July of '02 to August of '05.
17        Q.    And who created this document?
18        A.    Horizon Blue Cross/Blue Shield.
19        Q.    And they created it at your
20   request; is that correct?
21        A.    That's correct.
22        Q.    And this request was solely in
23   connection with this litigation?
24        A.    Yes.
25        Q.    Have you ever seen a document
```

```
1                    Rowan
2    like this, previous to that, from Horizon?
3         A.    No.
4         Q.    From any of the previous PBMs you
5    dealt with?
6         A.    No.
7         Q.    And what motivated you to ask for
8    this document?
9         A.    Request of counsel.
10        Q.    Did Horizon charge you for
11   providing this document?
12        A.    No.
13        Q.    So your statement that Neurontin
14   claims had been paid upon is based solely from
15   this document?
16        A.    Correct.
17        Q.    Okay.  And this document seems to
18   cover from July 2002 to August 2005.
19             So between 1998 and 2000, what's
20   your basis for saying that Neurontin claims
21   have been paid by the Fund?
22        A.    Based on the fact that it looks
23   to me that it's an eligible drug.
24        Q.    So you're assuming if it was an
25   eligible drug now, it probably was an eligible
```

```
1                    Rowan
2    drug previously?
3         A.    Correct.
4         Q.    Did the Fund itself have a policy
5    on paying Neurontin claims?
6         A.    No.
7         Q.    So it followed whatever policy
8    the PBMs or Horizon used?
9         A.    Correct.
10        Q.    And did this change from '94 to
11   the present?
12        A.    No.
13        Q.    So the Fund never developed its
14   own, or had any input on policies that other
15   parties had on its behalf on paying on
16   Neurontin?
17        A.    No.
18        Q.    Were you aware of any Neurontin
19   prescriptions that were ever denied by Horizon
20   or any of the PBMs during the class period?
21        A.    No.
22        Q.    So it's your testimony that
23   Neurontin claims have never been rejected by
24   the Fund?
25        A.    That's correct.
```

```
1                    Rowan
2         Q.    Did the Fund ever deny a
3    Neurontin claim because it was for an
4    off-label use?
5              MR. FARKAS:  Objection.  Asked
6         and answered.
7         Q.    Did the Fund, Horizon, or anyone
8    acting on its behalf, ever check to see if any
9    Neurontin claims were paid for off-label uses?
10        A.    Did we ever check to see?
11        Q.    Yeah, or anyone acting on your
12   behalf.
13        A.    No.
14        Q.    One more question on Exhibit 18.
15   You said you received this recently from
16   Horizon.  Did you receive anything else
17   recently from Horizon?
18        A.    No.
19        Q.    Did the Fund know how many of its
20   covered individuals took Neurontin?
21        A.    No.
22        Q.    Could the Fund find this out?
23        A.    I don't know.
24        Q.    Does the Fund know if the number
25   of covered individuals taking Neurontin
```

Rowan

1
2     changed throughout the class period?
3          A.    I don't know.
4          Q.    Can the Fund identify for how
5     long each of its covered individuals took
6     Neurontin?
7          A.    No, I don't know if it could or
8     not.
9          Q.    Has the Fund identified which of
10    its covered individuals took Neurontin?
11               MR. FARKAS:  Objection.  Asked
12          and answered.
13               MS. ABDELHAMID:  It's a different
14          question.
15          A.    Say it again.
16          Q.    Has the Fund identified which of
17    its covered individuals took Neurontin?
18          A.    No, we have not.
19          Q.    You testified earlier that the
20    Fund's covered individuals live mostly in New
21    Jersey, I think you said 96 percent, and the
22    rest in New York and Pennsylvania?
23          A.    Right.
24          Q.    Has this been true since 1994?
25          A.    Pretty much, yeah.

173

Rowan

1
2          Q.    Do all of the Fund's covered
3     individuals purchase their prescription drugs
4     in New Jersey, New York, or Pennsylvania?
5          A.    I would guess so.
6          Q.    Do you know if this has been true
7     throughout the class period?
8          A.    I would imagine so.  They would
9     buy them where they reside.
10         Q.    Did the alleged
11    misrepresentations in connection with the
12    Fund's claims all occur within New Jersey,
13    New York, and Pennsylvania?
14         A.    I would assume so.
15         Q.    What's the basis of that
16    assumption?
17         A.    Where the people reside, the
18    residences.
19         Q.    For each covered individual who
20    took Neurontin, does the Fund, or Horizon,
21    Caremark, or any of these third parties, have
22    records regarding other drugs that they took?
23         A.    They probably do.
24         Q.    Would the Fund have these
25    records?

174

Rowan

1
2          A.    No.
3          Q.    Who would have these records?
4          A.    Horizon.
5          Q.    Would Horizon have them for the
6     entire class period?
7          A.    No, because Horizon didn't have
8     the drugs until 1998, the drug coverage.
9          Q.    So from '94 to '98, National
10    Prescription Administrators or Express Scripts
11    would have them?
12         A.    Probably, yes, right.
13         Q.    And then after '99, between '98
14    and 2005, a combination of Horizon and Express
15    Scripts would have them, and after 2005
16    Horizon would have them, correct?
17         A.    Right.
18         Q.    Does the Fund have the right to
19    receive this data from Horizon and/or National
20    Prescription Administrators if it requests it?
21         A.    I believe so, yes.
22         Q.    Has the Fund ever done that?
23         A.    No.
24         Q.    Besides Exhibit 18, which we just
25    discussed, did you ever request any other

175

Rowan

1
2     information from Horizon regarding claims
3     data, whether medical or drug claims data?
4          A.    Well, I get the monthly printout
5     anyway.
6          Q.    Aside from the monthly run?
7          A.    Maybe.  Not frequently.  But
8     there's a possibility that maybe, yeah.
9          Q.    Do you remember the circumstances
10    of that?
11         A.    Well, it could have been somebody
12    for like rehabilitation treatment, or
13    something like that, that we might have
14    requested.
15         Q.    Is that the high-volume treatment
16    that you referred to earlier?
17         A.    No, separate.
18         Q.    Do any of the services the Fund
19    uses attempt to prevent drug interactions?
20         A.    Any of the services the Fund
21    uses?  I don't know.  I wouldn't think so.  I
22    don't know.
23         Q.    Do you know if the PBMs or
24    Horizon do anything like that on the Fund's
25    behalf?

176

Rowan

1  A.    No.  Wouldn't that be the
2  pharmacist that does that?
3  Q.    So, to your knowledge, the Fund
4  doesn't do anything?
5  A.    No.
6  Q.    Okay.  Now I'm going to ask a few
7  questions about the formulary.  And again, I
8  think I'm going to have to split into the
9  three time periods.
10      First of all, are you familiar
11  with the term "formulary"?
12  A.    Yes.
13  Q.    What does it mean to you?
14  A.    I think it's a listing of drugs.
15  Q.    Has a formulary ever been used to
16  process the Fund's prescription drug claims?
17  A.    I would imagine so.
18  Q.    All right.  So I'm going to,
19  again, go through this -- I know this is kind
20  of tiresome, but the transcript has to be
21  clear.
22      From '94 to '98 when National
23  Prescription Administrators was in charge of
24  the prescription drug claims, do you know if a

Rowan

1  Q.    Would the Fund have a copy of the
2  formulary used by National Prescription
3  Administrators?
4  A.    I don't think so.
5  Q.    Did you have an understanding as
6  how drugs were added or removed from the
7  National Prescription Administrators
8  formulary?
9  A.    No.
10  Q.    Did you have any involvement with
11  that process at all?
12  A.    No.
13  Q.    By "you," I still mean the Fund.
14  A.    Right.
15  Q.    Do you know if Neurontin was on
16  the National Prescription Administrators
17  formulary?
18  A.    I don't know.
19  Q.    Do you know what factors were
20  considered when adding a drug to the formulary
21  or taking one off in the '94-'98 time period?
22  A.    No, I do not.
23  Q.    Do you know, during that '94 to
24  '98, any consideration was given to whether a

Rowan

1  formulary was being used during that time?
2  A.    I believe it was.
3  Q.    Who generated this formulary?
4  A.    I don't know.
5  Q.    Did the Fund generate this
6  formulary?
7  A.    No.  No.
8  MR. FARKAS:  Objection to the
9  form.
10  Q.    And would you be the one who
11  knows about that, if the Fund did?
12  A.    Yes.
13  Q.    Did you ever see that formulary,
14  a document that embodied that formulary?
15  A.    Not that I can recall.
16  Q.    Did you understand it was just
17  implemented by National Prescription
18  Administrators, and you weren't sure where it
19  came from?
20  A.    Right.
21  Q.    Do you know what the significance
22  was of a drug being on the formulary used by
23  National Prescription Administrators?
24  A.    I'm not sure, no.

Rowan

1  drug was prescribed for an off-label use when
2  deciding whether to place it on the formulary
3  or not?
4  A.    I don't know.
5  Q.    Do you know if the formulary used
6  by the Fund at that time had a preferred drug
7  list?
8  A.    I'm not sure.
9  Q.    So now, moving on to 1998 to
10  2005, presumably the formularies in effect
11  during this time period would be both the NPA
12  one and any formulary that Horizon used.
13      Do you know if Horizon used a
14  formulary to administer --
15  A.    I believe they do, but I'm not
16  sure.
17  Q.    Was the Fund involved at all
18  in -- so you're not sure if Horizon used a
19  formulary?
20  A.    No, I believe they did, but I
21  can't say for sure.
22  Q.    Was the Fund involved at all in
23  the creation of that formulary?
24  A.    No.

Rowan

```
 1                    Rowan
 2      Q.   Is the Horizon formulary
 3 memorialized anywhere?  Does the Fund have a
 4 copy?
 5      A.   No.
 6      Q.   I want to look back at Exhibit 5.
 7 Do you know what is the relationship of this
 8 document, if any, to Horizon's formulary?
 9      A.   I don't know.
10      Q.   Do you know if Neurontin appears
11 in this drug guide?
12      A.   No, I don't know that.
13      Q.   Do you know what's the
14 significance of Neurontin appearing or not
15 appearing on this list?
16      A.   No, I do not.
17      Q.   If you could look at Exhibit 6.
18 Do you know the relationship of this document
19 to the formulary?
20      A.   No.
21      Q.   Do you know if Neurontin appears
22 in this document, in this listing?
23      A.   I do now.
24      Q.   But you only know because you
25 just looked at it?
```

```
 1                    Rowan
 2      A.   Yeah.
 3      Q.   Do you know the significance of
 4 Neurontin appearing or not appearing on this
 5 list?
 6      A.   No.
 7           MS. ABDELHAMID:  I want to mark
 8      as Exhibit 19 the letter from Vincent
 9      Giblin dated August 25, 2003.
10           (Rowan Exhibit 19, Letter from
11      Vincent Giblin dated August 25, 2003,
12      marked for identification, as of this
13      date.)
14      Q.   Do you recognize this document?
15      A.   Yes.
16      Q.   What is it?
17      A.   It's a notification that there
18 are some drugs being moved from, to a
19 nonpreferred status.
20      Q.   Who is responsible for moving
21 drugs on the attached drug guide to
22 nonpreferred status?
23      A.   Horizon or Caremark.
24      Q.   Did the Fund have any input into
25 this process?
```

Rowan

```
 1                    Rowan
 2      A.   No.
 3      Q.   Had this type of change happened
 4 before joining the class period, with respect
 5 to any drug?
 6      A.   I don't know for sure.
 7      Q.   Do you know what Neurontin's
 8 status was at the time?
 9      A.   No.
10      Q.   And do you know the process by
11 which drugs got added and dropped from
12 Horizon's formulary?
13      A.   I do not.
14      Q.   Do you know if whether a drug was
15 prescribed for off-label use was a factor in
16 including it or not including it in Horizon's
17 formulary?
18      A.   I don't know that.
19      Q.   Okay.  Do you know if Horizon's
20 formulary had a preferred drug list?
21      A.   I don't know.
22      Q.   Would an accurate recapitulation
23 of your testimony be that throughout the class
24 period you assumed that there was some
25 formulary in effect for Horizon and the
```

```
 1                    Rowan
 2 various PBMs, but the Fund was not at all
 3 involved with what went on or got deleted from
 4 that formulary?
 5      A.   That's correct.
 6      Q.   And as far as documents related
 7 to those formularies, do you think the Fund
 8 would have?
 9      A.   I don't think so.
10      Q.   And it just implemented the
11 formularies as, you know, they were
12 implemented by the PBMs or Horizon?
13      A.   That's correct.
14      Q.   And you don't know what the
15 status of Neurontin was on the formulary
16 during that time?
17      A.   No, I do not.
18      Q.   And your assumption that
19 Neurontin was on the formulary is solely from
20 the fact that it was paid for?
21      A.   Correct.
22      Q.   Do you know when Neurontin was
23 added to the Fund's formulary?
24      A.   No, I do not.
25      Q.   Do you know if, anytime during
```

1/12/2006  Rowan, Theresa A. (MDL)

```
 1                    Rowan
 2   the class period, Neurontin's status on any of
 3   the formularies changed?
 4        A.   No, I do not.
 5        Q.   And is it your testimony that you
 6   don't know whether off-label use generally or
 7   off-label use of Neurontin was a factor in
 8   keeping Neurontin on any of the formularies?
 9        A.   No, I don't know.
10        Q.   Do you know if Neurontin was ever
11   removed from any of the formularies?
12        A.   No, I don't know.
13        Q.   So as it stands today, you don't
14   know if Neurontin is on the operative
15   formulary for the Fund?
16        A.   No.
17        Q.   Do you recall ever having
18   discussions with anybody either at Horizon,
19   the PBMs, or the Fund, about any of the
20   formularies?
21        A.   No.
22        Q.   Do you recall having any
23   discussions with people at the Fund, Horizon,
24   or the PBMs, about the prescription drug
25   guides?
```

185

1/12/2006  Rowan, Theresa A. (MDL)

```
 1                    Rowan
 2        A.   Only that I may have requested
 3   one, but outside of that.
 4        Q.   And why would you have requested
 5   one?
 6        A.   A member might have wanted one.
 7        Q.   So there was never any
 8   discussions between you and anyone else
 9   regarding what drugs were or were not on the
10   prescription drug guides or the formularies?
11        A.   No.
12        Q.   Did the Fund implement any
13   programs or policies, at any point during the
14   class period, to contain prescription drug
15   costs?
16        A.   Yes.
17        Q.   What were these policies?
18        A.   Actually, it really wasn't a
19   policy.  They just encouraged people to use
20   generic brands instead of preferred.
21        Q.   Anything else?
22        A.   No, no.  It was to reduce the
23   cost, overall reimbursement costs of Local 68
24   to the prescription company.  And it would be
25   less cost for the member, as far as a
```

186

1/12/2006  Rowan, Theresa A. (MDL)

```
 1                    Rowan
 2   copayment, if they tried to find a generic.
 3        Q.   Do you know when this started to
 4   be encouraged?
 5        A.   I guess probably in 2001, 2002,
 6   when the prescription costs went through the
 7   roof.
 8        Q.   Do you know whose idea this was,
 9   whose idea at the Fund?
10        A.   Probably the administrative
11   manager.
12        Q.   And at the time, that would have
13   been Thomas Giblin?
14        A.   Right.
15        Q.   How was this push instituted?
16        A.   Through letters.
17        Q.   Besides the push towards generic
18   drugs, were there any other programs or
19   policies?
20        A.   For limitations?
21        Q.   Yeah.
22        A.   Not really.
23        Q.   Just to contain prescription drug
24   costs?
25        A.   Just to make people aware how
```

187

1/12/2006  Rowan, Theresa A. (MDL)

```
 1                    Rowan
 2   much it was actually costing the Union to
 3   continue the prescription benefit.
 4             MS. ABDELHAMID:  I'm going to
 5        mark as Exhibit 20 a letter from Vincent
 6        Giblin dated February 17, 2004.
 7             (Rowan Exhibit 20, Letter from
 8        Vincent Giblin dated February 17, 2004,
 9        marked for identification, as of this
10        date.)
11        Q.   Do you recognize this document?
12        A.   Yes.
13        Q.   What is it?
14        A.   It's a letter from Vincent Giblin
15   advising the membership of the prescription
16   costs and the changes in the co-payment.
17        Q.   Were you involved with the
18   preparation of this document?
19        A.   No, I was not.
20        Q.   Who, besides Vincent Giblin, who
21   would have been involved in the preparation of
22   such documents?
23        A.   Maybe Horizon.
24        Q.   Do you know if any other, besides
25   the change in the -- well, first of all, do
```

188

                    Rowan
1
2    you know if these changes in the co-pays were
3    instituted?
4         A.    Yes, they were.
5         Q.    Besides these changes in the
6    co-payments, do you know of any other
7    cost-cutting measures that were instituted in
8    connection with the trends identified in this
9    letter?
10        A.    Well, they instituted a
11   deductible.
12        Q.    Besides the deductible?
13        A.    No.
14        Q.    And do you recall at the time
15   this letter was sent, any discussions taking
16   place about the letter?
17        A.    In our office or --
18        Q.    Yeah.
19        A.    Members would call and ask
20   questions about it.
21        Q.    And did any of these -- what
22   kinds of questions would they ask?
23        A.    Well, they were curious as to why
24   it was going on, and that's when, you know,
25   they're asking what was preferred, what was

                    Rowan
1
2    nonpreferred.
3         Q.    You mean what was on -- would
4    they be asking what was on the preferred list
5    and what was not on the preferred list?
6         A.    Right.
7         Q.    And in order to answer that
8    question, you would go to the drug guide?
9         A.    Right.
10        Q.    And would you just tell them to
11   look at the drug guide?
12        A.    Well, I would tell them it was
13   available on the Internet, if they wanted to
14   look at it.
15        Q.    Okay.  Yet you weren't intimately
16   familiar with the drugs on the drug guide?
17        A.    No.
18        Q.    You just knew where to tell them
19   to get it.
20        A.    Exactly.
21        Q.    Do you recall ever getting any
22   questions about Neurontin?
23        A.    No.
24              MS. ABDELHAMID:  I want to mark
25        as Exhibit 21 Local 68 Engineers Union

                    Rowan
1
2    Welfare Fund Scheduled Benefits For the
3    Fiscal Year Ended June 30.
4              (Rowan Exhibit 21, Engineers
5         Union Welfare Fund Scheduled Benefits
6         For the Fiscal Year Ended June 30,
7         marked for identification, as of this
8         date.)
9         Q.    Do you recognize this document?
10        A.    No.
11        Q.    Have you ever seen any document
12   like this?
13        A.    No.
14              MS. ABDELHAMID:  I want to mark
15        as Exhibit 22, "Out-of-control health
16        care cost increases."
17              (Rowan Exhibit 22, Document
18        entitled "Out-of-control health care
19        cost increases," marked for
20        identification, as of this date.)
21        Q.    Do you recognize this document?
22        A.    No.
23        Q.    You've never seen anything like
24   this before?
25        A.    Oh my God, no.

                    Rowan
1
2              MS. ABDELHAMID:  Let's mark as
3         Exhibit 23 the letter from Vincent
4         Giblin dated March 24, 2003.
5              (Rowan Exhibit 23, Letter from
6         Vincent Giblin dated March 24, 2003,
7         marked for identification, as of this
8         date.)
9         Q.    Do you recognize this document?
10        A.    Only as what you gave to me now
11   as a letter from Vincent Giblin.
12        Q.    But you haven't seen this
13   document?
14        A.    No, I don't remember seeing it.
15        Q.    Have you ever seen a document
16   like the attached one before?
17        A.    Just that you gave me.
18        Q.    But previous to that?
19        A.    No, not really, no.  Not a
20   breakdown like that.
21        Q.    So this letter indicates that the
22   2003 Siegel health care cost trend survey is
23   enclosed.  But you would not know if this is
24   that?
25        A.    No, I don't think so.

Rowan

2       Q.     You can put that aside.

3              MS. ABDELHAMID:  Marking as

4       Exhibit 24, a letter from Vincent Giblin

5       dated September 10, 2001.

6              (Rowan Exhibit 24, Letter from

7       Vincent Giblin dated September 10, 2001,

8       marked for identification, as of this

9       date.)

10      Q.     Do you recognize this document?

11      A.     Only as a letter from Vincent

12 Giblin.

13      Q.     Do you recognize the attached

14 health care alert document?

15      A.     No, I don't recognize that at

16 all.

17      Q.     Do you know who would have been

18 involved in the preparation of that?

19      A.     I would assume Horizon.

20      Q.     You have no knowledge; you're

21 just assuming?

22      A.     Yeah, as far as the figures.

23      Q.     Do you know if this is the type

24 of document that Horizon would send, Horizon

25 would just send to the Fund?

193

Rowan

2       A.     No, I don't know.  I don't know.

3       Q.     Do you know who at the Fund would

4 generally receive this type of document?

5       A.     If something was generated like

6 this, the administrative manager would receive

7 this.

8       Q.     So it would be in Dennis Giblin's

9 files?

10      A.     Right.  I don't know who

11 generated this.

12      Q.     I have a more general question,

13 actually.  A number of these letters are

14 signed by Vincent Giblin, who is the business

15 manager of the Union, correct?

16      A.     Correct.

17      Q.     But you testified these letters

18 were only going to the Fund-covered

19 individuals.

20      A.     Right.  But maybe he sent it to

21 the entire membership.  See, that's a

22 different office, so I don't know.

23      Q.     So you're saying that any letter

24 signed by Vincent Giblin, you're not actually

25 sure if they're going to just the Fund-covered

194

Rowan

2 individuals or the Union --

3       A.     No, I'm not sure.

4       Q.     Would Vincent Giblin have any

5 reason to be sending letters about drug costs

6 and health care benefits to the Union

7 membership as a whole?

8       A.     He might, because I guess he was

9 watching out for their good.  I don't

10 know.  I couldn't answer that question.

11      Q.     And you don't know why it would

12 be the business manager of the Union, rather

13 than, say, the administrative manager of the

14 Fund, who would send out such a letter?

15      A.     No, I don't.

16      Q.     And it's still your testimony

17 that the Union is not involved in the

18 day-to-day operations of the Fund?

19      A.     No.  Yes, that's my testimony.

20             MS. ABDELHAMID:  Marking as

21      Exhibit 25, letter from Vincent Giblin

22      dated March 21, 2001.

23             (Rowan Exhibit 25, Letter from

24      Vincent Giblin dated March 21, 2001,

25      marked for identification, as of this

195

Rowan

2 date.)

3       Q.     Do you recognize this document?

4       A.     As a letter from Vincent Giblin,

5 I do.

6       Q.     Do you recognize the attached

7 health care alert?

8       A.     No, I don't.

9       Q.     Do you know where the Fund would

10 have received the information regarding Pfizer

11 that it put into this letter?

12      A.     No, I don't.  I wouldn't have any

13 idea.

14      Q.     Do you know who was involved with

15 the preparation of this letter besides Vincent

16 Giblin?

17      A.     No, I don't.

18      Q.     And do you know who prepared the

19 attached health care alert?

20      A.     No, I don't.

21      Q.     So it's your testimony that the

22 only systematic cost-cutting activity the Fund

23 put into place, or activities, was changing

24 the co-payment and encouraging the use of

25 generic drugs?

196

1/12/2006 Rowan, Theresa A. (MDL)

```
1                    Rowan
2        A.    Correct.
3        Q.    These were the only programs
4    during your 25 years --
5        A.    And the institution of the
6    deductible.
7        Q.    But those were the only three
8    systemic programs?
9        A.    Yes, pretty much.
10       Q.    Do you know if Horizon instituted
11   any kind of cost-containment program on behalf
12   of the Fund?
13       A.    I don't know.
14       Q.    Did the Fund ever request Horizon
15   to institute any kind of program or review
16   costs of drugs or anything like that?
17       A.    I don't know that.  That would be
18   why administrative manager would request that.
19       Q.    So that would also be Dennis
20   Giblin or Thomas Giblin before him?
21       A.    Yes.
22       Q.    And again, you didn't talk to
23   either one of them on this subject in
24   preparation for this deposition?
25       A.    No.
```

1/12/2006 Rowan, Theresa A. (MDL)

```
1                    Rowan
2        Q.    Are you familiar with the term
3    "prior authorization"?
4        A.    Not really.
5        Q.    So if I asked you whether a prior
6    authorization program was implemented in
7    connection with the Fund's prescription drug
8    coverage, you wouldn't know?
9        A.    No.
10       Q.    Let me describe briefly.  Prior
11   authorization is when certain limits are set
12   or certain criteria have to be met for a drug
13   to be dispensed.
14             For example, a third-party payor
15   could put a requirement on a PBM that the
16   doctor has to call in to get authorization for
17   a certain drug before the doctor prescribes
18   it.
19             Sometimes its implemented because
20   the drug is expensive, or for any number of
21   reasons.
22       A.    I see.
23       Q.    To your knowledge, was any kind
24   of program like this instituted in connection
25   with the Fund's prescription drug coverage?
```

1/12/2006 Rowan, Theresa A. (MDL)

```
1                    Rowan
2        A.    There might be a prior
3    authorization for expensive drugs.  But I'm
4    not positive.
5        Q.    On what basis do you say that on?
6        A.    Because I kind of remember that
7    there was a case where there was a very
8    expensive drug and I think that they had to
9    call, the doctor had to call first to get it
10   prescribed, but I don't remember the actual
11   drug or anything like that.
12       Q.    Who would the doctor have called?
13       A.    Probably the member would have
14   called our office, and then we would have
15   directed them to Horizon and then Caremark.
16       Q.    You don't remember what drug this
17   was?
18       A.    No, I don't.
19       Q.    How often do you receive calls
20   from members like that?
21       A.    Very rarely.
22       Q.    Who would be responsible for
23   receiving calls like that?
24       A.    Me.
25       Q.    And would any documents be
```

1/12/2006 Rowan, Theresa A. (MDL)

```
1                    Rowan
2    generated in connection with this process?
3        A.    No, that would just be a
4    telephone call.
5        Q.    So, roughly, in the past year,
6    how many calls like this would you say?
7        A.    I would say if I got one, it
8    would be a lot.  Really it's not the case of
9    something like that happening frequently.
10       Q.    Who -- do you know whose decision
11   it was to institute a program like that?
12       A.    No, I do not.  It might have come
13   just with the whole package.
14       Q.    From Horizon and PBM?
15       A.    Correct.
16       Q.    Do you recall ever having
17   discussions about instituting any kind of
18   program like that, like the Fund instituting
19   any type of --
20       A.    No.
21       Q.    To your knowledge, was Neurontin
22   a prior-authorization drug?
23       A.    No.
24       Q.    It was not a prior --
25       A.    No.
```

Rowan

2      Q.   Could the Fund have selected
3  Neurontin as a prior-authorization drug?
4      A.   I don't know.
5      Q.   Did the Fund ever consider making
6  Neurontin a prior authorization?
7      A.   I don't think so.
8      Q.   Is there a list of
9  prior-authorization drugs?
10     A.   Not that I know of.
11     Q.   Who at the Fund would be in
12  possession of such a list if it existed?
13     A.   I would have a list.
14     Q.   And you don't have a list?
15     A.   No.
16     Q.   Are you familiar with the term
17  "drug utilization review"?
18     A.   Yes.
19     Q.   Was a drug utilization review
20  program implemented in connection with the
21  Fund's prescription drug coverage?
22     A.   It was part of the package.
23     Q.   From?
24     A.   Horizon and Caremark.
25     Q.   Do you know what this drug

---

Rowan

2  utilization review consisted of?
3     A.   I think it was for
4  high-maintenance drugs, like high-price drugs,
5  the utilization of that.
6     Q.   Do you know if this drug
7  utilization review was in effect from 1994?
8     A.   Yeah, I would say that NPA used
9  to watch out if there was high volume of drugs
10  for a certain person.
11     Q.   Between '94 and '98?
12     A.   Yeah.
13     Q.   So did the utilization program
14  work differently in the three different time
15  periods?
16     A.   Well, when we had NPA --
17     Q.   So that's '94 to '98, just so the
18  record is clear.
19     A.   There was a yearly limit as far
20  as what could be purchased.
21     Q.   Was that a yearly limit per
22  person?
23     A.   Yes.
24     Q.   Was that a dollar limit?
25     A.   Yes, it was a dollar limit.

---

Rowan

2     Q.   So NPA, there was a dollar limit?
3     A.   Right.
4     Q.   And was that the only limit?
5  There was no limit on the kind of drugs or
6  anything like that?
7     A.   No.
8     Q.   Pure dollar.  And once you hit
9  it, you're not covered anymore?
10     A.   It was out-of-pocket then.
11     Q.   And did the Fund request that
12  that limit be imposed, or that was just the
13  package?
14     A.   No, that was the Fund request.
15     Q.   Do you remember what that dollar
16  limit was?
17     A.   $12,000.
18     Q.   Was it $12,000 from '94 to '98?
19     A.   It was per year.
20     Q.   And did the amount ever change?
21     A.   No.
22     Q.   Who decided that limit?
23     A.   The board of trustees.
24     Q.   From '94 to '98, was there any
25  other utilization that was taking place or

---

Rowan

2  just looking at that dollar limit, as far as
3  you know?
4     A.   Pretty much looking at the dollar
5  limit.
6     Q.   And then from the period '98 to
7  2005, did NPA, you know, the part that was
8  under NPA, did they still have the $12,000
9  limit?
10     A.   Yes.
11     Q.   How about the two plans under
12  Horizon?
13     A.   No, there was no limit.
14     Q.   There was no limit.
15     Could the Fund have requested a
16  dollar limit?
17     A.   Probably, yes.
18     Q.   But it elected not to do so?
19     A.   That's correct.
20     Q.   Why was that?
21     A.   I don't know.
22     Q.   So was there any kind of
23  utilization, drug utilization review program,
24  under the two Horizon plans going on?
25     A.   I would imagine there was.

**Page 205**

```
 1                    Rowan
 2       Q.    But you don't have any knowledge
 3  of what that was?
 4       A.    No, I wouldn't, no.
 5       Q.    And the Fund didn't request
 6  anything?
 7       A.    I don't know.  It could have been
 8  done by the administrative manager.
 9       Q.    So from '98 to 2005, the only
10  limit you knew of was those under the
11  traditional plan, which was NPA?
12       A.    That's correct.
13       Q.    And you said at the time there
14  was only 87 people?
15       A.    That's correct.
16       Q.    And then post 2005, presumably
17  the same situation, 'cause it's only the
18  Horizon plan?
19       A.    Right.
20       MS. ABDELHAMID:  Let's take a
21  break.
22             (Time noted:  3:12 p.m.)
23             (Recess taken.)
24             (Time noted:  3:15 p.m.)
25       Q.    Again, just to recap, the only
```

**Page 207**

```
 1                    Rowan
 2  "disease management"?
 3       A.    Yes.
 4       Q.    Was any disease management
 5  program implemented in connection with the
 6  Fund's prescription drug coverage, at any
 7  point?
 8       A.    No, not with the prescription
 9  coverage.
10       Q.    Was it implemented in some
11  other --
12       A.    In medical, for diabetes.
13       Q.    Was it done so at the Fund's
14  request?
15       A.    Yeah.
16       Q.    And was this under all the plans?
17       A.    No, it was just under the PPO.
18       Q.    So that's presently?
19       A.    Right.
20       Q.    But it was never done for
21  prescription drugs?
22       A.    No.
23       Q.    Okay.  Do you know if it was an
24  option for prescription drugs, to implement a
25  disease management --
```

**Page 206**

```
 1                    Rowan
 2  utilization drug review program you knew of
 3  from 1994 to 2005 was the $12,000 yearly cap
 4  that the Fund requested the NPA impose?
 5       A.    Right.
 6       Q.    And you assume other utilization
 7  reviews going on by Horizon, but you're not
 8  sure?
 9       A.    Right.
10       Q.    And the Fund has never requested
11  that Horizon institute any specific
12  utilization --
13       A.    As far as limitations?
14       Q.    Yes.
15       A.    No.
16       Q.    Would any documents have been
17  generated in conjunction with the $12,000
18  yearly limit of the NPA?
19       A.    Yeah, the members would have
20  received the notice that they were close to
21  the limit.
22       Q.    But would the Fund be in
23  possession of any documents?
24       A.    Probably not anymore, no.
25       Q.    Are you familiar with the term
```

**Page 208**

```
 1                    Rowan
 2       A.    I don't know.
 3       Q.    You don't know?
 4       A.    No.
 5       Q.    Was the Fund, or anyone on its
 6  behalf such as Horizon or its PBMs, involved
 7  in any academic detailing in any respect?
 8       A.    I don't know what you mean.
 9       Q.    You're not familiar with the term
10  "academic detailing"?
11       A.    No.
12       Q.    Did the Fund ever consider
13  implementing any cost-containment programs for
14  Neurontin?
15       A.    No.
16       Q.    Did it ever consider having its
17  third parties implement any cost-containment
18  programs for Neurontin?
19       A.    No.
20       Q.    Did the Fund ever communicate
21  with drug manufacturers?
22       A.    No.
23       Q.    Would you be in the best position
24  to know about that?
25       A.    No.
```

```
 1                   Rowan
 2        Q.    Who would be?
 3        A.    Probably the administrative
 4   manager.
 5        Q.    Do you know if he had any
 6   communication with --
 7        A.    I doubt it.
 8        Q.    Did the Fund ever have any
 9   communications with Pfizer/Warner-Lambert?
10        A.    No.  Not that I know of.
11        Q.    Is the Fund aware of
12   Pfizer/Warner-Lambert ever having any
13   communications with Horizon?
14        A.    Not that we're aware of.
15        Q.    Is the Fund aware of
16   Pfizer/Warner-Lambert ever having any
17   communications with the PBMs?
18        A.    Not that we're aware of.
19        Q.    Is the Fund aware that defendants
20   Pfizer and Warner-Lambert pled not guilty to
21   fraudulent off-label promotion?
22        A.    No.  Until this came up, we
23   didn't know about it.
24        Q.    So you've just learned about that
25   through your preparation for this?
```

209

```
 1                   Rowan
 2        A.    Right.
 3        Q.    Please tell me any information
 4   the Fund has regarding the civil action US ex
 5   rel. David Franklin V Parke Davis.
 6        A.    I don't have any.
 7        Q.    Are you aware of any government
 8   investigation into the off-label use or
 9   promotion of Neurontin?
10        A.    Just what I learned from this.
11        Q.    What is your understanding of the
12   government investigation into the off-label
13   use or promotion --
14        A.    That they sued Pfizer.
15        Q.    Who sued Pfizer?
16        A.    The justice department, I think,
17   and they were paid a settlement fee.
18        Q.    Which -- the justice
19   department -- is it your understanding it's
20   the federal justice department or the state?
21        A.    Federal.
22        Q.    And you became aware of this only
23   through your preparation for this deposition?
24        A.    Correct.
25        Q.    Do you have any information
```

210

```
 1                   Rowan
 2   regarding the alleged off-label promotion of
 3   which you accuse defendants was fraudulent?
 4        A.    No.
 5        Q.    Do you have any information that
 6   the prescriptions on which the lawsuit are
 7   based were written as a result of off-label
 8   promotion?
 9        A.    I don't know.
10        Q.    So your answer is no?
11        A.    No.
12        Q.    Has the Fund filed any other
13   lawsuit since its formation?
14        A.    I'm assuming they did.  I'm not
15   sure.
16        Q.    Do you know if any of these
17   lawsuits involve prescription drugs?
18        A.    Yes.
19        Q.    Which ones?
20        A.    Vioxx.
21        Q.    Was that lawsuit a class action?
22        A.    I don't know.
23        Q.    You can just tell me if you don't
24   know.
25              Do you know who was the defendant
```

211

```
 1                   Rowan
 2   in that lawsuit?
 3        A.    No.
 4        Q.    If you don't know, just tell me.
 5              You told me the product was
 6   Vioxx.  Do you know what the nature of the
 7   suit was?  Do you know what the suit was
 8   about?
 9        A.    No, I do not.
10        Q.    Do you know who the Fund's lawyer
11   was in that suit?
12        A.    No, I do not.
13        Q.    And do you know where the suit
14   was filed?
15        A.    No.
16        Q.    Are you familiar with the amended
17   class action complaint filed in this
18   litigation?
19        A.    In this one?  I received a copy,
20   but I didn't read it.
21              MS. ABDELHAMID:  I'm going to
22        mark as Exhibit 26 the Amended Class
23        Action Complaint.
24              (Rowan Exhibit 26, Amended Class
25        Action Complaint, marked for
```

212

```
 1                Rowan
 2       identification, as of this date.)
 3       Q.    Did you review the complaint in
 4  preparation for your deposition?
 5       A.    No.
 6       Q.    When did the Fund first learn of
 7  the alleged facts set forth in the amended
 8  class action complaint?
 9       A.    I just received this the other
10  day.
11       Q.    I understand you just received
12  this the other day.  But when did the Fund --
13  because you're speaking on behalf, as the
14  designated representative of the Fund -- learn
15  of the alleged facts set forth in this class
16  action complaint?
17       A.    I guess when we started to look
18  up the information a month or so ago.
19       Q.    So you learned about this a month
20  or so ago, and to your knowledge, you don't
21  know if anyone else at the Fund has knowledge
22  of the information contained in this
23  complaint?
24       A.    No.
25       Q.    Do you know if anyone at the Fund
```

213

```
 1                Rowan
 2  has knowledge of the alleged facts set forth
 3  in the amended class action complaint?
 4       A.    No.
 5       Q.    Do you know if anyone at the Fund
 6  undertook efforts that would have led to the
 7  discovery of the fact, of the alleged facts in
 8  the amended class action complaint?
 9       A.    I don't understand that.
10       Q.    Are you aware that many of the
11  allegations in this complaint relate to
12  off-label promotion?
13       A.    Now I do, yeah.
14       Q.    Are you aware of that?
15       A.    Yes.
16       Q.    Did the Fund monitor news media
17  for reports of off-label promotion?
18       A.    No.
19       Q.    Did the Fund take steps to learn
20  about recent developments regarding
21  prescription drugs?
22       A.    No.
23       Q.    How did the Fund come up with the
24  idea of filing this lawsuit?
25       A.    I don't know.
```

214

```
 1                Rowan
 2       Q.    Why is the Fund suing Pfizer?
 3       A.    Because of the off-label, I
 4  think.  I really don't know.
 5       Q.    If you don't know, just tell me.
 6       A.    I really don't know.
 7       Q.    What is the Fund seeking in this
 8  lawsuit?
 9       A.    I don't know.
10       Q.    Do you know what kind of damages
11  the Fund is seeking in this lawsuit?
12       A.    I would imagine monetary damages.
13       Q.    Do you know what is the conduct
14  of Pfizer that the Fund claims entitles it to
15  monetary damages?
16       A.    What the conduct is?
17       Q.    Yes.  What is that?
18       A.    They advertised or told doctors
19  that they could use the drug for other things
20  than the epilepsy that the drug was
21  manufactured for.
22       Q.    That's your understanding?
23       A.    Right.
24       Q.    Did anyone from the Fund provide
25  information for this complaint?
```

215

```
 1                Rowan
 2       A.    Not that I know of.
 3       Q.    What actions did the Fund take
 4  before filing this complaint?
 5       A.    I don't know.
 6       Q.    Was the Fund provided with any
 7  information before the complaint was filed?
 8       A.    I don't know.
 9       Q.    Did anyone from the Fund review
10  this complaint before it was filed?
11       A.    I don't know that either.
12       Q.    I know we discussed this a little
13  before, but I want to explore it.
14             Who at the Fund authorizes that a
15  suit be filed on the Fund's behalf?
16       A.    I would assume the administrative
17  manager.
18       Q.    That would be Dennis Giblin?
19       A.    Correct.
20       Q.    Is he the only person who has the
21  authority to act on behalf of the Fund in a
22  legal capacity?
23       A.    Yes.
24       Q.    Does anyone at the Union have the
25  capacity to act for the Fund?
```

216

1           Rowan
2      A.    No.
3      Q.    Act on behalf of the Fund?
4      A.    Of the Local 68 Union?
5      Q.    Yes.
6      A.    No.
7      Q.    Please turn to page 4 of the
8  complaint.  Look at paragraph 6.
9      A.    Okay.
10     Q.    Does anyone at the Fund have any
11 personal knowledge of the facts in the
12 complaint, besides paragraph 6?
13     A.    Say that again.
14     Q.    Does anyone at the Fund have any
15 personal knowledge about the facts alleged in
16 the complaint, besides paragraph 6?
17     A.    I don't think so.
18     Q.    The complaint alleges that
19 certain participating physicians made false
20 and misleading statements regarding
21 Neurontin's effectiveness for off-label uses
22 to other physicians.
23           What is the Fund's basis for
24 making that allegation?
25     A.    I don't know.

217

1           Rowan
2      Q.    The complaint also alleges that
3  certain Pfizer sales representatives made
4  fraudulent statements regarding Neurontin's
5  effectiveness for off-label uses to other
6  physicians.
7           What is the Fund's basis for
8  making that statement?
9      A.    I don't know.
10     Q.    The complaint alleges that Pfizer
11 caused certain articles regarding Neurontin's
12 off-label uses to be ghost-written.
13           What is the Fund's basis for
14 making that statement?
15     A.    I don't know.
16     Q.    The complaint alleges that Pfizer
17 caused false statements regarding Neurontin's
18 effectiveness for off-label use to be included
19 in published articles.
20           What's the Fund's basis for
21 making that statement?
22     A.    I don't know.
23     Q.    The complaint alleges that Pfizer
24 paid physicians to conduct nonscientific
25 studies for the purpose of promoting Neurontin

218

1           Rowan
2  off-label.
3           What is the Fund's basis for that
4  statement?
5      A.    I don't know.
6      Q.    The complaint alleges that
7  statements by certain doctors were false and
8  made with an intent to defraud.
9           What is the Fund's basis for
10 claiming that these statements are false?
11     A.    I don't know.
12     Q.    What is the Fund's basis for
13 claiming that these statements were made with
14 intent to defraud?
15     A.    I don't know.
16     Q.    In various places the complaint
17 lists numerous meetings and alleges that
18 fraudulent off-label promotion occurred at
19 these meetings.
20           What's the Fund's basis for
21 making this statement?
22     A.    I don't know.
23     Q.    The complaint also alleges that
24 alleged fraudulent conduct continued after
25 2000.

219

1           Rowan
2           What's the Fund's basis for
3  making this statement?
4      A.    I don't know.
5      Q.    Please turn to page 93 of the
6  complaint.  I direct your attention to
7  paragraph 235.  The first statement says,
8  "Upon information and belief, Pfizer has
9  routinely marketed Neurontin for off-label
10 indications up until May 2004."
11           What is the Fund's basis for
12 claiming such activity after 2000?
13     A.    I don't know.
14     Q.    Directing your attention to
15 paragraph 36, it states, "Upon information and
16 belief, as a result of defendants and the
17 off-label promotion, enterprises, illegal
18 promotional activities, physicians have and
19 continue to prescribe Neurontin to tens of
20 thousands of patients who are in need of an
21 effective treatment."
22           Is the explanation given above
23 this sentence the only explanation?
24     A.    You're on paragraph 236?
25     Q.    Uh-huh.

220

Rowan

1
2      A.    I didn't see that there.
3      Q.    End of the paragraph, "Upon
4  information and belief."
5      A.    What's your question?
6      Q.    My question is:  Is the
7  explanation given in the first part of the
8  sentence, i.e., "as a result of defendants and
9  the off-label promotion, enterprises, illegal
10  activities," is that explanation given the
11  only possible explanation for why physicians
12  haven't continued to prescribe Neurontin?
13      A.    I don't know.
14      Q.    Is Neurontin's effectiveness
15  another explanation for why physicians
16  continue to prescribe it?
17      A.    I don't know.
18      Q.    Directing your attention to
19  paragraph 237 on the next page.
20            What is the basis for claiming
21  that the letter discussed in paragraph 237 is
22  part of the alleged scheme?
23      A.    I don't know.
24      Q.    If you could turn to page 100,
25  paragraph 253.  What is the basis for the last

Rowan

1
2  sentence in paragraph 253, specifically
3  sentence that states, "The plaintiffs
4  specifically allege that the conduct and
5  patterns of conduct alleged here had occurred
6  and continued to occur after the consummation
7  of the merger between Pfizer, Inc. and
8  Warner-Lambert in year 2000"?
9      A.    I don't know.
10      Q.    If you could turn to paragraph
11  249 of the complaint, which is on page 98.
12  The first sentence states that "The fraudulent
13  scheme was designed to, and did, cause
14  plaintiffs in the class to pay for Neurontin
15  prescriptions to treat conditions for which
16  the drug is not effective."
17            Do you know the basis for the
18  allegation that the fraudulent scheme was
19  designed to cause plaintiffs in the class to
20  pay for Neurontin prescriptions?
21      A.    No, I don't.
22      Q.    How would you go about
23  determining that the scheme caused the Fund to
24  pay for Neurontin prescriptions to treat
25  conditions for which the drug is not

Rowan

1
2  effective?
3      A.    You would have to get a report
4  from Horizon.
5      Q.    Do you know that Horizon could
6  determine this information?
7      A.    Possibly.
8      Q.    But you're not sure?
9      A.    I don't know for sure.
10      Q.    Does the Fund have any specific
11  evidence of causation?
12      A.    Not that I know of.
13      Q.    Is the Fund claiming that
14  defendants' actions caused the Fund to pay for
15  Neurontin prescriptions for which the drug is
16  not effective?
17      A.    It appears that it does.
18      Q.    Do you know what the basis for
19  this claim is?
20      A.    No.
21      Q.    Did the Fund speak with the
22  participating physicians of any of its members
23  to determine that the defendants' alleged
24  conduct caused them to prescribe Neurontin?
25      A.    No.

Rowan

1
2      Q.    Does the Fund have any evidence
3  that the prescriptions for Neurontin for which
4  it was seeking recovery weren't the result of
5  the physicians' independent medical judgment?
6      A.    I don't know.
7      Q.    Does the Fund have any evidence
8  that the prescriptions of Neurontin for which
9  it is seeking recovery resulted from off-label
10  promotion?
11      A.    No, I don't know.
12      Q.    If you could look back at
13  paragraph 249.  It says here, it's basically
14  saying that plaintiffs "receive no greater
15  relief from or treatment of their medical
16  conditions than they would have received from
17  a placebo."
18            Does this include patients
19  covered from the Fund?
20            On 249, in the middle of the
21  paragraph, it says, "Plaintiffs whose
22  prescription drug charges were paid and who
23  were prescribed the drug for nonapproved uses
24  received no greater relief from or treatment
25  of their medical conditions than they would

**Page 225**

```
1                    Rowan
2    have received from a placebo."
3            Does this include patients
4    covered by the Fund?
5        A.   I would assume so, yes.
6        Q.   What is the Fund's basis for
7    alleging this?
8        A.   That, I don't know.
9        Q.   Can the Fund identify any of its
10   members for whom this is true?
11       A.   I don't know.
12       Q.   The next sentence in this
13   paragraph states that "The fraudulent scheme
14   also caused plaintiffs in the class to pay for
15   Neurontin prescriptions to treat
16   non-FDA-approved conditions for which it was
17   not effective."
18            How is that different from the
19   first sentence of 249?  If you don't know,
20   just tell me that.
21       A.   I feel like I'm taking an SAT.  I
22   don't know.
23       Q.   Paragraph 249 also alleges, in
24   the absence of defendants' improper conduct,
25   plaintiffs in the class would not have paid
```

**Page 226**

```
1                    Rowan
2    for such Neurontin prescriptions.
3            What is the Fund's basis for
4    alleging this?
5        A.   I don't know.
6        Q.   Does the Fund have any evidence
7    that its covered individuals' physicians would
8    not have prescribed Neurontin anyway?
9        A.   I don't know.
10       Q.   How would the Fund determine
11   whether the physicians of its members actually
12   were exposed to the alleged off-label
13   promotion?
14       A.   I don't know.
15       Q.   Does the Fund believe that all of
16   its members who took Neurontin were written
17   their Neurontin prescriptions as a result of
18   fraudulent off-label promotion?
19       A.   I don't know.
20       Q.   Is the Fund aware of any covered
21   individual whose physician has said that he or
22   she prescribed Neurontin based on
23   misrepresentation by defendants?
24       A.   That we know for a fact?  No.
25       Q.   Has the Fund investigated this?
```

**Page 227**

```
1                    Rowan
2        A.   No.
3        Q.   Are you aware of any instances in
4    which the Fund was exposed to the alleged
5    misrepresentations itself?
6        A.   I don't know.
7        Q.   Are you aware of any instances in
8    which the Fund relied upon such
9    misrepresentations in deciding whether to
10   reimburse Neurontin claims?
11       A.   I don't know.
12       Q.   Are you aware of anyone at the
13   Fund who was deceived by these alleged
14   misrepresentations?
15       A.   Not that I'm aware of, no.
16       Q.   The Fund is seeking damages in
17   this action, correct?
18       A.   As far as I can see, yes.
19       Q.   What is the Fund seeking damages
20   for?
21       A.   It would be the misrepresentation
22   of the drug, correct?
23       Q.   For what time period is the Fund
24   seeking damages?
25       A.   That, I don't know.
```

**Page 228**

```
1                    Rowan
2        Q.   Do you know if it's past April
3    2004?
4        A.   I don't know.
5        Q.   Do you know if the Fund is
6    seeking damages for gabapentin claims in
7    addition to Neurontin claims?
8        A.   That, I don't know.
9        Q.   Do you know what gabapentin is?
10       A.   No.
11       Q.   Gabapentin is the generic name
12   for Neurontin.
13       A.   Oh.
14       Q.   So your testimony is still that
15   you don't know if you're seeking --
16       A.   Right.
17       Q.   Is the Fund only seeking to
18   recover for off-label Neurontin claims?
19       A.   I don't know.
20       Q.   So you don't know if the Fund is
21   also seeking to recover if Neurontin was used
22   for its approved uses?
23            MR. FARKAS:  Objection.  Asked
24       and answered.
25            MS. ABDELHAMID:  It's a different
```

                    Rowan
1
2       question.
3               MR. FARKAS:  You can answer.
4       A.    I don't know.
5       Q.    What is the approximate amount of
6   the Fund's damages?
7       A.    I don't know.
8       Q.    When did the Fund first learn
9   that Neurontin was being prescribed off-label?
10      A.    I don't know that either.
11      Q.    Did the Fund take any actions to
12  stop its covered individuals and the
13  defendants from receiving coverage for such
14  prescriptions?
15      A.    Not that I'm aware.
16      Q.    After the Fund learned that
17  Neurontin was being prescribed for off-label
18  uses, did it think it was obligated to pay for
19  such prescriptions?
20      A.    I don't know.
21      Q.    Do you know if the Fund pays for
22  off-label prescriptions of Neurontin
23  currently?
24      A.    I don't know.
25      Q.    Since the Fund has become aware

                    Rowan
1
2       representative in any type of litigation
3   previously?
4       A.    No.
5       Q.    Has the Fund ever served as a
6   class representative in any kind of
7   litigation?
8       A.    I don't know.
9       Q.    What does the Fund understand its
10  role as a class representative to be?
11      A.    It represents the membership,
12  loss or damages for the membership.
13      Q.    For the membership of the Fund?
14      A.    For the prescribers, right.
15      Q.    Is it your understanding that the
16  Fund's role as a class representative is just
17  to represent the members of the Fund?
18      A.    They would represent whoever the
19  subscribers are.
20      Q.    Would they be representing
21  anybody else?
22      A.    And the dependents of the
23  subscribers.
24      Q.    In the capacity as a class
25  representative, would the Fund be representing

                    Rowan
1
2   of the actions on which this lawsuit is based,
3   has the Fund altered its payment practices for
4   Neurontin?
5       A.    No.
6       Q.    Just to be clear, you're not sure
7   what the payment practice is, but you're sure
8   that it hasn't been changed?
9       A.    There has not been a block put on
10  the payment of that drug.
11      Q.    So you believe that the Fund
12  continues to pay for Neurontin?
13      A.    As far as I would know, yes.
14      Q.    Under all circumstances
15  regardless of whether it's used for off- or
16  on-label?
17      A.    I would imagine.  I would know if
18  a drug was being blocked for payment.
19      Q.    How did the Fund come to sue
20  defendants as a class representative?
21      A.    I don't know.
22      Q.    Do you know if the Fund was
23  approached by anyone to do this?
24      A.    I don't know.
25      Q.    Have you ever served as a class

                    Rowan
1
2   anybody except their enrolled participants and
3   the dependents?
4       A.    Not that -- I believe not.
5       Q.    Would you look at paragraph 255
6   of the complaint, which is on page 100.
7             Have you read the definition of a
8   class there that is in the block quote?
9       A.    (Reading.)  Okay.
10      Q.    Is the Fund seeking to represent
11  this class?  Just answer if you know.
12      A.    I don't know.
13      Q.    Is it your testimony that you
14  don't know if the Fund is seeking to represent
15  any of the classes outlined here?
16      A.    I think -- I don't know.  I
17  thought it was just Local 68 subscribers.
18      Q.    So your understanding is that you
19  were just representing Local 68 subscribers?
20      A.    Right.
21      Q.    I'm going to ask some questions
22  about record retention and documents.
23            Do the Fund and the Union keep
24  separate records?
25      A.    Yes.

Rowan

Q.    Are these records kept in
separate warehouses, separate computers?  How
are they organized?

A.    Two separate buildings or
separate entities, as far as record keeping.

Q.    Is the Fund in a different
geographic -- you said that the Fund was at 11
Fairfield Place?

A.    No, the Union is at 11.  The Fund
is at 14.

Q.    Are these the same building, or
are they next to each other?

A.    Across the street.

Q.    So what goes on at the branches
of 425 Atlantic Avenue?

A.    It's just a branch office of the
Union.

Q.    So both of those, the Mutuchin
and Atlantic City --

A.    Mutuchin is no longer in
existence.

Q.    So it's just Atlantic City, the
branch of the Union?

A.    Correct.

233

Rowan

there.  That's about all.

Q.    Are the records of the Union kept
at Atlantic City or in West Caldwell?

A.    West Caldwell.

Q.    In 11 Fairfield Place?

A.    Right.

Q.    And then the records of the Fund?

A.    14 Fairfield Place.

Q.    So they are two separate
locations?

A.    Correct.

Q.    And now I'm talking about the
Fund.  Is there a department or division of
the Fund that's responsible for retaining
documents, such as a record or warehousing
department?

A.    We don't have an actual
department, no.

Q.    So does everybody just sort of
keep their own?

A.    The staff, right.

Q.    And there's no archives
department or anything like that?

A.    No.

235

Rowan

Q.    So no fund work really goes on?

A.    Just questions and answers.

Q.    What do you mean by that?

A.    We represent all the casinos, so
members of the Union would come in to enroll
participants and things like that.

There's a woman there, a
receptionist, she refers the calls to me if
there's welfare or fund calls.

Q.    Earlier you said the Union
represented stationary engineers?

A.    Correct.

Q.    Are these workers found in
casinos?

A.    Same.

Q.    These are the people that deal
with the heating and the plumbing?

A.    Right.

Q.    So you have no -- have you ever
had occasion to go to the Atlantic Avenue
branch yourself?

A.    Yes.

Q.    In what capacity?

A.    Just, I had gone to a meeting

234

Rowan

Q.    So the Fund depends upon its
individual staff members to keep records?

A.    Correct.

Q.    And what happens when a staff
member leaves?  What happens to that person's
records?

A.    If someone is hired in their
place, they're taken over by the next person.

Q.    And then that person keeps the
records, because it's just in their office?

A.    Right.

Q.    Just to go back to how the office
is organized.  You referred to the Fund office
before.

A.    Correct.

Q.    And you said your office is in
there and Dennis Giblin's office --

A.    It's the Fund office, the whole
office.

Q.    It's 14 Fairfield Place?

A.    Correct.

Q.    So it's your office, Dennis
Giblin's --

A.    And the other staff.

236