UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
In re:   NEURONTIN MARKETING, SALES          :
PRACTICES, AND PRODUCTS LIABILITY          :
LITIGATION          :          MDL Docket No. 1629
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
Master File No. 04-
THIS DOCUMENT RELATES TO:          :          10981
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x          Judge Patti B. Saris
:
ALL SALES AND MARKETING ACTIONS          :          Magistrate Judge Leo
:          T. Sorokin
:
:
:
:
:
:
:
:
ˇ

**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS'
MOTION TO COMPEL DEFENDANTS TO RESPOND TO CERTAIN
<u>INTERROGATORIES</u>**

DAVIS POLK & WARDWELL
450 Lexington Avenue
New York, NY 10017
(212) 450-4000
*Attorneys for Defendants Pfizer Inc.
and Warner-Lambert Company*

## TABLE OF AUTHORITIES

<span style="text-align:right; display:block">PAGE</span>

### CASES

Anco Eng'g Co. v. Bud Radio, Inc., 8 Fed. R. Serv. 37a.12, 1963 U.S. Dist.
LEXIS 10461 (D. Oh Dec. 17, 1963) ......................................................... 20

Cont'l Cablevision, Inc. v. Storer Broad. Co. 653 F.Supp. 451, 464 (D.Mass.
1986) ......................................................................................................... 20

Soldo v. Sandoz Pharms. Corp., 244 F. Supp. 2d 434, 537 (W.D. Pa. 2003).................. 17

### STATUTES

21 CFR 20.63(f) ...........................................................................................13-14

42 U.S.C. § 1320d(6) ....................................................................................... 13

### RULES

Federal Rules of Civil Procedure, Rule 33(d)...................................................... 9

Massachusetts Local Rule 33.1(1) ...................................................................... 9

Defendants Pfizer Inc. and Warner-Lambert Company (together, "defendants") submit this memorandum of law in opposition to plaintiffs' motion to compel defendants to respond to certain interrogatories.

## PRELIMINARY STATEMENT

More than one and a half years ago – on April 6, 2005 – plaintiffs served 36 exceedingly broad interrogatories, some of which defendants answered, others of which were premature, and still others of which sought information that is not relevant to the claims and defenses in this litigation.  Having ignored for many months the responses and objections that defendants served on May 6, 2005, plaintiffs now have moved to compel answers to 21 of the 36 interrogatories.  Disputes regarding the majority of these interrogatories were the subject of a meet-and-confer session and an exchange of letters between the parties in June and July 2005.  Despite this, plaintiffs failed to bring a motion to compel further answers to these interrogatories until now.

The Court should refuse to compel responses to the interrogatories at issue in plaintiffs' motion because the interrogatories are objectionable.  The interrogatories grouped into plaintiffs' first four categories are either dramatically overly broad, vague and ambiguous, or can only be answered by referring to documents as defendants have done.  Indeed, plaintiffs seem to be using at least some of these interrogatories as a means to make defendants incur the time and attorney fees associated with creating exhibits or summaries that plaintiffs wish to use in this case.  For example, with respect to interrogatory numbers 6 through 9, plaintiffs seek lists containing extensive information about every Neurontin-related "event" that has taken place since 1993.  In addition to the name, date and location of each event, plaintiffs want defendants to identify invitees,

1

attendees, sponsors, agendas, presentation content, and feedback.  This demand comes in spite of the fact that defendants have explained that they have not located any central source for such information, and plaintiffs are therefore asking the Court to require defendants to undertake a document-by-document review in order to create this chart. Plaintiffs clearly prefer that defendants incur the tremendous burden associated with creating such an exhibit for them.

The requests falling into plaintiffs' last two categories seek information that is irrelevant to these proceedings, and as such the Court should not require defendants to serve responses to these interrogatories.  For example, in interrogatory numbers 35 and 36, plaintiffs seek information about any motions defendants have filed over the last fourteen years relating to the sufficiency of proposed expert testimony about medical causation and adverse events.  Such motions have no bearing on the sales and marketing litigation.

Moreover, as described above, plaintiffs have waited too long to seek judicial intervention with respect to these interrogatories, providing an independent basis to deny plaintiffs' motion.

## FACTUAL BACKGROUND

On April 6, 2005, plaintiffs served interrogatories to which defendants served Responses and Objections on May 6, 2005 (the "Responses and Objections"). Defendants responded, subject to their objections, to a number of interrogatories, including interrogatory numbers 6, 7, 8, 9, 10, 11, 12, 14, 15, 16, and 17 (all of which are subjects of the plaintiffs' motion) by stating that responsive information could be found in documents which had been or would be produced.  See Declaration of Deborah L.

2

MacGregor ("MacGregor Decl.") Ex. A (a complete copy of Defendants' Responses and Objections to Plaintiffs' Interrogatories).  At the time defendants served their Responses and Objections, defendants had taken the position that the proper time frame for discovery was through December 31, 1998, a position they had supported by moving for a protective order on June 17, 2005.  <u>See</u> Dock. # 161.  Defendants objected to providing responses to certain other interrogatories, including interrogatory numbers 13, 18, 19, 20, 21, 22, 28, 29, 35, and 36, which are also the subject of the current motion.

On June 16, 2005, the parties participated in a meet-and-confer session regarding the interrogatories (the "2005 meet-and-confer session").  On July 8, 2005, plaintiffs wrote to follow-up on certain items from that session.  <u>See</u> Declaration of Ronald Aranoff dated November 30, 2006 ("Aranoff Decl.") (Dock. # 556) Ex. 2.  Only three interrogatories mentioned in that letter – numbers 18, 19 and 28 – are at issue in plaintiffs' motion to compel.  On July 19, 2005, defendants responded to plaintiffs' letter. With respect to interrogatory numbers 18 and 19, regarding marketing strategies, defendants stated their position that defendants had produced documents from the files of people responsible for the marketing of Neurontin and that, because the burden of identifying marketing strategies referenced within those documents is the same for plaintiffs as for defendants, plaintiffs should derive the response from the documents. <u>See</u> Aranoff Decl. Ex. 3, at 3.  With respect to interrogatory number 28, seeking lists of sales representatives and medical liaisons terminated within one year of the merger between Pfizer and Warner-Lambert, defendants had objected on the grounds that the interrogatory sought information that was, *inter alia*, irrelevant.  Nonetheless, defendants

agreed to at least look into whether such information was even available in a central location.  <u>Id.</u>

Plaintiffs acknowledge that the interrogatories were ripe for motion practice as of the time of their receipt of the July 19, 2005 letter and that they "began drafting a motion to compel" at that time.  <u>See</u> Memorandum of Law in Support of Plaintiffs' Motion to Compel Defendants to Respond to Certain Interrogatories ("Pl. Mem.") (Dock. # 562), at 3.  Yet more than six months passed after plaintiffs received defendants' letter until Magistrate Judge Sorokin stayed discovery on January 31, 2006.  Dock. # 270.  During this time plaintiffs took no action with respect to their interrogatories.  On June 19, 2006, the Court lifted the discovery stay.  Dock. # 372.  More than four additional months passed from the time that the stay was lifted until October 30, 2006, when plaintiffs wrote to defendants regarding the status of the interrogatories.

On November 13, 2006, defendants responded to plaintiffs' letter and reiterated the fact that they were producing documents from which the answer to many of the interrogatories could be derived.  Defendants also reiterated their objections to certain other interrogatories, though they expressed their belief that, due to the fact that more than fifteen months had passed since the parties had last discussed plaintiffs' interrogatories, during which the posture of the case had been further defined, it seemed that an additional meet-and-confer session might be of use.  <u>See</u> Aranoff Decl. Ex. 5. Accordingly, the parties telephonically conferred on November 22, 2006 (the "2006 meet-and-confer session").  During that session, defendants identified certain materials that they had already produced or were in the process of preparing for production that provided additional information responsive to some of the interrogatories.  MacGregor

Decl. ¶ 6.  In light of Discovery Order Number 3 (Dock. # 393), which established the time frame for discovery in the case to run through May 31, 2001, defendants also agreed to provide certain information in response to certain interrogatories relating purely to the Pfizer era.  MacGregor Decl. ¶ 7.

## ARGUMENT

The Court should deny plaintiffs' motion, as the interrogatories at issue in plaintiffs' motion to compel seek information that is overly broad, unduly burdensome, and / or irrelevant to this litigation.

## I.    DEFENDANTS HAVE RESPONDED PROPERLY TO THE INTERROGATORIES AT ISSUE

### A.    Neurontin Events and Articles

Defendants have agreed to provide information responsive to interrogatory numbers 6 though 12, and the Court should not require defendants to do more in this area due to the extreme burden that would be associated with such an effort.

Plaintiffs' requests for information related to so-called "Neurontin Events" seek information that is overly broad and unduly burdensome.  Plaintiffs failed to define the term "Event" in their interrogatories, but in their March 11, 2005 First Request for Production of Documents, plaintiffs defined "Event" broadly to include "any conference, seminar, gathering, dinner meeting, dinner, meal, advisory board meeting, consultant meeting, speaker event, speaker training, CME, conference call, teleconference, trip, vacation, or weekend getaway attended by physicians, funded, sponsored, or paid for in whole or in part by Defendants, whether directly or through a third party which received money from Defendants which was intended to be applied to any of the costs of the

Event." MacGregor Decl. Ex. B (excerpt of Class and Non-Class Plaintiffs' First Request for Production of Documents), at 3.

The burdensomeness of these requests if clearly demonstrated by, for example, Interrogatory number 6, which seeks the identification of every Neurontin-related event, sponsored in whole or in part by defendants, directly or indirectly, at which off-label uses of Neurontin were discussed, for a period of over ten years. MacGregor Decl. Ex. A, at 10-11. In requesting such information, plaintiffs ignore the fact that claims based on off-label promotion have been dismissed and that discussion of off-label uses is not per se illegal. Moreover, plaintiffs demand to receive a litany of information about each event, including date, location, vendors involved, speakers, invitees, attendees, hand-outs, presentations, and feedback forms. Id. Interrogatory number 7 seeks similar information relating to speakers bureau programs. Id. at 11-12. Interrogatory numbers 8 and 9, relating to vendors and Continuing Medical Education ("CME") providers, seek similar information related to events and are equally overly broad and burdensome. Id. at 13-14.

Defendants responded to these overly broad requests pursuant to Rule 33(d) of the Federal Rules of Civil Procedure and Rule 33.1 of the Local Rules of the United States District Court for the District of Massachusetts ("Mass. Local Rules"), by referring to documents. At the time defendants served their Responses and Objections, those documents related to the time period prior to December 31, 1998, which defendants believed was the appropriate time period. In the wake of Discovery Order Number 3, which expanded the time period to May 31, 2001, defendants have been reviewing, and

will soon produce, additional materials.[1]  Plaintiffs can derive the response to this

interrogatory from those materials.  Indeed, with respect to interrogatory number 7,

defendants already have produced information from the Warner-Lambert period about

physicians who acted as Neurontin speakers, including payment information.  Defendants

have agreed to produce, on January 15, 2007, the Pfizer database that includes the

location of Neurontin speaker bureau meetings, in addition to the speaker information

and the amount of the payment to speakers.

 Defendants have been unable to locate a similar database or central depository

relating to other types of Neurontin events or to vendors, nor have they identified

additional speakers bureau information maintained in a central location.  Defendants have

told plaintiffs this on several occasions.  MacGregor Decl ¶ 9.  Plaintiffs assert that the

defendants' production of information related to speakers is "calculated to be least

relevant to this case."  Pl. Mem. at 5.  Plaintiffs' reference to calculation on the part of

defendants is both self-serving and incorrect.  Defendants possess some information

regarding speakers in a central location and therefore are producing that source of

information.  Defendants have not located any central location for information about the

other types of events plaintiffs seek, such as consultants meetings or CME, and have

---

[1] Plaintiffs' suggestion that defendants have been dilatory in responding to their interrogatories is incorrect.  Pl. Mem. at 5.  Defendants have provided responses or interposed appropriate objections to plaintiffs' patently overly broad and unduly burdensome interrogatories.  Where plaintiffs disagreed with defendants' responses or objections, it was incumbent upon plaintiffs to seek relief from the Court after the parties had conferred in good faith.  Defendants had no obligation to provide information other than that which they agreed to provide in those responses without such judicial intervention.  Yet plaintiffs, while having taken no steps between July 19, 2005 and October 30, 2006 to pursue further responses to their interrogatories, suggest that defendants' failure to act is somehow deficient.  In fact, by waiting over fifteen months to file a motion to compel, plaintiffs should be deemed to have waived their right to compel further responses, as discussed further below.

therefore objected to providing information in response to this interrogatory outside the provision of responsive documents from relevant custodial files.[2]

If a so-called "Neurontin Event" was held by the company or by an outside vendor, to the extent the company maintains records relating to that event, they would exist in the files of the Neurontin marketing team as email, computer files, or in desk files. To provide the information plaintiffs demand in their interrogatories, defendants would have to review each document in these files, which consist of thousands of pages, and to create a list of any event identified in the course of that review. Responding to plaintiffs' interrogatories by reference to specific bates ranges would require the same document-by-document review. Defendants already have produced well over a million pages of documents, and will produce more documents from the Pfizer national marketing team for Neurontin over the course of the next few months. It would require a tremendous number of attorney hours to provide the information plaintiffs seek, and

---

[2] Plaintiffs are incorrect when they say defendants did not object to these requests on the grounds of burden. Pl. Mem. at 5. Defendants interposed a General Objection, which applied to each of these interrogatories, that the interrogatories were overly broad in seeking all or every example or incident relating to the information sought. See MacGregor Decl. Ex. A, at 3. Defendants also objected to the requests as seeking documents from a time frame that was overly broad. Finally, defendants responded to each of these interrogatories by noting that they had produced documents, and would produce more documents, from which the answer to these interrogatories could be derived, but that it was as burdensome for defendants to take that step as for plaintiffs.

Plaintiffs' claim that defendants' objection that the requests are "unworkable" is somehow inappropriate, Pl. Mem. at 5 n.5, is also incorrect. It is impossible for defendants to know whether someone who participated in an event about, e.g., epilepsy made a reference to an off-label use of Neurontin. Accordingly, only events with scheduled discussions of Neurontin for off-label uses could even be identified as responsive to these requests.

defendants could accomplish the task no more quickly or efficiently than plaintiffs could.[3]

Defendants' response to the interrogatories by referring to documents is appropriate under these circumstances.  Rule 33(d) of the Federal Rules of Civil Procedure states that when "the burden of deriving or ascertaining the answer [from documents] is substantially the same for the party serving the interrogatory as for the party served," then the responding party can simply "specify the records from which the answer may be derived or ascertained . . . ."  Fed. R. Civ. P. 33(d).  Moreover, "[a] specification shall be in sufficient detail to permit the interrogating party to locate and to identify, as readily as can the party served, the records from which the answer may be ascertained."  Id. (emphasis added).  The Massachusetts Local Rules similarly provide that when an interrogatory is responded to by reference to documents, "the specification of documents to be produced shall be in sufficient detail to permit the interrogating party to locate and identify the records and to ascertain the answer as readily as could the party for whom discovery is sought."  Mass. Local Rule 33.1(1) (emphasis added).  In this case, defendants have been unable to identify any method by which to identify the information about events and articles that plaintiffs seek short of conducting a document-by-document review of potentially responsive documents from the files of the Neurontin marketing team.  Defendants can do no better than to refer to these documents, and cannot further narrow the documents to bates numbers without engaging in an incredibly

---

[3] Indeed, plaintiffs' request that, should the Court grant their motion to compel, it order defendants to produce this information within 14 days of that order, Pl. Mem. at 6 n. 7, is not only abusive and harassing, but requests that which is physically impossible.

burdensome review process.  Moreover, defendants have produced all of these materials in electronic, text-searchable format.  Accordingly, plaintiffs can run the same types of text searches as defendants could to assist them in locating information.

Plaintiffs' interrogatory numbers 10 through 12 are equally broad, though they seek information relating to various types of published documents.  These interrogatories seek the identification of so called "Articles," so-called "Case Reports,"[4] letters to the editor, and (for interrogatory number 12) abstracts, relating to off-label uses of Neurontin that defendants may have funded, edited, or reviewed prior to publication, directly or indirectly.  See MacGregor Decl. Ex. A, at 15-17.  Moreover, the interrogatories define "Article" to mean "any article, manuscript, abstract, letter to the editor, written Case Report, text, paper, poster or writing of any description, whether published or otherwise." MacGregor Decl. Ex. C (excerpt from Class and Non-Class Plaintiffs' First Set of Interrogatories), at 1.  Defendants have produced, and will continue to produce, documents from which the response can be derived, subject to certain objections, including hundreds of Neurontin research reports and thousands of Neurontin articles in electronic form.  Defendants have told plaintiffs that they have been unable to locate a central depository that tracks the information plaintiffs seek related to publications, as with the events discussed above.  To the extent that there is information about the funding or review of articles, however, it most likely would be contained in the files of those who sat on the publication subcommittee for Neurontin.  The publications subcommittee was a

_____

[4] Note that, while plaintiffs do not define "Case Report" in their interrogatory requests, they do define the term in the First Request for Production of Documents as "a written or oral report that describes the treatment of an individual patient."  MacGregor Decl. Ex. B, at 2.

cross-functional team, and defendants will be producing the files of the marketing

members of this team.  Plaintiffs can derive the information that they seek from these

files.[5]

### B.     Pfizer Employees

In interrogatory numbers 13, plaintiffs seek the identity of "each committee,

board, counsel, team, group, working group, or other collection of employees" that was:

> charged with the responsibility of or was authorized to engage in
> formulating marketing plans, marketing strategies, marketing tactics,
> marketing development strategies, conducting indication decision analysis,
> making recommendations whether to seek regulatory approval, and setting
> or allocating marketing budgets for Neurontin . . . .

MacGregor Decl. Ex. A, at 18.[6]  These requests are overly broad and vague, particularly

in seeking information about every "counsel," "group," "working group," or "other

collection of employees," and groups "authorized to engage in" certain activities.

Because the Court has extended the time frame for discovery to the period

through May 31, 2001, at the 2006 meet-and-confer session defendants agreed to identify

the members of the Pfizer national marketing team for Neurontin.  Additionally, if there

are formal committees that met on a regular basis and had responsibility over time for

some aspect of marketing, publications, grants, or regulatory decisions regarding

---

[5] Finally, with respect to both events and publications, defendants will continue to investigate whether any central files exist that would provide the information plaintiffs seek.  The timeframe for discovery was only expanded on July 18, 2006 to include a portion of time after Pfizer and Warner-Lambert merged, and defendants still are identifying and locating information from that period.  The search for any such centrally-stored information is one of defendants' top discovery priorities.  As stated at the 2006 meet-and-confer session, if defendants locate such a source with responsive information, they will produce it promptly.  At this time, however, a reasonable search has not identified such a source, and accordingly defendants have no choice but to refer to documents in response to these interrogatories.

[6] At the 2006 meet-and-confer session the parties agreed that interrogatory number 22 seeks the same information as interrogatory number 13.  MacGregor Decl. ¶ 8.

Neurontin, defendants will take reasonable steps to identify such teams and their members from the relevant time period.  Defendants will provide this information by February 28, 2007.

### C.     Databases

Defendants have conducted a reasonable search to identify databases in these areas, and believe that they have fulfilled their obligations in response to interrogatory numbers 14 and 15.  For example, in response to interrogatory number 14, defendants agreed to produce the CMMS database, which contains information from Warner-Lambert about visits by sales representatives to doctors relating to Neurontin.  See MacGregor Decl. Ex. A, at 19.  Defendants will also be producing the Sherlock database, which contains this information from the Pfizer period.  Defendants were unaware that plaintiffs sought additional information about sales call databases, as plaintiffs did not mention this during the 2005 meet-and-confer session or the 2006 meet-and-confer session.  MacGregor Decl. ¶ 10.  At this time, defendants are unaware of the existence of any additional sales call databases.

On July 8, 2005, defendants produced the Merlin and Pfoenix databases, which include requests for medical information or reports of adverse events, in response to interrogatory number 15, which sought the identification of databases relating to communications between defendants and physicians.  MacGregor Decl. ¶ 11.  Defendants produced these databases with certain fields redacted.  The redactions included the names of patients, whether they submitted the request to the company or whether their names were mentioned in the subject of the call.  Id.  Such redactions of patient identifying information are required under the Health Insurance Portability and Accountability Act ("HIPAA").  See 42 U.S.C. § 1320d(6).  In addition, defendants redacted the names of physicians and pharmacists who placed calls to the company.  To the extent that the calls related to the reporting of an adverse event, such redactions are also required.  See 21

13

CFR 20.63(f) (stating that the names and identifying information of voluntary reporters of adverse events involving drugs shall not be disclosed by manufacturers). To the extent that defendants redacted the names of physicians or pharmacists who only were requesting information about Neurontin, and the inquiry is not associated with an adverse event or otherwise patient-specific, defendants agree to un-redact such names. Note that this will require a line-by-line review of thousands of entries to determine the context of each call, and accordingly defendants will not be able to provide the new version of the databases until February 28, 2007.

With respect to interrogatory number 16, requesting the identity of databases containing information about payments relating to doctors in connection with Neurontin, defendants have identified (and are producing) the BETSY database, which contains speaker payments. Defendants have also identified the APT database, which was Warner-Lambert's accounts payable database. Pfizer also maintains an accounts payable database. Defendants will conduct a reasonable search and identify the names of any additional databases that track payments related to Neurontin by January 15, 2007.

With respect to interrogatory number 17, requesting the identity of databases tracking information about prescriptions, defendants have offered to produce IMS data. During the November 22, 2006 meet-and-confer session, defendants noted that they believed there were other third-party vendor data that Pfizer maintains in the ordinary course of business, but that they had to look into this further. Defendants will conduct a reasonable search and will provide plaintiffs by January 15, 2007 with a list of databases that contain information regarding Neurontin prescriptions.

### D.    Marketing Strategies

Plaintiffs' requests in interrogatory numbers 18 through 21 relating to the identification of marketing strategies and tactics are vague and ambiguous. Plaintiffs ask defendants to identify all national or regional marketing strategies or tactics, along with the title, a description of the goals, and the budget, cost, and profit of implementing each. See MacGregor Decl. Ex. A, at 20-23. Defendants' production of the Neurontin operating plan during the relevant period ought to be sufficient. If plaintiffs want to understand further any additional steps defendants took to market Neurontin, they should review the responsive materials from the Neurontin marketing team, which are being produced.

Plaintiffs' argument that defendants must identify by bates number the documents responsive to their requests, Pl. Mem. at 9, fails for the reason set forth above regarding undue burden – namely, that the burden to review the documents is no less for defendants than for plaintiffs – and because the request is vague, ambiguous and unworkable. Does an email between two members of the Neurontin marketing team about the publication of a new article about Neurontin and the treatment of post-herpetic neuralgia encompass a marketing strategy or tactic? At its most extreme, virtually every email exchanged among the marketing team would be responsive to this request. To require defendants to decide which of these files relates to a national or regional marketing strategy or tactic is unworkable. Plaintiffs will have to review the materials that defendants are producing from these files and do their own work with respect to those materials.

15

Finally, plaintiffs' interrogatories are overly broad because they are not confined to relevant off-label uses of Neurontin.  Marketing strategies or tactics relating to growing the on-label market for Neurontin are irrelevant to this case.

### E.    Former Warner-Lambert Employees

Defendants objected to interrogatory numbers 28 and 29 on the grounds of relevance as well as burden.  In a transparent attempt to burden the defendants and to troll for disgruntled former employees, plaintiffs seek the identity of all Warner-Lambert employees "who were involved in the marketing sales, advertising, promotion, development, communications with physicians or dissemination of medical information relating to Neurontin" and who left the company within one year (before or after) of the June, 2000 merger between Pfizer and Warner-Lambert.  MacGregor Decl. Ex. A, at 27-28.  Thousands of employees left, were laid off, or down-sized as a result of the merger, and plaintiffs are seeking personal contact information for each of those employees who were "involved with" Neurontin.  Plaintiffs cite no support for their claim that they are "plainly entitled" to talk to former employees, Pl. Mem. at 10, much less that they are entitled to receive contact information for all such employees who had any involvement, no matter how minor, with Neurontin.[7]

---

[7] Moreover, plaintiffs' claim that these people are witnesses who can testify as to whether Pfizer halted the practices in which plaintiffs maintain Warner-Lambert engaged prior to the merger, Pl. Mem. at 10, does not even make sense with respect to those who left Warner-Lambert in advance of the merger or immediately thereafter.  If this is the rationale for the request, then plaintiffs have no need for the names of employees laid off up to twelve months *prior* to the merger, as such employees would have no insight to give to the question of Pfizer's practices.  While plaintiffs should not receive this information for the period after the merger either, plaintiffs' specious argument to support their request only reinforces the lack of relevance of the entire interrogatory.

16

Even were this request relevant and proper, which it is not, it is overly burdensome to require defendants to determine which of the many employees who left the company around the time of the merger were "involved with" Neurontin. Defendants have no means to determine this information through the use of their human resource databases. MacGregor Decl. ¶ 12. A list of people can be generated who left the company, but determining which of those employees were responsible for Neurontin would be an onerous job. Plaintiffs' proposed solution, which would require defendants to provide the name of all employees who left the company during this period, should not be adopted. Without a basis for providing this information, this is an unjustifiable invasion of the former employees' privacy in order to allow plaintiffs to engage in a fishing expedition.

### F.     Motions Challenging the Admissibility of Scientific Evidence

Plaintiffs' interrogatory numbers 35 and 36 are irrelevant and should be denied. The interrogatories request that defendants identify every occasion over the last fourteen years when they asserted that an opposing party's evidence that defendants' drugs caused a medical condition was not sufficient or admissible. Adverse event reports, however, are a very specific type of evidence and numerous federal courts throughout the country have held that, standing alone, they cannot establish legal causation, *i.e.*, that a certain drug is capable of causing a certain harm or did, in a particular instance cause a specific harm. See, e.g., Soldo v. Sandoz Pharms. Corp., 244 F. Supp. 2d 434, 537 (W.D. Pa. 2003) ("[T]he great weight of authority – and the most current authority – squarely rejects the use of [adverse drug events] and case reports for the purpose of establishing general causation). Sales and marketing plaintiffs allege that Neurontin was not effective

to treat certain off-label uses, and as such any position that Pfizer might have taken as to the legal or scientific reliability of certain evidence upon which experts proposed to rely to prove causation of a medical condition or adverse event has no bearing on this issue. Moreover, arguments as to the admissibility of expert testimony are by their nature fact-specific and as such do not relate to this litigation.

Even if plaintiffs were seeking relevant information, which they are not, their interrogatories are overly broad. They seek the identification, for every one of defendants' drugs, of every legal proceeding and every motion on this topic filed in the past fourteen years by the world's largest pharmaceutical company. To claim there would be no burden associated with this undertaking, Pl. Mem. at 11, is nonsensical on its face. Setting aside Warner-Lambert, which has not existed as its own company since the June 2000 merger, Pfizer alone has hundreds of pharmaceutical products, and has utilized numerous outside counsel to assist in its defense of thousands of law suits during the period which plaintiffs identify. To determine every proceeding and every motion would require Pfizer to identify each lawsuit to which it has been a party since 1993, and each law suit to which Warner-Lambert was a party from 1993 through June 2000, identify any outside counsel involved in such lawsuits, contact those counsel with this question, and have those counsel search their archived records to determine whether such a motion was ever made.[8] Indeed, because plaintiffs' interrogatories expressly seek any motion – including motions to dismiss and motions for summary judgment – in which a

---

[8] If plaintiffs seek published opinions relating to issues such as these they can, of course, locate such opinions through the standard case research process. Moreover, an increasing number of briefs are carried by the online legal research providers, rendering them available to plaintiffs virtually immediately.

certain argument was made, counsel would have to review all such motions to determine whether they would be responsive.  Counsel would then need to review any applicable protective order to determine whether the motion could be produced absent consent of the adversary, redaction, or court order.  Such a request, in addition to its irrelevance, is overly broad to the extreme.

## II.     PLAINTIFFS' MOTION TO COMPEL IS UNTIMELY

Plaintiffs' lengthy delay in filing their motion to compel defendants to respond to certain interrogatories is unreasonable, and this delay provides an independent grounds on which to deny plaintiffs the relief they seek.  Despite plaintiffs' conceded belief that their interrogatories were ripe for a motion to compel by July 19, 2005, Pl. Mem. at 3, they failed to bring such a motion (or to otherwise pursue their interrogatories) before the Court stayed discovery in the case, more than six months later.  After the Court lifted the stay on June 19, 2006, plaintiffs delayed over four additional months before raising issues related to their interrogatories.  Accordingly, plaintiffs have delayed filing their motion to compel a cumulative total of more than eleven months from the time at which they concede the issue was ripe for judicial intervention.[9]  Plaintiffs' motion should be dismissed as untimely.[10]

---

[9] Interrogatory numbers 13 and 22 request information about Pfizer employees.  Because defendants objected to providing information from the period after December 31, 1998, and this issue was not resolved until the Court issued Discovery Order Number 3, defendants do not contend that these requests for further information should be denied due to plaintiffs' delay in bringing their motion.

[10] Indeed, so much time had passed since plaintiffs raised issues relating to their interrogatories that, when they finally did so on October 30, 2006, defendants felt compelled to note that the parties should have an additional meeting to determine whether new issues were being raised.  See Aranoff Decl. Ex. 5, at 3.  In the course of the 2006 meet-and-confer session, however, it became clear that – with the exception of interrogatory numbers 13 and 22 regarding Pfizer-era employees – the same, stale issues were being raised with respect to the interrogatories against which plaintiffs have now moved.

Courts have found that a delay such as this can justify the denial of the relief sought.  In Cont'l Cablevision, Inc. v. Storer Broad. Co. 653 F.Supp. 451, 464 (D.Mass. 1986), this court held that a fifteen-month delay was sufficient reason to deny a party's motion to compel additional responses to interrogatories.  The Court noted that "'[t]he orderly administration of justice requires that a motion such as this must be filed within a reasonable time.'"  Id. at 464, quoting Anco Eng'g Co. v. Bud Radio, Inc., 8 Fed. R. Serv. 37a.12, 1963 U.S. Dist. LEXIS 10461 (D. Oh Dec. 17, 1963).  Plaintiffs have provided no reason for their delay in seeking to compel responses to the interrogatories.  While it is true that the Court stayed discovery at one point, it did not do so until more than six months after the interrogatories were ripe for a motion to compel.  After the stay was lifted, plaintiffs delayed more than four additional months before raising the issue.  Accordingly, the Court should deny the motion to compel responses or further information as untimely.

Dated: December 6, 2006

DAVIS POLK & WARDWELL

By:  /s/ James P. Rouhandeh
     James P. Rouhandeh
     Deborah L. MacGregor

450 Lexington Avenue
New York, New York 10017
(212) 450-4000

- and -

HARE & CHAFFIN

By:  /s/ David B. Chaffin
     David B. Chaffin

160 Federal Street
Boston, Massachusetts 02110
(617) 330-5000

*Attorneys for Defendants Pfizer Inc. and
Warner-Lambert Company*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management #3 on December 6, 2006.

<u>/s/ David B. Chaffin</u>