# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re: NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL DOCKET NO. 1629<br><br>Master File No.: 1:04-cv-10981-PBS<br><br>Judge Patti B. Saris<br>Mag. Judge Leo T. Sorokin |
| THIS DOCUMENT RELATES TO:<br>ALL MARKETING AND SALES PRACTICES ACTIONS | |

**PLAINTIFFS' REPLY MEMORANDUM IN FURTHER SUPPORT OF THEIR MOTION TO COMPEL DEFENDANTS TO RESPOND TO CERTAIN INTERROGATORIES**

## TABLE OF AUTHORITIES

### FEDERAL CASES

Carlson v. Freightliner LLC, 226 F.R.D. 343 ............................................................................. 3

Continental Cablevision, Inc. v. Storer Broadcasting Co., 653 F. Supp. 451 ..................... 6

Fann v. Giant Food, Inc., 115 F.R.D. 593 ................................................................................ 2

Kozlowski v. Sears, Roebuck & Co., 73 F.R.D. 73 .......................................................... 3

Pulsecard, Inc. v. Discover Card Services, Inc., 168 F.R.D. 295 ...................................... 4

Rainbow Pioneer v. Hawaii-Nevada Inv. Corp., 711 F.2d 902 ......................................... 4

In re Sulfuric Acid Antitrust Litig., 231 F.R.D. 351 ................................................................. 4

### FEDERAL RULES

Fed. R. Civ. P. 33 .............................................................................................................. 3

Fed. R. Civ. P. 37 .............................................................................................................. 6

### LOCAL RULES

Mass. Local Rule 37.1 ..................................................................................................... 6

i

Plaintiffs respectfully submit this memorandum of law in further support of Plaintiffs' motion to compel Defendants to respond to certain interrogatories.[1]

## ARGUMENT

### A. Neurontin Events and Articles

Defendants attempt to justify their failure to identify a single Neurontin-related event or article by making a series of lame excuses and faulty arguments. First, Defendants attempt to support their claim of burden by arguing that "claims based on off-label promotion have been dismissed and that discussion of off-label uses is not per se illegal." (Defs.' Mem. 6). Plaintiffs' claims, however, are not based on the fact that Defendants simply promoted Neurontin for off-label uses, but rather that Defendants fraudulently promoted Neurontin for uses that were unapproved *and* ineffective. Plaintiffs are entitled to learn the dates, locations, invitees, attendees, and content of Neurontin events so that we can know who was being told what by whom regarding Neurontin's efficacy for treating off-label conditions. The specifics of what took place at these events are at the heart of Plaintiffs' claims regarding Defendants' fraudulent off-label promotional enterprise, including what Defendants said about Neurontin's efficacy, for which uses, based on what scientific data or evidence.

Second, Defendants claim that they have fulfilled their obligations to respond to Interrogatories Nos. 6-12 by promising to produce documents from the files of marketing personnel. Defendants fail to mention, however, that they have not yet produced a single shred of paper from those files.[2] (Exhibit 1 to Declaration of Jeffrey D. Lerner, submitted herewith).

---

[1] All defined terms have the same meaning as those in Plaintiffs' Motion to Compel (Dock. #554).

[2] Defendants have pledged to begin producing documents from the marketing department on a rolling basis starting December 15, 2006 with a goal of completing that production within 90 days. (Lerner Decl. Ex. 1). There is no guarantee, however, that these documents will contain

1

Plaintiffs have been waiting for these documents since May 6, 2005, when Defendants served their initial Responses and agreed to produce marketing documents through December 31, 1998. (Aranoff Decl. Ex. 1). Since July 18, 2006, Defendants have been required to supplement their production through May 31, 2001. (Discovery Order No. 3, Dock. # 393). In other words, the documents that Defendants promised to produce in response to Interrogatories Nos. 6-12 are, with respect to pre-1999 documents, 19 months overdue, and with respect to 1999-2001 documents, 6 months overdue. Defendants cannot claim to have satisfied their discovery obligations by referring Plaintiffs to documents that have not been produced. In light of the fact that the discovery cut-off has been moved up to June 30, 2007, Defendants' undue delay in producing marketing information—whether through documents or written responses—is approaching the extreme, especially when considering Defendants' meager promise to "endeavor to compete this production within 90 days" after December 15, 2006. (Lerner Decl. Ex. 1).

Third, Defendants attempt to justify their unilateral decision to produce documents, rather than provide written responses, by claiming that they do not have responsive information readily accessible to them in a centrally located database or depository.[3] Of course, Defendants have an obligation to produce responsive information in their possession, custody or control, whether that information is centrally located or not. See Fann v. Giant Food, Inc., 115 F.R.D. 593, 596 (D.D.C. 1987) (even if records are stored in several locations, as opposed to a central location, defendant presented no evidence to suggest its employees could not quickly and efficiently

---

the information Plaintiffs are seeking. Defendants themselves admit that there is a "lack of visibility regarding the full scope of what will be entailed in responding to [Plaintiffs' document request]." Id. As such, Plaintiffs do not consider Defendants' impending document production a suitable substitution for written responses to their Interrogatories.

[3] Defendants' assertion that they do not have responsive information in a centrally located database is particularly surprising in light of a recent news article in which Pfizer touts its "nationally recognized e-discovery program." (Lerner Decl. Ex. 2).

2

search its files to uncover the requested information). The discovery rules do not excuse a party from answering an interrogatory simply because it is not convenient for them to do so. See Carlson v. Freightliner LLC, 226 F.R.D. 343, 370 (D. Neb. 2004) (objecting party's claim that answering discovery would require party to expend considerable time and effort analyzing "huge volumes of documents and information" is not a sufficient factual basis to sustain the objection). If Defendants were permitted to avoid answering simply because the responsive information cannot be found in a central location, then any large corporation could avoid discovery by de-centralizing its information system. See Kozlowski v. Sears, Roebuck & Co., 73 F.R.D. 73, 76 (D. Mass. 1976) (defendants, whose business generates massive records, not excused from complying with discovery rules by utilizing an inadequate record-keeping system). Defendants should be compelled to provide responsive information that is within their possession, custody, or control, wherever it may be located.[4]

Fourth, Defendants rely on Federal Rule 33(d) in arguing that their reference to "documents from the files of those persons responsible for the marketing of Neurontin" is a sufficient response to Plaintiffs' Interrogatories. As an initial matter, Rule 33(d) may only be invoked when the burden of deriving the information from the producing party's documents is the same for both parties. Fed. R. Civ. P. 33(d). Defendants claim that they, like Plaintiffs, would need to go document-by-document to cull the requested information, and therefore the burden is the same for both parties. The documents, however, *belong to the Defendants*, and therefore it should be presumed that they have an inherent familiarity with their documents that

---

[4] For example, Defendants claim they do not have any "central source" for certain event-related information, such as the names of invitees. (Defs.' Mem. 1-2.) Someone employed by Defendants was responsible for deciding which doctors to invite to events. Although this might not be a "central source" of information, it seems easy enough for Defendants to ascertain the requested information by talking to the employee responsible for invitees.

Plaintiffs cannot possibly share. See In re Sulfuric Acid Antitrust Litig., 231 F.R.D. 351, 366 (N.D. Ill. 2005) (effort involved in reviewing documents for information responsive to plaintiffs' interrogatories not as great for defendants because of defendants', and defense counsel's, familiarity with defendants' own documents). Therefore, the burden of deriving the answers is greater for Plaintiffs.

Furthermore, even if the burdens were the same, which they are not, Defendants have to *specify* which documents contain the responsive information. Defendants claim that they "can do no better than to refer to [marketing] documents, and cannot further narrow the documents to bates numbers without engaging in an incredibly burdensome review process." (Defs.' Mem. 9-10). Unfortunately, the law requires them to do precisely that. See Rainbow Pioneer v. Hawaii-Nevada Inv. Corp., 711 F.2d 902, 906 (9th Cir. 1983) (response that answers to interrogatories could be found in partnership books, banking accounts, computer printouts, and ledgers was insufficient due to failure to specify where in records the answers could be found); Pulsecard, Inc. v. Discover Card Services, Inc., 168 F.R.D. 295, 305 (D. Kan. 1996) (defendants may not refer generically to past or future document productions, they must identify which documents contain the answers; otherwise, they must completely answer the interrogatories without referring to documents). Therefore, Defendants should be compelled to provide written answers to Plaintiffs' Interrogatories. To the extent that the Court permits Defendants to refer to documents, Defendants should be compelled to specify a reasonable bates range where Plaintiffs can find documents that contain responsive information.

### B. Marketing Strategies

Defendants argue that production of the Neurontin operating plan and the above-referenced documents from the files of marketing personnel is sufficient to answer Plaintiffs' requests for the identification of each marketing strategy, including a description of the strategy

4

and other related information. Rather than refer to unspecified documents, it would seem that Defendants could answer these interrogatories by speaking to the employees who were responsible for developing and implementing the marketing strategies. For example, on March 29, 2005, plaintiffs in the products liability case deposed Suzanne Doft, Director/Team Leader of the Neurontin marketing team since 2003, and a member of the Neurontin marketing team since 2001. (Lerner Decl. Ex. 3). Ms. Doft was asked what the then-current marketing strategy was for Neurontin, to which she replied that there was none. Id. It should be just that simple for Defendants to ascertain the answers to Interrogatories Nos. 18-21.

### C. Former Warner-Lambert Employees

Defendants admit that a list can be generated of Warner-Lambert employees who left the company around the time of the merger, but that determining which of those employees were responsible for Neurontin would be "onerous." (Defs.' Mem. 17). Defendants have in their possession, however, the names of Neurontin sales representatives from both Warner-Lambert (the CMMS database) and Pfizer (the Sherlock database). (Defs. Mem. 13). All that needs to be done to respond to Plaintiffs' Interrogatories Nos. 28-29 is to compare the lists of Neurontin sales representatives with the list of Warner-Lambert employees who left the company around the time of the merger with Pfizer. If Defendants are unwilling to do this, they should provide Plaintiffs with all the information and let Plaintiffs determine who the terminated employees are. Plaintiffs are entitled to this information so that they can rebut Defendants' position that the illegal marketing practices for Neurontin were a Warner-Lambert problem that Pfizer ended.

### D. Motions Challenging the Admissibility of Scientific Evidence

Defendants intend to argue that Neurontin's efficacy can be proved using non-scientific anecdotal information. This argument, however, is at odds with not only the Daubert jurisprudence but also positions that Pfizer itself has taken in prior litigations. Plaintiffs are

5

entitled to cross examine Defendants' experts based on these prior, inconsistent positions. Defendants attempt to mask the irreconcilable nature of their positions by arguing that while case reports of adverse events cannot establish legal causation, case reports of positive events (i.e. efficacy) can. (Defs.' Mem. at 17-18). Defendants, however, do not and cannot explain how the two are different. Plaintiffs believe the most persuasive way to preclude Defendants from using anecdotal case reports to prove efficacy is to cite to Defendants' own arguments against an opposing party's use of precisely the same types of non-scientific, anecdotal evidence. Therefore, Defendants should be compelled to identify prior motions where they argued against the admissibility of adverse event reports.

### E. Timeliness

Defendants' desperate claim that Plaintiffs unreasonably delayed the filing of their motion to compel is without merit. As an initial matter, nothing in the Federal or Local Rules requires that a motion to compel be filed within a given period of time. Fed. R. Civ. P. 37(a)(2)(B); Mass. Local Rule 37.1. If anything, the Rules suggest that the moving party err on the side of waiting to file until it has exhausted all possible attempts to narrow the scope of the disagreement. Mass Local Rule 37.1(a). Defendants rely solely on a single case to support their claim of untimeliness, Continental Cablevision, Inc. v. Storer Broadcasting Co., 653 F. Supp. 451 (D. Mass. 1986), which is easily distinguishable from the situation here. In that case, the motion to compel was filed on the eve of trial, over six years after the litigation began, Id. at 453, and there was no intervening six month discovery stay. Having to answer discovery at such a late date in the proceedings is prejudicial to the answering party. Here, however, Defendants have not even attempted to argue that they have been prejudiced by the purported delay, nor can they. Defendants' only rationale for arguing that the motion is untimely is that they simply do not want to answer Plaintiffs' Interrogatories.

Furthermore, any purported delay in filing Plaintiffs' motion is due in large part to Defendants' own tactics. Plaintiffs have expended the majority of their time and resources on focusing on Defendants' document production, or lack thereof, because of Defendants' position that their document production would also contain the answers to Plaintiffs' Interrogatories. When it became clear that Defendants would not be providing documents in a timely fashion without judicial intervention, Plaintiffs began drafting a motion to compel. The Court stayed discovery before Plaintiffs could file their motion. After the Court lifted the discovery stay, Plaintiffs immediately renewed their efforts to obtain documents from Defendants, which has been a protracted process.[5] In the meantime, Defendants took no steps to supplement their Responses pursuant to Discovery Order No. 3, which required the production of responsive information through May 31, 2001. Plaintiffs again prepared to file a motion to compel, but first sent a letter to Defendants, as a courtesy in an effort to avoid unnecessary motion practice, to see if Defendants' positions had changed at all. Defendants insisted on a second meet and confer, during which they reiterated that the majority of responsive information is contained in documents that will be produced. Defendants cannot reasonably ask Plaintiffs to wait for their dilatory document production to ascertain the answers to the Interrogatories, and then complain that Plaintiffs waited too long to file a motion to compel.

## **CONCLUSION**

Based on the foregoing, Plaintiffs respectfully request that the Court order Defendants to respond to Plaintiffs' Interrogatories by a date certain in the near future.

---

[5] Defendants claim they have produced over one million pages. Defendants are apparently counting documents they produced in the *Young* case as part of the one million pages, despite the Court's finding that the documents produced in *Young* have not been produced in this case. Discover Order No. 5 (Dock. #484).

7

Dated: December 8, 2006  Respectfully Submitted,

By: **/s/ Thomas Greene**
Thomas Greene Esquire
Greene & Hoffman
125 Summer Street
Boston, MA 02110

By: **/s/ Barry Himmelstein**
Barry Himmelstein, Esquire
Lieff Cabraser Heimann &
Bernstein, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111-3339

By: **/s/ Don Barrett**
Don Barrett, Esquire
Barrett Law Office
404 Court Square North
P.O. Box 987
Lexington, MS 39095

By: **/s/ Daniel Becnel**
Daniel Becnel, Jr., Esquire
Law Offices of Daniel Becnel, Jr.
106 W. Seventh Street
P.O. Drawer H
Reserve, LA 70084

By: **/s/ James Dugan**
James Dugan, Esquire
Dugan & Browne
650 Poydras St., Suite 2150
New Orleans, LA 70130

*Members of the Class Plaintiffs' Steering Committee*

By: **/s/ Thomas M. Sobol**
Thomas M. Sobol
Hagens Berman Sobol Shapiro LLP
One Main Street, 4th Floor
Cambridge, MA 02142

8

*Plaintiffs' Liaison Counsel and Member of the Class Plaintiffs' Steering Committee*

By: **/s/ Richard Cohen**
Richard Cohen, Esquire
Lowey Dannenberg Bemporad
& Selinger, P.C.
The Gateway
One North Lexington Avenue
White Plains, NY 10601

By: **/s/ Linda P. Nussbaum**
Linda P. Nussbaum, Esquire
Cohen Milstein Hausfeld & Toll
150 East 52nd Street
Thirteenth Floor
New York, NY 10022

*Members of the Plaintiffs' Non-Class Steering Committee*