## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re:  NEURONTIN MARKETING AND SALES PRACTICES LITIGATION | MDL  Docket No.  1629 |
| | Master File No. 04-10981 |
| THIS DOCUMENT RELATES TO: | Judge Patti B. Saris |
| ALL ACTIONS | |

## CLASS AND NON-CLASS PLAINTIFFS' FIRST REQUEST FOR PRODUCTION OF DOCUMENTS

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, the Plaintiffs hereby request

Defendants Pfizer, Inc and Warner-Lambert Company produce for inspection and copying the

documents and materials described below at the offices of Greene & Hoffman, 125 Summer Street,

Suite 1410, Boston, MA 02110 within thirty days of the date of the service of this request.  Plaintiffs

further request that such production be made in accordance with the Definitions and Instructions set

forth below.

### Definitions and Instructions

### Definitions

The definitions contained in Rule 26.5 of the Local Rules of the United States District Court

for the District of Massachusetts are incorporated herein by reference.  Additionally, the following

definitions apply to this Document Request:

"And" includes the word "or" and vice-versa.

"Any" includes the and encompases "all" and vice-versa.

"APT Database" is the database described by James Murray in his March 29, 2002 deposition in the action <u>United States ex. rel. Franklin v. Parke-Davis</u>, No. 96-11651-PBS, United States District Court for the District of Massachusetts.

"Case report" means a written or oral report that describes the treatment of an individual patient.

"CBU" means (a) the divisions within Parke-Davis known as Customer Business Units, including the regional CBUs and the Managed Care CBU; and (2) any division with Pfizer that performed the function of a CBU after the merger of Pfizer and Warner-Lambert.

"Clinical trial" means a formal, blinded, prospective research study on human subjects conducted pursuant to a formal protocol and involving a control group

"CME" shall mean continuing medical education.

"CME Provider" shall mean an institution or entity certified by the Accreditation Council for Continuing Medical Education (ACCME) to provide continuing medical education or to issue CME credits to physicians.

"Communication" shall include oral, written or electronic communications.

"Defendants" shall mean "Pfizer" and "Warner-Lambert" and any of their predecessors or successors in interest, divisions, offices, subsidiaries, affiliates, and any present or former directors, officers, executives, trustees, employees, agents, attorneys, representatives and any other Person acting or purporting to act on its behalf, including, but not limited to, Parke-Davis.

"Document" shall have the meaning set forth in Rule 34(a) of the Federal Rules of Civil Procedure, and Local Rule 26.5, and includes all forms of writings as defined in Rule 1001(1) of the Federal Rules of Evidence, and includes any reduction to tangible form, whether written, recorded, taped, filmed, videotaped or in computer, digital or magnetic memory or storage, of communication,

2

information, or data, including any graphic matter of any kind or nature, however produced or reproduced, and also includes originals, drafts, and non-identical copies, wherever located. "Document" shall include, but not be limited to, books, contracts, agreements, correspondence, electronic mail (email), computer tapes, discs, magnetic memory, printouts and keypunch cards, memoranda, diaries, notes reports, bulletins, printed forms, telegraphic communications, pleadings and other legal papers, notes, telexes, telegrams, telecopies, facsimile reproductions, or "faxes," factual compilations, data compilations, statistical compilations, plans, diagrams, journals, change orders, studies, surveys, sketches, art work, graphics, checks, ledgers, catalogues, brochures, pamphlets, press releases, advertisements, invoices, minutes, photographs, microfilms, microfiche, films, personnel files, quotes, stenographic notes, computer disks, telephone records, schedules, bids, voice recordings, and transcriptions. This definition shall apply to all Documents in the possession, custody or control of the Defendants herein, or that of their attorneys, agents, employees, officers, directors, or representatives, irrespective of who generated, prepared or signed the Documents.

"DRUGDEX System" shall mean the proprietary reference service or product sold, licensed, or marketed by MICROMEDEX under the name DRUGDEX®.

"Event" shall mean any conference, seminar, gathering, dinner meeting, dinner, meal, advisory board meeting, consultant meeting, speaker event, speaker training, CME, conference call, teleconference, trip, vacation, or weekend getaway attended by physicians, funded, sponsored, or paid for in whole or in part by Defendants, whether directly or through a third party which received money from Defendants which was intended to be applied to any of the costs of the Event.

"Events, medical educational programs or educational materials that describe Neurontin's use for off-label indications" includes all events, programs and materials that devote attention to

3

Neurontin's use for off-label indications even if such subject is not the exclusive or primary focus of the event, program or materials.

"FDA" means the United States Food and Drug Administration.

"Goods or Services of Value" means any durable good or any service with a retail value in excess of $50, including but not limited to the provision of travel expenses, accommodations, entertainment or meals.

"Including" shall mean including, without limitation, the specific matter or Documents described.

"Identified Physicians" shall refer to: Jack Anstandig, Miroslav Backonja, Robert Baraff, Robert Barkin, Carl Bazil, Gregory Bergey, Ahmad Beydoun, Jane Boggs, Blaise Bourgeois, Thomas Browne, Joseph Bruni, Deborah Cantrell, Enrique Carrazana, Gregory Cascino, Mitchell Cohen, F. Michael Cutrer, John DeToledo, Orrin Devinsky, Bruce Ehrenberg, Alan Ettinger, James Ferrendelli, Robert S. Fisher, Bradley Galer, Jeffrey Gelblum, Barry Gidal, Frank Gilliam, Kenneth Gorson, Nina Graves, Hans Hansen, Paul Hardy, Barry Hendin, Gregory Holmes, John Hughs, Terrence Ketter, Jack A. Klapper, Ilo Leppik, Robert Leroy, David Longmire, David Marcotte, Ninan Mathew, Richard Mattson, Alexander Mauskop, Gary Mellick, Michael McLean, Michael Merren, Martha Morrell, George Morris, Solomon Moshe, Bruce Nicholson, Michael Nigro, Dennis Nitz, Douglas Nordli, John Pellock, Mark H. Pollack, Michael Privitera, R. Eugene Ramsey, William Rosenfeld, Edgar Ross, Anthony Ritaccio, Ralph S. Ryback, Rajesh Sachdeo, Raman Sankar, Steven Schachter, Jerome Schnitt, Stephen Silberstein, Michael Smith (Chicago, IL), Andrew Lawrence Stoll, Patricia Suppes, Norman Sussman, David Treiman, Basim Uthman, James Wheless, B. Joe Wilder, John W. Winkelman, and Mark Yerby.

"Identified Vendors" shall refer to the following companies:

4

1.    Cline Davis & Mann (including, but not limited to its Proworx division);

2.    Physicians' World (including, but not limited to, its Professional Postgraduate Services Division);

3.    Sudler and Hennessy (including, but not limited to, its Intramed division);

4.    Medical Education Programs, Ltd.

5.    Medical Education Consultants, LLC

6.    Medical Educational Services

7.    CME, Inc.

8.    Boron Lapore

9.    AMM/Adelphi

"IMS Data Files" shall mean all electronic database or spreadsheet files, in whatever file format containing data, information, or analytical methods or tools purchased from or licensed from IMS Health.

"Indirect funding" shall mean the funding of an activity or event useful to Defendants' pharmaceutical business, when such activity or event was not directly paid for by the Defendants, but was paid for by a person or vendor with whom Defendants had contracted, and one of the expected services with the contracting party was the funding of such activities and events.

"Indirect payments" shall mean payments made to a third party by or through a person or vendor that has directly contracted with any of the Defendants where one of the expected services provided by the contracting party is the payment of third parties who are providing services useful to Defendants' pharmaceutical business.

"Letter" shall mean a letter to the editor or similar written communication published in a medical journal, newsletter or publication.

5

"Medical study" shall mean a research study designed to investigate a specific question regarding the use of a pharmaceutical agent on human subjects. Clinical studies are included within this definition of medical study, however, case reports are not. A record review may or may not be within this definition of medical study.

"MICROMEDEX" shall mean MICROMEDEX, a division of the Thompson Corporation, and any of its predecessors or successors in interest, divisions, offices, subsidiaries, affiliates, and any present or former directors, officers, executives, trustees, employees, agents, attorneys, representatives and any other Person acting or purporting to act on its behalf.

"Neurontin" shall mean the drug with the chemical name gabapentin, marketed under the name Neurontin, and includes all uses or indications thereof.

"Neurontin Drug Evaluation" shall mean that portion of the DRUGDEX System which contains the Drug Evaluation for Neurontin, including but not limited any portions which discuss or set forth indications and Unapproved Indications for Neurontin.

"Off-label" shall mean uses of a drug, or the conditions for use of a drug, which has not received approval by the FDA. Use of a drug at a higher dosage than the dosage stated to be safe and effective in the drug's labeling, or use of a drug as a monotherapy when only approved for adjunct therapy both constitute an "off-label" use.

"Parke-Davis" shall mean Parke-Davis, a division of Warner-Lambert Company, and any of its predecessors or successors in interest, divisions, offices, subsidiaries, affiliates, and any present or former directors, officers, executives, trustees, employees, agents, attorneys, representatives and any other Person acting or purporting to act on its behalf.

6

"Person" or "Persons" shall mean any individual, corporation, organization, association, partnership, limited partnership, firm, joint venture, trustee, governmental body, agency, governing board, department or division, or any other entity.

"Pfizer" shall mean Defendant Pfizer, Inc. and any of its predecessors or successors in interest, divisions, offices, subsidiaries, affiliates, and any present or former directors, officers, executives, trustees, employees, agents, attorneys, representatives and any other Person acting or purporting to act on its behalf, including, but not limited to, Parke-Davis.

"Record review" shall mean a retrospective analysis of the medical records of an individual patient or a group of patients.

"Relating to" shall mean constituting, consisting of, referring to, reflecting, concerning, discussing, evidencing, commenting on, pertaining to, or having any logical or factual connection with the matter identified, in whole or in part.

"Third-party payor" shall mean an non-governmental entity that is (i) a party to a contract, issuer of a policy, or sponsor of a plan, which contract, policy or plan provides prescription drug coverage to natural persons, and is also (ii) at risk, pursuant to such contract, policy or plan, to pay or reimburse the amount associated with the cost of prescription drugs to natural persons covered by such contract, policy or plan (subject to such natural persons satisfying any obligation to pay a deductible and/or co-payment).

"Vendor" shall mean an entity which, in the ordinary course of its business, provides one or more of the following services to healthcare or pharmaceutical entities: (a) assistance in organizing, coordinating, planning or managing meetings or events; (b) assistance in writing, editing, placing, publishing or distributing medical articles or medical publications; or (c) assistance or consultation with marketing.

"Verbatims" shall mean the information or statements of physicians compiled by Scott-Levin or Verispan, LLC referred to or known as verbatims.

"Warner-Lambert" shall mean Warner-Lambert Company and any of its predecessors or successors in interest, divisions, offices, subsidiaries, affiliates, and any present or former directors, officers, executives, trustees, employees, agents, attorneys, representatives and any other Person acting or purporting to act on its behalf, including, but not limited to, Parke-Davis.

## Instructions

1.      In the event that any Document called for by this Document Request is withheld on the basis of a claim of privilege, that Document is to be identified as follows: author(s), addressee(s), indicated or blind copy recipient(s), date, subject matter, number of pages, attachments or appendices, all persons to whom distributed, shown or explained, the present custodian, and the nature of the privilege asserted.

2.      In the event that any Document called for by this Document Request has been destroyed, discarded, otherwise disposed of, or no longer exists, that Document is to be identified as completely as possible, including, without limitation, the following information: author(s), addressee(s), indicated or blind copy recipient(s), date, subject matter, date of disposal, reason for disposal, Person authorizing the disposal, the Person disposing of the Document, and identify its last known location and the reason it is no longer in existence.

3.      In the event that any information is redacted from a Document produced pursuant to this Document Request, that information is to be identified and the basis upon which such information is redacted be fully stated.

4.      In construing this Document Request, the singular shall include the plural and the plural shall include the singular.

8

5.    These document requests are continuing requests which require supplemental responses if a Defendant, or any person acting on its behalf, obtains additional information called for by a request. Each supplemental response shall be served on Plaintiffs no later than thirty (30) days after the discovery of the further information, and in no event shall any supplemental response be served later than the date for submission of a pre-trial memorandum.

6.    In producing documents and other materials, you are requested to furnish all documents or things in your possession, custody or control, regardless of whether such documents or materials are possessed directly by you or your directors, officers, agents, employees, representatives, subsidiaries, managing agents, affiliates, investigators, or by your attorneys or their agents, employees, representatives or investigators.

7.    Documents shall be produced as they are kept in the usual course of business or shall be organized and labeled to identify any file number, file name, or any other file identification system utilized by the responding party, as well as the location and custodian of such records. These requests include shall be deemed to include a request by the Plaintiffs to physically inspect any file drawer, filing cabinet or any other storage device where documents responsive to these requests are maintained at the time of the inspection of such documents.

8.    Documents attached to each other should not be separated.

9.    Unless otherwise stated, the time period for this Document Request shall be from January 1, 1994 to May, 2004. A request to provide documents or materials "at any time" is unlimited in temporal scope.

10.    The geographic scope of this Document Request is the United States; however, all requests for documents and other materials which relate to the safety or efficacy of Neurontin, or medical research and study relating to Neurontin are not limited to the United States.

11.     When a request calls for the production of an electronic database file or Data File, this file must be produced in a form compatible with Microsoft Access, or in any other format agreed to by the parties.

12.     If a request calls for the production of database records or database files that no longer exist in electronic form, all hard copies of the requested records and files, even if not entirely complete, should be provided.

## Documents Requested

1.     NDA 20-235

2.     All supplemental NDAs filed concerning Neurontin.

3.     All documents relating to any clinical trial conducted for the purpose of establishing the safety or efficacy of Neurontin for the treatment of any pain syndrome.

4.     All documents relating to any clinical trial conducted for the purpose of establishing the safety or efficacy of Neurontin for the treatment of any psychiatric syndrome.

5.     All documents relating to any clinical trial conducted for the purpose of establishing the safety of Neurontin for use by patients suffering from mental illnesses, including, but not limited to, bipolar disorder, depression, social phobia, anxiety disorder, panic disorder, obsessive compulsion disorder, mania, attention deficit disorder or attention deficit hyperactivity disorder.

6.     All documents relating to any clinical trial conducted at any time for the purpose of establishing efficacy or safety of Neurontin for the treatment of migraine or for migraine prophylaxis.

10

7.      All documents relating to any clinical trial conducted for the purpose of establishing the efficacy or safety of Neurontin for the treatment of social phobia

8.      All documents relating to any clinical trial conducted for the purpose of establishing the efficacy or safety of Neurontin for the treatment of anxiety disorder.

9.      All documents relating to any clinical trial conducted for the purpose of establishing the efficacy or safety of Neurontin for the treatment of any bipolar disorder.

10.     All documents relating to any clinical trial conducted for the purpose of establishing the efficacy or safety of Neurontin for the treatment of  restless leg syndrome.

11.     All documents relating to any clinical trial conducted for the purpose of establishing the efficacy of Neurontin for the treatment of RSD.

12.     All documents relating to any clinical trial conducted for the purpose of establishing the efficacy of Neurontin for the treatment of panic disorder.

13.     All documents relating to any clinical trial conducted for the purpose of establishing the efficacy of Neurontin for the treatment of sleep disorders.

14.     All documents relating to any clinical trial conducted for the purpose of establishing the efficacy of Neurontin at doses greater than 1800 mgs/day.

15.     All documents relating to any clinical trial conducted for the purpose of establishing the efficacy of Neurontin as a monotherapy for the treatment of epilepsy.

11

16.    All documents created at any time relating to the decision whether or not to file patent applications for Neurontin's use in treating conditions other than epilepsy, including, but not limited to, all clinical studies, research, market analysis or other information which was reviewed in making the decision to file such applications.

17.    All documents created at any time relating to the Neurontin Development Team, including but not limited to meeting minutes, agendas, all reports generated by the Neurontin Development team, and all communications distributed to members of the Neurontin Development Team.

18.    All documents relating to any market analysis of potential, expected or actual sales of Neurontin for any use other than as an adjunctive therapy in the treatment of epilepsy.

19.    All documents relating to any forecasts or projections of sales of Neurontin for any use other than as an adjunctive therapy in the treatment of epilepsy.

20.    All documents relating to any forecast or projection of estimated number of Neurontin prescriptions for any use other than as an adjunctive therapy in the treatment of epilepsy.

21.    All documents relating to any review, consideration, analysis, recommendation, approval of Neurontin's sales and marketing within the United States by the Parke-Davis New Product Committee.

22.    Documents sufficient to identify all persons who comprised the New Product Committee at any time it reviewed, considered, analyzed, recommended, or approved any aspect of Neurontin's sales and marketing within the United States.

23. All documents generated, reviewed, considered, analyzed or communicated by Parke-Davis's regulatory affairs department regarding any requirement (or lack of requirement) that Parke-Davis submit a supplemental NDA in order to engage in any marketing of Neurontin for any use other than as an adjunctive therapy in the treatment of epilepsy.

24. All documents generated, reviewed, considered, analyzed or communicated by Parke-Davis's regulatory affairs department regarding any recommendation by that department (or any person within that department) regarding Parke-Davis's submission of a supplemental NDA in order engage in any marketing of Neurotin for any use other than as adjunctive therapy in the treatment of epilepsy.

25. All documents, subsequent to 1993, relating to any review, consideration, analysis, recommendation or approval of Neurontin's sales and marketing within the United States by the Parke-Davis Marketing Council.

26. Documents sufficient to identify all persons who comprised the Parke-Davis Marketing Council at any time it reviewed, considered, analyzed, recommended, or approved any aspect of Neurontin's sales and marketing within the United States subsequent to 1993.

27. All documents relating to any decision by Parke-Davis or any of the Defendants to publicize off-label uses of Neurontin through articles published in medical journals.

28. All documents relating to marketing assessments of Neurontin for any use other than as an adjunctive therapy in the treatment of epilepsy.

13

29.    All documents relating to standard operating procedures within the Defendants for funding Events at which off-label uses of any of Defendants' drug products would be discussed.

30.    All documents relating to standard operating procedures within the Defendants for funding Events at which off-label uses of Neurontin would be discussed.

31.    All documents relating to standard operating procedures within the Defendants for inviting physicians to Events at which off-label uses of any of Defendants' drug products would be discussed.

32.    All documents relating to standard operating procedures within the Defendants for inviting physicians to Events at which off-label uses of Neurontin would be discussed.

33.    All records in Parke-Davis's and Pfizer's clinical communications database that concern requests from physicians for information relating to off-label use of Neurontin. The response to this request should include all fields of the database for every record produced.

34.    Copies of all articles that were sent to physicians who contacted Defendants requesting information relating to any off-label use of Neurontin.

35.    Copies of all forms of letters that were sent to physicians in response to physician requests for information relating to any off-label use of Neurontin.

36.    All records in any Parke-Davis database, including, but not limited to, the Parke-Davis APT database, relating to all Parke-Davis payments, directly or indirectly, to physicians for the conduct of medical studies on off-label usage of Neurontin. The response to this request should include all fields of the database for every record produced.

14

37.    All records in any Pfizer database relating to all payments, directly or indirectly, to physicians for the conduct of medical studies on off-label usage of Neurontin. The response to this request should include all fields of the database for every record produced.

38.    All documents relating to communications between any of the Defendants and any person who received a payment to conduct, review, design, analyze, write up or propose a medical study relating to any off-label use of Neurontin.

39.    All documents relating to internal communications within any of the Defendants relating to the conduct, review, design, analysis, write up, proposal or payment for medical studies relating to any off-label use of Neurontin.

40.    All documents relating to communications between any of the Defendants and any person who requested funding, sponsorship or any form of support to conduct, review, analyze, write up or propose a medical study relating to any off-label use of Neurontin.

41.    All documents relating to communications between any of the Defendants and any person who the Defendants solicited to conduct, review, analyze, write up or propose a medical study relating to any off-label use of Neurontin.

42.    All documents relating to communications between any of the Defendants and any person who received any form of payment to conduct, review, design, analyze, write up or propose a case study relating to any off-label use of Neurontin.

43.    All documents relating to internal communications within any of the Defendants

15

relating to the review, design, analysis, write up, proposal or payment for case studies relating to any off-label use of Neurontin.

44.    All documents relating to communications between any of the Defendants and any person who requested funding, sponsorship or any form of support to conduct, review, analyze, write up or propose a case study relating to any off-label use of Neurontin.

45.    All documents relating to communications between any of the Defendants and any person who the Defendants solicited to conduct, review, analyze, write up or propose a case study relating to any off-label use of Neurontin.

46.    All documents relating to communications between any of the Defendants and any person who received any form of payment to conduct, review, design, analyze, write up or propose a record review relating to any off-label use of Neurontin.

47.    All documents relating to internal communications within any of the Defendants relating to the review, design, analysis, write up, proposal or payment for record reviews relating to any off-label use of Neurontin.

48.    All documents relating to communications between any of the Defendants and any person who requested funding, sponsorship or any form of support to conduct, review, analyze, write up or propose a record review relating to any off-label use of Neurontin.

49.    All documents relating to communications between any of the Defendants and any person who the Defendants solicited to conduct, review, analyze, write up or propose a record review relating to any off-label use of Neurontin.

50.     All documents relating to peer marketing or peer to peer marketing of Neurontin.

51.     All documents relating to adopting peer marketing or peer to peer marketing strategies in connection with the marketing of Neurontin

52.     All documents relating to use of peer marketing or peer to peer marketing in order to publicize off-label use of Neurontin.

53.     All documents relating to physician visits by medical liaisons at which Neurontin was discussed.

54.     All documents relating to the content of information provided by medical liaisons at physician visits at which Neurontin was discussed.

55.     All records in Defendants' sales call database that relates to calls on physicians by Defendants' representatives where Neurontin was discussed.  The response to this request should include all fields of the database for every record produced.

56.     All records in any database maintained by the Defendants that contains data regarding visits to physicians by Defendants sales personnel or marketing personnel or medical liaisons relating to meetings between Defendants' representatives and physicians at which Neurontin was discussed.   The response to this request should include all fields of the database for every record produced.

57.     All documents relating to Events that presented information concerning the off-label use of Neurontin that were funded, directly or indirectly, by Defendants.

17

58.    All documents relating to communications between the Identified Vendors or any other Vendor and the Defendants regarding the planning, production, funding, design, hosting, holding, management or occurrence of Events at which the off-label use of Neurontin was discussed.

59.    All documents relating to communications between the Defendants and any CME Provider regarding the planning, production, funding, design, hosting, holding, management or occurrence of Events at which the off-label use of Neurontin was discussed.

60.    All documents relating to communications between any Vendor (including but not limited to, the Identified Vendors) and any third party (including, but not limited to, any CME provider) regarding the planning, production, funding, design, hosting, holding, or occurrence of Events at which the off-label use of Neurontin was discussed.

61.    All documents relating to communications between any Vendor, including, but not limited to, the Identified Vendors and the Defendants regarding  payment of persons who would make presentations at Events at which the off-label use of Neurontin was discussed or was expected to be discussed.

62.    All documents relating to communications between  any Vendor, including, but not limited to, the Identified Vendors and the Defendants regarding the payment of, or the provision of Goods or Service of Value to  persons who made presentations at Events at which the off-label use of Neurontin was discussed or was expected to be discussed.

63.    All documents relating to communications between  any Vendor, including, but not limited to, the Identified Vendors and the Defendants regarding  payment of, or the provision of

18

Goods or Service of Value to, persons who attended Events at which the off-label use of Neurontin was discussed or was expected to be discussed.

64.     All documents relating to communications between the Defendants and any Vendor, including, but not limited to, the Identified Vendors regarding strategies and tactics to expand off-label use of Neurontin.

65.     All documents relating to internal communications within the Defendants regarding the payment of, or the provision of Goods or Service of Value to persons who made presentations at Events at which the off-label use of Neurontin was discussed or was expected to be discussed.

66.     All documents relating to internal communications within the Defendants regarding payment of, or the provision of Goods or Service of Value to persons who attended Events at which the off-label use of Neurontin was discussed or was expected to be discussed.

67.     All documents relating to marketing strategies for Neurontin (whether at the national, regional or CBU level).

68.     All documents relating to tactical plans created to implement marketing strategies for Neurontin (whether at the national, regional or CBU level).

69.     All documents relating to any Vendor's, including, but not limited to, the Identified Vendors' design, composition, assistance with, execution, drafting or revision of any Neurontin marketing strategy.

70.     All documents relating to any Vendor's, including, but not limited to, the Identified

19

Vendors' design, composition, assistance with, execution, drafting or revision of any Neurontin tactical plan.

71.    All documents relating to any Vendor's, including, but not limited to, the Identified Vendors' consultation with the Defendants regarding Neurontin's marketing plans, marketing strategies or marketing tactics.

72.    All documents relating to any of the Identified Vendors' participation in the Neurontin Extended Disease Team.

73.    All documents relating to any communications from the Neurontin Extended Disease Team to any of the Identified Vendors.

74.    All documents relating to any communications to the Neurontin Extended Disease Team from any of the Identified Vendors.

75.    All documents relating to proposals from any Vendor, including, but not limited to, any of the Identified Vendors, to produce events, programs or educational materials which described the use of Neurontin for off-label indications for the Defendants.

76.    All documents relating to the content of events, programs or educational materials funded directly or indirectly by the Defendants that described the use of Neurontin for off-label indications, including, but not limited to all transcripts, audio tapes, videotapes, abstracts, summaries, synopses or computer generated presentations (such as Powerpoint).

77.    All documents relating to communications between Defendants and CME Providers

regarding Defendants' participation in, or funding of, medical education programs that described Neurontin's use for off-label indications.

78.     All documents relating to any event, medical education program or educational materials that describes Neurontin's use for off-label indications that was funded, in whole or in part, by an unrestricted grant by Defendants.

79.     All documents relating to any proposal to produce an event, medical education program or educational materials that describes Neurontin's use for off-label indications that was funded, in whole or in part, by an unrestricted grant by Defendants.

80.     All documents relating to any communications between the Defendants and the Identified Vendors regarding publicizing the off-label use of Neurontin.

81.     All documents relating to any "Consultants' Meeting" where physicians were retained as consultants to the Defendants and, as part of their consulting duties, were exposed to presentations that described Neurontin's use for off-label indications, including but not limited to:

    a.    Documents that identify all attendees;

    b.    Documents that identify all persons who made presentations regarding Neurontin's use for off-label indications;

    c.    Documents that identify the compensation each "consultant" received;

    d.    Documents that identify the compensation paid to each person who made a presentation regarding Neurontin's use for off-label indications;

    e.    Documents that identify all expenses covered for "consultants" who attended the consultants' meetings;

    f.    Documents that identify any other Goods or Service of Value provided to the consultants and/or to persons who made presentations regarding Neurontin's use for off-label indications;

    g.    Documents that evidence the content of the presentations made regarding Neurontin's use for off-label indications;

    h.    Documents that evidence any slides shown at the consultants' meeting regarding Neurontin's use for off-label indications;

    i.    Documents regarding any written materials that were distributed regarding

Neurontin's use for off-label indications;

 j. Documents that identify any consultation the "consultants" provided to the Defendants;

 k. Documents that evidence any surveys, questionnaires, or similar documents filled out by the "consultants";

 l. Documents that evidence any effort or attempt by the Defendants to track whether the "consultants" attending the consultants' meeting changed their prescription writing behavior after the consultants' meeting.

82. All documents relating to any "Advisory Board Meeting" where physicians attending for the purpose of advising the Defendants were exposed to presentations that described Neurontin's use for off-label indications, including but not limited to:

 a. Documents that identify all attendees;

 b. Documents that identify all persons who made presentations regarding Neurontin's use for off-label indications;

 c. Documents that identify the compensation each "advisor" received;

 d. Documents that identify the compensation paid to each person who made a presentation regarding Neurontin's use for off-label indications;

 e. Documents that identify all expenses covered for "advisors" who attended the advisory board committee meetings;

 f. Documents that identify any other Goods or Service of Value provided to the "advisors" and/or to persons who made presentations regarding Neurontin's use for off-label indications;

 g. Documents that evidence the content of the presentations made regarding Neurontin's use for off-label indications;

 h. Documents that evidence any slides shown at the advisory committee meeting regarding Neurontin's use for off-label indications;

 i. Documents regarding any written materials that were distributed regarding Neurontin's use for off-label indications;

 j. Documents that identify any advice the "advisors" provided to the Defendants;

 k. Documents that evidence any surveys, questionnaires, or similar documents filled out by the "advisors";

 l. Documents that evidence any effort or attempt by the Defendants to track whether the "advisors" attending the meeting changed their prescription writing behavior after the meeting.

83. All documents relating to any "continuing medical education" program produced with an unrestricted grant from the Defendants or from funding otherwise provided by Defendants (either

22

directly or indirectly) where presentations described Neurontin's use for off-label indications, including but not limited to:

  a. Documents that identify all attendees;

  b. Documents that identify all persons who made presentations regarding Neurontin's use for off-label indications;

  c. Documents that identify the compensation each attendee received;

  d. Documents that identify the compensation paid to each person who made a presentation regarding Neurontin's use for off-label indications;

  e. Documents that identify all expenses covered for attendees;

  f. Documents that identify any other Goods or Service of Value provided to the attendees and/or to persons who made presentations regarding Neurontin's use for off-label indications;

  g. Documents that evidence the content of the presentations made regarding Neurontin's use for off-label indications;

  h. Documents that evidence any slides shown at the continuing medical education program regarding Neurontin's use for off-label indications;

  i. Documents regarding any written materials that were distributed regarding Neurontin's use for off-label indications;

  j. Documents that evidence any effort or attempt by the Defendants to track whether the attendees changed their prescription writing behavior after the continuing medical education program.

  84. All documents relating to any Events not otherwise covered by Requests 81 through 83 which were produced with an unrestricted grant from the Defendants or from funding otherwise provided by Defendants (either directly or indirectly) where presentations described Neurontin's use for off-label indications, including but not limited to:

  a. Documents that identify all attendees;

  b. Documents that identify all persons who made presentations regarding Neurontin's use for off-label indications;

  c. Documents that identify the compensation each attendee received;

  d. Documents that identify the compensation paid to each person who made a presentation regarding Neurontin's use for off-label indications;

  e. Documents that identify all expenses covered for attendees;

  f. Documents that identify any other Goods or Service of Value provided to the attendees and/or to persons who made presentations regarding Neurontin's use for off-label indications;

  g. Documents that evidence the content of the presentations made regarding Neurontin's use for off-label indications;

  h. Documents that evidence any slides shown at the Events regarding Neurontin's use for off-label indications;

      i.     Documents regarding any written materials that were distributed regarding Neurontin's use for off-label indications;

      j.     Documents that evidence any effort or attempt by the Defendants to track whether the attendees changed their prescription writing behavior after the Events.

85.     All documents relating to communications between Defendants and the Identified Vendors regarding CME Providers available to, or committed to, present medical education programs that featured presentations regarding use of Neurontin for off-label indications.

86.     All documents relating to communications between Defendants and CME Providers regarding proposed or actual Events at which off-label uses of Neurontin were discussed or were expected to be discussed.

87.     All documents relating to communications between Defendants and CME Providers regarding the provision of unrestricted grants for proposed or actual Events at which off-label uses of Neurontin were discussed or were expected to be discussed.

88.     All documents relating to a "strategic partnership", as that term is defined and used in the December 22, 1995 letter from Larry Perlow, between Physician's World and Defendants.

89.     All documents relating to services performed by Physicians' World subsequent to December 22, 1995 with regard to the marketing of Neurontin.

90.     All documents relating to Physician's World and Parke-Davis sharing employees, office space, telephone systems and telephone numbers or any other resources.

91.     All documents relating to selection of speakers at Events funded directly or indirectly

by Parke-Davis where presentations were given that described the use of Neurontin for off-label uses.

92.     All documents relating to the home study program on pain which Physicians' World worked on for Defendants, including, but not limited to:

     a.     Documents relating to the purpose of the home study program;
     b.     Documents relating to the expenses incurred in creating the program and the payment for such expenses;
     c.     Documents relating to the selection of the persons who authored the program;
     d.     Documents related to the distribution of the program;
     e.     Documents that evidence the content of the program; and
     f.     Documents that evidence any effort or attempt by the Defendants to track whether persons who received the program changed their prescription writing behavior after exposure to the program.

93.     All documents relating to the formation of Neurobehavioral Working Group.

94.     All documents relating to any funding or financial support the Neurobehavioral Working Group has received from Defendants directly or indirectly.

95.     All documents relating to communications between the Neurobehavioral Working Group and the Defendants.

96.     All documents relating to communications between any of the Identified Vendors and the Defendants that reference the Neurobehavioral Working Group.

97.     All documents relating to the transfer, directly or indirectly, of any Goods or Service of Value from Defendants to the Neurobehavioral Working Group or any officer, agent, representative, employee or director of the Neurobehavioral Working Group.

98.     All documents relating to the Events identified in

      a.      paragraphs 65, 75, 81, 86, 90, 91, 129, 135, 150, 170, 179 and 197 of the Amended Class Action Complaint; and

      b.      paragraphs 68, 74 and 102 of the First Coordinated Amended Complaint.

99.    All documents relating to the creation, funding, distribution and presentation of a program called New Frontiers in Social Phobia and Bipolar Disorder.

100.    All documents relating to any workbooks or written materials that were created as part of an educational program entitled New Frontiers in Social Phobia and Bipolar Disorder.

101.    All documents relating to any communications between Defendants and any person who was involved in the creation, funding, orgainization or presentation of New Frontiers in Social Phobia and Bipolar Disorder, or any workbooks or written materials that were created in connection with said program.

102.    All documents relating to communications between Defendants and any physicians who made presentations regarding Neurontin's use for off-label uses at any Event funded directly or indirectly by the Defendants.

103.    All documents relating to communications between Defendants and any of the Identified Physicians regarding Neurontin's use for off-label uses at any Event funded directly or indirectly by the Defendants.

104.    All documents relating to any payments by Defendants, whether made directly or indirectly, to any speakers or physicians who made presentations regarding Neurontin's use for off-label uses at any Event funded directly or indirectly by the Defendants.

105.    All documents relating to any payments by Defendants, whether made directly or indirectly, to any of the Identified Physicians.

106.    All documents relating to any transfer of Goods or Service of Value from Defendants, whether made directly or indirectly, to any speakers or physicians who made presentations regarding Neurontin's use for off-label uses at any Event funded directly or indirectly by the Defendants.

107.    All documents relating to any transfer of Goods or Service of Value from Defendants, whether made directly or indirectly, to any of the Identified Physicians.

108.    All documents relating to any exchange of information, test results, clinical study results, clinical trial results, articles, monographs, research proposals, research results, abstracts, grant applications or data relating to off-label use of Neurontin between Defendants and physicians conducting research on Neurontin.

109.    All documents relating to any exchange of information, test results, clinical study results, clinical trial results, articles, monographs, research proposals, research results, abstracts, grant applications or data relating to off-label use of Neurontin between Defendants and speakers or physicians who made presentations regarding Neurontin's use for off-label uses at any Event funded directly or indirectly by the Defendants.

110.    All documents relating to any exchange of information, test results, clinical study results, clinical trial results, articles, monographs, research proposals, research results, abstracts, grant applications or data relating to off-label use of Neurontin between Defendants and any of the Identified Doctors.

111.   All documents relating to any communications between the Defendants and the authors of a published article, published letter, poster or abstract that concerns any off-label use of Neurontin.

112.   All documents relating to any communications between the Defendants and the Identified Physicians.

113.   All documents relating to any communications between the Defendants and speakers or physicians who made presentations regarding Neurontin's use for off-label uses at any Event funded directly or indirectly by the Defendants.

114.   All documents relating to any grants made to physicians by the Defendants with funds that were derived from any budget related to Neurontin.

115.   All documents relating to any grants by the Defendants made to any person in connection with Neurontin use or research on Neurontin.

116.   All documents relating to communications between Defendants and the recipients of any grants that were made in connection with Neurontin use or research on Neurontin, or paid, directly or indirectly, from funds the Defendants budgeted for Neurontin marketing.

117.   All documents relating to drafts and revisions of articles or abstracts relating to Neurontin that Defendants reviewed prior to the articles' or abstracts' publication.

118.   All documents relating to communications between the Defendants and any third parties retained by Defendants to assist potential authors of articles or abstracts relating to Neurontin.

119.    All documents relating to any expenditures by Defendants to provide technical writers to assist in the creation of medical articles relating to Neurontin.

120.    Documents sufficient to establish which published articles concerning Neurontin were funded or supported, directly or indirectly, by Defendants.

121.    All records in any of Defendants' databases, including, but not limited to, the Parke-Davis APT database, relating to any payment from Defendants to any author of an article, published letter or abstract that relates to Neurontin. However, for this request it is not necessary to produce records relating to authors who were employees of the Defendants during the time such authors were employed. The response to this request should include all fields of the database for every record produced.

122.    All records in any of Defendants' databases, including, but not limited to, the Parke-Davis APT database, relating to all payments from Defendants, directly or indirectly, to any of Identified Physicians. The response to this request should include all fields of the database for every record produced.

123.    All documents relating to communications regarding the placement of articles or abstracts relating to Neurontin by non-employees of the Defendants in medical journals.

124.    All documents relating to any publication strategy with regard to Neurontin considered, adopted, executed, funded, proposed or rejected by Defendants.

125.    All documents relating to any plans, programs, or efforts to encourage or assist physicians to write articles, published letters, posters or abstracts regarding Neurontin use.

126.    All documents relating to any plans or programs to encourage or assist physicians to instruct, make presentations to, advise, champion, or otherwise speak to other physicians about Neurontin use.

127.    All documents relating to any studies of Neurontin conducted or proposed by Dr. Kenneth Gorson.

128.    All documents relating to any article or abstract written by Dr. Kenneth Gorson concerning his research on Neurontin, including any drafts of any such articles or abstracts.

129.    All documents relating to any payments Dr. Kenneth Gorson received directly or indirectly from the Defendants.

130.    All documents relating to any studies of Neurontin conducted or proposed by Dr. Bruce Ehrenberg.

131.    All documents relating to any article or abstract written by Dr. Bruce Ehrenberg concerning his research on Neurontin, including any drafts of any such articles or abstracts.

132.    All documents relating to any payments Dr. Bruce Ehrenberg received directly or indirectly from the Defendants.

133.    All documents relating to any studies of Neurontin referenced on the three page table produced by the Defendants with Bates Numbers X005087 - X005089.

134.    All documents relating to any articles or abstracts describing the Neurontin studies

referenced on the three page table produced by the Defendants with Bates Numbers X005087 - X005089, including any drafts of any such articles or abstracts.

135.    All documents relating to any payments made to physicians in connection with the Neurontin studies referenced on the three page table produced by the Defendants with Bates Numbers X005087 - X005089.

136.    All documents relating to the efficacy or inefficacy of Neurontin for the treatment of any pain syndrome.

137.    All documents relating to the efficacy or inefficacy of Neurontin for the treatment of any psychiatric syndrome.

138.    All documents relating to the efficacy or inefficacy of Neurontin for the treatment of migraine.

139.    All documents relating to the efficacy or inefficacy of Neurontin for the treatment of social phobia

140.    All documents relating to the efficacy or inefficacy of Neurontin for the treatment of anxiety disorder.

141.    All documents relating to the efficacy or inefficacy of Neurontin for the treatment of any bipolar disorder.

142.    All documents relating to the efficacy or inefficacy of Neurontin for the treatment of restless leg syndrome.

143.    All documents relating to the efficacy or inefficacy of Neurontin for the treatment of RSD.

144.    All documents relating to the efficacy or inefficacy of Neurontin for the treatment of panic disorder.

145.    All documents relating to the efficacy or inefficacy of Neurontin for the treatment of sleep disorders.

146.    All documents relating to the efficacy or inefficacy of Neurontin at doses greater that 1800 mgs/day.

147.    All documents relating to the efficacy or inefficacy of Neurontin as a monotherapy for the treatment of epilepsy.

148.    All verbatim reports for Neurontin.

149.    All reports from Scott-Levin or Verispan, LLC which include comments by physicians on sales calls or presentations relating to Neurontin.

150.    All documents relating to any review, analysis or critique of data contained within verbatim reports on Neurontin or other reports Scott-Levin or Verispan, LLC which include comments by physicians on sales calls or presentations relating to Neurontin.

151.    All data, whether generated by Defendants or purchased from third parties, which reports on:

        a.    individual physicians who prescribe Neurontin;

b.    changes in physicians' prescribing patterns for Neurontin;
c.    uses for which Neurontin is prescribed;
d.    type of physicians and specialists that prescribe Neurontin;
e.    percentage of Neurontin prescribed by different medical specialties;
f.    percentage of Neurontin prescribed for off-label use;
g.    total volume of Neurontin prescriptions (in dollars and in terms of numbers of prescriptions);
h.    volume of Neurontin prescriptions for various uses (in dollars and in terms of numbers of prescriptions).

152.    All documents relating to any reports or analysis of any of the data requested in Request 151.

153.    All documents relating to any communications between the Defendants and MICROMEDEX, relating to any citation in the DRUGDEX compendium relating to the off-label use of Neurontin.

154.    Documents sufficient to show the identity of any employee of Defendants who was a member of the DRUGDEX System editorial board.

155.    Documents sufficient to show the identities of any person known to Defendants who forwarded to, submitted to, or brought to the attention of MICROMEDEX information relating to Neurontin's use for off-label uses.

156.    Documents sufficient to show the identifies of all persons known to Defendants who consulted for, were retained by, or who performed editorial duties on behalf of MICROMEDEX relating to the Neurontin Drug Evaluation.

157.    All documents relating to communications or correspondence between (a) MICROMEDEX, on one hand, and (b) Defendants on the other hand, which relate to this Proceeding, or any other legal proceeding, civil or criminal, relating to the marketing of Neurontin.

158.    All documents relating to information forwarded to, submitted to, or brought to the attention of MICROMEDEX relating to any off-label use of Neurontin, including all correspondence, journal articles, and case study reports.

159.    All documents relating to communications or correspondence between (a) MICROMEDEX or the DRUGDEX Division, on the one hand, and (b) Defendants on the other hand, which relate to or discuss any off-label use for Neurontin.

160.    All copies of the Neurontin Drug Evaluation whether in hardcopy form, electronic form or otherwise, including, but not limited to all quarterly iterations.

161.    All documents relating to any interpretations, analyses or critiques of any clinical trials which concerned any off-label use of Neurontin.

162.    All documents relating to any meta-analysis performed relating to any off-label use of Neurontin.

163.    All documents relating to any epidemiological studies concerning any off-label use of Neurontin.

164.    All documents created at any time relating to any clinical testing of Neurontin as a treatment for migraine or migraine prophylaxis.

34

165.    All documents that were submitted to the FDA in furtherance of NDA 20-235 that relate to Neurontin administration to migraine patients.

166.    All documents relating to any interpretation, analysis or critique of clinical trial 945-82.

167.    All documents relating to any interpretation, analysis or critique of clinical trial 945-177.

168.    All documents created at any time relating to whether or not there is a proportionality between the amount of a dose of gabapentin and the amount absorbed by the subject who has taken the drug.

169.    All documents relating to whether increasing the dosage of gabapentin results in more of the drug being absorbed by the human body.

170.    All documents relating to whether Neurontin exhibits dose related responses in humans for dosages greater than 1800 mg per day.

171.    All documents relating to communications between Defendants and the FDA regarding use of Neurontin at dosages in excess of 1800 mg per day.

172.    All documents relating to any public statement by Defendants that Parke-Davis had applied to the FDA for approval of Neurontin as monotherapy for epilepsy and its application had been denied.

173.    All documents relating to any public statement by Defendants that Parke-Davis had

applied to the FDA to change the labeling for Neurontin to increase its maximum effective dosage and its application had been denied.

174.   All documents relating to any analysis performed by Defendants to determine whether visits by medical liaisons to physicians increased the amount of Neurontin prescriptions written by those physicians.

175.   All documents relating to the data reviewed or analyzed by Defendants to determine whether visits by medical liaisons to physicians increased the amount of Neurontin prescriptions written by those physicians.

176.   All documents relating to any efforts by Defendants to track the Neurontin prescribing behavior of physicians who had been visited by a medical liaison.

177.   All documents relating to any efforts by Defendants to track the Neurontin prescribing behavior of physicians who had attended any Event funded, directly or indirectly, by Defendants at which off-label usage of Neurontin was discussed.

178.   All records in any database maintained by the Defendants which contains information regarding the Neurontin prescribing history of individual physicians, whether such records were generated by Defendants or purchased from third parties.  The response to this request should include all fields of the database for every record produced.

179.   All records relating to Neurontin prescriptions in the database that contains "physician-level prescription data." This database was referenced by James Murray on pages 74-75 in his March 29, 2002 deposition in the action United States ex. rel. Franklin v. Parke-Davis,  No.

96-11651-PBS, United States District Court for the District of Massachusetts. The response to this request should include all fields of the database for every record produced.

180. All documents relating to the studies identified in paragraph 229 of the Amended Class Complaint, including, but not limited to all documents that identify payments made in connection with the identified studies.

181. All documents relating to Defendants' decision to initiate the STEPS study of Neurontin.

182. All documents relating to the STEPS study of Neurontin that were generated by Parke-Davis's marketing department.

183. All documents relating to efforts by Defendants to track the prescription writing practices of physicians enrolled as "investigators" in the STEPS study of Neurontin.

184. All documents relating to efforts by Defendants to comply with the anti-kickback provisions of the Medicare and Medicaid laws in connection with physicians' receipt of payments or Goods or Service of Value.

185. All documents relating to Defendants' practices with regard to insuring compliance with that anti-kickback provisions of the Medicare and Medicaid law in connection with physicians' receipt of payments, or Goods or Service of Value from the Defendants.

186. All documents relating to Defendants' efforts to comply with the AMA's guidelines for payments to physicians.

187.   All documents relating to Defendants' interpretation, analysis or critique of the AMA's guidelines for payments to physicians.

188.   All documents relating to Defendants' standard operating procedures regarding payment of physicians for attending:

   a.   consultants' meetings;
   b.   advisory committees;
   c.   dinner meetings;
   d.   continuing medical education seminars;
   e.   teleconferences;
   f.   medical education Events.

189.   All documents relating to Defendants' standard operating procedures regarding payment of physicians for speaking at:

   a.   consultants' meetings;
   b.   advisory committees;
   c.   dinner meetings;
   d.   continuing medical education seminars;
   e.   teleconferences;
   f.   medical education Events.

190.   All documents relating to Defendants' standard operating procedures regarding provision of Goods or Service of Value to physicians attending:

   a.   consultants' meetings;
   b.   advisory committees;
   c.   dinner meetings;
   d.   continuing medical education seminars;
   e.   teleconferences;
   f.   medical education Events.

191.   All documents relating to Defendants' standard operating procedures regarding provision of Goods or Service of Value to physicians speaking at:

   a.   consultants' meetings;
   b.   advisory committees;
   c.   dinner meetings;
   d.   continuing medical education seminars;

    e.     teleconferences;

    f.     medical education Events.

192.    All documents relating to Defendants' standard operating procedures regarding payment or provision of Goods or Services of Value to physicians writing articles on Defendants' products.

193.    All documents relating to the mechanism of action of Neurontin on the human brain.

194.    All documents relating to Defendants' theories of the mechanism of action of Neurontin.

195.    All documents relating to whether the mechanism of action of Neurontin has been established.

196.    All documents relating to communications regarding the marketing of Neurontin that occurred between Pfizer and any representative of any consumer protection division of any State.

197.    All documents relating to any allegation by any state official that Defendants had violated any consumer protection statute.

198.    All documents relating to grand jury testimony regarding any investigation into Neurontin marketing.

199.    All documents produced to state officials investigating whether Defendants' marketing practices with regard to Neurontin violated state consumer protections statutes.

200.   Organization charts which reflect the marketing department of Parke-Davis between 1993 through 2000.

201.   Organization charts which reflect the marketing planning department of Parke-Davis between 1993 through 2000.

202.   Organization charts which reflect the marketing departments of Parke-Davis regional CBUs between 1993 and 2000.

203.   Organization charts which reflect the structure of the Parke-Davis Managed Care CBU.

204.   Organization charts which reflect the marketing department of Pfizer between June 2000 and May 2004

205.   Organization charts which reflect the composition of any department within Pfizer that between June 2000 and May 2004 performed the same functions as the Parke-Davis marketing planning department.

206.   Organization charts which reflect the marketing departments of regional offices of Pfizer between July 2000 and May 2004.

207.   Organization charts that reflect the composition of any cross-disciplinary team established within Pfizer that concerned any aspects of the life cycle of Neurontin between July 2000 and May 2004.

208. All documents relating to any reports made by Pfizer prior to the merger of Pfizer and Warner-Lambert regarding Neurontin, including any such reports which were created as part of Pfizer's due diligence prior to the merger.

209. All documents relating to due diligence Pfizer conducted with regard to the marketing and sales practices of Warner-Lambert prior to the merger of Pfizer and Warner-Lambert.

210. All documents relating to any analysis, evaluation, critique or examination of Neurontin's marketing, sales practices or life cycle which analysis, evaluation, critique, or examination was performed by Pfizer within one year of the date of the merger between Pfizer and Warner Lambert.

211. All documents relating to any team or committee within Pfizer that performed the same or similar function as the Neurontin Development Team for the period from July 2000 through May 2004, including, but not limited to all minutes, reports memoranda and summaries.

212. All documents relating to any team or committee within Pfizer that performed the same or similar function as the Neurontin Indication Decision Analysis Group for the period from July 2000 through May 2004, including, but not limited to all minutes, reports memoranda and summaries.

213. All documents relating to PromoTrak analysis or reports which discuss or reflect the amount or rate of change of Neurontin prescriptions, new months of therapy, or total months of therapy written by physicians.

214. All documents relating to Plan Trak analysis or reports which discuss or reflect the amount or rate of change of Neurontin prescriptions, new months of therapy, or total months of therapy written by physicians.

215. All documents relating to promostudies or promostudy reports which discuss or reflect the amount or rate of change of Neurontin prescriptions, new months of therapy, or total months of therapy written by physicians who attended an Event where Neurontin was discussed for any off-label use.

216. All documents relating to PlanTrak, PromoTrack, or promostudy reports or analysis which discuss or reflect the amount or rate of change of Neurontin prescriptions, new months of therapy, or total months of therapy written by physicians for all attendees and participants of STEPS investigators.

217. All documents relating to Neurontin Promotional Evaluations, Neurontin Promo Evals, or Neurontin Promotional Effectiveness studies for each Event in which off-label use of Neurontin was discussed.

218. All documents relating to any feasibility studies, and/or budgetary plans and/or budgetary requests that refer to the use of, and/or seek budgetary approval for the use of Medical Liasions and/or the medical liaison program.

219. All documents relating to requests for funding for use of medical liaisons and/or the medical liaison program.

220.    All documents that describe or refer to the role of medical liaisons in the marketing, promotion and sales of Neurontin and/or any drug manufactured by the Defendants.

221.    All documents relating to Neurontin "movers and shakers" or Neurontin "Key Influencers."

222.    All documents relating to Xponent data records that list physicians who prescribe and/or potentially prescribe Neurontin.

223.    All documents relating to Precision Marketing reports and documents that reference or pertain to physicians' prescription writing practices for Neurontin.

224.    All documents relating to Physician Information Request Form signed by a physician, and/or drug sales representative, and/or medical liaison pertaining to physician requests for information about Neurontin.

225.    All documents authored by and/or copied to the Core Marketing Team (or any member thereof), including but not limited to all minutes of meetings and memoranda, that reference approved uses and/or emerging uses and/or unapproved uses of Neurontin.

226.    All documents relating to slide kits provided by Defendants to any medical liaison who made calls to physicians regarding Neurontin.

227.    All documents relating to slides provided by the Defendants to any physician who made a presentation relating to Neurontin at any Event.

228.    All documents relating to approval of slides by Defendants (or by any contractor retained by them, including, but not limited to, the Identified Vendors) to be shown at any presentation relating to Neurontin at any Event.

229.    All documents relating to insurance reimbursement for off-label Neurontin prescriptions.

230.    All documents relating to third party payor reimbursement for off-label Neurontin prescriptions.

231.    All documents relating to Neurontin formulary approval for uses others than adjunct epilepsy therapy.

232.    All documents relating to any disapproval of coverage or reimbursement by an insurance company, third-party payor or government payor for any Neurontin prescription for an off-label use.

233.    All documents relating to marketing, sales or prescribing data regarding Neurontin Defendants have received from IMS Health.

234.    All documents relating to any review, analysis or critique of data Defendants received from IMS Health relating to Neurontin.

235.    All documents relating to marketing, sales or prescribing data regarding Neurontin Defendants have received from NDCHealth Corporation.

236.    All documents relating to any review, analysis or critique of data Defendants received from NDCHealth Corporation relating to Neurontin.

237.    All documents relating to studies and clinical trials involving the use of Neurontin to treat off-label conditions, including, but not limited to, the studies and clinical trials identified in paragraphs 108, 122, 127, 128, 132, 137, 142, 143, 152, and 163 of the First Coordinated Amended Complaint.

238.    All documents relating to any communications between medical liaisons or Defendants' sales representatives and any patient or consumer relating to Neurontin.

239.    All documents relating to, concerning or describing the terms of sale and price (including any discount, rebate, free sample of charge back) at which Neurontin was sold by Defendants to any physician, wholesaler, distributor or any other person or entity.

240.    Documents that reflect Defendants' total revenues, income and profit generated directly or indirectly form the sale of Neurontin, including without limitation financial statements, internal reports, memoranda and correspondence.

241.    All documents relating to actual or potential sales of Neurontin, including budgets, forecasts, economic projections, and any memoranda, correspondence, meeting minutes and other documentation discussing such budgets, forecasts and economic projections.

242.    All documents relating to payment or non-payment of claims relating to prescriptions for off-label use of Neurontin by third-party payors.

243.    All documents relating to Defendants' efforts to have Neurontin included on the formularies of third-party payors.

244.    All documents relating to the effect of the development and potential sale of Lyrica (pregabelin) on the marketing of Neurontin, including but not limited to any effect the development of Lyrica had on the decision not to seek approval of Neurontin for off-label uses.

245.    All documents relating to any instructions, comments, advice or communications given by Defendants to physicians or pharmacists regarding how reimbursement should be sought or obtained from third-party payors with regard to Neurontin prescriptions for off-label uses.

246.    All documents relating to any applications or certifications filed with the FDA pursuant to Section 401 of the Food and Drug Administration Modernization Act (FDAMA) with regard to off-label use of Neurontin.

247.    All documents relating to off-label use of Neurontin that Defendants have filed with the FDA pursuant to FDAMA.

248.    All documents relating to any lists of articles relating to off-label use of Neurontin that Defendants have submitted to the FDA pursuant to FDAMA.

249.    Copies of all documents relating to off-label use of Neurontin that Defendants have disseminated to physicians and third parties in accordance with FDAMA, including any labels and legends FDAMA requires to be placed upon such materials.

250.    All documents relating to budgets for marketing, advertising, promotion, sale, research and development of Neurontin at the national, regional and CBU level.

251.    All documents relating to any agreements among the Defendants relating to liabilities associated with the allegations and claims presented in this litigation, including, but not limited to any agreements entered into at or about the time of the merger between Warner-Lambert and Pfizer relating to liabilities for unlawful marketing and/or promotion of Neurontin.

252.    All documents relating to any insurance policies held by the Defendants that may provide coverage for the claims that are the subject of this litigation.

*by the Plaintiffs' attorneys,*

*Members of the Class Plaintiffs'*
*Steering Committee*


By:    _____
       Don Barrett, Esquire
       Barrett Law Office
       404 Court Square North
       P.O. Box 987
       Lexington, MS 39095


By:    _____
       Daniel Becnel, Jr., Esquire
       Law Offices of Daniel Becnel, Jr.
       106 W. Seventh Street
       P.O. Drawer H
       Reserve, LA 70084

By:    _____
       James Dugan, Esquire
       Dugan & Browne
       650 Poydras St., Suite 2150
       New Orleans, LA 70130


By:    *[signature]*
       _____
       Thomas Greene, Esquire, BBO # 210020
       Greene & Hoffman
       125 Summer Street
       Boston, MA 02110


By:    _____
       Barry Himmelstein, Esquire
       Lieff Cabraser Heimann & Bernstein
       Embarcadero Center West
       275 Battery Street, 30th Floor
       San Francisco, CA 94111-3339


By:    _____
       Thomas M. Sobol
       Hagens Berman LLP
       One Main Street, 4th Floor
       Cambridge, MA 02142

48

*Members of the Non-Class Plaintiffs'*
*Steering Committee*


By: _____

    Linda P. Nussbaum
    Cohen, Milstein, Hausfeld & Toll PLLC
    150 East 52nd Street, 30th Floor
    New York, NY  10022


By: _____

    Richard W. Cohen
    Lowey Danneberg Bemporad
     & Selinger, P.C.
    The Gateway - 11th Floor
    One North Lexington Avenue
    White Plains, NY  10601-1714


Date:  March 11, 2005