EXHIBIT 15

1  FIRST JUDICIAL DISTRICT COURT
   COUNTY OF SANTA FE
2  STATE OF NEW MEXICO
   Case Number CV-03-01377
3
4  MICHAEL SANTULLO, On His Own Behalf
   and On Behalf of All Similar Situated Individuals,
5
        Plaintiff,
6
   vs.
7
   PFIZER, INC., et al.,
8
        Defendants.
9
10
11
12
        DEPOSITION OF DOUGLAS BARRETT, MD
13
        December 7, 2004
14      1:25 PM
        2025 Rio Grande Boulevard, Northwest
15      Albuquerque, New Mexico  87104
16
17
        PURSUANT TO THE NEW MEXICO RULES OF CIVIL
18 PROCEDURE, this deposition was:
19
20 TAKEN BY:    MR. TOM OUTLER
              ATTORNEY FOR DEFENDANTS
21
22
23 REPORTED BY:  KATHY TOWNSEND, RPR-CP, CCR No.
              Kathy Townsend Court Reporters
24            110 Twelfth Street, Northwest
              Albuquerque, New Mexico  87102
25

1

                    I N D E X                PA

DOUGLAS BARRETT, MD

    Direct Examination by Mr. Outler

    Cross Examination by Mr. Ribble

    Redirect Examination by Mr. Outler        1

    Recross Examination by Mr. Ribble          1

CERTIFICATE OF COMPLETION OF DEPOSITION       1

SIGNATURE/CORRECTION PAGE                      1


            E X H I B I T S           MA

BARRETT EXHIBIT:

1.  Curriculum Vitae

2.  Patient Chart

3

1        A P P E A R A N C E S
2  For the Plaintiff:
3      BRANCH LAW FIRM
       Attorneys at Law
4      2025 Rio Grande, Northwest
       Albuquerque, New Mexico  87104
5      By:  MR. TURNER W. BRANCH
6      MR. DAN A. RIBBLE
       Attorney at Law
7      8405 Mendocino Drive, Northeast
       Albuquerque, New Mexico  87122
8
   For the Defendants:
9
       RODEY, DICKASON, SLOAN, AKIN & ROBB, PA
10     Attorneys at Law
       201 Third Street, Northwest
11     Suite 2200
       Albuquerque, New Mexico  87102
12     By:  MR. TOM OUTLER
13     DAVIS POLK & WARDWELL
       Attorneys at Law
14     450 Lexington Avenue
       New York, New York  10017
15     By:  MR. R. MICHAEL VAGNUCCI
16
17
18
19
20
21
22
23
24
25

2

1         DOUGLAS BARRETT, MD
2     after having been first duly sworn under oath,
3     was questioned and testified as follows:
4          DIRECT EXAMINATION
5  BY MR. OUTLER:
6     Q.   Good afternoon, Doctor.
7          Let me introduce myself again on the record.
8  My name is Tom Outler, and with me is Michael Vagnucci.
9  We represent the defendants in a case that's been filed
10 by Michael Santullo, who I believe for a period of time
11 was a patient of yours.
12    A.   Yes.
13    Q.   We represent Pfizer, Incorporated, Parke-Davis
14 and Warner-Lambert, who are defendants in this action.
15 It's a case about the prescription drug Neurontin.
16         It's not a products liability case, in the
17 sense that Mr. Santullo is alleging personal injury as a
18 result of having taken the product, but it's essentially
19 related to alleged marketing practices of Parke-Davis and
20 Warner-Lambert at an earlier time, and what effect, if
21 any, those practices -- the alleged practices may have
22 had on prescribers in other parts of the country.
23         We're in the process of doing some
24 preclassification discovery and talking to you and
25 Dr. Gwenn Robinson, who, as we understand it, were the

4

1  two physicians, and only two physicians, who prescribed
2  Neurontin at any time to Mr. Santullo.

3      I'm just going to be asking you some questions
4  about your treatment, specifically related to the use of
5  Neurontin for Mr. Santullo, and some general questions
6  about your prescribing practices.

7      As far as the general questions go, I don't
8  want you to identify any of your patients by name,
9  except, of course, for Mr. Santullo; and if my questions
10  reach to your treatment of other patients, then don't
11  give me any information that would allow me to identify
12  exactly who you're talking about.

13      Does that make sense?

14      A.   That makes sense.

15      Q.   Okay.  It sounds, from our earlier discussion,
16  that you've had your deposition taken before?

17      A.   Yes.

18      Q.   You're familiar with the routine, that you
19  listen to my questions, and then I'll stop talking, and
20  then I'll wait for you to finish your answer before I
21  start talking again?

22      A.   That sounds good.

23      Q.   Okay.  And if at any time you want to take a
24  break for any reason, just say so.  It's not an endurance
25  contest.  If you have any questions along the way, just

1  ask.

2      A.   Okay.

3      Q.   We have marked what you have brought -- you
4  brought a copy of your CV, and we've marked that as
5  Deposition Exhibit 1.

6      (Barrett Exhibit 1 marked.)

7      Q.   Does this Exhibit 1 fully represent your
8  educational background?

9      A.   It does.

10      Q.   That will save me from having to ask you
11  questions about those.

12      Can you tell me -- I know there is some mention
13  of probably what's your current practice on your CV as
14  well, but can you describe for me, just in general, what
15  your current practice is?

16      A.   I have a -- I'm in a general neurology
17  practice.  I practice with two other neurologists in a
18  multi-specialty group, but what I do specifically is a
19  wide variety of neurology, and so I categorize it as a
20  general neurology practice.

21      Q.   Okay.

22      A.   About 20 percent of my practice is pediatric
23  neurology and 80 percent is adult neurology.

24      In the pediatric neurology, I see a lot of
25  children with epilepsy, cerebral palsy and migraine.

1      In the adult portion of my medical practice, I
2  see a lot of adults with epilepsy, migraine, multiple
3  sclerosis, Parkinson's disease, dementia and cerebral
4  vascular disorders, as well as taking care of a lot of
5  people for peripheral nerve problems, as well.

6      Peripheral neuropathy is a big part of most
7  general neurology practices.  This includes peripheral
8  neuropathic problems, such as carpal tunnel syndrome,
9  pinched nerves in the neck, pinched nerves in the back,
10  or a large group of disorders that are called the
11  peripheral -- the polyneuropathies, in which multiple
12  nerves are affected simultaneously.

13      So that covers the vast majority of what I see
14  in my practice on a weekly basis.

15      (Mr. Turner Branch now present.)

16      Q.   Okay.  Very thorough.  Thank you very much.

17      I take it that you're board certified in
18  internal medicine, is that right?

19      A.   Not internal medicine, no.

20      Q.   Okay.

21      A.   I did two years of training in internal
22  medicine and then three years in neurology, and I'm board
23  certified only in neurology.

24      Q.   In neurology, okay.

25      And I assume you're licensed to practice in New

1  Mexico?

2      A.   Yes.

3      Q.   Any other states?

4      A.   Texas.

5      Q.   Okay.  Have you been licensed to practice in
6  any other states besides New Mexico and Texas in the
7  past?

8      A.   California, for a period of several years when
9  I was in training there; and then Washington for a period
10  of several years, because I was in training there as
11  well.

12      Q.   Okay.  Washington State?

13      A.   Washington State, right.

14      So I voluntarily allowed those licenses to
15  lapse when I just -- when I finally ascertained that I
16  wasn't likely to return to those states to practice.

17      Q.   Do you still practice in Texas at all?

18      A.   I've never practiced in Texas, no.  The Texas
19  license was only a recent acquisition, and so -- but I've
20  not yet practiced in Texas.

21      Q.   Fair enough.

22      Well, let's jump right to it.  I know you've
23  brought with you a copy of medical records that are from
24  your chart for Mr. Santullo.

25      A.   That's correct.

12/07/2004 Barrett, Douglas, MD (Santullo)

1    Q.   I know you've also brought a copy of your
2    original chart.  I think what you've brought as the
3    medical records part, let's go ahead and mark that as
4    Exhibit 2.
5         (Barrett Exhibit 2 marked.)
6         MR. OUTLER:  Did you get a copy over there?
7         MR. RIBBLE:  I had a copy over here.  I think
8    I've got it right here.  To be honest with you, I think
9    there is multiple copies.  I'm fine.
10   Q.   (BY MR. OUTLER)  I'll hand you what I've marked
11   as Exhibit 2 and just have you confirm for us that this
12   is a copy of the medical records for your treatment of
13   Mr. Santullo that you brought with you today.
14   A.   That is correct.
15   Q.   Okay.  Can you tell me when the first occasion
16   was you saw Mr. Santullo?
17   A.   Mr. Santullo was referred to my office to see
18   me and was first seen by me on August 21st, 2002, by way
19   of a referral from Dr. Gwenn Robinson.
20   Q.   Why did she refer Mr. Santullo to you?
21   A.   She wanted me to evaluate him for a problem of
22   peripheral neuropathy, also called polyneuropathy.
23   Q.   And you explained that to us, I think, a little
24   bit before, but can you tell me, again, what peripheral
25   neuropathy is?

9

12/07/2004 Barrett, Douglas, MD (Santullo)

1    A.   Peripheral neuropathy, in the larger sense of
2    the term, is any disturbance of peripheral nerve
3    function.  Peripheral nerves are those nerves that exist
4    outside of the brain and spinal cord.
5         So we, as neurologists, are simple people, so
6    we divide the nervous system into two groups, brain and
7    spinal cord, central nervous system, and everything else
8    is the peripheral nervous system.
9         So, in the largest sense, peripheral neuropathy
10   is any disturbance of the peripheral nervous system.
11        Used in the context of Mr. Santullo, it refers
12   to a disturbance in which multiple peripheral nerves are
13   being affected simultaneously and producing a syndrome
14   that is also known as polyneuropathy and sometimes known
15   as polyneuritis.
16   Q.   "Poly" suggesting there is multiple places in
17   the body that are experiencing the neuropathy?
18   A.   Multiple peripheral nerves are being affected
19   simultaneously.
20   Q.   And in what specific parts of his body was
21   Mr. Santullo complaining of nerve -- some sort of
22   neurological condition in?
23   A.   His symptoms related to numbness and a
24   vibrating sensation that he felt predominantly in
25   his feet and legs, but he also felt in his hands and

10

12/07/2004 Barrett, Douglas, MD (Santullo)

1    arms.
2    Q.   Okay.
3    A.   And he felt these predominantly in the most
4    peripheral aspects of those limbs -- so the feet,
5    the ankles, the leg below the knee, the hands, the
6    fingers, the wrists, and only a limited extent in the
7    forearms.
8    Q.   Okay.  Did he specifically refer to the
9    condition in all of the appendages that you just
10   mentioned?
11   A.   He had symptoms in all of those appendages,
12   that's correct.
13   Q.   What about pain?
14   A.   He also, I believe, was experiencing at that
15   time a sensation of discomfort -- well, I'll take that
16   back.  I'm rereading my notes here.
17        Initially, he did not experience any pain.  He
18   experienced just the numbness and the vibratory
19   sensation, as he described it, but I have a note here
20   that says, "He has experienced no pain in association
21   with this."
22   Q.   Okay.
23   A.   So, initially, he did not.  Subsequently, he
24   has.
25   Q.   Okay.  And this was in August of 2002?

11

12/07/2004 Barrett, Douglas, MD (Santullo)

1    A.   That's correct.
2    Q.   Now, upon referral from Dr. Robinson, was
3    Mr. Santullo already on any medications?
4    A.   He was at that time taking Norvasc, a medicine
5    for his blood pressure; Neurontin, which had been
6    prescribed because of the peripheral neuropathy, as I
7    understood it; Ranitidine, a treatment for ulcer disease;
8    aspirin; and he was also on a diuretic for his blood
9    pressure.
10   Q.   Did you, at that first visit, prescribe any
11   additional medications for Mr. Santullo?
12   A.   On the first occasion, I did not.
13   Q.   Okay.  Now, of the medications you mentioned
14   that he was already taking upon referral to you, did you
15   feel like any of your treatment possibly related to or
16   the condition that he had possibly related to any of the
17   medications he was already taking?
18        In other words, were those medications relevant
19   to you or to your treatment?
20        MR. RIBBLE:  That's a multiple question, format
21   objection.
22        MR. OUTLER:  Sure.
23        THE WITNESS:  There was -- well, they were
24   relevant in that none of the medicines that he was taking
25   was, in my mind, a potential cause for his symptoms.

12

1    Q.    (BY MR. OUTLER)  Okay.

2    A.    And one of the medicines, notably Neurontin,

3    that he was taking was being used for mitigating the

4    symptoms of the peripheral neuropathy.

5    Q.    Okay.

6    A.    So it was related in that way.

7    Q.    All right.  I take it, from the way you've

8    described your practice, that you recognized the drug

9    Neurontin when you saw Mr. Santullo and saw his chart at

10   that time?

11   A.    Yes.

12   Q.    What was your understanding of -- well, did you

13   talk with Dr. Robinson at all about Mr. Santullo's use of

14   Neurontin, specifically, or did you just note that it was

15   something he was on based on his records?

16   MR. RIBBLE:  Form of question, time and place.

17   A.    I've never had a conversation, actually, with

18   Dr. Robinson face-to-face or voice-to-voice on the

19   telephone about Mr. Santullo that I can recall.

20   Q.    Okay.

21   A.    And that's not atypical for the kind of

22   consultative practice I do.

23   Patients are sent to me by their referring

24   physicians, and, usually, if it's someone who is bright

25   and articulate, like Mr. Santullo, then the referring

13

1    physician can rely on the patient to provide the history,

2    provide the drugs, and if there is any questions, then I

3    would call the referring physician.

4    If it's more a complicated case, I may get a

5    letter of explanation or a phone call beforehand, but I

6    think that in Mr. Santullo's case that it was

7    straightforward enough, in this case, that Dr. Robinson

8    wanted me to see Mr. Santullo for the ongoing evaluation

9    and management of the peripheral neuropathy.

10   Q.    Okay.

11   A.    And so I understood that she had started him

12   on the Neurontin and understood the reasons for doing

13   that.

14   Q.    Now, was this -- something you said made me

15   think of something.

16   Was the information that Mr. Santullo was

17   taking Neurontin something you got directly from him, or

18   was it by way of examining his prior chart from

19   Dr. Robinson?

20   A.    The only part of his prior chart from

21   Dr. Robinson that I saw is some of the laboratory studies

22   that are enclosed in Exhibit 2.

23   The history of him taking Neurontin was

24   directly from him.

25   Q.    Do you recall anything he said about his use of

14

Neurontin regarding, you know, whether it was working or

any side effects, that sort of thing?

3    A.    The only thing he said -- I don't know

4    that we talked specifically about how the Neurontin

5    was or wasn't working at the time of the first

6    examination.

7    On subsequent examinations, we talked about how

8    the Neurontin wasn't working and altered the dose at that

9    time, but the first examination, I don't think we had

10   much of a conversation about that.

11   The first examination was primarily focused on

12   ascertaining the potential etiology of the peripheral

13   neuropathy.

14   Q.    Okay.  Did it seem appropriate to you that he

15   had been prescribed Neurontin for the condition that he

16   was experiencing?

17   A.    Yes.

18   Q.    Okay.  And can -- I know this sounds like a

19   strange question, but can you explain to me why that

20   would be appropriate?

21   A.    Well, it's a medicine that has been commonly

22   used in the neurology community for a number of years to

23   alter, suppress or mitigate symptoms of peripheral nerve

24   disease.

25   Q.    Okay.  Now, did you understand that its use for

15

1    peripheral neuropathy, or something similar to that,

2    would have been an off-label use of Neurontin?

3    A.    Yes.

4    Q.    Can you explain to us what your understanding

5    of an off-label use is?

6    A.    On off-label use is the use of a drug that is

7    currently released and marketed, but not specifically

8    delineated by the FDA to be used for that particular

9    condition.

10   Q.    And you said that it was something that you

11   understood to be commonly used in the -- I guess, in the

12   neurologist community for treating neuropathies of this

13   sort; is that right?

14   A.    That's correct.

15   Q.    Had you, prior to -- prior to noting that

16   Mr. Santullo was taking Neurontin, had you actually,

17   yourself, prescribed Neurontin for any of your patients

18   in the past?

19   A.    Yes.

20   Q.    What sort of conditions had you prescribed

21   Neurontin for in the past?

22   A.    I first began using Neurontin shortly after it

23   was released as an adjunct to other antiseizure therapies

24   for the treatment of seizure disorders, and then

25   subsequently, through journal articles and attending

16

1    national academic meetings, found that it was finding a
2    niche as a beneficial drug for the treatment of painful
3    peripheral nerve conditions.
4         So I subsequently began to use it for the
5    treatment of painful peripheral neuropathies,
6    polyneuropathies, for the treatment of trigeminal
7    neuralgia, a peripheral nerve disorder that affects the
8    face, and other nerve origin forms of pain.
9    Q.    Okay.  When you say that it was finding a niche
10   in that particular line of treatment, is that sort of
11   generally saying that other physicians were reporting
12   that it was effective --
13   A.    Yes.
14   Q.    -- in that treatment?
15   A.    Yes.
16   Q.    Okay.
17   A.    I think it began as a number of anecdotal
18   reports about this medicine being used for the treatment
19   of painful nerve conditions.
20   Q.    And just to clarify, anecdotal reports from
21   other physicians?
22   A.    That's correct.
23   Q.    I'm going to come back around to this topic in
24   a little bit, but I want to stick with Mr. Santullo for
25   now.

17

1         Just to go back to where we started, it did
2    seem like an appropriate course of treatment -- the
3    prescription of Neurontin seemed like the appropriate
4    course of treatment for Mr. Santullo at the time that you
5    first saw him; is that right?
6    A.    Yes.
7    Q.    Did you, yourself, write -- did you write any
8    kind of prescription for Neurontin on that visit, or was
9    he already under a prescription that could be refilled
10   from Dr. Robinson?
11   A.    I did not write one.  He was -- he had a
12   prescription from Dr. Robinson at the time of the first
13   visit.
14   Q.    Okay.
15   A.    So I didn't alter that at the time of the first
16   visit.
17   Q.    Let me ask you this, and this is a
18   hypothetical, but based on your medical judgment and
19   experience, if Dr. Robinson, then, had not already
20   prescribed Neurontin for Mr. Santullo, is it something
21   that you might have done?
22   A.    Yes.
23   Q.    Again, is that for the reasons that you've
24   already stated, that your experience and knowledge that
25   it had been used effectively in treating the types of

18

1    neuropathies that Mr. Santullo is experiencing?
2    A.    Right.  My knowledge of others' experience and
3    my own experience at that point.  By this time, Neurontin
4    had been on the market for probably eight years already,
5    and so I had accrued a good bit of experience in using
6    Neurontin.
7    Q.    Okay.
8    A.    And a large fraction of that experience was
9    using it for the treatment of painful nerve conditions.
10   Q.    Is it fair to say that, in your independent
11   medical judgment, Neurontin was an appropriate treatment
12   to at least try on Mr. Santullo at this time?
13   A.    Yes.
14   Q.    Now, let's just move on.
15        When was the next occasion you saw Mr.
16   Santullo?
17   A.    His next visit with me was on February 26th,
18   2003.
19   Q.    Okay.  And at this time, was he still taking
20   the Neurontin?
21   A.    He was on an ongoing dose of Neurontin, at a
22   dose of 300 milligrams three times a day at that time.
23   Q.    And that particular dosage, was that something
24   that Dr. Robinson had started him on, or was it something
25   that you had told him about at some point?

19

1    A.    No, that was the dose that he came to me with
2    from Dr. Robinson.
3    Q.    Okay.  Now, do you recall any discussions, on
4    this visit in February of 2003, about -- with Mr.
5    Santullo about the effectiveness of Neurontin or any side
6    effects he was having?
7    A.    I don't recall independently him having any
8    side effects, and I didn't record any side effects as
9    such.  He was still having a lot of numbness, and by that
10   time, beginning to experience some pain in his legs, so
11   we talked about that.  He didn't think that the
12   Neurontin, at a dose of 300 milligrams three times a day,
13   was of benefit to him, so we subsequently increased the
14   dose to 600 milligrams three times a day.
15   Q.    That kind of dosage increase -- so that would
16   have been 1,800 milligrams for a day -- for a total --
17   A.    Yes.
18   Q.    -- in a single day?
19   A.    Uh-huh.
20   Q.    Is that kind of dosage increase something that
21   you have made for other patients in the past?
22   A.    Yes.
23   Q.    And in your independent medical judgment, was
24   it appropriate to try the increased dosage here with
25   Mr. Santullo at the time?

20

1    A.    Yes.  I thought that increasing the dose was an
2    appropriate thing, given that his symptoms were
3    continuing despite the lower dose of Neurontin, and I
4    thought that, given his size and general state of health,
5    that it would be safe to simply double the dose rather
6    than to escalate it more slowly.
7    Q.    Okay.  Had you had patients in the past who had
8    responded to a similar type of dosage increase in
9    Neurontin?
10   A.    Yes.
11   Q.    Okay.  Whereas, they weren't responding to the
12   lower dose, but you did see a response with the higher
13   dose?
14   A.    That's correct.
15   Q.    Now, at this time, with the increased dosage,
16   did you need to write a new prescription for Neurontin,
17   or was he able simply to use the continuing one from
18   Dr. Robinson?
19   A.    I may have simply asked him to double the dose
20   and tell me how that worked out for him.  Let me just
21   refer to one thing here.
22   Q.    Sure.  If you want to take a look at your full
23   chart.
24   A.    I don't have a record of prescribing Neurontin,
25   writing a prescription or calling in a prescription to

1    his pharmacy, which means that what would have happened
2    is I would have said, "Why don't you go ahead and double
3    the dose," or I would have given him some office samples
4    of the 600-milligram form of Neurontin to take home with
5    him and try out.
6    Q.    Okay.
7    A.    And I must tell you, in all candor, I don't
8    have any documentation as to which of those things were
9    likely to have happened.
10   Q.    Okay.
11   A.    All I can tell you is that I had -- I was the
12   one that advised him to increase the dose to 600
13   milligrams three times a day.
14   Q.    Fair enough, then.
15         You had mentioned that you had with other
16   patients experienced a benefit -- or saw that the patient
17   experienced a benefit with the increased dosage.
18         Does that include patients who were suffering
19   from the same types of neuropathy that Mr. Santullo was
20   experiencing?
21   A.    Yes.
22   Q.    Did that past record with your other patients
23   influence your decision here to increase the dosage for
24   Mr. Santullo?
25   A.    Well, my accumulated experience, over multiple

1    patients, sort of buoyed up my comfort in making that
2    recommendation.
3    Q.    All things considered, in your professional
4    judgment, it was an appropriate course of treatment?
5    A.    Yes.
6    Q.    And then you instructed Mr. Santullo to come
7    see you again in six months, is that right?
8    A.    That's correct.
9    Q.    And he did, in fact, come back in August of
10   2003?
11   A.    That's correct.
12   Q.    And was he still taking the Neurontin at this
13   point?
14   A.    No.  In the interim, between those two visits,
15   between February 26th, 2003, and August 27th, 2003,
16   Mr. Santullo called me and -- he called me on July 17th,
17   2003, and said that he had heard some bad things about
18   Neurontin and wanted to get off Neurontin, and at that
19   juncture, we -- the following day, when I called him
20   back, we took him off the Neurontin and put him on a
21   different drug, amitriptyline, for the treatment of his
22   neuropathy.
23   Q.    And you said that was July 17th, 2003?
24   A.    That's correct.
25   Q.    And that looks like it's -- is that a document

1    that you've brought here with us that's in Exhibit 2?
2    A.    Yes.  It's in Exhibit 2.  It's one of the phone
3    messages.  It's the second phone message.
4    Q.    Okay.  Do you remember anything else?
5         MR. RIBBLE:  That one?
6         THE WITNESS:  This one.
7         MR. RIBBLE:  Thank you.
8         THE WITNESS:  Sure.
9    Q.    (BY MR. OUTLER)  You said he had called you and
10   said he heard some bad things about Neurontin.
11        Do you remember any more specifics about that?
12   A.    I think that there had been something in the
13   press that he had heard or read, and I can't remember
14   whether it was the television or the print media that he
15   referred to, but he'd gotten word that perhaps using
16   Neurontin was not the best thing for you if you had
17   neuropathy, and that it wasn't FDA approved for
18   neuropathy, and it suddenly made him feel uncomfortable
19   continuing to take this medication.
20   Q.    Did he say anything about having filed this
21   particular lawsuit at that time?
22   A.    I don't believe that I learned about the
23   lawsuit until, oh, perhaps earlier this year.  So I don't
24   remember there ever being a lawsuit question or issue --
25   Q.    Okay.

1    A.   -- at or about July of 2003.

2    Q.   Okay.  Do you remember him saying that patients

3 were experiencing any particular negative side effects as

4 a result of Neurontin, or was he more specific about what

5 bad things he had heard?

6    A.   You know, we didn't have a long conversation

7 about this, because I knew at or about the same time that

8 there had been some negative press about Neurontin, and

9 so I had a sense of what he was talking about.  So to be

10 perfectly honest, I didn't belabor the issue, we just

11 dropped the Neurontin and picked up amitriptyline.

12    Q.   When a patient calls you and tells you that,

13 for whatever reason, they are uncomfortable with a

14 particular medication, you're going to do what you

15 can to help that patient find an alternative; is that

16 right?

17    A.   Well, unless it's a medicine that I think that

18 they absolutely need.  I have people call me up all the

19 time and say, "I really don't want to take this

20 medicine," and I say, "Well, look, you know, this is the

21 best medicine for you, let's think about this for a

22 little bit."

23    But if it's something like Neurontin, it's not

24 critical, and we have alternatives, then there is no

25 reason to have him be persistently anxious about it, and

25

1 we'll just drop it.

2    Q.   Now, we already talked about you understood

3 that the use for neuropathy, like Mr. Santullo's, was an

4 off-label use for Neurontin?

5    A.   Yes.

6    Q.   Had you had any conversation -- prior to this

7 July 17th, 2003, conversation on the phone, had you

8 talked to Mr. Santullo about the fact that use of

9 Neurontin for his particular condition was off-label

10 use?

11    A.   I had not, no.

12    Q.   Okay.  Is that something that you -- I mean,

13 you've used other drugs off-label for other indications

14 in other patients; is that right?

15    A.   Yes.

16    Q.   Is it something you typically talk to patients

17 about, or it just depends on the circumstance?

18    A.   It depends on how long the drug has been used

19 as an off-label drug.

20    Q.   Okay.

21    A.   A lot of times, what I'll do is, if I'm using a

22 drug as an off-label drug, I will describe to the person,

23 you know, what the life history of the drug is in terms

24 of what it was originally developed for, and then explain

25 the logic, either through theoretical pharmacology or

26

1 just empirical evidence, as to why I think that this

2 particular medicine would be good for them, and describe

3 the side effects based on the published data for the --

4 for what the medicine was originally used for.

5    So if it's something, you know, relatively

6 recent -- I recently used a brand-new antidepressant

7 medication for the treatment of trigeminal neuralgia in a

8 person, and there is not an indication for this, there is

9 an indication for other forms of nerve problems, and I

10 explained why the medicine -- what the medicine is

11 normally used for, and why I thought it would be of

12 benefit in her, and then used this particular

13 antidepressant in an off-label sort of fashion.

14    So that's actually a pretty common practice --

15    Q.   Okay.

16    A.   -- not only of mine, but of other physicians.

17    Q.   In the case of Mr. Santullo, you don't recall

18 having that conversation with him?

19    A.   Well, I probably wouldn't have had that

20 conversation, since he'd already been on the medication

21 when he came to me --

22    Q.   I see.

23    A.   -- and it was pretty well-established --

24 Neurontin was pretty well-established at that time as

25 being a treatment for neuropathic pain.

27

1    Q.   So it wasn't something you felt like you needed

2 to explain to him?

3    A.   No.

4    Q.   While we're on the subject, I mean, what is

5 your understanding of -- since it was an off-label use at

6 the time, what was your understanding of why,

7 theoretically or pharmacologically, it was still an

8 appropriate treatment for neuralgia but -- not neuralgia,

9 but neuropathy?

10    A.   Well, Neurontin works to stabilize nerve

11 membranes.  That's how it works in epilepsy.  The exact

12 mechanism of how that occurs has not been well worked

13 out, but the net result is that it stabilizes nerve cell

14 membranes and alters the threshold at which they fire.

15    In theory, the same would apply for nerve cell

16 membranes in the peripheral nervous system, as well as in

17 the central nervous system, and neuropathic pain is

18 probably produced by aberrant firing of diseased nerves,

19 and so altering the threshold at which they fire would,

20 at least in theory, diminish the tendency for them to

21 fire, therefore, diminish the tendency for them to send

22 nerve impulses back to the central nervous system that

23 are interpreted as pain.

24    Q.   Now, would that be true of the kind of class

25 of antiseizure medication that I think Neurontin falls

28

1    into --

2    A.    Yes.

3    Q.    -- as a rule?

4    A.    (Witness nods head.)

5    Q.    That understanding of the theoretical mechanism

6    and pharmacology of Neurontin, did that influence your

7    opinion that, medically, this was an appropriate

8    treatment for Mr. Santullo?

9    A.    That's the logic I've used before with others,

10   that's correct.

11   Q.    That's part of your background and

12   understanding of what leads you to believe this is an

13   appropriate treatment?

14   A.    That's correct.

15   Q.    And you said he was -- you switched him at that

16   point after the phone call to amitriptyline.

17         What kind of drug is amitriptyline?

18   A.    Amitriptyline is an antidepressant medication.

19   Q.    That's not the one you were referring to just a

20   minute ago in your example that --

21   A.    No.    That was an even different antidepressant

22   medication.

23   Q.    And so it was an antidepressant at this time.

24   Was it also approved for any kind of neuropathy

25   treatment?

29

1    A.    I'll be candid with you, I don't know if it's

2    FDA approved for treatment of neuropathy or not.

3    Q.    Okay.

4    A.    I've been using amitriptyline for the treatment

5    of neuropathic pain for 25 years, and I must be honest,

6    I've never looked in the PDR to see if it's FDA approved

7    for that.

8    Q.    As far as you know, was your use of

9    amitriptyline for Mr. Santullo, or even for others for

10   neuropathy, an off-label use?

11   A.    It probably is an off-label use of

12   amitriptyline, yes.

13   Q.    And then there is a notation that this was of

14   no benefit.    Was -- it sounds like -- and it was of no

15   benefit as of August 27th, 2003; is that right?

16   A.    He stayed on the amitriptyline a very short

17   period of time, because he then called me ten days

18   later -- this is phone message number three, also in

19   Exhibit Number 2 -- and so he called on 7/28/2003 to say

20   that the amitriptyline produced side effects, and so, in

21   my August 27th, 2003, note, me saying that it was of no

22   benefit is a misstatement.    What he called back for was

23   that he was having side effects from the amitriptyline,

24   and so we then switched him on July 28th to Carbatrol.

25   Q.    And just to make sure we cover this, in the

30

1    earlier conversation, on July 17th, when he had asked you

2    to take him off of the Neurontin, did he report that he

3    was experiencing any specific side effects?

4    A.    Not that I recall, no.

5    Q.    Okay.    And there is nothing reflected in your

6    telephone notes?

7    A.    No.

8    Q.    Do you recall him saying what side effects he

9    was experiencing with the amitriptyline?

10   A.    Drowsiness.

11   Q.    Drowsiness?

12   A.    (Witness nods head.)

13   Q.    Is that a common side effect?

14   A.    Yes.

15   Q.    Was that interfering with his job, or something

16   to that effect?

17   A.    Just interfering with his cognitive abilities.

18   Q.    And at that point, you switched him to

19   Carbatrol?

20   A.    That's correct.

21   Q.    And what kind of drug is that?

22   A.    Carbatrol is an antiseizure medication.    It's

23   an antiepileptic medication.

24   Q.    Like Neurontin?

25   A.    Yes.

31

1    Q.    Do you know if it's approved for the type

2    of peripheral neuropathy that Mr. Santullo is

3    experiencing?

4    A.    I don't believe it is.    It's approved for

5    another type of neuropathy, trigeminal neuralgia, but I

6    don't believe it's approved for peripheral neuropathy of

7    the type Mr. Santullo was experiencing.

8    Q.    Okay.    So this would have been another

9    off-label use of a drug in the attempt to treat

10   Mr. Santullo?

11   A.    That's correct.

12   Q.    Now, I've seen -- I'd like to just get your

13   impression of this.

14         I've seen, in Dr. Robinson's records, a

15   reference to a diabetic neuropathy.    Is that a specific

16   type of neuropathy that's different from what you've been

17   describing?

18   A.    No.    Let me just explain, briefly.

19   Q.    Okay.

20   A.    Peripheral neuropathy, also called

21   polyneuropathy, is better looked at as a symptom and a

22   sign of some other disease process going on in the body.

23   Q.    Okay.

24   A.    So, for various reasons, there is a wide

25   variety of disease processes that can play themselves out

32

12/07/2004 Barrett, Douglas, MD (Santullo)

**Page 33**

1   through the peripheral nerves, and diabetes is probably
2   the prototype of that.
3       So what he has is a peripheral neuropathy --
4   initially, we didn't know that it was due to diabetes, it
5   subsequently became clear that he was diabetic, and we
6   attributed it to his diabetes, but a diabetic
7   polyneuropathy is just one form of polyneuropathy that
8   has, as its origin, as its underpinnings, diabetes.
9       Q.   Okay.
10      A.   Diabetes interferes with the metabolic
11  machinery of the nerve, causing it to dysfunction and
12  produce the symptoms that we've talked about.
13      Q.   So once you discovered that Mr. Santullo was a
14  diabetic, then the neuropathy being secondary to that
15  condition made sense?
16      A.   That's correct.
17      Q.   Okay.  Did that discovery bear in any way
18  on the drug treatments that you had been undertaking so
19  far?
20      A.   Not from my perspective, because I wasn't
21  handling his diabetes, that was something being done by
22  Dr. Robinson.
23      So I was still striving to produce some symptom
24  relief.  I knew that his diabetes was being well cared
25  for by Dr. Robinson, and that's the first line of therapy

**Page 34**

1   for a diabetic neuropathy, but failing that, then
2   symptomatic treatment of the pain and numbness is then
3   done with other medications, and that's what I was doing.
4       Q.   And the fact that there had been a diagnosis of
5   diabetes didn't suggest that any of the treatments -- the
6   drug treatments that had been tried so far for the
7   neuropathy were suddenly contraindicated in any way?
8       A.   That's correct --
9       Q.   Okay.
10      A.   -- not contraindicated.
11      Q.   Thank you.
12      I see you asked him again to come back to see
13  you in six months, and it looks like he did come in
14  February of 2004?
15      A.   That's correct.
16      Q.   And at this time he has been -- he's been off
17  the Neurontin and had been on the Carbatrol --
18      A.   That's correct.
19      Q.   -- for six months or so -- six or seven months?
20      A.   Right.
21      Q.   Were there any concerns about or side effects
22  related to Carbatrol use that you were concerned about or
23  watching for in Mr. Santullo?
24      A.   The biggest problems with Carbatrol is that it
25  can -- it can cause a bone marrow suppression, such that

**Page 35**

1   the production of white blood cells, red blood cells and
2   platelets by the bone marrow is reduced; and the other
3   thing that it can, on rare occasions, produce is liver
4   problems.  So those are things that we monitor
5   periodically.
6       Q.   And, in fact, there is a black-box warning on
7   the Carbatrol label; is that true?
8       A.   Yes.
9       Q.   And for precisely the reasons you just
10  described?
11      A.   Exactly.
12      Q.   Is it fair to say that you would use Carbatrol
13  -- or you did recommend Carbatrol use for Mr. Santullo
14  after having tried other things first?
15      A.   That's correct.
16      Q.   Okay.  It's not something that you would use
17  upon presentation of this kind of neuropathy as a first
18  line of treatment?
19      A.   I usually don't, just because I use, you know,
20  what I feel are some of the safer medications that don't
21  have those black-box warnings first.
22      Q.   And that would include Neurontin?
23      A.   Yes, it does.
24      Q.   Now, was this your last visit with
25  Mr. Santullo?

**Page 36**

1       A.   No.
2       Q.   Actually, it looks like there was one in August
3   of 2004?
4       A.   That's correct.
5       Q.   And why was he there to see you that time?
6       A.   I asked him, once again, to return in six
7   months.  I'd see him at six-month intervals just to
8   monitor his progress and reexamine him periodically, in
9   order to make sure that his course is consistent with
10  what I think is going on, and then periodically repeat
11  some of the electrophysiologic studies to more
12  objectively give us an idea of the pace of his disease.
13      Q.   And, again, the disease you're talking about is
14  the peripheral neuropathy?
15      A.   That's correct.
16      Q.   That's what you're there to treat?
17      A.   Exactly.
18      Q.   Was there anything remarkable, I suppose, in
19  this visit?
20      A.   No.  Actually, that visit showed that his
21  examination was stable and that his electrophysiologic
22  studies were stable.
23      Q.   I note that you have in your plan that the
24  Carbatrol dose will be increased to 300 milligrams twice
25  a day.

12/07/2004 Barrett, Douglas, MD (Santullo)

1    Is that what that means?

2    A.    That's correct, yes.

3    Q.    Why the increase in dosage there?

4    A.    He had previously responded well to 200

5  milligrams twice a day and had experienced little in the

6  way of pains, but when I saw him again in August, he felt

7  that there was more in the way of pains, and that's why I

8  altered the dose, is to try to mitigate the painful

9  experience.

10    Q.    Okay.  And I guess your plan is to see him then

11  again in the beginning of the year -- January, February

12  time frame?

13    A.    Yes.

14    Q.    And I suppose you'll find out at that time

15  whether the increased dosage has been effective?

16    A.    I presume it has.  He hasn't called to tell me

17  otherwise.  But we'll talk about it at that time.

18    Q.    Okay.  Now, you mentioned that you learned

19  about the lawsuit, you believed, earlier in 2004.

20    A.    This lawsuit?

21    Q.    This lawsuit, yes.

22    A.    Yes.

23    Q.    How did you come to know about the lawsuit?

24    A.    Oh, I think it was receiving something from one

25  or another law firm in the mail that sort of tipped me

37

1  off.

2    Q.    They all kind of run together, don't they?

3    Do you have a record there in your chart?

4    A.    Well, this is in November of 2004.  I guess

5  not.  Maybe I'm not sure, now that you asked the

6  question, but this is the -- no, I guess that this

7  communication from the Rodey firm didn't come until

8  November 11th.  Somehow, I knew about this before then.

9  Maybe he told me about it.

10    Q.    Okay.

11    A.    It's possible.  I don't record the entirety of

12  our conversation in the medical records, and so that may

13  have been a comment that he made or a conversation that

14  we had that I didn't incorporate into his medical

15  records.

16    But as memory serves me, it's something that

17  I'm pretty sure I knew about earlier this year, I don't

18  know how early.

19    Q.    Do you remember what you knew about it -- what

20  you came to know about it?

21    A.    Only that he was filing a suit via the Branch

22  firm regarding the use of Neurontin.

23    Q.    Do you recall asking him any questions about

24  it?

25    A.    I don't think I did.

38

1    Q.    Did you understand, from that conversation,

2  that he was claiming a particular adverse effect from the

3  drug or some other kind of claim, or do you even

4  remember?

5    A.    I don't remember what he said --

6    Q.    Okay.

7    A.    -- quite honestly, and I didn't push him on the

8  issue.

9    Q.    Was it your impression that he was claiming

10  some adverse effect from the drug?

11    A.    No.

12    Q.    Okay.  Did you wonder what it was about?

13    A.    Oh, I had a pretty good sense of what it was

14  about, given the press regarding Neurontin and such.

15    Q.    What was your sense of about -- of what it was

16  about?

17    A.    That there was a -- I thought it was a class

18  action suit against Pfizer regarding -- or, I mean,

19  against Parke-Davis regarding Neurontin, but that's about

20  as far as I took it.

21    Q.    Do you -- I hate to keep belaboring this, but

22  did you have a sense of what the class action suit was

23  about -- I mean, what the claims were that had been done

24  wrong?

25    A.    Yes, I thought that the claims may have been

39

1  related to product liability via an adverse effect from

2  the medication.

3    Q.    Okay.

4    A.    But, again, I didn't pursue that in any more

5  detail to figure out why these claims were being pursued.

6    Q.    Fair enough.  Thank you.

7    Now, have you spoken to -- have you spoken to

8  Mr. Branch about this case?

9    A.    I have not, no.

10    Q.    Have you spoken to anyone -- any attorneys

11  either representing Mr. Santullo, or otherwise, about

12  this particular case?

13    A.    You're the first one.

14    Q.    Okay.  And you were mentioning some

15  correspondence you received from my law firm, the Rodey

16  firm.

17    A.    That was a request for records in November of

18  this year.

19    Q.    I've never met you before today, is that

20  right --

21    A.    Not that I can recall, no.

22    Q.    -- to the best that you can recall?

23    A.    No.

24    Q.    The same for me.

25    Now, have you spoken -- apart from attorneys,

40

1  have you spoken to anyone else about this particular case

2  or Mr. Santullo's claims related to Neurontin?

3      A.   No.

4      Q.   And I take it that would include Dr. Robinson

5  as well?

6      A.   I have not spoken to her about this, no.

7      Q.   Okay.  Now, just so we end up in the right

8  place with regard to your treatment, the August 25th,

9  2004, visit was the last time you've seen Mr. Santullo?

10     A.   That's correct.

11     Q.   And do you have any telephone notes regarding

12 discussions with him since then?

13     A.   No.  The only other telephone note in Exhibit 2

14 is the telephone note that relates to setting up this

15 deposition.

16     Q.   Okay.  And that would have probably been either

17 somebody from my law firm or somebody from the Branch

18 firm?

19     A.   It was Dorothy Griego from the Branch firm.

20     Q.   Do you recall -- you've mentioned several for

21 us, but can you recall any other drugs, I guess, that

22 would fall into the antiseizure class of medications,

23 like Neurontin, that you have used in an off-label

24 fashion for treatment of neuropathy?

25     A.   Dilantin is another one that I've used.

1      Q.   Okay.  Do you have some understanding that the

2  class of drugs, the antiseizure class of drugs, is

3  particularly effective for some reason in the treatment

4  of neuropathy?

5      A.   Well, I think, for reasons that we talked

6  about before, we have a sense that they should be useful

7  in the treatment of neuropathy, and I think that that's

8  why they've been tried.  Ultimately, it's been a

9  trial-and-error experience to see which of these worked

10 and which of them don't work.

11     Q.   Okay.

12     A.   But we keep trying antiseizure medications

13 because of the theoretical considerations that they

14 stabilize nerve membranes.

15          Gabitril is another medicine that I use for

16 treatment of neuropathic pain.

17     Q.   Anything else you can think of?

18     A.   Not right offhand.

19     Q.   And the Dilantin and the Gabitril treatment for

20 neuropathy would be off-label uses for those drugs?

21     A.   Yes.

22     Q.   Is there any particular type of condition that

23 you see in your patients that you would be more likely to

24 treat with an off-label use of a drug?

25     A.   That's a good question.

1           The majority of neuropathic pains that we

2  treat, we treat in an off-label fashion, so people that

3  have pain from peripheral neuropathy, pain from a pinched

4  nerve, pain from their spinal cord disorder, pain left

5  over from a stroke.  We often use medications -- probably

6  the majority of medications we use are off-label, because

7  we tend not to use narcotics, which are -- which would be

8  the FDA-approved medications for the treatment of pain,

9  just because we know that neuropathic pain, narcotics are

10 not particularly useful.

11     Q.   Okay.

12     A.   So, you know, it's a perfectly valid question.

13 I guess I should go back and look through the PDR and see

14 which of the medicines I use are FDA approved and which

15 are not.  I've, quite frankly, not paid any attention,

16 not to be cavalier about it, but so much of neuropathic

17 pain is so unresponsive to on-label drugs that we simply

18 prefer to use off-label drugs because we have nothing

19 else to use.

20           So the treatment of neuropathy is, first of

21 all, always the ascertainment of and treatment of the

22 underlying condition.

23     Q.   Okay.

24     A.   But if we can't do that, then we push for a

25 lot of medicines off-label for the treatment of the

1  symptoms.

2      Q.   So it sounds like the group of the most useful

3  or usually effective drugs for the treatment of

4  neuropathy is precisely the group that are not approved

5  for those uses?

6      A.   So far as I know, that's correct.

7      Q.   Would you agree that different patients respond

8  differently to different types of medications?

9      A.   Oh, right.  Otherwise, we'd just have one

10 medicine, panacea-mycin to be used for everything.

11     Q.   That's excellent.

12           So you have to -- with a new patient, who

13 presents with a particular type of neuropathic pain, you

14 may have to try several --

15     A.   Right.

16     Q.   -- different types of treatments?

17     A.   Yes, and that's what I tell them at the onset,

18 in that I'm generally pretty candid when we're treating

19 neuropathic pain, is that this particular pain medication

20 is not a pain medicine, it's not a narcotic, it's not a

21 barbiturate, it's a medicine that's used for something

22 else, we're going to try it for your neuropathic pain, it

23 may work, it may not work, if it doesn't work, then we'll

24 move on to something else and do this in a trial-and-

25 error experience.

12/07/2004 Barrett, Douglas, MD (Santullo)

1    I tell them, frankly, that they are going to be
2  a little bit of a guinea pig while we're trying to figure
3  out what the right niche is for them, you know, what
4  their biochemical niche is, because, as exactly as you've
5  said, different people respond differently to the same
6  medication.  So I can have five people in that respond
7  perfectly to Carbatrol, and with the sixth, nothing will
8  happen.
9     Q.   Okay.  It's probably safe to say that you don't
10  guarantee a particular result to any patient?
11    A.   I try not to.
12    Q.   Would you say, in your class of patients for
13  whom you're treating for some neuropathy-type condition,
14  if you do use a drug treatment, what percentage of that
15  is likely to be an off-label use of a drug?
16    A.   Pretty high percent.  I'm not sure I could give
17  you a very exact number, but probably 80 to 90 percent of
18  the time --
19    Q.   Okay.
20    A.   -- we were using drugs in an off-label way for
21  neuropathic pain.
22    Q.   And sitting here today, what do you understand
23  the FDA-approved indication for Neurontin is?
24    A.   Treatment of seizures and treatment of -- there
25  is one other condition that it's FDA approved for, maybe

45

12/07/2004 Barrett, Douglas, MD (Santullo)

1  trigeminal neuralgia -- no, no, I'm sorry, postherpetic
2  neuralgia.  It escaped me for a moment.  So those are the
3  only two FDA indications of Neurontin, treatment of
4  epilepsy and treatment of postherpetic neuralgia.
5     Q.   Did you understand either of those indications
6  to change over your course of treatment of Mr. Santullo?
7     A.   Not that I'm aware of, no.
8     Q.   Now, you mentioned that you first prescribed
9  Neurontin, you believe, shortly after it was -- it came
10  out.
11         Do you remember when that was?
12    A.   About 1993.
13    Q.   Was your -- I know this is going a long way
14  back, but do you remember that you used it -- was that an
15  off-label use at the time?
16    A.   No, no, I first started using it for the
17  treatment of epilepsy, yes, and when it first came out,
18  it was specifically indicated for the adjunctive
19  treatment of epilepsy.
20         So it was not a stand-alone medicine, it was a
21  medicine that you would add to Dilantin or carbamazepine
22  or some other traditional antiseizure medicine in people
23  who were incompletely controlled with that more
24  traditional medication.
25    Q.   Okay.

46

12/07/2004 Barrett, Douglas, MD (Santullo)

1     A.   So we started using it adjunctively to that,
2  and then found out that it was kind of an equivocal
3  benefit for seizures, and then -- and then sort of
4  serendipitously found a niche for it elsewhere.
5     Q.   Do you remember, roughly, when you personally
6  first prescribed it in an off-label use for a neuropathy
7  or something else?
8     A.   I don't.  Sometime after 1993, but when,
9  exactly, I couldn't tell you with certainty.
10    Q.   Do you remember just kind of when it, as you
11  say, found a niche in the medical community for off-label
12  use?
13    A.   You know, my earliest remembrance, perhaps, is
14  being at an American Academy of Neurology meeting in
15  perhaps 1994 --
16    Q.   Okay.
17    A.   -- and listening to a discussion about
18  treatment of painful polyneuropathy with Neurontin.
19    Q.   Okay.
20    A.   Because I remember vaguely -- and this is fuzzy
21  around the edges, but I remember vaguely hearing about it
22  at a scientific meeting.
23    Q.   Did it make sense to you that it might be
24  effective for that kind of treatment, given the class of
25  drug that it was in?

47

12/07/2004 Barrett, Douglas, MD (Santullo)

1     A.   Yes.  I mean, we'd had good experience with
2  carbamazepine, Carbatrol, and others in the past for
3  neuropathic pains.  We'd had equivocal response to
4  Dilantin for neuropathic pains up to that point, so it
5  seemed like a pretty reasonable deductive leap.
6     Q.   Okay.  I know that was ten years ago, at least,
7  but do you remember anything about the sponsorship of
8  that particular conference or any other details about
9  it?
10    A.   Oh, in terms of all the disclaimers, right?
11  No, I don't, actually.
12    Q.   Okay.
13    A.   The conference, American Academy of Neurology,
14  is an organization -- a professional organization for
15  neurologists, but it's not immune to accepting large
16  amounts of money from the pharmaceutical industry.  So
17  I'm sure that there could have been something of that
18  wrapped into it, but I don't remember what it was.
19    Q.   Okay.
20    A.   I tend not to pay too much attention to it.
21    Q.   To sponsorships by pharmaceutical companies
22  or --
23    A.   Right.
24    Q.   -- however that comes about?
25    A.   Right.  You know, I have to tell you that I had

48

1  to look Neurontin up to remember which company that it
2  was produced by.  So I really pay very little attention
3  to it, to be perfectly honest.
4      Q.  Do you remember, at the time of this American
5  Academy of Neurologists -- did I get that right?
6      A.  (Witness nods head.)
7      Q.  -- is it Neurology or Neurologists?
8      A.  Neurology.
9      Q.  American Academy of Neurology.  Was this an
10 annual conference?
11     A.  Yes.
12     Q.  Okay.  Did you feel like any of the information
13 you were receiving was sort of inaccurate or in any way
14 deceptive at the time?
15     A.  No.  My sense of this was that this was being
16 -- these talks were being given by academic neurologists,
17 and I didn't get a sense that there was any kind of bias.
18 I got the sense that they were giving a pretty forthright
19 anecdotal rendition of their experiences in treating
20 neuropathic pain, and so I didn't -- I didn't get any
21 tingly sensations, you know, when I was listening to
22 this, that I was being duped in any way.
23     Q.  Did you subsequently come to think that about
24 that particular conference in 1994?
25     A.  No.

49

1      Q.  Okay.  Any other particular conferences that
2  you can remember where the subject of off-label use of
3  Neurontin in any way was discussed?
4      A.  I think -- I don't remember anything in
5  particular.  In a very general sort of way, I think that,
6  if you look through any of the pain literature,
7  especially recently, that Neurontin is a recurrent theme
8  for the treatment of pains other than postherpetic
9  neuralgia.  So I think that any time you read about
10 treatment of neuropathic pain, the name gabapentin/
11 Neurontin is very prominently figured into those
12 discussions.
13     Q.  Now, I want to ask you about your memory of
14 specifics on that front, but you were talking about
15 medical literature versus attending a conference; right?
16     A.  Right.  I don't remember any other specific
17 conferences that I may have attended that -- in which I
18 heard about Neurontin being used as a treatment for
19 neuropathic pain.
20     Q.  Okay.
21         MR. RIBBLE:  Forgive me, that conference was
22 1994; correct?
23         THE WITNESS:  That's correct.
24     Q.  (BY MR. OUTLER)  Had you ever -- you stated
25 that you believed that it was an appropriate, you know,

50

1  treatment, at least to try with Mr. Santullo at the time
2  he first presented to you as a patient, and the symptoms
3  he had then were numbness and tingling.
4          Had you ever prescribed Neurontin for a
5  previous patient whose, I guess, neuropathy symptoms were
6  also numbness and tingling?
7      A.  Yes.
8      Q.  Any idea how frequently that might have
9  occurred?
10     A.  You know, I see probably one peripheral
11 neuropathy patient a week --
12     Q.  Okay.
13     A.  -- 48 weeks a year, and probably a large
14 fraction of those at some time I put on Neurontin, if
15 they were experiencing pain.
16     Q.  Okay.
17     A.  Not everybody with neuropathy, with numbness
18 and tingling, also experience pain.  Pain is kind of a
19 variable response in peripheral neuropathy, but it
20 wouldn't surprise me if, you know, 20 or 30 percent of
21 those people I put on Neurontin for the treatment of
22 neuropathic pain.
23     Q.  Just the symptomatology of numbness, tingling,
24 but without pain, like you saw with Mr. Santullo the
25 first time?

51

1      A.  Right.  I don't often use Neurontin, or any
2  other medications, for just numbness and tingling, unless
3  the numbness and tingling has reached a painful
4  proportion or has reached a proportion in somebody where
5  they want to try something to see if they can get it
6  under control.
7      Q.  Okay.
8      A.  Sometimes the numbness and tingling is quite
9  annoying, and so we'll use something -- even if it's not
10 painful -- it's like coming back from the dentist and
11 your face is all numbed up, it's not really painful, but
12 it's irritating to have that sort of thing.
13         So we'll try something to help suppress those
14 symptoms in some individuals, but mostly we use it for
15 pain.
16     Q.  Okay.  Did that fact, the fact that you don't
17 normally prescribe it for those symptoms until -- you
18 know, until there is pain, or if there comes about to be
19 pain, did that fact cause you to second-guess in any way
20 Dr. Robinson's decision to place Mr. Santullo on
21 Neurontin?
22     A.  No.  I thought it was a reasonable thing to
23 do.
24     Q.  Okay.  In your professional experience, is
25 Neurontin a safe drug to use?

52

1   A.   Yes.

2   Q.   Is it effective, in your experience?

3   A.   For some things, yes.  It tends to be pretty

4   effective for pain control in people with neuropathies,

5   tends to be reasonably effective in people with

6   postherpetic neuralgias, although it doesn't always work

7   for people with postherpetic neuralgias.  It's, in my

8   mind, of equivocal benefit.

9        I don't use it for epilepsies any longer, just

10  because there is a whole bunch of better stuff available

11  for that, but I still use it, usually, as my first-line

12  agent for treatment of neuropathic pain.

13  Q.   So, again, the indicated -- the approved uses

14  are something you don't generally use it for anymore?

15  A.   Right.

16  Q.   And the off-label uses are the ones you use it

17  for the most?

18  A.   Exactly.

19  Q.   Do you remember any of your patients reporting

20  any particularly significant side effects from use of

21  Neurontin?

22  A.   Yes, a lot of times people -- we have to stop

23  it because it makes people drowsy.  I've had a couple of

24  people where it has made them really very confused.

25       When we were first learning to use it, you

53

1   know, people -- older individuals, or people with renal

2   failure, if we pushed the dose a little bit too hard, we

3   could make them really quite confused and disoriented.

4        So drowsiness, confusion, disorientation have

5   been major side effects.

6        I've had kids develop some pretty bad behavior

7   syndromes as a result of using Neurontin when we've used

8   it for epilepsy in children in the past.  So sedation and

9   cognitive disturbances are probably the major downside

10  risks of these medications.

11  Q.   Okay.

12  A.   And probably the major reason either -- failure

13  of effectiveness or the side effects are the major

14  reasons we stop the medicine.

15  Q.   And try something else?

16  A.   Right.

17  Q.   Just to make sure we're clear, you don't recall

18  Mr. Santullo reporting any of the types of side effects

19  you just mentioned?

20  A.   Not that I recall, no.

21  Q.   And your records don't reflect that he made any

22  such report?

23  A.   No.

24  Q.   Okay.  I'm going to -- I want to ask you some

25  real specific questions about things you may have read or

54

1   other seminars that were going on that you either did or

2   didn't attend.

3   Q.   Okay.

4   Q.   And also specific visits by either Pfizer,

5   Warner-Lambert or Parke-Davis sales representatives.

6        You probably -- it's probably safe to say you

7   have sales representatives from various pharmaceutical

8   companies that come to your office; is that right?

9   A.   That's correct.

10  Q.   Sitting here today, can you remember any

11  specific visits by a particular sales representative

12  in any context from Pfizer or Warner-Lambert or

13  Parke-Davis?

14  A.   Again, I am a little embarrassed, but the drug

15  reps sort of come in, and we talk about their drugs, and

16  half the time I don't know what drug company they are

17  from, unless that figures prominently onto their name

18  badge in some way.

19       So, yes, I'm sure that they've been there.  I

20  know that people from Parke-Davis have been there.  There

21  are Pfizer representatives in and out of the office all

22  the time; Warner-Lambert not infrequently.

23       So, yes, all of those drug reps have been in

24  and out of my office over the past 24 years or so.

25  Q.   At least once?

55

1   A.   At least once, if not once a week.

2   Q.   And 24 years, is that your practice in

3   Albuquerque or --

4   A.   Yes.

5   Q.   I don't know if you knew this, but let me just

6   make sure that you understand that Parke-Davis was a

7   division of Warner-Lambert, and Pfizer, as a company,

8   acquired Warner-Lambert and, as such, acquired the

9   Parke-Davis division as well.

10       Did you understand that?

11  A.   I learned that just recently.

12  Q.   Okay.  How recently?

13  A.   Just this past weekend in preparation for the

14  deposition.

15  Q.   So when I speak about the three of -- those

16  three entities, right now, it's Pfizer.

17  A.   Right.

18  Q.   But, you know, over the time in the past five

19  years, it was, you know, one of the three.

20       Actually, I believe Neurontin was originally a

21  Warner-Lambert drug, is that right?

22       MR. VAGNUCCI:  Parke-Davis.

23       MR. OUTLER:  A Parke-Davis drug.

24  Q.   (BY MR. OUTLER)  So, in any event, I don't want

25  to sound confusing when I'm talking about the three of

56

1   those --

2   A.   No, I understand.

3   Q.   -- but they are the same entity for practical

4   purposes right now.   They were different back then.

5   A.   Yes.

6   Q.   Do you remember any visits by sales

7   representatives related to Neurontin?

8   A.   Yes.

9   Q.   Okay.   When do you remember those?  Or, let's

10  say, how many such visits do you remember?

11  A.   Oh, quite -- almost, quite literally, weekly

12  since the drug was released to market.

13  Q.   And that was a visit by either a Parke-Davis,

14  Warner-Lambert or Pfizer representative, specifically,

15  related to Neurontin?

16  A.   Some nicely dressed person related to

17  Neurontin.

18  Q.   Okay.   But if they were selling Neurontin, safe

19  bet it was from one of those three entities?

20  A.   I would accept that.

21  Q.   So that was weekly since 1993?

22  A.   '93, yes.

23  Q.   When the drug representatives come to your

24  office, do they always see you, or is it -- can it happen

25  that if a drug rep is there that you don't see them on a

1   particular occasion?

2   A.   Oh, that can happen.   I may not see a drug rep

3   for Neurontin absolutely every week, but pretty close,

4   because they come in, and we have a place for them to

5   come into our office and sort of hang out, and we see

6   that they are there, and we go and socialize with them

7   and listen to what they have to say, because we

8   understand that that's what they do for a living, and

9   they, in turn, provide us samples for our patients.   It's

10  a quid pro quo.

11  Q.   It's a symbiosis of sorts?

12  A.   Right.

13  Q.   Do you recall ever specifically -- I know we're

14  talking about a lot of visits here, but can you recall

15  ever specifically requesting information from any of the

16  representatives about Neurontin?

17  A.   Yes.   They will generally bring information

18  about Neurontin, and I must say to a person -- and they

19  are quite careful about bringing information that only

20  has to do with FDA indications for the medication.

21      I can't tell you that they haven't let it slip

22  that this medicine could be used for other things, and if

23  we query that, what they have us do is fill out some

24  paperwork and then we can get research from the drug

25  companies' medical department.

1   Q.   Okay.

2   A.   So I have, at times in the past, for a wide

3   variety of medications -- not just Neurontin, but other

4   anticonvulsants and other medications -- requested

5   information from the medical department, in which they

6   will provide us abstracts or reprints or references to

7   the medical literature in which Neurontin may have been

8   used -- gabapentin, for example, may have used in the

9   treatment of diabetic peripheral neuropathy.

10  Q.   So if you specifically ask for some more

11  information or about a particular use, if that's an

12  off-label use, then you've started a process whereby you

13  have to fill out a form and then you'll receive

14  information from the medical department in the company?

15  A.   That's correct, yes.

16  Q.   Okay.

17  A.   And what they typically provide is not a

18  summary statement, but a list of -- it's usually a list

19  of abstracts in the medical literature that has to deal

20  with the question at hand.

21  Q.   And then if you wanted to see the full article,

22  you could do that research yourself?

23  A.   Right.

24  Q.   Now, I was a little confused about something

25  you said.

1        You said you couldn't swear that they -- at one

2   point in the past 10 or 11 years, they hadn't let it

3   slip.

4        To the best of your knowledge, sitting here

5   today, do you ever recall an instance where a

6   representative from one of these companies, without you

7   requesting information, started talking about an

8   off-label use of Neurontin?

9   A.   Not that I recall, no.

10  Q.   Okay.

11  A.   I mean, they -- when we get -- we get to know

12  these representatives pretty well, and so we will

13  sometimes ask them questions and chide them a little bit

14  about this, that or the other thing, and -- but they are

15  very -- really very careful about that --

16  Q.   Okay.

17  A.   -- I must say.

18  Q.   They are careful to follow the protocol --

19  A.   Right.

20  Q.   -- if you have to ask the question, and if you

21  do, they follow the process from there?

22  A.   Right.   So they may have said something like,

23  "Yes, there is medical literature to suggest that

24  Neurontin works for painful neuropathies, but we can't

25  talk to you about that, so fill out this piece of paper,

1    and we'll give you something -- get you something from
2    our medical department," and then the stuff from the
3    medical department comes, not through the drug
4    representative, but directly to me by mail.
5        Q.    Now, these -- you know, Parke-Davis,
6    Warner-Lambert, Pfizer, they don't make all of the drugs
7    that you've used off-label for -- or tried to use
8    off-label for treatment of neuropathies in other
9    patients; is that right?
10       A.    Right.
11       Q.    This behavior of the representatives from these
12   companies, is it consistent with the behavior of the
13   representatives from the other pharmaceutical companies
14   as well regarding off-label uses?
15       A.    Yes, they generally do it the same way.  So if
16   I ask for -- you know, if I ask the representative for
17   zonegram -- information about using zonegram for the
18   treatment of migraines, they are going to say that it's
19   not FDA approved for that, but, you know, we know that
20   other people have used it, and there is medical
21   information -- medical abstracts, medical literature,
22   that suggests that it can be used for that, and we can't
23   talk to you about it, but we can get you those data.
24       Q.    And you understand that the pharmaceutical
25   representatives are just doing their job according to law

61

1    in that respect?
2        A.    Right.
3        Q.    Has there ever been an occasion where you met
4    with a pharmaceutical representative from Parke-Davis,
5    Warner-Lambert, Pfizer, where you felt like they had, I
6    guess, violated that particular role they play?
7        A.    No.
8        Q.    Okay.  Now, let me ask you, of all the
9    information that you -- the volumes of information it
10   sounds like you receive over the course of so many years,
11   how much of it do you keep?
12       A.    About ten percent.
13       Q.    Is it something where you have an actual file
14   -- do you keep it in a general file related to detailing
15   by particular company, or would you keep it in a
16   patient-specific file?
17       A.    No, I keep it in a reprint file that's
18   categorized by disease entity.
19       Q.    Okay.
20       A.    So I have a file that says, "Peripheral
21   Neuropathy, Treatment."
22       Q.    Okay.
23       A.    And so if I got something from a drug company
24   that had specifically to do with treatment of peripheral
25   neuropathy, that I wanted to make sure that I could put

62

1    my fingers on a year from now, then it would get dropped
2    into that file.
3        Q.    Okay.
4        A.    If it was something that I read, and I thought
5    was superfluous to what I already had in my file, then it
6    would go in another file.
7        Q.    And that would include -- did you say you do
8    recall specifically asking the question about off-label
9    uses of Neurontin with a particular representative?
10       A.    I believe that I have in the past, because I
11   believe that -- and, again, this is ten years ago, so my
12   memory of this is a little fuzzy around the edges,
13   because what it -- you know, whether it was ten years
14   ago, or eight years ago, or seven years ago, or last
15   week, it sometimes kind of runs together.
16       Q.    I know that feeling.
17       A.    But I know that I've received information about
18   off-label uses of Neurontin via the mechanism that we
19   talked about before.
20       Q.    Is that something you, most likely, would have
21   kept in your file?
22       A.    Some of it, I would have kept.
23       Q.    Okay.
24       A.    And then I cull the file out from time to time,
25   and so if something, like Neurontin, for example, becomes

63

1    an accepted standard of care in the treatment of
2    peripheral neuropathy, I don't keep a lot of reprints
3    around to clog up my file, you know.
4            If some other drug X, which is less well-known
5    and less -- less widely used, avails itself as a
6    treatment, I may keep that in my reprint file until it
7    becomes either proved to be ineffective or it becomes the
8    standard of care, and then I may cull it out of the file.
9            So I may keep ten percent of the stuff, but
10   there may be only one percent of the stuff that hasn't
11   met the test of attrition.
12       Q.    That's interesting you bring that up.
13       Do you feel like use of Neurontin in the
14   treatment of peripheral neuropathy is a standard of care
15   at this point?
16       A.    Yes.
17       Q.    Okay.  If we -- I'd like to make this as easy
18   on your staff as possible, but I wonder if we can get a
19   copy of what you've kept in those files regarding -- that
20   would have anything to do with use of Neurontin
21   off-label.
22           Is that something we could get from you?
23       A.    Sure.  I can take a look and see what I've got.
24   I mean, you can --
25       Q.    We'll be glad to pay you for any kind of

64

1  charges associated with it.
2      A.    I think you may get lucky.  I think I may have
3  culled some of the stuff out of there recently, so it
4  won't cost you too much.
5      Q.    Okay.  How long do you think that the use of
6  Neurontin for peripheral neuropathy or similar conditions
7  has been the standard of care?
8      A.    At least the past seven or eight years.
9      Q.    So going back to the mid to late '90's, or so?
10     A.    Right.  Exactly.
11            Do you want a copy of this, too?
12            MR. RIBBLE:  Yes.  Of course.
13            THE WITNESS:  Somehow I knew the answer the
14  that.
15            MR. RIBBLE:  I was just going to tell you,
16  Doctor, you probably don't need to make a note.  Somebody
17  will remind you.
18            THE WITNESS:  Why did I not know the answer to
19  that?
20     Q.    (BY MR. OUTLER)  How big is your practice group
21  right now?
22     A.    30 physicians.
23     Q.    But not all neurologists?
24     A.    No.  There are two other neurologists in my
25  group.

65

1      Q.    Is off-label use of Neurontin, or even any
2  particular group of drugs off-label for treatments of
3  neuropathies, something that you discuss among your
4  office peers or the peers in this community?
5      A.    You know, if I'm having a problem with treating
6  some given individual, you know, I may stop one of my
7  partners -- we share a fairly large office, so it's easy
8  to do, you know -- and at the end of the day I may say,
9  "Hey, can you think of anything else I could use for this
10  particular process?"
11            Or I may simply get onto the Internet and go to
12  PubMed and pull up neuropathy and treatment, and just go
13  through the list of stuff that has been, you know,
14  recently written with respect to the treatment of painful
15  polyneuropathy.
16            So I use both mechanisms.  I flip through the
17  journals, I could go through my reprint file, I go
18  through the Internet, I go through my colleagues, both
19  here and at the University.
20     Q.    I'm sure the answer is yes to the question that
21  at some point in time you've discussed with one of your
22  colleagues the off-label use of Neurontin for neuropathy;
23  is that fair?
24     A.    I don't know if I ever have.
25     Q.    Never?

66

1      A.    I think it became pretty widely known to be
2  useful very rapidly.  I must say, it was something that
3  sort of emerged very quickly as a treatment for painful
4  polyneuropathy, and so it's -- I'm not sure that I ever
5  had this sort of discussion with them about, "What do you
6  think about using Neurontin?"
7      Q.    Okay.
8      A.    I think it may have been more, you know,
9  somebody saying, you know, "I tried Neurontin on this
10  person, and it worked really great."
11     Q.    Okay.
12     A.    It may have been that simple of a discussion;
13  not very archaic.
14     Q.    But your memory is that it was very early on --
15  and that would be after release in '93 --
16     A.    Right.
17     Q.    -- that it became, you know, well-known that
18  this was potentially an effective treatment for
19  neuropathies?
20     A.    Yes, I remember knowing about it as a treatment
21  for epilepsy, and about the same time that it was clear
22  that it was not the world's, you know, hottest drug for
23  epilepsy, there seemed to be an emergence of indications
24  for the use of it in peripheral neuropathy.
25     Q.    Okay.  What was going on?  I mean, what's your

67

1  memory of how that word was spreading or how physicians
2  came to have that information?
3      A.    Well, I think it was through ways that we've
4  talked about before, medical meetings, not so much the
5  Internet back then, but progressively more with time,
6  medical literature, information provided through
7  inquiries --
8      Q.    Okay.
9      A.    -- and just casual chat between physicians.
10     Q.    Okay.  And then probably trial and error with
11  patients?
12     A.    Right.
13            MR. OUTLER:  Okay.  I tell you what, I'd like
14  to take just a short break.
15            THE WITNESS:  Sure.
16            (Recess held from 2:50 to 3:01 PM.)
17     Q.    (BY MR. OUTLER)  Doctor, let's go back on the
18  record.
19            I think I can burn through these last few
20  questions here and stop taking up your time.
21            Have you ever heard of the term "medical
22  liaison" --
23     A.    Yes.
24     Q.    -- with regard to a pharmaceutical company?
25     A.    Oh, with -- I'm not sure with regards to --

68

1  well, yes, the people that, for example, provide this
2  information, I think, are called medical liaisons, now
3  that you mention it.
4      Q.  When you say "provide this information" --
5      A.  The information, for example, that I've gotten
6  from the drug companies when I've requested sending me
7  some medical abstracts or something, I think the -- the
8  person not infrequently it will come from is -- with a --
9  I'm sorry, I'm babbling.  It will not infrequently come
10  with a cover letter, and that cover letter is usually
11  signed by somebody that, I believe, is referred to as a
12  medical liaison.
13      Q.  Okay.
14      A.  But, again, I look at that quickly and then go
15  on to the meat of the substance, so --
16      Q.  And I think you may have answered this before,
17  but as far as a medical liaison goes, do you recall
18  speaking to one or receiving something from a medical
19  liaison at Pfizer or Warner-Lambert, Parke-Davis,
20  regarding Neurontin?
21      A.  I may have, but I don't remember that
22  specifically --
23      Q.  Okay.
24      A.  -- as an independent recollection.  I just
25  don't know.

1      Q.  Okay.  If that happened, apart from that and
2  apart from any discussions you had with the local sales
3  representatives, do you recall speaking with anyone at
4  Parke-Davis, Warner-Lambert, Pfizer, about off-label use
5  of Neurontin?
6      A.  I don't recall speaking with anybody
7  voice-to-voice or person-to-person, no.
8      Q.  Do you recall speaking to them in some other
9  way?
10      A.  No, no.  The only communication I would have
11  had was via them sending me a cover letter and then
12  attaching the medical information.
13      Q.  Okay.  Have you ever, sitting here today, had
14  the feeling or believed that any information you got from
15  Parke-Davis, Warner-Lambert, Pfizer, as a result of a
16  query from you for information, whether that information
17  was false or misleading in any way?
18      A.  I've never had that sense, no.
19      Q.  Looking back on your practice, since you began
20  prescribing Neurontin, do you consider any of the
21  information that you may have received from any of those
22  three to be false or misleading regarding use of
23  Neurontin?
24      A.  None that has ever struck me as such, no.
25      Q.  Do you ever -- do you believe that you've

1  received what you would consider exaggerated or false
2  claims about the safety or effectiveness of Neurontin for
3  off-label use?
4      A.  I can't recall anything that I ever thought was
5  an exaggerated claim, and I don't remember anything that
6  was exaggerated with respect to safety, either.
7      Q.  Okay.  Did you ever receive a cash payment or
8  any kind of monetary incentive from Pfizer,
9  Warner-Lambert, Parke-Davis, as an incentive to prescribe
10  Neurontin for an off-label use?
11      A.  No.
12      Q.  For that matter, have you received any kind of
13  cash payment as an incentive from any pharmaceutical
14  company to prescribe some drug?
15      A.  I'll tell you what I have done, and you can
16  draw your own conclusions, I guess.
17      I am not infrequently asked to give a
18  presentation about some process -- migraine, epilepsy,
19  that sort of thing -- that is underwritten by a
20  pharmaceutical company, and I will receive a check from
21  that pharmaceutical company as an honorarium for giving
22  that presentation.
23      I'm not constrained to talk only about their
24  drug, I can talk about anything that I want to.  So is
25  that an incentive to use their drug or not?  I don't

1  know.  I like to think not, but, you know, I'm not beyond
2  being swayed by money, like everybody else may not be
3  swayed by that, so occasionally -- so I guess you could
4  consider that an incentive to use their drug via a very
5  circuitous mechanism.
6      Q.  But the extent of that is that you are paid an
7  honorarium to speak at a particular conference about a
8  topic that the scope of which is entirely up to you, is
9  that right?
10      A.  That's correct.
11      Q.  And do you recall doing that for Pfizer,
12  Warner-Lambert or Parke-Davis?
13      A.  I believe I have done it for Pfizer.
14      Q.  Okay.  Do you recall doing that in regard to
15  use of Neurontin?
16      A.  No.
17      Q.  And this is going to sound like a ridiculous
18  question, I'm sorry for it, but forgetting about the
19  honorarium-speaking issue, if you had actually been
20  offered or received a direct cash payment from a
21  pharmaceutical company to prescribe a medication, would
22  you -- under those circumstances, would you have
23  prescribed the medication, even if the patient didn't
24  need it?
25      A.  No.

1    Q.    And that, most likely, would have been in
2    contravention to your medical judgment, in fact, if the
3    patient didn't need it?
4    A.    I would have been offended by that.  I would
5    have thrown them out of the office.
6    Q.    It's a safe bet to say that that's never
7    happened to you with regard to Pfizer, Warner-Lambert or
8    Parke-Davis?
9    A.    No, I've never -- I've never been approached in
10    just that way.
11          I think that the -- I've been approached more
12    insidiously, as I've discussed before, but it's never
13    been that overt.
14    Q.    And being approached insidiously, by that, are
15    you referring to the honorarium?
16    A.    Being paid an honorarium to -- by a drug
17    company.
18    Q.    Do you recall ever -- in that honorarium
19    presentation context, do you recall ever being asked to
20    say something that was false or misleading about a
21    particular drug?
22    A.    Not that I recall, no.
23    Q.    And, again, I know this is a crazy question,
24    but do you recall ever saying anything that you
25    considered false or misleading about a particular drug?

73

1    A.    Not to my knowledge, I haven't, no.
2    Q.    Have you ever received -- again, apart from
3    visits from the local sales representatives, have you
4    ever receive a cold call from anyone at the three
5    companies about off-label use of Neurontin?
6    A.    No.
7    Q.    Okay.
8    A.    No, never have.
9    Q.    Have you ever been asked to be part of a
10    speaker's bureau related to off-label use of Neurontin?
11    A.    No, not specifically Neurontin.  No.
12    Q.    Are you aware of ever having attended any
13    company-sponsored -- and by "company," I mean, again, one
14    of those three companies -- a company-sponsored
15    conference related to the off-labeled use of Neurontin,
16    or somewhere where the off-labeled use of Neurontin was
17    discussed?
18    A.    Not that I specifically recall, no.
19    Q.    Do you recall ever attending any continuing
20    medical education seminars or presentations where the
21    off-labeled use of Neurontin was discussed?  By a
22    speaker, I mean, not just among your peers, but by a
23    speaker.
24    A.    Well, what I told you before about, for
25    example, the American Academy of Neurology meeting would

74

1    fill that description.  That was a continuing medical
2    education meeting in which the off-label use of the
3    gabapentin was discussed, Neurontin.
4    Q.    What about seminars, those types of meetings,
5    in the 1996 or '97 time frame?  Do you recall any
6    specifics?
7    A.    I don't, no.  Sorry.
8    Q.    And you're doing exactly what I'm asking you to
9    do.  If you remember, please tell me.  If you don't, just
10    tell me that.
11    A.    Yes.
12    Q.    Did you ever receive a free tuition or free
13    accommodations or free meals or even cash to attend a
14    continuing medical education seminar?
15    A.    For anything, or just for Neurontin?
16    Q.    Let's start with for anything.
17    A.    Sure.
18    Q.    Okay.
19    A.    Yes, I have.
20    Q.    What about for Neurontin?
21    A.    Not for Neurontin, specifically.
22    Q.    I'm going to ask you about some very specific
23    events.
24          There was a postgraduate course by Merritt-
25    Putnam related to epilepsy on January 19th, 1996.  Did

75

1    you attend that?
2    A.    No.
3    Q.    What about a Merritt-Putnam seminar in Chicago,
4    Illinois, January 26th, 1996?
5    A.    No.
6    Q.    A conference called "New Frontiers in
7    Antiepileptics" -- I don't know if there is more to that,
8    but something like "New Frontiers in Antiepileptics," in
9    California, sometime in September or October of 1996?
10    A.    No.
11    Q.    A conference on Diabetic Neuropathy in Boston
12    at the Ritz-Carlton on June 22nd through the 24th, 1997?
13    A.    No.
14    Q.    A Merritt-Putnam symposium in Key Biscayne,
15    Florida, on September 7th, 1997?
16    A.    No.
17    Q.    Have you ever heard of the term "consultants'
18    meeting" in relationship to pharmaceutical companies?
19    A.    Yes.
20    Q.    What's your understanding of what that means?
21    A.    Well, what -- and I've participated in these,
22    and what they do is they invite you to come to the
23    meeting, hear about the disease process for which their
24    product is used, hear specifically about their product,
25    and then get together with personnel from the drug

76

1   company in break-out sessions to talk more specifically
2   about how this drug can be utilized or even sometimes
3   more specifically about how it can be marketed.
4        Q.   Okay.
5        A.   And what they will -- what will typically
6   happen in that circumstance is that you will go to
7   perhaps a day's worth of didactic sessions, in which you
8   listen to lectures from various thought leaders
9   throughout the United States -- academic physicians,
10  mostly.  They put you up in a nice hotel, buy you a nice
11  meal, and at the end of it, provide you a check as your
12  consultant's fee for coming and helping them sort through
13  things.
14       Q.   And you said you specifically have been called
15  to be, I guess, one of the consultants at the
16  consultants' meetings?
17       A.   Right.  I've done that for -- I've done that a
18  couple different times, where I've gone and listened to
19  the presentations, and then gone to the break-out
20  sessions and talked to pharmaceutical representatives
21  specifically about the medicines.
22            This, for the most part, has been exclusively
23  multiple sclerosis drugs, as it turns out.  I've never
24  done that for any of the companies that you've mentioned,
25  specifically for Neurontin, but it's -- I've done that

1   for multiple sclerosis drugs, one for a migraine drug --
2        Q.   Okay.
3        A.   -- and one for an anticonvulsant in the past.
4   Not Neurontin.
5        Q.   But you've never -- yes, you've never been
6   asked to do it for Neurontin?
7        A.   That's correct.
8        Q.   And that means you haven't -- you haven't been
9   in attendance at any kind of conference meetings related
10  -- excuse me, consultants' meetings related to Neurontin;
11  is that right?
12       A.   That's correct, I have not.
13       Q.   Do you recall ever taking part in any
14  teleconferences related to off-label use of Neurontin?
15       A.   No.
16       Q.   I know that sounds general, but I guess with
17  anybody -- with either other doctors or, you know,
18  pharmaceutical representatives or anybody in any context.
19  Is that still a no?
20       A.   That's still a no, yes.
21       Q.   Okay.  Have you ever participated in any study
22  related to off-label use of Neurontin?
23       A.   No.
24       Q.   Ever been asked to?
25       A.   No.

1        Q.   Now, you started to answer this very early on,
2   and I stopped you, I think, from completely answering it,
3   but have you ever read any studies related to off-label
4   use of Neurontin?
5        A.   I believe I probably have.  I can't quote you,
6   sitting here today, what those studies would be.
7        Q.   Okay.
8        A.   And if they survived my reprint file, that
9   would be the only way that I would know what they were.
10       Q.   Okay.  I might try to jog your memory on some
11  very specific titles, but --
12       A.   Okay.
13       Q.   -- sitting here today, you don't recall any
14  specifics?
15       A.   I don't, no.
16       Q.   Let me just ask you some specific titles, and,
17  again, just if you recall, please tell me; if not, just
18  tell me you don't remember.
19            "Statistical Analysis of Patients Treated with
20  Neurontin for Pain," by Hans Hansen, MD, in Statesville,
21  North Carolina?
22       A.   Doesn't sound familiar, no.
23       Q.   "Reduction of Sympathetically Medicated Pain
24  and Pseudomotor Function," written by David R. Longmire,
25  MD, in Russellville, Alabama?

1        A.   No recollection.
2        Q.   "Data Entry for Neurontin and Pain Analysis,"
3   by Travis Jackson, MD, and David Meyer, MD, in
4   Winston-Salem, North Carolina?
5        A.   No.
6        Q.   "Trial of Neurontin for Distal Symmetric
7   Polyneuropathy Associated with AIDS," Joseph Weissman,
8   MD, Atlanta, Georgia?
9        A.   I don't remember that one, no.
10       Q.   Okay.  "Neurontin for Neuropathic Pain" -- and,
11  I'm sorry, I wish I knew the journal names for these, but
12  if the titles ring any bells, tell me.
13            "Neurontin for Neuropathic Pain in Chronic Pain
14  Syndromes," Lavern Brett, MD, Washington, DC?
15       A.   Don't specifically recall.
16       Q.   Okay.  "Retrospective Chart Analysis of
17  Neurontin Use with Bipolar Disorder Patients," Ralph S.
18  Rybeck, MD?
19       A.   No.
20       Q.   "Retrospective Analysis of Neurontin in the
21  Treatment of Pain," again David R. Longmire, MD,
22  Russellville, Alabama?
23       A.   No.
24       Q.   "Retrospective Analysis of Neurontin in the
25  Treatment of Chronic Pain," Don Schanz, DO, Traverse

1    City, Michigan?
2         A.    No.
3         Q.    "Case Histories Relating to the Use of
4    Neurontin as an Adjuvant Analgesic," Beth J. Narcessian,
5    MD, West Orange, New Jersey?
6         A.    I'm not aware that one, either, no.
7         Q.    And you've never written any article or offered
8    to publish a case report regarding use of Neurontin by a
9    patient, is that right?
10        A.    That's correct, I have not.
11        Q.    Do you recall having read any specific case
12   reports regarding off-label use of Neurontin?
13        A.    I don't have an independent recollection of
14   reading case reports.  I may have, and I just simply
15   cannot remember if I did or not.
16        Q.    Okay.  If it's something -- if you did read a
17   case report, and you felt it was particularly
18   significant, is it the type of thing that might have made
19   its way into your file?
20        A.    Yes.
21        Q.    Okay.  Have you ever been offered any grant
22   money to either study or discuss off-label use of
23   Neurontin?
24        A.    No.
25        Q.    Ever asked to contribute any patients to a

1    study --
2         A.    No.
3         Q.    -- regarding Neurontin?
4         A.    No.
5         Q.    Okay.  Ever attend any dinner meetings with
6    anyone from Pfizer where the use of Neurontin off-label
7    was discussed?
8         A.    Not that I recall, no.
9         Q.    Okay.  When I say "Pfizer," I mean to include
10   the three.
11        A.    Right.
12        Q.    So would that still be a no?
13        A.    That would still be a no, yes.
14        Q.    Thank you.
15              Do you feel like you've ever been encouraged by
16   Pfizer, Warner-Lambert or Parke-Davis in any way to
17   prescribe Neurontin off-label?
18        A.    No.
19        Q.    What about by other physicians, do you feel
20   like you've been encouraged by other physicians to
21   prescribe Neurontin off-label?
22        A.    I wouldn't say "encouraged."  I would say that
23   if another physician had told me about this -- which was
24   clearly the case, I heard about this from another
25   physician to begin with -- and it seemed reasonable and

1    made sense, and they had a good response to it, then
2    that's something that I -- that I would try.
3              So, yeah, I don't know that "encouraged" would
4    be the right word, but that's how a lot of medical
5    learning comes about in any case is to get by word of
6    mouth anecdotal experiences from others, that you then
7    try it on your own, and then occasionally somebody will
8    do a study that looks at it a bit more scientifically,
9    but a lot of what we do comes that way.
10             So, I guess, the semantics of the word
11   "encouragement," I don't know if it applies, but I have
12   gotten information that way.
13        Q.    Okay.  In your independent medical judgment, do
14   you believe, sitting here today, that Neurontin is an
15   appropriate treatment to at least try in a patient with
16   neuropathic pain?
17        A.    Yes.
18              MR. OUTLER:  Okay.  Doctor, I think that's all
19   I've got.
20              I'll pass you over to Mr. Ribble.
21              MR. RIBBLE:  Okay.  Doctor, I just have a few
22   questions.
23                    CROSS EXAMINATION
24   BY MR. RIBBLE:
25        Q.    There were some areas I wasn't at all clear on,

1    and one of them is the sequence of time.
2              You mentioned, in your direct exam, that at
3    some point you had learned that the drug wasn't
4    particularly useful for epilepsy as an adjunct therapy.
5         A.    Well, I had come to that conclusion on my own.
6         Q.    Okay.
7         A.    And that wasn't something that anybody told me.
8    It was just that, through my own experience, I was
9    disappointed with the use of it as an antiepileptic
10   agent.
11        Q.    Now, did you ever use it -- or did anybody tell
12   you it was okay to use Neurontin as a monotherapy for
13   epilepsy?
14        A.    The whole time that I ever used it, it was
15   only indicated at that time as an add-on therapy.  I did
16   use it as a monotherapy in some individuals, but I was
17   never told to do that.  That's something that I did on my
18   own.
19        Q.    Was that a pure experiment thing, you
20   experimented on the patient?
21        A.    Yes.
22        Q.    And do you do that often?
23        A.    I will -- sometimes with antiepileptic
24   therapies, even though some of them are -- are indicated
25   as adjunctive therapy only, I will try them as

1    monotherapy.

2        Q.   Now, you're familiar with the FDA?

3        A.   Right.

4        Q.   And you understand, from your education and

5    training, the FDA requires a really stringent level of

6    proof by the manufacturer of a proposed drug in a new

7    drug application to do blind studies and to have real

8    science behind what they are claiming?

9        A.   Right.

10       Q.   And the FDA passes on the quality of that

11   science before they approve a drug for use in the public,

12   right?

13       A.   That's correct.

14       Q.   At least, that's the way it's supposed to work?

15       A.   Right.  Exactly.

16       Q.   And in reading the PDR, both in preparation for

17   today and in the past with regard to Neurontin, I

18   understood your testimony to be that Neurontin was only

19   approved by the FDA based on science submitted by its

20   manufacturer as an adjunct therapy for epileptic seizure?

21       A.   That's correct.

22       Q.   And then some time -- at a later date possibly

23   for the pain related to shingles, is what it really is,

24   isn't it?

25       A.   That's correct.

85

1        Q.   The common term is shingles?

2        A.   Right.

3        Q.   And shingles is a disease caused -- that's

4    caused by a virus?

5        A.   Sometimes.

6        Q.   And sometimes leaves nerve pain after it

7    strikes?

8        A.   Exactly.

9        Q.   And at some later date, the FDA actually

10   approved Neurontin for use with that condition; correct?

11       A.   Right.

12       Q.   And then again, based on your knowledge of

13   science and medicine, isn't it true that that would have

14   been based on a new application from Pfizer -- or let's

15   say the companies as you've gone through -- these three

16   companies, Parke-Davis, Warner-Lambert and Pfizer -- if I

17   say "the companies," will we be on the same page?

18       A.   We're on the same page.

19       Q.   Okay.  So if they were going to get an approval

20   for a use besides the adjunct therapy for epilepsy, and

21   they think they've got some other use it could be used

22   for, they have to go back to FDA, don't they?

23            MR. OUTLER:  Objection to the extent it calls

24   for expertise regarding the FDA process, but if you know

25   the answer --

86

1            MR. RIBBLE:  He can answer either way.  It's

2    not a proper objection.

3            Go ahead, Doctor.

4            THE WITNESS:  I believe that that's true.

5        Q.   (BY MR. RIBBLE)  And then at some point Pfizer

6    came back and got an extension of the use of Neurontin to

7    treat this shingles -- postshingles pain; right?

8        A.   That may be true.  I don't know that --

9        Q.   Okay.

10       A.   -- personally, but --

11       Q.   It was your impression from the PDR, the

12   Physicians' Desk Reference, that the FDA-approved uses

13   are limited to two things:  the adjunct therapy for

14   epilepsy, which you weren't too satisfied with --

15       A.   Right.

16       Q.   -- and the postshingles pain?

17       A.   That's correct.

18       Q.   And for no other use?

19       A.   There is no other FDA indication, that's

20   correct.

21       Q.   That's right.

22            Now, if there is science to back up another

23   use, the type of studies that are required by FDA, then

24   the drug company goes back to FDA and asks for another

25   additional use to be added to their drug license;

87

1    correct?

2            MR. OUTLER:  Objection.  Beyond the expertise

3    of the witness.

4        Q.   As far as your understanding.  I just want to

5    know what you understand.

6        A.   Well, I understand that they could do it that

7    way.

8            I think that there are -- there is two

9    approaches, is that if there is science to back it up,

10   they can resubmit things to the FDA and get an

11   indication, if they think that it would be beneficial to

12   do so.  If there is science to back it up, they can also

13   distribute that science and let the practitioners make up

14   their own mind.

15           I mean, that's -- as a practical matter, that's

16   exactly the way it's worked.

17       Q.   Okay.  So it's your understanding that a drug

18   company, like the companies involved here, can do

19   science, and by that I'm using kind of the term of art,

20   and that is to do the double-blind studies --

21       A.   Right.

22       Q.   -- that are necessary to have valid results,

23   epidemiological studies, and take those studies and sell

24   the drug on that basis, and they can do that without

25   going through FDA?

88

1    A.   No, I don't think they can sell the drug on
2    that basis.  That's not what I meant to say.

3         I think that if they want to sell the drug on
4    that basis, then they would have to get an FDA
5    indication, but what they -- what they can do is -- is
6    make available the science to the practitioner without
7    advertising science.  If I ask for the science and they
8    provide me the science, then I, as a practitioner, am
9    responsible for making the decision as to whether or not
10   to use the medication.

11   Q.   And your decision to use or not use a
12   medication is based entirely upon the science as you get
13   it in the PDR, from the FDA, and whatever other science
14   you get through journals that you read, and through
15   meetings that you attend, and through detail persons from
16   the companies themselves?

17        MR. OUTLER:  Object to the term "science," to
18   the extent that that mischaracterizes what the doctor has
19   stated as the basis of his prescribing decision.

20        MR. RIBBLE:  That's an improper objection.

21        Doctor, you can go ahead and answer.

22        THE WITNESS:  All right.  I get some
23   information from the PDR, and so I know, for the most
24   part, about the FDA-approved indications for a medicine,
25   but the other way that I get information to make a

89

1    decision on whether to use a drug and how to use a drug
2    is from the medical literature and from interactions with
3    my colleagues.

4    Q.   (BY MR. RIBBLE)  Okay.

5    A.   And so the information that I would get from
6    the drug company, or via the drug company, would be
7    basically medical literature that I could access myself.
8    So I use them as a conduit to getting that medical
9    literature.

10   Q.   Okay.  Now, were you aware, Doctor -- I know
11   you mentioned at some point that there was a television
12   or a print media expose on Pfizer -- let me put it this
13   way, on the companies and the way they were selling and
14   marketing on Neurontin.

15   A.   Right.

16   Q.   Did you ever look at any of the literature
17   about the charges that were brought against Pfizer for
18   that purpose?

19   A.   I never saw the television program.  I think it
20   was like a 20/20 program, or something along that line,
21   that talked about it a few years ago.  And then more
22   recently, 2003 era, I remember a newspaper article, or
23   so, talking about this.  But beyond that, I didn't look
24   into it in any detail, no.

25   Q.   Did you ask any of your colleagues about it?

90

1    A.   No.  I asked one of the drug reps about it, but
2    I didn't ask any of my colleagues about it.

3    Q.   Which drug rep did you ask about it?

4    A.   One of the -- one of the drug reps that was
5    providing Neurontin to our office at that time.

6    Q.   Do you recall what you asked this person and
7    roughly when this conversation occurred?

8    A.   It would have been sometime last year, and I
9    asked the question something along the line as to,
10   "What's the deal with the flap over Neurontin being used
11   for neuropathic pain?"

12   Q.   And do you recall what this person said to you?

13   A.   I think they said that it has to do with the
14   expose from the news television show a couple years ago
15   that seemed to show that the -- that the company was
16   pushing this drug for a non-FDA indication.

17   Q.   Was it your understanding that that's improper
18   and possibly illegal?

19        MR. OUTLER:  Objection.  Which?

20        MR. RIBBLE:  Pushing the drug for non- -- for
21   off-label uses.

22        THE WITNESS:  I understood that that was not
23   something they should be doing, and I'm -- I wasn't -- I
24   didn't ask about the legality of it, but I knew that that
25   would be unethical for them to do that.

91

1    Q.   (BY MR. RIBBLE)  So if Pfizer was, for
2    instance, to plead guilty to a couple of felony counts
3    regarding the way they marketed and labeled Neurontin,
4    and the way they created a market for off-label use,
5    would that affect your thinking with regard to the
6    information you received regarding whether or not
7    you should use it for any purpose other than FDA
8    approved?

9    A.   I don't think it would at this point, because
10   my experience with the medicine Neurontin has been -- my
11   experience with the medicine Neurontin has been such that
12   I found it to be a beneficial medicine for a lot of
13   people.

14        So even if the company was to plead to a felony
15   count with regards to that, I don't think it would impact
16   on my use of this particular medication.

17   Q.   Would it be fair to say, Doctor -- strike that.

18        Are you aware of any science, in the form of
19   studies, epidemiological studies, any kind of science
20   whatsoever that was performed on Neurontin and its uses,
21   that was not originating from the companies?

22   A.   That question, I can't answer.  I don't know.

23   Q.   So as far as you can sit here today, are you
24   aware of any information regarding the use of Neurontin
25   at all that came to you from any source other than the

92

1    companies?

2            MR. OUTLER:  He's already answered that

3    question.

4            MR. RIBBLE:  I'm asking it again, then.

5            THE WITNESS:  Well, I believe that -- and,

6    again, I don't recall the specifics, but I believe that

7    I've read abstracts of medical literature and heard CME

8    programs via the American Academy of Neurology that

9    didn't come directly from the company, insofar as I know,

10   that supported the use of Neurontin.

11       Q.    (BY MR. RIBBLE)  But you don't know either way

12   whether or not that information was provided strictly

13   from the company, do you?

14       A.    I do not.

15       Q.    It wouldn't be at all unusual for presenters at

16   these CME conferences to be the hand-maidens of a drug

17   company, would it?

18           MR. OUTLER:  Objection.  Argumentative.

19       A.    That can happen.

20       Q.    And it does happen?

21       A.    It does happen, no doubt.

22       Q.    You were at this society conference where

23   somebody gave a presentation on Neurontin.  You told us

24   about that.

25       A.    They talked about the use of Neurontin for the

93

1    treatment of painful peripheral neuropathy.

2        Q.    Okay.  And that would have been off-label use?

3        A.    That's correct.

4        Q.    Were you aware, at the time that this

5    presentation was being made, that it was a presentation

6    being made in a public organization for an off-label use

7    of this drug?

8        A.    Yes.

9        Q.    Do you have any idea who gave the lecture?

10       A.    I can't remember.

11       Q.    Do you remember when this meeting was?

12       A.    1994, May, San Diego, American Academy of

13   Neurology.

14       Q.    Now, at those meetings, and I'm just guessing,

15   because I've never been to one, but at those meetings,

16   there would be drug representatives from everywhere at

17   those meetings, wouldn't there?

18       A.    Yes.

19       Q.    And they have their little booths, and they are

20   all over the place with name badges --

21       A.    Right.

22       Q.    -- rubbing elbows, and "Buy my product,"

23   basically?

24       A.    Right.

25       Q.    So the fact that you go to this meeting, you're

94

1    going to run across drug salesmen, basically, that are

2    going to try to sell you drugs?

3        A.    Right.

4        Q.    And when you go to a meeting like that, do you

5    get handed literature?

6        A.    Sometimes.

7        Q.    Do you recall ever being handed literature by

8    any drug manufacturer that said to you that their -- that

9    they think you ought to try this drug for an off-label

10   use?

11       A.    Not that I recall.

12       Q.    If Pfizer -- and I just want you to make an

13   assumption here -- if Pfizer and the companies had

14   marketed illegally off-label use, pushed the off-label

15   use of this drug, before you first heard about the

16   off-label uses, would that not have been the only source

17   for that information to get to you?

18           MR. OUTLER:  Objection.  Improper hypothetical,

19   and also assumes a great deal of facts not in any

20   evidence.

21           MR. RIBBLE:  The facts are not only in

22   evidence, they've been pled to by the chief financial

23   officer, as appointed by the board of Warner-Lambert, but

24   we can argue about the propriety later.

25           MR. OUTLER:  Objection to the blatantly

95

1    inaccurate statement of counsel.

2            MR. RIBBLE:  I've got a copy of the transcript.

3    I'll read it to you.

4            Go ahead, Doctor.

5            THE WITNESS:  If I understood your question

6    correctly, if the companies were the only source of this

7    information, then it would follow that that would be the

8    only source that I would have had access to to get this

9    information.

10       Q.    (BY MR. RIBBLE)  And the only reason you would

11   have asked if Neurontin is good for off-label use is if

12   the company had planted that seed in the medical

13   community?

14           MR. OUTLER:  Objection.  Argumentative.

15       A.    You know, I don't know.  It's possible.  I

16   mean, the people that give these presentations at Academy

17   meetings are not beyond being biased, certainly.  I view

18   them as being academicians, and so many of them will

19   think about problems like painful polyneuropathy and cast

20   about to look for other medications that may be useful.

21           So whether or not this seed was planted by the

22   drug company, or whether it was something that a

23   researcher came up with spontaneously, is impossible for

24   me to know.

25       Q.    Okay.  But let me ask you to assume that no

96