EXHIBIT 16

1

1     UNITED STATES DISTRICT COURT

2       DISTRICT OF MASSACHUSETTS

3        MDL Docket No. 1629

4       Master File No. 04-10981

5

6   *  *  *  *  *  *  *  *  *  *  *  *  *  *

7   IN RE:  NEURONTIN MARKETING, SALES      *

8   PRACTICES, AND PRODUCTS LIABILITY       *

9   LITIGATION                              *

10  --------------------------------------  *

11  THIS DOCUMENT RELATES TO:               *

12  ALL MARKETING AND SALES PRACTICES       *

13  ACTIONS                                 *

14  *  *  *  *  *  *  *  *  *  *  *  *  *  *

15

16            VOLUME I

17          PAGES 1-311

18

19

20      VIDEOTAPED DEPOSITION OF

21     MEREDITH B. ROSENTHAL, Ph.D.

22  DATE:  TUESDAY, OCTOBER 24, 2006

23  TIME:  9:12 A.M. TO 5:01 P.M.

24

25

**2**

```
1        VIDEOTAPED DEPOSITION OF MEREDITH B.
2   ROSENTHAL, Ph.D., a witness called on behalf
3   of the Defendants, pursuant to the Federal
4   Rules of Civil Procedure, before Jessica L.
5   Williamson, Registered Merit Reporter,
6   Certified Realtime Reporter and Notary
7   Public in and for the Commonwealth of
8   Massachusetts, at the Offices of Hare &
9   Chaffin, 160 Federal Street, Boston,
10  Massachusetts, on Tuesday, October 24, 2006,
11  commencing at 9:12 a.m.
12
13  A P P E A R A N C E S
14
15  HAGENS BERMAN SOBOL SHAPIRO LLP
16     (By Edward Notargiacomo, Esq.)
17     One Main Street
18     Fourth Floor
19     Cambridge, Massachusetts  02142
20     (617) 482-3700
21     ed@hbsslaw.com
22     Counsel for the Plaintiffs
23
24
25
```

**3**

```
1   A P P E A R A N C E S, Continued
2
3   ZIMMERMAN REED PLLP
4      (By Ronald S. Goldser, Esq.)
5      651 Nicollet Mall
6      Suite 501
7      Minneapolis, Minnesota  55402
8      (612) 341-0040
9      rsg@zimmreed.com
10     Counsel for the Plaintiffs and
11     Midwest Health Plan
12     (Present by telephone.)
13
14  DAVIS POLK & WARDWELL
15     (By Edmund Polubinski III, Esq.
16     and Paul Mishkin, Esq.)
17     450 Lexington Avenue
18     New York, New York  10017
19     (212) 450-4429
20     edmund.polubinski@dpw.com
21     paul.mishkin@davispolk.com
22     Counsel for the Defendants
23
24  ALSO PRESENT:
25     Rahul Guha, Cornerstone Research
```

**4**

```
1                I N D E X
2   DEPONENT                           PAGE
3   MEREDITH B. ROSENTHAL, Ph.D.
4   Examination By Mr. Polubinski         7
5
6          E X H I B I T S
7   NO.                                PAGE
8   1  Expert Declaration of Meredith     6
       B. Rosenthal in Support of
9      Plaintiffs' Motion for Class
       Certification
10
11  2  Curriculum Vitae                  6
11
       3  Retention letter dated May 26,   36
12     2005
13  4  GMA Invoice, GMA000054 -          41
       GMA000074
14
       5  GMA Invoice, GMA000289 -         41
15     GMA294
16  6  Document headed "Rosenthal        66
       Time - 2005 Neurontin"
17
       7  Document headed "Greylock         69
18     McKinnon Associates Listing"
       dated 1/20/2006
19
       8  Expert Declaration of Raymond   105
20     S. Hartman in Support of
       Plaintiffs' Motion for Class
21     Certification
22  9  Notice of Deposition         123
23  10 Amended Class Action Complaint   152
24  11 Second Amended Class Action      152
       Complaint
25
```

**5**

```
1          E X H I B I T S
    NO.                                PAGE
2
    12  Document headed "1998           163
3       Strategic Plan and A&P
        Allocation Grid, Neurontin"
4
    13  Article headed "The U.S.        255
5       Pharmaceutical Industry:  Why
        major growth in times of cost
6       containment"
7   14  Declaration of Meredith        272
        Rosenthal in Response to
8       Defendants' Expert Keith E.
        Argenbright, M.D.
9
10
11
12
13
14
15
16  Note:  Original Exhibits 1 - 14 were
17  retained by the court reporter and forwarded
18  to Veritext New York for distribution.
19
20
21
22
23
24
25
```

**VERITEXT NEW YORK REPORTING COMPANY**

212-267-6868                                      516-608-2400

**6**

```
1              P R O C E E D I N G S
2         (Exhibit No. 1, Expert Declaration
3    of Meredith B. Rosenthal in Support of
4    Plaintiffs' Motion for Class Certification,
5    premarked for identification.)
6         (Exhibit No. 2, Curriculum Vitae,
7    premarked for identification.)          09:12:40
8         THE VIDEOGRAPHER:  Good morning.      09:12:40
9    We are recording and are now on the record.  09:12:41
10   Today's date is October 24th, 2006, and the  09:12:42
11   time is 9:12 p.m.  My name is George        09:12:45
12   Dobrentey.  I'm a legal videographer for     09:12:49
13   Veritext New York.  This is the deposition   09:12:51
14   of Meredith Rosenthal, In Re:  Neurontin     09:12:53
15   Marketing and Practices Litigation in the    09:12:56
16   United States District Court for the         09:12:58
17   District of Massachusetts, Master File No.   09:12:59
18   04-10981.                                    09:13:02
19   This deposition is being taken at 160        09:13:04
20   Federal Street, Boston, Massachusetts.  The  09:13:07
21   court reporter is Jessica Williamson.  The   09:13:09
22   counsel will state their appearances, and    09:13:12
23   the court reporter will administer the oath.  09:13:13
24        MR. NOTARGIACOMO:  Edward              09:13:14
25   Notargiacomo, Hagens Berman Sobol Shapiro,   09:13:16
```

**7**

```
1    for the plaintiffs.                          09:13:18
2         MR. POLUBINSKI:  Ted Polubinski         09:13:19
3    from Davis Polk & Wardwell for the           09:13:21
4    defendants.                                  09:13:23
5         MR. GOLDSER:  And on the telephone      09:13:24
6    my name is Ron Goldser, G-O-L-D-S-E-R.  I'm  09:13:25
7    for the plaintiffs, and in particular I      09:13:28
8    represent Midwest Health Plan.               09:13:30
9         MR. MISHKIN:  I'm Paul Mishkin from     09:13:33
10   Davis Polk for the defendants.               09:13:36
11        MR. GUHA:  I'm Rahul Guha,              09:13:38
12   Cornerstone Research.                        09:13:39
13
14        MEREDITH B. ROSENTHAL, Ph.D.
15   a witness called by counsel for the
16   Defendants, being first duly sworn, was
17   examined and testified as follows:
18
19              DIRECT EXAMINATION
20
21   BY MR. POLUBINSKI:                           09:13:50
22   Q.  Can you state your full name, please.    09:13:50
23   A.  Meredith B. Rosenthal.                   09:13:51
24   Q.  Now, what do you prefer, Dr. Rosenthal?  09:13:53
25   A.  Professor Rosenthal.                     09:13:55
```

**8**

```
1    Q.  Professor Rosenthal?                      09:13:56
2    A.  I have worked with a lot of clinicians, so  09:13:58
3    we distinguish between the M.D.s and the      09:14:00
4    Ph.D.s.                                       09:14:02
5    Q.  Fair enough.  I'll do my best.  I hope     09:14:03
6    you'll forgive me if I slip every now and     09:14:06
7    then.                                         09:14:08
8    A.  No problem.                               09:14:08
9    Q.  Okay.  Can you give me your business       09:14:08
10   address.                                      09:14:08
11   A.  My business address is 677 Huntington Avenue  09:14:08
12   in Boston.                                    09:14:12
13   Q.  And you prepared a declaration in this case  09:14:13
14   in support of plaintiffs' motion for class    09:14:15
15   certification, correct?                       09:14:19
16   A.  That's correct.                           09:14:19
17   Q.  I am handing you now a document that we've  09:14:19
18   marked as Rosenthal Exhibit 1, and I'll ask   09:14:21
19   you once you've had a chance to look at it    09:14:26
20   whether you recognize the document.           09:14:29
21   A.  Yes, I do.                                09:14:31
22   Q.  Exhibit 1 is your declaration and class    09:14:33
23   certification, right?                         09:14:36
24   A.  That's correct.                           09:14:37
25   Q.  And when we talk about this, I'll refer to  09:14:37
```

**9**

```
1    it as your declaration.  I may also refer to  09:14:40
2    it as your report.  In both cases it would    09:14:42
3    be great if we could agree that what I'm      09:14:45
4    referring to is this document, Exhibit 1.     09:14:47
5    Does that work for you?                       09:14:49
6    A.  Yes.                                      09:14:49
7    Q.  Great.  Let's turn to Page 21.  Looks like  09:14:50
8    you're at Page 21.  Is the signature there    09:15:04
9    your signature?                               09:15:06
10   A.  Yes, it is.                               09:15:07
11   Q.  And the date on Page 21 is August 8th, 2005,  09:15:07
12   correct?                                      09:15:10
13   A.  That's correct.                           09:15:11
14   Q.  Is that the date that you signed your      09:15:12
15   declaration?                                  09:15:14
16   A.  That's correct.                           09:15:15
17   Q.  Now, this declaration, I assume, contains an  09:15:15
18   accurate summary of your opinions in this     09:15:19
19   matter?                                       09:15:21
20   A.  That's correct.                           09:15:21
21   Q.  Are there any opinions that you intend to   09:15:21
22   offer at this stage in the proceeding that    09:15:25
23   aren't contained somewhere in your            09:15:27
24   declaration?                                  09:15:28
25   A.  No.                                       09:15:29
```

3  (Pages 6 to 9)

**10**

1 Q. All right. Let me also hand to you now a 09:15:30
2 document that we've marked as Rosenthal 09:15:34
3 Exhibit 2 and ask you to take a look at that 09:15:36
4 as well. Why don't I tell you, Exhibit 2 is 09:15:41
5 a document that plaintiffs' counsel produced 09:15:49
6 to us last week. It's my understanding that 09:15:51
7 it's your current CV; is that correct? 09:15:55
8 A. That's correct. 09:15:57
9 Q. Okay. Now, looking back to Exhibit 1 09:15:57
10 there's also a CV there. Attached is 09:16:04
11 Attachment A.1; is that correct? 09:16:08
12 A. Yes, that's correct. 09:16:14
13 Q. All right. And the second page of that CV 09:16:14
14 contains a heading titled "Testimony"? 09:16:21
15 A. Yes. I'm sorry, we're at the old CV, yes. 09:16:27
16 Q. We're talking about the CV -- 09:16:30
17 A. That's correct. 09:16:32
18 Q. -- that's attached to Exhibit 1? 09:16:32
19 A. Yes. 09:16:33
20 Q. And actually, that raises a question. 09:16:34
21 Looking at Exhibit 2 there doesn't appear 09:16:35
22 that there's a similar heading; is that 09:16:38
23 true? 09:16:40
24 A. That's correct. This is my academic CV. 09:16:40
25 Q. Are there any other differences between your 09:16:42

**11**

1 academic CV and what would be your CV for 09:16:44
2 purposes of this matter? 09:16:47
3 A. I would have to compare them one to one, but 09:16:48
4 I think it's just the inclusion of 09:16:49
5 testimony. 09:16:51
6 Q. Is there any reason why you wouldn't include 09:16:52
7 testimony on your academic CV? 09:16:54
8 A. It's not relevant. We have a standard CV 09:16:56
9 format for -- that we use for purposes of 09:16:59
10 things like promotion, annual reviews, and 09:17:02
11 so this was based on my standard School of 09:17:05
12 Public Health CV format, so that's my 09:17:09
13 current updated one, yeah. 09:17:11
14 Q. Looking back, then, at your CV that's 09:17:13
15 attached to Exhibit 1, we can set Exhibit 2 09:17:17
16 to one side for now. 09:17:20
17 A. Okay. 09:17:21
18 Q. You provided testimony in each of the three 09:17:21
19 cases that are listed here under 09:17:26
20 "Testimony" -- 09:17:28
21 A. Of -- 09:17:29
22 Q. -- on Page 2? 09:17:30
23 A. That's correct. Actually, I'm looking at 09:17:31
24 Augmentin. I provided written testimony 09:17:37
25 there. 09:17:39

**12**

1 Q. When you say "written testimony," what do 09:17:41
2 you mean? 09:17:42
3 A. A declaration. 09:17:42
4 Q. Okay. But you didn't provide oral testimony 09:17:44
5 in that matter at all? 09:17:46
6 A. No. 09:17:48
7 Q. Okay. How about the first matter that's 09:17:48
8 listed there, "In Re: Lupron," L-U-P-R-O-N, 09:17:51
9 "Marketing and Sales Practices Litigation"; 09:17:55
10 did you offer testimony there? 09:17:56
11 A. I offered oral testimony there. 09:17:58
12 Q. Deposition or trial, both? 09:18:00
13 A. Not exactly at trial. It was at -- I'm 09:18:03
14 sorry, I don't know the legal terms very 09:18:06
15 well. It was related to the allocation of 09:18:07
16 the ultimate settlement. 09:18:09
17 Q. So is it a -- would I be correct to assume 09:18:12
18 that it was a hearing related to allocation? 09:18:15
19 A. That sounds right. It was a hearing. 09:18:16
20 Q. In federal court? 09:18:19
21 A. In the federal court. 09:18:20
22 Q. Approximately when was that? 09:18:21
23 A. That was either December '04 or December 09:18:22
24 '05, but I think it must be December '04. 09:18:28
25     MR. NOTARGIACOMO: I think that's 09:18:31

**13**

1 right. 09:18:33
2 A. I'm sorry, I can check the date, but I think 09:18:33
3 it's December '04. 09:18:35
4 Q. And the third case that's listed here, "In 09:18:37
5 Re: Pharmaceutical Industry Average 09:18:39
6 Wholesale Price Litigation"? 09:18:41
7 A. That's correct. 09:18:43
8 Q. Have you offered testimony in that case? 09:18:43
9 A. I offered an oral testimony. It was a 09:18:45
10 somewhat unusual situation. The judge had 09:18:51
11 asked for a tutorial on pricing in the 09:18:53
12 pharmaceutical industry. And so I had a 09:18:58
13 written report, and I testified and was 09:19:00
14 cross-examined on that. But it's not 09:19:02
15 exactly in the trial, right? It was sort of 09:19:04
16 a pretrial session that she held. 09:19:06
17 Q. You were cross-examined also in court on the 09:19:08
18 tutorial -- 09:19:14
19 A. I was. 09:19:15
20 Q. -- that you provided? 09:19:14
21 A. Yes, I was. 09:19:15
22 Q. Did you offer deposition testimony in that 09:19:16
23 case? 09:19:18
24 A. Yes, I did. 09:19:18
25 Q. In addition to the cross-examination in 09:19:19

4 (Pages 10 to 13)

## 14

```
 1   court?                              09:19:22
 2  A.  That's right.  And so -- that's right.  So   09:19:23
 3      the deposition was earlier this year.  I   09:19:25
 4      could check the date, but, yeah, but the   09:19:28
 5      testimony in court was last December.   09:19:30
 6  Q.  Okay.  And I assume you have not testified   09:19:32
 7      at trial in that case?             09:19:36
 8  A.  That trial's coming up.           09:19:38
 9  Q.  Do you expect to testify at trial in that   09:19:40
10      case?                             09:19:44
11  A.  I do, although -- I do expect to testify.  I   09:19:44
12      haven't heard the final schedule, but I   09:19:46
13      expect to.                        09:19:49
14  Q.  Are there any other cases in which you've   09:19:49
15      offered testimony, other than the three that   09:19:52
16      are listed in your CV that's attached to   09:19:53
17      Exhibit 1?                        09:19:56
18  A.  No.                              09:19:58
19  Q.  Okay.  Have you, yourself, ever been a party   09:20:00
20      to a lawsuit before?              09:20:02
21  A.  No.                              09:20:03
22  Q.  Okay.  So you wouldn't, yourself, ever have   09:20:04
23      tried to be a lead plaintiff in a class   09:20:05
24      action?                           09:20:08
25  A.  No.                              09:20:08
```

## 15

```
 1  Q.  All right.  You've obviously testified a   09:20:08
 2      fair amount before, but in spite of that,   09:20::2
 3      just to make the record clear, I'll go   09:20:14
 4      forward with just a couple of rules that   09:20:16
 5      you're probably perfectly familiar with --   09:20::8
 6  A.  Great.                            09:20:20
 7  Q.  -- and you've probably spoken about already   09:20:20
 8      with plaintiffs' counsel.  The first is just   09:20:23
 9      that you understand your testimony here is   09:20:25
10      under oath?                       09:20:26
11  A.  Yes.                             09:20:27
12  Q.  And you also understand that if you don't   09:20:27
13      understand one of my questions, you let me   09:70:28
14      know, you won't just answer it?   09:20:31
15  A.  Yes.                             09:20:32
16  Q.  Great.  Can you give me your educational   09:20:33
17      background, starting with college.   09:20:40
18  A.  I have a BA, AB from Brown University in   09:20:41
19      international relations with a focus on   09:20:45
20      economics, certified track within   09:20:48
21      international relations.  And subsequent to   09:20:50
22      that I got a Ph.D. at Harvard.  There's a   09:20:52
23      university level Ph.D. in health policy.   09:20:55
24      Again, I did the economics track in that, so   09:20:58
25      my training is largely economics with   09:21:01
```

## 16

```
 1      application to health policy.       09:21:04
 2  Q.  And your Ph.D., which department would that   09:21:05
 3      have been in?  Was it in the economics   09:21:07
 4      department, or was it in specialized --   09:21:09
 5  A.  It's a faculty program, so it's actually a   09:21:11
 6      department of its own.  Health policy   09:21:14
 7      essentially is a department only for the   09:21:17
 8      purpose of offering a Ph.D., so the   09:21:18
 9      coursework for the economics track is the   09:21:20
10      same as a Ph.D. in economics minus   09:21:23
11      macroeconomic theory plus a selection of   09:21:25
12      health policy courses from the School of   09:21:29
13      Public Health, Kennedy School, other places   09:21:32
14      around the university.  So it's an   09:21:34
15      interdepartmental, interfaculty Ph.D.   09:21:35
16      program.                          09:21:39
17  Q.  Makes sense.  And actually, just now that   09:21:39
18      reminded me there is one other rule of the   09:21:41
19      road.  If you can be careful to let me   09:21:45
20      finish my questions even though I do have a   09:21:47
21      tendency to trail off when I ask them, it   09:21:51
22      generally will go better for Jessica and   09:21:52
23      also for us and for the record.   09:21:54
24  A.  Yes.  And feel free to remind me of that.   09:21:55
25      I'm afraid I have a tendency to speak too   09:21:58
```

## 17

```
 1      quickly.                          09:22:01
 2  Q.  All right.  So going back again to your   09:22:01
 3      educational background, you don't actually   09:22:03
 4      have a medical degree; is that correct?   09:22:07
 5  A.  That's correct.                   09:22:08
 6  Q.  And as part of your coursework or otherwise,   09:22:08
 7      have you ever attended any medical school?   09:22:11
 8  A.  No.                              09:22:14
 9  Q.  Have you taken coursework in clinical   09:22:14
10      medicine at all?                  09:22:16
11  A.  No.                              09:22:17
12  Q.  You don't have a degree in pharmacology   09:22:22
13      either, I take it.                09:22:23
14           (Phone ringing.)             09:22:26
15           MR. NOTARGIACOMO:  Excuse me.   09:22:27
16  A.  No.                              09:22:28
17           MR. POLUBINSKI:  Do we need to go   09:22:29
18      off the record?                   09:22:30
19           MR. NOTARGIACOMO:  No.        09:22:31
20  Q.  Okay.  Have you ever taken courses in   09:22:32
21      pharmacology?                     09:22:34
22  A.  No.                              09:22:34
23  Q.  And you don't have a law degree, either, I   09:22:34
24      take it?                          09:22:38
25  A.  No.                              09:22:38
```

5  (Pages 14 to 17)

18

1  Q.  Have you taken any law classes?          09:22:39
2  A.  No.                                      09:22:40
3  Q.  All right. What -- aside from your Ph.D.,    09:22:41
4       what other professional degrees or licenses    09:22:46
5       do you have, if any?                     09:22:48
6  A.  That's all.                              09:22:49
7  Q.  So you're not licensed to practice medicine;    09:22:50
8       is that right?                           09:22:53
9  A.  No, I'm not.                              09:22:53
10 Q.  And you wouldn't hold yourself out as an    09:22:53
11      expert in the practice of medicine, I take    09:22:55
12      it?                                      09:22:57
13 A.  I would not.                              09:22:57
14 Q.  And you're not licensed to prescribe        09:22:58
15      medication, either, correct?             09:23:01
16 A.  That's correct.                           09:23:02
17 Q.  And you've never prescribed a drug before?    09:23:02
18 A.  That's correct.                           09:23:06
19 Q.  What experience, if any, do you actually    09:23:06
20      have in the prescription writing process?    09:23:10
21 A.  Other than as a consumer of prescriptions,    09:23:12
22      none.                                    09:23:16
23 Q.  You're familiar with the term "third-party    09:23:16
24      payer" as it's used in the complaints in    09:23:21
25      this case?                               09:23:24

19

1  A.  Yes, I am.                                09:23:25
2  Q.  Have you ever done any work for an entity    09:23:25
3       that would qualify as part of the         09:23:28
4       plaintiffs' third-party payer subclass?    09:23:29
5  A.  I've worked for -- I sit on an advisory     09:23:32
6       panel for Blue Cross/Blue Shield of        09:23:35
7       Massachusetts. They have a group of local    09:23:38
8       experts, including clinicians, as well as    09:23:42
9       policy people such as myself advising them    09:23:44
10      on how to use quality information for public    09:23:47
11      reporting, pay for performance, the kinds of    09:23:51
12      things that, as you probably know, my work    09:23:54
13      relates to.                              09:23:56
14 Q.  Can you tell me what quality information     09:23:56
15      means, as you used it in that answer?     09:23:58
16 A.  Yes, sure. Generally, the data come from    09:24:00
17      either clinical charts or claims data and    09:24:04
18      profile things like appropriate use of      09:24:07
19      preventive screenings. So looking at       09:24:10
20      physicians, trying to establish whether a    09:24:13
21      physician has done all the right cancer     09:24:16
22      screenings for his or her patients or for    09:24:18
23      his or her diabetic patients, have they    09:24:21
24      gotten the right tests to make sure that    09:24:23
25      they control their diabetes.              09:24:26

20

1  Q.  So am I right that you look at information    09:24:28
2       relating to specific physicians, then?     09:24:29
3  A.  No. We -- the advisory panel has seen       09:24:31
4       aggregate data and discussed more          09:24:35
5       conceptually about how the data might be    09:24:37
6       appropriately used.                      09:24:39
7  Q.  Where does the aggregate data come from? Is    09:24:40
8       it internal to Blue Cross/Blue Shield, or    09:24:44
9       does it come from someplace else?         09:24:44
10 A.  They have another consultant, Health        09:24:46
11      Dialogue, that does a lot of analysis for    09:24:48
12      them, and Health Dialogue has brought to the    09:24:52
13      meeting PowerPoint presentations from their    09:24:55
14      data analysis.                           09:24:56
15 Q.  Do you know where their data comes from?    09:24:57
16 A.  I think their data comes largely from Blue    09:24:59
17      Cross/Blue Shield's old administrative      09:25:02
18      databases, but I'm not certain if they use    09:25:06
19      other data as well.                      09:25:08
20 Q.  How long have you served on this advisory    09:25:09
21      panel with Blue Cross/Blue Shield?        09:25:17
22 A.  That's a good question. I think September    09:25:18
23      of 2005 was the first meeting, and there    09:25:19
24      have been three or four since then, but I    09:25:22
25      could check the dates for you.            09:25:26

21

1  Q.  And how long do the meetings tend to run?    09:25:28
2       Is it approximately --                    09:25:31
3  A.  About two-hour meetings. They were dinner    09:25:32
4       meetings.                                09:25:34
5  Q.  And the discussions centered around these    09:25:36
6       PowerPoint presentations that Health       09:25:39
7       Dialogue prepares?                       09:25:40
8  A.  That's correct.                           09:25:43
9  Q.  Aside from your work on the advisory panel    09:25:44
10      with Blue Cross/Blue Shield, have you ever    09:25:46
11      done any other work for a member of the     09:25:48
12      third-party payer subclass, as you          09:25:50
13      understand it?                           09:25:52
14 A.  I have not done work for third-party payers.    09:25:53
15      I collaborate doing research with some      09:25:57
16      third-party payers. They don't pay me, and    09:26:00
17      they don't -- they don't set the research    09:26:03
18      questions or direct the results in any way,    09:26:06
19      but there have been collaborations.       09:26:08
20 Q.  Are you paid for your work on the advisory    09:26:10
21      panel with Blue Cross/Blue Shield?        09:26:12
22 A.  I am. I'm paid $500 for each meeting.      09:26:13
23 Q.  Do you have an understanding approximately    09:26:16
24      how many meetings you'll have per year?    09:26:22
25 A.  No, actually. And it's been somewhat        09:26:24

6  (Pages 18 to 21)

## 22

```
1    sporadic. We haven't had one for six to      09:26:27
2    nine months.                                 09:26:29
3  Q. And who decides whether to have the         09:26:29
4    meetings? Last question on this.             09:26:33
5  A. There's a quality -- one of their executives 09:26:34
6    in the quality area who oversees the         09:26:37
7    meetings and she contacts the advisory panel 09:26:40
8    and puts together the meetings.              09:26:42
9  Q. Actually, this isn't -- that wasn't the last 09:26:44
10   question. The last question I think is       09:26:46
11   going to be, how did you get involved with   09:26:47
12   your work on the advisory panel?             09:26:50
13 A. I publish widely in the area of pay for     09:26:52
14   performance and public reporting, and they   09:26:56
15   had seen my work, and since I was local it   09:27:00
16   made sense. They wanted to have a, you       09:27:02
17   know, an academic expert on this advisory    09:27:04
18   panel, and I was a natural --               09:27:07
19 Q. Who contacted -- I'm sorry, I cut you off.   09:27:09
20   Who contacted you?                           09:27:12
21 A. Originally I was contacted by Harold Picken, 09:27:13
22   who is one of their medical directors. He   09:27:16
23   is no longer with them, and actually, by the 09:27:17
24   time we had our first meeting he left, and   09:27:20
25   Karen Boudreau, who I believe also has the   09:27:21
```

## 23

```
1    title medical director -- they have numerous  09:27:24
2    medical directors at this level -- she runs  09:27:27
3    the meetings.                                09:27:30
4  Q. Have you ever worked in any capacity for any 09:27:31
5    governmental entity that has any involvement 09:27:42
6    in pharmaceutical reimbursement under any    09:27:44
7    federal or state program?                    09:27:46
8  A. No, I have not.                             09:27:48
9  Q. Do you have any direct experience with the  09:27:50
10   pharmaceutical reimbursement process?        09:27:55
11 A. Again, only as a consumer. No.              09:28:00
12 Q. Have you ever worked directly or indirectly  09:28:02
13   with the FDA?                                09:28:04
14 A. No. In my work on direct consumer          09:28:08
15   advertising I have presented on panels with  09:28:13
16   the FDA, Janet Woodcock, but I have never    09:28:14
17   done any work for them or a project         09:28:22
18   sponsored by them in any way.                09:28:24
19 Q. Who's Janet Woodcock?                       09:28:25
20 A. She -- you know, I just don't know her      09:28:27
21   position, but I think that her              09:28:29
22   responsibility is in the promotional area.   09:28:30
23   She's fairly high up in the FDA and still    09:28:35
24   there, to my knowledge.                      09:28:38
25 Q. So you haven't been directly involved with  09:28:42
```

## 24

```
1    an application to the FDA to approve a new    09:28:44
2    drug, I assume?                              09:28:47
3  A. No, I have not.                             09:28:48
4  Q. And that you wouldn't involve -- withdrawn.  09:28:48
5    You also wouldn't have been involved         09:28:51
6    with an application for approval of a        09:28:53
7    supplemental indication of an approved drug? 09:28:56
8  A. No, I have not.                             09:28:59
9  Q. Have you ever been involved in a clinical   09:29:00
10   trial involving a prescription drug?         09:29:02
11 A. No, I have not.                             09:29:04
12 Q. Have you ever taken Neurontin?              09:29:05
13 A. No, I have not.                             09:29:11
14 Q. To the best of your knowledge, do you know  09:29:12
15   anybody who's ever taken Neurontin?          09:29:15
16 A. To the best of my knowledge, I don't.       09:29:17
17 Q. Again, to the best of your knowledge, have  09:29:20
18   you ever spoken with anybody who's ever      09:29:22
19   taken Neurontin?                             09:29:24
20 A. To the best of my knowledge, I have -- I    09:29:25
21   have no knowledge of having spoken to anyone 09:29:27
22   who's taken Neurontin.                       09:29:29
23 Q. And I assume, based on your prior answers to 09:29:31
24   your prior questions, that you wouldn't have 09:29:35
25   been directly involved in any prescription   09:29:37
```

## 25

```
1    being written for Neurontin?                 09:29:39
2  A. That's correct.                            09:29:41
3  Q. And also that you wouldn't have been        09:29:41
4    involved in the reimbursement for any        09:29:45
5    prescription written for Neurontin?          09:29:48
6  A. That's correct.                            09:29:50
7  Q. Have you ever spoken with a doctor about the 09:29:51
8    prescribing of Neurontin?                    09:29:53
9  A. I have not.                                09:29:54
10 Q. All right. Now you're currently at the      09:30:05
11   Harvard School For Public Health, correct?   09:30:08
12 A. That's correct.                            09:30:09
13 Q. And what's your position there?             09:30:09
14 A. I'm associate professor of health economics 09:30:11
15   and policy.                                  09:30:13
16 Q. What is health economics and policy?        09:30:13
17 A. That's my title. The area relates to the    09:30:15
18   application of economic principles to health 09:30:19
19   policy.                                      09:30:21
20 Q. Would you say it's principally an economics  09:30:21
21   position or something else?                  09:30:30
22 A. I would say it's applied economics in the   09:30:32
23   area of health policy.                       09:30:39
24 Q. Do you supervise graduate students?         09:30:45
25 A. I do.                                      09:30:47
```

7 (Pages 22 to 25)

26

1  Q.  Have any of your graduate students assisted    09:30:48
2       you at all in your consulting work?    09:30:50
3  A.  No, they have not.    09:30:52
4  Q.  All right. Let's look again at Exhibit 1,    09:30:53
5       which is your declaration in the case, at    09:30:58
6       Paragraph 3 and specifically at the sentence    09:31:09
7       that carries over between Pages 2 and 3. It    09:31:11
8       reads, "Presently I am engaged in a large-    09:31:14
9       scale evaluation of the effects of    09:31:17
10      prescription drug formularies on drug choice    09:31:19
11      and health care spending."    09:31:21
12 A.  That's correct.    09:31:24
13 Q.  When did that study start?    09:31:24
14 A.  I would have to check the precise dates, but    09:31:26
15      I believe the work began about two years    09:31:32
16      ago. The funding started subsequent to    09:31:37
17      that, but I could check the dates both on    09:31:39
18      when the project started and when the    09:31:42
19      funding started. So we started doing some    09:31:44
20      of the work to prepare to submit a federal    09:31:46
21      grant. The federal grant was funded about a    09:31:49
22      year and a half ago.    09:31:52
23 Q.  How far along is the project along now?    09:31:52
24 A.  The project is fairly far along. We have    09:31:56
25      one paper that's final that's under review    09:31:59

27

1       and a second paper that's close.    09:32:02
2  Q.  With whom are you working on it?    09:32:05
3  A.  The principal investigator is Bruce Landon,    09:32:06
4       who's a physician at the Harvard Medical    09:32:10
5       School.    09:32:14
6  Q.  What specialty does he practice in?    09:32:14
7  A.  He's an internist.    09:32:17
8  Q.  And you had mentioned something about    09:32:18
9       funding before. Who's funding it?    09:32:24
10 A.  The funding comes from the Agency For Health    09:32:25
11      Care Research and Quality.    09:32:27
12 Q.  And I confess, I don't know what that is.    09:32:30
13      Can you tell me?    09:32:33
14 A.  The Agency For Health Care Research and    09:32:34
15      Quality is the primary funder for health    09:32:36
16      policy research. They're a small agency    09:32:39
17      under HHS, very small. And rather than    09:32:43
18      going to NIH, people like me who do this    09:32:47
19      kind of health policy work tend to look to    09:32:51
20      the HRQ, as it's called, for funding.    09:32:53
21 Q.  So it sounds like you've got one or maybe    09:32:58
22      two papers that are underway now. Have you    09:33:05
23      reached any conclusions that are either    09:33:07
24      preliminary or final about what the effects    09:33:08
25      of formularies are?    09:33:10

28

1  A.  Overall the results show that -- the    09:33:11
2       specific question was whether moving to a    09:33:18
3       single-tiered formulary to a three-tiered    09:33:22
4       formulary and changes in the co-payments,    09:33:25
5       whether that would save the payer, in this    09:33:28
6       case the insurance plan, money. And so    09:33:32
7       overall we find yes. Another finding is    09:33:36
8       that there's an increase in the rate of mail    09:33:40
9       order fulfillment under higher co-payments    09:33:43
10      because mail order essentially saves you one    09:33:47
11      co-payment. And another finding was that    09:33:50
12      generic substitution increases.    09:33:54
13 Q.  So would it be fair to say that your    09:34:03
14      conclusions are that prescription drug    09:34:06
15      formularies do have an impact on drug choice    09:34:10
16      in individual cases?    09:34:13
17 A.  Yes, that's correct.    09:34:15
18 Q.  Are written results available to the public    09:34:17
19      on this at all?    09:34:20
20 A.  On the paper?    09:34:21
21 Q.  Yeah.    09:34:22
22 A.  No. Traditionally in my field you can't    09:34:22
23      disseminate drafts of papers. If you want    09:34:26
24      to publish them, medical journals -- it's    09:34:29
25      called the Inglefinger rule after a New    09:34:32

29

1       England Journal of Medicine editor who made    09:34:36
2       this rule. The clinical journals are very    09:34:37
3       sensitive about having those results out, so    09:34:39
4       we hope that the paper would be accepted and    09:34:41
5       published soon, but right now it's under    09:34:43
6       wraps.    09:34:46
7  Q.  When do you anticipate, or if you can    09:34:46
8       anticipate, when it would actually be    09:34:49
9       available and published?    09:34:52
10 A.  It's a little hard to anticipate, but I    09:34:53
11      would say probably spring.    09:34:56
12 Q.  Now, you also work for Greylock McKinnon    09:34:57
13      Associates, correct?    09:35:05
14 A.  That's correct.    09:35:06
15 Q.  What is Greylock McKinnon?    09:35:07
16 A.  It's a consulting organization. They do    09:35:09
17      litigation support and some other kinds of    09:35:12
18      consulting.    09:35:13
19 Q.  What's your position there?    09:35:13
20 A.  Excuse me. I'm an academic affiliate. So    09:35:14
21      I'm not an employee per se, but I work with    09:35:20
22      them, and when I do expert witness work like    09:35:25
23      this, it all goes through them. I'm    09:35:30
24      supported by their staff.    09:35:32
25 Q.  Now, aside from being supported by their    09:35:35

8 (Pages 26 to 29)

**VERITEXT NEW YORK REPORTING COMPANY**

212-267-6868                                                    516-608-2400

**30**

1  staff, what does it mean that your work goes    09:35:37
2  through them?    09:35:39
3  A.  They do all the billing on my behalf and all    09:35:39
4    the administrative work relating to the    09:35:44
5    retention agreements.    09:35:50
6  Q.  How many academic affiliates are there at    09:35:53
7    Greylock McKinnon, if you know?    09:35:58
8  A.  I don't know.    09:36:00
9  Q.  Do you have an approximate sense?    09:36:00
10  A.  I would guess three or four.    09:36:02
11  Q.  Do you know any of the other academic    09:36:03
12    affiliates?    09:36:08
13  A.  Richard Frank. He's the one I'm certain    09:36:08
14    about, and I'm not certain about the others.    09:36:12
15    I think it's actually on their website,    09:36:15
16    though.    09:36:17
17  Q.  What portion of your work at Greylock    09:36:18
18    McKinnon is devoted to litigation support?    09:36:20
19  A.  That's all I do through them. I know they    09:36:22
20    have these other strategic consulting    09:36:25
21    projects on occasion, but I've only done    09:36:27
22    litigation work with them.    09:36:29
23  Q.  How large a business is it; do you know?    09:36:30
24  A.  I have no idea.    09:36:42
25  Q.  Do you have an office there?    09:36:42

**31**

1  A.  No.    09:36:44
2  Q.  In a typical month -- well, let me withdraw    09:36:45
3    that question.    09:36:50
4      Do you ever spend any time at their    09:36:51
5    offices?    09:36:54
6  A.  Occasionally, but it's rare.    09:36:54
7  Q.  Do you receive a regular paycheck from them?    09:37:01
8  A.  I do, not a paycheck per se since I'm not an    09:37:04
9    employee. I receive a fixed monthly amount,    09:37:08
10    and then we reconcile every six months or    09:37:12
11    something.    09:37:15
12  Q.  And what is the fixed monthly amount based    09:37:16
13    on? Is it a salary, or is it dependent on    09:37:21
14    the amount of work that you do?    09:37:23
15  A.  It's based on the amount of work that I do,    09:37:24
16    right. So it's a guess at what an average    09:37:27
17    monthly computation would be at my early    09:37:29
18    rate for the formal number of hours I work,    09:37:35
19    which of course in reality varies month to    09:37:37
20    month.    09:37:40
21  Q.  When did you start working there?    09:37:42
22  A.  I began working with them when I was a    09:37:44
23    doctoral student supporting -- doing    09:37:49
24    obviously much more rudimentary background    09:37:52
25    work for them running regressions, doing    09:37:56

**32**

1    data analysis. I believe 1996 is my best    09:37:58
2    guess as to when that first started.    09:38:00
3  Q.  How did you first decide to do it?    09:38:01
4      MR. NOTARGIACOMO: Objection. You    09:38:09
5    can answer.    09:38:10
6      THE WITNESS:  Okay.    09:38:11
7  A.  Some of my colleagues, my advisor was    09:38:12
8    working with them, and I'm interested in    09:38:16
9    industrial organization which you may know    09:38:20
10    is the field of economics that is -- largely    09:38:22
11    comes into play, particularly in antitrust    09:38:25
12    matters. So many -- most of the original    09:38:29
13    work was antitrust or related Hatch-Waxman    09:38:31
14    work.    09:38:36
15  Q.  Who is your advisor that had been working    09:38:37
16    with them?    09:38:39
17  A.  Richard Frank.    09:38:39
18  Q.  So who approached whom?    09:38:40
19  A.  I believe Richard asked me, and I think the    09:38:46
20    first thing I worked on -- I'm not certain    09:38:51
21    actually whether it was this. There was an    09:38:53
22    antitrust case brought against the    09:38:57
23    pharmaceutical wholesalers, and then I did    09:38:59
24    some work supporting the tobacco litigation    09:39:02
25    in Massachusetts. And both of those cases    09:39:05

**33**

1    were interesting intellectually and related    09:39:08
2    to my own interests.    09:39:12
3  Q.  And neither of those cases were cases in    09:39:13
4    which you offered testimony; is that    09:39:16
5    correct?    09:39:17
6  A.  That's correct.    09:39:17
7  Q.  Are you employed by any other entity beside    09:39:25
8    the School of Public Health and Greylock    09:39:28
9    McKinnon?    09:39:31
10  A.  I'm only employed by the School of Public    09:39:31
11    Health, that's correct.    09:39:34
12  Q.  Do you do any paid consulting outside of the    09:39:34
13    work that you do for Greylock McKinnon?    09:39:38
14  A.  From time to time I get paid in -- I guess    09:39:41
15    as a consultant, so, for example, the    09:39:43
16    Institute of Medicine recently put together    09:39:47
17    a committee on pay for performance, which is    09:39:51
18    an area that I have done a great deal of    09:39:54
19    research in, and they asked me with, Dr.    09:39:56
20    Landon, to write a background report for    09:39:59
21    them and paid us a fixed sum of money for    09:40:02
22    that. So I guess that would be consulting,    09:40:04
23    yes, that kind of thing every once in a    09:40:06
24    while.    09:40:10
25  Q.  But you don't have a formal consulting    09:40:10

9 (Pages 30 to 33)

**34**

1     arrangement with any other group, I take it?    09:40:12
2 A. Oh, no.      09:40:13
3 Q. Do you ever do litigation consulting, aside    09:40:15
4     from the work that you do through Greylock    09:40:16
5     McKinnon?      09:40:19
6 A. No.      09:40:19
7 Q. Now, as between your positions at the School    09:40:25
8     of Public Health and your work for Greylock    09:40:28
9     McKinnon, in a typical year how does your    09:40:32
10    income from those two sources break out, if    09:40:34
11    you understand my question?     09:40:38
12 A. I do. My income breaks out I think on    09:40:39
13     average fairly evenly, 50/50, in that    09:40:44
14     neighborhood.     09:40:49
15 Q. Okay. Aside from this matter and the AWP    09:40:56
16    matter that we talked about before, are you    09:40:57
17    active in other matters at Greylock McKinnon    09:40:59
18    now?      09:41:02
19 A. I am.      09:41:02
20 Q. How many?     09:41:03
21 A. I would want to check to be sure that I'm    09:41:09
22     correct about this, but I think there are    09:41:12
23     two other matters.     09:41:15
24 Q. Are they both litigation-related?    09:41:17
25 A. Yes, they are.     09:41:19

**35**

1 Q. What are those matters, if you can tell us?    09:41:20
2     THE WITNESS: Is it -- I never know    09:41:24
3     what I'm allowed to tell. Is it okay?    09:41:26
4     MR. NOTARGIACOMO: You can talk    09:41:28
5     about what other cases you're involved in,    09:41:29
6     yes.      09:41:31
7 A. I've been retained to work in a case related    09:41:32
8     to the drug Serostim.     09:41:34
9 Q. Can you spell that for my benefit and the    09:41:36
10    court reporter?     09:41:38
11 A. S-E-R-O-S-T-I-M. And also for the drug    09:41:38
12     Zyprexa, Z-Y-P-R-E-X-A.     09:41:47
13 Q. And those are two discrete matters, I take    09:41:54
14    it?      09:41:57
15 A. They are discrete matters.     09:41:57
16 Q. With whom at GMA, Greylock McKinnon, have    09:41:59
17    you been working, on the same team or    09:42:02
18    different teams?     09:42:05
19 A. It would be the same team. You mean the    09:42:05
20     staff?      09:42:09
21 Q. Uh-huh.     09:42:10
22 A. Yes, although both of those matters are in    09:42:10
23     the very early days. There has not been a    09:42:12
24     great deal of work.     09:42:15
25 Q. Are you working with lawyers in either of    09:42:15

**36**

1     those cases?     09:42:17
2 A. Yes.      09:42:17
3 Q. Who are they?     09:42:19
4 A. On Serostim, it's David Nalven from Hagens    09:42:19
5     Berman Sobol Shapiro, and on Zyprexa --    09:42:30
6     THE WITNESS: It's Tom, isn't it?    09:42:32
7     MR. NOTARGIACOMO: I believe so.    09:42:34
8 A. All right. Tom Sobol, also Hagens Berman    09:42:35
9     Sobol Shapiro.     09:42:40
10 Q. Okay. When were you retained in this case?    09:42:41
11 A. You know what? I would have to check the    09:42:50
12     documentation for when the retention was    09:42:53
13     actually done. I believe it would be early    09:42:55
14     last year, but I actually don't know the    09:42:58
15     date. I'm sorry.     09:43:00
16 Q. Why don't we make it easier for you and mark    09:43:01
17    the next exhibit. That's great.    09:43:03
18     (Exhibit No. 3, Retention letter    09:43:03
19     dated May 26, 2005, marked for    09:43:03
20     identification.)     09:43:30
21 Q. So the court reporter just handed you what    09:43:30
22     we've marked Rosenthal Exhibit 3. Could you    09:43:32
23     take a look at it, please.     09:43:36
24 A. Yes.      09:43:37
25 Q. Is this your retention letter in this    09:43:43

**37**

1     matter?     09:43:45
2 A. Yes, I believe it is.     09:43:45
3 Q. Was it ever signed?     09:43:47
4 A. It doesn't appear to be.     09:43:48
5 Q. Do you know whether it was ever signed?    09:43:50
6 A. I don't believe it was, no.     09:43:53
7 Q. Do you know why it wouldn't have been?    09:43:55
8 A. I don't. I'm sorry.     09:43:56
9 Q. Now, this agreement, unless I'm misreading    09:44:03
10    it, doesn't mention Greylock McKinnon; is    09:44:05
11    that correct?     09:44:08
12 A. That's correct, yes. I'm afraid that I    09:44:08
13     would have to amend. I forgot that this    09:44:12
14     letter was written directly to me and not to    09:44:16
15     Greylock McKinnon. It's the only case that    09:44:19
16     I have that's like this. So this doesn't go    09:44:21
17     through Greylock McKinnon.     09:44:24
18 Q. But your work on this matter isn't being    09:44:28
19     done independently of Greylock McKinnon, I    09:44:31
20     take it?      09:44:32
21 A. That's correct. I do get support from    09:44:32
22     Greylock McKinnon.     09:44:35
23 Q. So by "support" do you mean you use Greylock    09:44:35
24     McKinnon's staff or other resources to    09:44:38
25     work that you've performed so far?    09:44:41

10 (Pages 34 to 37)

## 38

1  A.  Yes, that's correct.                          09:44:42
2  Q.  Do you continue to expect to use Greylock      09:44:43
3      McKinnon's support staff?                      09:44:45
4  A.  I do.                                          09:44:46
5  Q.  And Greylock McKinnon would have actually      09:44:49
6      submitted your bills in this matter; is that   09:44:52
7      correct?                                       09:44:54
8  A.  That's correct.                                09:44:54
9  Q.  Okay.  Is there any other agreement that you   09:44:56
10     know of that governs your provision of         09:44:58
11     services in this case?                         09:45:01
12 A.  Not that I know of.                            09:45:01
13 Q.  Okay.  Can you describe your first contact     09:45:07
14     with plaintiffs' counsel in this case?         09:45:09
15 A.  To the best of my recollection, there was a    09:45:12
16     meeting, which may have actually have been a   09:45:18
17     conference call, but I believe it was a        09:45:20
18     face-to-face meeting where I met with Tom      09:45:22
19     Sobol and Tom Greene, and there may have       09:45:27
20     been others, I believe, from Tom Green's       09:45:32
21     office there to discuss the matter.            09:45:35
22 Q.  Do you know approximately when the meeting     09:45:36
23     would have taken place?                        09:45:39
24 A.  Well, I would have said it was early 2005,     09:45:40
25     perhaps around this time.                      09:45:43

## 39

1  Q.  Who contacted whom?                            09:45:45
2  A.  The offices of Hagens Berman Sobol Shapiro     09:45:46
3      contacted me.                                  09:45:53
4  Q.  Did they contact you directly?                 09:45:53
5  A.  Probably through Greylock McKinnon.            09:45:55
6  Q.  What was said at this first meeting or         09:45:56
7      conference call, to the best of your           09:46:01
8      recollection?                                  09:46:03
9  A.  To the best of my --                           09:46:04
10         MR. NOTARGIACOMO:  Objection.  You         09:46:05
11     can answer.                                    09:46:07
12 A.  To the best of my recollection, there was a    09:46:07
13     broad discussion about the history of the      09:46:10
14     case, including the prior federal matter.      09:46:13
15 Q.  Do you have an understanding of how the        09:46:25
16     plaintiffs' counsel would have learned of      09:46:27
17     you or why they would have retained you?       09:46:28
18 A.  I have worked with Hagens Berman Sobol         09:46:30
19     Shapiro on a number of matters.                09:46:34
20 Q.  And so your assumption is that based upon      09:46:39
21     your past work, that they were aware that      09:46:41
22     you might be interested or willing to          09:46:42
23     working on this case?                          09:46:45
24 A.  That would be my assumption.                   09:46:46
25 Q.  But you haven't had discussions with them      09:46:48

## 40

1      specifically about that, I take it?            09:46:51
2  A.  Specifically about why they asked me to work   09:46:53
3      for them on this case?                         09:46:56
4  Q.  Yes.                                           09:46:58
5  A.  No, I have not.                                09:46:58
6  Q.  Just one last question on this -- on           09:46:59
7      Rosenthal Exhibit 3.  It sounds like you did   09:47:06
8      do some work prior to May 26th of 2005 in      09:47:10
9      this case?                                     09:47:14
10 A.  I believe I did review some documents.         09:47:14
11 Q.  Okay.  Now, at the time you wrote your         09:47:16
12     declaration your hourly rate was $375 an       09:47:21
13     hour; is that correct?                         09:47:26
14 A.  That's correct.                                09:47:27
15 Q.  Now, is it still?                              09:47:28
16 A.  No.  I've been told that it's been raised to   09:47:28
17     $450.                                          09:47:32
18 Q.  That's an interesting way of phrasing your     09:47:34
19     answer to the question.  Who told you that     09:47:35
20     it's been raised to $450 an hour?              09:47:38
21 A.  Greylock McKinnon.  They -- when I was         09:47:41
22     promoted, we talked about an adjustment and    09:47:44
23     they said that would be a good adjustment.     09:47:47
24 Q.  So does Greylock McKinnon decide your hourly   09:47:49
25     rate for you?                                  09:47:52

## 41

1  A.  They advise me on it.                          09:47:53
2  Q.  Is the decision yours as to how much to        09:47:55
3      charge on an hourly basis?                     09:47:59
4  A.  Of course ultimately it's my decision.         09:48:00
5  Q.  But it sounds like it's based on their         09:48:02
6      advice?                                        09:48:05
7  A.  That's correct.                                09:48:05
8  Q.  I've got another exhibit coming up.            09:48:05
9          MR. POLUBINSKI:  Could we mark this        09:48:23
10     one as Rosenthal 4, please.                    09:48:24
11         (Exhibit No. 4, GMA Invoice,               09:48:24
12     GMA000054 - GMA000074, marked for              09:48:24
13     identification.)                               09:48:46
14         MR. POLUBINSKI:  And while we're at        09:48:46
15     it, why don't we mark this one as Rosenthal    09:48:47
16     5.                                             09:48:50
17         (Exhibit No. 5, GMA Invoice,               09:48:50
18     GMA000289 - GMA294, marked for                 09:48:50
19     identification.)                               09:48:52
20 Q.  All right.  While you're looking these over,   09:48:52
21     we've handed you two documents --              09:49:12
22 A.  Okay.                                          09:49:13
23 Q.  -- marked Rosenthal Exhibit 4 and 5; is that   09:49:13
24     right?  I'll just explain to you that we       09:49:18
25     received these invoices from plaintiffs'       09:49:26

11  (Pages 38 to 41)

## 42

1   counsel in response to our request for all   09:49:28
2   invoices, and what we've done here is   09:49:30
3   organize them in chronological order to the   09:49:32
4   best of our ability.   09:49:34
5  A.  Okay.   09:49:36
6  Q.  The reason that there are two separate   09:49:36
7   exhibits is that one of them was a batch   09:49:39
8   that was produced to us last -- well, last   09:49:40
9   winter, and then the other is a smaller   09:49:42
10   batch that was produced to us last week.   09:49:45
11   Your time appears to have been billed in   09:49:48
12   both of these invoices, although you can   09:49:50
13   look. And the one other just administrative   09:49:52
14   point that I should probably make on the   09:49:56
15   record is that they were produced to us   09:49:57
16   without control numbers or Bates numbers of   09:50:00
17   any kind.   09:50:02
18   So just for organization's sake what   09:50:02
19   we've done is we've affixed numbers to each   09:50:06
20   of the pages. The prefix on each of the   09:50:08
21   pages begins GMA, and the -- though I'm not   09:50:12
22   sure that any of these pages start with the   09:50:16
23   numeral 1 the first of the materials that   09:50:18
24   were produced to us do start with the   09:50:21
25   numeral 1.   09:50:22

## 43

1  A.  Okay. Thank you.   09:50:23
2  Q.  Were you involved in the preparation of   09:50:24
3   these invoices?   09:50:26
4  A.  No, I was not.   09:50:26
5  Q.  Are you aware of any other invoices that   09:50:27
6   would have been submitted in relation to the   09:50:31
7   time that you've spent on this engagement?   09:50:32
8  A.  To my knowledge, that's -- this would be all   09:50:34
9   of it.   09:50:38
10  Q.  And so, again, just to sort of clear this   09:50:38
11   up, relative to your retention letter it was   09:50:44
12   Greylock McKinnon that submitted bills to   09:50:47
13   plaintiffs' counsel for time that you billed   09:50:48
14   to this matter?   09:50:50
15  A.  That's correct. I submit my hours to them,   09:50:51
16   and they submit the invoices.   09:50:53
17  Q.  All right. Other than the fees that are   09:50:59
18   billed here, the hourly fees that are billed   09:51:02
19   by Greylock McKinnon for your time and the   09:51:06
20   time of their employees, do you expect that   09:51:08
21   you or Greylock McKinnon will receive any   09:51:13
22   payment of any other kind in connection with   09:51:14
23   this litigation?   09:51:17
24  A.  No. We are only paid for the hourly rates,   09:51:17
25   the hourly bills.   09:51:21

## 44

1  Q.  Now, it sounds like you've been retained by   09:51:22
2   at least some of the counsel for plaintiffs   09:51:26
3   in this case on other occasions; is that   09:51:28
4   right?   09:51:30
5  A.  That's correct.   09:51:30
6  Q.  Are all of those counsel at Hagens Berman   09:51:30
7   or have you worked with other plaintiffs'   09:51:35
8   counsel that are part of the plaintiffs'   09:51:37
9   counsel group in this case?   09:51:39
10  A.  In this case I've met some of the other   09:51:40
11   counsel such as the gentleman on the phone,   09:51:45
12   but largely I work with Ed and others at   09:51:47
13   Hagens Berman.   09:51:50
14  Q.  And is that true of your work in other   09:51:51
15   cases?   09:51:53
16  A.  It is largely true. I do have contact with   09:51:53
17   other counsel outside of Hagens Berman, but   09:51:58
18   for the most part it's been the counsel for   09:52:01
19   Hagens Berman.   09:52:04
20  Q.  Have you ever worked in a litigation support   09:52:05
21   capacity in any case in which Hagens Berman   09:52:07
22   was not counsel?   09:52:11
23  A.  I was once asked actually a long time ago,   09:52:13
24   maybe five years ago, five years ago it   09:52:18
25   would be, to work on a malpractice case   09:52:21

## 45

1   related to physician compensation. It   09:52:24
2   didn't go anywhere. The judge threw out the   09:52:28
3   issue related to physician compensation, so   09:52:32
4   there was -- but this was a law firm in   09:52:34
5   Phoenix.   09:52:36
6  Q.  Was your work in that case done through   09:52:37
7   Greylock McKinnon?   09:52:39
8  A.  No. It actually wasn't. It was before I   09:52:39
9   started working to a great degree with them,   09:52:42
10   so I was contacted directly by counsel based   09:52:46
11   on, again, work that I had published.   09:52:51
12  Q.  Do you remember the name of the law firm in   09:52:53
13   Phoenix?   09:52:55
14  A.  I don't, but I can find it.   09:52:56
15  Q.  Have you ever done any work for a   09:52:57
16   pharmaceutical company before?   09:53:07
17  A.  No, I have not.   09:53:08
18  Q.  And that includes Pfizer and Warner-Lambert,   09:53:09
19   I take it?   09:53:13
20  A.  That's correct.   09:53:13
21  Q.  Has any pharmaceutical company ever provided   09:53:14
22   financial support for any of your research   09:53:17
23   or academic work?   09:53:19
24  A.  No, they have not.   09:53:20
25  Q.  Now, the declaration that you submitted in   09:53:24

12 (Pages 42 to 45)

## 46

1  this case does discuss other instances in    09:53:32
2  which you've consulted or provided testimony    09:53:35
3  related to the health care or pharmaceutical    09:53:37
4  industries?    09:53:39
5  A.  That's correct.    09:53:48
6  Q.  Are the cases that are listed here in    09:53:48
7  Paragraph 2 of Exhibit 1 -- let me withdraw    09:53:49
8  the question.    09:53:58
9      Aside from the three cases that we    09:53:58
10  discussed in the beginning of your    09:54:01
11  testimony, are any of the cases that are    09:54:03
12  listed in the footnotes of Paragraph 2 of    09:54:06
13  your declaration cases in which you have    09:54:09
14  provided testimony?    09:54:11
15  A.  Sorry, can you point me to exactly which    09:54:15
16  cases you're looking at?  The ones after the    09:54:18
17  colon, or are you -- you're in a footnote?    09:54:21
18  Q.  Probably the easiest thing to do is just to    09:54:25
19  look at the footnotes    09:54:27
20  A.  Okay.    09:54:28
21  Q.  -- footnotes 1 through 5.  And there are a    09:54:28
22  number of cases that are listed there.  The    09:54:30
23  first three are cases that we discussed and    09:54:32
24  that are listed on your CV --    09:54:35
25  A.  Uh-huh.    09:54:36

## 47

1  Q.  -- as cases in which you've provided    09:54:37
2  testimony?    09:54:39
3  A.  Right.    09:54:40
4  Q.  The cases that are listed in Footnotes 4 and    09:54:41
5  5 are not.  So my question really is, what's    09:54:43
6  the nature of the services that you provided    09:54:48
7  in those cases, and specifically did you    09:54:50
8  serve in any sort of a testifying role in    09:54:55
9  any of those cases?    09:54:58
10  A.  I was a consulting expert in those cases, so    09:54:59
11  I conducted data analysis, reviewed    09:55:02
12  reimbursement issues, that kind of thing.    09:55:06
13  Q.  Okay.  Looking back at the cases that are    09:55:08
14  listed in Footnotes 1 through 3, which are    09:55:11
15  the ones that are listed in your --    09:55:13
16  A.  Yes.    09:55:15
17  Q.  -- CV, did you provide testimony in support    09:55:15
18  of class certification in any of those    09:55:19
19  cases?    09:55:22
20  A.  In Augmentin -- now, I would have to check    09:55:22
21  this to be sure I wrote a document, but I    09:55:30
22  believe the case was settled before it was    09:55:33
23  ever filed.    09:55:37
24  Q.  So with respect to Augmentin, you would not    09:55:37
25  have submitted testimony in support of --    09:55:39

## 48

1  A.  I think there's no -- I'm afraid my memory    09:55:41
2  is terrible, but I believe the answer is no.    09:55:44
3  Q.  How about Lupron?    09:55:46
4  A.  No.    09:55:49
5  Q.  And how about the AWP case?    09:55:50
6  A.  No.  I have the two documents that I filed    09:55:52
7  there were the tutorial and a declaration in    09:55:59
8  support of liability issues.    09:56:06
9  Q.  What was the subject matter of your    09:56:09
10  tutorial?    09:56:12
11  A.  The subject matter of the tutorial was    09:56:12
12  broadly about reimbursement for    09:56:16
13  pharmaceuticals in the U.S. with a focus in    09:56:19
14  particular on injectable drugs.  And --    09:56:26
15  Q.  And the tutorial I take it just described    09:56:32
16  the business generally?    09:56:35
17  A.  The tutorial describes how Medicare paid for    09:56:38
18  drugs through Part B.  It described how the    09:56:41
19  private sector reimburses drugs, both the    09:56:48
20  injectable drugs but also orals and    09:56:54
21  competition at various levels in the    09:57:01
22  industry and the economic issues -- economic    09:57:03
23  incentives around prescribing.    09:57:06
24  Q.  And the tutorial, I take it, was directed to    09:57:08
25  the Court in that case?    09:57:13

## 49

1  A.  It was directed to the court.    09:57:15
2  Q.  And I take it that, your understanding, the    09:57:17
3  aim of the tutorial was to provide    09:57:19
4  background knowledge about the area, or was    09:57:22
5  there something more?    09:57:24
6  A.  The aim was to provide background knowledge    09:57:25
7  on the institutions, how things worked and    09:57:27
8  the economic incentives.    09:57:30
9  Q.  So it sounds like, then, that this is the    09:57:32
10  first case in which you provided testimony    09:57:42
11  in support of class certification; is that    09:57:44
12  correct?    09:57:48
13  A.  I believe that's correct.    09:57:48
14  Q.  And so I take it, then, that it is the    09:57:48
15  case -- withdrawn.    09:57:57
16      So this would be the first case in    09:58:00
17  which you have analyzed whether causation or    09:58:02
18  injury could be proved on a class-wide    09:58:04
19  basis?    09:58:06
20  A.  As the primary expert, that's correct.  As a    09:58:07
21  consultant in other matters, certainly my    09:58:14
22  work related to that.    09:58:16
23  Q.  Well, let's split that up.  When you say "as    09:58:21
24  a primary expert," what do you mean?  Do you    09:58:23
25  mean as a testifying expert?    09:58:25

13  (Pages 46 to 49)

## 50

1  A. As a testifying expert.                    09:58:27
2  Q. Okay. So this is the first time that you've   09:58:28
3     offered a report on those issues?           09:58:30
4  A. That's correct.                            09:58:31
5  Q. You had mentioned that you have provided    09:58:32
6     advice on those issues as a consultant; is  09:58:36
7     that correct?                              09:58:38
8  A. Oh, I'm sorry. There's a case I'm missing.  09:58:38
9     I'm sorry. Can I back up?                   09:58:42
10 Q. Of course.                                  09:58:45
11 A. Wellbutrin SR.                              09:58:46
12 Q. Have you provided testimony in the          09:58:55
13    Wellbutrin SR case?                         09:59:01
14 A. I have filed a report in the Wellbutrin SR  09:59:03
15    case. I'm sorry.                            09:59:07
16 Q. When did you file it?                       09:59:10
17 A. You know, I need to check the date. It      09:59:11
18    should be -- it should be in -- I guess it's 09:59:13
19    subsequent to this, so it's not in the      09:59:19
20    footnotes. Can I get you the date?          09:59:21
21 Q. Sure.                                       09:59:22
22 A. I don't know it precisely right now.        09:59:23
23 Q. Sure. Can you just ballpark it? It was      09:59:24
24    after your report in this case --           09:59:27
25 A. It was after --                             09:59:28

## 51

1  Q. -- the time after August of --              09:59:29
2  A. Yes, it was sometime --                     09:59:29
3  Q. -- 2005?                                    09:59:36
4  A. Yes, it was. And I'm sorry, I just can't    09:59:31
5     ballpark it right now, but I would be happy  09:59:35
6     to get it for you at the next break.         09:59:37
7  Q. And I take it your work in the Wellbutrin   09:59:39
8     case is work that you're doing through      09:59:42
9     Greylock McKinnon?                          09:59:44
10 A. And Hagens Berman Sobol Shapiro.            09:59:44
11 Q. Do you know where the case is pending?      09:59:47
12 A. I do not.                                   09:59:49
13    MR. POLUBINSKI: Ed, do you know?           09:59:54
14    MR. NOTARGIACOMO: Not off the top          09:59:55
15    of my head. I wasn't involved in            09:59:56
16    Wellbutrin, but...                          09:59:59
17    MR. POLUBINSKI: Fair enough.               09:59:59
18    That's the last question I'll ask you, if I 10:00:00
19    can avoid it.                               10:00:02
20 A. I will follow up with you on that. I...     10:00:04
21 Q. Okay. Can you tell me, just generally       10:00:07
22    speaking, what the subject matter of your   10:00:11
23    report in that case is?                     10:00:13
24 A. It is related to class certification in a   10:00:14
25    Hatch-Waxman case.                          10:00:21

## 52

1  Q. What's your understanding of what a Hatch-   10:00:22
2     Waxman case is?                             10:00:25
3  A. It has to do with Paragraph 4,              10:00:25
4     certification, so generic entry under a     10:00:30
5     circumstance where the generic manufacturer 10:00:32
6     claims that patent's invalid.               10:00:34
7  Q. And so in a nutshell would it be correct to 10:00:44
8     describe the Wellbutrin case as a patent    10:00:48
9     dispute?                                    10:00:52
10 A. I'm not sure. That's a legal question, I'm  10:00:53
11    afraid. I'm not sure.                       10:00:57
12 Q. Fair enough.                                10:00:59
13    MR. NOTARGIACOMO: I'm supposed to          10:00:59
14    be objecting, not you.                      10:01:00
15 Q. And can you tell me what your report related 10:01:05
16    to class certification purports to opine on? 10:01:08
17 A. In the matter of Wellbutrin?                10:01:11
18 Q. Wellbutrin, yes, thank you.                 10:01:16
19 A. Purports to opine on common impact and      10:01:18
20    issues related to whether that impact can be 10:01:24
21    estimated reasonably using aggregate data.   10:01:27
22 Q. Have you offered testimony in that case?    10:01:36
23 A. I have not. Oral testimony?                 10:01:37
24 Q. Yeah.                                       10:01:40
25 A. No, I have not.                             10:01:40

## 53

1  Q. Do you know whether the Court has ruled on  10:01:42
2     the class certification motion in that case? 10:01:45
3  A. I do not know. I do not believe so.         10:01:47
4  Q. Okay. So aside from the Wellbutrin matter,  10:01:50
5     this is the first case in which you've      10:02:04
6     analyzed whether causation or injury can be 10:02:06
7     proved on a class-wide basis for purposes of 10:02:10
8     a class certification motion?               10:02:13
9  A. That's correct.                            10:02:14
10 Q. Has any of your published work dealt with   10:02:14
11    alleged or deceptive marketing of the drug?  10:02:24
12 A. No, it has not.                             10:02:25
13 Q. Has any of your published work dealt with   10:02:28
14    alleged or deceptive marketing of any       10:02:31
15    product?                                    10:02:35
16 A. No, it has not.                             10:02:36
17 Q. Do you have any prior experience with issues 10:02:39
18    related to FDA approval of prescription     10:02:41
19    drugs?                                      10:02:44
20    MR. NOTARGIACOMO: Objection. You           10:02:44
21    can answer.                                 10:02:45
22 A. I have certainly reviewed issues as they're 10:02:45
23    relevant, as a consulting expert reviewed   10:02:50
24    new drug approval documents, that kind of   10:02:54
25    thing, but do you mean industry experience? 10:02:56

14  (Pages 50 to 53)

## 54

1  Q.  No, just any experience at all.          10:03:00
2  A.  So I've looked at new drug approval and          10:03:02
3      ANDA-abbreviated new drug approval documents      10:03:08
4      on the FDA website.          10:03:12
5  Q.  What sort of documents?  Are they          10:03:13
6      documents -- let me phrase the question more      10:03:17
7      precisely.          10:03:21
8          Are they documents that relate to          10:03:22
9      specific drugs, or are they more general          10:03:23
10     policy-related documents?          10:03:27
11 A.  Looking at letters from the FDA to the          10:03:28
12     manufacturers in the cases of specific          10:03:34
13     drugs.          10:03:37
14 Q.  Can you think of any of those specific drugs      10:03:40
15     now off the top of your head?  Can you          10:03:43
16     recall them?          10:03:45
17 A.  Well, for example, for cases like Wellbutrin    10:03:45
18     SR I've looked at the letters that go out to      10:03:48
19     the generic manufacturers in response to          10:03:54
20     their abbreviated new drug applications.          10:03:58
21 Q.  Any others that you can remember?          10:04:01
22 A.  Specifically, no.  But this is a common part      10:04:04
23     of what we look at in these cases, so I          10:04:11
24     would say for many of these cases I have          10:04:14
25     looked at those letters.          10:04:16

## 55

1  Q.  When you say "these cases," do you mean all      10:04:17
2      of your cases or Wellbutrin and some other      10:04:19
3      smaller subset of cases?          10:04:23
4  A.  The cases that involve generic entry, which      10:04:25
5      would include Hytrin, Relafen, Cipro.          10:04:31
6  Q.  Do you have any prior experience with issues      10:04:38
7      related to off-label uses of a drug?          10:04:44
8  A.  No, I do not.          10:04:47
9  Q.  Okay.  Let's turn to your work in this case.      10:05:02
10     What have you been retained to do in this      10:05:04
11     case?          10:05:05
12 A.  I have been retained to provide written and      10:05:05
13     oral testimony related to whether or not it      10:05:14
14     can be shown that off-label promotion --          10:05:18
15     that certain allegations regarding off-label      10:05:22
16     promotion caused prescribing for Neurontin,      10:05:24
17     as well as increased dosing of Neurontin,          10:05:30
18     whether there's an economic theory to          10:05:37
19     support that, whether there's an empirical      10:05:40
20     model and finally whether there's data to      10:05:44
21     estimate such an empirical model to do that.      10:05:49
22 Q.  Anything else?          10:05:52
23 A.  Essentially that's obviously in the context      10:05:53
24     of the class whether these claims can be          10:05:59
25     shown to be common and whether the class          10:06:02

## 56

1      methods or the aggregate method makes sense      10:06:07
2      to estimate their effects.          10:06:11
3  Q.  Now, what you've just said sounds like you      10:06:16
4      might have limited your description of what      10:06:18
5      you did or what you've done related to class      10:06:20
6      certification.  Is there other work that          10:06:23
7      you've been retained to do in this case?          10:06:25
8  A.  That's the work that you have in front of      10:06:26
9      you.  That's essentially it.          10:06:30
10 Q.  And other than the work that's in front of      10:06:32
11     me, and you're referring to Exhibit No. 1,      10:06:34
12     there isn't, I take it, other work that          10:06:39
13     you're doing in the case?          10:06:41
14 A.  No, there isn't.          10:06:42
15 Q.  Okay.  Referring to Exhibit 1, you wrote the      10:06:47
16     declaration, correct?          10:06:50
17 A.  That's correct.          10:06:52
18 Q.  Who assisted you in writing, if anyone?          10:06:52
19 A.  I essentially wrote it myself.  As I          10:06:55
20     mentioned in the report, I consulted in          10:06:59
21     discussions with Richard Frank.          10:07:01
22 Q.  Now, aside from your discussions with          10:07:09
23     Richard Frank, are there any other ways in      10:07:11
24     which you would consider yourself not to      10:07:14
25     have written the report?  The reason I ask      10:07:16

## 57

1      that is that you said you essentially wrote      10:07:19
2      it yourself.          10:07:21
3  A.  I wrote the report myself.          10:07:22
4  Q.  Okay.  So you actually typed it yourself?      10:07:26
5  A.  Yes, I did.          10:07:28
6  Q.  Did you work on it at home or in your          10:07:28
7      office?  I assume you didn't work on it at      10:07:33
8      Greylock McKinnon?          10:07:35
9  A.  That's correct.  I probably mostly worked on    10:07:35
10     it at home.  It's possible I did some of the    10:07:38
11     work at my Harvard office.          10:07:42
12 Q.  When did the drafting begin?          10:07:43
13 A.  I'm not sure that I can say when the          10:07:48
14     drafting began.  Probably -- if it was filed    10:07:52
15     in August, probably about no more than a          10:07:57
16     month before that.          10:08:01
17 Q.  Did you prepare an outline before you          10:08:03
18     drafted the report?          10:08:08
19 A.  No, I did not.  I don't believe I did.          10:08:08
20 Q.  When did you complete -- to the best of your      10:08:14
21     recollection, when did you complete a first      10:08:18
22     draft?          10:08:20
23 A.  I'm sorry, I really don't recall.  I believe    10:08:20
24     that it would have been very close to that      10:08:27
25     filing date.          10:08:28

15  (Pages 54 to 57)

## 58

1  Q.  And do you recall in this case ever having        10:08:29
2      printed drafts to review them?        10:08:34
3  A.  Could you please repeat the question?        10:08:37
4  Q.  Sure.  And maybe I'll break it up.  It        10:08:41
5      sounds like you typed the report yourself        10:08:44
6      presumably on your computer or your laptop        10:08:46
7      or something else; is that correct?        10:08:48
8  A.  That's correct.        10:08:50
9  Q.  Okay.  In order to review it, did you always        10:08:50
10     review it on the screen, or did you print        10:08:55
11     out copies of the report, interim drafts and        10:08:57
12     bring them home and mark them up, that sort        10:09:00
13     of thing?        10:09:01
14 A.  I believe I worked on the screen.  I usually        10:09:02
15     do.        10:09:04
16 Q.  Did you share drafts of the report with        10:09:05
17     other people on your team at all?        10:09:07
18 A.  Again, I consulted with Richard.  I may have        10:09:09
19     shown him parts of the document, asked his        10:09:12
20     opinion about them.        10:09:16
21 Q.  Would you have sent in drafts of the        10:09:16
22     document by e-mail?        10:09:18
23 A.  I may have.        10:09:19
24 Q.  Other than Richard Frank, is there anybody        10:09:25
25     else with whom you would have shared drafts?        10:09:28

## 59

1  A.  I would have shared drafts -- the staff        10:09:29
2      would have helped with the footnote, so I        10:09:33
3      would have shared a draft with Greylock        10:09:35
4      McKinnon so that they could fill in case        10:09:37
5      numbers, that sort of thing.        10:09:39
6  Q.  And so would you have e-mailed them a copy        10:09:41
7      or printed them out a copy?        10:09:42
8  A.  I would have e-mailed a copy.        10:09:44
9  Q.  Do you know if those e-mails still exist?        10:09:57
10 A.  I do not.  On my outbound end we have very        10:09:58
11     limited space, so I wouldn't have the        10:10:03
12     outbound e-mail.        10:10:05
13 Q.  So other than an e-mail that you may have        10:10:06
14     sent to Richard Frank and an e-mail that you        10:10:14
15     may have sent with a draft of the document        10:10:16
16     to Greylock McKinnon, are there others with        10:10:18
17     whom you would have shared drafts?        10:10:20
18 A.  No.        10:10:21
19 Q.  Would you have sent more than one draft to        10:10:22
20     any of these groups of people?        10:10:23
21 A.  It's possible that I would have sent an        10:10:24
22     early draft and a later draft.        10:10:27
23 Q.  Did you receive comments on the drafts of        10:10:32
24     your declaration?        10:10:36
25 A.  Yes, I did.        10:10:38

## 60

1  Q.  From whom?        10:10:38
2  A.  I certainly received comments from Richard,        10:10:39
3      and I received comments from Ray Hartman at        10:10:47
4      Greylock McKinnon.        10:10:52
5  Q.  Anyone else?        10:10:53
6  A.  I'm not certain, but I think Renee        10:10:54
7      Rushnawitz, she often provides comments as        10:10:58
8      to form.        10:11:02
9  Q.  Were they -- well, let's go through them one        10:11:07
10     at a time.  With respect to Professor        10:11:09
11     Frank's comments --        10:11:12
12 A.  Uh-huh.        10:11:13
13 Q.  -- would they have been conveyed in a        10:11:13
14     handwritten markup or orally or some other        10:11:15
15     way?        10:11:17
16 A.  Orally.        10:11:17
17 Q.  Do you remember what his comments were?        10:11:19
18 A.  I remember largely that his comments related        10:11:20
19     to where the Dorfman-Steiner theory applied,        10:11:28
20     its relevance.  That's -- I remember a lot        10:11:34
21     of our discussion was about that.        10:11:38
22 Q.  Can you tell me what the Dorfman-Steiner        10:11:49
23     theory is?        10:11:51
24 A.  It has to do with the underpinnings of        10:11:51
25     advertising and the economics of        10:11:53

## 61

1      advertising.  Why do firms advertise, and        10:11:54
2      why don't we expect that advertising is        10:11:57
3      important in particular in the        10:12:00
4      pharmaceutical industry.  Excuse me.        10:12:02
5  Q.  When you say "important," what do you mean?        10:12:05
6  A.  Why will it be substantial?  Because of the        10:12:07
7      fact that there are substantial price        10:12:15
8      margins.        10:12:18
9  Q.  When you say "substantial," do you mean        10:12:21
10     substantial in a monetary way?        10:12:24
11 A.  I do.  That it'll be a significant activity.        10:12:25
12     So just to clarify, in industries where the        10:12:30
13     goods are commodities and essentially        10:12:35
14     they're interchangeable, they're very small        10:12:38
15     profit margins on those commodities.  We        10:12:42
16     expect to find little advertising.        10:12:44
17     Pharmaceuticals, they're -- for a variety of        10:12:46
18     reasons are higher profit margins, and we        10:12:52
19     would expect to find more advertising.        10:12:54
20 Q.  And how did you respond to the comments that        10:12:55
21     you received from Professor Frank on the        10:12:58
22     subject?        10:13:00
23 A.  I think I clarified and edited that section.        10:13:00
24 Q.  Okay.  How about Dr. Hartman; were his        10:13:07
25     comments conveyed to you orally or in a        10:13:11

16 (Pages 58 to 61)

**62**

1  handwritten markup or some combination of  10:13:13
2  the two?  10:13:15
3 A.  I believe they were oral.  10:13:15
4 Q.  What were the substance of his comments?  10:13:17
5 A.  The substance of his comments largely were  10:13:22
6  about expanding some of the descriptions,  10:13:26
7  providing more examples in the empirical  10:13:29
8  section.  10:13:34
9 Q.  And the empirical section of your report, if  10:13:37
10  you can direct us to that --  10:13:42
11 A.  Yes.  Sure.  10:13:43
12 Q.  -- so I know that we're on the same page.  10:13:43
13 A.  The section -- Section 6 in particular  10:13:46
14  around Paragraph 30 --  10:13:55
15 Q.  Section -- I'm sorry.  10:13:56
16 A.  Sorry.  Section 6.  10:13:57
17  MR. NOTARGIACOMO:  Page 13.  10:13:59
18 Q.  Roman numeral VI?  10:14:00
19 A.  Roman numeral VI, yes, Page 13, but in  10:14:02
20  particular the section with the formulas  10:14:03
21  that follows.  10:14:05
22 Q.  Right.  How did you respond to his comments?  10:14:09
23 A.  I expanded the examples I used and provided  10:14:10
24  more description about how the models might  10:14:15
25  actually be implemented.  10:14:19

**63**

1 Q.  And how about Renee Rushnawitz; how were her  10:14:20
2  comments conveyed, if you remember?  10:14:28
3 A.  I think Renee may have actually provided  10:14:30
4  suggestions either on a hard copy or  10:14:33
5  redline, and, again, she generally worries  10:14:39
6  about things like appropriate footnoting and  10:14:48
7  appropriate reference to what's in the  10:14:53
8  complaint, so she would have provided some  10:14:56
9  technical, essentially editorial, comments.  10:14:58
10 Q.  Do you still have the hard copy markup that  10:15:07
11  she did, or redline, whichever the case may  10:15:09
12  be?  10:15:09
13 A.  I don't believe I do, no.  10:15:13
14 Q.  Do you know what you would have done with  10:15:14
15  it?  10:15:17
16 A.  I don't think I would have saved it. I  10:15:17
17  would have had it shredded, I guess.  10:15:19
18 Q.  Okay. Other than Professor Frank, Dr.  10:15:23
19  Hartman, and Dr. Rushnawitz, Ms.  10:15:30
20  Rushnawitz --  10:15:34
21 A.  Ms.  10:15:34
22 Q.  -- Ms. Rushnawitz, did anybody else receive  10:15:35
23  drafts of your declaration prior to its  10:15:38
24  being finalized?  10:15:40
25 A.  I'm sure I sent a draft to the lawyers.  10:15:41

**64**

1 Q.  How far in advance of the filing would you  10:15:43
2  have done that?  10:15:53
3 A.  I'm sorry, I don't know, but I don't  10:15:53
4  think -- I don't think it would have been  10:15:55
5  very long in advance. I teach during this  10:16:01
6  period in the summer, and so it's a very  10:16:03
7  tight -- would have been a very tight  10:16:07
8  timeline for me.  10:16:10
9 Q.  Sure. And how would you have sent the draft  10:16:11
10  to the lawyers?  10:16:16
11 A.  I would have sent it by e-mail.  10:16:17
12 Q.  Did you receive comments from them?  10:16:19
13 A.  I spoke with Tom Sobol.  10:16:21
14 Q.  Anybody else?  10:16:27
15 A.  That's all that I recall.  10:16:28
16 Q.  Would you have received written comments  10:16:30
17  from Mr. Sobol or oral comments?  10:16:34
18 A.  They would have been oral.  10:16:36
19 Q.  Do you recall the substance of his comments?  10:16:37
20 A.  I don't. I recall that he did not have  10:16:42
21  specific comments about the declaration. I  10:16:50
22  don't recall any direct comments. I know  10:16:57
23  that we had a conversation about it, but I  10:16:59
24  don't -- I don't recall anything specific  10:17:06
25  that he suggested or any changes that I made  10:17:07

**65**

1  subsequent to that conversation.  10:17:10
2 Q.  Do you remember whether you did make changes  10:17:12
3  subsequent to the conversation?  10:17:14
4 A.  I don't recall making changes subsequent to  10:17:16
5  the conversation, no.  10:17:19
6 Q.  Would that have been because you disagreed  10:17:24
7  with comments that he made?  10:17:25
8 A.  No, that was not what happened.  10:17:26
9 Q.  When you say you don't recall making changes  10:17:33
10  in response to your conversation with him,  10:17:36
11  is it that you don't have a recollection  10:17:38
12  way or the other as to whether you did, or  10:17:40
13  is it your best recollection that you  10:17:43
14  didn't?  10:17:45
15 A.  My best recollection is that I didn't. It  10:17:45
16  was a year ago.  10:17:47
17 Q.  Sure.  10:17:48
18 A.  I recall a conversation, and I don't believe  10:17:49
19  that there were specific recommendations.  10:17:52
20 Q.  Okay. When did you complete your  10:17:55
21  declaration?  10:18:11
22  MR. NOTARGIACOMO:  Objection. You  10:18:11
23  can answer.  10:18:12
24 A.  I'm sorry, I don't know the exact date. I  10:18:12
25  know the date it was filed, but I don't --  10:18:18

17  (Pages 62 to 65)

**66**

1  since it was a year ago, I don't know the          10:18:20
2  exact date that I completed it.                     10:18:21
3  Q.  Relative to the -- right. Relative to the       10:18:24
4  date that it was signed, which appears to be        10:18:26
5  August 8th, 2005 --                                 10:18:28
6  A.  Right.                                          10:18:31
7  Q.  -- how far in advance of that date would you    10:18:31
8  have finished your edits on the document?           10:18:33
9  A.  I'm not certain, but typically very -- it       10:18:35
10  would have been very close to the date             10:18:39
11  itself.                                            10:18:40
12  Q.  Okay. I've got one more exhibit for you.       10:18:44
13      (Exhibit No. 6, Document headed               10:18:56
14  "Rosenthal Time - 2005 Neurontin," marked          10:18:56
15  for identification.)                               10:19:13
16  Q.  So we have just handed you a document that     10:19:13
17  is marked as Rosenthal Exhibit 6. Do you           10:19:21
18  recognize this document?                           10:19:24
19  A.  I do.                                          10:19:25
20  Q.  What is it?                                     10:19:26
21  A.  It's a summary of my hours.                    10:19:27
22  Q.  Who would have prepared it?                     10:19:28
23  A.  What goes in here was prepared by me. It       10:19:30
24  was consolidated by someone else on this           10:19:35
25  page, so -- but these I recognize as the way       10:19:37

**67**

1  that I record my time.                              10:19:41
2  Q.  Do you know who would have consolidated it?     10:19:42
3  Is it someone at Greylock McKinnon?                 10:19:45
4  A.  I can't certain. I would think that it          10:19:46
5  would be someone at Greylock McKinnon.             10:19:49
6  Q.  And so you record your time in handwritten      10:19:51
7  notations and then communicate it to               10:19:54
8  somebody else to record it; is that how that       10:19:56
9  works? And if I'm -- if I've got it wrong,         10:19:59
10  you can maybe just tell me from scratch what      10:20:03
11  your process is and how this would have been      10:20:06
12  created.                                           10:20:08
13  A.  So during a month I record either on my        10:20:09
14  calendar or in handwritten notes to myself        10:20:11
15  what I did, how long it took. At the end of       10:20:13
16  the month I submit hours to Greylock             10:20:16
17  McKinnon, and I submit them in a format that     10:20:20
18  looks like this for each project I worked        10:20:22
19  on. So there will be a monthly invoice with     10:20:25
20  a series of projects, whatever I worked on.      10:20:27
21  And so this is obviously the Neurontin           10:20:30
22  sections of those monthly invoices pulled        10:20:32
23  together.                                         10:20:35
24  Q.  So do you invoice Greylock McKinnon? Do you   10:20:35
25  send them a formal bill?                          10:20:39

**68**

1  A.  I send them a recording of my hours. I         10:20:40
2  don't know if that's a formal bill.               10:20:42
3  Q.  And do you do it by e-mail or by -- you        10:20:43
4  know, in some other document?                     10:20:46
5  A.  Yes, that's right. I send it by e-mail.       10:20:47
6  Q.  Is it correct that Rosenthal Exhibit 6        10:20:57
7  represents the total number of hours that        10:21:00
8  you would have spent in 2005 on this             10:21:02
9  engagement?                                        10:21:04
10  A.  That's correct.                               10:21:05
11  Q.  And I won't ask you to do the math, but if I  10:21:09
12  were to add these numbers up and come up         10:21:15
13  with a number that in the aggregate is just      10:21:18
14  shy of 70 hours, would that be a correct         10:21:21
15  cumulation of the total number of hours that     10:21:25
16  you've spent on the engagement in 2005?          10:21:27
17  A.  Assuming your math is correct, that number    10:21:30
18  looks approximately right.                        10:21:32
19  Q.  It's a very shaky assumption, but it's one    10:21:35
20  that I think we can verify later, if             10:21:37
21  necessary. And let's take a look at the          10:21:38
22  block of time for August. You'll see there       10:21:44
23  that for August 7 you've got four and a half     10:21:50
24  hours spent revising MR declaration.             10:21:53
25  A.  Uh-huh, that's correct.                       10:21:58

**69**

1  Q.  I'm assuming "MR declaration" is your          10:21:58
2  declaration in this case, Exhibit 1; is that      10:22:01
3  correct?                                           10:22:04
4  A.  That's correct.                               10:22:04
5  Q.  And so it would be safe to say, based on       10:22:04
6  this document, that you were revising your       10:22:06
7  declaration up until the day before it was       10:22:09
8  filed?                                             10:22:11
9  A.  That's correct.                               10:22:11
10     MR. POLUBINSKI:  Now, we've been             10:22:17
11  going about an hour and ten minutes. I'm        10:22:17
12  happy to keep going if you would like or        10:22:19
13  take a break, whatever you pleasure.            10:22:21
14     MR. NOTARGIACOMO:  Let's take a              10:22:22
15  break.                                           10:22:24
16     THE WITNESS:  That would be great.           10:22:24
17  Thank you.                                        10:22:26
18     THE VIDEOGRAPHER:  The time is               10:22:27
19  10:22. This is the end of Tape 1, and we        10:22:29
20  are off the record.                              10:22:31
21     (Recess taken.)                              10:22:35
22     (Exhibit No. 7, Document headed              10:22:35
23  "Greylock McKinnon Associates Listing,"         10:22:35
24  dated 1/20/2006, marked for identification.)    10:42:42
25     THE VIDEOGRAPHER:  The time is               10:42:42

**70**

```
1     10:42.  This is the beginning of Tape No. 2,   10:42:43
2    and we are back on the record.              10:42:45
3   BY MR. POLUBINSKI:                          10:42:47
4  Q.  All right.  Let's start by handing you,  10:42:47
5    Professor Rosenthal, a document marked as    10:42:52
6    Rosenthal Exhibit 7.  We previously showed   10:42:54
7    you the Greylock McKinnon invoices that we   10:43:01
8    received, which included your own invoices.  10:43:03
9    And what this is is another document that we  10:43:04
10    received from plaintiffs' counsel back last   10:43:06
11    winter, also apparently reflecting Greylock   10:43:09
12    McKinnon time records.  Have you seen this    10:43:14
13    before?                                      10:43:17
14 A.  I haven't, no.                             10:43:17
15 Q.  If you would turn to the page that we've   10:43:19
16    marked as GMA86.                            10:43:21
17 A.  Yes.  Oh, sorry, 86.                       10:43:28
18 Q.  Yeah.                                      10:43:30
19 A.  Yeah.                                      10:43:30
20 Q.  You'll see that it does contain some time  10:43:31
21    for you; is that correct?                   10:43:33
22 A.  I see that, yes.                           10:43:35
23 Q.  This doesn't appear to be all the time that 10:43:41
24    you've spent on this engagement, correct?   10:43:44
25 A.  I don't believe so, looking at it, since we 10:43:46
```

**71**

```
1    looked at that other document.  It had other  10:43:49
2    time, right?                                  10:43:53
3  Q.  Sure.  But the time that does appear on Page 10:43:53
4    86 does appear to be correct, as far as it    10:44:00
5    goes at least?                                10:44:03
6  A.  As far as it goes.  I would have to check my 10:44:03
7    records.                                      10:44:05
8  Q.  Fair enough.  But you don't have any reason  10:44:05
9    to think that it wouldn't be correct, I       10:44:08
10    assume?                                       10:44:11
11 A.  No, I don't have any reason to think that.   10:44:11
12 Q.  The first one is Charles King?              10:44:14
13 A.  Okay.                                        10:44:16
14 Q.  Do you know Charles King?                    10:44:17
15 A.  I do.                                         10:44:18
16 Q.  What is his -- withdrawn.                     10:44:19
17    Does he work for Greylock McKinnon?           10:44:21
18 A.  Yes, he does.  And I don't know technically  10:44:22
19    what his position is, but he works there      10:44:26
20    more or less full time, I think.              10:44:30
21 Q.  Did he work with you on your declaration in  10:44:32
22    this case?                                    10:44:34
23 A.  Again, this was a year ago.  I'm certain     10:44:35
24    that we would have spoken.  In particular,    10:44:38
25    we talked about marketing documents and       10:44:44
```

**72**

```
1    about what kinds of things to look for.  Dr.  10:44:48
2    King, Professor King, is formerly a           10:44:54
3    marketing professor at Harvard Business       10:44:56
4    School and so he has expertise in marketing   10:45:00
5    strategy.                                     10:45:03
6  Q.  Do you remember any specific conversations  10:45:05
7    that you had with him?                        10:45:07
8  A.  I don't, although I do -- again, I believe  10:45:08
9    it was with regard to what kinds of           10:45:15
10    documents we should request and look for in   10:45:18
11    the materials that we had access to.          10:45:22
12 Q.  Do you remember what the substance of those  10:45:27
13    conversations were, what he has to say about  10:45:30
14    documents?                                    10:45:33
15 A.  He named some specific terms for documents.  10:45:34
16    One that I remember is called a SWOT,         10:45:40
17    capital S, capital W, capital O, capital T,   10:45:44
18    strengths, weaknesses, opportunities and      10:45:48
19    threats, a kind of analysis that's standard   10:45:51
20    in marketing.  And so he had expertise in,    10:45:53
21    again, sort of how to describe the kinds of   10:45:59
22    marketing documents that would be useful.     10:46:04
23 Q.  Would these be documents that the defendants 10:46:05
24    would have, documents that some of the        10:46:11
25    plaintiffs might have, or something else?     10:46:12
```

**73**

```
1  A.  These were documents that the defendants     10:46:14
2    might have.                                   10:46:16
3  Q.  Would you have taken any notes of your       10:46:22
4    conversation with Mr. King, Dr. King,         10:46:24
5    Professor King?                               10:46:26
6  A.  I don't believe so.                          10:46:27
7  Q.  All right.  I'm going to need to ask you to  10:46:36
8    look at Page 77 to tell me how to pronounce   10:46:38
9    the name of this person whose name appears    10:46:41
10    here.                                         10:46:43
11 A.  Augusteijn.                                   10:46:55
12 Q.  Augusteijn.  Do you know who M. Augusteijn   10:46:56
13    is?                                           10:47:00
14 A.  I do.  Michael is a senior staff person at   10:47:00
15    Greylock McKinnon.                            10:47:04
16 Q.  Did he work on your report?                  10:47:08
17 A.  He, like the other staff, would have         10:47:10
18    provided support for the report doing         10:47:13
19    background work.                              10:47:18
20 Q.  Do you have a sense for what background work  10:47:23
21    he would have been doing?                     10:47:26
22 A.  I believe that he would have been looking at 10:47:27
23    some of the documents that were made          10:47:29
24    available to us, but I can't say for sure.    10:47:30
25 Q.  I would like to direct your attention on     10:47:34
```

19 (Pages 70 to 73)

74

```
1    Pages -- Page 77 to the entries for August.    10:47:35
2    1st, 2nd, 3rd, 4th, 5th and 8th. The    10:47:41
3    description under these time entries reads    10:47:50
4    "Hartman and Rosenthal affidavits."    10:47:53
5  A.  I see that.    10:47:56
6  Q.  Would you have been aware that Mr.    10:48:00
7    Augustejin was spending somewhere in the    10:48:01
8    range of 30, 35 hours in that first week of    10:48:03
9    August on your report and Dr. Hartman's?    10:48:06
10 A.  I wouldn't have been aware of what his time    10:48:12
11   was since he works in a separate office. I    10:48:15
12   would have been aware that he was helping to    10:48:18
13   support my report.    10:48:19
14 Q.  You don't have -- do you have any sense    10:48:22
15   specifically for what he might have been    10:48:24
16   doing in those days?    10:48:26
17 A.  I can't say precisely. Often one of the    10:48:28
18   things they do is essentially check every    10:48:33
19   statement, check every footnote to make sure    10:48:36
20   that it can be backed up.    10:48:39
21 Q.  Did you ever receive comments directly from    10:48:42
22   Mr. Augustejin on your declaration?    10:48:46
23 A.  You know, I can't be certain. It is    10:48:48
24   possible -- again, I might have sent a    10:48:52
25   document, for example, that was missing a    10:48:55
```

75

```
1    complete footnote, and he would be filling    10:48:58
2    in the complete footnote, that kind of    10:49:01
3    thing. That might have happened in a    10:49:04
4    redlined document. It would have been    10:49:05
5    purely of that kind of editorial nature.    10:49:09
6  Q.  When you say a redlined document, tell me    10:49:11
7    what you mean. Would he have sent back a    10:49:16
8    version of the document redlined to reflect    10:49:18
9    changes that me might have made in a    10:49:21
10 A.  That's correct. Again, pursuant    10:49:24
11   specifically to my instructions, "I need the    10:49:26
12   correct volume number for this," for    10:49:29
13   example.    10:49:31
14 Q.  How would you have communicated your    10:49:34
15   instructions to him? Would you have sent    10:49:35
16   him an e-mail with the instructions    10:49:36
17   attaching the document?    10:49:39
18 A.  I believe so.    10:49:40
19 Q.  Would you still have a copy of any e-mail    10:49:40
20   that you would have sent like that?    10:49:46
21 A.  I would not. Again, we have very limited    10:49:47
22   space that we're allocated through the    10:49:53
23   e-mail that I use through Harvard, and so my    10:49:56
24   sent mail is only about a month old, maybe    10:50:01
25   less.    10:50:04
```

76

```
1  Q.  And so you would have -- well, I guess just    10:50:05
2    to back up, with respect to all of the    10:50:08
3    various e-mails, the sending of drafts by    10:50:13
4    e-mail that we've discussed over the course    10:50:15
5    of the past hour or so, less than that    10:50:17
6    really, all of that e-mail would have been    10:50:19
7    sent by you and to you at your Harvard    10:50:23
8    e-mail address?    10:50:27
9  A.  That's correct.    10:50:27
10 Q.  Do you have a personal e-mail address, too?    10:50:28
11 A.  I don't use another e-mail address.    10:50:30
12 Q.  Okay. All right. The next name is Andrew    10:50:33
13   Bechtel?    10:50:39
14 A.  B-E-C-H-T-E-L.    10:50:43
15 Q.  Thank you. Do you know Mr. Bechtel?    10:50:46
16 A.  Yes. He's another staff person at Greylock    10:50:49
17   McKinnon.    10:50:51
18 Q.  Did he work with you on your declaration?    10:50:53
19 A.  Yes, I believe he did.    10:50:55
20 Q.  Do you know what he did?    10:50:56
21 A.  The same kind of thing that Michael would    10:50:57
22   have done.    10:51:00
23 Q.  So would you have sent drafts of your    10:51:00
24   declaration to Mr. Bechtel as well with    10:51:09
25   instructions to fill in parts of it or to    10:51:11
```

77

```
1    make specific changes?    10:51:14
2  A.  More likely, Michael would have delegated    10:51:15
3    some work to him. Michael is senior to him.    10:51:17
4  Q.  And I would like you to turn to Page 79.    10:51:22
5    You may already be there.    10:51:29
6  A.  Yes, I am.    10:51:32
7  Q.  And I would like to direct your attention to    10:51:32
8    the time entries on that page for August    10:51:34
9    4th, 5th, 7th and 8th. The description for    10:51:38
10   each of those entries reads "Neurontin    10:51:44
11   reports and backup," correct?    10:51:48
12 A.  That's correct.    10:51:50
13 Q.  Do you know what Mr. Bechtel would have been    10:51:50
14   doing during those days?    10:51:55
15 A.  Well, he would have been working on backup    10:51:57
16   for my report, as well as Dr. Hartman's; you    10:52:04
17   know, Dr. Hartman had a report filed at the    10:52:06
18   same time. And, again, they try to verify    10:52:09
19   every claim, every statement with some    10:52:13
20   documentation, the appropriate footnote, and    10:52:16
21   gather those documents to make sure that    10:52:19
22   everything can be backed up.    10:52:28
23 Q.  So Neurontin reports would have been your    10:52:28
24   declaration and Dr. Hartman's declaration --    10:52:32
25 A.  That's --    10:52:32
```

20  (Pages 74 to 77)

78

```
 1  Q.  -- presumably?                      10:52:34
 2  A.  That's my understanding, yes.       10:52:35
 3  Q.  What about "backup"; do you know what he's    10:52:37
 4      referring to there?                 10:52:38
 5  A.  Yes. So, for example, when I cite an    10:52:39
 6      academic article, that backup is the article    10:52:42
 7      itself.                            10:52:48
 8  Q.  Are there other examples aside from    10:52:52
 9      assembling academic articles that you cite?    10:52:57
10  A.  There may have been documents from the    10:52:58
11      Franklin materials.                10:52:59
12  Q.  If you look at the entry that's dated August    10:53:02
13      10th, 2005, do you see the description is    10:53:06
14      "Neurontin backup binder"?         10:53:10
15  A.  (No verbal response.)              10:53:12
16  Q.  Do you know what "Neurontin backup binder"    10:53:14
17      means?                          10:53:18
18  A.  It's an assemblage of those academic    10:53:18
19      articles and discovery documents that are    10:53:22
20      cited specifically in the report.    10:53:24
21  Q.  Do you have a copy of the Neurontin backup    10:53:28
22      binder?                          10:53:30
23  A.  With me right now?                 10:53:31
24  Q.  No, just --                        10:53:32
25  A.  Yes.                             10:53:33
```

79

```
 1  Q.  -- do you have one in your --       10:53:33
 2  A.  I do.                            10:53:36
 3  Q.  -- possession?                     10:53:36
 4  A.  I do.                            10:53:37
 5  Q.  Have you taken notes on it, written on the    10:53:38
 6      documents at all?                  10:53:40
 7  A.  I don't think so.                  10:53:41
 8  Q.  All right. Next name is -- let's look at    10:53:41
 9      Page 81. You can help me with this    10:53:54
10      pronunciation as well, O. B-I-Z-A-N?    10:53:56
11  A.  Yeah, I don't actually know how to pronounce    10:54:01
12      it, but his last name is B-I-Z-A-N, first    10:54:04
13      name Oded, O-D-E-D. It's Israeli, I    10:54:06
14      believe.                         10:54:13
15  Q.  So do you know Mr. Bizan?           10:54:13
16  A.  He was a -- he was another Ph.D. at Greylock    10:54:16
17      McKinnon at the time. He's no longer there.    10:54:23
18  Q.  Did he work with you on your declaration?    10:54:26
19  A.  He did not work on my declaration, that I    10:54:28
20      know of. He may have done some supporting    10:54:33
21      work that related to it.           10:54:35
22  Q.  Let's look at GMA Page 81, and in particular    10:54:39
23      the two entries on August 1st and August    10:54:44
24      2nd. The dec -- or the description reads,    10:54:47
25      "Compile cites for MR report"?       10:54:50
```

80

```
 1  A.  Uh-huh.                          10:54:53
 2  Q.  MR report, I take it --             10:54:53
 3  A.  Would be my --                    10:54:55
 4  Q.  -- would be your report?            10:54:55
 5      Do you have a sense for what Mr. Bizan    10:54:58
 6      was doing on August 1st and August 2nd?    10:55:01
 7  A.  I don't. It was a while ago, and I was not    10:55:04
 8      directly overseeing him.           10:55:07
 9  Q.  Would you have received comments from Mr.    10:55:13
10      Bizan at all?                     10:55:15
11  A.  I don't believe so.                10:55:15
12  Q.  And just to circle back to Mr. Bechtel,    10:55:19
13      would you have received comments directly    10:55:22
14      from him?                        10:55:25
15  A.  I don't believe so. Again, he may have    10:55:26
16      filled in specific references that I    10:55:29
17      indicated needed to be filled in. If you    10:55:31
18      consider that to be a comment, then it's    10:55:33
19      certainly possible.                10:55:35
20  Q.  And going back yet again to Mr. Augustejin,    10:55:43
21      you mentioned that he did similar work like    10:55:46
22      the work that you had described filling in    10:55:47
23      references and things like that. Would he    10:55:49
24      have given you any more substantive comments    10:55:51
25      than that?                       10:55:53
```

81

```
 1  A.  No, I don't think so.              10:55:54
 2  Q.  Okay. The next name is Professor Frank.    10:55:57
 3      And we've discussed a little bit the work    10:56:04
 4      that he's done with you in this matter, and    10:56:06
 5      we've also discussed that he would have    10:56:11
 6      reviewed a draft of your report at some    10:56:12
 7      point. If we could take a look at the page    10:56:14
 8      that's been marked GMA82. There are two    10:56:17
 9      time entries here for Professor Frank,    10:56:25
10      correct?                         10:56:27
11  A.  Uh-huh. Yes.                     10:56:28
12  Q.  This, I assume, is the same Professor Frank    10:56:28
13      that we've been talking about in this    10:56:32
14      deposition?                      10:56:34
15  A.  Yes, it is.                      10:56:34
16  Q.  Would you think that -- well, withdraw that.    10:56:46
17      The two time entries are dated June    10:56:48
18      1st, 2005 and July 1st, 2005. The    10:56:50
19      descriptions in both of them are    10:56:54
20      "Discussions with counsel, case team," and    10:56:56
21      the total amount of time between those two    10:56:58
22      entries is five hours?             10:57:00
23  A.  I see that, yes.                  10:57:13
24  Q.  Would you think that these two time entries    10:57:05
25      reflect all the time that Professor Frank    10:57:08
```

21 (Pages 78 to 81)

82

1  consulted with you on this matter?        10:57:10
2  A.  We may have had conversations subsequently    10:57:14
3     that he did not bill. To be honest, I am    10:57:16
4     not certain.        10:57:20
5  Q.  But five hours of consultation would be    10:57:24
6     within the realm of what you would have    10:57:27
7     expected that he would have spent on that,    10:57:29
8     on the engagement with you?        10:57:31
9  A.  I think that sounds reasonable, yes.    10:57:32
10  Q.  Why did you consult with Professor Frank?    10:57:42
11  A.  Professor Frank has significant experience    10:57:45
12     in looking at pharmaceutical promotion, in    10:57:49
13     particular, and its effects. As you may    10:57:53
14     know, he has a very long CV and some    10:58:03
15     important papers in the literature related    10:58:05
16     to pharmaceutical promotion.        10:58:08
17  Q.  Did you rely on his advice for any of your    10:58:13
18     work or any of his conclusions?        10:58:15
19  A.  No. The conclusions are my own. The work    10:58:17
20     is my own. We discussed it, again, as I    10:58:18
21     mentioned earlier, here, in particular, the    10:58:22
22     theoretical underpinnings.        10:58:24
23  Q.  Are there any particular parts of your    10:58:26
24     declaration that you would attribute more to    10:58:30
25     him than others?        10:58:31

84

1  A.  I may have taken some notes to jog my memory    10:59:42
2     about things to follow up on.        10:59:45
3  Q.  Do you still have them?        10:59:47
4  A.  I'm not sure.        10:59:50
5  Q.  Have you looked for them?        10:59:55
6  A.  I looked for everything that I could find    10:59:57
7     that was relevant to the case. I can't be    11:00:00
8     certain that there's not a piece of    11:00:02
9     notepaper somewhere, but I don't take    11:00:03
10     extensive notes.        11:00:05
11  Q.  You mentioned Dr. Frank, or Professor Frank,    11:00:09
12     by name in your declaration, correct --    11:00:15
13  A.  That's correct.        11:00:19
14  Q.  -- in Paragraph 5 which is on Page 3?    11:00:20
15     Why did you decide to mention him in    11:00:25
16     the declaration but none of the other    11:00:27
17     individuals at Greylock McKinnon who appear    11:00:29
18     to have spent time on your report?    11:00:31
19  A.  Dr. Frank is -- Professor Frank, to be    11:00:33
20     consistent, is an expert in this area, and,    11:00:37
21     again, our discussions were at a pretty high    11:00:40
22     level, talking about the theory here which    11:00:44
23     is particularly relevant, and so I decided    11:00:49
24     to mention him because he was an important    11:00:51
25     source of information, just like looking at    11:00:53

83

1  A.  As I mentioned before, I recall a particular    10:58:32
2     discussion about the theoretical    10:58:37
3     underpinnings and how to frame that most    10:58:41
4     usefully in the document, but the work is my    10:58:43
5     own.        10:58:47
6  Q.  How did you generally communicate with    10:58:53
7     Professor Frank on this engagement?    10:58:55
8  A.  I believe that -- as you see here, I believe    10:58:57
9     that he might have been in one of the early    10:59:01
10     face-to-face meetings, and then I spoke with    10:59:04
11     him on the phone.        10:59:07
12  Q.  Would you have sent e-mail back and forth    10:59:10
13     with him on the subject of your engagement    10:59:12
14     in this matter?        10:59:14
15  A.  It's possible.        10:59:15
16  Q.  But it sounds like you wouldn't have e-mails    10:59:18
17     still from that time period on your system?    10:59:21
18  A.  I would not.        10:59:23
19  Q.  Would you have taken notes from any of your    10:59:24
20     meetings with him?        10:59:31
21  A.  I don't believe so, no.        10:59:32
22  Q.  Would you have taken notes more generally in    10:59:35
23     any of the other meetings that you had in    10:59:36
24     this matter either with counsel or with    10:59:39
25     others at Greylock McKinnon?        10:59:41

85

1     the literature.        11:00:56
2  Q.  Was he a more important source for    11:01:04
3     information than other folks with whom you    11:01:06
4     might have consulted?        11:01:10
5  A.  I believe so. I believe he's a reference in    11:01:10
6     and of himself just like the published    11:01:13
7     literature is.        11:01:14
8  Q.  The next name is Joshua Peteet?        11:01:16
9  A.  P-E-T-E-E-T.        11:01:19
10  Q.  Thank you. Do you know Mr. Peteet?    11:01:21
11  A.  I do.        11:01:25
12  Q.  Did he work on your report?        11:01:31
13  A.  I believe he's provided support, and I know    11:01:32
14     he's provided support over the subsequent    11:01:34
15     months in preparation, for example, for this    11:01:36
16     meeting.        11:01:42
17  Q.  What sorts of support would he have provided    11:01:43
18     in the subsequent months?        11:01:45
19  A.  Again, finding additional documents, that    11:01:48
20     kind of thing.        11:01:51
21  Q.  If we could look at his time on Pages GMA84    11:02:03
22     and 85.        11:02:08
23  A.  Uh-huh.        11:02:13
24  Q.  He appears to have spent a fairly    11:02:13
25     substantial amount of time in July and into    11:02:16

22   (Pages 82 to 85)

86

```
 1    August of 2005 on "Data analysis," as it's      11:02:19
 2    described in these time records.                11:02:26
 3 A. Yes, I see that.                                11:02:29
 4 Q. Do you know what he was doing?                  11:02:31
 5 A. I am not certain the scope of what he was       11:02:31
 6    doing or what he calls "Data analysis." I       11:02:38
 7    see the concordance training there, and I       11:02:43
 8    wonder if that's about discovery documents.     11:02:45
 9    I don't understand -- I have a sort of          11:02:50
10    limited knowledge about concordance, but --     11:02:52
11 Q. You're lucky.                                   11:02:54
12 A. So I'm not sure exactly. And, again,            11:02:56
13    because Professor Hartman also had a report     11:02:59
14    here, I don't know what of his time would       11:03:00
15    have been on my work. As I mentioned, there     11:03:04
16    was some data that came to us, as I             11:03:10
17    mentioned in my declaration, from Tom           11:03:13
18    Greene's office, and we looked at those         11:03:16
19    data. So maybe that is what the issue is.       11:03:18
20 Q. Which data are you referring to?               11:03:24
21 A. National Disease and Therapeutic Index data     11:03:27
22    from IMS.                                       11:03:30
23 Q. Have you reviewed that data?                    11:03:38
24 A. I have.                                         11:03:40
25 Q. What sort of data is it?                        11:03:40
```

87

```
 1 A. It's data that looks at prescriptions of        11:03:41
 2    Neurontin by diagnosis.                         11:03:45
 3 Q. I'll ask you more about it later. Do you        11:04:01
 4    know whether it's been produced in response     11:04:03
 5    to your subpoena to the defendants?             11:04:05
 6 A. The data were in the Franklin documents, is     11:04:09
 7    my understanding.                               11:04:12
 8 Q. Okay.                                           11:04:13
 9 A. They are not data that we produced              11:04:16
10    ourselves. We reviewed something, again,        11:04:18
11    that was from the prior case.                   11:04:20
12 Q. You also testified that when Mr. Peteet         11:04:34
13    helped you prepare for "this meeting," you      11:04:39
14    meant this deposition by "this meeting,"        11:04:42
15    correct?                                        11:04:44
16 A. That's correct.                                 11:04:44
17 Q. Did he give you any new materials that you      11:04:45
18    hadn't seen before in preparation for this      11:04:47
19    deposition?                                     11:04:49
20 A. No, I don't believe he give me any new          11:04:51
21    materials. He looked back at -- helped me       11:04:53
22    search through the documents that would have    11:04:57
23    been in -- footnoted here, the Bates-           11:05:00
24    numbered documents that would have been         11:05:04
25    footnoted in my declaration.                    11:05:04
```

88

```
 1 Q. All right. And aside from the names that        11:05:13
 2    we've just talked about, in addition to the     11:05:15
 3    names that we discussed before, folks who       11:05:17
 4    would have provided comments on your draft,     11:05:19
 5    are there any other people who would have       11:05:21
 6    worked with you on this engagement?             11:05:23
 7 A. I'm thinking back a year ago. Let me just       11:05:28
 8    think about it for a minute. As far as I        11:05:30
 9    know, this would be it. I believe that's        11:05:43
10    all.                                            11:05:45
11 Q. Let's take a look back at the document that     11:06:02
12    has been marked as Rosenthal Exhibit 4. I       11:06:05
13    think that's the right number.                  11:06:07
14 A. Okay.                                           11:06:08
15 Q. It's the bigger stack of invoices.             11:06:08
16 A. Okay. Okay.                                     11:06:11
17 Q. And if we could turn to the page that's been    11:06:16
18    marked GMA52.                                   11:06:18
19 A. Okay.                                           11:06:20
20 Q. This is one of your time entries, correct?      11:06:20
21 A. I believe it's a summary. I didn't prepare      11:06:27
22    this, so I believe it's a summary of my         11:06:30
23    time.                                           11:06:32
24 Q. The description here for this period of         11:06:32
25    time, which appears to be December of 2005,     11:06:35
```

89

```
 1    reads, "Review materials; meetings with         11:06:38
 2    counsel" -- or "meeting with counsel and        11:06:43
 3    case team."                                     11:06:45
 4    Who would have comprised the case team          11:06:53
 5    for purposes of this description?               11:06:56
 6 A. At that time I believe that it would have       11:07:02
 7    included Oded Bizan. I believe he was still     11:07:04
 8    there during that time period. That's July.     11:07:09
 9    As well as Professor Hartman, Professor         11:07:13
10    Frank and then the staff, whoever was           11:07:15
11    available. I can't be certain who would         11:07:21
12    have been at the meeting, but it might have     11:07:22
13    included either Mr. Augustejin or Mr.           11:07:24
14    Bechtel.                                        11:07:27
15 Q. The beginning of your answer you said "at       11:07:30
16    that time." Has the case team changed over      11:07:32
17    time?                                           11:07:36
18 A. Again, Mr. -- Dr. Bizan is no longer at         11:07:36
19    Greylock McKinnon, and I believe he was in      11:07:42
20    on the -- some of those early meetings, as      11:07:44
21    certainly his time suggests. That's the         11:07:47
22    only real difference. You know, we haven't      11:07:50
23    met actively on this case in a while, as you    11:07:55
24    can see.                                        11:07:59
25 Q. So I asked you before about the specific        11:08:14
```

23 (Pages 86 to 89)

**90**

1  prep binder that Greylock McKinnon prepared    11:08:17
2  in connection with your declaration.    11:08:21
3      MR. NOTARGIACOMO:  Objection.  I    11:08:23
4  don't -- I think you're mischaracterizing    11:08:25
5  her previous testimony.    11:08:28
6  Q.  All right.  Do you recall testifying --    11:08:29
7      MR. NOTARGIACOMO:  You can answer    11:08:30
8  the question.    11:08:31
9  Q.  -- about a prep binder?    11:08:32
10 A.  A binder with backup materials --    11:08:34
11 Q.  A backup binder, thank you.    11:08:35
12 A.  -- that linked to --    11:08:35
13 Q.  I was mischaracterizing.    11:08:39
14 A.  -- my declaration.    11:08:39
15 Q.  My apologies.  It wasn't intentional.    11:08:40
16     Aside from the materials in the backup    11:08:43
17 binder, do you have a collection of case    11:08:45
18 materials?    11:08:46
19 A.  I think the backup binder constitutes    11:08:48
20 everything that I have other than my    11:08:52
21 declarations.    11:08:55
22 Q.  Would you have had copies of the documents    11:08:58
23 that are cited in your declaration prior to    11:09:00
24 their being assembled in the backup binder?    11:09:04
25 A.  I certainly saw copies of all those    11:09:06

**91**

1  documents as I was preparing my declaration.    11:09:08
2  Whether I had other hard copies around my    11:09:12
3  office, I can't say.    11:09:15
4  Q.  In what context would you have seen those    11:09:17
5  documents?    11:09:19
6  A.  I would have reviewed them as relevant to    11:09:20
7  the particular issues that I was looking at.    11:09:24
8  Q.  Would you have reviewed them at Greylock    11:09:26
9  McKinnon's offices or in your office?    11:09:29
10 A.  It's likely that I would have reviewed them    11:09:30
11 at Greylock McKinnon's offices.    11:09:32
12 Q.  Would you have taken notes of those    11:09:33
13 documents?    11:09:36
14 A.  Do you mean physically on the documents    11:09:36
15 themselves?    11:09:38
16 Q.  Either physically on the documents    11:09:40
17 themselves or notes just to remind you of    11:09:42
18 what you saw for when you prepared your    11:09:45
19 declaration.    11:09:49
20 A.  I don't believe so.  I don't believe that I    11:09:49
21 took notes on those documents, no.    11:09:52
22 Q.  I think we can set these to one side for    11:09:56
23 now.  Have you communicated in any way with    11:10:02
24 either of the named individual plaintiffs in    11:10:06
25 this case?    11:10:08

**92**

1  A.  No, I have not.    11:10:08
2  Q.  Have you communicated at all with their    11:10:09
3  doctors?    11:10:12
4  A.  No, I have not.    11:10:13
5  Q.  Have you communicated in any way with any    11:10:14
6  representatives of the named third-party    11:10:19
7  payer plaintiffs in this case?    11:10:22
8  A.  When you say "representatives," do you mean    11:10:24
9  other than counsel?    11:10:26
10 Q.  Yes, for now.  Yes.    11:10:27
11 A.  No, I have not.    11:10:31
12 Q.  You have obviously communicated with counsel    11:10:32
13 for plaintiffs generally in this case?    11:10:34
14 A.  Yes, I have.    11:10:36
15 Q.  Have you reviewed any documents that relate    11:10:36
16 specifically to either of the named    11:10:42
17 individual plaintiffs or their doctors?    11:10:44
18 A.  No, I have not.    11:10:45
19 Q.  So, for example, you wouldn't have seen    11:10:47
20 medical records for any of those -- for    11:10:49
21 either of the named individual plaintiffs?    11:10:52
22 A.  No, I have not.    11:10:54
23 Q.  Have you reviewed any documents that have    11:10:55
24 been provided to you by the third-party    11:11:00
25 payer plaintiffs?    11:11:03

**93**

1  A.  I do not believe I have reviewed any    11:11:04
2  documents provided by the third-party payer    11:11:09
3  plaintiffs.  I'm sorry, it's just been a    11:11:12
4  little while since the detail work for this,    11:11:14
5  but I believe the answer is no.    11:11:17
6  Q.  Have you reviewed any transcripts of    11:11:20
7  testimony or depositions by any of the named    11:11:21
8  individual plaintiffs or their doctors?    11:11:24
9  A.  No, I have not.    11:11:25
10 Q.  How about for any of the named third-party    11:11:28
11 payer plaintiffs' representatives?    11:11:34
12 A.  No, I have not.    11:11:37
13 Q.  Now, in connection with your work in this    11:11:38
14 case, have you communicated with any class    11:11:42
15 members, as you understand them to be    11:11:46
16 defined for purposes of your report?    11:11:48
17 A.  No, I have not.    11:11:49
18 Q.  All right.  This isn't the first time that    11:11:50
19 your deposition had been scheduled in this    11:11:57
20 case, correct?    11:11:59
21 A.  That's correct.  I believe it was scheduled    11:12:00
22 for January.    11:12:01
23 Q.  What's your understanding for why the    11:12:03
24 deposition didn't go forward then as    11:12:05
25 scheduled?    11:12:07

**VERITEXT NEW YORK REPORTING COMPANY**

212-267-6868                                            516-608-2400