94

```
 1  A.  My understanding is that there was a legal      11:12:07
 2      issue that needed to be resolved before the     11:12:10
 3      case could go forward.               11:12:13
 4  Q.  Do you have any understanding as to what the    11:12:13
 5      legal issue is or was?               11:12:15
 6  A.  I do not.                           11:12:16
 7  Q.  Are you familiar with a report and             11:12:18
 8      recommendation that the magistrate judge in     11:12:26
 9      this case would have issued relating to the     11:12:28
10      defendants' motion to dismiss the              11:12:30
11      complaints?                          11:12:33
12  A.  I am familiar with it. I don't understand       11:12:34
13      the legal issues, though.             11:12:36
14  Q.  Have you reviewed that report and              11:12:37
15      recommendation?                      11:12:40
16  A.  Not in detail. I believe I may have seen        11:12:40
17      it.                                 11:12:44
18  Q.  Have you had discussions with plaintiffs'       11:12:49
19      counsel about it?                    11:12:52
20  A.  We have discussed the issue generally.         11:12:52
21      Again, I have such limited understanding I     11:12:55
22      couldn't relate to you what the issue was,     11:12:57
23      though.                             11:12:59
24  Q.  When would you have discussed it with them?     11:12:59
25  A.  I would have discussed it with them when I      11:13:01
```

95

```
 1      learned that the deposition was not to be in    11:13:03
 2      January and perhaps again when the             11:13:07
 3      deposition was scheduled -- rescheduled.        11:13:11
 4  Q.  With whom would you have discussed it?         11:13:13
 5  A.  I believe it would have been Mr.               11:13:16
 6      Notargiacomo.                        11:13:18
 7  Q.  Do you remember anything about the substance    11:13:19
 8      of those conversations? Were they related      11:13:21
 9      to scheduling, or were they related to the     11:13:24
10      substance of the decision?            11:13:25
11  A.  I believe most of the discussion was related    11:13:29
12      to scheduling.                       11:13:31
13  Q.  You said "most of the discussion." Was any     11:13:35
14      part of the discussion related to something    11:13:38
15      other than scheduling?                11:13:40
16  A.  Mr. Notargiacomo might have said something      11:13:42
17      about the decision that you referenced.        11:13:47
18  Q.  But it sounds like you don't recall            11:13:49
19      precisely what he said?               11:13:51
20  A.  No, I don't.                         11:13:53
21          MR. NOTARGIACOMO: But it was          11:13:53
22      brilliant.                          11:13:54
23  A.  It was brilliant, and it went over my head.    11:13:55
24  Q.  I have no doubt. I have no doubt that it        11:13:58
25      was brilliant. I won't assume that it went     11:14:00
```

96

```
 1      over your head or not.                11:14:03
 2          Have you had discussions with Dr.     11:14:04
 3      Hartman about the magistrate judge's report    11:14:06
 4      and recommendation?                   11:14:08
 5  A.  I have not.                          11:14:09
 6  Q.  Now, since that time are you aware that         11:14:10
 7      Judge Saris ruled on objections to the         11:14:17
 8      report and recommendation?            11:14:20
 9  A.  I don't believe that I have knowledge of        11:14:23
10      this, no.                            11:14:24
11  Q.  Okay. Are you aware that plaintiffs have       11:14:24
12      filed a new complaint in this action?          11:14:29
13  A.  Yes, I have seen a new amended complaint.       11:14:31
14  Q.  And so have you reviewed the new amended        11:14:35
15      complaint?                           11:14:37
16  A.  I have.                             11:14:38
17  Q.  The new amended complaint is obviously not      11:14:38
18      on the list of documents that you considered   11:14:47
19      that's attached as attachments to your         11:14:49
20      report in Exhibit 1. I would assume that it    11:14:51
21      should be on an updated list if one were to     11:14:54
22      be created?                          11:14:57
23  A.  It should be, yes.                    11:14:58
24  Q.  Are there other documents that you can think    11:14:59
25      of aside from the new complaint that should    11:15:01
```

97

```
 1      be on such a list?                   11:15:04
 2  A.  I can't, but I would have to look back over     11:15:05
 3      the last week. For the most part, I            11:15:09
 4      reviewed those documents that were cited in    11:15:14
 5      my declaration. I did review the new           11:15:15
 6      complaint. I believe that would be it, but     11:15:18
 7      I would need to check for sure.            11:15:24
 8  Q.  Did you consider revising your report in        11:15:30
 9      view of the decision on the motion to          11:15:32
10      dismiss and/or the new complaint?          11:15:34
11  A.  No, I did not. To the extent that I had a      11:15:35
12      discussion with the lawyers about the          11:15:41
13      decision, I was -- it was not indicated that   11:15:43
14      I should consider revising my report in        11:15:47
15      light of that decision.               11:15:49
16  Q.  I assume that the topic wasn't raised as to    11:15:50
17      whether or not you would need to?          11:15:55
18  A.  I believe it wasn't raised.              11:15:56
19  Q.  And you didn't independently consider          11:15:59
20      whether you should or shouldn't revise your    11:16:01
21      declaration?                         11:16:04
22  A.  In my view, this was a legal matter, and I     11:16:04
23      didn't see the relevance.             11:16:09
24  Q.  I assume that you have no intention now of      11:16:18
25      submitting a revised report in connection      11:16:20
```

25  (Pages 94 to 97)

98

```
 1    with your opinions on class certification?    11:16:24
 2 A.  That's correct, I have no intention.         11:16:26
 3 Q.  Now, you were also retained to offer similar  11:16:27
 4     opinions in a case pending in Pennsylvania    11:16:37
 5     as well?                                      11:16:39
 6 A.  That's correct.                               11:16:39
 7 Q.  And will you understand if I refer to that    11:16:40
 8     case as the Clark case?                       11:16:44
 9 A.  I will if you tell me that's what it's        11:16:45
10     called.                                       11:16:48
11 Q.  Fair enough. I'll tell you that's what it's   11:16:48
12     called --                                     11:16:51
13 A.  Okay.                                         11:16:51
14 Q.  -- just to make things easier. It's easier    11:16:52
15     to say "Clark" than "Pennsylvania." In        11:16:55
16     fact, you submitted a declaration -- you      11:16:56
17     submitted your declaration in this matter as  11:16:59
18     an attachment to your declaration -- to a     11:17:01
19     declaration that you submitted in the Clark   11:17:03
20     case; is that correct?                        11:17:05
21 A.  That's correct.                               11:17:09
22 Q.  When were you first retained in the           11:17:10
23     Pennsylvania case, the Clark case?            11:17:11
24 A.  I don't know the exact date, but it would     11:17:13
25     have been not long after being retained in    11:17:16
```

99

```
 1     this matter.                                  11:17:19
 2 Q.  Would it have been before or after you        11:17:23
 3     actually submitted your declaration in this   11:17:27
 4     case?                                         11:17:29
 5 A.  I'm sorry, I don't know the answer to that    11:17:29
 6     question. I can check.                        11:17:33
 7 Q.  Let me ask it another way. Would you have     11:17:34
 8     had in mind the fact that the declaration     11:17:37
 9     that you were preparing in this case would    11:17:39
10     then later be submitted in the Clark case     11:17:40
11     while you were preparing your declaration in  11:17:42
12     this case?                                    11:17:43
13 A.  I don't believe so.                           11:17:44
14 Q.  How were you approached by counsel in the     11:17:45
15     Clark case to offer an opinion in that case?  11:17:52
16 A.  I was approached through the counsel in this  11:17:56
17     case.                                         11:17:59
18 Q.  Was that Mr. Notargiacomo?                    11:18:03
19 A.  I believe actually it was through Mr.         11:18:06
20     Greene's office.                              11:18:08
21 Q.  What did Mr. Greene say to you when he        11:18:16
22     approached you about it?                      11:18:18
23 A.  I'm not sure that the conversation -- the     11:18:19
24     original conversation was with me or with     11:18:21
25     Ms. Rushnawitz, so I don't know the exact     11:18:26
```

100

```
 1     words of the conversation. I --               11:18:29
 2 A.  That's fair. What's your best recollection    11:18:31
 3     as to what the substance of the conversation  11:18:33
 4     would have been?                              11:18:35
 5 A.  I honestly don't know. I think the issue of   11:18:35
 6     whether there would be any potential          11:18:46
 7     conflict between being on both cases may be   11:18:50
 8     what arose, but that's -- I have no           11:18:54
 9     recollection really of the substance.         11:19:00
10 Q.  Would Mr. Greene have suggested that you be   11:19:02
11     in touch with plaintiffs' counsel in the      11:19:05
12     Clark case?                                   11:19:07
13 A.  He may have. I'm not certain.                 11:19:07
14 Q.  Have you ever discussed your work in the      11:19:17
15     Clark case with counsel for plaintiffs in     11:19:18
16     this matter?                                  11:19:20
17 A.  I may have at some level.                     11:19:21
18 Q.  When you say "at some level," what do you     11:19:23
19     mean?                                         11:19:25
20 A.  They would have been aware that I was on the  11:19:25
21     case. As you may know, the only thing         11:19:27
22     that's happened in that case is sort of,      11:19:32
23     again -- I haven't been deposed in that       11:19:35
24     case, for example, but I'm sure that they     11:19:37
25     know that I'm on the case.                    11:19:42
```

101

```
 1 Q.  Would they have been aware that you would     11:19:44
 2     have attached the declaration in this matter  11:19:47
 3     as an attachment to your declaration in the   11:19:49
 4     Clark matter?                                 11:19:52
 5 A.  They would have been aware of that, yes.      11:19:53
 6 Q.  Would you have discussed that with him        11:19:54
 7     specifically?                                 11:19:56
 8 A.  I may have. Again, not with Mr.               11:19:56
 9     Notargiacomo, but maybe with Mr. Greene.      11:19:59
10 Q.  Have you discussed your work in this case     11:20:05
11     with counsel in the Clark matter?             11:20:07
12 A.  No, I have not.                               11:20:08
13 Q.  Did counsel in the Clark matter have          11:20:15
14     questions at all about your declaration as    11:20:17
15     it was submitted in this matter?              11:20:19
16 A.  They -- so obviously the declaration itself   11:20:20
17     was submitted in that matter, so they saw     11:20:25
18     the declaration. We would have spoken about   11:20:27
19     that declaration.                             11:20:29
20 Q.  Would they have seen drafts of it before it   11:20:34
21     was finalized?                                11:20:36
22 A.  No, because in Pennsylvania the declaration   11:20:37
23     had already been finalized, as you know,      11:20:44
24     before it was -- so it had been finalized in  11:20:48
25     the MDL, and then it was submitted as an      11:20:51
```

26 (Pages 98 to 101)

**VERITEXT NEW YORK REPORTING COMPANY**

212-267-6868                              516-608-2400

**102**

1    attachment in Pennsylvania. They would not   11:20:55
2    have seen drafts.   11:20:57
3  Q.  I assume you've never participated in joint   11:20:58
4    discussions with plaintiffs' counsel in   11:21:08
5    Clark and plaintiffs' counsel in this   11:21:10
6    matter?   11:21:12
7  A.  No, I have not.   11:21:12
8  Q.  Now, last November, November 2005, you   11:21:13
9    submitted a document in the Clark case that   11:21:24
10    was titled "Response to Defendants' Expert   11:21:26
11    Sara Fisher-Ellison, Declaration of Meredith   11:21:31
12    Rosenthal," correct?   11:21:34
13  A.  That's correct. I was not sure that that   11:21:38
14    had been filed.   11:21:41
15  Q.  Okay. But you did sign such a document; is   11:21:41
16    that right?   11:21:44
17  A.  I did sign such a document, yes.   11:21:44
18  Q.  And will you know what I mean if I refer to   11:21:46
19    this document as the Clark rebuttal?   11:21:49
20  A.  Yes.   11:21:51
21  Q.  Thank you. It's a little less of a   11:21:51
22    mouthful.   11:21:54
23    Why did you prepare the Clark   11:21:54
24    rebuttal?   11:21:57
25    MR. NOTARGIACOMO: I'm just going   11:21:57

**103**

1    to object to the line of questioning because   11:21:58
2    the rebuttal is not, I believe, within the   11:22:02
3    scope of the deposition notice per se, but   11:22:04
4    I'll allow her to answer the questions with   11:22:06
5    that objection on the record.   11:22:08
6  A.  By the counsel in the Clark case I received   11:22:11
7    a report submitted by Sara Fisher-Ellison,   11:22:18
8    which was a response to my declaration and   11:22:23
9    Professor Hartman's declaration. And I   11:22:29
10    responded to that response. I was asked to   11:22:34
11    prepare a written response.   11:22:38
12  Q.  Who asked you to prepare it?   11:22:41
13  A.  Counsel in Clark.   11:22:42
14  Q.  Did you communicate with counsel in this   11:22:48
15    case about your rebuttal report in the Clark   11:22:52
16    case?   11:22:53
17  A.  No, I did not.   11:22:53
18  Q.  Did you communicate with counsel in this   11:22:54
19    case about the fact that you were preparing   11:22:58
20    and signing a rebuttal in Clark in the first   11:23:00
21    instance?   11:23:04
22  A.  I don't believe so. It was last year, so I   11:23:04
23    can't remember precisely. They're aware now   11:23:09
24    of this report, but at the time I don't   11:23:11
25    believe there was any communication with   11:23:13

**104**

1    them about this.   11:23:15
2  Q.  Do you know how they're aware now of your   11:23:20
3    report?   11:23:20
4  A.  I have discussed it with Mr. Notargiacomo   11:23:22
5    subsequently.   11:23:25
6  Q.  Did you draft the rebuttal in the Clark case   11:23:30
7    in the same manner that you would have   11:23:32
8    prepared your declaration in this case that   11:23:34
9    we talked about?   11:23:36
10  A.  Yes. I drafted it.   11:23:37
11  Q.  Did you have some degree of involvement in   11:23:38
12    the preparation of your rebuttal declaration   11:23:44
13    in Clark by staff members at GMA?   11:23:46
14  A.  Staff members, again, would have supported   11:23:50
15    it to the extent that there were any   11:23:53
16    references, for example, to find literature   11:23:55
17    to search, yes, so it would have been the   11:23:59
18    same process.   11:24:00
19  Q.  Would you have communicated about your   11:24:04
20    rebuttal report with Dr. Hartman?   11:24:06
21  A.  Yes, I would have.   11:24:08
22  Q.  Would you have shared drafts with Dr.   11:24:10
23    Hartman?   11:24:11
24  A.  Yes, I'm certain I shared at least one draft   11:24:11
25    with him.   11:24:15

**105**

1  Q.  Would you have e-mailed him a draft the same   11:24:15
2    way we discussed before?   11:24:18
3  A.  Yes.   11:24:19
4  Q.  Would you have shared drafts -- excuse me,   11:24:19
5    withdrawn.   11:24:22
6    Would you have shared drafts with   11:24:22
7    others other than Dr. Hartman, drafts of the   11:24:25
8    Rosenthal rebuttal declaration in Clark?   11:24:28
9  A.  I believe that I would have shared it with   11:24:30
10    Ms. Rushnawitz and then whichever staff I   11:24:34
11    was working with at the time, which -- and,   11:24:37
12    again, there's some delegation, so...   11:24:41
13  Q.  Do you know if those drafts still exist?   11:24:43
14  A.  I don't know if those drafts still exist.   11:24:52
15    They do not on my computer.   11:24:56
16    MR. POLUBINSKI: Okay. We're going   11:25:08
17    to mark a new exhibit.   11:25:09
18    (Exhibit No. 8, Expert Declaration   11:25:10
19    of Raymond S. Hartman in Support of   11:25:10
20    Plaintiffs' Motion for Class Certification,   11:25:10
21    marked for identification.)   11:25:31
22    MR. NOTARGIACOMO: What number are   11:25:31
23    we up to?   11:25:32
24    THE WITNESS: 8.   11:25:33
25  Q.  All right. So we've handed you what is   11:25:39

27 (Pages 102 to 105)

## 106

1 marked as Rosenthal Exhibit 8, which is the    11:25:41
2 Expert Declaration of Raymond S. Hartman in    11:25:45
3 Support of Plaintiffs' Motion For Class    11:25:48
4 Certification.    11:25:50
5 A. I see that. Thank you.    11:25:52
6 Q. You are aware that Dr. Hartman submitted a    11:25:54
7 declaration in this case?    11:25:58
8 A. Yes, I am.    11:25:58
9 Q. And Dr. Hartman is the president of Greylock    11:25:59
10 McKinnon?    11:26:03
11 A. That's correct.    11:26:03
12 Q. Was it that would have engaged you as an    11:26:03
13 academic affiliate at Greylock McKinnon?    11:26:08
14 A. Yes, that's correct.    11:26:11
15 Q. Was he involved at all in your decision to    11:26:11
16 work in this matter?    11:26:14
17 A. Could you explain what you mean by    11:26:15
18 "involved"?    11:26:17
19 Q. Did he have any input into your decision to    11:26:18
20 work on this matter?    11:26:27
21 A. I don't believe so. I believe there was a    11:26:28
22 meeting again that we discussed earlier    11:26:34
23 where Mr. Sobol and Mr. Greene presented the    11:26:37
24 history of the case.    11:26:39
25 Q. Was Dr. Hartman at the meeting?    11:26:41

## 107

1 A. Dr. Hartman would have been at the meeting.    11:26:43
2 Q. Did Dr. Hartman arrange the meeting?    11:26:45
3 A. The meeting was at Greylock McKinnon. Dr.    11:26:49
4 Hartman arranged -- he did. He would have    11:26:54
5 arranged the meeting, that's right, yes.    11:26:58
6 Q. Did you speak with him about the case before    11:27:02
7 you spoke with Mr. Sobol and Mr. Greene? By    11:27:05
8 "him" I mean Dr. Hartman.    11:27:08
9 A. It's possible that we had an early    11:27:10
10 conversation about it, yes.    11:27:11
11 Q. To what extent was he involved in the    11:27:18
12 preparation of your declaration in the case?    11:27:21
13 A. To what ex -- Dr. Hartman, as we've    11:27:23
14 discussed, reviewed a draft, maybe two.    11:27:25
15 Q. Would you say that he edited your    11:27:34
16 declaration?    11:27:36
17 A. No, I would not say that.    11:27:36
18 Q. Let's look back at this document, the number    11:27:43
19 of which unfortunately I failed to write    11:27:47
20 down. I believe it's Exhibit 8.    11:27:52
21 A. Did you say 8?    11:27:57
22 Q. 8, I think.    11:27:58
23     MR. NOTARGIACOMO: That's Dr.    11:27:58
24 Rosenthal's report.    11:27:59
25 A. That's okay. I can find it.    11:27:59

## 108

1 Q. It's Rosenthal Exhibit 7 --    11:28:01
2 A. Okay.    11:28:01
3 Q. -- just so we're clear. And if we could    11:28:03
4 flip to -- well, we don't have to flip    11:28:03
5 anywhere, we can just look at the first    11:28:07
6 page --    11:28:08
7 A. Yeah.    11:28:08
8 Q. -- which is GMA75?    11:28:08
9 A. Yes, I see it.    11:28:13
10 Q. If I could direct your attention to the    11:28:14
11 entry for August 1st, 2005?    11:28:18
12 A. Yes, I see it.    11:28:22
13 Q. The description in the entry reads, "Edit    11:28:23
14 and finalize Hartman declaration; edit    11:28:28
15 Rosenthal declaration."    11:28:31
16 A. Yes, I see --    11:28:33
17 Q. Did I read that correctly?    11:28:34
18 A. Yes, you read that correctly.    11:28:35
19 Q. Now, it's not clear to me at least when he    11:28:37
20 did this, based on this document alone, but    11:28:39
21 I guess my assumption would be that it    11:28:45
22 appears to cover time from August 1st    11:28:47
23 through August 31st of 2005, that he would    11:28:50
24 have done this work in August. Does this    11:28:54
25 make sense to you?    11:28:56

## 109

1 A. That appears to be true, yes.    11:28:57
2 Q. And that just given the nature of what he's    11:28:58
3 working on and the fact that both    11:29:00
4 declarations were signed on August 8th, that    11:29:02
5 the work that he's referring to here would    11:29:05
6 have been done sometime approximately in the    11:29:07
7 first week of August?    11:29:09
8 A. That seems like a fair assumption.    11:29:10
9 Q. And the total amount of time that's    11:29:12
10 associated with this entry appears to be 24    11:29:15
11 hours?    11:29:18
12 A. That's correct.    11:29:18
13 Q. Now, one of the -- one piece of Dr.    11:29:19
14 Hartman's description here is "edit    11:29:29
15 Rosenthal declaration"?    11:29:31
16 A. I see that's the way he puts it, yes.    11:29:33
17 Q. When you say "that's the way he puts it," do    11:29:35
18 you take issue with the description?    11:29:38
19 A. Well, "edit" sounds a little more proactive.    11:29:39
20 I believe he reviewed the document, and he    11:29:42
21 puts his comments in redline.    11:29:45
22 Q. And the redline would have been sent back to    11:29:49
23 you by e-mail, I take it?    11:29:51
24 A. I believe that would be the case.    11:29:52
25 Q. Do you know if he did this once or more than    11:29:54

28 (Pages 106 to 109)

**VERITEXT NEW YORK REPORTING COMPANY**

212-267-6868                                        516-608-2400

## 110

```
 1    once?                                    11:29:56
 2 A. I don't know.  I would think only once.  11:29:56
 3 Q. Now, you mentioned before, I think, and if  11:30:08
 4    I'm mischaracterizing your testimony in any  11:30:11
 5    way, feel free to correct me, but I think   11:30:13
 6    you mentioned before that he had suggested  11:30:15
 7    that you expand descriptions or provide more  11:30:17
 8    examples in the empirical section of your   11:30:20
 9    report.                                  11:30:22
10 A. That's right.                            11:30:24
11 Q. Am I getting it right?                    11:30:25
12 A. Yes, that's correct.                     11:30:26
13 Q. Can you be any more specific about the ways  11:30:27
14    he suggested that you do those things?    11:30:29
15 A. Specifically around expressing those      11:30:31
16    equations and all the variations in how the  11:30:33
17    models might be estimated, so there's quite  11:30:39
18    a lot of description in that section, as you  11:30:41
19    see now, about the different considerations  11:30:43
20    about variables to include, about the way  11:30:46
21    that the time patterns of promotional       11:30:51
22    effects would be modeled specifically.      11:30:54
23 Q. Did he suggest additional variables to     11:30:58
24    include that may not have been mentioned in  11:31:00
25    the original draft that you had sent to him?  11:31:01
```

## 111

```
 1 A. He may have suggested examples of additional  11:31:03
 2    variables or categories.                    11:31:07
 3 Q. Aside from the suggestions that he made to   11:31:15
 4    you that we've just discussed about the      11:31:19
 5    empirical section of your report, are there  11:31:22
 6    other suggestions that he would have made in  11:31:24
 7    the context of his providing comments?       11:31:25
 8 A. I'm sure there were other places.  I can't  11:31:27
 9    remember exactly what those comments were.   11:31:29
10    I remember specifically it was around        11:31:31
11    expanding the empirical section, but I don't  11:31:34
12    know that there weren't other comments.      11:31:37
13 Q. Okay.  And just to ask you once more, the   11:31:39
14    redlined markups that he would have sent     11:31:49
15    back to you, do you still have copies of     11:31:52
16    those?                                      11:31:53
17 A. I wouldn't have copies of those.  I would   11:31:54
18    have then decided which comments to act on   11:31:58
19    and done an edited version which became the  11:32:03
20    final version.                             11:32:07
21 Q. What would you have done with the copies?   11:32:09
22    Excuse me, withdrawn.                      11:32:12
23    What would you have done with the          11:32:13
24    redline comments that he would have sent    11:32:14
25    you?                                       11:32:16
```

## 112

```
 1 A. They would essentially have been saved over.  11:32:16
 2 Q. When you say "saved over," what do you mean?  11:32:21
 3 A. Can I -- so if there's a comment, "Expand    11:32:26
 4    this here, consider discussing X, Y and Z,"  11:32:30
 5    I would have either decided not to or        11:32:35
 6    decided to expand here, and then I would     11:32:37
 7    have deleted the comment, revised, and it    11:32:39
 8    would form a new saved document.            11:32:42
 9 Q. And so you would have taken the attachment   11:32:44
10    that he sent to you, used that attachment as  11:32:47
11    your working document and then saved over    11:32:49
12    the document that was saved on your system?  11:32:52
13 A. Not necessarily.  I may have gone to the --  11:32:54
14    back to the document that was in my system.  11:32:58
15 Q. In which case what would have happened to    11:33:00
16    the attachment that he sent you?            11:33:03
17 A. It just would have been deleted with the     11:33:04
18    rest of my e-mail.                         11:33:07
19 Q. Let's look again at Rosenthal Exhibit 7,     11:33:18
20    again at Page 75, GMA/5.                    11:33:22
21 A. Uh-huh.  Yes.                              11:33:26
22 Q. That's a time entry that's immediately below  11:33:26
23    the one we just discussed, the time entry    11:33:29
24    that begins on July 1st of 2005.  The        11:33:31
25    description there reads, "Review documents;  11:33:34
```

## 113

```
 1    write damage declaration; edit Frank-        11:33:37
 2    Rosenthal white paper."                     11:33:40
 3    Did I read that correctly?                  11:33:42
 4 A. That's correct.                            11:33:43
 5 Q. Are you familiar with the Frank-Rosenthal    11:33:43
 6    white paper that's referred to in this time  11:33:53
 7    entry?                                     11:33:55
 8 A. That was an early draft of what became my    11:33:55
 9    declaration.  At the time it wasn't clear    11:33:58
10    who was going to take the lead on this work.  11:34:00
11 Q. When you say "it wasn't clear who was going   11:34:03
12    to take the lead," do you mean as between    11:34:06
13    you and Professor Frank?                    11:34:08
14 A. That's correct.                            11:34:10
15 Q. Who drafted the Frank-Rosenthal white paper  11:34:10
16    such as it is?                             11:34:12
17 A. I did.                                     11:34:13
18 Q. Would Professor Frank have provided comments  11:34:14
19    on that document?                          11:34:21
20 A. Ultimately.  When it was drafted, he was in  11:34:22
21    Europe.                                    11:34:25
22 Q. So to what extent -- was it truly a Frank-   11:34:30
23    Rosenthal white paper and not just a        11:34:33
24    Rosenthal white paper?                     11:34:35
25 A. Originally it was just a Rosenthal white     11:34:36
```

29  (Pages 110 to 113)

### 114

1    paper.    11:34:39
2  Q.  Now, again, it appears that Dr. Hartman has    11:34:40
3    indicated here that he edited the Frank-    11:34:42
4    Rosenthal white paper?    11:34:45
5  A.  Yes.    11:34:46
6  Q.  Do you know what he was doing?    11:34:50
7  A.  Again, he would have provided redline    11:34:51
8    comments.    11:34:54
9  Q.  Now, do you recall that Professor Frank was    11:34:59
10   in Europe at the time you were drafting    11:35:00
11   this -- well, withdrawn.    11:35:02
12       The drafting, I take it, for this    11:35:06
13   portion of -- or this early draft of your    11:35:08
14   report would have taken place in July or    11:35:10
15   possibly sometime before that?    11:35:12
16  A.  I believe that's right.  We could look at my    11:35:13
17    time to confirm that.    11:35:15
18  Q.  If you would like to do that, you can.    11:35:16
19  A.  Okay.    11:35:18
20       MR. NOTARGIACOMO:  4?    11:35:30
21  A.  Again, that's one that's a nice sum --    11:35:30
22  Q.  Thank you.  I've lost track.  6, Rosenthal    11:35:34
23    6?    11:35:36
24  A.  Right.  So that's -- oh, there's typos.    11:35:37
25    This should all be July, that's right.  Yes.    11:35:40

### 115

1  Q.  So the Frank-Rosenthal white paper he refers    11:35:47
2    to would presumably be the draft report that    11:35:50
3    appears on Rosenthal Exhibit 6 that you    11:35:53
4    began drafting on June 20 -- or July 27th?    11:35:55
5  A.  That's correct.    11:35:58
6  Q.  And then as you said the fact that it reads    11:35:58
7    June 27th on Rosenthal 6 is a typographical    11:36:02
8    error and that it should read July 27th?    11:36:06
9  A.  Yes, that's correct.    11:36:08
10  Q.  So it sounds like you would have sent an    11:36:09
11   initial draft of your report to Dr. Hartman    11:36:16
12   at some point in July of 2005?    11:36:20
13  A.  Yes, that's right.    11:36:22
14  Q.  And that he would have -- you would have    11:36:22
15   sent it to him by e-mail, I take it?    11:36:27
16  A.  I believe so, yes.    11:36:29
17  Q.  And he would have provided comments to you    11:36:30
18   in the same way we just discussed, in the    11:36:32
19   form of a redlined markup?    11:36:35
20  A.  That's correct.    11:36:37
21  Q.  Do you still have a copy of that redline?    11:36:37
22  A.  I don't believe I do.  I believe I submitted    11:36:39
23    everything I have.    11:36:41
24  Q.  To what extent were you involved in the    11:36:48
25    preparation of Dr. Hartman's declaration in    11:36:50

### 116

1    this case, which we've marked as Rosenthal    11:36:53
2    Exhibit 8?    11:36:55
3  A.  I would have given him comments in the same    11:36:58
4    manner that he gave me comments on my    11:37:01
5    document.    11:37:03
6  Q.  Which is to say he would have e-mailed you    11:37:05
7    copies of his draft?    11:37:07
8  A.  I believe that's how it would have happened    11:37:09
9    is by e-mail, yes.    11:37:11
10  Q.  And that you would have returned to him a    11:37:13
11    redlined markup?    11:37:16
12  A.  It's possible that we would have spoken just    11:37:18
13    by phone and we would have walked through    11:37:21
14    it. It would depend on how extensive my    11:37:23
15    comments were.    11:37:25
16  Q.  Can you remember one way or the other    11:37:25
17    whether you would have sent in redlined    11:37:27
18    markups in this case?    11:37:29
19  A.  I cannot.    11:37:30
20  Q.  Do you know how far in advance of August 8th    11:37:30
21    you would have seen a draft of his -- an    11:37:36
22    initial draft of his report?    11:37:38
23  A.  I do not.  Again, I could check my hours,    11:37:39
24    but I don't know how far in advance.    11:37:43
25  Q.  Would you like to check your hours and see    11:37:47

### 117

1    if they help you in that at all?    11:37:50
2  A.  It doesn't specifically mention that, so I    11:37:52
3    don't always provide a lot of detail in    11:37:55
4    there, so I can't tell.    11:37:56
5  Q.  Do you remember anything about the substance    11:38:01
6    of the comments that you would have provided    11:38:02
7    to Dr. Hartman on his declaration?    11:38:03
8  A.  I do not, no.  I'm sorry.    11:38:06
9  Q.  Do you remember whether he would have    11:38:10
10    accepted your comments?    11:38:14
11  A.  I do not remember that, no.    11:38:15
12  Q.  And just circling back to your Clark    11:38:21
13    rebuttal, was Dr. Hartman involved at all in    11:38:24
14    your decision to prepare the Clark rebuttal?    11:38:26
15  A.  In the decision as to whether to write a    11:38:30
16    written response?    11:38:32
17  Q.  Yes.    11:38:33
18  A.  I don't recall if he was involved in that    11:38:33
19    decision.    11:38:37
20  Q.  Would he have been involved in the    11:38:37
21    preparation of the declaration itself?    11:38:39
22  A.  Again, in that case I would have shown him a    11:38:41
23    draft.  He would have made comments.    11:38:44
24  Q.  Okay.  And you would have shown him the    11:38:46
25    draft, and you would have received comments    11:38:49

30  (Pages 114 to 117)

**VERITEXT NEW YORK REPORTING COMPANY**

212-267-6868                516-608-2400

**118**

1  in the same mechanical way that we've been    11:38:50
2  describing?    11:38:53
3  A.  Yes, that's correct.    11:38:54
4  Q.  Which is to say that you would send him a    11:38:54
5  draft by e-mail, he would send back to you a    11:38:57
6  marked-up redlined version of the draft by    11:39:00
7  e-mail?    11:39:02
8  A.  Usually that's the way it happens.    11:39:02
9  Sometimes, again, he would make oral    11:39:06
10  comments by phone.    11:39:07
11  Q.  What did you do to prepare for this    11:39:08
12  deposition?    11:39:11
13  A.  I reviewed the new complaint, as I    11:39:11
14  mentioned.  I reviewed my declaration and    11:39:15
15  the supporting documents.  I reviewed    11:39:18
16  Professor Fisher-Ellison's rebuttal and my    11:39:27
17  response.    11:39:30
18  Q.  In the Clark case, I take it?    11:39:31
19  A.  In the Clark case.    11:39:32
20  Q.  Anything else?    11:39:35
21  A.  I met with Mr. Notargiacomo.    11:39:36
22  Q.  Did you meet with anybody else?    11:39:45
23  A.  The gentleman on the phone, Mr. Goldser.    11:39:46
24  Q.  When did you first meet with them?    11:39:51
25  A.  We met last --    11:39:54

**119**

1  Q.  In the context of your preparation for this    11:39:56
2  deposition?    11:39:59
3  A.  Sorry.  We met last week.    11:39:59
4  Q.  Did you meet once or more than once?    11:40:01
5  A.  We met once.    11:40:03
6  Q.  For how long, approximately?    11:40:04
7  A.  For half a day, approximately, four hours.    11:40:06
8  Q.  Was Dr. Hartman present for that meeting?    11:40:10
9  A.  No, he was not.    11:40:15
10  Q.  Was anybody else present other than Mr.    11:40:16
11  Notargiacomo and Mr. Goldser?    11:40:20
12  A.  No.    11:40:23
13  Q.  What was the subject matter of your    11:40:23
14  discussions at the meeting?    11:40:24
15  A.  The subject matter related to what issues we    11:40:25
16  were likely to concentrate on, but    11:40:30
17  essentially that's sort of what seemed to be    11:40:36
18  the issues that defendants were likely to    11:40:39
19  fix on.    11:40:41
20  Q.  Did you prepare at all last winter for your    11:40:43
21  deposition when it was first scheduled?    11:40:46
22  A.  I would have to look at my time sheets.  I    11:40:48
23  believe it was canceled fairly far in    11:40:54
24  advance of the deposition itself, but I'm    11:40:56
25  afraid that that's too far back for me to    11:40:58

**120**

1  recall precisely.    11:41:03
2  Q.  Fair enough.  You had mentioned that you had    11:41:03
3  reviewed documents in preparation for your    11:41:06
4  deposition; is that correct?    11:41:08
5  A.  That's correct.    11:41:09
6  Q.  Who would have selected the documents that    11:41:10
7  you used to prepare?    11:41:12
8  A.  The documents that I looked at came -- for    11:41:13
9  the most part, I believe, all of them are    11:41:18
10  those documents that are cited in my    11:41:20
11  declaration, and those came -- I understand    11:41:23
12  that the GMA staff got those out of the    11:41:26
13  Franklin case, the documents in Franklin.    11:41:31
14  So I would say, you know, "Are there    11:41:34
15  promotional documents?", and they would find    11:41:37
16  documents.    11:41:41
17  Q.  Okay.  Now, what you're just describing is    11:41:41
18  how documents were selected when you    11:41:43
19  initially prepared your declaration --    11:41:45
20  A.  Right.    11:41:47
21  Q.  -- in this case; is that right?  Okay.    11:41:47
22  I'm talking more just about the    11:41:49
23  preparation, your deposition preparation    11:41:51
24  that you did.  I take it for that did you    11:41:52
25  select documents yourself, or did -- or were    11:41:54

**121**

1  they provided to you by somebody else?    11:41:57
2  A.  Again, in the last week I have asked the    11:41:59
3  staff in a couple of cases, "Can you find me    11:42:04
4  a document that has this in it?", and then    11:42:08
5  they would have looked in concordance to.    11:42:10
6  I'm not sure if those documents go outside    11:42:13
7  of my declaration.  I would have to check    11:42:15
8  the Bates numbers, but they're largely these    11:42:16
9  kinds of promotional documents that are    11:42:19
10  similar to the ones that are cited in my    11:42:21
11  declaration.  So the staff at GMA would have    11:42:23
12  produced them.    11:42:25
13  Q.  Okay.  And then aside from the new complaint    11:42:25
14  and Professor Fisher-Ellison's declaration,    11:42:31
15  are there any materials that you recall    11:42:36
16  reviewing that would not have been listed as    11:42:37
17  documents that you considered in your    11:42:41
18  declaration?    11:42:43
19  MR. NOTARGIACOMO:  I'm going to    11:42:46
20  object to the question as I don't understand    11:42:47
21  it, but if she does, she can answer it.    11:42:50
22  MR. POLUBINSKI:  Let me try it    11:42:52
23  again.    11:42:53
24  Q.  It sounds like some of the documents that    11:42:55
25  you reviewed in preparation for your    11:42:57

31 (Pages 118 to 121)

**122**

1    deposition today are documents that you    11:42:59
2    would have listed as documents you    11:43:01
3    considered when you first wrote the    11:43:03
4    declaration in the case, correct?    11:43:05
5  A.  That's correct.    11:43:06
6  Q.  There is -- you also reviewed the new    11:43:06
7    complaint in the case, correct?    11:43:11
8  A.  That's correct.    11:43:12
9  Q.  Which is not listed --    11:43:13
10 A.  That's correct.    11:43:14
11 Q.  -- in your report?    11:43:14
12    You also reviewed Professor Fisher-    11:43:16
13    Ellison's report in the Clark case which is    11:43:19
14    also not listed as a document that you've    11:43:20
15    considered in your declaration in this case,    11:43:22
16    correct?    11:43:24
17 A.  Yes, that's correct.    11:43:24
18 Q.  Other than those two documents, the new    11:43:25
19    complaint, Professor Fisher-Ellison's    11:43:29
20    report, are there any other documents that    11:43:31
21    you reviewed in your preparation for this    11:43:32
22    deposition that do not appear as documents    11:43:34
23    that you've considered in your declaration?    11:43:37
24 A.  I don't believe there's anything else.    11:43:39
25 Q.  Okay.    11:43:41

**123**

1      MR. POLUBINSKI: Let's mark the    11:43:54
2    next exhibit.    11:43:55
3      (Exhibit No. 9, Notice of    11:43:55
4    Deposition, marked for identification.)    11:44:16
5  Q.  I'm handing you a document that we've marked    11:44:16
6    as Rosenthal Exhibit 9. I assume that    11:44:18
7    you've seen this before?    11:44:27
8  A.  I have seen this before.    11:44:27
9  Q.  If you look three pages into the document,    11:44:33
10    you'll see the subpoena pursuant to which    11:44:36
11    you're testifying today, correct?    11:44:39
12 A.  That's correct.    11:44:41
13 Q.  Now, the subpoena also requests documents    11:44:41
14    from you; is that right?    11:44:45
15 A.  That's correct.    11:44:47
16 Q.  And you were aware of that, right?    11:44:48
17 A.  I was aware of that.    11:44:50
18 Q.  What, if anything, did you do to locate the    11:44:51
19    documents that are described in the document    11:44:59
20    request?    11:45:01
21 A.  The document request was responded to by    11:45:01
22    Greylock McKinnon, obviously with my input,    11:45:03
23    but they pulled together the documents to    11:45:06
24    respond to this.    11:45:09
25 Q.  Now, you mentioned that they did it with    11:45:11

**124**

1    your input?    11:45:13
2  A.  Uh-huh.    11:45:14
3  Q.  To what extent did you have input in that    11:45:14
4    process?    11:45:17
5  A.  Well, again, the documents that are listed    11:45:18
6    in my declaration, that are referenced in my    11:45:23
7    declaration, I obviously made that list, so    11:45:26
8    that is the primary place where they drew    11:45:33
9    from in terms of the documents to be    11:45:36
10    produced. And I tried to be complete about    11:45:37
11    anything that I looked at for the    11:45:41
12    declaration, and so I believe that that's    11:45:44
13    what was sent, unless it was publicly    11:45:47
14    available and then they traditionally don't    11:45:49
15    send those publicly available documents.    11:45:51
16 Q.  So am I right that the extent of your input    11:45:53
17    into the process of searching for the    11:45:56
18    documents would have been your having put    11:45:58
19    together the list of documents that you    11:46:00
20    considered when you first wrote the    11:46:01
21    declaration; is that correct?    11:46:03
22 A.  That's correct.    11:46:04
23 Q.  Did you do anything else specifically to    11:46:04
24    assist people at GMA, Greylock McKinnon, in    11:46:07
25    responding to the documentary portion of    11:46:12

**125**

1    your subpoena?    11:46:14
2  A.  Again, I would have -- I looked to see if I    11:46:15
3    had drafts, which I did not, to produce, so    11:46:17
4    what was on my hard drive.    11:46:22
5  Q.  Did you look for notes at all that I would    11:46:26
6    have taken?    11:46:28
7  A.  I did look for notes, but -- yes.    11:46:28
8  Q.  Did you look through your office for any    11:46:31
9    other materials that you might have had in    11:46:33
10    connection with this case?    11:46:36
11 A.  I did, and I don't have any other documents    11:46:36
12    in my office that I could locate.    11:46:41
13 Q.  And that includes -- well, just to circle    11:46:44
14    back to the last question, I take it you    11:46:46
15    didn't find notes when you looked for them?    11:46:49
16 A.  I didn't find notes, no.    11:46:51
17 Q.  All right. We've been talking about    11:47:12
18    Attachment A.2 to your declaration, which is    11:47:13
19    Exhibit 1, which is described as "Documents    11:47:15
20    Relied Upon." Do you see that?    11:47:20
21 A.  I do see that.    11:47:28
22 Q.  Now, aside from -- well, let me just ask it    11:47:29
23    more cleanly. Have you since -- since the    11:47:35
24    time you prepared this, sometime on or prior    11:47:40
25    to August 8th, 2005, have you since reviewed    11:47:43

126

```
1   other documents that you would include on      11:47:46
2   this list if you were to prepare it from        11:47:49
3   scratch?                                          11:47:52
4        MR. NOTARGIACOMO:  Objection.  I          11:47:54
5   think it's been asked and answered twice,        11:47:55
6   but I'll let her answer it again.                 11:47:58
7 A. I would add the Fisher-Ellison rebuttal and   11:47:59
8   my response to it, I guess, would count as       11:48:03
9   reviewing.  And I would add the new amended      11:48:07
10  complaint.                                        11:48:14
11 Q. Anything else?                                  11:48:15
12 A. I don't believe so.                             11:48:16
13 Q. Okay.  Who selected the legal documents that  11:48:17
14  appear listed as "Legal Documents" on the        11:48:26
15  first page of Attachment A.2 of Exhibit 1?       11:48:31
16 A. I was provided these documents by counsel.    11:48:37
17  I don't know if you -- what you mean by          11:48:40
18  "selected," but I was provided all of those      11:48:42
19  documents.                                        11:48:44
20 Q. Did you have any input into the documents --  11:48:49
21  I'll withdraw the question.                       11:48:56
22      Who selected for your review the             11:48:57
23  document -- who decided to put the -- well,      11:49:01
24  let me withdraw both of those questions.         11:49:03
25      Who selected the documents listed as        11:49:07
```

127

```
1   Bates-numbered documents for inclusion in       11:49:11
2   this list?                                        11:49:12
3 A. That would have been the staff at GMA.         11:49:14
4 Q. Would you have had any input into the          11:49:15
5   specific documents that are listed here?         11:49:18
6 A. I would have given direction about the topic  11:49:19
7   areas, the keywords to look for.                 11:49:22
8 Q. Did you review all the documents yourself     11:49:34
9   that are listed here under "Bates-numbered      11:49:36
10  documents"?                                       11:49:40
11 A. I have seen all these documents, yes.          11:49:41
12 Q. Have you seen documents other than the ones   11:49:43
13  that are listed here?                             11:49:45
14 A. I may have seen other documents that I then   11:49:46
15  did not rely on.                                  11:49:48
16 Q. How many other documents?  Do you have a      11:49:54
17  rough sense?                                      11:49:56
18 A. I don't.                                        11:49:56
19 Q. Would it have been more than the total        11:50:03
20  number of documents that are listed here         11:50:05
21  under "Bates-numbered documents" or less or     11:50:06
22  about the same?                                   11:50:10
23 A. I'm sorry, I really don't know.  This was     11:50:11
24  over a year ago.                                  11:50:14
25 Q. Did you rely at all on Mr. King or anybody    11:50:31
```

128

```
1   else at Greylock McKinnon for selection of      11:50:34
2   marketing documents?                              11:50:36
3 A. Mr. King may have been involved in            11:50:37
4   identifying the documents.  That is             11:50:42
5   possible.                                         11:50:44
6 Q. Were there any materials that you requested   11:50:52
7   from anybody at Greylock McKinnon or from       11:50:54
8   counsel that you didn't receive?                 11:50:56
9 A. No.                                             11:50:59
10 Q. Any categories of materials that you would    11:50:59
11  have wanted to see that you weren't able to      11:51:01
12  see?                                              11:51:03
13 A. No.                                            11:51:03
14 Q. Okay.                                           11:51:04
15      MR. NOTARGIACOMO:  I've lost track          11:51:20
16  of time, but it might be a good time for a       11:51:22
17  break whenever --                                11:51:25
18      MR. POLUBINSKI:  I was going to say         11:51:25
19  this isn't a bad time for a break.  It's         11:51:26
20  about five minutes to 12:00 if my watch is       11:51:28
21  right.  Maybe we can take a short break and      11:51:31
22  then come back and work a little bit and         11:51:34
23  then break for lunch sometime around a           11:51:37
24  quarter of 1:00 or 1:00.  Does that sound        11:51:39
25  good?                                             11:51:40
```

129

```
1       MR. NOTARGIACOMO:  Yes.  It's just         11:51:40
2   that I have a very short ten-minute              11:51:40
3   conference call I need to be on at 2:30.  So     11:51:41
4   if we could break at 2:30, it's a natural        11:51:44
5   place.                                            11:51:47
6       MR. POLUBINSKI:  Okay.  We should          11:51:48
7   be able to do that, and maybe what we'll do      11:51:48
8   is if we can be back soon, we can try to --      11:51:48
9   we'll break a little earlier for lunch so        11:51:48
10  that we don't have -- we can go off the          11:51:50
11  record now.                                       11:51:53
12      THE VIDEOGRAPHER:  The time is              11:51:53
13  11:52.  This is the end of Tape 2, and we        11:51:54
14  are off the record.                               11:51:57
15      (Recess taken.)                               11:51:58
16      THE VIDEOGRAPHER:  The time is              12:01:01
17  12:01 p.m.  This is the beginning of Tape 3,     12:01:09
18  and we are back on the record.                   12:01:11
19 BY MR. POLUBINSKI:                                12:01:11
20 Q. All right.  Professor Rosenthal, if you       12:01:13
21  could take a look, please, at Exhibit 1 to       12:01:21
22  your deposition, which is your declaration       12:01:24
23  in the case, and turn to Page 1 of the           12:01:24
24  declaration.  Page 1 reads, very beginning       12:01:28
25  of the executive summary, "I have been asked     12:01:32
```

**VERITEXT NEW YORK REPORTING COMPANY**

212-267-6868                                          516-608-2400

## 130

```
 1   to analyze and determine whether consumers      12:01:35
 2   and third-party payers who purchased or          12:01:37
 3   reimbursed for Neurontin for indications not     12:01:40
 4   approved by the Food and Drug Administration     12:01:42
 5   (FDA) would have been and continue to be         12:01:45
 6   impacted as a class and suffer economic          12:01:49
 7   damages as a result of the violations            12:01:52
 8   alleged in this matter."                         12:01:54
 9        Did I read that correctly?                  12:01:56
10 A.   Yes, you did.                                 12:01:57
11 Q.   The violations alleged in this sentence,      12:01:59
12   violations alleged in this matter, that          12:02:03
13   refers to the allegations in the amended         12:02:05
14   complaint?                                       12:02:07
15 A.   That's correct. Of course, at the time of     12:02:07
16   my writing, that was the complaint that was      12:02:11
17   then...                                          12:02:13
18 Q.   Right. So looking again at this first         12:02:15
19   sentence, does this mean, that you set           12:02:18
20   out to analyze and determine whether             12:02:20
21   defendants' allegedly improper off-label         12:02:23
22   promotion did, in fact, impact consumers and     12:02:27
23   third-party payers as a class?                   12:02:32
24 A.   As I say there, "would have been impacted."   12:02:34
25   So whether there's economic theory and           12:02:37
```

## 131

```
 1   evidence to support the idea that that           12:02:40
 2   promotion would have caused damages if the       12:02:42
 3   allegations were true.                           12:02:46
 4 Q.   What does it mean to be impacted as a class?  12:02:49
 5 A.   Whether the consumers and third-party payers  12:02:51
 6   would have been affected by a common             12:02:56
 7   mechanism and in the same way.                   12:02:59
 8 Q.   What do you mean by "in the same way"?        12:03:04
 9 A.   They -- the effect would have been similar    12:03:07
10   across the class; that is, they all -- in        12:03:10
11   this case they all would have consumed more      12:03:13
12   Neurontin than otherwise.                        12:03:16
13 Q.   Does this mean -- would that mean that each   12:03:23
14   member of the class, so each individual          12:03:26
15   who's a member of the class would have           12:03:28
16   somehow been impacted by defendants'             12:03:30
17   allegedly unlawful conduct, excuse me, or        12:03:32
18   does it mean something else?                     12:03:34
19 A.   It means that in the aggregate that the       12:03:35
20   class would have been affected in this way.      12:03:38
21   I'm not sure what you mean by "each member"      12:03:40
22   as opposed to all.                               12:03:42
23 Q.   Have you determined -- I guess another way    12:03:45
24   to put it is, have you determined that each      12:03:47
25   member of the class would have suffered some     12:03:48
```

## 132

```
 1   sort of injury, some sort of economic injury     12:03:50
 2   as a result of the conduct described in the      12:03:53
 3   complaint?                                       12:03:55
 4 A.   Well, at this stage of what I've done here    12:03:55
 5   is I have examined the economic theory and       12:03:58
 6   evidence as to the effects of promotion as       12:04:04
 7   it relates to the allegations in this case       12:04:10
 8   and what effect that would have on class         12:04:12
 9   members, that being consumers and third-         12:04:14
10   party payers, and their likelihood of           12:04:17
11   getting Neurontin for these off-label           12:04:19
12   indications. And so overall I've assessed        12:04:20
13   whether the class and all those included in      12:04:24
14   it would have been impacted, yes.                12:04:26
15 Q.   I guess to expect to be able to determine,    12:04:29
16   to expect that you would determine using         12:04:33
17   your model that each member of the class,        12:04:35
18   each and every individual member of the          12:04:38
19   class would have suffered some economic          12:04:40
20   injury?                                          12:04:42
21 A.   My understanding of what's appropriate in a   12:04:42
22   class matter like this is that I will do the     12:04:48
23   analysis at the aggregate level. This will       12:04:51
24   not be an issue where I'll look at every         12:04:55
25   individual class member.                         12:04:57
```

## 133

```
 1 Q.   Okay. So in answer to the question, you do    12:04:58
 2   not expect to do that analysis to determine      12:05:00
 3   whether each individual member of the class      12:05:03
 4   would have been injured?                         12:05:05
 5 A.   I do not expect to analyze individual class   12:05:06
 6   members, no.                                     12:05:09
 7 Q.   Do you anticipate that you conclude that      12:05:23
 8   there are any members of the class that have     12:05:24
 9   not suffered a loss of some kind, an             12:05:26
10   economic loss?                                   12:05:28
11        MR. NOTARGIACOMO: Objection. You           12:05:30
12   can answer.                                      12:05:31
13 A.   Let me just -- can I think about the          12:05:31
14   question for a second?                           12:05:33
15 Q.   Of course.                                    12:05:34
16 A.   I guess it would -- again, by definition      12:05:41
17   those in the class are individuals who          12:05:45
18   received Neurontin as a result of off-label     12:05:48
19   promotion, and so I anticipate that there --    12:05:52
20   this impact is common to all class members.      12:05:58
21   This is taking things slightly out of           12:06:01
22   order that I expected to do it, but can you      12:06:11
23   look at Paragraph 6 of your complaint -- not    12:06:13
24   your complaint, your declaration, excuse me.    12:06:17
25 A.   Okay.                                         12:06:19
```

34 (Pages 130 to 133)

---

**134**

```
 1  Q.  And it contains a definition of the class    12:06:19
 2      there, correct?                              12:06:22
 3  A.  Yes.                                         12:06:23
 4  Q.  Do you want to take a second to just read    12:06:26
 5      it?                                          12:06:28
 6  A.  Yes, I see it. Yes.                          12:06:29
 7  Q.  I think that you described to me the class   12:06:31
 8      was only people who purchased Neurontin by   12:06:33
 9      virtue of defendants' conduct, defendants'   12:06:36
10      off-label promotion just a second ago. Did   12:06:39
11      I understand your answer correctly?          12:06:42
12  A.  Yes, and perhaps I misstated it. What I      12:06:44
13      have been asked to do is to at this stage    12:06:46
14      identify whether there would have been an    12:06:49
15      effect and a model for identifying how that  12:06:53
16      effect would play out in the class. So what  12:06:57
17      I've been asked to look at is only the       12:07:01
18      incremental off-label use that is due to the 12:07:03
19      allegations, and that would apply to this    12:07:06
20      class of those purchasing Neurontin for      12:07:09
21      off-label uses as a whole.                   12:07:11
22  Q.  So am I right that your model wouldn't       12:07:15
23      provide you with a way of identifying any    12:07:17
24      individuals, specific individuals, who would 12:07:19
25      have not suffered an economic loss?          12:07:23
```

**135**

```
 1  A.  That's correct.                             12:07:25
 2  Q.  All right. A related question, I guess, is  12:07:25
 3      that you set out to analyze and determine   12:07:33
 4      whether class members were impacted and     12:07:35
 5      therefore suffered some amount of damages   12:07:37
 6      as a result of the violations alleged in    12:07:40
 7      this matter, correct?                       12:07:42
 8  A.  That's correct.                             12:07:46
 9  Q.  And then looking down in Paragraph 3 of your 12:07:46
10      executive summary on Page 1 of Exhibit 1 you 12:07:51
11      write, "There exists standard research       12:07:56
12      methods that may be applied to readily       12:07:59
13      available data to compute the quantity of    12:08:02
14      Neurontin purchased that was directly        12:08:04
15      induced by the allegedly illegal marketing   12:08:06
16      scheme."                                     12:08:08
17          Did I read that right?                   12:08:09
18  A.  Yes, you did.                                12:08:11
19  Q.  I'm assuming that your model would not       12:08:14
20      enable you to include -- conclude, rather,   12:08:18
21      that every class member suffered some harm   12:08:21
22      that was directly induced by the allegedly   12:08:23
23      illegal marketing scheme; is that correct?   12:08:27
24  A.  My analysis will look at the class as a      12:08:29
25      whole and will not look at effects at the    12:08:32
```

**136**

```
 1      individual level. Is that my correct         12:08:34
 2      understanding of your question?              12:08:38
 3  Q.  I think so. And so your model wouldn't       12:08:39
 4      enable you to tell -- to determine whether a 12:08:44
 5      particular given individual prescription was 12:08:48
 6      written as a result of the conduct that's    12:08:51
 7      described in the complaint?                  12:08:55
 8  A.  Yes, that's correct.                         12:08:56
 9  Q.  All right. Going back to the first sentence  12:08:56
10      and the term "violations alleged in this     12:09:12
11      matter," let's hold that thought there.      12:09:15
12      And then look to the first sentence of the   12:09:19
13      second paragraph. Now, you also describe     12:09:22
14      there "unlawful conduct alleged in the       12:09:25
15      amended complaint."                          12:09:28
16          Did I read that --                       12:09:31
17  A.  Yes.                                         12:09:31
18  Q.  -- correctly?                                12:09:32
19  A.  Yes, you read that correctly.                12:09:32
20  Q.  And then in the third paragraph, you         12:09:34
21      describe in the first sentence "wrongful     12:09:36
22      conduct"?                                    12:09:39
23  A.  Yes, I see that.                             12:09:39
24  Q.  And then you also describe in the second     12:09:40
25      sentence, "the allegedly illegal marketing   12:09:43
```

**137**

```
 1      scheme"?                                     12:09:46
 2  A.  Yes, I see that.                             12:09:48
 3  Q.  Those four terms, do you mean to use those   12:09:50
 4      interchangeably for purposes of this         12:09:53
 5      executive summary in your declaration?       12:09:54
 6  A.  Yes, I do.                                   12:09:56
 7  Q.  Okay. What makes a particular aspect of      12:09:58
 8      defendants' conduct, so, for example, a      12:10:04
 9      conversation between a sales representative   12:10:07
10      and a doctor, a violation for purposes of    12:10:08
11      your analysis?                               12:10:11
12          MR. NOTARGIACOMO: Objection, calls       12:10:12
13      for a legal conclusion, but you can answer.  12:10:13
14  A.  My understanding is that there are some      12:10:15
15      legal principles that apply to the           12:10:23
16      pharmaceutical company's provision of        12:10:26
17      information around the uses of its drugs,    12:10:29
18      and in the allegations there are claims      12:10:33
19      about misrepresentation of clinical findings 12:10:35
20      around those drugs and the like.             12:10:39
21  Q.  I guess going back to Mr. Notargiacomo's     12:10:53
22      objection, do you understand the             12:10:56
23      determination as to whether something is or  12:10:59
24      isn't a violation to be a legal              12:11:01
25      determination?                               12:11:03
```

35 (Pages 134 to 137)

138

1  A.  I do, yes.                              12:11:03
2  Q.  Do you have an understanding for how that    12:11:06
3     determination is going to be made?        12:11:09
4  A.  Again, I don't understand all the legal    12:11:10
5     issues here. My sense from looking at the    12:11:15
6     allegations is that it's somewhat          12:11:18
7     complicated, but I understand -- my current    12:11:21
8     understanding and my understanding at the    12:11:24
9     time was that I would be given more specific    12:11:25
10    information about which individual          12:11:28
11    promotional activities would ultimately be a    12:11:32
12    subject of the damage analysis when it gets    12:11:37
13    to implementation stage.                   12:11:41
14 Q.  And do you know who would be providing that    12:11:48
15    to you?                                    12:11:54
16 A.  I would expect counsel to provide that to    12:11:54
17    me.                                        12:11:56
18 Q.  So would you have any involvement in         12:11:56
19    determining whether a particular type of    12:11:58
20    conduct was unlawful or wrongful?          12:12:00
21 A.  No, I would not.                          12:12:03
22 Q.  Would you have any involvement in           12:12:04
23    determining whether a particular conduct --    12:12:05
24    piece of conduct was fraudulent?           12:12:08
25 A.  No, I would not.                          12:12:09

139

1  Q.  Here's a question: Is your understanding    12:12:11
2     that conduct that you characterize here as a    12:12:25
3     violation is the same thing as conduct that    12:12:28
4     would generate liability in this case? So    12:12:31
5     in other words, assuming -- and assuming    12:12:35
6     that it caused injury to a consumer or a    12:12:37
7     third-party payer?                         12:12:40
8        MR. NOTARGIACOMO: Objection.          12:12:40
9  A.  I am not sure I even would begin to know how    12:12:42
10    to answer that.                            12:12:46
11 Q.  Okay. Let me think of a... You know, I'll    12:12:48
12    withdraw the question. That's fine.        12:12:55
13    Are there violations or wrongful          12:12:58
14    conduct that you can think of that would not    12:13:06
15    generate liability? I guess maybe that's    12:13:08
16    another way to put it.                     12:13:10
17       MR. NOTARGIACOMO: Objection.          12:13:11
18 A.  I just -- that's such a broad question I'm    12:13:12
19    afraid I don't know how to answer it.      12:13:16
20 Q.  Okay. I guess -- I think I'll withdraw that    12:13:17
21    one, too. It's probably not necessary.    12:13:27
22    Let me ask you about Dr. Hartman's        12:13:29
23    report. What's your understanding of how    12:13:43
24    your report interacts with Dr. Hartman's?    12:13:43
25 A.  My understanding is that I am to look at    12:13:44

140

1     issues of the class definition essentially,    12:13:48
2     issues of whether there was a common impact,    12:13:53
3     whether there are sort of economic          12:13:55
4     circumstances that explain that common     12:13:59
5     impact, and talk about estimating the      12:14:01
6     quantity of Neurontin that was prescribed as    12:14:07
7     a result of the allegedly fraudulent or    12:14:12
8     illegal, whatever the appropriate way to    12:14:18
9     describe it is, behavior. Then Dr. Hartman    12:14:20
10    would use those quantities to estimate      12:14:23
11    damages.                                   12:14:25
12 Q.  So I guess, to boil it down, would it be    12:14:25
13    correct to say that Dr. Hartman's report    12:14:33
14    offers a methodology by which he would take    12:14:35
15    as an input your conclusions on class-wide    12:14:38
16    impact and then based on that input         12:14:42
17    calculate class-wide damages?              12:14:45
18 A.  That's my understanding.                   12:14:48
19 Q.  Dr. Hartman's doesn't -- or withdrawn.      12:14:51
20    Dr. Hartman's report doesn't reach an      12:14:54
21    independent conclusion as to class-wide    12:14:56
22    impact, does it?                           12:14:58
23       MR. NOTARGIACOMO: Objection. It's    12:14:59
24    beyond the scope. She didn't write Dr.    12:15:00
25    Hartman's report, and she's not here to    12:15:01

141

1     testify about Dr. Hartman's report. But    12:15:03
2     I'll let you answer the question.          12:15:05
3  Q.  Well, let me ask it this way: You've        12:15:06
4     reviewed Dr. Hartman's report, right?      12:15:08
5  A.  I have.                                   12:15:10
6  Q.  And you provided comments on his draft      12:15:10
7     report, correct?                           12:15:12
8  A.  That's correct.                           12:15:14
9  Q.  Do you have an understanding, based on your    12:15:15
10    review of his reports -- or his report, I    12:15:17
11    should say, as to whether he reaches -- or    12:15:20
12    it reaches an independent conclusion as to    12:15:23
13    class-wide impact?                         12:15:25
14 A.  I don't believe it does. I'm not sure that    12:15:25
15    I understand that term in the same way that    12:15:28
16    you do, but I believe, as we discussed, that    12:15:29
17    it talks about the methodology for          12:15:31
18    estimating damages from quantities.        12:15:33
19 Q.  So I guess, as you've described it, would it    12:15:35
20    be correct to say that neither you nor Dr.    12:15:47
21    Hartman have proposed a methodology which,    12:15:50
22    standing alone, would be capable of         12:15:54
23    calculating class-wide damages?            12:15:58
24       MR. NOTARGIACOMO: Object to the       12:16:01
25    question.                                 12:16:02

36  (Pages 138 to 141)

142

```
 1  Q.  Well, let me put it another way.  Your      12:16:06
 2      report and Dr. Hartman's report are        12:16:08
 3      interdependent for purposes of determining  12:16:09
 4      class-wide damages?                         12:16:12
 5  A.  That's correct.  That's my understanding.   12:16:13
 6  Q.  Okay.  All right.  Let's look again at      12:16:15
 7      Paragraph 6, which is the definition of the 12:16:31
 8      class, and why don't I just read it.  It    12:16:32
 9      reads, "All individuals and entities in the 12:16:37
10      United States and its territories who, for  12:16:39
11      purposes other than resale, purchased,      12:16:42
12      reimbursed, and/or paid for Neurontin for   12:16:44
13      indications not approved by the FDA during  12:16:47
14      the period from January 1, 1994, through the 12:16:50
15      present.  For purposes of the Class         12:16:53
16      definition, individuals and entities        12:16:56
17      purchased Neurontin if they paid some or all 12:16:58
18      of the purchase price."                     12:17:01
19      Did I read that correctly?                  12:17:02
20  A.  Yes, you did.                               12:17:04
21  Q.  Where does this definition come from?       12:17:05
22  A.  The definition comes from the amended class 12:17:07
23      action complaint dated February 1, 2005.    12:17:09
24  Q.  Did you have any involvement in the crafting 12:17:15
25      of the definition of the class in this case? 12:17:18
```

143

```
 1  A.  No, I did not.                              12:17:20
 2  Q.  What's your understanding of what "the      12:17:22
 3      present" is for purposes of the class       12:17:28
 4      definition?                                 12:17:32
 5      MR. NOTARGIACOMO:  Objection.  You          12:17:34
 6      can answer.                                 12:17:40
 7  A.  If I were to think about what the           12:17:40
 8      understanding was -- I thought I was working 12:17:43
 9      off the assumption that it was the present  12:17:45
10      at the time that I was drafting that, but   12:17:48
11      obviously it would have been the present at 12:17:49
12      the time the complaint was filed, that being 12:17:53
13      February 1, 2005.                           12:17:57
14  Q.  Does the date make a difference for purposes 12:18:03
15      of your analysis in your declaration?       12:18:06
16  A.  Would it affect the --                      12:18:09
17  Q.  Any of the conclusions that you reached?    12:18:13
18  A.  -- quantum of impact?  Oh, for the          12:18:15
19      conclusions that I reached?  No, it does not 12:18:18
20      make a difference.                          12:18:21
21  Q.  Have you participated in any discussions    12:18:23
22      about whether the class definition remains  12:18:25
23      appropriate in view of the Court's rulings  12:18:28
24      over the past year?                         12:18:30
25  A.  The subject did come up last week when we   12:18:31
```

144

```
 1      were reviewing as to whether the date would 12:18:36
 2      be changed by the Court.                    12:18:39
 3  Q.  Specifically when you say "the subject," you 12:18:41
 4      mean the subject of the date?               12:18:43
 5  A.  Of the end date in particular for the class. 12:18:46
 6  Q.  And when you say, "we had a discussion," who 12:18:49
 7      is "we"?                                    12:18:54
 8  A.  That would be Mr. Notargiacomo, Mr. Goldser 12:18:54
 9      and I.                                      12:18:57
10  Q.  What was the general content of the         12:18:57
11      discussion?                                 12:19:00
12  A.  I think it was something to the effect of   12:19:00
13      the -- you know, it's not clear what the    12:19:05
14      Court's ruling has what implication that has 12:19:11
15      for when the class -- for the class         12:19:13
16      definition in terms of the end date of it.  12:19:15
17  Q.  Did you discuss any other aspect of the     12:19:20
18      class definition in that conversation or any 12:19:24
19      other conversation about the Court's recent 12:19:27
20      rulings?                                    12:19:29
21  A.  The one thing we discussed was that it was  12:19:30
22      likely that my work when it comes to        12:19:32
23      implementation of this approach would need  12:19:36
24      to be done indication by indication.        12:19:39
25  Q.  When did -- did you have that discussion    12:19:41
```

145

```
 1      last week for the first time?               12:19:49
 2  A.  In terms of the Court's ruling.  As you     12:19:50
 3      know, in the declaration I talk about doing 12:19:54
 4      the analysis indication by indication.      12:19:56
 5  Q.  Right.  But so in terms of the implication  12:20:00
 6      of the Court's ruling on your analysis, the 12:20:02
 7      first discussion was last week?             12:20:07
 8  A.  I believe so.                               12:20:08
 9  Q.  And it was in the same conversation that we 12:20:14
10      just described, the conversation between    12:20:16
11      you, Mr. Notargiacomo and Mr. Goldser?      12:20:18
12  A.  Yes, that's correct.                        12:20:21
13  Q.  And what was the substance of that          12:20:26
14      conversation beyond what you've just        12:20:27
15      described?                                  12:20:29
16  A.  Again, this was when we met last week to    12:20:29
17      prepare, and the substance -- it was very   12:20:33
18      brief.  Again, the issue came up as to      12:20:36
19      whether the final class definition would    12:20:40
20      include an earlier end date, and I don't    12:20:42
21      remember everything that was said, but the  12:20:49
22      idea was it was unclear, we didn't know yet, 12:20:50
23      and that we would work with it as it became 12:20:55
24      clear.                                      12:20:57
25  Q.  All right.  You are aware that Neurontin was 12:21:00
```

37 (Pages 142 to 145)

146

1  approved by the FDA for the treatment of        12:21:06
2  postherpetic neuralgia in May of 2002,          12:21:09
3  correct?                              12:21:13
4  A.  Yes, that's correct.              12:21:13
5  Q.  And I hope you'll understand if I refer to  12:21:15
6  postherpetic neuralgia as PHN.  Does that       12:21:19
7  work for you?                         12:21:25
8  A.  I'll try to remember that, yes.   12:21:25
9  Q.  Okay.  If there's confusion at all, please  12:21:27
10 let me know.                          12:21:29
11 A.  Okay.                             12:21:30
12 Q.  What's your understanding for how the class  12:21:30
13 definition accounts for individuals and         12:21:33
14 entities who purchased, reimbursed and/or       12:21:34
15 paid for Neurontin for PHN?           12:21:37
16 A.  Before or after May 2002?         12:21:49
17 Q.  Well, I guess that's the question.  12:21:52
18 A.  Yeah.  Well, my understanding is that I --  12:21:53
19 obviously I read the complaint and tried to     12:21:57
20 summarize the allegations as best I could       12:22:00
21 here, my understanding, but I believe that      12:22:02
22 at the time I conduct my analysis I will get    12:22:07
23 direction from counsel about what specific      12:22:10
24 off-label promotions are to be considered as    12:22:12
25 illegal and during what time period.  And I     12:22:17

147

1  would imagine that would change for        12:22:26
2  something like postherpetic neuralgia which     12:22:28
3  received that approval in May 2002, so that     12:22:30
4  it might be different in 1996, for example,     12:22:32
5  than in 2002, but I don't -- I think that's     12:22:35
6  a legal issue.                        12:22:37
7  Q.  Well, let's talk about it just in terms of  12:22:40
8  who the members of the class are.     12:22:42
9  A.  Okay.                             12:22:44
10 Q.  Would you say that individuals and entities  12:22:44
11 who, quote, purchased, reimbursed and/or        12:22:48
12 paid for Neurontin, end quote, for PHN prior    12:22:52
13 to May 2002 would have -- are members of the    12:22:56
14 class?                                12:23:04
15 MR. NOTARGIACOMO:  Objection.         12:23:04
16 Calls for a legal conclusion.         12:23:04
17 MR. POLUBINSKI:  I'm asking for her   12:23:07
18 understanding, though.                12:23:08
19 A.  That was certainly my understanding at the  12:23:08
20 time of writing this, was that all those        12:23:10
21 that received an off-label prescription for     12:23:14
22 Neurontin for off-label uses would be   12:23:17
23 included, and so that that would follow to      12:23:19
24 this conclusion that you mentioned.   12:23:22
25 Q.  And that individuals or entities who        12:23:23

148

1  purchased, reimbursed and/or paid for   12:23:26
2  Neurontin for PHN after May 2002 after the      12:23:29
3  approval of PHN by the FDA would not be         12:23:32
4  included in the class?                12:23:34
5  MR. NOTARGIACOMO:  Objection, calls   12:23:35
6  for a legal conclusion.               12:23:36
7  A.  That would have been my understanding.  12:23:38
8  Q.  Now, is this an understanding that you      12:23:45
9  developed yourself in reading the class         12:23:46
10 definition, or did you have conversations       12:23:48
11 with anybody about the question?      12:23:49
12 A.  It was my understanding of reading the      12:23:50
13 complaint and the way I understood the          12:23:53
14 allegations.                          12:23:56
15 Q.  Now, your model assumes that you'll somehow  12:23:56
16 be able to identify all PHN prescriptions?      12:24:04
17 A.  That's correct.                   12:24:06
18 Q.  How do you anticipate doing that?  12:24:08
19 A.  I anticipate using the National Disease and  12:24:10
20 Therapeutic Index for one example.  That's a    12:24:13
21 database that describes prescriptions by        12:24:17
22 diagnosis.                            12:24:21
23 Q.  Are there other examples?         12:24:27
24 A.  I've also requested additional data from the  12:24:28
25 defendants from their own documents tracking    12:24:32

149

1  prescriptions by diagnosis.  As I mention in    12:24:35
2  some of my footnotes, I've seen some   12:24:38
3  examples.                             12:24:40
4  Q.  Anything else?                    12:24:41
5  A.  I also said I reviewed the National         12:24:45
6  Ambulatory Medical Care Survey, which is a      12:24:49
7  federally funded survey by the CDC that also    12:24:51
8  looks at office visits and prescribing          12:24:54
9  associated with those office visits and         12:24:58
10 diagnoses.                            12:25:00
11 Q.  So do you envision for purposes of your --  12:25:04
12 or I'm sorry, before we go on to that, is       12:25:06
13 there anything else other than the last         12:25:08
14 category you mentioned?               12:25:11
15 A.  Those are the data sources that I know of    12:25:12
16 and I know are available.  I would do a         12:25:14
17 broader search to see if there were other       12:25:17
18 alternative databases.  I understand that       12:25:19
19 Verispan, which is another consulting   12:25:21
20 company, offers a database that's similar to    12:25:25
21 the National Disease and Therapeutic Index,     12:25:27
22 but I have not reviewed those data.   12:25:30
23 Q.  So we discussed before that your model      12:25:33
24 assumes that you'll be able to identify all     12:25:41
25 PHN prescriptions, correct?           12:25:44

38 (Pages 146 to 149)

150

1  A.  That's correct.                              12:25:45
2  Q.  How does your model propose to treat          12:25:45
3      situations where the prescription was         12:25:51
4      written before FDA approval in May 2002 but   12:25:53
5      was paid for or reimbursed after May 2002?    12:25:57
6  A.  The data on the National Drug -- Disease and  12:26:01
7      Therapeutic Index, for example, are           12:26:09
8      documentation of when the prescribing took    12:26:12
9      place, which at least preliminarily that      12:26:13
10     seems like the right date to look to, is      12:26:16
11     when the prescription was written as opposed  12:26:24
12     to when it was reimbursed, to answer your     12:26:25
13     question.                                     12:26:27
14 Q.  Does your model propose identifying and       12:26:27
15     distinguishing between situations where a     12:26:31
16     patient received a prescription for the       12:26:33
17     first time for PHN and when a patient         12:26:34
18     received a prescription for a refill of PHN   12:26:39
19     or -- of Neurontin for PHN?                   12:26:43
20 A.  I guess I would have to think about that      12:26:46
21     issue a little bit and decide how to          12:26:48
22     appropriately incorporate that into my       12:26:53
23     analysis. I would need a little time to       12:26:56
24     think about that.                            12:26:58
25 Q.  Okay.                                         12:26:59

151

1  A.  That's not described specifically in here,    12:27:00
2      though, to answer your question, but that     12:27:02
3      might be relevant to the analysis.            12:27:04
4          MR. POLUBINSKI: I've got another          12:27:18
5      long section that I'm about to start          12:27:19
6      now, and I would be happy to do it, or if     12:27:21
7      you would like to break now for lunch, we     12:27:23
8      can come back and get a chunk in before your  12:27:24
9      call.                                         12:27:27
10         MR. NOTARGIACOMO: Yeah, why don't          12:27:27
11     we do that, break now and get a chunk in      12:27:28
12     before we break. Like I said, it'll be        12:27:32
13     about 15 minutes.                             12:27:34
14         MR. POLUBINSKI: Sounds good.               12:27:35
15     Okay. Go off the record.                      12:27:36
16         THE VIDEOGRAPHER: The time is             12:27:37
17     12:27 p.m., and we're off the record.         12:27:38
18     (Lunch recess taken.)                         12:27:41
19
20
21
22
23
24
25

152

1          AFTERNOON SESSION                          01:15:41
2      (Exhibit No. 10, Amended Class                01:17:48
3      Action Complaint, marked for                  01:17:48
4      identification.)                              01:17:49
5      (Exhibit No. 11, Second Amended               01:17:49
6      Class Action Complaint, marked for            01:17:49
7      identification.)                              01:17:48
8          THE VIDEOGRAPHER: The time is 1:18         01:17:50
9      p.m. We're back on the record.                01:18:10
10
11     (MEREDITH B. ROSENTHAL, Ph.D., Resumed.)       01:18:10
12         DIRECT EXAMINATION, Continued             01:18:10
13                                                    01:18:12
14 BY MR. POLUBINSKI:                                 01:18:12
15 Q.  All right. Professor Rosenthal, could you      01:18:12
16     look, please, at Exhibit 1, which is your     01:18:18
17     declaration in this case, the beginning of    01:18:20
18     Paragraph 7, which is on Page 4.              01:18:25
19 A.  Okay.                                          01:18:31
20 Q.  The very first sentence of Paragraph 7         01:18:31
21     reads, "For purposes of my analysis, I have   01:18:34
22     been directed by counsel to assume the        01:18:38
23     following facts as alleged in the complaint   01:18:39
24     to be true."                                  01:18:43
25         Did I read that correctly?                01:18:44

153

1  A.  Yes, you did.                                 01:18:45
2  Q.  And is it true that you've done that?         01:18:46
3  A.  Yes, it's true.                               01:18:47
4  Q.  All right. I'm going to hand you two          01:18:48
5      documents. The first one has been marked as   01:18:52
6      Rosenthal Exhibit 10. The second one has      01:18:54
7      been marked as Rosenthal Exhibit 11.          01:18:58
8  A.  Okay.                                          01:19:01
9  Q.  All right. Looking first at Rosenthal         01:19:13
10     Exhibit 10, that's the complaint that you're  01:19:15
11     referring to in --                            01:19:21
12 A.  Okay.                                          01:19:22
13 Q.  - the first sentence of Paragraph 7 of your   01:19:23
14     report, correct?                              01:19:26
15 A.  I'm just looking for the date on it. So       01:19:27
16     that would be the earlier complaint, right?   01:19:28
17     I --                                          01:19:31
18 Q.  Yes --                                        01:19:31
19 A.  Can I trust you on that?                      01:19:32
20 Q.  You are welcome to trust me on that.          01:19:34
21 A.  Very good, yeah. Yes, I understand this to     01:19:36
22     be the complaint that was in effect at the    01:19:38
23     time I wrote my report.                       01:19:40
24 Q.  And that's the complaint that you referred    01:19:41
25     to in the first sentence of Paragraph 7?      01:19:43

39 (Pages 150 to 153)

154

1  A.  That's correct.                              01:19:48
2  Q.  Okay.  And as we have discussed, you're      01:19:48
3      aware that plaintiffs have amended their     01:19:51
4      complaint since then?                        01:19:52
5  A.  Yes, I understand that.                      01:19:53
6  Q.  And if you take a look at Rosenthal Exhibit  01:19:54
7      11, can you tell me if that is the second    01:19:57
8      amended complaint in this matter, the        01:19:59
9      amendment to the complaint that we           01:20:01
10     discussed?                                   01:20:02
11 A.  Yes, I believe that we've done that          01:20:03
12     complaint, yes, the amended -- second        01:20:05
13     amended class action complaint.              01:20:06
14 Q.  All right.  You're aware that the Court in   01:20:08
15     this case has determined that some of the    01:20:17
16     allegations in the original class action     01:20:18
17     complaint were insufficient to state a claim 01:20:20
18     and should be dismissed, correct?            01:20:24
19         MR. NOTARGIACOMO:  Objection.  You       01:20:26
20     can answer.                                  01:20:27
21 A.  I'm aware that the Court made some decision  01:20:27
22     that pertained to the legal structure of the 01:20:30
23     case, and I would certainly believe your     01:20:34
24     assessment that's what happened.  I --       01:20:37
25     again, I don't thoroughly understand the     01:20:39

155

1      legal issues myself, but I do understand     01:20:42
2      that there was some decision that pertained  01:20:43
3      to the way this was going to be approached   01:20:47
4      legally.                                     01:20:49
5  Q.  Okay.  All right.  Let me direct your        01:20:49
6      attention to Rosenthal Exhibit 11, please,   01:21:04
7      to the very first page of the complaint,     01:21:07
8      Page 1, which is actually a couple of pages  01:21:10
9      into the document.                           01:21:12
10 A.  I see Page 1.                                01:21:14
11 Q.  And what I would like to do is ask you to    01:21:15
12     look at the Footnote No. 1 that appears at   01:21:19
13     the bottom of the first page.  And it's kind 01:21:24
14     of a mouthful, so I think I may not read it  01:21:31
15     into the record, if you don't mind.          01:21:34
16     Although frankly maybe it makes sense just   01:21:42
17     to do it.  It reads in the second amended    01:21:45
18     class action complaint, "Plaintiffs have     01:21:48
19     amended their allegations to provide         01:21:50
20     additional facts in support of their claims  01:21:51
21     and to correct certain deficiencies in the   01:21:53
22     first amended class action complaint as      01:21:56
23     determined by the Court (the allegations     01:21:59
24     concerning social phobia and restless leg    01:22:04
25     syndrome), but have left the remainder of    01:22:07

156

1      the FCAC largely undisturbed (e.g., the      01:22:10
2      allegations concerning the composition of    01:22:14
3      various RICO enterprises alleged)            01:22:17
4      notwithstanding the Court's adverse rulings  01:22:19
5      concerning the sufficiency of certain of     01:22:22
6      those allegations (e.g., the Court's         01:22:24
7      determination that certain of the alleged    01:22:26
8      RICO enterprises were not sufficiently       01:22:28
9      pled).  Plaintiffs have left these           01:22:31
10     allegations undisturbed to preserve their    01:22:33
11     appellate rights, not to require the Court   01:22:36
12     to revisit those issues at this time."       01:22:37
13     Did I read that correctly --                 01:22:41
14 A.  I believe you did.                           01:22:42
15 Q.  -- as best you can tell?  Okay.  Thanks.     01:22:42
16         MR. NOTARGIACOMO:  You got an A in       01:22:46
17     reading.                                     01:22:47
18         MR. POLUBINSKI:  I'm pretty good at      01:22:48
19     it.                                          01:22:57
20 Q.  Do you have an understanding of what the     01:22:51
21     certain deficiences in the first amended     01:22:54
22     class action complaint are for purposes of   01:22:56
23     this footnote?                               01:22:58
24 A.  I do not.                                    01:22:58
25 Q.  Okay.  And then in the last sentence which   01:22:59

157

1      reads, "The plaintiffs have left these       01:23:09
2      allegations undisturbed," do you know which  01:23:11
3      allegations those are?                       01:23:13
4  A.  I do not.                                    01:23:15
5  Q.  So I take it, then, that whether or not      01:23:16
6      those allegations, the ones that are         01:23:23
7      referred to in Footnote 1, are still in the  01:23:25
8      case have not impacted your analysis in your 01:23:28
9      declaration?                                 01:23:31
10 A.  My analysis relates to the overall economic  01:23:31
11     incentives in this environment, the impact   01:23:35
12     of promotion as we know it and my ability to 01:23:38
13     model the effects of promotional activities  01:23:43
14     that ultimately are deemed to be within the  01:23:48
15     scope of the case.  And so if I were told    01:23:50
16     that certain activities were no longer in    01:23:52
17     the scope of the allegations for the         01:23:56
18     purposes of conducting a damage analysis, I  01:23:58
19     would remove those.  So it does not affect   01:24:02
20     my analysis as it appears in my report.      01:24:04
21 Q.  Do you have any independent knowledge or     01:24:11
22     have you done any independent investigation  01:24:14
23     into the truth of any of the allegations in, 01:24:15
24     let's refer to the complaint that you looked 01:24:19
25     at when you first drafted your report,       01:24:22

40  (Pages 154 to 157)

---

**158**

1  Rosenthal 10?                               01:24:25
2  A.  As I stated in my declaration, I assume that   01:24:26
3      the allegations are true, and then I look at   01:24:29
4      what the effect would be under economic   01:24:34
5      theory under empirical evidence that we have   01:24:36
6      to date. So no, I did not judge whether the   01:24:39
7      allegations were true.                      01:24:43
8  Q.  So -- and you don't have any independent   01:24:44
9      knowledge as to whether they're true?      01:24:47
10 A.  I guess --                                 01:24:48
11      MR. NOTARGIACOMO: Objection. You   01:24:51
12  can answer.                                   01:24:52
13 A.  I'm not sure what would be included in that.   01:24:52
14      I have looked at discovery materials that   01:24:56
15      support those allegations. Would you      01:24:59
16      consider that to be independent knowledge or   01:25:01
17      that's material provided to me under the   01:25:03
18      case? So...                                01:25:05
19 Q.  Let me ask it to you this way: You're not   01:25:08
20      offering an opinion as to the truth of any   01:25:10
21      of the factual allegations in the complaint,   01:25:12
22      are you?                                   01:25:15
23      MR. NOTARGIACOMO: Objection.            01:25:15
24 Q.  I mean, aside from what's in your -- well,   01:25:15
25      let me just phrase it that way. You're not   01:25:18

---

**159**

1  offering an opinion as to the truth of any   01:25:19
2  of the underlying factual allegations that   01:25:21
3  are in the complaint?                        01:25:23
4  A.  No, I am not.                              01:25:24
5  Q.  Okay. And do you expect to?              01:25:26
6  A.  I do not. You mean a legal opinion about   01:25:27
7      whether --                                 01:25:32
8  Q.  Whether they're true or not.             01:25:32
9  A.  No.                                        01:25:34
10 Q.  Okay. Now, so at bottom, I guess, when   01:25:34
11      we're talking about what the allegations are   01:25:48
12      that are described in Paragraph 7 and      01:25:50
13      subparagraphs, what we're really talking   01:25:53
14      about, I guess, is the number of allegedly   01:25:55
15      improper statements by defendants about the   01:25:57
16      off-label use of Neurontin; is that a fair   01:26:01
17      characterization?                          01:26:03
18      MR. NOTARGIACOMO: Objection.            01:26:04
19 A.  So the summary here, going back to the   01:26:05
20      error --                                   01:26:08
21 Q.  Sure.                                       01:26:09
22 A.  -- describes a number of different        01:26:09
23      activities as they were summarized in the   01:26:11
24      first amended class action complaint, and   01:26:15
25      some of them have to do with statements.   01:26:18

---

**160**

1  Others -- I mean, I guess if you take       01:26:21
2  studies promoting studies as statements as   01:26:25
3  well, perhaps you mean to consider all of   01:26:31
4  these things as statements. I think they're   01:26:33
5  not quite all statements.                    01:26:35
6  Q.  Okay. Fair enough. That's a good         01:26:36
7      clarification. I guess, though, using the   01:26:38
8      broadest definition of statements, you don't   01:26:49
9      know, yourself, whether any of the allegedly   01:26:51
10      improper or unlawful statements that are   01:26:53
11      mentioned in the complaint were, in fact,   01:26:54
12      untruthful; is that right?                 01:26:56
13      MR. NOTARGIACOMO: Objection.            01:26:58
14 A.  Again, I guess I'm having a little trouble   01:26:59
15      just because some of the discovery materials   01:27:06
16      I have reviewed suggest deliberate        01:27:09
17      strategies that as a layperson it seemed   01:27:13
18      untruthful to me, but I am not trying to   01:27:16
19      judge whether or not those are truthful.   01:27:21
20      Again, I have been asked to assume those   01:27:24
21      allegations are true and proceed from there.   01:27:26
22 Q.  But -- and -- fair enough. We'll         01:27:29
23      leave it at that.                          01:27:33
24      Who wrote the subparagraphs for         01:27:34
25  Paragraph 7?                                  01:27:41

---

**161**

1  A.  I did.                                     01:27:41
2  Q.  What did you base your work upon in doing   01:27:43
3      that?                                      01:27:47
4  A.  I reviewed the complaint.                  01:27:47
5  Q.  Anything else?                             01:27:52
6  A.  I may have reviewed some other discovery   01:27:53
7      documents which you see are cited there, so   01:27:56
8      those are documents as they're cited, but   01:27:58
9      that's essentially what I reviewed, yes.   01:28:01
10 Q.  Okay. And would it be correct to say that   01:28:04
11      your descriptions in Paragraph 7 are based   01:28:09
12      principally upon the allegations in the   01:28:13
13      complaint?                                 01:28:14
14 A.  My descriptions in Paragraph 7 and the   01:28:15
15      subparts thereof were my understanding of   01:28:19
16      the allegations as they were presented in   01:28:20
17      the complaint.                             01:28:22
18 Q.  Look at Paragraph 8, which is on Page 6.   01:28:23
19 A.  Okay.                                       01:28:37
20 Q.  Paragraph 8 describes "detailing visits" by   01:28:37
21      Parke-Davis employees, correct?           01:28:44
22 A.  Yes.                                        01:28:48
23 Q.  Is there any reason why Paragraph 8 of your   01:28:48
24      report is not Paragraph 7h)?              01:28:51
25 A.  My recollection is that while the discovery   01:28:53

41 (Pages 158 to 161)

162

1  documents relate to that, I don't believe        01:28:57
2  that that was characterized in that way in       01:28:59
3  the document, and so I haven't included it        01:29:02
4  in Paragraph 7, which I describe as my            01:29:05
5  summary of the allegations in the complaint.     01:29:08
6  Q.  So by "the document" in your last answer you 01:29:11
7  mean the complaint?                               01:29:12
8  A.  I'm sorry, the complaint, yes.                01:29:15
9  Q.  So Paragraph 8, I guess, derives from an     01:29:20
10  independent review that you would have done      01:29:22
11  of the documents and not your review of the      01:29:23
12  complaint?                                        01:29:26
13  A.  It was from a review of other discovery      01:29:26
14  materials presented to me in the case, yes,      01:29:30
15  but you're right, it's -- I believe it's not     01:29:33
16  from the complaint itself. So if you             01:29:35
17  believe that to be independent review, you       01:29:38
18  Q.  Fair enough. You cite as a couple of         01:29:40
19  footnotes in Paragraph 8 two specific            01:29:45
20  documents.                                        01:29:48
21  A.  Yes.                                          01:29:48
22  Q.  Are there other documents aside from those   01:29:50
23  two that you would have reviewed to support      01:29:53
24  your conclusions -- or support the               01:29:55
25  description that you gave in Paragraph 8?        01:29:58

163

1  A.  Those were the documents that -- from        01:30:00
2  Paragraph 8.                                      01:30:04
3  Q.  Those two documents, the memorandum from J.  01:30:05
4  Rizzo?                                            01:30:08
5  A.  That's right.                                 01:30:09
6  Q.  And the 1998 strategic plan?                 01:30:09
7  A.  That's my belief is that it's only those two 01:30:11
8  documents. Again, I wrote this, I'm sorry,       01:30:15
9  a year ago, so I would have to check, but it     01:30:18
10  is my recollection, as you suggest, that the     01:30:20
11  detailing issues were not described in the       01:30:22
12  first amended class action complaint.            01:30:25
13  Q.  Okay.                                         01:30:27
14      MR. POLUBINSKI: All right. Let's             01:30:34
15  mark the next one.                                01:30:35
16      (Exhibit No. 12, Document headed             01:30:52
17  "1998 Strategic Plan and A&P Allocation         01:30:52
18  Grid, Neurontin," marked for                      01:30:52
19  identification.)                                  01:30:54
20  Q.  I'm handing you now a document that's been   01:30:54
21  marked as Rosenthal Exhibit 12.                  01:30:57
22  A.  Okay.                                         01:30:59
23  Q.  So the last sentence of Paragraph 8 reads,  01:30:59
24  "During these 'detailing visits,' samples       01:31:13
25  were also strategically used to encourage        01:31:14

164

1  physicians to initiate off-label treatment       01:31:18
2  for new patients"; is that correct?             01:31:20
3  A.  I'm sorry.                                    01:31:22
4  Q.  Did I read it right? I apologize.            01:31:23
5  A.  I need to go back. I must have the wrong     01:31:24
6  exhibit, so I'm going back to this.              01:31:27
7  Q.  Yeah, this is part of Exhibit 1, exactly,   01:31:29
8  Paragraph 8.                                      01:31:31
9  A.  Paragraph 8, yeah. And please tell me what  01:31:32
10  you were just reading from.                       01:31:39
11  Q.  Yeah, the last sentence.                      01:31:39
12  A.  "During these 'detailing visits,'" yes.     01:31:41
13  Q.  Okay. The footnote at the end of that        01:31:44
14  sentence refers to a document that's             01:31:48
15  described in your report as "1998 strategic     01:31:50
16  plan and A&P allocation grid" --                 01:31:55
17  A.  Yes.                                          01:31:59
18  Q.  -- is that correct?                           01:32:00
19  A.  Yes, that's correct.                          01:32:00
20  Q.  Okay. Now, is the document that I've just    01:32:02
21  handed you, Rosenthal Exhibit 12, the           01:32:03
22  document that's referred to in Footnote 25?     01:32:05
23  A.  I believe it is. Page 4073, yes, it is.     01:32:07
24  Q.  And just looking at it, this looks like a   01:32:12
25  strategic plan grid, I guess --                  01:32:17

165

1  A.  It does.                                       01:32:18
2  Q.  -- for 1998?                                   01:32:19
3      This is a forward-looking document,           01:32:20
4  isn't it?                                          01:32:22
5  A.  I would assume a strategic plan is a          01:32:22
6  forward-looking document, yes.                    01:32:24
7  Q.  And so it doesn't actually state what amount 01:32:26
8  of money would have been spent on sampling;      01:32:28
9  is that right?                                     01:32:31
10  A.  That's correct.                               01:32:31
11  Q.  How does this document support your          01:32:31
12  statement that samples were also used           01:32:35
13  strategically -- or strategically used to        01:32:37
14  encourage physicians to initiate off-label       01:32:41
15  treatment for new patients?                      01:32:43
16  A.  Well, again, samples were part of the        01:32:45
17  strategic plan for, in this case on the          01:32:48
18  first page, "Expand Neurontin use in            01:32:50
19  epilepsy through the introduction of            01:32:53
20  monotherapy."                                     01:32:57
21  Q.  All right. So on this first page you read    01:32:58
22  from the language in the top box which          01:33:00
23  reads, "Expand Neurontin use in epilepsy        01:33:02
24  through the introduction of monotherapy,"       01:33:06
25  correct?                                          01:33:09

42 (Pages 162 to 165)

166

```
 1  A.  Yes.                                01:33:09
 2  Q.  And then there is a separate line part way   01:33:09
 3      down in the document that reads "Samples"?   01:33:12
 4  A.  That's correct.                      01:33:14
 5  Q.  And then amounts that seem to be associated  01:33:14
 6      with that line entry, correct?        01:33:17
 7  A.  Yes, that was my understanding.       01:33:19
 8  Q.  Now, the doctors who would have received   01:33:21
 9      these samples would have been doctors who   01:33:22
10      treated epileptics, correct?          01:33:25
11  A.  Presumably.                          01:33:26
12  Q.  Would you agree with me that there would be  01:33:29
13      nothing inherently wrong with giving a      01:33:32
14      sample of Neurontin to an epileptologist?   01:33:34
15          MR. NOTARGIACOMO:  Objection.     01:33:36
16  A.  Again, I don't want to opine on a legal     01:33:37
17      issue like that.                     01:33:40
18  Q.  Let me ask it a different way.  You're aware  01:33:45
19      that in 1998 Neurontin was approved by the   01:33:49
20      FDA for use in treating epileptic seizures;   01:33:52
21      is that correct?                      01:33:55
22  A.  I'm aware of the indications for which it   01:33:55
23      was approved, right.  So you said 1998?     01:33:59
24  Q.  By 1998, which is the date on --      01:34:02
25  A.  Right.                               01:34:02
```

167

```
 1  Q.  -- the documents.                    01:34:04
 2  A.  It was improvements earlier than that for   01:34:04
 3      partial seizures as a secondary line -- a   01:34:07
 4      second line of treatment, right.      01:34:10
 5  Q.  And wouldn't it make sense that doctors who   01:34:15
 6      would be prescribing the drug for on-label   01:34:18
 7      uses at the time would have been people who   01:34:20
 8      were treating epileptics?             01:34:22
 9          MR. NOTARGIACOMO:  Objection.     01:34:24
10  A.  It would make sense that some of those   01:34:24
11      physicians would treat patients who were   01:34:27
12      epileptics.                          01:34:29
13  Q.  And so for a Pfizer sales -- for a    01:34:30
14      Parke-Davis sales representative to give a   01:34:33
15      sample to an epileptologist in 1998 would   01:34:37
16      not necessarily have been encouraging an   01:34:40
17      epileptologist to use that drug for an   01:34:43
18      off-label use?                       01:34:45
19          MR. NOTARGIACOMO:  Objection.     01:34:46
20  A.  I don't think I'm in a position to respond   01:34:49
21      to that intelligently, I'm sorry.  I think   01:34:52
22      that that's asking for an evaluation that I   01:34:55
23      can't really make.                   01:34:57
24  Q.  Okay.  Do you have any knowledge about   01:34:58
25      whether sampling for FDA-approved uses is   01:35:07
```

168

```
 1      permissible?                         01:35:09
 2  A.  As a -- from a layperson's perspective --   01:35:10
 3  Q.  Sure.                               01:35:16
 4  A.  -- it's my understanding that sampling is   01:35:16
 5      permissible.                         01:35:18
 6  Q.  Okay.  Would you have any way, based on this   01:35:18
 7      document or anything else, to distinguish   01:35:27
 8      between samples that were given to an   01:35:29
 9      epileptologist for an on-label use versus   01:35:32
10      samples that were given for an off-label   01:35:37
11      use?                                 01:35:39
12  A.  Based on this document and my understanding   01:35:40
13      about the way a pharmaceutical company   01:35:44
14      tracks their promotional activities, I would   01:35:47
15      expect that they may track these activities   01:35:50
16      historically in the same way as they look   01:35:54
17      forward to what those activities -- what   01:36:00
18      those tactics are to achieve their strategic   01:36:02
19      plan.  And so I would look to data that   01:36:06
20      Parke-Davis or Pfizer may have where they   01:36:09
21      had documented their own sampling activities   01:36:12
22      by indication.                       01:36:14
23  Q.  The first question I guess is I gather you   01:36:19
24      haven't seen any data like that to date?   01:36:21
25  A.  I have seen some -- as are in my footnotes   01:36:24
```

169

```
 1      here, some data where they evaluate their   01:36:28
 2      own promotional activities for return on   01:36:32
 3      investment after meetings, for example,   01:36:34
 4      looking at return on investment.  Those are   01:36:38
 5      cited in here.  And so I would look for   01:36:40
 6      similar kinds of documents related to   01:36:43
 7      sampling.                            01:36:46
 8  Q.  Do you have an expectation as to whether --   01:36:47
 9      or a recollection from having reviewed the   01:36:50
10      documents as to whether there would be   01:36:52
11      documents that would distinguish between   01:36:53
12      samples that were given for on-label uses   01:36:55
13      for epileptics and samples that were given   01:36:58
14      for off-label uses for epileptics?    01:37:00
15  A.  I do not have a specific recollection about   01:37:02
16      samples.  I would expect that free samples,   01:37:07
17      for example, that would be given to   01:37:09
18      psychiatrists could be easily distinguished   01:37:10
19      from free samples that were given to   01:37:14
20      neurologists and that kind of tracking   01:37:17
21      could take place.                    01:37:20
22  Q.  Let's look at Paragraph 9 of Exhibit 1,   01:37:31
23      which is your declaration.  Paragraph 9   01:37:34
24      begins, if I'm reading it correctly,   01:37:41
25      "Assuming these allegations are true, the   01:37:44
```

43  (Pages 166 to 169)

170

1　economic impacts to the class would be the　01:37:46
2　following."　01:37:48
3　　For purposes of that clause, these　01:37:53
4　allegations, does that mean the allegations　01:37:55
5　in Paragraph 7?　01:37:58
6　A.　Yes, the allegations in Paragraph 7.　01:37:59
7　Q.　Would it also include the facts that　01:38:03
8　you've -- would it also include the material　01:38:07
9　in Paragraph 8?　01:38:10
10　A.　The material in Paragraph 8 is there because　01:38:11
11　there's an interrelationship, in my view,　01:38:14
12　between those kinds of promotional　01:38:17
13　activities detailing in free samples, so I　01:38:19
14　include it in the models, but I would rely　01:38:24
15　on counsel to tell me which effects were　01:38:25
16　going to be considered in terms of the　01:38:29
17　ultimate impact.  These promotional　01:38:31
18　activities, they have an interrelationship.　01:38:33
19　Q.　Okay.  I'm asking you something I think much　01:38:36
20　more simple than that, actually, with　01:38:37
21　respect to Paragraph 9.  And I'm really just　01:38:39
22　trying to get at which of the allegations　01:38:41
23　you're talking about for purposes of　01:38:43
24　Paragraph 9 and what their conclusions are　01:38:45
25　that are laid forth there.  Are you focused　01:38:47

171

1　on just the allegations in Paragraph 7, or　01:38:51
2　do you also have Paragraph 8 in mind as　01:38:53
3　well?　01:38:55
4　A.　To be technically correct, it would be just　01:38:55
5　Paragraph 7, yeah.　01:39:02
6　Q.　Okay.  So how dependent are the opinions　01:39:03
7　that you give in Paragraphs 9a) and b) on　01:39:05
8　the assumptions in Paragraph 7?　01:39:10
9　　　MR. NOTARGIACOMO:  Objection.　01:39:13
10　A.　How dependent are they on the truth of the　01:39:17
11　allegations broadly?　01:39:21
12　Q.　Yeah.　01:39:24
13　A.　I guess they're fully dependent on the truth　01:39:26
14　of those allegations.　01:39:30
15　Q.　Okay.  So if one of the assumptions or if　01:39:32
16　one of the allegations that's listed in　01:39:34
17　Paragraph 7 turned out not to be well-　01:39:37
18　founded and wasn't supported by the facts as　01:39:40
19　they developed in the case, what effect　01:39:42
20　would that have on the conclusions that you　01:39:44
21　reach in Paragraphs 9a) and 9b)?　01:39:47
22　A.　Well, I guess --　01:39:50
23　　　MR. NOTARGIACOMO:  Objection.  You　01:39:51
24　can answer.　01:39:51
25　　　THE WITNESS:  Sorry.　01:39:52

172

1　A.　I guess I would just like to back up a　01:39:53
2　sec that --　01:39:57
3　Q.　Sure.　01:39:57
4　A.　-- if all of the allegations were -- turned　01:39:57
5　out to be untrue in the legal sense, that　01:40:01
6　they were determined to be untrue then, then　01:40:04
7　the models would no longer relate.  If　01:40:08
8　selected pieces of the allegations were　01:40:11
9　untrue, then there would be different　01:40:13
10　indications included in the ultimate　01:40:16
11　analysis and different elements of　01:40:18
12　promotional strategy in the analysis, but　01:40:20
13　the overall picture would be the same.  The　01:40:25
14　general conclusions about where the economic　01:40:28
15　theory relates to the impact and what the　01:40:29
16　empirical strategy would be for identifying　01:40:33
17　it are generalizable.　01:40:34
18　Q.　Okay.  Again, I think I might be asking　01:40:36
19　something that's a little bit more simple,　01:40:39
20　which is -- maybe just take a second to take　01:40:40
21　a look at the --　01:40:42
22　A.　Okay.　01:40:43
23　Q.　-- conclusions that you list specifically in　01:40:43
24　Paragraphs 9a) and 9b).  We'll talk about　01:40:47
25　them more specifically later --　01:40:51

173

1　A.　Okay.　01:40:53
2　Q.　-- but just take a second to look at them.　01:40:53
3　A.　Okay.  So the conclusions in 9a) would still　01:40:56
4　hold as long as one of the allegations, any　01:40:59
5　one of those allegations, are true.  And 9b)　01:41:03
6　of course relates specifically to the　01:41:09
7　allegation with regard to dosing.  And this　01:41:11
8　would depend on ---　01:41:16
9　Q.　Now, with respect to 9a) when you say "any　01:41:18
10　one of the allegations," what do you have in　01:41:20
11　mind when you say "allegations"?　01:41:22
12　A.　So let's say, for example, it turned out　01:41:25
13　that the only thing the Court determined was　01:41:28
14　illegal here was about the published　01:41:32
15　studies, funding certain published studies　01:41:38
16　or rewriting the conclusions of certain　01:41:41
17　published studies.  Then that would -- the　01:41:44
18　analysis would be restricted to the impact　01:41:46
19　of those particular promotional strategies,　01:41:47
20　tactics and whatever indication that related　01:41:51
21　to, so it would be the same general model,　01:41:54
22　but it would be narrowed to a certain　01:41:58
23　mechanism and certain indications that would　01:42:00
24　relate to that mechanism.　01:42:02
25　Q.　Okay.　01:42:04

44　(Pages 170 to 173)

174

```
1  A.  Is that clear?                          01:42:04
2  Q.  Uh-huh.  All right.  Let's focus now on what   01:42:05
3      the specific conclusions in 9a) and 9b) are.  01:42:18
4  A.  Okay.                                   01:42:21
5  Q.  Let's start with 9a) --                 01:42:21
6  A.  Okay.                                   01:42:23
7  Q.  -- Paragraph 9a) on Page 7 of Exhibit 1,   01:42:24
8      which reads, "The Class paid for many more   01:42:28
9      prescriptions of Neurontin for off-label   01:42:30
10     uses than it would have absent the off-label   01:42:32
11     promotional activities."                01:42:35
12         What do you mean by "many more      01:42:40
13     prescriptions"?                         01:42:42
14         MR. NOTARGIACOMO:  Objection.  You  01:42:43
15  can answer.                                01:42:44
16  A.  I guess that's a somewhat general statement   01:42:44
17     that given the data I've reviewed, the   01:42:48
18     impact would be something greater than a   01:42:53
19     small amount and so that more prescriptions   01:42:55
20     of Neurontin at some significant level would   01:43:01
21     be -- would have been written based on what   01:43:04
22     appears to be the widespread promotional   01:43:05
23     activities related to these off-label uses.   01:43:10
24  Q.  Is your -- well, is there any sort of   01:43:12
25     threshold as to what some significant level   01:43:20
```

175

```
1      is, in your mind?                       01:43:23
2  A.  No.                                     01:43:24
3  Q.  Is your conclusion with respect to the many   01:43:24
4      more prescriptions -- well, let me withdraw   01:43:36
5      the question.                           01:43:41
6         And what's the basis for that        01:43:42
7      conclusion?                             01:43:43
8  A.  The basis for the conclusion is a review of   01:43:44
9      the economics of promotion, review of the   01:43:48
10     empirical literature showing the response to   01:43:51
11     promotion and review of the discovery   01:43:53
12     documents.                              01:43:55
13  Q.  Is it based at all on your model?       01:43:56
14  A.  Have I done any empirical analysis with the   01:44:00
15     model?  No.  The model is a model.       01:44:05
16  Q.  And so this conclusion is based -- let me   01:44:07
17     withdraw the question.                  01:44:18
18         Have you done any quantitative work to   01:44:18
19     support the conclusion that you reach in   01:44:27
20     Paragraph 9a)?                          01:44:29
21  A.  I have not done any of my own analysis.  As   01:44:29
22     we discussed earlier, I've reviewed some   01:44:33
23     analysis that was done in the Franklin   01:44:35
24     matter, but I have not -- this data, I   01:44:37
25     haven't analyzed them myself.            01:44:43
```

176

```
1  Q.  Let me ask you about the analysis that was   01:44:45
2      done in the Franklin matter.  Is it referred   01:44:47
3      to anywhere in your list of documents relied   01:44:49
4      on in Attachment A.2 of your declaration?   01:44:53
5  A.  It's in the notes.  Let me find the note for   01:44:56
6      a moment.  I'm going to cross-reference.  It   01:44:59
7      should be towards the end.  Footnote 72   01:45:15
8      references -- it's all part of the Franklin   01:45:25
9      documents, so I don't know if it -- if that   01:45:27
10     was picked up in the documents.  I guess   01:45:34
11     that could have been an oversight, but it's   01:45:37
12     referenced there.                       01:45:40
13  Q.  Do you know whether any of that material has   01:45:45
14     been produced to defendants?            01:45:47
15  A.  I would have thought that it was.  It was my   01:45:48
16     understanding that it was.  If it hasn't,   01:45:51
17     I'm afraid that's an oversight.          01:45:55
18         MR. NOTARGIACOMO:  Just for the      01:45:56
19     record, it's my understanding that there's   01:45:57
20     an agreement between counsel that any   01:45:59
21     documents that were produced in the Franklin   01:46:01
22     case, whether it be from plaintiffs to   01:46:02
23     defendants or defendants to plaintiffs can   01:46:04
24     be used in this litigation without   01:46:06
25     reproducing those documents again to the   01:46:07
```

177

```
1      party that produced them in the first place.   01:46:09
2         MR. POLUBINSKI:  Fair enough.  I      01:46:11
3      guess, the thing that we're working on here   01:46:12
4      is really -- the issue that we're working   01:46:14
5      with here is that we don't know precisely   01:46:17
6      what documents these are.  I don't think   01:46:19
7      they've ever been described to us, and it   01:46:20
8      makes it difficult for us to ask about them   01:46:23
9      if we don't know what they are.  So let me   01:46:28
10     just ask that if you can -- or, Professor   01:46:28
11     Rosenthal, if you can let us know which   01:46:31
12     documents those are, and if they are indeed   01:46:33
13     ones that have come from us, that's fine,   01:46:35
14     but we would like to know what they are.   01:46:37
15         MR. NOTARGIACOMO:  Well, I think      01:46:38
16     the witness has just pointed to Paragraph --   01:46:39
17     I'm sorry, Footnote 73 which --          01:46:41
18         THE WITNESS:  72 actually.           01:46:44
19         MR. POLUBINSKI:  She pointed to      01:46:45
20     Footnote 72 which doesn't contain any sort   01:46:46
21     of reference to a particular set of         01:46:49
22     documents.                              01:46:50
23         THE WITNESS:  Although maybe 73 is   01:46:51
24     the correct reference for that same --   01:46:52
25         MR. NOTARGIACOMO:  My understanding   01:46:54
```

**VERITEXT NEW YORK REPORTING COMPANY**

212-267-6868                                                           516-608-2400

178

1  is that the affidavit of Seth Landefeld,        01:46:54
2  M.D. and Michael Steiman, M.D. --              01:46:56
3        THE WITNESS:  That is where it            01:46:56
4  comes from.                                     01:46:56
5        MR. NOTARGIACOMO:  -- is where it         01:46:59
6  comes from.                                     01:47:00
7        MR. POLUBINSKI:  Okay.                    01:47:01
8        MR. NOTARGIACOMO:  Which should be        01:47:02
9  something that was filed in the Franklin        01:47:04
10  case, so the defendants should have copies     01:47:05
11  of that.                                        01:47:07
12        MR. POLUBINSKI:  Fair.                   01:47:08
13  BY MR. POLUBINSKI:                              01:47:08
14  Q.  Okay.  So just to make the record clear,   01:47:08
15  Professor Rosenthal, is that true that the     01:47:10
16  rollout of these data and the preliminary      01:47:13
17  analysis with them is contained in Exhibit 8   01:47:15
18  attached to the affidavit of Seth Landefeld    01:47:18
19  and Michael Steiman?                            01:47:26
20  **A.  I believe that to be true.  I don't have the**  **01:47:31**
21  **document in front of me, but now that I see**  **01:47:32**
22  **this I do believe that to be true.  There**    **01:47:34**
23  **are some documents that are attached as**      **01:47:36**
24  **Exhibit B to that document.**                  **01:47:37**
25  Q.  Okay.  All right.  Going back to before --  01:47:43

179

1  to the questions that I asked before about      01:47:53
2  Paragraph 9a) in the conclusion that's set      01:47:58
3  forth in Paragraph 9a), have you, yourself,     01:47:59
4  done any quantitative work to support this      01:48:03
5  conclusion?                                      01:48:05
6  **A.  At this time I have not been asked to do**  **01:48:05**
7  **quantitative analysis.**                        **01:48:07**
8  Q.  Okay.  And is this Exhibit B document to the  01:48:08
9  Landefeld/Steiman declaration one of the        01:48:11
10  items that you would have relied upon in        01:48:15
11  reaching this conclusion?                        01:48:17
12  **A.  It was, yes, it was.**                      **01:48:18**
13  Q.  Now, the analysis that you did here to come  01:48:28
14  to this conclusion that the class paid for      01:48:33
15  many more prescriptions of Neurontin for        01:48:37
16  off-label uses than it would have absent the    01:48:38
17  off-label promotional activities, is the        01:48:41
18  analysis that you did to support that           01:48:44
19  statement the type of analysis that you've      01:48:46
20  done -- type of analysis that you've done       01:48:49
21  before?                                          01:48:51
22  **A.  Yes, it's certainly consistent with the type**  **01:48:51**
23  **of analysis that I've done, looking, for**     **01:48:57**
24  **example, at the impact of direct consumer**    **01:48:58**
25  **advertising on prescription drug spending.**   **01:49:00**

180

1  Q.  Now, in your other work in which you've done  01:49:03
2  this analysis, do you typically do your own     01:49:23
3  economic analysis to support it as well?        01:49:25
4  **A.  I guess I'm not sure I understand the**     **01:49:26**
5  **question.  You're distinguishing my own**       **01:49:31**
6  **economic analysis to support --**              **01:49:34**
7  Q.  From review of the literature and review of  01:49:36
8  documents.                                       01:49:39
9  **A.  In my publishable academic work I certainly**  **01:49:40**
10  **review the literature and previous models,**   **01:49:43**
11  **and that's, you know, sort of part of every**  **01:49:47**
12  **analysis, and then proceed with the analysis**  **01:49:50**
13  **itself, yeah.**                                 **01:49:53**
14  Q.  Okay.  Let's look at Paragraph 9b) --       01:49:53
15  **A.  Okay.**                                     **01:50:11**
16  Q.  -- which reads, "For all clinical            01:50:11
17  indications (both approved and unapproved),     01:50:14
18  the class paid for greater dosing of            01:50:17
19  Neurontin (either as many more pills or as      01:50:19
20  increased dosage for the same number of         01:50:21
21  pills) than it would have absent Parke-         01:50:25
22  Davis's promotional activities."                01:50:27
23        Did I read that one right?                01:50:29
24  **A.  Yes, you did.**                             **01:50:31**
25  Q.  Great.  And here what did you mean -- or    01:50:32

181

1  what do you mean by "many more pills"?          01:50:36
2  **A.  Again, this was a general statement about**  **01:50:39**
3  **the fact that I expect to find an impact**      **01:50:43**
4  **that's substantial based on discovery**         **01:50:47**
5  **materials, based on my knowledge and**          **01:50:50**
6  **expertise in health economics research and**    **01:50:53**
7  **particularly with regard to pharmaceutical**    **01:50:58**
8  **promotion.**                                     **01:51:00**
9  Q.  Are the bases for your conclusion on this    01:51:00
10  point the same as the bases for your            01:51:04
11  conclusion with respect to the many more        01:51:06
12  prescriptions described in Paragraph 9a),       01:51:09
13  generally speaking?                              01:51:11
14  **A.  Generally speaking, they come from discovery**  **01:51:12**
15  **documents, the allegations, the literature,**   **01:51:14**
16  **yes.**                                           **01:51:17**
17  Q.  And here, too, did you do any quantitative   01:51:20
18  work to support this conclusion?                01:51:24
19  **A.  At this time I have not been asked to do**   **01:51:25**
20  **quantitative work to support that.**            **01:51:28**
21  Q.  Okay.  In terms of your prior published      01:51:30
22  work, have you ever published an article        01:51:35
23  that would have reached a general statement-    01:51:39
24  type conclusion like this based only on         01:51:43
25  literature review and review of documents?      01:51:45

46 (Pages 178 to 181)

182

```
 1  A.  Well, this -- I mean, just say that the      01:51:47
 2      scope of what I was asked to do in this      01:51:53
 3      matter did not include data analysis because 01:51:56
 4      those data are not complete yet, they have   01:52:00
 5      not been provided to me, particularly        01:52:02
 6      promotional data that will need to come from 01:52:05
 7      the defendants.  And so generally when I'm   01:52:07
 8      writing an academic paper, I'm not in a      01:52:11
 9      position where I have to get to the next     01:52:14
10      stage of the litigation to get -- to        01:52:16
11      actually obtain the data.  So I mean, it     01:52:19
12      just seems like comparing apples and oranges 01:52:22
13      to me.                                       01:52:25
14  Q.  Fair enough.                                 01:52:25
15          MR. POLUBINSKI:  But, Jessica,           01:52:27
16      would you mind reading back the question     01:52:28
17      again.                                       01:52:29
18      (Record read.)                               01:52:29
19          MR. NOTARGIACOMO:  I'm just going        01:52:46
20      to object to the question.  It was vague     01:52:47
21      before.  You can answer it.                  01:52:48
22  A.  I've certainly published papers that have no 01:52:49
23      quantitative analysis in them that come to   01:52:54
24      policy conclusions.  I can't say that I have 01:52:56
25      done something exactly like this.  I guess   01:53:01
```

183

```
 1      it seems -- it seems hard to answer that     01:53:04
 2      question, but I have certainly published     01:53:06
 3      papers that reach conclusions about policies 01:53:10
 4      and about what's going on in the market      01:53:14
 5      without doing data analysis.                 01:53:16
 6  Q.  What are the -- thinking about the articles  01:53:18
 7      that you have in mind, what are the bases     01:53:25
 8      that support your conclusions in those       01:53:27
 9      papers?                                      01:53:29
10          MR. NOTARGIACOMO:  Objection.            01:53:32
11  A.  So thinking about some papers, for example,  01:53:32
12      our original direct consumer advertising     01:53:41
13      paper in the New England Journal, we look at 01:53:44
14      market trends in direct consumer             01:53:48
15      advertising, spending, and based on what we  01:53:54
16      know about the economics of the market and   01:53:57
17      those trends in spending, we draw some       01:53:59
18      conclusions about what effects they may have 01:54:02
19      even though at that point we didn't have the 01:54:04
20      data to actually estimate the effects.       01:54:06
21  Q.  Where did you get -- did you have data on    01:54:11
22      trends in spending?                          01:54:13
23  A.  We had spending data from -- that can be     01:54:14
24      purchased publicly.                          01:54:16
25  Q.  Okay.  You know what?  Let's move on and     01:54:17
```

184

```
 1      turn to Paragraph 12.                        01:54:30
 2  A.  Okay.                                        01:54:33
 3  Q.  Paragraph 12 of your declaration discusses,  01:54:33
 4      among other things, in the second sentence,  01:54:41
 5      traditions as, quote, "a trusted             01:54:47
 6      intermediary in prescription drug (and all   01:54:49
 7      health care) decision making," correct?      01:54:52
 8  A.  That's correct.                              01:54:56
 9  Q.  What do you mean by "trusted intermediary."  01:54:56
10  A.  I use that term to describe essentially a    01:55:00
11      collaborative decision-making process about  01:55:05
12      what drugs individuals take, so individual   01:55:07
13      consumers don't make these decisions         01:55:12
14      independently and to differing degrees rely  01:55:15
15      on their physicians to advise them on what   01:55:18
16      drugs they should take.                      01:55:20
17  Q.  What's the basis for your understanding of   01:55:25
18      what a trusted intermediary is for purposes  01:55:27
19      of this declaration?                         01:55:30
20  A.  Broadly, my training and expertise in health 01:55:30
21      economics.                                   01:55:36
22  Q.  And that would be your coursework, your      01:55:37
23      research, other things?                      01:55:42
24  A.  Both, my coursework, my research.  I do a    01:55:43
25      lot of interdisciplinary research with       01:55:48
```

185

```
 1      physicians on related issues.                01:55:50
 2  Q.  Moving down in Paragraph 12, reading the     01:55:53
 3      next sentence, "While patient preferences    01:56:01
 4      play a role in the choice of therapy,        01:56:04
 5      physicians have enormous influence over      01:56:06
 6      health care decisions, particularly for      01:56:08
 7      serious medical conditions."                 01:56:10
 8      Did I read that correctly?                   01:56:15
 9  A.  Yes, you did.                                01:56:18
10  Q.  Does the extent of patient involvement or    01:56:19
11      preferences vary depending on the situation? 01:56:21
12  A.  That would be my conclusion from, again,     01:56:25
13      theory as well as my research experience.    01:56:28
14  Q.  You know, based on theory and your research  01:56:32
15      experience, would you say that patients with 01:56:35
16      certain conditions are more likely to be     01:56:37
17      actively involved in choices with respect to 01:56:39
18      their treatment than others?                 01:56:43
19  A.  My understanding, and I don't think there's  01:56:44
20      terrific empirical evidence on this, would   01:56:48
21      be that patients are more involved when it   01:56:51
22      comes to a chronic condition where they have 01:56:53
23      significant experience with the same problem 01:56:56
24      over and over again and also where that      01:56:59
25      condition or the drugs are not subject to    01:57:03
```

47 (Pages 182 to 185)

**186**

1    sort of a life-threatening issue.        01:57:09
2        So the more serious the condition, my    01:57:11
3    understanding from economics and the      01:57:14
4    psychology that runs alongside it is that   01:57:17
5    patients are less likely to be involved when  01:57:20
6    it's a life-threatening issue.          01:57:22
7  Q.  So just to be clear about it, patients are   01:57:24
8    less likely to be involved in life-       01:57:30
9    threatening issues, more likely --       01:57:34
10 A.  In making independent decisions about      01:57:35
11   treatments when there's a life-threatening   01:57:38
12   condition or very serious condition.       01:57:41
13 Q.  Would you say that -- you know, over the   01:57:43
14   period we're talking about in the class     01:57:44
15   period since 1994, would you say that the   01:57:44
16   extent of patient involvement in health care  01:57:46
17   decisions or treatment decisions has changed  01:57:49
18   over time?                     01:57:51
19 A.  It's a speculation. I don't know that we   01:57:51
20   have evidence to that effect, but I do think  01:57:55
21   that people in the industry believe that to  01:57:57
22   be true, what with direct consumer       01:57:59
23   advertising for one thing that consumers    01:58:01
24   have become more involved.            01:58:05
25 Q.  And so would you agree that consumers are  01:58:06

**187**

1    increasingly seeking active participation in   01:58:09
2    their own health care?               01:58:11
3  A.  I believe that's a statement that I would   01:58:12
4    agree with.                    01:58:15
5  Q.  Now, despite patients' roles, you also state  01:58:18
6    that physicians have enormous influence over  01:58:22
7    health care decisions, particularly for     01:58:25
8    serious medical conditions?            01:58:28
9  A.  Yes.                        01:58:31
10 Q.  What conditions would you describe as being  01:58:32
11   serious medical conditions for purposes of   01:58:33
12   this statement?                  01:58:36
13 A.  Again, I think the sort of main          01:58:36
14   characteristic that I was thinking of when I  01:58:40
15   said that was if it were a life-threatening   01:58:42
16   condition. Decision-making under those     01:58:44
17   circumstances is very difficult, and      01:58:47
18   patients are most likely to defer to their   01:58:49
19   trusted physician in that case.          01:58:53
20 Q.  Are there other categories of serious      01:58:58
21   medical conditions that you would have in   01:59:00
22   mind aside from life-threatening conditions,  01:59:02
23   or is it the same thing for purposes of this  01:59:04
24   analysis?                     01:59:06
25 A.  I guess I haven't thought it through to that  01:59:10

**188**

1    degree of detail, but other conditions with   01:59:12
2    serious medical consequences.          01:59:17
3  Q.  Now, even setting aside the parameters that  01:59:18
4    you discussed before about patients who have  01:59:35
5    chronic illnesses versus non-chronic      01:59:39
6    illness, patients who have serious        01:59:43
7    conditions versus less serious conditions,   01:59:44
8    will individual patients still even outside   01:59:47
9    of those categories -- will it vary the     01:59:49
10   extent to which individual patients will     01:59:56
11   have input into their health care decisions,  01:59:58
12   into their treatment decisions?          02:00:01
13 A.  Certainly there will be some variation in    02:00:02
14   that, yes.                    02:00:03
15 Q.  And some consumers of health care will     02:00:06
16   necessarily be more inquisitive than others?  02:00:08
17 A.  Yes, I would agree with that statement.     02:00:11
18 Q.  Okay. Would you agree that the extent to    02:00:12
19   which a patient is involved in his or her    02:00:16
20   health care decisions will depend on a range  02:00:20
21   of factors?                    02:00:21
22       MR. NOTARGIACOMO: Objection. You    02:00:26
23   can answer.                    02:00:27
24 A.  I guess it would vary. It might be that     02:00:27
25   there are some predictable factors. Is that  02:00:30

**189**

1    what you mean?                  02:00:31
2  Q.  Yeah.                       02:00:32
3  A.  Some specific factors that are associated   02:00:32
4    with it.                      02:00:34
5  Q.  So, for example, age might be a predictive   02:00:34
6    factor?                      02:00:37
7  A.  Potentially.                    02:00:37
8  Q.  Education level?                  02:00:38
9        MR. NOTARGIACOMO: Objection.       02:00:40
10 A.  I don't have any data on this, so if you're  02:00:40
11   asking me to speculate, then I could      02:00:44
12   speculate along with you that those might be  02:00:47
13   important.                    02:00:50
14 Q.  I guess what I'm asking for is what -- you   02:00:50
15   know, is what your understanding would be   02:00:54
16   based on, you know, the work that you do and  02:00:55
17   the work that you've done in this area and   02:00:59
18   consumer choice in health care decisions,    02:01:00
19   things like that.                 02:01:03
20 A.  Based on the work that I've done in this    02:01:03
21   area, it does seem -- broadly in consumerism  02:01:05
22   it does seem that age is a factor. That's    02:01:09
23   one that comes to mind.              02:01:12
24 Q.  Okay. Would you think that education level   02:01:16
25   would be, too?                  02:01:18

48 (Pages 186 to 189)

**VERITEXT NEW YORK REPORTING COMPANY**

190

```
1        MR. NOTARGIACOMO:  Objection.        02:01:18
2  A.  Again, it seems reasonable, but I don't have   02:01:19
3     any specific data on that.            02:01:21
4  Q.  Okay.  Fair enough.  There may be any number   02:01:22
5     of factors, I guess, that could, you know,   02:01:24
6     in the aggregate impact on the extent to      02:01:27
7     which people are involved in their health    02:01:29
8     care decisions, right?                02:01:30
9        MR. NOTARGIACOMO:  Objection.        02:01:31
10 A.  There may be factors that influence whether   02:01:31
11    people are involved in their individual       02:01:35
12    health decisions, yes.                02:01:37
13 Q.  But none of the factors by themselves would   02:01:38
14    tell us whether a particular individual was   02:01:40
15    more involved or less involved in a           02:01:42
16    particular prescription decision, for         02:01:44
17    example?                          02:01:46
18       MR. NOTARGIACOMO:  Objection.        02:01:46
19 A.  There is some randomness in which a person   02:01:47
20    is more or less involved, you mean, so there   02:01:53
21    may be factors that are important, but they   02:01:56
22    wouldn't predict perfectly.           02:01:58
23 Q.  I'm not sure that randomness is necessarily   02:01:59
24    a -- but that there's -- that each          02:02:01
25    individual circumstance will be different   02:02:03
```

191

```
1     based on factors -- based on a range of      02:02:04
2     unquantifiable factors?               02:02:11
3        MR. NOTARGIACOMO:  Objection.        02:02:12
4  A.  I'm not sure.  There are many factors.   02:02:13
5     There may be factors that we've not          02:02:20
6     discussed.  Whether they're unquantifiable   02:02:21
7     or not, that seems like a strong statement,   02:02:25
8     but there are no doubt many factors that     02:02:27
9     affect whether an individual patient decides   02:02:30
10    to get involved in decision-making around   02:02:31
11    prescription drugs.                  02:02:34
12 Q.  Okay.  And here's another question that      02:02:35
13    relates to that:  I assume that there's no   02:02:37
14    accepted or reliable way to measure patient   02:02:40
15    involvement, that you're aware of?       02:02:42
16       MR. NOTARGIACOMO:  Objection.        02:02:43
17 A.  Well, there are general scales.  There's a   02:02:44
18    patient activation scale that's been       02:02:52
19    developed by Judy Hibbard at the University   02:02:54
20    of Oregon.  She's a psychologist, and she's   02:02:57
21    been motivated by this general area about   02:03:02
22    how to get consumers more involved in their   02:03:04
23    health and health care, and so she developed   02:03:06
24    a scale that measures their knowledge and   02:03:09
25    ability to become engaged in self-care and   02:03:13
```

192

```
1     choosing providers based on quality       02:03:18
2     information.                       02:03:20
3  Q.  Have you used her scale before?        02:03:21
4  A.  I haven't used her scale, no, I have not.   02:03:23
5  Q.  You wouldn't, I assume, anticipate using it   02:03:26
6     in your work in this case, would you?    02:03:30
7  A.  I had not -- I don't believe it's relevant   02:03:31
8     to my analysis, so I had not planned to use   02:03:34
9     it, no.                           02:03:36
10 Q.  Here's another general question:  You would   02:03:43
11    agree that some doctors would be more      02:03:46
12    accepting or inviting of patient involvement   02:03:47
13    than others?                       02:03:49
14       MR. NOTARGIACOMO:  Objection.        02:03:50
15 A.  It would be hard to disagree with that   02:03:51
16    statement.                        02:03:54
17 Q.  Okay.  That some doctors will provide more   02:03:54
18    information to their patients than others?   02:03:57
19 A.  I would agree --                    02:03:59
20       MR. NOTARGIACOMO:  Objection.        02:04:00
21       THE WITNESS:  Sorry.              02:04:01
22 Q.  You can answer.                     02:04:03
23 A.  Yes, I would agree with that.         02:04:03
24 Q.  Some doctors may, for example, give patients   02:04:05
25    articles or excerpts of articles regarding   02:04:08
```

193

```
1     medications that they prescribe?        02:04:11
2        MR. NOTARGIACOMO:  Objection.        02:04:12
3  A.  I can imagine that would be the case in some   02:04:12
4     cases.                           02:04:18
5  Q.  And that many don't?                 02:04:18
6        MR. NOTARGIACOMO:  Objection.        02:04:20
7  A.  And I can imagine that would also be the   02:04:20
8     case.                            02:04:23
9  Q.  Okay.  Next sentence is "Professional      02:04:24
10    norms -- next sentence in Paragraph 12 of   02:04:30
11    your declaration is "Professional norms      02:04:32
12    require physicians to use their clinical   02:04:35
13    skills, knowledge and experience to make   02:04:37
14    therapeutic choices that are in the best     02:04:39
15    interest of their patients."          02:04:41
16       What do you mean by "professional       02:04:48
17    norms"?                           02:04:49
18 A.  I was speaking broadly there, but you could   02:04:49
19    think narrowly of the Hippocratic Oath   02:04:54
20    which in addition to do no harm has       02:04:57
21    something to do with treating patients,   02:05:00
22    doing the best for patients.          02:05:05
23 Q.  When you say you were thinking broadly, are   02:05:06
24    there things besides the Hippocratic Oath   02:05:10
25    that you had in mind when you wrote this?   02:05:13
```

49 (Pages 190 to 193)