### 194

```
 1  A.   Again, sort of broad notions of professional   02:05:15
 2       norms that physicians are obliged to try to    02:05:17
 3       improve the health of their patients or        02:05:22
 4       maintain the health of their patients to the   02:05:23
 5       best of their ability.                         02:05:26
 6  Q.   Are the norms that you have in mind -- I       02:05:32
 7       take it -- well, withdrawn.                    02:05:33
 8            I take it from your answer that the       02:05:35
 9       norms that you have in mind aren't             02:05:36
10       necessarily written down someplace?           02:05:37
11  A.   That's right.                                  02:05:39
12  Q.   Would you include within the professional      02:05:42
13       norms that you're describing here things       02:05:43
14       like practice guidelines?                      02:05:46
15  A.   No.  I guess I would think of practice         02:05:48
16       guidelines not as being professional norms,    02:05:50
17       they are more external advice.  The point of   02:05:54
18       this describing professional norms is to say   02:05:59
19       that we don't expect physicians to act like    02:06:04
20       other profit-maximizing firms, that the only  02:06:07
21       thing that matters to them is, for example,    02:06:12
22       profit, as we do in other industries.  We      02:06:14
23       actually expect physicians to do things that   02:06:16
24       may not be in their best financial interest,   02:06:19
25       for example, but are in the interest of        02:06:21
```

### 195

```
 1       patients.  Practice guidelines I would         02:06:23
 2       consider to be an external imposition in a     02:06:26
 3       way.                                           02:06:31
 4  Q.   Okay.  Okay.  Taking you back to what          02:06:31
 5       professional norms might be, would you         02:06:37
 6       include -- well, let me withdraw that          02:06:42
 7       question, too.                                 02:06:45
 8            THE VIDEOGRAPHER:  Excuse me.  Five        02:06:51
 9       minutes.                                       02:06:52
10            MR. POLUBINSKI:  Okay.                     02:06:52
11  Q.   Well, I assume -- well, just to back up, I     02:06:53
12       guess, do the norms that you have in mind      02:06:58
13       here vary at all from state to state, the      02:07:00
14       professional norms?                            02:07:03
15  A.   Professional norms?  No.  I was referring      02:07:04
16       more generally to, again, sort of              02:07:07
17       physicians' commitments to their patients.     02:07:10
18  Q.   Right.  Which I guess it may not vary state    02:07:14
19       to state, but presumably it might vary from    02:07:16
20       doctor to doctor?                              02:07:18
21  A.   Again, I think of these kinds of               02:07:19
22       professional norms as being very broad and     02:07:24
23       about the commitments physicians make, all     02:07:28
24       physicians make when they, you know, receive   02:07:30
25       their degree and when they enter into          02:07:34
```

### 196

```
 1       practice around something as broad as the      02:07:36
 2       Hippocratic Oath which applies to all          02:07:39
 3       physicians.                                    02:07:41
 4  Q.   I guess what I'm saying is that if it's so     02:07:42
 5       broad that we can't look somewhere to see      02:07:45
 6       where it's written down and that there's       02:07:49
 7       some difficulty articulating what it is,       02:07:50
 8       wouldn't you imagine that different doctors    02:07:52
 9       might have different understandings of what    02:07:54
10       those professional norms are?                  02:07:56
11            MR. NOTARGIACOMO:  Objection.             02:07:57
12  A.   Different doctors may operationalize those     02:07:58
13       professional norms in different ways, yes.     02:08:04
14  Q.   Okay.  But you would expect that most          02:08:06
15       doctors would take the requirement to use     02:08:08
16       their skills and knowledge seriously?          02:08:09
17  A.   I would.                                       02:08:11
18            MR. POLUBINSKI:  I see we've got          02:08:23
19       very little time left on the videotape.  I     02:08:24
20       think this might be a good time to take a      02:08:26
21       break.                                         02:08:29
22            THE WITNESS:  Too bad it's not...         02:08:30
23            MR. POLUBINSKI:  Yeah, maybe we can      02:08:32
24       just take enough of a break to switch tapes.   02:08:33
25            THE VIDEOGRAPHER:  The time is            02:08:36
```

### 197

```
 1       2:08.  This is the end of Tape 3, and we are   02:08:37
 2       off the record.                                02:08:43
 3            (Videographer changes tape.)             02:10:04
 4            THE VIDEOGRAPHER:  The time is            02:10:09
 5       2:10.  This is the beginning of Tape 4, and    02:10:10
 6       we are back on the record.                     02:10:12
 7  BY MR. POLUBINSKI:                                  02:10:17
 8  Q.   Okay.  Professor Rosenthal, if you could       02:10:23
 9       take a look at Paragraph 16 of your            02:10:26
10       declaration.                                   02:10:27
11  A.   Okay.                                          02:10:28
12  Q.   All right.  Now, you write here that "The      02:10:33
13       FDA requires that manufacturers demonstrate    02:10:35
14       both the safety and efficacy of new drugs      02:10:37
15       before marketing them for sale."               02:10:41
16            Is that a correct description?            02:10:42
17  A.   That's correct.                                02:10:44
18  Q.   Okay.  The FDA first approved Neurontin for   02:10:45
19       marketing in 1994?                             02:10:47
20  A.   I thought it was 1993, but I'll take your      02:10:48
21       word for it.                                   02:10:51
22  Q.   Well, why don't we take a look back at         02:10:51
23       Paragraph 7a) of your declaration.             02:10:55
24  A.   Okay.                                          02:10:58
25  Q.   You know what?  In fact --                     02:11:08
```

50  (Pages 194 to 197)

**VERITEXT NEW YORK REPORTING COMPANY**

212-267-6868                                    516-608-2400

## 198

1  A.  Approved in December '93.          02:11:10
2  Q.  Yeah.  Okay.  You're right.          02:11:11
3  A.  You're right, they began selling in January   02:11:13
4     '94.                               02:11:16
5  Q.  In January of '94.  So you're not --    02:11:16
6  A.  So --                              02:11:16
7  Q.  -- shortly (sic) right.  Yeah, okay.     02:11:17
8  A.  Okay.                             02:11:18
9  Q.  Neurontin was initially approved for    02:11:19
10    treatment of what condition?          02:11:22
11 A.  For partial seizures for adjunctive therapy,   02:11:22
12    is my understanding.                 02:11:29
13 Q.  Okay.  Now, you also write in your      02:11:30
14    declaration -- and I think this is in     02:11:32
15    Paragraph 7c), the top of Page 5 -- that   02:11:34
16    Parke-Davis began seeking FDA approval for   02:11:39
17    other indications, which include pediatric   02:11:42
18    adjunctive treatment for seizures and also   02:11:45
19    for postherpetic neuralgia; is that correct?   02:11:49
20 A.  That's in 7c)?  Yes.                 02:11:53
21 Q.  What do you mean by "began seeking"?   02:11:55
22 A.  Again, this is based on the complaint and   02:12:06
23    some of the documents that came along with   02:12:08
24    it, internal memos, that they were        02:12:10
25    undertaking the clinical studies necessary   02:12:15

## 199

1     to get those new indications listed.      02:12:17
2  Q.  Okay.  Does it mean -- in your mind, does it   02:12:21
3     mean filing of supplemental new drug      02:12:24
4     applications?                        02:12:27
5  A.  I'm afraid it doesn't mean something quite   02:12:27
6     that detailed in my mind at all --        02:12:32
7  Q.  Okay.                             02:12:34
8  A.  -- but my understanding was more that it was   02:12:34
9     related to launching the clinical trials    02:12:37
10    necessary to do that.                 02:12:38
11 Q.  Now, Neurontin was eventually approved for   02:12:46
12    pediatric adjunctive treatment, correct?   02:12:47
13 A.  That's correct.                     02:12:51
14 Q.  And it was eventually approved for PHN also,   02:12:51
15    correct?                           02:12:54
16 A.  That is correct.                    02:12:55
17 Q.  What is PHN, by the way?             02:12:55
18    MR. NOTARGIACOMO:  Objection.        02:12:56
19 A.  My understanding is that it's pain        02:13:00
20    associated with herpes.               02:13:02
21 Q.  Where does your understanding come from?   02:13:06
22 A.  Review of the documents.             02:13:13
23 Q.  Do you understand PHN to be a type of    02:13:15
24    neuropathic pain?                    02:13:18
25    MR. NOTARGIACOMO:  Objection.        02:13:19

## 200

1  A.  I'm not a clinical expert, so I would not   02:13:19
2     have made that connection, no.          02:13:22
3  Q.  Okay.  What does FDA approval of Neurontin   02:13:24
4     for these indications mean in terms of     02:13:28
5     safety?                            02:13:30
6  A.  My understanding is that they were able to   02:13:31
7     meet certain standards for the level of    02:13:34
8     evidence from clinical trials that was     02:13:37
9     provided in terms of whether the trials were   02:13:40
10    sufficiently large, well-designed to show   02:13:44
11    evidence that the -- that Neurontin was safe   02:13:47
12    and effective for those indications.       02:13:49
13 Q.  Okay.  You've mentioned certain standards --   02:13:56
14 A.  Uh-huh.                           02:14:02
15 Q.  -- that were met in order to gain approval   02:14:02
16    for those indications.  What is your       02:14:05
17    understanding for what those standards are?   02:14:08
18 A.  The standards -- my understanding is that   02:14:09
19    the standards are generally that there need   02:14:13
20    to be two trials of sufficient size, and    02:14:16
21    generally the standard is a double-blind    02:14:20
22    randomized control trial.              02:14:24
23 Q.  Do you know what "sufficient size" means?   02:14:25
24 A.  I do not specifically, no.             02:14:28
25 Q.  Do you have a general understanding?      02:14:31

## 201

1  A.  I have a general understanding that it      02:14:32
2     relates to the statistical power of the    02:14:35
3     analysis, but I don't know what that would   02:14:39
4     be in this case.                     02:14:41
5  Q.  Upon what is your understanding based on in   02:14:42
6     terms of what the standards are for FDA    02:14:47
7     approval?                          02:14:50
8  A.  I've reviewed FDA regulations in the past.   02:14:51
9  Q.  Are you aware of whether there's any       02:15:01
10    follow-up reporting to keep the drug on the   02:15:03
11    market?                           02:15:06
12 A.  Whether there's any post-marketing         02:15:06
13    surveillance -- oh, reporting required of    02:15:08
14    the manufacturers --                 02:15:10
15 Q.  Precisely.                         02:15:11
16 A.  -- as opposed to by the FDA --           02:15:12
17 Q.  Yes.                             02:15:15
18 A.  -- itself?                          02:15:15
19 Q.  Yes.                             02:15:16
20 A.  That's a good question.  I don't know the   02:15:17
21    answer to that, no.                  02:15:19
22 Q.  After a drug is approved, do manufacturers   02:15:21
23    generally continue to conduct studies to    02:15:25
24    determine its effectiveness for other      02:15:27
25    conditions?                        02:15:30

**VERITEXT NEW YORK REPORTING COMPANY**

212-267-6868                                    516-608-2400

## 202

1    MR. NOTARGIACOMO: Objection.    02:15:31
2 A.  I don't know whether that would be a    02:15:31
3    generalization. Would I expect in other    02:15:35
4    cases that it might be done to try to find    02:15:38
5    new indications for a drug, for example? It    02:15:40
6    certainly seems possible.    02:15:44
7 Q.  Why might a company choose to conduct such    02:15:45
8    additional studies? Can you think of    02:15:54
9    reasons why they would?    02:15:56
10    MR. NOTARGIACOMO: Objection.    02:15:57
11 A.  I think generally a company would do so to    02:15:57
12    try to increase its sales.    02:16:02
13 Q.  Can you think of reasons why a company might    02:16:05
14    choose not to conduct additional studies?    02:16:12
15    MR. NOTARGIACOMO: Objection.    02:16:15
16 A.  I could imagine that a company might not    02:16:15
17    conduct those additional studies if they    02:16:20
18    were very close to, for example, patent    02:16:23
19    expiration or exclusivity expiration.    02:16:26
20 Q.  If subsequent studies show that a drug is    02:16:30
21    efficacious in treating other indications,    02:16:41
22    are pharmaceutical manufacturers required to    02:16:42
23    pursue FDA approval for those additional    02:16:44
24    indications?    02:16:46
25    MR. NOTARGIACOMO: Objection.    02:16:47

## 203

1 A.  I do not believe so, no.    02:16:47
2 Q.  Do you know if they're encouraged or advised    02:16:52
3    by the FDA to seek additional indications --    02:16:54
4    seek approval for additional indications?    02:16:58
5 A.  I know that in specific cases I'm aware --    02:17:01
6    maybe "no" is a little too deep-sounding.    02:17:04
7    I'm aware that in specific cases, for    02:17:06
8    example, for pediatric indications the FDA    02:17:09
9    has programs that encourage manufacturers to    02:17:12
10    do additional clinical trials by extending    02:17:13
11    exclusivity.    02:17:17
12 Q.  Aside from that circumstance, are you aware    02:17:18
13    of -- are you aware of any other    02:17:23
14    circumstances in which a manufacturer might    02:17:28
15    be encouraged or advised by the FDA to    02:17:31
16    pursue additional indications?    02:17:33
17 A.  I'm not aware of any specific instances.    02:17:35
18 Q.  And can you imagine any circumstances under    02:17:37
19    which a company might decide not to pursue    02:17:47
20    additional indications even where subsequent    02:17:49
21    studies might show efficacy?    02:17:51
22    MR. NOTARGIACOMO: Objection.    02:17:52
23 A.  Again, I could imagine the case where the    02:18:01
24    patent is due to expire very quickly, that    02:18:03
25    that would be the case.    02:18:06

## 204

1 Q.  Are you aware that other countries have    02:18:13
2    analogous regulatory structures to the FDA?    02:18:15
3 A.  It's my understanding that other certainly    02:18:17
4    OECD countries, developed countries, have    02:18:20
5    analogous institutions.    02:18:23
6 Q.  Can you tell us what you mean by "OECD    02:18:26
7    countries"?    02:18:30
8 A.  Sorry, Organization -- you're going to test    02:18:30
9    my recollection, Organization For Economic    02:18:32
10    Development. I can't remember what the C is    02:18:35
11    for. It's an organization of western    02:18:36
12    economies that probably dates back to the    02:18:40
13    '60s, and they have aligned for a variety of    02:18:44
14    things, at one time exchange rate    02:18:48
15    stabilization, but now it's just sort of --    02:18:51
16    it's a group of mostly northern European    02:18:56
17    countries, the U.S. and Canada.    02:18:59
18 Q.  Okay. Why don't we take the European Union    02:19:01
19    as an example of this.    02:19:08
20 A.  Okay.    02:19:09
21 Q.  How much do you know about the European    02:19:09
22    Union system for approving prescription    02:19:12
23    drugs for marketing?    02:19:14
24 A.  I don't know very much. I understand that    02:19:15
25    it's something that -- it's a policy area    02:19:18

## 205

1    that's not fully coordinated yet, so the --    02:19:21
2 Q.  Coordinated in what way?    02:19:25
3 A.  The countries within the European Union I    02:19:26
4    believe still reserve their own right to    02:19:29
5    approve drugs, so they don't do it all as a    02:19:30
6    union, is my understanding, at least my    02:19:34
7    latest knowledge.    02:19:36
8 Q.  Okay. Insofar as there is -- well, insofar    02:19:37
9    as the European Medicines Agency does    02:19:40
10    actually conduct this sort of review, do you    02:19:43
11    have any sense for how that -- how its    02:19:44
12    process differs from the FDA's process?    02:19:47
13 A.  I do not.    02:19:49
14 Q.  I assume, though, that you don't have any    02:19:53
15    reason to believe that regulators in the    02:19:55
16    European Union aren't committed, generally    02:19:57
17    speaking, to patient safety?    02:20:00
18    MR. NOTARGIACOMO: Objection.    02:20:01
19 A.  I don't have any reason to believe that    02:20:02
20    they're not committed to patient safety.    02:20:04
21 Q.  I didn't think you would, don't worry.    02:20:06
22    And you don't have any reason to think    02:20:08
23    that regulators in the EU are committed to    02:20:11
24    approving drugs only for indications for    02:20:14
25    which they've been proven to be effective?    02:20:17

52 (Pages 202 to 205)

**VERITEXT NEW YORK REPORTING COMPANY**

212-267-6868                                516-608-2400

### 206

```
1       MR. NOTARGIACOMO: Objection.        02:20:19
2   A.  I'm sorry, I think there was a double    02:20:20
3       negative in there, and I just didn't hear  02:20:22
4       which way it went, so could you repeat?  02:20:24
5       MR. POLUBINSKI: Maybe if you could     02:20:26
6       read it back.                          02:20:28
7   A.  That would be great.                    02:20:29
8       (Record read.)                          02:20:30
9   Q.  Well, maybe I should read it again. Sounds  02:20:46
10      like one of my double or triple negatives  02:20:48
11      wasn't picked up.                        02:20:51
12  A.  Actually, it was a missing negative that  02:20:52
13      I --                                     02:20:53
14  Q.  I think you're right, so let me ask it more  02:20:54
15      slowly. You don't have any reason to think  02:20:56
16      that regulators in the EU are not committed  02:20:57
17      to approving drugs only for indications for  02:21:01
18      which they've been proven to be effective?  02:21:03
19      MR. NOTARGIACOMO: Objection.         02:21:05
20  A.  I don't have any reason to draw that     02:21:07
21      conclusion, no.                          02:21:10
22  Q.  And I assume also you don't have any reason  02:21:11
23      to doubt the competence of the applicable  02:21:13
24      regulators in the EU?                    02:21:15
25      MR. NOTARGIACOMO: Objection.         02:21:16
```

### 207

```
1   A.  I have no information about the competence  02:21:17
2       of the regulators in the EU. I have no     02:21:20
3       reason to doubt it.                       02:21:23
4   Q.  And so you wouldn't have any basis on which  02:21:24
5       to second-guess an official determination by  02:21:26
6       the European Medicines Agency that a drug is  02:21:28
7       safe and effective for a particular         02:21:31
8       indication?                               02:21:33
9       MR. NOTARGIACOMO: Objection.         02:21:33
10  A.  I wouldn't have any basis, nor would I be  02:21:34
11      asked to render such an opinion.           02:21:39
12  Q.  Fair enough. And why wouldn't you be asked  02:21:40
13      to render such an opinion?                 02:21:42
14  A.  Because I'm not an expert on clinical       02:21:43
15      effectiveness.                            02:21:46
16  Q.  Fair enough. Neuropathic pain is one of the  02:21:47
17      off-label indications at issue in the case,  02:21:52
18      right?                                     02:21:54
19  A.  Yes, I believe that's true.               02:21:54
20  Q.  And Neurontin's not approved for treatment  02:21:55
21      of neuropathic pain generally in the U.S.,  02:21:58
22      right?                                     02:22:01
23  A.  You mean, generally accepted in the case of  02:22:01
24      postherpetic neuralgia?                    02:22:04
25  Q.  Precisely, yeah.                          02:22:04
```

### 208

```
1   A.  Right.                                    02:22:07
2   Q.  Are you aware that Neurontin is approved for  02:22:07
3       the treatment of neuropathic pain in the    02:22:11
4       European Union?                           02:22:14
5       MR. NOTARGIACOMO: Objection.         02:22:15
6   A.  I believe that was mentioned in the        02:22:15
7       complaint.                                02:22:16
8   Q.  And are you aware that it had previously    02:22:17
9       been approved for neuropathic pain in a     02:22:19
10      number of countries like Germany, France or  02:22:22
11      the U.K.?                                  02:22:24
12  A.  I believe you if you tell me that. I do     02:22:25
13      recall that it had been approved somewhere.  02:22:27
14  Q.  Do you have any reason to believe that the  02:22:29
15      conclusion of those regulatory bodies in    02:22:37
16      those countries is unsupported by           02:22:39
17      scientifically valid evidence that Neurontin  02:22:40
18      is effective for treatment of neuropathic   02:22:42
19      pain?                                     02:22:45
20      MR. NOTARGIACOMO: Objection.         02:22:45
21  A.  Other than the allegations made in the     02:22:46
22      complaint, I have no reason to believe that  02:22:48
23      that is unsubstantiated.                   02:22:51
24  Q.  Which allegations in the complaint do you  02:22:53
25      mean?                                     02:22:56
```

### 209

```
1   A.  Because there are allegations in the        02:22:56
2       complaint with regard to neuropathic pain    02:22:57
3       that suggests that there must be something  02:23:00
4       in the effectiveness evidence.            02:23:01
5   Q.  And you're aware that Neurontin -- well,    02:23:08
6       withdrawn.                                02:23:10
7       Are you aware that Neurontin was          02:23:11
8       approved for treatment of neuropathic pain  02:23:13
9       in several countries outside of Europe, too?  02:23:15
10  A.  I was not specifically aware of it. Again,  02:23:17
11      I was aware that some of these indications  02:23:20
12      had been approved elsewhere, but I don't    02:23:22
13      have the specific details in my head.      02:23:24
14  Q.  And you wouldn't have the details of any of  02:23:27
15      those countries' approvals of Neurontin for  02:23:28
16      treatment of neuropathic pain, I assume,    02:23:31
17      either?                                    02:23:33
18  A.  No, I wouldn't.                           02:23:33
19  Q.  Do you have any view as to whether a drug   02:23:40
20      that's been approved for another indication  02:23:42
21      in another country, but not in the U.S., is  02:23:43
22      unsafe?                                    02:23:46
23      MR. NOTARGIACOMO: Objection.         02:23:47
24  A.  I don't have a view on that, no.          02:23:48
25  Q.  Do you have a view as to whether a drug     02:23:54
```

**VERITEXT NEW YORK REPORTING COMPANY**

212-267-6868                                      516-608-2400

## 210

1  that's been approved for an indication in      02:23:56
2  another country but not in the U.S. for a      02:23:59
3  particular indication is inefficacious for      02:24:01
4  the indication for which it has not been       02:24:05
5  approved in the U.S.?                          02:24:08
6      MR. NOTARGIACOMO: Objection.               02:24:09
7 **A. I actually followed that.                 02:24:10**
8 Q. Good.                                        02:24:12
9 **A. No, I don't have any expertise to evaluate 02:24:13**
10 **that.                                        02:24:16**
11     MR. POLUBINSKI: Okay. I think              02:24:21
12 we're at a good stopping point for your        02:24:21
13 call, if that makes sense.                     02:24:25
14     MR. NOTARGIACOMO: Except my call           02:24:26
15 doesn't start for another nine minutes. It     02:24:27
16 starts at 2:30. So we can break, and it'll     02:24:29
17 just be a longer break.                        02:24:34
18     MR. POLUBINSKI: Yeah, why don't we         02:24:36
19 go off the record. What time do you have?      02:24:38
20     THE VIDEOGRAPHER: 2:24.                    02:24:42
21     MR. POLUBINSKI: It's all right.            02:24:42
22     THE VIDEOGRAPHER: Go off the               02:24:45
23 record?                                        02:24:45
24     MR. POLUBINSKI: Yes. Yeah.                 02:24:45
25     THE VIDEOGRAPHER: The time is              02:24:47

## 211

1  2:24. We're off the record.                    02:24:48
2      (Recess taken.)                            02:24:52
3      THE VIDEOGRAPHER: The time is 2:57         02:57:16
4  p.m., and we are back on the record.           02:57:19
5  BY MR. POLUBINSKI:                             02:57:23
6 Q. So, Professor Rosenthal, what is off-label   02:57:26
7  use?                                           02:57:31
8 **A. My working definition of off-label use was 02:57:32**
9 **use of a drug for a diagnosis or indication   02:57:37**
10 **other than that which is approved and         02:57:41**
11 **therefore covered on the FDA-approved label.  02:57:45**
12 Q. Would you agree that the FDA doesn't         02:57:51
13 restrict a doctor's discretion in deciding     02:57:54
14 whether to prescribe a drug off-label?         02:57:57
15 **A. That's correct.                           02:58:00**
16 Q. Do you have an understanding for why        02:58:01
17 off-label prescription is permitted by the     02:58:03
18 FDA?                                           02:58:05
19 **A. I do not have an understanding of what their 02:58:05**
20 **reasons are, no.                             02:58:08**
21 Q. Okay. Let's look at Paragraph 13 of your    02:58:08
22 report.                                        02:58:10
23 **A. Okay.                                     02:58:10**
24 Q. And look at the --                          02:58:10
25 **A. Oh, I'm sorry, I'm on Page 13.            02:58:23**

## 212

1 Q. That's okay.                                 02:58:25
2 **A. I'm sorry.                                 02:58:26**
3      MR. NOTARGIACOMO: Page 13.                 02:58:26
4 **A. Okay. All right. I'm with you.            02:58:29**
5 Q. And I'm looking at the second sentence. And 02:58:29
6  I think probab -- well, the second sentence    02:58:33
7  reads, "As the 'learned intermediary,' there   02:58:35
8  are times when it is legitimate for a          02:58:38
9  physician to carefully prescribe and monitor   02:58:40
10 off-label use of pharmaceuticals for           02:58:42
11 specific patients for specific indications."   02:58:45
12     Did I read that correctly?                 02:58:49
13 **A. Yes, you did.                             02:58:50**
14 Q. And what's the basis for that statement?    02:58:51
15 **A. My general training and experience working 02:58:53**
16 **in this area, that off-label use is a         02:58:55**
17 **routine part of clinical practice.            02:58:59**
18 Q. Does a doctor need to inform a patient when  02:59:00
19 he or she prescribes a drug off-label?         02:59:09
20     MR. NOTARGIACOMO: Objection.               02:59:11
21 **A. You know, I'm not sure if that would be the 02:59:12**
22 **case. I'm not sure the answer to that         02:59:16**
23 **question. You mean ethically does the        02:59:18**
24 **doctor need to inform a patient, or do you    02:59:20**
25 **mean legally?                                02:59:22**

## 213

1 Q. Any requirement that you're aware of at all. 02:59:23
2  Is there any requirement that you're aware     02:59:27
3  of that a doctor inform the patient that he    02:59:28
4  or she is prescribing a drug off-label?        02:59:30
5 **A. I'm not aware of any requirement, no.      02:59:33**
6 Q. Do you have an understanding for whether     02:59:35
7  some doctors do inform their patients that     02:59:37
8  they're prescribing a drug off-label?          02:59:39
9 **A. I don't have any evidence on that point.   02:59:41**
10 Q. Would you have any reason to believe that   02:59:46
11 some doctors do -- or don't, I should say?     02:59:49
12     MR. NOTARGIACOMO: Objection.               02:59:51
13 Q. Let me think of a clearer way to phrase the 02:59:52
14 question.                                      02:59:56
15 **A. Sure.                                     02:59:56**
16 Q. You wouldn't disagree with me if I told you 02:59:56
17 that some doctors informed patients that       03:00:01
18 they're prescribing drugs off-label,           03:00:04
19 correct?                                       03:00:05
20 **A. I wouldn't be surprised that some doctors do 03:00:07**
21 **inform their patients that they're            03:00:09**
22 **prescribing off-label.                       03:00:11**
23 Q. And you wouldn't be surprised to learn that 03:00:12
24 some doctors don't inform their patients       03:00:14
25 that they're prescribing drugs off-label?      03:00:15

54 (Pages 210 to 213)

## 214

1  MR. NOTARGIACOMO: Objection.  03:00:17
2 A. I would not be surprised to learn that.  03:00:17
3 Q. And I assume -- well, are you aware of any  03:00:21
4  way to know with respect to the  03:00:27
5  prescriptions that are at issue in your  03:00:30
6  report which of those prescriptions are ones  03:00:32
7  in which a doctor informed his or her  03:00:35
8  patient that the drug Neurontin was being  03:00:39
9  prescribed off-label?  03:00:42
10 A. No, there wouldn't be any way to know that.  03:00:42
11 Q. Looking back at your -- at the sentence that  03:00:46
12  we just read, what does the word  03:00:50
13  "legitimate" mean in the sentence?  03:00:52
14 A. I was using that term in a general  03:00:56
15  colloquial meaning of within the scope of  03:00:59
16  the physician's discretion, within the scope  03:01:03
17  of his or her professional discretion.  03:01:06
18 Q. So were you using it in a legal sense?  03:01:09
19 A. No. Again, I was using it in a colloquial  03:01:12
20  sense.  03:01:15
21 Q. Okay. By "colloquial," is that -- I guess  03:01:16
22  I'm still trying to understand quite what  03:01:19
23  that means. Is it legitimate in a clinical  03:01:21
24  sense?  03:01:24
25 A. I meant it in the sense that it would be  03:01:24

## 215

1  reasonable that there would be a basis upon  03:01:31
2  which the physician could reasonably justify  03:01:34
3  off-label prescribing.  03:01:39
4 Q. To justify it in a clinical sense?  03:01:42
5 A. In a professional sense. Perhaps that's  03:01:47
6  what you mean by "clinical."  03:01:52
7 Q. Sure. Can you provide an example of an  03:01:54
8  acceptable or legitimate off-label  03:01:58
9  prescribing circumstance?  03:02:01
10 A. I could imagine a circumstance in which  03:02:02
11  there is no approved treatment for a  03:02:06
12  condition, and a physician in that case  03:02:09
13  might choose to prescribe something  03:02:14
14  off-label.  03:02:16
15 Q. And what would make that off-label  03:02:19
16  prescription legitimate?  03:02:21
17 A. I guess, again, in the way that I understood  03:02:22
18  and used this term, based on some clinical  03:02:29
19  knowledge about the mechanism for whatever  03:02:33
20  illness it was and the drug itself.  03:02:37
21 Q. I assume that for a prescription to be  03:02:46
22  legitimate there must be some basis for the  03:02:48
23  doctor to believe that the drug will be  03:02:51
24  effective for the patient for the off-label  03:02:53
25  use at issue; is that right?  03:02:55

## 216

1 A. That's correct. That's perhaps a clearer  03:02:56
2  way of what I was trying to say, that there  03:03:01
3  was a condition that had a characteristic  03:03:03
4  that somehow fit with the way a drug acts.  03:03:05
5 Q. Okay. And whether or not it's legitimate I  03:03:08
6  assume would be based on the specific  03:03:12
7  circumstance of a patient?  03:03:14
8  MR. NOTARGIACOMO: Objection.  03:03:16
9 A. Again, I was using the term broadly that  03:03:17
10  there would be a professional justification  03:03:21
11  for doing so based on the patient and the  03:03:23
12  drug at hand.  03:03:27
13 Q. Medicaid reimburses for at least some  03:03:28
14  off-label prescriptions; is that correct?  03:03:35
15 A. I don't know the full details of how  03:03:37
16  Medicaid treats off-label use.  03:03:39
17 Q. Do you know any of the details about how  03:03:45
18  Medicaid treats off-label use?  03:03:47
19 A. I've certainly read something broadly about  03:03:49
20  it, but I'm afraid I don't feel qualified to  03:03:52
21  summarize what it is I read about it.  03:03:55
22 Q. Okay. Are you aware that private insurers  03:03:57
23  also reimburse for off-label uses?  03:04:04
24 A. That, I am aware of.  03:04:08
25 Q. Do you have any understanding for why they  03:04:09

## 217

1  do it?  03:04:10
2  MR. NOTARGIACOMO: Objection.  03:04:11
3 A. I don't know why, no.  03:04:11
4 Q. Okay. Let's look at Paragraph 13, which is  03:04:15
5  also on Page 7.  03:04:29
6 A. Yes, I'm there.  03:04:33
7 Q. The third sentence reads, "Such off-label  03:04:34
8  prescribing can benefit both individual  03:04:39
9  patients and patient populations as clinical  03:04:40
10  experience leads to the formation of  03:04:43
11  hypotheses to be tested in structured  03:04:46
12  clinical trials."  03:04:49
13  Did I read that one correctly?  03:04:50
14 A. Yes, you did.  03:04:51
15 Q. What do you mean by "benefit" in this  03:04:52
16  sentence as respects individual patients?  03:05:00
17 A. Let's see. Let me see if there's a way to  03:05:02
18  describe it. I mean generally with respect  03:05:12
19  to individual patients that they might --  03:05:18
20  they might have an improvement in their  03:05:21
21  condition as a result of prescribing, and  03:05:24
22  then with regard to populations --  03:05:29
23 Q. Uh-huh. Yes.  03:05:32
24 A. -- I meant in the sense of increasing the  03:05:32
25  available information with which to base  03:05:36

55 (Pages 214 to 217)

218

```
1    future clinical trials.                03:05:39
2  Q.  Okay.  So with respect to individual   03:05:44
3    patients, I guess you would agree that in   03:05:49
4    some circumstances at least an individual   03:05:54
5    patient can enjoy a tangible benefit by    03:05:55
6    virtue of an off-label prescription?       03:05:58
7  A.  Yes, that would certainly be true in some  03:06:02
8    cases.                                 03:06:05
9  Q.  And that -- is there any way to quantify   03:06:05
10   that benefit?                          03:06:44
11 A.  Could you be more specific?  Is there any   03:06:45
12   way to quantify --                     03:06:48
13 Q.  You know, why don't I withdraw the question,  03:06:50
14   actually.  That's fine.                03:06:52
15     Let's look at Paragraph 17, and in     03:06:53
16   particular let's look at the third sentence  03:07:08
17   here.  "In particular, promotional materials  03:07:10
18   may only make claims that are supported by   03:07:13
19   scientific evidence (supported by strict   03:07:17
20   scientific procedures) and they may not be   03:07:20
21   false or misleading."                  03:07:23
22     Did I read that correctly?           03:07:27
23 A.  Yes, you did.                        03:07:28
24 Q.  Upon what do you base that statement?    03:07:28
25 A.  A review of the -- I believe the code is   03:07:32
```

219

```
1    cited there, the Federal 21 CFR 202.1, just   03:07:38
2    a general, again, layman's review.  These   03:07:43
3    are sort of the underlying regulations in    03:07:45
4    this area.                            03:07:47
5  Q.  Anything else?                        03:07:48
6  A.  That's it.                          03:07:49
7  Q.  What does "supported by strict scientific   03:07:50
8    procedures" mean?                     03:07:56
9  A.  So, again, with regard to the scientific   03:07:57
10   evidence that was used to gain approval for   03:07:59
11   the drug for that indication, so clinical   03:08:02
12   trials, randomized control trials.     03:08:05
13 Q.  Is there -- is that all, or are there other   03:08:10
14   things?                               03:08:19
15 A.  My understanding is that there are a number   03:08:19
16   of rules around how the trials can be run,   03:08:21
17   how patients are selected, that sort of    03:08:24
18   thing.  Those all, again, are the same rules   03:08:26
19   about what kind of evidence will be used for   03:08:29
20   approval.                             03:08:32
21 Q.  Does your statement that I just read in    03:08:32
22   Paragraph 17 apply only to written        03:08:40
23   materials, or does this statement also apply   03:08:43
24   to oral communications?               03:08:45
25 A.  I believe it also applies to oral        03:08:47
```

220

```
1    communications.  Certainly the promotional   03:08:49
2    materials can be oral that are governed     03:08:52
3    by -- these rules also govern consumer      03:08:55
4    advertising which is broadcast on TV and    03:08:59
5    radio.                                03:09:05
6  Q.  And so this statement would apply, I assume,   03:09:05
7    also to the physician-oriented marketing    03:09:09
8    efforts that are described in Paragraph 19   03:09:12
9    on the next page of your declaration?      03:09:14
10 A.  That's my understanding.              03:09:16
11 Q.  Things like detailing, free samples,      03:09:17
12   sponsorship, medical education events?     03:09:20
13 A.  My understanding with regard to the        03:09:24
14   promotional claims, that they not be false   03:09:26
15   or misleading and are supported by evidence   03:09:29
16   and that they apply to all promotional      03:09:32
17   activities.                           03:09:34
18 Q.  Okay.  You also write in Paragraph 17, "FDA   03:09:34
19   regulations call for 'fair balance' in all   03:09:42
20   promotional claims and materials."        03:09:45
21 A.  That is correct.                      03:09:49
22 Q.  What is "fair balance"?                03:09:50
23 A.  Well, that's a quote, as you see, from the   03:09:53
24   code itself, and my interpretation is that   03:09:56
25   interpretation is that risks and benefits be   03:10:00
```

221

```
1    represented in fair proportion to their    03:10:04
2    actual magnitude.                     03:10:08
3  Q.  So it's a balancing of the presentation of   03:10:09
4    risks and benefits?                   03:10:17
5  A.  That's my understanding, and I have worked   03:10:18
6    most directly with this as it relates to    03:10:21
7    consumer advertising, and so in television   03:10:24
8    ads that means the level of volume, the size   03:10:28
9    of the fonts, whether the person is speaking   03:10:31
10   in the foreground or the background, but,    03:10:34
11   again, sort of the extent to which risks and   03:10:37
12   benefits are presented proportionally to    03:10:38
13   their potential impact.               03:10:42
14 Q.  Now, taking as an example the direct       03:10:44
15   consumer advertising, would it be correct to   03:10:49
16   say that what is or isn't fair balance will   03:10:53
17   depend on the circumstances of the specific   03:10:55
18   communication?                        03:10:58
19     MR. NOTARGIACOMO:  Objection.         03:11:01
20 A.  I can imagine that there's a -- the factors   03:11:01
21   that one would look at in a television ad    03:11:07
22   for example, would be somewhat different     03:11:10
23   than in a print ad.  As I mentioned,        03:11:13
24   obviously the print ad, it's really all     03:11:15
25   about font size and color and that sort of   03:11:17
```

56  (Pages 218 to 221)

222

```
 1    thing where -- on the television. I know    03:11:19
 2    there's been a lot of question about the    03:11:21
 3    type of speaker, the volume of speech, the  03:11:24
 4    speed of speech, so...              03:11:27
 5 Q. What about the content?            03:11:28
 6 A. Certainly the content matters, but I think a 03:11:29
 7    lot of what I've seen relates to how the    03:11:34
 8    content is presented. The content, I        03:11:38
 9    believe, typically comes from the approved   03:11:42
10    labeling.                     03:11:45
11 Q. In the case of the advertisements, correct?   03:11:46
12 A. That's correct.                    03:11:49
13 Q. So that obviously couldn't be true of        03:11:49
14    something like a discussion at a continuing    03:11:57
15    medical education event; is that correct?     03:12:00
16 A. You can imagine that there would be an       03:12:01
17    analogous yardstick.                 03:12:03
18 Q. Right. But how the yardstick is applied      03:12:05
19    would be based on the individual            03:12:08
20    circumstance, correct?                03:12:09
21    MR. NOTARGIACOMO: Objection.           03:12:15
22 A. I imagine that it would be applied somewhat   03:12:15
23    differently looking at a professional         03:12:18
24    conference.                     03:12:19
25 Q. All right. Let's move ahead to Paragraph 18   03:12:20
```

223

```
 1    where you write, quote, "Promotional        03:12:31
 2    materials must be consistent with the FDA-   03:12:34
 3    approved product labeling."            03:12:37
 4 A. I see that, yes.                   03:12:42
 5 Q. What does this mean in terms of             03:12:43
 6    communications by manufacturers on off-label  03:12:49
 7    uses?                        03:12:52
 8 A. My understanding is that manufacturers       03:12:52
 9    cannot promote their products according to    03:12:57
10    the FDA, that they cannot promote their       03:12:59
11    products for indications for which there has   03:13:02
12    not been approval.                  03:13:05
13 Q. When you say "manufacturers cannot promote    03:13:12
14    their products," you don't mean, do you,      03:13:15
15    that a manufacturer can never utter any       03:13:17
16    circumstances communicate any truthful or     03:13:19
17    non-misleading information about an          03:13:22
18    off-label use to a doctor, do you?          03:13:24
19    MR. NOTARGIACOMO: Objection.           03:13:26
20 A. I guess that's such a specific statement, it  03:13:26
21    seems that it calls for expertise that I       03:13:31
22    don't have. My understanding was that the     03:13:34
23    regulatory basis here was that promotion      03:13:36
24    needed to be consistent with what was        03:13:38
25    approved.                     03:13:40
```

224

```
 1 Q. Okay. I'm just asking you mainly about, you   03:13:40
 2    know, about the statement that's actually in   03:13:44
 3    your declaration itself. Do you have any      03:13:46
 4    understanding for how this statement that's    03:13:50
 5    in your declaration would apply generally to   03:13:52
 6    communications that are made by a            03:13:56
 7    manufacturer about an off-label use of a      03:13:57
 8    drug?                        03:13:59
 9 A. Do you mean --                     03:14:00
10    MR. NOTARGIACOMO: Objection.           03:14:03
11 A. Do you mean communications to physicians?      03:14:04
12 Q. Yes, I do.                       03:14:06
13 A. Okay. My understanding was that -- and       03:14:07
14    perhaps it's a misunderstanding, but my       03:14:11
15    understanding was that the FDA did not allow   03:14:13
16    manufacturers to promote through            03:14:18
17    communications to physicians their products    03:14:24
18    for indications for which they had not been    03:14:27
19    approved.                     03:14:30
20 Q. Okay. And I guess my question is, by the      03:14:33
21    verb "promote" is that meant to cover all      03:14:36
22    communications of any kind by a manufacturer   03:14:39
23    about off-label uses of one of its drugs?     03:14:41
24 A. It's meant to cover, I guess, those things    03:14:44
25    that I consider to be promotion, which would   03:14:49
```

225

```
 1    include detailing, those kinds of meetings    03:14:51
 2    where the speakers were there for continuing   03:14:58
 3    medical education -- where the speakers       03:15:00
 4    cannot be the promotional staff from the      03:15:05
 5    manufacturers, the kinds of promotional       03:15:10
 6    events and things like detailing, those       03:15:13
 7    sorts of visits that we talked about          03:15:16
 8    earlier. That's what I mean by "promotion."    03:15:18
 9 Q. Okay. So do you have an understanding as to   03:15:24
10    whether there may be some communications by    03:15:28
11    a manufacturer on off-label uses to doctors    03:15:30
12    that may not qualify as promotion, as you     03:15:33
13    define it --                    03:15:33
14 A. No.                          03:15:33
15 Q. -- in your answers?                 03:15:39
16 A. I don't have an understanding about that,     03:15:40
17    no.                         03:15:42
18 Q. Do you have an understanding -- let me give   03:15:42
19    you a couple of examples. Do you have an      03:15:48
20    understanding that the FDA rule that you      03:15:51
21    describe in your declaration would limit or    03:15:58
22    prohibit a doctor -- limit or prohibit a       03:16:01
23    manufacturer from providing a reprint of an    03:16:04
24    article published in the Journal of the       03:16:09
25    American Medical Association, for example,    03:16:13
```

57 (Pages 222 to 225)

226

1  that describes an off-label use if the         03:16:13
2  doctor asks the manufacturer for a reprint     03:16:15
3  of that article?                               03:16:18
4      MR. NOTARGIACOMO: Objection.               03:16:19
5  A. I think that's an area that goes a little   03:16:19
6     bit beyond my understanding, so I don't know  03:16:22
7     the specific restrictions.                  03:16:24
8  Q. Okay. I'm really just asking you as to      03:16:27
9     whether that sort of a circumstance is what  03:16:28
10    you had in mind when you wrote this first   03:16:30
11    sentence of Paragraph 18.                   03:16:32
12 A. What I had in mind in the sentence was to   03:16:34
13    generally make the point that the FDA as an  03:16:40
14    institution govern promotional activities in  03:16:44
15    the pharmaceutical sector and that the      03:16:47
16    general rules were that promotional         03:16:49
17    activities should be restricted to approved  03:16:52
18    uses. Whether there are some exceptions to  03:16:54
19    that, I don't know. And it sounds like      03:16:59
20    you're suggesting that if the physician     03:17:01
21    requests information on an off-label use,    03:17:03
22    maybe that's an exception, but my knowledge  03:17:05
23    doesn't go that deep.                       03:17:09
24 Q. Okay. Fair enough. I guess maybe can we    03:17:10
25    agree that there may be types of            03:17:13

227

1  communications between a manufacturer and a    03:17:14
2  doctor on off-label uses that don't fall       03:17:18
3  within the promotional materials guidance      03:17:22
4  that you describe in Paragraph 18?             03:17:26
5      MR. NOTARGIACOMO: Objection.               03:17:29
6  A. I would be willing to accept that, yes.     03:17:29
7  Q. Okay. For the next couple of questions why  03:17:35
8     don't we just assume for purposes of my    03:17:46
9     questions that some kinds of activity like  03:17:48
10    distribution of peer-reviewed journal       03:17:52
11    articles to doctors are, in fact, permitted  03:17:55
12    under the FDA's regulatory scheme. Again,   03:17:59
13    just for purposes of these questions, let's  03:18:01
14    assume that. Is that okay?                  03:18:03
15 A. Yes, that's okay with me.                   03:18:05
16 Q. Okay. You would agree that that sort of     03:18:06
17    activity might have an impact on            03:18:08
18    prescriptions written for off-label uses?   03:18:10
19 A. I would expect that the distribution of     03:18:12
20    materials, if they were positive, showed    03:18:18
21    effectiveness from these peer-reviewed      03:18:21
22    articles, might have an effect on           03:18:23
23    prescribing, yes.                           03:18:28
24 Q. And I assume you wouldn't be able to        03:18:30
25    identify which promotional off-label        03:18:33

228

1  activities might be permitted by the FDA and   03:18:34
2  which would not be, again, assuming that       03:18:37
3  some -- you know, that some are and some       03:18:39
4  aren't?                                        03:18:41
5      MR. NOTARGIACOMO: Objection.               03:18:42
6  A. I guess I'm not sure -- I'm happy to assume  03:18:42
7     that some are and some aren't, but are you  03:18:48
8     telling me that I can't tell which ones are  03:18:50
9     permitted and which ones aren't? So I don't  03:18:52
10    know what is the criterion for              03:18:55
11    "permissible."                              03:18:57
12 Q. Yeah, I guess it's a hard question to answer  03:18:58
13    if you're not aware of what the distinction  03:19:00
14    is. I'm fine with withdrawing the question.  03:19:02
15 A. Okay.                                       03:19:05
16 Q. Again, looking just at the first sentence of  03:19:06
17    Paragraph 16 and the statement that it      03:19:18
18    gives, under -- just following this         03:19:24
19    statement would it be correct to say that   03:19:31
20    the FDA would limit the circumstances in    03:19:35
21    which a manufacturer might provide what is  03:19:38
22    entirely truthful information about a drug?  03:19:40
23        MR. NOTARGIACOMO: Objection.            03:19:45
24 A. This is sort of the converse of what you    03:19:48
25    asked me to assume before, that there are   03:19:51

229

1  some circumstances in which truthful           03:19:54
2  information is limited by the FDA.             03:19:56
3  Q. Yeah, I mean, I think that's right.         03:20:02
4  A. My understanding, again, there may be       03:20:11
5     truthful information but which has not led  03:20:12
6     to the approval of an indication and        03:20:16
7     therefore cannot, for example, be included  03:20:17
8     in the product label which could be seen as  03:20:18
9     a form of promotion, so my understanding is  03:20:21
10    that that is correct.                       03:20:25
11 Q. Okay. Maybe a simpler way of putting it     03:20:25
12    would be to say that the FDA doesn't permit  03:20:27
13    a manufacturer to say whatever it wants to  03:20:29
14    about an off-label use, even if the         03:20:31
15    manufacturer's statements are entirely      03:20:33
16    truthful?                                   03:20:36
17 A. That was my understanding, yes.             03:20:36
18 Q. And so, again, just based on your           03:20:38
19    understanding as it's set forth in the      03:20:50
20    declaration, a manufacturer who provides    03:20:52
21    this truthful information about an off-label  03:20:54
22    use could very well violate federal laws or  03:20:56
23    the FDA's policies prohibiting off-label    03:20:59
24    promotion, correct?                         03:21:01
25        MR. NOTARGIACOMO: Objection.            03:21:02

**VERITEXT NEW YORK REPORTING COMPANY**

212-267-6868                                    516-608-2400

230

```
1  A.  I guess that's correct. I don't know --      03:21:03
2      when you say laws versus regulations, I        03:21:10
3      don't want to make a legal opinion that        03:21:13
4      doesn't make sense, but...                     03:21:14
5  Q.  That's fine. As opposed to laws or legal --   03:21:16
6      or regulation, let's just say, would violate   03:21:19
7      the policy that you describe in your           03:21:22
8      declaration?                                    03:21:24
9  A.  My understanding of the policy is that the    03:21:25
10     regulation applies to information whether      03:21:28
11     it's truthful or not.                           03:21:30
12 Q.  Okay. Are you offering an opinion in the      03:21:32
13     case on any matters that are related to the    03:21:45
14     FDA's regulation of the promotion of           03:21:47
15     prescription drugs?                             03:21:50
16 A.  My discussion of the FDA regulations was      03:21:51
17     sort of in the context of supporting sort of   03:21:53
18     the institutional setting of what's going      03:21:56
19     on, so I'm not making an opinion about FDA    03:21:59
20     regulations per say, but it's an important    03:22:01
21     part of the context.                            03:22:04
22 Q.  Let's turn back to Paragraph 12 of your       03:22:05
23     declaration, and I think I would like to       03:22:16
24     focus particularly on the last sentence --    03:22:24
25 A.  Okay.                                           03:22:27
```

232

```
1  Q.  But the statement's obviously not true of     03:23:37
2      all physicians -- for all physicians,          03:23:40
3      correct?                                         03:23:42
4  A.  It could not be said to be true of all         03:23:42
5      physicians for all evidence.                    03:23:46
6  Q.  Sure. That some physicians are more aware     03:23:49
7      than others of the latest evidence on --      03:23:52
8      latest scientific evidence on treatments,      03:23:56
9      right?                                           03:23:59
10 A.  That's right.                                   03:24:00
11 Q.  Why are physicians often not aware of the      03:24:00
12     latest scientific evidence on treatments?      03:24:06
13 A.  Well, the whys are the subject of theories.   03:24:10
14     It's sometimes hard to test that sort of      03:24:14
15     thing, but there are a couple of reasons      03:24:16
16     that you can imagine. First, there are many   03:24:19
17     new treatments every year, and in addition    03:24:23
18     to those new approved indications and drugs,   03:24:27
19     there are experiments going on and being       03:24:31
20     published in the literature, as you cited,     03:24:34
21     so there is just a substantial volume of       03:24:38
22     information; two, physician practice is        03:24:41
23     increasingly complicated, compressed due to    03:24:48
24     constraints on the payment system,             03:24:53
25     particularly for primary care physicians, so   03:24:55
```

231

```
1  Q.  -- which reads, "Thus, as I will describe in  03:22:27
2      more detail below, physicians are often not    03:22:31
3      aware of the latest scientific evidence on     03:22:34
4      treatments and rely heavily on commercial      03:22:37
5      sources of information, such as                03:22:39
6      pharmaceutical company promotional             03:22:41
7      materials."                                      03:22:44
8      Did I read that correctly?                      03:22:44
9  A.  Yes, you did.                                    03:22:45
10 Q.  Now, the first part of this statement that     03:22:49
11     physicians are often not aware of the latest   03:22:51
12     scientific evidence on treatments, what's     03:22:53
13     the basis for that statement?                  03:22:55
14 A.  The statement is based on the review of       03:22:57
15     studies that follows, and these studies have   03:23:02
16     been done at various points in time through    03:23:06
17     various methods, but showing that physicians   03:23:08
18     do rely on commercial sources of information   03:23:12
19     and are influenced by them.                     03:23:14
20 Q.  When you say that "physicians are often not    03:23:15
21     aware," what does that mean? What does the    03:23:24
22     word "often" mean there?                       03:23:26
23 A.  It's a -- I'm using it in very general        03:23:27
24     terms, that it's -- this is not an uncommon   03:23:32
25     situation.                                      03:23:35
```

233

```
1      there's limited amount of time that they can   03:25:02
2      use to read the literature; and third, many   03:25:04
3      physicians aren't really trained to evaluate   03:25:08
4      clinical studies scientifically.               03:25:11
5  Q.  Is that it, those three?                       03:25:20
6  A.  Those would be my three major issues, yeah.   03:25:21
7  Q.  Okay. I assume that none of the three is      03:25:24
8      that the information just isn't available;     03:25:26
9      is that correct?                                03:25:29
10 A.  That the information isn't available about    03:25:29
11     what studies have been done on new             03:25:33
12     treatments?                                      03:25:37
13 Q.  Yeah, what the latest scientific evidence on   03:25:37
14     treatments is?                                  03:25:41
15 A.  I guess by definition it seems like the       03:25:41
16     latest scientific evidence is available.       03:25:44
17 Q.  Okay. Pursuing a couple of these by           03:25:45
18     reference to --                                 03:25:54
19 A.  Okay.                                           03:25:55
20 Q.  -- your Paragraph 12 --                         03:25:55
21 A.  Okay.                                           03:26:00
22 Q.  -- you write in what I think is the next --    03:26:01
23     well, maybe not the next sentence. There is    03:26:05
24     a sentence that starts in the middle of the    03:26:08
25     paragraph that begins, "In practice, however   03:26:10
```

59 (Pages 230 to 233)

234

1  they," meaning physicians, I take it, "face    03:26:13
2  numerous constraints, including limited time    03:26:15
3  and cognitive ability to digest the    03:26:18
4  continuous flow of information about new    03:26:21
5  treatments."    03:26:22
6  A.  That's correct.    03:26:23
7  Q.  And that statement sort of encompasses at    03:26:23
8  least the last two of the three on your    03:26:29
9  list, I would think; is that correct?    03:26:30
10 A.  That is correct. It encompasses all three.    03:26:32
11 Q.  Okay. Will the time constraints facing    03:26:36
12 physicians vary from doctor to doctor?    03:26:44
13 A.  They may, yes.    03:26:45
14 Q.  Would they likely vary from specialty to    03:26:46
15 specialty as well?    03:26:49
16 A.  It's possible.    03:26:49
17 Q.  When you say that doctors have limited    03:26:51
18 cognitive ability, what do you mean by that?    03:26:58
19 A.  The ability to synthesize information from a    03:27:00
20 variety of sources, a variety of types when    03:27:05
21 there are many studies.    03:27:09
22 Q.  I'm assuming from there that you're not    03:27:16
23 suggesting that doctors in the aggregate    03:27:18
24 have more limited cognitive ability than the    03:27:19
25 population as a whole, even setting aside    03:27:22

235

1  economics, Ph.D.s and people with law    03:27:23
2  degrees?    03:27:25
3  A.  I would not ever make such a statement. I    03:27:26
4  really mean as all human beings given that    03:27:30
5  there are 10, 20 clinical journals published    03:27:34
6  in a given physician's discipline every    03:27:38
7  week, there's just too much information for    03:27:41
8  anyone to process even if one had the time    03:27:43
9  to read it all.    03:27:47
10 Q.  Would you agree that doctors on the whole    03:27:48
11 are knowledgeable about matters relating to    03:27:50
12 medical care?    03:27:55
13 A.  I would agree that doctors on the whole are    03:27:55
14 knowledgeable about matters relating to    03:27:58
15 medical care.    03:28:00
16 Q.  And in terms of cognitive ability, cognitive    03:28:05
17 ability is something that will obviously    03:28:10
18 vary from doctor to doctor?    03:28:12
19 A.  I would expect cognitive ability to vary    03:28:13
20 from doctor to doctor, yes.    03:28:17
21 Q.  And the ability to process the various    03:28:18
22 sources of information that are available to    03:28:20
23 doctors will vary from doctor to doctor?    03:28:22
24 A.  That could certainly be true, yes.    03:28:25
25 Q.  So I think we agreed that some doctors are    03:28:33

236

1  better informed about scientific evidence    03:28:35
2  and treatments than others; is that right?    03:28:37
3  A.  Yes, I would agree with that statement.    03:28:40
4  Q.  Okay. What are the things that would    03:28:42
5  account for variations and the extent to    03:28:45
6  which a particular doctor is well-informed?    03:28:48
7  MR. NOTARGIACOMO: Objection.    03:28:52
8  A.  One thing might be training. So, for    03:28:52
9  example, a physician with a degree in public    03:28:57
10 health might be better able to synthesize    03:29:00
11 the literature.    03:29:04
12 Q.  What about geographic location? Does that    03:29:06
13 make any difference?    03:29:11
14 MR. NOTARGIACOMO: Objection.    03:29:11
15 A.  I don't have a theory as to why it would    03:29:12
16 make a difference, no.    03:29:14
17 Q.  How about the institutional setting in which    03:29:14
18 the doctor works?    03:29:17
19 A.  That might make --    03:29:18
20 MR. NOTARGIACOMO: Objection.    03:29:19
21 A.  That might make a difference.    03:29:20
22 Q.  And so would you say that, for example, a    03:29:27
23 doctor who works in a large University    03:29:29
24 Hospital will generally be more likely to be    03:29:32
25 aware of the latest scientific treatments    03:29:34

237

1  than, say, a doctor who works in a remote    03:29:36
2  rural practice?    03:29:39
3  A.  As a theory it sounds like a reasonable one.    03:29:39
4  I don't have any empirical evidence on that,    03:29:47
5  but...    03:29:49
6  Q.  Fair enough. But in any event, it's    03:29:50
7  something that will ultimately depend on the    03:29:52
8  individual physician, him or herself, right?    03:29:54
9  MR. NOTARGIACOMO: Objection.    03:29:56
10 A.  There will be variation across physicians in    03:29:56
11 terms of their ability to make use of this    03:30:00
12 information, yes.    03:30:03
13 Q.  And won't individual doctors' level of    03:30:09
14 knowledge change from one point in time to    03:30:12
15 another?    03:30:14
16 MR. NOTARGIACOMO: Objection.    03:30:15
17 A.  Yes. I imagine a physician might read an    03:30:15
18 article, and their level of knowledge would    03:30:22
19 change.    03:30:24
20 Q.  Precisely. Or they might be better informed    03:30:24
21 after having just attended a stretch of    03:30:28
22 continuing medical education?    03:30:30
23 MR. NOTARGIACOMO: Objection.    03:30:33
24 A.  As an example, that seems like a reasonable    03:30:34
25 supposition.    03:30:39

**VERITEXT NEW YORK REPORTING COMPANY**

212-267-6868                                    516-608-2400

**238**

```
 1  Q.  Okay. Also in Paragraph 12 -- let's figure      03:30:40
 2      which sentence it is -- in the last sentence      03:30:46
 3      you say that physicians "rely heavily on         03:30:53
 4      commercial sources of information such as         03:30:58
 5      pharmaceutical company promotional               03:31:00
 6      materials"?                                       03:31:02
 7  A.  Yes, that's correct.                              03:31:03
 8  Q.  What's the basis for that statement?              03:31:05
 9  A.  There are some studies that I cite that           03:31:06
10      provide evidence of -- in specific               03:31:09
11      instances, but as also you may be aware and      03:31:12
12      I'm aware through my own research and            03:31:15
13      training that physicians have these sources      03:31:17
14      of information in their offices, and studies     03:31:20
15      show that they are influenced by them.           03:31:23
16  Q.  When you say the "sources of information in      03:31:28
17      their offices," what sources do you mean?        03:31:30
18  A.  Pamphlets, promotional -- even promotional       03:31:32
19      materials like pens and notepads.                03:31:35
20  Q.  So setting aside the pens and the notepads,      03:31:46
21      are the commercial sources of information        03:31:49
22      that you refer to necessarily different from     03:31:51
23      the latest scientific evidence of treatments     03:31:51
24      that you referred to elsewhere in the same       03:31:54
25      paragraph?                                        03:31:56
```

**239**

```
 1  A.  Are they necessarily different?                   03:31:56
 2  Q.  (No verbal response.)                             03:31:59
 3  A.  They may overlap, but they also include           03:31:59
 4      evidence that's not necessarily in the           03:32:02
 5      scientific literature. As you might have         03:32:04
 6      noticed in some of the studies, they             03:32:07
 7      particularly look at information that was         03:32:09
 8      provided through promotional materials but       03:32:11
 9      was inconsistent with the latest scientific      03:32:13
10      literature.                                       03:32:15
11  Q.  But we can agree that they do in some cases      03:32:16
12      at least overlap?                                 03:32:21
13  A.  We can agree on that, yes.                         03:32:25
14  Q.  How aware do you think doctors are that a        03:32:30
15      manufacturer's promotional materials may be      03:32:33
16      less than perfectly balanced?                     03:32:35
17  A.  Based on the survey data that I cite here,       03:32:36
18      physicians are aware in general that             03:32:45
19      pharmaceutical materials may not be              03:32:46
20      perfectly balanced. They report that.            03:32:48
21  Q.  So to what extent do you believe that           03:32:54
22      doctors could look with some skepticism on       03:32:55
23      the promotional efforts by manufacturers?        03:32:58
24  A.  I would expect physicians to look with some      03:33:01
25      skepticism, yes, on those promotional           03:33:03
```

**240**

```
 1      efforts.                                          03:33:10
 2  Q.  Do you believe that all doctors can be           03:33:10
 3      expected to respond to manufacturer              03:33:12
 4      information in the same way?                      03:33:13
 5  A.  I believe that the mechanism is the same.        03:33:18
 6      The quantum of response may vary from            03:33:20
 7      physician to physician.                           03:33:22
 8  Q.  When you say "the mechanism is the same,"        03:33:24
 9      what do you mean?                                 03:33:27
10  A.  Well, physicians are exposed to promotional     03:33:28
11      activities, and it influences their             03:33:32
12      prescribing behavior because it changes the     03:33:40
13      information they have in their head about an     03:33:42
14      indication or a drug and whether consciously    03:33:45
15      or not it affects their prescribing, as has     03:33:48
16      been shown certainly in the literature of       03:33:53
17      the impact of physician promotional             03:33:54
18      activities.                                       03:33:56
19  Q.  Now, I think you said that at least the         03:33:57
20      quantum, so in other words, the -- what I       03:34:00
21      understand to be the impact -- the extent to    03:34:03
22      which the manufacturer promotional materials    03:34:06
23      affect an individual doctor's decision will     03:34:10
24      vary from doctor to doctor; is that correct?    03:34:12
25  A.  That's correct, it will vary.                     03:34:15
```

**241**

```
 1  Q.  And the -- I think we probably also agree        03:34:17
 2      that the degree of skepticism with which a      03:34:22
 3      manufacturer's promotional materials are        03:34:26
 4      reviewed by a given doctor will vary from       03:34:29
 5      doctor to doctor; is that correct, too?          03:34:29
 6          MR. NOTARGIACOMO: Objection.                 03:34:33
 7  A.  That's correct.                                   03:34:33
 8  Q.  Now, I would imagine also -- well, let me       03:34:34
 9      withdraw it and phrase it a different way.       03:34:39
10      Wouldn't a doctor's level of                    03:34:41
11      skepticism also vary depending on the           03:34:44
12      context in which the particular kind of         03:34:46
13      promotional activity occurs?                     03:34:48
14          MR. NOTARGIACOMO: Objection.                 03:34:51
15  A.  Could you be more specific? I'm not sure        03:34:51
16      what kind of context you mean.                   03:34:53
17  Q.  Yeah, no. Sure, that's fine. A good             03:34:55
18      example might be, in the case of detailing      03:34:57
19      wouldn't you imagine that some sales            03:35:00
20      representatives would be more credible to       03:35:02
21      certain doctors than others?                     03:35:04
22          MR. NOTARGIACOMO: Objection.                 03:35:06
23  A.  I could certainly imagine that would be the     03:35:07
24      case.                                             03:35:09
25  Q.  Or, for example, that a particular sales        03:35:10
```

61 (Pages 238 to 241)

**242**

1  representative might have a particularly  03:35:12
2  good relationship with a specific doctor?  03:35:14
3      MR. NOTARGIACOMO: Objection.  03:35:16
4  A.  That could also be the case, sure.  03:35:17
5  Q.  And would a specific relationship -- I  03:35:24
6  guess, would those differences also impact  03:35:31
7  the degree of skepticism that a particular  03:35:36
8  doctor applied to a particular piece of  03:35:39
9  manufacturer promotion?  03:35:48
10 A.  Possibly.  03:35:51
11 Q.  Now, in view of the fact -- I think you  03:35:52
12 testified that levels of knowledge of  03:36:05
13 scientist -- latest scientist evidence will  03:36:07
14 vary from doctor to doctor, correct?  03:36:10
15 A.  That's correct.  03:36:11
16 Q.  And that different doctors might have  03:36:11
17 different levels of skepticism as respects  03:36:14
18 individual promotional activity, correct?  03:36:17
19 A.  Correct.  03:36:19
20 Q.  In view of this -- if some number of  03:36:19
21 different doctors all heard the same untrue  03:36:26
22 statement about a drug, isn't it possible  03:36:31
23 that some might be deceived, but some might  03:36:32
24 not?  03:36:35
25     MR. NOTARGIACOMO: Objection.  03:36:36

**243**

1  A.  It is possible that some physicians might  03:36:36
2  not be deceived by some untruthful  03:36:40
3  information if it was presented that way,  03:36:43
4  yes.  03:36:46
5  Q.  And can you think of any way to identify  03:36:46
6  which doctors were deceived and which were  03:36:49
7  not without some sort of individualized  03:36:51
8  inquiry into each individual doctor?  03:36:54
9  A.  If the purpose of my inquiry were to figure  03:36:58
10 out which doctors were deceived and which  03:37:03
11 were not, I guess the first thing I would  03:37:05
12 look at was their behavior, but -- if that  03:37:08
13 were the purpose of my inquiry.  03:37:13
14 Q.  And it would be an individualized look at  03:37:14
15 their behavior, I take it?  03:37:17
16 A.  Well, I guess that's --  03:37:18
17 Q.  If that's what you were looking at. I  03:37:19
18 understand that --  03:37:22
19 A.  Sorry, but, yes, it sounds like an  03:37:24
20 individualized question, and so therefore it  03:37:25
21 would require individualized inquiry.  03:37:28
22 Q.  Are there some physicians who don't ever  03:37:31
23 come into contact -- well, withdrawn. Let  03:37:33
24 me try that one again.  03:37:36
25     Are there some physicians who do not  03:37:37

**244**

1  ever come into contact with representatives  03:37:41
2  of manufacturers of particular drugs?  03:37:43
3  A.  I believe that may be true, yes.  03:37:46
4  Q.  And so you're aware that there are some  03:37:48
5  doctors or institutions that have policies  03:37:50
6  against meeting with sales representatives?  03:37:52
7  A.  I've heard of that, yes.  03:37:54
8  Q.  And you're probably also aware that there  03:37:55
9  will be some doctors who will choose not to  03:37:57
10 attend company-sponsored gatherings or  03:38:00
11 continuing medical education programs,  03:38:05
12 correct?  03:38:07
13 A.  Yes, that's certainly true.  03:38:07
14 Q.  And that some doctors or institutions have  03:38:09
15 policies that forbid them from accepting  03:38:12
16 samples from drug manufacturers; is that  03:38:16
17 correct?  03:38:18
18 A.  I've heard that as well.  03:38:19
19 Q.  In view of all that, there are definitely  03:38:21
20 going to be some doctors who prescribe  03:38:23
21 Neurontin for off-label uses during the  03:38:27
22 class period who had no contact whatsoever  03:38:28
23 with the defendants; would you agree with  03:38:30
24 that?  03:38:31
25 A.  That --  03:38:33

**245**

1      MR. NOTARGIACOMO: Objection.  03:38:33
2  A.  That certainly would follow from that  03:38:33
3  statement, yes.  03:38:35
4  Q.  And you wouldn't know of any way to identify  03:38:41
5  which doctors those were other than by a  03:38:44
6  doctor-by-doctor survey?  03:38:47
7  A.  I have not thought about identifying --  03:38:48
8  trying to identify those doctors, so I don't  03:38:53
9  know how to go about doing that.  03:38:55
10 Q.  As you sit here today, can you think of any  03:38:58
11 way to do it other than by doing an  03:39:01
12 individual doctor-by-doctor survey?  03:39:03
13 A.  I can't think, other than maybe an  03:39:05
14 institutional survey, but I think an  03:39:07
15 individual doctor's participation in events  03:39:09
16 or through the defendants' data on  03:39:11
17 participants in their own events.  03:39:14
18 Q.  All right. Let's turn to Paragraph 15 of  03:39:19
19 your declaration.  03:39:21
20 A.  Okay.  03:39:23
21 Q.  And let's read the first sentence, which  03:39:23
22 reads as follows: "Both physicians and  03:39:34
23 patients face an information problem in  03:39:37
24 selecting pharmaceutical treatments that  03:39:39
25 challenges typical conclusions about  03:39:41

62 (Pages 242 to 245)

246

```
 1   well-functioning markets."          03:39:43
 2       Did I read that one correctly?   03:39:47
 3 A.  Yes, you did.                      03:39:48
 4 Q.  What do you mean by "an information 03:39:49
 5   problem"?                            03:39:57
 6 A.  In this case there is not perfect  03:39:57
 7   information available about how a     03:40:00
 8   pharmaceutical treatment will work for an 03:40:02
 9   individual patient, so there may be some 03:40:04
10   information about the drug broadly, but 03:40:07
11   whether or not it will work for an    03:40:12
12   individual patient is unknown and may -- 03:40:13
13   there may be cases where the physician has 03:40:19
14   more information about this than a patient 03:40:22
15   does.  There may be cases where the   03:40:23
16   pharmaceutical manufacturer has more  03:40:26
17   information about this than either     03:40:28
18   physicians or patients have.          03:40:29
19       So it has the characteristics, not 03:40:30
20   just of broad uncertainty, but of certain 03:40:33
21   asymmetry between the physicians -- among 03:40:36
22   the physicians, patients and manufacturers. 03:40:39
23 Q.  So with respect to your last answer in this 03:40:46
24   statement, are you talking generally about 03:40:48
25   pharmaceutical products generally, or are 03:40:50
```

247

```
 1   you talking specifically about Neurontin 03:40:52
 2   here?                                 03:40:53
 3 A.  Here I'm talking generally about    03:40:54
 4   pharmaceutical products and health care 03:40:56
 5   broadly as well.                      03:40:59
 6 Q.  Okay.  Do you have an opinion as to whether 03:41:00
 7   all doctors would approach the information 03:41:17
 8   problem that you've just described in the 03:41:19
 9   same way?                             03:41:20
10 A.  I'm sorry, what do you mean by "approached"? 03:41:21
11   Do you mean try to mitigate or --     03:41:28
12 Q.  How do they respond to it in the context of 03:41:31
13   their prescription-writing decisions? 03:41:33
14 A.  Well, I guess one aspect of that response, 03:41:35
15   as we discussed before, might be to use the 03:41:42
16   scientific literature, and that might 03:41:50
17   differ, as we discussed before.       03:41:53
18 Q.  When you refer to markets in Paragraph 15 at 03:41:54
19   the end of that sentence --           03:42:04
20 A.  Uh-huh.                             03:42:05
21 Q.  -- what do you mean?                 03:42:05
22 A.  A market is where buyers and sellers come 03:42:08
23   together and a good or service is exchanged 03:42:15
24   at a price that's agreeable to both, if 03:42:19
25   those markets clear.  And so here I'm 03:42:21
```

248

```
 1   talking specifically about the normative 03:42:29
 2   conclusions that economists usually derive 03:42:32
 3   from looking at markets.  And so in many 03:42:33
 4   markets we say if a market is sustained, it 03:42:37
 5   must be, for example, that the consumers are 03:42:41
 6   willing to pay what the suppliers are  03:42:43
 7   willing to accept for a good, that the level 03:42:45
 8   of quality is consistent with the price.  So 03:42:49
 9   consumers are willing to pay that, it must 03:42:52
10   be worth that in terms of welfare.  And so 03:42:55
11   we start thinking about health care markets 03:43:01
12   in that context of making a judgment about 03:43:03
13   the welfare of individuals based on what 03:43:05
14   kinds of interactions they have in this 03:43:08
15   marketplace as buyers and sellers.    03:43:11
16 Q.  So the market that you're describing as the 03:43:16
17   market for prescription drugs, it's not a 03:43:19
18   market for information or something else, 03:43:20
19   correct?                              03:43:22
20 A.  The market I'm describing is the market for 03:43:22
21   prescription drugs, yes.              03:43:26
22 Q.  You also refer here to "typical conclusions 03:43:41
23   about well-functioning markets."  Although 03:43:43
24   to some degree you may have already provided 03:43:49
25   an answer to this question in your last 03:43:51
```

249

```
 1   answer, if you could tell me what those 03:43:53
 2   typical --                            03:43:56
 3 A.  Make it a little less --            03:43:56
 4 Q.  -- conclusions are.                 03:43:56
 5 A.  -- opaque.  The typical conclusions are that 03:43:58
 6   competition ensures Pareto efficiency, so 03:44:02
 7   ensures that there's no waste in the market. 03:44:06
 8   And under assumptions that often have to do 03:44:11
 9   with information issues, then competition 03:44:16
10   makes sure that we get the best allocation 03:44:22
11   and production of goods.              03:44:25
12       And that means broadly the quality of 03:44:27
13   goods will be right, the quantity consumed 03:44:29
14   will be right.  And so in the health care 03:44:32
15   market one characteristic that really is the 03:44:40
16   motivating challenge I think for the entire 03:44:44
17   field of health economics is the failure of 03:44:47
18   that to happen for a variety of reasons, in 03:44:51
19   large part because of the fact that there's 03:44:54
20   missing information about the benefits that 03:44:55
21   a mutual patient will get from a treatment. 03:44:59
22 Q.  So is that the way in which typical  03:45:05
23   conclusions about well-functioning markets 03:45:08
24   are challenged in this context?        03:45:10
25 A.  In particular, that what is consumed is the 03:45:13
```

63 (Pages 246 to 249)

## 250

1   right amount in the sense of Pareto   **03:45:18**
2   efficiency, so that if there were a $10   **03:45:23**
3   chocolate bar out there and people were   **03:45:29**
4   eating a lot of them, you wouldn't assume   **03:45:31**
5   that there was some inefficiency, just that   **03:45:33**
6   people were willing to pay $10.  In the   **03:45:36**
7   health care market it's never clear.   **03:45:39**
8  Q.  The next sentence in the same paragraph   03:45:46
9   reads, "Prescription drugs are 'credence   03:45:48
10   goods,' which means their effect may never   03:45:51
11   be known because of the interplay of myriad   03:45:54
12   factors that can affect the course of acute   03:45:58
13   or chronic wellness."   03:46:00
14     What is a credence good?   03:46:02
15  A.  That should say "illness."  I'm not sure why   **03:46:06**
16   it says "wellness."   **03:46:07**
17     A credence good is one whose value   **03:46:09**
18   is -- has to be accepted, essentially, by   **03:46:15**
19   the buyer.   **03:46:18**
20  Q.  Why does it need to be accepted by the   03:46:21
21   buyer?   03:46:24
22  A.  Well, in this specific instance, the best   **03:46:24**
23   way of understanding that is imagine that   **03:46:27**
24   you get drug treatment, and what happens is   **03:46:31**
25   you get no worse, but you don't know whether   **03:46:35**

## 251

1   that was because of the drug that you're on   **03:46:39**
2   currently or something that happened with   **03:46:43**
3   your condition itself or other things that   **03:46:44**
4   may be happening, for example, you know, a   **03:46:48**
5   change in the environment, that affected   **03:46:51**
6   your outcome. So there, again, many   **03:46:54**
7   clinical and non-clinical factors that   **03:46:58**
8   interact for an individual patient, that   **03:47:02**
9   they can never be certain which factor led   **03:47:04**
10   them to get better, worse...   **03:47:08**
11  Q.  Okay.  We'll get back to that concept --   03:47:11
12  A.  Okay.   **03:47:14**
13  Q.  -- at some point later.  A couple of other   03:47:14
14   terms for you.  What is a search good?   03:47:16
15  A.  A search good is a good, so there's -- to   **03:47:20**
16   distinguish from an experienced good, a   **03:47:29**
17   search good is one that you can evaluate   **03:47:31**
18   without having to individually consume.   **03:47:33**
19  Q.  Okay.   03:47:38
20  A.  An experience good --   **03:47:38**
21  Q.  That was my next question.   03:47:40
22  A.  -- is one where you have to try it.  So   **03:47:42**
23   imagine the chocolate example. You can't   **03:47:45**
24   tell by looking at the chocolate bar how   **03:47:48**
25   good it is, but once you try it, you know   **03:47:51**

## 252

1   how good it is.   **03:47:53**
2  Q.  Now, when we talk about these three   03:47:54
3   different categories, search goods,   03:47:58
4   experience goods and credence goods, we're   03:48:00
5   not talking about exclusive goods, are we?   03:48:04
6  A.  You're right.  These are general concepts   **03:48:07**
7   that may apply in part and differentially to   **03:48:10**
8   goods.   **03:48:14**
9  Q.  So a product could have attributes of an   03:48:15
10   experienced good and a search good at the   03:48:19
11   same time?   03:48:21
12  A.  Certainly.   **03:48:21**
13  Q.  You may have already baked this into one of   03:48:22
14   your answers already, but just so that I   03:48:32
15   understand, what's the basis of your   03:48:33
16   conclusion that all prescription drugs or   03:48:35
17   that prescription drugs are credence goods?   03:48:37
18  A.  The basis of that conclusion really has to   **03:48:39**
19   do with the notion of understanding clinical   **03:48:43**
20   effectiveness, broadly speaking, as a   **03:48:49**
21   scientific issue at the individual patient   **03:48:52**
22   level.  And so the issue is a -- is really   **03:48:55**
23   one that's conceptual, that there are   **03:49:02**
24   patient health factors that are not   **03:49:04**
25   measurable, and so if we look at one   **03:49:07**

## 253

1   individual patient experiencing a new drug,   **03:49:11**
2   for example, it's not possible to tell for   **03:49:14**
3   that one patient for sure whether their   **03:49:18**
4   treatment worked or didn't work based on   **03:49:22**
5   their own experience.   **03:49:24**
6  Q.  Have you relied on any published literature   03:49:25
7   in reaching your conclusion about   03:49:29
8   pharmaceutical products as credence goods?   03:49:31
9  A.  This is generally based on my experience and   **03:49:34**
10   training in health economics.  I can't cite   **03:49:37**
11   a specific article here.  The subject is   **03:49:40**
12   part of the Arrow paper that I described.   **03:49:46**
13  Q.  The which paper?   03:49:49
14  A.  The Footnote 30, the Kenneth Arrow paper,   **03:49:49**
15   which I cite in the previous sections.   **03:49:59**
16  Q.  Okay.  Is Neurontin any more a credence good   03:50:01
17   than other pharmaceutical products?   03:50:06
18  A.  No.  It's a characteristic of these goods.   **03:50:09**
19  Q.  Now, prescription drugs aren't exclusively   03:50:16
20   credence goods, right?   03:50:20
21  A.  Do they have characteristics of search goods   **03:50:21**
22   and experience goods?  Certainly.   **03:50:27**
23  Q.  You probably agree that pharmaceuticals, in   03:50:28
24   fact, have non-trivial experience qualities   03:50:31
25   as well; is that correct?   03:50:38

**VERITEXT NEW YORK REPORTING COMPANY**

212-267-6868                                 516-608-2400

254

```
 1  A.  I would agree that people might be able to        03:50:39
 2      draw fairly good conclusions, for example,        03:50:41
 3      if they took a drug and immediately had a         03:50:43
 4      reaction to that drug, that they -- that          03:50:46
 5      would be an experience-like quality. I            03:50:48
 6      would say nonetheless, the overarching            03:50:53
 7      conceptual problem is one in which there are      03:50:55
 8      so many patient factors and other influences      03:50:58
 9      on health that it's difficult to be certain       03:51:01
10      that -- to disentangle. But on a continuum        03:51:04
11      I guess I would agree with your statement.        03:51:09
12  Q.  Are you familiar with Ernst R. Berndt,            03:51:11
13      B-E-R-N-D-T?                                      03:51:17
14  A.  I am familiar with Professor Berndt.             03:51:18
15  Q.  Who is Professor Berndt?                          03:51:21
16  A.  He is a co-author of mine on some papers.         03:51:23
17      He is a professional at MIT and an expert in      03:51:26
18      pharmaceutical promotion.                         03:51:29
19  Q.  That answers my questions, which -- or            03:51:30
20      question, which is you would describe him as      03:51:33
21      an expert on the economics of pharmaceutical      03:51:35
22      markets, generally?                               03:51:39
23  A.  I would.                                          03:51:40
24          MR. POLUBINSKI:  Why don't we                 03:51:50
25      actually mark the next exhibit.                   03:51:50
```

255

```
 1          (Exhibit No. 13, Article headed              03:52:25
 2      "The U.S. Pharmaceutical Industry:  Why           03:52:25
 3      major growth in times of cost containment,"       03:52:29
 4      marked for identification.)                       03:52:11
 5          MR. NOTARGIACOMO:  What number?               03:52:12
 6          MR. POLUBINSKI:  13.                          03:52:12
 7  Q.  I've handed you, Professor Rosenthal, what's      03:52:13
 8      been marked as Rosenthal Exhibit 13.  It is       03:52:17
 9      an article by Professor Berndt.  The title        03:52:22
10      of the article is "The U.S. Pharmaceutical        03:52:25
11      Industry:  Why major growth in times of cost      03:52:27
12      containment."                                     03:52:31
13      I would like you to turn to Page 111.             03:52:33
14  A.  Okay.                                             03:52:42
15  Q.  And read along with me the beginning of the       03:52:42
16      second full paragraph, and in particular          03:52:45
17      which reads, "Clearly, prescription drugs         03:52:52
18      are predominantly experience goods."  The         03:52:54
19      sentence goes on, but that's the portion of       03:52:58
20      the sentence I was going to ask you about.        03:53:00
21      Do you have any reason to disagree                03:53:01
22      with Professor Berndt on this point?              03:53:02
23          MR. NOTARGIACOMO:  I'm sorry, you             03:53:06
24      just point -- I just lost my place.  Could        03:53:08
25      you point out which paragraph?                    03:53:11
```

256

```
 1          MR. POLUBINSKI:  Yeah, the first             03:53:11
 2      sentence of Paragraph 2.                          03:53:12
 3          MR. NOTARGIACOMO:  Thank you.                03:53:14
 4  A.  So Professor Berndt is distinguishing             03:53:15
 5      between search and experience goods here and      03:53:18
 6      noting that the fact that prescription drugs      03:53:23
 7      are not predominantly search goods results        03:53:26
 8      in their having high advertising-to-sales         03:53:32
 9      ratios, which incidentally is the Dorfman-        03:53:34
10      Steiner theorem that I mentioned earlier.         03:53:37
11      And I don't know that he would disagree with      03:53:42
12      my characterization of pharmaceutical             03:53:44
13      products as having aspects of credence goods      03:53:47
14      as well.                                          03:53:52
15      I think he's distinguishing them from             03:53:52
16      consumer products where we can look at the        03:53:54
17      attributes and the prices and we know most        03:53:57
18      of what we need to know.  So I'm not sure         03:53:59
19      that he disagrees with me.                        03:54:03
20  Q.  Would you agree with him, I guess, with his       03:54:05
21      statement to the effect that pharmaceutical       03:54:07
22      drugs are predominantly experience goods?         03:54:10
23  A.  I believe they have some characteristics of       03:54:14
24      experience goods and some of credence goods,      03:54:17
25      so I guess maybe I wouldn't have used the         03:54:20
```

257

```
 1      word "predominantly," which I guess means we      03:54:22
 2      disagree.                                         03:54:26
 3  Q.  Fair enough.  Now, but I guess you would          03:54:26
 4      agree that they do have -- they do have           03:54:34
 5      features of experience goods?                      03:54:40
 6  A.  I would agree with that statement, yes.           03:54:43
 7  Q.  Now, in view of that, assume that a doctor        03:54:45
 8      prescribes Neurontin to several patients for      03:54:52
 9      an off-label use, for neuropathic pain, for       03:54:55
10      example.  Would a doctor's future decisions       03:54:59
11      as to whether to prescribe Neurontin to           03:55:02
12      other patients for that same off-label use        03:55:04
13      be included by that doctor's understanding        03:55:07
14      of the degree of success experienced with         03:55:09
15      earlier patients?                                 03:55:11
16  A.  That would certainly be one piece of              03:55:12
17      information I would expect the physician to       03:55:14
18      use in his or her judgments.                      03:55:16
19  Q.  And so it's pretty -- it therefore stands to      03:55:23
20      reason, I guess, that doctors would be            03:55:26
21      influenced by their past experience with          03:55:28
22      Neurontin in future prescription decisions?       03:55:30
23  A.  I would expect that to be an influence, yes.      03:55:32
24  Q.  Why don't you turn to Paragraph 15 of your        03:55:40
25      report.                                           03:55:42
```

### 258

1  A.  Okay.                                03:55:43
2  Q.  And turn specifically to the concept of the   03:55:43
3      market as you've described it.  Would you   03:55:48
4      agree that the market that you describe in   03:55:51
5      Paragraph 15 differs in a number of ways   03:55:54
6      from other markets for other functional   03:55:57
7      goods?  I think you would, based on what we   03:56:01
8      just discussed.                          03:56:03
9  A.  I would agree with that.  Of course, again,   03:56:05
10     it's all a continuum.  I'm sure we could   03:56:07
11     find another good that has the same   03:56:10
12     characteristics.  Often legal services are   03:56:13
13     used as a comparison.  You can never be sure   03:56:16
14     whether that guilty verdict would have   03:56:18
15     happened with another lawyer.   03:56:20
16 Q.  Whether or not this shares attributes for   03:56:22
17     this legal services market, you do write,   03:56:27
18     for example, in the pharmaceutical market   03:56:29
19     that price plays little or no role in   03:56:31
20     individual prescribing decisions?   03:56:34
21 A.  That's correct.  Price has a very strange   03:56:36
22     role here, and there are multiple prices,   03:56:38
23     unlike in most markets where we have a   03:56:40
24     single market clearing price.   03:56:43
25 Q.  In this case at least, the price of a drug   03:56:44

### 259

1      doesn't -- does not fluctuate in response to   03:56:48
2      new information generally, does it?   03:56:52
3  A.  Generally speaking, if we're talking about   03:56:53
4      the AWP of the drug, the -- are we talking   03:56:58
5      about the list price of a drug?   03:57:04
6  Q.  Why don't we do that, yes, that's fine.   03:57:06
7  A.  Generally speaking, I believe the AWP is set   03:57:15
8      with -- well, I don't know all the factors   03:57:18
9      that influence a manufacturer's setting of   03:57:21
10     the AWP, but I know in many cases it stays   03:57:24
11     fairly stable over time.   03:57:27
12 Q.  Okay.  And that the AWP didn't fluctuate in   03:57:29
13     response to new information about a drug's   03:57:33
14     efficacy, generally speaking?   03:57:35
15 A.  I can't -- I just can't say for certain, but   03:57:37
16     I don't know of any --   03:57:40
17 Q.  Fair enough.   03:57:41
18 A.  -- evidence that does happen.   03:57:42
19 Q.  Okay.  And I guess also information in this   03:57:44
20     market isn't disseminated as it might be in   03:57:49
21     the context of, say, the securities market?   03:57:54
22 A.  I would expect the information flows much   03:57:56
23     more efficiently in the securities market.   03:57:57
24 Q.  There's no requirement, for example, that   03:58:00
25     information be released simultaneously or in   03:58:04

### 260

1      a publicly digestible format, information --   03:58:08
2          (Mr. Goldser disconnected.)   03:58:14
3          MR. NOTARGIACOMO:  He was going to   03:58:14
4      go off at 4:00, so that's fine.   03:58:15
5          MR. POLUBINSKI:  I don't blame him.   03:58:17
6  Q.  Let me start that question again.   03:58:20
7  A.  Sure.                                03:58:22
8  Q.  There is no equivalent to the securities   03:58:22
9      laws that would require that information be   03:58:24
10     released simultaneously in a publicly   03:58:25
11     digestible format?   03:58:29
12 A.  Not to my knowledge, no.   03:58:31
13 Q.  Okay.  So no 8-K equivalent -- 8-K filing   03:58:32
14     equivalent in the pharmaceutical industry?   03:58:34
15 A.  Not to my knowledge, no.   03:58:36
16 Q.  And there's no analyst community with regard   03:58:42
17     to prescription drugs the same way there is   03:58:44
18     in the securities market?   03:58:46
19 A.  Other than the analysts in the securities   03:58:47
20     market who, of course, looked at clinical   03:58:50
21     information to try to figure out what the   03:58:52
22     manufacturer's stocks are going to do, but I   03:58:54
23     don't know of any whose objective is   03:58:56
24     clinical.                          03:58:58
25 Q.  Okay.  And you wouldn't suggest that the   03:58:59

### 261

1      doctors look to the analyst community to   03:59:04
2      inform their knowledge of appropriate   03:59:06
3      clinical treatment; is that correct?   03:59:08
4  A.  I guess I wouldn't -- no, I guess I wouldn't   03:59:10
5      suggest that.   03:59:18
6  Q.  You would be surprised if they did?   03:59:18
7  A.  I would be surprised if they did, yes.   03:59:20
8  Q.  Okay.  And that there are necessarily -- I   03:59:31
9      guess would you agree that there will   03:59:32
10     necessarily be information differences with   03:59:34
11     regard to a particular pharmaceutical   03:59:36
12     product from geographic area to geographic   03:59:37
13     area?   03:59:40
14 A.  Again, as before, I didn't have a strong   03:59:41
15     theory about geography in this case, but I   03:59:44
16     certainly there may be differences in   03:59:48
17     information.  So, for example, if a clinical   03:59:50
18     trial took place at a particular health   03:59:52
19     industry, that the physicians in that health   03:59:55
20     industry might learn about its results   03:59:58
21     before everyone else did.   04:00:00
22 Q.  Sure.  And there would inevitably be   04:00:02
23     information differences from doctor to   04:00:04
24     doctor, too?   04:00:05
25 A.  As we discussed earlier.   04:00:06

66  (Pages 258 to 261)

### 262

```
 1  Q.  Now, in view of all of this, in view of the    04:00:11
 2      information problems that you've discussed,    04:00:14
 3      you wouldn't describe the market such as it    04:00:16
 4      is for pharmaceutical products as being an    04:00:20
 5      efficient market, would you?    04:00:23
 6  A.  If you mean "efficient" in the same way that    04:00:24
 7      I mean "efficient," I would not describe    04:00:28
 8      the -- the theory relates to the efficiency    04:00:30
 9      of the theorized outcome of a perfectly    04:00:34
10      competitive market. It's possible with    04:00:37
11      regulation you get a fairly efficient    04:00:39
12      market, but I would guess that it's not a    04:00:41
13      very efficient market, no.    04:00:43
14          MR. POLUBINSKI:  Okay.  I think    04:00:46
15      we're about to run out of videotape, so    04:00:46
16      let's just take a quick break while we    04:00:48
17      switch that.    04:00:51
18          THE WITNESS:  Okay.  I'll be really    04:00:51
19      quick.    04:00:51
20          MR. POLUBINSKI:  Okay.    04:00:52
21          THE VIDEOGRAPHER:  The time is 4:01    04:00:52
22      p.m.  This is the end of Tape 4, and we are    04:00:57
23      off the record.    04:01:00
24          (Recess taken.)    04:06:12
25          THE VIDEOGRAPHER:  The time is 4:06    04:06:16
```

### 263

```
 1      p.m.  This is the beginning of Tape 5, and    04:06:20
 2      we are back on the record.    04:06:23
 3  BY MR. POLUBINSKI:    04:06:25
 4  Q.  Okay.  Professor Rosenthal, in the Clark    04:06:25
 5      case in Pennsylvania you were asked to    04:06:34
 6      assume that there is not adequate evidence    04:06:35
 7      that Neurontin provided any clinical benefit    04:06:38
 8      for off-label uses; is that correct?    04:06:40
 9  A.  I believe that that's correct.  When you    04:06:44
10      mention the Clark case, I just don't have my    04:06:49
11      declaration in front of me, and it's been a    04:06:51
12      while, but I believe that's correct.    04:06:52
13  Q.  Okay.  Did you make a similar assumption in    04:06:54
14      this case -- or the same assumption, I    04:06:56
15      should say?    04:06:59
16  A.  For the purposes of my work I was focusing    04:06:59
17      on the effect on quantity and asked to    04:07:02
18      assume that all of that quantity would be    04:07:05
19      relevant for the ultimate estimate of    04:07:09
20      damages, so I believe I was asked to make    04:07:13
21      that same or similar assumption.    04:07:17
22  Q.  The assumption --    04:07:20
23  A.  I just need to look to see how it was    04:07:21
24      exactly phrased, but I believe that was the    04:07:23
25      assumption that I was asked to make, yes.    04:07:26
```

### 264

```
 1  Q.  You know what?  Just to make things easier,    04:07:28
 2      I think we have a copy of the Clark    04:07:30
 3      rebuttal, and I could just hand it to you.    04:07:32
 4  A.  Okay.  That would be great.    04:07:34
 5  Q.  We don't need to mark it as an exhibit.    04:07:45
 6  A.  Okay.    04:07:48
 7  Q.  On Page 3.    04:07:49
 8          (Witness reviews document.)    04:08:04
 9  A.  Right.  So that's exactly what I said, and    04:08:04
10      so that's exactly what I was asked to    04:08:06
11      assume.    04:08:08
12  Q.  And is that exactly what you were asked to    04:08:09
13      assume in this case as well?    04:08:11
14  A.  That's my understanding as well, yes.  For    04:08:12
15      my analysis, that was...    04:08:22
16  Q.  So for your analysis does your assumption    04:08:24
17      about Neurontin's efficacy apply to all of    04:08:26
18      its off-label uses or just certain uses?    04:08:30
19  A.  I expect -- so in my declaration I talk    04:08:33
20      about the off-label uses that were covered    04:08:36
21      in the first amended class action complaint.    04:08:38
22      I expect to be directed as to exactly which    04:08:41
23      of those indications I will be asked    04:08:44
24      ultimately to do the analysis on, and it    04:08:49
25      will be for those where that's the correct    04:08:52
```

### 265

```
 1      assumption, so yes.    04:08:55
 2  Q.  Okay.  For the indications that are    04:08:58
 3      identified for you at that time, you will    04:08:59
 4      assume that all prescriptions of Neurontin    04:09:01
 5      for those indications were ineffective?    04:09:05
 6  A.  That's my understanding is that's what    04:09:10
 7      I'll be asked to assume in the final    04:09:14
 8      analysis.    04:09:15
 9  Q.  Okay.  And so maybe just to make sure it's    04:09:16
10      crystal clear, for the purposes of your    04:09:49
11      analysis you would assume for the    04:09:52
12      indications that we're talking about, at    04:09:53
13      least, that Neurontin was ineffective for    04:09:55
14      every patient who was prescribed the drug    04:09:58
15      for an off-label use for that indication?    04:10:00
16  A.  For the purposes of my analysis, what I    04:10:03
17      understand the relevant assumption is,    04:10:08
18      excuse me, for members of the class where I    04:10:12
19      estimate the quantity of Neurontin use that    04:10:17
20      was caused by off-label promotion, that    04:10:19
21      there will be no relevance to any potential    04:10:21
22      clinical benefits that those patients may    04:10:25
23      have gotten or purported to have gotten.  So    04:10:28
24      for none of the patients will I calculate or    04:10:36
25      consider clinical benefits.    04:10:39
```

67 (Pages 262 to 265)

**266**

1  Q.  Now, is that because none of the patients    04:10:41
2  for those uses will have received any    04:10:43
3  clinical benefit?    04:10:46
4  A.  I'm not really in a position to judge that.    04:10:47
5  As you know, I'm not a clinical expert.    04:10:50
6  Sorry.    04:10:53
7  Q.  Do you have any understanding at all as to    04:10:57
8  whether the drug may well have been    04:10:59
9  effective for some number of those patients?    04:11:01
10  MR. NOTARGIACOMO:  Objection.    04:11:04
11 A.  I really don't have any expertise to judge    04:11:04
12  that.    04:11:06
13 Q.  Now, if it is the case that the drug was    04:11:15
14  indeed effective for some number of these    04:11:20
15  patients, does that mean that some number of    04:11:23
16  patients for whom Neurontin was perfectly    04:11:25
17  effective would be compensated under your    04:11:27
18  model?    04:11:30
19 A.  I believed it would be tautologically true    04:11:30
20  if you're telling me that if the drug were    04:11:39
21  effective, that some of those individuals    04:11:41
22  who were compensated were also -- also got    04:11:45
23  clinical benefit, then it seems    04:11:48
24  tautologically true that that would be the    04:11:50
25  case.    04:11:52

**267**

1  Q.  Okay. Another way, I guess, to ask -- or    04:11:53
2  maybe to ask a similar question, your model    04:11:55
3  itself wouldn't provide a way to identify    04:11:58
4  patients for whom the drug was effective and    04:12:00
5  patients for whom it wasn't, correct?    04:12:03
6  A.  That's correct.    04:12:07
7  Q.  Okay. And it sounds like you don't have any    04:12:07
8  independent opinion on the question of    04:12:08
9  whether Neurontin was or was not effective    04:12:09
10  with respect to any individual prescription?    04:12:11
11  MR. NOTARGIACOMO:  Objection.    04:12:14
12 A.  No, I don't have an opinion on that.    04:12:14
13 Q.  And do not have an independent opinion on    04:12:19
14  the more general question of whether    04:12:23
15  Neurontin was, as a general matter,    04:12:25
16  effective for any given off-label    04:12:27
17  indication?    04:12:29
18  MR. NOTARGIACOMO:  Objection.    04:12:30
19 A.  No, I do not.    04:12:32
20 Q.  Do you have any understanding as to the type    04:12:43
21  of showing of -- on efficacy that would be    04:12:44
22  necessary to cause you -- or really I guess    04:12:47
23  to cause plaintiffs' counsel or whoever's    04:12:52
24  making this decision to opt to include a    04:12:54
25  particular indication in the analysis that    04:12:59

**268**

1  you'll do in your model?    04:13:02
2  A.  No, I do not.    04:13:04
3  Q.  Okay. Again, let's just assume for now that    04:13:07
4  the assumption doesn't hold and that    04:13:23
5  Neurontin, you know, actually is effective    04:13:25
6  for off-label uses for some number of    04:13:28
7  people. Are you aware of any way, short of    04:13:30
8  an individual inquiry, of telling on an    04:13:35
9  individual-by-individual basis for whom    04:13:37
10  Neurontin was effective?    04:13:39
11  MR. NOTARGIACOMO:  Objection.    04:13:40
12 A.  I am not aware of a good way of telling    04:13:41
13  whether it was effective for those patients    04:13:46
14  even within an individual inquiry because of    04:13:49
15  the difficulty of determining from an    04:13:51
16  observational study whether a drug was    04:13:54
17  effective for a patient or not. I'm sorry,    04:13:57
18  I'm losing my voice.    04:13:59
19 Q.  Are you aware of any way, then, to make a    04:14:02
20  determination on an individual basis as to    04:14:04
21  whether Neurontin was effective for a given    04:14:07
22  prescription for a given patient?    04:14:10
23  MR. NOTARGIACOMO:  Objection.    04:14:11
24 A.  In the standard -- with the standards of    04:14:11
25  research that I typically use, I believe it    04:14:17

**269**

1  would be very difficult to do.    04:14:19
2  Q.  Now, again assuming that Neurontin really is    04:14:45
3  effective for off-label uses for some number    04:14:48
4  of people, that would mean that some number    04:14:50
5  of individual class members would not have    04:14:52
6  suffered any injury as a result of the    04:14:54
7  defendants' conduct here; is that correct?    04:14:58
8  A.  Based on the theory of injury, I guess I'm    04:15:02
9  not entirely sure how to translate the legal    04:15:07
10  theory of injury under here whether or not    04:15:10
11  they received some clinical benefit. There    04:15:14
12  may still be some legal theory of injury    04:15:16
13  based on having been misled, for example,    04:15:19
14  but I'm afraid this is getting outside of my    04:15:22
15  expertise.    04:15:24
16 Q.  Okay. I guess just thinking about a purely    04:15:25
17  economic out-of-pocket injury, or again    04:15:35
18  assuming that Neurontin is actually    04:15:38
19  effective for off-label uses for some number    04:15:40
20  of people, that some number of individual    04:15:42
21  class members would not have suffered any    04:15:45
22  sort of out-of-pocket economic injury as a    04:15:47
23  result of having paid for a prescription for    04:15:50
24  Neurontin that worked?    04:15:52
25  MR. NOTARGIACOMO:  Objection.    04:15:53

68  (Pages 266 to 269)

270

```
 1  A.  I think that the problem is a little more      04:15:56
 2      complicated than that, so for example, if I    04:15:58
 3      were trying to look at the issue of clinical   04:16:01
 4      benefit compared to, you know, what their      04:16:08
 5      co-payment was, those would need to be         04:16:10
 6      compared, and a but for world would have to    04:16:12
 7      be constructed. Had there not been the         04:16:16
 8      allegedly illegal off-label promotion, would   04:16:18
 9      they have gotten another drug that would       04:16:20
10      have been more effective? I think it's not     04:16:22
11      quite as straightforward as to whether or      04:16:24
12      not they got any clinical benefit.            04:16:25
13  Q.  Fair enough. And it sounds like it would be    04:16:27
14      a difficult inquiry that would require a       04:16:29
15      look into the specific circumstances in the    04:16:34
16      individual patient's case?                     04:16:36
17  A.  If you are asking this question about          04:16:37
18      whether an individual patient's clinical       04:16:39
19      benefit would mean that they were injured or   04:16:41
20      not, that is an individual question.           04:16:45
21  Q.  Okay. Your model doesn't set out to reduce     04:16:47
22      the total number of off-label Neurontin        04:16:54
23      prescriptions to account for amounts that      04:16:56
24      were spent on off-label prescriptions for      04:17:02
25      which Neurontin was perfectly effective?       04:17:04
```

271

```
 1  A.  My model would look at those promotional       04:17:06
 2      activities that were ultimately described to   04:17:12
 3      me by counsel to be subject to the             04:17:16
 4      allegations, and so if those included the      04:17:19
 5      indications that you are suggesting were       04:17:21
 6      perfectly effective, then that might be the    04:17:29
 7      case. I'm sorry, did I not answer your         04:17:31
 8      question? It was a long question.              04:17:34
 9  Q.  No, no, no. It was a long answer. I think      04:17:36
10      you did cover it, though.                      04:17:39
11  A.  Okay.                                          04:17:40
12  Q.  Do you have an understanding as to whether     04:17:40
13      this inquiry as to whether Neurontin was       04:17:44
14      effective for an individual patient or not     04:17:46
15      will occur at some point in the litigation?    04:17:48
16          MR. NOTARGIACOMO: Objection.               04:17:51
17  A.  My understanding is that this is a class       04:17:52
18      matter and that there will not be              04:17:55
19      individual -- individualized inquiries.        04:17:57
20      There may be evidence presented, and I don't   04:18:01
21      know of this for certain on scientific         04:18:06
22      studies, but aggregate impact.                 04:18:08
23  Q.  Okay. Fair enough. But you don't,             04:18:12
24      yourself, anticipate engaging in any sort of   04:18:14
25      analysis at any time on an individual          04:18:17
```

272

```
 1      patient-by-patient level?                      04:18:19
 2  A.  Looking at clinical effectiveness or           04:18:20
 3      anything else, no.                             04:18:22
 4  Q.  Okay.                                          04:18:23
 5          MR. POLUBINSKI: Let's do the next          04:18:29
 6      exhibit.                                       04:18:30
 7          (Exhibit No. 14, Declaration of            04:18:50
 8      Meredith Rosenthal in Response to              04:18:30
 9      Defendants' Expert Keith E. Argenbright,       04:18:30
10      M.D., marked for identification.)              04:18:51
11  Q.  All right. So we've handed you what is         04:18:58
12      marked as Rosenthal Exhibit --                 04:19:08
13  A.  14.                                            04:19:12
14  Q.  -- 14, thank you. I'm glad someone was         04:19:12
15      keeping better track than I am. This is a      04:19:17
16      declaration that you submitted to the Court    04:19:21
17      in this case; is that correct?                 04:19:22
18  A.  Excuse me. Yes, it is correct.                 04:19:24
19  Q.  Sorry to get you right in the middle of your   04:19:26
20      sip of water.                                  04:19:28
21  A.  I'm sorry, I'm just trying to sound a little   04:19:28
22      bit less fried here. It's just -- I've just    04:19:31
23      been losing my voice for the last couple of    04:19:33
24      days, and I think it's just a long day. But    04:19:39
25      if -- I'm okay.                                04:19:40
```

273

```
 1          THE WITNESS: (To the reporter.)            04:19:40
 2      If you can still -- can you still hear me       04:19:40
 3      okay?                                          04:19:40
 4  A.  It doesn't hurt.                               04:19:41
 5  Q.  All right. If it's a problem, let me know.     04:19:41
 6  A.  It's wear and tear.                            04:19:42
 7  Q.  Who asked you to prepare this?                 04:19:44
 8  A.  Specifically Ed asked me to prepare this.      04:19:45
 9  Q.  When you say "Ed," you mean Mr.                04:19:51
10      Notargiacomo?                                  04:19:54
11  A.  I'm sorry, Mr. Notargiacomo. I beg your        04:19:54
12      pardon.                                        04:19:58
13  Q.  That's okay. I call him Ed, too.               04:19:58
14      When did you start work on it?                 04:20:01
15  A.  Not very long before it was filed. It was a    04:20:02
16      rather quick deadline. So I would have to      04:20:09
17      look at my billing files to be sure, so it     04:20:11
18      was filed -- let me just take a quick look.     04:20:14
19      Oh, sorry, it was filed September 14th.        04:20:22
20      Without looking at my billing records I        04:20:25
21      would guess that I first reviewed the          04:20:27
22      materials, in particular Dr. Argenbright's     04:20:29
23      declaration, maybe a week to ten days          04:20:33
24      before.                                        04:20:36
25  Q.  Did anyone else work with you on your          04:20:40
```

69 (Pages 270 to 273)

274

```
 1   declaration, which is to say Rosenthal      04:20:42
 2   Exhibit 14?                                 04:20:45
 3 A. I would have had support again from the    04:20:46
 4   staff at GMA and including Renee Rushnawitz 04:20:51
 5   and Joshua Peteet and maybe others, but     04:20:59
 6   those are the two that come to mind, again  04:21:03
 7   with footnotes, questions about the         04:21:08
 8   databases, that kind of thing.              04:21:10
 9 Q. Did you share drafts with Ms. Rushnawitz and 04:21:16
10   Mr. Peteet in the context that we described 04:21:19
11   before?                                     04:21:21
12 A. I believe that I shared a draft certainly  04:21:23
13   with the two of them again for helping put  04:21:25
14   together the footnotes, and Renee Rushnawitz 04:21:28
15   would have read the draft and given me      04:21:31
16   feedback as to form.                        04:21:33
17 Q. Did she give you feedback as to anything   04:21:35
18   other than form?                            04:21:38
19 A. She might have raised questions where      04:21:38
20   something was unclear, but typically her    04:21:40
21   role is to provide feedback with respect to 04:21:42
22   form.                                       04:21:45
23 Q. How did they provide feedback? How did Ms. 04:21:47
24   Rushnawitz and/or Mr. Peteet provide        04:21:51
25   feedback to you?                            04:21:54
```

275

```
 1 A. I believe Ms. Rushnawitz would have        04:21:54
 2   redlined.                                   04:21:58
 3 Q. She would have redlined the document and   04:21:59
 4   e-mailed it back to you, I take it?         04:22:01
 5 A. I believe so.                              04:22:02
 6 Q. Okay. Would you still have her e-mails with 04:22:04
 7   the redlined versions attached?             04:22:08
 8 A. I don't believe I do. Again, this is       04:22:10
 9   September, and we really don't have much    04:22:14
10   capacity, so I think my e-mails go back only 04:22:18
11   within the month.                           04:22:21
12 Q. Can we ask you to go back and take a look  04:22:22
13   and see if you do have copies of it?        04:22:25
14 A. With regards --                            04:22:27
15     MR. NOTARGIACOMO: If there are            04:22:29
16   requests for the witness to pull documents  04:22:30
17   or data, I would only ask that it be        04:22:31
18   directed at counsel rather than the witness. 04:22:34
19     MR. POLUBINSKI: Fair enough. So          04:22:35
20   then I'll direct you to do that. If we      04:22:36
21   could take a look for any of these that you 04:22:38
22   might have and produce them.                04:22:39
23     MR. NOTARGIACOMO: We will look           04:22:42
24   into it.                                    04:22:42
25     MR. POLUBINSKI: Okay.                     04:22:50
```

276

```
 1   BY MR. POLUBINSKI:                          04:22:52
 2 Q. Do you have workpapers or other notes that 04:22:52
 3   you would have prepared in conducting your  04:22:55
 4   work on this declaration?                   04:22:56
 5 A. No, I would not.                           04:22:57
 6     (Discussion off the record.)              04:23:07
 7 Q. Okay. Let's flip to Page 2, Paragraph 6.   04:23:08
 8   Maybe I'm wrong about that.                 04:23:12
 9 A. Okay.                                      04:23:14
10     MR. NOTARGIACOMO: Page 3?                 04:23:17
11   I think we're Page 3, Paragraph 6.          04:23:18
12     MR. POLUBINSKI: Thank you, Ed.            04:23:23
13 A. Mr. Notargiacomo.                          04:23:24
14 Q. Second sentence reads, "Inferences about the 04:23:25
15   causal effects of a drug cannot be made     04:23:27
16   patient by patient."                        04:23:29
17 A. Yes, I see that.                           04:23:30
18 Q. What do you mean by "causal effects" there? 04:23:33
19 A. It's a term used in statistical analysis   04:23:35
20   pertaining to, as it suggests, the true     04:23:41
21   causal effects that the drug caused some    04:23:47
22   change in condition as opposed to an        04:23:53
23   association between the improvement or lack  04:23:55
24   of -- or lack of improvement, as the case   04:23:58
25   may be, as a result of the drug. So it      04:24:03
```

277

```
 1   relates specifically to a causal chain as   04:24:06
 2   opposed to an associate observation.        04:24:09
 3 Q. Are you saying in this sentence and in your 04:24:10
 4   declaration that it would be impossible to  04:24:17
 5   determine with a reasonable degree of       04:24:19
 6   scientific certainty whether a particular   04:24:21
 7   causal effect -- whether a particular drug  04:24:24
 8   had a particular causal effect on a patient? 04:24:27
 9 A. I'm saying the scientific standards for    04:24:29
10   understanding the causal effects of clinical 04:24:32
11   treatments generally and prescription drugs 04:24:35
12   in particular do not look at individual     04:24:37
13   patients in observation to determine the    04:24:40
14   effects. They rely on randomized control    04:24:43
15   trials.                                     04:24:46
16 Q. Let me ask the question again. Are you     04:24:47
17   saying that it's impossible to determine to 04:24:54
18   a reasonable degree of scientific certainty 04:24:56
19   whether a drug had a particular causal      04:24:59
20   effect on a particular patient?             04:25:01
21 A. In my view, it's -- it is impossible to say 04:25:03
22   with a sufficient degree of certainty the   04:25:06
23   level of scientific evidence that I would   04:25:10
24   use.                                        04:25:12
25 Q. All right. One thing that we can agree on, 04:25:18
```

70 (Pages 274 to 277)

**VERITEXT NEW YORK REPORTING COMPANY**

278

```
 1    I assume, is the determining whether a        04:25:21
 2    particular drug had a particular effect on a   04:25:25
 3    particular patient would be a difficult, in    04:25:27
 4    fact, intensive inquiry, if it were to be      04:25:31
 5    done?                                          04:25:34
 6 A.  If you were trying to look patient by         04:25:34
 7    patient to look for an effect, it would take   04:25:37
 8    some inquiry, yes.                             04:25:41
 9 Q.  Would you say it would be a difficult, in     04:25:42
10    fact, intensive inquiry?                       04:25:45
11 A.  Well, I'm not a clinical expert to know       04:25:47
12    exactly what one would need to gather in       04:25:50
13    this case for evidence. In the case of         04:25:54
14    specific indications I imagine it might        04:25:57
15    differ.                                        04:25:59
16 Q.  I assume that in order to conduct the         04:26:07
17    inquiry as to an individual patient, you       04:26:09
18    need to make inquiry of the specific           04:26:12
19    patient. Would that make sense?                04:26:16
20 A.  If you wanted to find out whether a specific  04:26:17
21    patient benefited, again, I believe the, in   04:26:20
22    my view, effectiveness needs to be             04:26:27
23    determined in a setting where you can rule     04:26:34
24    out other causes of improvement or lack of     04:26:36
25    improvement. And so if we're looking at a      04:26:39
```

279

```
 1    patient outside of that setting, I believe     04:26:41
 2    the challenges are very substantial, and so    04:26:45
 3    I guess, you know, it would require a lot of   04:26:50
 4    data to rule out all possible causes, and in   04:26:54
 5    particular we would require more data that I   04:26:57
 6    can imagine one could collect.                 04:26:59
 7 Q.  What sorts of data would you have in mind if  04:27:01
 8    you were to start collecting the data,         04:27:05
 9    recognizing how difficult it is?               04:27:07
10 A.  Well, again, I'm not a clinical expert, so I  04:27:09
11    don't know for these specific conditions       04:27:11
12    exactly how one would measure effectiveness.   04:27:12
13 Q.  All right. You just said that you're not a    04:27:15
14    clinical expert. I think you've said that a    04:27:34
15    few times during the course of this            04:27:36
16    deposition. Have you ever participated as a    04:27:37
17    researcher or an investigator or in some       04:27:41
18    other role in a clinical trial analyzing       04:27:44
19    safety or efficacy of a medication?            04:27:47
20 A.  No, I have not.                               04:27:49
21 Q.  Have you ever participated in the design of   04:27:50
22    a clinical trial analyzing the safety or       04:27:54
23    efficacy of a medication?                      04:27:57
24 A.  No, I have not.                               04:27:58
25 Q.  Do you have any experience in analyzing the   04:28:00
```

280

```
 1    clinical efficacy of a drug for a given        04:28:03
 2    patient or for a given patient population?     04:28:07
 3 A.  No.                                           04:28:09
 4 Q.  And I assume that you also haven't published  04:28:10
 5    on the clinical efficacy of a particular       04:28:12
 6    drug in treating a particular patient          04:28:15
 7    population?                                     04:28:17
 8 A.  No, I have not.                               04:28:18
 9 Q.  And I assume you haven't taught clinical      04:28:18
10    medical school classes, either?               04:28:23
11 A.  No, I have not.                               04:28:26
12 Q.  I do understand, though, that you've          04:28:26
13    conducted peer review for a medical journal,  04:28:30
14    for the Journal of the American Medical        04:28:32
15    Association; is that right?                    04:28:35
16 A.  Among others, yes, that's true.              04:28:36
17 Q.  As a referee for the Journal of the American 04:28:41
18    Medical Association do you review articles     04:28:44
19    that report on the results of clinical         04:28:46
20    trials on the effects of medications in        04:28:47
21    patient populations?                           04:28:49
22 A.  No, I do not.                                 04:28:52
23 Q.  What sorts of articles do you review?         04:28:53
24 A.  I review articles that relate to health       04:28:55
25    policy issues.                                 04:28:58
```

281

```
 1 Q.  You wouldn't expect that the Journal of the   04:29:04
 2    American Medical Association would ask an      04:29:07
 3    economist to review articles reporting on      04:29:08
 4    the results of clinical trials, I assume?      04:29:13
 5 A.  I would not expect that, no.                  04:29:16
 6 Q.  In view of this, do you have any              04:29:18
 7    qualifications to offer an opinion as to       04:29:20
 8    what would or wouldn't stand up to peer        04:29:22
 9    review in terms of an article reporting on     04:29:24
10    results of clinical trials?                    04:29:26
11         MR. NOTARGIACOMO: Objection.             04:29:28
12 A.  My credentials are that I have a Ph.D., I do  04:29:29
13    work in health services research. The          04:29:35
14    research design principles are broad. The      04:29:38
15    notion of causal inference comes from          04:29:42
16    statistics generally, which are the same       04:29:45
17    methods that I use. It's all in the same       04:29:48
18    methodological context. And so the fact        04:29:52
19    that this is looking particularly at           04:29:54
20    clinical research I don't believe to be the    04:29:56
21    central issue. The central issue is about      04:29:59
22    causal inference, and that's something that    04:30:01
23    I have a great deal of expertise in.           04:30:03
24 Q.  But do you have specific expertise on what a  04:30:05
25    medical journal would or wouldn't accept on    04:30:08
```

71 (Pages 278 to 281)

282

1    the subject?                                    04:30:10
2  A.  The statements that I made are based on my    04:30:11
3    expertise as a health services researcher.     04:30:22
4    I feel qualified to make those statements       04:30:24
5    generally about what's required for             04:30:26
6    research.                                        04:30:29
7  Q.  Okay.  In conducting your analysis in your    04:30:29
8    declaration that's been marked as Exhibit       04:31:11
9    1 -- you can set Exhibit 14 to one side --       04:31:13
10    you state on the first page of the              04:31:20
11    declaration, the executive summary, you         04:31:25
12    considered three different matters "(1) the     04:31:31
13    economic incentives for off-label promotion,   04:31:35
14    (2) whether empirical evidence and theory      04:31:39
15    suggests that pharmaceutical promotion could   04:31:40
16    have caused the class to be impacted, and       04:31:42
17    (3) whether such impact can be quantified       04:31:45
18    using standard methods."                        04:31:47
19  A.  Yes, I see that.                              04:31:51
20  Q.  Why did you consider the economic incentives  04:31:52
21    for off-label promotions in conducting your    04:31:54
22    analysis?                                        04:31:56
23  A.  I think it's important to put these          04:31:56
24    allegations into the context of how this        04:32:00
25    could happen in a marketplace setting, and     04:32:03

283

1    in particular why we expect there to be          04:32:07
2    significant reason for off-label promotion,      04:32:10
3    that goes back to that Dorfman-Steiner           04:32:12
4    theorem because it's essentially the            04:32:15
5    profitability.  Once a drug is -- once the       04:32:18
6    R&D has been done for a drug, there is every    04:32:21
7    reason because of very low marginal costs of     04:32:25
8    production to try to increase the volume of      04:32:28
9    that drug.  And so in my view, the economic      04:32:31
10    incentives, it's an important condition          04:32:34
11    under which the allegations occur.              04:32:37
12  Q.  In what way is that analysis relevant to     04:32:39
13    this specific question of the impact of the     04:32:49
14    alleged conduct?  And it sounds to me as        04:32:51
15    though you analyzed it -- you analyzed that     04:32:55
16    data in order to get an understanding of         04:32:58
17    what the incentives are for a manufacturer      04:33:00
18    to conduct additional promotion.  What's the    04:33:03
19    relevance to what the actual impact would be    04:33:05
20    on class members?                                04:33:07
21  A.  So my view of the relevance here is to        04:33:08
22    inform the Court as to this particular          04:33:13
23    setting, a setting which many courts are not    04:33:16
24    familiar with in great detail, and to show      04:33:22
25    that the context in which the allegations       04:33:24

284

1    take place is one in which there is             04:33:28
2    reasonable expectation that the defendants      04:33:32
3    would have profited from this kind of           04:33:35
4    impact.  It would have been motivated to do     04:33:37
5    that.  It's been my view it's part of the       04:33:40
6    important story of how this happened as much    04:33:43
7    as what impact it has.                          04:33:45
8  Q.  I guess I maybe didn't follow from the        04:33:46
9    answer.  Would you say that it is relevant      04:33:55
10    to the question of what the impact of the       04:33:58
11    alleged conduct was other than as --           04:34:01
12  A.  It's rel --                                    04:34:06
13  Q.  -- background?                                04:34:04
14  A.  I'm sorry.                                     04:34:05
15  Q.  That's fine.                                  04:34:07
16  A.  I believe it's relevant to showing that this  04:34:08
17    could have a broad effect.  If, for example,   04:34:13
18    in other markets where the knowledge about     04:34:20
19    the experience of a good disciplines this      04:34:23
20    kind of promotional activity where consumers   04:34:26
21    ultimately verify that the good is or isn't    04:34:29
22    worth what it was set out to be, then this      04:34:32
23    wouldn't expect to have a sustained effect.    04:34:36
24    It would only affect some small portion of     04:34:38
25    the market, and so it's relevant for           04:34:41

285

1    thinking about the magnitude of impact here.    04:34:43
2    It's talking about here's the setting where     04:34:46
3    there's imperfect information, and the          04:34:48
4    insurance coverage means there's very little    04:34:50
5    price sensitivity, and therefore there are      04:34:54
6    these large price margins and the incentives    04:34:56
7    are such that off-label promotion could be a    04:34:58
8    very profitable opportunity.                     04:35:01
9  Q.  Okay.  Insofar as it's relevant, it's        04:35:03
10    relevant from a theoretical perspective; is     04:35:05
11    that correct?                                    04:35:08
12        MR. NOTARGIACOMO:  Objection.              04:35:08
13  A.  It's relevant from an institutional and      04:35:08
14    theoretical -- if you're including sort of     04:35:14
15    the institutional aspects of that as           04:35:17
16    theoretical, it's the context.                 04:35:19
17  Q.  Okay.  You cited a number of studies on Page  04:35:22
18    7 of your declaration for the proposition      04:35:31
19    that doctors can be and sometimes are          04:35:34
20    influenced in their prescribing habits by      04:35:37
21    pharmaceutical promotion?                       04:35:40
22  A.  I'm sorry, we're on pages or paragraphs?      04:35:43
23  Q.  Pages this time, Pages 7 through 10.         04:35:45
24  A.  7 through 10, okay.  Yes.                     04:35:47
25  Q.  Do any of these studies relate specifically  04:35:49

72  (Pages 282 to 285)

**VERITEXT NEW YORK REPORTING COMPANY**

286

```
1    to Neurontin?                    04:35:54
2  A. I don't believe any of these studies relate    04:35:54
3    specifically to Neurontin, no.    04:35:58
4  Q. Are any of these studies focused in any way    04:36:02
5    on specific activities of Parke-Davis or    04:36:05
6    Warner-Lambert or Pfizer?    04:36:10
7  A. Not to my knowledge.    04:36:12
8  Q. And so the studies here are all general    04:36:14
9    studies that aren't specific to the    04:36:16
10   defendants or the prescription drug at issue    04:36:20
11   in this case?    04:36:22
12 A. That's correct.    04:36:23
13   MR. POLUBINSKI: Can we go off the    04:36:47
14   record for just ten seconds? We can go    04:36:48
15   right back on again.    04:36:50
16   THE VIDEOGRAPHER: The time is    04:36:52
17   4:36. We're off the record.    04:36:54
18   (Discussion off the record.)    04:36:56
19   THE VIDEOGRAPHER: The time is    04:37:15
20   4:37. We are back on the record.    04:37:19
21   BY MR. POLUBINSKI:    04:37:21
22 Q. All right. Let's take a look at Paragraph    04:37:21
23   29 of your declaration.    04:37:27
24 A. Okay.    04:37:31
25 Q. Paragraph 29 indicates, among other things,    04:37:31
```

288

```
1    was induced by the illegal promotional    04:38:49
2    activities."    04:38:50
3  A. That's correct. You've read that correctly    04:38:52
4    and understood it correctly.    04:38:55
5  Q. Now, is that a correct statement of what    04:38:55
6    you've done in this case as well?    04:38:57
7  A. The models include variables that will    04:38:58
8    capture the underlying off-label promotion    04:39:02
9    that happens for other reasons and separate    04:39:07
10   out what happens due to the allegedly    04:39:09
11   illegal promotional activities, that's    04:39:13
12   correct.    04:39:15
13 Q. Okay. And just to make it simple, is the    04:39:15
14   language that we just read from the Clark    04:39:19
15   rebuttal, is that language equally    04:39:22
16   applicable in this case?    04:39:24
17 A. Yes, that's right.    04:39:25
18 Q. And so it's correct to say that your    04:39:26
19   methodologies and analysis would reach a    04:39:28
20   level -- or reach a conclusion, rather, at    04:39:29
21   the aggregate class-wide level only,    04:39:32
22   correct?    04:39:33
23 A. That's correct. That's what I've been asked    04:39:34
24   to do is propose a method to estimate    04:39:35
25   aggregate class-wide damages -- I mean,    04:39:39
```

287

```
1    that the regression methods like those --    04:37:43
2    that regression methods like those that you    04:37:47
3    propose to use in your model can "estimate    04:37:49
4    average or aggregate effects on a set of    04:37:55
5    variables on an outcome of interest, such as    04:37:59
6    the quantity of a prescription drug sold."    04:38:02
7    Did I read that basically right?    04:38:06
8  A. You've read that correctly, yes.    04:38:08
9  Q. Okay. Great. Thanks. I boiled down that's    04:38:09
10   what you say -- that's what you would say    04:38:12
11   you propose to do with your model in this    04:38:13
12   case?    04:38:15
13 A. That's correct.    04:38:16
14 Q. And so in that sense it's correct to say    04:38:18
15   that your model seeks to determine aggregate    04:38:20
16   effects or average effects?    04:38:22
17 A. That's correct.    04:38:24
18 Q. In Paragraph 6 of your Clark rebuttal, which    04:38:24
19   you may still have in front of you, you    04:38:32
20   wrote that you and Dr. Hartman have put    04:38:34
21   forward a "methodology to analyze at the    04:38:37
22   aggregate class-wide level that portion of    04:38:38
23   total sales of Neurontin that would have    04:38:41
24   occurred absent the illegal promotional    04:38:43
25   activities and the incremental amount that    04:38:46
```

289

```
1    quantities that relate to damages.    04:39:41
2  Q. And so I think we've been through this, but    04:39:43
3    just to make sure it's clear, your analysis    04:39:48
4    doesn't provide a means of determining    04:39:50
5    whether a given individual class member was    04:39:52
6    economically harmed, correct?    04:39:55
7    MR. NOTARGIACOMO: Objection.    04:39:57
8  A. My understanding is that I -- the model is    04:39:57
9    intended to generate the aggregate that I    04:40:01
10   don't look at any individual class members    04:40:05
11   to determine what, you know, their    04:40:07
12   individual impact was.    04:40:11
13 Q. Okay. And so the model that you propose at    04:40:12
14   least wouldn't enable you to identify    04:40:15
15   individual class members for whom Neurontin    04:40:18
16   was effective, I take it?    04:40:20
17   MR. NOTARGIACOMO: Objection.    04:40:22
18 A. No, it would not.    04:40:22
19 Q. And it wouldn't enable you to identify    04:40:24
20   individual class members who were prescribed    04:40:26
21   Neurontin for a use for which it was never    04:40:31
22   actually promoted?    04:40:33
23   MR. NOTARGIACOMO: Objection.    04:40:35
24 A. The model will look at those specific    04:40:35
25   indications again for which there were    04:40:44
```

73 (Pages 286 to 289)

290

1    allegedly illegal promotional activities, so    04:40:47
2    if we're talking about an off-label use for    04:40:51
3    a different indication, then that won't be    04:40:53
4    in the data that I'm looking at ultimately.    04:40:57
5  Q.  Okay. And that will be -- which indications    04:41:01
6    to include or not to include will be    04:41:04
7    something upon which you receive    04:41:06
8    instructions before you run the model?    04:41:11
9  A.  That's my understanding, yes. That's what I    04:41:12
10    anticipate.    04:41:14
11  Q.  Okay. But you won't actually be conducting    04:41:15
12    that analysis yourself, I take it?    04:41:16
13  A.  I believe that I will be instructed by    04:41:18
14    counsel which indications will be subject to    04:41:20
15    the ultimate legal matter.    04:41:22
16  Q.  Okay. Your analysis in the model that you    04:41:24
17    proposed would not enable you to identify    04:41:28
18    individual class members whose doctors were    04:41:31
19    never exposed to any alleged misstatement    04:41:33
20    about Neurontin at the time of the    04:41:36
21    prescription?    04:41:37
22        MR. NOTARGIACOMO: Objection, asked    04:41:38
23    and answered.    04:41:39
24  A.  No. I won't be doing that level of    04:41:39
25    analysis, no.    04:41:42

291

1  Q.  And it wouldn't -- your model wouldn't    04:41:42
2    enable you to identify individual class    04:41:44
3    members whose doctors never relied on any    04:41:46
4    alleged misstatement about Neurontin at the    04:41:49
5    time of the prescription?    04:41:52
6        MR. NOTARGIACOMO: Objection, asked    04:41:52
7    and answered.    04:41:53
8  A.  No, it will not.    04:41:53
9  Q.  And your model wouldn't enable you to    04:41:55
10    identify individual class members whose    04:41:58
11    prescriptions were not caused in any way at    04:42:01
12    all by the alleged misstatement about    04:42:04
13    Neurontin?    04:42:05
14        MR. NOTARGIACOMO: Objection.    04:42:06
15  A.  The econometric analysis will pull out in    04:42:07
16    the aggregate the effects of the promotion,    04:42:12
17    separating that from other trends in    04:42:15
18    off-label promotion, other off-label    04:42:18
19    promotion that's associated with articles    04:42:19
20    published, that sort of thing, that are not    04:42:23
21    in the allegations. I will not look at    04:42:25
22    individual consumers or individual    04:42:28
23    physicians.    04:42:31
24  Q.  And so in that way you wouldn't be able to    04:42:31
25    identify individual class members or    04:42:33

292

1    individual patients whose prescriptions    04:42:35
2    wouldn't have been caused by any alleged    04:42:37
3    misstatement about Neurontin, correct?    04:42:40
4  A.  That's correct.    04:42:42
5  Q.  And finally, your analysis wouldn't enable    04:42:43
6    you to identify individual class members    04:42:47
7    whose doctors elected to prescribe Neurontin    04:42:50
8    to them even though they knew about the    04:42:52
9    alleged improper promotion?    04:42:54
10  A.  That's correct.    04:42:55
11  Q.  Okay. In your report you write that you    04:42:57
12    plan to use regression analysis; is that    04:43:03
13    correct?    04:43:05
14  A.  That's correct.    04:43:05
15  Q.  In the context of regression analysis, what    04:43:06
16    is an error term?    04:43:10
17  A.  Error term is the part of the unexplained    04:43:11
18    variation in whatever the outcome of    04:43:15
19    interest is.    04:43:19
20  Q.  Every regression model will have some degree    04:43:21
21    of error, I take it?    04:43:24
22  A.  That's correct.    04:43:26
23  Q.  One of the things your Clark rebuttal says    04:43:26
24    is that it describes all economic models as    04:43:31
25    a simplification of reality and that all    04:43:34

293

1    such models are simplified in some way?    04:43:38
2  A.  That's correct. A model by definition is    04:43:41
3    not the real thing.    04:43:43
4  Q.  So your model in this case isn't an    04:43:44
5    exception to that general principle?    04:43:46
6  A.  All economic models conform to that general    04:43:48
7    principal, and mine is no exception.    04:43:51
8  Q.  What does it mean for a model to be a    04:43:53
9    simplification of reality?    04:43:55
10  A.  It means that in the real world there are    04:43:58
11    any number of factors that affect every    04:44:02
12    outcome, everything that happens to every    04:44:06
13    economic factor, to the weather, to    04:44:10
14    everything. And a model looks to identify    04:44:13
15    the most important factors, and summarize    04:44:16
16    them in a sort of a finite number of    04:44:23
17    variables.    04:44:27
18  Q.  Okay. So in that sense a model, your model    04:44:27
19    in particular, will differ in some way from    04:44:32
20    what you describe as the real world; is that    04:44:34
21    correct?    04:44:36
22  A.  You're correct that the model will not be as    04:44:36
23    complete as the real world.    04:44:43
24  Q.  And that some level of error will be    04:44:44
25    tolerable in a model?    04:44:47

74  (Pages 290 to 293)