M. ROSENTHAL

325

```
1   respect to a prescription drug?                09:10:49
2 A. Yes.  My understanding is often guidelines    09:10:51
3   are not specific to drugs, so usually the      09:10:53
4   guidelines refer to class of drugs or to       09:10:56
5   the pharmaceutical treatment following         09:11:02
6   surgery, for example, but there may be         09:11:04
7   guidelines that are specific to a specific     09:11:07
8   drug in terms of whether to use it only        09:11:09
9   after a patient has failed on something        09:11:12
10  else, for example.  So are those the kinds     09:11:14
11  of guidelines that you're talking about?       09:11:19
12 Q. Yeah.  Let's focus on the latter that        09:11:20
13  you've just described --                       09:11:22
14 A. Okay.                         09:11:23
15 Q. -- that sort of deal with the use of a       09:11:23
16  particular prescription drug.  Could a         09:11:25
17  change in those guidelines affect the          09:11:28
18  prescription of Neurontin for a particular     09:11:30
19  off-label condition?                09:11:31
20 A. Assuming such guidelines existed that were   09:11:33
21  specific to Neurontin, yes.                    09:11:35
22 Q. And the same would be true for informal      09:11:36
23  practice guidelines, the same way they         09:11:39
24  would be for more formal ones?                 09:11:41
25 A. Can you tell me what you mean by "informal   09:11:42
```

326

```
1   practice guidelines"?             09:11:45
2 Q. Why don't -- why don't I withdraw the        09:11:48
3   question and just -- I'll withdraw the         09:11:51
4   question, that's fine.                09:11:53
5 A. Okay.                         09:11:54
6 Q. How about a new development in the           09:11:54
7   underlying science in the particular field    09:11:56
8   that relates to the particular indication?    09:11:58
9 A. So you mean the basic science --             09:12:01
10 Q. Yes.                          09:12:05
11 A. -- underpinnings?                 09:12:05
12    I guess if -- I don't know how              09:12:07
13  those kinds of changes translate into         09:12:09
14  clinical practice.  That information would    09:12:12
15  have to disseminate somehow.                  09:12:13
16 Q. Should it have disseminated somehow, could  09:12:14
17  it have impacted doctors' prescribing         09:12:17
18  behavior with respect to Neurontin for that   09:12:19
19  indication?                  09:12:21
20 A. I guess potentially, again, it seems second 09:12:23
21  order relative to clinical changes.           09:12:26
22 Q. How about a discussion of the use of        09:12:27
23  Neurontin in a medical school class to        09:12:30
24  treat the applicable condition?               09:12:33
25 A. What effect would it have on current        09:12:33
```

327

```
1   practice?  Because it seems tenuous to me,    09:12:37
2   but...                        09:12:41
3 Q. What about an effect on practice at some     09:12:42
4   point in the future?                09:12:45
5 A. Perhaps at some point in the future it       09:12:46
6   could have an effect if those students took   09:12:48
7   that knowledge and used it in practice        09:12:51
8   subsequently.                09:12:54
9 Q. How about a change in the availability of    09:12:54
10  therapeutic substitutes for treating a        09:12:56
11  particular condition?                09:12:59
12 A. That would certainly have an effect.        09:12:59
13 Q. How about FDA approval of Neurontin for a   09:13:03
14  related use?                 09:13:05
15 A. That can potentially have an effect as      09:13:05
16  well.                        09:13:09
17 Q. How about FDA approval of a drug with a     09:13:09
18  similar mechanism of action to Neurontin      09:13:11
19  for the applicable use?                09:13:13
20 A. I'm sorry, could you repeat it?  I'm again  09:13:14
21  losing all --                09:13:21
22 Q. Yeah, sure.                 09:13:21
23 A. -- the questions.                09:13:22
24    MR. POLUBINSKI:  Do you want to            09:13:22
25  read it back.                09:13:23
```

328

```
1 A. Thank you.                  09:13:23
2    (Record read.)               09:13:23
3 A. Yes, that could have an effect.              09:13:32
4 Q. How about FDA approval of a drug with a      09:13:33
5   similar mechanism of action to Neurontin      09:13:36
6   for a related use?                09:13:39
7 A. Potentially that could have an effect as     09:13:41
8   well.  Again, it seems second order.          09:13:42
9 Q. How about approval of Neurontin for the      09:13:44
10  applicable use in another country?            09:13:46
11 A. I guess possibly it could have an effect.    09:13:47
12  I think it's an empirical question.  I        09:13:52
13  don't actually know.                09:13:54
14 Q. Okay.  And when you say "it's an empirical   09:13:55
15  question," what does that mean?               09:13:58
16 A. I mean, it's not clear to me that           09:13:59
17  physicians in this country would be           09:14:01
18  influenced by -- would know or be             09:14:03
19  influenced by what was proved in other        09:14:05
20  countries.                  09:14:09
21 Q. But you couldn't rule out the possibility    09:14:09
22  without examining the data; is that           09:14:11
23  correct?                    09:14:13
24 A. That's correct.  If I were interested in     09:14:13
25  that question, I would need to look at the     09:14:15
```

5 (Pages 325 to 328)

M. ROSENTHAL

<table>
<tr><td colspan="2">

**329**

1    data.                                    09:14:17
2  Q. How about approval of Neurontin for a    09:14:17
3     related use in another country?          09:14:21
4  A. Yes, that could have an effect in the same 09:14:22
5     way.                                     09:14:26
6  Q. An approval of a drug with a similar     09:14:26
7     mechanism of action for the applicable use 09:14:29
8     in another country?                      09:14:31
9  A. Yes.                                     09:14:33
10 Q. How about a change in information on     09:14:35
11    Neurontin in the Physicians' Desk        09:14:37
12    Reference?                               09:14:40
13 A. Yes. I guess depending on what kind of   09:14:42
14    information you're talking about, if it   09:14:44
15    were salient information of some kind. I'm 09:14:45
16    not sure what kind of information you're  09:14:48
17    talking about.                           09:14:49
18 Q. Well, let's think of a couple of examples. 09:14:52
19 A. Okay.                                    09:14:54
20 Q. What about a change to the long list of   09:14:55
21    possible adverse events; could that have an 09:14:57
22    impact on prescribing behavior?          09:15:01
23 A. Potentially.                             09:15:02
24 Q. How about a warning on the label?        09:15:02
25 A. Potentially.                             09:15:04

</td><td>

**331**

1     any other informational content?          09:16:10
2  A. I'm --                                    09:16:13
3  Q. Does my question make sense?              09:16:16
4  A. So you mean a detailer who comes, drops off 09:16:17
5     samples and runs away without discussing   09:16:20
6     the drug?                                  09:16:22
7  Q. Without actually getting in to speak with  09:16:22
8     the doctor.                               09:16:25
9  A. We think free samples do have an effect    09:16:25
10    independently of the detailing visit,      09:16:28
11    although it's often difficult to tell.     09:16:29
12 Q. How about provision of samples of         09:16:31
13    competitor drugs without any other         09:16:34
14    informational content?                     09:16:35
15 A. Yes, that would have an effect.            09:16:37
16 Q. How about dissemination of the            09:16:38
17    manufacturer's own literature or brochures  09:16:39
18    or things like that?                       09:16:42
19 A. Potentially that would have an effect.     09:16:42
20 Q. What about the relative cost or price of   09:16:46
21    Neurontin relative to -- withdrawn.        09:16:50
22       How about the cost of Neurontin         09:16:53
23    relative to competitor drugs?             09:16:55
24 A. Cost to whom?                             09:16:57
25 Q. Good question. Let's take, for example,   09:16:58

</td></tr>
<tr><td>

**330**

1  Q. Okay. How about a change in information in  09:15:05
2     the Physicians' Desk Reference on other    09:15:12
3     drugs with a similar mechanism of action?   09:15:14
4  A. That could potentially have an effect again 09:15:15
5     in substitution.                           09:15:18
6  Q. Okay. How about information posted on a    09:15:19
7     bulletin board on the Internet about        09:15:20
8     Neurontin and treating the applicable       09:15:24
9     condition?                                 09:15:26
10 A. I suppose plausibly that someone could use  09:15:27
11    that information.                           09:15:31
12 Q. How about more specifically information     09:15:33
13    that's posted on a medical information site  09:15:34
14    on the Internet on treatment of the         09:15:37
15    applicable condition with Neurontin?        09:15:40
16 A. I guess that could also have an effect     09:15:42
17    potentially.                               09:15:45
18 Q. How about detailing visits about Neurontin? 09:15:52
19 A. As we discussed yesterday, we'd certainly   09:15:55
20    expect detailing visits to affect all       09:15:58
21    prescribing.                               09:16:01
22 Q. How about detailing visits about          09:16:02
23    competitive drugs?                         09:16:05
24 A. Yes, those should have an effect as well.   09:16:06
25 Q. Provision of samples of Neurontin without   09:16:08

</td><td>

**332**

1     the cost to a consumer who's paying for the  09:17:05
2     prescription him or herself.               09:17:07
3  A. So you mean a change in the co-payment, for  09:17:08
4     example?                                   09:17:10
5  Q. Uh-huh. Or for somebody who's not insured   09:17:11
6     or for whom the prescription isn't insured.  09:17:14
7  A. That price in theory would have an effect.   09:17:17
8     As you know, these price effects are hard   09:17:20
9     to identify because of the fact that most   09:17:22
10    people don't pay those prices out of        09:17:24
11    pocket.                                    09:17:26
12 Q. Okay. How about a change in the relative   09:17:26
13    cost or price of a drug paid by third-party  09:17:30
14    payers, reimbursement for the drug?         09:17:35
15 A. Potentially there could be some kind of    09:17:38
16    effect there. It's not clear that it's a    09:17:38
17    linear effect, that there is an effect for   09:17:40
18    every increment that has to do with the --   09:17:44
19    at some level the relative price may         09:17:46
20    matter.                                    09:17:47
21 Q. How about insurance coverage guidelines for  09:17:49
22    Neurontin?                                 09:17:51
23 A. Can you explain what you mean by "insurance  09:17:52
24    coverage guidelines"? Just simply whether  09:17:56
25    it's covered or not?                       09:17:58

</td></tr>
</table>

6 (Pages 329 to 332)

M. ROSENTHAL

**333**

1  Q. Yeah.                                        09:18:00
2  A. Certainly whether it's covered or not will    09:18:00
3     have an effect on its use.                   09:18:02
4  Q. And will whether or not a competitor drug     09:18:04
5     is covered have an effect on Neurontin's      09:18:08
6     use for that condition -- for the            09:18:10
7     applicable condition?                        09:18:12
8  A. Yes.                                          09:18:17
9  Q. Now, we've been talking about insurance       09:18:19
10    coverage guidelines. How about coverage       09:18:21
11    guidelines for PBMs? Do you know what I'm     09:18:23
12    talking about when I say PBM?                 09:18:25
13 A. I do know what you're talking about when      09:18:27
14    you say PBM. And, again, do you mean just     09:18:29
15    whether or not it's covered?                  09:18:32
16 Q. I do.                                         09:18:34
17 A. Okay. Then the same way, must ensure that     09:18:35
18    a PBM is acting essentially as the insurer    09:18:41
19    for pharmaceuticals, so...                    09:18:43
20 Q. How about the use of a prior authorization    09:18:45
21    program by a third-party payer for            09:18:53
22    Neurontin?                                    09:18:54
23 A. If a third-party payer required prior         09:18:55
24    authorization, that would have an effect on   09:18:57
25    Neurontin prescribing.                        09:18:59

**334**

1  Q. Do you know what a disease management         09:19:00
2     program is?                                   09:19:06
3  A. I do. Do you?                                 09:19:06
4  Q. Why don't I ask you to tell me what it is,    09:19:08
5     at least as you understand it.               09:19:12
6  A. Disease management programs are usually       09:19:13
7     condition-specific, although sometimes        09:19:15
8     they're more complex efforts to coordinate    09:19:17
9     and improve the quality of care for people    09:19:21
10    with chronic diseases, clearly.               09:19:23
11 Q. Okay. Would the implementation of a           09:19:25
12    disease management program have an            09:19:27
13    impact -- an implementation of a disease      09:19:29
14    management program that offers guidelines     09:19:31
15    in the treatment of the applicable           09:19:35
16    condition have an impact on the use of        09:19:37
17    Neurontin to treat that condition?           09:19:40
18 A. Again, if that program had guidelines that    09:19:41
19    were specific to Neurontin therapy, then      09:19:45
20    that could have an effect.                    09:19:48
21 Q. Are you familiar with the term "academic      09:19:51
22    detailing"?                                   09:19:53
23 A. I am.                                         09:19:54
24 Q. What does that mean?                          09:19:55
25 A. Academic detailing is an effort to inform     09:19:55

**335**

1     physicians about pharmaceutical therapies    09:20:00
2     generally, it could be on any topic, but      09:20:04
3     pharmaceutical therapies in the same way      09:20:06
4     that the industry does but using scientific   09:20:08
5     data instead of commercial promotional        09:20:12
6     information. So it's one-on-one. That's       09:20:14
7     the important piece of it, is that it's       09:20:18
8     peer-to-peer, one-on-one counseling.          09:20:21
9  Q. Would the implementation of an academic       09:20:22
10    detailing program on Neurontin have an        09:20:29
11    impact on prescription behavior with          09:20:31
12    respect to Neurontin?                         09:20:34
13 A. If such a program were targeting Neurontin    09:20:35
14    use, then yes.                                09:20:38
15 Q. All right. How about the availability of      09:20:41
16    Neurontin on a hospital or insurance          09:20:43
17    formulary?                                    09:20:45
18 A. Whether it's on the formulary would be        09:20:46
19    similar to whether it's covered, so yes,      09:20:48
20    the same way.                                 09:20:51
21 Q. And how about the availability of a           09:20:51
22    competitor drug on a formulary, an            09:20:54
23    insurance or hospital formulary?              09:20:57
24 A. Yes, same.                                    09:20:59
25 Q. How about a decision by a hospital to bar     09:21:00

**336**

1     acceptance of samples by its professionals?   09:21:03
2  A. Yes, I would expect that to have some         09:21:05
3     effect.                                       09:21:09
4  Q. How about a newspaper article reflecting      09:21:09
5     concerns about improper promotion by          09:21:13
6     defendants for off-label uses?               09:21:16
7  A. I suppose that could have some effect as      09:21:18
8     well.                                         09:21:21
9  Q. And you're familiar with the Franklin case;   09:21:21
10    you testified about that yesterday?           09:21:25
11 A. Yes.                                          09:21:27
12 Q. How about a news broadcast on the Franklin    09:21:27
13    case; would that have an impact on doctors'   09:21:30
14    prescribing behavior of Neurontin?           09:21:33
15 A. Potentially.                                  09:21:36
16 Q. How about an advertisement by a law firm      09:21:38
17    seeking to recruit individuals who have       09:21:40
18    taken Neurontin to file personal injury       09:21:42
19    lawsuits against the defendants?              09:21:44
20 A. I guess I'm not sure how those would get      09:21:46
21    out to physicians, but if physicians saw      09:21:51
22    such advertisements, possibly.                09:21:55
23 Q. So am I correct that your model would need    09:21:58
24    to at least consider whether to take into     09:22:10
25    account each of the factors that we've just   09:22:12

7 (Pages 333 to 336)

M. ROSENTHAL

**337**

1  discussed in determining the effects of          09:22:15
2  off-label promotional events and                09:22:17
3  expenditures on total aggregate                 09:22:19
4  prescriptions of Neurontin?                     09:22:21
5  A. So the model -- in setting up the model      09:22:22
6  I'll consider those factors that I deem to      09:22:26
7  be important determinants of quantity and       09:22:30
8  in particular where I would spend most of       09:22:33
9  my time worrying about those where the          09:22:36
10 timing is correlated with the off-label         09:22:38
11 promotions, the levels. The intensity of        09:22:40
12 these other factors could be correlated and     09:22:44
13 therefore confused with the off-label           09:22:47
14 promotions.                                     09:22:48
15      In addition, there are elements of         09:22:50
16 the model intended to capture some of these     09:22:53
17 other factors. For example, by using time       09:22:55
18 trends, linear quadratic time trends to         09:22:59
19 capture other secular trends in what's          09:23:04
20 happening in the market by including            09:23:07
21 variables on other drugs. So certainly          09:23:09
22 those factors would be considered and           09:23:12
23 incorporated either explicitly or captured      09:23:14
24 in the time trend, the secular trend.           09:23:16
25 Q. Okay. Just so I understand it, though, I     09:23:19

**338**

1  think you are saying that you would need to     09:23:21
2  at least consider the various factors that      09:23:23
3  we talked about?                                09:23:25
4  A. Can we agree what "consider" means?          09:23:26
5  Q. Consider to the extent they need to be       09:23:29
6  reflected in your model.                        09:23:32
7  A. Certainly I'll consider a wide range of      09:23:33
8  factors, including the types that we've         09:23:35
9  just discussed.                                 09:23:38
10 Q. Do you know how many in total there could    09:23:39
11 be?                                             09:23:43
12 A. No, I don't think it's possible to say.      09:23:43
13      And certainly the numbers depend on whether 09:23:47
14 you define them as finely as you have done      09:23:49
15 or if you, say, consider, you know,             09:23:52
16 promotional efforts of competitors, new         09:23:54
17 drug introduction, so there may be many         09:24:00
18 that we consider.                               09:24:01
19 Q. There could be -- withdrawn.                 09:24:06
20      How do you plan to consider these          09:24:08
21 different factors?                              09:24:11
22 A. Well, I will start with the literature on    09:24:12
23 what -- the impact of promotion on drug         09:24:16
24 utilization and look at models that have        09:24:21
25 been done in the past and what factors          09:24:23

**339**

1  they've included, and certainly of course       09:24:25
2  those do include things like, as you've         09:24:29
3  mentioned, competitor new drug entry into       09:24:31
4  the class, competitors' promotional             09:24:35
5  efforts, other secular trends that may          09:24:38
6  affect prescribing.                             09:24:41
7  Q. Aside from reviewing the literature to see   09:24:42
8  what past models have done, what else would     09:24:46
9  you need to do?                                 09:24:48
10 A. The first place I would start is the         09:24:49
11 literature for sure. I may consult some of      09:24:52
12 my clinical colleagues as well.                 09:24:54
13 Particularly I may try to find experts in       09:24:57
14 the treatment -- in the areas of treatment      09:24:58
15 for the indications that ultimately I'm         09:25:01
16 asked to model the indications.                 09:25:05
17 Q. Do you need, yourself, to actually look at   09:25:06
18 data with respect to some number or all of      09:25:09
19 these factors to figure out whether they        09:25:11
20 had a measurable impact on prescription         09:25:13
21 decisions?                                      09:25:17
22 A. Not necessarily. Modeling strategies         09:25:17
23 generally -- and economics you start with a     09:25:20
24 good theoretical model and include those        09:25:23
25 variables that should theoretically be          09:25:26

**340**

1  included. There is, of course, some point       09:25:28
2  when you're specifying the model itself          09:25:30
3  that you need to look at data. You can't         09:25:33
4  always include all variables because of          09:25:34
5  high degrees of correlation, for example.        09:25:36
6  Then at that point I would need to see           09:25:40
7  data, but the starting point is really to        09:25:41
8  develop a good theory.                           09:25:43
9  Q. But at some point -- I guess would you rely   09:25:46
10 on your theory alone, then, to rule out          09:25:49
11 whether to consider individual factors in        09:25:51
12 running your model?                              09:25:55
13 A. Not alone, but in some cases I might rely     09:25:56
14 alone on the theories. For example, there        09:26:00
15 are some things that I wouldn't include,         09:26:03
16 the ambient temperature based on the theory      09:26:06
17 that it has no affect on Neurontin               09:26:09
18 prescribing, and so I wouldn't consider          09:26:12
19 data on that.                                    09:26:14
20 Q. Fair enough. I think what we're talking       09:26:14
21 about are the factors that we've just            09:26:16
22 discussed. For purposes of those factors         09:26:18
23 do you anticipate relying on the literature      09:26:19
24 to exclude any of them from your analysis?       09:26:21
25 A. I would anticipate relying on the             09:26:24

8 (Pages 337 to 340)

M. ROSENTHAL

341

1  literature and data where possible, but it          09:26:27
2  does seem possible to me that I won't have         09:26:29
3  data on every one of those factors, and           09:26:31
4  then I would rely on theory and the               09:26:33
5  literature as to whether it was an                09:26:35
6  important factor.                                 09:26:41
7  Q.  Maybe just to get a little more precision     09:26:54
8  on this why don't we go back and look at a        09:26:57
9  few of these individual things --                09:27:00
10 A.  Okay.  The ones you mentioned?               09:27:00
11 Q.  Yeah, a few of the factors that we           09:27:01
12 discussed --                                     09:27:03
13 A.  Okay.                                         09:27:03
14 Q.  -- that you said might impact physician       09:27:03
15 prescribing behavior.  Let's start with the       09:27:06
16 first one, which is an article in a peer-          09:27:09
17 reviewed medical publication on the use of        09:27:12
18 Neurontin to treat the applicable              09:27:13
19 condition.                                        09:27:15
20 A.  Okay.                                         09:27:15
21 Q.  How do you anticipate that you would go       09:27:15
22 about finding out whether you would include       09:27:20
23 that particular publication -- whether you       09:27:22
24 would include publication of a particular         09:27:24
25 article in your model?                           09:27:25

342

1  A.  In that case of those articles, if there      09:27:28
2  were significant studies published, new          09:27:32
3  data published on Neurontin, in all              09:27:34
4  likelihood we would search PubMed and find       09:27:36
5  those articles and look to see about their       09:27:41
6  timing and see whether it made sense to          09:27:43
7  include them in the model.                       09:27:46
8  Q.  And so you would analyze each individual      09:27:50
9  article as to whether it fit that -- fit         09:27:52
10 those criteria?                                  09:27:54
11 A.  In all likelihood the number of articles     09:27:55
12 providing new data on Neurontin is a             09:27:58
13 reasonable number that we can find in the        09:28:00
14 literature review and decide which of them       09:28:02
15 provides new data on either effects or side      09:28:05
16 effects of Neurontin.                            09:28:09
17 Q.  What would you believe the reasonable        09:28:10
18 number to be for purposes of your last           09:28:14
19 answer?                                          09:28:16
20 A.  You mean whether it would be feasible?       09:28:16
21 Q.  Yeah.                                         09:28:19
22 A.  I don't know.  Something less than a          09:28:19
23 thousand.                                         09:28:21
24 Q.  Okay.  But it's at least possible that some   09:28:21
25 number less than a thousand articles would       09:28:35

343

1  have had some impact on prescribing              09:28:38
2  behavior of Neurontin --                        09:28:41
3       MR. NOTARGIACOMO:  Objection.              09:28:42
4  Q.  -- for off-label uses?                       09:28:43
5  A.  I believe I've already said it's at least    09:28:44
6  possible.                                        09:28:46
7  Q.  Okay.  We also talked about new articles in  09:28:46
8  peer-reviewed medical publications on the        09:28:55
9  use of drugs with similar mechanisms of          09:28:59
10 action to Neurontin to treat conditions.         09:29:01
11 How would you go about determining whether       09:29:04
12 that's a factor that you would include in        09:29:06
13 your model?                                      09:29:08
14 A.  I think in that case I would need to          09:29:09
15 consult a clinical expert in those areas.        09:29:12
16 Clearly I couldn't make that judgment about      09:29:15
17 whether it was a similar mechanism.              09:29:18
18 Q.  And once -- well, first question is, you      09:29:28
19 haven't consulted a clinical expert on that      09:29:30
20 now, I take it?                                   09:29:32
21 A.  No, I have not.                               09:29:32
22 Q.  Okay.  And then when you did, if you came     09:29:33
23 up with a list of drugs with a similar           09:29:37
24 mechanism of action, would you do the same       09:29:39
25 sort of search of PubMed that you described      09:29:42

344

1  before --                                        09:29:45
2  A.  Poten --                                      09:29:45
3  Q.  -- for articles?                             09:29:46
4  A.  Sorry.  I'm still cutting you off.            09:29:47
5       Potentially in combination with            09:29:52
6  some input from said clinical expert, so it      09:29:54
7  would certainly make sense to use some           09:29:56
8  clinical expertise on what were the             09:30:02
9  important trends in treatment in this area.      09:30:04
10 Q.  Okay.  One of the other factors that we      09:30:06
11 discussed was a continuing medical              09:30:16
12 education seminar addressing the use of          09:30:18
13 Neurontin to treat an applicable condition.      09:30:20
14 How would you go about determining whether       09:30:22
15 a particular seminar would have had an           09:30:25
16 impact on prescribing behavior?                 09:30:27
17 A.  So in part we have seen data collected by    09:30:28
18 Parke-Davis, fill in Warner-Lambert there.       09:30:34
19 Q.  We can say defendants, to make it easier.    09:30:39
20 A.  Defendants.  The defendants have some data   09:30:41
21 on CME, continuing medical education, for        09:30:42
22 Neurontin.  They have documented events and      09:30:47
23 attendance, that sort of thing.  So we do       09:30:50
24 have some data there.  And so I would start      09:30:53
25 with that.                                        09:30:57

VERITEXT/NEW YORK REPORTING COMPANY

212-267-6868                                                          516-608-2400

M. ROSENTHAL

345

1  Q.  Are there any other sources of data that        09:30:57
2      you would look to on this, or would that be     09:30:59
3      the principal source?                           09:31:01
4  A.  I think that would be the principal source.     09:31:02
5      There are also data collected by IMS Health     09:31:04
6      in the aggregate on meetings and events         09:31:08
7      associated with drugs, including Neurontin      09:31:11
8      and Neurontin's competitors.                    09:31:14
9  Q.  Okay.  In terms of the first category of        09:31:16
10     data, the data from defendants, is it your      09:31:22
11     understanding that that data will include       09:31:29
12     information about events that the               09:31:31
13     defendants didn't sponsor?  When I say          09:31:33
14     "events," I mean continuing medical             09:31:36
15     education events.                               09:31:38
16 A.  I'm not altogether clear on whether they        09:31:39
17     only have data on events that they              09:31:43
18     sponsored or events where they had              09:31:44
19     sponsored a speaker, for example, so made a     09:31:46
20     payment for a physician to give a talk          09:31:50
21     about research.  So it may be that there        09:31:53
22     are some meetings and events that they          09:31:56
23     don't have direct spending -- direct record     09:31:58
24     of.                                             09:32:00
25 Q.  Is it your view that meetings or events         09:32:03

346

1      that weren't supported by the defendants        09:32:06
2      could have had an impact on prescribing         09:32:08
3      behavior of Neurontin for off-label uses?       09:32:10
4  A.  Potentially.                                    09:32:12
5  Q.  And how would you go about finding out          09:32:15
6      whether those events had a measurable           09:32:16
7      impact?                                         09:32:18
8  A.  I think at this point I haven't tried to        09:32:18
9      get all the data on this, but I guess as a      09:32:23
10     starting place I would start with the           09:32:25
11     relevant medical societies.  So, again,         09:32:27
12     condition by condition there would be           09:32:32
13     different relevant medical societies.           09:32:33
14 Q.  When you say you would start with the           09:32:38
15     relevant medical societies, what would you      09:32:40
16     do?                                             09:32:43
17 A.  So contact, excuse me, the medical              09:32:43
18     education staff at the medical societies         09:32:45
19     for neurology, for psychiatry, yes, as was      09:32:48
20     relevant, see what kind of data they had.       09:32:53
21 Q.  And what impact would it have on your           09:32:57
22     analysis if they didn't have data               09:33:00
23     stretching back to the beginning of the         09:33:02
24     class period, 1994?                             09:33:03
25 A.  Then I would have to consider other             09:33:05

347

1      mechanisms for modeling that effect.            09:33:09
2  Q.  What other mechanisms would you consider?       09:33:17
3  A.  So in part the time trend might pick up         09:33:20
4      these kinds of events.  The other variables     09:33:23
5      that we talked about, including publication     09:33:28
6      of new articles, might pick up the timing       09:33:30
7      of these events.  If the publication of new     09:33:33
8      articles, you know, was -- as you may know,     09:33:35
9      the timing of publication of new releases       09:33:40
10     is often coordinated with national              09:33:42
11     meetings.                                       09:33:45
12         So, for example, you always see             09:33:45
13     the latest results of cardiovascular            09:33:47
14     disease clinical trials come out at the         09:33:51
15     same time as the big CME events for             09:33:53
16     cardiovascular specialists.  And so I           09:33:57
17     looked at those kinds of data.                  09:34:00
18 Q.  When you say in your last answer "pick up       09:34:02
19     the timing of these events" --                  09:34:05
20 A.  Yes.                                            09:34:08
21 Q.  -- can you tell me what that means?             09:34:08
22 A.  It would be because the events in the model     09:34:09
23     essentially would be capturing a point in       09:34:11
24     time.  There are indicator variables as I       09:34:17
25     described, so if there was an event, there      09:34:19

348

1      would be a variable for the point in time       09:34:21
2      at which that happens, and then potentially     09:34:23
3      the time since the event, and therefore if      09:34:26
4      a meeting and an article come out at the        09:34:30
5      same time, they essentially are capturing       09:34:32
6      the same information as far as the model's      09:34:34
7      concerned.                                      09:34:37
8  Q.  Assuming that the two are coordinated?          09:34:38
9  A.  Right.                                          09:34:40
10 Q.  How would you decide whether they're            09:34:40
11     sufficiently coordinated that you would be      09:34:44
12     able to use that analysis?                       09:34:46
13 A.  Well, I would have to review on a case-by-      09:34:47
14     case basis.                                     09:34:50
15 Q.  When you say "a case-by-case basis," would      09:34:50
16     that be with respect to each individual         09:34:54
17     event?                                          09:34:55
18 A.  Again, I think in this area I would consult     09:34:56
19     someone who's an expert in the treatment of     09:35:00
20     this particular condition for a way to          09:35:02
21     prioritize what are the important meetings,     09:35:05
22     for example, what were the important            09:35:09
23     clinical findings from this era.                09:35:11
24 Q.  And, again, just going back to where you        09:35:18
25     would come up with a list of meetings,          09:35:20

10 (Pages 345 to 348)

M. ROSENTHAL

### 349

1  other than reaching out to the relevant        09:35:23
2  medical societies?        09:35:25
3  A.  And defendants' own data.  Again, IMS        09:35:26
4  Health tracks these, tracks spending for        09:35:31
5  events, meetings and events, and I would        09:35:32
6  look to other data sources in the industry.        09:35:35
7  Q.  Okay.  Let's go on to one of the other        09:35:37
8  factors.        09:35:40
9  A.  Okay.        09:35:40
10  Q.  One of the other things that we agreed        09:35:41
11  might impact prescribing behavior in the        09:35:43
12  aggregate would be an informal conversation        09:35:45
13  among doctors -- or informal conversations        09:35:49
14  among doctors -- let's put it that way --        09:35:52
15  A.  Yes.        09:35:54
16  Q.  -- about the doctors' clinical experience        09:35:54
17  in the use of Neurontin to treat the        09:35:57
18  applicable condition.  How would you decide        09:35:58
19  whether to incorporate that into your        09:36:00
20  model?        09:36:02
21  A.  So clearly that would not be incorporated        09:36:02
22  into the model.  That's -- as we talked        09:36:04
23  about yesterday, the model doesn't include        09:36:08
24  every factor.  It's a simplification of        09:36:11
25  reality that focuses on major factors and        09:36:15

### 350

1  particularly those that might be correlated        09:36:19
2  with the variable of interest, again, the        09:36:21
3  allegedly illegal promotional activity.        09:36:24
4        And so in the case of        09:36:27
5  conversations between doctors I have no        09:36:28
6  reason to believe that those, other than        09:36:32
7  those caused by the allegedly illegal        09:36:34
8  activities, would be correlated with the        09:36:36
9  allegedly illegal activities.  And in        09:36:40
10  effect transmission of information among        09:36:43
11  physicians would be captured in that time        09:36:46
12  trend.        09:36:49
13  Q.  How confident are you that conversations        09:36:49
14  among doctors couldn't be correlated with        09:36:55
15  off-label promotion in some way?  So in        09:36:57
16  other words, you know, isn't it possible at        09:36:59
17  least that, you know, by virtue of, you        09:37:01
18  know, buzz in the medical community, for        09:37:07
19  lack of a better word, about a particular        09:37:09
20  off-label use that the defendants would        09:37:10
21  increase off-label promotion?        09:37:11
22  A.  Well, again, the model will took to the        09:37:12
23  specific timing of the promotional events,        09:37:16
24  and so if the buzz preceded the promotional        09:37:18
25  events or activities, then the buzz would        09:37:21

### 351

1  be captured as something other than caused        09:37:25
2  by the allegedly illegal activities.        09:37:29
3        And so because I'll be looking at        09:37:31
4  the specific time of these events and        09:37:34
5  separating out secular trends, which would        09:37:35
6  include the sort of natural diffusion of        09:37:38
7  information about Neurontin, I'm fairly        09:37:40
8  confident that those things can be        09:37:43
9  separated.        09:37:45
10  Q.  If they couldn't be separated, your results        09:37:52
11  would be biased; is that correct?        09:37:57
12  A.  If there was a correlation between them,        09:37:58
13  then there would be some bias, yes.        09:38:04
14  Q.  And if they were correlated -- well, I'll        09:38:12
15  withdraw the question.        09:38:17
16        All right.  One of the other        09:38:20
17  things that we discussed was changes in        09:38:23
18  practice guidelines within an institution        09:38:26
19  or professional group on the use of        09:38:29
20  Neurontin to treat a particular condition?        09:38:31
21  A.  Yes.        09:38:34
22  Q.  We agreed that that could potentially        09:38:34
23  impact prescribing behavior in the        09:38:36
24  aggregate, correct?        09:38:37
25  A.  Yes, we did.        09:38:38

### 352

1  Q.  How would you go about determining whether        09:38:39
2  or not to include that factor in your        09:38:42
3  model?        09:38:43
4  A.  I guess, again, in this case it would make        09:38:44
5  sense to consult a clinical expert for the        09:38:47
6  conditions considered.        09:38:49
7  Q.  What information would you get from the        09:38:50
8  clinical expert?        09:38:52
9  A.  About standard practices in terms of        09:38:52
10  guidelines.  Guidelines are variably used,        09:38:57
11  as you know, by condition, for cancer, for        09:39:02
12  example.  Cancer treatment is almost purely        09:39:06
13  protocol-driven.  That's well-known.  Many        09:39:08
14  other kinds of conditions there are very        09:39:11
15  few protocols for treatment, particularly        09:39:15
16  specific protocols about drugs.  So I would        09:39:17
17  talk to clinical experts to understand        09:39:20
18  better the patterns of treatment with        09:39:22
19  regard to these protocols.        09:39:24
20  Q.  Would you expect the clinical expert to be        09:39:28
21  able to provide you with information about        09:39:30
22  implementation of particular practice        09:39:34
23  guidelines at particular institutions?        09:39:36
24  A.  It's not clear to me that that would be        09:39:37
25  relevant until I consulted with the        09:39:40

11 (Pages 349 to 352)

M. ROSENTHAL

353

1 clinical expert to find out whether          09:39:42
2 guidelines such as these are used at all.     09:39:43
3 Q. Fair enough. But at this point you haven't  09:39:46
4 had that consultation?                         09:39:48
5 A. At this point I have not had that           09:39:49
6 consultation.                                  09:39:51
7 Q. All right. One of the other factors that   09:39:52
8 we discussed was a new development in the      09:39:53
9 underlying science of the particular field?    09:39:55
10 A. Yes.                                        09:39:59
11 Q. Assuming that that were disseminated       09:39:59
12 somehow to the prescribing public, how        09:40:02
13 would your model seek to take that into        09:40:06
14 account?                                       09:40:08
15 A. Well, again, I think it would make sense to 09:40:08
16 look at large significant trends in basic      09:40:11
17 science as it relates to these particular      09:40:15
18 types of drugs and conditions, and that        09:40:17
19 would take some clinical expertise, some       09:40:19
20 scientific expertise.                          09:40:21
21 Q. And so is that another category of issues   09:40:24
22 on which you would consult with a clinical     09:40:26
23 expert?                                        09:40:28
24 A. I think that probably would be --           09:40:28
25 Q. And the consult -- go ahead. I'm sorry, I   09:40:31

354

1 didn't mean to cut you off.                    09:40:34
2 A. -- would be in the category of              09:40:36
3 understanding better the clinical decisions    09:40:37
4 around each specific condition that I          09:40:40
5 model, and all of these factors, trends and    09:40:43
6 treatment, new drugs, new science, would be    09:40:45
7 part of that conversation.                     09:40:48
8 Q. And what information would you seek to get   09:40:51
9 out of the conversation, at least with         09:40:57
10 respect to this particular issue, a new       09:40:58
11 development in the underlying science?         09:41:01
12 A. So, again, potentially it's not altogether  09:41:03
13 clear to me that this is relevant, so the     09:41:06
14 new development in the science may have a      09:41:08
15 similar effect, for example, on all drugs     09:41:12
16 in the therapeutic class, and therefore it    09:41:16
17 may not enter the model in the same way.      09:41:18
18 So I guess I would hope to understand in      09:41:21
19 talking with a clinical expert if there      09:41:23
20 were trends that were likely to change the    09:41:26
21 off-label uses, change the use of off-label   09:41:29
22 prescribing.                                  09:41:32
23    And so I think without a specific         09:41:33
24 example it's hard for me to tell you          09:41:37
25 exactly how that would enter the model, but   09:41:39

355

1 if there was information, for example,         09:41:41
2 suddenly that this -- the whole class of       09:41:44
3 drugs is -- becomes clear that it's less       09:41:47
4 useful for treating this condition, then I     09:41:50
5 would expect that to have an effect, not       09:41:53
6 only on Neurontin prescribing, but on         09:41:56
7 prescribing of competitor drugs for the       09:41:58
8 same off-label uses.                           09:42:00
9 Q. Okay. Let's take that example that you     09:42:02
10 just gave.                                     09:42:04
11 A. Okay.                                       09:42:05
12 Q. If you learned -- if you learned that there 09:42:05
13 were trends of that kind, that it became      09:42:10
14 clear that, you know, at some point in time   09:42:13
15 that this whole class of drugs is less        09:42:17
16 useful in treating the applicable            09:42:19
17 condition, how would you seek to             09:42:21
18 incorporate that into your model?            09:42:22
19 A. Generally speaking, through another        09:42:24
20 variable about the dissemination, another     09:42:27
21 indicator variable about the dissemination    09:42:30
22 of that information, and it could be          09:42:32
23 modeled again as in the more detailed model   09:42:34
24 that I described in my declaration using a    09:42:36
25 comparison drug that should have the same     09:42:40

356

1 effect.                                        09:42:42
2 Q. How would you determine the timing of that  09:42:43
3 effect?                                        09:42:51
4 A. Based on publication of literature, in all  09:42:51
5 likelihood.                                    09:43:01
6 Q. All right. Here's another one: How about    09:43:04
7 FDA approval of a drug with a similar          09:43:06
8 mechanism of action for the applicable use?    09:43:08
9 We talked about how this might impact          09:43:11
10 prescribing behavior in the aggregate. How    09:43:13
11 would you go about -- how do you go about      09:43:16
12 determining how to incorporate that into      09:43:19
13 your model?                                    09:43:22
14 A. If there were a new entrant in the class, I 09:43:22
15 would in all likelihood include the entry     09:43:27
16 of that drug as part of the model.            09:43:28
17 Q. How would you identify which drug to        09:43:36
18 include?                                       09:43:38
19 A. Can you explain --                          09:43:38
20 Q. In other words, how would you identify      09:43:42
21 whether a particular drug other than          09:43:43
22 Neurontin is relevant in terms of an          09:43:44
23 additional approval by the FDA?               09:43:46
24 A. Sorry, I'm still not sure that -- so        09:43:48
25 whether a drug is a clinical substitute for   09:43:55

12 (Pages 353 to 356)

M. ROSENTHAL

357

1　Neurontin for a particular indication, how　09:43:58
2　would I identify that?　09:44:00
3　Q. Let's just back up. I think we had agreed　09:44:01
4　that FDA approval of a drug with a similar　09:44:03
5　mechanism of action for the applicable use　09:44:07
6　might impact physicians' prescribing　09:44:10
7　behavior in the aggregate; is that right?　09:44:13
8　　MR. NOTARGIACOMO: Objection,　09:44:14
9　asked and answered.　09:44:15
10 A. Yes. And I think I understood that to　09:44:16
11　mean --　09:44:19
12 Q. Okay.　09:44:19
13 A. -- a drug that was potentially　09:44:19
14　substitutable for Neurontin --　09:44:22
15 Q. Fair enough.　09:44:22
16 A. -- for the treatment.　09:44:24
17 Q. Okay. Fair enough. How would you come up　09:44:25
18　with a list of drugs that would potentially　09:44:27
19　be substitutable for Neurontin?　09:44:29
20 A. Again, such a list would be developed in　09:44:30
21　consultation with a clinical expert in the　09:44:33
22　area.　09:44:35
23 Q. Okay. And, again, you haven't had that　09:44:35
24　consultation at this point?　09:44:38
25 A. No, I have not.　09:44:40

359

1　we've looked at before, so it's not clear　09:45:50
2　to me that there's a very strong tie there.　09:45:53
3　　So, you know, I would certainly　09:45:55
4　consider that in reviewing the literature　09:45:57
5　and sort of developing the theoretical　09:46:00
6　model, but it seems like a second order　09:46:04
7　issue to me at this point.　09:46:06
8 Q. Without you having reviewed the data or --　09:46:07
9 A. Without having seen the complete data yet.　09:46:10
10 Q. We'll only do this for a couple more.　09:46:13
11　　Information posted on a medical　09:46:22
12　information site on the Internet related to　09:46:25
13　use of Neurontin for treatment of the　09:46:27
14　applicable condition, we agreed that that　09:46:29
15　might impact prescribing behavior in the　09:46:32
16　aggregate, correct?　09:46:34
17　　MR. NOTARGIACOMO: Objection.　09:46:35
18 A. That's correct.　09:46:35
19 Q. How would you go about determining whether　09:46:37
20　or not to include that factor in your　09:46:41
21　model?　09:46:43
22 A. I think that would fall -- I mean, I would　09:46:44
23　certainly have to consider it, but I think　09:46:46
24　that falls in the category of factors that　09:46:48
25　are in the background. I have no　09:46:50

358

1 Q. How about approval of a drug with a similar　09:44:41
2　mechanism of action for the applicable use　09:44:55
3　in another country? We agreed that that　09:44:57
4　might impact physician prescribing　09:44:59
5　behavior. How would you go about　09:45:02
6　determining whether to incorporate that　09:45:03
7　factor into your model?　09:45:05
8　　MR. NOTARGIACOMO: Objection.　09:45:06
9 A. That factor, I would expect to have　09:45:10
10　information on that from defendants. I'm　09:45:11
11　sorry, are we talking about Neurontin?　09:45:14
12 Q. We're talking about a drug with a similar　09:45:15
13　mechanism of action.　09:45:17
14 A. I'm -- it's not clear to me that that's　09:45:18
15　going to be an important factor, and I　09:45:21
16　haven't thought about how to incorporate　09:45:23
17　it. I believe that we're getting further　09:45:25
18　and further away from the central issue.　09:45:28
19 Q. How would you determine whether it's an　09:45:34
20　important factor or not? You said it's not　09:45:35
21　clear to you now whether or not it is.　09:45:37
22 A. I guess, you know, I would review the data,　09:45:39
23　and to my knowledge, that kind of factor is　09:45:42
24　not generally included looking at use of　09:45:46
25　drugs, for example, in all the studies that　09:45:48

360

1　theoretical reason to believe it's　09:46:52
2　correlated with the off-label prescribing,　09:46:53
3　the illegally -- excuse me, the allegedly　09:46:58
4　illegal off-label prescribing activities.　09:47:01
5 Q. Okay. Let me ask you a couple things about　09:47:03
6　that. When you say you think it's　09:47:05
7　something that's in the background, what　09:47:06
8　does that mean?　09:47:08
9 A. There's a notion that there are many　09:47:08
10　unmeasurable factors that may have small　09:47:11
11　effects on the decision to prescribe a drug　09:47:14
12　or take a drug and that the model would not　09:47:19
13　capture every one of these factors, would　09:47:23
14　capture the major ones and those that I　09:47:25
15　believe have the greatest potential to be　09:47:28
16　confounded with the variable of interest.　09:47:31
17 Q. Okay. Do you have an understanding as to　09:47:32
18　the extent to which doctors might consult　09:47:34
19　medical information sites in making　09:47:36
20　treatment decisions?　09:47:38
21 A. I don't have any -- you mean, do I have a　09:47:39
22　quantitative estimate of that?　09:47:42
23 Q. (No verbal response.)　09:47:43
24 A. I do not.　09:47:44
25 Q. Do you have any sense for that, I mean,　09:47:45

13 (Pages 357 to 360)

M. ROSENTHAL

```
                                                     361
1    whether it's something that doctors might      09:47:47
2    do in deciding how to treat their patients?   09:47:48
3  A. I don't have a sense that that is            09:47:50
4    scientifically backed up, so I wouldn't       09:47:57
5    want to give you my just general              09:48:00
6    impression.                          09:48:02
7  Q. Yeah, I guess I'm just trying to             09:48:02
8    understand, I think, what the -- you know,    09:48:03
9    what -- at least at this point what the       09:48:04
10   basis is for your assumption that this        09:48:05
11   would be an issue that's in the background.   09:48:07
12 A. The basis for my assumption is that it's --  09:48:10
13   there's no reason to believe that suddenly    09:48:13
14   that would start happening independently.     09:48:15
15   Again, independently it's happening at just   09:48:17
16   the same time that defendants began           09:48:21
17   promoting their drug for an off-label use.    09:48:24
18 Q. You would agree that it's at least possible  09:48:33
19   that the defendants would be monitoring the   09:48:34
20   same medical information websites that        09:48:35
21   doctors might be, correct?                    09:48:37
22 A. It is at least possible, but, again, since   09:48:39
23   I'm relying on timing for identification in   09:48:43
24   my model, if the website preceded the         09:48:45
25   defendants' allegedly illegal activities,     09:48:49
```

```
                                                     363
1    at the same time but that it begins -- it     09:49:57
2    has a similar pattern over time. And so       09:50:00
3    that's -- and rather than test for any        09:50:02
4    possible events that might have had that      09:50:05
5    same timing, one has to consider whether      09:50:07
6    it's possible for events to have the same     09:50:09
7    idiosyncratic patterns as the events of       09:50:12
8    interest here.                        09:50:15
9  Q. Let me ask it another way. Are you aware     09:50:22
10   of any way, as you sit here now, in which     09:50:25
11   you would be able to determine the timing     09:50:30
12   of postings on the Internet on medical       09:50:33
13   information websites on the use of            09:50:35
14   Neurontin to treat certain off-label --      09:50:36
15   certain off-label conditions?                09:50:41
16 A. It's not an issue I've looked into, no,      09:50:42
17   so...                                 09:50:45
18 Q. And assuming that the posting of            09:50:45
19   information on the use of Neurontin to        09:50:53
20   treat an applicable condition does have an   09:50:56
21   impact on prescribing behavior and assuming  09:50:59
22   that it's possible at least that it's        09:51:02
23   correlated with the defendants' promotion    09:51:03
24   for that off-label use, isn't it important   09:51:07
25   that you be able to tell which came first,   09:51:13
```

```
                                                     362
1    it would get picked up in the time trend      09:48:52
2    and not picked up in those variables that     09:48:54
3    represent the activities.            09:48:57
4  Q. How would you go about determining when the  09:48:58
5    postings on the website would have           09:49:00
6    occurred?                           09:49:02
7  A. Again, I wouldn't -- that's not the way the  09:49:02
8    model would work. I determine when the       09:49:06
9    allegedly illegal activities occurred, and   09:49:09
10   these other activities that may change over  09:49:11
11   time that may diffuse over time would get    09:49:13
12   picked up in the time trend.                 09:49:16
13 Q. Right. But I guess what we're talking       09:49:19
14   about, I guess -- well, withdrawn.           09:49:22
15        If you're relying on the timing to       09:49:23
16   separate out any possible correlation        09:49:26
17   between the two, isn't it important to know  09:49:27
18   the timing that the posting on the medical   09:49:29
19   information website -- the timing of the     09:49:32
20   posting on the particular medical           09:49:35
21   information website?                  09:49:37
22 A. It's only important to separate out if it    09:49:38
23   is miraculously simultaneous to the timing   09:49:47
24   of the events that I'm modeling; that is,    09:49:51
25   it doesn't -- it's not that it's going on    09:49:56
```

```
                                                     364
1    a posting on the medical information         09:51:16
2    website or the promotion?            09:51:18
3         MR. NOTARGIACOMO: Objection,            09:51:21
4    asked and answered.                  09:51:23
5  A. I think, again, that's -- the way the model  09:51:23
6    works is that if they're exactly -- if you   09:51:27
7    want me to assume that they happen at        09:51:33
8    exactly the same time, then they are         09:51:36
9    perfectly correlated and by definition       09:51:41
10   can't be separated, but when you do an       09:51:44
11   event study such as this, we look at the     09:51:47
12   timing of the event of interest. We don't    09:51:50
13   then measure every other event, and in part  09:51:54
14   some of the identification comes from the    09:51:59
15   fact that we can compare, for example,       09:52:01
16   treatment -- treatment for the particular    09:52:05
17   indication by use of Neurontin with other    09:52:08
18   drugs in the same class at the same time to  09:52:12
19   get additional identification.               09:52:15
20        So if that information were              09:52:17
21   disseminated and were broadly about the      09:52:19
22   use, for example, of anticonvulsants for     09:52:22
23   bipolar disorder, then we could see it       09:52:25
24   being picked up in these other drugs and     09:52:27
25   separate out the activities there from what  09:52:29
```

14 (Pages 361 to 364)

M. ROSENTHAL

<table>
<tr><td colspan="2">

**365**

1  was going on with Neurontin.  So there are  09:52:32
2  ways of identifying that in part, but the  09:52:34
3  general strategy is not to look at the  09:52:36
4  timing of every possible confounding event  09:52:38
5  but to be as detailed as possible about the  09:52:41
6  events in question.  09:52:44
7      (Pause.)  09:53:17
8  Q.  Okay.  We discussed yesterday that in order  09:53:18
9      to conduct your analysis, you or somebody  09:53:20
10     would need to determine whether a given  09:53:24
11     factor or a given expenditure is subject to  09:53:26
12     the alleged violations; is that correct?  09:53:28
13  A.  That I would be directed by counsel about  09:53:30
14     which particular activities were subject to  09:53:34
15     the action in question, yes.  09:53:38
16  Q.  Maybe -- well, let's -- I think that's one  09:53:40
17     of the things that I would like to try to  09:53:45
18     unwind.  09:53:47
19  A.  Okay.  09:53:48
20  Q.  We did agree that it's important to  09:53:48
21     determine which factors fall within XJT and  09:53:50
22     which factors fall within XKT?  09:53:55
23  A.  Yes, that's right.  09:53:58
24  Q.  Okay.  Is it correct that you are going to  09:53:59
25     be relying on counsel to identify whether  09:54:04

</td><td colspan="2">

**367**

1      So, for example, detailing, if in  09:55:21
2      the data I can't determine whether the  09:55:24
3      detailing was for an indication using  09:55:26
4      information that was allegedly illegal in  09:55:32
5      the sense that it's going to be part of  09:55:35
6      this action, then those would have to be  09:55:37
7      left in the other side of promotion, the  09:55:41
8      routine -- what's considered to be routine  09:55:47
9      and legal promotional activities?  09:55:49
10  Q.  In terms of the last determination that you  09:55:51
11     just discussed --  09:55:53
12  A.  Yeah.  09:55:55
13  Q.  -- who's making that decision, you or  09:55:55
14     counsel or somebody else?  09:55:57
15  A.  Well, in part it would have to do with the  09:55:58
16     data in consultation with counsel about  09:56:01
17     what the Court has indicated they can look  09:56:05
18     at in terms of -- so we -- you know, as we  09:56:08
19     discussed yesterday, I'm confused about the  09:56:11
20     difference between fraudulent and illegal,  09:56:12
21     but if there is some nuance there and  09:56:14
22     certain kinds of information is deemed to  09:56:18
23     be -- that we won't look at the impact of  09:56:21
24     that, then that would have some  09:56:23
25     determination of what goes in XJT versus  09:56:25

</td></tr>
<tr><td colspan="2">

**366**

1  each individual factor should fall within  09:54:07
2  XKT or XJT?  09:54:09
3  A.  I'm not sure if I understand precisely, but  09:54:11
4     maybe I could give an example --  09:54:16
5  Q.  Sure.  09:54:17
6  A.  -- of what I expect to learn.  That, for  09:54:18
7     example, I expect the counsel to tell me  09:54:20
8     for which indications the promotional  09:54:26
9     activities appear to be illegal and for  09:54:29
10    which ones are being pursued, so for  09:54:33
11    example, maybe the commercial activities  09:54:36
12    with regard to some indications will be  09:54:37
13    considered allegedly illegal and some  09:54:40
14    won't.  That will, of course, determine  09:54:44
15    which indications I model in general.  09:54:45
16        And then in particular it may be  09:54:48
17    deemed that certain kinds of activities,  09:54:50
18    meetings and events versus dinners, will be  09:54:54
19    considered to be the activities that  09:54:57
20    counsel's determined are part of the  09:55:03
21    allegations ultimately, and those are the  09:55:05
22    ones that I will be looking at the effects  09:55:07
23    of.  But in part also it may be that some  09:55:09
24    things are not separable, as we talked  09:55:19
25    about yesterday.  09:55:21

</td><td colspan="2">

**368**

1  XKT.  09:56:28
2  Q.  Do you expect that you would make that  09:56:28
3     determination or that that determination  09:56:31
4     would be made by someone at least on an  09:56:34
5     activity-by-activity basis?  09:56:35
6  A.  I would imagine it would be categories of  09:56:37
7     activities.  09:56:41
8  Q.  So in other words, I guess, let's think  09:56:42
9     about -- let's think about meetings.  09:56:44
10  A.  Okay.  09:56:48
11  Q.  I'm assuming that individual meetings could  09:56:49
12     qualify as factors in either XJT or XKT in  09:56:52
13     your model, right?  09:56:57
14  A.  Yes, that's correct.  09:56:57
15  Q.  You need to determine with respect to each  09:56:59
16     individual meeting, correct, whether it  09:57:03
17     falls into XJT or XKT?  09:57:04
18  A.  That's correct.  09:57:07
19  Q.  Is the same true of specific continuing  09:57:07
20     medical education seminars?  09:57:10
21  A.  Potentially, yes.  09:57:12
22  Q.  Is the same true of detailing visits?  09:57:13
23  A.  Detailing, I think we would have to make an  09:57:16
24     aggregate determination.  I have seen some  09:57:21
25     detailed data on detailing reports that  09:57:22

</td></tr>
</table>

15 (Pages 365 to 368)

**369**

1  show what was discussed during the                09:57:27
2  detailing visit, but without seeing the            09:57:28
3  data it's not clear to me how detailed             09:57:30
4  we'll be able to be on each of these               09:57:34
5  different promotional activities.  So once         09:57:37
6  I have all the data, it'll be a lot clearer        09:57:40
7  whether there is an aggregate decision or a        09:57:44
8  much more detailed analysis.                       09:57:46
9  Q.  In the case of expenditures, how do you        09:57:53
10  anticipate identifying which spending             09:57:57
11  should be characterized as O and which            09:57:58
12  spending should be categorized as M for           09:58:00
13  purposes of your model?                           09:58:03
14  A.  Again, I don't have complete data yet, but    09:58:04
15  in the data -- some of the data that I've         09:58:06
16  seen in the discovery documents, as I             09:58:08
17  illustrate in my declaration a few                09:58:10
18  examples, it does seem like defendants            09:58:12
19  break out spending for specific                   09:58:15
20  indications, for example, as it relates to        09:58:17
21  bipolar disorder, as an example.                  09:58:18
22  Q.  Will you be relying entirely on defendants    09:58:23
23  breaking out the data as between improper         09:58:28
24  activity on the one hand and proper               09:58:35
25  activity on the other hand?                       09:58:39

**370**

1  A.  It's not clear to me that entirely is the      09:58:10
2  right characterization of that.  Again, I          09:58:44
3  haven't pulled all the data together, but I        09:58:46
4  do believe the defendants' own tracking of         09:58:49
5  their promotional activities will be a             09:58:51
6  prime source of information here.  But as          09:58:53
7  we discussed also, there may be other kinds        09:58:55
8  of information such as publications that           09:58:58
9  appear in the general literature.                  09:59:00
10  Q.  How would publications that appear in the     09:59:06
11  general literature inform your                     09:59:06
12  understanding of whether a particular             09:59:07
13  expenditure should be categorized as O or         09:59:09
14  M?                                                09:59:13
15  A.  Sorry.  I was back on X.  So in terms of      09:59:16
16  spending, I believe it'll largely come from       09:59:23
17  defendants' data, but, again, I can't say         09:59:25
18  that will be exclusively true.                    09:59:27
19  Q.  Can you think, as you sit here today, of      09:59:29
20  anything other than defendants' data that         09:59:31
21  would provide you any insight on the              09:59:33
22  determination of whether a particular             09:59:35
23  expenditure is O or M?                            09:59:37
24  A.  I would look again to data sources such as    09:59:39
25  those that I've described before, IMS             09:59:42

**371**

1  Health, Verispan, that do track promotional        09:59:46
2  spending, and I don't know all the details         09:59:49
3  of all their products, but they do track           09:59:50
4  prescriptions by diagnosis.  It's possible         09:59:53
5  that they have more detailed data on               09:59:55
6  promotional spending as well.                      09:59:58
7  Q.  But you haven't conducted that analysis yet    09:59:59
8  or made those inquiries of IMS or Verispan         10:00:07
9  yet?                                               10:00:10
10  A.  With regard to the promotional data, not      10:00:10
11  yet, no.                                          10:00:12
12  Q.  Why not?                                      10:00:13
13  A.  I've not been asked to bring data together    10:00:14
14  for this.  I found potential data sources         10:00:16
15  in the discovery documents and also by            10:00:19
16  talking to IMS Health and Verispan about          10:00:23
17  their prescribing data to satisfy me that         10:00:25
18  the data were available to estimate this          10:00:28
19  model.                                            10:00:31
20  Q.  But this particular aspect of data you        10:00:33
21  didn't speak with them about; is that             10:00:35
22  right?                                            10:00:38
23  A.  Not as supplementing defendants' data, but    10:00:38
24  I observed that defendants tracked their          10:00:41
25  spending in a fairly detailed way.                10:00:43

**372**

1  Q.  When do you expect the determination of        10:00:47
2  whether a particular expenditure would fall        10:00:56
3  into O on the one hand or M on the other           10:00:58
4  hand would occur?                                  10:01:00
5  A.  When do I suspect that would occur?            10:01:01
6  Q.  (No verbal response.)                          10:01:03
7  A.  I guess I'm not really clear what you mean.    10:01:06
8  At the point at which I'm asked to proceed         10:01:09
9  with estimating my model, which I have not         10:01:11
10  been asked to do yet, then I would begin to       10:01:16
11  gather the data and specify all the               10:01:19
12  variables, and at that point that would be        10:01:23
13  relevant, whenever that is.                       10:01:25
14  Q.  Again, in the case of sampling you would      10:01:28
15  agree that some kinds of sampling are not         10:01:36
16  subject to the alleged violations; is that        10:01:39
17  correct?                                          10:01:40
18  A.  Yes, I would agree with that.                 10:01:40
19  Q.  But you also understand that some kinds do    10:01:45
20  constitute allegedly improper promotion for       10:01:47
21  purposes of this case?                            10:01:50
22  A.  I believe it was described in the             10:01:51
23  allegations, yes.                                 10:01:53
24  Q.  How do you intend to differentiate between    10:01:54
25  appropriate sampling and improper sampling        10:01:58

M. ROSENTHAL

373

```
1    for purposes of your analysis?              10:02:00
2 A.  To the extent that it's possible to use    10:02:01
3    defendants' own tracking of those data.     10:02:04
4 Q.  Is that something that you've done yet?     10:02:07
5 A.  As we discussed yesterday, looking at the  10:02:10
6    strategic documents, they talk specifically 10:02:13
7    in those documents about use of samples.    10:02:14
8 Q.  When you refer to "these documents," both  10:02:18
9    in this context and in your previous        10:02:20
10   answers, I'm assuming that the documents     10:02:23
11   you're referring to would be included        10:02:25
12   within the documents that you list as        10:02:26
13   having relied on in your declaration?        10:02:28
14 A.  Yes, in particular that strategic grid we  10:02:30
15   looked at yesterday is the one I'm talking   10:02:34
16   about.                                       10:02:36
17 Q.  And so it's those sorts of documents, the  10:02:36
18   strategic-grid-type documents, that you      10:02:41
19   anticipate relying on for purposes of doing  10:02:43
20   this analysis?                               10:02:45
21 A.  And we understand from other materials that 10:02:46
22   defendants have tracked the profitability,   10:02:50
23   return on investment related to their        10:02:52
24   promotional activities, and so we would      10:02:54
25   look for those kinds of documents as well.   10:02:56
```

374

```
1 Q.  Have you reviewed any of those documents to 10:03:01
2    date?                                        10:03:04
3 A.  I've reviewed a large number of documents   10:03:06
4    at one point, but I don't recall seeing any  10:03:09
5    specific accounting documents on these       10:03:11
6    return on investment models. I know that     10:03:14
7    they are referenced, and I note some         10:03:16
8    references in my declaration. There's        10:03:19
9    promo track analyses.                        10:03:22
10 Q.  Anything else?                             10:03:30
11 A.  I believe there's a footnote in my         10:03:31
12   declaration that lists a couple of           10:03:32
13   examples, but I believe promo track was the  10:03:34
14   principal and -- promotional effectiveness   10:03:36
15   system that they have.                       10:03:41
16     THE WITNESS:  Maybe a short break?         10:03:50
17     MR. POLUBINSKI:  Sure.  Sure.              10:03:51
18   Let's take a break.  That's fine.            10:03:52
19     THE VIDEOGRAPHER:  The time is             10:03:54
20   10:04.  This is the end of Tape 1, and we    10:03:56
21   are off the record.                          10:03:58
22     (Recess taken.)                            10:03:59
23     THE VIDEOGRAPHER:  The time is             10:04:05
24   10:14.  This is the beginning of Tape 2,     10:14:18
25   and we are back on the record.               10:14:19
```

375

```
1     BY MR. POLUBINSKI:                          10:14:21
2 Q.  So, Professor Rosenthal, in the case of     10:14:21
3    detailing, whether or not a given detailing  10:14:33
4    visit is appropriate, will necessarily       10:14:35
5    depend on what's said in the course of that  10:14:38
6    visit; is that correct?                      10:14:41
7 A.  Whether or not the allegations apply to     10:14:41
8    that detailing visit, you mean?              10:14:44
9 Q.  Yes.                                        10:14:46
10 A.  Okay.  That seems like that's the right way 10:14:46
11   to characterize it, what's said, what's      10:14:51
12   disseminated.                                10:14:53
13 Q.  Right.  And that like sampling not all      10:14:54
14   detailing is subject to the alleged          10:15:00
15   violations?                                  10:15:02
16 A.  I think that's right.                       10:15:02
17 Q.  With respect to detailing, how do you       10:15:03
18   intend to differentiate between appropriate  10:15:08
19   detailing and allegedly improper detailing?  10:15:11
20 A.  With respect to detailing, I have two kinds 10:15:17
21   of information I think will be               10:15:17
22   relevant, one -- and forgive me, I forget    10:15:18
23   the names of these reports, but one is       10:15:24
24   information on the detailing visits          10:15:27
25   themselves that the physicians who are       10:15:30
```

376

```
1    detailed provide that describes what was     10:15:32
2    discussed during the visit, and, two, again  10:15:37
3    are the strategic and marketing documents    10:15:40
4    that I've seen that quantify detailing for   10:15:43
5    specific indications.                        10:15:49
6 Q.  With respect to the first, to what extent   10:15:56
7    do you expect -- well, withdrawn.            10:16:01
8      Would you expect to make an               10:16:03
9    individual determination as to each          10:16:06
10   specific detailing visit and whether that    10:16:08
11   detailing visit constituted improper or      10:16:10
12   proper behavior?                             10:16:13
13 A.  I would expect to make a determination in  10:16:14
14   the aggregate as to the proportion of        10:16:16
15   detailing that would fall into those         10:16:18
16   categories, so not -- I don't believe that   10:16:20
17   that's what you mean by "individual          10:16:24
18   determination" like visit per visit, but to  10:16:27
19   characterize overall.                        10:16:30
20 Q.  Fair enough.  But you've used this data on  10:16:32
21   individual visits to inform your             10:16:36
22   conclusions about -- to inform your          10:16:37
23   aggregate conclusions?                       10:16:39
24 A.  At this time I think that data is to be one 10:16:40
25   of the things I use to try to break apart    10:16:44
```

17 (Pages 373 to 376)

M. ROSENTHAL

377

| | | |
|---|---|---|
| 1 | the detailing spending. | 10:16:46 |
| 2 | Q. With respect to the information on those | 10:16:52 |
| 3 | individual detailing visits, how would you | 10:16:54 |
| 4 | intend to distinguish between fraudulent | 10:16:56 |
| 5 | detailing on the one hand and detailing | 10:16:59 |
| 6 | that was not fraudulent on the other hand? | 10:17:01 |
| 7 | A. Again, determination of what's fraudulent | 10:17:03 |
| 8 | or illegal in some other manner, I would | 10:17:05 |
| 9 | expect counsel to advise me on how to | 10:17:07 |
| 10 | categorize that. | 10:17:12 |
| 11 | Q. So will counsel be making the individual | 10:17:13 |
| 12 | determinations about whether a specific | 10:17:15 |
| 13 | detailing visit involved fraudulent | 10:17:17 |
| 14 | behavior or not? | 10:17:20 |
| 15 | MR. NOTARGIACOMO: Objection. I | 10:17:21 |
| 16 | think that mischaracterizes her testimony. | 10:17:22 |
| 17 | MR. POLUBINSKI: Well, I am asking | 10:17:24 |
| 18 | her the question. | 10:17:24 |
| 19 | MR. NOTARGIACOMO: Fair enough. | 10:17:25 |
| 20 | A. I would expect to get input. I would | 10:17:26 |
| 21 | expect to be advised on what kinds of | 10:17:29 |
| 22 | things I should count in the allegedly | 10:17:30 |
| 23 | illegal bucket and what kinds of things I | 10:17:35 |
| 24 | shouldn't. | 10:17:37 |
| 25 | Q. And so you would get -- do you imagine you | 10:17:37 |

379

| | | |
|---|---|---|
| 1 | a given case? | 10:18:54 |
| 2 | A. I suppose it might. | 10:18:54 |
| 3 | Q. How about the doctor's fellowships that he | 10:18:55 |
| 4 | or she might have had after their medical | 10:18:58 |
| 5 | school? | 10:19:02 |
| 6 | A. It might. And may I just say that all of | 10:19:03 |
| 7 | these factors seem like second order to a | 10:19:09 |
| 8 | decision about off-label prescribing. | 10:19:11 |
| 9 | Q. How about the patient's specific systems? | 10:19:13 |
| 10 | A. Yes, that might affect prescribing. | 10:19:15 |
| 11 | Q. And that that wouldn't be a second order | 10:19:19 |
| 12 | impact in a particular individual | 10:19:22 |
| 13 | prescription decision? | 10:19:25 |
| 14 | A. As to whether or not the prescription for | 10:19:25 |
| 15 | Neurontin were given versus some other | 10:19:30 |
| 16 | drug? I mean, certainly the symptoms would | 10:19:32 |
| 17 | be relevant. | 10:19:34 |
| 18 | Q. How about the patient's medical history? | 10:19:35 |
| 19 | A. Yes, that would be relevant. | 10:19:37 |
| 20 | Q. How about other medications that the | 10:19:39 |
| 21 | patient might be taking at the time? | 10:19:41 |
| 22 | A. Yes. | 10:19:42 |
| 23 | Q. How about a specific request from a | 10:19:42 |
| 24 | specific patient? | 10:19:46 |
| 25 | A. Possibly. | 10:19:49 |

378

| | | |
|---|---|---|
| 1 | might get guidelines or some other sort of | 10:17:38 |
| 2 | instruction that would enable you to make | 10:17:40 |
| 3 | this determination yourself? | 10:17:42 |
| 4 | A. That might be the case. Without knowing | 10:17:43 |
| 5 | exactly how this will play out, I can't | 10:17:44 |
| 6 | say. | 10:17:48 |
| 7 | Q. All right. Aside from the events that we | 10:18:16 |
| 8 | discussed earlier this morning that might | 10:18:17 |
| 9 | impact aggregate quantities of Neurontin | 10:18:19 |
| 10 | prescribed for off-label uses, I'm going to | 10:18:22 |
| 11 | give you a much, much shorter list now and | 10:18:25 |
| 12 | ask you whether the following would be | 10:18:27 |
| 13 | additional individual factors that might | 10:18:30 |
| 14 | play into an individual physician's | 10:18:33 |
| 15 | prescribing decision. And if we can go | 10:18:35 |
| 16 | through each one and if you can just tell | 10:18:36 |
| 17 | me whether or not they might or might not, | 10:18:38 |
| 18 | that would be great. | 10:18:40 |
| 19 | The first one is an individual -- | 10:18:41 |
| 20 | is an individual doctor's medical school | 10:18:42 |
| 21 | education. | 10:18:44 |
| 22 | A. Would affect prescribing patterns in | 10:18:44 |
| 23 | general. | 10:18:49 |
| 24 | Q. And a decision on whether or not to | 10:18:49 |
| 25 | prescribe Neurontin for an off-label use in | 10:18:51 |

380

| | | |
|---|---|---|
| 1 | Q. How about the doctor's individual | 10:19:50 |
| 2 | independent review of the scholarly | 10:19:55 |
| 3 | literature? | 10:19:58 |
| 4 | A. Yes, I believe we talked about that | 10:19:58 |
| 5 | yesterday. | 10:20:01 |
| 6 | Q. And how about the doctor's individual | 10:20:01 |
| 7 | consultation of medical information | 10:20:06 |
| 8 | websites on the Internet? | 10:20:08 |
| 9 | A. Yes. | 10:20:09 |
| 10 | Q. Okay. We discussed yesterday the fact that | 10:20:09 |
| 11 | Neurontin was approved to treat PHN in | 10:20:23 |
| 12 | 2002, correct? | 10:20:26 |
| 13 | A. Yes, correct. | 10:20:27 |
| 14 | Q. Have plaintiffs' counsel instructed you at | 10:20:27 |
| 15 | this point to make any particular | 10:20:31 |
| 16 | assumptions with respect to Neurontin's | 10:20:33 |
| 17 | efficacy in treating PHN? | 10:20:35 |
| 18 | A. For the purposes of my work, I'm to | 10:20:37 |
| 19 | consider only the total quantity induced | 10:20:43 |
| 20 | without regard to efficacy. | 10:20:46 |
| 21 | Q. Okay. Let me put it another way. Do you | 10:20:47 |
| 22 | know whether plaintiffs' counsel will ask | 10:20:51 |
| 23 | you to include prescriptions for PHN prior | 10:20:53 |
| 24 | to May 2002 in your analysis in the model? | 10:20:56 |
| 25 | A. I don't know at this point exactly which | 10:20:58 |

18 (Pages 377 to 380)

M. ROSENTHAL

<table>
<tr><td colspan="2">381</td></tr>
<tr><td>1</td><td>indications will be included in the final</td><td>10:21:00</td></tr>
<tr><td>2</td><td>analysis, no.</td><td>10:21:03</td></tr>
<tr><td>3</td><td>Q. But those indications would have been</td><td>10:21:05</td></tr>
<tr><td>4</td><td>off-label uses, correct, prescriptions of</td><td>10:21:07</td></tr>
<tr><td>5</td><td>Neurontin for PHN prior to May 2002?</td><td>10:21:08</td></tr>
<tr><td>6</td><td>A. That's certainly described in the</td><td>10:21:11</td></tr>
<tr><td>7</td><td>allegations, so...</td><td>10:21:14</td></tr>
<tr><td>8</td><td>Q. On the other hand, because Neurontin was</td><td>10:21:15</td></tr>
<tr><td>9</td><td>approved for treatment of PHN in May of</td><td>10:21:18</td></tr>
<tr><td>10</td><td>2002, I think we can be confident that you</td><td>10:21:20</td></tr>
<tr><td>11</td><td>would not seek to include prescriptions of</td><td>10:21:24</td></tr>
<tr><td>12</td><td>Neurontin for PHN after that date in your</td><td>10:21:28</td></tr>
<tr><td>13</td><td>model, correct?</td><td>10:21:31</td></tr>
<tr><td>14</td><td>A. I think I'm probably going to need a little</td><td>10:21:37</td></tr>
<tr><td>15</td><td>more direction on the legal issues here.</td><td>10:21:38</td></tr>
<tr><td>16</td><td>As you know, promotional activities have a</td><td>10:21:41</td></tr>
<tr><td>17</td><td>long-lived impact, and so there will be</td><td>10:21:45</td></tr>
<tr><td>18</td><td>some continued impact of promotional</td><td>10:21:48</td></tr>
<tr><td>19</td><td>activities that took place before the</td><td>10:21:51</td></tr>
<tr><td>20</td><td>approval, but I don't know where that</td><td>10:21:53</td></tr>
<tr><td>21</td><td>stands as a legal matter. As an economic</td><td>10:21:57</td></tr>
<tr><td>22</td><td>matter there are effects.</td><td>10:21:59</td></tr>
<tr><td>23</td><td>Q. I guess here's my question:</td><td>10:22:01</td></tr>
<tr><td>24</td><td>A. Okay.</td><td>10:22:04</td></tr>
<tr><td>25</td><td>Q. As set forth in your declaration the class</td><td>10:22:04</td></tr>
</table>

<table>
<tr><td colspan="2">382</td></tr>
<tr><td>1</td><td>includes, among others, "individuals who</td><td>10:22:12</td></tr>
<tr><td>2</td><td>for purposes other than resale, purchased,</td><td>10:22:20</td></tr>
<tr><td>3</td><td>reimbursed, and/or paid for Neurontin for</td><td>10:22:22</td></tr>
<tr><td>4</td><td>indications not approved by the FDA."</td><td>10:22:25</td></tr>
<tr><td>5</td><td>A. So from a legal perspective it sounds like</td><td>10:22:29</td></tr>
<tr><td>6</td><td>those uses may be out, but you understand</td><td>10:22:31</td></tr>
<tr><td>7</td><td>what I mean by the --</td><td>10:22:36</td></tr>
<tr><td>8</td><td>Q. I do. I understand --</td><td>10:22:36</td></tr>
<tr><td>9</td><td>A. -- effects might be --</td><td>10:22:36</td></tr>
<tr><td>10</td><td>Q. -- precisely. I don't -- I'm not --</td><td>10:22:36</td></tr>
<tr><td>11</td><td>A. -- lasting?</td><td>10:22:37</td></tr>
<tr><td>12</td><td>Q. And I'm not taking issue with that. The</td><td>10:22:38</td></tr>
<tr><td>13</td><td>only thing I'm saying is that just by</td><td>10:22:42</td></tr>
<tr><td>14</td><td>reference to the definition of the class in</td><td>10:22:45</td></tr>
<tr><td>15</td><td>this case, you wouldn't expect to include</td><td>10:22:47</td></tr>
<tr><td>16</td><td>prescriptions for PHN after it was approved</td><td>10:22:53</td></tr>
<tr><td>17</td><td>by the FDA in your analysis of impact on</td><td>10:22:56</td></tr>
<tr><td>18</td><td>the class?</td><td>10:23:00</td></tr>
<tr><td>19</td><td>A. Not being a legal expert, I'm not sure -- I</td><td>10:23:01</td></tr>
<tr><td>20</td><td>wouldn't necessarily have read that that</td><td>10:23:04</td></tr>
<tr><td>21</td><td>way, but as you read it, perhaps that's the</td><td>10:23:07</td></tr>
<tr><td>22</td><td>right interpretation of the class</td><td>10:23:09</td></tr>
<tr><td>23</td><td>definition.</td><td>10:23:11</td></tr>
<tr><td>24</td><td>Q. If counsel instructs you to include</td><td>10:23:12</td></tr>
<tr><td>25</td><td>prescriptions for PHN prior to May 2002, I</td><td>10:23:15</td></tr>
</table>

<table>
<tr><td colspan="2">383</td></tr>
<tr><td>1</td><td>think you had said this before, but let me</td><td>10:23:21</td></tr>
<tr><td>2</td><td>confirm, your model would assume that all</td><td>10:23:22</td></tr>
<tr><td>3</td><td>such prescriptions for PHN are ineffective;</td><td>10:23:25</td></tr>
<tr><td>4</td><td>is that right?</td><td>10:23:28</td></tr>
<tr><td>5</td><td>A. Essentially the model does not account for</td><td>10:23:28</td></tr>
<tr><td>6</td><td>any health benefits from the prescriptions.</td><td>10:23:30</td></tr>
<tr><td>7</td><td>Q. And so you would include all PHN</td><td>10:23:32</td></tr>
<tr><td>8</td><td>prescriptions from that time frame in the Q</td><td>10:23:37</td></tr>
<tr><td>9</td><td>number that you provide to Dr. Hartman for</td><td>10:23:40</td></tr>
<tr><td>10</td><td>him to calculate damages; is that correct?</td><td>10:23:43</td></tr>
<tr><td>11</td><td>A. If so directed by counsel, that's what I</td><td>10:23:45</td></tr>
<tr><td>12</td><td>would do, yes.</td><td>10:23:47</td></tr>
<tr><td>13</td><td>Q. Are you aware of any reason why Neurontin</td><td>10:23:50</td></tr>
<tr><td>14</td><td>would have been less effective in treating</td><td>10:23:52</td></tr>
<tr><td>15</td><td>PHN prior to the FDA's supplemental</td><td>10:23:55</td></tr>
<tr><td>16</td><td>approval in 2002 than it was after?</td><td>10:23:58</td></tr>
<tr><td>17</td><td>A. I'm not aware of any reason, no.</td><td>10:24:00</td></tr>
<tr><td>18</td><td>Q. Do you have an understanding of why</td><td>10:24:04</td></tr>
<tr><td>19</td><td>defendants sought approval for Neurontin to</td><td>10:24:05</td></tr>
<tr><td>20</td><td>treat PHN when they did?</td><td>10:24:07</td></tr>
<tr><td>21</td><td>A. I'm not sure what you mean by "why." Why</td><td>10:24:09</td></tr>
<tr><td>22</td><td>that timing and not another --</td><td>10:24:19</td></tr>
<tr><td>23</td><td>Q. Sure.</td><td>10:24:20</td></tr>
<tr><td>24</td><td>A. -- or not at all?</td><td>10:24:20</td></tr>
<tr><td>25</td><td>Q. Yeah, what the circumstances were that</td><td>10:24:21</td></tr>
</table>

<table>
<tr><td colspan="2">384</td></tr>
<tr><td>1</td><td>would have driven the defendants to seek</td><td>10:24:23</td></tr>
<tr><td>2</td><td>approval for PHN at that time?</td><td>10:24:26</td></tr>
<tr><td>3</td><td>A. I don't think I do know the answer to that,</td><td>10:24:27</td></tr>
<tr><td>4</td><td>no.</td><td>10:24:30</td></tr>
<tr><td>5</td><td>Q. Okay. And you don't know, do you, whether</td><td>10:24:31</td></tr>
<tr><td>6</td><td>defendants had information at the time that</td><td>10:24:34</td></tr>
<tr><td>7</td><td>might have supported approval for another</td><td>10:24:36</td></tr>
<tr><td>8</td><td>indication, do you?</td><td>10:24:38</td></tr>
<tr><td>9</td><td>A. Not as I sit here. I know there are</td><td>10:24:38</td></tr>
<tr><td>10</td><td>numerous discovery documents about</td><td>10:24:43</td></tr>
<tr><td>11</td><td>strategic planning for obtaining new</td><td>10:24:46</td></tr>
<tr><td>12</td><td>indications with the FDA on a variety of</td><td>10:24:49</td></tr>
<tr><td>13</td><td>these conditions, but as I sit here, I</td><td>10:24:52</td></tr>
<tr><td>14</td><td>can't tell you if there was anything else</td><td>10:24:54</td></tr>
<tr><td>15</td><td>in the works at the time.</td><td>10:24:56</td></tr>
<tr><td>16</td><td>Q. And I guess the -- going back to what I</td><td>10:24:57</td></tr>
<tr><td>17</td><td>think my question was, which may not have</td><td>10:25:02</td></tr>
<tr><td>18</td><td>been perfectly phrased, do you know whether</td><td>10:25:04</td></tr>
<tr><td>19</td><td>defendants had information or data at the</td><td>10:25:06</td></tr>
<tr><td>20</td><td>time that would have actually supported an</td><td>10:25:09</td></tr>
<tr><td>21</td><td>application for approval of another</td><td>10:25:12</td></tr>
<tr><td>22</td><td>indication from the FDA?</td><td>10:25:16</td></tr>
<tr><td>23</td><td>A. And so, again, I'm afraid my answer wasn't</td><td>10:25:18</td></tr>
<tr><td>24</td><td>clear, either. I know there are discovery</td><td>10:25:21</td></tr>
<tr><td>25</td><td>documents that talk about those kinds of</td><td>10:25:23</td></tr>
</table>

19 (Pages 381 to 384)

M. ROSENTHAL

385

| | | |
|---|---|---|
| 1 | data, but I don't know at that particular | 10:25:27 |
| 2 | time if there were -- if they had clinical | 10:25:29 |
| 3 | trial evidence, is I assume what you | 10:25:33 |
| 4 | mean -- | 10:25:34 |
| 5 | Q. Yeah. | 10:25:35 |
| 6 | A. -- to support another application, no, I | 10:25:35 |
| 7 | don't. I believe it may be knowable, but I | 10:25:38 |
| 8 | don't know. | 10:25:43 |
| 9 | Q. We discussed yesterday that neuropathic | 10:25:43 |
| 10 | pain is one of the off-label indications at | 10:25:45 |
| 11 | issue in the case, correct? | 10:25:47 |
| 12 | A. That's correct, neuropathic pain not | 10:25:49 |
| 13 | including HPN. | 10:25:51 |
| 14 | Q. PHN? | 10:25:53 |
| 15 | A. PHN. | 10:25:54 |
| 16 | Q. At least after May of 2002, right? | 10:25:55 |
| 17 | A. Yes. | 10:25:57 |
| 18 | Q. And why don't -- actually, for purposes of | 10:25:57 |
| 19 | this series of questions, why don't we | 10:26:02 |
| 20 | assume since it's such a mouthful to say | 10:26:04 |
| 21 | neuropathic pain other than PHN after May | 10:26:07 |
| 22 | of 2002 -- | 10:26:09 |
| 23 | A. Just pain. | 10:26:10 |
| 24 | Q. -- can I just say pain? | 10:26:11 |
| 25 | A. Pain. | 10:26:12 |

386

| | | |
|---|---|---|
| 1 | Q. Great. Okay. Subject to further | 10:26:13 |
| 2 | instructions from your counsel, your model | 10:26:15 |
| 3 | would seek to measure the additional | 10:26:17 |
| 4 | incremental prescriptions for pain, | 10:26:20 |
| 5 | correct? | 10:26:22 |
| 6 | A. Again, assuming that -- I understand that | 10:26:22 |
| 7 | some of the legal issues are in flux, or at | 10:26:28 |
| 8 | least that's my understanding about which | 10:26:30 |
| 9 | indications, but if I were told that pain | 10:26:32 |
| 10 | was one of the indications that we were | 10:26:33 |
| 11 | looking at, that's what I would do. | 10:26:35 |
| 12 | Q. Okay. We discussed that Neurontin has been | 10:26:36 |
| 13 | approved for the treatment of neuropathic | 10:26:42 |
| 14 | pain throughout Europe and elsewhere | 10:26:44 |
| 15 | yesterday, correct? | 10:26:46 |
| 16 | A. I believe we did discuss that, yes. | 10:26:46 |
| 17 | Q. Okay. Let's assume for a moment that a | 10:26:48 |
| 18 | class member would have paid for a | 10:26:51 |
| 19 | prescription in the United States for | 10:26:52 |
| 20 | Neurontin to treat neuropathic pain and the | 10:26:56 |
| 21 | prescription worked, the patient's pain | 10:26:59 |
| 22 | went away. Had that patient received that | 10:27:00 |
| 23 | prescription in the United States, your | 10:27:04 |
| 24 | model would conclude that class member | 10:27:08 |
| 25 | would have been impacted and would suffer | 10:27:10 |

387

| | | |
|---|---|---|
| 1 | economic damages; is that correct? | 10:27:12 |
| 2 | A. As I've been directed by counsel to assume | 10:27:14 |
| 3 | that the relevant measure of economic | 10:27:17 |
| 4 | damages here is what was paid for those | 10:27:20 |
| 5 | units of Neurontin induced by the allegedly | 10:27:21 |
| 6 | illegal promotion, so, yes. | 10:27:26 |
| 7 | Q. And if the patient received the very same | 10:27:27 |
| 8 | prescription from a doctor in Europe whose | 10:27:30 |
| 9 | regulatory authority tells her that | 10:27:32 |
| 10 | Neurontin is effective for treatment of | 10:27:34 |
| 11 | neuropathic pain, would that patient have | 10:27:36 |
| 12 | been impacted and suffer economic damages? | 10:27:38 |
| 13 | A. The question of the patient in Europe is | 10:27:42 |
| 14 | outside the realm of that which I've been | 10:27:44 |
| 15 | asked to consider. They're not in the | 10:27:46 |
| 16 | class here, so I don't know what you mean. | 10:27:47 |
| 17 | This is based on a legal theory about, you | 10:27:50 |
| 18 | know, what -- based on a legal theory about | 10:27:54 |
| 19 | what the illegal behavior was, and I'm | 10:27:57 |
| 20 | directed to look at the economic | 10:27:59 |
| 21 | consequences of that. | 10:28:02 |
| 22 | Q. I guess what I'm asking is maybe just from | 10:28:02 |
| 23 | your perspective, are the economic | 10:28:05 |
| 24 | consequences of the prescription that's | 10:28:07 |
| 25 | written in Europe any different from the | 10:28:09 |

388

| | | |
|---|---|---|
| 1 | economic consequences for the prescription | 10:28:11 |
| 2 | that's written in the States for the same | 10:28:14 |
| 3 | indication? | 10:28:16 |
| 4 | A. I'm not sure with what you mean by "the | 10:28:16 |
| 5 | economic consequences." | 10:28:18 |
| 6 | Q. The economic consequences for the | 10:28:19 |
| 7 | individual patient. | 10:28:21 |
| 8 | A. The consequences that I have -- | 10:28:22 |
| 9 | Q. And/or -- I'm sorry. For the individual | 10:28:23 |
| 10 | patient and/or whatever entity is paying | 10:28:26 |
| 11 | for the individual patient's prescription? | 10:28:28 |
| 12 | A. If you want to ask whether the effects are | 10:28:31 |
| 13 | likely to differ on health status, whether | 10:28:35 |
| 14 | the effects are likely to differ in Europe | 10:28:40 |
| 15 | versus the U.S., I have no reason to | 10:28:42 |
| 16 | believe that the health effects differ, but | 10:28:44 |
| 17 | I've not been asked to consider those | 10:28:46 |
| 18 | health effects. | 10:28:47 |
| 19 | Q. Right. I'm asking about the economic | 10:28:48 |
| 20 | effects. You know, what you say in your | 10:28:50 |
| 21 | report that you do in the very first page | 10:28:52 |
| 22 | is that you analyze whether consumers or | 10:28:55 |
| 23 | third-party payers would have and continue | 10:29:06 |
| 24 | to be impacted and suffer economic damages, | 10:29:08 |
| 25 | and so I guess what I'm asking is whether | 10:29:12 |

M. ROSENTHAL

389

```
1   those same individuals or entities would        10:29:14
2   have been any more impacted or suffer any        10:29:18
3   more economic damages in the United States       10:29:20
4   for the exact same prescription as they          10:29:22
5   would have had they been prescribed the          10:29:25
6   same drug in Europe.                   10:29:29
7 A. That's again -- excuse me. My conclusions       10:29:30
8   are based on being directed to assume that       10:29:33
9   there were no clinical benefits to be            10:29:35
10  counted against the spending, and so that        10:29:39
11  conclusion is relevant to that model where       10:29:41
12  those clinical benefits cannot be shown.         10:29:43
13  So you're asking me to assume a different        10:29:46
14  framework in which those clinical benefits       10:29:49
15  can be shown to exist, and so -- is that         10:29:50
16  what you would like me to assume?                10:29:54
17 Q. No, I don't think so. I'm just sort of         10:29:55
18  looking at what the practical reality of         10:30:04
19  the situation is and what the economic           10:30:06
20  impacts of it are. Is there any greater          10:30:09
21  economic impact on the patient than we           10:30:12
22  talked about in the United States than the       10:30:14
23  patient in Europe?                     10:30:15
24 A. I guess I need to -- again, I'm sorry, I        10:30:17
25  don't mean to be difficult, but I need to        10:30:21
```

390

```
1   make some assumption about the clinical          10:30:22
2   effectiveness of the drug, and if you want       10:30:24
3   me to assume that drug was clinically            10:30:27
4   effective for those patients who got it in       10:30:30
5   the U.S. in a similar way to those patients      10:30:32
6   who got it in Europe, then the difference        10:30:35
7   would be the total spending on the drug,         10:30:36
8   which, as you know, is much less in Europe.      10:30:38
9 Q. I guess here's my question: Is there any        10:30:40
10  reason that that assumption -- that you can      10:30:42
11  think of that that assumption should be any      10:30:44
12  different for a patient in the U.S. than a       10:30:45
13  patient in Europe?                     10:30:47
14 A. I don't know of any reason, but, again,        10:30:49
15  I've not been asked to consider this case.       10:30:51
16 Q. Okay. Your report says that you intend to      10:31:05
17  group diagnoses into five categories by          10:31:07
18  reference to ICD-9 codes, correct?              10:31:09
19 A. I did categorize -- excuse me, can I look      10:31:12
20  at that again in my report?                10:31:16
21 Q. Sure. I think it's on Page 16, Footnote        10:31:18
22  64.                          10:31:51
23      (Discussion off the record.)             10:31:51
24 A. I see there's a typo in there, too.           10:31:52
25 Q. What's the typo that you mentioned you         10:31:57
```

391

```
1   noticed?                       10:31:59
2 A. That says "IVD" in the very last              10:31:59
3   characterization of ICD-9. Yes, so this         10:32:02
4   was sort of a preliminary grouping of           10:32:10
5   indications, but as we talked about before,     10:32:11
6   when we look individually by indication,        10:32:15
7   there may be some change -- my                10:32:20
8   understanding is there may be some change       10:32:21
9   in which indications I'm asked to look at       10:32:23
10  specifically.                    10:32:25
11 Q. So these may not be the groups -- the          10:32:26
12  groupings that you ultimately use at the        10:32:28
13  end of the day; is that your --                10:32:30
14 A. Ultimately. This is sort of based on my        10:32:32
15  preliminary examination of those ICD-9          10:32:34
16  codes and what was in the original             10:32:36
17  complaint.                      10:32:39
18 Q. Okay.                       10:32:45
19      MR. POLUBINSKI: Let's mark the             10:32:48
20  next document.                   10:32:48
21      (Exhibit No. 15, Document headed          10:32:49
22  "ICD-9 Codes for Neurontin, From IMS File,      10:32:49
23  Ben Sommers, August 3, 2005," marked for        10:32:49
24  identification.)                  10:32:49
25 Q. All right. I'm handing you a document that     10:33:06
```

392

```
1   we've marked as Rosenthal Exhibit 15.            10:33:08
2 A. Thank you.                       10:33:12
3 Q. Can you take a look at the document and let      10:33:13
4   me know when you've had a chance to look         10:33:15
5   through it.                      10:33:18
6 A. Yeah.                         10:33:19
7 Q. Do you recognize this document?                10:33:19
8 A. In the way that I would recognize a             10:33:20
9   document that I looked at about a year ago,      10:33:22
10  but, yes, it does look familiar.               10:33:24
11 Q. Okay. This document was produced to the        10:33:26
12  defendants in January 2006 by plaintiffs'        10:33:28
13  counsel. Do you know why it would have          10:33:34
14  been produced to us?                   10:33:35
15 A. I don't know. Perhaps in relationship to a     10:33:36
16  data request.                    10:33:46
17 Q. Okay. Did you review this document in          10:33:47
18  connection with your work on this matter at     10:33:48
19  all?                         10:33:50
20 A. I certainly reviewed it. Not being an         10:33:50
21  expert in clinical coding myself, I              10:33:52
22  wouldn't say that I could have checked it        10:33:53
23  in any real sense. Is that what you're          10:33:56
24  asking? I'm familiar with it.                 10:33:58
25 Q. Okay. Did you rely on the document in any      10:34:05
```

21 (Pages 389 to 392)

M. ROSENTHAL

393

```
 1     way in your report, in your analysis?        10:34:07
 2  A.  Not -- since there is no data analysis in    10:34:08
 3     my report, the answer is no.  We wanted to    10:34:15
 4     get a sense of the categories of data.  As    10:34:19
 5     I mentioned -- as we discussed yesterday,     10:34:26
 6     looking at the -- some data from the          10:34:28
 7     Franklin case that had been produced from     10:34:30
 8     the National Disease and Therapeutic Index,   10:34:32
 9     they have data by ICD-9 code.  We're trying   10:34:36
10     to understand those data a little better.     10:34:39
11     So we wanted to take a preliminary grouping   10:34:41
12     of those ICD-9 codes to see how they mapped   10:34:45
13     to these categories.                          10:34:48
14  Q.  Okay.  Can you tell me the circumstances in  10:34:52
15     which the document was prepared, so in        10:34:54
16     other words, who asked for it to be           10:34:59
17     prepared?                                     10:35:00
18  A.  I'm not sure who asked for it to be          10:35:01
19     prepared.  Again, when these data came to     10:35:06
20     light in the Franklin case, we wondered       10:35:08
21     what we would learn from them, how relevant   10:35:11
22     they were.  We didn't want to rely on the     10:35:13
23     groupings necessarily that had been done by   10:35:15
24     previous experts.  As we mentioned            10:35:21
25     yesterday, it was an attachment to their      10:35:24
```

395

```
 1  A.  I honestly don't know.                       10:36:16
 2  Q.  Do you know what your instructions or Ms.    10:36:22
 3     Rushnawitz's instructions were to Mr.         10:36:26
 4     Sommers in preparing this document?           10:36:28
 5  A.  I'm not 100 percent sure about the exact     10:36:32
 6     instruction, but I believe it went            10:36:35
 7     something like this:  Given that we have a    10:36:37
 8     list of ICD-9 codes from that National        10:36:40
 9     Disease and Therapeutic Index database, I     10:36:43
10     believe that these are all the ICD-9 codes    10:36:47
11     for which Neurontin was prescribed and that   10:36:49
12     he was then instructed to categorize them     10:36:54
13     into major groups, and I believe he was       10:36:56
14     given the categories as well.                 10:37:00
15  Q.  Okay.                                        10:37:01
16  A.  Okay.                                        10:37:05
17  Q.  On the subject of the categories maybe if I  10:37:05
18     could just -- well, I'll withdraw that        10:37:12
19     question.                                     10:37:14
20        Do you know if he wrote the                10:37:14
21     commentary that appears on the document?      10:37:15
22     So, for example, under the first heading,     10:37:18
23     which is "Seizures & Epilepsy," there is an   10:37:20
24     italicized notation that says, "These are     10:37:24
25     all variants on seizure disorders."           10:37:27
```

394

```
 1     report.  And so it was either myself or       10:35:26
 2     potentially Ms. Rushnawitz that asked for     10:35:29
 3     this categorization to be done.               10:35:31
 4  Q.  Okay.  And would it have been something      10:35:34
 5     that was commissioned on or about August      10:35:37
 6     3rd of 2005, which is the date that appears   10:35:39
 7     at the top of the document?                   10:35:42
 8  A.  I think it may have been updated around --   10:35:46
 9     I honestly -- I'm sorry, I just don't know.   10:35:48
10     I assume that that's the correct date --      10:35:50
11  Q.  That's fine.                                 10:35:52
12  A.  -- because it's there.                       10:35:52
13  Q.  Do you know who Ben Sommers is?              10:35:53
14  A.  I do.                                        10:35:55
15  Q.  Who's Ben Sommers?                           10:35:56
16  A.  He's a medical student that occasionally     10:35:57
17     works with us.                                10:35:59
18  Q.  When you say "us," what do you mean?         10:36:02
19  A.  With Greylock McKinnon.                      10:36:03
20  Q.  Do you know if he's compensated for the      10:36:04
21     work that he does?                            10:36:10
22  A.  I'm certain that he is.                      10:36:10
23  Q.  Do you have any sense for why his name       10:36:11
24     wouldn't have appeared on any of the          10:36:13
25     invoices that we received?                    10:36:14
```

396

```
 1  A.  I believe those are his notes, yes.          10:37:28
 2  Q.  Okay.  All right.  Now, I think we've        10:37:30
 3     discussed before that you expect that         10:37:43
 4     you'll receive data for your model that's     10:37:44
 5     broken down by ICD-9 codes?                   10:37:46
 6  A.  Again, one of the major sources of data      10:37:48
 7     that I talked about yesterday would be        10:37:50
 8     these kinds of data from the National         10:37:51
 9     Disease and Therapeutic Index, and those      10:37:54
10     are broken down by ICD-9 codes.               10:37:55
11  Q.  Is there any other data other than the NDTI  10:37:57
12     data that you imagine would be broken down    10:38:00
13     by ICD-9 codes?                               10:38:02
14  A.  There's a similar database that I've         10:38:03
15     learned about subsequently that's produced    10:38:05
16     by Verispan.  I haven't worked with those     10:38:07
17     data myself, but I believe they are also      10:38:09
18     broken out by ICD-9 codes.  They're           10:38:11
19     referenced --                                 10:38:17
20  Q.  How about -- how about data from -- I'm      10:38:19
21     going to have to just give you the acronyms   10:38:20
22     since I don't know --                         10:38:22
23  A.  That's okay.                                 10:38:22
24  Q.  -- what all the letters stand for, but       10:38:22
25     NAMCS?                                        10:38:26
```

22 (Pages 393 to 396)

M. ROSENTHAL

397

```
1   A. Yeah, I reference those as well in my        10:38:27
2       declaration. It's possible that I'll use     10:38:30
3       the NAMCS data, if that's okay, N-A-M-C-S.   10:38:33
4   Q. Do you know if they're broken down by ICD-9   10:38:38
5       codes as well?                               10:38:41
6   A. They have condition codes. I believe          10:38:41
7       they're ICD-9 codes as well.                 10:38:42
8   Q. Okay. Now, setting aside the data that you    10:38:50
9       mentioned before that was produced in the    10:38:58
10      Franklin case, which we can talk about        10:38:59
11      later --                                      10:39:02
12  A. Okay.                                          10:39:02
13  Q. -- have you collected any of this data yet?   10:39:03
14  A. We have sent a request for data to the        10:39:05
15      defendants, but I do not yet have access to  10:39:08
16      these kinds of data aside from the Franklin  10:39:10
17      case, yeah.                                   10:39:13
18  Q. All right. You haven't sought to collect      10:39:14
19      the data from any of these sources,          10:39:16
20      directly from any of these sources,          10:39:19
21      correct?                                      10:39:21
22  A. No, I have not done so for a variety of       10:39:21
23      reasons. One, it's very expensive to         10:39:24
24      obtain data from IMS Health directly, and    10:39:27
25      two, they don't allow this data to be used   10:39:31
```

398

```
1       for litigation purposes.                     10:39:33
2   Q. You mentioned IMS. Is that also true of       10:39:34
3       NAMCS?                                        10:39:39
4   A. The NAMCS is available publicly. And I'm      10:39:40
5       sorry, I have looked in general at those     10:39:45
6       data to see the frequency with which         10:39:48
7       Neurontin shows up, for example.             10:39:51
8   Q. Okay. Okay. Let's look at Rosenthal           10:39:52
9       Exhibit 15 a lot more closely.               10:40:00
10  A. Okay.                                          10:40:01
11  Q. If you flip through it, you'll see that       10:40:02
12      there are four different bold headings that  10:40:09
13      appear in this document. The first one is    10:40:14
14      "Seizures & Epilepsy." The second one is     10:40:17
15      "Psychiatric Diagnoses/Mental Illness," the  10:40:23
16      third one is "Pain," and the last one is     10:40:26
17      "Migraine," correct?                          10:40:32
18  A. That's correct.                               10:40:34
19  Q. Would you agree that these roughly            10:40:34
20      correspond, maybe even not so roughly        10:40:37
21      correspond, with the different groupings     10:40:40
22      that are referenced in Footnote 64 of your   10:40:44
23      declaration?                                  10:40:47
24  A. Yes, that's correct.                          10:40:47
25  Q. Who decided on this particular aggregation?   10:40:54
```

399

```
1   A. This aggregation, again, was provided to us  10:40:56
2       by Ben Sommers.                              10:41:01
3   Q. Do you have an understanding for what        10:41:02
4       dictated which ICD-9 codes belonged in      10:41:07
5       which group?                                 10:41:10
6   A. His knowledge of the clinical issues         10:41:16
7       related to each of these conditions.        10:41:18
8   Q. But it was a determination he made based on  10:41:19
9       his own clinical knowledge?                 10:41:23
10  A. That's right.                                 10:41:24
11  Q. Did he have input from you or Ms.            10:41:25
12      Rushnawitz at all on the subject?            10:41:28
13  A. Of how to categorize these? No, we were      10:41:29
14      seeking some understanding from him about   10:41:32
15      how these things generally played out.      10:41:34
16  Q. Okay. Your ability to accurately            10:41:35
17      disaggregate, in your mind, by indication   10:41:46
18      will depend on the correctness or accuracy  10:41:47
19      of the ICD-9 codes?                          10:41:50
20  A. My ultimate analyses, this analysis --      10:41:53
21  Q. Not necessarily this document. Let's set    10:41:57
22      this document to one side for purposes of   10:41:58
23      this question. But just the accuracy of --  10:42:00
24      well, depending on your ability to          10:42:03
25      accurately group indications by ICD-9 code, 10:42:05
```

400

```
1       correct?                                     10:42:09
2   A. In terms of those categories which I'm       10:42:09
3       ultimately directed by counsel are to be    10:42:13
4       the indications to be considered for        10:42:16
5       damages, yes.                                10:42:17
6   Q. And in the same way your ability to          10:42:25
7       distinguish between on-label and off-label  10:42:27
8       prescriptions of Neurontin will depend on   10:42:28
9       your being able to accurately group         10:42:30
10      diagnoses using ICD-9 codes, correct?        10:42:35
11  A. That's correct.                               10:42:38
12  Q. So to put it another way, without data from  10:42:43
13      whatever source it is, whether it's NDTI or  10:42:46
14      NAMCS, broken down by indication your model  10:42:49
15      would not be able to separate out on-label  10:42:52
16      from off-label prescriptions; is that        10:42:55
17      correct?                                     10:42:59
18  A. Though as we discussed yesterday there's a   10:42:59
19      simplified version of the model that         10:43:03
20      wouldn't distinguish them, that would look   10:43:04
21      at the effects of off-label prescribing on  10:43:06
22      total prescriptions, but as you noted        10:43:09
23      yesterday, it's not as good a model, it's    10:43:13
24      not as detailed a model as the model where  10:43:14
25      we break it out indication by indication.   10:43:17
```

23 (Pages 397 to 400)

M. ROSENTHAL

401

1    That is a model that can be run.    10:43:19
2  Q. Right. But I guess if we were interested    10:43:20
3    in separating out on-label prescriptions    10:43:22
4    from off-label prescriptions?    10:43:24
5  A. Clearly we need to be able to identify    10:43:25
6    them.    10:43:28
7  Q. Right. And the way to identify them is    10:43:28
8    with ICD-9 codes, correct?    10:43:29
9  A. That certainly seems to be the way that I    10:43:31
10    would think about going about it. Right    10:43:32
11    now I can't think of another way to do it,    10:43:33
12    but there may be other kinds of disease    10:43:36
13    groupings. ICD-9 is obviously the most    10:43:38
14    commonly used disease grouping.    10:43:43
15  Q. And as you sit here today, that's the way    10:43:44
16    that you envision doing this? You can't    10:43:48
17    think of another way that you can do it?    10:43:49
18  A. As I sit here today, I would expect to use    10:43:49
19    diagnosis codes, yes.    10:43:51
20  Q. Did you discuss the use of those groups    10:43:53
21    with anybody else other than Ms. Rushnawitz    10:43:56
22    and Mr. Sommers?    10:43:58
23  A. I'm sorry, I don't know what you mean by    10:43:59
24    that question. Did I discuss --    10:44:00
25  Q. The use of -- that's a slightly confused    10:44:02

402

1    question, I think.    10:44:10
2  A. Okay.    10:44:10
3  Q. All right. We discussed yesterday how --    10:44:11
4    and to some degree today as well how    10:44:23
5    counsel would instruct you which    10:44:26
6    indications to run through your model,    10:44:27
7    correct?    10:44:28
8  A. That's correct.    10:44:29
9  Q. And it would be through their instructions    10:44:29
10    that you would seek to exclude any uses for    10:44:42
11    which there have been no -- there had been    10:44:44
12    no fraudulent promotion?    10:44:45
13  A. That's correct.    10:44:48
14  Q. And you wouldn't be conducting any analysis    10:44:51
15    yourself as to whether defendants promoted    10:44:54
16    Neurontin for a given off-label use?    10:44:55
17  A. I wouldn't be conducting any analysis    10:44:57
18    myself to identify what falls into that    10:45:02
19    category, yes.    10:45:03
20  Q. Okay. At this point I'm assuming they    10:45:04
21    haven't yet identified any ICD-9 codes that    10:45:09
22    are listed on Rosenthal Exhibit 15 that you    10:45:12
23    would not include in your analysis --    10:45:15
24  A. No. I --    10:45:15
25  Q. -- is that correct?    10:45:17

403

1  A. That's correct. I have not received    10:45:17
2    specific instructions from counsel. In my    10:45:20
3    reading of the complaint as -- even the    10:45:22
4    original complaint that these categories    10:45:27
5    are described in broader terms. I don't    10:45:29
6    recall that they used ICD-9 codes there.    10:45:32
7  Q. Would you agree with me that the document    10:45:35
8    that -- well, would you agree with me that    10:45:39
9    Rosenthal 15 contains an exceedingly broad,    10:45:43
10    maybe even wildly overinclusive list of    10:45:50
11    possible ICD-9 codes to include in your    10:45:54
12    analysis?    10:45:57
13  A. This document -- my understanding of what's    10:45:57
14    in this document is that it includes every    10:46:01
15    ICD-9 code for which Neurontin is    10:46:04
16    prescribed. I don't know if any were    10:46:05
17    excluded, so it's a complete list.    10:46:10
18  Q. Okay. Fair enough. I will just to sort    10:46:13
19    of follow up on that question, if you can    10:46:19
20    turn to the second-to-last page.    10:46:21
21  A. Okay.    10:46:23
22  Q. These pages aren't -- or maybe they are    10:46:23
23    numbered on yours.    10:46:26
24  A. 97.    10:46:27
25  Q. Yeah, GMA97, thank you. At the very bottom    10:46:28

404

1    of the page there is an italicized notation    10:46:33
2    that reads, "The last page or so is filled    10:46:34
3    with non-neuropathic pain" -- oh, I'm    10:46:36
4    sorry.    10:46:37
5  A. Sorry. 96. I'm with you now.    10:46:45
6  Q. Let me start again. So we're looking at    10:46:47
7    GMA96, and what I'm looking at is the    10:46:49
8    italicized notation at the very bottom of    10:46:52
9    the page which reads, "The last page or so    10:46:53
10    is filled with non-neuropathic pain -- i.e.    10:46:55
11    your nerves work fine, you've just got a    10:46:58
12    major injury -- so Neurontin really isn't    10:47:01
13    the recommended drug, but who knows what    10:47:03
14    doctors are giving."    10:47:05
15    That would suggest to you that    10:47:07
16    would confirm your sense that this is an    10:47:08
17    inclusive list, correct?    10:47:09
18  A. Right. Again, he was trying to categorize    10:47:11
19    everything in the list in some way and to    10:47:14
20    explain to us what these things really were    10:47:17
21    in laymen's terms.    10:47:20
22  Q. Here's a question for you: Do you expect    10:47:30
23    that it would be you or plaintiffs' counsel    10:47:35
24    or somebody else who would seek to    10:47:39
25    translate the indications at issue in the    10:47:41

24 (Pages 401 to 404)

M. ROSENTHAL

---

**405**

1  case at whatever the appropriate time is        10:47:44
2  into the ICD-9 codes that are listed here        10:47:49
3  for purposes of deciding what to include in      10:47:51
4  your model?                                      10:47:54
5  A. That's a good question. Having not reached    10:47:55
6  that juncture of the investigation, it           10:47:59
7  would certainly not be me. I think the           10:48:01
8  question is whether it would be a clinical        10:48:04
9  expert under their direction or a clinical       10:48:06
10 expert under my direction who incidentally       10:48:09
11 wouldn't be a medical student but a real         10:48:11
12 clinical expert in this area. I don't know       10:48:14
13 at this time. I guess, again, I don't            10:48:17
14 understand exactly the legal issues around       10:48:23
15 what's in and what's out.                        10:48:25
16 Q. Okay.                                         10:48:26
17 A. But by no means would I as an economist       10:48:30
18 decide which ICD-9 codes map to which            10:48:33
19 indications.                                     10:48:40
20 Q. But in any event, the process hasn't yet      10:48:40
21 been done?                                       10:48:43
22 A. No, that hasn't. This really is just a        10:48:43
23 grouping of all the existing data into some      10:48:46
24 categories that we could understand what         10:48:49
25 they meant.                                      10:48:51

---

**406**

1  Q. So you don't know yet if you would have       10:48:52
2  difficulty matching ICD-9 codes with the         10:48:55
3  indications that are still relevant to the       10:48:58
4  case, because you haven't had to conduct         10:49:00
5  that analysis yet?                               10:49:03
6  A. I have not conducted that analysis yet.       10:49:04
7  Q. How do you propose to treat PHN for           10:49:08
8  purposes of your grouping?                       10:49:12
9  A. Again, as we discussed before, I'm not        10:49:13
10 entirely clear as to how that's going to be      10:49:16
11 treated legally, whether PHN is going to be      10:49:18
12 included as an indication to be considered.      10:49:20
13 And if it were, again, I think the issue         10:49:24
14 would be the same, consulting the                10:49:26
15 appropriate clinical expert as to which          10:49:29
16 ICD-9 codes would characterize PHN. I            10:49:31
17 don't know, sitting here, which those are.       10:49:34
18 Q. Okay. Would you agree at this point that      10:49:35
19 it would likely be important to be able to       10:49:42
20 isolate PHN prescriptions by ICD-9 codes         10:49:43
21 given that it's an on-label use for some         10:49:47
22 period of the class and it's an off-label        10:49:49
23 use for some period of the class?               10:49:51
24 A. I'm sorry, I just -- I haven't fully          10:49:53
25 thought about how to do that because I           10:49:56

---

**407**

1  haven't considered --                            10:49:58
2  Q. I'm just -- all I'm asking is whether you     10:49:59
3  would agree that it's something that you         10:50:01
4  would need to do.                                10:50:03
5  A. It might be important if I need to exclude    10:50:04
6  them.                                            10:50:07
7  Q. Okay. Or if you need to decide how to         10:50:07
8  group them?                                      10:50:09
9  A. You mean in the period after approval, for    10:50:10
10 example?                                         10:50:17
11 Q. Either one.                                   10:50:17
12 A. Well, in the period before approval it        10:50:18
13 might be included with other neuropathic         10:50:22
14 pain, might it not?                              10:50:24
15 Q. Okay.                                         10:50:26
16 A. In the period after it might be important     10:50:26
17 to decide how to identify it --                  10:50:29
18 Q. Fair enough.                                  10:50:29
19 A. -- depending on, again --                     10:50:31
20 Q. Fair enough. Could you take a second and      10:50:32
21 look through Rosenthal Exhibit 15 and find       10:50:36
22 for me the code for postherpetic neuralgia?      10:50:38
23        MR. NOTARGIACOMO: Objection.             10:50:44
24 A. Can you just tell me the answer to that       10:50:47
25 question? I'm assuming that it's not here,       10:50:49

---

**408**

1  but...                                           10:50:51
2  Q. Your assumption, as far as I'm aware, is      10:50:52
3  correct, but I don't want to be the one to       10:50:54
4  represent that to you.                           10:50:56
5  A. Okay. Well, then I'll need a few minutes.     10:50:56
6  Q. Take your time.                               10:50:59
7        (Witness reviews document.)                10:51:00
8  A. To the best of my ability to understand       10:52:07
9  these clinical terms, I don't see               10:52:09
10 postherpetic neuralgia. I certainly don't        10:52:11
11 see those specific words.                        10:52:13
12 Q. Do you have any understanding for why it's    10:52:14
13 not on the list?                                 10:52:16
14 A. No, I don't.                                  10:52:16
15 Q. There is no code for postherpetic            10:52:19
16 neuralgia, is there?                             10:52:21
17 A. I have no knowledge of whether there is or    10:52:21
18 isn't.                                           10:52:24
19 Q. So as you sit here today, though, you're      10:52:24
20 not aware of a way to isolate prescriptions      10:52:28
21 of Neurontin for PHN; is that correct?           10:52:30
22 A. I am not aware of a way to do that at this    10:52:32
23 point, no. I can imagine one could combine       10:52:36
24 codes for the -- as we talked about             10:52:38
25 yesterday, I'm not really clear whether          10:52:44

---

25 (Pages 405 to 408)

409

postherpetic neuralgia is related to herpes 10:52:46
or herpes zoster, but in any case there is 10:52:49
some underlying condition that I believe 10:52:52
it's related to. There may be some way to 10:52:53
identify postherpetic neuralgia by looking 10:52:55
at a combination of neuropathic pain and 10:52:56
the underlying condition codes for both of 10:52:59
those, but as I sit here today, I do not 10:53:01
know how I would implement that. 10:53:04
Q. Okay. Both yesterday and today you 10:53:05
testified that you reviewed some data that 10:53:11
you understood came from NDTI that was 10:53:15
produced by defendants in the Franklin 10:53:17
case? 10:53:19
A. Yes, that's right. 10:53:20
Q. And when I asked about that data, you 10:53:21
referred me to Footnote 72 of your 10:53:23
declaration, correct, which is Exhibit 1 to 10:53:26
your deposition? 10:53:30
A. And Footnote 73, yes. 10:53:35
Q. Okay. Footnote 72 reads, "Counsel has 10:53:40
already provided a roll out of these data 10:53:42
and conducted preliminary analysis with 10:53:44
them. The data that I have reviewed 10:53:45
clearly allow for identifying prescription 10:53:47

410

patterns by diagnosis." 10:53:49
Did I read that correctly? 10:53:52
A. Yes, you did. 10:53:53
Q. And you just referred me to Footnote 73 as 10:53:54
well -- 10:53:58
A. Yes. 10:53:58
Q. -- which refers to Pages 63 to 65 of 10:53:58
Exhibit B to the affidavit of C. Seth 10:54:04
Landefeld, M.D. and Michael Steiman, M.D. 10:54:08
and I take it that that document contains 10:54:17
the materials that you reference in 10:54:19
Footnote 72? 10:54:21
A. That's correct. 10:54:22
Q. And that therefore that's the information 10:54:25
that you've reviewed to clearly allow for 10:54:27
identifying prescription patterns by 10:54:31
diagnosis? 10:54:32
A. And, again, the list of ICD-9 codes that 10:54:32
goes along with that, yes. 10:54:36
MR. POLUBINSKI: Okay. Now let's 10:54:37
mark the next exhibit. 10:54:39
(Exhibit No. 16, Affidavit of C. 10:54:39
Seth Landefeld, M.D. and Michael Steiman, 10:54:39
M.D., marked for identification.) 10:54:56
Q. Okay. I'm handing you a document that's 10:54:57

411

been marked as Rosenthal Exhibit 16. Can 10:54:58
you turn to the specific pages that are 10:55:11
referenced in Footnote 73 of your 10:55:12
declaration -- 10:55:15
A. Okay. 10:55:15
Q. -- which is to say Pages 63 to 65 of 10:55:15
Exhibit B. 10:55:18
A. Okay. 10:55:31
Q. These three pages are the pages that you 10:55:31
had in mind, correct? 10:55:33
A. That's right, particularly the -- I'm 10:55:34
sorry, I can't see the page numbers, 63. 10:55:37
Q. Okay. And if you flip back to Page 62 -- 10:55:39
A. Okay. Yes. 10:55:44
Q. -- the top of 62 reads, "Appendix 1: Use 10:55:48
of gabapentin - national and Medicaid 10:55:54
program estimates." 10:55:57
A. Yeah. 10:56:01
Q. So the graphs that you referred to in 10:56:01
Footnote 73 are part of Appendix 1 to this 10:56:05
report; is that correct? 10:56:09
A. That's my understanding, yeah. 10:56:09
Q. Are you aware that the graphs on Pages 63 10:56:11
to 65 were created by the lawyers, Greene 10:56:23
and Hoffman? 10:56:26

412

A. I believe that that's right, that analysis 10:56:27
was done by the lawyers, yes, which is why 10:56:29
I don't -- didn't use it specifically. 10:56:31
Q. Okay. Did you review the underlying report 10:56:36
to which this document is attached as an 10:56:38
exhibit? 10:56:40
A. I may have. We certainly tried to learn 10:56:40
where the data came from, what assumptions 10:56:44
they made in plotting the data, yes. 10:56:48
Q. Okay. If we could look at Page 43 -- 10:56:54
A. Okay. 10:57:00
Q. -- of the report that is attached as 10:57:00
Exhibit B to this declaration. That report 10:57:05
is called "Expert Consultant's Report, 10:57:10
United States ex rel Franklin versus 10:57:14
Pfizer, Inc., et al., prepared by Michael 10:57:17
Steiman, M.D., C. Seth Landefeld, M.D., 10:57:20
Mary-Margaret Chren, M.D." 10:57:25
A. I'm sorry, you've lost me. At which page? 10:57:28
Q. It's Page 43 of the -- 10:57:31
A. Okay. 10:57:33
Q. -- of Exhibit B, the underlying report. 10:57:33
MR. NOTARGIACOMO: I'm sorry, I 10:57:38
don't see that language on Page 43. 10:57:39
A. (Indicating.) 10:57:43

M. ROSENTHAL

413

1  Q.  That's Page 43.                    10:57:44
2  A.  I'm in the right place?            10:57:45
3  Q.  Yes.                               10:57:46
4  A.  Okay. Sorry.                       10:57:47
5      MR. NOTARGIACOMO:  You've just     10:57:48
6  read something that -- I'm not sure where  10:57:49
7  it came from.                          10:57:51
8      MR. POLUBINSKI:  Yeah, what I just  10:57:54
9  read was the title of the report itself,  10:57:55
10  the title of what Exhibit B actually is.  10:57:56
11 A.  Yes.                               10:57:56
12     MR. POLUBINSKI:  It's an expert    10:57:56
13  consultant's report.                  10:57:58
14 A.  Okay.                              10:57:58
15     MR. NOTARGIACOMO:  Okay. Where     10:57:59
16  is -- I'm just asking where that language  10:57:59
17  is. What page?                        10:58:01
18     MR. POLUBINSKI:  Page 1 of Exhibit  10:58:01
19  B.                                    10:58:02
20 A.  Yeah.                              10:58:03
21     MR. POLUBINSKI:  I was reading it  10:58:09
22  really just to give context of what Exhibit  10:58:10
23  B really is.  I want focus on Page 43.  10:58:12
24  BY MR. POLUBINSKI:                    10:58:16
25 Q.  If you could focus with me on the first two  10:58:17

414

1  sentences at the top of the page.  They  10:58:23
2  read, "Documents provided by Pfizer/Parke-  10:58:27
3  Davis document massive growth in the use of  10:58:31
4  gabapentin for unapproved uses over the  10:58:34
5  mid- and late 1990s (RXD)" with a reference  10:58:38
6  to Footnote 10, "These are explained  10:58:44
7  graphically in Appendix 1."            10:58:47
8      You would agree that these          10:58:51
9  sentences refer to the graphs on Pages 63  10:58:51
10  to 65 that you cite --               10:58:58
11 A.  Yes.                               10:58:59
12 Q.  -- in your declaration, correct?   10:58:59
13 A.  Yes.                               10:59:00
14 Q.  Can you take a look at Footnote 10, please,  10:59:01
15  of your report.                       10:59:03
16 A.  Yeah.                              10:59:04
17 Q.  It's Footnote 10.  That reads, "This data  10:59:04
18  was compiled by Green and Hoffman from  10:59:10
19  documents received by Pfizer/Parke-Davis.  10:59:13
20  The original source of this data is  10:59:15
21  unclear, and we do not have clear  10:59:17
22  confirmation of the units of measurement  10:59:19
23  (e.g. we cannot be sure if they represent  10:59:21
24  the number of unique prescriptions, the  10:59:24
25  number of one month supplies of medications  10:59:27

415

1  dispensed, et cetera).  The classification  10:59:29
2  of individual diagnoses into categories and  10:59:33
3  disease was performed by Greene and Hoffman  10:59:36
4  and briefly reviewed by us."           10:59:36
5 A.  I see that.                         10:59:39
6 Q.  Have you been able to determine the  10:59:50
7  original source of the data or the units of  10:59:52
8  measurement that Drs. Landeman (sic),  10:59:55
9  Steiman and Chren were not able to?   10:59:59
10 A.  We confirmed with the office of Mr. Chren.  11:00:03
11  I don't know Mr. Hoffman, or Ms. Hoffman.  11:00:07
12  I don't know.  But with Mr. Chren that  11:00:09
13  these data -- the original source of the  11:00:11
14  data was the National Disease and  11:00:13
15  Therapeutic Index report from IMS.  And so  11:00:17
16  we learned about that data set in  11:00:20
17  particular, and the data set records  11:00:22
18  prescribing by physicians at an office  11:00:26
19  visit.                                11:00:29
20 Q.  Have you actually reviewed the underlying  11:00:31
21  data set yourself?                    11:00:33
22 A.  I have -- not the underlying data set, no.  11:00:34
23  I've seen the spreadsheets from which the  11:00:38
24  graphs were developed, but I did not use  11:00:40
25  the data myself because I didn't have the  11:00:46

416

1  original data set, so I couldn't confirm if  11:00:47
2  they were used appropriately.         11:00:49
3 Q.  Okay.  When you say you saw the  11:00:51
4  spreadsheets that were prepared from the  11:00:55
5  underlying data --                    11:00:56
6 A.  That list those diagnosis codes.    11:01:01
7 Q.  Okay.  Are those documents that are  11:01:02
8  referred to in the list of documents  11:01:06
9  considered in your report?            11:01:07
10 A.  Again, I don't -- I guess I don't know if  11:01:08
11  it's -- that's separate from this document  11:01:12
12  itself.  I guess the spreadsheets I did  11:01:15
13  see, I don't know that they're not -- I  11:01:19
14  don't know that they're in my list, no.  11:01:21
15     MR. POLUBINSKI:  We'd ask that you  11:01:25
16  or plaintiffs' counsel identify what the  11:01:26
17  spreadsheets are.  Insofar as they're  11:01:28
18  documents that have actually been produced  11:01:30
19  by defendants, we would be grateful to know  11:01:31
20  what the Bates number of those documents  11:01:33
21  are.  Insofar as they're documents that  11:01:35
22  were actually prepared for Dr. Rosenthal's  11:01:38
23  use, Professor Rosenthal's use in preparing  11:01:41
24  her declaration, we call for their  11:01:44
25  production.                           11:01:46

27 (Pages 413 to 416)

M. ROSENTHAL

417

1  A. I believe they were part of the Franklin          11:01:46
2    production itself, but...          11:01:49
3         MR. NOTARGIACOMO:  I'll look into          11:01:50
4    it.          11:01:52
5         THE WITNESS: Okay.          11:01:52
6  Q. All right. Aside from the spreadsheets          11:02:06
7    that we've just talked about that summarize          11:02:07
8    this data --          11:02:09
9  A. Yeah.          11:02:10
10 Q. -- have you reviewed any other NDTI data          11:02:10
11   for your work in this case?          11:02:13
12 A. No, I have not.          11:02:14
13 Q. We can set that document to one side.          11:02:26
14 A. Okay. Thank you.          11:02:28
15 Q. So in your declarations you've proposed          11:02:49
16   using two different data sets to collect          11:02:52
17   data on actual Neurontin prescriptions by          11:02:54
18   diagnosis, correct?          11:02:56
19 A. In my original declaration I believe I          11:02:57
20   named the NDTI, if it's okay to use that          11:02:59
21   abbreviation, and the NAMCS data as leading          11:03:06
22   candidates.          11:03:06
23 Q. Okay.          11:03:06
24 A. In my response to Argenbright I also note          11:03:06
25   the existence of this Verispan competitor.          11:03:09

418

1  Q. Okay. Have you ever used the data from the          11:03:11
2    Verispan competitor before?          11:03:15
3  A. No, I have not.          11:03:16
4  Q. Have you made any inquiries at all as to          11:03:17
5    the categories of data that might be          11:03:19
6    available to you through that source?          11:03:21
7  A. The staff spoke, so that would have been          11:03:22
8    Mr. Augusteijn in all likelihood spoke to a          11:03:27
9    salesperson at Verispan to ask about what          11:03:29
10   the data contained and confirmed that it          11:03:31
11   was similar in structure to the NDTI.          11:03:34
12 Q. Are you aware of any differences between          11:03:36
13   the Verispan data and the NDTI data in          11:03:44
14   terms of the differences that would be          11:03:48
15   relevant to the work that you are doing --          11:03:53
16   that you would contemplate doing in this          11:03:54
17   case?          11:03:56
18 A. I believe they have different sample sizes.          11:03:57
19   I don't know the exact sample size for the          11:03:59
20   Verispan data set, but in the other          11:04:00
21   comparisons between NAMCS -- sorry, between          11:04:03
22   IMS Health and Verispan for their          11:04:06
23   promotional data, for example, they survey          11:04:09
24   a different set of physician offices.          11:04:11
25 Q. Is it your sense that one set of data would          11:04:14

419

1    be any more reliable than the other set?          11:04:16
2  A. I believe they're both large data sets that          11:04:19
3    are widely used, but I haven't evaluated          11:04:24
4    whether one is better than the other yet.          11:04:27
5  Q. How would you envision using these three          11:04:28
6    different data sets in your work?          11:04:40
7  A. Well, I guess, again, I would sort of          11:04:42
8    evaluate first which database offered the          11:04:45
9    largest samples, the most detailed breakout          11:04:50
10   by diagnosis, for example, assuming they're          11:04:54
11   not all identical, and then primarily we          11:04:57
12   would likely look at monthly units of          11:05:01
13   Neurontin by diagnosis, potentially by          11:05:06
14   dosing, by NDC code.          11:05:10
15 Q. When you say "potentially by dosing," what          11:05:14
16   do you mean by "potentially"?          11:05:18
17 A. Well, it's not clear to me at this point          11:05:18
18   whether we roll up dosages or break them          11:05:21
19   out separately and estimate separate models          11:05:24
20   for each of them.          11:05:26
21 Q. When you say "roll up dosages," you mean?          11:05:30
22 A. Essentially add together extended units for          11:05:32
23   each dose.          11:05:35
24 Q. At this point do you envision that you          11:05:37
25   would need all three, or do you imagine          11:05:49

420

1    that they would be to some degree or          11:05:50
2    another redundant?          11:05:54
3  A. I guess at this point I would imagine, in          11:05:55
4    all likelihood, using more than one, given          11:06:01
5    that they're available, perhaps confirming          11:06:04
6    results with one or another. I'm not          11:06:06
7    entirely sure, if one were to prove really          11:06:09
8    superior to the others, then I would likely          11:06:11
9    only use one. But if there were different          11:06:13
10   strengths and weaknesses, I might          11:06:16
11   triangulate results with two.          11:06:18
12 Q. How would you determine whether one data          11:06:19
13   set's superior to another?          11:06:22
14 A. Well, largely having to do with the sample          11:06:23
15   size and the ability to break out these          11:06:25
16   diagnoses.          11:06:32
17 Q. I take it that that's not work that you've          11:06:32
18   done yet, looking into the different sample          11:06:38
19   sizes for each of these three data sets?          11:06:40
20 A. There was a little bit of that in my          11:06:42
21   response to Dr. Argenbright, as you may          11:06:45
22   recall in that report.          11:06:48
23 Q. Aside from what's set forth in your          11:06:52
24   declaration, have you done any analysis at          11:06:57
25   this point about the sample size through          11:06:59

28 (Pages 417 to 420)

M. ROSENTHAL

421

1 competing possibilities? 11:07:01
2 A. I have a general sense from having used 11:07:03
3 these data before that the NDTI has a 11:07:06
4 bigger sample size, for example, than the 11:07:10
5 NAMCS, but, again, I have not used the 11:07:12
6 Verispan data, so I don't know precisely 11:07:14
7 what their sample is. 11:07:16
8 Q. Have you done any work to date on the 11:07:20
9 relative strengths and weaknesses of the 11:07:24
10 different data sets in breaking 11:07:27
11 prescriptions out by indication? 11:07:30
12 A. Today I have not, no. 11:07:33
13 Q. Why not? 11:07:34
14 A. Because I -- what I viewed as my task with 11:07:34
15 regards to the data, this report was to 11:07:41
16 identify a number of data sets that would 11:07:45
17 provide plausible sources of information 11:07:46
18 for breaking out use by diagnosis, and it 11:07:48
19 appears that both the NDTI and the NAMCS 11:07:53
20 have those data, and at the time that I 11:07:57
21 must actually do the analysis decide which 11:08:00
22 of those is more appropriate. 11:08:02
23 Q. Do you have to decide based on what further 11:08:04
24 inquiry of NDTI or NAMCS? 11:08:14
25 A. And no doubt the literature as well. 11:08:17

422

1 Q. But there's no reason why you couldn't have 11:08:19
2 conducted that analysis at this stage? 11:08:22
3 A. And I made preliminary investigations into 11:08:23
4 the characteristics of these data sets that 11:08:27
5 I found sufficient to draw my conclusion 11:08:29
6 that the data would be available for the 11:08:30
7 analysis. 11:08:31
8 Q. All of these data sets are derived from 11:08:35
9 samples, correct? 11:08:37
10 A. Yes, that's true. 11:08:38
11 Q. And so there will be some amount of 11:08:41
12 inaccuracy that will be built into the 11:08:44
13 data? 11:08:45
14 A. There is what's termed sampling error in 11:08:46
15 every sample-based estimate. 11:08:49
16 Q. Here's another general question about the 11:08:52
17 data: I'm assuming that the patient 11:08:56
18 information in each of these data sets is 11:08:59
19 ultimately confidential? 11:09:00
20 A. When you say "patient information," do you 11:09:03
21 mean Mrs. Jones, her insurance number, that 11:09:07
22 kind of patient information? 11:09:09
23 Q. I guess the ultimate question that I'm 11:09:10
24 getting at is, none of these data would 11:09:12
25 enable you to determine the diagnosis 11:09:15

423

1 associated with any given identifiable 11:09:20
2 patient's prescription; is that correct? 11:09:22
3 A. Can I -- may I restate that -- 11:09:24
4 Q. Sure. 11:09:28
5 A. -- just to make sure I understand it? I 11:09:28
6 can't use these data to then link back to 11:09:30
7 an individual patient? 11:09:32
8 Q. Precisely. 11:09:35
9 A. Yes, that's true. 11:09:36
10 Q. And so that the data that you would 11:09:39
11 collect, of course, would be used only in 11:09:41
12 the aggregate analysis that we've been 11:09:43
13 talking about for the past day and a bit? 11:09:44
14 A. That's correct. 11:09:46
15 Q. Okay. And then it wouldn't be appropriate 11:09:46
16 for any sort of patient-by-patient 11:09:49
17 analysis? 11:09:50
18 A. Again, when you say "patient-by-patient," 11:09:51
19 you mean really a specific patient -- 11:09:54
20 Q. Sure. 11:09:57
21 A. -- as opposed to you could do a patient 11:09:57
22 level analysis, but that's not identifying 11:09:59
23 a specific patient. 11:10:00
24 Q. What do you mean by "a patient level 11:10:02
25 analysis," what you just said? 11:10:03

424

1 A. For example, you could imagine running a 11:10:05
2 logistic regression, a model looking at the 11:10:09
3 probability that an individual receives a 11:10:12
4 prescription for Neurontin as a function of 11:10:14
5 the variables in the NAMCS, for example, 11:10:18
6 private insurance coverage, for example. 11:10:22
7 That would be a patient level analysis, but 11:10:26
8 you still don't identify Mrs. Jones. 11:10:28
9 Q. Right. Right. Okay. Let's talk about -- 11:10:29
10 let me go back to your last answer. Can 11:10:45
11 you do what you just described in your last 11:10:47
12 answer with the NDTI data set? 11:10:48
13 A. I am not certain at what level of detail -- 11:10:50
14 again, since I don't have the raw data 11:10:55
15 themselves, I'm not certain what level of 11:10:57
16 detail is available in the NDTI, that NAMCS 11:10:59
17 is a patient level, it's a visit level 11:11:01
18 database. I understand the NDTI is 11:11:06
19 structured and sampled in a similar way, so 11:11:08
20 it may be possible to. 11:11:09
21 Q. But you don't know, as we sit here today, 11:11:10
22 whether you could go back to individual 11:11:12
23 patient records in the NDTI database? 11:11:14
24 A. I do not, as we sit here today. 11:11:16
25 Q. Let's talk about the NAMCS database for a 11:11:21

29 (Pages 421 to 424)