# EXHIBIT 17

```
                                                                    1
 1             IN THE UNITED STATES DISTRICT COURT

 2             FOR THE DISTRICT OF MASSACHUSETTS

 3

 4                  MDL DOCKET NO. 1629

 5                  MASTER FILE NO. 04-10981

 6

 7    IN RE:  NEURONTIN MARKETING, SALES       )

 8    PRACTICES, AND PRODUCTS LIABILITY        )

 9    LITIGATION                               )

10    ---------------------------------------- -

11    THIS DOCUMENT RELATES TO:                )

12    ALL ACTIONS                              )

13

14

15              Videotaped Deposition of RAYMOND S.

16    HARTMAN, taken before GREG S. WEILAND, CSR, RMR,

17    CRR, Notary Public, pursuant to the Federal Rules of

18    Civil Procedure for the United States District Court

19    pertaining to the taking of depositions, at

20    Suite 3800, One South Dearborn Street, in the City

21    of Chicago, Cook County, Illinois, commencing at

22    9:19 o'clock a.m., on the 13th day of December,

23    2006.

24
```

Page 2

```
 1  PRESENT:
 2  HAGENS BERMAN SOBOL SHAPIRO LLP
 3  One Main Street
 4  Fourth Floor
 5  Cambridge, Massachusetts 02142
 6  (617) 482-3700
 7  BY: MR. GREGORY H. MATTHEWS
 8  E-mail: gregm@hbsslaw.com
 9       On behalf of the Class
10       Plaintiffs;
11
12  DAVIS, POLK & WARDWELL
13  450 Lexington Avenue
14  New York, New York 10017
15  (212) 450-4000
16  BY: MR. EDMUND POLUBINSKI, III and
17      MR. PAUL MISHKIN
18  E-mail: edmund.polubinski@dpw.com
19       paul.mishkin@davispolk.com
20       On behalf of Defendants;
21
22
23
24
```

Page 3

```
 1  PRESENT (CONTINUED):
 2  SHOOK, HARDY & BACON, L.L.P.
 3  2555 Grand Boulevard
 4  Kansas City, Missouri 64108-2613
 5  (816) 474-6550
 6  BY: MR. JAMES P. MUEHLBERGER
 7  E-mail: jmuehlberger@shb.com
 8       On behalf of the Defendants.
 9
10  ALSO PRESENT:
11  MR. NICK PAGE, The Videographer;
12  MR. RAHUL GUHA, Ph.D., Cornerstone Research.
13
```

Page 4

```
 1       THE VIDEOGRAPHER: This is Nick Page in
 2  association with Veritext Reporting Services. I'm
 3  the operator of this camera.
 4       This deposition of Dr. Raymond Hartman is
 5  being taken at One South Dearborn, Chicago,
 6  Illinois, on December 13th, 2006, at 9:20 a.m., as
 7  indicated on the video screen.
 8       The case is captioned In Re Neurontin
 9  Marketing and Sales Practices Litigation, Master
10  File Number 04-10981.
11       Will the attorneys please identify
12  themselves for the video record.
13       MR. POLUBINSKI: Ted Polubinski from
14  Davis Polk for the Defendants.
15       MR. MISHKIN: Paul Mishkin from Davis Polk
16  for the Defendants.
17       MR. GUHA: Rahul Guha for Cornerstone
18  Research.
19       MR. MUEHLBERGER: Jim Muehlberger,
20  Shook Hardy, for the Defendants.
21       MR. MATTHEWS: Greg Matthews.
22  Hagens Berman Sobol Shapiro, for the Plaintiffs.
23       THE VIDEOGRAPHER: And will the court
24  reporter please identify himself and swear in the
```

Page 5

```
 1  witness.
 2       THE COURT REPORTER: My name is
 3  Greg Weiland. I'm a court reporter in Chicago,
 4  Illinois.
 5       (Witness sworn.)
 6       RAYMOND S. HARTMAN
 7  after being first duly sworn, testified as follows:
 8       EXAMINATION
 9  BY MR. POLUBINSKI:
10  Q.  Good morning.
11  A.  Good morning.
12  Q.  Would you please state your full name.
13  A.  Raymond S. Hartman.
14  Q.  And what's your business address,
15  Dr. Hartman?
16  A.  It is One Memorial Drive, Suite 1410,
17  Cambridge, Massachusetts 0246 -- 02420.
18  Q.  You prepared a declaration in this case in
19  support of plaintiffs' motion for class
20  certification, correct?
21  A.  I did.
22       (Hartman Exhibit 1 marked as
23        requested.)
24
```

2 (Pages 2 to 5)

6

BY MR. POLUBINSKI:
1
2    Q.  I'm going to hand you now a document that
3 we have premarked as Hartman Exhibit 1. I ask you
4 to take a look at the document.
5    A.  I have looked at it up to at least the
6 attachments, and it looks like my declaration.
7    Q.  Terrific. When we talk about this, I'll
8 refer to it as your declaration. I may also refer
9 to it sometimes as your report. If we can agree
10 that I'm talking about the same thing in both cases,
11 Exhibit 1, that might make things smoother.
12        Does that work for you?
13    A.  That works for me.
14    Q.  Terrific. Can you turn, please, to
15 Page 12 of Exhibit 1.
16        This is your signature on Page 12,
17 correct?
18    A.  It is.
19    Q.  And the date above your signature is
20 August 8th, 2005, correct?
21    A.  That's correct.
22    Q.  Which is the date on which you signed the
23 declaration?
24    A.  I would assume so.

7

1    Q.  This report, Exhibit 1, I assume contains
2 an accurate summary of your opinions in this matter;
3 is that correct?
4    A.  As of that date, that's correct.
5    Q.  Are there opinions that you intend to
6 offer at this stage that are not covered in the
7 declaration?
8    A.  I have not been asked to to date, so I
9 don't know.
10    Q.  Do you have any expectation that you will
11 be asked to supplement these opinions prior to the
12 court's decision on class certification?
13    A.  I have no idea one way or the other. No
14 one has spoken to me about that.
15    Q.  You've testified under oath before,
16 correct?
17    A.  I have.
18    Q.  Both at deposition and at trial?
19    A.  That's correct.
20    Q.  How many times?
21    A.  God, at deposition, in excess of 40 times
22 I would think. At trial, in excess of 20 times, 15,
23 20 times.
24    Q.  And you've testified on a number of these

8

1 occasions as a retained expert witness; is that
2 correct?
3    A.  That's correct.
4    Q.  Let's look at Attachment A to your
5 declaration.
6        Attachment A is your curriculum vitae,
7 correct?
8    A.  It is.
9    Q.  Can you please turn to the last two pages
10 of your CV. The first of these pages has the
11 following heading: Recent Testimony of Raymond
12 Hartman at Deposition, Hearing or Trial.
13    A.  Yes.
14    Q.  Are you with me yet?
15    A.  I am.
16    Q.  Okay. Are all of the occasions since 1995
17 when you've testified as a retained expert at a
18 deposition, hearing or trial identified in these
19 pages?
20    A.  I would -- you know, through 2005, through
21 the time in which this was filed, I assume they are
22 accurate. There's -- you know, there may be a few
23 that I've missed, but I think they're accurate
24 through 2005.

9

1    Q.  Okay. Since the time you signed the
2 declaration, are there other cases that you would
3 add to this list?
4    A.  I have -- let's see. So this is at
5 deposition or at trial.
6    Q.  Let me ask it this way.
7        Since that time, you've testified in the
8 AWP case again, is that correct, which is I think
9 the last -- it's not the last case. It's the last
10 case that's mentioned under 2004.
11    A.  I have testified in several at deposition
12 and at trial as a witness for the defendant in
13 several nuclear power cases that were analogous to
14 the In Re Tennessee Valley Authority case listed,
15 the last case on the -- unfortunately it's not
16 paginated here, but the last page of the cases.
17 Once was at trial, several depositions.
18        I have testified in deposition and at
19 trial in the AWP matter.
20        Have I done anything else? 2005 seems
21 like an eternity ago.
22        I would think that there have been a few
23 others at deposition, but it's -- I'd have to go
24 back and really check, and I could provide that for

10

1 you if you like.
2  Q. Let me ask you just quickly about the
3 Tennessee Valley Authority cases.
4      What's the general subject matter of those
5 matters?
6  A. The general subject matter of those, a
7 breach of a standard contract to remove nuclear
8 waste from the various nuclear generation sites
9 across the country, contracts that were entered into
10 by the USDOE with those utilities. So they're all
11 pretty much similar. It's what are the damages that
12 have arisen as a result of the breach of that
13 contract.
14  Q. Which is to say that your testimony in
15 those cases is about damages in those cases?
16  A. It's measuring -- it's analyzing the
17 operations of nuclear power plants and in actual and
18 but-for worlds and calculating actual and but-for
19 nuclear waste discharges in order to come up with
20 some measure of damages that have arisen as a result
21 of the alleged breach of contract.
22  Q. Okay. Let me also just quickly ask you
23 about your testimony in the AWP case.
24      Is your testimony at trial there complete?

11

1  A. It is not.
2  Q. Do you anticipate testifying again? I
3 gather you do.
4  A. I'm scheduled to testify Monday again.
5  Q. Okay. Have you yourself ever been a party
6 to a lawsuit?
7  A. No.
8  Q. And you've never yourself therefore been a
9 putative class plaintiff in a case?
10  A. No.
11  Q. Okay.
12  A. Well, I mean, you know, obviously as an
13 investor in mutual funds, I get these mailings from
14 various people that say if you've bought this stock
15 over a period of time you're a member of a class,
16 and I probably on some of those I've returned some
17 of those and some of them I haven't, so if that
18 would make me a member of the class, then I would be
19 a member of the class.
20  Q. Right. My question was actually
21 imprecise. Thank you for clarifying. I think I
22 meant to say a putative lead plaintiff in a class
23 action.
24  A. No.

12

1  Q. Could you please give me your educational
2 background starting with college?
3  A. I graduated -- I went to Princeton
4 University 1965 to 1969, graduating magna cum laude.
5 I went to MIT starting in 1969 and left in 1970-71
6 with a Master's Degree, thinking I was going to go
7 to Yale Law School that had accepted me. Then I
8 decided not to be a lawyer and I went back to MIT
9 and finished my Ph.D. in 1977.
10  Q. What was the subject of your Master's?
11  A. The subject of my Master's paper was
12 banking practices. If I can recall properly, it had
13 to do with banking practices in Japan.
14  Q. Right. But in terms of the just general,
15 the department in which you earned your Master's and
16 your Ph.D. at MIT, which department was that?
17  A. Department of Economics.
18  Q. Okay. You don't have a medical degree; is
19 that right?
20  A. That's correct.
21  Q. And you haven't attended medical school,
22 even though you almost attended law school?
23  A. No, I never even applied to medical
24 school.

13

1  Q. Okay. And you haven't done any course
2 work in medicine either?
3  A. No.
4  Q. And I assume you also don't have a degree
5 in pharmacology?
6  A. That's correct.
7  Q. Have you taken any courses in
8 pharmacology?
9  A. No.
10  Q. And I gather you never decided to go back
11 and get a law degree after having earned your Ph.D.?
12  A. I was tempted, but I did not, no.
13  Q. Okay. Have you ever taken any courses in
14 law?
15  A. I've taught in the program of law and
16 economics at the University of California in the law
17 school and for as a visiting associate professor,
18 and so, you know, as part of doing that, I sit in on
19 courses, I've worked with lawyers in terms of
20 research papers.
21      But in terms of taking a formal
22 matriculating or taking courses and taking the
23 exams, no.
24  Q. Do you have any professional degrees or

**Page 14**

1 licenses?
2   A.  Outside of my Ph.D.?
3   Q.  Yes.
4   A.  No.
5   Q.  And so you're not licensed to practice
6 medicine, of course?
7   A.  Of course.
8   Q.  Or -- withdrawn.
9       You're also not licensed to prescribe
10 medication; is that right?
11  A.  That's correct.
12  Q.  What experience do you have, if any, in
13 the actual prescription writing process?
14  A.  In the prescription writing process or
15 about the prescription writing process?
16  Q.  Well, I'd asked in the prescription
17 writing process, but if there's a clarification that
18 you need, you know, let me know.
19  A.  Well, certainly in studying how
20 competition occurs in this market and how generic
21 competition occurs, one looks at mandatory
22 substitution laws, antisubstitution laws, how
23 prescriptions are written to prevent substitution
24 and those types of things where there's designations

**Page 15**

1 of dispenses written, and so descriptive, I have a
2 descriptive understanding of how it is, and I've
3 seen a doctor write a prescription, but beyond that,
4 I'm not quite sure what you're asking.
5   Q.  Okay.  That's fine.  That's fine.
6       You're familiar with the term third-party
7 payor as it's used in plaintiffs' complaint in this
8 case, correct?
9   A.  I am.
10  Q.  Have you ever done any work for an entity
11 that would qualify as a member of plaintiffs'
12 third-party payor subclass?
13  A.  Have I ever done any work for a member of
14 the third-party payor subclass in any of the
15 litigation in which I've been involved?
16  Q.  Let's not limit it to litigation.
17      Have you ever done any work for, directly
18 for a member of the third-party payor subclass?
19  A.  Of the third-party payor subclass in this
20 matter?
21  Q.  That's right.
22  A.  Certainly in the number of the matters in
23 which I've been retained in the indirect purchaser
24 cases, named plaintiffs were third-party payors, so

**Page 16**

1 I was retained by those third-party payors in those
2 matters.
3       In terms of a retention by a third-party
4 payor to do strategic analysis or any kind of
5 marketing analysis, I don't recall now.  I've done a
6 lot of strategic work in econometric and statistical
7 work over the last 30 or 40 years for a lot of
8 different companies.  I don't recall at the moment
9 whether it involved insurance companies.
10  Q.  But to the best of your recollection, the
11 work that you've done at this point for third-party
12 payors or members of the third-party payor subclass
13 would be litigation-related work?
14  A.  To the best -- that's right.
15  Q.  So I assume you haven't had -- you haven't
16 done any work that would involve -- I'll withdraw
17 the question.
18      You're familiar with the term
19 Pharmaceutical Benefit Manager, correct?
20  A.  I am.
21  Q.  And if I call or if I refer to
22 Pharmaceutical Benefit Managers as PBMs, you'll know
23 what I'm talking about, I assume?
24  A.  I will.

**Page 17**

1   Q.  Good.  Have you ever done any work for a
2 PBM before?
3   A.  Directly, not that I recall.
4   Q.  Have you ever worked in any capacity for
5 any government entity that would have any direct
6 involvement in pharmaceutical reimbursement under
7 federal or state laws?
8   A.  Meaning an agency like CMS or HCFA, in
9 that capacity?
10  Q.  Those would be examples, yes.
11  A.  I've studied them in great detail, but
12 I've not worked for them specifically.
13  Q.  Do you have any direct experience in the
14 pharmaceutical reimbursement process aside from your
15 consulting work or testifying work?
16  A.  Well, I've -- in the process of the work
17 that I've done beginning with -- probably my first
18 real retention in the pharmaceutical industry was in
19 the brand name prescription drug litigation where I
20 consulted for the wholesale, wholesaler defendants.
21      Since that work, I've been working in this
22 industry almost nonstop, so I'm very familiar with
23 how claims are written, how they're paid, how the
24 process works.  I've reviewed probably summaries of

18

1 millions of claims and looking at the electronic
2 rollouts of claims that have been paid by PBMs and
3 paid by third-party payors, paid by the government,
4 so I've certainly seen the kind of information and
5 look at the financials of wholesalers, PBMs,
6 third-party payors. I've done it as a client, as
7 being retained by them, but I've looked at how that
8 process works and familiar with it.
9    Q. Fair enough. The work that you've done I
10 guess could probably be described as after-the-fact
11 analysis of prescription reimbursement as opposed to
12 actual participation in the process?
13    A. Well, I've not paid claims or been part of
14 the paying of claims or worked for a third-party
15 payor or for a PBM, so that's correct.
16    Q. Okay. And you've never worked directly or
17 indirectly for the FDA; is that right?
18    A. That's correct.
19    Q. Have you ever taken Neurontin?
20    A. I have.
21    Q. For what condition?
22    A. For a chronic pain condition. It was
23 prescribed.
24    Q. When did you take the drug?

19

1    A. There was a period of time starting a
2 number of years ago.
3    Q. How long was the period of time?
4    A. It continues.
5    Q. So you're taking Neurontin currently?
6    A. While I'm sitting here I'm on Neurontin.
7    Q. So how long in the aggregate have you been
8 taking Neurontin?
9    A. Several years.
10    Q. I assume that since you've continued to
11 take it for several years that it's been effective
12 for you?
13    A. Well, I'm taking it with a mix. I've had
14 a chronic pain problem for 20 years, and I've
15 been -- tried different medications to help with it,
16 and I've gone on and off medications, and so there's
17 a mix of medication that's being tried now, and the
18 mix is effective. I'm not sure which is the
19 effective part of it, but ...
20    Q. Okay. But Neurontin is part of that mix?
21    A. That's correct.
22    Q. If you didn't think it was effective,
23 would you have told your doctor that you didn't want
24 to keep taking the drug?

20

1    A. Well, my doctor and I have discussed --
2 I've gone off, I've gone on, and with different
3 other medications, and it's a continual balancing
4 act.
5    Q. You're aware, I assume, from your work in
6 this case that your prescription for Neurontin is
7 off-label?
8    A. I am.
9    Q. One last question on it.
10    Do you pay for your Neurontin prescription
11 yourself, or is it paid for by an insurance plan of
12 some kind?
13    A. It's paid for by a third-party payor and a
14 copay by myself obviously.
15    Q. So you're a member of the individual
16 consumer subclass in this case; is that correct?
17    A. I guess I am.
18    Q. And so if there were a recovery in this
19 case, you would be entitled to receive some amount
20 of damages?
21    A. I guess that's true.
22    Q. Have you given any thought to what the
23 amount of damages would be that you would recover if
24 plaintiffs were successful in this case personally?

21

1    A. My guess would be, as with most of these
2 class action matters in which I receive mailings, I
3 would receive -- I would receive nothing since I
4 wouldn't pay attention to the mailings. But if
5 it --
6    Q. Did you testify that in some cases maybe
7 you did send -- maybe you didn't.
8    A. I think in some cases I did and in some --
9 but that was when I was a younger man and I thought
10 there was some benefit to doing so.
11    Q. Do you now think there isn't a benefit of
12 doing so?
13    A. No, I've thought that the opportunity cost
14 of taking the time to do it is more than the
15 recovery for me individually.
16    So it's -- so, you know, the copays, you
17 know, they would amount to in the hundreds of
18 dollars I would assume over time.
19    Q. What's the -- well, withdrawn.
20    Do you have any understanding for the
21 reasons that your doctor prescribed you Neurontin as
22 part of the mix of medications that you've been
23 taking?
24    MR. MATTHEWS: Objection.

**Page 22**

```
 1        THE WITNESS: The -- as -- over time,
 2   there have been a number of drugs that were -- that
 3   we've tried, and so it was just one that it came to
 4   his attention, and whether it was through a peer
 5   champion or whatever promotional device, it came to
 6   his attention and he tried it.
 7   BY MR. POLUBINSKI:
 8       Q. Do you know if your doctor is aware of
 9   this litigation?
10       A. He is.
11       Q. Have you discussed it with him?
12       A. I mentioned it to him.
13       Q. What was his reaction?
14       A. He said oh, that's interesting.
15       Q. Did you discuss it further?
16       A. Not really. It's -- I mean, he -- there
17   wasn't much more to say, except the question from
18   Cornerstone. There wasn't much more to say than I
19   said oh, incidentally, there are these allegations,
20   and he said oh, that's interesting.
21       Q. That was the end of your conversation on
22   the subject of the litigation?
23       A. Yeah. There wasn't much more that could
24   be said. I mean, he --
```

**Page 23**

```
 1       Q. Was there any more that was said I guess
 2   is the question.
 3       A. No. You know, I said how did he become
 4   aware of it because I was curious, and I think he
 5   didn't recall, and that was it.
 6       Q. Is he aware that you're doing work in the
 7   litigation?
 8       A. Yeah, since we discussed it.
 9       Q. So that was one of the other things that
10   you discussed was that you were working with the
11   plaintiffs in the matter?
12       A. Yeah.
13       Q. Okay. Did you discuss the subject of your
14   testimony with him?
15       A. No. I just said I was involved in
16   litigation. I mean, the subject was Neurontin,
17   so ...
18       Q. Okay. What is Greylock McKinnon
19   Associates?
20       A. It's a litigation support firm, not unlike
21   Cornerstone Associates.
22       Q. What's your position there?
23       A. I'm the president and director.
24       Q. How many employees does it have in total?
```

**Page 24**

```
 1       A. We must have 15, 20 employees.
 2       Q. Is Greylock McKinnon a private corporation
 3   or a private entity --
 4       A. It is.
 5       Q. -- or is it publicly-traded?
 6       A. It's private.
 7       Q. Who owns Greylock McKinnon?
 8       A. There are several shareholders, myself and
 9   several -- and one other person.
10       Q. Is the other person an employee at
11   Greylock McKinnon as well?
12       A. Yeah.
13       Q. Who is it?
14       A. Renee Rushnawitz.
15       Q. Proportionally, approximately, how much of
16   Greylock McKinnon do you own versus Ms. Rushnawitz?
17       A. I own more than she does.
18       Q. How much more?
19       A. It's -- why is that relevant?
20       Q. I think I get to ask you the questions.
21       A. It's more than Mama Hartman ever told me
22   I'd own in a company.
23       Q. How old a firm is it?
24       A. It's probably about 10, 12 years old,
```

**Page 25**

```
 1   maybe older.
 2       Q. Is it a partnership?
 3       A. It's a C-corp.
 4       Q. Okay. In your declaration, Exhibit 1, you
 5   described Greylock McKinnon in Paragraph 1 as a
 6   consulting and litigation support firm; is that
 7   correct?
 8       A. That's correct.
 9       Q. What portion of your work personally is
10   devoted to litigation support as described in your
11   declaration, either in a consulting or testifying
12   capacity?
13       A. It depends on the time frame. There have
14   been times when most of it is consulting. There has
15   been times when most of it is litigation. It's
16   usually a mix.
17           I would say over the last five years it's
18   been mostly litigation.
19       Q. Other than litigation, what else do you
20   personally do at GMA?
21           And by the way, if I refer to it as GMA, I
22   assume that you'll understand that I mean
23   Greylock McKinnon Associates.
24       A. I will so assume.
```

26

1  What other work do I do?
2  Q.  Yes, other than litigation support.
3  A.  You mean in terms of professional work?
4  Q.  Yes.
5  A.  I do research for, say, for the World Bank
6  in terms of development projects, or there's a
7  variety of projects that are listed in my CV where
8  I've been asked to evaluate regulatory systems for
9  countries in Asia and Thailand or Indonesia,
10 restructuring their electric power industry. So
11 it's been regulatory types of restructuring efforts
12 aimed at improving electric power, several industry,
13 industrial areas or infrastructure. That's one
14 area.
15      Why don't I look at my CV and I'll -- I've
16 done a variety of consultations to public utility
17 commissions and rate base hearing types of settings
18 where they're interested in coming up with some
19 measures of productivity and yardsticks for
20 productivity. There have been rate for utilities
21 rate setting, price setting for residential,
22 commercial, industrial market segments.
23      So there's that type of strategic
24 analysis, pricing analysis for certain firms, market

27

1  analyses, competitive analyses.
2  Q.  Relatively speaking, what portion of the
3  firm's work as opposed to your work personally is
4  devoted to litigation support?
5  A.  Probably most of the firm's work is,
6  85 percent is litigation-related.
7  Q.  And approximately what portion,
8  approximately, of the firm's revenue is derived from
9  litigation support?
10 A.  Well, I would think about the same.
11 Q.  How are you compensated by
12 Greylock McKinnon?
13 A.  I'm compensated as -- on an hourly basis
14 as a --
15 Q.  So it's not a fixed salary, it's an hourly
16 rate essentially?
17 A.  That's correct, that's correct.
18 Q.  And so your received compensation, it's a
19 direct reflection to the number of hours that you
20 spend working on individual projects?
21 A.  As do you, that's correct.
22 Q.  I think you may be assuming too much about
23 how I'm compensated.
24 A.  Okay. Well, as I may think that you're

28

1  compensated.
2  Q.  All right. Do you receive any sort of,
3  any sort of fixed compensation separate from the
4  hourly rate that you're compensated for?
5  A.  I have a -- there's a fixed compensation
6  for running the firm, and so that -- that part is
7  fixed.
8  Q.  Okay. Do you receive any sort of bonus
9  that's not directly tied to the number of hours that
10 you spend working on a particular project?
11 A.  There -- I receive no bonus. There's not
12 a bonus that I get.
13 Q.  Okay. Are you employed by any entity
14 other than Greylock McKinnon?
15 A.  I have been over time, and the last year I
16 haven't been, but I have been over time.
17 Q.  Within, say, the past three years have you
18 been?
19 A.  I was retained by CapAnalysis and the law
20 firm with whom they are connected, the name of which
21 I forget at the moment. You probably know. It was
22 where the --
23 Q.  Again, you're assuming too much about my
24 knowledge or other things.

29

1  A.  It's the law firm that in the -- that was
2  the scene of the Julia Roberts movie, I forget, the
3  Pelican Brief in Washington. What's the -- I can't
4  remember it now. I don't remember the names of law
5  firms.
6      In any case, I do get asked to be an
7  expert by other law firms and use their staffs and
8  their related economic litigation support group, so
9  I do do that when it arises.
10 Q.  And do you not -- when you do that, do you
11 do it through Greylock McKinnon or do you do it
12 separate from?
13 A.  Separate from.
14 Q.  And you're compensated directly in those
15 cases by the firm as opposed to Greylock McKinnon
16 being compensated and presumably passing along some
17 percentage of the fee that they're paid?
18 A.  That's correct. I'm paid on an hourly
19 basis by those firms.
20 Q.  Okay. Is the understanding that I just
21 tried to describe of how you're paid by
22 Greylock McKinnon correct? So in other words, do
23 you receive some percentage of the fee that's paid
24 to Greylock McKinnon for the work that you do?

30

1  A. The -- any of the -- we have a number --
2 I'm paid precisely as all of our academic affiliates
3 are paid. We have a variety of academic affiliates
4 at Harvard and MIT and other universities, and there
5 is -- and the compensation is much like any other
6 litigation support firm based on hours and then a
7 credit for sales. There's some amount that's
8 related to the level of work that's created for the
9 firm that is formulaically determined as a payment.
10  Q. So the credit for sales that you just
11 described is something that's in addition to, you
12 know, whatever portion of the hourly rate that you
13 charge in a case?
14  A. That's right.
15  Q. How many litigation matters are active at
16 Greylock McKinnon right now?
17  A. With all of the academic affiliates
18 associated with Greylock McKinnon, I'd say 50 maybe.
19  Q. What percentage of those are you involved
20 in?
21  A. Please define the notion of involvement.
22 I mean, did I spend even an hour on or ones that I'm
23 involved with where I'm very -- I'm actively
24 involved with and I'm connected with writing the

31

1 declarations, participating with clients, and rather
2 than reviewing another affiliate's work and saying,
3 you know, saying someone wants some comments and
4 thinking about a problem and I might give them an
5 hour or two?
6  Q. For the sake of completeness, why don't we
7 do both. In other words, both the ones that you've
8 billed some amount of time to and the ones that you
9 are more involved in in the way that you just
10 described.
11  A. I would say I'm probably involved in
12 anywhere from 15 to 20 overall and then actively in
13 maybe at any point in time 5 to 8 maybe.
14  Q. Do you receive the credit for sales that
15 you just described for all of the 15 or 20 with
16 which you're involved?
17  A. No.
18  Q. Do you receive the credit for sales that
19 you've just described for all of the five to eight
20 in which you're substantially involved?
21  A. Depending if I'm the person who sold them.
22 If it was a sale, if it involved several affiliates
23 or experts leading to that retention, not unlike all
24 the litigation support firms in which I've worked,

32

1 there's a formula for sharing that sales credit.
2  Q. Of the five or eight that you mentioned
3 numbers-wise, how many would be ones for which you
4 receive a credit for sales?
5  A. For sales entirely or a portion?
6  Q. Let's do both.
7  A. Well, certainly the pharmaceutical cases,
8 since a lot of those are done with faculty at the
9 Harvard School of Public Health and the retention
10 has come based on a number of those people either
11 being involved or leading to the retention, it's
12 shared. Say the work I'm doing for the DOJ, that's
13 entirely my own sale, and so that's not shared.
14  Q. Okay. And again, do you receive some
15 credit for sales in each of the five or eight for
16 which you're substantially involved now?
17  A. Yeah, some on the ones that are shared and
18 then all the sales credit is due entirely to me if
19 I've been the person that sold it and it was sold
20 entirely at my effort and my work with that client.
21  Q. What about this litigation?
22  A. I don't recall on this litigation whether
23 this is shared or -- I think -- I have to check.
24  Q. You receive some portion of the credit for

33

1 sales in this litigation though I assume, correct?
2  A. That's correct.
3  Q. In the case of this litigation, how is
4 that credit for sales derived, I mean in other words
5 numerically?
6  A. There's an amount of dollars related to
7 the sales of the staff that support the experts, and
8 that percent and that amount, those dollars are
9 split in percentages, predetermined percentages
10 depending on the contribution toward selling that
11 case.
12  Q. In this case, what's the predetermined
13 percentage?
14  A. The predetermined percentage overall for
15 the back office --
16  Q. Sure.
17  A. -- for the staff?
18     I think it's 15 percent, but I'd have to
19 check.
20  Q. Do any of the other matters at
21 Greylock McKinnon besides this current one touch on
22 the off-label use of prescription drugs?
23  A. I think there are other matters ongoing,
24 but this is the -- I mean, there's the affiliated

**Page 34**

1 matter of Neurontin in Pennsylvania, and I don't
2 know if that's -- I mean, that's another matter
3 which I'm sure you'll want to discuss.
4     I'm not -- for some reason I think there
5 are some, another off-label case going on, but I
6 don't -- I'm not working on it. I think I've heard
7 that.
8  Q. Okay.
9  A. But that could be wrong.
10 Q. When were you retained in this case?
11 A. I would assume, given that the signature
12 date is August 8th, sometime in the early winter
13 of 2005, I would assume.
14    MR. POLUBINSKI: Okay. Let's mark the
15 next exhibit.
16     (Hartman Exhibit 2 marked as
17     requested.)
18 BY MR. POLUBINSKI:
19 Q. The court reporter has just handed you
20 what we've marked as Hartman Exhibit Number 2.
21    Is this your retention agreement in this
22 matter?
23 A. It seems to be.
24 Q. Was it ever signed?

**Page 35**

1  A. I would have to ask my partner
2 Renee Rushnawitz. The conversations with
3 Hagens Berman about this case may have started
4 earlier and the formal retention letter may have
5 been written as of May 26th. I don't recall. And
6 I would assume it was signed, but I'm not sure.
7  Q. So you don't yourself have in your
8 possession a signed copy, I assume?
9  A. I don't. I mean, if the -- if you had
10 asked that from us, for the retention letter, and it
11 had been signed, I assume we would have sent you the
12 signed copy. So I guess it wasn't signed. It was
13 prepared and in the flurry of activity didn't get
14 signed.
15 Q. Is there any other agreement that you're
16 aware of that governs the provision of services in
17 this case by either you or Greylock McKinnon?
18 A. Not that I know of. And as a corporate
19 policy, there wouldn't be.
20 Q. Please describe your first contact with
21 plaintiffs' counsel in this case.
22 A. I -- my recollection with the case work
23 going on in a variety of matters, it's hard for me
24 to recall even August of 2006.

**Page 36**

1 My recollection is that we spoke sometime,
2 as I'd mentioned the retention was in the winter of
3 2005, so I think probably we'd started -- we were
4 told this was on the horizon at that point by
5 counsel at Hagens Berman, and then at some point
6 meetings were set up with other counsel. I think
7 Mr. Green was one of those lawyers, and I forget the
8 other people. And the issues were explored and
9 discussed.
10    And so that's my recollection.
11 Q. By looking at the third page of Exhibit 2,
12 your hourly rate there is reflected as $400 an hour;
13 is that correct?
14 A. That's correct.
15 Q. Is it still $400 an hour?
16 A. On this matter or generally?
17 Q. On this matter.
18 A. I don't know if I've done much work on
19 this matter since then. I mean, I will guess you'll
20 tell me whether I did. And I'm not sure whether it
21 is. We could have increased it. Sometimes we
22 grandfather rates in for certain cases.
23    My rate on new matters would be 450 an
24 hour. I don't know if we've done that, changed that

**Page 37**

1 or not.
2    MR. POLUBINSKI: We will mark the next
3 exhibit.
4    It's actually two exhibits that we will
5 mark.
6     (Hartman Exhibits 3 and 4 marked
7     as requested.)
8 BY MR. POLUBINSKI:
9  Q. All right. I've just handed you what
10 we've marked as Hartman Exhibits 3 and 4. We
11 received these invoices from plaintiffs' counsel in
12 response to our request for all invoices, and what
13 we've done here is put them in chronological order.
14 And the little number stamps you see at the bottom
15 right are ones that we've put on the documents just
16 for ease of reference since they weren't paginated.
17    And the reason that there are two of these
18 is that they were sent to us in two batches, one
19 last winter and one earlier in the fall.
20 A. Uh-huh.
21 Q. And it appears at least that your time
22 appears to have been billed on these invoices.
23 A. It does.
24 Q. Were you involved in the preparation of

**Page 38**

1 these invoices?
2   A.  I submitted time as I do every month, and
3 so the preparation would have been merely reporting
4 my time. But in terms of preparing the tabulation
5 of the invoices, the hours, when it occurred, that
6 was not part of -- I don't do that.
7   Q.  Are you aware of any other invoices that
8 have been submitted seeking payment for time that
9 you or others at Greylock McKinnon have spent in
10 connection with your work in this matter?
11   A.  I wouldn't be. I mean, I would assume if
12 you've requested them we've sent you everything
13 that's there, and I'm surprised to see a date in
14 2004. It's, you know, the one invoice in 2004 and
15 then as I see the follow-up is in what my
16 recollection was, that it was in the winter of 2005
17 that conversations got a little more serious.
18       So yeah, no, I think this must be
19 everything. We would have provided everything to
20 you.
21   Q.  Other than fees for services that you or
22 Greylock McKinnon employees will provide to the
23 plaintiffs on an hourly basis in this case, do you
24 expect that you or Greylock McKinnon will receive

**Page 39**

1 any other payment of any kind from plaintiffs or
2 from plaintiffs' counsel in connection with this
3 case?
4   A.  Other than expenses and travel, no.
5   Q.  And other than potentially at least
6 participation in any sort of class-wide damages
7 award?
8   A.  If I'm -- if I'm a member of that class
9 and -- are you talking about because I'm taking
10 Neurontin or more generally?
11   Q.  As a member of the class.
12   A.  As a member of the class, first of all, I
13 don't -- I guess I'm a potential member of the
14 class. Whether I've --
15   Q.  Fair enough.
16   A.  So yeah, should there be a settlement,
17 should I follow up and deal with whatever issues are
18 required, I may receive several hundred dollars.
19   Q.  Have you been retained by at least some of
20 the counsel for the plaintiffs in this case on other
21 occasions?
22   A.  I have.
23   Q.  Which counsel?
24   A.  Hagens, Berman, Sobol & Shapiro.

**Page 40**

1   Q.  Which case or cases?
2   A.  Well, a multiple number of cases. I will
3 refer to my CV because it helps jog my memory, but
4 the -- a group of colleagues and myself were
5 retained by -- I'm terrible at remembering the names
6 of law firms. Please take no offense. I know you
7 guys are Sidley & Austin. It was the lead counsel
8 on the tobacco litigation that involved the attorney
9 general of the State of Massachusetts, and at that
10 point -- oh, it was Brown Rudnick, and Tom Sobol was
11 a partner for Brown Rudnick, and we worked, there
12 must have been six or seven of us at Harvard that
13 worked with Brown Rudnick and Mr. Sobol.
14       And so at that point we started working
15 with Mr. Sobol. Mr. Sobol moved on to
16 Leif Cabreser, and there were a number of cases that
17 came through Leif Cabreser that involved a variety
18 of drugs, pharmaceutical Hatch-Waxman matters that
19 are listed on Page 21 of my CV starting at 2001 to
20 the present.
21       I would say between the tobacco litigation
22 in 1998 and 1999, which was with Mr. Sobol and
23 Brown Rudnick, the matters on the following pages
24 following Page 20, they did not involve present

**Page 41**

1 counsel as far as I can see.
2       And then on Page 21, in 2001 the Relafen
3 matter in that bullet 2001 to the present involved
4 Hagens Berman. The Cipro cases and the terazosin
5 hydrochloride litigation was led by other lead
6 counsel or other firms. Hagens Berman may have been
7 one of the many plaintiffs' counsel that were part
8 of that, but I did not work with them on that.
9       The Lupron I worked directly with
10 Hagens Berman. Relafen was with Hagens Berman.
11       So there's -- you know, I'd say looking at
12 this, going through the number of assignments here,
13 the AWP case has obviously been Hagens Berman, but
14 then there's -- it's probably less than 50 percent.
15 It's maybe 20 percent of the matters that had
16 started with the counsel with which I'm working now
17 started in the tobacco litigation as reflects work
18 with that firm or with that lead counsel, lead
19 attorney who has brought me into that firm.
20   Q.  Very early in your last answer, maybe
21 several pages in the transcript at this point, you
22 referred to six or seven of us at Harvard.
23       Do you have yourself a relationship,
24 formal or otherwise, with Harvard University?

42

1  A. Well, several -- well, one of my former
2  students, Richard Frank from Boston University, is a
3  chaired professor at Harvard in the Harvard School
4  of Public Health. Another one of my colleagues who
5  was on the faculty with me at Boston University,
6  Tom McGuire, is a tenured professor at Harvard.
7  Meredith Rosenthal and Joe -- I've work with them.
8  I'm not an adjunct professor or I have no formal
9  relationship, but I do a lot of research for
10 publications and consulting, and they may have cases
11 that they're doing on their own that they want my
12 advice on or my input in.
13     So there is -- if you want to look at some
14 of the names, the -- well, it's an et al. Certainly
15 in that on Page 19 with the list of publications or
16 the list of reports that have led to peer-reviewed
17 publications, David Cutler, Arnold Epstein,
18 Richard Frank, myself, Charles King,
19 Joseph Newhouse, Tom McGuire.
20  Q. I don't mean to cut you off, but I think
21 that you answered the question somewhere in there
22 and said you don't have a formal relationship with
23 Harvard; is that true?
24  A. I don't have a -- I'm not a member of the

43

1  faculty in any way, that's right.
2  Q. Do you have some other formal relationship
3  with them?
4  A. Our friendships are very formal. We're --
5  Q. You strike me as a very formal person.
6  A. I am a profoundly formal person.
7  Q. Have you ever done any work for a
8  pharmaceutical company before?
9  A. In my entire -- in the life of my
10 consulting activities, in the long and winding path
11 that is reflected in my CV, I would guess I have,
12 but not a preponderance.
13     When I did work, when I worked for
14 Arthur D. Little, when I worked for some larger
15 consulting firms, I was at times called in to work
16 for a number of clients that I don't even recall
17 anymore, but as an econometrician/statistician I was
18 asked to do a variety of things.
19     But certainly in the last ten years I
20 haven't worked for pharmaceutical companies in any
21 meaningful way.
22  Q. And it sounds -- when you say in any
23 meaningful way, does that qualify your answer at
24 all? Have you done some work?

44

1  A. No, I've done no work that I can think of.
2  Q. And I assume from your last answer that
3  you don't have a specific recollection of ever
4  having done work for a pharmaceutical company?
5  A. That's correct.
6  Q. Are you aware of anyone else at
7  Greylock McKinnon having done work for a
8  pharmaceutical company before?
9  A. One of our affiliates works -- well,
10 actually -- I'm sorry, I mean, thinking about it in
11 that way, I have consulted in litigation to medical
12 device manufacturers in patent infringement matters.
13 Now, I don't know, so that's not pharmaceutical, but
14 it's medical devices. I don't know if that's
15 relevant to the purview of your question.
16     One of the affiliates of Greylock McKinnon
17 does a considerable amount of work for
18 pharmaceutical companies, Dr. Jerry Hausman, so one
19 of the affiliates does.
20  Q. Does he do that work through
21 Greylock McKinnon or separately from
22 Greylock McKinnon?
23  A. It depends. If there's a conflict, he
24 will have to do it through other, other litigation

45

1  support firms.
2  Q. Are you aware of his ever having done work
3  for a pharmaceutical company through
4  Greylock McKinnon?
5  A. Yeah, he -- yes, I'm pretty sure that's
6  true.
7     MR. POLUBINSKI: Okay. I've only got a
8  few minutes left on the tape, so this might as good
9  a time as any to change it.
10     Are you okay in terms of a break? Do you
11 want to keep going? Do you want to take a break?
12 What's your pleasure?
13     THE WITNESS: I'm good. I mean I might as
14 well hit the head since I'm drinking.
15     Let's go off the record.
16     THE VIDEOGRAPHER: This is the end of
17 Tape 1. We're off the record at 10:16.
18     (Whereupon, a short recess was
19     taken.)
20     THE VIDEOGRAPHER: This is the beginning
21 of Tape 2. We're back on the record at 10:25.
22 BY MR. POLUBINSKI:
23  Q. So you've discussed other instances and
24 your resume other instances in which you've

12 (Pages 42 to 45)

Page 46

1 consulted or provided testimony related to the
2 healthcare or pharmaceutical industries, correct?
3     A. Healthcare, pharmaceutical, medical device
4 industry, yes.
5     Q. Did you provide testimony in support of
6 class certification in each of these cases or only
7 some?
8     A. Only some.
9     Q. Which ones? And obviously feel free to
10 refer to your declaration, Exhibit 1.
11     A. So clearly in terms of starting working in
12 the -- in the area in 1996-97 on Page 19 -- oh, I'm
13 sorry, it's even earlier than that.
14     Q. Dr. Hartman, just to maybe help you out
15 here, I think we're just talking about testimony, so
16 what I've been looking at is the recent testimony
17 list at the end.
18     A. Okay. Well, then maybe let's do that.
19 That makes it easier, because there's consulting,
20 there were a number of consulting assignments for
21 the FTC and other groups and then consulting for the
22 testifying expert in the brand name prescription
23 drug litigation that involved the healthcare
24 industry going back to the mid '90s, but if you want

Page 47

1 to just -- where I've submitted testimony, I was the
2 testifying expert, clearly Hillenbrand, Trilogy, in
3 19 – no.
4         2002, there was the Hytrin matter, the
5 terazosin hydrochloride matter in which I submitted
6 testimony for damages and class certification, in Re
7 Buspirone Antitrust Litigation, the Ann Cunningham
8 matter, the ciprofloxacin hydrochloride matter, and
9 then that continued in 2003, those were all class,
10 for the class. The Relafen litigation was for the
11 class. The Lupron litigation was for the class.
12 The AWP matter was for the class. And that's the
13 ones that rose to the level of being deposed or
14 going to trial.
15         There were no doubt other instances where
16 I'd consulted or either submitted a piece of
17 testimony and then there was some aspect of the
18 arguments where I was not deposed or things were
19 postponed or whatever, so ...
20     Q. A number of the cases that you just
21 identified are antitrust or involved antitrust
22 claims; is that correct?
23     A. Many of them did. Some involved RICO
24 litigation.

Page 48

1     Q. All right. Focusing on the antitrust
2 claims, were they by and large price-fixing claims
3 or were they other things?
4     A. The cases for the most part, those
5 particular drugs were -- had violations of
6 Hatch-Waxman.
7     Q. Okay. You also mentioned RICO claims.
8         Were the RICO claims also related to price
9 fixing or other allegedly anticompetitive behavior?
10     A. Well, certainly in the Lupron matter it
11 was fraudulent marketing practices.
12     Q. What was the nature of the alleged fraud
13 in the Lupron matter?
14     A. The nature of the alleged fraud there
15 was -- involved certainly the promoting providers to
16 sell free samples, which is in violation of the
17 relevant laws, and also the promotion of competing
18 on spread and return to practice.
19     Q. Any others other than Lupron?
20     A. That were RICO?
21     Q. Uh-huh.
22     A. Where I submitted testimony or where I
23 consulted also?
24     Q. Well, let's start with testimony.

Page 49

1     A. I don't recall any that was -- that
2 involved testimony, and I could look, if you'd like,
3 I can look about consulting or we can just leave
4 that. It's up to you.
5     Q. Maybe we will come back to it.
6     A. Okay.
7     Q. Did any of the cases in which you
8 testified on class certification matters involve
9 allegedly deceptive marketing related to non-price
10 attributes of a product?
11     A. I don't recall. That I've testified in is
12 the question?
13     Q. Yes, testified is the question.
14     A. I'm trying to remember the details of the
15 complaint in the Lupron matter and whether part of
16 the fraudulent marketing involved more than merely
17 fraudulent pricing practices, whether there were
18 fraudulent promotional activities, and I don't
19 recall right at the moment.
20     Q. So with the possible exception of the
21 Lupron matter, to the best of your recollection,
22 this would be the first case in which you've
23 analyzed whether damages can be proved on a
24 class-wide basis in a case involving allegedly

Page 50

1 deceptive marketing related to the non-price
2 attributes of a product?
3     A.  Well, this, this case falls into the
4 general category of any of the types of matters,
5 antitrust, RICO, breach of contract matters or where
6 there's going to be -- you know, there were
7 conspiracies in some of the antitrust cases that
8 weren't just price fixing but agreements to restrict
9 generic entry.  So there were those matters that
10 arose that were not necessarily only price fixing in
11 terms of the anticompetitive behavior, but they all
12 translate into effects on quantities and prices.
13     So to the extent that this is a -- this
14 matter involves promotional activities for off-label
15 uses of a drug that leads to the demonstration of
16 sales and prices that occurred in the market that
17 were other than they would have been absent that
18 fraudulent promotion, it is -- when you say the
19 first case, it's just one of the many cases that fit
20 in the same pattern.
21     MR. POLUBINSKI:  Okay.  I'll move to
22 strike the answer as nonresponsive.
23     Could you read back the question again,
24 please.

Page 51

1     (Question read.)
2     THE WITNESS:  The -- and my answer and the
3 reason it took the form that it did was that my
4 assignment in this matter is not to prove the
5 impacts of the alleged fraudulent promotional claims
6 or off-label claims but to take the results of the
7 quantities that result from those claims -- I'm not
8 analyzing that impact.  Professor Rosenthal is doing
9 that.  I'm merely taking quantities that flow from
10 an analysis that she does, and I put them into a
11 model that looks like any of those models that I've
12 done in the past.
13     And this is the first time that the inputs
14 to my models happen to be generated from an
15 off-label promotion matter, but in the way that I'm
16 doing the modeling of those, of that, of those
17 claims and calculating damages, it's no different
18 than antitrust or the other RICO violations that
19 I've analyzed.
20 BY MR. POLUBINSKI:
21     Q.  Do you have any prior experience,
22 litigation-related or otherwise, with issues
23 relating to FDA approval?
24     A.  Certainly in the Hatch-Waxman matters

Page 52

1 issues of FDA approval and for an ANDA and for when
2 drugs are approved to come to market and how drugs
3 are approved by the FDA and the patterns of approval
4 of ANDAs and NDAs, I've examined those types of
5 issues, among others.
6     But when you say experience, did I work
7 for the FDA, no.  I've analyzed and I've reviewed
8 analyses of the way they process claims, how quickly
9 they -- not claims, but filing for approval of an
10 ANDA or an NDA.
11     Q.  Okay.  Aside from that, are there any
12 other -- is there any other experience that you
13 have -- let me withdraw the question.
14     Aside from your work in the Hatch-Waxman
15 matters, do you have any other prior experience,
16 litigation or otherwise, related to FDA approval?
17     A.  The -- in the patent litigation involving
18 medical devices, the FDA approval of different
19 stents and defibrillators and those kinds of issues
20 were relevant, and I reviewed that type of
21 information.
22     Q.  Have you ever been retained as an expert
23 in a case where your client was opposing class
24 certification?

Page 53

1     A.  I have been retained in cases that were
2 adverse to classes but not adverse to class
3 certification.
4     Q.  Let's look back at Exhibit 1, which is
5 your declaration.
6     Who wrote your declaration?
7     A.  I did.
8     Q.  Did you type it yourself?
9     A.  I did.
10     Q.  To the best of your recollection, when
11 would your drafting have begun?
12     A.  Oh, gosh, certainly as a -- as the time
13 frame comes close for submitting a declaration, I
14 will start out with a draft.  Well, after meeting
15 with clients or meeting with counsel -- excuse me,
16 I'm wrestling with this table here.
17     After meeting with the clients and the
18 interested parties, I probably started to put an
19 outline together of the issues that I would be
20 addressing, and then as my analysis and thinking
21 became clearer, I would continue to fill that in and
22 continue to save that document until probably
23 several weeks before it was due, and then I would
24 seriously expand it to the point that it was the

Page 54

1 final document.
2  Q. During the course of your preparation of
3 your draft of your report in this matter, I gather
4 you sent drafts of the declaration to other members
5 of your team by e-mail; is that correct?
6  A. I doubt it.
7  Q. Did you ever share a copy of your report
8 in any way with anyone else on your team?
9  A. Certainly if -- with staff that I -- let
10 me look through this because each declaration is a
11 little different, but let me describe generally what
12 would be going on. I may be writing a declaration
13 and laying it out, and then I might say, oh, here's
14 a section where I need -- I know I need IMS data,
15 and I will tell one of my staff members, you know,
16 call up the IMS rep and tell us, tell me again,
17 remind me what we can get there and things.
18  So they might write several sentences for
19 me saying, okay, here is what IMS will deliver now,
20 they've changed their product over time, and so
21 that -- there may be some staff interaction in that
22 way where I'll say that.
23  I no doubt discussed my declaration with
24 Dr. Rosenthal since I was designing it so that it

Page 55

1 would take the results of her analysis and develop
2 damage measures using the results of her analysis,
3 so there were discussions.
4  That's -- I don't -- I can't recall that I
5 would let myself send an e-mail of the document to
6 anyone.
7  Q. You're -- well, let me I guess ask it this
8 way.
9  Are you aware that Professor Rosenthal
10 testified that she received a draft of your report
11 by e-mail?
12  A. I have not reviewed her testimony. No.
13  Q. Do you have any reason to believe that her
14 testimony on that point might be inaccurate or
15 untruthful?
16  A. Well, I have no reason to believe that she
17 would be untruthful. Whether at the -- at what
18 stage she saw the draft, I mean, at some stage my
19 draft was ready for -- it was in its final stages to
20 be sent to counsel, and at that stage, it wouldn't
21 surprise me that she saw -- she may have seen the
22 draft. I mean, when the draft is close to final,
23 yes, there will be -- I will send it to counsel.
24  Q. When you send it to counsel when it's

Page 56

1 close to final, what form do you send it? Do you
2 send it by e-mail, or do you print a hard copy to
3 send to them?
4  A. I think it varies. I don't recall.
5  Q. In this case do you have any specific
6 recollection?
7  A. No, I don't.
8  Q. Aside from -- withdrawn.
9  Did you communicate with people on your
10 team in this matter by e-mail?
11  A. Probably.
12  Q. With whom would -- with whom would you
13 have communicated by e-mail?
14  A. Well, as I say, there may have been times
15 when I say, I've said, look, we need this from the
16 Red Book or we need this from the First DataBank, we
17 need this from IMS, we need this from NAMCS, we need
18 this from, you know, the NDTI data, and I may have
19 sent an e-mail to the people, it could be
20 Renee Rushnawitz, it could be Michael Augustine, it
21 could be Andrew Bechtel where I'd say, you know,
22 look, what's the most recent changes in IMS as to
23 how they send the National Prescription Audit data,
24 and he will tell me.

Page 57

1  And so it would be the e-mails of that
2 sort.
3  Q. Would you or any of the others at GMA with
4 whom you might have communicated by e-mail during
5 that period still have copies of those e-mails?
6  A. I doubt we have e-mails going that far
7 back.
8  Q. What would have happened to them?
9  A. Just at the ends -- we don't save e-mails
10 forever, so, you know, it's -- going back to 2005,
11 you know, I'd have to check, but, you know, we don't
12 back up our e-mails going back years. The computer
13 would just end up being clogged up with stuff.
14  Q. So I gather then no effort would have been
15 made in this case to preserve e-mails that you would
16 have written related to your work in this case?
17  A. Well, as a standard practice, we don't
18 destroy anything, but we don't keep things that are
19 beyond usage. I mean, there's, you know, there's
20 some analysis that I may have done with this, but I
21 didn't save analysis once the work is done.
22 Otherwise, our storage fees would be astronomical
23 given the size of databases we use and given the
24 cases we're working on.

Page 58

1    So, you know, I don't -- we -- normally
2 that's the standard procedure. We don't continue to
3 save things going years back, you know. Obviously
4 if I have e-mails from last month, they're probably
5 still there, but at some point we have our
6 information management person just purge the, you
7 know, the stuff that's junk that's past use.
8    Q.   And no special effort was made in this
9 case to save those e-mails?
10       MR. MATTHEWS: Objection.
11       THE WITNESS: No special effort was made
12 to do anything differently in this case than we do
13 for all our cases.
14 BY MR. POLUBINSKI:
15    Q.   Did you print drafts at all of your report
16 in this case prior to the final version?
17    A.   As a standard practice, I do not.
18    Q.   Would you have done it in this case?
19    A.   I don't see why I would have.
20    Q.   Would you have done it to share with
21 plaintiffs' counsel or with Professor Rosenthal or
22 with others who were working on your team even just
23 to proofread the document?
24    A.   Well, at the end of -- when the final

Page 59

1 document was -- when we got to the final week or so,
2 the standard practice would be to be printing it out
3 and then reading it and checking it for things
4 beyond what you'd normally see on the screen. I
5 mean, normally what I'll do is I'll be writing the
6 document, I'll be reviewing it on the screen and
7 work directly from the computer, and just rather
8 than proliferating drafts day to day to day to day,
9 I save in the same draft.
10       At some point we have to read it and print
11 it out, and at some point that draft is reviewed,
12 either I've sent electronically or reviewed in hard
13 copy by counsel, and my staff would be reviewing it
14 to correct it and for any type of formatting
15 problems and any kinds of data issues that are seen,
16 and at that point I would assume I had sent one to
17 Professor Rosenthal also. I don't recall doing
18 that.
19    Q.   Do you know if you still have those hard
20 copy drafts that you would have printed?
21    A.   The draft that was the final draft prior
22 to this being finalized, no, I -- we don't -- it's
23 not a practice of our firm to save the penultimate
24 draft.

Page 60

1    Q.   What would you have done with the
2 penultimate drafts?
3    A.   We would have just disposed of them.
4    Q.   Let's turn back to the documents that
5 we've marked as Hartman Exhibit 3 and Hartman
6 Exhibit 4.
7       You had mentioned when we first looked at
8 Hartman Exhibit 3 that the date on this document on
9 the first page of this document, which is denoted as
10 GMA54, struck you as being unusual.
11       Is the date on GMA54 April 28th, 2004?
12    A.   Is the date --
13    Q.   At the top of the first page.
14    A.   It certainly is.
15    Q.   And your name appears on this first page
16 as well, correct?
17    A.   That's correct.
18    Q.   And the date underneath your name is,
19 appears to be March 1st of 2004; is that right?
20    A.   That's correct.
21    Q.   Is that an accurate date as far as you
22 know?
23    A.   As far as I know, it is.
24    Q.   I take it you hadn't been formally

Page 61

1 retained at that point, correct?
2    A.   That's certainly what -- that's certainly
3 what -- under the retention letter, that would be
4 correct.
5    Q.   Here's a quick question for you about the
6 conventions that you use in preparing these
7 invoices.
8       Does the March 1st, 2004 date here mean
9 that the activities covered by this entry would have
10 occurred on that exact date, or is it something more
11 general?
12    A.   I think it's probably idiosyncratic in the
13 following sense, that I -- this is an invoice sent
14 out for March, and so it was time in March. I see
15 that it's all on March 1st. I doubt we received
16 the IMS data on March 1st on Page 2. I think this
17 was probably an early request for some data
18 analysis, and this was not even at this point not
19 even a case yet. There was some interest in data
20 analysis, and by convention, perhaps it just says
21 the 3/1/2004 through the end of the month, because
22 as you will note in later invoices, say the second
23 invoice dated April 26th, there are specific dates
24 or for the experts or the affiliates,

62

1 Professor Charles King or Dr. Charles King has a
2 range of dates as does Professor Rosenthal.
3     And so our convention is to record our
4 time daily just as most firms would do, and usually
5 we will present the backup if the client asks for
6 it. Otherwise, we will just present it in this
7 fashion spanning the month or, you know, again, I
8 can't say whether all -- this happened to be a
9 meeting that we had on the 1st of March or not.
10 I'm sure the data analysis didn't all take place on
11 the 1st of March, 2004, so it would be over that
12 month.
13    Q. There's an asterisk next to your name on
14 GMA54.
15        What does that mean?
16    A. Interesting. I don't know. I see it's on
17 all of them. They must like me. I don't know.
18 I've actually never noticed that.
19    Q. Who are they in the people who prepared
20 this?
21    A. The people are the accounting people who
22 prepare this, why they have me asterisked, I don't
23 know.
24        Is that throughout? I guess it is. I

63

1 guess it's denoting that I'm special in some way,
2 but I can't begin to tell you in what way. I don't
3 know.
4    Q. At least in what way they think you're
5 special?
6    A. That's right, or not special. But I
7 really couldn't tell you. I'm a little -- actually
8 I'm interested myself.
9    Q. The description in this entry reads
10 conversations, and the amount of time in the column
11 that reads hours/rate is 2.00, correct?
12    A. That's correct.
13    Q. Does that indicate that you would have had
14 two hours of conversations on or about March 1st
15 of 2004?
16    A. Well, it would indicate that over that
17 month I would have had two hours of conversations
18 with whomever was talking to me about what was --
19 what interest in the database that we obtained from
20 IMS. It could have been conversations with
21 Michael Augustine and Andrew Bechtel in performing
22 the analysis. It could have been conversations with
23 Renee Rushnawitz in terms of case management.
24        It's -- it strikes me that this was a

64

1 preliminary meeting of understanding the terrain, a
2 data terrain. Some data was gathered, and counsel
3 and staff asked me questions and what might be done
4 and how we might proceed and how we might interpret
5 whatever had been done, and that's what it was
6 going -- that's what that would reflect to me.
7    Q. Do you have a specific recollection of
8 these series of conversations at all?
9    A. No.
10    Q. So what you've just described in terms of
11 what would have happened surrounding these
12 conversations, is that based on your recollection or
13 based on your assumption of what would have
14 happened?
15    A. Well, it's based on what -- that's how I
16 would describe in any -- it's based on normal
17 procedure. If I'm doing -- if I were doing damage
18 analysis, I would say damage analysis, I would
19 assume. Sometimes I don't list what I've done.
20        But the -- I'm not going to remember
21 conversations. I have conversations with staff on
22 lots of cases, and they may say can I have 15
23 minutes of your time, half an hour of your time and
24 say, okay, what are you -- what is of interest to

65

1 you, what are you modeling, what do you need to do,
2 and I'll record that time on someone else's case and
3 it will just be, you know, conversations.
4    Q. You'd mentioned in one of your answers,
5 one of your prior answers that the conversations
6 would have included conversations with counsel as
7 well.
8        Is the counsel that you have in mind
9 Hagens Berman?
10    A. Well, I said they could have, and I think
11 they would have. I would assume that it was -- we
12 wouldn't have -- yeah, the counsel was Hagens Berman
13 is my recollection. It would have been Tom Sobol.
14        But I really don't know whether Tom Sobol
15 just said get this data, you know, so that -- if you
16 want to characterize that as a conversation, that's
17 fine. I don't know what the detail of that
18 conversation was. And it could be that all two
19 hours were with Tom Sobol. I don't recall that.
20    Q. You had mentioned the entry on the second
21 page of Exhibit 3 on Page GMA55 of the same date,
22 March 1st, 2004, that reads simply IMS data.
23    A. That's correct.
24    Q. And the date on that is also

17 (Pages 62 to 65)

VERITEXT CORPORATE SERVICES (800) 567-8658

66

1 March 1st of 2004?
2   A.  That's correct.
3   Q.  Do you know what IMS data this is
4 referring to?
5   A.  I -- since a variety of IMS data is -- we
6 use in a variety of contexts, I'm not sure what
7 particular IMS product this is in reference to.
8   Q.  Do you have any recollection at all as
9 to -- well, let me withdraw the question.
10      I think your prior answers had suggested
11 that this entry denotes that data was acquired or
12 analyzed or somehow or another gathered by somebody
13 on your staff; is that right?
14  A.  In the course of, standard course of our
15 work in the pharmaceutical industry, we will in a
16 consulting capacity obtain IMS data and do analysis,
17 and I assume this is one of an example of that
18 activity.
19  Q.  Do you know if you still have the data
20 that would have -- that's referred to in this entry?
21  A.  I would guess that whatever data we have
22 gathered from IMS in a consulting context we still
23 have.
24      MR. POLUBINSKI:  All right.  Well, we call

67

1 for its production.
2      MR. MATTHEWS:  If you can put that in a
3 letter, we can get back to you.
4 BY MR. POLUBINSKI:
5   Q.  Do you have any other recollection as to
6 precisely what IMS data this was?
7   A.  No.
8   Q.  Do you have any recollection as to how it
9 might have been used?
10  A.  Well, I discussed how, should IMS data be
11 needed in actually doing the damage analysis, the
12 types of IMS data that we would want to use or I
13 would want to use.
14      And so under our contracts with IMS, we
15 can't use data in a litigation context, but we can
16 use it to examine events and do analyses.
17      So we were probably review -- this would
18 have been a review of data of, you know, what's in
19 it and does it help us or not.
20  Q.  And so I take it that your review of this
21 data would be one of the things that you relied on
22 in some way or another in formulating the opinions
23 that are set forth in your declaration?
24  A.  Yes.

68

1   Q.  If I can ask you to take a look at
2 Exhibit 1 to your declaration and flip, please, to
3 the last page just denoted as Attachment B.  This
4 page reads Documents Relied Upon.
5      Did I read that correctly?
6   A.  You did.
7   Q.  Is the IMS data that you just testified
8 that you relied upon in formulating your opinions in
9 this declaration listed in this document?
10  A.  Well, let's -- let me qualify my response
11 as follows:  The opinions that I've put forward in
12 this declaration are opinions as to modeling and how
13 we would go about doing that modeling, and that is
14 certainly anything that is relied on reflects how I
15 would go about doing that modeling.
16      As you see mentioned here, there is IMS
17 data listed in my declaration.  There is National
18 Ambulatory Medical Care Survey data mentioned.
19 There is Red Book and First DataBank information
20 mentioned.
21      And I know what those are, so I didn't --
22 to the extent that it was relied on, I reviewed it.
23 I didn't need to rely on it to develop the modeling
24 methods that I've put forward.

69

1      So I want to qualify that relied on.  I
2 mean, it's obviously it would be something that
3 would be of use in doing this modeling, and then
4 it's something that I normally am able to obtain,
5 and it's such a standard database and source of data
6 that it is a given that it is used in situations of
7 this sort or analyses of this sort.
8   Q.  And you certainly did review it and
9 consider it?  By it, I mean the IMS data that was
10 downloaded in March of 2004 in the context of your
11 work in this case, right?
12  A.  I certainly reviewed it and considered it.
13  Q.  And going back to my earlier question,
14 it's not listed among the documents that you relied
15 on, correct?
16  A.  And that's why I wanted to clarify my
17 answer.  I did not need to see that information.  I
18 did not need that to put forward this methodology,
19 the formulaic methodology.  It's something that I
20 did review.
21      And as I say, I didn't put forward the
22 First DataBank too.  I know what's in there, and I
23 review that regularly, but I don't need to rely on
24 it because I've used it so much.

Page 70

1  Q. With respect to the First DataBank data, I
2 assume you didn't do a specific data pull or data
3 collection in connection with your work in this
4 case?
5  A. In the work in this case that mirrors the
6 formulaic methodologies of so many other damage
7 analyses that I have done in the Hatch-Waxman
8 matters, let's say, or in the Lupron matters, any of
9 the pharmaceutical matters involving end payors or
10 direct purchasers, I will use IMS data, I'll use
11 NAMCS data, I'll use First DataBank data, and I may
12 have looked at it or not at that point. I don't
13 recall. It's something that I would certainly
14 review.
15     And there's a -- as I discussed the
16 sources of data here, it's a complete laundry list.
17 It's not clear to me how much will be available of
18 these various sources, and so I'm putting together
19 everything that I could that could possibly be used,
20 and a subset of that will be used.
21     MR. POLUBINSKI: Okay. Could you read
22 back the last question, please.
23     (Question read.)
24     THE WITNESS: And my answer, perhaps a bit

Page 71

1 prolix, is that we have the First DataBank data that
2 has been acquired in other matters, and whether I
3 had that particular run, run for the AWPs for all
4 the different NDCs of Neurontin, I do not recall.
5 BY MR. POLUBINSKI:
6  Q. Let's look at the page on Exhibit 3 that
7 we've marked as GMA64. There's an entry by your
8 name here.
9  A. I'm sorry, page?
10  Q. Page 64. The date at the top of this
11 invoice is August 2nd, 2005.
12     Are you with me?
13  A. I'm getting there. I'm kind of seeing
14 the, getting a feel for the flow of the case by
15 looking at -- so it's July, and then you want the
16 August, which?
17  Q. The one that's GMA64.
18  A. Yeah, okay, got it, date of August 2nd
19 of 2005.
20  Q. Right. And the dates that correspond to
21 your time entry on this page run from July 1st,
22 2005, through July 31st, 2005, correct?
23  A. That's right.
24  Q. And the description under your name on

Page 72

1 this page reads, review documents, write damage
2 declaration, edit Frank-Rosenthal white paper.
3     Did I read that correctly?
4  A. You did.
5  Q. Am I correct that the Frank-Rosenthal
6 white paper was an early draft of what became
7 Professor Rosenthal's declaration?
8  A. I know that early on there was discussion
9 of Professor Frank and Professor Rosenthal
10 addressing this issue of how to model the event
11 study that is essentially the unlawful promotion for
12 the off-label use, and so there must have been some
13 draft of a paper, but I don't recall the exact
14 details of it, and I can't recall whether that's --
15 I know they both had put their heads together and
16 were -- and something was produced obviously and
17 there was a white paper.
18     We would have to ask Professor Rosenthal,
19 but I can't recall whether that turned out to be her
20 declaration or not. That's ...
21  Q. Do you still have a copy of the
22 Frank-Rosenthal white paper that you edited
23 presumably in July of 2005?
24  A. No. My guess would be if in editing that

Page 73

1 I would have seen something electronically, I would
2 have read, there might have been questions about
3 econometrics or some data thing, and I would have
4 responded with some red lined edits would be my
5 guess, but I don't remember.
6     I don't have a copy of that. I
7 wouldn't -- again, as a standard practice of our
8 firm, we don't keep all interim drafts or copies of
9 that type of material.
10  Q. So I take it then that you don't have
11 copies, electronic or paper copies, of any non-final
12 drafts of Professor Rosenthal's declaration?
13  A. We don't do that as standard practice. I
14 doubt it. That would go against our standard
15 corporate practice but in any matter.
16  Q. Let's look at Page 71, GMA71. The date on
17 this invoice is December 1, 2005.
18  A. Boy, I keep having an asterisk here, don't
19 I?
20     Okay. I'm there, GMA71.
21  Q. Right. There's an entry for you on this
22 page as well, correct?
23  A. There is.
24  Q. And the date next to your entry on this