74

1 page is, appears to be November 1st, 2005, through
2 November 30th, 2005; is that right?
3    A.  That's correct.
4    Q.  And the entry here reads review rebuttal
5 materials?
6    A.  That's correct.
7    Q.  What materials is your entry referring to
8 there?
9    A.  My recollection is that there was a --
10 there was a document or a white paper or perhaps
11 even a declaration, at least one, and I think it was
12 Sara Ellison, I think. I'd have to -- there were
13 some rebuttal materials that had been prepared in
14 rebuttal to the filing of my declaration and I think
15 Professor Rosenthal's declaration, and so that
16 was -- my recollection is that's what that review
17 was. There may -- there were rebuttal materials,
18 and whether it really was Sara Ellison, I don't
19 really recall, or Fiona Scott Morton. There's a
20 variety of people it could have been, and there was
21 some modeling discussion and I reviewed it.
22    Q.  The Ellison report that you referred to,
23 is that the Ellison report that was filed in the
24 similar matter to this matter that's pending in

75

1 Pennsylvania?
2    A.  It could have been. I'm really -- I don't
3 remember exactly. I think, I think it was
4 Sara Ellison, and it was clearly a description of
5 how one can do an event study, how one cannot do an
6 event study, what modeling methods work, what
7 modeling methods don't work. And whether it was in
8 Philadelphia, Pennsylvania, or this, I don't recall.
9    Q.  Would you have reviewed a hard copy or an
10 electronic copy of these rebuttal materials?
11    A.  It could have been either. I don't -- I
12 don't remember.
13    Q.  And I assume you would have provided
14 comments?
15    A.  Certainly.
16    Q.  Do you still have the copy of the rebuttal
17 materials on which you commented?
18    A.  I doubt it. No, I mean, my guess is no.
19    Q.  Do you have any recollection as to what
20 the substance of your comments were?
21    A.  Well, I know there were certain assertions
22 that -- can I just, was it indeed Sara Ellison so
23 that we're talking about the right person, or should
24 I just keep referring to it as rebuttal materials?

76

1    Q.  Assuming that we're talking about the same
2 thing, and I think we probably are, Sara Fisher
3 Ellison did file a declaration in response to your
4 declaration and Professor Rosenthal's in the matter
5 pending in Pennsylvania, which we often refer to as
6 the Clark matter after the name of the lead
7 plaintiff --
8    A.  Okay.
9    Q.  -- in that matter.
10    A.  And I thought it was by Sara Ellison, and
11 the -- there were -- my recollection is that there
12 were statements that were made by Ms. Ellison or
13 Ms. -- well, Ms. Ellison or Ms. Clark Ellison, in
14 any case, the rebuttal materials that made certain
15 assertions about what could or could not be done in
16 doing, in performing event studies that have been
17 proposed by Dr. Rosenthal, and I found -- and I
18 reviewed them and I found, and I critiqued them and
19 found what I thought were errors in those rebuttal
20 materials, and I no doubt made those clear to -- I
21 no doubt chatted with Professor Rosenthal about
22 those issues.
23    Q.  Would the comments that you said you would
24 have provided have been written or oral or both?

77

1    A.  I don't recall.
2    Q.  If they were written, would you still have
3 a copy of them?
4    A.  Again, as a matter of standard practice,
5 we wouldn't have saved interim materials.
6    Q.  Before I reminded you that it was
7 Professor Ellison who submitted the declaration in
8 the Clark case on behalf of defendants, you had
9 mentioned another name as well of somebody that you
10 thought may have submitted a declaration in
11 opposition to you.
12    A.  I did.
13    Q.  Who was that?
14    A.  Fiona Scott Morton.
15    Q.  Why did her name come to mind?
16    A.  Well, in a number of the pharmaceutical
17 matters, there are several women who have appeared
18 as for witnesses for defendants, and
19 Professor Morton, Scott Morton is one of them. And
20 so I couldn't really remember whether she had done,
21 had been in this particular matter or some other
22 matter, and I -- maybe they both did. I don't
23 recall now.
24    Q.  Have you communicated in any way with

78

1 either of the named individual plaintiffs in this
2 case?
3   A.  I don't recall. I'm looking for the named
4 plaintiffs, but I don't have it.
5       I don't recall whether in the initial
6 meetings one of the larger named plaintiffs may have
7 had someone there. I don't recall that, or I can't
8 say whether -- my staff may have communicated with
9 some of the named plaintiffs for data issues
10 possibly.
11  Q.  You don't have a specific recollection of
12 having communicated with any of the named individual
13 plaintiffs in this case, correct?
14  A.  I do not.
15  Q.  And do you have any specific knowledge of
16 anybody in your staff having communicated with any
17 of the named individual plaintiffs in this case?
18  A.  Not as I sit here today.
19  Q.  How about their doctors, have you
20 communicated in any way with any of the named
21 individual plaintiffs' doctors in this case?
22  A.  No.
23  Q.  Have you communicated in any way with any
24 of the named third-party payor plaintiffs in this

79

1 case?
2   A.  Well, those would have been -- when you
3 said named plaintiffs, those were the ones I was
4 thinking of. I doubt I would have -- I did not
5 communicate with any of the individual plaintiffs,
6 and now I see what you mean by individual.
7       The third-party payor plaintiffs, they
8 could have been at one of the initial meetings or
9 there could have been a communication for data
10 issues, what data they had and how it could help us
11 understand what had happened.
12  Q.  But as we discussed before, you don't have
13 a specific recollection of having had a conversation
14 like that?
15  A.  That's correct.
16  Q.  Have you reviewed any documents that
17 relate to either of the named individual plaintiffs,
18 and by that I mean individual people, in this case?
19  A.  Not that I recall.
20  Q.  Have you reviewed any documents that
21 relate to either the named individual plaintiffs'
22 doctors in this case?
23  A.  Not that I recall.
24  Q.  How about documents relating to the named

80

1 third-party payor plaintiffs?
2   A.  The -- in pulling together a declaration
3 of this sort and in supporting both myself and
4 Professor Rosenthal, my guess would be that the
5 staff had reviewed such documents, and to the extent
6 they showed them to me for a particular issue or
7 not, I can't recall. But we asked for as many
8 documents as we can get that are available. We will
9 generally ask for a list of the documents that exist
10 and then say, look, we want to look at this, this,
11 this and this.
12      And so there was no doubt that request,
13 and there was no doubt some review on the part of
14 staff, and the extent to which it went forward, I
15 don't recall.
16  Q.  Do you have any specific recollection of
17 having reviewed any documents related to named
18 third-party plaintiffs in the case?
19  A.  I've seen so many third-party payor
20 documents in the last two years that I don't
21 remember if I saw ones for here or other cases.
22  Q.  When you refer to the documents that
23 you've seen, they could have been in other cases,
24 for example in the AWP matter?

81

1   A.  I see third -- I see enumerable
2 third-party payor documents, so whether -- I don't
3 have a specific recollection of one based on a
4 Neurontin issue.
5   Q.  Have you reviewed any transcripts of
6 deposition testimony of any of the named plaintiffs
7 in this case, whether individuals or third-party
8 payors?
9   A.  I would as part of the damage analysis,
10 but I have not to date.
11  Q.  Have you reviewed any transcripts of
12 deposition testimony of any of the plaintiffs'
13 individual doctors in this case?
14  A.  Not yet, not to date.
15  Q.  Have you communicated with any class
16 members about your work in this case?
17  A.  Beyond the -- my recollection is about
18 what is possible with third-party payors, no, not to
19 my recollection.
20  Q.  So this isn't the first time that your
21 deposition has been scheduled, correct, in this
22 case?
23  A.  I take it that there were -- there was a
24 scheduling of a deposition at an earlier time, and I

82

1 can't remember whether it was in the Pennsylvania
2 matter or it was in this matter, but I do recall a
3 scheduling of a Neurontin deposition that did not
4 occur.
5     MR. POLUBINSKI: Okay. We're running out
6 of space on the tape, so maybe now is a good time to
7 change it.
8     THE VIDEOGRAPHER: This is the end of
9 Tape 2. Off the record at 11:21.
10         (Whereupon, a short recess was
11         taken.)
12    THE VIDEOGRAPHER: This is the beginning
13 of Tape 3. We're back on the record at 11:26.
14 BY MR. POLUBINSKI:
15   Q. So the earlier scheduled deposition in
16 this matter would have been your deposition in this
17 matter in January or February.
18     Does that sound right?
19   A. It does.
20   Q. Do you have any understanding for why that
21 deposition didn't go forward as scheduled?
22   A. No.
23   Q. Are you aware that a magistrate judge in
24 this case issued a report and recommendation

83

1 granting in part and denying in part a motion to
2 dismiss by the defendants around that time?
3   A. No.
4   Q. Have you ever reviewed the magistrate
5 judge's report and recommendation in this case on
6 the motion to dismiss?
7   A. No.
8   Q. Have you ever had discussions with
9 plaintiffs' counsel about it?
10   A. Since I didn't know that it existed, I've
11 really not talked about it or read it or know
12 anything about it.
13   Q. Okay. So I take it then that you also
14 would not have reviewed Judge Saris' ruling on the
15 objections to the report and recommendation?
16   A. No. Interesting, I didn't know
17 Judge Saris was involved in this matter.
18   Q. Are you aware that plaintiffs have filed a
19 new complaint since that time?
20   A. No.
21   Q. And are you aware that they have since
22 moved to amend the complaint again?
23   A. No.
24   Q. Since the time your deposition had first

84

1 been scheduled back in January or February of this
2 year, have you had any conversations with
3 plaintiffs' counsel about submitting a revised
4 declaration or a revised report in connection with
5 their motion for class certification?
6   A. If any conversations were had, they must
7 have been very brief, and I -- I don't recall them.
8 It may have been that, you know, there are times
9 when I -- counsel will call me, say, oh, we have got
10 to reschedule this and I will deal with certain
11 timing issues, say okay, and then it doesn't happen,
12 and then I move on to other things. I really don't
13 follow up the reasons why.
14   Q. There was no discussion though about a
15 revised report or a revised declaration in this
16 matter though?
17   A. Not that I recall.
18     MR. POLUBINSKI: Okay. Let's mark the
19 next document.
20         (Hartman Exhibit 5 marked as
21         requested.)
22 BY MR. POLUBINSKI:
23   Q. We've just handed you what has been marked
24 as Exhibit 5 to your deposition.

85

1     Have you seen this before?
2   A. Probably.
3   Q. This is the subpoena pursuant to which
4 you're testifying today, right?
5   A. Oh, is this for today? I see date and
6 time January 25th, 2006.
7   Q. Fair enough. Are you aware of a different
8 subpoena in this case pursuant to which you're
9 testifying?
10   A. No. I mean, I'm just told where to
11 appear. I'm just a willing worker.
12   Q. That makes two of us.
13   A. Yeah.
14   Q. The subpoena, Hartman Exhibit 5, also
15 requests documents from you and from
16 Greylock McKinnon, correct?
17   A. It does.
18   Q. Okay. And the documents that it requests
19 are listed in Schedule A, which begins on the third
20 page of the document?
21   A. Yes.
22   Q. If I can ask you to please flip to Page 3
23 of Schedule A, which is the second to the last page
24 of the document.

86

1  A. Right, I'm sorry, I'm just seeing
2 what's -- okay.
3     So I'm sorry, to which page?
4  Q. Page 3 of Schedule A.
5  A. Right.
6  Q. And please look specifically at Request
7 Number 2, which reads, all documents prepared by you
8 or at your direction, including drafts, in
9 connection with the formulation of your expert
10 opinions or your involvement as an expert witness in
11 this case.
12    Did I read that correctly?
13  A. You did.
14  Q. Did you ever have a conversation with
15 plaintiffs' counsel about whether you have drafts of
16 your report?
17  A. No. Well, I mean, did -- certainly we
18 would receive something like this and we would
19 respond to it as we normally do, and so there was
20 not something special about this about what would
21 include a draft or whatever, again, since, as I say
22 standard practice is we save over our documents
23 electronically and don't proliferate piles of paper.
24    So we produced -- we responded to this as

87

1 we would respond to any requirement of this sort.
2  Q. Okay.
3  A. So I didn't -- I don't remember any
4 specific discussion with counsel about that.
5  Q. Do you have any specific recollection
6 about what, if anything, you did to locate the
7 documents described in this document request
8 generally, not limited to Request Number 2?
9  A. Well, normally -- well, obviously we have
10 a variety of affiliates with the firm. We receive
11 requests of this sort very regularly. We're used to
12 telling the team that is supporting the particular
13 expert, okay, we've got to provide all the documents
14 extant that are subject to the subpoena, and we do.
15    So the staff -- you know, I don't oversee
16 that. The people that are the particular team
17 leader on the project would have made sure that
18 those were all pulled together and supplied, I would
19 assume, unless this were cancelled prior to the
20 delivery. I don't really remember what the order
21 was, whether we responded to this but then it was
22 cancelled, you know.
23  Q. Who is the team leader on this engagement?
24  A. I would have to -- it would either be

88

1 Michael Augustine or Andrew Bechtel or
2 Renee Rushnawitz.
3  Q. Would you have had any personal
4 involvement yourself at all in responding to the
5 document request attached to this subpoena?
6  A. No.
7  Q. Would you have looked on your computer,
8 for example, for any responsive material?
9  A. Well, I would have had my staff, they
10 would look. They would -- you know, they're used to
11 going to my files and gathering whatever is
12 necessary or whatever is extant to respond.
13  Q. But you didn't do it yourself?
14  A. No, I did not.
15  Q. Is the same true of hard copy materials
16 too?
17  A. The -- yeah, I mean, the standard practice
18 is that there would be whatever is there. I
19 wouldn't pull it together, you know. The staff
20 knows where to find those materials that are extant
21 and pulls them together and produces them.
22  Q. Would the communications on the subject
23 have been between plaintiffs' counsel and your
24 staff, or would you have been involved in the

89

1 communications at all?
2  A. I don't recall. It could be -- it could
3 be either way, but I don't recall.
4  Q. So you don't recall giving any
5 instructions to any of the folks on your team who
6 would have actually done the response to this
7 document request?
8  A. Well, they do it so often that there's not
9 a need for me. I was being -- I was being deposed
10 today. I assume there was a set of requests, and I
11 assume it's been responded to, and I didn't do -- I
12 had no involvement with that.
13  Q. Fair enough. So you wouldn't have done
14 anything specific in this case?
15  A. No. It's no different than any other
16 deposition.
17  Q. Okay. But as I said, I guess you wouldn't
18 have done anything specific in this case to satisfy
19 yourself that they had looked for and produced all
20 responsive documents other than reliance on your
21 general instructions to your staff and the way you
22 ordinarily do things?
23  A. Well, they normally do, and I've never had
24 a case where they didn't that I know of, and so yes,

Page 90

1  I do rely on them because they're trained to do
2  that.
3      Q.  All right. Let's look at Hartman
4  Exhibit 1, your report, your declaration in this
5  matter, and let's look first at Paragraph 9, which
6  is on Page 4 of the declaration.
7           The first sentence of Paragraph 9 reads, I
8  have been asked by counsel to review the complaint
9  and assume as true the alleged RICO violations and
10 other unlawful conduct described therein.
11          Did I read that correctly?
12     A.  You did.
13     Q.  And is it true that you've done that,
14 what's described in this sentence?
15     A.  I had done that prior to writing this
16 report.
17     Q.  And I gather that the complaint that you
18 refer to in this sentence is the Amended Class
19 Action Complaint, which is the complaint that would
20 have been in effect in the case at the time that you
21 wrote the declaration?
22     A.  That's correct, and it's -- I would have
23 assumed that it's cited, but maybe it's not.
24          MR. POLUBINSKI: Let me mark a couple of

Page 91

1  documents here.
2           (Hartman Exhibits 6, 7 and 8
3           marked as requested.)
4           THE WITNESS: Well, I do see in
5  footnotes 15 and 16 the citation to the complaint
6  that I was -- or in 16 that I was responding to and
7  citing.
8  BY MR. POLUBINSKI:
9      Q.  All right. Well, let me just quickly back
10 up and just make sure the record is clear on this.
11          We've handed you now documents that are
12 marked as, help me out here, Hartman Exhibit 6 --
13     A.  6, 7 and 8.
14     Q.  Thank you. The document that's marked as
15 Hartman Exhibit 6 is captioned the amended -- or
16 Amended Class Action Complaint?
17     A.  It is.
18     Q.  And I take it that that's the complaint
19 that you would have reviewed in connection with your
20 preparation of your declaration in this case?
21     A.  It appears to be so. It's certainly
22 dated, and I assume that it is.
23     Q.  Hartman Exhibit 7 is a document that's
24 titled Second Amended Class Action Complaint.

Page 92

1  You'll see the filing date at the top is
2  June 30th of 2006, correct?
3      A.  I see, yes.
4      Q.  And I gather from your prior answers that
5  you haven't seen this before?
6      A.  That's correct.
7      Q.  And then Hartman Exhibit 8 --
8      A.  May I just have a chance to quickly --
9      Q.  Absolutely.
10     A.  -- page through this here?
11         I see much of the same materials, but
12 okay, I'm now on Hartman Exhibit 8.
13     Q.  Terrific. Hartman Exhibit 8 is titled
14 Proposed Third Amended Class Action Complaint,
15 correct?
16     A.  It is.
17     Q.  And the filing date on this one is
18 November 2nd of 2006?
19     A.  That's correct.
20     Q.  And I take it you haven't seen this one
21 either?
22     A.  It, as I say, it looks similar to the
23 others, but I haven't looked, I haven't seen it to
24 confirm how it may differ.

Page 93

1      Q.  All right. So I gather you're not aware
2  or weren't aware before today that the court in this
3  case has determined that some of the allegations in
4  the original class action complaint, which is to say
5  Hartman Exhibit 6, were insufficient to state a
6  claim and should be dismissed?
7      A.  I've been aware of no rulings.
8      Q.  And so you wouldn't have considered how
9  the court's decisions in this case might impact your
10 analysis, correct?
11     A.  That's right.
12     Q.  Are you aware -- well, let me withdraw
13 that question.
14         I gather you're also not aware that some
15 of the allegations that the court rejected are still
16 present in the second and third amended class action
17 complaints, correct?
18     A.  I'm sorry, could you -- I didn't hear if
19 there was a double negative.
20     Q.  There might have been. Let me just say it
21 again, ask the question again.
22         You know what, I'll tell you the truth,
23 why don't we just withdraw it and cut through this a
24 little bit. I'm sure you'll be --

94

1  A.  I'd be delighted.
2  Q.  Why don't we for now, since you haven't
3 had an opportunity to review these, set aside
4 Hartman 7 and 8 and focus just on Hartman 6, which
5 is the complaint that you had reviewed and that you
6 discuss in your declaration in this matter.
7  A.  Okay.
8  Q.  Do you have any independent knowledge or
9 have you done any investigation into the truth of
10 the allegations in this complaint?
11  A.  There are certainly allegations about
12 particular -- I think they're called drug champions
13 or peers selling champions and there's certain
14 meetings and lodgings and studies and groups that
15 put out certain reports touting the efficacy of
16 Neurontin, and I have not done anything to confirm
17 or review the validity of those allegations.
18  Q.  And you're --
19  A.  I have looked at some data as to there are
20 allegations about increases in sales by certain
21 ICD-9 codes and for certain diagnoses, and I've
22 reviewed some IMS data in that regard.
23      So there are some aspects of some of the
24 allegations in here that I have reviewed and others

95

1 that I have not.
2  Q.  With respect to that first group that you
3 described before I interrupted your answer, I assume
4 that you're not offering an opinion as to the truth
5 of any of those factual allegations?
6  A.  That's right.
7  Q.  Let's look at Paragraph 13 of your report,
8 Exhibit 1. In the first sentence of Paragraph 13,
9 you refer to allegedly unlawful marketing practices.
10      Did I read that right?
11  A.  You did.
12  Q.  Let's flip ahead to Paragraph 16b now,
13 which is on Page 10 of your declaration. And about
14 midway through the second sentence of Paragraph 16b,
15 you write about the alleged RICO violations and
16 other unlawful conduct.
17      Did I read --
18  A.  I'm sorry, under which paragraph?
19  Q.  We're in 16b on Page 10.
20  A.  Oh, I see, yeah, I see.
21  Q.  The second sentence, and the portion that
22 I read reads the alleged RICO violations and other
23 unlawful conduct.
24  A.  That's --

96

1  Q.  Do you see that?
2  A.  It does so read.
3  Q.  And then the last time I'll make you do
4 this in this series of questions, we can look at the
5 next page on Paragraph 19c. The end of the sentence
6 discusses the unlawful promotional activities.
7  A.  It does.
8  Q.  With respect to each of the three phrases
9 that we just went to -- went through rather, are you
10 using those terms interchangeably?
11  A.  So the first appearance was in 9 did you
12 say?
13  Q.  It's actually in 13.
14  A.  Oh, 13, okay.
15      I am.
16  Q.  Looking specifically at 16b, what is your
17 understanding of what a RICO violation is as you use
18 it in Paragraph 16b?
19  A.  The -- I'm using that broadly as an
20 economist interpreting what has been alleged and
21 have been characterized as RICO violations in the
22 complaint, and so I have no more specific
23 understanding or application of that in this
24 context.

97

1  Q.  Do you have a specific understanding at
2 all as to what would make the marketing practices or
3 promotional activities at issue here unlawful?
4  A.  Well, I have an understanding. Again,
5 I've been asked to assume certain things, and
6 I've -- in being asked to assume that, I've reviewed
7 to some extent the requirements of the FDA in terms
8 of what can -- how a drug can be promoted and when
9 it can be promoted for off-label use or not and
10 what's required.
11      So that's the extent of my understanding.
12  Q.  Okay. So you're not offering an
13 independent opinion on the lawfulness or
14 unlawfulness of any particular conduct alleged in
15 the complaint?
16  A.  No, I'm not.
17  Q.  All right. Let's look again at
18 Paragraph 9. We already talked about the first
19 sentence, so let's look at the second sentence,
20 which reads, I have been asked to review the
21 declaration of Professor Meredith Rosenthal
22 discussing the class-wide impact of those
23 allegations and the economic injury caused thereby.
24      Did I read that right?

Page 98

1   A.  You did.
2   Q.  Have you done this?
3   A.  I had done that at that point, yes.
4   Q.  Okay. And by the way, those allegations
5 as used in this sentence are the allegations in the
6 Amended Class Action Complaint, correct?
7   A.  That's correct.
8   Q.  I gather, by the way, that you've also
9 reviewed declarations by Professor Rosenthal in the
10 Clark matter in Pennsylvania?
11  A.  I would assume that I did.
12  Q.  Okay. Is there anything in
13 Professor Rosenthal's reports with which you
14 disagree?
15  A.  Not that I recall.
16  Q.  Okay. Let's look at the next sentence of
17 Paragraph 9, which reads, finally, I have been asked
18 to describe standard economic models and formulaic
19 methodologies to monetize as economic damages the
20 injury incurred by the class and subclasses.
21      Did I get that one correctly?
22  A.  You did.
23  Q.  Would it be correct to say that in a
24 nutshell this sentence describes the original work

Page 99

1 that you proposed to do in this case as set forth in
2 this declaration?
3   A.  It does.
4   Q.  Okay.
5   A.  Are we done?
6   Q.  No, we're not, if only.
7      In 10a, you then write, standard formulaic
8 methodologies can be used to calculate damages in
9 this matter. These formulaic methodologies take as
10 inputs the measures of class-wide impact developed
11 and described by the Rosenthal declaration; is that
12 right?
13  A.  That's right.
14  Q.  Now, in both your model and in
15 Professor Rosenthal's, the numerical results of
16 Professor Rosenthal's analysis are denoted by the
17 letter Q; is that right?
18  A.  I assume hers are denoted by the letter Q.
19 I'd have to -- I forget. Generally economists use Q
20 for quantity.
21  Q.  Okay. Now, when you write in
22 Paragraph 10a that you take as inputs, that means
23 that you expect to take the value or values for Q,
24 assuming that that's the letter that

Page 100

1 Professor Rosenthal uses or has used it here, and
2 use them in your equation or the equations that you
3 propose in order to calculate damages; is that
4 right?
5   A.  Well, let's -- because I don't have her
6 declaration in front of me, and if you want to --
7   Q.  Why don't we do that. That might make
8 things easier. No need to guess.
9       (Hartman Exhibit 9 marked as
10          requested.)
11 BY MR. POLUBINSKI:
12  Q.  I'm handing you now what's been marked as
13 Hartman Exhibit 9.
14      Do you recognize this?
15  A.  Yes, it looks like her,
16 Professor Rosenthal's declaration in this matter.
17      And yes, she uses Q.
18  Q.  Okay. Maybe I'll give that question
19 another try now.
20      Q as calculated by Professor Rosenthal is
21 intended to reflect -- well, let me withdraw that
22 question.
23      When you write in Paragraph 10a of your
24 declaration that you take as inputs, that means that

Page 101

1 you expect to take the value or values for Q that
2 Professor Rosenthal calculates and then use them in
3 the equation or equations I guess that you propose
4 to calculate damages; is that right?
5   A.  Well, there are, as Professor Rosenthal
6 has laid out here, there are several ways that one
7 could be calculating quantities using standard event
8 study approaches, and depending upon how
9 disaggregated Q is and depending upon how the
10 allegations have changed and what -- how that may
11 affect particular diagnoses and therapeutic
12 indications, ultimately she will be analyzing and
13 calculating that amount, that quantity that was
14 induced by whatever fraudulent activities remain in
15 the complaint, and I will be taking those as my
16 point of departure and monetizing them using
17 standard databases and standard approaches, standard
18 methodology.
19  Q.  Let me try to put it another way.
20      The only source for Q in your model here
21 is Professor Rosenthal's analysis, right?
22  A.  That's correct.
23  Q.  So you don't intend to arrive at a value
24 for Q in some other way?

102

1  A.  I may -- I may end up disaggregating an
2  aggregate Q, but the point of departure for whatever
3  I do and however I apply the data and however I
4  implement the variety of methodologies or formulas
5  that can be used will start with the results from
6  her model, modeling effort and her analysis.
7  Q.  Okay. I think you had testified before,
8  and correct me if I've got this wrong, that your
9  assignment in this matter is not to prove impact,
10 that Professor Rosenthal is doing that; is that
11 right?
12 A.  The -- as it says on the second sentence
13 of Paragraph 9, I've been asked to review her
14 declaration assessing impact, and I've been asked
15 merely to monetize the economic damages of the
16 injury incurred.
17 Q.  Fair enough. So your model though as you
18 propose it here doesn't provide a methodology
19 independent of Professor Rosenthal's for determining
20 injury or impact on a class-wide basis?
21 A.  That's correct.
22 Q.  And I assume also that you do not yourself
23 consider whether each member of the class was
24 impacted or injured?

103

1  A.  Well, what I consider at this stage of any
2  of these analyses is a demonstration of class-wide
3  impact and the implications thereof, and so that's
4  the level at which I understand Professor Rosenthal
5  is and I read her models as doing and what I'm
6  monetizing.
7  Q.  So again, you don't actually consider
8  yourself then whether each member of the class was
9  injured or impacted, each individual member as
10 opposed to an aggregate determination?
11 A.  Well, as we've just decided, I'm not
12 addressing impact at all.
13 Q.  Fair enough. I assume also that you're
14 not in your analysis setting out to determine
15 whether any of the defendants' actions actually
16 caused any harm or injury?
17 A.  I am -- I think you've -- the nugget that
18 you got to before is I have been asked to describe a
19 methodology, models and methodologies to monetize
20 the economic damages, the injury incurred as in
21 economic injury given the definition of economic
22 injury, and so that's all I've done here.
23       So I haven't addressed that --
24 Q.  Okay.

104

1  A.  -- particular question.
2  Q.  I think you already essentially have said
3  this, but just to make sure I've got it straight,
4  your declaration sets forth a methodology by which
5  you'll calculate total damages in the aggregate, is
6  that correct, for each of the subclasses?
7  A.  For the class as a whole, for subclasses
8  as they may be delineated by the court or by
9  counsel.
10 Q.  Right. And your model, at least as it's
11 set forth in your declaration, wouldn't provide a
12 way to derive the appropriate amount of damages for
13 each individual member of the consumer subclass,
14 correct?
15 A.  I have not been asked, while I've done it
16 many times, I've not been asked to deal with issues
17 of allocation at this stage. I've merely been asked
18 to calculate aggregate class-wide damages.
19 Q.  Does your model presume that all class
20 members were damaged in some way?
21 A.  I've -- that's not the focus of what
22 I've -- the measure of class-wide impact in terms of
23 Q is performed by Dr. Rosenthal, and I'm monetizing
24 that Q.

105

1       So that's as far as I take it, I let my
2  assumptions go. I'm not being -- I haven't been
3  retained to deal with that issue of liability.
4  Q.  Fair enough. So your model wouldn't
5  provide a methodology for the court to be able to
6  determine the appropriate damages for an individual
7  member of the consumer subclass, right?
8  A.  While I have been asked many times to take
9  a model of this sort and calculate aggregate damages
10 and then refine it to deal with issues of allocation
11 for groups of class members or subclasses or groups
12 of individuals, I've done that many times, I have
13 not been asked to do that now. I've merely been
14 asked to calculate aggregate class-wide damages as a
15 result of impact proven and demonstrated by
16 Professor Rosenthal.
17 Q.  Do you have any understanding for how
18 plaintiffs would propose to the court determining
19 appropriate damages in this case, if any, for each
20 member of the consumer subclass?
21 A.  As I say, I've done that many times. I
22 haven't been asked to do it yet here, and so I
23 don't, not yet. That's for a later analysis.
24 Q.  Just to go through this quickly, your

106
1 model as set forth in your declaration also wouldn't
2 provide a way to derive the amount of damages for
3 each individual member of the third-party payor
4 subclass either, I assume?
5     A. Not yet.
6     Q. But that's an aggregate analysis as well?
7     A. That's correct.
8     Q. And then presumably you don't have an
9 understanding at this stage at least as to how
10 plaintiffs would propose that the court determine
11 appropriate damages, if any, for each individual
12 member of the third-party payor subclass; is that
13 right?
14     A. We will be asking and answering the same
15 question over and over again.
16     Q. We're done with them now, if you can just
17 answer that one for me.
18     A. It's something that I do in the normal
19 course of settlement allocation, and I haven't been
20 asked to do it yet.
21     Q. Let's look at Paragraph 13 of your
22 declaration, which reads, I've been directed by
23 counsel to assume that the appropriate measure of
24 class damages in this matter is the amount paid by

107
1 class members for units purchased as a result of the
2 allegedly unlawful marketing practices.
3         Did I read that correctly?
4     A. You did.
5     Q. So as envisioned here, you'd be
6 calculating damages based on the actual payments,
7 whether they're reimbursements or copay amounts
8 actually spent by class members on Neurontin
9 prescriptions; is that right?
10     A. That's correct.
11     Q. And that your analysis, at least as you
12 set it forth here, assumes that class members should
13 recover the full amount that was spent on the
14 increased Neurontin prescriptions as identified by
15 Professor Rosenthal?
16     A. Well, I've been directed by counsel that
17 one of the many recourses in equity is the full
18 amount paid, and that's the one they've told me to
19 assume is appropriate in this situation, so that's
20 what I've used.
21     Q. And so for consumers at least, that means
22 that they would recover the full amount of their
23 copay or their out-of-pocket expenses for the number
24 of prescriptions calculated by Professor Rosenthal,

108
1 correct?
2     A. As disaggregated to the types of
3 diagnoses, indications, et cetera, yes.
4     Q. And with third-party payors, they would
5 recover the full amount of the reimbursement that
6 they provided for the number of prescriptions of
7 Neurontin calculated by Professor Rosenthal?
8     A. Certainly the amount of reimbursement.
9 Whether the dispensing fee would figure into that is
10 something that is I'd need direction probably from
11 counsel on.
12     Q. Okay. Am I right, therefore, that your
13 proposed model assumes that the value of a Neurontin
14 prescription for an off-label use was zero?
15     A. I've made no assumption in any regard in
16 that way. I've merely been asked to -- I've been
17 directed by counsel that off-label promotion leading
18 to off-label sales is illegal, and the measure of
19 recovery in equity is the value of the drug -- is
20 the price paid, I'm sorry, for that unit.
21         And so I shouldn't have used value, it's
22 the price, and so that's -- I haven't been asked to
23 take into account any notion of value or not.
24     Q. Okay. So in any event, the damages here

109
1 that you award are the price paid, correct?
2     A. That's right.
3     Q. And your model makes that assumption
4 without regard to whether Neurontin was perfectly
5 effective for some class members?
6     A. It does not take into account whether
7 there was a placebo effect, whether there was real
8 efficacy or anything of that sort.
9     Q. So your model presumes that all class
10 members, even those for whom Neurontin actually
11 works, should recover damages?
12     A. My model assumes that given what the law
13 says about off-label promotion that that -- should
14 that be found illegal as a matter of law, there is a
15 measure of recovery as a matter of law, and that's
16 what my equation calculates. It does nothing more
17 than focusing on or doing an analysis of other
18 aspects.
19     Q. Let me ask it this way. Your model
20 doesn't provide a means of excluding those for whom
21 Neurontin was effective, correct?
22     A. The -- my model and the calculations that
23 I do are based on Qs that are calculated based on
24 the analysis and the modeling of

110

1 Professor Rosenthal.
2    Now, in that modeling, as I've reviewed
3 her work, there's an allowance for a certain amount
4 of off-label use that occurs in the normal course of
5 events by physicians not due to off-label promotion
6 but due to doctors trying to do some off-label use
7 of the drug.
8    But what I -- once her analysis has found
9 those Qs in excess of what would be the state of
10 affairs had there been no RICO violations or
11 unlawful marketing practices, I take those Qs and
12 monetize them.
13   Q. So again, just to ask my question again,
14 your model doesn't provide a means of excluding
15 those for whom Neurontin actually did work, correct?
16   A. My model is silent as to whether it works
17 or not.
18   Q. And so therefore, your model doesn't
19 provide a means of excluding those for whom
20 Neurontin worked?
21   A. If the -- my model doesn't focus on that
22 issue at all, so it doesn't include them, period.
23   Q. When you say it doesn't include them --
24   A. It doesn't include that issue. If there

111

1 was an off-label prescription --
2   Q. I'm sorry, when you say it doesn't include
3 that issue, it doesn't address the issue?
4   A. It doesn't address the issue, that's
5 right.
6   Q. Okay. You'd agree that if a given
7 individual class member had not been prescribed
8 Neurontin for the applicable off-label use, his or
9 her doctor may have prescribed another drug in its
10 place, correct?
11   A. Certainly in any particular therapeutic
12 setting, if Neurontin was not prescribed, some other
13 drug may have been prescribed.
14   Q. I assume you don't know of any way short
15 of a patient-by-patient inquiry of determining
16 whether any given patient would have been prescribed
17 an alternative drug had he or she not received
18 Neurontin, correct?
19   A. Could you repeat the question?
20      MR. POLUBINSKI: Could you read it back,
21 please.
22      (Question read.)
23      THE WITNESS: I'm finding it difficult to
24 get my head around what you're -- what the -- I

112

1 mean, obviously if Neurontin were not prescribed for
2 off-label indications, something else would have
3 occurred, which is not as I understand it and what
4 I've been asked to assume is irrelevant to damages.
5      And so I -- there's no need to pursue the
6 patient-by-patient inquiry that you seem to be
7 proposing. I'm not -- it's not part of what I've
8 been asked to analyze or monetize.
9 BY MR. POLUBINSKI:
10   Q. Fair enough. Should you be asked to
11 analyze that, are you aware of any way to do it
12 short of a patient-by-patient inquiry?
13   A. I have not -- I haven't analyzed or even
14 put my thoughts in that direction, but it's my
15 opinion as an economist and an econometrician that
16 one can deal with aggregate analyses and aggregate
17 behavior -- if one could not do analysis of a market
18 without asking every patient or every consumer in
19 that market what he or she would do or wouldn't do
20 under alternative circumstances, there would be no
21 analytic models done by Pfizer, by Parke-Davis to
22 analyze aggregate sales over groups of patients.
23 There would be no -- none of the publications that
24 have been done by Sara Ellison would have been peer

113

1 reviewed and reached journals.
2      Economists deal daily with predicting
3 average tendencies over groups of people where
4 individuals, where individuals vary, but one
5 summarizes the variation using a variety of
6 variables.
7      Now, I haven't been asked to do that here,
8 but I have no doubt that could be done.
9   Q. As you sit here today, do you have any
10 sense for how it could be done?
11   A. It's done -- Sara Ellison has done it for
12 demand for cephalosporins with Griliches and Hausman
13 and I always say Cockburne because I don't know how
14 to say his name, but they have a Rand journal
15 article where they have demands for alternative
16 cephalosporins that are alternative therapeutic
17 substitutes and generic substitutes, and the only
18 thing that they really look at is the differences in
19 price. They don't look at individual patients.
20 They look at total amounts prescribed.
21      And so there's a model. These kinds of
22 models are formulated for products in any market
23 where you correct as best you can for the variation
24 of groups of consumers, but reliable models have

### Page 114

1 been developed by pharmaceutical manufacturers to
2 predict total sales without going out and asking
3 every patient or every doctor what they're going to
4 do. They base it on statistical models.
5     And so the fact that it's been done for so
6 many drugs makes me believe -- Neurontin is no -- is
7 not so fundamentally different that a model could
8 not be done for Neurontin that does not require one
9 going out and talking to every single patient about
10 what his or her circumstances are and his or her
11 response to Neurontin was.
12    Q. Let's return to something slightly
13 different.
14    Had class members not been prescribed
15 Neurontin for an off-label use and had they been
16 prescribed an alternative drug along the lines of
17 what we've discussed several questions ago, it's
18 certainly possible that the alternative drug might
19 not have worked for -- might not have been effective
20 in treating their condition; is that correct?
21    A. You know, anything is possible.
22    Q. You certainly don't have any way of
23 determining that each of those alternative
24 prescriptions would have been effective, correct?

### Page 115

1    A. I've -- I have not been asked to do an
2 analysis of that sort or make any assumptions about
3 that.
4     So I -- it's ...
5    Q. That's fine. Now, whatever alternative
6 drug a patient would have received instead of
7 Neurontin would not have been free, correct? In
8 other words, the drug would have cost money?
9    A. That any prescription for a pharmaceutical
10 generally costs money.
11    Q. And the cost of the alternative drug would
12 have been incurred by the applicable class member
13 instead of the cost incurred for Neurontin; is that
14 correct?
15    A. If an alternative drug had been prescribed
16 instead of Neurontin, that's correct.
17    Q. And so that would be the case both for
18 individual class members, individual consumer class
19 members who would have made copays or paid for some
20 or all of the prescription out-of-pocket at least in
21 some cases, right?
22    A. If a different drug was used, they would
23 have paid a copay and/or an out-of-pocket cash
24 expense.

### Page 116

1    Q. And the TPP class member would have at
2 least in some cases reimbursed for the alternative
3 drug the very same way that they reimburse for
4 Neurontin?
5    A. They would have reimbursed for the drug
6 depending on the type of reimbursement that was
7 applicable.
8    Q. And in at least some cases, an alternative
9 drug might have cost even more than Neurontin,
10 correct?
11    A. There were lots of drugs out there that I
12 assume cost -- some cost less and some cost more.
13    Q. You don't have any reason to believe that
14 the price for the alternative drug would not have
15 been higher than the price for Neurontin at least in
16 some cases, right?
17    A. Well, I just have done no analysis of that
18 for me to, you know, have an opinion one way or the
19 other. I mean, it could be -- it could have been
20 half as much, it could have been twice as much. I
21 just don't know.
22    Q. It could have been either one though?
23    A. Yeah.
24    Q. Fair enough. And your proposed

### Page 117

1 calculations of damages does not in any event
2 purport to net out the amount that a class member
3 would have paid for a different drug other than
4 Neurontin, correct?
5    A. That's correct.
6    Q. Let's try just a hypothetical on this.
7 Imagine that a patient was prescribed Neurontin for
8 neuropathic pain. The drug was totally effective,
9 and to make things simple, let's say that the
10 patient paid for the prescription herself and it
11 cost $100, and just to make things simple, let's
12 assume that the prescription was caused by some
13 allegedly improper conduct that would generate
14 liability in this case.
15    As a starting point, is it correct to say
16 that your model would calculate damages for that
17 individual of $100?
18    A. Well, as a starting point, you're asking a
19 legal question, and, you know, and it's -- the --
20 whether that prescription would be included in a
21 damage calculation in the Q is the result of a legal
22 finding of whether that person used that drug as a
23 result of illegal activity.
24    And so beyond that, I don't do an

118
1  analysis.
2      Q.  Okay. Let's try to do it at the level of
3  your analysis.
4          Based on what I just said, let's say that
5  this person's $100 prescription does end up in
6  Professor Rosenthal's Q.
7          The work that you do as an economist, not
8  as a lawyer or anything else, would generate a value
9  for damages based on that prescription of $100,
10 correct?
11     A.  If that prescription ended up in
12 Professor Rosenthal's Q, it would be monetized as it
13 is just as we've said, either at the moment that she
14 paid out-of-pocket or the mix of copay plus the
15 reimbursement rate of the third-party payor.
16     Q.  Fair enough. So in the case of my
17 hypothetical where she paid the amount out-of-pocket
18 $100, her damages would be monetized as $100?
19     A.  That's correct.
20     Q.  And it would do so without regard for the
21 fact that the drug was perfectly effective for that
22 patient, again assuming that it was in
23 Professor Rosenthal's Q?
24     A.  Once I get the Qs, efficacy is not

119
1  something that I look at.
2      Q.  Okay. Now, imagine that if the patient
3  had not been prescribed Neurontin, she would have
4  been prescribed something else, an opiate for
5  example, that would have also cost $100, your model
6  would still treat that patient as having suffered
7  the same $100 loss even though the patient would
8  have spent the same amount on a different
9  medication, correct?
10     A.  You're saying instead of the Neurontin she
11 was prescribed an opiate?
12     Q.  Had she not been --
13     A.  Had she not been prescribed an opiate.
14     Q.  -- her doctor would have prescribed
15 something else.
16     A.  This other drug, and so in that case the Q
17 does not occur for her and she spends $100 on the
18 opiate, is that your hypothetical?
19     Q.  No, it's not. She still spent the money
20 on Neurontin, but had she not done so, her doctor
21 would have prescribed something else the same way we
22 described.
23     A.  No, so the hypothetical is we started out
24 she was -- Neurontin was prescribed, she spent the

120
1  $100, and I said that was if -- that unit was for an
2  indication in here subject to Professor Rosenthal's
3  model, the damages of $100 would be monetized for
4  her.
5          Now you're saying she goes to the doctor's
6  office and the doctor does not prescribe Neurontin;
7  is that right?
8      Q.  No. The doctor still prescribes
9  Neurontin. This is just an additional layer to the
10 same hypothetical.
11     A.  Plus another drug?
12     Q.  No, not another drug, but had she not been
13 prescribed Neurontin, and she was, but had she not
14 been prescribed Neurontin, she would have been
15 prescribed something else, in this case an opiate.
16     A.  Well, but that's -- but had she not been
17 prescribed Neurontin, so she's not prescribed
18 Neurontin.
19     Q.  If she had not been.
20     A.  Yeah, so she has not been prescribed
21 Neurontin. If she had not been, I'm just taking
22 your words at face value, she goes into the doctor's
23 office, the doctor doesn't prescribe Neurontin,
24 right? Had she not been prescribed Neurontin, she's

121
1  sitting there and she's not being prescribed
2  Neurontin, but she's being prescribed an opiate, is
3  that your hypothetical?
4      Q.  No, it's not. And I think we're having
5  enough trouble with this, and it's unimportant
6  enough that I think we can just move on.
7      A.  Okay.
8      Q.  You're familiar with the term but-for
9  damages, correct?
10     A.  Well, I'm familiar with the word but-for
11 world or but-for analysis.
12     Q.  In fact, you actually used it earlier in
13 one of your answers in this deposition.
14     A.  I probably used it a lot.
15     Q.  Fair enough.
16     A.  But I will say that it's spelled b-u-t and
17 where I've seen in other transcripts it's sometimes
18 spelled b-u-t-t, which is not the world I'm talking
19 about, but let us go on. I digress.
20     Q.  That's a helpful clarification. Thank you
21 very much.
22         I know we have got only three more minutes
23 left on the tape. I'd love to ask this set of
24 questions, if we can switch the tape and stay here,

31 (Pages 118 to 121)

VERITEXT CORPORATE SERVICES (800) 567-8658

Page 122

```
 1 and then once I get through them, we can break for
 2 lunch.
 3        Does that sound reasonable?
 4    A.  Sure.
 5        THE VIDEOGRAPHER: This is the end of
 6 Tape 3. We're off the record at 12:22.
 7            (Whereupon, an off-the-record
 8            discussion was held.)
 9        THE VIDEOGRAPHER: This is the beginning
10 of Tape 4. We're back on the record at 12:23.
11 BY MR. POLUBINSKI:
12    Q.  So we were just talking about but-for
13 damages, spelled with one T, correct?
14    A.  But-for worlds and damages calculated
15 therefrom.
16    Q.  Okay. Am I right the damages calculated
17 from a but-for world would be the difference between
18 the plaintiffs' economic position and what the
19 plaintiffs' economic position would have been absent
20 the alleged wrongdoing?
21    A.  The notion of damages and my use of a
22 but-for world is to take the actual world and which
23 it reflects the alleged unlawful activities of
24 defendants, whatever those activities may be, and
```

Page 123

```
 1 then it models the world, what it would look like
 2 absent or but for those unlawful activities.
 3        So in this particular case, absent the
 4 unlawful activities, Q would be less for certain
 5 indications that were subject to off-label
 6 promotion.
 7        And so that is the single and only way
 8 that but for is being used here, and it's a
 9 difference in quantities. And under the law, as I'm
10 being directed here, the issue of how much better
11 off or worse off a patient is is not relevant to the
12 fact that Q was increased as a result of the illegal
13 promotion.
14    Q.  Okay. Let me ask it this way, and right
15 now I'm just asking in the abstract. I'm not asking
16 about this case specifically at this point yet.
17        Would you agree that the point of
18 calculating damages in the way that we've described
19 looking at the but-for world would be to try to put
20 the plaintiff in approximately the position that he
21 or she would have been in in the absence of the
22 alleged wrongdoing?
23    A.  Well, I think it depends on what type of
24 illegal activity one is looking at. Certainly in an
```

Page 124

```
 1 antitrust case there are issues of overcharges where
 2 when you look at the but-for world you're looking at
 3 making the consumer whole as a result of the illegal
 4 activity, the disadvantage generated by a
 5 price-fixing scheme or a conspiracy to limit entry
 6 that led to higher prices. You're looking at a
 7 but-for world where the prices would be lower, and
 8 you make the consumer whole.
 9        There are for that same illegal activity,
10 there could be a recovery of unjust enrichment that
11 could be in excess of the overcharges, and it's a
12 matter of law what measure ends up being used or
13 appealed to.
14        So, I mean, there's notions of
15 compensatory, there's notions of punitive damages.
16 All of these -- there's -- it's depending on what
17 type of damages and what the legal situation is, it
18 could be to make a consumer whole or it could be
19 more than that or different than that.
20    Q.  Right. Right now I think though we're
21 just talking about damages calculated based on the
22 but-for world.
23    A.  Well, which but for? You said we were
24 being abstract and being general.
```

Page 125

```
 1    Q.  Let me just say that, well, you had
 2 referenced unjust enrichment and punitive damages in
 3 your last answer, correct?
 4    A.  That's correct.
 5    Q.  And neither of those sorts of damages are
 6 damages that are derived by reference to the but-for
 7 world in the way that we've been talking about,
 8 correct?
 9    A.  No, not true at all.
10    Q.  Okay. How is it true?
11    A.  Well, there's -- one can analyze a but-for
12 world, and measures of unjust enrichment would
13 flow -- I could go to an antitrust situation, an
14 antitrust violation, and I could calculate
15 overcharges to consumers, and I could also calculate
16 unjust enrichment, and they may differ considerably.
17 Both of them flow from a difference between an
18 actual and a but-for world.
19    Q.  There's just a question of whether you're
20 looking at it from the plaintiffs' perspective or
21 the defendants' perspective?
22    A.  Yeah, I mean, in that particular case it's
23 true.
24        There are cases where and there are people
```

126

1 that have written about the theory of when punitive
2 damages are appropriate, and because of the fact
3 that you're trying to set incentives such that if a
4 price-fixing scheme is only uncovered every fourth
5 price-fixing scheme that there's a social optimum of
6 setting punitive damages such that you want the
7 punishment to be sufficiently high so that there's a
8 deterrence so that if you catch one out of four it
9 will be enough to deter the other three so that they
10 won't enter into that unlawful activity.
11      Now, that measure of punitive damages is
12 still calculated as a measure between actual and the
13 but-for world, but it's a different interpretation.
14 It's a different theory of damages, and it's a
15 different measure of relief or measure of recovery
16 in equity.
17      And so all of them involve a but-for world
18 and an actual world, and you're asking me this very
19 generally, and so I'm responding very generally.
20 The relief that we're talk -- that I'm being asked
21 to assume here is not a difference between how well
22 off a patient may be or not be. There is a but-for
23 world. It's measured by differences in quantities,
24 and that's the legal direction that I've been given

127

1 to take, and an economist can develop models to
2 identify and calculate what will happen in a but-for
3 world, but how that gets monetized into damages can
4 vary considerably from case to case and legal -- the
5 law and law to law.
6    Q. Okay. The concepts of unjust enrichment
7 and punitive damages that you've just been talking
8 about are something different from putting
9 plaintiffs in approximately the position that they
10 would have been in the absence of the alleged
11 conduct, correct?
12    A. Well, no. The theory of the punitive
13 damages is to set damages high enough such that
14 consumers will not be put in -- that in the
15 expectation they will not be damaged over time.
16      So it's a different way of looking at how
17 do I keep consumers safe or how do I keep consumers
18 in a situation where they will not be damaged as
19 they are in a situation where it's discovered and
20 prosecuted.
21      So given that, you can ...
22    Q. Let me ask the question slightly
23 differently.
24      The concepts of unjust enrichment and

128

1 punitive damages are something different than
2 putting the plaintiffs in approximately the position
3 they would have been in the absence of the specific
4 wrongdoing alleged?
5    A. If what you're saying is that -- it's hard
6 for me to really get a sense of what you're asking
7 me. Clearly if what you're saying is, look, someone
8 consumes Neurontin, but then if they hadn't, it's
9 really the difference between the actual spending on
10 that and what they did do is less than the price. I
11 mean, you know, that's where we're going with this.
12      And I'm saying as a matter of law, that's
13 not what I understand. That's not the -- I haven't
14 been asked to do an economic analysis of thinking
15 about that, of whether the consumers may have been
16 better off, worse off or whatever, and one could
17 come to a but-for world and do that and compare
18 actual versus but for, but one can come to a but-for
19 world and an actual world and come up with other
20 measures to monetize the difference between the
21 actual and the but-for world, and I've been asked to
22 do it one way that I've been told is a remedy in
23 equity, and that's all I've done.
24      MR. POLUBINSKI: Okay. I think that's

129

1 probably a good place to break for lunch.
2      THE VIDEOGRAPHER: Off the record at
3 12:33.
4      (Whereupon, a lunch recess was
5      taken.)
6      THE VIDEOGRAPHER: We're back on the
7 record at 1:26.
8 BY MR. POLUBINSKI:
9    Q. Dr. Hartman, do you know approximately how
10 many third-party payors form the third-party payor
11 subclass?
12    A. I would assume at least 500, maybe more,
13 maybe 1,000.
14    Q. Okay. If the plaintiffs' brief in support
15 of their motion for class certification asserts that
16 there are thousands, would you have any reason to
17 disagree with that estimate?
18    A. No.
19    Q. Okay. And the third-party payor subclass
20 is made up a number of different kinds of entities,
21 correct?
22    A. It is.
23    Q. Let's look at your declaration,
24 Paragraph 8. This is Hartman Exhibit 1. There's a

130
1 definition here, which I gather comes from the
2 complaint, of the third-party payor subclass. I
3 think it's the second sentence of that definition
4 reads, such entities include but are not limited to
5 insurance companies, union health and welfare
6 benefit plans, entities with self-funded plans that
7 contract with a health insurance company or other
8 entity to serve as a third-party claims
9 administrator to administer their prescription drug
10 benefits, private entities paid by any governmental
11 entity including a state Medicaid program to provide
12 prescription drug benefits on a capitated basis, and
13 other organizations that paid for all or part of a
14 Neurontin prescription since January 1, 1994.
15     Did I read that correctly?
16  A.  You did.
17  Q.  Would you agree with me that at least some
18 of these third-party payors would have had multiple
19 different plans at a given time pursuant to which it
20 would have reimbursed for Neurontin?
21  A.  I would agree.
22  Q.  And that over the period since 1994, which
23 is covered by the class period as currently defined,
24 those plan offerings and their terms in at least

131
1 some cases have changed; is that correct?
2  A.  That's correct.
3  Q.  Some third-party payors would have used
4 PBMs or third-party administrators or both during
5 the class period in connection with reimbursement
6 for prescriptions of Neurontin, correct?
7  A.  I don't know if they would be using both,
8 but I've not -- I'm not aware of a situation like
9 that, but I guess it's possible.
10  Q.  Okay. And then some third-party payors
11 might not use either a third-party administrator or
12 PBM; is that correct?
13  A.  That's correct.
14  Q.  If I referred to third-party
15 administrators as TPAs, does that make sense to you?
16  A.  That's fine.
17  Q.  Great, okay. Now, for those that used --
18 for those third-party payors that used PBMs, the
19 PBMs could have filled different roles; is that
20 correct?
21  A.  Why don't you be more specific.
22  Q.  Sure, sure, that in some cases the PBM
23 might have functioned as a claims administrator?
24  A.  Generally my understanding, most of --

132
1 when you're using a PBM, they are going to be a
2 claims administrator for you.
3  Q.  And in some cases they may also serve as a
4 benefits advisor?
5  A.  They provide that service also.
6  Q.  And in some cases at least they might
7 provide or they might be full-service providers of
8 pharmaceutical reimbursement?
9  A.  PBMs offer a wide range of plans that will
10 help you do medical planning and benefits planning
11 and a variety of things, so they have -- they offer
12 a large variety of things.
13  Q.  Okay. Now, the exact range of services
14 that a given PBM would have offered might have
15 impacted the amount that a third-party payor would
16 reimburse for a given prescription, correct?
17  A.  Well, there's -- as I've reviewed PBM
18 contracts, there are negotiated contracts, and there
19 are issues that enter into the negotiation about how
20 much a third-party payor will -- the discounts off
21 AWP or whatever the reimbursement rate has to be
22 will be negotiated depending on what the third-party
23 payor brings to the table in terms of insured lives.
24 A bundle of things are addressed in those

133
1 negotiations. Normally a PBM offers a list where
2 there's a checklist if you want, you know, this, if
3 you want to provide benefits management for your
4 insureds, it's 50 cents per claim or whatever they
5 can negotiate, a wide range of different kinds of
6 options that's usually like a menu, a laundry list,
7 and we will take three from column A and three from
8 column B.
9     So there is that option to do that and
10 have those services, yes.
11  Q.  And I guess as a more general question,
12 each of those contracts between a PBM and a
13 third-party payor would be individually negotiated,
14 is that correct, you know, as you've just described?
15  A.  Well, each of those contracts a
16 third-party payor sits down and negotiates with a
17 PBM. The terms will be specific to that
18 negotiation, but what the data shows is that
19 those -- that variation is in a very narrow range of
20 outcomes.
21     And so yeah, they might be able to
22 negotiate AWP less 13 percent for, you know, a
23 tier 1 formulary and AWP less 17 percent or
24 whatever.

34 (Pages 130 to 133)

### Page 134

1  But the percentages and the reimbursement
2 rates, it turns out to be within a very narrow range
3 of outcomes.
4   Q. Fair enough. But they do vary as you just
5 said, correct?
6   A. Yes, slightly, yeah.
7   Q. Okay. Is it also the case that different
8 third-party payors could have used different PBMs
9 over the length of the class period? Actually let
10 me rephrase that and make it a little bit better.
11    Is it the case that a single third-party
12 payor might have used more than one PBM at some
13 point during the length of the class period, which
14 now runs from 1994 to the present?
15   A. That's correct.
16   Q. And that the role of the PBMs that that
17 third-party payor would have used could have changed
18 over the course of the class period; is that correct
19 too?
20   A. Well, the roles that the PBMs, even if a
21 TPP stays with a given PBM, sometimes they may
22 renegotiate the roles that are offered, and it's --
23 they could change, moving to another PBM.
24   Q. Fair enough. Now, going back to the

### Page 135

1 actual contract between the third-party payor and
2 the PBM, I think you've just testified that they
3 could have individually negotiated discounts with
4 respect to given drugs?
5   A. Well, what they -- what the PBMs generally
6 offer to a third-party payor is a pro forma contract
7 that involves, okay, for branded drugs it's going to
8 be AWP less this much, let's see if we're going to
9 set it at AWP less 15, AWP less 16, for generic
10 drugs we will treat them in this way, and then
11 there's a whole list of add-on options that might be
12 offered as part of that contract that the
13 third-party payor may decide to take or not.
14   Q. Okay. With respect to rebates, is it the
15 case that each third-party payor and PBM could have
16 individually negotiated rebate arrangements?
17   A. The sharing of rebates will also be
18 reflected in the contract and can be characterized
19 in, you know, in fairly quantifiable ranges, but
20 yeah, they could differ. There could be some
21 variation.
22   Q. And more specifically, the size of rebates
23 from the manufacturer to a given PBM might vary from
24 PBM to PBM with respect to a given medication?

### Page 136

1   A. Yes.
2   Q. And in addition, the amount of that rebate
3 that would pass through from each PBM to the
4 applicable third-party payor could also differ from
5 relationship to relationship?
6   A. From TPP to TPP?
7   Q. Yes.
8   A. It could.
9   Q. Okay. And that each of these differences
10 in the contractual arrangements between PBMs and
11 third-party payors could have impacted the net
12 amount that a third-party payor would have
13 ultimately paid for a prescription?
14   A. Well, what -- any group that is
15 negotiating in any market will be able to negotiate
16 some price or some cost or some reimbursement rate
17 that's going to vary slightly, so that there's not a
18 market that exists where there's not variation of
19 the sort we're talking about.
20    So yeah, there's going to be variation of
21 the sort that we're seeing, and it's the sort of
22 variation that in every application that I've done
23 analyzing third-party payors and PBMs and looking at
24 the claims and seeing the variation, it's -- there

### Page 137

1 is some variation. It can be characterized by
2 standard statistical metrics, averages and standard
3 deviations.
4    So yeah, there is some variation, and
5 there are standard methods that manufacturers use
6 to -- I mean, manufacturers are planning for sales
7 to this same group of entities, and they come up
8 with measures of what's going to happen and how the
9 market will shape out.
10    So yeah, there is variation. It's not
11 something that can't be handled by standard
12 methodologies.
13   Q. Does your model propose to account in some
14 way for each of these differences in determining
15 damages?
16   A. My model proposes as in any model at this
17 stage of the litigation to calculate damages at an
18 aggregate level taking account of averages across
19 representative groups to come up with average
20 measures of the variation that you're talking about
21 as is done in almost any damage model that's
22 implemented in any legal matter of this sort.
23   Q. But at this point, your model doesn't
24 specifically propose to account in some specific way

Page 138

1 for each of these differences in determining
2 damages --
3   A.  Well --
4   Q.  -- because it's an aggregate model?
5   A.  Well, it's an aggregate model, I'm going
6 to be using aggregate measures. I will look at IMS
7 data which summarizes average reimbursement by
8 third-party payors for a given drug. I mean, they
9 do a survey over many third-party payors.
10       So there are data sources that provide
11 averages, and IMS will provide such average
12 measures. I can go to the PBM data or third-party
13 payor data and see on average what the reimbursement
14 rates were for Neurontin by dosage, by script over
15 time, and when I have a representative group of
16 third-party payors or of that data, I can
17 characterize an average that will be used to
18 calculate an aggregate measure of damages.
19   Q.  Some third-party payors would have had
20 their own formularies during the class period; is
21 that correct?
22   A.  It's -- yeah, possibly. I mean, it's
23 becoming less the case, but it's more the PBMs, but
24 yeah, some of them have their own.

Page 139

1   Q.  Fair enough. And that some PBMs would
2 have been the entity to supply the formulary for a
3 given third-party payor; is that correct?
4   A.  That's right. That's the more common
5 practice.
6   Q.  Now, each of these formularies could and
7 probably do differ; is that correct?
8   A.  They vary slightly, yes.
9   Q.  You wouldn't disagree that the formulary
10 treatment of Neurontin could have changed with
11 respect to a given formulary over the course of the
12 class period, correct?
13   A.  Well, I would expect that it would, and I
14 would expect that it would show up in the summary
15 statistics for the -- that I've asked and identified
16 that I will rely on in estimating the model.
17   Q.  Third-party payors would have set their
18 own requirements for the amount of copayments that
19 their beneficiaries would have had to cover,
20 correct?
21   A.  The -- I would assume that their desires
22 would enter into how they were finally set. The
23 copays can differ by the number of tiers in the
24 formulary and how the third-party payor and what the

Page 140

1 PBM offered. I think it would depend on both of
2 them.
3   Q.  Fair enough. And they would vary from
4 third-party payor to third-party payor, correct?
5   A.  As everything else that we've been talking
6 about, that's right.
7   Q.  And that the copay amount for a given
8 third-party payor for Neurontin could have changed
9 over time?
10   A.  That's correct.
11   Q.  Do some third-party payors set copayments
12 as a percentage of total cost of a prescription?
13   A.  Certainly some do. Indemnity plans
14 certainly did early on, and it was a coinsurance
15 rate. That has become less of a characterization of
16 self-administered drugs over the last five or ten
17 years.
18       But to the extent that there are indemnity
19 plans, that in some of the applications where I've
20 done this kind of modeling I've differentiated
21 copays between third-party payors that just have a
22 copay and average copays indemnity plans where it's
23 a percentage basis.
24       And so it's possible. I think it's less

Page 141

1 the case these days, particularly for a
2 self-administered drug.
3   Q.  When you say you've differentiated copays
4 when you've done this kind of modeling in the past,
5 what does that mean?
6   A.  What it means is that when I've done
7 analyses of this sort where I'm doing damages and
8 I'm breaking them out by, say, type of third-party
9 payor, I have found that certain third-party payors
10 or PBMs that have offered certain plans, some being
11 indemnity, some being standard copay plans, they
12 track the claims record by the amount the ingredient
13 cost that's paid to a pharmacy, whether there's a
14 flat copay or whether there's a percentage
15 coinsurance.
16       And so there are -- sometimes there's
17 different programs offered where one will be a
18 percentage basis, the other will not be, and that
19 you get the claims records from third-party payors
20 or PBMs and you get tens of millions of claims and
21 you can watch patterns of whether the coinsurance,
22 how much more that was and what the copay was and
23 you can take averages of those measures. And I've
24 done that in antitrust cases that have involved

142

1 third-party payors.
2   Q.  In this case, do you have any plans to
3 disaggregate the damages amounts for indemnity
4 plans?
5   A.  Well, to the extent that I can get data
6 from PBMs and third-party payors, where the claims
7 data do that, I will disaggregate it as much as the
8 data will allow me to do.
9   Q.  Is that something you propose doing in
10 your declaration right now?
11   A.  Well, I proposed the data that I'm going
12 to ask for and I'm asking for under manufacturer
13 data. Manufacturers generally keep track of
14 utilization reviews from PBMs and third-party
15 payors, and they just send as part of this,
16 quarterly they have to send in all their claims for
17 all the given drugs of that manufacturer for rebates
18 purposes.
19       And that's a very rich -- this is in
20 Paragraph 15a, bullet 4, I've used that data before.
21 It's a very rich data source for claim-by-claim. It
22 will have the pharmacies. Depending if it's the PBM
23 or the third-party payor, which is in Paragraph 15d,
24 these guys keep -- information is the gold standard

143

1 in this industry because third-party payors and PBMs
2 want to keep track of every nickel and every claim
3 to get every rebate dollar that they can get.
4       And so they keep it, they computerize it,
5 they put it on diskettes and they send it to the
6 manufacturer that requires it.
7       Now, it's not always the case, but I've
8 found that it's the case. I'm going to certainly
9 see if it's the case here, and I've certainly used
10 that to identify -- they will identify in some of
11 the third-party payor information, as I say in 15d,
12 you know, you're going to have -- it's going to be
13 by NDC, date dispensed, quantity, prescription
14 number, name and address of the pharmacy, quantity,
15 health plan, amount paid. It's got copay,
16 dispensing fee.
17       I've used data like that regularly in
18 antitrust cases of this sort, and I'm expecting to
19 ask for this data whether -- there will be a way to
20 use some subset of whatever data is available to
21 deal with this issue at an aggregate level.
22   Q.  I think my question was probably a good
23 deal simpler than you may have assumed, just judging
24 from the length of your answer, which is, do you

144

1 plan on coming up with a separate damages number
2 that would be allocable to just indemnity plans, so
3 in other words a subset of the third-party payor
4 subclass?
5   A.  Perhaps --
6   Q.  But you're not --
7   A.  -- depending on whether the data allow me
8 to do that. I have to yet see how rich the data
9 provision is from your client, from either opt outs
10 or class members, from PBMs, what the data will
11 allow.
12   Q.  But at this point, it's fair to say that
13 your declaration contemplates coming up with in
14 Paragraph 18 effectively two damages numbers, one
15 that relates to the third-party payor subclass as a
16 whole and one that relates to the consumer subclass
17 as a whole, correct?
18   A.  Right now it identifies those two
19 subclasses, but the -- it is possible if the data
20 permit that I could disaggregate the third-party
21 payors into those that are indemnity plans and
22 non-indemnity plans if the data exists and if
23 they're relevant for the periods, and I won't know
24 that until I look at the data. They certainly were

145

1 relevant in some of the other cases that are listed
2 in which I've done class certification and damages.
3   Q.  All right. So in addition to copayments
4 that are a percentage of the total cost of a
5 particular medication, there are other arrangements
6 whereby the copayment is just a flat fee; is that
7 correct?
8   A.  That's correct.
9   Q.  And you'd agree that the dollar amount of
10 the flat fee reimbursement could have differed among
11 third-party payors, different third-party payors,
12 correct?
13   A.  As with everything else we're discussing,
14 I'm sure there was some variation.
15   Q.  And that there could have been variation
16 over time even with respect to a single third-party
17 payor, correct?
18   A.  That's correct.
19   Q.  And with respect to third-party payors
20 that charged copayments that were a percentage of
21 the total cost of Neurontin, the amount of the
22 percentage reimbursement could also have differed
23 between third-party payors, correct?
24   A.  Correct.

37 (Pages 142 to 145)

Page 146

1  Q. And that that too could have differed over
2 time?
3  A. I will stipulate to the fact that there is
4 variation in a variety of the things that you're
5 about to raise, and it's variation that arises in
6 any one of the cases or really in any industry among
7 any groups of different groups of purchasers, and
8 it's a variation that's addressed and handled by
9 standard formulaic statistical methods, which I
10 intend to use.
11  Q. Now, to make a truly precise determination
12 of the amount of damages, if any, for a single given
13 third-party payor, would the court or somebody at
14 some point in the future need to do an individual
15 analysis as to each plan that that individual
16 third-party payor might have used at a point in
17 time?
18  A. Well, I think this matter would work like
19 any other class action in that aggregate damages at
20 the stage that we're at, there's a question of
21 calculating an accurate measure of aggregate
22 damages, and then there will be a determination of
23 how those damages would be allocated across whatever
24 subclasses, there's two that are identified here,

Page 147

1 but should there be some mix within the third-party
2 payor group, and then the claims administration will
3 be related to putting forward records of having
4 purchased these drugs in ways that they've
5 tracked -- they track information given that it's
6 something that is a very standard thing that is done
7 by third-party payors and PBMs and manufacturers.
8  Q. Now, with respect to individual consumers
9 and the individual consumer subclass, each of those
10 individual patients could have had a different
11 reimbursement situation at any given point in time
12 based on the sort of prescription drug coverage, if
13 any, that they'd had at the time, right?
14  A. We've agreed to that already, yes.
15  Q. Okay. Now, different third-party payors
16 would also have had different arrangements with
17 consumers or their representatives on how the
18 third-party payor itself is paid or compensated; is
19 that correct?
20  A. Are you talking about premia or what?
21  Q. Yes, I'm talking -- yes.
22  A. Each insurer has premia, premiums that are
23 paid for insurance, yes.
24  Q. Is it the case that in some cases at least

Page 148

1 premia or premiums, depending on how good your Latin
2 is, will be determined by reference to the total
3 amount that the third-party payor reimburses for
4 prescriptions during a given time period?
5  A. That the premia paid by insureds, I'm --
6  Q. To the third-party payors.
7  A. To the third-party payors, I'm a, let's
8 say, a group plan that's using
9 Blue Cross/Blue Shield of -- where are you from?
10  Q. I'm from New York.
11  A. From New York, okay. So let's -- is HIP a
12 New York, H-I-P, health -- it doesn't matter. Let's
13 just take Blue Cross/Blue Shield of Massachusetts.
14 They will have group plans that will -- that can
15 cover corporate, corporations. It could have
16 different premia for large corporations and small
17 corporations, and those premia will vary, and if I'm
18 an individual member that is just having an
19 independent plan, a major medical plan, that could
20 differ too.
21       So yes, there will be different premia for
22 different groups that are being insured by
23 Blue Cross/Blue Shield.
24  Q. Let's set aside the example of

Page 149

1 Blue Cross/Blue Shield and a large third-party payor
2 like that.
3       Are there some third-party payors that
4 charge their insureds or their insureds'
5 representatives essentially a portion of the amounts
6 that they reimburse for prescriptions for a given
7 period of time?
8  A. Well, so now this is some sort of
9 self-insured plan where essentially the payments for
10 practices and doctors' practices and procedures and
11 prescriptions are passed through to insureds based
12 on how much they're paying or what their use is?
13  Q. In some way or another.
14  A. I don't really know of a case that works
15 that way.
16  Q. Okay.
17  A. I mean, indemnity plans go a little bit
18 toward that where it's a percentage of the amount,
19 but that's as close as I can --
20  Q. Okay.
21  A. -- that I know of.
22  Q. Let's look at Paragraph 13 of your report.
23 There's an equation set forth in Paragraph 13 that
24 provides a basic or generalized version of the

150

1 equation that you had planned to use to calculate
2 damages, correct?
3   A.  That's correct.
4   Q.  And that at least as set forth in
5 Equation 1, the equation contemplates that you'd
6 reach distinct calculations of aggregate damages by
7 dosage level, diagnosis group and time period; is
8 that correct?
9   A.  That is the plan now given what I think
10 the data will allow me to do. There may need to be
11 an aggregation, but I think sufficient data exists
12 to disaggregate it to that level.
13   Q.  When you say there may need to be a
14 disaggregation, what do you mean?
15   A.  You mean there may need to be an
16 aggregation?
17   Q.  I think you had -- oh, no, you're right,
18 it appears that you did say there may need to be an
19 aggregation. I'm sorry, I misheard you.
20       What do you mean?
21   A.  Well, the -- there is data that exists
22 that I have listed, the IMS data, that break out
23 survey data at the retail level, and they break out
24 retail method of payment that allow me to identify

151

1 by class group what the method of payment is,
2 Medicaid, cash payors, third-party payors.
3       There are databases like the NDTI
4 database, that's IMS National Disease and
5 Therapeutic Index, which is a physician office-based
6 survey which breaks out office visits by type of
7 diagnosis when a drug is being prescribed that would
8 allow me to identify Qs in a given year that would
9 be a total Q of Neurontin.
10       Suppose there's a total number of units by
11 a given dosage -- well, let's not even say by a
12 given dosage, let's just say total Q. There is data
13 that will allow me to say, look, 20 percent of that
14 was for office visits of doctors that was related to
15 chronic pain problems or migraines or psychiatric
16 difficulties or adjunctive therapy for epilepsy, and
17 so that would allow for a disaggregation by
18 diagnosis group.
19       The IMS data breaks out sales by strength
20 and dosage over time, so that will allow for a
21 disaggregation of the Q, total Q, total units sold
22 by dosage and strength, and the IMS data proceeds
23 monthly or quarterly or annually depending on how
24 you get it.

152

1       So there are ways to do disaggregations of
2 total Q into those different buckets.
3       Now, depending on whether the coverage or
4 the statistical representativeness of the data is
5 sufficient, it may be necessary to aggregate maybe
6 to over strengths or whatever. I mean, it's going
7 to depend on the data that's available. But right
8 now -- and that's what I mean by there may need to
9 be some aggregation across those three levels, but
10 right now I see no reason that there will have to
11 be, that one can essentially disaggregate the units
12 from Professor Rosenthal's analysis by a time
13 period, say quarterly, by the type of diagnosis, an
14 ICD-9 code, and by the strength, the dosage.
15       Given existing databases, all of which --
16 that's why I spent as much time identifying all the
17 various databases, all the data that's out there,
18 I'm not sure we will get all of this, but if we get
19 half of this, we can do the disaggregation. And
20 these are the types of data that I've used in doing
21 it in other cases that are not dissimilar from this
22 except it's not a -- it's not the same allegations.
23   Q.  Do you know how many diagnoses are at
24 issue in this case?

153

1   A.  Oh, probably more than 400 at the ICD-9
2 level.
3   Q.  I guess maybe let me ask it a different
4 way.
5       Do you know which diagnoses in this case
6 would be diagnoses that would generate liability
7 potentially?
8   A.  Well, I know it was alleged in the
9 whichever complaint I looked at, Hartman 6, the
10 Amended Class Action Complaint, and I've identified
11 them, excuse me, in Paragraph 12.
12       And so essentially at the time of the
13 beginning of the class period, the only FDA
14 indication for which it had been -- received
15 regulatory consent to promote was for adjunctive
16 therapy of symptoms of epilepsy, in adults it would
17 appear to me, and then there was a children's
18 indication for the same indication in 2002, and then
19 I think there were post hepatic pain that was
20 somewhat later than that.
21       So the -- all other diagnoses from the
22 ICD-9s I've grouped into five different groups here,
23 but the units that are subject to the alleged
24 unlawful promotional activities were all that were