154

not FDA approved and then any that were in excess dosing beyond the FDA approval, and that would include the ones for which it was FDA approved but just not in the levels of strengths that were prescribed.

Q. So is it your assumption that aside from the indications for which Neurontin had received an approval from the FDA that all other indications would -- prescriptions for all other indications would potentially generate liability in this case?

A. No, it's my understanding that there's going to be some off-label promotion -- off-label prescription or dispensing by doctors that would normally occur as one finds in any drug and particularly these anticonvulsants. It's mentioned in the complaint, and I think I mentioned in here that with Dilantin, for example, there's a certain percentage of the scripts that are written are off-label, but it's at the doctors' experimentation rather than as a result of the illegal, allegedly unlawful promotional activities.

So it's that increment that I see Professor Rosenthal analyzing and calculating and is subject to the damages in this matter.

155

Q. So in your subscript in Equation 1, dosage is denoted by the letter I; is that correct?

A. Yeah, as indicated in Paragraph 12 where it's probably -- it just -- it clearly lays it out and then talks about the ICD-9 codes. It's QIJT where I, if you look at Paragraph 12, I think it's the end of the second sentence where I denotes a dosage, J denotes a diagnosis based upon ICD-9 codes in aggregation, and T is the time period, year and quarter.

So that lays out the I, J and T definitions with accompanying footnotes, and ...

Q. Paragraph 12, the part that you just read from, indicates that you define Q in terms of extended units of Neurontin?

A. Right.

Q. What do you mean by extended units?

A. Numbers of pills. It can be described in a variety of ways, but it could be scripts, but then scripts would be determined by an average number of pills per script, and so it's -- I'm just using -- I'm using the IMS definition of extended units.

Q. And looking at footnote 23, you see that there are a number of different pill strengths?

156

A. Yes.

Q. Would extended units refer to just one of these pill strengths, or would any given one of these pills constitute a single extended unit?

A. Well, an extended unit, if one looks at the IMS data, one looks at data summarizing sale, unit sales, numbers of units of pills at 100 milligrams, 250 milligrams, 300, 400, each of them is a pill. They're not necessarily -- a 100 unit, extended unit doesn't equal an 800-milligram one. Obviously there will be different prices connected with each of those, but they're each an extended unit with a different price.

Q. Would you plan to disaggregate by dosage, or do you plan to disaggregate by dosage because you would expect different unit prices for different dosages?

A. I would expect different unit prices by dosage, and certainly the manufacturer data will show me what those are in the invoice data, what the ASPs were for extended units.

And so I certainly will start there and keep it at that level of disaggregation to the extent possible, and if not, then I will take

157

averages up to greater aggregations.

Q. Now, when you talk about disaggregating damages by dosage, I'm assuming that that means that you anticipate getting amounts of Q that are disaggregated by dosage from Professor Rosenthal; is that correct?

A. She might be able -- Professor Rosenthal may be able to do that, she may not be able to do that. If I just get aggregate Q, there are -- there's information, that's why I've discussed the IMS data and the National Prescription Audit data, where that differentiates total Q of a given drug by strength, by dosage.

So if her modeling turns out to only give me total Q, total units over time, and that's going to depend on -- she has proposed several different models, but suppose I only have total Q, the National Prescription Audit data provides information on total scripts and extended units by dosage, by strength.

So if there were 1,000 units in a given quarter, that will give me the breakout by 100 milligrams, 200, 250, whatever they all are. Again, there's three that are the most common, so I

would expect most of them to be in those three dosages as discussed in footnote 23.

Q. Is there anywhere in your declaration where you actually discuss in any way how you would do such a disaggregation if Professor Rosenthal didn't do the disaggregation for you?

A. Well, it's -- what I just told you, when your people from Cornerstone or whomever they're supporting look at the words of what I've said, they will understand what I'm saying about the frequencies reflected in this data that allow me to go from totals to individual dosages.

Q. But you don't say how you're going to do that? You don't tell the court, for example, how you would do this?

A. I'm just looking at the footnote here.

Well, it's -- perhaps I'm so used to doing this now that I assume that it's obvious, but the bullet under B, Paragraph 15b that says, look, the National Prescription Audit data summarizes total monthly reimbursements, dollars and units at retail, and total extended units by dosage.

Now, that's a sample, and I can go to the manufacturer and see total units sold and/or I can

use the IMS data for totals, but given that I have those totals by dosage, that's a frequency of all units sold by dosage.

So it's -- it's expert speak, I understand that, but I didn't think the judge wanted a long description of frequencies and complicated formulae for what are straightforward.

Q. So you -- well, go ahead.

A. Well, you know, I've put forward the equation I'm going to use, Equation 1, and I've described the data that will get me there, and, you know, that I thought was sufficient.

Q. Fair enough. So that aside from that, you assume that -- I should say you're asking the judge to essentially take on faith that you'd be able to do that analysis that isn't described in any more detail here than it is in Equation 1?

A. Well, I will ask the court to read the description and decide for -- I will not presume to tell the court what to do or how to interpret things, but I obviously put forward a description that is standard and I felt was sufficient for the court to understand what I was going to do.

MR. POLUBINSKI: Okay. Why don't we take

a break, or at least just enough time to change the tape. We have only got three minutes left.

THE VIDEOGRAPHER: This is the end of Tape 4. We're off the record at 2:12.

(Whereupon, a short recess was taken.)

THE VIDEOGRAPHER: This is the beginning of Tape 5. We're back on the record at 2:14.

BY MR. POLUBINSKI:

Q. Okay. I think you testified before that diagnosis groups are denoted by the letter J in your equation; is that correct?

A. That is correct.

Q. Okay. And you testified before that you expect to get the input for the letter Q from Rosenthal in your equation; is that correct?

A. That's correct.

Q. And that you don't expect to derive an independent opinion on the value of Q, is that correct as well?

A. That's correct.

Q. Okay. But one thing you do anticipate doing is assigning the results of Dr. Rosenthal's calculations to subclasses; is that correct?

A. Dr. Rosenthal provided several modeling approaches, some of which were more aggregate than others.

So depending on how disaggregated her results are, that will determine how much disaggregation I have to do here. She may give me Qs by diagnosis, let's say, and that is one of, my recollection, is one of the modeling efforts that she proposed.

And so if -- in that case, then I will not need to do it, but if she doesn't, then I will have to, I will perform the disaggregation.

Q. Okay. I gather you haven't reviewed Professor Rosenthal's deposition testimony; is that correct?

A. That's correct.

Q. Okay. Let's move on to Paragraph 14. In Paragraph 14, you write that for accurate implementation of Equation 1, you need to do generally speaking two things; is that correct?

A. That's right.

Q. The first of these things is that you have to determine what portions of the prescription -- prescriptions, I should say, in

Professor Rosenthal's Q were, quote, reimbursed by entities and/or individuals that were not members of either subclass, i.e., was reimbursed by Medicaid or by another governmental entity, correct?
A. Almost. You missed -- it's of total units that were prescribed. It wasn't just -- you had said prescriptions, but --
Q. Fair enough.
A. But, you know, it's --
Q. Fair enough.
A. -- of units in those prescriptions.
Q. Okay. And then you say below that in the first bullet that this disaggregation must be performed by dosage I and diagnosis J, correct?
A. I do.
Q. And is this because, as you write in the next bullet, that this disaggregation will likely vary by diagnosis?
A. That's correct.
Q. Okay. So in other words, I guess this is another way to put it is that the proportion of Q that's reimbursed by nonclass entities may differ from diagnosis to diagnosis?
A. I think that's likely, yes.

Q. Okay. Why do you believe that to be the case?
A. Well, there's -- it is perhaps urban legend, but it's my understanding of, or maybe it's hallway legend at Harvard School of Public Health, but the -- that Medicaid reimbursement is more frequently for antipsychotic medication, so there could be a greater set of prescriptions that are funded by Medicaid that would be for that indication, and that's something that I will want to see if that's the case. If that is true, then a greater percentage of those units that are prescribed for psychiatric problems or indications may not be part of the class, but only the data will tell me that, so I have to -- and to the extent that there might be some other variation, but that's probably the most important one that occurred to me as I was thinking about it.
But it would be issues like that that I'd want to investigate diagnosis type by diagnosis type.
Q. You haven't done that investigation yet, I take it?
A. Not for Neurontin, no, that's right.

Q. Okay. Would you also expect the disaggregation to vary by dosage?
A. I don't have an expectation one way or the other. I'd like to see if it does.
Q. Okay. The second thing that you proposed doing in Paragraph 14 and 14b is calculating reimbursement rates; is that correct?
A. That's correct.
Q. And you anticipate that reimbursement rates will vary by subclass; is that correct?
A. Yes.
Q. Why is that?
A. Well, certainly the third-party payor reimbursement rates will be greater than, generally speaking, if it's a flat copay, it will be greater than the copay amount.
So certainly the unit prices in Equation 1 that are paid by the amounts reimbursed by the insureds will be less than the unit reimbursement by the third-party payors --
Q. Okay.
A. -- on average.
Q. You also anticipate that reimbursement rates will vary by dosage too, correct?

A. I do.
Q. And why is that?
A. Well, normally a -- you're getting more, you're getting more gabapentin, I think is the molecule name, per 400-milligram dose than per 100-milligram dose, so it costs more, so there's just more. Each dosage has more of the active chemical ingredient that's being prescribed.
I'm just seeing if it is gabapentin is the molecule name, but I'll -- let's not worry about that.
Q. You also anticipate that reimbursement rates will vary by time period?
A. I do.
Q. And why is that?
A. Because they do generally.
Q. What's the basis of your understanding on that?
A. Well, as one observes prices of any commodity over the last 12 years, they varied over time, and this I expect will be no different. AWPs go up every year.
Q. Do you anticipate that reimbursement rates will vary by diagnosis?

A. Not -- I don't have that as a strict hypothesis right now. I don't -- I'm not -- I don't know why that would be the case. But it's something that I will -- I could find out.
Q. How would you find it out?
A. Well, I'll look at the data.
Q. Which data would you look at?
A. Well, the combinations of all of the data that I've put forward here. Let me just see if I can quickly identify it. I may not be able to.
But I -- my guess would be that it will not vary by diagnosis, but to the extent that I am able to distinguish that from either the IMS survey data or --
Q. Which IMS survey data do you have in mind?
A. The NDTI data.
And --
Q. The NDTI data doesn't provide data on reimbursement amounts, does it?
A. What it does is it provides the breakdown, the breakout of the visits, what the diagnosis was for the visit, what was the -- what pharmaceuticals were prescribed as a result of it, and I'd have to check to see whether it is rich enough to provide

the particular dosage.
But I would have to -- one, I don't -- I can't think of a reason that it would vary by diagnosis right off the bat except that the -- yeah, period, for the class members.
Q. It isn't something that you've considered though, I take it?
A. Should the data allow me to check, I will do so, and, you know, that's going to depend on how rich either the third-party payor information is, if they summarize reimbursements by the quantity and the prescription number and it's something about if there's anything about a diagnosis, but I'm not -- that's something that has been a second order focus to date.
Q. And if you weren't able to get third-party payor data by diagnosis, would you have any way of doing this check?
A. I can't be sure yet. I mean, there may be. There may be data. At times I find that there has been data by manufacturer that tracks these kinds of things, and so there's -- the discovery is still wide open to me, and I have yet to deal with every source of the data, but I'd have to guess that

based on the cases that I've done within the pharmaceutical area, the reimbursement does not vary by diagnosis to any substantial degree, but ...
Q. But that's your guess?
A. Well, it's an informed guess having looked at the data, but yeah, but I don't know yet.
Q. Do you anticipate further disaggregating reimbursement rates in your analysis?
A. From what I have put forward here?
Q. Uh-huh.
A. Not at the current time.
Q. So you don't, for example, anticipate calculating distinct reimbursement rates for each third-party payor, correct?
A. For each third -- at this stage of what I've been asked to do, it's just a class-wide impact in calculating the aggregate damages for the class, so I haven't been asked to do that.
Q. Okay. Let's flip ahead to Paragraph 16a. 16a is where you discuss how you anticipate determining reimbursement rates or P by subclass, correct?
A. That's correct.
Q. Now, in this first paragraph of 16a, you

write that manufacturer data will allow you to calculate wholesale prices; is that correct?
A. I would -- I'd call it prices at wholesale, ASPs, average sale price.
Q. Okay. Wholesale prices aren't used in your damage calculation though, are they?
A. Obviously what I want to get at are reimbursement rates, and reimbursement -- and third-party payors and consumers are not paying ASPs.
To the extent that I can observe patterns between ASPs and AWPs, I may be able to make some -- be able to do some projections of going from very detailed manufacturer data to AWP data to reimbursement data that's some percentage off of AWP, and I may use it as a validity check or ways of confirming certain things.
But it's not -- the ASPs are not the prices that appear in Equation 1.
Q. Let me ask you to look at footnote 31 of your declaration, which reads, while I will not use wholesale prices in the damage calculations, I will use them for critical review of the validity of those price data that will be used in the damages

calculations.

Did I read that correctly?

A. You did. That's just the way I wanted to answer that.

Q. Well, I was just going to ask you, the critical review of the validity of the price data that you referred to in footnote 31 is what you described just a moment ago; is that correct?

A. Well, that's part of it, you know. I'm going to get data from IMS, I'll get data from various sources, from third-party payors that will have reimbursement rates by third-party payors and by consumers.

There may be some -- I might find something in that data that when I look at what defendants are actually selling the drug for I'll say, hey, wait a minute, something doesn't quite look like here, either in price relationships that I'm seeing in the secondary sources, and that will allow me to fine tune some survey data if it seems like it's -- if it is necessary and in ways that are standard statistical ways that would be made clear as part of the damage analysis.

But I certainly would want to get the ASPs

from the manufacturer because that's the start of the whole wholesale chain of reimbursements that take place.

Q. Now, is that the manufacturer data that you cite in Paragraph 16a that you would need to perform this analysis, the ASPs?

A. 16a, I cite the manufacturer data in 15a.

Q. Precisely.

A. Yeah, that's where I want -- the data that I want from the manufacturer is going to involve all of that invoice data and price offsets, but I'll also want to get rebate data and then the rest of the data. I mean, the data from manufacturers will allow me to get ASPs from A bullet 1, ASPs net of rebates with A bullet 2, 1 and 2. The utilization review data from PBMs and third-party payors will show me actual reimbursement rates by class members, so that way I'll look at it from both ends.

Q. I take it you haven't received any of this data so far?

A. I would only start to receive this data as part of the damage analysis, and so I've yet to receive it, that's right. I don't know whether you have produced it to counsel yet.

Q. Have you requested it from counsel?

A. I always request all of these, and as it says in the 15a, I've requested and expect to receive.

Q. Don't you say in 15a that you have requested or will request? I mean --

A. Yeah.

Q. -- I guess my question is whether you've requested at all or not.

A. I see the parens there.

I've requested -- when I'm doing this, I say, look, I need this data, and then I tell counsel, and so they -- I assume they're going to ask for it at the time when the pleading is ripe, you know. I don't know what's -- I haven't followed all of the delays and what's for summary judgment and things.

So my assumption has been that we're not ready to go forward with the damage analysis, and when we are, that's when I'll get data.

Q. What's the relevant time period for your analysis, just your analysis as it relates to this first paragraph of 16a?

A. Well, as I've said earlier, I've been

asked to assume in the first complaint that the class period runs from January 1, 1994, to the present, and that was the present as of when I signed this.

I really don't know whether there have been legal decisions that have or whatever that have constrained this in some way, the class period, whether it is only through August of '05, whether it's continued through the present present, whether it's been truncated at the beginning. That is really irrelevant. I will get the data for whatever period I'm asked to do the analysis and I will do it.

Q. Fair enough. I guess my question is, you don't know whether all of the manufacturer data that you've requested would actually exist for the period dating back to 1994, do you?

A. Well, I've done damage analyses going back earlier than that, and I've gotten, I've gotten data for it. Where data is not available, there are methods of extrapolating information going backward.

Q. The damages analysis that you just referred to is in other cases?

A. Other cases, that's correct.

174

Q. Okay. And you don't know, as I said, whether all of the data exists in this case going back to the beginning of the class period, correct?
A. That's correct.
Q. And do I take it correctly from your last answer that if all of this information does not exist that you would seek to calculate damages by extrapolating from existing data?
A. Well, there are standard methods where there are missing data where there might be a year missing in the middle of the period or some data at the end, at the beginning of the period where one might interpolate, one might extrapolate, one might look at trends, and I would have to evaluate to see whether that was appropriate given what data was missing.
If the only data you have is for 2005, then extrapolation backwards is a bit risky.
Q. Let's go to the next paragraph within Paragraph 16a, which is at the top of Page 10. And although it's a mouthful, I'll try to read it. The IMS data, Paragraph 15.b, NPA and RMOP data, in combination with the TPP data in Paragraph 15.d and bullets 4 and 5 of Paragraph 15.a and the AWP/WAC

175

data, Paragraph 15.e, will provide the necessary information to calculate the reimbursement rates paid by TPPs, the reimbursement rates paid by uninsured cash payors, consumer subclass, and the copays paid by insured members of the consumer subclass, payments made by consumers for units reimbursed by TPPs.
I did my best. Did I read it correctly?
A. You did a very fine job.
Q. Thank you. Now, can we agree that aside from the sentence that I just read your declaration doesn't give the court or the defendants any more information on how you would propose to calculate reimbursement rates paid by third-party payors, uninsured cash payors or copays; is that right?
A. Well, I think the declaration speaks for itself and describes to someone who understands the methodological issues at play here what this means, and if this is not a reasonable description, then I fully assume your expert will say that this doesn't do it for these ways, and then should I -- should it be needed, I will on surrebuttal write out the -- I could have made this a 100-page dissertation, and I'm not sure the court would want this. This is

176

very -- this is standard use of this data, and it's been done in a lot of these pharmaceutical cases to date. So I am assuming a bit of sophistication on the part of the court.
To the extent more is needed, it obviously could be expanded should there be things that are unclear to the court.
Q. Okay. Let me ask it this way. You don't describe what information that you'd extract from each of the data sets that you list here; is that correct?
A. Well, the third -- I describe the data that I will extract. I don't reiterate in Paragraph A what I've already put forward in the previous paragraphs because it's just -- it would be redundant.
For example, I mention in this paragraph that you read the third-party payor data in Paragraph 15d. Well, Paragraph 15d is a long paragraph, and I've said that it has all of this data that summarizes claims, and it's going to allow me to see the products dispensed by the insured members by NDC and brand name, date, you know, the health plan in which the member is enrolled, the

177

amount by health plan as reimbursement, paid by health plan as reimbursement to the pharmacy, the dispensing fee, the amount paid by the insured member of the copay.
So it's identifying my ability to get data for every claim from a third-party payor in a given month that is paid the copay amount, the amount that's reimbursed by the third-party payor, and the dispensing fee.
I can take an average of those by dosage or whatever level of detail is here, and I will have an average measure of the reimbursements that are by those subclasses, and that's -- the heading of 16a is reimbursement rates by subclass. So that's one of the data sources.
I can check that. I will also have AWPs and WAC data from 15e. I'll be able to see whether the reimbursement rates follow a reasonable pattern of AWP less a certain percent that characterizes the range of discounts at retail that are standard across PBMs and third-party payors.
So there's all of this data that's cited here, this is a fairly pithy resummary of the elements that have been described at greater length

178

here, and I could have reiterated those again, but I think that --

Q. But your pithy resummary doesn't describe, for example, how the different data sets would interact; is that correct?

A. Well, it's -- they're very collegial data sets, and, I mean, I don't know what you mean by interact. These are data sets. You know, the IMS data summarizes the same thing that the -- the third-party payor data that I'm getting from the manufacturer data is also variations of the same data that's gathered by IMS at retail. They're all coming at this data from different directions.

And so it's the same data from different perspectives, from the payor's perspective, from the retail establishment's perspective, from the manufacturer's perspective, from the doctor's perspective of what he's prescribing it for, the diagnosis.

And so I've described the building blocks, and at the end of the day those building blocks allow me to take these data, this mix of data and come up with Ps by diagnosis, by time period, and by dosage.

179

Q. I guess the building blocks analogy is a good one.

You describe which building blocks you'll need, but you don't give in your declaration any description or indication as to how you will assemble those building blocks; is that correct?

A. Well, I did not believe one was necessary, that I thought that this was sufficiently complete for a court with experience in dealing with these kinds of issues to understand what was being stated here, and if more information were required that I could provide it.

Q. Okay. Well, let's talk about the different data sets that you list in a little bit more detail, and let's first look at the two IMS data sets that you say you'll use here, the NPA data set and the RMOP data set.

A. Right.

Q. Have you received or reviewed any of that data to date in this case?

A. The -- you've got to remember that the data that I will use in this case I can't -- under the contractual obligations of IMS, I can't order data from them and use it in litigation here. It

180

would have to come through defendants.

So I can look at IMS data for research or to do preliminary kinds of things, so the -- I know what's in the IMS data, I've seen it and gotten it in many cases, but and then I've seen a rollout of the NDTI data that has been put together by counsel, which is the next data source that is listed in B that you didn't quite get there.

Q. Right. The reason I didn't get there, by the way, is that you didn't list it there as among the different things in Paragraph 16a that you say that you would use to do this portion of your analysis.

A. Fair enough. Yeah.

So in any case, I've looked at this type of data in many other cases and understand that it will allow me to calculate prices, reimbursement rates by subclass, by dosage over time.

And so I haven't done it yet for Neurontin because I have yet to get that data from the sources where it could be provided for me in a way that I can use it.

Q. Do you --

A. But it will be no different than any of

181

the many other times that I've used it.

Q. But you haven't yet used it in this case?

A. That's right, that's right.

Q. Do you need data from both the NPA and RMOP data sets?

A. I would like data from both of them, yes.

Q. Why?

A. Because the National Prescription Audit will give me the data for total units, and it will give me the breakout between class members, TPPs, cash payors and Medicaid for new scripts, NRx rather than TRx. The retail method of payment data I like to look at because it gives both TRxs and NRxs. It's a little richer. It's a shorter period of time, but I like to --

Q. For those of us that aren't as expert as you, can you just tell me what again what NRx and TRx are?

A. I'm sorry, Rx is just a script, so that is just from -- everyone kind of knows Rx as being, you know, I need a medical prescription. It's an Rx.

TRx is just IMS' nomenclature for total scripts, and NRx is for rather than for refills, it's new scripts prescribed for a drug.

And so the different databases offer different coverage and in terms of whether it's NRx or TRx or both.

The retail method of payment in the National Prescription Audit is, when last I looked, and again IMS changes their product offerings regularly, so this is the -- when last I had reviewed it offers a method of payment, but it's only in terms of new scripts. And the retail method of payment I think also offers some geographic variation, which it right now is not an issue, but should it become an issue, that would be something that I may want, I may be interested in seeing.

Q. If you weren't able to get both data sets or data from both data sets, would you still be able to do your analysis?

A. Well, one, one can do an analysis as well as the data will permit, so if I were not able to get certain data that I've asked for here, I would use whatever data that I could get, and I would then do an analysis that would allow me to approximate rather than get -- it would be some approximation of Equation 1, and I would have to describe what that approximation was and how to make it conservative.

Obviously I'd like to get every piece of data that I've asked for in Paragraph 15. I don't need it all. There's redundancy built into my requests, and I would use that redundancy to in a damage analysis buttress it against a claim, well, oh, it really doesn't match this. Well, if I've looked at it in several different ways, I've been able to be much more sure of it.

One can only work with the data one has and indicate the level of -- it would be less precise. I'd have to give certain aspects of confidence about it or try and make it conservative in some way and make some assumptions to do that.

But being a quantitative economist, one is used to squeezing the most out of data that one realistically can to draw conclusions that are reasonable and as accurate as the data will allow and then indicate how accurate they may be and what a conservative interpretation would be.

Q. Okay. Flipping back to the same paragraph in 16a, the second paragraph, you also write here that you anticipate using third-party payor data.

Well, actually let me withdraw that question. I want to ask one last question about the

RMOP and NPA data sets.

Neither the RMOP nor the NPA data set distinguish prescriptions by diagnosis; is that correct?

A. That is -- when last I saw, they did not.

Q. Okay. Now let me move along to the third-party payor data that you mention in Paragraph 16a, which in turn refers us back to Paragraph 15d, as I think you probably mentioned in one of your earlier answers.

Have you received or reviewed any of this data to date?

A. No, not for this matter.

Q. Which of these data as set forth in Paragraph 15d would you need to do your analysis of reimbursement rates by subclass?

A. Well, certainly the -- merely obtaining the amount paid by the health plan as reimbursement to the pharmacy, the dispensing fee paid to the pharmacy and the amount paid by the insured member as copay along with what was dispensed by NDC, the dosage or the strength, would allow me to calculate, would provide a sample of amounts paid by as many third-party payors for which I had data across all

the formularies and plans that they had that would be an average for the reimbursement rates paid by the third-party payors as for the drug for the dispensing fee as copay by dosage.

Now, you know, there's also by date dispensed. That will give me the time period in which that would occur. We have got quantities there. There could be ways of -- well, never mind. I was thinking of one way of using the data. We don't need to get into it.

There could be geographical variation in this in terms of name and address of dispensing pharmacy. They will have the NAPB, a distinct number given to pharmacies, so that one could do -- both get at the averages over the country as a whole, you could do things geographically. You could do a lot with this kind of data.

Q. Do you need data from more than one third-party payor?

A. I would like data from more than one third-party payor. I would like data from as many third-party payors as I could get it. If I got data from one PBM, I would probably have data from many third-party payors. It will depend upon the mix

of -- I may get all the third-party payor data I need from the manufacturer. If they keep in utilization reviews third-party payor data that I've mentioned in 15a, bullet 4, that is this data, which they keep and submit to the manufacturers.

Q. By this data, you're referring to Paragraph 15d; is that correct?

A. 15d, that's right. So I've gotten this data from manufacturers, this third-party payor data, I've gotten claims data of this sort from PBMs and I've gotten it from third-party payors. I've gotten it from retailers, large retailers. I haven't mentioned -- I didn't see that we had any purchase on getting data from retailers in this matter.

But lots of people keep this, are interested in all of this data from various directions.

Q. Will you need third-party payor data for the entire class period?

A. I will need as -- I will make use of as much data as I can get, and so if there's going to be some data where there's -- the same thing as what we said before. If there's some data for which

there might be a gap, data is not available, I will see whether there are ways of interpolating it or extrapolating. I mean, if I have third-party payor data for two years, missing two and then another two ad I see another four and I see trends that I can relate to the manufacturer data, that's why I would want to get the manufacturer data to tell me what's happening overall in the market, I could use that manufacturer data to help interpolate missing data for the third-party payors.

The reimbursement rates would probably track, will track with AWPs. I will use -- I could use AWPs for years where there might not be much of a variation in what the percentage off AWP the reimbursement rate is.

So all of these data can be used to quantify and calibrate and make accurate this formulation, and if I described all of this to the court, the court would say enough already, this is standard ways of using data in these kinds of cases. And when it finally is submitted as a damage calculation, that's when it will become clear whether it is accurate or not accurate, where it fails, where it succeeds, if it does.

Q. Do I take it from the end of your last answer that we won't know until your results are finally submitted as a damage calculation, I'll quote here, whether it is accurate or not accurate, where it fails, where it succeeds, if it does? Did I understand that correctly?

A. Well, what I've been asked to do here is describe a formulaic methodology, and I've done it and the data I'll use.

Now, if it turns out that for some reason all data on Neurontin has been destroyed somehow at the manufacturer level and at the third-party payor levels, the formulaic methodology that has generally been designed to accommodate data that's known to exist in this industry can be estimated, and at some point your experts will review that, and, I mean, this is certainly what happens in any case of this sort.

Right now, this as proposed is an accurate way of calculating damages, using these data. If I go to all these sources and there's no data, well, then I guess it's less reasonable and less accurate. I don't believe that's the case. I've never found it to be the case in any industry.

Q. Here's another way to ask the question. I guess what I understand you saying is that the absence of data in a particular category would just mean that your end result would be less precise or less reliable incrementally, correct?

A. No.

Q. Okay. How am I incorrect?

A. It would depend on which, which data were absent. It may be that the Red Book data is not available to me.

Q. Sure.

A. You know, it's -- and then it will depend on -- it will depend on -- I can't begin to start to guess how something that might be absent might cause some inaccuracy somewhere.

Q. Fair enough, because you haven't yet had a chance to collect the data or look at it, correct?

A. Well, all I -- look, this is a methodology that's been used in many pharmaceutical cases and by people other than myself and used successfully and led to conclusions and decisions. It's -- types of this information are used in any antitrust case in any industry, in industries that keep much poorer records than this industry does. This is an

industry that its life blood is keeping track of all of these flows of scripts and rebates paid for the scripts.

So I have no doubt that the data will be available and will allow me to come up with an accurate calculation. Some -- I can't say which parts of it might not be there, but as a whole, this, what I've identified, there's enough redundancy in here that I will be able to do what I'm saying will be done.

Q. Will you need data from third-party payors to distinguish its prescriptions by diagnosis?

A. I don't think so.

Q. Okay. The last category of data that you mention in this paragraph of -- portion of Paragraph 16a is AWP/WAC data, correct?

A. That's right.

Q. Which is then described in your declaration in Paragraph 15e; is that correct?

A. That's right.

Q. How would you propose using this data for purposes of calculating reimbursement rates by subclass?

A. Well, as I said, suppose there were years

where there might be a break in the data, and suppose that as is known across plans and formularies that third-party payors generally reimburse for single-source drugs at AWP less, say, 13 to 18 percent, a very narrow range.

Suppose further that I'm missing the third-party payor data on reimbursements for three years, but I have AWP data and I have -- I can relate average reimbursements to AWP data for the other years, and I find out, yes, average reimbursements are about 14 percent, 15 percent below AWP. It will allow me to come up with an average reimbursement rate for years where I might not have third-party payor data drawing from an analysis of years where I do have third-party payor reimbursement data and AWP data and can look at the trends between the two of them.

So it would just be one more source of redundancy should there be some missing data. I could use it for interpolation, extrapolation.

Q. Okay. Let's go to the last paragraph of Paragraph 16a, which relates to rebates, and here you write, to the extent that rebates were used by defendants to incentivize prescription patterns,

rebates paid to TPPs need to be factored into the analysis.

Did I read that one right?

A. You did.

Q. How do you plan to factor rebates into the analysis that we just discussed?

A. Well, to the extent that I will get rebate information, if we turn to manufacturer data 15a, bullet 2, rebate data which I have worked with in the past summarizing rebates paid by particular defendants for particular drugs to particular entities, there's usually a rebate file that's kept, and it's how much is paid and for which drugs it's paid. Some manufacturers even allocate it to the drug.

There's going to be the other manufacturing data utilization reviews if that exists on the part of defendants in this matter that will indicate what was submitted for rebate payments and what was paid, and this will allow me to see rebates that were paid to third-party payors directly, those that were paid to PBMs to the extent that it breaks that out, and it usually does.

And so I will use that to identify the

extent to which rebates were paid by defendant in the -- defendants in the matter, and to the extent that that offset any reimbursement, if a third-party payor was reimbursing for 100 bucks but they got 5 bucks back per rebate per script in what they reimbursed, then the amount paid in Equation 1 would take account of that.

Q. Here's a question. I guess it may be the case that it's perfectly permissible for the court to view your analysis as sort of a black box into which you'll get this data and you'll come up with what these answers are.

But I guess just to sort of help me try to understand it, exactly what do you anticipate doing when you actually get this data? Do you anticipate, you know, creating an equation that would help you to understand it or to reconcile, you know, the data that you receive from different sources?

A. Well, the data that I receive, there will be primary sources of data that I will look to. I mean, ultimately Equation 1a is the compelling equation, so we have disaggregated there total units, extended units, scripts, however we delineate that, by dosage, diagnosis and time period, and an

194

average reimbursement rate for that period for that diagnosis if they vary across diagnoses, but they certainly will vary across strength and time period, and I will have estimates of Qs either at an aggregate level or I will disaggregate them using the NDTI data or the NAMCS data by diagnosis. I will have total units from the manufacturer, from IMS.

There will be -- I will have an Excel spreadsheet that will essentially have an average -- the PIJT and a Q superscript AIJT that will be the result of -- Q will be estimated from the manufacturing data, manufacturer data, I'll see what they're selling and what their books say in a given year. I'll see what the IMS, whether the IMS data confirms that whatever they're selling at wholesale is essentially being sold at retail. IMS data is retail survey.

Q. Sorry to cut you off, but I thought you'd said that your Q numbers are coming from Professor Rosenthal's.

A. They are coming from Professor Rosenthal's, but to the extent that I should have to disaggregate them, I'm sorry, if she

195

gives me the IJT, then all I'm doing is I'm calculating the reimbursement rates by third-party payors.

And so in that case, there's -- as I said, there will still be an Excel spreadsheet, the Qs, IJTs, that's subject to damages by those in each of those buckets, so there's three different buckets. I mean, there's a bucket defined by -- it's a three-dimensional set of buckets. I'm sure the court will like the concept. It's a Rubic Cube of buckets in which Qs will be set along strength, diagnosis and time, and then I'm going to have reimbursement rates by strength and by diagnosis, if that so matters, and time for the third-party payor class and the consumer class.

And the Ps, the amounts that were reimbursed will be developed from third-party payor information, from manufacturer information.

I'll use all of this information to come up with -- obviously I'm interested -- if the third-party payor information is sufficient and tells me everything, I'm done. That's all I need is the third-party payor data. But if it's not complete, I might need to go and use some of the

196

manufacturer data with some AWP data.

At the end of the day, I'm going to use all of the data that is there to have two cubes that multiply themselves, a relevant average price in a bucket times the units in a bucket, and that will give me a total, and that's just the totals that you see in Paragraph 18 where they're then summed over time.

And as many ways as I can calculate that -- if I can estimate the Ps, the reimbursements coming at it from three ways and I come up with estimates that are robust from each of those directions, I will have greater confidence. If I can tell the court, look, I've used third-party payor information, I've looked at the PBM claims information, and I've looked at the manufacturer information as to this particular element, it's merely going to buttress, it's going to make that a more complete, robust estimate. If one of those are missing, it doesn't mean I still can't do it.

Q. Right. I guess what I'm saying is, and by the way, I don't necessarily agree with the black box approach that I may have described in my last question, but would you say that the amount that you

197

will put into that cell, the cell that represents P for whatever particular disaggregation you're doing, I still don't have any sense for how you're going to do that other than sitting down with whatever data you have and looking at it and thinking really hard and then putting a number in the cell.

Is there something else to it that I'm missing?

A. Well, this -- there's -- one has to think hard and use a calculator and use a computer, and if I have for a given -- so suppose my data sources, suppose I have five third-party payors -- suppose I have one third-party payor in a given year, one PBM, and I have claims for the different dosages of Neurontin that are paid at retail that are either paid through the PBM that's acting as the TPA for some other self-insured group or an ERISA group or a Taft-Hartley group or whatever group that's using them as a third-party administrator, I will have a bunch of claims that will be for -- that will be paid at different pharmacies that might have slightly different amounts that they're selling it for, but I'll have amounts that were reimbursed. I might have 100,000 estimates for a given strength

from these different sources, and I'll take averages of those, and it will give me and it will show how tight that average is, and that will be an average reimbursement rate for the amounts of that dosage sold in that time period, that quarter.

And so it's not thinking so hard. It's getting a computer to get that data, make sure that it's all in the right cell and make sure that it's representative, make sure that you're representing a sufficient number of units sold and it has sufficient geographic diversity and it's representing -- it's representative enough to be an accurate estimate of the average.

And so that's not rocket science, but it's a lot of data that has to be crunched appropriately to come up with an average number.

MR. POLUBINSKI: How are we doing on the tape now?

THE VIDEOGRAPHER: Now would be a good time to change it.

MR. POLUBINSKI: Do you want to take a break?

THE WITNESS: I'm good to go.

THE VIDEOGRAPHER: This is the end of

Tape 5. We're off the record at 3:12.

(Whereupon, a short recess was taken.)

THE VIDEOGRAPHER: Beginning of Tape 6. We're back on record at 3:27.

BY MR. POLUBINSKI:

Q. So, Dr. Hartman, you testified earlier that if Professor Rosenthal does not give you a number for Q that's broken down by diagnosis that you yourself would perform that disaggregation; is that correct?

A. That's correct.

Q. Can you tell us again how you would do that?

A. Well, suppose she were to tell me that 1,000 units of Neurontin were sold in a given quarter in a given year, and I would have no idea what the diagnosis was. There are two data sources.

Q. 1,000 units of Neurontin?

A. 1,000 units, extended units, period. You can make it by dosage or not by dosage.

Q. And the number would be for Q, so in other words it wouldn't be --

A. It would be she's going to give me Q that

are attributable, if I understood your question, the Q attributable in a given period to the allegedly unlawful promotion.

Q. Precisely. So the 1,000 units --

A. 1,000 would be attributable to the unlawful promotion.

Q. Okay. Sorry to interrupt.

A. That's all right.

I would -- the NDTI data would tell me by office visits for periods of time for every office visit, physician's office visit that involved a prescription of Neurontin, it would tell me the disease, the disease for which it was or the ICD-9 code for which it was prescribed, so it would allow me to see of the 400 or so ICD-9 codes, I think there may even be more, it would allow me to classify the units by diagnosis.

Q. And you'd perform that classification yourself?

A. I would use the NDTI data or the NAMCS data, which does the same type of survey. It's a physician office-based survey that would give me the same kinds of information over the last -- and the NAMCS data is identified in footnote 29. Both of

those break out office visits where a prescription is written and what it is written for.

And so if she does not do it by diagnosis, I would do it by diagnosis using starting with those two data sources.

Q. Okay. And so am I correct then that what you'd be doing is coming up with a percentage of prescriptions in the aggregate that fall into different buckets that are grouped by ICD-9 codes?

A. That's right. Yeah, I should have taken it that last step. We have five diagnosis groupings here, and there are as many ICD-9 codes. There are the number of ICD-9 codes or disease categories that are reflected in the NAMCS data that would allow me to relate that to one of those -- well, the five categories of diagnosis that I've identified in whichever paragraph it was.

Q. Paragraph 12; is that right?

A. Paragraph 12, right.

Q. Are these -- go ahead.

A. Period.

Q. Are the five diagnosis code groupings in Paragraph 12 the five groupings or the five categories that you would use to do that analysis?

A. Well, I think right now that was the tentative grouping that I came up with. It could be a more refined grouping. It's certainly the grouping that seemed to be reflected in the promotional focus of the different activities on the part of defendants over time, that they were focusing on diagnoses of chronic pain, for migraines, for psychiatric problems, illnesses, and then a generic other category.

So that it would -- it's possible to extend that to another grouping or two, but that's the focus of what the -- in the complaint that I read, the activities were focused on those major areas.

Q. So if you were to regroup -- well, I guess my first question, did you come up with the five categories yourself personally?

A. No, I think I came up with it reading the Steiman and -- let me see the documents relied upon and see if I cited it there or if it's just -- oh, yeah, there was an affidavit and set of documents put forward by Seth Landefeld and Michael Steiman and then another document by the two of them and a third party, Chren, C-h-r-e-n, that did a

preliminary analysis of that sort that looked at promotional activities and then was looking at prescriptions in those categories.

So it was not my grouping, but it was consummate with what I read in the complaint.

Q. If you were to regroup ICD-9 codes, would it be you who was actually looking at the individual codes and deciding which bucket they go in, or would it be somebody else?

A. It would need to be someone who would be a doctor or someone with medical training.

Q. Fair enough. Okay. Going back to the method that you say you would use to disaggregate Q --

A. If asked.

Q. -- if asked to do so, right, you're saying that if, for example -- well, it's probably easiest to do this by way of example I guess. You're saying that if, for example, the data told you that 20 percent of Neurontin prescriptions in a given period were for chronic pain, then you would assign 20 percent of Rosenthal's Q, Professor Rosenthal's Q to chronic pain assuming that that were the relevant grouping?

A. That's correct.

Q. So your assumption is that the proportion of all prescriptions that were generated for a particular diagnosis would be the same as the proportion of prescriptions that were actually caused or induced by actionable conduct for that particular diagnosis?

A. Well, I'm assuming that whatever information I receive from Professor Rosenthal, whether it's by diagnosis or whether it's in total, will be that number of units attributable to the unlawful conduct or attributable to the conduct, yes.

So if I take the 20 percent of that of the aggregate number or she gives me a disaggregated number, I'm assuming that's what her -- I know that's what her model is going to be calculating, and that's the way I would interpret that.

Q. But you're assuming that the relative proportions are the same; is that correct?

A. The --

Q. Maybe it makes sense to read back my previous question.

A. Okay.

MR. POLUBINSKI: Can we do that?

I'll tell you what, why don't I read it, maybe that will help, because I can see it here on the screen.

BY MR. POLUBINSKI:

Q. Your assumption is that the proportion of all prescriptions that were generated for a particular diagnosis would be the same as the proportion of prescriptions that were actually caused or induced by actionable conduct for that diagnosis?

A. Well, since the -- since for all but the indications involving the adjunctive therapy for epilepsy, the other four groupings of diagnoses were off-label to begin with. All doctors' visits related to that would be actionable to the extent that they weren't calculated by Dr. Rosenthal to be the result of doctors doing that prescribing, a baseline of that kind of doctors prescribing rather than due to the unlawful promotion.

Q. Let me see if I can ask it maybe a different way, and this is somewhat of a hypothetical question.

But, for example, you could assume or you

could imagine that a drug manufacturer might promote significantly more heavily for a certain kind of use than another; is that correct?

A. Well, I think defendants' alleged behavior indicates that they did do that over time, that there were spurts of activity for one indication or another over time, so yeah.

Q. Okay. So fair enough. So for that period of time, would it make sense that there might be a relatively greater proportion of prescriptions for that particular indication that were caused by the defendants' allegedly improper conduct?

A. Certainly one would expect to find that the prescribing behavior for that conduct would be reflected in the prescribing behavior found in the NDTI or the NAMCS data.

In other words, if I'm -- if a lot -- if all of the increases in the scripts written, and let's not -- I can't remember the exact, which indication came first, but I think there was a spurt between '95 and '96 where one of the indications was pushed and then there was a big jump in that, in the scripts sold for that or scripts sold, and then sometime in the late spring of '95 or maybe it was

'96 there was a second set of indications that were promoted, the fact that there was that response shown in the data that I've seen to date, the preliminary data, I would expect to see that reflected in the prescribing behavior of physicians, that there would be a consonance between what the NTDI data and the NAMCS data were showing for the reasons for being prescribed and the allegations in the case.

Q. But doesn't Professor Rosenthal tell us that even under her analysis nonactionable conduct could have been responsible for those spikes? I mean, that's the whole point of her analysis, isn't it?

A. Well, her analysis is to correct -- it's a standard event analysis that would correct for other lawful events or occurrences or promotional activities and standard types of off-label prescription behavior for anticonvulsive drugs generally, let's say, say like what we might find with Dilantin, and identify that amount that was attributable -- that was not attributable to those factors, i.e., was attributable to the unlawful promotion.

Q. Your disaggregation, though, am I right, wouldn't provide any sort of a correction in that way --

A. Well --

Q. -- should you need to disaggregate if Professor Rosenthal doesn't?

A. Well, if my disaggregation -- again, this is where you come at this and with redundancy in the analysis. If I go to the NDTI data or the NAMCS data and I find that during a spurt when there's promoting for chronic pain and all of the scripts are being written for antipsychotic or for psychotic illnesses, well, then that would be a flag to me that something has to be looked at more closely.

Q. But you won't be doing the sort of event study that would enable you to recognize those correspondences or lack of correspondences, correct?

A. Well, I'll see the proportions in the data. I man, I'll see the percentages that will come out of the NDTI data.

Q. Right. But you won't know whether even under Professor Rosenthal's analysis some of that increase might be attributable to something that's unrelated to the actionable conduct based on just

the analysis that you're doing?

A. I guess I don't -- she's going to give me an aggregate Q or disaggregated Q that's due to the actionable conduct, and so you're saying if she gives me the aggregate Q, will my -- I'm going to go to data that will go to doctors' offices and tell me what the reasons for prescribing Neurontin are, what the diagnoses are.

And so I guess I'm not --

Q. But that data doesn't tell you anything about whether the cause of that increased amount of prescriptions was allegedly improper activity just on its face?

A. I don't -- the -- if I'm going to -- well, let me put it this way.

On its face, I will get an aggregate Q, and I will go to data that summarizes doctors' visits, and the point that you're getting at is, look, there's a subset of Q, but I'm going to be getting data for all Q, and so how am I going to know what's the subset of Q that is not actionable and what is actionable, right? Is that a fair way of reframing your question, or is that unfair?

Q. I'm not sure it is. I think -- well, why

210

don't you keep going with your answer. Why don't you keep going with your answer. I'll try to clarify if I need to. Or if you want me to, again, my -- I'm concerned only about relative proportions, okay.

A. Right.

Q. And I guess what I'm saying is that or what I'm asking is whether the analysis that you would do would just assume that the proportion of prescriptions that are generated for a particular diagnosis in the aggregate as reflected in the NDTI or NAMCS data set is the same proportion as the proportion of prescriptions reflected in Q that would have been caused by actionable conduct for that particular diagnosis.

A. How do I -- I mean, I'm having trouble putting into mathematical terms precisely how you're -- there will be -- so let's just say the following.

Let's, to make it easier, let's just say it's not dealing with epilepsy, let's say, so it's -- even though there could be -- if it's described as a monotherapy, prescribed as a monotherapy or in excess amounts that there could

211

be -- that that is an actionable prescription.

So we're talking about chronic pain when they're promoting it, and she comes up with a total Q for that year, and that's going to exclude the amount that's already being prescribed for epilepsy, and so I'm going to be able to see of the manufacturers' units the amount that was sold -- well, now, let's see if I'm going to have a -- the NDTI data will give me the percentages across all of the different uses, and certainly if there are uses in that period of time where there's no promotion for, let's say, psychiatric illnesses, then I would conclude from that data if there was no illegal promotion at that point that those prescriptions would not be subject to unlawful promotion if the promotion were not going on.

Q. How would you know that, the latter part? Do you plan on doing an analysis, an event study like Professor Rosenthal proposes doing?

A. No, no, no. I need to see what her -- I mean, that type of analysis will be straightforward. I'll have observed the measures of promotional activity as they are characterized and framed by Dr. Rosenthal and in whatever fashion she's looking

212

at the activity in the data she gets from defendants, and I forget how that was characterized in terms of numbers of meetings or dollars of promotions spent for certain uses. I mean, there's a whole set of activities that are identified in the complaint, and I forget how she's characterized those. I can -- well, I'm not going to testify for her.

But the point is the following: Suppose for the psychiatric uses -- let me just see when -- if she says when it starts. Let's see. It was the second quarter start of pain, three months after something organized pain -- okay.

So the psychiatric promotions did not commence until the fourth quarter of '97, okay. So I'm looking at Page 17 of her declaration. And it's a quote from relators' opposition to defendants' motion for summary judgment.

If I find that there are -- if that's the first time that there was off-label promotion and that's the measure that she has and she's incorporated into her model, which I will be -- which will be part of what I will be examining, and I find scripts that are written in the peer and NDTI

213

or NAMCS for those conditions, that will certainly not be the result of unlawful promotion because it won't have occurred at that point.

So as I'm using the NDTI data, I'm going to have to be introducing some of my own -- I'm not going to be doing an event study, per se, but I have to make it run so that it is in consort with the assumptions and the details of what she has incorporated into her model, and so, I mean, that's one way that I would do it.

I mean, each -- in each case, it will involve a different way of approximating it that I'm going to have to see what the data looks like before I can say how I'm going to do it.

Q. Let me ask you -- or let me just ask you a different question I guess.

Assuming that Professor Rosenthal does come up with a disaggregated value for Q, there wouldn't be any reason that you would go back and redo that analysis, is there?

A. I can't see that there would be.

Q. Okay.

A. I mean ...

Q. All right. Let's look at Paragraph 16b of

your declaration. The second sentence here talks about analysis that Professor Rosenthal will do, and essentially what this paragraph says is that Professor Rosenthal will calculate QIJT by calculating total units of Neurontin sold as the result of allegedly fraudulently marketing and then assigning those units to the relevant diagnosis code, correct?

A. That's correct.

Q. If Professor Rosenthal says that Q would equal zero for a particular dosage, diagnosis and time period, does that mean that there would be no damages for that particular dosage, diagnosis and time period?

A. If she attributes no unit sales to actionable, allegedly actionable behavior, conduct and behavior, then I would -- that would be the result of her analysis, and I would interpret it as such.

Q. Right. There would be no need, in other words, for you to calculate a number for P in that case; is that correct?

A. If there's no units that were subject to liability, there would be no need for a value.

Q. Fair enough. So even someone like me who knows that if you multiply something times zero, then the answer is zero, correct?

A. Oh, you're overstating the amount of your math anxiety, but ...

Q. You may be assuming too much.

And then you say in the next paragraph also within this Paragraph 16b that you will take Professor Rosenthal's calculations of QIJT and assign them to subclass by diagnosis and dosage using information that you've outlined in this sentence, correct?

A. That's correct.

Q. Why don't you include time period in your assignments of Q amounts to different subclasses?

A. I should have, it's an oversight, since the NPA and the RMOP will be delineated by time period.

Q. All right. So is it correct that here too your declaration doesn't give us any more information on the precise method that you would use to assign Professor Rosenthal's values for Q to the various subclasses or the two subclasses; is that right?

A. Well, again, it is I had felt straightforward enough. I've identified the NPA and the RMOP as identifying units reimbursed by Medicaid, third-party payors and cash payors, and so that would be the frequencies or the distributions of the percentages I would use toward the QIJTs over time by -- for the diagnosis I and dosage J and time period T.

Q. The NAMCS data set is the only one that you mention in Paragraph 16b that contains diagnosis level information; is that right?

A. No. It's my recollection that the NDTI data does also.

Q. Well, maybe that raises another question.

As I read it at least, I don't see a reference to NDTI data in this sentence in Paragraph 16b that talks about disaggregation by subclasses.

Am I right?

A. I would look at the NAMCS and the NDTI data. Yeah, I would have included NDTI also there, and --

Q. Does the NDTI data provide information on the method of reimbursement? It doesn't, does it?

A. I'm trying to remember now, and maybe that's why I didn't include it there. It's -- I would have to check again, and that probably may have answered your question to me why I didn't include it there.

Q. Glad to help.

A. I knew you were that kind of guy. You're a Princeton man through and through.

I think that's right.

Q. From whom do you plan to receive the NAMCS data?

A. It's -- I can download it from the appropriate web sites right now. I mean, it's a national -- we've just downloaded it in another matter, but it's either at the CDC -- I'm looking for who keeps the NAMCS data.

Okay. It's either going to be the National Center for Health Statistics or the CDC, and it's publicly available and can be downloaded directly.

Q. You haven't done that yet, I take it, in this case?

A. Not in this case, no.

Q. Why not?

A. I guess we're waiting to see whether -- if the case goes forward. I don't get asked to do the damage analysis until the class is certified, so I'm not going to start spending lots of money gathering these data if for some reason the class is not certified.

Q. Let's take a look now at Paragraph 17. You write in Paragraph 17 that some portion of Professor Rosenthal's Q will be reimbursed by Medicaid or other government payors or other nonclass members; is that correct?

A. That's correct.

Q. And I assume that the idea is that you would try to exclude these portions from your damages calculation somehow?

A. That's correct.

Q. Does your declaration provide any detail on how you would do that?

A. The -- it certainly identifies the fact that the IMS data in terms of the NPA data and the retail method of payment data does break out payment by Medicaid, by cash payors and by third-party payors. The NAMCS data breaks it out even more finely and has other government payors in there.

As we have done a variety of cases involving a variety of pharmaceuticals, we have gathered data on direct purchases by the DOD and by coverage through third-party payors of federal, state and local employees and retirees so that we have some information that we can use regardless of the pharmaceutical being analyzed what some kind of average numbers are for other amounts reimbursed by government entities.

And so that would be something that we would turn to and do that correction.

Q. Did I understand you right that you would be looking to data that you've collected in other cases to do this analysis?

A. No. What I'm saying is there is data that is available from the DOD and from Champus and Tricare and other sources that allow us to get some sense of lives that are covered by, say, third-party payors, but it's a TPA for the government, and so we're able to net out certain -- based on the data that has been gathered for just numbers of lives, and this is from the -- I forget the names of the data source, it's the Federal Employment Health and Benefits Statistics. There are standard data

sources that help identify where certain government employees and retirees are covered through self-funded kinds of insurance through TPAs and TPPs, and those would not be subject to the class under the definitions of the class.

Q. Your declaration doesn't even mention those sources anywhere, does it?

A. We wanted to surprise you with some additional deductions. It's just other government payors, and yeah, I haven't -- I haven't outlined every possible data source of correction, but every data source that exists will be used, and if I didn't take kind of those other governmental payors, your expert would take me to task.

So I've said Medicaid and other governmental payors, and those are -- the appropriate other governmental payors will be identified and netted out.

Q. Should we and our expert and the court expect any more surprises along this line?

A. I don't look at these as being surprises. Anyone who has analyzed your expert will say that this is the standard practice and procedure.

Q. Surprises was your word, Dr. Hartman.

A. It was? Well, we could have it read back. I'd like to see how I used it.

Q. Do you want to do it?

A. Yeah, let me hear it.

MR. POLUBINSKI: If you can just read the first sentence in response to my question.

THE WITNESS: No, read the question and let me hear the whole response.

MR. POLUBINSKI: Sure. The question and answer starting with your declaration doesn't even mention these sources anywhere, does it.

(Record read.)

THE WITNESS: It was -- I wanted to say generously provide you, but I see where -- there are no other surprises, and as I say, I doubt these -- these wouldn't be surprises to someone who has analyzed the market, but in a bit of playful late afternoon banter, I should not have used the word surprise.

BY MR. POLUBINSKI:

Q. Now, just again looking at Paragraph 17, even setting aside the sources of data that your declaration doesn't mention anywhere, Paragraph 17 doesn't tell us what data sources you would use to

222

conduct this analysis, am I right? That's something that we would need to divine from the rest of the report?

A. Well, the -- you know, it's pretty clear that in Paragraph 16b I'm talking about excluding Medicaid, with the retail method of payment, I'm talking about excluding nonclass members, and so I'm saying, look, having done so, you know, the amounts, the units will be less than the total units.

And so I've referred to Medicaid above, and whether I've said other governmental payors in the previous paragraph I am not sure, but clearly as we've discussed, it will do so.

And let me just see.

You know, as I say, even if we go back to Paragraph 15a, last bullet, I see information from manufacturers that identified method of payment and direct sales to, say, VA and DOD. I've mentioned there e.g. Medicaid, but, you know, any nonclass payors need to be excluded, and those are going to be governmental payors. And so whatever information I can find and gather and have gathered as part of the general practice of doing these kinds of analyses are included here.

223

So your discovery materials from your client may tell us that and have at times in the past with other cases where they break it out for us. That would be nice.

We have data that we've gathered from the Kaiser Foundation and from these various survey groups that look at federal employees and state and local employees and how their benefits are funded and their health insurance, and we've used them and can use them to net out purchases that would not be due specifically to the class members in this matter.

Q. Just to be sure, all of that is data though that you haven't collected in this case yet, correct?

A. Well, some of it is data that we just have on hand because we've got -- say the NAMCS data, I have the NAMCS data, lots of NAMCS data. We haven't rolled out Neurontin-related NAMCS data. I've gotten the data from the Kaiser Foundation and from this Federal Health and Employees Benefits group that covers insured lives generally. It's not drug-specific, but we use it as an approximation to get at drug patterns.

224

So some of it we have already.

Q. Do you anticipate using that data in your analysis in this case?

A. If it's appropriate, if it leads to a more accurate calculation, if it's needed, it will be used.

MR. POLUBINSKI: That's another thing we call for production of.

BY MR. POLUBINSKI:

Q. One of the other things, Dr. Rosenthal -- Dr. Hartman, excuse me.

A. I thought you were going to say something Dr. Rosenthal said.

Q. No. Let me start again on that one.

You also state in Paragraph 17 that you will need to account for the fact that units reimbursed by the third-party payor subclass will cause the consumer subclass to incur reimbursement damages in the form of copays.

Did I read that correctly?

A. You did.

Q. What you mean here, if I'm understanding it right, is essentially that you'll need to be sure to award damages nonduplicatively as between the two

225

subclasses; is that right?

A. Well, the -- yes. I mean, the damages related to the third-party payor subclass with a superscript of 1 takes all units by I, J and T as defined times the reimbursement rates that they pay or the reimbursement rates plus dispensing fee if that's the appropriate measure as directed by counsel.

Now, the subclass 2, the consumer subclass, the superscript 2 includes all purchases that were essentially cash purchases, out-of-pocket cash, and that's the -- that's the superscript 2, but there will also be a copay amount related to reimbursements for all units for which those units were paid as part of a TPP for that member, that was the insureds. The first group is noninsured, the second group is the copays for the insureds.

Q. I think this is consistent with what you just said, but would it be right to say that part of what you're doing here is making sure that the third-party payors don't recover amounts that they've already received from consumers in the form of copayments?

A. Well, usually the copayments are not paid

226

to the insurers, they're paid to the pharmacy. I go into the pharmacy, and the claim as submitted by the pharmacy says, okay, this copay was paid, you now owe us the remaining amount in ingredient cost and dispensing fee.

And so what would be included in P1, superscript 1, is the ingredient cost paid by the third-party payor and the dispensing fee perhaps, if I'm so directed, and it would not include a copay, but the copay doesn't go to the insured, it goes to the retailer, and that would be the copay down here for the units that were -- the primary amount was paid for through third-party payors.

Are you following me in this, more or less?

Q. More or less.

A. In other words, the Q1T are all units reimbursed by third-party payors. The sum of the amount of reimbursement is ingredient cost paid by the TPP, dispensing fee and copay. The copay is in Equation 2B in the second term. The first two are in Equation 2A on the same Qs.

Q. Okay. Here again, can you help me find where in your declaration you describe how you will

227

conduct this analysis, so in other words how you'll decide which parts fall into the copay amount, which parts fall into the reimbursement amount or the dispensing fee?

A. Well, the Qs, the total units will either -- let's assume I receive from Professor Rosenthal the disaggregation by diagnosis and dosage, okay, so all we're talking now about is the breakout between the two subclasses, third-party payors and consumers, and the consumers have damages in two forms. One, for those that are uninsured, they walk in and pay the full amount for the drug. Those that are insured merely walk in, they pay the copay, they get the drug and the rest of the bill is sent off to the PBM, to the insurer, and the PBM deals with taking care of all the data and the transactions.

The prices that you see here in the copays, these are all information that if you look at the IMS data and the NPA and the retail method of payment, they track amounts paid by cash payors and third-party payors. If you look at the -- this is in, I'm sorry, 15b.

If you look at the TPP data in 15d, they

228

track for their own customers, for their own insureds the amount that they pay as ingredient costs and copays.

So there's going to be data that I'm going to use and come up with the average just as we had talked about the Equation 1 here. Where I think we hopefully got close to the Rubics Cube of these buckets one times the other, this is just disaggregating this P in Equation 1 a little more finely so that I take account of the fact that some of this Q here is going to class 1 directly to the insureds, they walk in off the street, they pay.

So I find that out by the retail method of payment because they track at the retail level how many people pay cash, walk off the street and pay cash, how many people walk in and pay an insured amount.

So I'll have breakouts of the Qs along that line, and I will have -- they also break out the dollar amount spent by cash payors on a script.

So I will have the Ps for the uninsured, and that's the P2 when I start in Equation 2B, P superscript 2. From the third-party payor data, I'll have copays for the stuff that goes through the

229

third-party payors in Equation 2A, and so it's merely a disaggregation.

I mean, frankly, I generally in a variety of classes that have been certified, I don't really write a heck of a lot more of how these things get disaggregated. I mean, I -- I use these data to disaggregate this formula to get these groups, you know. I don't -- that's -- that's what's going on.

Q. When you're disaggregating values for Q in this way --

A. By subclass now.

Q. -- by subclass, yeah, by subclass, or also carving out nonclass payors, do you propose doing that in essentially the same way that you propose disaggregating by diagnosis? So in other words, do you propose doing that by coming up with a percentage of Q and just based on the third-party data that we've been talking about and then applying that percentage to the Q numbers that you get from Professor Rosenthal?

A. It will depend on how complete the data are. I may just get -- I may get retail method of payment that breaks it out by let's say Medicaid, third-party payors and cash payors, and suppose then

230

I have a little additional data from some other -- some of our other sources that say, look, some of this third-party payor reimbursement that you're seeing Q is really -- it's self-insured governmental employees, federal governmental employees, they shouldn't be part of the class, so let's net that little bit more out of the third-party payors.

Okay. So now I just have percentages that you've just said between consumers, cash payors and third-party payors. Now, there may be information that might allow me to -- there will be information that will allow that to differentiate by diagnosis because Medicaid is going to be bigger for psychiatric uses is my hypothesis, but I'll look at the NDTI data to see how that -- the retail method of payment data changes there by diagnosis, but essentially I'm going to be using these percentages to break out a total Q into units that are not subject to either class and those that are subject to the classes, and it will vary certainly by diagnosis to the extent possible or where there is that variation, but it's a set of percentages. In the same way we're breaking out buckets before, we're disaggregating them into constituent elements

231

here.

Q. Let's look again at Paragraph 15d, which describes TPP data. You say in this paragraph that you will request data from -- from each TPP in our class and from a group of opt-out TPPs if possible, correct?

A. That's correct.

Q. And again, I think we've discussed that you haven't requested any of that data yet?

A. Well, I've requested it in the sense of when we're ready to go forward they know I need this, so --

Q. Fair enough. Okay. One of the things that you say here is that you will request information from a group of opt-out TPPs if possible.

Have you identified the opt-out TPPs from whom you would make the request, or have you already made that request?

A. I've been told that there are a set of opt-out TPPs. I've been told that some may be cooperative, and that's all I've been told, and I'm told frequently in matters of this sort, and sometimes we've found that opt-outs are ready to

232

offer and share this type of data and other times not.

So I don't -- if possible, if they're willing to cooperate or receive that information or if it's legally allowable, I certainly want to get it. I'm going to want to get it from as many TPPs as we have the ability to get data.

Q. Now, you haven't identified specific opt-out TPPs from whom you would like data; is that correct?

A. Not yet, no.

Q. Okay. Have you made any sort of a generic request to plaintiffs' counsel on this front?

A. I just said that I understand there are opt-outs, I want their data, I want data from every one of them if we can get it.

Q. And you don't know yet at this stage which ones you might be able to get data from, correct?

A. That's correct.

Q. Do you know how many opt-out third-party payors there are?

A. I don't recall. I think I was told back then, but I don't recall now.

Q. All right. Let's look at Paragraph 15e,

233

which describes Red Book and First DataBank data.

Have you requested this information yet?

A. We have a substantial amount of this information, and so I'm not sure we will need incremental information, but until, until I'm told we're ready to go forward with this, I won't assess whether we have the data already in-house and whether we're going to need to do a supplemental request or purchase.

Q. And that's an assessment that you haven't yet done at this stage, correct?

A. That's correct.

Q. One of the things that you referred to in Paragraph 15e is negotiated reimbursement rates.

What is a negotiated reimbursement rate?

A. Well, I think just what we talked about, when third-party payors negotiating with PBMs or when PBMs are negotiating with retail pharmacies, certainly for our purposes it's third-party payors or PBMs negotiating rates at which they will reimburse for drugs.

They are usually -- the common denominator is a negotiated reimbursement rate off of AWP, in some cases WAC, but it's for the most part off of