# EXHIBIT 19

*In re: Neurontin Marketing, Sales Practices, and Products Liability Litigation*

## DECLARATION OF MICHAEL C. KEELEY, PH.D. IN OPPOSITION TO
## PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

### I.   Qualifications

1.   My name is Michael C. Keeley. I am a Senior Vice President of Cornerstone Research, an economic and financial consulting firm with offices in Menlo Park, San Francisco, and Los Angeles, California; Boston, Massachusetts; New York, New York; and Washington, D.C. I specialize in economic, financial, and statistical analysis. I earned an S.B. degree in mathematics from the Massachusetts Institute of Technology, and the University of Chicago awarded me M.A. and Ph.D. degrees in economics.

2.   For more than 20 years I have consulted and served as an expert witness on liability, damage, and class certification issues in a variety of cases including antitrust, intellectual property, and general business litigation. I have testified as an expert witness in a number of cases and served as a consultant in others.

3.   In particular, I have served as an expert or consultant in a number of cases in the pharmaceutical industry. I am currently serving as an expert addressing class certification in two antitrust cases involving allegations that the entry of a generic producer was delayed, and I have served as a consultant on damage issues in a third

case involving allegations of delayed entry by generic producers. Further, I have served as a consultant for the defendant in a case in which a branded pharmaceutical manufacturer was accused of monopolizing the market, helping to assess from an economic perspective plaintiffs' class certification, liability, and damage claims. In addition, I have provided consulting to one of the major pharmacy benefit managers ("PBMs") regarding whether plaintiffs' allegations of breach of alleged fiduciary duty could be addressed using common evidence or whether individual inquiry would be required. I also served as an expert for a pharmaceutical manufacturer that had accused another pharmaceutical manufacturer of patent misuse. Moreover, I also have served as an expert or consultant in a number of other cases in the health-care industry, addressing issues including hospital pricing and competition, the markets for medical devices, and the provision of physician services to hospitals.

4.      In addition to the cases mentioned above, I have consulted or served as an expert on class certification issues in a number of cases, including *S&M Farm Supply Inc. v. Pharmacia Corporation and Monsanto Company*; *In Re Compensation of Managerial, Professional and Technical Employees Antitrust Litigation*; *Raymond Verdin v. R&B Falcon Drilling USA, Inc., et al.*; and *Spartanburg Regional Healthcare System v. Hillenbrand Industries, Inc., et al.* I testified in opposition to class certification in the first of these cases and served as a consultant for the defendants in the second case, and the Courts in those cases denied the motions for class certification. The third and fourth cases settled before the Courts ruled on class certification.

5.    In addition to consulting on issues relating to litigation, I have consulted on non-litigation business, economic, and public policy issues.

6.    Before joining Cornerstone Research, I was a Research Officer at the Federal Reserve Bank of San Francisco. My responsibilities there included, among other things, analyzing bank mergers and acquisitions and making recommendations to the Board of Governors of the Federal Reserve System regarding whether or not such mergers and acquisitions might have anticompetitive effects. I also conducted economic and financial research related to policy and regulatory issues facing the Federal Reserve System.

7.    Prior to joining the Federal Reserve Bank of San Francisco, I founded and managed Stanford Research Institute's ("SRI's") Antitrust Economics Consulting Group. In addition to consulting on a variety of antitrust matters, my work at SRI focused on policy-oriented economic and statistical research.

8.    My research has been published widely in economics and finance journals. Based on citations of my research, I was selected for inclusion in *Who's Who in Economics*. I was also awarded the Garn prize for my research on bank risk-taking and I have served as a referee (i.e., reviewer) for many of the major economics and finance journals. Details of my qualifications are provided in my curriculum vitae in Exhibit A. A list of cases in which I have provided testimony since 2002 is provided in Exhibit B. Cornerstone Research is being compensated at my customary billing rate of $525 per hour for the work I have done on this case. Cornerstone Research's compensation is not dependent on the outcome of this litigation.

## II.  Case Background and Plaintiffs' Claims

9.      In December 1993, Neurontin was approved by the FDA for adjunctive therapy

in the treatment of partial seizures with and without secondary generalization in

patients twelve and over with epilepsy.[1]  In January 1994, the Parke-Davis division

of Warner-Lambert launched Neurontin.[2]  In 2000 and 2002, Pfizer, who acquired

Warner-Lambert in 2000, received approval for Neurontin in the treatment of

epilepsy in pediatric patients of ages three to twelve years old and post-herpetic

neuralgia, which is pain resulting from nerve damage caused by shingles,

respectively.[3]

10.     Plaintiffs allege that defendants engaged in false or misleading promotion of

Neurontin (gabapentin) for certain indications and/or for certain dosage levels that

were not approved by the FDA.[4,5]  In particular, plaintiffs allege that some off-label

promotions did not contain complete disclosures[6] and that some promotions

contained false information.[7]  Plaintiffs further allege that this alleged fraudulent

marketing for off-label uses caused damages to the members of the putative class

described below.[8]

11.     The proposed class consists of "all individuals and entities in the United States

and its territories who, for purposes other than resale, purchased, reimbursed, and/or

---

[1] Second Amended Class Action Complaint, *In re: Neurontin Marketing, Sales Practices and Products Liability Litigation*, MDL Docket No. 1629, Master File No. 04-10981, June 30, 2006 (hereafter Complaint), ¶ 17.

[2] Complaint, ¶¶ 4, 280-282.

[3] Ibid., ¶¶ 2, 12, 17.

[4] Ibid., ¶¶ 3, 143-219.

[5] Prescriptions for non-FDA approved indications are commonly referred to as off-label uses.

[6] Ibid., ¶¶ 29, 40, 46.

[7] Ibid., ¶¶ 41, 123, 135, 146, 152, 156, 164-165, etc.

[8] Ibid., ¶ 4.

paid for Neurontin for indications not approved by the FDA during the period from
January 1, 1994, through the present.[9]  For purposes of the Class definition,
individuals and entities 'purchased' Neurontin if they paid some or all of the
purchase price."[10]  The proposed class has been disaggregated into two distinct
proposed subclasses:  Third Party Payers ("TPPs")[11] and Consumers.[12]

### III.  Assignment

12.       I have been asked by counsel to undertake the following:

  a.  Conduct an economic analysis of whether common evidence can be used to
      show that each member of the proposed class was harmed as a result of
      actionable conduct, i.e., determine whether common evidence can be used to
      prove causation and injury to each class member or whether individual inquiry
      would be required;

  b.  Assess whether the amount of damages, if any, suffered by each of the
      proposed class members is amenable to common proof;

---

[9] Plaintiffs propose a class period that continues through the present even though according to plaintiffs:
(1) "Dr. David Franklin initiated a qui tam action on behalf of the United States against the Parke-Davis
division of Warner-Lambert in 1996." (2) "The federal court unsealed Dr. Franklin's original complaint in
January 2000." and (3) "In April 2002, the Court unsealed Dr. Franklin's amended complaint, which ...
contained details of Defendants' off-label promotion." (See Complaint, ¶ 262.)

[10] Ibid., ¶ 280.

[11] The Third Party Payer ("TPP") Subclass is defined as "[a]ll private, non-governmental entities in the
United States and its territories that are at risk, pursuant to a contract, policy, or plan, to pay or reimburse
all or part of the cost of Neurontin prescribed, provided, or administered to natural persons covered by such
contract, policy, or plan for indications not approved by the FDA during the period from January 1, 1994 to
the present.  Such entities include, but are not limited to, insurance companies, union health and welfare
benefit plans, entities with self-funded plans that contract with a health insurance company or other entity
to serve as a third-party claims administrator to administer their prescription drug benefits, private entities
paid by any governmental entity (including a state Medicaid program) to provide prescription drug benefits
on a capitated basis, and other organizations that paid for all or part of a Neurontin prescription since
January 1, 1994." Ibid., ¶ 281.

[12] The Consumer Subclass is defined as "[a]ll individuals in the United States and its territories who, for
purposes other than resale, purchased, reimbursed, or paid for some or all of the price of Neurontin, for
indications not approved by the FDA during the period from January 1, 1994 to the present." Ibid., ¶ 282.

c.   Review the declarations of Professor Meredith Rosenthal ("Rosenthal Declaration") and Dr. Raymond Hartman ("Hartman Declaration") and assess the validity of their analyses and claims.

## IV.  Materials Considered

13.   In reaching my opinions in this case, I reviewed a variety of materials including legal pleadings, documents produced in this case, academic articles, depositions, expert declarations, and other relevant materials.  I have reviewed the Rosenthal and Hartman Declarations and the materials relied upon therein.  In addition, I have reviewed the depositions of Professor Rosenthal and Dr. Hartman.  Exhibit C provides a complete listing of the materials that I have considered.  I reserve the right to revise my opinions in light of any additional materials including data, documents, and deposition or other testimony that may subsequently come to light.

## V.  Summary of Opinions

### a.  Determining whether the challenged conduct affected each physician's prescribing behavior (and thus had the potential to harm each proposed class member) requires individual inquiry.

14.   Professor Rosenthal agrees that physician prescribing behavior depends on the individual characteristics of the physician and his or her patient, and the sources of information the physician received, considered, and relied upon in making his or her decision, among other things.[13]  Thus, for any given off-label prescription, without individual inquiry, it is not possible to (1) determine whether the challenged promotions had even reached a given physician so that it might have influenced his

---

[13] See, for examples, Deposition of Meredith B. Rosenthal, Ph.D., *In re. Neurontin Marketing, Sales Practices and Products Liability Litigation*, MDL Docket No. 1629, Master File No. 04-10981, October 24-25, 2006 (Rosenthal Deposition), pp. 185-190, 192-193, 232-236, and 239-244.

or her prescribing, (2) if the physician were aware of the challenged promotion, whether it influenced his or her decision, and (3) even if it did influence the physician's prescribing decision, whether the physician's decision would have been any different if the challenged promotion were cured. Those proposed class members whose consumption of or payment for Neurontin were not affected by the challenged conduct cannot have been harmed.

**b. Assuming causation, determining whether the challenged conduct harmed or benefited each proposed class member requires individual inquiry.**

15.    Even for those proposed class members whose expenditures on or consumption of Neurontin were caused by the challenged conduct, to determine whether a proposed class member benefited or was harmed would depend on the alternative drug or treatment that would have been prescribed to the proposed Consumer class member (and potentially partially paid for by the proposed TPP class member) in the absence of the challenged conduct. TPPs would only be harmed if their expenditures on the alternative drug or treatment were less than their expenditures for Neurontin. For proposed members of the Consumer class, the determination of whether a proposed class member benefited or was harmed requires a comparison not only of expenditures, but of the relative efficacy of Neurontin in treating that patient's condition as compared with whatever alternative drug or treatment would have been pursued. Determining the cost and efficacy of the alternative treatment for each proposed class member would require individual inquiry.

### c. Professor Rosenthal and Dr. Hartman do not assess whether common evidence can be used to determine causation, injury, or damages.

16.     Neither Professor Rosenthal nor Dr. Hartman address whether common evidence can be used to show causation, harm, and damages to each proposed class member. Instead, Professor Rosenthal argues that the effect of off-label promotions on *aggregate* unit sales can be determined, and Dr. Hartman argues that this effect can be translated into an *aggregate* damage number. As I discuss below, I do not believe they are correct even regarding these claims. However, estimates of effects of the challenged promotions on aggregate unit sales or estimates of aggregate damages do not show that the challenged conduct affected each proposed class member's consumption of Neurontin or costs of treatment, or whether each proposed class member was harmed.

### d. Professor Rosenthal's proposed model fails to address plaintiffs' allegations.

17.     As mentioned above, plaintiffs allege that defendants failed to adequately and fully disclose material information about Neurontin in various off-label promotions and that defendants made false and misleading statements.[14] Professor Rosenthal fails to propose a method to estimate the effect of the challenged (or actionable) *conduct* on the off-label prescriptions of Neurontin. Instead she proposes a model she claims can estimate the effect of the challenged *promotions*. This distinction is

---

[14] For example, Plaintiffs allege that, as a result of an alleged failure to disclose allegedly material information, presenters at various events misleadingly or falsely suggested that the data uniformly showed Neurontin's efficacy for different off-label indications, such as monotherapy, pain, DPN (diabetic peripheral neuropathy), RLS (restless leg syndrome), migraine, and other disorders. See, for examples, Complaint, ¶147, alleging failure to disclose DPN study by Dr. Kenneth Gorson at "numerous events at which Neurontin's use for DPN was discussed"; Complaint, ¶157, alleging failure to present "anecdotal evidence ... of Neurontin's failure to treat pain" at presentations concerning Neurontin's use for pain; Complaint, ¶184, alleging failure to disclose negative clinical trials for social phobia at the events that discussed Neurontin's use as a treatment for the various anxiety disorders, etc.

crucial because, for example, a particular challenged off-label promotion might have a significant effect on Neurontin's off-label sales, but it might have had the same, or nearly the same, effect if the additional information plaintiffs claim should have been disclosed was disclosed or if any allegedly false claims were not made.

### e. Professor Rosenthal presents no support for her claim that her model would produce statistically reliable results.

18. Putting this fundamental problem aside, Professor Rosenthal's model is unlikely to produce statistically reliable estimates even of the aggregate effect of the challenged promotions (compared to no promotions) on unit sales because there are too many different types of promotions that took place at different times, and the effects of any given promotion will likely vary over time. To reliably estimate time-varying effects of the challenged promotions would likely require more observations than Professor Rosenthal would be able to obtain.

19. A related problem is that several explanatory variables, most notably other promotions for Neurontin that are not challenged, may be correlated with her key challenged promotion variables, thus leading to multicolinearity, and, as she admits, difficulty in reliably estimating the key coefficients of her model.[15] A further potential difficulty that Professor Rosenthal admitted is the potential of endogencity.[16] That is, correlation does not show causation. For example, promotion may be correlated with sales of Neurontin, but the correlation may be due, at least in part, to the fact that as Neurontin's sales grew, more was spent on

---

[15] Rosenthal Deposition, pp. 463-470.
[16] Professor Rosenthal acknowledged potential endogeneity as an issue she would have to address in her model in order to obtain unbiased results. Endogeneity refers to the potential for explanatory variables to be determined within the system as opposed to being exogenously determined. When explanatory variable are endogenous, their estimated ordinary least squares coefficients do not represent unbiased estimates of their causal effects. Ibid., pp. 450-451.

promoting Neurontin. I have serious doubts that Professor Rosenthal would be able to statistically control for endogeneity in a reliable manner (i.e., I have serious doubts that she would be able to obtain unbiased estimates of the true causal effects of the challenged promotions).

20.    Although Professor Rosenthal acknowledged these many potential econometric problems in her deposition,[17] she has done no work to determine the extent of these problems and has made no effort to show that her proposed approach is feasible.

### f. Dr. Hartman does not propose a method to determine aggregate economic damages, let alone any proposed class member's damages.

21.    Even if Professor Rosenthal could reliably estimate the effect of the challenged *conduct* (not challenged promotions) on off-label prescriptions of Neurontin, Dr. Hartman fails to put forward a method of determining aggregate economic damages. In deposition, he admitted that he did not even seek to measure economic damages, but instead based his measure of damages on instructions he had received from attorneys.[18] Dr. Hartman fails to consider what the behavior of the proposed class members would have been absent the challenged conduct, the first necessary step in an economic damage model. The economic damages, if any, suffered by proposed class members are *not* their expenditures on Neurontin. Their damages, if any, depend on both the cost and efficacy of whatever alternative treatment would have

---

[17] Professor Rosenthal acknowledged a number of potential problems with her model. For example, she agreed that issues related to multicolinearity, simultaneity/endogeneity, omitted variables, and degrees of freedom could result in her model providing biased or unreliable results. Rosenthal Deposition, pp. 447-451, 463-470, 471-473.

[18] Deposition of Raymond S. Hartman, Ph.D., *In re: Neurontin Marketing, Sales Practices and Products Liability Litigation*, MDL Docket No. 1629, Master File No. 04-10981, December 13, 2006 (Hartman Deposition), pp. 111–112, 122–127.

been provided absent the challenged conduct compared to the cost and efficacy of Neurontin. Thus, determining economic damages requires individual inquiry.

### g. Neither Professor Rosenthal nor Dr. Hartman explains how a scheme of alleged fraudulent promotion could have lasting and persistent effects of any significant magnitude.

22.     Finally, neither Professor Rosenthal nor Dr. Hartman advances a credible explanation of how a scheme of alleged fraudulent promotion could have lasting and persistent effects of any significant magnitude. Economics teaches that only products that meet consumers' needs survive and prosper. This is especially true for drugs like Neurontin, which are experience goods.[19] If Neurontin did not ameliorate patients' symptoms, they would complain to their physicians and the physicians would not continue to prescribe it. Thus, Neurontin's success for off-label uses over a long period of time suggests that it did meet at least a significant fraction of patients' needs.[20] At the very least, it would be a matter of individual inquiry to determine, which, if any, patients' needs were not met by Neurontin as alleged by the Plaintiffs. Dr. Hartman and Professor Rosenthal also fail to explain why Neurontin's sales did not decline after the allegations of false and misleading promotions were made public.

---

[19] See, for examples, Berndt, Ernst R., "The U.S. Pharmaceutical Industry: Why Major Growth In Times Of Cost Containment?," *Health Affairs*, Volume 20, No. 2, 2001; Azoulay, Pierre, "Do Pharmaceutical Sales Respond to Scientific Evidence?," *Journal of Economics & Management Strategy*, Volume 11, Number 4, Winter 2002, pp. 551–594; Coscelli, Andrea, and Matthew Shum, "An Empirical Model of Learning and Patient Spillovers in New Drug Entry," *Journal of Econometrics*, pp. 122 (2004) pp. 213–246; Ching, Andrew, and Masakazu Ishihara, "The Effects of Detailing on Prescribing Decisions under Quality Uncertainty," *Draft Paper*, August, 2006.

[20] As Dr. Hartman explained in his deposition, he has been taking Neurontin himself for a long period and continues to take Neurontin today even though he and his physician are fully aware of the allegations in this case. Hartman Deposition, pp. 18–23.

## VI. Physicians Rely on a Wide Variety of Types of Information in Determining Which Drugs to Prescribe—Common Evidence Cannot Be Used to Determine Whether the Alleged Fraudulent Promotions Affected Each Proposed Consumer Class Member's Use or Cost of Neurontin

### Physician prescribing behavior depends on many factors.

23.    As Professor Rosenthal acknowledges, physicians, along with patients and

TPPs, are the key decision makers in the prescribing of prescription drugs such as

Neurontin.[21] Like all decision makers, physicians are informed by a wide range of

sources of information that they can potentially utilize in making decisions. Also,

like all decision makers, different physicians will give different weights to different

types of information in arriving at their final prescribing decision.[22] However,

unlike the average consumer, physicians are highly trained, and, in particular, are

trained in using medical science to prescribe the drug that best addresses a patient's

symptoms. This often includes prescribing drugs for off-label uses. In fact, off-

label use is common and can be beneficial to patients.[23] In addition, Professor

---

[21] See, for examples, Rosenthal Deposition, pp. 184-187; Rosenthal Declaration, ¶¶ 12, 14; White, Lesley, and Lester W. Johnson, "Relative Influence of Physicians and Patients in the Prescribing Decision," *International Journal of Medical Marketing*, 2002, Vol. 2, No. 2; Chintagunta, Pradeep K., Renna Jiang and Ginger Z. Jin, "Patient Learning and Advertising in the Diffusion of Cox-2 Inhibitors," *Working Paper*, October, 2006; Schumock, Glen T., Surrey M. Walton, Hayley Y. Park, Edith A. Nutescu, Juan C. Blackburn, Jamie M. Finley and Richard K. Lewis, "Factors that Influence Prescribing Decisions," *The Annals of Pharmacotherapy*, April 2004, Volume 38; Pitt, Leyland and Deon Nel, "Pharmaceutical Promotion Tools – Their Relative Importance," *European Journal of Marketing*, 1988, Vol. 22, No. 5.

[22] Professor Rosenthal acknowledged that a wide range of factors could affect prescribing behavior of individual doctors and prescribers in the aggregate. However, the quantum of effect would "vary from physician to physician." Rosenthal Deposition, pp. 231-244, 320-336; Avorn, Jerry, Milton Chen and Robert Hartley, "Scientific versus Commercial Sources of Influence on the Prescribing Behavior of Physicians," *The American Journal of Medicine*, Volume 73, July 1982; Azoulay, "Do Pharmaceutical Sales Respond to Scientific Evidence?"; Christensen, Dale B., and Albert I. Wertheimer, "Sources of Information and Influence on New Drug Prescribing among Physicians in an HMO," *Soc. Sci. & Med.*, Vol. 13A, pp. 313-322, 1979; Marilyn Y. Peay and Edmund R. Peay, "Patterns of Preference for Information Sources in the Adoption of New Drugs by Specialists," *Soc. Sci. Med.*, Vol. 31, No. 4, pp. 467-476, 1990.

[23] See, for examples, DeMonaco, Harold J., Ayfer Ali, and Eric von Hippel, "The Major Role of Clinicians in the Discovery of Off-Label Drug Therapies," *Pharmacotherapy*, Volume 26, Number 3, 2006; Poole, Susan G., and Michael J. Dooley, "Off-label Prescribing in Oncology," *Support Care Cancer*, 2004.

Rosenthal concedes that if a drug has not been approved by the FDA, it does not mean that the drug lacks efficacy.[24]

24.     There is a wide range of factors that affect the prescription-writing behavior of physicians. Factors such as personal clinical experience with the drug or a drug with a similar mechanism of action, formulary status, cost, educational training, and specialty all can play a role for some physicians.[25] These and other factors have been studied in the economics, marketing, and medical literature, and there is general agreement about the fact that multiple factors drive the prescribing behavior of physicians. In fact, Professor Rosenthal also agrees with the general notion that a range of factors may influence individual doctors' prescription decisions. For example, Professor Rosenthal agrees that information published in peer-reviewed medical journals, new case reports in informal medical publications, continuing medical education seminars, informal talks given by authorities, informal conversations among doctors, formal practice guidelines, new scientific developments, FDA approval and approval in other countries of Neurontin as well

12:302–305; Jong, Geert W., Arnold G. Vulto, Matthijs de Hoog, Kristen J.M. Schimmel, Dick Tibboel and John N. van den Anker, "Unapproved and Off-Label Use of Drugs in a Children's Hospital," Volume 343;1125, October 12, 2000, Number 15; Kos, Mitja, Albert I Wertheimer, and Ales Mrhar, "Satisfaction with Pharmacotherapy for Approved and Off-Label Indications - A Delphi Study," *The Annals of Pharmacotherapy*, 2005 April, Volume 39; and Rosenthal Deposition, pp. 212, 217-218.
[24] Rosenthal Deposition, pp. 512-513.
[25] See, for examples, Pitt, et al., "Pharmaceutical Promotion Tools"; Denig, P., F.M. Haaijer-Ruskamp, H. Wesseling, and A. Versluis, "Impact of Clinical Trials on the Adoption of New Drugs within a University Hospital," *European Journal of Clinical Pharmacology*, 1991; 41:325-328; Wang, Richard Y. and Mark V. Pauly, "Spillover Effects of Restrictive Drug Formularies on Physician Prescribing Behavior: Evidence from Medicaid," *Journal of Economics and Management Strategy*, Volume 14, Number 3, Fall 2005, pp. 755-773; Reichert, Steven, Todd Simon and Ethan Halm, "Physicians' Attitudes about Prescribing and Knowledge of the Costs of Common Medications," *American Medical Association*, 2000; Segal, Richard, and Feng Wang, "Influencing Physician Prescribing," *Pharm Pract Manage Q*, 1999: 19(3), p. 43; Weiss, R., E. Charney, R. A. Baumgardner, P. S. German, E.D. Mellits, E.A. Skinner and J.W. Williamson, "Changing Patient Management: What Influences the Practicing Pediatrician," *Pediatrics*, 1990, 85:791-795; Fendrick, A.M., R.A. Hirth, and M.E. Chernew, "Differences Between Generalist and Specialist Physicians Regarding Helicobacter Pylori and Peptic Ulcer Disease," *American Journal of Gastroenterology*, Volume 91, No. 8, 1996; Jennings, M., "A Survey of Prescribing Variation in General Practice," *British Journal of Medical Economics*, 1996, 10: 79-82.

as its therapeutic substitutes, a change in the Physicians Desk Reference, information posted on a web site, detailing visits, provision of samples, the manufacturer's literature, insurance coverage guidelines, prior authorization programs, disease management programs, academic detailing, formulary status of a drug, and news articles all might influence physician prescribing behavior.[26] As a result of this wide range of factors potentially influencing physician prescribing behavior, individual inquiry would be required to determine whether the challenged conduct affected any given physician's prescribing behavior.

**Each patient's experience with a drug is one factor affecting his or her physician's prescribing behavior.**

25.     Among this wide range of factors, an important factor is the feedback a physician receives from his or her patients about a drug's efficacy. A physician is unlikely to continue to prescribe a drug when a patient tells him or her it does not work. Physicians consider the feedback their patients give them about a drug to form an opinion about its efficacy. Prescription drugs are experience goods, whose attributes can be ascertained only upon consumption over time.[27] The effectiveness of a given drug may differ from patient to patient and from diagnosis to diagnosis, and experience may prove that a particular drug may not be as effective in treating one patient or diagnosis as it is another.[28] Therefore, even if a physician initially

---

[26] Rosenthal Deposition, pp. 320-336.

[27] See, for examples, Berndt, "Why Major Growth In Times of Cost Containment?"; Azoulay, "Do Pharmaceutical Sales Respond to Scientific Evidence?"; Coscelli et al., "Patient Spillovers in New Drug Entry"; Ching et al., "Prescribing Decisions under Quality Uncertainty."

[28] See, for examples, Crawford, Gregory S., and Matthew Shum, "Uncertainty and Learning in Pharmaceutical Demand," *Econometrica*, Vol. 73, No. 4 (July, 2005), 1137–1173; Coscelli et al., "Patient Spillovers in New Drug Entry"; Chintagunta et al., "Patient Learning and Advertising"; Patsalos, Philip N., Walter Froscher, Francesco Pisani and Clementina M. van Rijn, "The Importance of Drug Interactions in Epilepsy Therapy," *Epilepsia*, 2002: 43(4), pp. 365-385.

relied upon the challenged aspect of a promotion in prescribing Neurontin for off-label uses, generally he or she will only continue to prescribe Neurontin to a particular patient if the patient is responsive to the treatment and his or her symptoms show improvement.[29]  Consequently, individual inquiry about each patent's experience with Neurontin would be required to assess whether the challenged conduct affected the physician's prescribing behavior.

26.    Indeed, Dr. Kylene Huler—a neurologist who treated Gerald Smith, a named plaintiff in this matter, in 1999-2001—confirms this fact in her deposition:[30]

> Q: Would you take a patient off Neurontin if it was not working?
> A: Yes, I would.
>
> A: I've had a couple of patients where it didn't work for their headaches because they had other symptoms; they felt dizzy or odd on it.  I will promptly stop it.  But they notice that quickly because it's one of those medicines that has a quick effect, and I stop it.  It's like any medicine; it's not one size fits all, there's no guarantee.  If it doesn't work, we stop it and switch gears.

27.    Dr. Huler also emphasized that the range of patient- and drug-specific factors such as patient medical history, age, gender, drug risk profile, and other medications the patient is taking or might have tried are very important factors that influence the choice of a medication.[31]  Dr. Huler also mentioned in her deposition that Neurontin was a type of medication that allowed her not to overload certain patients with a

---

[29] In addition, one would not expect physicians to continually prescribe drugs if serious side-effects developed in patients who used it for various off-label indications or if the FDA-approved alternatives were considered more effective treatment methods by physicians.  Physicians generally are not as responsive to persuasive advertising as they are to information they acquire about their patients' experiences when they uncover negative information about the efficacy of a drug.  For example, Chintagunta, et al. (2006) find that advertising did not play a significant role in explaining the diffusion patterns of Cox-2 inhibitors which were found to lead to cardiovascular disease.

[30] See Deposition of Kylene Huler, M.D., *In re: Neurontin Marketing, Sales Practices and Products Liability Litigation*, MDL Docket No. 1629, Master File No. 04-10981, November 1, 2006 (Huler Deposition), pp. 43, 194.

[31] Huler Deposition, pp. 26-29.

medicine for every symptom as it proved to be effective in treating multiple indications that have a tendency to concur.[32]

28.    Physicians take into account the efficacy of drugs in treating the specific symptoms of their patients.[33]  Studies have revealed that physicians also take into consideration other drug attributes such as the side-effect profiles, drug-to-drug interactions, routes of administration, frequency of dosing requirements, and the adoption of the drug for other indications in their prescribing decisions.[34]

29.    In addition, information regarding the efficacy of a given drug in treating a particular diagnosis may have spillover effects on other diagnoses.  For example, the information about Neurontin's FDA-approval for post-herpetic neuralgia could influence physicians' prescribing the drug for other conditions associated with neuropathic pain.[35]  As physicians get feedback from patients about the effectiveness of a drug in treating a particular diagnosis, they are likely to update their beliefs about the efficacy of the drug in treating alternative diagnoses as well.

**Peer-reviewed publications may influence some physicians' prescribing behavior.**

30.    Information about the characteristics of various drugs, such as the efficacy, side-effects, and interaction profile can be transmitted to physicians through peer-reviewed publications.  Physicians themselves indicate medical journals as one of

---

[32] Ibid., pp. 24-25, 43.

[33] See, for examples, Denig, P., F.M. Haaijer-Ruskamp, H. Wesseling, and A. Versluis, "Drug Expectations and Drug Choices of Hospital Physicians," *Journal of Internal Medicine*, 234: 155-163, 1993; White et al., "Relative Influence of Physicians and Patients."

[34] See, for examples, Segal, et al., "Influencing Physician Prescribing"; Patsalos et al., "Drug Interactions in Epilepsy Therapy."

[35] Indeed, Professor Rosenthal agrees that the FDA approval of Neurontin for a related use may potentially have an effect on physician prescribing behavior.  See Rosenthal Deposition, p. 327.

their sources of information in adopting new drugs.[36] Therefore, in the context of

Neurontin, publications about Neurontin and about anti-epileptic drugs ("AEDs") in

general could have an effect on the prescribing behavior of some physicians.[37]

There are also studies which empirically demonstrate that even in the presence of

advertising by pharmaceutical companies, scientific evidence (as embodied in

published clinical studies) has a significant effect on prescribing behavior.[38] Since

not all of the published information or scientific evidence about Neurontin is alleged

to be fraudulent, individual inquiry would be required to assess what information

had reached any given physician, whether that information was fraudulent, and

whether that information influenced a physician's prescribing behavior.

31.    In her deposition, Professor Rosenthal agrees that physicians are affected by

various factors including but not limited to information available in peer-reviewed

medical publications on use, safety and efficacy of Neurontin, drugs with a similar

mechanism of action to Neurontin and other drugs that had been used to treat

applicable conditions in making their prescribing decisions.[39] In addition she

confirms that there is significant variation among physicians in their ability to

---

[36] See, for examples, Peay and Peay, "Adoption of New Drugs by Specialists"; Christensen, "Drug Prescribing among Physicians in an HMO"; Kalb, Clifford C., "Psychological Motivations in Physician Prescribing Habits," *MM&M*, October 1978.

[37] See, for example, Bowden, Charles L., Gregory M. Asnis, Lawrence D. Ginsberg, Beth Bentley, Robert Leadbetter and Robin White, "Safety and Tolerability of Lamotrigine for Bipolar Disorder," *Drug Safety*, 2004; 27 (3): pp. 173-184. Clinical trials assessing the safety and efficacy of lamotrigine in the treatment of bipolar disorder demonstrated that lamotrigine is effective as a monotherapy and adjunctive therapy agent and "well tolerated with an adverse event profile generally comparable with that of a placebo."

[38] See, for examples, Calvo, Cecilia B., and Adolfo Rubinstein, "Influence of New Evidence on Prescribing Patterns," *JABFP*, November-December 2002, Vol. 15, No. 6, pp. 457-460; Azoulay, "Do Pharmaceutical Sales Respond to Scientific Evidence?" He estimates the effects that 'market expanding science' (i.e., scientific evidence) and 'comparative science' can have on prescription drug sales in the anti-ulcer drug market. In fact, the results imply that 'comparative science,' which is based on clinical trials using a comparator drug as opposed to a placebo, may even have a negative effect on a physician's decision to prescribe a drug if the results indicate that one drug is more efficacious than another in treating an indication.

[39] Rosenthal Deposition, pp. 320-336.

absorb new scientific evidence due to differences in their training, the type of practice they belong to, as well as the extent of their exposure to continued medical education.[40] Consequently, individual inquiry would be required to determine the effect, if any, of a particular peer-reviewed article on a particular physician's prescribing behavior.

**Approvals of Neurontin and other AEDs in other countries could affect some physicians' prescribing behavior.**

32.    In addition to published studies, information about the approvals of Neurontin and other AEDs by the FDA in the U.S. and similar regulatory bodies in other countries could have affected prescribing behavior of some doctors in the U.S. For example, Neurontin has been approved for a range of neuropathic pain conditions in more than 60 countries.[41] This approval information provided relevant Neurontin-specific information for physicians to consider in their prescribing decisions. Professor Rosenthal acknowledged this fact in her deposition and agreed that a range of events, such as approval of Neurontin for the applicable or a related use as well as approval of a drug with a similar mechanism of action for the applicable use in another country, could have a potential spill-over effect on prescriptions in the U.S.[42] Consequently, individual inquiry would be required to determine the effect of such approvals on each physician's prescribing behavior.

**"Word of mouth" can influence some physicians' prescribing behavior.**

33.    Physicians operate in an environment where informal communications among doctors, or "word of mouth," are important, as colleagues are generally perceived as

---

[40] Ibid., pp. 234-237.
[41] Pfizer, 2003 Financial Report.
[42] Rosenthal Deposition, pp. 328-329.

credible, reliable, and independent sources of information. Practitioners learn extensively from and draw upon their colleagues' clinical experiences.[43]

34.     The impact of social interaction among physicians on prescribing behavior has been studied in the academic literature. For example, Berndt, et al. found that distinct network effects operate at the brand-specific level, i.e., use of the product implicitly conveys important information about safety and efficacy of the drug, which increases word-of-mouth communications and accelerates the rate at which others become aware of and adopt the drug.[44]

35.     Professor Rosenthal agrees that interactions among physicians can influence prescribing behavior. She confirms that conversations among doctors about their clinical experience in the use of Neurontin or a drug with a similar mechanism of action could potentially influence prescription choices.[45] Consequently, individual inquiry would be required to determine the effect, if any, of conversations among physicians on the prescribing behavior of each physician.

**Patient-specific factors can affect physician prescribing behavior.**

36.     Physicians also rely upon patient-specific factors, such as medical history, prior medications taken, and severity of illness, in making their decision about which drug to prescribe. In addition, demands made by patients play a role in influencing physician prescribing decisions.[46] Professor Rosenthal not only agrees with the

---

[43] See, for examples, Christensen, "Drug Prescribing among Physicians in an HMO"; Bhatia, Tulikaa, Puneet Manchanda and Harikesh Nari, "Asymmetric Peer Effects in Physician Prescription Behavior: The Role of Opinion Leaders," June 2006.

[44] Berndt, Ernst R., Robert S. Pindyck, and Pierre Azoulay, "Consumption Externalities and Diffusion in Pharmaceutical Markets: Antiulcer Drugs," *The Journal of Industrial Economics*, Volume LI, No.2, June 2003, pp. 0022-1821.

[45] Rosenthal Deposition, pp. 323-324.

[46] See, for examples, White et al., "Relative Influence of Physicians and Patients"; Mellor, Phil, and Stuart Green, "A Novel Approach to Modeling the Prescribing Decision, Integrating Physician and Patient

above statement but also points out that patients suffering from chronic conditions without life-threatening consequences tend to be more involved in decisions about their treatments as they have significant experience "with the same problem over and over again."[47] Neuropathic pain is an example of a chronic disorder that may not have life-threatening consequences. As a result, according to Professor Rosenthal, one would expect patients taking Neurontin for neuropathic pain to be more involved in the decisions about their treatment than would patients suffering from non-chronic conditions. Furthermore, there seems to be agreement that patient involvement has increased over time.[48]

37. Moreover, as Dr. Vithal Dhaduk— a neurologist who treated Lorraine Kopa, another plaintiff in this matter—pointed out in his deposition, no drug works well for all patients:[49]

> A: Everybody's different metabolism is different. The receptive phenomenon by every individual is different. Even though mechanism may be the same, the doses may be the same, but the effectiveness is always variable. And that's why there's always studies done and there is a norm between low and high. If the drug falls within that category, they approve the medications.

Therefore, physicians must consider the likely and actual effect of a particular drug for each patient. Consequently, individual inquiry regarding the characteristics of each patient would be needed to determine each physician's prescribing behavior and whether that physician's prescribing behavior was affected by the challenged conduct.

---

Influences," *International Journal of Market Research*, Vol. 44 Quarter 4, 2002; Jennings, M., "Prescribing Variation in General Practice."
[47] Rosenthal Deposition, p. 185.
[48] Rosenthal Deposition, pp. 185-186, 379.
[49] Deposition of Vithal Dhaduk, M.D., *In re: Neurontin Marketing, Sales Practices and Products Liability Litigation*, MDL Docket No. 1629, Master File No. 04-10981, November 12, 2006 (Dhaduk Deposition), p. 18.

**The cost of a drug can affect some physicians' prescribing behavior.**

38.     Some physicians consider patients' out-of-pocket costs when deciding which drugs to prescribe. Therefore, whether a patient has prescription drug insurance, and if not, the cost of a drug, can play a role when making a treatment decision. Economic research confirms that some physicians are cost-conscious and prescribe treatments that are more affordable for patients.[50] In addition, Professor Rosenthal asserts that the cost of drugs could have an indirect effect on physicians' prescribing choices as price fluctuations of drugs and their substitutes could trigger coverage changes by third party payers.[51] Thus, the cost of Neurontin relative to other drugs and treatments is a factor that impacts some physicians' prescribing behavior. Individual inquiry would be required to determine the role that the cost of Neurontin relative to alternative treatments played in each physician's prescribing behavior.

**Some physicians were not directly exposed to the challenged promotions.**

39.     In addition to the numerous factors discussed above, marketing can play a role in the prescribing decisions of some physicians. However, it is worth highlighting that it is extremely likely that there was a subset of physicians that were never exposed to the alleged fraudulent promotions. For example, Dr. E. Michael Okin, an orthopedics surgeon who treated Gregory Clark in a related matter, pointed out

---

[50] Reichert, et al. concluded that most physicians (88%) felt the cost of medicines was an important factor in prescribing decision. Reichert, et al., "Physicians' Attitudes about Prescribing and Knowledge of the Costs." Hux, et al. studied clinicians' prescribing patterns for a drug from a class of therapeutically similar alternatives. Researchers confirmed that doctors take into account out-of-pocket costs of medications when prescribing for patients who have no insurance coverage. They found that only 8% of respondents selected an expensive substitute when patients were said to have no drug insurance and physicians were aware of the drug costs. Conversely, 38% of survey participants chose a more expensive alternative when prescribing for patients with drug benefit coverage and no cost information provided. Hux, Janet E., and David C. Naylor, "Drug Prices and Third Party Payments: Do They Influence Medication Selection?" *PharmacoEconomics,* 5(4):343-350, 1994.

[51] Rosenthal Deposition, pp. 331-332, 519-521.

that he had no exposure to any sort of marketing for Neurontin. He learned about off-label uses for Neurontin from one of the RSD (reflex sympathetic syndrome) patients he treated as well as the pain management specialists he referred his patients to for consultations on various pain conditions.[52] Moreover, he bases his independent medical judgment mostly on his personal experience.[53]

40.     As a matter of fact, Professor Rosenthal acknowledged that some physicians may never be exposed to pharmaceutical marketing campaigns due to a number of reasons. For example, some institutions and doctors have policies against meeting with sales representatives and accepting samples from drug manufacturers. In addition, some physicians can make a conscious decision of not attending manufacturer-sponsored events as well as continuing medical education programs.[54] Individual inquiry would be required to determine which physicians were exposed to the challenged promotions.

**Physicians rely to different extents on marketing materials.**

41.     Even among physicians who were exposed to the challenged promotions, there is likely to be significant variation in the degree to which they would rely on the information or whether it would influence their prescribing behavior. Recent academic research in the field of marketing using data on individual physicians shows that there are significant differences among physicians in terms of how they respond to marketing by pharmaceutical companies.[55]

---

[52] See Deposition of E. Michael Okin, M.D., *Gregory Clark and Linda Meashey, Individually and on behalf of others similarly situated, Plaintiffs v. Pfizer Inc., et al., Defendants*, Case No. 01819, pp. 29-30, 66-67.
[53] Ibid., pp. 38-39.
[54] Rosenthal Deposition, pp. 243-245.
[55] See, for examples, Avorn, et al., "Scientific versus Commercial Sources of Influence"; Manchanda, Puneet, and Pradeep Chintagunta, "Responsiveness of Physician Prescription Behavior to Salesforce Effort:

42.     In sum, common evidence cannot be used to determine whether and to what

extent, if any, the challenged conduct affected individual physician's prescribing

behavior and thus each proposed class member's use of Neurontin.  Each physician

is subject to a different set of information and different physicians put different

weights on different types of information in arriving at their prescribing decisions.

Consequently, it is not possible to determine with common evidence whether any

particular physician's prescribing of Neurontin has been affected by the challenged

conduct.  First, individual evidence would be required to determine whether a

physician was even exposed to the challenged promotions.  Second, even if the

physician were exposed, individual inquiry would be required to determine whether

the physician would not have written a prescription for an off-label use of Neurontin

had the promotion contained as complete a disclosure as plaintiffs claim it should or

if it had not contained allegedly false information.  For purposes of showing each

proposed class member's use of Neurontin was affected by the challenged conduct,

it not sufficient to show aggregate prescribing behavior was affected by the

challenged promotions or even the challenged conduct.  Even if the aggregate use of

Neurontin was influenced by the challenged *conduct* (which Professor Rosenthal

does not even address), there is no way to determine whether any particular

proposed class member's use was so affected.[56]  Finally, it is important to

---

An Individual Level Analysis," *Marketing Letters*,15:2–3, 129–145, 2004; Chintagunta, Pradeep, Puneet
Manchanda and Peter Rossi, "Response Modeling with Nonrandom Marketing-Mix Variables," *Journal of
Marketing Research*, November 2004; Narayanan, Sridhar and Puneet Manchanda, "Heterogeneous
Learning and the Targeting of Marketing Communication for New Products," *Working Paper*, September
2006; Manchanda, Puneet, Ying Xie and Nara Youn, "The Role of Targeted Communication and
Contagion in Product Adoption," *Working Paper*, October 2006.
[56] See discussion in Section IX below.

distinguish the effect of the challenged conduct on use, if any, from the effect, if any, on harm.

## VII. Substantial Differences Among TPPs Preclude the Use of Common Evidence to Analyze Causation, Injury, or Damages

### Whether a given TPP was harmed by the challenged conduct requires individual inquiry.

43.      A TPP would only be harmed by the challenged conduct if the volume of prescriptions for Neurontin covered by the TPP was affected by the challenged conduct and if the cost to the TPP of the covered Neurontin prescriptions was greater than the cost to it of the alternative drug (or other treatment) that would have been prescribed absent the challenged conduct.  According to the plaintiffs, if the challenged conduct did not take place, some physicians would not have prescribed Neurontin for off-label uses.  Instead, these physicians would most likely have prescribed other drugs or some other treatment.[57]  The nature and cost of the alternative treatment is likely to depend on patient characteristics as well as TPP characteristics, including the mix of patients (and their physicians) covered by any particular TPP, the mix of other drugs (or other non-drug treatments for that matter) prescribed by the physicians, the degree to which the physicians serving those particular patients had been influenced by the challenged conduct, the TPP's reimbursement policy for Neurontin and substitute drugs, and other factors.

---

[57] See, for examples, Huler Deposition, p. 52; Dhaduk Deposition, p. 77.  Dr. Huler stresses that she uses Neurontin in her practice to control pain symptoms in patients to delay the need for surgery.  Dr. Dhaduk lists alternatives other than Neurontin to treat neuropathic pain such as "different medications, different kind of physical therapies, trigger point injections, nerve block injections, epidural injections, as well as surgery to relieve the pain."  Dr. Hartman also agrees that some other treatment likely would have been prescribed if Neurontin had not, but does not address this in his analysis.  Hartman Deposition, p. 111-112.

Consequently, individual inquiry is required to determine whether any given TPP benefited or was harmed by the challenged conduct.

**TPPs encompass a wide range of entities.**

44.    Broadly defined, TPPs likely encompass insurers, employers, unions, trusts, or administrators that are responsible for the cost and payment of pharmaceutical benefits for an enrollee in a plan.  The TPP subclass in this matter includes a varied set of organizations including large national and regional plans, local plans, employer-sponsored plans, and union-sponsored plans.[58]  In a number of instances, multiple parties may be at least partially responsible for the payment of any particular patient's drug use.  For example, PBMs and employer-sponsored plans may both share in the cost of drug usage.

45.    As background, in the United States, a role of the TPP is to cover the drug costs, at least partially, of its members.[59]  TPPs and their agents, primarily PBMs, have emerged in the last decade as the main overseers of prescription drug plans.[60]  During this time, TPPs and PBMs have developed various strategies for controlling prescription drug consumption including formularies, mandatory generic substitution programs, tiered co-payment schemes, drug utilization reviews, mail-

[58] For example, the four named TPPs in this matter are Louisiana Health Service Indemnity Company d/b/a Blue Cross/Blue Shield of Louisiana (a regional plan); International Union of Operating Engineers Local No. 68 Welfare Fund (a union-sponsored plan); ASEA/AFSCME Local 42 Health Benefits Trust (a union-sponsored plan); and Harden Manufacturing Corporation (employer-sponsored plan). See Complaint, ¶¶ 5-8.  In addition, the TPP subclass also includes entities that contract with the plans, such as PBMs.
[59] There are three payment sources for prescription drugs: 1) TPPs (private firms), 2) Government (Medicaid/Medicare), and 3) Cash (no insurance).
[60] Many TPPs enter into contracts with PBMs for services related to the provision of prescription drug benefits.  The services provided by PBMs include plan design, benefits administration, formulary development, clinical management and mail-order pharmacy services.  Currently, PBMs manage pharmacy benefits for almost three-quarters of the insured individuals in the United States.  The growth of the PBM industry has been substantial over the last ten-to-fifteen years.

order pharmacies, and rebates from drug manufacturers/suppliers.[61] The extent to which these strategies are employed varies widely across the TPPs and they can have significant effects on the use of any particular drug and the cost of that drug to the TPP.[62]

**Formulary status and type of formulary can influence TPPs' costs.**

46.    There are a number of TPP characteristics that can influence the prescriptions written for a specific drug for its members and the costs the TPP incurs. One important factor is a drug's formulary status.[63] A formulary is a preferred list of drugs covered by a TPP. Some TPPs offer reimbursement only for drugs on their formularies and others offer higher reimbursement rates or lower co-pays for drugs on their formularies. The process of assigning drugs to a formulary is usually based on both therapeutic and economic considerations.[64] Given the subjective nature of

---

[61] See Federal Trade Commission, *Pharmacy Benefit Managers: Ownership of Mail-Order Pharmacies*, August 2005, 10-15.

[62] Professor Rosenthal's own research on "effects of prescription drug formularies on drug choice and health care spending" supports the above point. She finds that "moving from a single-tiered formulary to a three-tiered formulary and changes in the co-payments" reduced overall insurance costs, increased the rate of generic substitution and mail order fulfillment. Rosenthal Deposition, p. 28.

[63] "A formulary is a list of preferred drugs that a health plan encourages doctors to prescribe. Formularies generally include drugs within each therapeutic class. In an open formulary, drugs that are not listed on the formulary are still covered. In a closed formulary, only drugs that are listed on the formulary are covered, unless a medical exception is made. It is also possible to apply a closed formulary only to certain classes of drugs like ACE inhibitors, anti-cholesterol drugs, or allergy medications. In a managed open formulary, off-formulary drugs are still covered, but patients, doctors, and pharmacists are given incentives to comply with the formulary. For example, there has been an increase in the use of a three-tiered co-payment system whereby a generic drug has the lowest co-payment, a brand-name drug on the formulary falls in the middle, and an off-formulary brand-name drug is the most expensive." Mathematica Policy Research, Inc. report for Henry J. Kaiser Foundation, "The Role of PBMs in Managing Drug Costs: Implications for a Medicare Drug Benefit," January 2000, p. 15.

[64] While there is variance across plans, the most common process includes multiple steps. First, the Pharmacy and Therapeutics Committee for the TPP will determine whether a new product should be reimbursed on medical grounds, and if so, whether there are close therapeutic substitutes for this product. If a product does have close substitutes, then the decision on which product should be placed in the preferred tier will generally be made on economic grounds (e.g., based on their cost including rebates and discounts). For a discussion on the role of Pharmacy & Therapeutics Committees in setting formularies, see, for example, Deposition of Saira A. Jan, *In re: Neurontin Marketing, Sales Practices and Products*

this process, the formulary status of a given drug varies widely across TPPs.[65] Thus, individual inquiry would be required to determine the formulary status of the program, if any, under which each proposed Consumer class member obtained his or her drugs to determine the influence of formulary status on the consumer's use of Neurontin and the cost of Neurontin and alternative treatments to that TPP.

**Disease-management programs, co-pay amounts, and drug utilization reviews can affect a TPP's cost of a particular drug.**

47.    There are numerous factors in addition to formulary status and type of formulary, including disease-management programs, co-payment amounts, and drug utilization reviews,[66] that may impact the number of prescriptions written for a given drug within a specific TPP and the cost of coverage for that drug and alternative drugs. Such factors affect in part the number of prescriptions written for Neurontin and the costs of those prescriptions. They also can affect the number of prescriptions and the costs of whatever treatments would have allegedly been prescribed, if any, absent the challenged conduct. Since these factors vary among TPPs, individual inquiry would be required to determine whether any particular TPP was harmed by the challenged conduct.

48.    The extensive variation in these factors that exists within the proposed TPP subclass was acknowledged by Professor Rosenthal in her deposition testimony.[67]

---

*Liability Litigation*, MDL Docket No. 1629, Master File No. 04-10981, November 2, 2006 (Jan Deposition), pp. 34-40, 60.

[65] Furthermore, the type of formulary can vary across TPPs. For example, one TPP may have a three-tiered formulary, while another plan has a closed formulary. See, for example, Dranove, David, Edward F. X. Hughes, and Mark Shanley, "Determinants of HMO Formulary Adoption Decisions," *HSR: Health Services Research*, 38:1, Part I (February 2003).

[66] See, for example, "Prescription Drug Use and Expenditures in California: Key Trends and Drivers, 2001," California Health Care Foundation, p. 33.

[67] Rosenthal Deposition, pp. 515-538.

She agreed that TPP subclass members would differ along a number of dimensions such as formulary decisions, co-payments, latest research awareness, drug policy enforcement techniques, implementation of prior authorization and disease management programs, level of decision delegation to other third party administrators, and policies regarding coverage for off-label usage. Additionally, Professor Rosenthal agreed that the demographics of the insured pool of each TPP such as age, gender, occupational profile, and geography could differ substantially.[68] Because of the wide range of factors that vary by TPP, common evidence cannot be used to determine whether each member of the proposed TPP subclass was injured by the challenged conduct.

**Dr. Hartman's model cannot quantify the supposed harm suffered by any given TPP.**

49.    There is an additional reason why individual inquiry would be required to determine whether each proposed TPP class member was harmed or benefited from the challenged conduct. Neither Plaintiffs nor their experts have proposed a method by which they could determine the volume of prescriptions for any given TPP that were caused by the challenged conduct. Even if Professor Rosenthal had reliably estimated the effect of the challenged *conduct* (not challenged promotions) on off-label prescriptions of Neurontin, Dr. Hartman's methodology does not allow for these actionable prescriptions to be allocated among the TPPs. The *aggregate* calculation proposed by Professor Rosenthal and Dr. Hartman fails to consider

---

[68] Ibid., pp. 540-541.

variation in Neurontin prescriptions across TPPs.[69]  Individualized inquiry would be required to identify whether (and the extent to which) each TPP was injured by the alleged actionable conduct.

## VIII.  Substantial Differences Among Proposed Consumer Class Members Preclude the Use of Common Evidence to Analyze Injury or Damages

### Individual inquiry is required to determine harm, if any, to a proposed consumer class member

50.    Assuming that a proposed Consumer class member's consumption of Neurontin was affected by the challenged conduct (which would require individual inquiry of the proposed class member and his or her physician and TPP, if any), determining whether the proposed class member was harmed or benefited from this additional consumption requires individual inquiry.  The reason is that it is necessary to compare the net economic benefit the class member received from consuming Neurontin with that he or she would have received from an alternative drug or other treatment that would have been prescribed instead.  Only proposed class members whose net economic benefit from consuming Neurontin was lower than the alternative were potentially harmed.

51.    The net economic benefit, in turn, would depend on the cost of the alternative treatment and its efficacy compared to Neurontin.  For example, if Neurontin's efficacy were the same and the cost of the alternative were lower, then arguably the proposed class member was harmed.  However, if the alternative's cost were higher and its efficacy higher, then individual inquiry would be required to determine

---

[69] Dr. Hartman's calculation has two primary inputs: 1) the aggregate "Class purchases" calculated by Professor Rosenthal and 2) the reimbursement rate paid by the TPP or the Consumer subclass.  Despite the variance that occurs in reimbursement rates, Dr. Hartman calculates a single, aggregate reimbursement rate across all prescriptions for each dosage, diagnosis group, and time period.