# EXHIBIT 20

*In re: Neurontin Marketing, Sales Practices, and Products Liability Litigation*

**Declaration of Professor Fiona Scott Morton**

I. **Introduction**

   A. **Qualifications**

   1. My name is Fiona Scott Morton and I am a Professor of Economics at the Yale School of Management. After receiving a B.A. from Yale College and a Ph.D. from MIT, both in Economics, I taught at the Stanford University Graduate School of Business and the University of Chicago Graduate School of Business.

   2. My primary expertise is in the study of firms, markets, and competition. My research spans a variety of industries, including pharmaceuticals, merchant shipping, wineries, funeral homes, automobile retailing, e-commerce, and magazines. In the pharmaceuticals industry, I have conducted research into competition, generic entry, and the effects of procurement policies for pharmaceuticals for Medicaid; I am currently researching the effects of Medicare procurement of pharmaceuticals. My research has been widely disseminated through top peer-reviewed journals and research seminars and conferences to which I have been frequently invited.

   3. I serve, and have served, in an editing role for journals in the fields of Industrial Organization and Applied Microeconomics, such as the International Journal of Industrial Organization and the Berkeley Electronic Journal of Economic Analysis and Policy, and have won several prestigious research grants from the National Science Foundation. In 2005–2006, I was the Adam Smith Visiting Fellow at the University of Edinburgh Economics Department in Scotland. My professional experience is described in my curriculum vitae, which is attached as Appendix A.

   4. I am being compensated for work on this matter at my hourly rate of $450. My compensation is not dependent on the outcome of this matter.

B. **Assignment**

5. I have been asked by Counsel for Defendants in this matter[1] to review the declaration of Dr. Meredith Rosenthal and assess the validity of her assumptions, methods, and conclusions.

C. **Summary of opinions**

6. As an academic experienced in estimating econometric models, I do not believe that Dr. Rosenthal can apply the appropriate statistical technique to her model and successfully estimate the effect of promotions on off-label prescriptions. My conclusion stems from Dr. Rosenthal's lack of data, flaws in her model, and consideration of many statistical problems, all of which are discussed in detail below.

7. Dr. Rosenthal's proposed method provides no way to distinguish which prescriptions were generated by the allegedly fraudulent promotions and which would have occurred regardless.[2]

8. Nor will the experiment Dr. Rosenthal describes in her declaration estimate an accurate total number of prescriptions generated by the allegedly fraudulent promotions. Dr. Rosenthal assumes a but-for world which completely eliminates all events with any allegedly fraudulent promotional content. However, the but-for world would very likely contain alternate promotions (without the allegedly fraudulent content) that would be undertaken in place of the allegedly fraudulent promotions, and these would impact Neurontin prescriptions.

9. Based on the theory and results published in the literature, Dr. Rosenthal's single-equation model will not generate the correct estimate of the impact of promotion on prescriptions. Academic research in this field, including Dr. Rosenthal's own, widely acknowledges that an excluded factor (e.g., scientific progress) can drive both prescribing and promotions. The result would be a correlation between prescribing and promotions which Dr. Rosenthal's model would attribute to causation. Given this likelihood, Dr. Rosenthal's model as written in her

---

[1] Pfizer, Inc. and Warner-Lambert Company.
[2] As of this stage in the case, I do not have any knowledge of which specific promotional events or activities would generate liability. For ease of exposition in this declaration, I will use the term "allegedly fraudulent promotion" to refer to events or actions that would, if proven, generate liability in this case.

declaration[3] does not present an appropriate model or statistical technique to determine the true effect of promotion on prescribing. Furthermore, econometric theory can tell us the probable direction of the bias in the effect Dr. Rosenthal estimates. The effect of promotions on prescriptions that she estimates will likely be larger than the true effect.

10. As Dr. Rosenthal acknowledges in her deposition, she should instead use the technique called "instrumental variables."[4] This technique requires finding measures to serve as "instruments" that satisfy particular statistical properties – and one is needed for each promotional measure she decides to include in her model. As a researcher experienced in finding instruments, my opinion is that this task will be very difficult, and Dr. Rosenthal has not even begun the search for instruments. Without this technique, her estimate will not measure the causal effect of promotions on prescribing, and will not measure up to academic standards for empirical research.

11. The importance of establishing causality (in this instance, of promotions on prescribing) is central to the field of applied economics. The common standards for a peer-reviewed article would not be met by estimation of the model presented in Dr. Rosenthal's declaration.[5] A discussion of causality, determination of instruments, and a demonstration of the validity of the instruments would be expected for publication in a reputable peer-reviewed economics journal.

12. Dr. Rosenthal faces a very difficult environment in which to attempt to estimate the effect of promotions on prescribing. First, she or Plaintiffs' Counsel must determine which events would generate liability in this case and separately measure them. Second, given that data are only available at a monthly frequency, the maximum number of observations she can collect over the class period seriously limits the model she can estimate. As far as I can tell given the lack of any actual data or estimation in her declaration, she is unlikely to obtain sufficient critical data on detailing, on the diffusion of scientific knowledge, on monthly

---

[3] Specifically, Dr. Rosenthal's OLS model as specified in equation (2).
[4] Dr. Rosenthal agrees that off-label promotion may be endogenous in her model and says that in order to correct for endogeneity she would use an "instrumental variables" technique (Deposition of Meredith Rosenthal, pp. 448, 454 - 456).
[5] Dr. Rosenthal's OLS model.

Page 3

promotional expenditures, or on prescriptions of Neurontin by diagnosis. Furthermore, trends in the data and the use of the instrumental variables technique will almost surely reduce the precision of her results. Academic studies that have sought to measure the relationship between promotions and prescriptions have had more detailed and more numerous data, or a simpler model to estimate, or both.

13. Because Dr. Rosenthal has not actually collected much of her data, nor has she estimated anything, she can propose in her declaration and deposition various possible additions to the model and econometric techniques she might use without needing to confront the non-existence of data or the imprecision of the results that we would likely see if the empirical exercise had actually been carried out.

14. Dr. Rosenthal has made an ambitious proposal to estimate the causal impact of allegedly fraudulent promotions on prescribing. However, there are conceptual problems (causality), practical problems (identifying fraudulent events and measuring other data), and many statistical problems (multicollinearity, degrees of freedom, lack of variation) that stand in the way of her achieving that goal.

15. Because of all these problems, and the fact that they likely interact with and exacerbate one another, I do not believe that it is possible to carry out this analysis to the standard the economics profession demands, and obtain any meaningful answer that reflects the causal effect of allegedly fraudulent promotions on off-label prescribing.

16. In arriving at my conclusions I have relied upon the declaration and deposition of Dr. Rosenthal, various academic articles and other materials, and my experience in analyzing issues of this nature. The complete set of materials that I have considered is included as Appendix B to this declaration. I reserve the right to supplement my opinions in the future if additional documents or data become available.

II. **Summary of Dr. Rosenthal's model**

17. Dr. Rosenthal claims that she will be able to quantify total off-label prescriptions of Neurontin caused by allegedly fraudulent promotions, while controlling for

other factors that would affect Neurontin prescriptions such as non-fraudulent promotions and medical studies. She plans to do so by using multiple regression analysis, which is a widely-used statistical tool for estimating the effects of multiple explanatory variables, or "regressors," such as promotional expenditures for Neurontin on an explained, or "dependent," variable such as the number of off-label prescriptions written for Neurontin. Multiple regression analysis is used to break apart the total effect of several explanatory variables acting simultaneously on a dependent variable into the components attributable to each explanatory variable.

18. In Dr. Rosenthal's case, the dependent variable is off-label prescriptions of Neurontin for a particular diagnosis.[6] Included in the model as explanatory variables are allegedly fraudulent promotions and non-fraudulent promotions. In addition, Dr. Rosenthal contemplates including additional explanatory variables in her model (other than promotion) such as the age of the drug, journal articles about Neurontin, entry of substitute drugs, and others.[7]

19. Dr. Rosenthal plans to measure all the variables in the regression in each month of the class period, and, if possible, by diagnosis each month.

20. Dr. Rosenthal proposes to use the following model in her declaration to estimate the effect of off-label promotions on prescriptions (equation 2):

$$Q_{idt} = \beta_{d0} + \Sigma\, \beta_{1dj} X_{jt} + \Sigma\, \beta_{1dk} X_{kdt} + \beta_{2d} M_t + \beta_{3d} O_{dt}$$

The left-hand side, or dependent, variable is total off-label quantity of Neurontin reimbursed in period $t$ for dosage $i$ and diagnosis $d$.[8] This is the item of interest; Dr. Rosenthal would like to be able to explain movements and changes in the off-label quantity of Neurontin sold. The variables on the right-hand side are the explanatory variables which include: time-variant factors impacting the

---

[6] In her declaration, Dr. Rosenthal describes two regression models (equation 1 and equation 2). Equation 1 is similar to equation 2 except that it aggregates the analysis across diagnoses. I focus on equation 2 because Dr. Rosenthal stated in her deposition that she would most likely have to perform her analysis by diagnosis. (Deposition of Meredith Rosenthal, p. 144.)

[7] Declaration of Meredith Rosenthal, pp. 14-15.

[8] Dr. Rosenthal indicated in her deposition that she may aggregate the analysis across different dosages. (Deposition of Meredith Rosenthal, p. 419.)

Page 5

prescription behavior of physicians regarding Neurontin and not subject to alleged violations – these are contained in $X_{jt}$; time-variant factors subject to alleged violations related to diagnosis d ($X_{kdt}$); promotional spending on activities not subject to alleged violations ($M_t$); and promotional spending on activities subject to alleged violations related to diagnosis d ($O_{dt}$).[9]

21. The βs in the model above are known as coefficients. The coefficients from a multiple regression analysis are estimates of the effects of changes in each explanatory variable on the dependent variable as if only the variable in question were changed. In a simple model such as this one, a coefficient is multiplied by the variable it corresponds with in order to calculate that variable's impact on the dependent variable. Estimation of the model refers to the econometric procedure that generates estimates of the coefficients. The estimate of the coefficient indicates whether, and to what extent, that variable has an effect on the dependent variable.

22. An important attribute of an estimated coefficient from a regression is its precision. The precision of an estimate is used to determine if the estimated coefficient, and therefore the measured effect, is statistically different from zero. This precision can be stated using different types of statistical tools. One common tool is called a confidence interval. In his book Econometric Analysis, William Greene states, "…the estimate obtained will vary from sample to sample, and there is some probability that it will be quite erroneous…we use the sample data to construct an interval… such that we can expect this interval to contain the true parameter in some specified proportion of samples [e.g., 95% of the time], or equivalently, with some desired level of confidence."[10] If a confidence interval around an estimated coefficient becomes so large that it includes zero, we say that the estimated coefficient is not statistically different from zero, and we conclude that that explanatory variable has no discernable effect on the dependent variable.

---

[9] Declaration of Meredith Rosenthal, p. 16-17. The discussion that follows is also applicable to the alternative models described in Dr. Rosenthal's declaration.
[10] Greene, W.H. (1997), Econometric Analysis, 3rd edition, Prentice-Hall, Inc, Upper Saddle River, NJ, p. 153.

23. Dr. Rosenthal refers to standard errors in her deposition. Standard errors are another way to measure the precision of an estimated coefficient; they are also larger when the coefficient estimate is less precise.

24. Dr. Rosenthal's model, as presented in her declaration, is an ordinary least squares (OLS) model, which is a common type of regression analysis.[11] This model implicitly assumes that the true relationship between off-label prescriptions of Neurontin and promotional activities and spending is:

$$Q_{idt} = \beta_{d0} + \Sigma \beta_{1dj} X_{jt} + \Sigma \beta_{1dk} X_{kdt} + \beta_{2d} M_t + \beta_{3d} O_{dt} + u_{idt}$$

where $u_{idt}$ is an error term, or disturbance, capturing the influence of other factors, which are not included in the explanatory variables, on the off-label prescriptions. OLS estimation produces coefficients that when multiplied by the relevant variables result in a total that is called the predicted value of Q. However, no model can predict Q exactly. The error term accounts for the fact that the model will not fit perfectly.

25. Dr. Rosenthal's declaration contains no empirical results of any kind.

26. This model describes a simplified, aggregate relationship between promotions and purchases which Dr. Rosenthal plans to estimate; however, the type of data required, the correlations we expect to exist in that data, and the fundamental relationships among promotions, medical advances, and drug prescriptions, render it very unlikely that the model could be empirically estimated as envisioned. The sections of the declaration that follow explain in detail why I have such serious reservations about this research program.

27. In my opinion it is likely that the problems listed above, and explained in detail below, will pose insurmountable obstacles to reliable estimation of the model.

---

[11] Dr. Rosenthal mentions in her declaration that she will explore alternative specifications. However, she does not present any particular alternatives. (Declaration of Meredith Rosenthal, p. 16, footnote 63.)

### III. Dr. Rosenthal's proposed method cannot determine which class members, if any, were prescribed Neurontin due to allegedly fraudulent promotions

28. The methods proposed by Dr. Rosenthal purport to analyze the total off-label quantity of Neurontin sold by diagnosis over time.

29. If Dr. Rosenthal can successfully estimate her model, she claims that will allow her to know the proportion of total Neurontin off-label prescriptions caused by the allegedly fraudulent promotion of Neurontin, not *which* individual prescriptions were caused by the allegedly fraudulent promotions.[12]

30. Dr. Rosenthal acknowledges that some off-label prescribing of Neurontin would have occurred absent any of the allegedly fraudulent promotions.[13] Dr. Rosenthal's proposed method provides no way to distinguish which prescriptions were generated by the allegedly fraudulent promotions and which would have occurred regardless.

31. Instead, Dr. Rosenthal's method will produce a percentage which she would interpret as representing the fraction of off-label Neurontin prescriptions that were bought due to the allegedly fraudulent off-label promotions. She subtracts this amount from the total off-label quantity sold. Under her approach, the remaining Neurontin prescriptions would have been purchased for off-label use, even in the absence of allegedly fraudulent promotions (i.e., in Dr. Rosenthal's but-for world).

32. This means that Dr. Rosenthal's dependent variable, purchases of off-label prescriptions for Neurontin, includes prescriptions that would have been bought in the but-for world. Therefore, even if Dr. Rosenthal's model could be estimated correctly, she would not be able to segregate out cases where a physician

---

[12] Dr. Rosenthal states this point in her deposition. "Q. And so your model wouldn't enable you to tell – to determine whether a particular given individual prescription was written as a result of the conduct that's described in the complaint? A. Yes, that's correct." (Deposition of Meredith Rosenthal, p. 136); "Q. And so in that way you wouldn't be able to identify individual class members or individual patients whose prescriptions wouldn't have been caused by any alleged misstatement about Neurontin, correct? A. That's correct." (Deposition of Meredith Rosenthal, pp. 291-292).

[13] "Q. And so I guess you would agree with me that there are reasons that doctors would have prescribed Neurontin off-label that are unrelated to the alleged improper promotion? A. I would agree with that statement." (Deposition of Meredith Rosenthal, p. 300.) See also, Declaration of Meredith Rosenthal, p. 16.

Page 8

prescribed Neurontin without having been influenced in that decision by any allegedly fraudulent promotion.

33. As conceded by Dr. Rosenthal and as discussed in the depositions of Drs. Huler and Dhaduk, a wide range of factors influence each prescription decision.[14] To determine which prescriptions were caused by the allegedly fraudulent promotions, one would need to find out which physicians were exposed to the entire range of allegedly fraudulent promotions and exactly which of their prescriptions were induced by the allegedly fraudulent promotions. Also, one would need to know which colleagues those physicians spoke with about Neurontin and the effect they had on the prescribing choices of those colleagues. In fact, one would need to examine a host of factors that influence each prescribing decision. Such an enquiry would require analysis at an individual physician and/or patient level. Dr. Rosenthal's approach does not contemplate such an inquiry.

34. Furthermore, within the group that purchased Neurontin due to allegedly fraudulent promotions, Dr. Rosenthal's method cannot identify consumers for whom Neurontin was effective. For that reason, Dr. Rosenthal's method would also propose that class members recover the amounts they paid for Neurontin prescriptions that were entirely effective.

IV. **Dr. Rosenthal's but-for world is oversimplified and will therefore overestimate the impact of any allegedly fraudulent promotion**

35. In Dr. Rosenthal's deposition and declaration she describes how she would set the allegedly fraudulent activities to zero to determine what the level of off-label Neurontin prescriptions would have been in the but-for world.[15]

36. This reasoning is premised on a poor assumption which can be most succinctly illustrated with an example. Suppose a continuing medical education ("CME") event featured five publications favorable to Neurontin, and the Plaintiffs categorize it as allegedly fraudulent because two unfavorable publications were

---

[14] Deposition of Meredith Rosenthal, pp. 320-336; Deposition of Kylene Huler, pp. 26-29, 33, 38-39, 45-46; Deposition of Vithal Dhaduk, pp. 12-17, 23-25, 34-35, 43.
[15] Deposition of Meredith Rosenthal, p. 302; Declaration of Meredith Rosenthal, p. 19.

omitted from the discussion. If the two unfavorable publications were required to be included, as Plaintiffs allege, would the manufacturer cease to hold the CME event? More likely, the manufacturer would continue to sponsor the CME event, but the content would be either the five favorable papers plus the two unfavorable, or some other aspect of Neurontin altogether. Thus, in the but-for world, total promotions would include altered versions of what had been the allegedly fraudulent promotions, and would impact prescriptions. Although the manufacturer might alter the level and composition of many of those allegedly fraudulent promotions, it would be unlikely to eliminate them all completely.

37. Therefore, the experiment Dr. Rosenthal describes in her declaration, setting the level of allegedly fraudulent promotion to zero, will not provide an accurate estimate of the number of Neurontin prescriptions in the absence of allegedly fraudulent promotions. The promotions that would be undertaken in place of the allegedly fraudulent promotions in the but-for world would likely have an impact on Neurontin prescribing. In the Plaintiffs' but-for world Dr. Rosenthal assumes that all components of the allegedly fraudulent events are eliminated, which is not a reasonable assumption.

## V. Dr. Rosenthal's method cannot estimate the causal relationship between the allegedly fraudulent promotions and off-label prescriptions

38. Dr. Rosenthal would interpret the coefficient on the allegedly fraudulent promotional activity as causal: an increase of one dollar in the allegedly fraudulent promotional activity multiplied by the estimated coefficient would increase prescriptions by that total amount. However, Dr. Rosenthal's model suffers from an inability to estimate the true causal relationship due to a serious problem called endogeneity.

39. The problem of endogeneity arises when the dependent variable, e.g., number of prescriptions for Neurontin, and the explanatory variable, e.g., promotional expenditures for Neurontin, are affected by a common third variable which is not included in the model. Under these circumstances such a regression model will not provide a valid estimate of the causal impact of the explanatory variable on

the dependent variable. Instead the model will only show the correlation between them.

40. I illustrate the concept of endogeneity with an example from a non-economic environment. Consider the problem of a researcher attempting to determine if exposure to television violence impacts violent behavior. A study might find a significant positive association between aggressive behavior and violent programming. In a regression model this would mean the variable "hours spent watching violent TV shows" has a positive estimated coefficient in a model of violent behavior. Attributing causation in such a setting is problematic because there might potentially be a third variable, not included in the model, which influences both aggression and the amount of violence watched on TV. For example, a child with a particular tendency or affinity toward aggression would be more likely to be aggressive, and the same characteristic would also lead that child to be more likely to watch violent television. So the true model is that a violent personality trait causes a child *both* to watch violent TV and engage in violent behavior. The TV-watching does not cause the violent behavior, but many observers might think so because violent children watch more violent TV. In this kind of setting where a third factor is driving both outcomes, an economist would like to include that third factor, the propensity for violence, as an explanatory variable in the regression. Such a regression would produce a correct causal interpretation of the relationship. In practice, however, a child's underlying propensity for violence is not readily measurable; it is too difficult to quantify and use in the analysis. On the other hand, omission of this variable will typically lead to overstating the effect of violent programming on aggressive behavior.[16]

41. In the models that Dr. Rosenthal proposes in her declaration, omitted variables are likely to drive both prescribing and promotions in an analogous fashion. For example, prescriptions of Neurontin might well be affected by the state of medical knowledge of the basic science of the brain. It would stand to reason that Warner Lambert/Pfizer, the manufacturer of Neurontin, would notice this and engage in promotion at times when new knowledge about the basic science of the brain was

---

[16] Dr. Rosenthal agrees with this analysis. (Deposition of Meredith Rosenthal, pp. 445-446.)

diffusing through the medical profession.[17] In the presence of such an omitted variable, a correlation would arise over time between the allegedly fraudulent promotions and off-label prescribing. However, this correlation would be in part causally generated by the state of medical knowledge, which moves both prescribing and promotions in the same direction.

42. Both in her declaration and in her deposition, Dr. Rosenthal indicates she may not be estimating the causal effect of promotions because of endogeneity.[18] Given the possibility of an endogeneity problem, Dr. Rosenthal's model as written in her declaration does not present an appropriate statistical technique to determine the true relationship between the variables. It is not possible to proceed with OLS estimation of this model and expect to obtain the correct answer.

43. Furthermore, econometric theory can tell us the likely direction of the bias in the coefficient Dr. Rosenthal would estimate. Her OLS model requires, among other things, that the explanatory variables are not correlated with the disturbance term. If we know there is a positive correlation between the disturbance term (unexplained quantity sold) and one of the explanatory variables (promotion), the OLS coefficient on such an explanatory variable is likely to be overestimated. As Peter Kennedy notes in A Guide to Econometrics, "…[w]hen the disturbance is higher the dependent variable is higher, and owing to the correlation between the disturbance and the regressor, the regressor is likely to be higher, implying that too much credit for making the dependent variable higher is likely to be assigned

---

[17] The literature supports this example. Pierre Azoulay has found that scientific evidence (i.e., the results of medical studies) affects both sales and promotions. Omitting scientific evidence from his model caused the estimated effect of pharmaceutical detailing to be overstated. See Azoulay, P. (2002), "Do Pharmaceutical Sales Respond to Scientific Evidence?" *Journal of Economics and Management Strategy*, Vol. 11, No. 4, pp. 551-594.

[18] Declaration of Meredith Rosenthal, p. 16, footnote 63; "Q. So you would agree that off-label promotion in your model is possibly endogenous, correct? A. Possibly, yes." (Deposition of Meredith Rosenthal, p. 448); "Q. What are the consequences of leaving possible endogeneity like the endogeneity that we just talked about in a regression model unaddressed? A. Well, essentially it causes a bias either up or down." (Deposition of Meredith Rosenthal, p. 446).

to the regressor."[19] Indeed, research by Pierre Azoulay has found that OLS models overstate the effect of detailing on sales.[20]

44. In the OLS models that Dr. Rosenthal proposes to estimate, if an omitted variable such as medical knowledge positively affects the quantity of prescriptions and is also positively correlated with the level of promotions, the estimated effects of promotions on prescriptions will likely be overestimated.[21] Furthermore, if the omitted variable cannot be measured or is unobservable, Dr. Rosenthal will be unable to correct her model by simply adding more explanatory variables.

45. In paragraph 41 above, I described just one possible causal source for prescriptions and promotions, advances in medical knowledge, as an example of a possible omitted variable that could give rise to endogeneity. Dr. Rosenthal agrees that there are potentially many other factors one could substitute for "medical knowledge" that influence how physicians make prescribing decisions and therefore could give rise to endogeneity. Some of these factors may be measured by an econometrician assuming access to appropriate data, but a great many that Dr. Rosenthal agreed might affect prescribing are not readily measurable, for example, postings on medical websites, advances in basic science, and informal conversations.[22]

46. Dr. Rosenthal states in her declaration that she will test for endogeneity and correct for this problem if it exists.[23] She indicates in her deposition, and I completely concur, that the principal approach to fixing an endogeneity problem,

---

[19] Kennedy, P. (1992), A Guide to Econometrics, 3rd edition, MIT Press, Cambridge, MA, p. 135. For additional discussion of the bias direction, see Greene, W.H. (1997), Econometric Analysis, 3rd edition, Prentice-Hall, Inc, Upper Saddle River, NJ, pp. 288-290; and Wooldridge, J.M. (2002), Econometric Analysis of Cross Section and Panel Data, MIT Press, Cambridge, MA, pp. 61-62.
[20] Azoulay, P. (2002), "Do Pharmaceutical Sales Respond to Scientific Evidence?" *Journal of Economics and Management Strategy*, Vol. 11, No. 4, pp. 551-594. Dr. Azoulay's instrumental variable estimate of detailing is smaller than his OLS estimate. Dr. Azoulay also finds that scientific evidence (such as findings from clinical studies) increases both sales and detailing.
[21] Dr. Rosenthal agrees with this statement. (Deposition of Meredith Rosenthal, pp. 450-451)
[22] Deposition of Meredith Rosenthal, pp. 323, 330, 353.
[23] Declaration of Meredith Rosenthal, p. 16, footnote 63.

and thereby estimating the true causal effect, is the technique of instrumental variables.[24]

47. However, finding valid instruments with which to apply this technique is a difficult exercise. As Dr. Rosenthal explains in her deposition, an instrument must be able to predict the endogenous variable (i.e., promotional activities), but be otherwise uncorrelated with the dependent variable (i.e., prescriptions).[25] Dr. Rosenthal's model includes several endogenous variables for which instruments must be found, such as allegedly fraudulent promotional events and allegedly fraudulent promotional spending, as well as non-fraudulent events and non-fraudulent spending. She must therefore find multiple instruments that satisfy the requirements of instrumental variables.

48. The problem of endogenous promotions has been recognized by Dr. Rosenthal in her past research, although she has taken no steps to address it in her declaration. In her chapter in the book Frontiers in Health Policy Research, Dr. Rosenthal and her co-authors state that "[w]e account for the possibility that spending on DTCA [direct-to-consumer advertising] and physician promotion and product sales are jointly determined by estimating instrumental variables (IV) models where all three variables are assumed to be endogenous."[26] Only results from the IV models are presented, suggesting that the authors found direct-to-consumer advertising and physician promotions to be endogenous.[27]

49. In her past research, Dr. Rosenthal has used instruments related to direct-to-consumer advertising, such as the cost of television ad time.[28] Because Neurontin

---

[24] "Q. Are there any other ways other than instrumental variable analysis that you could – that you don't rely on timing to unwind an endogeneity problem? A. Instrumental variables would be sort of the chief candidate." (Deposition of Meredith Rosenthal, p. 456.)

[25] Deposition of Meredith Rosenthal, p. 458. These requirements are also explained in Greene, W.H. (1997), Econometric Analysis, 3rd edition, Prentice-Hall, Inc, Upper Saddle River, NJ, p. 288 and Kennedy, P. (1992), A Guide to Econometrics, 3rd edition, MIT Press, Cambridge, MA, p. 136.

[26] P. 15 in Rosenthal, M.B. et al. (2003), "Demand Effects of Recent Changes in Prescription Drug Promotion," in Frontiers in Health Policy Research, Vol. 6, pp. 1-26, edited by D. M. Cutler and A.M. Garber, MIT Press, Cambridge, MA.

[27] If Dr. Rosenthal found promotions to be exogenous, then OLS models would provide more precise estimates of the effects of promotion and should be relied upon over IV models. See, Kennedy, P. (1992), A Guide to Econometrics, 3rd edition, MIT Press, Cambridge, MA, pp. 136-137.

[28] Rosenthal, M.B. et al. (2003), "Demand Effects of Recent Changes in Prescription Drug Promotion," in Frontiers in Health Policy Research, Vol. 6, pp. 1-26, edited by D. M. Cutler and A.M. Garber, MIT Press, Cambridge, MA.

was not promoted using direct-to-consumer advertising, such factors will not be appropriate instruments for the analysis in this case.

50. In summary, because Dr. Rosenthal is interested in measuring the incremental effect of a particular promotional activity, it matters that the estimated coefficient is correct in magnitude, which it would not be using an OLS method. Without proper use of instrumental variables, Dr. Rosenthal's estimated coefficient will not reflect the causal impact of promotions on prescriptions.

51. Dr. Rosenthal has not attempted to identify instrumental variables as of yet, and I have serious doubts that Dr. Rosenthal will be able to find valid instruments, especially given the number of promotional variables that will require different instruments.[29]

52. The concept of endogeneity and the problems it creates for researchers interested in establishing causality is central to the field of applied economics. If a doctoral student came to me with a dissertation proposal in the form of Dr. Rosenthal's declaration I would tell the student that the proposal was incomplete. I would instruct the student to include a substantial section addressing the issues I discuss above in paragraphs 38-51. I would expect to see a model reflecting the researcher's view of the causal relationships, a discussion of why the instrumental variables method would provide the correct estimate, and a thorough discussion of where the researcher might find appropriate instruments for his or her setting, including a literature review describing instruments used by others in similar situations. This discussion is necessary in order to have a research project that will result in a reliable answer.

## VI. Dr. Rosenthal cannot solve the endogeneity problem by reference to a comparator drug or by relying on the timing of events

53. In her declaration, Dr. Rosenthal suggests finding a comparator drug to Neurontin.[30] She would then compare the proportion of off-label prescriptions between the two drugs. If Neurontin had more off-label prescribing than the

---

[29] Deposition of Meredith Rosenthal, pp. 460-462.
[30] Declaration of Meredith Rosenthal, p. 18.

comparator, she would conclude that those prescriptions were generated by fraudulent promotions. This is not a scientifically valid method. If one wanted to compare differences in off-label prescribing for two drugs, one would require two drugs that have exactly equal propensities for off-label prescribing. One can imagine that what makes a drug suited to off-label prescribing might be complex, pertaining to, among other things, the state of medical knowledge, the mechanism of action of the drug, and the availability of alternative therapies. It very likely cannot be captured by a few characteristics such as "treats epilepsy" and "benign side effect profile." To create a good experiment, it is necessary to choose a matching drug based on characteristics that make it suitable for off-label prescribing, which are likely to be difficult to measure. So Dr. Rosenthal's method is unlikely to succeed in finding an appropriate comparator drug.

54. In contrast to the line of argument taken in her declaration and Dr. Hartman's, in her deposition Dr. Rosenthal attempts to sidestep the difficulty in identifying an appropriate comparator drug by suggesting an alternate analysis: a comparison of changes over time in the amount of off-label prescribing for Neurontin and a comparator drug.[31] This approach relies on analyzing the timing of new promotions for Neurontin relative to increases in off-label prescriptions for Neurontin and the comparator drug. Dr. Rosenthal plans to identify increases in allegedly fraudulent promotions and trace them to subsequent prescribing responses in Neurontin and a comparator drug. If both drugs' off-label prescriptions increase, she will interpret the event to be a change in "buzz" that affected Neurontin promotions and both drugs' off-label prescriptions. However, if only Neurontin off-label prescriptions increase and the comparator's do not, she will conclude that Neurontin promotions caused the increased prescriptions.

55. This method will not work if the comparator drug has a different response to "buzz" than Neurontin. This appears to me to be quite likely, and Dr. Rosenthal proposes no model of exactly what she has in mind that causes changes over time. If the new scientific knowledge that interests physicians in Neurontin (and causes a promotion to be run) is not the same new scientific knowledge that interests

---

[31] Deposition of Meredith Rosenthal, pp. 435-436.

Page 16

them in the comparator drug, then there is no reason to expect Neurontin promotions or prescriptions would move in the same way as the comparator drug's. The only way to be sure one has identified a causal relationship through this approach is to choose a comparator drug with identical scientific characteristics, *and* identical changes in response to new knowledge and demand over time as Neurontin. This is both unlikely and impossible to test.

56. In her deposition, Dr. Rosenthal also says she will use the timing of events as an alternative method of solving the endogeneity problem. She expects to infer causality from the timing of changes in promotions and prescribing.[32] I interpret this to mean that she will look for a measurable change in off-label promotional spending in a particular month and then attempt to relate that to changes in prescriptions in the following month(s). If they do relate, she will conclude that the change in promotion caused the change in prescriptions. This method is not scientifically valid because it is perfectly possible that a scientific event or finding occurred that altered promotional behavior by the manufacturer and diffused more slowly into prescriptions and therefore is seen *after* the event even though it was not caused by the event. Just because two events occur in sequence does not mean one caused the other. A physician may have learned about the scientific news after the manufacturer, if that physician was not keeping up with the literature. Or, a physician may be as well-informed as the manufacturer, but may not have changed his prescription patterns in one month. Perhaps the patients whom the physician thinks would benefit from Neurontin, now that he has attended the CME event, do not all happen to make appointments with him in the month after he attended the CME class.[33]

57. Furthermore, Dr. Rosenthal says she will interpolate monthly data from annual data in cases where she does not have monthly data.[34] This means Dr. Rosenthal

---

[32] Deposition of Meredith Rosenthal, pp. 350-351, 361-362.

[33] A few classic citations that discuss the fact that timing alone cannot be used to infer causation are Bollen, K.A. (1989), Structural Equations with Latent Variables. Wiley, New York and Kenny, D.A. (1979), Correlation and Causality. Wiley, New York as cited in Cohen, J. et al. (2003), Applied Multiple Regression: Correlation Analysis for the Behavioral Sciences, 3rd edition, Lawrence Erlbaum Associates, Mahwah, NJ.

[34] "A. My understanding is that this is for the entire year 1998. Q. Would you be able to create a monthly series of promotional expenditures using a document like this? A. Again, as I mentioned before, if some variables are only available on an annual basis, I would interpolate... the monthly data..." (Deposition of Meredith Rosenthal, p. 504.)

would take one year's worth of promotional expenditure and divide it by twelve to get twelve identical monthly expenditures for that year. In those cases there will obviously be no monthly variation in the promotional data to exploit in the manner she intends, so she cannot use the timing strategy she outlines.

58. Thus, in conclusion, the two alternate methods (i.e., reference to a comparator drug and reliance on the timing of events) proposed by Dr. Rosenthal to address endogeneity and avoid using instrumental variables estimation are not valid.

## VII. Dr. Rosenthal's method requires data she does not have, and in some cases, cannot get

### A. Identifying allegedly fraudulent behavior

59. Since a conference, CME event, or detailing visit may or may not constitute fraudulent promotion depending on what was said at the event, Dr. Rosenthal or Plaintiffs' Counsel will have to be able to find out the content of each event in order to assign it to $X_{jt}$ or $X_{kdt}$, or to assign its costs to $M_t$ or $O_{dt}$.[35]

60. Without such an accurate division, Dr. Rosenthal cannot separately identify the effects of the allegedly fraudulent promotion from other promotion.

61. Dr. Rosenthal states in her deposition that neither she nor Plaintiffs' Counsel have yet determined which promotional events and spending are allegedly fraudulent.[36]

### B. Measurement problems

62. A number of issues arise when considering how to measure events to be included in the estimation, even if Dr. Rosenthal knows exactly what was said at each one. Will Dr. Rosenthal count up events? If so, will those with more allegedly

---

[35] Deposition of Meredith Rosenthal, pp. 146-147: "A. ... [A]t the time I conduct my analysis I will get direction from counsel about what specific off-label promotions are to be considered as illegal and during what time period."
[36] "Q. ... [Y]ou haven't at this point undertaken to begin an analysis of separating out legitimate expenditures activities [sic] on the one hand from improper activities expenditures on the other hand? A. I am not – I haven't received access to the data with which I'm going to do that, so there were documents requested to that effect." (Deposition of Meredith Rosenthal, p. 306); "Q. When do you expect the determination of whether a particular expenditure would fall into O on the one hand or M on the other hand would occur? A. ... At the point at which I am asked to proceed with estimating my model, which I have not been asked to do yet, then I would begin to gather the data and specify all the variables, and at that point that would be relevant, whenever that is." (Deposition of Meredith Rosenthal, p. 372).

Page 18

fraudulent material count more?[37] Will those with more physicians in attendance count more? Will those with more physicians in particular specialties or who prescribe more Neurontin count more? Will the number of hours in the event or its cost in dollars be the measure of the amount of fraudulent promotion?

63. Research cited in Dr. Rosenthal's declaration finds that detailing is more effective if free samples are given at the same time.[38] Does Dr. Rosenthal have information on which detailing visits included free samples? If not, detailing will not be measured correctly, and she will not be able to correctly estimate the impact of detailing visits.

64. William Greene, in Econometric Analysis, notes that when one variable is measured with error "…one might speculate that the problems would be isolated to the single coefficient. Unfortunately, this is not the case.… The coefficients are all biased as well, although in unknown directions. A badly measured variable contaminates all the least squares estimates. If more than one variable is measured with error, there is very little that can be said. Although expressions can be derived for the biases in a few of these cases, they generally depend on numerous parameters whose signs and magnitudes are unknown and, presumably, unknowable."[39] Thus, measurement error in several of Dr. Rosenthal's critical variables will likely bias her estimated coefficients.

C. **Missing data**

65. In her deposition, Dr. Rosenthal agrees that a long list of factors might affect Neurontin prescriptions. It may be difficult or impossible to find data that measure these factors. Dr. Rosenthal admits in her deposition, she might not have data on all the variables she would like to include, and will have to leave them out

---

[37] For example, some medical publications might be viewed differently by physicians than others, and therefore have a different impact on prescribing. Likewise medical speakers may be viewed as reputable or not. Dr. Huler discusses this in her deposition. (Deposition of Kylene Huler, pp. 16-17, 49-50.)

[38] Manchanda, P., P.K. Chintagunta, and S. Gertzis (2000), "Responsiveness of Physician Prescription Behavior to Salesforce Effort: An Individual Level Analysis," Chicago: University of Chicago, Graduate School of Business, unpublished manuscript, as cited in the Declaration of Meredith Rosenthal, p. 12.

[39] Greene, W.H. (1997), Econometric Analysis, 3rd edition, Prentice-Hall, Inc, Upper Saddle River, NJ, pp. 439-440.