| Funded Project | Payee | Payment |
|---|---|---|
| Case histories relating to use of Neurontin as an adjuvant analgesic | Elizabeth J. Narcessian, M.D; V.' Orange, NJ | $4,000.00 |

Plaintiff has reason to believe that other payments were made to physicians for other "studies" of questionable scientific credibility.

57.    One particularly large study conducted by Parke-Davis served as yet another engine to financially reward physicians for prescribing Neurontin. In 1995 and 1996, Parke-Davis conducted an enormous Phase IV trial known as STEPS. Although STEPS took the form of a research clinical trial, it was, in fact, a marketing ploy designed to induce neurologists to become comfortable prescribing Neurontin at a far higher dose than indicated in the FDA approved labeling. While most clinical studies have a limited number of investigators treating a number of patients qualified for the study, the STEPS protocol called for over 1,200 "investigators" to enroll only a few patients each. The participating physicians were instructed to titrate their patients to higher than labeled dosages of Neurontin to demonstrate that patients could tolerate high dosages of the drug. Rewarding physicians for prescribing high doses on Neurontin was another way to increase Neurontin sales because higher per patient dosages increased the amount of Neurontin sold. Additionally, the STEPS study was also designed to habituate physicians to place non-study patients on Neurontin on doses higher than found effective in the clinical trials monitored by the FDA.

58.    Physicians enrolling in the STEPS study were paid for agreeing to participate in the study and for every patient enrolled. At the conclusion of the study, Parke-Davis offered each of the 1,200 "investigators" additional cash for each patient the doctor kept on Neurontin after the study ended. These payments were unquestionably kickbacks, each participating doctor was expressly paid for writing Neurontin prescriptions for their patients. The number of "investigators" who received such payments are too many for Plaintiff to list herein. Additionally, Parke-Davis has exclusive control of the information regarding who received such payments at the conclusion of the STEPS trial.

-23-

### 4.     Payments to "Authors" of Ghost Written Articles

59.     Yet another method of rewarding doctors for their advocacy of Neurontin was to pay them honorarium for lending their names to scientific articles which were actually prepared and written by third parties retained by Parke-Davis. In 1996, Parke-Davis retained AMM/ADELPHI, Ltd. and Medical Education Systems, Inc. to prepare no less than twenty (20) articles for publication in various neurology and psychiatry journals. Most of these articles concerned "off-label" usage of Neurontin and were generated so that Parke-Davis would have completely controlled publications it could distribute pursuant to its "publication strategy." The content of these articles were actually written by non-physician technical writers retained by Parke-Davis, and Parke-Davis had the right to control the content of all the articles. Parke-Davis paid all expenses in connection with the creation of these publications.

60.     Once Parke-Davis and the technical writers conceived the articles, Parke-Davis and its outside firms attempted to find recognized Neurontin prescribers whose names could be used as the authors of these articles. In some cases, drafts of the articles were completed even before an "author" agreed to place his or her name on the article. This even occurred in connection with case histories that purported to describe the "author's" personal treatment of actual patients. The "authors" were each paid an honorarium of $1,000.00 to lend their names to these articles, and also were able to claim publication credit on their curriculum vitae.

61.     After the technical writers completed their work, Parke-Davis and its outside firms found journals that would publish the articles. Parke-Davis's role in creating, approving and sponsoring the articles was hidden from the public and from the FDA. While the articles might reference that the author received an honorarium from the outside firm, the articles failed to state that the honorarium was paid with money provided by Parke-Davis and that Parke-Davis had approved the content and hired the actual authors. For example, an article created by Medical Education Systems (MES), *Gabapentin and Lamotrignine: Novel Treatments for Mood and Anxiety Disorders*, published in CNS Spectrums noted that "an honorarium was received from Medical Education Systems for preparation of this article," but never revealed Parke-

Davis's retention and payment of MES or the fact that MES personnel, while under contract to Parke-Davis, wrote the article.

62.    Parke-Davis used these publications as part of their "publication strategy" by presenting the articles as evidence of independent research conducted by persons with no monetary interest in Neurontin. This impression, of course, was false. Parke-Davis created the articles to promote "off-label" uses for Neurontin, purchased the names and reputations of the authors with kickbacks and controlled the content of the articles.

### 5.    Speakers' Bureau

63.    Parke-Davis also founded the Speakers' Bureau, another method to make large and numerous payments to physicians who recommended Neurontin at teleconferences, dinner meetings, consultants meetings, educational seminars and other events. These speakers repeatedly gave short presentations relating to Neurontin which they were paid anywhere from $250.00 to $3,000.00 per event. Speakers such as Steven Schachter, B.J. Wilder, Ilo Leppik, Gary Mellick, David Longmire, Gregory Bergey, Michael Merren, David Treiman, Michael Sperling, Martha Morrell, R. Eugene Ramsay, John Pellock, Ahmad Beydoun, Thomas Browne, John Gates, Jeffrey Gelblum, Dennis Nitz, Robert Knobler and others received tens of thousands of dollars annually in exchange for recommending to fellow physicians that Neurontin be prescribed, particularly for "off-label" uses. The payments that these doctors received were far in excess of the fair value of the work they performed for Parke-Davis. Speakers who most zealously advocated Neurontin were hired most frequently for speaking events, notwithstanding the fact that many of these events purported to be independent medical education seminars where independent information was supposed to be delivered. The identity of the doctors in the Speaker's Bureau who received kickbacks through excessive compensation can only be determined after review of the records in the exclusive custody of the Defendant. Plaintiff is aware that extensive payments through the Speaker's Bureau took place between 1995 and 1997, the last year for which Plaintiff has access to records. Plaintiff is aware that "off-label"

promotion of Neurontin pursuant to the "publication strategy" continued after 1997 and, accordingly, believe such kickback payments continued at least through 2000.

64.     Parke-Davis's marketing personnel, including its medical liaison staff, informed physicians of the lucrative rewards of joining the Neurontin Speaker's Bureau. Physicians were informed that if they prescribed enough Neurontin, they, too, could also be eligible for receiving substantial payments just for describing their clinical experience to peers at events dedicated to promoting Neurontin's "off-label" uses. Parke-Davis' marketing personnel, however, made it clear that the only way the doctors could receive such cash payments was if they prescribed substantial amounts of Neurontin to their patients, preferably for "off-label" uses.

65.     Parke-Davis either knew that the payments described above constituted kickbacks or acted in reckless disregard of laws and regulations of which it was aware. Parke-Davis was well aware of the Medicare and Medicaid fraud and abuse laws, which included the Medicaid anti-kickback statute. It was further aware that the safe harbors established by the Department of Health and Human Services did not cover the extensive payments it made to doctors. Parke-Davis was aware that its payments did not comply with the guidelines of the American Medical Association for payments to physicians. It also knew that the payments had been made for the express purpose of encouraging the physicians to order Neurontin for their patients. Parke-Davis was also aware of the Inspector General's Special Fraud Alert, which raised particular concerns about drug marketing. Nonetheless, Parke-Davis did nothing to curb its kickback payments to physicians and could not have marketed Neurontin's "off-label" uses without such payments.

66.     In 1997, in the wake of an investigation by the FDA, Parke-Davis conducted a review of its marketing practices in light of existing Medicaid kickback regulations. As a result of that review, Parke-Davis determined that *none* of the programs described above should have been conducted in the manner previously conducted by Parke-Davis. Parke-Davis issued guidelines to comply with Federal Regulations which essentially prohibited each of the programs described above. Nonetheless, the payments to physicians for the "off-label" marketing of Neurontin did not cease and the programs continued at least until 1998. Given that Parke-

-26-

Davis's records demonstrate payments of inappropriate kickbacks to doctors through 1998, Plaintiff believes that such payments continued through the merger of Parke-Davis's parent, Warner-Lambert, with Defendant Pfizer in 2000, or perhaps even through the calling of a grand jury regarding Parke-Davis's marketing practices relating to Neurontin.

**C.    Parke-Davis's Use of "Medical Liaisons" to Promote Neurontin "Off-Label"**

67.    Parke-Davis's normal sales force was not permitted to promote "off-label" uses of Neurontin to its physician customers. The FDA, however, permitted drug company representatives to provide balanced, truthful information regarding "off-label" usage, if specifically requested by a physician, and if there was no attempt to solicit such information by the drug company. Commencing in 1995, Parke-Davis increasingly hired "medical liaisons" and trained them to aggressively solicit requests for "off-label" information from physicians. Once this door was open, Parke-Davis trained the "medical liaisons" to engage in full scale promotion of Neurontin's "off-label" uses, including repetitive distribution of non-scientific, anecdotal information designed to convince physicians that "off-label" usage of Neurontin was safe and effective. In effect, Parke-Davis used the "medical liaisons" as a surrogate sales force who had liberty to solicit physicians regarding "off-label" uses. Indeed, "medical liaisons" were selected and promoted based on their ability to sell and sales training was encouraged.

68.    On April 16, 1996, at a training session for medical liaisons, Parke-Davis in-house lawyers stopped the videotaping of a medical liaison training session to advise the liaisons that notwithstanding formal policies to the contrary, liaisons could "cold call" on physicians so long as they had executed request forms (forms that supposedly verified that the physician had initiated the meeting) at the end of the call. Moreover, the liaisons were informed that the request forms could be filled out by Parke-Davis sales representatives instead of the doctors. Company lawyers also informed the liaisons-in-training that there was no need to present balanced information to the customers and that liaisons should always remember that sales were necessary in order to keep the company profitable. The liaisons were also informed by the

-27-

lawyers, off camera, that there really was no definition of "solicitation" and that there were methods to induce the physicians to inquire about "off-label" uses. In effect, once the medical liaison got a meeting with a doctor, there were ways to get the information about "off-label" uses to the doctor even if the physician had not requested "off-label" information. The lawyers also warned the liaisons that under no circumstances should any information about "off-label" uses be put in writing.

69.    Medical liaisons were instructed in the clearest possible terms that they were to market and sell Neurontin based on its "off-label" uses. During a teleconference on May 24, 1996, John Ford ("Ford"), a senior marketing executive at Parke-Davis's Morris Plains headquarters, directly informed the medical liaisons that in order to market Neurontin effectively, Neurontin had to be marketed for monotherapy, pain, bipolar disorder and other psychiatric uses, all of which were "off-label." Ford conceded that such marketing had to be primarily performed by the medical liaisons, because they were the only ones who could discuss these matters. At another meeting with the medical liaisons, Ford was even more blunt:

> "I want you out there every day selling Neurontin. Look this isn't just me, it's
> come down from Morris Plains that Neurontin is more profitable. . . . We all
> know Neurontin's not growing adjunctive therapy, beside that is not where the
> money is. Pain management, now that's money. Monotherapy, that's money. We
> don't want to share these patients with everybody, we want them on Neurontin
> only. We want their whole drug budget, not a quarter, not half, the whole thing . .
> . .We can't wait for them to ask, we need to get out there and tell them up front. . .
> .That's where we need to be holding their hand and whispering in their ear
> Neurontin for pain, Neurontin for monotherapy, Neurontin for bipolar, Neurontin
> for everything . . . I don't want to see a single patient coming off Neurontin until
> they have been up to at least 4800 mg/day. I don't want to hear that safety crap
> either, have you tried Neurontin, every one of you should take one just to see
> there is nothing, it's a great drug."

70.    Thus, medical liaisons were trained to cold call high decile physicians (those who saw the most patients in a given specialty), and sell them on the "off-label" benefits of Neurontin. A key aspect of this selling was misrepresentation. The first misrepresentation was usually the status of the medical liaisons. With the full approval of marketing officials at Parke-Davis such as John Ford, Phil Magistro and John Krukar, medical liaisons were routinely

introduced as specialists in the specific drug they were presenting at a particular meeting. Thus, medical liaisons could be "experts" in anti-epileptic drugs at one moment and an hour later be an "expert" in cardiac medication. Medical liaisons were also encouraged to represent themselves as medical researchers, even though they neither conducted medical research nor analyzed medical research performed by others. It was not uncommon for medical liaisons to be introduced as physicians, even though they had no such qualifications. Sales personnel were instructed to introduce medical liaisons as scientific employees who were given momentary leave of their academic duties to make an individual presentation to the physician; the fact that the liaisons were part of Parke-Davis standard marketing detail was intentionally hidden.

71.    Parke-Davis employees instructed medical liaisons on the procedure that should be followed when presenting "The Neurontin Cold-Call Story" to a neurologist, general practitioner, or psychiatrist who was a target for off-label use:

- Mention that you are the eyes and ears of Parke-Davis research and that you are gathering clinical info;

- Then ask general questions about the nature of the practice;

- Mention Neurontin and its approved uses, but dismiss them as old news;

- Then ask leading questions about the number of pain patients that the practice sees;

- Then ask a series of questions that determine the practice profile for all of the potential "off-label" uses;

- Next reveal that Parke-Davis "has a great deal of information about the fantastic response rate of patients on Neurontin in all of these disease states";

- Move into a discussion of the clinical trials that this information is demanding;

- And the "90-95% response rate that we are seeing in more than 80% of patients";

- Present the doctor with any publications that are available and point out that many common drugs for pain treatment are in few if any publications;

- Ask the physician to place some patients on Neurontin and tell them that the medical liaison will stay in touch to help develop any case reports;

- Mention that case reports can be lucrative and can lead to clinical trials;

- Offer to do a presentation and luncheon for the entire practice or a group of his friends that will detail all of the "data" we have;

- Invite the physician to consultant meetings in the future and point out that they pay $250 plus a nice trip or meal in the city; and

- If a sales representative is present they should close the sale by asking that the next patient he sees should be put on Neurontin.

72.     It was during the training in Parsippany, NJ, that a whistleblower, who is now a plaintiff in a *qui tam* action in federal court in Boston, Dr. Paul Franklin, first witnessed the scope of the "off-label" claims that Parke-Davis intended its medical liaisons to market. The medical liaisons were provided with new company slides that detailed the "method" to use to increase the use of Neurontin in several different "off-label" practice types. The slide show contained a slide that showed the "Anecdotal Uses of Neurontin." The list included the following:[1]

- Reflex sympathetic dystrophy (RSD)

- Peripheral neuropathy

- Diabetic neuropathy

- Trigeminal neuralgia

- Post-Herpetic neuralgia

- Essential tremor

- Restless leg syndrome (RLS)

- Attention deficit disorder (ADD)

- Periodic limb movement disorder

---

[1]    According to the allegations of the federal court *qui tam* action, this slide was often updated with the addition of a new disease state and a new version sent to Dr. Franklin. It was updated so often that it was originally kept in a different slide format than the rest of the slides he had been given.

- Migraine
- Bipolar disorder
- Amyotrophic lateral sclerosis (ALS) [Lou Gehrig's Disease]
- Drug or alcohol withdrawal seizures

73.    Executives explained that "this list was very important to the company but that it makes Neurontin look like snake oil, so preempt the laughter by telling your physicians that 'I'm embarrassed to show you the next slide because it makes Neurontin look like snake oil, but the fact is, we are seeing extra-ordinary results, in some cases up to 90% response in all of these conditions,' that will get their attention." This executive went on to say that, "[n]otice all the studies we talk about, nothing gets a doc more interested in a drug than a study." Richard Grady, a medical liaison, asked if "we have any money to lace studies without big docs." He was instructed to "use the potential of a study to get in the door, even get protocols, but don't waste too much time and don't say you can get them a study, we don't have much money left." He was then told that "if anyone asks for back-up data say we are putting it together, then suggest that the doc put some of his patients on Neurontin and we will help him publish case reports that could help place a study in his practice. Everybody wins."

74.    None of the "off-label" claims made in the slide had been substantiated, let alone approved by the FDA. Yet, these claims were a cornerstone of the Parke-Davis scheme to increase "off-label" sales of Neurontin.

75.    Thus, extensive misrepresentations were also made regarding the scientific information concerning "off-label" usage of Neurontin. The following misrepresentations relating to "off-label" usage of Neurontin were routinely made to physicians with the knowledge and consent of marketing personnel at Parke-Davis, and continued to be made to doctors after the 2000 merger with Pfizer:

    1.    *Bipolar Disorder*. Medical liaisons informed psychiatrists that early results from clinical trials evaluating Neurontin for the treatment of bipolar disorder

indicated a ninety percent (90%) response rate when Neurontin was started at 900 mg/day dosage and increased to a dosage of 4800 mg/day. No such results existed. Nor was any type of clinical trial being conducted other than a pilot study. There were no clinical trials or studies indicating that Neurontin was safe or effective up to 4800 mg/day. Indeed, Parke-Davis was in possession of clinical trial evidence which showed that there was no dose response difference between patients who received 600 mg/day, 1200 mg/day and 2400 mg/day. Any data relating to the use of Neurontin in bipolar disorder was strictly anecdotal and of nominal scientific value. Indeed, most of the published reports on this topic had been written and commercially sponsored by Parke-Davis, although this fact was hidden. Medical liaisons were trained to inform psychiatrists that there were 110 reports of adverse effects for Neurontin when used for psychiatric purposes. In fact, such reports had been reported to Parke-Davis personnel, but Parke-Davis attempted to hide such reports from physicians.

2.    *Peripheral Neuropathy, Diabetic Neuropathy, and Other Pain Syndromes.* Medical liaisons were trained and instructed to report that "leaks" from clinical trials demonstrated that Neurontin was highly effective in the treatment of various pain syndromes and that a ninety percent (90%) response rate in the treatment of pain was being reported. No such body of evidence existed. Nor was there any legitimate pool of data from which a response rate, much less a ninety percent (90%) response rate, could be calculated. Medical liaisons were trained to claim support for these findings as a result of inside information about clinical trials where no such information existed. The only support for these claims was anecdotal evidence of nominal scientific value. Many of the published case reports had been created and/or sponsored by Parke-Davis in articles which frequently hid Parke-Davis's involvement in the creation of the article. Parke-

Davis's payment for the creation of these case reports was also hidden from physicians.

3.     *Epilepsy Monotherapy*.  Medical liaisons were strongly encouraged to push neurologists to prescribe Neurontin as the sole medication to treat epilepsy, even though studies only found it safe and effective as adjunctive therapy.  Medical liaisons were trained to inform neurologists that substantial evidence supported Parke-Davis's claim that Neurontin was effective as monotherapy.  In fact, at this time, Parke-Davis knew that clinical trials regarding Neurontin's efficacy as a monotherapy were inconclusive.  One of Parke-Davis's clinical trials, 945-82, demonstrated that Neurontin was not an effective monotherapy agent; the vast majority of patients in the study taking Neurontin were unable to continue with Neurontin alone.  The same study showed that there was no effective difference between administration of Neurontin at 600, 1200 or 2400 mg.  Notwithstanding this data, Parke-Davis continued to claim that physicians should use Neurontin at substantially higher doses than indicated by the labeling.  Indeed, although medical liaisons routinely claimed Neurontin to be effective as monotherapy, in 1997 the FDA refused to find Neurontin a safe and effective monotherapy.

4.     *Reflex Sympathetic Dystrophy ("RSD")*.  Medical liaisons informed physicians that extensive evidence demonstrated the efficacy of Neurontin in the treatment of RSD.  The only such evidence that existed was anecdotal reports of nominal scientific value.  Medical liaisons were trained to refer to case reports, most of which had been created or sponsored by Parke-Davis, as "studies."

5.     *Attention Deficit Disorder ("ADD")*.  Medical liaisons were instructed to inform pediatricians that Neurontin was effective for the treatment of ADD.  No data, other than occasional anecdotal evidence, supported this claim.  Nonetheless, the medical liaisons were trained to report that large number of

-33-

physicians had success treating ADD with Neurontin, when no such case reports existed.

      6.     *Restless Leg Syndrome ("RLS")*. RLS was another condition where Parke-Davis's medical liaisons were trained to refer to a growing body of data relating to the condition, when no scientific data existed. The only reports were anecdotal, most of which had been created and/or sponsored by Parke-Davis.

      7.     *Trigeminal Neuralgia*. Although medical liaisons represented that Neurontin could treat Trigeminal Neuralgia, once again no scientific data supported this claim with the exception of occasional anecdotal reports. No data demonstrated that Neurontin was as effective as currently available pain killers, most of which were inexpensive.

      8.     *Post-Herpatic Neuralgia ("PHN")*. Medical liaisons were trained to tell physicians that seventy-five percent (75%) to eighty percent (80%) of all PHN patients were successfully treated with Neurontin. Once again, no clinical trial data supported such a claim.

      9.     *Essential Tremor Periodic Limb Movement Disorder ("ETPLMD")*. Medical liaisons were trained to allege that Neurontin was effective in the treatment of these conditions. No scientific data supported such claims with the exception of anecdotal reports of nominal scientific value.

      10.    *Migraine*. Claims that Neurontin was effective in the treatment of migraine headaches were made by the medical liaisons and were supposedly based on early results from clinical trials. Although pilot studies had been suggested and undertaken, no early results of clinical trials existed to support these claims. Once again, any data relating to treatment of migraines was purely anecdotal and of nominal scientific value. Most of the case reports were either created or sponsored by Parke-Davis.

11.    *Drug* and *Alcohol Withdrawal Seizures*. Medical liaisons suggested that Neurontin be used in the treatment of drug and alcohol withdrawals despite the lack of any data supporting Neurontin as an effective treatment for these conditions.

76.    Misrepresentations by Parke-Davis were not limited to presentations by medical liaisons. As noted above, publications that Parke-Davis distributed as part of its "publication strategy" intentionally misrepresented Parke-Davis's role in the creation and sponsorship of the publications. Physicians were led to believe that the publications were the independent, unbiased research of the authors of the articles. In fact, many of the publications distributed to physicians were created by Parke-Davis and written by third parties retained by Parke-Davis who were under Parke-Davis's control. The fact that these articles were authored by ghostwriters retained by Parke-Davis was intentionally hidden, and the fact that the authors had financial ties to Parke-Davis was also intentionally undisclosed. For example, an article widely circulated by Parke-Davis concerning the use of Neurontin in the treatment of Restless Leg Syndrome asserted that the authors Gary A. Mellick and Larry B. Mellick, had not and never would receive financial benefit from anyone with an interest in Neurontin, yet the Mellick brothers had received tens of thousands of dollars for acting as speakers at Parke-Davis events. This financial connection was hidden from the persons who received copies of the Mellick brothers' articles.

77.    Defendants' strategy included paying doctors to appear as authors of journal articles on "off-label" uses of Neurontin, articles that were actually written by nonphysicians working under the direction of the company's marketers. The company then paid hundreds of doctors to attend expensive dinners and weekend retreats, where they were urged to prescribe Neurontin.

78.    Other doctors, often frequent prescribers of Neurontin, were paid to speak to other physicians about Neurontin's benefits. Finally, the company paid doctors to prescribe Neurontin and include those patients in clinical trials, which were designed mainly for marketing purposes.

79.    The company adopted the marketing strategy, after deciding not to perform the clinical trials needed to gain approval of new uses for Neurontin because it believed that the drug would soon lose patent protection.

80.    In fact, Parke-Davis engaged in an extensive and far-reaching campaign to use false statements to promote increased prescriptions of Neurontin.

81.    The scheme used a team of "medical liaisons." While medical liaisons are ordinarily connected to the research divisions of the manufacturer, Parke-Davis's medical liaisons were exclusively employed as sales and promotion personnel.

82.    Parke-Davis's medical liaisons were instructed to make exaggerated or false claims concerning the safety and efficacy of Parke-Davis drugs for "off-label" uses. They were also trained to convey that Neurontin could be prescribed for its various "off-label" uses in amounts of up to 4800 mg/day — far above the maximum dosage of 1800 mg per day approved by the FDA. To bolster their representations to physicians, medical liaisons were encouraged to misrepresent their scientific credentials and to pose as research personnel, rather than as sales representatives. This practice continued in the years 2000, 2001 and may still be continuing.

83.    Doctors were rewarded with kickbacks for prescribing large quantities of Parke-Davis drugs. These alleged kickbacks took various forms. For instance, some doctors were paid sums of money which were ostensibly compensation for drug studies. However, these studies were shams and had no scientific value. Other doctors were paid sums of money under the guise of being compensated for their services as "consultants" or "preceptors" or for participating in a "speaker's bureau." Doctors were also allegedly given cash payments for small record-keeping tasks, such as allowing Parke-Davis access to information about the doctors' patients who were receiving Neurontin. Other doctors prescribing large amounts of Parke-Davis drugs were given gifts such as travel tickets and tickets to the Olympics.

84.    When questions arose concerning the availability of reimbursement for prescriptions for "off-label" uses of Parke-Davis drugs, medical liaisons were instructed to coach doctors on how to conceal the "off-label" nature of the prescription.

-36-

85.    Parke-Davis took numerous actions to conceal its activities from the FDA, including shredding documents, falsifying documents, and encouraging medical liaisons to conduct their marketing activities without leaving a "paper trail" that might be discovered by the FDA.

86.    As part of the scheme and as set forth in a *qui tam* action filed by Dr. Paul Franklin, a former Parke-Davis employee:

- Upon order of the company and as a result of training of medical liaisons, Dr. Franklin of Parke-Davis "deliberately contrived reports to mislead physicians into believing that a body of data existed that demonstrated the effectiveness of Neurontin in the treatment of bipolar disease." In fact, no data existed at all to support the use of Neurontin in bipolar disorder.

- Dr. Franklin was trained and instructed to actively deceive physicians with contrived data, falsified "leaks" from clinical trials, scientifically flawed reports, or "success stories" that stated that Neurontin was highly effective in the treatment of a variety of pain syndromes. No such body of evidence existed.

- He was instructed to advise physicians that Parke-Davis had developed a large body of data to support the use of Neurontin as monotherapy. This was an "outright lie" and left patients unknowingly without good seizure control.

- Medical liaisons were instructed to tell physicians that a great deal of data existed that supported the safe use of Neurontin at levels that exceed 4800 mg/day. However, clinically significant safety data existed at dosing levels at only 1800 mg/day.

- Parke-Davis provided medical liaisons with slides that stated that Neurontin was effective for the treatment of Attention Deficit Disorders but no data existed to support that claim.

87.    The strategy was a success. In 2000, Warner-Lambert reported that more than 78% of Neurontin prescriptions had been written for indications other than epilepsy. Sales of Neurontin that year were $1.3 billion, and they rose to $1.7 billion, according to IMS Health (news/quote), a health care information company.

**D.    Illegal "Off-Label" Promotion Has Continued as Has the Continuing Impact of the Earlier Misconduct**

88.    As a result of the activities described above, many of which continue to occur after Dr. Franklin filed his whistleblower suit, physicians were inundated with false information about Neurontin. As a result, they continue to prescribe Neurontin for "off-label" uses for which there is no reliable scientific support.

89.    On information and belief, Pfizer has a company-wide practice of marketing "off-label" indications regardless of FDA limitations on the designated use of the product. "Off-label" marketing plans exist for Cox 2 inhibitors and, on information and belief, also exist for Neurontin. Pursuant to this practice, Defendants' sales representatives have, while visiting with doctors, violated FDA rules and regulations by marketing Neurontin for "off-label" uses.

90.    This continuing course of conduct is evidenced in part by the staggering growth of Neurontin sales for non-approved FDA use. Because there are no valid scientific studies supporting such use, a reasonable inference is that the use results from past and continuing promotional efforts by Defendants. This clear and unavoidable conclusion follows from observations regarding the ongoing extent of prescriptions written for "off-label" Neurontin use.

91.    First, from the perspective of overall Neurontin sales, "off-label" usage of Neurontin has actually *increased* during the years since 1999; in recent years, "off-label" prescriptions for Neurontin have exceeded 90% of all sales and, in some months, it appears that approved indication usage is negligible.

92.    Second, although Neurontin is prescribed for scores of "off-label" indications, since 1999 the types of "off-label" usage continue to be weighted in the precise areas where Defendants focused their unlawful marketing efforts: bipolar disorder, peripheral neuropathy, migraine, etc.

93.    Third, these focus treatment areas of continuing unapproved usage are subject to very intense competition between therapeutic substitutes (other drugs or treatments). Indeed, because manufacturers' incremental cost for drugs in these areas is very small (e.g., only pennies

to manufacture an additional pill), manufacturers compete aggressively for market share by spending huge amounts of money for marketing, promotional and sales activities. If any company was to simply pack its tent and discontinue programmatic promotional effort in any therapeutic arena, significant loss of overall sales within that diagnosis regime would certainly occur. For Neurontin, no such dip in overall sales, let alone any significant drop, has occurred.

94.     Fourth, Pfizer, like most branded drug companies, monitors the relationship of its sales to its promotional efforts in very short timeframe; Pfizer would be concerned about a drop in sales within a certain therapeutic regime not after a year look-back, or even a quarterly look-back, but over just weeks. The persistent maintenance of high Neurontin sales within multiple, targeted areas for "off-label" promotion over a period of years defies the conclusion that any significant backing away on the marketing, sales or promotion on Neurontin to each of those unapproved therapeutic areas.

95.     For example, sales of Neurontin for the treatment of bipolar disorder have steadily increased since its introduction. This increase is a direct result of Defendants' sales representatives recommending to doctors its use for this purpose and their distribution of unapproved promotional materials. These promotional efforts did not stop in 1999, but continued thereafter. There are no valid scientific studies that support Neurontin's use for bipolar disorders. Dr. C. Seth Landefeld has submitted an expert opinion in the *Franklin* litigation that a review of Drugdex for Neurontin, as of the end of August 2002, reveals "no published scientific studies to support Neurontin's use for ... bipolar disorder." As a result, tens of thousands of patients who need help and could use other drugs whose effectiveness has been established, were given and are being given Neurontin. These prescriptions for this purpose are still being written and are a direct result of Defendants' pre-2000 illegal promotional activities and post-2000 illegal promotional activities.

96.     Likewise, sales of Neurontin for pain, ALS, attention deficit disorder, depression and dosages in excess of 1800 mg per day, are also increasing without any scientific evidence supporting use of Neurontin for such indications. Again, as noted by Dr. Landefeld, as of the

-39-

end of the third quarter of 2002 "there were no published scientific studies to support Neurontin's use for" any of these indications or in an increased dose.

97.    Overall, "off-label" sales of Neurontin have steadily increased since 1998, and from 2000 to the present have consistently remained at 93% to 94% of all sales. Actual sales for approved uses has declined. Given the absence of scientific support for such uses, the genesis for those sales can only be past and continuing efforts by Defendants to promote "off-label" use.

98.    These continuing "off-label" promotional efforts are evidenced in part by a July 1, 2002 letter from Dr. Lisa Stockbridge of the Department of Health & Human Services ("HHS") to Pfizer, in which HHS notified Pfizer that certain of its marketing practices are "*in violation of the Federal Food, Drug and Cosmetic Act ... because it makes representations about Neurontin which are false and misleading.*" In particular, HHS had the following objections about Pfizer's "off-label" promotional activities:

> The presentation on the model of illustrations of cellular activity resulting from the administration of Neurontin ("Mechanism of Action"), In conjunction with the presentation of the human brain, and the prominent display of the name Neurontin makes representations about how Neurontin acts in the human brain. This presentation along with the depiction of the human brain and the prominent display of the name "Neurontin" suggest that the mechanism of action of Neurontin has been established in the human brain. *This suggestion of proof of the mechanism of action is false. Specifically, it is contrary to the language in the approved product labeling that states that "[t]he mechanism by which gabapentin* [Neurontin] *exerts its anticonvulsant action is unknown.*"

> Furthermore, the full presentation of the aforementioned areas of the human brain accompanied by purported "Mechanism of Action" and the prominent display of the name "Neurontin" is *misleading* because it suggests that Neurontin is useful for a broader range of CNS conditions than has been demonstrated by substantial evidence (*i.e.*, it can be used for the treatment of any specific or non-specific brain disorder through to involve the GABA-ergic neurotransmitted system that can originate in these parts of the brain). *Most obviously, the solo and prominent mention of the name Neurontin suggests that Neurontin can be used as monotherapy for various CNS disorders, notwithstanding that with respect to brain disorders, Neurontin is only indicated as "adjunctive therapy in the treatment of partial seizures with or without secondary generalization in patients over 12 years of age with epilepsy" and as "adjunctive therapy in the treatment of partial seizures in pediatric patients age 3-12 years.*"

> To address these objections, DDMAC recommends that Pfizer do the following:

-40-

1.    *Immediately discontinue the use of this model and any* other
      promotional material with the same or similar issues. (Emphasis
      added.)

99.    On information and belief, the foregoing promotional materials were used by

Pfizer employees to promote "off-label" use of Neurontin.

100.    These continuing efforts to illegally promote "off-label" use of Neurontin are also

evidenced in part by a letter from HHS dated June 6, 2001, in which HHS found Pfizer to have

again violated applicable law. This letter was sent by HHS in response to Pfizer's promotional

advertising sent to doctors in 2001 claiming that a study had indicated "Quality of Life

Improvements" with use of Neurontin. HHS found this promotional material to be misleading as

set forth in its letter to Pfizer:

> Ms. Andrea Garrity
> Director, Regulatory Affairs
> Pfizer, Inc.
> 235 East 42nd Street
> New York, New York 10017-5755
>
> Re:    **NDA #s 20-235, 20-882**
>        **Neurontin (gabapentin)**
>        **MACMIS #10174**
>
> Dear Ms. Garrity:
>
> Through routine monitoring and surveillance, the Division of Drug Marketing,
> Advertising, and Communications 9DDMAC) has identified a slim jim (ID
> #NSJ5095A1) for Neurontin that is *misleading and in violation of the Federal
> Food, Drug, and Cosmetic Act and applicable regulations.*
>
> Specifically, this slim jim misleadingly claims improvements in quality of life
> (QOL) parameters based on the Neurontin Evaluation of Outcomes in
> Neurological Practice (NEON) study. Among other QOL parameters, the
> misleading presentation includes improvement in social limitations, memory
> difficulties, energy level, and work limitations. The NEON study is not
> considered to be substantial evidence for claims of QOL improvements because
> it is not a controlled study.
>
> To address these objections, DDMAC recommends that Pfizer do the
> following:
>
> 1.    Immediately discontinue the use of this slim jim and any other
>       promotional material and practices with the same or similar messages.
>
> 2.    Respond to this letter within ten days. Your response should include a
>       statement of your intent to comply with the above, a list of all

-41-

promotional materials with the same or similar issues, and your methods for discontinuing these promotional materials. (Emphasis added.)

101.    Pfizer employees had been using the foregoing promotional materials to promote "off-label" use of Neurontin up until this letter of June 6, 2001.

102.    Defendants have sent promotional material to physicians suggesting that Neurontin was "well tolerated" with "proven efficacy" at doses "up to 2400 mg/day" and that doses of 3600 mg/day were also "well tolerated." As noted herein, there was no scientific evidence that would have met with FDA criteria supporting a claim for dosages in excess of 1800 mg/day and these promotional efforts are illegal attempts to encourage "off-label" uses.

103.    The promotional materials referred to above, as well as other promotional activities cited herein, were not submitted to the FDA for approval as required by FDAMA, 21 U.S.C. § 360aaa. Indeed, in the above-cited examples where HHS cited Pfizer for violating federal law, the violations were discovered as a result of HHS's "routine monitoring and surveillance" activities and not because Pfizer had submitted the materials as required by law.

E.    "Off-Label" Promotion is Illegal

104.    The "off-label" uses of Neurontin which are actively being promoted by Defendants are uses which are not recognized as medically accepted uses by the American Hospital Formulary Service Drug Information, the United States Pharmacopeia-Drug Information, or the American Medical Association Drug Evaluations, or by any peer-reviewed medical literature. Thus, these "off-label" uses are beyond the scope of uses designated by federal law and regulation, in particular 42 U.S.C. § 1396r-8, as eligible coverage by the Medicare and Medicaid programs.

105.    The citations in Drugdex for Neurontin, as of August 1997, indicate that the published scientific literature did not support the use of Neurontin for the following conditions: alcohol detoxification/alcohol withdrawal syndrome, ALS, antidepressant-induced bruxism, anxiety disorder, attention deficit disorder/attention deficit and hyperactivity disorder, behavior problems-dementia related, behavior dyscontrol, bipolar disorder, brachioradial pruritis, back

pain, Charles Bonnet syndrome, ciguatera poisoning, cluster headache, cocaine dependency, diabetic peripheral neuropathy, depression, dosages in excess of 1800 mg per day, dystonia, essential tremor, failed back surgery syndrome, headache (SUNCT), headache, hemifacial spasm, hiccups, Lesch-Nyhan syndrome, mania, migraine prophylaxis, menopausal hot flashes, mood stabilization, multiple sclerosis complications, myalgias taxane induced neuropathic pain syndromes, neuropathic cancer pain, HIV-related neuropathy, nicotine withdrawal, nystagmus, obsessive-compulsive disorder, orthostatis tremor, pain-postpoliomyelitis pain, pain-RSD, pain disorder, partial seizures-monotherapy, partial seizures-pediatric, partial seizures-refractory, phantom limb syndrome, postherpetic neuralgia, restless les syndrome, trigeminal neuralgia, seizures – acute intermittent prophyria, seizures – brain tumor-induced, seizures – clozapine-induced, seizures – generalized, seizures - status epilepticus, schizophrenia, social phobia, spasticity, or any other indication other than seizures – adjunctive therapy.

106.    As set forth above, despite the lack of scientific support, Defendants engaged in promotional activities for the purpose of having doctors use Neurontin to treat these diseases.

107.    Further, any representations by any agent, employee, or person hired by Parke-Davis that as of August 1997 there was scientific evidence supporting Neurontin's use for: alcohol detoxification/alcohol withdrawal syndrome, ALS, antidepressant-induced bruxism, anxiety disorder, attention deficit disorder/attention deficit and hyperactivity disorder, behavior problems-dementia related, behavior dyscontrol, dipolar disorder, brachioradial pruritis, back pain, Charles Bonnet syndrome, ciguatera poisoning, cluster headache, cocaine dependency, diabetic peripheral neuropathy, depression, dosages in excess of 1800 mg per day, dystonia, essential tremor, failed back surgery syndrome, headache (SUNCT), headache, hemifacial spasm, hiccups, Lesch-Nyhan syndrome, mania, migraine prophylaxis, menopausal hot flashes, mood stabilization, multiple sclerosis complications, myalgias taxane induced neuropathic pain syndromes, neuropathic cancer pain, HIV-related neuropathy, nicotine withdrawal, nystagmus, obsessive-compulsive disorder, orthostatis tremor, pain-postpoliomyelitis pain, pain-RSD, pain disorder, partial seizures-monotherapy, partial seizures-pediatric, partial seizures-refractory,

-43-

phantom limb syndrome, postherpetic neuralgia, restless legs syndrome, trigeminal neuralgia, seizures - acute intermittent prophyria, seizures – brain tumor-induced, seizures – clozapine-induced, seizures – generalized, seizures – status epilepticus, schizophrenia, social phobia, spasticity, or any other indication other than the partial seizures-adjunctive therapy; *would have been misleading in that the published literature cited in Drugdex did not support these indications at that time.* On information and belief, representations were made by Defendants' employees that Neurontin was appropriate for treatment of some of the foregoing diseases.

108.    The citations in Drugdex for Neurontin as of the third quarter of 2002, indicate that there were no published scientific studies to support Neurontin's use for the following indications:  alcohol detoxification/alcohol withdrawal syndrome, ALS, antidepressant-induced bruxism, anxiety disorder, attention deficit disorder/attention deficit and hyperactivity disorder, behavior problems-dementia related, behavior dyscontrol, dipolar disorder, brachioradial pruritis, back pain, Charles Bonnet syndrome, ciguatera poisoning, cluster headache, cocaine dependency, diabetic peripheral neuropathy, depression, dosages in excess of 1800 mg per day, dystonia, essential tremor, failed back surgery syndrome, headache (SUNCT), headache, hemifacial spasm, hiccups, Lesch-Nyhan syndrome, mania, migraine prophylaxis, menopausal hot flashes, mood stabilization, multiple sclerosis complications, myalgias taxane induced neuropathic pain syndromes, neuropathic cancer pain, HIV-related neuropathy, nicotine withdrawal, nystagmus, obsessive-compulsive disorder, orthostatis tremor, pain-postpoliomyelitis pain, pain-RSD, pain disorder, partial seizures-monotherapy, partial seizures-pediatric, partial seizures-refractory, phantom limb syndrome, postherpetic neuralgia, restless legs syndrome, trigeminal neuralgia, seizures – acute intermittent prophyria, seizures – brain tumor-induced, seizures – clozapine-induced, seizures – generalized, seizures - status epilepticus, schizophrenia, social phobia, spasticity, or any other indication other than the partial seizures-adjunctive therapy, partial seizures-pediatric, postherpetic neuralgia, and diabetic peripheral neuropathy.

109.    With the complete absence of scientific support for treatment of these diseases, sales growth which occurred for the use of Neurontin for these diseases was the result of Defendants' continuing promotional activities.

110.    Any representations by any agent, employee, or person hired by defendants that as of 2003 there was scientific evidence supporting Neurontin's use for:  alcohol detoxification/alcohol withdrawal syndrome, ALS, antidepressant-induced bruxism, anxiety disorder, attention deficit disorder/attention deficit and hyperactivity disorder, behavior problems-dementia related, behavior dyscontrol, dipolar disorder, brachioradial pruritis, back pain, Charles Bonnet syndrome, ciguatera poisoning, cluster headache, cocaine dependency, diabetic peripheral neuropathy, depression, dosages in excess of 1800 mg per day, dystonia, essential tremor, failed back surgery syndrome, headache (SUNCT), headache, hemifacial spasm, hiccups, Lesch-Nyhan syndrome, mania, migraine prophylaxis, menopausal hot flashes, mood stabilization, multiple sclerosis complications, myalgias taxane induced neuropathic pain syndromes, neuropathic cancer pain, HIV-related neuropathy, nicotine withdrawal, nystagmus, obsessive-compulsive disorder, orthostatis tremor, pain-postpoliomyelitis pain, pain-RSD, pain disorder, partial seizures-monotherapy, partial seizures-pediatric, partial seizures-refractory, phantom limb syndrome, postherpetic neuralgia, restless les syndrome, trigeminal neuralgia, seizures – acute intermittent prophyria, seizures – brain tumor-induced, seizures – clozapine-induced, seizures · generalized, seizures - status epilepticus, schizophrenia, social phobia, spasticity, or any other indication other than the partial seizures-adjunctive therapy, partial seizures-pediatric, postherpetic neuralgia, and diabetic peripheral neuropathy would have been misleading in that the published literature cited in Drugdex did not support these indications at that time.  On information and belief, Defendants made representations that there was scientific evidence supporting use for these diseases.

111.    Any statement or representation made by Parke-Davis, their employees or agents that Neurontin was safe and effective for migraine prophylaxis that provided information only on positive reports or trials while failing to disclose negative studies of similar or better

methodologic quality would not be a fair and balanced presentation and would be false and misleading. On information and belief, such statements were made during the period from 1995 through 2000.

112.    Any statement or representation made by Parke-Davis, their employees, or agents that Neurontin was safe and effective for treatment of neuropathic pain that provided information on positive reports or trials, while failing to disclose negative studies of similar or better methodologic quality, would not be a fair and balanced presentation and would be false and misleading. On information and belief, such statements were made during the period from 1995 through 2002.

113.    Federal laws and regulations governing the Medicare and Medicaid programs. In particular, 42 U.S.C. § 1320A-7 and 42 C.F.R. § 1001 prohibit kickbacks to physicians and medical care providers. "Kickbacks" have been defined as including payments, gratuities and other benefits paid to physicians who prescribe prescription drugs by the manufacturers of the drugs.

114.    As part of its nationwide program of "off-label" promotion of Neurontin, Parke-Davis established a system of paying kickbacks to physicians who are prescribers of large amounts of Neurontin. These kickbacks were administered by the Parke-Davis sales department, and frequently disguised as consultantships, although unrelated to any scientific or educational activity. The kickbacks took the form of cash payments, travel benefits, entertainment, Olympics tickets and other benefits. Parke-Davis established formal internal guidelines for the award of these benefits to physicians which are based entirely on the amount of prescriptions written by the physicians and the ability of the physician to influence other physicians to begin prescribing Neurontin for "off-label" uses.

115.    These kickbacks are strictly illegal and have had the effect of greatly increasing the amount of Neurontin prescriptions and indirectly the amount of money spent by the federal government for reimbursement of prescriptions covered by Medicare. The payment of these

-46-

kick-backs represents the inducement of federal payments through a pattern of fraudulent conduct and constitute false claims within the meaning of 31 U.S.C. § 3729.

116.    As part of its illegal "off-label" promotion of Neurontin, Parke-Davis has instructed and caused its sales personnel and its medical liaison employees to make false statements to physicians, and to provide physicians with written materials containing false statements, concerning the safety and efficacy of Neurontin for "off-label" uses. These statements were made with the intent of, and had the effect of, inducing physicians to increase their "off-label" prescription of Neurontin.

117.    The false and misleading statements made by Defendants' employees to physicians have included representations that scientific evidence exists that Neurontin is an effective remedy for pain, bipolar disorder, attention deficit disorder, reflex sympathetic dystrophy, post-herpetic neuralgia, and monotherapy for seizures. The false and misleading statements also include representations that Neurontin is known to be safe and effective in dosages of up to 4800 mg/day in all populations. The false statements include representations that clinical trials are ongoing or planned with respect to each of the above off-label uses. Each of these statements is unsupported by any legitimate scientific evidence.

F.    **Fraudulent Concealment**

118.    Defendants have and continue to conceal their off-label promotional activities. As for events occurring prior to May 2002, when the federal court file in the Franklin *qui tam* case was completely unsealed, in the exercise of reasonable diligence, Plaintiff could not have discovered the scheme alleged herein. Much of the scheme still remains concealed by Defendants.

G.    **The Role of Non-Physician Technical Writers, Physicians and Vendors in Defendants' Marketing Scheme**

119.    The non-physician technical writers, physician "authors," and vendors, namely AMM/Adelphi Ltd. ("AMM") and Medical Educational Systems, Inc. ("MES"), (collectively referred to herein as the "Promotional Strategists") were key parties in Defendants' improper