# EXHIBIT 51

THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

FILED
U.S. DISTRICT COURT
'04 JUN 21 AM 10: 29
SOUTH...
LAURA A...
CLERK IND'S

GERALD SMITH, on behalf of himself and all
others similarly situated,

      *Plaintiff,*

vs.

PFIZER, INC. and WARNER LAMBERT
COMPANY,

      *Defendants.*

1 : 04 CV-1052-JDT-WTL

Civil No.

Jury Trial Demanded

## CLASS ACTION COMPLAINT

Plaintiff, Gerald Smith, on behalf of himself and all others similarly situated, by counsel,
hereby alleges the following facts and states the following claims against Defendants, Warner-
Lambert Company and Pfizer, Inc. (collectively "Defendants").

### INTRODUCTION

1.      This class action is brought on behalf of similarly situated consumers to recover
the billions of dollars unwittingly paid to Defendants as a result of Defendants' illegal marketing
scheme designed to push and promote "off-label" uses of the prescription drug Neurontin. "Off-
label" is the term describing uses for a drug that are not approved by the U.S. Food and Drug
Administration ("FDA").

2.      Defendants' scheme involves a calculated and deceitful marketing campaign.
Defendants, like other drug companies, spend billions of dollars each year trying to persuade
doctors to prescribe their particular drugs. There are strict FDA regulations about what form that

EXHIBIT

A

tabbies

promotion can take. These requirements and rules are meant to ensure that drug companies give physicians and medical personnel trustworthy information, so that medications are prescribed appropriately.

3.    In 1993, Defendants received FDA approval to market and sell Neurontin for the treatment of epilepsy in certain doses. Starting as early as 1995, however, Defendants embarked on a course of conduct the purpose of which was to increase Neurontin sales for diseases and ailments with respect to which Neurontin had not received FDA approval, i.e. off-label. Defendants' sales department recognized a significant profit potential in the off-label promotion of Neurontin for other purposes and at higher dosages. Consequently, Defendants decided to completely avoid the normal regulatory process of the FDA pertaining to the marketing of a new use of a drug and to proceed in an illegal fashion. The decision was also made to actively conceal the illegal means which would be used to market the drug.

4.    Defendants' scheme was implemented so Defendants could tap into the enormous market for off-label uses in the United States. Ultimately, Defendants' actions proved successful as profits from Neurontin sales between 1995 to 2003 rose from $97.5 million to approximately $2.7 billion, due mostly to off-label uses. Approximately 90% of all Neurontin prescriptions were, and are currently, written for off-label purposes.

5.    Defendants' scheme, described in more detail below, ultimately duped physicians and consumers into believing that prescribing and taking Neurontin for the off-label uses that Defendants promoted was appropriate even though Defendants knew FDA approval had not been granted and, moreover, there was little – if any – scientific evidence suggesting Neurontin was safe and effective when so used.

MA029700000018

6.     The United States Attorney for the District of Massachusetts ultimately brought criminal charges against Defendants for this conduct. The attorneys general from many of the 50 states also commenced litigation against Defendants relating to this matter. On May 13, 2004, Defendants agreed to plead guilty to federal criminal charges, and at the same time, entered into a settlement agreement with the attorneys general.

## PARTIES

7.     Plaintiff Gerald Smith is a resident citizen of the State of Indiana. From 1999 through 2001, Plaintiff was prescribed and purchased the drug Neurontin for treatment of headache pain.

8.     Defendant Pfizer, Inc. is a Delaware corporation maintaining its principal place of business in New York. In 2000, Pfizer, Inc. merged with Defendant Warner-Lambert Company and created the present day company. Defendant Warner-Lambert Company manufactured, marketed and sold the drug Neurontin through its Parke-Davis division during the relevant time period.

## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because Plaintiff's claims arise under the laws of the United States in that Plaintiff alleges violations of the Racketeer Influenced and Corrupt Organizations Act, ("RICO") 18 U.S.C. § 1962 *et seq.*

10.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to Plaintiff's claims occurred, in part, in the Southern District of Indiana.

## FACTUAL ALLEGATIONS

- 3 -

## A.    FDA Regulations

11.    FDA regulations require any pharmaceutical company to seek and obtain FDA approval before any new drug may be marketed. Once approval is granted, a drug may only be promoted for the approved use at the approved dosage.

12.    Physicians may still prescribe drugs for unapproved uses. These uses are deemed "off-label" because they have not been approved by the FDA. A pharmaceutical company is permitted to disseminate certain information about off-label uses, but such dissemination must adhere to strict requirements. For instance, the manufacturer must submit an application to the FDA seeking approval of the drug for off-label use; the manufacturer must provide its marketing materials to the FDA prior to dissemination; the materials must be in unabridged form; and the manufacturer must include disclosures that the materials pertain to an unapproved use of the drug, and, if the FDA deems it appropriate, "additional objective and scientifically sound information . . . necessary to provide objectivity and balance." Food and Drug Administration Act of 1997, 21 U.S.C. § 360aaa, *et seq.* The dissemination of information in violation of these provisions violates the Food, Drug and Cosmetic Act. 21 U.S.C. § 331(z).

13.    Although these requirements permit pharmaceutical companies to disseminate to physicians and other health care practitioners qualified forms of written information concerning the safety, effectiveness, or benefit of a use not described in the approved labeling of a drug, 21 U.S.C. § 360aaa(a), manufacturers are permitted to provide only authorized information in the form of unabridged peer-reviewed articles or qualified reference publications. *Id.* § 360aaa-1. This law also requires pharmaceutical companies to furnish federal regulators with advance copies of the information they disseminate. 21 U.S.C. §360aaa. Any deviation from these requirements violates FDA regulations.

- 4 -

## B.    Neurontin And The Off-Label Marketing Scheme

16.    In December 1993, the FDA approved Neurontin as "adjunctive therapy" for the treatment of certain types of seizures in adult patients suffering from epilepsy. "Adjunctive therapy" means that the drug could not be prescribed by itself for the treatment of epilepsy, but as an add-on drug in the event that a primary anti-epilepsy drug was not successful. The FDA approved labeling stated that Neurontin is only effective at dosages ranging from 900 to 1800 mg/day.

17.    Defendants' original patent on Neurontin was set to expire in December 1998. This meant that Defendants had exclusive rights to the drug for a mere 5 years. After the expiration of the Neurontin patent Defendants would be forced to share the market for Neurontin with generic drug manufacturers. This would substantially reduce Defendants' profits and their ability to keep Neurontin's retail price high.

18.    At the time Defendants filed their New Drug Application ("NDA") with the FDA, Defendants intended Neurontin to be used for other indications besides epilepsy adjunctive therapy. In the early to mid 1990's, Defendants even filed patents for Neurontin claiming it to be effective in the treatment of depression, neurogenerative disease, mania, bipolar disease and for anxiety and panic.

19.    Defendants never sought FDA approval, however, for the use of Neurontin to treat the conditions described in the patent applications.

20.    Defendants' sole purpose was profits. The market for the off-label uses of Neurontin such as pain management, psychiatric disorders, anxiety and depression, were much larger than the market for epilepsy alone.

MA029700000018

21.    Early on, Defendants intended to file supplemental NDAs in order to expand Neurontin's approved indications, including applications for monotherapy and for various psychiatric and neurological indications. However, by 1995 Defendants came to the conclusion it would be uneconomical to assume the expense necessary to conduct clinical trials necessary to prove that Neurontin was safe and effective for these uses. Assuming Neurontin could be proved to be safe and effective, the 1998 expiration of the Neurontin patent meant that generic manufacturers of Neurontin would reap much of the reward that comes with proving Neurontin could be safely used for other indications.

22.    After performing extensive economic analysis, senior officials for Defendants determined that it was not sufficiently profitable for Defendants to obtain FDA approval for Neurontin's alternative uses. Instead, Defendants' officials developed a strategy that would allow Defendants to avoid the costs of proving that Neurontin was safe and effective for these other uses, while allowing Defendants to compete in the lucrative off-label markets. As one aspect of the scheme, Defendants decided to employ a "publication strategy" that would allow it to promote Neurontin by the massive distribution of publications supposedly written by independent researchers that purportedly described the scientific evaluation of Neurontin. A clear advantage of this strategy, from Defendants' perspective, was that it could be employed immediately - there would be no need to wait for the results of scientifically conducted clinical trials to determine if Neurontin was actually effective in the treatment of these conditions.

23.    As set forth above, federal regulations did not permit Defendants to promote unapproved uses of Neurontin. Defendants were allowed, however, to distribute publications created by independent "third parties" that described results of off-label uses of Neurontin as long as these materials were given in response to unsolicited requests from physicians.

- 6 -

Defendants exploited this narrow exception by creating events and programs that would allow their employees and independent contractors to promote off-label uses under circumstances that would allow Defendants the chance to deny, wrongfully, that they had actually promoted and solicited off-label usage.

24.     Marketing executives at Parke-Davis headquarters in Morris Plains, New Jersey and in its five regional customer business units ("CBUs") selected a marketing strategy which would deliberately lead to increased off-label usage of Neurontin even though Defendants knew that they could not promote Neurontin lawfully for non-approved uses. These executives knew that Defendants were not supposed to create or design the contents of the communications that would be distributed pursuant to the "publication strategy" or do anything to generate the practicing physicians' interest in receiving such communications. As demonstrated below, Defendants ignored these legal requirements and, instead, put into effect a pervasive pattern of illegal conduct, lasting from at least 1994 through 1998, and Plaintiff believes, to the present.

25.     Significant ingenuity and resourcefulness was necessary in order to execute this unlawful scheme without detection. Faced with the fact that their "publication strategy" required publications from independent physicians when no such publications existed, Defendants hired non-physician technical writers to create articles for medical journals and then paid actual specialists to be the articles' "authors." Faced with the fact that their normal marketing force could not deliver the off-label message, Defendants trained "medical liaisons," technical employees who were supposed to provide balanced scientific information to doctors, to sell off-label and solicit interest in off-label uses. And faced with the fact that in order for a publication strategy to actually increase usage of a drug, Defendants had to have a large group of doctors interested in experimenting on patients, and an even larger group of doctors who were interested

- 7 -


in receiving information about those experiments. Defendants generated both groups by liberally distributing payments to both groups of physicians through "consultants" meetings, speakers bureaus, medical education seminars, grants, "studies," advisory boards and teleconferences.

26.    Defendants carried out this scheme through the following, among other things:

- illegal kickbacks to physicians who prescribed large amounts of Neurontin for off-label purposes to patients whose prescriptions were paid for by Plaintiff and the class;

- the formation of a nationwide network of employees falsely referred to as "medical liaisons" whose actual assigned duties consisted entirely of conventional direct sales activities and which did not include any legitimate scientific activity;

- the illegal direct solicitation of physicians for off-label uses;

- the making of false statements to physicians and pharmacists concerning the efficacy and safety of Neurontin for off-label uses;

- the payment or offering of gratuities to Defendants' employees in order to procure their silence; and

- the active training of Defendants' employees in methods of avoiding detection of their activities by the FDA.

## C.    Defendants Used "Medical Liaisons" To Promote Off-Label Use

27.    Pursuant to federal regulations, Defendants' usual sales force was not permitted to promote off-label uses of Neurontin to their physician customers. The FDA, however, permitted drug company representatives to provide balanced, truthful information regarding off-label usage if (1) specifically requested by a physician and (2) if there was no attempt to solicit such information by the drug company.

28.    Beginning in 1995, Defendants increasingly hired "medical liaisons" and trained them to aggressively solicit requests for off-label information from physicians. Once this door was open, Defendants trained these medical liaisons to engage in full scale promotion of Neurontin's off-label uses, including repetitive distribution of non-scientific, anecdotal

- 8 -

information designed to convince physicians that off-label usage of Neurontin was safe and effective. In effect, Defendants used the medical liaisons as a surrogate sales force that had liberty to solicit physicians regarding off-label uses. Indeed, medical liaisons were selected and promoted based on their ability to sell.

29.     Defendants knew their use of these medical liaisons was unlawful, but continued the practice. In fact, the whistleblower in the *qui tam* action, Dr. David Franklin, was told by Defendants that the use of medical liaisons were merely "disguised" ways of getting around the FDA rules.

30.     For example, on April 16, 1996, at a training session for medical liaisons, Defendants' in-house lawyers stopped the video taping of a medical liaison training session to advise the liaisons that notwithstanding formal policies to the contrary, liaisons could "cold call" on physicians so long as they had executed request forms, i.e. forms that supposedly verified that the physician had initiated the meeting, at the end of the call. The liaisons were informed that the request forms could be filled out by Defendants sales' representatives instead of the doctors. Company lawyers also informed the liaisons in training that there was no need to present balanced information to the customers and those liaisons should always remember that sales were necessary in order to keep the company profitable. The liaisons were also informed by the lawyers, off camera, that there really was no definition of "solicitation" and that there were methods to induce the physicians to inquire about off-label uses. In effect, once the medical liaison got a meeting with a doctor, there were ways to get the information about off-label uses to the doctor even if the physician had not actually requested off-label information. The lawyers also warned the liaisons that under no circumstances should any information about off-label uses be put in writing.

- 9 -

31.    Medical liaisons were instructed in the clearest possible terms that they were to market and sell Neurontin based on its off-label uses. For example, on a teleconference on May 24, 1996, John Ford, a senior marketing executive for Defendants directly informed the medical liaisons that in order to market Neurontin effectively, Neurontin had to be marketed for monotherapy, pain, bipolar disorder, and other psychiatric uses, all of which were off-label. Ford conceded that such marketing had to be primarily performed by the medical liaisons, because they were the only ones who could discuss these matters. At another meeting with the medical liaisons, Ford was even more straightforward. He said:

> I want you out there every day selling Neurontin. Look this isn't just me, it's come down from Morris Plains that Neurontin is more profitable...We all know Neurontin's not growing adjunctive therapy, beside that is not where the money is. Pain management, now that's money. Monotherapy, that's money. We don't want to share these patients with everybody, we want them on Neurontin only. We want their whole drug budget, not a quarter, not half, the whole thing....We can't wait for them to ask, we need to get out there and tell them up front...That's where we need to be holding their hand and whispering in their ear, Neurontin for pain, Neurontin for monotherapy, Neurontin for bipolar, Neurontin for everything...I don't want to see a single patient coming off Neurontin until they have been up to at least 4800 mg/day. I don't want to hear that safety crap either, have you tried Neurontin, every one of you should take one just to see there is nothing, it's a great drug.

32.    Medical liaisons were trained with a "pitch" to cold call physicians who saw the most patients in a given specialty, and sell them on the off-label benefits of Neurontin. A key aspect of this scheme was misrepresentation. The first misrepresentation was usually the status of the medical liaisons as they, with the full approval of Defendants' marketing officials such as John Ford, Phil Magistro, and John Krukar, were routinely introduced as specialists in the specific drug they were presenting at a particular meeting. Medical liaisons were also encouraged to represent themselves as medical researchers, even though they neither conducted

- 10 -

medical research nor analyzed medical research performed by others. It was also not uncommon for medical liaisons to be introduced as physicians, even though they had no such qualifications. Sales personnel were instructed to introduce medical liaisons as scientific employees who were given momentary leave of their academic duties to make an individual appearance.

33.  Other aspects of this pitch (labeled the "Neurontin Cold Call Story") included the following aspects:

- Mention that you are the eyes and ears of Defendants' research and that you are gathering clinical info;

- Then ask general questions about the nature of the practice;

- Mention Neurontin and its approved uses, but dismiss them as old news;

- Ask leading questions about the number of pain patients that the practice sees;

- Ask a series of questions that determine the practice profile for all of the potential off-label uses;

- Reveal that Defendants have "a great deal of information about the fantastic response rate of patients on Neurontin in all of these disease states";

- Move into a discussion of the clinical trials that this information is demanding;

- And the "90-95% response rate that we are seeing in more than 80% of patients";

- Present the doctor with any publications that are available and point out that many common drugs for pain treatment are in few if any publications;

- Ask the physician to place some patients on Neurontin and tell them that the medical liaison will stay in touch to help develop any case reports;

- Mention that case reports can be lucrative and can lead to clinical trials;

- Offer to do a presentation and luncheon for the entire practice or a group of his friends that will detail all of the "data" we have;

- Invite the physician to consultant meetings in the future and point out that they pay $250 plus a nice trip or meal in the city; and

MA029700000018

- If a sales representative is present they should close the sale by asking that the next patient he sees should be put on Neurontin.

34. During a training session for medical liaisons, Dr. Franklin first witnessed the scope of the off-label claims that Defendants intended to market Neurontin. The medical liaisons were provided with new company slides that detailed the method to use to increase the use of Neurontin in several different off-label practice types. The slide show contained a slide that showed the "Anecdotal Uses of Neurontin" including reflex sympathetic dystrophy, peripheral neuropathy, diabetic neuropathy, trigeminal neuralgia, post-herpetic neuralgia, trigeminal neuralgia, post-Herpetic neuralgia, essential tremor, restless leg syndrome, attention deficit disorder, periodic limb movement disorder, migraine, bipolar disorder, Lou Gehrig's Disease, and drug or alcohol withdrawal seizures.

35. Defendants' executives explained that "this list was very important to the company but that it makes Neurontin look like snake oil, so preempt the laughter by telling your physicians that, 'I'm embarrassed to show you the next slide because it makes Neurontin look like snake oil, but the fact is, we are seeing extra-ordinary results, in some cases up to 90% response in all of these conditions, that will get their attention.'" Richard Grady, a medical liaison, asked if "we have any money to lace studies without big docs." He was instructed to "use the potential of a study to get in the door, even get protocols, but don't waste too much time and don't say you can get them a study, we don't have much money left." He was then told that "if anyone asks for back-up data say we are pulling it together, then suggest that the doc put some of his patients on Neurontin and we will help him publish case reports that could help place a study in his practice. Everybody wins."

36. Importantly, none of the off-label claims made in the slide had been substantiated, let alone approved, by the FDA.

37. Defendants also made extensive misrepresentations regarding the scientific information concerning off-label usage of Neurontin. According to Dr. Franklin, the following misrepresentations relating to off-label usage of Neurontin were routinely made to physicians

- 12 -

with Defendants' knowledge and consent:

- **Bipolar Disorder**: Medical liaisons informed psychiatrists that early results from clinical trials evaluating Neurontin for the treatment of bipolar disorder indicated a ninety percent (90%) response rate when Neurontin was started at 900 mg/day dosage and increased to a dosage of 4800 mg/day. No such results existed. Nor was any type of clinical trial being conducted other than a pilot study. There were no clinical trials or studies indicating that Neurontin was safe or effective up to 4800 mg/day. Indeed, Defendants were in possession at this time of clinical trial evidence which showed that there was no dose response difference between patients who received 600 mg/day, 1200 mg/day and 2400 mg/day. Any data relating to the use of Neurontin in bipolar disorder was strictly anecdotal and of nominal scientific value. Indeed, most of the published reports on this topic had been written and commercially sponsored by Defendants, although this fact was hidden. Medical liaisons were trained to inform psychiatrists that there were 110 reports of adverse effects for Neurontin when used for psychiatric purposes. In fact, such reports had been reported to Defendants' personnel, but Defendants attempted to hide such reports from physicians.

- **Peripheral Neuropathy, Diabetic Neuropathy, and Other Pain Syndromes**: Medical liaisons were trained and instructed to report that "leaks" from clinical trials demonstrated that Neurontin was highly effective in the treatment of various pain syndromes and that a ninety percent (90%) response rate in the treatment of pain was being reported. No such body of evidence existed. Nor was there any legitimate pool of data from which a response rate, much less a ninety percent (90%) response rate, could be calculated. Medical liaisons were trained to claim support for these findings as a result of inside information about clinical trials where no such information existed. The only support for these claims was anecdotal evidence of nominal scientific value. Many of the published case reports had been created and/or sponsored by Defendants in articles which frequently hid Defendants' involvement in the creation of the article. Defendants' payment for the creation of these case reports was also hidden from physicians.

- **Epilepsy Monotherapy**: Medical liaisons were strongly encouraged to push neurologists to prescribe Neurontin as the sole medication to treat epilepsy, even though studies only found it safe and effective as adjunctive therapy. Medical liaisons were trained to inform neurologists that substantial evidence supported Defendants' claim that Neurontin was effective as monotherapy. In fact, at this time, Defendants knew that clinical trials regarding Neurontin's efficacy as a monotherapy were inconclusive. One of Defendants' clinical trials demonstrated that Neurontin was not an effective monotherapy agent; the vast majority of patients in the study taking Neurontin were unable to continue with Neurontin alone. The same study showed that there was no effective difference between administration of Neurontin at 600, 1200 or 2400 mg. Notwithstanding this data, Defendants continued to claim that physicians should use Neurontin as substantially higher doses than indicated by the labeling. Indeed, although

- 13 -

medical liaisons routinely claimed Neurontin to be effective as monotherapy, in 1997 the Food and Drug Administration refused to find Neurontin a safe and effective monotherapy.

- **Reflex Sympathetic Dystrophy ("RSD")**: Medical liaisons informed physicians that extensive evidence demonstrated the efficacy of Neurontin in the treatment of RSD. The only such evidence that existed was anecdotal reports of nominal scientific value. Medical liaisons were trained to refer to case reports, most of which had been created or sponsored by Defendants, as "studies."

- **Attention Deficit Disorder ("ADD")**: Medical liaisons were instructed to inform pediatricians that Neurontin was effective for the treatment of ADD. No data, other than occasional anecdotal evidence, supported this claim. Nonetheless, the medical liaisons were trained to report that large number of physicians had success treating ADD with Neurontin, when no such case reports existed.

- **Restless Leg Syndrome ("RLS")**: RLS was another condition where Defendants' medical liaisons were trained to refer to a growing body of data relating to the condition, when no scientific data existed. The only reports were anecdotal, most of which had been created and/or sponsored by Defendants.

- **Trigeminal Neuralgia**: Although medical liaisons represented that Neurontin could treat Trigeminal Neuralgia, again no scientific data supported this claim with the exception of occasional anecdotal reports. No data demonstrated that Neurontin was as effective as currently available pain killers, most of which were inexpensive.

- **Post-Herpatic Neuralgia ("PHN")**: Medical liaisons were trained to tell physicians that seventy-five percent (75%) to eighty percent (80%) of all PHN patients were successfully treated with Neurontin. Once again, no clinical trial data supported such a claim.

- **Essential Tremor Periodic Limb Movement Disorder**: Medical liaisons were trained to allege that Neurontin was effective in the treatment of these conditions. No scientific data supported such claims with the exception of anecdotal reports of nominal scientific value.

- **Migraine**: Claims that Neurontin was effective in the treatment of migraine headaches were made by the medical liaisons and were supposedly based on early results from clinical trials. Although pilot studies had been suggested and undertaken, no early results of clinical trials existed to support these claims. Once again, any data relating to treatment of migraines was purely anecdotal and of nominal scientific value. Most of the case reports were either created or sponsored by Defendants.

- **Drug and Alcohol Withdrawal Seizures**: Medical liaisons suggested that

- 14 -

MA029700000018

Neurontin be used in the treatment of drug and alcohol withdrawals despite the lack of any data supporting Neurontin as an effective treatment for these conditions.

38.     Defendants knew and intended for physicians to rely on these misrepresentations. These physicians did so and consequently provided inaccurate and untruthful medical advice to their patients. Regardless, Defendants' personnel routinely made these misrepresentations as part of company policy. Along with Dr. Franklin, some of the other physicians who were lied to were Michael Davies, Joseph McFarland, Phil Magistro, Lisa Kellett, Joseph Dymkowski, Darly Moy, Richard Grady, Ken Lawler, and many others.

39.     Dr. Franklin also reported that Defendants were guilty of the following conduct:

- Upon order of the company and as a result of training of medical liaisons, Dr. Franklin "deliberately contrived reports to mislead physicians into believing that a body of data existed that demonstrated the effectiveness of Neurontin in the treatment of bipolar disease."

- Dr. Franklin was trained and instructed to actively deceive physicians with contrived data, falsified "leaks" from clinical trials, scientifically flawed reports, or "success stories" that stated that Neurontin was highly effective in the treatment of a variety of pain syndromes. No such body of evidence existed.

- He was instructed to advise physicians that Defendants has developed a large body of data to support the use of Neurontin as monotherapy. This was an "outright lie" and left patients unknowingly without good seizure control.

- Medical liaisons were instructed to tell physicians that a great deal of data existed that supported the safe use of Neurontin at levels that exceed 4800 mg/day. However, clinically significant safety data existed at dosing levels at only 1800 mg/day.

- Defendants provided medical liaisons with slides that stated that Neurontin was effective for the treatment of Attention Deficit Disorders but no data existed to support that claim.

**D.     Defendants' Illegal Payments to Doctors**

40.     Defendants' "publication strategy" required physicians and the "medical liaisons" to perform the work normally performed by the company's salesmen in order to promote

- 15 -

MA029700000018

Neurontin. Adoption of this strategy required Defendants to make tens of thousands of payments to the physicians who would act as a surrogate sales force was as well as practicing physicians who would receive the message. In other words, adoption of the publication strategy required Defendants to make thousands of payments to physicians for the purpose of having those doctors either recommend the prescription of Neurontin or to order Neurontin, in violation of federal kickback regulations. Defendants were aware that these regulations were violated routinely. The following describes the various programs Defendants used to make these payments to physicians:

### 1.    Consultants' Meetings

41.    Defendants used "consultants' meetings" to make illegal payments to physicians to encourage off-label use of Neurontin. Federal rules prohibit "kickbacks" to physicians and medical care providers in exchange for prescribing a particular drug. Defendants disguised their kickbacks as "consultantships."

42.    Under this guise, Defendants recruited physicians to dinners or conferences and paid them to hear presentations about off-label uses of Neurontin. Under the fiction that these doctors were acting as consultants, Defendants sometimes (but not always) had the doctors sign sham consulting agreements. At these meetings, Defendants would give these doctors lengthy presentations relating to Neurontin, particularly regarding off-label usage. Presentations would be made by Defendants' employees or physician speakers hired by Defendants for the purpose of promoting Neurontin, and attendees' questions relating to the administration of Neurontin use would be solicited and answered. At some conferences, the sponsoring organization or Defendants intentionally posed questions to the speakers about off-label use to insure that attendees were exposed to such information.

- 16 -

43.    At some, but not all, "consultants" meetings a few questions would be posed to the consultants regarding Defendants' marketing of Neurontin or how Defendants sales force could provide better service to the doctors. The consultants' meetings, however, were not held, and the consultants were not paid, for the purpose of providing Defendants with expert, independent advice. Defendants in many cases did not even record the "advice" provided by its consultants and what advice was collected was never acted upon or reviewed.

44.    Defendants did, however, routinely analyze whether the consultants' meetings were successful in getting the attendees to change their prescription writing practices. At some meetings, the consultants were directly asked if they would write more Neurontin prescriptions as a result of the meeting. Such a question would have been irrelevant if the actual purpose of the meeting was to receive the consultants' advice. Defendants also routinely tracked consultants' Neurontin prescription writing practices after these meetings. Using market data purchased from third parties, Defendants analyzed whether the doctors they had paid had in fact written more Neurontin prescriptions after the meeting. Again, such data was only relevant if the real purpose of the payments was to influence the doctors to order more Neurontin.

45.    A typical consultants' meeting was held in Jupiter Beach, Florida for neurologists from the North East CBU during the weekend of April 19-21, 1996. The "consultants" selected for this meeting were not chosen on the basis of their consulting acumen, but because of their potential to write Neurontin prescriptions. In a memorandum announcing the event to Defendants' personnel, the "Neurontin Marketing Team" acknowledged that in order to target neurologists with the greatest potential for writing Neurontin prescriptions, sales personnel must select potential attendees from a list of top prescription writers for anti-epileptic drugs in the Northeast; only persons who fell within this desirable demographic were allowed to be invited.

- 17 -

MA029700000018

46.     Qualifying physicians were given round-trip airfare to Florida (worth $800.00), two nights accommodations (worth $340.00), free meals and entertainment, ground transportation and a "consultant's fee" of $250.00. Ample time was provided so that Defendants' consultants could enjoy the beach resort. The value of the junket was approximately $2,000.00 per physician.

47.     The Jupiter Beach consultants meeting included two half days of presentations by Defendants relating to Neurontin, including extensive presentations relating to off-label uses. Although technically the presentations were provided by an independent company, Proworx, all aspects of the presentation were designed, monitored, and approved by Defendants. Defendants selected the speakers, picked the presentation topics, and previewed the content of the presentations to make sure that they were acceptable. Defendants paid all expenses relating to the consultants' meeting including all payments to the attendees and the presenters, all travel, accommodation, meals and entertainment expenses, all presentation expenses, all expenses and fees incurred by Proworx, and the substantial fees paid to the presenting physicians. Notwithstanding the FDA's prohibition regarding the provision of promotional materials on off-label uses, Defendants provided written abstracts of the presentations that detailed off-label use of Neurontin to each of its "consultants."

48.     Defendants made no effort to obtain professional advice at Jupiter Beach from the consultants Defendants had entertained during the weekend. A follow-up memorandum to Defendants' marketing officials noted that "the participants were delivered a hard hitting message about Neurontin" and emphasized that the participants were encouraged to use Neurontin at higher doses. More importantly, after the conference Defendants generated "trending worksheets" listing the doctors who attended the consultants' meeting. These

- 18 -

MA029700000018



worksheets enabled Defendants to track Neurontin prescription habits of the attendees before and after the consultants' meetings to determine if these "high writing" prescribers wrote more Neurontin prescriptions after the conference. Persuading these heavy prescribers to order more Neurontin for their patients was, in fact, the sole purpose of the Jupiter Beach meeting.

49. Defendants hosted dozens of similar consultants' meetings between late 1995 and 1997 in which the consultants received payments and gratuities as well as presentations on off-label Neurontin use designed to change the physicians' prescription writing habits. Comparable consultants' meeting included, but were not limited to the following:

| Topic | Location | Dates |
|---|---|---|
| Mastering Epilepsy | La Costa Resort, CA | July 20-23, 1995 |
| Mastering Epilepsy | Santa Fe, NM | Nov. 16-19, 1995 |
| Neurontin Consultants Conference | Marco Island, FL | February 2-4, 1996 |
| Pediatric Epilepsy | Hutchinson Island, FL | February 9-11, 1996 |
| Mastering Epilepsy | Walt Disney World, FL | February 22-25, 1996 |
| Pediatric Epilepsy | Hutchinson Island, FL | March 8-10, 1996 |
| Mastering Epilepsy | Ritz Carlton, Aspen, CO | April 18-21, 1996 |
| Affective Disorders in Psychiatry | Marco Island, FL | April 20, 1996 |
| Affective Disorder Consultants Conference | Southern Pines, NC | April 27, 1996 |
| Neuropathic Pain Conference | Palm Beach, FL | May 11, 1996 |
| Regional Consultants Conference | Ritz Carlton, Boston, MA | May 10-11, 1996 |
| Epilepsy Management Advisors Meeting | Sheraton Grande Torrey Pines, La Jolla, CA | June 21-23, 1996 |
| Epilepsy Management | Rancho Bernardo, CA | June 28-30, 1996 |

- 19 -

| Use of Anti-Convulsants in Psychiatric Disorders | Short Hills, NJ | October 18-19, 1996 |
| Non-epileptic Uses of Neurontin | Longboat Key, FL | Nov. 6, 1996 |
| Neurological Conditions Conference | Ritz Carlton, Atlanta, GA | Sept. 27-28, 1997 |

Other "consultants" meetings took place at Charleston, SC, Coconut Grove, FL, Naples, FL, Memphis, TN, Louisville, KY, Washington, D.C., Aspen, CO, and other places. Hundreds, if not thousands, of physicians received kickbacks to attend those events.

50.    Not all payments to consultants were made at conferences as elaborate as Jupiter Beach. Many such meetings consisted of expensive dinners at local restaurants. The emphasis on these meetings was also on off-label uses, and $200 "honorariums" were paid to the physicians who did nothing for the payment except show up. At none of the events did the consultants provide legitimate consultation to Defendants, but at all of the events the consultants were encouraged to increase their Neurontin prescription writing.

### 2.    Medical Education Seminars

51.    Another format where Defendants paid kickbacks to physicians to hear off-label promotion of Neurontin were programs billed as Continuing Medical Education seminars ("CME"). These conferences and seminars were set up to appear to qualify for an exception to the FDA's off-label marketing restrictions which permits physicians to learn about off-label uses of pharmaceuticals at independent seminars. Such seminars, however, must be truly independent of the drug companies. The drug companies may make "unrestricted grants" for the purpose of a seminar, but may not be involved in formulating the content of the presentations, picking the speakers, or selecting the attendees. None of these requirements were observed with regard to the CME seminars sponsored by Defendants for the promotion of off-label uses of Neurontin. While Defendants retained third party organizations, such as Proworx, to present the event

- 20 -

MA029700000018

seminars, it had control of virtually every aspect of these events, and the seminar companies obtained Defendants' approval for all content presented at the seminars. Defendants also paid all expenses, including all the seminar companies' fees.

52.    Although the seminar companies acted as the conduit for the payments and gratuities given to the physician attendees, like the Jupiter Beach consultants' meetings, Defendants controlled every aspect of the CME programs. Defendants designed and approved the programs; hand-picked the speakers for the seminars; approved the seminar presentations of the seminars; previewed, in most cases, the contents of the seminars prior to delivery; selected the attendees based on their ability and willingness to prescribe high quantities of Neurontin; evaluated the presentations to make sure Defendants' "message" was appropriately delivered; black-listed presenters whose presentations were not sufficiently pro-Neurontin; and monitored the prescribing patterns of the physicians who attended these conferences to insure the purpose of the conference – increased writing of Neurontin prescriptions – was achieved. Follow-up reports to marketing executives for Defendants highlighted that the attendees received presentations regarding off-label marketing and recommendations for dosages larger than those labeled effectively by the FDA. These memoranda also reported to senior executives the pledges made by attendees to order more Neurontin for their patients.

53.    For some seminars, high prescription writing physicians were selected to receive junkets comparable to those Defendants provided to the attendees of the Jupiter Beach "consultants" meetings. Others were less lavish, but physicians received free tuition, free accommodations, free meals, and cash. Frequently the Defendants' CME seminars were accredited by continuing medical education organizations, which meant that the physicians taking advantage of Defendants' junkets did not have to pay tuition or spend additional time to

- 21 -

MA029700000018

- $2,000.00 to Berge Ninmpolan, MD, "a great Neurontin believer," to attend a neurology seminar in San Francisco, in March 1996;

- $1,000.00 to the University of Texas at Houston, Department of Neurology to host a symposium where presentations would be made regarding successful off-label treatment with Neurontin;

- $3,000.00 to the University of Texas Medical School to host a conference in August 1996 at which a well known specialist in epilepsy, who prescribed Neurontin, would attend;

- $4,000.00 to pay for a neurologist from the University of Texas at San Antonio to attend the American Epilepsy Society Conference in December 1996, a conference at which Defendants was presenting extensive documentation on off-label uses for Neurontin;

- $2,500.00 to the University of Texas at Houston to bring Dr. B.J. Wilder to the campus to hold a seminar. Dr. Wilder was one of Neurontin's biggest boosters for off-label indications and had been paid tens of thousands of dollars to promote Neurontin's off-label uses for Defendants across the country;

- $2,500.00 in June 1996 to pay for representatives from the University of Pennsylvania Medical Center to attend a conference in Saint Petersberg, Russia on the utilization of anti-epileptic drugs, including Neurontin;

- $5,000.00 to Dr. Alan B. Ettinger, of Stony Brook, NY in December 1996, a physician who had informed Defendants that he was interested in possibly doing research in Neurontin and maintained a database of patients who were treated with Neurontin;

- $500.00 to Bruce Ehrenberg, of Boston, MA, a leading speaker for Defendants regarding off-label uses of Neurontin, to attend a conference in China;

- $1,000.00 to Israel Abrams, M.D., Paul C. Marshall, M.D., Beth Rosten, M.D. and Spencer G. Weig, M.D., of Worcester, MA, for educational programs in February 1996. According to the local Defendants' representative requesting the grant, "much of the Neurontin success in Worcester has been attributed to...the 4 pediepileptologists below.";

- $1,400.00 to Dr. Ahmad Beydoun of Ann Arbor, MI for post-graduate training in March 1996. This grant was processed on a quick turnaround, the Defendants representative noting "I realize that this is a very short time line; however, Dr. Beydoun is a very important customer.";

- $1,500.00 to Jim McAuley, Ph, Ph.D. for educational materials relating to epilepsy. Defendants decided to provide the funds because McAuley was an

MA029700000018

fulfill their continuing medical education licensure requirements by attending truly independent medical education programs.

54.    Representative CME programs sponsored by Defendants where they paid extensive kickbacks to attending physicians, included, but are not limited to, the following:

| Seminar | Location | Date |
|---------|----------|------|
| Merritt-Putnam Epilepsy Postgraduate Course | unknown | January 19, 1996 |
| Merritt-Putnam Seminar | Chicago, IL | January 26, 1996 |
| New Frontiers in AntiEpileptic Drug Use | California | Sept.-Oct. 1996 |
| Diabetic Neuropathy | Ritz Carlton, Boston, MA | June 22-24, 1997 |
| Merritt-Putnam Symposium | Key Biscayne, FL | September 11, 1997 |
| Merritt-Putnam Conference on Monotherapy | Palm Springs, CA | September 9, 1997 |
| Merritt-Putnam Conference on Monotherapy | St. Louis, MO | October 3, 1997 |
| Merritt-Putnam Symposium | Boston, MA | December 5, 1997 |

### 3.    Grants and "Studies"

55.    Defendants also made outright payments, in the form of grants, to reward demonstrated Neurontin believers and advocates. Defendants' sales managers identified key doctors who actively prescribed Neurontin or programs which were willing to host Neurontin speakers and encouraged such persons or programs to obtain "educational grants" from Defendants. Under this program of kickbacks Defendants paid:

- 22 -

advocate of Neurontin and he was important in getting another Defendants' drug, Cerebyx, accepted on the formulary for Ohio State University; and

- A grant in an unknown amount to University Hospital in Cleveland in exchange for the hosting programs regarding Neurontin's use in treating neuropathic pain at conferences specifically devoted to obtaining referrals from other doctors.

56.    These grants, and others, were charged to the Neurontin marketing budget. Each of these grants was made solely because an individual who would receive the money was a large Neurontin supporter or would host a program where a well-known Neurontin supporter would recommend that other physicians increase their prescriptions of Neurontin. Each of these grant awards constituted a reward or kickback for the recipient's advocacy of Neurontin.

57.    Defendants' medical liaisons informed leading Neurontin subscribers that significant advocacy for Neurontin would result in the payment of large grants. These studies did not involve significant work for the physicians. Often they required little more than collating and writing up office notes or records. Indeed, as noted below, Defendants frequently hired technical writers to write the articles for which the "authors" had been given grants.

58.    Defendants were aware that these articles and studies provided minimal scientific benefit. In a letter to the FDA in June 1997, Defendants submitted a list of "studies relating to pain, pain syndromes, and psychiatric disorders" which failed to include any of these numerous studies, purportedly funded by Defendants. Defendants intentionally neglected to report these "studies" to the FDA and concealed these "studies" from the FDA because they knew the funded "research" had no scientific value and would not be deemed to be studies by the FDA. Payments Defendants made for "studies" included, but were not limited to the following:

| Funded Project | Payee | Payment |
|---|---|---|
| Statistical Analysis of Patients Treated With Neurontin For Pain | Hans Hansen, M.D.; Statesville, NC | $7,000.00 |

- 24 -