studies, purportedly funded by Defendants. Defendants intentionally neglected to report these "studies" to the FDA and concealed these "studies" from the FDA because they knew the funded "research" had no scientific value and would not be deemed to be studies by the FDA. Payments Defendants made for "studies" included, but were not limited to the following:

| Funded Project | Payee | Payment |
|---|---|---|
| Statistical Analysis of Patients Treated With Neurontin For Pain | Hans Hansen, M.D.; Statesville, NC | $7,000.00 |
| Reduction of Sympathetically Medicated Pain and Sudomotor Function | David R. Longmire, M.D.; Russellville, AL | $7,000.00 |
| Data Entry for Neurontin and Pain Analysis | Travis Jackson, M.D., David Meyer, M.D.; Winston-Salem, NC | unknown |
| Trial of Neurontin for distal symmetric polyneuropathy associated with AIDS | Joseph Weissman, M.D. Atlanta, GA | $20,000.00 |
| Neurontin for neuropathic pain in chronic pain syndromes | Lavern Brett, M.D. Washington, D.C. | $25,000.00 |
| Retrospective chart analysis of Neurontin use with bipolar disorder patients | Ralph S. Rybeck, M.D. | $5,000.00 |
| Retrospective Analysis of Neurontin in the treatment of pain | David R. Longmire, M.D.; Russellville, AL | $2,000.00 |
| Retrospective Analysis of Neurontin in the treatment of chronic pain | Don Schanz, D.O. Traverse City, MI | $8,000.00 |
| Case histories relating to use of Neurontin as an adjuvant analgesic | Elizabeth J. Narcessian, M.D.; W. Orange, NJ | $4,000.00 |

Plaintiff has reason to believe that other payments were made to physicians for other "studies" of questionable scientific credibility.

59.    One particularly large study conducted by Defendants served as yet another engine to financially reward physicians for prescribing Neurontin.    In 1995 and 1996, Defendants conducted an enormous trial known as STEPS.  Although STEPS took the form of a research clinical trial, it was, in fact, a marketing ploy designed to induce neurologists to become comfortable prescribing Neurontin at a far higher dose than indicated in the FDA approved labeling.  While most clinical studies have a limited number of investigators treating a number of patients qualified for the study, the STEPS protocol called for over 1,200 "investigators" to enroll only a few points each.   The participating physicians were instructed to titrate their patients to higher than labeled dosages of Neurontin to demonstrate that patients could tolerate high dosages of the drug.  Rewarding physicians for prescribing high doses of Neurontin was another way to increase Neurontin sales because higher per patient dosages increased the amount of Neurontin sold.  Additionally, the STEPS study was also designed to habituate physicians to place non-study patients on Neurontin on doses higher than found effective in the clinical trials monitored by the FDA.

60.    Physicians enrolling in the STEPS study were paid for agreeing to participate in the study and for every patient enrolled.  At the conclusion of the study, Defendants offered each of the 1,200 investigators additional cash for each patient the doctor kept on Neurontin after the study ended.  These payments were unquestionably kickbacks; each participating doctor was expressly paid for writing Neurontin prescriptions for their patients.  The number of investigators who received such payments is too many for Plaintiff to list.  Additionally, Defendants have exclusive control of the information regarding who received such payments at the conclusion of the STEPS trial.

### 4.    Payments to "Authors" of Ghost Written Articles

61.    Yet another method of rewarding doctors for their advocacy of Neurontin was to pay them honorarium for lending their names to scientific articles which were actually prepared and written by third parties retained by Defendants.    In 1996, Defendants retained AMM/ADELPHI, Ltd. ("AMM") and Medical Education Systems, Inc., ("MES") to prepare no less than twenty (20) articles for publication in various neurology and psychiatry journals. Most of these articles concerned off-label usage of Neurontin and were generated so that Defendants would have completely controlled publications they could distribute pursuant to their "publication strategy."    The content of these articles were actually written by non-physician technical writers retained by Defendants, and Defendants had the right to control the content of all the articles.    Defendants paid all expenses in connection with the creation of these publications.

62.    Once Defendants and the technical writers conceived the articles, Defendants and their outside firms attempted to find recognized Neurontin prescribers whose names could be used as the authors of these articles.    In some cases, drafts of the articles were completed even before an "author" agreed to place his or her name on the article.    This even occurred in connection with case histories that purported to describe the "author's" personal treatment of actual patients. The "authors" were paid an honorarium of $1,000.00 to lend their names to these articles, and also were able to claim publication credit on their curriculum vitae.

63.    Defendants and their outside firms found journals that would publish the articles. Defendants' role in creating, approving and sponsoring the articles was hidden from the public. While the articles might reference that the author received an honorarium from the outside firm, the articles failed to state that the honorarium was paid with money provided by Defendants and

27

that Defendants had approved the content and hired the actual authors. For example, an article created by Medical Education Systems ("MES"), *Gabapentin and Lamotrignine: Novel Treatments for Mood and Anxiety Disorders,* published in CNS Spectrums noted that "an honorarium was received from Medical Education Systems for preparation of this article," but never revealed Defendants' retention and payment of MES or the fact the MES personnel, while under contract to Defendants, wrote the article.

64.    Defendants used these publications as part of their publication strategy by presenting the articles as evidence of independent research conducted by persons with no monetary interest in Neurontin. This impression, of course, was false. Defendants created the articles to promote off-label uses for Neurontin, purchased the names and reputations of the authors with kickbacks and controlled the content of the articles.

### 5.    Speakers' Bureau

65.    Defendants also founded the Speakers' Bureau, another method to make large and numerous payments to physicians who recommended Neurontin at teleconferences, dinner meetings, consultants meetings, educational seminars, and other events. These speakers repeatedly gave short presentations relating to Neurontin for which they were paid anywhere from $250.00 to $3,000.00 per event. Speakers such as Steven Schachter, B.J. Wilder, Ilo Leppik, Gary Mellick, David Longmire, Gregory Bergey, Michael Merren, David Treiman, Michael Sperling, Martha Morrell, R. Eugene Ramsay, John Pellock, Ahmad Beydoun, Thomas Browne, John Gates, Jeffrey Gelblum, Dennis Nitz, Robert Knobler and others received tens of thousands of dollars annually in exchange for recommending to fellow physicians that Neurontin be prescribed, particularly for off-label uses. The payments that these doctors received were far in excess of the fair market value of the work they performed for Defendants. Speakers who

most zealously advocated Neurontin were hired most frequently for speaking events, notwithstanding the fact that many of these events purported to be independent medical education seminars where independent information was supposed to be delivered. The identity of the doctors in the Speaker's Bureau who received kickbacks through excessive compensation can only be determined after review of the records in the exclusive custody of the Defendant.

66.    Defendants' marketing personnel, including its medical liaison staff, informed physicians of the lucrative rewards of joining the Neurontin Speaker's Bureau. Physicians were informed that if they prescribed enough Neurontin, they, too, could also be eligible for receiving substantial payments just for describing their clinical experience to peers at events dedicated to promoting Neurontin's off-label uses. Defendants' marketing personnel, however, made it clear that the only way the doctors could receive such cash payments was if they prescribed substantial amounts of Neurontin to their patients, preferably for off-label uses.

67.    Defendants either knew that the payments described above constituted kickbacks or acted in reckless disregard of federal laws and regulations that prohibit such kickbacks. They also knew that federal safe harbors did not cover the extensive payments their made to doctors. Moreover, Defendants were aware that their payments did not comply with the AMA's guidelines for payments to physicians.

68.    In 1997, in the wake of an investigation by the FDA, Defendants conducted a review of their marketing practices in light of existing Federal kickback regulations. As a result of that review, Defendants determined that none of the programs described above should have been conducted in the manner previously conducted by Defendants. Defendants issued guidelines to comply with the Federal regulations which essentially prohibited each of the programs described above. Nonetheless, the payments to physicians for the off-label marketing

of Neurontin did not cease and the programs continued at least until 1998. Defendants' records demonstrate payments of inappropriate kickbacks to doctors through 1998, and perhaps up to the guilty plea in May, 2004.

## CLASS ACTION ALLEGATIONS

69.     Plaintiff brings this class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a general class (the "Class") consisting of:

> All insurance providers and other third party payors, including self-funded plans, but excluding governmental entities, that paid Neurontin expenses incurred by any consumer after being prescribed said medication for medical conditions other than those conditions for which Neurontin was approved by the U.S. Food & Drug Administration in the United States and Puerto Rico from January 1, 1994 to the present time.

70.     Excluded from the Class are: (i) all present and former authorized agents and spouses of such authorized agents of Defendants; (ii) all present and former employees and spouses of such employees of Defendants; (iii) any Class member who timely elects to be excluded from the Class; and (iv) all members of the judiciary of this Court and their immediate families.

71.     The proposed Class is sufficiently definite so that it is administratively feasible to determine whether a particular individual is a member. Also, the proposed Class consists of thousands of members, and therefore, is so numerous that joinder is impractical.

72.     Plaintiff's claims are typical of the claims of the Class because Plaintiff, like all Class members, paid for Neurontin for off-label uses not approved by the FDA.

73.     There are questions of law and fact common to the Class which include, but are not limited to:

> a.     Whether Defendants developed and carried out a uniform national pattern of conduct. whereby physicians, consumers and TPPs were duped into

believing the off-label uses promoted by Defendants were approved by the FDA;

b.    Whether Defendants knew or should have known that Neurontin was not approved by the FDA for purposes other than as a secondary drug for the treatment of epilepsy;

c.    Whether Defendants intentionally misrepresented the intended and approved uses of Neurontin through employees and "medical liaisons" employed to promote off-label uses for Neurontin;

d.    Whether Defendants knew or were reckless in not knowing the nature and condition of the products sold to the consuming public;

e.    Whether Defendants embarked on an illegal scheme to provide kickbacks to physicians prescribing large amounts of Neurontin for off-label purposes to consumers;

f.    Whether Defendants recklessly and/or intentionally, concealed the intended use of Neurontin from Plaintiff and members of the Class;

g.    Whether Defendants recklessly and/or intentionally made false statements to physicians and pharmacists concerning the efficacy and safety of Neurontin for off-label uses;

h.    Whether Defendants' conduct has resulted in a violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962 *et seq.*;

i.    Whether Defendants' conduct has resulted in a violation of Louisiana's Unfair Trade Practices Act, LSA-R.S. 51:1405 *et seq.*;

j.    Whether Defendants' conduct has resulted in unjust enrichment at the expense of Plaintiff and the Class;

k.    Whether Plaintiff and Class members are entitled to compensatory and punitive damages, and the amount of such damages;

l.    Whether Plaintiff and Class members are entitled to equitable, declaratory and injunctive relief; and

m.    Whether Plaintiff and Class members are entitled to attorneys' fees.

74.    These common issues of law and fact predominate over individual issues pertaining to individual Class members and class certification is a superior method of resolving those claims.

75.    Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff is a member of the Class and is willing to serve as a representative of the Class. Plaintiff has retained counsel with substantial experience in prosecuting nationwide complex and third party payor class actions.  Plaintiff and Plaintiff's counsel are committed to vigorously prosecuting this action on behalf of the Class.

76.    Class certification pursuant to F.R.C.P. 23(b)(2) is appropriate because Defendants' course of dealing with members of the Class adversely affects all members of the Class, thereby making appropriate final and injunctive relief corresponding to declaratory relief with respect to the Class as a whole, whereby Defendants would be compelled to cease such course of dealing:

77.    Class certification pursuant to F.R.C.P. 23(b)(3) is appropriate because a class action is superior to all other available methods for the fair and efficient adjudication of this controversy and the questions of law or fact common to the members of the Class predominate over any questions affecting only individual Class members.  Moreover, the damages suffered by individual Class members are small compared to the burden and expense of individual prosecution of the litigation needed to address Defendants' conduct.  Further, it would be virtually impossible for the members of the Class individually to effectively redress the wrongs that they have individually suffered.  Even if Class members themselves could afford such individual litigation, the court system could not, given the size of the Class.  In addition, individualized litigation increases the delay and expense to all parties and to the court system.

Individualized litigation also presents a potential for inconsistent or contradictory judgments. By contrast, class litigation presents far fewer management difficulties, allows adjudication of claims that might otherwise go unaddressed because of the expense of bringing individual litigation, and provides the benefits of uniform adjudication, economies of scale, and comprehensive supervision by a single court.

## THE ROLE OF GHOST WRITERS IN
## DEFENDANTS' MARKETING SCHEME

78.    The major non-physician writers, or "ghost writers", and vendors (collectively "ghost writers"), were important parts in Defendants' overall marketing plan.  These ghost writers knowingly and intentionally, communicated and distributed the misrepresentations concerning off-label uses of Neurontin.  For instance, the ghost writers generated inaccurate and unscientific articles pertaining to the safety and efficacy of Neurontin and the physicians loaned their names – and thereby became "authors" – to these articles.

79.    The vendors, AMM and MES, published these articles in medical journals across the nation.  Also, physicians participated in so-called "studies" that misrepresented facts and evidence pertaining to Neurontin.

80.    These ghost writers were participants in Defendants' marketing scheme and were conscious of, and participated in, the illegal scheme.  They also operated collectively, for a common purpose, and as a continuing unit to perpetuate Defendants' scheme.

81.    The ghost writers knowledge, involvement, and activity is exhibited by (1) the failure to alert physicians, patient, FDA officials, or consumer third party payors about the spread of misinformation concerning off-label uses; (2) their acceptance of incentives in exchange for supporting, authoring, or publicizing the above described misrepresentations

knowing physicians, consumer and third party payors would rely on these misrepresentations; and (3) their agreement to permit Defendants to control the information relaying to the public in the articles.

## WARNER LAMBERT'S PLEA OF GUILTY TO THE FEDERAL INFORMATION CHARGING CRIMINAL VIOLATIONS OF THE FOOD DRUG AND COSMETIC ACT

82.    On May 13, 2004, Warner Lambert was charged with criminal violations of the federal Food Drug and Cosmetic Act in an information brought by Department of Justice in the United States District Court for the District of Massachusetts.

83.    The information presented criminal charges against Warner Lambert for violations of 21 U.S.C. 331(a) and (d), 333(a)(2), 352(f)(1) and 355(a) based upon the misconduct set forth above.

84.    The information charged that Warner Lambert violated 21 U.S.C. 331(a) and (d) by introducing and distributing Neurontin into interstate commerce for uses other than its approved uses and by introducing and delivering Neurontin into interstate commerce in violation of 21 U.S.C. 355, which required Warner Lambert to obtain FDA approval for all of the proposed intended uses of Neurontin .

85.    The information further charged that Warner Lambert violated 21 U.S.C. 352(f) (1) by misbranding Neurontin without adequate directions in its label for its proper use.

86.    The information further charged that Warner Lambert violated 21 U.S.C 355(a) by introducing and delivering Neurontin into interstate commerce without applying for and obtaining FDA approval for Neurontin's proposed and intended uses.

87.    Warner Lambert entered a plea of guilty to all of the above-referenced criminal charges immediately upon the filing of such charges.

## USE OF THE MAILS AND WIRES

88.    During the Class Period, Defendants used thousands of mail and interstate wire communications to create and manage their fraudulent scheme. Defendants' scheme involved national marketing and sales plans and programs, and encompassed physicians and victims across the country.

89.    Defendants' use of the mails and wires to perpetrate their fraud involved thousands of communications throughout the Class Period, including:

- marketing and advertising materials about the off-label uses of Neurontin for which the drug is not safe and medically efficacious, such materials being sent to doctors across the country;

- communications, including financial payments, with the Vendors, AMM and MES, non-physician technical writers, and physician "authors" discussing and relating to the publication of articles touting off-label uses of Neurontin for which the drug is not safe and medically efficacious;

- communications with the Vendors and physicians that fraudulently misrepresented that Neurontin was scientifically proven to be safe and effective for off-label uses;

- communications with patients and third party payors, including Plaintiffs and the Class, inducing payments for Neurontin to be made in reliance on misrepresentations concerning the use of Neurontin for non-medically necessary uses; and

- Receiving the proceeds of the Defendants' improper scheme.

90.    In addition, Defendants' corporate headquarters have communicated by United States mail, telephone, and facsimile with various local district managers, medical liaisons and pharmaceutical representatives in furtherance of Defendants' scheme.

## COUNT ONE

## VIOLATION OF 18 U.S.C. § 1962(c) - MES ENTERPRISE

91.    Plaintiff incorporates the allegations contained in the preceding paragraphs.

92.    Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3) who conducted the affairs of the enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

93.    The "MES Enterprise" is an association-in-fact within the meaning of 18 U.S.C. § 1961(4), consisting of all Defendants, including their employees and agents, and MES. The MES Enterprise is an ongoing organization that functions as a continuing unit. The MES Enterprise was created and/or used as a tool to effectuate Defendants' pattern of racketeering activity. The Defendant "persons" are distinct from the MES Enterprise.

94.    The MES Enterprise engaged in and affected interstate commerce, because, *inter alia*, it marketed, sold, purchased, or provided Neurontin to thousands of individuals throughout the United States.

95.    Defendants have exerted control over the MES Enterprise, and Defendants have participated in the operation or management of the affairs of the MES Enterprise, through the following actions:

- Defendants have asserted direct control over the information and content disseminated to the Vendors (including MES), physicians and the public regarding the medical safety and efficacy of Neurontin for off-label uses in articles published across the country;
- Multiple instances of selling or otherwise dealing in dangerous drugs in a manner punishable under the laws of the United States

- Defendants have asserted direct control over the creation and distribution of mass-marketing and sales materials sent to Vendors and physicians through the United States; and

- Defendants have placed their own employees and agents in positions of authority and control in the MES Enterprise.

96.    Defendants have conducted and participated in the affairs of the MES Enterprise through a pattern of racketeering activity by selling or otherwise dealing in dangerous drug in a manner punishable under the laws of the United States, as set forth in the information and guilty plea described above, as well by acts indictable under 18 U.S.C. §§ 1341 and 1343 (mail and wire fraud), as described above.

97.    In implementing their fraudulent scheme, Defendants were acutely aware that Plaintiff and members of the Class depend on the honesty of Defendants in representing the safety and medical efficacy of Neurontin's uses.

98.    As detailed above, Defendants' fraudulent scheme consisted of, *inter alia:* (a) causing providers to misrepresent the off-label use(s) for which Neurontin was being prescribed so that Plaintiff and members of the Class were unaware that contrary to their plain language they were purchasing Neurontin for off-label uses; (b) deliberately misrepresenting the uses for which Neurontin was safe and effective so that Plaintiff and members of the Class paid for this drug to treat symptoms for which it was not scientifically proven to be safe and effective; (c) publishing or causing to have published materials containing false information upon which physicians, Plaintiff, and members of the Class relied upon when choosing to prescribe or pay for Neurontin to treat off-label uses for which the drug is not scientifically proven to be safe or medically efficacious; and (d) actively concealing, and causing others to conceal, information about the true safety and efficacy of Neurontin to treat conditions for which it had not been approved by the FDA.

99.    Defendants' scheme was calculated to ensure Plaintiff and the Class would pay for Neurontin to treat a wide variety of uses which Defendants knew were not necessarily treatable with Neurontin.

100.   Each of Defendants' acts involved in the selling or otherwise dealing in dangerous drugs in a manner punishable under the laws of the United States and Defendants' fraudulent mailings and interstate wire transmissions constitute "racketeering activity" within the meaning of 18 U.S.C. § 1961(1). Collectively, these violations constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

101.   Defendants engaged in a pattern of racketeering activity intending to defraud Plaintiff and the Class.

102.   The above described racketeering activities amounted to a common course of conduct intended to deceive Plaintiff and the Class. Defendants' criminal acts of racketeering had the same pattern and similar purpose of defrauding Plaintiff and the Class. Each such racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiff and the members of the Class. Defendants' fraudulent activities are part of their ongoing business and constitute a continuing threat to the property of Plaintiff and the Class.

103.   The pattern of racketeering activity alleged herein and the MES Enterprise are separate and distinct from each other. Defendants engaged in a pattern of racketeering activity alleged herein for the purpose of conducting the affairs of the MES Enterprise.

104.   Plaintiff and members of the Class have been injured in their property because Plaintiff and members of the Class have made billions of dollars in payments of Neurontin that they would not have made had Defendants not engaged in their pattern of racketeering activity.

105.   Plaintiff and members of the Class relied to their detriment on Defendants' fraudulent misrepresentations and omissions.

106. Plaintiff and members of the Class' injuries were directly and proximately caused by Defendants' racketeering activity as described above.

107. By virtue of these violations of 18 U.S.C. § 1962(c), Defendants are jointly and severally liable to Plaintiff and the Class for three times the damages Plaintiff and the Class have sustained, plus the cost of this suit, including reasonable attorneys' fee.

## COUNT TWO

### VIOLATION OF 18 U.S.C. § 1962(c) – AMM ENTERPRISE

108. Plaintiff incorporates the allegations contained in the preceding paragraphs.

109. Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3) who conducted the affairs of the enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

110. The "AMM Enterprise" is an association-in-fact within the meaning of 18 U.S.C. § 1961(4), consisting of each of Defendants, including their employees and agents, and AMM. The AMM Enterprise is an ongoing organization that functions as a continuing unit. The AMM Enterprise was created and/or used as a tool to effectuate Defendants' pattern of racketeering activity. The Defendant "persons" are distinct from the AMM Enterprise.

111. The AMM Enterprise engaged in and affected interstate commerce, because, *inter alia*, it marketed, sold, purchased, or provided Neurontin to thousands of individuals throughout the United States.

112. Defendants have exerted control over the AMM Enterprise, and Defendants have participated in the operation or management of the affairs of the AMM Enterprise, through the following actions:

- Defendants have asserted direct control over the information and content disseminated to the Vendors (including AMM), physicians and the public

39

regarding the medical safety and efficacy of Neurontin for off-label uses in articles published across the country;

- Multiple instances of selling or otherwise dealing in dangerous drugs in a manner punishable under the laws of the United States;

- Defendants have asserted direct control over the creation and distribution of mass-marketing and sales materials sent to Vendors and physicians through the United States; and

- Defendants have placed their own employees and agents in positions of authority and control in the AMM Enterprise.

113.    Defendants have conducted and participated in the affairs of the AMM Enterprise through a pattern of racketeering activity by selling or otherwise dealing in dangerous drug in a manner punishable under the laws of the United States, as set forth in the information and guilty plea described above, as well by acts indictable under 18 U.S.C. §§ 1341 and 1343 (mail and wire fraud), as described above.

114.    In implementing their fraudulent scheme, Defendants were acutely aware that Plaintiff and members of the Class depend on the honesty of Defendants in representing the safety and medical efficacy of Neurontin's uses.

115.    As detailed above, Defendants' fraudulent scheme consisted of, *inter alia*:  (a) causing providers to misrepresent the off-label use(s) for which Neurontin was being prescribed so that Plaintiff and members of the Class were unaware that contrary to their plain language they were purchasing Neurontin for off-label uses; (b) deliberately misrepresenting the uses for which Neurontin was safe and effective so that Plaintiff and members of the Class paid for this drug to treat symptoms for which it was not scientifically proven to be safe and effective; (c) publishing or causing to have published materials containing false information upon which physicians, Plaintiff, and members of the Class relied upon when choosing to prescribe or pay for Neurontin to treat off-label uses for which the drug is not scientifically proven to be safe or

medically efficacious; and (d) actively concealing, and causing others to conceal, information about the true safety and efficacy of Neurontin to treat conditions for which it had not been approved by the FDA.

116.    Defendants' scheme was calculated to ensure the Plaintiff and the Class would pay for Neurontin to treat a wide variety of uses which Defendants knew were not necessarily treatable with Neurontin.

117.    Each of Defendants' acts involved in the selling or otherwise dealing in dangerous drugs in a manner punishable under the laws of the United States and Defendants' fraudulent mailings and interstate wire transmissions constitute "racketeering activity" within the meaning of 18 U.S.C. § 1961(1). Collectively, these violations constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

118.    Defendants engaged in a pattern of racketeering activity intending to defraud Plaintiff and the Class.

119.    The above described racketeering activities amounted to a common course of conduct intended to deceive Plaintiff and the Class. Defendants' criminal acts of racketeering had the same pattern and similar purpose of defrauding Plaintiff and the Class. Each such racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiff and the members of the Class. Defendants' fraudulent activities as part of their ongoing business and constitute a continuing threat to the property of Plaintiff and the Class.

120.    The pattern of racketeering activity alleged herein and the AMM Enterprise are separate and distinct from each other. Defendants engaged in a pattern of racketeering activity alleged herein for the purpose of conducting the affairs of the AMM Enterprise.

121.   Plaintiff and members of the Class have been injured in their property by reason of these violations in that Plaintiff and members of the Class have made billions of dollars in payments of Neurontin that they would not have made had Defendants not engaged in their pattern of racketeering activity.

122.   Plaintiff and members of the Class relied to their detriment on Defendants' fraudulent misrepresentations and omissions.

123.   Plaintiff's and members of the Class' injuries were directly and proximately caused by Defendants' racketeering activity as described above.

124.   By virtue of these violations of 18 U.S.C. § 1962(c), Defendants are jointly and severally liable to Plaintiff and the Class for three times the damages Plaintiff and the Class have sustained, plus the cost of this suit, including reasonable attorneys' fee.

## COUNT THREE

## VIOLATION OF 18 U.S.C. § 1962(c) – GROUP ENTERPRISE

125.   Plaintiff incorporates the allegations contained in the preceding paragraphs.

126.   Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3) who conducted the affairs of the enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

127.   The "Group Enterprise" is an association-in-fact within the meaning of 18 U.S.C. § 1961(4), consisting of Pfizer and Warner-Lambert, including their employees and agents, and the non-physician writers, physician "authors" and Vendors located throughout the United States who participated in the fraudulent schemes described above.   The Group Enterprise is an ongoing organization and functions as a continuing unit.   The Group Enterprise was created

and/or used as a tool to effectuate Defendants' pattern of racketeering activity. The Defendant "persons" are distinct from the Group Enterprise.

128.    The Group Enterprise falls within the meaning of 18 U.S.C. § 1961(4), and consists of a group of "persons" associated together for the common purposes of marketing and selling Neurontin to Plaintiff and the Class and earning profits therefrom.

129.    The Group Enterprise engaged in and affected interstate commerce, because, *inter alia*, it marketed, sold, purchased, or provided Neurontin to thousands of individuals throughout the United States.

130.    Defendants have exerted control over the Group Enterprise, and Defendants have participated in the operation or management of the affairs of the Group Enterprise, through the following actions:

- Defendants have asserted direct control over the information and content disseminated to doctors and the public regarding the medical safety and efficacy of Neurontin for off-label uses in articles published across the country;

- Multiple instances of selling or otherwise dealing in dangerous drugs in a manner punishable under the laws of the United States;

- Defendants have asserted direct control over the creation and distribution of mass-marketing and sales materials sent to doctors through the United States; and

- Defendants have placed their own employees and agents in positions of authority and control in the Group Enterprise.

131.    Defendants have conducted and participated in the affairs of the Group Enterprise through a pattern of racketeering activity by selling or otherwise dealing in dangerous drug in a manner punishable under the laws of the United States, as set forth in the information and guilty plea described above, as well by acts indictable under 18 U.S.C. §§ 1341 and 1343 (mail and wire fraud), as described above.

132.    In implementing their fraudulent scheme, Defendants were acutely aware that Plaintiff and members of the Class depend on the honesty of Defendants in representing the safety and medical efficacy of Neurontin's uses.

133.    As detailed above, Defendants' fraudulent scheme consisted of, *inter alia:* (a) causing providers to misrepresent the off-label use(s) for which Neurontin was being prescribed so that Plaintiff and members of the Class were unaware that contrary to their plain language they were purchasing Neurontin for off-label uses; (b) deliberately misrepresenting the uses for which Neurontin was safe and effective so that Plaintiff and members of the Class paid for this drug to treat symptoms for which it was not scientifically proven to be safe and effective; (c) publishing or causing to have published materials containing false information upon which physicians, Plaintiff, and members of the Class relied upon when choosing to prescribe or pay for Neurontin to treat off-label uses for which the drug is not scientifically proven to be safe or medically efficacious; and (d) actively concealing, and causing others to conceal, information about the true safety and efficacy of Neurontin to treat conditions for which it had not been approved by the FDA.

134.    Defendants' scheme was calculated to ensure the Plaintiff and the Class would pay for Neurontin to treat a wide variety of uses which Defendants knew were not necessarily treatable with Neurontin.

135.    Each of Defendants' acts involved in the selling or otherwise dealing in dangerous drugs in a manner punishable under the laws of the United States and Defendants' fraudulent mailings and interstate wire transmissions constitute "racketeering activity" within the meaning of 18 U.S.C. § 1961(1). Collectively, these violations constitute a "pattern of racketeering

activity" within the meaning of 18 U.S.C. § 1961(5). Collectively, these violations constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

136.   Defendants engaged in a pattern of racketeering activity intending to defraud Plaintiff and the Class.

137.   The above described racketeering activities amounted to a common course of conduct intended to deceive Plaintiff and the Class. Defendants' criminal acts of racketeering had the same pattern and similar purpose of defrauding Plaintiff and the Class. Each such racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiff and the members of the Class. Defendants' fraudulent activities as part of their ongoing business and constitute a continuing threat to the property of Plaintiff and the Class.

138.   The pattern of racketeering activity alleged herein and the Group Enterprise are separate and distinct from each other. Defendants engaged in a pattern of racketeering activity alleged herein for the purpose of conducting the affairs of the Group Enterprise.

139.   Plaintiff and members of the Class have been injured in their property by reason of these violations in that Plaintiff and members of the Class have made billions of dollars in payments of Neurontin that they would not have made had Defendants not engaged in their pattern of racketeering activity.

140.   Plaintiff and members of the Class relied to their detriment on Defendants' fraudulent misrepresentations and omissions.

141.   Plaintiff and members of the Class' injuries were directly and proximately caused by Defendants' racketeering activity as described above.

142.   By virtue of these violations of 18 U.S.C. § 1962(c), Defendants are jointly and severally liable to Plaintiff and the Class for three times the damages Plaintiff and the Class have sustained, plus the cost of this suit, including reasonable attorneys' fee.

## COUNT FOUR

### VIOLATION OF 18 U.S.C. § 1962(d)
### BY CONSPIRING TO VIOLATE 18 U.S.C. § 1962 (c)

143.   Plaintiff incorporates the allegations contained in the preceding paragraphs.

144.   Section 1962(d) of RICO provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b) or (c) of this section."

145.   Defendants have violated § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c). The object of this conspiracy has been and is to conduct or participate in, directly or indirectly, the conduct of the affairs of the § 1962(c) Enterprises described previously through a pattern of racketeering activity.

146.   As demonstrated in detail above, Defendants' co-conspirators have engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy, including material misrepresentations and omissions designed to defraud Plaintiff and the Class of money.

147.   The nature of the above-described Defendants' co-conspirators' acts, material misrepresentations, and omissions in furtherance of the conspiracy gives rise to an inference that they not only agreed to the objective of an 18 U.S.C. § 1962(d) violation of RICO by conspiring to violate 18 U.S.C. § 1962(c), but they were aware that their ongoing fraudulent and extortionate acts have been and are part of an overall pattern of racketeering activity.

148.   As a direct and proximate result of Defendants' overt acts and predicate acts in furtherance of violating 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. §§ 1962(c),

Plaintiff and the Class have been and are continuing to be injured in their business or property as set forth more fully above.

149.    Defendants have sought to and have engaged in the commission of and continue to commit overt acts, including the following unlawful racketeering predicate acts:

- Multiple instances of mail and wire fraud violations of 18 U.S.C. §§ 1341 and 1342;

- Multiple instances of selling or otherwise dealing in dangerous drugs in a manner punishable under the laws of the United States;

- Multiple instances of mail and wire fraud violations of 18 U.S.C. §§ 1341 and 1346; and

- Multiple instances of wire fraud violations of 18 U.S.C. §§ 1343 and 1346.

150.    Defendants' violations of the above federal laws and the effects thereof detailed above are continuing and will continue unless injunctive relief prohibiting Defendants' illegal acts constituting a pattern of racketeering activity is fashioned and imposed by the Court.

<u>COUNT FIVE</u>

**VIOLATION OF LOUISIANA'S UNFAIR TRADE PRACTICES ACT**

151.    Plaintiff incorporates the allegations contained in the preceding paragraphs.

152.    Defendants engaged in deceptive trade practices in violation of <u>Louisiana's Unfair Trade Practices Act, Louisiana Rev. Code LSA-R.S. 51:1405 *et seq.* by, *inter alia:*</u> (a) causing providers to misrepresent the off-label use(s) for which Neurontin was being prescribed so that Plaintiff and members of the Class were unaware that contrary to their plain language they were purchasing Neurontin for off-label uses; (b) deliberately misrepresenting the uses for which Neurontin was safe and effective so that Plaintiff and members of the Class paid for this drug to treat symptoms for which it was not scientifically proven to be safe and effective; (c) publishing or causing to have published materials containing false information upon which physicians,

47

Plaintiff, and members of the Class relied upon when choosing to prescribe or pay for Neurontin to treat off-label uses for which the drug is not scientifically proven to be safe or medically efficacious; and (d) actively concealing, and causing others to conceal, information about the true safety and efficacy of Neurontin to treat conditions for which it had not been approved by the FDA.

153.    To this date, Defendants continue to engage in the foregoing unlawful practices in violation of Louisiana' Unfair Trade Practices Act.

154.    Plaintiff and the Class suffered actual damages as a direct and proximate result of Defendants' unfair methods of competition and unfair or deceptive acts or practices.

**COUNT SIX**

**UNJUST ENRICHMENT**

155.    Plaintiff incorporates the allegations contained in the preceding paragraphs.

156.    Defendants have knowingly received, and continue to receive, a substantial benefit at the expense of Plaintiff and Class members.

157.    It would be unjust and unconscionable to permit Defendants to enrich themselves at the expense of Plaintiff and Class members and to retain the funds that Defendant wrongfully obtained from Plaintiff and Class members.

**FRAUDULENT CONCEALMENT/
EQUITABLE TOLLING OF STATUTE OF LIMITATIONS**

158.    Any applicable statutes of limitation have been tolled by Defendants' affirmative acts of deliberate and fraudulent concealment.  Through such acts, Defendants have been able to conceal from Plaintiff and the Class the truth about Defendants' practice of falsely representing the approved uses of Neurontin, thereby tolling the running of the applicable statutes of limitation.

159.    Plaintiff and the Class could not reasonably have discovered Defendants' wrongful conduct as alleged herein.

160.    Defendants are estopped from relying on any statute of limitations defense because of their unfair or deceptive conduct.

161.    Until shortly before the filing of this Complaint, Plaintiff had no knowledge that Defendants were engaged in the wrongful conduct alleged herein.

162.    Because of the self-concealing nature of Defendants' actions, and their affirmative acts of concealment, Plaintiff asserts the tolling of any applicable statutes of limitations affecting his claims.

163.    Because of the self-concealing nature of Defendants' actions, and their affirmative acts of concealment, Plaintiff asserts the tolling of any applicable statutes of limitations affecting his claims.

## PRAYER FOR RELIEF

WHEREFORE, BlueCross BlueShield of Louisiana, on their own behalf, and on behalf of all others similarly situated, prays that the Court enter judgment against Defendants in each claim for relief, jointly and severally, as follows:

a.    Certification of the Class, appointment of BlueCross BlueShield of Louisiana as the Class Representative, and appointment of the undersigned counsel of record as Class Counsel;

b.    For claims involving RICO, three times the damages (as established at trial) sustained by Plaintiff and the Class as a result of Defendants' conduct, Plaintiffs' costs in this suit and reasonable attorneys' fees;

c.    For Violating the Louisiana' Unfair Trade Practices Act, actual damages (as established at trial) and reasonable attorneys' fees;

d.    For the claim of unjust enrichment, restitution and/or

disgorgement and other equitable relief as the Court deems appropriate;

e.     For an order awarding such other and further relief as this Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff respectfully demands a jury trial for all individual and Class claims so

triable.

Respectfully submitted,

JAMES R. DUGAN, II
DUGAN & BROWNE
3500 N. Hullen Street
Metairie, Louisiana 70002
Telephone: (504) 456-8600
Facsimile: (504) 456-8624

CHARLES A. O'BRIEN
BLUECROSS BLUESHIELD OF LOUISIANA
5525 Reitz Avenue
P.O. Box 98029
Baton Rouge, Louisiana 80809
Telephone: (225) 295-2454
Facsimile: (225) 297-2760

### PLEASE SERVE:

Pfizer, Inc.
through its agent for services of process
C T Corporation System
8550 Union Plaza Blvd.
Baton Rouge, Louisiana 70809

50