# EXHIBIT 53



**TRUJILLO RODRIGUEZ & RICHARDS, LLC**
Lisa J. Rodriguez (LR 6767)
Donna Siegel Moffa (DSM4634)
8 Kings Highway West
Haddonfield, New Jersey 08033
(856) 795-9002
(856) 795-9887 - Facsimile

Attorneys for Plaintiffs and the Class
(Additional Counsel Listed on Signature Page)

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| ASEA/AFSCME LOCAL 52 HEALTH BENEFITS TRUST and BRIAN KRAH, on behalf of themselves and all others similarly situated, | CASE NO. |
| Plaintiffs, | |
| vs. | |
| PFIZER INC. and WARNER-LAMBERT COMPANY, | JURY TRIAL DEMANDED |
| Defendants. | |

## CLASS ACTION COMPLAINT

### I.  NATURE OF THE CASE

1.  This class action is brought by Plaintiffs ASEA/AFSCME Local 52 Health Benefits Trust ("ASEA") and Brian Krah ("Krah"), on behalf of themselves and a class of similarly situated individuals and entities (the "Class") to recover billions of dollars they paid to Defendants as a result of Defendants' fraudulent scheme to market and sell the drug Neurontin® ("Neurontin") for a variety of uses for which it is not approved, safe, and/or medically efficacious.  ASEA is a self-funded health benefit trust providing health care coverage to employees of the State of Alaska who are members of the General Governmental Union

- 1 -

325580.1

6/2/04

represented by ASEA/AFSCME Local 52. The Trust's third party administrator is Administrative Services, Inc., located at 111 W. Cataldo, Suite 110, Spokane, WA 98205-0434. Krah is a resident of Illinois and lives at 345 Poplar Court, Lindenhurst, IL 60046.

2.    Defendant Pfizer, Inc. ("Pfizer") currently markets and sells Neurontin, a drug approved for the treatment of epilepsy. Prior to Pfizer's acquisition of Warner-Lambert Company ("Warner-Lambert") in 2000, Neurontin was marketed and sold by Parke-Davis, a division of Warner-Lambert.

3.    This action arises out of the unlawful manipulation of an enormous market for a prescription drug. Pharmaceutical companies must apply to the United States Food and Drug Administration ("FDA") for approval to sell a new drug. Although the FDA often approves drugs for narrow purposes, physicians are free to prescribe approved drugs as they see fit to treat any condition or symptom. As discussed in more detail below, these unapproved uses are deemed "off-label" uses. The market for off-label uses often dwarfs the market for the drug's approved uses.

4.    Pharmaceutical companies spend billions of dollars per year trying to persuade physicians to prescribe their drugs, both for approved and for off-label uses. Strict federal laws and regulations govern the promotion and marketing of drugs for off-label uses. These laws and regulations are designed to insure that physicians receive accurate, scientifically valid information regarding the effectiveness and safety of a drug for a particular use.

5.    Defendants' promotion of Neurontin for off-label uses ran roughshod over these laws and regulations. From 1994 through at least 1998 and likely continuing to the present, Defendants created and implemented a fraudulent marketing and sales scheme in order dramatically to boost sales of Neurontin and to reap unlawful and unfair profits at the expense of

325580.1

healthcare insurers, physicians, consumers, and others. Between themselves and with other organizations and entities, Defendants created a pervasive, illegal system for the specific purpose of causing Plaintiffs and members of the Class to purchase Neurontin to treat a host of conditions and symptoms for which the drug had not received FDA approval. Defendants aggressively marketed and sold Neurontin for these off-label uses – which ranged from treatment for anxiety to treatment for alcoholism – in spite of a dearth of scientific evidence suggesting that the drug was safe or medically efficacious when so used.

6.    Defendants' improper sales and marketing practices included, *inter alia*: (a) deliberately misrepresenting the safety and medical efficacy of Neurontin for a variety of off-label uses; (b) knowingly misrepresenting the existence and findings of scientific data, studies, reports and clinical trials concerning the safety and medical efficacy of Neurontin for a variety of off-label uses; (c) deliberately misrepresenting the credentials and qualifications of certain of Defendants' employees as specialists, medical researchers, physicians and scientific employees in order to market and sell Neurontin for various off-label uses; (d) wrongfully and illegally compensating physicians for prescribing Neurontin for various off-label uses; (e) intentionally instructing and coaching physicians and pharmacists how to conceal and misrepresent the use of Neurontin for off-label purposes on claim forms submitted to third-party payors; (f) intentionally causing physicians and pharmacists to submit claim forms to third-party payors containing information misrepresenting Neurontin; (g) knowingly publishing articles, studies and reports misrepresenting the scientific credibility of data and touting the medical efficacy of Neurontin for off-label uses; and (h) intentionally misrepresenting and concealing Defendants' role and participation in the creation and sponsorship of a variety of articles and publications used to sell Neurontin to off-label markets.

325580.1

7.   Defendants' scheme reaped them significant financial gain. From 1995 to 2003, Defendants' revenues from the sale of Neurontin soared from $97.5 million to nearly $2.7 billion. By 2003, 90% of all Neurontin prescriptions were for off-label uses, compared with 50% in 1996. Sales of the drug have grown at a rate of 50% per year, fueled primarily by prescriptions for off-label uses.

8.   Defendants' fraudulent scheme has spawned a host of government civil and criminal actions. Dr. David Franklin, a former Parke-Davis employee and a whistleblower, initiated a *qui tam* action in the Federal District Court for the District of Massachusetts in 1996 (the "*qui tam* action"). The United States also commenced a criminal action against Warner-Lambert, and the attorneys general of the fifty states and the District of Columbia sued Warner-Lambert for violations of the states' consumer protection statutes. On May 13, 2004, the two civil action settled, and Warner-Lambert agreed to plead guilty to violations the Federal Food, Drug, and Cosmetic Act, and Warner-Lambert agreed to pay $240 million in fines and settlements.

9.   Neither the Attorneys General's settlement nor the federal fines includes relief for private individuals and entities who purchased Neurontin in reliance on Defendants' misrepresentations and omissions. Accordingly, Plaintiffs bring this action to collect damages he and Class members have suffered as a result of Defendants' conduct.

## II.   PARTIES

10.   Plaintiff ASEA/AFSCME Local 52 Health Benefits Trust was created through collective bargaining between the State of Alaska and ASEA/AFSMCE Local 52 to provide reimbursement for eligible health, vision, dental and prescription drug claims incurred by employees of the State of Alaska who are members of the General Governmental Unit represented by ASEA/AFSCME Local 52. At various times during the class period, ASEA paid

- 4 -

325580.1

or reimbursed eligible Trust participants' prescription drug benefits for Neurontin in Alaska and elsewhere other than for resale and was injured by the illegal conduct alleged herein.

11.    Plaintiff Brian Krah is an Illinois resident. He was prescribed and purchased Neurontin for the treatment of generalized anxiety disorder, an off-label use for which Neurontin is not approved.

12.    Defendant Pfizer, Inc. is a Delaware corporation with its principal place of business at 235 East 42nd Street, New York, New York. Pfizer is principally engaged in the manufacture and sale of pharmaceuticals and is one of the largest pharmaceutical companies in the United States.

13.    Defendant Warner-Lambert Company was acquired in June 2000 by Pfizer. This acquisition included Warner-Lambert's Parke-Davis division. Prior to the acquisition, Warner-Lambert was a Delaware corporation that maintained its principal place of business at 201 Gabor Road, Morris Plains, New Jersey. In 1993, Warner-Lambert received FDA approval to market Neurontin in the United States and did so through its Parke-Davis division. After the acquisition, the marketing of Neurontin continued to be managed at the merged-out companies' Morris Plains, New Jersey location.

III.    **JURISDICTION AND VENUE**

14.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, because this action arises under the laws of the United States, and 28 U.S.C. § 1964(c), because this action alleges violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962.

15.    This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the violations of the New Jersey Consumer Fraud Act, the Uniform Deceptive Trade Practices Act, and Plaintiffs' allegations of common law fraud and unjust enrichment.

-5-

16.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and (c), and 18 U.S.C. § 1965. Defendants implemented their fraudulent and deceitful marketing scheme in this district, as well as nationwide, through physicians, sales representatives, and class members who reside and transact business in this district. In addition, *In re Neurontin Antitrust Litigation*, MDL 1479, is currently pending in this district in the Newark Vicinage. Furthermore, Defendants Parke-Davis and Warner-Lambert had their principal places of business in this district during all times relevant to this Complaint.

IV.    **FACTUAL ALLEGATIONS**

    A.    **"Off-Label" Uses for Prescription Drugs**

17.    A pharmaceutical company may not market a new drug in the United States until the FDA approves it as safe and effective for specific indications at specified dosages. The indication and dosages are set forth in the drug's labeling, which the FDA also approves.

18.    Physicians may prescribe drugs for unapproved uses. Such uses are deemed "off-label," because they are not listed on the FDA-approved labeling for the drug. Pharmaceutical companies may not freely market their products for off-label uses. Although the Food and Drug Administration Act of 1997 ("FDAMA"), 21 U.S.C. § 360aaa, *et seq.*, specifically authorizes a pharmaceutical company to disseminate "written information concerning the safety, effectiveness, or benefit of a use not described in the approved labeling of a drug or device," *id.* § 360aaa(a), this written information must comply with several strict requirements. The manufacturer must submit an application to the FDA seeking approval of the drug for the off-label use; the manufacturer must provide the materials its plans to use to market the drug for off-label uses to the FDA prior to dissemination; the materials must be in unabridged form; and the manufacturer must include disclosures that the materials pertain to an unapproved

325580.1

use of the drug, and, if the FDA deems it appropriate, "additional objective and scientifically sound information . . . necessary to provide objectivity and balance." 21 U.S.C. § 360aaa(b)(1)-(6); *id.* § 360aaa-1; *id.* § 360aaa(c). The dissemination of information in violation of these provisions violates the Food, Drug and Cosmetic Act, as amended by the FDAMA. 21 U.S.C. § 331(z).

19.     Although the FDAMA permits pharmaceutical companies to disseminate to health care practitioners qualified forms of "written information concerning the safety, effectiveness, or benefit of a use not described in the approved labeling of a drug," 21 U.S.C. § 360aaa(a), manufacturers are permitted to provide only "authorized information" in the form of unabridged peer-reviewed articles or qualified reference publications. *Id.* § 360aaa-1. The FDAMA also requires pharmaceutical companies to furnish federal regulators with advance copies of the information they disseminate. 21 U.S.C. § 360aaa.

**B.    Neurontin**

20.     In December 1993, the FDA approved Neurontin as "adjunctive therapy" for the treatment of certain types of these seizures in adult patients suffering from epilepsy. "Adjunctive therapy" means that the drug cannot be prescribed by itself for the treatment of epilepsy. Rather, it is prescribed in the event that a primary anti-epilepsy drug – or an epilepsy monotherapy – is not successful. The FDA approved labeling of Neurontin stated that the drug is only effective at does ranging from 90 to 1800 mg/day.

21.     Neurontin has also been approved to treat post-herpetic neuralgia, or pain resulting from nerve damage caused by shingles.

325580.1

**C.**    **Parke-Davis's Deliberate Decision to Avoid FDA Approval and Market Neurontin Off-Label**

22.    By the time the FDA approve Neurontin in 1993, Defendants had only five years remaining before their patent for the drug expired. This left Defendants with only a small window of exclusivity for this drug during which it could recap monopolistic profits from its sale. After the expiration of the Neurontin patent, Defendants would be forced to share the market for Neurontin with generic drug manufacturers, substantially reducing their profits and their ability to keep Neurontin's retail price high.

23.    At the time Parke-Davis filed its NDA ("New Drug Application") with the FDA to solicit its approval for Neurontin, Defendants intended Neurontin to be used to treat conditions other than epilepsy. In the early 1990s, Defendants filed several patent applications for Neurontin as a treatment for depression, neurogenerative disease, mania, bipolar disease, and anxiety. Notwithstanding the claims made in their patent applications, Defendants never sought FDA approval for the use of Neurontin to treat any of these conditions.

24.    With approximately two million epileptics in the United States, the market for adjunctive therapy for epilepsy patients is and has always been limited. In comparison, the market for the other uses of Neurontin contemplated by Defendants – pain management, psychiatric disorders, anxiety and depression – were virtually unbounded. Defendants knew that if these markets could be tapped, they could enjoy enormous profits from sales of the drug.

25.    Initially, Defendants intended to file supplemental NDAs in order to expand Neurontin's approved indications, including applications for monotherapy (which would permit Neurontin to be prescribed by itself for epilepsy treatment) and for various psychiatric and neurological indications. However, by 1995 Defendants recognized that it would be uneconomical to assume the expense and time necessary to conduct clinical trials required to

- 8 -

prove that Neurontin was safe and effective for these uses. Assuming Neurontin could be proven to be safe and effective, the near term expiration of the patent meant that generic manufacturers of Neurontin would reap much of the reward of proving Neurontin could be safely used for other indications.

26.    After performing extensive economic analysis, senior officials at Parke-Davis determined that it was not sufficiently profitable for Defendants to obtain FDA approval for Neurontin's alternative uses. Instead, Parke-Davis officials developed a strategy that would allow Defendants to avoid the costs of proving that Neurontin was safe and effective for these other uses, while allowing Defendants to compete in the lucrative off-label markets. Taking advantage of a loophole in the FDA's off-label marketing rules, Defendants decided to employ a "publication strategy," by which they would promote Neurontin by the massive distribution of publications supposedly written by independent researchers that purportedly described the scientific evaluation of Neurontin. Another advantage of this strategy, from Defendants' perspective, was that it could be employed immediately – there was no need to wait for the results of scientifically conducted clinical trials to determine if Neurontin was actually effective in the treatment of these conditions.

27.    Federal laws and regulations do not permit pharmaceutical companies to promote drugs for unapproved uses, except in the manner described in Paragraphs 17 and 18. Defendants were allowed to distribute publications authored by third parties that described results of off-labeled use of Neurontin, provided that such material was only distributed in response to unsolicited requests from physicians. Defendants decided to exploit this narrow exception by creating events and programs that would insure a smooth flow of off-label

promotional material from employees and independent contractors under Defendants' control to physicians, while allowing Defendants to deny that they had solicited off-label usage.

28.    Marketing executives at Parke-Davis' headquarters in Morris Plains, New Jersey and in its five regional customer business units (CBUs) knew that Defendants were not supposed to create or design the contents of the communications that would be distributed pursuant to the "publication strategy" or do anything to generate the practicing physicians' interest in receiving such communications. As demonstrated below, Defendants ignored these legal requirements and instead put into effect a pervasive pattern of illegal conduct lasting from at least 1994 through 1998, and Plaintiffs believe, up to the present.

29.    Significant ingenuity and resourcefulness were necessary to execute this unlawful scheme without detection. Faced with the fact that their "publication strategy" required publications from independent physicians when no such publications existed, Defendants hired nonphysician technical writers to create articles for medical journals and then paid actual specialists to be the articles' "authors." Faced with the fact that federal laws and regulations prevented its normal marketing force from delivering the off-label message, Defendants trained their medical liaisons – technical employees who were supposed to provide balanced, scientifically legitimate information to doctors – to sell off-label and solicit interest in off-label uses. In order for a "publication strategy" to increase usage of a drug, Defendants had to have a large group of doctors interested in experimenting on patients, and an even larger group of doctors who were interested in receiving information about those experiments. Defendants generated both groups by liberally distributing payments to groups of physicians through "consultants" meetings, speakers bureaus, medical education seminars, grants, "studies," advisory boards and teleconferences. Further details of these programs are described below.

- 10 -

30.    Parke-Davis carried out its scheme by employing the following strategies, among others:

- forming a nationwide network of employees falsely referred to as "medical liaisons," whose actual duties consisted entirely of conventional direct sales activities and which did not include any legitimate scientific activity;

- paying illegal kickbacks to physicians who prescribed large amounts of Neurontin for off-label purposes to patients;

- directly and illegally soliciting physicians to write prescriptions for off-label uses;

- making false statements to physicians and pharmacists concerning the efficacy and safety of Neurontin for off-label uses;

- paying or offering gratuities to Defendants' employees in order to procure their silence; and

- actively training Defendants' employees to avoid detection of their activities by the FDA.

D.    Defendants' Use of Medical Liaisons to Promote Off-Label Uses for Neurontin

31.    Defendants' normal sales force was not permitted to promote off-label uses of Neurontin to its physician customers. The FDA, however, permitted drug company representatives to provide balanced, truthful information regarding off-label usage if specifically requested by a physician and if there were no attempt to solicit such information by the drug company. Starting in 1995, Defendants hired medical liaisons and trained them aggressively to solicit requests for off-label information from physicians. Having opened this door to a conversation about Neurontin, medical liaisons would then engage in full-scale promotion of Neurontin's off-label uses, including by providing non-scientific, anecdotal information designed to convince physicians that off-label usage of Neurontin was safe and effective. In effect, Parke-Davis used the medical liaisons as a surrogate sales force who marketed Neurontin for off-label

- 11 -

uses. Indeed, medical liaisons were selected and promoted based on their ability to sell, and sales training was encouraged.

### 1.    Training of Medical Liaisons to Misrepresent Neurontin's Uses

32.    With full knowledge that the use of medical liaisons to market Neurontin for off-label purposes was unlawful, Defendants nonetheless intentionally encouraged their personnel to engage in such behavior. When he was hired by Defendants in March of 1996, Dr. Franklin, the whistleblower, was specifically asked whether he would have difficulty working in gray areas or bending rules. High level personnel within Parke-Davis acknowledged to Dr. Franklin that the use of medical liaisons by the South Central, North Central and North East CBUs were thinly disguised methods of evading the FDA's policies on off-label promotion.

33.    Similarly, on April 16, 1996, at a training session for medical liaisons, Defendants' in-house lawyers stopped the videotaping of a medical liaison training session to advise the liaisons that, notwithstanding formal policies to the contrary, liaisons could "cold call" physicians so long as they obtained executed request forms – or forms that supposedly verified that the physician had initiated the meeting – by the end of the call. The liaisons were informed that the request forms could be filled out by Defendants' sales representatives instead of the doctors. Company lawyers also informed the liaisons that there was no need to present balanced information to the customers, and that liaisons should always remember that sales were necessary in order to keep the company profitable.

34.    Continuing their off-camera instruction, Defendants' lawyers told medical liaisons that there really was no definition of "solicitation," and that there were methods to induce physicians to inquire about off-label uses. In effect, the lawyers' message went as follows: once a medical liaison got a meeting with a physician, the liaison could and should use a

- 12 -

325580 1

number of different techniques to insure that he or she gave the physician unscientific, anecdotal information about off-label uses, even if such information were initially unsolicited.

35.    Confirming the suspect nature of their instructions, the lawyers warned the liaisons under no circumstances should any information about off-label uses be put in writing.

36.    Defendants repeatedly reinforced the instruction that medical liaisons should market and sell Neurontin. In a teleconference on May 24, 1996, John Ford, a senior marketing executive at Parke-Davis' Morris Plains headquarters, told medical liaisons that Neurontin must be marketed for monotherapy, pain, bipolar disease, and other psychiatric uses, all of which were off-label. Because only they could discuss these matters, Ford conceded, medical liaisons effectively had to do Defendants' marketing and sales work.

37.    At another meeting with the medical liaisons, Ford put his instructions in even blunter terms:

"I want you out there every day selling Neurontin. Look this isn't just me, it's come down from Morris Plains that Neurontin is more profitable .... We all know Neurontin's not growing adjunctive therapy, beside that is not where the money is. Pain management, now that's money. Monotherapy, that's money. We don't want to share these patients with everybody, we want them on Neurontin only. We want their whole drug budget, not a quarter, not half, the whole thing .... We can't wait for them to ask, we need to get out there and tell them up front .... That's where we need to be holding their hand and whispering in their ear Neurontin for pain, Neurontin for monotherapy, Neurontin for bipolar, Neurontin for everything .... I don't want to see a single patient coming off Neurontin until they have been up to at least 4800mg/day. I don't want to hear that safety crap either, have you tried Neurontin, every one of you should take one just to see there is nothing, it's a great drug."

38.    The pitch medical liaisons were to use with physicians was rife with both misrepresentations and marketing messages. Defendants trained medical liaisons to proceed through what was deemed the "Neurontin Cold Call Story" when discussing the drug with a

- 13 -

neurologist, general practitioner, or psychiatrist who was a target for off-label use. The "story"
went as follows:

- Mention that you are the eyes and ears of Parke-Davis research and that you are gathering clinical information;

- Then ask general questions about the nature of the practice;

- Mention Neurontin and its approved uses, but dismiss them as old news;

- Then ask leading questions about the number of pain patients that the practice sees;

- Then ask a series of questions that determine the practice profile for all of the potential off-label uses;

- Next reveal that Parke-Davis "has a great deal of information about the fantastic response rate of patients on Neurontin in all of these disease states";

- Move into a discussion of the clinical trials that this information is demanding;

- Mention the "90-95% response rate that we are seeing in more than 80% of patients";

- Present the doctor with any publications that are available and point out that many common drugs for pain treatment are in few if any publications;

- Ask the physician to place some patients on Neurontin and tell them that the medical liaison will stay in touch to help develop any case reports;

- Mention that case reports can be lucrative and can lead to clinical trials;

- Offer to do a presentation and luncheon for the entire practice or a group of his friends that will detail all of the "data" we have;

- Invite the physician to consultant meetings in the future and point out that they pay $250 plus a nice trip or meal in the city; and

- If a sales representative is present, he or she should close the sale by asking the physician to prescribe Neurontin to the next patient he or she sees.

39.    During a training session for medical liaisons, Dr. Franklin witnessed the
scope of the off-label conditions for which Parke-Davis intended to market Neurontin. One slide
shown at the session, entitled "Anecdotal Uses of Neurontin," included the following as off-label

- 14 -

conditions for which medical liaisons were instructed to promote Neurontin: reflex sympathetic dystrophy, peripheral neuropathy, diabetic neuropathy, trigeminal neuralgia, post-herpetic neuralgia, essential tremor, restless leg syndrome, attention deficit disorder, periodic limb movement disorder, migraine, bipolar disorder, amyotrophic lateral sclerosis (Lou Gehrig's Disease); and drug or alcohol withdrawal seizures.

40.    Executives explained that "this list was very important to the company but that it makes Neurontin look like snake oil, so preempt the laughter by telling your physicians that 'I'm embarrassed to show you the next slide because it makes Neurontin look like snake oil, but the fact is, we are seeing extraordinary results, in some cases up to 90% response in all of these conditions,' that will get their attention." This executive went on to say that, "notice all the studies we talk about, nothing gets a doc more interested in a drug than a study."

41.    None of the claims as to the medical efficacy of Neurontin for the treatment of any of these conditions has been substantiated.

2.    <u>Misrepresentations Made by Medical Liaisons</u>

42.    As discussed above, medical liaisons were trained to "cold call" physicians, particularly high decile physicians (those who saw the most patients in a given specialty), and sell them on the off-label benefits of Neurontin. Central to this strategy were myriad misrepresentations. First, with full approval of Defendants' marketing officials, including John Ford, Phil Magistro, and John Krukar, medical liaisons routinely misrepresented themselves as specialists in the specific drug they were presenting at a particular meeting. To wit, medical liaisons could be experts in anti-epileptic drugs at one moment and an hour later be an expert in cardiac medication. Medical liaisons were also encouraged to represent themselves as medical researchers, even thought they neither conducted medical research nor analyzed medical research performed by others, or as physicians, and even though they had no such

- 15 -

qualifications. Sales personnel were instructed to introduce medical liaisons as scientific

employees who were given momentary leave of their academic duties to make an individual

presentation to the physician; the fact that the liaisons were part of Defendants' standard

marketing detail was intentionally hidden.

43.    Extensive misrepresentations were also made regarding the scientific

information concerning off-label usage of Neurontin. The following misrepresentations relating

to off-label usage of Neurontin were routinely made to high decile physicians in the North East

and other CBUs with the knowledge and consent of persons such as Phil Magistro, John Krukar,

and other marketing personnel among Defendants' employees. According to Dr. Franklin,

medical liaisons were trained to make these misrepresentations in 1995 and 1996, and

Dr. Franklin believes that this conduct continued after his departure from Warner-Lambert in

1996:

- *Bipolar Disorder.* Medical Liaisons informed psychiatrists that early results from clinical trials evaluating Neurontin for the treatment of bipolar disorder indicated a ninety percent (90%) response rate when Neurontin was started at 900mg/day dosage and increased to a dosage of 4800mg/day. No such results existed. Nor was any type of clinical trial being conducted other than a pilot study. There were no clinical trials or studies indicating that Neurontin was safe or effective up to 4800mg/day. Indeed, Parke-Davis was in possession at this time of clinical trial evidence which showed that there was no dose response difference between patients who received 600 mg, 1200 mg and 2400 mg/day. Any data relating to the use of Neurontin in bipolar disorder was strictly anecdotal and of nominal scientific value. Furthermore, most of the published reports on this topic had been written and commercially sponsored by Parke-Davis, although this fact was hidden. Medical liaisons were trained to inform psychiatrists that there were no reports of adverse effects for Neurontin when used for psychiatric purposes. In fact, such reports had been reported to Parke-Davis personnel but Parke-Davis attempted to hide such reports from physicians.

- *Peripheral Neuropathy, Diabetic Neuropathy, and Other Pain Syndromes.* Medical liaisons were trained and instructed to report that "leaks" from clinical trials demonstrated that Neurontin was highly effective in the treatment of various pain syndromes and that a ninety percent (90%) response rate in the treatment of pain was being reported. No such body of evidence existed. Nor was there any legitimate pool of data from which a response rate, much less a ninety percent (90%) response rate,

- 16 -

325580 1

could be calculated. Medical liaisons were trained to claim support for these findings in inside information about clinical trials where no such information existed. The only support for these claims were anecdotal evidence of nominal scientific value. Many of the published case reports had been created and/or sponsored by Parke-Davis in articles which frequently hid Parke-Davis's involvement in the article's creation. Parke-Davis's payment for the creation of these case reports was also hidden from physicians.

- *Epilepsy Monotherapy.* Medical liaisons were strongly encouraged to push neurologists to prescribe Neurontin as the sole medication to treat epilepsy, even though studies only found it safe and effective as adjunctive therapy. Medical liaisons were trained to inform neurologists that substantial evidence supported Parke-Davis' claim that Neurontin was effective as monotherapy. In fact, Parke-Davis knew that clinical trials on point had proven inconclusive. One of Parke-Davis' clinical trials, number 945-82, demonstrated that Neurontin was not an effective monotherapy agent. The vast majority of patients in the study taking Neurontin were unable to continue with Neurontin alone. The same study showed that there was no effective difference between administration of Neurontin at 600, 1200 or 2400mg. Notwithstanding this data, the company continued to claim that physicians should use Neurontin at substantially higher doses than indicated by the labeling. Indeed, although medical liaisons routinely claimed Neurontin to be effective as monotherapy, in 1997 the Food and Drug Administration refused to find Neurontin to be a safe and effective monotherapy.

- *Reflex Sympathetic Dystrophy ("RSD").* Medical liaisons informed physicians that extensive evidence demonstrated the efficacy of Neurontin in the treatment of RSD. The only such evidence that existed was anecdotal reports of nominal scientific value. Medical liaisons were trained to refer to case reports, most of which had been created or sponsored as "studies" by Parke-Davis.

- *Attention Deficit Disorder ("ADD").* Medical liaisons were instructed to inform pediatricians that Neurontin was effective for the treatment of ADD. No data, other than occasional anecdotal evidence, supported this claim. Nonetheless, the medical liaisons were trained to report that large number of physicians had success treating ADD with Neurontin, when no such case reports existed.

- *Restless Leg Syndrome ("RLS").* RLS was another condition where Parke-Davis medical liaisons were trained to refer to a growing body of data relating to the condition, when no scientific data existed. The only reports were anecdotal, most of which had been created and/or sponsored by Parke-Davis.

- *Trigeminal Neuralgia.* Although medical liaisons represented that Neurontin could treat Trigeminal Neuralgia, again no scientific data supported this claim with the exception of occasional anecdotal reports. No data demonstrated that Neurontin was as effective as currently available pain killers, most of which were inexpensive.

- 17 -

- *Essential Tremor Periodic Limb Movement Disorder ("ETPLMD")*. Medical liaisons were trained to allege that Neurontin was effective in the treatment of these conditions. No scientific data supported such claims with the exception of anecdotal reports of nominal scientific value.

- *Migraine*. Claims that Neurontin was effective in the treatment of migraine headaches were made by the medical liaisons and were supposedly based on early results from clinical trials. Although pilot studies had been suggested and undertaken, no early results of clinical trials existed to support these claims. Once again, any data relating to treatment of migraines was purely anecdotal and of nominal scientific value. Most of the case reports were either created or sponsored by Parke-Davis.

- *Drug and Alcohol Withdrawal Seizures*. Medical liaisons suggested that Neurontin be used in the treatment of Drug and Alcohol Withdrawals despite the lack of any data supporting Neurontin as an effective treatment for these conditions.

44.    Defendants knew and intended that physicians would rely on the misrepresentations and therefore provide inaccurate and untruthful medical advice to their patients regarding Neurontin's safety and effectiveness as a treatment for off-label conditions. Nonetheless, Defendants' employees routinely made these misrepresentations as part of company policy. In addition to Dr. Franklin, these misrepresentations were made at Defendants' instruction to physicians by, among others, Michael Davies, Joseph McFarland, Phil Magistro, Lisa Kellett, Joseph Dymkowski, Daryl Moy, Richard Grady, Ken Lawler and others.

45.    Not all physicians targeted by Defendants would have received all of the misrepresentations described above. Each specialist would have received the misrepresentations relating to his or her practice. If physician's practice focused on epilepsy, that doctor would not have received information relating to the treatment of ADD, but he or she would have received misrepresentations relating to monotherapy. Regardless of the specialty, unsupported claims of effectiveness for off-label usage was a key portion of medical liaisons presentations relating to Neurontin.

46.    Dr. Franklin reports that the medical liaisons engaged in the following conduct at Defendants' instruction and with Defendants' knowledge:

- Upon order of the company, and as a result of medical liaison training, Dr. Franklin "deliberately contrived reports to mislead physicians into believing that a body of data existed that demonstrated the effectiveness of Neurontin in the treatment of bipolar disease." In fact, no data existed to support the use of Neurontin for bipolar disease.

- Dr. Franklin was trained and instructed actively to deceive physicians with contrived data, falsified "leaks" from clinical trials, scientifically flawed reports, or "success stories" that states that Neurontin was highly effective in the treatment of a variety of pain syndromes. No such body of evidence existed.

- Dr. Franklin was instructed to advise physicians that Defendants had developed a large body of data to support the use of Neurontin as monotherapy. This was an "outright lie" and left patients unknowingly without good seizure control.

- Medical liaisons were instructed to tell physicians that a great deal of data existed supporting the safe use of Neurontin at levels that exceeded 4800 mg/day. However, clinical safety data existed at dosing levels of only 1800 mg/day.

- Defendants provided medical liaisons with slides that stated that Neurontin was effective for the treatment of ADD, but no data existed to support that claim.

E.    **Parke-Davis' Systematic Payments to Doctors for the Purpose of Increasing Neurontin Prescriptions**

47.    Defendants' "publication strategy" required physicians (and its medical liaisons) to perform the work normally performed by the Company's salesman in order to promote Neurontin. Adoption of this strategy required Defendants to make tens of thousands of dollars in payments both to physicians who would act as a surrogate sales force as well as to practicing physicians who would receive the Neurontin off-label message. In other words, pursuant to the "publication strategy," Defendants made thousands of payments to induce physicians either to recommend the prescription of Neurontin or to order Neurontin, in violation of federal kickback laws. Defendants knew that their employees and independent contractors

- 19 -

under their control violated these laws and regulations routinely. The following describes the various ways Defendants funneled bribes to physicians.

### 1.  Consultants' Meetings

48.    Defendants regularly used "consultants" meetings to channel illegal payments to physicians to encourage them to prescribe Neurontin for off-label uses. 42 U.S.C. § 1320A-7 and 42 C.F.R. § 1001 prohibit kickbacks to physicians and medical care providers. "Kickbacks" include payments, gratuities, and other benefits paid to physicians who prescribe prescription drugs by the manufacturers of those drugs. Defendants disguised these kickbacks as "consultantships," by purportedly hiring physicians for their expert opinions. Entirely unrelated to any scientific or educational activity, these kickbacks took the form of cash payments, travel benefits, entertainment, and other benefits. Defendants established internal guidelines to govern the award of these benefits to physicians. These guidelines were based on the number of prescriptions the physician wrote for Neurontin and the ability of that physician to influence her colleagues to prescribe Neurontin for off-label purposes.

49.    These consultantships followed a familiar pattern. Defendants recruited physicians to dinners or conferences and paid them to hear presentations about off-label uses of Neurontin. Defendants sometimes (but not always) had the doctors sign sham consulting agreements. At these meetings Defendants would give these doctors lengthy presentations relating to Neurontin, particularly regarding off-label usage. Presentations would be made by Defendants employees or physician speakers hired by Defendants for the purpose of promoting Neurontin, and attendees' questions relating to the administration of Neurontin use would be solicited and answered. At some conferences, the sponsoring organization or Defendants intentionally posed questions to the speakers about off-label use to insure that the attendees were exposed to such information.

- 20 -

50.    At some "consultants" meetings, a few questions would be posed to the "consultants" regarding Defendants marketing of Neurontin or how Defendants sales force could provide better service to the doctors. The consultants' meetings, however, were not held – and the "consultants" were not paid – for the purpose of providing Defendants with expert, independent advice. Defendants in many cases did not even record the "advice" provided by its "consultants," and what little advice was collected was never acted upon or reviewed.

51.    Rather, Defendants routinely analyzed whether consultants meetings successfully influenced physicians' prescription writing practices. At some meetings, the "consultants" were directly asked if they would write more Neurontin prescriptions as a result of the meeting. Such a question would have been irrelevant if the actual purpose of the meeting was to receive the "consultants'" advice. Defendants also routinely tracked consultants' Neurontin prescription writing practices after these meetings. Using market data purchased from third parties, Defendants analyzed whether the doctors they had paid had in fact written more Neurontin prescriptions after the meeting. Again, such data was only relevant if the real purpose of the payments was to influence the doctors to order more Neurontin.

52.    A typical "consultants'" meeting was held in Jupiter Beach, Florida, for neurologists from the Northeast CBU during the weekend of April 19-21, 1996. The "consultants" selected for this meeting were not chosen on the basis of their consulting acumen, but because of their potential to write Neurontin prescriptions. In a memorandum announcing the event to Defendants' personnel, the Neurontin Marketing Team acknowledged that in order to target neurologists with the greatest potential for writing Neurontin prescriptions, sales personnel must select potential attendees from a list of the top prescription writers for anti-

epileptic drugs in the Northeast. Only persons who fell within this desirable demographic were to be invited.

53.    Qualifying physicians were given a round-trip airfare to Florida (worth $800.00), two nights' accommodations (worth $340.00), free meals and entertainment, ground transportation and a "consultant's fee" of $250.00. Ample time was provided so that the Parke-Davis consultants could enjoy the beach resort. The value of the junket was approximately $2,000.00 per physician.

54.    The Jupiter Beach consultants' meeting included two half days of presentations by Defendants relating to Neurontin, including extensive presentations relating to off-label uses. Although technically the presentations were provided by an independent company, Proworx, all Defendants designed, monitored, and approved all aspects of the presentation. They selected the speakers, picked the presentation topics, and previewed the content of the presentations to make sure that they were acceptable. Defendants paid all expenses relating to the consultants' meeting, including all payments to the attendees and the presenters, all travel, accommodation, meals and entertainment expenses, all presentation expenses, all expenses and fees incurred by Proworx, and the substantial fees paid to the presenting physicians. Notwithstanding the FDA's prohibition regarding the provision of promotional materials relating to off-label uses, Defendants provided written abstracts of the presentations that detailed off-label use of Neurontin to each of their "consultants."

55.    Defendants made no effort to obtain professional advice at Jupiter Beach from the "consultants" Defendants had wined, dined, and entertained during the weekend. A follow-up memorandum to Defendants' marketing officials noted that "the participants were delivered a hard hitting message about Neurontin," and emphasized that the participants were

- 22 -