encouraged to use Neurontin at higher doses. More importantly, after the conference Defendants generated "trending worksheets" listing the doctors who attended the consultants' meeting. These worksheets enabled Defendants to track Neurontin prescription habits of the attendees before and after the consultant's meetings to determine if these "high writing" prescribers wrote more Neurontin scripts after the conference. Persuading these heavy prescribers to order more Neurontin for their patients was, in fact, the sole purpose of the Jupiter Beach junket.

56. Jupiter Beach was not unique. Defendants hosted dozens of consultants' meetings between late 1995 and 1997 in which the "consultants" received payments and gratuities as well as presentations on off-label Neurontin use designed to change the physicians' prescription writing habits. Comparable consultants' meetings included, but were not limited to, the following:

| Topic | Location | Date |
|---|---|---|
| Mastering Epilepsy | La Costa Resort, CA | July 20-23, 1995 |
| Mastering Epilepsy | Santa Fe, NM | Nov. 16-19, 1996 |
| Neurontin Consultants Conference | Marco Island, FL | Feb. 2-4, 1996 |
| Pediatric Epilepsy | Hutchinson Island, FL | Feb. 9-11, 1996 |
| Mastering Epilepsy Science | Walt Disney World, FL | Feb. 22-25, 1996 |
| Pediatric Epilepsy | Hutchinson Island, FL | March 8-10, 1996 |
| Mastering Epilepsy | Aspen, CO | April 18-21, 1996 |
| Affective Disorders in Psychiatry | Marco Island, FL | April 20, 1996 |
| Affective Disorder Consultants Conference | Southern Pines, NC | April 27, 1996 |
| Neuropathic Pain Conference | Palm Beach, FL | May 11, 1996 |
| Regional Consultants Conference | Boston, MA | May 10-11, 1996 |
| Epilepsy Management Advisors Meeting | La Jolla, CA | June 21-23, 1996 |
| Epilepsy Management | Rancho Bernardo, CA | June 28-30, 1996 |
| Use of Anti-Convulsants in Psychiatric Disorders | Short Hills, NJ | Oct. 18-19, 1996 |
| Non-Epileptic Uses of Neurontin | Longboat Key, FL | Nov. 6, 1996 |

| Neurological Conditions Conference | Atlanta, GA | Sept. 27-28, 1997 |
|---|---|---|

Other consultants' meetings took place in Charleston, S.C., Coconut Grove, FL, Naples, FL, Memphis, TN, Louisville, KY, Washington, D.C., Aspen, CO, and other places. Hundreds, if not thousands, of physicians received kickbacks to attend these events.

     57. Not all payments to consultants were made at conferences as elaborate as Jupiter Beach. Many consultants' meetings consisted of lavish dinners at local restaurants. The emphasis on these meetings was also on off-label uses, and Defendants paid $200 "honorariums" to the physicians who did nothing for the payment except show up. At none of the events did the consultants provide legitimate consultation to Defendants, but at all of the events the "consultants" were encouraged to increase their Neurontin prescriptions.

    2.    **Medical Education Seminars**

     58. Another format where Defendants paid kickbacks to physicians to hear off-label promotion of Neurontin were programs billed as Continuing Medical Education seminars (CME). These conferences and seminars were set up to appear to qualify for an exception to the FDA's off-label marketing restrictions. This exception permits physicians to learn about off-label uses of pharmaceuticals at independent seminars. Such seminars, however, must be truly independent of the drug companies. The companies may make "unrestricted grants" for the purpose of a seminar, but they may not be involved in formulating the content of the presentations, picking the speakers, or selecting the attendees. Defendants observed none of these requirements with regard to the CME seminars they sponsored for the promotion of off-label uses of Neurontin. While Defendants retained third party organizations, such as Proworx and Medical Education Systems, to present the event seminars, it had control of virtually every aspect of these events. Furthermore, the seminar companies obtained Defendants' approval for

all content presented at the seminars. Defendants also paid all expenses, including all the seminar companies' fees.

59. Although the seminar companies acted as the conduit for the payments and gratuities given to the physician attendees, Defendants controlled every aspect of the CME programs. They designed and approved the programs; hand-picked the speakers for the seminars; approved the seminar presentations; previewed, in most cases, the contents of the seminars prior to delivery; selected the attendees based on their ability and willingness to prescribe high quantities of Neurontin; evaluated the presentations to make sure Defendants' "message" was appropriately delivered; black-listed presenters whose presentations were not sufficiently pro-Neurontin; and monitored the prescribing patterns of the physicians who attended these conferences to insure the purpose of the conference–increased writing of Neurontin prescriptions–was achieved. Follow-up reports to marketing executives at Parke-Davis highlighted that the attendees received presentations regarding off-label marketing and recommendations for dosages larger than those labeled effective by the FDA. These memoranda also reported to senior executives the pledges made by attendees to order more Neurontin for their patients.

60. For some seminars, high prescription-writing physicians were selected to receive junkets comparable to those Parke-Davis provided to the attendees of the Jupiter Beach consultants' meetings. Others were less lavish, but physicians still received free tuition, free accommodations, free meals, and cash. Frequently Defendants' CME seminars were accredited by continuing medical education organizations, which meant that the physicians taking advantage of Defendants' junkets did not have to pay tuition or spend additional time to fulfill

their continuing medical education licensure requirements by attending truly independent medical education programs.

61.     Representative CME programs sponsored by Parke-Davis where it paid extensive kickbacks to attending physicians, included, but are not limited to, the following:

| Seminar | Location | Date |
| --- | --- | --- |
| Merritt-Putnam Epilepsy Postgraduate Course | | Jan. 19, 1996 |
| Merritt-Putnam Seminar | Chicago, IL | Jan. 26, 1996 |
| New Frontiers in Anti-Epileptic Drug Use | California | Sept.-Oct. 1996 |
| Diabetic Neuropathy | Boston, MA | June 22-24, 197 |
| Merritt Putnam Symposium | Key Biscayne, FL | September 11, 1997 |
| Merritt Putnam Conference on Monotherapy | Palm Springs, CA | Sept. 19, 1997 |
| Merritt-Putnam Conference on Monotherapy | St. Louis, MO | Oct. 3, 1997 |
| Merritt-Putnam Symposium | Boston, MA | Dec. 5, 1997 |

3.     **Grants and "Studies"**

62.     Defendants also made outright payments, in the form of grants, to reward demonstrated Neurontin believers and advocates.  Defendants' sales managers identified key doctors who actively prescribed Neurontin or programs which were willing to host Neurontin speakers and encouraged such persons or programs to obtain "educational grants" from them. Under this program of kickbacks Defendants paid:

- $2,000.00 to Berge Ninmpolan, MD, "a great Neurontin believer," to attend a neurology seminar in San Francisco, in March 1996.

- $1,000.00 to the University of Texas at Houston Department of Neurology to host a symposium where presentations would be made regarding successful off-label treatment with Neurontin.

- $3,000.00 to the University of Texas Medical School to host a conference in August 1996 at which a well-known specialist in epilepsy, who prescribed Neurontin, would attend.

- 26 -

- $4,000.00 to pay for a neurologist from the University of Texas at San Antonio to attend the American Epilepsy Society Conference in December 1996, a conference at which Parke-Davis was presenting extensive documentation on off-label uses for Neurontin.

- $2,500.00 to the University of Texas in Houston to bring Dr. B.J. Wilder to the campus to hold a seminar.  Dr. Wilder was one of Neurontin's biggest boosters for off-label indications and had been paid tens of thousands of dollars to promote Neurontin's off-label uses for Parke-Davis across the country.

- $2,500.00 in June 1996 to pay for representatives from the University of Pennsylvania Medical Center to attend a conference in Saint Petersburg, Russia on the utilization of anti-epileptic drugs, including Neurontin.

- $5,000.00 to Dr. Alan B. Ettinger, of Stonybrook, N.Y. in December 1996, a physician who had informed Parke-Davis that he was interested in possibly doing research in Neurontin and maintained a database of patients who were treated with Neurontin.

- $500 to Bruce Ehrenberg, of Boston, MA, a leading speaker for Parke-Davis regarding off-label use of Neurontin, to attend a conference in China.

- $1000 to Israel Abrams, M.D., Paul C. Marshall, M.D., Beth Rosten, M.D. and Spencer G. Weig, of Worcester MA, for educational programs in February 1996. According to the local Parke Davis representative requesting the grant, "much of the Neurontin success in Worcester has been attributed to . . . the 4 pedi[atric] epileptologists below."

- $1,400 to Dr. Ahmad Beydoun of Ann Arbor, MI for post-graduate training in March 1996.  This grant was processed on a quick turnaround, the Parke-Davis representative noting "I realize that this is a very short time line; however, Dr. Beydoun is a very important customer."

- $1,500 to Jim McAuley, R.Ph, Ph.D. for educational materials relating to epilepsy. Parke-Davis decided to provide the funds because McAuley was an advocate of Neurontin and he was important in getting another Parke-Davis drug, Cerebyx, accepted on the formulary for Ohio State University.

- A grant in an unknown amount to University Hospital in Cleveland in exchange for hosting programs regarding Neurontin's use in treating neuropathic pain at conferences specifically devoted to obtaining referrals from other doctors.

63.     These grants, and others, were charged to the Neurontin marketing budget.

Each of these grants were made solely because an individual who would receive the money was

- 27 -

325580.1

a large Neurontin supporter or would host a program where a well known Neurontin supporter would recommend that other physicians increase their prescriptions of Neurontin. Each of these grant awards constituted a reward or kickback for the recipient's advocacy of Neurontin.

64.     Defendants' medical liaisons informed leading Neurontin subscribers that significant advocacy for Neurontin would result in the payment of large grants. These studies did not involve significant work for the physicians. Often times they required little more than collating and summarizing office notes or records. Oftentimes, the physicians contributed nothing at all to the study; as noted below, Defendants frequently hired technical writers to write the articles for which the "authors" had been given grants.

65.     Defendants were aware that these articles and studies provided minimal scientific benefit. In a letter to the FDA in June 1997, Defendants submitted a list of "studies relating to pain, pain syndromes, and psychiatric disorders" but failed to include any of the studies described in Paragraph 63, purportedly funded by Parke-Davis. Defendants intentionally neglected to report these "studies" to the FDA because they knew the funded "research" had no scientific value and would not be deemed studies by the FDA. Payments Defendants made for these "studies" included, but were not limited to, the following:

| Funded Project | Payee | Payment |
|---|---|---|
| Statistical Analysis of Patients Treated With Neurontin For Pain | Hans Hansen, M.D., Statesville, N.C. | $7,000.00 |
| Reduction of Sympathetically Medicated Pain and Sudomotor Function | David R. Longmire, M.D., Russellville, AL | $7,000.00 |
| Data entry for Neurontin and Pain Analysis | David Meyer, M.D. | [amount unknown] |
| Trial of Neurontin for distal symmetric polyneuropathy associated with AIDS | Joseph Weissman, M.D., Atlanta, GA | $20,000.00 |

| Funded Project | Payee | Payment |
|---|---|---|
| Neurontin for neuropathic pain in chronic pain syndromes | Lavern Brett, M.D., Washington, D.C. | $25,000.00 |
| Retrospective chart analysis of Neurontin use with bipolar disorder patients | Ralph S. Rybeck, M.D. | $5,000.00 |
| Retrospective Analysis of Neurontin in the treatment of pain | David R. Longmire, M.D., Russellville, AL | $2,000.00 |
| Retrospective Analysis of Neurontin in the treatment of chronic pain | Don Schanz, D.O., Traverse City, MI | $8,000.00 |
| Case histories relating to use of Neurontin as an adjuvant analgesic | Elizabeth J. Narcessian, M.D., W. Orange, N.J. | $4,000.00 |

Plaintiffs have reason to believe that other payments were made to physicians for other "studies" of questionable scientific credibility.

66.     One particularly large study conducted by Parke-Davis served as yet another engine to financially reward physicians for prescribing Neurontin. In 1995 and 1996 Parke-Davis conducted an enormous Phase IV trial known as STEPS. Although STEPS took the form of a research clinical trial, it was, in fact, a marketing ploy designed to induce neurologists to gain comfort prescribing Neurontin at a far higher dose than indicated in the FDA-approved labeling. While most clinical studies have a limited numbers of investigators treating a number of patients qualified for the study, the STEPS protocol called for over 1,200 "investigators" to enroll only a few patients each. The participating physicians were instructed to titrate their patients to higher-than-labeled dosages of Neurontin to demonstrate that patients could tolerate high dosages of the drug. Rewarding physicians for prescribing high doses on Neurontin was another way to increase Neurontin sales, as higher per-patient dosages increased the amount of Neurontin sold. Additionally, the STEPS study was also designed to habituate physicians to

- 29 -

place non-study patients on Neurontin on doses higher than those found effective in the clinical trials monitored by the FDA.

67.     Physicians enrolling in the STEPS study were paid for agreeing to participate in the study and for every patient enrolled. At the conclusion of the study, Parke-Davis offered each of the 1,200 investigators additional cash for each patient the doctor kept on Neurontin after the study ended. These payments without question constituted kickbacks, since each participating doctor was expressly paid for writing Neurontin prescriptions for their patients.

### 4.     Payments to "Authors" of Ghost Written Articles

68.     Yet another method of rewarding doctors for their advocacy of Neurontin was to pay them honoraria for lending their names to scientific articles which were actually prepared and written by third parties Defendants had retained. In 1996 Parke-Davis retained AMM/ADELPHI, Ltd. ("AMM") and Medical Education Systems, Inc. ("MES") to prepare no less than twenty articles for publication in various neurology and psychiatry journals. Most of these articles concerned off-label usage of Neurontin. They were generated in a manner such that Defendants would have publications, the content of which they controlled, which they could distribute pursuant to their "publication strategy". Non-physician technical writers were retained by Defendants, and Defendants had the right to control the content of all of the articles. Defendants paid all expenses in connection with the creation of these publications.

69.     Once Defendants and the technical writers conceived the articles, Defendants and their outside firms attempted to find recognized Neurontin prescribers whose names could be used as the authors of these articles. In some cases, drafts of the articles were completed even before an "author" agreed to place his or her name on the article. This occurred even in connection with case histories that purported to describe the "author's" personal

- 30 -

treatment of actual patients. The "authors" were paid an honorarium of $1,000.00 to lend their names to these articles.

70.     Defendants and their outside firms also found journals to publish the articles. Defendants' role in creating, approving and sponsoring the articles was hidden from the public. While the articles might reference that the author received an honorarium from the outside firm, the articles failed to state that the honorarium was paid with money provided by Defendants and that Defendants had approved the content and hired the actual authors. For example, an article created by MES, *Gabapentin and Lamotrignine: Novel Treatments for Mood and Anxiety Disorders*, published in *CNS Spectrums*, noted that "an honorarium was received from Medical Education Systems for preparation of this article," but never revealed Defendants' retention of and payment to MES, or the fact that MES personnel, while under contract to Defendants, wrote the article.

71.     Publications Defendants distributed as part of their "publication strategy," intentionally misrepresented Defendants' role in the creation and sponsorship of the publications. Physicians were led to believe that the publications were the independent, unbiased research of the authors of the articles. For example, an article widely circulated by Defendants concerning the use of Neurontin in the treatment of Restless Leg Syndrome asserted that the authors Gary A. Mellick and Larry B. Mellick had not and never would receive financial benefit from anyone with an interest in Neurontin,. Yet the Mellick brothers had received tens of thousands of dollars for acting as speakers at Defendants' events.

5.     **Speakers' Bureau**

72.     Defendants also formed the Speakers' Bureau, another method to make large and numerous payments to physicians who recommended Neurontin at teleconferences, dinner meetings, consultants meetings, educational seminars, and other events. These speakers

repeatedly gave short presentations relating to Neurontin, for which they were paid anywhere from $250.00 to $3,000.00 per event. Speakers such as Steven Schachter, B.J. Wilder, Ilo Leppik, Gary Mellick, David Longmire, Gregory Bergey, Michael Merren, David Treiman, Michael Sperling, Martha Morrell, R. Eugene Ramsay, John Pellock, Ahmad Beydoun, Thomas Browne, John Gates, Jeffrey Gelblum, Dennis Nitz, Robert Knobler and others received tens of thousands of dollars annually in exchange for recommending to fellow physicians that Neurontin be prescribed, particularly for off-label uses. The payments that these doctors received greatly exceeded the fair value of the work they performed for Defendants. Speakers who most zealously advocated Neurontin were hired most frequently for speaking events, notwithstanding the fact that many of these events purported to be independent medical education seminars where independent information was supposed to be delivered.

73.     Defendants' marketing personnel, including its medical liaison staff, informed physicians of the lucrative rewards of joining the Speakers' Bureau. They told physicians were informed that if they prescribed enough Neurontin, they could also be eligible for receiving substantial payments just for describing their clinical experience to peers at events dedicated to promoting Neurontin's off-label uses. Defendants marketing personnel, however, made it clear that such invitations hinged on whether physicians prescribed sizeable enough quantities of Neurontin, preferably for off-label uses.

74.     Defendants were well aware that federal law prohibits such kickbacks. They also knew that federal safe harbors did not cover the extensive payments they made to doctors. Furthermore, Defendants were aware that their payments did not comply with the AMA's guidelines for payments to physicians.

- 32 -

75.    In 1997, in the wake of an investigation by the FDA, Parke-Davis conducted a review of its marketing practices in light of existing Medicaid kickback regulations. As a result of that review, Parke-Davis determined that none of the programs described above should have been pursued.  Parke-Davis issued guidelines to comply with Federal regulations, which essentially prohibited each of the programs described above.  Nonetheless, the payments to physicians for the off-label marketing of Neurontin did not cease, and the programs continued at least until 1998.  Plaintiffs believe that such payments continued after the merger of Warner-Lambert with Pfizer, and perhaps up to Warner-Lambert's guilty plea on May 13, 2004.

**F.    Illegal "Off-Label" Promotion Has Continued As Has The Continuing Impact Of The Earlier Misconduct**

76.    As a result of the conduct described above, physicians received large amounts of false information and therefore continue to prescribe Neurontin for off-label uses for which there is no reliable scientific support.

77.    Upon information and belief, Pfizer has routinely marketed Neurontin for off-label indications up until May of 2004, regardless of FDA limitations on the approved use of the particular product.  The staggering growth of Neurontin sales for non-approved FDA use highlights this continuing course of conduct.  From 1995 to 2003, Neurontin's sales soared from $97.5 million to nearly $2.7 billion.  With no reliable scientific studies supporting off-label uses, and with 90% of all prescriptions for Neurontin written for such uses, it is reasonable to infer that this explosion in sales stems from past and continuing promotional efforts by Defendants.

78.    Furthermore, although Neurontin is prescribed for many off-label indications, since 1999 the types of off-label usage continue to be weighted in the precise areas where Defendants focused their unlawful marketing efforts, i.e., as treatments for bipolar disorder, peripheral neuropathy, and migraine headaches.

- 33 -

79.     Various therapeutic substitutes compete for market share in these areas, with aggressive marketing efforts. If any company discontinued their promotional efforts in any of these treatment areas, they would suffer significant losses within that area. Neurontin has suffered no such drop in sales.

80.     Overall, "off-label" sales for Neurontin have steadily increased since 1998, and from 2000 onward have consistently represented 93-94% of all sales. Actual sales for approved uses have declined. Given the dearth of scientific support for off-label uses, this ratio of off-label sales to approved sales must be attributed to the past and continuing efforts by Defendants to promote Neurontin for off-label uses.

81.     Dr. C. Seth Landefeld opined in the *qui tam* litigation that a review of a drug reference source for Neurontin, as of August, 2002, revealed "no published scientific studies to support Neurontin's use for ... bipolar disorder." As a result of Defendants' illegal promotional activities, physicians have and continue to prescribe Neurontin to tens of thousands of patients who are in need of an effective treatment.

82.     A July 1, 2002, letter from Dr. Lisa Stockbridge of the Department of Health & Human Services ("HHS") confirms that Defendants continued as of that date to engage in off-label promotional efforts. Dr. Stockbridge notified Pfizer that certain of its marketing practices are "in violation of the Federal Food, Drug and Cosmetic Act ... because [Pfizer] makes representations about Neurontin that are false and misleading." HHS made the following objections to Pfizer's promotional activities:

> The presentation on the model of illustrations of cellular activity resulting from the administration of Neurontin ("Mechanism of Action"), In conjunction with the presentation of the human brain, and the prominent display of the name Neurontin makes representations about how Neurontin acts in the human brain. This presentation along with the depiction of the human brain and the

prominent display of the name "Neurontin" suggest that the mechanism of action of Neurontin has been established in the human brain. *This suggestion of proof of the mechanism of action is false. Specifically, it is contrary to the language in the-approved product labeling that states that " [t]he mechanism by which gabapentin [Neurontin] exerts its anticonvulsant action is unknown."*

Furthermore, the full presentation of the aforementioned areas of the human brain accompanied by purported "Mechanism of Action" and the prominent display of the name "Neurontin" is *misleading* because it suggests that Neurontin is useful for a broader range of CNS conditions than has been demonstrated by substantial evidence (i.e., it can be used for the treatment of any specific or non-specific brain disorder thought to involve the GABA-ergic neurotransmitted system that can originate in these parts of the brain). *Most obviously, the solo and prominent mention of the name Neurontin suggests that Neurontin can be used as monotherapy for various CNS disorders, notwithstanding that with respect to brain disorders, Neurontin is only indicated as "adjunctive therapy in the treatment of partial seizures with or without secondary generalization in patients over 12 years of age with epilepsy" and as "adjunctive therapy in the treatment of partial seizures in pediatric patients age 3-12 years."*

To address these objections, DDMAC recommends that Pfizer do the following:

> *1.    Immediately discontinue the use of this model and any* other promotional material with the same or similar issues. (Emphasis added.)

83.    On information and belief, the promotional materials described in

Dr. Stockbridge's letter were used by Pfizer employees to promote off-label uses of Neurontin.

84.    A second HHS letter, from June 6, 2001, again confirms that Pfizer's

marketing practices violated federal law. The letter addresses Pfizer's promotional advertising

that related to a 2001 study heralding "quality of life improvements" from the use of Neurontin

and reads as follows:

325580 1

Ms. Andrea Garrity
Director, Regulatory
Affairs Pfizer, Inc.
235 East 42nd Street
New York, New York 10017-5755

Re:   NDA #s 20-235, 20-882 Neurontin (gabapentin) MACMIS
      # 10174

Dear Ms. Garrity:

Through routine monitoring and surveillance, the Division of Drug
Marketing, Advertising, and Communications 9DDMAC) has
identified a slim jim (ID #NSJ5095A1) for Neurontin that *is
misleading and in violation of the Federal Food, Drug, and
Cosmetic Act and applicable regulations.*

Specifically, this slim jim misleadingly claims improvements in
quality of life (QOL) parameters based on the Neurontin
Evaluation of Outcomes in Neurological Practice (NEON) study.
Among other QOL parameters, the misleading presentation
includes improvement in social limitations, memory difficulties,
energy level, and work limitations. The NEON study is not
considered to be substantial evidence for claims of QOL
improvements because it is not a controlled study.

To address these objections, DDMAC recommends that Pfizer do
the following:

1.   Immediately discontinue the use of this slim jim and any
other promotional material and practices with the same or similar
messages.

2.   Respond to this letter within ten days. Your response
should include a statement of your intent to comply with the above,
a list of all promotional materials with the same or similar issues,
and your methods for discontinuing these promotional materials.

(Emphasis added.) Pfizer employees had used the foregoing promotional materials to market

off-label uses for Neurontin up until the company received this June 6, 2001, letter.

85.   The promotional materials referred to above, as well as other promotional

activities described herein, were not submitted to the FDA for approval as required by FDAMA,

21 U.S.C. § 360aa. In the above-cited examples where HHS cited Pfizer for violating federal

325580 1

law, HHS discovered the violations through its routine monitoring and surveillance activities, and not because Pfizer submitted its materials to HHS as required by law.

86.     Citations in a medical reference text for Neurontin, as of August 1997, confirm that there is no basis in the published scientific literature for the use of Neurontin to treat the following conditions: alcohol detoxification/alcohol withdrawal syndrome, ALS, antidepressant-induced bruxism, anxiety disorder, attention deficit disorder/attention deficit and hyperactivity disorder, behavior problems-dementia related, behavior dyscontrol, dipolar disorder, brachioradial pruritis, back pain, Charles Bonnet syndrome, ciguatera poisoning, cluster headache, cocaine dependency, diabetic peripheral neuropathy, depression, dosages in excess of 1800 mg per day, dystonia, essential tremor, failed back surgery syndrome, headache (SUNCT), headache, hemifacial spasm, hiccups, Lesch-Nyhan syndrome, mania, migraine prophylaxis, menopausal hot flashes, mood stabilization, multiple sclerosis complications, myalgias taxane induced neuropathic pain syndromes, neuropathic cancer pain, HIV-related neuropathy, nicotine withdrawal, nystagmus, obsessive-compulsive disorder, orthostatis tremor, pain-postpoliomyelitis pain, pain-RSD, pain disorder, partial seizures-monotherapy, partial seizures-pediatric, partial seizures-refractory, phantom limb syndrome, postherpetic neuralgia, restless les syndrome, trigeminal neuralgia, seizures - acute intermittent prophyria, seizures - brain tumor-induced, seizures - clozapine-induced, seizures -generalized, seizures - status epilepticus, schizophrenia, social phobia, spasticity, or any other indication other than seizures - adjunctive therapy.

87.     Nonetheless, as set forth above, Defendants engaged in promotional activities to convince physicians to use Neurontin to treat these conditions.

325580.1

88.     Any representations by any agent, employee, or person hired by Parke-Davis that, as of August 1997, scientific evidence supported Neurontin's use for the conditions listed in Paragraph 86 would therefore have been misleading.  Upon information and belief, Defendants' employees made representations that Neurontin was an appropriate treatment for some or all of these conditions.

89.     Citations in a medical reference-text for Neurontin, as of the third quarter of 2002, confirm that there is no basis in the published scientific literature for the use of Neurontin to treat the following conditions: alcohol detoxification/alcohol withdrawal syndrome, ALS, antidepressant-induced bruxism, anxiety disorder, attention deficit disorder/attention deficit and hyperactivity disorder, behavior problems-dementia related, behavior dyscontrol, dipolar disorder, brachioradial pruritis, back pain, Charles Bonnet syndrome, ciguatera poisoning, cluster headache, cocaine dependency, diabetic peripheral neuropathy, depression, dosages in excess of 1800 mg per day, dystonia, essential tremor, failed back surgery syndrome, headache (SUNCT), headache, hemifacial spasm, hiccups, Lesch-Nyhan syndrome, mania, migraine prophylaxis, menopausal hot flashes, mood stabilization, multiple sclerosis complications, myalgias taxane induced neuropathic pain syndromes, neuropathic cancer pain, HIV-related neuropathy, nicotine withdrawal, nystagmus, obsessive-compulsive disorder, orthostatis tremor, pain-postpoliomyelitis pain, pain-RSD, pain disorder, partial seizures-monotherapy, partial seizures-pediatric, partial seizures-refractory, phantom limb syndrome, postherpetic neuralgia, restless les syndrome, trigeminal neuralgia, seizures - acute intermittent prophyria, seizures - brain tumor-induced, seizures - clozapine-induced, seizures - generalized, seizures - status epilepticus, schizophrenia, social phobia, spasticity, or any other indication other

- 38 -

than the partial seizures-adjunctive therapy, partial seizures-pediatric, postherpetic neuralgia, and diabetic peripheral neuropathy.

90.    With the complete absence of scientific evidence to support the use of Neurontin to treat these conditions, the growth in Neurontin sales which occurred due to Neurontin's use for these conditions resulted from Defendants' continuing promotional activities.

91.    Any representations by any agent, employee, or person hired by Parke-Davis that, as of the third quarter of 2002, scientific evidence supported Neurontin's use for the conditions listed in Paragraph 89 would therefore have been misleading. Upon information and belief, Defendants' employees made representations that Neurontin was an appropriate treatment for some or all of these conditions.

### G.    Government Actions

92.    As noted above, Dr. Franklin initiated a *qui tam* action on behalf of the United States against Warner-Lambert in 1996. He alleged two counts of false claims caused by the knowing promotion of prescription sales ineligible for Medicaid Reimbursement and caused by the payment of kickbacks in violation of the Medicaid anti-kickback provisions, 31 U.S.C. § 3729. The federal court unsealed the complaint in the case in May of 2002.

93.    Fifty-one attorneys general also commenced a lawsuit against Warner-Lambert, alleging violations of state consumer protection laws that occurred when Warner-Lambert promoted Neurontin for various off-label uses.

94.    The United States Attorney for the District of Massachusetts filed a criminal information against Warner-Lambert. On May 13, 1994, the company pleaded guilty to several violations of the Food, Drug and Cosmetic Act, 21 U.S.C. §§331(a), 331(d), 333(a), 352(f)(1), and 355. Warner-Lambert was fined $240 million and agreed to cease and desist its

- 39 -

pattern of misconduct. The *qui tam* and the state attorneys general actions settled at the same time, with $24,640,000 of the fine going to Dr. Franklin and $38 million going to the states.

95.     The Assurance of Voluntary Compliance entered into between the states and Warner-Lambert explicitly provided that claims brought by individual consumers and entities were excluded from the settlement.

## V.     FRAUDULENT CONCEALMENT

96.     Plaintiffs were not and could not have become aware of Defendants' misconduct until the complaint in the *qui tam* action was unsealed in May of 2002. Defendants have and continue to conceal their off-label promotional activities. They have done so by, *inter alia*, (a) promoting Neurontin for off-label uses by soliciting physicians to lend their names to articles actually written by Defendants' employees and/or independent contractors under Defendants' control; (b) failing to disclose to the FDA the materials they used to promote Neurontin for off-label uses; (c) using medical liaisons, who are authorized to dispense solicited, scientifically-supported information, as disguised sales representatives; (d) misrepresenting their marketing and sales pitches as educational material at consultants' meetings and CME conferences; and (e) misrepresenting the safety and medical efficacy of Neurontin's off-label uses through their publication strategy. Because of these and other acts of concealment, Plaintiffs could not have discovered the scheme alleged herein in the exercise of reasonable diligence. Much of the scheme remains concealed by Defendants.

## VI.    THE ROLE OF NON-PHYSICIAN TECHNICAL WRITERS, PHYSICIANS AND VENDORS IN DEFENDANTS' MARKETING SCHEME

97.     The non-physician technical writers, physician "authors," and vendors, namely AMM and MES (collectively "Promotional Strategists") were key parties in Defendants' improper marketing and sales scheme. They knowingly and willfully facilitated, communicated,

and distributed the misrepresentations concerning the use of Neurontin for off-label uses. The non-physician technical writers wrote articles based on inaccurate and sometimes no scientific evidence concerning the safety and efficacy of Neurontin to treat off-label symptoms. The physicians lent their names as "authors" to such articles, misrepresenting the authorship and objectivity of such articles. Further, AMM and MES (collectively "Vendors") caused these articles to be published in a variety of medical journals across the country. In addition, the physicians who performed and participated in sham "studies" regarding the safety and efficacy of Neurontin for off-label uses were key parties to Defendants' scheme, as these physicians knowingly misrepresented facts and evidence concerning Neurontin's off-label uses.

98.    The Promotional Strategists were active participants in Defendants' scheme and were aware of, and interacted with, other participants in the fraudulent scheme.

99.    The Promotional Strategists operated collectively, for a common purpose, and as a continuing unit to perpetrate the fraudulent scheme relating to Neurontin.

100.    The Promotional Strategists' collective knowledge, involvement, and activity is evidenced by:

- the failure of the Promotional Strategists to advise government regulators, private insurers, and patients, including Plaintiffs and the Class, of the existence and spread of such misinformation concerning off-label uses of Neurontin;

- the acceptance by the Promotional Strategists of various types of incentives from Defendants in return for their agreement to write, author, and have published articles containing misrepresentations, knowing that other physicians and consumers would rely on such information; and

325580-1

- the agreement of the Promotional Strategists to permit Defendants to control the information relayed to the public in such articles.

## VII.   DEFENDANTS' MOTIVE

101.   Defendants' motive in creating and operating the fraudulent scheme and RICO Enterprises described herein was fraudulently to obtain additional revenues from the marketing and sale of Neurontin.

102.   The fraudulent scheme was designed to, and did, cause Plaintiffs and the Class to pay for Neurontin prescriptions to treat conditions for which the drug is not medically necessary. The fraudulent scheme also caused Plaintiffs and the Class to pay for Neurontin prescriptions to treat non-FDA approved conditions. In the absence of Defendants' improper conduct, Plaintiffs and the Class would not have paid for such Neurontin prescriptions.

## VIII.   USE OF THE MAILS AND WIRES

103.   During the Class Period, Defendants used thousands of mail and interstate wire communications to create and manage their fraudulent scheme. Defendants' scheme involved national marketing and sales plans and programs, and encompassed physicians and victims across the country.

104.   Defendants' use of the mails and wires to perpetrate their fraud involved thousands of communications throughout the Class Period, including:

- marketing and advertising materials about the off-label uses of Neurontin for which the drug is not safe and medically efficacious, such materials being sent to doctors across the country;

- communications, including financial payments, with the Vendors, non-physician technical writers, and physician "authors" discussing and relating to the publication of

articles touting off-label uses of Neurontin for which the drug is not safe and medically

efficacious;

- communications with the Vendors, doctors and private insurers that fraudulently

  misrepresented that Neurontin was scientifically proven to be safe and effective for off-

  label uses;

- communications with health insurers and patients, including Plaintiffs and the Class,

  inducing payments for Neurontin to be made in reliance on misrepresentations

  concerning the use of Neurontin for non-medically necessary uses; and

- receiving the proceeds of the Defendants' improper scheme.

105.   In addition, Defendants' corporate headquarters have communicated by

United States mail, telephone, and facsimile with various local district managers, medical

liaisons and pharmaceutical representatives in furtherance of Defendants' schemes.

## IX.   CLASS ACTION ALLEGATIONS

106.   Under Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring

this action on behalf of themselves and a Class, defined as:

> All individuals and entities in the United States and its territories
> who, for purposes other than resale, purchased, reimbursed and/or
> paid for Neurontin for indications not approved by the FDA during
> the period from January 1, 1994, through the present. For
> purposes of the Class definition, individuals and entities
> "purchased" Neurontin if they paid some or all of the purchase
> price.

Excluded from the Class are (a) Defendants and any entity in which any Defendant has a

controlling interest, and their legal representatives, officers, directors, assignees and successors,

and (b) any co-conspirators.  Also excluded from the class are any judge or justice to whom this

action is assigned, together with any relative of such judge or justice within the third degree of

relationship, and the spouse of any such person.

- 43 -

325580.1

107. The Class consists of numerous individuals and entities throughout the United States, making individual joinder impractical, in satisfaction of Rule 23(a)(1). The disposition of the claims of the Class members in a single class action will provide substantial benefits to all parties and to the Court.

108. The claims of the representative Plaintiffs are typical of the claims of the Class, as required by Rule 23(a)(3), in that the representative Plaintiffs are persons who, like all Class members, purchased and/or paid for Neurontin for indications not approved by the FDA. Such representative Plaintiffs, like all Class Members, have been damaged by Defendants' misconduct, in that, among other things, they paid for Neurontin to treat a condition for which the drug had not been demonstrated to be medically effective or safe, and for which the drug was not FDA-approved.

109. The factual and legal bases of Defendants' misconduct are common to all members of the Class and represent a common thread of fraud and other misconduct resulting in injury to Plaintiffs and all members of the Class.

110. There are many questions of law and fact common to Plaintiffs and the Class, and those questions predominate over any questions that may affect individual Class members, within the meaning of Rule 23(a)(2) and 23(b)(3). Common questions of law and fact include, but are not limited to, the following:

- Whether Neurontin is medically necessary for uses not approved by the FDA;

- Whether Defendants engaged in a fraudulent and/or deceptive scheme of improperly marketing and selling Neurontin for conditions for which it is not safe or medically efficacious;

- 44 -

- Whether Defendants engaged in a fraudulent and/or deceptive scheme of improperly marketing and selling Neurontin to treat conditions for which the drug was not approved by the FDA;

- Whether Defendants coached or instructed physicians how to conceal the off-label nature of Neurontin prescriptions on claim forms submitted by or to Plaintiffs and members of the Class;

- Whether it was the policy and practice of Defendants to prepare, fund and publish materials which contained false information and misrepresentations regarding off-label uses for Neurontin;

- Whether Defendants paid non-physician technical writers to write articles containing misinformation and misrepresentations concerning purported scientific evidence regarding the safety and medical efficacy of Neurontin to treat off-label conditions;

- Whether Defendants paid physicians to "author" articles written by others containing misinformation and misrepresentations concerning purported scientific evidence to support the use of Neurontin for the treatment of conditions for which it has not been scientifically proven to be safe or medically effective;

- Whether Defendants paid Vendors, namely AMM and MES, to market articles containing misinformation and misrepresentations concerning purported scientific evidence regarding off-label uses of Neurontin for which the drug is not safe or medically necessary;

- Whether Defendants are liable to the Class Members for damages for conduct actionable under the New Jersey Consumer Fraud Act;

- 45 -

- Whether Defendants are liable to Class Members for damages for conduct actionable under the Uniform Deceptive Trade Practices Act;

- Whether Defendants are liable to Class Members for damages for conduct actionable under the RICO statute;

- Whether Defendants are liable to Class Members for damages for conduct actionable as common law fraud;

- Whether Defendants unjustly enriched themselves at the expense of Class Members;

- Whether Defendants engaged in a pattern or practice that directly caused Plaintiffs and Class Members to pay for Neurontin prescriptions that were for non-medically necessary uses;

- Whether Defendants engaged in a pattern and practice that directly caused Plaintiffs and Class Members to pay for Neurontin prescriptions that were for non-FDA approved uses; and

- Whether Defendants engaged in a pattern of deceptive and/or fraudulent activity with the intent to defraud Plaintiffs and the Class Members.

111.    Plaintiffs will fairly and adequately represent and protect the interests of the Class, as required by Rule 23(a)(4). Plaintiffs have retained counsel with substantial experience in the prosecution of nationwide class actions. Plaintiffs and their counsel are committed to the vigorous prosecution of this action on behalf of the Class and have the financial resources to do so. Neither Plaintiffs nor counsel have any interests adverse to those of the Class.

112.    Plaintiffs and members of the Class have suffered, and will continue to suffer, harm and damages as a result of Defendants' unlawful and wrongful conduct. A class

- 46 -

action is superior to other available methods for the fair and efficient adjudication of the controversy under Rule 23(b)(3). Absent a class action, most members of the Class likely would find the cost of litigating their claims to be prohibitive, and will have no effective remedy at law. The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants, and promotes consistency and efficiency of adjudication.

## X.   TOLLING OF APPLICABLE STATUTES OF LIMITATIONS

113.   Any applicable statutes of limitations have been tolled by Defendants' knowing and active concealment and denial of the facts alleged herein. Plaintiffs and members of the Class have been kept in ignorance of vital information essential to the pursuit of these claims, without any fault or lack of diligence on their part. Plaintiffs and members of the Class could not reasonably have discovered the fraudulent nature of Defendants' conduct. Accordingly, Defendants are estopped from relying on any statute of limitations to defeat any of Plaintiffs' or the Class' claims.

## FIRST CLAIM FOR RELIEF
## VIOLATION OF 18 U.S.C. § 1962(c) (THE MES ENTERPRISE)

114.   Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

115.   Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3) who conducted the affairs of the enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

116.   The MES Enterprise is an association-in-fact within the meaning of 18 U.S.C. § 1961(4), consisting of each of Defendants, including their employees and agents, and MES. The MES Enterprise is an ongoing organization that functions as a continuing unit. The

- 47 -