**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| In re: NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | ) MDL DOCKET NO. 1629 ) ) Master File No.: 1:04-cv-10981-PBS ) ) Judge Patti B. Saris ) Mag. Judge Leo T. Sorkin |
| THIS DOCUMENT RELATES TO: ALL MARKETING AND SALES PRACTICES ACTIONS | ) ) ) ) |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS'
MOTION TO COMPEL DEFENDANTS' PRODUCTION OF DOCUMENTS**

**I.    Introduction**

The instant motion concerns two sets of requests for production of documents, one dealing mostly with custodial files of employees who were outside of the national marketing team, and the another dealing with specific categories of information that are not likely to be contained in the marketing team's files.

**A.    Plaintiffs' Discovery Requests and Defendants' Responses**

On October 16, 2006, Sales and Marketing Plaintiffs served the Class and Non Class Plaintiffs' Second Request for Production of Documents upon Defendants ("Second Request"). On November 13, 2006, Defendants served their Responses and Objections to Class and Non-Class Plaintiffs' Second Request for Production of Documents. See Exhibit A to Declaration of Ilyas J. Rona in Support of Plaintiffs' Motion to Compel Defendants' Production of Documents, filed contemporaneously herewith ("Rona Declaration").

1

On October 19, 2006, Plaintiffs served the Class and Non Class Plaintiffs' Third Request for Production of Documents upon Defendants ("Third Request").[1] On November 20, 2006, Defendants served their Responses and Objections to Class and Non-Class Plaintiffs' Third Request for Production of Documents. See Exhibit B to Rona Declaration. As set forth in those discovery responses, Defendants have objected to providing a significant portion of the documents requested by Plaintiffs. Defendants' main objections to the Requests are that the documents requested are not relevant, have previously been produced, or are not likely to lead to the discovery of admissible evidence.[2]

### B. The Outcome of the Meet-and-Confer Process

Counsel for the parties engaged in extensive discussions concerning Defendants' objections to Plaintiffs' discovery requests pursuant to Fed. R. Civ. P. 37(a)(2)(B). The first meet-and-confer took place on January 11, 2007 via a phone conference. See Rona Declaration, ¶ 6. During the initial meet and confer, the parties were able to resolve some of the discovery disputes. As to the remaining disputes, the parties held a second meet-and-confer on January 19, 2007. See Rona Declaration, ¶ 7.

During the second meet and confer, Defendants were clear in stating that there was certain documentation that it would not provide. Specifically, Defendants refuse to produce the custodial files of a number of Pfizer employees, including Suzan Carrington, Ellen Dukes, Joan Kaplan, John Marino, Marino Garcia, Paula Smith, and Kirk Taylor. See Rona Declaration, ¶ 8.

---

[1] Plaintiffs served two separate and distinct documents that were both mistakenly entitled Plaintiffs' Third Request for Production of Documents. This error is not relevant to the substance of this motion.

[2] Defendants also objected based on the relevant time period. However, the Court's order permitting the Plaintiffs to file a Third Amended Complaint resolved the discovery time limitation dispute.

In addition, Defendants refuse to produce responsive documentation to Request for Production Nos. 18, 19, 20, 21, 26, and 27. See Rona Declaration, ¶ 8.

## II. The Specific Requests for Production in Dispute

As set forth below, Defendants have objected to providing any responsive documentation in response to certain requests in the Second Request and Third Request for Production of Documents. Plaintiffs now seek to compel the Defendants to answer the following specific requests[3]:

### A. Third Request, Nos. 18, 21, and 27

Request No. 18:

All documents relating to indications an/or product uses considered by Defendants for Neurontin, including but not limited to any written verifications, agendas and meeting minutes in connection with "Consultant Meetings" as described on document V000003.

Response to Request No. 18:

In addition to the General Objections, Defendants object to Request No. 18 on the grounds that it is overly broad an unduly burdensome, including by requesting "all such documents "relating to" a number of topics. Defendants further object on the grounds that the request is duplicative of other requests include in Class and Non-Class Plaintiffs' First Request for the Production of Documents, to which Defendants responded and objected on April 11, 2005. Defendants further object on the grounds that the request is not limited to the appropriate time period., Defendants further object on the grounds that the request is not limited to documents relating to the relevant off-label uses of Neurontin, an therefore seeks daunts that are not relevant to the litigation nor reasonably calculated to led to the discovery of admissible evidence. Defendants further object on the grounds that they have already produced documents responsive to this request.

Subject to and without waiving the General Objections and the foregoing Specific Objections, Defendants will produce, at a mutually convenient time and location, additional documents, to the extent they exist, from the files of the marketing team for Neurontin that related to the use of Neurontin for relevant off-label indications through May 31, 2001.

Request No. 21:

All documents regarding market trends, anticipated and actual effects of generic entry and/or product goals for Neurontin, including but not limited to, short and long-range forecasts

---

[3] For the convenience of the Court, Plaintiffs will recite the Request and Response Verbatim.

for Neurontin, market share analysis and tracking, product planning and development and price launch or price change market analysis.

Response to Request No. 21:

In addition to the General Objections, Defendants object to Request No.21 on the grounds that it is overly broad and unduly burdensome, including by requesting "all" such documents. Defendants further object on the grounds that the request is duplicative of other request included in Class and Non-Class Plaintiffs' First Request for the Production of Documents, to which Defendants responded and objected on April 11, 2005, and which were discussed at meet-and-confer sessions in May and June, 2005. Defendants further object on the grounds that the request is not limited to the appropriate time period. Defendants further object on the grounds that the request is not limited to documents relating to the relevant off-label uses of Neurontin. Defendants further object on the grounds that the request seeks documents that are not relevant to the litigation nor reasonably calculated to lead to the discovery of admissible evidence. Defendants further object on the grounds that they have already produced documents responsive to this request.

Subject to and without waiving the General Objections and the foregoing Specific Objections, Defendants will produce, at a mutually convenient time and locations, additional documents , to the extent they exist, from the files of the marketing team for Neurontin that relate to the use of Neurontin for relevant off-label indications through May 31, 2001.

Request No. 27:

All documents reflecting communications among Defendants' sales force and detailing personnel regarding Neurontin sales or promotion.

Response to Request No. 27:

In addition to the General Objections, Defendants object to Request No. 27 on the grounds that it is patently overly broad, unduly burdensome, harassing and oppressive, particularly by requesting "all" such documents from "Defendants' sales force and detailing personnel." Defendants further object on the grounds that the request is not limited to the appropriate time period. Defendants further object on the grounds that the request is not limited to documents relating to the relevant of-label uses of Neurontin, an therefore seeks documents that are not relevant to the litigation nor reasonably calculated to lead to the discovery of admissible evidence.

Subject to and without waiving the General Objections an the foregoing Specific Objections, Defendants will produce, at a mutually convenient time and location, additional documents, to the extent they exist, from the files of the marketing team for Neurontin that relate to the use of Neurontin for relevant off-label indications through May 31, 2001.

4

Argument

For Request Nos. 18, 21, and 27, Defendants agreed to produce some responsive documentation, but only if found in the "marketing team" files. However, as this Court has already recognized, the scope of this litigation goes far beyond such a limitation. Indeed, the title of this litigation is *In re Neurontin Marketing, Sales Practices, and Product Liability Litigation*. Defendant recently tried this limiting approach in responding to Plaintiff's First Set of Interrogatories, which this Court summarily rejected as insufficient in Discovery Order No. 7.

With respect to Request No. 18, Plaintiffs seek information relating to the indication and product uses for which Neurontin was considered. This information is relevant, as it will tend to show whether the Defendants based their decisions vis-à-vis off-label uses on the market potential (as Plaintiffs contend) or on the existence of bona fide science (as Defendants contend). Either way, such information is relevant to claims and/or defenses in this litigation and should be produced.

With respect to Request No. 21, Plaintiffs seek "market trends, anticipated and actual effects of generic entry and/or product goals for Neurontin…" This information includes: "short and long-range forecasts for Neurontin, market share analysis and tracking, product planning and development and price launch or price change market analysis." While some of the requested information may be found in the marketing team's files, much of the requested information is housed either in specialty groups (i.e. tracking, price launch etc.) that are outside of marketing, or it is likely to originate in the upper echelons of Pfizer, and outside of the purview of the marketing team. For example, "product planning and development" are normally functions that are done prior to the marketing team's involvement in a drug. These functions decide whether a

drug gets marketed. For obvious reasons, leaving that decision to the marketing department would be problematic.

With respect to Request No. 27, Defendants have already conceded that the VP of Sales and certain regional sales managers have relevant information. Thus, there is no reason why responsive information could not be produced at least from the files of those individuals. Moreover, to the extent that the Sales Department maintained its records of its internal communications concerning Neurontin, such information is relevant and should be produced.

      **B.**     **<u>Third Request, No. 19</u>**

<u>Request No. 19</u>

All documents supporting value analysis for marketing Neurontin to providers, health plans and/or other payers.

<u>Response to Request No. 19:</u>

In addition to the General Objections, Defendants object to Request No. 19 on the grounds that it is overly broad and unduly burdensome, including by requesting "all" such documents. Defendants further object to the request on the grounds that the phrases "value analyses" and "providers, heath plans and/or other payers" are vague an ambiguous. Defendants further object on the grounds that the request is not limited to the appropriate time period. Defendants further object on the grounds that the request is not limited to documents relating to the relevant off-label uses of Neurontin, and therefore seeks documents that are not relevant to the litigation nor reasonably calculated to lead to the discovery of admissible evidence.

      <u>Argument</u>

Value analysis refers to the concept of analyzing and computing a drug's usefulness based on cost-benefit analysis. In general terms, value analysis looks at a drug's benefits and costs in terms of dollars and cents, and compares that analysis to those of other drugs. Thus, an integral part of a value analysis to take a drug's benefits, if any, and compare that to the cost. If the same benefits can be obtained for less, then a drug's "value" will be deemed low. Plaintiffs have alleged this to be the case for a wide variety of Neurontin's indications. For this reason

6

alone, such documents should be produced. Of course, Pfizer contends the opposite—that Neurontin is actually effective for a wide variety of indications. If this is true, and it would be a defense in this litigation, then Plaintiffs are equally entitled to information which is "reasonably calculated to lead to the discovery of admissible evidence" relating to the "claim or defense of *any* party." See Amica Mut. Ins. Co. v. W.C. Bradley Co., 217 F.R.D. 79 (D. Mass. 2003); Fed. R. Civ. P. 26(b)(1).

Finally, Plaintiffs believe that value analysis was itself part of the marketing campaign, and that misleading statements made in a value analysis are actionable. The average consumer and physician does not pay for anything more than a fraction of the cost of a prescribed drug; for this reason, value analysis is directed at the parties that actually pay for drugs, i.e. "health plans and/or other payers." In this litigation, several of the class representatives are precisely such third party payors. To the extent that they were misled into believing that Neurontin was valuable or useful to treat indications when it in fact was not, such documents should be produced.

### C.   Third Request, No. 20

Request No. 20:

All documents generated, reviewed, considered, analyzed or communicated by Defendants which announce or summarize drug indications for Neurontin.

Response to Request No. 20:

In addition to the General Objections, Defendants object to Request No. 20 on the grounds that it is overly broad and unduly burdensome, including by requesting "all" such documents. Defendants further object on the grounds that the request is vague, ambiguous and incomprehensible. Defendants further object on the grounds that the request is not limited to the appropriate time period. Defendants further object on the grounds that the request is not limited to documents relating to the relevant off-label uses of Neurontin, and therefore seeks documents that are not relevant to the litigation nor reasonably calculated to lead to the discovery of admissible evidence.

Subject to and without waiving the General Objections and the foregoing Specific Objections, Defendants will produce for inspection and copying, at a mutually convenient time and location, the Neurontin NDAs and INDs.

Argument

In this request, Plaintiffs seek documents that "announce or summarize" Neurontin's indications—basic documentation that reflects the indications of Neurontin from the Defendants' perspective. The request applies to internal and external documents, and is not limited to those documents that were filed with the FDA. (In fact, given the procedural history of this case, the FDA is hardly the best place to look for relevant documents relating to the fraudulent marketing of Neurontin). Although the text of the request does not mention the FDA, Defendants have apparently unilaterally inserted such a limitation into the request and have only agreed to produce the NDAs (New Drug Applications) and INDs (Investigational New Drug applications), documents that are filed with the FDA. Such a limitation is inexplicable. Plaintiffs clearly seek internal and external documents that summarize and discuss the gambit of off-label uses that are the subject of this litigation. Such relevant documentation is basic and goes to the heart of Plaintiffs' allegations.

D. **Custodial Files:**
**Second Request, No. 1 (n), (q), (t), (bb), (gg), (pp), and (rr)**

In the Second Request, Plaintiffs requested the custodial files of multiple individuals that worked on Neurontin either during the Warner-Lambert or Pfizer years. Defendants have agreed to produce the custodial files of some, but are still refusing to produce a number of custodial files, including those for Suzan Carrington, Ellen Dukes, Joan Kaplan, John Marino, Marino

Garcia, Paula Smith, and Kirk Taylor.[4]  During the two meet-and-confers discussing the custodial files, Defendants stated basis for not producing was that Plaintiffs have not fully articulated a reason they want the named custodial files.  Defendants do not dispute that these individuals had some type of involvement with Neurontin; rather, Defendants have turned the Federal Rules of Civil Procedure on its head by requiring the Plaintiffs to specifically explain the relevance of these custodians, rather than articulating themselves why these custodians are not relevant.  Given that the Defendants have vastly superior information about the relevance of these custodians, such an approach is designed to prejudice the Plaintiffs and leads inevitably to motion practice.  Moreover, such an inappropriate shift of the burden puts Plaintiffs in the prejudicial position of being forced to either: (a) point out information (such as job titles, departments etc.) that Defendants are already aware of; or (b) disclose their work product and mental impressions concerning the litigation if there is information that Defendants are not already aware of.  If Defendants have a legitimate basis to not produce the files, they can articulate a reason for the objection.  However, they have thus far abjectly failed to do so.

Moreover, the relevance of these individuals should be self-evident to the Defendants.  For example:

Suzan Carrington was the Senior Manager of for the Office of Grants and Contracts.  As the Court may recall, Defendants have refused to identify *all* members of the Neurontin grants committee and will only produce documents from *some* of the members—i.e. those that were on the Neurontin marketing and medical teams.  Suzan Carrington appears not to be a member of either team; clearly, as a Senior Manager, she is highly likely to possess relevant information

---

[4] Additionally, Defendants have refused to produce the custodial files of Doreen Gasparella, John Rocchi, and Jon Sloss.  Plaintiffs believe that these custodians have relevant information and that their files should be produced.  Furthermore, Defendants have identified David Murphy as a Warner-Lambert era custodian, even though Plaintiffs are aware that Pfizer employed him after the merger. To the extent that Mr. Murphy's Pfizer-era custodial file is <u>not</u> being produced, Plaintiffs include seek his custodial file by this motion as well.

9

about the grant process, including the ultimate decision about which grants get approved and which grants get declined.

Ellen Dukes was involved in Outcomes Research, a sector of Pfizer that reviewed the costs and benefits of a drug, specifically the cost of <u>not</u> treating a patient with a drug.  With respect to Neurontin, the main goal of Outcomes Research was to develop information that supported the off-label marketing message.  For example, if Pfizer wanted physicians to use Neurontin for bipolar disorder, one prong of the marketing message (apart from suppressing the existence of negative clinical information) would be to "inform" doctors of the cost of <u>not</u> treating their bipolar patients with Neurontin.  Clearly, such information is part-and-parcel of the marketing campaign, and should be produced.

Joan Kaplan was a Senior Manager of Professional (i.e. physician) Relations, a position that involved coordination with key Neurontin Opinion Leaders, high-prescribing physicians who toured the country at Pfizer's expense, extolling the virtues of Neurontin.  At this stage in the litigation, the relevance of Pfizer's interaction with Opinion Leaders cannot be disputed and Ms. Kaplan's custodial file should be produced.

John Marino and Marino Garcia were both key members of the Neurontin Worldwide Marketing Team.[5]  Both were instrumental in developing and driving the key Pfizer marketing strategies for Neurontin.  The Neurontin Worldwide Marketing Team supervised and set the direction for all marketing activities, including national marketing activities.  A review of the documents produced thus far indicates that it was the Neurontin Worldwide Marketing Team— not the national marketing team—that decided which indications would be pursued and formulated the strategies.  While the national marketing team may have had discretion over how

---

[5] Somewhat confusingly, it appears possible that at some point, both John Marino and Marino Garcia were team leaders.

the marketing strategies were implemented (i.e. tactics), it does not appear that it had any discretion over formulation of the overarching marketing strategies. Pfizer's assertion that the Worldwide Team had nothing to do with the US is simply wrong. The Worldwide Team was primarily responsible for setting the global marketing plans, and given the fact that the US is by far the largest single market, and provides a majority of the profits, the Worldwide Team not surprisingly spent much of its time focused on the United States. For example, John Marino was actively involved in the suppression of at least one negative study for Neurontin.

Moreover, Marino Garcia was one of the senior marketing employees on the "$A_2D$ Team," a team that was in charge of marshalling scientific evidence to support Neurontin's use in psychiatric and neuropathic pain-related indications. Class Plaintiffs believe that the $A_2D$ Team became one of Pfizer's core marketing teams. Accordingly, both John Marino and Marino Garcia's custodial files should be produced.

Paula Smith was in charge of Worldwide Marketing Operations and was in charge of coordinating the stock of Neurontin marketing materials. Thus, she is the best person to go to obtain sets of the marketing materials that Pfizer used, and her custodial file should be produced.

Kirk Taylor was a member of the medical team and was a member of the Publications Sub-Committee ("PSC"). Given that Defendants have represented that they would produce the files of medical team members that were on the PSC, Plaintiffs are at a loss why Defendants will not produce his file. Nevertheless, such files are relevant and should be produced.

### III    Conclusion

For the foregoing reasons, Plaintiffs respectfully request that the Court order the Defendants to produce: (a) all responsive documentation to Request Nos. 18, 19, 20, 21, and 27

11

from the Third Request; and (b) the custodial files of Suzan Carrington, Ellen Dukes, Joan Kaplan, John Marino, Marino Garcia, Paula Smith, and Kirk Taylor, called for in the Second Request.

Respectfully submitted,

| For the Plaintiffs: | Dated: January 29, 2007 |
|---|---|
| /s/ Thomas M. Sobol, Esq.<br>HAGENS BERMAN SOBOL SHAPIRO LLP<br>Thomas M. Sobol, Esq. (BBO #471770)<br>Ed Notargiacomo, Esq. (BBO#567636)<br>One Main Street, 4th Floor<br>Cambridge, MA 02142 | |
| LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP<br>Barry Himmelstein, Esq.<br>275 Battery Street, 30th Floor<br>San Francisco, CA 94111-3339 | |
| GREENE & HOFFMAN<br>Thomas Greene, Esq.<br>125 Summer Street<br>Boston, MA 02110 | |
| DUGAN & BROWNE<br>James Dugan, Esq.<br>650 Poydras Street, Suite 2150<br>New Orleans, LA 70130 | |
| BARRETT LAW OFFICE<br>Don Barrett, Esq.<br>404 Court Square North<br>P.O. Box 987<br>Lexington, MS 39095 | |
| LAW OFFICES OF DANIEL BECNEL, JR.<br>Daniel Becnel, Jr., Esq.<br>106 W. Seventh Street<br>P.O. Drawer H | |

| | |
|---|---|
| Reserve, LA 70084 | |
| SHAPIRO HABER & URMY LLP<br>Thomas G. Shapiro, Esq. (BBO #454680)<br>53 State Street<br>Boston, MA 02109 | |
| COHEN, MILSTEIN, HAUSFELD & TOLL, PLLC<br>Linda P. Nussbaum, Esq.<br>150 East 52nd Street, 30th Floor<br>New York, NY 10022 | |
| COHEN, MILSTEIN, HAUSFELD & TOLL, PLLC<br>Michael D. Hausfeld, Esq.<br>1100 New York Avenue, N.W.<br>West Tower, Suite 500<br>Washington, DC 20005 | |
| RAWLINGS & ASSOCIATES, PLLC<br>Mark D. Fischer, Esq.<br>Mark Sandmann, Esq.<br>325 W. Main Street<br>Louisville, KY 40202 | |
| JOEL Z. EIGERMAN, ESQ.<br>50 Congress Street, Suite 200<br>Boston, MA 02109 | |
| BERMAN DEVALERIO PEASE TABACCO BURT & PUCILLO<br>Peter A. Pease, Esq. (BBO #392880)<br>One Liberty Square<br>Boston, MA 02109 | |
| LOWEY DANNENBERG BEMPORAD & SELINGER, PC<br>Richard Bemporad, Esq.<br>Richard W. Cohen, Esq.<br>Peter St. Phillip, Jr., Esq.<br>Todd S. Garber, Esq.<br>The Gateway – 11th Floor<br>One North Lexington Avenue<br>White Plains, NY 10601-1714 | |
| BERMAN DEVALERIO PEASE TABACCO BURT & | |

| | |
|---|---|
| PUCILLO<br>Joseph J. Tobacco, Jr., Esq.<br>425 California Street, Suite 2025<br>San Francisco, CA 94104-2205 | |
| JOHN F. INNELLI, LLC<br>John F. Innelli, Esq.<br>1818 Market Street, Suite 3620<br>Philadelphia, PA 19103 | |