# EXHIBIT A

|  |  |
|---|---|
| IN RE VIOXX® LITIGATION<br><br>**RECEIVED AND FILED**<br>JUL 21 2006<br>**ATLANTIC COUNTY LAW DIVISION** | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION: ATLANTIC COUNTY<br><br>CASE NO. 619<br><br>CIVIL ACTION<br><br>**ADDENDUM TO THE PROTECTIVE ORDER GOVERNING THE PRODUCTION OF INFORMATION PROPRIETARY TO IMS HEALTH INCORPORATED** |

IT IS HEREBY STIPULATED AND AGREED, AND FOR GOOD CAUSE SHOWN, AND ORDERED THAT:

1. This order is an addendum to the Court's Amended Stipulation and Protective Order Regarding Confidential Information, dated December 16, 2004 ("Protective Order").

2. "IMS Information" shall mean any data or information licensed by IMS or any of its affiliated companies to the Defendant or any other party from whom such data are sought by Plaintiffs, including but not limited to data from any of the following information services: DDD™ suite of services, Xponent® suite of services, National Prescription Audit™, National Disease and Therapeutic Index™, and National Sales Perspectives™. "IMS Information" shall also include any data derived in whole or in part from any of the IMS Information.

3. Defendant shall designate all Documents (as defined in the Protective Order) it produces that contain IMS Information as "IMS Confidential," using the procedures set out in paragraph 6 of the Protective Order, and marking the pages, or production media in the case of electronic information, "IMS CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER."

4. All provisions of the Protective Order shall apply to documents designated "IMS Confidential" to the same extent as to documents designated "Confidential" under that order.

5. Consistent with the provisions of the Protective Order, all counsel and all parties shall undertake appropriate measures to take all steps reasonably required to protect the confidentiality of IMS Information when using it for any purpose related to this litigation, including use of IMS Information in motion practice, depositions and trial, including narrowly tailoring exhibits and using only those portions of IMS Information (e.g. select pages, tables or data) reasonably required rather than a large document when practical.

1225385.1

6. Absent further order of the Court and prior notice to IMS, no party shall disclose documents designated "IMS Confidential" to a competitor of IMS, whether or not such competitor is a party or a consultant or expert for a party in the proceeding. For purposes of this paragraph the following entities shall be deemed competitors of IMS: (a) Dendrite International, Inc., (b) Verispan, LLC, (c) Source Healthcare Analytics, Inc., (d) Health Products Research, Inc., (e) Health Market Sciences, Inc., (f) Cegedim, S.A., (g) Taylor Nelson Sofres plc, (h) NFO WorldGroup, Inc., and (i) Gfk NOP Inc., and each of their respective employees, affiliates, subsidiaries, successors and assigns.

7. For documents designated "IMS Confidential," disclosure under paragraphs 10(a) and 10(f) of the Protective Order is limited to attorneys for claimants in pending U.S. litigation alleging personal injury or economic loss arising from the alleged use, purchase, or payment of Vioxx®, who (a) are bound by this order or a substantially similar order entered in another U.S. court, or (b) agree to be bound by this order and sign a certification to that effect.

DONE this 21 day of July, 2006.

_____
Carol E. Higbee, P.J.Cv.

| | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION: ATLANTIC COUNTY |
|---|---|
| IN RE VIOXX® LITIGATION | CASE NO. 619<br><br>CIVIL ACTION |

### CERTIFICATION OF MR. HOSSAM SADEK, OF IMS HEALTH INCORPORATED

I, Hossam Sadek, of full age, do hereby certify and say:

1. I am Vice President of the Sales Force Effectiveness business line of IMS Health Incorporated ("IMS") for the Americas region. I have management responsibility for a number of IMS products and services throughout North and South America, including doctor level services in the United States. I have been employed by IMS and its affiliates for more than seventeen years.

2. I have personal knowledge of the information provided herein.

### IMS BACKGROUND

3. IMS Health is the world's leading provider of information, research and analysis to the health care industry, with data collection and reporting activities in more than 100 countries and a strong 50-year reputation for the responsible handling of sensitive health and commercial information. IMS tracks and analyzes information relating to all phases of the pharmaceutical product life cycle, helping companies within the pharmaceutical industry with activities ranging from drug development to product management. In addition, IMS information is used by a broad range of clients, including pharmaceutical manufacturers, biotechnology firms, professional service firms, financial analysts, government and regulatory agencies,

1166636.1

researchers, and educators. IMS information is used in healthcare research to benefit patients and the health care community in a wide range of applications, including: (1) setting and promoting public health policy, (2) accelerating healthcare innovation, (3) driving best clinical practice, (4) maintaining safety, (5) enabling patients to make better decisions, and (6) balancing value and cost. IMS combines comprehensive pharmaceutical data with extensive advanced decision support tools, functions and industry expertise to deliver hundreds of products and services throughout the world. IMS produces and delivers to its customers vast quantities of information relating to the pharmaceutical and health care industries (e.g., in recent months, IMS delivered more than 17 billion data records per month electronically to its customers in North and South America). IMS revenues for the 2005 calendar year were $1.8 billion, the majority of which is derived from the delivery and support of IMS data services.

4.  In the United States, IMS provides many services, which can be principally segmented into the following categories: (a) syndicated market research services, (b) sales management information services, and (c) consulting services. Following is a brief description of some of these services:

(a)  Xponent® ("Xponent") is IMS Health's prescription information service, providing information to pharmaceutical companies to support sales planning and measurement activities. Xponent was introduced in the marketplace in 1992. Xponent collects patient de-identified prescription information from approximately 70 percent of the 54,000 pharmacies in the United States, and applies patented, proprietary methodologies to estimate the remaining 30 percent of the market. This enables IMS to custom project for more than one million prescribers every month. Furthermore, Xponent reports information for the growing mail service and long-term care markets. Of the

-2-

1166636.1

information captured, more than 97 percent are matched to either a prescriber or a prescriber's zip code, thus crediting the prescription to the territory of origin. Over 100 pharmaceutical companies rely on Xponent for a variety of sales management activities every month.

(b)     National Prescription Audit is an information service which measures the outflow of prescriptions, or the rate at which drugs move out of pharmacies into the hands of consumers. The data are projected to a national level, and reported for the retail channel, mail service and long term care. The National Prescription Audit was introduced into the market in 1952.

(c)     National Disease and Therapeutic Index is a market research service which reports statistical information about the patterns and treatments of disease encountered by office-based physicians in the United States. The data are projected to a national level. The service was introduced into the market in 1958.

5.     To produce its information services, IMS incorporates its employee know-how and infrastructure to produce a number of proprietary methodologies and other value-added processes used to develop and sustain their products and services, including the products described above, as follows:

(a)     Upon receipt of data, IMS performs a preliminary examination to ensure that data is in a computer readable format and meets certain limited data edit criteria. All panel information received by IMS is subject to a quality control process to ensure and maintain the integrity of the Rx database and IMS employs a number of methodologies to screen all data received by panel suppliers;

-3-

1166636.1

(b) Data that passes preliminary examination has certain elements matched and translated to IMS's master files (i.e., numbering schemes and common identifiers) and data that is not likely to be used in IMS products is eliminated;

(c) IMS continues to test and examine data to improve completeness and accuracy;

(d) Any data which meets IMS's pre-defined criteria is then imported into a database used to produce products for customers;

(e) Because data is not collected from every source of information in the United States, reports generated for clients generally apply one or more IMS statistically-derived projection methodologies to report total activity for the applicable report.

(f) IMS information is presented in numerous formats, over different time periods, and at different levels of specificity. For example, the information is presented yearly, quarterly, monthly, and weekly, and at the national, regional, state, zip code, and doctor levels.

During the relevant period, IMS has invested hundreds of millions of dollars in the development, enhancement and production of these services.

## IMS'S PRODUCTS INCLUDE HIGHLY SENSITIVE BUSINESS INFORMATION AND TRADE SECRETS.

6. These business intelligence products utilize highly sensitive business information and trade secrets.

7. IMS generates its products and services using unique data collection techniques, sampling methods, and projections.

8. IMS has invested and continues to invest considerable resources in generating its data. IMS has business relationships with over 29,000 data suppliers covering

-4-

1166636.1

225,000 data sites around the world. Each of these relationships requires careful cultivation and management.

9. Although there are competitive offerings, no one else in the marketplace could replicate the breadth of IMS's information because no other organization has IMS's supplier relationships, proprietary processes, and know how. knows these aspects of IMS's business.

10. The market for this type of data is highly competitive. Information requested by Plaintiffs would be extremely valuable to IMS's competitors and its would-be competitors because it could reveal supplier relationships, data collection methods, sampling techniques, and marketing information proprietary to IMS, or could otherwise be used to validate or enhance competitive offerings.

### IMS CAREFULLY AND RIGOROUSLY PROTECTS ITS CONFIDENTIAL INFORMATION FROM PUBLIC DISCLOSURE.

11. IMS exercises great care in preserving the confidentiality of its commercial information both internally and externally.

12. IMS has a number of internal controls to safeguard its data. The IMS global data center is physically located in a building with secure card access and security personnel. All computers are secured by user names and passwords. Access to data and other assets on IMS mainframe computers are user-defined. Standard operating procedures, policies, and employee training are all used to ensure proper handling and confidential treatment of IMS information. All employees sign confidentiality agreements upon the start of their employ with IMS, and all employees (other than administrative staff) sign agreements containing non-competition restrictions in order to protect IMS intellectual property.

-5-

1166636.1

13. IMS carefully safeguards its proprietary information through its business relationships. IMS acquires data for its products and services pursuant to written contracts, which contain restrictions on use and disclosure of the data. After processing the data and creating IMS proprietary databases, IMS produces and licenses reports to others pursuant to written license agreements. These agreements limit use of information for internal purposes of clients, and have strict confidentiality requirements. Third parties that gain access to IMS data for the purpose of providing services to an IMS client must first sign a third-party agreement with IMS (which also has strict confidentiality requirements). Contractors performing work on behalf of IMS are required to sign services agreements with strict confidentiality requirements.

## PUBLIC DISCLOSURE OF IMS DATA WOULD CAUSE IMS SEVERE BUSINESS AND ECONOMIC HARM.

14. Loss of protection over its data would severely jeopardize IMS's business, as its business model is premised on customers paying to utilize the data compilations; if portions of data are available without charge, the value of the data is diminished.

15. Disclosure could reveal information to IMS competitors, including supplier relationships, data collection methods, sampling techniques and marketing information proprietary to IMS.

16. IMS has contractual relationships with data suppliers that require IMS to report instances when the data is disclosed. Dissemination would cause IMS to incur considerable expense in monitoring data dissemination, reporting to its data sources, or potentially it may even cause IMS to breach one of its data source agreements.

17. IMS has built a high degree of trust with its data suppliers and related stakeholders in the health care industry over a period of fifty years. New IMS products and services, new business opportunities, new markets, and new uses of IMS information are

1166636.1

carefully examined to ensure these will not be contrary to the interests of data suppliers and other health care stakeholders. IMS consults with its data suppliers if there is uncertainty whether an IMS business opportunity is likely to have a material adverse effect on their business interests. IMS carefully limits use of IMS data, restricts disclosure, and only licenses its data to parties that intend to use the data in a responsible manner and not in a manner contrary to the interests of IMS's data suppliers. Breaching these agreements may result in loss of supplier relationships.

## DISCLOSURE OF IMS DATA IS NOT IN THE PUBLIC INTEREST.

18.     Disclosure of IMS data does not serve the public interest. IMS sells products that are widely used in the pharmaceutical industries. Healthcare consumers are benefited by these products because they promote competition and access to information in the marketplace.

19.     IMS data are relied on by the government for a variety of uses. IMS prescription drug sales estimates are typically used by the Federal Trade Commission to identify competing market participants and estimate market shares in connection with antitrust review of pharmaceutical company mergers. The Food and Drug Administration rely on the use of IMS information in connection with their regulation and monitoring of the marketplace. IMS information has been used by the U.S. General Accounting Office (the investigative arm of Congress), the U.S. Department of Defense, the U.S. Department of Labor, the U.S. Department of Justice, the Centers for Disease Control, attorney general offices for more than twenty states, the Centers for Medicaid and Medicare Services, the Institute of Medicine of the National Academy of Sciences, and the World Bank.

20.     IMS data are made available to researchers in academic institutions throughout the country.

-7-

1166636.1

## DEFENDANT'S USE OF IMS DATA

21. I received information from IMS service personnel regarding production statistics for reports delivered to Defendant. Based on this information, I estimate that Defendant receives approximately 15 million to 20 million data records per month from IMS in the United States. This means that even if only two years of data are available, it will total approximately 360 million to 480 million data records. Using a conservative estimate of 3000 pages per banker's box, and five data records per page, Defendant received approximately 72,000 to 96,000 boxes of IMS data for a two year period.

I certify that the foregoing statements made by me are true. I understand that if they are willfully false, I am subject to punishment.

*/s/ Hasan S*

Hossam Sadek

March 17, 2006

## CERTIFICATION PURSUANT TO RULE 1:4-4(c)

I, Gary N. Wilcox, do hereby certify and say:

1. Hossam Sadek has acknowledged the genuineness of his signature as affixed to the Certification attached hereto.

2. A copy of the Certification with an original signature affixed will be filed, if requested by the Court or a party.

I certify that the foregoing statements made by me are true. I understand that if they are willfully false, I am subject to punishment.

_____
Gary N. Wilcox

Date: March 17, 2006

|  | SUPERIOR COURT OF NEW JERSEY |
|---|---|
| IN RE VIOXX® LITIGATION | LAW DIVISION: ATLANTIC COUNTY |
|  | CASE NO. 619 |
|  | CIVIL ACTION |

## CERTIFICATION OF ROBERT J. HUNKLER

I, Robert J. Hunkler, of full age, do hereby certify and say:

1. I am Director, Professional Relations for IMS Health Incorporated ("IMS"). I am the primary liaison between IMS and physicians, physician groups and other healthcare providers. I deal with the day to day operational and contractual issues with the American Medical Association, field concerns from physicians, and assist the IMS public and government affairs groups with proposed legislation adverse to company interests.

2. I have personal knowledge of the information provided herein.

3. In my work I have met with many doctors and representatives of organizations of doctors and discussed their views on the collection of doctor level data.

4. Many doctors accept the collection and use of this data only because of uses that are important to them, such as recruitment of patients for clinical trials, and directing delivery of educational materials and drug samples.

5. IMS has consistently prohibited the use of IMS doctor level information to confront doctors regarding their prescriptions for legal or other purposes.

6. Such uses are problematic because IMS information applies sampling, editing, bridging, projection and production techniques that are susceptible to error and variance that cannot be quantified with respect to an individual doctor, while the data overall and in the aggregate are very valuable and useful when used for its intended purposes (e.g., marketing, research).

7. When individuals have used IMS doctor level data to confront doctors with regard to their prescriptions, doctors have responded by seeking to block access by IMS and others to doctor level data.

8. In the past ten years there have been numerous attempts to pass legislation that would restrict IMS's access to doctor level data. In 2006, IMS has responded to such legislative efforts in six states.

9. I hereby certify under penalty of perjury that Exhibit A attached to this Certification is a true and accurate copy of an analysis prepared by IMS. The identifying information for the individual doctors has been removed.

10. The analysis contained in Exhibit A shows the total number of prescriptions dispensed by a retail pharmacy chain for each doctor associated with a medical facility during a one week period in 2004, as reported by that pharmacy chain to IMS.

_____
Robert J. Hunker

March 30, 2006

-2-

| DOCTOR NUMBER | FACILITY NAME | DOCTOR NAME | TOTAL Rx |
|---|---|---|---|
| 12345678 | ABC Medical Center | DOCTOR 01 | 569 |
| 12345678 | | DOCTOR 02 | 2 |
| 12345678 | | DOCTOR 03 | 3 |
| 12345678 | | DOCTOR 04 | 2 |
| 12345678 | | DOCTOR 05 | 3 |
| 12345678 | | DOCTOR 06 | 2 |
| 12345678 | | DOCTOR 07 | 7 |
| 12345678 | | DOCTOR 08 | 4 |
| 12345678 | | DOCTOR 09 | 1 |
| 12345678 | | DOCTOR 10 | 7 |
| 12345678 | | DOCTOR 11 | 1 |
| 12345678 | | DOCTOR 12 | 3 |
| 12345678 | | DOCTOR 13 | 2 |
| 12345678 | | DOCTOR 14 | 2 |
| 12345678 | | DOCTOR 15 | 10 |
| 12345678 | | DOCTOR 16 | 2 |
| 12345678 | | DOCTOR 17 | 3 |
| 12345678 | | DOCTOR 18 | 1 |
| 12345678 | | DOCTOR 19 | 52 |
| 12345678 | | DOCTOR 20 | 8 |
| 12345678 | | DOCTOR 21 | 1 |
| 12345678 | | DOCTOR 22 | 4 |
| 12345678 | | DOCTOR 23 | 3 |
| 12345678 | | DOCTOR 24 | 2 |
| 12345678 | | DOCTOR 25 | 8 |
| 12345678 | | DOCTOR 26 | 1 |
| 12345678 | | DOCTOR 27 | 1 |
| 12345678 | | DOCTOR 28 | 2 |
| 12345678 | | DOCTOR 29 | 5 |
| 12345678 | | DOCTOR 30 | 6 |
| 12345678 | | DOCTOR 31 | 3 |
| 12345678 | | DOCTOR 32 | 1 |
| 12345678 | | DOCTOR 33 | 2 |
| 12345678 | | DOCTOR 34 | 1 |
| 12345678 | | DOCTOR 35 | 1 |
| 12345678 | | DOCTOR 36 | 1 |
| 12345678 | | DOCTOR 37 | 4 |
| 12345678 | | DOCTOR 38 | 1 |
| 12345678 | | DOCTOR 39 | 3 |
| 12345678 | | DOCTOR 40 | 3 |
| 12345678 | | DOCTOR 41 | 1 |
| 12345678 | | DOCTOR 42 | 1 |
| 12345678 | | DOCTOR 43 | 1 |
| 12345678 | | DOCTOR 44 | 6 |
| 12345678 | | DOCTOR 45 | 1 |
| 12345678 | | DOCTOR 46 | 3 |
| 12345678 | | DOCTOR 47 | 1 |

| DOCTOR NUMBER | FACILITY NAME | DOCTOR NAME | TOTAL Rx |
|---|---|---|---|
| 12345678 | | DOCTOR 48 | 3 |
| 12345678 | | DOCTOR 49 | 10 |
| 12345678 | | DOCTOR 50 | 1 |
| 12345678 | | DOCTOR 51 | 4 |
| 12345678 | | DOCTOR 52 | 1 |
| 12345678 | | DOCTOR 53 | 17 |
| 12345678 | | DOCTOR 54 | 3 |
| 12345678 | | DOCTOR 55 | 2 |
| 12345678 | | DOCTOR 56 | 1 |
| 12345678 | | DOCTOR 57 | 1 |
| 12345678 | | DOCTOR 58 | 3 |
| 12345678 | | DOCTOR 59 | 7 |
| 12345678 | | DOCTOR 60 | 13 |
| 12345678 | | DOCTOR 61 | 6 |
| 12345678 | | DOCTOR 62 | 12 |
| 12345678 | | DOCTOR 63 | 26 |
| 12345678 | | DOCTOR 64 | 2 |
| 12345678 | | DOCTOR 65 | 7 |
| 12345678 | | DOCTOR 66 | 4 |
| 12345678 | | DOCTOR 67 | 1 |
| 12345678 | | DOCTOR 68 | 3 |
| 12345678 | | DOCTOR 69 | 1 |
| 12345678 | | DOCTOR 70 | 1 |
| 12345678 | | DOCTOR 71 | 5 |
| 12345678 | | DOCTOR 72 | 2 |
| 12345678 | | DOCTOR 73 | 2 |
| 12345678 | | DOCTOR 74 | 2 |
| 12345678 | | DOCTOR 75 | 1 |
| 12345678 | | DOCTOR 76 | 1 |
| 12345678 | | DOCTOR 77 | 2 |
| 12345678 | | DOCTOR 78 | 1 |
| 12345678 | | DOCTOR 79 | 3 |
| 12345678 | | DOCTOR 80 | 1 |
| 12345678 | | DOCTOR 81 | 1 |
| 12345678 | | DOCTOR 82 | 6 |
| 12345678 | | DOCTOR 83 | 1 |
| 12345678 | | DOCTOR 84 | 1 |
| 12345678 | | DOCTOR 85 | 3 |
| 12345678 | | DOCTOR 86 | 19 |
| 12345678 | | DOCTOR 87 | 2 |
| 12345678 | | DOCTOR 88 | 1 |
| 12345678 | | DOCTOR 89 | 13 |
| 12345678 | | DOCTOR 90 | 2 |
| 12345678 | | DOCTOR 91 | 4 |
| 12345678 | | DOCTOR 92 | 3 |
| 12345678 | | DOCTOR 93 | 13 |
| 12345678 | | DOCTOR 94 | 2 |

| DOCTOR NUMBER | FACILITY NAME | DOCTOR NAME | TOTAL Rx |
|---|---|---|---|
| 12345678 | | DOCTOR 95 | 5 |
| 12345678 | | DOCTOR 96 | 3 |
| 12345678 | | DOCTOR 97 | 1 |
| 12345678 | | DOCTOR 98 | 13 |
| 12345678 | | DOCTOR 99 | 6 |
| 12345678 | | DOCTOR 100 | 2 |
| 12345678 | | DOCTOR 101 | 2 |
| 12345678 | | DOCTOR 102 | 1 |
| 12345678 | | DOCTOR 103 | 1 |
| 12345678 | | DOCTOR 104 | 1 |
| 12345678 | | DOCTOR 105 | 2 |
| 12345678 | | DOCTOR 106 | 8 |
| 12345678 | | DOCTOR 107 | 3 |
| 12345678 | | DOCTOR 108 | 3 |
| 12345678 | | DOCTOR 109 | 2 |
| 12345678 | | DOCTOR 110 | 6 |
| 12345678 | | DOCTOR 111 | 2 |
| 12345678 | | DOCTOR 112 | 2 |
| 12345678 | | DOCTOR 113 | 3 |
| 12345678 | | DOCTOR 114 | 7 |
| 12345678 | | DOCTOR 115 | 2 |
| 12345678 | | DOCTOR 116 | 1 |
| 12345678 | | DOCTOR 117 | 2 |
| 12345678 | | DOCTOR 118 | 11 |
| 12345678 | | DOCTOR 119 | 7 |
| 12345678 | | DOCTOR 120 | 1 |
| 12345678 | | DOCTOR 121 | 7 |
| 12345678 | | DOCTOR 122 | 1 |
| 12345678 | | DOCTOR 123 | 3 |
| 12345678 | | DOCTOR 124 | 5 |
| 12345678 | | DOCTOR 125 | 1 |
| 12345678 | | DOCTOR 126 | 2 |
| 12345678 | | DOCTOR 127 | 2 |
| 12345678 | | DOCTOR 128 | 4 |
| 12345678 | | DOCTOR 129 | 8 |
| 12345678 | | DOCTOR 130 | 5 |
| 12345678 | | DOCTOR 131 | 1 |
| 12345678 | | DOCTOR 132 | 8 |
| 12345678 | | DOCTOR 133 | 2 |
| 12345678 | | DOCTOR 134 | 1 |
| 12345678 | | DOCTOR 135 | 1 |
| 12345678 | | DOCTOR 136 | 1 |
| 12345678 | | DOCTOR 137 | 2 |
| 12345678 | | DOCTOR 138 | 2 |