**EXHIBIT C**

# PFIZER, INC.
## Contract

May, 2000
Through
December, 2000
Data Months

# NDC Health Information Services

## TABLE OF CONTENTS

| SECTION | PAGE |
|---|---|
| Service Agreement | 3-13 |
| Source Prescriber Payer | 14-15 |
| Source Territory Manager | 16-18 |
| Source Hospital Outflow | 19-21 |
| Custom Profiles | 22-23 |
| Source Launchtrac/Weekly Rx | 24-26 |
| Source Consensus | 27-28 |
| DOCS | 29 |
| District Outflow Reporting Services (DORS) | 30-31 |
| Ad Hoc Allocation | 32 |
| DirectRx | 33 |
| Mail Order | 34-35 |
| Attachment | 36 |
| 3rd Party Agreement | 37-38 |

# NDC HEALTH INFORMATION SERVICES (ARIZONA) INC.

## SERVICE AGREEMENT

This Agreement, made and entered into this 5th day of June, 2000, by and between NDC HEALTH INFORMATION SERVICES (ARIZONA) INC., a Delaware corporation ("NDC"), having its principal place of business at 2394 East Camelback Road, Phoenix, Arizona 85016, and PFIZER, INC., a _____ corporation ("PFIZER"), having its principal place of business at 235 East 42nd Street New York, New York 10017.

### RECITALS

NDC provides a variety of Informational Services to the pharmaceutical industry. PFIZER wishes to obtain one or more of these Services from the providers of such Services under the terms and conditions provided hereinbelow.

NOW THEREFORE, and in consideration of the mutual promises contained herein, the parties agree as follows:

1. **SERVICES PROVIDED BY NDC**

Under and subject to the terms of this Agreement, NDC shall provide PFIZER with the Services specified below and in the following Addenda attached hereto:

- Source Prescriber Payer              (see Addendum A)
- Source Territory Manager             (see Addendum B)
- Source Hospital Outflow              (see Addendum C)
- Custom Profiles                      (see Addendum D)
- Source Launchtrac/Weekly RX          (see Addendum E)
- Source Consensus                     (see Addendum F)
- DOCS                                 (see Addendum G)
- District Outflow Reporting System (DORS)  (see Addendum H)
- Ad Hoc Allocation                    (see Addendum I)

PFIZER:

- Direct Rx (see Addendum J)
- Mail Order (see Addendum K)

2. PRICING AND PAYMENT

2.1 In consideration for the services provided to PFIZER hereunder, PFIZER shall pay the fees to NDC as shown in the table below. These fees shall be adjusted for any additional services requested by PFIZER and provided by NDC as outlined in the attached Addenda.

|  | 5/1/00-12/31/00 Monthly Fees |
|---|---|
| Source Prescription Service Agreement (Includes standard and custom reports for Prescriber/Payer, Territory Manager, Hospital Outflow) | $915,731 |
| Custom Profiles (Includes Hospital, Puerto Rico) | $32,525 |
| Source Consensus | $41,514 |
| Weekly Rx | $177,500 |
| Mail Order | $36,200 |
| Ad Hoc Allocation | $75,000 |
| LaunchTrac | $28,500 |
| Technical Support | $3,267 |
| TOTAL Fixed Fee | $1,310,237 |
| DORS* | $26,161 |
| DOCS* | $27,300 |
| Prescriber Payer Profiles* | $90,125 |
| Est. Monthly Total | $1,453,823 |

(*)   Service will be discontinued during the term of the contract. Each service will be listed on the consolidated invoice for the months they are delivered.

2.2   PFIZER shall pay for the basic services provided by NDC in monthly installments in advance on the first day of each month. Payment for any additional services requested by PFIZER and provided by NDC will be invoiced upon delivery of such services. A finance fee of 1-1/2% per month will be imposed on all payments more than thirty (30) days overdue.

2.3   PFIZER agrees to provide a Performance Improvement Incentive for early and correct delivery of four key Sales deliverables.

   2.3.1   The incentive program will be applied to the following four monthly deliverables:

   | Sales Deliverable | Target Number of Days to Deliver After the Close of the Data Month |
   | --- | --- |
   | Source Prescriber Payer | 25 |
   | Source Territory Manager | 35 |
   | Source Hospital Outflow | 35 |
   | Sherlock Custom Profiles | 28 |

   Some of the Sales deliverables have multiple parts. A single delivery date will be based on all parts of a deliverable being received.

   2.3.2   The Performance Incentive will be determined based on the following criteria for each of the four deliverables:

   | Delivery Date | Incentive Amount |
   | --- | --- |
   | On time delivery | 0 |
   | 1-2 business days early | $10,000 per deliverable per month |
   | 3-4 business days early | $15,000 per deliverable per month |
   | 5 or more business days early | $20,000 per deliverable per month |

    2.3.3  Monthly reporting of delivery dates and acceptability of materials will be reviewed by PFIZER and NDC. The incentive program will be reconciled at the end of each calendar quarter. Any incentive amounts due to NDC will be invoiced at that time. A portion of any earned incentives will be distributed to the NDC Team dedicated to servicing PFIZER, as determined in NDC's sole discretion. PFIZER Service Team management may make non-binding recommendations to NDC regarding such distribution.

3. **TERMS AND TERMINATION**

    3.1  The term of this Agreement shall be for May, 2000 through December, 2000 data months.

    3.2  If the parties mutually agree to renew on modified terms for any renewal year(s), an addendum including, but not limited to, any waivers, modifications or alterations of the current Agreement, shall be executed by duly authorized representatives of the respective parties.

    3.3  In the event that NDC commits a material breach of this Agreement, PFIZER shall have the right to terminate the Agreement by providing NDC with ninety (90) days prior written notice of termination; provided, however, that such notice of termination shall be null and void if the breach has been cured by the party in default within said ninety (90) day period. PFIZER will only be obligated to pay the amounts due for work performed up to the date of the breach. However, if NDC cures the breach within said ninety (90) day period, PFIZER will continue to pay for the services performed by NDC.

    3.4  In the event that PFIZER commits a material breach of any obligation imposed upon it in this Agreement, NDC shall have the right to terminate this Agreement in respect of the aggrieved party's products and services by providing PFIZER with ninety (90) days prior written notice of termination;

provided, however, that such notice of termination shall be null and void if the breach has been cured within said ninety (90) day period.

3.5   Within sixty (60) days after termination of this Agreement, however occurring, PFIZER shall return to NDC all data, information and software (hardcopy, tapes, cartridges, etc.), in PFIZER's possession that had been supplied to it hereunder.

4.   **DATA ACCURACY, RIGHTS TO CONFIDENTIALITY**

4.1   NDC shall use its reasonable efforts to be both complete and accurate in compiling the data, information and software to be supplied to PFIZER. Upon discovery of inaccurate or incomplete data, PFIZER shall provide NDC with written notice specifying the nature of the inaccuracy or incompleteness. In the event of late delivery or non-compliant delivery according to mutually agreed upon specifications of PFIZER's four key sales deliverables, NDC's fees shall be reduced in accordance with this Section 4.1.

4.1.1   The four deliverables being measured are Source Prescriber/Payer (Addendum A), Source Territory Manager (Addendum B), Source Hospital Outflow (Addendum C) and Sherlock Custom Profiles (Addendum D). The four deliverables will be delivered according to mutually agreed upon specifications. Any deliverables received by PFIZER that do not meet prior mutually agreed to specifications will be considered late until corrected and delivered. If an incorrect deliverable arrives at PFIZER early and the corrected replacement will be delivered late, for measurement purposes, the number of days early, between the contracted date and actual delivery date, shall be deducted from the number of days late in the reprocessing of any incorrect deliverable before any grace days will be charged. Delivery dates will initially be measured by the receipt of a data

cartridge, DLT or CD. When electronic file transfer is fully operational, the delivery dates will be by the receipt date recorded by PFIZER's server in New York.

4.1.2 The parties agree that there will be a total pool of eighteen (18) grace calendar days for the term of this agreement issued before any financial penalties are incurred. Nine (9) of the grace days can be applied against the late delivery of Source Prescriber Payer, Source Territory Manager and Source Hospital Outflow. The remaining nine (9) grace days can be applied to only Sherlock Custom Profiles. If PFIZER, after being informed of any impacts to the delivery schedule of these four product deliverables, has requested and approved of any changes to the deliverables and has not met timing and material requirements specified in the product Addenda, extended delivery times will be agreed to by both parties when determining if a deliverable is late.

4.1.3 If no changes have been requested or requested changes have been submitted by PFIZER according to Addenda specifications, and the eighteen (18) grace calendar days have been used, then a reduction of fees will be assessed against NDC. The reduction will be $50,000 for the first day of each month, and $10,000 for each additional day up to a maximum of $100,000 per month.

4.1.4 PFIZER and NDC will review deliverables and acceptance reports monthly. Penalties will be reconciled on a quarterly basis through the issuance of credits.

4.2 NDC shall hold all information supplied to it by PFIZER relating to the business of PFIZER in strict confidence, unless it is already known to NDC at the time of disclosure, it is already publicly available or becomes so through no fault of NDC, or release thereof is consented to by PFIZER.

4.3    PFIZER acknowledges that any information, data or software supplied by NDC to it hereunder is proprietary and confidential to NDC and that PFIZER has the right only to use such information, data and software in accordance with the terms of this Agreement. All such information, data and software shall be used solely for the benefit of PFIZER or its wholly owned and majority owned subsidiaries and shall not be sold, transferred, disclosed in whole or in part or given to any third party, without prior written consent of NDC. Such data, information or software shall be disclosed only to agents or contractors of PFIZER to the extent necessary for them to perform their duties for PFIZER and then only if they have undertaken similar obligations of confidentiality, by formally executing the Third Party Data Use Agreement attached hereto (See Addendum L). No data or information supplied to PFIZER shall be quoted or attributed to NDC, including without limitation advertising or press releases, without NDC's prior written consent thereto.

4.4    PFIZER agrees that under no circumstances will any representative or agent of PFIZER share or discuss, directly or indirectly, any data, information, reports, software, or delivery systems provided under this Agreement, with any pharmacies or prescribers, or with any persons employed or engaged by the aforementioned parties.

4.5    NDC agrees to the following exemption in the release of data. PFIZER can share or discuss market share data with Managed Care Organizations (MCO). PFIZER agrees that each MCO is only permitted to see their specific data and not that of any other MCO. PFIZER assumes responsibility for educating MCO contacts on the following issues: Each MCO is only permitted to see their data and not that of another MCO. Shares are based on sample data and may produce different results than rebate shares. Shares may also differ from rebate shares based on differences in market definitions.

4.6   PFIZER shall defend and indemnify NDC with respect to any claim, suit, loss, cost, or expense of any third party arising out of PFIZER's breach of Paragraphs 4.3, 4.4 and 4.5 hereinabove.

4.7   PFIZER shall obtain signed Confidentiality Agreements from all PFIZER's field sales personnel regarding the use and application of all data, information, reports, software and delivery systems provided under this Agreement.

5.   **MISCELLANEOUS PROVISIONS**

5.1   Neither party shall be considered in default because of any failure in performance of this Agreement, if said failure arises out of causes beyond said party's reasonable control and without its fault or negligence. Such causes may include, but are not limited to, acts of God or a public enemy, acts of the Government in either its sovereign or contractual capacity, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, degradation of telephone or other communication services, or unusually severe weather conditions.

5.2   PFIZER is responsible for any data agent agreements and related fees required to meet PFIZER-defined specifications for products and services provided under this Agreement. (Attachment 1)

5.3   No waiver, modification or alteration of any of the provisions of this Agreement shall be binding unless approved in writing by a duly authorized representative of the parties.

5.4   This Agreement shall not be assignable by either party without the prior written consent of the other, except that (i) this Agreement may be assigned by PFIZER to any parent, subsidiary or affiliated company, so long as PFIZER remains liable for its performance under this Agreement, or any successor entity in connection with a sale of substantially all PFIZER's

business, and (ii) NDC may assign this Agreement to its corporate parent or to an affiliate that is wholly-owned by a common corporate parent, so long as NDC remains liable for its performance under this Agreement.

5.5    This Agreement shall be construed in accordance with the laws of the State of New York.

5.6    PFIZER agrees to be responsible for and pay and discharge when due any and all federal, state and local sales, use or other such tax that may be levied, assessed, imposed or charged in connection with the performance of this Agreement, except for taxes on NDC's net income. NDC will use commercially reasonable efforts to invoice any such taxes which may be applicable as promptly as possible. PFIZER hereby agrees to indemnify and hold NDC harmless against any loss, damage, interest assessed or penalty whatsoever in any way arising from the failure of PFIZER to pay such tax.

5.7    It is expressly agreed that this Agreement embodies the entire contractual agreement of the parties in relation to the subject matter hereof and that no other agreement or understanding, verbal or otherwise, exists between the parties at the time of execution hereunder, with respect to such subject matter.

5.8    All notices required by this Agreement shall be given by certified or registered mail, return receipt requested, or by any type of express mail or express delivery service for which a receipt will be obtained.

If to PFIZER, such notices shall be addressed to:
PFIZER, Inc.
235 East 42nd Street
New York, New York 10017

If to NDC, such notices shall be addressed to:
Controller
NDC Health Information Services (Arizona) Inc.
2394 East Camelback Road
Phoenix, Arizona 85016

with a copy to:
Office of the Corporate Secretary
National Data Corporation
National Data Plaza
Atlanta, Georgia 30329-2010

5.9  The parties' rights and obligations under Paragraphs 3.5, 4.2, 4.3, 4.4, 4.5, 4.6 and 5.6 shall survive any termination of this Agreement.

5.10 IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date and year first above written.

PFIZER, INC.
By: _____
Printed Name: J PATRICK KELLY
Title: SR. VP - WORLDWIDE MARKETING
Date: 6/16/00

NDC HEALTH INFORMATION SERVICES (ARIZONA) INC.
By: _____
Printed Name: Suellyn Tornay
Title: Vice President/Law
Date: 6/26/00

## SIXTH AMENDMENT TO
## SERVICE AGREEMENT

THIS SIXTH AMENDMENT TO SERVICE AGREEMENT (this "Sixth Amendment") is made and entered into and is effective as of the 1st day of June, 2005, by and between NDCHEALTH HEALTH INFORMATION SERVICES (ARIZONA) INC. ("NDCHEALTH"), a Delaware corporation with its principal place of business at 2394 E. Camelback Road, Phoenix, Arizona 85016, and PFIZER, INC., having its principal place of business at 235 East 42nd Street, New York, New York 10017 ("PFIZER") (collectively referred to herein as the "Parties").

## W I T N E S S E T H:

WHEREAS, PFIZER and NDCHEALTH entered into Service Agreement dated June 5, 2000 (the "Original Agreement"); and

WHEREAS, PFIZER and NDCHEALTH entered into that certain First Amendment to the Original Agreement dated January 1, 2001; and

WHEREAS, PFIZER and NDCHEALTH entered into that certain Second Amendment to the Original Agreement dated January 1, 2002; and

WHEREAS, PFIZER and NDCHEALTH entered into that certain Third Amendment to the Original Agreement dated June 11, 2003; and

WHEREAS, PFIZER and NDCHEALTH entered into that certain Fourth Amendment to the Original Agreement dated March 24, 2004; and

WHEREAS, PFIZER and NDCHEALTH entered into that certain Fifth Amendment to the Original Agreement dated January 1, 2005; and

WHEREAS, the Original Agreement, as amended by the First Amendment, Second Amendment, Third Amendment, Fourth Amendment and Fifth Amendment is hereafter called the "Agreement", and

WHEREAS, the parties desire to further amend certain of the terms of the Agreement, as more particularly set forth in herein.

NOW, THEREFORE, in consideration of the foregoing recitals, the mutual covenants and conditions contained herein, and other good and valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1. <u>Term</u>.  Section 3.1 of the Agreement is hereby deleted in its entirety and replaced with the following new Section 3.1:

    3.1   The term of this Agreement shall begin on June 1, 2005 and shall continue through December 31, 2006 (the "Term"). The Services provided hereunder, however, may be delivered on a data month or data week basis. As used herein, "data month" or "data

week" shall mean delivery of data within a set number of days following the close of the previous month or week as the case may be (as defined in each specific Addendum).

2. Trendtrac. The parties agree that pursuant to PFIZER's request, the delivery of Trendtrac was cancelled effective with the January 2005 data month. Accordingly, Addendum L is hereby deleted in its entirety. The amount of $151,320 collected for Trendtrac under the Fifth Amendment for the renewal term January 1, 2005 through May 31, 2005 will be deducted from the initial invoice due for Services provided to Pfizer pursuant to this Sixth Amendment.

3. Pricing and Payment. Section 2.1 of the Agreement is hereby deleted in its entirety and replaced with the following:

   2.1(a)  In consideration for the Services provided to PFIZER hereunder, PFIZER shall pay the fees to NDCHEALTH as shown in the table below. These fees shall be adjusted for any additional services requested by PFIZER and provided by NDCHEALTH.

| SERVICES | Monthly Fees<br>June 2005 – Dec 2005<br>Data Months | Monthly Fees<br>Jan 2006 - Dec 2006<br>Data Months |
|---|---|---|
| Standard and custom reports for Prescriber/Payer, Territory Manager, Hospital Outflow | $1,750,687 | $1,834,320 |
| Information Architecture Ancillary Data /Services | $34,873 | $38,627 |
| Weekly Rx | $351,300 | $368,081 |
| Mail Order | $73,373 | $76,878 |
| DORS | $51,198 | $53,644 |
| Ad Hoc Fund Allocation * | $32,757 | $62,519 |
| Technical Support | $3,971 | $3,971 |
| Discount | ($92,850) | |
| Monthly Total | $2,205,309 | $2,438,040 |

* Ad Hoc Fund Allocation - a fixed monthly dollar amount is allocated for custom Pfizer requests. See Addendum I attached hereto.

   2.1(b)  During the Term of the Agreement, upon the mutual written agreement of the parties (as evidenced by an appropriate amendment to this Agreement) new markets and/or new sales forces may be added to the following Services for targeting and compensation purposes at no additional cost:

IN WITNESS WHEREOF, the parties hereto have caused this Sixth Amendment to be executed by their duly authorized officers.

NDCHEALTH HEALTH INFORMATION SERVICES (ARIZONA) INC.

By: _____
Name: H. Alan Rosenberg
Title: ~~VP Legal & Risk Management~~ General Counsel, Business Units
Date: 5/27/05

PFIZER, INC.

By: _Michael P. Tarnok_
Name: Michael P. Tarnok
Title: Sr VP Finance - US Pharmaceuticals
Date: 5/27/05



APPROVED BY RDG 5/27/05 NDCHEALTH LEGAL DEPT

## ADDENDUM I

## AD HOC FUND ALLOCATION

## SCOPE OF DATA AND SERVICES

A fixed monthly dollar amount is allocated for custom PFIZER requests. Such requests are generally one-time deliverables utilizing existing NDCHEALTH data contracted for by PFIZER.

**Terms and Conditions**

- Projects eligible for the Ad Hoc Allocation Fund will be those requested by the following PFIZER departments:
  - Sales Operations
  - Sales
  - Information Sciences
  - Business Technology
  - Market Analytics

- Such request for projects eligible for this fund must be made in writing.

- No more than 5% of the ad hoc allocation per year can be applied to projects requiring non-purchased data sources (i.e., those not included in the terms of the contract like SOURCE Non-Retail).

- This fund may not be used for any sales contest expenses.

- This fund may not be used for new business development.

- This fund may not be used for vended or outsourced project costs, but rather such costs shall be a pass through for payment directly by PFIZER.

- Appropriate written approvals/authorizations must be obtained for Market Analytics request in excess of $10,000. Any project in excess of $30,000 will also require written approvals/authorizations.

NDCHEALTH shall retain records on all projects that have been charged against this fund. Each project will be priced solely in accordance with NDCHEALTH's Pricing Committee's guidelines. On a monthly basis, NDCHEALTH shall provide PFIZER with a list of projects that have been charged against the fund.

A fixed dollar amount of $750,228 will be allocated for Ad Hoc requests for both the 2005 and 2006 calendar years. The 2005 amount includes any unused portion of the Ad Hoc fund as specified in the Fifth Amendment up to an overall total of $750,228 for the 2005 calendar year. NDCHEALTH has the right to approve in advance any request which will cause the cumulative amount of Ad Hoc requests to exceed the fixed dollar amount of the Ad Hoc Fund. At the end of each calendar year, should the dollar volume of Ad Hoc requests exceed the fixed amount, NDCHEALTH will assume the responsibility for all NDCHEALTH-approved requests. Should PFIZER not utilize the entire amount

of monies contained in the Ad Hoc Fund upon the end of each calendar year, then no refund shall be issued to them by NDCHEALTH and such monies shall become fully earned by NDCHEALTH.