UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE NEURONTIN MARKETING AND SALES PRACTICES LITIGATION | ) ) ) ) |
| | MDL Docket No. 1629 |
| | Master File No. 04-10981 |
| THIS DOCUMENT RELATES TO: | ) ) ) |
| | Judge Patti B. Saris |
| ALL SALES AND MARKETING ACTIONS | ) ) ) |
| | Magistrate Leo T. Sorokin |

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION TO
<u>COMPEL DEFENDANTS' PRODUCTION OF DOCUMENTS</u>**

It is axiomatic that the simplest way to determine whether a particular document is relevant to a particular litigation is to examine the document.  Defendants have shunned this obvious approach, and prefer instead to debate the relevance of documents without even examining them.  Quite tellingly, in their Memorandum of Law in Opposition to Plaintiffs' Motion to Compel Defendants' Production of Documents ("Opposition"), Defendants don't deny that responsive documents may very well exist within the materials requested; rather they simply refuse to produce the documents because of their surmise—not apparently based on a *physical review* of the documents at issue—that there may be irrelevant information mixed in with the relevant.  For example, Defendants are refusing to produce custodial files of certain individuals, even though they acknowledge that these individuals clearly had some involvement with Neurontin, because they claim that the custodians had numerous duties that are unrelated to Neurontin or the sales and marketing thereof.

The problem with this position is that the Federal Rules of Civil Procedure do not require that every page of the requested documents be wholly relevant.    All that is required is

that the requested materials be "reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26 (b)(1); a standard which Plaintiffs have met. Short of an actual review of the documents that disproves this reasonable calculation, the discovery should be had. For these reasons set forth below and in Plaintiffs' original memorandum ("Memorandum") (Docket No. 618), the Motion to Compel should be granted.

      A.      <u>Second Request for Production of Documents (Custodial Files)</u>

Given that Pfizer employs more than 100,000 employees,[1] it is difficult to characterize Plaintiffs' request for 56 individually-named custodial files—a mere 0.056% of the total workforce—as anything but narrowly drawn to elicit relevant information. The targeted nature of the requests is only underscored by the fact that Defendants will be producing the overwhelming majority of these custodial files. All that remains is a dispute relating to 6 of the custodians.

With some detail, Plaintiffs' Memorandum set forth specific reasons why the custodial files of Suzan Carrington, Ellen Dukes, Joan Kaplan, Paula Smith, Kirk Taylor, Marino Garcia, and John Marino were reasonably calculated to lead to the discovery of admissible evidence. In their Opposition, Defendants agreed, for the very first time, to produce the custodial file of John Marino, the head of the Neurontin Worldwide Marketing Team.[2] Such a concession, coming after the filing of a motion, rather than during either of the two meet-and-confer sessions, is emblematic of the reason why Plaintiffs' have frequently had to resort to motion practice to get relevant discovery.

---

[1] <u>See</u> About Pfizer, http://www.pfizer.com/pfizer/are/mn_about_company.jsp (accessed February 6, 2007).

[2] As the Court may recall from the previous hearing, Defendants argued that documents from the Neurontin Worldwide Marketing Team did not need to be produced. Apparently, they have had a change of heart.

For the remaining custodians, Defendants are still refusing to produce the files. Other than unsupported supposition, the only rationale offered as to why these custodial files should be not produced is based on an *inquiry* conducted by Deborah MacGregor, one of the attorneys representing Pfizer—an inquiry which apparently did not include a physical examination of documents. Rather, Ms. MacGregor appears simply to have canvassed employees at Pfizer—in many cases not even the actual custodian—and determined, based on this second-hand information, that Plaintiffs are not entitled to any documents.

Unfortunately, as set forth below, Defendants admit that these individuals had some role in Neurontin, and they don't deny that responsive documentation exists in the requested custodial files. Indeed, Defendants have no basis to deny that responsive documents exist in the custodial files because *they haven't even reviewed them.*

1. Suzan Carrington

Defendants don't deny that Suzan Carrington played a role in Neurontin. Instead, they try their hand at a little misdirection by stating that Ms. Carrington played "no role *specific to* Neurontin." See Opposition at 9 (emphasis added). Of course, Plaintiffs are not required to identify only those individuals whose roles were specific to Neurontin, nor do Defendants define what a *specific* role even is. Missing is any assertion that Ms. Carrington played *no role* with respect to Neurontin, a claim that presumably cannot be supported. Also missing is a claim that she did not play at least a *general* role. In fact, Defendants readily admit that Ms. Carrington was the person responsible for receiving grant requests and forwarding them on to the grant committee, *for all products*. Thus, it cannot be disputed that a request seeking documents from the Senior Manager of the office that dispensed grants is reasonably calculated to lead to the discovery of admissible evidence relating to grants issued in

connection with one product in particular, Neurontin. Nor can it be disputed that grants relating to Neurontin are particularly relevant in this case. (Third Amended Class Action Complaint, ¶¶ 57, 70, 103, 106 – 07, 132, 228, 248 – 55). Thus, the custodial file of Suzan Carrington should be produced.

2. Ellen Dukes

Defendants do not deny: (i) that Ellen Dukes was involved in Outcomes Research; (ii) that Outcomes Research was involved in the development information that supported the off-label marketing message and is thus relevant to this case; (iii) that Ms. Dukes worked on Neurontin; or (iv) that Ms. Dukes worked on neuropathic pain indications other than postherpetic neuralgia inside the United States. Rather, Defendants state that Outcomes Research had many goals some of which might be irrelevant to this case, that Ms. Dukes worked "*almost* entirely" on postherpetic neuralgia, and that the focus of her efforts in other types of neuropathic pain was in countries outside of the United States. None of this amounts to a denial that Ms. Dukes was involved in the off-label marketing of Neurontin in the United States. Certainly, Defendants could have reviewed her custodial file and arrived at the conclusion that no relevant documents exist (to the extent that such fact is true). However, they have not done so. Instead, as was the case with Suzan Carrington, Defendants have chosen to use verbal gymnastics, which suggest on their face, that relevant documents do in fact exist. Because the request for Ellen Dukes and her documents relating to Outcomes Research is reasonably calculated to lead to the discovery of admissible evidence, her custodial file should be produced.

3. Joan Kaplan

The refusal to produce the custodial file of Joan Kaplan or a different Senior Manager of Professional Relations presents an all-too-common problem that has bedeviled smooth and efficient discovery in this case. Even though it is clearly obvious that the documents of a Senior Manager of Professional Relations (whoever that may be) are relevant in this case, Defendants have not offered to produce *any* document from a Senior Manager of Professional Relations. However, when Plaintiffs identify Professional Relations as a relevant portion of Pfizer and endeavor to identify that group's Senior Manager—Ms. Kaplan—Defendants argue that Plaintiffs have chosen the wrong custodian, without identifying the correct custodian or offering to produce said custodian's file. If it is true that Ms. Kaplan did not do any work with physicians inside the United States (a fact that is contradicted by the documents produced thus far in the case), then the Defendants should, at a minimum, be required to identify her US counterpart. Such a move would likely eliminate this point of contention between the parties.[3]

4.   Paula Smith

In a case involving the sales and marketing of Neurontin, the subject of what marketing materials were distributed is of obvious relevance and will be hotly litigated. Thus, Plaintiffs are stunned that Defendants would concede that Paula Smith "tracked orders for marketing materials", but not concede that such information is relevant. Plaintiffs seek to learn what materials were sent and to whom. According to Pfizer, this was precisely the job of Ms. Smith.[4] Accordingly, Defendants should be compelled to provide her custodial file.

5.   Kirk Taylor

---

[3] Nevertheless, as with the previous custodians, Pfizer does not claim that Ms. Kaplan played *no* role in the United States. Rather, they claim that she was "*primarily* involved" outside the US, which suggests that she probably played some role in the US as well.

[4] Again, Defendants have not reviewed the custodial file of Ms. Smith. Therefore, to state that her custodial file doesn't contain the actual marketing materials is premature.

Defendants do not dispute that the Neurontin Publications Sub-Committee ("PSC") is highly relevant to this case, nor could they, as the allegations relating to PSC are clearly set forth in the complaint. (Third Amended Class Action Complaint, ¶¶ 126, 128, 267). Nor do they dispute Kirk Taylor's presence at PSC meetings; Defendants admit that Mr. Taylor "may have attended some of the Neurontin PSC meetings." Instead, Defendants claim that Mr. Taylor's involved in the Neurontin PSC should not be discoverable because he "was a member of a different product team."[5] It is unclear why this alleged fact would make Mr. Taylor's custodial file irrelevant. The fact that Mr. Taylor attended Neurontin PSC meetings makes his custodial file more than likely to contain admissible evidence. Moreover, there is no reason to think that Mr. Taylor's Neurontin documents are duplicative. Indeed, Defendants have not reviewed the files of Mr. Taylor and thus can't say the documents are duplicative, how many meetings he attended, or how burdensome it would be to produce the documents relating to the meetings that he *did* attend.

5.      Marino Garcia

In the two meager sentences devoted to Marino Garcia in the Opposition, one very important fact is left out: much of the clinical research relating to Neurontin was carried out abroad. In fact, many of the negative studies whose publications were suppressed were carried out in foreign countries. For example, the suppressed negative diabetic peripheral neuropathy study was conducted in the UK (Third Amended Class Action Complaint, ¶ 148), the suppressed negative migraine study was conducted in Europe (Third Amended Class Action

---

[5] Perhaps it would have been helpful if the Defendants identified what the other product was. Plaintiffs' review of limited documents produced thus far suggests that Kirk Taylor was involved in pregabalin. Given the fact that "the off-label marketing of Neurontin was closely coordinated with Pfizer's premarketing of pregabalin" (Third Amended Class Action Complaint, ¶ 44), it is not a surprise that Mr. Taylor attended various Neurontin PSC meetings. In fact, it was common for Pfizer to create joint Neurontin/pregabalin teams to create efficient and coordinated decisions relating to the two products. This is all the more reason to produce Mr. Taylor's custodial file.

6

Complaint, ¶¶ 195 – 97), and the suppressed negative monotherapy study was conducted in Eastern Europe (Third Amended Class Action Complaint, ¶ 190).  In an era of Pub-Med and internationally available journal articles, whether a study originated within the United States is largely irrelevant.  All that matters is where the study ends up (or in the case of the suppressed studies, where it doesn't end up).  The obvious effect of the suppression on physicians practicing inside the United States is the same.

It is a fact that like many activities, clinical research is cheaper abroad.  Pfizer is not the first company to outsource its commercial activities.  Given the obvious geographic and linguistic affinities involved in working with foreign scientists who were conducting research for Pfizer, it is no surprise that much of Pfizer's clinical trial work and publication development was coordinated by Major Markets, just as much of it was coordinated in the US by the domestic marketing team.  However, blocking Plaintiffs' access to such relevant documents simply because they happen to be found within the Major Markets team will deprive the Plaintiffs of evidence that is central to this case.  It is very telling that Defendants do not claim that Major Markets does not possess *any* relevant documents, a claim that would be easy to make if in fact Major Markets had no involvement with conduct alleged in this case.

   B. <u>Third Request for Production of Documents</u>

   1. <u>Request No. 18, 21, and 27</u>

As Plaintiffs stated in their opening Memorandum, Defendants seek to limit their production to the "marketing team".  Defendants don't deny that responsive documents exist elsewhere or that Plaintiffs are otherwise entitled to the production.  Rather, they seek to make this a marketing case, a position Defendant used before but failed when this Court summarily rejected as insufficient in Discovery Order No. 7.

2. <u>Request No. 19</u>

Defendants' assertion that Plaintiffs' Third Amended Complaint doesn't contain allegations with respect to false statements made to Third-Party Payors ("TPP") is erroneous. Plaintiffs' Third Amended Complaint alleges the following:

> Pfizer hosted a meeting of the Neuropathic Pain Management Advisory Board at the Disney BoardWalk Resort in Orlando, Florida. **The guests were senior managers and medical directors of various pharmacies and pharmacy benefits managers who had influence over formulary decision-making, i.e., what drugs are covered for what uses by various health care plans**. The advisory board was coordinated and managed by Health Strategies Group, Inc., a New Jersey company that specializes in "increasing the manufacturer's value and influence on PBM product placement decisions." The goal of this advisory board meeting was to secure Neurontin's formulary status for broad areas of neuropathic pain. Specifically, the meeting was to "support Neurontin's use in neuropathic pain management with managed care customer," even though Pfizer was aware that Neurontin did not have the data to support a broad neuropathic pain indication, that different neuropathic pain conditions involved different models of pain and thus required different treatments, and that Pfizer's internal data did not support the granting of any indications in the area of neuropathic pain other than postherpetic neuralgia.

(Third Amended Class Action Complaint, ¶ 280 (emphasis added).

A PBM is an entity that processes pharmacy claims, manages drug formularies, and negotiates manufacturer rebates and pharmacy discounts on behalf of a TPP. Thus, Plaintiffs' allegations of fraud on TPPs include fraud on PBMs, who very often make formulary decisions for the TPPs. Defendants understand the interrelationship between PBMs and TPPs and are aware of the relevance of PBMs, as exhibited by the fact that they have deposed several in this case, including Caremark and Medco. Moreover, most of the class representatives in this matter are TPPs. Thus, the conduct directed towards TPPs is a central part of this case. Accordingly, Defendants should be compelled to provide this documentation.

3. <u>Request No. 20</u>

8

Plaintiffs aren't seeking every document that mentions the word Neurontin; rather, Plaintiffs simply seek all documentation that either announces indications for Neurontin or summarizes indications for Neurontin.  To that end, Defendants response is insufficient in limiting the documents to the NDA and IND, which were long ago produced.  The crux of this entire case is Defendants' broad and calculated over-promotion and marketing of Neurontin for off-label uses; uses that will not be contained only within the four corners of an IND or NDA.  Accordingly, Plaintiffs request far exceeds the limitations arbitrarily imposed by the Defendants, but is not overbroad as Defendants suggest.

With respect to the internal website for Neurontin, Defendants have allegedly been searching for it.  However, Plaintiffs requested it months ago.  Surely Defendants are technology sophisticated enough to answer, at a bare minimum, the simple question as to whether such a website exists.

## CONCLUSION

Wherefore, Plaintiffs, by counsel, respectfully requests that this Court grant their Motion to Compel Defendants' Production of Documents in its entirety.

Respectfully submitted,

| **For the Plaintiffs:** | |
|---|---|
| /s/ Thomas M. Sobol, Esq.<br>**HAGENS BERMAN SOBOL SHAPIRO LLP**<br>Thomas M. Sobol, Esq. (BBO #471770)<br>Ed Notargiacomo, Esq. (BBO#567636)<br>One Main Street, 4th Floor<br>Cambridge, MA 02142 | |

| | |
|---|---|
| **LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP**<br>Barry Himmelstein, Esq.<br>275 Battery Street, 30th Floor<br>San Francisco, CA 94111-3339 | |
| **GREENE & HOFFMAN**<br>Thomas Greene, Esq.<br>125 Summer Street<br>Boston, MA 02110 | |
| **DUGAN & BROWNE**<br>James Dugan, Esq.<br>650 Poydras Street, Suite 2150<br>New Orleans, LA 70130 | |
| **BARRETT LAW OFFICE**<br>Don Barrett, Esq.<br>404 Court Square North<br>P.O. Box 987<br>Lexington, MS 39095 | |
| **LAW OFFICES OF DANIEL BECNEL, JR.**<br>Daniel Becnel, Jr., Esq.<br>106 W. Seventh Street<br>P.O. Drawer H<br>Reserve, LA 70084 | |
| **SHAPIRO HABER & URMY LLP**<br>Thomas G. Shapiro, Esq. (BBO #454680)<br>53 State Street<br>Boston, MA 02109 | |
| **COHEN, MILSTEIN, HAUSFELD & TOLL, PLLC**<br>Linda P. Nussbaum, Esq.<br>150 East 52nd Street, 30th Floor<br>New York, NY 10022 | |
| **COHEN, MILSTEIN, HAUSFELD & TOLL, PLLC**<br>Michael D. Hausfeld, Esq.<br>1100 New York Avenue, N.W.<br>West Tower, Suite 500<br>Washington, DC 20005 | |

| | |
|---|---|
| **RAWLINGS & ASSOCIATES, PLLC**<br>Mark D. Fischer, Esq.<br>Mark Sandmann, Esq.<br>325 W. Main Street<br>Louisville, KY 40202 | |
| **JOEL Z. EIGERMAN, ESQ.**<br>50 Congress Street, Suite 200<br>Boston, MA 02109 | |
| **BERMAN DEVALERIO PEASE TABACCO BURT & PUCILLO**<br>Peter A. Pease, Esq. (BBO #392880)<br>One Liberty Square<br>Boston, MA 02109 | |
| **LOWEY DANNENBERG BEMPORAD & SELINGER, PC**<br>Richard Bemporad, Esq.<br>Richard W. Cohen, Esq.<br>Peter St. Phillip, Jr., Esq.<br>Todd S. Garber, Esq.<br>The Gateway – 11th Floor<br>One North Lexington Avenue<br>White Plains, NY 10601-1714 | |
| **BERMAN DEVALERIO PEASE TABACCO BURT & PUCILLO**<br>Joseph J. Tabacco, Jr., Esq.<br>425 California Street, Suite 2025<br>San Francisco, CA 94104-2205 | |
| **JOHN F. INNELLI, LLC**<br>John F. Innelli, Esq.<br>1818 Market Street, Suite 3620<br>Philadelphia, PA 19103 | |