UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION ) ) ) ) | MDL Docket No. 1629 Master File No. 04-10981 |
| THIS MOTION RELATES TO: ) ) ALL ACTIONS ) ) | Judge Patti B. Saris Mag. Judge Leo T. Sorokin |

**MEMORANDUM OF LAW IN SUPPORT OF IMS HEALTH INCORPORATED'S MOTIONS TO INTERVENE AND FOR A PROTECTIVE ORDER**

**INTRODUCTION**

IMS HEALTH Incorporated ("IMS HEALTH") is not a party to the actions and has no interest in their outcome. On February 12, 2007, the Court ordered that Pfizer produce to all plaintiffs confidential data that IMS HEALTH licensed to Pfizer. While the Court's order subjects the production of this information to the existing protective order, the existing protective order as applied to this licensed data imposes burdens on IMS HEALTH that the Court may not have anticipated. IMS HEALTH respectfully moves for leave to intervene for the purpose of requesting that the Court modify the protective order to address these issues.

The existing protective order provides that deposition testimony regarding "Confidential Information" loses its confidentiality unless within thirty (30) days of receipt of a transcript one of the parties specifically designates by page and line number that the information is to be treated as Confidential Information. (Stip. Prot. Order ¶4(c)). Unless modified, the existing protective order would require that IMS HEALTH monitor the depositions taken in the actions to ensure that the appropriate steps were taken to maintain the confidentiality of its data. The effort and

9108249 1

expense in doing so in MDL actions as extensive as these is a substantial burden on a non-party. IMS HEALTH respectfully requests that the Court modify the order to provide that non-party data remains "Confidential Information" unless the Court orders otherwise after notice to the non-party and an opportunity to be heard by the Court.

In addition, the existing protective order provides that in "no event shall disclosure of Confidential Information be made to any competitor of *any party* . . . irrespective of whether they are retained as an expert in this action." (Stip. Prot. Order ¶5) (emphasis supplied). The order does not expressly extend that protection to prohibit disclosure of Confidential Information to competitors of non-parties whose information is produced. IMS HEALTH respectfully requests that the Court modify the order to extend such protections to non-parties.

The Court's order also requires production of all of the subject data to all parties in the MDL actions, rather than tailoring production so that only that data arguably involved in a given case is produced in that case. As discussed below, even with the protections in the Court's existing protective order, such wide-spread dissemination of data whose substantial commercial value is derived, in part, from the fact that it is not widely available will cause undue harm to IMS HEALTH. Thus, IMS HEALTH respectfully requests that Court's order be modified to tailor the requirement to produce data in each action so that data is produced only with respect to transactions at issue in the particular action.

Finally, IMS HEALTH respectfully requests that the Court modify its order to limit the use of "physician-level" data. Such data is not an actual record of transactions regarding a physician about whom data is reported, but rather consists of projections arrived at by proprietary statistical means of estimation. Over the entire body of the data, the physician by physician results are sufficient for the commercial purposes for which the projections are

generated. They are not, however, by any means a record of what was prescribed by a particular physician.

The Court's order leaves the question of the use of and weight given to physician-level projections to be decided on a case by case basis by the presiding judge or finder of fact in each case. (Feb. 12, 2007 Order). While the Court's approach is understandable under many circumstances, here the approach imposes a very heavy burden on a non-party such as IMS HEALTH. Given the number of cases and prescribers involved in the MDL actions, IMS HEALTH stands a substantial risk of having its employees repeatedly called to testify whenever any of the parties in these multitudinous actions seeks to use the data as proof of a fact about a particular physician's prescribing practice and parties opposed to that use seek to demonstrate that which is demonstrable at present, *viz.*, that the data is not a record of any actual fact. Moreover, as described below, IMS HEALTH's business suffers substantial detriment when physicians learn that the data is being misused as "proof" of their past prescribing practices.

Thus, IMS HEALTH respectfully requests that the Court modify its order to provide that physician level-data not be used in any context that would suggest that the data are factual, rather than merely statistically indicative, including that they may not be used by any party for purposes of affirmative proof or impeachment of witnesses.

The form of protective order requested by IMS HEALTH is submitted with this Motion ("Proposed Order").

## BACKGROUND

### IMS Health And Its Services

IMS HEALTH is in the business of creating information products and services based on unique and proprietary data collection and analysis techniques. IMS HEALTH's unique and

proprietary techniques enable IMS HEALTH to produce estimates and projections that, when used in a manner consistent with the design and production of a particular product or service, depict pharmaceutical and healthcare activity. Many of IMS HEALTH's products are tailored to the unique informational needs associated with the pharmaceutical industry and are widely used by industry participants and regulators to examine trends in the pharmaceutical industry. A key attribute of most of IMS HEALTH's information products—including all that appear to be at issue here—is that they are derived from the application of statistical estimation methods to discrete samples of data and therefore constitute only estimates, not actual, empirical data. For example, IMS HEALTH compiles de-identified prescription drug sales data from a sample of pharmacies and extrapolates from that sample to an estimate of overall, nationwide sales by all pharmacies.

### IMS HEALTH Has Developed Distinctive Information Products And Services That Are Highly Valuable

IMS HEALTH's data collection and information reporting activities are performed in more than 100 countries and the company enjoys a strong fifty year reputation for the responsible handling of sensitive health and commercial information. IMS HEALTH tracks and analyzes information relating to all phases of the pharmaceutical product life cycle, helping companies within the pharmaceutical industry with activities ranging from drug development to product management. IMS HEALTH information is used by a broad range of clients, including pharmaceutical manufacturers, biotechnology firms, professional service firms, financial analysts, government and regulatory agencies, researchers, and educators. IMS HEALTH information is used in health care research to benefit patients and the health care community in a wide range of applications, including: (1) setting and promoting public health policy, (2) accelerating health care innovation, (3) driving best clinical practice, (4) maintaining safety, (5)

enabling patients to make better decisions, and (6) balancing value and cost. IMS HEALTH combines comprehensive pharmaceutical information with extensive advanced decision support tools, functions, and industry expertise to deliver hundreds of products and services throughout the world. IMS HEALTH produces and delivers to its customers vast quantities of information relating to the pharmaceutical and health care industries (e.g., in recent months, IMS HEALTH delivered more than 17 billion data records per month electronically to its customers in North and South America). IMS HEALTH revenues for the 2006 calendar year were $1.96 billion, the majority of which were derived from the delivery and support of IMS HEALTH information. During the relevant period, IMS HEALTH has invested hundreds of millions of dollars in the development, enhancement, and production of these services. Exh. 1, ¶¶ 3-5.

IMS HEALTH has invested and continues to invest considerable resources in generating its information products and services. IMS HEALTH has business relationships with over 29,000 data suppliers, including selected pharmacies, clinics, hospitals, physicians, wholesalers, the American Medical Association ("AMA"), and others. Each of these relationships requires careful cultivation and management. These data sources yield information covering 225,000 sites around the world. Id. ¶ 8.

IMS HEALTH uses unique data collection techniques, sampling methods, and encryption technologies. Id. ¶ 7. Most IMS HEALTH information is generated via sampling techniques. For example, IMS HEALTH collects data from approximately 70 percent of the 54,000 pharmacies in the United States **[confirm]** and compiles data on approximately 1.4 million prescribers (e.g., physicians, dentists, nurse practitioners, and other Health care professionals). Id. ¶ 4(a). Of course, this means that IMS HEALTH does not have information for approximately 30 percent of pharmacies in the United States. Because data are not collected from every source

of information in the United States, IMS HEALTH's information services generally apply one or more IMS HEALTH statistically-derived projection methodologies to report total activity for the applicable report. Id. ¶ 5(e).

Pfizer is a subscriber to a variety of IMS HEALTH information products and consequently has in its possession a large volume of information that is proprietary to IMS HEALTH. Use of the information requested by the parties without appropriate, specifically tailored restrictions is likely to cause severe business harm to IMS HEALTH in the marketplace. Further, release of vast volumes of IMS HEALTH data to a large number of lawyers and their experts puts IMS HEALTH and its intellectual property at substantially greater risk of release to the public. Even disclosure to the untold numbers of plaintiffs, potential plaintiffs, plaintiffs' counsel, experts and others who will have access to the information under the existing Protective Order will adversely affect the value of IMS HEALTH's data because its value, in part, is dependant on the fact that so few have access to it. The commercial value of IMS HEALTH information decreases the more widely it gets disseminated. Id. ¶14.

Disclosure and use of its information by litigants—even under the terms protective order currently in place in this litigation—will not only expose IMS HEALTH's information to misappropriation by competitors, but will also jeopardize IMS HEALTH's ability to collect and compile the raw data from which its estimates and projections are derived and thereby jeopardize IMS HEALTH's ability to provide its products and services at all. For example, physicians are likely to oppose continued collection of prescription information from retail pharmacies—IMS HEALTH's source for sample prescribing data from which it derives physician prescribing estimates—if doing so exposes the physicians to claims that they prescribed as is reflected in IMS's data.

IMS HEALTH's interests are congruent with a substantial public interest in continued availability of IMS HEALTH's information. IMS HEALTH's information is relied upon by the government officials who regulate the pharmaceutical industry. Id. ¶ 19. For example, IMS HEALTH prescription drug sales estimates are typically used by the Federal Trade Commission to identify competing market participants and to estimate market shares in connection with antitrust review of pharmaceutical company mergers. Id. The Food and Drug Administration relies on IMS HEALTH information in connection with its regulation and monitoring of the marketplace. Id. IMS HEALTH information has been used by the U.S. Government Accountability Office (the investigating arm of Congress), the U.S. Department of Defense, the U.S. Department of Labor, the U.S. Department Justice, the Centers for Disease Control, attorney general offices for more than twenty states, the Centers for Medicaid and Medicare Services, the Institute of Medicine of the National Academy of Sciences, the World Bank, and medical and academic institutions throughout the country. Id. ¶¶ 19-20.

Consumers are benefited by the more effective competition that occurs in the pharmaceutical industry as a result of the ability of all participants in that industry to make informed decisions on the basis of IMS HEALTH information. Thus, the public's interest in commercial competition in the pharmaceutical industry and in effective regulation of that industry is at risk if IMS HEALTH's ability to profitably produce its products and services is compromised by requests such as those before the Court.

Building and maintaining an information business such as IMS HEALTH's business is based upon the trust of data suppliers that information disclosed to IMS HEALTH will be protected and handled in a responsible manner (i.e., not in a manner contrary to the legitimate interests of the stakeholders to which such information relates). Id. ¶¶ 16-17. If IMS HEALTH

were to violate this trust it could lose access to the data; without these data, IMS HEALTH would not be able to offer its products and services. Id. IMS HEALTH has built a high degree of trust with its data suppliers and related stakeholders in the health care industry over a period of fifty years. Id. ¶ 17. New IMS HEALTH products and services, new business opportunities, new markets, and new uses of IMS HEALTH information are carefully examined to ensure these will not be contrary to the interests of data suppliers and other health care stakeholders. Id. IMS HEALTH consults with its data suppliers if there is uncertainty whether an IMS HEALTH business opportunity is likely to have a material adverse effect on their business interests. Id. IMS HEALTH carefully limits use of its data, restricts disclosure, and only licenses its information products and services to selected parties that intend to use them in a responsible manner and not in a manner contrary to the interests of IMS HEALTH's data suppliers. Id. These are the business rules of IMS HEALTH's industry, by which IMS HEALTH has successfully operated for more than fifty years.

### IMS HEALTH Employs Extensive General Protections In Safeguarding Its Information.

IMS HEALTH takes great care to guard its information from unrestricted disclosure. It employs both internal and external controls and only discloses information through contractual agreements with restrictions on the use and disclosure of IMS HEALTH information. Id. ¶ 11-13. These safeguards are necessary because the market for these services is highly competitive. Id. ¶ 10. The methods of encrypting, sampling, and projecting data, the methods of cleaning (i.e., identifying and resolving anomalies in the data) and processing the data, the classification of IMS HEALTH information (e.g., common identifiers for products, individuals, and organizations), the format of the information, and the resulting information products are all proprietary intellectual property of IMS HEALTH. Id. ¶ 4, 7. IMS HEALTH information is presented in numerous

formats, over different time periods, and at different levels of specificity. For example, the information is presented yearly, quarterly, monthly, and weekly, and at the national, regional, state, zip code, and doctor levels. Id. ¶ 5(f).

IMS HEALTH generates its products using unique data collection techniques, sampling methods, and projections not known outside the universe of participants in, and regulation of, pharmaceutical and health industries. **[Affiant]** Cert. ¶ 6, 7, 9. Pharmaceutical companies and their regulators can only obtain IMS HEALTH information by license from IMS HEALTH. IMS HEALTH licenses reports to others pursuant to written license agreements. These agreements limit use of information for internal purposes of clients and have strict confidentiality requirements. Third-parties that gain access to IMS HEALTH data for the purpose of providing services to an IMS HEALTH client must first sign a third-party agreement with IMS HEALTH (which also has strict confidentiality requirements). Id.

IMS HEALTH also has a number of internal controls to safeguard its information. The IMS HEALTH global data center is physically located in a building with secure card access and security personnel. All computers are secured by user names and passwords. Access to data and other assets on IMS HEALTH mainframe computers is user-defined. Standard operating procedures, policies, and employee training are all used to ensure proper handling and confidential treatment of IMS HEALTH information. All employees sign confidentiality agreements upon the start of their employment with IMS HEALTH, and all employees (other than administrative staff) sign agreements containing non-competition restrictions in order to protect IMS HEALTH intellectual property. Id. ¶¶ 11-13.

**Doctor-Specific Data Are Not Records Of Facts.**

Plaintiffs seek doctor-level information which is derived from data obtained principally from pharmacies. Id. ¶ 4. Doctor-level information should be treated with special care because it is susceptible to error and variance for various reasons that cannot be quantified for an individual doctor, and there is no independent source to verify or contradict the information or provide any indication the estimate may be wrong. While doctor-level information across the entire database is accurate and reliable, the information with respect to any particular physician is an estimate susceptible to error or variance that cannot be quantified. Although the information appears as "fact" in the form of numerical precision, it is not a fact. Some examples of potential causes for variances and limitations on doctor-specific data, include:

- Pharmacists may enter prescription information into the pharmacy system for a group physician practice using only the name of the first physician listed on the prescription of a list of all doctors in the group practice. When this information is reported to IMS HEALTH, it appears that the prescriptions written by various doctors in the group practice have all been written by one doctor.

- The physician identifiable information received from pharmacies is frequently limited (e.g., last name and first initial of a doctor). As a result, there are errors in linking the information to the correct doctor (e.g., does T. Smith refer to Dr. Tina Smith, Dr. Tom Smith, Sr., or Dr. Tom Smith, Jr.). IMS HEALTH employs sophisticated, proprietary algorithms to properly link this information, but errors do occur (e.g., dentists identified as prescribing anti-depressants or birth control pills).

- If a doctor has most of her prescriptions filled at unsampled pharmacies, there is a higher likelihood that the estimate for that doctor will be incorrect.

The risk of error is consistent with the appropriate commercial uses of IMS HEALTH information. For example, pharmaceutical companies use doctor-specific information to identify doctors for distribution of educational materials and drug samples. If the doctor-level information is inaccurate, a client may use this information to leave too many samples with a given doctor or the wrong doctor may receive educational materials. On the other hand, the information is not appropriate for affirmative proof in legal proceedings because weaknesses in the data could lead

9108249 1

10

to erroneous findings. Therefore, the information should never be used in legal proceedings as fact or primary evidence. This issue is ripe for the Court to address now because given the multitude of parties, leaving the decision on use to a case by case determination will subject a non-party (IMS HEALTH) to the substantial burden of being called to testify in numerous cases in which it has no interest for the purpose of demonstrating what is known now, *i.e.*, the data are not proof of any facts.

In addition, Doctor-level data are sensitive because if doctors cease to cooperate in data collection, or put pressure on data suppliers to stop supplying data, then IMS HEALTH will simply have no product based on such data.

## DISCUSSION

### Intervention Is Appropriate Here.

Under Federal Rule of Civil Procedure 24(b), IMS HEALTH is permitted to seek intervention to seek modification of an existing protective order. See Public Citizen v. Liggett Group, Inc., 858 F.2d 775, 784 (1st Cir.1988), cert. denied, 488 U.S. 1030 (1989) (finding nonparty had legitimate interest in modifying protective order) (citing Beef Industry Antitrust Litigation, 589 F.2d 786, 788-789 (5th Cir.1979)); Johnson v. City of Tulsa, 2003 WL 24015150, *1 (N.D.Okla. 2003) ("'every court of appeals to have considered the matter has come to the conclusion that Rule 24 is sufficiently broad-gauged to support a request of intervention'" by a third-party to challenge a protective order.) (quoting Jessup v. Luther, 227 F.3d 993 (7th Cir. 2000)); EEOC v. Nat'l Children's Ctr., Inc., 146 F.3d 1042, 1045 (D.C.Cir. 1998) (collecting cases); United Nuclear Corp. v. Cranford Ins. Co., 905 F.2d 1424, 1427 (10th Cir. 1990) ("[C]ourts have widely recognized that the correct procedure for a nonparty to challenge a protective order is through intervention for that purpose.") (citations omitted).

### IMS HEALTH Data Constitute Trade Secrets And Other Proprietary Commercial Information Protected By Federal Rules Of Civil Procedure 26(C).

Plaintiffs' requests seek the production of trade secrets and other proprietary commercial information. Such information has expressly been identified as subject to protection from disclosure under the Federal Rules of Civil Procedure, absent certain protections. Rule 26(c)(7) of the Federal Rules of Civil Procedure provides that the Court may order "that a trade secret or other confidential research, development, or commercial information not be disclosed or be disclosed only in a designated way."

IMS HEALTH information is valuable to IMS HEALTH's competitors because it could reveal IMS HEALTH's proprietary methodologies, sales and marketing strategies, and product development or could otherwise be used to validate or enhance competitive offerings. Id. ¶ 10. IMS HEALTH expends considerable efforts and money to develop its information. During the relevant period, IMS HEALTH has invested hundreds of millions of dollars in the development, enhancement, and production of these services. Id. ¶ 5. To produce its information services, IMS HEALTH incorporates its employee know-how and infrastructure to produce a number of proprietary methodologies and other value-added processes used to develop and sustain their products and services as detailed in the Certification of **[name of affiant]**. Id. IMS HEALTH expends great effort to build relationships with data suppliers. Id. ¶ 8. And, finally, although there are competitive offerings, IMS HEALTH information—in its entirety—could not be replicated. The breadth of IMS HEALTH's information could not be replicated because no other organization has IMS HEALTH's supplier relationships, proprietary processes, and know how. Id. ¶¶ 7-9.

### The Balance Weighs in Favor Of Modification Of The Protection Order To Limit Production And Use

The Court should balance the parties' need for discovery against the potential harm to IMS HEALTH. Bailey, 980 F.Supp. at 583. In Farley v. Cessna Aircraft Co., No. 93-6948, 1994 U.S. Dist. LEXIS 10205 (E.D. Pa. July 22, 1994), (the court should "'balance the requesting party's need for information against the injury that might result if uncontrolled disclosure is compelled. When the risk of harm to the owner of [a] trade secret or confidential information outweighs the need for discovery, disclosure [through discovery] cannot be compelled . . .'" Id. at *4).

As discussed above, IMS HEALTH would suffer considerable harm if its highly sensitive and proprietary information were disclosed, absent suitable protections. Disclosure and use of IMS HEALTH data in litigation without proper limitations would create business hardships for IMS HEALTH that are disproportionate to Plaintiffs' need for the information. If IMS HEALTH information is placed in the public domain and accessible to competitors or customers of IMS HEALTH without payment, even occasionally, the value of IMS HEALTH's information products would be diminished, causing economic and business harm to IMS HEALTH. Id. ¶ 14.

These concerns are particularly acute in these consolidated actions, because of the large number of plaintiffs, potential plaintiffs, plaintiffs' counsel, experts and others who will have access to the information. IMS HEALTH's business is the provision—for payment—of specialized information created at enormous and ongoing expense. Id. ¶¶ 4, 14. IMS HEALTH's ability to continue in that business would cease if the information were in the public domain and available to customers or competitors of IMS HEALTH without payment. Id. ¶ 14. These business concerns are particularly strong as to any disclosure that would expose IMS HEALTH's data collection techniques, sampling methods, algorithms, and other statistical methods to examination without the contractual limits that IMS HEALTH uniformly imposes on access to its

products and services. Id. ¶ 15. The protections requested in the attached Proposed Order are actually less stringent than the limitations on disclosure used in IMS HEALTH service agreements. For these reasons, good cause exists for modification of the Court's orders.

IMS HEALTH has demonstrated that there is good cause to issue a protective order. IMS HEALTH is not a litigant in these proceedings. There are no special considerations regarding public entities or public domain involved in this litigation. IMS HEALTH does not dispute that certain IMS HEALTH information may be relevant to this litigation. IMS HEALTH does not object to Defendant's production of *relevant* data that are specifically tailored to this litigation. See Bonin v. World Umpires Ass'n., 204 F.R.D. 67, 70 (E.D. Pa. 2001) (granting a protective order where the defendant "candidly recognized that its financial books and records are relevant to this litigation and it is willing to produce them").

There is, however, good cause for the Court to issue a protective order that limits the scope of the information produced to that which is related to this litigation and to protect IMS HEALTH from the potential harm that flows from production and use of this data.

**There Is Good Cause To Limit The Scope Of Use Of Doctor-Level Data.**

The Proposed Order limits the uses of Doctor Identifiable Confidential Information. As shown above, IMS HEALTH exercises particular caution in safeguarding doctor-level information. These additional safeguards are necessary because the collection of data on this granular level is fundamental to the underpinnings of several major IMS HEALTH products.

In addition, these safeguards are necessary because these types of data are susceptible to variance and error at the doctor level which cannot be quantified or identified, rendering some undetermined amount of the data misleading with respect to legal applications. This information should not be used as affirmative proof of an individual data point, this information is based on

projections that are merely statistically indicative. It is worth noting that IMS HEALTH has been consistent in its approach regarding the use of doctor-level information for legal applications. In the past, IMS HEALTH has resisted similar requests regarding the use of IMS HEALTH doctor-level information in legal proceedings or government enforcement activities unless suitable protections were agreed upon. Other courts have entered orders limiting the use of doctor level data.

Other courts have acknowledged the probative limitations on the use of projections to prove the truth of a fact. In Nebraska v. Perkins, 364 N.W.2d 20, 25 (Neb. 1985), the court held that "[a] U.S. census report does not provide an accurate accounting of the number of residents in a given county" for the purposes of showing that the defendant's jury panel was unrepresentative. The Census Act itself has "prohibited the use of statistical sampling in calculating the population for the purposes of apportionment" since the first census of 1790. See also Department of Commerce v. House of Representatives, 525 U.S. 316, 335 (1999) (affirming this interpretation of the Census Act). The limited evidentiary value of projections when balanced against the harm to IMS HEALTH if use is not limited provides good cause to limit the scope of use of IMS HEALTH doctor-level information in these proceedings.

### The Protective Order Currently In Place Does Not Adequately Protect IMS HEALTH's Interests.

The existing Stipulated Protective Order ("Protective Order") does not adequately protect IMS HEALTH's interests. It was drafted to protect the parties to the litigation and many of the protections afforded the parties under the Protective Order do not extend to non-party IMS HEALTH. For instance, there is no provision in the Protective Order that allows for any practical means for IMS HEALTH the opportunity to review, designate and maintain as

confidentially any portion of interrogatory answers or portions of depositions that contain confidential IMS HEALTH information. See Protective Order paragraph 4(c).

The Protective Order's disclosure terms would adversely affect the value of IMS HEALTH's products. As discussed above, disclosure and use of IMS HEALTH data in litigation without proper limitations creates business hardships for IMS HEALTH. IMS HEALTH information is highly specialized, created at enormous and ongoing expense and is of such a nature that its commercial value dissipates the more it is distributed. In a consolidated action such as this where, absent the safeguard of a specifically tailored protective order, an untold numbers of plaintiffs, potential plaintiffs, plaintiffs' counsel, experts and others will have access to IMS HEALTH information—irrespective of whether they actually *need* access to the information. To the extent any of these individuals is a competitor of IMS HEALTH's such access is particularly worrisome to IMS HEALTH and the Courts. Courts recognize that increased likelihood of competitive injury is particularly high when a business competitor is likely to have access to confidential information. See Bailey, 980 F.Supp. 560 at 583. Therefore, the Protective Order currently in place does not adequately protect IMS HEALTH's interests and should be modified.

### IMS HEALTH's Proposed Order Balances The Interests Of The Parties.

IMS HEALTH requests that the Court enter the attached Proposed Order. The provisions of the Proposed Order are narrowly tailored to address IMS HEALTH's business concerns while allowing the parties to use IMS HEALTH information for certain purposes. Each of the provisions of the Proposed Order is summarized below:

- *Designation of "IMS HEALTH Confidential" Documents:* Separate designation of IMS HEALTH information will facilitate application of the necessary protections.

- *Appropriate Measures to Protect IMS HEALTH Confidential Documents:* Requires notice and an opportunity to be heard before confidentiality is lost.

- *No Disclosure to IMS HEALTH Competitors: Provides that* competitors shall not receive IMS HEALTH information.

- *Disclosure is Limited to Neurontin Cases:* Limits use to Neurontin actions and requires that counsel be subject to the Proposed Order.

- *Scope of Production:* Each Plaintiff shall limit their document requests as to IMS HEALTH information to call for only (a) IMS HEALTH information that relates to dispensing activities in the United States associated with Neurontin, aggregated or reported at a national level of geography and aggregated or summarized for one or more calendar years, and (b) doctor-level information for doctor(s) actually at issue in a particular case.

- *Scope of Use:* Doctor-level information may not be used as affirmative proof. This provision addresses the fact that doctor-level information is inherently unsuitable *as* legal proof of a particular doctor's prescribing activity.

The provisions listed above and in the Proposed Order are reasonable requests, specifically tailored to protect IMS HEALTH's trade secrets and commercial information. They allow Plaintiffs to use IMS HEALTH information for discovery purposes but limit its disclosure.

## CONCLUSION

IMS HEALTH respectfully requests that the Court (1) allow it to intervene for the limited purpose of seeking revision of the protective orders and (2) enter the attached Proposed Order for the protection of IMS HEALTH's trade secrets and commercial information.

IMS HEALTH INCORPORATED

By its attorney,

/s/ Ian Crawford
Ian Crawford (BBO#544475)
Todd & Weld LLP
28 State Street
Boston, MA 02109
(617) 720-2626
icrawford@toddweld.com

DATED: February 20, 2007

9108249 1

17

Of Counsel:

George J. Tzanetopoulos
Ethan Hastert
Mayer, Brown, Rowe & Maw LLP
71 S. Wacker Drive
Chicago, IL 60606
(312) 701-7026