UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION ) ) ) ) | MDL Docket No. 1629<br>Master File No. 04-10981 |
| THIS MOTION RELATES TO:  ) )  ALL ACTIONS ) ) | Judge Patti B. Saris<br>Mag. Judge Leo T. Sorokin |

## CERTIFICATION OF KARRIE M. HONTZ, OF IMS HEALTH INCORPORATED

I, Karrie M. Hontz, of full age, do hereby certify and say:

1.  I am Director of Marketing of IMS Health Incorporated ("IMS") for the Americas region. I have been employed by IMS and its affiliates for more than twelve years.

2.  I have personal knowledge of the information provided herein.

IMS BACKGROUND

3.  IMS Health is the world's leading provider of information, research and analysis to the health care industry, with data collection and reporting activities in more than 100 countries and a strong 50-year reputation for the responsible handling of sensitive health and commercial information. IMS tracks and analyzes information relating to all phases of the pharmaceutical product life cycle, helping companies within the pharmaceutical industry with activities ranging from drug development to product management. In addition, IMS information is used by a broad range of clients, including pharmaceutical manufacturers, biotechnology firms, professional service firms, financial analysts, government and regulatory agencies, researchers, and educators. IMS information is used in healthcare research to benefit patients and the health care community in a wide range of applications, including: (1) setting and promoting public health policy, (2) accelerating healthcare innovation, (3) driving best clinical practice, (4) maintaining safety, (5) enabling patients to make better decisions, and (6) balancing value and cost. IMS combines

comprehensive pharmaceutical data with extensive advanced decision support tools, functions and industry expertise to deliver hundreds of products and services throughout the world. IMS produces and delivers to its customers vast quantities of information relating to the pharmaceutical and health care industries (e.g., in recent months, IMS delivered more than 17 billion data records per month electronically to its customers in North and South America). IMS revenues for the 2006 calendar year were $1.96 billion, the majority of which is derived from the delivery and support of IMS data services.

4. In the United States, IMS provides many services, which can be principally segmented into the following categories: (a) syndicated market research services, (b) sales management information services, and (c) consulting services. Following is a brief description of some of these services:

a. Xponent® ("Xponent") is IMS Health's prescription information service, providing information to pharmaceutical companies to support sales planning and measurement activities. Xponent was introduced in the marketplace in 1992. Xponent collects patient de-identified prescription information from approximately 70 percent of the 54,000 pharmacies in the United States, and applies patented, proprietary methodologies to estimate the remaining 30 percent of the market. This enables IMS to custom project for more than one million prescribers every month. Furthermore, Xponent reports information for the growing mail service and long-term care markets. Of the information captured, more than 97 percent are matched to either a prescriber or a prescriber's zip code, thus crediting the prescription to the territory of origin. Over 100 pharmaceutical companies rely on Xponent for a variety of sales management activities every month.

b. National Prescription Audit is an information service which measures the outflow of prescriptions, or the rate at which drugs move out of pharmacies into the hands of consumers. The data are projected to a national level, and reported for the retail channel,

mail service and long term care. The National Prescription Audit was introduced into the market in 1952.

  c. National Disease and Therapeutic Index is a market research service which reports statistical information about the patterns and treatments of disease encountered by office-based physicians in the United States. The data are projected to a national level. The service was introduced into the market in 1958.

5. To produce its information services, IMS incorporates its employee know-how and infrastructure to produce a number of proprietary methodologies and other value-added processes used to develop and sustain their products and services, including the products described above, as follows:

  a. Upon receipt of data, IMS performs a preliminary examination to ensure that data is in a computer readable format and meets certain limited data edit criteria. All panel information received by IMS is subject to a quality control process to ensure and maintain the integrity of the Rx database and IMS employs a number of methodologies to screen all data received by panel suppliers;

  b. Data that passes preliminary examination has certain elements matched and translated to IMS's master files (i.e., numbering schemes and common identifiers) and data that is not likely to be used in IMS products is eliminated;

  c. IMS continues to test and examine data to improve completeness and accuracy;

  d. Any data which meets IMS's pre-defined criteria is then imported into a database used to produce products for customers;

  e. Because data is not collected from every source of information in the United States, reports generated for clients generally apply one or more IMS statistically-derived projection methodologies to report total activity for the applicable report.

  f. IMS information is presented in numerous formats, over different time periods, and at different levels of specificity. For example, the information is presented yearly, quarterly, monthly, and weekly, and at the national, regional, state, zip code, and doctor levels.

During the relevant period, IMS has invested hundreds of millions of dollars in the development, enhancement and production of these services.

### IMS'S PRODUCTS INCLUDE HIGHLY SENSITIVE BUSINESS INFORMATION AND TRADE SECRETS.

6. These business intelligence products utilize highly sensitive business information and trade secrets.

7. IMS generates its products and services using unique data collection techniques, sampling methods, and projections.

8. IMS has invested and continues to invest considerable resources in generating its data. IMS has business relationships with over 29,000 data suppliers covering 225,000 data sites around the world. Each of these relationships requires careful cultivation and management.

9. Although there are competitive offerings, no one else in the marketplace could replicate the breadth of IMS's information because no other organization has IMS's supplier relationships, proprietary processes, and know how.

10. The market for this type of data is highly competitive. Information requested by Plaintiffs would be extremely valuable to IMS's competitors and its would-be competitors because it could reveal supplier relationships, data collection methods, sampling techniques, and marketing information proprietary to IMS, or could otherwise be used to validate or enhance competitive offerings.

### IMS CAREFULLY AND RIGOROUSLY PROTECTS ITS CONFIDENTIAL INFORMATION FROM PUBLIC DISCLOSURE.

11. IMS exercises great care in preserving the confidentiality of its commercial information both internally and externally.

12. IMS has a number of internal controls to safeguard its data. The IMS global data center is physically located in a building with secure card access and security personnel. All computers are secured by user names and passwords. Access to data and other assets on IMS mainframe computers are user-defined. Standard operating procedures, policies, and employee training are all used to ensure proper handling and confidential treatment of IMS information. All employees sign confidentiality agreements upon the start of their employ with IMS, and all employees (other than administrative staff) sign agreements containing non-competition restrictions in order to protect IMS intellectual property.

13. IMS carefully safeguards its proprietary information through its business relationships. IMS acquires data for its products and services pursuant to written contracts, which contain restrictions on use and disclosure of the data. After processing the data and creating IMS proprietary databases, IMS produces and licenses reports to others pursuant to written license agreements. These agreements limit use of information for internal purposes of clients, and have strict confidentiality requirements. Third parties that gain access to IMS data for the purpose of providing services to an IMS client must first sign a third-party agreement with IMS (which also has strict confidentiality requirements). Contractors performing work on behalf of IMS are required to sign services agreements with strict confidentiality requirements.

## PUBLIC DISCLOSURE OF IMS DATA WOULD CAUSE IMS SEVERE BUSINESS AND ECONOMIC HARM.

14. Loss of protection over its data would severely jeopardize IMS's business as its business model is premised on customers paying to utilize the data compilations; if portions of data are available without charge, the value of the data is diminished.

15. Disclosure could reveal information to IMS competitors, including supplier relationships, data collection methods, sampling techniques and marketing information proprietary to IMS.

16. IMS has contractual relationships with data suppliers that require IMS to report instances when the data is disclosed. Dissemination would cause IMS to incur considerable expense in monitoring data dissemination, reporting to its data sources, or potentially it may even cause IMS to breach one of its data source agreements.

17. IMS has built a high degree of trust with its data suppliers and related stakeholders in the health care industry over a period of fifty years. New IMS products and services, new business opportunities, new markets, and new uses of IMS information are carefully examined to ensure these will not be contrary to the interests of data suppliers and other health care stakeholders. IMS consults with its data suppliers if there is uncertainty whether an IMS business opportunity is likely to have a material adverse effect on their business interests. IMS carefully limits use of IMS data, restricts disclosure, and only licenses its data to parties that intend to use the data in a responsible manner and not in a manner contrary to the interests of IMS's data suppliers. Breaching these agreements may result in loss of supplier relationships.

## DISCLOSURE OF IMS DATA IS NOT IN THE PUBLIC INTEREST.

18. Disclosure of IMS data does not serve the public interest. IMS sells products that are widely used in the pharmaceutical industries. Healthcare consumers are benefited by these products because they promote competition and access to information in the marketplace.

19. IMS data are relied on by the government for a variety of uses. IMS prescription drug sales estimates are typically used by the Federal Trade Commission to identify competing market participants and estimate market shares in connection with antitrust review of pharmaceutical company mergers. The Food and Drug Administration rely on the use of IMS information in connection with their regulation and monitoring of the marketplace. IMS information has been used by the U. S. Government Accountability Office (the investigative arm of Congress), the U.S. Department of Defense, the U.S. Department of Labor, the U.S. Department of Justice, the Centers for Disease Control, attorney general offices for more than twenty states, the

Centers for Medicaid and Medicare Services, the Institute of Medicine of the National Academy of Sciences, and the World Bank.

20. IMS data are made available to researchers in academic institutions throughout the country.

I certify that the foregoing statements made by me are true. I understand that if they are willfully false, I am subject to punishment.


__/s/ Karrie M. Hontz__


February 20, 2007

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re: NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL Docket No. 1629<br><br>Master File No. 04-10981 |
| THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS | Judge Patti B. Saris |

### CERTIFICATION

1.  My name is _____. I live at _____. I am employed as (state position) _____ by (state name and address of employer) _____.

2.  I have read the Protective Order (the "Order") that has been entered in this litigation, and a copy of it has been given to me. I understand the provisions of the Order, and agree to comply with and to be bound by its provisions.

3.  I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

   Executed this ___ day of _____, _____.

   _____