UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| IN RE NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | ) ) ) ) ) | |
| THIS DOCUMENT RELATES TO: | ) ) ) | MDL Docket No. 1629 Master File No. 04-10981 Judge Patti B. Saris Mag. Judge Leo T. Sorokin |
| ALL MARKETING AND SALES PRACTICES ACTIONS | ) ) ) ) | |

**CLASS PLAINTIFFS' MOTION FOR PERMISSION TO FILE AN OVERSIZED REPLY MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**

Pursuant to United States District Court for the District of Massachusetts Local Rule 7.1(b)(4), the Class Plaintiffs (*Harden Manufacturing Corp., et al. v. Pfizer, Inc., et al*.) respectfully request leave of the Court to file the attached reply memorandum in support of their motion for class certification in excess of the 20-page limit set forth in Rule 7.1(b)(4). Plaintiffs are responding to an opposition brief of 49 pages filed by Defendants, which raises numerous complex issues of fact and law that cannot be responded to in 20 pages. Class Plaintiffs apologize for burdening the Court with such a lengthy proposed reply brief without having obtained prior permission, but Class Plaintiffs were unable to estimate the required length of their reply brief sufficiently in advance of its completion.

Dated: February 21, 2007                    Respectfully Submitted,

By:    /s/ Barry Himmelstein
       Barry Himmelstein, Esquire
       Lieff Cabraser Heimann &
       Bernstein, LLP
       Embarcadero Center West
       275 Battery Street, 30th Floor
       San Francisco, CA 94111-3339

By:    /s/ Thomas Greene
       Thomas Greene Esquire
       Greene & Hoffman
       125 Summer Street
       Boston, MA 02110

By:    /s/ Don Barrett
       Don Barrett, Esquire
       Barrett Law Office
       404 Court Square North
       P.O. Box 987
       Lexington, MS 39095

By:    /s/ Daniel Becnel
       Daniel Becnel, Jr., Esquire
       Law Offices of Daniel Becnel, Jr.
       106 W. Seventh Street
       P.O. Drawer H
       Reserve, LA 70084

By:    /s/ James Dugan
       James Dugan, Esquire
       Dugan & Browne
       650 Poydras St., Suite 2150
       New Orleans, LA 70130

By:    /s/ Thomas M. Sobol
       Hagens Berman Sobol Shapiro LLP
       One Main Street, 4th Floor
       Cambridge, MA  02142
       Boston, MA 02110

*Members of the Class Plaintiffs'*
*Steering Committee*

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | ) ) ) ) |
| | ) |
| THIS DOCUMENT RELATES TO: | ) ) |
| ALL MARKETING AND SALES PRACTICES ACTIONS | ) ) ) ) |

MDL Docket No. 1629
Master File No. 04-10981
Judge Patti B. Saris
Mag. Judge Leo T. Sorokin

**REPLY MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION**

# TABLE OF CONTENTS

**Page**

I.  RESPONSE TO DEFENDANTS' STATEMENT OF FACTS ........................................1

    A.  The Consumer Class Representatives ....................................................................1

        1.  Gerald Smith..............................................................................................2

        2.  Lorraine Kopa ...........................................................................................6

    B.  The Third Party Payor Class Representatives ......................................................9

        1.  ASEA...........................................................................................................9

        2.  Harden.......................................................................................................11

        3.  BCBSLA ...................................................................................................13

II. COMMON ISSUES PREDOMINATE.........................................................................14

    A.  Whether Or Not Neurontin Is Effective In Treating Off-Label Conditions Presents Common Questions Susceptible of Common Proof...............................14

    B.  Plaintiffs Have Alleged Uniform Misrepresentations and Omissions .................15

        1.  Plaintiffs Have Alleged Uniform Omissions ...........................................16

        2.  Plaintiffs Have Alleged Uniform Published Misrepresentations .............17

        3.  Plaintiffs Have Alleged Uniform Oral Misrepresentations ......................18

    C.  Proximate Cause and Damages are Susceptible of Common Proof.....................24

        1.  The Calculation of Class-Wide Impact on an Aggregate Basis Is Not a Barrier to Class Certification ..........................................................28

        2.  Exposure Heterogeneity and Response Heterogeneity Are Irrelevant ...................................................................................................34

        3.  "Omitted Variable Bias" Poses No Barrier to A Valid Estimate of Class-Wide Impact or Aggregate Damages.............................................35

    D.  Reliance Is Not An Element of Plaintiffs' RICO Claim.......................................37

    E.  Reliance May Be Presumed on Plaintiffs' Common Law Fraud Claim...............38

    F.  Plaintiffs Can Demonstrate Class-Wide Injury Without Examining Individual Medical Records.................................................................................39

    G.  Affirmative Defenses Do Not Predominate.........................................................42

    H.  The Court May Apply New Jersey Law ...............................................................45

        1.  New Jersey Law May Constitutionally Be Applied .................................46

**TABLE OF CONTENTS**
**(continued)**

| | | | Page |
|---|---|---|---|

|     | 2. | New Jersey Choice of Law Rules Lead to the Application of New Jersey Law ...................................................................................47 |
|     | 3. | Massachusetts' Choice of Law Rules Parallel New Jersey's ...................53 |
| III. | THE CLASS IS ASCERTAINABLE.................................................................54 |
| IV. | PLAINTIFFS' CLAIMS ARE TYPICAL AND THEY WILL ADEQUATELY REPRESENT THE CLASS.........................................................................56 |
| V. | THE THIRD PARTY PAYORS HAVE STANDING TO SUE UNDER THE NJCFA...............................................................................................59 |
| VI. | A CLASS ACTION IS SUPERIOR TO AND MORE MANAGEABLE THAN THOUSANDS OF INDIVIDUAL ACTIONS.................................................61 |
| VII. | CONCLUSION..............................................................................................62 |

# TABLE OF AUTHORITIES

**Page**

## CASES

*Adair v. Sorenson*,
  134 F.R.D. 13 (D. Mass. 1991)................................................................58

*Arc Networks v. Gold Phone Card Co.*,
  756 A.2d 636 (N.J. Super. Ct. Law Div. 2000) ......................................59

*Aspinall v. Philip Morris, Inc.*,
  442 Mass. 381 (2004)................................................................................30

*Bank of China v. NBM, L.L.C.*,
  126 S. Ct. 675 (2005)................................................................................37

*Bertulli v. Independent Ass'n of Continental Pilots*,
  242 F.3d 290 (5th Cir. 2001)....................................................................62

*Blue Cross & Blue Shield of N.J., Inc.*,
  36 F. Supp. 2d (E.D.N.Y. 1999)................................................................33

*Brown v. Philip Morris Inc.*,
  228 F. Supp. 2d 506 (D.N.J. 2002)..........................................................38

*Bruno v. Superior Court*,
  127 Cal. App. 3d 120 (Cal. Ct. App. 1981) ............................................30

*Cetel v. Kirwan Fin. Group, Inc.*,
  460 F. 3d 494 (3d Cir. 2006) ....................................................................59

*Clay v. American Tobacco Co.*,
  188 F.R.D. 483 (S.D. Ill. 1999)....................................................56, 57, 58

*Computer Systems Engineering, Inc. v. Qantel Corporation*,
  740 F.2d 59 (1st Cir. 1984)......................................................................53

*CPC Intern., Inc. v. Northbrook Excess & Surplus Ins. Co.*,
  962 F.2d 77 (1st Cir. 1992)......................................................................52

*Dellinger v. Pfizer, Inc.*,
  2006 WL 2057654 (W.D.N.C. July 19, 2006)........................15, 39, 42

*Desiano v. Warner Lambert Co.*,
  326 F.3d 339 (2d Cir. 2003) ....................................................................60

*Desiderio v. D'Ambrosio*,
  190 N.J. Super. 424 (Ch. Div. 1983) ......................................................44

*Duhaime v. John Hancock Mut. Life Ins. Co.*,
  177 F.R.D. 54 (D. Mass. 1997)....................................................18, 56, 57

*Dukes v. Wal-Mart. Inc.*.
  --- F.3d ---, 2007 WL 329022 (9th Cir. Feb. 6, 2007) ................29, 30, 31

*East Coast Office Systems, Inc. v. Citicorp Vendor Finance, Inc.*,
  Civ. No. 06-24 (GEB), 2006 U.S. Dist. LEXIS 82044 (D.N.J. Nov. 9, 2006)................59, 60

# TABLE OF AUTHORITIES
### (continued)

Page

*Eastern Mountain Platform Tennis, Inc. v. Sherwin-Williams Co., Inc.*,
    40 F.3d 492 (1st Cir. 1994)........................................................................52

*Elec. Mobility Corp. v. Bourns Sensors/Controls, Inc.*,
    87 F. Supp. 2d 394  (D.N.J. 2000) ...........................................................59

*Falise v. Amer. Tobacco*,
    94 F. Supp. 2d 316 (E.D.N.Y. 2000) ........................................................30

*Foister v. Purdue Pharma L.P.*,
    No. 01-268-DCR, 2002 WL 108608 (E.D. Ky. Feb. 26, 2002) ...............40

*Fuller v. Fruehauf Trailer Corp.*,
    168 F.R.D. 588 (E.D. Mich. 1996) ...........................................................19

*Gantes v. Kason Corp.*,
    679 A.2d 106 (N.J. 1996) ..........................................................................49

*Grace v. Perception Technology Corp.*,
    128 F.R.D. 165 (D. Mass. 1989)..........................................................47, 58

*Heindel v. Pfizer, Inc.*,
    381 F. Supp. 2d 364 (D.N.J. 2004) ...........................................................40

*Hilao v. Estate of Marcos*,
    103 F.3d 767 (9th Cir. 1996) .....................................................................33

*Huffman v. Monroe County Community School Corporation*,
    588 N.E.2d 1264 (Ind. 1992) ......................................................................6

*In re Am. Cont'l Corp./Lincoln Sav. & Loan Sec. Litig.*,
    140 F.R.D. 425 (D. Ariz. 1992)...........................................................18, 19

*In re Baycol Prods. Litig.*,
    218 F.R.D. 197 (D. Minn. 2003) .........................................................40, 58

*In re Biogen Securs. Litig.*,
    179 F.R.D. 25 (D. Mass. 1997)..................................................................58

*In re Bridgestone/Firestone, Inc.*,
    288 F.3d 1012 (7th Cir. 2002) ...................................................................56

*In re Cardizem CD Antitrust Litig.*,
    200 F.R.D. 326 (E.D. Mich. 2001) ...........................................................29

*In re Express Scripts, Inc. Pharmacy Benefits Management Litig.*,
    MDL No. 1672, 2006 U.S. Dist. LEXIS 65168 (E.D. Mo. Sept. 13, 2006) ...........................59

*In re Flat Glass Antitrust Litig.*,
    191 F.R.D. 472 (W.D. Pa. 1999) ...............................................................43

*In re LifeUSA Holding, Inc.*,
    242 F.2d 136 (3d Cir. 2001) ......................................................................19

*In re Lupron Marketing & Sales Practices Litig.*,
    295 F. Supp. 2d 148 (D. Mass. 2003) ........................................................37

## TABLE OF AUTHORITIES
### (continued)

Page

*In re NCAA I-A Walk-On Football Players Litig.*,
  2006 U.S. Dist. LEXIS 28824 (W.D. Wash. May 3, 2006) ...................................34

*In re New Motor Vehicles Canadian Export Antitrust Litig.*,
  235 F.R.D. 127 (D. Me. 2006)..............................................................................29

*In re Pharm. Indus. Avg. Wholesale Price Litig.*,
  230 F.R.D. 61 (D. Mass. 2005).........................................19, 32, 33, 37, 52, 53, 54

*In re Polymedica Corp. Securs. Litig.*,
  432 F.3d 1 (1st Cir. 2005)......................................................................................15

*In re Prudential Ins. Co. America Sales Practices Litig.*,
  962 F. Supp. 450 (D.N.J. 1997), *aff'd in part, vacated in part on other
  grounds,* 148 F.3d 283 (3d Cir. 1988) .................................................................32

*In re Prudential Sec. Inc. Ltd. P'ships Litig.*,
  163 F.R.D. 200 (S.D.N.Y. 1995) ...........................................................................18

*In re Relafen Antitrust Litigation*,
  221 F.R.D. 260 (D.Mass. 2004)............................................................................54

*In re Rezulin Litig.*,
  Judicial Council Coordination Proceeding No. 4122 (Cal. Sup. Ct. Apr. 29,
  2003) .....................................................................................................................40

*In re Rezulin Prod. Liab. Litig.*,
  392 F. Supp. 2d 597 (S.D.N.Y. 2005) ...................................................................60

*In re Rezulin Prods. Liab. Litig.*,
  210 F.R.D. 61 (S.D.N.Y. 2002) ..........................................................40, 43, 46, 56, 58

*In re Synthroid Marketing Litigation*,
  188 F.R.D. 295 (N.D. Ill. 1999)........................................................................17, 57

*In re Tyco Int'l, Inc.*,
  2006 WL 2349338 (D.N.H. Aug. 15, 2006) ..........................................................59

*In re Visa Check/MasterMoney Antitrust Litig.*,
  280 F.3d 124 (2d Cir. 2001) ..................................................................................61

*In re Warfarin Sodium Antitrust Litig.*,
  212 F.R.D. 231 (D. De. 2002) ...............................................................................28

*Insolia v. Philip Morris, Inc.*,
  186 F.R.D. 535 (W.D. Wis. 1998) ....................................................................19, 58

*Int'l Union of Op. Eng'rs Local 68 Welfare Fund v. Merck & Co., Inc.*,
  No. ATL-L-3015-04, 2004 WL 3767338 (N.J. Super. L. July 8, 2004) ...............60

*International Union of Operating Engineers Local #68 Welfare Fund v. Merck &
  Co., Inc.*,
  894 A.2d 1136 (N.J. Super. Ct. App. Div. 2006) .................................................47

*Kaufman v. i-Stat Corp.*,
  754 A.2d 1188 (N.J. 2000) ....................................................................................38

# TABLE OF AUTHORITIES
## (continued)

Page

*Klay v. Humana, Inc.*,
  382 F.3d 1241 (11th Cir. 2004) ........................................................62

*Knutson v. Daily Review, Inc.*,
  548 F.2d 795 (9th Cir. 1976) ...........................................................32

*Lessard v. Metropolitan Life Ins. Co.*,
  103 F.R.D. 608 (D. Me. 1984)......................................................43, 44

*Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach*,
  523 U.S. 26 (1998)...........................................................................46

*Lone v. Trans World Airlines. Inc.*.
  761 F. Supp. 1320 (N.D. Ill. 1991) ..................................................32

*Losacco v. F.D. Rich Const. Co., Inc.*,
  992 F.2d 382 (1st Cir. 1993)............................................................52

*M. Berenson Co., Inc. v. Faneuil Hall Marketplace, Inc.*,
  100 F.R.D. 468 (D. Mass. 1984)......................................................57

*Margulies v. Chase Manhattan Mortg. Corp.*,
  No. A-4087-03T3, 2005 WL 2923580 (N.J. Super. Ct. App. Div. Nov. 7,
  2005)..............................................................................................52

*Martin v. Am. Med. Sys., Inc. v. Pfizer, Inc.*,
  1995 WL 680630 (S.D. Ind. Oct. 25, 1995) ................................56, 58

*Mexico Money Transfer Litig.*,
  267 F.3d 743 (7th Cir. 2001)...........................................................29

*Moore v. Painewebber, Inc.*,
  306 F.3d 1247 (2d Cir. 2002) ..........................................................19

*Morgan v. Markerdowne Corp.*,
  201 F.R.D. 341 (D.N.J. 2001)..........................................................38

*Muise v. GPU. Inc.*.
  371 N.J. Super. 13, 851 A.2d 799 (N.J. Super. App. Div. 2004) ........33

*Neufeld v. Neufeld*,
  910 F. Supp. 977 (S.D.N.Y. 1996) ...................................................45

*Oshana v. Coca-Cola Bottling Co.*,
  225 F.R.D. 575 (N.D. Ill. 2005).................................................56, 58

*Papergraphics International, Inc. v. Correa*,
  910 A.2d 625 (N.J. Super. 2006) .....................................................59

*Park Inn Intern., L.L.C. v. Mody Enterprises, Inc.*,
  105 F. Supp. 2d 370 (D.N.J. 2000)...................................................45

*Peterson v. H&R Block Tax Servs., Inc.*,
  174 F.R.D. 78 (N.D. Ill. 1997)........................................................37

## TABLE OF AUTHORITIES
### (continued)

Page

*Phillips Petroleum Co. v. Shutts*,
   472 U.S. 797 (1985)................................................................46

*Platten v. HG Bermuda Exempted Limited*,
   437 F.3d 118 (2d Cir. 2006) ...................................................37

*Reicher v. Berkshire life Ins. Co. of America*,
   360 F.3d 1 (1st Cir. 2004) ......................................................53

*Rivera v. Wyeth-Ayerst Labs*,
   83 F.3d 315 (5th Cir. 2002)....................................................40

*Schwab v. Philip Morris, Inc.*,
   449 F. Supp. 2d 992 (E.D.N.Y. 2006) ...............................30, 33

*Singer v. AT&T Corp.*,
   185 F.R.D. 681 (S.D. Fla. 1998).............................................38

*Smilow v. Southwestern Bell Mobile Sys., Inc.*,
   323 F.3d 32 (1st Cir. 2003).....................................................43

*Spark v. MBNA Corp.*,
   178 F.R.D. 431 (D. Del. 1998) ...............................................38

*Sprague v. General Motors Corp.*,
   133 F.3d 388 (6th Cir. 1998) ..................................................57

*Swack v. Credit Suisse First Boston*,
   230 F.R.D. 250 (D. Mass. 2005)..............................................15

*Systems Management. Inc. v. Loiselle*,
   303 F.3d 100 (1st Cir. 2002)...................................................37

*Tingley Systems, Inc. v. CSC Consulting, Inc.*,
   152 F. Supp. 2d 95 (D. Mass. 2001).........................................53

*United States ex rel Franklin v. Parke-Davis*,
   2003 WL 22048255 (D. Mass. Aug. 22, 2003) ........................25

*Varacallo v. Mass. Mut. Ins. Co.*,
   752 A.2d 807 (N.J. Super Ct. App. Div. 2000) ..............31, 38, 39

*Waste Mgmt. Holdings, Inc. v. Mowbray*,
   208 F.2d 288 (1st Cir. 2000)...............................................15, 43

*Waters v. Int'l Precious Metals Corp.*,
   172 F.R.D. 479 (S.D. Fla. 1996).............................................38

*Williams v. Purdue Pharma Co.*,
   297 F. Supp. 2d 171 (D. D.C. 2003) ........................................40

*Yaffe v. Powers*,
   454 F.2d 1362 ........................................................................61

*Zapka v. Coca-Cola Co.*,
   2000 WL 1644539 (N.D. Ill. Oct. 27, 2000) ...........................55

**TABLE OF AUTHORITIES**
**(continued)**

Page

**STATUTES**

28 U.S.C. § 1391......................................................................................................45

**TREATISES**

NEWBERG & CONTE, NEWBERG ON CLASS ACTIONS (4th ed. 2002).....................29, 33, 43, 44, 55

Moore's Federal Practice (3d ed. 2006) ....................................................................58

D. Radley, S. Finkelstein, *et al.*, *Off-Label Prescribing Among Office-Based Physicians*, 166 Arch. Intern. Med. 1021 (May 8, 2006) .................................................24, 25

E.R. Berndt, L. Bui, D. Reiley and G. Urban, "Information, Marketing and Pricing in the U.S. Anti-Ulcer Drug Market," *American Economic Review*, Vol. 85, No. 2, May 1995 .....................................................................................36

*Manual for Complex Litigation* (4th ed. 2006).........................................................55

*Restatement (Second) of Conflict of Laws*.....................................47, 49, 50, 51, 52, 53

Plaintiffs Louisiana Health Service Indemnity Company dba BlueCross/BlueShield of Louisiana ("BCBSLA"); ASEA/AFSCME Local 52 Health Benefits Trust ("ASEA"); Harden Manufacturing Corporation ("Harden"); Gerald Smith; and Lorraine Kopa (collectively, "Plaintiffs") respectfully submit this reply memorandum of law in support of their motion for class certification.[1]

## I.    RESPONSE TO DEFENDANTS' STATEMENT OF FACTS

### A.    The Consumer Class Representatives

At its core, this litigation concerns the ways in which Defendants influenced and even corrupted the medical profession. Plaintiffs have alleged a far-reaching, decade-long, nationwide campaign to market Neurontin for off-label uses for which there was no scientific evidence it was effective, and for which there was negative clinical data that was suppressed. By 2003, these unsupported uses accounted for more than 90% of all Neurontin prescriptions. TACAC ¶ 47. This marketing campaign was executed using the following comprehensive strategies and tactics: (a) Defendants paid dozens of trained speakers millions of dollars to deliver false and misleading presentations concerning off-label uses, also known as "key messages"; (b) Defendants hired technical writers to write and publish countless journal articles containing the "key messages"; (c) Defendants paid physicians millions of dollars to participate in various marketing tactics—such as consultant meetings, dinner meetings, CMEs, and sham studies such as STEPS, where they were exposed to the "key messages,"; and (d) Defendants sent their legions of sales representatives to relentlessly detail physicians and reinforce the "key messages."

From this perspective, the individual consumers and their physicians are a perfect

---

[1] As noted in Defendants' opposition, the Union of Operating Engineers, Local No. 68 Welfare Fund has withdrawn as a class representative, for reasons wholly unrelated to this litigation.

embodiment of the results of Defendants' marketing scheme.  As set forth below, the two individually named class representatives suffered from conditions for which there is no scientific evidence of Neurontin's efficacy.  Not surprisingly, Neurontin did not effectively treat these off-label conditions.  As it turns out—and this was not known at the time these class representatives were selected—the prescribing physicians were thoroughly enmeshed in Defendants' marketing scheme.  Both had attended numerous marketing events, and both had been detailed hundreds of times on Neurontin.  Given the breadth of the fraudulent marketing campaign that is alleged, it is no coincidence that *both* individually named class representatives received off-label prescriptions for ineffective uses and that *both* of their prescribing physicians were significantly involved in the Neurontin marketing campaign.  It is therefore hard to imagine two class representatives who could be more typical.

### 1.     **Gerald Smith**

Defendants entirely ignore Gerald Smith's repeated, consistent and unequivocal testimony that Neurontin was *not* effective in treating his pain, which did not improve until after he *discontinued* the use of Neurontin and other prescription drugs altogether.  At the outset of Mr. Smith's deposition, Defendants' counsel learned that Mr. Smith's pain improved only after he stopped taking Neurontin.  Struggling to establish that Neurontin may have played at least a minor role in improving Mr. Smith's condition, Defendants' counsel attempted to elicit an admission that Mr. Smith had perhaps "started to get better" during the time he took Neurontin, but the answer only confirmed that Neurontin provided no benefit at all:

    Q       So, you had started to get better but you hadn't gotten to where you are
    today?
    A       No, not at all.
    Q       You hadn't started to get better?
    A       No, I had not.
    Q       So you stopped taking all the medications before you started to get
            better?

   A  Yes.

Deposition of Gerald Smith[2] ("Smith Depo.") at 27-28.  Mr. Smith explicitly reaffirmed that

Neurontin did not relieve his headache pain:

   Q  During the period that you were taking Neurontin, did your headaches
   ever get better?
   A  No.

Smith Depo. at 70-71.

   Faced with Mr. Smith's unequivocal testimony that Neurontin was ineffective,

defendants urge the Court to credit instead the statements of Mr. Smith's neurologist, Dr. Huler,

concerning the benefits that Mr. Smith *appeared* to have received from Neurontin.  Mr. Smith

made it very clear, however, that all such references to improvements in his condition reflected

nothing more than occasional good days in an unrelenting "roller coaster" experience of pain,

and that the roller coaster did not come to a stop until after he discontinued all his prescription

medications.  Smith Depo. at 83, 85, 96, 102.

   Ironically, Dr. Huler's testimony only underscores why she is a typical physician in this

case.  Like most physicians, Dr. Huler does not conduct independent research and instead relies

upon the information she receives from pharmaceutical companies and what she learns from

other physicians regarding the off-label use of a drug such as Neurontin.  Deposition of Kylene

Huler, M.D.[3] ("Huler Depo.") at 151.  In evaluating information from pharmaceutical companies,

Dr. Huler tries to avoid "biased" studies that are "skewed towards marketing" or that are

"sponsored by the drug companies."  Huler Depo. at 131.  Of course, this litigation centers

largely upon Defendants' *disguising* their biased marketing materials as legitimate research.  Dr.

Huler also emphasized that she disdains advice from "drug whores" who will tout the benefits of

---

[2] The transcript of the Smith Deposition is attached as Exhibit 2 to Rowland Decl.

[3] The transcript of the Huler Deposition is attached as Exhibit 1 to Rowland Decl.

a drug "depending upon who's paying him to give the lecture." Huler Depo. at 157, 158. Dr.

Huler explained that she is deeply troubled by some of the very practices within the

pharmaceutical industry that go to the heart of the Plaintiffs' claims against Defendants in this

litigation:

> But I'm saying I know of certain physicians. We call them, you know, drug
> whores. I mean, basically they – they are paid tremendous amounts of money to
> tout a medication, and they will speak on behalf of the company with canned,
> premade slides and give a lecture that basically glorifies the medication they're
> being paid heavily by that pharmaceutical company to market the medication. I
> do not go to those lectures.

Huler Depo. at 158.

The problem for Dr. Huler is that, like other doctors, she thinks she can detect

commercial bias, but she cannot. Dr. Huler acknowledged that there is no public disclosure of

such payments, and that she must rely upon word of mouth reports as to whether a doctor is

receiving such improper payments, which is an unreliable grapevine because it is limited to the

comments by participating doctors who choose to brag that it is "easy way to make money." *Id.*

Dr. Beydoun provides a compelling example of this. Dr. Huler identified Dr. Beydoun as

a speaker at at least two of the Neurontin events she attended. Huler Depo. at 18, 48. Dr. Huler

also believed Dr. Beydoun to be an independent, unbiased source of information. Huler Depo. at

18, 48 ("It was just Dr. Beydoun presented his research. He was not marketing anything; he was

just presenting his research on that medication that he had done for pain."). She was also unsure

whether he received any money from the Defendants to give these presentations. Huler Depo.

at 91.

In fact, Dr. Beydoun was one of the most notorious "hired guns" in Defendants' stable of

physicians. Parke-Davis alone paid him $122,036 to speak about Neurontin between 1994 and

1997. TACAC ¶ 110. Dr. Beydoun received another $76,331.93 from Pfizer to speak about

Neurontin between 2001 and 2004.  *See* Reply Declaration of Ilyas J. Rona in Support of

Plaintiffs' Motion for Class Certification ("Rona Decl."), Exh. D.

      In sum, even though Dr. Huler prefers to avoid biased information regarding off-label

uses of a drug such as Neurontin, she lacks the ability to determine whether Defendants

manipulated the stream of information regarding Neurontin by paying physicians to promote it

for off-label uses.  In other words, Mr. Smith's physician is unable to escape the improper

marketing practices that lie at the heart of this litigation. [4]

      Defendants' influence upon Dr. Huler's prescribing habits is not limited to their "behind

the scenes" manipulation of the flow of information regarding Neurontin within the medical

community.  Defendants' sales representatives detailed Dr. Huler hundreds of times.  Huler

Depo. at 191-222, Exh. 2.  Indeed, Dr, Huler earned the informal title of "Pfizer Queen" through

her aggressive prescribing of Neurontin and other Pfizer products.  Huler Depo. at 218.

      Defendants argue that Mr. Smith has not suffered any damages as a result of the money

he spent to purchase Neurontin because he received a settlement in a personal injury action

arising out of an automobile accident, and that his payments for Neurontin were included in his

claim for damages in that matter.  Citing no law, Defendants offer the affidavit of Edward

Liptack, the lawyer for the defendants in the personal injury action, who points out that Smith

released all claims for medical expenses, including amounts paid for Neurontin, in the settlement

agreement.  Exh. 43 to Declaration of Matthew B. Rowland ("Rowland Decl.," Dkt. No. 586).

      Defendants' argument suffers from two fundamental flaws.  First, the fact that the release

---

[4] Dr. Huler described a series of "red flags" that identify biased or untrustworthy "drug whores" -- many of which correspond to the factual allegations underlying Plaintiffs' claims in this litigation -- such as information disseminated by physicians who spend a disproportionate amount of time traveling to speak about drugs, or who perform no original research and are involved in ghost-written articles.  Huler Depo. at 158-63.  Dr. Beydoun should have raised numerous "red flags."  *See* TACAC ¶¶ 110, 115, 248.

in personal injury action encompassed all of the claims raised in that action does not mean that

Mr. Smith received any compensation for any of the specific payments he made to purchase

Neurontin.  The complaint in that personal action raised claims for pain and suffering, mental

anguish, lost wages, and other matters.  As in most settlements, the defendants (or their insurer)

paid a sum of money representing *less* than the total amount of damages claimed in exchange for

a release of all claims, with no specific amount paid to settle any of the several types of damages

claimed.  Accordingly, Mr. Smith has not been compensated in full for his Neurontin purchases.[5]

Perhaps more fundamentally, the settlement does not release Mr. Smith's claims against

Pfizer or Warner Lambert Company, or "any and all claims for medical expenses;" it only

releases claims against "Michael G. Jones and Raleigh E. Norris, their heirs, representatives,

employees, insurers and assigns."  Ex. C to Liptak Affidavit.  *See e.g., Huffman v. Monroe*

*County Community School Corporation*, 588 N.E.2d 1264 (Ind. 1992) (releases apply only to

persons intended to be released by terms of the release agreement).[6]

### 2.    Lorraine Kopa

After Lorraine Kopa, a licensed practical nurse, suffered injuries as a result of a car

accident, she went to see Dr. Dhaduk who prescribed Neurontin for her chronic neck and back

pain.  Deposition of Lorraine Mary Kopa[7] ("Kopa Depo.") at 38.  Chronic pain one of the

conditions for which Defendants promoted Neurontin most aggressively.  Although there is no

evidence that Neurontin is effective for neck and back pain, Dr. Dhaduk urged Ms. Kopa to take

---

[5] Indeed, the Settlement Distribution Sheet prepared by Mr. Smith's counsel itemizes a series of
expenses for certain medical services, such as Dr. Huler's bill and other expenses, but does not
show any payment for the purchase of Neurontin.  *See* Exh. A to Declaration of James Young.

[6] Mr. Smith is an Indiana resident, and the scope of the release would be construed under Indiana
law.

[7] The transcript of the Kopa Deposition is attached as Exhibit 5 to the Rowland Decl.

the Neurontin, insisting that it would help.  Deposition of Vithal Dhaduk[8] ("Dhaduk Depo.") at

91 – 9); Kopa Depo. at 59.  Ms. Kopa never had success with Neurontin for her neck and back

pain.  Kopa Depo. at 30, 84, 103-106.  Ms. Kopa only continued taking Neurontin because she,

like many other patients in pain, feel intimidated by their doctors and trust that they have

superior knowledge to the average patient.  (Kopa Depo. at 86, 96, 134.  Finally, after many

months of suffering, Ms. Kopa terminated her visits with Dr. Dhaduk, and discontinued taking

Neurontin.  Kopa Depo. at 134-35.

Despite the fact that Ms. Kopa did not benefit from Neurontin, Dr. Dhaduk never

attempted to discontinue Neurontin and never suggested an alternative medication; instead he

*increased* her dosage.  Kopa Depo. at 82-84, 114-15); Dhaduk Depo. at 239-40.  During a seven-

month period, Dr. Dhaduk increased Ms. Kopa's dosage from 400 milligrams to 900 milligrams

even though Ms. Kopa continued to report that she felt worse on the medication than she had

when she first began taking it.  Kopa Depo. at 30, 85, 89; Dhaduk Depo. at 239-40.  Of course,

increasing the dose to achieve efficacy was a consistent "key message" for Defendants.  *See*

TACAC ¶ 123.  Perhaps more significantly, increasing the dose was precisely the reaction that

Defendants urged when Neurontin appeared to be ineffective.  TACAC ¶¶ 205, 215.  *If*

*Neurontin does not appear to be working*, Pfizer told doctors, *you must increase the dose until it*

*does work*.  Like thousands of other physicians, Dr. Dhaduk appears to have swallowed this "key

message," hook, line and sinker.

This is not altogether surprising, given that Dr. Dhaduk himself was a STEPS

investigator, and received $300 for every patient he enrolled in the program.  Dhaduk Depo. at

143:17-146:6.  "Although STEPS took the form of a research clinical trial, it was, in fact, a

---

[8] The transcript of the Dhaduk Deposition is attached as Exhibit 4 to the Rowland Decl.

marketing ploy designed to induce neurologists to become comfortable prescribing Neurontin at a far higher dose than indicated in the FDA approved labeling." TACAC ¶ 252. Dr. Dhaduk also had been "trained" by the Defendants as a speaker, spoke regularly about Neurontin, and earned significant fees. Dhaduk Depo. at 131-32, 135, 270, 289. Defendants also paid Dr. Dhaduk to attend their conferences and consultant meetings and listen to other speakers discuss Neurontin. Dhaduk Depo. at 127, 141, 284-86. The entire time Dr. Dhaduk attended these events, both as speaker and listener, his airfare, hotel and meals were also paid for by Defendants. Dhaduk Depo. at 128. Finally, Dr. Dhaduk has received hundreds of visits from Defendants' sales representatives and medical liaisons. Dhaduk Depo. at 110, 117.[9]

Given his close ties to Defendants and his involvement in the marketing of Neurontin, it should come as no surprise that Dr. Dhaduk regularly prescribes Neurontin to his patients (Dhaduk Depo. at 19) or that he believes Neurontin is effective for certain off-label uses (Dhaduk Depo. at 32-33). That Defendants are the inspiration for this prescribing behavior is exemplified by the fact that Dr. Dhaduk chose to raise the dose of Ms. Kopa's prescriptions—rather than discontinue Neurontin altogether—when it appeared that the treatment was not working.

Defendants argue that Ms. Kopa's claims are atypical because Dr. Dhaduk's so-called "intimidation" of her to take Neurontin was an "intervening event." If anything, Ms. Kopa's experience—a patient who follows her physician's instructions regardless of her own

---

[9] Indeed, Dr. Dhaduk met with counsel for Defendants prior to his deposition and was paid by Defendants for his time spent traveling, preparing and testifying at deposition. Dhaduk Depo. at 158-65. His fee for testifying was at least $1,000 and possibly more than $5,000, plus expenses for his travel, hotel, and meals. Dhaduk Depo. 158:4-11; 161:12-17; 162:2-17; 164:17:20; 165:4-8; 166:9-12.

inclinations, believing her doctor knows best—makes her a *model* patient, not an atypical one.[10]

In sum, Ms. Kopa's claims could not be more typical of the claims of the class.

###### B.  **The Third Party Payor Class Representatives**

###### 1.  **ASEA**

The ASEA Health Benefits Trust ("ASEA" or "the Trust") is a relatively small[11] health

benefits trust serving approximately 17,000 Alaska government employees and their dependents.

Deposition of Fred Grant Brown[12] ("Brown Depo.") at 114:10-11.  Contrary to Defendants'

assertion, ASEA's benefits plan does not distinguish between prescriptions made for on- versus

off-label use—both are covered.[13]  Brown Depo. at 273:18-23.  A claim for Neurontin is covered

---

[10] When Ms. Kopa relayed her concerns about Neurontin's side effects to Dr. Dhaduk, he expressed frustration over Ms. Kopa's lack of trust in him, saying "I'm your doctor, you don't trust me, would I give you something that isn't good for you?  You're not going to take it, then what am I here for?"  Kopa Depo. at 85-86; Dhaduk Depo. at 107.

[11] ASEA is governed by a Board of six elected Trustees, none of whom are physicians or insurance specialists.  *Id.* at 196:18-22 (noting lack of sophistication of Trustees).  Fred Brown has served as chair of the Trust since its inception in late 2000.  *Id.* at 7:3-4; 28:5-19.  He is an attorney employed by the State of Alaska as a Workers' Compensation Hearings Officer.  *Id.* at 7:20- 8:3.  He has no medical education or training.  *Id.* at 9:19-12:7 (describing education and training).  The Trust has no employees.  *Id.* at 29:11-13.  Instead, ASEA's Board of Trustees relies on its benefits consultant (Colleen Savoie), *id.* at 19:3-6, its claims administrator (Administrative Services, Inc. (ASI)), *see id.* at 43:20-44:5 (noting those who know most about the day-to-day practices of the Trust would be Colleen Savoie and Valera Kingsley of ASI); and its pharmacy benefits manager ("PBM") (CareMark, formerly AdvancePCS), *id.* at 54:10-19 (noting the Trust's PBM would know the most about the Trust's experience of on- versus off-label prescription drug usage).  *See also id.* at 265:17-24.  The Trust also employs the services of a utilization review and case management provider (Intercorp).  *Id.* at 155:12-21.  Ultimately, however, the Trustees make all decisions regarding the plan's policies and application of those policies to it members.  *Id.* 67:22-24.  *See also* Deposition of Colleen Savoie ("Savoie Depo.") at 170:1-4 ("The Board of Trustees is ultimately responsible for all aspects of the employee benefit plan."), attached as Exhibit 7 to Rowland Decl.

[12] The transcript of the Smith Deposition is attached as Exhibit 6 to the Rowland Decl.

[13] Indeed, the plan language relied upon by Defendants as excluding coverage for off-label prescriptions, *i.e.*, that a drug "will be determined to be experimental or investigational if . . . [a]pproval, as required by the FDA, has not been granted for marketing" (Exh. 46 to Rowland Decl. at ASEA/ASI 00075), says no such thing, as Neurontin *has* been approved by the FDA for

if it is prescribed by a licensed physician. *Id.* at 321:22-322-15. *See also id.* at 327:10-13

(noting the Trust has never considered rejecting a claim for Neurontin because it was for an off-

label use).[14]

ASEA's plan is designed to let participants in consultation with their physicians decide

which medications are most cost-effective for treatment. Deposition of Colleen Savoie[15]

("Savoie Depo.") at 175:19-179:18. Thus, ASEA does not use a closed formulary limiting

available drug choices but rather incentivizes its participants to consider cost-effectiveness by

reimbursing a percentage of a prescription cost as opposed to paying a fixed co-pay for all drugs.

*Id.* "[T]he presumption is that the medications are being appropriately prescribed." *Id.* at

71:20-21.

Indeed, ASEA, like most other TPPs, has no way to even determine whether any

particular prescription was written for an on- or off-label use, because ASEA, like most TPPs,

uses a PBM to manage its drug benefits, and the only information the PBMs receive is what is

entered by the pharmacy filling the prescription – *i.e.* the drug prescribed, dosage, number of

tablets, and cost. ASEA simply does not have the ability to monitor all of its prescription drug

---

marketing for its *approved* uses, adjunctive epilepsy therapy and postherpetic neuralgia.

[14] Ms. Savoie's testimony that the Plan did not cover off-label prescriptions was simply incorrect and contrary to the testimony of Mr. Brown. As Ms. Savoie noted in her testimony, her statement was based solely on her speculation that such an exclusion "could be in the exclusion for experimental or investigational treatment, or it may be in the definition of a covered drug . . . ." Savoie Depo. at 53:23-54:18. Ms. Savoie was also clear, however, that the Trustees determine what the Plan does and does not cover. *Id.* at 203:12-204:2 (noting the trustees' interpretation of whether the experimental exclusion in the plan applied to off-label prescriptions would control). The Trust's Chair, Fred Brown, is the "first contact for policy questions." Brown Depo. at 28:8-13. Notwithstanding this testimony, should the Court find that ASEA's plan (or Harden's or BCBSLA's) excludes coverage for off-label prescriptions, Plaintiffs can easily simplify their definition of the Third Party Payor Subclass to require only that each TPP member have paid for or reimbursed for off-label Neurontin prescriptions.

[15] The transcript of the Savoie Deposition is attached as Exhibit 7 to Rowland Decl.

claims and determine whether they are for on- or off-label uses. Brown Depo. at 47:11-15; Savoie Depo. at 55:17-56:21. Ms. Savoie also noted that if the plan covers off-label use, there would be no need to prevent payment of such claims. *Id.* at 69:21-23.[16]

Finally, Defendants' assertion that Mr. Brown testified the Trust has no basis for its claim that Neurontin is ineffective or that Defendant's illegal conduct caused it to pay for off-label uses, grossly misrepresents the record. Def. Mem. at 12-13. Mr. Brown expressly qualified the referenced testimony as "[o]utside of the attorney/client privilege and outside of the reading of the Complaint." Brown Depo. at 306:22-307:5. Thus, all Mr. Brown said was that ASEA had no factual bases for or opinions concerning its claims, apart from information provided by its attorneys. *See also id.* at 400: 11-13 (The Trust is "going to rely on its attorneys to develop that information and its theories."). Such reliance is entirely proper for any client, including a proposed class representative.

## 2. **Harden**

Defendants have also misstated the record with respect to whether the benefit plans governing Harden's employees actually excluded coverage for off-label prescriptions.

---

[16] ASEA should not have to bear the administrative and economic burden of implementing pre-authorization procedures for Neurontin where such procedures are made necessary solely due to Defendants' use of a fraudulent and illegal marketing scheme. Even if ASEA were willing to do so, Ms. Savoie did not testify, as Defendants imply, that the use of "prior authorization" would necessarily prevent coverage of off-label prescriptions. Def. Mem. at 11-12. Defendants' selective quote from the record omits Ms. Savoie's testimony that it was "pure speculation" on her part as to whether such a process would necessarily reveal why the drug was being prescribed. Savoie Depo. at 58:2-20. She also noted that the use of a preauthorization requirement for any one drug "disrupts the process for the participant" and "costs money," reducing funds available to pay benefits. *Id.* at 59:8-23. She observed that prior authorization is not typically used to prevent off-label use, but rather to identify prescriptions given for an uncovered treatment (e.g., use of an acne medication for cosmetic purposes.) *Id.* at 60:13-61:2. *See also id.* at 64:8-10 ("none of our clients have specifically implemented programs that limit off label usages"). Similarly, Ms. Savoie's only testimony as to whether retrospective drug utilization review could effectively prevent off-label coverage (Def. Mem. at 12), was to state "whether that would catch off-label use, I don't know." Savoie Depo. at 62:1-6.

Defendants' brief correctly asserts that the record reflects an exclusion for "investigational"

drugs in Harden's benefit plans, but misleadingly indicates that a stated criteria in those plans for

what is considered investigational is whether the drug has received FDA approval "for the

specific use for which it is prescribed or used."  Def. Mem. at 13.  No mention of the FDA or of

the quoted language appears anywhere in the portions of the record cited by Defendants, nor in

any of the benefit plans related to Harden. [17]

---

[17] In 1999, when Harden's health benefits became self-funded, its benefit plan excluded "investigational treatment, procedures, . . .drugs [and] drug usage . . ." Deposition of Lee Dorrill ("Dorrill Depo."), Exhibit 27 (Rona Decl., Exh. E) at HAR00775. From 1999 through 2003, the term "investigational" was defined as "[a]ny treatment, . . .drugs [or] drug usage . . that either [Blue Cross Blue Shield of Alabama, "BCBSAL"] have not recognized as having scientifically established medical value, or that does not meet generally accepted standards of medical practice." Id. at HAR00779. There is nothing in the record to indicate that BCBSAL ever understood that Neurontin was ineffective for various off-label prescriptions, or that this language on "investigational" drugs was meant to apply in the off-label context.

   In 2003, the exclusion language in Harden's benefit plan remained largely the same with the exception that it explicitly excluded services that are part of a clinical trial. Dorrill Depo., Exhibit 28 (Rona Decl.,Exh. F) at HAR00185. However, the definition of "investigational" was expanded to explain that BCBSAL would, when possible, develop written medical criteria concerning any "services or supplies that we consider to be investigational." Id. at HAR00189. Again, there is no evidence that in 2003 BCBSAL understood Neurontin was not effective for various off-label uses. There is no evidence or testimony that this language was meant to apply to off-label prescriptions and BCBSAL issued no written medical criteria relevant to Neurontin. When asked about the language of Harden's 2003 benefit plan, the 30(b)(6) deponent from BCBSAL denied that the language applied to off-label prescriptions. "Q. Did the two provisions that provided a definition of "investigational" in Harden's self-funded Summary Plan Descriptions exclude drugs that have been prescribed for off-label uses? . . . A. I didn't see that terminology in these definitions." Dorrill Depo., at 276.

   BCBSAL did not have a policy related to off-label prescriptions until July of 2004, several months after this litigation commenced. At that time, BCBSAL issued a policy on off-label drug use that indicated off-label use would be covered if a drug had FDA approval (presumably for any indication) and if the drug was either listed in various drug compendia or, failing such a listing, if the drug's use was supported by two articles from major peer-reviewed journals "which supports the proposed use for the specific medical condition as safe and effective." There is no evidence any analysis of Neurontin was undertaken by BCBSAL based on these criteria.

3.     **BCBSLA**

Defendants argue that "BCBSLA does not belong to the putative TPP subclass defined in the complaint because it, too, has a provision in its policies excluding investigational and experimental drugs from coverage." Def. Mem. at 14-15 (citing Deposition of Susan Hoomaian (Exh. 12 to Rowland Decl., "Hoomaian Depo.") at 100. This is incorrect and/or misleading for a number of reasons. Ms. Hoomaian was not referring to any particular coverage policy, or to any document at all in the testimony cited by Defendants. BCBSLA has dozens if not hundreds of products, *each of which* has its own language and exclusions, and the language of these policies and exclusions changed over time. Deposition of Milam W. Ford[18] (Exh. 11 to Rowland Decl.,"Ford Depo.") at 214-16. The only way to tell if a given insured's policy had such language would be to look in each instance at the applicable contract language and make an assessment of what the policy was with respect to coverage of off-label drug use. Ford Depo. at 387-88.

The type of exclusions referred to—that of not covering drugs for investigational or experimental uses—can only be implemented through a prior authorization program. Ford Depo. at 339-40. The language is designed to give BCBSLA the option of excluding drugs for these uses, but does not operate to effect that option. Ford Depo. at 334-48. Prior Authorization has only been implemented on a few very high-cost, low-volume drugs that have a high potential for abuse, *e.g.* Actiq, a powerful opiate used to treat breakthrough cancer pain that comes in the form of a lollipop. Ford Depo. at 153. Prior authorization for Neurontin is not an option for BCBSLA because the Louisiana marketplace would not accept such an intrusion into the patient-physician relationship, and there has even been state legislation proposed to prohibit prior authorization

---

[18] The transcript of the Ford Deposition is attached as Exhibit 11 to Rowland Decl.

being used to deny payment for off-label uses, similar to existing laws that require payment for cancer drugs given off-label. Ford Depo. at 83-87. A prior authorization program for Neurontin would be on a much larger scale than any of BCBSLA's existing prior authorization programs, would vastly increase the expense and resources necessary to implement and run such a program, and would put BCBSLA at a significant competitive disadvantage in its marketplace. Ford Depo. at 83-87, 138-39. BCBSLA has never implemented a prior authorization program for the purpose of curtailing off-label prescriptions. Ford Depo. at 372.

Defendants also portray BCBSLA's P & T committee in a misleading way. BCBSLA maintains an open formulary, meaning that it pays for all FDA approved drugs regardless of formulary status. Ford Depo. at 129-30. Prior to 2000, BCBSLA adopted the Medco formulary, which was entirely controlled by Medco and Medco's P & T committee. Ford Depo. at 237. Even after 2000, BCBSLA's P & T committee still relied heavily on the PBM and only reviews new drugs or classes of drugs. Ford. Depo. at 149-50. These reviews did not apply to Neurontin because it was already included in the Medco formulary. Ford Depo. at 445.

## II.     COMMON ISSUES PREDOMINATE

### A.     Whether Or Not Neurontin Is Effective In Treating Off-Label Conditions Presents Common Questions Susceptible of Common Proof

Give the duration and pervasiveness of Defendants' "peer-to-peer" off-label marketing scheme, and the number of physicians Defendants have paid to promote Neurontin for off-label uses, it is hardly surprising that Defendants are able to muster declarations from several physicians (Drs. Slaby, Bird, Potolicchio, and Rapoport) attesting to Neurontin's efficacy in treating off-label conditions.[19] Whether or not Neurontin is *actually* effective in treating these

---

[19] Indeed, as the Court itself observed at a hearing, "I'm assuming your doctors who you've put up at these various conferences will say that, or you have experts who will say that, right? . . . It's effective and that aspirin wouldn't have done it, and based on their clinical experience, ya-da-da.

conditions presents common questions, to be determined by common proof, not anecdotal

evidence concerning individual class members.  As Defendants successfully argued in the related

case of *Dellinger v. Pfizer, Inc.*, 2006 WL 2057654 (W.D.N.C. July 19, 2006), anecdotal

evidence and individual case histories do *not* provide scientific evidence of causation admissible

under *Daubert*.  *Id.* at *9-*11.  *See* Part III-F, *infra*.  This issue was aired at length in connection

with Plaintiffs' Objections to Discovery Order No. 4 (*see* Dkt. No.462 at 11-14), which would

have required Plaintiffs to produce thousands of class members' individual medical records.  The

Court reversed this ruling, satisfied that Plaintiffs can seek to establish inefficacy by more

generalized, common proof. [20]  At this stage of the litigation, Plaintiffs need establish no more.[21]

These fundamental, overarching common questions are central to this litigation, and – standing

alone – predominate over any individual questions.

### B.      Plaintiffs Have Alleged Uniform Misrepresentations and Omissions

Defendants argue that the TACAC contains "a bewildering variety of alleged oral

misstatements made at different times, to different doctors, on altogether different subjects."

Def. Mem. at 21-22.  To support this sweeping assertion, Defendants ignore:  (1) one of

---

I'm assuming you're going to say that."  Transcript, Motion Hearing, Sept. 27, 2006 at 21:14-21.

[20] *See* Transcript, Motion Hearing, Sept. 27, 2006 at 16:7-10 ("MR. ROUHANDEH: They have to demonstrate that in fact Neurontin was ineffective for those off-label uses.  THE COURT: Again, they can meet their burden by putting in these studies, as far as I'm concerned.").

[21] Plaintiffs will not "take the bait" and litigate the merits of these issues prematurely.  Although the Court may look beyond the pleadings in deciding whether the requirements of Rule 23 are met, *see Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.2d 288, 297 (1st Cir. 2000), it is not appropriate to inquire into "whether a plaintiff will prevail on the merits" at the class certification stage.  *In re Polymedica Corp. Securs. Litig.*, 432 F.3d 1, 6 (1st Cir. 2005); *Mowbray*, 208 F.3d at 298 (holding that question at class certification stage "is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met"); *Swack v. Credit Suisse First Boston*, 230 F.R.D. 250, 257 (D. Mass. 2005) ("all of the courts seem to agree that whatever the inquiry, it may only go so far as necessary to resolve the questions raised by the Rule 23 requirements.").

Plaintiffs' two main theories of recovery—fraud based on omissions (rather than affirmative misrepresentations); (2) one of the two main modalities of fraud—the creation and dissemination of misleading publications; and (3) seven of eight major therapeutic areas where such omissions are alleged to have occurred (*i.e.*, every off-label condition at issue except epilepsy monotherapy). Individually, each of these three deficiencies are sufficient to defeat Defendants' argument that there is insufficient uniformity in their alleged misrepresentations. Collectively, they demonstrate that Defendants' argument is utterly devoid of merit.

### 1.    Plaintiffs Have Alleged Uniform Omissions

Defendants ignore the fact that a substantial part of the alleged fraud is based on omission and suppression of material facts relating to Neurontin's off-label uses. As this Court has recognized, "Plaintiffs have stated a claim with respect to any theory based on Defendant's misrepresentation of the results of scientific studies or *omission of existing negative studies*." Memorandum and Order dated June 12, 2006 (Dkt. No. 356) at 21 (emphasis added). While the TACAC is replete with numerous allegations of suppression, Plaintiffs will highlight one: suppression of the failed diabetic peripheral neuropathy trial (study 945-224) conducted by Dr. Reckless in the UK. TACAC ¶¶ 148-49, 257-61. When Parke-Davis saw that the results of Dr. Reckless's trial were negative, it decided: "at this point in time we will not be publishing the data." Reply Declaration of Ilyas J. Rona in Support of Motion for Class Certification ("Rona Decl."), Exh. A at 015317. The rationale for suppression was simple: "we should take care *not to publish anything that damages neurontin's marketing success*." *Id*. (emphasis added).

Within several months, Pfizer completed its acquisition of Warner-Lambert, and agreed that publication of the Reckless study would have a damaging impact on their successful efforts to market Neurontin for diabetic peripheral neuropathy:

I think that we can *limit the potential downsides of the 224 study* by delaying the

> publication for as long as possible and also from where it is published.  More
> importantly it will be more important to how WE write up the study.  We are
> using a medical agency to put the paper together which we will show to Dr
> Reckless.  *We are not allowing him to write it up himself*.

Rona Decl., Exh. B at 002098 (emphasis added).  The results of the Reckless study were never

published, nor forwarded to DRUGDEX.  TACAC ¶ 149.  By definition, such omissions are

uniform; the failure to disclose that Neurontin had been shown to be ineffective for a particular

use is always the same.

　　　　Although Class Plaintiffs have alleged that there were important clinical trial results for

each of the major categories of off-label use that were suppressed, or the results of which were

omitted at presentations to physicians, nowhere in Defendants' brief is there a single reference to

any of the suppressed studies—not to the failed bipolar depression studies conducted internally

and externally (TACAC ¶¶ 172-74), not to the failed panic study (TACAC ¶¶ 182-85), not to the

failed European migraine study (TACAC ¶¶ 195-201), not to the failed nociceptive pain studies

(TACAC ¶ 152), not to the failed diabetic peripheral neuropathy studies of Drs. Gorson and

Reckless (TACAC ¶¶ 146-49, 156), not to the negative Restless Leg Syndrome/Periodic Limb

Movement Syndrome study of Dr. Ehrenberg (TACAC ¶¶ 164-67), and not to the negative

epilepsy monotherapy study conducted in Eastern Europe (TACAC ¶ 190).  When "educating"

physicians to prescribe Neurontin for these off-label conditions, it is difficult to imagine a *more*

material omission than these studies concluding that the drug has no discernable therapeutic

effect.  As was the case in *In re Synthroid Marketing Litigation*, 188 F.R.D. 295, 297 (N.D. Ill.

1999), such a concerted effort to suppress negative clinical trial results—the "gold standard" in

determining a drug's efficacy or inefficacy—is both actionable and certifiable.

### 2.　　Plaintiffs Have Alleged Uniform Published Misrepresentations

　　　　Defendants also ignore entirely those sections of the TACAC that address Defendants'

original off-label marketing strategy, the "publication strategy." *See* TACAC ¶¶ 25-30, 39-40,

43-53, 111-37, 256, 262-74. Unlike the "peer-selling" program, the publication strategy relied

entirely on uniform *written* misrepresentations, usually drafted by Defendants or the medical

marketing firms they hired, which appeared in published articles. The TACAC offers a

representative set of these misrepresentations at paragraphs 268-274.[22] These misrepresentations

were undoubtedly uniform.

### 3. Plaintiffs Have Alleged Uniform Oral Misrepresentations

Essentially, Defendants argue that oral misrepresentations must be identical in order to be

sufficiently uniform. Given that it is rare for different speakers (or even the same speaker on

different days) to utter the same words without reading from a teleprompter, Defendants seem to

argue that it is next to impossible to ever certify a class based on oral misrepresentations.

Despite Defendants' contention that there is "virtual unanimity" among courts on fraud cases

involving oral misrepresentations, "[i]t is well settled that oral representations will not preclude

certification of a class that is otherwise appropriate." *In re Prudential Sec. Inc. Ltd. P'ships

Litig.*, 163 F.R.D. 200, 207 n.9 (S.D.N.Y. 1995) (approving settlement class); *see also Duhaime

v. John Hancock Mut. Life Ins. Co.*, 177 F.R.D. 54, 64 (D. Mass. 1997) (certifying class where

oral misrepresentations were made pursuant to a common scheme).[23] Whether the

misrepresentations in this case were made at different times or concerned different off-label uses

---

[22]For example, "the article by Brodie et al., published in Epilepsia (September 2002), falsely
stated that: 'GBP [gabapentin] also has been shown to be effective as monotherapy in adults with
partial seizures,' when in fact the trials it cited did not support efficacy." TACAC ¶ 269.
Similarly, "[t]he article by Guttuso, published in Obstetrics and Gynecology (February 2003),
falsely stated: 'gabapentin has shown efficacy in controlled studies for neuropathic pain,
migraine headache…'" and various other conditions. TACAC ¶ 271.

[23] The Ninth Circuit has "followed an approach that favors class treatment of fraud claims
stemming from a 'common course of conduct.'" *In re Am. Cont'l Corp./Lincoln Sav. & Loan
Sec. Litig.*, 140 F.R.D. 425, 427 (D. Ariz. 1992) (quoting *Blackie v. Barrack*, 524 F.2d 891, 902
(9th Cir. 1975)).

of Neurontin is less important than whether the misrepresentations are themselves substantively

unified as part of an "overarching representation."  *See Fuller v. Fruehauf Trailer Corp.*, 168

F.R.D. 588, 599 (E.D. Mich. 1996) (certifying Rule 23(b)(2) class where various oral

representations were "part and parcel of an overarching representation that lifetime medical

benefits would be provided to its retirees").  *See also In re Am. Cont'l Corp./Lincoln Sav. &*

*Loan Sec. Litig.*, 140 F.R.D. 425, 430 (D. Ariz. 1992) (refusing to decertify class where oral

representations were "sufficiently uniform" as part of a common sales approach).  As this Court

has stated, the central inquiry is whether there is material uniformity among the

misrepresentations.  *See AWP*, 230 F.R.D. at 82.  As long as the misrepresentations are

materially uniform, the form of the misrepresentations—whether they are written or in the form

of a script or not, for example—is irrelevant.  cited by Defendants, cautioned that "[T]he inquiry

should remain focused on whether material variations in the misrepresentations existed.  No

particular form of evidentiary proof is mandated." *Moore v. Painewebber, Inc.*, 306 F.3d 1247,

1255 (2d Cir. 2002).[24]

 The TACAC clearly alleges that all of the alleged misrepresentations were centrally

devised and disseminated as part of an overarching strategy to mislead physicians into

prescribing Neurontin for specific off-label uses.  TACAC ¶¶ 23-31.  Parke-Davis, and later

---

[24] *Moore*, involving the sale of life insurance policies, is otherwise distinguishable, as is
Defendants' other authority.  In *Moore*, the Court itself summarized the wide variations in sales
pitches used by brokers, including variations even in how brokers characterized their product,
including as a retirement program, an IRA, and sometimes neglecting to mention that the product
involved life insurance at all.  *See* 306 F.3d at 1256.  No such wide variation is alleged here.  *In
re LifeUSA Holding, Inc.*, 242 F.2d 136, 146 (3d Cir. 2001) involved a sprawling number of
speakers (over 30,000) making non-uniform misrepresentations to over 280,000 potential buyers
of an annuity contract.  Similarly, *Insolia v. Philip Morris, Inc.*, 186 F.R.D. 535, 545 (W.D. Wis.
1998) involved a putative class of smokers who began smoking prior to 1964, and the Court
addressed the problem of varying oral misrepresentations in the context of assessing Rule 23(a)'s
typicality prong, not predominance.

Pfizer, decided to promote Neurontin for these uses despite the lack of scientific support. TACAC ¶¶ 21-35, 256-61. Marketing Neurontin for off-label uses in the absence of scientific support forced the Defendants necessarily to engage in fraud. TACAC ¶ 46.

Defendants concentrated their efforts on two methods to disseminate false information about Neurontin: (1) the "publication strategy," discussed *supra*, and (2) peer-selling efforts where those misleading articles were publicized to physicians. TACAC ¶ 53, 275. In both areas, Defendants created and controlled the content, and hired medical marketing firms to manage the content. TACAC ¶¶ 42 – 60, 275. Defendants retained a stable of physicians to serve as authors and paid speakers to deliver the content. TACAC ¶¶ 103, 110. Most importantly, Defendants demanded and enforced strict adherence to their positive marketing messages, science be damned:

> Parke-Davis's control of the content of events produced by Cline Davis (and the other participating vendors) was best illustrated at a continuing medical education symposium coordinated by Cline Davis on behalf of American Diabetes Association, held in Boston, MA on June 23, 1997. At the eleventh hour, Cline Davis and Parke-Davis realized that one of the speakers, who had previously been recommended by Parke-Davis, would describe negative results in her study of Neurontin's use for an off-label indication. Unable to cancel the presentation without grossly violating the rules for conducting accredited continuing medical education seminars, Cline Davis, in its own words, took steps "to counteract a possible 'negative' presentation." Cline Davis planted a doctor in the audience to ask questions that would lead the presenter to make favorable statements during the question and answer period after her talk. According to Cline Davis's own words, this plant "did indeed lead Dr. Bril to address some of the positive aspects of anticonvulsants and Neurontin." In a memorandum written a day after the event, Cline Davis acknowledged its responsibility for allowing a presentation by a physician with an independent view, reaffirmed its "policy to complete a literature search to determine who authors favorable articles on the topics outlined" and assured Parke-Davis that "guidelines have been to set to ensure that this type of situation [a negative presentation] does not happen again."

TACAC ¶ 64.

As the off-label marketing campaign grew, so too did the system employed by Defendants to disseminate uniform and consistent messages about Neurontin's off-label uses.

For example, Plaintiffs allege that Pfizer retained two medical marketing firms, Medical Action

Communications ("MAC") and Fallon Medica, to develop articles that:

> contained Pfizer's false and misleading "key messages."  These "key messages"
> were designed to conceal Neurontin's lack of efficacy for specific off-label uses.
> One of MAC and Fallon Medica's duties was to make sure that all manuscripts
> submitted for publication contained the *"correct" key message*.  MAC and Fallon
> Medica assumed the responsibility of reviewing abstracts forwarded from around
> the world to make sure that "*they are inline with the current messages and do not
> contain errors or inconsistencies*."

TACAC ¶¶ 262-64 (emphasis added).  Plaintiffs allege that once these articles were published,

"Pfizer used the medical marketing firms to ensure that the false and misleading 'key messages'

were faithfully communicated at the hundreds of scientific conferences, symposia, seminars,

continuing medical education events ('CMEs'), and other events."  TACAC ¶¶ 275.  Pfizer then

" trained its sales representatives to repeat the false 'key messages' that were prepared as part of

publications strategy."  TACAC ¶¶ 276.  Slides from an April 4, 2001 training session show that

sales representatives were trained to deliver "key messages" in face-to-face encounters with

physicians identical to those published in journal articles and communicated at the marketing

events.  *See* Rona Decl., Exh. C.

The TACAC sets forth in considerable detail numerous examples of these "key

messages," which are uniform with the alleged misrepresentations that the company routinely

made.  For example, it was a "key message" to tell doctors that Neurontin had "proven efficacy

in neuropathic pain."  TACAC ¶ 277.  This key message was uniformly delivered to physicians,

both in published articles (TACAC ¶ 271) ("gabapentin has shown efficacy in controlled studies

for neuropathic pain") and at marketing events (TACAC ¶ 279) ("effective and safe in reducing

neuropathic pain"); (TACAC ¶ 286) ("effective and safe and safe [*sic*] in reducing pain…making

it easier to form an overall impression of the broad effectiveness of gabapentin in neuropathic

pain,").  Clearly, such misrepresentations were not random, but part and parcel of the same

*overarching* misrepresentation: that Neurontin had "proven efficacy in neuropathic pain." The question is not whether there are *any* variations, as Pfizer argues, but whether the variations are *material*, as set forth in *Moore*, 306 F.3d at 1255.

Defendants single out one use— epilepsy monotherapy—as illustrative of disparate misrepresentations, but ignore at least seven other therapeutic areas where Plaintiffs' allegations are demonstrably uniform. For example, Class Plaintiffs have alleged the following examples of misrepresentations with respect to bipolar disorder:

- At a Parke-Davis marketing event in 1997, Parke-Davis falsely stated that Neurontin was "*effective*" for "*bipolar.*"

- In December 1998, a Parke-Davis sales representative falsely stated to a physician that Neurontin was an "*effective treatment of bipolar disorder.*"

- At a Parke-Davis marketing event in December 1998, Parke-Davis falsely stated that Neurontin was "*Effective on bipolar.*"

- At a Parke-Davis marketing event at the airport Marriott in San Francisco in August 1998, Parke-Davis falsely stated that Neurontin was "*Innovative and effective ...for bipolar II.*"

TACAC ¶ 176. These alleged misrepresentations are not only uniform, but virtually identical.

Similarly, Plaintiffs allege the following examples of misrepresentations with respect to pain:

- In October 1995, a Parke-Davis sales representative stated that Neurontin had received a "*[n]ew indication for chronic pain.*"

- In December 1995, a Parke-Davis sales representative stated that Neurontin was a "*[g]ood anticonvulsant for chronic pain* and restless leg syndrome."

- In July 1996, a Parke-Davis sales representative stated that Neurontin was "*[e]ffective for many types of chronic pain.*"

- In December 1996, a Parke-Davis sales representative stated that Neurontin was "*[g]ood for back pain; neuropathic pains.*"

TACA, ¶ 15). While perhaps not identically worded, these misrepresentations are nevertheless materially uniform, and fully in line with the "key messages" Defendants trained their

representatives to deliver.

Even in the case of monotherapy, Defendants' arguments are unpersuasive. First, two of the misrepresentations quoted by Defendants, "excellent first line therapy" versus "effective for monotherapy," are materially uniform. Second, the misrepresentations and omissions relating to the clinical trials were part and parcel of the overarching misrepresentation concerning Neurontin's efficacy for monotherapy. If Neurontin were truly effective for monotherapy, how could there be negative clinical trials? Defendants sought to avoid that question by misrepresenting the results of Clinical Study 945-82 and a separate Eastern European study as being positive when in fact both studies were negative.

Finally, Defendants suggest that the balance of the statements, which "concern Neurontin's prospects for obtaining FDA approval for a monotherapy indication," are materially at odds with the other statements. They are not. A statement that a drug is FDA-approved for an indication (or will be, based on inside corporate knowledge) is materially uniform and consistent with a statement that the underlying data established efficacy, because the FDA's standard for determining efficacy is no different from the scientific community's at large. Defendants sold Neurontin as being effective for monotherapy, even though they knew that the data was not supportive and that the FDA would reject their monotherapy application based on this data. This is not a "bewildering array" of misrepresentations; it is a carefully conceived and meticulously executed scheme to defraud.[25]

---

[25] Despite the fact that Defendants have yet to produce a single audiotape or transcript of the hundreds of marketing events in question, they ask the Court to assume that misrepresentations made at those events must be lacking in uniformity. There is no basis to indulge such a presumption. If anything, because Defendants are uniquely in control of such information, any such presumption should be in Plaintiffs' favor. The Court has already ruled that "Plaintiffs have met Fed. R. Civ. P. 9(b)'s requirement of pleading fraud with particularity with respect to statements made by physicians about pain, dose dependency, diabetic neuropathy, and

C.    **Proximate Cause and Damages are Susceptible of Common Proof**

Defendants argue that in order to establish proximate cause, Plaintiffs will be required to show *which* specific prescriptions for Neurontin were written as a result of their deceptive off-label promotional activities, and that Plaintiffs will be unable to do so without deposing every physician in the country that prescribed Neurontin for an off-label use. This is obviously an impossible task, and an unnecessary one as well. It is sufficient that Plaintiffs can establish, *on an aggregate, class-wide basis*, the total sales of Neurontin for each off-label condition that would not have occurred but for defendants' misleading off-label marketing campaign, and the portion of those damages borne by the Third Party Payor Subclass and the Consumer Subclass.

In approaching this issue, it is important to bear in mind that there exists an entire sub-industry – composed of companies such as IMS Health and Verispan – that collect and analyze prescription data for Pfizer and other pharmaceutical manufacturers, which the pharmaceutical companies use to manage their business, develop their marketing plans, and monitor their success. Indeed, it appears that Pfizer spends well in excess of $100 million a year purchasing such information from IMS alone.[26] A recent study of this data, "the first study to systematically characterize the extent of off-label prescribing in general outpatient care," demonstrates that with respect to off-label prescriptions, Neurontin is in a class by itself. D. Radley, S. Finkelstein, *et al.*, *Off-Label Prescribing Among Office-Based Physicians*, 166 Arch. Intern. Med. 1021 (May 8, 2006) (Rona Decl., Exh. H), at 1025. Using IMS data on the 500 most frequently prescribed

monotherapy, restless leg syndrome, bipolar, and panic disorder…" Memorandum and Order dated June 12, 2006 (Dkt. No. 356) at 20. Until Defendants produce evidence of what was said at marketing events, they should not be allowed to use a lack of evidence to defeat class certification.

[26] IMS reports that its "largest pharmaceutical customer generates 7 percent of our revenue," which was $1.958 billion in 2006, and identifies Pfizer as its customer with the largest market share. *See* http://ir.imshealth.com/phoenix.zhtml?c=67124&p=irol-faq; http://media.corporate-ir.net/media_files/irol/67/67124/IMSFinancialFactsFinal.pdf.

drugs in 2001, the authors determined that "Gabapentin [the generic name for Neurontin] had the

highest proportion of off-label prescription (83%),"[27] and that there was "little or no scientific

support" for 80% of these prescriptions.[28]  *Id*. at 1023-25.  Noting the *Franklin* litigation, the

authors suggest that "the high degree of off-label use observed for gabapentin" may be due to

Defendants' "inappropriate marketing."  *Id*. at 1026.

> In *Franklin*, the Court dealt with the proximate cause/damages issue as follows:

> Whether Parke-Davis's conduct was a substantial factor in causing the presentation of false Medicaid claims is a question of fact. Relator has produced enough evidence on this score to create at least a genuine issue of material fact. In particular, Relator has produced circumstantial evidence (*e.g*., the rates of off-label prescriptions before and after physician conferences hosted by Parke-Davis) and direct evidence (the "Verbatim" market-research reports recording doctors' state of mind after marketing meetings).

> Parke-Davis also disputes that Relator can reliably extrapolate the prescription activities of a small sample of ten doctors to the off-label prescription rates of over 3000 physicians in fifty states, and, as discussed above, Parke-Davis challenges the reliability of the underlying data used to determine whether a prescription is for off-label uses.  But the Court will defer the daunting task of determining whether a reliable statistical method exists for measuring nation-wide damages.

*United States ex rel Franklin v. Parke-Davis*, 2003 WL 22048255, *4 (D. Mass. Aug. 22, 2003).

Defendants challenge the sufficiency of establishing, through Plaintiffs' experts, the

---

[27] Plaintiffs allege that by 2003, the percentage of Neurontin prescriptions for off-label use had grown even further, to an astounding 90%.  TACAC ¶ 47.

[28] The authors used DRUGDEX to determine the existence and degree of scientific support for off-label uses.  *Id*. at 1022-23.  Plaintiffs have described in detail how Defendants have manipulated DRUGDEX to suppress failed clinical trials entirely or grossly distort their results.  *See* TACAC ¶¶ 133-35, 146 (study concluded Neurontin ineffective in treating diabetic peripheral neuropathy; Defendants submitted falsified abstract to DRUGDEX which omitted this conclusion and suggested instead that "higher doses" were needed), 136 (Defendants never forwarded to DRUGDEX failed study showing Neurontin ineffective in treating bipolar disorder), 148-49 (Defendants never forwarded to DRUGDEX second study concluding Neurontin ineffective in treating diabetic peripheral neuropathy), 172-73 (although Parke-Davis claimed it informed DRUGDEX of all studies, two separate studies which concluded Neurontin ineffective in treating bipolar disorder were omitted from DRUGDEX).

aggregate number and cost of off-label Neurontin prescriptions written as a result of Defendants'
misconduct. Contrary to Defendants' contentions, the use of these aggregate figures presents no
barrier to class certification.

Professor Rosenthal's Declaration filed in support of Plaintiffs' Motion for Class
Certification ("Rosenthal Decl.") establishes two things. First Prof. Rosenthal thoroughly
reviews the relevant literature empirically analyzing physician prescription behavior in response
to pharmaceutical promotion and marketing. She concludes that there is strong evidence of a
causal link between pharmaceutical promotion and drug sales and that the effects of promotion
occur regardless of whether the messages being promoted are true or false. Rosenthal Decl. ¶13.
Neither Defendants nor their experts challenge Prof. Rosenthal's conclusions in this regard.

Second, Prof. Rosenthal sets out an econometric model to estimate the class-wide impact
of Defendants' off-label promotion. Prof. Rosenthal sets forth a time-series regression analysis
that will allow her, using various measures of independent variables correlated with Neurontin
sales, to calculate the total number or prescriptions of Neurontin that resulted from Defendants'
fraud. Rosenthal Decl. at ¶¶ 32, 35. In her most detailed model, Prof. Rosenthal establishes a
methodology to measure the total number of prescriptions for each particular off-label indication
separately. *Id.* ¶ 35. Under all formulations of her model, Prof. Rosenthal allows for the
possibility that a certain amount of off-label promotion of Neurontin would have occurred in the
absence of Defendants' conduct and removes those sales from her measure of the impact to the
class. *Id.* ¶ 37.

The methodology set forth by Prof. Rosenthal reflects standard statistical methods,
regularly employed by economists and econometricians, to study the correlation between two
variables such as the off-label promotion and the off-label sales of Neurontin. Reply Declaration

of Professor Meredith Rosenthal ("Rosenthal Reply") ¶¶ 4,6,14; Reply Declaration of Dr.

Raymond Hartman ("Hartman Reply") ¶ 17.  Prof. Rosenthal's Declaration is intended to

demonstrate the type of model that can be implemented and the types of results that can be

calculated.  It sets out a methodology and identifies some of the time-variant factors that impact

the prescription behavior of physicians regarding Neurontin which Prof. Rosenthal will use in

her model[29] and also identifies some of the statistical methodologies and technical issues to be

overcome and some suggestions for how they could be overcome.  Rosenthal Decl. nt. 63.  Prof.

Rosenthal acknowledges that in implementing her model, depending on what the data reveals, "it

may be necessary to experiment with alternative specifications and practices."  Rosenthal Decl.

¶ 36b.

Defendants' brief identifies three criticisms of Prof. Rosenthal's model they claim are

fatal to class certification.[30]  Defendants claim that Prof. Rosenthal's model, as an aggregate

measurement, would fail to identify the individuals who would have received Neurontin off-label

even in the absence of Defendants' scheme to promote Neurontin off-label, that her model fails

to deal with the issue of "heterogeneity," and that her model fails to account for various market

place variables, other than Defendants' off-label promotion, that could influence the number of

off-label Neurontin prescriptions.

---

[29]  Some of these factors include time since market entry, time since FDA approval, indicators
identifying the publication of studies favorable to FDA approved uses of Neurontin, launch of
therapeutic substitutes for Neurontin, and the launch of medical marketing events for specific
off-label indications.  *Rosenthal Decl.* ¶¶32,33, ftn 60.

[30] Other criticisms of Dr. Rosenthal's and Dr. Hartman's methodologies appear in the
Declarations of  Prof. Scott-Morton ("*Scott-Morton Decl.*"), Dr. Michael Keeley ("*Keeley Decl.*")
and Professor Chintagunta ("*Chingtagunta Decl.*") and are dealt with separately in the Rebuttal
Declarations of Drs. Rosenthal and Hartman filed herewith.

1.    **The Calculation of Class-Wide Impact on an Aggregate Basis Is Not a Barrier to Class Certification**

Defendants challenge the sufficiency of establishing, through Plaintiffs' experts, an aggregate number of off-label Neurontin prescriptions written as a result of Defendants' misconduct. They complain that as an aggregate measurement Prof. Rosenthal cannot identify particular class members who would have received Neurontin for off-label purposes even in the absence of Defendants' conduct. Def. Mem. at 29-31.

Prof. Rosenthal acknowledges that some small number of individuals would have received Neurontin for off-label indications even if Defendants had not undertaken their wide-spread fraudulent off-label marketing campaign. However, no model can determine which individuals would have obtained Neurontin off-label if Defendants had acted differently. What Defendants fail to understand is not just that Prof. Rosenthals' model cannot identify these individuals, but that these individuals cannot be identified at all because they exist only in theory. They exist only in a "but for" world that has never existed – one in which Defendants acted legally. The best that any model can do is to adjust an estimation of class-wide impact to "credit" Defendants for those sales they would have made in the "but for" world, thus eliminating any danger of over recovery by the Class. Prof. Rosenthal's model does just this. Rosenthal Decl. ¶ 37.

It is also important to note that the inability to identify the few individual class members who would have received Neurontin off-label anyway is restricted to consumers in the class. Given the large percentage of off-label use for Neurontin, even the smallest TPP is almost statistically certain to have paid for off-label uses for Neurontin. The existence of a small number of class members who may not have been injured does not defeat class certification. *See, e.g.*, *In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 252 (D. De. 2002); *In re*

*Cardizem CD Antitrust Litig.*, 200 F.R.D. 326, 331 (E.D. Mich. 2001) ("courts have routinely observed that the inability to show injury as to a few does not defeat class certification where the plaintiffs can show widespread injury to the class").

Courts will routinely award aggregate damages, sometimes termed "fluid recovery," in cases in which liability to the class is established and the size of the class or nature of the fraud means that individual damages calculations are impractical.[31] *See In re New Motor Vehicles Canadian Export Antitrust Litig.*, 235 F.R.D. 127, 143 (D. Me. 2006). As the leading treatise on class actions states, "Aggregate computation of class monetary relief is lawful and proper. Challenges that such aggregate proof affects substantive law and otherwise violates the defendant's due process or jury trial rights to contest each members claim individually, will not withstand analysis…. Virtually all circuits that have considered this issue…. have expressly condoned aggregate proofs of damages in other contexts [than antitrust]." 3 NEWBERG & CONTE, NEWBERG ON CLASS ACTIONS § 10.5, at 483-84 (4th ed. 2002). This treatise also notes, "When proofs permit aggregate damages to be assessed for some members of the class, such aggregate proof should be allowed even though it is not available for all class members." *Id.* at n. 25. *See also Dukes v. Wal-Mart, Inc.*, --- F.3d ---, 2007 WL 329022, at *19 (9th Cir. Feb. 6, 2007) (citing Newberg treatise and finding that the analysis of aggregate data does not violate the defendant's due process rights).

Fluid recovery furthers the policy interests behind collective litigation where exact damages determinations are not possible. Judge Weinstein recently noted that "Without this use of fluid recovery, 'some class actions… would neither compensate nor deter… and would reward its foresight in stealing from the multitude in small amounts.'" *Schwab v. Philip Morris, Inc.*,

---

[31] Fluid recovery has been used in civil RICO actions. *See Mexico Money Transfer Litig.*, 267 F.3d 743 (7th Cir. 2001).

449 F. Supp. 2d 992, 1254 (E.D.N.Y. 2006) (quoting *Bruno v. Superior Court*, 127 Cal. App. 3d

120, 127 (Cal. Ct. App. 1981)); *see also Dukes*, 2007 WL 329022, at *19 ("aggregate proof of

the defendant's monetary liability promotes the deterrence objectives of the substantive laws

underlying the class actions…") (citation omitted).  If direct causation and damages must be

demonstrated *individually* for every class member in a consumer protection suit, the broad

remedial purposes of consumer protection statutes would be defeated.  *See Aspinall v. Philip

Morris, Inc.*, 442 Mass. 381, 398 (2004) (" . . . claiming, as defendants do, that individual proof

is necessary, or that benefits will vary widely between smokers, raises a specious issue that, if

followed to conclusion, would eviscerate G.L. c. 93A as a remedy to abate this deceptive

advertising.')[32]

The Seventh Circuit has endorsed a case-by-case approach to the use of fluid recovery,

directing courts to consider the goals of deterrence, disgorgement, and compensation in

determining whether the fluid recovery device should be used.  *See Simer v. Ross*, 661 F.2d 655,

676-78 (7th Cir. 1981).  New Jersey's class action rule, R. 4:32-2(c), explicitly provides for the

use of fluid recovery, stating, "In any class action, the judgment may, consistent with due

process of law, confer benefits upon a fluid class, whose members may be, but need not have

been members of the class in suit."  The provision is intended to apply to cases in which "it

would be highly impracticable, if not impossible, to allocate and distribute the judgment among

persons who were members of the class at the time the action was brought or at the time the

judgment was entered."  Pressler, *Current N.J. Court Rules*, comment one on R. 4-32, p. 1591

(2004).  The New Jersey Consumer Fraud Act ("NJCFA") also specifically provides for the

---

[32] *See also Falise v. Amer. Tobacco*, 94 F. Supp. 2d 316, 333 (E.D.N.Y. 2000) ("To require
reliance on specific misrepresentations where indirect channels of communication were integral
to the success of the scheme would produce the perverse result of having the most massive and
sinister fraudulent schemes be the ones that must escape civil-RICO liability.").

determination of aggregate damages, providing that any person violating the NJCFA "shall be liable for a refund of all monies acquired by means of any practice declared herein to be unlawful." N.J.S.A. 56:8-2.12.

Fluid recovery can be used even where there exists the possibility that certain class members may be over-compensated. *See*, *e.g.*, *Barr v. WUI/TAS, Inc.*, 1976 WL 1205 (S.D.N.Y. 1976) (approving settlement in a pre-fixing case against telephone answering service, with equal monetary distribution to all class members because there was no method of determining the precise amount that any particular subscriber was overcharged); *see also Schwab*, 449 F. Supp. 2d at 1269 (permitting fluid recovery in case involving marketing of "light" cigarettes even though "[t]his form of fluid recovery tends – like almost all aggregate litigation – to overcompensate some and undercompensate other members of the class who may have relied differently on the 'lights' designation and may have acted differently and for different reasons relevant to damages…. While a court must be alert to issues of due process and must not value efficiency over fairness to both parties, illegally injured plaintiffs should not be fobbed off on the basis of real and imagined management problems that can be circumvented in a fair adjudication."). The possibility of overcompensation of some limited number of class members does not preclude class certification, even without resorting to the use of fluid recovery. *See Varacallo v. Mass. Mut. Life Ins. Co.*, 332 N.J. Super. 31, 48, 752 A.2d 807, 816-17 (certifying class in case brought under New Jersey Consumer Fraud Act despite possibility of existence of superceding cause for policyholder loss). This is also not a case where there is a danger that Defendants would be, through the use of an aggregate award, punished for behavior that would be legal where it occurred; violations of RICO, a federal statute, are at issue. *See Dukes*, 2007 WL 329022, at *19.

Further, the possibility of imprecision in the use of aggregate damages is no bar to their use. Damages awards in class actions "need not be 100 percent accurate." *Long v. Trans World Airlines, Inc.*, 761 F. Supp. 1320, 1327 (N.D. Ill. 1991); *In re Prudential Ins. Co. America Sales Practices Litig.*, 962 F. Supp. 450, 517 n.46 (D.N.J. 1997), *aff'd in part, vacated in part on other grounds,* 148 F.3d 283 (3d Cir. 1988) (aggregate damages may be estimated so long as "sufficient facts [are] introduced so that a court can arrive at an intelligent estimate without speculation or conjecture."); *see also Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163, 1171 ("It is important to distinguish between uncertainty in the fact of damage and in the amount of damage.") (citing *Knutson v. Daily Review, Inc.*, 548 F.2d 795, 811 (9th Cir. 1976) ("Different standards govern proof of the fact and proof of the amount of damages.")). As the *Long* court stated, a defendant "has no 'right' to an individualized determination of damages for each plaintiff; the desire for accuracy must be balanced against other factors such as the burdens of discovery in relation to the size of the individual claims." *Id.*

Several methods are available to establish the amount of aggregate damages, and the Court must conclude only that the proffered expert methodology for calculating damages on an aggregate class-wide basis is "not so insubstantial as to preclude class certification." *In re Pharm. Indus. Avg. Wholesale Price Litig.*, 230 F.R.D. 61, 90 (D. Mass. 2005). These methods, including statistical analysis, can be used to make determinations even about reliance. *See Schwab*, 449 F. Supp. 2d at 1118 ("In this circuit variations in individual reliance may be adjusted in a variety of ways including averaging through statistical analysis and variations in damages awards."); and 1241 ("When, as in the case at bar, the plaintiffs are a widely spread group complaining of injury from a common course of conduct by defendants, statistical analysis may provide a more accurate and comprehensible form of evidence than would the testimony of

millions of individual smokers.")[33]  As Judge Weinstein noted in the recent *Schwab* opinion,

statistical extrapolation can be conducted in a way that does not overly burden courts or litigants.

*See Schwab*, 449 F. Supp. 2d at 1120-21 (citing cases in which relatively small samples were

used); *see also Hilao v. Estate of Marcos*, 103 F.3d 767, 782-87 (9th Cir. 1996) (use of statistical

sample of class claims in determining compensatory damages did not violate due process clause

since adversarial resolution of each class member's not practicable); *see also* 3 Newberg, § 10.12

(endorsing pragmatic approach to distribution of damages, including use of averages, statistical

samples, and extrapolation).[34]

        Defendants' reliance, in arguing that individual damages determinations would defeat

predominance in this case, on this Court's class certification decision in *In re Pharmaceutical

Industry Average Wholesale Price Litigation* is misplaced.  Contrary to Defendants' argument,

this Court (conditionally) declined to certify a nationwide class of third-party payors because of

variations in state consumer protection laws, not because of any attempt to "sweep individual

damages issues under the judicial rug" through averaging of damages.  *In re Pharm. Indus. Avg.

Wholesale Price Litig.*, 230 F.R.D. at 86, 90.  The Court assessed the methodologies for

calculating damages and determined that the above-stated standard had been met.[35]

---

[33] *Schwab* also cited *Blue Cross & Blue Shield of N.J., Inc.*, 133 F. Supp. 2d at 172 (explaining propriety of statistical extrapolation for entity suffering damages in aggregate); and *Blue Cross & Blue Shield of N.J., Inc.*, 36 F. Supp. 2d at 575 (E.D.N.Y. 1999) ('The aggregation of millions of alleged injuries in the instant suit can be expected to yield more accurate results with respect to the causation issue since projections based upon a large statistical base will be available, thus reducing the size of the possible error.").

[34] The use of mathematical models is particularly appropriate where there is a presumption of damage to every class member.  *See Muise v. GPU, Inc.*, 371 N.J. Super. 13, 51, 851 A.2d 799, 822 (N.J. Super. App. Div. 2004).  Assuming Plaintiffs' proffered formula for calculating classwide damages is acceptable despite the possibility of over- or under-compensation of certain Class members, that concern is lessened where reliance on Defendants' misrepresentations is presumed, eliminating individual liability questions.

[35] The context in which this Court stated in the *AWP* decision that "it is not permissible to use

2.      **Exposure Heterogeneity and Response Heterogeneity Are Irrelevant**

In the context of this case, exposure heterogeneity and response heterogeneity are technical terms for the idea that different physicians may be exposed to differing levels of promotional activity and that two physicians exposed to the same level of promotional activity may respond differently to those promotions. Chintagunta Decl. ¶ 9.  Defendants contend that any failure to measure the exposure and response among individual physicians is fatal to class certification.  However, Prof. Rosenthal's model is one that seeks to determine the impact of Defendant's promotional activities to the entire class.  As such individual physician exposure to particular promotions or individual physician reaction to the same promotion are not ignored, they are accounted for in Prof. Rosenthal's aggregate measurement of impact to the class. Rosenthal Reply ¶¶ 3, 12, 25.  There is no need, nor is it practical, to measure individual physician exposure or response if there are reliable methodologies for estimating the aggregate class-wide impact of Defendants' promotions.  *See In re Prudential Ins. Co. America Sales Practices Litig.*, 962 F. Supp. 450, 517 n.46 (D.N.J. 1997), *aff'd in part, vacated in part on other grounds,* 148 F.3d 283 (3d Cir. 1988) (third circuit found class certification appropriate despite the fact that different plaintiffs in the class had claims and injuries depending on different sales tactics by Defendants).

---

methods such as averaging damages to sweep individual issues under the judicial rug," 230 F.R.D. at 87, was in citing a Fifth Circuit case in which, like *AWP*, the Court made no categorical holding that an averaging of damages was prohibited, but determined only that the proffered method of approximation of damages in that case was not adequate.  Defendants' other authority regarding damages calculations is also inapposite.  Defendants first cite dicta from *Lemon v. Harlem Globetrotters Int'l, Inc.*, 437 F. Supp. 2d 1089, 1104 n.10 (D. Ariz. 2006), a Lanham Act case brought by several individuals. The Court in *In re NCAA I-A Walk-On Football Players Litig.*, 2006 U.S. Dist. LEXIS 28824, at *27 (W.D. Wash. May 3, 2006) discussed damages calculations in the context of considering whether the proposed class representative was an adequate representative, highlighting unique conflicts – not present here – in the allocation of damages among class members.

Defendant's marketing expert, Professor Chintagunta, recounts the academic literature documenting exposure and response heterogeneity related to physicians and pharmaceutical promotions. *Chintagunta Decl.* ¶¶ 14-28.   In regards to Prof. Rosenthal's proposed model he then acknowledges that "[a]n approach such as this, if indeed it could be implemented, would answer questions of the following nature: what would be the total increase or decrease in the number of prescriptions written for a drug if the total spending on a particular promotional activity increased or decreased by a particular amount?"  Chintagunta Decl. ¶29.  This is exactly the purpose of Prof. Rosenthal's methodology - to reliably measure the impact of Defendants' fraudulent promotional activities in furtherance of off-label prescriptions of Neurontin for various unapproved uses on the total off-label prescriptions of Neurontin for that unapproved use.  The existence of heterogeneity among or across physicians is irrelevant for that purpose and does not preclude class certification.

### 3.   "Omitted Variable Bias" Poses No Barrier to A Valid Estimate of Class-Wide Impact or Aggregate Damages

Defendants challenge Prof. Rosenthal's model because they claim it fails to account for every factor in the marketplace that may effect the decision of a physician to prescribe Neurontin off label.  Def. Memo p. 29, Keeley Decl.  ¶¶19,32-33, Scott Morton Decl. ¶9, and because it fails to account for individual differences in how TPPs deal with off-label prescriptions.  Def. Memo p.30, Keeley Decl. ¶43-48.   In statistical terms Defendants complain of "omitted variable bias" – the possibility that a model seeking to describe a causal relationship is biased in its conclusions because it omits a variable or variables that are also correlated with the variable of interest (in this case the amount of off-label prescriptions of Neurontin).

Prof. Rosenthal's Declaration provides the Court with an example of the variables she will use in her model, however the list of variables she provides is illustrative, not exhaustive.

She will go where the analysis leads her and if there are significant explanatory variables besides Defendants off-label promotional activities that help explain off-label sales of Neurontin which she has not previously listed, she will build them into her model. Rosenthal Reply ¶ 22.

However, what Defendants and their experts conveniently ignore is that the economic analysis such as Prof. Rosenthal proposes in this matter, indeed all economic analysis, are based on models which are by definition simplified in some manner. The fact that each and every variable of which the human mind can conceive is not built into the analysis does not render the model inadequate. Rosenthal Reply ¶¶ 19-22, Hartman Reply ¶ 17, Att. A at 4. Empirical economic analysis which involve models such as Prof. Rosenthal proposes and that omit a litany of possible variables are considered important enough to be used to inform public policy and alter business practices. Prof. Rosenthal cites such studies in her review of the economic literature specific to pharmaceutical promotion in her Declaration. [36]

Such analysis is routinely undertaken by econometricians by focusing on the main predictors of the variable in interest. In this case Prof. Rosenthal proposes to incorporate those variables that might occur within a pattern, over time, which correspond in time to the off-label promotion of Defendants for specific off-label indications. There is no reason to believe the variables identified by Defendants and their experts, such as different levels of sophistication amongst TPPs, or the varying impact of promotions on different individual physicians, will vary across time in a fashion that is correlated with the promotional events or publications intended by Defendants to increase off-label prescriptions for specific off-label indications. Rosenthal Reply

---

[36] *See e.g.* E.R. Berndt, L. Bui, D. Reiley and G. Urban, "Information, Marketing and Pricing in the U.S. Anti-Ulcer Drug Market," *American Economic Review*, Vol. 85, No. 2, pp. 100-105, May 1995. In this model of pharmaceutical demand, Berndt et al. include only variables for price, detailing, journal advertising, direct-to-consumer advertising and an indicator of whether the observation occurred after the FDA approved the particular drug for second clinical indication.

¶ 29.

### D.      Reliance Is Not An Element of Plaintiffs' RICO Claim

Defendants' contention that reliance is an element of Plaintiffs' RICO claim is flatly

incorrect.  As the First Circuit held in *Systems Management, Inc. v. Loiselle*, 303 F.3d 100, 103-

04 (1st Cir. 2002), "Reliance is doubtless the most obvious way in which fraud can cause harm,

but it is not the only way…. There is no good reason here to depart from RICO's literal language

by importing a reliance requirement into RICO."  *See also In re Lupron Marketing & Sales*

*Practices Litig.*, 295 F. Supp. 2d 148, 166 (D. Mass. 2003) ("There is… no element of reliance,

reasonable or not, in the mail and wire fraud statutes.").  As the Court held in *AWP*, "*Loiselle*

establishes that the plaintiff class members need not have heard or directly relied" on

Defendants' misrepresentations and omissions; Plaintiffs need only "demonstrate a link"

between Defendants' conduct and class members' injuries.  230 F.R.D. at 93.[37]  As set forth

above, this can be done via common proof, and does not require individualized factual inquiries.

The focus of the predominance requirement remains Defendants' scheme to defraud.  *See*

*Peterson v. H&R Block Tax Servs., Inc.*, 174 F.R.D. 78, 84 (N.D. Ill. 1997) ("variations in

individual reliance do not defeat certification because a scheme to defraud … violates RICO

regardless of the characteristics of the scheme's intended victims.").[38]

---

[37] Despite the clear holding of *Loiselle*, Defendants argue for a reliance requirement the First
Circuit has expressly rejected.  Defendants cite *Platten v. HG Bermuda Exempted Limited*, 437
F.3d 118 (2d Cir. 2006), where the plaintiffs failed to allege proximate cause between
defendants' wrongful conduct and their injuries.  *Id.* at 132.  The court, in dismissing plaintiffs'
RICO claim, simply pointed to a lack of reliance, which is, as the First Circuit pointed out in
*Loiselle*, is "the most obvious way in which fraud can cause harm" 303 F.3d at 104, but did not
hold that reliance was an *element* of plaintiffs' claim.  Defendants' other "authority," an amicus
brief of the Solicitor General arguing that *Loiselle* does not mean what it plainly says, is mere
argument, not authority.  As *certiorari* in that case was dismissed (*see Bank of China v. NBM,
L.L.C.*, 126 S. Ct. 675 (2005)), *Loiselle* remains controlling.

[38] Even if reliance *were* required, Plaintiffs are entitled to a presumption of reliance in RICO

**E.**   **Reliance May Be Presumed on Plaintiffs' Common Law Fraud Claim**

Nor do issues of reliance present a barrier to certification of Plaintiffs' common law fraud claim; this is a case where reliance may be presumed.[39]  In their opening brief, Plaintiffs set forth the elements of common law fraud, showed that those elements are susceptible to class-wide proof, and explained that reliance and causation may be presumed under New Jersey law[40] where, as here, the misrepresentation or omission was material.  Indeed, when considering whether to prescribe a drug for a particular condition, it would be difficult to imagine a *more* material omission than a study concluding that the drug has no therapeutic effect.

In response, Defendants do not challenge Plaintiffs' assertion of materiality, but question the continued vitality of *Varacallo v. Mass. Mut. Ins. Co.*, 752 A.2d 807 (N.J. Super Ct. App. Div. 2000), pointing to dicta in *Kaufman v. i-Stat Corp.*, 754 A.2d 1188, 1995 (N.J. 2000), a case addressing whether a *fraud-on-the-market theory* (which Plaintiffs have repeatedly disclaimed) should be applied to establish indirect reliance in a consumer fraud case, and two cases applying that dicta, *Morgan v. Markerdowne Corp.*, 201 F.R.D. 341, 347-49 (D.N.J. 2001), and *Brown v. Philip Morris Inc.*, 228 F. Supp. 2d 506, 518-19 (D.N.J. 2002), which, as Plaintiffs pointed out in their opening brief, expressly distinguished *Varacallo*.  *See* 228 F. Supp. 2d at 520 n.14.  *Varacallo* is not an aberration, but based upon "universally recognized principles of law" that reliance may be presumed when misrepresentations and/or nondisclosures are deemed

---

class actions involving a uniform scheme to defraud, such as the one at issue in this case.  *See Spark v. MBNA Corp.*, 178 F.R.D. 431, 436 (D. Del. 1998) ("Generally, the court may presume reliance 'where it is logical to do so.'" (citation omitted)); *Waters v. Int'l Precious Metals Corp.*, 172 F.R.D. 479 (S.D. Fla. 1996); *Singer v. AT&T Corp.*, 185 F.R.D. 681 (S.D. Fla. 1998).

[39] Plaintiffs are not required to demonstrate reliance, presumed or otherwise, on their NJCFA claim, which "does not require proof of reliance," and, by its terms, imposes liability for violations "whether 'any person has in fact been misled, deceived or damaged thereby.'" *Gennari v. Weichert Co. Realtors*, 691 A.2d 350, 366 (N.J. 1997) (quoting N.J.S.A. 56:8-2).

[40] The choice of law issue is further addressed in Part III-H, *infra*.

"material."  752 A.2d at 817-18 (citations omitted).[41]

In this case, the pervasiveness of Defendants' conduct, the uniform nature of the conduct, and the materiality of Defendants' misrepresentations and nondisclosures make it appropriate to presume reliance.  Indeed, in *Dellinger,* even though the plaintiff could offer no evidence that the prescribing physician was directly exposed to Defendants' off-label marketing efforts, the Court concluded that:

> [V]iewing the evidence in the light most favorable to Plaintiff, Dr. Miller could have been influenced by the professional opinion of one or more of his colleagues, who had been influenced by Defendants' alleged unfair and deceptive trade practices.  Notably, Dr. Miller admits that sources are fairly limited concerning drug studies and findings.  In fact, Dr. Miller also concedes that his colleagues would have likely learned about the "off-label" usage of drugs through some study or report.  Therefore, *based on the extensive misrepresentations made regarding scientific information of the "off-label" usage of Neurontin, there is a genuine issue as to whether the Defendants' conduct indirectly caused Dr. Miller to prescribe Neurontin for an "off-label" use*.

*Id*. at *7 (emphasis added, record citations omitted).  The same conclusion is appropriate here. Defendants so saturated the market with disinformation regarding Neurontin's effectiveness for off-label uses that reliance may fairly be presumed.

### F.    Plaintiffs Can Demonstrate Class-Wide Injury Without Examining Individual Medical Records

Defendants argue that Plaintiffs cannot show class-wide injury, because the trier of fact would have to examine each class member's medical records to determine whether Neurontin was effective in treating the off-label condition for which it was prescribed.  Defendants persist in misconstruing Plaintiffs' case.  Plaintiffs do not claim that Neurontin was effective in treating *some* class members but not others for these conditions; Plaintiffs claim that Neurontin was not

---

[41] *Accord Vasquez v. Superior Court*, 94 Cal. Rptr. 796 (Cal. 1971); *Murray v. Sevier*, 156 F.R.D. 235, 248-49 n.11 (D. Kan. 1994); *Cope v. Metropolitan Life Ins. Co*., 696 N.E.2d 1001, 1008 (Ohio 1998); *Adams v. Little Missouri Minerals Ass'n*, 143 N.W.2d 659, 684-85 (N.D. 1966); *Davis v. Southern Bell Tel. & Tel. Co.*, 158 F.R.D. 173, 177-80 (S.D. Fla. 1994).

effective in treating *any* class members for these conditions. Without a properly controlled study establishing that Neurontin is effective in treating the off-label condition at issue for at least *some* persons (*i.e.*, "general causation"), the question of *which* persons it was effective for (*i.e.*, "specific causation") does not even arise. [42]

As Plaintiffs explained in their Objections to Discovery Order No. 4 (Dkt. No. 462), it is not possible to determine from individual medical records whether Neurontin was effective in treating a particular class member for the off-label condition the drug was prescribed for. As Defendants' own expert noted in his declaration, "most of the conditions at issue in this litigation (such as pain and bipolar disorder) . . . cannot be assessed through empirical testing." Argenbright Decl. (Dkt. No. 430) ¶ 21. In other words, while the efficacy of a cholesterol-lowering drug, or a blood pressure medication, may be determined by objective measures (*i.e.*, lower cholesterol or blood pressure), there is no purely objective measure for the efficacy of treatments for the off-label conditions Neurontin was prescribed for, such as chronic pain, mood and anxiety disorders. Instead, "success" in treating these conditions is highly subjective, and treating physicians are forced to rely primarily on self-reporting by the patient.

The placebo response rates for these conditions – *i.e.*, the percentage of patients who report a significant improvement in their condition when treated with a *sugar pill* – can be as

---

[42] The pharmaceutical cases cited by Defendants in support of their argument all involved drugs that had been approved by the FDA to treat the conditions for which they were prescribed, establishing their efficacy; all were either personal injury cases, or cases alleging that the manufacturer concealed serious health risks; none alleged that the drug in question was ineffective. *See Williams v. Purdue Pharma Co.*, 297 F. Supp. 2d 171, 176 (D. D.C. 2003) (OxyContin); *Rivera v. Wyeth-Ayerst Labs*, 83 F.3d 315, 320 (5th Cir. 2002) (Duract); *Heindel v. Pfizer, Inc.*, 381 F. Supp. 2d 364, 379-80 (D.N.J. 2004) (Celebrex and Vioxx); *Foister v. Purdue Pharma L.P.*, No. 01-268-DCR, 2002 WL 108608 (E.D. Ky. Feb. 26, 2002) (OxyContin); *In re Baycol Prods. Litig.*, 218 F.R.D. 197 (D. Minn. 2003) (Baycol); *In re Rezulin Litig.*, Judicial Council Coordination Proceeding No. 4122 (Cal. Sup. Ct. Apr. 29, 2003) (Rezulin); *In re Rezulin Prods. Liab. Litig.*, 210 F.R.D. 61 (S.D.N.Y. 2002) (Rezulin).

high as 67% for anxiety disorders, and 60% for major depressive disorders. *See* Rosenthal Decl.
(Dkt. No. 463) at 6 n.11. Indeed, Defendants' own study of Neurontin and neuropathic pain
showed placebo response rates of 22%. *Id.* Accordingly, the most that can be determined from
individual medical records is whether the patient *reported feeling better after taking Neurontin*,
not whether Neurontin was *actually effective in treating the condition*. Without a proper control
group, it is impossible to determine whether a patient reported feeling better because Neurontin
"worked" for them, or because of the placebo effect, spontaneous remission, or for some other
reason. *See* Rosenthal Decl. (Dkt. No. 463) ¶¶ 10-13. The diverging testimony of Mr. Smith and
Ms. Kopa, who expressed no doubt whatsoever that Neurontin was ineffective in alleviating their
conditions, and their physicians, who (Defendants argue) considered their treatment a success,
only underscores the inherent unreliability of drawing conclusions regarding efficacy from
individual patient records.

In *Dellinger*, Pfizer, represented by the same counsel, prevailed in a *Daubert* motion to
*exclude* as scientifically unsound the very type of anecdotal evidence they argue Plaintiffs must
*introduce* in this case. In *Dellinger*, the plaintiff, who was prescribed Neurontin for pain, an off-
label use, argued that it caused his pancreatitis, supported by an expert who based his causation
opinion on individual case reports and anecdotal data instead of properly designed and controlled
trials or studies. Pfizer successfully argued, as numerous courts have held,[43] that such anecdotal

---

[43] In support of its argument, Pfizer cited – and the court credited – a raft of cases for the
proposition that individual case reports do not provide admissible evidence of causation:

> *See Soldo*, 244 F. Supp. 2d at 537 ("the great weight of authority -- and the most
> current authority -- squarely rejects the use of [adverse drug events] and case
> reports for the purpose of establishing general causation"); *Nelson*, 92 F. Supp. 2d
> at 969 ("reports themselves do not contain a testable and systemic inquiry into the
> mechanism of causation ... they do not demonstrate a causal link sufficient for
> admission to a finder of fact in court"). . . . *McClain v. Metabolife Int'l, Inc.*, 401
> F.3d 1233, 1250 (11th Cir. 2005) ("Uncontrolled anecdotal information offers one

data and individual case histories do *not* provide scientific evidence of causation admissible under *Daubert*. *Id.* at \*9-\*11. The fact that BCBSLA's director of pharmacy services, and ASEA's benefits consultant – neither of whom are qualified to opine on the subject – guessed that individual medical records would "probably" or "presumably" enable a medical expert to determine whether Neurontin was effective for a particular patient, does not magically transform them into scientifically reliable evidence.[44]

### G.     Affirmative Defenses Do Not Predominate

Defendants argue that they are entitled to raise several affirmative defenses that raise individual issues precluding certification. As the First Circuit has stated, "Courts traditionally

---

of the least reliable sources to justify opinions about both general and individual causation"); Rider, 295 F.3d at 1199 (case reports "reflect only reported data, not scientific methodology"); *Glastetter v. Novartis Pharms. Corp.*, 107 F. Supp. 2d 1015, 1030 (E.D. Mo. 2000) ("a number of courts have concluded that case reports are not a scientifically reliable basis for a causation opinion .... Such case reports are not reliable, because normally, such reports 'record nothing more than a temporal association between an exposure and a particular occurrence'"); *Brumbaugh v. Sandoz Pharm. Corp.*, 77 F. Supp. 2d 1153, 1157 (D. Mont. 1999) ("anecdotal reports are not generally accepted as reliable scientific evidence to establish causation"); *Jones v. United States*, 933 F. Supp. 894, 899 (N.D. Cal. 1996) ("anecdotal case reports ... are not derived through the scientific method"), *aff'd*, 127 F.3d 1154 (9th Cir. 1997), cert. denied, 524 U.S. 946 (1998); *Casey v. Ohio Med. Prods.*, 877 F. Supp. 1380, 1385 (N.D. Cal. 1995) ("case reports are not reliable scientific evidence of causation, because they simply describe reported phenomena without comparison to the rate at which the phenomena occur in the general population or in a defined control group; do not isolate and exclude potentially alternative causes; and do not investigate or explain the mechanism of causation").

Defendants' Memorandum of Law in Support of Defendants' Motion to Exclude Testimony By Christopher Keeys, *Dellinger v. Pfizer Inc.*, 2006 WL 826302, 8-9 (W.D.N.C. Feb. 14, 2006).
[44] It is apparent that Ms. Savoie's opinion that expert review of an individual plan participant's medical records is how ASEA might determine if Neurontin was effective, lacked any legitimate basis or conviction. *See* Savoie Depo. at 221:21-222:15 (testifying over a "lacks foundation" objection and in a manner so tentative it prompted the court reporter to record her "statement" as a question, that "presumably" this is how such a determination would be made). Ms. Savoie has no medical education or training. *See id.* at 11:1-13:12 (noting Ms. Savoie has a B.A. and is licensed in insurance). [ADD RE BCSBLA]

have been reluctant to deny class action status under Rule 23(b)(3) simply because affirmative defenses may be available against individual members." *Smilow v. Southwestern Bell Mobile Sys., Inc.*, 323 F.3d 32, 39 (1st Cir. 2003); *see also* 3 Newberg, § 4.26 ("The existence of… affirmative defenses against various class members… will not usually bar a finding of predominance of common issues…").  Even if individual issues emerge with respect to certain individual defenses, a court has the discretion and means to address those issues through, for example, subclassing.  *See Smilow*, 323 F.3d at 39-40.

The First Circuit has expressly rejected any *per se* rule treating the potential presence of class member-specific statute of limitations issues as a barrier to certification.  *See Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 295-96 (1st Cir. 2000).  "As long as a sufficient constellation of common issues binds class members together, variations in the sources and application of statutes of limitations" will not bar class certification.  *Id.* at 296; *see also Smilow*, 323 F.3d at 39 ("[W]here common issues otherwise predominated, courts have usually certified Rule 23(b)(3) classes even though individual issues were present in one or more affirmative defenses."); *Lessard v. Metropolitan Life Ins. Co.*, 103 F.R.D. 608, 612 (D. Me. 1984).[45]

Contrary to Defendants' claims, fraudulent concealment and/or the applicability of the discovery rule raise predominantly common, not individual questions.  *See In re Flat Glass Antitrust Litig.*, 191 F.R.D. 472, 488 (W.D. Pa. 1999) (holding that "crucial common questions on… fraudulent concealment… will relate to whether defendants successfully concealed the

---

[45] *In re Rezulin*, 210 F.R.D. 61 (S.D.N.Y. 2002), cited by Defendants, does not alter this well-established First Circuit law.  There, the Court based its holding that predominance was not present on the finding that individual questions, "particularly" those related to causation and reliance dominated, *see id.* at 68, disposing of affirmative defenses in one sentence.  *See id.* at 67.  *In re Massachusetts Diet Drug Litigation*, 338 F. Supp. 2d 198 (D. Mass. 2004), a non-class decision, is similarly of no help to Defendants.  There, the Court determined whether genuine issues of material fact existed as to the application of the discovery rule, not whether its application defeated predominance.

existence of the alleged conspiracy, which proof will be common among the class members…");
*see also* Newberg, § 4:26 ("Challenges based on… fraudulent concealment… are rejected and
will not bar predominance satisfaction because those issues go to the right of a class member to
recover, in contrast to the underlying common issues of the defendant's liability."). In this case,
the key concealment question is whether Defendants actively concealed their various schemes to
fraudulently promote off-label uses of Neurontin. Proof of that conduct will be common among
class members. Further, as Defendants have acknowledged in prior briefing, the focus of the
fraudulent concealment inquiry will be the chronology of the *Franklin* action, particularly the
unsealing of the amended complaint in that case and the resulting publicity. *See* Defs.' Mem.
Supp. Mot. Dismiss (Dkt. No. 60) at 35-39; Pls. Joint Mem. Opp. Mot. Dismiss (Dkt. No. 101) at
35-39. These events are common to all class members, simplifying the application of the
discovery rule, and avoiding individualized, fact-specific inquiries.[46]

Defendants also state conclusorily that the equitable doctrines of laches and unclean
hands will raise individual issues. Defendants simply cite one case that sets forth the laches
doctrine, which generally applies only in the *absence* of an applicable statute of limitations,
*Desiderio v. D'Ambrosio*, 190 N.J. Super. 424 (Ch. Div. 1983). Defendants' citation of *In re
Prempro*, 230 F.R.D. 555, 563 (E.D. Ark. 2005), in arguing for the predominance of individual
issues raised by the unclean hands defense, is inapposite. There, the Court did not address
individual issues raised by the unclean hands defense itself, but only discussed that defense in the
context of choice of law issues raised by the application of different states' unclean hands
doctrines. These defenses likewise present no barrier to class certification. *See Lessard*, 103

---

[46] Even Defendants have never argued that the statute of limitations bars Plaintiffs' claims under
the NJCFA, which has a six-year statute of limitations, or Plaintiffs' RICO claims that accrued
within four years of the April 2004 filing of the first class action.

F.R.D. at 612 (certifying class where defendant failed to show that individual issues related to an affirmative defense predominated over common questions representing a "significant aspect of the case").

> H.    **The Court May Apply New Jersey Law**

Defendants argue that "application of the laws of all 50 states is required" (Def. Mem. at 37), focusing myopically on boilerplate allegations in Plaintiffs' original complaints that "a substantial part of the events giving rise to Plaintiffs' claims occurred" in the districts in which the cases were filed, which merely recites the statutory venue standard. *See* 28 U.S.C. § 1391(a),(b) (action may be brought in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred").[47]  The venue statute "does not require that plaintiffs establish that the [district in which the action was filed] has 'the most substantial contacts to the dispute; rather it is sufficient that a substantial part of the events occurred [there], even if *a greater part of the events occurred elsewhere*.'"  *Neufeld v. Neufeld*, 910 F. Supp. 977, 986 (S.D.N.Y. 1996) (emphasis added, citation omitted); *see also Park Inn Intern., L.L.C. v. Mody Enterprises, Inc.*, 105 F. Supp. 2d 370, 376 (D.N.J. 2000) ("[t]he statute only requires a 'substantial part' of the events to have occurred in the District to establish venue.  It does not require a majority of the events to take place here").

To be sure, Plaintiffs have alleged that Defendants' fraudulent scheme was national in scope, involving presentations to physicians in many different states.  But Plaintiffs have not alleged a series of independent, random acts of deception geographically dispersed across the 50 states; Plaintiffs have alleged a single, integrated scheme that was carefully conceived,

---

[47] Each of the allegations quoted by Defendants appear in the separate "venue" paragraphs of Plaintiffs' respective original complaints.  *See Harden* Complaint (Exh. 49) ¶ 21 (D. Mass.); *Kopa* Complaint (Exh. 50) ¶ 11 (S.D.N.Y.); *Smith* Complaint (Exh. 51) ¶ 10 (S.D. Ind.); *BCBSLA* Complaint (Exh. 52) ¶ 12 (E.D. La.); *ASEA* Complaint (Exh. 53) ¶ 16 (D. N.J.).

orchestrated, and monitored from Parke-Davis/Warner Lambert's New Jersey headquarters.  *See,*

*e.g.,* TACAC ¶¶ 314 ("Although many of Defendants' sales and marketing strategies were

executed through the Customer Business Unit ("CBU") system, a network of regional sales

divisions that covered the entire country, those strategies were developed and disseminated by

Defendants' Morris Plains, New Jersey headquarters.").  This is sufficient to permit application

of New Jersey state law under the Constitution, and under New Jersey and Massachusetts choice

of law rules.[48]  Because recent New Jersey appellate authority renders this an "easy call,"

Plaintiffs will address the application of New Jersey's choice of law rules first.

### 1.      New Jersey Law May Constitutionally Be Applied

Defendants argue that because their misconduct crossed state lines, under *Phillips*

*Petroleum Co. v. Shutts*, 472 U.S. 797 (1985), it would be "impermissible . . . for the Court to

apply one state's laws to the claims of all absent class members."  Def. Mem. at 37.  In support

of this argument, Defendants cite only *In re Rezulin Prods. Liab. Litig.*, 210 F.R.D. 61 (S.D.N.Y.

2002), which does not even mention *Shutts.*  Contrary to Defendants' argument, in *Shutts*, the

Supreme Court expressly held that a single state's law *may* be applied extraterritorially to the

claims of nonresidents, so long as that state has "a 'significant contact or significant aggregation

of contacts' to the claims asserted by each member of the plaintiff class, contacts 'creating state

interests,' in order to ensure that the choice of . . . law is not arbitrary or unfair."  472 U.S. at

---

[48] Defendants do not dispute that the Court must apply the choice of law rules of the district(s) in
which the action(s) proposed for certification were originally filed.  As stated in Plaintiffs'
opening brief, Plaintiffs propose that the Court certify a class in the *Harden Manufacturing* case,
which was filed in this district, applying Massachusetts choice of law rules, so that the class
action may be tried in this district.  *See Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach*,
523 U.S. 26 (1998) (actions transferred pursuant to 28 U.S.C. § 1407 must be remanded to their
respective transferor districts for trial).  Alternatively, should the Court find that Massachusetts
choice of law rules would require application of the laws of all 50 states, and that application of
these laws would defeat certification of Plaintiffs' state law claims, Plaintiffs move for
certification in the *ASEA* case, as to which New Jersey choice of law rules apply.

821-22 (citations omitted). Plaintiffs' allegation that Defendants conceived and orchestrated

their scheme to defraud from their New Jersey headquarters easily satisfies this standard.[49]

**2.    New Jersey Choice of Law Rules Lead to the Application of New Jersey Law**

In *Vioxx II*, the Court affirmed Judge Higbee's decision,[50] cited in Plaintiffs' opening

brief, which certified a national class under the NJCFA, applying New Jersey's choice of law

rules. The Court emphatically endorsed Judge Higbee's "governmental interest analysis"

considering the contacts set forth in the *Restatement (Second) of Conflict of Laws* §§ 6, 145, and

148(2), which applies "'[w]hen the plaintiffs' action in reliance took place in whole or in part in

a state other than that where the false representations were made.'" 894 A.2d at 296 (quoting §

148(2)). Because the Court's analysis in *Vioxx II* is directly applicable here, Plaintiffs quote it at

length:

> Merck argues that each of the significant relevant contacts referenced in the *Restatement's* § 148(2)(a)-(f), pertaining to misrepresentation, except for Merck's place of incorporation and initiation of the alleged fraud, occurred in the state where each prospective plaintiff third-party payor conducts business. Thus, Merck asserts that New Jersey cannot possibly be the State with the strongest interests over this litigation.
>
> The choice of law analysis, however, is not a simple tabulation of contacts and "[n]o definite rules as to the selection of the applicable law can be stated." *Ibid.* As the Restatement points out "any rule of choice of law, like any other common law rule, represents an accommodation of conflicting values." *Restatement,*

---

[49] *See, e.g., Grace v. Perception Technology Corp.*, 128 F.R.D. 165, 171 (D. Mass. 1989) (applying Massachusetts choice of law rules, applying Massachusetts law to claims of national class; holding *Shutts* test satisfied because defendant was headquartered in Massachusetts, individual defendants resided in Massachusetts, and misrepresentations emanated from Massachusetts); *International Union of Operating Engineers Local #68 Welfare Fund v. Merck & Co., Inc.*, 894 A.2d 1136, 1153 (N.J. Super. Ct. App. Div. 2006) ("*Vioxx II*," discussed *infra*) (where defendant headquartered in and misconduct emanated from New Jersey, application of New Jersey law to national class "is not unconstitutionally 'arbitrary or unfair.'" (quoting *Shutts*)).

[50] *International Union of Operating Engineers Local #68 Welfare Fund v. Merck & Co., Inc.*, No. ATL-L-3015-03-MT, 2005 WL 2205341 (July 29, 2005).

*supra*, § 6 comment c. Our analysis must be geared toward determining how the contacts relate to and affect the governmental policies underlying each state's statute.

As Merck argues, plaintiff's principal place of business is a contact "of substantial significance when the loss is pecuniary in its nature." *Restatement, supra*, § 148 comment i. This is so because the state of the victim's residence will bear the social consequences of the victim's loss. *Ibid.* However, "the place of loss does not play so important a role in the determination of the law governing actions for fraud and misrepresentation as does the place of injury in the case of injuries to persons or to tangible things." *Restatement, supra*, § 148 comment c.

"[W]hen the primary purpose of the tort rule involved is to deter or punish misconduct, the place where the conduct occurred has peculiar significance." *Id.* § 145 comment e. With such a law, seeking to deter or punish misconduct, "the state where the conduct took place may be the state of dominant interest and thus that of most significant relationship." *Id.* § 145 comment c. "The place where the defendant made his false representations ... is as important a contact in the selection of the law governing actions for fraud and misrepresentation as is the place of the defendant's conduct in the case of injuries to persons or tangible things." *Id.* § 148 comment c.

New Jersey's contacts with this dispute are both extensive and weighty. Besides having the plaintiff class representative organized and operating in New Jersey, Merck is a New Jersey corporation with its corporate home located in this state. Vioxx was primarily developed in New Jersey. Scientific research, studies, and presentations relating to the safety of Vioxx and its clinical studies were conducted in this State. The ultimate decision-making power regarding Vioxx's marketing and development was exercised in New Jersey.

The fraud allegedly was conceived of and executed from New Jersey. Merck's senior-level committee in charge of overseeing the "broad development of [its] products," including Vioxx, and providing "a final sign-off on plans and activities related to the product," met in New Jersey. This group is allegedly connected to deliberate suppression and/or misrepresentation of damaging information concerning Vioxx. In addition, a board of scientific advisors expressed its concerns to Merck in New Jersey. Manipulation of clinical studies allegedly took place in New Jersey as well. It was this manipulation that aimed to spur sales of the drug and, in part, hide its risks. Thus, the claimed misrepresentations and omissions in the marketing and advertising of the drug all emanated largely from New Jersey.

By contrast, the contacts each prospective member of the plaintiffs' class has had with this litigation relate to receipt of the alleged fraudulent communications and the resulting economic loss. Merck undoubtedly sent representatives and various communications from New Jersey, and perhaps elsewhere, to the states of various third-party payors. However, once Vioxx was added to the various formularies,

the third-party payors had no choice but to pay for any Vioxx prescription in accordance with their formularies. The prescription process was controlled by health care providers who are not part of this litigation. Plaintiff, on behalf of the class, is claiming only economic loss resulting from Merck's alleged fraud. There are no out-of-state-resident-plaintiffs who had Vioxx prescribed and suffered some adverse physical or mental consequence. There are no disabled plaintiffs who may become dependent on any state's welfare system or other safety net program.

New Jersey's interests in this litigation, in our opinion, far outweigh the interests of all other states. All consumer fraud laws in the nation are designed to protect consumers to some degree. "Their differences do not represent competing or conflicting resolutions of a particular policy issue. Rather [the laws] reflect a legislative determination to attack the same evil." *Boyes, supra*, 27 F.Supp.2d at 548.[51]

This litigation seeks to place no obligations on any other state's businesses. Instead, third-party payors from other states may be compensated for losses suffered allegedly because of Merck's fraud. No state has an interest in denying its own citizens recovery while protecting a foreign New Jersey corporation when the conduct at issue took place, to a significant degree, in New Jersey. "Application of New Jersey law will not undermine [other states'] interest[s] in compensating [their] injured residents because that interest is not actually implicated or compromised by allowing a [consumer fraud] action brought by [non-residents of New Jersey] to proceed against" a New Jersey corporation. *Gantes, supra*, 145 N.J. at 497-98, 679 A.2d 106.[52] In short, Merck has not established how denying a putative plaintiff relief against a New Jersey corporation would further the concerns of any given state's consumer protection law.

* * *

Accordingly, we agree with Judge Higbee that, based upon the evidence she had before her, New Jersey law may properly be applied to the entire plaintiff class, as this state has the most significant relationship to the alleged fraud and the parties.

894 A.2d at 1148-49, 1153 (citations omitted).

Defendants seek to distinguish *Vioxx* on the ground that "at bottom, the alleged fraud in Local 68 involved a single decision – New Jersey by one New Jersey corporation – to market an unsafe drug." Def. Mem. at 40. The Court's description of the "the basic facts . . . necessary to

---

[51] *Boyes v. Greenwich Boat Works, Inc.*, 27 F. Supp. 2d 543 (D.N.J. 1998).

[52] *Gantes v. Kason Corp.*, 679 A.2d 106 (N.J. 1996).

understand the dispute" belies Defendants' narrow characterization:

> Plaintiff alleges that while attempting to market and sell Vioxx, Merck fraudulently misrepresented and suppressed material information regarding the drug and its comparative safety and efficacy as compared with traditional competitors. According to plaintiff, *third-party payors across the nation were specifically targeted with this false marketing, advertising, and promotion* in an attempt to justify the high cost that was being charged for the new drug.

894 A.2d at 1139 (emphasis added).

The principal difference between *Vioxx II* and this case is that while Warner-Lambert and Merck were both headquartered in New Jersey, and orchestrated the misconduct alleged from there, Merck was also a New Jersey domiciled corporation. However, "[i]n the case of corporations, the principal place of business is a more important contact than the place of incorporation." *Restatement* § 148(2), comment i.[53]

As in *Vioxx II*, "[t]he fraud allegedly was conceived of and executed from New Jersey," the defendant's headquarters, by its "senior level committee[s] in charge of overseeing the 'broad development of [its] products," including Neurontin. 894 A.2d at 1148-49; *see* TACAC ¶¶ 21-31 (detailing development of off-label marketing scheme at corporate level by Neurontin Development Team, Parke Davis Marketing and Planning department, New Product Committee, and Parke-Davis Marketing Council). As in *Vioxx II*, "[i]t was this manipulation that aimed to spur sales of the drug . . . . Thus, the claimed misrepresentations and omissions in the marketing

---

[53] Indeed, the Court may take judicial notice of the fact that most large corporations, including Defendants, choose to incorporate or reincorporate in Delaware to take advantage of its business-friendly corporate governance law, regardless of whether they have any business operations at all in that state, rendering a Delaware corporation's domicile meaningless in determining the appropriate law to apply in disputes with third parties sounding in tort. Similarly, Plaintiffs respectfully submit that the domicile of a single plaintiff, which is purely fortuitous, should not control the choice of law determination for a class of many thousands. Should the Court find that the withdrawal of Local 68 as a class representative tips the balance against application of New Jersey law, Plaintiffs respectfully request leave to designate another New Jersey class member as a class representative.

and advertising of the drug all emanated largely from New Jersey." 894 A.2d at 849.

By contrast, the contacts of the home state of each Plaintiff class member are even more attenuated than in *Vioxx II*. As described in the TACAC, one of Defendants' principal marketing tactics was to hold meetings of prescribing physicians disguised as CME conferences at resort destinations around the country. *See* TACAC ¶¶ 45-46, 51-52, 54-55, 64, 98, 170, 184, 186, 228, 245-47. As a result, many prescribing physicians were exposed to Defendants' misleading marketing messages in states in which they do not practice;[54] which caused them to write off-label Neurontin prescriptions for patients in their home states; paid for primarily by third party payors, who may bear the loss in yet a third state, and to a lesser extent, consumers. In such cases, which are no doubt many,[55] application of the law of the class members' state of residence would lead to the absurd result that damages for the same Neurontin prescription would be subject to the laws of two different states — the consumer's domicile (generally having suffered a smaller, co-payment share of the loss), and the third party payor's (generally suffering the remainder).

As between the available alternatives, the "deterrent" interests are clearly concentrated in New Jersey, and are well-served by application of its laws, while the "compensation" interests of the other states — scattered though they are — will *also* be best served by the application of New Jersey law, permitting the certification of a nationwide class, and a class-wide a recovery,

---

[54] Indeed, given the lavish attention showered by Defendants on the highest prescribing physicians (*see* TACAC ¶ 235), and the eight-year duration of Defendants' off-label marketing campaign, it appears likely that many of those most strongly affected were exposed to Defendants' misrepresentations in multiple states.

[55] While ASEA, Harden, and BCBSLA insure primarily within their respective states, the Third Party Payor Subclass doubtless includes many companies, such as plaintiffs Aetna, Guardian, and Kaiser, who provide prescription drug benefits in more than one state.

rather than the merely *theoretical* application of each state's law, resulting in none.[56] If each

state's interest in seeing its residents compensated is real, and not imaginary, those interests can

best be served by the choice of law determination most likely to provide that compensation —

or, at a minimum, one that will not defeat it. So long as the law chosen has sufficient contacts to

the controversy under *Shutts*, which New Jersey plainly has, the choice of that law offends no

due process right of Defendants.

While *Vioxx II* may not be *controlling*, it is far and away the most analogous choice of

law decision by any New Jersey state court.[57] Its conclusion that "New Jersey's interests . . . *far*

*outweigh* the interests of all other states" (894 A.2d at 1149 (emphasis added)) does not describe

a "close call," and rests firmly on a detailed and thoughtful examination of the choice of law

issue. This Court need not *agree* with *Vioxx II* to recognize that it is more appropriate to follow

the closest and highest decision of a New Jersey state appellate court on a question of New

Jersey state law than to contravene it.[58]

---

[56] As the Court noted in *AWP*, Defendants' true purpose in arguing for the application of 50 state laws is to defeat class certification entirely, so that they will never be held to answer under *any* state's law. *See* 230 F.R.D. at 83 ("Having smelled victory on the choice-of-law issue, defendants expect a knock-dead punch on their argument that the differences among the state consumer laws are so significant that they cause individual issues to predominate."). This would utterly defeat the purpose of *every* state's consumer protection law, which cannot possibly advance the interests of *any* state.

[57] *Margulies v. Chase Manhattan Mortg. Corp.*, No. A-4087-03T3, 2005 WL 2923580 (N.J. Super. Ct. App. Div. Nov. 7, 2005), cited by Defendants, involved a mortgage loan by a New Jersey-based lender to Maryland residents secured by their Maryland home, where the loan documents contained a Maryland choice of law provision. *Id.* at *6. The court did not "consider this a close case," finding that "[p]arties entering into a transaction in Maryland affecting Maryland real estate would naturally expect Maryland law to apply." *Id.* at *8.

[58] *See Eastern Mountain Platform Tennis, Inc. v. Sherwin-Williams Co., Inc.*, 40 F.3d 492, 499 (1st Cir. 1994) ("While … not controlling, the decisions of lower state courts are often the best indicator of how the high court will resolve an issue."); *Losacco v. F.D. Rich Const. Co., Inc.*, 992 F.2d 382, 384 (1st Cir. 1993) ("The decisions of intermediate state appellate courts are trustworthy data for ascertaining state law."); *CPC Intern., Inc. v. Northbrook Excess & Surplus Ins. Co.*, 962 F.2d 77, 91 (1st Cir. 1992) (quoting *West v. A.T. & T. Co.*, 311 U.S. 223, 237

### 3.     Massachusetts' Choice of Law Rules Parallel New Jersey's

Contrary to Defendants' overly simplistic argument, Massachusetts' choice of law rules do not reflexively require application of "the substantive law of consumers' home states to state law consumer fraud claims." Def. Mem. at 38. Like New Jersey, Massachusetts has rejected any such rigid rules in favor of a "flexible approach,"[59] inviting Massachusetts courts to "feel free . . . to borrow from any of the various lists to help focus . . . attention on the considerations particularly relevant to the case." *Reicher v. Berkshire life Ins. Co. of America*, 360 F.3d 1, 5 (1st Cir. 2004) (citations and internal quotations omitted). In cases alleging common law fraud and statutory consumer fraud, the First Circuit has expressly held that "a Massachusetts court would apply a test not materially different from that of the *Restatement (Second) of Conflict of Laws* § 148[(2)] in determining the law applicable". *Computer Systems Engineering, Inc. v. Qantel Corporation*, 740 F.2d 59, 70 (1st Cir. 1984). This is the same test applied by the court in *Vioxx II*.

Plaintiffs acknowledge that in *AWP*, the Court reached a different conclusion under § 148(2), but in that case, the factors stacked up differently. In *AWP*, the Court found factor (a), "the place where the plaintiff acted in reliance upon the defendant's representations," the most important, pointing to each class member's state of residence. 230 F.R.D. at 82-83. But here, the class members took no specific action in reliance upon Defendants' misrepresentations, the consumers merely took the medicine prescribed for them by their physicians, and they and the third party payors paid for it. In *AWP*, the Court also considered factor (b), "the place where the

---

(1940)) ("'Where an intermediate appellate court rests its considered judgment upon the rule of law which it announces, that is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.'").

[59] *Tingley Systems, Inc. v. CSC Consulting, Inc.*, 152 F. Supp. 2d 95 (D. Mass. 2001)

plaintiff received the representations," as pointing toward each class member's state of residence (*id.* at 83), but here, as described above, the highest-prescribing physicians were likely exposed to Defendants' off-label marketing at events held *out-of-state*. This leaves only factor (d), the plaintiffs' domicile, as pointing to the laws of all 50 states. *Id*. Plaintiffs respectfully suggest that it would be entirely appropriate for the Court to heed the First Circuit's suggestion that it "feel free" (360 F.3d at 5) to choose and weigh the various factors differently in different cases,[60] and apply New Jersey substantive law in the *Harden Manufacturing* case.[61]

### III.   THE CLASS IS ASCERTAINABLE

Defendants object that the class is not ascertainable because each consumer class member's and each third party payor's subscribers' individual medical records must be examined to determine whether they paid for an off-label Neurontin prescription. With 83%-90% of Neurontin prescriptions being written for off-label uses, and even the smallest TPPs such as *Harden* paying for Neurontin prescriptions for at least 20 individuals, it is a safe bet that almost every TPP has paid for at least *one* such prescription, and so is a member of the defined class and the Third Party Payor Subclass. Consumers can also easily identify themselves as either class members who received Neurontin for its only approved indications, adjunctive epilepsy therapy or shingles pain, or for some other condition, without reference to murky subjective criteria.

As the Manual for Complex Litigation states, "An identifiable class exists if its members

---

[60] *In re Relafen Antitrust Litigation*, 221 F.R.D. 260 (D.Mass. 2004), an antitrust case and the only other Massachusetts choice of law decision relied upon by Defendants, did not even consider the Restatement § 148 factors, rendering the decision of little precedential value here.

[61] In the alternative, should the Court find that Massachusetts choice of law rules require application of the laws of all 50 states, this should not pose a barrier to class certification, for the same reasons found by the Court in AWP: plaintiffs "are pressing only the theory that defendants intentionally made fraudulent misrepresentations . . . . Therefore, different standards governing scienter do not present individual issues," and "there is no indication that different definitions of reliance and causation will matter or cannot be resolved as a matter of law prior to trial." 230 F.R.D. at 85.

can be ascertained by reference to objective criteria. The order defining the class should avoid

subjective standards (e.g., a plaintiff's state of mind) or terms that depend on resolution of the

merits (e.g., persons who were discriminated against)." *Manual for Complex Litigation*, § 2.22

(4th ed. 2006); *see also* Newberg, §§ 6:14 and 13:45 ("[S]ubjective terms should not be used in

defining the class."). The proposed class definition – based on the purchase of Neurontin for off-

label uses – is objective, ascertainable, and requires no inquiry into any individual class

member's state of mind, or whether the drug "worked" for them.[62]

       In similar vein, Defendants object that Plaintiffs' proposed class definition is overbroad

because it "makes no causal reference to defendants' alleged misconduct." *See* Defs.' Mem. at

42. Defendants' attempt to introduce subjective and merits-based elements into the class

definition would prevent the certification of all consumer class actions. In almost every

consumer fraud case, there will be some class members who were not exposed to the

representations at issue; some class members who were exposed to the representations but did

not consider them material; and some class members who saw but were not fooled by them.

Plaintiffs need not provide, as Defendants would require, a list of all class members who were

deceived by Defendants' fraudulent statements, but must instead only set forth a class definition

so that class membership is ascertainable through objective criteria. This Plaintiffs have done.

*See* Newberg, § 13:45 ("A complaint need not outline every detail qualifying a person to be a

class member…, since that information needed to meet that requirement can only be obtained

through discovery."); § 6:17 ("It is unnecessary… that class members be individually

identified."); *Zapka v. Coca-Cola Co.*, 2000 WL 1644539, at *3-4 (N.D. Ill. Oct. 27, 2000) ("A

class may be certified although the initial definition includes members who have not been injured

---

[62] This limitation distinguishes this case from *Zapka*, cited by Defendants, in which the court
noted that the class had been defined first by reference to class members' state of mind.

or do not wish to pursue claims against the defendant.").[63]

Finally, Defendants complain that class membership is not ascertainable because the class definition contains no end date. Plaintiffs propose an end date of December 31, 2004, which coincides with the introduction of generic gabapentin, and Pfizer's abandonment of its Neurontin marketing efforts.[64]

## IV.  PLAINTIFFS' CLAIMS ARE TYPICAL AND THEY WILL ADEQUATELY REPRESENT THE CLASS

The typicality requirement under Rule 23(a)(3) is satisfied when the claims of the representative plaintiffs "arise from the same course of conduct that gave rise to the claims of the absent [class] members." *In re New England Mutual Life Ins. Co. Sales Pract. Litig.*, 183 F.R.D. 33, 39 (D. Mass. 1998) (quoting *Duhaime v. John Hancock Mutual Life Ins. Co.*, 177 F.R.D. 54, 56 (D. Mass. 1997)). This Court has noted that "[t]ypicality refers to the nature of the *claim* of

---

[63] Defendants' other authority, none from the First Circuit, is readily distinguishable. The court in *In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012 (7th Cir. 2002) focused on individual problems inherent in applying the consumer fraud laws of several states, in the varied uses and specifications of the tire at issue, and the question of whether those with increased risk of harm should be part of the class, concerns and questions not present here. *In re Rezulin Products Liability Litigation*, 210 F.R.D. 61 (S.D.N.Y. 2002) was a personal injury class action, raising individualized causation questions highlighted by the court and not present in this case. *Martin v. Am. Med. Sys., Inc. v. Pfizer, Inc.*, 1995 WL 680630, at *5 (S.D. Ind. Oct. 25, 1995), also a product liability case, focused on problems with the typicality and adequacy of representation and on standing for class members who had not suffered physical injury. *Clay v. American Tobacco Co.*, 188 F.R.D. 483, 490 (S.D. Ill. 1999) was a tobacco case in which the class was again not bounded by date and judged to be too amorphous, not distinguishing among, for example, current and former smokers. In *Oshana v. Coca-Cola Bottling Co.*, 225 F.R.D. 575, 580-81 (N.D. Ill. 2005), the defendant argued that membership in the class would require looking into whether class members saw particular advertisements, whereas this case's class definition is based on the objective criteria of purchase of Neurontin for off-label uses.

[64] *See* Pfizer Investor News Release, *Pfizer Inc Fourth-Quarter 2004 Performance Report* (available at http://www.pfizer.com/pfizer/are/investors_releases/2005pr/mn_2005_0119.jsp) ("Full-year worldwide revenues for Neurontin were $2.723 billion in 2004, up 1 percent, and were $481 million in the fourth quarter of 2004, down 39 percent. The decline in the fourth quarter is due to the at-risk launch of generic gabapentin by Ivax, Alpharma, and Teva in the U.S."). In the alternative, Plaintiffs propose an end date of May 13, 1994, the day of Warner-Lambert's guilty plea in *Franklin*.

the class representatives, and not to the specific *facts* from which the claim arose or relief is sought." *M. Berenson Co., Inc. v. Faneuil Hall Marketplace, Inc.*, 100 F.R.D. 468, 470 (D. Mass. 1984) (emphasis added). The claims of the class representatives and those of the class arise out of the same course of conduct.

Allegations that a company's upper-level decision-makers were the original source of the misleading information, and that plaintiffs made purchases they otherwise would not have made after the misleading information flowed downstream, satisfy the typicality requirement. *In re New England*, 183 F.R.D. at 39. The fact that the misleading information reaches class members (or in this case, their physicians) in different ways does not defeat typicality. *Duhaime*, 177 F.R.D. at 63.

Defendants rely heavily on caselaw from outside the First Circuit in arguing that Plaintiffs' claims are atypical because they are based on "widely divergent facts," *Sprague v. General Motors Corp.*, 133 F.3d 388, 399 (6th Cir. 1998), or because plaintiffs' claims are based on a "complex course of conduct engaged in by the defendants over a long period of time, as opposed to a single act to which all class members have been exposed equally." *Clay v. American Tobacco Co., Inc.*, 188 F.R.D. 483, 492 (S.D. Ill. 1999). The district courts in this Circuit, however, including this Court, have repeatedly held that a class representative's claims need not be identical to those of the class as a whole in order to satisfy typicality, but need only be "based on the same legal theory and arise from the same course of conduct." In this case, liability will turn on whether Defendants' purposely misled the medical community about the efficacy of Neurontin for off-label uses, not on the individual decisions and circumstances of people along the chain of distribution. *In re Synthroid Mktg. Litig.*, 188 F.R.D. 295, 299 (N.D.

Ill. 1999).[65]

Defendants argue that plaintiffs are not typical because each consumer plaintiff took Neurontin for specific off-label uses, and so lacks the incentive to prove other class members' claims based on other off-label uses. As a preliminary matter, this argument does not apply to the third-party payers, who, likely having paid for *all* off-label uses, will have ample incentive to pursue claims for all uses. As for the consumers, their claims arise from the same general course of conduct, and they and their attorneys are committed to proving up the full scope of Defendants' misconduct, and obtaining the fullest possible relief for the class.[66]

Finally, the third party payers are adequate class representatives. A class representative "need not have personal knowledge of all the relevant facts to be an adequate representative." *In re Biogen Securs. Litig.*, 179 F.R.D. 25, 40 (D. Mass. 1997) (Saris, J.) (quoting *Adair v. Sorenson*, 134 F.R.D. 13, 18-19 (D. Mass. 1991)). "It is sufficient if the named plaintiffs understand the issues behind the complaint, that they are dedicated to the vigorous prosecution of the case and are represented by counsel who are qualified to do so." *Grace v. Perception*

---

[65] The four personal injury actions cited by Defendants, *Am. Med. Sys.*, 75 F.3d at 1081, *Baycol*, 218 F.R.D. at 205-06, *Rezulin*, 210 F.R.D. at 67, and *Orthopedic Bone Screw*, 1995 WL 273597, at *11 n.13, did not involve this form of misrepresentation. This distinction also renders inapposite Defendants' other authority, drawn exclusively from the Seventh Circuit, cited for the proposition that all Class members must have been subject to the same misstatements. For example, in *Oshana*, 225 F.R.D. at 582, class members had to show exposure to direct misrepresentations through advertising. The courts in *Insolia*, 186 F.R.D. at 545, and *Clay*, 188 F.R.D. 492-93, both involving large smoker classes, found typicality not satisfied where class members had to show causation by proving exposure to industry propaganda, but also had to account for an almost limitlessly diffuse set of influences, including, as the *Clay* court emphasized, "society." *Clay*, 188 F.R.D. at 493.

[66] Should the Court believe it is necessary, subclasses of consumers, separated by the various off-label uses for which Neurontin was purchased, could be created, with additional class representatives for each of the major categories of off-label uses. "If there is any doubt as to the plaintiff's representative capacity, the court may . . . appoint new or additional representatives, or create subclasses if conflicts arise. Plaintiffs should be given a reasonable amount of time to construct subclasses if they are necessary." 5 Moore's Fed. Prac. § 23.25[6] (3d ed. 2006).

*Technology Corp.*, 128 F.R.D. 165, 171 (D. Mass. 1989).  *See also In re Tyco Int'l, Inc.*, 2006

WL 2349338, at *2 (D.N.H. Aug. 15, 2006) ("Class representatives are not required to possess

'expert knowledge' about the case, and may rely heavily on class counsel for guidance.").  The

TPPs more than meet this standard.

## V.   THE THIRD PARTY PAYORS HAVE STANDING TO SUE UNDER THE NJCFA

Defendants renew their argument that TPPs do not have standing to sue under the

NJCFA, citing several cases holding only that purchases of goods not ordinarily sold to the

general public, and purchases of consumer goods sold at wholesale *for resale*, fall outside the

scope of the NJCFA. [67]  This case involves neither situation.  Neurontin is emphatically a

---

[67] In *Papergraphics International, Inc. v. Correa*, 910 A.2d 625 (N.J. Super. 2006), the Court explained that "the CFA does not cover every sale in the marketplace.  Rather, CFA applicability hinges on the nature of a transaction, requiring a case by case analysis."  *Id.* at *9.  The court held that the transaction at issue — the purchase of 10,000 printer ink cartridges for resale — was "not the type of 'consumer transaction' covered by the statute."  *Id.* at *11.  Similarly, in *East Coast Office Systems, Inc. v. Citicorp Vendor Finance, Inc.*, Civ. No. 06-24 (GEB), 2006 U.S. Dist. LEXIS 82044 (D.N.J. Nov. 9, 2006), the court confirmed "that 'it is the character of the transaction rather than the identity of the purchaser which determines if the [CFA] is applicable.'"  *Id.* at *5 (quoting *Elec. Mobility Corp. v. Bourns Sensors/Controls, Inc.*, 87 F. Supp. 2d 394, 400 (D.N.J. 2000)).  The court found that the transaction at issue — the wholesale purchase of used office equipment for resale by an office equipment dealer — was not covered by the CFA, under the same per se exclusion of purchases at wholesale for resale.  *Id.* at *8.  In *Cetel v. Kirwan Fin. Group, Inc.*, 460 F. 3d 494 (3d Cir. 2006), the court held that the "product" at issue, which the court described as a "complex tax avoidance scheme designed primarily to allow an investor to make tax-deductible contributions while allowing for a permanent tax deferral upon withdrawal," did not "qualify as 'products and services sold to consumers in the popular sense[,]' such that they fall within the ambit of the CFA."  *Id.* at 514 (quoting *Arc Networks v. Gold Phone Card Co.*, 756 A.2d 636, 638 (N.J. Super. Ct. Law Div. 2000)).  In *Arc Networks*, the defendant purchased "bulk telephone and computer services" from the plaintiff which "could only be accessed through the "800" numbers and PINS that [defendant] provided to purchasers of its phone cards."  *Id.* at 638.  The court held that this transaction fell outside the NJCFA because defendants' "purpose in contracting for [plaintiff's] services was to resell those services to purchasers of its phone cards."  *Id.* at 592.  Finally, in *In re Express Scripts, Inc. Pharmacy Benefits Management Litig.*, MDL No. 1672, 2006 U.S. Dist. LEXIS 65168 (E.D. Mo. Sept. 13, 2006), the plaintiff, a union health and welfare fund, sued its pharmacy benefits manager for entering into "'secret self-dealings' with drug manufacturers to obtain additional profits."  *Id.* at *10.  The court held that because the contracted-for services were "not available to the general public," they were "not within the ambit" of the NJCFA.  *Id.* at *38-*39.

consumer good sold to the general public — it is consumed in the literal sense by the members of the general public for whom it has been prescribed.  Nor are the purchases at issue — made by these consumers, and reimbursed or paid for in part by the third party payors — sales for resale. If Defendants wish to analogize to these cases, the analogous transaction is the sale of Neurontin by the pharmaceutical distributor to the pharmacy, not the sale by the pharmacy to the consumer-patient.

As Defendants' authorities' hold, "'it is the character of the transaction rather than the identity of the purchaser which determines if the [CFA] is applicable.'" *East Coast Office Systems*, 2006 U.S. Dist. LEXIS 82044 at *5 (citations omitted).  The fact that third party payors may pay or reimburse for the prescription does not change the fundamental character of each sale, which remains a retail-consumer transaction.

In the *Vioxx* litigation, the court upheld similar third-party payor claims in the face of virtually identical arguments:

> The court finds that the limit placed by defendants that a "person" under the Act must be the one who actually takes the medication or uses the product is too simplistic.  The focus should be on a misrepresentation causing a "person" to pay for something they otherwise would not have been willing to pay for because of the higher cost.  This fits the purpose of the Act.  If for example, a "person" buys a gift for a third party based on false advertising, it does not matter that the person who is duped into making the purchase does not personally use the product.

*Int'l Union of Op. Eng'rs Local 68 Welfare Fund v. Merck & Co., Inc.*, No. ATL-L-3015-04, 2004 WL 3767338 (N.J. Super. L. July 8, 2004), at *6.[68]  Obviously, the deterrent and remedial

---

[68] As Defendants point out, the district court in *In re Rezulin Prod. Liab. Litig.*, 392 F. Supp. 2d 597, 616-17 (S.D.N.Y. 2005), declined to follow *Vioxx* in favor of the narrow interpretation of the NJCFA advanced by Defendants.  The *Rezulin* decision is currently on appeal, and an earlier decision in that case has already been reversed by the Second Circuit for taking an overly restrictive view of the NJCFA.  *Desiano v. Warner Lambert Co.*, 326 F.3d 339, 348-51 (2d Cir. 2003).  Plaintiffs respectfully submit that this later decision suffers from similar infirmities, and that it would be more prudent to follow closely analogous decisions of New Jersey state courts on questions of New Jersey state law.

purposes of the NJCFA would be completely eviscerated if the manufacturer and distributor of a

$2.7 billion a year consumer product — Neurontin — could escape liability for its fraudulent

marketing practices merely because most of the cost of the product is paid for by third parties.

Because this case involves the sale of a consumer product to consumers, not sales for resale, the

TPPs have standing to sue under the NJCFA.

## VI.    A CLASS ACTION IS SUPERIOR TO AND MORE MANAGEABLE THAN THOUSANDS OF INDIVIDUAL ACTIONS

Ignoring caselaw that manageability-based denials of class certification are disfavored,

*see In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 139-40 (2d Cir. 2001),

Defendants contend, without any support beyond the lack of a formal trial plan accompanying

Plaintiffs' opening brief,[69] that this case is not manageable.  Defendants' wholly conclusory

argument is not based on a single, specifically identified manageability issue – even a

speculative one – and is insufficient to defeat certification.  *See Yaffe v. Powers*, 454 F.2d 1362,

1365 (stating that courts should not refuse to certify classes because of "vaguely-perceived

management problems").[70]

Defendants ignore the essence of the superiority analysis, which is comparative.  In

assessing whether a class action is the superior form of adjudication, courts "are not assessing

whether [a] class action will create significant management problems, but instead determining

---

[69] In *Castano v. Am. Tobacco Co.*, 84 F.3d 734 (5th Cir. 1996), relied upon by Defendants, the court's only comment on manageability was that the lower court "failed to perform its duty to determine whether the class action would be manageable in light of state law variations."  *Id.* at 744.  Similarly, in *In re Prempro Prods. Liab. Litig.*, 230 F.R.D. 555 (E.D. Ark. 2005), also cited by Defendants, the court complained that "application of multiple state laws can render a case unmanageable," and that plaintiffs failed to present "an adequate trial plan and proper jury instructions" addressing this problem.  *Id.* at 568.  This case faces no such obstacle, as Plaintiffs assert claims under only federal and New Jersey state law.

[70] In addition to not being required, a trial plan would be premature at this stage, as Defendants have not even completed their document production.

whether it will create relatively more management problems than any of the alternatives." *Klay v. Humana, Inc.*, 382 F.3d 1241, 1273 (11th Cir. 2004). "[D]efendants must not merely show that individual actions are *feasible*; they must show that individual members have an interest sufficient to make them *desirable*." *Bertulli v. Independent Ass'n of Continental Pilots*, 242 F.3d 290, 299 (5th Cir. 2001) (emphasis in original). Defendants do not engage in this analysis at all, or otherwise show why a multitude of individual suits, with potentially inconsistent outcomes, is preferable to a class action. After three years of litigation, only a handful of the largest third party payors have filed their own actions. The willingness of the remainder to let this case proceed as a class action is a strong endorsement of collective, rather than individual litigation.[71]

## VII.    CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully request that the Court certify the class and subclasses pursuant to Fed. R. Civ. P. 23(b)(3), appoint Plaintiffs the representatives of the class and subclasses, and appoint interim class counsel to represent the interests of the certified class and subclasses.

---

[71] Defendants also argue that the availability of attorneys' fees under state consumer protection laws is sufficient to make individual actions economical. A case like this, properly litigated on an individual basis, still requires the investment of millions of dollars in attorney time and out-of-pocket expenses, which may well eclipse all but the largest individual TPP verdicts. A mere fee-shifting provision does not make such litigation economically viable, or make the benefits of aggregation somehow disappear. *See Bertulli*, 242 F.3d at 299 (affirming certification and finding that availability of attorney's fees under statute "do[es] not alter the relatively low damages most plaintiffs would receive"); *Tardiff v. Knox County*, 218 F.R.D. 332 (D. Me. 2003) (finding superiority requirement satisfied despite availability of attorneys' fees in individual actions), *aff'd*, 365 F.3d 1 (1st Cir. 2004). The relatively low individual damages available here also makes the superiority analysis in *Castano*, cited by Defendants, inapplicable. There, the Court specifically noted that "individual damage claims are high, and punitive damages are available in most states," making individual cases attractive. 84 F.3d at 748.

Dated: February 21, 2007    Respectfully Submitted,

By: /s/ Barry Himmelstein
   Barry Himmelstein, Esquire
   Lieff Cabraser Heimann &
   Bernstein, LLP
   Embarcadero Center West
   275 Battery Street, 30th Floor
   San Francisco, CA 94111-3339

By: /s/ Thomas Greene
   Thomas Greene Esquire
   Greene & Hoffman
   125 Summer Street
   Boston, MA 02110

By: /s/ Don Barrett
   Don Barrett, Esquire
   Barrett Law Office
   404 Court Square North
   P.O. Box 987
   Lexington, MS 39095

By: /s/ Daniel Becnel
   Daniel Becnel, Jr., Esquire
   Law Offices of Daniel Becnel, Jr.
   106 W. Seventh Street
   P.O. Drawer H
   Reserve, LA 70084

By: /s/ James Dugan
   James Dugan, Esquire
   Dugan & Browne
   650 Poydras St., Suite 2150
   New Orleans, LA 70130

***Members of the Class Plaintiffs'
Steering Committee***

By:     /s/ Thomas M. Sobol
        Hagens Berman Sobol Shapiro LLP
        One Main Street, 4th Floor
        Cambridge, MA  02142
        Boston, MA 02110

***Plaintiffs' Liaison Counsel and Member of
the Class Plaintiffs' Steering Committee***