UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE NEURONTIN MARKETING, SALES ) PRACTICES, AND PRODUCTS LIABILITY ) LITIGATION ) | |
| ) | |
| THIS DOCUMENT RELATES TO: ) | MDL Docket No. 1629 |
| ) | Master File No. 04-10981 |
| ) | Judge Patti B. Saris |
| ALL MARKETING AND ) | Mag. Judge Leo T. Sorokin |
| SALES PRACTICES ACTIONS ) | |

**REPLY DECLARATION OF ILYAS J. RONA**
**FILED IN SUPPORT**
**OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

I, Ilyas J. Rona, do hereby state and depose, the following:

1.      I am an associate at the law firm Greene & Hoffman, P.C., and I am an attorney duly admitted to practice law in the Commonwealth of Massachusetts and to appear before the United States District Court for the District of Massachusetts.  All statements made herein are based on facts personally known or represented to me, and if called upon, I could testify competently thereto.

2.      Attached at Exhibit A is a true and accurate copy of Pfizer_TMF_CRF_0015313, which is a string of email communications involving various Parke-Davis employees between April 20, 2000 and June 26, 2000 relating to Dr. Reckless and Study 945-224.

3.      Attached at Exhibit B is a true and accurate copy of is a true and accurate copy of Pfizer_LeslieTive_0020985, which is a string of email communications involving various Pfizer employees between September 26, 2000 and October 16, 2000 relating to Dr. Reckless and Study 945-224.

4.     Attached at <u>Exhibit C</u> is a true and accurate copy of Pfizer_LeslieTive_0012730, which is a set of slides relating to a sales training meeting in held in Puerto Rico on April 4, 2001.

5.     Attached at <u>Exhibit D</u> is a true and accurate copy of a report reflecting Pfizer's payments to Dr. Ahmad Beydoun, generated from the BETSY database.

6.     Attached at <u>Exhibit E</u> is a true and accurate copy of Exhibit 27 to the Deposition of Lee Dorrill.

7.     Attached at <u>Exhibit F</u> is a true and accurate copy of Exhibit 28 to the Deposition of Lee Dorrill.

8.     Attached at <u>Exhibit G</u> is a true and accurate copy of Exhibit 2 to the Deposition of Kylene Huler, M.D.

9.     Attached as <u>Exhibit H</u> is a true and accurate copy of D. Radley, S. Finkelstein, et al., *Off-Label Prescribing Among Office-Based Physicians*, 166 Arch. Intern. Med. 1021 (May 8, 2006).

Signed under the pains and penalties of perjury this 21st day of February 2007.


/s/ Ilyas J. Rona
Ilyas J. Rona

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE: NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION ) ) ) ) ) | MDL Docket No. 1629<br>Master File No. 04-10981 |
| THIS DOCUMENT RELATES TO: ) ) ) | Judge Patti B. Saris |
| ALL MARKETING AND SALES PRACTICES ACTIONS ) ) ) | Magistrate Judge Leo T. Sorokin |

**EXHIBITS A – D TO DECLARATION OF ILYAS J. RONA**

**FILED IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

**FILED UNDER SEAL**

**CONFIDENTIAL INFORMATION SUBJECT TO COURT ORDER**

This envelope contains documents which are filed
under seal in this case by the Class Plaintiffs and,
by Order of this Court, dated January 18, 2005,
shall not be opened nor the contents displayed or
revealed except as provided in that order or by
further order of the Court.

Dated: February 21, 2007

_____
Ilyas J. Rona, Esq.
BBO # 642964
GREENE & HOFFMAN, P.C.
125 Summer Street., Suite 1410
Boston, MA 02110
(617) 261-0040

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the enclosed documents were served upon the attorney
of record for the defendant via e-mail and regular mail on February 21, 2007.

_____
Ilyas J. Rona

# Exhibit E



# Harden
# Manufacturing
# Corporation

Effective July 1, 1999

HAR00754

HAR00754

# WELCOME

All of us at Blue Cross and Blue Shield of Alabama pledge to you we will provide the best service we can in the administration of your group health care plan. This booklet summarizes your group's benefits. It also summarizes conditions, limitations, and exclusions to those benefits. There are sections explaining eligibility and defining certain words, too. Please be sure to read the entire booklet. This booklet is a "summary plan description" or "plan" as defined by ERISA, the Employee Retirement Income Security Act of 1974 as amended.

Blue Cross and Blue Shield of Alabama is an independent corporation operating under a license from the Blue Cross and Blue Shield Association, an association of independent Blue Cross and Blue Shield Plans. The Blue Cross and Blue Shield Association permits us to use the Blue Cross and Blue Shield service marks in the state of Alabama. Blue Cross and Blue Shield of Alabama is not acting as an agent of the Association. No representation is made that any organization other than Blue Cross and Blue Shield of Alabama and your employer will be responsible for honoring this contract. The purpose of this paragraph is for legal clarification; it does not add additional obligations on the part of Blue Cross and Blue Shield of Alabama not created under the original agreement.

If you have any questions which the person in your company who deals with employee benefits cannot answer, please call our Customer Service at the number listed on the back cover.

# TABLE OF CONTENTS

SUMMARY OF HEALTH BENEFITS ........................................................................... 2

ELIGIBILITY ................................................................................................. 5

WAITING PERIODS ........................................................................................... 8

HEALTH BENEFITS ........................................................................................... 9

BENEFIT CONDITIONS ...................................................................................... 14

COORDINATION OF BENEFITS (COB) ........................................................................ 14

SUBROGATION ............................................................................................... 15

GENERAL INFORMATION ..................................................................................... 16

HEALTH BENEFIT EXCLUSIONS ............................................................................... 20

DEFINITIONS ............................................................................................... 24

STATEMENT OF ERISA RIGHTS .............................................................................. 28

Este folleto describe brevemente en Ingles sus derechos del plan y beneficios bajo el Harden Manufacturing Corporation Health Insurance Plan. Si no comprendes cualquier parte de este folleto, ponese en contacto con Senor Eugene Matthews, el administrador del plan, en su officina a 7155 State Highway 13, Haleyville, AL 35565 durante las horas del officina regular. Tambien puede llamar la officina del administrador del plan a (205) 486-7872.

Group Number 42003/000,001

1

HAR00755

## SUMMARY OF HEALTH BENEFITS

This table is a summary of benefits and is subject to all other terms and conditions of the Plan

| INPATIENT HOSPITAL BENEFITS | | | |
|---|---|---|---|
| Benefit | Maximum Benefit Amounts * | Deductible ** | Copay |
| Participating Hospital | 365 days of care during each hospital confinement | $250 per admission | $50 copay for the 2nd through the 6th days |
| Non-Participating Hospital | 365 days of care during each hospital confinement | $250 per admission | $50 copay for the 2nd through the 6th days; hospital charges less $10 a day for room and board; 25% of other charges |
| Preadmission Certification | Required for all admissions except maternity; emergency admissions require notification within 48 hours of admission; for precertification call 1-800-248-2342 toll-free | | |

\* If you are discharged from and readmitted to a hospital within 90 days, the days of each stay will apply toward your 365 day maximum; inpatient hospital days are limited to a combined Participating and Non-Participating maximum of 365 days for each confinement.

\*\* The deductible is due for each admission or readmission, except for one pregnancy, transfers from one hospital to another, or when two or more family members are admitted as inpatients as a result of injuries received in one accident

\*\*\* In Alabama, benefits for Non-Participating hospitals are available only in cases of accidental injury.

| OUTPATIENT HOSPITAL BENEFITS * | | | |
|---|---|---|---|
| Benefit | Maximum Benefit Amounts | Deductible | Copay |
| Preferred Outpatient Facility: | | | |
| Accidental Injury | | No deductible | No copay |
| Surgery | | No deductible | $100 |
| Medical Emergency | | No deductible | $100 |
| Non-Preferred Outpatient Facility: | | | |
| Accidental Injury (within 72 hours) | | No deductible | No copay |
| Surgery | | No deductible | $100 |
| Medical Emergency | | $400 calendar year Major Medical deductible | 20% |

\* In Alabama, benefits for Non-Participating hospitals are available only in cases of accidental injury.

| PREFERRED HOME HEALTH AND HOSPICE BENEFITS | | | |
|---|---|---|---|
| Benefit | Maximum Benefit Amounts | Deductible | Copay |
| Preferred Home Health and Hospice Care | See "Preferred Home Health Care" section of this booklet for more information | No deductible | No copay |

2

HAR00756

HAR00754

## PMD PHYSICIAN BENEFITS

| Benefit | Maximum Benefit Amounts | Deductible | Copay * |
|---|---|---|---|
| Emergency Room Care | | No deductible | $20 per visit |
| Office Visit and Outpatient Consultations | | No deductible | $20 per visit |
| Surgery and Assistant Surgery | | No deductible | No copay |
| Anesthesia | | | |
| Laboratory and Pathology | | | |
| X-Rays | | | |
| Chemotherapy and Radiation Therapy | | | |
| Second Surgical Opinion | | | |
| In-Hospital Medical Care | | | |
| In-Hospital Consultation | | | |

## PMD PREVENTIVE BENEFITS

| Benefit | Maximum Benefit Amounts | Deductible | Copay |
|---|---|---|---|
| In-Hospital Routine Newborn Care | | No deductible | No copay |
| Routine Well Child Care | Nine visits for the first two years of a baby's life and one each year for ages two through six | No deductible | $20 per visit |
| Routine Immunizations | | No deductible | No copay |
| Routine Pap Smears | One each year for females | No deductible | No copay |
| Routine Mammogram | One baseline for females age 35-39 and one each year for age 40 and over | No deductible | No copay |
| Routine Prostate Specific Antigen | One each year for males age 40 and over | No deductible | No copay |

* PMD copays are required for each office visit per person; PMD copays are not covered expenses.

3

HAR00757

HAR00754

| NON-PMD PHYSICIAN BENEFITS IN ALABAMA | | | |
|---|---|---|---|
| Benefit | Maximum Benefit Amounts | Deductible | Copay |
| Emergency Room Care<br><br>Office Visit and Outpatient Consultations<br><br>Surgery and Assistant Surgery<br><br>Anesthesia<br><br>Laboratory and Pathology<br><br>X-Rays<br><br>Chemotherapy and Radiation Therapy<br><br>Second Surgical Opinion<br><br>In-Hospital Medical Care<br><br>In-Hospital Consultation | | $400 calendar year Major Medical deductible | 50% of the PMD Fee Schedule plus any difference between the PMD Fee Schedule and the provider's actual charge * |

\* The amount you must pay the Non-PMD physician in Alabama does not count toward your $400 out-of-pocket Major Medical maximum.

| MAJOR MEDICAL BENEFITS | | | |
|---|---|---|---|
| Benefit | Maximum Benefit Amounts | Deductible | Copay |
| Office Visits, Ambulance Service, etc.* | $1,000,000 in a lifetime | The first $400 of covered expenses per member each year (three deductibles per family)** | 20% of covered expenses, plus the Major Medical deductible, until your $400 out-of-pocket maximum*** has been met (three per family); thereafter, covered expenses are paid at 100% for the remainder of the calendar year |
| Chiropractic Services | 12 visits or $400 per person each calendar year whichever occurs first | $400 calendar year Major Medical deductible | 20% |
| Allergy Testing and Treatment | $200 per person each calendar year | $400 calendar year Major Medical deductible | 20% |

\* Most Major Medical expenses are paid at 80% of the UCR fee after the calendar year Major Medical deductible is met. Some expenses, such as durable medical equipment, are not paid at a percent of the UCR fee but are paid at a percent of a fee schedule that has been developed for such items. These are also subject to the Major Medical deductible.

\*\* Only one Major Medical deductible is required when two or more family members have expenses resulting from injuries received in one accident.

\*\*\* The out-of-pocket maximum does not include the Major Medical deductible, copays to a Non-PMD physician in Alabama, outpatient mental and nervous services or non-covered expenses.

4

HAR00754

HAR00758

| PRESCRIPTION DRUGS | | | |
|---|---|---|---|
| Benefit | Maximum Benefit Amounts | Deductible | Copay |
| Point-of-Sale Drug Program | Note: No benefits are available for prescription drugs purchased at a Non-Participating Pharmacy | Brand - $400 calendar year Major Medical deductible<br><br>Generic - No deductible | Brand - 20%<br><br>Generic - No copay |

| INDIVIDUAL CASE MANAGEMENT | |
|---|---|
| Benefit | |
| Individual Case Management | Services available through Comprehensive Managed Care, see the Individual Case Management section for details |

# ELIGIBILITY

## Who Is Eligible For This Plan?

You may join this plan if you work 30 hours a week or more and meet all of our other participation and eligibility rules as well as those of your employer, such as a period you must wait to become eligible.

## How Do I Apply For The Plan?

Fill out an application form completely and give it to your employer or group. You must name all eligible dependents to be covered on the application. Your group will collect all of the employees' applications and send them to us.

## Which Of My Dependents Are Eligible?

Your eligible dependents are: (1) your spouse (of the opposite sex); (2) an unmarried child under age 19; (3) an unmarried child age 19 to 23 while a full-time student in a state accredited school, not working full-time and chiefly depending on you for support; (4) an unmarried child under age 19 (or 23 if a "full-time student") while a "qualified medical child support order" exists for the subscriber; (5) an incapacitated child who is not able to support himself and who depends on you for support, if the incapacity occurred before age 19 (or 23 if a "full-time student") and while covered by the plan. The child may be a natural child, a stepchild residing in the household of the eligible employee, a legally adopted child, or a child placed for adoption, or any other unmarried child who depends solely on the employee for support and regularly and permanently resides with the employee in a parent-child relationship and for whom the employee has permanent legal custody.

A grandchild is only eligible if they meet all of the following guidelines: (a) under 19 years of age; (b) chiefly dependent on the employee for support; (c) resides in the same household full-time with the employee in a parent-child relationship; (d) is not employed on a regular full-time basis. The grandchild's parent may not be covered by the employee's contract unless the grandchild has been adopted by the grandparents.

You are obligated to send Blue Cross a copy of any court order for child support. If we receive a court order for child support, we will notify the proper parties and give them our procedures to determine if it is a "qualified medical child support order" as defined by federal law. We will review the order and if it is a "qualified" one we will cover the child on the date the court ordered. If the

5

order is not a "qualified" one, we will notify the proper parties that we have determined the order is not "qualified" and of the basis for that decision.

## When Does My Coverage Begin?

If we accept your application, you will receive an identification card  Your coverage begins the date your group becomes effective with us if you applied before the group's effective date.  If you apply later but within 30 days after you become eligible, the effective date of your coverage will be on the date you became eligible.  If your group has an annual open enrollment period and you are a "late enrollee," you may enroll only during that period.  Your coverage for conditions which are not pre-existing will begin on your group's next monthly billing date.  A "late enrollee" is any member who doesn't enroll during the first 30 days he is eligible or during a special enrollment period  A newborn baby's effective date is its birth date when added within 30 days.  A dependent added by marriage or adoption is effective on the date of that event if added within 30 days.  If you have individual coverage, you must change to family coverage to add a dependent.  If we decline your application, all the law requires us to do is refund any fees paid.

## What is a Special Enrollment Period?

An employee or dependent (1) who doesn't enroll during the first 30 days of eligibility, and (2) who writes us then that they aren't enrolling due to other coverage, and (3) whose other coverage was either COBRA coverage that was exhausted or coverage by other health plans which ended due to loss of eligibility or failure of the employer to pay toward that coverage, and (4) who requests enrollment within 30 days of the exhaustion or termination of coverage, may enroll during a special enrollment period.

A dependent of an employee who becomes a dependent by marriage, birth, or adoption may enroll within 30 days of the event.  If the employee, spouse, or when there is a birth or adoption, is eligible but hasn't enrolled, they may also enroll during that 30 day period.  The effective date will be the date of marriage, birth, or adoption.

## If I Work After Age 65 or Become Eligible for Medicare, Am I Still Covered?

If you are 65 or over, actively working, and your group employs less than 20 employees, as a general rule Medicare is considered to be the primary coverage on the active employee or covered spouse, and group health care coverage will not be continued; however, supplemental coverage may be available.  Should your group employ 20 or more employees, please contact your group administrator to assist in the determination of benefit options.

If you or your spouse are eligible for Medicare due to disability, and your group employs less than 100 employees, Medicare is considered to be primary.  Supplemental coverage may be available. If you or any member of your group is eligible for Medicare due to End-Stage Renal Disease (ESRD), please contact your group administrator for coordination of coverage.

## When Will Coverage Terminate?

Plan coverage ends when the first of the following happens:

1.  The date of divorce or other termination of marriage;

2.  The date a child ceases to be a dependent;

3.  The date of the subscriber's death for his dependents;

4.  The date of death for any subscriber or dependent;

5.  Your group fails to pay us the amount due within 30 days after the day due;

6.  Upon discovery of fraud or intentional misrepresentation of a material fact by you or your group;

6

HAR00760

HAR00754

7. At any time your group fails to comply with the contribution or participation rules in the enrollment agreement;

8. When none of your group's members still live, reside or work in Alabama;

9. On 30 days advance written notice from your group to us;

10. On the day after your employment terminates due to discharge, resignation, or otherwise;

11. On the first day that you cease to be scheduled to work at least 30 hours during a normal work week;

12. On the first day following any leave of absence that started prior to July 1, 1999, if you fail to return to work promptly upon the expiration of such leave of absence;

13. In the case of a leave of absence provided for by the Family Medical Leave Act that commences on or after July 1, 1999, the first day following the expiration of such leave, if you fail to return to promptly upon the expiration of such leave;

14. In the case of a leave of absence, other than a leave of absence provided for by the Family Leave Act, that starts on or after July 1, 1999,

    a. if the leave is for more that fourteen days, the fifteenth day of the leave, or

    b. if the leave if for less than fourteen days, the last day of the leave unless you return to work promptly after the leave ends.

In all cases the termination occurs automatically and without notice. All the dates of termination assume that payment for coverage for you and all other employees in the proper amount has been made to that date. If it has not, termination will occur back to the date to which coverage was last paid.

## Am I Eligible For COBRA?

A federal law (COBRA) allows former employees and dependents to continue their coverage in certain circumstances beyond the date on which their coverage would otherwise have ceased. This means that if the employee is covered by COBRA, he may continue coverage under this plan after the date it would have ceased. Generally, COBRA allows former employees to continue coverage for themselves and their dependents for 18 months after their reduction in hours or their job ends, unless they were terminated for gross misconduct, and allows former dependents to continue their coverage for 36 months after the death of the subscriber, divorce from the subscriber, loss of dependent status, or the subscriber's entitlement to Medicare. This Plan will comply with the COBRA law, which applies to plans with 20 or more employees.

**COBRA Coverage:** COBRA coverage will be the same that other members of the group plan have. Your plan benefits and premium will change if the benefits and premium for the group change. If your employer terminates coverage with us, your COBRA coverage with us will also terminate the same date. Your employer has complete discretion to change insurers or terminate coverage entirely.

**Premium Payment:** If you qualify for COBRA coverage, you will be required to pay 102% of the group's premium. Members who are disabled under Title II or Title XVI of the Social Security Act when or during the 60 days following the subscriber's termination or reduction in hours occurs will be required to pay 150% of the group's premium for the 19th through the 29th months of coverage. If it is determined that you are no longer disabled under Title II or Title XVI of the Social Security Act, you must give us notice and your COBRA coverage will end the month that begins more than 30 days after the date the determination is made.

**Notice and Election Period:** You must notify your employer within 60 days of a divorce or other event that makes a dependent no longer eligible for coverage. If you fail to do so, COBRA coverage will not be offered to the former dependent   Your employer alone must give you notice of your

7

HAR00754

HAR00761

rights to COBRA coverage. You should obtain a "Continuation of Coverage" application from your employer when you become entitled to Medicare or are terminated. In addition, dependents should obtain a "Continuation of Coverage" application from your employer when you become divorced, when they are no longer eligible for coverage, or when you (the employee) die. Assuming you have given any required notice to the employer, you have 60 days after any of these events or, if you are a dependent, 60 days from the date you receive the notice from the group of the qualifying event, whichever is later, to elect coverage. Premiums will be due from the day your regular group coverage ends. You have 45 days to pay the first premium. Each monthly premium must be paid in full within 30 days of the due date.

**Cancellation of Continuation Coverage:** If you do not pay your premium for "Continuation of Coverage" on time, your coverage will automatically end and will not be reinstated. Your coverage will also end if you become covered by other group coverage through employment or marriage, or if you become entitled to Medicare if your eligibility for other coverage occurs after the effective date of your "Continuation of Coverage." It will also end if the employer discontinues the entire group plan.

**Continuation of Coverage**

If (1) your health coverage ends under the first three paragraphs under "When Will Coverage Terminate;" and (2) you have a total of 18 months or more creditable coverage without a 63 day break in coverage; and (3) you are not eligible for coverage under a group health plan, Medicare, or Medicaid and have no other health care coverage; and (4) if eligible for COBRA coverage, you have elected and exhausted that coverage; then you may be eligible for individual coverage in accordance with the Health Insurance Portability and Accountability Act of 1996 and regulations under it. Check with your State Department of Insurance for more details.

Provided your group health plan is administered by Blue Cross, we will make available to you a direct-pay health benefits contract in the following events:

- When the continuation of group health benefits option (as provided by COBRA) for you or your dependent terminates at the end of your COBRA eligibility. (If COBRA coverage ends prior to three years or 18 months a direct-pay contract is not offered.)

- When you are no longer eligible for coverage by the group plan and you are not eligible for the continuation of group health benefits option.

The benefits provided by this direct-pay contract differ from your group coverage. The Conversion Health Contract ensures that you will have some protection against medical bills without additional waiting periods or loss of continuous coverage. To receive this coverage, you must apply to Blue Cross within 30 days after the date the member becomes ineligible for coverage with your group. Information about the Conversion Health Contract and applications are available from your group and Blue Cross.

## WAITING PERIODS

**For Pre-Existing Conditions**

The first 9 months (270 days) you are covered under this plan there are no benefits for "pre-existing conditions." If you are a "late enrollee," there are no benefits for the first 18 months (546 days) of your coverage for pre-existing conditions. A pre-existing condition is any condition, no matter how caused, for which you received medical advice, diagnosis, care, or for which treatment was recommended or received during the six months before your contract coverage began.

8

HAR00754

HAR00762

Pre-existing conditions do not apply to newborns enrolled within 30 days of birth or adopted children under age 18 enrolled within 30 days of the date of adoption or placement for adoption. Pre-existing conditions do not apply to pregnancy.

**Credit for Prior Coverage**

If you were covered by another plan before becoming covered by this plan, we'll credit the time toward the 9 (270 days) or 18 (546 days) month pre-existing conditions waiting period, if:

1. there is no greater than a 63 day break in coverage, and

2. the last coverage was "creditable coverage," i.e., under an individual or group health plan including COBRA, Medicare, Medicaid, U.S. Military, Champus, Federal Employee Program, Indian Health Service, Peace Corps Service, a State risk pool or a public health service.

---

# HEALTH BENEFITS

All benefits are subject to all deductibles, conditions, limitations and exclusions of the plan.

**BEFORE YOUR HOSPITAL ADMISSION--CAUTION:** One of several requirements for hospital benefits is that we certify the medical necessity of your hospital stay in advance, except for emergencies and when you are admitted to a Concurrent Utilization Review Hospital by a Preferred Medical Doctor. Emergency admissions require notice to us within 48 hours and must also be certified by us as both medically necessary and as an emergency admission. You may appeal these decisions. Failure to obtain our certificate of medical necessity will result in no benefits being paid for your hospital stay or the admitting physician. Just because we certify a hospital admission as medically necessary does NOT mean we have decided to pay benefits for it. For example, the admission may be for a pre-existing condition or any other excluded condition.

**Inpatient Hospital Benefits**

1. Bed and board and general nursing care in a semiprivate room; or

2. Use of special hospital units such as intensive care or burn care and the hospital nurses who staff them; and

3. Use of operating, delivery, recovery, and treatment rooms and the equipment in them;

4. Administration of anesthetics by hospital employees and all necessary equipment and supplies;

5. Casts and splints, surgical dressings, treatment and dressing trays;

6. Diagnostic tests, including laboratory exams, metabolism tests, cardiographic exams, encephalographic exams, and x-rays;

7. Physical therapy, hydrotherapy, radiation therapy and chemotherapy;

8. Oxygen and equipment to administer it;

9. All drugs and medicines used by you and administered in the hospital;

10. Regular nursery care and diaper service for a newborn baby while its mother has coverage;

11. Blood transfusions administered by a hospital employee, but not including whole blood or blood plasma.

Note: In Alabama, benefits for Non-Participating Hospitals are available only in cases of accidental injury.

9

HAR00754

HAR00763

### Inpatient Hospital Benefits for Maternity

Group health plans and health insurance issuers offering group health insurance coverage generally may not under Federal law, restrict benefits for any hospital length of stay in connection with childbirth for the mother or newborn child to less than 48 hours following a normal vaginal delivery, or less than 96 hours following a cesarean section, or require that a provider obtain authorization from the plan or insurance issuer for prescribing a length of stay not in excess of the above periods.

### Outpatient Hospital Benefits

1. Treatment of an accidental injury within 72 hours;

2. Hemodialysis;

3. Lab tests, x-rays and other diagnostic tests usually done before elective surgery;

4. Services of a Participating Ambulatory Surgical Facility;

5. Surgery and related services (subject to copay).

Note: In Alabama, benefits for Non-Participating Hospitals are available only in cases of accidental injury.

### Preferred Outpatient Facility Benefits

1. Emergency treatment of an accidental injury;

2. Chemotherapy and radiation therapy;

3. IV therapy;

4. Hemodialysis;

5. X-rays, lab and pathology services;

6. Medical emergency;

7. Surgery.

### Preferred Home Health Care

1. Preferred Home Health Care benefits which are home IV therapy, intermittent home nursing visits by an R.N. or L.P.N. and home phototherapy. The services must be ordered by your physician, approved in advance by us and provided by a Preferred Home Health Care Provider. When these services are provided outside of Alabama, benefits are paid only if authorized in advance by our Managed Care nurses at 1-800-821-7231.

2. Preferred Hospice benefits which are physician home visits, medical social services, physical therapy, inpatient respite care, home health aide visits from one to four hours, durable medical equipment and symptom management. The services and supplies must be furnished by a Preferred Hospice to a member certified by his physician to have less than six months to live. We must approve the services in advance and reapprove them every 60 days or when the level of care is to change. When these services are provided outside of Alabama, benefits are paid only if authorized in advance by our Managed Care nurses at 1-800-821-7231.

Note: Private Duty Nursing Services are not covered under Preferred Home Health Care.

### PMD (Preferred Medical Doctor) Benefits

1. Surgery, which includes preoperative and postoperative care, reduction of fractures and endoscopic procedures;

10

HAR00754

HAR00764

2.  Anesthesia by a PMD for a covered service;

3.  Second surgical opinion services by a PMD;

4.  Obstetrical care for childbirth, pregnancy, and the usual care before and after those services;

5.  Inpatient visits by a PMD while you're a hospital patient for other than surgery, obstetrical care, or radiation therapy except for an unrelated condition;

6.  Consultation for a medical, surgical or maternity condition by a specialty PMD but only one for each hospital stay;

7.  Diagnostic lab, x-ray and pathology services in a PMD's office when related to covered services but not allergy testing;

8.  Radiation therapy and chemotherapy by a PMD;

9.  Care by a PMD in the emergency room of a hospital for other than surgery or maternity (subject to copay);

10. Exam, diagnosis, and treatment for an illness or injury besides routine office visits and allergy treatment in a PMD's office (subject to copay).

Your PMD physician or other Preferred or Participating Provider may bill another group health plan for any difference between the amount we pay and his charge for any service which is a benefit of this plan.

PMD Preventive Services

1.  Routine immunizations by a PMD to prevent diphtheria, tetanus, pertussis, polio, rubella, mumps, measles, Hib (meningitis, epiglottitis and joint infections), hepatitis B and chicken pox;

2.  Inpatient visits by a PMD for routine newborn care;

3.  One routine pap smear a year for females;

4.  One baseline mammogram for females age 35-39; one mammogram a year for age 40 and over;

5.  One prostate specific antigen test each year for males age 40 and over;

6.  One PMD office visit a year when combined with a routine pap smear, mammogram or prostate screening (subject to copay);

7.  Nine office visits for the first two years of a baby's life; annual exams for ages two through six (subject to copay).

**Preferred Radiology Provider Benefits**

CAT scans and MRI scans are paid at 100% of the PMD Fee Amount Payable only if performed by a Preferred Radiology Provider. Not all PMD Providers are approved as Preferred Radiology Providers. Ask before you have a CAT scan or MRI scan whether your provider is a Preferred Radiology Provider. If the CAT scan or MRI scan is performed by other than a Preferred Radiology Provider, it will be paid under Non-PMD benefits.

**Non-PMD Benefits**

For a PMD service provided by a Non-PMD Provider in Alabama, the benefit is 50% of the lesser amount for the service listed in the PMD Fee Schedule or for billed charges. Your 50% copay and the amount you pay in excess of 50% of the PMD Fee Schedule do not count toward your Major Medical out-of-pocket maximum. For a PMD service provided by a Non-PMD Provider outside of Alabama the benefit is based on the UCR fee. Your copay does count toward your Major

11

Medical out-of-pocket maximum. A Non-PMD Provider will not be paid for PMD Preventive Services.

## Major Medical Prescription Drug Point-of-Sale Benefits

1. In Alabama benefits are only for prescriptions purchased from Participating Alabama Pharmacies. Prescriptions purchased from Non-Participating Pharmacies in Alabama are not covered. Participating Pharmacies give you a number which you must give us when you file your drug claim. We call the number a "Claim Authorization Number."

2. To be eligible for benefits, drugs must be legend drugs prescribed by a physician and dispensed by a licensed pharmacist. Legend drugs are medicines which must by law be labeled, "Caution: Federal Law prohibits dispensing without a prescription." Oral contraceptives qualify for benefits when prescribed for a medical condition but not when prescribed for birth control.

3. Drugs can be dispensed in a maximum of a 90 day supply for each drug or refill. Refills are allowed only after 50% of the previous prescription has been used, e.g., 15 days into a 30 day supply.

4. Insulin may be dispensed up to a 90 day supply. Syringes and needles for insulin doses are also covered up to a 90 day supply.

5. Drugs dispensed from Non-Participating Pharmacies outside of Alabama have the same benefits as drugs dispensed from Participating Pharmacies. If you use a Non-Participating Pharmacy you must pay any difference above the amount we would pay a Participating Pharmacy and you must file the claim; we will pay you direct. Please see the "Filing A Claim" section.

## Major Medical Benefits

1. Semiprivate room and board, general nursing care, and all necessary hospital services and supplies when your inpatient hospital benefits are all used.

2. Outpatient hospital services.

3. Anesthesia for surgery or obstetrical care when given by other than the surgeon, obstetrician or hospital employee.

4. Physical therapy and hydrotherapy given by a licensed physical therapist.

5. Radiation therapy and chemotherapy.

6. Lab and x-ray exams and other diagnostic tests such as allergy testing.

7. Drugs that require a written prescription by a physician and must be filled by a licensed pharmacist. In the state of Alabama, drugs must be filled by a Participating pharmacist in order to receive coverage.

8. Blood, blood plasma, and visualizing dyes.

9. Artificial arms and other prosthetics; leg braces and other orthopedic devices.

10. Medical supplies such as oxygen, crutches, casts, catheters, colostomy bags and supplies, and splints.

11. Treatment of natural teeth injured while covered by this plan by a force outside your mouth or body, if service is received within 90 days of the injury.

12. Professional ambulance service to the closest hospital that could treat the condition.

13. The less expensive for rental or purchase of durable medical equipment such as wheelchairs and hospital beds.

12

HAR00766

HAR00754

14. Hemodialysis services of a Participating Renal Dialysis Facility.

15. Treatment of mental and nervous disorders including alcoholism and drug addiction.

16. Physician's covered services. Surgery includes preoperative and postoperative care, reduction of fractures and endoscopic procedures, maternity deliveries and heart catherization. The UCR and PMD fees for surgical care follow these rules:

   a   If two or more related surgical procedures are done in the same session, we allow for only the procedure with the largest fee. If the procedures are not related but done during the same session, we allow the full amount for the procedure with the largest fee and one-half of the fee for each of the others.

   b.   For delivery of twins, triplets, etc., we allow the one largest fee, whatever the number of babies or how they are delivered.

   c.   When two different specialists assist each other to operate in the same field as co-surgeons, we allow each 75% of the fee for the surgery. We won't allow them more for assisting at surgery, as they assisted each other.

17. Phase I therapy and exams for TMJ disorders according to the guides of the American Academy of Craniomandibular Disorders.

## Individual Case Management

Unfortunately, some people suffer from catastrophic, long-term, and chronic illness or injury. If you have a catastrophic, long-term, or chronic illness or injury, a Blue Cross Registered Nurse may assist you in accessing the most appropriate health care for your condition. The nurse case manager will work with you, your physician, and other health care professionals to design a treatment plan to best meet your health care needs. In order to implement the plan, you, your physician, and Blue Cross must agree to the terms of the plan. The program is voluntary to you and your physician. Under no circumstances are you required to work with a Blue Cross case management nurse. Benefits provided to you through Individual Case Management are subject to your benefit contract maximums. If you think that you may benefit from Individual Case Management, please call the Health Management division at (205)733-7067 or 1-800-821-7231.

## Organ, Tissue and Cell Transplants

The organs, tissue and cell transplants for which there are benefits are: (1) heart; (2) liver; (3) lungs; (4) pancreas; (5) kidney; (6) heart-valve; (7) skin, (8) cornea; (9) small bowel; and (10) bone marrow, which includes stem cells and tissue to restore or make stronger the bone marrow function. The transplant must be performed in a hospital or other facility on our list of approved facilities for that type of transplant and it must have our advance written approval. When we approve a facility for transplant services it is limited to the specific types of transplants stated. Donor organ costs are limited to search, removal, storage and the transporting the organ and removal team.

There are no transplant benefits for: (1) any artificial or mechanical devices; (2) organ or bone marrow transplants from animals; (3) donor costs available through other group coverage; (4) if any government funding is provided; (5) the recipient if not covered by this plan; (6) recipient or donor room, food, or transportation costs we did not approve in writing; (7) a condition or disease for which a transplant is considered investigational; (8) transplants performed in a facility not on our approved list for that type or which we have not given written approval in advance.

HAR00767

HAR00754

# BENEFIT CONDITIONS

To qualify as plan benefits, medical services and supplies must meet the following:

1. They must be furnished after your effective date and the contract effective date;

2. Services or supplies for any pre-existing condition must be furnished after the 9 month (270 days) or 18 month (546 days) waiting period;

3. We must determine before, during or after services and supplies are furnished that they are medically necessary;

4. PMD benefits must be furnished while you're covered by this plan and the physician must have a PMD contract with us;

5. Services and supplies must be furnished when the plan and your coverage both are in effect and fully paid for. No benefits will be provided for services you receive after the plan or your coverage ends, even if they are for a condition which began before the plan or your coverage ends.

# COORDINATION OF BENEFITS (COB)

Plan benefits aren't payable to the amount they are provided by another group plan or if another plan is the "primary" plan. Which plan is primary is decided by the first rule below that applies:

1. If the other plan has no COB provision, it is primary.

2. Employee/Dependent: The plan covering the patient as an employee is primary over the plan covering the patient as a dependent.

3. Dependent Child/Parents Not Separated or Divorced: If both plans cover the patient as a dependent child, the plan of the parent whose birthday falls earlier in the year will be primary. If the parents have the same birthday, the plan covering the patient longer is primary. If both plans don't use this "birthday rule" the other plan's rule will be used.

4. Dependent Child/Separated or Divorced Parents: If two or more plans cover the patient as a dependent child of divorced or separated parents, benefits are determined in this order:

   a. First, the plan of the parent with custody;

   b. Then, the plan of the spouse of the parent with custody;

   c. Last, the plan of the parent without custody.

   If there is a court order that specifically states that one parent must provide the child's health expenses, that parent's plan is primary.

5. Active/Inactive Employee or Dependent: The plan covering a person as an active employee is primary over a plan covering the person as laid off or retired.

6. Longer/Shorter Length of Coverage: If none of the above rules determine the order of payment, the plan covering the patient the longer time is primary.

If this plan is secondary, it will not pay more than if it had been primary.

14

HAR00754

HAR00768

## SUBROGATION

### Right of Subrogation

If we pay or provide any benefits for you under this plan, we are subrogated to all rights of recovery which you have in contract, tort, or otherwise against any person or organization for the amount of benefits we have paid or provided. That means that we may use your right to recover money from that other person or organization.

### Right of Reimbursement

Besides the right of subrogation, we have a separate right to be reimbursed or repaid from any money you, including your family members, recover for an injury or condition for which we've paid plan benefits. This means that you promise to repay us from any money you recover the amount we've paid or provided in plan benefits. It also means that if you recover money as a result of a claim or a lawsuit, whether by settlement or otherwise, you must repay us. And, if you are paid by any person or company besides us, including the person who injured you, that person's insurer, or your own insurer, you must repay us. In these and all other cases, you must repay us.

We have the right to be reimbursed or repaid first from any money you recover, even if you are not paid for all of your claim for damages and you aren't made whole for your loss. This means that you promise to repay us first even if the money you recover is for (or said to be for) a loss besides plan benefits, such as pain and suffering. It also means that you promise to repay us first even if another person or company has paid for part of your loss. And it means that you promise to repay us first even if the person who recovers the money is a minor. In these and all other cases, we still have the right to first reimbursement or repayment out of any recovery you receive from any source.

### Right to Recovery

You agree to furnish us promptly all information which you have concerning your rights of recovery or recoveries from other persons or organizations and to fully assist and cooperate with us in protecting and obtaining our reimbursement and subrogation rights in accordance with this section.

You or your attorney will notify us before filing any suit or settling any claim so as to enable us to participate in the suit or settlement to protect and enforce our rights under this section. If you do notify us so that we are able to and do recover the amount of our benefit payments for you, we will share proportionately with you in any attorneys' fees charged you by your attorney for obtaining the recovery. If you do not give us that notice, our reimbursement or subrogation recovery under this section will not be decreased by any attorney's fee for your attorney.

You further agree not to allow our reimbursement and subrogation rights under this plan to be limited or harmed by any other acts or failures to act on your part. It is understood and agreed that if you do, we may suspend or terminate payment or provision of any further benefits for you under the plan.

15

HAR00769

HAR00754

## GENERAL INFORMATION

### Member Rights

Each member enrolled in the plan has the right to:

1. Receive medically necessary and appropriate care and services as defined in this plan;

2. Receive courteous and respectful care and services from Blue Cross and Blue Shield of Alabama staff and Participating Providers;

3. Receive information in clear and understandable terms;

4. Participate in the decision-making process regarding his or her care and treatment;

5. Refuse treatment;

6. File complaints and grievances when dissatisfied with the care and treatment received as outlined in the section, "Your Right of Review and Grievances."

### Claims and Appeals

### Filing A Claim

For you to obtain benefits we must receive a properly filed claim from you or your provider. Most providers file for you. If your services are provided outside of Alabama or are for Major Medical claims, you may have to file the claim yourself. Simply call our Customer Service Department at the number on the back cover of this plan booklet and ask for the claim form you need. Then fill it out, attach an itemized bill and send it to us at 450 Riverchase Parkway East, Birmingham, Alabama 35244-2858. Claims must be submitted and received by us within 24 months after the service takes place to be eligible for benefits.

If the claim does not have all the information on it we need, we will not consider it but will return it, noting what is lacking. When we do get all the information we will see if the claim meets plan requirements. We will send the submitter a written decision as to the amount paid and, if any part is denied, the reason for denial. If we need more information, we'll tell you what we need. You agree that any decision we make in administering the plan which is not arbitrary and capricious will be final. All these decisions are subject to review.

### Filing A Claim For Prescription Drugs

Remember to show the Participating Pharmacist your Blue Cross identification card with the *Rx* on it when you have a prescription filled.

The pharmacist will give you a Claim Authorization Number  You should put this number, along with the prescription number, the date that you had the prescription filled and the total amount of the prescription on the claim form when you fill it out. The claim form that you should use is a Major Medical Point-of-Sale Participating Pharmacy Prescription Drug Claim form (CL-94).

If you are not in Alabama when you get a prescription filled and you go to a Non-Participating Pharmacy, to receive your 100% generic prescription drug benefits, you must file your prescription on claim form (CL-90). Name brand prescriptions should be filed on claims form (CL-438). You will not be given a Claim Authorization Number if you go to a Non-Participating pharmacy

Send the completed claim to Blue Cross and Blue Shield of Alabama at 450 Riverchase Parkway East, Birmingham, Alabama 35244-2858

16

HAR00754

HAR00770

## Who Is Paid

Some of the contracts we have with providers of services, such as hospitals, require us to pay benefits directly to the providers. With other claims we choose whether to pay you or the provider. If you or the provider owes us money we may deduct the amount owed from the benefit paid. When we pay or deduct the amount owed from you or the provider, this completes our obligation to you under the plan. We need not honor an assignment of your claim to anyone. Upon your death or incompetence, or if you are a minor, we may pay your estate, your guardian or any relative we believe is due to be paid. This, too, completes our plan obligation to you.

## Your Right to Review and Grievances

Your satisfaction is our primary goal. We strive to handle any complaints quickly and resolve them so you are satisfied. Complaints should be lodged with our Customer Service Representatives whose number is listed at the end of the plan. They will research the issue with the proper department and notify you of our action. If you are still not satisfied, you can have further review through the grievance process.

You may have any of our decisions reviewed. This includes decisions on claims, preadmission certification, postadmission review for such items as pre-existing conditions, precertification of private duty nursing, medical necessity and whether surgery was cosmetic or reconstructive.

## To Request A Review (Claim or Any Other Grievance)

1. Send a written request to us at 450 Riverchase Parkway East, Birmingham, Alabama 35244-2858. Do this within 60 days after you get the denial. State your full name, contract number and claim number. Include a copy of the Claim Report. As a part of your written request, send all questions, comments and additional information you want us to review. Mark the envelope "Claim Review." You may review our records in our Birmingham office with reasonable notice. We will address additional questions, comments or information then.

2. We will use everything you send us to review your prior decision and will write you of our new decision and the reasons for it within the time allowed by ERISA.

3. In some cases, such as claims by a PMD, the provider may have a right of review or a means of dispute resolution, too. If the provider asks us to review a claim of yours, we won't make a final decision on your claim and you agree to wait until the provider's review is finished before taking further action on your requested review.

## ARBITRATION

**IF YOU ARE STILL NOT SATISFIED WITH THE RESOLUTION OF YOUR COMPLAINT, WE WILL SETTLE THE DISPUTE THROUGH BINDING ARBITRATION UNDER THE FEDERAL ARBITRATION ACT AND ACCORDING TO THE RULES AND PROCEDURES IN THE AMERICAN ARBITRATION ASSOCIATION'S DISPUTE RESOLUTION PROGRAM FOR ARBITRATION OF INSURANCE CLAIMS DISPUTES. IF YOU REQUEST ARBITRATION, YOU WILL BE PROVIDED A COPY OF THE RULES AND PROCEDURES OF THE AMERICAN ARBITRATION ASSOCIATION, OR YOU MAY REQUEST A COPY AT ANY TIME BY WRITING TO US AT OUR BIRMINGHAM ADDRESS. YOU HAVE AGREED TO SUBMIT ALL CLAIMS OR GRIEVANCES YOU HAVE THAT ARISE OUT OF, OR ARE IN ANY WAY RELATED TO, THE CONTRACT, INCLUDING ANY CLAIMS YOU MAY HAVE AGAINST PREFERRED OR PARTICIPATING HEALTH CARE PROVIDERS FOR MEDICAL CARE RENDERED PURSUANT TO YOUR CONTRACT, FOR**

17

HAR00754

HAR00771

FINAL AND BINDING RESOLUTION BY ARBITRATION. SUBMITTING ALL SUCH CLAIMS TO BINDING ARBITRATION IN EXCHANGE FOR THE INCREASED COVERAGE AND BENEFITS AVAILABLE UNDER THE PREFERRED OR OTHER PARTICIPATING HEALTH CARE PROVIDER CONTRACT PROHIBITS YOU FROM FILING ANY ACTION IN LAW OR EQUITY FOR BREACH OF CONTRACT OR TORT BEFORE THE ARBITRATION AWARD IS MADE. WE WILL PAY ALL COSTS OF ARBITRATION EXCEPT THE COST OF YOUR REPRESENTATION. BUT, IF THE ARBITRATOR FINDS THAT YOU ASKED FOR ARBITRATION WITHOUT A GOOD REASON, HE OR SHE MAY RULE YOU HAVE TO PAY ALL COSTS. THE ARBITRATION WILL BE SET IN THE COUNTY WHERE YOU LIVE UNLESS YOU AND WE AGREE TO ANOTHER PLACE. THE ARBITRATION WILL BEGIN WITHIN 60 DAYS AFTER NOTICE OF ARBITRATION FROM YOU TO US OR US TO YOU. ONCE THE ARBITRATION AWARD IS ENTERED, JUDGMENT UPON THE AWARD MAY BE ENTERED IN ANY COURT HAVING JURISDICTION THEREOF. WHILE BLUE CROSS AND BLUE SHIELD OF ALABAMA HAS MADE THIS BINDING ARBITRATION PROCEDURE AVAILABLE TO THE PARTIES, BLUE CROSS AND BLUE SHIELD HAS NO RESPONSIBILITY FOR YOUR SELECTION OF A HEALTH CARE PROVIDER, NOR FOR THE QUALITY OF CARE RENDERED. ANY AWARD MADE AT ANY STAGE OF THE ARBITRATION PROCEEDING IS THE RESPONSIBILITY OF THE HEALTH CARE PROVIDER AND NOT OF BLUE CROSS AND BLUE SHIELD. UNDER THE FEDERAL ARBITRATION ACT, AWARD SHALL NOT BE SET ASIDE EXCEPT UPON THE GROUNDS IN THE FEDERAL ARBITRATION ACT.

### Notice

We give you notice when we mail it or send it electronically to you or your group at the latest address we have. You and your group are assumed to receive notice three days after we mail it. Your group is your agent to receive notices from us about the plan. The group is responsible for giving you all notices from us. We are not responsible if your group fails to do so. Mail notices to us at 450 Riverchase Parkway East, Birmingham, Alabama 35244-2858, with your full name and contract number. We get notice when it arrives at this address.

### Correcting Payments

While we try to pay all claims quickly and correctly, we do make mistakes. If we pay you or a provider in error, the payee must repay us. If he does not, we may deduct the amount paid in error from any future amount paid to you or the provider. If we deduct it from an amount paid to you, it will show in your Claim Report.

### Responsibility For Providers

We are not responsible for what providers do or fail to do. If they refuse to treat you or give you poor or dangerous care, we cannot be responsible. We need not do anything to enable them to treat you.

### Misrepresentation

If you make any material misrepresentation in applying for coverage, when we learn of this we may terminate your coverage back to your effective date. We need not even refund any payment for

18

HAR00754

HAR00772

your coverage. If your group materially misrepresents its application it will be as though the plan never took effect, and we need not even refund any payment for any member.

## Respecting Your Privacy

To administer this plan we need your medical information from physicians, hospitals and others. To decide if your claim should be paid or denied or whether other parties are legally responsible for some or all of your expenses, we need records from health care providers and other plan administrators. By applying for coverage and participating in this plan, you authorize us to obtain, use and release all records about you and your minor dependents that we need in order to administer this plan. If you or any provider refuse to provide records, information or evidence we request within reason, we may deny any more payments to the one refusing. We will strive to keep this information confidential and release it only to others who have a legitimate need for the information. We will not be liable for uses of the information which we have not authorized.

## Multiple Coverage

If you are covered both by this contract and by a non-group contract we issue, you will be entitled to benefits only under the one that provides the most coverage for you.

## Applicable Law

The federal ERISA law governs this plan. If any state law applies, the law of Alabama governs.

## Plan Terminations

1.  The plan may be terminated at any time by either the group or Blue Cross by giving 30 days notice in writing to the other.

2.  The plan may be terminated by Blue Cross immediately by notice in writing to the group when the group has other group health coverage.

3.  If the group fails to pay the amount due within 30 days after it becomes due, the plan will terminate automatically and without notice to you or the group as of the date due for the payment.

## Changes in Plan

1.  Any or all of the provisions of this plan may be amended by the employer at any time and from time to time, by an instrument in writing.

2.  No representative or employee of Blue Cross is authorized to amend or vary the terms and conditions of this plan or to make any agreement or promise not specifically contained herein or to waive any provision hereof.

## Out-of-Area Copay

When you obtain health care services through the BlueCard Program outside of the Alabama service area, the amount you pay for covered services is usually calculated on the lower of:

1.  The actual billed charges for your covered services, or

2.  The negotiated price that the other Blue Cross/Blue Shield Plan passes on to us

Often, this "negotiated price" will consist of a simple discount. But sometimes it is an estimated final price that factors in expected settlements, or other non-claim transactions, with your health care provider or with a specified group of providers. "Non-claim transactions" include, but are not limited to, the lost investment income on advance deposits made with providers in order to induce them to give a discount to a Blue Cross and/or Blue Shield Plan. The negotiated price may also be a discount from billed charges that reflects average expected

19

HAR00754

HAR00773

savings. The estimated or average price may be adjusted in the future to correct for over-estimation or under-estimation of past prices.

In addition, laws in a small number of states require Blue Cross and/or Blue Shield Plans to calculate your payment for covered services in a way that does not reflect the entire real or potential savings on a particular claim. When you receive covered health care services in those states, your required payment for these services will be calculated using their statutory methods.

## HEALTH BENEFIT EXCLUSIONS

We **will not** provide benefits for the following:

1.  Services or expenses we determine are not medically necessary.

2.  Services, care, or treatment you receive after the date your coverage ends. This means, for example, that if you are in the hospital when your coverage ends, we will not pay for any more hospital days. We do not insure against any condition such as pregnancy or injury. We provide benefits only for services and expenses furnished while this plan is in effect.

3.  Services or expenses for cosmetic surgery. "Cosmetic surgery" is any surgery done primarily to improve or change the way one appears. "Reconstructive surgery" is any surgery done primarily to restore or improve the way the body works or correct deformities that result from disease, trauma or birth defects. Reconstructive surgery is a covered benefit; cosmetic surgery is not. (See category "c" below for exceptions due to the Women's Health and Cancer Rights Act.) Complications or later surgery related in any way to cosmetic surgery is not covered, even if medically necessary, if caused by an accident, or if done for mental or emotional relief.

    a.  Please contact us prior to surgery to find out whether a procedure will be reconstructive or cosmetic. You and your physician must prove to our satisfaction that surgery is reconstructive and not cosmetic. You must show us history and physical exams, visual fields measures and photographs before and after surgery.

    b.  Some surgery is always cosmetic such as ear piercing, neck tucks, face lifts, buttock and thigh lifts, implants to small but normal breasts, hair implants for male pattern baldness and correction of frown lines on the forehead. In other surgery, such as blepharoplasty (eyelids), rhinoplasty (nose), chemical peel and chin implants, it depends on why that procedure was done. For example, a person with a deviated septum may have trouble breathing and many sinus infections. To correct this they have a septoplasty. During surgery the physician may remove a hump or shorten the nose (rhinoplasty). The septoplasty would be reconstructive surgery while the rhinoplasty would be denied as cosmetic surgery. Surgery to remove excess skin from the eyelids (blepharoplasty) would be cosmetic if done to improve your appearance but reconstructive if done because your eyelids kept you from seeing very well.

    c.  Effective October 21, 1998 and after, as required by the Women's Health and Cancer Rights Act, coverage will be provided to a member who is receiving benefits for a medically necessary mastectomy and who elects breast reconstruction after the mastectomy for:

        ▪  reconstruction of the breast on which a mastectomy has been performed;

        ▪  surgery and reconstruction of the other breast to produce a symmetrical appearance;

        ▪  prostheses; and

20

HAR00754

HAR00774

- treatment of physical complications of all stages of mastectomy, including lymphedemas.

This coverage will be provided in consultation with the attending physician and the patient, and will be subject to the same annual deductibles and coinsurance provisions that apply for the other medical and surgical benefits.

4. Services or expenses to care for, treat, fill, extract, remove or replace teeth or to increase the periodontium. The periodontium includes the gums, the membrane surrounding the root of a tooth, the layer of bone covering the root of a tooth and the upper and lower jaws and their borders, which contain the sockets for the teeth. Care to treat the periodontium, dental pulp or "dead" teeth, irregularities in the position of the teeth, artificial dental structures such as crowns, bridges or dentures, or any other type of dental procedure is excluded. Hydroxyapatite or any other material to make the gums rigid is excluded. It does not matter whether their purpose is to improve conditions inside or outside the mouth (oral cavity). These services, supplies or expenses are not covered even if they are used to prepare a patient for services or procedures that are plan benefits. For example, braces on the teeth are excluded for any purpose, even to prepare a person with a cleft palate for surgery on the bones of the jaw. This does not apply to those services by a physician to treat or replace natural teeth which are harmed by accidental injury covered under Major Medical Benefits.

5. Dental implants into, across, or just above the bone and related appliances. Services or expenses to prepare the mouth for dental implants such as those to increase the upper and lower jaws or their borders, sinus lift process, guided tissue regrowth or any other surgery, bone graphs, hydroxyapatite and similar materials. These services, supplies or expenses are not covered even if they are needed to treat conditions existing at birth, while growing, or resulting from an accident. These services, supplies or expenses are excluded even if they are medically or dentally necessary.

6. Services or expenses in cases covered in whole or in part by worker's compensation or employers' liability laws, state or federal. This applies whether you fail to file a claim under that law. It applies whether the law is enforced against or assumed by the employer. It applies whether the law provides for hospital or medical services as such. Finally, it applies whether your employer has insurance coverage for benefits under the law.

7. Services or expenses covered in whole or in part under the laws of the United States, any state, county, city, town or other governmental agency that provides or pays for care, through insurance or any other means. This applies even if the law does not cover all your expenses.

8. Services or expenses for which a member is, or would be, entitled to under Medicare, whether the member properly and timely applied for, or submitted claims to, Medicare.

9. Routine well child care and routine immunizations except as provided in PMD benefits.

10. Routine physical examinations except as provided in PMD benefits.

11. Services or expenses for custodial care. Care is "custodial" when its primary purpose is to provide room and board, routine nursing care, training in personal hygiene, and other forms of self-care or supervisory care by a physician for a person who is mentally or physically disabled.

12. Investigational treatment, procedures, facilities, drugs, drug usage, equipment, or supplies.

13. Services or expenses for routine foot care such as removal of corns or calluses or the trimming of nails (except mycotic nails).

14. Hospital admissions in whole or in part when the patient primarily receives services to rehabilitate such as physical therapy, speech therapy, or occupational therapy.

15. Services and expenses provided to a hospital patient which could have been provided on an outpatient basis, given the patient's condition and the services provided. Major Medical

---

21

HAR00754

HAR00775

benefits for those services will apply as though the services were provided on an outpatient basis. Examples are hospital stays primarily for diagnosis, diagnostic study, medical observation, rehabilitation, physical therapy and hydrotherapy.

16. Services or expenses for, or related to, sexual dysfunctions or inadequacies not related to organic disease or which are related to surgical sex transformations.

17. Services for or related to pregnancy, including the six week period after delivery, of any dependent other than the employee's wife.

18. Services or expenses for an accident or illness resulting from war, or any act of war, declared or undeclared, or from riot or civil commotion.

19. Services or expenses for treatment of injury sustained in the commission of a crime or for treatment while confined in a prison, jail, or other penal institution.

20. Services or expenses for which a claim is not properly submitted to Blue Cross.

21. Services or expenses primarily to lose weight due to excess fat, heart disease, or diabetes. This exclusion does not apply to surgery for morbid obesity if medically necessary and meets the guidelines and limitations set by Blue Cross.

22. Services or expenses which you are not legally obligated to pay, or for which no charge would be made if you had no health coverage.

23. Services or expenses for or related to organ, tissue or cell transplantations except specifically as allowed by this plan.

24. Dental treatment for or related to temporomandibular joint (TMJ) disorders. This includes Phase II, according to the guidelines approved by the Academy of Craniomandibular Disorders. These treatments permanently alter the teeth or the way they meet and include such services as balancing the teeth, shaping the teeth, reshaping the teeth, restorative treatment, treatment involving artificial dental structures such as crowns, bridges or dentures, full mouth rehabilitation, dental implants, treatment for irregularities in the position of the teeth or a combination of these treatments.

25. Services or expenses for or related to Assisted Reproductive Technology (ART). ART is any process of taking human eggs or sperm or both and putting them into a medium or the body to try to cause reproduction. Examples of ART are in vitro fertilization and gamete intrafallopian transfer.

26. Eyeglasses or contact lenses or related examination or fittings. One pair of eyeglasses, contact lenses or one pair of each will be covered under Major Medical if they replace the lens of the eye after eye surgery or injury or defect.

27. Services or expenses for personal hygiene, comfort or convenience items such as air-conditioners, humidifiers, whirlpool baths, and physical fitness or exercise apparel. Exercise equipment is also excluded. Some examples of exercise equipment are shoes, weights, exercise bicycles or tracks, weights or variable resistance machinery, and equipment producing isolated muscle evaluations and strengthening. Treatment programs, the use of equipment to strengthen muscles according to preset rules, and related services performed during the same therapy session are also excluded.

28. Services or expenses for speech, occupational, recreational, or educational therapy.

29. Services or expenses for eye exercises, eye refractions, visual training orthoptics, shaping the cornea with contact lenses, or any surgery on the eye to improve vision including radial keratotomy.

30. Services or expenses for acupuncture, biofeedback and other forms of self-care or self-help training.

22

HAR00754    HAR00776

31. Hearing aids or examinations or fittings for them.

32. Services or expenses of a hospital stay, except one for an emergency, unless we certify it before your admission. Services or expenses of a hospital stay for an emergency if we are not notified within 48 hours, or on our next business day after your admission, or if we determine that the admission was not medically necessary

33. Services or expenses of private duty nurses.

34. Services, care, treatment, or supplies furnished by a facility which is not a Participating Ambulatory Surgical Facility, a Participating Hospital, Participating Renal Dialysis Facility, a Preferred Home Health Care Agency, a Preferred Hospice, a Non-Participating Hospital, a Preferred Care Outpatient Facility or a Preferred Provider as defined under this contract.

35. Services and expenses rendered by a Non-Preferred Home Health Care or Non-Preferred Hospice provider in Alabama which is not a Preferred Home Health Care or Preferred Hospice provider. Non-Preferred Home Health Care and Non-Preferred Hospice providers located outside of Alabama are eligible for benefits only when authorized through Managed Care as an alternative benefit through the Comprehensive Managed Care Program.

36. Services or expenses any provider rendered to a member who is related to the provider by blood or marriage or who regularly resides in the provider's household. Examples of a provider include a physician, a licensed registered nurse (R.N.), a licensed practical nurse (L.P.N.) or a licensed physical therapist.

37. Services or expenses of any kind for nicotine addiction such as smoking cessation treatment. The only exception to this exclusion is expenses for nicotine withdrawal drugs prescribed by a physician and dispensed by a licensed pharmacist from a Participating Pharmacy or a Non-Participating Pharmacy located outside of Alabama.

38. Travel, even if prescribed by your physician.

39. Inpatient care or treatment for mental and nervous disorders or disease (including alcoholism and drug addiction) is excluded under Major Medical once the basic hospital days are exhausted

40. Services or expenses of any kind provided by a Non-Participating Hospital located in Alabama for any benefits under this plan, except for inpatient and outpatient hospital benefits in case of accidental injury and for outpatient hospital service benefits in case of accidental injury, as more fully described under "Inpatient Hospital Benefits" and "Outpatient Hospital Benefits."

41. Services or expenses for a claim we have not received within 24 months after services were rendered or expenses incurred.

42. Services or expenses for physical therapy which does not require a licensed physical therapist, given the level of simplicity and the patient's condition, will not further restore or improve the patient's bodily functions, or is not reasonable as to number, frequency or duration.

43. Services or expenses in any federal hospital or facility except as provided by federal law.

44. Services or expenses for sanitarium care, convalescent care, or rest care.

45. Oral contraceptives or other birth control methods except when they are prescribed by a physician for a medical condition and not for the purpose of birth control.

46. Drugs or medicines dispensed from a pharmacy in the state of Alabama which is not a Participating Pharmacy.

47. Anesthesia services or supplies, or both, by local infiltration.

48. Mental/nervous and substance abuse services.

---

23

HAR00754

HAR00777

# DEFINITIONS

**Accidental Injury:** A traumatic injury to you caused solely by an accident. The injury must occur while you are covered by the plan.

**Alternative Benefits:** A benefit program that gives you and your family an alternative to lengthy hospitalizations. It is designed to provide the patient with the best environment for recovery and in the most cost effective setting. Also known as "Comprehensive Managed Care" and "Individual Case Management."

**Application:** The subscriber's original application form and any written supplemental application we accept.

**Assisted Reproductive Technology (ART):** Any combination of chemical and/or mechanical means of obtaining gametes and placing them into a medium (whether internal or external to the human body) to enhance the chance that reproduction will occur. Examples of ART include, but are not limited to, in vitro fertilization, gamete intrafallopian transfer, zygote intrafallopian transfer and pronuclear stage tubal transfer.

**Blue Cross:** Blue Cross and Blue Shield of Alabama.

**BlueCard Program:** An arrangement among Blue Cross Plans by which a member of one Blue Cross Plan receives benefits available through another Blue Cross Plan located in the area where services occur.

**Certification of Medical Necessity:** The written results of our review using recognized medical criteria to determine whether a member requires treatment in the hospital before he is admitted, or within 48 hours of the next business day after the admission in the case of emergency admissions. Certification of medical necessity means only that a hospital admission is medically necessary to treat your condition. Certification of medical necessity does not mean that your group has paid us all monies due for you. Certification of medical necessity does not consider whether your admission is excluded by this plan.

**Charge:** The reasonable charge not exceeding the provider's actual charge regularly and customarily made for those services or supplies. For services or supplies furnished to a member by a Preferred Provider, "charge" means the amount for those services or supplies which Blue Cross has agreed upon with the Preferred Provider. In the case of services or supplies for which a usual, customary and reasonable fee exists (other than a Preferred Provider) the charge will be the UCR fee.

**Concurrent Utilization Review Program (CURP):** A program designed to promote the most efficient and effective use of health care resources while utilizing cost effective methods to administer hospitalization.

**Contract:** The Group Health Benefits contract between your Group and Blue Cross and Blue Shield of Alabama. The contract is made up of (1) your Group's Group Application for the contract; (2) this Summary Plan Description; and (3) any written change to this Summary Plan Description. Your contract number is listed on your I.D. card.

**Contract Effective Date:** The date the Group Health Benefits contract becomes effective; the same date we accept the Group Application.

**Cosmetic Surgery:** Any surgery done primarily to improve or change the way one appears, cosmetic surgery does not primarily improve the way the body works or correct deformities resulting from disease, trauma or birth defect. For important information on cosmetic surgery, see the "Exclusions" section.

**Custodial Care:** Care primarily to provide room and board for a person who is mentally or physically disabled.

24

HAR00754

HAR00778

**Dependent:** See the explanation in the "Eligibility and Enrollment" section.

**Durable Medical Equipment:** Equipment we approve as medically necessary to diagnose or treat an illness or injury or to prevent a condition from becoming worse. To be durable medical equipment an item must be made to withstand repeated use, be for a medical purpose rather than for comfort or convenience, be useful only if you are sick or injured, and be related to your condition and prescribed by your physician to use in your home.

**Effective Date:** The date on which the coverage of each individual subscriber and dependent begins as listed in Blue Cross's records.

**Eligible Person:** Any employee or member of the group or other person who meets the eligibility standards of their plan and is designated as eligible to us by the group.

**Family Coverage:** Coverage for a subscriber and one or more dependents.

**Group:** The employer, association, or other entity which contracts with Blue Cross and through which you have coverage.

**Group Application:** The document in which the employer applies to us for a group benefits plan.

**Home Health Care Agency:** A Preferred or a Non-Preferred Home Health Care Agency.

**Hospice:** A Preferred or a Non-Preferred hospice.

**Hospital:** A Participating or a Non-Participating Hospital as defined in this plan.

**Individual Case Management:** Benefits which are an alternative to more expensive covered benefits. They provide the patient with the best environment for recovery and in the most cost-effective setting. Also known as "Comprehensive Managed Care."

**Inpatient:** A registered bed patient in a hospital.

**Investigational:** Any treatment, procedure, facility, equipment, drugs, drug usage, or supplies that either we have not recognized as having scientifically established medical value, or that does not meet generally accepted standards of medical practice.

**Medical Emergency:** A medical condition that occurs suddenly and without warning with symptoms which are so acute and severe as to require immediate medical attention to prevent permanent damage to the health, other serious medical results, serious impairment to bodily function, or serious and permanent lack of function of any bodily organ or part.

**Medically Necessary or Medical Necessity:** Services or supplies which are necessary to treat your illness, injury, or symptom.

To be medically necessary, services or supplies must be determined by Blue Cross to be:

- appropriate and necessary for the symptoms, diagnosis, or treatment of your medical condition;

- provided for the diagnosis or direct care and treatment of your medical condition;

- in accordance with standards of good medical practice accepted by the organized medical community;

- not primarily for the convenience and/or comfort of you, your family, your physician, or another provider of services;

- is not "investigational;"

- performed in the least costly setting required by your medical condition.

25

HAR00754

HAR00779

A "setting" may be your home, a physician's office, a Participating Ambulatory Surgical Facility, a hospital's outpatient department, a hospital when you are an inpatient, or another type of facility providing a lesser level of care. Only your medical condition is considered in deciding which setting is medically necessary. Your financial or family situation, the distance you live from a hospital or other facility, or any other non-medical factor is not considered. As your medical condition changes, the setting you need may also change. Ask your physician if any of your services can be performed on an outpatient basis, or in a less costly setting.

**Member:** A subscriber or eligible dependent who has coverage under the contract. The term member also refers to a former dependent or subscriber who was not terminated for gross misconduct, who is eligible for and covered under COBRA.

**Mental and Nervous Disorders:** These are mental disorders, mental illness, psychiatric illness, mental conditions and psychiatric conditions. These disorders, illnesses and conditions are considered mental and nervous disorders whether they are of organic, biological, chemical, or genetic origin. They are considered mental and nervous disorders however they are caused, based or brought on. Mental and nervous disorders include, but are not limited to psychoses, neuroses, schizophrenic-affective disorders, personality disorders, and psychological or behavioral abnormalities associated with temporary or permanent dysfunction of the brain or related system of hormones controlled by nerves. They are intended to include disorders, conditions, and illnesses listed in DSM-III or DSM-IV (Diagnostic and Statistical Manual of Mental Disorders).

**Non-Participating Hospital:** Any hospital (other than a Participating Hospital) that has been approved by the Alabama Hospital Association or the American Hospital Association as a "general" hospital or meets the requirements of the American Hospital Association for registration or classification as a "general medical and surgical" hospital. "General" hospitals do not include those that are classified or could be classified under standards of the American Hospital Association as "special" hospitals. Examples of these "special" hospitals are those classified for psychiatric, alcoholism and other chemical dependency, rehabilitation, mental retardation, chronic disease or any other specialty. "General" hospitals also do not include facilities primarily for convalescent care or rest or for the aged, school or college infirmaries, sanatoria, or nursing homes.

**Non-Participating Pharmacy:** Any pharmacy which is not a Participating Pharmacy.

**Non-Preferred Home Health Care Agency:** Any home health care agency which is not a Preferred Home Health Care Agency.

**Non-Preferred Hospice:** Any hospice which is not a Preferred Hospice.

**Participating Ambulatory Surgical Facility:** Any facility with which Blue Cross has a Participating Ambulatory Surgical Facility contract for furnishing health care services.

**Participating Hospital:** Any hospital with which Blue Cross has a contract for furnishing health care services.

**Participating Pharmacy:** Any pharmacy with which Blue Cross or its subsidiary, Preferred Care Services, Inc., has a contract for dispensing prescription drugs.

**Participating Renal Dialysis Facility:** Any free-standing hemodialysis facility with which Blue Cross has a contract for furnishing health care services.

**Physician:** One of the following when licensed and acting within the scope of that license at the time and place you are treated or receive services: Doctor of Medicine (M.D.), Doctor of Osteopathy (D.O.), Doctor of Dental Surgery (D.D.S.), Doctor of Medical Dentistry (D.M.D.), Doctor of Chiropractic (D.C.), Doctor of Podiatry (D.P.M.), Doctor of Optometry (O.D.), and Psychologist (Ph.D. or Psy D.), as defined in Section 27-1-18 of the Alabama Code.

**Plan:** This Summary Plan Description describing the benefits of your Employee's Health Benefits Plan.

26

HAR00754

HAR00780

**Preadmission Certification and Postadmission Review:** The procedures used to determine whether a member requires treatment as a hospital inpatient prior to a member's admission, or within 48 hours, or the next business day after the admission in the case of an emergency admission, based upon medically recognized criteria.

**Preferred Care:** A program whereby providers have agreements with Blue Cross to furnish certain medically necessary services and supplies according to an agreed upon fee schedule for medical and surgical procedures, certain services and supplies to members entitled to benefits under the Preferred Care Program.

**Preferred Home Health Care Agency:** Any home health care agency in Alabama with which Blue Cross has a contract.

**Preferred Home Health Care Fee Schedule:** The schedule of procedures and the fee amounts listed in the Preferred Home Health Care Fee Schedule or the amount of the Preferred provider's actual charge, whichever is less for Preferred Home Health Care Benefits.

**Preferred Hospice:** Any hospice in Alabama with which Blue Cross has a contract.

**Preferred Medical Doctor or Preferred Physician:** A physician who has an agreement with Blue Cross to provide surgical and medical services to members entitled to benefits under the PMD Program or another Preferred Care Program through a contract with Blue Cross.

**Preferred Provider or Participating Provider:** Any provider of health care services or supplies (such as a Preferred Physician, Preferred Medical Laboratory, Preferred Radiology Provider, or Preferred Outpatient Facility) who has an agreement with Blue Cross to furnish services or supplies to members entitled to benefits under the Preferred Care Program.

**Preferred Radiology Provider or PRP:** Any provider with which Blue Cross and Blue Shield of Alabama has a contract for the furnishing of diagnostic radiology procedures such as computerized axial tomography (CAT scan) and magnetic resonance imaging (MRI scan).

**Pregnancy:** The condition of and complications arising from a woman having a fertilized ovum, embryo or fetus in her body-usually, but not always, in the uterus-and lasting from the time of conception to the time of childbirth, abortion, miscarriage or other termination.

**Private Duty Nursing:** Nursing care provided in the patient's home by a licensed professional nurse (R.N.) or a licensed practical nurse (L.P.N.) who does not reside in the patient's home and is not related to the patient by blood or marriage.

**PMD Fee Amount Payable:** The amount that will be paid to a Preferred Physician or other Preferred Provider. It is the fee for a procedure listed in the PMD Fee Schedule or the amount of the Preferred Provider's actual charge, whichever is less.

**PMD Fee Schedule:** The schedule of medical and surgical procedures and the fee amounts for those procedures under the Preferred Medical Doctor program and other Preferred Provider programs as applicable.

**Radiology Schedule:** The schedule of radiological procedures which is on file and available for examination at the Birmingham offices of Blue Cross.

**Subscriber:** The employee whose application for coverage under the contract is made and accepted by Blue Cross.

**UCR (Usual, Customary and Reasonable Fee):** That part of a provider's charge that we will allow as covered expenses. The usual, customary and reasonable value of the provider's service is based on historical data developed from the following criteria:

- how much he charges his patients for the same or a similar service;

27

HAR00781

HAR00754

- the variance in the charges by most providers for the same service in the same geographic area, if possible;

- whether the procedure requires more time, skill, or experience than it usually requires;

- the value of the procedure compared to other services;

- whether the UCR fee exceeds the PMD fee for the same services;

- out-of-state adjustments to account for the way providers charge in other states;

- the rate of inflation using any generally recognized measure. This may cap any increase in the PMD fee.

The UCR allowance will not exceed the amount the provider charges.

We, Us, Our: Blue Cross and Blue Shield of Alabama.

You, Your: The subscriber or member as shown by context.

---

## STATEMENT OF ERISA RIGHTS

The following statement is required by federal law and regulation. As a participant in this plan you are entitled to certain rights and protections under the Employee Retirement Income Security Act of 1974 (ERISA). ERISA provides that all plan participants shall be entitled to:

Examine, without charge, at the plan administrator's office and at other specified locations, all plan documents, including insurance contracts and copies of all documents filed by the plan with the U.S. Department of Labor, such as detailed annual reports and plan descriptions

Obtain copies of all plan documents and other plan information upon written request to the plan administrator. The administrator may make a reasonable charge for the copies.

Receive a summary of the plan's annual financial report. The plan administrator is required by law to furnish each participant with a copy of this summary annual report.

In addition to creating rights of plan participants, ERISA imposes duties upon the people who are responsible for the operation of the employees benefit plan. The people who operate your plan, called "fiduciaries" of the plan, have a duty to do so prudently and in the interest of you and other plan participants and beneficiaries. No one, including your employer, or any other person, may fire you or otherwise discriminate against you in any way to prevent you from obtaining a welfare benefit or exercising your rights under ERISA. If your claim for a welfare benefit is denied in whole or in part you must receive a written explanation of the reason for the denial. You have the right to have a plan review and reconsideration of your claim. Under ERISA, there are steps you can take to enforce the above rights. For instance, if you request materials from the plan and do not receive them within 30 days, you may file a suit in a federal court. In such a case, the court may require the plan administrator to provide the materials and pay you up to $110 a day until you receive the materials, unless the materials were not sent because of reasons beyond the control of the administrator. If you have a claim for benefits which is denied or ignored, in whole or in part, you may file suit in a state or federal court. If it should happen that plan fiduciaries misuse the plan's money or if you are discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor, or you may file suit in federal court. The court will decide who should pay court costs and legal fees. If you are successful the court may order the person you have sued to pay these costs and fees. If you lose, the court may order you to pay these costs and fees, for example, if it finds your claim is frivolous. If you have any questions about your plan, you should contact the plan administrator. If you have any questions about this statement or about your rights under ERISA, you should contact the nearest office of the Pension and Welfare Benefits

28

HAR00754

HAR00782

Administration, U.S. Department of Labor, listed in your telephone directory or the Division of Technical Assistance and Inquiries, Pension and Welfare Benefits Administration, U.S. Department of Labor, 200 Constitution Avenue, N.W., Washington, D.C. 20210.

## Administrative Information

The following information is provided to complete the requirements for making this a Summary Plan Description as outlined in the Employee Retirement Income Security Act.

1. The Plan's official name is: Harden Manufacturing Corporation Group Health Care Plan

2. The Plan Sponsor and Plan Administrator is:

    Harden Manufacturing Corporation
    7155 State Highway 13
    Haleyville, Alabama 35565

3. The Plan Number assigned by the Plan Sponsor is: 501

4. The I.R.S. Employer Identification Number (EIN) of the Sponsor is: 63-0635982

5. The Plan provides hospital and medical benefits as administered under a contract by Blue Cross and Blue Shield of Alabama under group number 42003/000,001. Blue Cross has complete discretion to interpret and administer the provisions of the Plan. Its administrative functions include paying claims, determining medical necessity, etc. The address of Blue Cross and Blue Shield of Alabama is 450 Riverchase Parkway East, Birmingham, Alabama 35244-2858. The plan benefits are self-insured.

6. The Agent for legal process is:

    Harden Manufacturing Corporation
    7155 State Highway 13
    Haleyville, Alabama 35565

7. The records of the health plan are kept on the basis of a policy year which begins on July 1st and ends on the following June 30th.

8. Harden Manufacturing Corporation currently intends to continue the Group Health Care Plan as described herein, but reserves the right, in its discretion, to amend, reduce or terminate the plan and coverage at any time for active employees, retirees, former employees, and all dependents.

9. This is an Employer-Employee Shared Cost Plan. The sources of the contributions to this Plan are currently the employer and the employee in relative amounts as described in writing by the employer and considered to be a part of this contract. While the employer may change its level of contribution at any time, the employer must always contribute at least a portion of your premiums. Any information concerning what is to be paid by the employee in the future will be furnished by the employer in writing and will constitute a part of this Plan.

    The method by which the contribution is calculated is that Blue Cross will determine the Plan's experience and other factors and notify the employer of the new rate of contribution.

29

HAR00754

HAR00783

450 Riverchase Parkway East

P.O. Box 995

Birmingham, Alabama 35298-0001

**Customer Service:**

988-2200 (in Birmingham)

or 1-800-292-8868 toll-free

**Preadmission Certification:**

988-2245 (in Birmingham)

or 1-800-248-2342 toll-free

Rapid Response:

988-5401 (in Birmingham)

1-800-248-5123 toll-free

41003/000,601
Health Plan

03/99

HAR00754

HAR00784

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| IN RE: NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | ) ) ) ) ) | MDL Docket No. 1629 Master File No. 04-10981 |
| THIS DOCUMENT RELATES TO: | ) ) ) | Judge Patti B. Saris |
| ALL MARKETING AND SALES PRACTICES ACTIONS | ) ) ) ) | Magistrate Judge Leo T. Sorokin |

## EXHIBIT G TO DECLARATION OF ILYAS J. RONA

## FILED IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

## FILED UNDER SEAL

### CONFIDENTIAL INFORMATION SUBJECT TO COURT ORDER

This envelope contains documents which are filed under seal in this case by the Class Plaintiffs and, by Order of this Court, dated January 18, 2005, shall not be opened nor the contents displayed or revealed except as provided in that order or by further order of the Court.

Dated: February 21, 2007

Ilyas J. Rona, Esq.
BBO # 642964
GREENE & HOFFMAN, P.C.
125 Summer Street., Suite 1410
Boston, MA 02110
(617) 261-0040

### CERTIFICATE OF SERVICE

I hereby certify that a true copy of the enclosed documents were served upon the attorney of record for the defendant via e-mail and regular mail on February 21, 2007.

Ilyas J. Rona

Exhibit H

ORIGINAL INVESTIGATION

# Off-label Prescribing Among Office-Based Physicians

*David C. Radley, MPH; Stan N. Finkelstein, MD; Randall S. Stafford, MD, PhD*

**Background:** Unlike medicines prescribed for Food and Drug Administration–approved indications, off-label uses may lack rigorous scientific scrutiny. Despite concerns about patient safety and costs to the health care system, little is known about the frequency of off-label drug use or the degree of scientific evidence supporting this practice.

**Methods:** We used nationally representative data from the 2001 IMS Health National Disease and Therapeutic Index (NDTI) to define prescribing patterns by diagnosis for 160 commonly prescribed drugs. Each reported drug-diagnosis combination was identified as Food and Drug Administration–approved, off-label with strong scientific support, or off-label with limited or no scientific support. Outcome measures included (1) the proportion of uses that were off-label and (2) the proportion of off-label uses supported by strong scientific evidence. Multivariate analyses were used to identify drug-specific characteristics predictive of increased off-label use.

**Results:** In 2001, there were an estimated 150 million (95% confidence interval, 127-173 million) off-label mentions (21% of overall use) among the sampled medications. Off-label use was most common among cardiac medications (46%, excluding antihyperlipidemic and antihypertensive agents) and anticonvulsants (46%), whereas gabapentin (83%) and amitriptyline hydrochloride (81%) had the greatest proportion of off-label use among specific medications. Most off-label drug mentions (73%; 95% confidence interval, 61%-84%) had little or no scientific support. Although several functional classes were associated with increased off-label use ($P<.05$), few other drug characteristics predicted off-label prescription.

**Conclusions:** Off-label medication use is common in outpatient care, and most occurs without scientific support. Efforts should be made to scrutinize underevaluated off-label prescribing that compromises patient safety or represents wasteful medication use.

*Arch Intern Med. 2006;166:1021-1026*

THE FOOD AND DRUG ADMINistration (FDA) focuses on market entry for prescription drugs rather than regulating physicians' prescribing practices, allowing off-label use of medications for indications beyond those formally evaluated by the manufacturer. Off-label prescribing of medications is legal,[1] often thought to be supported by scientific evidence,[2] and common in certain clinical settings.[3,4] Although this practice provides a pathway to innovation in clinical practice, it raises key concerns about risks to patients and costs to the health care system.[5-7]

Despite sufficient evidence justifying some off-label practices, lack of FDA approval means that off-label uses are not given the same degree of scientific scrutiny as labeled indications. Scientific evidence documenting the efficacy of off-label uses in routine practice settings commonly falls short of what the drug's manufacturer would be required to provide the FDA to receive approval for that indication. Although regulation in this area is evolving, FDA policy prohibits direct-to-consumer promotion of drugs for un-

Author Affiliations: Center for Evaluative Clinical Sciences, Dartmouth Medical School, Hanover, NH (Mr Radley); Program on the Pharmaceutical Industry, Sloan School of Management, Massachusetts Institute of Technology, Cambridge (Dr Finkelstein); and Program on Prevention Outcomes and Practices, Stanford Prevention Research Center, Stanford, Calif (Dr Stafford). Dr Finkelstein is now additionally with Harvard Medical School, Boston, Mass.

approved uses and restricts such promotion to physicians.

Previously published studies of off-label prescribing typically consider this practice in the context of narrowly defined clinical populations, including those with psychiatric disorders,[3,8] those with human immunodeficiency virus and AIDS,[9] children,[10,11] pregnant women,[12] and others commonly underserved by FDA-approved medicines.[4,13] None of these studies have systematically described the overall magnitude of off-label prescribing or the consequences of prescribing drugs for unevaluated or underevaluated indications. A study published in 1985 examined the 100 most common uses of marketed medicines and found that 31 were for indications not initially approved by the FDA, of which 18 were not subsequently scrutinized.[14]

Using a nationally representative sample documenting physician prescribing by diagnosis, we examined the overall frequency and clinical circumstances of off-label prescription among commonly prescribed medications as a function of the strength of scientific support for those practices.

Downloaded from www.archinternmed.com, on February 19, 2007
©2006 American Medical Association. All rights reserved.

## METHODS

We used a nationally representative survey of physician prescribing practices to examine off-label prescribing among office-based physicians in the United States. Observed drug uses were identified by clinical indication and determined to be labeled (FDA approved), off-label (lacking FDA approval) with scientific evidence of therapeutic efficacy, or off-label without supporting evidence. Our analytic goals were to estimate the magnitude of off-label use, the most frequent conditions and drug classes contributing to off-label use, and whether observed off-label uses were supported by scientific evidence and to identify medication-specific characteristics predictive of this practice.

## DATA SOURCE

Data for this analysis come from the 2001 National Disease and Therapeutic Index (NDTI).[15] The NDTI is a continuing survey of US office-based physicians conducted by IMS Health (Plymouth Meeting, Pa). The NDTI contains nationally representative diagnostic and treatment data similar to that contained in the National Ambulatory Medical Care Survey.[16,17] A panel of office-based physicians is selected through random stratified sampling from the master lists of the American Medical Association and the American Osteopathic Association (both in Chicago, Ill) to participate in quarterly samplings of their clinical activity. Each quarter, approximately 3500 physicians report on each patient encounter during 2 randomly selected consecutive workdays. In 2001, there were 403 975 sampled patient-physician encounters with recorded medication therapy. For each patient encounter, physicians are instructed to record all diagnoses and indicate drug therapy specifically used to treat each diagnosis. Each patient encounter can generate multiple diagnoses, and there is direct correspondence between the recorded diagnosis and prescribed drug therapy. Physician-reported drug uses include new medications prescribed during that encounter or continued drug therapy that was previously ordered, even if no specific action was taken during that encounter. Drug uses are weighted to reflect national utilization patterns and referred to as drug mentions.

## SAMPLED MEDICATIONS
## AND OBSERVED DIAGNOSES

The NDTI provided data for the top 500 medications in rank order by frequency of NDTI drug mentions in 2001. This analysis considered commonly used medications, including the top 100 by number of NDTI mentions, plus 60 additional randomly selected medications. Medications with over-the-counter availability in 2001 were excluded from this study. This strategy captured prescription medicines from a wide range of therapeutic contexts, but with a preponderance of antibiotics, hypertension therapies, and analgesics because of their prevalence as top sellers. The medications identified in this sample accounted for approximately 56% of all estimated prescription drug use in 2001. Medications were identified by their chemical name, and drug mentions for proprietary and generic versions were combined to give the total mentions for that chemical when at least 1 version was in the original 160-medication sample.

The NDTI lists drug mentions stratified by the top 40 diagnoses associated with each medication. Diagnoses, coded using the *International Classification of Diseases, Ninth Revision, Clinical Modification*,[18] were grouped into 1 of the following 3 categories: FDA approved, off-label with strong scientific support, or off-label with limited or no scientific support. Diagnoses were considered FDA approved if they could be matched to the therapeutic indications reported in the drug's package insert (as compiled in the *Physicians' Desk Reference: 2002*[19]) and assumed to be well supported by scientific evidence. Any diagnosis that could not be matched to a labeled indication was considered off-label.

The degree of supporting evidence was assessed for each off-label indication treated with the medicines in our sample. We used the DRUGDEX system (Thomson Micromedex, Greenwood Village, Colo), a nationally recognized pharmaceutical compendium that describes the efficacy and scientific documentation for labeled and off-label uses of prescription drugs[20] and that has been used to approve payment for off-label uses by Medicaid,[21] to create a database of scientifically supported but off-label indications for each drug in our sample. An indication was considered to be scientifically supported if, according to DRUGDEX, its effectiveness has been shown in controlled trials or observed in clinical settings.[22] All other indications that lacked FDA approval or that did not meet the criteria for having scientific support were considered to be off-label with little or no scientific support.

To give added confidence in our use of DRUGDEX, we independently evaluated the type of evidence used by DRUGDEX in its differentiation of levels of evidence for off-label indications in a subsample of medications. We found that indications our method classified as evidence-based were always supported by clinical trials, whereas those indications with little or no scientific support tended to rely on observational data or case reports. The **Figure** shows the strategy used to classify drug mentions by their level of scientific support.

We were unable to separate patterns of use by the presence of comorbidities that might alter our assessment of whether the drug mention was for an off-label use. Because we were concerned that this might result in misclassification, we examined the comorbidities associated with congestive heart failure to gauge the magnitude of such misclassification. In this example, the concern is that substantial misclassification of angiotensin-converting enzyme inhibitors would result if congestive heart failure were to be reported frequently with other diagnoses for which angiotensin-converting enzyme inhibitors are often prescribed. In 2001, 47% of patients with congestive heart failure were reported to have at least 1 comorbidity, although in only 10% was that comorbidity was hypertension or coronary artery disease, the 2 conditions most likely to have an angiotensin-converting enzyme inhibitor reported as therapy. Although we acknowledge this shortcoming, it seems unlikely to dramatically affect our findings.

Drug-specific characteristics including therapeutic class, age, degree of promotion, use as a long- vs short-term therapy, form, and manufacturer were evaluated for their ability to predict off-label use. Medications were assigned to 1 of 13 mutually exclusive functional classes based on the therapeutic intent of its labeled indications. Duration of use was considered long-term (continued use >4 weeks) or short-term (use <4 weeks). Approval date and patent exclusivity dates for each drug were obtained from the FDA's *Electronic Orange Book, 2003 Vol: Food and Drug Administration*[23] and used to calculate the drug's age and generic availability in year 2001. For medications available in multiple formulations, only that most commonly used in ambulatory settings was considered. Drugs were considered to have a high degree of promotion if they were among the 20 most heavily direct-to-consumer promoted drugs in 2000.[24] Manufacturers represented by fewer than 5 medications among the sampled drugs were grouped, as were manufacturers with similar patterns of off-label use among the sampled medications, and generically available medications were considered to be represented by a single, nonspecific manufacturer. Breadth of therapeutic definition was measured as the total number of approved indications reported in the *Physicians' Desk Reference*.[19]

Downloaded from www.archinternmed.com, on February 19, 2007
©2006 American Medical Association. All rights reserved.



**Figure.** Assessment of scientific support for each drug-diagnosis combination. Drug mentions are weighted estimates of national prescription drug occurrences based on observed medication use. CI indicates confidence interval; FDA, Food and Drug Administration; *ICD-9-CM, International Classification of Diseases, Ninth Revision, Clinical Modification*[15]; NDTI, National Disease and Therapeutic Index; and PDR, *Physicians' Desk Reference*.[19]

## STATISTICAL ANALYSIS

The unit of analysis was the drug mention; the principle outcome measures were proportion and frequency of off-label prescription among sampled medications. We used multivariate regression to evaluate the ability of specific drug characteristics to predict off-label prescription. This allowed us to test several hypotheses: for example, that increased off-label prescription is associated with particular functional classes, use as a long-term therapy, older drug age, generic availability, a high degree of direct-to-consumer promotion, or manufacturer. The dependent variable was the counted number of drug mentions for off-label uses, and was transformed using a natural logarithm to normalize the distribution. Drugs from the same chemical class share many physical and therapeutic characteristics and, therefore, are not independent with regard to likelihood of prescription. To account for this lack of independence, models were fit clustering on the chemical class with robust variance estimates for the standard error.[25,26] Reported risk ratios (RRs) represent the independent likelihood of that characteristic predicting increased off-label prescription. Data analysis was performed using STATA software, version 8 (StataCorp, College Station, Tex).

## RESULTS

The NDTI reported an estimated 725 million total drug mentions among the sampled drugs for year 2001. Although most (575 million [79%]) were for FDA-approved indications, many drug mentions (150 million [21%]) lacked FDA approval for the condition they were used to treat. Therapeutic activity among these medicines was largely supported by scientific evidence, with 85% of all drug mentions (616 million) being FDA-approved or evidence-based off-label uses; 15% of the drug mentions reported herein lacked scientific evidence for the indication they were used to treat. Among off-label mentions, most (73%) lacked evidence of clinical efficacy, and less than one third (27%) were supported by strong scientific evidence (Figure).

Substantial variation in off-label use was observed across functional classes. Considering medication uses with strong and limited or no scientific support together, off-label prescription was rare among medications for glycemic control in diabetes mellitus (<1%) and infrequent among analgesics (6%) and medications to lower lipid levels (7%). Off-label prescription was most common among cardiac medications (antianginals, antiarrhythmics, and anticoagulants) (46%; 95% confidence interval [CI], 39%-53%), anticonvulsants (46%; 95% CI, 39%-53%), and antiasthmatics (42%; 95% CI, 35%-48%) (**Table 1**). Off-label prescription with limited or no scientific support was more common than supported off-label use in all therapeutic classes except diabetes therapies. The greatest disparity between supported and unsupported off-label prescription occurred among psychiatric (4% strong support vs 96% limited or no support) and allergy therapies (11% strong support vs 89% limited or no support).

High volumes of off-label prescription were correlated with high number of total drug mentions for specific drugs (*P*<.001). This is evident in **Table 2**, which shows the top 5 medications by volume of off-label mentions, 3 of which (albuterol sulfate, amoxicillin, and azithromycin) were among the top 5 medications by overall use. Gabapentin had the highest proportion of off-label prescription (83%), followed by amitriptyline hydrochloride (81%) and dexamethasone (79%). Among medications with the highest proportions of off-label use, most lacked evidence of clinical efficacy. This is especially true for gabapentin, where only 20% of its off-label use had strong support compared with 80% with

Downloaded from www.archinternmed.com , on February 19, 2007
©2006 American Medical Association. All rights reserved.

**Table 1. Off-label Prescription and Degree of Scientific Support by Functional Class**

| | | | Off-label Use | | | |
| | | | Strong Scientific Support | | Little or No Scientific Support | |
| Functional Class (No. in Class) | Estimated No. of Mentions in Millions | % of Off-label Mentions* per Class | No. of Mentions in Millions | % of Off-label Mentions* | No. of Mentions in Millions | % of Off-label Mentions* |
|---|---|---|---|---|---|---|
| Cardiac therapies† (4) | 9.5 | 46 | 3.8 | 39 | 5.8 | 61 |
| Anticonvulsants (4) | 6.6 | 46 | 1.1 | 17 | 5.4 | 83 |
| Antiasthmatics (9) | 17.7 | 42 | 8.3 | 47 | 9.4 | 53 |
| Allergy therapies (9) | 14.7 | 34 | 1.7 | 11 | 13.1 | 89 |
| Psychiatric therapies‡ (16) | 18.0 | 31 | 1.0 | 6 | 17.0 | 94 |
| Peptic ulcer and dyspepsia therapies (7) | 7.0 | 30 | 1.2 | 17 | 5.8 | 83 |
| Antimicrobials (28) | 35.5 | 23 | 11.6 | 33 | 23.9 | 67 |
| Other§ (15) | 13.4 | 23 | 3.0 | 23 | 10.4 | 77 |
| Antihypertensives (30) | 16.8 | 14 | 6.8 | 41 | 10.0 | 59 |
| Women's health therapies‖ (8) | 2.3 | 11 | 0.5 | 23 | 1.7 | 77 |
| Agents to lower lipid levels (6) | 2.0 | 7 | 0.8 | 40 | 1.2 | 60 |
| Analgesics (15) | 6.2 | 6 | 1.3 | 21 | 4.9 | 79 |
| Diabetes therapies (8) | 0.3 | 1 | 0.2 | 54 | 0.1 | 46 |
| **Total** | **150.0** | **21** | **41.2** | **27** | **108.7** | **73** |

*Drug mentions are weighted estimates of national prescription drug occurrences based on observed medication use.
†Includes antianginals (2), antiarrhythmics (1), and anticoagulants (1).
‡Includes antidepressants (9), anxiolytics (5), and antipsychotics (2).
§Includes noninhaled corticosteroids (5), thyroid agents (1), ophthalmologic preparations (2), impotence therapy (1), osteoporosis therapy (1), stimulants (1), antigout therapy (1), antiglaucoma therapy (1), antiemetics (1) and bladder/prostate treatment (1).
‖Includes hormone therapy (6) and oral contraception (2).

**Table 2. Top 5 Medications by Volume and Proportion of Off-label Prescription***

| | | Off-label Mentions, %† | | |
| Top 5 Medications | No. of Off-label Drug Mentions† in Thousands | All | With Strong Scientific Support | With Little or No Scientific Support |
|---|---|---|---|---|
| **No. of off-label mentions** | | | | |
| Albuterol sulfate | *10 087* | 53 | 36 | 18 |
| Amoxicillin | *8180* | 25 | 13 | 11 |
| Digoxin | *4423* | 66 | 25 | 41 |
| Methylprednisolone | *3822* | 54 | 7 | 47 |
| Azithromycin | *3700* | 22 | 16 | 5 |
| **Proportion of total mentions that were off-label** | | | | |
| Gabapentin | 3561 | *83* | 17 | 66 |
| Amitriptyline hydrochloride | 837 | *81* | 21 | 60 |
| Dexamethasone (oral) | 2355 | *79* | 23 | 56 |
| Isosorbide mononitrate | 1532 | *75* | 48 | 27 |
| Risperidone | 1821 | *66* | <1 | 66 |
| Digoxin | 4423 | *66* | 25 | 41 |
| **Proportion of total mentions with strong scientific support** | | | | |
| Isosorbide mononitrate | 1532 | 75 | *48* | 27 |
| Albuterol | 10 087 | 53 | *36* | 18 |
| Famotidine | 911 | 61 | *30* | 31 |
| Digoxin | 4423 | 66 | *25* | 41 |
| Ipratropium bromide | 1200 | 47 | *25* | 22 |
| **Proportion of total mentions with limited/no scientific support** | | | | |
| Gabapentin | 3561 | 83 | 17 | *66* |
| Risperidone | 1821 | 66 | <1 | *66* |
| Temazepam | 346 | 63 | <1 | *63* |
| Ciprofloxacin hydrochloride (optic solution) | 2104 | 64 | 2 | *62* |
| Amitriptyline | 837 | 80 | 21 | *60* |
| Nortriptyline hydrochloride | 343 | 65 | 5 | *60* |

*Each section of the table represents the top 5 medications using different metrics to capture varying facets of off-label medication use. Italics represent the numeric metric used to produce the given ranking.
†Drug mentions are weighted estimates of national prescription drug occurrences based on observed medication use.

Downloaded from www.archinternmed.com, on February 19, 2007
©2006 American Medical Association. All rights reserved.

limited or no support. Conversely, off-label use for several medications was supported by a high degree of scientific evidence. Among the 24 medications for which most (>50%) of the off-label uses were scientifically supported, hypertension therapies were most common (7/21), followed by antimicrobials (4/21) and medications to lower lipid levels (3/21). It is not surprising, then, that 3 hypertension therapies (losartan potassium, atenolol, and a combination of hydrochlorothiazide and metoprolol tartrate) were among those medications with the highest degree of scientifically supported off-label use.

Few drug-specific characteristics were associated with off-label prescription (**Table 3**). Relative to analgesics, diabetes medications (RR, 0.04) were associated with less likelihood of off-label prescription, whereas anticonvulsants (RR, 5.7), psychiatric agents (RR, 4.1), allergy therapies (RR, 4.8), antiasthmatics (RR, 3.4), medications for peptic ulcer and dyspepsia (RR, 4.6), and cardiac medications (RR, 6.8) were associated with increased likelihood of off-label prescription. Other drug characteristics, including age, long-term use, combination therapies, formulation, dosing frequency, direct-to-consumer promotion, and manufacturer, showed few meaningful associations with off-label prescription.

### Table 3. Drug-Specific Characteristics Associated With Off-label Prescription

| Characteristic | RR (95% CI) | |
| --- | --- | --- |
| | Unadjusted | Adjusted* |
| Analgesics | 1.00 | 1.00 |
| Allergy therapies | 4.64 (2.80-7.69) | 4.83 (2.19-10.62) |
| Antiasthmatics | 3.33 (1.89-5.88) | 3.44 (1.60-7.46) |
| Anticonvulsants | 3.54 (1.98-6.31) | 5.67 (2.49-12.91) |
| Antimicrobials | 1.94 (1.02-3.72) | 1.96 (1.09-3.54) |
| Cardiac therapies | 6.80 (3.29-14.05) | 6.75 (2.66-17.11) |
| Diabetes therapies | 0.02 (0.00-0.11) | 0.04 (0.01-0.16) |
| Peptic ulcer and dyspepsia therapies | 3.04 (2.14-4.33) | 4.58 (2.17-9.76) |
| Psychiatric therapies | 3.18 (2.04-4.96) | 4.08 (1.99-8.36) |
| Tablet | 1.00 | 1.00 |
| Capsule | 1.09 (0.61-1.94) | 0.61 (0.41-0.93) |
| Other medication forms† | 0.10 (0.01-0.82) | 0.33 (0.14-0.78) |
| No. of approved indications identified in *PDR* | 1.05 (1.02-1.07) | 1.03 (1.01-1.05) |

Abbreviations: CI, confidence interval; *PDR*, *Physicians' Desk Reference*; RR, relative risk.

*Only drug-specific characteristics with a statistically significant association with off-label prescription are presented here. Adjustments were made for manufacturer, functional class, drug age, degree of direct-to-consumer promotion, use as a long-term therapy, medication form, frequency of use, and generic availability.

†Includes solution/suspension and injectable medication.

<hr>

### COMMENT

Using data from a nationally representative survey of office-based physicians, we found that about 21% of all estimated uses for commonly prescribed medications were off-label, and that 15% of all estimated uses lacked scientific evidence of therapeutic efficacy. We believe that ours is the first study to systematically characterize the extent of off-label prescribing in general outpatient care. The magnitude of off-label use varied widely among specific medications and drug classes, exceeding 50% for some anticonvulsants, psychiatric medications, and antiasthmatics. No more than 30% of the off-label practices we observed were supported by strong scientific evidence.

Many of the observed off-label drug mentions, particularly among medications frequently used off-label, represent a logical extension of the FDA-approved indication. For example, certain unapproved uses of antibiotics could be justified by laboratory studies demonstrating that the disease-causing organism responds to drug therapy. Albuterol, which is approved to treat asthma, is a clinically accepted off-label therapy for physiologically similar chronic obstructive pulmonary disease. Other medications are seen to exhibit a "class effect," such as the use of a particular angiotensin-converting enzyme that lacks approval for congestive heart failure.

In contrast, some of the observed off-label uses were as therapy for indications distinctly different from those for which the drug was approved. Examples include the use of metformin hydrochloride, approved for glycemic control in type 2 diabetes, as a therapy for relatively few patients with polycystic ovary syndrome and gabapentin, labeled for use as an anticonvulsant, as a widely used therapy for chronic nonspecific pain. Substantial heterogeneity remains in the degree to which many off-label practices, even those that seem to represent logical extensions of the labeled indication, are supported by scientific evidence.

Our findings echo those of an earlier study conducted 2 decades ago that considered the degree of evidence supporting a drug's efficacy for a limited number of specific drug-indication pairs.[14] Both studies indicate a need for more extensive postmarketing surveillance to identify non–evidence-based prescribing practices that lacked FDA approval. We suggest that policy makers confront these issues by asking the following questions: (1) What kinds of data could inform our understanding of the clinical and economic implications of off-label and non–evidence-based prescribing? (2) How can such data be collected or accessed once a drug has entered the market? and (3) Should decisions to "sanction" additional therapeutic uses without regulatory scrutiny consider the evidence or be left to market forces?

Differentiating off-label situations that are clinically reasonable from those that may be of concern is an essential first step. Such issues are at the forefront of prescription drug policy in Europe, where various systems have been established to monitor medication use after initial approval by regulatory authorities.[25] Regulators in Britain may label new drugs with a black triangle, signaling physicians to exercise caution when prescribing them; they can also monitor outcomes through a voluntary database of physicians' prescribing experiences. In France, pharmacovigilance centers track postapproval prescribing of drugs, whereas the European Medicines Agency can require drug manufacturers to collect and analyze postapproval surveillance data and mandate license renewal at shorter time intervals. These examples are designed primarily to protect patient safety, although simi-

Downloaded from www.archinternmed.com, on February 19, 2007
©2006 American Medical Association. All rights reserved.

lar strategies could be used to inform judicious, evidence-based, and cost-effective prescribing choices.

We need to know more about the factors that produce off-label medication use. Gabapentin drew substantial media attention, because its manufacturer was investigated and convicted for inappropriate marketing of off-label uses of the drug.[28] Although our data do not allow us to link off-label medication use to promotional activities for specific off-label indications, the high degree of off-label use observed for gabapentin suggests the need to better understand the determinants of off-label medication use, including the potential influence of pharmaceutical marketing.

Several limitations of this analysis should be noted. The sampled medications accounted for slightly more than half of all drug mentions in 2001. Patterns of use among these common medications may not be indicative of those for other drugs. Comorbidities, which were not accounted for in our analysis, could potentially explain some off-label uses, although the potential for misclassification bias remains small given the direct correspondence between diagnosis and medication. Similarly, we were unable to verify the use of many antibiotics for off-label without the results of supporting laboratory tests. Although these limitations may cause us to overestimate some off-label uses, others could cause off-label practices to be underestimated. For example, off-label uses defined by patient population were likely missed because these data were unable to account for patient characteristics such as age, sex, or pregnancy. Finally, we were limited in our ability to capture the gradient of evidence that exists for most off-label uses of the drugs in this sample. By establishing a high threshold for what is termed scientific support, the drug uses we identified as unsupported may have varying degrees of scientific evidence that fall short of this threshold. As is often the case with retrospective studies, we had to rely on data collected by others, primarily for different purposes. In these situations, we attempted to make conservative assumptions and consider how our results might have varied with somewhat different assumptions. Our main findings remained robust following such considerations.

CONCLUSIONS

The ability to prescribe medicines off label brings greater latitude to turn scientific knowledge into innovative clinical practice. Although attention should be given to the situations where evidence based off-label use is clinically beneficial, policy makers must begin to consider strategies for mandatory postapproval surveillance that focus on curtailing underevaluated off-label practices that jeopardize patient safety or represent economically wasteful prescribing practices.

**Accepted for Publication:** November 22, 2005.

**Correspondence:** Randall S. Stafford, MD, PhD, Stanford Prevention Research Center, Program on Prevention Outcomes and Practices, Hoover Pavilion, 211 Quarry Rd, Stanford, CA 94305 (rstafford@stanford.edu).

**Financial Disclosure:** None.

**Funding/Support:** This study was supported by research grant R01-HS013405 from the Agency for Healthcare Research and Quality. Merck and Company, Inc, and IMS Health provided access to the data used in this analysis.

**Role of the Sponsor:** None of the 3 supporting organizations played a role in the design and conduct of the study, analysis and interpretation of the data, or the preparation and approval of the manuscript.

REFERENCES

1. Appler WD, McMann GL. View from the nation's capital: "off-label" uses of approved drugs: limits on physicians' prescribing behavior. *J Clin Psychopharmacol.* 1989;9:369-370.
2. Chavey WE II, Blaum CS, Bleske BE, Van Harrison R, Kesterson S, Nicklas JM. Guideline for the management of heart failure caused by systolic dysfunction, II: treatment. *Am Fam Physician.* 2001;64:1045-1054.
3. Chen H, Deshpande AD, Jiang R, Martin BC. An epidemiological investigation of off-label anticonvulsant drug use in the Georgia Medicaid population. *Pharmacoepidemiol Drug Saf.* 2005;14:629-638.
4. Loder EW, Biondi DM. Off-label prescribing of drugs in specialty headache practice. *Headache.* 2004;44:636-641.
5. Hoo GW. Off label, on target? *Chest.* 2004;126:1025-1025.
6. Nightingale SL. Off-label use of prescription drugs. *Am Fam Physician.* 2003;68:425-427.
7. Pomerantz JM, Finkelstein SN, Berndt ER, et al. Prescriber intent, off-label usage, and early discontinuation of antidepressants: a retrospective physician survey and data analysis. *J Clin Psychiatry.* 2004;65:395-404.
8. Stone KJ, Viera AJ, Parman CL. Off-label applications for SSRIs. *Am Fam Physician* 2003;68:498-504.
9. Brosgart CL, Mitchell T, Charlebois E, et al. Off-label drug use in human immunodeficiency virus disease. *J Acquir Immune Defic Syndr Hum Retrovirol* 1996; 12:56-62.
10. Choonara I, Conroy S. Unlicensed and off-label drug use in children. Implications for safety. *Drug Saf.* 2002;25:1-5.
11. McIntyre J, Conroy S, Avery A, Corns H, Choonara I. Unlicensed and off label prescribing of drugs in general practice. *Arch Dis Child.* 2000;83:498-501.
12. Rayburn WF, Turnbull GL. Off-label drug prescribing on a state university obstetric service. *J Reprod Med.* 1995;40:186-188.
13. Donofrio PD, Busis NA. Regulatory and reimbursement issues in treating patients with immune-mediated neuropathies. *Neurology.* 2002;59:S41-S45.
14. Strom BL, Melmon KL, Miettinen OS. Post-marketing studies of drug efficacy: why? *Am J Med.* 1985;78:475-480.
15. IMS HEALTH. *National Disease and Therapeutic Index, Medication Reference File, 2001.* Plymouth Meeting, Pa: IMS Health; 2001.
16. Stafford RS, Radley DC. The underutilization of cardiac medications of proven benefit, 1990 to 2002. *J Am Coll Cardiol.* 2003;41:56-61.
17. Zell ER, McCaig LF, Kupronis BA, Besser RE, Schuchat A. A comparison of the National Disease and Therapeutic Index and the National Ambulatory Medical Care Survey to evaluate antibiotic usage. Available at: http://amstat.org/sections/srms /Proceedings. Accessed February 27, 2006.
18. *International Classification of Diseases, Ninth Revision, Clinical Modification.* Washington, DC: Public Health Service, US Dept of Health and Human Services; 1988
19. Medical Economics Co. *Physicians' Desk Reference.* 2002, 56th ed. Montvale, NJ: Medical Economics Co; 2002
20. Healthcare Series MICROMEDEX. *MICROMEDEX Healthcare Series.* Greenwood Village, Colo: MICROMEDEX; 2002
21. Payment for Covered Outpatient Drugs and Biologicals. 69 Federal Register 55763 (2004) (codified at 42 CFR §405, 410, 411, 414, 418, 424, 484, 486).
22. Healthcare Series Quarterly Listing. Updated MICROMEDEX. Winter New Rx Vol 113. Greenwood Village, Colo: MICROMEDEX Healthcare Series; 2002.
23. Center for Drug Evaluation and Research. Electronic Orange Book. 2003 Vol: Food and Drug Administration. Available at: http://www.fda.gov/cder/ob. Accessed February 27, 2006.
24. Rosenthal MB, Berndt ER, Donohue JM, Frank RG, Epstein AM. Promotion of prescription drugs to consumers. *N Engl J Med.* 2003;346:498-505.
25. Liang K, Zeger S. Longitudinal data analysis using generalized linear models. *Biometrika.* 1986;73:13-22.
26. Long J, Ervin L. Using heteroscedasticity-consistent standard errors in the linear regression model. *Am Stat.* 2000;54:217-224.
27. Wilde Mathews A. US gets dose of ideas on drug safety tactics from developed nations: in Europe and elsewhere, vigilance remains high in postapproval stage. *Wall Street Journal Europe.* December 31, 2004;22(234):1.
28. Larkin M. Warner-Lambert found guilty of promoting Neurontin off label. *Lancet Neurol.* 2004;3:387.

Downloaded from www.archinternmed.com, on February 19, 2007
©2006 American Medical Association. All rights reserved.