## REPLY DECLARATION OF PROFESSOR MEREDITH ROSENTHAL

### I.    Background

1.      The following report details my response to issues raised by Defendants' experts Dr. Scott Morton, Dr. Keeley, and Dr. Chintagunta.[1]  Because I have already addressed many of the issues discussed below in an earlier report to the Court, I incorporate by reference my previous declaration filed in this case,[2] and do not repeat the observations and opinions that are contained therein.  In addition to the documents cited in my previous declaration, I have relied upon the documents listed in Attachment A to this report.  An updated version of my *curriculum vitae* appears in Attachment B.

### II.    Summary of Opinions

2.      Having reviewed the declarations of Drs. Scott Morton, Keeley, and Chintagunta as well as the depositions of Drs. Scott Morton and Keeley,[3] I am of the opinion that none of the issues they raise undermine the analysis and opinions I have provided regarding common impact to the proposed Class and the ability to estimate aggregate damages to the Class as a whole.

---

[1]  Declaration of Professor Fiona Scott Morton, December 21, 2006 (hereafter "*Scott Morton Declaration*"); Declaration of Michael C. Keeley, Ph.D. in Opposition to Plaintiffs' Motion for Class Certification, December 21, 2006 (hereafter "*Keeley Declaration*"); Declaration of Pradeep K. Chintagunta, December 20, 2006 (hereafter "*Chintagunta Declaration*"); all *In re: Neurontin Marketing Sales Practices, and Products Liability Litigation*, US District Court District of Massachusetts, MDL Docket No. 1629, Master File No. 04-10981-PBS.

[2]  "The Economics of Off-Label Promotion and Estimation of Impact on the Class of Neurontin Endpayers," Declaration of Meredith Rosenthal, *In re: Neurontin Marketing Sales Practices, and Products Liability Litigation*, US District Court District of Massachusetts, MDL Docket No. 1629, Master File No. 04-10981-PBS, August 8, 2005 (hereafter "*Rosenthal Declaration*").

[3]  Deposition of Fiona Scott Morton, February 7, 2007 (hereafter "*Scott Morton Deposition*"); Deposition of Michael C. Keeley, January 25, 2007 (hereafter "*Keeley Deposition*"); both *In re: Neurontin Marketing Sales Practices, and Products Liability Litigation*, United States District Court District of Massachusetts, MDL Docket No. 1629, Master File No. 04-10981-PBS.

CONTAINS CONFIDENTIAL INFORMATION SUBJECT TO COURT ORDER

3.     In their reports, Defendants' experts have raised the usual objections that variation in the characteristics of members of the proposed Class (*e.g.*, the training of the treating physician, the formulary of the health plan, the medical history of the patient) is suggestive of the need for individualized inquiry.[4]  While I agree that there are indeed differences among Class members that relate to the magnitude of impact each member experienced as a result of the allegedly unlawful conduct, the econometric methods I propose nonetheless will produce a valid estimate of the aggregate number of Neurontin prescriptions caused by the marketing and promotional activities at issue.

4.     Defendants' expert reports focus extensively on textbook econometric concerns that apply to almost any analysis and attempt to use these arguments to suggest that my analysis cannot demonstrate and measure the impact of the allegedly unlawful conduct.  To the extent that valid empirical issues are raised, however, in my previous report I also identified these challenges to measuring the impact of off-label promotion and suggested how I would address them.[5]  While a fairly sophisticated analysis is required to estimate the impact of Defendants' alleged unlawful promotion of Neurontin, the empirical issues are similar to those that I have addressed in other work[6] and are generally present in health policy work, where outcomes are often subject to influence by multiple economic and clinical factors.  Moreover, none of the valid modeling challenges identified by Defendants' experts is particularly unusual in economic analysis generally: academic economists and expert witnesses overcome the same list of

---

[4]  *Keeley Declaration*, ¶ 14; *Scott Morton Declaration*, ¶ 33.

[5]  *Rosenthal Declaration*, ¶¶ 29-41.

[6]  See, for examples, M.B. Rosenthal, E.R. Berndt, J.M. Donohue, A.M. Epstein and R.G. Frank, "Demand Effects of Recent Changes in Prescription Drug Promotion" in *Frontiers in Health Policy Research*, v. 6, David M. Cutler and Alan M. Garber, editors,  MIT Press, June 2003; and M.B. Rosenthal, R.G. Frank, Z. Li and A.M. Epstein, "From Concept to Practice: Early Experience with Pay-for-Performance," *The Journal of the American Medical Association* (*JAMA*), 294(14): 1788-93, October 12, 2005.

econometric problems routinely in peer-reviewed publications and for the purposes of class certification.

5.      In the remainder of my report I provide a detailed accounting of the flaws and omissions that I believe render Defendants' expert reports unconvincing in their attempts to defeat Class certification.  In Section III, I address Dr. Scott Morton's report; in Section IV I respond to Dr. Keeley; and in Section V, I address Dr. Chintagunta's essay on response heterogeneity.

## III.    <u>Report of Dr. Scott Morton</u>

6.      Dr. Scott Morton undertakes a lengthy catalogue of the potential hazards that my proposed analysis will face and concludes without any empirical basis that I am unlikely to be able to overcome the many limitations she identifies regarding the available data and estimation techniques.  While she reviews a standard set of econometric concerns, most of which I have anticipated and noted in my own declaration,[7] she does not acknowledge that leading economists have contributed to a body of literature that examines the impact of promotion on pharmaceutical sales and in so doing have faced and satisfactorily addressed these same problems using data and methods analogous to those I describe in my report.  Indeed, nowhere in her report does Dr. Scott Morton acknowledge or critique the best-known papers in the economic literature on promotion, which I review in my earlier declaration.[8]  Instead, she asserts that "The studies in this area typically have some advantage over Dr. Rosenthal's proposal in that they have data at the physician level, more observations, a simpler model, or some combination of the above."[9]  To support her assertion, Dr. Scott Morton selectively reviews two papers by Defendants' other

---

[7]  *Rosenthal Declaration*, ¶¶ 29-41.

[8]  *Rosenthal Declaration*, ¶¶ 20-28.

[9]  *Scott Morton Declaration*, ¶ 81.

expert, Dr. Chintagunta.   But the literature review contained in one of those two studies contradicts her statement that the standard analytic strategies in this area involve physician-level data:

> "To summarize, most previous research in this area has looked at aggregate analyses of the sales (prescriptions) – detailing relationship."[10]

7.      Moreover, in her description of a purportedly superior aggregate analysis of promotional effects undertaken by Dr. Chintagunta with R. Desiraju, Dr. Scott Morton makes transparent her willingness to apply a double standard for analytical rigor.   According to her, my proposed model "describes a simplified aggregate relationship between promotions and purchases,"[11] while their analysis is "simpler" in a good way because it includes only one promotional variable, detailing.   But of course, the underlying economics that are at play are the same in their model of promotion and sales as in mine, so that including only detailing in the Chintagunta/Desiraju model raises the issue of omitted variable bias, a problem that Dr. Scott Morton counts against my approach later in her declaration[12] but ignores when it comes to Dr. Chintagunta's work.

8.      Throughout her report, Dr. Scott Morton relies on abstract, worst-case scenario arguments while ignoring the existence of a substantial body of peer-reviewed literature on the effects of pharmaceutical promotion, which effectively demonstrates that standard econometric techniques are available to minimize the impact of a wide array of challenges to estimation and causal inference.

---

[10] P. Manchanda and P.K. Chintagunta, "Responsiveness of Physician Prescription Behavior to Salesforce Effort: An Individual Level Analysis," *Marketing Letters*, Vol. 15(2-3), p. 132.

[11] *Scott Morton Declaration*, ¶ 26.

[12] *Scott Morton Declaration*, ¶ 67 as well as in ¶¶ 41-43.

---

### *Dr. Scott Morton Misunderstands the Purpose of My Analysis*

9.      Before she lists all of the possible econometric problems I might encounter, Dr. Scott Morton criticizes my method on two conceptual grounds: (1) the fact that the model is designed to estimate an aggregate impact and does not identify which prescriptions were written due to the allegedly unlawful conduct, and (2) the fact that I assume that the promotional activities that were the vehicle for the allegedly unlawful conduct would not have occurred in a but-for scenario.

10.      With regard to the first point, as Dr. Scott Morton should be aware, I have been asked to address the question of whether Class-wide impact would have occurred if the allegations regarding Neurontin promotions are true and to propose a standard method for estimating the aggregate impact of the allegedly unlawful promotions on prescriptions of Neurontin.  I have been instructed by Counsel that questions of allocation are addressed at a later stage in the litigation.

11.      By misconstruing the purpose of my analysis, Dr. Scott Morton misleads the Court, saying my model "would not be able to segregate out cases where a physician prescribed Neurontin without having been influenced in that decision by any allegedly fraudulent promotion."[13]  But the purpose of my proposed model is precisely to segregate aggregate off-label promotion not caused by the alleged conduct from the impact of the alleged conduct.   The model does so by using regression techniques that not only assume an independent (i.e., unrelated to Pfizer/Warner Lambert's promotional activities) level and trend in off-label use, but

---

[13]  *Scott Morton Declaration*, ¶ 32.

also allow for the fact that non-challenged promotional activities will "spill over" into off-label uses.

12.    Moreover, despite the fact that the majority of the literature on promotion of prescription drugs[14] uses the same aggregate prescription data that I propose, Dr. Scott Morton takes the position that I would need to conduct a detailed individual analysis to: "find out which physicians were exposed to the entire range of allegedly fraudulent promotions.  Also, one would need to know which colleagues those physicians spoke with about Neurontin and the effect they had on the prescribing choices of those colleagues."[15]   In other words, she claims that the analysis would require tracing out the causal pathway for each individual prescription and identifying those that were linked to physicians exposed to the fraud or physicians exposed to other physicians exposed to the fraud (and so on.)  As witnessed by the literature I reviewed in my declaration[16] such an analysis could not be described as a standard approach to estimating the effect of an economic phenomenon such as promotion of prescription drugs.  It is noteworthy that the few papers that use physician-level measures of marketing exposure as described by Dr. Scott Morton appear in the marketing literature where the prime interest is in optimizing marketing strategy (that is, understanding how to target marketing efforts to gain the maximum advantage), in contrast to the economic literature which is concerned with aggregate effects.

13.    The second conceptual point of contention that Dr. Scott Morton raises against my proposed analytical method is in the specification of the but-for scenario.[17] The scenario that my model is designed to capture is one in which the promotional activities, including meetings, peer-

---

[14]  See, for examples, *Rosenthal Declaration*, ¶¶ 20-28.

[15]  *Scott Morton Declaration*, ¶ 33.

[16]  *Rosenthal Declaration*, ¶¶ 20-28.

[17]  *Scott Morton Declaration*, ¶¶ 36-37.

to-peer marketing lunches and dinners, and detailing visits to psychiatrists to discuss bipolar disorder would not have occurred. In contrast, Defendants' experts propose a scenario in which the flow of promotional efforts (and dollars associated with them) is unchanged but the alleged omission or inclusion of false information does not occur. Dr. Scott Morton's alternative but-for scenario appears to have been constructed for the sole purpose of arguing that impact cannot be estimated from available data. In particular, such a but-for scenario fits awkwardly with standard economics. Dr. Scott Morton has not explained, for example, what would be the economic rationale for Pfizer/Warner Lambert to hold a meeting to promote Neurontin for an off-label use for which there was no scientific support and do so with full disclosure of the lack of or negative evidence related to the use. To imagine such a but-for scenario borders on the absurd for the allegations related to peer-to-peer marketing and the use of scientific channels to spread misinformation.[18]

### *Dr. Scott Morton's Recitation of Problems Common to the Economic Literature on Promotion and Most Econometric Analyses is Uninformative*

14.     From Paragraph 38 of her declaration onwards, Dr. Scott Morton focuses on the challenges that I or any researcher would face in modeling the impact of Defendants' allegedly unlawful conduct. I do not debate that each of these issues may theoretically arise and constrain my analysis. But these problems are not unique to my proposed methodology nor are they without available remedies that are commonly used by economists, including Dr. Scott Morton and her coauthors. Furthermore, while Dr. Scott Morton has guessed that the cumulative impact of the specification and estimation problems I will need to address will be to render my analysis

---

[18]  Amended Class Action Complaint, *In re: Neurontin Marketing and Sales Practices Litigation*, MDL Docket No. 1629, Master File No. 04-10981-PBS, February 1, 2005 (hereafter *Complaint*), Section IV.D

impossible, she could not know this because neither she nor I have obtained all the data needed to determine the magnitudes of these problems.[19]

15.     The first econometric problem that Dr. Scott Morton raises is endogeneity, which she describes using an example in which an unmeasured or immeasurable factor such as the state of medical knowledge affects both sales and promotion and therefore causes the coefficient on promotion to be biased relative to the true effect of promotion on sales.  While she initially acknowledges that I address endogeneity in my report, Dr. Scott Morton then describes at length how my "OLS" model[20] will fail despite the fact that I suggest that I will test for and accommodate endogeneity in my model[21]  and describe specifically in my deposition the instrumental variables approach for doing so, which she notes is the appropriate course.[22]

---

[19] In fact, she agrees to that in deposition: "Q. When you say 'likely,' is that something we can quantify, or no?  A. The reason that I can't say for sure that the problems listed above will be insurmountable is because it would require actual data to confirm it 100 percent" (*Scott Morton Deposition*, p. 48).  She also adds in deposition that she has not seen data "from Pfizer or Warner-Lambert, Parke-Davis in terms of its marketing sales and promotion over time" (at p. 65).

[20] Dr. Scott Morton references my model as an "OLS" (ordinary least squares) model despite the fact that this is a term that refers to a method of estimation that can be applied to a range of models and nowhere in my declaration have I suggested that I would estimate the model using OLS.

[21] *Rosenthal Declaration*, footnote 63.

[22] *Scott Morton Declaration*, ¶ 46.  In a discussion regarding the Berndt article, in deposition Dr. Scott Morton responds to the following question: "Do you have an opinion as to whether or not the authors of this article adequately addressed the issue of endogenity by the employment of instrumental variables?"

> A. Yes, I think that they have. Let me remark once again that this is easier than what Professor Rosenthal is trying to do because she has four measures that are very slightly different for the same thing.  Here they included endogenous variables, even though there are three of them they're quite different.  So you have the price which doesn't move very much, and then you have detailing, which as they use is the instrument we discussed before, which is the cumulative marketing efforts on the other drugs.  And then direct to consumer advertising, I don't know what -- they are not explicit about why production worker wages or price indices for intermediate goods would have anything to do with that, but clearly those would affect price.  So they have, you know, they have a good story, I would say, for their instruments for these drugs.  And that's the part that I'm -- it's not clear to me that Professor Rosenthal could do" (*Scott Morton Deposition*, pp. 121-122).

Once again, it is clear that Dr. Scott Morton is "assuming" that this cannot be done with no evidence to support it. In fact, in her deposition she admits in response to "How do economists go about trying to investigate the availability or lack thereof of valid instruments in a matter such as this?" that "So this is the part of the field that I think is most difficult, because it requires creativity and also perseverance, and so therefore I cannot tell you a methodology by which you find instruments, that just doesn't exist" (p. 89).  She further states:

16.    While Dr. Scott Morton has not analyzed data for Neurontin, she suggests that it is possible to predict the direction of the potential bias due to endogeneity in the version of my proposed analysis she assumes will be undertaken without use of instrumental variables.  She bases this conclusion on the notion that scientific knowledge is the cause of the endogeneity problem.  In her description she assumes that the updating of medical knowledge is positively correlated with levels of promotional efforts and cites a recent paper that controlled for the timing and content of scientific publications in a model of the impact of marketing on prescription drug sales.  But she does not suggest what would be the sign of the bias if the new medical knowledge suggested that Neurontin was ineffective for off-label uses.    My understanding of the allegations is that the Class is seeking compensation precisely because there is no valid "medical knowledge" to support claims related to certain off-label promotions for Neurontin.  Thus, assuming the allegations are true, the bias, if any, would be negative and therefore the impact of the conduct at issue would be underestimated.

17.    While I expect to undertake the instrumental variables analysis discussed above, I also noted in my earlier declaration that I would also look for one or more comparator drugs that could permit a refinement of my analysis.  Such an approach can be termed a "difference-in-difference" or "quasi-experimental" analysis because it uses a contemporaneous comparison

---

"I certainly would be looking for a fuller discussion of instruments and a proposal of what she might use.  One cannot know if they're adequate until after one has run the regression and done the test" (p. 151).

That is precisely the point.  All of the problems Dr. Scott Morton suggests will be insurmountable can and will be dealt with at the analysis phase of this litigation once I receive the necessary data.  To suggest at this point that my model cannot do so is premature.  Dr. Scott Morton goes on to say in her deposition:

"…I think one of the features of the profession that's perhaps an art rather than a science is deciding how appropriate it is to use one variable or data source rather than another in attempting to measure a particular concept" (p. 147).

group to filter out common trends from the effect of the variable of interest.[23]   Despite the fact

that this approach is widely used by economists to estimate causal effects, Dr. Scott Morton

contends that it will not be useful in this case, because: "The only way to be sure one has

identified a causal relationship through this approach is to choose a comparator drug with

identical scientific characteristics, and identical changes in response to new knowledge and

demand over time as Neurontin.  This is both unlikely and impossible to test.[24]"  Dr. Scott

Morton's characterization of the standard for using such an approach is not, however, the norm

used in the research design literature.[25]   As she says, there is no way to prove a non-randomly

assigned comparison group is perfectly exchangeable with an intervention group.   For this

reason, such proof is not a useful standard for judging when difference-in-difference analysis is

appropriate.   Instead, the standard is that the contemporaneous comparison group should be

selected based on comparability at baseline and, in particular, with regard to characteristics that

may be associated with the effect of interest.[26]

18.     In the conclusion to her section on endogeneity, Dr. Scott Morton suggests that it will not

be useful to examine the timing of the alleged conduct and changes in sales for the targeted off-

label uses and "avoid using instrumental variables."   But I did not propose such an analysis as

the principal method of estimating the impact of the allegedly unlawful conduct.   Such an

---

[23]  In ¶ 54, Dr. Scott Morton claims I contradicted myself in my deposition with regard to comparator drugs.  In fact, I was simply explaining that my analysis would consider use of a comparator drug in the context of a panel data analysis which would be the standard economic approach.

[24]  *Scott Morton Declaration*, ¶ 55.

[25]  For example, the classic text on research design notes that "In quasi-experiments, the counterfactual inference often depends on a nonequivalent comparison group deliberately chosen to have maximum pretest similarity to the treatment group on as many observed characteristics as possible or on some particular feature that the researcher believes will be a particularly salient threat to validity" (W.R. Shadish, T.D. Cook, and D.T. Campbell, *Experimental and Quasi-experimental Designs for Generalized Causal Inference*, 2001, pp. 159-160).

[26]  *Ibid*.

analysis might, however, be a useful way of providing support for the primary econometric analysis. The use of multiple sources of information to support inferences when the econometrician faces a set of complex relationships is indeed a valid approach, and one that has been exemplified by Dr. Scott Morton's own work. For example, in her paper on brand and generic firms in the pharmaceutical industry, Dr. Scott Morton addresses the question of whether there are economic advantages to integration between brand name and generic drug operations using four sets of analyses, including a section culling anecdotes from the field.[27]

### Dr. Scott Morton's Statements about Missing/Omitted Factors are Disengenuous

19.    First, Dr. Scott Morton does not acknowledge what every economist knows: models are a simplification of reality by definition and therefore all models are missing some factors that affect the dependent variable. For example, in Dr. Scott Morton's paper on the distortionary effects of Medicaid drug rebate policy, she estimates a drug price equation that includes only Medicaid market share, whether or not there is generic competition, the number of therapeutic substitutes, years on the market and a set of therapeutic class dummy variables.[28] She does not control for drug characteristics, such as whether the drug had priority review status, dosing frequency, formulation (e.g., injectable vs. oral) or side effect profile, all of which could be expected to affect drug prices.

20.    Likewise, in paragraph 63, she suggests that I need to know which detail visits involved free samples to estimate correctly the average effect of detailing despite the fact that the major

---

[27] F. Scott Morton, "Horizontal Integration between Brand and Generic Firms in the Pharmaceutical Industry," *Journal of Economics and Management Strategy*, 11(1):135-168, 2002.

[28] F. Scott Morton and M. Duggan, "The Distortionary Effects of Government Procurement: Evidence from Medicaid Prescription Drug Purchasing," *Quarterly Journal of Economics*, Vol 121(1), 2006.

papers in this area do not include such a variable.[29]  And as mentioned above (in paragraph 6), Dr. Scott Morton turns around in paragraph 82 to commend Dr. Chintagunta's use of a "simpler model" that included only detailing and thus omitted data on free samples and journal advertising.

21.    In another example of using a much higher standard for my proposed analysis than her own work and that of other economists, she dismisses my discussion of including time trends in my model.  In the economic literature on promotion of pharmaceuticals, the age of a drug or time since entry is nearly always included.[30]  Because my analysis focuses on a single drug, this is exactly the same as a time trend, a fact that Dr. Scott Morton ignores.  In fact Dr. Scott Morton includes an identical measure, "time on market," in her model of drug prices that appears in her recent paper with Mark Duggan.[31]  They state that this variable captures the fact that newer drugs embody newer technology and therefore cost more, but this is no different than my model in which I describe the role of the time trend in terms of capturing market awareness.[32]

22.    Finally, it should be noted that at this time, I do not know precisely which promotional activities will be identified as within the scope of the allegations, which off-label uses will be targeted in the final analysis, and what form the data provided by the Defendants will take.

---

[29]  J. Rizzo, "Advertising and Competition in the Ethical Pharmaceutical Industry: The Case of Antihypertensive Drugs," *Journal of Law and Economics*, Vol. XLII, April 1999; E.R. Berndt, L. Bui, D. Reiley and G. Urban, "Information, Marketing and Pricing in the US Antiulcer Drug Market," *American Economic Review*, Vol. 85(2), 1995; M. Hurwitz and R. Caves, "Persuasion or Information? Promotion and the Shares of Brand Name and Generic Pharmaceuticals," *Journal of Law and Economics,* Vol. 31, 1988; E.R. Berndt, L. Bui, D. Reiley and G. Urban, "The Roles of Marketing, Product Quality and Price Competition in the Growth and Composition of the U.S. Anti-Ulcer Drug Industry," National Bureau of Economic Research (Cambridge, MA), Working Paper No. 4904, October 1994.

[30]  For examples: Berndt, *et al.* (1995), *op. cit.* and Berndt, *et al.* (1994), *op. cit.* use AGE of the drug in market share equations; Rizzo (1999), *op. cit.* uses two year dummy variables, a variable that measures the number of years a drug has been on patent, as well as the square of that term; Hurwitz and Caves (1988), *op. cit.* use a single year dummy (they have two years of data) and a variable that measures the number of years a drug was on patent.

[31]  Scott Morton and Duggan (2006), *op. cit.*

[32]  *Rosenthal Declaration*, ¶ 33.

Therefore, I cannot describe in detail which variables should be included in the analysis although I have outlined both categories of variables and specific examples.[33] Dr. Scott Morton does not acknowledge this point but merely assumes that I will omit some important confounding factors. Absurdly, she also asserts that "it appears that data availability or ex-post statistical significance will guide the choice since no theory or literature has been brought to bear on the problem,"[34] despite my detailed review of the theory and empirical evidence on promotion in Section V of my declaration as well as my characterization of the variables that will be included in my analysis with reference to the prior literature and theory.[35]

### Dr. Scott Morton's Exhaustive List of Econometric Issues Fails to Undermine the Proposed Analysis

23.     In her paragraphs 68-80, Dr. Scott Morton provides a didactic tour of common econometric problems including multicolinearity, small numbers ("degrees of freedom"), sampling error, uncertainty about correct functional form, lack of variation, and lack of power due to instrumental variables.   For further details on the failure of these arguments see Attachment B to the Reply Declaration of Raymond S. Hartman in this matter.  While these are all valid issues, all of the papers in this literature face some or all of the same problems and they have all been judged by peer-review to meet the standards of economic analysis.  All of these issues affect Dr. Scott Morton's own published work.[36]

---

[33]  *Rosenthal Declaration*, ¶¶ 33-34.

[34]  *Scott Morton Declaration*, ¶ 67.

[35]  *Rosenthal Declaration*, ¶¶ 33-34.

[36]  For example, Dr. Scott Morton questions the precision of using the National Disease and Therapeutic Index (NDTI) database to obtain diagnosis-specific estimates of prescriptions.  The NDTI database is an office-based survey of physicians with a sample size of approximately 3,000-3,500 reflecting more than 300,000 patient encounters per year.  The data summarize the reasons for a patient's visit, diagnosis, primary payer, and the drugs prescribed (called drug mentions).

---

24.     Moreover, I acknowledge and propose methods to address the most important challenges named in this section.  But as I have observed elsewhere in my review of her declaration, Dr. Scott Morton has overlooked or chooses to ignore sections of my report that contradict her assertions.  For example, in paragraph 74 with reference to time patterns of promotional effects, Dr. Scott Morton claims "Dr. Rosenthal's model does not consider this critical aspect of physician learning at all."  But in my paragraph 34 of my 2005 declaration, I, in fact, note that "it may be necessary to…introduce lagged values of $O_t$ and/or the stock (cumulative sum) of promotional spending as in King and Berndt.  These additional variables reflect the key insight in the economic literature on promotion that shows long-lived effects on prescribing patterns."

## IV.    Dr. Keeley

### *Summary of Issues Raised by Dr. Keeley*

25.     In contrast to Dr. Scott Morton, Dr. Keeley largely focuses his rebuttal on the traditional defense to Class certification that individual issues confound an aggregate analysis.  This defense fails because the Class is united by way of being harmed through a common mechanism (allegedly unlawful promotion of off-label uses) and while impact may be mediated by physician, consumer or third-party payer characteristics, such individual variation is subsumed and reflected in the aggregate or average effect.

---

These survey data are widely used in research (see, for example, D.C. Radley, S.N. Finkelstein, R.S. Stafford, "Off-label Prescribing Among Office-Based Physicians," *Archives of Internal Medicine*, Vol. 166, 2006) as well as by pharmaceutical companies for strategic purposes.  Another source of office-based survey data with a smaller sample size that provides similar information, is the National Ambulatory Medical Expenditure Survey fielded by the Centers for Disease Control.  Those data, which suffer from the same sampling issues described by Dr. Scott Morton as damaging to my analysis have been used by Dr. Scott Morton and her colleague M. Duggan in a recent paper on the effects of Medicaid rebate policy on drug pricing (Scott Morton and Duggan (2006), *op. cit.*).

For additional examples, see Reply Declaration of Raymond S. Hartman, February 21, 2007, *In re: Neurontin Marketing Sales Practices, and Products Liability Litigation*, Attachment B.

---

26.     Dr. Keeley, in an exact replica of Dr. Scott Morton's comments, also asserts the reasonability of Defendants' preferred but-for scenario, in which only the language of promotion is changed, but the promotional events and efforts themselves remain.  Likewise, he picks up on her concerns that the econometric challenges that I face will render my task impossible to complete, without supporting these claims by way of reference to the previous literature on promotion or related data analysis.

27.     Finally, Dr. Keeley raises a new issue that exposes his lack of familiarity with health care markets.  He suggests that even if there were truth to the allegations, the market would quickly detect those false claims because patients would observe treatment failure and stop taking Neurontin.  Below, I suggest the reasons why standard economic logic ("only products that meet consumers' needs survive and prosper")[37] may not apply here and provide a dramatic recent example to illustrate.

### Dr. Keeley's Cataloguing of Factors that Could Affect Prescribing is a Pointless Exercise

28.     Dr. Keeley describes a long list of factors that could affect physician and patient decisions about using Neurontin in individual cases.  In my deposition, I was asked to review a similar list and render an opinion as to whether such factors could affect an individual's likelihood of receiving Neurontin.[38]

29.     But the existence of variation and a multitude of independent factors affecting prescribing does not itself stand in the way of demonstrating common impact.  An analysis of aggregate impact subsumes and reflects the distribution of individual characteristics that influence

---

[37] *Keeley Declaration*, ¶ 22.

[38] Deposition of Meredith Rosenthal, October 24, 2006, *In re: Neurontin Marketing Sales Practices, and Products Liability Litigation*, US District Court District of Massachusetts, MDL Docket No. 1629, Master File No. 04-10981-PBS (hereafter "*Rosenthal Deposition*").

prescribing.  This fact has been recognized in the certification of countless classes, including those in pharmaceutical pricing cases, which are analogous to the current matter.  The only issue that needs to be addressed in the proposed analysis is the set of variables that belong in an aggregate model of promotional effects, which are dealt with in my previous declaration.[39] Variables that capture factors such as patient preferences, medical history, or severity of illness[40] are not included in the aggregate model because there is no reason to believe that they change over time in the aggregate, and more importantly there is no reason to expect these factors to be correlated with the variable of interest (the measures of the allegedly unlawful conduct).

### Dr. Keeley's Claim that Measuring Injury Requires Individual Inquiry is Incorrect

30.     In his second section, Dr. Keeley provides another long list of factors affecting the extent of financial injury to third-party payers and a broader measure of injury (welfare loss) to consumer Class members.  In his exegesis, he notes at several junctures that I agreed that each of these factors could come into play in individual cases.  But his analysis again fails to explain why an aggregate analysis would not capture the average effect on Class members, nor does he concede that Dr. Hartman was instructed by Counsel to assume that the measure of injury would be the amount paid for Neurontin.  Moreover, even if the Court decides to rely on an alternative measure of injury, such as the difference between the amount paid for Neurontin and the amount that would have been paid for an alternative therapy, an aggregate analysis that produces an estimate of the average effect is still appropriate and feasible.

---

[39] *Rosenthal Declaration*, ¶¶ 33-34.

[40] *Rosenthal Declaration*, ¶ 36.

***Dr. Keeley Puts Forward the Same Implausible But-for Scenario as Dr. Scott Morton***

31.     I have already addressed the flaws in Defendants' experts' but-for scenario in which they attempt to separate the allegedly fraudulent information (or omission thereof) from the promotional activities that were the vehicle for such information.  In particular, neither Dr. Scott Morton nor Dr. Keeley explain why Pfizer/Warner Lambert would find it profit-maximizing to hold an event or detail physicians with information about the lack of evidence to support Neurontin's off-label uses.  The fact that both experts construct identical but-for scenarios, and propose one that cannot easily be modeled with existing data, is unlikely to be coincidental.

***Dr. Keeley Ignores the Existence of Standard Econometric Methods and the Previous Literature***

32.     Dr. Keeley asserts that I present no support for the claim that my model would produce statistically reliable results.  While he does not describe what he believes would be adequate support, Dr. Keeley concludes on the basis of his experience[41] with similar models that I will not be able to overcome the analytical limitations of the aggregate analysis I propose.  Dr. Keeley undermines his own credibility when he claims to know that certain technical problems are of an insurmountable magnitude without analyzing any data and then turns around and criticizes my failure to assess the magnitude of problems like multicolinearity.[42]  In so doing, he also fails to acknowledge that critical data with which I propose to implement my model have not yet been produced to me.

---

[41]  I would note that Dr. Keeley has done almost no research in the area of health care or pharmaceutical economics. In his deposition, he conceded that he hasn't "published any work directly related to the healthcare field" nor "focused more specifically on the pharmaceutical industry" (*Keeley Deposition*, pp. 19-20)

[42]  *Keeley Declaration*, ¶¶ 56-57.

33.    Dr. Keeley also completely ignores the existence of a substantial literature on aggregate promotional effects in the pharmaceutical industry, although he includes the key papers in the list of materials relied upon.  The fact of numerous peer-reviewed articles estimating the impact of promotion on sales of prescription drugs bears witness to the fact that such analysis is feasible and moreover, that there are standard economic methods for doing so in light of the statistical problems Dr. Keeley asserts will be fatal.

### *Why the Effects of the Alleged Fraud Do Not Dissipate Over the Class Period*

34.    Dr. Keeley doubts whether the Class could have been impacted over the entire Class period even if the allegations are true.  His claim is that markets enforce "truth in advertising." That is, even if a manufacturer disseminated false information through its marketing schemes, patients and physicians would quickly learn the truth (that is, that Neurontin was not effective for certain off-label uses) and stop paying for Neurontin.  Relatedly, he objects to my use of the term "credence good" to describe prescription drugs[43] which suggests that patients cannot tell with certainty whether a drug improved or worsened their condition.  But the inability of patients to evaluate their care has been recognized by economists as a central feature of health care markets (and reason for health care market failures) since Kenneth Arrow wrote his seminal paper on "Uncertainty and the Welfare Economics of Medical Care."[44]  This is not to say that a patient will not know if he or she feels better after taking a drug (if the condition is symptomatic) but that there are other factors, including placebo effects and regression to the mean (i.e., a patient suffering symptoms who begins a new treatment may have improved subsequently in the natural

---

[43]  *Keeley Declaration*, ¶ 62.

[44]  K. Arrow, "Uncertainty and the Welfare Economics of Medical Care," *The American Economic Review*, Vol. 53: 941-73, 1963.  For a more recent application, see for example, W. Emons, "Credence Goods and Fraudulent Experts," *The RAND Journal of Economics*, Vol. 28(1), Spring 1997.

course of a disease), that make it difficult if not impossible for an individual patient to attribute improvement to a particular drug.

35.    Empirical support for the failure of health care markets to work in the way Dr. Keeley suggests is plentiful.  In a recent paper examining patterns of off-label use of medications, Radley, *et al.* found that 15% of drug mentions reported in the National Disease and Therapeutic Index (an IMS database that I describe in my August 2005 declaration and in footnote 36 of this report) "lacked scientific evidence for the indication they were used to treat."  Notably, this same article noted that Gabapentin (Neurontin) had the highest proportion of off-label use of any drug.[45]  Another prominent example where there is extensive and persistent off-label use where scientists agree that there is no net benefit and the potential for harm is in the use of antibiotics for viral conditions.[46]

## V.      Dr. Chintagunta's Essay on Response Heterogeneity

36.    For unknown reasons, Dr. Chintagunta's report only briefly touches on issues related to Class certification.  Indeed it appears that he was only asked to:

> I have been asked by counsel for Defendants to assess if physicians are similarly situated in terms of being exposed to and being responsive to marketing activities of pharmaceutical companies. Within that context, I have also been asked to evaluate if aggregate regression models are appropriate for analyzing the impact of pharmaceutical promotions on prescribing decisions of physicians. I have not been asked to provide any opinions on the full range of factors that may affect physicians' prescription writing behavior.[47]

---

[45]  Radley, *et al.*, *op. cit.*

[46]  See, for example, J. Hickner, "A New Look at an Old Problem: Inappropriate Antibiotic Prescribing for Acute Respiratory Infections," *Annals of Family Medicine*, 2006; 4: 484-485.

[47]  *Chintagunta Declaration*, ¶ 7.

Accordingly, Dr. Chintagunta provides an academic tour of the literature on response variation with little reference to the problem at hand.

37.    Only towards the end of his report in paragraphs 32-35 does Dr. Chintagunta explain any connection between his essay and the proposed analysis and he limits his comments to generic statements about aggregation and endogeneity.  I have addressed the issue of endogeneity extensively above, so I will not repeat that discussion here.  Dr. Chintagunta's concerns about aggregation bias relate to his work on response heterogeneity and, similar to econometric issues raised by the other experts, they pertain very broadly to all aggregate analyses, examples of which include the leading papers on prescription drug promotion.[48]  The aggregation bias he identifies depends on both the degree of response heterogeneity and the nature of the underlying response function.  Without having the data I describe in my declaration in hand, it is impossible to assess the likely magnitude of such a bias.  Moreover, the article that Dr. Chintagunta cites in his declaration on this topic[49] also suggests that there are standard means of accounting for aggregation bias, and indeed they offer simulation evidence to support the effectiveness of such adjustments.

38.    Moreover, like the other experts, he pretends that these issues are not part of standard economic analysis and routinely dealt with in the literature.  For example, in paragraph 34 he states: "A major challenge is to identify good instruments – variables that are correlated with the endogenous explanatory variable but uncorrelated with the excluded factors comprising the error term in the regression model.  There is no obvious way of verifying the latter requirement."  But this is an absurdly generic statement.  There is an enormous literature using instrumental

---

[48]  Berndt, *et al.*, (1994) *op. cit.*; Berndt, *et al.*, (1995) *op. cit.*; Rizzo, *op. cit.*; Hurwitz and Caves, *op. cit.*

[49]  M. Christen, *et al.* (1997), "Using Market-Level Data to Understand Promotion Effects in a Nonlinear Model," *Journal of Marketing Research,* Vol. 34, No. 3, pp. 322-334.

variables.[50]    Moreover, there are commonly-used tests for exogeneity (the "obvious way of verifying" that Dr. Chintagunta worries does not exist), such as the Hausman test, which is routinely used in the literature and referred to by Defendants' other expert, Dr. Scott Morton.[51] Most agree these tests are imperfect, but they are standard approaches, accepted in the peer-reviewed literature.

## VI.    **Summary and Conclusions**

39.    Defendants' experts have offered a recitation of the usual claims that Class members vary in their situation and magnitude of injury, but do not explain why such variation precludes demonstration of impact on the Class as a whole or estimation of an average effect on Class members.    Moreover, they do not explain how such variation is different in character from the variability among members of approved Classes in similar legal matters, including antitrust matters related to pharmaceutical pricing where the institutional setting is identical to the one in this case.

40.    Similarly, Defendants' experts have largely reiterated and expanded upon a list of routine econometric problems that I noted in my earlier declaration would need to be addressed in my proposed analysis.    To draw the conclusion that these standard problems will undermine my analysis, Defendants' experts do not present empirical evidence but instead make abstract arguments.    Nowhere do they acknowledge that there is a body of peer-reviewed literature on the aggregate effects of pharmaceutical promotion that demonstrates the feasibility of such analysis

---

[50]  See, for example, the list of articles provided by Dr. Scott Morton in her footnote 61.

[51]  Dr. Scott Morton recognizes this in her deposition: "And then, of course, there's a test, you can do ex-post to see if your instruments are valid" (*Scott Morton Deposition*, p. 90).

and the availability of standard econometric methods to estimate impact despite the empirical challenges of the setting and data.

41.    In summary, I am of the opinion that none of the issues raised by Defendants' experts is sufficient to undermine the analysis and opinions I have provided regarding the mechanism of common impact to the proposed Class and the availability of standard economic methods to estimate aggregate damages.


Meredith Rosenthal
February 21, 2007

**Attachment A**

CONTAINS CONFIDENTIAL INFORMATION SUBJECT TO COURT ORDER

## Attachment A: Additional Documents Relied Upon

### Legal Documents

Amended Class Action Complaint, *In re: Neurontin Marketing and Sales Practices Litigation*, MDL Docket No. 1629, Master File No. 04-10981-PBS, February 1, 2005.

Declaration of Michael C. Keeley, *In re: Neurontin Marketing Sales Practices, and Products Liability Litigation*, US District Court District of Massachusetts, MDL Docket No. 1629, Master File No. 04-10981-PBS, December 21, 2006.

Declaration of Professor Fiona Scott Morton, *In re: Neurontin Marketing Sales Practices, and Products Liability Litigation*, US District Court District of Massachusetts, MDL Docket No. 1629, Master File No. 04-10981-PBS, December 21, 2006.

Declaration of Pradeep K. Chintagunta, *In re: Neurontin Marketing Sales Practices, and Products Liability Litigation*, US District Court District of Massachusetts, MDL Docket No. 1629, Master File No. 04-10981-PBS, December 20, 2006.

Deposition of Fiona Scott Morton, *In re: Neurontin Marketing Sales Practices, and Products Liability Litigation*, US District Court District of Massachusetts, MDL Docket No. 1629, Master File No. 04-10981-PBS, February 7, 2007.

Deposition of Meredith Rosenthal, *In re: Neurontin Marketing Sales Practices, and Products Liability Litigation*, US District Court District of Massachusetts, MDL Docket No. 1629, Master File No. 04-10981-PBS, October 24, 2006.

Deposition of Michael C. Keeley, *In re: Neurontin Marketing Sales Practices, and Products Liability Litigation*, US District Court District of Massachusetts, MDL Docket No. 1629, Master File No. 04-10981-PBS, January 25, 2007.

### Other Documents

Berndt, Ernst R., Linda Bui, David Reiley and Glen Urban, "The Roles of Marketing, Product Quality and Price Competition in the Growth and Composition of the U.S. Anti-Ulcer Drug Industry," National Bureau of Economic Research, Working Paper No. 4904, October 1994.

Christen, Markus, *et al.*, "Using Market-Level Data to Understand Promotion Effects in a Nonlinear Model," *Journal of Marketing Research,* Vol. 34(3), August 1997.

Emons, Winand, "Credence Goods and Fraudulent Experts," *The RAND Journal of Economics*, Vol. 28(1), Spring 1997.

Hickner, John, "A New Look at an Old Problem: Inappropriate Antibiotic Prescribing for Acute Respiratory Infections," *Annals of Family Medicine*, Vol. 4, 2006.

Radley, David C., *et al.*, "Off-label Prescribing Among Office-Based Physicans," *Archives of Internal Medicine*, Vol. 166, 2006.

Rosenthal, Meredith B., Ernst R. Berndt, Julie M. Donohue, Arnold M. Epstein, Richard G. Frank, "Demand Effects of Recent Changes in Prescription Drug Promotion," *Frontiers in Health Policy Research*, v. 6, David M. Cutler and Alan M. Garber, editors, MIT Press, June 2003.

Rosenthal, Meredith B., Richard G. Frank, Zhonghe Li and Arnold M. Epstein, "From Concept to Practice: Early Experience with Pay-for-Performance," *The Journal of the American Medical Association*, 294(14), October 12, 2005.

Scott Morton, Fiona and Mark Duggan, "The Distortionary Effects of Government Procurement: Evidence from Medicaid Prescription Drug Purchasing," *Quarterly Journal of Economics*, Vol. 121(1), 2006.

Shadish, William R., Thomas D. Cook, and Donald T. Campbell, *Experimental and Quasi-Experimental Designs for Generalized Causal Inference*, Houghton Mifflin Company, 2001.

**Attachment B**

*Meredith Rosenthal Curriculum Vitae*

# CURRICULUM VITAE

February, 2007

## MEREDITH B. ROSENTHAL

677 Huntington Avenue
Boston, MA  02115
(617) 432-3418

DATE & PLACE OF BIRTH:
5/7/68              Boston, MA

EDUCATION:
1998              Health Policy (Economics track), Ph.D., Harvard University
1990              International Relations, A.B., Brown University

ACADEMIC APPOINTMENTS
1998-             Associate Professor of Health Economics and Policy
                  Department of Health Policy and Management
                  Harvard School of Public Health

OTHER PROFESSIONAL EXPERIENCE:
1993-1994         Analyst, Health Economics Research, Inc./The Center for Health
                  Economics Research
1990-1993         Consultant, Price Waterhouse, Tax Economics Department

PROFESSIONAL SOCIETIES:
1995-present      Member: AcademyHealth, American Public Health Association,
                  International Health Economics Association, American Society of Health
                  Economists

PUBLIC SERVICE
    2001          Chair, Massachusetts Special Commission on Physician Compensation
    2003          Expert Testimony, Senate Special Committee on  Aging, Hearing on
                  Direct to Consumer Advertising of Prescription Drugs: Exploring the
                  Consequences
    2005          Expert Testimony, House Committee on Education and Workforce, House
                  Subcommittee on Employer-Employee Relations, Hearing on Examining
                  Pay-for-Performance Measures and Other Trends in Employer-Sponsored
                  Health Care
AWARDS
    2003          Labelle Lectureship in Health Policy, McMaster University
    2006          Alfred P. Sloan Foundation Industry Studies Fellowship

MAJOR ADMINISTRATIVE RESPONSIBILITIES:

| | |
|---|---|
| 2000-present | Committee on Higher Degrees in Health Policy, Harvard University |
| 1998-present | Admissions Committee, Ph.D. Program in Health Policy, Harvard University |

EDITORIAL ACTIVITIES:

| | |
|---|---|
| 1997-1998 | Assistant Editor, Evidence-based Health Policy and Management |
| 1997-present | Referee: *Journal of Health Economics*, *Inquiry*, *Health Services Research*, *Health Affairs, Journal of the American Medical Association* |

MAJOR RESEARCH INTERESTS:
Financial incentives for physicians
Economics of the pharmaceutical industry
Pay-for-performance in health care
Consumer-directed health plans
Behavioral health

TEACHING EXPERIENCE:

| | |
|---|---|
| 1999 | Health Policy and Management 507: Mental Health Economics and Policy in the United States |
| 2003-present | Health Policy and Management 209: Economics of Health Policy |

RECENT WRITTEN AND ORAL TESTIMONY:
*IBEW - NECA Local 505 Health & Welfare Plan and Joanne C. Gaddy v. SmithKline Beecham Corporation, and GlaxoSmithKline, plc*, United States District Court for the Eastern District of Pennsylvania.

*In re Augmentin Antitrust Litigation,* No. 02-CV-442, United States District Court for the Eastern District of Virginia.

*In re Lupron Marketing and Sales Practices Litigation*, United States District Court, District of Massachusetts, MDL No. 1430, CA No. 01-CV-10861.

*In re Pharmaceutical Industry Average Wholesale Price Litigation*, United States District Court for the District of Massachusetts, MDL No. 1456, Civil Action: 01-CV-12257-PBS

*In re Neurontin Marketing and Sales Practices Litigation*, MDL No. 1629, Master File No. 04-10981, United States District Court, District of Massachusetts.

*Gregory Clark and Linda Meashey vs. Pfizer Inc., and Warner-Lambert Company*, Court of Common Pleas, Philadelphia County, No. 001819.

*Meredith Rosenthal Curriculum Vitae*

BIBLIOGRAPHY

1. Rosenthal MB, Geraty RD, Frank RG, and Huskamp HA.  Psychiatric Provider Practice Management Companies: Adding Value to Behavioral Health? *Psychiatric Services*, 50(8): 1011-1013, August, 1999.

2. Rosenthal MB.  Risk Sharing and Delegation in Managed Behavioral Health Care, *Health Affairs*, 18(5): 204-13, (September/October), 1999.

3. Huskamp HA, Rosenthal MB, Frank RG, Newhouse JP.  The Medicare Prescription Drug Benefit: How Will the Game Be Played? *Health Affairs*, 19(2): 8-23, (March/April), 2000.

4. Rosenthal MB.  Risk Sharing and the Supply of Mental Health Services,  *Journal of Health Economics*, 19(6): 1047-1065,  2000.

5. Cutler DM, Epstein AM, Frank RG, Hartman RS, King C, Newhouse JP, Rosenthal MB, and Vigdor ER.  How Good a Deal Was the Tobacco Settlement? Assessing Payments to Massachusetts,  *Journal of Risk and Uncertainty*, 21 (2/3): 235-61, 2000.

6. Rosenthal MB, Landon BE, Huskamp HA.  Managed Care and the Role of Physician Organizations in Four Markets,  *Health Affairs*, 20(5):187-93, (September/October), 2001.

7. Rosenthal MB, Frank RG, Buchanan JL, and Epstein AM. Scale and Structure of Capitated Physician Organizations in California,  *Health Affairs*, 20(4):109-119, 2001.

8. Frank RG and Rosenthal MB. Plan Choice, Risk Bearing and Experience Rating: Explaining the Demand for Risk Adjustment, *Inquiry*,38(3):290-8, (Fall) 2001.

9. Cutler DM, Gruber J, Hartman RS, Landrum ME, Newhouse JP and Rosenthal MB.  The Economic Impacts of the Tobacco Settlement, *Journal of  Policy Analysis and Management*, 21(1): 1-19 (Winter) 2001.

10. Rosenthal MB and Newhouse JP. Managed Care and Efficient Rationing, *Journal of Health Care Finance*, 28(4):1-10, (Summer), 2002.

11. Rosenthal MB, Berndt ER, Frank RG, Donohue JM, and Epstein AM. Promotion of Prescription Drugs to Consumers, *New England Journal of Medicine*, 346(7):498-505, Feb. 2002.

12. Rosenthal MB, Frank RG, Buchanan JL, and Epstein AM. Transmission of Financial Incentives to Physicians by Intermediary Organizations in California, *Health Affairs*, 21(4):197-205, July-August, 2002.

13. Mello M, Rosenthal MB, and Neumann PJ. Direct-to-Consumer Advertising and Shared Liability for Pharmaceutical Manufacturers,  *JAMA*,  289(4): 477-81,  Jan. 22, 2003.

14. Rosenthal MB, Fernandopulle R, Song HR, and Landon BE. Paying for Quality: Providers' Incentives for Quality Improvement, *Health Affairs*, 23(2):127-41, March-April, 2004.

15. Rosenthal MB, Hsuan C. and Milstein A.  Awakening Consumer Stewardship of Health Benefits: Prevalence and Differentiation of New Health Plan Models. *Health Services Research*, 39(4): 1055-1070, August 2004.

16.  Donohue JM, Berndt ER, Rosenthal MB, Epstein AM, and Frank RG. Effects of Pharmaceutical Promotion on Adherence to Guideline Treatment of Depression. *Medical Care*, 42(12):1176-85, December 2004.

17. Rosenthal MB. Doughnut-hole Economics. *Health Affairs*, 23(6):129-35, November-December, 2004.

18. Rosenthal MB, Frank RG, Li Z, and Epstein AM.  From Concept to Practice: Early Experience with Pay-for-Performance.  *JAMA*, 294(14): 1788-93, October 12, 2005.

19. Rosenthal MB, Hsuan C. and Milstein A.  A Report Card on the Freshman Class of Consumer-directed Health Plans.  *Health Affair*s, 24(6):1592-1600, November-December, 2005.

20. Rosenthal MB, Newhouse JP, and Zaslavsky AM. The Geographic Distribution of Physicians Revisited, *Health Services Research*, 40(6 Part I):1931-1952, December 2005.

21. Rosenthal MB, Minden S, Manderscheid R, Henderson S.  A Typology of Organizational and Contractual Arrangements for Purchasing and Delivery of Behavioral Health Care.  *Administration and Policy in Mental Health*, Published Online: December 29, 2005.

22. Rosenthal MB and Frank RG. What is the Empirical Basis for Quality-based Incentives in Health Care? *Medical Care Research and Review*, 63(2):135-157, April 2006.

23. Rosenthal MB and Daniels NB. Beyond Competition: the Normative Implications of Consumer-Driven Health Plans. *Journal of Health Politics, Policy, and Law*. 2006;31(3):671-686.

24. Rosenthal MB, Landon BE, Normand S-LT, Epstein AM.  Pay for performance in commercial HMOs. *New England Journal of Medicine.*  November 2, 2006;355(18):1895-1902.

25. Mehrotra A, Epstein AM, Rosenthal MB.  Do Integrated Medical Groups Provide Higher Quality Care than IPAs? *Annals of Internal Medicine,* 145:826-33, December 5, 2006.

26. Rosenthal MB and Dudley RA.  Pay-for-Performance: Will the Latest Payment Trend Improve Care? *Journal of the American Medical Association*, 297(7):740-43, February 21, 2007.

Essays

1. Rosenthal MB.  Provider Reimbursement in the Twenty-first Century.  *Oncology Economics*, 1;2000.

2. Rosenthal MB.  Commentary on The economics of direct-to-consumer advertising of prescription-only drugs: prescribed to improve consumer welfare?  *Journal of Health Services Research and Policy*, 8; 2003.

Book Chapters

1. Rosenthal MB, Berndt ER, Donohue JM, Epstein AM, Frank RG. Demand Effects of Recent Changes in Prescription Drug Promotion. In <u>Frontiers in Health Policy Research</u>, v. 6, David M. Cutler and Alan M. Garber, editors,  MIT Press. June 2003.

2. Rosenthal MB, Donohue JM.  Direct-to-Consumer Advertising of Prescription Drugs: A Policy Dilemma.  In <u>Ethics, Public Policy, and the Pharmaceutical Industry in the 21st Century</u>, ed. M. Santoro, Cambridge University Press.  Forthcoming.