# Reply Declaration of Raymond S. Hartman

## I.    Qualifications

1.    My name is Raymond S. Hartman.  Since I have previously submitted my qualifications to the Court in this matter,[1] I do not repeat them here.  I do proffer my current CV in Attachment A to indicate additions to my previously submitted qualifications.  Additional materials relied upon in preparation of this Declaration are listed in Attachment C.

## II.    Overview and Summary

2.    I have been asked by Counsel to the named Plaintiffs and the Class to review the rebuttal Declarations put forward by Defendants' experts, Dr. Michael C. Keeley and Dr. Fiona Scott Morton.[2]

3.    While some of their criticisms are directed at my proposed analysis, the preponderance is directed at the modeling efforts proposed by Dr. Meredith Rosenthal.  Since I rely upon calculations made by Dr. Rosenthal, I analyze and respond to both sets of criticisms and indicate why they are without merit.  Indeed, at times the criticisms appear disingenuous, since the variations of the proposed modeling efforts that they criticize and characterize as impossible have been successfully implemented and published in peer-reviewed journal articles by them specifically and/or by other academics upon whom they rely in their testimony.

4.    My Declaration proceeds as follows.  In Section III, I address the criticisms of Defendants' expert of my proposed analysis.  In Section IV, I address the criticisms of selected Defendants' experts of the Declaration of Dr. Rosenthal.  Section V provides a summary of my opinions.

---

[1] "Estimation of Class-wide Damages," Declaration of Raymond S. Hartman, August 8, 2005, *In re: Neurontin Marketing and Sales Practices Litigation*, MDL Docket No. 1629, Master File No. 04-10981, United States District Court, District of Massachusetts.

[2] Declaration of Professor Fiona Scott Morton, December 21, 2006 (hereafter "*Scott Morton Declaration*"); Declaration of Michael C. Keeley, Ph.D., in Opposition to Plaintiffs' Motion for Class Certification, December 21, 2006 (hereafter "*Keeley Declaration*"); *In re: Neurontin Marketing Sales Practices, and Products Liability Litigation*, US District Court District of Massachusetts, MDL Docket No. 1629, Master File No. 04-10981-PBS.

I also reviewed the Declaration of Dr. Pradeep Chintagunta (Declaration of Pradeep K. Chintagunta, December 20, 2006 (hereafter "*Chintagunta Declaration*")).  I find his analysis focuses upon certain detailed aspects of Dr. Rosenthal's analysis; Dr. Rosenthal responds to his critiques.

CONTAINS CONFIDENTIAL INFORMATION SUBJECT TO COURT ORDER

### III.    Criticisms by Defendants' Expert of My Proposed Analysis

5.    Dr. Keeley is the expert that directly criticizes the analysis in my Declaration.  I characterize his criticisms as follows:

a)  He asserts that I have not identified (indeed have not "even addressed") methods and common evidence that can be used to analyze, show causation, injury and calculate the quantum of damages for each proposed class member, i.e., individual damages (Keeley ¶¶ 16, 58, 60).

b)  He asserts that I have failed "to put forward a method of estimating aggregate damages" (Keeley ¶¶ 21, 58, 60).

c)  He asserts that the methods that I have proposed to monetize injury as damages are not measures of "economic damages" (Keeley ¶¶ 58, 60).

d)  Finally, he asserts, with regularity, that issues of variation across Class members render the class device inappropriate for this litigation because "individual inquiry would be required"[3] of each Class member.  This last criticism seems to be addressed both at my analysis and the analysis of Dr. Rosenthal.

6.    That he should make the assertion summarized in ¶ 5.a) above regarding the necessity that I analyze and calculate damages for each (and apparently every) class member comes as no surprise, given his instructions from his counsel.  Dr. Keeley reports that he was "asked by counsel to undertake the following:"

a)  "Conduct an economic analysis of whether common evidence can be used to show that each member of the proposed class was harmed as a result of actionable conduct, i.e., determine whether common evidence can be used to prove causation and injury to each class member or whether individual inquiry would be required" (Keeley ¶ 12.a));

b)  "Assess whether *the amount of damages*, if any, suffered *by each* of the proposed class members is amenable to common proof" (Keeley ¶ 12.b), emphasis added).

7.    It is my understanding, based on instruction from Counsel and considerable experience in class action matters, that at this stage of the litigation such a showing and calculation of *individual damages* is not required.  It is my understanding that Plaintiffs' experts must use common evidence to demonstrate Class-wide impact resulting from the challenged conduct and put forward standard formulaic methodologies using that common evidence for calculating the aggregate monetary value of Class-wide injury.

Dr. Rosenthal and I have done just that.  She has put forward standard economic and statistical methods, adapting those found in peer-reviewed research journals, to calculate the extent to which aggregate prescriptions (TRx) of Neurontin were and have been prescribed for off-label usage as a result of the challenged conduct.  Her methods make use of common Class-wide evidence and well-known and accepted data sources. Using the same common Class-wide evidence, I have put forward standard formulaic

---

[3]  He uses this exact phrase (or a very similar version thereof) at ¶¶ 15, 21, 22, 24, 25, 30, 31, 32, 35, 37, 38, 40, 42, 43, 46, 47, 49, 50, 51, 52, 59.  In some paragraphs (*e.g.*, ¶ 51), he uses the phrase several times.

methods for calculating the aggregate Class-wide damages resulting from that impact and injury.

8.  It is my understanding that analysis and measurement of each "proposed class member's quantum of damages" (Keeley ¶ 58), is left to the allocation phase of litigation, *should* liability and aggregate damages be proven. I have performed such allocation analyses in a number of class action cases.[4] I have always been asked to do so after the class certification, liability and aggregate damages phases

9.  Dr. Keeley's second criticism, summarized in my ¶ 5.b) above, seems related to his criticism as summarized in ¶ 5.c). Specifically, he asserts (for example, Keeley ¶ 21) that "[e]ven if Professor Rosenthal could reliably estimate the effect of the challenged *conduct* on off-label prescriptions of Neurontin, Dr. Hartman fails to put forward a method of determining aggregate economic damages" (emphasis in original).

This assertion is false. I have put forward a method in ¶ 13 of my August 8, 2005 Declaration. As stated therein, "I have been directed by Counsel to assume that the appropriate measure of Class damages in this matter is the amount paid by Class members for units purchased as a result of the allegedly unlawful marketing practices." Dr. Keeley acknowledges this method in ¶¶ 58 & 59. He simply does not accept it.[5]

While he may not agree with the method and measure that I use to calculate damages, I certainly have put one forward sufficiently explicit for Dr. Keeley to reject with *emphasis* (emphasis in original, Keeley ¶ 59): "The economic damages, if any, suffered by proposed Consumer class members [and TPPs] are *not* their expenditures on Neurontin."

10.  Dr. Keeley has overreached in the following ways.

a)  He assumes (Keeley ¶ 58) that "economic damages" are defined by the reimbursement rate paid for Neurontin by a Class member compared to "the

---

[4] For examples, *In re: Lupron® Marketing and Sales Practices Litigation*, United States District Court, District of Massachusetts, MDL No. 1430, Master File No. 01-CV-10861-RGS [Memorandum and Order Approving Settlement and Certifying the Class, May 12, 2005]; *HIP Health Plan of Florida, Inc., On Behalf of Itself and All Others Similarly Situated v. Bristol-Myers Squibb Co. and American Bioscience*, Case Number 1:01CV01295, United States District Court for the District of Columbia; *In re Buspirone Antitrust Litigation*, MDL No. 1413, United States District Court for the Southern District of New York; *In re Relafen Antitrust Litigation*, United States District Court, District of Massachusetts, Master File No. 01-CV-12222-WGY; *In re Remeron Antitrust Litigation*, United States District Court, District of New Jersey, Master Docket No. 02-CV-2007.

[5] Indeed, Dr. Keeley seems to find my instructions from Counsel somehow improper and unseemly, asserting, "In deposition, he [Dr. Hartman] admitted that he did not even seek to measure economic damages, but instead based his measure of damages on instructions he had received from attorneys" (Keeley ¶¶ 21 & 58). This assertion implies the following:

- There is only one measure of economic damages; it is the one introduced by Dr. Keeley; and I "did not *even* seek to measure" it (emphasis added).
- Instead, I based my measure "on instructions … received from attorneys."
- Under cross-examination in deposition, I admitted these apparent analytic improprieties.

For the reasons discussed in the text, these criticisms fail.

---

alternative treatment, if any, that would have been prescribed in lieu of the Neurontin prescription and the costs of that treatment."

b) While that is certainly one way to define and calculate damages, it is by no means the only way; nor is it the "correct" way. Damages have been and are defined and assessed in a variety of ways, including unjust enrichment damages, punitive damages, and a variety of measures of recovery in equity. None of these damage calculations take account of alternative treatments (specifically) or alternative but-for worlds (generally). In these cases, these measures of damages were determined appropriate, *as a matter of law*.

c) As noted in the preceding paragraph, I was asked by Counsel to assume that "the amount paid by Class members for units purchased as a result of the allegedly unlawful marketing practices" is the "appropriate measure for Class damages." I have assumed that this Court will decide whether this measure is appropriate.[6]

d) There is no single correct way to define damages generally or even economic damages specifically. A variety of damage measures have been used in a variety of legal cases. The damage measure used is usually determined by the prevailing law and the economic facts at issue. For one obvious example, antitrust measures of damages may differ from damage measures in fraud cases. Furthermore, antitrust economic damages are usually defined relative to a single simplified but-for world, despite the fact that innumerable but-for worlds could be hypothesized for each Plaintiff [7] and despite the fact that Dr. Keeley believes that in this matter "economic damages, if any, … depend on both the cost and efficacy of *whatever alternative treatment would have been provided* [to individual Class members] absent the challenged conduct compared to the cost and efficacy of Neurontin" (Keeley ¶ 21, emphasis added).

---

[6] Indeed, I assume that the Court could find, as a matter of law, that the damages per unit sold (Rx) may be less than the value fraudulently attributed to each script subject to the challenged conduct (*i.e.*, P). If this were to occur, aggregate damages could be recalculated under this direction.

[7] For one example, it is well known that airline ticket prices for a given route can vary widely, certainly by more than 50%; see for example S. Borenstein and N.L Rose (1994), "Competition and Price Dispersion in the U.S. Airline Industry," *Journal of Political Economy*, 102(4), pp. 653-683. This did not preclude class certification in this industry; see *In re Domestic Air Transp. Antitrust Litig.* 137 F.R.D. 677 (N.D.Ga.1991) where 12.5 million class members purchased tickets for an array of different routes, at diverse times, at a multitude of varying prices, and on diverse terms. The but-for world in this case was not required to examine the potentially tens of thousands of alternative different re-routing possibilities that could have occurred, but for the antitrust violation.

For a second example, in *In re Sumitomo Copper Litig.* 182 F.R.D. 85 (S.D.N.Y. 1998), a class consisting of two subclasses, purchasers and sellers of Comex copper futures contracts over a two-year period, was certified despite differing interests between long and short subclasses: "[in the Second Circuit] factual differences in the amount of damages, date, size or manner of purchase, the type of purchaser, the presence of both purchasers and sellers, and other concerns will not defeat class action certification when plaintiffs allege that the same unlawful course of conduct affected all members of the proposed class" (citations omitted). Identification and quantification of the possible permutations of alternative but-for portfolio positions were not required for each and every class member in order to calculate economic damages in that matter.

---

CONTAINS CONFIDENTIAL INFORMATION SUBJECT TO COURT ORDER

e) The measure of damages that I was instructed to use is a measure of "economic damages" in the following sense. Those Class members and their TPPs that reimbursed for a prescription of Neurontin that was promoted by Pfizer for an off-label treatment paid price P per prescription (Rx). Promotion was off-label precisely because the FDA has not determined through standard clinical trials that Neurontin was efficacious for that treatment and insufficient scientific evidence exists to support the efficacy of Neurontin for that treatment. In these cases, the benefit or value to the patient in this treatment was zero at best, and might even have been negative (and possibly extremely negative) if there were adverse side effects.[8] In this case, the price paid as a measure of value (P) minus the value received (0) = P = the "economic" measure of damages from a prescription of Neurontin for an off-label use; *i.e.*, the value fraudulently ascribed to Neurontin by the off-label promotion.

11.    Finally, as summarized in 5.d) above, Dr. Keeley asserts, incorrectly, that issues of variation across Class members render the class device inappropriate for this litigation because of the extensive "individual inquiry … required" of each Class member. As this Court knows, this is a familiar Defense argument. These arguments are not compelling.

There is absolutely no market in which there is not some measure of variation across all individuals in the market. If variation in the factual situations of individuals constituting a market rendered aggregate economic analysis impossible unless each and every individual were included in the analysis, all standard and accepted forms of economic analysis would be impossible. The following *illogical* conclusions would ensue.

a) All econometric analysis and forecasting which relied upon samples of heterogeneous economic entities and/or individuals *would be unreliable and without merit*. Such analysis calculates "averages" or "expected values" of economic variables, such as prices and reimbursement rates, rather than the exact amount for each individual or economic entity. This conclusion would hold for essentially all applied econometric research and analysis. It would hold for the peer-reviewed published research of Dr. Keeley, Dr. Scott Morton, Dr. Ernst Berndt, and others which I will introduce in Section IV below. It would hold for the scientific research cited by Dr. Rosenthal in her August 8, 2005 Declaration at ¶¶ 20-27.

b) Innovator drug manufacturers *would be wasting resources* if they developed and relied upon aggregate models and sample data (where the samples include quite heterogeneous consumers and physicians) to calculate and forecast the following: aggregate impact of promotional activity upon product demand; aggregate impact of innovator-product launch price upon aggregate demand and market share; aggregate impact upon demand of alternative price discount and rebate strategies;

---

[8] Clearly, a measure of damages equal to the reimbursement rate is quite conservative for the prescription of Neurontin for those psychiatric diagnoses for which no FDA clinical support existed and for which extreme side effects (including suicide) occurred.

and the aggregate impact upon demand of generic launch.  It would follow that Pfizer would not undertake such research in its standard course of business.[9]

c) Antitrust damages *could never* be calculated unless the actual world and the but-for world of *all* individuals harmed by the antitrust violation were explicitly analyzed and measured.  In short, antitrust damages *could never* be calculated.  Certainly, the courts and well-known academics would disagree.[10]

d) No class *would ever* be certified.  Hence, the courts that certified the classes cited in footnote 4 or courts that have certified classes in markets for other pharmaceuticals have done so in error.[11]

12.    However, Dr. Keeley's position may be more modest.  Dr. Keeley may believe that heterogeneity and variation among economic entities (and potential class members) generally does not defeat econometric analysis, damage calculation and Class certification.  However, he may believe that the specific variability in *this* market and *this* matter is *much greater* than that found in other markets and matters, and because variability across Class members is incrementally greater in this matter, Class certification is impossible and "individual inquiry would be required" (see footnote 3 above).

---

[9] See, e.g., Parke Davis Marketing Planning document, "PD Marketing Assessment, Neurontin in Psychiatric Disorders," (VO90603-691) which is a compilation of a variety of situation analyses each providing  "an assessment of the market potential for Neurontin in the treatment of" a variety of different disorders (e.g., at V090605).  The overall conclusion/recommendations state: "The off-label use generated by the 3 studies in the US ($204 million a year in 1999 when data exclusivity ends) would largely justify the investment ($1.989 million)" (V090603).  The document includes a variety of forecasts including prevalence of disorders, projected populations diagnosed, market share projections and market value profiles (e.g., at V090690).  Also see, Parke Davis Marketing Planning, "Marketing Assessments, Neurontin in Neuropathic Pain and Spasticity," (WL07520-47); "Neurontin (CI-945) Indication Publications Decision Analysis," (V053850-77, at V053851 it is stated that "The purpose of this analysis is to examine the distributions of potential return on investment in publication strategies for CI-945 use in non-epilepsy indications.")

[10] While not a class action, Daniel Rubinfeld and Peter Steiner discuss regression methods to assess average price impacts and damages for a large group of plaintiffs in a pharmaceutical market (sales of ampicillin) subject to the same individual variabilities found here; see their discussion of *In re Ampicillin Antitrust Litigation*, 88 F.R.D. 174 (D.C. Cir. 1983) in D.L. Rubinfeld and P.O. Steiner, "Quantitative Methods in Antitrust Litigation," *Law and Contemporary Problems*, 46(4), Autumn 1983.  See also Daniel Rubinfeld, "Reference Guide on Multiple Regression," pp. 179-227; and Robert E. Hall and Victoria A. Lazear, "Reference Guide of Estimation of Economic Losses in Damages Awards," pp. 277-332; both appearing in *Reference Manual on Scientific Evidence*, Second Edition, 2000, West Group.

Note that Daniel Rubinfeld is the Robert L. Bridges Professor of Law and Professor of Economics and is the Director of the Program in Law and Economics, University of California at Berkeley.

[11] See, for example, *In re Cardizem CD Antitrust Litigation*, Master File No. 98-MD-1278, 200 F.R.D. 326 (E. D. Mich. 2001); *In re Terazosin Hydrochloride Antitrust Litigation*, Case No. 99-MDL-1317 Seitz/Garber, United States District Court for the Southern District of Florida; and  *Cipro Cases I and II,* Judicial Council Coordination Proceeding Nos. 4154 and 4220 (Superior Court, San Diego County).

---

If true, however, Dr. Keeley must put forward his bright-line threshold of variability and indicate how it is that this market and this matter exceed that threshold while all other markets identified above do not. He has not done so.

13.    In summation, classes have been certified in matters alleging antitrust violations and fraudulent marketing practices in pharmaceutical markets and other markets where there was as much or more variability across individual Class members than is found in this market. That being said, as this Court has opined elsewhere, "it is not permissible to use methods such as averaging damages to sweep individual issues under the judicial rug."[12]

14.    The methods proposed by Dr. Rosenthal and me do not "sweep individual issues under the judicial rug." As I discuss in greater detail below (Section IV), Dr. Rosenthal has proposed standard economic and statistical methods to calculate the number of prescriptions of Neurontin prescribed as a result of Pfizer's allegedly illegal off-label promotional efforts. Her proposed methods incorporate methods implemented in peer-reviewed research appearing in the top economic journals in the country. Her proposed econometric methods make use of the best available data in the country, which were used in the aforementioned peer-reviewed journal articles. Some of these peer-reviewed journal articles have been authored or co-authored by Defendants' experts in this matter (Dr. Scott Morton) and by independent experts who have provided guidance to this Court in other matters (Dr. Ernst Berndt).

I have proposed to value all prescriptions of Neurontin prescribed to and reimbursed by Class members for all off-label treatments at the average reimbursement rate paid for those prescriptions times the number of such prescriptions. I will make use of the same data cited above to determine average reimbursement rates by TPPs and consumers. This use of an average reimbursement rate will provide an accurate measure of the aggregate reimbursements paid by the Class members for the off-label treatments resulting from the illegal off-label promotions. This method takes as the measure of damages the full price paid for the Neurontin prescriptions. This measure avoids most, if not all, issues of variation raised by Dr. Keeley.

## IV.    Criticisms by Defendants' Experts of Dr. Rosenthal's Proposed Approach

### A.  Introduction

15.    Because I rely upon the analysis implemented and calculations produced by Dr. Rosenthal, it is important for my analysis that her analysis be well specified and properly estimated. I have reviewed her August 8, 2005 Declaration and find that to be the case.

16.    Drs. Keeley and Scott Morton, however, expend considerable energy raising almost every possible problem identified in a graduate text on econometrics as being

---

[12] *In re: Pharmaceutical Industry Average Wholesale Price Litigation, Memorandum and Order re: Motion for Class Certification,* United States District Court, District of Massachusetts, MDL No. 1456, Civil Action No. 01-12257, p. 62.

relevant to the analysis proposed by Dr. Rosenthal. Their tactics seem to be the following. They introduce a problem; they assert that *it may* be a problem for Dr. Rosenthal's analysis; they proffer conclusions that, as a result of these possible problems, Dr. Rosenthal will not likely be able to estimate the model she proposes.

In the process, they put forward no evidence that any of the problems mentioned will occur or will render her analysis impossible; they merely insinuate that such problems will most likely arise and will most likely be insurmountable.

### B.  Analytic Overview

17.    In doing so, they fail to mention existing peer-reviewed research that successfully implements models quite similar to those proposed by Dr. Rosenthal. They fail to mention that some of their own, and their colleagues, published, peer-reviewed research makes use of the same data, addresses some of the same questions and is characterized by the same conditions that they find offensive in Dr. Rosenthal's proposed analysis. They fail to mention similar research using similar data upon which they rely in their research. A small set of examples include the following:

a)  F. Scott Morton, "Barriers to Entry, Brand Advertising, and Generic Entry in the US Pharmaceutical Industry," *International Journal of Industrial Organization (IJIO),* 2000. This paper attempts to answer the following question: Does the level of pre-patent-expiration brand advertising for an innovator drug by the innovator firm discourage or deter entry by generic manufacturers of that drug when patent expiration occurs? Hence, it addresses and measures the effectiveness of pharmaceutical promotional expenditures. It uses monthly IMS data for estimation. It faces, and deals with, some of the same estimation problems that Drs. Scott Morton and Keeley raise with respect to Dr. Rosenthal's proposed modeling effort.

b)  H. Grabowski and J. Vernon, "Brand Loyalty, Entry, and Price Competition in Pharmaceuticals after the 1984 Drug Act," *Journal of Law and Economics (JLE),* 35, 1992. This research analyzes the effect of innovator-drug-firm promotional expenditures upon the decision of generic manufacturers to enter a given market, making use of the same IMS data on promotional spending. It has been recognized as one of the early seminal analyses of pharmaceutical markets that addressed issues of drug promotional expenditure and generic entry. It is relied upon by Dr. Scott Morton in her above-cited *IJIO* article (at p. 1089). However, this research is subject to, in a much greater degree, the same criticisms that Drs. Scott Morton and Keeley raise against the proposed analysis of Dr. Rosenthal. However, this research has stood the test of time and continues to be relied upon.

c)  E.R. Berndt, L. Bui, D. Reiley and G. Urban, "Information, Marketing and Pricing in the U.S. Anti-Ulcer Drug Market," *American Economic Review*, 85 (2), May 1995. This paper measures the effect of promotional spending (of various types) upon the demand (in terms to total prescriptions written, or TRx) for $H_2$-antagonists, including Tagamet, Zantac, Pepcid and Axid. The research estimates demand elasticities with respect to prices and promotional variables, and

differentiates between "industry expanding" and "rivalrous" promotional efforts. The authors use monthly time series of IMS data, the same data proposed by Dr. Rosenthal. The authors face all of the problems raised by Drs. Scott Morton and Keeley, yet they are able to use standard econometric methods to overcome any problems and to estimate marketing elasticities of demand that are statistically significant.

d) S.F. Ellison and W.P. Mullin, "Gradual Incorporation of Information: Pharmaceutical Stocks and the Evolution of President Clinton's Health Care Reform," *Journal of Law and Economics (JLE)*, XLIV, April 2001. Dr. Ellison is a co-editor, with Dr. Scott Morton, of the *International Journal of Industrial Organization*. The primary question addressed by this paper is: What was the effect of health care reform discussions on the value of pharmaceutical firms' equity? While this paper does not address the effect of promotional expenditures upon demand, it does purport to measure the financial impact of perceived yet uncertain implementation of health care regulations. In doing so, these authors make use of an event-study approach similar to that proposed by Dr. Rosenthal in this matter and subject to many of the criticisms raised by Drs. Scott Morton and Keeley. However, these authors were able to make use of standard statistical methods to overcome analytic and estimation problems.

e) S.F. Ellison and C. Wolfram, "Coordinating on Lower Prices: Pharmaceutical Pricing under Political Pressure," *RAND Journal of Economics*, 37(2) Summer 2006. This paper also examines impacts of the Clinton health care reform on pharmaceutical industry behavior. Its focus however is to detect strategic price reductions used to forestall demands for reform and to document and measure collective action by pharmaceutical companies to lower prices under the pressure of calls for new regulation. To do so, they examine simple IMS time series data on price changes to see if they are consistent with the theory that Clinton health care reform discussions caused coordinated price reductions. They develop proxy measures of "political sensitivity" for individual companies and assess whether these measure predict price changes and pricing coordination. In doing so, they must address many of the statistical problems raised by Drs. Scott Morton and Keeley with regard to the proposed modeling efforts of Dr. Rosenthal. They are able to do so, because statistical methods have been developed to allow for overcoming such problems.

18.    The point of this recitation is the following. If the economics profession had to dismiss all policy questions simply because the data available to analyze and answer these questions were complex and its use raised complex statistical issues, **no** quantitative analysis would be performed and no quantitative answers would be developed. That is simply not the state of the world. A rich diversity of statistical and econometric tools has been developed, precisely because data are imperfect and measuring specific phenomena is imprecise. Defendants' experts and other professional economists have made use of the same data and statistical methods proposed by Dr. Rosenthal to address the same and similar issues.

The extent to which the statistical methods are successful will only become clear during the damage analysis. However, their relevance and accuracy can and will be assessed and scrutinized during that damage analysis.

To raise all of these issues before one even undertakes the analysis is simply to raise red herrings. There is absolutely no *a priori* reason that the modeling efforts proposed by Dr. Rosenthal cannot be implemented, using the methods and data used by the economists cited in ¶ 17 above.

19.    Finally, Drs. Scott Morton and Keeley selectively mischaracterize the statistical methods proposed by Dr. Rosenthal, and Drs. Scott Morton and Keeley make some fundamental errors in discussing the underlying econometric issues that must be and will be addressed by Dr. Rosenthal in her analysis. I introduce these mischaracterizations and errors in my Attachment B.

### C.  More Detailed Analysis

20.    The following overarching facts support Dr. Rosenthal's proposed modeling structure and proposed estimation procedures:

- The fact that research performed by Defendants' experts and other experts has addressed the similar or the same questions as those addressed by Dr. Rosenthal;

- The fact that Defendants' experts and other experts have frequently used similar economic models and similar if not the same data sources; and

- The fact that Defendants' experts were able to address any statistical or econometric issues that arose in their analysis.

21.    However, as mentioned in ¶ 16 above, Defendants' experts have introduced a laundry list of potential econometric problems, which they hypothesize may arise and may render Dr. Rosenthal's proposed econometric analysis impossible. They certainly have not demonstrated in any way that they will arise.

22.    The potential econometric problems identified by Drs. Scott Morton and Keeley include the following:

a)    Measurement error. Dr. Scott Morton raises this issue at ¶¶ 62-64.

b)    Missing data. Dr. Scott Morton raises this issue at ¶¶ 65- 66.

c)    Omitted variables. Dr. Scott Morton raises this issue at ¶ 67; however she seriously mischaracterizes it as a simultaneity/endogeneity problem at ¶¶ 38-41.

d)    Multicollinearity. Dr. Scott Morton raises this issue at ¶¶ 68-69 and Dr. Keeley raises it at ¶¶ 19 & 56.

e)    Endogeneity. Dr. Scott Morton confusedly raises this issue at ¶¶ 38-41. Dr. Keeley raises it, without confusion, at ¶¶ 19 & 56.

f)    Number of observations and resulting degrees of freedom. Dr. Scott Morton raises this issue at ¶¶ 71-72; Dr. Keeley does so at ¶¶ 18 & 56.

g) The precision of measuring prescriptions by diagnosis using IMS data. Dr. Scott Morton raises this issue at ¶ 73.

h) The fact that physicians' prescription behavior and habits may change slowly over time as knowledge accumulates and habits are formed. Dr. Scott Morton raises this issue at ¶¶ 74-75. Dr. Keeley raises the issue at ¶ 61; however, he takes an opposite position, asserting that physician prescribing behavior changes rapidly.

i) Lack of variation in data. Dr. Scott Morton raises this issue at ¶ 76.

j) Insufficiency of available candidate instrumental variables (IVs); IV is a specific econometric estimation technique. Dr. Scott Morton raises this issue at ¶ 77.

k) Large confidence intervals arising as a result of the use of instrumental variables. Dr. Scott Morton raises this issue at ¶ 77.

23.     While I have indicated above that these potential econometric problems are standard; that they can be dealt with using standard statistical methods; and that they have been dealt with in the research cited above (¶ 17); the Court may feel it necessary that each potential econometric problem be addressed more fully. I do so in Attachment B.

24.     Based upon my analysis of each and every potential problem posed by Defendants' experts, I find there is nothing posed which is not standard and which has not been addressed by economists who are expert in the necessary statistical methods and with this market. Indeed, as I demonstrate in Attachment B, the discussion by Defendants' experts demonstrates some surprisingly uninformed understanding of the underlying econometric issues.


## V.     Summary and Conclusions

25.     Drs. Scott Morton and Keeley have put forward evidentiary criteria for the formulaic methodologies and analytic methods proposed by Dr. Rosenthal and me that I understand to be inappropriate at this stage of the litigation. We have demonstrated that common evidence can be relied upon to show Class-wide impact resulting from the challenged conduct; we have put forward standard formulaic methodologies using that common evidence for calculating the aggregate monetary value of Class-wide injury.

Likewise, Drs. Scott Morton and Keeley have introduced a laundry list of potential econometric problems that merely *could* arise, yet which they *believe* are sufficiently likely to render the proposed analysis improbable or impossible. Defendants' experts have come to this conclusion without conducting any empirical analysis.

However, the econometric methods, issues and models proposed by Dr. Rosenthal and me are quite similar to those implemented and published by Defendants' experts, their colleagues and other experts. Drs. Scott Morton and Keeley cannot have it both ways. They cannot rely on, implement and publish similar models using similar data and similar statistical methods and deny that opportunity to Dr. Rosenthal and me. That is what they have done.

I declare under penalty of perjury that this Declaration is true and correct.
Executed on February 21, 2007

Dr. Raymond S. Hartman

**Attachment A**

January 2007

# Raymond S. Hartman
*Curriculum Vita*

Date of Birth:          3/31/47

Address/Phone:          Greylock McKinnon Associates
                        1 Memorial Drive, Suite 1410
                        Cambridge, MA  02142
                        617-871-6901

## DEGREES

B.A.  (MAGNA CUM LAUDE) Princeton University 1969
M.S.  Massachusetts Institute of Technology  1971
Ph.D. Massachusetts Institute of Technology  1977

## Ph.D. DISSERTATION

An Oligopolistic Pricing Model of the U.S. Copper Industry (MIT, 1977)

## HONORS, SCHOLARSHIPS, AND FELLOWSHIPS

| | |
|---|---|
| 1969-71 | National Science Foundation Fellowship to MIT |
| 1965-69 | Alfred P. Sloan Scholarship to Princeton |
| 1969 | Woodrow Wilson Fellowship Honorable Mention |
| 1965 | National Merit Scholarship Finalist |

## RESEARCH AND TEACHING INTERESTS

Econometrics/Statistics
The Economics of Regulated Industries
Energy and Environmental Economics
Microeconomics
Industrial Organization
Law and Economics

2

# POSITIONS

| | |
|---|---|
| 1967-1969 | Research Staff, Financial Research Center and Center for Economic Research, Princeton University |
| 1970 | Research Staff, Board of Governors, Federal Reserve Board, Washington, DC |
| 1972-1992 | Consultant and Staff Economist, Arthur D. Little, Inc. |
| 1977-1984 | Research Faculty, Massachusetts Institute of Technology |
| 1977-1983 | Assistant Professor, Department of Economics, Boston University |
| 1983-1989 | Associate Professor, Department of Economics, Boston University |
| 1983-1988 | Principal & Academic Principal, The Analysis Group |
| 1988-1993 | Visiting Associate Professor/Visiting Faculty, Boalt School of Law, University of California, Berkeley |
| 1988-1995 | Founding Principal, The Law and Economics Consulting Group |
| 1995-1996 | Vice President, Charles River Associates |
| 1996-1999 | Senior Consultant, Charles River Associates |
| 1996-2000 | Director, Cambridge Economics, Inc. |
| 2000-2004 | Special Consultant, Lexecon Inc. |
| 1997- | Director and President, Greylock McKinnon Associates |

# OTHER PROFESSIONAL ACTIVITIES

Research Referee,    *Bell/Rand Journal of Economics, Resources Policy, IPC Science and Technology Press, Management Science, Land Economics, Science, Energy Journal, Applied Economics, Econometrica, Review of Economics and Statistics, Journal of Business and Economic Statistics, International Economic Review, Journal of Economics and Management Strategy, Pakistan Journal of Applied Economics, Journal of Health Economics, American Economic Review, Review of Industrial Organization*

# PAPERS APPEARING IN OR BEING SUBMITTED FOR PUBLICATION IN REFEREED JOURNALS AND BOOKS

"Frontiers in Energy Demand Modeling," <u>Annual Review of Energy</u>, 4, 1979.

"The Economic Impacts of Environmental Regulations on the US Copper Industry," with K. Bozdogan and R Nadkarni, <u>The Bell Journal of Economics</u>, 10(2), Autumn 1979, pp 589-618.

"Schumpeterian Waves of Innovation and Infrastructure Development in Great Britain and the United States: The Kondratieff Cycle Revisited," with D. Wheeler, <u>Research in Economic History</u>, 1979, Vol 4, Chapter 2.

"U. S. Demand for Copper: An Introduction to Theoretical and Econometric Analysis," with K. Bozdogan, in R. Mikesell, <u>The World Copper Industry</u>, Resources for the Future, 1979, Chapter 5.

"Some Evidence on Differential Inventory Behavior in Competitive and Non-Competitive Market Settings,"

Quarterly Review of Economics and Business, 20(2), Summer 1980, pp. 11-27.

"Short-Run Residential Demand for Fuels:  A Disaggregated Approach," with A. Werth, Land Economics, 57(2), May 1981, pp. 197-212.

"An Analysis of Department of Energy Residential Appliance Efficiency Standards," The Energy Journal, 2(3), Summer 1981, pp. 49-70.

"A Note on the Use of Aggregate Data in Individual Choice Models:  Discrete Consumer Choice Among Alternative Fuels for Residential Appliances," Journal of Econometrics, 18, 1982, pp. 313-335.

"A Probability Model of Oligopoly Pricing,"  Applied Economics, 14(3), June 1982, pp. 219-234.

"A Note on Externalities and the Placement of Property Rights:  An Alternative Formulation to the Standard Pigouvian Results," The International Review of Law and Economics, 2(1), June 1982, pp. 111-118.

"A Note on the Appropriateness of Conditional Logit for the Modeling of Residential Fuel Choice," Land Economics, 58, November 1982, pp. 478-87.

"The Estimation of Short-Run Household Electricity Demand Using Pooled Aggregate Data," Journal of Business and Economic Statistics, 1(2), April 1983, pp. 127-135.

"The Importance of Technology and Fuel Choice in the Analysis of Utility-Sponsored Conservation Strategies for Residential Water Heating," The Energy Journal, 5(3), July 1984.

"Measuring the Effects of Utility-Sponsored Conservation Programs - Do the Programs Work," Energy Systems and Policy, 8(3), 1984.

"The Estimation of the Effects of Utility-Sponsored Conservation Programs," with M. Doane, Applied Economics, 18(1), 1986, pp. 1-25.

"Household Discount Rates Revisited," with M. Doane, The Energy Journal, 7(1), Winter 1986.

"Energy Conservation Programmes:  The Analysis and Measurement of Their Effects," Energy Policy, October 1986.

"Product Quality and Market Efficiency:  The Effect of Product Recalls on Resale Prices and Firm Valuation," The Review of Economics and Statistics, 69(2), May 1987, pp. 367-371.

"The Use of Hedonic Analysis for Certification and Damage Calculations in Class Action Complaints," with M. Doane, The Journal of Law, Economics and Organization, Fall 1987.

"Taking the Con Out of Conservation Program Evaluation" with Michael Doane, Resources and Energy, 9, 1987, pp. 187-207.

"Self-Selection Bias in the Evaluation of Voluntary Energy Conservation Programs," Review of Economics and Statistics, 70(3), August 1988.

"Household Preference for Interruptible Rate Options and the Revealed Value of Service Reliability," with

4

M. Doane and C.K. Woo, <u>The Energy Journal</u>, 9, 1988.

"Households' Perceived Value of Service Reliability: An Analysis of Contingent Valuation Data," with M. Doane and C.K. Woo, <u>The Energy Journal</u>, 9, 1988.

"An Empirical Model of Product Design and Pricing Strategy," <u>International Journal of Industrial Organization</u>, 7(4), December 1989.

"Hedonic Methods for Evaluating Product Design and Pricing Strategies," <u>Journal of Economics and Business</u>, 41(3), August 1989.

"Status Quo Bias in the Measurement of Value of Service," with M. Doane and C.K. Woo, <u>Resources and Energy</u>, Volume 12, 1990, pp. 197-214.

"Product Emulation Strategies in the Presence of Reputation Effects and Network Externalities: Some Evidence from the Minicomputer Industry," with D. Teece, <u>Economics of Innovation and New Technology</u>, Volume 1, 1990, pp. 157-182.

"Consumer Rationality and the Status Quo," with M. Doane and C.K. Woo, <u>Quarterly Journal of Economics</u>, Volume 106, February, 1991, pp. 141-162.

"A Monte Carlo Analysis of Alternative Estimators in Models Involving Selectivity," <u>Journal of Business and Economic Statistics</u>, 9(1), January, 1991, pp. 41-49.

"Assessing Market Power in Regimes of Rapid Technological Change," with D. Teece, W. Mitchell and T. Jorde, <u>Industrial and Corporate Change</u>, 2(3), 1993, pp. 317-350.

"Estimation of Household Preferences for Long Distance Telecommunications Carrier," with Z. Naqvi, <u>Journal of Regulatory Economics</u>, 6(2), May, 1994, pp. 197-220.

"Strategic Rate Making in the Context of Dynamic Ramsey Pricing," with K. Jensen and K. Seiden, <u>Applied Economics</u>, 26, 1994, pp. 363-374.

"Incentive Regulation: Market Based Pollution Control for the Real World?" with David Wheeler, in Claudio Frischtak, ed., <u>Regulatory Policies and Reform: A Comparative Perspective</u>, World Bank/Oxford University Press, chapter 11, 1996.

"The Efficiency Effects of Electric Utility Mergers: Lessons from Statistical Cost Analysis," <u>Energy Law Journal</u>, 17(2), Fall 1996.

"The Use of Regression Techniques in Transfer Price Analysis," with Delores Wright and J.D. Opdyke, <u>European Taxation</u>, International Bureau of Fiscal Documentation, TP, Suppl. No. 18, July 1996.

"The Regulatory Contract and Restructuring: A Modest Proposal," with R.D. Tabors, <u>The Electricity Journal</u>, 9(10), December 1996.

"Predicting the Efficiency Effects of Mergers," <u>Journal of Forensic Economics</u>, 9(3), Fall 1996.

"The Cost of Air Pollution Abatement," with David Wheeler and Manjula Singh, <u>Applied Economics</u>,

5

Volume 29, 1997.

"Optimal Operating Arrangements in the Restructured World: Economic Issues", with R.D. Tabors, Energy Policy, 25(7), 1997.

"The Use of Statistical Methods in Disparate Impact Cases: The Northern Mariana Islands Case," Litigation Economics Digest, 3(1), Summer 1998.

"How Good a Deal Was the Tobacco Settlement?: Assessing Payments to Massachusetts", with David Cutler, Arnold Epstein, Richard Frank, Charles King, Joseph Newhouse, Elizabeth Richardson and Meredith Rosenthal,  Journal of Risk and Uncertainty, 21(2/3), 2000.

"Price-Performance Competition and the Merger Guidelines," Review of Industrial Organization , 18, 2001.

"The Microeconomic Analysis of Pollution, Pollution Abatement and Pollution Abatement Regulation," with D. Wheeler, The Pacific and Asian Journal of Energy, 10(2), December 2000.

"The Economic Impacts of the Tobacco Settlement," with David Cutler, Jonathan Gruber, Mary Beth Landrum, Joseph Newhouse and Meredith Rosenthal, Journal of Policy Analysis and Management, 21(1), Winter 2002.

"Tobacco manufacturers are now compensating states for smoking-related costs.  How will this affect the economy?", with David Cutler, Jonathan Gruber, Joseph Newhouse and Meredith Rosenthal, Regional Review, Federal Reserve  Bank of Boston, 12(2), 2002, Quarter 2.

"An Analysis of Price Discrimination in Brand Name Drug Wholesaling," with Richard Frank and Benjamin Sommers, International Journal of the Economics of Business, forthcoming 2007.

Contributions of economic forecasting articles to the popular press, such as Management Forum and Nations Business


**PAPERS IN PROGRESS**

"Welfare Measures in Discrete Choice Markets"

"Market Definition and Pharmaceutical Market Competition," with Richard Frank and Haiden Huskamp


**CONFERENCE PAPERS AND PRESENTATIONS**

"Policies To Maximize Economic Growth In Japan," in Foreign Experience with Monetary Policies to Promote Economic and Social Priority Programs, Committee on Banking and Currency, 92nd Congress, Washington, May, 1972.

Comments on "Econometric Models of Choice and Utilization of Energy-Using Durables" by D. Brownstone, Electric Power Research Institute Workshop on the Choice and Utilization of Energy Using

6

Durables, Boston, Nov. 1-2, 1979.

"Market Penetration of Energy Technologies," talk given in the Boston University 1980 Spring Lecture Series, "Man and Energy: Energy and Regional Growth," 1979.

"Discrete Consumer Choice among Alternative Fuels and New Technologies for Residential Energy-Using Appliances," MIT Energy Laboratory Working Paper, #MIT-EL-79-049WP, August, 1979. Paper given at the TIMS/ORSA Meetings, "Market Penetration Assessment of New Energy Technologies," May 4-7, 1980, and at the MIT Industrial Liaison Program, "The Future Demand for Energy," March l8, 1980.

"Department of Energy Residential Appliance Efficiency Standards-An Overview," Papers and Proceedings, Second Annual North American Meeting of the International Association of Energy Economists, October 1980.

Comments on "A Review of the Conditional Demand Approach to Electricity Demand Estimation," by S. George, Electric Power Research Institute Workshop on End-Use Modeling and Conservation Analysis, Atlanta, Nov. 17-19, 1980.

"Measuring the Effects of Utility Sponsored Conservation Programs." Paper presented at the Fourth Symposium on Electric Utility Load Forecasting: Focus on the Short Run, Electric Power Research Institute Workshop, Dallas, Texas, December 1982.

"Measuring the Impact of Utility Residential Conservation Programs: Two Case Studies," with S. Braithwait and M. Doane. Paper presented in the Electric Power Research Institute National Symposium Proceedings, Annual Review of Demand and Conservation, Atlanta, May 1984, and Buildings and Their Energy Systems, St. Louis, October 1984.

"Measuring Program-Induced Energy Savings: A Comparison of Alternating Methods," with M. Doane, in Electric Power Research Institute National Symposium Proceedings, Energy Expo 1985: Meeting Energy Challenges, Peragon Press.

"Taking the Con Out of Conservation Program Evaluation." Paper presented at "Energy Conservation Program Evaluation," Argonne National Laboratory Conference, Chicago, August, 1985, and at the Eighth Annual North American Conference of the International Association of Energy Economists, MIT, Cambridge, November 1986.

"Quality and Efficiency of Limited Information Maximum Likelihood Estimators: A Monte Carlo Simulation Study," with M. Sonnenschein. Paper presented at the 27th International Meeting of the Institute of Management Sciences, Brisbane, Australia, 1986.

"Product Emulation Strategies in the Presence of Reputation Effects and Network Externalities: Some Evidence from the Minicomputer Industry," with D. Teece. Paper presented at National Bureau of Economic Research, Conference on Productivity Measurement, July, 1987, and Stanford Center for Economic Policy Research Conference on Compatibility Standards and Information Technology: Business Strategy and Public Policy Issues, February 1989.

Comments and discussion on "Efficient Postal Discounts" by John Panzar and "Efficient Component Pricing for Postal Service: It Ain't That Efficient!" by Michael Crew and Paul Kleindorfer -- both papers presented at the Session on Postal Economics, American Economic Association Meetings, Washington

7

D.C., January 7, 1995.

"Making Electricity Markets Work: Competitive Models and Constraints to Competition," paper given at the Conference, "Keeping the Lights On: Technical and Institutional Issues in a Restructured Electricity Industry," Massachusetts Institute of Technology, Cambridge, October 19-20, 1995.

"A Discussion of Market Power in a Non-Merger Context: RTG/Power Pool Commercial Practice Issues," paper given at the Conference "Market Power: The Antitrust Dilemma for the Electric Industry," Washington DC, March 4, 1996.

Comments and discussion on "Electricity Data Needs: An Economic Perspective," by Douglas Hale, Office of Statistical Standards, Meeting of the American Statistical Association Committee on Energy Statistics, Washington, DC, Fall 1996.

## MASSACHUSETTS INSTITUTE OF TECHNOLOGY (MIT); ANALYSIS GROUP, INC., (AG); LAW AND ECONOMICS CONSULTING GROUP (LECG); AND ARTHUR D. LITTLE, INC., (ADL) REPORTS

### MIT Related

MIT Energy Management and Economics Group, The Conditional/Generalized Maximum Likelihood Logit Computer Program: Instructions for Use, MIT Energy Laboratory Report, MIT-EL-78-013, June 1978.

MIT Model Assessment Group, Independent Assessment of Energy Policy Models: Two Case Studies, Report to the Electric Power Research Institute, EPRI-EA-1071, Project 1015-1, May 1979.

MIT Residential Energy Demand Group, Aggregate Pooled Data Utilized and/or Developed for Residential Energy Demand, MIT Energy Laboratory Working Paper, #MIT-EL-79-047, August 1979.

MIT Energy Laboratory, Assessment of the Appropriate Methods of Incorporating Appliance Engineering Analyses and Data into Residential End-Use Demand Models, Report to the Electric Power Research Institute, Number EA 4146, 1982.

Hartman, Suggested Procedures for the Validation of Bonneville Power Administration's Residential Energy Forecasting Model, Report to Bonneville Power Administration, June 1983.

R. Hartman and P. Spinney, Incentive Regulation for the Restructured Electric Power Industry in Massachusetts, MIT School of Engineering, Laboratory for Electromagnetic and Electronic Systems, LEES Working Paper wp-96-005, September, 1996.

### AG Related

AG, Recent Contributions to the Theory and Measurement of Service Reliability, Task 1 Report, Prepared for Niagara Mohawk Power Corporation, September, 1987.

AG, Review of Existing Niagara Mohawk Power Corporation Procedures for Collecting Data on Outage

8

Costs, Task 2 Report, Prepared for the Niagara Mohawk Power Corporation, September, 1987.

AG, The Design of Methods and Implementation Procedures to Collect Data on Customer Outage Costs and the Value of Service Reliability, Task 3 Report, Prepared for the Niagara Mohawk Power Corporation, January 1988.

AG, Customer Outage Costs and the Value of Service Reliability: Draft Analysis Plan for Residential and Large Commercial/ Industrial Customers, Draft Report prepared for the Niagara Mohawk Power Corporation, August 1988.


**LECG Related**

LECG, Optimal Plant and Firm Size in the Electric Power Industry:  Report on Academic/Industry Literature, Report to the Division of Ratepayer Advocates, California Public Utility Commission, August, 24, 1989.

LECG, Analysis of Competitive Consequences and Efficiency Claims for the Proposed Merger Between Southern California Edison and San Diego Gas and Electric, Report to the Division of Ratepayer Advocates, California Public Utility Commission, December, 1989.

LECG, Report on the Proposed Merger of the Southern California Edison Company and the San Diego Gas and Electric Company, Report to the California Public Utilities Commission, Division of Rate Payer Advocates,  Application 88-12-035, February, 1990, Exhibit 10,500;

LECG, A Critique of the Commodity Futures Trading Commission (CFTC) Study: "Economic Analysis of Dual Trading on Commodity Exchanges", Report prepared for the Coffee, Sugar and Cocoa Exchange, Inc., March, 1990

LECG, Report on the Proposed Merger of the Southern California Edison Company and the San Diego Gas and Electric Company -Surrebuttal:  Econometric Analysis of Merger Impacts, Report to the California Public Utilities Commission, Division of Rate Payer Advocates, Application 88-12-035, July, 1990, Exhibit 10,511.

LECG, A Critical Analysis of the Proposed Merger Between Kansas Power and Light Company and Kansas Gas and Electric Company, Report to the Missouri Public Service Commission, March 25, 1991.

LECG, Petitioners' Economic Testimony in the Matter of Certain Carbon Steel Flat Products, Final Hearing before the United States International Trade Commission, June 29-30, 1993.

LECG, Petitioners' Post Hearing Brief in the Matter of Certain Carbon Steel Flat Products, before the United States International Trade Commission, July 7, 1993.

Hartman, "Returns to Scale and Scope in the Electric Utility Industry: Review of Existing Econometric Analyses and Examination of Their Applicability to the Proposed Merger Between Southern California Edison and the San Diego Gas & Electric Company," LECG Working paper, September, 1989.

Hartman, "Measuring Productivity for the United States Postal Services,"  Report to the Resource Technology Center of Arthur D. Little, Inc. and the United States Postal Services, January, 1991.

Hartman, "The Relevance of Incentive Regulation to the United States Postal Service," Report to the Resource Technology Center of Arthur D. Little, Inc. and the United States Postal Services, February, 1992.

Hartman, "The Relevance of Incentive Regulation for Environmental Policy Modeling," Report to the World Bank, February, 1992.

Hartman, "Issues in the Valuation and Aggregation of Goods and Services: A Concept Paper," Report to the World Bank, Socio-Economic Data Division, International Economics Department, May, 1992.

Hartman, "A Framework for the Spatial Development of Infrastructure: The Electric Power Industry," Report to the Government of Indonesia, Bappenas, Jakarta, July, 1992.

Hartman, "Stimulating Pollution Abatement Efforts in the Brantas River Basin," Report to World Bank, Indonesian Environmental Mission, Jakarta, August, 1992.

Hartman, "Policies to Control Emissions from Energy Production and Use in Thailand," Report to the World Bank, East Asia Country Operations, January, 1993.

World Bank, Thailand: Managing Environmental Impacts in a High-Growth Economy, Country Economic Report, April 5, 1993.


**ADL Related**

ADL, Growth Patterns of U.S. Industries and Markets in 1973: The Year Ahead, 1972.

ADL, Tourism in Maryland: Analysis and Recommendations, Report to the Maryland Department of Economic and Community Development, 1972.

ADL, Economic Impact Study of the Pollution Abatement Equipment Industry, Report to the Environmental Protection Agency, December 1972.

ADL, Economic Transition of Distressed Communities, An Analytical Study, Report to the Economic Development Administration, U.S. Department of Commerce, 1974.

ADL, Tourism in Maine: Analysis and Recommendations, Report to the Maine Vacation Travel Analysis Committee, May 1974.

ADL, Tourism in San Diego: Its Economic, Fiscal and Environmental Impacts, Report to the City of San Diego, November 1974.

ADL, The Economic Impact of Proposed OSHA Airborne Arsenic Standards, Report to the American Smelting and Refining Company, June 1975.

ADL, Preliminary Projections of New England's Energy Requirements, Report to the New England Regional Commission, September 1975.

ADL, Economic Impact of Environmental Regulations on the U.S. Copper Industry, Preliminary Rough

Draft Report to the U.S. Environmental Protection Agency, 1976.

ADL, Pacific Gas and Electric Company Estimates of Energy Conservation Potential, 1980-2000, Report to the Public Utilities Commission of the State of California, June 1980.

ADL, Southern California Edison Estimates of Electricity Conservation Potential, Report to the Public Utilities Commission of the State of California, June 1981.

ADL, Southern California Edison Projections of Conservation Goals 1982-1986, Report to the California Public Utilities Commission for Southern California Edison, October 1981.

ADL, Estimate of Conservation Penetration for the Southern California Gas Company Service Area, 1981-1986, Report to the Southern California Gas Company, November 1981.

ADL, Electricity and Natural Gas Conservation Potential in the San Diego Gas and Electric Service Territory, Report to the Public Utility Commission of the State of California, April 1982.

ADL, Integrated Conservation Planning/Load Forecasting System Technical Users Guide, Report to San Diego Gas and Electric Company, Vols. I and II, Summer 1982.

ADL, A Method for Evaluating Residential Conservation Programs:  Interim Report, Report to the Electric Power Research Institute, RP 1587, March 1983.

ADL, Measuring the Impact of Residential Conservation, Volume II: An Econometric Analysis of Portland General Electric Company Data, Report to the Electric Power Research Institute, EPRI EA-3606, September 1985.

ADL, Measuring the Impact of Residential Conservation, Volume III: An Econometric Analysis of General Public Utilities Inc. Data, Report to the Electric Power Research Institute, EPRI EA-3606, Project 1587, May 1986.

ADL, Measuring the Impact of Residential Conservation, Volumes IV: A Comparison of Alternative Methods, Report to the Electric Power Research Institute, EPRI EA-3606, Project 1587, May 1986.

ADL, Evaluation of EUA's Proposed Acquisitions of Unitil and Fitchburg Electric, Report to Gaston and Snow, March 12, 1990.

Hartman, "Critical Review of Selected Energy End-Use Models and Proposed Specifications for PG&E End-Use Modeling Efforts," Arthur D. Little, Inc., Working Memorandum #13 for Pacific Gas and Electric Co., June 1979, Arthur D. Little, San Francisco.

Hartman, "Potential State-of-the Art Energy Demand Models for Use in Developing an Integrated Natural Gas Forecasting and Conservation Planning System for Southern California Gas Company," Arthur D. Little Working Paper, June 1981, Arthur D. Little, San Francisco.

Hartman, "A Critical Review of the Delmarva 1981-2000 Load Forecast," with James C. O'Keefe, Arthur D. Little Working Paper, September 1981, Arthur D. Little, San Francisco.

Hartman, "Analyzing and Measuring the Effects of Utility Sponsored Conservation Programs," Arthur D.

Little Energy Group Discussion Paper, September 1982, Arthur D. Little, San Francisco.


## UNPUBLISHED WORKING PAPERS

"An Examination of the Use of Probability Modeling for the Analysis of Inter-fuel Substitution in Residential Fuel Demand," with M. Hollyer, MIT Energy Lab Working Paper #MIT-EL-77-0l8WP, July 1977.

"A Critical Survey of Three Copper Industry Models and Their Policy Uses," MIT Energy Lab Working Paper #MIT-EL-77-028WP, September 1977.

"The Evolutionary Model of Technical Change:  Historical Evidence from Great Britain and the United States:, with D. Wheeler, mimeo, December 1977.

"A Critical Review of Single Fuel and Interfuel Substitution Residential Energy Demand Models," MIT Energy Laboratory Report #MIT-EL-78-003, March 1978.

"A Generalized Logit Formulation of Individual Choice," MIT Energy Laboratory Working Paper #MIT-EL- 79-0l0WP, February 1979.

"A Model of Residential Energy Demand," MIT Energy Laboratory Working Paper, #MIT-EL-79-041WP, August 1979.

"The Incorporation of Solar Photovoltaics into a Model of Residential Energy Demand," MIT Energy Laboratory Working Paper #MIT-El 80-014WP, May 1980.

"Consumer Choice Among Alternative Fuels and Appliance Technologies: An Analysis of the Effects of Alternative Energy Conservation Strategies,"  MIT Energy Laboratory Working Paper #MIT-EL 82-036WP, June 1982.

"Estimation of Hedonic Supply Curves For Residential Water Heaters Using Technical Data and Federal Testing Guidelines," with Alan Cox and Mary Litterman, MIT Energy Laboratory Working Paper #MIT-EL 82-037WP, June 1982.

"A Monte Carlo Examination of the Heckman and the Manski-Lerman Estimators in Discrete/Continuous Models of Demand," October 1986.

"The Value of Service Reliability: Alternative Welfare Measures," with C.K. Woo, October, 1988.

"The Use of Hedonic Analysis in Defining and Measuring Market Size:  The Extension of the Merger Guidelines to Heterogeneous Products," Working Paper No. 91-12, Program in Law and Economics. School of Law, Boalt Hall

12

# EXPERIENCE IN CONSULTING AND EXPERT TESTIMONY

## Overview of Qualifications

Dr. Hartman is an economist specializing in microeconomics, econometrics and the study of industrial organization. Microeconomics is the science used to analyze and characterize the behavior of groups of consumers and producers that constitute markets. Econometrics is a science that makes use of mathematics and statistics to measure and quantify economic behavior and economic phenomena in markets. The study of industrial organization makes use of both microeconomic theory and econometrics. It focuses upon the structure, conduct and performance of the participants (consumers and producing firms) in markets and industries, for the purposes of predicting behavior and addressing such policy issues as antitrust, regulation and industrial policy.

He has taught economics, conducted economic research and provided economic consulting in his areas of specialization for thirty-five years. He taught economics as an Assistant Professor and Associate Professor within the Department of Economics at Boston University over the period 1977-1988. He taught economics as a Visiting Associate Professor and member of the Visiting Faculty at the School of Law, Boalt Hall, University of California at Berkeley over the period 1988-1993. He was a member of the research faculty at MIT over the period 1977-1982, during which time he conducted research in energy markets for the United States Department of Energy. During the same time, he declined the offer of a Visiting Assistant Professorship within the Department of Applied Economics at MIT, and instead lectured on a selective basis. Since 1971, he has consulted to federal and state governmental bodies, private corporations, law firms, consulting companies, research organizations and international lending organizations. He has been and continues to be a research referee for a variety of academic journals, including the top academic journals in the country. He is the author of more than 100 refereed journal articles, book chapters and research/consulting reports.

He has submitted oral and written testimony before federal and state courts of law and regulatory commissions. His testimony as an expert witness has addressed anticompetitive behavior, merger efficiencies, breach of contract, employment discrimination, patent infringement, class certification and the estimation of damages in a variety of markets and industries including, but not limited to, the pharmaceutical industry, the health care services industry, the electric power industry, the banking industry, the agrochemical industry, the copper industry, the defense industry, the cable TV industry, the tobacco industry, the electrical and mechanical carbon products industry, the medical devices industry and the construction industry. He has consulted to counsel on litigation matters in a broader array of markets.

While his experience has been broadly-based across industries, two industries/markets have been primary subjects of substantial consulting, research and litigation support.

## Experience in Energy Markets and Regulated Industries

Since 1977, Dr. Hartman's expertise and experience have involved regulated industries generally and the markets for electric power and natural gas specifically. His consulting and/or litigation assignments have included load forecasting, evaluation of conservation and load management programs, econometric cost analysis, analysis of revenue requirements and rate-making, analysis of value of service reliability, the analysis of mergers and acquisitions, analysis of industry restructuring, analysis of manipulation of spot and future prices in energy markets, and analysis of contract damages arising from DOE's partial breach of the Standard Contract regarding storage of nuclear waste. In these assignments, Dr. Hartman has consulted for

13

such clients as Arizona Public Service, the Pacific Gas and Electric Company, the Southern California Edison Company, the Southern California Gas Company, the San Diego Gas and Electric Company, Portland General Electric Company, Bonneville Power Administration, General Public Utilities, Northeast Utilities, Niagara Mohawk Power Corporation, the Delmarva Power Corporation, Florida Power Corporation, Sithe Energies, the California Energy Commission and Public Utilities Commission, the Missouri Public Service Commission, the Rhode Island Division of Public Utilities, the Attorney General of the State of Massachusetts, the Electric Power Research Institute, the Gas Research Institute, the U.S. Department of Energy, the U.S. Department of Justice, the World Bank, and the governments of Indonesia and Thailand. He has consulted for a number of other clients whose identity must remain confidential.

## Experience in Health Care and Pharmaceutical Markets

Over the past 10 years, Dr. Hartman has participated as testifying or consulting expert in a wide array of matters related to health-care markets generally and, more specifically, markets for medical devices and pharmaceutical products. For examples, working with a team of health care experts, he submitted written testimony assessing and measuring the impacts of smoking on Medicaid health care costs in the Commonwealth of Massachusetts. He submitted testimony analyzing the competitive impacts upon and damages to a class of dental laboratories caused by the restrictive dealer practices of a dominant U.S. manufacturer of medical prostheses - false teeth. He consulted to the group of wholesaler defendants in the Brand-Name Prescription Drugs Antitrust Litigation, addressing issues of wholesaler pricing across classes of trade. He consulted to counsel to a manufacturer of cardiovascular stents and other related devices in a variety of patent infringement matters, addressing such issues as competition, market penetration of new products and economic damages arising from patent infringement. He consulted for one group of private plaintiffs in the antitrust matter regarding the prescription drugs lorazepam & clorazepate and for the Federal Trade Commission in the matter of Hoechst Marion Roussel, Inc., Carderm Capital L.P. and Andrx Corporation concerning antitrust claims involving the prescription drug Cardizem CD. That consultation addressed issues of market definition, product competition, class certification and damage estimation. He consulted to counsel on the matter of damages to the class of direct purchasers of the prescription drug Taxol and on the matter of damages to the class of indirect end-payer purchasers of the prescription drugs K-Dur, Augmentin, Bextra, Celebrex and Vioxx. He submitted testimony addressing class certification, liability and/or damages for the class of end-payer purchasers in antitrust or RICO litigation concerning the prescription drugs Hytrin, BuSpar, Relafen, Lupron, Premarin, Cipro in the states of New York and California and in the United States, and Neurontin in the United States and Pennsylvania. In the MDL AWP litigation, he submitted testimony in support of the certification of the class of end-payer purchasers of those pharmaceutical products produced by AstraZeneca, the Bristol-Myers Squibb Group, the Johnson & Johnson Group, the GlaxoSmithKline Group and the Schering Plough Group that were alleged to have been the subject of a scheme to fraudulently inflate their Average Wholesale Price (AWP); he subsequently submitted testimony supporting findings of causation, liability and the calculation of damages for those end-payer groups for which class certification was granted. He has consulted to and/or submitted testimony for the Offices of the Attorneys General for the states of New York, Connecticut, Montana and Nevada in analogous matters. His testimony has been the basis for the certification of class in a variety of these matters. His testimony has been the basis for approval supporting settlement agreements in a variety of these and other pharmaceutical matters.

## Specific Assignments

1972-1975:     In consultation with Arthur D. Little, Inc., Dr. Hartman developed economic impact models to assess the effects of environmental regulations upon the U.S. pollution abatement equipment industry and upon a particular U.S. copper smelting company.

1972-1975:      In consultation with Arthur D. Little, Inc., Dr. Hartman developed economic models to assess the regional macroeconomic and industrial impacts of alternative strategies to promote tourism-related industries.  The models were used in the United States by the states of Maryland and Maine and for the Philadelphia Bicentennial Commission.  Internationally, the models were used by the Ministry of Planning of Mexico to assess the national and regional importance of tourism coming into Acapulco.

1976-1977:      Consultation with Arthur D. Little, Inc. for the U.S. Environmental Protection Agency. The effort involved the design, estimation and implementation of an econometric simulation model that was used to assess the impact of pollution abatement legislation on the U.S. copper industry.  The model was designed to incorporate engineering cost estimates attributable to the abatement legislation while accounting for the noncompetitive pricing behavior in the industry.  The model was used to evaluate and revise proposed abatement legislation.  This analysis was the basis for Dr. Hartman's Ph.D. dissertation and several of his publications.

1977-1982:      Working as the testifying expert, Dr. Hartman analyzed the presence of a price-fixing conspiracy among the major U.S. copper producers during the 1970's.  His testimony addressed issues of liability and developed a model of damages.  See

> Affidavit to United States District Court for the Southern District of New York, *J.N. Futia Co., Inc., Plaintiff, Against Phelps Dodge Corporation, et al., Defendants,* 78 Civ. 4547 (ADS), 1978.

> Deposition for United States District Court, Southern District of New York for *Reading Industries, Inc., et al. (Plaintiffs) against Kennecott Copper Corporation, et al. (Defendants)*, 17 Civ. 1736 (MEL), 1982.

1979:      Working for the California Energy Commission, Dr. Hartman developed and presented a Statement of Opinion and Critical Review of Selected Energy End-Use Models and Proposed Specifications for PG&E End-Use Modeling Efforts before the California Energy Commission Hearings on Utility Construction and Siting, November 26-30, 1979.

1984:      Testifying expert for the class of all individuals who employed the services of members of Massachusetts Furniture and Piano Movers Association.  The analysis developed an econometric model to assist in certifying the class and measuring the damages common to that class.  See

> Affidavit to United States District Court for the District of Massachusetts in the Matter of *Kenett Corporation et al v.  Massachusetts Furniture and Piano Movers Association Inc. et al*, May 1984, Civil Action No. 82-140-Z.

1984-1986:      In consultation with the U. S. Postal Service, Dr. Hartman identified appropriate econometric methods for analysis of the determinants of Postal Service costs.  The particular methods he suggested were "hedonic" cost techniques, which are specifically designed to account for the fact that both increased levels of production and improved product attributes increase costs.  The techniques assisted the Postal Service in quantification of the cost impacts of the attributes of service quality for alternative classes of service.  For example, the techniques allowed for estimation of the differential cost impacts of alternative service priorities, size and weight attributes of the various classes of mail.

He later applied these techniques for a group of second class mailers.  The analysis was introduced before the Postal Service Commission to assess whether proposed postal rate changes reflected actual costs.

<u>1984-1986</u>:        The development of econometrically-based strategic planning models, which allow for estimation of the effects on corporate profits of alternative product design and pricing strategies. The models allow for examining specific design strategies by explicitly incorporating detailed product attributes. The models were developed for Westin Hotels and Shell Oil. The Westin models have been implemented into an interactive PC tool that facilitates pricing decisions at the front desk.

<u>1985</u>:        For analysis presented before the International Trade Commission, Dr. Hartman helped develop and estimate a model to evaluate the domestic effects of importation of certain synthetic aramid fibers. The analysis was used in adjudicating an international patent infringement complaint.

<u>1985-1986</u>:        Dr. Hartman participated in an analysis of one of the nation's largest mutual funds. The study was undertaken as part of a class action alleging inappropriate management fees. The study assessed competition in the money market mutual fund industry. It measured investors' sensitivity to changes in yield and to the level of services provided. It also statistically identified the determinants of the costs of providing mutual fund services.

<u>1985-1986</u>:        The development for GTE Laboratories of econometric demand models for analysis and measurement of the determinants of demand for telecommunications services. The models explicitly address the separate customer decisions to subscribe to one of several telecommunications carriers and the demand for telecommunications services, conditional upon the subscription decision. The analysis was employed by GTE to assist their subsidiary, GTE Sprint, in the design of marketable services, where the services were differentiated by tariff, perceived service quality, provider reputation, and specialized customer services. The analysis is summarized in the paper

>    "Estimation of Household Preferences for Long Distance Telecommunications Carrier", *Journal of Regulatory Economics*, Volume 6, 1994.

<u>1985-Present</u>:    Dr. Hartman has performed a variety of economic damage analyses in cases of personal injury, wrongful injury and wrongful death. He has worked for both plaintiff and defendant. He has been deposed in such matters as recently as 1995.

<u>1986</u>:        For a major natural gas pipeline, preparation of an analysis of the effects of natural gas deregulation as proposed in the Federal Energy Regulatory Commission's Notice of Proposed Rulemaking No. 436.

<u>1986-1987</u>:    Working for the class of owners of selected General Motors' X Cars and VW Rabbits, Dr. Hartman specified and estimated econometric models that assisted in the certification of class and estimation of class damages. The damages flowed directly from allegedly-concealed design flaws in these automobiles. The methods are described in

>    "The Use of Hedonic Analysis for Certification and Damage Calculations in Class Action Complaints," with M. Doane, *The Journal of Law, Economics and Organization*, Fall 1987.

<u>1986-1987</u>:    Development of damage models for litigation in high technology industries. The models were developed in several cases. One involved alleged patent infringement by a major Japanese semiconductor firm, and the second involved market foreclosure of a domestic minicomputer emulator. In these efforts, Dr. Hartman developed econometric models to estimate the market potential, absent the violation, for the particular product foreclosed or whose patent was infringed. The methods are described generically in

"Product Emulation Strategies in the Presence of Reputation Effects and Network Externalities: Some Evidence from the Minicomputer Industry," with D. Teece, *Economics of Innovation and New Technology*, Volume 1, 1990.

1987:          Analysis of the competitive effects of relaxing the restrictions on the Bell Regional Operating Companies regarding their vertical extension upstream into equipment manufacture and downstream into the provision of selected telecommunication services.  The study was introduced before Judge Greene in the triennial review of the divestiture of the Bell operating companies from AT&T.

1987-1988:     For a major gas utility, participation in analysis of the economic effects arising if bypass of an existing pipeline were allowed by state and federal regulation.  The analysis developed methods for assessing when competitive bypass is socially desirable.  The analysis also developed and used an econometric model to simulate the effects of bypass on demand and prices.

1988:          Analysis of the competitive effects the acquisition of trade secrets through the predatory hiring of a competitor's essential labor force.  See

               Analysis submitted in testimony in the case *Universal Analytics Inc. v. MacNeil Schwendler, Corp*.

1988-1989:     As part of their proposed acquisition of Public Service of New Hampshire, Dr. Hartman was retained by Northeast Utilities, Inc. to develop and estimate load forecasting models.  The models were used to assess the demand implications of alternative rate assumptions proposed as part of the acquisition. The forecasts were introduced as part of Northeast Utilities' filings before the bankruptcy court, the state public utility commissions, the SEC and the FERC.

1989:          As part of major antitrust litigation against the leading vendors of airline computer reservation systems, Dr. Hartman helped develop liability analysis and models for the estimation of damages.

1989:          As a proposed testifying expert for Parnelli Jones, Inc., Dr. Hartman analyzed the antitrust implications of Firestone's retail trade practices, particularly alleged vertical and horizontal restraints of trade. He designed damage models for the alleged violations.

1989 - Present:  Dr. Hartman has performed and continues to perform the market analyses required for Hart-Scott-Rodino applications and second requests supporting mergers and acquisitions in a variety of industries, including specialty chemicals, airlines, health care and medical diagnostic products, and energy products and services.

1989-1990:     Dr. Hartman participated as a principal investigator and testifying expert for the Division of RatePayer Advocates of the California Public Utility Commission in an analysis of the economic and legal implications of the proposed merger between Southern California Edison Company and San Diego Gas and Electric Company.  Dr. Hartman's responsibilities included overall study design, econometric analysis of scale and scope economies arising with the merger, and analysis of efficiencies purportedly arising with the coordination of the demand-side management programs of the two utilities.   His direct and surrebuttal testimony is found in

               California Public Utilities Commission, Division of Rate Payer Advocates, Report on the Proposed Merger of the Southern California Edison Company and the San Diego Gas and Electric Company,

Volume V, Chapter II, Application 88-12-035, February, 1990, Exhibit 10,500;  and

California Public Utilities Commission, Division of Rate Payer Advocates, <u>Report on the Proposed Merger of the Southern California Edison Company and the San Diego Gas and Electric Company</u>, <u>Surrebuttal:  Econometric Analysis of Merger Impacts</u>, Application 88-12-035, July, 1990, Exhibit 10,511.

<u>1989-1990</u>:          Working with Arthur D. Little, Inc., Dr. Hartman participated as a principal investigator and testifying expert in a merger study for several small New England utilities within Nepool.  Dr. Hartman designed and implemented a statistical study of returns to scale and scope in the industry.  Using the statistical results, Dr. Hartman developed opinions regarding the efficiency effects of the proposed merger. His analysis appears as an independent Appendix to

Arthur D. Little, Inc., <u>Evaluation of EUA's Proposed Acquisitions of UNITIL and Fitchburg</u>, Report to Gaston and Snow, March 12, 1990, presented in support of the acquisition to the Securities and Exchange Commission and the New Hampshire Public Utilities Commission.

<u>1990</u>:                  Working for a group of commodity futures exchanges, Dr. Hartman participated as Principal Investigator in a critical review of a statistical and econometric study performed by the Commodity Futures Trading Commission.  The CFTC study was developed to assess the effects of dual trading on commodity futures markets, in order to implement proposed regulations curtailing such trading.

<u>1990</u>:                  Working with Barakat and Chamberlin, Inc., Dr. Hartman developed a Ramsey pricing model for Arizona Public Service Corporation.  The Ramsey pricing model was used to develop and explore alternative rate strategies for a variety of residential, commercial and industrial market segments. The analysis was submitted in formal rate hearings.

<u>1990-1992</u>:          Working with the Technology Research Center of Arthur D. Little, Inc. for the United States Postal Service, Dr. Hartman specified and estimated econometric models to analyze the determinants of productivity for the largest 120 post offices in the United States. The econometric models are being used to identify the most and least productive offices, with the purpose of learning from the performance of the most productive offices in order to improve the performance of the least productive offices.  The models are being used to design and implement incentive regulation mechanisms to increase productivity across post offices.

A second set of econometric models have been specified and estimated to quantify the effects of the attributes of alternative postal services and rate classes upon total postal service costs.  The results of this analysis are being used to design postal rates for alternative classes of service which reflect the real costs of providing the services.  The analysis and its results will be introduced into the postal rate hearings.

<u>1990-1997</u>:          Working with the World Bank, Dr. Hartman has specified and is estimating a set of econometric models to measure both the level and types of pollutants emitted by United States plants and establishments and the costs of abating those pollutants. The models identify and quantify, at the plant level, the relationship between the emission of approximately 300 pollutants and the scale of production, the types of technology used, the age and characteristics of the plant and equipment used, the extent to which abatement equipment has been installed, and the costs (capital and operating) of abating alternative pollutants.

The models will be used in the following ways in developing countries and Eastern European countries: to assist the countries to predict and assess the environmental implications of reliance upon certain

technologies and industries in development; to assess the effectiveness of alternative regulatory methods for abating pollution, including effluent standards, effluent taxes, effluent licenses, technology standards, effluent banks, and alternative property right schemes; to implement incentive regulation mechanisms to better stimulate abatement compliance; and to identify and prioritize those industries that can abate certain pollutants at least cost.

As part of this effort, Dr. Hartman has also designed a specific incentive regulation system for pollution abatement compliance in Indonesia. The system is based upon the most recent theory in regulated incentive mechanisms. The system will ultimately evolve into an effluent bank or a system of effluent fees. If the effort is successful, it will form the basis for environmental institutions in other developing countries. In the process of designing this system, he has reviewed the institutional and statutory basis for environmental policy in Indonesia.

Also as part of this work, Dr. Hartman is in the process of designing the institutional and statutory structures for Environmental Protection Agencies in a variety of developing countries. The institutional structures will be designed to articulate and implement pollution abatement policies that are informed by the econometric modeling described above.

1991:          Dr. Hartman participated as a principal investigator and testifying expert for the Missouri Public Service Commission in a critical analysis of the proposed merger between Kansas Power and Light Company and Kansas Gas and Electric Company. Dr. Hartman's responsibilities included overall study design, analysis of scale and scope economies arising with the merger, analysis of unanticipated transitional cost arising with the merger and an econometric event study of the stock market's response to the merger. His testimony appears in

A Critical Analysis of the Proposed Merger Between Kansas Power and Light Company and Kansas and Electric Company, Report to the Missouri Public Service Commission, March 25, 1991.

1991:          Working for the Resolution Trust Corporation in its litigation against Michael Milken and Drexel Burnham Lambert Inc., Dr. Hartman developed data and econometric models to measure the size of the relevant antitrust markets dominated by Drexel and to estimate the size of the economic damages produced by Drexel's alleged monopolization of those markets.

1991-1992:     Working for the Indonesian government and the United States Agency for International Development, Dr. Hartman critically reviewed the structure of the Indonesian electric power industry and the institutions regulating that industry. The purpose of the analysis was to assist the government with privatizing their energy industries. His analysis focused upon the following: developing better data and models for predicting demand and supply; identifying and implementing more efficient industrial structures; and developing better regulatory regimes.

1992:          Working for the World Bank, Dr. Hartman designed methods to measure and compare the social value of the environmental effects of alternative development projects, at the microeconomic and macroeconomic levels. His analysis focused upon standard and contingent valuation survey approaches and their use in econometric settings.

1992-1993:     Working for the World Bank in Bangkok, Dr. Hartman characterized and critically analyzed the environmental effects of Thailand's energy use patterns. He focused upon the use and production of electric power, petroleum, coal and natural gas. He developed recommendations for environmental policy changes that included, but were not limited to, fuel taxes, effluent standards, technology standards, and

19

privatization of environmental monitoring within a "bubble" policy approach.

<u>1992-1993</u>:     Working for a biomedical company (a producer of vascular grafts) in an antitrust situation, Dr. Hartman designed and implemented survey techniques and econometric models to measure the size of the relevant markets and market power within those markets.

<u>1992-1993</u>:     In a proceeding before the International Trade Commission, Dr. Hartman critiqued ITC econometric methods used for estimating elasticities of demand, supply and substitution among domestic and imported products. His focus was selected steel products. He formulated and estimated alternative models and methods to improve the existing estimates. He developed presentation materials for the Commission and testified before the Commission. His testimony is included in

> LECG, <u>Petitioners' Economic Testimony in the Matter of Certain Carbon Steel Flat Products</u>, Final Hearing before the United States International Trade Commission, June 29-30, 1993; and

> LECG, <u>Petitioners' Post Hearing Brief in the Matter of Certain Carbon Steel Flat Products</u>, before the United States International Trade Commission, July 7, 1993.

<u>1992-1997</u>:     Working for the World Bank, Dr. Hartman has designed and is currently implementing a set of regional econometric/engineering models that accurately portray and predict the economic, environmental, infrastructural and socio-demographic effects of large-scale, World-Bank-funded infrastructural projects. The models combine input-output and econometric methods.

Given the Bank experience that many of their financially-sponsored projects create significant unanticipated environmental effects, the models are designed to be broad and comprehensive enough to incorporate and predict all important effects. The models systematically characterize the relationship between resource-based economic growth and the regional environment in which that growth occurs.

The models are currently being implemented for assessing project developments in the Carajas region of the Brazilian Amazonian rain forest, which is a large, dynamic and ecologically sensitive frontier area. The methods implemented for Brazil will be generalized for analysis of economic growth in ecologically similar areas, such as the Lake Baikal region of the former Soviet Union.

<u>1993-1994</u>:     Working for the Commonwealth of the Northern Mariana Islands, Dr. Hartman developed and presented testimony rebutting a complaint by the United States Department of Justice that the Public School System of the Commonwealth practiced employment discrimination against teachers of Filipino and native Carolinian origin. Dr. Hartman's testimony examined both hiring and compensation practices. His testimony included hedonic regression analysis of the market for public school teachers in the islands. This analysis measured how teacher attributes and qualifications determined teacher salaries and hiring. The results of the analysis indicated that salary differentials resulted from differences in teacher qualifications rather than discrimination.

<u>1993-Present</u>:     Working either as the testifying expert or supporting other testifying experts, Dr. Hartman has participated in a variety of patent infringement cases. He has developed, supported and estimated alternative theories and measures of damages for manufacturers of coaxial cable and a variety of alternative medical devices.

<u>1993-1998</u>:     Working as the testifying expert, Dr. Hartman developed models estimating the damages to the business of a construction general contractor that were caused by the malicious prosecution of the contractor's

20

insurance company.

1994:          Working for the United States Wheat Associates in a proceeding before the ITC, Dr. Hartman designed and implemented an econometric study to assess and quantify the extent to which Canadian Wheat Board imports into the U.S. undersold domestic supplies and thereby materially interfered with the United States Department of Agriculture Wheat Program. The econometric study was hedonic. The study measured how non-price attributes are valued in U.S. wheat markets. The non-price attributes analyzed included such things as protein content, shipment defects, moisture content and a number of end-use performance characteristics. Having measured the value of these attributes in U.S. markets, the analysis indicated how the Canadian Wheat Board fixed import prices below market levels, given the attributes of the imported wheat.

1994:          Working as a testifying expert for Gallo Wines in a proceeding before the ITC, Dr. Hartman designed and implemented a statistical study of the US wine industry that analyzed the impacts of Chilean wine imports upon the domestic industry that would result from the inclusion of Chile in a Free Trade Agreement with the US.

1994:          Working as a testifying expert for an insurer of a member of the Asbestos Claims Facility and Center for Claims Resolution, Dr. Hartman developed a statistical analysis estimating alternative indemnification liabilities expected under the Settlement Share Analysis of the Center for Claims Resolution and under the tort system. The results were used to make strategic decisions regarding the desirability of participating in the Class Action Settlement relative to litigating the claims.

1994:          Working for several regional Bell Operating companies, Dr. Hartman has developed models and survey procedures to analyze and quantify the determinants of demand for local services, long-distance services and PCS services. The models quantify how consumers respond to and select among alternative carriers who differentiate their services by performance attributes and vendor reputation. The models also estimate the level of service demand, conditional upon the selection of service vendor. The models are being used to quantify the nature of competition among local carriers and long-distance carriers in the Intralata market. The models are also being used to help develop bidding strategies for specific RBOCs as they participate in the FCC auctions for the PCS spectra.

1995:          Working as a testifying expert for a group of independent television stations and program producers, Dr. Hartman developed an econometric analysis of the impacts of the Prime Time Access Rule (PTAR) upon the economic performance of independent television stations. The analysis was submitted to the Federal Communications Commissions as part of their consideration of the repeal of the Rule. Dr. Hartman's analysis proved that PTAR had a strong, statistically significant effect upon the economic performance of these stations, and that its repeal would adversely impact them.

          His testimony is included in

          The Economic Effects of Repealing the Prime Time Access Rule: Impact on Broadcasting Markets and the Syndicated Program Market, Report prepared by LECG and presented before the Federal Communications Commission, MM Docket No. 94-123, March 7, 1995.

1995:          Working for a big six accounting firm, Dr. Hartman designed and implemented a hedonic regression analysis to calculate transfer prices under the comparable uncontrolled price (CUP) method. The analysis is discussed in

          "The Use of Regression Techniques in Transfer Price Analysis," with Delores Wright and J.D.

Opdyke, *European Taxation,* 1996.

1995-1996:       Working as the testifying expert for a major high tech firm in New England, Dr. Hartman has developed rebuttal and affirmative testimony to rebut claims of age discrimination in the termination of a group of employees over forty.  His rebuttal testimony involved critically reviewing statistical analyses purporting to demonstrate disparate treatment and disparate impact.  His affirmative testimony has involved designing and implementing econometric models to identify and estimate those factors actually determining the compensation and termination decisions of the defendant.

1995-1996:       Working as the testifying expert for the Office of Attorney General of the State of Massachusetts, Dr. Hartman has analyzed and helped develop the State's positions on the following issues: restructuring the electric utility industry in Massachusetts and New England; regulating those entities in the restructured industry that will remain subject to regulation; and valuing those assets that may be stranded as a result of restructuring.  As part of the effort, Dr. Hartman also critically reviewed the restructuring proposals of the largest utilities in the state.  His testimony appears in

"The Market for Power in New England:  The Competitive Implications of Restructuring," a report prepared for the Office of the Attorney General, Commonwealth of Massachusetts and submitted February 16, 1996 in support of their filing to the Department of Public Utilities as part of DPU 95-30, which was initiated August 15, 1995.

1995-1996:       Working as the testifying expert, Dr. Hartman represented Florida Power Corporation in a contract dispute with Independent Power Producers.  His analysis and testimony focused upon issues of damages incurred as a result of a breach of contract.

1995-1999:       Working with a team of economists, Dr. Hartman represented the group of wholesalers in the retail prescription drug price fixing conspiracy case.  His efforts included industry analysis and participation in cross examination of plaintiffs' experts.

1996:       Working as the testifying expert for the Division of Public Utilities of the State of Rhode Island, Dr. Hartman has analyzed and helped develop the State's positions on restructuring the electric utility industry in Rhode Island and New England, for both the State's Public Utilities Commission and the FERC.  As part of the effort, Dr. Hartman also critically reviewed the restructuring proposals of some of the utilities in the state.  His testimony appears in

"The Division Plan to Restructure the Electric Utility Industry in Rhode Island,"  Volume 2 of Supporting Testimony to the State of Rhode Island and Providence Plantations Public Utilities Commission, in re:  Electric Industry Restructuring, Docket 2320, April 12, 1996.

1996:       Working with a team of engineering firms, an international investment banking firm, a big six accounting firm and several national law firms, Dr. Hartman developed models of demand, supply and futures markets in restructured electric power markets to assist a major industry participant in evaluating specific alternative acquisition strategies.

1996:       Working with a team of economists developing evidence for presentation before the High Court of New Zealand, Dr. Hartman critically reviewed and rebutted a variety of econometric analyses of natural gas markets and more broadly-defined energy markets in New Zealand.  These analyses were used to determine the size of antitrust markets for a variety of energy products.

1996:             Dr. Hartman was retained by a major mid-west utility to critically review and rebut analyses and evidence presented before the FERC and the relevant State Commissions concerning the competitive impacts of the proposed Primergy merger.

1996-2003:       Working as the testifying expert, Dr. Hartman analyzed the employment practices and procedures of the Florida Power Corporation during a reduction in force, to assess the validity of a complaint that those practices and procedures resulted in a pattern of age discrimination.  In his testimony, Dr. Hartman implemented a variety of statistical and econometric analyses to address and quantify claims of disparate impact and disparate treatment.

1996-1997:       Working for US Airways with a team of economists, Dr. Hartman specified and estimated a variety of econometric consumer choice models to measure customer preferences for the services of alternative air carriers in a cross section of US-European origin-destination markets.  The models were used to evaluate the economic impacts of both the proposed alliance between American Airlines and British Airways and alternative proposals to condition that alliance.

1996-1997:       Working as the testifying expert, Dr. Hartman represented a major national retail pharmaceuticals wholesaler in litigation brought by a regional distributor alleging monopolization of wholesale services to distinct classes of trade.  His analysis addressed market definition, the analysis of competition generally and analysis of the competitive impact of specific contractual arrangements.

1997:             Working with a team of experts, Dr. Hartman analyzed economic impacts of the construction of the Warrior Run Cogeneration plant which was under construction in Western Maryland and was contracted to sell power to Allegheny Power System's (APS) Maryland subsidiary, Potomac Edison.

1997:             Working as the testifying expert for the Office of Ratepayer Advocates of the California Public Utilities Commission, Dr. Hartman critically reviewed the efficiencies estimated by Applicants to be induced by the proposed merger of Pacific Enterprises and Enova Corporation.

1997:             Working with a team of economists, Dr. Hartman prepared affirmative and rebuttal testimony in a breach of contract matter in the pharmaceutical industry arbitrated before the International Chamber of Commerce.

1997-2000:       Working as the testifying expert, Dr. Hartman developed analysis supporting certification of class and estimation of damages for the class of purchasers of thermal fax paper in the US over the period 1990-1992 who were damaged as a result of a price fixing conspiracy by major suppliers.

1998:             Working as the testifying expert, Dr. Hartman analyzed the employment practices, procedures and personnel data of the Florida Power Corporation, in general and in particular, to assess the validity of a complaint that a specific employee had been subjected to racial discrimination.

1998-1999:       Working with a team of economists for the Office of the Attorney General of the State of Massachusetts, Dr. Hartman developed and implemented econometric models to analyze and measure the health care costs arising under the Medicaid program that have been attributable to smoking.  The analysis appears in the following documents:

> David M. Cutler, Arnold M. Epstein, Richard G. Frank, Raymond S. Hartman, Charles King and Joseph P, Newhouse, *The Impact of Smoking on Medicaid Spending in Massachusetts: 1970-1998 -- Report on Methods*, June 15, 1998;

23

David M. Cutler, *et. al., The Impact of Smoking on Medicaid Spending in Massachusetts: 1970-1998 - - Results From The Inclusive Approach for Adults*, July 1, 1998;

David M. Cutler, *et. al., The Impact of Smoking on Medicaid Spending in Massachusetts: 1991-1998 - - Results From The Disease-Specific Approach for Adults and Overall Summary*, July 11, 1998.

Drawing upon these efforts, Dr. Hartman worked with the same team of experts to analyze the economic impacts of the Master Settlement Agreement and to present their findings to the Tobacco Fee Arbitration Panel.

1999:         Working as one of two testifying experts for the Office of the Attorney General of the Commonwealth of Massachusetts, Dr. Hartman critically analyzed potential rate increases relevant to Joint Petitions introduced by both Eastern Enterprises/Colonial Gas Company and Boston Edison/Commonwealth Energy Systems.  His testimony appears as

Joint Testimony of Seabron Adamson and Raymond Hartman on Behalf of the Massachusetts Attorney General, in the matter of the Joint Petition of Eastern Enterprises and Colonial Gas Company For Approvals of Merger Pursuant to G.L. c. 164, §§ 96 and 94, DTE 98-128, March 26, 1999.

Joint Testimony of Seabron Adamson and Raymond Hartman on Behalf of the Massachusetts Attorney General, in the matter of the Joint Petition of Boston Edison Company, Cambridge Electric Light Company, Commonwealth Electric Company and Commonwealth Gas Company For Approval of Rate Plan Pursuant to G.L. c. 164, §§ 76 and 94, DTE 99-19, April 30, 1999.

1999-2000:      Dr. Hartman was retained by a group of industrial purchasers of copper to develop and implement methods and models to assess liability and measure damages in the matter involving the manipulation of the spot and future prices of copper on the London Metals Exchange by Sumitomo Corporation and Yasuo Hamanaka over the period 1987-1996.

1999-Present:   Dr. Hartman consulted with counsel and the testifying expert in the development of data and models needed to certify class and measure damages in a price fixing case involving the manufacturer (Mylan) of generic clorazepate and lorazepam.

1999-2001:      Working as the testifying expert, Dr. Hartman analyzed liability arising from a variety of restrictive dealer arrangements implemented by Dentsply International Inc., a U.S. manufacturer of artificial teeth, to foreclose entry by rival manufacturers from the US dental-laboratory dealer network.  Dr. Hartman developed and implemented methods to measure damages to the class of dental laboratories that purchased artificial teeth from Dentsply at prices above the competitive prices that would have obtained absent the restrictive dealer arrangements.

1999-2000:      Working with a team of economists for the Federal Trade Commission, Dr. Hartman analyzed the pro-competitive and anti-competitive nature of settlement agreements between generic and pioneer drug manufacturers resolving patent infringement litigation arising from certification under Paragraph IV of the Hatch Waxman Act (Drug Price Competition and Patent Term Restoration Act).  Particular settlements analyzed include the settlement between Abbott Laboratories and Geneva Pharmaceuticals regarding the drug Hytrin and the settlement between Hoechst Marion Roussel (Aventis) and Andrx Corporation regarding the drug Cardizem.

1999-2000:      Working as the testifying expert for the class of purchasers of Nine West shoes, Dr. Hartman was asked to analyze liability and measure damages arising from an alleged conspiracy to raise and maintain

the prices of women's shoes manufactured by the Nine West Group Inc. and sold by a variety of general merchandise retailers through their upscale retail department stores. The defendants in the case included Nine West Group Inc., Federated Department Stores, Inc., Dayton Hudson Corporation, Lord and Taylor, Nordstrom, Inc., May Department Stores, Macy's, Bloomingdale's, Inc., and other general merchandise retailers.

<u>2000</u>:          Working with the testifying expert, Dr. Hartman assisted in the analysis and estimation of economic damages to a Class defined as all smokers with 20-pack years each of whom contracted lung cancer which was substantially contributed to by cigarette smoking.

<u>2000</u>:          Working with a team of economists, Dr. Hartman developed econometric models to analyze and measure the impacts of subject imports, non-subject imports and factor price changes upon the prices of structural steel beams during the period 1998-1999.  The work was presented before the International Trade Commission.

<u>2001</u>:          Working with a team of economists, Dr. Hartman developed econometric models to analyze and measure the impacts of subject imports, non-subject imports and factor price changes upon the prices of structural steel beams and during 2000.  He also developed econometric models to analyze and measure the impacts of subject imports, non-subject imports and factor price changes upon the prices of cold rolled and hot rolled steel during the Period of Inquiry of 1997-1999.  Both efforts were presented before the International Trade Commission.

<u>2001-present</u> :   Working as the testifying expert, Dr. Hartman developed and submitted testimony in support of class certification of and the calculation of damages to the class of indirect purchasers of the anti-hypertensive drug, Hytrin, produced by Abbott Laboratories and the generic equivalent of Hytrin, generic terazosin hydrochloride, produced by Geneva Pharmaceuticals. The class alleges monopolization and violation of the Hatch Waxman Act (Drug Price Competition and Patent Term Restoration Act).

<u>2001-Present</u>:   Working as consultant and testifying expert, Dr. Hartman has been retained by counsel to the classes of indirect or direct purchasers of a variety of branded pharmaceuticals (including but not limited to Augmentin, Bextra, Cipro (New York, California, U.S.), BuSpar, Celebrex, Vioxx, K-Dur, Taxol, Lupron, Relafen, Paxil, Neurontin, Remeron, Tamoxifen, Premarin, Wellbutrin and Zyprexa) to analyze and submit testimony dealing with class certification, liability, market definition, damage calculations and settlement allocations arising from violations of the Hatch Waxman Act (Drug Price Competition and Patent Term Restoration Act), related state-specific unfair competition statutes and the RICO Act.

Dr. Hartman's testimony in this area has been relied upon (and cited thereto) for certification of end-payer consumer classes in the following matters:

- *In re: Terazosin Hydrochloride Antitrust Litigation*, United States District Court, Southern District of Florida, Case No. 99-MDL-1317-Seitz/Klein [Order Granting Indirect Purchaser Plaintiffs' Motions for Class Certification of State-Wide Classes, April 8, 2004]
- *In re Cipro Cases I and II*, D043543 (JCCP Nos. 4154, 4220), Court of Appeal, Fourth Appellate District, Division One, State of California [Decision affirming class certification not titled but marked as "Not to Be Published in Official Reports," Filed 7/21/04]
- *In re: Relafen Antitrust Litigation*, United States District Court, District of

25

Massachusetts, Master File No. 01-12239-WGY [Memorandum granting certification for an exemplar class, May 12, 2004]

Dr. Hartman's testimony has been relied upon (and cited as necessary) for approval of proposed settlement allocations in the following matters:

- *In re: Lupron® Marketing and Sales Practices Litigation*, United States District Court, District of Massachusetts, MDL No. 1430, Master File No. 01-CV-10861-RGS [Memorandum and Order Approving Settlement and Certifying the Class, May 12, 2005]
- *HIP Health Plan of Florida, Inc., On Behalf of Itself and All Others Similarly Situated v. Bristol-Myers Squibb Co. and American Bioscience*, Case Number 1:01CV01295, United States District Court for the District of Columbia
- *In re Buspirone Antitrust Litigation*, MDL No. 1413, United States District Court for the Southern District of New York
- *In re Relafen Antitrust Litigation*, United States District Court, District of Massachusetts, Master File No. 01-CV-12222-WGY
- *In re Remeron Antitrust Litigation*, United States District Court, District of New Jersey, Master Docket No. 02-CV-2007

2001:    Working as consultant to counsel for various U.S. steel producers, Dr. Hartman worked with a team of economists to develop econometric models to analyze and measure the impacts of imports, demand and factor price changes upon the prices of domestically produced carbon steel flat products and carbon steel long products in the Section 201 hearings before the International Trade Commission. Dr. Hartman testified before the ITC in the hearings. The Commission decided in favor of most of the products subject to these analyses.

2001:    Working as consultant to counsel for Nucor Steel Corporation, Dr. Hartman worked with a team of economists to develop econometric models to analyze and measure the impacts of imports, demand and factor price changes upon the prices of domestically produced carbon steel cold rolled products for preliminary hearings before the International Trade Commission.

2001-2002:    Consulting to counsel for the Plaintiff Class, Dr. Hartman analyzed the targeting of youth by cigarette advertisements in the matter *in re Devin Daniels, et. al., v. Philip Morris Companies, Inc., et. al.,* Case Number 719446, coordinated with JCCP 4042.

2001-2003:    Working as testifying expert, Dr. Hartman developed and presented statistical evidence analyzing the relative performance of a particular cardiovascular surgeon litigating the fact that his surgical privileges had been revoked as a result of incompetent surgical performance and results. He testified before an arbitration panel in the matter.

2003:    Working as the testifying expert for Defendants, Dr. Hartman submitted testimony analyzing the allegation of racial discrimination on the part of Wells Fargo Home Mortgage, Inc. and Norwest Mortgage, Inc.

2003:    Working as a consulting expert to counsel for the class of purchasers of graphite electrodes, Dr. Hartman developed econometric models to assess the impact of alleged antitrust violations.

2003:            Working as a consulting expert for counsel to the class of direct purchasers, Dr. Hartman reviewed materials in a matter regarding antitrust allegations concerning the manufacture and sale of microcrystalline cellulose in the United States.

2003:            Working as a consulting expert to counsel for a large electrical generation company, Dr. Hartman developed economic and econometric models to analyze the allegation that this electrical generation company participated in a conspiracy to manipulate prices of power sold in California.

2003:            Working as the testifying expert, Dr. Hartman submitted testimony which analyzed and calculated the economic impacts and damages to the U.S. growers and quota holders of flue-cured and burley tobacco leaf caused by a price-fixing conspiracy among the major U.S. tobacco leaf buyers and cigarette manufacturers.

2004:            Working as the consulting expert for the United States Department of Justice, Dr. Hartman critically analyzed the calculation of the economic damages borne by an electric power generation utility as a result of the breach of the Standard Contract with the U.S. Department of Energy to remove spent nuclear fuel in 1998.  Dr. Hartman's analysis included a critical review and rebuttal of the models and data put forward by the utility's experts in the calculation of damages; the development and presentation of alternative and improved models and corrected data to more accurately calculate damages; a critical review of econometric analyses put forward by one of the utility's experts; and a review of the economics of re-licensing existing nuclear generating facilities.

2004:            Working as the testifying expert, Dr. Hartman submitted testimony in support of the certification of the class of purchasers of electrical carbon products who have been alleged to have been impacted and injured economically as a result of a price-fixing customer-allocation conspiracy of the major suppliers of such products in the United States.

2004-Present:    Working as the testifying expert, Dr. Hartman submitted testimony in support of the certification of the class of end payer purchasers of those pharmaceutical products produced by AstraZeneca, the Bristol Myers Squibb Group, the Johnson and Johnson Group, the Glaxo-Smith-Kline Group and the Schering Plough Group that were subject to an alleged scheme to fraudulently inflate their Average Wholesale Price (AWP), thereby fraudulently inflating the reimbursement rates paid by the Class members for those pharmaceuticals when their reimbursement rates were formulaically related to the AWP.  Dr. Hartman is consulting on related litigation undertaken by the Offices of the Attorneys General for the States of New York, Connecticut, Arizona, Nevada, Montana and Pennsylvania.   He has also submitted testimony establishing liability and calculating damages for those Classes certified by the MDL Court and those States seeking remedy.  2004-2005:     Working as a consulting expert to counsel for a major electricity and gas utility holding company, Dr. Hartman developed models to evaluate allegations of affiliate abuse by the regulated gas distribution entities and the trading entities of the holding company.  The alleged abuses concerned spot and forward gas markets in California.

2005:            Working as the testifying expert for the United States Department of Justice, Dr. Hartman developed models to critically analyze the cost submissions to the U.S. Court of Federal Claims by the TVA for monetary damages alleged to have resulted from partial breach by the U.S. Department of Energy of the Standard Contract to remove spent nuclear fuel from TVA beginning in 2002. Dr. Hartman's analysis included a critical review and rebuttal of the models, data and cost analyses put forward by the utility and the development and implementation of alternative and improved models and corrected data to more accurately calculate costs attributable to the alleged partial breach.

<u>2005-2007:</u>      Working again as the testifying expert for the United States Department of Justice, Dr. Hartman developed models to critically analyze the cost submissions to the U.S. Court of Federal Claims by the Systems Fuel Inc., a subsidiary of Entergy, for monetary damages alleged to have resulted from partial breach by the U.S. Department of Energy of the Standard Contract to remove spent nuclear fuel from SFI facilities in Mississippi and Arkansas.  Dr. Hartman's analysis has included a critical review and rebuttal of the SFI models, data and cost analyses put forward by the utilities and the development and implementation of alternative and improved models and corrected data to more accurately calculate costs attributable to the alleged partial breach.

**Attachment B**

## Attachment B: Detailed Analysis of Econometric Issues

1.      Recall from ¶ 22 of the text of my Declaration, that Defendants' experts, Drs. Scott Morton and Keeley raise the following potential econometric problems:

   a) Measurement error.  Dr. Scott Morton raises this issue at ¶¶ 62-64.

   b) Missing data.  Dr. Scott Morton raises this issue at ¶¶ 65- 66.

   c) Omitted variables.  Dr. Scott Morton raises this issue at ¶ 67; however she seriously mischaracterizes it as a simultaneity/endogeneity problem at ¶¶ 38-41.

   d) Multicollinearity.  Dr. Scott Morton raises this issue at ¶¶ 68-69 and Dr. Keeley raises it at ¶¶ 19 & 56.

   e) Endogeneity.  Dr. Scott Morton confusedly raises this issue at ¶¶ 38-41.  Dr. Keeley raises it, without confusion, at ¶¶ 19 & 56.

   f) Number of observations and resulting degrees of freedom.  Dr. Scott Morton raises this issue at ¶¶ 71-72; Dr. Keeley does so at ¶¶ 18 & 56.

   g) The precision of measuring prescriptions by diagnosis using IMS data. Dr. Scott Morton raises this issue at ¶ 73.

   h) The fact that physicians' prescription behavior and habits may change slowly over time as knowledge accumulates and habits are formed.  Dr. Scott Morton raises this issue at ¶¶ 74-75.  Dr. Keeley raises the issue at ¶ 61; however, he takes an opposite position, asserting that physician prescribing behavior changes rapidly.

   i) Lack of variation in data.  Dr. Scott Morton raises this issue at ¶ 76.

   j) Insufficiency of available candidate instrumental variables (IVs); note, IV is a specific econometric estimation technique.  Dr. Scott Morton raises this issue at ¶ 77.

   k) Large confidence intervals arising as a result of the use of instrumental variables. Dr. Scott Morton raises this issue at her ¶ 77.

2.      This recitation of possible econometric problems is only that – a recitation, an identification of possible statistical problems that could arise when Dr. Rosenthal implements her proposed modeling.  These same potential problems are faced with every empirical analysis undertaken by any research economist.  These same potential problems must be and have been addressed in every research effort undertaken by Drs. Scott Morton and Keeley. Let me describe each issue and its relevance to Dr. Rosenthal's analysis to the degree that is necessary here.

### a)  Measurement Error

3.      Dr. Scott Morton expresses concern that Dr. Rosenthal's independent variables may be measured with error, and that such measurement error may cause biased estimation of the model parameters of interest.   While it is possible that some

measurement error will occur, the unspoken reality is that measurement error is an unfortunate problem which occurs to some degree in every econometric analysis undertaken. It is almost impossible to gather sufficient data to analyze an important policy issue or important type of consumer behavior without having to rely upon some variables that are measured less than perfectly. The issue facing any applied econometrician is whether the measurement error is so significant that it is impossible to draw statistical inferences of any value.

4.    Indeed, the particular variables of Dr. Rosenthal, about which Dr. Scott Morton expresses greatest concern, are the promotional efforts specifically aimed at inducing off-label prescription behavior and which are embodied in specific CME (continuing medical education) conferences, "peer-selling" events, publications, detailing, and the like. One can measure such efforts in a variety of ways, including dollars spent on the challenged activities, the amount of time involved, or the number of doctors reached.

These measures are really no different than the IMS data measuring promotional spending on detailing, journal advertising and free samples for FDA-approved uses. These IMS data do not differentiate whether such dollars reach "physicians in particular specialties" (Scott Morton ¶ 62); or "the number of hours in the [detailing] event" (Scott Morton ¶ 62) per dollar spent; or whether "detailing is more effective if free samples are given at the same time" (Scott Morton ¶ 63). Yet Dr. Scott Morton uses such IMS data (as an important advertising variable) in her research appearing in the *International Journal of Industrial Organization (IJIO)*, 18 (2000), pp, 1085-1104; see ¶ 17.a) of the text of my Declaration.

5.    In the same paper, Dr. Scott Morton relies upon research by Grabowski and Vernon, entitled "Brand Loyalty, Entry, and Price Competition in Pharmaceuticals After the 1984 Drug Act;" see ¶ 17.b) of the text of my Declaration. That research also analyzed the effect of innovator-drug-firm promotional expenditures upon the decision of generic manufacturers to enter a given market and made use of the same IMS data on promotional spending subject to the same measurement error as those data used by Dr. Scott Morton.

6.    Likewise, in their paper, "Information, Marketing and Pricing in the US Antiulcer Drug Market" (see ¶ 17.c) in the text of my Declaration), E. Berndt, *et al.*, make use of IMS promotional expenditures to assess their impact upon demand for $H_2$-antagonists, including Tagamet, Zantac, Pepcid and Axid. They estimate demand elasticities with respect to price and promotional variables, despite the fact that their measures of promotional activity must suffer from the same measurement error that Dr. Scott Morton attributes to those of Dr. Rosenthal.

7.    Finally, in the paper by Dr. Scott Morton's co-editor at the *International Journal of Industrial Organization*, Dr. Sarah Ellison (with Mary Wolfram), "Coordinating on Lower Prices: Pharmaceutical Pricing under Political Pressure," *Rand Journal* (see ¶ 17.e) of the text of my Declaration), these authors attempt to develop measures of causation summarizing "*political sensitivity*" of individual companies and, having done so, to assess whether these measures of "political sensitivity" predict price changes and pricing coordination. The two measures of "political sensitivity" they use are the

following: the level of the firm's concern about being regulated, which they "proxy" by "the percent of a firm's revenues derived from sales to the elderly;" and the amount of profits that would be lost from regulation, which they proxy by the "revenue-weighted average of the length of time remaining on a firm's patents."

This variable, "*political sensitivity*," and the bases for its measurement ("the percent of a firm's revenues derived from sales to the elderly" and the "revenue-weighted average of the length of time remaining on a firm's patents") clearly provide a measure that is subject to incomplete determination and measurement error of "political sensitivity." One must ask, just what is political sensitivity; is it linear; and is it fully explained by these two proxy variables? I doubt it. Yet, this empirical analysis has taken advantage of all statistical methods available to diminish the impact of the inherent measurement error; it has been published in one of the top journals in the country (the *Rand Journal*); it has been the basis for policy understanding and measurement.[1]

8.      In short, in all of these cases, the analyses were found sufficiently accurate by the authors and the journals to provide important analytic and policy insights and measurement. There is no reason to believe that Dr. Rosenthal's use of the same or similar data will not also provide equally useful and accurate measures. Defendants' experts cannot have it both ways. What works for them and their colleagues (and indeed the profession) will work for Dr. Rosenthal and me in this matter.

---

[1] Indeed, in her deposition (Deposition of Fiona Scott Morton, February 7, 2007 (hereafter "*Scott Morton Deposition*") *In re: Neurontin Marketing Sales Practices, and Products Liability Litigation*, United States District Court District of Massachusetts, MDL Docket No. 1629, Master File No. 04-10981-PBS.at pp. 146-147), Dr. Scott Morton admits that econometric modeling of market behaviors subject to policy, regulatory and/or legal strictures requires the application of correct statistical methods, the use of the best data available and where necessary a certain amount of **creative adaptability or "*art*,"** as follows (emphasis added):

"Q. …well, how accurately would the percentage of a firm's revenues derived from sales to the elderly measure their political sensitivity?

A. So if you think that the government has an interest in spending less on drugs and it feels that it's responsible for either drug coverage for the elderly or obtaining somehow low prices for the elderly on their behalf, then this measures the size of that problem.

Q. Is there a way *to measure how accurate such a definition matches political sensitivity* in some way?

A. Well, *I don't think political sensitivity has an inherent definition* of its own in the economics literature, so since they've defined it, and these are their measures, ….

Q. It seems to me that this -- when there is a *concept that doesn't have its own inherent definition, a concept like political sensitivity*, is it common for economists to look to some concrete measure and redefine what it is they're talking about in order to be able to have some type of a method to quantify the concept?

A. I would say that there are *some times people* who would like to *undertake ambitious research projects and cannot measure the thing* they would like to measure, and so they measure something else instead, and sometimes those judgments are better than others. And I think *one of the features of the profession that's perhaps an art rather than a science* is deciding how appropriate it is to use one variable or data source rather than another in attempting to measure a particular concept."

---

### b)  Missing Data

9.      Dr. Scott Morton raises the specter of potentially missing data that will make it impossible for Dr. Rosenthal to accurately estimate the effect of off-label promotion on aggregate prescriptions written (TRx).   While every econometric effort faces the possibility that some data will be missing, there is no reason to believe that such an event will occur in this case, given the richness of the IMS data sources and the data provided by Defendants.  If some data are missing, there are econometric methods to adjust for that missing data and to judge whether such an adjustment is appropriate or not.   Does Dr. Scott Morton really want to assert that missing data are more likely in this market and for this issue than for the many other markets and issues that rely upon alternative data? That is not the case.

### c)  Omitted Variables

10.      Dr. Scott Morton asserts (¶¶ 38-41 and 67) that there will be omitted factors that will make estimation of the important causal relationship impossible. An example of an omitted factor she introduces is "the state of medical knowledge of the basic science of the brain" (¶ 41).

        It is true that "the state of medical knowledge" is always changing, for all families of drugs and procedures.  It is true that it has not been included by Dr. Rosenthal. However, it is certainly not clear that it will have a relatively stronger effect on the TRx of Neurontin relative to Neurontin's other therapeutic substitutes.  Likewise, it is highly unlikely that it can be measured without measurement error, which Dr. Scott Morton argues should be avoided (see ¶¶ 1.a) and 3-8 of this Attachment).

        Indeed, I have no idea how it could be measured; I have seen no research claiming to have measured it.  It has certainly not been included in the analyses of the effect of promotional expenditures upon pharmaceutical demand and generic entry conducted by Dr. Scott Morton (in her *IJIO* article), in the *JLE* article by Grabowski and Vernon, or in the Berndt, *et al. AEA* article. If a measure of "the state of [relevant] medical knowledge" must be included by Dr. Rosenthal, it certainly should have been required in these other efforts.  It was not.

11.      Likewise, "the [relative] state of medical knowledge" would certainly have differential effects upon the equity value of alternative pharmaceutical companies and on the "*political sensitivity*" of alternative firms to health care regulation.  These issues were formally analyzed; the results published in top journals by Ellison and Mullin (¶ 17.d) of the text of my Declaration) and by Ellison and Wolfram (see ¶ 17.e) of the text of my Declaration); and neither of the analyses included a measure of the state of medical knowledge.

12.      If Dr. Scott Morton really believes in the necessity of including this variable, she must believe therefore that these other research papers, including her own, should not have been published or that they are incorrect.  Alternatively, she should not be allowed to impose different standards upon the proposed analysis of Dr. Rosenthal.

13.    However, a more disquieting aspect of Dr. Scott Morton's discussion of "omitted variables" is her apparent unfamiliarity with the underlying econometric theory. Specifically, in discussing omitted variables, she incorrectly asserts (at her ¶ 39) "The problem of endogeneity arises when the dependent variable, e.g., number of prescriptions for Neurontin, and the explanatory variable, e.g., promotional expenditures for Neurontin, are affected by a common third variable which is not included in the model."

14.    Dr. Scott Morton **has not** described the problem of endogeneity; her econometric characterization is incorrect. Put simply (but with sufficient technical rigor), *endogenous* variables are those that are determined simultaneously by *exogenous* variables and the error processes of a system of equations being analyzed.[2] The "problem of endogeneity" arises when an economist is estimating one equation of interest **in that system of equations** and endogenous variables appear on the right hand side as regressors. In this case, simple ordinary least squares (OLS) estimators are biased and inconsistent, **regardless** of whether another third variable is omitted or not. Even if there were "a common third variable" and it **was included** in the model, the problem of endogeneity would occur and must be corrected.

Likewise, even if there were **no simultaneity,** and therefore no "**problem of endogeneity,**" and therefore all the right hand side regressors were independent and not

---

[2] The issue of the problem of endogeneity arises **only** in the context of system estimation, as any rigorous theoretical graduate text in econometrics makes clear.

For one renowned example, see J. A. Hausman, "Simultaneous Equation Models," Volume 1, chapter 7, in Z. Griliches and M. Intriligator, editors, *Handbook of Econometrics*, North Holland, 1983, at p. 392. Dr. Hausman considers "a linear regression specification [equation (1.1)] which relates the quantity purchased of a commodity to its prices at time *t*." He asks "is eq. (1.1) a demand curve or a supply curve or should we examine the least squares estimate … to decide upon our answer?" He answers "The econometricians' answer is that *both* quantity and price are *simultaneously* determined by the actions of the market so that to understand the quantity and price relationship we need to treat the two variables *as jointly endogenous*" (emphasis added). To ignore this simultaneity is to ignore the endogeneity problem.

For a second venerable example, see H. Theil, *Principles of Econometrics*, John Wiley, 1971, which deals with simultaneous equation estimation in his chapter 9. He describes (at his p. 430) a system of equations (for which estimators are sought) which "is [used] to describe a subset of its variables [the *endogenous* variables] in terms of the other variables [the *exogenous* variables]. … The intuitive background of this distinction is that the values of certain variables (the *exogenous* variables) are determined 'from the outside,' that is, in a way which is independent of the process described by the equation system, whereas the values of the other (*endogenous*) variables are determined, jointly and simultaneously, by the exogenous variables and the disturbances" in the system (emphasis added).

For a quite recent example, W. Greene, *Econometric Analysis*, Prentice Hall, 2003, chapter 15 likewise defines systems of **structural equations**, consisting of **jointly dependent** or **endogenous** variables which are determined by **exogenous** variables. At p. 379, he states "Because the endogenous variables are all correlated with the disturbances, the least squares estimators of the parameters of equations with endogenous variables on the right-hand side are inconsistent." This, precisely, is the ***problem of endogeneity***. In his footnote 3, he states "This failure of least squares is sometimes labeled **simultaneous-equations bias**" (emphasis in the original).

See also Takeshi Amemiya, *Advanced Econometrics*, Harvard University Press, 2001, chapter 7 (on systems estimation).

---

endogenous, an omitted variable will cause biased and inconsistent parameter estimates if simple ordinary estimation methods (OLS) are used.

Hence, all of this discussion about omitted variables has nothing to do with endogeneity. Omitted variables will be a problem regardless of whether TRx of Neurontin and promotional expenditures are simultaneously determined and subject to the endogeneity problem.[3]

15.    This is an important point because the problem of endogeneity is common. It is faced almost all the time and there are very simple methods to correct for it.[4] That is **not the case** for omitted variables.[5]

16.    To summarize, at ¶ 52, Dr. Scott Morton takes these issues one step further, and assuming a professorial role, states "The concept of endogeneity and the problems it creates for researchers interested in establishing causality is central to the field of applied economics. If a doctoral student came to me with a dissertation proposal in the form of Dr. Rosenthal's declaration I would tell the student that the proposal was incomplete."

I agree with Dr. Scott Morton that the issue of "establishing causality is central to the field of applied economics." I agree that the "problem of endogeneity" complicates identification and the measurement of causality; but I must interject that it is rarely more than a minor inconvenience, one explicitly anticipated by Dr. Rosenthal.[6] I certainly disagree that the problem of endogeneity is equivalent to the problem of omitted variables. I have taught graduate econometrics at Boston University and the University of California at Berkeley. To use the same tone as Dr. Scott Morton's evaluation of Dr. Rosenthal's declaration (see previous paragraph), if a graduate student gave as muddled and confused a discussion of the relationship between endogeneity and omitted variables as I find in Dr. Scott Morton's ¶¶ 38-43, I would fail that student.[7]

---

[3]  Indeed, Theil (*op. cit.*) deals with omitted variables in single equation estimation (pp. 548-551), where the endogeneity problem does not exist and in systems estimation (p. 552) where the problem of endogeneity does exist. He demonstrates that these are distinct and separate problems.

[4]  At p. 412 (*op. cit.*), Dr. Hausman discusses the two standard most frequently-used estimation techniques to cure the "problem of endogeneity": instrumental variables (IV) or two-stage least squares (2SLS). He states "the 2SLS estimator is numerically identical to the optimal IV estimator." Theil (*op. cit.*) introduces 2SLS in chapters 9.5 and 10. Greene (*op. cit.*) introduces IV and 2SLS estimators in his chapter 15. Amemiya (*op. cit.*) develops IV and 2SLS estimators in his chapter 7.

[5]  While a common solution to the problem of endogeneity, IV or 2SLS is highly unlikely to provide unbiased/consistent estimates in the presence of an omitted variable. An omitted variable causes bias only if it is correlated with included regressors for which causality is being tested and measured. A valid IV must be sufficiently correlated with the included variable of interest and be uncorrelated with the error process, which includes the omitted variable "in practicality." If the IV is correlated with the included variable, it must therefore certainly be correlated with the omitted variable in the error term in all cases where omitted variables cause bias. The resulting IV estimator is therefore also biased and inconsistent.

[6]  See her August 8, 2005 Declaration at footnote 63.

[7]  I have found some textbooks in applied, **as opposed to theoretical**, econometrics that improperly refer to omitted variables as "raising an endogeneity problem." That characterization is wrong, as a matter of theoretical econometrics, as discussed in footnotes 2-5 above.

---

### d) **Multicollinearity**

17.     Multicollinearity occurs when certain variables in a regression model are so closely correlated that numerical problems arise in the computation of the estimates of the model parameters of interest.  As a result of severe multicollinearity, statistical interpretation and tests of the estimation results may be difficult or impossible.

        The risk of multicollinearity arises in any modeling effort.  It must be confronted as it arises.  Standard methods exist for dealing with multicollinearity, including the use of principal components.[8]  Indeed, I have made use of principal components to diminish the statistical effects of multicollinearity in several peer-reviewed journal articles designed to accurately identify and estimate the specific casual effect of a particular legal violation.[9]

### e) **Endogeneity**

18.     This problem has been introduced above, as part of the discussion of Dr. Scott Morton's incorrect conflation of the problem of omitted variables with the problem of endogeneity.  Dr. Keeley has the correct understanding of the problem of endogeneity, stating (¶ 56) "A further difficulty that Professor Rosenthal admitted is the potential of endogeneity of her key variables measuring the challenged promotion. That is, correlation does not show causation.  For example, promotions may be correlated with sales of Neurontin, but the correlation may be due, at least in part, to the fact that as Neurontin's sales grew, more was spent on promoting Neurontin."  In the nomenclature of econometric theory (see footnotes 2-5 above), both sales and promotional expenditures are likely endogenous to a system of equations determining Pfizer's behavior, and that endogeneity must be addressed.

        Fortunately, such endogeneity can be addressed using two-stage least squares (2SLS), also discussed above.  While Dr. Keeley "doubts that Professor Rosenthal would be able to statistically control for endogeneity" (¶ 56), he puts forward no evidence supporting this claim.  Indeed, Berndt, *et al.* (see ¶ 17.c of the text of my Declaration) had no difficulty finding the necessary instrumental variables (IVs) to implement 2SLS in a very similar analysis.  Preliminary analysis suggests that there will be a sufficient number of candidate IVs.[10]

---

[8]  Greene (*op. cit.*, pp. 57-59) introduces the method of principal components in cases of multicollinearity.

[9]  R. Hartman, "Product Quality and Market Efficiency: The Effect of Product Recalls on Resale Prices and Firm Valuation," *The Review of Economics and Statistics,* 69(2), May 1987; and R. Hartman and M. Doane, "The Use of Hedonic Analysis for Certification and Damage Calculations in Class Action Complaints," *The Journal of Law, Economics and Organization,* Fall 1987.

[10]  While Dr. Scott Morton admits to the existence of candidate IVs in her deposition (pp. 150-151), she asserts, without evidence, that it will be more difficult for Dr. Rosenthal to develop IVs.

        "Q. The instrumental variables that have been used by Messrs. Berndt and others in connection with their work on the effect of marketing, promotion, advertising on prescription drug sales, do you -- are you of the opinion that any one or more of those instruments are not available to Professor Rosenthal in this circumstance?

#### f)  Number of Observations and the Resulting Degrees of Freedom

19.     Both Defendants' experts raise this issue.  It is a pure quibble.  Dr. Rosenthal will have aggregate monthly time series data spanning 1994 through 2006, or 156 observations, for estimating her model in her Equation (1).   She also plans to disaggregate the model further across diagnoses (approved and unapproved), which will expand the number of her observations, perhaps by as much as 3 to 4 times, yielding approximately 468 to 624 observations and adding cross-sectional variation.   This number of observations is more than sufficient for her purposes.

20.     For some basis of comparison, the number of observations found in those important research papers measuring the impact of drug promotional expenditures (as cited in ¶ 17) of the text of my Declaration are the following:

- F. Scott Morton, "Barriers to Entry, Brand Advertising, and Generic Entry in the US Pharmaceutical Industry," *International Journal of Industrial Organization*: → 92 to 98 observations.

- H. Grabowski and J. Vernon, "Brand Loyalty, Entry, and Price Competition in Pharmaceuticals after the 1984 Drug Act," *Journal of Law and Economics (JLE)*: → 17 observations.

- E.R. Berndt, L. Bui, D. Reiley and G. Urban, "Information, Marketing and Pricing in the U.S. Anti-Ulcer Drug Market," *American Economic Review*: → 201 to 291 observations.

Clearly, peer reviewed research has been successfully conducted with much smaller data sets than the one to be used by Dr. Rosenthal.

---

A.  I believe they are available to her in the physical sense.  But the question is whether they satisfy the econometric needs of her study, which means that they have to be correlated with off-label prescribing of Neurontin for particular indications, and not correlated with the sales of, you know, sales of Neurontin or policies of the firm, and that seems to me to be quite difficult.  And some of the instruments that we discussed in the Berndt, *et al.* article work for his setting and they don't work for her setting.

Q.  So you would be looking, then, for a fuller discussion and identification of instruments in connection with this study in order to know whether or not they are adequate?

…

A.  I certainly would be looking for a fuller discussion of instruments and a proposal of what she might use.  One cannot know if they're adequate until after one has run the regression and done the test."

  Note the following.  Dr. Scott Morton has admitted to the existence of IVs, which are recognized as necessary by any qualified econometrician.  Dr. Scott Morton has correctly noted that it won't be clear whether particular candidate IVs will be "adequate until after one has run the regression and done the test," which is precisely what Dr. Rosenthal has proposed.  Dr. Scott Morton certainly has not demonstrated that the IVs used by Berndt *et al.* won't "work for her [Dr. Rosenthal's] setting;" or that non-linear transformations of those IVs won't work; or that other IVs are not available and/or won't work.  As a practicing econometrician with nearly 40 years experience, I find Dr. Scott Morton's suppositions highly improbable.

---

CONTAINS CONFIDENTIAL INFORMATION SUBJECT TO COURT ORDER

### g) The Precision of Measuring Prescriptions by Diagnosis Using IMS Data

21.     Dr. Scott Morton questions, somewhat inexplicably, the precision of using the IMS database product, the National Disease and Therapeutic Index (NDTI) database. The NDTI database is an office-based survey of physicians reflecting a considerable sample size (as of the late 1990s, 3,000-3,500 physicians responding annually summarizing approximately 340,000 patient encounters).   The data summarize the therapeutic reasons for a patient's visit (disease code); the method of payment (type of insurer); the drug(s) prescribed (by prescriptions); and the strength and form of the drugs prescribed (by dosage and whether tablet/capsule).

These survey data are recognized by experts (academic and research) in this field as one of the best available samples summarizing the therapeutic reasons for patient visits and the alternative drugs and medical therapies prescribed.  Another source of office-based survey data (with a somewhat smaller sample size and number of respondents), which provides similar information, is the NAMCS data base.[11]

Both databases have been used successfully and without challenge in a variety of legal cases, where it was necessary to measure the distribution of patients by type of treatment, type of drug therapy prescribed and by disease.  I have used and defended the use of these data in several legal cases.

22.      The fact that Dr. Scott Morton questions the use of these data is inexplicable for several reasons. First, she relies regularly, as do most other experts and academics studying this industry, upon IMS data products.  Second, she states "The NDTI data are based on a sample of physicians; therefore estimates from the NDTI data may not be accurate because the sample is not representative of the overall population of physicians."

However, all samples are just that, surveys of subsets of the relevant population being analyzed. While the NDTI survey is designed to accurately summarize the overall population,[12] it and all samples are subject to some variation.  Indeed, all IMS data are based upon survey; the NPA and NSP databases are based upon samples of hospitals and retailers.[13]   Imprecision arises with these samples too.   Yet the three peer-reviewed

---

[11] The National Ambulatory Medical Care Survey (NAMCS) is a widely-used public data set which provides information on the characteristics of the patients (including their insurance) and the providers that use drugs in ambulatory settings (i.e., patients' office visits).  The NAMCS is a national probability sample survey of office-based physicians which is conducted by the Division of Health Care Statistics, National Center for Health Statistics (NCHS) and the Centers for Disease Control and Prevention (CDC).

[12] The NDTI uses a 2-stage stratified cluster design; NAMCS uses a 3-stage stratified cluster probability design.

[13] The IMS National Sales Perspective (NSP) data is collected through a survey done at the retail acquisition level, or wholesale level.  The survey data include sales through the following channels: independent, long-term care, food stores, mail service, clinics, non-federal hospitals, federal facilities, home health care, HMO, and several miscellaneous categories.  The information in "IMS National Sales Perspectives is the most comprehensive, national-level prescription sales database.  The National Sales Perspectives tracks sales activity for all pharmaceutical distribution channels, including major retail food stores and chains, mass merchandisers, independent pharmacies, mail service pharmacies, hospitals, clinics, closed-wall HMOs, long-term care, home health care, and prisons/universities.  Sales information is

---

research analyses cited above in ¶ 20, including the one by Dr. Scott Morton, make use of these other IMS survey data.

IMS data, including the NDTI data, are considered accurate enough for peer-reviewed academic work and have been found accurate enough for analyses in support of litigation.

### h)  The Pattern of Physicians' Prescription Behavior and Habits

23.    It is well-recognized in the economics profession that consumer behaviors, producer behaviors and physician prescription behaviors may change over time.  It is possible that such behaviors change quickly, although there exists considerable evidence that they generally change slowly and inertially.[14]  The two Defendants' experts take opposite positions on this matter.  Dr. Scott Morton suggests that physicians' prescription behavior and habits may change slowly over time as knowledge accumulates and habits are formed; see her ¶¶ 74-75.  Dr. Keeley raises the issue at his ¶ 61; however, he takes an opposite position, asserting that physician prescribing behavior changes rapidly.

24.    This question has been explicitly raised, modeled and answered by Berndt, *et al.* for a different class of drugs.  Berndt, *et al.* estimate elasticities of demand for promotional efforts, which indicate how quickly the promotional efforts induce prescribing behavior.  They also find that the effects of industry-expanding promotional efforts depreciate very slowly over time (indeed at 0.0%, or not at all), while the stock of market-share based promotional efforts depreciate somewhat more quickly (30% per year).

25.    The following facts are clear from the Berndt, *et al.* analysis and from economic theory. There is no theoretical result demonstrating or suggesting how quickly physicians will respond to promotional efforts for FDA-approved indications and/or for off-label indications.  There is not a theoretical result demonstrating or suggesting how quickly the impacts of such promotional efforts will depreciate.  These are empirical questions.  Dr. Rosenthal's data will allow her to calculate these response patterns using model formulations analogous to those used by Dr. Berndt, *et. al.*

---

compiled from more than 100 pharmaceutical manufacturers and more than 300 wholesaler and chain warehouses" (see IMS Health website at http://www.imshealth.com).

The IMS National Prescription Audit (NPA) data is a survey conducted at the retail level, measuring transactions that take place through the following outlets: chain stores, long-term care, independent, food stores, and mail service.  The information in the "IMS National Prescription Audit Plus is derived from IMS Health's Xponent service, one of the most complete, national-level prescription databases in the U.S. Xponent captures roughly 70% of all prescriptions in the U.S.  IMS then uses a patented projection methodology from a stratified and geographically balanced sample to represent 100% coverage of U.S. prescription activity at retail, mail service, long-term care, and managed care outlets" (see IMS Health website at http://www.imshealth.com).

[14] The literature on the slow adaptation of economic behaviors to new facts is rich; a recent summary of some of the literature is found in Daniel McFadden, "Free Markets and Fettered Consumers," *American Economic Review*, 2006, 96(1), pp. 5-29.

---

### i)  Lack of Variation in Data.

26.     Dr. Scott Morton unnecessarily raises this issue at her ¶ 76.  It is true that sufficient variation in the underlying economic variables must be present to allow for accurate estimation of the underlying parameters of interest.  However, all econometric analyses face the possibility of finding insufficient variation.  If there is insufficient variation, it will become apparent during the analysis proposed by Dr. Rosenthal.  If there is insufficient variation, there are methods that Dr. Rosenthal will employ to diminish the problem.

However, given that the type of analysis Dr. Rosenthal has proposed has been implemented by Berndt, *et al.*; given the fact that Dr. Rosenthal will likely be able to introduce even greater cross-sectional variation across diagnoses; it is unlikely that lack of variation in the data will pose an insurmountable problem for Dr. Rosenthal. Certainly, Dr. Scott Moron has not introduced any empirical analysis demonstrating that it will.

### j)  Insufficiency of Available Candidate Instrumental Variables (IVs)

27.     Dr. Scott Morton raises this issue at her ¶ 77.  It fails for the reason discussed above in ¶ 18.

### k)  Large Confidence Intervals Induced by the Use of Instrumental Variables.

28.     Dr. Scott Morton raises this issue at her ¶ 77.  She states the obvious: "IV estimation will increase the confidence intervals around the estimated coefficients and reduce her [Dr. Rosenthal's] ability to draw meaningful conclusions from her model." This is true; Dr. Rosenthal knows this; I know this.  It is a fact understood by any trained econometrician; it is a reality faced by all econometricians doing empirical work. It is like the law of gravity.  It exists; we deal with it.

Since IV and 2SLS (which is a form of IV) are so common in applied econometrics, this issue is commonly understood and commonly dealt with.  It is dealt with by Berndt, *et al.*  Their treatment of it does not lead to an inability to estimate their results of interest in a statistically reliable fashion.  While Dr. Rosenthal's results may have larger confidence intervals than would be the case if IVs were not required, there is no reason generally, and no evidence specifically, to conclude that she will still not be able to calculate statistically reliable results.  Reliable results are produced all the time with IV and 2SLS.

### l)  A Final Comment Regarding Dr. Scott Morton's Discussion of Endogeneity

29.     Not only does Dr. Scott Morton incorrectly conflate the "omitted variable problem" with the "problem of endogeneity;" not only does she seem to imply (incorrectly) that Dr. Rosenthal's use of IV/2SLS may make it sufficiently more difficult

---

to obtain statistically reliable results that it becomes impossible; but also, at her ¶¶ 42-45 Dr. Scott Morton mischaracterizes Dr. Rosenthal's approach as "Her OLS model" (¶ 43).

Indeed, she describes Dr. Rosenthal's model as an OLS model even more emphatically in her deposition, stating "So if you look at equation two, for example, and her [Dr. Rosenthal's] description of how she would estimate it, it is described as an OLS model except for possibly the footnote."[15]

30.    I sincerely have no understanding of why Dr. Scott Morton would make such an utterly and demonstrably false statement.  In the text that Dr. Scott Morton cites, there is **no mention of OLS**.  The text merely puts forward an economic model, with no specification of the stochastic structure.  Prior to estimation, a stochastic error term would be added and the appropriate estimation strategies developed.  In her Equations (1) and (2), Dr. Rosenthal has not even introduced that error term, much less proposed estimation techniques.  Dr. Rosenthal states that proper estimation will be performed.  The types of estimation are discussed in, and only in, the footnote 63 to which Dr. Scott Morton refers.  OLS is not mentioned.

Indeed, in her Declaration, Dr. Scott Moron continues to falsely discuss Dr. Rosenthal's analysis as if Dr. Rosenthal had specified and planned to estimate an OLS regression.  Dr. Scott Morton's creative misinterpretation of Dr. Rosenthal's Declaration introduces a phantom model and estimation strategy, the problems of which Dr. Scott Morton then explores (without need) in her ¶ 43.

31.    Dr. Rosenthal has not put forward an OLS model because, as she acknowledges in her deposition (as cited by Dr. Scott Morton in her footnote 18), OLS would lead to bias. Dr. Rosenthal will make use of a variety of alternative estimation methods, allowing for a rich specification of the error process, including 2SLS, IV, NL-2SLS (non-linear 2SLS) and ARIMA models (auto-regressive-integrated-moving-average models).  Indeed, after all of her discussion of OLS models, Dr. Scott Morton "completely concurs" (at her ¶ 46) with Dr. Rosenthal's approach to the endogeneity problem.  If Dr. Scott Morton completely concurs, then Dr. Rosenthal **has not put forward** an OLS model.

---

[15]  *Scott Morton Deposition*, p. 166.

**Attachment C**

## Attachment C: Additional Documents Relied Upon

**Neurontin Legal Documents** (*In re: Neurontin Marketing Sales Practices, and Products Liability Litigation*, US District Court District of Massachusetts, MDL Docket No. 1629, Master File No. 04-10981-PBS)

Declaration of Michael C. Keeley, December 21, 2006.

Declaration of Professor Fiona Scott Morton, December 21, 2006.

Declaration of Pradeep K. Chintagunta, December 20, 2006.

Deposition of Fiona Scott Morton, February 7, 2007.

"Neurontin (CI-945) Indication Publications Decision Analysis," (VO53850-77).

Parke Davis Marketing Planning document, "PD Marketing Assessment, Neurontin in Psychiatric Disorders," (VO90603-691).

Parke Davis Marketing Planning, "Marketing Assessments, Neurontin in Neuropathic Pain and Spasticity," (WL07520-47).

## Other Documents

Amemiya, Takeshi, *Advanced Econometrics*, Harvard University Press, 2001.

Berndt, Ernst R., *et al*., "Information, Marketing and Pricing in the US Antiulcer Drug Market," *American Economic Review*, Vol. 85(2), 1995.

Borenstein, S. and N.L. Rose, "Competition and Price Dispersion in the U.S. Airline Industry," *Journal of Political Economy*, Vol. 102(4), 1994.

Ellison, Sara Fisher and Catherine Wolfram, "Coordinating on Lower Prices: Pharmaceutical Pricing under Political Pressure," *RAND Journal of Economics*, Vol. 37(2), 2006.

Grabowski, Henry G. and John M. Vernon, "Brand Loyalty, Entry, and Price Competition in Pharmaceuticals After the 1984 Drug Act," *Journal of Law & Economics*, Vol. 35(2), 1992.

Greene, William H., *Econometric Analysis*, Prentice Hall, 2003.

Hall, Robert E. and Victoria A. Lazear, "Reference Guide of Estimation of Economic Losses in Damages Awards," pp. 277-332, *Reference Manual on Scientific Evidence*, Second Edition, 2000, West Group.

Hartman, Raymond S. and Michael J. Doane, "The Use of Hedonic Analysis for Certification and Damage Calculations in Class Action Complaints," *The Journal of Law, Economics and Organization,* Fall 1987.

Hartman, Raymond S., "Product Quality and Market Efficiency The Effect of Product Recalls on Resale Prices and Firm Valuation," *The Review of Economics and Statistics,* Vol. 69(2), May 1987.

Hausman, Jerry A., "Simultaneous Equation Models," Vol. 1, chapter 7, in Z. Griliches and M. Intriligator, editors, *Handbook of Econometrics*, North Holland, 1983.

IMS Health website at http://www.imshealth.com.

McFadden, Daniel, "Free Markets and Fettered Consumers," *American Economic Review*, 2006, 96(1).

Memorandum and Order re: Motion for Class Certification, *In re: Pharmaceutical Industry Average Wholesale Price Litigation*, United States District Court, District of Massachusetts, MDL No. 1456, Civil Action No. 01-12257.

Rubinfeld Daniel L., "Reference Guide on Multiple Regression," pp. 179-227, *Reference Manual on Scientific Evidence*, Second Edition, 2000, West Group.

Rubinfeld, Daniel L. and Peter O. Steiner, "Quantitative Methods in Antitrust Litigation," *Law and Contemporary Problems*, 46(4), Autumn 1983.

Scott Morton, Fiona, "Barriers to Entry, Brand Advertising, and Generic Entry in the US Pharmaceutical Industry," *International Journal of Industrial Organization*, Vol. 18(7), 2000.

Theil, Henry, *Principles of Econometrics*, New York: John Wiley & Sons., 1971.