UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In Re: NEURONTIN MARKETING AND SALES PRACTICES LITIGATION | MDL Docket No. 1629 |
| THIS DOCUMENT RELATES TO:<br><br>ASSURANT HEALTH, INC., ET AL. v. PFIZER, INC., ET AL., NO. 05-10535 | Master File No. 04-10981<br><br>Judge Patti B. Saris<br>Magistrate Judge Leo T. Sorokin |

**PLAINTIFFS' OBJECTIONS TO DISCOVERY ORDER NO. 9**

Pursuant to Rule 72(a) of the Federal Rules of Civil Procedure, Sales and Marketing Plaintiffs object to Discovery Order No. 9 issued by Magistrate Judge Sorokin on February 12, 2007. Specifically, Plaintiffs object to two sections of Discovery Order No. 9. First, Plaintiffs object to the Court's denial of Plaintiffs' Motion to Compel Request No. 19 of Plaintiffs Third Request for Production of Documents. Secondly, the Order neglected to address Plaintiffs' request for the custodial file of Ellen Dukes. As a result, Sales and Marketing Plaintiffs fully expect that Defendants will refuse to produce Ms. Dukes' file.

ARGUMENT

While the main thrust of this case concerns the statements that Defendants made to prescribing physicians—statements that Sales and Marketing Plaintiffs contend were false and thus caused the physicians to prescribe Neurontin when they otherwise would not have—the matters at issue concern a different target audience of misrepresentations: health plans, health insurers and other third party payors (collectively, "TPPs"). TPPs are entities that actually pay for Neurontin prescriptions. As Neurontin grew to be a blockbuster drug, with annual sales exceeding first $1 billion and then $2 billion, Pfizer increasingly became a victim of its own

success.  As Neurontin sales skyrocketed, so too did questions about why an expensive drug with a narrow approval for epilepsy (and then later a narrow approval for postherpetic neuralgia) was being reimbursed at alarming rates.  In fact, by 2003, Neurontin was in the top ten in drug sales, meaning that TPPs were now paying for a drug few had even heard of at levels that were being spent on other much more well-known drugs with much broader indications, such as Nexium, Zyprexa, Zoloft, and Celebrex.  In fact, Neurontin sales in 2003 even exceeded those of a number of very widely used drugs, including: Vioxx, Oxycontin, Wellbutrin, Allegra, Paxil, Viagra, Cipro and Bextra.  Neurontin's status as a blockbuster drug also coincided with news that Pfizer was being investigated criminally for marketing of Neurontin, that there were pending civil claims, and that were allegations that Warner-Lambert and Pfizer had engaged in off-label marketing of the drug.

In order to continue the unabated flow of money, Pfizer launched a campaign to convince TPPs and PBMs that Neurontin was a worthwhile expenditure for a variety of off-label uses. Pfizer accomplished this goal through the creation of "value analysis" and "outcomes research." Value analysis attempts to quantify the value of a drug in terms of the benefit it provides.  Thus, if two drugs provide the same benefit, but one is cheaper than the other, a value analysis would favor the cheaper drug.  The goal of value analysis is to convince TPPs that drugs—even expensive drugs—are worth the money.

On the other side of the coin, outcomes research attempts to ascribe a dollar value to the costs of <u>not</u> treating a certain patient with a certain condition.  The goal of outcomes research was to convince TPPs that not treating a patient with Neurontin is actually more expensive than treating the patient with Neurontin.

Sales and Marketing Plaintiffs believe that Pfizer made false statements to TPPs and PBMs through the use of faulty value analyses and outcomes research. Accordingly, Sales and Marketing Plaintiffs have sought to obtain the Neurontin value analyses and outcomes research that Pfizer performed, both in terms of the internal analyses and the statements that were made to TPPs and PBMs. Sales and Marketing Plaintiffs have specifically requested value analysis (Request No. 19 to the Third Request for Production of Documents) as well as the custodial file of Ellen Dukes, who performed Outcomes Research relating to Neurontin (Request No. 1(q) to the Second Request for Production of Documents). Plaintiffs are entitled to both Ms. Dukes file and all responsive documents to Request No. 19 as both provide highly relevant documentation that Plaintiff can otherwise not obtain. Given that all of the Coordinate Plaintiffs and a majority of the Class Plaintiffs are in fact TPPs, denial of the narrow items requested will prevent the Sales and Marketing Plaintiffs from obtaining critical Pfizer internal documents relating to a distinct area of fraud: fraud on TPPs and PBMs. Accordingly, Plaintiffs respectfully request that the Court Order the Defendants to immediately provide Ms. Dukes' file and all responsive documentation to Request No. 19.

### A. Request No. 19

Plaintiffs' No. 19 requested that Defendants produce:

> All documents supporting value analyses for marketing Neurontin to providers, health plans and/or other payers.

In response, Defendants stated:

> In addition to the General Objections, Defendants object to Request No. 19 on the grounds that it is overly broad and unduly burdensome, including by requesting "all" such documents. Defendants further object to the request on the grounds that the phrases "value analyses" and "providers, health plans and/or other payers" are vague and ambiguous. Defendants further object on the grounds that the request is not limited to the appropriate time

period. Defendants further object on the grounds that the request is not limited to documents relating to the relevant off-label uses of Neurontin, and therefore seeks documents that are not relevant to the litigation nor reasonably calculated to lead to the discovery of admissible evidence.

As described in Discovery Order No. 9, the conclusion to deny Plaintiffs' request apparently was based on Defendants' counsel's representation that documents were being produced "containing such statements in the course of [Defendants'] production of other documents." Discovery Order No. 9 at p. 4. However, the production of other documents containing value analysis for marketing Neurontin does not mean that all documents supporting those analyses will be produced. For example, internal value analyses will not be produced. Such files would contain information about the truth or falsity of value analysis statements—rather than just the actual statements themselves (which is all that Defendants have agreed to produce).

Value analysis is directed at the parties that actually pay for drugs, i.e., "health plans and/or other payors." It refers to the concept of analyzing and computing a drug's usefulness based on cost-benefit analysis in monetary terms, and the comparison of that cost-benefit analysis to other drugs' cost-benefit analysis. If the same benefits can be obtained for less, then a drug's "value" will be deemed low.

In this case, Plaintiffs have alleged that Defendants made misrepresentations to providers health plans and/or other payors regarding the cost-benefit analysis of Neurontin.[1] For example,

> Pfizer hosted a meeting of the Neuropathic Pain Management Advisory Board at the Disney BoardWalk Resort in Orlando,

---

[1] At the hearing on February 8 (and in Defendants' brief), Defendants argued that they had not been aware that the Plaintiffs claimed that Defendant had made misrepresentations directly to third-party payors regarding Neurontin. However, the Third Amended Coordinated Complaint and Third Amended Class Action Complaint had numerous allegations that Defendants had made misrepresentations directly to Third-Party Payors. *See* Third Coordinated Amended Complaint, ¶¶2, 4, 20, 26, 27, 32, 33, 100, 225 227(d) 237 (a)(c), 251, 264 (b)(c)(d), 277 (b)(c)(d), 290 (b)(c)(d), 303 (b)(c)(d), 316 (b)(c)(d), 329 (b)(c)(d), 370, 371 (b)(c)(d); Third Amended Class Action Complaint ¶¶ 4, 5-8, 120, 254, 280, 306.

>Florida. **The guests were senior managers and medical directors of various pharmacies and pharmacy benefits managers who had influence over formulary decision-making, i.e., what drugs are covered for what uses by various health care plans.** The advisory board was coordinated and managed by Health Strategies Group, Inc., a New Jersey company that specializes in "increasing the manufacturer's value and influence on PBM product placement decisions." The goal of this advisory board meeting was to secure Neurontin's formulary status for broad areas of neuropathic pain. Specifically, the meeting was to "support Neurontin's use of neuropathic pain management with managed care customer," even though Pfizer was aware that Neurontin did not have the data to support a broad neuropathic pain indication, that different neuropathic pain conditions involved different models of pain and thus required different treatments, and the Pfizer's internal data did not support the granting of any indications in the area of neuropathic pain other than postherpetic neuralgia.

(Third Amended Class Action Complaint, ¶ 280 (emphasis added)).

As a result, documents responsive to Request No. 19 are likely to lead to the discovery of admissible evidence and should be produced. Plaintiffs are entitled to information which is "reasonably calculated to lead to the discovery of admissible evidence" relating to the "claim or defense of *any* party." See Amica Mut. Ins. Co. v. W.C. Bradley Co., 217 F.R.D. 79 (D. Mass. 2003); Fed. R. Civ. P. 26(b)(1). To the extent that health plans and/or other payors (such as third-party payors) were misled into believing that Neurontin was valuable or useful to treat indications when it in fact was not, such documents should be produced.

### B. Ellen Dukes

In Plaintiffs' Second Request for Production of Documents, Plaintiffs requested the custodial files of multiple individuals including Ellen Dukes. Following Defendants refusal to comply with the Request, Plaintiffs filed their Motion to Compel. However, Discovery Order No. 9 neglected to address Ms. Dukes' custodial file. As a result, Sales and Marketing Plaintiffs fully expect that Defendants will refusing to produce it.

As Plaintiffs set forth in their Motion to Compel, Defendants do not deny: (i) that Ellen Dukes was involved in Outcomes Research; (ii) that Outcomes Research was involved in the development information that supported the off-label marketing message and is thus relevant to this case; (iii) that Ms. Dukes worked on Neurontin; (iv) that Ms. Dukes worked on neuropathic pain indications other than postherpetic neuralgia inside the United States or (v) that Ms. Dukes did the very value analysis is relevant and is partially being produced in response to Request No. 19. Rather, Defendants state that Outcomes Research had many goals some of which might be irrelevant to this case, that Ms. Dukes worked "*almost* entirely" on postherpetic neuralgia, and that the focus of her efforts in other types of neuropathic pain was in countries outside of the United States. None of this amounts to a denial that Ms. Dukes was involved in the off-label marketing of Neurontin in the United States. Certainly, Defendants could have reviewed her custodial file and arrived at the conclusion that no relevant documents exist (to the extent that such fact is true). However, they have not done so. Because the request for Ellen Dukes and her documents relating to Outcomes Research is reasonably calculated to lead to the discovery of admissible evidence, her custodial file should be produced.

### C. Conclusion

Plaintiffs respectfully request that the Court modify Discovery Order No.9 and compel Defendants to produce all documents responsive to Request No.19 and the Custodial File of Ellen Dukes.

For the Plaintiffs:                                    Dated: February 27, 2007

/s/ Thomas M. Sobol, Esq.
HAGENS BERMAN SOBOL SHAPIRO LLP

Thomas M. Sobol, Esq. (BBO #471770)
Ed Notargiacomo, Esq. (BBO#567636)
One Main Street, 4th Floor
Cambridge, MA 02142

LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
Barry Himmelstein, Esq.
275 Battery Street, 30th Floor
San Francisco, CA 94111-3339

GREENE & HOFFMAN
Thomas Greene, Esq.
125 Summer Street
Boston, MA 02110

DUGAN & BROWNE
James Dugan, Esq.
650 Poydras Street, Suite 2150
New Orleans, LA 70130

BARRETT LAW OFFICE
Don Barrett, Esq.
404 Court Square North
P.O. Box 987
Lexington, MS 39095

LAW OFFICES OF DANIEL BECNEL, JR.
Daniel Becnel, Jr., Esq.
106 W. Seventh Street
P.O. Drawer H
Reserve, LA 70084

SHAPIRO HABER & URMY LLP
Thomas G. Shapiro, Esq. (BBO #454680)
53 State Street
Boston, MA 02109

COHEN, MILSTEIN, HAUSFELD & TOLL,
PLLC
Linda P. Nussbaum, Esq.
150 East 52nd Street, 30th Floor
New York, NY 10022

COHEN, MILSTEIN, HAUSFELD & TOLL, PLLC
Michael D. Hausfeld, Esq.
1100 New York Avenue, N.W.
West Tower, Suite 500
Washington, DC 20005

RAWLINGS & ASSOCIATES, PLLC
Mark D. Fischer, Esq.
Mark Sandmann, Esq.
325 W. Main Street
Louisville, KY 40202

Joel Z. Eigerman, Esq.
50 Congress Street, Suite 200
Boston, MA 02109

BERMAN DEVALERIO PEASE TABACCO BURT & PUCILLO
Peter A. Pease, Esq. (BBO #392880)
One Liberty Square
Boston, MA 02109

LOWEY DANNENBERG BEMPORAD & SELINGER, PC
Richard Bemporad, Esq.
Richard W. Cohen, Esq.
Peter St. Phillip, Jr., Esq.
Todd S. Garber, Esq.
The Gateway – 11th Floor
One North Lexington Avenue
White Plains, NY 10601-1714

BERMAN DEVALERIO PEASE TABACCO BURT & PUCILLO
Joseph J. Tobacco, Jr., Esq.
425 California Street, Suite 2025
San Francisco, CA 94104-2205

JOHN F. INNELLI, LLC
John F. Innelli, Esq.
1818 Market Street, Suite 3620
Philadelphia, PA 19103