### 6.    Representations Regarding Social Phobia

100.    At events produced by Parke-Davis, participating physicians expressly stated or implied that Neurontin was effective for the treatment of social phobia.

101.    The speakers who made these statements did not have any clinical evidence to support such claims. These statements implied that clinical trial evidence sufficient to establish causation existed, but as discussed below, the only clinical study conducted was inconclusive regarding Neurontin's effectiveness for the treatment of social phobia. Prior to its receipt of results of its social phobia clinical trial, Parke-Davis had no reasonable scientific basis for claiming that Neurontin was effective in treating social phobia, because no clinical trial data existed.

102.    Even after July 22, 1997, when Parke-Davis received results from its clinical study, it could not state that clinical trial evidence demonstrated Neurontin's efficacy for social phobia. While results were generally favorable on the small sample that completed the study, there were wide inexplicable discrepancies in efficacy between male subjects and female subjects, and between individuals above age 35 compared to those below age 35. The authors admitted that the data was limited, did not conclude that Neurontin was effective, and acknowledged that further studies were necessary to determine whether a dose-response relationship existed. Any statement made by Parke-Davis that claimed or suggested that Neurontin was effective to treat social phobia that did not disclose the limitations of the clinical trial evidence was not fair and balanced and consequently was false and misleading. No such information was provided in the events that promoted treatment of social phobia with Neurontin.

103. At presentations concerning Neurontin's use for social phobia, neither the participating physicians, nor the participating vendors, nor the Defendants informed the attendee physicians that Defendants had deliberately suppressed negative studies pursuant to the Publication Scheme. There were in fact negative studies that indicated or found that Neurontin was not effective for social phobia and information regarding these studies was not disclosed.

104. At presentations concerning Neurontin's use for social phobia, anecdotal evidence was presented to support Neurontin's use. At none of the presentations, however, was anecdotal evidence presented of Neurontin's failure to treat social phobia even though such evidence had been made known to Defendants. Defendants' intentional failure to provide a fair and balanced presentation of the anecdotal information concerning Neurontin's treatment for social phobia made their presentation false and misleading.

### 7. Representations Regarding Panic Disorder

105. Without favorable results from a well-designed panic disorder clinical trial that established Neurontin's efficacy for that condition, Parke-Davis had no reasonable scientific basis for claiming that Neurontin was effective in treating panic disorder. Nonetheless at events produced by Parke-Davis, physician participants routinely stated that Neurontin was effective for the treatment of panic disorder.

106. The speakers who made these statements did not have any clinical evidence to support such claims. These statements implied that clinical trial evidence sufficient to establish causation existed, but as discussed below, clinical studies that were conducted did not find that Neurontin is effective for the treatment of panic disorder. On

every occasion sponsored by Parke-Davis in which a presentation was given on the use of Neurontin for panic disorder without informing physicians that there was no scientific basis for using Neurontin, Parke-Davis failed to inform the physician attendees of material information that was required to be presented in order for its statements on the use of Neurontin to not be misleading and false and to satisfy its obligation to provide fair and balanced information.

107.    In October 1997, Parke-Davis received results of its own clinical trial that found that Neurontin was no more efficacious than placebo in treating panic disorder. Parke-Davis did not publish the results of the negative panic disorder clinical trial until 2000. Regardless of the results of the clinical trial, Parke-Davis continued to sponsor presentations to physician attendees where Neurontin was promoted for use with panic disorder patients. In most of these presentations, the attendee physicians were not informed of the negative clinical trial evidence.

108.    At the presentations concerning Neurontin's use for panic disorder, anecdotal evidence was presented to support Neurontin's use. At none of the presentations, however, was anecdotal evidence presented of Neurontin's failure to treat panic disorder patients, even though such evidence had been made known to Defendants. Defendants' intentional failure to provide a fair and balanced presentation of the anecdotal information concerning Neurontin's treatment for panic disorder made their presentations false and misleading.

### 8.    Representations Regarding Monotherapy

109.    In numerous presentations produced by Parke-Davis, physician participants asserted that Neurontin was effective monotherapy for the treatment of

38

epilepsy, despite the fact that it had only been approved by the FDA for adjunctive therapy. As early as November 1995, Parke-Davis knew that clinical trial evidence demonstrated that Neurontin was not an effective monotherapy treatment. Notwithstanding its knowledge of the unsuccessful clinical trials, Parke-Davis continued to make false representations about Neurontin's efficacy as a monotherapy medication and failed to disclose to most attendee physicians the negative clinical trial evidence in its possession.

110. For example, at the Jupiter Beach consultants' meeting in August 1996, Dr. Harden and Dr. LeRoy gave presentations that claimed that Neurontin was effective for monotherapy. Drs. Harden and Leroy misrepresented the results of Clinical Study 945-82, both by claiming that the study did not evidence a failure of Neurontin efficacy and by misrepresenting the lack of a dose response. Furthermore, Dr. Leroy misrepresented that an Eastern European clinical trial had been successful when in fact the double blind codes of the study had not been broken and patient recruitment had not been completed. Notwithstanding that the only long-term clinical trial of Neurontin as monotherapy at the time of the Jupiter Beach meeting demonstrated that Neurontin was not effective for that use, attendees at Jupiter Beach came away with the message that Neurontin was effective. Drs Harden and Leroy could have only received information about the status of these unpublished clinical trials from Parke-Davis.

111. Parke-Davis knew that proof of efficacy for monotherapy required successful completion of two clinical trials demonstrating Neurontin's efficacy. Clinical Study 945-82, a double blind, placebo-controlled study, was designed to be a pivotal study in support of monotherapy. But the results were negative, and failed to demonstrate

that Neurontin was effective in treating seizures at doses up to 2400 mg/day. As early as November 1995, Parke-Davis knew that Clinical Trial 945-82 did not support a monotherapy indication. In addition to failing to establish monotherapy efficacy, Clinical Trial 945-82 also failed to establish a dose response at 600, 1200 and 2400 mg.

112.    Parke-Davis also knew that another clinical trial, the Eastern European pilot study 945-177 (an extension of the 945-77 protocol) failed to establish dose differentiation and statistically significant efficacy. Parke-Davis did not intend to publish the results of 945-177, nor did they intend to publish the combined results of 945-77 and 945-177.

113.    On September 13, 1996, Parke-Davis submitted a supplemental New Drug Application ("NDA") with the FDA, requesting approval of Neurontin as monotherapy for partial seizures. The FDA determined the application to be non-approvable on August 26, 1997 because of insufficiency of evidence of Neurontin's effectiveness. The FDA noted that Clinical Study 945-82 failed to yield evidence of effectiveness. Parke-Davis did not disclose that its application for monotherapy had been denied.

114.    Although Parke-Davis sales representatives were not supposed to make representations about Neurontin's use for monotherapy, their sales representatives routinely made false statements concerning Neurontin's utility as a monotherapy agent. Similar statements were regularly made by the Parke-Davis's sales forces from at least 1999 through 2004. Representative statements made to physicians include:

* In January 1997, a Parke-Davis sales representative falsely stated that Neurontin was "Excellent first line [monotherapy] or add-on prescription for seizures."

* In a 1998 event, Parke-Davis falsely stated that Neurontin "Is effective as monotherapy."

40

* In October 1995, a Parke-Davis sales representative falsely stated that Neurontin's indicated use was "Soon to be monotherapy."

* In June 1998, after the FDA had already rejected the monotherapy indication and Parke-Davis had abandoned pursuing approval for monotherapy, a Parke-Davis sales representative stated that Neurontin was "moving toward monotherapy indication in seizures."

115.    In a Parke-Davis marketing event in 1998, Parke-Davis went so far as to state that Neurontin was "now approved as monotherapy for seizures."

### 9.    Representations Regarding Migraine

116.    Parke-Davis knew that there was no pre-clinical rationale that would support the use of Neurontin in migraine prophylaxis.

117.    Parke-Davis conducted a 12-week migraine prophylaxis study in Europe during the late 1980's that revealed no statistically significant difference in migraine attack frequency between placebo and 900 mg of Neurontin therapy.

118.    In addition to the failed European migraine trial, Parke-Davis knew of several reports of negative results of Neurontin for migraine use, including reports from Dr. Seymour Solomon, Director of the Headache Unit at Montefiore Medical Center; Dr. John Rothrock, Chairman of the Department of Neurology at University of Alabama; Dr. Kenneth Michael Anthony Welch, Professor of Clinical Neurology at the University of Michigan; and Dr. Fred Michael Cutrer, Department of Neurology at Massachusetts General Hospital.

119.    Parke-Davis never disclosed the negative results.

120.    On May 25, 1996, Parke-Davis held an advisory board meeting to discuss "Gabapentin in the Management of Migraine." Parke-Davis's principal investigator for

41

Neurontin and migraine chaired the meeting, and there were several other physicians in attendance. There were also several Parke-Davis employees in attendance, including the author of the marketing assessment, John Boris, who was aware of the failed European clinical trial. The purpose of the meeting was to discuss the knowledge of Neurontin's possible utility in the area of migraine and to solicit feedback on the development of clinical trials.

121. At the advisory board meeting, Parke-Davis suppressed any reference to the failed migraine study of the late 1980s. Leslie Magnus-Miller, Parke-Davis's Medical Affairs Director was directly asked, "But do you have any data [relating to Neurontin and migraine]?" Dr. Magnus-Miller responded: "We didn't...No, not really, because we didn't capture headache baseline." Edda Guerrero added: "Unfortunately we did not, not even in monotherapy I think. Right?" John Boris did not correct this misstatement. Parke-Davis also failed to mention that there was "no established preclinical rationale that would support the use of Neurontin in migraine prophylaxis."

122. Thereafter, pursuant to marketing strategies and tactics developed by it, Parke-Davis regularly presented programs or caused programs to be presented in which physician participants touted Neurontin as being effective for the treatment of migraine.

123. Such statements were false and misleading. In these presentations, Parke-Davis failed to inform physician participants of the failed migraine trial or the negative anecdotal evidence it received from its own advisory board physicians. It also failed to inform physicians that there was no established rationale that would support the use of Neurontin for migraine and no clinical trial evidence. Defendants' failure to provide this

42

information violated their duty of providing fair and balanced information and made any prior statements about Neurontin's use for migraine false and misleading.

124. Although Parke-Davis's sales representatives were not supposed to make representations about Neurontin's use for migraine, their sales representatives routinely made false statements regarding the utility of Neurontin in treating migraine.

### 10. False Statements About Other Indications

125. Neurontin is prescribed for many additional indications for which there is no scientific support and which are not approved by the FDA. Pursuant to marketing strategies and tactics developed by Parke-Davis, programs were regularly presented in which physician participants touted Neurontin as being effective for other conditions in addition to those described. Such statements were false and misleading, because there was no clinical trial evidence that Neurontin was effective for the treatment of any conditions other than adjunctive therapy for partial seizures and post herpetic neuralgia. In these presentations, Parke-Davis failed to inform physician attendees that there was no established rationale that would support the use of Neurontin for conditions other that adjunctive therapy for partial seizures and postherpetic neuralgia. Defendants' failure to provide this information violated their duty of providing fair and balanced information and made any prior statements about Neurontin's use for conditions other than adjunctive therapy for partial seizures and postherpetic neuralgia false and misleading.

### 11. False Statements about Dosage

126. Early in its experience in marketing Neurontin, Parke-Davis learned that many physicians did not consider the drug to be efficacious. Parke-Davis attempted to explain this lack of efficacy by trying to convince doctors that they had not given the

43

patient sufficient medication.  At an advisory board meeting, Parke-Davis stated it "therefore went on an aggressive campaign to try to convince the doctors to push the dose of Neurontin up into the 2400 to 3600 mg range."

127.  Evidence from clinical studies did not support Parke-Davis's marketing campaign to increase Neurontin dosages beyond the limit approved by the FDA on the grounds of efficacy.  Further, Parke-Davis knew of this lack of efficacy.  As early as December 30, 1994, Parke-Davis knew that there was a lack of proportionality between the dose of gabapentin administered to subjects and the level absorbed.  In other words, increasing the dosage of Neurontin does not necessarily mean that more Neurontin is actually absorbed by the body due to the manner it is excreted and the maximum levels that can accumulate.

128.  As of November 14, 1995, Parke-Davis knew that Clinical Trial 945-82 did not show a dose related response.  Patients who took 600 mg of Neurontin did not achieve any different results than patients who took 1200mg or 2400 mg.  Such results were at odds with Parke-Davis's claim that the larger the dose, the better the effect.

129.  Notwithstanding the failure of Clinical Trial 945-82 to exhibit a dose relationship, and notwithstanding the fact that the Core Marketing Team within Parke-Davis intended to initiate a nationwide campaign to convince physicians to increase dosing to at least 2400 mg/day (33% greater than the maximum dosage proven safe and effective), Parke-Davis made the deliberate decision that it would not initiate clinical trials to determine if higher dosages (1800mg to 3600mg) were effective in add-on therapy.

44

130. A second monotherapy clinical trial confirmed the lack of improved efficacy at higher dosages. In Clinical Trial 945-77, 900 mg/day Neurontin was found to be just as efficacious as Neurontin at 1800 mg/day. Defendants made a deliberate decision not to release the results of clinical trials that did not establish any dose differentiation.

131. Although Parke-Davis was routinely sponsoring programs that recommended that dosages be increased to as high as 4800 mg/day, Parke-Davis knew that it did not have sufficient toxicology data to prove that Neurontin was safe at dosages as high as 3600 mg.

132. During programs presented by Parke-Davis, physician participants routinely stated that dosages above the maximum approved by the FDA increased Neurontin's efficacy. For example, during the migraine advisory board meeting, Dr. Rafferty, a pre-clinical researcher from Parke-Davis, falsely stated the following: "The antiepileptic activity of gabapentin is quite dose dependent. Oh yeah." Parke-Davis was aware that its own clinical trial on Neurontin for epilepsy monotherapy had shown no dose-related difference in efficacy in doses ranging from 600 mg per day to 2400 mg per day. The negative findings of the monotherapy trial were not disclosed to the advisory board members.

133. At the "consultants" meeting in Jupiter Beach in April 1996, Longmire stated that: "most [patients] do better as you raise [the dose] higher." At the same presentation, and in other presentations, such as the Consultants' Meeting at the Boston Ritz Carlton, Longmire also stated that the only reason a patient who was actually taking his medication and not malingering would not receive any benefit from Neurontin was if

45

he was not receiving a high enough dose. Neither Longmire nor the other Parke-Davis personnel present informed the physicians that Parke-Davis's own clinical trials established that there was no dose relationship.

134.    At the Consultants' Meeting at the Boston Ritz- Carlton in May 1996, Longmire made false statements such as: "the problem with Neurontin in terms of real trigeminal neuralgia is that it has to be titrated upward. And when I say 1500 milligrams, that's the target starting dose. There are colleagues in the Huntsville area who, I have people on 5400 with no side effects." This statement was false and misleading for a number of reasons: it implied that Neurontin was effective for trigeminal neuralgia at higher-than-approved doses; it did not disclose side effects reported to Parke-Davis at the higher level; it did not disclose the absence of toxicology data at these levels; it did not disclose there was no clinical data to support Neurontin's efficacy on trigeminal neuralgia; and it failed to disclose Parke-Davis's own clinical trials that questioned the existence of a dose relationship.

135.    Notwithstanding the lack of toxicology data and clinical trial data supporting Neurontin's use at higher doses, attendees at Jupiter Beach were led to believe that they should be prescribing Neurontin at higher doses.

136.    Parke-Davis applied to the FDA to increase the effective dose range to include 3600 mg/day and to increase the maximum recommended dose to 4800 mg/day. On August 26, 1997, the FDA denied the application because there was no evidence that Neurontin was safe or effective at such doses.

137. Parke-Davis never disclosed that the FDA denied its request to increase the maximum approved dose of Neurontin, that the FDA had determined that Parke-Davis

46

had not provided sufficient evidence of safety at higher doses, and that there was no clinical trial evidence that Neurontin was more effective at higher doses. Parke-Davis continued to market Neurontin at higher doses without these disclosures.

138. Notwithstanding the FDA's refusal to increase the maximum approved dosage of Neurontin and its finding that no clinical evidence supported Neurontin's efficacy at dosages greater 1800 mg per day, Parke-Davis presented numerous programs where physician participants asserted that Neurontin was effective and safe at dosages above 1800 mg. All such representations were false and misleading. Additionally, at these presentations the physician participants did not disclose the clinical trial evidence that demonstrated that there was no dose response above 1800 mg per day.

139. Defendants' failure to provide this information was a violation of defendants' duties to provide fair and balanced information and made any prior representations about use of Neurontin at dosages greater than 1800 mg false and misleading.

### 12. Misrepresentation of Promotional Nature of Events

140. As described above, all of the events presented by Parke-Davis were made to appear to the attendee physicians to be bona fide educational events where disinterested leading clinicians shared their knowledge and experience in an educational setting. In fact, these events were peer-selling promotional events designed to convince the attending physicians to prescribe Neurontin. Important facts that would have warned the attendee physicians that they were attending a promotional event for a drug company were concealed. These included the following facts:

* That virtually all of the publications and/or studies that purported to support Neurontin's use for off-label indications were funded by the Defendants;

47

\* That virtually all of the studies that purported to support Neurontin's use for off-label indications had not been initiated by the physicians who were credited as authors, but by the Defendants and other participants in the Off-Label Promotion Scheme pursuant to a corporate marketing plan designed to increase off-label sales;

\* That studies existed that found that Neurontin was not effective for off-label uses, but Defendants had deliberately refused to publish or publicize such studies; and

\* That the participating doctors who were conducting the peer selling had been paid substantial subsidies to use Neurontin on their patients or in reward for their recommending Neurontin's use for off-label indications.

141. At all events that appeared to be continuing medical education programs, the members of the Off-Label Promotion Scheme described Defendants' contribution as merely the provision of an "unrestricted" grant. For the reasons set forth above, the grants provided by Defendants were not unrestricted but instead were conditioned on Defendants' receipt of a comprehensive program that advocated Neurontin's use for off-label indications and displayed the drug in the most favorable light available. Hiding Defendants' control of the content of the program and misrepresenting its financial support as an "unrestricted" grant were materially false statements that concealed the promotional nature of the programs. Had the attending physicians known the programs were outright promotion they would have viewed the presentations with greater skepticism and doubted the claims of the participating physicians that Neurontin was effective for the off-label indications.

F.   **Parke-Davis's Use of Medical Liaisons to Promote Off-Label Uses for Neurontin**

142. Parke-Davis's normal sales force was not permitted to promote off-label uses of Neurontin to its physician customers. The FDA, however, permitted drug

company representatives to provide balanced, truthful information regarding off-label usage if specifically requested by a physician and if there were no attempt to solicit such information by the drug company. Starting in 1995, Parke-Davis hired medical liaisons that were ostensibly supposed to provide this information to physicians who had requested it. Medical liaisons were also supposed to coordinate funding of studies and clinical trials with interested physicians.

143.    In fact, the medical liaison program was part of the same marketing plan and marketing tactics that promoted Neurontin off-label through the Off-Label Promotion Scheme.  As another component of the marketing plans produced by the Neurontin Extended Disease Team, Defendants trained medical liaisons to solicit requests for off-label information aggressively from physicians.  Having opened this door to a conversation about Neurontin, medical liaisons would then engage in full-scale promotion of Neurontin's off-label uses, including by providing non-scientific, anecdotal information designed to convince physicians that off-label usage of Neurontin was safe and effective. In effect, Parke-Davis used the medical liaisons as a surrogate sales force who marketed Neurontin for off-label uses.  Indeed, medical liaisons were selected and promoted based on their ability to sell, and sales training was encouraged.

144.    For their presentations to physicians, medical liaisons were trained to provide the same false information described above regarding the efficacy of Neurontin for off-label uses.  Similarly, the medical liaisons did not provide all information necessary to make their prior disclosures not false and misleading, including not limited to, failing to inform the physicians with whom they met that there was no scientific

evidence to support Neurontin's use for non-approved indications, failing to disclose negative clinical trial evidence, and failing to disclose negative anecdotal evidence.

### G. Parke-Davis's Systematic Payments to Doctors for the Purpose of Increasing Neurontin Prescriptions

145. Customarily, drug companies such as Parke-Davis inform physicians of their new products and those products' uses through office meetings at the physicians' offices by the drug companies' sales force. Defendants could not use this practice to inform physicians of unapproved uses for Neurontin because it could not use its traditional sales force to promote for off-label uses. Defendants had to devise a way to get the doctors to hear their message in other forums. They also had to induce physicians to become part of the Off-Label Promotion Scheme and recommend Neurontin for off-label uses. Parke-Davis elected to pay kickbacks and otherwise provide participant and attendee physicians with items of substantial value to induce them to listen to the off-label marketing pitch, to prescribe Neurontin, and to recommend Neurontin to other physicians. Parke-Davis also paid kickbacks and provided other items of value to reward physicians for having prescribed Neurontin. Parke-Davis made thousands of payments for these purposes in violation of kickback and bribery laws. Many of these payments were technically made by the vendor participants, but Parke-Davis provided the funds for all of the payments, knowing that these payments would be made to induce physicians to change their prescribing behavior regardless of their fiduciary duties to their patients, their practices and their treatment networks.

146. Plaintiffs have already described how Parke-Davis paid physician participants, such as Defendant Longmire, substantial fees (as well as extensive travel benefits) for agreeing to engage in peer-to-peer selling on behalf of off-label Neurontin.

Plaintiffs have also described how Defendants induced physicians to use Neurontin on their patients or rewarded physicians for having used Neurontin on their patients by paying them for "studies" that had minimal, if any, scientific value or paying them to use their names on ghost written articles. Such payments and provision of items of value were expressly performed for the purpose of influencing the recipients' conduct.

147. Additionally, Parke-Davis provided payments and items of substantial value to physicians that were the targets of the Off-Label Promotion Scheme. Parke-Davis routinely provided substantial items of value to these physicians to attend events at which off-label uses of Neurontin were being promoted. The following describes various ways Parke-Davis funneled bribes to physicians.

### 1. Consultants' Meetings

148. Parke-Davis regularly convened "consultants" meetings as a method for funneling cash and other benefits to physicians in exchange for hearing extensive presentations on the use of Neurontin for off-label purposes. There was no attempt at these meetings, which were often held in luxury resorts, to conform to the requirements of a Continuing Medical Education ("CME") meeting. Instead, Defendants and the vendor participants structured the meeting as if the attendee doctors had been retained by Parke-Davis to advise the company on a strategic issue. The "consultants" were not chosen to attend based on particular skills or expertise the physician possessed, but because of the potential to write Neurontin prescriptions. Only "high decile," i.e., high prescribing, physicians were selected for these meetings.

149. The vendor participants arranged for the doctors' transportation, lodging and entertainment and sometimes (but not always) had the doctors sign sham consulting

51

agreements. At these meetings Parke-Davis's agents or employees or doctor participants, such as Defendant Longmire, would give the "consultants" substantial presentations relating to Neurontin, particularly its use for unapproved indications. At some conferences, the vendor participant or Defendants intentionally posed questions to the speakers about off-label use to insure the attendees were exposed to such information.

150.   The consultants' meetings were not held, and the "consultants" were not paid, for the purpose of providing Parke-Davis with expert, independent advice. Defendants in many cases did not even record the "advice" provided by its "consultants," and what little advice was collected was never acted upon or reviewed. Rather, Parke-Davis routinely analyzed whether consultants' meetings successfully influenced physicians' prescription writing practices. At some meetings, the "consultants" were directly asked if they would write more Neurontin prescriptions as a result of the meeting. Such a question would have been irrelevant if the actual purpose of the meeting was to receive the "consultants'" advice. Parke-Davis also routinely tracked consultants' Neurontin prescription writing practices after these meetings. Using market data purchased from third parties, Parke-Davis analyzed whether the doctors they had paid had in fact written more Neurontin prescriptions after the meeting. Again, such data was only relevant if the real purpose of the payments was to influence the doctors to order more Neurontin.

151.   A typical "consultants'" meeting was held in Jupiter Beach, Florida, for neurologists from Warner-Lamberts' Northeast Customer Business Unit during the weekend of April 19-21, 1996. The "consultants" selected for this meeting were not chosen on the basis of their consulting acumen, but because of their potential to write

Neurontin prescriptions. In a memorandum announcing the event to Parke-Davis's personnel, the Neurontin Marketing Team acknowledged that in order to target neurologists with the greatest potential for writing Neurontin prescriptions, sales personnel must select potential attendees from a list of the top prescription writers for antiepileptic drugs in the Northeast. Only persons who fell within this desirable demographic were to be invited.

152.     Qualifying physicians were given a round-trip airfare to Florida (worth $800.00), two nights' accommodations (worth $340.00), free meals and entertainment, ground transportation and a "consultant's fee" of $250.00. Ample time was provided so that the Parke-Davis consultants could enjoy the beach resort. The value of attending the meeting was approximately $2,000.00 per physician.

153.     The Jupiter Beach consultants' meeting included two half-days of presentations by Defendants relating to Neurontin, including extensive presentations relating to off-label uses. Technically, the Proworx division of Cline Davis produced the event; however, Defendants designed, monitored, and approved all aspects of the presentation. They selected the speakers, picked the presentation topics, and previewed the content of the presentations to make sure that they were acceptable. Parke-Davis paid all expenses relating to the consultants' meeting, including all payments to the attendees and the presenters, all travel, accommodation, meals and entertainment expenses, all presentation expenses, all expenses and fees incurred by Proworx, and the substantial fees paid to the participant physicians. Notwithstanding the FDA's prohibition regarding the provision of promotional materials relating to off-label uses, Parke-Davis provided

written abstracts of the presentations that detailed off-label use of Neurontin to each of their "consultants."

154. Defendants made no effort to obtain professional advice at Jupiter Beach from the "consultants" Defendants wined, dined, and entertained during the weekend. A followup memorandum to Parke-Davis's marketing officials noted that "the participants were delivered a hard-hitting message about Neurontin," and emphasized that the participants were encouraged to use Neurontin at higher doses. More importantly, after the conference Parke-Davis generated "trending worksheets" listing the doctors who attended the consultants' meeting. These worksheets enabled Defendants to track Neurontin prescription habits of the attendees before and after the consultant's meetings to determine if these "high writing" prescribers wrote more Neurontin prescriptions after the conference. Persuading these heavy prescribers to prescribe more Neurontin for their patients was, in fact, the sole purpose of the Jupiter Beach meeting.

155. Jupiter Beach was not unique. Defendants, in conjunction with the vendor participants, hosted many consultants' meetings in which the "consultants" received payments and gratuities, as well as presentations on off-label Neurontin use designed to change the physicians' prescription writing habits.

156. Not all payments to consultants were made at conferences as elaborate as Jupiter Beach. Many consultants' meetings consisted of lavish dinners at local restaurants. The emphasis on these meetings was also on off-label uses, and Parke-Davis paid $200 "honorariums" to the physicians who did nothing for the payment except show up. At none of the events did the consultants provide legitimate consultation to

Defendants, but at all of the events the "consultants" were encouraged to increase their Neurontin prescriptions.

## 2. Medical Education Seminars

157. Another format where Parke-Davis paid kickbacks to physicians to hear off-label promotion of Neurontin were programs billed as CME seminars. These conferences and seminars were set up to appear to qualify for the exception to the FDA's off-label rules that permitted physicians to learn about off-label uses of pharmaceuticals at independent seminars. However, these were not bona fide educational seminars. The reasons they were not bona fide are described in more detail above, but include the following: that Defendants designed and approved the programs; that Defendants handpicked the speakers; that Defendants approved the presentations; that Defendants selected the attendees based on their ability and willingness to prescribe high quantities of Neurontin; and Defendants monitored the prescribing patterns of the physicians who attended these conferences.

158. All of this was done to insure the purpose of the conference—to increase writing of Neurontin prescriptions—was achieved. Follow-up reports to marketing executives at Parke-Davis highlighted that the attendees received presentations regarding off-label marketing and recommendations for dosages larger than those labeled effective by the FDA. These memoranda also reported to senior executives the pledges made by attendees to order more Neurontin for their patients.

159. For some seminars, high prescription-writing physicians were selected to receive trips comparable to those Parke-Davis provided to the attendees of the Jupiter Beach consultants' meetings. Others were less lavish, but physicians still received free

55

tuition, free accommodations, free meals, and cash. Frequently Defendants' CME seminars were accredited by continuing medical education organizations, which meant that the physicians taking advantage of Defendants' "CME" meetings did not have to pay tuition or spend additional time to fulfill their continuing medical education licensure requirements by attending truly independent medical education programs.

### 3. Grants and "Studies"

160. Parke-Davis also made outright payments, in the form of supposed grants, to reward demonstrated Neurontin advocates. Parke-Davis's sales managers identified key doctors who actively prescribed Neurontin or programs that were willing to host Neurontin speakers and encouraged such persons or programs to obtain "educational grants" from them. Under this program of kickbacks Parke-Davis paid:

* $2,000.00 to Berge Ninmpolan, MD, "a great Neurontin believer," to attend a neurology seminar in San Francisco, in March 1996.

* $1,000.00 to the University of Texas at Houston Department of Neurology to host a symposium where presentations would be made regarding successful off-label treatment with Neurontin.

* $3,000.00 to the University of Texas Medical School to host a conference in August 1996 at which a well-known specialist in epilepsy, who prescribed Neurontin, would attend.

* $4,000.00 to pay for a neurologist from the University of Texas at San Antonio to attend the American Epilepsy Society Conference in December 1996, a conference at which Parke-Davis was presenting extensive documentation on off-label uses for Neurontin.

* $2,500.00 to the University of Texas in Houston to bring Dr. B.J. Wilder to the campus to hold a seminar. Dr. Wilder was one of Neurontin's biggest boosters for off-label indications and had been paid tens of thousands of dollars to promote Neurontin's off-label uses for Parke-Davis across the country.

* $2,500.00 in June 1996 to pay for representatives from the University of Pennsylvania Medical Center to attend a conference in Saint Petersburg, Russia on the utilization of anti-epileptic drugs, including Neurontin.

* $5,000.00 in December 1996 to Dr. Alan B. Ettinger, of Stonybrook, N.Y., a physician who had informed Parke-Davis that he was interested in possibly doing research in Neurontin and maintained a database of patients who were treated with Neurontin.

* $500 to Bruce Ehrenberg, of Boston, MA, a leading speaker for Parke-Davis regarding off-label use of Neurontin, to attend a conference in China.

* $1000 to Israel Abrams, M.D., Paul C. Marshall, M.D., Beth Rosten, M.D. and Spencer G. Weig, of Worcester MA, for educational programs in February 1996. According to the local Parke Davis representative requesting the grant, "much of the Neurontin success in Worcester has been attributed to . . . the 4 pedi[atric] epileptologists below."

* $1,400 to Dr. Ahmad Beydoun of Ann Arbor, MI for post-graduate training in March 1996. This grant was processed on a quick turnaround, the Parke-Davis representative noting "I realize that this is a very short time line; however, Dr. Beydoun is a very important customer."

* $1,500 to Jim McAuley, R.Ph, Ph.D. for educational materials relating to epilepsy. Parke-Davis decided to provide the funds because McAuley was an advocate of Neurontin and he was important in getting another Parke-Davis drug, Cerebyx, accepted on the formulary for Ohio State University.

* A grant in an unknown amount to University Hospital in Cleveland in exchange for hosting programs regarding Neurontin's use in treating neuropathic pain at conferences specifically devoted to obtaining referrals from other doctors.

161.    These grants, and others, were charged to the Neurontin marketing budget.

Each of these grants were made solely because an individual receiving the money was a large Neurontin supporter or was going to host a program where a well known Neurontin supporter would recommend that other physicians increase their prescriptions of Neurontin. Each of these grant awards constituted a reward or kickback for the recipient's advocacy of Neurontin.

162. Parke-Davis's medical liaisons informed leading Neurontin prescribers that significant advocacy for Neurontin would result in the payment of large grants. These studies did not involve significant work for the physicians. Often they required little more than collating and summarizing office notes or records. Often the physicians contributed nothing at all to the study because Parke-Davis frequently hired technical writers to write the articles for which the "authors" had been given grants.

163. Defendants were aware that these articles and studies provided minimal scientific benefit. In a letter to the FDA in June 1997, Parke-Davis submitted a list of "studies relating to pain, pain syndromes, and psychiatric disorders" but failed to include any of the studies described below. Parke-Davis intentionally neglected to report these "studies" to the FDA because they knew the funded "research" had no scientific value and would not be deemed a scientific trial by the FDA. Payments Parke-Davis made for these "studies" included $7,000.00 to Longmire for "Neurontin For Pain Reduction of Sympathetically Medicated Pain and Sudomotor Function," and $2,000.000 to Longmire for "Retrospective Analysis of Neurontin in the Treatment of Pain." Other payments included, but were not limited to, the following:

* Statistical Analysis of Patients Treated With Hans Hansen, M.D., Statesville, N.C.; $7,000.00

* Data entry for Neurontin and Pain Analysis David Meyer, M.D. [amount unknown] Trial of Neurontin for distal symmetric polyneuropathy associated with AIDS; Joseph Weissman, M.D., Atlanta, GA; $20,000.00

* Neurontin for neuropathic pain in chronic pain syndromes; Lavern Brett, M.D., Washington, D.C.; $25,000.00

* Retrospective chart analysis of Neurontin use with bipolar disorder patients; Ralph S. Rybeck, M.D.; $5,000.00

58

* Retrospective Analysis of Neurontin in the treatment of chronic pain; Don Schanz, D.O.; Traverse City, MI; $8,000.00

* Case histories relating to use of Neurontin as an adjuvant analgesic Elizabeth J. Narcessian, M.D.; W. Orange, N.J.; $4,000.00

164. Plaintiffs do not believe these are the only such payments made. One particularly large study conducted by Parke-Davis served as yet another engine to reward physicians financially for prescribing Neurontin. In 1995 and 1996 Parke-Davis conducted an enormous Phase IV trial known as STEPS. Although STEPS took the form of a research clinical trial, it was, in fact, a marketing ploy designed to induce neurologists to become comfortable prescribing Neurontin at a far higher dose than indicated in the FDA approved labeling. While most clinical studies have a limited number of investigators treating a number of patients qualified for the study, the STEPS protocol called for over 1,200 "investigators" to enroll only a few patients each. The participating physicians were instructed to titrate their patients to higher-than-labeled dosages of Neurontin to demonstrate that patients could tolerate high dosages of the drug. Rewarding physicians for prescribing high doses of Neurontin was another way to increase Neurontin sales, as higher per-patient dosages increased the amount of Neurontin sold. Additionally, the STEPS study was also designed to induce physicians to place non-study patients on Neurontin on doses higher than those found effective in the clinical trials monitored by the FDA.

165. Physicians enrolling in the STEPS study were paid for agreeing to participate in the study and for every patient enrolled. At the conclusion of the study, Parke-Davis offered each of the 1,200 investigators additional cash for each patient the doctor kept on Neurontin after the study ended. These payments constituted kickbacks,

59

since each participating doctor was expressly paid for writing Neurontin prescriptions for their patients and the payment was offered expressly to change the physicians' behavior.

### H. Illegal Off-Label Promotion Has Continued As Has The Continuing Impact Of The Earlier Misconduct

166. As a result of the conduct described above, physicians received large amounts of false information and therefore continue to prescribe Neurontin for off-label uses for which there is no reliable scientific support, and for which it is not effective or medically necessary.

167. A July 1, 2002, letter from Dr. Lisa Stockbridge of the Department of Health & Human Services ("HHS") confirms that Defendants continued as of May 2002 to engage in off-label promotional efforts. Dr. Stockbridge notified Pfizer that certain of its marketing practices are "in violation of the Federal Food, Drug and Cosmetic Act . . . because [Pfizer] makes representations about Neurontin that are false and misleading." In particular, HHS determined that Pfizer marketing materials suggested that the mechanism of action of Neurontin had been established when it was not appropriate to make such a claim, and that materials suggested that Neurontin could be used as monotherapy when it was only appropriate to indicate Neurontin as adjunctive therapy in the treatment of partial seizures. The Stockbridge letter determined that Pfizer's marketing materials were misleading and ordered immediate discontinuation of their use. The marketing practices found to be misleading by HHS are consistent with those routinely engaged in through the Off-Label Promotion Scheme under Parke-Davis's direction.

60

## V.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### VIOLATION OF THE ALABAMA DECEPTIVE TRADE PRACTICES ACT
#### (Ala. Code § 8-19-1, *et seq.*)
#### (Against All Defendants)

170.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

171.    The Alabama Deceptive Trade Practices Act ("ADTPA"), Ala. Code §8-19-5 (1975), prohibits:

* Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do not have or that a person has sponsorship, approval, status, affiliation, or connection that he or she does not have;

* Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;

* Causing confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services; and

* Engaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce.

172.    As alleged herein, Defendants violated such sections of the ADTPA.

173.    Defendants' commission of these acts or practices declared unlawful under the ADTPA caused monetary damage to consumers, as well as to Plaintiffs, in that both consumers and Plaintiffs were caused to pay for Neurontin when it was not medically necessary or effective for the condition for which it was prescribed. This action, which is to recover damages, but which will also deter Defendants from engaging in similar conduct in the future, will have the effect of protecting the interests of both the consuming public and legitimate businesspersons in Alabama.

61

174.    Pursuant to Ala. Code §8-19-10 (1975), Plaintiffs have a private right of action for violations of the ADTPA to recover any actual damages sustained by them, and to recover other amounts allowed by the ADTPA.

175.    As a proximate cause of the violations of the ADTPA, Plaintiffs have been damaged and injured.

176.    To the extent it is applicable, Plaintiffs have complied with Ala. Code § 8-19-10(e), having provided a written demand for relief to Defendants at least 15 days prior to the filing of this action. Defendants have made no written tender of settlement.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs seek from Defendants the amount of actual damages sustained by them, treble damages, costs and attorneys' fees, and any other damages or relief allowed by law.

### SECOND CLAIM FOR RELIEF
### UNJUST ENRICHMENT
**(Against Pfizer, Warner-Lambert, and Fictitious Defendants A-ZZZ)**

177.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

178.    As the intended and expected result of their wrongdoing as set forth in this Complaint, Defendants have profited and benefited from payments made by Plaintiffs for Neurontin.

179.    In exchange for the payments made for Neurontin, and at the time the payments were made, Plaintiffs expected that the drug was a safe, medically effective and necessary treatment for the condition, illness, disease, disorder or symptom for which it was prescribed by a physician.

62

concealing or suppressing, and causing others to conceal or suppress, information about the true safety and efficacy of Neurontin which allowed the drug to be prescribed for reasons not approved by the FDA; and (e) actively concealing or suppressing, and causing others to conceal or suppress, information about the results of scientific studies or negative clinical evidence.

184. Defendants knew at the time that they made these misrepresentations that such were false or that Defendants had failed to disclose facts they were under an obligation to disclose, and willfully deceived Plaintiffs to act to their detriment.

185. Defendants were aware and intended that Plaintiffs would reasonably rely on these misrepresentations or omissions, and that such representations or omissions were material in Plaintiffs' decision to pay for Neurontin. Defendants contemplated, therefore, that Plaintiffs would be induced by reasonably relying on Defendants misrepresentations and omissions to act to Plaintiffs' detriment.

186. Defendants were under a duty to disclose the material facts alleged herein to have been omitted and/or suppressed, particularly where Defendants had knowledge superior to Plaintiffs of said material facts.

187. Defendants intended to deceive Plaintiffs by their misrepresentations, omissions, and active concealment of material facts, as alleged herein.

188. Plaintiffs reasonably relied upon Defendants' numerous misrepresentations and omissions of material fact. Plaintiffs had no reason to doubt the scientific validity of the information Defendants promoted through their marketing and sales strategies.

64

189. Defendants' misrepresentations and omissions of material fact directly and proximately caused Plaintiffs' damages.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs seek from Defendants an amount of compensatory and punitive damages as assigned by a jury, costs and attorneys' fees, and any other damages or relief allowed by law.

## FOURTH CLAIM FOR RELIEF
## NEGLIGENT OR WANTON CONDUCT
### (Against All Defendants)

190. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

191. Defendants engaged in negligent or wanton conduct in that they:

    a. misrepresented the efficacy and scientific studies related to Neurontin;

    b. failed to disclose existing negative clinical evidence;

    c. advertised and marketed the drug as being efficacious for off-label purposes with no clinical support;

    d. provided misleading and false information to physicians to induce them to prescribe Neurontin for off-label uses; and

    e. committed all other acts and/or omissions alleged herein.

192. Defendants were under a duty to act reasonably under the circumstances alleged herein, and breached that duty by the actions and omissions alleged herein.

193. Defendants acted intentionally, willfully and consciously in committing the acts and/or omissions alleged herein.

65

194.   As a proximate consequence of said conduct, Plaintiffs have been caused to suffer injury and damages.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs request from Defendants an amount of compensatory and punitive damages as assigned by a jury, costs and attorneys' fees, and any other damages or relief allowed by law.

### FIFTH CLAIM FOR RELIEF
### NEGLIGENCE OR WANTONNESS PER SE
#### (Against All Defendants)

195.   Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

196.   The FDCA and regulations promulgated thereunder with respect to the marketing of drugs for off-label uses were enacted or promulgated to protect a class of persons that includes Plaintiffs. One of the purposes of the FDCA and related regulations is to insure that physicians are provided with accurate information about the drugs they prescribe, so that patients are prescribed drugs that are medically effective and necessary, and so that third-party payers, such as Plaintiffs, may presume that drugs for which they provide payment are medically effective and necessary.

197.   The injuries Plaintiffs complain of herein are of the type contemplated by the FDCA and regulations promulgated thereunder.

198.   Defendants have violated the FDCA and related regulations by committing the acts and/or omissions alleged herein. Indeed, Defendant Warner-Lambert has pled guilty to violating the FDCA and related regulations.

199.   Defendants are therefore guilty of negligence as a matter of law.

66

200.  Defendants acted intentionally, willfully and consciously in violating the FDCA and related regulations, and are therefore also guilty of wantonness as a matter of law.

201.  Defendants' violation of the FDA and related regulations proximately caused Plaintiffs injury and damages.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs request from Defendants an amount of compensatory and punitive damages as assigned by a jury, costs and attorneys' fees, and any other damages or relief allowed by law.

### SIXTH CLAIM FOR RELIEF
### CONSPIRACY
### (Against All Defendants)

202.  Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

203.  Defendants conspired and/or combined with one another and/or with unknown third parties to accomplish the unlawful acts alleged herein, and/or to accomplish lawful ends by unlawful means, which acts and/or means included, but are not limited to, providing false, misleading, incomplete and inaccurate information related to the efficacy and FDA-approved uses of Neurontin as herein alleged.

204.  As a proximate consequence of said conspiracy and collusion among the named Defendants and/or among the named Defendants and unknown third parties, the Plaintiffs have been injured and damaged.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs request from Defendants an amount of compensatory and punitive damages as assigned by a jury, costs and attorneys' fees, and any other damages or relief allowed by law.

67

**PLAINTIFFS DEMAND A TRIAL BY STRUCK JURY AS TO ALL CLAIMS ASSERTED HEREIN AND ALLOWABLE BY LAW.**

Respectfully Submitted By:

**KIMBERLY REDMAN WEST**
**ASB-2419-E65K**
**For Plaintiff Blue Cross and Blue Shield of Alabama Only**

**OF COUNSEL:**
Wallace, Jordan, Ratliff & Brandt, LLC
P.O. Box 530910
Birmingham, Alabama 35253-0910
(205) 870-0555
(205) 871-7534 (facsimile)
kw@wallacejordan.com

**PAMELA BEARD SLATE**
**ASB-8938-A43P**
**For Plaintiff Blue Cross and Blue Shield of Alabama Only**

**OF COUNSEL:**
Slate Kennedy LLC
166 Commerce Street, Suite 350
Montgomery, Alabama 36104-2560
(334) 262-3300
(334) 262-3301 (facsimile)
pslate@slatekennedy.com

**JOSH J. WRIGHT**
**ASB-4891-W51J**
**For Plaintiff Municipal Workers Compensation Fund, Inc. Only**

**OF COUNSEL:**
Hollis & Wright, P.C.
505 North 20th STteet
Suite 1750

68

Birmingham, AL 35203
(205) 324-3600
(205) 324-3636 (facsimile)
joshw@hollis-wright.com

Plaintiffs' addresses are as follows:

Blue Cross and Blue Shield of Alabama
450 Riverchase Parkway East
Birmingham, Alabama 35244

Municipal Workers Compensation Fund, Inc.
535 Adams Avenue
Montgomery, Alabama 36104

## PLEASE SERVE DEFENDANTS VIA THE FOLLOWING MEANS AS FOLLOWS:

### By Certified Mail, Return Receipt Requested:

**Pfizer, Inc.**
c/o The Corporation Company
2000 Interstate Park Drive, Suite 204
Montgomery, Alabama 36109

**Warner-Lambert Company LLC**
c/o The Corporation Company
2000 Interstate Park Drive, Suite 204
Montgomery, Alabama 36109

**Warner-Lambert Company**
235 East 42nd Street
New York, New York 10017

**Parke-Davis, a Division of Warner Lambert Company LLC**
        **and Warner Lambert Company**
235 East 42nd Street
New York, New York 10017

### By Certified Mail, Return Receipt Requested, Restricted Delivery:

**David B. Longmire, M.D.**
13150 Highway 43
Russellville, Alabama 35653-4558

69

**PURSUANT TO ALA. CODE § 8-19-10(d), PLEASE ALSO MAIL A COPY OF THIS COMPLAINT TO:**

Troy King, Attorney General
Office of the Attorney General
Alabama State House
11 South Union Street, Third Floor
Montgomery, AL 36130

and

Ellen Brooks, District Attorney
Office of the District Attorney of Montgomery County, Alabama
P.O. Box 1667
Montgomery, Alabama 36102-1667