**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |
|---|---|
| In re:  NEURONTIN MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION | :  MDL Docket No. 1629<br>:<br>:  Master File No. 04-10981<br>: |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x  Judge Patti B. Saris

THIS DOCUMENT RELATES TO:              :  Magistrate Judge Leo T.
                                       :  Sorokin

ROBIN STERNS BRIGGS, as Administratrix  :
of the Estate of ROBERT MERRILL BRIGGS,  :
Deceased,                               :
                                        :
          Plaintiffs,                   :
                                        :
v.                                      :
                                        :
PFIZER, INC., et al.,                   :
                                        :
          Defendants.                   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM OF DEFENDANT TEVA**
**PHARMACEUTICALS USA, INC. IN SUPPORT**
**OF ITS MOTION TO DISMISS THE COMPLAINT**

Teva Pharmaceuticals USA, Inc. ("Teva") submits this Memorandum in support

of Teva's Motion to Dismiss the Complaint in the above-captioned action as to it on the

grounds of Fed. R. Civ. P. 12(b)(6).

**STATEMENT OF FACTS**

**1.     The Claims Alleged Against Teva in the Complaint**

This action seeks relief for injuries allegedly suffered by plaintiff's decedent,

Douglas Merrill Briggs, as a result of the use of a prescription pharmaceutical product,

Neurontin®, or its generic equivalent gabapentin, for an unapproved or so-called "off-

label" use, the treatment of pain.  The action was filed in the United States District Court

for the Southern District of New York on or about December 26, 2006, and process was
served on Teva on February 20, 2007.  The action was transferred to this MDL by CTO-
36, dated February 16, 2007.  Parties defendant include Pfizer, Inc., Warner-Lambert
Company and its subsidiary, Parke Davis, the manufacturer of Neurontin (collectively
"Pfizer" or the "Pfizer Defendants"), and Teva, a manufacturer of a generic gabapentin
product.

     As this Court is well aware, the branded Neurontin product has been the subject
of substantial litigation attention; however, Teva has become involved in Neurontin/
gabapentin litigation as a manufacturer of generic gabapentin only recently.  The instant
action is Teva's fifth such products liability case, the first four having been served in
February, May and October 2006 and January 2007, by the same national counsel who
represent plaintiff herein.  It is Teva's understanding, as evidenced by the allegations of
the actions in which it has been served[1], that the theories of liability upon which much of
the litigation against Pfizer turns are premised upon contentions of excessive or otherwise
improper marketing of Neurontin, particularly for off-label uses.  Without regard for the
merit of any such arguments, it should suffice to note that, as a generic manufacturer,
Teva did not engage in any of the marketing practices complained of, most or all of
which were actually conducted before Teva's entry into the market with its generic
gabapentin product.

     While the Complaint, comprising some 272 paragraphs of allegations, purports to
state ten claims for relief, only the Seventh, Eighth, Ninth and Tenth Claims for Relief,
set forth in the last 25 paragraphs of substantive allegations, allege claims against Teva.

---

[1] The Complaint in the instant action is annexed hereto as Exhibit A.

These four claims for relief purport to sound in negligence, breach of warranty, strict products liability and wrongful death; however, as will be shown, essentially the only wrongful conduct alleged by plaintiffs as to Teva in each instance is that Teva lawfully complied with federal regulations in securing the right to manufacture and sell gabapentin for its FDA-approved indications.  Teva respectfully submits that, not only is such alleged conduct not sufficient to state a claim for relief under any cognizable law, but that under the doctrine of federal preemption pursuant to the Supremacy Clause of the United States Constitution, it cannot be held liable under state law merely for complying with federal statutory and regulatory law.

For example, in the Seventh Claim for Relief, in which plaintiffs purport to assert a claim of negligence, plaintiffs allege (Complaint ¶ 249),  that Teva had a duty to exercise reasonable care in the design and development of gabapentin.  Plaintiffs further allege (Complaint ¶ 250), that Teva breached such duty, insofar as

> Teva, by adopting the statements, studies, labeling and representations of the brand name manufacturer of Neurontin, directly and indirectly, advertised, marketed and promoted gabapentin for the treatment of nerve damage . . . .

The Complaint is devoid of any factual allegations that support the conclusory statement that Teva "adopted" the statements, studies, labeling or representations of Pfizer, the manufacturer of Neurontin.  Rather, plaintiffs are characterizing as such Teva's compliance with the federal regulatory scheme for the approval of generic drugs, described at length below, in which a proponent of a generic drug product is not required to reproduce the safety and efficacy testing required of the innovator (brand name manufacturer) of the drug, but must only show "bioequivalence" of its generic version of the drug with the branded product.  On that condition, the generic manufacturer does not

"adopt" the branded product's labeling, but is *required* by force of the Food and Drug Act and FDA regulation to conform its labeling to that of the branded drug. It is such mere compliance with federal law that plaintiffs allege to be a breach of Teva's common law duty.

Similarly, the Eighth Claim for Relief purports to assert a claim for breach of warranty. Teva's warranties allegedly consist (Complaint ¶¶ 257, 258) in its

> adopting the statements, studies, labeling and representations of the brand name manufacturer of Neurontin, . . . directly and indirectly, advertising, marketing and promoting gabapentin for the treatment of nerve damage, and by placing this drug in the stream of commerce knowing that gabapentin would be prescribed for the treatment of nerve damage.

Thus, Teva's purported warranties with respect to the use of gabapentin as a treatment for nerve damage are alleged to have come about in one of three ways: (i) the mere fact of its compliance with federal law in securing the right to manufacture and market the product *for purposes other than the treatment of nerve damage*; (ii) its "direct and indirect" advertising, marketing and promotion of the product; and (iii) its placing the product in the stream of commerce *for purposes other than the treatment of nerve damage*.

The Complaint is devoid of specific allegations that Teva marketed or promoted, *or even intended*, its gabapentin to be employed by physicians for any "off-label" purposes, including the treatment of nerve damage. The Complaint is rife with such allegations as to Pfizer, but there is a very good reason for the absence of such allegations as to Teva. As plaintiffs well know, Teva simply did not advertise or promote its gabapentin product for any purposes, much less for off-label uses. Plaintiffs themselves recognize (Complaint ¶ 115) that a manufacturer illegally misbrands a drug if its labeling

contains references to, or it engages directly or indirectly in promotion of the drug for off-label purposes. Tellingly, nowhere in the Complaint do plaintiffs allege that Teva was guilty of such misbranding. Rather, plaintiffs seek to infer from the mere fact of Teva's public announcement of the availability of its generic gabapentin product that it was aware of the off-label market for Neurontin and was implicitly chargeable with all marketing efforts, lawful or wrongful, by the manufacturer of Neurontin (Complaint ¶ 136, 137). Teva submits that this contention is so far-fetched as not to constitute the colorable basis for the existence of a warranty.

The Ninth Claim for Relief purports to state a cause of action for strict products liability. As will be shown below, it is well-established that, in the context of prescription pharmaceutical drugs, there is no cause of action for strict products liability failure to warn, but rather that failure to warn claims sound only in negligence. Moreover, nowhere in the Ninth Claim for Relief do plaintiffs allege that Teva failed to provide adequate warnings about the risks of using gabapentin for its FDA-approved indications. Insofar as plaintiffs intend to argue that Teva had a duty to warn about the risks entailed in using gabapentin for the off-label indication of pain, there is no such allegation either, nor do plaintiffs even begin to explain how Teva could provide such a warning, consistent with its obligations under federal law and regulation, acknowledged by plaintiffs in Complaint ¶ 115, not to misbrand the product. In short, plaintiffs have failed to state even a rudimentary strict products liability claim for relief.

Finally, the Tenth Claim for Relief, the wrongful death claim, is purely derivative of plaintiffs' other substantive claims for relief, and cannot survive if the other claims fail.

### 2.     Federal Regulation of Generic Drugs

The manufacture and sale of prescription drug products in the United States is a highly regulated industry, under the jurisdiction of the FDA. The FDA draws its statutory authority as to the approval of such manufacture and sale of drugs primarily from its enabling statute, the Food, Drug and Cosmetic Act, 21 U.S.C. § 301, et seq., as amended by the Drug Price Competition and Patent Restoration Act of 1984 (the "Hatch-Waxman Amendments") (collectively, the "Food and Drug Act"), and has promulgated regulations implementing such statutes, which may be found in pertinent part at 21 C.F.R. Part 314.

Broadly speaking, under the United States' regulatory scheme, prescription drugs fall into two categories, new or branded drugs and generic drugs. A "new drug" is one that has not yet been established or generally recognized by persons with relevant scientific training as safe and effective for the purposes or medical indications for which its use is intended. 21 U.S.C. § 312(p). The right to manufacture and market such a drug in the United States is secured through the filing of a "New Drug Application" or NDA. In order to obtain approval of an NDA, the applicant must demonstrate the safety and efficacy of the drug for its intended indications to the satisfaction of the FDA, typically through the conduct of extensive clinical trials in humans. The research and development of such drugs and the conduct of the requisite clinical trials is often a costly process, which takes years to complete. The big, research-driven pharmaceutical companies who bring such drugs to market are most often accorded patent protection and a period of exclusivity in marketing their drugs, which are sold under proprietary brand names and are often very expensive.

In the public policy interest of fostering competition, lower medical costs and more affordable prescription drugs, Congress and the FDA enacted statutory provisions and regulations to encourage the manufacture and marketing of the other category of drugs, known as generic drugs. Specifically, the Hatch-Waxman Amendments (codified at 21 U.S.C. § 355(j), 35 U.S.C. §§ 156, 271, 281), established the current procedure for obtaining approval from the FDA to market and sell a generic drug, allowing the generic maker to submit an abbreviated NDA ("ANDA"). The ANDA applicant need only certify that the generic manufacturer will produce a bio-equivalent of the brand name drug and that the labeling and warnings of the generic drug are identical to that of the approved innovator drug. 21 U.S.C. § 355(j)(2)(A).

An ANDA applicant is not required or expected to conduct clinical trials to establish the safety and efficacy of its drug. The Food and Drug Act and FDA's regulatory scheme thereunder contemplates that safety and efficacy will have been established by the pharmaceutical company who originally submitted the NDA for the counterpart branded or "reference listed" drug. In contrast, the generic manufacturer is obliged only to conduct so-called "bioequivalency" studies, to establish that its dosage formulation of the generic product has the same pharmacological action in the human body as does the reference listed drug. In that case, that is if the generic version of the drug is shown to be "bioequivalent" to the reference listed drug, it is assumed to have the same safety and efficacy profile. It is this avoidance of the need for time-consuming and costly clinical trials that permits generic drugs to be brought to market quickly and at less expense.

The flip side of this regulatory framework is that the labeling, that is the prescribing information or "package insert" of the generic drug, may not deviate in any material respect from that of its reference listed drug. But for differences relating to the fact of the product being manufactured by a different company, chiefly physical description, inactive ingredients and omitted indications, the generic manufacturer's labeling, including all statements as to Warnings, Precautions, Contraindications, Adverse Reactions, etc. must adhere letter for letter to the language in the corresponding provisions of the labeling of the reference listed drug.

On or about October 8, 2004, Teva received approval of an ANDA for gabapentin capsules, a generic version of the reference listed drug Neurontin®, a Parke-Davis product. In securing approval of its gabapentin capsule ANDA, Teva did not conduct safety and efficacy testing *per se*, but rather conducted tests through which it demonstrated to the satisfaction of the FDA that its gabapentin product was bioequivalent to Neurontin. Further, Teva conformed its FDA-approved gabapentin labeling in all material respects, including Warnings and listed Adverse Reactions, to that of Neurontin. Not to have done so would have meant that its gabapentin product was misbranded, unapprovable and unsaleable in the United States. As noted above, plaintiff acknowledged this fact in the Complaint at ¶ 115.

Teva's gabapentin was and is indicated for use in the treatment of epilepsy and postherpetic neuralgia. As noted correctly by plaintiffs, the use of gabapentin in the treatment of any other medical indication is an "off-label" use, which has not been

approved by the FDA.[2]  Specifically, Teva's full prescribing information/product label
for gabapentin neither contained nor contains any reference to the treatment of pain,
peripheral neuropathy, reflex sympathetic dystrophy or complex regional pain syndrome,
nor could it, if Teva was to be in compliance with federal law and FDA regulations.

## ARGUMENT

## I.

## THE COMPLAINT FAILS TO STATE A CLAIM INSOFAR AS ANY ATTEMPT TO IMPOSE TORT LIABILITY UPON TEVA UNDER STATE COMMON LAW IS PREEMPTED BY THE SUPREMACY CLAUSE OF THE UNITED STATES CONSTITUTION AND FEDERAL LAW

The Supremacy Clause of the United States Constitution, article VI, clause 2,
preempts any state law that conflicts with the exercise of federal power.  *Fid. Fed. Sav. &
Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 102 S. Ct. 3014 (1982).  "Pre-emption may be
either express or implied, and 'is compelled whether Congress' command is explicitly
stated in the statute's language or implicitly contained in its structure and purpose.'"
*Matter of Cajun Elec. Power Co-op., Inc.*, 109 F.3d 248, 254 (5th Cir. 1997) *citing Jones
v. Rath Packing Co.*, 430 U.S. 519, 525 (1977).

Without explicit pre-emptive language in the relevant statute, congressional intent
to displace state law may be inferred because the "[t]he scheme of federal regulation may
be so pervasive as to make reasonable the inference that Congress left no room for the
States to supplement it," because "the Act of Congress may touch a field in which the
federal interest is so dominant that the federal system will be assumed to preclude
enforcement of state laws on the same subject," or because "the object sought to be

---

[2] Notwithstanding the lack of FDA approval, physicians, in the exercise of their sound clinical judgment,
may lawfully prescribe gabapentin for purposes other than those indicated in the product label.

obtained by federal law and the character of obligations imposed by it may reveal the same purpose." *Id.* citing *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947). This so-called "conflict preemption", where "a state common-law claim directly conflict[s] with a federal regulation . . ., or if it [is] impossible to comply with any such regulation without incurring liability under state common law," *Sprietsma v. Mercury Marine*, 537 U.S. 51, 65, 123 S. Ct. 518 (2002), is applicable to the instant case.

In this case, to impose common law liability upon Teva USA for manufacturing and marketing gabapentin in compliance with federal law and regulation of generic drugs, including for a failure to provide adequate warnings, would directly conflict with Congress' statutory scheme for fostering the availability of generic drugs and Teva USA's rights and obligations under, *inter alia*, the Hatch-Waxman Amendments, 21 C.F.R. § 314.94, which prescribes the procedures for filing an ANDA, and Section 505(j) of the Food and Drug Act, 21 U.S.C. § 335(j)(2)(A)(v), which requires an ANDA applicant to submit to the FDA,

> information to show that *the labeling proposed for the new drug is the same as the labeling approved for the listed drug* referred to in clause (i) except for changes required because . . . the new drug and the listed drug are produced or distributed by different manufacturers.

(Emphasis added.) *See also* the FDA implementing regulations at 21 C.F.R. § 314.94(a)(8)(iv)(applicant must submit side-by-side comparison of proposed labeling with labeling of the reference listed drug, with all differences annotated and explained; no differences permitted, except as enumerated therein) and 21 C.F.R. §314.127(a)(7)(FDA will refuse to approve an ANDA if applicant cannot demonstrate that the labeling proposed for the drug is identical to that of the reference listed drug, but for the

enumerated exceptions).  Moreover, the generic label must also be maintained in

conformity with that of the reference listed drug thereafter, on pain of withdrawal of

approval of the ANDA.  21 C.F.R. § 314.150(b)(10).

While it has sometimes been argued that an ANDA holder has a right to enhance

warnings through the mechanism of 21 C.F.R. § 314.70(c)(6)(iii)(A), the so-called

"Changes Being Effected Amendment" provision, FDA has repeatedly made clear that it

does not interpret its regulations in this way.  In fact, a generic drug manufacturer cannot

add to or revise any warnings on its product labeling without the FDA's express direction or

prior approval.  *See* 57 Fed. Reg. at 17,957, 17,961.[3]  Rather, the agency's position has

always been that under 21 C.F.R. § 314.70(c), *no labeling changes can be made unilaterally*

*by a generic manufacturer.*  The FDA has expressly rejected public requests that ANDA

applicants be allowed unilaterally to change or deviate from the labeling of the innovator

drug to add contraindications, warnings, precautions, adverse reactions, and other safety

related information. 57 Fed. Reg. 17,961.  This was not an equivocal statement or one

open to interpretation.  On the occasion of the publication of the Final Rulemaking on

ANDA regulations in 1992, FDA stated:

> Two comments said the labeling provisions should be revised to
> permit ANDA applicants to deviate from the labeling for the
> reference listed drug to add contraindications, warnings,
> precautions, adverse reactions, and other safety-related information.
> * * *
> *FDA disagrees with the comments.  Except for labeling*
> *differences due to exclusivity or a patent and differences under*
> *section 505(j)(2)(v) of the [Food and Drug Act], the ANDA*
> *product's labeling must be the same as the listed drug product's*

---

[3] Exhibit "B".

11

> *labeling because the listed drug product is the basis for ANDA approval.*

(57 Fed. Reg. 17,961, April 23, 1992; emphasis added.)

This long-held position is made even more abundantly clear today by the admonishment in the November 1999 FDA Guidance and the April 2004 Revision I to that Guidance[4] that "[a]ll labeling changes for ANDA products must be consistent with § 505(j) of the Act," (FDA Guidances at 24), *i. e.*, must conform exactly to the labeling of the reference listed drug. Further, the FDA in a December 24, 1996 letter cautioned ANDA holders that they cannot adopt innovator labeling which has been unilaterally revised by the innovator through the mechanism of 21 C.F.R. § 314.70(c), unless and until such revised innovator drug labeling has been affirmatively approved by the agency. The letter stated that "[t]he FDA must still review, possibly recommend changes and approve the [revised innovator drug] labeling before it is acceptable for use as model labeling for an [ANDA] product." Letter from Douglas L. Sporn, Director, Office of Generic Drugs, Center for Drug Evaluation and Review at 8.[5] *See also* 57 Fed. Reg. at 17,957, 17,961 and FDA Guidance at 24.

The FDA has taken the same position in *amicus curiae* briefs filed as recently as last month. For example, *see* Brief for *Amicus Curiae* The United States of America, filed December 4, 2006, in *Colacicco v. Apotex, Inc., et al.*, United States Court of Appeals for the Third Circuit, No. 06-3107, at 7-8.[6] Similarly, *see* the FDA's *amicus* brief filed in the same case in the court below on May 10, 2006, United States District Court for the Eastern District of Pennsylvania, Civ. Action No. 05-CV-05500-MMB, at

---

[4] Exhibit "C".
[5] Exhibit "D".
[6] Exhibit "E"

16-17, which, as discussed further below, proved persuasive to the District Court.[7]

*Colacicco v. Apotex, Inc.*, 432 F. Supp. 514 (E.D. Pa. 2006).

In its *amicus* brief to the Third Circuit, the FDA could not be clearer:

> For a generic drug manufacturer, there is no statutory or regulatory provision permitting a labeling change to be made without prior FDA approval.  To the contrary, a generic drug manufacturer is required to conform to the approved labeling for the listed drug.  *See* 21 C.F.R. § 314.150(b)(10); *see also* 57 Fed. Reg. 17,950, 17953, 17,961 (1992).If a generic drug manufacturer believes that new safety
>
> information should be added to the label for its drug, it is directed to contact FDA with "adequate supporting information."

*Amicus Brief* at 7-8.

The FDA also addressed point blank the contention sometimes raised in opposition to the preemption argument, that 21 C.F.R. § 314.70(c) authorizes an ANDA holder to enhance warnings through a Changes being Effected amendment.  While lengthy, the FDA's response is worth repeating in full.

> The plaintiff asserts that 21 C.F.R. § 314.70(c) empowers a generic drug manufacturer to add a new warning to the label for its drug without prior FDA approval.  That regulatory provision, however – like the other provisions of Title 21, Part 314, subpart B of the Code of Federal Regulations – applies to applications involving drug products for which a full application has been submitted, *i. e.*, innovator drug products.  Drug manufacturers that submit abbreviated applications to market generic drugs are subject to the requirements set forth in Title 21, Part 3314, Subpart C. Although Subpart C contains a provision requiring applicants to "comply with the requirements of §§ 314.70 and 314.71 regarding the submission of supplemental applications and other changes to an approved abbreviated application," 21 C.F.R. § 314.97, that provision does not modify the requirement that the drug label for a generic drug must be the same as the label for the approved innovator drug (with limited exceptions not relevant here).  Any ambiguity in the regulatory text has been clarified by FDA, which

_____

[7] Exhibit "F"

> explained at the time of promulgation that the regulations do not
> authorize generic drug manufacturers to add new warnings to the
> approved labeling for the innovator drug. *See* 57 Fed. Reg. at
> 17,961, 17,953, 17,955.

*Id.* at 8 n.4

Accordingly, for generic drug makers, such as Teva in the instant case, the use of
label language as to warnings, precautions, contraindications and adverse reactions
prescribed by FDA in its regulatory capacity is *mandatory*, language from which the
manufacturer *may not deviate*.  The imposition of state tort liability for complying with
this mandatory federal regulation is clearly an impermissible violation of the Supremacy
Clause of the U.S. Constitution, and should not be countenanced by this court.[8]

Last year, the FDA directly addressed the issue of preemption in products liability
cases, and decisively pronounced its belief that its regulations have broad preemptive
effect.  In January 2006, the agency issued a new Final Rule On Requirements On the
Content and Format of Labeling for Human Prescription Drug and Biological Products

---

[8] A line of cases exists, in which it has been held that FDA approval of label warnings constitutes a
minimum standard, which does *not* conflict with state common law interests, and, accordingly, does not
form a basis for conflict preemption.  However, the instant case is critically distinguishable from that
seemingly negative authority, in that those cases dealt with *NDA* drugs.  For NDA holders, courts have
reasoned, 21 C.F.R. § 314.70(c) permits the manufacturer to add or strengthen contraindications, warnings,
precautions and adverse reactions without prior FDA approval. Thus, manufacturers "could and should
provide stronger warnings as soon as such a warning is warranted."  *Cartwright v. Pfizer, Inc.*, 369 F. Supp.
2d 876 (E.D. Tex. 2005).  As shown above, Teva USA, as an ANDA holder, *cannot avail itself of this
regulation unilaterally to strengthen or enhance its warnings.*  This distinction inescapably undercuts the
rational of *Cartwright* and the like cases cited therein that FDA label approval sets only a minimum
standard.  Similarly, *Brasher v. Sandoz Pharmaceuticals Corp.*, 2001 U.S. Dist. LEXIS 18364 (N.D. Ala.
September 21, 2001) is distinguishable, to the extent that the court argues in n.13, that defendant's reliance
on FDA approval of label language is misplaced.  In *Brasher*, as in *Cartwright*, the court assumes freedom
on the part of the defendant manufacturer (NDA holder) to change the product label to enhance warnings.
In *Foster v. American Home Products Corp*., 29 F.3d 165 (4th Cir. 1994), the U.S. Fourth Circuit Court of
Appeals relied upon 21 C.F.R. § 314.70(c) to opine that there is also no preemption of state law failure to
warn claims with respect to generic drug manufacturers.  However, these statements in the *Foster* decision
were dicta as to issues not dispositive of the claims before the court, did not appear to have been briefed by
the parties, and were plainly wrong in view of the authority discussed above.

("Final Rule on Labeling")[9]. Therein, the FDA takes head-on the contention that its labeling requirements represent minimum standards, and argues rather that it interprets the Food and Drug Act and its own regulatory scheme thereunder to establish both a floor and a ceiling for the disclosure of risk information. The FDA states that it carefully controls the content of labeling as its principal tool for educating health care professionals about the risks and benefits of approved products and notes that requirements of additional disclosures are not necessarily protective of patients, but may erode and disrupt the careful representations of those risks and benefits. The agency concludes that state law conflicts with and stands as an obstacle to the achievement of the full objectives and purposes of federal law if it purports wither to compel the inclusion of warning language it has considered and found scientifically unsubstantiated or to preclude the inclusion of language the agency has deemed appropriate.

In addition to the January 2006 Rulemaking, FDA has taken the same position in recent *amicus curiae* filings. For example, *see* Brief for *Amicus Curiae* The United States of America, filed May 10, 2006, in *Colacicco v. Apotex, Inc., et al.*, United States District Court for the Eastern District of Pennsylvania, Civ. Action No. 05-CV-05500-MMB, at 16-17 (Ex. "F").

The Supreme Court has long and repeatedly recognized that, "[t]he agency is uniquely qualified to determine whether a particular form of state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Lohr v. Medtronic, Inc.*, 518 U.S. 470, 496, 116 S. Ct. 2240, 2255 (1996); *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S. Ct. 399, 404 (1941), a finding that the FDA

---

[9] Comment 13, the relevant portion of this extensive document, is annexed as Ex. "G".

expressly made in the Final Rule on Labeling. Accordingly, the FDA's expansive view of its preemptive authority is entitled to deference, but one need not go nearly as far as does the agency to conclude that preemption is appropriate as to generic labeling, where the ANDA holder literally has no freedom of action with respect to label content.

In fact, on May 25, 2006, the *Colacicco* court rendered its well-reasoned decision, accepting the arguments urged by the FDA in its amicus brief and granting summary judgment to defendant, generic drug manufacturer Apotex:

> Accordingly, we find that state tort law which would hold a generic drug manufacturer liable for failing to modify a label when, pursuant to the Hatch-Waxman Amendments to the FDCA, the ANDA approval process required that the labeling be the same as that approved for the innovator drug, and a when the FDA would have deemed any post-approval enhancements "false or misleading," would actually conflict with the FDCA. For these reasons, as well as our conclusion that we must afford deference to the FDA's position that the claims are preempted, we find that Plaintiff's failure-to-warn claims are impliedly preempted.

(432 F. Supp. 2d at 537-38.)

Several months ago, in a case virtually identical in all material respects to the instant action, the Superior Court of the State of California, San Francisco County, reached the same result in *Conte v. Wyeth, et al.*, Case No. CGC-04-437382, slip op. (September 14, 2006)[10]. *Conte* is a metoclopramide products liability case, in which plaintiff is alleged to have suffered tardive dyskinesia as a result of the use of generic metoclopramide products, whose manufacture and marketing are sanctioned by the FDA under precisely the same regulatory scheme applicable to Teva's gabapentin products.

---

[10] A copy of this as yet unpublished opinion is annexed as Ex. "H".

In reliance upon *Colacicco* and upon *In re Bextra and Celebrex Marketing Sales Practices and Products Liability Litigation*, 2006 WL 2374742 (N.D. Cal. Aug. 16, 2006),[11] discussed below, the *Conte* court (per Dondero, J.) held that plaintiff's strict products liability, negligence, negligence per se, breach of express warranties and breach of implied warranties claims, all sounding in failure to warn, were preempted by FDA regulation (slip op. at 9). Late last month, Judge Dondero reaffirmed this ruling, granting summary judgment to Teva on these same grounds.[12]

*In re Bextra*, decided two months ago, goes as far or farther than *Colacicco* and *Conte*. In that case, Judge Breyer of the U.S. District Court for the Northern District of California carefully analyzed the preemption issue in light of FDA's January 2006 Final Rule on Labeling, which, as discussed above, asserts broad preemptive authority, and held that the agency's claims of preemption are entitled to deference. *Id.* at 6-9. Judge Breyer expressly recognized that FDA's position and his holding conflict with older cases such as those noted in n. 7, *supra*, and, indeed, even with FDA's own earlier position, but concluded that FDA's current view of its authority cannot be found erroneous:

> [T]he FDA is the agency charged with administering the FDCA and striking a "somewhat delicate balance" among its statutory objectives. . . . The FDA is in a better position than the Court to determine whether state laws that encourage manufacturers to propose defensive labels upset the FDA's careful balance of statutory objectives.

---

[11] Annexed hereto as Exhibit "I".

[12] Judge Dondero's most recent decision is annexed hereto as Exhibit "J".

(*Id.* at 7; citation omitted.)  Accordingly, the court held that plaintiffs' claims based upon the manufacturer's failure to warn about cardiovascular risks now alleged to be associated with Bextra and Celebrex are preempted.  *Id.*[13]

Inescapably, Teva was disabled by federal law and regulation from varying the mandated label language, and cannot be held liable under state law for not doing so.[14] Insofar as Teva's alleged liability under any asserted claim for relief is premised, wholly or in part, on its compliance with the Food and Drug Act or any FDA regulations promulgated thereunder, with respect to the content of its labeling, such claims are preempted and should be dismissed as to Teva.  This is true whether such claims are clothed in the guise of negligence, breach of warranty or strict products liability.

Similarly, with respect to claims of failure to test adequately, for a state to impose liability upon a generic drug manufacturer for failing to conduct independent safety testing of an ANDA drug would directly undercut the regulatory scheme established by Congress, described at pp. 5-8, *supra,* and would vitiate the public policy expressly espoused by Congress of fostering the widespread availability of affordable generic drugs.  Such state action, through common law or otherwise, is not permitted by the Supremacy Clause, and to the extent that plaintiff's negligence claims are premised upon a failure to test argument, such claims must also be dismissed.

_____

[13] *In re Bextra* goes further than *Colacicco,* in that the former case involves an NDA holder.  Accordingly, the *Bextra* court was not relying upon the distinction drawn above between the rights of NDA and ANDA holders with respect to enhancing label warnings without prior FDA permission.  Rather, Judge Breyer accepted FDA's rationale in the Final Rule on Labeling that it is the final arbiter of label content, even when the "Changes Being Effected Amendment" provision is utilized.  Teva agrees and urges this Court to follow *In re Bextra*, but notes that the Court need not go that far to conclude that the claims against Teva are preempted, based upon Teva's inability under any circumstances to utilize 21 C.F.R. § 314.70(c) to vary its label from that prescribed to it by FDA.

## II.

### PLAINTIFFS' BREACH OF WARRANTY CLAIMS FAIL TO STATE A CLAIM FOR RELIEF INSOFAR AS TEVA GAVE NO WARRANTIES, EXPRESS OR IMPLIED, WITH RESPECT TO THE USE OF GABAPENTIN FOR THE TREATMENT OF PAIN

As noted above and clearly acknowledged by plaintiffs in the Complaint, treatment of nerve damage is an off-label use of gabapentin. There is no dispute, nor can there be that Teva's product labeling did not contain any reference to this off-label use, and there are no allegations that Teva actually promoted or offered its gabapentin product for sale for this off-label use. Under these circumstances, there clearly can have been no express warranty given by Teva as to the use of gabapentin for the treatment of pain, nor have plaintiffs alleged anywhere what such express warranty may have consisted of. Absent a warranty, there just as clearly cannot be a claim for relief for breach of warranty.

It is left only to consider whether applicable implied warranties may have arisen merely by operation of Teva having placed gabapentin in the stream of commerce. In Complaint ¶ 258, plaintiff charges that "Teva . . . impliedly warranted . . . that gabapentin was safe and effective for the purposes for which is had been placed in the stream of commerce by defendant Teva." Despite plaintiffs' best efforts to conflate Teva's conduct with that of Pfizer, those purposes are demonstrably the treatment of epilepsy and post-herpetic neuralgia. As held by the court in *Huntman v. Danek Medical, Inc.*, 1998 U.S. Dist. LEXIS 13431 (S.D. Cal. Feb. 24, 1998), "[i]n the absence of evidence that a doctor made the decision to use a product in an 'off-label' manner in reliance on a manufacturer's misrepresentations, claims for . . . breach of

---

[14] At least one other state court has also adopted the FDA's rationale and granted summary judgment to a pharmaceutical manufacturer in a products liability case on preemption grounds. *See Abramowitz v. Cephalon*, 2006 WR 560639 (N.J. Super. March 3, 2006) (Ex. "K").

warranty cannot stand." So too in the instant case. There are no allegations in the
Complaint of *any* representations by Teva as to the use of gabapentin for the treatment of
nerve damage, much less misrepresentations. Under these circumstances, plaintiffs'
warranties claims against Teva cannot stand.

**III.**

**PLAINTIFFS' STRICT PRODUCTS LIABILITY
CLAIM FOR RELIEF FAILS FOR LACK OF
ALLEGATIONS AS TO TEVA'S FAILURE TO WARN**

Plaintiffs' Ninth Claim for Relief is framed in terms of strict products liability, it
being alleged (Complaint ¶ 265) that gabapentin was not safe and effective for the
treatment of pain. The State of North Carolina[15] abolished the cause of action of strict
liability in tort by statute, N.C.G.S. § 99B-1.1, the full and unambiguous text of which is,
"There shall be no strict liability in tort in product liability actions." Accordingly, insofar
as plaintiff's Ninth Claim for Relief purports to assert strict products liability as the basis
for liability thereunder, such claim patently fails as a matter of law.

Even to the extent that strict products liability might be deemed cognizable as to
plaintiff's claims, it is widely accepted that the theory of strict products liability is not
applicable to failure to warn claims involving prescription drugs, and that a
manufacturer's duty with respect to such products is to exercise reasonable care to
provide adequate warnings as to the risks of their use. *See* Restatement (2d) of Torts
§ 402A, Comment k, which states, in pertinent part:

---

[15] The Complaint alleges that plaintiff's decedent was a resident of the State of North Carolina at all times
relevant to his use of gabapentin. While the action was originally filed in the Southern District of New
York, it does not appear that New York has any relationship to the events complained of. Under these
circumstances, the substantive law of North Carolina will likely apply to plaintiff's common law claims
against Teva. (Teva itself has its principal place of business in Pennsylvania. However, as Pennsylvania

20

> There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use. . . . Such a product, properly prepared and accompanied by proper directions and warning, is not defective, nor is it *unreasonably* dangerous. [This] is true of many . . . drugs, vaccines, and the like, many of which for this very reason cannot legally be sold except to physicians, or under the prescription of a physician. . . . The seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk.

In *Hahn v. Richter*, 543 Pa. 558, 673 A.2d 888 (1996), plaintiff sought damages for injuries allegedly caused by Depo-Medrol. The court held that:

> [*Incollingo v. Ewing*, 444 Pa. 263, 282 A.2d 206 (1971) and *Baldino v. Castagna*, 505 Pa. 239, 478 A.2d 807 (1984)] as well as comments j and k [to Restatement (2d) 402A}. make it clear that where the adequacy of warnings associated with prescription drugs is at issue, the failure of the manufacturer to exercise reasonable care to warn of dangers, i.e., the manufacturer's negligence, is the only recognized basis of liability.

Prior to its abolition of the cause of action of strict product liability, North Carolina in fact acknowledged Restatement (Second) of Torts § 402A to similar effect. *See, e. g., Batiste v. Amer. Home Prod. Corp.*, 32 N.C. App. 1, 11, 231 S.E.2d 269, 275 (1977).[16]

---

and New York follow the Restatement (2d) of Torts § 402A, Comment k, and North Carolina would if it still recognized strict products liability as a tort cause of action, the choice of law issue is moot.)

[16] Teva assumes for these purposes that plaintiffs' strict products liability claim is intended to be a failure to warn claim, as the Ninth Claim for Relief does not assert a design defect. Pursuant to Restatement (3d) of Torts § 6(c):

> A prescription drug . . . is not reasonably safe due to design defect if the foreseeable risks of harm posed by the drug . . . are sufficiently great in relation to its foreseeable therapeutic benefits that reasonable health-care providers,

As there is no cognizable strict products liability claim for relief against Teva under the circumstances alleged in the Complaint, the Ninth Cause of Action should be dismissed as to Teva for this reason as well.[17]

## IV.

## PLAINTIFF'S WRONGFUL DEATH
## CLAIM MUST ALSO BE DISMISSED

It should suffice only to note that plaintiff's Tenth Claim for Relief, the wrongful death claim, has no substantive content with respect to allegations of culpable conduct by Teva, other than to incorporate by reference the allegations made theretofore in the Complaint (Complaint ¶¶ 269-272). Accordingly, to the extent that such alleged conduct by Teva is not actionable for all of the reasons set forth above, the wrongful death claim must also fail.

---

knowing of such foreseeable risks and therapeutic benefits, would not prescribe the drug or medical device for any class of patients.

Plaintiffs make no such allegations with respect to gabapentin, nor does Teva understand plaintiffs to be contending that gabapentin is so unsafe as to be unsuitable for use by any patients, including those suffering from epilepsy or postherpetic neuralgia, its approved indications. As these are the only indications for which Teva sought approval for sale, a design defect claim plainly cannot stand against Teva.

[17] The illogicality of asserting a failure to warn claim, sounding either in strict products liability or negligence, with respect to an off-label use, is only highlighted by plaintiffs' acknowledgment, noted above, that any reference in the product label to the off-label use would not only contravene Teva's regulatory obligations to conform its gabapentin labeling to that of Neurontin®, but would also result in the product being unlawfully misbranded. This would invite regulatory or even criminal enforcement proceedings, such as those involving Warner-Lambert Company, evidenced by Exhibit A to the Complaint herein.

## CONCLUSION

For all of the foregoing reasons, Teva respectfully requests that its Motion to Dismiss be granted in all respects.

Dated: March 12, 2007                  Respectfully submitted,
          Boston, Massachusetts

TEVA PHARMACEUTICALS USA, INC.

By its attorneys,

/s/ U. Gwyn Williams
U. Gwyn Williams (BBO # 565181)
GOODWIN PROCTER LLP
Exchange Place
Boston, MA 02109-2881
617.570.1000

-and-

Jonathan I. Price
GOODWIN PROCTER LLP
599 Lexington Avenue
New York, NY 10022
212.818.8300

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on March 12, 2007.

/s/ U. Gwyn Williams