# EXHIBIT A

# UNITED STATES DISTRICT COURT

| FOR THE SOUTHERN | District of | NEW YORK |
|---|---|---|

ROBIN STERN BRIGGS, as Administratrix of the Estate of
DOUGLAS MERRILL BRIGGS, Deceased
Plaintiff,

V.

PFIZER INC., PARKE-DAVIS, a division of Warner-Lambert
Company and Warner-Lambert Company LLC, WARNER-
LAMBERT COMPANY, WARNER-LAMBERT COMPANY
LLC, and TEVA PHARMACEUTICALS USA, INC.,

Defendants.

**SUMMONS IN A CIVIL CASE**

CASE NUMBER:

**06 CV 15451**

TO: (Name and address of Defendant)

PFIZER INC.
235 East 42nd Street
New York, New York 10017

WARNER-LAMBERT COMPANY and
WARNER-LAMBERT COMPANY LLC
201 Tabor Road
Morris Plains, New Jersey 07950

PARKE-DAVIS, a division of Warner Lambert
201 Tabor Road
Morris Plains, New Jersey 07950

TEVA PHARMACEUTICALS USA, INC.
1090 Horsham Road
North Wales, Pennsylvania 19454

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

FINKELSTEIN & PARTNERS, LLP
436 Robinson Avenue
Newburgh, NY 12550

an answer to the complaint which is herewith served upon you, within ___Twenty (20)___ days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after service.

## J. MICHAEL McMAHON

DEC 2 6 2006

| CLERK | DATE |
|---|---|

(By) DEPUTY CLERK

File #231943-06/rag

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------x
ROBIN STERN BRIGGS, as Administratrix
of the Estate of DOUGLAS MERRILL BRIGGS,
deceased,

06 CV 15451

                 Plaintiff,

       -against-                      COMPLAINT

                                 Plaintiff Demands
                                 Trial by Jury

PFIZER INC., PARKE-DAVIS,
a division of Warner-Lambert Company
and Warner-Lambert Company LLC,
WARNER-LAMBERT COMPANY,
WARNER-LAMBERT COMPANY LLC and
TEVA PHARMACEUTICALS USA, INC.,



                 Defendants.
------------------------------------------x

     Plaintiff, by attorneys, FINKELSTEIN & PARTNERS, LLP, as

and for the Verified Complaint herein allege upon information

and belief the following:

**STATEMENT OF THE CASE**

    1.   This is an action to recover damages for personal

injuries sustained by, and the wrongful death of, plaintiff's

decedent as the direct and proximate result of defendants'

wrongful conduct in connection with the designing, developing,

manufacturing, distributing, labeling, advertising, marketing,

promoting, and selling of the prescription drug Neurontin, which

was marketed and sold by the defendants, PFIZER INC., PARKE-DAVIS, a Division of Warner-Lambert Company and Warner-Lambert Company LLC, WARNER-LAMBERT COMPANY and WARNER-LAMBERT COMPANY LLC, (hereinafter collectively referred to as the "Pfizer defendants"), and the prescription drug gabapentin, the generic form of Neurontin, which was marketed and sold by the defendant, TEVA PHARMACEUTICALS USA, INC., (hereinafter referred to as "Teva"), especially for such "off-label" uses as the treatment of pain, a purpose for which Neurontin and gabapentin had not received FDA approval, and at dosages higher than had been approved by the FDA and had been properly tested on humans, even though Neurontin and gabapentin had not been tested and studied for this purpose and had not been found to be safe and effective at any dosage for the treatment of pain.

## PARTIES AND JURISDICTION

2.    Jurisdiction exists as against the defendants, PFIZER INC., PARKE-DAVIS, a division of Warner-Lambert Company and Warner-Lambert Company LLC (hereinafter "PARKE-DAVIS"); WARNER-LAMBERT COMPANY, WARNER-LAMBERT COMPANY LLC and TEVA PHARMACEUTICALS USA, INC., pursuant to:

(a)   28 U.S.C. Section 1332, in that the plaintiff, ROBIN STERN BRIGGS, as Administratrix of the Estate of DOUGLAS MERRILL BRIGGS, deceased, is a citizen and resident of the State

of North Carolina, at the time of his death, plaintiff's decedent, DOUGLAS MERRILL BRIGGS, was a citizen and resident of the State of North Carolina, the defendant, PFIZER INC., is incorporated in business in the State of Delaware and maintains its principal place of business in the State of New York, the defendant, PARKE-DAVIS, is incorporated in the State of Michigan, and maintains its principal place of business in the State of New Jersey, the defendant, WARNER-LAMBERT COMPANY, is incorporated in the State of Delaware and maintains its principal place of business in the State of New Jersey, the defendant, WARNER-LAMBERT COMPANY LLC, is a limited liability company organized under the laws of the State of Delaware, whose sole shareholder and member is the defendant, PFIZER INC., and the defendant, TEVA PHARMACEUTICALS USA, INC., is incorporated in the State of Delaware and maintains its principal place of business in the Commonwealth of Pennsylvania, and the amount in controversy exceeds the sum of $75,000.00 exclusive of interest and costs.

(b)  28 U.S.C. Section 1391, in that jurisdiction is founded only on diversity of citizenship, and all defendants are subject to personal jurisdiction in the Judicial District of the Southern District of New York and may be deemed to reside in the Southern District of New York.

3

3.    That prior to the commencement of this action by Order of the Superior Court of the County of Mecklenburg, State of North Carolina, plaintiff, ROBIN STERN BRIGGS, was granted Letters Testamentary with respect to the Estate of the deceased, DOUGLAS MERRILL BRIGGS, on the 16th day of February, 2005, and at all times hereinafter mentioned, duly qualified and entered upon her duties as such Administratrix and is now acting in such capacity.    A copy of said Order is attached hereto.

4.    That at the time of death on December 25, 2004, plaintiff's decedent was then of the age of 54 years and prior thereto, was generally in good health, industrious and possessed of all faculties.

5.    That at the time of plaintiff's decedent death, he was married and survived by his wife, the plaintiff, ROBIN STERN BRIGGS.

6.    That at all times hereinafter mentioned, upon information and belief, the defendant, PFIZER INC., was and still is a corporation organized and existing under the laws of the State of Delaware.

7.    That at all times hereinafter mentioned, upon information and belief, the defendant, PFIZER INC., was and still is a foreign corporation authorized to do business in the State of New York.

4

8.    That at all times hereinafter mentioned, upon information and belief, the defendant, PFIZER INC., was and still is a business entity actually doing business in the State of New York.

9.    That at all times hereinafter mentioned, upon information and belief, the defendant, PARKE-DAVIS, a division of Warner-Lambert Company and Warner-Lambert Company LLC (hereinafter "PARKE-DAVIS"), was and still is a corporation organized and existing under the laws of the State of Michigan.

10.    That at all times hereinafter mentioned, upon information and belief, the defendant, PARKE-DAVIS, was and still is a foreign corporation authorized to do business in the State of New York.

11.    That at all times hereinafter mentioned, upon information and belief, the defendant, PARKE-DAVIS, was and still is a business entity actually doing business in the State of New York.

12.    That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY, was and still is a corporation organized and existing under the laws of the State of Delaware.

13.    That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY,

was and still is a foreign corporation authorized to do business in the State of New York.

14. That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY, was and still is a business entity actually doing business in the State of York.

15. That at all times hereinafter mentioned, upon information and belief, the defendant, PARKE-DAVIS, is a division of the defendant, WARNER-LAMBERT COMPANY.

16. That at all times hereinafter mentioned, upon information and belief, the defendant, PARKE-DAVIS, is a subsidiary of the defendant, WARNER-LAMBERT COMPANY.

17. That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY LLC, was and still is a limited liability company organized and existing under the laws of the State of Delaware.

18. That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY LLC, was and still is a foreign limited liability company authorized to do business in the State of New York.

19. That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY LLC, was and still is a business entity actually doing business in the State of New York.

20. That at all times hereinafter mentioned, upon information and belief, the defendant, TEVA PHARMACEUTICALS USA, INC., was and still is a corporation organized and existing under the laws of the State of Delaware.

21. That at all times hereinafter mentioned, upon information and belief, the defendant, TEVA PHARMACEUTICALS USA, INC., was and still is a foreign corporation authorized to do business in the State of New York.

22. That at all times hereinafter mentioned, upon information and belief, the defendant, TEVA PHARMACEUTICALS USA, INC., was and still is a business entity actually doing business in the State of New York.

23. That at all times hereinafter mentioned, upon information and belief, the defendant, TEVA PHARMACEUTICALS USA, INC., has its headquarters and principal place of business in the County of Montgomery, Commonwealth of Pennsylvania.

24. That at all times hereinafter mentioned, upon information and belief, the defendant, PFIZER INC., is the sole shareholder and member of the defendant, WARNER-LAMBERT COMPANY LLC.

25. That at all times hereinafter mentioned, upon information and belief, the defendant, PARKE-DAVIS, is a division of the defendant, WARNER-LAMBERT COMPANY LLC.

7

26.  That at all times hereinafter mentioned, upon information and belief, the defendant, PARKE-DAVIS, is a subsidiary of the defendant, WARNER-LAMBERT COMPANY LLC.

27.  That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY, is a division of the defendant, PFIZER INC.

28.  That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY, is a subsidiary of the defendant, PFIZER INC.

29.  That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY, is a successor in interest to the defendant, PARKE-DAVIS.

30.  That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY LLC, is a division of the defendant, PFIZER INC.

31.  That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY LLC, is a subsidiary of the defendant, PFIZER INC.

32.  That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY LLC, is a successor in interest to the defendant, PARKE-DAVIS.

33.  That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY, is a successor in interest to the defendant, PARKE-DAVIS.

8

34.    That on a date prior to December 25, 2004, the defendant, WARNER-LAMBERT COMPANY, assumed the assets and liabilities of the defendant, PARKE-DAVIS.

35.    That on a date prior to December 25. 2004, the defendant, WARNER-LAMBERT COMPANY, expressly assumed all liabilities and obligations of the defendant, PARKE-DAVIS.

36.    That on a date prior to December 25, 2004, the defendant, WARNER-LAMBERT COMPANY, impliedly assumed all liabilities and obligations of the defendant, PARKE-DAVIS.

37.    That on a date prior to December 25, 2004, the defendant, PARKE-DAVIS, and the defendant, WARNER-LAMBERT COMPANY, merged with each other.

38.    That on a date prior to December 25, 2004, the defendant, PARKE-DAVIS, merged with the defendant, WARNER-LAMBERT COMPANY, and the defendant, PARKE-DAVIS, became a part of the defendant, WARNER-LAMBERT COMPANY.

39.    That on a date prior to December 25, 2004, the defendant, PARKE-DAVIS, and the defendant, WARNER-LAMBERT COMPANY, consolidated with each other.

40.    That on or about December 31, 2002, the defendant, WARNER-LAMBERT COMPANY LLC, assumed the assets and liabilities of the defendant, PARKE-DAVIS.

41.   That on or about December 31, 2002, the defendant, WARNER-LAMBERT COMPANY LLC, expressly assumed all liabilities and obligations of the defendant, PARKE-DAVIS.

42.   That on or about December 31, 2002, the defendant, WARNER-LAMBERT COMPANY LLC, impliedly assumed all liabilities and obligations of the defendant, PARKE-DAVIS.

43.   That on or about December 31, 2002, the defendant, PARKE-DAVIS, and the defendant, WARNER-LAMBERT COMPANY LLC, merged with each other.

44.   That on or about December 31, 2002, the defendant, PARKE-DAVIS, merged with the defendant, WARNER-LAMBERT COMPANY LLC, and the defendant, PARKE-DAVIS, became a part of the defendant, WARNER-LAMBERT COMPANY LLC.

45.   That on or prior to December 31, 2002, the defendant, PARKE-DAVIS, and the defendant, WARNER-LAMBERT COMPANY LLC, consolidated with each other.

46.   That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY LLC, is a successor in interest to the defendant, WARNER-LAMBERT COMPANY.

47.   That on or prior to December 31, 2002, the defendant, WARNER-LAMBERT COMPANY LLC, assumed the assets and liabilities of the defendant, WARNER-LAMBERT COMPANY.

48.   That on or prior to December 31, 2002, the defendant, WARNER-LAMBERT COMPANY LLC, expressly assumed all liabilities and obligations of the defendant, WARNER-LAMBERT COMPANY.

49.   That on or prior to December 31, 2002, the defendant, WARNER-LAMBERT COMPANY LLC, impliedly assumed all liabilities and obligations of the defendant, WARNER-LAMBERT COMPANY.

50.   That on or prior to December 31, 2002, the defendant, WARNER-LAMBERT COMPANY, and the defendant, WARNER-LAMBERT COMPANY LLC, merged with each other.

51.   That on or prior to December 31, 2002, the defendant, WARNER-LAMBERT COMPANY, merged with the defendant, WARNER-LAMBERT COMPANY LLC, and the defendant, WARNER-LAMBERT COMPANY, became a part of the defendant, WARNER-LAMBERT COMPANY LLC.

52.   That on or prior to December 31, 2002, the defendant, WARNER-LAMBERT COMPANY, and the defendant, WARNER-LAMBERT COMPANY LLC, consolidated with each other.

53.   That at all times hereinafter mentioned, upon information and belief, the defendant, PFIZER INC., is a successor in interest to the defendant, PARKE-DAVIS.

54.   That at all times hereinafter mentioned, upon information and belief, the defendant, PFIZER INC., is a successor in interest to the defendant, WARNER-LAMBERT COMPANY.

55.   That at all times hereinafter mentioned, upon information and belief, the defendant, PFIZER INC., is a

11

successor in interest to the defendant, WARNER-LAMBERT COMPANY
LLC.

56.  That on a date prior to December 25, 2004, the
defendant, PFIZER INC., assumed the assets and liabilities of
the defendant, PARKE-DAVIS.

57.  That on a date prior to December 25, 2004, the
defendant, PFIZER INC., assumed the assets and liabilities of
the defendant, WARNER-LAMBERT COMPANY.

58.  That on a date prior to December 25, 2004, the
defendant, PFIZER INC., expressly assumed all liabilities and
obligations of the defendant, PARKE-DAVIS.

59.  That on a date prior to December 25, 2004, the
defendant, PFIZER INC., impliedly assumed all liabilities and
obligations of the defendant, PARKE-DAVIS.

60.  That on a date prior to December 25, 2004, the
defendant, PFIZER INC., expressly assumed all liabilities and
obligations of the defendant, WARNER-LAMBERT COMPANY.

61.  That on a date prior to December 25, 2004, the
defendant, PFIZER INC., impliedly assumed all liabilities and
obligations of the defendant, WARNER-LAMBERT COMPANY.

62.  That on or prior to December 31, 2002, the defendant,
PFIZER INC., assumed the assets and liabilities of the
defendant, WARNER-LAMBERT COMPANY LLC.

12

63.    That on or prior to December 31, 2002, the defendant, PFIZER INC., expressly assumed all liabilities and obligations of the defendant, WARNER-LAMBERT COMPANY LLC.

64.    That on or prior to December 31, 2002, the defendant, PFIZER INC., impliedly assumed all liabilities and obligations of the defendant WARNER-LAMBERT COMPANY LLC.

65.    That on a date prior to December 25, 2004, the defendant, PFIZER INC., and the defendant, PARKE-DAVIS, merged with each other.

66.    That on a date prior to December 25, 2004, the defendant, PFIZER INC., and the defendant, WARNER-LAMBERT COMPANY, merged with each other.

67.    That on or before December 25, 2004, the defendant, PFIZER INC., and the defendant, WARNER-LAMBERT COMPANY LLC, merged with each other.

68.    That on a date prior to December 25, 2004, the defendant, PFIZER INC., and the defendant, PARKE-DAVIS, merged with each other and the defendant, PARKE-DAVIS, became a part of the defendant, PFIZER INC.

69.    That on a date prior to December 25, 2004, the defendant, PFIZER INC., and the defendant, WARNER-LAMBERT COMPANY, merged with each other and the defendant, WARNER-LAMBERT COMPANY, became a part of the defendant, PFIZER INC.

13

70. That on or prior to December 31, 2002, the defendant, PFIZER INC., and the defendant, WARNER-LAMBERT COMPANY LLC, merged with each other and the defendant, WARNER-LAMBERT COMPANY LLC, became a part of the defendant, PFIZER INC.

71. That on a date prior to December 25, 2004, the defendant, PFIZER INC., and the defendant, PARKE-DAVIS, consolidated with each other.

72. That on a date prior to December 25, 2004, the defendant, PFIZER INC., and the defendant, WARNER-LAMBERT COMPANY, consolidated with each other.

73. That at all times hereinafter mentioned, upon information and belief, the defendant, PFIZER INC., has its principal place of business in the State of New York.

74. In the year 2000, the defendant, PFIZER INC., acquired the defendant, WARNER-LAMBERT COMPANY, and as the result of that acquisition, the defendant, PFIZER INC., is responsible for all liabilities resulting from the acts or omissions of the defendant, WARNER-LAMBERT COMPANY, which occurred prior to such acquisition.

75. In the year 2000, the defendant, PFIZER INC., acquired the defendant, PARKE-DAVIS, a division of Warner-Lambert Company, and as the result of that acquisition, the defendant, PFIZER INC., is responsible for all liabilities resulting from

the acts or omissions of the defendant, PARKE-DAVIS, which occurred prior to such acquisition.

76. On or prior to December 31, 2002, the defendant, PFIZER INC., acquired the defendant, WARNER-LAMBERT COMPANY LLC, and pursuant to the terms of and conditions of that acquisition, the defendant, PFIZER INC., is responsible for all acts or omissions of the defendant, WARNER LAMBERT-COMPANY, LLC, occurring prior to such acquisition.

77. That at all times hereinafter mentioned, upon information and belief, the defendant, PFIZER INC., presently markets and sells the drug Neurontin.

78. That on a date prior to December 25, 2004, the defendant, PFIZER INC., marketed and sold the drug Neurontin.

79. That at all times hereinafter mentioned, upon information and belief, the defendant, PFIZER INC., is engaged in the business of designing, manufacturing, advertising, marketing, and selling pharmaceutical drugs, including Neurontin, and in pursuance of this business, transacts business within the State of New York and contracts to provide goods and services in the State of New York.

80. That at all times hereinafter mentioned, upon information and belief, the defendant, PFIZER INC., committed a tortious act inside the State of New York, which caused injury to plaintiff's decedent inside the State North Carolina.

15

81.   That at all times hereinafter mentioned, upon information and belief, the defendant, PFIZER INC., committed a tortious act outside the State of New York, which caused injury to plaintiff's decedent inside the State of North Carolina.

82.   That at all times hereinafter mentioned, upon information and belief, the defendant, PFIZER INC., regularly does and solicits business and engages in a persistent course of conduct in the State of New York, deriving substantial revenue from goods and products consumed in the State of New York.

83.   That at all times hereinafter mentioned, upon information and belief, the defendant, PFIZER INC., expects or should reasonably expect its acts to have consequences in the State of New York, and derives substantial revenue from interstate or international commerce.

84.   That at all times hereinafter mentioned, upon information and belief, the defendant, PARKE-DAVIS, presently markets and sells the drug Neurontin.

85.   That on a date prior to December 25, 2004, the defendant, PARKE-DAVIS, marketed and sold the drug Neurontin.

86.   That at all times hereinafter mentioned, upon information and belief, the defendant, PARKE-DAVIS, is engaged in the business of designing, manufacturing, advertising, marketing, and selling pharmaceutical drugs, including Neurontin, and in pursuance of this business, transacts business

16

within the State of New York and contracts to provide goods and services in the State of New York.

87. That at all times hereinafter mentioned, upon information and belief, the defendant, PARKE-DAVIS, committed a tortious act inside the State of New York, which caused injury to plaintiff's decedent inside the State of North Carolina.

88. That at all times hereinafter mentioned, upon information and belief, the defendant, PARKE-DAVIS, committed a tortious act outside the State of New York, which caused injury to plaintiff's decedent inside the State North Carolina.

89. That at all times hereinafter mentioned, upon information and belief, the defendant, PARKE-DAVIS, regularly does and solicits business and engages in a persistent course of conduct in the State of New York, deriving substantial revenue from goods and products consumed in the State of New York.

90. That at all times hereinafter mentioned, upon information and belief, the defendant, PARKE-DAVIS, expects or should reasonably expect its acts to have consequences in the State of New York, and derives substantial revenue from interstate or international commerce.

91. That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY, presently markets and sells the drug Neurontin.

17

92. That on a date prior to December 25, 2004, the defendant, WARNER-LAMBERT COMPANY, marketed and sold the drug Neurontin.

93. That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY, is engaged in the business of designing, manufacturing, advertising, marketing, and selling pharmaceutical drugs, including Neurontin, and in pursuance of this business, transacts business within the State of New York and contracts to provide goods and services in the State of New York.

94. That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY, committed a tortious act inside the State of New York, which caused injury to plaintiff's decedent inside the State North Carolina.

95. That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY, committed a tortious act outside the State of New York, which caused injury to plaintiff's decedent inside the State North Carolina.

96. That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY, regularly does and solicits business and engages in a persistent

18

course of conduct in the State of New York, deriving substantial revenue from goods and products consumed in State of New York.

97.   That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY, expects or should reasonably expect its acts to have consequences in the State of New York, and derives substantial revenue from interstate or international commerce.

98.   That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY LLC, presently markets and sells the drug Neurontin.

99.   That on a date prior to December 25, 2004, the defendant, WARNER-LAMBERT COMPANY LLC, marketed and sold the drug Neurontin.

100. That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY LLC, is engaged in the business of designing, manufacturing, advertising, marketing, and selling pharmaceutical drugs, including Neurontin, and in pursuance of this business, transacts business within the State of New York.

101. That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY LLC, committed a tortious act inside the State of New York, which caused injury to plaintiff's decedent inside the State of North Carolina.

19

102. That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY LLC, committed a tortious act outside the State of New York, which caused injury to plaintiff's decedent inside the State of North Carolina.

103. That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY LLC, regularly does and solicits business and engages in a persistent course of conduct in the State of New YOrk, deriving substantial revenue from goods and products consumed in the State of New York.

104. That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY LLC, expects or should reasonably expects its acts to have consequences in the State of New York, and derives substantial revenue from interstate or international commerce.

105. That at all times hereinafter mentioned, upon information and belief, the defendant, TEVA PHARMACEUTICALS USA, INC., presently markets and sells the drug gabapentin.

106. That on a date prior to December 25, 2004, the defendant, TEVA PHARMACEUTICALS USA, INC., marketed and sold the drug gabapentin.

107. That at all times hereinafter mentioned, upon information and belief, the defendant, TEVA PHARMACEUTICALS USA,

20

INC., is engaged in the business of designing, manufacturing,
advertising, marketing, and selling pharmaceutical drugs,
including the drug gabapentin, and in pursuance of this
business, transacts business within the State of New York.

108. That at all times hereinafter mentioned, upon
information and belief, the defendant, TEVA PHARMACEUTICALS USA,
INC., committed a tortious act inside the State of New York,
which caused injury to plaintiff's decedent inside the State of
North Carolina.

109. That at all times hereinafter mentioned, upon
information and belief, the defendant, TEVA PHARMACEUTICALS USA,
INC., committed a tortious act outside the State of New York,
which caused injury to plaintiff's decedent inside the State of
North Carolina.

110. That at all times hereinafter mentioned, upon
information and belief, the defendant, TEVA PHARMACEUTICALS USA,
INC., regularly does and solicits business and engages in a
persistent course of conduct in the State of New York, deriving
substantial revenue from goods and products consumed in the
State of New York.

111. That at all times hereinafter mentioned, upon
information and belief, the defendant, TEVA PHARMACEUTICALS USA,
INC., expects or should reasonably expects its acts to have

consequences in the State of New York, and derives substantial revenue from interstate or international commerce.

## BACKGROUND

### STATEMENT OF THE CASE

112. Pursuant to the Food, Drug, and Cosmetic Act ("FDCA") 21 U.S.C. §§ 301 et seq., new pharmaceutical drugs cannot be distributed in interstate commerce unless the sponsor of the drug demonstrates to the satisfaction of the Food and Drug Administration ("FDA") that the drug is safe and effective for each of its intended uses. 21 U.S.C. § 355(a) and (d).

113. However, the FDCA does not prevent doctors from prescribing a drug approved for a particular use for other uses that are different than those approved by the FDA ("off-label" usage).

114. Nonetheless, even though physicians may prescribe drugs for "off-label" usage, the FDCA prohibits drug manufacturers themselves from marketing and promoting a drug for a use that the FDA has not approved.  21 U.S.C. § 331(d).

115. A manufacturer illegally "misbrands" a drug if the drug's labeling includes information about unapproved uses or if the manufacturer engages directly or indirectly in marketing or promoting the drug for unapproved uses.

116. Instead, if a manufacturer desires to market and promote the drug for new uses in addition to those already approved, the materials on "off-label" usage must meet certain stringent requirements and the manufacturer must resubmit the drug to the FDA testing and approval process for the proposed new use.

117. The above-described statutory and regulatory system and process was designed to protect the public, including plaintiff's decedent, from the dangers arising from drugs which, although approved for a certain specific condition, disease or purpose, could cause injury and harm if used for an "off-label" purpose without adequate study and testing of the drug for such "off-label" usage, and to protect the public, including plaintiff's decedent, from the dangers arising from deceptive, misleading, and inaccurate advertising, marketing, and promotional materials issued directly or indirectly by the manufacturer to encourage the "off-label" usage of the drug without adequate testing and study of that drug for such "off-label" usage.

118. PARKE-DAVIS, now owned by PFIZER INC., applied for, and in December, 1993, received FDA approval to market and sell Neurontin solely for "adjunctive therapy" in the treatment of certain types of seizures in adult patients suffering from epilepsy, and the FDA approved labeling of Neurontin for that

23

purpose and stated that the drug is only effective at 900 to 1800 milligrams per day.

119. At no time prior to plaintiff's decedent being prescribed Neurontin and gabapentin did defendants receive FDA approval for any other use of Neurontin and gabapentin except for the above-described treatment of epilepsy or for higher dosages for any purpose, and the FDA never approved the usage of Neurontin and gabapentin at any dosage for the treatment of pain.

120. Commencing in 1995, the Pfizer defendants, as the manufacturer of Neurontin, began to directly and indirectly advertise, market and promote Neurontin for additional "off-label" uses for which FDA approval had not been obtained, including treatment for pain, and at higher dosages than had been tested and approved, in violation of the above-described statutory and regulatory system and process, including the FDCA, which prohibits manufacturers from directly or indirectly advertising, marketing and promoting a drug for "off-label" usage, and instead requires that the manufacturer resubmit the drug to the FDA testing and approval process for the proposed new use and that the materials issued by the manufacturer relating to the proposed new use meet certain stringent requirements.

24

121. The Pfizer defendants, as the manufacturer of Neurontin, directly and indirectly advertised, marketed and promoted Neurontin for the treatment of pain, and encouraged that higher dosages than those tested be prescribed, even though the Pfizer defendants knew or should have known that there were not adequate tests and studies establishing and confirming that Neurontin was safe and effective for the treatment of pain, and even though the Pfizer defendants knew or should have known that there were no adequate studies showing that Neurontin was safe when prescribed at dosages higher than those approved by the FDA.

122. At all times hereinafter mentioned, upon information and belief, the Pfizer defendants marketed and promoted Neurontin for the treatment of pain, even though the Pfizer defendants knew or should have known that Neurontin caused many symptoms or related risk factors associated with suicidal behavior by persons suffering from pain.

123. At all times hereinafter mentioned, upon information and belief, the Pfizer defendants marketed and promoted Neurontin for the treatment of pain, even though the Pfizer defendants knew or should have known that Neurontin had no effect in relieving or correcting the symptoms or causes of pain.

124. The Pfizer defendants' conduct in promoting "off-label" uses of Neurontin for treatment of pain, constituted a wanton, callous and reckless disregard of the safety of the public and, in particular of persons suffering from pain.

125. In promoting "off-label" uses of Neurontin, and at higher dosages than approved by the FDA, including treatment pain, the Pfizer defendants acted without regard to the potential danger and harm to persons for whom the drug was prescribed for the treatment of pain.

126. The Pfizer defendants actively distributed, sold and placed Neurontin into the stream of commerce and directly and indirectly advertised, marketed and promoted Neurontin as being safe and effective for the treatment of pain and in dosages higher than those approved by the FDA, even though the only approved use of Neurontin at that time was as "adjunctive therapy" for the treatment of epilepsy and even though the FDA had specified a maximum recommended dosage.

127. Neurontin is not reasonably safe and effective for the treatment of persons suffering from pain, and is not reasonably safe when consumed in higher dosages than those approved by the FDA, and the Pfizer defendants' conduct of illegally advertising, marketing and promoting Neurontin for this "off-label" use was unlawful, deceptive and misleading and was violative of the FDCA.

128. By reason of the Pfizer defendants' conduct of directly and indirectly advertising, marketing and promoting Neurontin for the treatment of pain, in an unlawful manner, physicians commenced prescribing Neurontin to their patients diagnosed as suffering from pain, frequently at dosages higher than those approved by the FDA.

129. Upon information and belief, the defendant, WARNER-LAMBERT COMPANY LLC; was indicted in the United States District Court for the District of Massachusetts for violations of 21 U.S.C. §§ 331(a), 331(d), 333(a), 352(f)(1) and 355, and a copy of such criminal Information is annexed hereto as Exhibit "B" and incorporated into this complaint by reference.

130. Upon information and belief, on or about the 7th day of June, 2004, the defendant, WARNER-LAMBERT COMPANY LLC, formally pled guilty to all charges contained in the Information.

131. On October 8, 2004, defendant Teva received approval from the Food and Drug Administration for its Abbreviated New Drug Application ("ANDA") to distribute gabapentin in capsule form.

132. Defendant Teva was able to obtain approval to manufacture gabapentin, the generic version of the brand name drug Neurontin, without performing their own safety and effectiveness studies by submitting an ANDA to the FDA. 21 U.S.C. § 355 et seq.

27

133. The ANDA process allowed defendant Teva to submit data which demonstrated that the generic drug gabapentin is the same as the previously approved brand name drug Neurontin in regard to: active ingredients; method of administration and dosage; prescribed usage recommended in the labeling; and that the proposed drug is "bioequivalent" to the prior approved drug. 21 U.S.C. § 355(j)(2)(A).

134. In essence, in view of the regulatory scheme enacted by Congress and the FDA, the generic manufacturer adopts the studies, labeling, warnings and representations of the brand name manufacturer, without independent investigation in order to gain approval of the generic drug through an expedited process.

135. Pursuant to 21 C.F.R. § 314.70, manufacturers, such as defendant Teva, who have received approval for a generic drug pursuant to the ANDA process, are allowed to amend a drug's labeling without receiving FDA prior approval in order to, inter alia, add or strengthen a contraindication, warning, precaution, or adverse reaction; add or strengthen an instruction about dosage and administration that is intended to increase the safe use of the drug product; and delete false, misleading, or unsupported indications for use or claims for effectiveness. Moreover, manufacturers such as defendant Teva, may apply to the FDA for approval to amend a drug's labeling, subsequent to

28

receiving the initial ANDA approval, to strengthen a contradiction, warning, precaution, etc.

136. A Press Release posted on the internet site of defendant Teva's parent, Teva Pharmaceuticals Industries Ltd., on October 8, 2004, demonstrates that defendant Teva was well aware that Neurontin was a $1.7 billion dollar drug for just the twelve-month period ending in June 2004. It is reasonable to assume that a sophisticated manufacturer such as defendant Teva also was well aware that the due to the sheer volume of recorded sales of Neurontin, and that the brand name drug was being promoted and prescribed for off-label uses and for uses other than the sole use that was approved by the FDA, namely, for treatment for epilepsy.

137. That defendant Teva was aware of the studies, off-label usage, etc., and did not change the label, and/or failed to apply to the FDA to change the label subsequent to receiving approval of the ANDA for gabapentin, to caution against same demonstrates that defendant Teva was a willing beneficiary of, and indirectly participated in, and continued to perpetuate the fraudulent, negligent and reckless conduct as alleged herein.

138. The drugs Neurontin and gabapentin were ineffective in the treatment of the causes and symptoms of plaintiff's decedent's pain, and plaintiff's decedent sustained injury and harm by reason of this reliance upon Neurontin and gabapentin to

be effective in the treatment as prescribed by his physicians of such pain.

139. That at all times hereinafter mentioned, plaintiff's decedent was diagnosed by his physician as suffering from pain, and was being treated by his physician for such condition.

140. That at all times hereinafter mentioned, upon information and belief, in reliance upon defendants' direct and indirect advertising, marketing and promoting of Neurontin and gabapentin as being safe and effective for the treatment of pain, plaintiff's decedent's physician prescribed Neurontin and gabapentin to treat plaintiff's decedent's pain.

141. That prior to December 11, 2004, plaintiff's decedent was provided with and consumed samples of Neurontin manufactured and distributed by the Pfizer defendants, as recommended and prescribed by plaintiff's decedent's physician.

142. That on December 11, 2004, plaintiff's decedent purchased 90 300-milligram gabapentin capsules manufactured and distributed by defendant Teva, as recommended and prescribed by plaintiff's decedent's physician.

143. That at all times hereinafter mentioned, plaintiff's decedent purchased and consumed Neurontin and gabapentin, as recommended and prescribed by his physician and in the dosages prescribed, in an effort to control the effects of pain.

30

144. The drugs Neurontin and gabapentin were not safe and effective for the treatment of plaintiff's decedent's pain, and plaintiff's decedent sustained injury and harm by reason of his consumption of Neurontin and gabapentin as prescribed by his physician in an effort to treat his pain.

145. The drugs Neurontin and gabapentin were ineffective in the treatment of the causes and symptoms of plaintiff's decedent's pain, and plaintiff's decedent sustained injury and harm by reason of this reliance upon Neurontin and gabapentin to be effective in the treatment as prescribed by his physician of such pain.

146. By reason of plaintiff's consumption of Neurontin and gabapentin in a manner and at a dosage prescribed by his physician in an effort to treat his pain, on December 25, 2004, plaintiff's decedent committed suicide.

147. The injuries sustained by plaintiff's decedent were caused by or were contributed to by plaintiff's decedent's consumption of Neurontin and gabapentin at a dosage prescribed by his physician for the treatment of pain, in a manner consistent with the direct and indirect advertising, marketing and promoting of this drug for such "off-label" use by the defendants.

## AS AND FOR A FIRST CAUSE OF ACTION
## AGAINST THE PFIZER DEFENDANTS FOR NEGLIGENCE

148. Plaintiff repeats and reiterates the allegations previously set forth herein.

149. That at all times hereinafter mentioned, the Pfizer defendants were under a duty to exercise reasonable care in the design and development of Neurontin, in particular, in the advertising, marketing and promoting of Neurontin, both directly and indirectly, to ensure that Neurontin was not used in the treatment of conditions such as pain, for which it was not effective and to ensure that Neurontin was not used in a manner or to treat conditions where the Pfizer defendants knew or should have known that the user could sustain injuries and harm from the drug.

150. That the Pfizer defendants negligently, recklessly, grossly negligently, wantonly and willfully displayed a morally culpable and conscious disregard of the rights of others in that they failed to exercise reasonable care and failed to fulfill the above-stated duty by the manner that the Pfizer defendants, directly and indirectly, advertised, marketed and promoted Neurontin for the treatment of pain, even though Neurontin had not been scientifically determined to be safe for such use and even though Neurontin was, in fact, not reasonably safe for such use, and furthermore, the Pfizer defendants failed to adequately

32

warn of the risk of suicide or aggressive, self-destructive

behavior of which the Pfizer defendants knew or should have

known about.

151. That the Pfizer defendants were further negligent,

reckless, grossly negligent, wanton and willfully displayed a

morally culpable and conscious disregard of the rights of others

by manufacturing, distributing, selling, advertising, marketing

and promoting Neurontin even though such drug was not safe or ·

effective for any purpose because it caused or influenced

persons using the drug for any purpose to engage in self-

destructive behavior including committing suicide and by failing

to adequately warn the public of such risks.

152. The aforesaid incident and the injuries sustained by

plaintiff's decedent were caused by or were contributed to by

the negligence, recklessness, gross negligence, wantonness,

willfulness, and conscious and callous disregard of the safety

of the public, including plaintiff's decedent, on the part of

the Pfizer defendants in the design, manufacture, distribution,

advertising, marketing and promoting of Neurontin as being safe

and effective in the treatment of pain, and by inducing the

public, including plaintiff's decedent, to believe that

Neurontin was effective in the treatment of the causes and

symptoms of pain.

33

153. That at all times hereinafter mentioned, upon information and belief, the above-described culpable conduct by the Pfizer defendants was a proximate cause of injuries sustained by plaintiff's decedent.

154. That at all times hereinafter mentioned, plaintiff's decedent did not contribute to his injuries by reason of any negligence or culpable conduct on his part.

155. That as a result of the aforesaid occurrence, the injuries sustained by and the death of plaintiff's decedent resulting there from, plaintiff's decedent's beneficiaries suffered extensive monetary and pecuniary losses and other compensatory damages were also incurred and paid out including necessary medical, hospital, funeral and concomitant expenses. In addition, plaintiff's decedent was deprived of a chance for effective and/or successful treatment.

156. By reason of the foregoing, plaintiff's decedent's beneficiaries sustained damages in a sum which exceeds the jurisdictional limits of all lower courts which would have jurisdiction of this matter, and in addition, plaintiff seeks punitive and exemplary damages against the Pfizer defendants in an amount to be determined upon the trial of this matter.

## AS AND FOR A SECOND CAUSE OF ACTION
## AGAINST THE PFIZER DEFENDANTS FOR BREACH OF WARRANTY

157. Plaintiff repeats and reiterates the allegations previously set forth herein.

158. That at all times hereinafter mentioned, upon information and belief, the Pfizer defendants, by directly and indirectly advertising, marketing and promoting Neurontin for the treatment of pain, and by placing this drug in the stream of commerce knowing that Neurontin would be prescribed for the treatment of pain, in reliance upon the representations of the Pfizer defendants, expressly warranted to all foreseeable users of this drug, including plaintiff's decedent, that Neurontin was safe and effective for the treatment of pain.

159. That the Pfizer defendants impliedly warranted in manufacturing, distributing, selling, advertising, marketing and promoting Neurontin to all foreseeable users, including plaintiff's decedent, that Neurontin was safe and effective for the purposes for which it had been placed in the stream of commerce by the Pfizer defendants, including for the treatment of pain, and that Neurontin was reasonably safe, proper, merchantable and fit for the intended purposes, including for the treatment of pain.

35

160. That at all times hereinafter mentioned, plaintiff's decedent relied upon the aforesaid express and implied warranties by the Pfizer defendants.

161. That at all times hereinafter mentioned, plaintiff's decedent's use of Neurontin prior to and up to the time of the above-described incident was consistent with the purposes for which the Pfizer defendants directly and indirectly advertised, marketed and promoted Neurontin, and plaintiff's decedent's use of Neurontin was reasonably contemplated, intended and foreseen by the Pfizer defendants at the time of the distribution and sale of Neurontin by the Pfizer defendants, and, therefore, plaintiff's decedent's use of Neurontin was within the scope of the above-described express and implied warranties.

162. The Pfizer defendants breached the aforesaid express and implied warranties because Neurontin was not safe and effective for the treatment of pain, and because plaintiff's decedent's use of Neurontin for the treatment of pain, caused or contributed to the incident described herein.

163. Plaintiff gave appropriate notice to the Pfizer defendants of the breach of the aforesaid express and implied warranties or such notice was otherwise excused.

164. By reason of the foregoing, plaintiff's decedent's beneficiaries sustained damages in a sum which exceeds the jurisdictional limits of all lower courts which would have

36

jurisdiction of this matter, and in addition, plaintiff seeks

punitive and exemplary damages against the Pfizer defendants in

an amount to be determined upon the trial of this matter.

**AS AND FOR A THIRD CAUSE OF ACTION**
**AGAINST THE PFIZER DEFENDANTS FOR PRODUCTS LIABILITY**

165. Plaintiff repeats and reiterates the allegations

previously set forth herein.

166. That at all times hereinafter mentioned, the drug

Neurontin was not suited for the treatment of pain, and was not

safe and effective for the treatment of pain, even though the

Pfizer defendants directly and indirectly advertised, marketed

and promoted Neurontin for such use.

167. That at all times hereinafter mentioned, the drug

Neurontin was not safe and was not suited for the purposes for

which the Pfizer defendants, directly and indirectly,

advertised, marketed and promoted the drug at the time the

Pfizer defendants designed, manufactured, distributed and sold

the drug and placed the drug in the stream of commerce.

168. That at all times hereinafter mentioned, upon

information and belief, the Pfizer defendants assumed a strict

products liability to users and to persons using Neurontin,

including plaintiff's decedent, who sustained injuries, harm and

damages by reason of the use of Neurontin for purposes directly

37

and indirectly advertised, marketed, and promoted by the Pfizer defendants, including for the treatment of pain.

169. By reason of the foregoing, plaintiff's decedent's beneficiaries sustained damages in a sum which exceeds the jurisdictional limits of all lower courts which would have jurisdiction of this matter, and in addition thereto, plaintiff seeks punitive and exemplary damages against the Pfizer defendants in an amount to be determined upon the trial of this matter.

### AS AND FOR A FOURTH CAUSE OF ACTION
### AGAINST THE PFIZER DEFENDANTS FOR FRAUDULENT MISREPRESENTATION

170. Plaintiff repeats and reiterates the allegations previously set forth herein.

171. The Pfizer defendants materially misrepresented material facts concerning the safety and effectiveness of Neurontin in the treatment of pain.

172. The Pfizer defendants' affirmative misrepresentations include but are not limited to the acts set forth in the following paragraphs.

173. In or about 1993, the Pfizer defendants submitted a new drug application (NDA) for approval of a drug called Neurontin (also known by the chemical name "gabapentin"), which was a new drug within the meaning of 21 U.S.C. § 321(p) and 21 C.F.R. § 310.3(h)(4) and (5). In that application, the Pfizer

38

defendants sought to demonstrate the drug's safety and efficacy for, and sought approval for, use only as adjunctive therapy in the treatment of partial seizures with and without secondary generalization in adults with epilepsy. On or about December 30, 1993, the FDA approved Neurontin for that specific use only. Because the Pfizer defendants had not sought approval of any other uses nor submitted information in its NDA which demonstrated the safety and efficacy of Neurontin for any such uses, Neurontin was not approved for any use or condition other than that approved use.

174. Commencing in at least June of 1995 and continuing through at least the date of this incident, unapproved uses for Neurontin included post-herpetic neuralgia, painful diabetic neuralgia, anxiety disorder, social phobias, bipolar disorder, alcohol withdrawal syndrome, amyotrophic lateral sclerosis (ALS), spinal cord injury, essential tremor, restless leg syndrome, reflex sympathetic dystrophy (RSD), and migraine headaches, among other uses.

175. The Pfizer defendants did not file a new NDA seeking FDA approval for any of these unapproved uses at any time prior to the date of this incident.

176. The Pfizer defendants conducted evaluations of the market potential for certain of the unapproved uses for Neurontin, including but not limited to:  post-herpetic

39

neuralgia, painful diabetic neuralgia, anxiety disorder, social

phobias, and bipolar disorder.

177. In or about the fall of 1995, the Pfizer defendants'

Southeast Customer Business Unit ("SECBU") created a planning

document regarding Neurontin, which included a page titled:

"SECBU RIGHT ON THE MARK WITH NEURONTIN AND PAIN" over a picture

of a target and listed "Neurontin for Pain Strategies" including

plans for conference calls on pain and a pain consultant

meeting.

178. Certain of the Pfizer defendants' annual strategic

plans and other marketing planning documents for Neurontin

included quarterly and annual goals, objectives, strategies and

tactics for increasing sales of the unapproved uses of the

drug.  The marketing plans budgeted for and funded these

tactics.

179. Commencing in early 1995 and continuing at least

through the date of this incident, the Pfizer defendants

determined not to seek FDA approval for certain unapproved uses.

180. In or about April and May of 1995, the Pfizer

defendants performed a marketing assessment of proposed

psychiatric indications for Neurontin.  In that marketing

assessment, the Pfizer defendants forecast potential revenue

from Neurontin for bipolar disorder and anxiety treatment under

two scenarios:  with and without FDA approval.  The Pfizer

40

defendants' Neurontin Development Team and New Product Committee reviewed the potential psychiatric uses and concluded that the Pfizer defendants would not seek approval to promote and sell the drug for these unapproved uses.

181. In or about July of 1995, the Pfizer defendants' assessment of Neurontin's market potential for neuropathic pain was distributed to the Pfizer defendants' Neurontin Development Team and to the Pfizer defendants' Vice President for marketing. That assessment stated that "there is no intention to fully develop the indication at this point." Full development would have required submission of an NDA to the FDA for approval.

182. One of the principal factors the Pfizer defendants considered in determining whether to seek approval for Neurontin for other uses was the short patent protection available for Neurontin. Another factor was the negative impact such approval might generate on potential sales of another drug that the Pfizer defendants were developing. The Pfizer defendants expected this new drug would be approved by the FDA not only for epilepsy but also for a variety of uses beyond Neurontin's approved use.

183. Once Neurontin's patent expired, other companies could seek approval to distribute generic equivalents of Neurontin. Such approval, however, would be limited to the approved

therapeutic use for Neurontin set forth in the Pfizer defendants' original NDA approval for Neurontin.  If the Pfizer defendants sought and obtained approval for any of the unapproved uses, then upon expiration of the patent, generic equivalents of Neurontin could also be sold for those unapproved uses.  The Pfizer defendants were concerned that under those circumstances the generic equivalents would undermine sales of the new drug that was under development.

184. Commencing about June of 1995 until at least the date of this incident, by certain conduct described in greater detail below, the Pfizer defendants promoted the sale and use of Neurontin for certain conditions other than the approved use.

185. In October 1995, a member of the Pfizer defendants' Epilepsy Disease Team circulated a memorandum to a group including other senior members of the Pfizer defendants' Epilepsy Disease Team noting that data purchased from an outside vendor showed that doctors had reported that the main message of certain sales pitches (known as "details"), given by 10 of 50 of the Pfizer defendants' sales representatives for whom data was available in a two-month period, was for off-label use of Neurontin.  Nine were for pain and one was for reflex sympathetic dystrophy, a painful nerve damage syndrome.

42

186. On or about July 10, 1996, the Pfizer defendants' sales representative met with a doctor in Monroe, Louisiana, and detailed a doctor on Neurontin for the treatment of pain.

187. Also in 1996, a sales representative created a document that stated that sales representatives could ask doctors during a Neurontin detail if they ever used other anti-epileptic drugs for painful neuropathies and could mention that approximately 35% of all Neurontin use is non-seizure. This same document, entitled "Neurontin Can Do/Can't Do," stated that sales representatives could present lunch programs on Neurontin and pain. The document indicated that it was to be forwarded to the Northcentral Customer Business Unit.

188. The Pfizer defendants employed "medical liaisons" who were presented to physicians as employees of the company's Medical and Scientific Affairs Department. On the following occasions, which are not all-inclusive, the Pfizer defendants' medical liaisons promoted Neurontin for unapproved uses:

(a) In or about June of 1996, the Pfizer defendants' sales representative requested that the Pfizer defendants' medical liaison make a presentation at Longwood Gardens in Kennett Square, Pennsylvania, to a group of physicians who were members of a local medical society.

(b) The sales representative and the medical liaison selected the topic for the presentation to the local medical

43

society.   After deciding in consultation with the sales
representative that Neurontin would be the topic of the
presentation, the medical liaison prepared the presentation.

(c)   Among the topics of the presentation was the use
of Neurontin for unapproved uses.

(d)   During the presentation, in the presence of the
sales representative, the medical liaison promoted the use of
Neurontin in the treatment of a number of unapproved uses.

(e)   After the presentation, the Pfizer defendants'
Medical Director praised the event as "another great example of
use of the medical liaisons" and an area business manager called
it an "outstanding utilization of . . . one of the medical
affairs liaisons."

189. The Pfizer defendants organized a consultant meeting
at the Jupiter Beach Resort in Palm Beach, Florida, on April 19-
21, 1996.  Approximately 42 physicians attended the meeting,
including nine physicians who made presentations relating to
unapproved uses of Neurontin.

190. The Pfizer defendants invited certain doctors to this
meeting based upon their history of writing a large number of
prescriptions for Neurontin or similar drugs.  As part of this
event, the Pfizer defendants paid for accommodations and meals
for the invited doctors and their spouse or guest, and paid an
honorarium to each of the doctor attendees.

44

191. Among the presentations made to the physicians in attendance was one relating to unapproved uses entitled "Reduction of Pain Symptoms During Treatment with Gabapentin." In the meeting's agenda, this presentation was listed as "Anticonvulsant Advances." During this presentation, Neurontin was promoted for use in the treatment of pain.

192. Another presentation made at the Jupiter Beach conference was entitled "Anticonvulsant Advances: Nonepileptic Uses of Anti Epileptic Drugs." During this presentation, Neurontin was promoted for use in the treatment of essential tremor, episodic dyscontrol and pain.

193. On or about May 8, 1996, following the Jupiter Beach conference, the Pfizer defendants circulated to employees in the Northeast region the agenda to the meeting, specifying the off-label topics, the faculty list, the attendee list and presentation abstracts discussing the off-label content of the presentations.

194. From August 1-5, 1996, the Pfizer defendants organized an "advisory board meeting," in Atlanta, Georgia, in conjunction with the 1996 Summer Olympics. The Pfizer defendants expressly instructed several of the physician speakers to address some of the unapproved uses.

195. During that meeting, the Pfizer defendants hosted doctors at the Chateau Elan Winery and Resort, in Atlanta,

Georgia, and paid all the expenses for eighteen "consultants" and their spouses to attend the Olympics, including tickets to the closing ceremonies.  The Pfizer defendants already had numerous opportunities to consult with the doctors and, in fact, many of them had spoken on the Pfizer defendants' behalf at prior meetings.

196. Certain of the physician speakers promoted Neurontin for unapproved uses in their presentations.

197. On or about March 1, 1996, the Pfizer defendants sponsored a teleconference moderated by the Pfizer defendants' employee with a pain specialist as a speaker on Neurontin.  The speaker promoted Neurontin for the treatment of pain to doctors participating in the teleconference.

198. In or about May, 1996, the Pfizer defendants' Medical Director held such a teleconference entitled "Neurontin, A Clinical Update" in which the Medical Director promoted off-label uses of Neurontin to the doctors participating in the teleconference.

199. The Pfizer defendants hosted dozens of "consultants" meetings between late 1995 and 1997 in which the "consultants" received payments and gratuities as well as presentations on "off-label" Neurontin use designed to change the physicians' prescription writing habits.  Such consultants' meetings included, but were not limited to the following:

46

| Topic | Location | Dates |
|-------|----------|-------|
| Mastering Epilepsy | La Costa Resort, CA | July 20-23, 1995 |
| Mastering Epilepsy | Santa Fe, NM | Nov. 16-19, 1995 |
| Neurontin Consultants Conference | Marco Island, FL | Feb. 2-4, 1996 |
| Pediatric Epilepsy | Hutchinson Island, FL | Feb. 9-11, 1996 |
| Mastering Epilepsy Science | Walt Disney World, FL | Feb. 22-25, 1996 |
| Pediatric Epilepsy | Hutchinson Island, FL | Mar. 8-10, 1996 |
| Mastering Epilepsy | Ritz Carlton, Aspen, CO | Apr. 18-21, 1996 |
| Affective Disorders in Psychiatry | Marco Island, FL | Apr. 20, 1996 |
| Neurological Consultants (discussed previously) | Jupiter Beach, FL | Apr. 19-21, 1996 |
| Affective Disorder Consultants Conference | Southern Pines, NC | Apr. 27, 1996 |
| Neuropathic Pain Conference | Palm Beach, FL | May 11, 1996 |
| Regional Consultants Conference | Ritz Carlton, Boston, MA | May 10-11, 1996 |
| Epilepsy Management Advisors Meeting | Sheraton Grande Torrey Pines, La Jolla, CA | June 21-23, 1996 |
| Epilepsy Management | Rancho Bernardo, CA | June 28-30, 1996 |
| Use of Anti-Convulsants in Psychiatric Disorders | Short Hills, NJ | Oct. 18-19, 1996 |
| Non-epileptic Uses of Neurontin | Longboat Key, FL | Nov. 6, 1996 |

Neurological                Ritz Carlton,              Sep. 27-28, 1997
Conditions Conference       Atlanta, GA

Other "consultants" meetings took place at Charleston, SC,

Coconut Grove, FL, Naples, FL, Memphis, TN, Louisville, KY,

Washington, DC, Aspen, CO, and other places.  Hundreds, if not

thousands, of physicians received kickbacks to attend these

events.

    200. The Pfizer defendants rewarded doctors for their

advocacy of Neurontin by paying them honoraria for lending their

names to scientific articles which were actually prepared and

written by third parties retained by the Pfizer defendants.  In

1996, the Pfizer defendants retained AMM/ADELPHI, Ltd. and

Medical Education Systems, Inc., to prepare no less than twenty

(20) articles for publication in various neurology and

psychiatry journals.  Most of these articles concerned "off-

label" usage of Neurontin and were generated so that the Pfizer

defendants could completely control the publications distributed

pursuant to its "publications strategy."  The content of these

articles were actually written by non-physician technical

writers retained by the Pfizer defendants and the Pfizer

defendants had the right to control the content of all the

articles.  The Pfizer defendants paid all expenses in connection

with the creation of these publications.

48

201. The Pfizer defendants also founded a speakers' bureau, another method of making large and numerous payments to physicians who recommended Neurontin for "off-label" uses, together with teleconferences, dinner meetings, consultants meetings, educational seminars, and other events.

202. The Pfizer defendants utilized medical liaisons who were provided with new company slides that detailed methods to increase "off-label" use of Neurontin, including the following:

Reflex sympathetic dystrophy (RSD)

Peripheral neuropathy

Diabetic neuropathy

Trigeminal neuralgia

Post-herpetic neuralgia

Essential tremor

Restless leg syndrome (RLS)

Attention deficit disorder (ADD)

Periodic limb movement disorder

Migraine

Bipolar disorder

Amyotrophic lateral sclerosis (ALS/Lou Gehrig's Disease)

Drug or alcohol withdrawal seizures

203. The following enumerated misrepresentations, which are not intended to be all-inclusive, relating to "off-label" usage

of Neurontin were routinely made to physicians with the knowledge and consent of marketing personnel of the Pfizer defendants:

a.    *Bipolar Disorder*.  Medical liaisons informed psychiatrists that early results from clinical trials evaluating Neurontin for the treatment of bipolar disorder indicated ninety percent (90%) response rate when Neurontin was started at 900 mg/day dosage and increased to a dosage of 4800 mg/day.  No such results existed.

b.    *Peripheral Neuropathy, Diabetic Neuropathy, and Other Pain Syndromes*.  Medical liaisons stated that clinical trials demonstrated that Neurontin was highly effective in the treatment of various pain syndromes and that a ninety percent (90%) response rate in the treatment of pain was being reported.  No such body of evidence existed.  The Pfizer defendants continued to claim that physicians should use Neurontin at substantially higher doses than indicated by the labeling.  Indeed, although medical liaisons routinely claimed Neurontin to be effective as monotherapy, in 1997 the FDA refused to find Neurontin as a safe and effective monotherapy.

c.    *Reflex Sympathetic Dystrophy ("RSD")*.  Medical liaisons informed physicians that extensive evidence demonstrated the efficacy of Neurontin in the treatment of RSD.

50

The only such evidence that existed was anecdotal reports of nominal scientific value.

d.    *Attention Deficit Disorder ("ADD")*.  Medical liaisons were instructed to inform pediatricians that Neurontin was effective for the treatment of ADD.  No data, other than occasional anecdotal evidence, supported this claim.

e.    *Restless Leg Syndrome ("RLS")*.  RLS was another condition where the Pfizer defendants' medical liaisons were trained to refer to a growing body of data relating to the condition, when no scientific data existed.

f.    *Trigeminal Neuralgia*.  Although medical liaisons represented that Neurontin could treat trigeminal neuralgia, again no scientific data supported this claim with the exception of occasional anecdotal reports.  No data demonstrated that Neurontin was as effective as currently available pain killers, most of which were inexpensive.

g.    *Post-Herpetic Neuralgia ("PHN")*.  Medical liaisons were trained to tell physicians that seventy-five percent (75%) to eighty percent (80%) of all PHN patients were successfully treated with Neurontin.  Once again, no clinical trial data supported such a claim.

h.    *Essential Tremor Periodic Limb Movement Disorder ("ETPLMD")*.  Medical liaisons were trained to allege that Neurontin was effective in the treatment of these conditions.

51

No scientific data supported such claims with the exception of anecdotal reports of nominal scientific value.

i. *Migraine*. Claims that Neurontin was effective in the treatment of migraine headaches were made by the medical liaisons and were supposedly based on early results from clinical trials. Although pilot studies had been such suggested and undertaken, no early results of clinical trials existed to support these claims. Once again, any data relating to treatment of migraines was purely anecdotal and of nominal scientific value. Most of the case reports were either created or sponsored by the Pfizer defendants.

j. *Drug and Alcohol Withdrawal Seizures*. Medical liaisons suggested that Neurontin be used in the treatment of drug and alcohol withdrawals despite the lack of any data supporting Neurontin as an effective treatment for these conditions.

204. The Pfizer defendants sponsored a 1998 study, which was scientifically valid, conducted at the Harvard Bipolar Research Program, which concluded that patients receiving Neurontin did worse than those on sugar pills, but even though the Pfizer defendants were fully aware of these results from the tests which they sponsored, the Pfizer defendants did not publish the results until two years later after a substantial number of physicians had already been induced to prescribe

52

Neurontin and a substantial number of patients had already been
induced to take Neurontin.

205. At each of the presentations known to the plaintiff's
decedent concerning Neurontin on pain, at least one of the
presenters expressly stated or implied that Neurontin was
effective for the treatment of pain. A representative statement
was made by Dr. David Longmire, a participating physician, at
the Jupiter Beach Consultants Meeting in April 1996 when he
stated that Neurontin was effective for the treatment of pain.
Dr. Longmire repeated that statement at a May 1996 Consultants
Meeting at the Ritz Carlton in Boston. Another physician
participant, Dr. Steven Schacter, made a similar statement at
the May 1996 meeting when he stated that "pain specialists are
finding that low dosages of Neurontin are effective."
Comparable statements were made by another physician
participant, Dr. Bruce Nicholson, in April 1996 at the Jupiter
Beach Consultants Meeting, in May 1996 at the Boston Ritz
Carlton Consultants Meeting, and in June 1996 at a Philadelphia
Consultants Meeting. Upon information and belief, similar
statements were made at all events presented by the Pfizer
defendants that discussed Neurontin's use for pain indications.
These events include, but are not limited to the following
events:

| Topic | Date | Location |
|---|---|---|
| Neurontin Consultants Meeting | Apr. 19-21, 1996 | Jupiter Beach, FL |
| Neurontin Consultants Meeting | May 3-4, 1996 | Philadelphia, PA |
| Neurontin Consultants Meeting | May 10-11, 1996 | Boston, MA |
| Advisory Board Meeting | Apr. 14-16, 2000 | Grand Wailea Resort Hotel & Spa, Maui, HI |
| Merritt-Putnam Speakers Training Advanced Perspectives in the Management of Neurological and Mood Disorders | Apr. 28-30, 2000 | Enchantment Resort Sedona, AZ |
| New Treatment Options for the Management of Pain: The Role of Anticonvulsants | Apr. 2000 | Four Seasons Irving, TX |
| Advisory Board Meeting | May 26, 2000 | Disney Yacht Club Orlando, FL |
| New Directions in the Understanding and Treatment of Pain | Mar. 24, 2001 | Plaza Hotel New York, NY |
| New Directions in the Understanding and Treatment of Pain | Mar. 2-3, 2001 | Hilton Novi Detroit, MI |
| New Directions in the Understanding and Treatment of Pain | May 4-5, 2001 | Westin Galleria Houston, TX |
| New Directions in the Understanding and Treatment of Pain | Feb. 9-10, 2001 | Harbor Court Hotel Baltimore, MD |

| | | |
|---|---|---|
| New Directions in the Understanding and Treatment of Pain | Mar. 9-10, 2001 | Fairmont Kansas City Kansas City, MO |
| New Directions in the Understanding and Treatment of Pain | May 11-12, 2001 | Peabody Memphis Memphis, TN |
| New Directions in the Francisco Understanding and Treatment of Pain | Mar. 16-17, 2001 | Fairmont San <br><br> San Francisco, CA |
| Advisory Board Meeting | June 16-18, 2000 | Westin Resort Hilton Head, SC |
| New Directions in the Understanding and Treatment of Pain | May 18-19, 2001 | Sheraton Universal City, Universal City, CA |
| New Directions in the Understanding and Treatment of Pain | May 18-19, 2001 | Miami Biltmore Miami, FL |
| New Directions in the Understanding and Treatment of Pain | Mar. 23-24, 2001 | Ritz Carlton New Orleans, New Orleans, LA |
| New Directions in the Understanding and Treatment of Pain | Mar. 23-24, 2001 | Sheraton Music City Nashville, TN |
| New Directions in the Understanding and Treatment of Pain | Mar. 30-31, 2001 | Ritz Carlton St. Louis, St. Louis, MO |
| New Directions in the Treatment of Neuropathic Pain | Oct. 9-11, 1998 | Madeira, Portugal |

206. At events produced by the Pfizer defendants, physician participants routinely stated that Neurontin was effective for the treatment of restless leg syndrome or RSD. Events presented by the Pfizer defendants that discussed Neurontin's use as a

55

treatment for restless leg syndrome or RSD include, but are not

limited to, the following event:

| Topic | Date | Location |
|-------|------|----------|
| Advisory Board Meeting | Mar. 29, 2000 | Hyatt Regency Hotel San Antonio, TX |

207. At events produced by the Pfizer defendants, physician

participants routinely stated that Neurontin was effective for

the treatment of bipolar disorder. Events presented by the

Pfizer defendants that discussed Neurontin's use as a treatment

for bipolar disorder include, but are not limited to, the

following events:

| Topic | Date | Location |
|-------|------|----------|
| Advisory Board Meeting | Mar. 29, 2000 | Hyatt Regency Hotel San Antonio, TX |
| Parke-Davis Speakers Bureau Meeting | Jan. 21-23, 2000 | Fairmont Scottsdale Princess, Scottsdale, AZ |
| Merritt-Putnam Speakers Bureau Current Perspectives in the Understanding of Neurobehavioral Disorders | Mar. 24-26, 2000 | Four Seasons Regent Beverly Wilshire Beverly Hills, CA |
| Merritt-Putnam Speakers Bureau | Apr. 7-9, 2000 | Wyndham New Orleans at Canal Place, New Orleans, LA |
| Merritt-Putnam Speakers Training Advanced Perspectives in the Management of Neurological and Mood Disorders | Apr. 28-30, 2000 | Enchantment Resort Sedona, AZ |

| | | |
|---|---|---|
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 16, 1998 | Maison Robert Boston, MA |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 16, 1998 | Sunset Grill Nashville, TN |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 16, 1998 | Pescatore Fish Cafe Seattle, WA |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 17, 1998 | Patrick's Bayside Bistro, St. Pete's Beach, FL |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 17, 1998 | Heathman Hotel Portland, OR |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 18, 1998 | Downtown Club Philadelphia, PA |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 18, 1998 | Morton's of Chicago Buckhead, Atlanta, GA |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 18, 1998 | Huntington Hotel San Francisco, CA |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 19, 1998 | Brass Elephant Baltimore, MD |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mar. 19, 1998 | Ristorante DeGrezia New York, NY |
| The Use of Anticonvulsants in Psychiatry | Oct. 23-25, 1998 | Barcelona, Spain |

208. At events produced by the Pfizer defendants, physician participants routinely stated that Neurontin was effective for

57