# EXHIBIT B

17950    Federal Register / Vol. 57, No. 82 / Tuesday, April 28, 1992 / Rules and Regulations

# DEPARTMENT OF HEALTH AND HUMAN SERVICES

## Food and Drug Administration

### 21 CFR Parts 2, 5, 10, 310, 314, 320, and 433

[Docket No. 85N-0214]

RIN 0905-AB63

### Abbreviated New Drug Application Regulations

**AGENCY:** Food and Drug Administration, HHS.

**ACTION:** Final rule.

**SUMMARY:** The Food and Drug Administration (FDA) is issuing final regulations for most of its requirements for abbreviated new drug applications (ANDA's). FDA published a proposed rule for ANDA's in the Federal Register of July 10, 1989 (54 FR 28872). These regulations implement title I of the Drug Price Competition and Patent Term Restoration Act of 1984 (Pub. L. 98-417) (the 1984 amendments). This final rule covers subjects such as ANDA content and format, approval and nonapproval of an application, and suitability petitions. This rule does not finalize the provisions of the proposed rule on patent certification and market exclusivity; FDA is still examining the issues pertaining to those provisions and will finalize them in a future edition of the Federal Register.

**EFFECTIVE DATE:** The regulations will become effective on June 29, 1992.

**FOR FURTHER INFORMATION CONTACT:** Philip L. Chao, Center for Drug Evaluation and Research (HFD-362), Food and Drug Administration, 5600 Fishers Lane, Rockville, MD 20857, 301-295-8049.

**SUPPLEMENTARY INFORMATION:**

## I. Background

### A. New Drug Approval: 1938 to 1962

In 1938, Congress passed the Federal Food, Drug, and Cosmetic Act (the act). The act created a premarket approval system for drug products that required applicants seeking drug product approval to submit a new drug application (NDA) to FDA. The NDA would contain information demonstrating, among other things, that the drug product was safe. The act also provided that an NDA would automatically become effective (i.e., the product could be lawfully marketed) within a fixed period unless the agency affirmatively refused to approve the application.

In addition to drug products that had an effective NDA, many products were marketed without effective applications. These products were identical, similar, or related to products with effective NDA's. The manufacturers of these products had concluded that their drug products were generally recognized as safe, or had received advisory opinions from FDA that an NDA was not required because the products were generally recognized as safe.

In 1962, Congress amended the drug approval provisions of the act to require affirmative approval to NDA's before marketing. The amendments required applicants to show that their products were both safe and effective (Pub. L. 87-781 (October 10, 1962)). Thus, on or after October 10, 1962, a person could not market a new drug without an approved NDA that contained sufficient safety information as well as substantial evidence establishing the drug's effectiveness for its intended uses.

The 1962 amendments also deemed NDA's that had become effective before October 10, 1962, to be approved. As with postenactment drugs, the 1962 amendments required these "pre-1962" drugs to be shown to be effective for their intended uses. Consequently, FDA began a program to evaluate the drugs that had been deemed approved to determine whether there was substantial evidence of their effectiveness. This systematic evaluation and the implementation of FDA's findings became known as the Drug Efficacy Study Implementation (DESI). Under DESI, FDA contracted with the National Academy of Sciences/ National Research Council (NAS/NRC), which established expert panels to review available evidence of effectiveness and to provide recommendations to FDA. FDA considered the NAS/NRC panels' recommendations about the effectiveness of these DESI drugs, and announced its conclusions through Federal Register notices. These notices, known as DESI notices, contain the acceptable marketing conditions for the class of drug products covered by the notice.

### B. The ANDA Procedure for Pre-1962 Drugs

If a manufacturer had a pre-1962 NDA in effect for a drug product, FDA continued its approval if the manufacturer submitted a supplemental new drug application to conform the product's indications for use to those determined to be effective in the DESI review. Yet, as stated above, many drug products had active ingredients and indications that were identical or very similar to the drug products found to be effective in the DESI review but lacked NDA's themselves. In implementing the DESI program with respect to these duplicate products, FDA concluded that each such drug product was a "new drug" that required its own approved NDA before it could be legally marketed (*United States* v. *Generix Drug Corp.*, 460 U.S. 453 (1983)). Additionally, FDA issued a policy statement in the Federal Register of May 28, 1968 (33 FR 7758) that revoked the earlier advisory opinions that drugs could be marketed without prior FDA clearance. This rule was codified at 21 CFR 310.100.

Shortly thereafter, FDA created the ANDA procedure for the approval of duplicate products in reliance on the DESI evaluation. In brief, after the DESI program had found a particular drug product to be effective and suitable for ANDA's, FDA published a Federal Register notice announcing its conclusions. Any manufacturer of a duplicate drug product that did not have an approved NDA was then required to submit an ANDA to obtain approval to market the duplicate version of the approved drug. (See 34 FR 2673, February 27, 1969; 35 FR 6574, April 24, 1970; and 35 FR 11273, July 14, 1970.)

Before 1984, FDA based these ANDA approvals on the theory that the evidence of effectiveness necessary for approval of an NDA had been provided, reviewed, and accepted during the DESI process. Evidence of the drug's safety had been determined on the basis of information contained in the pioneer NDA and by the subsequent marketing experience with the drug. FDA required ANDA applicants to submit information that showed the applicant's ability to manufacture a product of acceptable quality whose safety and effectiveness were equivalent to the drug product whose safety and effectiveness had been established. Thus, ANDA applicants provided information on the drug product's formulation, manufacture, quality control procedures, and labeling. DESI notices specified additional information, such as bioavailability/bioequivalence data, for the ANDA.

### C. Procedures for Duplicates of Post-1962 Drugs ("Paper NDA" Policy)

FDA never extended its ANDA policy for pre-1962 drugs to duplicates of drugs first approved for marketing on or after October 10, 1962, although it did consider the possibility of such an extension either by regulation or through legislation. (See 54 FR 28872 at 28873 and citations therein.) As patents began to expire for many post-1962 drugs, including some high volume, therapeutically important drug products,

EXHIBIT E

many manufacturers became interested in changing the NDA system to permit ANDA's for post-1962 drug products.

FDA did allow some duplicate drug products of drugs first approved after 1962 to be marketed under its "paper NDA" policy. (See 46 FR 27396, May 19, 1981.) This policy permitted FDA to approve NDA's for post-1962 drug products on the basis of safety and effectiveness information derived primarily from published reports based on well-controlled studies. This meant that manufacturers did not have to conduct their own tests, but adequate literature, including detailed reports of adequate and well-controlled studies, was available for only a fraction of the post-1962 drugs. Moreover, the staff effort involved in reviewing paper NDA's ultimately proved to be a substantial and inefficient use of agency resources.

### D. The Drug Price Competition and Patent Term Restoration Act of 1984

From 1978 to 1984, Congress considered various bills that would have authorized an ANDA procedure for duplicate versions of post-1962 drug products. Other bills under consideration during this period sought to restore patent life lost while awaiting Federal marketing approval. Congress combined the ANDA procedure for post-1962 drug products and patent term restoration in the Drug Price Competition and Patent Term Restoration Act of 1984 (Pub. L. 98-417).

The law consisted of two different titles. Title I authorized the approval of duplicate versions of drug products, approved under section 505 of the act, under an ANDA procedure. Title II authorized the extension of patent terms for approved new drug products (including antibiotics and biological drug products), some medical devices, food additives, and color additives. Congress intended the two titles to provide a careful balance between promoting competition among brand-name and duplicate or "generic" drugs and encouraging research and innovation.

Title I amended section 505 of the act by establishing a statutory ANDA procedure for duplicate and related versions of human drugs approved under section 505(b) of the act. These procedures are inapplicable to antibiotics (which are approved under section 507 of the act) and biological drug products licensed under 42 U.S.C. 262. The statute adopted, with few modifications, the agency's ANDA procedure for pre-1962 drugs. It required all applicants to provide certain patent information; provided for the submission and approval of applications for which the investigations relied on by the applicant to satisfy the "full reports" of safety and effectiveness requirement were not conducted by or for which the applicant had not obtained a right of reference or use from the person who conducted the investigations; established rules for disclosure of safety and effectiveness data submitted as part of an NDA; and provided specific time periods during which ANDA's and NDA's for certain drug products may not be submitted or approved. The act also required FDA to promulgate new regulations implementing the statute. In the Federal Register of July 10, 1989 (54 FR 28872), FDA published a proposed rule on ANDA's. This final rule contains most of the provisions contained in that proposal.

FDA published a final rule implementing Title II in the Federal Register of March 7, 1988 (53 FR 7298). This rule is codified at 21 CFR Part 60.

### II. Highlights of this Final Rule

This final rule amends 21 CFR Part 314 to establish new requirements and procedures for NDA and ANDA applicants under the 1984 amendments. The rule also revises the bioavailability and bioequivalence requirements at 21 CFR part 320 to conform to the 1984 amendments and current agency policy. Minor conforming amendments are made to 21 CFR parts 2, 5, 10, 310, 314, and 433. Additionally, because the agency will issue final regulations governing patent certification and marketing exclusivity requirements at a future date, FDA has revised or deleted cross-references to those provisions and, where possible, replaced them with statutory citations.

The final rule's major provisions are as follows:

#### A. Abbreviated Applications

The statutory provisions governing ANDA requirements and procedures are at section 505(j) of the act (21 U.S.C. 355(j)).

The statute permits ANDA's for: (1) A drug product that is the "same" as a drug product listed in the approved drug product list published by FDA (the "listed drug") with respect to active ingredient(s), route of administration, dosage form, strength, and conditions of use recommended in the labeling; and (2) a drug product with certain changes from a listed drug if FDA has approved a petition from a prospective applicant permitting the submission of an ANDA for the changed drug product.

Subpart C of part 314 addresses an ANDA applicant's requirements and responsibilities. The final rule is substantially similar to the proposal, although FDA has made some minor changes, such as requiring applicants to include a table of contents in the review copies of an ANDA (21 CFR 314.94(a)(2)), and other minor changes regarding periodic reports from ANDA holders (21 CFR 314.98). One noteworthy change concerns the chemistry, manufacturing, and controls section of an ANDA. Under the proposed rule, applicants would have been required to identify and characterize inactive ingredient differences between their products and those in the reference listed drug. FDA received numerous comments stating that, for many drug products, applicants would be unable to discover which inactive ingredients were used in the reference listed drug. Consequently, the final rule requires applicants to identify and describe such differences regarding inactive ingredients only for topical drug products, drug products intended for parenteral use, and drug products intended for ophthalmic or otic use. The inactive ingredients for these products are listed on the products' labels. For other drug products, the final rule requires applicants to identify and characterize only the inactive ingredients in their own products.

FDA has also revised some policies that were announced in the preamble to the proposed rule. For example, the preamble to the proposed rule indicated that FDA would accept an ANDA submission that contained a bioequivalence protocol. This policy had the unintended effect of encouraging applicants to file incomplete ANDA's. Therefore, FDA is announcing that it will no longer accept an ANDA that does not contain the results of a complete bioequivalence study if such a study is required for approval. These and other changes are described in more detail in the responses to comments below.

#### B. ANDA Suitability Petitions

Under section 505(j)(2)(C) of the act, an ANDA applicant may petition FDA for permission to file an ANDA for a drug product that has one different active ingredient in a combination product, or whose route of administration, dosage form, or strength differs from that of the listed drug. These are the only types of changes permitted in an ANDA.

The final rule, at 21 CFR 314.93, describes the information that a petitioner must include in its petition. The information must demonstrate that the change from the listed drug requested for the proposed drug product

**17952    Federal Register / Vol. 57, No. 82 / Tuesday, April 28, 1992 / Rules and Regulations**

may be adequately evaluated for approval without data from investigations to show the proposed drug product's safety or effectiveness and that a drug product with a different active ingredient may be adequately evaluated for approval as safe and effective on the basis of information required to be submitted in an ANDA.

In the preamble to the 1989 proposed rule, FDA invited comments on a policy that would provide for the confidentiality of any petition submitted under section 505(j)(2)(C) of the act until FDA either approved or disapproved the petition. At the time of the proposed rule, FDA's policy was to make these petitions available to the public. The agency received an equal number of comments in favor of and opposed to such a policy. The comments favoring confidentiality argued that the public availability of suitability petitions would adversely affect the petitioner's commercial interests. The comments opposing confidentiality said that the public availability of these petitions would enhance the decisionmaking process. FDA agrees with the latter view. By making suitability petitions publicly available, FDA has received valuable comments and information from third parties. These comments and information have contributed to the agency's evaluation of some suitability petitions. Consequently, FDA will continue its policy of making such petitions available to the public.

An ANDA submitted under an approved petition would generally be required to contain the same information as an ANDA for a drug product that is the same as a listed drug except that FDA may require additional information regarding the difference between the proposed drug product and the listed drug. Additionally, FDA requires that the listed drug referred to in the ANDA be the one upon which the petition was based and that the applicant refer to the petition in its ANDA and include a copy of FDA's response approving submission of an ANDA.

*C. 505(b)(2) Applications*

The 1984 amendments also amended section 505(b) of the act (21 U.S.C. 355(b)) to create another type of application. These applications, known as 505(b)(2) applications, are similar to applications under the agency's "paper NDA" policy. Unlike the paper NDA policy, however, section 505(b)(2) of the act applies to applications that contain investigations relied upon by the applicant to provide full reports of safety and effectiveness where the investigations were not conducted by or for the applicant and the applicant has not obtained a right of reference or use from the person who conducted the investigations. (See 21 U.S.C. 355(j)(2).) Thus, section 505(b)(2) of the act is not restricted to literature-supported NDA's for duplicates of approved drugs; it covers all NDA's for drug products that rely on studies not conducted by or for the applicant or for which the applicant does not have a right of reference.

A 505(b)(2) application is submitted under section 505(b)(1) of the act. Consequently, these applications are subject to the same statutory provisions as full NDA's. The statute, however, gives 505(b)(2) applicants additional obligations, such as patent certification, that are similar to those of ANDA applicants. The final rule addresses 505(b)(2) application procedures at 21 CFR 314.50.

The preamble to the proposed rule (54 FR 28872 at 28891) asked whether FDA should adopt a policy whereby a 505(b)(2) application for a drug product with a change in dosage form, strength, route of administration, or active ingredient would be treated as a petition under section 505(j)(2)(C) of the act. Most comments opposed such a policy, asserting that the policies and procedures for 505(b)(2) applications are or should be distinct from those for suitability petitions. After careful consideration, the agency believes that the policy would prolong review of 505(b)(2) applications and suitability petitions. Consequently, FDA will not adopt the proposed policy.

*D. Withdrawal or Suspension of Approval of an ANDA*

The statute authorizes the Secretary of Health and Human Services (the Secretary) to withdraw or suspend the approval of any ANDA for a generic drug if: (1) Grounds exist for withdrawal under section 505(e) of the act; (2) the approval of the listed drug referred to by the generic applicant is withdrawn or suspended; or (3) the manufacturer voluntarily withdraws the listed drug from sale for what the agency determines are safety or effectiveness reasons. The final rule contains provisions on withdrawal and suspension at 21 CFR 314.150 to 314.153.

**III. Comments on the Proposed Rule**

*Section 10.30—Citizen Petition*

Proposed § 10.30 (e)(2) and (e)(4) would have amended FDA's citizen petition regulations to provide for responses to petitions filed in accordance with section 505(j)(2)(C) of the act.

1. FDA received one comment on proposed § 10.30(e)(2). The comment agreed with the provision, and FDA has finalized it without change.

*Section 10.45—Court Review of Final Administrative Action; Exhaustion of Administrative Remedies*

2. Two comments objected to proposed § 10.45(d), which would make FDA's response to a petition for reconsideration, rather than a response to a petition under section 505(j)(2)(C) of the act, final agency action. Both comments said that FDA had no authority to require a petition for reconsideration and would give petitioners the right to request a hearing or declare FDA's response to the suitability petition to be final agency action.

FDA disagrees with the comments. FDA has the authority to require adherence to a petition for reconsideration procedure, and such a requirement is practical in this case. From a practical standpoint, the agency receives a large number of suitability petitions each year. If every response to a suitability petition were to be considered as final agency action, the agency would be obliged to devote more resources to each petition to create a comprehensive administrative record. This approach would prolong the review of all suitability petitions without any appreciable benefit to petitioners or the agency. In fact, requiring a petition for reconsideration is to the petitioner's benefit because it ensures that senior FDA officials review the decision on the suitability petition. As for the authority to require a petition for reconsideration, the agency does not agree that it lacks authority to establish by regulation what constitutes final agency action on a petition.

*Section 310.305—Records and Reports Concerning Adverse Drug Experiences on Marketed Prescription Drugs for Human Use Without Approved New Drug Applications*

3. FDA received one comment on proposed § 310.305 (a)(3) and (c)(4), which, in part, would require persons to report or review reports of therapeutic failure. The proposed rule would amend the existing regulation, which required manufacturers, packers, and distributors of marketed prescription drug products that are not the subject of an approved NDA or ANDA to maintain records and report to FDA "(1) all serious, unexpected adverse drug experiences associated with the use of their drug products and (2) any significant increase in the frequency of a serious, expected

adverse drug experience." The comment suggested that FDA delete "therapeutic failure" and replace it with "significant failure of expected pharmacological action."

The agency declines to adopt the comment's suggestion. Section 310.305 uses the term "therapeutic failure" to correspond to similar language for adverse drug experience reporting for drugs subject to premarket approval. (See § 314.80; 54 FR 28872 at 28911.) In the preamble to the proposed rule, FDA explained that it was deleting the word "significant" from the phrase "any significant failure of expected pharmacological action" because the word "significant" had been a source of confusion and ambiguity. (See 54 FR 28872 at 28889.) Thus, FDA proposed to amend §§ 314.80 and 310.305 to require reports of "therapeutic failure" to eliminate this confusion and require all reports of therapeutic failure (54 FR 28872 at 28889).

*Section 314.1—Scope*

4. FDA received no comments on the proposed changes to 21 CFR 314.1, but did receive two general comments regarding the proposed rule's scope. One comment asked FDA to permit ANDA's for duplicates of "drug substances for which the specifications are very tightly drawn for both potency and purity," such as insulin preparations, and for copies of biotechnology-derived drug products. The second comment recommended that FDA accept ANDA's with warnings or precautions in addition to those on the reference listed drug's label, provided that such information was not indicative of diminished safety or effectiveness of the generic drug product.

Section 505(j) of the act permits ANDA's only for duplicate and related versions of previously approved drug products. The ANDA applicant relies on a prior agency finding of safety and effectiveness based on the evidence presented in a previously approved new drug application. If investigations on a drug's safety or effectiveness are necessary for approval, an ANDA is not permitted. Thus, under the statute, an ANDA would only be permitted for a drug product with "tight specifications" or a biotechnology-derived drug product only if such a product is the same as a product previously approved under section 505 of the act or if FDA has approved submission of an ANDA under a petition filed under section 505(j)(2)(C) of the act.

As for accepting ANDA's with additional warnings or precautions, section 505 (j)(2)(A)(v) and (j)(3)(G) of the act requires that the applicant's proposed labeling be the same as that of the reference listed drug unless: (1) The labeling differences are due to an approved petition under section 505(j)(2)(C) of the act (otherwise referred to as a "suitability petition"); or (2) the drug product and the reference listed drug are produced or distributed by different manufacturers. (See 21 U.S.C. 355 (j)(2)(A)(v) and (j)(3)(G).) Thus, the exceptions in section 505 (j)(2)(A)(v) and (j)(3)(G) of the act are limited. In addition, under the patent and exclusivity provisions of the act, the ANDA labeling may be required to carry fewer indications than the reference listed product's labeling or to have other labeling differences. In the preamble to the proposed rule, the agency described various types of labeling differences that might fall within the permitted exceptions. An ANDA applicant is required to include in its ANDA a side-by-side comparison of the applicant's proposed labeling with the currently approved labeling for the reference listed drug. The agency will carefully review all differences annotated by the applicant in determining if such differences fall within the limited exceptions permitted by the act.

*Section 314.3—Definitions*

FDA received 14 comments concerning the definitions of "listed drug" and "reference listed drug" under proposed § 314.3. The proposed rule had defined a "listed drug," in part, as:

* * * a new drug product that has been approved for safety and effectiveness under section 505(c) or approved under section 505(j) of the act, the approval of which has been withdrawn or suspended under section 505(e) (1) through (5) or (j)(5) of the act, and which has not been withdrawn from sale for what FDA has determined are reasons of safety or effectiveness. Listed drug status is evidenced by the drug product's inclusion in the current edition of FDA's "Approved Drug Products with Therapeutic Equivalence Evaluations" (the list) or any current supplement to the list.

The proposed rule defined a "reference listed drug" as "the listed drug identified in an abbreviated new drug application or identified by FDA as the drug product upon which an applicant relies in seeking approval of its abbreviated application."

5. With respect to the "listed drug" definition, one comment objected to the exclusion of drugs marketed in compliance with an over-the-counter (OTC) monograph and products with OTC and prescription indications. A second comment said that FDA must list DESI products and post-1962 approved drug products even if the drug products were no longer marketed by September 24, 1984, because section 505(j)(6)(A)(i) of the act requires those products be listed. Four comments objected to listing drugs that have delayed effective dates of approval, while one comment favored listing such drugs.

FDA agrees in part and disagrees in part with the comments. As defined in section 505(j)(6) of the act, a listed drug is one that was approved for safety and effectiveness under section 505(c) of the act or approved under section 505(j) of the act. Drug products marketed in compliance with an OTC monograph rather than pursuant to an approval under section 505(c) or (j) of the act are not listed drugs under the statute.

With respect to DESI products and post-1962 approved drug products that are no longer marketed, FDA stated its position in the preamble to the proposed rule. In brief, FDA declines to allocate its scarce resources to publish and maintain lists of drug products that no longer generate interest with respect to marketing (54 FR 28877 through 28878). FDA does, however, maintain a list of discontinued products as an appendix to the list, and has created a procedure to return these products and other discontinued products to the list where appropriate. If a drug firm wishes to submit an ANDA for a generic version of one of these drug products, it may petition FDA to relist the drug product and provide information to show that the drug product was not withdrawn from sale due to safety or effectiveness reasons.

With respect to drug products with delayed effective dates of approval, FDA has determined that such products should not be listed. An approval with a delayed effective date is tentative and does not become final until the effective date. FDA has concluded that only drug products with final, effective approvals are to be listed under section 505(j)(6) of the act. FDA has amended the definitions of "listed drug" and "the list" to clarify that only drugs with an effective approval are listed drugs.

Similarly, with respect to drug products that are subject to the DESI program and do not meet the conditions for approval of effectiveness as set forth in a DESI notice, FDA has reexamined its policy and no longer regards the DESI notice published in the Federal Register as a "listed drug." Section 505(j)(6) of the act describes a "listed drug" as a drug that has been approved for safety and effectiveness. A drug product that must satisfy the conditions for approval of effectiveness as set forth in a DESI notice, therefore, does not fall within section 505(j)(6) of the act and cannot be a listed drug. Therefore, the

**17954** Federal Register / Vol. 57, No. 82 / Tuesday, April 28, 1992 / Rules and Regulations

agency has revised the definition of listed drug so that a DESI notice will not suffice as a "listed drug."

6. Five comments addressed the definition of "reference listed drug." Three comments suggested that the oldest or first NDA product be the reference listed drug while one comment suggested that any FDA-approved drug be a "referenced listed drug." Another comment recommended designating "reference listed drugs" in the publication titled, "Approved Drug Products with Therapeutic Equivalence Evaluations," commonly known as the "Orange Book."

As noted in the preamble to the proposed rule, FDA intends the reference listed drug to be the same drug product selected by the agency as the reference standard for bioequivalence determinations. Therefore, FDA has revised the definition of "reference listed drug" to make clear that a "reference listed drug" is a listed drug identified by FDA as the drug product upon which an applicant relies in seeking approval of its abbreviated application. In some instances, such as the submission of an ANDA for a product with multiple strengths, there may be more than one reference listed drug. In these instances, FDA considers each strength to represent a different drug product and will require an ANDA applicant to demonstrate that each proposed drug product is bioequivalent to its corresponding reference listed drug. FDA will identify in future editions of the Orange Book those approved drugs that FDA regards as reference listed drugs. In the interim, FDA will maintain a list of reference listed drugs at the Dockets Management Branch (HFA-305), Food and Drug Administration, room 1-23, 12420 Parklawn Dr., Rockville, MD 20857, until the Orange Book can be revised. FDA hopes that designating a single reference listed drug against which all generic versions must be shown to be bioequivalent will avoid possible significant variations among generic drugs and their brand name counterparts. Such variation could result if generic drugs established bioequivalence to different reference listed drugs.

7. One comment recommended defining "appropriate reliance" for purposes of section 505(b)(2) applications. The comment noted that the preamble to the proposed rule had stated "Appropriate reliance on an analysis of (spontaneous) adverse reaction reports will not cause application to be one described by section 505(b)(2) or 505(c)(3)(D)( of the act." (54 FR 28872 at 28891). The comment said it did not believe that an application containing an analysis of adverse reaction reports in place of safety studies "should be considered a full application for the purpose of 'breaking exclusivity' granted to another sponsor's drug."

FDA believes that the comment has misinterpreted the agency's position. The preamble to the proposed rule stated that, for drug products with a U.S. marketing history, an analysis of the spontaneous adverse reaction reports "may, in some cases, be substituted for some of the safety data" in a full NDA (54 FR 28872 at 28891). The agency believes that an analysis of spontaneous adverse reaction can provide some safety information when: (1) The drug product has a U.S. marketing history; and (2) there is a substantial amount of adverse drug reaction experience for that drug product. For example, an applicant could submit such an analysis to substitute for certain animal studies that would otherwise be required to show the kinds of risks that might be expected when the drug is tested in humans, or to show which certain infrequent side effects occur rather than conduct large, Phase 3 clinical studies to prove the same result. Thus, FDA does not contemplate that an applicant under section 505(b)(1) of the act will substitute an analysis of adverse reaction reports for all safety information.

*Section 314.50—Content and Format of an Application*

The proposed rule contained several revisions and additions to the existing requirements at 21 CFR 314.50. The proposed revisions were minor. For example, under proposed § 314.50(a)(2), an applicant would be required to provide a statement whether the submission is an original application, a 505(b)(2) application, a resubmission, or a supplement to an application. The proposed additions focused on patent information and certifications and claimed exclusivity, and are not included in this final rule.

8. Proposed § 314.50(g)(3) would require an applicant who is submitting an application under section 505(b) of the act and who has a "right of reference or use" as defined in § 314.4(b) to include a "written statement signed by the owner of the data from each such investigation that the applicant may rely on in support of the approval of its application, and provide FDA access to, the underlying raw data that provide the basis for the report of the investigation submitted in its application." One comment would provide FDA access to the underlying raw data "only if FDA would not otherwise have access to the information that is needed for an adequate review of the application."

Section 314.50(g)(3) simplifies the process in which FDA can have access to raw data if such data are needed to review an application. Without this provision, if FDA determined that it needed to examine the raw data, it would be obligated to suspend the review process, request that the applicant obtain a written statement from the owner of the data to give FDA access to the data, and wait for the written statement to arrive before continuing its review. The provision, therefore, streamlines the review process by eliminating the need for requests and correspondence between FDA, applicants, and owners of data referenced by applicants after FDA had begun its review. The agency will utilize this authority when it believes that access to the raw data is necessary for reviewing the application.

*Section 314.54—Procedure for Submission of an Application Requiring Investigations for Approval of a New Indication for, or Other Change from, a Listed Drug*

FDA received two comments on proposed § 314.54. This provision would permit any person seeking approval of a drug product that represents a modification of a listed drug and for which investigations other than bioequivalence or bioavailability studies are essential to the approval of the change to submit a 505(b)(2) application.

9. One comment said FDA should revise proposed § 314.54(a) to state that a 505(b)(2) application is appropriate for changing a drug from prescription to OTC status.

FDA declines to adopt the comment. The regulation, as written, does not preclude submission of a 505(b)(2) application to change a drug from prescription to OTC status, so the suggested revision is unnecessary.

10. A second comment objected to proposed § 314.54(b) because it would prevent applicants from submitting applications requiring investigations for approval of a change from a listed drug for drugs whose only difference from the reference listed drug is that the extent to which the listed ingredients are absorbed or otherwise made available to the site of action to a lesser degree compared to the reference listed drug. The comment said FDA should judge drug products individually.

FDA declines to accept the comment. Differences in the extent to which a drug is absorbed will affect the drug's

Federal Register / Vol. 57, No. 82 / Tuesday, April 28, 1992 / Rules and Regulations    17955

therapeutic effectiveness. For example, a drug whose extent of absorption is less than that of the reference listed drug may be less effective or even ineffective. Consequently, FDA will not accept applications for products under § 314.54(b) whose extent of absorption is less than that for the reference listed drug.

FDA has, however, amended § 314.54(b) to state that it also will not accept an application under § 314.54 for a product whose only difference from the reference listed drug is an unintentional, lesser rate of absorption. FDA is making this change because a drug whose rate of absorption is unintentionally less than that of the reference listed drug may be less effective.

### Section 314.55—Abbreviated Application; Section 314.56—Drug Products for Which Abbreviated Applications are Suitable

FDA received no comments on its proposal to remove these provisions, and, therefore, has removed them from 21 CFR part 314.

### Section 314.60—Amendments to an Unapproved Application

11. FDA received two comments on proposed § 314.60. In general, proposed § 314.60 stated when an applicant could submit an amendment to an application filed under § 314.100 but not yet approved, and also stated when an unapproved application could not be amended. One comment asked FDA to explain how exclusivity would be affected if a section 505(b)(2) application is amended before another section 505(b)(2) application, which had been filed earlier, is approved. The second comment claimed that § 314.60(d) would permit section 505(b)(2) applications to become effective regardless of new drug exclusivity. This comment said FDA should revise the rule to declare that a section 505(b)(2) application "that would not be approvable but for a previously approved application * * * be made subject to the exclusivity of that previously approved application."

The preamble to the proposed rule explained that, for concurrently pending 505(b)(2) applications, any 505(b)(2) application submitted to FDA before the approval of another NDA that qualifies for exclusivity under section 505(c)(3)(D)(ii) of the act (granting 5 years of exclusivity) is "not affected by this exclusivity provision." (54 FR 28872 at 28901.) This is because section 505(c)(3)(D)(ii) of the act prohibits only the "submission," and not the approval, of a 505(b)(2) application that refers to a previously approved application. The only exception to the policy on concurrently pending 505(b)(2) applications is where "the first applicant to obtain approval and to qualify for exclusivity publishes its data and the competing applicant amends its application to include the first applicant's published data * * *. Where that data would be essential to the approval of the competing application, the second application will be deemed to refer to the first application" and not permitted to avoid exclusivity. Id. This policy is covered under § 314.60(b)(1)(ii), so the comment's suggestion is unnecessary.

FDA disagrees with the second comment's assertion that the rule permits section 505(b)(2) applications to become effective regardless of exclusivity. The statute clearly states that the Secretary may not approve, or, in one case, that applicants cannot submit, an application before an exclusivity period expires. (See 21 U.S.C. 355(c)(3)(D)(i) through (c)(3)(D)(v).) The rule observes these restrictions and pertains only to amendments to unapproved applications; it does not address approvals. Section 314.60(b) is, in fact, designed to protect an applicant's exclusivity under section 505(c)(3)(D)(ii) of the act while simultaneously preserving an applicant's incentive to publish the studies on which approval was based. Thus, FDA does not adopt the comment's suggested language.

### Section 314.70—Supplements and Other Changes to an Approved Application

FDA received no comments on this provision, but has amended the provision to adopt references to statutory, rather than regulatory, provisions or to explain what information should be provided. However, the agency wishes to remind ANDA applicants that, as noted in paragraph 4 above, the labeling for an ANDA product must, with few exceptions, correspond to that for the reference listed drug.

### Section 314.71—Procedures for Submission of a Supplement to an Approved Application

FDA received no comments on this provision and has finalized it without change.

### Section 314.80—Postmarketing Reporting of Adverse Drug Experiences

FDA proposed several changes to 21 CFR 314.80 under the proposed rule. Section 314.80(a) under the existing regulation defined an "adverse drug experience," in part, as "any significant failure of expected pharmacological action." The proposed rule would delete the adjective "significant" from this definition and, as a result, require reporting of "any failure of expected pharmacological action." The proposed rule also would require applicants to review all adverse drug experience information "obtained or otherwise received by the application from any source, foreign or domestic," and to review periodically the frequency of reports of adverse drug experiences "that are both serious and expected and reports of therapeutic failure (lack of effect), regardless of source, and report any significant increase in frequency as soon as possible * * *."

12. FDA received several comments on adverse drug experience reporting under proposed § 314.80. Four comments supported the rule. Five objected to deleting the adjective "significant" from the phrase "any significant failure of expected pharmacological action" in the existing definition of "adverse drug experience," or asked FDA to limit the rule. The comments said the rule would require additional reports and generate reports with little value.

As stated in the preamble to the proposed rule, FDA deleted the word "significant" from § 314.80 because the word has been a source of confusion and ambiguity. (54 FR 28872 at 28889.) By amending the rule, FDA intended to require reports of any drug failure, as the agency considers all such failures to be significant. Id. This modification will provide a complete picture of adverse drug experiences, rather than selected reports, and will improve the agency's ability to determine whether it should take regulatory action.

13. One comment said a "therapeutic failure" should include excessive or exaggerated responses to a drug.

FDA declines to amend the rule as suggested. FDA does not consider such responses to be "therapeutic failures" under § 314.80. They are, however, covered under § 314.80 because they usually manifest themselves as adverse drug experiences. Consequently, applicants are obligated to report them as adverse drug experiences.

### Section 314.81—Other Postmarketing Reports

The proposed rule would amend 21 CFR 314.81 to require applicants to submit a Form FDA 2657 (Drug Product Listing) within 15 working days of the withdrawal from sale of a drug product. The proposed rule also contained details regarding the information to be submitted, such as the National Drug Code number, the drug product's

**17956**    Federal Register / Vol. 57, No. 82 / Tuesday, April 28, 1992 / Rules and Regulations

established name and proprietary name, and the date of withdrawal from sale.

14. One comment asked FDA to clarify whether an applicant's obligation to submit postmarketing reports begins when FDA approves its ANDA or when the ANDA approval becomes effective.

Although the preamble to the proposed rule said proposed § 314.81 would apply upon the ANDA approval regardless of the ANDA's effective date (54 FR 28872 at 28889), FDA has reconsidered this position in light of its policy on delayed effective dates and approvals. FDA does not consider a drug to be approved until the effective date of approval and regards those drug products with delayed effective dates as having tentative approvals. This policy affects § 314.81 because section 505(k) of the act authorizes reporting requirements for drug products that have an approval "in effect." Thus, an applicant's obligation to submit postmarketing reports will begin when the ANDA approval becomes effective.

15. Two comments addressed the 15-day reporting deadline in proposed § 314.81(b)(3)(iii)(a). One comment said a company "does not always know within 15 days of its last shipment that it intends to discontinue marketing a product" and "it is not always clear to a company whether a product is going to be withdrawn from marketing or just temporarily suspended." The comment would have applicants notify FDA that they will withdraw a product when they decide to permanently withdraw the product from sale. The second comment added that the existing rule's annual reporting requirement was satisfactory.

FDA believes the first comment misinterprets the provision. FDA does not expect parties to submit reports within 15 days from the date of their last shipment. The 15-day period begins from the time the firm decides to withdraw the product from the market. Such withdrawals are not limited to permanent withdrawals; FDA is interested in any decision to discontinue marketing because of the possible implications for the product's safety and efficacy. The agency also declines to replace the 15-day reporting period with an annual reporting requirement as suggested by the second comment. The withdrawal of an approved NDA drug product may affect the marketing of duplicate ANDA drug products, so timely reports of drug product withdrawals may be very important.

*Section 314.92—Drug Products for Which Abbreviated Applications May be Submitted*

FDA received four comments on proposed § 314.92. The proposed rule stated that abbreviated applications are suitable for certain drug products, such as drug products that are the same as a listed drug, drug products that meet the monograph for an antibiotic drug for which FDA has approved an application, drug products for which FDA has found an ANDA to be suitable and has announced such a finding in the Federal Register, and drug products that FDA has declared to be suitable for an ANDA submission under the petition procedures.

16. One comment asked FDA to refuse ANDA's for DESI drugs on the grounds that the statute only applies to post-1984 ANDA's. The comment noted that DESI drugs are reviewed by category rather than active ingredient and said some DESI active ingredient categories lack a "readily identifiable pioneer NDA product." Another comment supported ANDA's for DESI drugs.

The ANDA provisions of the 1984 amendments are applicable to all generic drugs for which approval is sought after September 24, 1984, the date on which the statute was enacted. Perpetuating different ANDA systems for pre-1962 drugs and post-1962 drugs would be needlessly confusing, illogical, and inefficient to FDA, the public, and industry. Therefore, FDA has included DESI drugs in these regulations.

Upon further consideration, FDA agrees that ANDA's may be inappropriate for some DESI drug products. In the DESI process, a DESI-reviewed NDA or ANDA is usually considered approved for safety and effectiveness through the approval of a supplement that brings the NDA or ANDA drug product into compliance with a DESI-upgrade notice. The DESI-upgrade notice describes what information the NDA or ANDA holder must provide in order for its drug product to be considered effective. If the NDA or ANDA holder complies with the notice through an approved supplement, then the drug product is considered to be safe and effective and can be listed in the Orange Book. Once this occurs, a person may be able to submit an ANDA for the product. However, if the NDA or ANDA holder fails to comply with the notice, the NDA or ANDA drug product is not considered to be approved for effectiveness and cannot be a listed drug. Under these circumstances, an ANDA cannot be submitted because there is no "listed drug." Therefore, FDA has revised § 314.92 by removing paragraph (a)(3) and renumbering paragraph (a)(4) as (a)(3). An applicant seeking to rely on the findings reflected in a DESI-upgrade notice, in the absence of a listed drug, should submit its application under section 505(b)(2) of the act.

Once a drug subject to a DESI notice is approved for safety and effectiveness and can serve as a listed drug, the agency will require the submission of an ANDA under section 505(j) of the act for a generic version of the product. As a matter of policy, the agency does not accept applications under section 505(b)(2) of the act when there is a listed drug that would provide a basis for an application under section 505(j) of the act. For clarity, FDA has added a new paragraph (d)(9) in § 314.101. The issue had been discussed in the preamble to the proposed rule (54 FR 28890 through 28891). At that time, the agency proposed to treat a 505(b)(2) application as submitted under section 505(j) of the act if the application was for a duplicate of a listed drug eligible for approval under section 505(j) of the act. Id. FDA believes that the policy it is describing in new § 314.101(d)(9), that an application for a drug such as this needs to be submitted by the applicant as an ANDA under section 505(j) of the act, is the preferable approach.

17. Two comments concerned proposed § 314.92(a)(3), which said, in part, that an ANDA would be suitable for a drug product that is the same as a listed drug and that the term "same as" means "identical in active ingredient(s), dosage form, strength, route of administration, and conditions of use, except that conditions of use for which approval cannot be granted because of exclusivity or an existing patent may be omitted." The proposed rule would also require potential applicants to comply with § 314.122, "Submitting an abbreviated application for, or a 505(j)(2)(C) petition that relies on, a listed drug that is no longer marketed," if the listed drug had been voluntarily withdrawn or not offered for sale by its manufacturer. One comment asked FDA to define "strength." The second objected to the language on voluntary withdrawals. The comment said NDA holders should disclose the reasons for withdrawing a product, and FDA should determine whether those reasons raise safety or efficacy questions, and then give ANDA holders an opportunity to examine and respond to the information on the withdrawal.

"Strength" refers to the amount of the product's active ingredient and is usually expressed in terms of weight. For example, a drug that is available as a 50 milligram (mg) tablet and a 100 mg tablet has two "strengths."

As for voluntary withdrawals and the reasons for a withdrawal, FDA refers

the reader to its discussion of identical comments at § 314.161 below.

17a. Additionally, although the preamble to the proposed regulation stated: "Section 507(a) of the act permits the submission of abbreviated applications for *duplicates* of all antibiotics the agency has already approved for marketing" (emphasis added) (54 FR 28872 at 28878), the proposed regulation (§ 314.92(a)(2)) referred only to products that meet the monograph. Because, in some instances, a generic antibiotic may be a duplicate of an approved antibiotic but may not meet the monograph in every respect for that approved antibiotic, the agency has broadened the language of the proposed regulation to include generic antibiotics that either are duplicates of, or meet the monograph for, the approved antibiotic. This change is made at the agency's initiative to reflect the intent of the agency expressed in the preamble to the proposed regulation.

*Section 314.93—Petition To Request a Change from a Listed Drug*

Proposed § 314.93(b) stated that a person who wants to submit an ANDA for a drug product "which is not identical to a listed drug product in route of administration, dosage form, and strength, or in which one active ingredient is substituted for one of the active ingredients in a listed combination drug, must first obtain permission from FDA to submit such an abbreviated application."

18. Most comments agreed with the proposal, but one comment suggested that the rule be revised to state that FDA will not accept a suitability petition if the proposed drug product has different inactive ingredients which "may have some effect on the safety or efficacy of the altered product." Another comment asserted that the safety and effectiveness of a proposed new combination drug cannot be determined without drug interaction data.

FDA declines to accept the comments. Under the statute, suitability petitions are for drugs that have a different active ingredient, route of administration, dosage form, or strength. (See 21 U.S.C. 355(j)(2)(C).) A person seeking marketing approval of a drug product that differs from the listed drug product only with respect to inactive ingredients is not required to submit a suitability petition. FDA also notes that § 314.94(a)(9)(ii) requires applicants to identify and characterize the inactive ingredients used in the proposed drug product, and this information should permit FDA to determine whether the different inactive ingredients affect the product's safety. If FDA determines that the inactive ingredients of the drug are unsafe, the agency will refuse to approve the ANDA. (See 21 U.S.C. 355(j)(3)(H); 21 CFR 314.127.)

As for proposed new combination drug products, the statute expressly authorizes petitions for drugs with one different active ingredient. The petitioner must provide information to show that the different active ingredient is "an active ingredient of a listed drug or a drug which does not meet the requirements of section 201(p)" (21 U.S.C. 355(j)(3)(C)(iii)(II)). Although the statute does not expressly require drug interaction data, it authorizes FDA to refuse to approve a petition if "investigations must be conducted to show the safety and effectiveness of the drug or of any of its active ingredients" or if a drug product containing a different active ingredient "may not be adequately evaluated for approval as safe and effective on the basis of the information required to be submitted in an abbreviated application" (21 U.S.C. 355(j)(2)(C)(i) and (j)(2)(C)(ii)). Thus, if the agency determines that the safety and effectiveness of a proposed combination drug product cannot be shown without drug interaction data, FDA will not approve the petition. FDA has, on its own initiative, revised the language in § 314.93(d) to clarify the circumstances under which a petitioner may identify more than one listed drug. The revised language corresponds more closely to the statutory language.

19. One comment suggested that the agency revise proposed § 314.93(d)(3) regarding proposed combination drug products with one different active ingredient. The proposed rule would require petitioners to provide information to show that:

If the proposed drug product is a combination product with one different active ingredient, including a different ester or salt, from the reference listed drug, that the different active ingredient has previously been approved in a listed drug or is a drug that does not meet the definition of "new drug" in section 201(p) of the act.

The comment suggested that § 314.93(d)(3) be revised to state that ingredients listed as Category I (generally recognized as safe or generally recognized as effective) in a tentative final or final OTC monograph are "substitutable ingredients."

FDA declines to revise the rule as requested. The rule is consistent with section 505(j)(2)(A)(ii)(III) of the act, which states that the different active ingredient must be "an active ingredient of a listed drug or of a drug which does not meet the requirements of section 201(p) * * *." Therefore, in order to be a "substitutable ingredient," a Category I ingredient must be either an active ingredient of a listed drug or an active ingredient that does not meet the definition of a "new drug." An ingredient included in a final OTC drug monograph would be a "substitutable ingredient" because it does not meet the definition of a "new drug."

20. One comment asked FDA to accept petitions to submit an ANDA for a product whose labeling differs from the reference listed drug by being "more clear or offer better directions regarding how the drug should be taken."

FDA declines to accept the comment. Suitability petitions are for drugs that have a different active ingredient, route of administration, dosage form, or strength. (See 21 U.S.C. 355(j)(2)(C).) Labeling differences, therefore, are not proper subjects for a suitability petition.

FDA reminds applicants that the labeling for an ANDA product must be the same as the labeling for the listed drug product except for differences due to different manufacturers, exclusivity, etc. (See 21 U.S.C. 355(j)(3)(G).) An ANDA applicant who believes that the labeling for a proposed drug product should differ from that approved for the reference listed drug should contact FDA to discuss whether labeling for both generic and listed drugs should be revised.

21. One comment objected to proposed § 314.93(e)(1)(v) because FDA would refuse to approve a petition if the reference listed drug had been voluntarily withdrawn from sale and FDA had not determined whether the withdrawal was for safety or effectiveness reasons. The comment would revise the rule to require manufacturers to provide detailed reasons for withdrawing a drug product and, if FDA concluded that those reasons involved safety or effectiveness issues, require FDA to provide this information to prospective ANDA applicants or petitioners.

FDA declines to amend the rule as requested. The statute does not require FDA to determine why a listed drug was withdrawn from sale in every case, and the agency believes it would be impractical to do so. The agency discusses this subject in greater detail in its discussion of the comments to 21 CFR 314.151 through 314.152.

22. Five comments focused on the term "limited confirmatory testing" mentioned in the preamble to proposed § 314.93(e)(2). Proposed § 314.93(e)(2) stated that the phrase, "investigations must be conducted," meant "information derived from animal or clinical studies is necessary to show that the drug product is safe or effective." The

**17958**  Federal Register / Vol. 57, No. 82 / Tuesday, April 28, 1992 / Rules and Regulations

preamble to the proposed rule explained that:

> If preclinical or clinical data are needed to support safety, or if clinical data are needed to support the effectiveness of the requested change, then an abbreviated new drug application is not appropriate for the proposed drug product, and FDA will not approve a petition. However, under certain circumstances, data from limited confirmatory testing to show that the characteristics that make the proposed drug product different from the listed drug do not alter its safety and effectiveness may be accepted in a petition or as additional data to be included in an ANDA resulting from an approved petition.
>
> 54 FR 28872 at 28880.

One comment asked FDA to define "limited confirmatory testing." Two comments noted that the preamble to the proposed rule would permit limited confirmatory testing but that the rule itself would not approve a petition if animal or clinical studies are needed. The comments suggested revising the rule so a drug product "for which any testing other than bioavailability testing is required is ineligible for ANDA treatment." Two other comments said limited confirmatory testing would create a new class of applications or permit firms to avoid full NDA requirements; these comments would eliminate such testing or limit their use to "very rare circumstances."

As stated in the preamble to the proposed rule, by "limited confirmatory testing," FDA means "simple studies intended to rule out unlikely problems." (See 54 FR 28872 at 28880.) Such tests do not include animal or clinical studies whose information is necessary to show that the drug is safe or effective. (See 21 CFR 314.93(e)(2).) Thus, FDA does not intend to permit petitioners to substitute limited confirmatory testing for clinical studies or otherwise circumvent NDA requirements.

23. One comment objected to the language in proposed § 314.93(e)(3), which said FDA may "at any time during the course of its review of an abbreviated new drug application, request additional information required to evaluate the change approved under the petition." The comment argued that this language would permit FDA to revoke its approval of a petition even after an ANDA is submitted.

When read in its entirety, § 314.93(e)(3) states that when FDA approves a petition, the agency may describe what additional information, if any, will be required to support an ANDA for the drug product, and that this approval should not be construed as preventing FDA from requesting additional information to evaluate the

ANDA. Thus, the provision concerns information needed to support approval of the ANDA rather than the information needed to evaluate the petition.

As for "revoking" approval of a suitability petition, FDA is amending § 314.93 by adding a new paragraph (f) to give the agency express authority to withdraw approval of a suitability petition if new information indicates that approval should be withdrawn. Such information can come from any source, including ANDA's submitted under the petition. This amendment will ensure that suitability petition approvals continue to reflect valid, scientific judgment and reasoning and prevent would-be ANDA applicants from relying on suitability petitions that, in light of new information, would not have been granted had the new information been available when the petition was under consideration.

*Section 314.94—Content and Format of an Abbreviated Application*

FDA received over 100 comments pertaining to ANDA format and content. Most recommended revisions or clarification while several expressed general agreement with specific provisions.

*Table of Contents*

24. One comment suggested that proposed § 314.94(a)(2), which would require the archival copy of an ANDA to contain a table of contents, be revised to require that both archival and review copies of an ANDA contain a table of contents.

Although the provision in question only pertains to archival copies of an application, FDA agrees with the comment and has amended § 314.94(d)(2) accordingly.

*Basis for an ANDA Submission*

25. Two comments addressed reference listed drugs under proposed § 314.94(a)(3)(i). The proposed rule would require an ANDA to contain "the name of the reference listed drug, including its dosage form and strength." The comments noted that the preamble to the proposed rule stated that the pioneer drug would "usually" be the reference listed drug, but, if more than one listed drug existed for the same drug product, the preamble recommended that applicants contact the Director of the Division of Bioequivalence before selecting a reference listed drug (54 FR 28880–28881). The comments asked FDA to explain how FDA determines which drugs should be reference listed drugs, and one comment proposed that the pioneer drug serve as the reference

listed drug "unless there are sound scientific reasons for which a substitute may be preferred."

As stated above, FDA has revised the rule so that FDA will designate all reference listed drugs. Generally, the reference listed drug will be the NDA drug product for a single source drug product. For multiple source NDA drug products or multiple source drug products without an NDA, the reference listed drug generally will be the market leader as determined by FDA on the basis of commercial data. FDA recognizes that, for multiple source products, a product not designated as the listed drug and not shown bioequivalent to the listed drug may be shielded from direct generic competition. If an applicant believes that there are sound reasons for designating another drug as a reference listed drug, it should consult FDA. Once FDA designates that reference listed drug, that drug will continue to be the reference standard even if the drug is later replaced as the market leader. The Orange Book will identify all reference listed drugs, so applicants are no longer instructed to call the Director of the Division of Bioequivalence. FDA has, however, deleted the language regarding Federal Register notices from § 314.94(a)(3)(i). As discussed elsewhere in this rule, the agency no longer regards a DESI notice as a listed drug and will not accept an ANDA in the absence of a listed drug.

*Active Ingredients*

26. Two comments sought more exacting standards or requirements for establishing that a generic drug and a listed drug contain the "same" active ingredients. Proposed § 314.94(a)(5)(i) would require an ANDA to contain information to show that the active ingredient in a single-active-ingredient product to be "the same as that of the reference single-active-ingredient listed drug." One comment stated that the active ingredients in the proposed drug product must be identical to those in the reference listed drug and that blood level comparisons are inadequate to establish such identity. The comment added that the rule should provide technical or scientific criteria for determining whether two active ingredients are equivalent.

The second comment would require applicants to demonstrate that their active ingredients "exhibit the same physical and chemical characteristics, that no additional residues or impurities can result from the different manufacture or synthesis process; and that the stereochemistry characteristics

and solid state forms of the drug have not been altered."

Under the statute, an ANDA applicant must show that its active ingredient is the same as that in the reference listed drug (21 U.S.C. 355(j)(2)(A)(ii)). FDA will consider an active ingredient to be the same as that of the reference listed drug if it meets the same standards for identity. In most cases, these standards are described in the U.S. Pharmacopeia (U.S.P.). However, in some cases, FDA may prescribe additional standards that are material to the ingredient's sameness. For example, for some drug products, standards for crystalline structure or stereoisomeric mixture may be required. Should questions arise, an applicant should contact the Office of Generic Drugs to determine what information would be necessary to demonstrate that its active ingredient is the same as that in the reference listed drug.

As for possible impurities or residues in the ANDA product, ANDA applicants would be required to provide information on the drug substance and the drug product as part of the chemistry, manufacturing, and controls section of the application. (See 21 CFR 314.94(a)(9); 314.50(d)(1).) This would include information on impurities and residues. The "Guideline for Submitting Supporting Documentation in Drug Applications for the Manufacture of Drug Substances" suggests that impurities "should not only be detected and quantitated, but should also be identified and characterized when this is possible with reasonable effort." This guideline adds that "All major impurities should be individually limited. The maximum amount per unit dose of every individual impurity should be provided. If there is information on toxicity or information on toxic limits that have been set of these impurities, this information should be provided." If the manufacturing, packing, or processing controls cannot ensure the product's identity, strength, quality, and purity, or if the drug's composition is unsafe, FDA will not approve the ANDA. (See 21 U.S.C. 355 (j)(3)(A) and (j)(3)(H).)

27. One comment sought clarification of proposed § 314.94(a)(5)(ii)(A). That provision would require an ANDA for a combination drug product to contain information to show that the active ingredients are the same as those for the reference listed drug, or,

* * * If one of the active ingredients differs from one of the active ingredients of the reference listed drug and the abbreviated application is submitted pursuant to the approval of a petition under § 314.93 to vary such active ingredient, information to show

that the other active ingredients of the drug product are the same as the other active ingredients of the reference listed drug. Information to show that the different active ingredient of another listed drug or of a drug which does not meet the definition of a "new drug" in section 201(p) of the act, and such other information about the different active ingredient that FDA may require.

The comment asked FDA to clarify the phrase "such other information about the different active ingredient that FDA may require."

The phrase quoted by the comment reflects the statutory language at section 505(j)(2)(A)(ii)(III) of the Act. FDA has not requested any additional information from applicants under this authority, and cannot predict what type of information it would require. Nevertheless, the final rule keeps this language and will not foreclose its use.

Bioequivalence

FDA received nine comments on proposed § 314.94(a)(7). That section describes the kinds of information required to demonstrate bioequivalence.

28. One comment suggested that applicants be given the option of submitting a proposed bioavailability or bioequivalence study protocol for review and comment either as part of an ANDA or before submitting an ANDA so that applicants do not conduct questionable or unnecessary studies.

Since publication of the proposed rule, FDA has changed its policies regarding the submission of incomplete ANDA's. Under earlier policy, FDA permitted ANDA applicants to submit ANDA's with bioequivalence study protocols and to provide bioequivalence study data at a later date. This policy has resulted in a significant and unwarranted expenditure of resources in reviewing applications that had little potential for approval. FDA will therefore no longer accept an ANDA that does not contain complete bioequivalence study data if such data are required for approval. However, with respect to pre-ANDA submissions of bioequivalence protocols, FDA will continue, to the extent that time constraints and resources permit, to provide guidance on such protocols before an ANDA is submitted. Applicants wishing such guidance may submit requests for review of proposed protocols to the Director, Division of Bioequivalence. The Division will attempt to provide informal comments on such submissions as time and resources permit. The agency has also revised § 314.94(a)(7)(i) to delete the language concerning Federal Register notices. As stated earlier, the agency no longer regards a DESI notice as a listed drug and will not

accept an ANDA in the absence of a listed drug.

29. One comment recommended that FDA give each holder of an NDA for an innovator drug an opportunity to comment on any bioequivalence study protocol proposed by an ANDA applicant if "nonabsorbed drugs" are involved. The comment would also establish deadlines for the NDA holder to respond to the protocol and for FDA to issue a decision.

FDA has considerable scientific expertise in the critical review of bioequivalence protocols. If additional expertise is necessary, the agency will seek advice from sources such as the Generic Drug Advisory Committee on an "as needed" basis. The agency also notes that, as a basic matter, giving NDA holders a role in reviewing the applications of potential competitors could create a conflict of interest and compromise an applicant's confidential information. Therefore, FDA is not adopting the comment.

30. One comment stated that an FDA request for additional information under proposed § 314.94(a)(7)(ii) should be made within 30 days after the initial submission of the ANDA. As drafted, proposed § 314.94(a)(7)(ii) would require an ANDA submitted under a suitability petition to vary an active ingredient to contain "the results of any bioavailability or bioequivalence testing required by the agency, and any other information required by the agency to show that the different active ingredient is of the same pharmacological or therapeutic class as that of the changed ingredient in the reference listed drug, and that the proposed drug product can be expected to have the same therapeutic effect as the reference listed drug."

FDA declines to accept the comment. If FDA determines, after receiving an ANDA that was submitted pursuant to an approved suitability petition, that the ANDA applicant must submit additional information, this determination represents a finding that the information is necessary to ensure that the proposed ANDA drug product has the same therapeutic effect as the reference listed drug. (See 21 U.S.C. 355(j)(2)(A)(iv).) The agency will not, therefore, forego requesting such information simply because a specific time period has expired. FDA will act on ANDA's as expeditiously as agency resources and priorities permit, but cannot guarantee that the agency will be able to identify, within 30 days, all instances where it needs to request information.

31. One comment interpreted proposed § 314.94(a)(7)(ii) to mean that

**17960** Federal Register / Vol. 57, No. 82 / Tuesday, April 28, 1992 / Rules and Regulations

safety and efficacy studies could be required and asked FDA to state that a product requiring more than bioequivalence testing cannot be the subject of an ANDA.

FDA will not require safety and effectiveness investigations under § 314.94(a)(7)(ii). As stated in section 505(j)(2)(C) of the act and § 314.93(e)(1)(i), if clinical investigations are needed to establish a product's safety or effectiveness, that product is not suitable for approval under an ANDA. FDA does not, however, interpret this section to preclude the use of data to demonstrate whether a proposed drug product will have the same therapeutic effect as a reference listed drug.

FDA has, however, revised § 314.94(a)(7)(ii) to state that an ANDA submitted under an approved petition must contain the results of any bioavailability or bioequivalence testing or any other information required by FDA to show that the active ingredients of the proposed drug product are of the same pharmacological or therapeutic class as those in the reference listed drug and that the proposed drug product can be expected to have the same therapeutic effect as the reference listed drug. This change encompasses ANDA's for single-ingredient drug products submitted pursuant to an approved suitability petition. The proposed rule inadvertently omitted a reference to such ANDA's and unintentionally created a potential problem for some ANDA applicants. For example, if the approved suitability petition permitted a change in dosage form, it might be difficult for some applicants to demonstrate bioequivalence between the new dosage form and the dosage form of the reference listed drug. e.g., between a cream and a tablet. The change corrects this problem and corresponds to the statutory language in section 505(j)(2)(A)(iv) of the act.

32. Proposed § 314.94(a)(7)(ii)(A) stated that FDA would consider a proposed drug product to have the same therapeutic effect as a reference listed drug if the applicant provided information demonstrating that:

There is an adequate scientific basis for determining that substitution of the specific proposed dose of the different active ingredient for the dose of the member of the same pharmacological or therapeutic class in the reference listed drug will yield a resulting drug product of the same safety and effectiveness.

One comment would delete the adjective "same" from the phrase "of the same safety and effectiveness" because "[i]t may not be possible to have exactly the same safety and effectiveness, for example, if a different active ingredient is included in a combination product and safety or efficacy is enhanced." The comment recommended replacing the words "of the same safety and effectiveness" with "whose safety and effectiveness have not been adversely affected."

FDA agrees and has revised the rule accordingly.

33. One comment suggested amending proposed § 314.94(a)(7)(iii) to state that waivers from the in vivo bioavailability or bioequivalence requirement are possible under 21 CFR 320.22. As drafted, proposed § 314.94(a)(7)(iii) made no reference to waivers.

FDA declines to adopt the suggestion. Section 314.94(a)(7), generally, and § 314.94(a)(7)(iii), specifically, do not require in vivo bioequivalence. The provisions state the statutory requirement that an ANDA contain information to show bioequivalence and that, if that information is obtained from an in vivo study, the applicant include in its application information about the analytical and statistical methods used and information to show that the study was conducted in compliance with 21 CFR parts 50 and 56. Information to show bioequivalence may, depending on the drug product, come from an in vivo or an in vitro study.

34. Two comments focused on institutional review board (IRB) and informed consent requirements at proposed § 314.94(a)(7)(iii). The proposed rule would have required a statement regarding compliance with the IRB and informed consent requirements at 21 CFR parts 56 and 50, respectively, for each in vivo bioequivalence study in an ANDA. One comment asked FDA to identify the party responsible for providing a statement on IRB review and informed consent. The comment suggested that the "sponsor," which FDA presumes is the ANDA applicant, make such statements only after the sponsor had conducted an "appropriate on-site inspection of the records and the informed consent process as the study is performed." The second comment suggested revising the regulation to identify the party making the statement. The comment explained that sponsors who have transferred their obligations to contract research organizations should be able to provide the names and addresses of such organizations rather than make the statements on IRB review and informed consent themselves.

FDA declines to accept the comments. The ANDA applicant is ultimately responsible for ensuring that the ANDA satisfies all statutory and regulatory obligations, including IRB review under 21 CFR part 56 and informed consent under 21 CFR part 50. This is true even if the ANDA applicant has elected to use a contract research organization to conduct the study. If an ANDA does not contain such a statement, FDA may refuse to receive it. (See § 314.101(b)(3); see also § 314.101(d)(7).)

**Labeling**

Proposed § 314.94(a)(8) set forth labeling requirements for ANDA's. The proposal would require applicants to provide copies of the currently approved labeling for the reference listed drug, labels and labeling for the proposed drug product, and a statement that the applicant's proposed labeling is the same as that for the reference listed drug except for certain differences, including, but not limited to, differences due to exclusivity or patent protection. The proposal, at § 314.94(a)(8)(iv), would also require applicants to provide a side-by-side comparison of the applicant's proposed labeling with the approved labeling for the reference listed drug. The proposed rule did not state how applicants could acquire copies of the reference listed drug's labeling, but the preamble said current approved labeling could be obtained under the Freedom of Information Act (FOIA) (54 FR 28872 at 28884).

35. Several comments stated that obtaining copies of drug labeling under FOIA would be time-consuming, difficult, or impractical. The comments suggested that FDA develop procedures to display such labeling or to provide them to applicants upon written or oral request. One comment also said that FDA should routinely provide ANDA applicants with updated labeling.

FDA disagrees that its FOIA system is inadequate for ANDA labeling purposes. The agency's FOIA system handles information requests in an orderly and expeditious manner. The procedure for requesting information is both simple and straightforward. (See 21 CFR 20.40.) Additionally, FDA regulations, in most instances, require the Freedom of Information Staff to respond to a freedom of information request within 10 working days. (See 21 CFR 20.41(b).) For these reasons, FDA declines to create an alternate system for providing drug labeling.

As for providing updated labeling information, the agency does not believe it is currently feasible to routinely provide updated labeling on all products eligible for ANDA's. The Office of Generic Drugs (OGD) encourages applicants to contact OGD before submitting an ANDA for advice on what labeling would be the most appropriate to use for its proposed product. Such

Federal Register / Vol. 57, No. 82 / Tuesday, April 28, 1992 / Rules and Regulations    17961

labeling can ordinarily be obtained from one or more of the following sources, including (1) OGD labeling guidance documents, (2) the innovator or generic drug product labeling from the product itself, (3) Physician's Desk Reference, (4) FDA's Freedom of Information Office, or (5) calling the Drug Information Services Branch directly at 301-443-3910. FDA also provides further guidance to an ANDA applicant after the applicant submits proposed labeling. After ANDA approval, FDA tracks the labeling status of the pioneer drug product and, if necessary, notifies ANDA holders when and how they must revise their labeling.

36. One comment asked FDA to clarify its policy regarding the use of the ANDA holder's name on the label and package insert when the ANDA holder neither manufactures nor distributes the drug product.

FDA's policy regarding the names on drug product labeling is set forth at 21 CFR 201.1 as authorized by section 502 of the act (21 U.S.C. 352). In general, § 201.1 states that, with few exceptions, no person other than the manufacturer, packer, or distributor may be identified on the label of a drug or drug product. The Orange Book discusses this subject in greater detail and recognizes that, under certain circumstances, the ANDA holder's name might not appear on the product's labeling. (See "Approved Drug Products with Therapeutic Equivalence Evaluations," pp. 1-3 (1991).)

37. One comment asked how ANDA applicants should present proposed labeling. The comment said that FDA should specify its exact requirements or permit applicants to submit labeling in any format they choose.

FDA believes that detailed instructions on the size and format of proposed labeling are not appropriate for this regulation. Applicants who have questions about the presentation of labeling in ANDA's should contact the Program Support Staff, Office of Generic Drugs, for guidance.

38. Proposed § 314.94(a)(8)(ii) would require ANDA applicants to provide copies of the label and labeling for the proposed drug product. Two comments suggested that FDA amend the rule to permit applicants to provide photographs of labeling rather than actual copies of the labeling when the label is printed on a tube or shipping carton.

FDA declines to accept the comment. Actual copies of tube labeling and other labeling help FDA determine the prominence of the information presented and whether the information is legible. These determinations cannot be easily made by the review of photographs. Ordinarily, however, FDA does not require submission of copies of shipping carton labeling as part of an abbreviated application.

39. Two comments opposed the requirement for a side-by-side comparison between the proposed ANDA drug product's labeling and the reference listed drug product's labeling under proposed § 314.94(a)(8)(iv). The comments said the comparison would be cumbersome and impractical, and suggested annotated changes or highlighted changes instead of comparisons.

In contrast, three comments supported side-by-side labeling but asked that ANDA holders be required to complete labeling revisions within 30 days of any change in the listed drug's labeling or to provide labeling comparisons every 6 months to ensure that the ANDA drug's labeling matched that of the listed drug. One comment said FDA should create a mechanism to compel ANDA holders to revise their labeling to conform to the listed drug product once the ANDA is approved.

The final rule retains the requirement of side-by-side labeling comparisons. Side-by-side comparisons enable FDA reviewers to readily identify differences between the ANDA applicant's and the innovator's product labeling. FDA does not believe that this requirement will impose a significant burden on ANDA applicants.

As for creating a mechanism to compel labeling revisions, section 505(e)(2) of the act authorizes the withdrawal of approval of an application if "there is a lack of substantial evidence that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the labeling thereof." This provision applies to both ANDA and NDA drug products. Because an ANDA must have labeling that is the same as the reference listed drug under section 505(j)(2)(A)(v) of the act, FDA believes that a generic drug product approved on the basis of studies conducted on the listed drug and whose labeling is inconsistent with the listed drug's labeling might not be considered safe and effective for use under the conditions prescribed, suggested, or recommended in the listed drug's labeling. FDA, therefore, has revised § 314.150 to permit the agency to withdraw approval of an ANDA if the applicant fails to maintain labeling in compliance with the requirements of the act.

As for requiring ANDA holders to submit drug labeling at periodic intervals, FDA believes that the existing reporting requirements at 21 CFR 314.70 and 314.81 ensure that labeling changes are brought to FDA's attention in an appropriate and timely fashion. The agency will advise ANDA holders of changes to be made after approval, but postapproval changes resulting from the expiration of exclusivity or patent protection are the responsibility of the ANDA holder.

40. Two comments said the labeling provisions should be revised to permit ANDA applicants to deviate from the labeling for the reference listed drug to add contraindications, warnings, precautions, adverse reactions, and other safety-related information. One comment added that ANDA applicants should be allowed to delete some of the indications contained in the labeling for the reference listed drug.

FDA disagrees with the comments. Except for labeling differences due to exclusivity or a patent and differences under section 505(j)(2)(v) of the act, the ANDA product's labeling must be the same as the listed drug product's labeling because the listed drug product is the basis for ANDA approval. Consistent labeling will assure physicians, health professionals, and consumers that a generic drug is as safe and effective as its brand-name counterpart. (See 54 FR 28872 at 28884.) If an ANDA applicant believes new safety information should be added to a product's labeling, it should contact FDA, and FDA will determine whether the labeling for the generic and listed drugs should be revised. After approval of an ANDA, if an ANDA holder believes that new safety information should be added, it should provide adequate supporting information to FDA, and FDA will determine whether the labeling for the generic and listed drugs should be revised.

41. One comment suggested revising proposed § 314.94(a)(8)(iv) to exempt ANDA holders from being required to submit pharmacokinetic data to support new labeling unless the new labeling pertained to serious health or safety effects. The proposed provision stated that differences between an ANDA applicant's proposed labeling and the labeling approved for the reference listed drug may include, among other things, differences in pharmacokinetics. The comment explained that "insignificant labeling changes otherwise could become a tool to impede the ability of generics to compete, or force them to raise prices to the consumer in order to absorb the cost of additional, insignificant and, perhaps, unnecessary pharmacokinetic studies."

The comment misinterpreted the proposed requirement. The provision

**17962**   Federal Register / Vol. 57, No. 82 / Tuesday, April 28, 1992 / Rules and Regulations

does not impose a pharmacokinetic data requirement for all labeling changes. In fact, FDA believes that most labeling changes that do not involve serious health or safety effects will be acceptable without new pharmacokinetic data. However, FDA also believes that some labeling changes may be formulation-specific and that such changes may require additional pharmacokinetic data (e.g., addition of a food effect statement). FDA, therefore, reserves the right to examine such labeling changes on a case-by-case basis to determine whether additional pharmacokinetic data are necessary before the ANDA holder changes labeling.

42. One comment proposed revising the third sentence in proposed § 314.194(a)(8)(iv), which listed certain permissible labeling differences between the ANDA drug product and the reference listed drug, to read as follows:

> Such differences protected by patent or accorded exclusivity by 505(j)(4)(D) of the act between the applicant's proposed labeling and labeling approved for the reference listed drug may include differences in expiration date, formulation, bioavailability, or pharmacokinetics, labeling revisions made to comply with current FDA labeling guidelines or other guidance, or omission of an indication protected by patent or accorded exclusivity under section 505(j)(4)(D) of the act.

The comment explained that the revision would protect ANDA applicants from "a possible claim of inducement or infringement where a nonapproved, but patented, method of administration is discussed in the innovator's label" or the labeling refers to more than one method of use and "some but fewer than all of the methods of use are entitled to nonpatent exclusivity."

FDA agrees in part with the comment and has amended the provision to state that differences between the applicant's proposed labeling and labeling approved for the reference listed drug may include omissions of an indication "or other aspect of labeling protected by patent or accorded exclusivity under section 505(j)(4)(D) of the act."

*Chemistry, Manufacturing, and Controls*

FDA received a number of comments on the chemistry, manufacturing, and controls section of an ANDA.

43. Many comments sought further definitions or explanations regarding ANDA chemistry, manufacturing, and controls documentation requirements, including information on technical details, such as determining the source of impurities, potential degradation, and test methodologies. Two comments asked FDA to develop guidelines on acceptable levels of preservatives and other inactive ingredients.

These comments raise technical questions that are beyond the scope of this rule. FDA has already issued a number of guidelines addressing many of the questions. These guidelines apply to both full and abbreviated applications, and a list of available guidelines may be obtained from CDER Executive Secretariat Staff, Center for Drug Evaluation and Research (HFD–8), Food and Drug Administration, 5600 Fishers Lane, Rockville, MD 20857. FDA will consider the comments in determining whether to revise existing guidelines or to develop new guidelines.

44. Several comments objected to the provisions in proposed § 314.94(a)(9) requiring ANDA applicants to use the same inactive ingredients as the reference listed drug or to identify and characterize the differences between inactive ingredients. The comments stated that ANDA applicants might not know or might be unable to discover all inactive ingredients used in the reference listed drug. The comments suggested that FDA either not require that the inactive ingredients be the same or require the disclosure of the inactive ingredients used in the reference listed drug.

Because the labeling regulations do not require listing of inactive ingredients for drug products in an oral dosage form (see 21 CFR 201.100(b)(5)), ANDA applicants may be unable to discover what inactive ingredients were used in such drug products. Consequently, FDA has revised § 314.94(a)(9) to require ANDA applicants to include such a comparison only for drug products intended for parenteral use, ophthalmic or otic use, or topical use. ANDA applicants will be able to determine the inactive ingredients in reference listed drugs for these dosage forms because such ingredients are disclosed on the labeling. (See 21 CFR 201.100(b)(5).) For other drug products, FDA has revised § 314.94(a)(9)(iii) to require applicants only to identify and characterize the inactive ingredients in the proposed drug product and to provide information demonstrating that the inactive ingredients do not affect product safety.

45. Proposed § 314.94(a)(9)(iv) stated, in part, that:

> * * * an applicant may seek approval of a drug product (intended for ophthalmic or otic use) that differs from the reference listed drug in preservative, buffer, substance to adjust tonicity, or thickening agent provided that the applicant identifies and characterizes the differences and provides information demonstrating that the differences do not

affect the safety of the proposed drug product, except that in a product intended for ophthalmic use, an applicant may not change a buffer or substance to adjust tonicity for the purpose of claiming a therapeutic advantage over or difference from the listed drug, e.g., by using a balanced salt solution as a diluent as opposed to an isotonic saline solution, or by making a significant change in the pH or other change that may raise questions of irritability.

(54 FR 28872 at 28923).

One comment objected to the example involving balanced salt solutions and isotonic saline solutions in proposed § 314.94(a)(9)(iv). The comment explained that changes in an ophthalmic buffer or tonicity agent from isotonic saline to balanced salt solutions do not raise serious safety questions, and FDA cannot presume that such changes are to claim a therapeutic advantage.

When read in its entirety, the second sentence in § 314.94(a)(9)(iv) simply states that an applicant whose product is intended for ophthalmic use cannot change a buffer or substance to adjust tonicity "for the purpose of claiming a therapeutic advantage over or difference from the listed drug * * *." The rule does not state that use of a balanced salt solution as opposed to an isotonic saline solution would be impermissible in itself or that FDA would presume such changes to be for claiming a therapeutic advantage. Determining whether the applicant claims a therapeutic advantage over or difference from the listed drug depends on the circumstances surrounding each case.

*Samples*

46. FDA received one comment regarding generic drug product samples under proposed § 314.94(a)(10). The proposed rule would require ANDA applicants to comply with the sampling provisions at 21 CFR 314.50 (e)(1) and (e)(2) but would not require ANDA applicants to submit samples until FDA requested them. The comment suggested revising the rule to require ANDA applicants to obtain samples and to retain them in their stability containers for all lots of a finished product. The comment added that FDA should "make itself available as a witness if requested for the distribution of samples to laboratories for bioavailability studies."

Under existing current good manufacturing practice (CGMP) regulations, manufacturers are already required to retain samples. (See 21 CFR 211.84 and 211.170.) FDA has also issued an interim rule that requires applicants who conduct in-house bioavailability and bioequivalence testing and contract laboratories who conduct such testing to

Federal Register / Vol. 57, No. 82 / Tuesday, April 28, 1992 / Rules and Regulations    17963

retain reserve samples of the drug products used to conduct the studies. The interim rule, which appeared in the Federal Register of November 8, 1990 (55 FR 47034), and existing CGMP regulations will help FDA ensure that the samples sent to laboratories match the drug product to be produced. Therefore, the suggestion that FDA be available to witness distribution of samples to laboratories is unnecessary. FDA anticipates publication of a final rule shortly.

*Patent Certification*

FDA received a number of comments regarding patent certifications under proposed § 314.94(a)(12). The agency is still examining these comments and will finalize the provisions for patent certification at a later date.

*DESI Drugs*

47. Two comments objected to the inclusion in proposed § 314.94(b) of DESI drugs in the ANDA regulations. The proposed rule would permit persons to file ANDA's for a duplicate of a drug product that is subject to the DESI review or a DESI-like review and also a listed drug. If the ANDA is for a drug product that is a duplicate of a drug product that is subject to the DESI review or a DESI-like review and not listed, the proposed rule would require applicants to comply with the conditions set forth in the applicable DESI notice or other notice with respect to conditions of use and labeling and the ANDA content and format requirements. One comment argued that the statute applies only to post-1984 ANDA's so including DESI drugs was inappropriate. The comment suggested deleting this provision but noted that "additional special considerations need to be recognized" when finalizing the rule because, for some DESI active ingredient categories, there is no readily identifiable pioneer NDA product. A second comment stated that, under proposed § 314.94(b)(2), DESI drugs cannot be reference listed drugs unless they are listed or the applicant has filed an application under section 505(b)(1) or (b)(2) of the act.

The ANDA provisions of the 1984 amendments are applicable to all generic drugs for which approval is sought after September 24, 1984, the date on which the statute was enacted. However, after careful consideration, FDA agrees that ANDA's are inappropriate if the drug product that is the subject of a DESI review or DESI-like review has not complied with the conditions for effectiveness set forth in a DESI notice or other notice. In the absence of an approved product that satisfies the conditions set forth in the DESI notice or other notice, there is no "listed drug" within the provisions of section 505(j)(6) of the act, and an ANDA cannot be submitted for that drug.

Therefore, FDA will no longer accept an ANDA for a DESI drug product when there is no listed drug for that product, and has deleted § 314.94(b)(2) entirely. An applicant seeking approval of a drug product covered by a DESI upgrade notice before a product is approved for safety and effectiveness under that notice should submit a 505(b)(2) application to the Office of Generic Drugs. Generally the 505(b)(2) application must contain the information specified in section 505(b)(2) of the act, except that the labeling must meet the conditions of use announced as effective in the relevant DESI upgrade notice. In satisfying the full reports of investigations requirement under section 505(b)(1)(A) of the act, the applicant may refer to the agency's conclusions in the DESI upgrade notice about the product's safety and effectiveness and must demonstrate that the proposed drug product is bioequivalent to the drug product that is the subject of the relevant DESI upgrade notice. The agency will generally employ the same mechanisms and standards in approving a section 505(b)(2) application for a DESI drug product that it would for and ANDA under section 505(j).

*Section 314.96—Amending an Unapproved ANDA*

FDA received a small number of comments concerning proposed § 314.96. The proposed rule would permit applicants to amend an ANDA that had been submitted, but not yet approved, to revise existing information or to provide additional information. The proposed rule also explained when an amendment might extend the review period.

48. One comment objected to a preamble statement which said "data from a bioequivalence study where only a protocol was contained in the original submission" could be an example of a major ANDA amendment. (See 54 FR 28872 at 28868.) The comment said that an ANDA application should be complete when submitted and not completed through amendments.

FDA agrees with the comment. Under current policy, FDA does not accept an ANDA that contains only a bioequivalence study protocol. This policy is consistent with the statutory provision requiring an ANDA to contain information showing that the applicant's drug product is, rather than "will be shown to be," bioequivalent to the reference listed drug. (See 21 U.S.C. 355(j)(2)(A)(iv).)

49. One comment asked whether ANDA applicants could amend applications without informing FDA of their intent to amend them or withdraw applications after receiving an approvable or not approvable letter.

Under 21 CFR 314.110(b), an ANDA applicant who has received an approvable letter must correct the deficiencies described in the approvable letter "by amendment within the specified time period" or FDA will refuse to approve the abbreviated application. The ANDA applicant may also ask the agency to provide an opportunity for a hearing. Under 21 CFR 314.120(b), an ANDA applicant who has received a not approvable letter must amend or withdraw the ANDA or notify FDA of an intent to file an amendment within 180 days after the date of the not approvable letter. Under 21 CFR 314.120(a)(3), an ANDA applicant may also ask the agency to provide an opportunity for a hearing. If an ANDA applicant fails to respond within 180 days to the not approvable letter, FDA will consider the ANDA applicant's failure to respond to be a request to withdraw the ANDA. Thus, an ANDA applicant that receives an approvable or not approvable letter may amend its ANDA without informing FDA of its intent to amend the ANDA. The regulations also do not require ANDA applicants to provide notice of intent to withdraw an ANDA.

50. Several comments discussed "major" and "minor" amendments in relation to proposed § 314.96(a)(2) and (a)(3). Proposed § 314.96(a)(2) would permit FDA to extend the review period if the amendment contained significant new data requiring additional time for agency review. Proposed § 314.96(a)(3) would treat the submission of an ANDA amendment to resolve substantial deficiencies as set forth in a not approvable letter as an agreement between FDA and the applicant to extend the review period 120 days. Neither provision referred to "major" or "minor" amendments, but the preamble to the proposed rule explained that a major amendment would be one which required substantial review time. The preamble provided several examples of such major amendments, including amendments containing data from a new bioequivalence study or stability or sterility study submitted in support of a drug product reformulation or changes in the manufacturing or controls procedures.

One comment stated that an amendment, regardless of whether it