**17964**  Federal Register / Vol. 57, No. 82 / Tuesday, April 28, 1992 / Rules and Regulations

was a "major" or "minor" amendment, should not result in any extension of the review period if FDA had not begun to review the application. This comment also suggested that "minor" amendments, which it defined as requiring less than 8 hours of review time, only result in a 14-day extension to the review period.

FDA disagrees with the comment. A policy that would permit applicants to submit amendments containing significant data or information without extending the review period would encourage the submission of incomplete ANDA's and create new administrative problems between applicants and the agency. For example, disputes would arise as to whether an amendment had been submitted before review had begun or whether a particular FDA action constituted "review."

As for extension periods, FDA has decided not to adopt proposed § 314.96(a)(2). The agency found the proposed provision to be unfeasible and has decided to retain the concepts at § 314.60. Consequently, FDA has revised § 314.96(a)(2) to state that an amendment containing significant data or information requiring additional time for agency review will constitute an agreement by the applicant to extend the date by which the agency is required to reach a decision on the application. The revised paragraph states that FDA will ordinarily extend the review period "only for the time necessary to review the significant data or information," and this period will not exceed 180 days. This paragraph, as revised, is similar to the preexisting requirements under § 314.60 and encourages ANDA applicants to submit complete applications.

Proposed § 314.96(a)(2) also stated that FDA would notify an applicant of the length of the extension. The agency has decided not to adopt the notification provision. FDA's experience suggests that it is difficult and impractical to predict the length of an extension for an ANDA given the unpredictable nature of its workload. At the same time, FDA emphasizes that extensions under this paragraph will be "only for the time necessary to review the new information." The agency hopes to be able to limit extensions under § 314.96(a)(2), which applies to amendments submitted other than in response to a not approvable letter, to generally not more than 120 days if resources permit.

With regard to the comment regarding "minor" amendments, under current Office of Generic Drugs policy, FDA distinguishes between major and minor amendments only with regard to amendments submitted in response to a not approvable letter. These are covered under § 314.96(a)(3).

51. Three comments concerned extending the review period for amendments under proposed § 314.96(a)(3). One comment suggested that the extension be "not more than 120 days." Another comment said major amendments responding to FDA reviewers should not constitute an agreement to extend the review period. This comment added that if an extension were necessary, "it should not affect the entire ANDA, but only the discipline in which it is generated." The third comment objected to § 314.96(a)(3) entirely and claimed, without explanation, that it was inconsistent with the statute.

As stated above with regard to § 314.96(a)(2), FDA has decided against the adoption of proposed § 314.96(a)(3) and, instead, has revised § 314.96(a)(3) to state that the submission of an amendment containing significant data or information to resolve deficiencies in the application as set forth in a not approvable letter constitutes an agreement between FDA and the applicant to extend the review period. This paragraph, as revised, corresponds to similar requirements under § 314.60. The extension will only be for the time necessary to review the significant data or information and would not exceed 180 days.

FDA notes that under current Office of Generic Drugs policy, FDA distinguishes between major and minor amendments submitted in response to not approvable letters. (See memorandum issued July 11, 1991, from the Director, Office of Generic Drugs, to Office Division Directors, Deputy Division Directors, Associate Office Directors, and Branch Chiefs). FDA currently considers a minor amendment to be one that an experienced chemist reasonably can be expected to take less than 1 hour to complete the review. Under current policy, FDA commits to make every attempt to take action on a minor amendment within 60 days of its receipt, subject to applicable agency clearances such as a field inspection or microbiology consult.

Although the agency would like to be able to review all major amendments and applications within the 180-day period provided by statute, and would like to establish goals for reviewing these submissions in even shorter time periods, current resources do not provide a basis for establishing such goals for the foreseeable future. The Agency's goal at this time is to meet its obligations under the statute and to review these submissions as efficiently and as expeditiously as possible without affecting the scientific integrity of the review.

The agency disagrees, however, with the comments that would prevent the agency from extending the review period. FDA's experience indicates that some amendments that are intended to respond to not approvable letters can be extremely complex and present new information. If the agency could not extend the review period after receiving such amendments, the only practical recourse would be not to approve the application and have the applicant submit a new ANDA. This would be inefficient and wasteful, so § 314.96(a)(3) treats an amendment under this paragraph as an agreement to extend the review period. This permits both FDA and the applicant to continue working on the ANDA.

FDA emphasizes, however, that an applicant who receives a not approvable letter and wishes to submit an amendment to resolve the deficiencies identified in the not approvable letter should confine its amendment to the subjects discussed in the letter. Completely new information on topics not raised in the not approvable letter only prolongs FDA review.

FDA disagrees with the comment claiming that the provision is inconsistent with the statute. Under section 505(j)(4)(A) of the act, FDA must approve or disapprove an application within 180 days after its initial receipt or "within such additional period as may be agreed upon * * *." The statute clearly recognizes that deciding whether to approve an application may require more than 180 days.

52. One comment said FDA should, upon submission of an ANDA, notify the applicant of the date on which the agency would approve or not approve the ANDA. Alternatively, the comment would require FDA to review an ANDA once it had been submitted to determine whether the application may be received.

FDA declines to adopt the comment. Under § 314.101(b)(2), FDA will notify applicants, in writing, whether the agency will receive an ANDA. (Such written notice, however, is not provided when FDA receives an ANDA supplement.) FDA will not, however, create a deadline for informing applicants whether an ANDA is received because such deadlines would be impractical. FDA cannot predict the number of applications it will receive in any given period and must remain flexible to assign its staff to respond to agency demands and priorities. As for notifying applicants of the latest date on

Federal Register / Vol. 57, No. 82 / Tuesday, April 28, 1992 / Rules and Regulations    17965

which FDA should approve or not approve an ANDA. § 314.100(a) states that FDA will send an ANDA applicant an approval letter, approvable letter, or not approvable letter within 180 days of receipt of an ANDA.

*Section 314.97—Supplements and Other Changes to an Approved Abbreviated Application*

FDA received no comments on this provision and has finalized it without change.

*Section 314.98—Postmarketing Reports*

Proposed § 314.98 would require an applicant that has an approved abbreviated antibiotic application or approved ANDA to comply with adverse drug experience reporting requirements. Proposed § 314.98(c), however, would not require holders of approved ANDA's or abbreviated antibiotic applications to submit periodic reporting of adverse drug experiences "if no adverse drug experience reports have been received and no labeling changes have been initiated by the applicant during the reporting interval."

53. Several comments, however, said postmarketing report requirements should be the same for NDA and ANDA holders. One comment said FDA should require ANDA holders to submit a periodic report that would indicate whether a company had received any adverse drug experience reports during the reporting period.

After careful consideration, FDA has revised § 314.98 to require ANDA applicants to submit a periodic report of adverse drug experiences even if the ANDA applicant has not received any adverse drug experience reports or initiated any labeling changes. As revised, the requirement is identical to that imposed on NDA holders. Periodic reports by ANDA holders will help FDA determine whether ANDA products have appropriate labeling and ensure that no adverse drug experiences go unreported.

54. FDA, on its own initiative, has amended § 314.98(a) to require abbreviated antibiotic application and ANDA applicants to comply with the recordkeeping requirements under § 314.80. This change corrects an inadvertent omission from the original proposal.

*Section 314.99—Other Responsibilities of an Applicant of an Abbreviated Application*

FDA received no comments on this provision and has finalized it without change.

*Section 314.100—Timeframes for Reviewing Applications and Abbreviated Applications; Section 314.101—Filing an Application and an Abbreviated Antibiotic Application and Receiving an Abbreviated New Drug Application*

Proposed § 314.100 discussed timeframes for reviewing applications and abbreviated applications. In general, the proposed rule would have FDA review an application or abbreviated application and send the applicant an approval letter, approvable letter, or not approvable letter within 180 days of receipt of an application under section 505(b) of the act, or an ANDA under section 505(j) of the act, or an abbreviated antibiotic application under section 507 of the act. Proposed § 314.101 concerned the circumstances under which FDA would file an application and an abbreviated antibiotic application and receive an ANDA. FDA received several comments suggesting additional agency obligations when an application or abbreviated antibiotic application is filed and when an ANDA is received.

55. One comment wanted the agency to amend proposed § 314.100 to require FDA to acknowledge receipt of an application and to issue an application number. The comment suggested that this occur within 14 days after the application is submitted.

Section 314.101 states that FDA will notify applicants, in writing, whether an application or abbreviated application is filed or received. (See 21 CFR 314.101(a)(2) and (b)(2).) These letters should contain an application number. As noted in paragraph 52 above, FDA believes that establishing a fixed time period for determining whether an application may be received would be impractical considering the number of applications and supplements FDA receives. As a result, FDA declines to amend the rule as requested.

56. Two comments suggested that either proposed § 314.100 or § 314.101 be amended to have FDA expressly determine whether an ANDA is "received" within 30 days of its submission.

FDA declines to accept the comments. As stated earlier, FDA cannot predict how many applications will be submitted in a given period, so it must retain flexibility to respond to any demands imposed on the agency. Creating an additional 30-day deadline in the ANDA review process would limit that flexibility without any significant benefit to FDA or to applicants.

57. Another comment said proposed § 314.101(b) should not authorize FDA to determine whether an abbreviated application may be received.

FDA rejects this comment. By determining whether an application is "received," FDA encourages applicants to submit ANDA's that comply with statutory and regulatory requirements and are sufficiently complete for substantive review to begin. This conserves FDA resources by permitting FDA reviewers to devote their time to examining reviewable applications.

58. Two comments stated that an ANDA lacking bioequivalence or bioavailability information, completed bioequivalence studies, or stability data to support at least a 24-month expiration date should not be received.

As stated earlier, FDA no longer accepts an ANDA that lacks complete bioequivalence or bioavailability information at the time of its initial submission. Consequently, the agency has deleted § 314.101(d)(8), which pertained to ANDA's that did not contain the results of any required or completed bioequivalence or bioavailability study.

As for the comment suggesting that an ANDA lacking stability data to support at least a 24-month expiration date not be received, FDA declines to adopt the comment. Although most ANDA's contain such stability data, applicants have submitted and FDA has approved ANDA's containing stability data that support a different expiration date.

59. FDA received two comments on proposed § 314.101(e)(1). The proposed provision stated that FDA will refuse to file an application or abbreviated antibiotic application or consider an ANDA not to have been received if the drug product that is the subject of the submission "is already covered by an approved application or abbreviated application and the applicant of the submission is merely a distributor and/or repackager of the already approved drug product." One comment suggested that the first sentence be revised to state that FDA "may refuse to file" an application or abbreviated application if any of the listed conditions apply. The comment explained that FDA should have discretion to file an application, notwithstanding the existence of an approved application, when the applicant could justify the need for the duplicate application or abbreviated application. The second comment asked FDA to file duplicate ANDA's if two or more companies jointly develop the product or if an exclusive licensee or distributor seeks to file an ANDA with the licensor's consent.

Section 314.101(e)(1) was intended to prevent distributors from forcing FDA to

17966    Federal Register / Vol. 57, No. 82 / Tuesday, April 28, 1992 / Rules and Regulations

review applications for drug products that are already covered by approved applications. Reviewing an application is extremely time-consuming, and FDA's resources are limited. To permit applicants to force review of an application for a product that is already covered by an approved application would result in a severe drain on FDA resources to review duplicate applications, create duplicate product and patent listings in the Orange Book, and contribute to the agency's accumulation of applications. FDA did not, however, intend to apply this provision against companies that jointly develop a product. The agency, therefore, is amending § 314.101 to change the refusal in proposed § 314.101(e)(1) to accept duplicate applications to a discretionary refusal to accept duplicate applications under a new § 314.101(d)(8). FDA has also revised § 314.101(d)(8) to clarify that the agency may refuse to file an application or refuse to consider an ANDA to be received for a drug product when the application already has an approved application or abbreviated application for the same drug product.

Additionally, the agency has created a new § 314.101(d)(9) to clarify that the agency may refuse to file a 505(b)(2) application for a drug that is a duplicate of a listed drug and is eligible for approval under section 505(j) of the act.

60. One comment asked FDA to amend § 314.101(f)(2) to add time periods for setting a hearing date following ANDA disapproval and for issuing a decision on a hearing. The comment also requested procedures for appealing a disapproval that would give the applicant "immediate attention" and be considered to be "final agency action."

The regulation pertaining to not approvable letters to applicants, § 314.120, states that when the agency refuses to approve an application, abbreviated antibiotic application, or ANDA, it will give the applicant a written notice of an opportunity for a hearing under § 314.120(a)(3). Section 314.200 states that, if the Commissioner of Food and Drugs grants a hearing, the hearing will begin within 90 days after the expiration of the time for requesting the hearing unless the parties otherwise agree in the case of denial of approval, and as soon as practicable in the case of withdrawal of approval (§ 314.200(g)(5)). Thus, there is no need to amend § 314.101(f)(2) to set a hearing date.

FDA also declines to set a deadline for resolving hearings or appeals. The demands placed on the presiding officer and other FDA employees assigned to administrative hearings can be immense depending on, among other things, the number of documents submitted to the administrative record. A large administrative record, coupled with the other obligations placed on the agency's employees, makes a deadline for resolving these matters impractical.

Finally, the administrative hearing regulations contain procedures for appealing a disapproval (e.g., 21 CFR 10.33 and 10.35). Parties may also seek judicial review as provided in 21 CFR 314.235(b).

*Section 314.102—Communications Between FDA and Applicants*

FDA received four comments regarding communications between FDA and applicants under proposed § 314.102. The proposed rule was substantially similar to the existing provision at 21 CFR 314.102 with the exception of new language to account for abbreviated applications and the availability of conferences and meetings for abbreviated applications. Proposed § 314.102(b) said FDA reviewers would make every reasonable effort to inform applicants of easily correctable deficiencies found in an application or abbreviated application or whether the agency would need more data or information. Proposed § 314.102(c) provided for 90-day conferences "to inform applicants of the general progress and status of their applications, and to advise applicants of deficiencies which have been identified by that time and which have not already been communicated." These conferences would be available for applications for all new chemical entities and major new indications of marketed drugs. Proposed § 314.102(d) would provide end-of-review conferences "to discuss what further steps need to be taken by the applicant before the application or abbreviated application can be approved." Finally, proposed § 314.102(e) indicated that applicants could request other meetings to discuss scientific, medical, or other issues.

61. One comment would require FDA reviewers to call ANDA applicants before issuing deficiency letters. The comment claimed FDA reviewers misinterpret or misread applications and could resolve these misunderstandings without a deficiency letter if they called ANDA applicants.

FDA declines to adopt the comment. The agency fully intends to communicate with ANDA applicants to resolve issues that arise during the ANDA review process but believes that requiring FDA reviewers to call ANDA applicants would be impractical and an inefficient use of resources. Some issues cannot be resolved or adequately described in a telephone call.

62. One comment proposed amending § 314.102(d) to require FDA to hold an end-of-review conference within 30 days of the issuance of a not approvable letter. Two comments addressed meetings under proposed § 314.102(e). One comment would require FDA reviewers and chemists to meet with any applicant upon 30 days notice. Finally, another comment urged FDA to be "liberal and speedy in granting requests for meetings on issues that arise during the review process."

FDA declines to accept the comments. FDA will make every attempt to grant requests for meetings that involve important issues, but, due to limited resources and other demands on reviewers, will not conduct meetings on a regular basis. The agency reiterates that 90-day conferences are available "on applications for all new chemical entities and major new indications of marketed drugs" (21 CFR 314.102(c) (emphasis added)), and that end-of-review conferences are available on all applications and abbreviated applications "with priority given to applications for new chemical entities and major new indications for marketed drugs and for the first duplicates for such drugs" (21 CFR 314.102(d)). Thus, for ANDA's, 90-day conferences will generally be unavailable, and end-of-review conferences will be given low priority.

FDA adds that ANDA applicants who do request a meeting are encouraged to submit an agenda of important issues in advance for FDA's consideration. This will permit the agency to focus on specific issues and conserve resources.

*Section 314.103—Dispute Resolution*

FDA received no comments on this provision and has finalized it without change.

*Section 314.104—Drugs with Potential for Abuse*

63. Only one comment addressed proposed § 314.104, which states that FDA will inform the Drug Enforcement Administration (DEA) when an application or abbreviated application is submitted for a drug that appears to have an abuse potential. The comment supported the rule but asked FDA to "ensure the confidentiality of any information, including even the fact that an application has been submitted prior to providing that information to DEA."

Section 314.104 simply reflects FDA's obligation, under 21 U.S.C. 811(f), to forward to DEA information on any drug having a stimulant, depressant, or

hallucinogenic effect on the central nervous system if "it appears that such drug has abuse potential." (See 21 U.S.C. 811(f).) FDA's disclosure of information to another Federal agency does not necessarily result in the public disclosure of that information. (See 21 CFR 20.85.) Indeed, the regulation on public disclosure of information at § 314.430 states that FDA will not publicly disclose the existence of an application or an abbreviated application before sending the applicant an approval letter unless the application or abbreviated application's existence has been previously publicly disclosed or acknowledged (21 CFR 314.430(b)). This includes data in an application or abbreviated application (21 CFR 314.430(c)). Disclosure of any trade secret information obtained under section 505 of the act is also prohibited by section 301(j) of the act.

### Section 314.105—Approval of an Application and an Abbreviated Application

64. FDA received two comments on proposed § 314.105(d). Under that provision, FDA will approve an ANDA and send the applicant an approval letter if the agency finds none of the grounds for refusing ANDA approval to apply. Both supported the rule, but one comment said an approval letter should not raise any new issues "except on the data submitted in response to an approvable letter."

With the exception of editorial matters or other minor deficiencies in an ANDA, approval letters should not raise new issues for applicants to resolve. Therefore, the comment's suggestion is unnecessary.

FDA has, on its own initiative, clarified that an approval with a delayed effective date is tentative and does not become final until the effective date. The agency has also amended § 314.105(c) to state that an abbreviated application must meet statutory standards for manufacturing and controls, labeling, and "where applicable, bioequivalence." This change reflects the statutory requirements for an ANDA.

### Section 314.110—Approvable Letter to the Applicant

FDA received seven comments regarding approvable letters to applicants under proposed § 314.110. The proposed rule stated that FDA would send applicants an approvable letter "if the application or abbreviated application substantially meets the requirements of this part and the agency believes that it can approve the application or abbreviated application if specific additional information or material is submitted or specific conditions * * * are agreed to by the applicant." Proposed § 314.110 (a)(1) through (a)(5) would give those submitting full or abbreviated antibiotic applications 10 days to respond to or act on an approvable letter, request a hearing, or agree to an extension of the review period. Under proposed § 314.110(b), FDA would send approvable letters to ANDA applicants only if the ANDA substantially meets FDA requirements and the agency believed that "it can approve the abbreviated application if minor deficiencies in the draft labeling are corrected and final printed labeling is submitted." The proposed rule did not give ANDA applicants a specific time period to respond to an approvable letter.

65. Two comments recommended revising proposed § 314.110(a)(3). That provision stated that an NDA applicant who receives an approvable letter may ask FDA to provide an opportunity for a hearing on the question of whether there are grounds for denying approval of the application under section 505(d) of the act. One comment urged FDA to provide an opportunity for a hearing to ANDA applicants. The second comment suggested revising the rule to provide hearing dates.

With respect to ANDA applicants, FDA is amending § 314.110(b) to permit ANDA applicants to request, within 10 days after the date of an approvable letter, that FDA provide an opportunity for a hearing. This is consistent with the opportunity for a hearing provided to applicants who receive a not approvable letter under § 314.120, although the agency believes that most issues raised by approvable letters should be capable of being resolved without a hearing. The agency is also amending § 314.110(a)(3) to note that abbreviated antibiotic applications applicants will have an opportunity to request a hearing under § 314.125. The proposed rule inadvertently omitted such language even though §§ 314.101 and 314.125 suggested that these applicants had an opportunity for a hearing.

As for providing hearing dates, FDA believes that amending the rule to provide hearing dates would be impractical. FDA's experience with scheduling administrative hearings shows that finding mutually acceptable hearing dates can be difficult, and the parties often request postponements even after a hearing date has been set.

66. Two comments suggested that FDA prescribe time limits for its review of amendments submitted in response to an approvable letter. One comment would require FDA to review an ANDA applicant's response to an approvable letter within 45 days. A second comment would require FDA to review an ANDA applicant's response within 90 days.

FDA declines to amend the rule as suggested. Under § 314.110(b), FDA will send an approvable letter to an ANDA applicant only if the ANDA meets regulatory requirements under 21 CFR part 314 and FDA "believes that it can approve the abbreviated application if minor deficiencies are corrected * * *." However, FDA's ability to review an applicant's response to an approvable letter can vary due to a number of factors, such as the reviewer's skill, speed, and work load, the quality of the amendment or submission, and the complexity of the issues. Thus, the final rule does not require the agency to review an applicant's response within a single, predetermined time period. Unless the applicant's response to the approvable letter contains significant data or information requiring an extension of the review period, FDA should complete, and has the goal of completing, most of these reviews before 60 days have expired.

67. Two comments asked FDA to clarify when it would issue an approvable letter to an ANDA applicant. Under proposed § 314.110(b), FDA would send an ANDA applicant an approvable letter "only if the application substantially meets the requirements of this part and the agency believes that it can approve the abbreviated application if minor deficiencies in the draft labeling are corrected and final printed labeling is submitted." One comment said an approvable letter should be appropriate for more than minor labeling changes, and should also be used for changes such as a change in U.S.P. requirements, or the addition or deletion of an alternate analytical method. The second comment asked FDA to define the phrase, "substantially meets the requirements of this part."

FDA agrees that approvable letters may be appropriate for more than minor labeling deficiencies. Consequently, the agency has revised the rule to state that minor labeling deficiencies are simply an example of the type of deficiencies for which an approvable letter may be appropriate.

As for the phrase, "substantially meets the requirements of this part," FDA means that, with the exception of minor deficiencies, the ANDA complies with the requirements under 21 CFR part 314.

### Section 314.120—Not Approvable Letter to the Applicant

Proposed § 314.120 described the circumstances under which FDA would send a not approvable letter. Proposed § 314.120(a)(1) and (a)(2) would require applicants to amend, withdraw, or notify FDA of an intent to amend an application or abbreviated application. Proposed § 314.120(a)(3) would permit applicants to ask FDA to provide a hearing on the question of whether there are grounds for denying approval of the application under section 505(d) or (j)(3) of the act. Applicants would be required to respond to a not approvable letter within 10 days, except that ANDA applicants, under proposed § 314.120(b), would have 180 days to respond.

68. Most comments on proposed § 314.120 recommended changes to response times. One comment suggested amending § 314.120(a) to give applicants 30 days to respond to a not approvable letter. Two comments asked that the regulation require ANDA applicants to respond to a not approvable letter within 10 days rather than the 180 days given at § 314.120(b).

FDA declines to amend the rule as suggested by the comments. The comments did not contain any justification for revising the response times, and FDA sees no reason to do so.

69. One comment asked that proposed § 314.120(a)(3) be revised to make clear that ANDA and NDA applicants, upon receipt of a not approvable letter, have the right to request that the agency provide the applicant an opportunity for a hearing.

Section 314.120(a)(3) was intended to apply to both ANDA applicants and to NDA applicants. FDA, therefore, agrees with the comment and has revised the provision accordingly. FDA has also revised § 314.120(b) to clarify that an ANDA applicant must make its request for a hearing to FDA within 10 days after the date of the not approvable letter.

### Section 314.122—Submitting an Abbreviated Application for, or a 505(j)(2)(C) Petition That Relies on, a Listed Drug That is no Longer Marketed

70. One comment suggested that the title be revised to read. "Submitting an Abbreviated Application for * * *" The comment said this change would be consistent with the definitions in § 314.3

FDA agrees and has revised the title accordingly.

### Section 314.125—Refusal to Approve an Application or an Abbreviated Antibiotic Application

FDA received no comments on this provision and has finalized it without substantive change.

### Section 314.127—Refusal to Approve an Abbreviated New Drug Application

Proposed § 314.127 provided a list of reasons for refusing to approve an ANDA. In general, these reasons corresponded to those listed at section 505(j)(3) of the act.

71. One comment asked FDA to amend proposed § 314.127(c) to describe the type of information that it would require an ANDA applicant to submit to show that an active ingredient in an ANDA product is the same as the active ingredient in the reference listed drug. In brief, proposed § 314.127(c) would, in relevant part, have FDA refuse to approve an ANDA if there is insufficient information to show that the active ingredient(s) in the proposed drug product are the "same" as those in the reference listed drug.

Under 21 CFR 314.120, if FDA believes that an application is not approvable, it will notify the applicant in writing and describe the deficiencies in the application. Thus, in the situation described by the comment, the applicant could use the agency's written response to determine how it could demonstrate that its active ingredient is the same as that in the reference listed drug. Depending upon the circumstances, an applicant might find additional guidance in drug compendia or FDA guidelines. (See paragraph 26 above for a related comment.) The comment's suggestion, therefore, is unnecessary.

72. Proposed § 314.127(g) (now § 314.127(a)(7)) would permit FDA to refuse to approve an abbreviated application if information in the ANDA "is insufficient to show that the labeling proposed for the drug is the same as the labeling approved for the listed drug * * * except for changes required because of differences approved in a petition under § 314.93 or because the drug product and the reference listed drug are produced or distributed by different manufacturers." One comment said FDA should also require ANDA holders to obtain current labeling for the listed drug every 6 months and update their own labeling accordingly.

FDA has revised § 314.150 to require ANDA holders to maintain current labeling. Failure to do so may result in withdrawal of approval. FDA will not, however, require ANDA holders to obtain current labeling or to update their own labeling every 6 months because

drug labeling does not change on a regularly scheduled basis.

73. A second comment recommended adding "or because of patent requirements" to the end of proposed § 314.127(g).

FDA agrees that a patent may be a valid reason for labeling differences between the reference listed drug and the ANDA drug product and that such differences should not be a basis for refusing to approve an ANDA. FDA has, therefore, revised the rule to indicate that labeling differences may also be due to patents or exclusivity. However, FDA cautions that it will not approve an ANDA with different labeling if the labeling differences affect product safety or efficacy. For example, if the patent protects information on a new dosing regimen and FDA concludes that the preexisting dosing regimen is unsafe, the different labeling for the proposed ANDA product would be grounds for refusing to approve the ANDA.

74. Proposed § 314.127(h)(1)(i) (now § 314.127(a)(8)(i)(A)) would permit FDA to refuse to approve an ANDA if FDA had any information that the proposed drug product's inactive ingredients are unsafe for use under the conditions prescribed, recommended, or suggested in the proposed drug product's labeling. Proposed § 314.127(h)(1)(ii) (now § 314.127(a)(8)(i)(B)) would permit FDA to refuse to approve an ANDA if the proposed drug product's composition was unsafe under the conditions prescribed, recommended, or suggested in the proposed labeling because of the type or quantity of inactive ingredients included or the manner in which the inactive ingredients are included. One comment asked FDA to merge proposed § 314.127(h)(1)(i) and (h)(1)(ii) or to explain their differences.

FDA declines to revise the rule as suggested. Section 314.127(a)(8)(i)(A) and (a)(8)(i)(B) (proposed § 314.127(h)(1)(i) and (h)(1)(ii)) reflects the statutory language at section 505(j)(3)(H)(i) and (j)(3)(H)(ii) of the act, respectively, and serves different purposes. To illustrate, if FDA concluded that an inactive ingredient in a proposed ANDA product was unsafe, it could refuse to approve the ANDA under § 314.127(a)(8)(i)(A). If the proposed ANDA product involved a combination of inactive ingredients and the combination (as opposed to each inactive ingredient), either by the type or quantity of an inactive ingredient or the manner of formulation of the inactive ingredients into the product, shows that the product was unsafe, the refusal to approve the ANDA would occur under § 314.127(a)(8)(i)(B).

FDA received four comments on proposed § 314.127(h)(2) (now § 314.127(a)(8)(ii)). Under the proposal, FDA would consider a drug product's inactive ingredients or composition to be unsafe and refuse to approve an ANDA if, on the basis of information available to FDA, "there is a reasonable basis to conclude that one or more of the inactive ingredients of the proposed drug or its composition raise serious questions of safety."

75. One comment said FDA must have a valid scientific reason, rather than a "reasonable basis" under proposed § 314.127(h)(2)(i), to conclude that an inactive ingredient raises "serious questions of safety." A second comment would replace the list of examples with a shorter, generalized list of safety questions.

If the reference to "valid scientific reason" is meant to suggest that the agency must have proof that a drug is unsafe before taking action, FDA disagrees with the comment. The preamble to the proposed rule explained how FDA concluded that section 505(j)(3)(H) of the act authorizes the agency to refuse to approve an ANDA if there is a reasonable basis to conclude that a drug product's inactive ingredients or composition raises serious questions about drug safety. In brief, section 505(e) of the act permits FDA to withdraw ANDA approval if there is evidence that the drug "is not shown to be safe." FDA can invoke this provision whenever there is a reasonable basis to conclude that a drug is unsafe even if the agency lacks proof that the drug is unsafe (54 FR 28902). In comparison, section 505(j)(3)(H) of the act authorizes FDA to refuse to approve an ANDA if "information submitted in the application or any other information available to the Secretary" shows that the drug's inactive ingredients or composition is unsafe. If FDA construed section 505(j)(3)(H) of the act as requiring proof that a drug product is unsafe before it could act, the agency would be obliged to approve an ANDA and then immediately initiate a proceeding to withdraw approval.

The U.S. Supreme Court has held that, in interpreting the act, it must be given "'the most harmonious, comprehensive meaning possible' in light of the legislative policy and purpose," and must not "'impute to Congress a purpose to paralyze with one hand what it sought to promote with the other.'" Weinberger v. Hynson, Westcott and Dunning, Inc., 412 U.S. 609, 631–632 (1973) [quoting Clark v. Uebersee Finanz-Korp., 332 U.S. 480, 488–489]. It would be inconsistent with these principles to interpret section 505(j)(3)(H) of the act as imposing a burden of proof on the agency that would require approval of potentially unsafe drugs, or require a greater showing that a drug is not safe to disapprove a product than is required to withdraw approval of it. Therefore, FDA is interpreting that section as authorizing disapproval of an ANDA on the same basis as withdrawal under section 505(e)(2) of the act. Thus, an ANDA may be disapproved if there is a reasonable basis to conclude that one of its inactive ingredients or its composition raises serious questions about the drug's safety.

As for deleting the list of examples of changes that raise serious questions of safety, FDA has elected to amend the last sentence in § 314.127(a)(8)(ii)(A) (proposed § 314.127(h)(2)(i)) to read, "Examples of the changes that may raise serious questions of safety include, but are not limited to, the following." This amendment shows that the list of examples is not exhaustive and that the described changes do not automatically raise serious safety concerns that preclude ANDA approval.

The proposed rule listed several examples of changes that raise serious questions of safety. These examples included the "use of a controlled release mechanism never before approved for the drug" (proposed § 314.127(h)(2)(i)(E)) and "a change in composition to include a significantly higher concentration of one or more inactive ingredients than previously used in the drug product" (proposed § 314.127(h)(2)(i)(F)).

76. The third comment asked FDA to delete § 314.127(h)(2)(i)(E) and (h)(2)(i)(F) (now § 314.127(a)(8)(ii)(A)(5) and (a)(8)(ii)(B)(6)). The comment claimed that the use of a different controlled release mechanism or a change in composition to include a significantly higher concentration of one or more inactive ingredients should not preclude ANDA approval. The comment also suggested revising § 314.127(h)(2)(i)(F) to read, "A change in composition to include levels of an inactive ingredient for which published data may exist showing such levels to be unsafe."

FDA declines to accept the comment. When read in its entirety, proposed § 314.127(h)(2) states that FDA will consider a drug's inactive ingredients or composition to be unsafe and refuse to approve an ANDA if "there is a reasonable basis to conclude that one or more of the inactive ingredients of the proposed drug or its composition raise serious questions of safety." FDA believes that such a reasonable basis may exist in the absence of published data. As the rule and the preamble to the proposed rule note, the examples listed in proposed § 314.127(h)(2)(i)(E) and (h)(2)(i)(F) simply illustrate FDA's experience. (See 54 FR 28903.) Thus, if the proposed drug product uses a delivery or release mechanism that has never been approved for that drug or contains a higher concentration of one or more inactive ingredients, FDA will not automatically refuse to approve the ANDA. Instead, FDA will refuse to approve the ANDA only if there is a reasonable basis to conclude that the change raises serious safety questions.

FDA has, however, revised the wording in the final rule at § 314.127(a)(8)(ii)(A)(5) to replace "a controlled release mechanism" with "a delivery or a modified release mechanism." This change reflects the agency's experience with novel delivery or modified release mechanisms and places emphasis on the delivery mechanism or modified release mechanism itself whereas the proposed rule could have been interpreted as focusing concern solely on controlled release mechanisms.

FDA has also revised the final rule at § 314.127(a)(8)(ii)(A)(6) to replace "higher concentration" with "greater content." This change recognizes the fact that minutely higher concentrations of one or more inactive ingredients do not always present serious questions of safety. In contrast, a drug that has a greater content of one or more inactive ingredients often presents serious questions of safety.

77. Proposed § 314.127(h)(2)(ii) (now § 314.127(a)(8)(ii)(B)) said FDA would consider an inactive ingredient in, or the composition of, a drug product intended for parenteral use to be unsafe and refuse to approve the ANDA unless "it contains the same inactive ingredients, other than preservatives, buffers, and antioxidants, in the same concentration as the listed drug, and, if it differs from the listed drug in a preservative, buffer, or antioxidant, the application contains sufficient information to demonstrate that the difference does not affect the safety of the drug product." A comment said that requiring information to show that changes in a preservative, buffer, or antioxidant do not affect safety was "unnecessarily excessive" because FDA knows commonly used preservatives, buffers, and antioxidants. The comment suggested revising the provision only to require submission of information on preservatives, buffers, and antioxidants that are not commonly used.

The statute authorizes the Secretary to withhold approval of an ANDA if

17970 Federal Register / Vol. 57, No. 82 / Tuesday, April 28, 1992 / Rules and Regulations

information submitted in the application or any other information available shows that "(i) the inactive ingredients of the drug are unsafe for use under the conditions prescribed, recommended, or suggested in the labeling proposed for the drug, or (ii) the composition of the drug is unsafe under such conditions because of the type or quantity of inactive ingredients included or the manner in which the inactive ingredients are included." (See 21 U.S.C. 355(j)(3)(H).) Thus, under the statute, the inquiry is not whether each preservative, buffer, and antioxidant is commonly used or known; instead, the inquiry is whether the preservatives, buffers, and antioxidants in the proposed drug product are safe under the conditions prescribed, recommended, or suggested in the labeling. Section 314.127(a)(8)(ii)(B) of this final rule reflects this concern, which is particularly acute for parenteral drug products. Therefore, FDA declines to revise the rule as suggested.

Section 314.150—Withdrawal of Approval of an Application or Abbreviated Application

Proposed § 314.150 concerned withdrawals of approvals of an application or abbreviated application under section 505(e) of the act. The proposed rule would permit FDA to withdraw approval of an application or abbreviated application under certain enumerated conditions, such as a finding that an imminent hazard to the public health exists (§ 314.150(a)(1)), or a finding that clinical data or other experience, tests, or scientific data show the drug is safe for use under the conditions of use approved in the application or abbreviated application (§ 314.150(a)(2)(i)).

78. Two comments said FDA should create a new provision authorizing the agency to withdraw an abbreviated application if the abbreviated application holder failed to modify its labeling to match labeling changes in the reference listed drug.

FDA agrees and has revised the rule accordingly. New § 314.150(b)(10) states that the ANDA applicant's failure to maintain drug labeling that is consistent with that of the listed drug may be grounds for withdrawing approval of the abbreviated application. The only exceptions to this withdrawal provision are labeling differences approved in the original ANDA or resulting from a patent issued on the listed drug after approval of the ANDA or from exclusivity accorded to the listed drug after approval. However, as noted in paragraph 39 above, if the agency concludes that a labeling difference resulting from patent protection or exclusivity compromises the safety or effectiveness of the generic drug product for any remaining conditions of use, FDA may withdraw approval of the ANDA under this provision.

Section 314.151—Withdrawal of Approval of an Abbreviated New Drug Application Under Section 505(j)(5) of the Act; Section 314.152—Notice of Withdrawal of Approval of an Application or Abbreviated Application for a New Drug

79. Proposed § 314.151 (concerning withdrawals of approval of ANDA's under 21 U.S.C. 355(j)(5)) did not provide ANDA applicants the opportunity for an oral hearing in the event of a withdrawal. FDA received seven comments claiming that ANDA applicants should have an opportunity for a hearing or an oral hearing when FDA proposes to withdraw approval of an application or abbreviated application. In general, the comments argued that ANDA applicants should have the opportunity for a hearing on due process grounds or to "assure fairness." One comment stated that section 505(e) of the act authorizes hearings whenever the agency proposes to withdraw approval of an application approved under section 505, and, therefore, ANDA holders were entitled to hearings because ANDA's are authorized by section 505(j) of the act. One comment, however, would deny ANDA applicants the opportunity for a hearing because an ANDA "is completely dependent on the continued approval of the reference listed drug" and the ANDA applicant "does not take the place of the listed drug applicant for purposes of exercising the right to protect that drug."

The statute and regulations contemplate withdrawing ANDA approval under two different circumstances. First, if FDA finds the ANDA product unsafe for use, lacks substantial evidence of effectiveness under the conditions of use prescribed, recommended, or suggested in its labeling, contains an untrue statement of material fact, or meets any of the other grounds for withdrawal under section 505(e) of the act, the agency may withdraw approval "after due notice and opportunity for hearing to the applicant" (21 U.S.C. 355(e)). For ANDA products, the regulations pertaining to a withdrawal of approval under section 505(e) of the act are at § 314.150. These regulations, contrary to some of the comments' assertions, do give ANDA holders an opportunity for a hearing on a proposal to withdraw approval of an ANDA to the extent that one or more of the grounds for withdrawal under section 505(e) of the act directly apply to the ANDA product. (See § 314.150 (a) and (b).)

The second situation in which ANDA approval may be withdrawn focuses on withdrawal of the listed drug rather than the ANDA product itself. Under section 505(j)(5) of the act, if the listed drug is withdrawn for safety or effectiveness reasons or any of the grounds listed in section 505(e) of the act, ANDA approval "shall be withdrawn or suspended * * *." The statute does not require FDA to give the ANDA holder an opportunity for a hearing before withdrawing or suspending ANDA approval.

The preamble to the proposed rule discusses this subject in greater detail. (See 54 FR 28904 through 28907.)

Notwithstanding the absence of a statutory requirement for a hearing, some comments claimed that due process requires FDA to give applicants an opportunity for an oral hearing for a proposal to withdraw ANDA approval under section 505(j)(5) of the act. FDA disagrees. As noted in the preamble to the proposed rule, courts have declared a "paper hearing" that provides adequate notice and a genuine opportunity to present one's case to be adequate. (See 54 FR 28904, July 10, 1989, and cases cited therein.) Section 314.151, therefore, gives ANDA holders a paper hearing and, if FDA cannot resolve the issues on the basis of the written submissions, permits FDA to hold a limited oral hearing. (See 21 CFR 314.151(b) and (c)(3).)

FDA believes these procedures are consistent with the statute and provide ANDA applicants adequate due process. Consequently, FDA declines to amend the rule as requested.

Section 314.153—Suspension of Approval of an Abbreviated New Drug Application; Section 314.161—Determination of Reasons for Voluntary Withdrawal of a Listed Drug

Proposed § 314.153(b) contained procedures for suspension of an ANDA when a listed drug is voluntarily withdrawn for safety or effectiveness reasons. The preamble to the proposed rule stated that "if a drug manufacturer withdraws a drug from the market which accounted for significant sales to that manufacturer, and there is no evidence to the contrary, it will be presumed that the withdrawal was for safety or effectiveness reasons" (54 FR 28907). The agency expressed its intent to employ the same presumption in applying proposed § 314.161.

80. FDA received eight comments on proposed §§ 314.153 and 314.161. All eight comments objected to the presumption stated in the preamble, but for different reasons. Many comments listed possible reasons why an NDA holder would voluntarily withdraw a drug for business or economic reasons alone. Some comments said ANDA holders should not have the burden of showing why the NDA holder voluntarily withdrew the reference listed drug. These comments would have FDA determine the reasons for a withdrawal or require the NDA holder to state its reasons for withdrawing the listed drug. Other comments said the presumption might adversely affect an NDA holder in product liability litigation. A minority of comments said the presumption's reference to "significant sales" was too vague and would produce different results between large and small firms; these comments argued that FDA, if it retained the presumption, should examine research and development expenses, percentage of a company's gross revenues, or the product's sales record for the previous year.

As stated in the preamble to the proposed rule, FDA is aware that companies may withdraw a drug from the market for reasons unrelated to the product's safety or effectiveness. (See 54 FR 28907.) The preamble also noted that FDA is not required to determine why a sponsor voluntarily withdrew a listed drug, and, considering the number of drugs withdrawn from the market every year, "it would be a needless expenditure of resources for the agency to determine the reason for each such withdrawal." Id. The comments have not raised any new issues or advanced any compelling justification for changing the presumption. The agency does note, however, that the presumption is a rebuttable one, and adds that the agency will, when the product is a top 200 drug (as reported in the April issue of Pharmacy Times which is based on data obtained from the National Prescription Audit conducted by IMS America, Ltd., Ambler, PA), and in other cases when it deems it to be necessary, contact the sponsor of the listed drug to inquire about the reasons for a voluntary withdrawal. In addition, the regulations do not prohibit NDA holders from disclosing their reasons for withdrawing a drug product from marketing, and FDA would consider that information in determining whether the withdrawal was for safety and effectiveness reasons. FDA would not consider the NDA holder's stated reasons for withdrawing a drug to be determinative because such remarks could be biased. Similarly, if an ANDA applicant can show that the reasons for withdrawal of the listed drug are not relevant to the safety or effectiveness of the ANDA drug product, the agency will not suspend ANDA approval. (See 21 CFR 314.153(b)(6).)

As for the comments suggesting alternatives to "significant sales," FDA agrees that the term may have different meanings to different companies, and will adopt a case-by-case approach when determining whether a product accounted for significant sales.

For these reasons, FDA has retained the presumption without change.

*Section 314.160—Approval of an Application or Abbreviated Application for Which Approval Was Previously Refused, Suspended, or Withdrawn; Section 314.162—Removal of a Drug Product from the List; Section 314.200—Notice of Opportunity for Hearing; Notice of Participation and Request for Hearing; Grant or Denial of Hearing*

FDA received no comments on these provisions and has finalized them without change.

*Section 314.430—Availability for Public Disclosure of Data and Information in an Application or Abbreviated Application*

81. FDA received four comments on proposed § 314.430. The proposal simply added the term "abbreviated application" to FDA's preexisting public disclosure policies and did not make any substantive changes to those policies. Two comments asked FDA to release a summary basis of approval (SBA) or permit ANDA sponsors to release their own SBA's when an ANDA is approved.

Section 314.430(e)(2)(ii) permits FDA to make an SBA available for public disclosure after FDA sends an approval letter. Hence, the comment's request to have FDA release an SBA is unnecessary. FDA also declines to amend the rule to permit sponsors to release their own SBA's. The rule pertains only to the release of information by FDA; sponsors are always free to disclose whatever truthful and nonmisleading information they wish about their own products.

82. One comment asked FDA to amend the rule to reveal the "presence" of a pending ANDA without any further identification so applicants could make "a more educated decision" about possible exclusivity.

While the comment has some merit, FDA declines to amend the rule at this time. The agency is reexamining certain aspects of its public disclosure policies, but notes that a suit to declare a patent to be invalid or not infringed by the manufacture, use, or sale of a drug product may suggest that an ANDA for that drug product has been submitted.

83. Another comment would give all NDA holders an opportunity to prevent disclosure of information for which they had previously requested confidentiality.

The act states that safety and effectiveness data submitted in an application under section 505(b) of the act and not previously disclosed to the public, "shall be made available to the public, upon request, unless extraordinary circumstances are shown." (See 21 U.S.C. 355(l).) Thus, the statute clearly favors disclosure of safety and effectiveness data except in limited situations. FDA is reexamining its policies with respect to section 505(l) of the act, and, until it completes its deliberations, declines to amend the rule as requested. FDA will continue its policy of consulting parties before disclosing information where the confidentiality of data and information is uncertain. (See, e.g., 21 CFR 20.45.)

*Section 314.440—Addresses for Applications and Abbreviated Applications*

FDA received no comments on this provision. However, due to reorganizations within FDA, the agency has revised the addresses to which abbreviated antibiotic application applicants and ANDA applicants are to send documents and correspondence.

*Section 320.1—Definitions*

Proposed § 320.1 defined "bioequivalence," in part, as "the absence of a significant difference in the rate and extent to which the active ingredient or active moiety in pharmaceutical equivalents or pharmaceutical alternatives becomes available at the site of drug action when administered at the same molar dose under similar conditions in an appropriately designed study."

84. Six comments argued that § 320.1 should not include nonsystemically absorbed drug products and should not provide mechanisms other than blood level tests for bioequivalence. The comments noted that section 505(j)(7) of the act states that a drug shall be considered to be bioequivalent to a listed drug if, inter alia, "the rate and extent of absorption of the drug do not show a significant difference from the rate and extent of absorption of the listed drug when administered at the same molar dose of the therapeutic ingredient under similar experimental

**17972**  Federal Register / Vol. 57, No. 82 / Tuesday, April 28, 1992 / Rules and Regulations

conditions * * *." The comments claimed that this statutory provision precludes FDA from approving ANDA's for nonsystemically absorbed drug products because, the comments argued, the rate and extent of absorption of such products cannot be measured. One comment stated that in vivo bioavailability studies should be done to confirm that drugs not intended to be absorbed are not unintentionally absorbed.

The agency does not agree with the comments' interpretation of the statute. In 1977, FDA issued final regulations establishing the requirements for demonstrating the bioavailability and bioequivalence of drug products approved under both full new drug applications and ANDA's (21 CFR part 320). The definitions of "bioavailability" and "bioequivalence" adopted in those regulations were, in all pertinent respects, identical to the language used in section 505(j)(7) of the act. Although the 1977 regulations and the 1984 amendments to the act, which incorporate in the statutory provision on "bioequivalence" the language of those regulations, refer to "rate and extent of absorption," the 1977 regulations explicitly applies to drugs that are not intended for systemic absorption.

As originally proposed, the regulatory definition of "bioavailability" contained explicit reference to bioavailability studies other than systemic absorption studies. In the 1977 final rule, the Commissioner of Food and Drugs removed the references to the types of studies that can demonstrate bioavailability or bioequivalence as unnecessary and placed descriptions of appropriate studies in §§ 320.23, 320.24, 320.53, and 320.57. At the same time, the Commissioner of Food and Drugs specifically rejected a comment urging the definition of bioavailability to be restricted to products absorbed into the systemic circulation, stating that the concept of bioavailability applies to all drug products. (See 42 FR 1638 at 1639; January 7, 1977.)

All drug products must be absorbed through some physical barrier to reach the site of drug action, even if that absorption involves only dispersion into a body fluid pool or entry into surface cells. It is well established that drugs may be either locally or systemically absorbed, and nothing in the language of the statute requires that the absorption result in transit through cells or to the systemic circulation. Because Congress adopted the language of the 1977 regulations, and because the legislative history contains no evidence that Congress intended to exclude nonsystemically absorbed drugs from the coverage of the ANDA provisions of the 1984 amendments. FDA rejects the interpretation of section 505(j)(7)(B) of the act offered by these comments.

FDA also disagrees that blood levels are always appropriate or necessary measurements of bioequivalence. Bioequivalence can be established by pharmacodynamic measurement as well as by in vitro techniques and bioequivalence studies with clinical endpoints. The preferred method for establishment of bioequivalence, including the need to confirm that drugs not intended to be absorbed are not unintentionally absorbed, is determined on a case-by-case basis, depending on the drug under study.

Section 505(j)(6) of the act directs the Secretary to publish a list of all approved drugs for which ANDA's may be submitted and to state "whether in vitro or in vivo bioequivalence studies, or both such studies, are required * * *" (21 U.S.C. 355(j)(6)). In vitro studies are "test tube" studies intended to simulate drug effects in the human body, and are, by definition, indirect measurements of bioequivalence. Had Congress intended to require only direct measurements of the rate and extent of absorption in the human body, it would not have also permitted in vitro studies to satisfy the bioequivalence requirements. Thus, the statute permits and FDA's longstanding regulations provide for both indirect and direct measurements of bioequivalence applicable to nonsystemically absorbed drug products.

In summary, FDA's inclusion of nonsystemically absorbed drug products and inclusion of mechanisms other than blood level tests to establish the bioequivalence of drug products are consistent with the statute. The final rule therefore describes the types of studies that can be appropriately used to demonstrate bioavailability, and describes the bioavailability studies that are appropriate for nonsystemically absorbed drugs.

85. Proposed § 320.1 (a) and (e) defined "bioavailability" and "bioequivalence" using the phrase "active ingredient or active moiety." One comment proposed that the term "active moiety," which is used in proposed § 320.1 (a) and (e), does not find any statutory support and the regulations should instead use the statutory term "active ingredient." The comment's position was based on two court cases, *Abbott v. Young*, and *Glaxo v. Quigg*, which addressed the issue of using the term "active ingredient" as provided by statute instead of using the term "active moiety," with respect to the exclusivity provisions of title I and the patent term extension provisions of title II of the 1984 amendments, respectively. The comment stated that the courts concluded that there is a significant difference between the plain meaning of the statutory term "active ingredient" and the use of "active moiety." Equating the two is not permitted absent clear congressional intent. Thus, the comment argued that the term "active moiety" should not be used.

FDA disagrees with the comment. The court cases referred to by the comment are not relevant to FDA's use of the term "active moiety" in 21 CFR part 320. The statutory definition of "bioavailability" (section 505(j)(7)(A) of the act) uses the phrase "active ingredient or therapeutic ingredient," and the language on "bioequivalence" (section 505(j)(7)(B) of the act) uses the phrase "therapeutic ingredient." The agency is not substituting the phrase "active moiety" for the phrase "active ingredient." The phrase "active ingredient" remains in the definition of "bioavailability" in § 320.1(a) as in the statutory definition. The phrase "active ingredient" is not used in the statutory provision on "bioequivalence."

Congress clearly intended a meaning different from "active ingredient" by the term "therapeutic ingredient" or it would not have used both terms. The term "active moiety" refers to the molecule or ion in an active ingredient, excluding those appended portions of the molecule that cause the ingredient to be an ester, or a salt or other noncovalent derivative that is responsible for the physiological or pharmacological action of the ingredient. The agency believes that the term "active moiety" is more appropriate and has substituted this term for the term "therapeutic moiety" or "therapeutic ingredient" in defining the terms "bioavailability" and "bioequivalence."

86. One comment supported the proposed definition in § 320.1(e) of "bioequivalence" and opposed "across the board in vivo testing requirements." The comment asked FDA to "retain an open attitude toward the use of in vitro tests" and to have the regulations "reflect the fact that there are indeed other current and evolving methodologies, such as 'punch bioassays' and 'skin-blanching' tests, that will provide an equal measure of scientific comfort to demonstrate bioequivalence."

The final rule does not impose across-the-board in vivo testing requirements. With respect to drug products that are not included in the classes of drug

products described in § 320.22 for which the submission of evidence obtained in vivo is waived. FDA will consider requests for waiver of evidence obtained from in vivo testing on an individual basis. In addition, when other, more accurate, sensitive, and reproducible testing methods are not available, FDA will accept appropriately designed comparative clinical trials for purposes of demonstrating in vivo bioequivalence. Section 320.24 describes in vivo and in vitro testing approaches in descending order of accuracy, sensitivity, and reproducibility that are acceptable to FDA for determining the bioavailability or bioequivalence of a drug product.

87. The proposed definition of bioequivalence at § 320.1(e) provides that where there is an intentional difference in rate (e.g., in certain controlled release dosage forms), certain pharmaceutical equivalents or alternatives may be considered bioequivalent if there is no significant difference in the extent to which the active ingredient of moiety becomes available at the site of drug action. This applies only if the difference in the rate at which the active ingredient or moiety becomes available at the site of drug action is reflected in the proposed labeling, is not essential to the attainment of effective body drug concentrations, and is considered medically insignificant for the drug.

One comment suggested that the last sentence in § 320.1(e) be amended by replacing the conjunction "and" with "or." The comment also suggested that FDA define an "intentional difference" as one that involves the improvement of patient compliance or the manufacture of a more pharmaceutically elegant dosage form.

FDA declines to revise the definition as suggested by the comment. The use of the conjunction "and" in the regulation is consistent with statutory language in section 505(j)(7)(B)(ii) of the act. FDA also declines to define "intentional difference" as one that involves the improvement of patient compliance or the manufacture of a more pharmaceutically elegant dosage form because there may exist other valid reasons for altering rate, for example, to reduce toxic effects produced by high concentrations of a drug in an immediate release formulation.

88. Proposed § 320.1(e) defines bioequivalence to mean the absence of a significant difference in the rate and extent to which the active ingredient or active moiety in pharmaceutical equivalents or pharmaceutical alternatives become available at the site of drug action when administered at the same molar dose under similar conditions in an appropriately designed study. Several comments asked FDA to clarify the meaning of the phrase "significant difference" in the definition. Two comments understood "significant difference" to mean a "medically significant" or "therapeutically significant" difference. Other comments interpreted the phrase as meaning a statistically significant difference.

The determination of a significant difference requires first a judgment as to what difference in a bioequivalence parameter of interest is medically important and, second, a statistical analysis of data for the parameter to ensure that the difference determined to be important is not likely to be exceeded. Thus, based on clinical experience, the agency has developed statistical criteria for determining the bioequivalence of drug products. For example, there is a presumption that most drug products show no significant difference from the rate and extent of absorption of the listed drug and that the differences are unlikely to be clinically significant in patients when their absorption (AUC and $C_{max}$) is within 20 percent of the listed drug in normal subjects, and the probability that the results occurred by chance is less than 5 percent ($p<.05$).[1] In other words, unless there is a justification for different limits, the extent of absorption of the generic product must be not less than 80 percent, and not more than 120 percent, of the extent of absorption from the listed or innovator product. However, FDA will reexamine approval

[1] See "Report by the Bioequivalence Task Force on Recommendations from the Bioequivalence Hearing Conducted by the Food and Drug Administration, September 29–October 1, 1986," report dated January 1988 (Ref. 1). "There was consensus at the Hearing that differences of less than 20% in AUC and Cmax between products in normal subjects are unlikely to be clinically significant in patients. * * * Under current review procedures, the 90% confidence interval for the ratio of the test product mean AUC to that of the innovator must lie entirely within the interval (0.80, 1.20)." (Page 29.)

Attachment five to the Report by the Bioequivalence Task Force states "current practice is to carry out the two one-sided tests at the .05 level of significance."

Attachment ten to the Report by the Bioequivalence Task Force states "For approval in most cases, the generic manufacturer must show that a 90% confidence interval of the difference between the mean response of its product and that of the innovator is within the limits ± 20% of the innovator mean. * * * FDA should use the 90% confidence interval (i.e., two one-sided t-tests each at .05 level of significance) to evaluate the difference between treatments."

See, also, Schulmaass (Ref. 2 at p. 676), "the common ± 20% criteria" and Nightingale and Morrison (Ref. 3 at p. 1200), "With very few exceptions, experts have concluded that differences of less than 20% in the mean AUC between brand name and generic copies are acceptable."

criteria for products falling outside the established statistical boundaries when applicants submit to FDA convincing evidence to establish a greater window of bioavailability or bioequivalence.

89. One comment asked FDA to clarify the difference between bioequivalence and therapeutic equivalence for products with intentional rate differences. Another comment argued that to rate some controlled release dosage form drugs as bioequivalent to an immediate release listed drug, but not as therapeutically equivalent, would create two subsets of bioequivalent products—one where products are therapeutically equivalent, and another where products are not therapeutically equivalent, leading to confusion in interchangeability.

Therapeutic equivalence was defined in the Federal Register of January 12, 1979 (44 FR 2932 at 2937). To be rated as therapeutically equivalent, drug products must be pharmaceutical equivalents—i.e., contain identical amounts of the same active drug ingredient in the same dosage form—and meet identical compendia or other applicable standards of identity, strength, quality, and purity; must not present a known or potential bioinequivalence problem (or, if so, must meet an appropriate bioequivalence standard); must be adequately labeled; and must be manufactured in compliance with the regulations governing CGMP's. The agency will approve certain products with intentional rate differences as bioequivalent and rate them as therapeutically equivalent provided that they are pharmaceutical equivalents and the difference in rate at which the active ingredient or moiety becomes available at the site of drug action is intentional, reflected in the proposed labeling, is not essential to the attainment of effective body drug concentrations on chronic use, and is considered medically insignificant for the drug (21 CFR 320.2(e)).

The agency believes that it is appropriate to approve certain controlled release dosage form drug products that are pharmaceutical alternatives, for which bioequivalence can be demonstrated, even though products that are not pharmaceutical equivalents cannot be rated as therapeutically equivalent. The agency's publication "Approved Drug Products with Therapeutic Equivalence Evaluations" (the list) does not rate these products as therapeutically equivalent; thus, FDA does not consider them interchangeable. Because pharmaceutical alternatives are listed

**17974**  Federal Register / Vol. 57, No. 82 / Tuesday, April 28, 1992 / Rules and Regulations

under separate headings, and because only products rated as equivalent under the same heading are interchangeable, there should be no confusion about their interchangeability.

90. One comment disagreed that a product whose absorption rate is intentionally different from the listed drug's absorption rate can nevertheless be bioequivalent. The comment cited nitroglycerine as a product whose absorption rate is critical to effectiveness. Another comment stated that the rate differences should not need to be intentional for these products to be bioequivalent.

Both the statute and the final rule consider a product with a different rate of absorption than the listed product to be bioequivalent to the listed product only if the difference in rate is (1) intentional, (2) reflected in the labeling, (3) not essential to the attainment of effective body concentrations on chronic use, and (4) considered to be medically insignificant. All four criteria must be met for a product with a different rate of absorption to be considered bioequivalent. Thus, a product cannot be rated as bioequivalent to a listed drug when there is a difference in rate of absorption that is not intended or when the difference in rate of absorption is medically significant.

91. One comment asked that FDA expand by example or therapeutic category the drugs that can differ in rate of absorption and still be bioequivalent.

The agency is unaware of any category of products that can differ in rate of absorption and still be considered bioequivalent. Because an intentional rate difference from the reference product would need to be shown to be medically insignificant, FDA believes that determinations of bioequivalence in such cases would need to be made on a case-by-case basis.

*Section 320.21—Requirements for Submission of In Vivo Bioavailability and Bioequivalence Data*

Proposed § 320.21 would revise FDA's existing requirements for submitting in vivo bioavailability data to include in vivo bioequivalence data.

92. One comment stated that § 320.21(b), which would require evidence of bioequivalence to be included in an ANDA, contradicts the agency practice of accepting applications containing only bioequivalence protocols.

As stated above at paragraph 28, FDA will only accept complete applications. Incomplete applications will not be accepted. Thus, § 320.21(b) of this rule is consistent with current agency practice.

93. Proposed § 320.21(c) would require any person submitting a supplemental application to include bioavailability or bioequivalence evidence if the supplemental application proposes: (1) A change in the manufacturing process; (2) a labeling change to provide for a new indication, if clinical studies are required to support the new indication, or (3) a labeling change to provide for a new dosage regimen or an additional dosage regimen for a special patient population, if clinical studies are required to support the new or additional dosage regimen. One comment suggested that § 320.21(c)(2) and (c)(3) apply only to supplements to applications submitted under section 505(b) of the act. A second comment recommended that § 320.21(c)(2) and (c)(3) be removed because, the comment declared, bioavailability or bioequivalence data should not be needed in addition to clinical studies.

FDA disagrees with the suggested changes. The regulation at § 320.21(c)(2) and (c)(3) applies to supplements to ANDA's approved under section 505(j) of the act as well as to supplements to NDA's approved under section 505(b). (Because such a supplement to an ANDA would require review of clinical data, FDA would treat it as a submission under section 505(b) of the act.) There are a number of reasons why the agency would want bioavailability or bioequivalence data to be included in a supplement for which clinical studies were being conducted. For example, when a supplement covers a new dosage regimen, the agency is concerned about the possibility of nonlinear kinetics. Likewise, for a new patient population, the agency is concerned about the way the drug is absorbed, distributed, and cleared by the body in the target population. Some supplements for a new labeling indication will be for drug products for which a bioavailability study was never performed. In addition, clinical studies are often not done using the final formulation, and the agency may need bioavailability or bioequivalence information on the final formulation. However, in vivo bioavailability or bioequivalence studies are not always needed, and paragraphs (a)(2) and (b)(2) in § 320.21 provides for FDA to waive the requirement for in vivo studies based on the submission of adequate information.

94. Proposed § 320.21(g) would, under specific circumstances, require any person holding an approved full or abbreviated application to submit to FDA a supplemental application containing new evidence demonstrating in vivo bioavailability or bioequivalence. One comment asked that the information that would cause FDA to require new evidence demonstrating in vivo bioavailability or bioequivalence be made publicly available and that the source of such information be disclosed.

FDA's regulations governing public information are intended to "make the fullest possible disclosure of records to the public, consistent with the rights of persons in trade secrets and confidential commercial or financial information * * *" (21 CFR 20.20(a)). Publicly disclosable information includes information contained in citizen petitions as well as information submitted as part of an application under section 505(b) of the act. (See 21 CFR 10.20(j); 21 U.S.C. 355(l).) FDA will make every effort possible—consistent with its obligations to preserve certain trade secret and confidential commercial information—to make public any information it receives that would cause the agency to require new in vivo bioavailability or bioequivalence information.

95. One comment said that FDA should require retention of product samples tested for bioequivalence and that samples should be drawn from commercial-sized lots produced on the equipment that will be used to manufacture the marketed product.

FDA agrees in part with the comment. In the Federal Register of November 8, 1990 (55 FR 47034), FDA published an interim rule that requires retention of bioavailability and bioequivalence testing samples. The interim rule applies to manufacturers who conduct in-house bioavailability and bioequivalence tests and to facilities conducting such testing under contract for a drug manufacturer. FDA does not agree that bioequivalence studies need necessarily be conducted on commercial-sized lots if certain conditions are met. See Office of Generic Drugs Policy and Procedure Guide 22–90 (September 13, 1990).

*Section 320.22—Criteria for Waiver of Evidence of In Vivo Bioavailability or Bioequivalence*

Proposed § 320.22 would, among other things, revise the existing criteria for waiving evidence of in vivo bioavailability to include waivers of in vivo bioequivalence, delete automatic waivers of in vivo bioavailability for certain drug products, and remove the list of "bioproblem" drugs.

96. One comment argued that the statute prohibits a waiver of in vivo bioequivalence data. Another comment urged that § 320.22 be revised to waive in vivo bioequivalence requirements for

Federal Register / Vol. 57, No. 82 / Tuesday, April 28, 1992 / Rules and Regulations    17975

topically applied preparations and drug products that are oral dosage forms not intended to be absorbed.

Although the statute requires ANDA applicants to provide bioequivalence information (except where the ANDA is being submitted for a change in a listed drug for which a suitability petition has been granted), it does not require that bioequivalence be shown through in vivo methods. For example, section 505(j)(6)(A)(i)(II) of the act requires the Secretary to publish and make available to the public "whether in vitro or in vivo bioequivalence studies, or both such studies, are required for applications * * *." If ANDA applicants were limited to in vivo bioequivalence methods, the statutory reference to in vitro methods would be superfluous. FDA, therefore, disagrees with the comment that the statute prohibits waivers of in vivo methods for demonstrating bioequivalence.

FDA has removed the automatic waiver of evidence of in vivo bioavailability for topically applied preparations and oral dosage forms not intended to be absorbed because the agency believes in vivo bioavailability may be required for certain products. Variations in the manufacturing process used by each individual manufacturer may result in differences in the bioavailability of these drug products. While neither topical drug products nor oral dosage forms not intended to be absorbed are listed in the class of products whose bioavailability may be considered self-evident based on other data in the application, applicants of such products may nevertheless request a waiver of the requirements for in vivo data under § 320.22(a). The agency will review each product on a case-by-case basis to determine if an in vivo study is necessary.

97. One comment said the proposed rule would increase duplicative safety and efficacy tests and increase the time and expense of obtaining ANDA's by reverting to "across-the-board" in vivo study requirements. It argued that removing automatic waivers for topical and nonsystemically absorbed drugs would make it nearly impossible for an ANDA applicant to obtain marketing approval and impose new bioavailability standards that exceed the pioneer's testing requirements.

Although § 320.22, as revised, removes the automatic waiver for topical and nonsystemically absorbed oral dosage products, this change does not require applicants to submit evidence of in vivo bioavailability or in vivo bioequivalence in every case. The elimination of the automatic waiver for nonsystemically absorbed oral dosage products simply reflects FDA's view that requests for waiver of in vivo bioavailability and bioequivalence for these products need to be reviewed on a case-by-case basis. While the amendments may well increase the number of in vivo studies required, the regulation does permit applicants to request a waiver of the requirement for the submission of evidence in the form of in vivo bioavailability or bioequivalence data provided the product meets the criteria in § 320.22.

FDA concedes that the burden of showing bioequivalence may sometimes be comparable to, or perhaps even greater than, the pioneer's burden of showing bioavailability. In such cases, FDA believes that the additional data are needed to meet current standards for bioequivalence. FDA also notes that the generic company's burden is not likely to be nearly as great as the pioneer's burden of showing that a drug product is safe and effective for its proposed uses.

98. Under proposed § 320.22(b)(1), FDA would waive the requirement for submission of evidence obtained in vivo demonstrating the bioavailability or bioequivalence of drug products that are solutions for intravenous administration. The proposal stated that the in vivo bioavailability or bioequivalence of these drug products is "self-evident" provided that the drug products contain the same active and inactive ingredients in the same concentration as the listed drug product (21 CFR 320.22(b)(1)(ii)). Proposed § 320.22(c) would provide for a waiver of in vivo data requirement for those "parenteral drug products that are determined to be DESI-effective or that are shown to be identical in both active and inactive ingredient formulation" to a drug product that is currently approved in an NDA (provided that the drug is neither in suspension form, nor phenytoin sodium powder).

On its own initiative, FDA is revising § 320.22(b)(1)(i) to include solutions for all parenteral injections within its scope. As revised, the provision includes, among others, intraocular, intravenous, subcutaneous, intramuscular, intra-arterial, intrathecal, intrasternal, and intraperitoneal solutions intended for parenteral injection. The in vivo bioavailability or bioequivalence of any drug product in that class may be shown without in vivo data if the product contains the same active and inactive ingredients in the same concentration as a drug product that is a subject of an approved full new drug application. Because all parenteral solutions are now included at § 320.22(b)(1)(i), the agency has deleted § 320.22(c), which is no longer needed.

99. Proposed § 320.22(b)(3) would waive the requirement for submission of evidence obtained in vivo demonstrating the bioavailability or bioequivalence of a product that is an oral solution, elixir, syrup, tincture, or similar other solubilized form provided that it contains: (1) An active ingredient in the same concentration and dosage form as a drug product that is the subject of an approved full new drug application; and (2) no inactive ingredient that may significantly affect absorption of the active ingredient or active moiety. One comment asked that ophthalmic and otic solutions be added to the class of products described in § 320.22(b)(3) whose bioavailability or bioequivalence is deemed self-evident.

Although FDA does not believe that the in vivo bioavailability or bioequivalence of otic and ophthalmic solutions can be considered self-evident based on compliance with the criteria described in § 320.22(b)(3), FDA does believe that it can assume the bioavailability or bioequivalence of an ophthalmic or otic product, if the product meets the criteria described in § 320.22(b)(1)(ii), i.e., the product contains the same active and inactive ingredients in the same concentration as a drug product that is the subject of an approved full new drug application. The regulation is revised accordingly.

100. Two comments objected to the requirement in § 320.22(b)(1)(ii) that inactive ingredients be the same as those in the listed drug, arguing that some differences should be allowed and that ANDA applicants do not know the inactive ingredients in the listed drug.

FDA declines to accept the comment. The final rule requires drug products intended for parenteral injection to contain the same inactive ingredients in the same concentrations to obtain a waiver from the in vivo bioavailability or bioequivalence requirement because FDA cannot always predict the consequences of minor changes (e.g., in salt concentration). FDA believes this criterion is important to retain even when the necessary information is not freely available to ANDA applicants. FDA notes that under 21 CFR 201.100(b)(5) drug products for other than oral use must usually list the names of all inactive ingredients except flavorings, perfumes, and color additives. In addition, under 21 CFR 201.100(b)(5)(iii), a drug product, "if it is intended for administration by parenteral injection, (must list) the quantity or proportion of all inactive ingredients, except that ingredients added to adjust the pH or to make the drug isotonic may be declared by name

and a statement of their effect * * *." Thus, ANDA applicants should be able to determine the identity of inactive ingredients for all nonoral dosage forms and the quantity or proportion of inactive ingredients for many drug products, including all parenterals. In many other cases, the identity and quantity of inactive ingredients will be voluntarily disclosed on the listed drug's lable or otherwise ascertainable.

101. Proposed § 320.22(b)(3)(i) stated the conditions under which the bioavailability or bioequivalence of oral solutions, elixirs, syrups, tinctures, or similar products could be considered self-evident. One comment asked that § 320.22(b)(3)(i) be revised to include solutions for application to the skin.

The agency agrees that the in vivo bioavailability or bioequivalence of a solution for application to the skin may be considered self-evident, provided that it has the same active ingredients in the same concentration as the listed drug and no inactive ingredient or change in formulation that may significantly affect absorption of the active drug ingredient or active moiety. Therefore, the regulation at § 320.22(b)(3)(i) has been revised to include solutions for application to the skin. On its own initiative, FDA is revising § 320.22(b)(3)(iii) to make clear that the waiver in that section is conditioned on the applicant making no change in product formulation, including deletion of an inactive ingredient, that may significantly affect the absorption of the active drug ingredient or active moiety.

102. Existing § 320.22(d)(5) waives the requirement for the submission of evidence obtained in vivo demonstrating the bioavailability of a drug product if the product contains the same active drug ingredient and is in the same strength and dosage form as a drug product that is the subject of an approved full or abbreviated new drug application, and both products meet an appropriate in vitro test. FDA proposed to remove this provision, stating that there was no evidence to show that in vitro data alone are regularly sufficient to assure bioequivalence. Three comments asked that existing § 320.22(d)(5) be retained. One comment contended that FDA had little evidence to show that in vitro data alone are not sufficient for the same product manufactured by the same sponsor.

FDA rejects these comments. The burden of showing that a new product is bioavailable or bioequivalent rests with the applicant. In general, the submission of in vivo data is required to support a new product unless there is a known in vivo/in vitro correlation, in which case in vitro data alone may be sufficient. Section 320.22(d) of this final rule lists certain classes of drug products whose bioavailability or bioequivalence may be demonstrated by evidence obtained in vitro in lieu of in vivo. (In addition, FDA continues to waive in vivo data for certain drugs determined to be effective for at least one indication under the DESI program.) As FDA has no evidence to show that in vitro data alone are regularly sufficient to support the bioequivalence of any other drug classes, the agency believes that it is inappropriate to retain existing § 320.22(d)(5). Section 320.22(d)(5) is, therefore, removed.

103. One comment urged that existing § 320.22(d)(5) be retained as a mechanism for waiving in vivo data requirements for minor formulation changes, i.e., changes in colors or flavor. The comment stated that some FDA review divisions require new applications for products that contain a new flavor or color, and concluded that these newly formulated products are not eligible for the waivers described in proposed § 320.22(e)(4).

The comment is incorrect in assuming that products that are reformulated to contain a new flavor, color, or preservative are ineligible for waiver under proposed § 320.20(e)(4) (§ 320.20(d)(4) in this final rule). Such new formulations are eligible for waiver whether they are covered by a new application or by a supplement to an approved application.

104. Proposed § 320.22(e)(2) (§ 320.22(d)(2) in this final rule) would waive the requirement for the submission of in vivo bioavailability evidence if the drug product "is in the same dosage form, but in a different strength, and is proportionally similar in its active and inactive ingredients to another drug product for which the same manufacturer has obtained approval" and the bioavailability of the other drug product has been demonstrated, both drug products meet an appropriate in vitro test approved by FDA, and the applicant submits evidence showing that both drug products are proportionally similar in their active and inactive ingredients. One comment suggested that the agency revise § 320.22(e)(2) to include all dosage forms, including extended release dosage forms. A second comment asked FDA to extend the waiver to extended release capsules whose active ingredients are beaded materials.

The agency never intended to include extended release dosage forms, and has modified § 320.22(d)(2) to so state. The agency disagrees that it would be appropriate to grant waivers to all extended release dosage forms or to all extended release capsules whose active ingredients are beaded materials because the current state of science and technology does not always permit meaningful correlations between in vitro dissolution rates and the rate and extent of in vivo bioavailability for these products. FDA believes that waivers may be appropriate under some circumstances for certain beaded extended release dosage forms. Waivers are ordinarily granted for certain beaded dosage forms, where bioavailability has already been established and the only difference between the reference product and the drug under study is not in the type of bead, but in the quantity of beads. However, waivers will not be granted for beaded dosage forms with nonlinear kinetics because differences of minor therapeutic consequence at lower dose could become greatly exaggerated at higher doses. FDA will consider waiver requests for such products on an individual basis.

105. Proposed § 320.22(g) would permit FDA to require in vivo bioavailability or bioequivalence data if it determines that any difference between the drug product and a listed drug may affect the bioavailability or bioequivalence of the drug product. One comment asked that § 320.22(g) not be used unfairly by pioneer companies to remove generic applicants from the market by bombarding the agency with small bioequivalence changes.

This provision, renumbered § 320.22(f), if not intended and would not be implemented to give unfair marketing advantage to any particular manufacturers. Rather, it permits FDA to impose additional requirements to ensure the continued bioavailability or bioequivalence of a drug product.

*Section 320.23—Basis for Demonstrating in Vivo Bioavailability or Bioequivalence*

The proposed amendments to § 320.23 would, among other things: (1) Permit applicants whose drug products are not intended to be absorbed into the bloodstream to demonstrate bioavailability by measuring the rate and extent to which the active ingredient or active moiety was absorbed and became available at the site of drug action (§ 320.23(a)(1)); (2) state that statistical techniques used shall be of sufficient sensitivity to detect differences in rate and extent of absorption that are not attributable to subject variability (§ 320.23(a)(2)); (3) rephrase the conditions under which a drug product whose rate of absorption

Case 1:04-cv-10981-PBS    Document 673-5    Filed 03/12/2007    Page 14 of 16

differs from the reference listed drug can be considered bioavailable (§ 320.23(a)(3)); and (4) declare two drug products to be bioequivalent if they are pharmaceutical equivalents or pharmaceutical alternatives whose rate and extent of absorption do not show a significant difference when administered at the same molar dose of the active moiety under similar experimental conditions, either single dose or multiple dose (§ 320.23(b)).

106. One comment stated that proposed language in § 320.23(a)(2) on "differences in rate * * * of absorption" is ambiguous. The comment said the phrase could be interpreted to mean either differences in the "first-order micro-rate constant for absorption," or, alternatively, maximum concentration, $C_{max}$, and time to maximum concentration, $T_{max}$.

The comment correctly points out that the regulation does not specify how absorption rate should be measured. Because drug product parameters may vary, absorption parameters are determined based on the nature of the drug being evaluated.

### Section 320.24—Types of Evidence to Establish Bioavailability or Bioequivalence

107. One comment asked that § 320.24 require that an applicant submitting an ANDA for a drug that has a significant difference in a pharmacodynamic parameter that is correlated with safety or therapeutic effect demonstrate that the difference is not clinically significant. The comment also asked that § 320.24 be revised to state FDA's willingness to accept in support of an ANDA pharmacodynamic evidence in lieu of pharmacokinetic profiles when one or more pharmacodynamic parameters correlate with a drug's therapeutic effect.

The ANDA process is intended to provide a rapid and efficient route for generic drug approval. Section 505(j)(7) of the act requires that FDA find a generic drug product to be bioequivalent to the reference listed drug if differences in their rates and extents of drug absorption fall within predetermined statistical limits.

Standards for determining bioequivalence for a product are intended to reflect the nature of the therapeutic response for that product. Once the therapeutic index has been determined, the equivalence of a product's therapeutic response can be measured via plasma drug concentrations, which are generally believed to provide a precise and accurate reflection of product performance. It is highly unlikely that a clinically significant difference in product safety and efficacy will exist for a product that meets an applicable bioequivalence standard. However, should postmarketing surveillance or other information suggest the possibility of therapeutic inequivalence, the approval criteria for that drug entity would be reevaluated.

In general, for systemically absorbed drugs, blood level profiles are a more sensitive index of rate and extent of drug delivery than pharmacodynamic measures. Therefore, except for cases where the agency has indicated otherwise, when blood levels of a drug are measurable, product bioavailability and bioequivalence will be based on pharmacokinetic rather than pharmacodynamic response.

108. Proposed § 320.24(a) stated that applicants should conduct bioavailability or bioequivalence studies "using the most accurate, sensitive, and reproducible approach * * *." One comment suggested that proposed § 320.24(a) be revised to state that applicants who have begun bioequivalence testing under an FDA guidance document would not have to recommence their studies if FDA's guidance changes in the interim.

FDA declines to adopt the comment. Generally, the agency will not ask an applicant to recommence a study that is conducted under an FDA guidance document. However, if new information suggests the need to reconsider agency guidance on study design, the agency will not be bound by that previous guidance. Therefore, under some important circumstances, it may be necessary for an applicant to recommence a study.

109. Proposed § 320.24(b) lists tests in descending order of accuracy, sensitivity, and reproducibility that are acceptable approaches for establishing the bioavailability and bioequivalence of a drug product. On its own initiative, the agency has added to the list of acceptable tests "currently available in vitro tests that ensure human in vivo bioavailability." The addition is intended for drug products determined to be effective under DESI for at least one indication that contain no active ingredients regarded as presenting either actual or potential bioequivalence problems or drug quality or standards issues. These products are coded "AA" in the list of "Approved Drug Products with Therapeutic Equivalence Evaluations." The agency has created new § 320.24(b)(5) to list these in vitro tests, and has renumbered proposed § 320.24(b)(5) as § 320.24(b)(6).

110. One comment questioned whether the three tests listed in § 320.24(b)(1) are themselves listed in descending order of accuracy, sensitivity, and reproducibility. The comment suggested that FDA renumber the approaches to make clear its intent.

The approaches in § 320.24(b)(1) are listed in descending order of accuracy, sensitivity, and reproducibility. This means that the approach under § 320.24(b)(1)₁ is preferable to § 320.24(b)(1)(ii), as the comment suggested. The agency believes the regulatory language clearly captures the agency's intent, and does not believe that renumbering the approaches is needed. The comment is therefore rejected.

111. Under proposed § 320.24(b)(1), one approach for demonstrating bioavailability or bioequivalence would be through "an in vivo test in humans in which the concentration of the active ingredient or active moiety and its active metabolites, in whole blood, plasma, serum, or other appropriate biological fluid is measured as a function of time." One comment contended that measurement of active metabolites in an in vivo test should be the exception rather than the rule, and that measurement of metabolites should not be required where the activity of the metabolite is not well documented.

In general, the determination of whether a metabolite would be used in the assessment of a product's bioavailability or bioequivalence is dependent upon the pharmacokinetic characteristics of the drug (e.g., product input function, rate of metabolite formation, and half-lives of the various species). Section 320.24(b) has been revised to make clear that measurement of active metabolites will only be required when appropriate.

112. Two comments objected to the inclusion in the list of approaches to demonstrate the bioavailability or bioequivalence of a product of "well-controlled clinical trials that establish the safety and effectiveness of the product" (§ 320.24(b)(4)). The comments argued that clinical efficacy or safety trials to demonstrate bioequivalence are not bioequivalence determinations under the statute. The comments suggested that FDA should treat as a 505(b) application any ANDA application whose bioequivalency is based on clinical safety and effectiveness data.

As stated elsewhere in this document, the statute does not restrict applicants to a specific method for demonstrating bioequivalence. The preexisting regulations at 21 CFR 320.57 permitted applicants to demonstrate bioavailability and bioequivalence

through well-controlled clinical trials. The final rule retains this provision in § 320.24(b)(4). The measurement of clinical endpoints may thus be an acceptable approach for establishing bioequivalence for purposes of ANDA approval. The fact that clinical trial data are submitted to demonstrate bioequivalence does not therefore force FDA to convert an application to a section 505(b) application.

113. Proposed § 320.24(b)(4) would permit an applicant to determine a product's in vivo bioavailability or bioequivalence through well-controlled clinical trials or comparative clinical trials provided that analytical methods "cannot be developed" to determine that product's bioavailability or bioequivalence through the tests listed in proposed § 320.24(b)(1), (b)(2), or (b)(3). The comment urged that FDA replace the phrase "cannot be developed" with "have not been developed."

The agency declines to accept the comment because it believes that well-controlled clinical trials or comparative clinical trials should be used only when analytical methods cannot be developed using current technology. To allow clinical trials when such methods have not been developed would encourage their use in situations where technology exists, but an applicant prefers not to develop the analytical methods.

Section 320.30—Inquiries to FDA and FDA Review of Protocols

Proposed § 320.30 strongly recommends that persons planning to conduct a bioavailability or bioequivalence study submit proposed protocols to FDA for review before conducting the study. The proposed regulation also provided addresses for general inquiries on in vivo bioavailability and bioequivalence requirements.

114. Two comments suggest that the regulation be revised to require FDA to review proposed protocols. Two other comments asked that, to ensure timely review, the regulation specify a time period in which FDA must respond to requests for review of a protocol.

The agency will review proposed protocols as expeditiously as its resources and other agency demands permit. However, due to limited resources and an inability to predict the volume of submissions it will receive, the agency cannot commit itself to reviewing regularly all protocols nor will FDA specify a time limit for conducting reviews.

115. Proposed § 320.30(b)(2) would have FDA offer advice with respect to whether the reference material to be used in a proposed bioavailability or bioequivalence protocol is appropriate. One comment asked that, when there are two approved innovator products that are not bioequivalent to each other, FDA allow either to be the reference standard.

As noted in the preamble to the proposed rule (54 FR 28872 at 28880), FDA intends to select reference listed drugs, which will be the reference standards for bioequivalence determinations. FDA will identify in future editions of the publication "Approved Drug Products with Therapeutic Equivalence Evaluations" the reference listed drug. By designating a single reference listed drug against which all generic versions must be shown to be bioequivalent, FDA hopes to avoid significant variations among generically equivalent drug products. Also, as stated previously, if an applicant believes that there are sound reasons for designating another drug as a reference listed drug, it should consult FDA.

Section 320.31—Applicability of Requirements Regarding an "Investigational New Drug Application"

Proposed § 320.31 listed the types of bioavailability and bioequivalence studies for which an investigational new drug application (IND) would be required. Proposed § 320.31(a)(3) would require an IND if the in vivo bioavailability or bioequivalence study involved a cytotoxic drug product.

116. Two comments asked FDA to justify requiring IND's for cytotoxic products and for multiple-dose studies on controlled release products when no single-dose studies have been completed.

FDA believes that IND's are appropriate in these cases because of the potential risks to study participants through dose dumping or other toxic effects. FDA has 30 days to review and respond to an IND to determine potential safety problems and to assure effects that could threaten the safety of the subject participating in the study.

Section 320.51—Procedures for Establishing or Amending a Bioequivalence Requirement

117. The proposed rule proposed to remove 21 CFR 320.51, which sets forth procedure for establishing or amending a bioequivalence requirement. One comment asked that § 320.51 not be removed because it requires FDA to use notice and comment rulemaking to develop or amend a bioequivalence requirement.

Because the 1984 amendments require that any new generic drug products be demonstrated to be bioequivalent to the reference listed drug (unless it is the subject of an approved ANDA suitability petition), additional authority to impose bioequivalence requirements with respect to such products is not needed. However, on its own initiative, the agency has decided not to remove § 320.51 because it establishes a procedure to impose bioequivalence requirements on other classes of drug products not covered by the bioequivalence requirements in the 1984 amendments, including drug products not subject to premarket approval and drug products whose new drug status is not yet determined. In this final rule, § 320.51 has been redesignated and revised as § 320.32.

IV. Economic Assessment

FDA has considered the economic impact of this regulation which clarifies and facilitates the implementation of Public Law 98-417. Title I of Public Law 98-417 eliminated unnecessary regulatory barriers for generic drug products and has resulted in generic competition on many important post-1962 drugs. Generic drug sales account for a significant portion of total prescription drug sales, and many of these sales would not have occurred in the absence of Public Law 98-417.

Prior to the implementation of title I of Public Law 98-417, in order to market a generic post-1962 drug product, drug sponsors were required to duplicate the innovator's safety and efficacy testing and to submit a "duplicate" NDA. Under title I, sponsors no longer incur duplicate testing costs and are able to market generic products after submitting and gaining approval for an ANDA which does not include the duplicate testing requirement. The costs associated with preparing and submitting an ANDA are significantly lower than the costs for submitting duplicate NDA's for the same products.

The benefits of these implementing regulations for title I are twofold: (1) Savings to consumers who purchase generic post-1962 prescription drug products, and (2) savings to sponsors of generic drug products who submit ANDA's to the agency in order to gain approval to market their products. The consumer savings are the result of the increased availability of lower-priced generic drug products. As new generic products are made available annually (as their patents expire and generic drug products enter the marketplace) the savings to consumers should reach several billion dollars annually over the next 5 to 10 years. The savings to sponsors will vary depending on the

number of applications submitted annually. Small businesses will also be favorably affected because the barriers to market entry have been lowered thereby allowing these firms to enter the generic drug market without incurring duplicate safety and efficacy testing costs. Consequently, FDA concludes the benefits of these regulations implementing title I far exceed the costs. FDA also believes it has streamlined the ANDA process as much as possible thus minimizing the costs and maximizing the net benefits.

The regulatory framework for processing ANDA's under section 505(j) of the act has been in existence since the enactment of the Drug Price Competition and Patent Term Restoration Act in 1984. Thus, most required procedures and their associated economic consequences have been in effect since that time. This rule simply clarifies and facilitates the implementation of the act and will not affect the pace or magnitude of these impacts. Therefore, FDA concludes that this rule is not a "major rule" as defined by Executive Order 12291 and does not require a regulatory impact analysis. Similarly, the agency certifies that the rule will not have a significant economic impact on a substantial number of small entities, and therefore does not require a regulatory flexibility analysis under the Regulatory Flexibility Act of 1980 (Pub. L. 96–354).

V. Environmental Impact

The agency has determined under 21 CFR 25.24(a)(8) that this action is of a type that does not individually or cumulatively have a significant effect on the human environment. Therefore, neither an environmental assessment nor an environmental impact statement is required.

VI. Paperwork Reduction Act of 1980

This final rule contains information collections which have been submitted for approval to the Office of Management and Budget under the Paperwork Reduction Act of 1980. The title, description, and respondent description of the information collection are shown below with an estimate of the annual reporting and recordkeeping burden. Included in the estimate is the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information.

*Title:* Abbreviated New Drug Application Regulations.

*Description:* The information requirements collect information from persons who must obtain FDA approval prior to marketing generic copies of previously approved drugs. These persons must submit information in the form of applications, notices, and certifications. FDA will use the information submitted to determine whether the proposed generic drug is eligible for consideration, under what provisions an application would be considered, and whether the proposed drug is identical to the pioneer drug it purports to copy.

*Description of Respondents:* Businesses.

ESTIMATED ANNUAL REPORTING AND RECORDKEEPING BURDEN

| Section | Annual number of respondents | Annual frequency | Average burden per response | Annual burden hours |
|---|---|---|---|---|
| 314.50(g) | 1 | 1 | 1 hour | 1 |
| 314.50(i) | 8 | 1 | 2 hours | 16 |
| 314.50(j) | 50 | 1 | 2 hours | 100 |
| 314.54 | 10 | 1 | 80 hours | 800 |
| 314.60, 310.305 | 40 | 1 | 8 hours | 320 |
| 314.81 | 700 | 1 | 10 min | 119 |
| 314.93 | 82 | 1 | 10 hours | 820 |
| 314.94 | 850 | 1 | 160 hours | 136,000 |
| 314.110 | 10 | 1 | 40 hours | 400 |
| 314.122, 314.161 | 1 | 1 | 10 hours | 10 |
| Total | | | | 138,586 |

There were no comments received on the Paperwork Reduction Act clearance submission or on the burden estimates. Therefore, no changes have been made to these burden estimates. However, the final rule does not finalize the provisions of the proposed rule on patent certification and market exclusivity. The agency has not included those estimates in the final rule.

VII. References

The following information has been placed on display in the Dockets Management Branch (address above) and may be seen by interested persons between 9 a.m. and 4 p.m., Monday through Friday.

1. "Report by the Bioequivalence Task Force on Recommendations from the Bioequivalence Hearing Conducted by the Food and Drug Administration, September 29–October 1, 1986," January 1988.

2. Schuirmann, D. J., "A Comparison of the Two One-Sided Tests Procedure and the Power Approach for Assessing the Equivalence of Average Bioavailability," Journal of Pharmacokinetics and Biopharmaceutics, 15:657, 1987.

3. Nightingale, S. and J. Morrison, "Generic Drugs and the Prescribing Physician," Journal of the American Medical Association, 4:258:9:1200, 1987.

4. Skelly, J. P. et al., "Workshop Report: In Vitro and In Vivo Testing and Correlations for Oral Controlled/Modified-Release Dosage Forms," Pharmaceutical Research, 7:975–982, 1990.

List of Subjects

21 CFR Part 2

Administrative practice and procedure, Cosmetics, Drugs, Foods.

21 CFR Part 5

Authority delegations (Government agencies), Imports, Organization and functions (Government agencies).

21 CFR Part 10

Administrative practice and procedure, News media.

21 CFR Part 310

Administrative practice and procedure, Drugs, Labeling, Medical devices, Reporting and recordkeeping requirements.

21 CFR Part 314

Administrative practice and procedure, Confidential business information, Drugs, Reporting and recordkeeping requirements.