# EXHIBIT G

overdose (recommended a new section entitled "Toxicity and Overdose") and characteristics by which a tablet can be identified (color, markings, shape, etc.).

The agency acknowledges the importance of information about managing drug overdose and characteristics by which a tablet can be identified and took care to make this information prominent in the FPI. However, space for Highlights is limited and the agency has made judgments about which information is most important for safe and effective use and thus must appear in Highlights. The agency has concluded that information about managing overdose or product identification characteristics (except scoring) will not be required in Highlights. The agency has retained scoring in Highlights because this information is needed to appropriately tailor a dose for some patients (e.g., a patient is unable to take two tablets of a drug because of a particular side effect, but is able to take one-and-one-half tablets).

(Comment 8) One comment stated that the information presented in Highlights should be in bulleted format to the extent possible to avoid redundancy with the information in the FPI.

FDA agrees that information presented in Highlights, not otherwise required to be bulleted under § 201.57(d)(4), should be succinctly summarized and in a format (e.g., bulleted) that calls attention, and provides easy access, to the more detailed information in the FPI. Highlights is not a verbatim repetition of selected information contained in the FPI.

(Comment 9) One comment requested that the sections in Highlights be reordered to lend more prominence to risk information. The comment stated that all risk information, including contraindications and drug interactions, should be placed before the "Dosage and Administration" and "How Supplied" sections.

The order of the sections in Highlights tracks the order of the corresponding sections in the FPI. The agency believes the order of information in Highlights must be consistent with the FPI so that practitioners can efficiently navigate from Highlights to the corresponding section of the FPI. As discussed in more detail in the preamble to the proposed rule (65 FR 81082 at 81084), the revised order of the sections in the FPI was based on extensive focus group testing and surveys of physicians to determine which sections they believe are most important to prescribing decisions and which sections they reference most frequently.

The agency believes that the order of information in Highlights required by the final rule gives sufficient prominence to risk information. The agency also believes that the formatting requirements, the one-half page length restriction for Highlights (excluding space for a boxed warning, if one is required) (§ 201.57(d)(8)), and the limitations on the amount of information that can be included in Highlights will ensure that all the information in Highlights has adequate prominence and is visually accessible.

(Comment 10) One comment expressed concern about the implications of Highlights for FDA's initiative to improve pregnancy labeling. The comment stated that the preliminary format FDA has discussed in public meetings (which would replace the pregnancy category designations) could not be readily condensed into an informative single sentence in Highlights. The comment suggested that electronic labeling could potentially solve this problem by linking to additional information about prescribing in specific patient populations and by linking to pregnancy registry databases and tertiary specialty texts as well.

The agency anticipates that the planned revisions to the requirements for the "Pregnancy" subsection of labeling are unlikely to affect the information in Highlights about use of drugs during pregnancy. The agency agrees that the electronic labeling initiative holds great promise for providing rapid access to related information of varying levels of complexity and detail, including information about drug exposure during pregnancy.

(Comment 11) Several comments recommended that there be an educational campaign in conjunction with the publication of the final rule to ensure that practitioners understand that Highlights contains only limited information and should not be relied on without reference to the FPI.

The agency agrees that there should be, and it plans to initiate, an educational campaign to familiarize health care practitioners with the new labeling format. The agency also agrees that an important component of the educational message should be that Highlights alone does not contain all the information FDA has determined is needed to use a drug safely and effectively.

*D. Comments on Product Liability Implications of the Proposed Rule*

In the proposal, FDA requested comments on the product liability implications of revising the labeling for prescription drugs.

(Comment 12) In comments, some manufacturers expressed concerns that, by highlighting selected information from the FPI to the exclusion of information not highlighted, they make themselves more vulnerable to product liability claims. Some of these comments also stated that the Highlights limitation statement, which states that Highlights does not contain all the information needed to prescribe a drug safely and effectively and that practitioners should also refer to the FPI, would not constitute an adequate legal defense in a case alleging failure to provide adequate warning of a drug's risks.

Based on the agency's research and analysis in developing the prototype labeling that was the basis for the proposed rule (see comment 2), the agency has concluded that a labeling format that includes Highlights is more effective than a format that omits Highlights. In response to the comments and as discussed in the response to comment 35, FDA has taken steps to enhance the prominence of the Highlights limitation statement. FDA believes the statement will be effective in reminding prescribers that the information in the Highlights should not be relied on exclusively in making prescribing decisions and that it is important to consult the more detailed information in the FPI. We also believe that this limitation statement will help to ensure that the labeling will be considered in its entirety in any product liability action. FDA acknowledges the comment's concerns and, as discussed more fully in response to comment 13, believes that under existing preemption principles such product liability claims would be preempted.

(Comment 13) Some comments stated that the new format requirements might have product liability implications for drugs that are not subject to the new requirements. These comments expressed concern that labeling in the old format might be characterized by plaintiffs as inferior to labeling in the new format and, as a result, could be used as evidence that a manufacturer did not provide adequate warnings. They requested that the agency state in the final rule that FDA approval of labeling, whether it be in the old or new format, preempts conflicting or contrary State law, regulations, or decisions of a

court of law for purposes of product liability litigation.

FDA believes that under existing preemption principles, FDA approval of labeling under the act, whether it be in the old or new format, preempts conflicting or contrary State law. Indeed, the Department of Justice (DOJ), on behalf of FDA, has filed a number of amicus briefs making this very point. In order to more fully address the comments expressing concern about the product liability implications of revising the labeling for prescription drugs, we believe it would be useful to set forth in some detail the arguments made in those amicus briefs. The discussion that follows, therefore, represents the government's long standing views on preemption, with a particular emphasis on how that doctrine applies to State laws that would require labeling that conflicts with or is contrary to FDA-approved labeling.

Under the act, FDA is the expert Federal public health agency charged by Congress with ensuring that drugs are safe and effective, and that their labeling adequately informs users of the risks and benefits of the product and is truthful and not misleading. Under the act and FDA regulations, the agency makes approval decisions based not on an abstract estimation of its safety and effectiveness, but rather on a comprehensive scientific evaluation of the product's risks and benefits under the conditions of use prescribed, recommended, or suggested in the labeling (21 U.S.C. 355(d)). FDA considers not only complex clinical issues related to the use of the product in study populations, but also important and practical public health issues pertaining to the use of the product in day-to-day clinical practice, such as the nature of the disease or condition for which the product will be indicated, and the need for risk management measures to help assure in clinical practice that the product maintains its favorable benefit-risk balance. The centerpiece of risk management for prescription drugs generally is the labeling which reflects thorough FDA review of the pertinent scientific evidence and communicates to health care practitioners the agency's formal, authoritative conclusions regarding the conditions under which the product can be used safely and effectively. FDA carefully controls the content of labeling for a prescription drug, because such labeling is FDA's principal tool for educating health care professionals about the risks and benefits of the approved product to help ensure safe and effective use. FDA continuously works to evaluate the latest available scientific information to monitor the safety of products and to incorporate information into the product's labeling when appropriate.

Changes to labeling typically are initiated by the sponsor, subject to FDA review, but are sometimes initiated by FDA. Under FDA regulations, to change labeling (except for editorial and other minor revisions), the sponsor must submit a supplemental application fully explaining the basis for the change (§§ 314.70 and 601.12(f) (21 CFR 314.70 and 601.12(f))). FDA permits two kinds of labeling supplements: (1) Prior approval supplements, which require FDA approval before a change is made (§§ 314.70(b) and 601.12(f)(1)); and (2) "changes being effected" (CBE) supplements, which may be implemented before FDA approval, but after FDA notification (§§ 314.70(c) and 601.12(f)(2)). While a sponsor is permitted to add risk information to the FPI without first obtaining FDA approval via a CBE supplement, FDA reviews all such submissions and may later deny approval of the supplement, and the labeling remains subject to enforcement action if the added information makes the labeling false or misleading under section 502(a) of the act (21 U.S.C. 352). Thus, in practice, manufacturers typically consult with FDA prior to adding risk information to labeling. As noted in response to comment 5, however, a sponsor may not use a CBE supplement to make most changes to Highlights.

Since the proposed rule was published, FDA has learned of several instances in which product liability lawsuits have directly threatened the agency's ability to regulate manufacturer dissemination of risk information for prescription drugs in accordance with the act. In one case, for example, an individual plaintiff claimed that a drug manufacturer had a duty under California State law to label its products with specific warnings that FDA had specifically considered and rejected as scientifically unsubstantiated.[4] In some of these cases, the court determined that the State law claim could not proceed, on the ground that the claim was preempted by Federal law,[5] or was not properly before the court by operation of the doctrine of primary jurisdiction.[6] In some cases, however, the court has permitted the claim to proceed.[7]

State law actions can rely on and propagate interpretations of the act and FDA regulations that conflict with the agency's own interpretations and frustrate the agency's implementation of its statutory mandate. For example, courts have rejected preemption in State law failure-to-warn cases on the ground that a manufacturer has latitude under FDA regulations to revise labeling by adding or strengthening warning statements without first obtaining permission from FDA. (*See, e.g., Eve* v. *Sandoz Pharm. Corp.*, 2002 U.S. Dist. LEXIS 23965 (S.D. In. Jan. 28, 2002); *Ohler* v. *Purdue Pharma, L.P.*, 2002 U.S. Dist. LEXIS 2368 (E.D. La. Jan. 22, 2002); *Motus* v. *Pfizer Inc.*, 127 F. Supp. 2d 1085 (C.D. Cal. 2000); *Bansemer* v. *Smith Labs., Inc.*, 1988 U.S. Dist. LEXIS 16208 (E.D. Wis. Sept. 12, 1988); *McEwen* v. *Ortho Pharm Corp.*, 528 P.2d 522 (Ore. 1974).) In fact, the determination whether labeling revisions are necessary is, in the end, squarely and solely FDA's under the act. A manufacturer may, under FDA regulations, strengthen a labeling warning, but in practice manufacturers typically consult with FDA before doing so to avoid implementing labeling changes with which the agency ultimately might disagree (and that therefore might subject the manufacturer to enforcement action).

Another misunderstanding of the act encouraged by State law actions is that FDA labeling requirements represent a minimum safety standard. According to many courts, State law serves as an appropriate source of supplementary safety regulation for drugs by encouraging or requiring manufacturers to disseminate risk information beyond that required by FDA under the act. (*See, e.g., Brochu* v. *Ortho Pharm. Corp.*, 642 F.2d 652 (1st Cir. 1981); *Salmon* v. *Parke-Davis and Co.*, 520 F.2d 1359 (4th Cir. 1975); *Caraker* v. *Sandoz Pharm. Corp.*, 172 F. Supp. 2d 1018 (S.D. Ill.

---

[4] *Dowhal* v. *SmithKline Beecham Consumer Healthcare*, 2002 Cal. App. LEXIS 4384 (Cal. Ct. App. 2002), reversed, 2004 Cal. LEXIS 3040 (Cal. April 15, 2004).

[5] *E.g., Ehlis* v. *Shire Richwood, Inc.*, 233 F. Supp. 2d 1189, 1198 (D.N.D. 2002), aff'd on other grounds, 367 F.3d 1013 (8th Cir. 2004).

[6] *E.g., Bernhardt* v. *Pfizer, Inc.*, 2000 U.S. Dist. LEXIS 16963 (S.D.N.Y. Nov. 16, 2000). This doctrine allows a court to refer a matter to an administrative agency for an initial determination where the matter involves technical questions of fact and policy within the agency's jurisdiction. If a court finds that the agency has primary jurisdiction, the court stays the matter and instructs the plaintiff to initiate an action with the agency. *See, e.g., Israel* v. *Baxter Labs., Inc.*, 466 F.2d 272, 283 (D.C. Cir. 1972); see also 21 CFR 10.60.

[7] *Dowhal* v. *SmithKline Beecham Consumer Healthcare*, 2002 Cal. App. LEXIS 4384 (Cal. Ct. App. 2002), reversed, 2004 Cal. LEXIS 3040 (Cal. April 15, 2004); *Bernhardt* v. *Pfizer, Inc.*, 2000 U.S. Dist. LEXIS 16963 (S.D.N.Y. November 16, 2000); *Motus* v. *Pfizer, Inc.*, 127 F. Supp. 2d 1085 (C.D. Cal. 2000), summary judgment granted, 196 F. Supp. 2d 984, 986 (C.D. Cal. 2001), aff'd, 2004 U.S. App. LEXIS 1944 (9th Cir. February 9, 2004); *In re Paxil Litigation*, 2002 U.S. Dist. LEXIS 16221 (C.D. Cal. August 16, 2002), transferred, 296 F. Supp. 2d 1374 (J.P.M.L. 2003).

2001); *Mazur* v. *Merck & Co., Inc.*, 742 F. Supp. 239 (E.D. Pa. 1990); *In re Tetracycline Cases*, 747 F. Supp. 543 (W.D. Mo. 1989).) In fact, FDA interprets the act to establish both a "floor" and a "ceiling," such that additional disclosures of risk information can expose a manufacturer to liability under the act if the additional statement is unsubstantiated or otherwise false or misleading. Given the comprehensiveness of FDA regulation of drug safety, effectiveness, and labeling under the act, additional requirements for the disclosure of risk information are not necessarily more protective of patients. Instead, they can erode and disrupt the careful and truthful representation of benefits and risks that prescribers need to make appropriate judgments about drug use. Exaggeration of risk could discourage appropriate use of a beneficial drug.

State law requirements can undermine safe and effective use in other ways. In the preamble accompanying the proposal, FDA noted that liability concerns were creating pressure on manufacturers to expand labeling warnings to include speculative risks and, thus, to limit physician appreciation of potentially far more significant contraindications and side effects (65 FR 81082 at 81083). FDA has previously found that labeling that includes theoretical hazards not well-grounded in scientific evidence can cause meaningful risk information to "lose its significance" (44 FR 37434 at 37447, June 26, 1979). Overwarning, just like underwarning, can similarly have a negative effect on patient safety and public health. (See section X of this document.) Similarly, State-law attempts to impose additional warnings can lead to labeling that does not accurately portray a product's risks, thereby potentially discouraging safe and effective use of approved products or encouraging inappropriate use and undermining the objectives of the act. (*See, e.g., Dowhal* v. *SmithKline Beecham Consumer Healthcare*, 2002 Cal. App. LEXIS 4384 (Cal. Ct. App. 2002) (allowing to proceed a lawsuit involving a California State law requiring warnings in the labeling of nicotine replacement therapy products that FDA had specifically found would misbrand the products under the act), reversed, 2004 Cal. LEXIS 3040 (Cal. April 15, 2004).)

State law actions also threaten FDA's statutorily prescribed role as the expert Federal agency responsible for evaluating and regulating drugs. State actions are not characterized by centralized expert evaluation of drug regulatory issues. Instead, they encourage, and in fact require, lay judges and juries to second-guess the assessment of benefits versus risks of a specific drug to the general public—the central role of FDA—sometimes on behalf of a single individual or group of individuals. That individualized reevaluation of the benefits and risks of a product can result in relief—including the threat of significant damage awards or penalties—that creates pressure on manufacturers to attempt to add warnings that FDA has neither approved nor found to be scientifically required. This could encourage manufacturers to propose "defensive labeling" to avoid State liability, which, if implemented, could result in scientifically unsubstantiated warnings and underutilization of beneficial treatments.

FDA has previously preempted State law requirements relating to drugs in rulemaking proceedings. For example:

- In 1982, FDA issued regulations requiring tamper-resistant packaging for OTC drugs. In the preamble accompanying the regulations, FDA stated its intention that the regulations preempt any State or local requirements that were "not identical to * * * [the rule] in all respects" (47 FR 50442 at 50447, November 5, 1982).
- In 1986, FDA issued regulations requiring aspirin manufacturers to include in labeling a warning against use in treating chicken pox or flu symptoms in children due to the risk of Reye's Syndrome. In the accompanying preamble, FDA said the regulations preempted "State and local packaging requirements that are not identical to it with respect to OTC aspirin-containing products for human use" (51 FR 8180 at 8181, March 7, 1986).
- In 1994, FDA amended 21 CFR 20.63 to preempt State requirements for the disclosure of adverse event-related information treated as confidential under FDA regulations (59 FR 3944, January 27, 1994). (See also 47 FR 54750, December 3, 1982) ("FDA believes that differing State OTC drug pregnancy-nursing warning requirements would prevent accomplishment of the full purpose and objectives of the agency in issuing the regulation and that, under the doctrine of implied preemption, these State requirements are preempted by the regulation as a matter of law.")

As noted previously, DOJ has made submissions to courts in a number of cases in which private litigants asserted a State law basis for challenging the adequacy of risk information provided by manufacturers for drugs in accordance with FDA requirements under the act. In each case, DOJ argued that the doctrine of preemption precluded the plaintiff's claim from proceeding.[8] The practice of addressing conflicting State requirements through participation in litigation (including product liability cases) in which the Government is not a party is not new. For example, DOJ participated on FDA's behalf in favor of pre-emption in *Jones* v. *Rath Packing Company*, 430 U.S. 519 (1977), *Grocery Manufacturers of America, Inc.* v. *Gerace*, 755 F.2d 993 (2d Cir. 1985), *Eli Lilly & Co., Inc.* v. *Marshall*, 850 S.W.2d 155 (Tex. 1993), and *Buckman Co.* v. *Plaintiffs' Legal Comm.*, 531 U.S. 341, 352–53 (2001). FDA believes that State laws conflict with and stand as an obstacle to achievement of the full objectives and purposes of Federal law when they purport to compel a firm to include in labeling or advertising a statement that FDA has considered and found scientifically unsubstantiated. In such cases, including the statement in labeling or advertising would render the drug misbranded under the act (21 U.S.C. 352(a) and (f)). The agency believes that State law conflicts with and stands as an obstacle to achievement of the full objectives and purposes of Federal law if it purports to preclude a firm from including in labeling or advertising a statement that is included in prescription drug labeling. By complying with the State law in such a case and removing the statement from labeling, the firm would be omitting a statement required under § 201.100(c)(1) as a condition on the exemption from the requirement of adequate directions for use, and the omission would misbrand the drug under 21 U.S.C. 352(f)(1). The drug might also be misbranded on the ground that the omission is material within the meaning of 21 U.S.C. 321(n) and makes the labeling or advertising misleading under 21 U.S.C. 352(a) or (n).

Consistent with its court submissions and existing preemption principles, FDA believes that at least the following

---

[8] The DOJ submissions in these cases relied on the doctrine of implied preemption or primary jurisdiction. Although the act itself contains no general express pre-emption provision for drugs, a provision of legislation amending the drug provisions addresses the relationship of the legislation to State law. Section 202 of the Drug Amendments of 1962 (Public Law 87-781, Title II, section 202, 76 Stat. 793 (October 10, 1962)) provides: "Nothing in the amendments made by this Act to the Federal Food, Drug, and Cosmetic Act shall be construed as invalidating any provision of State law which would be valid in the absence of such amendments unless there is a direct and positive conflict between such amendments and such provision of State law." The existence of a legislative provision addressing pre-emption does not bar the operation of ordinary principles of implied preemption (*Geier* v. *American Honda Motor Co., Inc.*, 529 U.S. 861, 869 (2000)).

claims would be preempted by its regulation of prescription drug labeling: (1) Claims that a drug sponsor breached an obligation to warn by failing to put in Highlights or otherwise emphasize any information the substance of which appears anywhere in the labeling; (2) claims that a drug sponsor breached an obligation to warn by failing to include in an advertisement any information the substance of which appears anywhere in the labeling, in those cases where a drug's sponsor has used Highlights consistently with FDA draft guidance regarding the "brief summary" in direct-to-consumer advertising ("Brief Summary: Disclosing Risk Information in Consumer-Directed Print Advertisements," 69 FR 6308 (February 2004)) (see comment 112); (3) claims that a sponsor breached an obligation to warn by failing to include contraindications or warnings that are not supported by evidence that meets the standards set forth in this rule, including § 201.57(c)(5) (requiring that contraindications reflect "[k]nown hazards and not theoretical possibilities") and (c)(7); (4) claims that a drug sponsor breached an obligation to warn by failing to include a statement in labeling or in advertising, the substance of which had been proposed to FDA for inclusion in labeling, if that statement was not required by FDA at the time plaintiff claims the sponsor had an obligation to warn (unless FDA has made a finding that the sponsor withheld material information relating to the proposed warning before plaintiff claims the sponsor had the obligation to warn); (5) claims that a drug sponsor breached an obligation to warn by failing to include in labeling or in advertising a statement the substance of which FDA has prohibited in labeling or advertising; and (6) claims that a drug's sponsor breached an obligation to plaintiff by making statements that FDA approved for inclusion in the drug's label (unless FDA has made a finding that the sponsor withheld material information relating to the statement). Preemption would include not only claims against manufacturers as described above, but also against health care practitioners for claims related to dissemination of risk information to patients beyond what is included in the labeling. (See, e.g., *Bowman* v. *Songer*, 820 P.2d 1110 (Col. 1991).)

FDA recognizes that FDA's regulation of drug labeling will not preempt all State law actions. The Supreme Court has held that certain State law requirements that parallel FDA requirements may not be preempted (*Medtronic, Inc.* v. *Lohr*, 518 U.S. 470, 495 (1996) (holding that the presence of a State law damages remedy for violations of FDA requirements does not impose an additional requirement upon medical device manufacturers but "merely provides another reason for manufacturers to comply with * * * federal law"); id. at 513 (O'Connor, J., concurring in part and dissenting in part); id)). *But see Buckman Co.* v. *Plaintiffs' Legal Comm.*, 531 U.S. 341, 352–53 (2001) (holding that "fraud on the FDA" claims are preempted by Federal law); 21 U.S.C. 337(a) (restricting the act enforcement to suits by the United States); *In re Orthopedic Bone Screw Prods. Liability Litig.*, 159 F.3d 817, 824 (3d Cir. 1998) ("Congress has not created an express or implied private cause of action for violations of the FDCA or the MDA [Medical Device Amendments]").

*E. Highlights—Comments on Specific Provisions*

The agency received comments on the following provisions of the proposed rule relating to the content of Highlights:

• *Drug names, dosage form, route of administration, and controlled substance symbol (proposed § 201.57(a)(1))*

In proposed § 201.57(a)(1), FDA specified the information concerning the identity of the product that would be included at the beginning of Highlights.

(Comment 14) One comment recommended that this information be moved above the title "Highlights of Prescribing Information" in Highlights.

The agency does not agree that the information required by § 201.57(a)(1) should be placed above the title "Highlights of Prescribing Information." The agency believes that the title of each of the three major portions of prescription drug labeling ("Highlights of Prescribing Information," "Full Prescribing Information: Contents," and "Full Prescribing Information") should be placed at the beginning of the corresponding information so that the title is readily apparent to users.

• *Inverted black triangle (proposed § 201.57(a)(2))*

FDA proposed to require that products that contain a new molecular entity, new biological product, or new combination of active ingredients have in their labeling an inverted black triangle to indicate that the drug or drug combination had been approved in the United States for less than 3 years (proposed § 201.57(a)(2)). This proposal also applied to marketed products approved for a new indication, for use by a new route of administration, or with a novel drug delivery system.

(Comment 15) Several comments opposed, or expressed reservations about, the use of an inverted black triangle to identify a product, indication, or dosage form that has been approved for less than 3 years. There were concerns that the symbol is not universally understood and could therefore be confusing to practitioners. One comment stated that use of icons to convey public health information has historically been unsuccessful. Some of the comments stated that if the inverted black triangle were retained, the agency would need to conduct an extensive educational campaign to educate practitioners about its meaning and purpose. Some comments also expressed the concern that labeling containing the symbol could be in circulation much longer than 3 years after approval, which would undermine the significance of the symbol. One comment stated that the symbol implies, without basis, that newer drugs are inherently less safe than older drugs. Some comments stated that the criteria for when a new indication would extend the time for which a product must have the inverted black triangle are not clear.

Two comments stated that a bold approval date might be more informative than the inverted black triangle. Another comment recommended using the designation "New-Rx" to identify a product that has been approved for less than 3 years.

Other comments expressed strong support for the inverted black triangle as a mechanism to prompt practitioners to more carefully scrutinize the labeling of newer products and more diligently report adverse events. The comments maintained that use of the inverted black triangle could lead to earlier detection of rare, serious adverse reactions and, thus, could potentially save lives. One comment suggested extending the time that the inverted black triangle would be required to 5 years.

The agency has reconsidered its proposal to require use of the inverted black triangle to identify products that have been marketed for less than 3 years. The agency continues to believe strongly in the goals of the inverted black triangle—to help ensure that prescribers use a product with particular care during its initial years of marketing and to make prescribers more diligent in reporting suspected adverse reactions for newer products. However, the agency agrees with comments that, in prescription drug labeling, the inverted black triangle is not universally