UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION ) ) ) ) ) | |
| ) | MDL Docket No. 1629 |
| THIS DOCUMENT RELATES TO: ) | Master File No. 04-10981 |
| ) | Judge Patti B. Saris |
| ALL MARKETING AND ) | Mag. Judge Leo T. Sorokin |
| SALES PRACTICES ACTIONS ) | |
| ) | |
| ) | |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION**

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................................ 1

II.    RESPONSE TO DEFENDANTS' STATEMENT OF FACTS ......................................... 2

    A.     The Consumer Class Representatives ................................................................ 2

        1.     Gerald Smith ..................................................................................... 2

        2.     Lorraine Kopa ................................................................................... 4

    B.     The Third Party Payor Class Representatives ................................................... 6

        1.     ASEA ................................................................................................ 6

        2.     Harden ............................................................................................... 7

        3.     BCBSLA ........................................................................................... 8

III.   COMMON ISSUES PREDOMINATE .................................................................. 9

    A.     Whether Or Not Neurontin Is Effective In Treating Off-Label Conditions Presents Common Questions Susceptible of Common Proof ............................... 9

    B.     Plaintiffs Have Alleged Uniform Misrepresentations and Omissions ................ 10

        1.     Plaintiffs Have Alleged Uniform Omissions ........................................ 10

        2.     Plaintiffs Have Alleged Uniform Published Misrepresentations ............. 12

        3.     Plaintiffs Have Alleged Uniform Oral Misrepresentations .................... 12

    C.     Proximate Cause and Damages are Susceptible of Common Proof ................... 16

    D.     Reliance Is Not An Element of Plaintiffs' RICO Claim ..................................... 21

    E.     Reliance May Be Presumed on Plaintiffs' Common Law Fraud Claim .............. 21

    F.     Plaintiffs Can Demonstrate Class-Wide Injury Without Examining Individual Medical Records ............................................................................. 23

    G.     Affirmative Defenses Do Not Predominate ...................................................... 25

    H.     The Court May Apply New Jersey Law ........................................................... 26

        1.     New Jersey Choice of Law Rules Lead to the Application of New Jersey Law ....................................................................................... 28

        2.     Massachusetts' Choice of Law Rules Parallel New Jersey's .................. 31

IV.    THE CLASS IS ASCERTAINABLE ....................................................................... 33

V.     PLAINTIFFS' CLAIMS ARE TYPICAL AND THEY WILL ADEQUATELY REPRESENT THE CLASS .................................................................................... 35

## TABLE OF CONTENTS
### (continued)

Page

VI.    THE THIRD PARTY PAYORS HAVE STANDING TO SUE UNDER THE
       NJCFA ................................................................................................................. 38

VII.   A CLASS ACTION IS SUPERIOR TO AND MORE MANAGEABLE THAN
       THOUSANDS OF INDIVIDUAL ACTIONS ............................................................... 39

VIII.  CONCLUSION……………………………………………………………………….40

# TABLE OF AUTHORITIES

**Page**

## CASES

*Adair v. Sorenson,*
    134 F.R.D. 13 (D. Mass. 1991) ................................................................. 37

*Arc Networks v. Gold Phone Card Co.,*
    756 A.2d 636 (N.J. Super. Ct. Law Div. 2000) ..................................... 38

*Bank of China v. NBM, L.L.C.,*
    126 S. Ct. 675 (2005) ............................................................................. 21

*Bertulli v. Independent Ass'n of Continental Pilots,*
    242 F.3d 290 (5th Cir. 2001) ................................................................ 40

*Brown v. Philip Morris Inc.,*
    228 F. Supp. 2d 506 (D.N.J. 2002) ...................................................... 22

*Cetel v. Kirwan Fin. Group, Inc.,*
    460 F. 3d 494 (3d Cir. 2006) ................................................................ 38

*Clay v. American Tobacco Co.,*
    188 F.R.D. 483 (S.D. Ill. 1999) ............................................... 34, 35, 36

*Computer Systems Engineering, Inc. v. Qantel Corporation,*
    740 F.2d 59 (1st Cir. 1984) .................................................................. 32

*CPC Intern., Inc. v. Northbrook Excess & Surplus Ins. Co.,*
    962 F.2d 77 (1st Cir. 1992) .................................................................. 31

*Dellinger v. Pfizer, Inc.,*
    2006 WL 2057654 (W.D.N.C. July 19, 2006) .................... 9, 23, 24, 25

*Desiano v. Warner Lambert Co.,*
    326 F.3d 339 (2d Cir. 2003) ................................................................ 39

*Duhaime v. John Hancock Mut. Life Ins. Co.,*
    177 F.R.D. 54 (D. Mass. 1997) ...................................................... 12, 35

*East Coast Office Systems, Inc. v. Citicorp Vendor Finance, Inc.,*
    Civ. No. 06-24 (GEB), 2006 U.S. Dist. LEXIS 82044 (D.N.J. Nov. 9, 2006) .............. 38, 39

*Eastern Mountain Platform Tennis, Inc. v. Sherwin-Williams Co., Inc.,*
    40 F.3d 492 (1st Cir. 1994) .................................................................. 31

*Foister v. Purdue Pharma L.P.,*
    No. 01-268-DCR, 2002 WL 108608 (E.D. Ky. Feb. 26, 2002) ........... 23

*Fuller v. Fruehauf Trailer Corp.,*
    168 F.R.D. 588 (E.D. Mich. 1996) ...................................................... 12

*Grace v. Perception Technology Corp.,*
    128 F.R.D. 165 (D. Mass. 1989) ..................................................... 27, 38

-iii-

# TABLE OF AUTHORITIES
## (continued)

Page

*Heindel v. Pfizer, Inc.*,
381 F. Supp. 2d 364 (D.N.J. 2004) ................................................................ 23

*Huffman v. Monroe County Community School Corporation*,
588 N.E.2d 1264 (Ind. 1992) ......................................................................... 37

*In re Baycol Prods. Litig.*,
218 F.R.D. 197 (D. Minn. 2003) ............................................................... 23, 36

*In re Biogen Securs. Litig.*,
179 F.R.D. 25 (D. Mass. 1997) ...................................................................... 37

*In re Bridgestone/Firestone, Inc.*,
288 F.3d 1012 (7th Cir. 2002) ....................................................................... 34

*In re Express Scripts, Inc. Pharmacy Benefits Management Litig.*,
MDL No. 1672, 2006 U.S. Dist. LEXIS 65168 (E.D. Mo. Sept. 13, 2006) .......................... 38

*In re Flat Glass Antitrust Litig.*,
191 F.R.D. 472 (W.D. Pa. 1999) .................................................................... 26

*In re LifeUSA Holding, Inc.*,
242 F.2d 136 (3d Cir. 2001) .......................................................................... 13

*In re Lupron Marketing & Sales Practices Litig.*,
295 F. Supp. 2d 148 (D. Mass. 2003) .............................................................. 21

*In re Polymedica Corp. Securs. Litig.*,
432 F.3d 1 (1st Cir. 2005) ............................................................................. 10

*In re Prudential Sec. Inc. Ltd. P'ships Litig.*,
163 F.R.D. 200 (S.D.N.Y. 1995) .................................................................... 12

*In re Relafen Antitrust Litigation*,
221 F.R.D. 260 (D.Mass. 2004) ..................................................................... 32

*In re Rezulin Litig.*,
Judicial Council Coordination Proceeding No. 4122 (Cal. Sup. Ct. Apr. 29,
2003) ....................................................................................................... 23

*In re Rezulin Prod. Liab. Litig.*,
392 F. Supp. 2d 597 (S.D.N.Y. 2005) ............................................................. 39

*In re Rezulin Prods. Liab. Litig.*,
210 F.R.D. 61 (S.D.N.Y. 2002) ................................................................ passim

*In re Synthroid Marketing Litigation*,
188 F.R.D. 295 (N.D. Ill. 1999) ................................................................ 11, 36

*In re Tyco Int'l, Inc.*,
2006 WL 2349338 (D.N.H. Aug. 15, 2006) ...................................................... 38

*In re Visa Check/MasterMoney Antitrust Litig.*,
280 F.3d 124 (2d Cir. 2001) .......................................................................... 40

*Insolia v. Philip Morris, Inc.*,

## TABLE OF AUTHORITIES
### (continued)

Page

186 F.R.D. 535 (W.D. Wis. 1998) ................................................................. 13, 36

*International Union of Operating Engineers Local #68 Welfare Fund v. Merck & Co., Inc.*,
894 A.2d 1136 (N.J. Super. Ct. App. Div. 2006) ......................................... 27, 28

*Kaufman v. i-Stat Corp.*,
754 A.2d 1188 (N.J. 2000) ................................................................................. 22

*Klay v. Humana, Inc.*,
382 F.3d 1241 (11th Cir. 2004) ........................................................................ 40

*Lessard v. Metropolitan Life Ins. Co.*,
103 F.R.D. 608 (D. Me. 1984) .......................................................................... 25

*Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach*,
523 U.S. 26 (1998) ............................................................................................ 27

*M. Berenson Co., Inc. v. Faneuil Hall Marketplace, Inc.*,
100 F.R.D. 468 (D. Mass. 1984) ...................................................................... 35

*Margulies v. Chase Manhattan Mortg. Corp.*,
No. A-4087-03T3, 2005 WL 2923580 (N.J. Super. Ct. App. Div. Nov. 7, 2005) ............................................................................................................... 31

*Martin v. Am. Med. Sys., Inc. v. Pfizer, Inc.*,
1995 WL 680630 (S.D. Ind. Oct. 25, 1995) ............................................... 34, 36

*Moore v. Painewebber, Inc.*,
306 F.3d 1247 (2d Cir. 2002) ........................................................................... 13

*Morgan v. Markerdowne Corp.*,
201 F.R.D. 341 (D.N.J. 2001) .......................................................................... 22

*Neufeld v. Neufeld*,
910 F. Supp. 977 (S.D.N.Y. 1996) ................................................................... 27

*Oshana v. Coca-Cola Bottling Co.*,
225 F.R.D. 575 (N.D. Ill. 2005) ................................................................... 34, 36

*Papergraphics International, Inc. v. Correa*,
910 A.2d 625 (N.J. Super. 2006) ...................................................................... 38

*Park Inn Intern., L.L.C. v. Mody Enterprises, Inc.*,
105 F. Supp. 2d 370 (D.N.J. 2000) ................................................................... 27

*Peterson v. H&R Block Tax Servs., Inc.*,
174 F.R.D. 78 (N.D. Ill. 1997) ......................................................................... 21

*Phillips Petroleum Co. v. Shutts*,
472 U.S. 797 (1985) .......................................................................................... 27

*Platten v. HG Bermuda Exempted Limited*,
437 F.3d 118 (2d Cir. 2006) ............................................................................. 21

*Reicher v. Berkshire life Ins. Co. of America*,

## TABLE OF AUTHORITIES
### (continued)

Page

360 F.3d 1 (1st Cir. 2004) .................................................................. 32

*Rivera v. Wyeth-Ayerst Labs*,
83 F.3d 315 (5th Cir. 2002) ................................................................. 23

*Singer v. AT&T Corp.*,
185 F.R.D. 681 (S.D. Fla. 1998) ........................................................ 21

*Smilow v. Southwestern Bell Mobile Sys., Inc.*,
323 F.3d 32 (1st Cir. 2003) ................................................................ 25

*Spark v. MBNA Corp.*,
178 F.R.D. 431 (D. Del. 1998) .......................................................... 21

*Sprague v. General Motors Corp.*,
133 F.3d 388 (6th Cir. 1998) ............................................................. 35

*Systems Management, Inc. v. Loiselle*,
303 F.3d 100 (1st Cir. 2002) .............................................................. 21

*Tingley Systems, Inc. v. CSC Consulting, Inc.*,
152 F. Supp. 2d 95 (D. Mass. 2001) .................................................. 31

*Waters v. Int'l Precious Metals Corp.*,
172 F.R.D. 479 (S.D. Fla. 1996) ....................................................... 21

*Williams v. Purdue Pharma Co.*,
297 F. Supp. 2d 171 (D. D.C. 2003) .................................................. 23

*Yaffe v. Powers*,
454 F.2d 1362 (1st Cir. 1972) ............................................................ 40

## STATUTES AND RULES

28 U.S.C. § 1391 ................................................................................. 27

Fed. R. Civ. P. 23 …………………….……………………………………………………*passim*

## TREATISES

Moore's Federal Practice (3d ed. 2006).............................................. 36

Newberg & Conte, *Newberg On Class Actions* (4th ed. 2002) .................... 16, 17, 25, 26, 33,34

*Manual for Complex Litigation, Fourth* (2004)................................... 33

*Restatement (Second) of Conflict of Laws* ................................ 28, 29, 32

## OTHER AUTHORITIES

D. Radley, S. Finkelstein, *et al.*, *Off-Label Prescribing Among Office-Based
Physicians*, 166 Arch. Intern. Med. 1021 (May 8, 2006) ...................... 18

-vi-

Plaintiffs Louisiana Health Service Indemnity Company dba BlueCross/BlueShield of Louisiana ("BCBSLA"); ASEA/AFSCME Local 52 Health Benefits Trust ("ASEA"); Harden Manufacturing Corporation ("Harden"); Gerald Smith; and Lorraine Kopa (collectively, "Plaintiffs") respectfully submit this reply memorandum of law in support of their motion for class certification.[1]

## I.    **INTRODUCTION**

At its core, this litigation concerns the ways in which Defendants influenced and even corrupted the medical profession.  Plaintiffs have alleged a far-reaching, decade-long, nationwide campaign to market Neurontin for off-label uses for which there was no scientific evidence it was effective, and for which there was negative clinical data that was suppressed.  By 2003, these unsupported uses accounted for more than 90% of all Neurontin prescriptions.  *See* Third Amended Class Action Complaint ("TACAC") ¶ 47.  This marketing campaign was executed using the following comprehensive strategies and tactics: (a) Defendants paid dozens of trained speakers millions of dollars to deliver false and misleading presentations concerning off-label uses, also known as "key messages;" (b) Defendants hired technical writers to write and publish countless journal articles containing the "key messages;" (c) Defendants paid physicians millions of dollars to participate in various marketing tactics—such as consultant meetings, dinner meetings, continuing medical education events, and sham studies such as STEPS, where they were exposed to the "key messages;" and (d) Defendants sent their legions of sales representatives to relentlessly detail physicians and reinforce the "key messages."

From this perspective, the individual consumer plaintiffs and their physicians are a perfect embodiment of the results of Defendants' marketing scheme.  As set forth below, the two

---

[1] As noted in Defendants' opposition, the Union of Operating Engineers, Local No. 68 Welfare Fund has withdrawn as a class representative, for reasons wholly unrelated to this litigation.

consumer class representatives suffered from conditions for which there is no scientific evidence

of Neurontin's efficacy.  Not surprisingly, Neurontin did not effectively treat these off-label

conditions.  As it turns out—and this was not known at the time these class representatives were

selected—the prescribing physicians were thoroughly enmeshed in Defendants' marketing

scheme.  Both had attended numerous marketing events, and had been detailed hundreds of times

on Neurontin.  Contrary to Defendants' argument, it would be hard to imagine two consumer

plaintiffs better or more typical of the Consumer Subclass.

## II.    RESPONSE TO DEFENDANTS' STATEMENT OF FACTS

### A.    The Consumer Class Representatives

#### 1.    Gerald Smith

Defendants ignore Gerald Smith's repeated and consistent testimony that Neurontin was

*not* effective in treating his pain, which did not improve until after he *discontinued* the use of

Neurontin and other prescription drugs altogether.[2]  Defendants urge the Court to credit instead

the statements of his neurologist, Dr. Huler, concerning the benefits that Mr. Smith *appeared* to

have received from Neurontin.  Mr. Smith made it very clear, however, that all such references to

improvements in his condition reflected nothing more than occasional good days in an

unrelenting "roller coaster" experience of pain, and that the roller coaster did not come to a stop

until after he discontinued all of his prescription medications.  Smith Depo. at 83:2-10, 85:9-24,

96:16-25, 102:3-15.

Ironically, Dr. Huler's testimony only underscores why she is a typical physician in this

---

[2] Struggling to establish that Neurontin may have played at least a minor role in improving Mr. Smith's condition, Defendants repeatedly attempted to elicit an admission that Mr. Smith had "started to get better" during the time he took Neurontin, but his answer, "No, not at all." and "No, I had not." only confirmed that Neurontin provided no benefit at all.  Deposition of Gerald Smith ("Smith Depo.," Exh. 2 to Declaration of Matthew B. Rowland ("Rowland Decl.," Dkt. No. 586)) at 27:24-28:11.  Mr. Smith explicitly reaffirmed that Neurontin did not relieve his headache pain.  *Id*. at 70:23-71:2.

case.  Like most physicians, Dr. Huler does not conduct independent research and instead relies upon the information she receives from pharmaceutical companies and what she learns from other physicians regarding the off-label use of a drug such as Neurontin.  Deposition of Kylene Huler, M.D. ("Huler Depo.," Exh. 1 to Rowland Decl.) at 151.  In evaluating information from pharmaceutical companies, Dr. Huler tries to avoid "biased" studies that are "skewed towards marketing" or that are "sponsored by the drug companies."  *Id*. at 130:7-25.  Of course, this litigation centers largely upon Defendants' *disguising* their biased marketing materials as legitimate research.  Dr. Huler also emphasized that she disdains advice from "drug whores" who will tout the benefits of a drug "depending upon who's paying him to give the lecture."  *Id*. at 157:13-158:23.  Dr. Huler explained that she is deeply troubled by some of the very practices within the pharmaceutical industry that go to the heart of Plaintiffs' claims against Defendants in this litigation:

> But I'm saying I know of certain physicians.  We call them, you know, drug whores.  I mean, basically they – they are paid tremendous amounts of money to tout a medication, and they will speak on behalf of the company with canned, premade slides and give a lecture that basically glorifies the medication they're being paid heavily by that pharmaceutical company to market the medication.  I do not go to those lectures.

Huler Depo. at 158:2-10.

Like other doctors, Dr. Huler thinks she can detect commercial bias, but she cannot.  Dr. Huler acknowledged that there is no public disclosure of such payments, and that she must rely on word of mouth reports as to whether a doctor is receiving such improper payments, which is an unreliable source of information because it is limited to the comments by participating doctors who choose to brag that it is an "easy way to make money."  *Id*. at 158:15-159:24.

Dr. Beydoun provides a compelling example of this.  Dr. Huler identified Dr. Beydoun as a speaker at at least two of the Neurontin events she attended.  *Id*. at 17:22-18:7, 48:2-10.  Dr.

Huler also believed Dr. Beydoun to be an independent, unbiased source of information. *See id.* at 93:5-8 ("It was just Dr. Beydoun presented his research.  He was not marketing anything; he was just presenting his research on that medication that he had done for pain.").  She was also unsure whether he received any money from the Defendants to give these presentations. *Id.* at 91:20-25.

In fact, Dr. Beydoun was one of the "hired guns" in Defendants' stable of physicians. Parke-Davis alone paid him $122,036 to speak about Neurontin between 1994 and 1997. TACAC ¶ 110.  He received another $76,331.93 from Pfizer to speak about Neurontin between 2001 and 2004. *See* Reply Declaration of Ilyas J. Rona in Support of Plaintiffs' Motion for Class Certification ("Rona Decl."), Exh. D.

In sum, even though Dr. Huler prefers to avoid biased information regarding off-label uses of a drug such as Neurontin, she was unable to escape the improper marketing practices that lie at the heart of this litigation.[3]  Defendants' influence upon Dr. Huler's prescribing habits is not limited to their "behind the scenes" manipulation of the flow of information regarding Neurontin within the medical community.  Defendants' sales representatives detailed Dr. Huler hundreds of times. *Id.* at 191-222, Exh. 2.  Indeed, Dr, Huler earned the informal title of "Pfizer Queen" through her aggressive prescribing of Neurontin and other Pfizer products. *Id.* at 218.

## 2.    **Lorraine Kopa**

After Lorraine Kopa, a licensed practical nurse, suffered injuries as a result of a car accident, she went to see Dr. Dhaduk, who prescribed Neurontin for her chronic neck and back pain, one of the conditions for which Defendants promoted Neurontin most aggressively.

---

[3] Dr. Huler described a series of "red flags" that identify biased or untrustworthy "drug whores" — many of which correspond to the factual allegations underlying Plaintiffs' claims in this litigation — such as information disseminated by physicians who spend a disproportionate amount of time traveling to speak about drugs, or who perform no original research and are involved in ghost-written articles.  Huler Depo. at 158:11-164:6.  Dr. Beydoun should have raised numerous "red flags." *See* TACAC ¶¶ 110, 115, 248.

Deposition of Lorraine Mary Kopa ("Kopa Depo.," Exh. 5 to Rowland Decl.) at 38. Dr. Dhaduk urged Ms. Kopa to take the Neurontin, insisting that it would help. Deposition of Vithal Dhaduk ("Dhaduk Depo.," Exh. 4 to Rowland Decl.) at 91; Kopa Depo. at 59. Ms. Kopa never had success with Neurontin for her neck and back pain. Kopa Depo. at 30, 84, 103-106. Ms. Kopa only continued taking Neurontin because she, like many other patients in pain, felt intimidated by her doctor and trusted that he had superior knowledge to the average patient. Kopa Depo. at 86, 96, 134. Finally, after many months of suffering, Ms. Kopa terminated her visits with Dr. Dhaduk, and discontinued taking Neurontin. Kopa Depo. at 134-35.

Despite the fact that Ms. Kopa did not benefit from Neurontin, Dr. Dhaduk never discontinued Neurontin or prescribed an alternative medication; instead he *increased* her dosage from 400 milligrams to 900 milligrams over a seven month period, even though she continued to report that she felt worse on the medication than she had when she first began taking it. Kopa Depo. at 30, 85, 89; Dhaduk Depo. at 239-40. Of course, increasing the dose to achieve efficacy was a consistent "key message" for Defendants, and precisely the reaction that Defendants urged when Neurontin appeared to be ineffective. *See* TACAC ¶¶ 123, 205, 215.

Dr. Dhaduk's behavior is not surprising, given that he was a STEPS investigator, and received $300 for every patient he enrolled in the program. Dhaduk Depo. at 143:17-146:6. "Although STEPS took the form of a research clinical trial, it was, in fact, a marketing ploy designed to induce neurologists to become comfortable prescribing Neurontin at a far higher dose than indicated in the FDA approved labeling." TACAC ¶ 252. Dr. Dhaduk also had been "trained" by the Defendants as a speaker, spoke regularly about Neurontin, and earned significant fees. Dhaduk Depo. at 131-32, 135, 270, 289. Defendants also paid Dr. Dhaduk to attend their conferences and consultant meetings and listen to other speakers discuss Neurontin.

*Id*. at 127, 141, 284-86.  Dr. Dhaduk's airfare, hotel and meals were always paid for by

Defendants.  Dhaduk Depo. at 128.  Finally, Dr. Dhaduk has received hundreds of visits from

Defendants' sales representatives and medical liaisons.  *Id*. at 110, 117.[4]

Given his close ties to Defendants and his involvement in the marketing of Neurontin, it

is no surprise that Dr. Dhaduk regularly prescribes Neurontin to his patients (*id*. at 19) or that he

believes Neurontin is effective for certain off-label uses (*id*. at 32-33), or that he increased Ms.

Kopa's dosage— rather than discontinue Neurontin altogether—when it appeared that the

treatment was not working.[5]

### B.    The Third Party Payor Class Representatives

#### 1.    ASEA

The ASEA Health Benefits Trust ("ASEA" or "the Trust") serves approximately 17,000

Alaska government employees and their dependents.  Deposition of Fred Grant Brown ("Brown

Depo.," Exh. 6 to Rowland Decl.) at 114:10-11.  Contrary to Defendants' assertion, ASEA's

benefits plan does not distinguish between prescriptions made for on- versus off-label use—both

are covered.[6]  Brown Depo. at 273:18-23.  A claim for Neurontin is covered if it is prescribed by

a licensed physician.  *Id.* at 321:22-322:15.  *See also id.* at 327:10-13 (noting the Trust has never

---

[4] Indeed, Dr. Dhaduk met with counsel for Defendants prior to his deposition and was paid by Defendants for his time spent traveling, preparing and testifying at deposition.  Dhaduk Depo. at 158-65.  His fee for testifying was at least $1,000 and possibly more than $5,000, plus expenses for his travel, hotel, and meals.  Dhaduk Depo. 158:4-11; 161:12-17; 162:2-17; 164:17:20; 165:4-8; 166:9-12.

[5] When Ms. Kopa relayed her concerns about Neurontin's side effects to Dr. Dhaduk, he expressed frustration over Ms. Kopa's lack of trust in him, saying "I'm your doctor, you don't trust me, would I give you something that isn't good for you?  You're not going to take it, then what am I here for?"  Kopa Depo. at 85-86; Dhaduk Depo. at 107.

[6] Indeed, the plan language relied upon by Defendants as excluding coverage for off-label prescriptions, *i.e.*, that a drug "will be determined to be experimental or investigational if . . . [a]pproval, as required by the FDA, has not been granted for marketing" (Exh. 46 to Rowland Decl. at ASEA/ASI 00075), says no such thing, as Neurontin *has* been approved by the FDA for marketing for its *approved* uses, adjunctive epilepsy therapy and postherpetic neuralgia.

considered rejecting a claim for Neurontin because it was for an off-label use).[7]

ASEA does not use a closed formulary limiting available drug choices but rather incentivizes its participants to consider cost-effectiveness by reimbursing a percentage of a prescription cost as opposed to paying a fixed co-pay for all drugs.  Savoie Depo. at 175:19-179:18.  Indeed, ASEA, like most other TPPs, has no way to even determine whether any particular prescription was written for an on- or off-label use, because ASEA, like most TPPs, uses a PBM to manage its drug benefits, and the only information the PBMs receive is what is entered by the pharmacy filling the prescription – *i.e.* the drug prescribed, dosage, number of tablets, and cost.  ASEA simply does not have the ability to monitor all of its prescription drug claims and determine whether they are for on- or off-label uses.  Brown Depo. at 47:11-15; Savoie Depo. at 55:17-56:21.

### 2. __Harden__

Defendants have also misstated the record with respect to whether the benefit plans governing Harden's employees excluded coverage for off-label prescriptions.   Defendants point to an exclusion for "investigational" drugs in Harden's benefit plans, but misleadingly argue that a stated criteria for what is considered "investigational" is whether the drug has received FDA approval "for the specific use for which it is prescribed or used."  Def. Mem. at 13.  No mention of the FDA or of the quoted language appears anywhere in the portions of the record cited by

---

[7] Mr. Brown has served as chair of the Trust since its inception in late 2000.  *Id.* at 7:3-4; 28:5-19.  Ms. Savoie's testimony that the Plan did not cover off-label prescriptions was simply incorrect and contrary to the testimony of Mr. Brown.  As Ms. Savoie noted in her testimony, her statement was based solely on her speculation that such an exclusion "could be in the exclusion for experimental or investigational treatment, or it may be in the definition of a covered drug . . . ."  Deposition of Colleen Savoie ("Savoie Depo.," Exh. 7 to Rowland Decl.) at 53:23-54:18.  Ms. Savoie was clear that the Trustees determine what the Plan does and does not cover.  *Id.* at 203:12-204:2 (noting the trustees' interpretation of whether the experimental exclusion in the plan applied to off-label prescriptions would control).  The Trust's Chair, Fred Brown, is the "first contact for policy questions."  Brown Depo. at 28:8-13.  Notwithstanding Mr. Brown's testimony, should the Court find that ASEA's plan (or Harden's or BCBSLA's) excludes coverage for off-label prescriptions, Plaintiffs can easily simplify their definition of the Third Party Payor Subclass to require only that each TPP member have paid for or reimbursed for off-label Neurontin prescriptions.

Defendants, nor in any of the benefit plans related to Harden.[8]

### 3.     BCBSLA

Defendants also argue that BCBSLA policies exclude "investigational" drugs from coverage, continuing to confound the distinct concepts of experimental and off-label use.  In any event, this type of exclusion can only be implemented through a prior authorization program. Deposition of Milam W. Ford ("Ford Depo.," Exh. 11 to Rowland Decl.) at 339-40.  The policy language gives BCBSLA the *option* of excluding drugs for investigational uses, but does not automatically effect that option.  Ford Depo. at 334-48.  BCBSLA has never implemented a prior authorization program for the purpose of curtailing off-label prescriptions.  Ford Depo. at 372. Prior authorization has only been implemented on a few very high-cost, low-volume drugs that have a high potential for abuse, *e.g.* Actiq, a powerful opiate used to treat breakthrough cancer pain that comes in the form of a lollipop.  Ford Depo. at 153.  A prior authorization program for Neurontin would be on a much larger scale than any of BCBSLA's existing prior authorization programs, would vastly increase the expense and resources necessary to implement and run such a program, and would put BCBSLA at a significant competitive disadvantage in its marketplace. Ford Depo. at 83-87, 138-39.

Defendants also portray BCBSLA's P & T committee in a misleading way.  BCBSLA maintains an open formulary, meaning that it pays for all FDA approved drugs regardless of

---

[8] In 1999, when Harden's health benefits became self-funded, its benefit plan excluded "investigational treatment, procedures, . . .drugs [and] drug usage . . ."  Deposition of Lee Dorrill ("Dorrill Depo.," Exh. 9 to Rowland Decl.), Exhibit 27 (Rona Decl., Exh. E) at HAR00775.  From 1999 through 2003, the term "investigational" was defined as "[a]ny treatment, . . .drugs [or] drug usage . . that either [Blue Cross Blue Shield of Alabama, "BCBSAL"] have not recognized as having scientifically established medical value, or that does not meet generally accepted standards of medical practice."  *Id.* at HAR00779.  Nothing in the record indicates that BCBSAL ever understood that Neurontin was ineffective for various off-label uses, or that this language on "investigational" drugs was meant to apply in the off-label context.  In 2003, the definition of "investigational" was expanded to explain that BCBSAL would, when possible, develop written criteria concerning any "services or supplies that we consider to be investigational."  *Id.* at HAR00189.  When asked about the language of Harden's 2003 benefit plan, the deponent from BCBSAL denied that the language applied to off-label prescriptions.  Dorrill Depo., at 276.  BCBSAL did not have a policy related to off-label prescriptions until July of 2004, several months after this litigation commenced.

formulary status.  Ford Depo. at 129-30.  Prior to 2000, BCBSLA adopted the Medco formulary,

which was entirely controlled by Medco and Medco's P & T committee.  Ford Depo. at 237.

Even after 2000, BCBSLA's P & T committee still relied heavily on Medco and only reviews

new drugs or classes of drugs.  Ford. Depo. at 149-50.  These reviews did not apply to Neurontin

because it was already included in the Medco formulary.  Ford Depo. at 445.

## III.    COMMON ISSUES PREDOMINATE

### A.    Whether Or Not Neurontin Is Effective In Treating Off-Label Conditions Presents Common Questions Susceptible of Common Proof

Give the duration and pervasiveness of Defendants' "peer-to-peer" off-label marketing

scheme, and the number of physicians Defendants have paid to promote Neurontin for off-label

uses, it is hardly surprising that Defendants are able to muster declarations from several

physicians (Drs. Slaby, Bird, Potolicchio, and Rapoport) attesting to Neurontin's efficacy in

treating off-label conditions.[9]  Whether or not Neurontin is *actually* effective in treating these

conditions presents common questions, to be determined by common proof, not anecdotal

evidence concerning individual class members.  As Defendants successfully argued in the related

case of *Dellinger v. Pfizer, Inc.*, 2006 WL 2057654 (W.D.N.C. July 19, 2006), individual case

histories do *not* provide scientific evidence of causation admissible under *Daubert*.  *Id.* at *9-

*11.  *See* Part III-F, *infra*.[10]  These fundamental, overarching common questions are central to

---

[9] Indeed, as the Court itself observed at a hearing, "I'm assuming your doctors who you've put up at these various conferences will say that, or you have experts who will say that, right? . . . It's effective and that aspirin wouldn't have done it, and based on their clinical experience, ya-da-da. I'm assuming you're going to say that."  Transcript, Motion Hearing, Sept. 27, 2006 at 21:14-21.

[10] This issue was aired at length in connection with Plaintiffs' Objections to Discovery Order No. 4 (*see* Dkt. No. 462 at 11-14), which would have required Plaintiffs to produce thousands of class members' individual medical records.  The Court reversed this ruling, satisfied that Plaintiffs can seek to establish inefficacy by more generalized, common proof.  *See* Transcript, Motion Hearing, Sept. 27, 2006, at 16:7-10 ("MR. ROUHANDEH: They have to demonstrate that in fact Neurontin was ineffective for those off-label uses.  THE COURT: Again, they can meet their burden by putting in these studies, as far as I'm concerned.").

this litigation, and – standing alone – predominate over any individual questions.[11]

B.    **Plaintiffs Have Alleged Uniform Misrepresentations and Omissions**

Defendants argue that the TACAC contains "a bewildering variety of alleged oral misstatements made at different times, to different doctors, on altogether different subjects." Def. Mem. at 21-22.  To support this sweeping assertion, Defendants ignore:  (1) one of Plaintiffs' two main theories of recovery—fraud based on omissions (rather than affirmative misrepresentations); (2) one of the two main modalities of fraud—the creation and dissemination of misleading publications; and (3) seven of eight major therapeutic areas where such omissions are alleged to have occurred (*i.e.*, every off-label condition at issue except epilepsy monotherapy).  Defendants' argument is utterly devoid of merit.

1.    **Plaintiffs Have Alleged Uniform Omissions**

As this Court has recognized, "Plaintiffs have stated a claim with respect to any theory based on Defendant's misrepresentation of the results of scientific studies or *omission of existing negative studies*."  Memorandum and Order dated June 12, 2006 (Dkt. No. 356) at 21 (emphasis added).  While the TACAC is replete with numerous allegations of suppression, Plaintiffs will highlight one:  suppression of the failed diabetic peripheral neuropathy trial (study 945-224) conducted by Dr. Reckless in the UK.  TACAC ¶¶ 148-49, 257-61.  When Parke-Davis saw that the results of Dr. Reckless's trial were negative, it decided:  "at this point in time we will not be publishing the data."  Reply Declaration of Ilyas J. Rona in Support of Motion for Class Certification ("Rona Decl."), Exh. A at 015317.  The rationale for suppression was simple:  "we should take care *not to publish anything that damages neurontin's marketing success*."  *Id.*

---

[11] Plaintiffs will not "take the bait" and litigate the merits of these issues prematurely.  Although the Court may look beyond the pleadings in deciding whether the requirements of Rule 23 are met, it is not appropriate to inquire into "whether a plaintiff will prevail on the merits" at the class certification stage.  *In re Polymedica Corp. Securs. Litig.*, 432 F.3d 1, 6 (1st Cir. 2005); *Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.2d 288, 297-98 (1st Cir. 2000).

(emphasis added).

Within several months, Pfizer completed its acquisition of Warner-Lambert, and agreed that publication of the Reckless study would have a damaging impact on their successful efforts to market Neurontin for diabetic peripheral neuropathy:

> I think that we can *limit the potential downsides of the 224 study* by delaying the publication for as long as possible and also from where it is published. More importantly it will be more important to how WE write up the study. We are using a medical agency to put the paper together which we will show to Dr Reckless. *We are not allowing him to write it up himself*.

Rona Decl., Exh. B at 002098 (emphasis added). The results of the Reckless study were never published, nor forwarded to DRUGDEX. TACAC ¶ 149. By definition, such omissions are uniform; the failure to disclose that Neurontin had been shown to be ineffective for a particular use is always the same.

Plaintiffs have alleged that there were important clinical trial results for each of the major categories of off-label use that were suppressed, or the results of which were omitted at presentations to physicians: failed bipolar depression studies conducted internally and externally (TACAC ¶¶ 172-74); a failed panic study (TACAC ¶¶ 182-85); a failed European migraine study (TACAC ¶¶ 195-201); failed nociceptive pain studies (TACAC ¶ 152); the failed diabetic peripheral neuropathy studies of Drs. Gorson and Reckless (TACAC ¶¶ 146-49, 156); the negative Restless Leg Syndrome/Periodic Limb Movement Syndrome study of Dr. Ehrenberg (TACAC ¶¶ 164-67); and the negative epilepsy monotherapy study conducted in Eastern Europe (TACAC ¶ 190). Defendants ignore these allegations entirely. When "educating" physicians to prescribe Neurontin for these off-label conditions, it is difficult to imagine a *more* material omission than studies concluding that the drug has no discernable therapeutic effect. As was the case in *In re Synthroid Marketing Litigation*, 188 F.R.D. 295, 297 (N.D. Ill. 1999), such a concerted effort to suppress negative clinical trial results—the "gold standard" in determining a

drug's efficacy or inefficacy—is both actionable and certifiable.

### 2.    Plaintiffs Have Alleged Uniform Published Misrepresentations

Defendants also ignore entirely those sections of the TACAC that address Defendants' original off-label marketing strategy, the "publication strategy."  *See* TACAC ¶¶ 25-30, 39-40, 43-53, 111-37, 256, 262-74.  Unlike the "peer-selling" program, the publication strategy relied entirely on uniform *written* misrepresentations, usually drafted by Defendants or the medical marketing firms they hired, which appeared in published articles.  The TACAC offers a representative set of these misrepresentations at paragraphs 268-274.  These misrepresentations were undoubtedly uniform.

### 3.    Plaintiffs Have Alleged Uniform Oral Misrepresentations

Essentially, Defendants argue that oral misrepresentations must be identical in order to be sufficiently uniform.  Given that it is rare for different speakers (or even the same speaker on different days) to utter the same words without reading from a teleprompter, Defendants seem to argue that it is next to impossible to ever certify a class based on oral misrepresentations. Despite Defendants' contention that there is "virtual unanimity" among courts on fraud cases involving oral misrepresentations, "[i]t is well settled that oral representations will not preclude certification of a class that is otherwise appropriate."  *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 163 F.R.D. 200, 207 n.9 (S.D.N.Y. 1995) (approving settlement class); *see also Duhaime v. John Hancock Mut. Life Ins. Co.*, 177 F.R.D. 54, 64 (D. Mass. 1997) (certifying class where oral misrepresentations were made pursuant to a common scheme).  Whether the misrepresentations in this case were identical is less important than whether they are substantively unified as part of an "overarching representation."[12]  As this Court stated in *In re*

---

[12] *See Fuller v. Fruehauf Trailer Corp.*, 168 F.R.D. 588, 599 (E.D. Mich. 1996) (certifying class where various oral representations were "part and parcel of an overarching representation that lifetime medical benefits would be

*Pharm. Indus. Avg. Wholesale Price Litig.*, 230 F.R.D. 61, 82 (D. Mass. 2005) (*"AWP"*), the

central inquiry is whether there is material uniformity among the misrepresentations.  "[T]he

inquiry should remain focused on whether material variations in the misrepresentations existed."

*Moore v. Painewebber, Inc.*, 306 F.3d 1247, 1255 (2d Cir. 2002).[13]

The TACAC clearly alleges that the misrepresentations were centrally devised and

disseminated as part of an overarching strategy to mislead physicians into prescribing Neurontin

for specific off-label uses, despite the lack of scientific support.  TACAC ¶¶ 21-35, 256-61.

Defendants disseminated false information about Neurontin via the "publication strategy,"

discussed *supra*, and peer-selling efforts where those misleading articles were publicized to

physicians.  TACAC ¶ 53, 275.  In both areas, Defendants created and controlled the content,

hired medical marketing firms to manage the content, and retained a stable of physicians to serve

as authors and paid speakers to deliver the content.  TACAC ¶¶ 42-60, 103, 110, 275.

Defendants demanded and enforced strict adherence to their positive marketing messages,

*science be damned.  See* TACAC ¶ 64 (when Parke-Davis and Cline Davis realized speaker

would describe negative results of her own study, Cline Davis planted shill in audience, and

assured Parke-Davis that "guidelines have been to set to ensure that this type of situation [a

negative presentation] does not happen again").

As the off-label marketing campaign grew, so too did the system employed by

---

provided to its retirees").  *See also In re Am. Cont'l Corp./Lincoln Sav. & Loan Sec. Litig.*, 140 F.R.D. 425, 430 (D. Ariz. 1992) (refusing to decertify class where oral representations were "sufficiently uniform" as part of a common sales approach).

[13] *Moore*, involving the sale of life insurance policies, is otherwise distinguishable, as is Defendants' other authority. In *Moore*, the Court itself summarized the wide variations in sales pitches used by brokers, including variations even in how brokers characterized their product, including as a retirement program, an IRA, and sometimes neglecting to mention that the product involved life insurance at all.  *See* 306 F.3d at 1256.  No such wide variation is alleged here.  *In re LifeUSA Holding, Inc.*, 242 F.2d 136, 146 (3d Cir. 2001) involved over 30,000 speakers making non-uniform misrepresentations to over 280,000 potential buyers of annuity contracts.  Similarly, *Insolia v. Philip Morris, Inc.*, 186 F.R.D. 535, 545 (W.D. Wis. 1998) involved a putative class of smokers who began smoking prior to 1964, and the Court addressed the problem of varying oral misrepresentations in the context of assessing Rule 23(a)'s typicality prong, not predominance.

Defendants to disseminate uniform and consistent messages about Neurontin's off-label uses.

For example, Pfizer retained two medical marketing firms, Medical Action Communications

("MAC") and Fallon Medica, to develop articles that:

> contained Pfizer's false and misleading "key messages." These "key messages"
> were designed to conceal Neurontin's lack of efficacy for specific off-label uses.
> One of MAC and Fallon Medica's duties was to make sure that all manuscripts
> submitted for publication contained the *"correct" key message*. MAC and Fallon
> Medica assumed the responsibility of reviewing abstracts forwarded from around
> the world to make sure that "*they are inline with the current messages and do not
> contain errors or inconsistencies*."

TACAC ¶¶ 262-64 (emphasis added). Once these articles were published, "Pfizer used the

medical marketing firms to ensure that the false and misleading 'key messages' were faithfully

communicated at the hundreds of scientific conferences, symposia, seminars, continuing medical

education events ('CMEs'), and other events." TACAC ¶¶ 275. Pfizer then "trained its sales

representatives to repeat the false 'key messages' that were prepared as part of [the] publications

strategy." TACAC ¶¶ 276. Slides from an April 4, 2001 training session show that sales

representatives were trained to deliver "key messages" in face-to-face encounters with

physicians identical to those published in journal articles and communicated at the marketing

events. *See* Rona Decl., Exh. C.[14]

Defendants single out one use— epilepsy monotherapy—as illustrative of disparate

misrepresentations, but ignore at least seven other therapeutic areas where Plaintiffs' allegations

are demonstrably uniform.[15]

---

[14] The TACAC sets forth in considerable detail numerous examples of these "key messages," which are uniform with the alleged misrepresentations that the company routinely made. For example, it was a "key message" to tell doctors that Neurontin had "proven efficacy in neuropathic pain." TACAC ¶ 277. This key message was uniformly delivered to physicians, both in published articles (TACAC ¶ 271) ("gabapentin has shown efficacy in controlled studies for neuropathic pain") and at marketing events (TACAC ¶ 279) ("effective and safe in reducing neuropathic pain"); (TACAC ¶ 286) ("effective and safe and safe [sic] in reducing pain"). Clearly, such misrepresentations were not random, but part and parcel of the same overarching misrepresentation. The question is not whether there are *any* variations, as Pfizer argues, but whether the variations are *material*. *Moore*, 306 F.3d at 1255.

[15] For example, Class Plaintiffs have alleged the following examples of misrepresentations with respect to bipolar

Even in the case of monotherapy, Defendants' arguments are unpersuasive.  First, two of the misrepresentations quoted by Defendants, "excellent first line therapy" versus "effective for monotherapy," are materially uniform.  Second, the misrepresentations and omissions relating to the clinical trials were part and parcel of the overarching misrepresentation concerning Neurontin's efficacy for monotherapy.  If Neurontin were truly effective for monotherapy, how could there be negative clinical trials?  Defendants avoided that question by misrepresenting the results of Clinical Study 945-82 and a separate Eastern European study as being positive when in fact both studies were negative.

Finally, Defendants suggest that the balance of the statements, which "concern Neurontin's prospects for obtaining FDA approval for a monotherapy indication," are materially at odds with the other statements.  They are not.  A statement that a drug is FDA-approved for an indication (or will be, based on inside corporate knowledge) is materially uniform with a statement that the underlying data establish efficacy, because the FDA's standard for determining efficacy is no different from the scientific community's at large.  Defendants sold Neurontin as being effective for monotherapy, even though they knew that the data was not supportive and that the FDA would reject their monotherapy application based on this data.  This is not a "bewildering variety" of misrepresentations; it is a carefully conceived and meticulously

---

disorder:

> • At a Parke-Davis marketing event in 1997, Parke-Davis falsely stated that Neurontin was "effective" for "bipolar."
>
> • In December 1998, a Parke-Davis sales representative falsely stated to a physician that Neurontin was an "effective treatment of bipolar disorder."
>
> • At a Parke-Davis marketing event in December 1998, Parke-Davis falsely stated that Neurontin was "Effective on bipolar."
>
> • At a Parke-Davis marketing event at the airport Marriott in San Francisco in August 1998, Parke-Davis falsely stated that Neurontin was "Innovative and effective …for bipolar II."

TACAC ¶ 176.  These alleged misrepresentations are not only uniform, but virtually identical.  *See also* TACAC ¶ 158 (setting forth additional materially uniform misrepresentations with respect to pain).

executed scheme to defraud.[16]

    **C.**      **Proximate Cause and Damages are Susceptible of Common Proof**

Defendants argue that in order to establish proximate cause and damages, Plaintiffs will

be required to show *which* specific prescriptions for Neurontin were written as a result of their

deceptive off-label promotional activities, and that Plaintiffs will be unable to do so without

deposing every physician in the country that prescribed Neurontin for an off-label use.  This is

obviously an impossible task, and an unnecessary one as well.  It is sufficient that Plaintiffs can

establish, *on an aggregate, class-wide basis*, the total sales of Neurontin for off-label conditions

that would not have occurred but for defendants' misleading off-label marketing campaign, and

the portion of those damages borne by the Third Party Payor Subclass and the Consumer

Subclass.

Courts routinely award aggregate damages, sometimes termed "fluid recovery," in cases

in which the size of the class or nature of the fraud makes individual damages calculations

impractical.  *See In re New Motor Vehicles Canadian Export Antitrust Litig.*, 235 F.R.D. 127,

143 (D. Me. 2006).  As the leading treatise on class actions states: "Aggregate computation of

class monetary relief is lawful and proper.  Challenges that such aggregate proof affects

substantive law and otherwise violates the defendant's due process or jury trial rights to contest

each members claim individually, will not withstand analysis…. Virtually all circuits that have

considered this issue…. have expressly condoned aggregate proofs of damages in other contexts

[than antitrust]."  3 Newberg & Conte, *Newberg On Class Actions* § 10.5, at 483-84 (4th ed.

---

[16] Despite the fact that Defendants have yet to produce a single audiotape or transcript of the hundreds of marketing events in question, they ask the Court to assume that misrepresentations made at those events must be lacking in uniformity.  There is no basis to indulge such a presumption.  If anything, because Defendants are uniquely in control of such information, any such presumption should be in Plaintiffs' favor.  Until Defendants produce evidence of what was said at marketing events, they should not be allowed to use a lack of evidence to defeat class certification.

2002) ("*Newberg*").[17]

Fluid recovery furthers the policy interests behind collective litigation where exact damages determinations are not possible.[18] If direct causation and damages must be demonstrated individually for every class member, the broad remedial purposes of consumer protection statutes would be defeated.[19] Fluid recovery can be used even where there exists the possibility that certain class members may be over-compensated.[20] The possibility of imprecision in the use of aggregate damages is no bar to their use. Damages awards in class actions "need not be 100 percent accurate." *Long v. Trans World Airlines, Inc.*, 761 F. Supp. 1320, 1327 (N.D. Ill. 1991).[21] The Court must conclude only that the proffered expert methodology for calculating damages on an aggregate class-wide basis is "not so insubstantial as to preclude class certification." *AWP*, 230 F.R.D. at 90.[22]

---

[17] *See also Dukes v. Wal-Mart, Inc.*, --- F.3d ---, 2007 WL 329022, at *19 (9th Cir. Feb. 6, 2007) (citing Newberg treatise and finding that analysis of aggregate data does not violate defendant's due process rights). Indeed, New Jersey's class action rule, R. 4:32-2(c), explicitly provides for the use of fluid recovery, stating, "[i]n any class action, the judgment may, consistent with due process of law, confer benefits upon a fluid class, whose members may be, but need not have been members of the class in suit."

[18] "Without this use of fluid recovery, 'some class actions… would neither compensate nor deter… and would reward its foresight in stealing from the multitude in small amounts.'" *Schwab v. Philip Morris, Inc.*, 449 F. Supp. 2d 992, 1254 (E.D.N.Y. 2006) (quoting *Bruno v. Superior Court*, 127 Cal. App. 3d 120, 127 (Cal. Ct. App. 1981)); *see also Dukes*, 2007 WL 329022, at *19 ("aggregate proof of the defendant's monetary liability promotes the deterrence objectives of the substantive laws underlying the class actions") (citation omitted).

[19] *See Aspinall v. Philip Morris, Inc.*, 442 Mass. 381, 398 (2004) ("claiming, as defendants do, that individual proof is necessary, or that benefits will vary widely between smokers, raises a specious issue that, if followed to conclusion, would eviscerate G.L. c. 93A as a remedy to abate this deceptive advertising").

[20] *See, e.g., Barr v. WUI/TAS, Inc.*, 1976 WL 1205 (S.D.N.Y. 1976) (approving settlement in a pre-fixing case against telephone answering service, with equal monetary distribution to all class members because there was no method of determining the precise amount that any particular subscriber was overcharged); *see also Schwab*, 449 F. Supp. 2d at 1269 (permitting fluid recovery in case involving marketing of "light" cigarettes even though "[t]his form of fluid recovery tends – like almost all aggregate litigation – to overcompensate some and undercompensate other members of the class who may have relied differently on the 'lights' designation and may have acted differently and for different reasons relevant to damages").

[21] *See also In re Prudential Ins. Co. America Sales Practices Litig.*, 962 F. Supp. 450, 517 n.46 (D.N.J. 1997), *aff'd in part, vacated in part on other grounds*, 148 F.3d 283 (3d Cir. 1988) (aggregate damages may be estimated so long as "sufficient facts [are] introduced so that a court can arrive at an intelligent estimate without speculation or conjecture").

[22] Defendants' reliance, in arguing that individual damages determinations would defeat predominance in this case, on this Court's class certification decision in *AWP* is misplaced. Contrary to Defendants' argument, this Court

In approaching this issue, it is important to bear in mind that there exists an entire sub-industry – composed of companies such as IMS Health and Verispan – that collect and analyze prescription data for Pfizer and other pharmaceutical manufacturers, which the pharmaceutical companies use to manage their business, develop their marketing plans, and monitor their success.  Indeed, it appears that Pfizer spends well in excess of $100 million a year purchasing such information from IMS alone.[23]  A recent study of this data, "the first study to systematically characterize the extent of off-label prescribing in general outpatient care," demonstrates that with respect to off-label prescriptions, Neurontin is in a class by itself.  D. Radley, S. Finkelstein, *et al.*, *Off-Label Prescribing Among Office-Based Physicians*, 166 Arch. Intern. Med. 1021 (May 8, 2006) (Rona Decl., Exh. H), at 1025.  Using IMS data on the 500 most frequently prescribed drugs in 2001, the authors determined that "Gabapentin [the generic name for Neurontin] had the highest proportion of off-label prescription (83%),"[24] and that there was "little or no scientific support" for 80% of these prescriptions.[25]  *Id*. at 1023-25.  Noting the *Franklin* litigation, the authors suggest that "the high degree of off-label use observed for gabapentin" may be due to Defendants' "inappropriate marketing."  *Id*. at 1026.

---

declined to certify a nationwide class of third-party payors because of variations in state consumer protection laws, not because of any attempt to "sweep individual damages issues under the judicial rug" through averaging of damages.  *AWP*, 230 F.R.D. at 86, 90.

[23] IMS reports that its "largest pharmaceutical customer generates 7 percent of our revenue," which was $1.958 billion in 2006, and identifies Pfizer as its customer with the largest market share.  *See* http://ir.imshealth.com/phoenix.zhtml?c=67124&p=irol-faq; http://media.corporate-ir.net/media_files/irol/67/67124/IMSFinancialFactsFinal.pdf.

[24] Plaintiffs allege that by 2003, the percentage of Neurontin prescriptions for off-label use had grown even further, to an astounding 90%.  TACAC ¶ 47.

[25] The authors used DRUGDEX to determine the existence and degree of scientific support for off-label uses.  *Id*. at 1022-23.  Plaintiffs have described in detail how Defendants have manipulated DRUGDEX to suppress failed clinical trials entirely or grossly distort their results.  *See* TACAC ¶¶ 133-35, 146 (study concluded Neurontin ineffective in treating diabetic peripheral neuropathy; Defendants submitted falsified abstract to DRUGDEX which omitted this conclusion and suggested instead that "higher doses" were needed), 136 (Defendants never forwarded to DRUGDEX failed study showing Neurontin ineffective in treating bipolar disorder), 148-49 (Defendants never forwarded to DRUGDEX second study concluding Neurontin ineffective in treating diabetic peripheral neuropathy), 172-73 (although Parke-Davis claimed it informed DRUGDEX of all studies, two separate studies which concluded Neurontin ineffective in treating bipolar disorder were omitted from DRUGDEX).

Defendants complain that Prof. Rosenthal's model for determining aggregate damages:[26] (1) cannot identify the specific individuals who would have received Neurontin off-label absent the misconduct alleged; (2) does not account for "heterogeneity" among physicians; and (3) does not account for various marketplace variables that could influence the number of off-label Neurontin prescriptions. As to the first point, as set forth above, as a matter of law, it is *not necessary* for Plaintiffs to identify the specific off-label prescriptions that would have been written absent Defendants' misconduct, so long as Plaintiffs can estimate, on an *aggregate* basis, the number and total cost of off-label Neurontin prescriptions that would not have been written absent Defendants' misconduct. Prof. Rosenthal acknowledges that some small number of individuals would have received Neurontin for off-label indications even if Defendants had not undertaken their wide-spread fraudulent off-label marketing campaign, and her model estimates and "credits" Defendants for those sales. Rosenthal Decl. ¶ 37.[27]

In the context of this case, "exposure heterogeneity" and "response heterogeneity" are technical terms for the idea that different physicians may be exposed to differing levels of promotional activity and that two physicians exposed to the same level of promotional activity may respond differently to those promotions. Defendants contend that any failure to measure the exposure and response among individual physicians is fatal to class certification. Individual

---

[26] Prof. Rosenthal's Declaration filed in support of Plaintiffs' Motion for Class Certification ("Rosenthal Decl.") sets forth a time-series regression analysis that will allow her to calculate the total number or prescriptions of Neurontin that resulted from Defendants' fraud. *Id.* ¶¶ 32, 35. In her most detailed model, Prof. Rosenthal establishes a methodology to measure the total number of prescriptions for each particular off-label indication separately. *Id.* ¶ 35.

[27] In any event, the inability to identify the relatively few class members who would have received Neurontin off-label anyway is restricted to the Consumer Subclass. With 90% of Neurontin prescriptions being written for off-label uses, and even the smallest TPPs such as *Harden* paying for Neurontin prescriptions for 20 individuals, even the smallest TPP is statistically almost certain to have paid for off-label Neurontin. The existence of a relatively small number of consumer class members who may not have been injured does not defeat class certification. *See, e.g., In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 252 (D. De. 2002); *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 326, 331 (E.D. Mich. 2001) ("courts have routinely observed that the inability to show injury as to a few does not defeat class certification where the plaintiffs can show widespread injury to the class").

physician exposure to particular promotions or individual physician reaction to the same promotion are not ignored, they are accounted for in Prof. Rosenthal's aggregate measurement of impact on the class.  Reply Declaration of Professor Meredith Rosenthal ("Rosenthal Reply") ¶¶ 3, 12, 25.  It is neither necessary nor practical to measure individual physician exposure or response if there are reliable methodologies for estimating the aggregate class-wide impact of Defendants' promotions.  *See In re Prudential Ins. Co. America Sales Practices Litig.*, 962 F. Supp. 450, 517 n.46 (D.N.J. 1997), *aff'd in part, vacated in part on other grounds*, 148 F.3d 283 (3d Cir. 1988) (class certification appropriate despite the fact that different plaintiffs in the class had claims and injuries depending on different sales tactics by Defendants).

Finally, Defendants complain that Prof. Rosenthal's model does not account for every factor in the marketplace that may affect the decision of a physician to prescribe Neurontin off-label, and does not account for individual differences in how TPPs deal with off-label prescriptions.  In statistical terms, Defendants complain of "omitted variable bias" – the possibility that a model seeking to describe a causal relationship is biased in its conclusions because it omits a variable or variables that are also correlated with the variable of interest (in this case the amount of off-label prescriptions of Neurontin).  Prof. Rosenthal provides the Court with examples of the variables she will use in her model, however the list of variables she provides is illustrative, not exhaustive.  She will go where the analysis leads her and if there are additional significant explanatory variables, she will build them into her model.[28]  Rosenthal

---

[28] All economic analyses are based on models which are by definition simplified in some manner.  The fact that every conceivable variable is not built into the analysis does not render the model inadequate.  Rosenthal Reply ¶¶ 19-22, Reply Declaration of Dr. Raymond Hartman ¶ 17, Att. A at 4.  Such econometric analyses routinely focus on the main predictors of the variable in interest, and are considered important enough to inform public policy and alter business practices.  There is no reason to assume that the variables identified by Defendants, such as different levels of sophistication amongst TPPs, or the impact of promotions on different individual physicians, will vary across time in a fashion that is correlated with the promotional events or publications intended by Defendants to increase off-label prescriptions for specific off-label indications, but Prof. Rosenthal proposes to incorporate any such variables.  Rosenthal Reply ¶ 29.

Reply ¶ 22.

### D.    Reliance Is Not An Element of Plaintiffs' RICO Claim

Defendants' contention that reliance is an element of Plaintiffs' RICO claim is flatly

incorrect.[29]  As the Court held in *AWP*, "*Loiselle* establishes that the plaintiff class members

need not have heard or directly relied" on Defendants' misrepresentations and omissions;

Plaintiffs need only "demonstrate a link" between Defendants' conduct and class members'

injuries.  230 F.R.D. at 93.[30]  As set forth above, this can be done via common proof, and does

not require individualized factual inquiries.  The focus of the predominance requirement remains

Defendants' scheme to defraud.[31]

### E.    Reliance May Be Presumed on Plaintiffs' Common Law Fraud Claim

Nor do issues of reliance present a barrier to certification of Plaintiffs' common law fraud

claim; this is a case where reliance may be presumed.[32]  In their opening brief, Plaintiffs

---

[29] As the First Circuit held in *Systems Management, Inc. v. Loiselle*, 303 F.3d 100, 103-04 (1st Cir. 2002), "Reliance is doubtless the most obvious way in which fraud can cause harm, but it is not the only way.… There is no good reason here to depart from RICO's literal language by importing a reliance requirement into RICO."  *See also In re Lupron Marketing & Sales Practices Litig.*, 295 F. Supp. 2d 148, 166 (D. Mass. 2003) ("There is… no element of reliance, reasonable or not, in the mail and wire fraud statutes.").

[30] Despite this controlling authority, Defendants argue for a reliance requirement, citing a Second Circuit case, *Platten v. HG Bermuda Exempted Limited*, 437 F.3d 118 (2d Cir. 2006).  In that case, the court dismissed plaintiffs' RICO claim "because plaintiffs never alleged proximate cause between defendants' wrongful conduct and plaintiffs' injuries."  *Id.* at 132.  While the court highlighted a lack of reliance — which, as *Loiselle* notes, is "the most obvious way in which fraud can cause harm" 303 F.3d at 104 — it did not hold that reliance was an *element* of plaintiffs' claim.  Defendants' other "authority," an amicus brief of the Solicitor General arguing that *Loiselle* does not mean what it plainly says, is mere argument, not authority.  As *certiorari* in that case was dismissed (*see Bank of China v. NBM, L.L.C.*, 126 S. Ct. 675 (2005)), *Loiselle* remains controlling.

[31] *See Peterson v. H&R Block Tax Servs., Inc.*, 174 F.R.D. 78, 84 (N.D. Ill. 1997) ("variations in individual reliance do not defeat certification because a scheme to defraud … violates RICO regardless of the characteristics of the scheme's intended victims.").  Even if reliance *were* required, Plaintiffs are entitled to a presumption of reliance in RICO class actions involving a uniform scheme to defraud, such as the one at issue in this case.  *See Spark v. MBNA Corp.*, 178 F.R.D. 431, 436 (D. Del. 1998) ("Generally, the court may presume reliance 'where it is logical to do so.'" (citation omitted)); *Waters v. Int'l Precious Metals Corp.*, 172 F.R.D. 479 (S.D. Fla. 1996); *Singer v. AT&T Corp.*, 185 F.R.D. 681 (S.D. Fla. 1998).

[32] Plaintiffs are not required to demonstrate reliance, presumed or otherwise, on their NJCFA claim, which "does not require proof of reliance," and, by its terms, imposes liability for violations "whether 'any person has in fact been misled, deceived or damaged thereby.'"  *Gennari v. Weichert Co. Realtors*, 691 A.2d 350, 366 (N.J. 1997) (quoting N.J.S.A. 56:8-2).

explained that reliance may be presumed under New Jersey law[33] where, as here, the misrepresentation or omission was material. Indeed, when considering whether to prescribe a drug for a particular condition, it would be difficult to imagine a *more* material omission than a study concluding that the drug has no therapeutic effect.

In response, Defendants do not challenge Plaintiffs' assertion of materiality, but question the continued vitality of *Varacallo v. Mass. Mut. Ins. Co.*, 752 A.2d 807 (N.J. Super Ct. App. Div. 2000), pointing to dicta in *Kaufman v. i-Stat Corp.*, 754 A.2d 1188, 1995 (N.J. 2000), a case addressing whether a *fraud-on-the-market theory* (which Plaintiffs have repeatedly disclaimed) should be applied to establish indirect reliance in a consumer fraud case, and two cases applying that dicta, *Morgan v. Markerdowne Corp.*, 201 F.R.D. 341, 347-49 (D.N.J. 2001), and *Brown v. Philip Morris Inc.*, 228 F. Supp. 2d 506, 518-19 (D.N.J. 2002), which, as Plaintiffs pointed out in their opening brief, expressly distinguished *Varacallo*. *See* 228 F. Supp. 2d at 520 n.14. *Varacallo* is not an aberration, but based upon "universally recognized principles of law" that reliance may be presumed when misrepresentations and/or nondisclosures are deemed "material." 752 A.2d at 817-18 (citations omitted).[34]

In this case, the pervasiveness of Defendants' conduct, the uniform nature of that conduct, and the materiality of Defendants' misrepresentations and nondisclosures make it appropriate to presume reliance. Indeed, in *Dellinger,* even though the plaintiff could offer no evidence that the prescribing physician was directly exposed to Defendants' off-label marketing efforts, the Court concluded that "based on the extensive misrepresentations made regarding

---

[33] The choice of law issue is further addressed in Part III-H, *infra*.

[34] *Accord Vasquez v. Superior Court*, 94 Cal. Rptr. 796 (Cal. 1971); *Murray v. Sevier*, 156 F.R.D. 235, 248-49 n.11 (D. Kan. 1994); *Cope v. Metropolitan Life Ins. Co.*, 696 N.E.2d 1001, 1008 (Ohio 1998); *Adams v. Little Missouri Minerals Ass'n*, 143 N.W.2d 659, 684-85 (N.D. 1966); *Davis v. Southern Bell Tel. & Tel. Co.*, 158 F.R.D. 173, 177-80 (S.D. Fla. 1994).

scientific information of the 'off-label' usage of Neurontin, there is a genuine issue as to whether the Defendants' conduct indirectly caused Dr. Miller to prescribe Neurontin for an 'off-label' use." 2006 WL 2057654 *7. The same conclusion is appropriate here. Defendants so saturated the market with disinformation regarding Neurontin's effectiveness for off-label uses that reliance may fairly be presumed.

F.    **Plaintiffs Can Demonstrate Class-Wide Injury Without Examining Individual Medical Records**

Defendants argue that Plaintiffs cannot show class-wide injury, because the trier of fact would have to examine each class member's medical records to determine whether Neurontin was effective in treating the off-label condition for which it was prescribed. Defendants persist in misconstruing Plaintiffs' case. Plaintiffs do not claim that Neurontin was effective in treating *some* class members but not others for these conditions; Plaintiffs claim that Neurontin was not effective in treating *any* class members for these conditions. Without a properly controlled study establishing that Neurontin is effective in treating the off-label condition at issue for at least *some* persons (*i.e.*, "general causation"), the question of *which* persons it was effective for (*i.e.*, "specific causation") does not even arise.[35]

As Plaintiffs explained in their Objections to Discovery Order No. 4 (Dkt. No. 462), it is not possible to determine from individual medical records whether Neurontin was effective in treating a particular class member for the off-label condition the drug was prescribed for.

---

[35] The pharmaceutical cases cited by Defendants in support of their argument all involved drugs that had been approved by the FDA to treat the conditions for which they were prescribed, establishing their efficacy; all were either personal injury cases, or cases alleging that the manufacturer concealed serious health risks; none alleged that the drug in question was ineffective. *See Williams v. Purdue Pharma Co.*, 297 F. Supp. 2d 171, 176 (D. D.C. 2003) (OxyContin); *Rivera v. Wyeth-Ayerst Labs*, 83 F.3d 315, 320 (5th Cir. 2002) (Duract); *Heindel v. Pfizer, Inc.*, 381 F. Supp. 2d 364, 379-80 (D.N.J. 2004) (Celebrex and Vioxx); *Foister v. Purdue Pharma L.P.*, No. 01-268-DCR, 2002 WL 108608 (E.D. Ky. Feb. 26, 2002) (OxyContin); *In re Baycol Prods. Litig.*, 218 F.R.D. 197 (D. Minn. 2003) (Baycol); *In re Rezulin Litig.*, Judicial Council Coordination Proceeding No. 4122 (Cal. Sup. Ct. Apr. 29, 2003) (Rezulin); *In re Rezulin Prods. Liab. Litig.*, 210 F.R.D. 61 (S.D.N.Y. 2002) (Rezulin).

"Success" in treating these conditions is highly subjective,[36] and treating physicians are forced to rely primarily on self-reporting by the patient.[37]  The diverging testimony of Mr. Smith and Ms. Kopa, who expressed no doubt whatsoever that Neurontin was ineffective in alleviating their conditions, and their physicians, who (Defendants argue) considered their treatment a success, only underscores the inherent unreliability of drawing conclusions regarding efficacy from individual patient records.

In *Dellinger*, Pfizer, represented by the same counsel, prevailed in a *Daubert* motion to *exclude* as scientifically unsound the very type of anecdotal evidence they argue Plaintiffs must *introduce* in this case.[38]  Pfizer successfully argued, as numerous courts have held,[39] that individual case histories do *not* provide scientific evidence of causation admissible under *Daubert*.  *Id*. at *9-*11.  The fact that BCBSLA's director of pharmacy services, and ASEA's

---

[36] As Defendants' own expert noted in his declaration, "most of the conditions at issue in this litigation (such as pain and bipolar disorder) . . . cannot be assessed through empirical testing."  Argenbright Decl. (Dkt. No. 430) ¶ 21.  In other words, while the efficacy of a cholesterol-lowering drug, or a blood pressure medication, may be determined by objective measures (*i.e.*, lower cholesterol or blood pressure), there is no purely objective measure for the efficacy of treatments for the off-label conditions Neurontin was prescribed for, such as chronic pain, mood and anxiety disorders.

[37] The placebo response rates for these conditions – *i.e.*, the percentage of patients who report a significant improvement in their condition when treated with a *sugar pill* – can be as high as 67% for anxiety disorders, and 60% for major depressive disorders.  *See* Rosenthal Decl. (Dkt. No. 463) at 6 n.11.  Indeed, Defendants' own study of Neurontin and neuropathic pain showed placebo response rates of 22%.  *Id*.  Accordingly, the most that can be determined from individual medical records is whether the patient *reported feeling better after taking Neurontin*, not whether Neurontin was *actually effective in treating the condition*.  Without a proper control group, it is impossible to determine whether a patient reported feeling better because Neurontin "worked" for them, or because of the placebo effect, spontaneous remission, or for some other reason.  *See* Rosenthal Decl. (Dkt. No. 463) ¶¶ 10-13.

[38] In *Dellinger*, the plaintiff, who was prescribed Neurontin for pain, an off-label use, argued that it caused his pancreatitis, supported by an expert who based his causation opinion on individual case reports and anecdotal data instead of properly designed and controlled trials or studies.

[39] In support of its argument, Pfizer cited – and the court credited – a raft of cases for the proposition that individual case reports do not provide admissible evidence of causation, including *Soldo v. Sandoz Pharmaceuticals Corp.*, 244 F. Supp. 2d 434, 537 (W.D. Pa. 2003); *Nelson v. American Home Prods. Corp.*, 92 F. Supp. 2d 954, 969 (W.D. Mo. 2000); *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1250 (11th Cir. 2005); *Rider v. Sandoz Pharmacetical Corp.*, 295 F.3d 1194, 1199 (11th Cir. 2002); *Glastetter v. Novartis Pharms. Corp.*, 107 F. Supp. 2d 1015, 1030 (E.D. Mo. 2000); *Brumbaugh v. Sandoz Pharm. Corp.*, 77 F. Supp. 2d 1153, 1157 (D. Mont. 1999); *Jones v. United States*, 933 F. Supp. 894, 899 (N.D. Cal. 1996), *aff'd*, 127 F.3d 1154 (9th Cir. 1997), *cert. denied*, 524 U.S. 946 (1998); *Casey v. Ohio Med. Prods.*, 877 F. Supp. 1380, 1385 (N.D. Cal. 1995).  *See* Defendants' Memorandum of Law in Support of Defendants' Motion to Exclude Testimony By Christopher Keeys, *Dellinger v. Pfizer Inc.*, 2006 WL 826302, *8*-9 (W.D.N.C. Feb. 14, 2006).

benefits consultant – neither of whom are qualified to opine on the subject – guessed that individual medical records would "probably" or "presumably" enable a medical expert to determine whether Neurontin was effective for a particular patient, does not magically transform them into scientifically reliable evidence.[40]

### G. Affirmative Defenses Do Not Predominate

Defendants argue that they may raise several affirmative defenses that raise individual issues, precluding certification. As the First Circuit has stated, "Courts traditionally have been reluctant to deny class action status under Rule 23(b)(3) simply because affirmative defenses may be available against individual members." *Smilow v. Southwestern Bell Mobile Sys., Inc.*, 323 F.3d 32, 39 (1st Cir. 2003); *see also* 3 *Newberg*, § 4.26 ("The existence of… affirmative defenses against various class members… will not usually bar a finding of predominance of common issues"). Even if individual issues emerge with respect to certain defenses, the Court has the discretion and means to address those issues through, for example, subclassing. *See Smilow*, 323 F.3d at 39-40.

The First Circuit has expressly rejected the presence of potential class member-specific statute of limitations issues as a barrier to certification. "As long as a sufficient constellation of common issues binds class members together, variations in the sources and application of statutes of limitations" will not bar class certification. *Mowbray*, 208 F.3d at 296.[41]

---

[40] Ms. Savoie's opinion that expert review of an individual plan participant's medical records might enable ASEA to determine if Neurontin was effective lacked any legitimate basis or conviction. *See* Savoie Depo. at 221:21-222:15 (testifying over a "lacks foundation" objection and in a manner so tentative it prompted the court reporter to record her "statement" as a question, that "presumably" this is how such a determination would be made). Ms. Savoie has no medical education or training. *See id.* at 11:1-13:12 (noting Ms. Savoie has a B.A. and is licensed in insurance).

[41] *See also Smilow*, 323 F.3d at 39 ("[W]here common issues otherwise predominated, courts have usually certified Rule 23(b)(3) classes even though individual issues were present in one or more affirmative defenses."); *Lessard v. Metropolitan Life Ins. Co.*, 103 F.R.D. 608, 612 (D. Me. 1984). *In re Rezulin*, 210 F.R.D. 61 (S.D.N.Y. 2002), cited by Defendants, does not alter this well-established First Circuit law. There, the Court based its holding that predominance was not present on the finding that individual questions, "particularly" those related to causation and reliance dominated, *see id.* at 68, disposing of affirmative defenses in one sentence. *See id.* at 67. *In re*

Contrary to Defendants' claims, fraudulent concealment and/or the applicability of the discovery rule raise predominantly common, not individual questions.  In this case, the key question is whether Defendants actively concealed their various schemes to fraudulently promote off-label uses of Neurontin.  Proof of that conduct will be common among class members.[42] Further, as Defendants have acknowledged in prior briefing, the focus of the fraudulent concealment inquiry will be the chronology of the *Franklin* action, particularly the unsealing of the amended complaint in that case and the resulting publicity.  *See* Defs.' Mem. Supp. Mot. Dismiss (Dkt. No. 60) at 35-39; Pls. Joint Mem. Opp. Mot. Dismiss (Dkt. No. 101) at 35-39. These events are common to all class members, making individualized inquiries unnecessary.[43]

## H.    The Court May Apply New Jersey Law

Defendants argue that "application of the laws of all 50 states is required" (Def. Mem. at 37), focusing myopically on boilerplate allegations in Plaintiffs' original complaints that "a substantial part of the events giving rise to Plaintiffs' claims occurred" in the districts in which the cases were filed,[44] which merely recites the statutory venue standard.[45]  To be sure, Plaintiffs

---

*Massachusetts Diet Drug Litigation*, 338 F. Supp. 2d 198 (D. Mass. 2004), a non-class decision, is similarly of no help to Defendants.  There, the Court determined whether genuine issues of material fact existed as to the application of the discovery rule, not whether its application defeated predominance.

[42] *See In re Flat Glass Antitrust Litig.*, 191 F.R.D. 472, 488 (W.D. Pa. 1999) (holding that "crucial common questions on… fraudulent concealment… will relate to whether defendants successfully concealed the existence of the alleged conspiracy, which proof will be common among the class members"); *see also* Newberg, § 4:26 ("Challenges based on… fraudulent concealment… are rejected and will not bar predominance satisfaction because those issues go to the right of a class member to recover, in contrast to the underlying common issues of the defendant's liability.").

[43] Defendants also state conclusorily that the equitable doctrines of laches and unclean hands will raise individual issues.  Defendants simply cite one case that sets forth the laches doctrine (which generally applies only in the *absence* of an applicable statute of limitations), *Desiderio v. D'Ambrosio*, 190 N.J. Super. 424 (Ch. Div. 1983), and *In re Prempro*, 230 F.R.D. 555, 563 (E.D. Ark. 2005) which did not address individual issues raised by the unclean hands defense itself, but only discussed that defense in the context of choice of law issues.  These defenses likewise present no barrier to class certification.  *See Lessard*, 103 F.R.D. at 612 (certifying class where defendant failed to show that individual issues related to an affirmative defense predominated over common questions representing a "significant aspect of the case").

[44] Each of the allegations quoted by Defendants appear in the separate "venue" paragraphs of Plaintiffs' respective original complaints.  *See Harden* Complaint (Exh. 49 to Rowland Decl.) ¶ 21 (D. Mass.); *Kopa* Complaint (Exh. 50 to Rowland Decl.) ¶ 11 (S.D.N.Y.); *Smith* Complaint (Exh. 51 to Rowland Decl.) ¶ 10 (S.D. Ind.); *BCBSLA*

have alleged that Defendants' fraudulent scheme was national in scope, involving presentations

to physicians in many different states.  But Plaintiffs have not alleged a series of independent,

random acts of deception geographically dispersed across the 50 states; Plaintiffs have alleged a

single, integrated scheme that was carefully conceived, orchestrated, and monitored from Parke-

Davis/Warner Lambert's New Jersey headquarters.[46]  This is sufficient to permit application of

New Jersey state law under the Constitution,[47] and under New Jersey and Massachusetts choice

of law rules.[48]  Because recent New Jersey appellate authority renders this an "easy call,"

---

Complaint (Exh. 52 to Rowland Decl.) ¶ 12 (E.D. La.); *ASEA* Complaint (Exh. 53 to Rowland Decl.) ¶ 16 (D. N.J.).

[45]  *See* 28 U.S.C. § 1391(a),(b) (action may be brought in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred").  The venue statute "does not require that plaintiffs establish that the [district in which the action was filed] has 'the most substantial contacts to the dispute; rather it is sufficient that a substantial part of the events occurred [there], even if *a greater part of the events occurred elsewhere.*'"  *Neufeld v. Neufeld*, 910 F. Supp. 977, 986 (S.D.N.Y. 1996) (emphasis added, citation omitted); *see also Park Inn Intern., L.L.C. v. Mody Enterprises, Inc.*, 105 F. Supp. 2d 370, 376 (D.N.J. 2000) ("[t]he statute only requires a 'substantial part' of the events to have occurred in the District to establish venue.  It does not require a majority of the events to take place here").

[46]  *See, e.g.,* TACAC ¶ 314 ("Although many of Defendants' sales and marketing strategies were executed through the Customer Business Unit ('CBU') system, a network of regional sales divisions that covered the entire country, those strategies were developed and disseminated by Defendants' Morris Plains, New Jersey headquarters.").

[47]  In passing, Defendants argue that because their misconduct crossed state lines, under *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985), it would be "impermissible . . . for the Court to apply one state's laws to the claims of all absent class members."  Def. Mem. at 37.  In support of this argument, Defendants cite only *In re Rezulin Prods. Liab. Litig.*, 210 F.R.D. 61 (S.D.N.Y. 2002), which does not even mention *Shutts*.  Contrary to Defendants' argument, in *Shutts*, the Supreme Court expressly held that a single state's law *may* be applied extraterritorially to the claims of nonresidents, so long as that state has "a 'significant contact or significant aggregation of contacts' to the claims asserted by each member of the plaintiff class, contacts 'creating state interests,' in order to ensure that the choice of . . . law is not arbitrary or unfair."  472 U.S. at 821-22 (citations omitted).  Plaintiffs' allegation that Defendants conceived and orchestrated their scheme to defraud from their New Jersey headquarters easily satisfies this standard.  *See, e.g., Grace v. Perception Technology Corp.*, 128 F.R.D. 165, 171 (D. Mass. 1989) (applying Massachusetts law to claims of national class; holding *Shutts* test satisfied because defendant was headquartered in Massachusetts, individual defendants resided in Massachusetts, and misrepresentations emanated from Massachusetts); *International Union of Operating Engineers Local #68 Welfare Fund v. Merck & Co., Inc.*, 894 A.2d 1136, 1153 (N.J. Super. Ct. App. Div. 2006) ("*Vioxx II,*" discussed *infra*) (where defendant headquartered in and misconduct emanated from New Jersey, application of New Jersey law to national class "is not unconstitutionally 'arbitrary or unfair.'" (quoting *Shutts*)).

[48]  Defendants do not dispute that the Court must apply the choice of law rules of the district(s) in which the action(s) proposed for certification were originally filed.  As stated in Plaintiffs' opening brief, Plaintiffs propose that the Court certify a class in the *Harden Manufacturing* case, which was filed in this district, applying Massachusetts choice of law rules, so that the class action may be tried in this district.  *See Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26 (1998) (actions transferred pursuant to 28 U.S.C. § 1407 must be remanded to their respective transferor districts for trial).  Alternatively, should the Court find that Massachusetts choice of law rules would require application of the laws of all 50 states, and that application of those laws would defeat certification of Plaintiffs' state law claims, Plaintiffs move for certification in the *ASEA* case, as to which New Jersey choice of law

Plaintiffs will address the application of New Jersey's choice of law rules first.

**1.    New Jersey Choice of Law Rules Lead to the Application of New Jersey Law**

In *Vioxx II*, the court affirmed Judge Higbee's decision,[49] cited in Plaintiffs' opening brief, which certified a national class under the New Jersey Consumer Fraud Act ("NJCFA"), applying New Jersey's choice of law rules.  The court emphatically endorsed Judge Higbee's "governmental interest analysis," considering in detail the contacts set forth in the *Restatement (Second) of Conflict of Laws* §§ 6, 145, and 148(2),[50] and concluding that:

> The fraud allegedly was conceived of and executed from New Jersey.  Merck's senior-level committee in charge of overseeing the "broad development of [its] products," including Vioxx, and providing "a final sign-off on plans and activities related to the product," met in New Jersey.  This group is allegedly connected to deliberate suppression and/or misrepresentation of damaging information concerning Vioxx. . . . Manipulation of clinical studies allegedly took place in New Jersey as well.  It was this manipulation that aimed to spur sales of the drug and, in part, hide its risks.  Thus, the claimed misrepresentations and omissions in the marketing and advertising of the drug all emanated largely from New Jersey.

> By contrast, the contacts each prospective member of the plaintiffs' class has had with this litigation relate to receipt of the alleged fraudulent communications and the resulting economic loss.  . . . There are no out-of-state-resident-plaintiffs who had Vioxx prescribed and suffered some adverse physical or mental consequence.  There are no disabled plaintiffs who may become dependent on any state's welfare system or other safety net program.

> New Jersey's interests in this litigation, in our opinion, far outweigh the interests of all other states.  [¶]  . . . No state has an interest in denying its own citizens recovery while protecting a foreign New Jersey corporation when the conduct at issue took place, to a significant degree, in New Jersey.

> . . . Accordingly, we agree with Judge Higbee that, based upon the evidence she had before her, New Jersey law may properly be applied to the entire plaintiff class, as this state has the most significant relationship to the alleged fraud and the

---

rules apply.

[49] *International Union of Operating Engineers Local #68 Welfare Fund v. Merck & Co., Inc.*, No. ATL-L-3015-03-MT, 2005 WL 2205341 (July 29, 2005).

[50] Because the Court's extensive analysis in *Vioxx II* is directly applicable here, but page limits effectively preclude Plaintiffs from presenting it in detail, Plaintiffs respectfully request that the Court review the relevant portion of that decision, 894 A.2d at 1147-53.

parties.

894 A.2d at 1148-49, 1153 (citations omitted).

Defendants seek to distinguish *Vioxx* on the ground that "at bottom, the alleged fraud in Local 68 involved a single decision – made in New Jersey by one New Jersey corporation – to market an unsafe drug." Def. Mem. at 40. The *Vioxx II* Court's description of the "the basic facts . . . necessary to understand the dispute" belies Defendants' narrow characterization:

> Plaintiff alleges that while attempting to market and sell Vioxx, Merck fraudulently misrepresented and suppressed material information regarding the drug and its comparative safety and efficacy as compared with traditional competitors. According to plaintiff, *third-party payors across the nation were specifically targeted with this false marketing, advertising, and promotion* in an attempt to justify the high cost that was being charged for the new drug.

894 A.2d at 1139 (emphasis added).

The principal difference between *Vioxx II* and this case is that while Warner-Lambert and Merck were both headquartered in New Jersey, and orchestrated the misconduct alleged from there, Merck was also a New Jersey domiciled corporation. However, "[i]n the case of corporations, the principal place of business is a more important contact than the place of incorporation." *Restatement* § 148(2), comment i.[51]

As in *Vioxx II*, "[t]he fraud allegedly was conceived of and executed from New Jersey," the defendant's headquarters, by its "senior level committee[s] in charge of overseeing the 'broad development of [its] products," including Neurontin. 894 A.2d at 1148-49; *see* TACAC ¶¶ 21-31 (detailing development of off-label marketing scheme at corporate level by Neurontin

---

[51] Indeed, the Court may take judicial notice of the fact that most large corporations, including Defendants, choose to incorporate or reincorporate in Delaware to take advantage of its business-friendly corporate governance law, regardless of whether they have any business operations at all in that state, rendering a Delaware corporation's domicile meaningless in determining the appropriate law to apply in disputes with third parties sounding in tort. Similarly, Plaintiffs respectfully submit that the domicile of a single plaintiff, which is purely fortuitous, should not control the choice of law determination for a class of many thousands. Should the Court find that the withdrawal of Local 68 as a class representative tips the balance against application of New Jersey law, Plaintiffs respectfully request leave to designate another New Jersey class member as a class representative.

Development Team, Parke Davis Marketing and Planning department, New Product Committee, and Parke-Davis Marketing Council).  As in *Vioxx II*, "[i]t was this manipulation that aimed to spur sales of the drug . . . . Thus, the claimed misrepresentations and omissions in the marketing and advertising of the drug all emanated largely from New Jersey."  894 A.2d at 849.

By contrast, the contacts of the home state of each Plaintiff class member are even more attenuated than in *Vioxx II*.  As described in the TACAC, one of Defendants' principal marketing tactics was to hold meetings of prescribing physicians disguised as CME conferences at resort destinations around the country.  *See* TACAC ¶¶ 45-46, 51-52, 54-55, 64, 98, 170, 184, 186, 228, 245-47.  As a result, many prescribing physicians were exposed to Defendants' misleading marketing messages in states in which they do not practice;[52] which caused them to write off-label Neurontin prescriptions for patients in their home states; paid for primarily by third party payors, who may bear the loss in yet a third state, and to a lesser extent, consumers.  In such cases, which are no doubt many,[53] application of the law of the class members' state of residence would lead to the absurd result that damages for the same Neurontin prescription would be subject to the laws of two different states — the consumer's domicile (generally having suffered a smaller, co-payment share of the loss), and the third party payor's (generally suffering the remainder).

As between the available alternatives, the "deterrent" interests are clearly concentrated in New Jersey, and are well-served by application of its laws, while the "compensation" interests of the other states — scattered though they are — will *also* be best served by the application of

---

[52] Indeed, given the lavish attention showered by Defendants on the highest prescribing physicians (*see* TACAC ¶ 235), and the eight-year duration of Defendants' off-label marketing campaign, it appears likely that many of those most strongly affected were exposed to Defendants' misrepresentations in multiple states.

[53] While ASEA, Harden, and BCBSLA insure primarily within their respective states, the Third Party Payor Subclass doubtless includes many companies, such as plaintiffs Aetna, Guardian, and Kaiser, who provide prescription drug benefits in more than one state.

-30-

New Jersey law, permitting the certification of a nationwide class, and a class-wide a recovery, rather than the merely *theoretical* application of each state's law, resulting in none.[54]

While *Vioxx II* may not be *controlling*, it is far and away the most analogous choice of law decision by any New Jersey state court.[55] Its conclusion that "New Jersey's interests . . . *far outweigh* the interests of all other states" (894 A.2d at 1149 (emphasis added)) does not describe a "close call," and rests firmly on a detailed and thoughtful examination of the choice of law issue. This Court need not *agree* with *Vioxx II* to recognize that it is more appropriate to follow the closest and highest decision of a New Jersey state appellate court on a question of New Jersey state law than to contravene it.[56]

### 2. Massachusetts' Choice of Law Rules Parallel New Jersey's

Contrary to Defendants' overly simplistic argument, Massachusetts' choice of law rules do not reflexively require application of "the substantive law of consumers' home states to state law consumer fraud claims." Def. Mem. at 38. Like New Jersey, Massachusetts has rejected any such rigid rules in favor of a "flexible approach,"[57] inviting Massachusetts courts to "feel

---

[54] As the Court noted in *AWP*, Defendants' true purpose in arguing for the application of 50 state laws is to defeat class certification entirely, so that they will never be held to answer under *any* state's law. *See* 230 F.R.D. at 83 ("Having smelled victory on the choice-of-law issue, defendants expect a knock-dead punch on their argument that the differences among the state consumer laws are so significant that they cause individual issues to predominate."). This would utterly defeat the purpose of *every* state's consumer protection law, which cannot possibly advance the interests of *any* state.

[55] *Margulies v. Chase Manhattan Mortg. Corp.*, No. A-4087-03T3, 2005 WL 2923580 (N.J. Super. Ct. App. Div. Nov. 7, 2005), cited by Defendants, involved a mortgage loan by a New Jersey-based lender to Maryland residents secured by their Maryland home, where the loan documents contained a Maryland choice of law provision. *Id.* at *6. The court did not "consider this a close case," finding that "[p]arties entering into a transaction in Maryland affecting Maryland real estate would naturally expect Maryland law to apply." *Id.* at *8.

[56] *See Eastern Mountain Platform Tennis, Inc. v. Sherwin-Williams Co., Inc.*, 40 F.3d 492, 499 (1st Cir. 1994) ("While … not controlling, the decisions of lower state courts are often the best indicator of how the high court will resolve an issue."); *CPC Intern., Inc. v. Northbrook Excess & Surplus Ins. Co.*, 962 F.2d 77, 91 (1st Cir. 1992) (quoting *West v. A.T. & T. Co.*, 311 U.S. 223, 237 (1940)) ("'Where an intermediate appellate court rests its considered judgment upon the rule of law which it announces, that is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.'").

[57] *Tingley Systems, Inc. v. CSC Consulting, Inc.*, 152 F. Supp. 2d 95, 114 (D. Mass. 2001).

free . . . to borrow from any of the various lists to help focus . . . attention on the considerations particularly relevant to the case." *Reicher v. Berkshire life Ins. Co. of America*, 360 F.3d 1, 5 (1st Cir. 2004) (citations and internal quotations omitted). In cases alleging common law and statutory consumer fraud, the First Circuit has expressly held that "a Massachusetts court would apply a test not materially different from that of the *Restatement (Second) of Conflict of Laws* § 148[(2)] in determining the law applicable . . . ." *Computer Systems Engineering, Inc. v. Qantel Corporation*, 740 F.2d 59, 70 (1st Cir. 1984). This is the same test applied by the court in *Vioxx II*.

Plaintiffs acknowledge that in *AWP*, the Court reached a different conclusion under § 148(2), but in that case, the factors stacked up differently.[58] In *AWP*, the Court found factor (a), "the place where the plaintiff acted in reliance upon the defendant's representations," the most important, pointing to each class member's state of residence. 230 F.R.D. at 82-83. But here, the class members took no specific action in reliance upon Defendants' misrepresentations, the consumers merely took the medicine prescribed for them by their physicians, and they and the third party payors paid for it. In *AWP*, the Court also considered factor (b), "the place where the plaintiff received the representations," as pointing toward each class member's state of residence (*id*. at 83), but here, as described above, the highest-prescribing physicians were likely exposed to Defendants' off-label marketing at events held *out-of-state*. This leaves only factor (d), the plaintiffs' domicile, as pointing to the laws of all 50 states. *Id*. Plaintiffs respectfully suggest that it would be entirely appropriate for the Court to heed the First Circuit's suggestion that it "feel free" (360 F.3d at 5) to choose and weigh the various factors differently in different cases,

---

[58] *In re Relafen Antitrust Litigation*, 221 F.R.D. 260 (D.Mass. 2004), an antitrust case and the only other Massachusetts choice of law decision relied upon by Defendants, did not even consider the Restatement § 148 factors, rendering the decision of no precedential value here.

and apply New Jersey substantive law in the *Harden Manufacturing* case.[59]

## IV.    THE CLASS IS ASCERTAINABLE

Defendants object that the class is not ascertainable because each consumer class member's and each third party payor's subscribers' individual medical records must be examined to determine whether they paid for an off-label Neurontin prescription.  With 83%-90% of Neurontin prescriptions being written for off-label uses, and even the smallest TPPs such as *Harden* paying for Neurontin prescriptions for 20 individuals, it is a safe bet that virtually every TPP has paid for at least *one* such prescription, and so is a member of the defined class and the Third Party Payor Subclass.  Consumers can also easily identify themselves as either class members who received Neurontin for its only approved indications, adjunctive epilepsy therapy or shingles pain, or for some other condition, without reference to murky subjective criteria.

As the authoritative Manual for Complex Litigation states, "[a]n identifiable class exists if its members can be ascertained by reference to objective criteria.  The order defining the class should avoid subjective standards (e.g., a plaintiff's state of mind) or terms that depend on resolution of the merits (e.g., persons who were discriminated against)."  *Manual for Complex Litigation, Fourth* § 2.22 (2004); *see also Newberg*, §§ 6:14 and 13:45 ("subjective terms should not be used in defining the class").  The proposed class definition – based on the purchase of Neurontin for off-label uses – is objective, ascertainable, and requires no inquiry into any individual class member's state of mind,[60] or whether the drug "worked" for them.

---

[59] In the alternative, should the Court find that Massachusetts choice of law rules require application of the laws of all 50 states, this should not pose a barrier to class certification, for the same reasons found by the Court in AWP: plaintiffs "are pressing only the theory that defendants intentionally made fraudulent misrepresentations . . . . Therefore, different standards governing scienter do not present individual issues," and "there is no indication that different definitions of reliance and causation will matter or cannot be resolved as a matter of law prior to trial."  230 F.R.D. at 85.

[60] This distinguishes this case from *Zapka v. Coca-Cola Co.*, 2000 WL 1644539 (N.D. Ill. Oct. 27, 2000), cited by Defendants, in which the court noted that the class had been defined first by reference to class members' state of mind.

In similar vein, Defendants object that Plaintiffs' proposed class definition is overbroad because it "makes no causal reference to defendants' alleged misconduct." *See* Defs.' Mem. at 42. Defendants' attempt to introduce subjective and merits-based elements into the class definition would prevent the certification of all consumer class actions. In almost every consumer fraud case, there will be some class members who were not exposed to the representations at issue; some class members who were exposed to the representations but did not consider them material; and some class members who saw but were not fooled by them. Plaintiffs need not provide, as Defendants would require, a list of all class members who were deceived by Defendants' fraudulent statements; Plaintiffs need only define the class by objective criteria.[61]

Finally, Defendants complain that class membership is not ascertainable because the class definition contains no end date. Plaintiffs propose an end date of December 31, 2004, which coincides with the introduction of generic gabapentin, and Pfizer's abandonment of its Neurontin marketing efforts.[62]

---

[61] *See* Newberg, § 6:17 ("It is unnecessary… that class members be individually identified."); *Zapka*, 2000 WL 1644539, at *3-4 ("A class may be certified although the initial definition includes members who have not been injured or do not wish to pursue claims against the defendant."). Defendants' other authority, none from the First Circuit, is readily distinguishable. *In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012 (7th Cir. 2002) focused on individual problems inherent in applying the consumer fraud laws of several states, in the varied uses and specifications of the tire at issue, and the question of whether those with increased risk of harm should be part of the class, concerns and questions not present here. *In re Rezulin Products Liability Litigation*, 210 F.R.D. 61 (S.D.N.Y. 2002) was a personal injury class action, raising individualized causation questions highlighted by the court and not present in this case. *Martin v. Am. Med. Sys., Inc. v. Pfizer, Inc.*, 1995 WL 680630, *5 (S.D. Ind. Oct. 25, 1995), also a product liability case, focused on problems with typicality and adequacy of representation and on standing for class members who had not suffered physical injury. *Clay v. American Tobacco Co.*, 188 F.R.D. 483, 490 (S.D. Ill. 1999) was a tobacco case in which the class was not bounded by date and judged too amorphous, not distinguishing among current and former smokers. In *Oshana v. Coca-Cola Bottling Co.*, 225 F.R.D. 575, 580-81 (N.D. Ill. 2005), the defendant argued that membership in the class would require looking into whether class members saw particular advertisements, whereas this case's class definition is based on the objective criteria of purchase of Neurontin for off-label uses.

[62] *See* Pfizer Investor News Release, *Pfizer Inc Fourth-Quarter 2004 Performance Report* (available at http://www.pfizer.com/pfizer/are/investors_releases/2005pr/mn_2005_0119.jsp) ("Full-year worldwide revenues for Neurontin were $2.723 billion in 2004, up 1 percent, and were $481 million in the fourth quarter of 2004, down 39 percent. The decline in the fourth quarter is due to the at-risk launch of generic gabapentin by Ivax, Alpharma, and Teva in the U.S."). In the alternative, Plaintiffs propose an end date of May 13, 1994, the day of Warner-Lambert's

## V.     PLAINTIFFS' CLAIMS ARE TYPICAL AND THEY WILL ADEQUATELY REPRESENT THE CLASS

The typicality requirement of Rule 23(a)(3) is satisfied when the claims of the representative plaintiffs "arise from the same course of conduct that gave rise to the claims of the absent [class] members." *In re New England Mutual Life Ins. Co. Sales Pract. Litig.*, 183 F.R.D. 33, 39 (D. Mass. 1998) (quoting *Duhaime v. John Hancock Mutual Life Ins. Co.*, 177 F.R.D. 54, 56 (D. Mass. 1997)). "Typicality refers to the *nature of the claim* of the class representatives, and not to the *specific facts from which the claim arose* or relief is sought." *M. Berenson Co., Inc. v. Faneuil Hall Marketplace, Inc.*, 100 F.R.D. 468, 470 (D. Mass. 1984) (emphasis added). The claims of the class representatives are typical of the claims of the class because they arise out of the same course of conduct.

Allegations that a company's upper-level decision-makers were the original source of misleading information, and that plaintiffs made purchases they otherwise would not have made after the misleading information flowed downstream, satisfy the typicality requirement. *In re New England*, 183 F.R.D. at 39. The fact that the misleading information reaches class members (or in this case, their physicians) in different ways does not defeat typicality. *Duhaime*, 177 F.R.D. at 63.

Defendants rely heavily on caselaw from outside the First Circuit in arguing that Plaintiffs' claims are atypical because they are based on "widely divergent facts," *Sprague v. General Motors Corp.*, 133 F.3d 388, 399 (6th Cir. 1998), or a "complex course of conduct engaged in by the defendants over a long period of time, as opposed to a single act to which all class members have been exposed equally." *Clay v. American Tobacco Co., Inc.*, 188 F.R.D. 483, 492 (S.D. Ill. 1999). The district courts in this Circuit, however, including this Court, have

---

guilty plea in *Franklin*.

repeatedly held that a class representative's claims need not be identical to those of the class as a whole in order to satisfy typicality, but need only arise from the same "course of conduct that gives rise to the claims of other class members, and [be] based on the same legal theory. *See, e.g., AWP*, 230 F.R.D. at 78. In this case, liability will turn on whether Defendants purposely misled the medical community about the efficacy of Neurontin for off-label uses, not on the individual decisions and circumstances of people along the chain of distribution. *In re Synthroid Mktg. Litig.*, 188 F.R.D. 295, 299 (N.D. Ill. 1999).[63]

Defendants argue that Plaintiffs are not typical because each consumer plaintiff took Neurontin for specific off-label uses, and so lacks the incentive to prove other class members' claims based on other off-label uses. As a preliminary matter, this argument does not apply to the third-party payors, who, likely having paid for *all* off-label uses, have ample incentive to pursue claims for all uses. As for the consumers, their claims arise from the same general course of conduct, and they and their attorneys are committed to proving up the full scope of Defendants' misconduct, and obtaining the fullest possible relief for the class.[64]

Defendants argue that Mr. Smith is an atypical and inadequate class representative because he cannot recover damages as a result of his Neurontin purchases in light of his personal

---

[63] The four personal injury actions cited by Defendants, *In re Am. Med. Sys.*, Inc., 75 F.3d 1069, 1081 (6th Cir. 1996), *Baycol*, 218 F.R.D. at 205-06, *Rezulin*, 210 F.R.D. at 67, and In re *Orthopedic Bone Screw Prods. Liab. Litig.*, 1995 WL 273597, *11 n.13 (E.D. Pa. 1995), did not involve this form of misrepresentation. This distinction also renders inapposite Defendants' other authority, drawn exclusively from the Seventh Circuit, cited for the proposition that all Class members must have been subject to the same misstatements. For example, in *Oshana*, 225 F.R.D. at 582, class members had to show exposure to direct misrepresentations through advertising. The courts in *Insolia*, 186 F.R.D. at 545, and *Clay*, 188 F.R.D. 492-93, both involving large smoker classes, found typicality not satisfied where class members had to show causation by proving exposure to industry propaganda, but also had to account for an almost limitlessly diffuse set of influences, including, as *Clay* emphasized, "society." *Clay*, 188 F.R.D. at 493.

[64] Should the Court believe it is necessary, subclasses of consumers, separated by the various off-label uses for which Neurontin was purchased, could be created, with additional class representatives for each of the major categories of off-label uses. "If there is any doubt as to the plaintiff's representative capacity, the court may . . . appoint new or additional representatives, or create subclasses if conflicts arise. Plaintiffs should be given a reasonable amount of time to construct subclasses if they are necessary." 5 Moore's Fed. Prac. § 23.25[6] (3d ed. 2006).

injury settlement, which released all claims for medical expenses, including amounts paid for Neurontin. This argument suffers from two fundamental flaws. First, as in most personal injury cases, Mr. Smith sought compensation for pain and suffering, mental anguish, and lost wages, as well as medical expenses, and the case settled for *less* than the total amount of damages claimed in exchange for a release of all claims, with no specific amount paid to settle any of the several types of damages claimed.[65] Accordingly, the fact that the release encompassed all of the claims raised in that action does not mean that Mr. Smith received *any* compensation for his purchases of Neurontin. Nor does the settlement release Mr. Smith's claims against Pfizer or Warner Lambert Company, or "any and all claims for medical expenses;" it only releases claims against "Michael G. Jones and Raleigh E. Norris, their heirs, representatives, employees, insurers and assigns." Ex. C to Liptak Affidavit.[66]

Defendants argue that Ms. Kopa's claims are atypical because Dr. Dhaduk's so-called "intimidation" of her to take Neurontin was an "intervening event." If anything, Ms. Kopa's experience—a patient who follows her physician's instructions regardless of her own inclinations, believing her doctor knows best—makes her a *model* patient, not an atypical one.

Finally, the third party payors are adequate class representatives. A class representative "need not have personal knowledge of all the relevant facts to be an adequate representative." *In re Biogen Securs. Litig.*, 179 F.R.D. 25, 40 (D. Mass. 1997) (Saris, J.) (quoting *Adair v. Sorenson*, 134 F.R.D. 13, 18-19 (D. Mass. 1991)). "It is sufficient if the named plaintiffs understand the issues behind the complaint, that they are dedicated to the vigorous prosecution of

---

[65] Indeed, the Settlement Distribution Sheet prepared by Mr. Smith's counsel itemizes a series of expenses for certain medical services, such as Dr. Huler's bill and other expenses, but does not show any payment for the purchase of Neurontin. *See* Exh. A to Declaration of James Young.

[66] *See e.g., Huffman v. Monroe County Community School Corporation*, 588 N.E.2d 1264 (Ind. 1992) (releases apply only to persons intended to be released by terms of the release agreement). Mr. Smith is an Indiana resident, and the scope of the release would be construed under Indiana law.

the case and are represented by counsel who are qualified to do so." *Grace*, 128 F.R.D. at 171.

*See also In re Tyco Int'l, Inc.*, 2006 WL 2349338, at *2 (D.N.H. Aug. 15, 2006) ("Class

representatives are not required to possess 'expert knowledge' about the case, and may rely

heavily on class counsel for guidance.").  The TPPs more than meet this standard.[67]

## VI.    THE THIRD PARTY PAYORS HAVE STANDING TO SUE UNDER THE NJCFA

Defendants renew their argument that TPPs do not have standing to sue under the

NJCFA, citing several cases holding only that purchases of goods not ordinarily sold to the

general public, and purchases of consumer goods sold at wholesale *for resale*, fall outside the

scope of the NJCFA.[68]  This case involves neither situation — indeed, the class definition

expressly *excludes* purchases for "resale."  *See* TACAC ¶ 315.  Neurontin is emphatically a

consumer good sold to the general public — it is consumed in the literal sense by the members of

---

[67] Defendants' assertion that Mr. Brown testified ASEA has no basis for its claim that Neurontin is ineffective, or that Defendant's illegal conduct caused it to pay for off-label uses, grossly distorts the record.  Def. Mem. at 12-13. Mr. Brown expressly qualified the referenced testimony as "[o]utside of the attorney/client privilege and outside of the reading of the Complaint."  Brown Depo. at 306:22-307:5.  Thus, all Mr. Brown said was that ASEA had no factual bases for or opinions concerning its claims, *apart from information provided by its attorneys*.  *See also id*. at 400: 11-13 (The Trust is "going to rely on its attorneys to develop that information and its theories.").  Such reliance is entirely proper for any client, including a proposed class representative.

[68] In *Papergraphics International, Inc. v. Correa*, 910 A.2d 625 (N.J. Super. 2006), the Court explained that "the CFA does not cover every sale in the marketplace.  Rather, CFA applicability hinges on the nature of a transaction, requiring a case by case analysis."  *Id*. at *9.  The court held that the transaction at issue — the purchase of 10,000 printer ink cartridges for resale — was "not the type of 'consumer transaction' covered by the statute."  *Id*. at *11. Similarly, in *East Coast Office Systems, Inc. v. Citicorp Vendor Finance, Inc*., Civ. No. 06-24 (GEB), 2006 U.S. Dist. LEXIS 82044 (D.N.J. Nov. 9, 2006), the court found that the transaction at issue — the wholesale purchase of used office equipment for resale by an office equipment dealer — was not covered by the CFA, under the same *per se* exclusion of purchases at wholesale for resale.  *Id*. at *8.  In *Cetel v. Kirwan Fin. Group, Inc*., 460 F. 3d 494 (3d Cir. 2006), the court held that the "product" at issue, which the court described as a "complex tax avoidance scheme designed primarily to allow an investor to make tax-deductible contributions while allowing for a permanent tax deferral upon withdrawal," did not "qualify as 'products and services sold to consumers in the popular sense[,]' such that they fall within the ambit of the CFA."  *Id*. at 514 (quoting *Arc Networks v. Gold Phone Card Co*., 756 A.2d 636, 638 (N.J. Super. Ct. Law Div. 2000)).  In *Arc Networks*, the defendant purchased "bulk telephone and computer services" from the plaintiff which "could only be accessed through the '800' numbers and PINS that [defendant] provided to purchasers of its phone cards."  *Id*. at 638.  The court held that this transaction fell outside the NJCFA because defendants' "purpose in contracting for [plaintiff's] services was to resell those services to purchasers of its phone cards."  *Id*. at 592.  Finally, in *In re Express Scripts, Inc. Pharmacy Benefits Management Litig*., MDL No. 1672, 2006 U.S. Dist. LEXIS 65168 (E.D. Mo. Sept. 13, 2006), the plaintiff, a union health and welfare fund, sued its pharmacy benefits manager for entering into "'secret self-dealings' with drug manufacturers to obtain additional profits."  *Id*. at *10.  The court held that because the contracted-for services were "not available to the general public," they were "not within the ambit" of the NJCFA.  *Id*. at *38-*39.

the general public for whom it has been prescribed.

As Defendants' authorities' hold, "'it is the character of the transaction rather than the identity of the purchaser which determines if the [CFA] is applicable.'"  *East Coast Office Systems*, 2006 U.S. Dist. LEXIS 82044 at *5 (citations omitted).  The fact that third party payors may pay or reimburse for the prescription does not change the fundamental character of each sale, which remains a retail-consumer transaction.  If Defendants wish to analogize to the "sale for resale" cases, the analogous transaction is the sale of Neurontin by the pharmaceutical distributor to the pharmacy, not the sale by the pharmacy to the consumer-patient.  Obviously, the deterrent and remedial purposes of the NJCFA would be completely eviscerated if the manufacturer and distributor of a $2.7 billion a year consumer product — Neurontin — could escape liability for its fraudulent marketing practices merely because most of the cost of retail sales is paid for by third parties.[69]  Because this case involves the sale of a consumer product to consumers, not sales for resale, the TPPs have standing to sue under the NJCFA.

## VII.     A CLASS ACTION IS SUPERIOR TO AND MORE MANAGEABLE THAN THOUSANDS OF INDIVIDUAL ACTIONS

Defendants contend that this case is not manageable, but do not identify a single applicable manageability issue.[70]  This is insufficient to defeat certification.[71]

---

[69] In the *Vioxx* litigation, the court similarly held that "the limit placed by defendants that a 'person' under the Act must be the one who actually takes the medication or uses the product is too simplistic. . . . If for example, a "person" buys a gift for a third party based on false advertising, it does not matter that the person who is duped into making the purchase does not personally use the product."  *Int'l Union of Op. Eng'rs Local 68 Welfare Fund v. Merck & Co., Inc.*, No. ATL-L-3015-04, 2004 WL 3767338 (N.J. Super. L. July 8, 2004), at *6.  As Defendants point out, the district court in *In re Rezulin Prod. Liab. Litig.*, 392 F. Supp. 2d 597, 616-17 (S.D.N.Y. 2005) declined to follow *Vioxx* in favor of the narrow interpretation of the NJCFA advanced by Defendants.  The *Rezulin* decision is currently on appeal, and an earlier decision in that case has already been reversed for taking an overly restrictive view of the NJCFA.  *See Desiano v. Warner Lambert Co.*, 326 F.3d 339, 348-51 (2d Cir. 2003).  Plaintiffs respectfully submit that this later decision suffers from similar infirmities, and that it would be more prudent to follow closely analogous decisions of New Jersey state courts on questions of New Jersey state law.

[70] In *Castano v. Am. Tobacco Co.*, 84 F.3d 734 (5th Cir. 1996), relied upon by Defendants, the court's only comment on manageability was that the lower court "failed to perform its duty to determine whether the class action would be manageable in light of state law variations."  *Id*. at 744.  Similarly, in *In re Prempro Prods. Liab. Litig.*, 230 F.R.D. 555 (E.D. Ark. 2005), also cited by Defendants, the court complained that "application of multiple state

Defendants also ignore the essence of the superiority analysis, which is comparative.  In assessing whether a class action is the superior form of adjudication, courts "are not assessing whether [a] class action will create significant management problems, but instead determining whether it will create relatively more management problems than any of the alternatives."  *Klay v. Humana, Inc.*, 382 F.3d 1241, 1273 (11th Cir. 2004).  "[D]efendants must not merely show that individual actions are *feasible*; they must show that individual members have an interest sufficient to make them *desirable*."  *Bertulli v. Independent Ass'n of Continental Pilots*, 242 F.3d 290, 299 (5th Cir. 2001) (emphasis in original).  After three years of litigation, only a handful of the largest third party payors, and *no* consumers (aside from those claiming personal injuries) have filed their own actions.  The willingness of the remainder to let this case proceed as a class action is a strong endorsement of collective, rather than individual litigation.[72]

## VIII.  CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully request that the Court certify the class and subclasses pursuant to Fed. R. Civ. P. 23(b)(3).

---

laws can render a case unmanageable," and that plaintiffs failed to present "an adequate trial plan and proper jury instructions" addressing this problem.  *Id.* at 568.  This case faces no such obstacle, as Plaintiffs assert claims under only federal and New Jersey state law.  In addition to not being required, a trial plan would be premature at this stage, as Defendants have not even completed their document production.

[71] *See In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 139-40 (2d Cir. 2001) (manageability-based denials of class certification are disfavored); *Yaffe v. Powers*, 454 F.2d 1362, 1365 (1st Cir. 1972) (courts should not refuse to certify classes because of "vaguely-perceived management problems").

[72] Defendants argue that the availability of attorneys' fees under state consumer protection laws is sufficient to make individual actions economical.  A case like this, properly litigated on an individual basis, still requires the investment of millions of dollars in attorney time and out-of-pocket expenses, which may well eclipse all but the largest individual TPP verdicts.  A mere fee-shifting provision does not make such litigation economically attractive, or make the benefits of aggregation somehow disappear.  *See Bertulli*, 242 F.3d at 299 (affirming certification and finding that availability of attorney's fees under statute "do[es] not alter the relatively low damages most plaintiffs would receive"); *Tardiff v. Knox County*, 218 F.R.D. 332 (D. Me. 2003) (finding superiority requirement satisfied despite availability of attorneys' fees in individual actions), *aff'd*, 365 F.3d 1 (1st Cir. 2004).  *Compare Castano*, 84 F.3d at 748 ("individual damage claims are high, and punitive damages are available in most states," making individual cases attractive).

Dated: March 19, 2007

Respectfully Submitted,

By:    */s/ Barry Himmelstein*
       Barry Himmelstein, Esquire
       Lieff Cabraser Heimann &
       Bernstein, LLP
       Embarcadero Center West
       275 Battery Street, 30th Floor
       San Francisco, CA 94111-3339

By:    */s/ Thomas Greene*
       Thomas Greene, Esquire
       Greene & Hoffman
       125 Summer Street
       Boston, MA 02110

By:    */s/ Thomas M. Sobol*
       Hagens Berman Sobol Shapiro LLP
       One Main Street, 4th Floor
       Cambridge, MA  02142
       Boston, MA 02110

By:    */s/ Don Barrett*
       Don Barrett, Esquire
       Barrett Law Office
       404 Court Square North
       P.O. Box 987
       Lexington, MS 39095

By:    */s/ Daniel Becnel*
       Daniel Becnel, Jr., Esquire
       Law Offices of Daniel Becnel, Jr.
       106 W. Seventh Street
       P.O. Drawer H
       Reserve, LA 70084

By:    */s/ James Dugan*
       James Dugan, Esquire
       Dugan & Browne
       650 Poydras St., Suite 2150
       New Orleans, LA 70130

       ***Members of the Class Plaintiffs'
       Steering Committee***