# IN THE CIRCUIT COURT OF FRANKLIN COUNTY, ALABAMA

| | |
|---|---|
| DAVID R. LONGMIRE, M.D. )<br>)<br>    Plaintiff, )<br>)<br>v. )<br>)<br>PFIZER, INC., a foreign corporation qualified to do )<br>business in the State of Alabama )<br>c/o Its Registered Agent For Service Of Process In The )<br>State of Alabama: )<br>The Corporation Company )<br>2000 Interstate Park Drive )<br>Suite 204 )<br>Montgomery, Alabama 36109 )<br>)<br>and )<br>)<br>WARNER-LAMBERT COMPANY, LLC, a foreign )<br>corporation qualified to do business in the State of )<br>Alabama )<br>c/o Its Registered Agent For Service Of Process In The )<br>State of Alabama: )<br>The Corporation Company )<br>2000 Interstate Park Drive )<br>Suite 204 )<br>Montgomery, Alabama 36109 )<br>)<br>and )<br>)<br>WARNER-LAMBERT COMPANY )<br>235 East 42nd Street )<br>New York, New York 10017 )<br>)<br>And )<br>)<br>PARKE-DAVIS, a Division of Warner Lambert )<br>Company LLC and Warner-Lambert Company )<br>235 East 42nd Street )<br>New York, New York 10017, )<br>)<br>and ) | CIVIL ACTION<br><br>NO.: CV-2006-120<br>(JURY DEMAND) |

| | |
|---|---|
| FICTICIOUS DEFENDANTS, the identities of which are unknown to Plaintiff, and through the exercise of due diligence, cannot be known to Plaintiffs at this time, but who will be added as defendants by amendment as necessary, upon Plaintiff's identifying them, A, B, C, intending to refer to those persons or entities that are the predecessors or successors-in-interest to the named defendants.<br><br>Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) |

## PLAINTIFF'S FIRST AMENDED COMPLAINT

### INTRODUCTION

1. This complaint concerns the fraud perpetrated by the Defendants on plaintiff Dr. David R. Longmire ("Dr. Longmire"), an Alabama neurologist. The Defendants engaged in a scheme to illegally and fraudulently market an epilepsy drug that was about to lose its profitability unless the Defendants found a way to increase its use for other conditions. They targeted Dr. Longmire to be an unwitting pawn in this scheme. When the scheme fell apart, Dr. Longmire was left in its wake. Dr. Longmire seeks compensation for the harm caused by the Defendants' willfully fraudulent and deceitful conduct.

### PARTIES

2. Dr. Longmire is an individual and a resident of Franklin County, Alabama.

3. Defendant Pfizer, Inc. ("Pfizer") is a Delaware corporation with a principal place of business at 235 East 42nd Street, New York, New York 10017. Pfizer is principally engaged in the manufacture and sale of pharmaceuticals and is one of the largest pharmaceutical companies in the United States. Pfizer is the successor-in-interest to defendant Warner-Lambert Company LLC and its Parke-Davis Division.

4. Defendant Warner-Lambert Company LLC is the successor to defendant

Warner-Lambert Company (together referred to as "Warner-Lambert") and was acquired in June 2000 by Pfizer. Prior to the acquisition, Warner-Lambert was a Delaware corporation that maintained its principal place of business at 201 Tabor Road, Morris Plains, New Jersey 07950. In 1993, Warner-Lambert received approval from the United States Food and Drug Administration ("FDA") to market Neurontin in the United States. After the acquisition, the marketing of Neurontin continued to be managed at the merged-out company's Morris Plains, New Jersey location.

5. Defendant Warner-Lambert Company is the predecessor to defendant Warner-Lambert Company LLC.

6. Parke-Davis was the division of Warner-Lambert Company LLC and its predecessor, Warner-Lambert Company, that marketed and sold Neurontin prior to Pfizer's acquisition of Warner-Lambert Company LLC ("Parke-Davis").

7. Fictitious Defendants A-C refers to persons or entities that are the predecessors or successors-in-interest to the named defendants.

8. References to Pfizer, Warner-Lambert, and Parke-Davis include all three entities and/or their predecessors and successors, and the Fictitious Defendants A-C (for the sake of clarity, all collectively referred to as the "Defendants" unless otherwise specified).

## FACTUAL ALLEGATIONS

### A. Overview of Defendant's Fraudulent Conduct

9. On May 13, 2004, Warner-Lambert, and/or its Parke-Davis Division, pleaded guilty to a criminal information (the "Criminal Information") filed in the United States District Court for the District of Massachusetts and admitted it criminally violated the Federal Food,

Drug and Cosmetic Act, 21 U.S.C. § 331 *et seq.* in connection with its marketing and sales practices for a drug known as Neurontin.

10. The FDA approved Neurontin in 1993 for use only as adjunctive therapy in the treatment for epilepsy.

11. According to the Criminal Information, by the fall of 1995, Warner-Lambert recognized that potential future Neurontin sales for epilepsy therapy were limited. In or about April or May of 1995, according to the Criminal Information, Warner-Lambert conducted evaluations that indicated a market potential for certain unapproved uses for Neurontin, commonly known as "off-label" uses. These uses included post-herpetic neuralgia, painful diabetic neuralgia, anxiety disorder, social phobias, and bipolar disorder.

12. In order to avoid the federal statutes and regulations which make it illegal for a manufacturer to promote off-label uses of its product, the Defendants, in violation of federal law, engaged in a number of fraudulent marketing and sales schemes to promote the sale and use of Neurontin for off-label uses.

13. One of the Warner-Lambert's fraudulent schemes involved using physicians to promote the off-label use of Neurontin because off-label promotional prohibitions do not apply to physicians, who can treat a medical condition with any prescription drug that would benefit the patient. Warner-Lambert admitted to such a scheme, which is described in the Criminal Information.

14. Part of this fraudulent and deceptive scheme targeted neurologists, including Dr. Longmire, to leverage their experience with the use of Neurontin for pain. These neurologists were specifically told that Warner-Lambert intended to apply to the FDA for

approval for the expanded use of Neurontin in the treatment of neuropathic pain.

15. Warner-Lambert provided study grants, solicited the targeted physicians to publish articles supporting the expanded use of Neurontin to reduce pain, and, through seemingly independent medical education companies, invited these physicians to speak at so-called consultants' meetings and educational events. Warner-Lambert represented that it was gathering the studies and articles as part of its effort to obtain clinical data to support an FDA application for approval of Neurontin as a treatment for certain types of neuropathic pain.

16. Unknown to the targeted physicians, including Dr. Longmire, Warner-Lambert had little or no intention of actually presenting either the results of the studies or the publications to the FDA. Also unknown to the targeted physicians, including the Plaintiff, the seemingly independent medical education companies were actually hired by Warner-Lambert to further this scheme.

17. Warner-Lambert, however, could not openly, honestly, and without deception and fraud inform the targeted physicians of its plans and methods and/or its actual intent to ignore, violate, and circumvent the federal prohibitions in this area. As a result, Warner-Lambert dealt unfairly, deceptively, untruthfully and fraudulently with these physicians, subjecting them to increased legal exposure, claims, and damages. Dr. Longmire is one of the physicians whom Warner-Lambert targeted, exploited and used as set forth below.

### B. Background of David R. Longmire, M.D.

18. Dr. Longmire is a physician licensed to practice in the State of Alabama, specializing in pain evaluation and management, neurological assessment, and clinical neurophysiology. He is a Clinical Associate Professor in the Department of Internal Medicine at

the University of Alabama Birmingham-Huntsville Regional Medical Campus, Huntsville, Alabama.

19. Since 1969, Dr. Longmire has had a special interest in the area of clinical and neuro-physiological assessment of various forms of neuropathic pain.

20. From 1991-1994, Dr. Longmire published a number of articles relating to the neurological aspects of pain and the diagnostic evaluation of various forms of neuropathic pain disorders. By the end of 1994 he observed that the intensity and distribution of comorbid pain in several seizure patients appeared to decrease when Neurontin was added to their regular seizure medications, whereas the pain persisted before the introduction of Neurontin.

### C. Solicitation by Defendant Warner-Lambert

21. On or about 1995, Dr. Beth Attiyas-Yon ("Attiyas-Yon"), then a Parke-Davis representative, invited Dr. Longmire to participate in a small meeting of academic and practicing physicians in Atlanta, Georgia, to discuss their individual and collective experience with Neurontin. In addition to speaking about seizures, each speaker related similar observations in patients who experienced a reduction in comorbid pain when given Neurontin. When a medical school faculty member from Kentucky asked senior management officials from Parke-Davis, including Attiyas-Yon and Dr. Leslie Magnus-Miller ("Magnus-Miller"), why Parke-Davis was not developing Neurontin for use in neuropathic pain, a third Parke-Davis senior manager, who remains unknown at this point, explained that such topics could only be answered after all appropriate studies and reports were submitted to the FDA in an application for a new indication for the use of Neurontin.

22. Several months after that meeting, Attiyas-Yon, after discussion with Magnus-

Miller, suggested that Dr. Longmire apply for an educational grant from Parke-Davis to analyze the clinical records of comorbid pain in patients who had been given Neurontin for seizures.

23. Subsequently the results of Dr. Longmire's findings underwent peer review to determine if they met criteria for a poster presentation at the annual meeting of the American Medical EEG Association (now the Association for EEG and Clinical Neuroscience). The findings were accepted and *Clinical Electrocephalography*, a medical journal, published an abstract.

24. Parke-Davis and/or Warner-Lambert provided Dr. Longmire four additional developmental grants for actuarial studies on comorbid or neuropathic pain and its response to Neurontin.

25. From 1996 through 1998, Parke-Davis and/or Warner-Lambert, acting by itself or through certain agents, including seemingly independent medical education companies ("CME companies") such as Proworx, MEDED, and Professional Post-Graduate Services, invited Dr. Longmire to speak at various Continuing Medical Education ("CME") meetings of physicians regarding his observations on Neurontin in epilepsy as well as its effect on comorbid or neuropathic pain. Although the seemingly independent CME companies technically operated the meetings, according to the Criminal Information Warner-Lambert and its Parke-Davis Division actually controlled the content of the meetings as part of the fraudulent and illegal marketing scheme.

26. Warner-Lambert, its Parke-Davis Division, and/or the CME companies as their agents told Dr. Longmire that the lectures were intended to present early studies of the development of Neurontin for seizures to physicians who were not aware of the indications or

Page 7 of 16 Pages

methods of using Neurontin, and also told Dr. Longmire that he could speak about off-label uses of Neurontin where appropriate.

27. Dr. Longmire specifically asked Warner-Lambert, Parke-Davis, and/or the CME companies if his giving such lectures and presentations was legal and ethical, and they told him that the meetings were legal and ethical because all were CME programs offered by independent medical education companies. Such programs are required to follow guidelines set by the Accreditation Council for Continuing Medical Education, and Dr. Longmire believed they did.

28. Dr. Longmire asked if his participation in small discussion groups, consisting of five to six well-known academic neurologists, epileptologists and pain physicians for the purpose of creating, editing or reviewing educational materials that contained discussion of neuropathic pain was appropriate. Warner-Lambert, Parke-Davis, and/or the CME companies as their agents told Dr. Longmire that Warner-Lambert had decided to proceed with multicenter control trials on two types of neuropathic pain to support the Defendant's application for FDA approval for the use of Neurontin to treat neuropathic pain, and that therefore his participation in such discussion groups was appropriate. Upon information and belief, based on documentation in complaints filed relating to the subject matter of this case, it has been alleged that as of 1995 Parke-Davis had no intention of seeking such FDA approval.

29. Relying on the representations of Warner-Lambert, Parke-Davis, and or the CME companies as their agents, and unaware of either Warner-Lambert's involvement or the fraudulent marketing scheme, Dr. Longmire accepted invitations to present on his experiences with Neurontin at various meetings purportedly organized by independent CME companies, but which were actually organized by Warner-Lambert and/or Parke-Davis in furtherance of their

fraudulent and illegal marketing scheme.

30. In 1996, Professional Post-Graduate Services, acting as Warner-Lambert's agent, hire Dr. Longmire to give presentations in Phoenix, Arizona, Buffalo, New York, and Dallas, Texas. Also in 1996, ProWorx, acting as Warner-Lambert's agent, hired Dr. Longmire to give presentations in Jupiter Beach, Florida, Philadelphia, Pennsylvania, Boston, Massachusetts, and New York, New York. The Parke-Davis Speakers Bureau hired Dr. Longmire to speak in Pittsburgh, Pennsylvania, and Long Island, New York in 1996 and in Fort Lauderdale, Florida in 1998. MEDED, acting as Warner-Lambert's agent, invited Dr. Longmire to speak in Newark, New Jersey in 1997 and in Franklin County, Alabama in 1998.

31. At each of these meetings, Dr. Longmire shared his clinical experience and category analysis of patients who had initially been placed on Neurontin for seizures, then for other neurological abnormalities including neuropathic pain. The Defendants failed to disclose, and Dr. Longmire was unaware, that such meetings were part of the Defendants' fraudulent and illegal marketing scheme, and that the Defendants controlled the content of such meetings.

32. Dr. Longmire only recently discovered the Defendants' fraudulent conduct. The earliest Dr. Longmire could have discovered the Defendants' fraudulent conduct was when the Defendants' pleaded guilty to the Criminal Information on May 13, 2004.

### D. The Defendant's Illegal, Fraudulent and Deceptive Practices

33. Subsequent to the Defendants' guilty plea regarding its illegal, fraudulent and deceptive practices relating to the marketing of Neurontin, several consolidated complaints against the Defendants have been filed in the United States District Court for the District of Massachusetts on behalf of classes of individuals and third-party payors, which allege that the

Defendants created and implemented a fraudulent marketing and sales scheme to boost the sales of Neurontin.

34. Dr. Longmire is specifically named in these complaints as participating in this fraudulent marketing scheme, even though he was ignorant of the Defendants' scheme to illegally promote off-label uses of Neurontin. The complaints identify Dr. Longmire as a speaker at various conferences where he presented information regarding the use of Neurontin as a pain-management drug. Dr. Longmire believed he was handpicked to speak based on his expertise in pain management, not as a delivery-mechanism for a vast and fraudulent marketing scheme. The Defendants failed to disclose to Dr. Longmire that the conference organizers, supposedly independent medical education companies, were actually acting at the behest of the Defendants in order to further the fraudulent marketing scheme. Dr. Longmire staked his reputation on presenting his clinical observations to his peers and colleagues at independently organized events free of potential conflicts or ethical violations, only to find out later that the Defendants used him as a pawn.

35. The Defendants willfully and knowingly concealed from Dr. Longmire the fact that the invitations it extended asking him to speak at various meetings and conferences were in fact part of a fraudulent scheme to skirt FDA regulations and illegally market Neurontin for off-label uses. Dr. Longmire believed that his efforts were directed toward educating medical professionals on the various uses of Neurontin, but because of the Defendants' deceit, he unwittingly became part of the Defendants' fraudulent and illegal marketing scheme.

36. The Defendants also misrepresented to Dr. Longmire that it was seeking FDA approval for Neurontin as a drug to treat neuropathic pain, whereas in reality the Defendants

had no intention of seeking such approval when it could profit from the off-label use of Neurontin by continuing to promote it illegally.

37. If Dr. Longmire had known of the Defendants' fraudulent and illegal marketing scheme, he would not have placed his professional practice and reputation in jeopardy by accepting invitations to speak at meetings, the contents of which the Defendants used as an important element in its illegal marketing scheme.

### E. Harm to Plaintiff

38. As a direct result of the Defendants' fraudulent misrepresentations, concealment and deceit, a certain insurance company and worker compensation fund have threatened to sue Dr. Longmire for his alleged role in the Defendants' fraudulent and illegal marketing scheme, forcing him to incur substantial legal costs in preparation for his defense, and exposing him to potential liability.

39. As a direct result of the Defendants' fraudulent misrepresentations, concealment, and deceit, Dr. Longmire's name has been included in the multi-district litigation lawsuits, thereby impugning his reputation among his colleagues and peers and calling his integrity into question. Before the filing of such lawsuits, a search of Dr. Longmire's name on the Internet resulted in hyperlinks to his academic work, whereas now the same search results in hyperlinks to complaints filed in the multi-district litigation actions.

### COUNT I
### (Fraudulent Misrepresentation: Ala. Code § 6-5-101)

40. The Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

41. By deliberately misrepresenting to Dr. Longmire that the Defendants were

seeking FDA approval for certain off-label uses of Neurontin, the Defendants made false representations of material fact to Dr. Longmire.

42. By deliberately misrepresenting its own role in controlling the content of certain CME meetings at which Dr. Longmire spoke, by misrepresenting the role of such meetings in the Defendant's scheme to illegally market Neurontin, and by assuring Dr. Longmire that his participation in such meetings comported with all ethical guidelines, the Defendants made false representations of material fact to Dr. Longmire.

43. The Defendants knew that their representations to Dr. Longmire were false when made.

44. Dr. Longmire justifiably relied on the Defendants' representations in accepting invitations to speak about his clinical experience with Neurontin.

45. The Defendants' conduct deceived Dr. Longmire into believing that he was acting independently of the Defendants, free of any potential ethical violations or conflicts of interest.

46. The Defendants' conduct in misrepresenting to Dr. Longmire its intentions of seeking FDA approval for certain off-label uses of Neurontin and in misrepresenting the independence of certain CME meetings in order to further its illegal marketing scheme was gross, oppressive and malicious.

47. Dr. Longmire has suffered damages as a result of the Defendants' fraudulent conduct.

### COUNT II
### (Suppression of a Material Fact: Ala. Code § 6-5-102)

48. The Plaintiff incorporates by reference all preceding paragraphs as if fully set

forth herein..

49. The Defendants had a duty to inform Dr. Longmire of their fraudulent and illegal marketing scheme and their role in controlling the content of certain CME meetings to which the Defendants invited Dr. Longmire to speak.

50. The Defendants deliberately concealed such material information when they failed to inform Dr. Longmire of their fraudulent and illegal marketing scheme.

51. The Defendants' conduct in concealing such material information was gross, oppressive and malicious.

52. As a direct result of the Defendants' failure to disclose such information, Dr. Longmire has suffered actual injury.

## COUNT III
### (Fraudulent Deceit: Ala. Code § 6-5-104)

53. The Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein..

54. In failing to disclose to Dr. Longmire that he was actually a pawn in the Defendants' fraudulent and illegal marketing scheme, that the CME meetings to which he was invited were actually part of the illegal marketing scheme, and that the Defendants never intended to seek FDA approval for certain off-label uses of Neurontin, the Defendants deliberately and knowingly deceived Dr. Longmire in order to use him as a pawn in their fraudulent and illegal marketing scheme.

55. The Defendants asserted that Dr. Longmire's participation in the CME meetings regarding the use of Neurontin for certain off-label uses was ethical and free of any potential conflicts of interest even though the Defendants knew such representations were false when

made.

56. The Defendants promised that Dr. Longmire's participation in such meetings was free from any potential legal or ethical violations, even though the Defendants knew that such meetings violated both the law and ethical guidelines.

57. The Defendants' deceitful conduct was gross, oppressive and malicious.

58. As a direct result of the Defendants' willfully fraudulent and deceitful conduct, Dr. Longmire has suffered damages.

## COUNT IV
### (Negligence or Wantonness Per Se)

58. The Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

59. The Alabama statutes relating to fraud, namely Ala. Code §§ 6-5-101, 6-5-102 and 6-5-104, were enacted to protect all persons who suffer damage as a result of another's fraud, a class of persons that clearly includes Dr. Longmire. The purpose of these statutes encompasses a protection for physicians who are deliberately mislead and rely on such misrepresentations, omissions, and deceit to their detriment.

60. The injuries Plaintiff complains of herein are of the type contemplated by the statutes.

61. Defendants have violated the statutes by committing the acts and/or omissions alleged herein.

62. Defendants are therefore liable for negligence as a matter of law.

63. Defendants also acted intentionally, consciously, and with a reckless disregard for the consequences of their actions in violating the aforementioned statutes, and are therefore

also liable for wantonness as a matter of law.

64. Defendants' violation of the fraud statutes proximately caused Plaintiff's injury and damages.

## COUNT V
### (Negligent or Wanton Conduct)

65. The Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

66. Defendants engaged in negligent or wanton conduct by:

   a. misrepresenting to the Plaintiff the nature and purpose of the purportedly independent CME meetings to which the Plaintiff was invited to speak;

   b. failing to disclose to the Plaintiff that the CME companies that organized the meetings detailed above were not independent, but actually hired as agents of the Defendants in order to further the fraudulent and illegal marketing scheme;

   c. failing to disclose to the Plaintiff that the Defendants never intended to seek FDA approval for certain off-label uses of Neurontin;

   d. committing all other acts or omissions alleged herein.

67. Defendants were under a duty to act reasonably under the circumstances alleged herein.

68. Defendants breached their duty to the Plaintiff by engaging in the acts or omissions alleged herein.

69. Defendants acted intentionally, willfully and consciously by engaging in the acts or omissions alleged herein.

Page 15 of 16 Pages

70. As a direct result of the Defendants' conduct, the Plaintiff has suffered damages.

**WHEREFORE**, Plaintiff David R. Longmire demands judgment against Defendants Warner-Lambert Company LLC, Warner-Lambert Company, its Parke-Davis Division, and Pfizer, Inc., jointly and severally, as follows:

a. On Counts One, Two and Three, the actual damages suffered by the Plaintiff;

b. On Counts One, Two and Three, find that the Defendant's conduct was gross, oppressive and malicious, and award three times the damages the Plaintiff has sustained as a result of Defendant's conduct pursuant to Ala. Code § 6-11-20; and,

c. Such other and further relief as may be just and proper under the circumstances.

### JURY DEMAND

The plaintiff demands a trial by jury.

DAVID R. LONGMIRE, M.D.

By his attorney,



Michael L. Weathers (WEA006)
121 W. Alabama St. - Suite 5
Florence, AL 35630-5586
Telephone and Facsimile: (256) 764-1318

Dated: May 15, 2006