# EXHIBIT "A"

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

|  |  |  |
|---|---|---|
| ALABAMA ASSOCIATED GENERAL CONTRACTORS, INC.; AUTOMOTIVE AFTERMARKET FUND; WORKERSFIRST COMPFUND; THE ALABAMA SELF-INSURED WORKER'S COMPENSATION FUND; THE HEATHCARE WORKERS COMPENSATION SELF-INSURANCE FUND; THE ALABAMA WORKERS' COMPENSATION SELF-INSURANCE FUND; ALABAMA TRUCKING ASSOCIATION WORKER'S COMPENSATION SELF-INSURANCE FUND; and ASSOCIATION OF COUNTY COMMISSIONS SELF-INSURANCE FUND, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | CIVIL ACTION NO. 2:06CV523-T |
| PFIZER, INC., successor in interest to WARNER-LAMBERT COMPANY; DAVID REYNOLDS LONGMIRE; jointly and individually, | ) ) ) ) ) | |
| Defendants. | ) ) ) ) | |

## NOTICE OF REMOVAL

COMES NOW Pfizer Inc. ("Pfizer") (incorrectly identified in the complaint as "Pfizer, Inc."), the only party properly joined and aligned as a defendant in the above-styled cause, and gives notice, with full reservation of all defenses, that this case is hereby removed from the Circuit Court of Montgomery County, Alabama to the United States District Court for the

1

Middle District of Alabama, Northern Division. As and for its Notice of Removal, Pfizer shows unto the Court as follows:

1.    This lawsuit is a civil action within the meaning of the Acts of Congress relating to removal of cases. See 28 U.S.C. §§ 1441(b), 1446(b).

2.    Plaintiffs instituted this civil action in the Circuit Court of Montgomery County, Alabama on May 5, 2006, against Pfizer and David Reynolds Longmire ("Longmire"), said case number being CV-2006-1252 in said court. Plaintiffs allege that they have suffered substantial economic damages as a direct result of Pfizer's allegedly unlawful and fraudulent marketing scheme designed to promote "off-label" uses of the prescription medication Neurontin®. A true and correct copy of all process and pleadings served on Pfizer as well as copies of all documents contained in the Circuit Court of Montgomery County's clerk's office file as of the morning of June 12, 2006 are attached hereto as Exhibit A as required by Local Rule 81.1 and are incorporated by reference herein.

3.    This removal is filed within thirty (30) days of initial service on any defendant and is, therefore, timely pursuant to 28 U.S.C. § 1446(b).

4.    This action originally could have been filed in this Court under 28 U.S.C. § 1332 because complete diversity of citizenship exists between the properly joined and aligned parties and the amount in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs.

## I.    COMPLETE DIVERSITY OF CITIZENSHIP EXISTS BETWEEN PLAINTIFFS AND PFIZER

5.    Plaintiffs are all residents and citizens of the State of Alabama. Compl. ¶¶ 7-14.

6.    Pfizer Inc. is and was at the time of the institution of this civil action a corporation organized under and by virtue of the laws of the state of Delaware, having its headquarters in the

State of New York.

7.      Longmire is a resident and citizen of the State of Alabama who has been improperly aligned and fraudulently joined as a defendant in this action. See infra Section III.

## II.    THE AMOUNT-IN-CONTROVERSY REQUIREMENT IS SATISFIED

8.      The amount-in-controversy requirement is clearly satisfied in this case. Among other things, Plaintiffs assert claims for unjust enrichment, negligence, wantonness and every conceivable variety of fraud. Compl. ¶¶ 85-123. In their Complaint, Plaintiffs allege that Pfizer's intentional, fraudulent and illegal conduct resulted in unspecified and "substantial" economic damages to Plaintiffs. Id. ¶¶ 7-14, 87, 92, 97, 101, 105, 109, 118, 123, 136. In addition to seeking unlimited compensatory damages, Plaintiffs demand unspecified punitive damages. Id. ¶¶ 97, 101, 105, 118, 123, 136.

9.      When, as here, plaintiffs make an unspecified claim for damages, the removing party need only show by a preponderance of the evidence that the amount in controversy exceeds the jurisdictional limit. Tapscott v. MS Dealer Serv. Corp., 77 F.3d 1353, 1357 (11th Cir. 1996), abrogated on other grounds by Cohen v. Office Depot, Inc., 204 F.3d 1069 (11th Cir. 2001). Moreover, "[w]hen determining the jurisdictional amount in diversity cases, punitive damages must be considered." Holley Equip. Co. v. Credit Alliance Corp., 821 F.2d 1531, 1535 (11th Cir. 1987); see Swafford v. Transit Cas. Co., 486 F. Supp. 175, 177 (N.D. Ga. 1980) ("It is clear that in determining the jurisdictional amount in controversy, punitive damages are to be counted." (citing Bell v. Preferred Life Assurance Soc'y, 320 U.S. 238 (1943)). This case involves numerous third-party payors suing to recover for "substantial" Neurontin® payments made over almost a decade. These plaintiffs are also seeking punitive damages. Accordingly, in these circumstances, it is clear that the amount in controversy exceeds $75,000, exclusive of

3

interest and costs.

### III.  PFIZER MAY PROPERLY REMOVE THIS CASE WITHOUT THE CONSENT OF LONGMIRE

10.     Removal without the consent of Longmire is appropriate in this case because (1) he should be a realigned as a plaintiff; and (2) he has been fraudulently joined as a defendant.

#### A.     Longmire Should Be Realigned as a Plaintiff

11.     Longmire has been improperly named as a defendant in this case for the sole purpose of defeating Pfizer's right to remove this action to federal court. Such practice is not appropriate under federal law. Indeed, "no policy is served by allowing a mislabeled 'defendant' to defeat the true defendants' right to remove the case by withholding its consent." Premier Holidays Int'l, Inc. v. Actrade Capital, Inc., 105 F. Supp. 2d 1336, 1340 (N.D. Ga. 2000), aff'd, 2002 WL 3179469 (11th Cir. 2002).

12.     The Court is, of course, not bound by the manner in which the Complaint characterizes the parties, but is duty bound to "look beyond the pleadings and arrange the parties according to their sides in the dispute." City of Indianapolis v. Chase Nat'l Bank, 314 U.S. 63, 69 (1941); see also Boland v. State Auto Mut. Ins. Co., 144 F. Supp 2d 1282, 1284 (M.D. Ala. 2001) ("It is the court's responsibility to align the parties according to their interests in litigation and, if interests of a party named as defendant coincide with those of plaintiff in relation to the purpose of the lawsuit, the named defendant must be realigned as plaintiff for jurisdictional purposes." (citation and internal quotation marks omitted)). "Litigation is the pursuit of practical ends, not a game of chess. Whether the necessary collision of interest exists, is therefore not to be determined by mechanical rules. It must be ascertained from the *principal purpose of the suit and the primary and controlling matter in dispute*." City of Indianapolis, 314 U.S. at 69 (emphasis added).

4

13.     One week after the Complaint in this matter was filed, Longmire filed a separate complaint against Pfizer in Franklin County Circuit Court. See Exhibit B. Longmire's core allegations against Pfizer in that matter track the core allegations of Plaintiffs in this matter, i.e., that Pfizer created an unlawful and fraudulent marketing scheme designed to promote "off-label" use of the prescription drug Neurontin® to their detriment. Compare Exh. B at 4, ¶ 12 with Compl. at 2, ¶ 1.

14.     The obvious "primary and controlling matter" in this case is a determination as to whether Pfizer created and/or orchestrated any such fraudulent and illegal marketing scheme and whether Plaintiffs or Longmire suffered any resulting damage. All parties except Pfizer desire to prove that such a marketing scheme existed, and Pfizer will endeavor to refute this primary allegation. While there may be secondary disputes, alignment for jurisdictional purposes should be based upon the primary dispute in the lawsuit. See U.S. Fidelity & Guar. Co. v. Algernon-Blair, Inc., 705 F. Supp. 1507, 1513 (M.D. Ala. 1988) ("[T]he court concludes that the true interests of USF&G and Algernon-Blair coincide as to the primary dispute in this lawsuit. Despite the fact that their interests may collide in a contingent secondary dispute, they are properly co-plaintiffs for purposes of this lawsuit.").

**B.     Longmire Has Been Fraudulently Joined**

15.     Moreover, there is no reasonable possibility that Plaintiffs will prevail on their various causes of action against Longmire, all predicated on alleged fraudulent acts or omissions, because Plaintiffs have failed to plead these claims with the specificity required by Rule 9(b) of the Federal Rules of Civil Procedure and the Alabama Rules of Civil Procedure, both of which call for dismissal if averments of fraud are not stated "with particularity." See Wakeland v. Brown & Williamson Tobacco Corp., 996 F. Supp. 1213, 1221 (S.D. Ala. 1998) (failure to

5

alleged particular facts supporting claims against in-state defendants violated Rule 9(b) and supported finding of fraudulent joinder); see also Legg v. Wyeth, 428 F.3d 1317 (11th Cir. 2005) (articulating fraudulent joinder standard).

16.    Here, Plaintiffs fail to plead the "time, place and purported contents of the false representations" allegedly made by Longmire. Estate of Scott v. Scott, 907 F. Supp. 1495, 1498 (M.D. Ala. 1995); see Ala. R. Civ. P. 9(b) (Committee Comments on 1973 Adoption, subdivision (b)) (stating that plaintiff's allegations must show the "time, place and the content or substance of the false representations, the fact misrepresented, and an identification of what has been obtained"). Similarly, Plaintiffs fail to allege with particularity how they relied on any fraudulent statements by Longmire.

17.    Finally, Plaintiffs have no reasonable possibility of prevailing on any of their claims against Longmire as they have failed to allege a causal link (an essential element of all of their claims) between Longmire's alleged fraudulent and unlawful behavior and their purported payments for Neurontin® prescribed for "off-label" uses.

## IV.    ALL PREREQUISITES FOR REMOVAL HAVE BEEN SATISFIED

18.    As set forth above, this Notice of Removal is timely filed.

19.    Because Longmire is improperly aligned and fraudulently joined, his consent to removal is unnecessary.

20.    Pursuant to 28 U.S.C. §§ 81(b)(1) and 1446(a), the United States District Court for the Middle District of Alabama, Northern Division is the proper court for removal of this action being the district and division of said Court for the County in which said action is pending.

22.    The prerequisites for removal under 28 U.S.C. §§ 1441 and 1446 have been met.

23.    If any question arises as to the propriety of the removal of this action, Pfizer

6

requests the opportunity to present a brief and oral argument in support of its position that this case is removable.

WHEREFORE, the removing Defendant, Pfizer Inc., desiring to remove this case to the United States District Court for the Middle District of Alabama, Northern Division, being the district and division of said Court for the County in which said action is pending pray that the filing of this Notice of Removal with this Court and the filing of the Notice of Filing of Notice of Removal with the Clerk of the Court of Montgomery County, Alabama shall effect the removal of said suit to this Court.

DATED this __ day of June 2006.

Respectfully submitted,

Brian A. Wahl (WAH003)
One of the Attorneys for Defendants

**OF COUNSEL:**

Fred M. Haston III (HAS012)
Andrew B. Johnson (JOH168)
BRADLEY ARANT ROSE & WHITE LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, Alabama 35203
Telephone: (205) 521-8000
Facsimile: (205) 521-8800

7

OF COUNSEL

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this date served the above and foregoing Notice of Removal on:

**COUNSEL FOR PLAINTIFFS**

Steven A. Martino
W. Lloyd Copeland
TAYLOR MARTINO KUYKENDALL
Post Office Box 894
Mobile, Alabama 36601-0894

Charles H. Dodson
Joseph D. Steadman
DODSON & STEADMAN, P.C.
Post Office Box 1908
Mobile, Alabama 36633-1908

Gregory C. Cook
BALCH & BINGHAM, LLP
1901 6th Avenue North
Suite 2600
Birmingham, Alabama 35203

**DAVID REYNOLDS LONGMIRE, M.D.**
13150 Highway 43
Russellville, Alabama 35653

by placing a copy of same in the United States Mail, first-class postage prepaid and addressed to his regular mailing address, on this __12th__ day of June 2006.

OF COUNSEL

8

# EXHIBIT "A"

**CT** CORPORATION
A WoltersKluwer Company

**Service of Process
Transmittal**
05/18/2006
Log Number 511169918

**TO:**     Allen P Waxman
            Pfizer Inc.
            M.S. 150/02/14, 235 East 42nd Street
            New York, NY, 10017-5755

**RE:**     **Process Served in Alabama**

**FOR:**    Pfizer Inc. (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Alabama Associated General Contractors, Inc., et al. Pltfs. vs. Pfizer, Inc., et al. Dfts. |
| **DOCUMENT(S) SERVED:** | Summons, Complaint |
| **COURT/AGENCY:** | Montgomery County Circuit Court, AL<br>Case # CV 06 1252 |
| **NATURE OF ACTION:** | Intellectual Property Litigation - Trade Secret Infringement - Off label marketing scheme |
| **ON WHOM PROCESS WAS SERVED:** | The Corporation Company, Montgomery, AL |
| **DATE AND HOUR OF SERVICE:** | By Certified Mail on 05/18/2006 postmarked on 05/04/2006 |
| **APPEARANCE OR ANSWER DUE:** | 30 days |
| **ATTORNEY(S) / SENDER(S):** | Steven A. Martino<br>PO Box 894<br>Mobile, AL, 36601 |
| **ACTION ITEMS:** | SOP Papers with Transmittal, via Fed Ex 2 Day, 790435236628 |
| **SIGNED:**<br>**ADDRESS:** | The Corporation Company<br>2000 Interstate Park Drive<br>Suite 204<br>Montgomery, AL, 36109 |
| **TELEPHONE:** | 334-387-7680 |



MAY 2 2 2006

PFIZER LITIGATION GROUP

Page 1 of 1 / CT

Information displayed on this transmittal is for CT Corporation's
record keeping purposes only and is provided to the recipient for
quick reference. This information does not constitute a legal opinion
as to the nature of action, the amount of damages, the answer date,
or any information contained in the documents themselves.
Recipient is responsible for interpreting said documents and for
taking appropriate action. Signatures on certified mail receipts
confirm receipt of the package only, not of its contents.



JH
UNITED STATES POSTAL SERVICE MONTGOMERY AL 361

18 MAY 2006 PM 11

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

• Sender: Please print your name, address, and ZIP+4 in this box •

Montgomery County Circuit
Clerk's Office
Post Office Box 1667
Montgomery, AL 36102-1667

667   B014

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

The Corporation Company
2000 Interstate Park Drive
Suite 204
Montgomery, AL 36109

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _____  ☐ Agent
                        ☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:          ☐ No

SEC DI
Cv-06-1252

3. Service Type
☑ Certified Mail    ☐ Express Mail
☐ Registered        ☑ Return Receipt for Merchandise
☐ Insured Mail      ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)    ☐ Yes

2. Article Number
(Transfer from service label)

7004 2890 0002 8273 1610

PS Form 3811, February 2004    Domestic Return Receipt    102595-02-M-1540

| State of Alabama<br>Unified Judicial System<br><br>Form ARCivP-93    Rev. 5/99 | COVER SHEET<br>CIRCUIT COURT - CIVIL CASE<br>(Not For Domestic Relations Cases) | Case Number CV-04-1252<br>C|V|<br>Date of Filing:  Month  Day  Year<br>Judge Code: JLH |
|---|---|---|

## GENERAL INFORMATION

**IN THE CIRCUIT COURT OF** Montgomery County _____, **ALABAMA**

*(Name of County)*

Alabama Associated General Contractors, Inc., et al. v. Pfizer, Inc., et al.

| **Plaintiff** | | **Defendant** | |
|---|---|---|---|

**First Plaintiff**  ☑ Business  ☐ Individual   **First Defendant**  ☑ Business  ☐ Individual
 ☐ Government  ☐ Other    ☐ Government  ☐ Other

---

**NATURE OF SUIT:**  Select primary cause of action, by checking box *(check only one)* that best characterizes your action:

**TORTS: PERSONAL INJURY**

- ☐ WDEA - Wrongful Death
- ☐ TONG - Negligence: General
- ☐ TOMV - Negligence: Motor Vehicle
- ☐ TOWA - Wantonness
- ☐ TOPL - Product Liability/AEMLD
- ☐ TOMM - Malpractice-Medical
- ☐ TOLM - Malpractice-Legal
- ☐ TOOM - Malpractice-Other
- ☑ TBFM - Fraud/Bad Faith/Misrepresentation
- ☐ TOXX - Other: _____

**TORTS: PROPERTY INJURY**

- ☐ TOPE - Personal Property
- ☐ TORE - Real Property

**OTHER CIVIL FILINGS**

- ☐ ABAN - Abandoned Automobile
- ☐ ACCT - Account & Nonmortgage
- ☐ APAA - Administrative Agency Appeal
- ☐ ADPA - Administrative Procedure Act
- ☐ ANPS - Adults in Need of Protective Services

**OTHER CIVIL FILINGS (cont'd)**

- ☐ MSXX - Birth/Death Certificate Modification/Bond Forfeiture Appeal/<br>Enforcement of Agency Subpoena/Petition to Preserve
- ☐ CVRT - Civil Rights
- ☐ COND - Condemnation/Eminent Domain/Right-of-Way
- ☐ CTMP - Contempt of Court
- ☐ CONT - Contract/Ejectment/Writ of Seizure
- ☐ TOCN - Conversion
- ☐ EQND - Equity Non-Damages Actions/Declaratory Judgment/Injunction<br>Election Contest/Quiet Title/Sale For Division
- ☐ CVUD - Eviction Appeal/Unlawful Detainer
- ☐ FORJ - Foreign Judgment
- ☐ FORF - Fruits of Crime Forfeiture
- ☐ MSHC - Habeas Corpus/Extraordinary Writ/Mandamus/Prohibition
- ☐ PFAB - Protection From Abuse
- ☐ FELA - Railroad/Seaman (FELA)
- ☐ RPRO - Real Property
- ☐ WTEG - Will/Trust/Estate/Guardianship/Conservatorship
- ☐ COMP - Workers' Compensation
- ☐ CVXX - Miscellaneous Circuit Civil Case

---

**ORIGIN** *(check one):*  F ☑ INITIAL FILING   A ☐ APPEAL FROM<br>DISTRICT COURT   O ☐ OTHER: _____

 R ☐ REMANDED   T ☐ TRANSFERRED FROM<br>OTHER CIRCUIT COURT

---

**HAS JURY TRIAL BEEN DEMANDED?**  ☑ YES  ☐ NO   Note: Checking "Yes" does not constitute a demand for a jury trial. (See Rules 38 and 39, Ala.R.Civ.P, for procedure)

---

**RELIEF REQUESTED:**  ☑ MONETARY AWARD REQUESTED   ☐ NO MONETARY AWARD REQUESTED

**ATTORNEY CODE:** MAR057   Date 3/4/06   _____<br>Signature of Attorney/Party filing this form

---

**MEDIATION REQUESTED:**  ☐ YES  ☑ NO  ☐ UNDECIDED

| State of Alabama | SUMMONS - CIVIL | Case Number |
|---|---|---|
| Unified Judicial System | | CV-06- 1252 |

## IN THE CIRCUIT COURT OF MONTGOMERY COUNTY, ALABAMA

ALABAMA ASSOCIATED GENERAL           PFIZER, INC., et al.,
CONTRACTORS, INC., et al.

    Plaintiffs,                              Defendants

NOTICE TO REGISTERED AGENT OF PFIZER, INC.:
    The Corporation Company
    2000 Interstate Park Drive
    Suite 204                              D1
    Montgomery, AL 36109

    The Complaint which is attached to this summons is important and you must take immediate action to protect your rights. You or your attorney are required to mail or hand deliver a copy of a written Answer, either admitting or denying each allegation in the Complaint to STEVEN A. MARTINO, Attorney for Plaintiffs, whose address is Post Office Box 894, Mobile, Alabama 36601. THIS ANSWER MUST BE MAILED OR DELIVERED WITHIN THIRTY (30) DAYS AFTER THIS SUMMONS AND COMPLAINT WERE DELIVERED TO YOU OR A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT. YOU MUST ALSO FILE THE ORIGINAL OF YOUR ANSWER WITH THE CLERK OF THIS COURT.

TO ANY SHERIFF OR ANY PERSON AUTHORIZED by either Rule 4.1(b)(2) or 4.2(b)(2) or 4.4(b)(2) of the Alabama Rules of Civil Procedure: You are hereby commanded to serve this summons and a copy of the complaint in this action upon Defendant.

__X__ This service by certified mail of this summons is initiated upon written request of the Plaintiff pursuant to Rule 4.1© of the Alabama Rules of Civil Procedure.

__05/16__ ,2006     _Melissa Pittman_     By: _Kn_
Date                  Clerk/Register

RETURN ON ...

__ Certified

__ I certify
Complaint
County, Al

**U.S. Postal Service**
**CERTIFIED MAIL RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)
For delivery information visit our website at www.usps.com

**OFFICIAL USE**

| Postage | $ |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ |

Sent The Corporation Company
Street 2000 Interstate Park Drive
or P Suite 204
City Montgomery, AL 36109

PS

office on (Date)
ereto).

opy of the Summons and
in

Postmark
Here

FILED IN CIRCUIT COURT OF MONTGOMERY COUNTY
2006 MAY -5 PM 2:45

| State of Alabama | SUMMONS - CIVIL | Case Number |
|---|---|---|
| Unified Judicial System | | CV-06- 1252 |

## IN THE CIRCUIT COURT OF MONTGOMERY COUNTY, ALABAMA

ALABAMA ASSOCIATED GENERAL          PFIZER, INC., et al.,
CONTRACTORS, INC., et al.

    Plaintiffs,                                Defendants

NOTICE TO: David Reynolds Longmire, M.D.
          13150 Highway 43
          Russellville, AL 35653                  D82

    The Complaint which is attached to this summons is important and you must take immediate action to protect your rights.  You or your attorney are required to mail or hand deliver a copy of a written Answer, either admitting or denying each allegation in the Complaint to STEVEN A. MARTINO, Attorney for Plaintiffs, whose address is Post Office Box 894, Mobile, Alabama 36601.  THIS ANSWER MUST BE MAILED OR DELIVERED WITHIN THIRTY (30) DAYS AFTER THIS SUMMONS AND COMPLAINT WERE DELIVERED TO YOU OR A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT.  YOU MUST ALSO FILE THE ORIGINAL OF YOUR ANSWER WITH THE CLERK OF THIS COURT.

  X  TO ANY SHERIFF OR ANY PERSON AUTHORIZED by either Rule 4.1(b)(2) or 4.2(b)(2) or 4.4(b)(2) of the Alabama Rules of Civil Procedure:  You are hereby commanded to serve this summons and a copy of the complaint in this action upon Defendant.

  ___  This service by certified mail of this summons is initiated upon written request of the Plaintiff pursuant to Rule 4.1© of the Alabama Rules of Civil Procedure.

___05/16/06___,2006    _Melissa Pittman_  By: _kk_
Date                 Clerk/Register

---

RETURN ON SERVICE:

___  Certified Mail return receipt received in this office on (Date) _____.  (Return receipt attached hereto).

___  I certify that I personally delivered a copy of the Summons and Complaint to _____ in _____ County, Alabama, on (Date) _____.

_____, 2006    _____
Date                       Server Signature

Address of Server_____    _____
_____    Type of Process Server

2006 MAY 15  PM 2:44  CIRCUIT COURT OF MONTGOMERY COUNTY FILED

## IN THE CIRCUIT COURT OF MONTGOMERY COUNTY, ALABAMA

| | |
|---|---|
| **ALABAMA ASSOCIATED GENERAL CONTRACTORS, INC.; AUTOMOTIVE AFTERMARKET FUND; WORKERSFIRST COMPFUND; THE ALABAMA SELF-INSURED WORKER'S COMPENSATION FUND; THE HEALTHCARE WORKERS COMPENSATION SELF-INSURANCE FUND; THE ALABAMA WORKERS' COMPENSATION SELF-INSURANCE FUND; ALABAMA TRUCKING ASSOCIATION WORKER'S COMPENSATION SELF-INSURANCE FUND; and ASSOCIATION OF COUNTY COMMISSIONS SELF-INSURANCE FUND,** | * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * |
| **Plaintiffs,** | * <br> * |
| **vs.** | * Civil Action No. _Cv-06-1252_ <br> * |
| **PFIZER, INC., successor in interest to WARNER-LAMBERT COMPANY; DAVID REYNOLDS LONGMIRE; jointly and individually,** | * <br> * <br> * <br> * |
| **Defendants.** | * |

2006 MAY -5 PM 2:43

CIRCUIT COURT OF MONTGOMERY COUNTY

FILED

### COMPLAINT

Plaintiffs, the Alabama Associated General Contractors, Inc. the Automotive Aftermarket Fund, the WorkersFirst Compfund, the Alabama Self-Insured Worker's Compensation Fund, the Healthcare Workers' Compensation Self-Insurance Fund, and the Alabama Workers' Compensation Self-Insurance Fund, Alabama Trucking Association Worker's Compensation Self-Insurance Fund, and Association of County Commissions Self-Insurance Fund, allege as follows against Defendants Pfizer, Inc., successor in

interest to Warner-Lambert Company ("Pfizer")[1], and David Reynolds Longmire, jointly and individually:

## INTRODUCTION

1.    This action is brought as a result of Pfizer's unlawful marketing scheme designed to push and promote "off-label" uses of the prescription drug Neurontin. "Off-label" is the term describing uses for a drug that are not approved by the U.S. Food and Drug Administration ("FDA"). The scientific name for Neurontin is gabapentin.

2.    Pfizer's scheme involves a deceitful marketing campaign. Pfizer, like other drug companies, spends millions of dollars each year trying to persuade doctors to prescribe their particular drugs. There are strict FDA regulations about what form that promotion can take, however. These requirements and rules are meant to ensure that drug companies give physicians and medical personnel trustworthy information, so that medications are prescribed appropriately.

3.    In 1993, Pfizer received FDA approval to market and sell Neurontin for the treatment of epilepsy in certain doses. Starting as early as 1995, however, Pfizer embarked on a course of conduct the purpose of which was to increase Neurontin sales for diseases and ailments with respect to which Neurontin had not received FDA approval, *i.e.,* off-label. Pfizer's sales department recognized a significant profit potential in the off-label promotion of Neurontin for other purposes and at higher dosages. Consequently, Pfizer decided to completely avoid the normal regulatory process of the FDA pertaining to

---

[1] As used herein, unless otherwise stated the term "Pfizer" collectively means Pfizer, Inc.; Warner-Lambert Company; and Parke-Davis, a division of Warner-Lambert Company.

2

the marketing of a new use of a drug and to proceed in an illegal fashion. The decision was also made to actively conceal the illegal means which would be used to market the drug.

4.     Pfizer's scheme was implemented so Pfizer could tap into the enormous market for off-label uses in the United States. Ultimately, Pfizer's actions proved successful as annual profits from Neurontin sales between 1995 to 2003 rose from $97.5 million to approximately $2.7 billion, due mostly to off-label uses. Approximately 90% of all Neurontin prescriptions were, and are currently, written for off-label purposes.

5.     Pfizer's scheme, described in more detail below, ultimately duped physicians, consumers, and third-party payors into believing that prescribing and taking Neurontin for the off-label uses that Pfizer promoted were appropriate even though Pfizer knew FDA approval had not been granted and, moreover, knew there was no legitimate scientific evidence suggesting Neurontin was safe and effective when so used.

6.     The United States Attorney for the District of Massachusetts ultimately brought criminal charges against Pfizer for this conduct. On May 13, 2004, Pfizer agreed to plead guilty to these federal criminal charges.

## PARTIES AND VENUE

7.     Plaintiff, Alabama Associated General Contractors, Inc., is a self-insured member of a non-incorporated pooling agreement among employers instituted pursuant to Ala. Code 1975 § 25-5-9 in which employers pool their worker's compensation liabilities. Plaintiff pays for medical costs incurred by its members, including the costs of prescription medications. Plaintiff's principal place of business is in Irondale, Alabama. Plaintiff has paid substantial monies for Neurontin prescribed for off-label uses.

8.     Plaintiff, the Automotive Aftermarket Fund, is a self-insured member of a non-

3

incorporated pooling agreement among employers instituted pursuant to Ala. Code 1975 § 25-5-9 in which employers pool their worker's compensation liabilities. Plaintiff pays for medical costs incurred by its members, including the costs of prescription medications. Plaintiff's principal place of business is in Montgomery, Alabama. Plaintiff has paid substantial monies for Neurontin prescribed for off-label uses.

9.     Plaintiff, the WorkersFirst Compfund, is a self-insured member of a non-incorporated pooling agreement among employers instituted pursuant to Ala. Code 1975 § 25-5-9 in which employers pool their worker's compensation liabilities. Plaintiff pays for medical costs incurred by its members, including the costs of prescription medications. Plaintiff's principal place of business is in Birmingham, Alabama. Alabama. Plaintiff has paid substantial monies for Neurontin prescribed for off-label uses.

10.     Plaintiff, the Alabama Self-Insured Worker's Compensation Fund, is a self-insured member of a non-incorporated pooling agreement among employers instituted pursuant to Ala. Code 1975 § 25-5-9 in which employers pool their worker's compensation liabilities. Plaintiff pays for medical costs incurred by its members, including the costs of prescription medications. Plaintiff's principal place of business is in Birmingham, Alabama. Alabama. Plaintiff has paid substantial monies for Neurontin prescribed for off-label uses.

11.     Plaintiff, the Healthcare Workers' Compensation Self-Insurance Fund, is a self-insured member of a non-incorporated pooling agreement among employers instituted pursuant to Ala. Code 1975 § 25-5-9 in which employers pool their worker's compensation liabilities. Plaintiff pays for medical costs incurred by its members, including the costs of prescription medications. Plaintiff's principal place of business is in Montgomery, Alabama. Alabama. Plaintiff has paid substantial monies for Neurontin prescribed for off-label uses.

4

12.     Plaintiff, the Alabama Workers' Compensation Self-Insurance Fund, is a self-insured member of a non-incorporated pooling agreement among employers instituted pursuant to Ala. Code 1975 § 25-5-9 in which employers pool their worker's compensation liabilities. Plaintiff pays for medical costs incurred by its members, including the costs of prescription medications. Plaintiff's principal place of business is in Montgomery, Alabama. Alabama. Plaintiff has paid substantial monies for Neurontin prescribed for off-label uses.

13.     Plaintiff, the Alabama Trucking Association Worker's Compensation Self-Insurance Fund, is a self-insured member of a non-incorporated pooling agreement among employers instituted pursuant to Ala. Code 1975 § 25-5-9 in which employers pool their worker's compensation liabilities. Plaintiff pays for medical costs incurred by its members, including the costs of prescription medications. Plaintiff's principal place of business is in Montgomery, Alabama. Plaintiff has paid substantial monies for Neurontin prescribed for off-label uses.

14.     Plaintiff, the Association of County Commissions Self-Insurance Fund, is a self-insured member of a non-incorporated pooling agreement among employers instituted pursuant to Ala. Code 1975 § 25-5-9 in which employers pool their worker's compensation liabilities. Plaintiff pays for medical costs incurred by its members, including the costs of prescription medications. Plaintiff's principal place of business is in Montgomery, Alabama. Plaintiff has paid substantial monies for Neurontin prescribed for off-label uses.

15.     Defendant Pfizer, Inc. is a Delaware corporation maintaining its principal place of business in the State of New York. In June of 2000, Pfizer, Inc. merged with Warner-Lambert Company and created the present-day company. Prior to that date, Warner-Lambert Company manufactured, marketed and sold the drug Neurontin through

5

its Parke-Davis division. Since that date, Pfizer, Inc., has manufactured, marketed and sold Neurontin. Pfizer, Inc., is liable for Warner-Lambert Company's tortious conduct in the marketing and sale of Neurontin prior to June 2000, pursuant to principles of corporate-successor liability applicable to mergers; because Pfizer, Inc., expressly agreed to assume the obligations of Warner-Lambert Company; and because Pfizer, Inc., is a mere continuation of Warner-Lambert Company.

16.    Defendant David Reynolds Longmire ("Longmire") is an individual and a resident citizen of the State of Alabama. Longmire is a physician who participated in Pfizer's unlawful marketing scheme as hereinafter set out.

17.    Venue is proper in Montgomery County pursuant to Ala. Code 1975 § 6-3-7(a) and pursuant to Rule 82(c) of the *Alabama Rules of Civil Procedure*, because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred there; and because it is the county in which one or more of Plaintiffs maintained their principal office at the time of the accrual of the causes of action set out herein, and Pfizer does business by agent in said county.

18.    Plaintiffs bring this action based solely upon the common law and statutory law of the State of Alabama. Plaintiffs' claims herein are not based upon any federal constitutional provision, federal statute, federal law, or federal regulation, and Plaintiffs do not seek relief in this Complaint under any federal constitutional provision, statute, law, or regulation. Plaintiffs' expressly and irrevocably waive and disavow any claim and any relief arising under any federal constitutional provision, statute, law, or regulation, whether the same is pled in this Complaint or not. If it is determined that any one or more of Plaintiffs' claims arise under any federal constitutional provision, statute, law, or regulation, then

6

Plaintiffs simply have no cause of action and no remedy with respect to such claim or claims, because Plaintiffs have permanently and irrevocably waived any federal claims and remedies with respect to the matters set out in this Complaint. Plaintiffs have elected to bring their claims based solely upon Alabama state law.

### FACTUAL ALLEGATIONS

**A.    FDA Regulations**

19.    FDA regulations require any pharmaceutical company to seek and obtain FDA approval before any new drug may be marketed. Once approval is granted, a drug may only be promoted for the approved use at the approved dosage.

20.    Physicians may still prescribe drugs for unapproved uses. These uses are deemed "off-label" because they have not been approved by the FDA. A pharmaceutical company is permitted to disseminate certain information about off-label uses, but such dissemination must adhere to strict requirements. For instance, the manufacturer must submit an application to the FDA seeking approval of the drug for off-label use; the manufacturer must provide its marketing materials to the FDA prior to dissemination; the materials must be in unabridged form; and the manufacturer must include disclosures that the materials pertain to an unapproved use of the drug, and, if the FDA deems it appropriate, "additional objective and scientifically sound information . . . necessary to provide objectivity and balance." Food and Drug Administration Act of 1997, 21 U.S.C. § 360aaa, *et seq*. The dissemination of information in violation of these provisions violates the Food, Drug and Cosmetic Act. 21 U.S.C. § 331(z).

21.    Although these requirements permit pharmaceutical companies to disseminate to physicians and other health care practitioners qualified forms of written

information concerning the safety, effectiveness, or benefit of a use not described in the approved labeling of a drug, 21 U.S.C. § 360aaa(a), manufacturers are permitted to provide only authorized information in the form of unabridged peer-reviewed articles or qualified reference publications. *Id.* § 360aaa-1. This law also requires pharmaceutical companies to furnish federal regulators with advance copies of the information they disseminate. 21 U.S.C. §360aaa. Any deviation from these requirements violates FDA regulations.

**B.    Neurontin And The Off-Label Marketing Scheme**

22.    In December 1993, the FDA approved Neurontin as "adjunctive therapy" for the treatment of certain types of seizures in adult patients suffering from epilepsy. "Adjunctive therapy" means that the drug could not be prescribed by itself for the treatment of epilepsy, but as an add-on drug in the event that a primary anti-epilepsy drug was not successful. The FDA approved labeling stated that Neurontin is only effective at dosages ranging from 900 to 1800 mg/day.[2]

23.    Pfizer's original patent on Neurontin was set to expire in December 1998. This meant that Pfizer had exclusive rights to the drug for a mere 5 years. After the expiration of the Neurontin patent Pfizer would be forced to share the market for Neurontin with generic drug manufacturers. This would substantially reduce Pfizer's profits and its ability to keep Neurontin's retail price high.

24.    At the time Pfizer filed its New Drug Application ("NDA") with the FDA, Pfizer intended Neurontin to be used for other indications besides epilepsy adjunctive therapy.

---

[2] In May of 2002, the FDA also approved Neurontin for management of postherpetic neuralgia, pain resulting from nerve damage caused by shingles.

In the early to mid 1990's, Pfizer filed patent applications for Neurontin claiming it to be effective in the treatment of depression, neurogenerative disease, mania, bipolar disease and for anxiety and panic.

25.    Pfizer never sought FDA approval, however, for the use of Neurontin to treat the conditions described in the patent applications.

26.    Pfizer's sole purpose was profits.  The market for the off-label uses of Neurontin such as pain management, psychiatric disorders, anxiety and depression, were much larger than the market for epilepsy alone.

27.    Early on, Pfizer intended to file supplemental NDAs in order to expand Neurontin's approved indications, including applications for monotherapy[3] and for various psychiatric and neurological indications. However, by 1995 Pfizer came to the conclusion it would be uneconomical to assume the expense necessary to conduct clinical trials necessary to prove that Neurontin was safe and effective for these uses. Assuming Neurontin could be proved to be safe and effective, the 1998 expiration of the Neurontin patent meant that generic manufacturers of Neurontin would reap much of the reward that comes with proving Neurontin could be safely used for other indications.

28.    After performing extensive economic analysis, senior officials for Pfizer determined that it was not sufficiently profitable for Pfizer to obtain FDA approval for Neurontin's alternative uses. Instead, Pfizer's officials developed a strategy that would allow Pfizer to avoid the costs of proving that Neurontin was safe and effective for these other uses, while allowing Pfizer to compete in the lucrative off-label markets. As one

---

[3] "Monotherapy" means that the drug can be prescribed by itself for the treatment of epilepsy.

aspect of the scheme, Pfizer decided to employ a "publication strategy" that would allow it to promote Neurontin by the massive distribution of publications supposedly written by independent researchers that purportedly described the scientific evaluation of Neurontin. A clear advantage of this strategy, from Pfizer's perspective, was that it could be employed immediately - there would be no need to wait for the results of scientifically conducted clinical trials to determine if Neurontin was actually effective in the treatment of these conditions.

29.    As set forth above, federal regulations did not permit Pfizer to promote unapproved uses of Neurontin. Pfizer was allowed, however, to distribute publications created by independent "third parties" that described results of off-label uses of Neurontin as long as these materials were given in response to unsolicited requests from physicians. Pfizer exploited this narrow exception by creating events and programs that would allow their employees and independent contractors to promote off-label uses under circumstances that would allow Pfizer the chance to deny, wrongfully, that they had actually promoted and solicited off-label usage.

30.    Marketing executives at Parke-Davis headquarters in Morris Plains, New Jersey and in its five regional customer business units ("CBUs") selected a marketing strategy which would deliberately lead to increased off-label usage of Neurontin even though Pfizer knew that they could not promote Neurontin lawfully for non-approved uses. These executives knew that Pfizer was not supposed to create or design the contents of the communications that would be distributed pursuant to the "publication strategy" or do anything to generate the practicing physicians' interest in receiving such communications. As demonstrated below, Pfizer ignored these legal requirements and, instead, put into

effect a pervasive pattern of illegal conduct, lasting from at least 1994 through 1998, and, on information and belief, through May of 2004.

31.    Significant ingenuity and resourcefulness was necessary in order to execute this unlawful scheme without detection. Faced with the fact that their "publication strategy" required publications from independent physicians when no such publications existed, Pfizer hired non-physician technical writers to create articles for medical journals and then paid actual specialists to be the articles' "authors." Faced with the fact that their normal marketing force could not deliver the off-label message, Pfizer trained "medical liaisons," technical employees who were supposed to provide balanced scientific information to doctors, to promote off-label uses of Neurontin. And, faced with the fact that in order for a publication strategy to actually increase usage of a drug, Pfizer had to have a large group of doctors interested in experimenting on patients, and an even larger group of doctors who were interested in receiving information about those experiments, Pfizer generated both groups by liberally distributing payments to both groups of physicians through "consultants" meetings, speakers bureaus, medical education seminars, grants, "studies," advisory boards and teleconferences.

32.    Pfizer carried out this scheme through the following, among other means:

- illegal kickbacks to physicians who prescribed large amounts of Neurontin for off-label purposes to patients;

- the formation of a nationwide network of employees falsely referred to as "medical liaisons" whose actual assigned duties consisted entirely of conventional direct sales activities and which did not include any legitimate scientific activity;

- the illegal direct solicitation of physicians to prescribe Neurontin for off-label uses;

- the making of false statements to physicians and pharmacists concerning the efficacy and safety of Neurontin for off-label uses;

- the making of false statements to physicians that there was legitimate scientific evidence supporting the efficacy and safety of Neurontin for off-label uses;

- the payment or offering of gratuities to Pfizer's employees in order to procure their silence; and

- the active training of Pfizer's employees in methods of avoiding detection of their activities by the FDA.

33.    Pursuant to federal regulations, Pfizer's usual sales force was not permitted to promote off-label uses of Neurontin to their physician customers. The FDA, however, permitted drug company representatives to provide balanced, truthful information regarding off-label usage if (1) specifically requested by a physician and (2) if there was no attempt to solicit such information by the drug company.

34.    Beginning in 1995, Pfizer hired additional "medical liaisons" and trained them to aggressively solicit requests for off-label information from physicians. Once this door was open, Pfizer trained these medical liaisons to engage in full-scale aggressive promotion of Neurontin's off-label uses, including repetitive distribution of non-scientific, anecdotal information designed to convince physicians that off-label usage of Neurontin was safe and effective. In effect, Pfizer used the medical liaisons as a surrogate sales force that had liberty to solicit physicians regarding off-label uses. Indeed, medical liaisons were selected and promoted based on their ability to sell.

35.    Pfizer knew their use of these medical liaisons was unlawful, but continued the practice. In fact, the whistleblower in a federal *qui tam* action, Dr. David Franklin, was

12

told by Pfizer that the use of medical liaisons was merely a "disguised" way of getting around the FDA rules.

36.    For example, on April 16, 1996, at a training session for medical liaisons, Pfizer's in-house lawyers stopped the video taping of a medical liaison training session to advise the liaisons that notwithstanding formal policies to the contrary, liaisons could "cold call" on physicians so long as they had executed request forms, *i.e.*, forms that supposedly verified that the physician had initiated the meeting, at the end of the call. The liaisons were informed that the request forms could be filled out by Pfizer's sales representatives instead of the doctors. Company lawyers also informed the liaisons in training that there was no need to present balanced information to the customers and those liaisons should always remember that sales were necessary in order to keep the company profitable. The liaisons were also informed by the lawyers, off camera, that there really was no definition of "solicitation" and that there were methods to induce the physicians to inquire about off-label uses. In effect, once the medical liaison got a meeting with a doctor, there were ways to get the information about off-label uses to the doctor even if the physician had not actually requested off-label information. The lawyers also warned the liaisons that under no circumstances should any information about off-label uses be put in writing.

37.    Medical liaisons were instructed in the clearest possible terms that they were to market and sell Neurontin based on its off-label uses. For example, at a teleconference on May 24, 1996, John Ford, a senior marketing executive for Pfizer directly informed the medical liaisons that in order to market Neurontin effectively, Neurontin had to be marketed for monotherapy, pain, bipolar disorder, and other psychiatric uses, all of which were off-label. Ford conceded that such marketing had to be primarily performed by the medical

13