# EXHIBIT E

Case 1:04-cv-10981-PBS    Document 731-6    Filed 04/13/2007    Page 1 of 4

```
            UNITED STATES DISTRICT COURT
             DISTRICT OF MASSACHUSETTS



HARDEN MANUFACTURING          )
CORPORATION,                  )
              Plaintiff,      )
                              )
                              ) CA No. 04-10981-PBS
vs.                           )
                              )
                              )
PFIZER, INC., et al,          )
              Defendants.     )


BEFORE:  THE HONORABLE LEO T. SOROKIN, M.J.



                   STATUS CONFERENCE




       John Joseph Moakley United States Courthouse
                   Courtroom No. 14
                   One Courthouse Way
                    Boston, MA 02210
                 Thursday, June 15, 2006
                       3:00 P.M.




                 Cheryl Dahlstrom, RMR
                 Official Court Reporter
       John Joseph Moakley United States Courthouse
             One Courthouse Way, Room 3209
                    Boston, MA 02210
         Mechanical Steno - Transcript by Computer
```

8cee6961-0f43-4a06-80cd-6ec19324b3ff

Page 62

1  case where we cross-noticed depositions, all of which didn't go
2  forward, but we cross-noticed depositions there to avoid
3  duplicative deposition.
4      THE COURT: All right.
5      MR. ROUHANDEH: Your Honor, if I can, just very
6  briefly?
7      THE COURT: Yes.
8      MR. ROUHANDEH: On the first point, we're not making
9  more work for ourselves. I think, surely, plaintiffs' counsel
10 must know, in producing these documents, if we have to get
11 everything relating to Neurontin, we have to have temporary
12 attorneys review that; lawyers have to review it all for
13 privilege. The way discovery is done, it's not more work for
14 us. It's less work for us if we can target the documents we
15 want out of any database.
16     Then on the earnings issue, I had never said that they
17 couldn't take a deposition. Presumably, they'll ask every one
18 of these sales representatives how did you get paid. I think
19 that's the way that should be worked out.
20     In terms of this criminal issue and bankruptcy and
21 financial issues, we know -- there was one plaintiff who was
22 convicted, or at least accused of, contributing to the
23 delinquency of a minor. If we have some arbitrary cutoff and
24 we think that was a triggering event in that person's life --
25     THE COURT: That person was the victim of that offense

Page 63

1  or was the perpetrator?
2      MR. ROUHANDEH: The perpetrator of that offense. We
3  also have another one where there was --
4      THE COURT: Do you have an expert who says that the
5  perpetrator of that offense typically found that a triggering
6  event for psychiatric illness?
7      MR. ROUHANDEH: Sure, and the prosecution relating to
8  that, absolutely. I won't go through the details of that
9  person's circumstance, but I don't think anyone could
10 reasonably disagree that there's a long history of suicidal
11 thoughts and other things all tied to past criminal issues.
12 There's also a bankruptcy just prior to a suicide. So,
13 therefore, financial issues are going to be relevant in many of
14 these cases.
15     We're not making this up and saying, hypothetically,
16 it could be relevant. We've gotten some discovery from them
17 for some of this, and we've produced several million pages of
18 documents to them which they don't --
19     THE COURT: I understand generally what's going on in
20 people's lives that's problematic like some of these you
21 referred to is relevant to or potentially relevant to the
22 question of causation, which is really what you're saying,
23 right?
24     MR. ROUHANDEH: Yes.
25     THE COURT: What gives me a little bit of concern on

Page 64

1  some of them is the breadth and scope of -- albeit discovery --
2  on some things which are more sensitive and, you know, that's
3  what I've been thinking about.
4      MR. ROUHANDEH: There, your Honor, we will make sure
5  that there's a protective order here that protects them. It's
6  very clear that they've put their medical issue and they've put
7  their psychiatric issue -- their psychiatric state of mind at
8  issue, and these are going to be extraordinarily sensitive
9  issues. We are going to go into a number of things that are
10 very sensitive to these individuals.
11     I guess in terms of just a final thought on a couple
12 of issues -- one remaining issue, that is, in terms of what
13 happened in those other cases, we're not saying it's completely
14 irrelevant what happened in the other cases. We're just saying
15 we don't agree with their version necessarily. We don't
16 necessarily agree that it automatically should apply here.
17 Thank you.
18     THE COURT: With respect to the depositions, the
19 motions for protective order for Tischer (phon), that's moot,
20 right, because you --
21     MR. FROMSON: That's correct. We've agreed on a date
22 and a location for that particular deposition, Judge.
23     THE COURT: So that one I don't have to rule on. Mei
24 Dong (phon), the question is where to do it, right?
25     MR. FROMSON: That raises an issue for future

Page 65

1  depositions as well.
2      THE COURT: Let me just ask you, as a practical
3  question, Mr. Rouhandeh, or both of you. Putting aside what
4  the rule says, it would seem that -- putting aside what the
5  rule might say and putting aside what the case were -- is it a
6  man or a woman?
7      MR. ROUHANDEH: Woman.
8      THE COURT: Miss Dong. Putting aside -- if Miss Dong
9  had had some unusual hardship, particular situation her life,
10 that would be different. If she did, it seems to me,
11 automatically, you all have to go there. That's the way it is.
12 You're the lawyers in the case. In terms of as a general
13 matter, why wouldn't it be a lot more practical and efficient
14 to schedule the depositions when there's one person from some
15 place in New York where you might be able to then schedule a
16 sequence and you do them sort of in a row. If you had six
17 people in Michigan to do, that might make sense for all of you
18 to troop out to Michigan. But why not do it, as a practical
19 matter, that way?
20     MR. ROUHANDEH: Your Honor, there are -- it may not be
21 six. There may be dozens of people in Michigan. Ann Arbor is
22 one of the research facilities for Pfizer. They've already
23 noticed depositions of a couple of people who are out there.
24 There are undoubtedly going to be more. We don't think --
25 first of all, we don't think that we're required to move that

Page 78

1  number, that those people ought to be deposed in Michigan where
2  they work and reside.
3      MR. FROMSON: Judge, I don't think defendants' counsel
4  is willing to bring the boxes of documents from Ann Arbor to
5  New York for us to review. But, nevertheless, those
6  individuals who go out to Ann Arbor to review case report forms
7  may or may not be but, generally, are more qualified to deal
8  with the scientific issues than might the attorney assigned and
9  who has prepared for the deposition of a witness. It's not
10 necessarily the same person going to review the boxes of
11 documents and the person who's preparing for the depo.
12     As far as being able to meet and confer with defense
13 counsel on a date, it simply has not worked out in the past.
14 The best way is to serve a Notice of Deposition with
15 appropriate notice of at least 30 days, and then there's even a
16 protocol in place which says, if you can't do it within 30
17 days, you can even have seven days to propose another date.
18     If that needs to be changed or amended appropriately,
19 I can understand that. If you want us to give 45 days' notice,
20 we can do that. But to say we have to get on the phone and say
21 is this good for you, it's not good for me, it's not good for
22 him, it's not good for her, when do we then get to file the
23 notice if no one is agreeing on the date? Everything starts
24 with the notice.
25     The defense counsel wants to stick to the letter of

Page 79

1  the law here. They want procedures to be followed. They want
2  demands to be served. Therefore, we file and serve the notice
3  within appropriate time frame. That's where it has to start
4  with.
5      THE COURT: Okay.
6      MR. ROUHANDEH: Your Honor, I really take offense with
7  this idea that we're now nitpicking and taking advantage of
8  every rule when, in fact, they're taking advantage of the CMO
9  thing. I don't think it's really within the spirit of the
10 litigation and the rules to say we've got to take the
11 deposition. We even asked them, are you really going to make
12 us move for a protective order on this issue? Yes. You have
13 to move for a protective order if you're not going to give a
14 date within seven working days of the day we picked. We gave
15 them alternatives dates for many depositions. They weren't
16 within seven days and they made us move for protective order.
17     Talking about nitpicking and looking at the rules, I
18 don't think, you know, they ought to be able to make that
19 allegation. What we're saying is there's a practical issue in
20 terms of whether witnesses should have to travel, that there's
21 a practical issue, that they've been there before and we'll
22 line them up at their convenience and --
23     THE COURT: I have a question, Mr. Fromson. How many
24 people right now do you know that you want to depose? I'm not
25 saying these are all the people you want to depose. Right now,

Page 80

1  that you know, roughly. Is it five? Fifty? A ballpark. I'm
2  not holding you to it. I just want to get an idea.
3      MR. FROMSON: I would approximate between 20 --
4  approximately 25. However -- and when they were here before
5  you on May 18th, they couldn't tell you whether any of the
6  witnesses were going to be produced. They couldn't disclose it
7  to you because they were relying upon the CMO and reserving
8  their rights to serve a protective order.
9      So they're not telling me -- they're not getting my
10 notice and calling me the next day. And I'm sure they're
11 making efforts to produce people, but I'm not getting the calls
12 close enough -- with enough time to really make an informed
13 decision.
14     If there's a problem with the notice, it has to move
15 faster because, I think, if they contacted me within a week of
16 being served with the notice, it gives everyone enough time to
17 try and resolve a deposition, but not to call me on the sixth
18 day before the deposition is going to take place or, rather,
19 the seventh day before the deposition is going to take place
20 because they say --
21     THE COURT: Are you aware of where the 25 people are?
22     MR. FROMSON: I can't tell you today. I don't right
23 now.
24     THE COURT: I'm not asking you to tell me at this
25 moment. Do you have that information available to you?

Page 81

1      MR. FROMSON: I would defer to Andrew Finkelstein.
2  But I'm sure, if pushed to it, we would do the adequate
3  research and come up with a very efficient list.
4      MR. FINKELSTEIN: If I may just put a little
5  perspective on it, your Honor. Part of our challenge here is,
6  we asked from day one, over two years ago, give us an
7  organizational chart. We don't want to waste our time doing
8  depositions. We will pinpoint who we want to do. We want to
9  start at the top of the food chain. If we think we need to
10 move down, we will. It doesn't exist. That's the response we
11 got. It was an out-and-out inaccuracy. I'll define it as that
12 because they've produced documents, and I see organizational
13 charts suddenly in the documents they've produced.
14     So the spirit of this litigation is not going where we
15 trust one another. That's the problem. We're happy to start
16 right at the top of the food chain, take only the depositions
17 we need to put in our case and we're done. I'm not looking to
18 do this for the rest of my career. I simply wanted to know who
19 --
20     What are we left with? We're left with trying to
21 figure out, go through millions of documents. This may be the
22 party we want to depose. We notice them. We don't receive a
23 phone call. We only get -- in front of your Honor, are they
24 going to produce them? We don't know. And then, all of a
25 sudden, right before the sixth day, we're not producing them.