# EXHIBIT 2

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

--------------------------------X

IN RE:   NEURONTIN MARKETING,

SALES PRACTICES, AND PRODUCTS

LIABILITY LITIGATION

--------------------------------X

THIS DOCUMENT RELATES TO:

ALL MARKETING AND SALES

PRACTICES ACTIONS

--------------------------------X


VOLUME III

PAGES 547-703

CONTINUED VIDEOTAPED DEPOSITION OF

MEREDITH B. ROSENTHAL, Ph.D.

New York, New York

March 6, 2007


Reported by:
Bonnie Pruszynski, RMR

Page 548

1
2
3
4          Continued videotaped deposition of
5     MEREDITH B. ROSENTHAL, Ph.D. held at Davis
6     Polk & Wardell, LLP, 450 Lexington Avenue,
7     New York, New York, before Bonnie
8     Pruszynski, a Notary Public of the State of
9     New York.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 549

1
2     A P P E A R A N C E S :
3     HAGENS BERMAN SOBOL & SHAPIRO, LLP
      Attorneys for Plaintiffs
4         One Main Street, Fourth Floor
          Cambridge, MA 02142
5     BY:    EDWARD NOTARGIACOMO, ESQ.
6     SHOOK, HARDY & BACON, LLP
      Attorneys for Defendants
7         2555 Grand Boulevard
          Kansas City, Missouri 64108-2613
8     BY:    JAMES P. MUEHLBERGER, ESQ. (via
          telephone)
9
      DAVIS POLK & WARDELL
10    Attorneys for Defendants
          450 Lexington Avenue
11        New York, New York 10017
      BY:    EDMUND POLUBINSKI III, ESQ.
12        PAUL MISHKIN, ESQ.
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 550

1
2
3                    I N D E X
4     WITNESD                    PAGE
5     Meredith B. Rosenthal, Ph.D.
6     Continued Examination
7     By Mr. Polubinki          551
8                E X H I B I T S
9     Rosenthal
10    Exhibit 18  Reply Declaration       551
11    Exhibit 19  Declaration of          569
          Michael C. Keeley
12    Exhibit 20  Declaration of Fiona    569
          Scott Morton
13    Exhibit 21  Declaration of Pradeep  569
          C. Chintagunta
14    Exhibit 22  Outline for Reply Brief 582
15    Exhibit 23  Draft, Reply Brief      588
16    Exhibit 24  Draft, Reply Brief      588
17    Exhibit 25  Draft, Reply Brief      588
18    Exhibit 26  Hartmen Reply Declaration 612
19    Exhibit 27  Letter, 2/26/07         616
20    Exhibit 28  Third Amended Class Action 641
          Complaint, Proposed
21    Exhibit 28A Third Amended Class Action 641
          Complaint
22    Exhibit 29  February 2003 Article   645
23    Exhibit 30  March 2001 Article      653
24    Exhibit 31  May 1995 Article        676
25

Page 551

1         Meredith Rosenthal, Ph.D.
2         (Rosenthal Exhibit 18 marked for
3     identification as of this date.)
4         THE VIDEOGRAPHER:  Good morning.  My
5     name is Daniel McClutchy of Veritext, New
6     Jersey.  The date today is March 6th, 2007,
7     and the time is approximately 11:25 a.m.
8         This deposition is being held in the
9     office of Davis, Polk and Wardell located at
10    450 Lexington Avenue, New York, New York.
11        The caption of this case is In Re
12    Neurontin Sales Practices and Products
13    Liability Litigation in the U.S. District
14    Court, District of the Massachusetts, docket
15    number 1629, master file 04/10981.
16        The name of the witness is Professor
17    Meredith Rosenthal.  This is day three.
18        At this time the attorneys will
19    identify themselves and the parties they
20    represent, after which our court reporter,
21    Bonnie Pruszynski, will swear in the witness
22    and we can proceed.
23        MR. NOTARGIACOMO:  Edward
24    Notargiacomo, Hagens, Berman, Sobol &
25    Shapiro for the plaintiffs.

Meredith Rosenthal, Ph.D.
1
2      MR. POLUBINSKI:  Ted Polubinski from
3    Davis, Polk and Wardwell for the defendants.
4      MR. MISHKIN:  Paul Mishkin, Davis,
5    Polk and Wardell for the defendants.
6      MR. POLUBINSKI:  I think we might
7    have lost most of that.
8      MR. MULDOON:  James P. Muhlberger,
9    Shook, Hardy and Bacon for the defendants.
10   MEREDITH ROSENTHAL, Ph.D.
11      called as a witness, having been first
12      duly sworn, was examined and testified
13      as follows:
14   EXAMINATION (Continued)
15   BY MR. POLUBINSKI:
16   Q    Good morning, Professor Rosenthal.
17   A    Good morning.
18   Q    Since we last met in October of 2006,
19   you have prepared a reply declaration in this case
20   in further support of plaintiff's motion for class
21   certification; is that correct?
22   A    That's correct.
23   Q    Let me hand you what we pre-marked as
24   Rosenthal Exhibit 18.  This is your reply
25   declaration; correct?

Meredith Rosenthal, Ph.D.
1
2    A    That's correct.
3    Q    When we talk about this, I will refer
4    to it as your reply declaration or sometimes maybe
5    just as your reply.  I may also occasionally slip
6    up and refer to it as rebuttal declaration or
7    rebuttal.
8       Can we agree, if I use those terms we
9    are talking about the same thing, and that that is
10   Exhibit 18?
11   A    Yes.
12   Q    Let's turn to page 22.  This is your
13   signature on page 22; correct?
14   A    That's correct.
15   Q    And the date underneath your
16   signature is February 21, 2007?
17   A    That's correct.
18   Q    And is that the date that you signed
19   it?
20   A    I believe so, yes.
21   Q    Let me also hand you what had been
22   marked as Exhibit 1 to your deposition.  This is
23   marked last October.
24      Exhibit 1 is your original
25   declaration in this matter from August of 2005; is

Meredith Rosenthal, Ph.D.
1
2    that correct?
3    A    That's correct.
4    Q    Okay.  And I take it that this is the
5    previous declaration that you referred to in the
6    first paragraph of your reply?
7    A    That's correct.  Is it -- not the
8    first footnote, but yes.
9    Q    The first paragraph.
10   A    I'm.
11   Q    I'm sorry if I misspoke.
12   A    That's okay, yes, sorry.
13   Q    Am I correct that, together with
14   Exhibit 1, your original declaration, Exhibit 18,
15   your reply, contains an accurate summary of your
16   opinions in this matter?
17   A    That's correct.
18   Q    Are there any opinions that you
19   intend to offer at this stage of the proceeding
20   that aren't contained in either Exhibit 18 or
21   Exhibit 1?
22   A    No.
23   Q    Since we spoke last at the end of
24   October of 2006, have you provided any testimony
25   under oath in any other matters?

Meredith Rosenthal, Ph.D.
1
2    A    I believe my CV was updated, so I --
3    could I take a look at it?
4    Q    Of course, please.
5    A    I have a terrible memory for these
6    things.
7       Since October?  I believe I may have
8    been deposed in another matter since.  I think it
9    must have been in the -- sorry, the Wellbutrin
10   matter.
11   Q    Approximately when would you have
12   been -- I will let you finish.
13   A    Sorry.  I believe that is the first
14   matter listed there.
15   Q    When you say, sorry to cut you off.
16   When you say listed there, you are referring now
17   to your CV, your updated CV which is attached as
18   attachment B to Exhibit 18; is that correct?
19   A    That's correct.  I believe that first
20   I'm not as familiar with the legal names of them,
21   but that first matter, which refers to IBEW NECA
22   Local 505 and Joanne C. Gady versus SmithKline
23   Beecham.  I believe that is -- that is the matter
24   on which I was deposed and I don't have the
25   precise date.  I could check it, but I believe it

Page 556

Meredith Rosenthal, Ph.D.

1    was subsequent to our meeting in October.
2
3        Q    Any other testimony under oath, other
4    than your deposition in the Wellbutrin matter?
5        A    No, I don't believe so.  I don't
6    think so.
7        Q    Okay.  Well, let's ask --
8        A    Oh, sorry.  I'm not sure, actually,
9    if I was, I believe -- excuse me, I believe I may
10   have testified in the In Re:  Pharmaceutical
11   Industry Average Wholesale Price Litigation.  I
12   believe that was actually December.
13       Q    That's the case we sometimes refer to
14   as the AWP litigation?
15       A    That's correct.  Yes.  I'm sorry
16   there is not a date there will, but I believe that
17   was December.
18       Q    Both of those cases, or your
19   testimony in both of those cases, I should say,
20   was as a retained expert witness; is that correct?
21       A    That's correct.
22       Q    Have you submitted any written
23   declarations or expert reports in any cases other
24   than your reply since October 2006?
25       A    Yes.  And again, I guess I would have

Page 557

Meredith Rosenthal, Ph.D.

1    to go through the list.
2
3            Let me just look back at that list.
4    I'm sorry.
5            So, in the Wellbutrin matter that we
6    discussed earlier, I have submitted a reply
7    declaration an an opposing expert rebuttal report.
8        Q    Any others?
9        A    In the WP matter, I submitted a
10   report that was the basis for my oral testimony.
11   I'm not sure what that's called.
12           And there is one more.
13       Q    Okay.
14       A    I just submitted a report in a matter
15   relating to a case against Eli Lilly.
16       Q    Is that case referenced on page two
17   of your CV?
18       A    It may not be, because it hadn't been
19   submitted at the time this was submitted.  It was
20   just last week, I believe, and that's it.  I don't
21   know what the name of that case is.  It's
22   regarding Zyprexa.
23       Q    Maybe working our way backwards
24   then --
25       A    Um-hum.

Page 558

Meredith Rosenthal, Ph.D.

1
2        Q    -- let me ask you about the Eli Lilly
3    litigation in which you just submitted your
4    report.
5        A    Yes.
6        Q    Can you tell me by whom you were
7    retained in the Eli Lilly litigation?
8        A    I was retained by plaintiffs for the
9    class of end payers.
10       Q    Can you tell me the nature of the
11   claims in that case as best you understand them?
12       A    As best I can summarize them, the
13   claims relate to lack of disclosure of risk
14   information, as well as fraudulent claims with
15   regard to the safety and efficacy of Zyprexa for
16   certain unapproved uses.
17       Q    Who are the plaintiffs counsel with
18   whom you are working in that case?
19       A    Hagens, Berman, Sobol & Shapiro.
20       Q    Do you know where the case is
21   pending?
22       A    It's also in the Massachusetts
23   Federal Court, it's my understanding.
24       Q    Can you tell me the basic subject
25   matter of the declaration or the report that you

Page 559

Meredith Rosenthal, Ph.D.

1
2    filed recently in that case?
3        A    The report was in support of class
4    certification, liability, and included estimates
5    of related damages.
6        Q    So, the report was both a class
7    certification and liability report?
8        A    It was end-to-end, yes.
9        Q    Is it your understanding that the
10   court in that case is currently considering a
11   class certification motion?
12       A    It is.  Although my understanding may
13   be somewhat flawed, but I understand that the
14   court asked for all of these issues to be dealt
15   with in a single report.
16       Q    Focusing just on class certification,
17   can you tell me what the conclusions of your
18   report were?
19       A    In my report, I conclude that there
20   is common evidence that can be used to examine and
21   demonstrate the effect of the allegations that I
22   described before, alleging misinformation and
23   fraudulent marketing, and that the class was
24   impacted through common mechanism, and I guess
25   that's sort of -- that's where the class

1          Meredith Rosenthal, Ph.D.
2    certification piece of it goes, yes.
3        Q    How about the liability piece?
4        A    And liability, I demonstrate through
5    an econometric model that the marketing by
6    defendants affected sales of Zyprexa, which
7    essentially supports plaintiffs' allegations.
8        Q    Can you describe for me, in general
9    terms, the nature of the model that you just
10   described in your last answer?
11       A    The model uses IMS data, aggregate
12   sales and marketing expenditures, and estimates
13   the incremental effect of defendants' marketing on
14   sales.
15       Q    I take it you have actually run the
16   model in that case?
17       A    Yes, I have.
18       Q    Okay.  Let's turn now to the
19   Wellbutrin matter.
20       A    Okay.
21       Q    With apologies, if you have discussed
22   this in your prior deposition.
23            Can you remind me if we did discuss
24   it or tell me if we did discuss it, by whom you
25   were retained in that case?

1          Meredith Rosenthal, Ph.D.
2        A    I was also retained by counsel for
3    the plaintiffs, similar class of plaintiffs, end
4    payers.  And I am again working with Hagens,
5    Berman, Sobol & Shapiro.
6        Q    Can you describe for me the nature of
7    that case?
8        A    That matter relates to foreclosure of
9    generic entry.
10       Q    Can you tell me, just generally
11   speaking, the subject matter of the opinions that
12   you have offered to date in that case, in what I
13   gather is probably an original declaration and in
14   the reply declaration that you just recently
15   submitted?
16       A    That's right.  So, again this was a
17   report -- perhaps, I didn't say -- it is a report
18   in support of class certification.  In that
19   report, I describe how generic entry affects the
20   class, and what they paid for this particular
21   drug, and demonstrate that common evidence can be
22   shown, can be used to estimate liability and
23   damages.
24       Q    What's your understanding or the
25   status of the class certification motion in that

1          Meredith Rosenthal, Ph.D.
2    case?
3        A    I believe it's pending.
4        Q    And then last question about the AWP
5    case.  Is your work in that case done or is it
6    ongoing?
7        A    It's ongoing.
8        Q    Do you anticipate that you will be
9    called again to testify in that case?
10       A    I believe I will, yes.  There's a, if
11   I can describe it in my own simplistic terms, it's
12   a case with many layers, and there are subclasses
13   that the judge has asked to be examined in
14   separate trials, and there are as well a first --
15   multiple set, actually.  Actually may be more than
16   two sets of defendants that will be examined in
17   sequence.  So, I believe the next set of issues is
18   due to come before the court at the end of April.
19       Q    And do you anticipate testifying at
20   that time?
21       A    I do, yes.
22       Q    And in the broadest terms, what do
23   you anticipate the subject matter of your
24   testimony in that case to be?
25       A    I have been told that I will be asked

1          Meredith Rosenthal, Ph.D.
2    to testify with regard to -- excuse me, a tutorial
3    that I prepared for the court two years ago, that
4    I believe is listed, that we discussed the last
5    time we met.
6            And in this case, there will be a
7    jury, that I will be presenting some of the
8    relevant facts from that tutorial about the
9    pharmaceutical market, how it works, how
10   reimbursement works, coverage, and other relevant
11   issues.
12       Q    Going back to the Eli Lilly matter,
13   is that a case in which you are being supported by
14   Greylock McKinnon Associates?
15       A    That's correct.
16       Q    Are there other experts that have
17   offered declarations in support of class
18   certification or in support of liability as well?
19       A    There are other clinical experts.
20       Q    Let me ask you about that.  How many
21   clinical experts?
22       A    You know, I don't think I could give
23   you the full number.  There are numerous clinical
24   experts that have offered reports, and some of the
25   reason that I am a little unclear on how many of

1          Meredith Rosenthal, Ph.D.
2    them are in my case is that there was a parallel
3    personal injury case that I had no involvement
4    with, but that resulted in the production of some
5    reports by clinical experts.
6          Q     But am I correct to understand that
7    at least some number of clinical experts submitted
8    reports in connection with the same motion that
9    you submitted your report in?
10         A     That's correct.
11         Q     Just to make sure it's clear, other
12   than the clinical experts in your report, there
13   weren't other reports that were submitted in
14   support of the motion for class certification
15   together with the submission that you all made?
16         A     I'm not privy to that.  In fact,
17   there may have been, but there are none that I
18   have seen that I have been made aware of.
19         Q     Okay.  As best you understand them,
20   to the extent that you can summarize them, what
21   are the conclusions that are contained in the
22   clinical expert reports that were submitted at the
23   same time your report was submitted in the Eli
24   Lilly matter?
25         A     My understanding of the general

1          Meredith Rosenthal, Ph.D.
2    subject matter of the clinical expert reports
3    relates to the true versus claimed clinical
4    effectiveness of the drug Zyprexa for certain
5    off-label uses, as well as supporting the notion
6    that defendants had access to information about
7    safety and effectiveness with regard to both
8    approved and unapproved uses that was not made
9    known to the public.
10         Q     To what extent, if at all, did your
11   report in the Eli Lilly matter rely on the
12   conclusions of any of the clinical experts that
13   you just described?
14         A     The word "rely" I understand has a
15   sort of specific legal meaning, but I do make
16   reference to one of these clinical -- actually,
17   probably several of these clinical reports in my
18   report.  And if that is what you mean by "rely,"
19   then that's the case.
20         Q     Maybe you could help me out by
21   putting a finer point on it.  When you say you
22   reference them, can you tell me a little bit more
23   about what that means?
24         A     Sure.  I reference them with regard
25   to providing substantive evidence, if you will,

1          Meredith Rosenthal, Ph.D.
2    regarding plaintiffs' allegations.  So, in
3    discussing the allegations and the impact of --
4    the behavior of defendants on the class, I make
5    reference, for example, to the clinical reports
6    asserting that these off-label uses were
7    clinically not supported by the evidence.  So,
8    they do not form the basis of any calculations I
9    make, but I refer to them in order to show that
10   what I have reviewed supports the allegations that
11   I have been asked to assume are correct, can be
12   proved.
13         Q     Let me ask you a hypothetical
14   question.
15              If the same experts had concluded --
16   and this may reflect my misunderstanding of the
17   case, but I will ask the hypothetical anyway.
18              Assume that the experts that you are
19   referring to and that you referenced in your
20   report had concluded something different from what
21   I assume they concluded; for example, that
22   Zyprexa, is that the drug we are talking about?
23         A     Yes, it is.
24         Q     So, for example, that Zyprexa
25   actually was safe and effective for each of the

1          Meredith Rosenthal, Ph.D.
2    off-label uses in that case.
3              Would your report in that case have
4    reached a different conclusion?
5         A     Well, I guess that is a hypothetical
6    that I am not sure how I would answer that, but if
7    there -- if those clinical reports suggested that
8    Zyprexa was safe and effective for those uses, I
9    would understand that those uses wouldn't be in
10   the scope of the allegations, since the
11   allegations are specifically with regard to uses
12   that have not been shown to be safe and effective.
13         Q     And, again, what impact, if any,
14   would that have had on our conclusions about
15   injury in that case or damages?
16         A     So, in this hypothetical would, if
17   those reports were credible, and I -- I think that
18   they would likely have led to further narrowing of
19   which use's impact of the allegations was measured
20   for.
21              So, for example, the allegations with
22   regard to off-label uses were quite specific with
23   regard to diagnoses, and if some of these were
24   further proven to have sufficient evidence for
25   safety and effectiveness, that may have resulted

1              Meredith Rosenthal, Ph.D.
2    in a different damages calculation, but I am not
3    sure that I understand the legal issues well
4    enough to say for sure that -- the nuances of what
5    fraud means in these instances.  I'm not sure if I
6    understand it completely.
7         Q    Okay.  But just setting aside the
8    legal implications, would you have reached the
9    same conclusion about injury or damages had the
10   experts, had you found them to be credible, had
11   they concluded that the drug was entirely safe and
12   effective for the off-label uses that -- all of
13   the off-label uses that are at issue in that case?
14        A    I think, again, to me it does come to
15   a legal issue.  Maybe I am wrong about that, but
16   my understanding is that, at least for me, it's
17   not entirely clear what level of safety and
18   effectiveness evidence needs to be shown for
19   plaintiffs to have proved their allegations to be
20   true, just the allegations, not the impact.
21             Do you understand what I am saying?
22   Since the beginning of this case, I have been -- I
23   think there have been some discussion about those
24   issues, what's -- what would be fraudulent.
25        Q    I certainly don't want to invite you

1              Meredith Rosenthal, Ph.D.
2    to offer a legal conclusion one way or other.
3         A    I think I was focused more on just
4    what the economic implications were.
5         Q    I will tell you what.  I think we can
6    come back to it if we need to.
7              I assume it's still the case that you
8    have never taken Neurontin yourself, is that true?
9         A    That is still the case.
10        Q    All right.  I'm going to mark three
11   documents as exhibits.
12             (Rosenthal Exhibits 19, 20 and 21
13             marked for identification as of this date.)
14        Q    All right.  So, Professor Rosenthal,
15   we have handed you three documents that we have
16   marked as Exhibits 19, 20 and 21.
17             Do you recognize these exhibits?
18        A    I do.
19        Q    Okay.  Maybe, just for the record, we
20   can quickly say what they are.
21             Exhibit 19, which I handed you, is, I
22   believe, the Declaration of Michael C. Keeley
23   Ph.D. in opposition to plaintiff's motion for
24   class certification.
25             Exhibit 20 is the Declaration of

1              Meredith Rosenthal, Ph.D.
2    Professor Fiona Scott Morton, and 21 is
3    declaration of Pradeep C. Chintagunta.
4              So, you have seen all three of these
5    declarations before I take it?
6         A    Yes, I have.
7         Q    All right.  In the first sentence of
8    your reply, you write -- your report, Exhibit 18,
9    you write, rather, the following report details my
10   response to issues raised by defendant's expert,
11   Dr. Scott Morton, Dr. Keeley and Dr. Chintagunta.
12             Did I read that correctly.
13        A    Yes, you did.
14        Q    Then footnote one of your reply cites
15   declarations that have been submitted by each of
16   these three experts; is that right?
17        A    That's correct.
18        Q    The declarations that are listed in
19   footnote one are Exhibits 19 through 21; is that
20   correct?
21        A    I believe that's correct.
22        Q    So, these are the documents to which
23   you are responding in your reply?
24        A    Yes, that's correct.
25        Q    And they are the documents that raise

1              Meredith Rosenthal, Ph.D.
2    the issues that you mention in the first sentence
3    of your reply?
4         A    That's correct.
5         Q    When did you first see these three
6    declarations, 19, 20, and 21?
7         A    I believe that I first saw them in
8    early January.  I don't have a specific date.
9         Q    Can you give my any more precision
10   than that, would it have been -- Go ahead.
11        A    I can't -- I know -- I believe it
12   would have been the first half of January.
13        Q    Who gave them to you?
14        A    They came from Mr. Notargiacomo.
15   They may have been directly sent to me.  I am not
16   certain if they came through Greylock McKinnon.
17   Usually documents are delivered to Greylock
18   McKinnon, and then they send me a copy.
19        Q    Do you remember how they were
20   transmitted to you, a hard copy or e-mailed or
21   some other way?
22        A    I think they may have actually been
23   e-mailed to me.
24        Q    Do you recall who would have e-mailed
25   them to you?

Page 572

Meredith Rosenthal, Ph.D.

1
2    A    I think, actually, they, indeed, may
3  have been e-mailed to me directly by
4  Mr. Notargiacomo, but I am not certain.
5    Q    Recognizing your uncertainty on that
6  point, do you recall whether there would have been
7  any message at all in the text of the e-mail that
8  forwarded these documents?
9    A    I'm sorry.  I don't.
10    Q    Do you know if you still have the
11  e-mail?
12    A    I don't believe so my e-mail box I --
13  fills up, has relatively little capacity.  So, I
14  think it only has e-mail for the last several
15  weeks.
16    Q    And so would you have deleted the
17  e-mail that had been sent to you?
18    A    Yes.
19    Q    I am looking now at what I think is,
20  I think it's Exhibit 21, which is Professor
21  Chintagunta's declaration, although I think you
22  could probably look at any one of these exhibits,
23  and maybe just flip to the date on the signature
24  line.
25    A    Okay.

Page 573

Meredith Rosenthal, Ph.D.

1
2    Q    In the case of Exhibit 21, it's on
3  page 19.
4    A    Yes, I see that.
5    Q    And the date on the document is
6  December 20th, 2006; correct?
7    A    That's correct.
8    Q    Do you have any understanding for why
9  Professor Chintagunta's, Professor Scott Morton's
10  and Dr. Keeley's reports would not have been sent
11  to you in late December, and not sent to you until
12  sometime in early January?
13    A    I don't.  I think at the time that i
14  received them, there was some confusion about
15  whether I had gotten them already, but I don't
16  know if they had been sent and somehow not gotten
17  through my spam filter, I'm not sure.
18    Q    Okay.  Recognizing that you don't
19  recall what might have been in the e-mail that had
20  originally been sent to you -- I'm sorry, did I
21  cut you off?  Did you mean to say something else?
22    Recognizing that you don't recall
23  what might have been in the e-mail that
24  transmitted these documents to you, do you
25  remember receiving any instructions of any kind at

Page 574

Meredith Rosenthal, Ph.D.

1
2  the time you received these documents?  When I say
3  "these documents" I mean Exhibits 19 through 21.
4    A    I believe, in general, I was asked to
5  review them.
6    Q    Anything else?
7    A    And I was asked to consider what
8  types of questions might be useful for depositions
9  of the opposing experts.
10    Q    Anything else?
11    A    I think that would be it.
12    Q    I think you said you believed, in
13  general, that you were asked to review them.  Is
14  there anything more specific that you recall than
15  that?
16    A    I said in that general, because I am
17  not sure if I was asked immediately when they were
18  sent to compose a reply, but I would have assumed
19  that I was to compose a reply.
20    Q    Let's ask about that.
21    All right.  At some point in time, I
22  guess a decision was made that you would prepare a
23  response of some kind to these declarations?
24    A    That's correct.
25    Q    Do you recall when that decision

Page 575

Meredith Rosenthal, Ph.D.

1
2  would have been made?
3    A    No, I don't.
4    Q    Recognizing that you filed your reply
5  at some point in mid February, February 21, I
6  guess, can you give any sort of a rough sense of
7  when the decision would have been made, between
8  the time you received them in early January and
9  the time that you filed them, or that they were
10  filed, I should say, on February 21?
11    A    It was always my assumption, from the
12  time that I received them, that I would be filing
13  a reply, so I don't know about a specific
14  decision.
15    Q    Okay.  On what was your assumption
16  based?
17    A    Previous experience.
18    Q    Do you recall any discussions on the
19  question of whether you would prepare a reply?
20    A    I don't -- there may have, there may
21  have been one where we discussed the issue, but it
22  would not have been one in which there was
23  disagreement.
24    I think, again, I assumed there would
25  be a reply, and I would have spoken with

Page 576

Meredith Rosenthal, Ph.D.

Mr. Notargiacomo about the timing of that reply.

3    Q     Other than Mr. Notargiacomo, is there
4  anyone else with whom you would have discussed
5  your reply, the prospect of your preparing a
6  reply?
7    A     Yes, I spoke with Dr. Hartman.
8    Q     Anyone else?
9    A     And Ms. Rushnowitz, both of Greylock
10  McKinnon Associates.
11   Q     Would you have had discussions with
12  either Dr. Hartman or Ms. Rushnowitz prior to your
13  beginning work on preparing a reply?
14   A     Do you mean prior to receiving the
15  reports?
16   Q     Well, let's start with that.
17        Prior to receiving the reports, sure.
18   A     Not prior to receiving the reports.
19   Q     Okay.  How about between receiving
20  the reports and, you know, the beginning of the
21  drafting process?
22   A     Certainly, once I had personally
23  received the reports -- and, again, they may have
24  been delivered to Greylock McKinnon at an earlier
25  date.  But once I, personally, received the

Page 577

Meredith Rosenthal, Ph.D.

reports, I would expect that we had a discussion

3  on that same day about timing of a reply.
4    Q     When you say "we," you mean Dr.
5  Hartman and Ms. Rushnowitz?
6    A     I do, yes.
7    Q     Mr. Notargiacomo as well?
8    A     Yes, I believe so.
9    Q     Would you have discussed anything
10  more than the timing of the reply at that point?
11   A     Probably, because we had other
12  matters that we were working on.  We might have
13  discussed staffing, how much time I would spend,
14  when I could begin; that kind of thing.
15   Q     Would you have discussed anything
16  about what the substance of the reply would be?
17   A     I don't believe so.  I think we may
18  have discussed, for example, whether there would
19  be a single reply or one reply for each expert.
20   Q     What do you recall about the
21  discussions on that subject?
22   A     I believe we all agreed that it made
23  more sense to put them all in one report.
24   Q     So, I take it from, from your last
25  answer that you wrote your reply yourself?

Page 578

Meredith Rosenthal, Ph.D.

2    A     Yes.
3    Q     And who would have assisted you or
4  who did assist you, I should say?
5    A     I would have gotten the same kind of
6  support I described in our previous meeting from
7  Rene Rushnowitz, and so that would include
8  retrieving and putting in place the appropriate
9  citations to legal documents and other documents,
10  as well as from the staff at GMA, to gather papers
11  from the CV's of the various experts, to gather
12  additional research papers.
13   Q     Other than Ms. Rushnowitz, do you
14  know who else, how many other people, for example,
15  would have assisted you in the latter capacity?
16   A     I believe that Andrew Bectal would
17  have largely done the work, but it may also be
18  that Joshua Petit and Katherine Young assisted,
19  particularly in gathering articles.
20   Q     Did Ms. Rushnowitz do any work on
21  your reply, other than retrieving and putting in
22  place legal citations and citations to other
23  documents?
24   A     She would have read it for -- to
25  examine things like grammar, the use of language.

Page 579

Meredith Rosenthal, Ph.D.

She often reviews these documents to make sure

3  that, for example, that I have explicated things
4  like econometric terms that may not be widely
5  used, widely understood, make sure I have
6  explicated them clearly enough; that sort of
7  thing.
8    Q     And then other than gathering
9  additional research papers, would Mr. Bectal,
10  Mr. Petit and Ms. Young have done any other work
11  on your reply?
12   A     May I have a look at it?
13   Q     Of course.
14   A     I need to remember all the
15  substantive, what's in the report.
16        I believe Ms. Rushnowitz also read
17  through the deposition transcripts and helped me
18  identify appropriate quotations to include.
19   Q     When you say the deposition
20  transcripts, which deposition transcripts do you
21  mean?
22   A     Yes.  Sorry, the deposition
23  transcripts of Dr. Fiona Scott Morton and Dr.
24  Keeley.
25   Q     Anything else?

Page 580

Meredith Rosenthal, Ph.D.

1    Meredith Rosenthal, Ph.D.
2    A    I think that --I think that would be
3  all.  I believe that would be all.
4    Q    Did you actually type your reply
5  declaration yourself?
6    A    I did.
7    Q    And you did all the typing yourself,
8  I take it?
9    A    I did, except for, as I mentioned,
10  Ms. Rushnowitz added some of those footnotes.
11    Q    Did you prepare the document on your
12  computer or a computer at Greylock McKinnon?
13    A    I believe that I prepared it all on
14  my own computer.  I -- I am not entirely sure that
15  there wasn't one day that I was sitting at
16  Greylock McKinnon, which I do infrequently, and
17  wrote some part of it there.  So, it's possible
18  that it was on, in part, on a computer at Greylock
19  McKinnon.
20    Q    Just a quick follow up to the last
21  question.
22    I guess, my understanding, in generic
23  terms, is that you would have been working on an
24  electronic document that would have to essentially
25  live someplace.  Did the document live on your

Page 581

1    Meredith Rosenthal, Ph.D.
2  computer or did it live on Greylock McKinnon's or
3  did it change at some point in time?
4    A    It would have -- when I had completed
5  the draft and needed notes added to it, I would
6  have sent it from my computer to Ms. Rushnowitz.
7    Q    By e-mail, I take it?
8    A    Yes.
9    Q    When did the drafting, itself,
10  actually begin, to the best of your recollection?
11    A    There -- it was delayed by -- I was
12  away until January 20th, and there was another
13  matter that I was working on, so I believe the
14  drafting would have -- you know, I'm not honestly
15  sure.  I believe I started the draft and then, if
16  my recollection is correct, there was a change in
17  the due date for the report, but I may be mixing
18  that up.  My sense is that most of the drafting
19  that I did on the report, most of the report was
20  written rather close to when it was filed because
21  of other matters.
22    Q    You prepared an outline first; is
23  that correct?
24    A    I did, yes.
25    Q    Let's me mark the next exhibit.

Page 582

Meredith Rosenthal, Ph.D.

1    Meredith Rosenthal, Ph.D.
2    (Rosenthal Exhibit 22 marked for
3  identification as of this date.)
4    Q    All right.  I have handed you a
5  document that we are marked as Exhibit 22 to your
6  deposition.
7    A    I see that, yes.
8    Q    Do you recognize Exhibit 22?
9    A    I do.
10    Q    Okay.  The title at the top of
11  Exhibit 22 reads:  Outline for M. Rosenthal reply
12  to defendants' experts.
13    Did I read that correctly?
14    A    You did.
15    Q    I take it you wrote this outline
16  yourself?
17    A    I did.
18    Q    Does seeing this outline give you any
19  sort of greater sense for when you might actually
20  have completed it?
21    A    Does it have a date on it?
22    Q    I haven't been able to find a date,
23  but -- but I probably don't know the document as
24  well as you do.
25    A    No.  I, again, I believe it was

Page 583

1    Meredith Rosenthal, Ph.D.
2  fairly close to the date of filing, but I don't
3  know precisely.
4    Q    Okay.  Did you have discussions about
5  the subject matter that is contained within this
6  outline with anyone prior to your completing it?
7    A    No, I did not.
8    Q    Did you have discussions with anyone
9  about the substance of the defendants' experts'
10  reports to which you were responding prior to your
11  completing this outline?
12    A    Not in any specific detail.  As I
13  mentioned before, as soon as I received the
14  documents, I did speak with Dr, Hartman,
15  Ms. Rushnowitz, and I no doubt had conversations
16  with them about the fact that a reply would be
17  necessary and that there were clearly issues to
18  address.
19    We did not speak in any detail about
20  what I was going to address.
21    Q    Did you speak in something other than
22  in detail about what you were going to address?
23    A    Sure.  We certainly agreed that the
24  documents were largely about econometric issues,
25  for example.

Page 584

Meredith Rosenthal, Ph.D.

1
2    Q    Anything else?
3    A    And -- and I imagine we agreed that
4    defendants' expert reports contained many flaws
5    that should be addressed in a reply.
6    Q    Anything else?
7    A    I believe that would be the general
8    nature of the conversation.
9    Q    Would you have addressed what you are
10   describing now as flaws in any more detail than
11   that?
12   A    We may have talked about specific
13   examples. I can't recall any. And we certainly
14   didn't have a detailed discussion about the range
15   of issues.
16   Q    Did you provide this outline to
17   anyone?
18   A    I provided this to Mr. Notargiacomo.
19   Q    Anybody else?
20   A    I may have cc'd, carbon copied, Rene
21   Rushnowitz on that e-mail.
22   Q    Would you have written anything in
23   the e-mail forwarding this document in the text of
24   the e-mail?
25   A    I believe I would have said something

Page 585

Meredith Rosenthal, Ph.D.

1
2    like, "here's a rough outline of my reply." I
3    might have used rebuttal in that statement --
4    Q    You wouldn't be alone if you had.
5    A    Declaration.
6    Q    Anything else?
7    A    I can't think of anything else. I
8    might have mentioned the timing of when I would
9    actually able to write the reply.
10   Q    Do you still have a copy of the
11   e-mail?
12   A    No. As I mentioned, I, my e-mail box
13   is only up-to-date for about two weeks.
14   Q    Okay. And you wouldn't have printed
15   a copy of it, I take it?
16   A    No, I wouldn't have.
17   Q    Did you have discussions with
18   Mr. Notargiacomo, or anyone else, about this
19   outline?
20   A    I don't believe that we talked about
21   the outline in any detail. He may have said,
22   "that looks fine," but other than that, I don't
23   believe we had discussions.
24   Q    Other than what you just described,
25   did you receive any comments on the outline from

Page 586

Meredith Rosenthal, Ph.D.

1
2    Mr. Notargiacomo or from anyone else?
3    A    No, I did not.
4    Q    Okay. Prior to the version of the
5    outline that you e-mailed to Mr. Notargiacomo, did
6    you print or e-mail any other drafts of the
7    outline to anybody?
8    A    I don't believe so. It's possible
9    that I didn't get all the way through to the end
10   and I sent a partial version of it that, maybe,
11   didn't have one of the experts referenced in it.
12   I was working a lot of late nights to make this
13   happen, so I think it is possible that I had an
14   incomplete version of it that I sent.
15   Q    To whom?
16   A    It would have also been to
17   Mr. Notargiacomo.
18   Q    Other than that incomplete version
19   that you had mentioned, are there any other
20   versions of it that you recall having sent to
21   anybody?
22   A    Not that I recall, no.
23   Q    Do you still have a copy of the
24   incomplete version that you just described?
25   A    No, I wouldn't. It became the

Page 587

Meredith Rosenthal, Ph.D.

1
2    complete version.
3    Q    When you say it became a complete
4    version, what do you mean?
5    A    Well, so, I had gotten all the way
6    through, I believe. I may have only actually have
7    gotten through Scott Morton, and then ran out of
8    time, sent what I had, went back, added Dr. Keeley
9    and Dr. Chintagunta, and then sent it. So it was
10   just added to the end of that document.
11   Q    So, would you have made any
12   modifications to the part that you had already
13   written?
14   A    It's possible that I did.
15   Q    Did you make any further
16   modifications to this document after the version
17   that we have here?
18   MR. NOTARGIACOMO: This document
19   being Exhibit 22?
20   MR. POLUBINSKI: Yes, thank you, Ed.
21   THE WITNESS: I don't think so. I
22   can't be certain, because I am not entirely
23   sure of the date of the version that you
24   have, and I understand neither are you, but
25   I don't see any reason why I would have

Page 588

Meredith Rosenthal, Ph.D.

1
2    modified the outline.
3        When I was ready, I used it to help
4    me write the draft.
5        MR. POLUBINSKI:  I'm going to mark
6    three more exhibits.
7        (Rosenthal Exhibits 23, 24 and 25
8    marked for identification as of this date.)
9    Q    Okay.  So, I have just handed you
10   documents that we have marked as Exhibits 23, 24,
11   and 25 to your deposition.
12       And I guess I ought to mention, just
13   for the record, that if you look at these
14   documents you will see some little letters and
15   numbers at the bottom of each page that begin with
16   GMA.
17       I should let you know that these are
18   numbers that we have added here, sort of for
19   our -- for our and, I guess, the court's internal
20   convenience in terms of trying to keep these
21   documents straight in the future.
22       Other than that, I don't believe
23   there are any differences between these documents
24   and documents provided to us last week by
25   Mr. Notargiacomo.

Page 589

Meredith Rosenthal, Ph.D.

1
2        With that as a preface, can you tell
3    me what Exhibits 23, 24, and 25 are?
4    A    I believe they are drafts of my reply
5    declaration that I would have sent to
6    Mr. Notargiacomo.
7    Q    And I apologize for putting you on
8    the spot and the testing you like this, if you
9    might be able to take just a quick second and flip
10   through them, and tell me roughly the order that
11   they are prepared.  And not to be overly
12   suggestive of an answer, but what we have tried to
13   do, at least based on our own guessing, is put
14   them in the order in which they would have been
15   completed.
16   A    So, I agree with your ordering.  They
17   do appear in that order.  And, as I recall,
18   perhaps from the outline incorrectly, but I got
19   through Dr. Scott Morton when I ran out of time
20   and energy, so, that's that first draft.
21   Q    Okay.  I assume from your prior
22   answers that you would have actually done all of
23   the typing on each of these drafts but for,
24   perhaps, a citations here or there that may have
25   been inserted by Ms. Rushnowitz?

Page 590

Meredith Rosenthal, Ph.D.

1
2    A    That's correct.
3    Q    Let's try to quickly run through
4    these.  For Exhibit 23, this first draft, which I
5    think, as you described, gets through your
6    discussion of Professor Scott Morton, do you
7    remember to whom this would have been provided, if
8    anyone?
9    A    I believe, again, that I would have
10   sent it to Mr. Notargiacomo and I would likely
11   have carbon copied Ms. Rushnowitz on that e-mail.
12   Q    Anybody else?
13   A    Not to my knowledge, no.
14   Q    Do you remember approximately when
15   you would have sent that document?
16   A    I don't.  I believe it would have
17   been -- you know, I'm not certain.  I believe it
18   would have been -- it's a Sunday night, but I
19   think it probably was about two weeks before it
20   was filed.
21   Q    Okay.
22   A    Maybe only one, but --
23   Q    And I take it from your earlier
24   answer that you would have sent it by e-mail to
25   Mr. Notargiacomo?

Page 591

Meredith Rosenthal, Ph.D.

1
2    A    Yes, I would have.
3        And, excuse me, I notice that Dr.
4    Scott Morton's deposition was February 7th, and so
5    this would, I believe, have to have been the week
6    following that.
7    Q    Okay.  Would there have -- do you
8    recall if there was any message in the text of the
9    e-mail that accompanied this document, Exhibit 23?
10   A    It would have been something to the
11   effect of "this is all I can do for now, and I
12   will continue adding to the document."
13   Q    Anything else?
14   A    No, I don't believe so.
15   Q    Why would you have sent the document
16   at that point?
17   A    I would have sent the document just
18   to let Mr. Notargiacomo know how far I was
19   getting, that I wasn't completely ignoring my
20   task.  And I would have carbon copied
21   Ms. Rushnowitz on it to give her a sense of the
22   kind of help I would need.
23       You will note that there are sort of
24   little parenthetical comments in there about
25   citations that I need.

Meredith Rosenthal, Ph.D.
1
2    Q    Going back to that e-mail, is this an
3  e-mail that you think you still might have or is
4  it an e-mail that no longer exists?
5    A    It would be in the same category, of
6  -- I don't believe I have anything within the last
7  two weeks -- outside the last two weeks.  So I
8  believe this would have been, let's say, a month
9  ago, but not quite.
10    Q    Did you receive comments on Exhibit
11  23 from anybody?
12    A    I don't believe so.  I believe
13  because it was incomplete, that I didn't get
14  comments from anyone.  They were, perhaps, waiting
15  for the full version.
16    Q    Okay.  How about Exhibit 24, let's
17  turn to Exhibit 24.  To whom would you have sent
18  Exhibit 24?
19    A    I believe I would have sent this to
20  Mr. Notargiacomo, again, with a carbon copy to
21  Ms. Rushnowitz, possibly also to Andrew Bectal,
22  who often helped me with citations as well.
23    Q    Approximately when would you have
24  sent Exhibit 24?
25    A    I believe it would have been just a

Meredith Rosenthal, Ph.D.
1
2  day or two after Exhibit 23.  I believe I picked
3  up the writing the next morning and tried to
4  complete it.
5    Q    And I take it that Exhibit 24 would
6  have been transmitted via an e-mail which you no
7  longer have on your system?
8    A    That's correct.
9    Q    Would the text of that e-mail have
10  contained anything that you wrote?
11    A    I believe, again, it would have been
12  a general statement about the completeness of any,
13  any issues that I was still looking into, maybe
14  some comments for Rene about adding citations.
15    Q    Did you receive comments on Exhibit
16  24?
17    A    Well, I'm not certain if I got
18  comments on this draft or only the final one.  I
19  would certainly -- just because this is, this was
20  not the final draft, I'm not sure when
21  Ms. Rushnowitz would have given me comments,
22  again, largely grammatical, in the way of phrasing
23  things, suggesting that I explain more simply
24  certain things.
25    I did get comments from

Meredith Rosenthal, Ph.D.
1
2  Mr. Notargiacomo on the final draft, and I am
3  afraid I just don't recall if I received any
4  comments from him on this intermediate draft.
5    Q    Okay.  Let's move ahead to Exhibit
6  25.  Is this the final draft to which you have
7  been referring?
8    A    This is what I assume is the final
9  draft.  I haven't compared it to what was actually
10  filed.  It doesn't have my signature on it.  I
11  take it it's not the one that was actually filed,
12  but it seems to have none of those little notes to
13  myself and others about things to fill in that I
14  have noticed at least.  So I am -- I believe this
15  is likely to be very close to the final draft.
16    Oh, there is one right there, cite to
17  Keeley.  So this would have been very close to the
18  end.
19    Q    I assume Exhibit 25 would have been
20  transmitted in the same way we just discussed?
21    A    That's correct.
22    Q    Any differences other than the date
23  on which it was sent?
24    A    Not that I know of.
25    Q    And, so, is this the final draft on

Meredith Rosenthal, Ph.D.
1
2  which you would have received comments from
3  Mr. Notargiacomo?
4    A    I believe that's the stage at which I
5  received comments.  It is possible that he gave me
6  some comments on an earlier draft, but it couldn't
7  have been anything memorable.  I don't recall
8  getting comments.
9    MR. NOTARGIACOMO:  Thanks.
10    Q    Do you remember anything about the
11  comments that you received from Mr. Notargiacomo
12  at any point in this process?
13    MR. NOTARGIACOMO:  Other than their
14  absolute brilliance?
15    A    I recall that they were largely,
16  again, editorial in nature.  I believe we had some
17  debate over whether there should be an article
18  preceding the word literature, and I conceded to
19  his request that I add an article before the word
20  literature.  And I believe his other comments,
21  which we discussed over the phone, were of a
22  similar nature.
23    Q    Okay.  So, anything other than
24  discussing the finer points of grammar that you
25  can recall?

Meredith Rosenthal, Ph.D.

1
2  A    Nothing.  At one point, I believe it
3  was Mr. Notargiacomo, who made me aware of the
4  Radley article that is cited in the draft -- in
5  the final report.  So, that might have been
6  another thing, he asked me if I was aware of that
7  article.
8  Q    Just for the record, can you point us
9  to the article in Exhibit 18?
10  A    In the draft.
11  Q    Either in Exhibit 25, the draft or if
12  it's in the final, Exhibit 18, which is the filed
13  copy of your reply, as I understand it?
14  A    Yes.  Let me just find the citation.
15  Paragraph 35, oh, that's not the
16  first, because it says ipso.
17  I am having trouble finding the first
18  cite of it.
19  Oh, there it is.  Let me see where
20  that footnote starts.  Footnote 36, which is
21  referenced in paragraph 23.
22  Q    Thank you.
23  Okay.  Aside from Exhibits 23 through
24  25, and the outline that has been marked as
25  Exhibit 22, did you e-mail drafts or print drafts

Meredith Rosenthal, Ph.D.

1
2  for your review other than those?
3  A    I don't think so.  I believe my work
4  on this, as I have mentioned, was fairly
5  compressed.
6  Q    Okay.  So, aside from those drafts,
7  you wouldn't have shared drafts with anybody else?
8  A    It's possible that I shared a draft
9  with Dr. Hartman.  I do not recall doing that or
10  discussing it with him, but he may have reviewed a
11  draft.
12  Q    When you say he may have reviewed a
13  draft, do you mean that he may have reviewed a
14  draft and you didn't know he was reviewing it, or
15  that he may have reviewed a draft and you just
16  can't remember whether he did?
17  A    I can't remember.  And it would make
18  sense to me that he would have wanted to see it in
19  preparing his own report.  So, I believe that he
20  probably did review.
21  I don't remember sending it to him,
22  but he may have been given a draft by
23  Ms. Rushnowitz, for example, to review.  I don't
24  believe I received any comments from him, however.
25  Q    When did you complete your

Meredith Rosenthal, Ph.D.

1
2  declaration?
3  A    I believe that I -- well, I -- I
4  mean, I signed it, I believe, the day it was
5  filed.  So, that would have been the time that I
6  gave it the last read through to make sure there
7  were no other errors, typos, that sort of thing.
8  If that's what you mean by complete, I believe
9  that would have been on February 21.
10  Q    Have you taken notes at meetings that
11  you may have had or notes on materials that you
12  may have reviewed in this case since the time of
13  our last meeting at the end of October of 2006?
14  A    We have not had meetings on this
15  case, to my recollection.  And I might have
16  highlighted, put stickies on defendants' rebuttal
17  report, expert rebuttal reports, but I don't
18  believe I have separate notes.
19  Q    Okay.  I take it that you still have
20  not communicated in any way with either of the
21  named individual plaintiffs in this case?
22  A    I have not.
23  Q    Or with their doctors?
24  A    No, I have not.
25  Q    And I also take it you still haven't

Meredith Rosenthal, Ph.D.

1
2  communicated with any representatives of the named
3  third-party payer plaintiffs either?
4  A    No, I have not.
5  Q    Since we last spoke, have you
6  reviewed any documents related to either of the
7  named individual plaintiffs or their doctors?
8  A    Their specific individual documents,
9  no.
10  Q    Is the same true with respect to
11  documents from the name third-party payer
12  plaintiffs?
13  A    That's correct.
14  Q    Aside from the testimony that you
15  just mentioned, Dr. Keeley's and Professor Scott
16  Morton's?
17  A    Yes.
18  Q    Have you reviewed transcripts of any
19  testimony or depositions in this case?
20  A    Aside from those expert reports, no,
21  I have not.
22  Q    And aside from communications that
23  you may have had with Dr. Hartman, have you
24  communicated with any class members, either
25  individuals or third-party payers, in connection

Page 600

Meredith Rosenthal, Ph.D.

1     Meredith Rosenthal, Ph.D.
2  with your work on this case?
3     A    No, I have not.
4     Q    Focusing on the final draft of your
5  reply, Exhibit 18 -- and I think you can probably
6  largely set the other ones aside, although we may
7  come back to a couple of them.
8     A    Okay.
9     Q    Your reply doesn't supplement or
10 modify the econometric model that you proposed in
11 your original declaration in August of '05; is
12 that correct?
13    A    That's correct.  I believe I expand
14 on some of the issues that you and I discussed in
15 my deposition, for example, and that were
16 specifically raised by defendants' experts.
17    Q    But just in terms of the actual
18 econometric model, itself, you haven't
19 supplemented that or modified it at all?
20    A    No -- no.
21    Q    Or the equations, for example, that
22 maybe are -- the equations that are described in
23 your original declaration, Exhibit 1 to your
24 deposition?
25    A    That's correct.  The equations remain

Page 601

1     Meredith Rosenthal, Ph.D.
2  the same.
3     Q    And your reply, if I am reading it
4  correctly, doesn't indicate that you have done any
5  tests or trial runs of the proposed model; is that
6  correct?
7     A    No, that's correct.
8     Q    And I also assume -- well, withdrawn.
9        I also understand that your reply
10 doesn't propose any sort of modification to your
11 proposed model that would enable you to identify
12 specific prescriptions that were caused by
13 defendants allegedly actionable conduct?
14    A    Other than explaining what was in my
15 original declaration, it provides no new methods,
16 simply expanding upon some aspects of the methods
17 that I proposed in my original declaration.
18    Q    Okay.  But again, I think just to go
19 back to the question, the proposed model doesn't
20 or the model you propose in your original
21 declaration -- well, let me with withdraw it.
22 That's fine.
23        Another question that was that you
24 don't propose a modification to your model that
25 would enable to you determine whether any given

Page 602

1     Meredith Rosenthal, Ph.D.
2  off-label prescription was effective or not?
3     A    That is not the purpose of my model,
4  no.
5     Q    And I think, if I am reading it
6  right, your reply does not reflect that you have
7  done any modeling or testing on how you may
8  address any possible indigenity that you may
9  encounter?
10    A    The reply does not include any new
11 empirical results of any kind.
12    Q    And it doesn't propose instruments
13 either, I take it?
14    A    I would have to read that section.  I
15 don't believe that I proposed specific instruments
16 in the reply.
17    Q    If you would like to do it, you can
18 do it.
19    A    I can also take your word for it.
20    Q    Whichever you prefer, I don't want to
21 ask you to do either one.
22    A    That's fine.
23    Q    I guess in the same way your reply
24 doesn't reflect that you have done any modeling or
25 tests to determine how you might address any

Page 603

1     Meredith Rosenthal, Ph.D.
2  multi-collinearity that you might encounter?
3     A    In the absence of data, it would be
4  very difficult to do such testing.
5     Q    And am I right to understand it that
6  your reply doesn't suggest that you have done any
7  empirical work of any kind at this point in this
8  case?
9     A    That's correct.
10    Q    Was there ever any consideration that
11 you are aware of as to whether you should try to
12 run your model with some data, perhaps publicly
13 available data, to see if it could work?
14    A    There was not consideration in my
15 view, because there would be little point to doing
16 that without the critical independent variables of
17 interest.
18    Q    Okay.  Let's turn back to Exhibit 22,
19 which is the outline, I believe, you prepared of
20 your reply.
21        And let's -- I'm sorry, take your
22 time.
23    A    I have trouble finding 22.  I know
24 it's in here.
25    Q    It's a big stack.

Meredith Rosenthal, Ph.D.

1
2    A    Yes, go ahead.
3    Q    Let's look on the first page, at
4  Section 2.3.2 --
5    A    Um-hum.
6    Q    -- which reads, the entire purpose of
7  the class action is to avoid individual inquiry
8  and examine aggregate damages.
9        Did I read that correctly?
10   A    Yes, you did.
11   Q    I don't find this sentence or any
12 other sentence that expressly discusses the
13 purposes or procedural requirements of class
14 actions in your final reply, Exhibit 18.  Am I
15 missing it or is it not there?
16   A    That text was written in my own
17 language.  What got translated when I wrote the
18 reply declaration, itself, was more of a statement
19 about what I believe I was asked to do, what my
20 understanding of what's required for class
21 certification.  Those subjects are addressed in my
22 reply.
23   Q    That was, the translation that you
24 described, to use your term, something that you
25 thought to do on your own or was it something that

Meredith Rosenthal, Ph.D.

1
2  you may have discussed with anybody else?
3    A    That is something I did on my own.  I
4  don't believe anyone, again, I don't believe
5  anyone offered me comments on the outline, and I
6  don't believe, in the few comments that I received
7  from, for example, Mr. Notargiacomo, this issue
8  was raised.
9        I don't believe it's in the earlier
10 draft, is it?  I could look.
11   Q    If you like, you could.
12   A    Does it appear in any draft?
13   Q    I don't know.  I don't think so.  You
14 are welcome to look if you like.
15   A    I don't believe it did either.  I
16 believe it was simply something that, when I
17 translated it, I didn't use that language because
18 it sounds a little bit like a legal opinion,
19 doesn't it?
20   Q    So, is that the reason that you would
21 have done the translation as it were?
22   A    Looking back, it seems like it might
23 have been.
24   Q    Okay.  So, let me ask you:  Is it
25 your understanding, as it's reflected in this

Meredith Rosenthal, Ph.D.

1
2  sentence in the outline, that the purpose of the
3  class action device is to avoid individual
4  inquiry, even where there are true individualized
5  differences among proposed class members on the
6  question of whether a defendant's conduct caused
7  harm to some number of -- some number of class
8  members?
9        MR. NOTARGIACOMO:  Objection.
10   A    My understanding is that, as I noted
11 in my outline, that the purpose is to avoid it,
12 that the requirements for a class action are such
13 that those individual issues did not predominate.
14 That is my -- my layperson's understanding.
15       But, again, that the purpose is to
16 aggregate a multitude of related claims that can
17 be demonstrated with common evidence.
18       MR. POLUBINSKI:  Why don't we take a
19 quick break now to change the type?
20       VIDEOGRAPHER:  Going off the record.
21 The time is 12:41.  This ends tape one.
22       (Recess taken.)
23       THE VIDEOGRAPHER:  Back on the
24 record.  The time is the 12:49.  This is
25 tape two.

Meredith Rosenthal, Ph.D.

1
2  BY MR. POLUBINSKI:
3    Q    Okay.  Let's keep looking at Exhibit
4  22, which is your outline.
5        And let's look at Section 2.5.4,
6  which is on page three.
7    A    Okay.
8    Q    And in taking -- I would like to look
9  at the second to the last sentence.
10       That sentence reads:  But in assuming
11 the allegations are true, I have assumed that
12 there is no science to suggest Neurontin is
13 effective for migraine, et cetera, except for that
14 manufactured by Pfizer/Warner Lambert, question
15 mark.
16   A    Okay.
17   Q    Here is another one.  I don't find
18 this sentence or its equivalent in your final
19 reply.
20       Am I missing it at all?
21   A    Yes, I can find that for you.  It
22 wouldn't be the sentence, but the idea.
23       Paragraph 16, you see it ends, thus
24 assuming the allegations are true, the bias, if
25 any, are negative; therefore, the impact of the

Meredith Rosenthal, Ph.D.

1
2  conduct at issue would be underestimated.
3      Q    You are reading from the last
4  sentence of paragraph 16 on page nine; correct?
5      A    That's correct.
6      Q    I guess, let me ask you, focusing
7  still on the outline --
8      A    Okay.
9      Q    -- and this statement as it's drafted
10  here, that there is no science to suggests
11  Neurontin is effective for migraines, et cetera,
12  except for that manufactured by Pfizer/Warner
13  Lambert.
14          Is that an assumption that you have
15  made in connection with the opinions that you have
16  offered in this case?
17      A    My understanding of the allegations
18  is that the conditions for which this matter will
19  go forward, the specific off label uses for which
20  this matter will go forward, will be the ones that
21  plaintiffs can prove that there is no evidence
22  that they -- that Neurontin is effective for those
23  uses.
24      Q    Okay.  Maybe it makes sense to read
25  back the question.  I think your answer might have

Meredith Rosenthal, Ph.D.

1
2  been slightly different.
3          Do you mind doing that, Bonnie?
4      (Record read.)
5      A    So, I think I would say the same
6  thing.  Let me be more precise to address what I
7  think may be your concern.
8          Migraine is a specific off-label use
9  that is mentioned in the complaint with regard to
10  allegations that Pfizer/Warner Lambert promoted
11  Neurontin for use for this particular off-label
12  condition without positive evidence, and sometimes
13  in the presence of negative evidence.  Migraine is
14  certainly one of those conditions that is
15  mentioned in the complaint with regard to those
16  allegations.
17          And so, again, here in the outline, I
18  mention it as an example at the beginning of the
19  list of the things that aren't listed,
20  essentially, et cetera, but that is my
21  understanding of the allegations.
22      Q    Okay.  Maybe let me ask it this way.
23  Assuming that this is not true, that there is, in
24  fact, science to suggest that Neurontin is
25  effective for migraine, or whichever other

Meredith Rosenthal, Ph.D.

1
2  off-label use that was not manufactured, as you
3  write it here, by Pfizer/Warner Lambert, what
4  impact would that have on your analysis?
5      A    Well, again, my analysis assumes that
6  the allegations can be proven to be true.  If the
7  allegations, for example, with regard to a
8  specific condition, such as migraine, cannot be
9  proven, then it would not be appropriate to
10  estimate damages related to those conditions.
11      Q    Okay.  Let's look at Exhibit 23,
12  which I think is -- okay?
13      A    Okay.
14      Q    -- what we had established I think
15  was the first of the drafts of your report that
16  were produced to us by plaintiff's counsel.
17      A    Okay.
18      Q    And, in particular, let me direct
19  your attention to the first sentence of paragraph
20  two on the first page.
21      A    Okay.
22      Q    And let me just read the beginning of
23  it.  It reads:  Having reviewed the declarations
24  of Drs. Scott Morton, Keeley and Chintagunta, as
25  well as the deposition of Dr. Scott Morton taken

Meredith Rosenthal, Ph.D.

1
2  on February 7th, 2007, I am of the opinion, and
3  then it goes on.
4      A    Um-hum.
5      Q    In the preamble that I just read, you
6  list only Professor Scott Morton's deposition; is
7  that correct?
8      A    That's correct.
9      Q    In your final declaration, you added
10  Dr. Keeley's deposition to the list of materials
11  that you considered as described in that sentence.
12      A    That's correct.  I didn't obtain that
13  deposition until much later.
14      Q    Okay.  So this wasn't just an
15  inadvertent omission on your part, but that you
16  hadn't actually received, at least at that point
17  in time, Dr. Keeley's deposition?
18      A    I don't believe so, unless I hadn't
19  corrected the draft at that point.  But I know I
20  didn't receive the deposition until much later.
21      Q    Do you have an understanding why you
22  didn't receive it until much later?
23      A    I believe his deposition was later
24  than Dr. Scott Morton's.
25      Q    Is that your understanding?

Meredith Rosenthal, Ph.D.

1
2    A    It is my understanding.  Was it prior
3   to Dr. Scott Morton?
4          MR. NOTARGIACOMO:  It was.
5    A    I guess I have a misunderstanding, so
6   I don't know.
7    Q    Had you planned to review his
8   deposition transcript all along?
9    A    I would think so, yes.
10         MR. POLUBINSKI:  Okay.  Let's mark
11  the next exhibit.
12         (Rosenthal Exhibit 26 marked for
13  identification as of this date.)
14   Q    Okay.  Professor Rosenthal we have
15  just handed you a document that has been marked as
16  Exhibit 26 to your deposition.
17         Do you recognize this document?
18   A    I do.
19   Q    Can you tell us what it is?
20   A    It's the reply declaration of Dr.
21  Hartman.
22   Q    When did you become aware that Dr,
23  Hartman was going to be preparing a reply
24  declaration?
25   A    Well, when I mentioned I first

Meredith Rosenthal, Ph.D.

1
2   received the defendants' rebuttal reports, that
3   would have been part of that same conversation
4   about writing a reply.
5    Q    At that time or, really, at any time
6   prior to the filing of your reply, did you discuss
7   with him, or with anyone else, any division of
8   labor as between your reply and his?
9    A    We would have had that conversation.
10  I'm not sure if it would be exactly division of
11  labor, but we talked about whether he would reply
12  to all the experts or just the ones that mentioned
13  him specifically.
14   Q    Do you recall when that conversation
15  would have taken place?
16   A    Well, I think, again, at the time
17  that I first received the expert reports.
18   Q    And if I am remembering right, the
19  other participant in that conversation might have
20  been Ms. Rushnowitz?
21   A    I believe that's correct.
22   Q    Possibly Mr. Notargiacomo, too, or --
23   A    I believe we might have spoken with
24  Mr. Notargiacomo as well, yes.
25   Q    Can you describe your recollection of

Meredith Rosenthal, Ph.D.

1
2   the substance of that conversation?
3    A    I believe the substance would have
4   been regarding the extent to which it was
5   redundant to have two reply declarations.
6    Q    Evidently, the decision was
7   ultimately made that it either wouldn't be
8   redundant or that you would accept the redundancy;
9   is that correct?
10   A    That appears to be correct.
11   Q    Do you recall which of those two
12  options it was or maybe a third option?
13   A    I think we made an effort not to make
14  the replies redundant.
15   Q    Do you remember why the decision was
16  made that you would both prepare replies as
17  opposed to doing a single one?
18   A    I don't.  I don't.
19   Q    To what extent was Dr. Hartman
20  involved in the preparation of your reply in this
21  case?
22   A    He was very uninvolved.  I, as I
23  mentioned before, I drafted it myself, and I don't
24  believe I received comments from him, not to the
25  best of my recollection.

Meredith Rosenthal, Ph.D.

1
2    Q    Okay.  To what extent were you
3   involved in the preparation of Dr. Hartman's reply
4   in this case, that is Exhibit 26.
5    A    I was not at all involved with the --
6   with the drafting of his reply.  I -- I believe I
7   read a draft, but as well, I don't believe I gave
8   him any comments.
9    Q    Why didn't you give him any comments?
10   A    I really didn't read his draft with
11  an eye towards giving him comments, and we were
12  both very busy and traveling.
13   Q    If you didn't read his draft with an
14  eye towards giving comments, what was the purpose
15  of your review?
16   A    I guess, again, I wanted to see the
17  range of issues that he had covered.
18   Q    Other than that original, initial
19  discussion that we have talked about here in which
20  you did this, you had this discussion about
21  whether to file two replies or not, did you have
22  any other discussions with Dr. Hartman about the
23  substance of either his reply or your reply before
24  the time that they were filed?
25   A    I don't believe so.  I might have

Page 616

1          Meredith Rosenthal, Ph.D.
2    asked him for some of the papers that he had been
3    reviewing from Dr. Scott Morton's CV, for example.
4    I might have asked him for copies of some of those
5    papers, but I believe we had very few
6    conversations during this time period.
7       Q    Okay.  Let's move on to the next
8    exhibit.
9          (Rosenthal Exhibit 27 marked for
10   identification as of this date.)
11      Q    Okay.  We have just handed you a
12   document that's been marked as Exhibit 27 to your
13   deposition.
14          Have you seen this before?
15      A    I may have.  I'm not 100 percent sure
16   if I saw this.  I certainly recognize the one
17   below it.  I believe I may have seen this, yes.
18      Q    Let's look at the second paragraph of
19   the letter.
20          You would agree with me, by the way,
21   that  this paragraph, this portion of the letter
22   really relates to request for production of
23   materials by you and Dr. Hartman; is that correct?
24      A    That's correct.
25      Q    Let's look at the second sentence of

Page 617

1          Meredith Rosenthal, Ph.D.
2    the letter.  As before, we call for production of
3    drafts of their declarations, either their
4    original declarations in this matter or their
5    rebuttal declarations which were provided to
6    defendants on February 22, 2007.
7          Did I read that correctly?
8       A    Yes.
9       Q    Also, just for the record, so that
10   it's clear -- I'm not sure it's clear yet --
11   Exhibit 27 is a letter from me to Mr. Notargiacomo
12   dated February 26th, 2007, and it attaches, as you
13   noted, some prior correspondence, letters from me
14   to Mr. Notargiacomo.
15          Going back to the sentence that I
16   just read, what, if anything, did you do to locate
17   the documents that are called for here?
18      A    My understanding was that Greylock
19   McKinnon sent all the appropriate documents.  So,
20   again, because as I mentioned before, I didn't
21   save these drafts beyond this period, I didn't
22   have additional drafts to send.  But it's my
23   understanding that Mr. Notargiacomo had retained
24   those drafts.
25      Q    Okay.  Let me ask you a couple

Page 618

1          Meredith Rosenthal, Ph.D.
2    things.
3          You said that your understanding was
4    that Greylock McKinnon sent all appropriate
5    documents.  Where did that understanding come
6    from?
7       A    They -- these kinds of letters
8    generally go to them and they put together the
9    production.  And, so, for example, my updated CV,
10   time records, bills and invoices would have been
11   gathered by them and produced.
12      Q    One of the things you said in your
13   prior answer was that you didn't save drafts
14   beyond this period.
15          What did you do mean by that?
16      A    So, once -- I don't save early drafts
17   of a reply, so that you have these that I sent to
18   Mr. Notargiacomo, but I retained the final draft
19   only, because I am worried about having earlier
20   drafts around that I believe are the final
21   version, and try to pick them up and find that
22   they have, for example, incomplete citations, so I
23   only save the final draft.
24      Q    So, I understand from your last
25   answer that the drafts that we have are drafts

Page 619

1          Meredith Rosenthal, Ph.D.
2    that would have come from Mr. Notargiacomo, as
3    opposed to from you or from Greylock McKinnon?
4       A    They did not come from me.  I believe
5    that they came from Mr. Notargiacomo's files.
6       Q    Okay.  Let's look at the third
7    sentence of the same paragraph.
8          Other materials called for include,
9    but are not limited to, work papers, written and
10   electronic communications, time records, and bills
11   and invoices prepared in connection with any work
12   they or others working at their direction have
13   done in this case.
14          Did I read that one correctly?
15      A    Yes.
16      Q    What, if anything, did you do to
17   locate the documents described in this sentence?
18      A    Again, I have provided my time and
19   tracking of my time for Greylock McKinnon.  My
20   understanding is that they gathered all of those
21   items as relevant and submitted them.
22      Q    Did you have any conversations with
23   anybody at Greylock McKinnon about whether they
24   had done that or not?
25      A    I don't recall.

Page 620

Meredith Rosenthal, Ph.D.

1  Meredith Rosenthal, Ph.D.
2      Q    Aside from the e-mails conveying the
3  drafts then we have looked at, and the e-mail from
4  Mr. Notargiacomo to conveying the declarations,
5  the defendant's declarations in this case, did you
6  communicate about this engagement in any way by
7  e-mail, other than those e-mails since October of
8  2006?
9      A    I would imagine that there are other
10  e-mails with regard to scheduling issues.  I do
11  not believe that there would have been substantive
12  communications.
13      Q    I assume from your prior answers that
14  insofar as there were any e-mails that you would
15  have sent or received, that you wouldn't still
16  have those; is that correct?
17      A    That's correct.
18      Q    And I assume, also, that you haven't
19  created any work papers in connection with your
20  work on this case since October of last year?
21      A    I'm not entirely sure what you mean
22  by "work papers."  I believe that is a term with a
23  specific definition.
24      Q    Okay.  I guess, you know, maybe a
25  broader way to describe it then is other than your

Page 621

1  Meredith Rosenthal, Ph.D.
2  reply in this case, and any drafts of that reply,
3  have you created any written or electronic
4  documents related to the work that you have done
5  in this matter since October 2006?
6      A    No.  The documents we have reviewed
7  today would be all of it.
8      Q    Do you know if anyone at Greylock
9  McKinnon, or anywhere else working at your
10  direction, would have created work papers using
11  the definition that I just tried to come up with
12  in my last question since October of 2006?
13      A    Not to my knowledge.  The only thing
14  I can think of would be, for example, creating a
15  list of documents of related articles, but that
16  would be attached to my declaration.  I don't
17  believe so.
18      Q    Okay.  I assume there weren't any
19  documents that were responsive to the request in
20  Exhibit 27 that you provided to counsel but which
21  were not produced to us?
22      A    No, certainly not.
23      Q    Okay.  Let's look at the letter, the
24  first letter that is attached to the February 26th
25  letter in Exhibit 27 that I think you maybe

Page 622

1  Meredith Rosenthal, Ph.D.
2  mentioned before.
3      The letter is dated November 1st,
4  2006, and is also from me to Mr. Notargiacomo.
5  And I believe you testified that you have seen
6  this letter before?
7      A    I believe I have seen this one.
8      Q    When did you first see it?
9      A    I don't recall.
10      Q    Would it have been before you began
11  work on your reply in this case or after?
12      A    I really don't recall.  I believe it
13  might have been before.
14      Q    Okay.  Let's look at the second
15  sentence of the letter, which reads:  We again ask
16  that both plaintiffs' counsel and Professor
17  Rosenthal and Dr. Hartman re-double their efforts
18  to locate and produce any existing material --
19  including clean and marked up versions of drafts
20  of the witness' declarations in this case -- in
21  response to the subpoenas dated December 12th,
22  2005, the subpoenas, by no later than Wednesday,
23  November 8, 2006.
24      Did I read that one correctly, more
25  or less?

Page 623

1  Meredith Rosenthal, Ph.D.
2      A    Yes.
3      Q    I take it you were aware that the
4  defendants had made this request?
5      A    I believe so, yes.
6      Q    What, if anything, have you done to
7  locate any drafts of your original declaration in
8  this case in response to this request?
9      A    As I mentioned before, I don't save
10  those original drafts that were sent, so I -- I
11  didn't have anything to send.  I don't know if
12  they were saved by someone else and might have
13  been sent.  I'm not aware of that.
14      Q    Okay.  Did you take any steps at all
15  to respond to this request?
16      A    I did not.
17      Q    Let's look at the request in footnote
18  number one, which reads:  In addition, we
19  reiterate the request made at Professor
20  Rosenthal's deposition for production of, or, if
21  already produced, identification of the
22  spreadsheets summarizing third-party data on
23  Neurontin sales that Professor Rosenthal testified
24  that she has reviewed.
25      I take it you were aware of this

Page 624

Meredith Rosenthal, Ph.D.

1     Meredith Rosenthal, Ph.D.
2   request as well?
3     A    That's right.  I was.
4     Q    What, if anything, did you do to
5   locate the documents called for in this request in
6   footnote one of this November 1st, 2006, letter?
7     A    I have a somewhat incomplete
8   recollection, but I do recall that we discussed
9   that those documents had been part of the Franklin
10   matter.  There was some discussion that suggested
11   to me that they did not need to be produced again
12   because they had been produced in that matter.
13     Q    Just focusing on the second aspect of
14   the question or the request, I guess, was that if
15   they have already been produced, that defendants
16   requested identification of the spreadsheets that
17   you had referred to in your prior testimony.
18     What steps, if any, did you take to
19   identify the spreadsheets that you were thinking
20   about when you testified back in October?
21     A    I certainly discussed it with
22   Ms. Rushnowitz and I believe with
23   Mr. Notargiacomo.  And I believe, again, the
24   substance of the conversation was that because
25   those were in the Franklin matter, that it would

Page 625

Meredith Rosenthal, Ph.D.

1     Meredith Rosenthal, Ph.D.
2   be made known that they had been produced for that
3   matter, and that I needed to not take any further
4   steps to make sure those were produced.
5     Q    Are you aware that they were never
6   produced or identified to defendants?
7     A    I was not aware of that, no.
8     Q    Would you be able to identify the
9   documents, assuming they had been produced in the
10   Franklin matter, now?
11     A    I think I would, yes.
12     Q    As you sit here today or would you --
13     A    The sentences are vague enough, but
14   my understanding is that this refers to the
15   national disease and therapeutic index data that
16   we reviewed and referenced in my earlier
17   declaration.
18     Q    Let's take a look back at Exhibit
19   1 -- rather, your original declaration, and just
20   see if we can try to figure this out.
21     A    Okay.  That should be 18; right?
22     Q    It's Exhibit 1, actually --
23     A    Oh, 1, sorry.
24     Q    -- which had been marked at your
25   earlier deposition.

Page 626

Meredith Rosenthal, Ph.D.

1     Meredith Rosenthal, Ph.D.
2     A    It must have been at the bottom.
3   That would be it.
4     Allow me a moment.  I will find what
5   I thought was the reference.
6     MR. NOTARGIACOMO:  I don't think
7   there is a question on the table, is there?
8   BY MR. POLUBINSKI:
9     Q    There may not be.  We can certainly
10   put one on the table.  If you can help me find in
11   Exhibit 1 -- go ahead.
12     A    Paragraph 40, subparagraph C,
13   footnote 72, and the related text preceding it.
14     Q    Okay.  I think we have been through
15   this before in your earlier deposition, but I'm
16   assuming that, I gathered from your earlier
17   testimony, that you had reviewed something other
18   than the material referenced in footnote 73 to
19   support this statement in paragraph 41, sub C; is
20   that correct?  Or is it just the material
21   referenced in footnote 73?
22     A    It is the material referenced in
23   footnote 73.  There is -- that, of course, is a
24   paper document, and there was a physical Excel
25   spreadsheet that the paper document came from, and

Page 627

Meredith Rosenthal, Ph.D.

1     Meredith Rosenthal, Ph.D.
2   so that it was the backup from that file that I
3   was talking about.
4     But it is that, what's in footnote
5   73, that was used to prepare Exhibit B in their
6   report.
7     Q    Okay.  But it's something in addition
8   to Exhibit B, I take it?
9     A    I think of it as being part of
10   Exhibit B.  If you are saying that the Excel
11   spreadsheet that was the backup for Exhibit B is
12   something different, then yes.
13     Q    I gather that Exhibit B was actually
14   submitted to the court in the Franklin matter and
15   we have a copy of what was submitted to the court.
16     Are you referring to something more
17   than what's in that document or is it just the
18   material that would have been submitted to the
19   court?
20     A    It's just the material that was in
21   Exhibit B, that is my --
22     Q    So, there isn't an additional
23   spreadsheet, in addition to what might have been
24   referenced in that particular document, that you
25   relied on?

Meredith Rosenthal, Ph.D.

1          Meredith Rosenthal, Ph.D.
2     A     No.
3     Q     Okay. Let's look at attachment A of
4  Exhibit 18, your reply.
5          And attachment A reads:  Additional
6  documents relied upon.  Did I read that correctly?
7     A     That's correct.
8     Q     And, so, are the documents that are
9  listed here in attachment A all of the additional
10 documents that you relied on in connection with
11 your work in this matter?
12    A     That's correct.
13    Q     And when you say "additional," I take
14 it what you mean is in addition to the documents
15 that were identified in your first declaration, as
16 reflected in attachment A.2 of Exhibit 1; is that
17 correct?
18    A     That's correct.
19    Q     Have you reviewed any documents,
20 other than the ones reflected in Attachment A
21 to Exhibit 18, in connection with your work in
22 this case since October of last year?
23    A     I would have reviewed a few more
24 articles by Dr. Scott Morton.  I believe I looked
25 at some of Dr. Keeley's papers, but I didn't use

1          Meredith Rosenthal, Ph.D.
2  them in my declaration, so I don't include them
3  here.
4     Q     The first document that is listed in
5  attachment A is the Amended Class Action Complaint
6  in this case, dated February 1, 2005.
7          Are you aware that's no longer the
8  operative complaint in this case?
9     A     I -- now that you mention it, I
10 believe I understood that there were revisions.
11 Perhaps, this is -- I think it's just a question
12 of having referenced the wrong one.
13    Q     Okay. So, you are, generally
14 speaking, at least aware that there are further
15 amendments to the complaint that have been filed
16 in this case?
17    A     That's my understanding, yes.
18    Q     Which of those complaints did you
19 rely on in formulating your opinions that are set
20 forth in your reply.
21    A     Well, I would have used the most
22 recent one, at least to my understanding.
23    Q     Okay. So, is it correct to say that
24 this first document here should be third amended
25 class action complaint?

1          Meredith Rosenthal, Ph.D.
2     A     I believe that's correct, yes.
3     Q     Also on this list are declarations
4  and deposition testimony of Professors Scott
5  Morton and Chintagunta, and Dr. Keeley; correct?
6     A     That's correct.
7     Q     Now, are you aware that they were not
8  the only expert declarations that defendants filed
9  with their papers in opposition to plaintiffs'
10 class -- motion for class certification in this
11 case?
12    A     I believe that there were some
13 clinical experts, but I did not review them for my
14 reply.
15    Q     Okay. When you say "clinical
16 experts," I take it you mean declarations that
17 were filed by medical doctors, experts in clinical
18 practice in connection with the filing of
19 defendant's opposition to plaintiffs' motion for
20 class certification; is that correct?
21    A     That's correct.
22    Q     It sounds like you were aware of
23 these declarations.  Did you review them?
24    A     I do not recall.  I may have received
25 them, but I certainly didn't spend any time on

1          Meredith Rosenthal, Ph.D.
2  them.  I may have looked at one of them, but I
3  don't recall specifically.
4     Q     So, am I correct, at most, you would
5  have looked at maybe one of them?
6     A     I think that's correct.
7     Q     You wouldn't have actually reviewed
8  them in connection with your work here?
9     A     With the exception of the declaration
10 of Dr. Argonbright, as we have discussed in the
11 past, I don't believe I reviewed any of the
12 clinical expert reports in connection with this
13 work, certainly.
14    Q     And do you remember were they -- they
15 were provided to you, I take it?
16    A     I'm sorry for the memory loss
17 problems, but I believe that I did receive at
18 least one clinical expert report.
19    Q     I guess, is there a reason that you
20 wouldn't have reviewed their reports?
21    A     The reports I didn't believe were
22 relevant for my work in that I am not a clinical
23 expert, so I wasn't in a position to be able to
24 evaluate them.  So I would assume that plaintiffs
25 would employ clinical experts to address those

Page 632

Meredith Rosenthal, Ph.D.

1   issues, and should matters of relevance come out
2   of that, then I would need to know about it, but
3   the reports, themselves, I am not in a position to
4   judge.
5       Q    Do you know whether plaintiffs have
6   employed clinical experts in this case?
7       A    I do not know that.
8       Q    So, you haven't had contact, at least
9   with any clinical experts in this case that
10  plaintiffs have employed?
11      A    No, I have not.
12      Q    And you are not aware of whether or
13  not they have retained clinical experts one way or
14  the other; is that correct?
15      A    I'm afraid I'm not.
16      Q    In the Eli Lilly matter that you
17  discussed before, you said that you reviewed
18  declarations that had been prepared by clinical
19  experts in that case; correct?
20      A    Yes, that's correct.
21      Q    Had there been reports by clinical
22  experts in this case, is there a reason why you
23  wouldn't have reviewed those?
24      A    In that matter, I --
25

Page 633

Meredith Rosenthal, Ph.D.

1       Q    In this case.
2       A    I'm sorry.  Excuse me.  In this case,
3   the issues I'm addressing right now don't require
4   looking at the clinical expert reports.  In the
5   Zyprexa matter, the clinical expert reports seemed
6   most relevant in the damage calculations, in the
7   phase of examining impact quantitatively.
8       Q    Why?
9       A    Well, here I am focused on the method
10  for doing so, not the specific clinical
11  applications that the ultimate analysis will
12  examine.
13      Q    But opinions of clinical experts, am
14  I correct that opinions of clinical experts would
15  impact any ultimate damage calculation that you
16  reach in this case?
17      A    I think in order to make a damage
18  calculation, I need to know which allegations to
19  assume can be proven.  If that evolves from the
20  original complaint because of expert testimony,
21  then that would certainly impact the scope of my
22  calculations.
23      Q    How so?
24      A    Well, again, if the court were to
25

Page 634

Meredith Rosenthal, Ph.D.

1   find, for example, that certain kinds of diagnoses
2   could not be examined because there was not
3   evidence to suggest that the allegations were
4   true, then I would incorporate that into my
5   calculations.
6       Q    When you say the allegations, in your
7   last sentence; so, in other words, if the court
8   were to find that certain kinds of diagnoses could
9   not be examined because there was not evidence to
10  suggest the allegations were true, which
11  allegations are you talking about there?
12      A    So, the allegations with regard to
13  improper marketing of Neurontin for unapproved
14  uses.
15      Q    And I take it that the opinions of
16  the clinical experts would reflect on that
17  question?
18      A    That -- whatever the resolution of
19  those two sets of opinions, right, there will be
20  plaintiffs clinical experts presumably, and
21  defendants clinical experts, and someone will
22  judge, not I, because I am not a clinical expert,
23  which of those is more meaningful, and that will
24  go to my results.
25

Page 635

Meredith Rosenthal, Ph.D.

1       Q    Were there no dispute, I guess, were
2   the only expert testimony the testimony that's
3   been offered by defendants in opposition to the
4   motion for class certification, what impact, if
5   any, would that have on your damages calculation?
6       MR. NOTARGIACOMO:  Object to the
7   question, but you can answer.
8       A    The damages calculation, as it's
9   described now, is quite general, and
10  generalizable, and so it applies to whichever of
11  the allegations can finally be proved.  So, I can
12  do an analysis and I have described an analysis
13  that goes condition by condition.
14      So, the court, and a jury has a role
15  to play in this matter, can determine damages by
16  condition.
17      Q    Am I right, just focusing on sort of
18  indication by indication, does your report or your
19  analysis assume that at least on an
20  indication-by-indication basis Neurontin worked
21  for everyone or worked for no one, but that there
22  is no in-between?
23      MR. NOTARGIACOMO:  Objection.
24      A    Could you reiterate that.  I'm just
25

Meredith Rosenthal, Ph.D.

1    Meredith Rosenthal, Ph.D.
2  trying to under the nuance of your question.  I'm
3  sorry.
4    Q    Yeah.  Does your report -- let me
5  withdraw it.
6        Does your proposed model assume that,
7  for a particular indication at least, on an
8  indication-by-indication basis, Neurontin either
9  worked for everyone who took it or for no one who
10  took it, but that there isn't some sort of middle
11  ground where it may have worked for some and not
12  for others?
13    A    My model endeavors to estimate the
14  impact of the allegedly improper marketing on use.
15  Dr. Hartman's model then looks at that quantity,
16  and will apply a damage theory to it, which, as
17  he's been instructed to date, is only about how
18  much the class spent on those drugs and does not
19  account for, as you suggest, whether individuals
20  benefitted or not from the drug.
21    Q    I guess what I am trying to get at
22  is:  I gather that in your opinion, in the Eli
23  Lilly case, whether the drug worked or not does
24  impact your ultimate damages calculation in some
25  way or another; am I right about that?

1    Meredith Rosenthal, Ph.D.
2    A    Not, I believe, in the way that you
3  mean it.  You are talking about an individual
4  level of fact and --
5    Q    I'm not talking about that.  I'm
6  just -- all I am asking is whether, is whether the
7  two are related somehow.
8        You had said before that your report
9  in that matter refers to and makes assumptions
10  based on the opinions of clinical experts that
11  have been filed by the plaintiff's counsel in that
12  case, and my understanding is that the reason that
13  it refers to them is because the question of
14  efficacy is relevant to your damages calculation.
15  Am I right about that or not?
16    A    It's relevant to my willingness to
17  assume the allegations are true.  It's only
18  relevant as a piece of support for that
19  assumption.
20    Q    Okay.  All right.  Let's move on.
21        We are actually at 1:30.  Do you want
22  to break now, it's up to you?
23    A    That's great, thank you.
24        THE VIDEOGRAPHER:  Going off the
25  record.  This ends tape two.

1    Meredith Rosenthal, Ph.D.
2        (Recess taken.)
3        THE VIDEOGRAPHER:  Back on the
4  record.  The time is the 2:05.  This is tape
5  three.
6  BY MR. POLUBINSKI:
7    Q    Okay.  Let's -- let's turn, again, to
8  your proposed model, and let's look especially, or
9  in particular, at page two, paragraph three.
10    A    Exhibit 1?
11    Q    Of exhibit 18, I'm sorry.
12    A    Okay.
13    Q    My fault, the reply declaration.
14    A    I'm sorry.  Could you repeat.
15    Q    Page two, paragraph three.  And, in
16  particular, what I would like to do is look at the
17  last clause of -- that you end this paragraph
18  with, which reads:  The econometric models I
19  propose nonetheless will produce a valid estimate
20  of the aggregate number of Neurontin prescriptions
21  caused by the marketing and promotional activities
22  at issue; correct?  Did I read that right?
23    A    Correct.
24    Q    Am I right that the marketing and
25  promotional activities at issue in this sentence

1    Meredith Rosenthal, Ph.D.
2  would be the activities that the plaintiffs or the
3  court later inform you are fraudulent?
4    A    That's correct.
5    Q    I believe that you testified before
6  the last time we met, that you wouldn't be the
7  person, you yourself wouldn't be the person
8  deciding whether a particular piece of conduct was
9  fraudulent or not; is that correct?
10    A    That's correct.
11    Q    And I assume that that's still a
12  correct understanding of your role?
13    A    That's correct.
14    Q    And if I am remembering it right, I
15  believe, instead, that you would expect
16  plaintiff's counsel to inform you whether a
17  particular piece of conduct was actionable or not;
18  is that correct?
19    A    That's correct.
20    Q    And if I remember it right, the time
21  at which that happened I think you described as
22  the implementation stage?
23    A    That's correct.
24    Q    Okay.  And if I understand it right,
25  at the implementation stage, what you would do is

Meredith Rosenthal, Ph.D.

1
2  you would plan to use your proposed model to
3  generate the aggregate incremental number of
4  additional prescriptions caused by the marketing
5  and promotional activities at issue; is that
6  correct?
7      A    That's correct.
8      Q    In generic terms at least, you would
9  expect the marketing and promotional activities at
10 issue to include publication of certain articles?
11     A    Those are certainly named in the
12 complaint.  So, yes, in those terms.
13     Q    In the same terms, would you also
14 expect the marketing and promotional activities at
15 issue to include presentations to doctors at CME
16 events and the like?
17     A    That's correct.
18     Q    Also teleconferences sponsored by the
19 company?
20     A    That's correct.
21     Q    How about certain face-to-face
22 meetings, such as detailing visits?
23     A    That's correct, yes.
24     Q    Anything else that I am forgetting
25 that would fall within the category of marketing

Meredith Rosenthal, Ph.D.

1
2  and promotional activities at issue?
3      A    I believe those are the main
4  categories.  There are a large number of
5  activities that are mentioned in the complaint
6  specifically, but I think that you have hit upon
7  the largest ones.
8      Q    Okay.  By seeking to measure the
9  impact of the marketing and promotional activities
10 at issue, your proposed model would seek to
11 measure the difference between the number of
12 Neurontin prescriptions that actually occurred, on
13 the one hand, and on the other hand number of
14 Neurontin prescriptions that would have occurred
15 had the marketing and promotional activities at
16 issue not taken place at all; is that correct?
17     A    That's correct.
18     Q    So, I think we can agree that your
19 proposed model would not be proposing to create a
20 "but for scenario" in which some number of the
21 marketing and promotional activities at issue
22 would have still taken place in some altered or
23 corrected form; is that correct?
24     A    That's correct.
25         (Rosenthal Exhibit 28 marked for

Meredith Rosenthal, Ph.D.

1
2  identification as of this date.)
3      Q    We pre-marked the next exhibit, which
4  I will hand to you now.  It's been marked as
5  Exhibit 28 to your deposition.
6          Do you recognize this document?
7      A    Yes, I do.
8      Q    What is it?
9      A    This is the third amended class
10 action complaint.  It says proposed, which I am
11 not entirely sure what that means, in brackets.
12     Q    Okay.
13     A    It says it was filed on the top,
14 so --
15     Q    No, no, no.  I understand that.
16         I guess what I may do is swap out --
17 is swap out the exhibit after the fact if you
18 don't mind.
19     A    Okay.
20         MR. POLUBINSKI:  Can we go off the
21 record for just one second?
22         MR. NOTARGIACOMO:  Sure.
23         THE VIDEOGRAPHER:  Going off the
24 record.  The time is 2:10.
25         (Discussion held off the record.)

Meredith Rosenthal, Ph.D.

1
2          THE VIDEOGRAPHER:  Back on the
3  record.  The time is 2:11.
4          MR. POLUBINSKI:  Okay.  While we were
5  off the record, we talked about the fact
6  that the exhibit that we have marked is the
7  proposed third amended complaint in this
8  action.
9          As Mr. Notargiacomo and I discussed,
10 the court granted leave to file the third
11 amended complaint on December 18th of 2006,
12 and it had been our intention to mark the
13 actual complaint as filed as an exhibit.  To
14 the best of our collective understanding, I
15 think that's right, Ed.
16         MR. NOTARGIACOMO:  That's right.
17         MR. POLUBINSKI:  The proposed third
18 amended complaint is identical to the actual
19 third amended complaint that was actually
20 filed, and we will go ahead with the
21 questioning, using the proposed third
22 amended complaint, realizing that at some
23 point in the future we will swap it out with
24 the actual third amended complaint as filed.
25 Of course, if there are any changes, we can

Page 644

Meredith Rosenthal, Ph.D.

1       Meredith Rosenthal, Ph.D.
2  deal with that issue then.  We are
3  reasonably confident that there aren't.  In
4  the interest of moving ahead, we will
5  proceed that way as long as everyone is fine
6  with that.
7       MR. NOTARGIACOMO:  That is fine with
8  me.
9       Q    So, can you turn, please, to page 109
10 of Exhibit 28?  And in particular, take a look at
11 paragraph 268.
12      A    Okay.
13      Q    Okay.  This paragraph provides a list
14 of certain journal articles, published between
15 2001 and 2005, concerning certain off-label uses
16 of Neurontin; is that correct?
17      A    That's correct.
18      Q    Okay.  Let's turn to the next page of
19 the complaint, and look at the first sentence of
20 paragraph 269.
21           And do you see that plaintiff alleged
22 that the articles listed on the previous page,
23 "contained numerous false and misleading key
24 messages"?
25      A    I see that sentence, yes.

Page 645

1       Meredith Rosenthal, Ph.D.
2       Q    Some number of these articles, I take
3  it, would potentially be included among the
4  marketing and promotional activities at issue in
5  this case, is that your understanding?
6       A    They would certainly consider them
7  for inclusion, yes.
8       Q    Okay.  For context, why don't we look
9  at some of those specific allegations regarding
10 some of these articles, and let's look at
11 paragraph 271, which is at the bottom of page 110.
12           In that paragraph, plaintiffs allege
13 that an article by Dr. Thomas Guttoso,
14 G-U-T-T-O-S-O, regarding hot flashes published in
15 Obstetrics and Gynecology in February of 2003,
16 made a false statement.
17           Do you see that?
18      A    I do see that, yes.
19           MR. POLUBINSKI:  Let's mark the next
20 exhibit.
21           (Rosenthal Exhibit 29 marked for
22 identification as of this date.)
23      Q    So, we have handed you a document I
24 believe we have marked as Exhibit 29.
25           Does this appear to be the article

Page 646

1       Meredith Rosenthal, Ph.D.
2  that is discussed in paragraph 271 of the third
3  amended complaint?
4       A    It does appear to -- I was just
5  looking for a date on the article, this says --
6       Q    If you look down at the very bottom.
7       A    Right, great.  February 2003.
8  February 2003, Obstetrics and Gynecology.  It does
9  appear to be the article.
10      Q    Do you see on first page of the
11 article, the second column, the last paragraph on
12 the page, I think it's the second sentence, the
13 article reads:  Since then, gabapentin has show
14 efficacy in control studies for neuropathic pain,
15 migraine headache, essential tremor, panic
16 disorder and social phobia.
17           Did I read that correctly?
18      A    Yes, you did.
19      Q    Okay.  Let's look at back at
20 paragraph 271 in the third amended complaint,
21 which carries over between page 110 and 111.
22           Do you see that the sentence that I
23 just read to you is something that the complaint
24 alleges to be false?
25      A    Right.  That is the omission of

Page 647

1       Meredith Rosenthal, Ph.D.
2  reference to negative studies in those areas, is
3  that what you are describing?
4       Q    I'm looking at the first sentence.
5  Maybe that will get us to the -- what just said
6  maybe gets us to the answer.
7           But the first sentence says that the
8  article falsely states, and then reads from the
9  sentence that I think we just read; is that
10 correct?
11      A    I think that's right, yes.
12      Q    I think what you were looking at was
13 the next page --
14      A    Yes.
15      Q    -- which reads: the articles is
16 misleading, I think it probably means to say
17 misleadingly, the article misleading omitted any
18 reference to negative studies in those areas and
19 falsely cited the panic disorder trial as
20 supporting efficacy when, in fact, it did not.
21 Did I read that --
22      A    I see that, sorry.
23      Q    Now, other than the allegations that
24 are contained in paragraph 271, are you aware of
25 any other allegations of false or misleading

Meredith Rosenthal, Ph.D.

1        Meredith Rosenthal, Ph.D.
2   statements that plaintiffs allege were made in Dr.
3   Guttoso's 2003 article?
4      A   Assuming they would have been
5   referenced in the same paragraph, I don't see
6   anything else.
7      Q   Okay.  So, I guess, if the articles
8   had omitted the allegedly false statements
9   regarding Neurontin's efficacy for these other
10  conditions, or if they had simply referred to the
11  allegedly negative studies described in the
12  complaint, plaintiff's allegations about this
13  article would no longer apply?
14        MR. NOTARGIACOMO:  Objection.  Calls
15  for a legal conclusion.
16     Q   As you understand it.
17     A   I -- it sounds to me that you are
18  asking me if, if the information that we just
19  discussed that you just read to me from this
20  article was not in the article, there would be no
21  violation alleged associated with this article, is
22  that --
23     Q   Let me put it another way that, I
24  think, is probably simpler.
25     A   Okay.

1        Meredith Rosenthal, Ph.D.
2     Q   If the article's author had omitted
3  the allegedly false statement regarding
4  Neurontin's efficacy, or had referred to the
5  allegedly negative studies that are described in
6  the complaint, plaintiffs' allegations about what
7  made the article false would no longer accurately
8  describe the article?
9     A   I agree with regard to the
10  allegations that I can see here that we have
11  discussed.  I can't say that there are no other
12  allegations in the complaint that might cover this
13  article, but I certainly, what I see here refers
14  very specifically to this paragraph.
15     Q   And as you sit here right now, you
16  don't know of any other allegations in the
17  complaint that apply to this article?
18     A   That's correct.
19     Q   Do you have an opinion as to whether
20  this article by Dr. Guttoso regarding hot flashes
21  would have still been published if the authors had
22  been prohibited from including this sentence
23  regarding Neurontin's efficacy for these
24  conditions?
25     A   Having not read the article, I can't

1        Meredith Rosenthal, Ph.D.
2   say the extent to which those statements are
3  important in framing the trial results.  I don't
4  really know.
5     Q   Would it help if you took a minute to
6  look through the article?
7     A   Sure.
8     Q   Let me know when you have had enough
9  time to look at it.
10     A   The specific statements that you read
11  to me do not seem to be related to any of the
12  major conclusions that they draw in the
13  discussion.  So I -- you know, I can't say for
14  sure, but I think it's certainly possible that the
15  article would have been published in the absence
16  of those statements.
17     Q   You don't, in any event, have any
18  basis for saying that the article would not have
19  been published in the absence of those statements?
20     A   That's correct.
21     Q   I think, as we discussed, your model
22  seeks to estimate or would seek to estimate, among
23  other things, the effect that publication of
24  journal articles had on Neurontin prescriptions;
25  is that correct?

1        Meredith Rosenthal, Ph.D.
2     A   That's correct.
3     Q   In measuring the impact of journal
4  articles on prescriptions of Neurontin, your model
5  would not have anyway to account for the
6  possibility that an article, such as Dr. Guttoso's
7  February 2003 article, marked as Exhibit 29 would
8  have still been published even if the authors had
9  been required to omit or correct the allegedly
10  fraudulent statements that are contained within
11  it?
12     A   That's correct.
13     Q   Okay.  Instead, your model has
14  proposed to measure the impact on prescriptions of
15  entire articles, not portions of articles?
16     A   That's correct.  I -- may I note that
17  this article is about gabapentin's effects on hot
18  flashes, correct.  And, so, I would look to see
19  it's effects regarding the specific areas that are
20  mentioned in the complaint here, the panic
21  disorder, the claim about not having negative
22  studies relating to panic disorder, et cetera.
23      So, those would be connected to the
24  specific conditions for which the allegations were
25  made.

Page 652

Meredith Rosenthal, Ph.D.

1
2   Q     I guess I'm not sure I --
3   A     So.
4   Q     -- understand your clarification.
5   A     So, to the extent this article were
6   published in the "but for world," it would be
7   presumed to affect use of hot flashes in the "but
8   for world" without mention of these other uses of
9   gabapentin.  And, so, the issue related to the
10  statement about these other uses should be
11  considered in the context of the allegations with
12  regard to promotion of Neurontin for those other
13  uses, not for hot flashes.
14  Q     Let me see if I understand this.  Are
15  you saying that promotion for hot flashes is not
16  something that you understand would generate
17  liability in this case?
18  A     I was not, actually.  And as I sit
19  here now, I would have to really review the
20  complaint to tell you whether that was at issue or
21  not.  My statement was that the relevance of this
22  article for estimating impact would go to the
23  off-label uses for which these specific mentions
24  are alleged to be fraudulent, and had those
25  statements not been in the article, and the

Page 653

Meredith Rosenthal, Ph.D.

1
2   article was published otherwise, presumably that
3   is a "but for world" in which this article doesn't
4   address those other uses.
5   Q     Maybe it makes sense to move on to
6   the next article to try to get at this a little
7   more cleanly.
8   A     Okay.
9         (Rosenthal Exhibit 30 marked for
10        identification as of this date.)
11  Q     So, we have handed you what I think
12  has been marked Exhibit 30 to your deposition.
13  And let's look -- let's look, actually, first back
14  at Exhibit 28, the third amended complaint.
15  A     Okay.
16  Q     And look at paragraph 272, on page
17  111.
18  A     Okay.  I see it.
19  Q     272 reads:  Another article by
20  Guttoso published in the Journal of Pain Symptom
21  Management, March 2004 falsely stated that,
22  "gabapentin was approved, in brackets in 2002, as
23  a treatment for neuropathic pain," when, in fact,
24  the FDA had informed Pfizer that its application
25  for neuropathic pain was not approvable.

Page 654

Meredith Rosenthal, Ph.D.

1
2         Did I read that correctly?
3   A     Yes, you did.
4   Q     Let's look at Exhibit 30.  Does this
5   appear to be the article that is discussed in
6   paragraph 272 of the third amended complaint?
7   A     It does appear to be this article,
8   yes.
9   Q     Let's flip to the second page of the
10  exhibit, which is page 275, of the article,
11  itself, or of the journal in which the article is
12  published, I guess.
13        And take a look at the first sentence
14  under the heading "comment."  The first sentence
15  reads:  "Gabapentin is a gamma aminobutyric acid"
16  -- did I do okay on that?
17  A     Sorry.  I didn't mean to smile.
18  Q     Not at all.
19        Gaba-analog approved in 1994 as an
20  anti-convulsant and in 2002 as a treatment for
21  neuropathic pain.
22        With apologies for my pronunciation,
23  did I read that correctly otherwise?
24  A     Yes.
25  Q     And looking back at paragraph 272,

Page 655

Meredith Rosenthal, Ph.D.

1
2   the sentence that I just read, or at least part of
3   that sentence, is the portion of this article that
4   the complaint alleges is false; is that correct?
5   A     That appears to be correct, yes.
6   Q     Now, other than the allegations that
7   are contained in paragraph 272, are you aware of
8   any other allegations of false or misleading
9   statements that plaintiffs have made with respect
10  to Dr. Guttoso's March 2004 article?
11  A     There are none that I can tell you
12  exist now.  I would need to review the complaint.
13  But I believe you if you said there are no others
14  mentioned.
15  Q     In any event, as we sit here today,
16  there aren't any others that you know of?
17  A     That's correct.
18  Q     We discussed at your deposition in
19  October, didn't we, that Neurontin was approved
20  for the treatment of posthepatitic neuralgia in
21  2002?
22  A     That's correct.
23  Q     You are aware, I assume, that
24  posthepatitic neuralgia is a type of neuropathic
25  pain; correct?

Page 656

Meredith Rosenthal, Ph.D.

1
2     A     That's my understanding.
3     Q     So, you would agree that insofar as
4  this sentence is at all the misleading, it could
5  be made perfectly accurate by changing it to read
6  that gabapentin was approved in 2002 as a
7  treatment for posthepatitic neuralgia, a type of
8  neuropathic pain?
9     A     That would appear to be a correct
10  statement, yes.
11     Q     And, so, all we would be doing is
12  adding five words to the article, and you are
13  welcome to either take my counting as true, or you
14  can do your own counting, whichever you prefer.
15     A     With regard to the five words, I will
16  take your counting.  Of course, it only takes one
17  word to change the entire meaning of a sentence,
18  so I am not sure what your point is there.
19     Q     I guess my question is:  If Dr.
20  Guttoso had added those five words, plaintiffs'
21  allegation about why this article is allegedly
22  fraudulent would no longer be accurate?
23     A     That seems to be true, yes.
24     Q     Do you have an opinion as to whether
25  this article by Dr. Guttoso would have still been

Page 657

Meredith Rosenthal, Ph.D.

1
2  published if the author had needed to add the five
3  words that we just discussed?
4     A     As with the other article, I am not a
5  clinical expert in this area.
6          Since this is a case report, and is
7  drawing some conclusions that it seems are related
8  to gabapentin's previous approval as a treatment
9  for a neuropathic pain, it may be relevant, but
10  it's very hard for me to tell whether that's an
11  important fact or not.  So, I can't say.
12     Q     Okay.  But you don't have any basis
13  at this point for saying that the article would
14  not have been published?
15     A     That's true.
16     Q     And sort of to circle back, in
17  measuring the impact of journal articles on the
18  prescription of Neurontin, your model wouldn't
19  account for the possibility that an article like
20  this one, Dr. Guttoso's February or March 2004
21  article, would have still been published in this
22  modified or corrected form; is that correct?
23     A     The model would, does not account for
24  that.  What data I put into the model, of course,
25  I would take into consideration which articles to

Page 658

Meredith Rosenthal, Ph.D.

1
2  look at for which conditions, right, which ones
3  were relevant.
4     Q     Okay.  I'm not quite sure what that
5  means.  Maybe you could tell me a little bit more.
6     A     Well, it's not clear to me that every
7  article individually would appear relevant at the
8  time of modeling.  I would certainly examine the
9  articles as we have just done.
10     Q     Can you say conclusively at this
11  point the publication of this article in this form
12  did not cause additional prescriptions of
13  Neurontin for off-label uses?
14     A     Can I say conclusively that the
15  article did not?  Certainly, not at this point,
16  no.
17     Q     Assuming that you can't reach that
18  conclusion, would you be able to exclude this
19  article from your model?  Or do you anticipate
20  that you would be able to reach that conclusion at
21  some future date?
22     A     I would need to evaluate all of --
23  all of the data that would go into estimating my
24  model, including any specific articles, as well as
25  the other forms of promotion that will ultimately

Page 659

Meredith Rosenthal, Ph.D.

1
2  go in the model.
3     Q     I guess if you -- if you can't
4  conclude that this article would not have impacted
5  total promotions, you would try to take it into
6  consideration in your modeling; is that correct?
7     A     One way or another, you mean, not
8  necessarily -- I will need to account for the
9  publication of articles related to -- such as
10  these, related to Neurontin's use for the
11  indications that I am ultimately asked to estimate
12  impact for, right.
13          So, I would need to evaluate whether
14  this should be included, and it would certainly
15  require some outside judgment from someone who is
16  expert in this field as to whether this article
17  should be included or not.
18     Q     And when you include the article,
19  just to circle back, you would either include the
20  article as published or not include the article at
21  all.  Would you be modeling, essentially, is, you
22  know, the effect of the article as published
23  versus the effect if the article had not been
24  published at all; is that correct?
25     A     I believe, if I understand you

Page 660

1        Meredith Rosenthal, Ph.D.
2    correctly, that it will -- it may be appropriate
3    to include it in either both the actual and "but
4    for worlds" or just the actual world.
5        Q    Okay. I think I understand that.
6            Let's set the article aside and look
7    at pages 74 and 75 of the third amended complaint,
8    paragraph 184.
9            Okay. 184, if I understand it
10   correctly, sets forth the list of events that
11   discussed Neurontin's use as a treatment for the
12   various anxiety disorders, but failed to inform
13   physicians of the negative clinical trials for
14   social phobia.
15           Is my understanding correct?
16       A    That -- I believe that's what it
17   says, yes.
18       Q    So, some number of these events, I
19   take it, would potentially be included among the
20   marketing and promotional activities whose effects
21   on prescribing you would be trying to measure; is
22   that right?
23       A    That's right.
24       Q    Let's flip to the page before, page
25   74, and look at paragraph 83 and, in particular,

Page 661

1        Meredith Rosenthal, Ph.D.
2    focus on this third sentence, sort of in the
3    middle of the paragraph, which reads: In some of
4    the programs described below, physicians were
5    informed that Parke Davis had conducted a clinical
6    trial which appeared to support Neurontin's use
7    for social phobia. But by failing in the same
8    presentation to disclose the negative trial
9    relating to panic disorder, defendants presented a
10   misleading picture of the Neurontin's efficacy.
11           Did I read those two sentences
12   correctly?
13       A    Yes, you did.
14       Q    Do you have any opinion as to whether
15   programs discussing Neurontin's use in treating
16   social phobia would have taken place if the
17   speakers at those program would have been required
18   to mention not only an apparently positive study
19   regarding social phobia, but also a negative study
20   regarding panic disorder?
21       A    My -- my current understanding is
22   that if such a requirement were made, if, in fact,
23   they were required to report the negative trial
24   results, that would essentially have -- have made
25   the event a much less profitable proposition,

Page 662

1        Meredith Rosenthal, Ph.D.
2    right. So, to show positive results for one
3    anxiety disorder and negative results for another
4    would certainly have been a less favorable
5    marketing message and is likely to have reduced
6    the profitability of that event.
7        Q    Okay. But I guess my question is:
8    Do you have any bases for saying the programs
9    wouldn't have gone forward?
10       A    Since this didn't actually happen,
11   there is no data one can look at to say for
12   certain, but it would be my presumption that the
13   return on investment of offering this event would
14   have been lower, and that would have raised the
15   probability that they would not have had the
16   events altogether.
17       Q    What is -- I'm sorry. What is your
18   presumption based on?
19       A    Pure economics. So, if they came in,
20   marketing Neurontin for social phobia, in the
21   context of these broader anxiety disorders, and
22   also mentioned some negative results for anxiety
23   disorders, on that they might not have seen any
24   increase in prescribing rate.
25       Q    I guess when you say pure economics,

Page 663

1        Meredith Rosenthal, Ph.D.
2    I'm not sure I -- I'm not sure I understand what
3    the sort of -- what the foundational, you know,
4    what the basis of that is.
5        A    So, the notion of a return on
6    investment, the reason a manufacturer would hold
7    events like this is because they hope to increase
8    total prescribing for Neurontin.
9        Q    And on what are you basing your
10   assumptions on what the comparative return on
11   investment would be?
12       A    The fact that advertising, giving
13   information about the negative clinical trial
14   result, where there is no approved indication,
15   could actually reduce prescriptions for that
16   indication in this case -- sorry, panic disorder.
17       Q    I guess on what are you basing the
18   conclusion that -- that the defendants would have,
19   you know, would have concluded that the positive
20   trial results would not have outweighed any, you
21   know, disclosure of negative studies as well?
22       A    I can't say for sure that the
23   negative would have outweighed the positive, but
24   certainly it would have changed the balance, and
25   likely reduced the probability of having these

Meredith Rosenthal, Ph.D.

1
2  events altogether.
3      Q    Can you say with certainty that these
4  programs would not have gone forward?
5      A    Not with certainty, no.
6      Q    So, it's at least possible that they
7  would have gone forward, correct, if they had
8  disclosed both studies?
9      A    Well, yes.  Again, but think about
10  the analysis overall.  If the question is looking
11  at the effects of these marketing events on use of
12  Neurontin for panic disorder, then it seems fairly
13  clear that the events should be irrelevant to the
14  use of panic disorder in the "but for world."
15          In the -- in the actual world, both
16  panic -- sorry, the social phobia results would
17  have been discussed and the lack of impact on
18  panic disorder would have been discussed.
19          Can I clarify?
20      Q    Yes, you can.  I am having a hard
21  time following your answer.
22      A    It seems a reasonable assumption to
23  suggest that the model should consider that this
24  event didn't exist for the purposes of panic
25  disorder use in the "but for world."  While it

Meredith Rosenthal, Ph.D.

1
2  may have existed with regard to this positive
3  effect on social phobia, they're separate models
4  by condition here; right?
5      Q    It's your model, you tell me.
6      A    There are separate models by
7  condition.  And, so, the effect that it just
8  wouldn't happen would be a positive effect on
9  promotion with regard to panic disorder.
10      Q    So, help me out here.  So, your model
11  would be modeling these social phobia programs for
12  their marginal impact on panic disorder?
13      A    To the extent that the allegations
14  are supported here, the allegations, to me,
15  suggest that the lack of disclosure of the
16  negative trial of panic disorder led to the
17  presumption that the social phobia effects could
18  be generalized to other anxiety conditions.
19      Q    Okay.  Let me ask you this:  If you
20  are, if your assumption about whether the company
21  would have gone forward with these presentations,
22  you know, if they had needed to disclose both
23  trials instead of just focusing on one, if that
24  assumption turns out to be incorrect, either
25  because that's how the facts play out or the court

Meredith Rosenthal, Ph.D.

1
2  makes some ruling to that effect --
3      A    Okay.
4      Q    -- am I right that your model would
5  still assume that these events would not have
6  taken place at all?
7      A    Again, the model doesn't assume
8  anything.  It depends on what data I ultimately
9  put into it, based on what the court tells me is
10  the right set of assumptions, or counsel tells me
11  the right set of assumptions about what can be
12  proved; and if that's the right set of
13  assumptions, if the right set of assumptions is to
14  assume that these events wouldn't have happened,
15  then that's what I will do.
16      Q    Okay.  Maybe you can help me.  You
17  can just explain it yourself.
18          You know, if you learn that the
19  assumption that you have made about whether or not
20  these events would have gone forward had the
21  negative trial needed to be disclosed as well, if
22  that assumption is wrong, how would you model
23  these events?  How would these events work their
24  way into your model, if at all?
25      A    I am still not clear.  Either, either

Meredith Rosenthal, Ph.D.

1
2  the assumption is correct that the events --
3  correct in the legal sense, that the events would
4  not have taken place because the allegations are
5  true, then the events in my model pick up the
6  alleged effects of the -- of the off-label
7  promotional activities.
8          If I am told that is the wrong
9  assumption for legal reasons, then these events
10  would be captured in general promotional spending,
11  for example.  So, in the portion of unchallenged
12  promotional spending.
13      Q    So, but you wouldn't model these
14  events as events, specifically, other than in the
15  way the spending is baked into that portion of
16  your equation?
17      A    I think it's not altogether clear at
18  this point.  Now, clearly if there are several
19  hundred events, all of them could not be modeled
20  as individual events, and the general trend in the
21  literature is to model promotion in terms of
22  spending, rather than the timing of specific
23  events.
24          As I described in my model, I
25  consider both and potentially use both.

Page 668

Meredith Rosenthal, Ph.D.

1
2    Q    If you actually modeled these events
3    as events, using the assumptions that you are
4    using about what the company would or wouldn't
5    have done, if your assumption proved to be wrong,
6    but that wasn't a conclusion that was ever reached
7    formally or explained to you by plaintiffs or by
8    anybody else, your model results would be
9    inaccurate; isn't that correct?
10    A    The effects of these --
11    Q    Yeah.
12    A    -- events would capture, again, in
13    that instance, where there is some legitimate
14    activity that would have happened anyhow, the
15    effects that I measured would caption both the
16    legitimate activity and the allegedly unlawful
17    activity if that's the case, yes.
18    Q    You understand that plaintiffs and
19    defendants disagree as to whether Neurontin's use
20    for various off-label indications is supported by
21    scientific evidence; correct?
22    A    I believe that I understand that to
23    be the case, yes.
24    Q    Okay.  Let me ask you to assume,
25    hypothetically, that for a given indication the

Page 669

Meredith Rosenthal, Ph.D.

1
2    scientific evidence supporting that use is mixed.
3    A    Okay.
4    Q    So, for example, that there are both
5    valid published studies that show that Neurontin
6    does have a statistically beneficial effect
7    compared with placebo, and then there are other
8    studies that fail to detect any statistically
9    significant beneficial effect as compared to a
10    placebo.
11    And assume that the plaintiffs have
12    alleged, as they have here, that were events where
13    positive studies were discussed, but the negative
14    studies were not disclosed.
15    Are you with me?
16    A    I am, yes.
17    Q    I think, as we discussed, your
18    proposed model would seek to measure how many
19    fewer Neurontin prescriptions would have been
20    written if the events in question had not taken
21    place at all; correct?
22    A    That's correct.
23    Q    And that your model would not seek to
24    measure how many fewer prescriptions would have
25    been written if the events had taken place, but

Page 670

Meredith Rosenthal, Ph.D.

1
2    the defendants had actually discussed both the
3    positive and negative studies; right?
4    A    That's correct.
5    I guess, I am sorry, this area is
6    just somewhat layered, so can I -- I understand
7    that there is a legal issue about not only whether
8    there is any evidence as to Neurontin's
9    effectiveness with regard to specific indications,
10    but what, what would be consider fraudulent based
11    on the specific level of evidence.
12    And that is sort of the extent of my
13    knowledge, but it seems like it's quite a legal
14    issue as to whether some evidence of effectiveness
15    is going to be deemed relevant or not here.
16    Q    Let me ask you a more general
17    question.
18    Have you assumed all of the
19    allegations in the complaint to be true for
20    purposes of your model?
21    A    In the most recent complaint, yes.
22    Q    Okay.  That includes allegations that
23    Neurontin is not effective for the off-label uses
24    at issue; right?
25    A    My understanding is that some of the

Page 671

Meredith Rosenthal, Ph.D.

1
2    allegations are more nuanced than that, but that
3    may be my somewhat poor understanding.  I believe
4    there is discussion of off-label uses, again, for
5    which, as you mention, there is some conflicting
6    clinical trials, so I guess I am not entirely sure
7    that I would agree with the statement you just
8    said.
9    Q    Okay.  Okay.  Maybe let me ask this
10    -- maybe you could help me out a little bit more,
11    and just explain a little bit more what your
12    understanding of that nuanced view is.
13    A    Well, my reading of the allegations
14    was that it wasn't a simple case of just
15    establishing that there was no proof of
16    effectiveness.  My understanding was that some of
17    the allegations, as we just reviewed, relate to
18    only presenting half the story, so presenting
19    positive results without presenting negative
20    results.
21    So, if we are just talking about no
22    evidence of effectiveness, it seems like those
23    positive studies show some evidence of
24    effectiveness and need to be taken in context with
25    the negative studies.

Meredith Rosenthal, Ph.D.

1     So, does that make sense?
2        Q    That's helpful.  I think we can
3  probably keep moving.
4        Let's set aside the complaint and
5  these articles for a minute -- maybe for more than
6  a minute, we will see -- and turn back to your
7  reply, Exhibit 18.
8        MR. NOTARGIACOMO:  I was hoping you
9  would get to her reply at some point today.
10       MR. POLUBINSKI:  We will be spending
11  some time on her reply, Ed.
12       MR. NOTARGIACOMO:  As opposed to
13  going over her previous deposition and
14  original report.
15  BY MR. POLUBINSKI:
16       Q    Let's look at paragraph 17, which
17  is -- starts on page nine.
18       A    Okay.
19       Q    -- and let's look at the first
20  sentence which reads:  While I expect to undertake
21  the instrumental variables analysis above, I also
22  noted in my earlier declaration that I would also
23  look for one or more comparative drugs that can
24  permit a refinement of my analysis.

Meredith Rosenthal, Ph.D.

1        Did I read that correctly?
2        A    Yes, you did.
3        Q    Then you refer in the next sentence
4  to a difference indifference or quasi experimental
5  analysis; correct?
6        A    Yes, that's correct.
7        Q    And then, if we turn the page, the
8  next sentence reads:  Despite the fact -- why
9  don't we just focus on this one clause, which
10  reads:  This approach is widely used by economists
11  to estimate causal effect.
12       Did I read that correctly?
13       A    Yes, you did.
14       Q    Okay.  Are you aware of any published
15  research that has estimated the effects of
16  promotions on sales for a particular drug using a
17  difference inference comparator drug approach
18  along the lines of what you outline here?
19       A    I am not aware of such an analysis,
20  no.
21       Q    So, to the best of your knowledge,
22  your analysis would be the first one to do this?
23       A    For this specific relationship
24  between promotion and a prescription, use of a

Meredith Rosenthal, Ph.D.

1  prescription drug, yes.
2        Q    Professor Scott Morton, Dr. Keeley
3  and Professor Chintagunta identify in the reports
4  what you describe as valid empirical issues or
5  valid modeling challenges that you would face in
6  recreating your proposed model; correct?
7        A    That's correct.
8        Q    Would it be fair to characterize the
9  analysis that you would need to apply as
10  sophisticated or complex?
11       A    I believe I did so, yes.
12       Q    That raises a question for me.
13       In your outline I think you described
14  the analysis as being a "complex analysis."  I
15  think the terminology that you used eventually in
16  your report was "fairly sophisticated."  Does that
17  sound right?
18       You are welcome to take look at
19  Exhibit 22, if you would like.
20       A    Certainly.  Oh, I believe you are on
21  Exhibit 22.  I am just wondering if I used the
22  complex language as well.
23       Q    Sure, I will let you look.
24       A    But you may be right, that I changed

Meredith Rosenthal, Ph.D.

1  it to -- I have no specific recollection.
2        Q    Is there any significance to the
3  change, I guess, is my question?
4        A    No.
5        Q    Paragraph four on page two, the very
6  bottom sentence, which carries over to the next
7  page reads:  Academic economists and expert
8  witnesses overcome the same list of econometric
9  problems routinely in peer-reviewed publications
10  and for the purposes of class certification.  Did
11  I read that one right?
12       A    I'm sorry.  I lost you, paragraph --
13       Q    I'm sorry, paragraph four, starting
14  on page two, and carrying over to page three.
15       A    Yes.  I see it now.  Thank you.
16       Q    Okay.  For the time being, let's set
17  aside the expert witnesses portion and focus just
18  on academic economists.
19       A    Okay.
20       Q    Who are the academic economists you
21  have in mind who have done this sort of work in
22  peer-reviewed publication?
23       A    In the detailed portion of my report
24  that was sort of a summary statement, I cite a

Meredith Rosenthal, Ph.D.

1
2  number of articles by Professor Scott Morton, by
3  Professor Ernst Berndt from MIT, and others who
4  have published in this area.
5         MR. POLUBINSKI:  Let's mark another
6  exhibit.
7         (Rosenthal Exhibit 31 marked for
8  identification as of this date.)
9  Q    So, Professor Rosenthal, we have
10 handed you an exhibit which we have marked as
11 Exhibit 31 to your deposition.  It appears to be
12 an article by Ernst Berndt and others titled
13 Information, Marketing and Pricing in the U.S.
14 Anti-ulcer Drug Market, published in the American
15 Economic Review in May of 1995; is that correct?
16 A    That's correct.
17 Q    You cite this article in your reply;
18 correct?
19 A    Yes, I did.
20 Q    Is this one of the -- well, I'm going
21 to withdraw that question.
22        In this article, Professor Berent and
23 his coauthors estimate the effects of promotions
24 on the sales of anti-ulcer medications; is that
25 right?

Meredith Rosenthal, Ph.D.

1
2  A    That's right.
3  Q    And, among other things, his model
4  used instrumental variables to do so; is that
5  correct?
6  A    That's correct.
7  Q    What promotional variables did
8  Professor Berent include in this model, in this
9  model in this article?
10 A    Professor Berent includes detailing
11 journal advertising and direct-to-consumer
12 advertising in the model.
13 Q    Am I correct that he didn't try to
14 estimate the effects of specific individual
15 promotional events on prescribing behavior?
16 A    Not promotional events.  You will
17 note that he has an event, essentially, in the
18 model for the approval of the indication of these
19 drugs for GERD, gastro esophageal reflux disease.
20 Q    Okay.  For what purpose did he use
21 that event?
22 A    He's looking to see if it changes the
23 nature of competition, I believe.
24 Q    Okay.  But he doesn't estimate the
25 effects of specific individual promotional events;

Meredith Rosenthal, Ph.D.

1
2  correct?
3  A    No, he does not.
4  Q    Professor Berent didn't try to
5  distinguish in his article between the effects of
6  fraudulent versus non-fraudulent promotions; is
7  that correct?
8  A    No, he did not.
9  Q    And, so, specifically he didn't try
10 to distinguish between fraudulent and
11 non-fraudulent detailing and the impacts that
12 would have on prescribing behavior?
13 A    That's correct.
14 Q    Or fraudulent versus non-fraudulent
15 journal advertising?
16 A    That's correct.
17 Q    Or direct-to-consumer advertising
18 either?
19 A    That's correct.
20 Q    Are you aware of any published
21 research by Professor Berent or by anybody else
22 that has tried to estimate the relative effects of
23 fraudulent versus non-fraudulent promotions on the
24 sales of a particular pharmaceutical product?
25 A    As you might be aware, it's very

Meredith Rosenthal, Ph.D.

1
2  difficult to get data such as that for use in
3  publishable work.  I'm not aware of any such
4  studies.
5  Q    So, you are not aware of any
6  published research that has successfully found
7  instruments for fraudulent and non-fraudulent
8  promotions; correct?
9  A    I'm not aware of any study.
10 Q    In Exhibit 31, did Professor Berndt
11 estimate his model for specific indications of a
12 drug?
13 A    No.  He doesn't have data on use by
14 condition, so, no, he does not.
15 Q    When you say he doesn't have data for
16 use by condition, that would be presumably NDTI or
17 NANCS data that he would use for that?
18 A    It would be possible to use such
19 data, but he's not using that data, no.
20 Q    Do you know of any published research
21 estimating the effects of pharmaceutical
22 promotions on sales that has relied on NDTI or
23 NANCS data to allocate those sales into particular
24 allocations?
25 A    Not that I'm aware of, no.

Meredith Rosenthal, Ph.D.

1  
2   Q    So, as best you are aware, your model  
3  would be the first to do that?  
4       A    To the extent that I know, yes.  
5       Q    Okay.  Since your last deposition,  
6  you haven't done any work that would enable you to  
7  determine how precise your estimates will  
8  ultimately be, assuming that your are successful  
9  in implementing the model; is that correct?  
10      A    That's correct.  You mean quantify  
11  the precision?  
12      Q    Sure.  
13      A    Yes.  
14      Q    You haven't been able to tell how  
15  large a margin of error you might have in the  
16  ultimate answer that your model would produce?  
17      A    That's correct.  
18      Q    Let me use a hypothetical example to  
19  make sure I understand this point.  
20           Let's assume that you are  
21  successfully able to implement your model, and you  
22  estimate that a certain type of allegedly improper  
23  promotional activity increases the total level of  
24  Neurontin prescriptions in a given period of time  
25  by ten percent.  

Meredith Rosenthal, Ph.D.

1  
2       A    Okay.  
3       Q    Follow me there?  
4       A    I do.  
5       Q    You wouldn't know for sure, after  
6  having done that, that the number was exactly ten  
7  percent; is that correct?  
8       A    The standard in econometrics, of  
9  course, is to estimate something within confidence  
10  interval of standard errors, that's correct.  
11      Q    So, there would be come range --  
12      A    That's correct.  
13      Q    -- that you felt confident would  
14  contain the correct answer?  
15      A    That's correct.  
16      Q    And it's possible, in this  
17  hypothetical example, that that range would be  
18  between five and 15 percent?  
19      A    It's possible.  I can't say right now  
20  without having all my data.  
21      Q    Sure.  And just for purposes of these  
22  questions, using that hypothetical, and  
23  understanding that you don't know if that's  
24  correct or not, could we describe that as being a  
25  margin of error of, say, of 50 percent in either  

Meredith Rosenthal, Ph.D.

1  
2  direction?  
3       A    If the -- you are saying if the  
4  parameter estimate were ten percent, and the  
5  confidence intervals were plus or minus five,  
6  essentially, I could agree to that use of  
7  terminology, yes.  
8       Q    If it turned out that your estimates  
9  had a margin of error of 50 percent in either  
10  direction, would you consider that to be  
11  acceptable for purposes of your analysis?  
12      A    Well, the standard for the analysis,  
13  for econometric analysis, typically is to use --  
14  to look at the standard errors of the estimate and  
15  see if zero is included in there, essentially.  
16  And, so, you are saying zero is not included in my  
17  confidence interval, the 95 percent confidence  
18  interval; that that might, in fact, be a valid  
19  estimate, yes.  
20      Q    Let me see if I understand your last  
21  answer.  
22           Would --  
23      A    Okay.  
24      Q    -- would, as long as your margin of  
25  the error doesn't include zero, would that be an  

Meredith Rosenthal, Ph.D.

1  
2  acceptable result from your perspective in the  
3  analysis that you proposed to do?  
4       A    Again, that's a -- that would be a  
5  standard economic interpretation of regression  
6  results.  If your coefficients are significantly  
7  different from zero, then you would say there is  
8  an effect and your beta estimate is an unbiased  
9  estimate of that effect, regardless of the  
10  confidence intervals.  
11      Q    Okay.  So, in doing that, looking  
12  back, I guess, at the hypothetical that we were  
13  just talking about, 50 percent as a margin of  
14  error would not be an atypically large margin of  
15  error for a model like this?  
16      A    I don't know.  I would have to look  
17  at -- if you are saying a model like this, look at  
18  similar models to see exactly how big the  
19  confidence intervals are.  I would have guessed  
20  they were somewhat tighter than that, but I can't  
21  say sitting here right now that that wouldn't be  
22  true.  
23      Q    Okay.  So you don't know, as you sit  
24  here, one way or the other, whether in published  
25  work by Professor Berent or by others, the

Page 684

Meredith Rosenthal, Ph.D.

1    published estimates at times had margins of error
2    that were higher than 50 percent?
3        A    I don't know that.  I would be happy
4    to look at the article if you would like.
5        Q    You are welcome to do it if you would
6    like, or although my question is really more
7    general, whether you would agree with me that it
8    wouldn't be uncommon to have margins of error that
9    were in excess of 50 percent as I just described
10   it.
11       A    I believe that's correct, that it
12   wouldn't be uncommon.
13       Q    Okay.  The last time we met you
14   testified that you don't have a law degree and
15   that you haven't taken any law classes; is that
16   correct?
17       A    That's correct.
18       Q    I assume that is still true.  I'm not
19   aware of a law degree that you can get in six
20   months or less.
21            MR. NOTARGIACOMO:  Mail order.  I'm
22       sure you can find something on an internet.
23       A    Certainly not while working 60 hours
24   a week and raising two children.

Page 685

Meredith Rosenthal, Ph.D.

1        Q    Fair enough.
2            In view of the fact that you haven't
3    had time, in view of your other commitments, to
4    take law classes and get a law degree in the
5    intervening time, you wouldn't hold yourself out
6    as a lawyer or an expert in legal matters;
7    correct?
8        A    No, I would not.
9        Q    And you are not seeking in your reply
10   declaration, are you, to offer an opinion in this
11   case on what is or isn't appropriate on class
12   certification as a legal matter?
13       A    No, I would not, no.
14       Q    A question on that front.
15           You had mentioned, in answer to a
16   question earlier this morning, the term
17   predominance or predominate in the context of one
18   of your answers.
19           Do you have an -- do you have an
20   understanding of what that term means in the
21   context of class certification?
22       A    I don't.  Whether there is a numeric
23   standard of some kind, is that what your question
24   is?

Page 686

Meredith Rosenthal, Ph.D.

1        Q    It -- it's a question.  You are
2    welcome to answer that one if you would like.
3        A    I don't -- I don't have an
4    understanding of whether there is a metric by
5    which we could say this is predominant or not, but
6    rather that in the context in which I used it this
7    morning, that there would be some legal judgment
8    as to whether individual issues were predominant
9    or not.
10       Q    But as you sit here right now, you
11   don't have a numerical sense one way or the other
12   as to what that would mean?
13       A    That's correct.
14       Q    Okay.  Let's go back to that sentence
15   in paragraph four that carries over between page
16   two into three, the one that reads: Academic
17   economists and expert witnesses overcome the same
18   list of econometric problems routinely in
19   peer-reviewed publications and for the purposes of
20   class certification.
21           We talked a little bit about the
22   econometric part.  I would like to talk about the
23   expert witness part.  Upon what are you basing
24   that statement?

Page 687

Meredith Rosenthal, Ph.D.

1        A    Largely upon my work with cases in
2    the pharmaceutical matters related to generic
3    entry.
4        Q    And those are case in which you have
5    testified?
6        A    Either cases in which I have
7    testified or in which I have been a consulting
8    expert.
9        Q    I think we have talked about the
10   cases in which you have testified.  Can you give
11   us any more information on the cases in which you
12   have been a consulting expert?
13       A    Sure.  I think I would need to look
14   at my original declaration --
15       Q    Please do.
16       A    -- for a list.
17           So, those include, as listed here in
18   paragraph two of my original declaration, which I
19   believe is filed August 8th, 2005 -- yes.
20           In paragraph two, I list cases
21   related to the drug K-Dur, D-U-R, Cardizem CD,
22   Hytrin, Buspar, Relafen, Cipro, lorazepam and
23   clorazepate, and Taxol.
24           And above I mention the drugs Lupron

1          Meredith Rosenthal, Ph.D.
2   and Augmentin.  I believe those would be the ones.
3       Q     Okay.  So, the list that's here on
4   page two of your original declaration, Exhibit 1,
5   to your deposition is a complete list?
6       A     I believe it's a complete list.
7       Q     Okay.  Aside from cases in which you
8   have testified, or in which you have consulted,
9   are there any other cases upon which you are
10  basing this observation?
11      A     I have seen other cases referenced,
12  for example, in articles about the use of
13  economics in antitrust, for example, but I don't
14  think I could tell you specific case cites.
15          I know there are some cases that seem
16  to get cited frequently with regard to ready to
17  eat cereals, with regard to airline ticket
18  pricing.  Those are antitrust cases, I believe,
19  all of them.
20      Q     Can you, as you sit here today, help
21  me out on the articles, on what the articles were
22  that you are referring to in which these cases
23  were mentioned?
24      A     I'm afraid I can't.  I don't -- I
25  don't rely on them, and so I don't have the cites

1          Meredith Rosenthal, Ph.D.
2   handy.
3       Q     You say you don't rely on them,
4   are -- is information that you would have gleaned
5   from those articles not something that impacts
6   your ability to make the statement on which we are
7   focused in your reply?
8       A     In my view, it's a much more general
9   statement; that these class action matters go
10  forward, I have been -- I have participated in
11  class action matters that have gone forward, and
12  that it's well-known that these matters all tend
13  to address similar issues.
14      Q     Let's look at paragraph 29 on pages
15  15 and 16.
16      A     Okay.
17      Q     Really, I guess, the sentence --
18  well, let's read both sentences, beginning on page
19  15, your declaration, your reply reads:  An
20  analysis of aggregate impact subsumes and reflects
21  the distribution of individual characteristics
22  that influence prescribing.  This fact has been
23  recognized in the certification of countless
24  classes, including those in pharmaceutical pricing
25  cases, which are analogous to the current matter.

1          Meredith Rosenthal, Ph.D.
2       Are the countless cases to which you
3   are referring ones that are cited in page two of
4   your original declaration?
5       A     Those are inherently countable.
6          The countless classes that I refer
7   here as, again, it's a general statement about the
8   fact that there are class action matters that are
9   certified, and proceed all the time in industry;
10  and then, specifically, the pharmaceutical pricing
11  cases, that's the next clause, are the cases that
12  are in paragraph two of my original declaration.
13      Q     Can you think of any other cases that
14  fall within the countless cases, other than the
15  ones that you have listed in your original
16  declaration on page two?
17      A     Other cases that come to mind would
18  include Microsoft antitrust matter.
19      Q     Any others?
20      A     Not -- no others that I can name
21  specifically.
22      Q     Are there any additional bases, other
23  than the ones that we discussed in the context of
24  the statement on page two and three of your
25  declaration, that you know of that you support

1          Meredith Rosenthal, Ph.D.
2   this statement about there being countless cases?
3       A     In my view, the reason for which I
4   did not give a specific cite, this is a
5   self-evident fact.
6       Q     And I guess what I would like to get
7   a sense for is why you think it is self-evident.
8       A     That classes have been certified.
9       Q     Not that classes have been certified,
10  but that -- we can re-read the sentence, but that
11  an analysis of aggregate impact subsumes and
12  reflects the distribution of individual
13  characteristics that influence prescribing.
14      A     I believe you have interpreted very
15  narrowly that sentence, that an aggregate analysis
16  subsumes and reflects the individual effects, in
17  this case it's of prescribing.
18      Q     Maybe it's helpful to look at it that
19  way.  When you write in the second sentence that
20  pharmaceutical pricing cases are analogous to the
21  current matter.  You are not offering a conclusion
22  that those cases are analogous to these cases as
23  legal matter, are you?
24      A     No, I am not.
25      Q     And that are you not qualified to

Meredith Rosenthal, Ph.D.

1  offer a legal opinion on that subject, I take it;
2  right?
3      A    No, certainly not.
4      Q    In the pharmaceutical pricing cases
5  that you are discussing here, am I right in
6  understanding that those cases are ones in which
7  experts used econometric analysis to measure the
8  impact of certain conduct or behavior on a "but
9  for price"?
10     A    That's correct.
11     Q    Okay. Let me ask you this then: You
12 are not aware of any case, are you, in which a
13 court has certified a class in which plaintiffs
14 relied on econometric analysis to determine
15 whether particular representations by defendants
16 about non-price attributes of a medication caused
17 doctors to prescribe that medication to their
18 patients?
19     A    I'm not aware of a case, not as I sit
20 here today, no.
21     Q    But as you sit here today and as best
22 you know, plaintiffs are asking the court to do so
23 here for first time ever?
24     A    That may be the case, as far as I

Meredith Rosenthal, Ph.D.

1  know.
2      Q    It's still the case that you haven't
3  actually attempted to run your model? I think we
4  talked about this, but just to be sure, is that
5  true?
6      A    That's true.
7      Q    And that you haven't yet collected
8  all of the data that you would need to run your
9  model?
10     A    That's correct.
11     Q    And that you still don't know,
12 because of that, precisely what andogeneity
13 problems you would encounter?
14     A    Correct.
15     Q    Or precisely what multi-collinearity
16 problems you might encounter?
17     A    That's correct.
18     Q    And I think this sort of goes to our
19 earlier discussions, but you don't yet know
20 whether the estimates that you reach or that you
21 would reach in running your model would be
22 statistically significant?
23     A    That's correct.
24     Q    Or know what the fit of your model

Meredith Rosenthal, Ph.D.

1  would be?
2      A    That's correct.
3      Q    Let's look at page -- I think we are
4  on page 16.
5          The next paragraph, paragraph 30, you
6  discuss here Dr. Hartman's assumption that the
7  measure of injury would be the amount paid for
8  Neurontin; correct.
9      A    That's correct.
10     Q    Then you write, moreover, even if the
11 court decides to rely on an alternative measure of
12 the injury, such as the difference between the
13 amount paid for Neurontin and the amount that
14 would have been paid for an alternative therapy,
15 an aggregate analysis that produces an average
16 effect is still appropriate and feasible.
17         Did I read that correctly?
18     A    Yes, you did.
19     Q    Aside from this sentence, your
20 declaration doesn't provide any further
21 information about such an analysis, does it?
22     A    No, it does not.
23     Q    Does Dr. Hartman's?
24     A    I -- I believe, I'm not sure, I

Meredith Rosenthal, Ph.D.

1  believe his reply may also touch on this issue,
2  with regard to this same section of Dr. Keeley's
3  report.
4      Q    I guess my question is: Do you know
5  if Dr. Hartman's reply declaration provides any
6  more information about how such an analysis would
7  be done aside from -- you know, beyond what's
8  here?
9      A    I don't believe so.
10     Q    Okay. Are you aware of any work
11 having been done by you or Dr. Hartman or anyone
12 at Greylock McKinnon that would support such an
13 analysis?
14     A    To -- for example.
15     Q    In this case?
16     A    Empirical work, again, you mean?
17     Q    Empirical work or other analysis.
18     A    No, I don't believe there's been any
19 analysis.
20     Q    Okay. Now, you are aware that there
21 is a portion of Dr. Hartman's declaration that
22 discusses the specific more technical econometric
23 issues raised by Professor Scott Morton; correct?
24     A    That's correct.

Page 696

Meredith Rosenthal, Ph.D.

1  
2  Q    Did you offer any input into the
3  drafting of that section?
4  A    No, I did not.
5  Q    Did you review it before it was
6  filed?
7  A    I believe I did, yes.
8  Q    Have you heard anyone, either Dr,
9  Hartman or anybody else, express any view as to
10 the likelihood that the court would ever read
11 Exhibit B, which is the portion of Dr. Hartman's
12 declaration that addresses the specific
13 econometric issues?
14 A    I have not heard any such opinion,
15 no.
16 Q    Okay. Let's look at paragraph 26 of
17 attachment B to Dr. Hartman's --
18 A    I'm sorry, I forgot. Do I have his
19 report?
20 Q    Yes, you do. I'm sorry. It's
21 Exhibit 26.
22      MR. NOTARGIACOMO:  What paragraph?
23 Q    Twenty-six, which is on page 11, I
24 believe.
25 A    Page 11 of attachment B?

Page 697

Meredith Rosenthal, Ph.D.

1  
2  Q    Yes.
3  A    Is that at the end or somewhere in
4  the middle?
5  Q    It's close to the end.
6  A    Okay.
7  Q    Okay. Let's look at the last
8  sentence of the -- I guess it's really the second
9  paragraph of this one, of this paragraph, which
10 reads as follows:  Certainly, Dr. Scott Moron has
11 not introduced any empirical analysis
12 demonstrating that it will.
13      Did I read that correctly?
14 A    I'm afraid that you did.
15      MR. NOTARGIACOMO:  It's obviously a
16 typo and not meant to connote anything by
17 the missing T, if that's the question.
18 Q    Let's turn to the next page,
19 paragraph 30. The first sentence of the second
20 paragraph of paragraph 30, indeed, in her
21 declaration, Dr. Scott Moron continues to falsely
22 discuss Dr. Rosenthal's analysis as if Dr.
23 Rosenthal had specified and planned to estimate an
24 OLS regression.
25      Did I read that one right more or

Page 698

Meredith Rosenthal, Ph.D.

1  
2  less?
3  A    Yes.
4  Q    Are there any other ones that you are
5  aware of that I am missing?
6  A    I never noticed these typos. I'm
7  certain that they are exactly that.
8  Q    Okay. Aside from Exhibit B of his
9  reply, are you aware if Dr. Hartman ever, in
10 conversation or otherwise, referred to Professor
11 Scott Morton as Dr. Moron or the like.
12 A    Absolutely not. I'm not aware of any
13 instances and that would not be consistent with
14 what I know of Dr. Hartman.
15      MR. POLUBINSKI:  Okay. Why don't we
16 take a break?
17      VIDEOGRAPHER:  Going off the record.
18 The time is 3:21. This ends tape three.
19      (Recess taken.)
20      THE VIDEOGRAPHER:  We are back on the
21 record. The time is 3:30. This is tape
22 four.
23      MR. POLUBINSKI:  Okay. One
24 housekeeping matter while we were off the
25 record is that we did get a hold of the

Page 699

Meredith Rosenthal, Ph.D.

1  
2  third amended class action complaint as
3  filed.
4       What we have done is marked it as a
5  separate exhibit to this deposition. It's
6  marked as Rosenthal Exhibit 28A.
7       As we discussed on the record before,
8  we believe that or we expect that it's
9  materially identical to Exhibit 28, which is
10 the proposed third amended class action
11 complaint.
12      MR. NOTARGIACOMO:  That's fine.
13      MR. POLUBINSKI:  With that piece of
14 housekeeping out of the way, I think we have
15 no further questions at this time.
16      MR. NOTARGIACOMO:  Plaintiffs have no
17 questions at this time.
18      MR. POLUBINSKI:  So, let's go off the
19 record.
20      THE VIDEOGRAPHER:  This concludes the
21 videotape deposition of Professor Meredith
22 Rosenthal.
23      Going off the record. The time is
24 2:39.
25              oOo

Page 700

```
 1          Meredith Rosenthal, Ph.D.
 2      I, MEREDITH B. ROSENTHAL, Ph.D.,
 3  the witness herein, do hereby certify that the
 4  foregoing testimony of the pages of this
 5  deposition to be a true and correct transcript,
 6  subject to the corrections, if any, shown on the
 7  attached page.
 8          _____
 9          MEREDITH B. ROSENTHAL, Ph.D.
10  Subscribed and sworn to before me this
11  _____day of _____,_____.
12  _____
13      NOTARY PUBLIC
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 702

```
 1
 2  ____ ____  CHANGE:_____
 3          REASON:_____
 4  ____ ____  CHANGE:_____
 5          REASON:_____
 6  ____ ____  CHANGE:_____
 7          REASON:_____
 8  ____ ____  CHANGE:_____
 9          REASON:_____
10  ____ ____  CHANGE:_____
11          REASON:_____
12  ____ ____  CHANGE:_____
13          REASON:_____
14  ____ ____  CHANGE:_____
15          REASON:_____
16  ____ ____  CHANGE:_____
17          REASON:_____
18  ____ ____  CHANGE:_____
19          REASON:_____
20  ____ ____  CHANGE:_____
21          REASON:_____
22  ____ ____  CHANGE:_____
23          REASON:_____
24
25      _____
        MEREDITH B. ROSENTHAL, Ph.D.
```

Page 701

```
 1
 2  STATE OF NEW YORK  )    Pg.  of  Pgs.
 3  COUNTY OF NEW YORK  )
 4      I wish to make the following changes
 5  for the following reasons:
 6  PAGE  LINE
 7  ____ ____  CHANGE:_____
 8          REASON:_____
 9  ____ ____  CHANGE:_____
10          REASON:_____
11  ____ ____  CHANGE:_____
12          REASON:_____
13  ____ ____  CHANGE:_____
14          REASON:_____
15  ____ ____  CHANGE:_____
16          REASON:_____
17  ____ ____  CHANGE:_____
18          REASON:_____
19  ____ ____  CHANGE:_____
20          REASON:_____
21  ____ ____  CHANGE:_____
22          REASON:_____
23  ____ ____  CHANGE:_____
24          REASON:_____
25
```

Page 703

```
 1
 2          C E R T I F I C A T E
 3  STATE OF NEW YORK    )
 4                  : SS.
 5  COUNTY OF NEW YORK    )
 6
 7
 8      I, BONNIE PRUSZYNSKI, a Notary
 9  Public with and for the State of New York,
10  do hereby certify:
11      That MEREDITH B. ROSENTHAL, the witness
12  whose deposition is hereinbefore set forth,
13  was duly sworn by me and that such deposition
14  is a true record of the testimony given by
15  the witness.
16      I further certify that I am not related
17  to any of the parties to this action by
18  blood or marriage, and that I am in no way
19  interested in the outcome of this matter.
20      IN WITNESS WHEREOF, I have hereunto
21  set my hand this 13th of March, 2007.
22
23          _____
24          Bonnie Pruszynski
25
```

## A

**ability** 689:6
**able** 582:22
    585:9 589:9
    625:8 631:23
    658:18,20
    680:14,21
**absence** 603:3
    650:15,19
**absolute** 595:14
**Absolutely**
    698:12
**academic** 675:8
    675:19,21
    686:17
**accept** 614:8
**acceptable**
    682:11 683:2
**access** 565:6
**accompanied**
    591:9
**account** 636:19
    651:5 657:19
    657:23 659:8
**accurate** 554:15
    656:5,22
**accurately** 649:7
**acid** 654:15
**action** 550:20,21
    604:7 606:3,12
    629:5,25
    642:10 643:8
    689:9,11 690:8
    699:2,10
    703:17
**actionable**
    601:13 639:17
**actions** 547:11
    604:14
**activities** 638:21
    638:25 639:2
    640:5,9,14
    641:2,5,9,15
    641:21 645:4
    660:20 667:7
**activity** 668:14
    668:16,17
    680:23

**actual** 600:17
    643:13,18,24
    660:3,4 664:15
**add** 595:19
    657:2
**added** 580:10
    581:5 587:8,10
    588:18 611:9
    656:20
**adding** 591:12
    593:14 656:12
**addition** 623:18
    627:7,23
    628:14
**additional**
    578:12 579:9
    617:22 627:22
    628:5,9,13
    640:4 658:12
    690:22
**address** 583:18
    583:20,22
    602:8,25 609:6
    631:25 653:4
    689:13
**addressed** 584:5
    584:9 604:21
**addresses**
    696:12
**addressing**
    633:4
**advertising**
    663:12 677:11
    677:12 678:15
    678:17
**affect** 652:7
**afraid** 594:3
    632:16 688:24
    697:14
**aggregate**
    560:11 604:8
    606:16 638:20
    640:3 689:20
    691:11,15
    694:16
**ago** 563:3 592:9
**agree** 553:8
    589:16 616:20

641:18 649:9
    656:3 671:7
    682:6 684:8
**agreed** 577:22
    583:23 584:3
**ahead** 571:10
    594:5 604:2
    626:11 643:20
    644:4
**airline** 688:17
**allegation**
    656:21
**allegations**
    559:21 560:7
    566:2,3,10
    567:10,11,19
    567:21 568:19
    568:20 607:11
    607:24 608:17
    609:10,16,21
    610:6,7 633:19
    634:4,7,11,12
    634:13 635:12
    637:17 645:9
    647:23,25
    648:12 649:6
    649:10,12,16
    651:24 652:11
    655:6,8 665:13
    665:14 667:4
    670:19,22
    671:2,13,17
**allege** 645:12
    648:2
**alleged** 644:21
    648:21 652:24
    667:6 669:12
**allegedly** 601:13
    636:14 648:8
    648:11 649:3,5
    651:9 656:21
    668:16 680:22
**alleges** 646:24
    655:4
**alleging** 559:22
**allocate** 679:23
**allocations**
    679:24

**Allow** 626:4
**altered** 641:22
**alternative**
    694:12,15
**altogether**
    662:16 664:2
    667:17
**amended** 550:20
    550:21 629:5
    629:24 642:9
    643:7,11,18,19
    643:22,24
    646:3,20
    653:14 654:6
    660:7 699:2,10
**amendments**
    629:15
**American**
    676:14
**aminobutyric**
    654:15
**amount** 694:8
    694:14,14
**analogous**
    689:25 691:20
    691:22
**analysis** 610:4,5
    633:12 635:13
    635:13,20
    664:10 672:22
    672:25 673:6
    673:20,23
    674:10,15,15
    682:11,12,13
    683:3 689:20
    691:11,15
    692:8,15
    694:16,22
    695:7,14,18,20
    697:11,22
**andogeneity**
    693:13
**Andrew** 578:16
    592:21
**answer** 560:10
    567:6 577:25
    589:12 590:24
    608:25 618:13

618:25 635:8
    647:6 664:21
    680:16 681:14
    682:21 685:16
    686:3
**answers** 589:22
    620:13 685:19
**anticipate** 562:8
    562:19,23
    658:19
**antitrust** 688:13
    688:18 690:18
**anti-convulsant**
    654:20
**anti-ulcer**
    676:14,24
**anxiety** 660:12
    662:3,21,22
    665:18
**anybody** 584:19
    586:7,21
    590:12 592:11
    597:7 605:2
    619:23 668:8
    678:21 696:9
**anyway** 566:17
    651:5
**apologies** 560:21
    654:22
**apologize** 589:7
**apparently**
    661:18
**appear** 589:17
    605:12 645:25
    646:4,9 654:5
    654:7 656:9
    658:7
**appeared** 661:6
**appears** 614:10
    655:5 676:11
**application**
    653:24
**applications**
    633:12
**applies** 635:11
**apply** 636:16
    648:13 649:17
    674:10

**approach**
  673:11,18
**appropriate**
  578:8 579:18
  610:9 617:19
  618:4 660:2
  685:12 694:17
**approvable**
  653:25
**approval** 657:8
  677:18
**approved** 565:8
  653:22 654:19
  655:19 656:6
  663:14
**approximately**
  551:7 555:11
  590:14 592:23
**April** 562:18
**area** 657:5 670:5
  676:4
**areas** 647:2,18
  651:19
**Argonbright**
  631:10
**article** 550:22
  550:23,24
  595:17,19
  596:4,7,9
  645:13,25
  646:5,9,11,13
  647:8,17 648:3
  648:13,20,20
  648:21 649:7,8
  649:13,17,20
  649:25 650:6
  650:15,18
  651:6,7,17
  652:5,22,25
  653:2,3,6,19
  654:5,7,10,11
  655:3,10
  656:12,21,25
  657:4,13,19,21
  658:7,11,15,19
  659:4,16,18,20
  659:20,22,23
  660:6 676:12

**approach**
  676:17,22
  677:9 678:5
  684:5
**articles** 578:19
  621:15 628:24
  640:10 644:14
  644:22 645:2
  645:10 647:15
  648:7 650:24
  651:4,15,15
  657:17,25
  658:9,24 659:9
  672:6 676:2
  688:12,21,21
  689:5
**article's** 649:2
**aside** 568:7
  596:23 597:6
  599:14,20,22
  600:6 620:2
  660:6 672:5
  675:18 688:7
  694:20 695:8
  698:8
**asked** 559:14
  562:13,25
  566:11 574:4,7
  574:13,17
  596:6 604:19
  616:2,4 659:11
**asking** 637:6
  648:18 692:23
**aspect** 624:13
**aspects** 601:16
**asserting** 566:6
**assist** 578:4
**assisted** 578:3
  578:15,18
**associated**
  648:21
**Associates**
  563:14 576:10
**assume** 566:11
  566:18,21
  569:7 589:21
  594:8,19 601:8
  620:13,18
  621:18 631:24

**approach**
  633:20 635:20
  636:6 637:17
  639:11 655:23
  666:5,7,14
  668:24 669:11
  680:20 684:19
**assumed** 574:18
  575:24 607:11
  670:18
**assumes** 610:5
**assuming**
  607:10,24
  609:23 625:9
  626:16 648:4
  658:17 680:8
**assumption**
  575:11,15
  608:14 637:19
  664:22 665:20
  665:24 666:19
  666:22 667:2,9
  668:5 694:7
**assumptions**
  637:9 663:10
  666:10,11,13
  666:13 668:3
**attached** 555:17
  621:16,24
  700:7
**attaches** 617:12
**attachment**
  555:18 628:3,5
  628:9,16,20
  629:5 696:17
  696:25
**attempted** 693:4
**attention** 610:19
**attorneys** 549:3
  549:6,10
  551:18
**attributes**
  692:17
**atypically**
  683:14
**Augmentin**
  688:2
**August** 553:25
  600:11 687:20

**author** 649:2
  657:2
**authors** 649:21
  651:8
**available** 603:13
**Avenue** 548:6
  549:10 551:10
**average** 556:11
  694:16
**avoid** 604:7
  606:3,11
**aware** 564:18
  596:3,6 603:11
  612:22 623:3
  623:13,25
  625:5,7 629:7
  629:14 630:7
  630:22 632:13
  647:24 655:7
  655:23 673:15
  673:20 678:20
  678:25 679:3,5
  679:9,25 680:2
  684:20 692:13
  692:20 695:11
  695:21 698:5,9
  698:12
**AWP** 556:14
  562:4
**a.m** 551:7
**A.2** 628:16

—————
        **B**
—————

**B** 547:17 548:5
  550:5,8 555:18
  627:5,8,10,11
  627:13,21
  696:11,17,25
  698:8 700:2,9
  702:25 703:11
**back** 557:3
  563:12 569:6
  587:8 592:2
  600:7 601:19
  603:18 605:22
  606:23 608:25
  617:15 624:20
  625:18 638:3

**author**
  643:2 646:19
  653:13 654:25
  657:16 659:19
  672:7 683:12
  686:15 698:20
**backup** 627:2,11
**backwards**
  557:23
**Bacon** 549:6
  552:9
**baked** 667:15
**balance** 663:24
**based** 575:16
  589:13 637:10
  662:18 666:9
  670:10
**bases** 662:8
  690:22
**basic** 558:24
**basing** 663:9,17
  686:24 688:10
**basis** 557:10
  566:8 635:21
  636:8 650:18
  657:12 663:4
**Bectal** 578:16
  579:9 592:21
**Beecham** 555:23
**began** 622:10
**beginning**
  568:22 576:13
  576:20 609:18
  610:22 689:18
**behavior** 566:4
  677:15 678:12
  692:9
**believe** 553:20
  555:2,7,13,19
  555:23,25
  556:5,9,9,12
  556:16 557:20
  562:3,10,17
  563:4 569:22
  570:21 571:7
  571:11 572:12
  574:4 577:8,17
  577:22 578:16
  579:16 580:3

580:13 581:13
581:15 582:25
584:7,25
585:20,23
586:8 587:6
588:22 589:4
590:9,16,17
591:5,14 592:6
592:8,12,12,19
592:25 593:2
593:11 594:14
595:4,16,20
596:2 597:3,19
597:24 598:3,4
598:8,18
600:13 602:15
603:19 604:19
605:4,4,6,9,15
605:16 611:18
611:23 613:21
613:23 614:3
614:24 615:6,7
615:25 616:5
616:17 618:20
619:4 620:11
620:22 621:17
622:5,7,12
623:5 624:22
624:23 628:24
629:10 630:2
630:12 631:11
631:17,21
637:2 639:5,15
641:3 645:24
655:13 659:25
660:16 668:22
671:3 674:12
674:21 677:23
684:12 687:20
688:2,6,18
691:14 694:25
695:2,10,19
696:7,24 699:8
**believed** 574:12
**beneficial** 669:6
669:9
**benefitted**
636:20

**Berent** 676:22
677:8,10 678:4
678:21 683:25
**Berman** 549:3
551:24 558:19
561:5
**Berndt** 676:3,12
679:10
**best** 558:11,12
564:19 581:10
614:25 643:14
673:22 680:2
692:22
**beta** 683:8
**beyond** 617:21
618:14 695:8
**bias** 607:24
**big** 603:25
683:18
**bills** 618:10
619:10
**bit** 565:22
605:18 658:5
671:10,11
686:22
**blood** 703:18
**Bonnie** 547:23
548:7 551:21
609:3 703:8,24
**bottom** 588:15
626:2 645:11
646:6 675:7
**Boulevard** 549:7
**box** 572:12
585:12
**brackets** 642:11
653:22
**break** 606:19
637:22 698:16
**Brief** 550:14,15
550:16,17
**brilliance**
595:14
**broader** 620:25
662:21
**broadest** 562:22
**Buspar** 687:23
**busy** 615:12

---
**C**
---
**C** 549:2 550:11
550:13 555:22
569:22 570:3
626:12,19
703:2,2
**calculation**
568:2 633:16
633:19 635:6,9
636:24 637:14
**calculations**
566:8 633:7,23
634:6
**call** 617:2
**called** 552:11
557:11 562:9
617:17 619:8
624:5
**Calls** 648:14
**Cambridge**
549:4
**capacity** 572:13
578:15
**caption** 551:11
668:15
**capture** 668:12
**captured** 667:10
**carbon** 584:20
590:11 591:20
592:20
**Cardizem**
687:22
**carries** 646:21
675:7 686:16
**carrying** 675:15
**case** 551:11
552:19 556:13
557:15,16,21
558:11,18,20
559:2,10
560:16,25
561:7,12 562:2
562:5,5,9,12
562:24 563:6
563:13 564:2,3
565:19 566:17
567:2,3,15
568:13,22

569:7,9 573:2
598:12,15,21
599:19 600:2
603:8 608:16
614:21 615:4
619:13 620:5
620:20 621:2
622:11,20
623:8 628:22
629:6,8,16
630:11 632:7
632:10,20,23
633:2,3,17
636:23 637:12
645:5 652:17
657:6 663:16
668:17,23
671:14 685:12
687:5 688:14
691:17 692:13
692:20,25
693:3 695:16
**cases** 556:18,19
556:23 687:2,7
687:11,12,21
688:7,9,11,15
688:18,22
689:25 690:2
690:11,11,13
690:14,17
691:2,20,22,22
692:5,7
**categories** 641:4
**category** 592:5
640:25
**causal** 673:12
**cause** 658:12
**caused** 601:12
606:6 638:21
640:4 692:17
**cc'd** 584:20
**CD** 687:22
**cereals** 688:17
**certain** 558:16
565:4 571:16
572:4 587:22
590:17 593:17
593:24 634:2,9

640:10,21
644:14,15
662:12 680:22
692:9 698:7
**certainly** 568:25
576:22 583:23
584:13 593:19
609:14 616:16
621:12 624:21
626:9 630:25
631:13 633:22
640:11 645:6
649:13 650:14
658:8,15
659:14 662:4
663:24 674:21
684:24 692:4
697:10
**certainty** 664:3
664:5
**certification**
552:21 559:4,7
559:11,16
560:2 561:18
561:25 563:18
564:14 569:24
604:21 630:10
630:20 635:5
675:11 685:13
685:22 686:21
689:23
**certified** 690:9
691:8,9 692:14
**certify** 700:3
703:10,16
**cetera** 607:13
608:11 609:20
651:22
**challenges** 674:6
**change** 581:3,16
606:19 656:17
675:4 701:7,9
701:11,13,15
701:17,19,21
701:23 702:2,4
702:6,8,10,12
702:14,16,18
702:20,22

changed 663:24
674:25
changes 643:25
677:22 701:4
changing 656:5
characteristics
689:21 691:13
characterize
674:9
check 555:25
children 684:25
Chintagunta
550:13 570:3
570:11 587:9
610:24 630:5
674:4
Chintagunta's
572:21 573:9
Cipro 687:23
circle 657:16
659:19
citation 596:14
citations 578:9
578:22,22
589:24 591:25
592:22 593:14
618:22
cite 594:16
596:18 675:25
676:17 691:4
cited 596:4
647:19 688:16
690:3
cites 570:14
688:14,25
City 549:7
claim 651:21
claimed 565:3
claims 558:11
558:13,14
606:16
clarification
652:4
clarify 664:19
class 550:20,21
552:20 558:9
559:3,6,11,16
559:23,25

561:3,18,20,25
563:17 564:14
566:4 569:24
599:24 604:7
604:13,20
606:3,5,7,12
629:5,25
630:10,10,20
635:5 636:18
642:9 675:11
685:12,22
686:21 689:9
689:11 690:8
692:14 699:2
699:10
classes 684:16
685:5 689:24
690:6 691:8,9
clause 638:17
673:10 690:11
clean 622:19
cleanly 653:7
clear 564:11
568:17 617:10
617:10 658:6
664:13 666:25
667:17
clearly 579:6
583:17 667:18
clinical 563:19
563:21,23
564:5,7,12,22
565:2,3,12,16
565:17 566:5
567:7 630:13
630:15,17
631:12,18,22
631:25 632:7
632:10,14,19
632:22 633:5,6
633:11,14,15
634:17,21,22
634:23 637:10
657:5 660:13
661:5 663:13
671:6
clinically 566:7
clorazepate

687:24
close 581:20
583:2 594:15
594:17 697:5
CME 640:15
coauthors
676:23
coefficients
683:6
collected 693:8
collective
643:14
column 646:11
come 562:18
568:14 569:6
600:7 618:5
619:2,4 621:11
632:2 681:11
690:17
comment 654:14
comments
585:25 591:24
592:10,14
593:14,15,18
593:21,25
594:4 595:2,5
595:6,8,11,20
597:24 605:5,6
614:24 615:8,9
615:11,14
commitments
685:4
common 559:20
559:24 561:21
606:17
communicate
620:6
communicated
598:20 599:2
599:24
communicatio...
599:22 619:10
620:12
company 640:19
665:20 668:4
comparative
663:10 672:24
comparator

673:18
compared 594:9
669:7,9
competition
677:23
complaint
550:20,21
609:9,15 629:5
629:8,15,25
633:21 640:12
641:5 642:10
643:7,11,13,18
643:19,22,24
644:19 646:3
646:20,23
648:12 649:6
649:12,17
651:20 652:20
653:14 654:6
655:4,12 660:7
670:19,21
672:5 699:2,11
complaints
629:18
complete 587:2
587:3 593:4
597:25 598:8
688:5,6
completed 581:4
582:20 589:15
completely
568:6 591:19
completeness
593:12
completing
583:6,11
complex 674:11
674:15,23
compose 574:18
574:19
compressed
597:5
computer
580:12,12,14
580:18 581:2,6
conceded 595:18
concern 609:7
concerning

644:15
conclude 559:19
659:4
concluded
566:15,20,21
568:11 663:19
concludes
699:20
conclusion
567:4 568:9
569:2 648:15
658:18,20
663:18 668:6
691:21
conclusions
559:17 564:21
565:12 567:14
650:12 657:7
conclusively
658:10,14
condition
609:12 610:8
635:14,14,17
665:4,7 679:14
679:16
conditions
608:18 609:14
610:10 648:10
649:24 651:24
658:2 665:18
conduct 601:13
606:6 608:2
639:8,17 692:9
conducted 661:5
confidence
681:9 682:5,17
682:17 683:10
683:19
confident 644:3
681:13
conflicting
671:5
confusion
573:14
connected
651:23
connection
564:8 599:25

608:15 619:11
620:19 628:10
628:21 630:18
631:8,12
**connote** 697:16
**consider** 574:7
645:6 664:23
667:25 670:10
682:10
**consideration**
603:10,14
657:25 659:6
**considered**
611:11 652:11
**considering**
559:10
**consistent**
698:13
**consulted** 688:8
**consulting** 687:8
687:13
**contact** 632:9
**contain** 681:14
**contained**
554:20 564:21
583:5 584:4
593:10 644:23
647:24 651:10
655:7
**contains** 554:15
**context** 645:8
652:11 662:21
671:24 685:18
685:22 686:7
690:23
**continue** 591:12
**Continued**
547:16 548:4
550:6 552:14
**continues**
697:21
**control** 646:14
**convenience**
588:20
**conversation**
584:8 613:3,9
613:14,19
614:2 624:24

698:10
**conversations**
583:15 616:6
619:22
**conveying** 620:2
620:4
**copied** 584:20
590:11 591:20
**copies** 616:4
**copy** 571:18,20
585:10,15
586:23 592:20
596:13 627:15
**correct** 552:21
552:22,25
553:2,13,14,17
554:2,3,7,13
554:17 555:18
555:19 556:15
556:20,21
563:15 564:6
564:10 566:11
570:17,20,21
570:24 571:4
573:6,7 574:24
581:16,23
590:2 593:8
594:21 599:13
600:12,13,25
601:6,7 603:9
608:4,5 611:7
611:8,12
613:21 614:9
614:10 616:23
616:24 620:16
620:17 626:20
628:7,12,17,18
629:23 630:2,5
630:6,20,21
631:4,6 632:15
632:20,21
633:15 638:22
638:23 639:4,9
639:10,12,13
639:18,19,23
640:6,7,17,20
640:23 641:16
641:17,23,24

644:16,17
647:10 649:18
650:20,25
651:2,9,12,16
651:18 655:4,5
655:17,22,25
656:9 657:22
659:6,24
660:15 664:7
667:2,3 668:9
668:21 669:21
669:22 670:4
673:6,7 674:7
674:8 676:15
676:16,18
677:5,6,13
678:2,7,13,16
678:19 679:8
680:9,10,17
681:7,10,12,14
681:15,24
684:12,17,18
685:8 686:14
692:11 693:11
693:15,18,24
694:3,9,10
695:24,25
700:5
**corrected**
611:19 641:23
657:22
**corrections**
700:6
**correctly** 570:12
582:13 601:4
604:9 617:7
619:14 622:24
628:6 646:17
654:2,23 660:2
660:10 661:12
673:2,13
694:18 697:13
**correspondence**
617:13
**counsel** 558:17
561:2 610:16
621:20 622:16
637:11 639:16

666:10
**countable** 690:5
**counting** 656:13
656:14,16
**countless** 689:23
690:2,6,14
691:2
**COUNTY** 701:3
703:5
**couple** 600:7
617:25
**course** 555:4
579:13 626:23
643:25 656:16
657:24 681:9
**court** 547:2
551:14,20
558:23 559:10
559:14 562:18
563:3 627:14
627:15,19
633:25 634:8
635:15 639:3
643:10 665:25
666:9 692:14
692:23 694:12
696:10
**court's** 588:19
**cover** 649:12
**coverage** 563:10
**covered** 615:17
**create** 641:19
**created** 620:19
621:3,10
**creating** 621:14
**credible** 567:17
568:10
**critical** 603:16
**current** 661:21
689:25 691:21
**currently**
559:10
**cut** 555:15
573:21
**CV** 555:2,17,17
557:17 616:3
618:9
**CV's** 578:11

**D**

**D** 550:3
**damage** 633:7
633:16,18
636:16
**damages** 559:5
561:23 567:15
568:2,9 604:8
610:10 635:6,9
635:16 636:24
637:14
**Daniel** 551:5
**data** 560:11
603:3,12,13
623:22 625:15
657:24 658:23
662:11 666:8
679:2,13,15,17
679:19,19,23
681:20 693:9
**date** 551:3,6
553:15,18
555:25 556:16
561:12 569:13
571:8 572:23
573:5 576:25
581:17 582:3
582:21,22
583:2 587:23
588:8 594:22
612:13 616:10
636:17 642:2
645:22 646:5
653:10 658:21
676:8
**dated** 617:12
622:3,21 629:6
**Davis** 548:5
549:9 551:9
552:3,4 661:5
**day** 551:17
577:3 580:15
593:2 598:4
700:11
**deal** 644:2
**dealt** 559:14
**debate** 595:17
**December**

556:12,17
573:6,11
622:21 643:11
**decides** 694:12
**deciding** 639:8
**decision** 574:22
574:25 575:7
575:14 614:6
614:15
**declaration**
550:10,11,12
550:13,18
552:19,25
553:4,6,25
554:5,14 557:7
558:25 561:13
561:14 569:22
569:25 570:3
572:21 580:5
585:5 589:5
598:2 600:11
600:23 601:15
601:17,21
604:18 611:9
612:20,24
621:16 623:7
625:17,19
628:15 629:2
631:9 638:13
672:23 685:11
687:15,19
688:4 689:19
690:4,12,16,25
694:21 695:6
695:22 696:12
697:21
**declarations**
556:23 563:17
570:5,15,18
571:6 574:23
610:23 614:5
617:3,4,5
620:4,5 622:20
630:3,8,16,23
632:19
**deemed** 670:15
**defendants**
549:6,10 552:3

552:5,9 560:6
560:13 562:16
565:6 566:4
582:12 583:9
584:4 598:16
600:16 601:13
613:2 617:6
623:4 624:15
625:6 630:8
634:22 635:4
661:9 663:18
668:19 670:2
692:16
**defendant's**
570:10 606:6
620:5 630:19
**definition**
620:23 621:11
**degree** 684:15
684:20 685:5
**delayed** 581:11
**deleted** 572:16
**delivered** 571:17
576:24
**demonstrate**
559:21 560:4
561:21
**demonstrated**
606:17
**demonstrating**
697:12
**depends** 666:8
**deposed** 555:8
555:24
**deposition**
547:16 548:4
551:8 553:22
556:4 560:22
579:17,19,20
579:22 582:6
588:11 591:4
600:15,24
610:25 611:6
611:10,13,17
611:20,23
612:8,16
616:13 623:20
625:25 626:15

630:4 642:5
653:12 655:18
672:14 676:11
680:5 688:5
699:5,21 700:5
703:12,13
**depositions**
574:8 599:19
**describe** 560:8
561:6,19
562:11 613:25
620:25 649:8
674:5 681:24
**described**
559:22 560:10
565:13 578:6
585:24 586:24
590:5 600:22
604:24 611:11
619:17 635:10
635:13 639:21
648:11 649:5
661:4 667:24
674:14 684:10
**describing**
584:10 647:3
**Despite** 673:9
**detail** 583:12,19
583:22 584:10
585:21
**detailed** 584:14
675:24
**detailing** 640:22
677:10 678:11
**details** 570:9
**detect** 669:8
**determine**
601:25 602:25
635:16 680:7
692:15
**device** 606:3
**diagnoses**
567:23 634:2,9
**difference**
641:11 673:5
673:18 694:13
**differences**
588:23 594:22

606:5
**different** 566:20
567:4 568:2
609:2 627:12
683:7
**difficult** 603:4
679:2
**direct** 610:18
**direction** 619:12
621:10 682:2
682:10
**directly** 571:15
572:3
**direct-to-cons...**
677:11 678:17
**disagree** 668:19
**disagreement**
575:23
**disclose** 661:8
665:22
**disclosed** 664:8
666:21 669:14
**disclosure**
558:13 663:21
665:15
**discuss** 560:23
560:24 613:6
694:7 697:22
**discussed** 557:6
560:21 563:4
575:21 576:4
577:9,13,15,18
594:20 595:21
600:14 605:2
624:8,21
631:10 632:18
643:9 646:2
648:19 649:11
650:21 654:5
655:18 657:3
660:11 664:17
664:18 669:13
669:17 670:2
690:23 699:7
**discusses** 604:12
695:23
**discussing** 566:3
595:24 597:10

661:15 692:6
**discussion**
568:23 577:2
584:14 590:6
615:19,20
624:10 642:25
650:13 671:4
**discussions**
575:18 576:11
577:21 583:4,8
585:17,23
615:22 693:20
**disease** 625:15
677:19
**disorder** 646:16
647:19 651:21
651:22 661:9
661:20 662:3
663:16 664:12
664:14,18,25
665:9,12,16
**disorders**
660:12 662:21
662:23
**dispute** 635:2
**distinguish**
678:5,10
**distribution**
689:21 691:12
**District** 547:2,3
551:13,14
**division** 613:7
613:10
**docket** 551:14
**doctors** 598:23
599:7 630:17
640:15 692:18
**document** 547:9
573:5 580:11
580:24,25
582:5,23
584:23 587:10
587:16,18
590:15 591:9
591:12,15,17
612:15,17
616:12 626:24
626:25 627:17

627:24 629:4
629:24 642:6
645:23
**documents**
569:11,15
570:22,25
571:17 572:8
573:24 574:2,3
578:9,9,23
579:2 583:14
583:24 588:10
588:14,21,23
588:24 599:6,8
599:11 617:17
617:19 618:5
619:17 621:4,6
621:15,19
624:5,9 625:9
628:6,8,10,14
628:19
**doing** 597:9
603:15 609:3
614:17 633:11
656:11 683:11
**doubt** 583:15
**Dr** 570:11,11,11
573:10 576:7
576:12 577:4
579:23,23
583:14 587:8,9
589:19 591:3
597:9 599:15
599:23 610:25
611:10,17,24
612:3,20,22
614:19 615:3
615:22 616:3
616:23 622:17
628:24,25
630:5 631:10
636:15 645:13
648:2 649:20
651:6 655:10
656:19,25
657:20 674:3
694:7,24 695:3
695:6,12,22
696:8,11,17

697:10,21,22
697:22 698:9
698:11,14
**draft** 550:15,16
550:17 581:5
581:15 588:4
589:20 590:4
593:18,20
594:2,4,6,9,15
594:25 595:6
596:4,10,11
597:8,11,13,14
597:15,22
600:4 605:10
605:12 611:19
615:7,10,13
618:18,23
**drafted** 608:9
614:23
**drafting** 576:21
581:9,14,18
615:6 696:3
**drafts** 586:6
589:4,23
596:25,25
597:6,7 610:15
617:3,21,22,24
618:13,16,20
618:25,25
620:3 621:2
622:19 623:7
623:10
**draw** 650:12
**drawing** 657:7
**Drs** 610:24
**drug** 561:21
565:4 566:22
568:11 636:20
636:23 673:17
673:18 674:2
676:14 679:12
687:22
**drugs** 636:18
672:24 677:19
687:25
**due** 562:18
581:17
**duly** 552:12

703:13
**D-U-R** 687:22
_____
**E**
**E** 549:2,2 550:3
550:8 703:2,2
**earlier** 557:6
576:24 590:23
595:6 605:9
618:19 625:16
625:25 626:15
626:16 672:23
685:17 693:20
**early** 571:8
573:12 575:8
618:16
**eat** 688:17
**econometric**
560:5 579:4
583:24 600:10
600:18 638:18
675:9 682:13
686:19,23
692:8,15
695:23 696:13
**econometrics**
681:8
**economic** 569:4
676:15 683:5
**economics**
662:19,25
688:13
**economists**
673:11 675:8
675:19,21
686:18
**Ed** 587:20
643:15 672:12
**editorial** 595:16
**EDMUND**
549:11
**Edward** 549:5
551:23
**effect** 559:21
560:13 591:11
650:23 659:22
659:23 665:3,7
665:8 666:2

669:6,9 673:12
683:8,9 694:17
**effective** 566:25
567:8,12
568:12 602:2
607:13 608:11
608:22 609:25
670:23
**effectiveness**
565:4,7 567:25
568:18 670:9
670:14 671:16
671:22,24
**effects** 651:17
651:19 660:20
664:11 665:17
667:6 668:10
668:15 673:16
676:23 677:14
677:25 678:5
678:22 679:21
691:16
**efficacy** 558:15
637:14 646:14
647:20 648:9
649:4,23
661:10
**effort** 614:13
**efforts** 622:17
**either** 554:20
576:12 596:11
598:20 599:3,6
599:24 602:13
602:21 605:15
614:7 615:23
617:3 636:8
656:13 659:19
660:3 665:24
666:25,25
678:18 681:25
682:9 687:7
696:8
**electronic**
580:24 619:10
621:3
**Eli** 557:15 558:2
558:7 563:12
564:23 565:11

632:17 636:22
**empirical**
602:11 603:7
674:5 695:17
695:18 697:11
**employ** 631:25
**employed** 632:7
632:11
**enable** 601:11
601:25 680:6
**encounter** 602:9
603:2 693:14
693:17
**endeavors**
636:13
**ends** 606:21
607:23 637:25
698:18
**end-to-end**
559:8
**energy** 589:20
**engagement**
620:6
**entire** 604:6
651:15 656:17
**entirely** 568:11
568:17 580:14
587:22 620:21
642:11 671:6
**entry** 561:9,19
687:4
**equation** 667:16
**equations**
600:21,22,25
**equivalent**
607:18
**Ernst** 676:3,12
**error** 680:15
681:25 682:9
682:25 683:14
683:15 684:2,9
**errors** 598:7
681:10 682:14
**esophageal**
677:19
**especially** 638:8
**ESQ** 549:5,8,11
549:12

essential 646:15
essentially 560:7
  580:24 609:20
  659:21 661:24
  677:17 682:6
  682:15
established
  610:14
establishing
  671:15
estimate 561:22
  610:10 636:13
  638:19 650:22
  650:22 659:11
  673:12 676:23
  677:14,24
  678:22 679:11
  680:22 681:9
  682:4,14,19
  683:8,9 697:23
estimated
  673:16
estimates 559:4
  560:12 680:7
  682:8 684:2
  693:21
estimating
  652:22 658:23
  679:21
et 607:13 608:11
  609:20 651:22
evaluate 631:24
  658:22 659:13
event 650:17
  655:15 661:25
  662:6,13
  664:24 677:17
  677:21
events 640:16
  660:10,18
  662:16 663:7
  664:2,11,13
  666:5,14,20,23
  666:23 667:2,3
  667:5,9,14,14
  667:19,20,23
  668:2,3,12
  669:12,20,25

677:15,16,25
eventually
  674:16
evidence 559:20
  561:21 565:25
  566:7 567:24
  568:18 606:17
  608:21 609:12
  609:13 634:4
  634:10 668:21
  669:2 670:8,11
  670:14 671:22
  671:23
Evidently 614:6
evolves 633:20
exactly 613:10
  681:6 683:18
  698:7
Examination
  550:6 552:14
examine 559:20
  578:25 604:8
  633:13 658:8
examined
  552:12 562:13
  562:16 634:3
  634:10
examining 633:8
example 566:5
  566:21,24
  567:21 577:18
  578:14 579:3
  583:25 597:23
  600:15,21
  605:7 609:18
  610:7 616:3
  618:9,22
  621:14 634:2
  667:11 669:4
  680:18 681:17
  688:12,13
  695:15
examples 584:13
Excel 626:24
  627:10
exception 631:9
excess 684:10
exclude 658:18

excuse 556:9
  563:2 591:3
  633:3
exhibit 550:10
  550:11,12,13
  550:14,15,16
  550:17,18,19
  550:20,21,22
  550:23,24
  551:2 552:24
  553:10,22,24
  554:14,14,20
  554:21 555:18
  569:21,25
  570:8 572:20
  573:2 581:25
  582:2,5,8,11
  587:19 590:4
  591:9 592:10
  592:16,17,18
  592:24 593:2,5
  593:15 594:5
  594:19 596:9
  596:11,12,25
  600:5,23
  603:18 604:14
  607:3 610:11
  612:11,12,16
  615:4 616:8,9
  616:12 617:11
  621:20,25
  625:18,22
  626:11 627:5,8
  627:10,11,13
  627:21 628:4
  628:16,21
  638:10,11
  641:25 642:3,5
  642:17 643:6
  643:13 644:10
  645:20,21,24
  651:7 653:9,12
  653:14 654:4
  654:10 672:8
  674:20,22
  676:6,7,10,11
  679:10 688:4
  696:11,21

698:8 699:5,6
  699:9
exhibits 569:11
  569:12,16,17
  570:19 572:22
  574:3 588:6,7
  588:10 589:3
  596:23
exist 655:12
  664:24
existed 665:2
existing 622:18
exists 592:4
expand 600:13
expanding
  601:16
expect 577:2
  639:15 640:9
  640:14 672:21
  699:8
expenditures
  560:12
experience
  575:17
experimental
  673:5
expert 556:20
  556:23 557:7
  564:22 565:2
  570:10 577:19
  584:4 598:17
  599:20 613:17
  630:8 631:12
  631:18,23
  633:5,6,21
  634:23 635:3
  657:5 659:16
  675:8,18 685:7
  686:18,24
  687:9,13
experts 563:16
  563:19,21,24
  564:5,7,12
  565:12 566:15
  566:18 568:10
  570:16 574:9
  578:11 582:12
  583:9 586:11

600:16 613:12
  630:13,16,17
  631:25 632:7
  632:10,14,20
  632:23 633:14
  633:15 634:17
  634:21,22
  637:10 692:8
explain 593:23
  666:17 671:11
explained 668:7
explaining
  601:14
explicated 579:3
  579:6
express 696:9
expressly 604:12
extent 564:20
  565:10 614:4
  614:19 615:2
  650:2 652:5
  665:13 670:12
  680:4
eye 615:11,14
e-mail 572:7,11
  572:12,14,17
  573:19,23
  581:7 584:21
  584:23,24
  585:11,12
  586:6 590:11
  590:24 591:9
  592:2,3,4
  593:6,9 596:25
  620:3,7
e-mailed 571:20
  571:23,24
  572:3 586:5
e-mails 620:2,7
  620:10,14

**F**

F 703:2
face 674:6
face-to-face
  640:21
fact 564:16
  583:16 609:24

637:4 642:17
643:5 647:20
653:23 657:11
661:22 663:12
673:9 682:18
685:3 689:22
690:8 691:5
**facts** 563:8
665:25
**fail** 669:8
**failed** 660:12
**failing** 661:7
**fair** 674:9 685:2
**fairly** 583:2
597:4 664:12
674:17
**fall** 640:25
690:14
**false** 644:23
645:16 646:24
647:25 648:8
649:3,7 655:4
655:8
**falsely** 647:8,19
653:21 697:21
**familiar** 555:20
**far** 591:18
692:25
**fault** 638:13
**favorable** 662:4
**FDA** 653:24
**feasible** 694:17
**February**
550:22 553:16
575:5,5,10
591:4 598:9
611:2 617:6,12
621:24 629:6
645:15 646:7,8
651:7 657:20
**Federal** 558:23
**felt** 681:13
**fewer** 669:19,24
**field** 659:16
**figure** 625:20
**file** 551:15
615:21 627:2
643:10

**filed** 559:2 575:4
575:9,10
581:20 590:20
594:10,11
596:12 598:5
615:24 629:15
630:8,17
637:11 642:13
643:13,20,24
687:20 696:6
699:3
**files** 619:5
**filing** 575:12
583:2 613:6
630:18
**fill** 594:13
**fills** 572:13
**filter** 573:17
**final** 593:18,20
594:2,6,8,15
594:25 596:5
596:12 600:4
604:14 607:18
611:9 618:18
618:20,23
**finally** 635:12
**find** 582:22
596:14 604:11
607:17,21
618:21 626:4
626:10 634:2,9
684:23
**finding** 596:17
603:23
**fine** 585:22
601:22 602:22
644:5,7 699:12
**finer** 565:21
595:24
**finish** 555:12
**Fiona** 550:12
570:2 579:23
**first** 552:11
554:6,8,9
555:13,19,21
562:14 570:7
571:2,5,7,12
581:22 589:20

590:4 596:16
596:17 604:3
610:15,19,20
612:25 613:17
621:24 622:8
628:15 629:4
629:24 644:19
646:10 647:4,7
653:13 654:13
654:14 672:20
673:23 680:3
692:24 697:19
**fit** 693:25
**five** 656:12,15
656:20 657:2
681:18 682:5
**flashes** 645:14
649:20 651:18
652:7,13,15
**flawed** 559:13
**flaws** 584:4,10
**flip** 572:23
589:9 654:9
660:24
**Floor** 549:4
**focus** 661:2
673:10 675:18
**focused** 569:3
633:10 689:7
**focusing** 559:16
600:4 608:6
624:13 635:18
665:23
**follow** 580:20
681:3
**following** 570:9
591:6 664:21
701:4,5
**follows** 552:13
697:10
**footnote** 554:8
570:14,19
596:20,20
623:17 624:6
626:13,18,21
626:23 627:4
**footnotes** 580:10
**foreclosure**

561:8
**foregoing** 700:4
**forgetting**
640:24
**forgot** 696:18
**form** 566:8
641:23 657:22
658:11
**formally** 668:7
**forms** 658:25
**formulating**
629:19
**forth** 629:20
660:10 703:12
**forward** 608:19
608:20 662:9
664:4,7 665:21
666:20 689:10
689:11
**forwarded**
572:8
**forwarding**
584:23
**found** 568:10
679:6
**foundational**
663:3
**four** 675:6,14
686:16 698:22
**Fourth** 549:4
**framing** 650:3
**Franklin** 624:9
624:25 625:10
627:14
**fraud** 568:5
**fraudulent**
558:14 559:23
568:24 639:3,9
651:10 652:24
656:22 670:10
678:6,10,14,23
679:7
**frequently**
688:16
**front** 685:15
**full** 563:23
592:15
**further** 552:20

567:18,24
587:15 625:3
629:14 694:21
699:15 703:16
**future** 588:21
643:23 658:21

### G

**gabapentin**
646:13 652:9
653:22 654:15
656:6
**gabapentin's**
651:17 657:8
**Gaba-analog**
654:19
**Gady** 555:22
**gamma** 654:15
**gastro** 677:19
**gather** 561:13
578:10,11
627:13 636:22
**gathered** 618:11
619:20 626:16
**gathering**
578:19 579:8
**general** 560:8
564:25 574:4
574:13,16
584:7 593:12
635:10 667:10
667:20 670:16
684:8 689:8
690:7
**generalizable**
635:11
**generalized**
665:18
**generally** 561:10
618:8 629:13
**generate** 640:3
652:16
**generic** 561:9,19
580:22 640:8
687:3
**GERD** 677:19
**getting** 591:19
595:8

**give** 563:22
    571:9 575:6
    582:18 591:21
    615:9 687:11
    691:4
**given** 593:21
    597:22 601:25
    668:25 680:24
    703:14
**giving** 615:11,14
    663:12
**gleaned** 689:4
**GMA** 578:10
    588:16
**go** 557:2 571:10
    601:18 604:2
    608:19,20
    618:8 626:11
    634:25 642:20
    643:20 652:22
    658:23 659:2
    686:15 689:9
    699:18
**goes** 560:2 611:3
    635:14 693:19
**going** 563:12
    569:10 583:20
    583:22 588:5
    592:2 606:20
    612:23 617:15
    637:24 642:23
    670:15 672:14
    676:20 698:17
    699:23
**Good** 551:4
    552:16,17
**gotten** 573:15,16
    578:5 587:5,7
**grammar**
    578:25 595:24
**grammatical**
    593:22
**Grand** 549:7
**granted** 643:10
**great** 637:23
    646:7
**greater** 582:19
**Greylock**

563:14 571:16
    571:17 576:9
    576:24 580:12
    580:16,18
    581:2 617:18
    618:4 619:3,19
    619:23 621:8
    695:13
**ground** 636:11
**guess** 556:25
    559:24 567:5
    574:22 575:6
    580:22 588:12
    588:19 602:23
    608:6 612:5
    615:16 620:24
    624:14 631:19
    635:2 636:21
    642:16 648:7
    652:2 654:12
    656:19 659:3
    662:7,25
    663:17 670:5
    671:6 675:4
    683:12 689:17
    691:6 695:5
    697:8
**guessed** 683:19
**guessing** 589:13
**Guttoso** 645:13
    649:20 653:20
    656:20,25
**Guttoso's** 648:3
    651:6 655:10
    657:20
**Gynecology**
    645:15 646:8
**G-U-T-T-O-S...**
    645:14

_____

**H**
**H** 550:8
**Hagens** 549:3
    551:24 558:19
    561:4
**half** 571:12
    671:18
**hand** 552:23

553:21 641:13
    641:13 642:4
    703:21
**handed** 569:15
    569:21 582:4
    588:9 612:15
    616:11 645:23
    653:11 676:10
**handy** 689:2
**happen** 586:13
    662:10 665:8
**happened**
    639:21 666:14
    668:14
**happy** 684:4
**hard** 571:20
    657:10 664:20
**Hardy** 549:6
    552:9
**harm** 606:7
**Hartman** 576:7
    576:12 577:5
    583:14 597:9
    599:23 612:21
    612:23 614:19
    615:22 616:23
    622:17 695:12
    696:9 698:9,14
**Hartman's**
    615:3 636:15
    694:7,24 695:6
    695:22 696:11
    696:17
**Hartmen** 550:18
**headache**
    646:15
**heading** 654:14
**heard** 696:8,14
**held** 548:5 551:8
    642:25
**help** 565:20
    588:3 591:22
    626:10 650:5
    665:10 666:16
    671:10 688:20
**helped** 579:17
    592:22
**helpful** 672:3

691:18
**hereinbefore**
    703:12
**hereunto** 703:20
**higher** 684:3
**highlighted**
    598:16
**hit** 641:6
**hold** 663:6 685:6
    698:25
**honestly** 581:14
**hope** 663:7
**hoping** 672:9
**hot** 645:14
    649:20 651:17
    652:7,13,15
**hours** 684:24
**housekeeping**
    698:24 699:14
**hundred** 667:19
**hypothetical**
    566:13,17
    567:5,16
    680:18 681:17
    681:22 683:12
**hypothetically**
    668:25
**Hytrin** 687:23

_____

**I**
**IBEW** 555:21
**idea** 607:22
**identical** 643:18
    699:9
**identification**
    551:3 569:13
    582:3 588:8
    612:13 616:10
    623:21 624:16
    642:2 645:22
    653:10 676:8
**identified** 625:6
    628:15
**identify** 551:19
    579:18 601:11
    624:19 625:8
    674:4
**ignoring** 591:19

**III** 547:14
    549:11
**imagine** 584:3
    620:9
**immediately**
    574:17
**impact** 566:3
    567:13,19
    568:20 607:25
    610:4 633:8,16
    633:22 635:5
    636:14,24
    641:9 651:3,14
    652:22 657:17
    659:12 664:17
    665:12 689:20
    691:11 692:9
**impacted** 559:24
    659:4
**impacts** 678:11
    689:5
**implement**
    680:21
**implementation**
    639:22,25
**implementing**
    680:9
**implications**
    568:8 569:4
**important** 650:3
    657:11
**improper**
    634:14 636:14
    680:22
**IMS** 560:11
**inaccurate**
    668:9
**inadvertent**
    611:15
**include** 578:7
    579:18 602:10
    619:8 629:2
    640:10,15
    659:18,19,20
    660:3 677:8
    682:25 687:18
    690:18
**included** 559:4

645:3 659:14
659:17 660:19
682:15,16
**includes** 670:22
677:10
**including**
622:19 649:22
658:24 689:24
**inclusion** 645:7
**incomplete**
586:14,18,24
592:13 618:22
624:7
**incorporate**
634:5
**incorrect** 665:24
**incorrectly**
589:18
**increase** 662:24
663:7
**increases** 680:23
**incremental**
560:13 640:3
**independent**
603:16
**index** 625:15
**indicate** 601:4
**indication**
635:19,19
636:7 663:14
663:16 668:25
677:18
**indications**
659:11 668:20
670:9 679:11
**indication-by-...**
635:21 636:8
**indifference**
673:5
**indigenity** 602:8
**individual**
598:21 599:7,8
604:7 606:3,13
637:3 667:20
677:14,25
686:9 689:21
691:12,16
**individualized**

**individually**
658:7
**individuals**
599:25 636:19
**industry** 556:11
690:9
**inference** 673:18
**influence** 689:22
691:13
**inform** 639:3,16
660:12
**information**
558:14 565:6
648:18 663:13
676:13 687:12
689:4 694:22
695:7
**informed** 653:24
661:5
**infrequently**
580:16
**inherently** 690:5
**initial** 615:18
**injury** 564:3
567:15 568:9
694:8,13
**input** 696:2
**inquiry** 604:7
606:4
**inserted** 589:25
**insofar** 620:14
656:3
**instance** 668:13
**instances** 568:5
698:13
**instructed**
636:17
**instructions**
573:25
**instrumental**
672:22 677:4
**instruments**
602:12,15
679:7
**intend** 554:19
**intention** 643:12
**interest** 603:17

644:4
**interested**
703:19
**intermediate**
594:4
**internal** 588:19
**internet** 684:23
**interpretation**
683:5
**interpreted**
691:14
**interval** 681:10
682:17,18
**intervals** 682:5
683:10,19
**intervening**
685:6
**introduced**
697:11
**investment**
662:13 663:6
663:11
**invite** 568:25
**invoices** 618:10
619:11
**involved** 614:20
615:3,5
**involvement**
564:3
**in-between**
635:23
**ipso** 596:16
**irrelevant**
664:13
**issue** 568:13,15
575:21 605:7
608:2 638:22
638:25 640:5
640:10,15
641:2,10,16,21
644:2 645:4
652:9,20 670:7
670:14,24
695:2
**issues** 559:14
562:17 563:11
568:3,24
570:10 571:2

583:17,24
584:15 593:13
600:14 606:13
615:17 620:10
632:2 633:4
674:5 686:9
689:13 695:24
696:13
**items** 619:21

---
**J**

**James** 549:8
552:8
**January** 571:8
571:12 573:12
575:8 581:12
**Jersey** 551:6
**Joanne** 555:22
**Joshua** 578:18
**journal** 644:14
650:24 651:3
653:20 654:11
657:17 677:11
678:15
**judge** 562:13
632:5 634:23
**judgment**
659:15 686:8
**jury** 563:7
635:15

---
**K**

**Kansas** 549:7
**Katherine**
578:18
**Keeley** 550:11
569:22 570:11
579:24 587:8
594:17 610:24
630:5 674:3
**Keeley's** 573:10
599:15 611:10
611:17 628:25
695:3
**keep** 588:20
607:3 672:4
**key** 644:23
**kind** 573:25
574:23 577:14

578:5 591:22
602:11 603:7
685:24
**kinds** 618:7
634:2,9
**know** 557:21
558:20 563:22
571:11 572:10
573:16 575:13
576:20 578:14
581:14 582:23
583:3 588:17
590:17 591:18
594:24 597:14
603:23 605:13
611:19 612:6
620:24 621:8
623:11 632:3,6
632:8 633:19
649:16 650:4,8
650:13 655:16
659:22 663:3
663:19,21
665:22 666:18
679:20 680:4
681:5,23
683:16,23
684:4 688:15
690:25 692:23
693:2,12,20,25
695:5,8 698:14
**knowledge**
590:13 621:13
670:13 673:22
**known** 565:9
625:2
**K-Dur** 687:22

---
**L**

**label** 608:19
**labor** 613:8,11
**lack** 558:13
664:17 665:15
**Lambert** 607:14
608:13 609:10
610:3
**language** 578:25
604:17 605:17

674:23
**large** 641:4
  680:15 683:14
**largely** 578:17
  583:24 593:22
  595:15 600:6
  687:2
**largest** 641:7
**late** 573:11
  586:12
**law** 684:15,16
  684:20 685:5,5
**lawyer** 685:7
**layered** 670:6
**layers** 562:12
**layperson's**
  606:14
**learn** 666:18
**leave** 643:10
**led** 567:18
  665:16
**legal** 555:20
  565:15 568:3,8
  568:15 569:2
  578:9,22
  605:18 648:15
  667:3,9 670:7
  670:13 685:7
  685:13 686:8
  691:23 692:2
**legitimate**
  668:13,16
**letter** 550:19
  616:19,21
  617:2,11
  621:23,24,25
  622:3,6,15
  624:6
**letters** 588:14
  617:13 618:7
**let's** 553:12
  556:7 560:18
  574:20 576:16
  581:25 590:3
  592:8,16 594:5
  603:18,21
  604:3 607:3,5
  610:11 612:10

616:7,18,25
619:6 621:23
622:14 623:17
625:18 628:3
637:20 638:7,7
638:8 644:18
645:10,19
646:19 653:13
653:13 654:4,9
660:6,24 672:5
672:17,20
675:17 676:5
680:20 686:15
689:14,18
694:4 696:16
697:7,18
699:18
**level** 568:17
  637:4 670:11
  680:23
**Lexington** 548:6
  549:10 551:10
**liability** 547:7
  551:13 559:4,7
  560:3,4 561:22
  563:18 652:17
**likelihood**
  696:10
**Lilly** 557:15
  558:2,7 563:12
  564:24 565:11
  632:17 636:23
**limited** 619:9
**line** 572:24
  701:6
**lines** 673:19
**list** 557:2,3
  609:19 611:6
  611:10 621:15
  630:3 644:13
  660:10 675:9
  686:19 687:17
  687:21 688:3,5
  688:6
**listed** 555:14,16
  563:4 570:18
  609:19 628:9
  629:4 644:22

687:18 690:15
**literature**
  595:18,20
  667:21
**litigation** 547:7
  551:13 556:11
  556:14 558:3,7
**little** 563:25
  565:22 572:13
  588:14 591:24
  594:12 603:15
  605:18 653:6
  658:5 671:10
  671:11 686:22
**live** 580:25,25
  581:2
**LLP** 548:6
  549:3,6
**Local** 555:22
**locate** 617:16
  619:17 622:18
  623:7 624:5
**located** 551:9
**long** 644:5
  682:24
**longer** 592:4
  593:7 629:7
  648:13 649:7
  656:22
**look** 555:3 557:3
  572:22 579:12
  588:13 604:3
  605:10,14
  607:5,8 610:11
  616:18,25
  619:6 621:23
  622:14 623:17
  625:18 628:3
  638:8,16
  644:10,19
  645:8,10 646:6
  646:19 650:6,9
  651:18 653:13
  653:13,16
  654:4,13 658:2
  660:6,25
  662:11 672:17
  672:20,24

674:19,24
682:14 683:16
683:17 684:5
687:14 689:14
691:18 694:4
696:16 697:7
**looked** 620:3
  628:24 631:2,5
**looking** 572:19
  593:13 605:22
  607:3 633:5
  646:5 647:4,12
  654:25 664:10
  677:22 683:11
**looks** 585:22
  636:15
**lorazepam**
  687:23
**loss** 631:16
**lost** 552:7
  675:13
**lot** 586:12
**lower** 662:14
**Lupron** 687:25

_____

**M**

**M** 582:11
**MA** 549:4
**Mail** 684:22
**main** 549:4
  641:3
**major** 650:12
**Management**
  653:21
**manufactured**
  607:14 608:12
  610:2
**manufacturer**
  663:6
**March** 547:19
  550:23 551:6
  653:21 655:10
  657:20 703:21
**margin** 680:15
  681:25 682:9
  682:24 683:13
  683:14
**marginal** 665:12

**margins** 684:2,9
**mark** 569:10
  581:25 588:5
  607:15 612:10
  643:12 645:19
  676:5
**marked** 551:2
  553:22,23
  569:13,16
  582:2,5 588:8
  588:10 596:24
  612:12,15
  616:9,12
  622:19 625:24
  641:25 642:4
  643:6 645:21
  645:24 651:7
  653:9,12 676:7
  676:10 699:4,6
**market** 563:9
  676:14
**marketing**
  547:5,10
  559:23 560:5
  560:12,13
  634:14 636:14
  638:21,24
  640:4,9,14,25
  641:9,15,21
  645:4 660:20
  662:5,20
  664:11 676:13
**marriage** 703:18
**Massachusetts**
  547:3 551:14
  558:22
**master** 551:15
**material** 622:18
  626:18,20,22
  627:18,20
**materially** 699:9
**materials**
  598:11 611:10
  616:23 619:8
**matter** 553:25
  554:16 555:8
  555:10,14,21
  555:23 556:4

| | | | | |
|---|---|---|---|---|
| 557:5,9,14 | 634:24 | 688:23 | 638:1 639:1 | **middle** 636:10 |
| 558:25 560:19 | **means** 565:23 | **mentions** 652:23 | 640:1 641:1 | 661:3 697:4 |
| 561:8,11 | 568:5 642:11 | **Meredith** | 642:1 643:1 | **migraine** 607:13 |
| 562:23 563:12 | 647:16 658:5 | 547:17 548:5 | 644:1 645:1 | 609:8,13,25 |
| 564:24 565:2 | 685:21 | 550:5 551:1,17 | 646:1 647:1 | 610:8 646:15 |
| 565:11 581:13 | **meant** 697:16 | 552:1,10 553:1 | 648:1 649:1 | **migraines** |
| 583:5 608:18 | **measure** 641:8 | 554:1 555:1 | 650:1 651:1 | 608:11 |
| 608:20 617:4 | 641:11 651:14 | 556:1 557:1 | 652:1 653:1 | **mind** 609:3 |
| 621:5 624:10 | 660:21 669:18 | 558:1 559:1 | 654:1 655:1 | 642:18 675:22 |
| 624:12,25 | 669:24 692:8 | 560:1 561:1 | 656:1 657:1 | 690:17 |
| 625:3,10 | 694:8,12 | 562:1 563:1 | 658:1 659:1 | **minus** 682:5 |
| 627:14 628:11 | **measured** | 564:1 565:1 | 660:1 661:1 | **minute** 650:5 |
| 632:17,25 | 567:19 668:15 | 566:1 567:1 | 662:1 663:1 | 672:6,7 |
| 633:6 635:16 | **measuring** | 568:1 569:1 | 664:1 665:1 | **Mishkin** 549:12 |
| 637:9 685:13 | 651:3 657:17 | 570:1 571:1 | 666:1 667:1 | 552:4,4 |
| 689:25 690:18 | **mechanism** | 572:1 573:1 | 668:1 669:1 | **misinformation** |
| 691:21,23 | 559:24 | 574:1 575:1 | 670:1 671:1 | 559:22 |
| 698:24 703:19 | **medical** 630:17 | 576:1 577:1 | 672:1 673:1 | **misleading** |
| **matters** 554:25 | **medication** | 578:1 579:1 | 674:1 675:1 | 644:23 647:16 |
| 577:12 581:21 | 692:17,18 | 580:1 581:1 | 676:1 677:1 | 647:17,25 |
| 632:2 685:7 | **medications** | 582:1 583:1 | 678:1 679:1 | 655:8 656:4 |
| 687:3 689:9,11 | 676:24 | 584:1 585:1 | 680:1 681:1 | 661:10 |
| 689:12 690:8 | **meeting** 556:2 | 586:1 587:1 | 682:1 683:1 | **misleadingly** |
| **McClutchy** | 578:6 598:13 | 588:1 589:1 | 684:1 685:1 | 647:17 |
| 551:5 | **meetings** 598:10 | 590:1 591:1 | 686:1 687:1 | **missing** 604:15 |
| **McKinnon** | 598:14 640:22 | 592:1 593:1 | 688:1 689:1 | 607:20 697:17 |
| 563:14 571:16 | **members** 599:24 | 594:1 595:1 | 690:1 691:1 | 698:5 |
| 571:18 576:10 | 606:5,8 | 596:1 597:1 | 692:1 693:1 | **Missouri** 549:7 |
| 576:24 580:12 | **memorable** | 598:1 599:1 | 694:1 695:1 | **misspoke** |
| 580:16,19 | 595:7 | 600:1 601:1 | 696:1 697:1 | 554:11 |
| 617:19 618:4 | **memory** 555:5 | 602:1 603:1 | 698:1 699:1,21 | **misunderstan...** |
| 619:3,19,23 | 631:16 | 604:1 605:1 | 700:1,2,9 | 566:16 612:5 |
| 621:9 695:13 | **mention** 571:2 | 606:1 607:1 | 702:25 703:11 | **MIT** 676:3 |
| **McKinnon's** | 588:12 609:18 | 608:1 609:1 | **message** 572:7 | **mixed** 669:2 |
| 581:2 | 629:9 652:8 | 610:1 611:1 | 591:8 662:5 | **mixing** 581:17 |
| **mean** 565:18 | 661:18 671:5 | 612:1 613:1 | **messages** 644:24 | **model** 560:5,9 |
| 573:21 574:3 | 687:25 | 614:1 615:1 | **met** 552:18 | 560:11,16 |
| 576:14 577:4 | **mentioned** | 616:1 617:1 | 563:5 639:6 | 600:10,18 |
| 579:21 587:4 | 580:9 583:13 | 618:1 619:1 | 684:14 | 601:5,11,19,20 |
| 597:13 598:4,8 | 585:8,12 | 620:1 621:1 | **method** 633:10 | 601:24 602:3 |
| 618:15 620:21 | 586:19 597:4 | 622:1 623:1 | **methods** 601:15 | 603:12 636:6 |
| 628:14 630:16 | 599:15 609:9 | 624:1 625:1 | 601:16 | 636:13,15 |
| 637:3 654:17 | 609:15 612:25 | 626:1 627:1 | **metric** 686:5 | 638:8 640:2 |
| 659:7 680:10 | 613:12 614:23 | 628:1 629:1 | **Michael** 550:11 | 641:10,19 |
| 686:13 695:17 | 617:20 622:2 | 630:1 631:1 | 569:22 | 650:21 651:4 |
| **meaning** 565:15 | 623:9 641:5 | 632:1 633:1 | **Microsoft** | 651:13 657:18 |
| 656:17 | 651:20 655:14 | 634:1 635:1 | 690:18 | 657:23,24 |
| **meaningful** | 662:22 685:16 | 636:1 637:1 | **mid** 575:5 | 658:19,24 |

659:2 664:23
665:5,10 666:4
666:7,22,24
667:5,13,21,24
668:8 669:18
669:23 670:20
674:7 677:3,8
677:9,12,18
679:11 680:2,9
680:16,21
683:15,17
693:4,10,22,25
**modeled** 667:19
668:2
**modeling** 602:7
602:24 658:8
659:6,21
665:11 674:6
**models** 638:18
665:3,6 683:18
**modification**
601:10,24
**modifications**
587:12,16
**modified** 588:2
600:19 657:22
**modify** 600:10
**moment** 626:4
**month** 592:8
**months** 684:21
**morning** 551:4
552:16,17
593:3 685:17
686:8
**Moron** 697:10
697:21 698:11
**Morton** 550:12
570:2,11
579:23 587:7
589:19 590:6
610:24,25
612:3 628:24
630:5 674:3
676:2 695:24
698:11
**Morton's** 573:9
591:4 599:16
611:6,24 616:3

**motion** 552:20
559:11 561:25
564:8,14
569:23 630:10
630:19 635:5
**move** 594:5
616:7 637:20
653:5
**moving** 644:4
672:4
**MUEHLBER...**
549:8
**Muhlberger**
552:8
**MULDOON**
552:8
**multiple** 562:15
**multitude**
606:16
**multi-collinea...**
603:2 693:16

———————
**N**
**N** 549:2 550:3
**name** 551:5,16
557:21 599:11
690:20
**named** 598:21
599:2,7 640:11
**names** 555:20
**NANCS** 679:17
679:23
**narrowing**
567:18
**narrowly** 691:15
**national** 625:15
**nature** 558:10
560:9 561:6
584:8 595:16
595:22 677:23
**NDTI** 679:16,22
**NECA** 555:21
**necessarily**
659:8
**necessary**
583:17
**need** 569:6
579:14 591:22

591:25 624:11
632:3 633:19
655:12 658:22
659:8,13
671:24 674:10
687:14 693:9
**needed** 581:5
625:3 657:2
665:22 666:21
**needs** 568:18
**negative** 607:25
609:13 647:2
647:18 648:11
649:5 651:21
660:13 661:8
661:19,23
662:3,22
663:13,21,23
665:16 666:21
669:13 670:3
671:19,25
**neither** 587:24
**neuralgia**
655:20,24
656:7
**Neurontin** 547:5
551:12 569:8
607:12 608:11
608:22 609:11
609:24 623:23
634:14 635:21
636:8 638:20
641:12,14
644:16 650:24
651:4 652:12
655:19 657:18
658:13 662:20
663:8 664:12
669:5,19
670:23 680:24
694:9,14
**Neurontin's**
648:9 649:4,23
659:10 660:11
661:6,10,15
668:19 670:8
**neuropathic**
646:14 653:23

653:25 654:21
655:24 656:8
657:9
**never** 569:8
625:5 698:6
**new** 547:18,18
548:7,7,9
549:11,11
551:5,10,10
601:15 602:10
701:2,3 703:3
703:5,9
**night** 590:18
**nights** 586:12
**nine** 608:4
672:18
**non-fraudulent**
678:6,11,14,23
679:7
**non-price**
692:17
**Notargiacomo**
549:5 551:23
551:24 571:14
572:4 576:2,3
577:7 584:18
585:18 586:2,5
586:17 587:18
588:25 589:6
590:10,25
591:18 592:20
594:2 595:3,9
595:11,13
596:3 605:7
606:9 612:4
613:22,24
617:11,14,23
618:18 619:2
620:4 622:4
624:23 626:6
635:7,24
642:22 643:9
643:16 644:7
648:14 672:9
672:13 684:22
696:22 697:15
699:12,16
**Notargiacomo's**

619:5
**Notary** 548:8
700:13 703:8
**note** 591:23
651:16 677:17
**noted** 606:10
617:13 672:23
**notes** 581:5
594:12 598:10
598:11,18
**notice** 591:3
**noticed** 594:14
698:6
**notion** 565:5
663:5
**November** 622:3
622:23 624:6
**nuance** 636:2
**nuanced** 671:2
671:12
**nuances** 568:4
**number** 551:15
563:23 564:7
606:7,7 623:18
638:20 640:3
641:4,11,13,20
645:2 660:18
676:2 681:6
**numbers** 588:15
588:18
**numeric** 685:23
**numerical**
686:12
**numerous**
563:23 644:23

———————
**O**
**oath** 554:25
556:3
**Object** 635:7
**Objection** 606:9
635:24 648:14
**observation**
688:10
**Obstetrics**
645:15 646:8
**obtain** 611:12
**obviously**

697:15
**occasionally**
  553:5
**occurred** 641:12
  641:14
**October** 552:18
  553:23 554:24
  555:7 556:2,24
  598:13 620:7
  620:20 621:5
  621:12 624:20
  628:22 655:19
**offer** 554:19
  569:2 685:11
  692:2 696:2
**offered** 561:12
  563:17,24
  605:5 608:16
  635:4
**offering** 662:13
  691:21
**office** 551:9
**off-label** 565:5
  566:6 567:2,22
  568:12,13
  602:2 609:8,11
  610:2 644:15
  652:23 658:13
  667:6 668:20
  670:23 671:4
**oh** 556:8 594:16
  596:15,19
  625:23 674:21
**okay** 554:4,12
  556:7 557:13
  560:18,20
  564:19 568:7
  569:19 572:25
  573:18 575:15
  576:19 582:10
  583:4 585:14
  586:4 588:9
  589:21 590:21
  591:7 592:16
  594:5 595:23
  596:23 597:6
  598:19 600:8
  601:18 603:18

605:24 607:3,7
607:16 608:8
608:24 609:22
610:11,12,13
610:17,21
611:14 612:10
612:14 615:2
616:7,11
617:25 619:6
620:24 621:18
621:23 622:14
623:14 625:21
626:14 627:7
628:3 629:13
629:23 630:15
637:20 638:7
638:12 639:24
641:8 642:12
642:19 643:4
644:12,13,18
645:8 646:19
648:7,25
651:13 653:8
653:15,18
654:16 657:12
658:4 660:5,9
662:7 665:19
666:3,16
668:24 669:3
670:22 671:9,9
672:19 673:15
675:17,20
677:20,24
680:5 681:2
682:23 683:11
683:23 684:14
686:15 688:3,7
689:16 692:12
695:11,21
696:16 697:6,7
698:8,15,23
**OLS** 697:24
**omission** 611:15
  646:25
**omit** 651:9
**omitted** 647:17
  648:8 649:2
**once** 576:22,25

618:16
**ones** 600:6
  608:20 613:12
  628:20 641:7
  658:2 688:2
  690:3,15,23
  692:7 698:4
**ongoing** 562:6,7
**oOo** 699:25
**operative** 629:8
**opinion** 605:18
  611:2 636:22
  649:19 656:24
  661:14 685:11
  692:2 696:14
**opinions** 554:16
  554:18 561:11
  608:15 629:19
  633:14,15
  634:16,20
  637:10
**opposed** 614:17
  619:3 672:13
**opposing** 557:7
  574:9
**opposition**
  569:23 630:9
  630:19 635:4
**option** 614:12
**options** 614:12
**oral** 557:10
**order** 566:9
  589:10,14,17
  633:18 684:22
**ordering** 589:16
**original** 553:24
  554:14 561:13
  600:11,23
  601:15,17,20
  615:18 617:4
  623:7,10
  625:19 633:21
  672:15 687:15
  687:19 688:4
  690:4,12,15
**originally**
  573:20
**ought** 588:12

**outcome** 703:19
**outline** 550:14
  581:22 582:11
  582:15,18
  583:6,11
  584:16 585:2
  585:19,21,25
  586:5,7 588:2
  589:18 596:24
  603:19 605:5
  606:2,11 607:4
  608:7 609:17
  673:19 674:14
**outside** 592:7
  659:15
**outweighed**
  663:20,23
**overall** 664:10
**overcome** 675:9
  686:18
**overly** 589:11

_____
        **P**
**P** 549:2,2,8
  552:8
**page** 550:4
  553:12,13
  557:16 573:3
  588:15 604:3
  607:6 608:4
  610:20 638:9
  638:15 644:9
  644:18,22
  645:11 646:10
  646:12,21
  647:13 653:16
  654:9,10
  660:24,24
  672:18 673:8
  675:6,8,15,15
  686:16 688:4
  689:18 690:3
  690:16,24
  694:4,5 696:23
  696:25 697:18
  700:7 701:6
**pages** 547:15
  660:7 689:14

700:4
**paid** 561:20
  694:8,14,15
**pain** 646:14
  653:20,23,25
  654:21 655:25
  656:8 657:9
**panic** 646:15
  647:19 651:20
  651:22 661:9
  661:20 663:16
  662:14,16
  664:18,24
  665:9,12,16
**paper** 626:24,25
**papers** 578:10
  578:12 579:9
  616:2,5 619:9
  620:19,22
  621:10 628:25
  630:9
**paragraph**
  554:6,9 596:15
  596:21 607:23
  608:4 610:19
  616:18,21
  619:7 626:12
  626:19 638:9
  638:15,17
  644:11,13,20
  645:11,12
  646:2,11,20
  647:24 648:5
  649:14 653:16
  654:6,25 655:7
  660:8,25 661:3
  672:17 675:6
  675:13,14
  686:16 687:19
  687:21 689:14
  690:12 694:6,6
  696:16,22
  697:9,9,19,20
  697:20
**parallel** 564:2
**parameter**
  682:4
**parenthetical**

**Parke** 661:5
**part** 580:17,18
  587:12 611:15
  613:3 624:9
  627:9 655:2
  686:23,24
**partial** 586:10
**participant**
  613:19
**participated**
  689:10
**particular**
  561:20 609:11
  610:18 627:24
  636:7 638:9,16
  639:8,17
  644:10 660:25
  673:17 678:24
  679:23 692:16
**particularly**
  578:19
**parties** 551:19
  703:17
**patients** 692:19
**Paul** 549:12
  552:4
**payer** 599:3,11
**payers** 558:9
  561:4 599:25
**peer-reviewed**
  675:10,23
  686:20
**pending** 558:21
  562:3
**people** 578:14
**percent** 616:15
  680:25 681:7
  681:18,25
  682:4,9,17
  683:13 684:3
  684:10
**perfectly** 656:5
**period** 616:6
  617:21 618:14
  680:24
**permit** 672:25
**person** 639:7,7
**personal** 564:3

**personally**
  576:22,25
**perspective**
  683:2
**Petit** 578:18
  579:10
**Pfizer** 653:24
**Pfizer/Warner**
  607:14 608:12
  609:10 610:3
**Pg** 701:2
**Pgs** 701:2
**pharmaceutical**
  556:10 563:9
  678:24 679:21
  687:3 689:24
  690:10 691:20
  692:5
**phase** 633:8
**phobia** 646:16
  660:14 661:7
  661:16,19
  662:20 664:16
  665:3,11,17
**phone** 595:21
**phrasing** 593:22
**physical** 626:24
**physicians**
  660:13 661:4
**Ph.D** 547:17
  548:5 550:5
  551:1 552:1,10
  553:1 554:1
  555:1 556:1
  557:1 558:1
  559:1 560:1
  561:1 562:1
  563:1 564:1
  565:1 566:1
  567:1 568:1
  569:1,23 570:1
  571:1 572:1
  573:1 574:1
  575:1 576:1
  577:1 578:1
  579:1 580:1
  581:1 582:1
  583:1 584:1

585:1 586:1
587:1 588:1
589:1 590:1
591:1 592:1
593:1 594:1
595:1 596:1
597:1 598:1
599:1 600:1
601:1 602:1
603:1 604:1
605:1 606:1
607:1 608:1
609:1 610:1
611:1 612:1
613:1 614:1
615:1 616:1
617:1 618:1
619:1 620:1
621:1 622:1
623:1 624:1
625:1 626:1
627:1 628:1
629:1 630:1
631:1 632:1
633:1 634:1
635:1 636:1
637:1 638:1
639:1 640:1
641:1 642:1
643:1 644:1
645:1 646:1
647:1 648:1
649:1 650:1
651:1 652:1
653:1 654:1
655:1 656:1
657:1 658:1
659:1 660:1
661:1 662:1
663:1 664:1
665:1 666:1
667:1 668:1
669:1 670:1
671:1 672:1
673:1 674:1
675:1 676:1
677:1 678:1
679:1 680:1

681:1 682:1
683:1 684:1
685:1 686:1
687:1 688:1
689:1 690:1
691:1 692:1
693:1 694:1
695:1 696:1
697:1 698:1
699:1 700:1,2
700:9 702:25
**pick** 618:21
  667:5
**picked** 593:2
**picture** 661:10
**piece** 560:2,3
  637:18 639:8
  639:17 699:13
**place** 578:8,22
  613:15 641:16
  641:22 661:16
  666:6 667:4
  669:21,25
**placebo** 669:7
  669:10
**plaintiff** 644:21
**plaintiffs** 549:3
  551:25 558:8
  558:17 560:7
  561:3,3 566:2
  568:19 598:21
  599:3,7,12
  608:21 622:16
  630:9,19
  631:24 632:6
  632:11 634:21
  639:2 645:12
  648:2 649:6
  655:9 656:20
  668:7,18
  669:11 692:14
  692:23 699:16
**plaintiff's**
  552:20 569:23
  610:16 637:11
  639:16 648:12
**plan** 640:2
**planned** 612:7

697:23
**play** 635:16
  665:25
**please** 555:4
  644:9 687:16
**plus** 682:5
**point** 565:21
  572:6 574:21
  575:5 577:10
  581:3 591:16
  595:12 596:2,8
  603:7,15
  611:16,19
  643:23 656:18
  657:13 658:11
  658:15 667:18
  672:10 680:19
**points** 595:24
**Polk** 548:6
  549:9 551:9
  552:3,5
**Polubinki** 550:7
**Polubinski**
  549:11 552:2,2
  552:6,15
  587:20 588:5
  606:18 607:2
  612:10 626:8
  638:6 642:20
  643:4,17
  645:19 672:11
  672:16 676:5
  698:15,23
  699:13,18
**poor** 671:3
**portion** 616:21
  655:3 667:11
  667:15 675:18
  675:24 695:22
  696:11
**portions** 651:15
**position** 631:23
  632:4
**positive** 609:12
  661:18 662:2
  663:19,23
  665:2,8 669:13
  670:3 671:19

671:23
**possibility** 651:6
  657:19
**possible** 580:17
  586:8,13
  587:14 595:5
  597:8 602:8
  650:14 664:6
  679:18 681:16
  681:19
**possibly** 592:21
  613:22
**posthepatitic**
  655:20,24
  656:7
**potentially**
  645:3 660:19
  667:25
**practice** 630:18
**Practices** 547:6
  547:11 551:12
**Pradeep** 550:13
  570:3
**preamble** 611:5
**preceding**
  595:18 626:13
**precise** 555:25
  609:6 680:7
**precisely** 583:3
  693:13,16
**precision** 571:9
  680:11
**predominance**
  685:18
**predominant**
  686:6,9
**predominate**
  606:13 685:18
**preface** 589:2
**prefer** 602:20
  656:14
**preparation**
  614:20 615:3
**prepare** 574:22
  575:19 580:11
  614:16 627:5
**prepared** 552:19
  563:3 580:13

581:22 589:11
  603:19 619:11
  632:19
**preparing** 576:5
  576:13 597:19
  612:23
**prescribe**
  692:18
**prescribing**
  660:21 662:24
  663:8 677:15
  678:12 689:22
  691:13,17
**prescription**
  602:2 657:18
  673:25 674:2
**prescriptions**
  601:12 638:20
  640:4 641:12
  641:14 650:24
  651:4,14
  658:12 663:15
  669:19,24
  680:24
**presence** 609:13
**presentation**
  661:8
**presentations**
  640:15 665:21
**presented** 661:9
**presenting**
  563:7 671:18
  671:18,19
**presumably**
  634:21 653:2
  679:16
**presumed** 652:7
**presumption**
  662:12,18
  665:17
**previous** 554:5
  575:17 578:6
  644:22 657:8
  672:14
**pre-marked**
  552:23 642:3
**price** 556:11
  692:10

**pricing** 676:13
  688:18 689:24
  690:10 691:20
  692:5
**print** 586:6
  596:25
**printed** 585:14
**prior** 560:22
  576:12,14,17
  576:18 583:6
  583:10 586:4
  589:21 612:2
  613:6 617:13
  618:13 620:13
  624:17
**privy** 564:16
**probability**
  662:15 663:25
**probably** 561:13
  565:17 572:22
  577:11 582:23
  590:19 597:20
  600:5 647:16
  648:24 672:4
**problems**
  631:17 675:10
  686:19 693:14
  693:17
**procedural**
  604:13
**proceed** 551:22
  644:5 690:9
**proceeding**
  554:19
**process** 576:21
  595:12
**produce** 622:18
  638:19 680:16
**produced**
  610:16 618:11
  621:21 623:21
  624:11,12,15
  625:2,4,6,9
**produces** 694:16
**product** 678:24
**production**
  564:4 616:22
  617:2 618:9

623:20
**Products** 547:6
  551:12
**Professor**
  551:16 552:16
  569:14 570:2
  572:20 573:9,9
  590:6 599:15
  611:6 612:14
  622:16 623:19
  623:23 674:3,4
  676:2,3,9,22
  677:8,10 678:4
  678:21 679:10
  683:25 695:24
  698:10 699:21
**Professors** 630:4
**profitability**
  662:6
**profitable**
  661:25
**program** 661:17
**programs** 661:4
  661:15 662:8
  664:4 665:11
**prohibited**
  649:22
**promoted**
  609:10
**promotion**
  652:12,15
  658:25 665:9
  667:21 673:25
**promotional**
  638:21,25
  640:5,9,14
  641:2,9,15,21
  645:4 660:20
  667:7,10,12
  677:7,15,16,25
  680:23
**promotions**
  659:5 673:17
  676:23 678:6
  678:23 679:8
  679:22
**pronunciation**
  654:22

**proof** 671:15
**propose** 601:10
  601:20,24
  602:12 638:19
**proposed** 550:20
  600:10 601:5
  601:11,17,19
  602:15 606:5
  636:6 638:8
  640:2 641:10
  641:19 642:10
  643:7,17,21
  651:14 669:18
  674:7 683:3
  699:10
**proposing**
  641:19
**proposition**
  661:25
**prospect** 576:5
**prove** 608:21
**proved** 566:12
  568:19 635:12
  666:12 668:5
**proven** 567:24
  610:6,9 633:20
**provide** 584:16
  694:21
**provided** 554:24
  584:18 588:24
  590:7 617:5
  619:18 621:20
  631:15
**provides** 601:15
  644:13 695:6
**providing**
  565:25
**Pruszynski**
  547:23 548:8
  551:21 703:8
  703:24
**public** 548:8
  565:9 700:13
  703:9
**publication**
  640:10 650:23
  658:11 659:9
  675:23

publications
    675:10 686:20
publicly 603:12
publishable
    679:3
published
    644:14 645:14
    649:21 650:15
    650:19 651:8
    652:6 653:2,20
    654:12 657:2
    657:14,21
    659:20,22,24
    669:5 673:15
    676:4,14
    678:20 679:6
    679:20 683:24
    684:2
pure 662:19,25
purpose 602:3
    604:6 606:2,11
    606:15 615:14
    677:20
purposes 604:13
    664:24 670:20
    675:11 681:21
    682:11 686:20
put 577:23
    589:13 598:16
    618:8 626:10
    648:23 657:24
    666:9
putting 565:21
    578:8,21 589:7

**Q**

qualified 691:25
quantify 680:10
quantitatively
    633:8
quantity 636:15
quasi 673:5
question 562:4
    566:14 575:19
    580:21 601:19
    601:23 606:6
    607:14 608:25
    621:12 624:14

626:7 629:11
634:18 635:8
636:2 637:13
656:19 662:7
664:10 669:20
670:17 674:13
675:4 676:21
684:7 685:15
685:17,24
686:2 695:5
697:17
questioning
    643:21
questions 574:8
    681:22 699:15
    699:17
quick 580:20
    589:9 606:19
    674:13
quickly 569:20
    590:3
quite 567:22
    592:9 635:10
    658:4 670:13
quotations
    579:18

**R**

**R** 549:2 703:2
**Radley** 596:4
**raise** 570:25
**raised** 570:10
    600:16 605:8
    662:14 695:24
**raises** 674:13
**raising** 684:25
**ran** 587:7
    589:19
**range** 584:14
    615:17 681:11
    681:17
**rate** 662:24
**reach** 633:17
    658:17,20
    693:21,22
**reached** 567:4
    568:8 668:6
**read** 570:12

578:24 579:16
582:13 598:6
602:14 604:9
608:24 609:4
610:22 611:5
615:7,10,13
617:7,16
619:14 622:24
628:6 638:22
646:17,23
647:9,21
648:19 649:25
650:10 654:2
654:23 655:2
656:5 661:11
673:2,13
675:12 689:18
694:18 696:10
697:13,25
reading 601:3
    602:5 608:3
    671:13
reads 582:11
    604:6 607:10
    610:23 622:15
    623:18 628:5
    638:18 646:13
    647:8,15
    653:19 654:15
    661:3 672:21
    673:9,11 675:8
    686:17 689:19
    697:10
ready 588:3
    688:16
realizing 643:22
really 613:5
    615:10 616:22
    622:12 650:4
    652:19 684:7
    689:17 697:8
reason 563:25
    587:25 605:20
    631:19 632:23
    637:12 663:6
    691:3 701:8,10
    701:12,14,16
    701:18,20,22

701:24 702:3,5
702:7,9,11,13
702:15,17,19
702:21,23
reasonable
    664:22
reasonably
    644:3
reasons 667:9
    701:5
rebuttal 553:6,7
    557:7 585:3
    598:16,17
    613:2 617:5
recall 571:24
    572:6 573:19
    573:22 574:14
    574:25 575:18
    577:20 584:13
    586:20,22
    589:17 591:8
    594:3 595:7,15
    595:25 597:9
    613:14 614:11
    619:25 622:9
    622:12 624:8
    630:24 631:3
receive 585:25
    592:10 593:15
    611:20,22
    631:17
received 573:14
    574:2 575:8,12
    576:23,25
    583:13 594:3
    595:2,5,11
    597:24 605:6
    611:16 613:2
    613:17 614:24
    620:15 630:24
receiving 573:25
    576:14,17,18
    576:19
Recess 606:22
    638:2 698:19
recognize
    569:17 582:8
    612:17 616:16

642:6
recognized
    689:23
Recognizing
    572:5 573:18
    573:22 575:4
recollection
    581:10,16
    598:15 613:25
    614:25 624:8
    675:2
record 569:19
    588:13 596:8
    606:20,24
    609:4 617:9
    637:25 638:4
    642:21,24,25
    643:3,5 698:17
    698:21,25
    699:7,19,23
    703:14
records 618:10
    619:10
recreating 674:7
reduce 663:15
reduced 662:5
    663:25
redundancy
    614:8
redundant
    614:5,8,14
refer 553:3,6
    556:13 566:9
    673:4 690:6
reference
    565:16,22,24
    566:5 626:5
    647:2,18
referenced
    557:16 566:19
    586:11 596:21
    625:16 626:18
    626:21,22
    627:24 629:12
    648:5 688:11
referred 554:5
    624:17 648:10
    649:4 698:10

referring 555:16
566:19 594:7
627:16 688:22
690:3
refers 555:21
625:14 637:9
637:13 649:13
refinement
672:25
reflect 566:16
602:6,24
634:17
reflected 605:25
628:16,20
reflects 689:20
691:12,16
reflux 677:19
regard 558:15
563:2 565:7,24
567:11,22,23
609:9,15 610:7
620:10 634:13
649:9 652:12
656:15 665:2,9
670:9 688:16
688:17 695:3
regarding
557:22 566:2
614:4 645:9,14
648:9 649:3,20
649:23 651:19
661:19,20
regardless 683:9
regression 683:5
697:24
reimbursement
563:10
reiterate 623:19
635:25
Relafen 687:23
relate 558:13
671:17
related 559:5
599:6 606:16
610:10 621:4
621:15 626:13
637:7 650:11
652:9 657:7

659:9,10 687:3
687:22 703:16
relates 547:9
561:8 565:3
616:22
relating 557:15
651:22 661:9
relationship
673:24
relative 678:22
relatively
572:13
relevance 632:2
652:21
relevant 563:8
563:10 619:21
631:22 633:7
637:14,16,18
657:9 658:3,7
670:15
relied 627:25
628:6,10
679:22 692:15
rely 565:11,14
565:18 629:19
688:25 689:3
694:12
remain 600:25
remember
571:19 573:25
579:14 590:7
590:14 595:10
597:16,17,21
614:15 631:14
639:20
remembering
613:18 639:14
remind 560:23
Rene 578:7
584:20 593:14
repeat 638:14
replies 614:14
614:16 615:21
reply 550:10,14
550:15,16,17
550:18 552:19
552:24 553:4,5
554:6,15

556:24 557:6
561:14 570:8
570:14,23
571:3 574:18
574:19 575:4
575:13,19,25
576:2,5,6,13
577:3,10,16,19
577:19,25
578:21 579:11
580:4 582:11
583:16 584:5
585:2,9 589:4
596:13 600:5,9
601:3,9 602:6
602:10,16,23
603:6,20
604:14,18,22
607:19 612:20
612:23 613:4,6
613:8,11 614:5
614:20 615:3,6
615:23,23
618:17 621:2,2
622:11 628:4
629:20 630:14
638:13 672:8
672:10,12
676:17 685:10
689:7,19 695:2
695:6 698:9
report 557:7,10
557:14 558:4
558:25 559:3,6
559:7,15,18,19
561:17,17,19
564:9,12,23
565:11,18
566:20 567:3
570:8,9 577:23
579:15 581:17
581:19,19
596:5 597:19
598:17 610:15
627:6 631:18
635:19 636:4
637:8 657:6
661:23 672:15

674:17 675:24
695:4 696:19
Reported
547:23
reporter 551:20
reports 556:23
563:24 564:5,8
564:13,22
565:2,17 566:5
567:7,17
573:10 576:15
576:17,18,20
576:23 577:2
583:10 584:4
598:17 599:20
613:2,17
631:12,20,21
632:4,22 633:5
633:6 674:4
represent
551:20
representations
692:16
representatives
599:2
request 595:19
616:22 621:19
623:4,8,15,17
623:19 624:2,5
624:14
requested
624:16
require 633:4
659:15
required 604:20
651:9 661:17
661:23
requirement
661:22
requirements
604:13 606:12
research 578:12
579:9 673:16
678:21 679:6
679:20
resolution
634:19
respect 599:10

655:9
respond 623:15
responding
570:23 583:10
response 570:10
574:23 622:21
623:8
responsive
621:19
result 663:14
683:2
resulted 564:4
567:25
results 602:11
634:25 650:3
661:24 662:2,3
662:22 663:20
664:16 668:8
671:19,20
683:6
retained 556:20
558:7,8 560:25
561:2 617:23
618:18 632:14
retrieving 578:8
578:21
return 662:13
663:5,10
review 574:5,13
597:2,20,23
612:7 615:15
630:13,23
652:19 655:12
676:15 696:5
reviewed 566:10
597:10,12,13
597:15 598:12
599:6,18
610:23 621:6
623:24 625:16
626:17 628:19
628:23 631:7
631:11,20
632:18,24
671:17
reviewing
597:14 616:3
reviews 579:2

**revisions** 629:10
**re-double**
    622:17
**re-read** 691:10
**right** 561:16
    569:10,14
    570:7,16
    574:21 582:4
    594:16 602:6
    603:5 613:18
    624:3 625:21
    633:4 634:20
    635:18 636:25
    637:15,20
    638:22,24
    639:14,20,24
    643:15,16
    646:7,25
    647:11 649:15
    658:2 659:12
    660:22,23
    662:2 665:4
    666:4,10,11,12
    666:13 670:3
    670:24 674:18
    674:25 675:12
    676:25 677:2
    681:19 683:21
    686:11 692:3,6
    697:25
**risk** 558:13
**RMR** 547:23
**role** 635:15
    639:12
**Rosenthal**
    547:17 548:5
    550:5,9 551:1
    551:2,17 552:1
    552:10,16,24
    553:1 554:1
    555:1 556:1
    557:1 558:1
    559:1 560:1
    561:1 562:1
    563:1 564:1
    565:1 566:1
    567:1 568:1
    569:1,12,14

570:1 571:1
572:1 573:1
574:1 575:1
576:1 577:1
578:1 579:1
580:1 581:1
582:1,2,11
583:1 584:1
585:1 586:1
587:1 588:1,7
589:1 590:1
591:1 592:1
593:1 594:1
595:1 596:1
597:1 598:1
599:1 600:1
601:1 602:1
603:1 604:1
605:1 606:1
607:1 608:1
609:1 610:1
611:1 612:1,12
612:14 613:1
614:1 615:1
616:1,9 617:1
618:1 619:1
620:1 621:1
622:1,17 623:1
623:23 624:1
625:1 626:1
627:1 628:1
629:1 630:1
631:1 632:1
633:1 634:1
635:1 636:1
637:1 638:1
639:1 640:1
641:1,25 642:1
643:1 644:1
645:1,21 646:1
647:1 648:1
649:1 650:1
651:1 652:1
653:1,9 654:1
655:1 656:1
657:1 658:1
659:1 660:1
661:1 662:1

663:1 664:1
665:1 666:1
667:1 668:1
669:1 670:1
671:1 672:1
673:1 674:1
675:1 676:1,7
676:9 677:1
678:1 679:1
680:1 681:1
682:1 683:1
684:1 685:1
686:1 687:1
688:1 689:1
690:1 691:1
692:1 693:1
694:1 695:1
696:1 697:1,23
698:1 699:1,6
699:22 700:1,2
700:9 702:25
703:11
**Rosenthal's**
    623:20 697:22
**rough** 575:6
    585:2
**roughly** 589:10
**routinely** 675:10
    686:19
**ruling** 666:2
**run** 560:15
    590:3 603:12
    693:4,9
**running** 693:22
**runs** 601:5
**Rushnowitz**
    576:9,12 577:5
    578:7,13,20
    579:16 580:10
    581:6 583:15
    584:21 589:25
    590:11 591:21
    592:21 593:21
    597:23 613:20
    624:22

——————
**S**
**S** 549:2 550:8

**safe** 566:25
    567:8,12
    568:11
**safety** 558:15
    565:7 567:25
    568:17
**sales** 547:6,10
    551:12 560:6
    560:12,14
    623:23 673:17
    676:24 678:24
    679:22,23
**save** 617:21
    618:13,16,23
    623:9
**saved** 623:12
**saw** 571:7
    616:16
**saying** 568:21
    627:10 650:18
    652:15 657:13
    662:8 682:3,16
    683:17
**says** 596:16
    642:10,13
    646:5 647:7
    660:17
**scenario** 641:20
**scheduling**
    620:10
**science** 607:12
    608:10 609:24
**scientific** 668:21
    669:2
**scope** 567:10
    633:22
**Scott** 550:12
    570:2,11 573:9
    579:23 587:7
    589:19 590:6
    591:4 599:15
    610:24,25
    611:6,24 612:3
    616:3 628:24
    630:4 674:3
    676:2 695:24
    697:10,21
    698:11

**second** 589:9
    607:9 616:18
    616:25 622:14
    624:13 642:21
    646:11,12
    654:9 691:19
    697:8,19
**section** 602:14
    604:4 607:5
    695:3 696:3
**see** 571:5 573:4
    582:7 587:25
    588:14 596:19
    597:18 603:13
    607:23 615:16
    622:8 625:20
    644:21,25
    645:17,18
    646:10,22
    647:22 648:5
    649:10,13
    651:18 652:14
    653:18 672:7
    675:16 677:22
    682:15,20
    683:18
**seeing** 582:18
**seek** 641:10
    650:22 669:18
    669:23
**seeking** 641:8
    685:10
**seeks** 650:22
**seen** 564:18
    570:4 616:14
    616:17 622:5,7
    662:23 688:11
**self-evident**
    691:5,7
**send** 571:18
    617:22 623:11
**sending** 597:21
**sense** 575:6
    577:23 581:18
    582:19 591:21
    597:18 608:24
    653:5 667:3
    672:2 686:12

691:7
**sent** 571:15
  572:17 573:10
  573:11,16,20
  574:18 581:6
  586:10,14,20
  587:8,9 589:5
  590:10,15,24
  591:15,17
  592:17,19,24
  594:23 617:19
  618:4,17
  620:15 623:10
  623:13
**sentence** 570:7
  571:2 604:11
  604:12 606:2
  607:9,10,18,22
  608:4 610:19
  611:11 616:25
  617:15 619:7
  619:17 622:15
  634:8 638:25
  644:19,25
  646:12,22
  647:4,7,9
  649:22 654:13
  654:14 655:2,3
  656:4,17 661:2
  672:21 673:4,9
  675:7 686:15
  689:17 691:10
  691:15,19
  694:20 697:8
  697:19
**sentences**
  625:13 661:11
  689:18
**separate** 562:14
  598:18 665:3,6
  699:5
**sequence** 562:17
**set** 562:15,17
  600:6 629:19
  660:6 666:10
  666:11,12,13
  672:5 675:17
  703:12,21

**sets** 562:16
  634:20 660:10
**setting** 568:7
**Shapiro** 549:3
  551:25 558:19
  561:5
**shared** 597:7,8
**Shook** 549:6
  552:9
**show** 566:9
  646:13 662:2
  669:5 671:23
**shown** 561:22
  567:12 568:18
  700:6
**signature**
  553:13,16
  572:23 594:10
**signed** 553:18
  598:4
**significance**
  675:3
**significant**
  669:9 693:23
**significantly**
  683:6
**similar** 561:3
  595:22 683:18
  689:13
**simple** 671:14
**simpler** 648:24
**simplistic**
  562:11
**simply** 593:23
  601:16 605:16
  648:10
**single** 559:15
  577:19 614:17
**sit** 625:12
  649:15 652:18
  655:15 683:23
  686:11 688:20
  692:20,22
**sitting** 580:15
  683:21
**six** 684:20
**slightly** 609:2
**slip** 553:5

**smile** 654:17
**SmithKline**
  555:22
**Sobol** 549:3
  551:24 558:19
  561:5
**social** 646:16
  660:14 661:7
  661:16,19
  662:20 664:16
  665:3,11,17
**someplace**
  580:25
**somewhat**
  559:13 624:7
  670:6 671:3
  683:20
**soon** 583:13
**sophisticated**
  674:11,17
**sorry** 554:11,12
  555:9,13,15
  556:8,15 557:4
  572:9 573:20
  579:22 603:21
  625:23 631:16
  633:3 636:3
  638:11,14
  647:22 654:17
  662:17 663:16
  664:16 670:5
  675:13,14
  696:18,20
**sort** 559:25
  565:15 575:6
  579:6 582:19
  588:18 591:23
  598:7 601:10
  635:18 636:10
  657:16 661:2
  663:3 670:12
  675:22,25
  693:19
**sound** 674:18
**sounds** 605:18
  630:22 648:17
**spam** 573:17
**speak** 583:14,19

583:21
**speakers** 661:17
**speaking** 561:11
  629:14
**specific** 565:15
  567:22 571:8
  574:14 575:13
  583:12 584:12
  599:8 601:12
  602:15 608:19
  609:8 610:8
  620:23 633:11
  645:9 650:10
  651:19,24
  652:23 658:24
  667:22 670:9
  670:11 673:24
  675:2 677:14
  677:25 679:11
  688:14 691:4
  695:23 696:12
**specifically**
  567:11 600:16
  613:13 631:3
  641:6 649:14
  667:14 678:9
  690:10,21
**specified** 697:23
**spend** 577:13
  630:25
**spending** 667:10
  667:12,15,22
  672:11
**spent** 636:18
**spoke** 554:23
  576:7 599:5
**spoken** 575:25
  613:23
**sponsored**
  640:18
**spot** 589:8
**spreadsheet**
  626:25 627:11
  627:23
**spreadsheets**
  623:22 624:16
  624:19
**SS** 703:4

**stack** 603:25
**staff** 578:10
**staffing** 577:13
**stage** 554:19
  595:4 639:22
  639:25
**standard** 681:8
  681:10 682:12
  682:14 683:5
  685:24
**start** 576:16
**started** 581:15
**starting** 675:14
**starts** 596:20
  672:18
**State** 548:8
  701:2 703:3,9
**stated** 653:21
**statement** 585:3
  593:12 604:18
  608:9 626:19
  645:16 649:3
  652:10,21
  656:10 671:7
  675:25 686:25
  689:6,9 690:7
  690:24 691:2
**statements**
  648:2,8 650:2
  650:10,16,19
  651:10 652:25
  655:9
**states** 547:2
  647:8
**statistically**
  669:6,8 693:23
**status** 561:25
**steps** 623:14
  624:18 625:4
**stickies** 598:16
**story** 671:18
**straight** 588:21
**Street** 549:4
**studies** 646:14
  647:2,18
  648:11 649:5
  651:22 663:21
  664:8 669:5,8

669:13,14
670:3 671:23
671:25 679:4
**study** 661:18,19
679:9
**sub** 626:19
**subclasses**
562:12
**subject** 558:24
561:11 562:23
565:2 577:21
583:5 692:2
700:6
**subjects** 604:21
**submission**
564:15
**submitted**
556:22 557:6,9
557:14,19,19
558:3 561:15
564:7,9,13,22
564:23 570:15
619:21 627:14
627:15,18
**subparagraph**
626:12
**subpoenas**
622:21,22
**Subscribed**
700:10
**subsequent**
556:2
**substance**
577:16 583:9
614:2,3 615:23
624:24
**substantive**
565:25 579:15
620:11
**subsumes**
689:20 691:11
691:16
**successful** 680:8
**successfully**
679:6 680:21
**sufficient**
567:24
**suggest** 603:6

607:12 609:24
634:4,11
636:19 664:23
665:15
**suggested** 567:7
624:10
**suggesting**
593:23
**suggestive**
589:12
**suggests** 608:10
**summarize**
558:12 564:20
**summarizing**
623:22
**summary**
554:15 675:25
**Sunday** 590:18
**supplement**
600:9
**supplemented**
600:19
**support** 552:20
559:3 561:18
563:17,18
564:14 578:6
626:19 637:18
661:6 690:25
695:13
**supported**
563:13 566:7
665:14 668:20
**supporting**
565:5 647:20
669:2
**supports** 560:7
566:10
**sure** 556:8
557:11 564:11
565:24 567:6
568:3,4,5
573:17 574:17
576:17 579:2,5
580:14 581:15
583:23 587:23
593:20 598:6
613:10 616:15
617:10 620:21

625:4 642:11
642:22 650:7
650:14 652:2
656:18 658:4
663:2,2,22
671:6 674:24
680:12,19
681:5,21
684:23 687:14
693:5 694:25
**swap** 642:16,17
643:23
**swear** 551:21
**sworn** 552:12
700:10 703:13
**Symptom**
653:20
**system** 593:7

─────────

**T**

**T** 550:8 697:17
703:2,2
**table** 626:7,10
**take** 554:4 555:3
560:15 570:5
577:24 580:8
581:7 582:15
585:15 589:9
590:23 593:5
594:11 598:19
598:25 602:13
602:19 603:21
606:18 623:3
623:14,25
624:18 625:3
625:18 627:8
628:13 630:16
631:15 634:16
644:10 645:2
654:13 656:13
656:16 657:25
659:5 660:19
674:19 685:5
692:2 698:16
**taken** 569:8
598:10 606:22
610:25 613:15
638:2 641:16

641:22 661:16
666:6 667:4
669:20,25
671:24 684:16
698:19
**takes** 656:16
**talk** 553:3
686:23
**talked** 584:12
585:20 613:11
615:19 643:5
686:22 687:10
693:5
**talking** 553:9
566:22 627:3
634:12 637:3,5
671:21 683:13
**tape** 606:21,25
637:25 638:4
698:18,21
**task** 591:20
**Taxol** 687:24
**technical** 695:23
**Ted** 552:2
**teleconferences**
640:18
**telephone** 549:8
**tell** 558:6,10,24
559:17 560:24
561:10 565:22
569:5 589:2,10
612:19 652:20
655:11 657:10
658:5 665:5
680:14 688:14
**tells** 666:9,10
**ten** 680:25 681:6
682:4
**tend** 689:12
**term** 604:24
620:22 685:17
685:21
**terminology**
674:16 682:7
**terms** 553:8
560:9 562:11
562:22 579:4
580:23 588:20

600:17 640:8
640:12,13
667:21
**terrible** 555:5
**testified** 552:12
556:10 622:5
623:23 624:20
639:5 684:15
687:6,8,11
688:8
**testify** 562:9
563:2
**testifying**
562:19
**testimony**
554:24 556:3
556:19 557:10
562:24 599:14
599:19 624:17
626:17 630:4
633:21 635:3,3
700:4 703:14
**testing** 589:8
602:7 603:4
**tests** 601:5
602:25
**text** 572:7
584:23 591:8
593:9 604:16
626:13
**thank** 587:20
596:22 637:23
675:16
**Thanks** 595:9
**theory** 636:16
**therapeutic**
625:15
**therapy** 694:15
**thing** 553:9
577:14 579:7
596:6 598:7
609:6 621:13
**things** 555:6
578:25 579:3
593:23,24
594:13 609:19
618:2,12
650:23 677:3

**think** 552:6
  555:8 556:6
  563:22 567:17
  568:14,23
  569:3,5 571:22
  572:2,14,19,20
  572:21 573:13
  574:11,12
  575:24 577:17
  580:2,2 585:7
  586:13 587:21
  590:5,19 592:3
  597:3 600:5
  601:18 602:5
  605:13 608:25
  609:5,7 610:12
  610:14 612:9
  613:16 614:13
  621:14,25
  625:11 626:6
  626:14 627:9
  629:11 631:6
  633:18 639:21
  641:6,18
  643:15 646:12
  647:9,11,12,16
  648:24 650:14
  650:21 653:11
  660:5 664:9
  667:17 669:17
  672:3 674:14
  674:16 687:10
  687:14 688:14
  690:13 691:7
  693:4,19 694:4
  699:14
**thinking** 624:19
**third** 550:20,21
  614:12 619:6
  629:24 642:9
  643:7,10,17,19
  643:21,24
  646:2,20
  653:14 654:6
  660:7 661:2
  699:2,10
**third-party**
  599:3,11,25

  623:22
**Thomas** 645:13
**thought** 604:25
  626:5
**three** 551:17
  569:10,15
  570:4,16 571:5
  588:6 607:6
  638:5,9,15
  675:15 686:17
  690:24 698:18
**ticket** 688:17
**tighter** 683:20
**time** 551:7,18
  557:19 562:20
  563:5 564:23
  573:13 574:2
  574:21 575:8,9
  575:12 577:13
  581:3 587:8
  589:19 598:5
  598:12 603:22
  606:21,24
  611:17 613:5,5
  613:16 615:24
  616:6 618:10
  619:10,18,19
  630:25 638:4
  639:6,20
  642:24 643:3
  650:9 658:8
  664:21 672:12
  675:17 680:24
  684:14 685:4,6
  690:9 692:24
  698:18,21
  699:15,17,23
**times** 684:2
**timing** 576:2
  577:3,10 585:8
  667:22
**title** 582:10
**titled** 676:12
**today** 551:6
  621:7 625:12
  655:15 672:10
  688:20 692:21
  692:22

**told** 562:25
  667:8
**top** 582:10
  642:13
**total** 659:5
  663:8 680:23
**touch** 695:2
**tracking** 619:19
**transcript** 612:8
  700:5
**transcripts**
  579:17,20,20
  579:23 599:18
**translated**
  604:17 605:17
**translation**
  604:23 605:21
**transmitted**
  571:20 573:24
  593:6 594:20
**traveling** 615:12
**treating** 661:15
**treatment**
  653:23 654:20
  655:20 656:7
  657:8 660:11
**tremor** 646:15
**trend** 667:20
**trial** 601:5
  647:19 650:3
  661:6,8,23
  663:13,20
  665:16 666:21
**trials** 562:14
  660:13 665:23
  671:6
**tried** 589:12
  593:3 621:11
  678:22
**trouble** 596:17
  603:23
**true** 565:3
  568:20 569:8
  599:10 606:4
  607:11,24
  609:23 610:6
  634:5,11
  637:17 656:13

  656:23 657:15
  667:5 670:19
  683:22 684:19
  693:6,7 700:5
  703:14
**try** 590:3 603:11
  618:21 625:20
  653:6 659:5
  677:13 678:4,9
**trying** 588:20
  636:2,21
  660:21
**turn** 553:12
  560:18 592:17
  603:18 638:7
  644:9,18 672:7
  673:8 697:18
**turned** 682:8
**turns** 665:24
**tutorial** 563:2,8
**Twenty-six**
  696:23
**two** 557:16
  562:16 563:3
  585:13 590:19
  592:7,7 593:2
  606:25 610:20
  614:5,11
  615:21 634:20
  637:7,25 638:9
  638:15 661:11
  675:6,15
  684:25 686:17
  687:19,21
  688:4 690:3,12
  690:16,24
**type** 580:4
  606:19 655:24
  656:7 680:22
**types** 574:8
**typically** 682:13
**typing** 580:7
  589:23
**typo** 697:16
**typos** 598:7
  698:6

  _____
        **U**

**ultimate** 633:12
  633:16 636:24
  680:16
**ultimately** 614:7
  658:25 659:11
  666:8 680:8
**Um-hum** 557:25
  604:5 611:4
**unapproved**
  558:16 565:8
  634:14
**unbiased** 683:8
**uncertainty**
  572:5
**unchallenged**
  667:11
**unclear** 563:25
**uncommon**
  684:9,13
**underestimated**
  608:2
**underneath**
  553:15
**understand**
  558:11 559:13
  564:6,19
  565:14 567:9
  568:3,6,21
  587:24 596:13
  601:9 603:5
  618:24 639:24
  642:15 648:16
  652:4,14,16
  659:25 660:5,9
  663:2 668:18
  668:22 670:6
  680:19 682:20
**understanding**
  558:23 559:9
  559:12 561:24
  564:25 568:16
  573:8 580:22
  604:20 605:25
  606:10,14
  608:17 609:21
  611:21,25
  612:2 617:18
  617:23 618:3,5

619:20 625:14
629:17,22
637:12 639:12
643:14 645:5
656:2 660:15
661:21 670:25
671:3,12,16
681:23 685:21
686:5 692:7
**understood**
579:5 629:10
**undertake**
672:21
**uninvolved**
614:22
**UNITED** 547:2
**unlawful** 668:16
**updated** 555:2
555:17 618:9
**up-to-date**
585:13
**use** 553:8 578:25
604:24 605:17
609:8,11 610:2
628:25 636:14
640:2 652:7
659:10 660:11
661:6,15
664:11,14,25
667:25 668:19
669:2 673:25
677:20 679:2
679:13,16,17
679:18 680:18
682:6,13
688:12
**useful** 574:8
**uses** 558:16
560:11 565:5,8
566:6 567:2,8
567:9,11,22
568:12,13
608:19,23
634:15 644:15
652:8,10,13,23
653:4 658:13
670:23 671:4
**use's** 567:19

**Usually** 571:17
**U.S** 551:13
676:13
———————
**V**
**vague** 625:13
**valid** 638:19
669:5 674:5,6
682:18
**variables** 603:16
672:22 677:4,7
**various** 578:11
660:12 668:20
**Veritext** 551:5
**version** 586:4,10
586:14,18,24
587:2,4,16,23
592:15 618:21
**versions** 586:20
622:19
**versus** 555:22
565:3 659:23
678:6,14,23
**VIDEOGRAP...**
551:4 606:20
606:23 637:24
638:3 642:23
643:2 698:17
698:20 699:20
**videotape**
699:21
**videotaped**
547:16 548:4
**view** 603:15
671:12 685:3,4
689:8 691:3
696:9
**violation** 648:21
**visits** 640:22
**VOLUME**
547:14
———————
**W**
**waiting** 592:14
**want** 568:25
602:20 637:21
**wanted** 597:18
615:16
**Wardell** 549:9

551:9 552:5
**Wardwell** 548:6
552:3
**wasn't** 580:15
591:19 611:14
631:23 668:6
671:14
**way** 557:23
569:2 571:21
586:9 587:5
593:22 594:20
598:20 602:23
609:22 616:20
620:6,25
632:14 636:25
637:2 644:5
648:23 659:7
666:24 667:15
683:24 686:12
691:19 699:14
703:18
**Wednesday**
622:22
**week** 557:20
588:24 591:5
684:25
**weeks** 572:15
585:13 590:19
592:7,7
**welcome** 605:14
656:13 674:19
684:6 686:3
**Wellbutrin**
555:9 556:4
557:5 560:19
**well-known**
689:12
**went** 587:8
**weren't** 564:13
621:18
**WHEREOF**
703:20
**whichever**
602:20 609:25
635:11 656:14
**Wholesale**
556:11
**widely** 579:4,5

673:11
**willingness**
637:16
**wish** 701:4
**withdraw**
601:21 636:5
676:21
**withdrawn**
601:8
**WITNESD**
550:4
**witness** 551:16
551:21 552:11
556:20 587:21
622:20 686:24
700:3 703:11
703:15,20
**witnesses** 675:9
675:18 686:18
**wondering**
674:22
**word** 565:14
595:18,19
602:19 656:17
**words** 634:8
656:12,15,20
657:3
**work** 562:5
576:13 578:17
578:20 579:10
597:3 600:2
603:7,13 619:9
619:11 620:19
620:20,22
621:4,10
622:11 628:11
628:21 631:8
631:13,22
666:23 675:22
679:3 680:6
683:25 687:2
695:11,17,18
**worked** 635:21
635:22 636:9
636:11,23
**working** 557:23
558:18 561:4
577:12 580:23

581:13 586:12
619:12 621:9
684:24
**works** 563:9,10
**world** 652:6,8
653:3 660:4
664:14,15,25
**worlds** 660:4
**worried** 618:19
**wouldn't** 567:9
585:4,14,16
586:25 597:7
607:22 614:7
620:15 631:7
631:20 632:24
639:6,7 657:18
662:9 665:8
666:14 667:13
668:4 681:5
683:21 684:9
684:13 685:6
**WP** 557:9
**write** 570:8,9
585:9 588:4
610:3 691:19
694:11
**writing** 593:3
613:4
**written** 556:22
581:20 584:22
587:13 604:16
619:9 621:3
669:20,25
**wrong** 568:15
629:12 666:22
667:8 668:5
**wrote** 577:25
580:17 582:15
593:10 604:17
———————
**X**
**X** 547:4,8,12
550:3,8
———————
**Y**
**Yeah** 636:4
668:11
**year** 620:20
628:22

**years** 563:3
**York** 547:18,18
  548:7,7,9
  549:11,11
  551:10,10
  701:2,3 703:3
  703:5,9
**Young** 578:18
  579:10

**Z**

**zero** 682:15,16
  682:25 683:7
**Zyprexa** 557:22
  558:15 560:6
  565:4 566:22
  566:24 567:8
  633:6

**0**

**02142** 549:4
**04/10981** 551:15
**05** 600:11

**1**

**1** 553:22,24
  554:14,21
  600:23 625:19
  625:22,23
  626:11 628:16
  629:6 638:10
  688:4
**1st** 622:3 624:6
**1:30** 637:21
**100** 616:15
**10017** 549:11
**109** 644:9
**11** 696:23,25
**11:25** 551:7
**110** 645:11
  646:21
**111** 646:21
  653:17
**12th** 622:21
**12:41** 606:21
**12:49** 606:24
**13th** 703:21
**15** 681:18
  689:15,19

**16** 607:23 608:4
  689:15 694:5
**1629** 551:15
**17** 672:17
**18** 550:10 551:2
  552:24 553:10
  554:14,20
  555:18 570:8
  596:9,12 600:5
  604:14 625:21
  628:4,21
  638:11 672:8
**18th** 643:11
**184** 660:8,9
**19** 550:11
  569:12,16,21
  570:19 571:6
  573:3 574:3
**1994** 654:19
**1995** 550:24
  676:15

**2**

**2.3.2** 604:4
**2.5.4** 607:5
**2/26/07** 550:19
**2:05** 638:4
**2:10** 642:24
**2:11** 643:3
**2:39** 699:24
**20** 550:12
  569:12,16,25
  571:6
**20th** 573:6
  581:12
**2001** 550:23
  644:15
**2002** 653:22
  654:20 655:21
  656:6
**2003** 550:22
  645:15 646:7,8
  648:3 651:7
**2004** 653:21
  655:10 657:20
**2005** 553:25
  622:22 629:6
  644:15 687:20

**2006** 552:18
  554:24 556:24
  573:6 598:13
  620:8 621:5,12
  622:4,23 624:6
  643:11
**2007** 547:19
  551:6 553:16
  611:2 617:6,12
  703:21
**21** 550:13
  553:16 569:12
  569:16 570:2
  570:19 571:6
  572:20 573:2
  574:3 575:5,10
  598:9
**22** 550:14
  553:12,13
  582:2,5,8,11
  587:19 596:25
  603:18,23
  607:4 617:6
  674:20,22
**23** 550:15 588:7
  588:10 589:3
  590:4 591:9
  592:11 593:2
  596:21,23
  610:11
**24** 550:16 588:7
  588:10 589:3
  592:16,17,18
  592:24 593:5
  593:16
**25** 550:17 588:7
  588:11 589:3
  594:6,19
  596:11,24
**2555** 549:7
**26** 550:18
  612:12,16
  615:4 696:16
  696:21
**26th** 617:12
  621:24
**268** 644:11
**269** 644:20

**27** 550:19 616:9
  616:12 617:11
  621:20,25
**271** 645:11
  646:2,20
  647:24
**272** 653:16,19
  654:6,25 655:7
**275** 654:10
**28** 550:20
  641:25 642:5
  644:10 653:14
  699:9
**28A** 550:21
  699:6
**29** 550:22
  645:21,24
  651:7 689:14

**3**

**3:21** 698:18
**3:30** 698:21
**30** 550:23 653:9
  653:12 654:4
  694:6 697:19
  697:20
**31** 550:24 676:7
  676:11 679:10
**35** 596:15
**36** 596:20

**4**

**40** 626:12
**41** 626:19
**450** 548:6
  549:10 551:10

**5**

**50** 681:25 682:9
  683:13 684:3
  684:10
**505** 555:22
**547-703** 547:15
**551** 550:7,10
**569** 550:11,12
  550:13
**582** 550:14
**588** 550:15,16
  550:17

**6**

**6** 547:19
**6th** 551:6
**60** 684:24
**612** 550:18
**616** 550:19
**641** 550:20,21
**64108-2613**
  549:7
**645** 550:22
**653** 550:23
**676** 550:24

**7**

**7th** 591:4 611:2
**72** 626:13
**73** 626:18,21,23
  627:5
**74** 660:7,25
**75** 660:7

**8**

**8** 622:23
**8th** 687:20
**83** 660:25

**9**

**95** 682:17