# EXHIBIT 4

*In re: Neurontin Marketing, Sales Practices, and Products Liability Litigation*

**REBUTTAL DECLARATION OF MICHAEL C. KEELEY, PH.D. IN**

**OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

## I.     Qualifications

1.      My name is Michael C. Keeley.  I am a Senior Vice President of Cornerstone

Research, an economic and financial consulting firm.  I previously submitted a

declaration in this matter on December 21, 2006[1] that described my qualifications

and consequently I do not repeat them here.  I have attached as Exhibit A, however,

an updated list of cases in which I have testified.

## II.     Assignment

2.      I have been asked by counsel to review and assess the rebuttal declarations of

Professor Meredith Rosenthal and Dr. Raymond Hartman.[2]  I have also been asked

to review and comment on the sections of the Plaintiffs' Reply Memorandum in

Support of Motion for Class Certification that relate to my original declaration.[3]

---

[1] Declaration of Michael C. Keeley, Ph.D. in Opposition to Plaintiffs' Motion for Class Certification, December 21, 2006 ("Keeley Declaration"), *In re: Neurontin Marketing, Sales Practices and Products Liability Litigation*, MDL Docket No. 1629, Master File No. 04-10981.

[2] Reply Declaration of Professor Meredith Rosenthal, February 21, 2007 ("Rosenthal Rebuttal") *In re: Neurontin Marketing, Sales Practices and Products Liability Litigation*, MDL Docket No. 1629, Master File No. 04-10981 and Reply Declaration of Raymond S. Hartman, February 21, 2007 ("Hartman Rebuttal") *In re: Neurontin Marketing, Sales Practices and Products Liability Litigation*, MDL Docket No. 1629, Master File No. 04-10981.

[3] Reply Memorandum of Law in Support of Motion for Class Certification, February 21, 2007 ("Plaintiffs' Reply Memorandum"), *In re: Neurontin Marketing, Sales Practices and Products Liability Litigation*, MDL Docket No. 1629, Master File No. 04-10981.

### III.  Materials Considered

3.      Exhibit B lists the additional materials I have received and considered since I

wrote my previous declaration.  These materials include the Rosenthal Rebuttal, the

Hartman Rebuttal, Volume III of Professor Rosenthal's deposition, the Plaintiffs'

Reply Memorandum, the Third Amended Class Action Complaint ("Complaint")

and the academic papers cited in the Rosenthal Rebuttal and the Hartman Rebuttal.


### IV.  Summary of Opinions

####   A.    Causation and injury cannot be demonstrated for every member of the proposed class, and individual inquiry would be required to determine which class members, if any, can in fact demonstrate causation and injury.

4.      Professor Rosenthal agrees that her model would be unable to identify those

individuals who suffered no injury resulting from the challenged conduct, including

those individuals for whom Neurontin was effective.[4]  Only individual inquiry

could determine which proposed class members, if any, were allegedly injured and

which were not.

5.      Plaintiffs and their experts agree with the related point that it is not possible to

prove causation for each proposed class member using common evidence.[5]  In fact,

---

[4] Even if Neurontin was ineffective for a particular class member, it does not necessarily mean that the class member suffered any economic injury.  To show true economic injury for a given class member, Plaintiffs would have to show that the challenged conduct caused that proposed class member's consumption of or payment for Neurontin and that Neurontin was less effective or cost less than the treatment that would have been prescribed but for the challenged conduct.  That is, plaintiffs would have to show that, but for the challenged conduct, the proposed class member would have been better off.

[5] In her deposition, Professor Rosenthal agrees with the general notion that a range of factors may influence individual doctors' prescription decisions.  Deposition of Meredith B. Rosenthal, Ph.D., *In re: Neurontin Marketing, Sales Practices and Products Liability Litigation*, MDL Docket No. 1629, Master File No. 04-10981, October 24-25, 2006 ("Rosenthal Deposition, 10/06"), pp. 320-336.

Professor Rosenthal and Dr. Hartman concede that at least some members of the proposed class would have paid for off-label Neurontin prescriptions regardless of Defendants' allegedly improper conduct.[6]

6.      The proposed class is not united by way of being harmed through a common mechanism because the challenged promotions encompass many different events and different types of alleged fraud regarding different off-label uses of Neurontin.

### B.    Dr. Hartman fails to address economic damages.

7.      Dr. Hartman agrees that the Court may well find that his proposed measure of damages (expenditures on Neurontin) does not measure economic harm. However, Dr. Hartman fails to explain how he could measure even aggregate economic damages should the Court require the calculation of economic damages (i.e., compensatory damages) as economists commonly understand them.[7]

8.      In any event, even if Dr. Hartman's measure of damages were correct, he has not put forth any method of determining each proposed class member's alleged damages, if any, and states that it is not necessary to do so. Dr. Hartman argues that determining each proposed class member's quantum of damages should be left to the "allocation" phase of the case, but he fails to discuss any potential method of allocating damages. Allocating damages and determining whether any given proposed class member even was damaged would require mini-trials for each proposed class member.

---

[6] Although Professor Rosenthal and Dr. Hartman make claims that they will estimate classwide impact or that they will show common impact, in fact they admit that their models will do no such thing because they admit a number of members of the proposed class will not be impacted by the challenged conduct.

[7] In my previous declaration, I discussed at length the appropriate calculation of economic damages in this instance depends on both the cost and efficacy of whatever alternative treatment would have been provided absent the challenged conduct, compared to the cost and efficacy of Neurontin. Keeley Declaration, paragraphs 50-51.

**C.   Professor Rosenthal will not be able to overcome the many econometric problems I identified.**

9.     Professor Rosenthal agrees that she may face a variety of difficult econometric problems.[8] She mentions conceptual approaches to deal with some of these problems, such as using the instrumental variables approach to deal with endogeneity.  However, Professor Rosenthal fails to offer specific solutions to any of these problems.  Nor does she provide adequate explanation for why her model would be expected to overcome the simultaneous presence of the numerous econometric problems.  Instead, Professor Rosenthal and Dr. Hartman cite a few academic articles, but none of these papers has attempted to do what Professor Rosenthal has proposed:  measure the effects of a large number of challenged promotion events while controlling for other promotions that were not challenged.  In fact, Professor Rosenthal concedes that she is not aware of any published research that has ever attempted to distinguish quantitatively the effects of allegedly fraudulent promotion as distinct from the effects of non-fraudulent promotion, let alone overcome the various econometric problems that would arise in such an exercise (e.g., finding instruments for fraudulent and non-fraudulent promotions).

**D.   Professor Rosenthal fails to explain how the sales of Neurontin for off-label uses could have continued to grow over so long a period and even after the allegations in this case were made public.**

10.     As I discuss below, Professor Rosenthal fails to credibly explain how the impact of the challenged promotions could have been so long-lived if Neurontin were not effective in treating patients' symptoms.  In particular, she fails to explain why

---

[8] These econometric problems include endogeneity, omitted variable bias, multicollinearity and measurement error.  Rosenthal Rebuttal, paragraphs 14-15, 22-24.

Neurontin continued to experience rapid sales growth even following the public disclosure of the allegations in this matter. Professor Rosenthal has provided no support in the published literature for her assertion that prescription drugs used to treat patients' symptoms are credence goods. Moreover, Plaintiffs and their experts fail to address findings in randomized controlled trials that Neurontin is an effective treatment for many off-label indications as well as clinical evidence that Neurontin is effective.

### E. Professor Rosenthal still fails to explain how her proposed model would address plaintiffs' allegations.

11.     Professor Rosenthal still fails to propose a method to estimate the effect of the challenged (or actionable) *conduct* on the off-label prescriptions of Neurontin. Instead she proposes a model she claims can estimate the effect of the challenged *promotions*. Stated differently, Professor Rosenthal's proposed model is unable to distinguish between the alleged fraudulent and non-fraudulent aspects of the same event and would include the non-fraudulent aspects of the event in estimating the effect of the event. Her model, therefore, would overestimate the effect, if any, of the challenged conduct.

## V. Causation and Injury Cannot Be Demonstrated for Every Member of the Proposed Class, and Individual Inquiry Would be Required to Determine Which Class Members, If Any, Can in Fact Demonstrate Causation and Injury

12.     In my previous declaration, I noted the analysis proposed by Professor Rosenthal fails to put forward a method that would show which proposed class members' prescriptions, if any, were caused by Defendants' allegedly improper conduct. Specifically, I discussed Professor Rosenthal's concession that there are

proposed class members whose consumption of or payment for Neurontin was not caused by the challenged conduct.[9] Furthermore, even proposed class members whose consumption of or payment for Neurontin was caused by the challenged conduct were not necessarily injured—whether they were injured would depend on whether Neurontin was effective for them and Neurontin's cost relative to any alternative treatment.[10] In her rebuttal declaration Professor Rosenthal concedes the fact that her aggregate methodology is incapable of demonstrating causation and injury as to every class member and that it cannot identify those class members who were not harmed.[11] Instead of attempting to demonstrate causation and injury as to every class member, Professor Rosenthal and Dr. Hartman merely argue that their aggregate analysis will enable them to estimate an amount of aggregate damages across the class.

13.     In his rebuttal report, Dr. Hartman references a case involving airline ticket prices in an attempt to support use of an aggregate damages analysis in this context.[12] In doing so, however, he fails to consider that in the airline example, all of the members of the class had been harmed by the same action, while in this case, the Plaintiffs' and their experts acknowledge that not all members of the proposed class have been harmed and the challenged actions vary widely and are not common to proposed class members. The proposed class in this case is not united by way of being harmed through a common mechanism because 1) not all proposed class

---

[9] Rosenthal Deposition, 10/06, pp. 243-245. See Keeley Declaration, paragraphs 40-42.
[10] Professor Rosenthal concedes that her model cannot identify proposed class members for whom Neurontin was effective. Rosenthal Deposition, 10/06, p. 267. Moreover, as explained above in footnote 4, even if Neurontin was not effective for a particular patient, it does not necessarily mean that the class member suffered any economic injury. The existence of economic injury, if any, would depend on the cost and efficacy of any alternative treatment that the class member would have paid for in the but-for world.
[11] Rosenthal Rebuttal, paragraphs 9-10.
[12] Hartman Rebuttal, footnote 7.

members are injured, 2) the mechanism is not common, i.e., the challenged promotions encompass many different events and different types of alleged fraud regarding different off-label uses of Neurontin, and 3) challenged promotions are not even alleged to have had a common effect or even have reached all proposed class members.

## VI.  Dr. Hartman Fails to Address Economic Damages

14.    In my previous declaration, I noted that Dr. Hartman's proposed measure of damages is not economic damages and that he has no basis for his damage measure other than that his counsel directed him to use this measure.[13]  In his rebuttal report, Dr. Hartman agrees that the Court may well find that his proposed measure of damages (expenditures on Neurontin) does not measure the economic harm allegedly suffered by some proposed class members and that the Court may require the calculation of economic damages (i.e., compensatory damages) as economists commonly define them.[14]  In addition, Dr. Hartman fails to outline a methodology to calculate even aggregate economic damages in the event that the court determines that my definition of economic damages is appropriate.  Similarly, Professor Rosenthal fails to outline such a methodology.[15]

15.    Furthermore, Dr. Hartman mischaracterizes my measure of economic damages.  While my report specifically states that true economic damages would take into account the efficacy and price of the alternative treatment, in his discussion of my framework for calculating damages Dr. Hartman disregards the efficacy of the

---

[13] Keeley Declaration, paragraphs 21, 58.
[14] Hartman Rebuttal, footnote 6.
[15] Professor Rosenthal states that Plaintiffs' experts would be able to implement such a model, but provides no details regarding the model.  Rosenthal Rebuttal, paragraph 30.

alternative treatment. But when discussing his own model, Dr. Hartman concedes that his damage approach relies on the assumption that the efficacy of Neurontin was zero or negative.[16] Dr. Hartman's assumption regarding Neurontin's efficacy contradicts the evidence in the case, including Dr. Hartman's own use of Neurontin.

16.     Moreover, Dr. Hartman mischaracterizes my argument related to the calculation of damages. My argument is not that variation per se among class members precludes aggregate analysis. My argument is that because causation and injury cannot be proven for every class member, there is no way, based on common evidence, to avoid awarding damages to proposed class members who have suffered no harm.

17.     In any event, Dr. Hartman has not put forth any method of determining each proposed class member's alleged damages, if any, and states that it is not necessary to do so. Dr. Hartman argues that determining each proposed class member's quantum of damages would be left to the "allocation" phase of the case, but he fails to discuss any potential method of allocating damages.[17] This is because there is no method of allocating supposed aggregate damages using common evidence. Allocating damages and determining whether any given proposed class member even was damaged would require mini-trials on each proposed class members' damages.

---

[16] Hartman Rebuttal, paragraph 10e.
[17] Hartman Rebuttal, paragraphs 7-8.

## VII. Professor Rosenthal Will Not Be Able to Overcome the Many Econometric Problems I Identified

18.    Both Professor Rosenthal and Dr. Hartman concede that there are numerous potential econometric issues related to Professor Rosenthal's proposed aggregate model, such as endogeneity, multicollinearity, omitted variable bias and measurement error.[18]    However, Professor Rosenthal provides only conceptual approaches as to how she would deal with these econometric problems—she offers no specific solutions, nor has she done any work to show that these problems could be overcome in this context.[19]    For example, despite the fact that data is not required to do so, Professor Rosenthal does not specify potential instruments that she might use in an instrumental variables model.    In fact, all that Professor Rosenthal, as well as Dr. Hartman, is able to say at this stage is "trust me, I will figure out how to deal with these challenges during a later phase of the case."[20, 21]

19.    Professor Rosenthal also provides no explanation as to how she will overcome the challenge of dealing with all of these econometric issues *simultaneously*, as the existence of multiple econometric problems tends to increase the difficulty of addressing those problems.    In her rebuttal report she considers each econometric

---

[18] Rosenthal Rebuttal, paragraphs 14-15, 22-24; Hartman Rebuttal, Attachment B, paragraphs 3, 10, 17-18.
[19] Professor Rosenthal concedes that she a) has not attempted to run her proposed model, b) has not yet collected all of the data needed to run her proposed model, c) does not know precisely what endogeneity or multicollinearity problems she will encounter and d) does not know whether the estimates in her proposed model will be statistically significant.  Deposition of Meredith B. Rosenthal, Ph.D., *In re: Neurontin Marketing, Sales Practices, and Products Liability Litigation*, MDL Docket No. 1629, Master File No. 04-10981, 3/6/07 ("Rosenthal Deposition, 3/6/07"), pp. 693-694.
[20] Rosenthal Rebuttal, paragraph 4, footnote 22; Hartman Rebuttal, paragraphs 18-19, Attachment B, paragraphs 8, 26, 28.
[21] In Attachment B to his rebuttal declaration, Dr. Hartman attempts to trivialize the extent of the econometric problems Professor Rosenthal will face. Note that I do not agree with many of Dr. Hartman's arguments in Attachment B to his rebuttal declaration.  Regardless, the discussion in this appendix is largely irrelevant because of the following:  1) Professor Rosenthal concedes that these potential econometric issues exist, 2) Professor Rosenthal fails to offer any specific solutions to these problems and 3) Professor Rosenthal's model is substantially more ambitious than any of the "comparable" studies cited by Professor Rosenthal or Dr. Hartman.

problem separately and suggests a conceptual solution for each problem in isolation, citing articles that have addressed one or only a few of the problems she will encounter. In fact, Professor Rosenthal's model is unprecedented and more ambitious than any of the supposedly "comparable" models that she cites in the literature.

20.     One particularly difficult problem Professor Rosenthal will face is attempting to measure the effects of a large number of challenged promotional events while controlling for other promotions that were not challenged. I discussed this point in detail in my original declaration, and Professor Rosenthal has now conceded in her deposition that she is not aware of anyone ever attempting to address this problem even in isolation, let alone in the simultaneous presence of the various other econometric problems discussed above.[22] This problem is especially challenging because it requires instruments for both fraudulent and non-fraudulent promotions. Professor Rosenthal has not even proposed candidates for such instruments, and I have severe doubts that she would be able to find any. Indeed, Professor Rosenthal concedes that she is not aware of any published research that has successfully found instruments for fraudulent and non-fraudulent promotions.[23]

21.     Another significant problem that Professor Rosenthal faces is the use of IMS Health NDTI data to define the dependent variable, which introduces larger measurement error than typically found in the literature analyzing the effect of pharmaceutical promotion on sales. The survey-based nature of the NDTI data will

---

[22] Rosenthal Deposition, 3/6/07, pp. 678-679.
[23] Rosenthal Deposition, 3/6/07, p. 679.

introduce incremental measurement error that is not typically encountered in other studies.[24]

### VIII. Professor Rosenthal Fails to Explain How the Sales of Neurontin for Off Label Uses Could Have Continued to Grow Over So Long a Period and Even After the Detailed Allegations in this Case Were Made Public

22.    In my previous declaration, I noted that neither Professor Rosenthal nor Dr. Hartman advances a credible explanation of how a scheme of alleged fraudulent promotion could have lasting and persistent effects of any significant magnitude especially after the allegations in this case became public. In fact, the evidence shows that Neurontin sales continued to grow rapidly following the public disclosure of the allegations regarding challenged promotions in 2000 and 2002.[25] In response, Professor Rosenthal argues that Neurontin (and prescription drugs) are credence goods and that placebo effects and regression to the mean are possible explanations for Neurontin's continued sales growth. Even if this were true, it would not explain why prescriptions for Neurontin continued to grow after the public disclosures in 2000 and 2002. Moreover, as I discussed at length in my previous declaration, Professor Rosenthal is not able to cite any literature indicating that prescription drugs, especially prescription drugs that address patients' symptoms, are credence goods. Rather, prescription drugs are generally considered

---

[24] For example, for one million annual drug appearances in the NDTI data, the 95% confidence interval range is +/- 27.96 percent. Moreover, the smaller the number of drug appearances, the larger the confidence interval becomes. Professor Rosenthal's use of NDTI data by indication and on a monthly basis will suffer from even less precision than using the data for all indications on an annual basis because of the smaller sample sizes she will use. IMS Health (2006), National Disease and Therapeutic Index[TM], Drug, Vol. 1, IMS Health Inc., Plymouth Meeting, PA, pp. 13-14.

[25] In my previous declaration, I noted that Neurontin sales increased from $1.2 billion in 2000 to $2.5 billion in 2004. This substantial sales growth occurred despite disclosures related to the alleged fraudulent off-label promotions in 2000 and 2002. Keeley Declaration, footnote 82.

to be experience goods because consumers are generally able to ascertain the efficacy of prescription drugs upon consumption over time.[26]

23.    In addition, Plaintiffs and their experts completely overlook the existence of positive randomized controlled trial data for many of the off-label indications for which Neurontin was prescribed, including migraine headaches, neuropathic pain, restless leg syndrome and others.[27] This evidence of Neurontin's efficacy in treating off-label indications helps to explain Neurontin's continued sales and prescription growth following the public disclosure of the allegations in this case.

## IX.    Professor Rosenthal Still Fails to Explain How Her Proposed Model Would Address Plaintiffs' Allegations

24.    Professor Rosenthal still fails to propose a method to estimate the effect of the challenged (or actionable) *conduct* on the off-label prescriptions of Neurontin. Instead she proposes a model she claims can estimate the effect of the challenged *promotions*. Stated differently, Professor Rosenthal's proposed model is unable to distinguish between the alleged fraudulent and non-fraudulent aspects of the same event and would include the non-fraudulent aspects of the event in estimating the effect of the event. This distinction is crucial because, for example, a particular challenged off-label promotion might have a significant effect on Neurontin's off-label sales, but it might have had the same, or nearly the same, effect if the

---

[26] Berndt, Ernst R., "The U.S. Pharmaceutical Industry: Why Major Growth In Times Of Cost Containment?," *Health Affairs*, Volume 20, No. 2, 2001; Azoulay, Pierre, "Do Pharmaceutical Sales Respond to Scientific Evidence?," *Journal of Economics & Management Strategy*, Volume 11, Number 4, Winter 2002, pp. 551–594; Coscelli, Andrea, and Matthew Shum, "An Empirical Model of Learning and Patient Spillovers in New Drug Entry," *Journal of Econometrics,* 122 (2004) 213–246; Ching, Andrew, and Masakazu Ishihara, "The Effects of Detailing on Prescribing Decisions under Quality Uncertainty," *Draft Paper*, August, 2006. See Keeley Declaration, footnote 19.

[27] Expert Report of Dr. Andrew Slaby, M.D., Ph.D., M.P.H., pp. 9-10; Expert Report of Dr. Shawn Bird, November 29, 2006, pp.4-5; Expert Report of Dr. Samuel Potolicchio, December 8, 2006, pp. 2-3; and Expert Report of Dr. Alan M. Rapoport, M.D., December 1, 2006, p. 2.

additional information plaintiffs claim should have been disclosed was disclosed or if any allegedly false claims were not made.

25.    Professor Rosenthal's only response to this criticism in her rebuttal report is that (some) promotions might have been entirely fraudulent so that the only cure for the fraud would be to not have any promotion.[28] However, she provides no basis for this assertion, and indeed her views are not consistent with many of plaintiffs' allegations.[29] Moreover, in her deposition, Professor Rosenthal concedes that many of the plaintiffs' allegations are "nuanced" and relate to "only presenting half of the story."[30] In spite of this concession, Professor Rosenthal also agrees that her model is unable to distinguish between fraudulent and non-fraudulent aspects of the same event and that her proposed model would therefore capture *both*.[31]

## X.    Conclusion

26.    For all of the reasons discussed above (and in my previous declaration), alleged causation and injury and alleged damages of each proposed class member cannot be determined using common evidence. Instead, individual inquiry would be required.

---

[28] Rosenthal Rebuttal, paragraphs 13, 31.
[29] As described in my original declaration, the Complaint is littered with instances where the challenged conduct could be cured via additional disclosures. Keeley Report, footnote 14. Professor Rosenthal has now confirmed this point in her deposition. For example, she sees no reason why two articles by Dr. Guttoso regarding hot flashes would not have been published even if the articles had been "corrected" in the minor ways necessary to address Plaintiffs' only allegations of fraud regarding these articles. Rosenthal Deposition. 3/6/07, pp. 649-651, 656-657.
[30] Rosenthal Deposition, 3/6/07, p. 671.
[31] Rosenthal Deposition, 3/6/07, pp. 668-670.

## XI. Signature

I declare under penalty of perjury that this Declaration is true and correct.

Dated: April 23rd, 2007

Michael C. Keeley, Ph.D.

# Exhibit A

# Dr. Michael C. Keeley's Prior Testimony Since 2002

I have given expert testimony in written testimony, deposition and/or at trial since 2002 as indicated below. I have indicated in bold the party by whom I was retained.

2007:  *Carmen Migliaccio, et al.  v.* **Midland National Life Insurance Company**
(declaration)
— United States District Court Central District of California, Western Division, Case No. 2:06-CV-01007-CAS (MANx)
— Reed Smith LLP, 1999 Harrison Street, Suite 2400, Oakland, CA  94612-3572
— Class action alleging incomplete disclosures in the sale of fixed-index annuities. Assessment of whether common evidence can be used to address plaintiffs' claims and assessment of the validity of plaintiffs' experts' analysis.

2007:  *Ross v. Hewlett Packard Corp.*
(expert report, deposition, trial)
— Superior Court of California County of Santa Clara, Case No. 104 CV 015323
— Wilson, Sonsini, Goodrich & Rosati, 650 Page Mill Road, Palo Alto, CA 94304
— Assess the earn-out provisions of technology purchase agreement.

2006:  *In Re:  Neurontin Marketing, Sales Practices, and Products Liability Litigation (retained by* **Pfizer, Inc and Warner-Lambert Company)**
(declaration, deposition)
— United States District Court District of Massachusetts, Master File No. 04-10981
— Davis, Polk & Wardwell, 450 Lexington Avenue, New York, NY  10017
— Class action in which plaintiffs allege that defendants engaged in false or misleading promotion of Neurontin for certain indications and/or for certain dosage levels that were not approved by the FDA.  Assessment of whether common evidence can be used to address plaintiffs' claims and assessment of the validity of plaintiffs' experts' declarations.

2006:  *Gary Yokoyama, et al. v.* **Midland National Life Insurance Company**
(declaration)
— United States District Court District of Hawai'i, Civil No. CV 05-00303 JMS KSC
— Reed Smith LLP, 1999 Harrison Street, Suite 2400, Oakland, CA  94612-3572
— Class action alleging incomplete disclosures in the sale of fixed-index annuities. Assessment of whether common evidence can be used to address plaintiffs' claims and assessment of the validity of plaintiffs' expert's analysis.

2006: *In the Matter of: Certain Incremental Dental Positioning Adjustment Appliances and Methods of Producing Same (retained by **Align Technology**) (expert report, deposition)*

— United States International Trade Commission, Washington, DC, Inv. No. 337-TA-562

— Paul, Hastings, Janofsky & Walker LLP, 875 15th Street, N.W., Washington, DC 20005

— Section 337 matter. Analysis of the domestic industry.

2006: ***LG. Philips LCD Co., Ltd.** v. Tatung Co. of America, et al.*
(expert report, deposition, trial testimony)

— United States District Court – Central District of California, Case No. CV-02-6775 CBM (JTLx)

— Morgan, Lewis & Bockius LLP, 1111 Pennsylvania Avenue, NW, Washington, DC 20004

— Patent infringement matter. Assessment of plaintiff's damages.

2006: *Saskia V.W. Hilton v. Children's Hospital San Diego; **San Diego Diagnostic Radiology Medical Group, Inc.; Lee Pinckney, M.D., Lee Harvey, M.D., Patrick Carey, M.D.; and Melvin Senac, M.D.***
(expert report)

— United States District Court – Southern District of California, Civil Action No. 02-CV-01080 L

— Sheppard, Mullin, Richter & Hampton LLP, 501 West Broadway, 19th Floor, San Diego, CA 92101

— Antitrust matter alleging Section I and Section II violations. Assessment of the validity of plaintiff's antitrust claims.

2006: *Power Integrations, Inc. v. **Fairchild Semiconductor International, Inc. and Fairchild Semiconductor Corporation***
(expert reports, deposition, trial testimony)

— United States District Court – District of Delaware, Civil Action No. 04-1371-JJF

— Orrick, Herrington & Sutcliffe LLP, 1000 Marsh Road, Menlo Park, CA 94025-1015

— Patent infringement matter. Assessment of the validity of plaintiff's damage claim and plaintiff's expert's analysis.

2005:  *Spartanburg Regional Healthcare System v.* **Hillenbrand Industries, Inc., et al.**
(declaration, affidavits, depositions)

— United States District Court – District of South Carolina, Civil Action No. 7 03 2141 20

— Boies, Schiller & Flexner LLP, 5301 Wisconsin Avenue, NW, Suite 800, Washington, D.C. 20015

— Class action alleging tying and attempted monopolization. Assessment of factors pertaining to class certification and assessment of the validity of plaintiff's experts' declarations.

2005:  *Brunswick Bowling & Billiards Corporation v.* **Shanghai Zhonglu Industrial Co. Ltd.**
(expert reports, testimony at arbitration)

— Hong Kong International Arbitration Centre

— Williams, Kastner & Gibbs PLLC, Two Union Square, 601 Union Street, Suite 4100, Seattle, WA 98101-2380

— Assessment of damages resulting from Zhonglu's antitrust counterclaim alleging patent misuse. Assessment of the validity of Brunswick's breach of contract damage claim.

2005:  *Central Valley Dairymen, Inc. v.* **Sorrento Lactalis, Inc., fka Sorrento Cheese Company,**
*Inc.* (depositions, declaration, trial testimony)

— Superior Court of California County of Stanislaus, Case No. 331029

— Hoge, Fenton, Jones & Appel, Inc., 60 South Market Street, Suite 1400, San Jose, CA 95113-2396

— Alleged breach of contract. Assessment of the validity of plaintiff's damage claim.

2004:  *Klein and Klein v.* **North American Company for Life and Health Insurance, et al.**
(declarations, deposition)

— Superior Court of California County of Los Angeles – Central District, Case No. BC 257856

— Flemings & Phillips LLP, 1340 Treat Boulevard, Suite 630, Walnut Creek, CA 94597; Pepper Hamilton, 3000 Two Logan Square, Eighteenth and Arch Streets, Philadelphia, PA 19103-2799

— Alleged deceptive sales practices. Assessment of the validity of plaintiffs' expert's claims regarding the predictability of interest rate changes.

2004:  *Arleen Freeman, et al., v.* ***San Diego Association of Realtors, et al.***
(expert report, deposition)

— United States District Court for the Southern District of California, Case No. 98-CV-0139-WQH (JMA)

— Paul, Hastings, Janofsky & Walker LLP, 55 Second Street, 24th Floor, San Francisco, CA  94105-3441

— Antitrust matter.  Analysis of whether conduct at issue caused antitrust impact or damages.


2004:  ***Medtronic Vascular, Inc., et al****. v. Advanced Cardiovascular Systems, Inc., et al.*  (expert reports, deposition)

— United States District Court for the District of Delaware, Civil Action No. 98-80-SLR

— McDermott, Will & Emery, 18191 Von Karman Ave., Suite 400, Irvine California 92612-7107

— Matter alleging theft of trade secrets and patent infringement.  Assessment of Medtronic's trade secret damages.  Assessment of the validity of Advanced Cardiovascular Systems' patent damage claim.


2004:  *Mattel, Inc. v.* ***JAKKS Pacific, Inc., et al.***  (declaration, deposition)

— Superior Court of the State of California for the County of Los Angeles, Case No. BC 244868

— Feder, Kaszovitz, Isaacson Weber, Skala, Bass & Rhine LLP, 750 Lexington Avenue, 23rd Floor, New York, NY  10022-1200

— Matter alleging theft of trade secrets.  Assessment of the validity of plaintiffs' damage claims.


2003:  *Analysis of the MEIE Syndicate* (retained by the Australian Taxation Office) (expert report)

— Australian Taxation Office, 100 Market Street, Sydney NSW 2000 Australia

— Analysis of the licensing and funding of the MEIE Syndicate's transfer and development of technology.

2003:  *KLA Tencor Corporation v. **Tokyo Seimitsu Co., Ltd.; and TSK America, Inc.**,* (expert reports, deposition)

— United States District Court, Northern District of California, Oakland Division, Case No. CV-01-2489 SBA

— Howrey Simon Arnold & White, LLP, 301 Ravenswood Avenue, Menlo Park, CA 94025

— Antitrust counterclaim in a patent matter.  Assessment of the competitive effects of the alleged patent misuse.

2003:  *S&M Farm Supply Inc. v. **Pharmacia Corporation and Monsanto Company*** (expert reports, deposition)

— United District Court, Eastern District of Missouri, Eastern Division, Case No. 4:02CV518ERW

— Husch & Eppenberger, LLC, 190 Carondelet Plaza, Suite 600, St. Louis, MO  63105

— Class action price fixing matter.  Assessment of factors pertaining to class certification.  Assessment of the validity of plaintiff's expert's analysis.

2003:  *Lawrence J. Knipp and Nykar Technologies, L.P. v. Raymond M. Galasso and **Thompson & Knight L.L.P.*** (expert report)

— In the District Court of Tarrant County, Texas, 153rd Judicial District, Case No. 153-191270-02

— Shannon, Gracey, Ratliff, & Miller, L.L.P., 777 Main St., 38th Floor, Fort Worth, TX 76102-5304

— Matter alleging negligence in patent prosecution.  Assessment of the validity of plaintiffs' damage claims and plaintiff's expert's analysis.

2002:  *In re **Retail Services, Inc. and Freebie, Inc.**, v. Freebies Publishing, Eugene F. Zannon, and Gail Zannon* (expert report, deposition)

— United States District Court for the Eastern District of Virginia, Civil No. 02-111-A

— Gibson, Dunn & Crutcher LLP, 1050 Connecticut Avenue, N.W., Washington, DC 20036-5306

— Assessment of plaintiff's trademark damage claims.

2002:  *In re Pacific Gas and Electric Company, Debtor* (retained by **NCPA**) (expert report, trial testimony)
   — United States Bankruptcy Court, Northern District of California, No. 01-30923 DM
   — Brobeck Phleger & Harrison LLP, One Market Plaza, Spear Street Tower, San Francisco, CA  94123
   — Antitrust and breach of contract claims in Bankruptcy Court.  Assessment of the damages of certain NCPA members.

2002:  *In the Matter of the Arbitration of The Venetian Casino Resort LLC dba Venetian Resort Hotel Casino and ExxonMobil Corporation* (expert report and testimony)
   — American Arbitration Association, Case #181 00122 01 TMS
   — Walther, Key, Maupin, Oats, Cox & LeGoy, Lakeside Professional Plaza, 3500 Lakeside Court, Reno, NV  89509
   — Breach of contract matter.  Assessment of the validity of plaintiffs' damage claims and plaintiffs' expert's analysis.

2002:  *MacPherson's Inc., et al. v. Windermere Real Estate Services Company, et al.* (expert report)
   — United States District Court, Western District of Washington at Seattle, No. C01-1885P
   — Demco Law Firm, 5224 Wilson Avenue South, Seattle, WA  98118
   — Real estate antitrust matter involving both Section I and Section II claims:  Assessment of the validity of plaintiffs' antitrust claims.

2002:  *Microblend, L.L.C. and GC Intermark Company, L.L.C. v. Exxon Mobil Corporation, Mobil Oil Corporation and Mobil Corporation* (expert report)
   — United States District Court for the Eastern Division of Virginia, Civil Action No. 02-145-A
   — Patton Boggs LLP, 2550 M Street, N.W., Suite 500, Washington, DC  20037-1350
   — Breach of contract matter.  Analyses and assessment of damage claims.

2002:  ***Spirit Airlines, Inc.*** *v. Northwest Airlines* (expert reports, depositions)
   — United States District Court, Eastern District of Michigan, Southern Division
   — Kenny Nachwalter Seymour Arnold Critchlow & Spector, 1100 Miami Center, 201 South Biscayne Blvd., Miami, FL  33131-4327
   — Monopolization case alleging predatory pricing.  Assessment of damages resulting from the predatory pricing.

2002: *In re Sorbates Direct Purchaser Antitrust Litigation (retained by the **class**) (expert reports, deposition)*

— United States District Court for the Northern District of New York, Case No. C-98-04886 CAL

— Berman DeValerio Pease Tabacco Burt & Pucillo, P.C., 425 California Street, Suite 2025, San Francisco, CA  94104-2205

— Matter alleging price fixing of sorbates.  Assessment of damages resulting from the price fixing.

# Exhibit B

# Documents Considered by Michael C. Keeley, Ph.D.[1]

| Document Title, Bates Numbers | Document Date |
|---|---|
| Defendants' Proposed Memorandum of Law in Opposition to the Class Plaintiffs' Motion for Class Certification, with Exhibits 1-76 | December 22, 2006 |
| Proposed Third Amended Class Action Complaint | November 02, 2006 |
| Reply Memorandum of Law in Support of Plaintiffs' Motion for Class Certification | March 19, 2007 |
| Class Plaintiffs' Motion for Permission to File an Oversized Reply Memorandum of Law in Support of Motion for Class Certification | February 21, 2007 |
| Deposition of Michael C. Keeley, Ph.D. | January 25, 2007 |
| Deposition of Fiona M. Scott Morton | February 07, 2007 |
| Deposition of Meredith B. Rosenthal, Ph.D. | March 06, 2007 |
| Reply Declaration of Raymond S. Hartman, with Attachments A-C | February 21, 2007 |
| Reply Declaration of Professor Meredith Rosenthal, with Attachments A-B | February 21, 2007 |
| Declaration of Andrew E. Slaby, M.D., PH.D, M.P.H. | |
| Declaration of Alan M. Rapoport, M.D. | December 1, 2006 |
| Declaration of Samuel Potolicchio | December 8, 2006 |
| Declaration of Shawn J. Bird, M.D. | November 29, 2006 |

Berndt, Ernst R., Linda Bui, David Reiley and Glen Urban, "The Roles of Marketing, Product Quality and Price Competition in the Growth and Composition of the U.S. Anti-Ulcer Drug Industry," National Bureau of Economic Research,Working Paper No. 4904, October 1994

Borenstein, S. and N.L. Rose, "Competition and Price Dispersion in the U.S. Airline Industry," Journal of Political Economy, Vol. 102(4), 1994

Christen, Markus, et al., "Using Market-Level Data to Understand Promotion Effects in a Nonlinear Model," Journal of Marketing Research, Vol. 34(3), August 1997

---

[1] The documents listed herein are in addition to other documents that I previously considered in connection with my original declaration. For a list of those documents, see Exhibit C of Declaration of Michael C. Keeley, Ph.D. in Opposition to Plaintiffs' Motion for Class Certification, December 21, 2006 ("Keeley Declaration"), *In re: Neurontin Marketing, Sales Practices and Products Liability Litigation*, MDL Docket No. 1629, Master File No. 04-10981.

Ellison, Sara Fisher and Catherine Wolfram, "Coordinating on Lower Prices: Pharmaceutical Pricing under Political Pressure," RAND Journal of Economics, Vol. 37(2), 2006

Emons, Winand, "Credence Goods and Fraudulent Experts," The RAND Journal ofEconomics, Vol. 28(1), Spring 1997

Hartman, Raymond S. and Michael J. Doane, "The Use of Hedonic Analysis for Certification and Damage Calculations in Class Action Complaints," The Journal of Law, Economics and Organization, Fall 1987

Hartman, Raymond S., "Product Quality and Market Efficiency The Effect of Product Recalls on Resale Prices and Firm Valuation," The Review of Economics and Statistics, Vol. 69(2), May 1987

Hausman, Jerry A., "Simultaneous Equation Models," Vol. 1, chapter 7, in Z. Griliches and M. Intriligator, editors, Handbook of Econometrics, North Holland, 1983. IMS Health website at http://www.imshealth.com

Hickner, John, "A New Look at an Old Problem: Inappropriate Antibiotic Prescribing for Acute Respiratory Infections," Annals of Family Medicine, Vol. 4, 2006

McFadden, Daniel, "Free Markets and Fettered Consumers," American Economic Review, 2006, 96(1)

Radley, David C., et al., "Off-label Prescribing Among Office-Based Physicans," Archives of Internal Medicine, Vol. 166, 2006

Rosenthal, Meredith B., Ernst R. Berndt, Julie M. Donohue, Arnold M. Epstein, Richard G. Frank, "Demand Effects of Recent Changes in Prescription Drug Promotion," Frontiers in Health Policy Research, v. 6, David M. Cutler and Alan M. Garber, editors, MIT Press, June 2003

Rosenthal, Meredith B., Richard G. Frank, Zhonghe Li and Arnold M. Epstein, "From Concept to Practice: Early Experience with Pay-for-Performance," The Journal of theAmerican Medical Association, 294(14), October 12, 2005

Rubinfeld, Daniel L. and Peter O. Steiner, "Quantitative Methods in Antitrust Litigation," Law and Contemporary Problems, 46(4), Autumn 1983

Scott Morton, Fiona, "Barriers to Entry, Brand Advertising, and Generic Entry in the US Pharmaceutical Industry," International Journal of Industrial Organization, Vol. 18(7), 2000

Scott Morton, Fiona and Mark Duggan, "The Distortionary Effects of Government Procurement: Evidence from Medicaid Prescription Drug Purchasing," Quarterly Journal of Economics, Vol. 121(1), 2006