# EXHIBIT 5

*In re: Neurontin Marketing, Sales Practices, and Products Liability Litigation*

**Reply Declaration of Fiona Scott Morton**

## I.    Assignment

1.  I have been asked by counsel for Defendants in this matter to review and respond
    to the reply declarations filed by Drs. Raymond Hartman and Meredith Rosenthal
    dated February 21, 2007.[1] In doing so, I incorporate by reference my original
    declaration dated December 21, 2006.[2] My original declaration contained my
    qualifications as well as a list of documents relied upon. Appendix A contains an
    updated version of my curriculum vitae and Appendix B contains the list of
    additional documents I have relied upon.

## II.    Summary of Opinions

2.  There are substantial areas of agreement between Drs. Rosenthal, Hartman, and
    myself. In particular, we agree that Dr. Rosenthal's model cannot, and will not, be
    used to determine which prescriptions were affected by the allegedly fraudulent
    promotions, or which Neurontin consumers, if any, were harmed. Secondly, we
    agree that there are numerous econometric problems that could potentially arise
    when Dr. Rosenthal attempts to estimate her model.

3.  Aside from these areas of agreement, there remain several critical points of
    disagreement that I want to address.[3] A major area of disagreement, which in my
    view is devastating to Dr. Rosenthal's proposed estimation, is the effect of the
    simultaneous presence of several econometric problems in her setting – all of

---

[1] Reply Declaration of Raymond S. Hartman, 2/21/07, ("Hartman Reply Declaration") and Reply Declaration of
Professor Meredith Rosenthal, 2/21/07, ("Rosenthal Reply Declaration"); both *In re: Neurontin Marketing, Sales
Practices, and Products Liability Litigation*, MDL Docket No. 1629, Master File No. 04-10981.
[2] Declaration of Professor Fiona Scott Morton, 12/21/06, *In re: Neurontin Marketing, Sales Practices, and
Products Liability Litigation*, MDL Docket No. 1629, Master File No. 04-10981.
[3] Several more minor areas of disagreement were raised by Drs. Hartman and Rosenthal in their reply
declarations. The omission of any discussion of those areas of disagreement is not meant to suggest that I agree
with the opinions of Drs. Rosenthal and Hartman. Indeed, none of the opinions I expressed in my opening
declaration have changed.

which, as noted above, Dr. Rosenthal concedes are valid potential issues she would need to overcome.[4] In their reply declarations, Plaintiffs' experts discuss how to overcome one econometric problem at a time; each problem is dismissed as minor, while citations are provided to articles that have overcome that particular problem in a particular setting. In this way, Plaintiffs' experts hope to convince the Court that the cumulative impact of these estimation problems is not substantial. However, none of the research Plaintiffs' experts cite in their reply declarations contains estimation that *simultaneously* overcomes all of the econometric problems faced by Dr. Rosenthal in this case. Her project is substantially complicated by the simultaneous presence of all of these problems, which I believe precludes its successful implementation.

4.  Three additional particularly significant problems with Dr. Rosenthal's proposed analysis are: the inability of her model to separate the effects of fraudulent versus non-fraudulent components contained in the same events, which will lead to overstating the effects of the allegedly fraudulent promotions; the overwhelming likelihood that no appropriate comparator drug is available that would allow Dr. Rosenthal to accurately estimate the effects of the allegedly fraudulent promotions on Neurontin prescriptions; and the challenge – never before successfully addressed and overcome – of finding valid instrumental variables for both fraudulent and non-fraudulent promotions, which is crucial to establishing causality. These problems are discussed below.

5.  If these issues with Dr. Rosenthal's model could truly be resolved as Drs. Rosenthal and Hartman claim, then there is no reason why they could not have made progress addressing these issues in the eighteen months since their original expert reports were filed, for example, by identifying potential instruments or by finding appropriate characteristics for comparator drugs. However, Plaintiffs' experts' reply declarations contain no new work on these important problems or in fact on any aspect of Professor Rosenthal's proposal.

---

[4] See Rosenthal Reply Declaration, ¶¶4, 23.

6. Lastly, Plaintiffs' experts have mischaracterized my discussion of causality to suggest that I would require every possible variable to be included in Dr. Rosenthal's model.[5] Clearly, there is no possible way to include every factor, and I have not suggested that it is necessary to do so. However, as I have already indicated in my original declaration, the omission of a factor (e.g., scientific progress) related to both prescribing and promotions can result in a correlation between prescribing and promotions that needs to be distinguished from causation. Nevertheless, the inability to include every variable does not negate the importance of explicitly tracing out the causal pathways in order to identify endogenous variables and potential instruments for such variables. Nor does it negate the need to explain how these variables will be measured.

### III.  Drs. Rosenthal and Hartman agree that Dr. Rosenthal's model is unable to identify the effects of promotion on individual consumers

7. Dr. Rosenthal concedes that some consumers were not affected by the allegedly fraudulent promotion, and she concedes that her method cannot identify which consumers were harmed by the allegedly fraudulent promotions.[6] Dr. Rosenthal's methodology is not capable of tracing the causal link between allegedly fraudulent promotions through to those consumers that were actually harmed, if any. Drs. Rosenthal and Hartman instead ignore these individual issues, stating only that these issues can be resolved later – at some allocation phase – without providing any specifics on how they could do then what they concede their model cannot do now.[7]

### IV.  Dr. Rosenthal agrees that she is likely to encounter various econometric problems and also agrees that she should use instrumental variables in her attempt to establish causality

8. Dr. Rosenthal concedes that the econometric difficulties I list in my opening declaration are valid and need to be overcome, including the problem of

---

[5] Hartman Reply Declaration, Attachment B, ¶¶10-12.
[6] Deposition of Meredith B. Rosenthal, Ph.D., *In re: Neurontin Marketing, Sales Practices, and Products Liability Litigation*, MDL Docket No. 1629, Master File No. 04-10981, 10/24/06 ("Rosenthal Deposition, 10/24/06"), pp. 136, 291-292, 300.
[7] Hartman Reply Declaration, ¶¶7-8; Rosenthal Reply Declaration, ¶10.

establishing causality as opposed to mere correlation.[8] In addition, Drs. Rosenthal and Hartman concede that in this setting an instrumental variables method is the appropriate technique to attempt to establish causality.[9] However, as I describe in more detail in Section VI, we disagree on the feasibility of carrying out an instrumental variables estimation in this context. It is my opinion that successfully implementing instrumental variables in this setting, and therefore establishing the correct causal impact of promotions on prescriptions, will not be possible.

## V.    No published research has simultaneously overcome all the econometric difficulties faced by Dr. Rosenthal

9.    Although, as noted above, Plaintiffs' experts concede that the econometric difficulties I list in my opening declaration are valid and need to be overcome, they characterize these difficulties as being run-of-the-mill[10] and cite a number of papers whose authors have overcome one, or a few, of these problems.[11] The key

---

[8] Rosenthal Reply Declaration, ¶¶4, 23; Deposition of Meredith B. Rosenthal, Ph.D., *In re: Neurontin Marketing, Sales Practices, and Products Liability Litigation*, MDL Docket No. 1629, Master File No. 04-10981, 10/25/06 ("Rosenthal Deposition, 10/25/06"), p. 448.
[9] Rosenthal Reply Declaration, ¶15; Hartman Reply Declaration, Attachment B, ¶¶18, 31.
[10] Rosenthal Reply Declaration, ¶4; Hartman Reply Declaration, ¶24.
[11] Berndt, E.R., L. Bui, D. Reiley and G. Urban (1995), "Information, Marketing and Pricing in the U.S. Anti-Ulcer Drug Market," *American Economic Review*, Vol. 85, No. 2, pp. 100-105; Ellison, S.F. and W.P. Mullin, (2001) "Gradual Incorporation of Information: Pharmaceutical Stocks and the Evolution of President Clinton's Health Care Reform," *Journal of Law and Economics*, Vol. 44, pp. 89-129; Ellison, S.F. and C. Wolfram, (2006) "Coordinating on Lower Prices: Pharmaceutical Pricing under Political Pressure," *RAND Journal of Economics*, Vol. 37, No. 2, pp. 324-340; Gonul, F.F., F. Carter, E. Petrova and K. Srinivasan (2001), "Promotion of Prescription Drugs and Its Impact on Physicians' Choice Behavior,"*Journal of Marketing*, Vol. 65, No. 3, pp. 79-90; Grabowski, H. and J. Vernon, (1992) "Brand Loyalty, Entry, and Price Competition in Pharmaceuticals after the 1984 Drug Act," *Journal of Law and Economics*, Vol. 35, No. 2, pp. 331-350; Hartman, R.S., (1987) "Product Quality and Market Efficiency: The Effect of Product Recalls on Resale Prices and Firm Valuation," *Review of Economics and Statistics*, Vol. 69, No. 2, pp. 367-372; Hartman, R.S. and M.J. Doane, (1987) "The Use of Hedonic Analysis for Certification and Damage Calculations in Class Action Complaints," *Journal of Law, Economics and Organization*, Vol. 3, No. 2, pp. 351-372; Hurwitz, M.A. and R.E. Caves (1988), "Persuasion or Information? Promotion and the Shares of Brand Name and Generic Pharmaceuticals," *Journal of Law and Economics*, Vol. 31, No. 2, pp. 299-320; King III, C. (2002), "Marketing, Product Differentiation and Competition in the Market for Antiulcer Drugs," Harvard Business School Working Paper, Boston MA; Manchanda, P. and P.K. Chintagunta (2004), "Responsiveness of Physician Prescription Behavior to Salesforce Effort: An Individual Level Analysis," *Marketing Letters*, Vol. 15, No. 2-3, pp. 129-145; Radley, D.C., S.N. Finkelstein, R.S. Stafford (2006), "Off-label Prescribing Among Office-Based Physicians," *Archives of Internal Medicine*, Vol. 166, pp. 1021-1026; Rizzo, J. (1999) "Advertising and Competition in the Ethical Pharmaceutical Industry: The Case of Antihypertensive Drugs," *Journal of Law and Economics*, Vol. 42, No. 1, pp. 89-116; Rosenthal, M.B., E.R. Berndt, J.M. Donohue, A.M. Epstein and R.G. Frank, (2003) "Demand Effects of Recent Changes in Prescription Drug Promotion" in *Frontiers in Health Policy Research*, Vol. 6, David M. Cutler and Alan M. Garber, editors, MIT Press, pp. 1-26; Rosenthal, M.B., R.G. Frank, Z. Li and A.M. Epstein, (2005)

is that none of the papers they cite has had to simultaneously cope with as many problems as Dr. Rosenthal will have in her setting, which include the need for instruments, multicollinearity, measurement error in the dependent variable due to use of NDTI data, use of aggregate data for estimation of individual-driven effects, separation of promotion variables into fraudulent v. non-fraudulent promotions, and few observations. These problems will interact and exacerbate each other. For example, estimation results will be less precise when one has relatively few observations and has to simultaneously employ instrumental variables; similarly, employing instrumental variables will be much more difficult when the endogenous variables are highly collinear.

10. My review of the articles cited by Drs. Rosenthal and Hartman, as well as two additional articles cited in my original declaration,[12] confirms that no published research has simultaneously solved all the problems that Dr. Rosenthal will face.[13] In fact, as Dr. Rosenthal has acknowledged, at least one of the issues – separating the effects of fraudulent v. non-fraudulent promotions – has never been addressed at all, let alone faced in conjunction with so many other problems.[14] Since

---

"From Concept to Practice: Early Experience with Pay-for-Performance," *Journal of the American Medical Association*, Vol. 294, No. 14, pp. 1788-1793; Scott Morton, F. (2000), "Barriers to Entry, Brand Advertising, and Generic Entry in the US Pharmaceutical Industry*," International Journal of Industrial Organization*, Vol. 18, No. 7, pp. 1085-1104; Scott Morton, F. and M. Duggan (2006), "The Distortionary Effects of Government Procurement: Evidence from Medicaid Prescription Drug Purchasing," *Quarterly Journal of Economics*, Vol. 121, Vol. 1, pp. 1-30.

[12] In addition to the articles cited in footnote 11, two more articles I have cited in my original declaration are: Chintagunta, P.K. and R. Desiraju (2005), "Strategic Pricing and Detailing Behavior in International Markets," *Marketing Science*, Vol. 24, No. 1, pp. 67-80; Chintagunta, P.K., P. Manchanda and P. Rossi (2004), "Response Modeling with Nonrandom Marketing-Mix Variables," *Journal of Marketing Research*, Vol. 41, pp. 467-478.

[13] For each of these papers (some of which specifically address the effect of promotions in pharmaceutical markets while others do not), I analyzed whether they overcome the problems described above in ¶9, namely, whether they used the instrumental variables technique; faced a multicollinearity problem sufficiently severe as to limit the number of variables included in the analysis; overcame problems associated with measurement error in the dependent variable due to the use of NDTI data; used disaggregate data for estimation of individual-driven effects or did not analyze individual-driven effects; estimated different effects of promotion by content; or used more than 624 observations in estimation, which is the maximum number of observations that Dr. Hartman has claimed will be available to Dr. Rosenthal for her analysis. See Hartman Reply Declaration, Attachment B, ¶19. (Note that the number of observations will actually be far lower if Dr. Rosenthal carries out her analysis on an indication-by-indication basis, as she plans to do according to her testimony. See Rosenthal Deposition, 10/24/06, p. 144.) None of the papers addressed, much less solved, all of these problems simultaneously.

[14] Deposition of Meredith B. Rosenthal, Ph.D., *In re: Neurontin Marketing, Sales Practices, and Products Liability Litigation*, MDL Docket No. 1629, Master File No. 04-10981, 3/6/07 ("Rosenthal Deposition, 3/6/07"), pp. 678-679.

academics typically strive to publish research that conquers harder problems, this evidence indicates to me that no academic has successfully estimated a model of the effects of promotion with all these problems present simultaneously.[15]

11. In summary, the source of the difference between Dr. Rosenthal's opinion and mine as to the difficulty of the estimation stems from her consideration of each econometric problem in isolation, whereas I consider the estimation as a whole, which is in fact how it will have to be carried out. In light of the multiple econometric problems Dr. Rosenthal will face and the limitations of her data, I do not believe her proposed model can be successfully implemented.

## VI.　Further problems with Dr. Rosenthal's proposed analysis

### A.　Dr. Rosenthal's model has no ability to separate out the effects of fraudulent versus non-fraudulent components of particular promotional events

12. Setting aside the econometric difficulties discussed above, Dr. Rosenthal has conceded that her model cannot separate out the effects of fraudulent versus non-fraudulent components of the same event.[16] When her model attempts to measure the impact on prescriptions of an allegedly fraudulent statement or omission, it will measure the impact on prescriptions of the *entire event* where that statement or omission occurred, including the impact of non-fraudulent aspects of that event.[17]

13. Thus, Dr. Rosenthal's proposed methodology would, in many cases, greatly overstate the effect on prescriptions of defendants' allegedly improper conduct.

---

[15] Even among the published studies, which faced fewer econometric problems than Dr. Rosenthal will face, the effects of promotional variables are not always significant. (See, for example, Hurwitz, M. and R. Caves (1988), "Persuasion or Information? Promotion and the Shares of Brand Name and Generic Pharmaceuticals," *Journal of Law and Economics*, Vol. 31, No. 2, pp. 299-320; Chintagunta, P.K. and R. Desiraju (2005), "Strategic Pricing and Detailing Behavior in International Markets," *Marketing Science*, Vol. 24, No.1, pp. 67-80; Rosenthal, M.B., E.R. Berndt, J.M. Donohue, A.M. Epstein and R.G. Frank (2003), "Demand Effects of Recent Changes in Prescription Drug Promotion" in *Frontiers in Health Policy Research*, v. 6, David M. Cutler and Alan M. Garber, editors, MIT Press, pp. 1-26.)

[16] Rosenthal Deposition, 3/6/07, p. 668.

[17] Dr. Rosenthal has conceded that a number of the allegations in this case are that Neurontin promotional events contained both allegedly fraudulent and non-fraudulent information. (See Rosenthal Deposition, 3/6/07, p. 671: "Well, my reading of the allegations was that it wasn't a simple case of just establishing that there was no proof of effectiveness. My understanding was that some of the allegations, as we just reviewed, relate to only presenting half the story, so presenting positive results without presenting negative results.")

For example, all events which contained a single item of allegedly fraudulent content would be analyzed for the impact they had *as a whole* on prescriptions, not for the impact that the single item of allegedly fraudulent content had on prescriptions.

14. Another way of describing this problem is that Dr. Rosenthal has incorrectly defined the "but-for" world. Dr. Rosenthal is attempting to analyze prescriptions in a "but-for" world where defendants' allegedly fraudulent promotions never took place. But, as she conceded in her deposition,[18] in creating this "but-for" world, she removes from the actual world not just defendants' allegedly fraudulent promotion, but also aspects of defendants' non-fraudulent promotions that occurred at the same events. Thus, one can see that Plaintiffs' "but-for" world will have less Neurontin promotion than a "but-for" world in which only allegedly fraudulent promotion is eliminated. Reducing Neurontin promotions more than would have occurred in the true "but-for" world will inflate Plaintiffs' estimates of the effect of allegedly fraudulent promotions on prescriptions.

**B. Dr. Rosenthal's comparator drug methodology has never before been implemented and I do not believe it could be successfully implemented in this setting**

15. Dr. Rosenthal has dismissed my critique of her proposed comparator drug analysis but has still provided no support for her suggestion that she could successfully implement this analysis, an analysis she acknowledges has never before been implemented in this context.[19] She has neither conducted research to identify valid comparator drugs nor adequately described a method to do so, despite the fact that neither task requires data on Neurontin sales or promotions.[20] Merely selecting a

---

[18] Rosenthal Deposition, 3/6/07, p. 668.
[19] Rosenthal Deposition, 3/6/07, pp. 673-674.
[20] For a drug to be an appropriate comparator, it is necessary that, absent the fraudulent promotions and controlling for other factors, the trends in off-label prescribing would have been the same for that drug and Neurontin. However, differences in side effects, indications, drug interactions, and mechanisms of action will cause these trends to differ. A casual review of the drugs that treat epilepsy suggests that finding a valid comparator drug will be extremely difficult. All first generation anti-epileptic drugs ("AEDs"), such as Dilantin, have worse side effect and drug interaction profiles than Neurontin, which likely means that secular trends in physician prescribing will differ for these drugs as compared to Neurontin. Most second generation AEDs, such

drug that also treats epilepsy, as in the Dilantin example from her declaration,[21] is insufficient because differences in side effects, drug interactions, indications, and mechanisms of action would likely cause the off-label sales trend for Dilantin to differ substantially from the off-label sales trend for Neurontin. The result is that off-label Dilantin prescriptions are a poor predictor of Neurontin off-label prescriptions.[22]

16. More problematic is that there is no way to *test* whether a drug is a good comparator for Neurontin; Dr. Rosenthal will simply have to *assume* that the factors listed above do not differentially affect off-label sales for her comparator drug and Neurontin.[23] This is clearly not a scientifically valid approach. Because the choice of match so strongly affects the estimate of the "correct" proportion of off-label prescriptions, the comparator drug must match Neurontin on all attributes that determine off-label prescribing. I do not think that such a match can be found, and therefore I do not think a comparator drug will teach us anything about the relationship between promotion and off-label prescribing of Neurontin.

---

as Zonegran and Topamax, also have substantially worse side effect profiles than Neurontin, leading to the same problem. In addition, many AEDs are FDA-approved for indications for which Neurontin is not approved and as such could not be used as comparator drugs, at least for those indications.

[21] "The Economics of Off-Label Promotion and Estimation of Impact on the Class of Neurontin Endpayers," Declaration of Meredith Rosenthal, *In re: Neurontin Marketing, Sales Practices, and Products Liability Litigation*, MDL Docket No. 1629, Master File No. 04-10981, 8/8/05 ("Rosenthal Declaration"), ¶37.

[22] In her deposition, Dr. Rosenthal indicated that applying a differences-in-differences approach on a comparator drug such as Dilantin would allow her to break apart 'secular trends' in off-label use which are independent of the allegedly fraudulent promotional activity. (Rosenthal Deposition, 10/25/06, pp. 434-440.) However, Dr. Rosenthal fails to consider that Dilantin's 'secular trends' may differ from Neurontin's since it has substantially different side effect and drug interaction profiles and is a first generation AED, while Neurontin is a second generation AED.

[23] Dr. Rosenthal paraphrases authors Shadish, Cook, and Campbell: "...[the] comparison group should be selected based on comparability at baseline and, in particular, with regard to characteristics that may be associated with the effect of interest" and implies that I disagree with these authors. (Rosenthal Reply Declaration,¶17.) On the contrary, I completely endorse their description of the issue: "[h]owever, the extent to which the pretest can render selection implausible depends on the size of any selection bias and the role of any unmeasured variables that cause selection and are correlated with the outcome. The absence of pretest differences in a quasi-experiment is never proof that selection bias is absent." (Shadish, W.R., T.D. Cook, and D.T. Campbell (2002), Experimental and Quasi-experimental Designs for Generalized Causal Inference, Houghton Mifflin Company, p. 138.) The impossibility of matching on all the "characteristics that may be associated with the effect of interest" in this case is the source of my disagreement with Dr. Rosenthal.

**C. Estimating the relative effects of fraudulent versus non-fraudulent promotions will be extremely difficult, if not impossible**

17. While Plaintiffs' experts and I agree that instrumental variables is the technique one would use to attempt to address the problem of endogeneity, we disagree on how difficult this will be to accomplish in this setting. As I explained in my opening declaration and as I elaborate below, I do not believe that Dr. Rosenthal can successfully implement instrumental variables here.

18. Dr. Rosenthal agrees that there is no literature attempting to estimate the relative effects of fraudulent versus non-fraudulent promotional activity on pharmaceutical sales, and thus there exists no literature that has been able to successfully apply instrumental variables to measure the effects of fraudulent versus non-fraudulent promotions.[24] Implementing instrumental variables is particularly challenging in this context because the instruments must satisfy an additional criterion: they must specifically target the differences between fraudulent versus non-fraudulent promotions without being correlated with the manufacturer's desire to promote Neurontin generally. If instead, they simply pick up the manufacturer's propensity to promote in a general way (e.g., because of changes in the cost of doing so), the first stage of the econometric estimation will generate two variables that are very collinear. Then the second stage estimation will be unable to distinguish between the effects of the allegedly fraudulent promotions variable and the non-fraudulent promotions variable because they will move almost identically. Since the purpose of the analysis is to distinguish them, the estimation will be unable to obtain a result.

19. Dr. Rosenthal does not propose any potential instruments,[25] and nowhere in the published literature have I seen instruments that would be able to distinguish between fraudulent and non-fraudulent promotions. I note that considering and proposing instruments does not require any data, so if potential instruments for

---

[24] Rosenthal Deposition, 3/6/07, pp. 678-679.

[25] "A. The reply does not include any new empirical results of any kind. Q. And it doesn't propose instruments either, I take it? A. I would have to read that section. I don't believe that I proposed specific instruments in the reply." (Rosenthal Deposition, 3/6/07, p. 602.)

fraudulent and non-fraudulent promotions actually existed, there is no reason that they could not have been identified yet.

20. This very serious issue has been brushed aside by Dr. Hartman ("I must interject that it is rarely more than a minor inconvenience") as if endogeneity is a trivial problem that many other researchers have easily solved in the past.[26] Addressing endogeneity is not trivial, and finding valid instruments can be a very difficult exercise without the substantial complicating factor of distinguishing between fraudulent and non-fraudulent promotions.[27] To the best of my knowledge, no one has ever addressed, let alone overcome, the extremely challenging endogeneity problem presented here, requiring instruments for both fraudulent and non-fraudulent promotions.

## VII.    Contrary to the claims of Dr. Hartman, I do not propose that every factor that influences prescribing behavior should be included in Dr. Rosenthal's model

21. Plaintiffs' experts have used my discussion of causality to suggest that I would require every possible variable to be included in Dr. Rosenthal's model.[28] They have misconstrued my criticism. Of course, there is no way to include every factor, and I have not suggested that it is necessary to do so.[29] As discussed above, the technique that yields an unbiased estimated coefficient when such factors, that are potentially related to both prescribing and promotions, cannot be included is instrumental variables.[30, 31] Dr. Rosenthal agrees with this conclusion.[32] However,

---

[26] Hartman Attachment B, ¶16.

[27] Wooldridge (2002), while discussing use of instrumental variables method, states that "…it can be very difficult to find a good instrumental variable for an endogenous explanatory variable because the variable must satisfy two different, often conflicting, criteria." (Wooldridge, J.M. (2002), Econometric Analysis of Cross Section and Panel Data, MIT Press, pp. 87-88.)

[28] Hartman Reply Declaration, Attachment B, ¶¶10-12.

[29] An example of a factor that cannot be included because it cannot be measured is the state of medical knowledge. (Hartman Reply Declaration, ¶10.)

[30] Scott Morton Declaration, ¶¶45-46.

[31] Dr. Hartman claims that I have mistakenly characterized omitted variables bias as an endogeneity problem (Hartman Reply Declaration, Attachment B, ¶¶13-16.) However, several econometrics textbooks and academic articles describe it as such. For example, Hamilton (1994) and Wooldridge (2002) define an endogenous variable to be one that is correlated with the regression error term, a phenomenon that can be caused by omitted variables. (Hamilton, J.D. (1994), Time Series Analysis, Princeton University Press; Wooldridge, J.M. (2002), Econometric Analysis of Cross Section and Panel Data, MIT Press.) Furthermore, Wooldridge argues that endogeneity generally arises due to omitted variables, measurement error or simultaneity. Moreover, Dr.

even though one cannot include every variable that affects prescriptions, a description of a proposed model typically has a discussion of what the theory predicts are the most important variables to include and why, a discussion of the previous literature and what variables were found to be important in prior work, and some indication of how the researcher plans to measure those variables. Such a description should also trace out the causal pathways in order to identify endogenous variables and potential instruments. None of this is present in Dr. Rosenthal's declaration.[33]

## VIII.  Conclusion

22. Based on the discussion above, I continue to believe that Dr. Rosenthal's proposed methodology will not produce reliable estimates of the effects of the allegedly fraudulent promotions. Nothing in the reply declarations of Drs. Hartman and Rosenthal has changed my opinion regarding the feasibility of Dr. Rosenthal's proposed analysis or the reasonableness of Dr. Rosenthal's assumptions.

I declare under penalty of perjury that this Declaration is true and correct.

---

Rosenthal herself agreed in her deposition that "endogeneity occurs when one or more of the independent variables is correlated with the error term." (Rosenthal Deposition, 10/24/06, p. 444.) Regardless of what language is used to describe the problem, and despite Dr. Hartman's claim to the contrary in paragraph ¶15 in Attachment B of his Reply, the academic literature agrees that instrumental variables is the appropriate remedy. For example, Angrist (1990), Angrist and Krueger (1991), Evans and Schwab (1995) and Hoxby (2000) use instrumental variables as a remedy to the omitted variable bias in the context of a self-selection problem. (Angrist, J.D. (1990), "Lifetime Earnings and the Vietnam Era Draft Lottery: Evidence from Social Security Administrative Records," *American Economic Review,* Vol. 80, No. 3, pp. 313-336; Angrist, J.D. and A.B. Krueger (1991), "Does Compulsory School Attendance Affect Schooling and Earnings?" *Quarterly Journal of Economics,* Vol. 106, No. 4, pp. 979-1014; Evans, W.N. and R.M. Schwab (1995), "Finishing High School and Starting College: Do Catholic Schools Make a Difference?" *Quarterly Journal of Economics,* Vol. 110, No. 4, pp. 941-974; Hoxby, C.M. (2000), "Does Competition Among Public Schools Benefit Students and Taxpayers?" *American Economic Review,* Vol. 90, No. 5, pp. 1209-1238.)
[32] Rosenthal Reply Declaration, ¶15.
[33] Dr. Rosenthal claims in her reply declaration that she has included in her original declaration a discussion of variables that prior research has found to be important factors. (Rosenthal Reply Declaration, ¶22.) I have reviewed Dr. Rosenthal's original declaration. Her literature review does not identify which factors were included as explanatory variables, and which of them were found to be important, in prior research of the effects of promotions on pharmaceutical sales. Her declarations also do not shed light on which factors would be expected to be important based on economic theory or how explanatory variables other than promotional spending that are included in her model would be measured. Finally, Dr. Rosenthal does not discuss causal pathways in her setting nor does she identify and describe any instruments needed to establish causality.

Fiona Scott Morton

Date

23 April 2007

**APPENDIX A**

# Fiona M. Scott Morton

**School of Management**
**Yale University**
**P.O. Box 208200**
**New Haven, CT 06520-8200**

**++1.203.432.5569 voice**
**++1.203.432.6974  fax**
**fiona.scottmorton@yale.edu**

## Employment:

| | |
|---|---|
| 2006 - present | Senior Associate Dean for Faculty Development, Yale School of Management |
| 2002 - present | Professor of Economics, Yale School of Management |
| 2005 - 2006 | Adam Smith Visiting Fellow in Economics, University of Edinburgh, Scotland |
| 2000 - 2002 | James L. Frank '32 Associate Professor of Private Enterprise and Management, Yale School of Management |
| 1999 - 2000 | Associate Professor of Economics and Strategy, Yale School of Management |
| 1997 - 1999 | Assistant Professor of Economics and Strategy Graduate School of Business, University of Chicago |
| 1994 - 1997 | Assistant Professor of Strategic Management Graduate School of Business, Stanford University |
| 1991 - 1992 | Instructor for Economics 10, Prof. Martin Feldstein, Harvard University |

## Education:

| | |
|---|---|
| 1994 | Massachusetts Institute of Technology, PhD. Economics |
| 1989 | Yale University, B.A. Economics, *magna cum laude* |

## Peer-reviewed Articles:

"Entry and Predation: British Shipping Cartels 1879-1929"
*Journal of Economics & Management Strategy*:6:4:679-724, 1997

"The Strategic Response by Pharmaceutical Firms to the Medicaid Most-Favored-Customer Rules"
*The RAND Journal of Economics*:28:2:269-290, 1997

"The Interaction Between a Most-Favored-Customer Clause and Price Dispersion: An Empirical Examination of the Medicaid Rebate Rules of 1990"
*Journal of Economics & Management Strategy*:6:1:151-174, 1997

"Misclassification of the Dependent Variable in a Discrete-Response Setting"
Joint with Jerry Hausman, MIT, and Jason Abrevaya, University of Chicago
*Journal of Econometrics*:87:2:239-269, 1998

"Social Status, Entry, and Predation: The Case of British Shipping Cartels 1879-1929"
Joint with Joel Podolny, Yale SOM
*The Journal of Industrial Economics*:47:1:41-67, 1999

"Barriers to Entry, Brand Advertising, and Generic Entry in the US Pharmaceutical Industry"
*International Journal of Industrial Organization*:18:7:1085-1104, 2000

"Entry Decisions in the Generic Pharmaceutical Industry"
*The RAND Journal of Economics*:30:3:421-440, 1999

"Love or Money? The Effects of Owner Motivation in the California Wine Industry"
Joint with Joel Podolny, Yale SOM
*The Journal of Industrial Economics*:50:4:431-456, 2002

# Fiona M. Scott Morton

"Horizontal Integration between Brand and Generic Firms in the Pharmaceutical Industry"
    *Journal of Economics & Management Strategy*:11:1:135-168, 2002
"Internet Car Retailing"
    Joint with Florian Zettelmeyer, UC Berkeley and Jorge Silva-Risso, UC Riverside
    *The Journal of Industrial Economics*:49:4, 2001
"The Strategic Positioning of Store Brands in Retailer-Manufacturer Negotiations"
    Joint with Florian Zettelmeyer, UC Berkeley
    *Review of Industrial Organization*:24:2:161-194, 2004
"Consumer Information and Discrimination: Does the Internet Affect the Pricing of New Cars to Women and Minorities?"
    Joint with Florian Zettelmeyer, UC Berkeley and Jorge Silva-Risso, UCLA
    *Quantitative Marketing and Economics*:1:1:65-92, 2003
"Behavioral Biases Meet the Market: the Case of Magazine Subscription Prices"
    Joint with Sharon Oster, Yale SOM
    *Berkeley Electronic Journals in Economic Analysis & Policy Advances*:5:1, 2005
"The Distortionary Effects of Government Procurement: Evidence from Medicaid Prescription Drug Purchasing"
    Joint with Mark Duggan, University of Maryland
    *Quarterly Journal of Economics*:121:1, 2006
"The Role of the Internet in Lowering Prices: Evidence from Matched Survey and Auto Transaction Data"
    Joint with Florian Zettelmeyer, UC Berkeley and Jorge Silva-Risso, UC Riverside
    *Journal of Marketing Research*, May 2006
"State Casket Sales Restrictions: a Pointless Undertaking?"
    Joint with Judy Chevalier, Yale SOM
    Forthcoming in *The Journal of Law and Economics*, February 2008

**Working Papers:**

"Cowboys or Cowards: Why are Internet Car Prices Lower?"
    Joint with Florian Zettelmeyer, UC Berkeley and Jorge Silva-Risso, UC Riverside
"A Test of Bargaining Theory in the Auto Retailing Industry"
    Joint with Florian Zettelmeyer, UC Berkeley and Jorge Silva-Risso, UC Riverside
"Scarcity Rents in Car Retailing"
    Joint with Florian Zettelmeyer, UC Berkeley and Jorge Silva-Risso, UC Riverside

**Research in Progress:**

"Technology Adoption and Organizational Change in the Retail Auto Industry"
    Joint with Florian Zettelmeyer, UC Berkeley and Jorge Silva-Risso, UC Riverside
"The Effect of the Medicare Drug Benefit on Pharmaceutical Prices"
    Joint with Mark Duggan, University of Maryland
"The Impact of Loss Aversion in Auto Transactions"
    Joint with Sharon Oster, Yale SOM
"The Reasons for Asset Reallocation: Efficiency or Agency?
    Joint with Gavin Kretzschmar, Univ of Edinburgh
"Dying for a Discount"
    Joint with Judy Chevalier, Yale SOM, and David Harrington, Kenyon College

# Fiona M. Scott Morton

**Other Publications:**

"Why Economics has been Fruitful for Strategy"
*Financial Times*, Mastering Strategy Series, 4 Oct 1999
"Strategic Complements and Substitutes"
*Financial Times*, Mastering Strategy Series, 8 Nov 1999
"The Problems of Price Controls"
*Regulation*:24:1, Spring 2001
"Consumer Benefit from Use of the Internet"
*NBER Innovation Policy and the Economy*:6, 2005

**Awards:**

| | |
|---|---|
| 2007 | Green Award, *Journal of Marketing Research*, for the paper "How the Internet Lowers Prices: Evidence from Matched Survey and Automobile Transaction Data" |
| 2005 - 2008 | National Science Foundation Research Grant 0518858 "The Effect of Government Procurement of Pharmaceuticals" Joint with Mark Duggan, University of Maryland |
| 2001 - 2003 | National Science Foundation Research Grant 0111885 "The Effect of Internet Car Shopping on Prices and Discrimination" Joint with Florian Zettelmeyer, UC Berkeley |
| 1998 - 2002 | National Science Foundation Research Grant 9810178 "Studies of Competition" |
| 1995 | Distinguished Teaching Commendation: One of three "second prizes" given by Stanford MBA students for excellence in teaching during the academic year 1994-1995 |
| 1993 - 1994 | Program on the Pharmaceutical Industry, MIT, grant for full tuition and stipend |

**Teaching:**

*Competitive Strategy*: Elective MBA course covering topics in I.O. such as price and quantity
competition, entry, and antitrust, as well as strategy concepts such as industry analysis,
competitive advantage, and sustainability
*E-commerce Strategy:* Elective MBA course applying microeconomic principles to understand the
sources of profit in information technology-based businesses

**PhD Students Supervised** (PhD institution, year; first placement):

Andrea Coscelli (Stanford GSB, 1998; University College London)
Brian Viard (University of Chicago GSB, 2000; Stanford GSB)
Paris Cleanthous (Yale, 2003; NYU Stern)
Juan Esteban Carranza (Yale, 2004; Wisconsin Madison)
Henry Schneider (Yale, 2006; Cornell Johnson School)

**Memberships and Professional Service:**

American Economics Association

# Fiona M. Scott Morton

NBER Research Associate, Industrial Organization
First Western Bancorp Inc. (now Sky Bank, Bowling Green, Ohio) Board of Directors (1998-1999)
StreamSage.com Advisory Board (2000-2004)
*Economic Policy* Panel (2002-2004)
*Review of Industrial Organization* Editorial Board (2002-2004)
*The Journal of Industrial Economics* Associate Editor (2003-2006)
*International Journal of Industrial Organization* Co-Editor (2005-present)
*BE Journal of Economics Analysis and Policy,* Editor (2006-present)
*Journal of Economic Perspectives*, Associate Editor (2007-)

**Invited Research Presentations Given at:**

Dartmouth Econ, MIT Econ, Harvard Econ. Harvard Business School, Yale Econ, Yale Law, Columbia Econ, Columbia Business School, NYU Stern, U. Penn Wharton School, Univ. of Maryland Econ, Federal Trade Commission, Univ. of Delaware Econ, Duke Econ, Univ. of Virginia Econ, Carnegie Mellon Heinz School, Northwestern Econ, Northwestern Kellogg GSM, Chicago Econ, Chicago GSB, Purdue Econ, Univ. of Michigan Business School, Washington Univ. St. Louis Olin School, Iowa State Econ, Univ. of Rochester Business School, Cornell Econ, Univ. of Texas at Austin, Univ. of Arizona, Stanford GSB, UC Berkeley Econ, UC Berkeley Haas School, UCLA Econ, Univ. of Toronto Econ (Canada), Univ. of British Columbia (Canada), Queens University (Canada), Univ. of Munich (Germany), Univ. of Linz (Austria), London School of Economics (England), Office of Fair Trading (England), Oxford University (England), Cambridge University (England), Edinburgh University (Scotland), Stirling University (Scotland), European University Institute (Italy), IDEI Toulouse (France)

**Conferences (Presenter or Discussant):**

Boston University healthcare I.O. conference: 1995, 1999, 2004
Stanford Strategy Conference: 1996, 1997 (organizer), 1999, 2000
Harvard Business School Strategy Conference: 1999, 2004
Economic Policy Conference: 2002 spring and fall, 2003 fall, 2004 fall
American Economics Assn. Meetings: 2001, 2002, 2004, 2005, 2007
IO NBER Summer Institute: 1998, 2001 (organizer and presenter), 2003
IO NBER Winter Meetings: 1995, 1996, 2000, 2004
NBER e-commerce group conferences: 2000, 2001
NBER conference on non-profits: 2002
NBER conference on IO of healthcare: 1998
NBER conference on innovation policy: 2005
IDEI (Toulouse) e-commerce conference: 2001, 2003 (co-author presented), 2005
Univ. of British Columbia IO conference: 2004
WZB Institute Behavioral IO conference, Berlin, Germany: 2005
CEPR Applied IO conference: 2006
UCL Behavioral IO conference, England: 2006
NBER conference on intellectual property: 2006

**Referee for:**

*Review of Economic Studies, Quarterly Journal of Economics, The RAND Journal of Economics, The Journal of Industrial Economics, Journal of Economics & Management Strategy, Journal of Health*

## Fiona M. Scott Morton

*Economics, Review of Industrial Organization, International Journal of Industrial Organization, American Economic Review,* National Science Foundation, *Journal of Law and Economics, Journal of Political Economy, Journal of Law, Economics, and Organization, Marketing Science, Management Science, Strategic Management Journal, Review of Economics and Statistics, Journal of Econometrics, European Economic Review, Berkeley Electronic Journals, The American Journal of Managed Care, Contemporary Economic Policy*

**Government Testimony:**

FTC hearings, "Possible Anticompetitive Efforts to Restrict Competition on the Internet," Auto Panel, October 2002
Senate Finance Committee Hearings, "Prescription Drug Pricing and Negotiation: An Overview and Economic Perspectives for the Medicare Prescription Drug Benefit" January 2007

**Media (major only):**

*New York Times,* April 24, 2003: G:8: col. 3
*Business Week,* May 13, 2002: 3782: p. 32
CNN TV News, January 2002
*New York Times,* December 6, 2001: C:2: col 1
*Wall Street Journal,* January 6, 1999: B1

**Personal:**

Date of Birth:  20 Feb 1967     Sex:  Female     Citizenship: USA
Marital status:   Married to Stephen R. Latham;  three children

Updated: 12-Jan-2007

5

**Appendix B**

## List of Additional Documents Considered
## By Fiona Scott Morton[1]

### Case Materials

Third Amended Class Action Complaint, In re: Neurontin Marketing, Sales Practices, and Products Liability Litigation, MDL Docket No. 1629, Master File No. 04-10981, 11/02/06.

Reply Memorandum of Law in Support of Plaintiffs' Motion for Class Certification. In re: Neurontin Marketing, Sales Practices, and Products Liability Litigation, MDL Docket No. 1629, Master File No. 04-10981, 2/22/07.

Reply Declaration of Professor Meredith Rosenthal, 2/21/07.

Reply Declaration of Raymond S. Hartman, 2/21/07.

Deposition of Meredith B. Rosenthal, 3/6/2007.

### Academic Articles

Angrist, J.D. (1990), "Lifetime Earnings and the Vietnam Era Draft Lottery: Evidence from Social Security Administrative Records," *American Economic Review*, Vol. 80, No. 3, pp. 313-336.

Angrist, J.D. and A.B. Krueger (1991), "Does Compulsory School Attendance Affect Schooling and Earnings?" *Quarterly Journal of Economics*, Vol. 106, No. 4, pp. 979-1014.

Borenstein, S. and N.L. Rose (1994), "Competition and Price Dispersion in the U.S. Airline Industry," *Journal of Political Economy*, Vol. 102, No. 4, pp. 653-683.

Markus, C., S. Gupta, J.C. Porter, R. Staelin, and D.R. Wittink (1997), "Using Market-Level Data to Understand Promotion Effects in a Nonlinear Model," *Journal of Marketing Research*, Vol. 34, No. 3, pp. 322-334.

Ellison, S.F. and W.P. Mullin, (2001) "Gradual Incorporation of Information: Pharmaceutical Stocks and the Evolution of President Clinton's Health Care Reform," *Journal of Law and Economics*, Vol. 44, pp. 89-129.

Ellison, S.F. and C. Wolfram (2006), "Coordinating on Lower Prices: Pharmaceutical Pricing under Political Pressure," *RAND Journal of Economics*, Vol. 37, No. 2, pp. 324-340.

---

[1] The documents listed herein are in addition to other documents that I previously considered in connection with my original declaration. For a list of those documents, see Exhibit B of Declaration of Professor Fiona Scott Morton, December 21, 2006, *In re: Neurontin Marketing, Sales Practices, and Products Liability Litigation*, MDL Docket No. 1629, Master File No. 04-10981.

Emons, W. (1997), "Credence Goods and Fraudulent Experts," *RAND Journal of Economics*, Vol. 28, No. 1, pp. 107-119.

Evans, W.M. and R.M. Schwab, (1995) "Finishing High School and Starting College: Do Catholic Schools Make a Difference?" *Quarterly Journal of Economics*, Vol. 110, No. 4, pp. 941-974.

Hartman, R.S. and M.J. Doane (1987), "The Use of Hedonic Analysis for Certification and Damage Calculations in Class Action Complaints," *Journal of Law, Economics and Organization*, Vol. 3, No. 2, pp. 351-372.

Hartman, R.S. (1987), "Product Quality and Market Efficiency: The Effect of Product Recalls on Resale Prices and Firm Valuation," *Review of Economics and Statistics*, Vol. 69, No. 2, pp. 367-372.

Hausman, J.A. (1983), "Simultaneous Equation Models,", in Z. Griliches and M. Intriligator, editors, *Handbook of Econometrics*, North Holland, Vol. 1, chapter 7, pp. 392-448.

Hickner, J. (2006), "A New Look at an Old Problem: Inappropriate Antibiotic Prescribing for Acute Respiratory Infections," *Annals of Family Medicine*, Vol. 4, No. 6, pp. 484-485.

Hoxby, C.M. (2000) "Does Competition among Public Schools Benefit Students and Taxpayers?" *American Economic Review*, Vol. 90, No. 5, pp. 1209-1238.

King III, C. (2002), "Marketing, Product Differentiation and Competition in the Market for Antiulcer Drugs," Harvard Business School Working Paper, Boston MA.

Manchanda, C. and P.K. Chintagunta, "Responsiveness of Physician Prescription Behavior to Salesforce Effort: An Individual Level Analysis," *Marketing Letters*, Vol. 15, No. 2-3, pp. 129-145.

McFadden, D. (2006), "Free Markets and Fettered Consumers," *American Economic Review*, Vol. 96, No. 1, pp. 5-29.

Radley, D.C., S.N. Finkelstein, R.S. Stafford, (2006) "Off-label Prescribing Among Office-Based Physicians," *Archives of Internal Medicine*, Vol. 166, pp. 1021-1026.

Rubinfeld, D.L. and P.O. Steiner (1983), "Quantitative Methods in Antitrust Litigation," *Law and Contemporary Problems*, No. 46, Vol. 4, pp. 69-141.

Scott Morton, F. (2000), "Barriers to Entry, Brand Advertising, and Generic Entry in the US Pharmaceutical Industry*," International Journal of Industrial Organization*, Vol. 18, No. 7, pp. 1085-1104.

Scott Morton, F. and M. Duggan (2006), "The Distortionary Effects of Government Procurement: Evidence from Medicaid Prescription Drug Purchasing," *Quarterly Journal of Economics*, Vol. 121, Vol. 1, pp. 1-30.

**Books**

Hamilton, J. (1994), <u>Time Series Analysis</u>, Princeton University Press.

Shadish, W.R., T.D. Cook, and D.T. Campbell (2002), <u>Experimental and Quasi-experimental Designs for Generalized Causal Inference</u>, Houghton Mifflin Company, chapter 5.

**Other**

American Epilepsy Society (2007), "Anti-epileptic Drug Information" (2007), available at <u>http://aesnet.org/Visitors/PatientsPractice/aed/index.cfm</u>

Anticonvulsants 2005, "Table of Contents" available at <u>http://www.bioportfolio.com/cgi-bin/acatalog/info_164.html</u>