# Exhibit B

## BIPOLAR AND OTHER MOOD DISORDERS

**THE STANDARD FALSE MESSAGE BY DEFENDANTS**

Following a May 1997 Advisory Board Meeting that recommended that Parke-Davis implement "educational tactics" to move Neurontin ahead of other anticonvulsants for treatment of bipolar disorder, Parke-Davis implemented a national marketing campaign intended to mislead psychiatrists that Neurontin was effective in treating bipolar and other mood disorders. This campaign was centered on the communication of specific false messages in presentations, journal articles, and "Dear Doctor" letters. As described below, each of these specific messages was false and/or misleading:

| STANDARD FALSE MESSAGES BY DEFENDANTS | |
|---|---|
| #1. | Neurontin is an effective treatment for bipolar and other mood disorders. |
| #2. | Neurontin is a mood stabilizer. |
| #3. | Existing medical evidence (which Defendants would purport to summarize in their presentation, articles or letters) supports the use of Neurontin for bipolar and mood disorders. |

**DISSEMINATION OF THE STANDARD FALSE MESSAGE**

Parke-Davis's marketing plan called for presentations containing the above false messages to be presented at such venues as American Psychiatric Association (APA) advisory boards, APA symposia, U.S. Psychiatric & Mental Health Congresses, Psychiatric Times Supplements, Psychiatric Times weekend conferences, dinner meetings, teleconferences, CME conferences, CME audiotapes, bipolar treatment guidelines, grand rounds programs, CBU advisory boards, and consultant meetings. The false messages were included in several journals and articles that were distributed to over 50,000 psychiatrists, on websites that received more than 750,000 hits a month and meetings and conferences that were attended by no less than 8,500

psychiatrists. Additionally, the false message delivered at each event or in each publication, either explicitly or implicitly, was that Neurontin was an effective treatment for bipolar disorder. Details of some presentations, publications and events are described below:

- A presentation entitled "New Options for Bipolar Disorder" given by Dr. Zajecka at the 1997 U. S. Psychiatric & Mental Health Congress on November 15, 1997. Dr. Zajecka used slides prepared by CME, Inc. which contained the Standard False Messages set forth above. This event was attended by numerous psychiatrists.

- As a companion to the 1997 U.S. Psychiatric & Mental Health Congress, Parke-Davis distributed a "journal supplement" in two journals: Psychiatric Times, which was delivered to 40,000 psychiatrists; and Clinical Neuroscience Times, which was delivered to 35,000 primary care and OB/GYNs, who were the highest writers of psychotropic prescriptions. The articles were prepared by CME, Inc. and contained the Standard False Messages set forth above. The "journal supplement" was also posted on CME, Inc.'s worldwide Mental Health InfoSource website that received 750,000 hits per month. Moreover, a one-hour audiocassette course based on the 1997 Congress symposium was produced and distributed to 20,000 key physicians.

- During March 1998 and April 1998, Defendant conducted a series of 50 dinner programs and 16 teleconferences entitled "Closing the Psychiatry-Neurology Divide: Emerging Uses of Anticonvulsants" in 41 cities, including Boston, Nashville, Seattle, St. Petersburg, Portland, Philadelphia (2), Atlanta, San Francisco (3), New York (2), Baltimore, Raleigh, Los Angeles (3), Cincinnati, Denver, Sacramento, Ann Arbor, Kansas City, San Diego, San Jose, Rochester, St. Louis, Phoenix, Newark/West Orange, Chicago (2), Houston (2), New Orleans (2), Cambridge, Minneapolis, Dallas, Miami, Detroit, Greensboro, Pittsburgh, Cleveland, Washington, D.C., Harford, Hackensack, Newton, Chicago/Evanston, Garden City, NY, and San Bernardino. At

2

each dinner meeting and teleconference, the same slides developed by MES were used containing the Standard False Messages set forth above.  A total of 350 psychiatrists participated in the events.

- In May 1998, Defendants distributed a teaching monograph in CNS Spectrums, a psychiatric journal with 50,000 monthly subscribers, in which Drs. Sussman and Asnis delivered the Standard False Messages set forth above.

- During July through October 1998, Defendant conducted 30 seminars entitled, "New Treatment Frontiers in Social Phobia and Bipolar Disorder" in 30 cities attended by 5,645 psychiatrists.  CME, Inc. prepared a workbook containing the Standard False Messages set forth above and provided it to every psychiatrist in attendance.

- In late 1998, Defendant circulated a psychiatry supplement in the Cleveland Clinic Journal of Medicine, with a circulation of 45,000 monthly subscribers, in which Dr. Sussman delivered the Standard False Messages set forth above.

- In 1999, Parke-Davis held 53 meetings for psychiatrists entitled "New Frontiers in Social Phobia and Bipolar Disorders-1999," which were held in 30 cities: Dallas, Houston, Denver, New Orleans, Kansas City, St. Louis, Miami, Washington, D.C., Atlanta, Tampa, Baltimore, Charlotte, Chicago, Cincinnati, Indianapolis, Cleveland, Minneapolis, Dearborn, Los Angeles, San Francisco, Seattle, Phoenix, Universal City, San Diego, New York, Pittsburgh, Newark Long Island, Philadelphia, and Boston.  The anticipated number of attendees was 6,225 physicians.  The slides were prepared by CME, Inc. and contained the Standard False Messages set forth above.

- In May through December 1999, Defendants held at least 45 meetings for psychiatrists entitled, "New Frontiers in Anxiety, Substance Abuse and Bipolar Disorders." These meetings

were attended by an estimated amount of 8,500 psychiatrists and 7,000 audiocassettes were distributed. The slides and cassettes were prepared by CME, Inc. and contained the Standard False Messages set forth above.

- Beginning in February 1999 and continuing through June 1999, Parke-Davis sponsored a dinner series program entitled "New Treatment Strategies in Psychiatry: Role of Anticonvulsants," consisting of 8 dinners organized in major cities within the north central region of the country. The program was run a second time. At each meeting Dr. Sussman and other physicians delivered the Standard False Messages set forth above.

- In late 1999, Leslie Magnus-Miller, an employee of the Defendants, authored a supplement which was distributed in *Epilepsia,* a journal with a monthly circulation of 15,000 monthly subscribers, in which Magnus-Miller delivered the Standard False Messages set forth above.

- In 2000, Parke-Davis held a series of programs for psychiatrists entitled "Anxiety & Bipolar Disorders: Challenges in Current Management," which were held in numerous cities. The slides for these events were prepared by CME, Inc. and contained the Standard False Messages set forth above.

- In October 2000, Pfizer held a marketing event in West Orange, NJ, where a Pfizer speaker delivered the Standard False Messages set forth above.

- Between December 4, 1998 and October 27, 1999, Parke-Davis delivered the Standard False Messages set forth above in a "Dear Doctor" letter to 5,593 physicians.

- Between September 1997 and February 1999, Parke-Davis's monthly Neurontin details (visits by a sales representative) of psychiatrists increased from less than 100 to more than 7,000. From the beginning of 1999 through 2001, Parke-Davis and Pfizer made a total of 166,198

4

Neurontin details on 21,315 psychiatrists.  At the time of the merger, 43% of all Neurontin

details were on psychiatrists.

- After Pfizer's merger with Parke-Davis, Pfizer's sales force continued to detail

psychiatrists, detailing more than 9,000 psychiatrists an estimated 25,000 times - of which more

than 9,487 were made after a Pfizer directive prohibiting such details had issued.

### RESULTS OF THE MISLEADING MARKETING CAMPAIGN

In 1995, there were no recorded prescriptions for Neurontin for any mood disorder.

Through the third quarter of 1997, only 1.6% of all Neurontin prescriptions could be attributed to

any type of mood disorder.

From the date of the 1997 Advisory Board to the end of the first quarter 1998, Neurontin

prescriptions for bipolar and other mood disorders increased 1,000%.   By the end of the first

quarter of 1998, Neurontin use for bipolar and other mood disorders had bumped up to 13% of

all Neurontin prescriptions, up from the approximately 1.6% experienced during its first 3 years

on the market.

As shown on the chart below, from September 1997 to September 1999, Neurontin's use

in bipolar disorder and other mood disorders increased 1700%:



Starting in September 1999, psychiatrists prescribed more Neurontin prescriptions than did any other specialty. From 1997 through 2004, more than 12,000 psychiatrists wrote an estimated 6.2 million Neurontin prescriptions with an aggregate cost of $780,000,000. The above marketing messages were received by virtually all of these psychiatrists.

**EVIDENCE THAT THE MARKETING CAMPAIGN WAS FALSE AND MISLEADING**

When Parke-Davis conducted its Marketing Assessment for Bipolar Disorder in 1995, the authors of the study admitted there was "no scientific rationale" for Neurontin's use for bipolar and other psychiatric disorders. Commencing in 1997, Defendants learned of at least three clinical trials that scientifically established that Neurontin was not an effective treatment for

bipolar and other mood disorders.[1]

Thus, Defendants knew when they made the presentations and distributed their publications that Standard Messages #1 and #2 were false; they knew the scientific evidence uniformly established that Neurontin was ineffective for the treatment of bipolar and mood disorders. Further, in their presentations and articles, which Defendants have admitted were required to be fair and balanced, they deliberately failed to mention these clinical trials when they described the current medical evidence that "supported" the use of Neurontin for these uses, instead describing only favorable anecdotal reports and non-scientific studies (Standard False Message #3). Defendants routinely denied that any clinical trial evidence existed, even though they had been aware of the negative trials since 1997.

## CLASS PLAINTIFFS' EVIDENCE OF CAUSATION OF DAMAGE

Class Plaintiffs will present expert psychiatric testimony that Neurontin is not an effective treatment for bipolar disorder or other mood disorders or an effective mood stabilizer; that any article or presentation on the use of Neurontin for those conditions subsequent to May 1997 which failed to include information regarding Neurontin's failed clinical trials would be misleading and deceptive, and the information regarding those clinical trials was so material regarding Neurontin's efficacy for bipolar and other mood disorders that no reasonable psychiatrist who had been informed of such trials would conclude that Neurontin was an effective treatment for the condition.

---

[1]     These trials were:

- A clinical trial conducted by Frye, et al. in 1997, concluding that Neurontin was no more efficacious than placebo;
- A trial conducted by Pande, et al. in 1997, concluding that Neurontin was less effective than placebo; and
- A trial conducted by Guille, et al., the results of which were available in 1999, concluding that Neurontin was no more effective than placebo.

Based on this testimony, the Class Plaintiffs anticipate that their expert healthcare econometricians will testify that the increased prescription of Neurontin for bipolar and other mood disorders after the third quarter of 1997 was due to the Defendants' false and misleading marketing campaigns.

## NEUROPATHIC PAIN

Neuropathic pain is a series of pain syndromes with diverse causes including diabetic peripheral neuropathy (DPN), trigeminal neuralgia, postherpetic neuralgia (PHN), neuropathic facial pain, reflex sympathetic dystrophy (RSD) and others.   Most neuropathic pain syndromes are chronic[1] in nature, meaning that longer term treatments are required.  Thus, neuropathic pain represents a lucrative financial market.  However, the FDA has refused to recognize neuropathic pain as a single treatable indication, but instead considers each subsidiary pain syndrome to constitute a separate indication.  Consequently, it requires proof of efficacy for each of the neuropathic pain syndromes in order to approve a drug's use for each condition.

## THE STANDARD FALSE MESSAGES BY DEFENDANTS

By 2001, Defendants had only been able to demonstrate that Neurontin was effective for one narrow type of neuropathic pain—PHN.  However, for all other neuropathic pain types, Defendants were unable to obtain replicated evidence of Neurontin's efficacy; for certain indications, the trials were in fact negative.  Notwithstanding the negative or inconclusive evidence, Parke-Davis, and subsequently Pfizer, decided to implement a deceptive marketing campaign that falsely claimed that Neurontin was effective for all neuropathic pain conditions, and selectively disseminated positive trials for isolated indications, while suppressing or omitting the negative evidence in those same or other areas.  These campaigns were centered on the communication of the following false messages in presentations, journal articles and supplements, and "Dear Doctor" letters made to thousands of physicians:

---

[1] While not identical concepts—i.e. not all neuropathic pain is chronic and not all chronic pain is neuropathic—Defendants and some physicians often used the terms interchangeably.  Accordingly, "neuropathic" and "chronic" should be construed as having the same meaning herein.

| **STANDARD FALSE MESSAGE BY DEFENDANTS** | |
|---|---|
| #1. | Neurontin has proven efficacy in treating neuropathic pain, regardless of etiology.[2] |
| #2. | Neurontin should be used as first line therapy for all types of neuropathic pain. |
| #3. | Existing medical evidence (which Defendants would purport to summarize in their presentation, articles or letters) supports the use of Neurontin to treat all types of neuropathic and/or chronic pain. |
| #4. | Neurontin has been proven effective in treating diabetic peripheral neuropathy. |

For the reason described below, each of these messages was false and/or misleading.

**DISSEMINATION OF THE STANDARD FALSE MESSAGES**

  Defendants' marketing plans called for a "media blitz" that would widely disseminate the Standard Messages about Neurontin's use for "chronic pain" among tens of thousands of physicians and millions of consumers.  In addition to hosting hundreds of presentations which exposed thousands of doctors to these false messages, and distributing hundreds of thousands of copies of the articles that reported favorable clinical trials, the "media blitz" also included distribution of hundreds of slide kits, a teleconference series to increase the use of Neurontin for neuropathic pain, a hundred dinner meetings to discuss "New Advances in Pain Management," 150 Grand Rounds sponsored by Defendants, half-day seminars designed to "increase the use of Neurontin for Pain," a press kit on the subject of chronic Neuropathic pain to be distributed to the consumer press, a satellite media tour entitled "Medical Breakthrough in Chronic Pain Management," a video news release also entitled "Medical Breakthrough in Chronic Pain Management,"  a national broadcast initiative designed to secure television coverage on the national  morning news shows; production of faux news segments to be broadcast on commercial radio stations (which were heard by 17 million listeners); a print media initiative designed to

---

[2] Etiology means: "cause, origin; specifically: the cause of a disease or abnormal condition." Merriam-Webster Online Dictionary (May 23, 2007), *available at* http://www.m-w.com/dictionary/etiology.

place stories about Neurontin's treatment of "severe pain" in newspapers in the top 25 major markets and national news weeklies; and creation of web sites and the flooding of internet bulletin boards and chat rooms.  In addition to these extraordinary media tactics, Defendants also made dozens of presentations at pain conferences and distributed thousands of copies of favorable articles containing the messages.  A description of some of the presentations and articles containing the Standard False Messages on Neuropathic Pain are set forth below:

- A 24-page CME "supplement" in the journal Internal Medicine mailed to 56,000 physicians.

- A CME Case Study Series on DPN, prepared by Cline Davis & Mann ("Cline Davis") and Medical Education Resources, Inc. ("MER"), distributed to 350 physicians.

- At the APS Annual Meeting in New Orleans, LA in October 1997, and again at the APS Annual Meeting held in San Diego in November 1998, Parke-Davis gave numerous poster presentations which made misleading representations about Neurontin's efficacy for treating neuropathic pain and DPN and about the existing medical evidence supporting those conclusions, while omitting the results of the Gorson study.  These meetings were attended by hundreds of physicians, mostly pain specialists.

- Content relating to neuropathic pain, posted on www.pain.com, a website hosted by Dannemiller, a medical marketing firm retained by defendants.

- A Neurontin neuropathic pain CME program entitled "The Pharmacologic Management of Neuropathic Pain" held in March 1998 in Scottsdale, AZ at the Annual Meeting of the Society of Pain Practice Management, attended by more than 400 pain specialists.

- "Progress in Anesthesiology," a publication that that was distributed to pain specialists and which was posted on the www.pain.com website.

3

- In the December 1998 issue of JAMA, a journal with a circulation of more than 325,000 physicians, Parke-Davis published two articles on Neurontin, one for PHN and the other for DPN, both of which contained the above misrepresentations. The DPN article, published by Backonja, stated that Neurontin has been "reported anecdotally and in open-label case series to be effective in treating pain syndromes, including painful diabetic neuropathy" but omitted reference to the Gorson study which had concluded that Neurontin was ineffective. The Backonja article also finished with the conclusion that Neurontin "offers advantages [in treating neuropathic pain]…as a first line agent." The Rowbotham article made the same misrepresentations, stating that Neurontin "has been reported anecdotally to relieve pain in patients with intractable neuropathic pain," while failing to mention the Gorson study. The article makes the same conclusion as well, that Neurontin "can be added to the list of first-line medications for treatment of chronic neuropathic pain syndromes such as PHN."

- In connection with the publication of the two JAMA articles, Parke-Davis launched an unprecedented media blitz this media blitz to "Establish Neurontin as the treatment of choice for post-herpetic neuralgia and diabetic neuropathy," "generate interest in and coverage of gabapentin's efficacy in chronic pain management," and "Saturate trade and consumer media with a variety of telecommunications vehicles." The target of this media blitz was the entire medical community, including PCPs, Neurologists, Anesthesiologists, Nurse Practitioners, Pharmacists, Patients, Caregivers, Family, and the "Consumer and Trade Media." This media blitz included the following activities:

  o The distribution of 300,000 copies of the JAMA articles to neurologists, primary care physicians, pain specialists and diabetes specialists through various channels including direct mail.
  o The distribution of 500 slide kits to be used by speakers at marketing events.

o  A Neuropathic Pain CME Teleconference Series held in November and December 1998 targeting neurologists, PCPs, pain specialists, anesthesiologists, orthopedic surgeons, and diabetes specialists "to increase use of Neurontin for pain" and "increase use of Neurontin in diabetic pain patients."

o  10 Neuropathic Pain Advisory Boards, where the two JAMA articles and slide kits were presented.

o  100 CME Dinner Meeting Series held in the first quarter of 1999 entitled "New advances in pain management," where the two JAMA articles and slide kits were presented.  The purpose of these dinner meetings, which were targeted to neurologists, PCPs, pain specialists, anesthesiologists, orthopedic surgeons, and diabetes specialists, was "to increase use of Neurontin for pain" and "increase use of Neurontin in diabetic pain patients."   The cost of faculty "training" and slide development for the dinner meetings alone was $60,000.

o  150 CME Grand Rounds conducted in early 1999, targeting neurologists, PCPs, pain specialists, anesthesiologists, orthopedic surgeons, and diabetes specialists "to increase use of Neurontin for pain" and "increase use of Neurontin in diabetic pain patients."

o  25 half-day seminars, targeting neurologists, PCPs, pain specialists, anesthesiologists, orthopedic surgeons, and diabetes specialists "to increase use of Neurontin for pain" and "increase use of Neurontin in diabetic pain patients."

o  A press kit on the subject of chronic neuropathic pain and available treatments for members of the consumer press. The press kit consisted of press releases on third party letterhead (TBD), which emphasized the "pitch"—the sales message—of "the clinical utility of gabapentin in a host of chronic pain states."  The press releases included: "Breakthrough in Chronic Pain Management" appearing on Dannemiller letterhead, as well as "Diabetic Neuropathy" appearing on a university's letterhead. Defendants also sought to obtain "widespread coverage" from the following trade journals: "Contemporary Dialysis & Nephrology News & Issues," "Internal Medicine News," "Internal Medical World Report," "Infectious Disease News," "Journal of Infectious Disease," "Modern Medicine," "Medical Tribune," "Neurology," "Journal of Geriatric Psychiatry & Neurology," "APS Bulletin," "Pain Forum," "Anesthesiology News," "Dermatology World," "Dermatology Times," "Family Practice News," "American Family Physician," "American Nurse," "The Nurse Practitioner," "Pharmacy Times," and "Drug Topics."

o  A "Satellite Media Tour" entitled "Medical Breakthrough in Chronic Pain Management," which targeted morning and noon-time health segments."  The media tour featured Drs. Rowbotham, Beydoun, and Backonja discussed "gabapentin performing exceptionally well in the treatment of…neuropathic pain."

o  A "Video News Release (VNR)" entitled "Medical Breakthrough in Chronic Pain Management," which contained similar presentations by Drs. Rowbotham and Beydoun.  Defendants also created and distributed an "In-Flight VNR" shown

aboard every United, Northwest, TWA, and America West throughout the month of December in order "To extend the reach of the VNR and to secure viewership by a 'captive' audience."

o    An aggressive national broadcast media initiative to secure television coverage of the JAMA publications. Network morning shows ("Today," "Good Morning America"), evening news programs ("The CBS Evening News With Dan Rather"), and network news magazines ("Dateline NBC," "20/20") were targeted for interviews with Defendants' "key spokespeople" on the use of Neurontin for neuropathic pain. The TV blitz resulted in 40 million "impressions."

o    Flooding the radio waves with a tour of Drs. Rowbotham, Beydoun, and Backonja an additional 10-15 "key P-D markets" via radio as well as a press release which was distributed to 300 radio stations around the country and had the potential to generate "more than 7 million listener impressions." Parke-Davis also produced a faux "news segment" to ran on a nationally syndicated health program, Radio Health Journal, which was aired on an average of 270 stations each week and had a reach that covered more than 80% of the United States, including all top 25 markets and 45 of the top 50. The segment discussed "neuropathic pain and the role of gabapentin in its treatment." This radio blitz resulted in 17 million "impressions."

o    An aggressive print media initiative placing stories in consumer daily newspapers in the top 25 media markets (e.g.; New York Times, Chicago Tribune, Los Angeles, Houston, and Boston), national news weeklies such as Time, Newsweek, Business Week, and U.S. News and World Report, and health and fitness magazines with national circulation (e.g., Self, Prevention). Parke-Davis also developed a "wire story" which could be distributed to "10,000 newspapers nationwide" with quotes from Drs. Rowbotham and Beydoun "on the importance of gabapentin in treating the severe pain associated with these conditions." This print media blitz resulted in 71 million "impressions."

o    The retention of Cline Davis & Mann to conduct a "20-City Local Market Publicity Tour" to "explain how gabapentin can effectively treat… diabetic neuropathy, through a series of local television and print interviews."

o    The creation of online "Ask the Experts" postings on numerous internet websites where Neurontin was pitched as the "treatment of choice for neuropathic pain - specifically…diabetic neuropathy." These websites included: Diabetes Research Institute Foundation, American Academy of Pain Management (AAPM), American Pain Society (APS), American Chronic Pain Society, International Association for the Study of Pain, and Dannemiller Memorial Education Foundation (www.pain.com).

o    Flooding internet chat rooms, bulletin boards, and news groups (e.g. alt.support.chronic-pain) with surrogates who posted "pointed questions and comments about the use of gabapentin for the treatment of neuropathic pain." Parke-Davis also resorted to spamming physicians through the use of a "blast e-mail" promoting the two JAMA studies.

6

- o Parke-Davis also targeted consumers directly with "data to inform consumers about the use of Neurontin as an appropriate treatment for pain."
- o In February through August 1999, Parke-Davis placed display booths at meetings of the American Academy of Pain Medicine, American Medical Directors Association, the American Diabetes Association, World Congress on Pain and American Association of Diabetes RN Educators.

- At a meeting entitled "Advances in Epilepsy and AEDs" held in June 1999 in Lake Geneva, WI, Backonja and other presenters stated that there were only two clinical trials relating to Neurontin and neuropathic pain, and that Neurontin's efficacy in diabetic peripheral neuropathy and mixed neuropathic pains had been "demonstrated in double-blind studies." The negative Gorson and Reckless studies were omitted from all presentations.

- In 1999, Parke-Davis held a series of meetings entitled "New Pharmacologic Options for the Management of Neuropathic Pain." A printed monograph authored by Beydoun as well as an audiocassette stated that "Based on the results of [clinical] trials…gabapentin [is] first-line therapy for the treatment of painful peripheral neuropathies," but omitted any reference to the Gorson and Reckless studies. The monograph also refers to Neurontin's "efficacy" in the treatment of neuropathic pain and lists the drugs a "first-line" therapy for peripheral neuropathic pain.

- In June 1999, at a conference on neuropathic pain held in Washington, DC, Marco Papagallo stated that Neurontin's "efficacy for neuropathic pain has been established."

- At advisory board meetings held by CoMed on in Aspen, CO in March 2000 and Napa Valley, CA in April 2000, attendees were told that Neurontin should be used as a "first line treatment" for neuropathic pain.

- In the first half of 2000, Intramed managed "an extraordinary schedule of pain programs," with 34 CME meetings held in 35 cities, including Detroit, Phoenix, La Jolla, CA, Indianapolis, Orlando, Las Vegas, Houston, Washington, Kansas City, Miami, Memphis, Fresno,

Norfolk, VA, Nashville, Los Angeles, Greenville, SC, Spokane, Fort Lauderdale, New Orleans, Cleveland, Minneapolis, San Antonio, San Francisco, Chicago, Denver, Dallas, Baltimore, Omaha, Palo Alto, Albuquerque, Oklahoma City, Atlanta, Louisville, Palm Beach, and Richmond, VA.  The speakers at these meetings included Beydoun, Bergey, McLean, Freeman and Nicholson.

- In early 2000, Parke-Davis conducted 75 half-day CME pain meetings through Dannemiller entitled "New Treatment Options in Management of Pain: The Role of Anticonvulsants," which were attended by 7,500 physicians from dozens of cities around the country.

- Parke-Davis also conducted 125 CME dinner series entitled "Re-evaluating Neuropathic Pain Treatment Algorithms," which were attended by 3,750 physicians.

- Parke-Davis conducted a series 75 grand rounds entitled "Applications of Anticonvulsants in Neurologic Conditions."

- Parke-Davis also conducted 37 CME dinner series through Joslin Diabetes Center entitled "Diabetic Neuropathies and Microvascular Complications," which were attended by more than 6,600 physicians.

- Parke-Davis also conducted 16 half-day CME meetings entitled "Practical Approaches to the Treatment of Chronic Neuropathic Pain," held in 12 cities, including Boston, New York, Philadelphia, Washington, Atlanta, Miami, Chicago, Dallas, Houston, Phoenix, San Francisco, and Los Angeles.  The speakers included Nicholson, Stacey, and Edgar Ross.

- In March 2000 and June 2000, Dannemiller mailed "Progress in Neurology" supplements relating to "Entrapment of Entrapment Neuropathies of Upper Extremities," and "Entrapment of Entrapment Neuropathies of Lower Extremities," to all neurologists in the United States.

- In June 2000, October 2000 and December 2000, Parke-Davis mailed "Progress in Pain Management" supplements relating to "Diagnosis and Treatment of Peripheral Neuropathies," "Chronic Neck and Back Pain," and "Diabetic Neuropathy," to 50,000 primary care physicians.

- In June 2000, August 2000, and September 2000, Parke-Davis mailed a newsletter "Literature and Case Study Review" to 27,000 primary care physicians.

- In 2001, Pfizer held a series of meetings entitled "New Directions in the Understanding & Treatment of Chronic Pain." During those meetings, presentations were made which stated Neurontin to be effective for neuropathic pain and speakers reviewed published clinical trials on Neurontin but omitted reference to the negative Gorson, Reckless or POPP studies.

- In fall 2002, Pfizer published the Serpell study in the Pain Journal, which had a circulation of 7,660. The article contained the key promotional message "To reinforce the broader efficacy message of gabapentin in treating a broad range of neuropathic pain symptoms irrespective of the particular pain syndrome or its cause."

- In October 2002, Pfizer published an article in the Pain Journal, which has a circulation of more than 7,000 primarily pain specialists, which repeated the same false statements. It referred to "evidence from large randomized trials in two types of neuropathic pain [DPN and PHN]" but omitted any reference to the negative trials of Gorson and Reckless." It stated further that: "Case reports, pilot studies, and retrospective reviews also suggest efficacy gabapentin in a variety of neuropathic pain syndromes…," avoiding any reference to the negative Gorson, Reckless and POPP studies.

- In March 2003, hundreds of attendees of APS annual meeting held in Chicago, IL were shown several posters, "Halwagy, et al., Gabapentin Improves Neuropathic Pain in Patients Refractory to Prior Treatment With Combined Antiepileptic and Tricyclic Antidepressants";

9

which contained the Standard Message that Neurontin had "demonstrated efficacy in neuropathic pain syndromes" and that the efficacy was "irrespective of etiology." The Standard Messages were then repeated in an article that was published in the October 2004 issue of P&T, a journal with a circulation of approximately 50,000 that serves members of the pharmacy and therapeutics committees of hospitals and managed care organizations as well as state and federal formulary decision makers.

- From December 1998 through the present, Defendants mailed several versions of a "Dear Doctor" letter on "various pain conditions" to 7,891 physicians that falsely stated that "available data from other studies… suggests that gabapentin should be considered in the treatment of neuropathic pain as first-line agents [sic]," while omitting any reference to the failed Scandinavian POPP study or to the failed studies of Gorson, Reckless, and Tai.

- It is estimated that Pfizer detailed more than 1 million physicians between 2000 and 2004. Even as late as 2004, Pfizer was using sales messages that the FDA had found to be false and misleading. A sales script produced for 2004 called for sales reps to conclude their sales pitches by stating that Neurontin had "proven efficacy in the management of neuropathic pain of PHN" and that Neurontin "effectively relieves the neuropathic pain of PHN."

**RESULTS OF THE MISLEADING MARKETING CAMPAIGN**

The impact of Defendants' false marketing of neuropathic pain so saturated the medical community that in August 2001 (well before the FDA's approval of an indication for PHN), nearly 50% of physicians believed that Neurontin was FDA-approved for all types of neuropathic pain. The following chart shows the dramatic increase in neuropathic pain prescriptions, even before the FDA approval for PHN:



** Figures reflect an estimate based on only 6 months of available data.

**EVIDENCE THAT MARKETING CAMPAIGN WAS FALSE AND MISLEADING**

On August 6, 2001, Pfizer applied to the FDA for a labeling change for Neurontin that would state that the drug was effective for the management of neuropathic pain.  Pfizer subsequently learned that FDA would likely reject the application because Neurontin's efficacy for neuropathic pain syndromes beyond PHN had not been demonstrated.  This was not a surprise to Pfizer, as its own internal experts had arrived at the same conclusion.   In fact, Pfizer and its internal experts were aware of a litany of clinical trials (more than what was submitted to the FDA) which failed to show that Neurontin was effective to treat various forms of neuropathic pain, including the following:

- A trial conducted by Gorson in 1996, concluding that Neurontin was not significantly more effective than placebo for diabetic peripheral neuropathy;

11

- A trial conducted by Reckless et al. in 1998, concluding that Neurontin was not significantly more effective than placebo for diabetic peripheral neuropathy;

- A trial published by Morello in 1999, which failed to show that Neurontin was more effective than amitriptyline for the treatment of diabetic peripheral neuropathy;

- A trial conducted by Serpell et al. in 2000, which showed that Neurontin was not significantly more effective than placebo for neuropathic pain of varying etiology outside of PHN;

- A trial conducted by Pfizer in Scandinavia in 2001, concluding that Neurontin was not significantly more effective than placebo for post-operative and posttraumatic neuropathic pain; and

- A trial published in 2002 by Tai, which showed that Neurontin was not significantly effective in treating neuropathic pain following a spinal cord injury.

To avoid going before the FDA Advisory Committee and risking a public rejection of the neuropathic pain application (which would undermine the key marketing message that Neurontin was effective for neuropathic pain), Pfizer amended its application to include only PHN data. This decision was based on Pfizer's own understanding that Neurontin was not effective for all neuropathic pain syndromes regardless of etiology; consequently, it knew that Message #1 was false.  It also knew that it was not a first line treatment for neuropathic pain (Message #2), but a treatment of last resort because it only worked for PHN and its efficacy for DPN, despite numerous attempts, had never been replicated in a confirming clinical trial.  In its articles and presentations, where Pfizer's employees have admitted that the company had a duty to present all relevant evidence in a fair and balanced manner, it only presented the favorable clinical trials and it suppressed the numerous negative clinical trials that would have demonstrated that Neurontin

12

was not effective for all neuropathic pain syndromes (Message #3), including DPN (Message #4). Pfizer intentionally concealed the mountain of negative clinical trial evidence from the many thousands of physicians who were exposed to the Standard Messages set forth above.

**CLASS PLAINTIFFS' EVIDENCE OF CAUSATION OF DAMAGE**

The Class Plaintiffs anticipate that they will present expert medical testimony that Neurontin is not an effective treatment for all types of neuropathic pain, that it should not be used first line due to its cost and unproven efficacy, and that there is significant evidence suggesting that Neurontin is ineffective for treating DPN. Expert testimony will demonstrate that any article or presentation on the use of Neurontin for neuropathic pain which failed to include information regarding Neurontin's failed clinical trials would be misleading and deceptive, and the information regarding those clinical trials was so material regarding Neurontin's efficacy for neuropathic pain that no reasonable physician who had been informed of such trials would conclude that Neurontin was an effective treatment of neuropathic pain other than PHN, or that it should be used first line for conditions other than PHN.

Based on this testimony, the Class Plaintiffs anticipate that their expert healthcare econometricians will testify that the increased prescription of Neurontin for neuropathic pain outside of PHN after 1997 was due to the Defendants' false and misleading marketing campaigns, and that the class plaintiffs were damaged by paying for these excess prescriptions.