UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

------------------------------------------------------------------------x
                                             :

In re:  NEURONTIN MARKETING, SALES     :
         PRACTICES AND PRODUCTS     :
         LIABILITY LITIGATION        :    MDL Docket No. 1629
------------------------------------------------------------------------x
                                             :    Master File No. 04-10981

THIS DOCUMENT RELATES TO:        :
                                             :    Judge Patti B. Saris

MARTHA ACCETTULLO et al. v. PFIZER INC. et al.,  :
06-10912-PBS                          :    Magistrate Judge Leo T. Sorkin
                                             :

VIRGIL L. ANDERSON et al. v. PFIZER INC et al.,  :
06-11024-PBS                          :
                                             :

KAMALIHA Y. BREWSTER et al. v. PFIZER INC. et al., :
06-11022-PBS                          :
                                             :

CHARLES D. GIRARD, Sr. et al v. PFIZER, INC. et al., :
06-11023-PBS                          :
------------------------------------------------------------------------x

## PLAINTIFF'S SECOND AMENDED COMPLAINT

Plaintiffs, by attorneys, Law Offices of Newton B. Schwartz, Sr., Jack W. Harang and

Sacks & Weston as and for the Verified Complaint herein alleges upon information and belief

the following:

## STATEMENT OF THE CASE

1.     This is an action to recover damages for personal injuries and/or death sustained by

the Plaintiffs, MARTHA ACCETTULLO, et al, as the direct and proximate result of Defendants'

wrongful conduct in connection with the designing, developing, manufacturing, distributing,

labeling, advertising, marketing, promoting and selling of the prescription drug Neurontin,

especially for such "off-label" uses as the treatment of peripheral neuropathy, diabetic

neuropathy, trigeminal neuralgia, attention deficit disorder (ADD), periodic limb movement

disorder, post-herpetic neuralgia, painful diabetic neuralgia, anxiety disorder, social phobias, bipolar disorder, alcohol withdrawal syndrome, amyotrophic lateral sclerosis (ALS), spinal cord injury, essential tremor, restless leg syndrome, reflex sympathetic dystrophy (RSD), and migraine headaches, among other "off-label" uses, herein after the "17 conditions", a purpose for which Neurontin had not received FDA approval, and at dosages higher than had been approved by the FDA and had been properly tested on humans, even though the drug had not been tested and studied for that purpose and had not been found to be safe and effective at any dosage for the treatment of above "off-label" uses.

## PARTIES AND JURISDICTION

2.      Jurisdiction exists as against the Defendants, PFIZER INC., PARKE-DAVIS, a division of Warner-Lambert Company and Warner-Lambert Company LLC (hereinafter "PARKE-DAVIS"), WARNER-LAMBERT COMPANY and WARNER-LAMBERT COMPANY LLC, pursuant to:

a.  28 U.S.C. Section 1332, in that the Plaintiffs, MARTHA ACCETTULLO, et al are citizens and residents of the States shown on Ex. A, the Defendant, PFIZER INC., is incorporated in business in the State of Delaware and maintains its principal place of business in the State of New York, the Defendant, PARKE-DAVIS, is incorporated in the State of Michigan, and maintains its principal place of business in the State of New Jersey, the Defendant, WARNER-LAMBERT COMPANY, is incorporated in the State of Delaware and maintains its principal place of business in the State of New Jersey, the Defendant, WARNER-LAMBERT COMPANY LLC, is a limited liability company organized under the laws of the State of Delaware, whose sole shareholder and member is

the Defendant, PFIZER INC., and the amount in controversy exceeds the sum of $75,000.00 exclusive of interest and costs.

b.   28 U.S.C. Section 1391(a) et seq., in that jurisdiction is founded only on diversity of citizenship, and a substantial part of the events or omissions giving rise to these claims occurred in the Judicial Districts in the states as alleged herein after.

3.     That at all times hereinafter mentioned, upon information and belief, the Defendant, PFIZER, INC., was and still is a foreign corporation organized under the laws of the Sate of Delaware.

4.     That at all times hereinafter mentioned, upon information and belief, the Defendant, PFIZER INC., was and still is a foreign corporation authorized to do business in the State of New York.

5.     That at all times hereinafter mentioned, upon information and belief, the Defendant, PFIZER INC., was and still is a business entity actually doing business in the State of New York.

6.     That at all times hereinafter mentioned, upon information and belief, the Defendant, PARKE-DAVIS, a division of Warner-Lambert Company and Warner-Lambert Company LLC (hereinafter "PARKE-DAVIS"), was and still is a foreign corporation organized under the laws of the State of Michigan.

7.     That at all times hereinafter mentioned, upon information and belief, the Defendant, PARKE-DAVIS, was and still is a foreign corporation authorized to do business in the State of New York.

8.     That at all times hereinafter mentioned, upon information and belief, the Defendant, PARKE-DAVIS, was and still is a business entity actually doing business in the State of New York.

9.     That at all times hereinafter mentioned, upon information and belief, the Defendant, WARNER-LAMBERT COMPANY was and still is a foreign corporation organized under the laws of the State of Delaware.

10.     That at all times hereinafter mentioned, upon information and belief, the Defendant, WARNER-LAMBERT COMPANY, was and still is a foreign corporation authorized to do business in the State of New York.

11.     That at all times hereinafter mentioned, upon information and belief, the Defendant, WARNER-LAMBERT COMPANY, was and still is a business entity actually doing business in the State of New York.

12.     That at all times hereinafter mentioned, upon information and belief, the Defendant, PARKE-DAVIS, is a division of the Defendant, WARNER-LAMBERT COMPANY.

13.     That at all times hereinafter mentioned, upon information and belief, the Defendant, PARKE-DAVIS, is a subsidiary of the Defendant, WARNER-LAMBERT COMPANY.

14.     That at all times hereinafter mentioned, upon information and belief, the Defendant, WARNER-LAMBERT COMPANY LLC, was and still is a foreign limited liability company organized under the laws of the State of Delaware.

15.     That at all times hereinafter mentioned, upon information and belief, the Defendant, WARNER-LAMBERT COMPANY LLC, was and still is a foreign limited liability company authorized to do business in the State of New York.

16.     That at all times hereinafter mentioned, upon information and belief, the Defendant, WARNER-LAMBERT COMPANY LLC, was and still is a business entity actually doing business in the State of New York.

17.    That at all times hereinafter mentioned, upon information and belief, the Defendant, PFIZER INC., is the sole shareholder and member of the Defendant, WARNER-LAMBERT COMPANY LLC.

18.    That at all times hereinafter mentioned, upon information and belief, the Defendant, PARKE-DAVIS, is a division of the Defendant, WARNER-LAMBERT COMPANY LLC.

19.    That at all times hereinafter mentioned, upon information and belief, the Defendant, PARKE-DAVIS, is a subsidiary of the Defendant, WARNER-LAMBERT COMPANY LLC.

20.    That at all times hereinafter mentioned, upon information and belief, the Defendant, WARNER-LAMBERT COMPANY, is a division of the Defendant, PFIZER INC.

21.    That at all times hereinafter mentioned, upon information and belief, the Defendant, WARNER-LAMBERT COMPANY, is a subsidiary of the Defendant, PFIZER INC.

22.    That at all times hereinafter mentioned, upon information and belief, the Defendant, WARNER-LAMBERT COMPANY, is a successor in interest to the Defendant, PARKE-DAVIS.

23.    That at all times hereinafter mentioned, upon information and belief, the Defendant, WARNER-LAMBERT COMPANY LLC, is a division of the Defendant, PFIZER INC.

24.    That at all times hereinafter mentioned, upon information and belief, the Defendant, WARNER-LAMBERT COMPANY LLC, is a subsidiary of the Defendant, PFIZER INC.

25.    That at all times hereinafter mentioned, upon information and belief, the Defendant, WARNER-LAMBERT COMPANY LLC, is a successor in interest to the Defendant, PARKE-DAVIS.

26.     That at all times hereinafter mentioned, upon information and belief, the Defendant, WARNER-LAMBERT COMPANY, is a successor in interest to the Defendant, PARKE-DAVIS.

27.     That on a date prior to June 4, 2004, the Defendant, WARNER-LAMBERT COMPANY, assumed the assets and liabilities of the Defendant, PARKE-DAVIS.

28.     That on a date prior to June 4, 2004, the Defendant, WARNER-LAMBERT COMPANY, expressly assumed all liabilities and obligations of the Defendant, PARKE-DAVIS.

29.     That on a date prior to June 4, 2004, the Defendant, WARNER-LAMBERT COMPANY, impliedly assumed all liabilities and obligations of the Defendant, PARKE-DAVIS.

30.     That on a date prior to June 4, 2004, the Defendant, PARKE-DAVIS, and the Defendant, WARNER-LAMBERT COMPANY, merged with each other.

31.     That on a date prior to June 4, 2004, the Defendant, PARKE-DAVIS, merged with the defendant, WARNER-LAMBERT COMPANY, and the Defendant, PARKE-DAVIS, became a part of the Defendant, WARNER-LAMBERT COMPANY.

32.     That on a date prior to June 4, 2004, the Defendant, PARKE-DAVIS, and the Defendant, WARNER-LAMBERT COMPANY, consolidated with each other.

33.     That on or about December 31, 2002, the Defendant, WARNER-LAMBERT COMPANY LLC, assumed the assets and liabilities of the Defendant, PARKE-DAVIS.

34.     That on or about December 31, 2002, the Defendant, WARNER-LAMBERT COMPANY LLC, expressly assumed all liabilities and obligations of the Defendant, PARKE-DAVIS.

35.    That on or about December 31, 2002, the Defendant, WARNER-LAMBERT COMPANY LLC, impliedly assumed all liabilities and obligations of the Defendant, PARKE-DAVIS.

36.    That on or about December 31, 2002, the Defendant, PARKE-DAVIS, and the Defendant, WARNER-LAMBERT COMPANY LLC, merged with each other.

37.    That on or about December 31, 2002, the Defendant, PARKE-DAVIS, merged with the Defendant, WARNER-LAMBERT COMPANY LLC, and the Defendant, PARKE-DAVIS, became a part of the Defendant, WARNER-LAMBERT COMPANY LLC.

38.    That on or prior to December 31, 2002, the Defendant, PARKE-DAVIS, and the Defendant, WARNER-LAMBERT COMPANY LLC, consolidated with each other.

39.    That at all times hereinafter mentioned, upon information and belief, the Defendant, WARNER-LAMBERT COMPANY LLC, is a successor in interest to the Defendant, WARNER-LAMBERT COMPANY.

40.    That on or prior to December 31, 2002, the Defendant, WARNER-LAMBERT COMPANY LLC, assumed the assets and liabilities of the Defendant, WARNER-LAMBERT COMPANY.

41.    That on or prior to December 31, 2002, the Defendant, WARNER-LAMBERT COMPANY LLC, expressly assumed all liabilities and obligations of the Defendant, WARNER-LAMBERT COMPANY.

42.    That on or prior to December 31, 2002, the Defendant, WARNER-LAMBERT COMPANY LLC, impliedly assumed all liabilities and obligations of the Defendant, WARNER-LAMBERT COMPANY.

43.    That on or prior to December 31, 2002, the Defendant, WARNER-LAMBERT COMPANY, and the Defendant, WARNER-LAMBERT COMPANY LLC, merged with each other.

44.    That on or prior to December 31, 2002, the Defendant, WARNER-LAMBERT COMPANY, merged with the Defendant, WARNER-LAMBERT COMPANY LLC, and the Defendant, WARNER-LAMBERT COMPANY, became a part of the Defendant, WARNER-LAMBERT COMPANY LLC.

45.    That on or prior to December 31, 2002, the Defendant, WARNER-LAMBERT COMPANY, and the Defendant, WARNER-LAMBERT COMPANY LLC, consolidated with each other.

46.    That at all times hereinafter mentioned, upon information and belief, the Defendant, PFIZER INC., is a successor in interest to the Defendant, PARKE-DAVIS.

47.    That at all times hereinafter mentioned, upon information and belief, the Defendant, PFIZER INC., is a successor in interest to the Defendant, WARNER-LAMBERT COMPANY.

48.    That at all times hereinafter mentioned, upon information and belief, the Defendant, PFIZER INC., is a successor in interest to the Defendant, WARNER-LAMBERT COMPANY LLC.

49.    That on a date prior to June 4, 2004, the Defendant, PFIZER INC., assumed the assets and liabilities of the Defendant, PARKE-DAVIS.

50.    That on a date prior to June 4, 2004, the Defendant, PFIZER INC., assumed the assets and liabilities of the Defendant, WARNER-LAMBERT COMPANY.

51.    That on a date prior to June 4, 2004, the Defendant, PFIZER INC., expressly assumed all liabilities and obligations of the Defendant, PARKE-DAVIS.

52.     That on a date prior to June 4, 2004, the Defendant, PFIZER INC., impliedly assumed all liabilities and obligations of the Defendant, PARKE-DAVIS.

53.     That on a date prior to June 4, 2004, the Defendant, PFIZER INC., expressly assumed all liabilities and obligations of the Defendant, WARNER-LAMBERT COMPANY.

54.     That on a date prior to June 4, 2004, the Defendant, PFIZER INC., impliedly assumed all liabilities and obligations of the Defendant, WARNER-LAMBERT COMPANY.

55.     That on or prior to December 31, 2002, the Defendant, PFIZER INC., assumed the assets and liabilities of the Defendant, WARNER-LAMBERT COMPANY LLC.

56.     That on or prior to December 31, 2002, the Defendant, PFIZER INC., expressly assumed all liabilities and obligations of the Defendant, WARNER-LAMBERT COMPANY LLC.

57.     That on or prior to December 31, 2002, the Defendant, PFIZER INC., impliedly assumed all liabilities and obligations of the Defendant WARNER-LAMBERT COMPANY LLC.

58.     That on a date prior to June 4, 2004, the Defendant, PFIZER INC., and the Defendant, PARKE-DAVIS, merged with each other.

59.     That on a date prior to June 4, 2004, the Defendant, PFIZER INC., and the Defendant, WARNER-LAMBERT COMPANY, merged with each other.

60.     That on or before June 4, 2004, the Defendant, PFIZER INC., and the Defendant, WARNER-LAMBERT COMPANY LLC, merged with each other.

61.     That on a date prior to June 4, 2004, the Defendant, PFIZER INC., and the Defendant, PARKE-DAVIS, merged with each other and the Defendant, PARKE-DAVIS, became a part of the Defendant, PFIZER INC.

62.    That on a date prior to June 4, 2004, the Defendant, PFIZER INC., and the Defendant, WARNER-LAMBERT COMPANY, merged with each other and the Defendant, WARNER-LAMBERT COMPANY, became a part of the Defendant, PFIZER INC.

63.    That on or prior to December 31, 2002, the Defendant, PFIZER INC., and the Defendant, WARNER-LAMBERT COMPANY LLC, merged with each other and the Defendant, WARNER-LAMBERT COMPANY LLC, became a part of the Defendant, PFIZER INC.

64.    That on a date prior to June 4, 2004, the Defendant, PFIZER INC., and the Defendant, PARKE-DAVIS, consolidated with each other.

65.    That on a date prior to June 4, 2004, the Defendant, PFIZER INC., and the Defendant, WARNER-LAMBERT COMPANY, consolidated with each other.

66.    That at all times hereinafter mentioned, upon information and belief, the Defendant, PFIZER INC., has its principal place of business in the State of New York.

67.    In the year 2000, the Defendant, PFIZER INC., acquired the Defendant, WARNER-LAMBERT COMPANY, and as the result of that acquisition, the Defendant, PFIZER INC., is responsible for all liabilities resulting from the acts or omissions of the Defendant, WARNER-LAMBERT COMPANY, which occurred prior to such acquisition.

68.    In the year 2000, the Defendant, PFIZER INC., acquired the Defendant, PARKE-DAVIS, a division of Warner-Lambert Company, and as the result of that acquisition, the Defendant, PFIZER INC., is responsible for all liabilities resulting from the acts or omissions of the Defendant, PARKE-DAVIS, which occurred prior to such acquisition.

69.    On or prior to December 31, 2002, Defendant, PFIZER INC., acquired the Defendant, WARNER-LAMBERT COMPANY LLC, and pursuant to the terms of and conditions of that

acquisition, the Defendant, PFIZER INC., is responsible for all acts or omissions of the Defendant, WARNER LAMBERT-COMPANY, LLC, occurring prior to such acquisition.

70.     That at all times hereinafter mentioned, upon information and belief, the Defendant, PFIZER INC., presently markets and sells the drug Neurontin.

71.     That on a date prior to June 4, 2004, the Defendant, PFIZER INC., marketed and sold the drug Neurontin.

72.     That at all times hereinafter mentioned, upon information and belief, the Defendant, PFIZER INC., is engaged in the business of designing, manufacturing, advertising, marketing, and selling pharmaceutical drugs, including Neurontin, and in pursuance of this business, transacts business within the State of New York and contracts to provide goods and services in the State of New York.

73.     That at all times hereinafter mentioned, upon information and belief, the Defendant, PFIZER INC., committed a tortuous act inside the State of New York, which caused injury to Plaintiffs.

74.     That at all times hereinafter mentioned, upon information and belief, the Defendant, PFIZER INC., committed a tortuous act outside the State of New York, which caused injury to Plaintiffs.

75.     That at all times hereinafter mentioned, upon information and belief, the Defendant, PFIZER INC., regularly does and solicits business and engages in a persistent course of conduct in the State of New York, deriving substantial revenue from goods and products consumed in the State of New York.

76.     That at all times hereinafter mentioned, upon information and belief, the Defendant, PFIZER INC., expects or should reasonably expect its acts to have consequences in the State of New York, and derives substantial revenue from interstate or international commerce.

77.     That at all times hereinafter mentioned, upon information and belief, the Defendant, PARKE-DAVIS, presently markets and sells the drug Neurontin.

78.     That on a date prior to June 4, 2004, the Defendant, PARKE-DAVIS, marketed and sold the drug Neurontin.

79.     That at all times hereinafter mentioned, upon information and belief, the Defendant, PARKE-DAVIS, is engaged in the business of designing, manufacturing, advertising, marketing, and selling pharmaceutical drugs, including Neurontin, and in pursuance of this business, transacts business within the State of New York and contracts to provide goods and services in the State of New York.

80.     That at all times hereinafter mentioned, upon information and belief, the Defendant, PARKE-DAVIS, committed a tortuous act inside the State of New York, which caused injury to Plaintiffs.

81.     That at all times hereinafter mentioned, upon information and belief, the Defendant, PARKE-DAVIS, committed a tortuous act outside the State of New York, which caused injury to Plaintiffs.

82.     That at all times hereinafter mentioned, upon information and belief, the Defendant, PARKE-DAVIS, regularly does and solicits business and engages in a persistent course of conduct in the State of New York, deriving substantial revenue from goods and products consumed in the State of New York.

83.     That at all times hereinafter mentioned, upon information and belief, the Defendant, PARKE-DAVIS, expects or should reasonably expect its acts to have consequences in the State of New York, and derives substantial revenue from interstate or international commerce.

84.     That at all times hereinafter mentioned, upon information and belief, the Defendant, WARNER-LAMBERT COMPANY, presently markets and sells the drug Neurontin.

85.     That on a date prior to June 4, 2004, the Defendant, WARNER-LAMBERT COMPANY, marketed and sold the drug Neurontin.

86.     That at all times hereinafter mentioned, upon information and belief, the Defendant, WARNER-LAMBERT COMPANY, is engaged in the business of designing, manufacturing, advertising, marketing, and selling pharmaceutical drugs, including Neurontin, and in pursuance of this business, transacts business within the State of New York and contracts to provide goods and services in the State of New York.

87.     That at all times hereinafter mentioned, upon information and belief, the Defendant, WARNER-LAMBERT COMPANY, committed a tortuous act inside the State of New York, which caused injury to Plaintiffs.

88.     That at all times hereinafter mentioned, upon information and belief, the Defendant, WARNER-LAMBERT COMPANY, committed a tortuous act outside the State of New York, which caused injury to Plaintiffs.

89.     That at all times hereinafter mentioned, upon information and belief, the Defendant, WARNER-LAMBERT COMPANY, regularly does and solicits business and engages in a persistent course of conduct in the State of New York, deriving substantial revenue from goods and products consumed in State of New York.

90.     That at all times hereinafter mentioned, upon information and belief, the Defendant, WARNER-LAMBERT COMPANY, expects or should reasonably expect its acts to have consequences in the State of New York, and derives substantial revenue from interstate or international commerce.

91.     That at all times hereinafter mentioned, upon information and belief, the Defendant, WARNER-LAMBERT COMPANY LLC, presently markets and sells the drug Neurontin.

92.     That on a date prior to June 4, 2004, the Defendant, WARNER-LAMBERT COMPANY LLC, marketed and sold the drug Neurontin.

93.     That at all times hereinafter mentioned, upon information and belief, the Defendant, WARNER-LAMBERT COMPANY LLC, is engaged in the business of designing, manufacturing, advertising, marketing, and selling pharmaceutical drugs, including Neurontin, and in pursuance of this business, transacts business within the State of New York.

94.     That at all times hereinafter mentioned, upon information and belief, the Defendant, WARNER-LAMBERT COMPANY LLC, committed a tortuous act inside the State of New York, which caused injury to Plaintiffs.

95.     That at all times hereinafter mentioned, upon information and belief, the Defendant, WARNER-LAMBERT COMPANY LLC, committed a tortuous act outside the State of New York, which caused injury to Plaintiffs.

96.     That at all times hereinafter mentioned, upon information and belief, the Defendant, WARNER-LAMBERT COMPANY LLC, regularly does and solicits business and engages in a persistent course of conduct in the State of New York, deriving substantial revenue from good and products consumed in the State of New York.

97.    That at all times hereinafter mentioned, upon information and belief, the Defendant, WARNER-LAMBERT COMPANY LLC, regularly does and solicits business and engages in a persistent course of conduct in the State of New York, deriving substantial revenue from interstate commerce.

## BACKGROUND

## STATEMENT OF THE CASE

98.    Pursuant to the Food, Drug, and Cosmetic Act ("FDCA") 21 U.S.C. §§ 301 et seq., new pharmaceutical drugs cannot be distributed in interstate commerce unless the sponsor of the drug demonstrates to the satisfaction of the Food and Drug Administration ("FDA") that the drug is safe and effective for each of its intended uses. 21 U.S.C. § 355(a) and (d).

99.    However, the FDCA does not prevent doctors from prescribing a drug approved for a particular use for other uses that are different than those approved by the FDA ("off-label" usage).

100.    Nonetheless, even though physicians may prescribe drugs for "off-label" usage, the FDCA prohibits drug manufacturers themselves from marketing and promoting a drug for a use that the FDA has not approved. 21 U.S.C. § 331(d).

101.    A manufacturer illegally "misbrands" a drug if the drug's labeling includes information about unapproved uses or if the manufacturer engages directly or indirectly in marketing or promoting the drug for unapproved uses.

102.    Instead, if a manufacturer desires to market and promote the drug for new uses in addition to those already approved, the materials on "off-label" usage must meet certain stringent requirements and the manufacturer must resubmit the drug to the FDA testing and approval process for the proposed new use.

103.   The above-described statutory and regulatory system and process is designed to protect the public, including Plaintiffs, from the dangers arising from drugs which, although approved for a certain specific condition, disease or purpose, could cause injury and harm if used for an "off-label" purpose without adequate study and testing of the drug for such "off-label" usage and to protect the public, including Plaintiffs herein, from the dangers arising from deceptive, misleading, and inaccurate advertising, marketing, and promotional materials issued directly or indirectly by the manufacturer to encourage the "off-label" usage of the drug without adequate testing and study of that drug for such "off-label" usage.

104.   PARKE-DAVIS, now owned by PFIZER INC., applied for, and in December, 1993, received FDA approval to market and sell Neurontin solely for "adjunctive therapy" in the treatment of certain types of seizures in adult patients suffering from epilepsy, and the FDA approved labeling of Neurontin for that purpose and stated that the drug is only effective at 900 to 1800 milligrams per day.

105.   Defendants did not receive FDA approval for any other use of Neurontin except for the above-described treatment of epilepsy or for higher dosages for any purpose, and the FDA never approved the usage of Neurontin at any dosage for the treatment of the "17 conditions".

106.   Commencing in 1995, Defendants, as the manufacturer of Neurontin, began to directly and indirectly advertise, market and promote Neurontin for additional "off-label" uses for which FDA approval had not been obtained, including treatment for the "17 conditions" at higher dosages than had been tested and approved, in violation of the above-described statutory and regulatory system and process, including the FDCA, which prohibits manufacturers from directly or indirectly advertising, marketing and promoting a drug for "off-label" usage, and instead requires that the manufacturer resubmit the drug to the FDA testing and approval process for the

16

proposed new use and that the materials issued by the manufacturer relating to the proposed new use meet certain stringent requirements.

107.    Defendants, as the manufacturer of Neurontin, directly and indirectly advertised, marketed and promoted Neurontin for the treatment of the "17 conditions", and encouraged that higher dosages than those tested be prescribed, even though Defendants knew or should have known that there were not adequate tests and studies establishing and confirming that Neurontin was safe and effective for the treatment of above "17 conditions", and even though Defendants knew or should have known that there were no adequate studies showing that Neurontin was safe when prescribed at dosages higher than those approved by the FDA.

108.    At all times hereinafter mentioned, upon information and belief, Defendants marketed and promoted Neurontin for the treatment of the "17 conditions" even though Defendants knew or should have known that Neurontin caused many symptoms or related risk factors associated with suicidal behavior by persons suffering from above "17 conditions".

109.    At all times hereinafter mentioned, upon information and belief, Defendants marketed and promoted Neurontin for the treatment of the "17 conditions" even though Defendants knew or should have known that Neurontin had no effect in relieving or correcting the conditions or causes of above uses.

110.    Defendants' conduct in promoting "off-label" uses of Neurontin for treatment of the "17 conditions" constituted a wanton, callous and reckless disregard of the safety of the public.

111.    In promoting "off-label" uses of Neurontin, and at higher dosages than approved by the FDA, including treatment of the "17 conditions", Defendants acted without regard to the potential danger and harm to persons for whom the drug was prescribed for the treatment of above "17 conditions" hereinafter, "conditions".

112.   Defendants actively distributed, sold and placed Neurontin into the stream of commerce and directly and indirectly advertised, marketed and promoted Neurontin as being safe and effective for the treatment of pain and in dosages higher than those approved by the FDA, even though the only approved use of Neurontin at that time was as "adjunctive therapy" for the treatment of epilepsy and even though the FDA had specified a maximum recommended dosage.

113.   Neurontin is not reasonably safe and effective for the treatment of persons suffering from the "conditions" and is not reasonably safe when consumed in higher dosages than those approved by the FDA, and Defendants' conduct of illegally advertising, marketing and promoting Neurontin for "off-label" uses was unlawful, deceptive and misleading and was in violation of the FDCA.

114.   By reason of Defendants' conduct of directly and indirectly advertising, marketing and promoting Neurontin for the treatment of pain in an unlawful manner, physicians commenced prescribing Neurontin to their patients diagnosed as suffering from the "conditions", frequently at dosages higher than those approved by the FDA.

115.   Upon information and belief, the Defendant, WARNER-LAMBERT COMPANY LLC, was indicted in the United States District Court for the District of Massachusetts for violations of 21 U.S.C. §§ 331(a), 331(d), 333(a), 352(f)(1) and 355, and a copy of such criminal Information is annexed hereto as Exhibit "B" and incorporated into this complaint by reference.

116.   Upon information and belief, on or about the 7th day of June, 2004, the Defendant, WARNER-LAMBERT COMPANY LLC, formally pled guilty to all charges contained in the Information.

117.   The drug Neurontin was ineffective in the treatment of the causes and symptoms of each Plaintiffs conditions of the "conditions" as set forth in each Plaintiffs individual medical records being provided contemporaneously been and incorporated by relevance herein for all purposes the Plaintiffs sustained injury and harm by reason of this reliance upon Neurontin to be effective in the treatment as prescribed by physicians of such "conditions".

118.   That at all times hereinafter mentioned, Plaintiffs were diagnosed by their physician as suffering from the "conditions" and were being treated by their physicians for such conditions, as shown on each of their medical and hospital records being contemporaneously furnished to Defendants with the filing of this First Amended Original Complaint, including again for those transferred from the WD AR previously furnished a disk of 14,000 Plaintiffs and containing all of their medical records of treatment. This was by agreement of counsel and the court there prior to transfer to the MDL.

119.   That at all times hereinafter mentioned, upon information and belief, in reliance upon Defendants' direct and indirect advertising, marketing and promoting of Neurontin as being safe and effective for the treatment of the "conditions", Plaintiffs physician prescribed Neurontin to treat Plaintiffs "conditions".

120.   That at all times hereinafter mentioned, Plaintiffs purchased and consumed Neurontin, as recommended and prescribed by their physicians and in the dosages prescribed, in an effort to control the effects of their conditions.

121.   The drug Neurontin was not safe and effective for the treatment of Plaintiffs' "conditions". Plaintiffs' sustained personal injury and harm by reason of their consumption of Neurontin as prescribed by their physicians in an effort to treat their conditions.

122.   The drug Neurontin was ineffective in the treatment of the causes and symptoms of Plaintiffs' "conditions". Plaintiffs' sustained personal injury and harm by reason of this reliance upon Neurontin to be effective in the treatment as prescribed by their physicians of the "conditions".

123.   By reason of Plaintiffs' consumption of Neurontin in a manner and at a dosage prescribed by their physicians in an effort to treat the "conditions", Plaintiffs' successfully and unsuccessfully attempted to commit suicide, thereby sustained severe personal injuries.

124.   The injuries and/or death sustained by each Plaintiff was caused by or was contributed to by each Plaintiff's consumption of Neurontin at a dosage prescribed each by their physicians for the treatment of the "conditions", in a manner consistent with the direct and indirect advertising, marketing and promoting of this drug for such "off-label" use by Defendants.

### AS AND FOR A FIRST CAUSE OF ACTION AGAINST THE DEFENDANTS

125.   Plaintiffs repeat and reiterate the allegations previously set forth herein.

126.   That at all times hereinafter mentioned, Defendants were under a duty to exercise reasonable care in the design and development of Neurontin and, in particular, in the advertising, marketing and promoting of Neurontin, both directly and indirectly, to ensure that Neurontin was not used in the treatment of conditions such as the "conditions", for which it was not effective and to ensure that Neurontin was not used in a manner or to treat conditions where Defendants knew or should have known that the user could sustain injuries and harm from the drug.

127.   That Defendants negligently, recklessly, grossly negligently, wantonly and willfully displayed a morally culpable and conscious disregard of the rights of others in that they failed to exercise reasonable care and failed to fulfill the above-stated duty by the manner that Defendants, directly and indirectly, advertised, marketed and promoted Neurontin for the

treatment of the "conditions", even though Neurontin had not been scientifically determined to be safe for the treatment of such above conditions and even though Neurontin was, in fact, not reasonably safe for the treatment of such above conditions and furthermore, Defendants failed to adequately warn of the risk of suicide or aggressive, self-destructive behavior of which Defendants knew or should have known about.

128.    That Defendants were further negligent, reckless, grossly negligent, wanton and willfully displayed a morally culpable and conscious disregard of the rights of others by manufacturing, distributing, selling, advertising, marketing and promoting Neurontin even though such drug was not safe or effective for any purpose because it caused or influenced persons using the drug for any purpose to engage in self-destructive behavior including committing suicide and by failing to adequately warn the public of such risks.

129.    The aforesaid incident and the injuries sustained by Plaintiffs were caused by or was contributed to by the negligence, recklessness, gross negligence, wantonness, willfulness, and conscious and callous disregard of the safety of the public, including Plaintiffs, on the part of Defendants in the design, manufacture, distribution, advertising, marketing and promoting of Neurontin as being safe and effective treatment of the "conditions" and by inducing the public, including Plaintiffs, to believe that Neurontin was effective in the treatment and of the causes and symptoms of above conditions.

130.    That at all times hereinafter mentioned, upon information and belief, the above-described culpable conduct by Defendants was a proximate cause of injuries sustained by Plaintiffs.

131.    That at all times hereinafter mentioned, Plaintiffs did not contribute to their injuries and/or death by reason of any negligence or culpable conduct on their part.

132.   That by reason of the foregoing, Plaintiffs were caused to sustain severe and serious personal injuries to their mind and body, some of which, upon information and belief, are permanent with permanent effects of pain, disability, disfigurement and loss of body function. Further, Plaintiffs were caused to expend and become obligated for diverse sums of money for the purpose of obtaining medical care and/or cure in an effort to alleviate the suffering and ills sustained as a result of these occurrences. Plaintiffs further were caused to lose substantial periods of time from their normal vocation, and upon information and belief, may continue to be restricted in that manner into the future and suffer similar losses. In addition, Plaintiffs are deprived of a chance for effective and/or successful treatment.

133.   By reason of the foregoing, Plaintiffs were each damaged in a sum which exceeds the jurisdictional limits of all lower courts which would have jurisdiction of this matter, and in addition, each Plaintiff seeks punitive and exemplary damages severally against Defendants in an amount to be determined upon the trial of this matter.

## AS AND FOR A SECOND CAUSE OF ACTION AGAINST THE DEFENDANTS

134.   Plaintiffs repeat and reiterate the allegations previously set forth herein.

135.   That at all times hereinafter mentioned, upon information and belief, Defendants, by directly and indirectly advertising, marketing and promoting Neurontin for the "conditions" by placing this drug in the stream of commerce knowing that Neurontin would be prescribed for the treatment of above conditions in reliance upon the representations of Defendants, expressly warranted to all foreseeable users of this drug, including Plaintiffs, that Neurontin was safe and effective for the treatment of above conditions.

136.   That Defendants impliedly warranted in manufacturing, distributing, selling, advertising, marketing and promoting Neurontin to all foreseeable users, including Plaintiffs, that

Neurontin was safe and effective for the purposes for which it had been placed in the stream of commerce by Defendants, including the "conditions" that Neurontin was reasonably safe, proper, merchantable and fit for the intended purposes, including for the treatment of the "conditions".

137.    That at all times hereinafter mentioned, Plaintiffs each relied upon the aforesaid express and implied warranties by Defendants.

138.    That at all times hereinafter mentioned, Plaintiffs use of Neurontin prior to and up to the time of the above-described incident was consistent with the purposes for which Defendants directly and indirectly advertised, marketed and promoted Neurontin, and Plaintiffs use of Neurontin was reasonably contemplated, intended and foreseen by Defendants at the time of the distribution and sale of Neurontin by Defendants, and, therefore, Plaintiffs use of Neurontin was within the scope of the above-described express and implied warranties.

139.    Defendants breached the aforesaid express and implied warranties because Neurontin was not safe and effective for the treatment of the "conditions" and because Plaintiffs use of Neurontin for the treatment of above conditions caused or contributed to the incidents described herein.

140.    Plaintiffs each gave appropriate notice to Defendants of the breach of the aforesaid express and implied warranties or such notice was otherwise excused.

141.    By reason of the foregoing, Plaintiffs' each sustained damages in a sum which exceeds the jurisdictional limits of all lower courts which would have jurisdiction of this matter, and in addition, Plaintiffs seeks punitive and exemplary damages against Defendants severally in an amount to be determined upon the trial of this matter.

## AS AND FOR A THIRD CAUSE OF ACTION AGAINST THE DEFENDANTS

142.    Plaintiffs each repeat and reiterate the allegations previously set forth herein.

143.    That at all times hereinafter mentioned, the drug Neurontin was not suited for the treatment of the "conditions" and was not safe and effective for the treatment of above conditions even though Defendants directly and indirectly advertised, marketed and promoted Neurontin for these "off-label" purposes.

144.    That at all times hereinafter mentioned, the drug Neurontin was not safe and was not suited for the purposes for which Defendants, directly and indirectly, advertised, marketed and promoted the drug at the time Defendants designed, manufactured, distributed and sold the drug and placed the drug in the stream of commerce.

145.    That at all times hereinafter mentioned, upon information and belief, Defendants assumed a strict products liability to users and to persons using Neurontin, including Plaintiffs, who each sustained injuries, harm and damages by reason of the use of Neurontin for purposes directly and indirectly advertised, marketed, and promoted by Defendants, including for the treatment of the "conditions".

146.    By reason of the foregoing, each Plaintiff was damaged in a sum which exceeds the jurisdictional limits of all lower courts which would have jurisdiction of this matter, and in addition, Plaintiffs seeks punitive and exemplary damages against Defendants severally in an amount to be determined upon the trial of this matter.

## AS AND FOR A FOURTH CAUSE OF ACTION AGAINST THE DEFENDANTS

**A.    Defendants' Use of the Off Label Enterprise to Make False Statements to Plaintiffs' Physicians**

147.    When presenting off-label information about Neurontin to physicians in response to unsolicited requests for information on unapproved uses, Defendants were required by law to

provide fair and balanced information. Defendants were also required to provide fair and balanced information whenever it engaged in promotional activities. Fair balance was not limited to written materials but to all presentations. Defendants knew that whenever they were required to provide fair and balanced information, federal law and industry standards required them to provide any negative information as well as positive information about their drug products.

148. Within the medical community, in the context of describing properties of approved prescription drugs, the terms "effective" and "efficacy" have specific and well understood meaning. Because the FDA will only find a drug product to be effective if the proposed use is supported by well designed, placebo-controlled clinical trials that establish a causal relationship to a statistically significant degree, a statement that a drug is "effective" or "works" or "has been proven to…" is understood to mean that well controlled clinical studies support the use. To make such a statement without such clinical trial proof is misleading. Further, failure to inform physicians that no placebo controlled clinical trials support a representation of drug efficacy is a violation of a pharmaceutical company's obligation to disclose.

149. Although Defendants have extensively promoted Neurontin for off-label purposes, few placebo-controlled, clinical studies have been conducted on off-label uses of Neurontin. Most of the studies that have been conducted were negative or inconclusive at best. Placebo controlled clinical trials for Neurontin's use for bi-polar disorder, unipolar disorder, essential tremor, controlled diabetic pain, and panic disorder have all failed to show that Neurontin is effective for those conditions. Any presentation concerning Neurontin's use for indications other than those approved by the FDA that purports to rely on clinical or published evidence must also describe those clinical studies that have found Neurontin is not effective for off-label uses. Where such information is not provided, any statements about Neurontin's effectiveness or

suitability for off-label uses is false, misleading, distorted, inaccurate, unfair, imbalanced and omits material facts necessary to be disclosed.

150. Further, federal law and industry standards also prohibit Defendants from misrepresenting scientific evidence that supported (or failed to support) claims that a drug was effective for a specific condition. Thus, anecdotal evidence of a drug's usefulness for a particular given condition could not be presented as the equivalent of the findings of a well designed clinical trial. To fail to comply with these standards violated the Defendants' legal duty to provide accurate and non-misleading information.

151. The Off-Label Promotion Enterprise routinely and knowingly provided false, inaccurate, misleading, distorted, unfair and unbalanced information about Neurontin's use for unapproved indications. Without discovery, Plaintiffs can not catalog each misrepresentation and/or misleading statement about Neurontin made by Defendants because Plaintiffs do not possess all transcripts of all meetings. These transcripts are solely in possession of the Defendants and have yet to be produced to Plaintiffs. Plaintiffs do however possess representative transcripts which demonstrate that the participating physicians made the same or substantially similar representations when they gave presentations involving off-label use of Neurontin at different events arranged by the Off-Label Promotion Enterprise, and that once the participating vendors assembled the content of an off-label promotional (or "educational") program, they repeated the program numerous times on numerous occasions across the country. As a result, the Plaintiffs are aware of misrepresentations, misleading statements and material omissions that were made in specific events as well as misrepresentations, misleading statements and material omissions that were likely made at numerous other events. A description of the false statements, misleading statements and material omissions follow:

B.  **False and Misleading Statements Regarding Treatment of Pain**

152.    Defendants were aware that pain types are highly heterogeneous in terms of etiology, pathophysiology, diagnosis and treatment. According to the Merck Manual of Medical Information: Second Edition (2003), there are few major categories of pain, most notably including nociceptive pain and neuropathic pain. Nociceptive pain is caused by an injury to the body and its tissues such as a cut or bruise. This type of pain is typically felt as aching, sharp or throbbing pain. Neuropathic pain is caused by abnormalities in the nerves, spinal cord, or brain and may be felt as a burning or tingling sensation or as hypersensitivity to touch or cold. Neuropathic pain includes such syndromes as phantom limp pain, postherpetic neuralgia, reflex sympathetic dystrophy, causalgia, trigeminal neuralgia and diabetic peripheral neuropathy.

153.    Defendants were aware that individual pain conditions, regardless of whether they are nociceptive or neuropathic, differ in etiology, pathophysiology, diagnosis and treatment. The fact that a treatment may be beneficial for one type of pain does not suggest that it will be effective for other pain conditions, even those in the same pain category. Thus a treatment for one particular type of neuropathic pain will not necessarily be effective for any other type of neuropathic pain.

154.    Despite knowing these facts, Defendants intentionally blurred the lines between different pain conditions by making representations to physicians that data relating to very narrow pain indications applied to all other pain indications. Defendants used the indications for postherpetic neuralgia, a very narrow form of neuropathic pain limited to people with shingles, as well as anecdotal evidence from other equally limited conditions; to convince physicians that Neurontin was a miracle drug for all pain conditions.

155.    In so doing, the Defendants suppressed a growing body of clinical evidence showing that, for specific pain indications; Neurontin was not effective or that, at best the evidence was inconclusive. For example, in 1996, Parke-Davis funded a placebo controlled clinical trial conducted by Dr. Kenneth Gorson, a doctor at St. Elizabeth's Hospital in Boston, Massachusetts, on the use of Neurontin as a treatment for diabetic peripheral neuropathy. On August 23, 1997, Dr. Gorson submitted a draft of his study to Parke-Davis, accompanied by an abstract. The results of the study were negative. Nonetheless, Parke-Davis wrote and circulated an abstract that hid and misrepresented Dr. Gorson's negative findings. Defendants caused the Drugdex Information System to include language that falsely and inaccurately described Dr. Gorson's findings in its citation to Dr. Gorson's article. The Drugdex citation to Dr. Gorson's article falsely states "the authors suggest that higher does of gabapentin are needed". This language is consistent with the false abstract which Parke-Davis circulated, but no such language appears in Dr. Gorson's article. The Drugdex article also omits Dr. Gorson's conclusion that gabapentin "is probably ineffective" for the treatment of diabetic neuropathy. Therefore, Defendants are responsible for the circulation of false and misleading information regarding the Gorson study and Neurontin's effectiveness for diabetic peripheral neuropathy.

156.    After receiving the results of the Gorson study, the Off-Label Promotion Enterprise continued to present numerous events at which Neurontin's use for diabetic peripheral neuropathy were discussed. The physician-participants at these presentations failed to describe the results and conclusions of Dr. Gorson's study and Defendant's representatives likewise failed to provide such information.

157.    In 1998, Defendants received the results of the largest clinical trial that has been conducted relating to Neurontin and diabetic peripheral neuropathy. One of the lead investigators

of the study was Dr. Reckless from the United Kingdom. The results of the trial were thoroughly negative, so much so that there was no opportunity to even favorably spin the results as positive. In fact, the Defendants own research states: "There was no statistically significant difference between any of the gabapentin groups [600, 1200 or 2400mg per day] and the placebo group for endpoint mean pain score or at any time throughout the trial".

158.   Parke-Davis decided to suppress the results of the trial and block publication of the results by informing Dr. Reckless that it did not want the results published. Dr. Reckless indicated that he would publish the results himself if Parke-Davis did not. This was perceived by Parke-Davis as a "veiled threat". Ultimately, Parke-Davis prevailed and the negative study was never published. Moreover, Pfizer never forwarded a copy of its research report to Drugdex. Thus, Drugdex does not contain a single reference to the most important piece of scientific evidence relating to Neurontin and diabetic peripheral neuropathy. Defendants' failure to describe the negative evidence of the Gorson and Reckless studies made their representations regarding Neurontin's use for diabetic peripheral neuropathy false and misleading.

159.   By no later than May 2000, Defendants were specifically aware that Neurontin's efficacy with regard to various neuropathies other than postherpetic neuralgia was poor. Defendants' own internal clinical trial of neuropathies of mixed etiology showed that Neurontin's efficacy in other painful neuropathies apart from postherpetic neuralgia could not be demonstrated. However, by pooling the data on various neuropathies, Defendants created the misleading appearance that Neurontin offered significant improvement over a placebo in treating neuropathies of various types. This false conclusion was conveyed to physicians, upon information and belief at marketing events subsequent to June 2000 that are identified herein.

160.   Pfizer was unable to get the FDA to adopt this false conclusion. In December 2001,

recognizing that the FDA would likely reject its application for approval to market Neurontin for

neuropathic pain because of the lack of supporting study data, Pfizer amended the application to

exclude from FDA consideration all data relating to neuropathies other than postherpetic

neuralgia. This allowed Pfizer to obtain FDA approval for postherpetic neuralgia at the expense

of a broader indication. Nevertheless, Pfizer continued to instruct physicians that Neurontin's

efficacy for a wide variety of neuropathies had been proven when in fact it knew that favorable

data was limited to postherpetic neuralgia.

161.   In addition to neuropathic pain, Defendants also suppressed a number of trials where

Neurontin's efficacy in providing analgesic efficacy for nociceptive was proven to be no better

than a placebo and clearly inferior to less expensive, proven analgesics. For example, the

Defendants suppressed the results of Protocol 1032-001, which compared gabapentin and

hydrocodone in patients with postoperative pain following orthopedic surgery. According to

internal Research Report No. 720-04471, the study found: "Overall, the analgesic effect of

[gabapentin and hydrocodone] treatment was similar to [hydrocodone] treatment alone." In short,

no statistical changes occurred in the measures used to measure pain when gabapentin was added

to the hydrocodone therapy. The findings lack of analgesic activity were confirmed by a later

study, Protocol 1035-001, which compared gabapentin and hydrocodone in patients with

postoperative pain from dental surgery. The findings of this study were compiled in Research

Report 720-04483. Nevertheless, the Defendants continuously made statements to physicians,

including Plaintiffs' physicians that falsely claimed Neurontin was effective for nociceptive pain.

162.   At each of the presentations known to Plaintiffs concerning Neurontin and pain, at

least one of the presenters expressly stated or implied that Neurontin was effective for the

treatment of broad and unqualified categories of pain, including various types of both nociceptive and neuropathic pain. A representative statement was made by Dr. David Longmire, a participating physician, at the Jupiter Beach Consultants' meeting in April 1996 when he stated that Neurontin was effective for treatment of pain. Dr. Longmire repeated that statement at a May 1996 Consultant's Meeting at the Ritz Carlton in Boston. Another physician participant, Dr. Steven Schacter, made a similar statement at the May 1996 meeting when he stated that "pain specialists are finding that low dosages of Neurontin are effective". Plaintiffs are aware of comparable statements made by another physician participant, Dr. Bruce Nicholson, in April 1996 at the Jupiter Consultants' Meeting, in May 1996 at the Boston Ritz Carlton meeting and in June 1996 at a Philadelphia Consultants' Meeting. Pleading upon information and belief, similar statements were made at all events presented by the Off-Label Promotion Enterprise that discussed Neurontin's use for pain indications.

These events include but are not limited to the following:

163.   The speakers who made the favorable statements about Neurontin's allegedly broad efficacy in pain never mentioned the suppressed negative data and misleadingly or falsely suggested that the data uniformly showed Neurontin's efficacy in all pain areas, when in fact the Defendants knew otherwise.

164.   In none of the presentations in which Neurontin's use for pain was promoted did the physician-participant or any person connected to the Off-Label Promotion Enterprise acknowledge that there was in fact negative clinical data, including the trials conducted by Dr. Gorson and Dr. Reckless, or that the small amount of favorable data was only limited to one very narrow indication-postherpetic neuralgia. Defendants' failure to disclose this material

information made any statement stating that Neurontin was effective for any pain syndrome other than postherpetic neuralgia false and misleading.

165.   At every presentation concerning Neurontin's use for pain, the participating physicians, the participating vendors, and the Defendants, did not inform the physician-attendees that Defendants had deliberately suppressed negative studies pursuant to the Publication Strategy or that it was a policy of the Defendants to suppress publication of completed trials that were negative. Negative studies, such as Dr. Reckless' trial, were not published. When negative data was published despite the Defendants' best efforts to suppress, such as was the case with Dr. Golson's letter to the editor, the Defendants attempted to sabotage the publication or blunt its impact, such as submitting a false, doctored abstract to Drugdex.

166.   At every presentation concerning Neurontin's use for pain, anecdotal evidence was presented to support Neurontin's use. At not one of these presentations, however, was anecdotal evidence presented of Neurontin's failure to treat pain, even though such evidence had been made known to Defendants. Defendants' intentional suppression of negative anecdotal information concerning Neurontin's treatment for pain made their presentations false and misleading.

167.   Although they were not supposed to discuss off-label indications with physicians, Parke-Davis sales representatives regularly made false statements to doctors about Neurontin's utility in treating pain. The following are representative false statements by the sales force. Plaintiffs were only able to obtain evidence of such statements for a limited time period between 1995 and 1997, but are aware of "verbatim" reports that exist for the last several years. Upon information and belief, review of recent verbatim reports will demonstrate that similar statements were regularly made by the Defendants' sales forces from 1999 through 2004.

- In October 1995, a Parke-Davis sales representative stated that Neurontin had received a "[n]ew indication for chronic pain."
- In December 1995, a Parke-Davis sales representative stated that Neurontin was a "[g]ood anticonvulsant for chronic pain and restless leg syndrome."
- In July 1996, a Parke-Davis sales representative stated that Neurontin was "[e]ffective for many types of chronic pain."
- In December 1996, a Parke-Davis sales representative stated that Neurontin was "[g]ood for back pain; neuropathic pains."

## C.  Representations Regarding Restless Leg Syndrome (RLS)/ Periodic Limb Movement Syndrome (PLMS)

168.  At events produced by the Off-Label Promotion Enterprise, physician participants routinely stated that Neurontin was effective for the treatment of nocturnal myoclonus, more commonly referred to as restless leg syndrome (RLS) and/or periodic limb movement syndrome (PLMS). Patients suffering from RLS/PLMS have frequent, involuntary limb movements that interfere with the quality and duration of their sleep.

169.  Events presented by the Off-Label Promotion Enterprise that discussed Neurontin's use as a treatment for RLS/PLMS, included, but are not limited to, the following event:

| Topic | Location | Date |
|---|---|---|
| Advisory Board Meeting | Hyatt Regency Hotel San Antonio, TX | March 29, 2000 |

170.  The speakers who made these statements did not have any clinical evidence to support such claims. These statements implied that clinical trial evidence sufficient to establish causation existed. However, as discussed below, the clinical studies in existence do not find that Neurontin is effective for the treatment of RLS/PLMS.

171.  Upon information and belief, in the presentations in which Neurontin's use for RLS/PLMS was promoted, neither the physician-participants nor any person connected to the Off-Label Promotion Enterprise acknowledged the lack of any clinical trial evidence to support a

claim of efficacy. Defendants' failure to disclose this material information made any statement stating that Neurontin was effective for these indications false and misleading.

172.   Upon information and belief, at every presentation concerning Neurontin's use for RLS/PLMS, the participating physicians, the participating vendors, and the Defendants did not inform the attendee physicians that Defendants had deliberately suppressed negative studies pursuant to the Publication Strategy. As described below, at least one negative study existed which found that Neurontin was not effective for these conditions, and upon information and belief, the results of this study were never disclosed when Neurontin's use for RLS/PLMS was discussed.

173.   In 1996, Parke-Davis funded an open label study conducted by Dr. Bruce Ehrenberg of the New England Medical Center "to assess the efficacy of gabapentin (Neurontin) in the treatment of restless legs syndrome/periodic limb movements." Dr. Ehrenberg's study was negative. Neurontin did not affect any of the participants' limb movements during sleep, and the majority of participants had no improvement in quality of sleep.

174.   Despite this outcome, Parke-Davis's medical liaisons falsely told physicians that Dr. Ehrenberg's patients had a 90% response rate to Neurontin. In a June 1996 conference call taped by Dr. David Franklin, medical liaisons discussed making such assertions routinely. Neither medical liaisons nor physician participants amended their statements to physicians once the results of Dr. Ehrenberg's study were known.

175.   Former Parke-Davis officials have admitted that although the results were not favorable, the results of Ehrenberg's study should have been published and made known to clinicians. Indeed, Parke-Davis hired AMM/Adelphi to organize Ehrenberg's data and to develop a manuscript for him. After the results were received, however, Parke-Davis took no steps to

publish an article based on Dr. Ehrenberg's results. Parke-Davis's actions were consistent with the publication strategy, which only intended to publish studies with favorable results. Parke-Davis's policy of only publishing and disclosing the results of favorable studies directly violates it obligation to disclose favorable and unfavorable results pursuant to its obligation to only make fair and balanced statements relating to its drug products.

176.   Upon information and belief, at every presentation concerning Neurontin's use for restless leg syndrome and periodic limb movement syndrome, anecdotal evidence was presented to support Neurontin's use. At none of the presentations, however, was negative evidence presented of Neurontin's failure to treat RLS/PLMS, even though such evidence was known by Defendants. Defendants' intentional failure to provide negative clinical evidence concerning Neurontin's treatment for RLS/PLMS made their presentations false and misleading.

177.   Although they were not supposed to discuss off-label indications with physicians, Parke-Davis sales representatives regularly made false statements to doctors about Neurontin's utility in treating RLS/PLMS. The following are representative false statements by the sales force. Plaintiffs were only able to obtain evidence of such statement for a limited time period between 1995 and 1997, but are aware of "verbatim" reports that exist for the last several years. Upon information and belief, review of recent verbatim reports will demonstrate that similar statements were regularly made by the Defendants' sales forces from 1999 through 2004.

- In August 1996, a Parke-Davis sales representative falsely stated that Neurontin was "Effective in controlling postherpetic pain; restless leg syndrome, peripheral neuropathy, migraine headache."
- In December 1996, a Parke-Davis sales representative stated that Neurontin was "Good for restless leg syndrome."

### D.  Representations Regarding Bipolar Disorder and Other Mood Disorders

178.  In May 1995, when Parke-Davis created its original marketing assessment for the use of Neurontin to treat bipolar disorder, which is commonly called, manic depression, it knew that there was no scientific rationale for Neurontin being an effective agent for treatment. Nonetheless, it planned to promote, and intended the Off-Label Promotion Enterprise to promote, Neurontin heavily for bipolar disorder and other mood disorders.

179.  At events produced by the Off-Label Promotion Enterprise, physician participants routinely stated that Neurontin was effective for the treatment of bipolar disorder and other mood disorders. Events presented by the Off-Label Promotion Enterprise that discussed Neurontin's use as a treatment for bipolar disorder included, but are not limited to, the following events:

| Topic | Location | Date |
|---|---|---|
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Mason Robert<br>Boston, MA | March 16, 1998 |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Sunset Grill<br>Nashville, TN | March 16, 1998 |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Pescatore Fish Café<br>Seattle, WA | March 16, 1998 |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Patrick's Bayside Bistro<br>St. Pete's Beach, FL | March 17, 1998 |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Heathman Hotel<br>Portland, OR | March 17, 1998 |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Downtown Club<br>Philadelphia, PA | March 18, 1998 |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Morton's of Chicago Buckhead<br>Atlanta, GA | March 18, 1998 |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Huntington Hotel<br>San Francisco, CA | March 18, 1998 |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Brass Elephant<br>Baltimore, MD | March 19, 1998 |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series | Ristorante DeGrezia<br>New York, NY | March 19, 1998 |
| The Use of Anticonvulsants in Psychiatry | Barcelona, Spain | October 23-25, 1998 |
| Parke-Davis Speakers Bureau Meeting | Fairmont Scottsdale Princess<br>Scottsdale, AZ | January 21-23, 2000 |

| Topic | Location | Date |
|---|---|---|
| Merritt-Putnam Speakers Bureau: Current Perspectives in the Understanding of Neurobehavioral Disorders | Four Seasons Regent Beverly Wilshire<br>Beverly Hills, CA | March 24-26, 2000 |
| Advisory Board Meeting | Hyatt Regency Hotel<br>San Antonio, TX | March 29, 2000 |
| Merritt-Putnam Speakers Bureau | Wyndham New Orleans at Canal Place<br>New Orleans, LA | April 7-9, 2000 |
| Merritt-Putnam Speakers Training: Advanced Perspectives in the Management of Neurological and Mood Disorders | Enchantment Resort<br>Sedona, AZ | April 28-30, 2000 |
| 2000 CME | Westin William Penn Hotel<br>Philadelphia, PA | May 21, 2000 |

180.   The speakers who made these statements did not have any clinical evidence to support such claims. These statements implied that clinical trial evidence sufficient to establish causation existed, but as discussed below, clinical studies that were conducted did not find that Neurontin is effective for the treatment of bipolar disorder. On every occasion the Off-Label Promotion Enterprise gave a presentation on the use of Neurontin for bipolar disorder without informing physicians that there was no scientific basis for using Neurontin, it omitted to inform the physician attendees of material information that was required to be presented in order for its statements on the use of Neurontin to not be misleading and false and to satisfy its obligation to provide fair and balanced information.

181.   As early as May 20, 1997, Parke-Davis knew that clinical trial evidence established that Neurontin was not significantly superior to placebo in treating bipolar disorder. At the 1997 Annual Meeting of the American Psychiatric Association in San Diego, CA , investigators presented the results of a placebo controlled clinical trial comparing placebo, lamotrigine and Neurontin on depression and bipolar patients that established that Neurontin was not

significantly more effective than placebo and considerably less effective than a competitor drug, lamotrigine. By the third quarter of 1997, Parke-Davis knew that the results of its own clinical trial of Neurontin showed that placebo was more effective than Neurontin in treating bipolar disorder.

182.    Although Parke-Davis knew the results of its negative bipolar disorder clinical trial as early as 1997, it did not publish the results until 2000, nor did it halt the sponsorship of events that promoted Neurontin as an effective treatment of bipolar disorder and other mood disorders and psychiatric conditions. Further, Parke-Davis contends it informs Drugdex of all articles concerning Neurontin that are not contained in Drugdex's monograph on Neurontin. Drugdex has never included citations to either of the articles that document the negative clinical trials for bipolar disorder.

183.    Regardless of the clinical trial results, the Off-Label Promotion Enterprise continued to make presentations to physician attendees where Neurontin was promoted for use with patients suffering from bipolar disorder and other mood disorders. In most of these presentations, the attendee physicians were not informed of the negative clinical trial evidence. For example, the Off-Label Promotion Enterprise created and sponsored a series of dinner meetings for psychiatrists entitled "Closing the Psychiatry-Neurology Divide: Emerging Uses of Anticonvulsants." This program was presented dozens of times in 1998, including one in St. Petersburg, Florida at Patrick's Bayside Inn. As part of the program, psychiatrists were informed Neurontin was indicated for bipolar disorder, that early evidence suggested that it had antidepressive and mood stabilizing effects, and "data are increasing but currently limited to favorable case reports and open trials." The program did not inform attendees of the unfavorable

clinical trials that found that Neurontin was not effective for bipolar disorder and that it was less effective than a placebo.

184.    Upon information and belief, anecdotal evidence was presented to support Neurontin's use at every presentation concerning Neurontin's use for bipolar disorder. None of the presentations admitted to negative evidence of Neurontin's failure to treat bipolar disorder patients, even though such evidence had been made known to Defendants. Defendants' intentional failure to provide negative clinical evidence concerning Neurontin's treatment for bipolar disorder made their presentations false and misleading.

185.    Although they were not supposed to discuss off-label indications with physicians, after placebo-controlled clinical results established that Neurontin was not effective for the treatment of bipolar disorder, Parke Davis's sales force nonetheless regularly made false statements about Neurontin's utility in treating bipolar disorder and other mood disorders. Plaintiffs were only able to obtain evidence of such statement for a limited time period between 1995 and 1997, but are aware of "verbatim" reports that exist for the last several years. Upon information and belief, review of recent verbatim reports will demonstrate that similar statements were regularly made by the Defendants' sales forces from 1999 through 2004. Representative statements made to physicians include:

- At a Parke-Davis marketing event in 1997, Parke-Davis falsely stated that Neurontin was "effective" for "bipolar."
- In December 1998, a Parke-Davis sales representative falsely stated to a physician that Neurontin was an "effective treatment of bipolar disorder."
- At a Parke-Davis marketing event in December 1998, Parke-Davis falsely stated that Neurontin was "Effective on bipolar."
- At a Parke-Davis marketing event at the airport Marriott in San Francisco in August 1998, Parke-Davis falsely stated that Neurontin was "Innovative and effective …for bipolar II."

### E. Representations Regarding Anxiety Disorders, including Panic Disorder, Social Phobia, and Generalized Anxiety Disorder

186.  In its Manual and Statistical Manual of Mental Disorders (4th ed. 1994) ("DSM-IV-TR"), the American Psychiatric Association ("APA") recognizes the following as related anxiety disorders: Acute Stress Disorder (acute psychological consequences of previous trauma), Agoraphobia (anxiety about being in places where escape may be difficult or embarrassing, such as being away from home or in crowds), Generalized Anxiety Disorder (nonspecific anxiety), Obsessive-Compulsive Disorder (obsessive thoughts and compulsive rituals), Panic Disorder (unprovoked panic attacks), Posttraumatic Stress Disorder (non-acute psychological consequences of previous trauma), Separation Anxiety Disorder (inappropriate and excessive anxiety concerning separation from home or relatives), Social Phobia (irrational fear of embarrassment), and Specific Phobia (other specific irrational fears). Patients suffering from these disorders exhibit symptoms and reactions that may be similar; what distinguishes the disorders from each other, primarily, are the cues, triggers and situations that cause them to occur.

187.  There is a significant co-morbidity between Panic Disorder and other Anxiety Disorders, such as Social Phobia and Generalized Anxiety Disorder, and it is frequently difficult to differentiate one from the other. For example, according to the DSM-IV-TR, the majority of individuals with Social Phobia experience situational bound panic attacks (e.g. a person experiences a panic attack whenever speaking in public). Similarly, the line between Generalized Anxiety Disorder and other anxiety disorders may not be clear, since by definition Generalized Anxiety Disorder can include such other disorders. The DSM-IV-TR recognizes that Generalized Anxiety Disorder frequently co-occurs with other anxiety disorders, including Panic Disorder and Social Phobia.

188. The similarities between the various anxiety disorders and the difficulty in distinguishing one from another in a clinical setting can create challenges for treating the conditions through medication. Where it is difficult to distinguish which disorder the patient is suffering from, the best pharmacological choice is often the medication that is effective in treating all of the related anxiety disorders. Where it is uncertain, for example whether the patient is suffering from social phobia or panic disorder, it is clearly preferable to treat the patient with a medication that is effective in treating both conditions.

189. The subtle differences between the anxiety disorders, however, also create a marketing opportunity for a drug company that has a medication that is potentially useful in treating any of the conditions. Given the similarities between the disorders, a company marketing a medication effective for the treatment of, panic disorders, knows that treating physicians will likely prescribe the same medication for social phobia and generalized anxiety disorder, absent knowledge that the medication is ineffective for the related conditions. Arriving at its decision to market Neurontin for various anxiety disorders, including Panic Disorder and Social Phobia, Parke-Davis recognized that these disorders were related. In fact, the Defendants relied on the DMS-IV-TR in formulating their Marketing Assessments for Neurontin and Psychiatric Disorders. Defendants were aware that due to the high co-morbidities and similarities among the various anxiety disorders, clinicians would consider a favorable study on any one anxiety disorder to be sufficient cause to try Neurontin in the other anxiety disorders.

190. Without a favorable result from a well-designed clinical trial for any of the specific anxiety disorders that established Neurontin's efficacy for that condition, Parke-Davis had no reasonable scientific basis for claiming that Neurontin was effective for any of the anxiety disorders. Nonetheless at events produced by the Off-Label Promotion Enterprise, physician

participants routinely stated that Neurontin was effective for the treatment of the anxiety disorders, including without limitation Panic Disorder, Social Phobia and Generalized Anxiety Disorder.

191.   In October 1997, Parke-Davis received results of its own clinical trial that found that Neurontin was no more efficacious than placebo in treating Panic Disorder. Parke-Davis did not publish the results of the negative Panic Disorder clinical trial until 2000. Moreover, regardless of the results of the clinical trial, the Off-Label Promotion Enterprise continued to make presentations to physician attendees where Neurontin was promoted for use with patients suffering from various anxiety disorders. In most of these presentations, the attendee physicians were not informed of the negative clinical trial evidence relating to Neurontin and Panic Disorder.

192.   Physicians were not told there was simply no scientific evidence demonstrating Neurontin's efficacy in various anxiety disorders such Generalized Anxiety Disorder, Agoraphobia, Obsessive-Compulsive Disorder, Separation Anxiety or Specific Phobia (other specific irrational fears). This omission led physicians to believe that any statement about Neurontin and one of the anxiety disorders would apply equally to other anxiety disorders. In some of the programs described on pages 36-37 physicians were informed that Parke-Davis had conducted a clinical trial which appeared to support Neurontin's use for social phobia. But by failing, in the same presentation, to disclose the negative trial relating to panic disorder, Defendants presented a misleading picture of Neurontin's efficacy. The existence of a negative study on a closely related disorder not only questioned the validity of the social phobia study, but failed to let physicians know that Neurontin was not appropriate when the patient had a differential diagnosis of social phobia or when a patient was suffering from a disorder closely

related to panic disorder. Defendants knew the limitations of Neurontin's efficacy on closely related disorders was critical information physicians required to properly utilize Neurontin in patients suffering from anxiety disorders, but intentionally withheld such information because it would deter physicians from prescribing Neurontin for anxiety patients.

193.   Events presented by the Off-Label Promotion Enterprise that discussed Neurontin's use as a treatment for the various anxiety disorders, but failed to inform physicians of the negative clinical trials for social phobia included, but are not limited to, events listed on pages 36-37.

194.   Upon information and belief, at every presentation concerning Neurontin's use for anxiety disorders, negative data concerning Neurontin and Panic Disorder was suppressed. Moreover, upon information and belief, anecdotal evidence was presented to support Neurontin's use for a variety of anxiety disorders. None of the presentations mentioned Neurontin failed to effectively treat patients with an anxiety disorder, even anecdotal evidence—let alone scientific evidence, though such evidence had been made known to Defendants. Defendants' intentional failure to provide a fair and balanced presentation of the anecdotal information concerning Neurontin's treatment for anxiety disorders made their presentations false and misleading. Moreover, the suppression and omission of the negative Panic Disorder clinical trial made all statements materially omissive misrepresentations.

195.   Representative false statements concerning Neurontin's use in anxiety disorders include:

- On April 1, 2001, at a CME event held at Hyatt Regency in Milwaukee, WI, a speaker told the attendees of Neurontin's "Value in treatment of anxiety / pain."
- On May 20, 1998, at a dinner meeting at the Heathman Lodge in Vancouver, WA, a speaker told the physician-attendees that Neurontin "May be helpful in panic [disorder]."

**F.      Representations Regarding Monotherapy**

196.   In numerous presentations produced by the Off-Label Promotion Enterprise, physician participants asserted that Neurontin was effective monotherapy for the treatment of epilepsy, despite the fact that it had only been approved by the FDA for adjunct therapy. As early as November 1995, Parke-Davis knew that clinical trial evidence demonstrated that Neurontin was not an effective monotherapy treatment. Notwithstanding its knowledge of the unsuccessful clinical trials, the Off-Label Promotion Enterprise, under Parke-Davis's control, continued to make false representations about Neurontin's efficacy as a monotherapy medication and failed to disclose to most attendee physicians the negative clinical trial evidence in its possession.

197.   For example, at the Jupiter Beach consultants' meeting in August 1996, Dr. Harden and Dr. LeRoy gave presentations that claimed that Neurontin was effective for monotherapy. Drs. Harden and Leroy misrepresented the results of Clinical Study 945-82, both by claiming that the study did not evidence a failure of Neurontin efficacy and by misrepresenting the lack of a dose response. Furthermore, Dr. Leroy misrepresented that an Eastern European clinical trial had been successful when in fact the double blind codes of the study had not been broken and patient recruitment had not been completed. Notwithstanding that the only long-term clinical trial of Neurontin as monotherapy at the time of the Jupiter Beach meeting demonstrated that Neurontin was not effective for that use, attendees at Jupiter Beach came away with the message that Neurontin was effective. Drs Harden and Leroy could have only received information about the status of these unpublished clinical trials from Parke-Davis. Parke-Davis knew that proof of efficacy for monotherapy required successful completion of two clinical trials demonstrating Neurontin's efficacy. Clinical Study 945-82, a double blind, placebo-controlled study, was designed to be a pivotal study in support of monotherapy. But the results were negative, and

failed to demonstrate that Neurontin was effective in treating seizures at doses up to 2400 mg/day. As early as November 1995, Parke-Davis knew that Clinical Trial 945-82 did not support a monotherapy indication. In addition to failing to establish monotherapy efficacy; Clinical Trial 945-82 also failed to establish a dose response at 600, 1200 and 2400 mg.

198.   Parke-Davis also knew that another clinical trial, the Eastern European pilot study 945-177 (an extension of the 945-77 protocol) failed to establish dose differentiation and statistically significant efficacy. Parke-Davis did not intend to publish the results of 945-177, nor did they intend to publish the combined results of 945-77 and 945-177.

199.   On September 13, 1996, Parke-Davis submitted a supplemental NDA to approve Neurontin as monotherapy for partial seizures. The FDA determined the application to be non-approvable on August 26, 1997 because of insufficiency of evidence of Neurontin's effectiveness. The FDA noted that Clinical Study 945-82 failed to yield evidence of effectiveness. Parke-Davis did not make public that its application for monotherapy had been denied. Representative events at which the Off-Label Promotion Enterprise continued to make presentations that Neurontin was effective for monotherapy without disclosing that the FDA had denied its application for a monotherapy indication included, but are not limited to:

| Topic | Location | Date |
|---|---|---|
| Advisory Board Meeting | San Antonio, TX | March 29, 2000 |
| Hyatt Regency Hotel Monotherapy Speakers Bureau Meeting | La Quinta Resort Palm Springs, CA | September 1997 |

200.   Although Parke-Davis sales representatives were not supposed to make representations about Neurontin's use for monotherapy, their sales representatives routinely made false statements concerning Neurontin's utility as a monotherapy agent. Plaintiffs were only able to obtain evidence of such statement for a limited time period between 1995 and 1997, but are aware of "verbatim" reports that exist for the last several years. Upon information and

belief, review of recent verbatim reports will demonstrate that similar statements were regularly made by the Defendants' sales forces from 1999 through 2004. Representative statements made to physicians include:

- In January 1997, a Parke-Davis sales representative falsely stated that Neurontin was "Excellent first line [monotherapy] or add-on prescription for seizures."
- In a 1998 event, Parke-Davis falsely stated that Neurontin "Is effective as monotherapy."
- In June 1998, after the FDA had already rejected the monotherapy indication and Parke-Davis had abandoned pursuing approval for monotherapy, a Parke-Davis sales representative stated that Neurontin was "moving toward monotherapy indication in seizures."

201.   In a Parke-Davis marketing event later in 1998, Parke-Davis went so far as to state that Neurontin was "now approved as monotherapy for seizures."

## G.   Representations Regarding Migraine and Various Forms of Headache

202.   Parke-Davis knew that there was no pre-clinical rationale that would support the use of Neurontin in migraine prophylaxis.

203.   Parke-Davis conducted a 12-week migraine prophylaxis study in Europe during the late 1980s that revealed no statistically significant difference in migraine attack frequency between placebo and 900 mg of Neurontin therapy.

204.   In addition to the failed European migraine trial, Parke-Davis knew of several reports of negative results of Neurontin for migraine use, including reports from Dr. Seymour Solomon, Director of the Headache Unit at Montefiore Medical Center; Dr. John Rothrock, Chairman of the Department of Neurology at University of Alabama; Dr. Kenneth Michael Anthony Welch, Professor of Clinical Neurology at the University of Michigan; and Dr. Fred Michael Cutrer, Department of Neurology at Massachusetts General Hospital.

205.   Parke-Davis never disclosed the negative European trial on migraine to any persons outside of the company, and the negative results were never published.

206.  On May 25, 1996, Parke-Davis held an advisory board meeting to discuss "Gabapentin in the Management of Migraine." Parke-Davis's principal investigator for Neurontin and migraine chaired the meeting, and there were several other physicians in attendance. There were also several Parke-Davis employees in attendance, including the author of the marketing assessment, John Boris, who was aware of the failed European clinical trial. Vendor participant AMM/Adelphi ran the meeting. The purpose of the meeting was to discuss the knowledge of Neurontin's possible utility in the area of migraine and to solicit feedback on the development of clinical trials.

207.  Parke-Davis suppressed any reference to the failed migraine study of the late 1980s at the advisory board meeting. Leslie Magnus-Miller, Parke-Davis's Medical Affairs Director was directly asked, "But do you have any data [relating to Neurontin and migraine]?" Dr. Magnus-Miller responded: "We didn't…No, not really, because we didn't capture headache baseline." Edda Guerrero added: "Unfortunately we did not, not even in monotherapy I think. Right?" John Boris did not correct this misstatement. Parke-Davis also failed to mention that there was "no established preclinical rational that would support the use of Neurontin in migraine prophylaxis."

208.  Thereafter, pursuant to marketing strategies and tactics developed by Parke-Davis and the Off-Label Promotion Enterprise, the Off-Label Promotion Enterprise regularly presented programs in which physician participants touted Neurontin as being effective for the treatment of migraine and other forms of headache. Events where such presentations were made include, but were not limit to, the following:

| Topic | Location | Date |
|---|---|---|
| Advisory Board Meeting | Hyatt Regency Hotel San Antonio, TX | March 29, 2000 |
| Gabapentin in the Management of Migraine | Short Hills, NY | May 25, 1996 |

209.   In these presentations, Parke-Davis failed to inform physician participants of the failed migraine trial or the negative anecdotal evidence it received from its own advisory board physicians. It also failed to inform physicians that there was no established rationale that would support the use of Neurontin for migraine and no clinical trial evidence. Defendants' failure to provide this information violated their duty of providing fair and balanced information and made any prior statements about Neurontin's use for migraine false and misleading.

210.   Although Parke-Davis's sales representatives were not supposed to make representations about Neurontin's use for migraine, their sales representatives routinely made false statements regarding the utility of Neurontin in treating migraine and other forms of headache. Plaintiffs were only able to obtain evidence of such statement for a limited time period between 1995 and 1997, but are aware of "verbatim" reports that exist for the last several years. Upon information and belief, review of recent verbatim reports will demonstrate that similar statements were regularly made by the Defendants' sales forces from 1999 through 2004. Representative statements made to physicians include a statement made by a Parke-Davis salesperson in August 1996 who stated "Effective in controlling …migraine headache."

## H.  False Statements About Other Indications

211.   Neurontin is prescribed for hundreds of additional indications for which there is no scientific support and which are not approved by the FDA. Pursuant to marketing strategies and tactics developed by Parke-Davis and the Off-Label Promotion Enterprise, the Off-Label Promotion Enterprise regularly presented programs in which physician participants touted Neurontin as being effective for other conditions in addition to those described. Such statements were false and misleading, because there were no clinical trial evidence that Neurontin was effective for the treatment of any conditions other than adjunct therapy for partial seizures and

post-herpetic neuralgia. In these presentations, Parke-Davis failed to inform physician attendees that there was no established rationale that would support the use of Neurontin for conditions other adjunct therapy for partial seizures and post-herpetic neuralgia. Defendants' failure to provide this information violated their duty of providing fair and balanced information and made any prior statements about Neurontin's use for conditions other than adjunct therapy for partial seizures and post-herpetic neuralgia false and misleading.

### I.   Representations Regarding Dosages Above the FDA-Approved Maximum

212.   Although Neurontin's maximum effective dose approved by the FDA was between 900 mg and 1800 mg per day, Defendants embarked on a scheme to induce physicians to raise the daily dose of their patients far beyond the 1800 mg threshold. The scheme served two purposes. The first purpose was the naked desire for more profit. As previously alleged, in the mid-1990s, the cost of a patient's Neurontin regimen within the FDA-approved daily dose range of 900 mg to 1800 mg was between $2.25 and $4.50 per day. This translated into a monthly cost of between $68.50 and $137.00, and a yearly cost of between $800 and $1,600. Defendants determined that they could increase the revenue for Neurontin—even if they never obtained any new patients—by simply causing doctors to increase the dose of Neurontin for existing patients. Thus, for example, the annual revenue from one patient could be doubled—from $1,600 per year to as much as $3,200—if that patient simply ingested 3600 mg per day, rather than 1800 mg. The following table shows just how profitable the higher-than-approved doses could be:

| AVERAGE COST NEURONTIN (mid-1990s) | | | |
|---|---|---|---|
| Daily Dose | Per Day | Per Month | Per Year |
| 900 mg | $2.25 | $68.50 | $821.25 |
| 1800 mg | $4.50 | $137.00 | $1,642.50 |
| 2400 mg | $5.40 | $164.25 | $1,971.00 |
| 3600mg | $8.10 | $246.50 | $2,956.50 |
| 4800 mg | $10.80 | $328.75 | $3,942.00 |

213.   The second purpose was to counter criticisms of Neurontin from physicians who were resistant to the Defendants' marketing efforts. Early in its experience in marketing Neurontin, Parke-Davis learned that many physicians did not consider the drug to be efficacious; in fact, it was commonly referred to as "gaba-water." Parke-Davis attempted to explain this lack of efficacy by trying to convince doctors that they had not given the patient sufficient medication. At an advisory board meeting, Parke- Davis stated it "therefore went on an aggressive campaign to try to convince the doctors to push the dose of Neurontin up into the 2400 to 3600 mg range."

214.   Evidence from clinical studies did not support Parke-Davis's marketing campaign to increase Neurontin dosages beyond the limit approved by the FDA. Further, Parke-Davis knew of this lack of efficacy. As early as December 30, 1994, Parke-Davis knew that there was a lack of proportionality between the dose of gabapentin administered to subjects and the level absorbed. In other words, increasing the dosage of Neurontin does not necessarily mean that more Neurontin is actually absorbed by the body due to the manner it is excreted and the maximum levels that can accumulate.

215.   As of November 14, 1995, Parke-Davis knew that clinical trials 945-82 did not show a dose related response. Patients who took 600 mg of Neurontin did not achieve any different

results than patients who took 1200mg or 2400 mg. Such results were at odds with Parke-Davis's claim that the larger the dose, the better the effect.

216.    Notwithstanding the failure of Clinical Trial 945-82 to exhibit a dose relationship, and notwithstanding the fact that the Core Marketing Team within Parke-Davis intended to initiate a nationwide campaign to convince physicians to increase dosing to 2400 mg/day (33% greater than the maximum dosage proven safe and effective), Parke-Davis made the deliberate decision that it would not initiate clinical trials to determine if higher dosages (1800mg to 3600mg) were effective in add-on therapy.

217.    A second monotherapy clinical trial confirmed the lack of improved efficacy at a higher dosage. In Clinical Trial 945-77, 900 mg/day Neurontin was found to be just as efficacious as Neurontin at 1800 mg/day. Defendants made a deliberate decision not to release the results of clinical trials that did not establish any dose differentiation.

218.    Although Parke-Davis was routinely sponsoring programs that recommended that dosages be increased to as high as 4800 mg/day, Parke-Davis knew that it did not have sufficient toxicology data to prove that Neurontin was safe at dosages as high as 3600 mg.

219.    During programs presented by the Off-Label Promotion Enterprise, physician participants routinely stated that dosages above the maximum approved by the FDA increased Neurontin's efficacy. For example, during the migraine advisory board meeting, Dr. Rafferty, a pre-clinical researcher from Parke-Davis, falsely stated the following: "The antiepileptic activity of gabapentin is quite dose dependent. Oh yeah." Parke-Davis was aware that its own clinical trial on Neurontin for epilepsy monotherapy had shown no dose-related difference in efficacy in doses ranging from 600 mg per day to 2400 mg per day. The negative findings of the monotherapy trial were not disclosed to the advisory board members.

220.   At the "consultants" meeting in Jupiter Beach in April 1996, Dr. Longmire stated that: "most [patients] do better as you raise [the dose] higher." At the same presentation, and in other presentations, such as the Consultants' Meeting at the Boston Ritz Carlton, Dr. Longmire also stated that the only reason a patient who was actually taking his medication and not malingering would not receive any benefit from Neurontin was if he was not receiving a high enough dose. Neither Dr. Longmire nor the other Parke-Davis personnel present informed the physicians that Parke-Davis's own clinical trials established that there was no dose relationship.

221.   At the same Consultants' Meeting, Dr. LeRoy stated: "we found that clinical usage requires [daily dosages of] 2200, 3200, 3600, up to what I think… again, as I said earlier, a limit of about 4800 milligrams." At a minimum, this statement was not fair and balanced in that it did not disclose any contrary findings about the lack of dose-related response, including Parke-Davis's own outpatient study that failed to identify a dose response. It also did not disclose that Parke-Davis had no toxicology data establishing safety at doses this high.

222.   At the Consultants' Meeting at the Boston Ritz-Carlton in May 1996, Dr. Longmire made false statements such as: "the problem with Neurontin in terms of real trigeminal neuralgia is that it has to be titrated upward. And when I say 1500 milligrams, that's the target starting dose. There are colleagues in the Huntsville area who, I have people on 5400 with no side effects." This statement was misleading for a number of reasons: it implied that Neurontin was effective for trigeminal neuralgia at higher-than-approved doses; it did not disclose side effects reported to Parke-Davis at higher level; it did not disclose the absence of toxicology data at these levels; it did not disclose there was no clinical data to support Neurontin's efficacy on trigeminal neuralgia; and it failed to disclose Parke-Davis's own clinical trials that questioned the existence of a dose relationship.

223.   Notwithstanding the lack of toxicology data and clinical trial data supporting Neurontin's use at higher doses, attendees at Jupiter Beach were convinced that they should be prescribing Neurontin at amounts in excess of its labeling. One physician noted "[O]ne of the main messages that I got out of the speakers [that doctors haven't been pushing the dose up high enough]. (Inaudible) 4800 milligrams (Inaudible). And I've sort of gone to 24 and maybe a little higher and then stopped. To me, that was an important point (Inaudible) I'm not really pushing the drug enough."

224.   Parke-Davis applied to the FDA to increase the effective dose range to include 3600 mg/day and to increase the maximum recommended dose to 4800 mg/day. On August 26, 1997, the FDA denied the application because there was no evidence that Neurontin was safe at such doses.

225.   The FDA also informed Parke-Davis that if it did provide safety data, it could only obtain the labeling change if it further disclosed that "evidence from controlled trials fails to provide evidence that higher dose of Neurontin are more effective than those recommended."

226.   Parke-Davis never disclosed that the FDA denied its request to increase the maximum approved dose of Neurontin, that the FDA had determined that Parke-Davis had not provided sufficient evidence of safety at higher doses, and that there was no clinical trial evidence that Neurontin was more effective at higher doses. Parke-Davis continued to market Neurontin at higher doses without these disclosures.

227.   Notwithstanding the FDA's refusal to increase the maximum approved dosage of Neurontin and its finding that no clinical evidence supported Neurontin's efficacy at dosages greater 1800 mg per day, the Off-Label Promotion Enterprise presented numerous programs where physician participants asserted that Neurontin was effective and safe at dosages above

1800 mg. All such representations were false and misleading. Additionally, at these presentations the physician participants did not disclose the clinical trial evidence that demonstrated that there was no dose response above 1800 mg per day. Defendants' failure to provide this information was a violation of Defendants' duties to provide fair and balanced information and made any prior representations about use of Neurontin at dosages greater than 1800 mg false and misleading. In addition to the events identified above, other events where these false and misleading statements were made include, but are not limited to, the following:

| Topic | Location | Date |
|---|---|---|
| Advisory Board on Neurontin | Royal Sonesta New Orleans, LA | February 4-6, 2000 |
| Merritt-Putnam Speakers Bureau Current Perspectives in the Understanding of Neurobehavioral Disorders | Four Seasons Regent Beverly Wilshire Beverly Hills, CA | March 24-26, 2000 |
| Advisory Board Meeting | Hyatt Regency Hotel San Antonio, TX | March 29, 2000 |

## J. Representations Concerning Lack of Side Effects

228.   Parke-Davis knew that there was a dose relationship between Neurontin and side effects. Clinical Trial 945-77 demonstrated that patients were three times more likely to have side effects at 1800 mg/day than at 900 mg/day.

229.   Parke-Davis was aware that the January 1996 edition of Epilepsy reported behavioral side effects of gabapentin in seven children who received Neurontin as adjunctive therapy. The most troublesome behaviors were tantrums, aggression towards others, hyperactivity, and defiance.

230.   Parke-Davis knew as of November 19, 1996 that high doses of gabapentin could lead to weight gain.

231. Parke-Davis also knew that, similar to other anti-epileptic drugs, patients on high doses of Neurontin had to be titrated down, or else they would suffer withdrawal symptom side effects.

232. At numerous events presented by the Off-Label Promotion Enterprise, physician participants informed physician attendees that Neurontin use at high levels did not cause side effects. For example, at the Jupiter Beach Consultants' Meeting in April 1996, Dr. Schachter stated: "Well, I don't think there's any data suggesting that there's any withdrawal syndrome from Neurontin at this point." At that time, Parke-Davis was aware of at least anecdotal reports of withdrawal syndrome and that Neurontin patients had to be tapered off Neurontin in much the same manner that they titrated up, but physician attendees were not informed of this information.

233. Similarly, at the Boston Ritz Carlton Consultants Meeting in May 1996, Dr. Longmire falsely stated that adverse reactions tend to be idiosyncratic, and that they did not seem to be dose-dependent. Again, the physician attendees were not informed of the medical evidence in Parke-Davis's possession that side effects were dose responsive. Defendants' failure to provide this information was a violation of Defendants' duties to provide fair and balanced information and made any prior representations about Neurontin's propensity to induce side effects at dosages over 1800 mg /day false and misleading.

234. In every event presented by the Off-Label Promotion Enterprise, including but not limited to, every event identified in this Amended Complaint, participating physicians asserted that Neurontin had a low side effect profile and therefore there was little risk in using the drug for off-label, unapproved indications. This "fact" was one of Neurontin's largest selling points. Failure to provide a fair and balanced presentation of the side effects that were caused by

Neurontin, especially at elevated doses, falsely implied that Neurontin was safe when prescribed for unapproved indications.

235.   At every presentation concerning Neurontin's use for off-label indications, anecdotal evidence was presented to support Neurontin's lack of side effects. Upon information and belief, none of the presentations, however, was anecdotal evidence presented of Neurontin's causation of debilitating side effects even though such evidence had been made known to Defendants. Defendants' intentional failure to provide a fair and balanced presentation of the anecdotal information concerning Neurontin's safety made their presentation false and misleading.

## K.  Misrepresentation of Promotional Nature of Events

236.   As described above, all of the events presented by the Off-Label Promotion Enterprise were made to appear to the attendee physicians to be bona fide educational events where disinterested leading clinicians shared their knowledge and experience in an educational setting. In fact, these events were peer selling promotional events designed to convince the attending physicians to prescribe Neurontin. Important facts that would have warned the attendee physicians that they were attending a promotional event for a drug company were concealed. These included the following facts:

- That virtually all of the publications and/or studies that purported to support Neurontin's use for off-label indications were funded by the Defendants;
- That virtually all of the studies that purported to support Neurontin's use for off-label indications had not been initiated by the physicians who were credited as authors, but by the Defendants and other members of the Off-Label Promotion Enterprise pursuant to a corporate marketing plan designed to increase off-label sales;
- That studies existed that found that Neurontin was not effective for off-label uses, but Defendants had deliberately refused to publish or publicize such studies; and
- That the participating doctors who were conducting the peer selling had been paid substantial subsidies to use Neurontin on their patients or in reward for their recommending Neurontin's use for off-label indications.

All events that appeared to be continuing medical education programs, the members of the Off-Label Promotion Enterprise described Defendants' contribution as merely the provision of an "unrestricted" grant. For the reasons set forth above, the grants provided by Defendants were not unrestricted but instead were conditioned on Defendants' receipt of a comprehensive program that advocated Neurontin's use for off-label indications and displayed the drug in the most favorable light available. Hiding Defendants' control of the content of the program and misrepresenting its financial support as an "unrestricted" grant were materially false statements that concealed the promotional nature of the programs. Had the attending physicians known the programs were outright promotion they would have viewed the presentations with greater skepticism and doubted the claims of the participating physicians that Neurontin was effective for the off-label indications.

## AS AND FOR A FIFTH CAUSE OF ACTION AGAINST THE DEFENDANTS

237.    Each Plaintiff repeats and reiterates the allegations previously set forth herein.

238.    Defendants knowingly and willfully engaged in unfair, deceptive and unconscionable acts and practices and disseminated information that was deceptive, misleading and false in a material way, in connection with the promotion and sale of Neurontin, in violation of N.J.S.A. § 56:8-2, for the purpose of influencing and inducing physicians and medical providers to prescribe Neurontin, at excessively high dosages, for unapproved "off-label" uses, including the "conditions" to disabled patients/consumers such as Plaintiffs, and knowingly took advantage of the inability of disabled patients/consumers such as Plaintiffs reasonably to protect their interests because of their physical and mental impairments and causing such disabled patients/consumers to purchase, acquire and use Neurontin, at high dosages, for unapproved "off-label" uses, including the "conditions", as prescribed by their physicians and medical providers.

239.   By reason of Defendants' unconscionable, deceptive and unfair acts and practices and dissemination of deceptive misleading and false information, reasonable patients/consumers acting reasonably, such as Plaintiffs, were caused to successfully and unsuccessfully commit suicide and to sustain actual damages and injuries.

240.   By reason of the foregoing, each Plaintiff sustained actual damages in a sum which exceeds the jurisdictional limits of all lower courts which would have jurisdiction of this matter, and in addition, Plaintiffs seek punitive and exemplary damages against Defendants in an amount to be determined upon the trial of this matter, costs and reasonable attorney fees.

WHEREFORE, each Plaintiff above demand judgment against the Defendants as follows:

a.   The sum of $100,000,000.00 each on the First Cause of Action, together with punitive damages and exemplary damages in an amount to be determined upon the trial of this Action; not exceeding 9-1 per *State Farm Mutual Auto Insurance Co. v. Campbell,* 123 S.Ct. 1513 (2003)

b.   The sum of $100,000,000.00 each on the Second Cause of Action, together with punitive damages and exemplary damages in an amount to be determined upon the trial of this Action;

c.   The sum of $100,000,000.00 each on the Third Cause of Action, together with punitive damages and exemplary damages in an amount to be determined upon the trial of this Action;

d.   The sum of $100,000,000.00 each on the Fourth Cause of Action, together with punitive damages and exemplary damages in an amount to be determined upon the trial of this Action;

e.  A sum which exceeds the jurisdictional limits of all lower courts which the jury would find to be fair, adequate and just on the Fifth Cause of Action, together with punitive damages and exemplary damages in an amount to be determined upon the trial of this Action, and reasonable attorney's fees, as may be found by the Court upon the trail of this Action, together with the interest, costs and disbursements of this Action.

Respectfully submitted,

_____
NEWTON B. SCHWARTZ, SR.
*Law Offices of Newton B. Schwartz, Sr.*
Texas State Bar No.17869000
1911 Southwest Freeway
Houston, Texas 77098
Telephone:    (713) 630-0708
Facsimile:    (713) 630-0789

JACK W. HARANG
*Law Offices Jack W. Harang, APLC*
Louisiana State Bar No.15083
3500 North Hullen Street
Metairie, Louisiana 70002
Telephone:    (504) 456-8658
Facsimile:    (504) 456-8641

JULIE C. PARKER (Atty. No. 91418)
ANDREW B. SACKS (Atty. No. 41393)
JOHN K. WESTON (Atty. No. 26314)
*Sacks & Weston*
114 Old York Rd.
Jenkintown, Pennsylvania 19046
Telephone:    (215) 925-8200
Facsimile:    (215) 925-0508