# Exhibit 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| IN RE NEURONTIN MARKETING AND SALES PRACTICES LITIGATION | ) ) ) | MDL Docket No. 1629 |
| THIS DOCUMENT RELATES TO: | ) ) | Master File No. 04-10981 |
| THE GUARDIAN LIFE INSURANCE COMPANY OF AMERICA v. PFIZER INC., et al., 04 CV 10739 (PBS) and | ) ) ) ) | Judge Patti B. Saris |
| AETNA, INC. v. PFIZER INC., et al., 04 CV 10958  (PBS) | ) ) ) ) | |

## THIRD COORDINATED AMENDED COMPLAINT

**TABLE OF CONTENTS**

Page

I.      NATURE OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

III.    JURISDICTION AND VENUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

IV.     FACTUAL ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        A.    Neurontin . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        B.    Defendants' Deliberate Decision to Avoid Seeking FDA Approval
              and Promote Off-Label Uses for Neurontin Through the Publication
              of False and Misleading Scientific, Medical and Clinical Data . . . . . . . . . . . . . . 7

        C.    Implementation of the "Publication Strategy"
              and Creation of the Promotion Enterprise . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        D.    The Promotion Enterprise . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

              1.    The Role of Medical Marketing Firms -- The
                    Vendor Participants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

                    (a)    Cline Davis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

                    (b)    Thompson Physicians World . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

                    (c)    Sudler & Hennessey . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

                    (d)    MEDED/MEDCON . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

                    (e)    MES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

                    (f)    HCC . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

                    (g)    AMM/Adelphi . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

              2.    The Role of Physicians -- The Physician Participants . . . . . . . . . . . . . . . 34

              3.    Participation and Knowledge of the Vendor and
                    Physician Participants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

        E.    Defendants' Use of the Promotion Enterprise to Fraudulently
              Promote Neurontin -- The Misrepresentations . . . . . . . . . . . . . . . . . . . . . . . . . . 40

|     | 1.  | Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40 |
|     | 2.  | False and Misleading Statements Regarding Pain . . . . . . . . . . . . . . . . . . 40 |
|     | 3.  | False and Misleading Statements Regarding Diabetic Peripheral Neuropathy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44 |
|     | 4.  | False and Misleading Statements Regarding Restless Leg Syndrome . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46 |
|     | 5.  | False and Misleading Statements Regarding Bipolar Disorder . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48 |
|     | 6.  | False and Misleading Statements Regarding Social Phobia . . . . . . . . . . 51 |
|     | 7.  | False and Misleading Statements Regarding Panic Disorder . . . . . . . . . 54 |
|     | 8.  | False and Misleading Statements Regarding Migraine . . . . . . . . . . . . . . 56 |
|     | 9.  | False and Misleading Statements Regarding Monotherapy for Epilepsy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58 |
|     | 10. | False and Misleading Statements Regarding Dosages Above the FDA-Approved Maximum . . . . . . . . . . . . . . . . . . . . 61 |
|     | 11. | False and Misleading Statements Regarding the Lack of Side Effects . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65 |
|     | 12. | False and Misleading Statements Regarding Other Indications . . . . . . . 66 |
| F.  | Alternative Treatments Cheaper than Neurontin . . . . . . . . . . . . . . . . . . . . . . . . 66 |
| G.  | Alternative Sub-Enterprises . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68 |
| H.  | The Unlawful Conduct Continues Following the Pfizer Merger With Warner-Lambert and Through At Least December 2004 . . . . . . . . . . . . . . 69 |
|     | 1.  | Articles Sponsored by Pfizer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72 |
|     | 2.  | Presentations and Marketing Events Sponsored By Pfizer That Promoted the Same Misleading Key Messages as the MAC and Fallon Medica Articles . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77 |
| I.  | The Continuing Impact of Defendants' Fraudulent Off-Label Promotion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92 |
| J.  | Related Government Actions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94 |

V.      FRAUDULENT CONCEALMENT AND
        TOLLING OF STATUTES OF LIMITATIONS ............................... 95

VI.     DEFENDANTS' MOTIVE ............................................... 96

VII.    USE OF THE MAILS AND WIRES ....................................... 97

VIII.   SCOPE OF THE ALLEGATIONS ........................................ 98

        A.      Time ...................................................... 98

        B.      Geographic Scope .......................................... 98

IX.     CLAIMS FOR RELIEF ................................................ 98

        FIRST CLAIM FOR RELIEF
        Violation of 18 U.S.C. § 1962(c) (The Promotion Enterprise) ..................... 98

        SECOND CLAIM FOR RELIEF
        Violation of 18 U.S.C. § 1962(c) (The Cline Davis Sub-Enterprise) .............. 101

        THIRD CLAIM FOR RELIEF
        Violation of 18 U.S.C. § 1962(c) (The Physicians World Sub-Enterprise) .......... 104

        FOURTH CLAIM FOR RELIEF
        Violation of 18 U.S.C. § 1962(c) (The Sudler & Hennessey Sub-Enterprise) ....... 108

        FIFTH CLAIM FOR RELIEF
        Violation of 18 U.S.C. § 1962(c) (The MEDED/MEDCON Sub-Enterprise) ....... 111

        SIXTH CLAIM FOR RELIEF
        Violation of 18 U.S.C. § 1962(c) (The MES Sub-Enterprise) ..................... 114

        SEVENTH CLAIM FOR RELIEF
        Violation of 18 U.S.C. § 1962(c) (The HCC Sub-Enterprise) ..................... 117

        EIGHTH CLAIM FOR RELIEF
        Violation of 18 U.S.C. § 1962(c) (The AMM/Adelphi Sub-Enterprise) ............ 120

        NINTH CLAIM FOR RELIEF
        Violation of 18 U.S.C. § 1962(c) (The Publication/Marketing Sub-Enterprise) ...... 123

        TENTH CLAIM FOR RELIEF
        Violation of 18 U.S.C. § 1962(d) by Conspiring to Violate 18 U.S.C. § 1962(c) ..... 127

        ELEVENTH CLAIM FOR RELIEF
        Violations of the California Unfair Competition Law

Cal. Bus. & Prof. Code § 17200 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 129

TWELFTH CLAIM FOR RELIEF
Violations of the Consumer Protection Statutes of the Remaining 49 States,
The District of Columbia and the Commonwealth of Puerto Rico . . . . . . . . . . . . . . . 130

THIRTEENTH CLAIM FOR RELIEF
Insurance Fraud - Violation of 18 Pa. C.S. § 4117 . . . . . . . . . . . . . . . . . . . . . . . . . . . 135

FOURTEENTH CLAIM FOR RELIEF
Restitution/Disgorgement for Unjust Enrichment . . . . . . . . . . . . . . . . . . . . . . . . . . . . 137

X.    DEMAND FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 138

DEMAND FOR A JURY TRIAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 139

Plaintiffs, The Guardian Life Insurance Company of America ("Guardian"), Kaiser

Foundation Health Plan, Inc., Kaiser Foundation Hospitals, and Aetna, Inc. ("Aetna")

(collectively, "Plaintiffs"), bring this lawsuit against defendants Pfizer, Inc. ("Pfizer"), Warner-

Lambert Company ("Warner-Lambert") and Parke-Davis, a division of Warner-Lambert

(collectively referred to as "Parke-Davis" or "Defendants").  The facts and information averred

herein are based upon Plaintiffs' personal knowledge and beliefs and upon investigation of

counsel.  For their Third Coordinated Amended Complaint against Defendants, Plaintiffs allege

as follows:[1]

## I.    NATURE OF THE CASE

1.    Plaintiffs are large health insurers that were among the principal victims of

Defendants' wrongful scheme to promote and market the prescription drug Neurontin®.

Neurontin was a drug with limited sales potential for Defendants – as an adjunctive therapy for

the treatment of partial seizures in adults with epilepsy and, later, as a treatment for shingles in

adults.  Based on the extremely limited utility of the drug, Defendants initially projected that

their total sales of Neurontin would approximate $500 million over its life span.

2.    To increase their sales of Neurontin, Defendants embarked on a comprehensive

campaign to promote Neurontin for unapproved and inappropriate uses through a fraudulent and

deceptive marketing program.  Defendants (a) deliberately misrepresented the scientific, medical

and clinical data concerning the safety, effectiveness and usefulness of Neurontin; (b) suppressed

or mischaracterized negative studies of the drug; and (c) caused misleading presentations to be

---

[1] Plaintiffs have included in this Second Amended Complaint certain facts and claims that
have been dismissed by the Court to preserve Plaintiffs' right to seek review on these matters.
See Kolling v. American Power Conversion Corp., 347 F.3d 11, 16 & n.10 (1st Cir. 2003).

made to Plaintiffs and physicians concerning Neurontin, its recommended and effective dosages, efficacious uses and lack of purported side effects.

3.     Defendants' unlawful scheme to inflate sales of Neurontin was extraordinarily successful, with sales soaring from $97.5 million in 1995 to more than $2.7 billion in 2003. Notably, by 2003, *90% of all Neurontin prescriptions were for off-label uses.*

4.     Plaintiffs and other third-party payors ("TPPs") paid the vast majority of the purchase price of Neurontin and thus suffered the largest direct economic injury from the wrongdoing. Indeed, the financial success of Defendants' scheme depended upon targeting Plaintiffs, other health insurers, and doctors. Neurontin was a relatively expensive medication that cost on average more than $125 for a prescription and of which Plaintiffs and other TPPs often paid more than $100 (80%) of the total cost. Defendants thus knew that the substantial drug sales that Defendants sought were dependent upon TPPs, such as Plaintiffs, covering the cost of Neurontin or purchasing and dispensing the drug to plan members. It was also essential that Plaintiffs and other TPPs not favor alternative treatments that were cheaper or more effective than Neurontin for the medical conditions for which it was being prescribed. Plaintiffs paid for Neurontin in quantities far exceeding its warranted use, and these vast payments (and resulting revenues for Defendants) were the result of Defendants' fraudulent scheme.

5.     In 2004, Warner-Lambert pled guilty to violating the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 331, et seq., by distributing an unapproved new drug and distributing a misbranded drug; entered into a voluntary compliance agreement with the State Attorneys General; and paid $430 million in fines and penalties, as a result of Defendants' unlawful off-label promotion and sale of Neurontin. By this action, Plaintiffs seek to recover their excessive payments for Neurontin and the amounts by which Defendants were unjustly enriched.

## II.    **PARTIES**

6.    Guardian is a mutual life insurance company organized and existing under the laws of the state of New York. Guardian provides health payment benefits to approximately 1.3 million people in all 50 states. From 1994 to the present, Guardian has paid tens of millions of dollars to U.S. pharmacies for excessive payments for Neurontin caused by Defendants' wrongful acts.

7.    Kaiser Foundation Health Plan, Inc., a not-for-profit corporation with its headquarters in Oakland, California, is among the largest health maintenance organizations in the United States. As of December 2004, Kaiser Foundation Health Plan, Inc. had 8.2 million members in nine states and the District of Columbia, with over 6 million members in California. The remaining members are in Colorado, Georgia, Maryland, Virginia, Oregon, Washington, Hawaii, Ohio and the District of Columbia. Kaiser Foundation Health Plan, Inc. offers its members pharmacy benefits that include coverage of Neurontin. Kaiser Foundation Health Plan, Inc. owns and operates its own in-house pharmacies in the same nine states in which it has members and the District of Columbia. These pharmacies purchase prescription drugs, including Neurontin, and dispense these drugs directly to Kaiser Foundation Health Plan, Inc. members. A limited number of health plan members purchase their prescription drugs through a pharmacy benefit manager retained by Kaiser Foundation Health Plan, Inc. From 1994 to the present, Kaiser Foundation Health Plan, Inc. has paid tens of millions of dollars for excessive prescriptions of Neurontin caused by Defendants' wrongful acts.

8.    Kaiser Foundation Hospitals is a not-for-profit California corporation which owns and operates thirty hospitals in California, Oregon and Hawaii and contracts with Kaiser Foundation Health Plan, Inc. to provide or arrange for hospital services for Kaiser Foundation Health Plan, Inc. members in each state in which Kaiser Foundation Health Plan, Inc. operates.

1825 / CMP / 00080151.WPD v1                   3

From 1994 to the present, Kaiser Foundation Hospitals has paid tens of millions of dollars for excessive prescriptions of Neurontin caused by Defendants' wrongful acts.

9.    Aetna is a Pennsylvania corporation with its principal place of business in Hartford, Connecticut. By and through its subsidiaries, Aetna provides health payment benefits to more than 13 million people in virtually every state and territory of the United States and have agreements with tens of thousands of participating pharmacies in the United States. From 1994 to the present, Aetna has paid tens of millions of dollars to U.S. pharmacies for excessive prescriptions of Neurontin for Aetna members in every state in the United States, the District of Columbia and the Commonwealth of Puerto Rico.

10.    Defendant Pfizer is a Delaware corporation with its principal place of business at 235 East 42nd Street, New York, New York. Pfizer is principally engaged in the manufacture and sale of pharmaceuticals and is one of the largest pharmaceutical companies in the world.

11.    Defendant Warner-Lambert was acquired in June 2000 by Pfizer. This acquisition included Warner-Lambert's Parke-Davis division. Prior to the acquisition, Warner-Lambert was a Delaware corporation with its principal place of business at 201 Tabor Road, Morris Plains, New Jersey. In 1993, Warner-Lambert received FDA approval to market Neurontin in the United States as an adjunct therapy for epilepsy and did so through its Parke-Davis division. After the acquisition, the marketing of Neurontin continued to be managed at the merged companies' Morris Plains, New Jersey location.

### III.    JURISDICTION AND VENUE

12.    This Court has subject matter jurisdiction over all of the claims of Plaintiffs pursuant to 28 U.S.C. § 1331, because the claims in this action arise under the laws of the United States; pursuant to 18 U.S.C. § 1964, because this Court has jurisdiction to prevent and restrain violations of 18 U.S.C. § 1962 (RICO); pursuant to 28 U.S.C. § 1332, because there is complete

diversity of citizenship and the amount in controversy exceeds $75,000, exclusive of interest and

costs; and pursuant to 28 U.S.C. § 1367(a), because this Court has supplemental jurisdiction over

all non-federal clams in this action that form part of the same case or controversy as those within

the Court's original jurisdiction.

13.     This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the

violations of the Uniform Deceptive Trade Practices Act statutes, Pennsylvania Insurance Fraud

Statute, and Plaintiffs' allegation of unjust enrichment.

14.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and (c),

and 18 U.S.C. § 1965.

## IV.     FACTUAL ALLEGATIONS

### A.     Neurontin

15.     New pharmaceutical drugs may not be marketed in the United States until the

sponsor of the pharmaceutical has proven to the FDA that the drug is safe and effective for

specific indications at specified dosages. 21 U.S.C. § 355(b); 21 C.F.R. § 310.3(h)(f). The

indication and dosages approved by the FDA are set forth in the drug's labeling, the content of

which is also approved by the FDA. Although it is not unlawful for physicians to prescribe

approved drugs for indications or at dosages different than those set forth in a drug's labeling

(referred to as "off-label" use), the Food, Drug, and Cosmetic Act generally prohibits drug

companies from marketing or promoting approved drugs for uses other than those set forth in the

drug's approved labeling. 21 U.S.C. § 355(b). Neurontin was not, pursuant to 21 U.S.C. §

355(i), exempt from the prohibition against commercializing off-label uses. This regulatory

scheme protects patients and consumers by insuring that pharmaceutical companies do not

promote drugs for uses other than those found to be safe and effective by an independent,

scientific governmental body.

16.     Pfizer currently markets and sells Neurontin, a brand name prescription drug composed of the chemical compound (1-aminomethyl)-1-cyclohexaneacetic acid, generically known as gabapentin. On December 30, 1993, Neurontin was approved by the FDA for use as an "adjunctive therapy" in the treatment of partial seizures with and without secondary generalization in adults with epilepsy in doses from 900 mg to 1800 mg per day. Adjunctive therapy means that the drug cannot be prescribed by itself for the treatment of epilepsy -- it is to be used in combination with another front line epilepsy drug. The FDA did not find Neurontin to be safe and effective as a "monotherapy" -- a single drug treatment for epilepsy. The drug sponsor, Defendant Warner-Lambert, did not seek FDA approval in 1993 for any medical condition other than epilepsy.

17.     In May 2002, Pfizer obtained FDA approval for Neurontin to treat postherpetic neuralgia (pain resulting from shingles of herpes zoster) in adults, another limited market of consumers. Again, the approved dosage was 900 mg to 1800 mg per day. Adjunctive epilepsy therapy and postherpetic neuralgia are the only two conditions for which Neurontin has been approved by the FDA.

18.     Notwithstanding the limited market for Neurontin, Defendants reaped skyrocketing financial returns from the wrongful scheme. In 1995, Defendants' revenue from the sale of Neurontin was $97.5 million; by 1997, sales increased to $292 million; by 1999, sales increased to $913 million; by 2000, sales increased to more than $1 billion; and by 2003, worldwide sales of Neurontin reached nearly $2.7 billion. This dramatic increase in sales -- approximately 50% per year -- was fueled almost entirely by prescriptions for off-label uses and was the direct result of Defendants' fraudulent marketing scheme. For example, in 1996, 50% of Neurontin's sales were attributable to off-label uses; in 2000, more than 78% of the Neurontin

prescriptions written were for off-label uses; and by 2003, 90% of all Neurontin prescriptions

were for off-label uses.

### B.   Defendants' Deliberate Decision to Avoid Seeking FDA Approval and Promote Off-Label Uses for Neurontin Through the Publication of False and Misleading Scientific, Medical and Clinical Data

19.   At the time Neurontin was approved by the FDA in 1993, Defendants knew that

the market for adjunctive therapy for epilepsy was relatively small with a population potential of

approximately two million patients. In fact in May 1994, Defendants estimated that Neurontin's

ultimate sales potential was $500 million over the lifetime of the drug. Defendants also knew

that the FDA prohibited drug manufacturers from promoting and marketing their drugs for uses

not approved by the FDA. Accordingly, the fraudulent scheme devised by Defendants not only

misrepresented the scientific data regarding Neurontin, but also misrepresented the creator and

promoter of that information.

20.   Defendants also knew that causing Plaintiffs and other TPPs to list Neurontin on

their formularies (lists of approved drugs for which payment will be made) and without

restrictions (such as dosage limitations) was critical to their scheme, as Plaintiffs paid on average

about $84 of the $109 cost of a typical 100 pill (300 mg) prescription.

21.   In the late 1980s and early 1990s, Defendants considered other potential uses for

Neurontin besides epilepsy. Defendants filed several patent applications for Neurontin as a

treatment for depression, neurodegenerative disease, mania, bipolar disease and anxiety.

Notwithstanding the claims made in their patent applications, however, Defendants chose not to

seek FDA approval for these indications or start the internal process within Parke-Davis to

obtain approval for these uses. Senior product managers at Parke-Davis viewed Neurontin as a

niche drug and advised Warner-Lambert to lower its expectations regarding the ultimate sales

potential for Neurontin.

22.     Despite that earlier view, in October 1994, the Neurontin Development Team, a group of high-level officials at Parke-Davis in charge of clinical research, patents, regulatory, marketing and manufacturing issues, began to consider whether Parke-Davis should attempt to extend Neurontin's use to psychiatric disorders, a market significantly larger than epilepsy. Other anticonvulsant drugs had been used for (and FDA-approved for) psychiatric disorders, including bipolar disorder, panic disorder, post-traumatic stress disorder and possibly personality disorders. Defendants knew, however, that there was no scientific rationale supporting Neurontin's safety or effectiveness for these psychiatric uses because Neurontin has a different mechanism of action from other anti-epileptic medications.

23.     In January 1995, Parke-Davis' Marketing and Planning Department presented a preliminary market analysis to the Neurontin Development Team for Neurontin's use for psychiatric indications. Without considering whether the drug could be proven to be safe or effective for such uses, the report viewed the market as very favorable for Neurontin. At the same Neurontin Development Team meeting, the possibility of expanding the market for Neurontin's use for pain syndromes, another market substantially larger than epilepsy, was also discussed.

24.     In February 1995, the New Product Committee ("NPC") informed the Neurontin Development Team that it supported the development of Neurontin for other indications and asked for a formal proposal. John Boris was instructed to prepare market feasibility analyses of new potential indications, including bipolar disorder, generalized anxiety disorder, social phobia, neuropathic pain and migraine prophylaxis.

25.     In March 1995, a senior scientist in Parke-Davis' Research Department informed the Neurontin Development Team that bipolar disorder may not be a good area to pursue for regulatory approval because of the short patent exclusivity period (the patent on Neurontin was

set to expire in December 1998) and the difficulty and expense in conducting the necessary

clinical studies to demonstrate whether the drug was safe and effective to treat bipolar disorder.

The Development Team, however, considered simply publishing scientific, medical and clinical

data regarding the safety and medical effectiveness and usefulness of Neurontin for psychiatric

uses including bipolar disorder. Certain members of Parke-Davis' Regulatory Department

opposed the pursuit of a "publication strategy," stating that seeking FDA approval for bipolar

disorder through appropriate clinical studies was the correct way to proceed. That

recommendation was not followed.

26.     On March 22, 1995, the Parke-Davis Marketing Council met in Lyons, France,

and recommended that Parke-Davis pursue a "publication strategy" instead of following the

formal regulatory approval channels with regard to psychiatric indications for Neurontin. Thus,

given the relatively short period of patent protection, Parke-Davis chose to avoid the costly and

thorough process of seeking FDA approval, and instead, directly and immediately set out to

persuade the healthcare field to use Neurontin to treat off-label conditions through a myriad of

fraudulent acts. Members of the Marketing Council included the then-President of Parke-Davis,

Tony Wild, and other senior management.

27.     Central to Parke-Davis' marketing effort were Plaintiffs and other TPPs, which

paid the vast majority of the cost of Neurontin prescribed for patients. To facilitate those sales,

Warner-Lambert had a "Health Care Management" division whose sole responsibility was to

market pharmaceutical products, including Neurontin, to Plaintiffs and other TPPs. Headed by

George Cavic, that division employed a staff of approximately 100 "National Account

Mangers," or "NAMs."

### C.      Implementation of the "Publication Strategy" and Creation of the Promotion Enterprise

28.    In May 1995, a formal Parke-Davis Marketing Assessment report recommended

that the company implement this publication strategy for various psychiatric indications. The

report predicted that the revenues generated by sales for these indications would justify

investment in the publication strategy. The report, however, specifically noted a lack of

scientific rationale for Neurontin's use for bipolar disorder, since Neurontin has a different

mechanism of action from other anti-epileptic drugs. This crucial distinction also made

Neurontin suspect for treating acute mania and panic disorder, as its use for those conditions

rested on the same rationale for using Neurontin to treat bipolar disorder.

29.    In July 1995, Parke-Davis' Marketing and Planning Department went beyond

psychiatric conditions, and issued a Marketing Assessment on Neuropathic Pain and Spasticity.

That report recommended that Parke-Davis pursue a similar publication strategy in the areas of

neuropathic pain associated with peripheral nerve damage due to diabetes mellitus, trigeminal

neuralgia, postherpetic pain, neuropathic facial pain, and reflex sympathetic dystrophy and

disseminate the results of only "favorable" studies through publication in medical literature and

key neurological and pain congresses. Parke-Davis approved these marketing assessments and

adopted the recommendations regarding the publication strategy for the neuropathic pain market.

30.    Parke-Davis' New Product Committee also approved the decision to conduct

publication studies for Neurontin in migraine prophylaxis, and again restricted publication to

only "positive" study results. As a result, the negative results of a clinical trial conducted in the

1980s relating to Neurontin and migraine have never been published.

31.    Convincing physicians to prescribe Neurontin at doses far exceeding the FDA-

approved level of 900 mg to 1800 mg per day was also an integral component of Defendants'

wrongful scheme. Defendants aggressively urged doctors to increase their doses of Neurontin

despite the results of at least two clinical trials showing that increased doses did not achieve different results in patients.

32.     Thus, by late 1995, senior management at Parke-Davis had committed the company to promoting Neurontin through a publication strategy for a myriad of off-label uses rather than by seeking FDA approval. The object of Defendants' publication strategy was to disseminate false and misleading information regarding these off-label uses for Neurontin as widely as possible through seminars, events, presentations and medical literature.

33.     Scientific data and evidence did not exist supporting such off-label uses, and Defendants made, and caused others to make, misrepresentations and false statements as part of their publication strategy in order to persuade doctors to prescribe Neurontin for off-label uses and Plaintiffs and other TPPs to pay for the drug. No clinical trial showed that Neurontin was safe or effective for any of these conditions.

### D.    The Promotion Enterprise

34.     In order to implement the publication strategy, Parke-Davis created the Promotion Enterprise composed of the Defendants, half a dozen medical marketing firms (the "vendor participants") and several dozen physicians (the "physician participants"). These participants acted together in promoting Neurontin to the healthcare industry. The acts of the Promotion Enterprise centered on the vendor participants organizing and hosting numerous seminars and events over the course of several years that were falsely represented to be neutral, educational forums. At these events, the physician participants provided misleading and deceptive information to fellow physicians on the off-label uses of Neurontin (a/k/a peer-to-peer marketing events). The physician participants were not independent, but received "behind the scenes" coaching and remuneration from the vendor participants and Defendants.

35.    The Promotion Enterprise also caused numerous articles and promotional pieces

to be published in medical literature throughout the country misrepresenting the safety, efficacy,

effectiveness and usefulness of Neurontin to treat a variety of off-label conditions. As part of the

written publication component of the Promotion Enterprise, Defendants hired non-physician

technical writers to write the necessary articles, with input and direction from Defendants and

the vendor participants. Neither Defendants nor the vendor participants wanted their names on

the articles so, in a practice known as "ghostwriting," Defendants paid physician participants for

use of their names as the articles' "authors," giving the false impression that the article was

unbiased and not sponsored by the drug manufacturer. In order to monitor the status of these

publications, and in order to coordinate and execute the ghostwriting plan, marketing firms such

as Medical Education Systems ("MES") and AMM/Adelphi were necessary. The role played by

MES and AMM/Adelphi in assisting Defendants in creating publications was very similar to the

role played by the marketing firms in the coordination of the peer-to-peer marketing events.

36.    Because Defendants' marketing personnel were not permitted to deliver the off-

label message under FDA regulations, Defendants fraudulently circumvented this prohibition by

training medical liaisons -- technical employees of Defendants who were supposed to provide

balanced scientific information to doctors -- to market off-label and solicit interest in off-label

uses. Defendants trained the medical liaisons to unlawfully engage in full scale promotion of

Neurontin's off-label uses, with the use of non-scientific, anecdotal information designed to

convince physicians to prescribe Neurontin for off-label conditions. The medical liaisons were

trained to cold call physicians and sell them on the safety, efficacy and usefulness of Neurontin

for off-label uses. This sales effort involved numerous material misrepresentations, including

the status of the medical liaisons. With the full approval of Defendants' marketing officials,

including John Ford, Phil Magistro and John Krukar, medical liaisons were routinely introduced

as specialists in the specific drug they were presenting at a particular meeting. Thus, medical

liaisons were presented as experts in anti-epileptic drugs at one moment and later were touted as

experts in cardiac medication. Medical liaisons also were encouraged to represent themselves as

medical researchers, even though they neither conducted medical research nor analyzed medical

research performed by others. On occasion, medical liaisons were introduced as physicians,

even though they had no such qualifications. Sales personnel were instructed to introduce

medical liaisons as scientific employees who had been given temporary leave from their

academic duties to make an individual presentation to the physician; the fact that the liaisons

were part of Defendants' marketing program was intentionally hidden.

     37.    Medical liaisons were instructed in clear terms that they were to market and sell

Neurontin for off-label uses and at dosages exceeding safe and effective levels. During a

teleconference on May 24, 1996, John Ford, a senior marketing executive at Parke-Davis' Morris

Plains headquarters, directly informed the medical liaisons that Neurontin had to be marketed for

off-label uses, including monotherapy, pain, bipolar disease, and other psychiatric uses. At

another meeting with the medical liaisons, Ford was even blunter, directing his medical liaisons

to tout Neurontin for "everything," irrespective of efficacy, dosage limitations or "that safety

crap":

> I want you out there every day selling Neurontin. Look this isn't
> just me, it's come down from Morris Plains that Neurontin is more
> profitable.... We all know Neurontin's not growing adjunctive
> therapy, besides that is not where the money is. Pain management,
> now that's money. Monotherapy, that's money. We don't want to
> share these patients with everybody, we want them on Neurontin
> only. We want their whole drug budget, not a quarter, not half, the
> whole thing.... We can't wait for them to ask, we need to get out
> there and tell them up front.... That's where we need to be holding
> their hand and whispering in their ear Neurontin for pain,
> Neurontin for monotherapy, Neurontin for bipolar, Neurontin for
> everything.... I don't want to see a single patient coming off
> Neurontin until they have been up to at least 4800mg/day. I don't

> want to hear that safety crap either, have you tried Neurontin,
> every one of you should take one just to see there is nothing, it's a
> great drug.

38.     Defendants controlled the content of the messages delivered at the seminars,

meetings and other events and in the publications sponsored by the vendor and physician

participants, including the misinformation and false statements concerning the safety, efficacy,

effectiveness and usefulness of Neurontin for off-label uses.  Physicians in the audience were

deceived into thinking that the events were educational in nature and independent from control

of the pharmaceutical manufacturer.  Similarly, the physicians and other healthcare professionals

who read the articles put together and published by the Promotion Enterprise were deceived into

thinking these articles were unbiased and based on credible scientific data.  And, the physicians

who were contacted by Defendants' medical liaisons were deceived into thinking that these

employees were providing truthful balanced scientific information about Neurontin when in fact

they were fraudulently acting as Defendants' surrogate sales force.

39.     Defendants also paid purported "grants" to reward demonstrated Neurontin

prescribers to continue to advocate the prescription of Neurontin for off-label uses to colleagues.

Defendants' medical liaisons informed leading Neurontin prescribers that significant advocacy

for Neurontin through "studies" would result in the payment of large grants.  These studies did

not involve significant work for the physicians.  Oftentimes, the physicians contributed nothing

at all to the study because Defendants frequently hired technical writers to write the articles for

which the "authors" had been given grants.  Defendants accounted for and charged these grants

to the Neurontin marketing budget.

40.     Defendants were aware that these articles and studies provided minimal scientific

benefit.  In a letter to the FDA in June 1997, Defendants submitted a list of "studies relating to

pain, pain syndromes, and psychiatric disorders" but failed to include any of the studies

described below.  Defendants intentionally neglected to report these studies to the FDA because

Defendants knew the "research" had no scientific value and would not be deemed a scientific

trial by the FDA.  Payments Defendants made for these "studies" included the following:

| Funded Project | Payee | Payment |
|---|---|---|
| Statistical Analysis of Patients Treated With Neurontin For Pain | Hans Hansen, M.D. Statesville, NC | $7,000 |
| Reduction of Sympathetically Medicated Pain and Sudomotor Function | David R. Longmire, M.D. Russellville, AL | $7,000 |
| Data Entry for Neurontin and Pain Analysis | David Meyer, M.D. | [amount unknown] |
| Trial of Neurontin for Distal Symmetric Polyneuropathy Associated with AIDS | Joseph Weissman, M.D. Atlanta, GA | $20,000 |
| Neurontin for Neuropathic Pain in Chronic Pain Syndromes | Lavern Brett, M.D. Washington, DC | $25,000 |
| Retrospective Chart Analysis of Neurontin use with Bipolar Disorder Patients | Ralph S. Rybeck, M.D. | $5,000 |
| Retrospective Analysis of Neurontin in the Treatment of Pain | David R. Longmire, M.D. Russellville, AL | $2,000 |
| Retrospective Analysis of Neurontin in the Treatment of Chronic Pain | Don Schanz, D.O. Traverse City, MI | $8,000 |
| Case Histories Relating to Use of Neurontin as an Adjuvant Analgesic | Elizabeth J. Narcessian, M.D. West Orange, NJ | $4,000 |

        41.    To hide the lack of scientific support for the off-label uses, and Defendants' direct

involvement in the seminars and articles, the Promotion Enterprise employed improper and

unlawful sales and marketing practices that included:  (a) deliberately misrepresenting the safety,

medical efficacy, effectiveness, usefulness and effective dosages of Neurontin for a variety of

uses; (b) knowingly misrepresenting the existence and findings of scientific data, studies, reports

and clinical trials; (c) deliberately concealing negative findings or the absence of positive

findings; (d) misrepresenting the credentials and qualifications of certain of Defendants'

employees as specialists, medical researchers, physicians and scientific employees in order to

market and sell Neurontin; (e) wrongfully and illegally compensating physicians for prescribing
Neurontin for various off-label uses; (f) knowingly publishing articles, studies and reports
misrepresenting the scientific credibility of data regarding Neurontin; (g) intentionally
misrepresenting and concealing Defendants' role and participation in the creation and
sponsorship of a variety of events, articles and publications used to sell Neurontin; (h)
intentionally misrepresenting and concealing the financial ties between Defendants and other
participants in the Enterprise; (i) fraudulently using medical liaisons to directly solicit, market
and promote Neurontin for off-label uses to physicians; and (j) improperly financially inducing
physicians to prescribe Neurontin by providing grants for their advocacy of Neurontin through
"studies" which had minimal or no scientific value.

42.    All of the participants in the Promotion Enterprise had the common purpose of
aiding Defendants in deceptively and fraudulently marketing Neurontin for off-label uses and
achieving significant "market expansion" for Neurontin. Each participant received substantial
revenue from the scheme. The more successful these marketing events, the more events there
would be in the future, and the more fees each participant would receive for organizing or
participating in the events. For these reasons, the participants knowingly and willingly agreed to
assist Defendants in their fraudulent promotion of Neurontin, notwithstanding that such a
promotional campaign required the systematic repetition of false and misleading statements to
thousands of physicians throughout the United States.

43.    Parke-Davis, and subsequent to Pfizer's acquisition of Warner-Lambert, Pfizer,
controlled and directed the overall Promotion Enterprise by (a) controlling the content of the
presentations, speeches, promotional events and articles that misrepresented off-label usage of
Neurontin; and (b) compensating the participants for their efforts on behalf of the Enterprise.

    1.    **The Role of Medical Marketing Firms -- The Vendor Participants**

44.    Third party medical marketing firms were central to Parke-Davis' fraudulent

marketing scheme. Indeed, the tactical plans Parke-Davis used to implement its fraudulent

publication strategy were proposed by advertising companies such as Cline, Davis & Mann, Inc.

and Thompson Physicians World when representatives of those entities sat on Parke-Davis'

Neurontin Extended Disease Team.

45.    Defendants' plans called for medical marketing firms to organize and host, and

the Defendants to review and pay for, hundreds of events, including medical education seminars,

consultant meetings, advisory boards, speakers bureaus, teleconferences and dinner meetings

where the physician participants of the Promotion Enterprise would deceptively promote the off-

label use of Neurontin to thousands of doctors who were not prescribing Neurontin for adjunct

epilepsy treatment. As detailed below, during each of these events, materially false and

inaccurate information about Neurontin was given to the attendee physicians to induce them to

prescribe Neurontin for off-label uses and at excessive dosages.

46.    As part of the Promotion Enterprise, the third party marketing firms MES and

AMM/Adelphi worked directly with Defendants and the physician participants to write and

publish numerous articles discussing the use of Neurontin to treat various off-label conditions for

which there was little or no credible scientific support.

47.    The planning and coordination of these events and publications by the Promotion

Enterprise required extensive use of the wires and mails, including mailing invitations to

physicians, booking hotels and airplane tickets, arranging meals, scheduling teleconference calls,

and coordinating the content of the presentations on Neurontin at the event and in the

publications.

48.    The firms who participated in the Promotion Enterprise included Cline, Davis &

Mann, Inc. (and its Proworx division), Thompson Physicians World (and its Professional

Postgraduate Services division), Sudler & Hennessey (and its Intramed division), MEDED,

MES, Healthcare Communications Group and AMM/Adelphi. Plaintiffs' knowledge of the

specific activities of these third-party marketing firms is limited because of the obstructive

tactics by Defendants and the marketing firms. Plaintiffs have only had the opportunity to

review limited records, mostly of events between 1994 and 1998, held for the Northeast

Customer Business Unit ("CBU"). Plaintiffs are aware that similar events were held across the

United States between 1994 until May 2004. Although Plaintiffs have not seen records of the

vast majority of such events and cannot specify them because the records are in the possession,

custody or control of Defendants or the other members of the Promotion Enterprise, even the

limited information available reveals the illegal nature of Defendants' conduct.

(a)    <u>Cline Davis</u>

49.    Cline, Davis & Mann, Inc. ("Cline Davis") is a New York, New York based

advertising and marketing firm, which does significant business with the pharmaceutical

industry. Beginning in either late 1995 or early 1996, Cline Davis provided, and continues to

provide, Defendants with strategic management services, including advising Defendants on

strategies and tactics to expand the on-label and off-label use of Neurontin. To this day, Cline

Davis directs the advertising campaigns for various Pfizer products, including Neurontin and

Viagra. Through its Proworx division, Cline Davis also managed and coordinated various

marketing events, including consultant meetings and other peer-to-peer sales marketing events

for Neurontin.

50.    Cline Davis shared with the Defendants the costs associated with the off-label

marketing of Neurontin. For example, when Cline Davis exceeded the budgeted amounts under

its strategic management services for Neurontin in 1996, Parke-Davis agreed to split the budget

overrun with Cline Davis "in the spirit of partnership and a commitment to a long term

relationship." The sharing of costs is evidence that the relationship between Cline Davis and the

Defendants was that of partners in an enterprise, not principal and agent.

51.     Cline Davis and the Defendants maintained systematic linkages between

themselves, including continuing coordination between their respective marketing teams. For

example, at all relevant times hereto, a Cline Davis employee was a member of Parke-Davis'

Extended Neurontin Disease Team, which was a high-level, confidential, internal

interdisciplinary group composed of members from the following departments:  Strategic

Planning/Information Management, Neurontin Marketing, Advertising and Promotion, Product

Planning, Medical Affairs, Forecasting, Training and Development, Healthcare Management,

Public Relations, as well as representatives of Parke-Davis' five regional offices (known as

"CBUs").

52.     The Jupiter Beach, Florida consultants meeting held during the weekend of April

19-21, 1996 is one example of a meeting sponsored and produced by the Promotion Enterprise.

Cline Davis' Proworx division worked with Defendants and physician participants to arrange

this meeting to encourage neurologists from the Northeast CBU to increase their Neurontin

prescriptions. Defendants' sales personnel were instructed by the Neurontin Marketing Team to

select potential invitee neurologists from a list of the top prescription writers for antiepileptic

drugs in the Northeast. During the meeting, attendees "were delivered a hard hitting message

about Neurontin," and encouraged to prescribe Neurontin at higher doses for epilepsy.

Technically the event was produced by Proworx, however, Defendants designed, monitored and

approved all aspects of the presentation. Defendants selected the physician participant speakers,

picked the presentation topics and previewed the content of the presentations to ensure they were

acceptable. Defendants paid all expenses relating to the consultants meeting, including all

payments for (i) the attending neurologists (valued at approximately $2,000 per attendee), (ii) the

presentation expenses, (iii) all expenses and fees incurred by Proworx, and (iv) the substantial fees paid to the participant physicians.

53.    Parke-Davis' control of the content of events produced by Cline Davis was further illustrated at a continuing medical education symposium coordinated by Cline Davis on behalf of the American Diabetes Association, held in Boston, Massachusetts, on June 23, 1997. At the eleventh hour, Cline Davis and Parke-Davis learned that one of the speakers, who had been previously recommended by Parke-Davis, was going to describe negative results in her study of Neurontin's use for an off-label indication. Unable to cancel the presentation without grossly violating the rules for conducting accredited continuing medical education ("CME") seminars, Cline Davis, in its own words, took steps "to counteract a possible 'negative' presentation." It planted a doctor in the audience to ask questions that would lead the presenter to make favorable statements during the question and answer period after her talk, and this plant "did indeed lead Dr. Bril to address some of the positive aspects of anticonvulsants and Neurontin." In a memorandum written by Cline Davis to Parke-Davis a day after the event, Cline Davis acknowledged its responsibility for allowing a presentation by a physician with an independent view, reaffirmed its "policy to complete a literature search to determine who authors favorable articles on the topics outlined" and assured Parke-Davis that "guidelines have been to set to ensure that this type of [negative presentation] situation does not happen again."

54.    There was a common communication network for sharing information on a regular basis among Cline Davis, the Defendants and the physician participants. Cline Davis and Defendants routinely exchanged letters, memoranda, emails and phone calls, as did Cline Davis and the physician participants. There were also regular meetings among Cline Davis and Defendants, including high-level "face-to-face" meetings with the high-level marketing officials on both sides, where overall goals and strategies would be discussed. There were also more

frequent, lower-level "Toolbox" meetings, where individual strategies and tactics were discussed and progress in various areas of the off-label marketing scheme was monitored.

55.    Some, but not all, of the events Cline Davis presented on behalf of the Promotion Enterprise included:

| Event | Date | Location |
|-------|------|----------|
| Neurontin Consultants Meeting | April 19-21, 1996 | Jupiter Beach, FL |
| Neurontin Consultants Meeting | May 3-4, 1996 | Philadelphia, PA |
| Neurontin Consultants Meeting | May 10-11,1996 | Boston, MA |

**(b)    Thompson Physicians World**

56.    Thompson Physicians World ("Physicians World") is a New Jersey based marketing and medical education firm, which does considerable business with the pharmaceutical and healthcare industries. Physicians World managed and coordinated various marketing events, including speakers bureaus, advisory boards and other peer-to-peer marketing events.

57.    Through its wholly owned and controlled Professional Postgraduate Services ("PPS") division, Physicians World also managed and coordinated various medical educational events. PPS purported to be a properly accredited sponsor of CME events.

58.    Like Cline Davis, Physicians World began in 1995 to actively advise Parke-Davis on strategies and tactics to expand the on-label and off-label uses of Neurontin.

59.    On December 22, 1995, at about the same time that Defendants formed their partnership with Cline Davis, Larry Perlow, Parke-Davis' Vice President of Portfolio Management, announced that Parke-Davis and Physicians World had formed a "strategic partnership" to handle speakers bureaus, advisory boards and consultants meetings. The memorandum indicates that services formerly handled internally by Parke-Davis' Marketing Support Services would be divided between Physicians World and Parke-Davis' Marketing

Logistics Department. Under the strategic partnership, speakers bureaus, advisory boards and

consultants meetings would be arranged by Physicians World; non-speaker medical education

programs, grants and processing of all checks against advertising and promotion and

departmental budgets would be handled by Marketing Logistics.

   60. The same December 22, 1995 memorandum also announced that Parke-Davis and

Physicians World would commingle employees. On January 1, 1996, Parke-Davis' Marketing

Support staff joined Physicians World as full-time employees. Even though the employees were

based at Physician World's Secaucus, New Jersey office, the employees continued to use the

same toll free (800) numbers that they used at Parke-Davis, continued to use Parke-Davis

letterhead, and provided the same services to Parke-Davis employees who contacted them.

   61. To clarify marketing responsibilities in the wake of the strategic partnership and

employee reassignments, Physicians World created various grids, which were circulated to

marketing and sales colleagues in Parke-Davis and adopted as Parke-Davis policy. These grids

explained the procedures for Parke-Davis and Physicians World to follow depending on whether

the event fell under Physicians World's jurisdiction or remained the responsibility of the Parke-

Davis Marketing Logistics Department.

   62. The use of these grids by both Parke-Davis and Physicians World, as well as the

sharing of the toll free (800) numbers by the employees reassigned from Parke-Davis to

Physicians World, and the continued use by the reassigned employees of Parke-Davis letterhead,

evidences the continuing coordination and overlap of leadership functions, as well as the

establishment of a joint communications network between Physicians World and Parke-Davis.

   63. According to the written coordination policies jointly developed by Parke-Davis

and Physicians World, if an event were non-promotional, i.e., a CME, then the "accredited

institution" -- not Parke-Davis or Physicians World -- was  to pick the speakers and the content

of the presentations. The presentations were supposed to be fair and balanced, and were not supposed to pitch one drug product over another. According to the written policies, when the events were promotional, Parke-Davis and Physicians World were allowed to be "actively involved in speaker identification, recruitment as well as assistance with program content." However, the presentations of these handpicked speakers were supposed to be "strictly limited to approved indications," not off-label uses.

64.    In practice, however, Physicians World and Parke-Davis actively, knowingly, and with full support of one another, circumvented or directly violated both of the foregoing policies. In fact, the distinction between promotional and education events was rendered meaningless, as Physicians World owned and controlled PPS, which was the "accredited institution" for Physicians World's CME events. Regardless of the nature of the event, Physicians World, which was staffed by former Parke-Davis marketing employees and shared an address and an 800 telephone number with Parke-Davis, selected the physician-speakers and attendees, and controlled the content of the presentations. Among the off-label programs Physicians World marketed where Parke-Davis controlled the content was an accredited home study program on pain which was planned to be circulated to 10,500 neurologists and pain doctors, and "educational" programs on Neurontin's use for psychiatric conditions. In both cases the accrediting institution, which was supposed to be independent, was PPS, Physicians World's division.

65.    Parke-Davis and Physicians World circumvented their promotional/educational polices in other ways. Parke-Davis occasionally held advisory committee meetings and consultants meetings for the purpose of getting independent advice from experts regarding particular aspects of existing or planned drug products. When it came to Neurontin, however, Parke-Davis did not actually seek any input from the attendees and the real purpose of the

meetings was to misrepresent to the attendees Neurontin's safety, medical efficacy, effectiveness, usefulness and recommended dosages. The Neurontin meetings frequently were held at luxury resorts and the attendee's travel, room and board were paid by Parke-Davis.

66.    There was a common communication network for sharing information on a regular basis among Physicians World, Defendants and the physician participants. Physicians World and Defendants routinely exchanged letters, memoranda, emails and phone calls, as did Physicians World and the physician participants.

### (c)    Sudler & Hennessey

67.    Sudler & Hennessey is a New York, New York based advertising and marketing firm, which does significant business with the pharmaceutical and healthcare industries. Since 1995, Sudler & Hennessey provided and continues to provide Defendants with strategic management services, advising them on strategies and tactics to expand the on-label and off-label use of Neurontin. Through its Intramed Educational Group division, Sudler & Hennessey also managed and coordinated various marketing events, including consultant meetings and other peer-to-peer marketing events.

68.    Sudler & Hennessey and Defendants maintained systematic linkages between themselves, including continuing coordination between their respective marketing teams. Sudler & Hennessey also maintained systemic linkages with the physician participants, including continuing coordination of seminars, events and presentations.

69.    Sudler & Hennessey recommended various unlawful ways for Parke-Davis to expand off-label uses for Neurontin. In fact, Sudler & Hennessey designed the blueprint for large off-label marketing junkets. In July 1995, Sudler & Hennessey held a multi-day consultants meeting at the La Costa Resort and Spa in Carlsbad, California. This event featured lectures about off-label uses from physicians who became regular and willing participants in the

Promotion Enterprise, including Drs. Schachter, Browne, Morrell, Morris, Pellock and Ritaccio. Collectively, these physicians have earned more than $500,000 (excluding travel, lodging and meals benefits) by participating in the Promotion Enterprise. The Carlsbad program even included a lecture that taught attendee physicians how to participate in the peer-to-peer marketing scheme as paid speakers and/or authors. This event served as the model for future large-scale marketing events.

70.    Sudler & Hennessey also helped to organize the Neurobehavioral Working Group. The Group appeared to be a committee of concerned physicians from various medical fields who sought better pharmacological treatment for patients suffering from migraine, epilepsy, neuropathic pain, psychological disorders and sleep disturbances. In reality it was a marketing tactic created by Sudler & Hennessey and funded by Parke-Davis to create publications and deliver lectures that informed other physicians of Neurontin's supposed off-label efficacy in the major off-label categories by creating the belief that these categories are interrelated. There was no scientific evidence for this claim and no clinical evidence showing that Neurontin was effective for any of these conditions other than adjunctive epilepsy therapy. The physician lecturers for the Neurobehavioral Working Group were physician participants of the Promotion Enterprise including Drs. Devinsky, Morrell and Schachter (who collectively received more than $200,000 for their participation in the Enterprise).

71.    Sudler & Hennessey has carried and continues to carry out many similar off-label marketing events all around the country. In those events, Sudler & Hennessey routinely recommends speakers who are favorable to Neurontin.

72.    Some, but not all, of the events Sudler & Hennessey presented on behalf of the Off-Label Promotion Enterprise included:

| Event | Date | Location |
|---|---|---|
| Neurontin Consultants Meeting | April 19-21, 1996 | Jupiter Beach, FL |
| Neurontin Consultants Meeting | May 3-4, 1996 | Philadelphia, PA |
| Neurontin Consultants Meeting | May 10-11,1996 | Boston, MA |
| Emerging Concepts on the Use of Anticonvulsants CME at Marriott Sawgrass Resort | April 1997 | Ponte Vedra, FL |
| Emerging Concepts on the Use of Anticonvulsants CME | May 1997 | Saratoga Springs, NY |
| Emerging Concepts on the Use of Anticonvulsants CME | June 1997 | Boston, MA |
| Emerging Concepts on the Use of Anticonvulsants CME | July 1997 | Saratoga Springs, NY |
| Emerging Concepts on the Use of Anticonvulsants CME | May 1998 | Hershey, PA |
| Consultants Conference:  Neuropathic Pain Syndrome | April 20, 1996 | Marco Island, FL |
| Current Applications in Neurological Conditions Grand Rounds at the Buckhead Resort | Sept. 27-28, 1997 | Atlanta, GA |
| Anticonvulsants, Current Applications in Neurological Conditions ("Weekend Pain Meeting") at the Four Seasons Hotel | July 1998 | Boston, MA |
| Anticonvulsants, Current Applications in Neurological Conditions | July 1998 | New York, NY |
| Consultants Conference | Feb. 2-4, 1996 | Marco Island, FL |
| Mastering Epilepsy Regional Consultants Meeting at the La Costa Resort and Spa | July 1995 | Carlsbad, CA |
| New Treatment Options for the Management of Pain: The Role of Anticonvulsants at the Four Seasons | April 2000 | Irving, TX |
| Advisory Board at the Disney Yacht Club | May 26, 2000 | Orlando, FL |
| New Directions in the Understanding and Treatment of Pain at the Plaza Hotel | March 24, 2001 | New York, NY |
| New Directions in the Understanding and Treatment of Pain at the Hilton Novi | March 2–3, 2001 | Detroit, MI |
| New Directions in the Understanding and Treatment of Pain at the Westin Galleria | May 4–5, 2001 | Houston, TX |
| New Directions in the Understanding and Treatment of Pain at the Harbor Court Hotel | February 9–10, 2001 | Baltimore, MD |
| New Directions in the Understanding and Treatment of Pain at the Fairmont Kansas City | March 9–10, 2001 | Kansas City, MO |
| New Directions in the Understanding and Treatment of Pain at the Peabody Memphis | May 11–12, 2001 | Memphis, TN |
| Advisory Board Meeting at the Grand Wailea Resort Hotel and Spa | April 14-16, 2000 | Maui, HI |

| Event | Date | Location |
|-------|------|----------|
| New Directions in the Understanding and Treatment of Pain at the Fairmont San Francisco | March 16–17, 2001 | San Francisco, CA |
| Advisory Board Meeting at the Westin Resort | June 16-18, 2000 | Hilton Head, SC |
| New Directions in the Understanding and Treatment of Pain at the Sheraton Universal City | May 18–19, 2001 | Universal City, CA |
| New Directions in the Understanding and Treatment of Pain at the Miami Biltmore | May 18–19, 2001 | Miami, FL |
| New Directions in the Understanding and Treatment of Pain at the Ritz Carlton New Orleans | March 23–24, 2001 | New Orleans, LA |
| New Directions in the Understanding and Treatment of Pain at the Sheraton Music City | March 23–24, 2001 | Nashville, TN |
| New Directions in the Understanding and Treatment of Pain at the Ritz Carlton St. Louis | March 30–31, 2001 | St. Louis, MO |

### (d)   MEDED/MEDCON

73.     Through at least 1997, Medical Education Programs, Ltd. ("MEDED") was a

pharmaceutical marketing firm located in Danbury, Connecticut.  MEDED was dissolved in

1997, and its principals established a spin-off pharmaceutical marketing firm known as Medical

Education Consultants, LLC ("MEDCON"), located in Danbury, Connecticut.  At all times

relevant hereto, MEDED, and then subsequently MEDCON, provided and continues to provide

Defendants with strategic management services, advising them on strategies and tactics to

expand the on-label and off-label use of Neurontin.  MEDED/MEDCON also managed and

coordinated various marketing events, including regional consultant meetings for Defendants'

various CBUs.  MEDED/MEDCON was acquired by Wicks Medical Information, LLC, which is

located in New York, New York.

74.     MEDED/MEDCON recommended various unlawful methods for the Defendants

to expand off-label use and assisted in the implementation of those methods.  For example,

MEDED/MEDCON coordinated a series of Neuropathic Pain Consultants Meetings held at

various regional resorts during the Spring of 1996 on behalf of the Southeast CBU.  The

speakers at these events were handpicked by Parke-Davis to present only certain information

regarding Neurontin and encourage its use for conditions other than epilepsy. The number of

attendees was far too large for a bona fide consultant meeting. MEDED/MEDCON also

coordinated an Advisory Board on Neurontin and psychiatric uses for the Southeast CBU at the

Grand Cypress Hotel in Orlando, Florida on May 2–4, 1997.

75.    MEDED/MEDCON worked with Sudler & Hennessey and Defendants to provide

services relating to the Neurobehavioral Work Group, including registering and organizing the

Group's website.

76.    MEDED/MEDCON also assisted Defendants to create misleading articles about

off-label Neurontin use pursuant to the publication strategy. Doctors Wilder, Schachter,

Longmire, and Nicholson were retained as physician participants in the Promotion Enterprise

and collectively received more than $400,000 for participating in the Enterprise. Upon

information and belief, these physicians lent their names to articles they did not write regarding

Neurontin's use in pain syndromes for inclusion in a supplement to the journal Pain Digest. The

content of these articles was developed by MEDED. Although copies of the Neurontin pain

supplement would be sent to the subscribers of Pain Digest, MEDED planned to distribute five

times as many copies to physicians who attended the off-label Neurontin events MEDED

produced for Parke-Davis.

77.    There was  a common communication network for sharing information on a

regular basis among MEDED/MEDCON, Defendants and the physician participants.

MEDED/MEDCON and Defendants routinely exchanged letters, memoranda, emails and phone

calls, as did MEDED/MEDCON and the physician participants.

78.    Some, but not all, of the events MEDED/MEDCON presented on behalf of the

Promotion Enterprise included:

| Event | Date | Location |
|---|---|---|
| Consultants Conference: Neuropathic Pain Syndrome | April 20, 1996 | Marco Island, FL |
| Current Applications in Neurological Conditions Grand Rounds at the Buckhead Resort | Sept. 27-28, 1997 | Atlanta, GA |
| Anticonvulsants, Current Applications in Neurological Conditions ("Weekend Pain Meeting") at the Four Seasons Hotel | July 1998 | Boston, MA |
| Anticonvulsants, Current Applications in Neurological Conditions | July 1998 | New York, NY |

### (e)   MES

79.   Medical Educations Systems ("MES") is a marketing firm based in Philadelphia, Pennsylvania, which does significant business with the healthcare and pharmaceutical industries. MES specializes in coordinating CMEs, peer-to-peer sales events, and training pharmaceutical sales staffs. MES managed and coordinated various marketing events for the Defendants, including consultant meetings and other peer-to-peer marketing events concerning Neurontin. MES was acquired by Cardinal Health, Inc., a corporation based in Dublin, Ohio, which provides products, services and technologies supporting the healthcare industry.

80.   MES and Defendants maintained systematic linkages between themselves, including continuing coordination between their respective marketing teams. MES also maintained systemic linkages with the physician participants, including continuing coordination of seminars, events, presentations and articles.

81.   MES recommended various unlawful ways for Parke-Davis to expand off-label uses of Neurontin. For example, MES arranged a purported consultants meeting held in Chicago, Illinois on July 19-20, 1996. Although the topic was "Expanding the Paradigm of Antiepileptic Use," the meeting in reality was a marketing event meant to favorably misrepresent Neurontin for off-label uses, specifically pain and psychological uses. MES has carried and continues to carry out many similar off-label marketing events all around the country, all "in

support of Neurontin." In those events, MES routinely selected speakers known to be acceptable

to Defendants and who limited the data provided to the audience to mislead the physicians as to

the medical efficacy, effectiveness, usefulness and recommended dosages of Neurontin.

82.    MES also assisted Defendants in publishing a variety of misleading articles about

Neurontin and off-label uses. Defendants decided the topics to be covered and paid all expenses

in connection with the creation of these articles. Technical writers for MES drafted the articles,

which were then submitted to a physician participant who "loaned" his or her name to the article

in exchange for payment of an honorarium. Working with MES, Defendants approved the topics

and contents of the articles and, to the extent possible, the selection of the journals where the

articles were published.

83.    Between 1997 and 1998, MES prepared at least twelve different articles in this

manner. Although its proposal claimed to seek funding for articles relating to epilepsy, the

actual articles that were developed were in fact mostly for off-label uses which included pain,

behavioral disorders, mania and hypomania, mood and anxiety disorders, migraine, bipolar

disorder, refractory epilepsy and monotherapy. The intended articles were as follows:

| Credited Author | Subject |
| --- | --- |
| M. Afzal Choudhry | Mental retardation (Epilepsia) |
| Ahmad Beydoun | Monotherapy (Neurology; Pharmacotherapy) |
| Mark H. Pollack | Mood and anxiety disorders (CNS Spectrums; Am J Psychiatry) |
| Patricia (Tricia) Suppes | Mania and hypomania (J Affective Disorders) |
| Basim Uthman | Monotherapy (JAMA) |
| Barry Gidal | Elderly patients (The Consultant Pharmacist) |
| Martha Morrell | Female patients (Am J Obstet Gynecol) |
| John M. Pellock | Mental retardation (Epilepsia) |
| John M. Pellock | Pediatric patients (Pediatrics) |
| Michael Merren | Pain and tremor (Journal of Southern Medicine) |
| Gail Anderson | Elderly patients (The Consultant Pharmacist) |
| Gail Anderson | Pharmacokinetics (Pharmacotherapy) |