| Credited Author | Subject |
|---|---|
| Maurice Druzin | Female patients (Am J Obstet Gynecol) |
| Hans Hansen | Chronic pain and migraine (Ann Intern Med) |

84.    Defendants' role in creating, approving and sponsoring these articles was hidden

from the public.  For example, one of the MES articles, supposedly written by Dr. Pollack

entitled Gabapentin and Lamotrigine:  Novel Treatments for Mood and Anxiety Disorders,

published in CNS Spectrums, noted that "an honorarium was received from Medical Education

Systems for preparation of this article," but never revealed Parke-Davis' retention and payment

of MES or the fact that the article was written by MES personnel, under contract to Parke-Davis.

85.    There was a common communication network for sharing information on a

regular basis among MES, Defendants and the physician participants.  MES and Defendants

routinely exchanged letters, memoranda, emails and phone calls, as did MES and the physician

participants.

                    (f)    **HCC**

86.    Healthcare Communications Group ("HCC") was a pharmaceutical marketing

firm located in New Jersey.  HCC managed and coordinated various marketing events for the

Defendants, including consultant meetings and other peer-to-peer marketing events.  HCC

carried out off-label marketing events for Defendants all around the country.  In those events,

HCC selected speakers known to be acceptable to Defendants who support off-label use of

Neurontin.  Some, but not all, of the events HCC presented on behalf of the Promotion

Enterprise included:

| Event | Date | Location |
|---|---|---|
| Emerging Concepts on the Use of Anticonvulsants CME at Marriott Sawgrass Resort | April 1997 | Ponte Vedra, FL |
| Emerging Concepts on the Use of Anticonvulsants CME | May 1997 | Saratoga Springs, NY |
| Emerging Concepts on the Use of Anticonvulsants | June 1997 | Boston, MA |

| CME | | |
|---|---|---|
| Emerging Concepts on the Use of Anticonvulsants CME | July 1997 | Saratoga Springs, NY |
| Emerging Concepts on the Use of Anticonvulsants CME | May 1998 | Hershey, PA |

### (g)    AMM/Adelphi

87.    AMM/Adelphi is a marketing firm originally based in New York, New York that was acquired by Access Worldwide, based in Boca Raton, Florida. AMM/Adelphi also assisted Defendants in publishing a variety of articles about Neurontin and off-label uses. Similar to the tactics used with MES, Defendants decided the topics to be covered and paid all expenses in connection with the creation of these articles.

88.    AMM/Adelphi developed the articles using its own technical writers, with very little, or in some cases, no input from the authors. This occurred even in connection with case histories that purported to describe the "author's" personal treatment of actual patients. The "authors" that approved the final drafts were physician participants in the Promotion Enterprise and were each paid an honorarium of $1,000 to lend their names to these articles.

89.    AMM/Adelphi prepared at least eight different case history reports for the Northeast CBU alone in 1996. Most of the articles that were developed by AMM/Adelphi related to off-label uses of Neurontin, including pain, neuropathic pain, RSD and restless leg syndrome. The articles AMM/Adelphi was retained to prepare included the following:

| Credited Author | Subject |
|---|---|
| Smith | Neurontin for Treatment of Pain |
| Dwarkaneth | Neuropathic pain & RSD |
| Enrique Carrazana | Neuropathic pain (Journal of Pain and Symptom Management) |
| Steven Schachter | Neuropathic pain (Journal of Pain and Symptom Management) |
| Sutherland | Psychiatric uses |

90.    There was a common communication network for sharing information on a regular basis among AMM/Adelphi, Defendants and the physician participants. AMM/Adelphi

and Defendants routinely exchanged letters, memoranda, emails and phone calls, as did

AMM/Adelphi and the physician participants.

**2.    The Role of Physicians -- The Physician Participants**

91.    One of Parke-Davis' principal strategies for fraudulently marketing Neurontin

was to target key physicians, preferably within the major teaching hospitals, to serve as

"Neurontin champions." These doctors promoted Neurontin to their peers through peer selling

programs by (i) misrepresenting Neurontin's safety, medical efficacy, effectiveness and

usefulness for off-label uses; (ii) claiming that Neurontin was being widely prescribed by other

physicians for off-label uses without disclosing the deception that drove those prescriptions; (iii)

suggesting possible mechanisms of action that could explain Neurontin's supposed efficacy in

off-label areas, even though they knew the mechanism of action was not and still is not

understood; and (iv) misrepresenting that they were privy to the latest clinical data that would

support off-label uses, but which had not yet been released.

92.    To lure physicians to participate in the Promotion Enterprise, Defendants

approached target doctors and informed them of Defendants' interest in funding research

opportunities and clinical trials at their institutions; doctors who were willing to "speak

favorably" about Neurontin could likely receive substantial funds in the form of research grants.

Parke-Davis instructed its sales departments to select doctors at the major teaching hospitals to

become "Neurontin experts," who in turn would be paid to deliver the Neurontin message to

other physicians to increase Neurontin sales.  This could be done formally to other physicians at

marketing events or informally to colleagues within the hospital or practice.

93.    Having recruited these physicians, the Promotion Enterprise created the false

perception that physicians were clinically using Neurontin and investigating its efficacy for off-

label uses on their own initiative, and not as a result of Defendants' illegal and fraudulent

marketing activities. Defendants used a cadre of physicians (the physician participants) to create

this perception. Defendants, principally through the vendor participants, paid these physicians

(in addition to providing free travel to resorts, free lodging and free meals) to induce them to

write journal articles and give talks at medical education seminars, advisory boards, consultant

meetings, speakers bureaus and similar events that favorably discussed the off-label use of

Neurontin. The individual physician participants received tens of thousands of dollars to

promote Neurontin's off-label uses. In fact, some individual physician participants received

more than $100,000 for their participation.

     94.    Among other activities, the physician participants gave off-label Neurontin

presentations at national, regional and local marketing events set up by Defendants and the

vendor participants, and made favorable statements about Neurontin's off-label uses in

teleconferences.

     95.    The physician participants were absolutely critical to the success of the Promotion

Enterprise and all of the marketing plans crafted by Defendants and the vendor participants. The

participation of these select physicians allowed Defendants and vendor participants to disguise

promotional events as educational events or consultants meetings with purported neutral doctors,

when in fact the speakers were biased and the events were promotional.

     96.    Some physicians participated in the Promotion Enterprise by publishing

misleading journal articles and letters to the editor about off-label use of Neurontin. Defendants

paid large sums of money, often in the form of research grants, to the physician participants in

order to publish such articles. In some cases, the physician was not required to perform any

research or even write the article. Marketing firms, including MES and AMM/Adelphi, who

were financed by Defendants, ghostwrote articles under the physician participants' names.

Physicians merely had to "lend" their names to the articles, in exchange for a payment.

97.    Physicians who participated in the Promotion Enterprise, either as speakers or as authors, entered into a mutually advantageous relationship with Defendants.  The more favorable a physician's statements were, the more he or she received in the form of speaker fees or research grants.  Physicians who refused to deliver the favorable off-label message Defendants wanted were blackballed, and did not receive additional payments.

98.    Physician participants worked with, and were retained by, multiple vendor participants.  All of the physician participants had personal relationships with employees of Defendants, and it was frequently Defendants who recommended to the vendors specific individual physician participants for events.  Thus, a physician participant might speak at a resort for an educational event held by Sudler & Hennessey one weekend, give an almost identical presentation at a different resort hundreds of miles away for Physician World the next weekend, and provide the same information (and misrepresentations) at a dinner meeting sometime in between for MEDED at a third location.

99.    Plaintiffs do not at this time know the identity of all of the physician participants. The Promotion Enterprise sponsored hundreds of events across the country and numerous articles between 1996 and 2004 and Plaintiffs have only had an opportunity to review the records of a small subgroup of these events and articles.  Based on the records reviewed to date at least 28 physician participants, identified below, each received $25,000 or more for participating in the Promotion Enterprise's activities for the time period indicated.  Each of these physician participants appeared at multiple events and deceptively promoted off-label use of Neurontin at each event.

| Physician Participant | Amount | Physician Participant | Amount |
|---|---|---|---|
| Wilder, Joe (1/94-11/97) | $307,958 | Nitz, Dennis (5/95-5/96) | $58,187 |
| Ramsey, R. Eugene (2/94-12/97) | $163,446 | Yerby, Mark (3/94-12/97) | $57,741 |

| Physician Participant | Amount | Physician Participant | Amount |
|---|---|---|---|
| Browne, Thomas (9/93-12/97) | $142,364 | Wheless, James (1/95-11/97) | $54,829 |
| Ferrendelli, James (11/93-10/97) | $124,863 | Leppik, Ilo (12/93-11/97) | $49,250 |
| Beydoun, Ahmad (6/94-12/97) | $122,036 | Merren, Michael (3/94-11/97) | $47,606 |
| Pellock, John (3/94-10/97) | $119,940 | DeToledo, John (10/95-12/97) | $45,434 |
| Bergey, Gregory (9/93-12/97) | $106,987 | Ritaccio, Anthony (3/94-1/97) | $44,258 |
| Morrell, Martha (10/93-11/97) | $91,730 | Uthman, Basim (5/94-12/97) | $43,902 |
| McLean, Michael (7/93-11/97) | $83,343 | Smith, Michael (3/94-9/97) | $40,028 |
| Sachdeo, Rajesh (3/94-12/97) | $74,954 | Devinsky, Orrin (5/94-10/97) | $37,250 |
| Treiman, David (4/94-10/97) | $73,118 | Moshe, Solomon (4/94-12/97) | $34,250 |
| Morris, George (3/94-11/97) | $72,878 | Gelblum, Jefferey (1/96-12/97) | $28,978 |
| Schachter, Steven (5/94-9/97) | $71,477 | Longmire, David (11/95-5/97) | $28,469 |
| Bruni, Joseph (10/93-12/97) | $60,585 | Rosenfeld, William (3/94-2/97) | $26,730 |

### 3.    Participation and Knowledge of the Vendor and Physician Participants

100.    The vendor and physician participants were active participants in Defendants'
publication strategy and were aware of Defendants' scheme to improperly market Neurontin for
off-label uses and at excessive dosages. Cline Davis, Physicians World, Sudler & Hennessey,
MEDED/MEDCON, MES and AMM/Adelphi each worked with Defendants and the physician
participants, for a common purpose, and as a continuing unit to perpetrate the fraudulent scheme
relating to the creation of events, seminars, publications and articles promoting Neurontin for
off-label uses for which it had not been proven to be safe and effective. The vendor and
physician participants' knowledge, involvement and activity is evidenced by:

- the coordination of the numerous events, seminars and presentations across the
  country among Defendants, vendor participants and physician participants as to
  time, location and message content;

- the coordination of the numerous articles published as part of the Enterprise among Defendants, vendor participants and physician participants as to time, publication and message content;

- the failure of each vendor and physician participant to advise government regulators, patients and private insurers, including Plaintiffs, of the existence and spread of such misinformation concerning off-label uses of Neurontin;

- the acceptance by the vendor and physician participants of various types of incentives from Defendants in return for their agreement to host, coordinate and speak at events, and write, author, and have published articles containing misrepresentations, knowing that other physicians, consumers and healthcare professionals would use such information; and

- the agreement of the vendor and physician participants to permit Defendants to control the information relayed to the public in such presentations and articles.

101.    Further, Defendants, vendor participants and physician participants deliberately omitted from the events in which they were involved the following:

- the lack of clinical trial evidence to support Neurontin's off-label uses;

- negative clinical trial results demonstrating that Neurontin was no more effective than placebo for several off-label conditions;

- negative anecdotal evidence that Neurontin did not work for off-label conditions;

- that virtually all publications and studies that allegedly supported Neurontin's off-label use had been funded by Defendants;

- that virtually all publications and studies that allegedly supported Neurontin's off-label use had been initiated by Defendants pursuant to a corporate marketing plan designed to increase off-label sales and excessive prescriptions for Neurontin;

- that no scientific evidence explained Neurontin's mechanism of action, which meant there was no scientific explanation regarding why Neurontin might work for the off-label uses and at the excessive dosages for which Neurontin was being promoted;

- that Parke-Davis had deliberately decided not to publish or publicize any studies concluding that Neurontin was not effective for off-label uses or at the dosages being touted;

- that the participating doctors conducting the peer selling had been paid substantial sums to use Neurontin on their patients for off-label purposes or at the dosages being touted; and

- that the events were not funded, as advertised, by an unrestricted grant from Defendants, but were conditioned upon the participating vendors and sponsoring institutions putting on presentations that painted off-label use of Neurontin in the most favorable light.

E.    **Defendants' Use of the Promotion Enterprise to Fraudulently Promote Neurontin -- The Misrepresentations**

1.    **Introduction**

102.    Although Defendants have extensively promoted Neurontin for off-label purposes, few placebo-controlled, clinical studies have been conducted on off-label uses of Neurontin. Most of those that have been conducted produced negative or inconclusive results. Placebo-controlled clinical trials for Neurontin's use for bipolar disorder, unipolar disorder, essential tremor, spasticity, controlled diabetic pain and panic disorder all failed to show that Neurontin is effective for those conditions.

103.    Although Plaintiffs are aware of Defendants' policy of suppressing unfavorable

studies because of the express terms of the corporate decisions implementing the publication

strategy, most information regarding negative studies funded by Parke-Davis remains in the sole

possession, custody or control of Parke-Davis and/or members of the Promotion Enterprise.

Defendants have never produced the results of many of these studies to the public or to Plaintiffs

or their attorneys.

### 2.    False and Misleading Statements Regarding Pain

104.    At each of the pain presentations known to Plaintiffs, presenters expressly stated,

or implied, that Neurontin was medically safe, efficacious, effective and useful for the treatment

of pain. A representative statement was made by Dr. David Longmire at the Jupiter Beach

consultants meeting in April 1996 when he stated that Neurontin was effective for the treatment

of pain. Dr. Longmire repeated that statement at a May 1996 consultants meeting at the Ritz

Carlton in Boston, and another physician participant, Dr. Steven Schacter made a similar

statement at the same meeting when he stated that "pain specialists are finding that low dosages

of Neurontin are effective."  Plaintiffs are aware of comparable statements being made by

another physician participant, Dr. Bruce Nicholson, in April 1996 at the Jupiter Beach

consultants meeting in May 1996 at the Boston Ritz Carlton consultants meeting, and in June

1996 at a Philadelphia consultants meeting.

105.    Dr. Longmire has sued Defendants for fraud, claiming he was used by Defendants

as "an unwitting pawn" in Defendants' unlawful  scheme to increase sales of Neurontin. David

R. Longmire, M.D. v. Pfizer, Inc., et al., CV-2006-120 (Cir. Ct., Franklin Co., Ala.). In

paragraph 30 of his Amended Complaint, dated May 15, 2006, Dr. Longmire alleges that he was

hired by Defendants and their marketing firms and spoke at numerous conferences across the

country organized by Defendants touting Neurontin for pain management:

30.    In 1996, Professional Post-Graduate Services,
acting as Warner-Lambert's agent, hire Dr. Longmire to give
presentations in Phoenix, Arizona, Buffalo, New York, and Dallas,
Texas. Also in 1996, ProWorx, acting as Warner-Lambert's agent,
hired Dr. Longmire to give presentations in Jupiter Beach, Florida,
Philadelphia, Pennsylvania, Boston, Massachusetts, and New
York, New York. The Parke-Davis Speakers Bureau hired Dr.
Longmire to speak in Pittsburgh, Pennsylvania, and Long Island,
New York in 1996 and in Fort Lauderdale, Florida in 1998.
MEDED, acting as Warner-Lambert's agent, invited Dr. Longmire
to speak in Newark, New Jersey in 1997 and in Franklin County,
Alabama in 1998.

106.    Upon information and belief, similar statements were made at all events presented

by the Promotion Enterprise that discussed Neurontin's use for pain, which included the

following events:

| Event | Date | Location |
|---|---|---|
| Neurontin Consultants Meeting | April 19-21, 1996 | Jupiter Beach, FL |
| Neurontin Consultants Meeting | May 3-4, 1996 | Philadelphia, PA |
| Neurontin Consultants Meeting | May 10-11,1996 | Boston, MA |
| Advisory Board Meeting at the Grand Wailea Resort Hotel and Spa | April 14-16, 2000 | Maui, HI |
| Merritt-Putnam Speakers Training Advanced Perspectives in the Management of Neurological and Mood Disorders at the Enchantment Resort | April 28-30, 2000 | Sedona, AZ |
| New Treatment Options for the Management of Pain: The Role of Anticonvulsants at the Four Seasons | April 2000 | Irving, TX |
| Advisory Board at the Disney Yacht Club | May 26, 2000 | Orlando, FL |
| New Directions in the Understanding and Treatment of Pain at the Plaza Hotel | March 24, 2001 | New York, NY |
| New Directions in the Understanding and Treatment of Pain at the Hilton Novi | March 2-3, 2001 | Detroit, MI |
| New Directions in the Understanding and Treatment of Pain at the Westin Galleria | May 4-5, 2001 | Houston, TX |
| New Directions in the Understanding and Treatment of Pain at the Harbor Court Hotel | February 9-10, 2001 | Baltimore, MD |
| New Directions in the Understanding and Treatment of Pain at the Fairmont Kansas City | March 9-10, 2001 | Kansas City, MO |
| New Directions in the Understanding and Treatment of Pain at the Peabody Memphis | May 11-12, 2001 | Memphis, TN |

| Event | Date | Location |
|---|---|---|
| Advisory Board Meeting at the Grand Wailea Resort Hotel and Spa | April 14-16, 2000 | Maui, HI |
| New Directions in the Understanding and Treatment of Pain at the Fairmont San Francisco | March 16-17, 2001 | San Francisco, CA |
| Advisory Board Meeting at the Westin Resort | June 16-18, 2000 | Hilton Head, SC |
| New Directions in the Understanding and Treatment of Pain at the Sheraton Universal City | May 18-19, 2001 | Universal City, CA |
| New Directions in the Understanding and Treatment of Pain at the Miami Biltmore | May 18-19, 2001 | Miami, FL |
| New Directions in the Understanding and Treatment of Pain at the Ritz Carlton New Orleans | March 23-24, 2001 | New Orleans, LA |
| New Directions in the Understanding and Treatment of Pain at the Sheraton Music City | March 23-24, 2001 | Nashville, TN |
| New Directions in the Understanding and Treatment of Pain at the Ritz Carlton St. Louis | March 30-31, 2001 | St. Louis, MO |
| New Advances in the Treatment of Neuropathic Pain | October 9-11, 1998 | Madeira, Portugal |

107.    The speakers who made these statements did not have any clinical evidence to support such claims. The statements implied that clinical trial evidence sufficient to establish medical safety and efficacy, effectiveness and usefulness existed, but with the exception of Neurontin's use for postherpetic neuralgia, there is no clinical trial evidence supporting the claim that Neurontin is effective for the treatment of pain.

108.    In virtually all of the presentations in which Neurontin's use for pain was promoted, neither the physician participant nor any person connected to the Promotion Enterprise acknowledged that no clinical trial evidence supported a claim of efficacy. Defendants' failure to disclose this material information made any statement that Neurontin was effective for any pain syndrome, other than postherpetic neuralgia, false and misleading.

109.    At every presentation concerning Neurontin's use for pain, "favorable" anecdotal evidence was presented to support Neurontin's use. Unfavorable anecdotal evidence was not disclosed even though Defendants were aware of such evidence.

110.    Although they were not supposed to discuss off-label indications with physicians,

Parke-Davis sales representatives regularly made false statements to doctors about Neurontin's

safety and medical efficacy, effectiveness and usefulness in treating pain. The following are

representative false statements by Defendants' sales force to doctors. Plaintiffs were only able to

obtain evidence of such statements for a limited time period between 1995 and 1997, but are

aware of "verbatim" reports -- anonymous surveys filled out by physicians after they have been

in contact with a pharmaceutical company's sales representative which the pharmaceutical

company later reviews to see if it is effectively communicating its sales message and remaining

within FDA guidelines -- which exist for the last several years. Upon information and belief,

review of more recent verbatim reports will demonstrate that similar statements were regularly

made by Defendants' sales forces from 1998 through 2004.

- In October 1995, a Parke-Davis sales representative stated that Neurontin had
  received a "New indication for chronic pain."

- In December 1995 a Parke-Davis sales representative stated that Neurontin was a
  "Good anticonvulsant for chronic pain and restless leg syndrome."

- In July 1996, a Parke-Davis sales representative stated that Neurontin was
  "Effective for many types of chronic pain."

- In December 1996, a Parke-Davis sales representative stated that Neurontin was
  "Good for back pain; neuropathic pains."

### 3.    False and Misleading Statements Regarding
###        Diabetic Peripheral Neuropathy

111.    Prior to October 16, 1997, Parke-Davis had no reasonable basis to claim or

suggest that Neurontin was safe or effective or could be possibly effective to treat diabetic

peripheral neuropathy. Nonetheless, at events produced by the Promotion Enterprise, physician

participants routinely falsely stated that Neurontin was safe and effective for this condition. For example, at the Jupiter Beach consultants meeting in April 1996, Dr. Nicholson stated that diabetic neuropathy patients "will" have their burning sensations relieved with the use of Neurontin. No clinical trial support or comparable evidence existed when this statement was made. Upon information and belief, similar statements were made at all events presented by the Promotion Enterprise that discussed Neurontin's use as a treatment for diabetic peripheral neuropathy, which included the following events:

| Event | Date | Location |
|---|---|---|
| Neurontin Consultants Meeting | April 19-21, 1996 | Jupiter Beach, FL |
| New Advances in the Treatment of Neuropathic Pain | October 9-11, 1998 | Madeira, Portugal |

112.    In 1996, Parke-Davis funded a placebo-controlled clinical trial concerning the use of Neurontin to treat diabetic peripheral neuropathy. The trial was conducted by Dr. Kenneth Gorson, a doctor at St. Elizabeth's Hospital in Boston, Massachusetts. The results of Gorson's study were negative. On August 23, 1997, Gorson submitted a draft of his study to Parke-Davis, accompanied by an abstract plainly stating that the study did not support Neurontin's use for diabetic peripheral neuropathy. Its conclusion stated that gabapentin "is probably no more effective than a placebo in the treatment of painful diabetic neuropathy."

113.    Nonetheless, Parke-Davis wrote and circulated a revised abstract that hid and misrepresented Dr. Gorson's negative findings and gave his study a more favorable conclusion. In January 1998, Parke-Davis circulated this revised abstract of the Gorson article with a conclusion stating, "Gabapentin may be effective in the treatment of painful diabetic neuropathy. Our results suggest that further studies evaluating higher dosages of gabapentin are warranted." Dr. Gorson refused to adopt this revision. In February 1999, more than one year later and almost two years after the study's completion, the results of Dr. Gorson's study were published in a

letter to the editor of the Journal of Neurology, Neurosurgery & Psychiatry, vol. 66, pages 251-52. The article concluded, "The results of this study suggest that gabapentin is probably ineffective or only minimally effective for the treatment of painful diabetic neuropathy at a dosage of 900 mg/day."

114.    Parke-Davis also submitted to the Drugdex Drug Information System, a widely used computer database that contains pharmaceutical information and article citations, a draft of an article which contained language that is consistent with the false abstract of Dr. Gorson's study circulated by Parke-Davis but which is not contained in the actual article. Drugdex published a citation to the Gorson article, which states, falsely, "the authors suggest that higher doses of gabapentin are needed." No such language is in the article. The Drugdex article omits the author's conclusion that gabapentin is "probably ineffective" for the treatment of painful diabetic neuropathy.

115.    After it received the results of the Gorson study, the Promotion Enterprise continued to promote Neurontin as effective for treating diabetic peripheral neuropathy at hundreds of presentations nationwide. The physician participants did not describe the results and conclusions of Dr. Gorson's study, nor did Defendants' representatives provide such information. Defendants' failure to describe the negative studies breached their obligation to provide fair and balanced information and made their representations regarding Neurontin's use for diabetic peripheral neuropathy false and misleading.

4.    **False and Misleading Statements Regarding Restless Leg Syndrome**

116.    At events produced by the Promotion Enterprise, physician participants routinely misrepresented that Neurontin was effective for the treatment of nocturnal myclonus, more commonly known as restless leg syndrome and/or periodic limb movement (collectively,

"restless leg syndrome"). Patients suffering from these conditions have frequent, involuntary limb movements interfering with the quality and duration of sleep. Events presented by the Promotion Enterprise that discussed Neurontin's use as a treatment for restless leg syndrome included the Advisory Board Meeting held at the Hyatt Regency Hotel on March 29, 2000 in San Antonio, Texas.

117.    Upon information and belief, at every presentation concerning Neurontin's use for restless leg syndrome, neither the physician participants, the vendor participants, nor Defendants informed the attendee physicians that Defendants had deliberately suppressed negative studies pursuant to the publication strategy. As described below, there was in fact at least one negative study that found that Neurontin was not effective for this condition, and upon information and belief, the results of this study were never disclosed when Neurontin's use for restless leg syndrome was discussed.

118.    Pursuant to its plan to reward doctors who used Neurontin for off-label indications, in 1996 Parke-Davis funded an open label study conducted by Dr. Bruce Ehrenberg of the New England Medical Center "to assess the efficacy of gabapentin [Neurontin] in the treatment of restless leg syndrome/periodic limb movements."

119.    Dr. Ehrenberg's study was negative, finding that sleep improved for less than half of the participants who took the drug. Moreover, the drug did not affect any of the participants' limb movements during sleep, and the majority of participants experienced no improvement in quality of sleep.

120.    Despite these adverse results, Parke-Davis' medical liaisons falsely told physicians that Dr. Ehrenberg's patients had a 90% response rate to Neurontin. Medical liaisons discussed making such assertions routinely in a June 1996 conference call taped by Dr. David

Franklin. Neither the medical liaisons nor the physician participants amended their statements to physicians once the results of Dr. Ehrinberg's study were known.

121.    Former Parke-Davis officials have admitted that although the results were not favorable, the results of Dr. Ehrenberg's study should have been published and made known to doctors. Indeed, Parke-Davis hired AMM/Adelphi to organize his data and to develop a manuscript for him. After the negative results were received, however, Parke-Davis took no steps to publish an article based on Dr. Ehrenberg's results. Parke-Davis' actions were consistent with its publication strategy, which intended to only publish studies with favorable results. Parke-Davis' policy of only publishing and disclosing the results of favorable studies directly violated its obligation to disclose favorable and unfavorable results pursuant to its obligation to make only fair and balanced statements relating to its drug products.

122.    In addition, an article widely circulated by Defendants concerning the use of Neurontin in the treatment of restless leg syndrome asserted that the authors Gary A. Mellick and Larry B. Mellick had not and never would receive financial benefit from anyone with an interest in Neurontin. The Mellick brothers had in fact received tens of thousands of dollars for acting as speakers at Defendants' events. Moreover, Gary Mellick never disclosed that he was a consultant for Parke-Davis and was assisting the company in developing the market for off-label uses of Neurontin.

123.    Although they were not supposed to discuss off-label indications with physicians, Parke-Davis sales representatives regularly made false statements to doctors about Neurontin's safety, efficacy, effectiveness and usefulness in treating restless leg syndrome. The following are representative false statements by the sales force to doctors. Plaintiffs were only able to obtain evidence of such statements for a limited time period between 1995 and 1997, but are aware of "verbatim" reports that exist for the last several years. Upon information and belief,

review of recent verbatim reports will demonstrate that similar statements were regularly made

by the Defendants' sales forces from 1998 through 2004.

- In August 1996, a Parke-Davis sales representative falsely stated that Neurontin
  was "Effective in controlling postherpetic pain; restless leg syndrome, peripheral
  neuropathy, migraine headache."

- In December 1996, a Parke-Davis sales representative stated that Neurontin was
  "Good for restless leg syndrome."

### 5.    False and Misleading Statements Regarding Bipolar Disorder

124.    Parke-Davis knew when it created its original marketing assessment for the use of

Neurontin to treat bipolar disorder (commonly called manic depression) in May 1995 that there

was no scientific rationale for Neurontin being a safe and effective treatment for the condition.

Nonetheless, Parke-Davis planned and intended the Promotion Enterprise to promote Neurontin

heavily for bipolar disorder. Events presented by the Promotion Enterprise that discussed

Neurontin's use as a treatment for bipolar disorder included the following:

| Event | Date | Location |
|---|---|---|
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series: Dinner Meeting at Maison Robert | March 16, 1998 | Boston, MA |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series: Dinner Meeting at Sunset Grill | March 16, 1998 | Nashville, TN |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series: Dinner Meeting at the Pescatore Fish Café | March 16, 1998 | Seattle, WA |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series: Dinner Meeting at Patrick's Bayside Bistro | March 17, 1998 | St. Pete's Beach, FL |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series: Dinner Meeting at the Heathman Hotel | March 17, 1998 | Portland, OR |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series: Dinner Meeting at the | March 18, 1998 | Philadelphia, PA |

| Event | Date | Location |
|---|---|---|
| Downtown Club | | |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series: Dinner Meeting at Morton's of Chicago – Buckhead | March 18, 1998 | Atlanta, GA |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series: Dinner Meeting at the Huntington Hotel | March 18, 1998 | San Francisco, CA |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series: Dinner Meeting at the Brass Elephant | March 19, 1998 | Baltimore, MD |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series: Dinner Meeting at Ristorante DeGrezia | March 19, 1998 | New York, NY |
| The Use of Anticonvulsants in Psychiatry | October 23–25, 1998 | Barcelona, Spain |
| Parke-Davis Speakers Bureau Meeting at the Fairmont Scottsdale Princess | January 21-23, 2000 | Scottsdale, AZ |
| Merritt-Putnam Speakers Bureau Current Perspectives in the Understanding of Neurobehavioral Disorders at the Four Seasons Regent Beverly Wilshire | March 24-26, 2000 | Beverly Hills, CA |
| Advisory Board Meeting at the Hyatt Regency Hotel | March 29, 2000 | San Antonio, TX |
| Merritt-Putnam Speakers Bureau at the Wyndham New Orleans at Canal Place | April 7-9, 2000 | New Orleans, LA |
| Merritt-Putnam Speakers Training Advanced Perspectives in the Management of Neurological and Mood Disorders at the Enchantment Resort | April 28-30, 2000 | Sedona, AZ |

125.    The Promotion Enterprise falsely claimed that Neurontin was effective for the treatment of bipolar disorder to induce physicians to prescribe Neurontin to treat this condition. The Promotion Enterprise failed to inform the physicians of material information, and its statements were false and misleading, on every occasion in which the Enterprise gave a presentation on bipolar disorder without informing physicians that there was no scientific basis supporting this use.

126.    As early as May 20, 1997, Parke-Davis knew that clinical trial evidence established that Neurontin was not significantly superior to placebo in treating bipolar disorder.

At the 1997 annual meeting of the American Psychiatric Association in San Diego, California, investigators presented the results of a placebo-controlled clinical trial comparing placebo, lamotrigine and Neurontin on depression and bipolar patients. The results showed that Neurontin was not significantly more effective than placebo and considerably less effective than the competitor drug lamotrigine.

127.    Despite the results of the clinical trials, the Promotion Enterprise continued to make presentations to physicians promoting Neurontin to treat patients with bipolar disorder. For example, the Promotion Enterprise created and sponsored a series of dinner meetings for psychiatrists entitled "Closing the Psychiatry-Neurology Divide:  Emerging Uses of Anticonvulsants."  This program was presented dozens of times in 1998, including in St. Petersburg, Florida at Patrick's Bayside Inn.  As part of the program, psychiatrists were informed that Neurontin was indicated for bipolar disorder, that early evidence suggested that it had anti-depressive and mood stabilizing effects, and that "data are increasing but currently limited to favorable case reports and open trials."  The program did not inform attendees of the unfavorable clinical trials that found that Neurontin was not effective for bipolar disorder.

128.    Similarly, Parke Davis sales force regularly made false statements to physicians about Neurontin's utility in treating bipolar disorder.  Plaintiffs were only able to obtain evidence of such statements for a limited time period between 1995 and 1997, but are aware of "verbatim" reports that exist for the last several years.  Upon information and belief, recent verbatim reports will demonstrate that similar statements were regularly made by Defendants' sales force from 1998 through 2004.  Representative statements made to physicians included:

•       At a Parke-Davis marketing event in 1997, Parke-Davis falsely stated that Neurontin was "effective" for "bipolar."

- In December 1998, a Parke-Davis sales representative falsely stated to a physician that Neurontin was an "effective treatment of bipolar disorder."

- At a Parke-Davis marketing event in December 1998, Parke-Davis falsely stated that Neurontin was "Effective on bipolar."

- At a Parke-Davis marketing event at the airport Marriott in San Francisco in August 1998, Parke-Davis falsely stated that Neurontin was "Innovative and effective … for bipolar II."

129.    Parke-Davis did not publish the results of the negative bipolar disorder clinical trial until 2000.  Drugdex has never included citations to either of the articles that document the negative clinical trials for bipolar disorder in its compendium.

### 6.    False and Misleading Statements Regarding Social Phobia

130.    At events produced by the Promotion Enterprise, physician participants routinely stated that Neurontin was effective for the treatment of social phobia.  Events presented by the Promotion Enterprise which discussed Neurontin's use as a treatment for social phobia included the following:

| Event | Date | Location |
|---|---|---|
| Advisory Board Meeting at the Hyatt Regency Hotel | March 29, 2000 | San Antonio, TX |
| Parke-Davis Speakers Bureau Meeting at the Fairmont Scottsdale Princess | January 21-23, 2000 | Scottsdale, AZ |
| Merritt-Putnam Speakers Bureau Current Perspectives in the Understanding of Neurobehavioral Disorders at the Four Seasons Regent Beverly Wilshire | March 24-26, 2000 | Beverly Hills, CA |
| Merritt-Putnam Speakers Bureau at the Wyndham New Orleans at Canal Place | April 7-9, 2000 | New Orleans, LA |
| Merritt-Putnam Speakers Training Advanced Perspectives in the Management of Neurological and Mood Disorders at the Enchantment Resort | April 28-30, 2000 | Sedona, AZ |
| 1998 CME Psychiatry Dinner Meeting and | March 16, 1998 | Boston, MA |

| Event | Date | Location |
|---|---|---|
| Teleconference Series: Dinner Meeting at Maison Robert | | |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series: Dinner Meeting at Sunset Grill | March 16, 1998 | Nashville, TN |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series: Dinner Meeting at the Pescatore Fish Café | March 16, 1998 | Seattle, WA |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series: Dinner Meeting at Patrick's Bayside Bistro | March 17, 1998 | St. Pete's Beach, FL |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series: Dinner Meeting at the Heathman Hotel | March 17, 1998 | Portland, OR |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series: Dinner Meeting at the Downtown Club | March 18, 1998 | Philadelphia, PA |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series: Dinner Meeting at Morton's of Chicago – Buckhead | March 18, 1998 | Atlanta, GA |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series: Dinner Meeting at the Huntington Hotel | March 18, 1998 | San Francisco, CA |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series: Dinner Meeting at the Brass Elephant | March 19, 1998 | Baltimore, MD |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series: Dinner Meeting at Ristorante DeGrezia | March 19, 1998 | New York, NY |
| The Use of Anticonvulsants in Psychiatry | October 23–25, 1998 | Barcelona, Spain |

Upon information and belief, at each of these events, participating physicians expressly stated, or implied, that Neurontin was effective for the treatment of social phobia.

131.    The speakers who made these statements did not have any clinical evidence to support such claims. These statements implied that clinical trial evidence sufficient to establish causation existed, but as discussed below, the only clinical study conducted was inconclusive regarding Neurontin's effectiveness for the treatment of social phobia. Prior to its receipt of results of its social phobia clinical trial on July 22, 1997, Parke-Davis had no reasonable

scientific basis for claiming that Neurontin was effective in treating social phobia, because no clinical trial data existed.

132.    Even after Parke-Davis received the results from its clinical study in July 1997, it could not state that the evidence unconditionally supported Neurontin's use for social phobia. The authors of the study admitted that the data was limited. They did not conclude that Neurontin was effective, and acknowledged that further studies were necessary to determine whether a dose-response relationship existed. The authors of the study could not explain why there appeared to be wide ranges of effectiveness between male subjects and female subjects, and between individuals above age thirty-five compared to those below age thirty-five.

133.    Notwithstanding the lack of clinical trial evidence to support Neurontin's use for patients with social phobia, the Promotion Enterprise held numerous events where the physician participants informed physicians that Neurontin was effective for the treatment of social phobia, and failed to inform attendees of the limitations of the clinical trial evidence. Such statements were false and misleading.

### 7.    False and Misleading Statements Regarding Panic Disorder

134.    Without favorable results from a well-designed panic disorder clinical trial that established Neurontin's efficacy for that condition, Parke-Davis had no reasonable scientific basis for claiming that Neurontin was effective in treating panic disorder. Nonetheless at events produced by the Promotion Enterprise, physician participants routinely stated that Neurontin was effective for the treatment of panic disorder. Events presented by the Promotion Enterprise which discussed Neurontin's use as a treatment for panic disorder included the following:

| Event | Date | Location |
|---|---|---|
| Advisory Board Meeting at the Hyatt Regency Hotel | March 29, 2000 | San Antonio, TX |

| Event | Date | Location |
|---|---|---|
| Parke-Davis Speakers Bureau Meeting at the Fairmont Scottsdale Princess | January 21-23, 2000 | Scottsdale, AZ |
| Merritt-Putnam Speakers Bureau Current Perspectives in the Understanding of Neurobehavioral Disorders at the Four Seasons Regent Beverly Wilshire | March 24-26, 2000 | Beverly Hills, CA |
| Merritt-Putnam Speakers Bureau at the Wyndham New Orleans at Canal Place | April 7-9, 2000 | New Orleans, LA |
| Merritt-Putnam Speakers Training Advanced Perspectives in the Management of Neurological and Mood Disorders at the Enchantment Resort | April 28-30, 2000 | Sedona, AZ |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series: Dinner Meeting at Maison Robert | March 16, 1998 | Boston, MA |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series: Dinner Meeting at Sunset Grill | March 16, 1998 | Nashville, TN |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series: Dinner Meeting at the Pescatore Fish Café | March 16, 1998 | Seattle, WA |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series: Dinner Meeting at Patrick's Bayside Bistro | March 17, 1998 | St. Pete's Beach, FL |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series: Dinner Meeting at the Heathman Hotel | March 17, 1998 | Portland, OR |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series: Dinner Meeting at the Downtown Club | March 18, 1998 | Philadelphia, PA |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series: Dinner Meeting at Morton's of Chicago – Buckhead | March 18, 1998 | Atlanta, GA |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series: Dinner Meeting at the Huntington Hotel | March 18, 1998 | San Francisco, CA |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series: Dinner Meeting at the Brass Elephant | March 19, 1998 | Baltimore, MD |
| 1998 CME Psychiatry Dinner Meeting and Teleconference Series: Dinner Meeting at Ristorante DeGrezia | March 19, 1998 | New York, NY |
| The Use of Anticonvulsants in Psychiatry | October 23–25, 1998 | Barcelona, Spain |

135.    The speakers who made these statements did not have any clinical evidence to support such claims. These statements implied that clinical trial evidence sufficient to establish causation existed, but as discussed below, clinical studies that were conducted did not find Neurontin effective for the treatment of panic disorder. On every occasion the Promotion Enterprise gave a presentation on the use of Neurontin for bipolar disorder without informing physicians that there was no scientific basis for using Neurontin, the Enterprise failed to inform the physician attendees of material information that was required to be presented for the statements on the use of Neurontin to not be misleading and false.

136.    Not until October 1997, did Parke-Davis receive results of its own clinical trial which found that Neurontin was no more efficacious than placebo in treating panic disorder. Parke-Davis did not publish the negative results of this clinical trial until 2000. Despite the results of the clinical trial, the Promotion Enterprise continued to mislead physician attendees at various events and seminars sponsored by the Promotion Enterprise by failing to disclose the negative clinical trial evidence and representing that Neurontin was effective and useful to treat panic disorder.

### 8.    False and Misleading Statements Regarding Migraine

137.    Parke-Davis knew that there was no preclinical rationale supporting the use of Neurontin in migraine prophylaxis.

138.    Parke-Davis conducted a twelve-week migraine prophylaxis study in Europe during the late 1980s which revealed no statistically significant difference in migraine attack frequency between placebo and 900 mg per day of Neurontin therapy.

139.    In addition to the failed European migraine trial, Parke-Davis knew of several reports of negative results of Neurontin for migraine use, including reports from Dr. Seymour Solomon, Director of the Headache Unit at Montefiore Medical Center; Dr. John Rothrock,

Chairman of the Department of Neurology at University of Alabama; Dr. Kenneth Michael

Anthony Welch, Professor of Clinical Neurology at the University of Michigan; and Dr. Fred

Michael Cutrer, Department of Neurology at Massachusetts General Hospital.

140.    Parke-Davis never disclosed the negative European trial on migraine to any

persons outside of the company, and the negative results were never published.

141.    On May 25, 1996, Parke-Davis held an advisory board meeting to discuss

"Gabapentin in the Management of Migraine." Parke-Davis' principal investigator for

Neurontin and migraine chaired the meeting, and there were several other physicians in

attendance. There were also several Parke-Davis employees in attendance, including the author

of the marketing assessment, John Boris, who was aware of the failed European clinical trial.

Vendor participant AMM/Adelphi ran the meeting. The purpose of the meeting was to discuss

Neurontin's possible utility in the area of migraine and to solicit feedback on the development of

clinical trials.

142.    At the advisory board meeting, Parke-Davis suppressed any reference to the failed

migraine study of the late 1980s. Leslie Magnus-Miller, Parke-Davis' Medical Affairs Director,

was directly asked, "But do you have any data [relating to Neurontin and migraine]?" Dr.

Magnus-Miller responded: "We didn't...No, not really, because we didn't capture headache

baseline." Edda Guerrero added: "Unfortunately we did not, not even in monotherapy I think.

Right?" John Boris did not correct this misstatement. Parke-Davis also failed to mention that

there was "no established preclinical rationale that would support the use of Neurontin in

migraine prophylaxis."

143.    Thereafter, pursuant to marketing strategies and tactics developed by Parke-Davis

and the Promotion Enterprise, the Promotion Enterprise regularly presented programs in which

physician participants touted Neurontin as being effective for the treatment of migraine. Events

where such presentations were made include the following:

| Event | Date | Location |
|---|---|---|
| Advisory Board Meeting at the Hyatt Regency Hotel | March 29, 2000 | San Antonio, TX |
| Gabapentin in the Management of Migraine | May 25, 1996 | Short Hills, NY |

Such statements were false and misleading. In these presentations, Parke-Davis failed to inform

physician participants of the failed migraine trial or the negative anecdotal evidence it received

from its own advisory board physicians. It also failed to inform physicians that there was no

established rationale or clinical trial evidence that would support the use of Neurontin for

migraine. Defendants' failure to provide this information made any prior statements about

Neurontin's use for migraine false and misleading.

144.    Parke-Davis sales representatives routinely made false statements regarding the

safety, efficacy, effectiveness and usefulness of Neurontin in treating migraine. Plaintiffs were

only able to obtain evidence of such statements for a limited time period between 1995 and 1997,

but are aware of "verbatim" reports that exist for the last several years. Upon information and

belief, recent verbatim reports will demonstrate that similar statements were regularly made by

the Defendants' sales forces from 1998 through 2004. Representative statements made to

physicians include a statement made by a Parke-Davis salesperson in August 1996 who stated

"Effective in controlling … migraine headache."

### 9.    False and Misleading Statements Regarding Monotherapy for Epilepsy

145.    The Promotion Enterprise repeatedly fraudulently asserted that Neurontin was

effective as a monotherapy treatment for epilepsy. Parke-Davis knew that proof of efficacy for

monotherapy required successful completion of two clinical trials demonstrating Neurontin's

efficacy. Clinical Study 945-82, a double-blind, placebo-controlled study, was designed to be a pivotal study in support of monotherapy. But the results were negative, failing to demonstrate that Neurontin was effective in treating seizures at doses up to 2400 mg per day. In addition to failing to establish monotherapy efficacy, clinical trial 945-82 failed to establish a dose-response at 600, 1200 and 2400 mg per day. Thus, as early as November 1995, Parke-Davis knew that clinical trial 945-82 did not support a monotherapy indication.

146.    Parke-Davis also knew that another clinical trial concerning Neurontin's use as a monotherapy, the Eastern European pilot study 945-177, an extension of the 945-77 protocol, failed to establish dose differentiation and statistically significant efficacy. Parke-Davis did not intend to publish the results of 945-177, nor did it intend to publish the combined results of 945-77 and 945-177.

147.    Despite these negative trial results, the Promotion Enterprise continued to assert that Neurontin was an effective monotherapy for the treatment of epilepsy. For example, at the Jupiter Beach consultants meeting in August 1996, Dr. Harden and Dr. LeRoy gave presentations to attending physicians claiming that Neurontin was effective for monotherapy. Drs. Harden and Leroy misrepresented the results of Clinical Study 945-82, claiming that the study did not evidence a failure of Neurontin's efficacy and the lack of a dose response. Further, Dr. Leroy misrepresented that the Eastern European clinical trial was successful, when, in fact, the double blind codes of the study had not been broken, and patient recruitment had not been completed. Drs. Harden and Leroy could have only received information about the status of these unpublished clinical trials from Parke-Davis. Thus, while at the time of the Jupiter Beach meeting the only long-term clinical trials concerning Neurontin's use as monotherapy demonstrated that Neurontin was not effective for that use, physician attendees at Jupiter Beach came away with the message that Neurontin was effective as a monotherapy.

148.    On September 16, 1996, Parke-Davis submitted a supplemental NDA to the FDA

seeking approval of Neurontin as a monotherapy for partial seizures.  On August 26, 1997, the

FDA rejected Parke-Davis' application finding that the clinical trials performed did not establish

effectiveness.  Parke-Davis actively promoted Neurontin for monotherapy before it applied for

FDA approval, before it received the FDA's response, and defiantly, after the FDA rejected its

application for monotherapy.  The Enterprise never mentioned the material fact that the FDA had

rejected the application for monotherapy.

149.    Representative events at which the Promotion Enterprise continued to make

presentations that Neurontin was effective for monotherapy without disclosing that the FDA had

denied Parke-Davis' application for a monotherapy indication included the following:

| Event | Date | Location |
|---|---|---|
| Advisory Board Meeting at the Hyatt Regency Hotel | March 29, 2000 | San Antonio, TX |
| Monotherapy Speakers Bureau Meeting at the La Quinta Resort | September 1997 | Palm Springs, CA |

150.    Parke-Davis sales representatives routinely made false statements concerning

Neurontin's safety, efficacy, effectiveness and usefulness as a monotherapy agent.  Plaintiffs

were only able to obtain evidence of such statements for a limited time period between 1995 and

1997, but are aware of "verbatim" reports that exist for the last several years.  Upon information

and belief, recent verbatim reports will demonstrate that similar statements were regularly made

by Defendants' sales force from 1998 through 2004.  Representative statements made to

physicians included:

- In January 1997, a Parke-Davis sales representative falsely stated that Neurontin

    was "Excellent first line [monotherapy] or add-on prescription for seizures."

- In a 1998 event, Parke-Davis falsely stated that Neurontin "is effective as

    monotherapy."

- In October 1995, a Parke-Davis sales representative falsely stated that Neurontin's indicated use was "soon to be monotherapy."

- In June 1998, after the FDA had already rejected the monotherapy indication and Parke-Davis had abandoned pursuing approval for monotherapy, a Parke-Davis sales representative stated that Neurontin was "moving toward monotherapy indication in seizures."

- In a Parke-Davis marketing event later in 1998, Parke-Davis went so far as to state that Neurontin was "now approved as monotherapy for seizures."

### 10.    False and Misleading Statements Regarding Dosages Above the FDA-Approved Maximum

151.    A central part of Defendants' strategy to increase sales of Neurontin was to convince physicians to prescribe it for adjunctive therapy and other medical conditions at doses far exceeding the FDA-approved level, which was 900 to 1800 mg per day. At an advisory board meeting Parke-Davis admitted, "we therefore went on an aggressive campaign to try to convince the doctors to push the dose of Neurontin up into the 2400 to 3600 mg range."

152.    Yet, as early as December 30, 1994, Parke-Davis knew that an increased dosage of Neurontin does not mean that it is more effective because only a certain amount of the drug is actually absorbed by the body due to the manner in which it is excreted and the maximum levels that can accumulate.

153.    As of November 1995, Parke-Davis knew that clinical trial 945-82 did not show a dose-related response. Parke-Davis also knew that clinical trial 945-77 failed to establish dose differentiation and statistically significant efficacy. See ¶¶ 137-44, supra. Such results were at odds with Parke-Davis' assertion that the larger the dose, the better the effect.

154.    Despite these negative trial results, Defendants initiated a nationwide campaign to

convince physicians to increase dosing to 2400 mg per day, 33% greater than the maximum

dosage approved by the FDA as safe and effective.

155.    In 1995 and 1996 Parke-Davis conducted an enormous Phase IV trial known as

STEPS. Although STEPS took the form of a research clinical trial, it was in fact, a marketing

ploy designed to induce neurologists to become comfortable prescribing Neurontin at a far

higher dose than indicated in the FDA-approved labeling. While most clinical studies have a

limited number of investigators treating a number of patients qualified for the study, the STEPS

protocol called for over 1,200 physician "investigators" to enroll only a few patients each. The

participating physicians were instructed to titrate their patients to higher-than-labeled dosages of

Neurontin to demonstrate that patients could tolerate high dosages of the drug. The STEPs study

was designed to condition physicians to prescribe dosages for non-study patients higher than

those found effective in the clinical trials monitored by the FDA. Physicians who enrolled in the

STEPS study were paid for agreeing to participate in the study and for every patient enrolled. At

the conclusion of the study, Parke-Davis offered each of the 1,200 investigators additional cash

for each patient the doctor kept on Neurontin after the study ended.

156.    Although Parke-Davis was routinely sponsoring programs that recommended that

dosages be increased to as high as 4800 mg per day, Parke-Davis knew that it did not have

sufficient toxicology data to prove that Neurontin was safe at dosages as high as even 3600 mg

per day.

157.    Nonetheless, during programs presented by the Promotion Enterprise, physician

participants routinely stated that dosages above the maximum approved by the FDA increased

Neurontin's efficacy. For example, during the migraine advisory board meeting, Dr. Rafferty, a

preclinical researcher from Parke-Davis, falsely stated: "The antiepileptic activity of gabapentin

is quite dose dependent. Oh yeah." The negative findings of the monotherapy trial were not

disclosed to the advisory board members.

158.    At the consultants meeting in Jupiter Beach in April 1996, Dr. Longmire stated:

"most [patients] do better as you raise [the dose] higher." At the same presentation, and in other

presentations, such as the consultants meeting at the Boston Ritz Carlton in May 1996, Dr.

Longmire stated that the only reason a patient who was actually taking his medication and not

malingering would not receive any benefit from Neurontin was if he was not receiving a high

enough dose. Neither Dr. Longmire nor the other Parke-Davis personnel present informed the

physicians that Parke-Davis' own clinical trials established that there was no dose relationship.

159.    At the consultants meeting at the Boston Ritz, Dr. Longmire deceptively stated:

"the problem with Neurontin in terms of real trigeminal neuralgia is that it has to be titrated

upward. And when I say 1500 mg, that's the target starting dose. There are colleagues in the

Huntsville area who, I have people on 5400 with no side effects." This statement was

misleading in that it (a) misrepresented that Neurontin was effective for trigeminal neuralgia at

higher-than-approved doses, (b) did not disclose side effects reported to Parke-Davis at higher

levels, (c) did not disclose the absence of toxicology data at these levels, (d) did not disclose

there was no clinical data to support Neurontin's efficacy on trigeminal neuralgia, and (e) failed

to disclose Parke-Davis' own clinical trials that questioned the existence of a dose relationship.

160.    At the same consultants meeting in Boston, Dr. LeRoy stated: "we found that

clinical usage requires [daily dosages of] 2200, 3200, 3600, up to what I think … again, as I said

earlier, a limit of about 4800 milligrams." This statement failed to disclose any contrary

findings, including Parke-Davis' own outpatient study which had failed to identify a dose related

response. Nor did this statement disclose that Parke-Davis had no toxicology data establishing

safety at doses this high.

161.    Notwithstanding the lack of toxicology data and clinical trial data supporting

Neurontin's use at higher doses, physicians who attended these consultants meetings were

persuaded that they should be prescribing Neurontin at dosages in excess of its FDA-approved

levels. One physician noted "one of the main messages that I got out of the speakers [that

doctors haven't been pushing the dose up high enough]. (Inaudible) 4800 mg (Inaudible). And

I've sort of gone to 24 and maybe a little higher and then stopped. To me, that was an important

point (Inaudible) I'm not really pushing the drug enough."

162.    As part of its monotherapy application to the FDA, Parke-Davis sought approval

to increase the effective dose range to 3600 mg per day and to increase the maximum

recommended dose to 4800 mg per day. On August 26, 1997, the FDA denied the application

because there was no evidence that Neurontin was safe at such doses.

163.    The FDA also informed Parke-Davis that if it did provide safety data, Parke-

Davis could only obtain the labeling change if it further disclosed that "evidence from controlled

trials fails to provide evidence that higher dose of Neurontin are more effective than those

recommended."

164.    Parke-Davis never disclosed that the FDA denied its request to increase the

maximum approved dose of Neurontin, that the FDA had determined that Parke-Davis had not

provided sufficient evidence of safety at higher doses, and that there was no clinical trial

evidence that Neurontin was more effective at higher doses.

165.    Notwithstanding the FDA's refusal to increase the maximum approved dosage of

Neurontin and its finding that no clinical evidence supported Neurontin's efficacy at dosages

greater than 1800 mg per day, Parke-Davis continued to market Neurontin at higher doses

without these disclosures. In addition to the events identified above, the Promotion Enterprise

presented numerous programs where physician participants asserted that Neurontin was effective

and safe at dosages exceeding 1800 mg per day. These events included the following:

| Event | Date | Location |
|---|---|---|
| Advisory Board on Neurontin at the Royal Sonesta | February 4-6, 2000 | New Orleans, LA |
| Merritt-Putnam Speakers Bureau Current Perspectives in the Understanding of Neurobehavioral Disorders at the Four Seasons Regent Beverly Wilshire | March 24-26, 2000 | Beverly Hills, CA |
| Advisory Board Meeting at the Hyatt Regency Hotel | March 29, 2000 | San Antonio, TX |

### 11.    False and Misleading Statements Regarding the Lack of Side Effects

166.    Parke-Davis knew that there was a dose relationship between Neurontin and side effects. Clinical trial 945-77 demonstrated that patients were three times more likely to have side effects at 1800 mg per day than at 900 mg per day.

167.    Parke-Davis was aware that the January 1996 edition of Epilepsy reported behavioral side effects of gabapentin in seven children who received Neurontin as adjunctive therapy. The most troublesome behaviors were tantrums, aggression towards others, hyperactivity and defiance.

168.    Parke-Davis knew as of November 19, 1996 that high doses of gabapentin (i.e., Neurontin) could lead to weight gain.

169.    Parke-Davis also knew that similar to other anti-epileptic drugs, patients on high doses of Neurontin had to be titrated down, or else they would suffer withdrawal symptom side effects.

170.    At numerous events presented by the Promotion Enterprise, physician participants informed physician attendees that Neurontin use at high-dose levels did not cause adverse side effects. For example, at the Jupiter Beach consultants meeting in April 1996, Dr. Schachter stated: "Well, I don't think there's any data suggesting that there's any withdrawal syndrome from Neurontin at this point." Parke-Davis was aware, however, of at least anecdotal reports of withdrawal syndrome and that Neurontin patients had to be tapered off Neurontin in much the

same manner that they titrated up, but physician attendees were not informed of this information.

171.    Similarly, at the Boston Ritz Carlton consultants meeting in May 1996, Dr. Longmire falsely stated that adverse reactions tended to be idiosyncratic, and that they did not seem to be dose-dependent. Again, the physician attendees were not informed of the medical evidence in Parke-Davis' possession that side effects were indeed dose responsive. Defendants' failure to provide this information made any prior representations about Neurontin's propensity to induce side effects at dosages exceeding 1800 mg day false and misleading.

### 12.    False and Misleading Statements Regarding Other Indications

172.    Neurontin was prescribed for hundreds of additional off-label indications for which there is no scientific support as to its safety, efficacy, effectiveness or usefulness. Pursuant to marketing strategies and tactics developed by Parke-Davis and the Promotion Enterprise, the Promotion Enterprise regularly presented programs in which physician participants misrepresented Neurontin as being effective for conditions other than those described above. Such statements were false and misleading because there was no clinical trial evidence showing that Neurontin was safe and effective for the treatment of any conditions other than adjunct therapy for partial seizures and postherpetic neuralgia in adults. In these presentations, Parke-Davis failed to inform physician attendees that there was no established rationale that would support the use of Neurontin for conditions other than adjunct therapy for partial seizures and postherpetic neuralgia. Defendants' failure to provide this information rendered any prior statements about Neurontin's use for conditions other than adjunct therapy for partial seizures and postherpetic neuralgia in adults false and misleading.

### F.    Alternative Treatments Cheaper than Neurontin

173.    There were numerous alternative medications that were cheaper and more optimal than Neurontin to treat the conditions for which Defendants were touting Neurontin, including

several medications (such as aspirin and ibuprofen) not ordinarily covered by Plaintiffs'

formularies. These alternative cheaper or more desirable medications included:

### 2003 Average Discounted Price Before Member Cost-Share – FDA-approved Drugs for These Indications

|  | cost/day | cost/30 days |
|---|---|---|
| **attention deficit disorder** | | |
| amphetamine | $2.31 | $69 |
| clonidine | $0.35 | $10 |
| methylphenidate | $1.17 | $35 |
| **bipolar disorder** | | |
| carbamazepine | $0.61 | $18 |
| chlorpromazine | $1.22 | $37 |
| lithium | $0.45 | $14 |
| valproic acid | $1.52 | $46 |
| **social phobia** | | |
| paroxetine | $2.29 | $69 |
| sertraline (Zoloft) | $2.67 | $80 |
| venlafaxine (Effexor) | $2.54 | $76 |
| **panic disorder** | | |
| alprazolam | $0.31 | $9 |
| clonazepam | $0.66 | $20 |
| fluoxetine | $0.79 | $24 |
| **migraine prophylaxis** | | |
| propranolol | $0.28 | $8 |
| timolol | $0.88 | $27 |
|  | | |
| Neurontin | $4.21 | $126 |

174.    Defendants' unlawful scheme thus caused Plaintiffs to pay for Neurontin where

alternative treatments at a small fraction of the cost were readily available.

175.    Additionally (see paragraphs 1-4, 18, 37 and 151-165, supra), Defendants

increased Plaintiffs' costs by inducing physicians to prescribe Neurontin at dosages far

exceeding its recommended, safe or effective levels (of 900 mg to 1800 mg per day). As also

noted previously (e.g., paragraphs 112, 119, 126 and 138, supra), clinical evidence known to

Parke-Davis established that Neurontin was not more efficient than placebo for certain conditions.

176.    Plaintiffs instituted a number of measures to reduce their economic harm once they became aware of Defendants' wrongdoing, including instituting in certain circumstances dosage limitations on Neurontin and mandating that their members or patients be prescribed other anti-epileptic or other appropriate treatments before Neurontin is prescribed.

G.    **Alternative Sub-Enterprises**

177.    As part of their fraudulent marketing scheme, and alternatively to the Promotion Enterprise, Defendants established individual sub-enterprises consisting of Defendants and each individual vendor participant. These alternative sub-enterprises are as follows:

(a)    The Cline Davis Sub-Enterprise. Defendants and Cline Davis formed the Cline Davis Sub-Enterprise with the goal and purpose of promoting Neurontin for uses for which it was not proven to be safe, medically efficacious, effective or useful. The facts and allegations set forth in paragraphs 49 through 55, supra, are incorporated herein by reference.

(b)    The Physicians World Sub-Enterprise. Defendants and Physicians World formed the Physicians World Sub-Enterprise with the goal and purpose of promoting Neurontin for uses for which it was not proven to be safe, medically efficacious, effective or useful. The facts and allegations set forth in paragraphs 56 through 66, supra, are incorporated herein by reference.

(c)    The Sudler & Hennessey Sub-Enterprise. Defendants and Sudler & Hennessey formed the Sudler & Hennessey Sub-Enterprise with the goal and purpose of promoting Neurontin for uses for which it was not proven to be safe, medically efficacious, effective or useful. The facts and allegations set forth in paragraphs 67 through 72, supra, are incorporated herein by reference.