(d)    The MEDED/MEDCON Sub-Enterprise.  Defendants and

MEDED/MEDCON formed the MEDED/MEDCON Sub-Enterprise with the goal and purpose

of promoting Neurontin for uses and at dosages for which it was not proven to be safe, medically

efficacious, effective or useful.  The facts and allegations set forth in paragraphs 73 through 78,

supra, are incorporated herein by reference.

(e)    The MES Sub-Enterprise.  Defendants and MES formed the MES Sub-

Enterprise with the goal and purpose of promoting Neurontin for uses and at dosages for which it

was not proven to be safe, medically efficacious, effective or useful.  The facts and allegations

set forth in paragraphs 79 through 85, supra, are incorporated herein by reference.

(f)    The HCC Enterprise.  Defendants and HCC formed the HHC Sub-

Enterprise with the goal and purpose of promoting Neurontin for uses and at dosages for which it

was not proven to be safe, medically efficacious, effective or useful.  The facts and allegations

set forth in paragraph 86, supra, are incorporated herein by reference.

(g)    The AMM/Adelphi Sub-Enterprise.  Defendants and AMM/Adelphie

formed the AMM/Adelphie Sub-Enterprise with the goal and purpose of promoting Neurontin

for uses and at dosages for which it was not proven to be safe, medically efficacious, effective or

useful.  The facts and allegations set forth in paragraphs 87 through 90, supra, are incorporated

herein by reference.

**H.    The Unlawful Conduct Continues Following the Pfizer Merger
With Warner-Lambert and Through at Least December 2004**

178.    Following the merger in June 2000 (the "Merger") of Pfizer and Warner-Lambert,

Parke-Davis' parent, Pfizer took control of the development and marketing of all Parke-Davis

pharmaceutical products, including Neurontin.  Many of the Parke-Davis employees responsible

for Neurontin's off-label promotion became employees of Pfizer and continued to work on

Neurontin's off-label marketing. Senior management of Pfizer began to evaluate Neurontin and

had to decide if it wanted to continue the unlawful and misleading off-label marketing of

Neurontin. After reviewing Neurontin, and its increasing sales generated by off-label use, Pfizer

elected to continue the Publication Strategy and continue influencing physicians to prescribe

Neurontin for non-approved uses by suppressing negative clinical information regarding

Neurontin.

179.    Pfizer concluded, as had Parke-Davis, that Neurontin's most promising markets

were for indications for which Neurontin had not been approved. Indeed, Pfizer knew that

Neurontin would not be approved for its most promising market, generalized treatment for

neuropathic pain, because of the failed pain trials conducted Drs. Reckless and Gorson. Pfizer

further knew that the Neurontin was ineffective to treat the most common form of pain,

nociceptive pain. Pfizer was also aware that the FDA had declined to approve Neurontin for

epilepsy monotherapy, a much more lucrative market that the adjunctive therapy market, because

of negative clinical data. Pfizer knew as well that it could dramatically increase profits for

Neurontin if physicians could be convinced to prescribe Neurontin at daily dosages that far

exceeded the dose range supported by clinical evidence. Finally, Pfizer was aware that sales for

Neurontin's one approved use, adjunctive therapy for epilepsy, only represented a tiny fraction

of overall sales revenue. In fact, adjunctive therapy sales had reached a plateau in 1995 and had

subsequently been declining.

180.    Notwithstanding its knowledge that Neurontin was not effective for most pain

indications and other potentially lucrative markets, Pfizer elected to expand the publication

strategy (described in paragraphs 28-33, supra). Pfizer continued to pay for the creation of

numerous articles favoring Neurontin therapy for unapproved uses, while deliberately failing to

disclose in the articles that clinical studies had shown that Neurontin was not effective for these uses.

181.    Pfizer's marketing plans also called for the promotion of these one-sided articles to practicing physicians at the hundreds of scientific conferences, meetings and CME seminars that occurred each year. Pfizer developed "key messages" that were false and misleading and were the same in both the articles and the presentations. For example, one key message touted Neurontin as a "fast and effective monotherapy agent" that had "proven efficacy" in monotherapy. This key message was false, as Neurontin's efficacy in monotherapy has never been established and the FDA has specifically rejected an application for Neurontin monotherapy based on inconclusive or unfavorable data. Another key message was to convince physicians that Neurontin's effectiveness increased at higher dosages, and that Neurontin needed to be titrated to 3600 mg per day to determine efficacy. This too was false, as the FDA has consistently found that there is no evidence of greater efficacy beyond 1800 mg per day. One marketing firm used by Pfizer, Medical Action Communications, Inc. ("MAC"), noted that journal discussions of Neurontin's dosing were "inconsistent and sporadic," and vowed to make sure future publications "consistently address proper dosing of Neurontin," even though the so-called "proper" message was false and misleading.

182.    The articles and the subsequent presentations publicizing these "key messages" in the articles were developed pursuant to the same marketing plans. Pfizer intended that the same misrepresentations and omissions that made the articles misleading would be repeated in the subsequent presentations to physicians at various conferences and CME seminars. Plaintiffs do not have transcripts of the presentations that publicized the key messages contained in the articles, but are aware such presentations took place (and the dates and locations of some of the presentations are set forth below), and upon information and belief, the vendors who organized

the presentations followed the plan and deliberately omitted the negative information regarding

off-label Neurontin use that made the articles misleading.

183.    Pfizer also decided to continue suppressing and misrepresentating the results of

negative clinical studies.  For example, after the Merger, Pfizer acquired the unpublished results

of the failed diabetic peripheral neuropathy trial (study 945-224) conducted by Dr. Reckless in

the United Kingdom.  Pfizer concluded, as had Parke-Davis, that the results of the Reckless

study would have a damaging impact on the continuing effort to market Neurontin, both for

diabetic peripheral neuropathy specifically, and for neuropathic pain generally.  Thus, Pfizer

made a conscious and independent decision to suppress the Reckless study by delaying

publication as long as possible, not allowing Dr. Reckless to write the article himself, hiring a

technical writing firm to write the article in a manner Pfizer viewed as favorable, and ultimately

revoking all editorial and financial support for the article.  Moreover, although Pfizer was aware

that Parke-Davis had suppressed various negative studies, or had misrepresented the results to

make negative studies positive, Pfizer never attempted to correct the record with accurate and

complete information.

### 1.    Articles Sponsored by Pfizer

184.    After the Merger, Pfizer retained MAC, a marketing firm based in New Jersey

that is a subsidiary of Quintiles Transnational Corp.; and Fallon Medica ("Fallon Medica"), a

division of Cline Davis, based in Red Bank, New Jersey, as the primary vendors to write, edit,

and manage publication of journal articles about Neurontin and its off-label uses.  Pfizer decided

the topics the articles would cover and paid all expenses in connection with the creation of these

articles.  Through its technical writers, MAC and Fallon Medica wrote and edited manuscripts on

Neurontin's off-label uses, and actively managed the prompt and favorable publication of the

articles.  The articles were then submitted to a physician who "loaned" his or her name to the

article in exchange for payment of an honorarium. Defendants approved the topics, content and, to the extent possible, the journal in which the article was published.

185.    Working with MAC and Fallon Medica, Pfizer created a publication strategy for Neurontin that was larger and more centralized than Warner-Lambert's misleading publication effort. The overwhelming majority of the articles that MAC and Fallon Medica developed, either by ghostwriting the manuscript or by editing an author's manuscript and discussing the edits with Pfizer, contained Pfizer's false and misleading "key messages." These "key messages" were designed to conceal Neurontin's lack of efficacy for specific off-label uses.

186.    One of MAC and Fallon Medica's duties was to ensure that all manuscripts submitted for publication contained the "correct" key message. MAC and Fallon Medica assumed the responsibility of reviewing abstracts forwarded from around the world to make sure that "they are inline with the current messages and do not contain errors or inconsistencies."

187.    MAC and Fallon Medica were also given the task of increasing the number of articles published concerning the off-label use of Neurontin. At a meeting of Pfizer and MAC representatives in 2002, MAC noted that only 12 MAC-drafted manuscripts had been published in 2001, 42% of which related to epilepsy. Only 4 of the publications related to neuropathic pain, and none related to psychiatric uses. In 2002, MAC planned to increase the number of manuscripts published or submitted to at least 17, with 7 relating to neuropathic pain, 3 to movement disorders, 1 to migraine, and 1 to hot flashes. Only 24% of the articles related to epilepsy. MAC identified one of the goals for 2002 and 2003 as continuing "to build on publications momentum." One way to meet this goal was to maximize the number of publications that resulted from individual studies. Whereas, typically one study results in one published article, MAC and Pfizer decided that each study could generate two, three or more published articles. This tactic was referred to as a "rollout of existing data." MAC and Fallon

Medica were successful in meeting the goal of increasing the number of publications, as the number of published journal articles touting Neurontin for off-label uses soared during their stewardship of the publication strategy.

188.    MAC and Fallon Medica were aware of the promotional nature of these publications, stating in one document that each publication on an off-label use had the potential for " promotional use." This knowledge was not surprising as Pfizer had instructed the vendors of the need to "increase the number of publications and presentations, particularly in neuropathic pain." Pfizer further directed MAC to contact Pfizer's investigators and company offices outside the United States to offer assistance with their preparation of manuscripts for publication.

189.    MAC and Fallon Medica were also aware of the misleading nature of the publications strategy. At a Pfizer-MAC Publications Sub-Committee meeting held on April 17, 2002, a grid outlining various published articles relating to Neurontin's off-label uses was distributed. The grid listed several articles that Pfizer conceded were negative but nevertheless intended to use by spinning them as being positive. MAC and Pfizer routinely discussed the use of false and misleading "key messages" for Neurontin, as well as the drug's "weaknesses" and ways to address them. MAC routinely helped develop ways to make negative data seem positive. For example, in an email from MAC to Pfizer dated November 6, 2002, MAC recommended lowering the efficacy threshold for a trial relating to chronic pain to increase the number of patients who appeared to respond, a technique known in the pharmaceutical industry as "moving the goalposts."

190.    Between 2001 and 2005, MAC and Fallon Medica prepared, edited and managed the submission of dozens of different articles on Neurontin's off-label uses. These articles included:

| **Credited Authors** | **Subject** | **Date (Journal)** |
|---|---|---|
| Brodie, Chadwick, Anhut, Otte, Messmer, Maton, Sauermann, Murray, and Elizabeth Garofalo | Monotherapy | September 2002 (Epilepsia) |
| Garcia-Borreguero | Restless legs syndrome | November 2002 (Neurology) |
| Miroslav Backonja | Neuropathic pain and excessive dose | January 2003 (Clinical Therapeutics) |
| Thomas Guttuso | Hot flashes | February 2003 (Obstet. Gynecol.) |
| Serpell | Neuropathic pain syndromes | May 2003 (Pain) |
| Barry Gidal and Michael McLean | Excessive dose | May 2003 (Clinical Therapeutics) |
| Spira, Beran | Chronic daily headache | December 2003 (Neurology) |
| Thomas Guttuso | Hot flashes | January 2004 (Breast Cancer Res. Treat.) |
| Thomas Guttuso | Hot flashes | March 2004 (J. Pain Symptom Manage.) |
| Formica, Verger, Sol, Morralla | Spasticity | January 2005 (Med Clin.) |

191.    The articles on off-label use of Neurontin prepared or written by MAC and Fallon Medica based on data supplied by Pfizer contained numerous false and misleading "key messages." For example, the article by Brodie et al., published in Epilepsia (September 2002), falsely stated: "GBP [gabapentin] also has been shown to be effective as monotherapy in adults with partial seizures," when in fact the trials it cited did not support efficacy. These were the same trials that Parke-Davis knew as early as 1995 did not support the monotherapy indication,

and the same trials that the FDA reviewed when it rejected the monotherapy application in August 1997.

192.    Similarly, the article Garcia-Borreguero et al., "Treatment of restless legs syndrome with gabapentin: a double-blind, cross-over study," published in the November 2002 issue of Neurology, contained false statements.  It claimed that Neurontin had demonstrated therapeutic activity as a treatment for diabetic peripheral neuropathy but omitted any reference to the negative findings in the Gorson and Reckless studies.  Similarly, the suggestion that Neurontin's efficacy in treatment of restless leg syndrome and periodic limb movement had not been directly studied in any formal clinical trials and that the Garcia-Borreguero study was the first to do so failed to mention the study by Dr. Ehrenberg in 1996 finding that Neurontin did not affect any of the participants' limb movements during sleep.  An internal Pfizer memorandum confirmed the promotional nature of the Garcia-Borreguero publication, which was used to support the detailing of physicians on the use of Neurontin to treat restless leg syndrom.  The publication was also presented at various events described in ¶ 212, infra.

193.    The article by Guttuso, published in Obstetrics and Gynecology (February 2003), falsely stated: "gabapentin has shown efficacy in controlled studies for neuropathic pain, migraine headache, essential tremor, panic disorder, and social phobia." The article deceptively omitted any reference to negative studies in those areas, and falsely cited the panic disorder trial as supporting efficacy.

194.    Another article by Guttuso, published in the Journal of Pain Symptom Management (March 2004), falsely stated: "[Gabapentin was approved] in 2002 as a treatment for neuropathic pain," when in fact the FDA had informed Pfizer that its application for neuropathic pain was non-approvable.

195.    The article by Spira et al. relating to chronic daily headache and migraine,

published in Neurology (December 2003), misleadingly omitted any reference to the negative

study in migraine headache conducted by Parke-Davis in the late 1980s.

196.     The article by Gidal et al., a review article discussing Neurontin and excessive

doses published in Clinical Therapeutics (May 2003), misrepresented the negative results of the

various trials that failed to establish a dose response and falsely suggested that these trials

established Neurontin's greater efficacy at doses exceeding 1800 mg per day.

2.     **Presentations and Marketing Events Sponsored By
Pfizer That Promoted the Same Misleading Key
Messages as the MAC and Fallon Medica Articles**

197.     As set forth above, Pfizer's marketing strategy was concentrated largely on:

(a) preparing journal articles, using false or misleading statements to suggest Neurontin is

effective for a variety of off-label uses, and (b) presenting the content of those journal articles to

thousands of physicians at scientific conferences and through the process of detailing.  Pfizer

was also able to control the content of the presentations through the use of various medical

marketing firms, such as Adelphi, Current Medical Directions, Embryon, Impact Group, PPSI,

Cline Davis and Sudler & Hennessey.  Pfizer continuing Parke-Davis' practice of using these

medical marketing firms to create the illusion that the information being presented was accurate,

objective and scientific, and that the content was not controlled by Pfizer.  This was not the case,

as Pfizer used the medical marketing firms to ensure that the false and misleading "key

messages" were faithfully communicated at the hundreds of scientific conferences, symposia,

CME seminars and other events.  In fact, Pfizer sought to infiltrate so many supposedly

educational meetings that it retained an additional medical marketing firm, Medical Education

Networks, simply to review the hundreds of scientific meetings and CME seminars held annually

and to target specific meetings for the presentation of false and misleading information about

Neurontin's off-label uses.

198.    Pfizer trained its sales representatives to repeat the false "key messages" that were

prepared as part of the publication strategy. At a sales training meeting held in Puerto Rico on

April 4, 2001, senior Pfizer employees Angela Crespo, David Probert and Robert Glanzman

delivered a presentation to Pfizer sales representatives indoctrinating them with Pfizer's "key

messages" about Neurontin's off-label uses, which the sales representatives would then repeat to

physicians being detailed. The "key messages" were primarily in the areas of pain, epilepsy and

dosing and omitted any mention of negative data relating to those areas, thus painting a false and

misleading picture of Neurontin's off-label use. First, the presentation omitted any reference to

the failed Gorson and Reckless studies in diabetic peripheral neuropathy, thus causing the sales

representatives to advise physicians that there was no negative data relating to Neurontin and

diabetic peripheral neuropathy. Second, the presentations omitted any reference to the failed

monotherapy trials or to the FDA rejection of Parke-Davis' application for a monotherapy

indication based on those failed trials, causing the sales representatives to advise physicians

falsely that there was no negative data relating to Neurontin's off label use as a monotherapy for

epilepsy. Finally, the presentations falsely informed the sales representatives that physicians

needed to "titrate up to 3600 mg/day for greater efficacy" notwithstanding the absence of

evidence to support titration beyond 1800 mg for greater efficacy. In fact, the FDA had twice

rejected Defendants' efforts to increase the recommended dosage exceeding 1800 mg per day

based on a lack of scientific support, yet another material fact that the Pfizer employees withheld

from the company's sales representatives.

199.    These same false "key messages" were also prominently featured at scores of

Pfizer-sponsored medical conferences, advisory boards and consultants meetings. The "key

message" for pain was Neurontin's "proven efficacy in neuropathic pain." Pfizer delivered this

key message without disclosing the Gorson and Reckless studies. Pfizer also claimed that the

therapeutic dose was 3,600 mg per day, when such a dose had not been proven to be effective. Pfizer's "key message" for epilepsy was Neurontin was "an ideal monotherapy agent" without referencing the negative clinical studies or the FDA's rejection of the monotherapy indication. Moreover, 3,600 mg per day was touted as an "effective dose," even though studies had failed to establish this fact and the FDA had specifically rejected the Company's efforts to include the higher dosage in the approved labeling.

200.    As set forth below, Pfizer succeeded in having the false and misleading "key messages" presented at numerous physician-attended events held between 2001 and 2004.

201.    On September 21 and 22, 2001, at the Fourth International Conference on the Mechanisms and Treatment of Neuropathic Pain, held in San Francisco, California, Pfizer presented physicians with numerous presentations and posters that contained false and misleading information. For example, on September 21st, Michael Rowbotham and Miroslav Backonja -- both paid speakers of Pfizer -- delivered a presentation review of clinical trial data on Neurontin and neuropathic pain where they falsely concluded: "Gabapentin was effective and safe in reducing neuropathic pain in patients suffering with diabetic peripheral neuropathy, postherpetic neuralgia, or neuropathic pain resulting from various etiologies in 5 multicenter studies." This conclusion was false as the data in Pfizer's possession failed to show efficacy for diabetic peripheral neuropathy or neuropathic pain apart from postherpetic neuralgia. Rowbotham made a separate presentation where he claimed that Neurontin "has efficacy in painful diabetic neuropathy ... and reflex sympathetic dystrophy." This presentation failed to disclose the negative data on diabetic peripheral neuropathy and the evidence concluding that it was unclear whether Neurontin was more effective than placebo for treating reflex sympathetic dystrophy. In a separate lecture, C. Peter Watson touted Neurontin as a treatment for diabetic peripheral neuropathy without mentioning the failed Gorson and Reckless studies. In another

separate lecture, Bradley Galer misleadingly suggested that the effective dose for Neurontin in treating neuropathic pain syndromes was as high as 6,000 mg per day. This contention was false and failed to disclose the scientific adverse evidence demonstrating no such correlation between efficacy and dose. Finally, on September 22nd, Kenneth Schmader delivered a lecture about Neurontin and diabetic peripheral neuropathy that contained similarly deceptive statements.

202.    On March 3-4, 2002, Pfizer hosted a meeting of the Neuropathic Pain Management Advisory Board at the Disney BoardWalk Resort in Orlando, Florida. The guests were senior managers and medical directors of various pharmacies and pharmacy benefits managers who had influence over formulary decision-making, i.e., the drugs covered by various health care plans and the uses for which those drugs are covered. The advisory board was coordinated and managed by Health Strategies Group, Inc., a New Jersey company that specializes in "increasing the manufacturer's value and influence on PBM product placement decisions." The goal of this advisory board meeting was to secure Neurontin's formulary status for broad areas of neuropathic pain. Specifically, the meeting was to "support Neurontin's use in neuropathic pain management with managed care customer," even though Pfizer was aware that Neurontin did not have the data to support a broad neuropathic pain indication, that different neuropathic pain conditions involved different models of pain and thus required different treatments, and that Pfizer's internal data did not support the granting of any indications in the area of neuropathic pain other than postherpetic neuralgia.

203.    On March 16-20, 2002, Pfizer presented information at the Clinical and Scientific Congress of the International Anesthesia Research Society in San Diego that misleadingly suggested that Neurontin was effective for restless leg syndrome, periodic limb movement syndrome, and related pain, without disclosing the negative clinical data from Dr. Ehrenberg's clinical trial on those conditions.

204.    On April 13-20, 2002, at the American Academy of Neurology Annual Meeting in Denver, Pfizer presented false and misleading information in the form of "posters/presentations" suggesting Neurontin's efficacy in various off-label uses including mood, tremor in patients with multiple sclerosis, and spinal muscular atrophy ("SMA"). Pfizer failed to disclose the ample negative clinical evidence demonstrating Neurontin was ineffective to treat those conditions. For example, Pfizer failed to disclose Neurontin had been demonstrated to be ineffective in treating mood disorders. Moreover, Pfizer also failed to disclose the fact that "the results of [Pfizer's] clinical trial in SMA also show no benefit in SMA."

205.    On June 6-13, 2002, at the Associated Professional Sleep Societies conference in Seattle, Pfizer orally promoted Neurontin for use in treating restless leg syndrome without disclosing the negative results from the Ehrenberg study.

206.    On August 17-22, 2002, Pfizer funded an international congress for the International Association for the Study of Pain for 4,500 physicians from around the world, including the United States, which was held in San Diego, CA. The meeting was coordinated by PPSI, a medical marketing firm. Through posters and presentations, Pfizer misleadingly presented information suggesting Neurontin's efficacy generally in neuropathic pain and specifically in chronic peripheral post-operative and post-traumatic neuropathic pain, as well as painful HIV neuropathy, without disclosing the ample negative clinical data in those areas. Pfizer also falsely presented information suggesting that larger doses of Neurontin were more efficacious, despite mounting clinical evidence that doses exceeding 1800 mg were not superior.

207.    On November 10, 2002, Pfizer presented information at the International Congress of Parkinson's Disease and Movement Disorders meeting held in Miami, FL. Pfizer orally promoted Neurontin for use in treating restless leg syndrome without disclosing the negative results from the Ehrenberg study.

208.    On November 21, 2002, Pfizer presented information at the International
Conference on the Mechanisms and Treatment of Neuropathic Pain annual meeting held in
Bermuda. The meeting was coordinated by Embryon, a medical marketing firm. Pfizer, which
was a platinum sponsor of the event, presented abstracts prepared by MAC containing false and
misleading statements that Neurontin was "effective and safe and safe in reducing pain,"
including "phantom limb pain, complex regional pain syndrome, postmastectomy,
postlaminectomy, or trigeminal neuralgia." Pfizer commented that its presentation had been
successful, "making it easier to form an overall impression of the broad effectiveness of
gabapentin in neuropathic pain." Pfizer knew that this impression was false, especially after the
FDA's rejection of a such a broad indication. Pfizer also presented unscientific information
falsely suggesting that Neurontin was more effective with doses as high as 3,600 mg per day.
According to Pfizer, this presentation "will help to reinforce the importance of individualizing
gabapentin dose and not relying on the convenience of a fixed dose." Dr. Rowbotham, a paid
speaker for Pfizer, delivered a lecture designed to cause attendees to prescribe Neurontin broadly
for neuropathic pain. In the lecture, Rowbotham favorably touted Neurontin's clinical trial
results in neuropathic pain, while misrepresenting or omitting the negative clinical data about
Neurontin that had prevented Neurontin from receiving FDA approval for neuropathic pain areas
other than postherpetic neuralgia. Dr. Rowbotham further stressed the disadvantages of
Neurontin's competitor products, characterizing them as "hard to use," having only "few
studies," or having "large failed trials."

209.    On March 20-23, 2003, Pfizer presented false and misleading information at the
American Pain Society annual meeting, held in Chicago. The meeting was coordinated by
Global Medical Information, a medical marketing firm hired by Pfizer. Doctors Dworkin,
Shapiro, Stacey, Berger, and Rowbatham --all regular, paid speakers for Pfizer -- presented

physicians with false and misleading information about Neurontin's efficacy in neuropathic pain, migraines, lower back pain, and hot flashes. Pfizer also falsely stated that Neurontin was "shown to reduce postoperative pain," even though Pfizer was aware of at least two clinical trials demonstrating a lack of efficacy. Pfizer also misleadingly suggested Neurontin efficacy for hot flashes, migraine headaches, lower back pain and related conditions, mood disorders, sleep related movement disorders, anxiety-related disorders, and fibromyalgia, without disclosing the negative scientific evidence demonstrating a lack of efficacy for these conditions.

210.    On May 6-9, 2004, during the annual meeting for the American Pain Society in Vancouver, Canada, Pfizer presented information falsely suggesting that Neurontin was effective to treat general pain, peri- and postoperative pain, chronic phantom, and residual limb pain. Pfizer also presented false and misleading information about Neurontin's efficacy at excessive doses. The false and misleading nature of the representations in areas beyond Neurontin's proven efficacy is confirmed by subsequent requests for information by attendees for information relating to "neuropathic pain conditions, perioperative use, use in diabetic peripheral neuropathy ... dosing to effectiveness, maximum dose, use in restless leg syndrome, [and] use in chronic pain...."

211.    On June 5, 2004, Pfizer funded a lecture entitled "New Approaches to the Treatment of Painful Diabetic Peripheral Neuropathy" during the American Diabetes Association's 64th Scientific Sessions in Orlando, Florida. Program content and product information was developed with the approval of Pfizer by Current Medical Directions, Inc., a subsidiary of Sudler & Hennessey. The stated purpose of the lecture was to "address the current understanding of painful diabetic peripheral neuropathy (DPN) and emerging treatment options.... Presentations will shed new light on DPN, giving physicians new strategies to manage neuropathic pain.... A neurologist will provide an overview based on data from recent

clinical trials testing promising new therapies." Not surprisingly, the information provided was false and misleading because the attendees were not advised of the failed Reckless 945-224 study or the negative results of the Gorson study. Rather, physician-attendees were given the false and misleading impression that Neurontin was efficacious for diabetic peripheral neuropathy and that favorable study results had been replicated.

212.    Upon information and belief, Pfizer repeated or caused to be repeated the same false and misleading "key messages" at all of its marketing events. The following is a representative and non-exclusive list of Pfizer-sponsored events held between 2001 and 2004:

| **TITLE** | **DATE** | **LOCATION** |
|---|---|---|
| Joslin Diabetes Center Symposium: Glucose Control, Neuropathic Complications and the Diabetic Foot: Impacting Outcomes | February 27, 2001 | San Francisco, CA |
| Joslin Diabetes Center Symposium: Glucose Control, Neuropathic Complications and the Diabetic Foot: Impacting Outcomes | February 28, 2001 | Beverly Hills, CA |
| American Academy of Pain Medicine ("AAPM") Directions in the Understanding & Treatment of Chronic Pain | March 2 –3, 2001 | Detroit, MI |
| Joslin Diabetes Center Symposium: Glucose Control, Neuropathic Complications and the Diabetic Foot: Impacting Outcomes | March 6, 2001 | New Orleans, LA |
| Joslin Diabetes Center Symposium: Glucose Control, Neuropathic Complications and the Diabetic Foot: Impacting Outcomes | March 7, 2001 | Memphis, TN |
| AAPM Directions in the Understanding & Treatment of Chronic Pain | March 9-10, 2001 | Cleveland, OH |
| AAPM Directions in the Understanding & Treatment of Chronic Pain | March 16-17, 2001 | Baltimore, MD |
| AAPM Directions in the Understanding & Treatment of Chronic Pain | March 16-17, 2001 | San Francisco, CA |

| **TITLE** | **DATE** | **LOCATION** |
|---|---|---|
| Joslin Diabetes Center Symposium: Glucose Control, Neuropathic Complications and the Diabetic Foot: Impacting Outcomes | March 20, 2001 | Farmington, CT |
| Joslin Diabetes Center Symposium: Glucose Control, Neuropathic Complications and the Diabetic Foot: Impacting Outcomes | March 21, 2001 | Cincinnati, OH |
| Joslin Diabetes Center Symposium: Glucose Control, Neuropathic Complications and the Diabetic Foot: Impacting Outcomes | March 22, 2001 | St. Louis, MO |
| AAPM Directions in the Understanding & Treatment of Chronic Pain | March 23-24, 2001 | New Orleans, LA |
| Merritt-Putnam Lecture Series | March 24, 2001 | New York, NY |
| Joslin Diabetes Center Symposium: Glucose Control, Neuropathic Complications and the Diabetic Foot: Impacting Outcomes | March 28, 2001 | Denver, CO |
| AAPM Directions in the Understanding & Treatment of Chronic Pain | March 30-31, 2001 | St. Louis, MO |
| Joslin Diabetes Center Symposium: Glucose Control, Neuropathic Complications and the Diabetic Foot: Impacting Outcomes | April 3, 2001 | Norfolk, VA |
| Joslin Diabetes Center Symposium: Glucose Control, Neuropathic Complications and the Diabetic Foot: Impacting Outcomes | April 3, 2001 | Springfield, MA |
| Joslin Diabetes Center Symposium: Glucose Control, Neuropathic Complications and the Diabetic Foot: Impacting Outcomes | April 4, 2001 | Raleigh, NC |
| Joslin Diabetes Center Symposium: Glucose Control, Neuropathic Complications and the Diabetic Foot: Impacting Outcomes | April 10, 2001 | Kansas City, MO |
| Joslin Diabetes Center Symposium: Glucose Control, Neuropathic Complications and the Diabetic Foot: Impacting Outcomes | April 11, 2001 | San Diego, CA |

| **TITLE** | **DATE** | **LOCATION** |
|---|---|---|
| Joslin Diabetes Center Symposium: Glucose Control, Neuropathic Complications and the Diabetic Foot: Impacting Outcomes | April 11, 2001 | Milwaukee, WI |
| Joslin Diabetes Center Symposium: Glucose Control, Neuropathic Complications and the Diabetic Foot: Impacting Outcomes | April 12, 2001 | Portland, OR |
| Joslin Diabetes Center Symposium: Glucose Control, Neuropathic Complications and the Diabetic Foot: Impacting Outcomes | April 18, 2001 | Salt Lake City, UT |
| Joslin Diabetes Center Symposium: Glucose Control, Neuropathic Complications and the Diabetic Foot: Impacting Outcomes | April 19, 2001 | Phoenix, AZ |
| American Pain Society meeting | April 19-22, 2001 | Phoenix, AZ |
| Merritt-Putnam Speaker Training | April 20-22, 2001 | Las Vegas, NV |
| Joslin Diabetes Center Symposium: Glucose Control, Neuropathic Complications and the Diabetic Foot: Impacting Outcomes | April 26, 2001 | Philadelphia, PA |
| Joslin Diabetes Center Symposium: Glucose Control, Neuropathic Complications and the Diabetic Foot: Impacting Outcomes | May 1, 2001 | Dallas, TX |
| Joslin Diabetes Center Symposium: Glucose Control, Neuropathic Complications and the Diabetic Foot: Impacting Outcomes | May 2, 2001 | Miami, FL |
| Joslin Diabetes Center Symposium: Glucose Control, Neuropathic Complications and the Diabetic Foot: Impacting Outcomes | May 3, 2001 | Columbia, SC |
| AAPM Directions in the Understanding & Treatment of Chronic Pain | May 4-5, 2001 | Houston, TX |
| American Psychiatric Association | May 5-10, 2001 | New Orleans, LA |
| AAPM Directions in the Understanding & Treatment of Chronic Pain | May 11-12, 2001 | Memphis, TN |

| TITLE | DATE | LOCATION |
|---|---|---|
| Joslin Diabetes Center Symposium: Glucose Control, Neuropathic Complications and the Diabetic Foot: Impacting Outcomes | May 15, 2001 | Columbus, OH |
| Joslin Diabetes Center Symposium: Glucose Control, Neuropathic Complications and the Diabetic Foot: Impacting Outcomes | May 16, 2001 | Syracuse, NY |
| Joslin Diabetes Center Symposium: Glucose Control, Neuropathic Complications and the Diabetic Foot: Impacting Outcomes | May 16, 2001 | Nashville, TN |
| AAPM Directions in the Understanding & Treatment of Chronic Pain | May 18-19, 2001 | University City, CA |
| Joslin Diabetes Center Symposium: Glucose Control, Neuropathic Complications and the Diabetic Foot: Impacting Outcomes | May 24, 2001 | Westchester, NY |
| AAPM Directions in the Understanding & Treatment of Chronic Pain | June 1-2, 2001 | Miami, FL |
| Merritt-Putnam Regional Speaker Training | June 1-3, 2001 | Renaissance Stanford Court Hotel, San Francisco, CA |
| Joslin Diabetes Center Symposium: Glucose Control, Neuropathic Complications and the Diabetic Foot: Impacting Outcomes | June 7, 2001 | Louisville, KY |
| AAPM Directions in the Understanding & Treatment of Chronic Pain | June 8-9, 2001 | Nashville, TN |
| AAPM Directions in the Understanding & Treatment of Chronic Pain | June 8-9, 2001 | Kansas City, MO |
| Merritt-Putnam Regional Speaker Training | June 8-10, 2001 | Ritz-Carlton, Boston, MA |
| Joslin Diabetes Center Symposium: Glucose Control, Neuropathic Complications and the Diabetic Foot: Impacting Outcomes | June 12, 2001 | San Antonio, TX |

| TITLE | DATE | LOCATION |
|---|---|---|
| Joslin Diabetes Center Symposium: Glucose Control, Neuropathic Complications and the Diabetic Foot: Impacting Outcomes | June 21, 2001 | Baltimore, MD |
| Joslin Diabetes Center Symposium: Glucose Control, Neuropathic Complications and the Diabetic Foot: Impacting Outcomes | June 26, 2001 | Newark, NJ |
| Joslin Diabetes Center Symposium: Glucose Control, Neuropathic Complications and the Diabetic Foot: Impacting Outcomes | June 28, 2001 | Seattle, WA |
| Fourth International Conference on the Mechanisms and Treatment of Neuropathic Pain | September 21-22, 2001 | San Francisco, CA |
| Advisory Board: Use of GABA Analogues in Social Anxiety Disorder" at the Mark Hotel | October 30, 2001 | New York, NY |
| Neuropathic Pain in the Workplace Advisory Board at the Millennium Broadway Hotel | November 7-8, 2001 | New York, NY |
| Neuropathic Pain Management Advisory Board at the, Florida | March 3-4, 2002 | Disney BoardWalk Resort, Orlando, FL |
| Clinical and Scientific Congress of the International Anesthesia Research Society | March 16-20, 2002 | San Diego, CA |
| American Pain Society | March 24-27, 2002 | Baltimore, MD |
| American Academy of Neurology Annual Meeting | April 13 – 20, 2002 | Denver, CO |
| American College of Physicians | April 23-25, 2002 | Philadelphia, PA |
| American Psychiatric Association annual meeting | May 18-23, 2002 | Philadelphia, PA |
| Associated Professional Sleep Societies conference | June 6-13, 2002 | Seattle, WA |
| Satellite meeting | August 14, 2002 | Tijuana |

| TITLE | DATE | LOCATION |
|---|---|---|
| International Association for the Study of Pain International Congress | August 17-22, 2002 | San Diego, CA |
| American Neurological Association's Annual Meeting | October 13-16, 2002 | New York, NY |
| US Psychiatric and Mental Health Congress | October 28-31, 2002 | Las Vegas, NV |
| International Congress of Parkinson's Disease and movement Disorders meeting | November 10, 2002 | Miami, FL |
| International Conference on the Mechanisms and Treatment of Neuropathic Pain annual meeting | November 21, 2002 | Bermuda |
| American Epilepsy Society's annual meeting | December 6, 2002 | Seattle, WA. |
| Pre-Med South Regional Primary Care Congress | February 14-16, 2003 | Ft. Lauderdale, FL |
| American Academy of Pain Medicine: Annual Meeting | February 19-23, 2003 | New Orleans, LA |
| American Pain Society meeting | March 20-23, 2003 | Chicago, IL |
| Anxiety Disorders Association of America: National Conference | March 27-March 30, 2003 | Toronto |
| American Academy of Neurology | March 29-April 5, 2003 | Honolulu, HI |
| Pre-Med West Regional Primary Care Congress | April 3-5, 2003 | Long Beach, CA |
| Consortium of MS Centers meeting | May 28-31, 2003 | San Diego, CA |
| Associated Professional Sleep Societies Annual Meeting | June 3, 3003 | Chicago, IL |
| Pre-Med Mid-West Regional Primary Care Congress | June 19-21, 2003 | Chicago, IL |

| **TITLE** | **DATE** | **LOCATION** |
|---|---|---|
| 2002 Families of Spinal Muscular Atrophy Family and Professional Conference | June 21-23, 2002 | Schaumburg, IL |
| American Academy of Pain Management Annual Clinical Meeting | September 4-7, 2003 | Denver, CO |
| American Academy of Family Practitioners | October 1-5, 2003 | New Orleans, LA |
| American Osteopathic Association | October 12-14, 2003 | New Orleans, LA |
| Pre-Med Mid Atlantic Regional Primary Care Congress | October 16-18, 2003 | Washington, DC |
| American College of Rheumatology | October 25-27, 2003 | San Antonio, TX |
| Pre-Med East Regional Primary Care Congress | November 7-9, 2003 | Boston, MA |
| Pfizer Satellite Symposium to the 2003 Society for Neuroscience Meeting at the Sheraton New Orleans Hotel | November 10, 2003 | New Orleans, LA |
| American Epilepsy Society | December 5-12, 2003 | Boston, MA |
| American Academy of Dermatology | February 7-10, 2004 | Washington, DC |
| AAPM | March 3-7, 2004 | Orlando, FL |
| American Academy of Orthopedic Surgeons 2004 annual meeting | March 10-14, 2004 | San Francisco, CA |
| Anxiety Disorders Association of America | March 11-14, 2004 | Miami, FL |
| MAP Pain Advisory Boards | March 18, 2004 | New York, NY |
| Pri-Med South Regional Conference | April 1-4, 2004 | Ft. Lauderdale, FL |
| Neuropathic Pain HQ Preceptorship | April 19, 2004 | Boston, MA |
| American Academy of Neurology | April 24-May 1, 2004 | San Francisco, CA |
| Society of Biological Psychiatry | April 29-May 1, 2004 | New York, NY |

| TITLE | DATE | LOCATION |
|-------|------|----------|
| American Psychiatric Association | May 1-6, 2004 | New York, NY |
| Second Annual Joint Scientific Meeting of the America Pain Society and Canadian Pain Society | May 6-9, 2004 | Vancouver |
| American Pain Society Annual Scientific Meeting | May 8-9, 2004 | Vancouver |
| Pri-Med West Regional Conference | May 12-15, 2004 | Boston, MA |
| Associated Professional Sleep Societies | June 5-10, 2004 | Philadelphia, PA |
| American Diabetes Association's 64th Scientific Sessions | June 5, 2004 | Orlando, FL |
| Pri-Med West Regional Conference | June 16-19, 2004 | Rosemont, IL |
| National Pain Forum | October 1-3, 2004 | Philadelphia, PA |
| National Speaker Training | October 8-9, 2004 | Chicago, IL |
| American College of Nurse Practitioners conference | October 20-24, 2004 | Philadelphia, PA |
| International Society of Anaesthetic Pharmacology conference | October 22, 2004 | Las Vegas, NV |
| American Society of Anesthesiologists | October 23-27, 2004 | Las Vegas, NV |
| Pri-Med East Regional Conference | October 28-31, 2004 | Boston, MA |
| International Conference on the Mechanisms and Treatments of Neuropathic Pain conference | November 4-6, 2004 | Bermuda |
| Pri-Med Mid-Atlantic Regional Conference | November 17-20, 2004 | Boston, MA |
| US Psychiatric and Mental Health conference | November 18-21, 2004 | San Diego, CA |
| The American College of Neuropsychopharmacology 2004 conference | December 12-16, 2004 | Puerto Rico |

I.    **The Continuing Impact of Defendants' Fraudulent Off-Label Promotion**

213.    As a result of the intense and prolonged fraudulent scheme described above, the medical literature and usage practices relating to Neurontin have been severely contaminated by years of false and misleading information regarding the scientific, medical and clinical data relating to the safety, medical efficacy, effectiveness and usefulness of Neurontin for conditions other than as adjunctive therapy for epilepsy or shingles in adults and at specified dosages. Based on this false information, physicians continue to prescribe, and Plaintiffs continue to pay for, Neurontin to treat off-label uses for which there is no reliable scientific support and at excessive dosages.

214.    Upon information and belief, Pfizer routinely marketed Neurontin for off-label indications until at least December, 2004. The staggering growth of Neurontin sales highlights this continuing course of conduct. From 1995 to 2003, Neurontin's sales soared from $97.5 million to nearly $2.7 billion. With no reliable scientific studies supporting off-label uses, and with at least 90% of all prescriptions for Neurontin written for such uses, it is reasonable to infer that the sharp increase in sales stems from illegal past and continuing promotional efforts by Defendants. Physicians have and continue to prescribe Neurontin to tens of thousands of patients who are in need of effective treatments.

215.    Furthermore, although Neurontin is prescribed for many off-label indications, since 1999 the types of off-label usage continue to be weighted in the precise areas where Defendants focused their unlawful marketing efforts, i.e., as treatments for bipolar disorder, peripheral neuropathy and migraines.

216.    A July 1, 2002, letter from Dr. Lisa Stockbridge of the Department of Health & Human Services ("HHS") confirms that Defendants continued as of that date to engage in

wrongful off-label promotional efforts. Dr. Stockbridge notified Pfizer that certain of its

marketing practices are "in violation of the Federal Food, Drug and Cosmetic Act ... because

[Pfizer] makes representations about Neurontin that are false and misleading." In particular,

HHS determined that Pfizer's marketing materials suggested that the mechanism of action of

Neurontin had been established, when it was not appropriate to make such a claim. The FDA

also stated that Pfizer materials suggested that Neurontin could be used as monotherapy, when it

was only appropriate to indicate Neurontin as adjunctive therapy in the treatment of partial

seizures. HHS determined that Pfizer's marketing materials were misleading and ordered

immediate discontinuation of their use. The marketing practices found to be misleading by HHS

in 2002 are similar to, or the same as, those routinely engaged in by the Promotion Enterprise

under Parke-Davis', and then Pfizer's, direction.

### J.    Related Government Actions

217.    As noted above, Dr. Franklin initiated a qui tam action on behalf of the United

States against Warner-Lambert in 1996. He alleged two counts of false claims caused by the

knowing promotion of prescription sales of Neurontin ineligible for Medicaid reimbursement

and caused by the payment of kickbacks in violation of the Medicaid anti-kickback provisions,

31 U.S.C. § 3729. The federal court unsealed the original complaint in the qui tam action in

January 2000. In May 2002, the Court unsealed the qui tam amended complaint, which for the

first time, contained details of Defendants' off-label promotion and fraudulent marketing

scheme. In April 2003, Dr. Franklin filed an opposition to a motion for summary judgment in

the qui tam action which unsealed numerous documents revealing the existence and operation of

Defendants' fraudulent marketing practices and the Promotion Enterprise.

218.    Based on the conduct alleged in the qui tam action, the State Attorneys' General

commenced a lawsuit against Warner-Lambert alleging violations of state consumer protection

laws and the U.S. Department of Justice filed a criminal information against Warner-Lambert.

On May 13, 2004, Warner-Lambert announced its agreement to plead guilty and pay more than

$430 million to resolve the criminal charges and civil liabilities in connection with Parke-Davis'

illegal and fraudulent promotion of unapproved uses for Neurontin.  According to the

Department of Justice Press Release, "[a]s a consequence of the unlawful promotion scheme,

patients who received the drug for unapproved and unproven uses had no assurance that their

doctors were exercising their independent and fully-informed medical judgment, or whether the

doctor was instead influenced by misleading statements made by, or inducements provided by,

Warner-Lambert." Dept. of Justice Press Release, May 13, 2004.

219.    The Assurance of Voluntary Compliance entered into between the State Attorneys

General and Warner-Lambert explicitly provided that claims brought by individual consumers

and entities were excluded from the settlement.

220.    On June 9, 2004, Warner-Lambert pled guilty to Counts I and II of the

Information in the criminal case, United States v. Warner-Lambert Company LLC, 1:04 CR

10150 (Stearns, J.).  Count I was distribution of an unapproved new drug in violation of 21

U.S.C. §§ 331(d), 333(a)(2) & 335(a), and Count II was distribution of a misbranded drug:

inadequate directions for use, in violation of 21 U.S.C. §§ 331(a), 333(a)(2) & 352(f)(1).  Both

Counts specifically re-alleged and incorporated by reference allegations regarding Warner-

Lambert's off-label promotion through its sales representatives, medical liaisons, consultants'

meetings and advisory boards, and teleconferences.

## V.    FRAUDULENT CONCEALMENT AND
##    TOLLING OF STATUTES OF LIMITATIONS

221.    Defendants' fraudulent marketing scheme depended on concealing their

involvement in off-label promotion of Neurontin. Indeed, the Promotion Enterprise was created

precisely to make it appear to the public that Defendants did not have a hand in any discussions

or promotion of off-label use. Additionally, as described above, Defendants had the Promotion

Enterprise perform off-label promotion in the semblance of legitimate consultants' meetings,

continuing education seminars, journal articles and medical education events. Also as described

above, Defendants' involvement was hidden because Defendants hid their financial connections

with the physician participants and used the vendor participants as payment intermediaries.

These activities and others described above concealed Defendants' fraudulent promotional

activities and Plaintiffs could not have discovered the scheme alleged herein earlier in the

exercise of reasonable diligence. Indeed, much of the scheme to this day remains concealed by

Defendants.

222.    The earliest Plaintiffs could have reasonably become aware of the fraudulent

marketing scheme was May 2003, when the details of Defendants' interactions with the other

participants in the Promotion Enterprise were disclosed through the filing of previously sealed

materials in opposition to Defendants' motion for summary judgment in the qui tam action.

Alternatively, Plaintiffs in the exercise of reasonable diligence could not have learned of the

fraudulent marketing scheme until some of the details were disclosed when the amended

complaint was unsealed in the qui tam case in May 2002.

223.    Any applicable statutes of limitations have been tolled by Defendants' knowing

and active concealment and denial of the facts alleged herein. Plaintiffs have been kept in

ignorance of vital information essential to the pursuit of these clams, without any fault or lack of

diligence on their part. Plaintiffs could not reasonably have discovered the fraudulent nature of

Defendants' conduct. Accordingly, Defendants are estopped from relying on any statute of

limitations to defeat any of Plaintiffs' claims.

## VI.    DEFENDANTS' MOTIVE

224.    Defendants' motive in creating and operating the fraudulent scheme and RICO

Enterprises described herein was to fraudulently obtain significant additional revenues from the

marketing and sale of Neurontin.

225.    The fraudulent scheme was designed to, and did, cause Plaintiffs to pay for

Neurontin prescriptions to treat conditions for which the drug is not proven to be medically safe,

efficacious, effective or useful. Plaintiffs paid millions of dollars for Neurontin that would not

have been paid absent the fraudulent scheme.

## VII.    USE OF THE MAILS AND WIRES

226.    Defendants used thousands of mail and interstate wire communications to create

and manage their fraudulent scheme. Defendants' scheme involved national marketing and sales

plans and programs, and encompassed physicians, medical marketing firms and victims across

the country.

227.    Defendants' use of the mails and wires to perpetrate their fraud involved

thousands of communications, including:

(a)    marketing and advertising materials about the off-label uses of Neurontin

for which the drug is not proven to be safe, medically efficacious, effective and useful, such

materials being sent to doctors across the country;

(b)    communications, including financial payments, with the vendor and

physician participants discussing and relating to the publication of articles misrepresenting off-

label uses of Neurontin;

      (c)    communications with the vendor and physician participants that fraudulently misrepresented that Neurontin was scientifically proven to be safe, medically efficacious, effective and useful for off-label uses;

      (d)    <u>communications with health insurers and patients, including Plaintiffs, inducing payments for Neurontin to be made based on misrepresentations concerning the safety, efficacy, effectiveness and usefulness of Neurontin; and</u>

      (e)    receiving the proceeds of the Defendants' improper scheme.

228.    In addition, Defendants' corporate headquarters have communicated by United States mail, telephone and facsimile with various local district managers, medical liaisons and pharmaceutical representatives in furtherance of Defendants' scheme.

## VIII.  <u>SCOPE OF THE ALLEGATIONS</u>

### A.    <u>Time</u>

229.    The conduct and patterns of conduct alleged herein, relating to the sale and marketing of Neurontin, occurred between December 30, 1993, the date that the FDA approved the marketing of Neurontin, and the present day. The conduct and patterns of conduct alleged herein occurred and continued to occur well after the consummation of the merger between Pfizer and Warner-Lambert in June 2000.

### B.    <u>Geographic Scope</u>

230.    The conduct and patterns of conduct alleged herein, relating to the sale and marketing of Neurontin, took place throughout the entire United States and District of Columbia, as well as various other territories and foreign countries. Although Defendants' upper-level management has been based in Morris Plains, New Jersey or New York, New York, the actual

sales and marketing activities described herein were executed principally through Defendants'

CBU system, a network of regional sales division that covered the entire country.

## IX.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
#### Violation of 18 U.S.C. § 1962(c) (The Promotion Enterprise)

231.    Plaintiffs incorporate by reference all preceding paragraphs, as if fully set forth

herein.

232.    Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3) who

conducted the affairs of the enterprise through a pattern of racketeering activity in violation of

18 U.S.C. § 1962(c).

233.    The enterprise is an association-in-fact within the meaning of 18 U.S.C. § 1961(4)

consisting of (i) Defendants, including their employees and agents, (ii) the vendor participants,

Cline Davis, Physicians World, Sudler & Hennessey, MEDED, MES, HCC and AMM/Adelphi,

and (iii) the physician participants as set forth in paragraph 99, supra ("Promotion Enterprise").

The Promotion Enterprise is an ongoing organization that functions as a continuing unit.  The

Promotion Enterprise was created and used as a tool to effectuate Defendants' pattern of

racketeering activity.  The Defendant "persons" are distinct from the Promotion Enterprise.

234.    The Promotion Enterprise falls within the meaning of 18 U.S.C. § 1961(4) and

consists of a group of "persons" associated together for the common purpose of promoting

Neurontin for off-label uses and earning profits therefrom.

235.    Defendants have conducted and participated in the affairs of the Promotion

Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1)

and 1961(5), which includes multiple instances of mail fraud in violation of 18 U.S.C. § 1341,

and multiple instances of wire fraud in violation of 18 U.S.C. § 1343, as described above.

236.    The Promotion Enterprise engaged in and affected interstate commerce, because, inter alia, it marketed, sold, purchased or provided Neurontin to thousands of entities and individuals throughout the United States.

237.    Defendants exerted control over the Promotion Enterprise, and Defendants participated in the operation or management of the affairs of the Promotion Enterprise, through a variety of actions including the following:

(a)    Defendants controlled the content of the messages being delivered by the Promotion Enterprise at each seminar, event and presentation, and in the publications by the vendor and physician participants, including the misinformation and false statements concerning the safety, efficacy, effectiveness and usefulness of Neurontin for off-label uses.

(b)    Defendants controlled the stream of information disseminated by the Promotion Enterprise concerning Neurontin by ensuring that only favorable results were published and disclosed and unfavorable results were suppressed.

(c)    Defendants selected and approved which physician participant(s) would deliver the off-label message at each seminar, event and presentation, and selected and approved each physician "author" for the published materials propounded by the Promotion Enterprise.

(d)    Defendants selected who attended each seminar, event and presentation sponsored by the Promotion Enterprise.

(e)    Defendants paid the vendor and the physician participants for their participation in the Promotion Enterprise.

(f)    Defendants placed their own employees and agents in positions of authority and control in the Promotion Enterprise.

238.    As detailed above, Defendants' fraudulent scheme consisted of, inter alia:

(a) deliberately misrepresenting, and causing others to misrepresent, the uses for which

Neurontin was safe and effective so that Plaintiffs paid for this drug to treat symptoms for which

it was not scientifically proven to be safe, efficacious, effective and useful; (b) presenting

seminars and events misrepresenting off-label uses for Neurontin for which Defendants' knew

were not proven to be scientifically safe, efficacious, effective and useful to physician attendees

and other healthcare providers; (c) publishing or causing to have published materials containing

false information upon which physicians and Plaintiffs relied upon when choosing to prescribe

or pay for Neurontin to treat off-label uses; (d) actively concealing, and causing others to

conceal, information about the true safety, efficacy, effectiveness and usefulness of Neurontin to

treat conditions for which it had not been approved by the FDA; and (e) misrepresenting the

appropriate and effective dosages for the drug.

239.    Defendants' scheme and the above described racketeering activities amounted to

a common course of conduct intended to cause Plaintiffs and others to pay for excessive amounts

of Neurontin. Each such racketeering activity was related, had similar purposes, involved the

same or similar participants and methods of commission, and had similar results affecting similar

victims, including Plaintiffs. Defendants' fraudulent activities are part of their ongoing business

and constitute a continuing threat to Plaintiffs' property.

240.    The pattern of racketeering activity alleged herein and the Promotion Enterprise

are separate and distinct from each other. Defendants engaged in a pattern of racketeering

activity alleged herein for the purpose of conducting the affairs of the Promotion Enterprise.

241.    Plaintiffs have been injured in their property by reason of these violations in that

Plaintiffs have made millions of dollars in payments for Neurontin that they would not have

made had Defendants not engaged in their pattern of racketeering activity.

242.    Plaintiffs' injuries were directly and proximately caused by Defendants' racketeering activity, as described above.

243.    By virtue of these violations of 18 U.S.C. § 1962(c), Defendants are jointly and severally liable to Plaintiffs for three times the damages Plaintiffs have sustained, plus the cost of this suit, including reasonable attorneys' fees.

### SECOND CLAIM FOR RELIEF
### Violation of 18 U.S.C. § 1962(c) (The Cline Davis Sub-Enterprise)

244.    Plaintiffs incorporate by reference all preceding paragraphs, as if fully set forth herein.

245.    In the alternative, Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3) who conducted the affairs of the enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

246.    The enterprise is an association-in-fact within the meaning of 18 U.S.C. § 1961(4) consisting of (i) Defendants, including their employees and agents; and (ii) Cline Davis (collectively, the "Cline Davis Sub-Enterprise"). The Cline Davis Sub-Enterprise is an ongoing organization that functions as a continuing unit. The Cline Davis Sub-Enterprise was created and used as a tool to effectuate Defendants' pattern of racketeering activity. The Defendant "persons" are distinct from the Cline Davis Sub-Enterprise.

247.    The Cline Davis Sub-Enterprise falls within the meaning of 18 U.S.C. § 1961(4) and consists of a group of "persons" associated together for the common purpose of promoting Neurontin for off-label uses and earning profits therefrom.

248.    Defendants have conducted and participated in the affairs of the Cline Davis Sub-Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and 1961(5), which includes multiple instances of mail fraud in violation of 18 U.S.C. § 1341,

99

and multiple instances of wire fraud in violation of 18 U.S.C. § 1343, as described above.

249.    The Cline Davis Sub-Enterprise engaged in and affected interstate commerce, because, inter alia, it marketed, sold, purchased or provided Neurontin to thousands of entities and individuals throughout the United States.

250.    Defendants exerted control over the Cline Davis Sub-Enterprise, and Defendants participated in the operation or management of the affairs of the Cline Davis Sub-Enterprise, through a variety of actions including the following:

(a)    Defendants controlled the content of the messages being delivered by the physician participants at each seminar, event and presentation sponsored by Cline Davis, including the misinformation and false statements concerning the safety, efficacy, effectiveness and usefulness of Neurontin for off-label uses.

(b)    Defendants controlled the stream of information disseminated by the Cline Davis Sub-Enterprise concerning Neurontin by ensuring that only favorable results were published and disclosed and unfavorable results were suppressed.

(c)    Defendants selected and approved which physician participant(s) would deliver the off-label message at each seminar, event and presentation and selected and approved each physician "author" for the published materials propounded by the Cline Davis Sub-Enterprise.

(d)    Defendants selected who attended each seminar, event and presentation sponsored by the Cline Davis Sub-Enterprise.

(e)    Defendants paid Cline Davis for its participation in the Cline Davis Sub-Enterprise and split budget overruns with Cline Davis for activities furthering the Cline Davis Sub-Enterprise.

(f)    Defendants placed their own employees and agents in positions of

authority and control in the Cline Davis Sub-Enterprise, and permitted Cline Davis to place its

own employees on Defendants' Extended Neurontin Disease Team.

251.    As detailed above, Defendants' fraudulent scheme consisted of, inter alia:

(a) deliberately misrepresenting, and causing others to misrepresent, the uses for which

Neurontin was safe and effective so that Plaintiffs paid for this drug to treat symptoms for which

it was not scientifically proven to be safe, efficacious, effective and useful; (b) presenting

seminars and events misrepresenting off-label uses for Neurontin for which Defendants' knew

were not proven to be scientifically safe, efficacious, effective and useful to physician attendees

and other healthcare providers; (c) publishing or causing to have published materials containing

false information upon which physicians and Plaintiffs relied upon when choosing to prescribe

or pay for Neurontin to treat off-label uses; (d) actively concealing, and causing others to

conceal, information about the true safety, efficacy, effectiveness and usefulness of Neurontin to

treat conditions for which it had not been approved by the FDA; and (e) misrepresenting the

appropriate and effective dosages for the drug.

252.    Defendants' scheme and the above described racketeering activities amounted to

a common course of conduct intended to cause Plaintiffs and others to pay for excessive amounts

of Neurontin. Each such racketeering activity was related, had similar purposes, involved the

same or similar participants and methods of commission, and had similar results affecting similar

victims, including Plaintiffs. Defendants' fraudulent activities are part of their ongoing business

and constitute a continuing threat to Plaintiffs' property.

253.    The pattern of racketeering activity alleged herein and the Cline Davis Sub-

Enterprise are separate and distinct from each other. Defendants engaged in a pattern of

racketeering activity alleged herein for the purpose of conducting the affairs of the Cline Davis Sub-Enterprise.

254.    Plaintiffs have been injured in their property by reason of these violations in that Plaintiffs have made millions of dollars in payments for Neurontin that would not have made had Defendants not engaged in their pattern of racketeering activity.

255.    Plaintiffs' injuries were directly and proximately caused by Defendants' racketeering activity as described above.

256.    By virtue of these violations of 18 U.S.C. § 1962(c), Defendants are jointly and severally liable to Plaintiffs for three times the damages Plaintiffs have sustained, plus the cost of this suit, including reasonable attorneys' fees.

## THIRD CLAIM FOR RELIEF
### Violation of 18 U.S.C. § 1962(c) (The Physicians World Sub-Enterprise)

257.    Plaintiffs incorporate by reference all preceding paragraphs, as if fully set forth herein.

258.    In the alternative, Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3) who conducted the affairs of the enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

259.    The enterprise is an association-in-fact within the meaning of 18 U.S.C. § 1961(4) consisting of (i) Defendants, including their employees and agents; (ii) Physicians World (collectively, the "Physicians World Sub-Enterprise"). The Physicians World Sub-Enterprise is an ongoing organization that functions as a continuing unit. The Physicians World Sub-Enterprise was created and used as a tool to effectuate Defendants' pattern of racketeering activity. The Defendant "persons" are distinct from the Physicians World Sub-Enterprise.

260.    The Physicians World Sub-Enterprise falls within the meaning of 18 U.S.C. §