1961(4) and consists of a group of "persons" associated together for the common purpose of promoting Neurontin for off-label uses and earning profits therefrom.

261.    Defendants have conducted and participated in the affairs of the Physicians World Sub-Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and 1961(5), which includes multiple instances of mail fraud in violation of 18 U.S.C. § 1341, and multiple instances of wire fraud in violation of 18 U.S.C. § 1343, as described above.

262.    The Physicians World Sub-Enterprise engaged in and affected interstate commerce, because, inter alia, it marketed, sold, purchased or provided Neurontin to thousands of entities and individuals throughout the United States.

263.    Defendants exerted control over the Physicians World Sub-Enterprise, and Defendants participated in the operation or management of the affairs of the Physicians World Sub-Enterprise, through a variety of actions including the following:

(a)    Defendants controlled the content of the messages being delivered by the physician participants at each seminar, event and presentation sponsored by Physicians World, including the misinformation and false statements concerning the safety, efficacy, effectiveness and usefulness of Neurontin for off-label uses.

(b)    Defendants controlled the stream of information disseminated by the Physicians World Sub-Enterprise concerning Neurontin by ensuring that only favorable results were published and disclosed and unfavorable results were suppressed.

(c)    Defendants selected and approved which physician participant(s) would deliver the off-label message at each seminar, event and presentation and selected and approved each physician "author" for the published materials propounded by the Physicians World Sub-

Enterprise.

(d)     Defendants selected who attended each seminar, event and presentation sponsored by the Physicians World Sub-Enterprise.

(e)     Defendants paid Physicians World for its participation in the Physicians World Sub-Enterprise.

(f)     Defendants formed a strategic partnership with Physicians World in order to carry out the activities of the Physicians World Sub-Enterprise. This partnership included the commingling of employees among Defendants and Physicians World.

(g)     Defendants placed their own employees and agents in positions of authority and control in the Physicians World Sub-Enterprise.

264.    As detailed above, Defendants' fraudulent scheme consisted of, inter alia: (a) deliberately misrepresenting, and causing others to misrepresent, the uses for which Neurontin was safe and effective so that Plaintiffs paid for this drug to treat symptoms for which it was not scientifically proven to be safe, efficacious, effective and useful; (b) presenting seminars and events misrepresenting off-label uses for Neurontin for which Defendants' knew were not proven to be scientifically safe, efficacious, effective and useful to physician attendees and other healthcare providers; (c) publishing or causing to have published materials containing false information upon which physicians and Plaintiffs relied upon when choosing to prescribe or pay for Neurontin to treat off-label uses; (d) actively concealing, and causing others to conceal, information about the true safety, efficacy, effectiveness and usefulness of Neurontin to treat conditions for which it had not been approved by the FDA; and (e) misrepresenting the appropriate and effective dosages for the drug.

265.    Defendants' scheme and the above described racketeering activities amounted to

a common course of conduct intended to cause Plaintiffs and others to pay for excessive amounts

of Neurontin. Each such racketeering activity was related, had similar purposes, involved the

same or similar participants and methods of commission, and had similar results affecting similar

victims, including Plaintiffs. Defendants' fraudulent activities are part of their ongoing business

and constitute a continuing threat to Plaintiffs' property.

266.    The pattern of racketeering activity alleged herein and the Physicians World Sub-

Enterprise are separate and distinct from each other. Defendants engaged in a pattern of

racketeering activity alleged herein for the purpose of conducting the affairs of the Physicians

World Sub-Enterprise.

267.    Plaintiffs have been injured in their property by reason of these violations in that

Plaintiffs have made millions of dollars in payments for Neurontin that would not have made had

Defendants not engaged in their pattern of racketeering activity.

268.    Plaintiffs' injuries were directly and proximately caused by Defendants'

racketeering activity as described above.

269.    By virtue of these violations of 18 U.S.C. § 1962(c), Defendants are jointly and

severally liable to Plaintiffs for three times the damages Plaintiffs have sustained, plus the cost of

this suit, including reasonable attorneys' fees.

### FOURTH CLAIM FOR RELIEF
**Violation of 18 U.S.C. § 1962(c) (The Sudler & Hennessey Sub-Enterprise)**

270.    Plaintiffs incorporate by reference all preceding paragraphs, as if fully set forth

herein.

271.    In the alternative, Defendants are "persons" within the meaning of 18 U.S.C.

§ 1961(3) who conducted the affairs of the enterprise through a pattern of racketeering activity in

violation of 18 U.S.C. § 1962(c).

272.    The enterprise is an association-in-fact within the meaning of 18 U.S.C. § 1961(4) consisting of (i) Defendants, including their employees and agents; and (ii) Sudler & Hennessey (collectively, the "Sudler & Hennessey Sub-Enterprise"). The Sudler & Hennessey Sub-Enterprise is an ongoing organization that functions as a continuing unit. The Sudler & Hennessey Sub-Enterprise was created and used as a tool to effectuate Defendants' pattern of racketeering activity. The Defendant "persons" are distinct from the Sudler & Hennessey Sub-Enterprise.

273.    The Sudler & Hennessey Sub-Enterprise falls within the meaning of 18 U.S.C. § 1961(4) and consists of a group of "persons" associated together for the common purpose of promoting Neurontin for off-label uses and earning profits therefrom.

274.    Defendants have conducted and participated in the affairs of the Sudler & Hennessey Sub-Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and 1961(5), that includes multiple instances of mail fraud in violation of 18 U.S.C. § 1341, and multiple instances of wire fraud in violation of 18 U.S.C. § 1343, as described above.

275.    The Sudler & Hennessey Sub-Enterprise engaged in and affected interstate commerce, because, inter alia, it marketed, sold, purchased or provided Neurontin to thousands of entities and individuals throughout the United States.

276.    Defendants exerted control over the Sudler & Hennessey Sub-Enterprise, and Defendants participated in the operation or management of the affairs of the Sudler & Hennessey Sub-Enterprise, through a variety of actions including the following:

(a)    Defendants controlled the content of the messages being delivered by the physician participants at each seminar, event and presentation sponsored by Sudler &

Hennessey, including the misinformation and false statements concerning the safety, efficacy, effectiveness and usefulness of Neurontin for off-label uses.

(b)      Defendants controlled the stream of information disseminated by the Sudler & Hennessey Sub-Enterprise concerning Neurontin by ensuring that only favorable results were published and disclosed and unfavorable results were suppressed.

(c)      Defendants selected and approved which physician participant(s) would deliver the off-label message at each seminar, event and presentation and selected and approved each physician "author" for the published materials propounded by the Sudler & Hennessey Sub-Enterprise.

(d)      Defendants selected who attended each seminar, event and presentation sponsored by Sudler & Hennessey.

(e)      Defendants paid Sudler & Hennessey for its participation in the Sudler & Hennessey Sub-Enterprise.

(f)      Defendants placed their own employees and agents in positions of authority and control in the Sudler & Hennessey Sub-Enterprise.

277.      As detailed above, Defendants' fraudulent scheme consisted of, inter alia: (a) deliberately misrepresenting, and causing others to misrepresent, the uses for which Neurontin was safe and effective so that Plaintiffs paid for this drug to treat symptoms for which it was not scientifically proven to be safe and efficacious, effective and useful; (b) presenting seminars and events misrepresenting off-label uses for Neurontin for which Defendants' knew were not proven to be scientifically safe, efficacious, effective and useful to physician attendees and other healthcare providers; (c) publishing or causing to have published materials containing false information upon which physicians and Plaintiffs relied upon when choosing to prescribe

or pay for Neurontin to treat off-label uses; (d) actively concealing, and causing others to conceal, information about the true safety, efficacy, effectiveness and usefulness of Neurontin to treat conditions for which it had not been approved by the FDA; and (e) misrepresenting the appropriate and effective dosages for the drug.

278.    Defendants' scheme and the above described racketeering activities amounted to a common course of conduct intended to cause Plaintiffs and others to pay for excessive amounts of Neurontin. Each such racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiffs. Defendants' fraudulent activities are part of their ongoing business and constitute a continuing threat to Plaintiffs' property.

279.    The pattern of racketeering activity alleged herein and the Sudler & Hennessey Sub-Enterprise are separate and distinct from each other. Defendants engaged in a pattern of racketeering activity alleged herein for the purpose of conducting the affairs of the Sudler & Hennessey Sub-Enterprise.

280.    Plaintiffs have been injured in their property by reason of these violations in that Plaintiffs have made millions of dollars in payments for Neurontin that would not have made had Defendants not engaged in their pattern of racketeering activity.

281.    Plaintiffs' injuries were directly and proximately caused by Defendants' racketeering activity as described above.

282.    By virtue of these violations of 18 U.S.C. § 1962(c), Defendants are jointly and severally liable to Plaintiffs for three times the damages Plaintiffs have sustained, plus the cost of this suit, including reasonable attorneys' fees.

### FIFTH CLAIM FOR RELIEF
### Violation of 18 U.S.C. § 1962(c) (The MEDED/MEDCON Sub-Enterprise)

283.    Plaintiffs incorporate by reference all preceding paragraphs, as if fully set forth herein.

284.    In the alternative, Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3) who conducted the affairs of the enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

285.    The enterprise is an association-in-fact within the meaning of 18 U.S.C. § 1961(4) consisting of (i) Defendants, including their employees and agents; and (ii) MEDED/MEDCON (collectively, the "MEDED/MEDCON Sub-Enterprise"). The MEDED/MEDCON Sub-Enterprise is an ongoing organization that functions as a continuing unit. The MEDED/MEDCON Sub-Enterprise was created and used as a tool to effectuate Defendants' pattern of racketeering activity. The Defendant "persons" are distinct from the MEDED/MEDCON Sub-Enterprise.

286.    The MEDED/MEDCON Sub-Enterprise falls within the meaning of 18 U.S.C. § 1961(4) and consists of a group of "persons" associated together for the common purpose of promoting Neurontin for off-label uses and earning profits therefrom.

287.    Defendants have conducted and participated in the affairs of the MEDED/MEDCON Sub-Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and 1961(5), that includes multiple instances of mail fraud in violation of 18 U.S.C. § 1341, and multiple instances of wire fraud in violation of 18 U.S.C. § 1343, as described above.

288.    The MEDED/MEDCON Sub-Enterprise engaged in and affected interstate commerce, because, inter alia, it marketed, sold, purchased or provided Neurontin to thousands

of entities and individuals throughout the United States.

289.    Defendants exerted control over the MEDED/MEDCON Sub-Enterprise, and Defendants participated in the operation or management of the affairs of the MEDED/MEDCON Sub-Enterprise, through a variety of actions including the following:

(a)    Defendants controlled the content of the messages being delivered by the physician participants at each seminar, event and presentation sponsored by MEDED/MEDCON, including the misinformation and false statements concerning the safety, efficacy, effectiveness and usefulness of Neurontin for off-label uses.

(b)    Defendants controlled the stream of information disseminated by the MEDED/MEDCON Sub-Enterprise concerning Neurontin by ensuring that only favorable results were published and disclosed and unfavorable results were suppressed.

(c)    Defendants selected and approved which physician participant(s) would deliver the off-label message at each seminar, event and presentation and selected and approved each physician "author" for the published materials propounded by the MEDED/MEDCON Sub-Enterprise.

(d)    Defendants selected who attended each seminar, event and presentation sponsored by the MEDED/MEDCON Sub-Enterprise.

(e)    Defendants paid MEDED/MEDCON for its participation in the MEDED/MEDCON Sub-Enterprise.

(f)    Defendants placed their own employees and agents in positions of authority and control in the MEDED/MEDCON Sub-Enterprise.

290.    As detailed above, Defendants' fraudulent scheme consisted of, inter alia: (a) deliberately misrepresenting, and causing others to misrepresent, the uses for which

Neurontin was safe and effective so that Plaintiffs paid for this drug to treat symptoms for which it was not scientifically proven to be safe, efficacious, effective and useful; (b) presenting seminars and events misrepresenting off-label uses for Neurontin for which Defendants' knew were not proven to be scientifically safe, efficacious, effective and useful to physician attendees and other healthcare providers; (c) publishing or causing to have published materials containing false information upon which physicians and Plaintiffs relied upon when choosing to prescribe or pay for Neurontin to treat off-label uses; (d) actively concealing, and causing others to conceal, information about the true safety, efficacy, effectiveness and usefulness of Neurontin to treat conditions for which it had not been approved by the FDA; and (e) misrepresenting the appropriate and effective dosages for the drug.

291.    Defendants' scheme and the above described racketeering activities amounted to a common course of conduct intended to cause Plaintiffs and others to pay for excessive amounts of Neurontin. Each such racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiffs. Defendants' fraudulent activities are part of their ongoing business and constitute a continuing threat to Plaintiffs' property.

292.    The pattern of racketeering activity alleged herein and the MEDED/MEDCON Sub-Enterprise are separate and distinct from each other. Defendants engaged in a pattern of racketeering activity alleged herein for the purpose of conducting the affairs of the MEDED/MEDCON Sub-Enterprise.

293.    Plaintiffs have been injured in their property by reason of these violations in that Plaintiffs have made millions of dollars in payments for Neurontin that would not have made had Defendants not engaged in their pattern of racketeering activity.

294.    Plaintiffs' injuries were directly and proximately caused by Defendants'
racketeering activity as described above.

295.    By virtue of these violations of 18 U.S.C. § 1962(c), Defendants are jointly and
severally liable to Plaintiffs for three times the damages Plaintiffs have sustained, plus the cost of
this suit, including reasonable attorneys' fees.

**SIXTH CLAIM FOR RELIEF**
**Violation of 18 U.S.C. § 1962(c) (The MES Sub-Enterprise)**

296.    Plaintiffs incorporate by reference all preceding paragraphs, as if fully set forth
herein.

297.    In the alternative, Defendants are "persons" within the meaning of 18 U.S.C.
§ 1961(3) who conducted the affairs of the enterprise through a pattern of racketeering activity in
violation of 18 U.S.C. § 1962(c).

298.    The enterprise is an association-in-fact within the meaning of 18 U.S.C. § 1961(4)
consisting of (i) Defendants, including their employees and agents; and (ii) MES (collectively,
the "MES Sub-Enterprise"). The MES Sub-Enterprise is an ongoing organization that functions
as a continuing unit. The MES Sub-Enterprise was created and used as a tool to effectuate
Defendants' pattern of racketeering activity. The Defendant "persons" are distinct from the
MES Sub-Enterprise.

299.    The MES Sub-Enterprise falls within the meaning of 18 U.S.C. § 1961(4) and
consists of a group of "persons" associated together for the common purpose of promoting
Neurontin for off-label uses and earning profits therefrom.

300.    Defendants have conducted and participated in the affairs of the MES Sub-
Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1)
and 1961(5), that includes multiple instances of mail fraud in violation of 18 U.S.C. § 1341, and

multiple instances of wire fraud in violation of 18 U.S.C. § 1343, as described above.

301.    The MES Sub-Enterprise engaged in and affected interstate commerce, because, inter alia, it marketed, sold, purchased or provided Neurontin to thousands of entities and individuals throughout the United States.

302.    Defendants exerted control over the MES Sub-Enterprise, and Defendants participated in the operation or management of the affairs of the MES Sub-Enterprise, through a variety of actions including the following:

(a)    Defendants controlled the content of the messages being delivered by the physician participants at each seminar, event and presentation sponsored by MES, including the misinformation and false statements concerning the safety, efficacy, effectiveness and usefulness of Neurontin for off-label uses.

(b)    Defendants controlled the stream of information disseminated by the MES Sub-Enterprise concerning Neurontin by ensuring that only favorable results were published and disclosed and unfavorable results were suppressed.

(c)    Defendants selected and approved which physician participant(s) would deliver the off-label message at each seminar, event and presentation and selected and approved each physician "author" for the published materials propounded by the MES Sub-Enterprise.

(d)    Defendants selected who attended each seminar, event and presentation sponsored by the MES Sub-Enterprise.

(e)    Defendants paid MES for its participation in the MES Sub-Enterprise.

(f)    Defendants placed their own employees and agents in positions of authority and control in the MES Sub-Enterprise.

303.    As detailed above, Defendants' fraudulent scheme consisted of, inter alia:

(a) deliberately misrepresenting, and causing others to misrepresent, the uses for which Neurontin was safe and effective so that Plaintiffs paid for this drug to treat symptoms for which it was not scientifically proven to be safe, efficacious, effective and useful; (b) presenting seminars and events misrepresenting off-label uses for Neurontin for which Defendants' knew were not proven to be scientifically safe, efficacious, effective and useful to physician attendees and other healthcare providers; (c) publishing or causing to have published materials containing false information upon which physicians and Plaintiffs relied upon when choosing to prescribe or pay for Neurontin to treat off-label uses; (d) actively concealing, and causing others to conceal, information about the true safety, efficacy, effectiveness and usefulness of Neurontin to treat conditions for which it had not been approved by the FDA; and (e) misrepresenting the appropriate and effective dosages for the drug.

304.    Defendants' scheme and the above described racketeering activities amounted to a common course of conduct intended to cause Plaintiffs and others to pay for excessive amounts of Neurontin. Each such racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiffs. Defendants' fraudulent activities are part of their ongoing business and constitute a continuing threat to Plaintiffs' property.

305.    The pattern of racketeering activity alleged herein and the MES Sub-Enterprise are separate and distinct from each other. Defendants engaged in a pattern of racketeering activity alleged herein for the purpose of conducting the affairs of the MES Sub-Enterprise.

306.    Plaintiffs have been injured in their property by reason of these violations in that Plaintiffs have made millions of dollars in payments for Neurontin that would not have made had Defendants not engaged in their pattern of racketeering activity.

307.    Plaintiffs' injuries were directly and proximately caused by Defendants'

racketeering activity as described above.

308.    By virtue of these violations of 18 U.S.C. § 1962(c), Defendants are jointly and

severally liable to Plaintiffs for three times the damages Plaintiffs have sustained, plus the cost of

this suit, including reasonable attorneys' fees.

**SEVENTH CLAIM FOR RELIEF**
**Violation of 18 U.S.C. § 1962(c) (The HCC Sub-Enterprise)**

309.    Plaintiffs incorporate by reference all preceding paragraphs, as if fully set forth

herein.

310.    In the alternative, Defendants are "persons" within the meaning of 18 U.S.C.

§ 1961(3) who conducted the affairs of the enterprise through a pattern of racketeering activity in

violation of 18 U.S.C. § 1962(c).

311.    The enterprise is an association-in-fact within the meaning of 18 U.S.C. § 1961(4)

consisting of (i) Defendants, including their employees and agents; and (ii) HCC (collectively,

the "HCC Sub-Enterprise"). The HCC Sub-Enterprise is an ongoing organization that functions

as a continuing unit. The HCC Sub-Enterprise was created and used as a tool to effectuate

Defendants' pattern of racketeering activity. The Defendant "persons" are distinct from the

HCC Sub-Enterprise.

312.    The HCC Sub-Enterprise falls within the meaning of 18 U.S.C. § 1961(4) and

consists of a group of "persons" associated together for the common purpose of promoting

Neurontin for off-label uses and earning profits therefrom.

313.    Defendants have conducted and participated in the affairs of the HCC Sub-

Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1)

and 1961(5), that includes multiple instances of mail fraud in violation of 18 U.S.C. § 1341, and

multiple instances of wire fraud in violation of 18 U.S.C. § 1343, as described above.

314.    The HCC Sub-Enterprise engaged in and affected interstate commerce, because, inter alia, it marketed, sold, purchased or provided Neurontin to thousands of entities and individuals throughout the United States.

315.    Defendants exerted control over the HCC Sub-Enterprise, and Defendants participated in the operation or management of the affairs of the HCC Sub-Enterprise, through a variety of actions including the following:

(a)    Defendants controlled the content of the messages being delivered by the physician participants at each seminar, event and presentation sponsored by HCC, including the misinformation and false statements concerning the safety, efficacy, effectiveness and usefulness of Neurontin for off-label uses.

(b)    Defendants controlled the stream of information disseminated by the HCC Sub-Enterprise concerning Neurontin by ensuring that only favorable results were published and disclosed and unfavorable results were suppressed.

(c)    Defendants selected and approved which physician participant(s) would deliver the off-label message at each seminar, event and presentation and selected and approved each physician "author" for the published materials propounded by the HCC Sub-Enterprise.

(d)    Defendants selected who attended each seminar, event and presentation sponsored by the HCC Sub-Enterprise.

(e)    Defendants paid HCC for its participation in the HCC Sub-Enterprise.

(f)    Defendants placed their own employees and agents in positions of authority and control in the HCC Sub-Enterprise.

316.    As detailed above, Defendants' fraudulent scheme consisted of, inter alia:

(a) deliberately misrepresenting, and causing others to misrepresent, the uses for which

Neurontin was safe and effective so that Plaintiffs paid for this drug to treat symptoms for which

it was not scientifically proven to be safe, efficacious, effective and useful; (b) presenting

seminars and events misrepresenting off-label uses for Neurontin for which Defendants' knew

were not proven to be scientifically safe, efficacious, effective and useful to physician attendees

and other healthcare providers; (c) publishing or causing to have published materials containing

false information upon which physicians and Plaintiffs relied upon when choosing to prescribe

or pay for Neurontin to treat off-label uses; (d) actively concealing, and causing others to

conceal, information about the true safety, efficacy, effectiveness and usefulness of Neurontin to

treat conditions for which it had not been approved by the FDA; and (e) misrepresenting the

appropriate and effective dosages for the drug.

317.    Defendants' scheme and the above described racketeering activities amounted to

a common course of conduct intended to cause Plaintiffs and others to pay for excessive amounts

of Neurontin. Each such racketeering activity was related, had similar purposes, involved the

same or similar participants and methods of commission, and had similar results affecting similar

victims, including Plaintiffs. Defendants' fraudulent activities are part of their ongoing business

and constitute a continuing threat to Plaintiffs' property.

318.    The pattern of racketeering activity alleged herein and the HCC Sub-Enterprise

are separate and distinct from each other. Defendants engaged in a pattern of racketeering

activity alleged herein for the purpose of conducting the affairs of the HCC Sub-Enterprise.

319.    Plaintiffs have been injured in their property by reason of these violations in that

Plaintiffs have made millions of dollars in payments for Neurontin that would not have made had

Defendants not engaged in their pattern of racketeering activity.

320.    Plaintiffs' injuries were directly and proximately caused by Defendants'

racketeering activity as described above.

321.    By virtue of these violations of 18 U.S.C. § 1962(c), Defendants are jointly and

severally liable to Plaintiffs for three times the damages Plaintiffs have sustained, plus the cost of

this suit, including reasonable attorneys' fees.

**EIGHTH CLAIM FOR RELIEF**
**Violation of 18 U.S.C. § 1962(c) (The AMM/Adelphi Sub-Enterprise)**

322.    Plaintiffs incorporate by reference all preceding paragraphs, as if fully set forth

herein.

323.    In the alternative, Defendants are "persons" within the meaning of 18 U.S.C.

§ 1961(3) who conducted the affairs of the enterprise through a pattern of racketeering activity in

violation of 18 U.S.C. § 1962(c).

324.    The enterprise is an association-in-fact within the meaning of 18 U.S.C. § 1961(4)

consisting of (i) Defendants, including their employees and agents; and (ii) AMM/Adelphi

(collectively, the "AMM/Adelphi Sub-Enterprise"). The AMM/Adelphi Sub-Enterprise is an

ongoing organization that functions as a continuing unit. The AMM/Adelphi Sub-Enterprise

was created and used as a tool to effectuate Defendants' pattern of racketeering activity. The

Defendant "persons" are distinct from the AMM/Adelphi Sub-Enterprise.

325.    The AMM/Adelphi Sub-Enterprise falls within the meaning of 18 U.S.C. §

1961(4) and consists of a group of "persons" associated together for the common purpose of

promoting Neurontin for off-label uses and earning profits therefrom.

326.    Defendants have conducted and participated in the affairs of the AMM/Adelphi

Sub-Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§

1961(1) and 1961(5), that includes multiple instances of mail fraud in violation of 18 U.S.C.

§ 1341, and multiple instances of wire fraud in violation of 18 U.S.C. § 1343, as described above.

327.    The AMM/Adelphi Sub-Enterprise engaged in and affected interstate commerce, because, inter alia, it marketed, sold, purchased or provided Neurontin to thousands of entities and individuals throughout the United States.

328.    Defendants exerted control over the AMM/Adelphi Sub-Enterprise, and Defendants participated in the operation or management of the affairs of the AMM/Adelphi Sub-Enterprise, through a variety of actions including the following:

(a)    Defendants controlled the content of the messages being delivered by the physician participants at each seminar, event and presentation sponsored by AMM/Adelphi, including the misinformation and false statements concerning the safety, efficacy, effectiveness and usefulness of Neurontin for off-label uses.

(b)    Defendants controlled the stream of information disseminated by the AMM/Adelphi Sub-Enterprise concerning Neurontin by ensuring that only favorable results were published and disclosed and unfavorable results were suppressed.

(c)    Defendants selected and approved which physician participant(s) would deliver the off-label message at each seminar, event and presentation and selected and approved each physician "author" for the published materials propounded by the AMM/Adelphi Sub-Enterprise.

(d)    Defendants selected who attended each seminar, event and presentation sponsored by the AMM/Adelphi Sub-Enterprise.

(e)    Defendants paid AMM/Adelphi for its participation in the AMM/Adelphi Sub-Enterprise.

(f)    Defendants placed their own employees and agents in positions of authority and control in the AMM/Adelphi Sub-Enterprise.

329.    As detailed above, Defendants' fraudulent scheme consisted of, inter alia: (a) deliberately misrepresenting, and causing others to misrepresent, the uses for which Neurontin was safe and effective so that Plaintiffs paid for this drug to treat symptoms for which it was not scientifically proven to be safe, efficacious, effective and useful; (b) presenting seminars and events misrepresenting off-label uses for Neurontin for which Defendants' knew were not proven to be scientifically safe, efficacious, effective and useful to physician attendees and other healthcare providers; (c) publishing or causing to have published materials containing false information upon which physicians and Plaintiffs relied upon when choosing to prescribe or pay for Neurontin to treat off-label uses; (d) actively concealing, and causing others to conceal, information about the true safety, efficacy, effectiveness and usefulness of Neurontin to treat conditions for which it had not been approved by the FDA; and (e) misrepresenting the appropriate and effective dosages for the drug.

330.    Defendants' scheme and the above described racketeering activities amounted to a common course of conduct intended to cause Plaintiffs and others to pay for excessive amounts of Neurontin. Each such racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiffs. Defendants' fraudulent activities are part of their ongoing business and constitute a continuing threat to Plaintiffs' property.

331.    The pattern of racketeering activity alleged herein and the AMM/Adelphi Sub-Enterprise are separate and distinct from each other. Defendants engaged in a pattern of racketeering activity alleged herein for the purpose of conducting the affairs of the

AMM/Adelphi Sub-Enterprise.

332.    Plaintiffs have been injured in their property by reason of these violations in that Plaintiffs have made millions of dollars in payments for Neurontin that would not have made had Defendants not engaged in their pattern of racketeering activity.

333.    Plaintiffs' injuries were directly and proximately caused by Defendants' racketeering activity as described above.

334.    By virtue of these violations of 18 U.S.C. § 1962(c), Defendants are jointly and severally liable to Plaintiffs for three times the damages Plaintiffs have sustained, plus the cost of this suit, including reasonable attorneys' fees.

## NINTH CLAIM FOR RELIEF
### Violation of 18 U.S.C. § 1962(c)
### (The Publication/Marketing/Physician Sub-Enterprise)

335.    Plaintiffs incorporate by reference all preceding paragraphs, as if fully set forth herein.

336.    In the alternative, Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3) who conducted the affairs of the enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

337.    The enterprises are associations-in-fact within the meaning of 18 U.S.C. § 1961(4) consisting of each of the following: (a) the members of the Cline Davis Sub-Enterprise and the physician participants identified in paragraph 99, supra (the "Cline Davis/Physician Sub-Enterprise"); (b) the members of the Physicians World Sub-Enterprise and the physician participants identified in paragraph 99, supra (the "Physicians World/Physician Sub-Enterprise"); (c) the members of the Sudler & Hennessey Sub-Enterprise and the physician participants identified in paragraph 99, supra (the "Sudler & Hennessey/Physician Sub-

Enterprise"); (d) the members of the MEDED/MEDCON Sub-Enterprise and the physician

participants identified in paragraph 99, supra (the "MEDED/MEDCON/Physician Sub-

Enterprise"); (e) the members of the MES Sub-Enterprise and the physician participants

identified in paragraph 99, supra (the "MES/Physician Sub-Enterprise"); (f) the members of the

HCC Sub-Enterprise and the physician participants identified in paragraph 99, supra (the

"HCC/Physician Sub-Enterprise"); and (g) the members of the AMM/Adelphi Sub-Enterprise

and the physician participants identified in paragraph 99, supra (the "AMM/Adelphi/Physician

Sub-Enterprise"). The seven foregoing Sub-Enterprises are collectively referenced herein as the

"Publication/Marketing/Physician Sub-Enterprises." Each of the

Publication/Marketing/Physician Sub-Enterprises is an ongoing organization that functions as a

continuing unit. Each was created and used as a tool to effectuate Defendants' pattern of

racketeering activity. The Defendant "persons" are distinct from each of the

Publication/Marketing/Physician Sub-Enterprises.

     338.    Each of the Publication/Marketing/Physician Sub-Enterprises falls within the

meaning of 18 U.S.C. § 1961(4) and consists of a group of "persons" associated together for the

common purpose of promoting Neurontin for off-label uses and earning profits therefrom.

     339.    Defendants have conducted and participated in the each of the

Publication/Marketing/Physician Sub-Enterprises through a pattern of racketeering activity

within the meaning of 18 U.S.C. §§ 1961(1) and 1961(5), that includes multiple instances of mail

fraud in violation of 18 U.S.C. § 1341, and multiple instances of wire fraud in violation of 18

U.S.C. § 1343, as described above.

     340.    Each of the Publication/Marketing/Physician Sub-Enterprises engaged in and

affected interstate commerce, because, inter alia, it marketed, sold, purchased or provided

Neurontin to thousands of entities and individuals throughout the United States.

341.    Defendants exerted control over each of the Publication/Marketing/Physician Sub-Enterprises, and Defendants participated in the operation or management of each of the Publication/Marketing/Physician Sub-Enterprises, through a variety of actions including the following:

(a)    Defendants controlled the content of the messages being delivered by the physician participants at each seminar, event and presentation sponsored, including the misinformation and false statements concerning the safety, efficacy, effectiveness, usefulness and appropriate dosages of Neurontin;

(b)    Defendants controlled the stream of information disseminated by each of the Publication/Marketing/Physician Sub-Enterprises concerning Neurontin by ensuring that only favorable results were published and disclosed and unfavorable results were suppressed;

(c)    Defendants selected and approved which physician participant(s) would deliver the off-label message at each seminar, event and presentation and selected and approved each physician "author" for the published materials propounded by each of the Publication/Marketing/Physician Sub-Enterprises;

(d)    Defendants selected who attended each seminar, event and presentation sponsored by each of the Publication/Marketing/Physician Sub-Enterprises;

(e)    Defendants paid the other participants for their participation in each of the Publication/Marketing/Physician Sub-Enterprises; and

(f)    Defendants placed their own employees and agents in positions of authority and control in each of the Publication/Marketing/Physician Sub-Enterprises.

342.    As detailed above, Defendants' fraudulent scheme consisted of, inter alia:

(a) deliberately misrepresenting, and causing others to misrepresent, the uses for which Neurontin was safe and effective so that Plaintiffs paid for this drug to treat symptoms for which it was not scientifically proven to be safe and efficacious, effective and useful; (b) presenting seminars and events misrepresenting off-label uses for Neurontin for which Defendants' knew were not proven to be scientifically safe, efficacious, effective and useful to physician attendees and other healthcare providers; (c) publishing or causing to have published materials containing false information upon which physicians and Plaintiffs relied upon when choosing to prescribe or pay for Neurontin to treat off-label uses; (d) actively concealing, and causing others to conceal, information about the true safety, efficacy, effectiveness and usefulness of Neurontin to treat conditions for which it had not been approved by the FDA; and (e) misrepresenting the appropriate and effective dosages for the drug.

343.    Defendants' scheme and the above described racketeering activities amounted to a common course of conduct intended to cause Plaintiffs and others to pay for excessive amounts of Neurontin. Each such racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiffs. Defendants' fraudulent activities are part of their ongoing business and constitute a continuing threat to the Plaintiffs' property.

344.    The patterns of racketeering activity alleged herein and for each of the Publication/Marketing/Physician Sub-Enterprises are separate and distinct from each other. Defendants engaged in a pattern of racketeering activity alleged herein for the purpose of conducting the affairs of each of the Publication/Marketing/Physician Sub-Enterprises.

345.    Plaintiffs have been injured in their property by reason of these violations in that Plaintiffs have made millions of dollars in payments for Neurontin that they would not have

made had Defendants not engaged in their pattern of racketeering activity.

346.    Plaintiffs' injuries were directly and proximately caused by Defendants' racketeering activity as described above.

347.    By virtue of these violations of 18 U.S.C. § 1962(c), Defendants are jointly and severally liable to Plaintiffs for three times the damages Plaintiffs have sustained, plus the cost of this suit, including reasonable attorneys' fees.

**TENTH CLAIM FOR RELIEF**
**Violation of 18 U.S.C. § 1962(d) by Conspiring to Violate 18 U.S.C. § 1962(c)**

348.    Plaintiffs incorporate by reference all preceding paragraphs, as if fully set forth herein.

349.    Section 1962(d) of RICO provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b) or (c) of this section."

350.    Defendants have violated section 1962(d) by conspiring to violate 18 U.S.C. § 1962(c). The object of this conspiracy has been and is to conduct or participate in, directly or indirectly, the conduct of the affairs of the section 1962(c) Enterprises described previously through a pattern of racketeering activity.

351.    As demonstrated in detail above, Defendants' co-conspirators have engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy, including material misrepresentations and omissions designed to defraud Plaintiffs of money.

352.    The nature of the above-described Defendants' co-conspirators' acts, material misrepresentations, and omissions in furtherance of the conspiracy gives rise to an inference that they not only agreed to the objective of an 18 U.S.C. § 1962(d) violation of RICO by conspiring to violate 18 U.S.C. § 1962(c), but they were aware that their ongoing fraudulent acts have been and are part of an overall pattern of racketeering activity.

353.    As a direct and proximate result of Defendants' overt acts and predicate acts in furtherance of violating 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. §§ 1962(c), Plaintiffs have been and are continuing to be injured in their business or property, as set forth more fully above.

354.    Defendants have sought to and have engaged in the commission of and continue to commit overt acts, including the following unlawful racketeering predicate acts:

(a)    Multiple instances of mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1342;

(b)    Multiple instances of mail fraud in violation of 18 U.S.C. §§ 1341 and 1346; and

(c)    Multiple instances of wire fraud in violation of 18 U.S.C. §§ 1343 and 1346.

355.    Defendants have sought to and have engaged in the violations of the above federal laws and the effects thereof detailed above are continuing and will continue unless injunctive relief prohibiting Defendants' illegal acts constituting a pattern of racketeering activity is fashioned and imposed by the Court.

## ELEVENTH CLAIM FOR RELIEF
### Violations of the California Unfair Competition Law
### Cal. Bus. & Prof. Code § 17200

356.    Plaintiffs repeat and reallege each of the preceding paragraphs, as if fully set forth herein.

357.    Defendants engaged in unfair competition in knowing violation of the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, et seq., when Defendants knowingly and intentionally misrepresented the medical safety, efficacy, effectiveness and usefulness and

appropriate dosages of Neurontin.

358.    Defendants' unfair and deceptive acts were specifically designed to induce
Plaintiffs to pay for excessive amounts of Neurontin.

359.    As a result of Defendants' violations of Business and Professions Code section
17200, Defendants have been unjustly enriched at the expense of Plaintiffs.  Absent Defendants'
unlawful, fraudulent and deceptive conduct, Plaintiffs would not have paid for excessive
amounts of Neurontin.

360.    The acts, omissions, misrepresentations, practices and non-disclosures of
Defendants, as alleged herein, constituted and constitute a continuous course of conduct of unfair
competition by means of unfair, unconscionable, unlawful and/or fraudulent business acts or
practices within the meaning of California Business and Professions Code section 17200, et seq.,
including, but not limited to the following:

(a)    violations of the RICO statute, 18 U.S.C. § 1962(c) and (d), as set forth
above;

(b)    violations of the consumer protection statutes of the remaining forty-nine
states, the District of Columbia and the Commonwealth of Puerto Rico, as set forth below;

(c)    Defendants' acts and business practices as described above are otherwise
unfair, unconscionable, unlawful and fraudulent, whether or not in violation of the California
Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, et seq., the RICO statute, 18 U.S.C.
§ 1962(c) and (d), or the consumer protection statutes of the remaining states, the District of
Columbia and Puerto Rico; and

(d)    Defendants' acts and practices are fraudulent or deceptive within the
meaning of California Business and Professions Code section 17200, et seq.

361.    The unlawful and unfair business practices of Defendants have injured and
present a continuing threat of injury to Plaintiffs in that Defendants' conduct has caused
Plaintiffs to pay for excessive amounts of Neurontin.

362.    As alleged herein, Defendants have been unjustly enriched as a result of their
unfair competition.  Plaintiffs are accordingly entitled to equitable relief including restitution
and/or disgorgement of all revenues, earnings, profits, compensation and benefits which may
have been obtained by Defendants as a result of such business acts or practices, pursuant to
California Business and Professions Code sections 17203 and 17204.

### TWELFTH CLAIM FOR RELIEF
### Violations of the Consumer Protection Statutes of the Remaining 49 States, The District of Columbia and the Commonwealth of Puerto Rico

363.    Plaintiffs repeat and reallege each of the preceding paragraphs, as if fully set forth
herein.

364.    Defendants engaged in unfair competition or unfair, unconscionable, deceptive or
fraudulent acts or practices in knowing violation of any and all state consumer protection statutes
when Defendants knowingly and intentionally misrepresented the medical safety, efficacy,
effectiveness, usefulness and appropriate dosages of Neurontin.

365.    Defendants' unfair or deceptive acts or practices were specifically designed to
and did induce Plaintiffs to pay for excessive amounts of Neurontin.

366.    Defendants have violated the consumer protection statutes of the remaining forty-
nine states, the District of Columbia and the Commonwealth of Puerto Rico, as follows:

(a)    Defendants have engaged in unfair competition or unfair or deceptive acts
or practices in violation of Ala. Code § 8-19-1, et seq.;

(b)    Defendants have engaged in unfair competition or unfair or deceptive acts

or practices in violation of Alaska Stat. § 45.50.471, et seq.;

        (c)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ariz. Rev. Stat. § 44-1522, et seq.;

        (d)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ark. Code § 4-88-101, et seq.;

        (e)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices or has made false representations in violation of Colo. Rev. Stat. § 6-1-105, et seq.;

        (f)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Conn. Gen. Stat. § 42-110b, et seq.;

        (g)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 6 Del. Code § 2511, et seq.;

        (h)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices or made false representations in violation of D.C. Code § 28-3901, et seq.;

        (i)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Fla. Stat. § 501.201, et seq.;

        (j)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ga. Stat. § 10-1-392, et seq.;

        (k)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Haw. Rev. Stat. § 480, et seq.;

        (l)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Idaho Code § 48-601, et seq.;

        (m)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 815 ILCS § 50511, et seq.;

        (n)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ind. Code Ann. § 24-5-0.5.1, et seq.;

        (o)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Iowa Code § 714.1 b, et seq.;

        (p)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Kan. Stat. § 50-623, et seq.;

        (q)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ky. Rev. Stat. § 367.110, et seq.;

        (r)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of La. Rev. Stat. § 51:1401, et seq.;

        (s)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 5 Me. Rev. Stat. § 207, et seq.;

        (t)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Md. Com. Law Code § 13-101, et seq.;

        (u)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mass. Gen. L. Ch. 93A, et seq.;

        (v)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mich. Stat. § 445.901, et seq.;

        (w)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. § 325F.67, et seq.;

        (x)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Miss. Code Ann. § 75-24-1, et seq.;

        (y)      Defendants have engaged in unfair competition or unfair or deceptive acts

or practices in violation of Vernon's Mo. Rev. Stat. § 407.0 10, <u>et seq.</u>;

      (z)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code § 30-14-101, <u>et seq.</u>;

      (aa)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. § 59-1601, <u>et seq.</u>;

      (bb)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Nev. Rev. Stat. § 598.0903, <u>et seq.</u>;

      (cc)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. § 358-A: 1, <u>et seq.</u>;

      (dd)    Defendants have engaged in unfair competition or unfair, unconscionable or deceptive acts or practices in violation of N.J. Stat. Ann. § 56:8-1, <u>et seq.</u>;

      (ee)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.M. Stat. Ann. § 57-12-1, <u>et seq.</u>;

      (ff)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices m violation of N.Y. Gen. Bus. Law § 349 <u>et seq.</u>;

      (gg)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.C. Gen. Stat. § 75-1.1, <u>et seq.</u>;

      (hh)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.D. Cent. Code § 51-15-01, <u>et seq.</u>;

      (ii)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices m violation of Ohio Rev. Stat. § 1345.0 1, <u>et seq.</u>;

      (jj)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices or made false representations in violation of Okla. Stat. tit. 15 § 751, <u>et seq.</u>;

(kk)   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Or. Rev. Stat. § 646.605, et seq.;

(ll)   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 73 Pa. Stat. § 201-1, et seq.;

(mm)   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of R.I. Gen. Laws. § 6-13.1-1, et seq.;

(nn)   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Laws § 39-5-10, et seq.;

(oo)   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Code Laws § 37-24-1, et seq.;

(pp)   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Tenn. Code § 47-18-101, et seq.;

(qq)   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Tex. Bus. & Com. Code § 17.41, et seq.;

(rr)   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Utah Code Ann. § 13-11-1, et seq.;

(ss)   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Vt. Stat. Ann. tit. 9, § 2451, et seq.;

(tt)   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Va. Code § 59.1-196, et seq.;

(uu)   Defendants have engaged in unfair competition or unfair, deceptive or fraudulent acts or practices in violation of Wash. Rev. Code. § 19.86.010, et seq.;

(vv)   Defendants have engaged in unfair competition or unfair or deceptive acts

or practices in violation of W. Va. Code § 46A-6-101, et seq.;

      (ww)   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wis. Stat. § 100.20, et seq.;

      (xx)   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wyo. Stat. § 40-12-100, et seq.; and

      (yy)   Defendants have engaged in unfair competition or unfair or deceptive acts or practice in violation of 23 L.P.R.A. § 1001, et seq., the applicable statute for the Commonwealth of Puerto Rico.

367.   As a direct and proximate result of Defendants' unfair methods of competition and unfair or deceptive acts or practices, Plaintiffs have suffered damages in an amount to be proved at trial by paying for excessive amounts of Neurontin.

**THIRTEENTH CLAIM FOR RELIEF**
**Insurance Fraud - Violation of 18 Pa. C.S. § 4117**

368.   Plaintiffs repeat and reallege each of the preceding paragraphs, as if fully set forth herein.

369.   The Pennsylvania Insurance Fraud Statute, 18 Pa. C.S. § 4117(a)(2), provides that a person commits an offense if he or she:

> Knowingly and with the intent to defraud any insurer or self-
> insured, presents or causes to be presented to any insurer or self-
> insured any statement forming a part of, or in support of a claim
> that contains any false, incomplete or misleading information
> concerning any fact or thing material to the claim.

370.   Defendants knowingly and with intent to defraud have engaged in a pattern of causing to be presented to Plaintiffs false, incomplete, and misleading insurance claim information.

371.   Defendants' fraudulent schemes consisted of:  (a) causing providers to

misrepresent the off-label use(s) for which Neurontin was being prescribed so that Plaintiffs and

their members were unaware that they were paying Neurontin claims for off-label uses; (b)

deliberately misrepresenting the uses for which Neurontin was safe and effective and useful so

that Plaintiffs and their members unwittingly paid for the drug to treat symptoms for which it

was not scientifically proven to be safe, effective or useful; (c) publishing or causing to have

published materials containing false information upon which physicians, Plaintiffs and their

members relied upon when choosing to prescribe or pay for Neurontin to treat off-label uses for

which the drug was not scientifically proven to be safe or medically efficacious, effective or

useful; (d) actively concealing, and causing others to conceal, information about the true safety

and efficacy, effectiveness and usefulness of Neurontin to treat conditions for which it had not

been approved by the FDA; and (e) misrepresenting the appropriate and effective dosages for the

drug.

372.    Defendants' schemes discussed in the previous paragraphs were calculated to

ensure that Plaintiffs would be over-billed for Neurontin.

373.    Each of the fraudulent acts detailed above constitutes "Insurance Fraud" within

the meaning of 18 Pa. C.S. § 4117(a). Collectively, these violations constitute a pattern of

insurance fraud within the meaning of 18 Pa. C.S. § 4117(g).

374.    Much of the wrongful, deceptive and unfair conduct detailed in this Complaint

took place in Pennsylvania and/or caused injury to Plaintiffs and others in Pennsylvania.

375.    The above-described pattern of insurance fraud amounted to a common course of

conduct intended to deceive Plaintiffs. Each such fraudulent act was related, had similar

purposes, involved the same or similar participants and methods of commission, and had similar

results affecting similar victims, including Plaintiffs. Defendants' fraudulent activities were and

are part of its regular way of conducting its ongoing business, and constitute a present and

continuing threat to the property of Plaintiffs.

376.    By reason of the foregoing, and as a proximate cause of said pattern of fraudulent

activity and its acts committed in furtherance thereof, Plaintiffs have suffered grievous injury

and have been damaged, as alleged herein.

377.    By virtue of these violations of 18 Pa. C.S. § 4117, Defendants are liable to each

Plaintiff for three times the damages sustained, plus investigation expenses, costs of this suit, and

reasonable attorneys' fees and expenses.

### FOURTEENTH CLAIM FOR RELIEF
#### Restitution/Disgorgement for Unjust Enrichment

378.    Plaintiffs repeat and reallege each of the preceding paragraphs, as if fully set forth

herein.

379.    Plaintiffs have conferred on Defendants' benefits in the form of payments for

Neurontin that would not have been made had Defendants not engaged in the wrongful acts and

practices alleged herein.

380.    Retention of the payments and other benefits by Defendants would be inequitable

and unjust in this case because Defendants' deceptive conduct caused Plaintiffs to pay for

Neurontin when they otherwise would not have had to do so.

381.    In fairness, under the equitable doctrine of unjust enrichment, Defendants should

be required to disgorge to Plaintiffs the revenues or profits Defendants earned from their

improper sales of Neurontin to Plaintiffs' members.

**X.    DEMAND FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment against Defendants, jointly and severally, as

follows:

        (a)     On Plaintiffs' First through Ninth Claims for Relief, three times the damages each Plaintiff has sustained as a result of Defendants' conduct, plus Plaintiffs' costs in this suit, including reasonable attorneys' fees.

        (b)     On Plaintiffs' Tenth Claim for Relief, an award to each Plaintiff of the disgorgement of all sums improperly received by Defendants, plus costs of this suit, and reasonable attorneys' fees and expenses;

        (c)     On Plaintiffs' Eleventh Claim for Relief, an award to each Plaintiff of the maximum damages allowable under such statutes;

        (d)     On Plaintiffs' Twelfth Claim for Relief, an award to each Plaintiff of three times the damages sustained as a result of Defendants' conduct, plus investigation expenses, costs of this suit, and reasonable attorneys' fees and expenses;

        (e)     On Plaintiffs' Thirteenth Claim for Relief, an award to each Plaintiff of disgorgement of all sums improperly received by Defendants;

        (f)     An award of prejudgment interest in the maximum amount allowable by law;

        (g)     An award to Plaintiffs of their costs and expenses in this litigation and reasonable attorneys' and expert fees and expenses; and

        (h)     An award to Plaintiffs of such other and further relief as may be just and proper under the circumstances.

## DEMAND FOR A JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), each Plaintiff demands a trial by jury

on all issues so triable.

Dated: November __, 2006

**For Plaintiff Guardian Life Insurance Co. Of America:**

 /s/ Thomas G. Shapiro
Thomas G.  Shapiro (BBO # 454680)
Theodore Hess-Mahan (BBO # 557109)
**SHAPIRO HABER & URMY LLP**
53 State Street
Boston, MA 02109
Telephone: (617) 439-3939
Facsimile: (617) 439-0134


**OF COUNSEL:**

**COHEN, MILSTEIN, HAUSFELD & TOLL, P.L.L.C.**
Linda P. Nussbaum, Esq.
150 East 52nd Street, 30th Floor
New York, NY  10022
Telephone:  (212) 838-7797
Facsimile:  (212) 838-7745

- and -

**COHEN, MILSTEIN, HAUSFELD & TOLL, P.L.L.C.**
Michael D. Hausfeld, Esq.
1100 New York Avenue, N.W
West Tower, Suite 500
Washington, DC  20005
Telephone:  (202) 408-4600
Facsimile:  (202) 408-4699

**RAWLINGS & ASSOCIATES, PLLC**
Mark D. Fischer, Esq.
Mark Sandmann, Esq.
325 W. Main Street
Louisville, KY  40202
Telephone:  (502) 587-1279
Facsimile:  (502) 584-8580

**For Plaintiffs Kaiser Foundation Health Plan, Inc. and Kaiser Foundation Hospitals:**

 /s/ Thomas G. Shapiro
Thomas G. Shapiro (BBO # 454680)
Theodore Hess-Mahan (BBO # 557109)
**SHAPIRO HABER & URMY LLP**
53 State Street
Boston, MA 02109
Telephone: 617-439-3939
Facsimile: 617-439-0134

**OF COUNSEL:**

**COHEN, MILSTEIN, HAUSFELD & TOLL, P.L.L.C.**
Linda P. Nussbaum, Esq.
150 East 52nd Street, 30th Floor
New York, NY 10022
Telephone: (212) 838-7797
Facsimile: (212) 838-7745

                - and -

**COHEN, MILSTEIN, HAUSFELD & TOLL, P.L.L.C.**
Michael D. Hausfeld, Esq.
1100 New York Avenue, N.W
West Tower, Suite 500
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699

**For Plaintiff Aetna, Inc.:**

 /s/ Peter A. Pease
Peter A. Pease, Esq.
 (BBO # 392880)
**BERMAN DEVALERIO PEASE
 TABACCO BURT & PUCILLO**
One Liberty Square
Boston, MA 02109
Telephone: (617) 542-8300
Facsimile: (617) 542-1194

**OF COUNSEL:**

**LOWEY DANNENBERG BEMPORAD**
   **& SELINGER, P.C.**
Richard Bemporad, Esq.
Richard W. Cohen, Esq.
Gerald Lawrence, Esq.
Peter St. Phillip Jr., Esq.
Todd S. Garber, Esq.
The Gateway - 11th Floor
One North Lexington Avenue
White Plains, NY  10601-1714
Telephone:  (914) 997-0500
Facsimile:  (914) 997-0035

**BERMAN DEVALERIO PEASE**
   **TABACCO BURT & PUCILLO**
Joseph J. Tabacco, Jr., Esq.
425 California Street, Suite 2025
San Francisco, CA  94104-2205
Telephone: (415) 433-3200
Facsimile:  (415) 433-6382

**JOHN F. INNELLI, LLC**
John F. Innelli, Esq.
1818 Market Street, Suite 3620
Philadelphia, PA  19103
Telephone: (215) 5612-1011
Facsimile:  (215) 561-0012