# Exhibit 12

test test test test test

test test test test test test test Keith all the, Mr. All the, Ken Fromson, Mr. Fromson, Keith Altman, TPHR all the, TPEUPBG partners, TPEUPBG STAOEPB partners,

MR. CHAMPION: Test test.

MR. BARNES: Test test TPHERT, in your Ron continue, TPHERT continue, they are continue, TPHERPB, TPHERPBT, test test test test test post-herpetic nuralgia test test Darko Davis test test Pregabalin, Neurontin test test.

MR. FROMSON: Test test.

MR. STRAZZERI: Test test Joseph Strazzeri, Troy Alford, Vincent Gunter, Irwin Levin, Eric PAP, Mr. PAP part Greene, Mr. G Green,.

MR. BARNES: Test test KREUTS million, mise million, Ms. Might, Pfizer test Vincent Guntor, Mr. Guntor,.

MR. LEVIN: Irwin Levin, Mr. Levin Shook, Hardy & Bacon Cohen & Malad.

Test.

THE VIDEOGRAPHER: My name is Lee

Bowry of Veritext LLC. The date today is July 10, 2007 and the time is approximately 9:08 a.m.

This deposition is being held in the office of Davis Polk and Ward, located at 450, leg ton avenue, New York, New York. The caption of this case is inre Neurontin marketing and sales practices litigation in the United States District Court for the District of Massachusetts, Docket No. 1629 Master File No. 0410981.

The name of the witness is Ms. Lucy Castro.

At this time I would like all the attorneys to identify themselves and the parties they represent, after which our court reporter, Brad Rainoff, will swear in the witness and we can proceed.

MR. LEVIN: Irwin Levin, Cohen & Malad on behalf of the class plaintiffs Eric Pavlack on Cohen & Malad SHRAS PHRAFS Annmarie Daley insurance plaintiffs Ken Fromson along with nonattorney Keith Altman products liability plaintiff Joseph Strazzeri with the law firm Jones Day for would it and state court litigation accompanying me is Bart Green a

summer SOERBGT at law firm Christine Mylod paralegal from Pfizer tray all the with the firm of Shook, Hardy & Bacon representing Pfizer and Warner Lambert.

MR. GUNTER: VINe begun shook Dake for Pfizer defendants,

MR. GUNTER: Before we start, I would just like to read a statement into the record. Lucy Castro is appearing for deposition today with the understanding that the following terms apply. This deposition including the cross noticing of it in certain state court cases is being taken in accordance with case management order numbers 35 entered in re Neurontin marketing sales practices and products liability litigation M TKP-PPLT L number 1629 and other applicable law and procedures.

Any examination and objection made by an attorney for any plaintiff is adopted amend deemed validly made on behalf of all plaintiffs represented or whose interests are represented in the MDL proceedings in all Neurontin state court cases. Any examination and objection made by an attorney for a defendant is deemed validly made on behalf of that defendant and the MDL

proceed TPH-GS all Neurontin state court cases. The use at trial add admissibility of any portion of this deposition will be determined by the applicable trial court in each case. Participation in this deposition by examination or by opposing any objection shall not constitute an appearance as counsel pro HOSG vehicle in any state court action this deposition is being taken subject to the amended stipulated protective order entered in re Neurontin marketing sales practices and products liability litigation MDL No. 1629 and any applicable protective orders of confidentiality entered in Neurontin state court cases. Attendance at this deposition is limited to counsel and parties who agree to be subject to the amended stipulated protective order in the Neurontin MDL counsel and parties who have executed the agreement of confidentiality attached to the amended stipulated protective order that they were not previously subject to this protective order. And counsel and parties who are subject to a protective order of confidentiality and the respective Neurontin state court cases <10> for purposes of this

deposition only the amended stipulated protective order in the MDL No. 1629 is deemed applicable to Neurontin state court cases in which no protective order has been entered.

Subject to this understanding, we are prepared to begin the deposition.

BY MR. LEVIN:

Q. Would you state your name, please.

Can I just make a STPOPBS to the statement that was read? We object to the statement to the extent that you are suggesting by reading that statement that we are agreeing that any examination objection made by the defendants are validly made. Reserve all rights to object to such examination objections.

MR. GUNTER: Just real quick do we need the counsel on the telephone to SPNERB their AP PAOEPRPBS.

BY MR. LEVIN:

Q. Would you STAUPRPL, please?

A. Lucy Castro man Rick KAEU.

Q. How do you prefer to be addressed?

A. Lucy Castro is fine.

Q. All right. Ms. Castro my name is Irwin Levin, I am going to be asking you a

series of questions. If at any time you need a break or anything just holler and we'll take a break, is that acceptable?

A. Yes.

Q. All right. What's you're home address?

A. 131 Sherman place, Jersey City, New Jersey.

Q. Your date of birth?

A. 2/13/67.

Q. And your Social Security number?

A. 14956-9873.

Q. Could you tell us a little bit about your educational background?

A. Sure. I have an undergraduate Bachelor's in science from Rutgers University, college of pharmacy. And that was in 1990. I am a licensed New Jersey pharmacist. And I have a master's in science in health policy from the new school university in New York.

Q. What sort of things does that master's training cover?

A. It covers a little -- it is a lot like -- it shares classes with the public health school in Colombia. It also has some component

of an MBA.

Q. What was the purpose for taking that master's degree?

A. Because I wanted to further my education.

Q. Okay. But was there a goal, was there sort of a career goal with that? I guess I am asking if I was your dad and I was paying for it I would say what do you want to do that for?

A. The PHRAPL is very interesting. It contained a lot of science in the context of society if you will and I found that very interesting.

Q. Have you had any education since you obtained your master's, formal education?

A. No.

Q. Could you tell me about your employment background?

A. Sure. I started out as a pharmacist in pal mark pharmacy out of school and in 1991 I started with SAOBB TKPWAOEUG in their safety department as a -- I'm sorry, in their drug information department as a drug information associate. A year plus later I started in safety and it was a combined position, drug

safety and drug information.

Q. How long were you in that position?

A. I was there four years and then they became -- actually before four years they became November SRARTS, they merged with SAPB TKOS at the time. And after less than a year as a November SRARTS I moved to Pfizer.

Q. What year did you move to Pfizer?

A. 1996.

Q. Why did you move to Pfizer?

A. They were moving further west and it would be too far from home and I was -- I had started my master's program at that time.

Q. Who was moving farther west?

A. The company was, SAPB dose.

Q. An dose was?

A. I'm sorry, TPHOEP SRARTS so that we were moving to what was I think the SAPB dose site at that point further west in New Jersey.

Q. Pfizer was closer?

A. Yes, and I can use public transportation.

Q. What was your position with Pfizer when you started TPHR?

A. I started in drug safety as a a drug

safety associate.

Q. Now, what were your responsibilities in drug safety?

A. As a drug safety associate I was responsible for case processing.

Q. What does that mean?

A. I processed any cases that were distributed by what was then the case triager so any reports coming from around the world would come into the department and they were -- they were basically given to the -- we weren't divided at that point by therapeutic area or nothing of the sort zero they were given to the different associates to process and enter into the database.

Q. So a case is a -- is somebody who is called in, complained or at least identified some kind of problem that needed investigation, is that fair?

A. It could -- that could be one of the source. It could be any source, it could be the literature, it could be a clinical trial, a serious case.

Q. And was there a division of Pfizer that drug safety was part of?

A. At that time I believe we were part of -- let me try and remember what the acronym was. I believe it was PPG.

Q. What was PPG?

A. Pfizer pharmaceuticals. I don't remember what the G stood for.

Q. Was -- what were you supposed to do when you were in drug safety? Investigate?

A. You assess the case and determined if the events that were being reported were on label and what type of report it would be in terms of reporting to the FDA.

Q. What if it was off label?

A. It was deemed unexpected then.

Q. What do you mean deemed unexpected?

A. It was unexpected according to the product label.

Q. If it was on label did you report to the FDA?

A. Yes, we did.

Q. On all occasions?

A. On all appropriate occasions.

Q. Define appropriate.

A. Well, for example, if it was a literature report that's not serious and it is

expect B-D, it doesn't get reported to the -- to the FDA. If it is unexpected we would put it into the database because it would need to be reported into the European you union or back then other parts of the world.

Q. Define expected?

A. Expected according to the product label.

Q. So give us a real world example of something that you worked on when you were in drug safety that was expected. That was reported to the FDA <!0>

A. A case may have come in on X product and the report was of a rash and so I would look at the package insert for that product and determine if rash was listed as an adverse event and if it was then I would make it a nonserious, if THR-FDS no other information, nonserious expected case and it would go into the database as such.

Q. What if you got a report of something that wasn't on the label, that would be unexpected?

A. That would be unexpect.

Q. Could you give us a real world example

of that?

A. Let's say X product, a report on X product came in and it was hives and no other information and I would check the product label, hives was not part of that and I would make that unexpected, it would go into the database as nonserious report of hives.

Q. Then that would not be reported to the FDA?

A. No, it would.

Q. Okay. So both expected and unexpected would be reported to the FDA?

A. From consumers and from healthcare professionals, yes.

Q. Okay. And how long were you in that position of drug safety?

A. I was there probably a little bit over a year, then the department reorganized and I became the manager for a clinical trial reporting.

Q. How long were you in that position?

A. Probably two years plus.

Q. What were your duties and responsibilities?

A. I was responsible for the team that

processed clinical trial, serious of adverse events, SAEs and we worked with the team that reported those cases to us the clinical trial steam that reported those cases to us and we insTHAURD they were entered into the database appropriately if it was a case that required expedited reporting that we did so within the timeframes and also if there was a report that needed to <10> be done on the clinical trial itself, to insure that we had all those cases in the database so that they could run their tables.

Q. How long were you the manager of clinical trial reporting?

A. Approximately two years maybe a little bit more and then we reorganized again and I led a group that did case processing for all types of cases on a subset of products and then that team also was the team responsible for implementing or I guess testing potentially new procedures before they were rolled out to the department.

Q. How long were you in that position?

A. 96, 2000 -- maybe a year.

Q. Do you maintain a curriculum violate

TAEU or resume?

A. Yes, I do.

Q. Do you maintain that at work?

A. Yes.

MR. LEVIN: We call for the production of that document. Unless I am in error it's not been produced.

Q. Okay. So what was your next position at Pfizer?

A. I came to regulatory.

Q. When was that?

A. In 2001, September. No, 2000, 2000 September.

Q. Why did you move to regulatory?

A. That was always where I wanted to eventually end up in regulatory.

Q. Why is that?

A. I think it combined a lot of different areas that I find interesting. You have the science behind it, you have the CMC, the chemistry manufacturing controls, you have the clinical work, you have also then the interaction with the agency.

Q. Had you ever interacted with the FDA directly before you were in regulatory?

A. No.

Q. How long -- what's your present position?

A. I am a director in worldwide regulatory affairs with responsibility for the U.S., though.

Q. How long have you been in that position?

A. As a director, approximately four years.

Q. Would that be going back to about 2003?

A. Yes.

Q. Okay. Then when you came to regulatory in September of 2000, what was your position?

A. I was a senior manager.

Q. How long were you in that position?

A. Two plus years.

Q. Was that up until the time you became a director?

A. Correct.

Q. Okay. What were your duties and responsibilities as a senior manager?

A. I was assigned a product and when I

started out I was shadowing a senior regulatory professional and I was shadowing her on anything she was doing but I would eventually handle Neurontin.

Q. Was that an Andrea Garrity?

A. Yes, that is the case.

Q. How long did you shadow an Andrea Garrity before you became in charge if you will of Neurontin?

A. Not very long. Maybe two months at most.

Q. When did you become responsible for Neurontin?

A. Before the end of 2000.

Q. So, then, you would have shadowed an Andrea Garrity sometime between September of 2000 and the end of 2000?

A. Yes.

Q. Is that TPHAEUR?

A. Yes.

Q. Okay. How was it decided that you would be involved in Neurontin?

A. I don't know. I was just given the product.

Q. Okay. What were your duties and

responsibilities with regard to Neurontin?

A. I was to support Neurontin on a global basis.

Q. What does that mean?

A. That meant that I was responsible for the U.S. directly and then I had to support the other countries in whatever regulatory needs they may have. So, for example, in they needed a response to a regulatory query I would help assemble the appropriate team so that they could get their response in a timely fashion.

Q. Okay. What kind of formal training did you receive at any time with regard to the FDA?

A. Formal training? No formal training. The shadowing, we were given a binder of documents and the cf, R.

Q. Is that binder of documents still exist?

A. I doubt it. <!0>

Q. How are new people trained? Do they have a new binder?

A. Today?

Q. Yes.

A. There is some formal training now and

you also mentor and do the shadowing as well.

Q. How long is the mentoring process now?

A. Up to six months.

Q. If I understand you correctly there was not a mental TORG program whether you came back into regulatory, is that correct?

A. A form AP one, you did shadow someone and an Andrea was always behind the scenes if I ever needed anything.

Q. I understand that I assume you can talk to anybody at Pfizer you need to talk to at any time about anything, is that fair?

A. That's fair.

Q. Okay. When I asked you a minute ago what the situation is now, I understood you to say that there was a mentoring and SHADing, okay? Is that correct?

A. The SHADing is part of the mentoring.

Q. Okay. Let's go back to when you came into regulatory. Was there a formal mentoring the way it exists today?

A. It was but it was just much short STKPWHRAOER tell me the difference between then and now.

A. Besides the mentoring or --

Q. Talking about mentoring?

A. It is basically the same thing and you always take someone senior with the new person, many times it may be even the team leader of the department of that particular therapeutic area.

Q. But I thought you said it was a lot shower when you did it?

A. Yes.

Q. What was the difference in time between then and now?

A. People have up to six months at the time I only had two months. And that was about average.

Q. Did you have to pass any kind of test or anything to prove your proficiency in whatever information Pfizer thought you needed to deal with the FDA?

A. No.

Q. What's the difference between the mentoring and the shadowing that you described?

A. The shadowing is more of a physical thing if you will that you actually go with the individual to all the meetings to all the activities that <!0> would be required of the person once they are on their own. A big

component of that being standing meetings if you will, so you come up to speed with things that you are going to do every day.

Q. When you became the person at Pfizer who was responsible for Neurontin, did you become aware of any of the history of Neurontin with regard to Warner Lambert?

A. I became aware of some of the history.

Q. How did you become aware?

A. Through an Andrea. I also visited Ann Arbor a couple of times with her and we got access to some of the databases and so forth so we could access them as appropriate.

Q. What was your understanding when you started being involved in Neurontin as to what if anything Parke Davis and Warner Lambert had done wrong with regard to Neurontin?

MR. GUNTER: Just note my objection.

A. That they had done wrong?

Q. Yes. Were you aware of anything that in your mind you thought might KAEUTD that Warner Lambert or Parke Davis had done anything wrong with regard to Neurontin?

A. No.

Q. So when you became the person at

Pfizer responsible for Neurontin, in your mind with the information that you had, Warner Lambert and Parke Davis had never done anything wrong with regard to Neurontin, correct?

MR. GUNTER: Note my objection.

A. That is correct.

Q. Okay?

A. Are you asking about something specific.

Q. No, I am asking about anything, ma'am, that you became aware of that thought might have been wrong or that you would do differently?

A. No. The only thing was that our internal counsel made us aware of a case that was on going, but that's it.

Q. What was your understanding of the case that was on going?

A. The case that was on going at the time was regarding sales practices, promotion practices.

Q. Nothing he told you indicated to you that Warner Lambert or Parke Davis had ever done anything wrong?

MR. GUNTER: Objection. I will SRAOEUZ the witness not to answer to the extent

it reveals attorney-client privilege.

MR. LEVIN: I am not asking what the attorney told her.

Q. What I am asking is, ma'am, of the information that you got, you concluded after listening to that information you concluded as you sit here today that you don't know of anything that you think Warner Lambert or Parke Davis did wrong with regard to Neurontin?

MR. GUNTER: And objection. That's been asked and answered SEFRLT TAOEUFLSZ.

Q. You can answer?

A. I answered that already.

Q. So the answer is is that even after having a discussion with counsel regarding the sales practices regarding Neurontin, even with that information, your testimony is ask that you don't know of anything that Warner Lambert or Parke Davis did with regard to Neurontin that you would consider to be wrong?

MR. GUNTER: Objection.

Q. Is that correct?

MR. GUNTER: Objection, again, the witness did answer that.

Q. You can answer I want to make sure I

understand, am I correct?

A. I am correct.

Q. Thank you?

A. What you have asked is specific in time and place and to a specific persons. I would not characterize that as a company, so that's my same answer.

Q. Well, do you understand -- you think that the people who did this on behalf -- let me ask you this. What's your understanding of what happened to Warner Lambert and Parke Davis as a result of these people who were doing bad things?

MR. GUNTER: Objection.

A. Warner Lambert pled guilty.

Q. Warner Lambert pled guilty? Now, that's not a person or an individual, that's a company, isn't it? Isn't that your understanding?

A. Warner Lambert is a company, yes.

Q. Okay. And you still stand by your statement that you don't think that Warner Lambert about anything wrong?

A. Yes, I do.

Q. Sapped that's the same standard that

you use in regulatory, isn't that right?, that is, that if individuals do something wrong it is the individual's fault and not the fault of the company, right?

A. That's not what I said.

Q. So let me ask you this. Today in your company in Pfizer, if individuals do things that are wrong <!0>, is Pfizer responsible or not?

A. We are responsible. And that's why Warner Lambert pled guilty. But it is the actions of the individual and Pfizer took remedial action, etc.

Q. Well, corporations aren't anything except people, are they?

MR. GUNTER: Objection.

Q. Are they, ma'am?

MR. GUNTER: Motor my objections R* - objection.

A. KORPBGS are made of people, yes.

Q. Desks don't do bad things, do they?

MR. GUNTER: Note my objection.

Q. Do they, PHRAPL?

A. No.

Q. And had you -- okay.

If you had been regulatory when you

were at Warner Lambert during the time that these people were doing bad things, would you have done anything different?

A. I really can't answer that because I'm not sure of what the exact things that you are referring to are.

Q. Mean so when you became at regulatory for Neurontin, nobody ever told you what had been done wrong with regard to Neurontin in the past?

MR. GUNTER: Objection, asked and answered.

A. What the exact things were? No.

Q. Did you ever ask?

A. Not really, because when I started on the product they had very defined -- they have well defined what could and couldn't be done in terms of promotion, in terms of medical activities and so forth. So I knew the boundaries --

Q. But all drug companies have had those boundaries for years and years, isn't that true?

A. They were TREUAGTer for Neurontin than for the rest of our products.

Q. Okay. Did you ever see the guilty

plea?

A. I did not.

Q. Did you ever ask exactly what is it that Warner Lambert pled guilty to?

A. I did not.

Q. Did it matter to you?

A. No.

Q. WAPL.

Q. Now, at the time you took Neurontin, the market -- there was a table that was set -- that's a poor question, let me withdraw that.

At the time you started being involved in Neurontin, it had been marketed for a number of years, isn't that correct?

A. That is correct.

Q. Are you aware of any steps that Pfizer took to correct any misconceptions that might be in the market with regard to Neurontin?

A. When I came on to the product, like I said, we had well defined practices that were allowed for the product from a marketing and promotional standpoint.

Q. And did those well defined standards include telling physicians that Neurontin was not indicated for general neuropathic pain?

A. It involved telling anyone that was detailed what the actual indication was at the time.

Q. But I didn't ask you that question.

My question was are you aware of any of these standards that indicated that you should tell physicians specifically -- well, strike that.

You understood at least in generic sense that what Warner Lambert and Parke Davis did wrong was off label market Neurontin, isn't that correct?

A. That was the allegation, yes.

Q. Well, ma'am, you said allegation. What do you mean by allegation?

A. At the time it was not a completed case.

Q. When was it a completed case?

A. I think it was 2005.

Q. Okay. Do you have any doubts in your mind that Warner Lambert and Parke Davis off label marketed Neurontin?

A. I know that they pled guilty but I don't know the specifics of the case.

Q. Pardon *F.

Q. Do you know what -- strike that.

When Pfizer started marketing Neurontin, Neurontin had already been marked illegally, correct?

MR. GUNTER: Objection.

A. It HR-B market TPOD or while.

Q. I'm not asking you AR for a time it had been marketed off label illegally?

MR. GUNTER: Note my objection.

A. Like I said it HR-B market TPOD AR while already.

Q. PHRAPL with all due respect that's not the question I am asking you I know it had been marketed for a while.

You knew when you started your involvement with Neuronbin that there were at least allegations if not a guilty plea and a multimillion dollar fine you knew that there were allegations that it had been off label marketed, correct?

MR. GUNTER: Note my objection, lack of foundation.

A. I knew there was a case on going for those practices, yes.

Q. Well, did you care whether it was from

you or not whether those allegations were true or not?

MR. GUNTER: Objection, asked and answered.

A. I cared that we were doing what was right at the time.

Q. But the market that you were dealing with was a market which if those allegations had been true had already been TAEUPTed by illegal activity, isn't that true?

MR. GUNTER: Objection.

Q. If the allegations were true?

A. I can't -- I don't know how to respond that that quite honestly. What exactly do you mean by tainted.

Q. Marketed illegally.

A. Like I said there was an allegation of that at the time, yes.

Q. I understand that. Let me ask you this. What percentage of the sales of Neurontin were off label?

A. I don't recall. That would be something that our marketers would know.

Q. You never knew?

A. I know that we saw presentations to

that effect when they prepare for their budgeting and so forth but I really don't recall.

Q. Ms. Castro --

A. I know *R I know it was pretty high.

Q. It was pretty high?

A. Yes.

Q. Do you know of any other drug that you have ever worked on where the off label usage was greater than Neurontin?

A. I couldn't answer that for other products, for my products -- I have worked mostly on new products, so.

Q. Fine. My question -- look, you have been in the drug industry for a long time. My question is are you aware of any drug that you ever worked on at any time for any company in any circumstances that ever had as high an off label usage as Neurontin?

MR. GUNTER: Object as to the forty.

A. None of the products I have worked on, no.

Q. Are you aware of any product in the world that had a higher off label usage than Neurontin?

A. I can't speak to other products.

Q. No, I am not asking you to vouch for them I'm asking what you know, miss KASZ.

Are you aware of any other pharmaceutical product in the WAORLD world that had higher off label use than Neurontin?

MR. GUNTER: Objection, that's been asked and answered.

A. Like I said I don't really know about other products.

Q. So just make sure I am understanding. You don't know of any other product that had higher off label usage than Neurontin?

MR. GUNTER: Objection.

Q. Is that correct?

MR. GUNTER: She just answered that.

A. Yes. I don't know what the off sale sales of other products, off label sales of other products are so I couldn't really comment on that.

Q. Does it PHAERBT to you whether or not the off label -- strike that.

Would it matter to you if the message that Pfizer was putting out was being widely misinterpreted by the medical community as a

regulator, would you care about that?

A. Yes, I would.

Q. Why?

A. It is important that our products are appropriately handled in this arena and we certainly took steps to make sure that that was not the case for all the -- for example, with the physicians that we -- that we trained on our slide kits and that sort of thing they got training on what was appropriate to say or not about off label promotion, etc. so we did all -- we did training to insure that this was the case.

Q. The physicians who you trained were already high prescribers of Neurontin, isn't that correct?

MR. GUNTER: Objection.

A. I can't answer that.

Q. You don't know that one way or the other?

A. No.

Q. So let's go back to my question.

If in fact the message that Pfizer was putting out was being misinterpreted by physicians or a high percentage of physicians

you indicated that that would be a concern of youre, correct?

A. Yes.

Q. And if your boss comes in and says zero my goodness we just found out that our message is being misconstrued by a large number of physicians. Ms. Castro, what do you think we ought to do to fix this problem, what would you say?

A. It depends on what is identified as the issue.

Q. Okay. Let me tell you the issue. Let's assume that a high percentage of physicians believe that Neurontin is indicated for general neuropathic pain? They do a discussed and they fined high percentage of physicians believe that to be true, would that bother you or not?

A. If a physician prescribes off label, that is their prerogative. It is not something that is regulated by the FDA, it is not regulated by us so if they felt that the product was effective for whatever off label indications and it is appropriate for their patient then it is the right thing for them to do to prescribe

it for that patient.

Q. You have been well drained but that wasn't my question?

MR. GUNTER: Objection prove to STPRAOEUBG the comment KPAER by counsel. Georgia there is no question pending.

MR. LEVIN: I am reSKW-G that one.

MR. GUNTER: Well, then I object because she just answered that question.

MR. LEVIN: That's fine you can APBLGS2.

A. I answered that question already.

Q. PHRAPL with all due respect he'll object and instruct you when he doesn't want to you answer but could you answer that question?

MR. GUNTER: Objection. She is free to answer about again it was asked and answered.

MR. LEVIN: Okay no reason to quibble.

A. Like I said, maybe they thought it was already AF approved because it was effective for that but we were appropriately marketing the product and telling them what the indications were at the time.

Q. Ma'am you told me a minute ago that if the message that was getting out was wrong, that

you thought that Pfizer ought to have to do something about it, do you recall that testimony?

A. That is incorrect. The statement is if the message was interpreted incorrectly.

Q. Fine?

A. But we were not providing a message that we were indicated for any type of neuropathic pain indication. We were on label in terms of injunctive epilepsy and all materials were in line with that indication.

Q. Ma'am my question is is that if 40 percent of the doctors in America say that we thought based on the information that we got that Neurontin was indicated for general neuropathic pain, are you telling me that as a person in the regulatory department of Pfizer that's okay with you?

MR. GUNTER: Objection. That's again it's been asked and answered.

MR. LEVIN: Different question.

MR. GUNTER; SRABUGS, incomplete HEUPT it will.

MR. LEVIN: Fine, you can answer.

A. If we provided the appropriate

materials that didn't have anything to do with neuropathic pain, then I'm fine with that.

Q. So now provided materials that had nothing to do with general neuropathic pain you would be okay with it? Okay.

Well, doesn't that incentivize your company to come as close to the line as possible?

MR. GUNTER: Objection, argumentative.

A. No, it doesn't.

Q. Okay. If 40 percent of the physicians surveyed -- sound like a match game notice R* now -- to 40 percent of the physicians surveyed said that they thought that Neurontin was indicated for neuropathic pain based on the information that they got, okay, what do you think you could do to dispel this misimpression?

MR. GUNTER: Objection. It is an incomplete hypothetical.

MR. LEVIN: You can answer.

A. Like I said we did a lot of corrective action.

Q. R* we --

Q. Tell --

Q. I wasn't SKPW-G to cut you off I SHAUT

you were done?

A. We insured that all our materials were on label, we insured that for Neurontin there was no W L P, we insured everything we could within what all the practices our field and all our personnel actually that dealt with Neurontin, that it was all on label.

Q. Are you aware of any communication whatsoever from Pfizer to the field force or to the public in any manner, way, shape or form that said Neurontin is not FDA approved for general neuropathic pain?

A. I am aware of training <10> internally but nothing to the public.

Q. Thank you.

Q. So if in fact the sales of Neurontin going back to the Warner Lambert Parke Davis days were increased because of it legal marketing practices, to your knowledge since you have been at Pfizer, there has been nothing done to specifically address those and affirmatively dispel the notion other than as far as you understand it, staying within the label as you promote it today, is that fair?

MR. GUNTER: Objection as to the form

of that question.

MR. LEVIN: You can answer.

A. Like I stated previously, we did not do a communication external SHREU about we did do training, we also -- the field force was only allowed to detail to very specific physicians that would be neurologist and !Err! HREP toll gists and all internal training was on label, again.

TKAEB, TKAEBS pad.

Q. What were the regulations that Warner Lambert had with regard to detailing?

MR. GUNTER: Objection, that's getting -- calls for speculation she never worked for Warner Lambert.

A. I am not aware of what their practices were.

Q. You PHEFPBGS the the acronym W L P, what is that?

A. Washington Legal Foundation.

Q. You just mentioned that your field force was only allowed to detail to certain type of physicians, do you recall that?

A. Yes.

Q. What type of physicians?

A. Neurologist, !Err! HREP toll gists.

To your knowledge, then, Pfizer never marketed Neurontin to primary care physicians, is that correct?

A. We did, once we got the pH on indication.

Q. Once you marketed for PHN you never mentioned general neuropathic pain in any way, correct?

A. In terms of promoting for general neuropathic pain.

Q. Yes?

A. No.

Q. Okay. So I won't see anything that would be directed to the public that mentions anything about general neuropathic pain?

MR. GUNTER: Objection.

A. There are pieces that have disease state information that start with providing con text in terms of disease state so that PHN can be understood. In general my understanding from materials I -PP seen is that neuropathic pain in general is under recognized, under diagnosed and certainly the lay public doesn't understand it well even to this day. So our materials gave

very brief context and immediately went into PHN.

Q. So it would be your understanding then that the primary focus of the terms that you are aware of would have been PHN and other neuropathic pain for context would just be a minor part of the --

A. Very minor, yes.

Q. That would be important to you a a a regulator as somebody involved in the regulatory department, right?

A. Absolutely.

Q. Why would that be important?

A. Like I said we wanted to make sure we are on label and in fact that type of approach was precleared with the FDA's D STK-FPLT Mach division.

Q. But let's leave the FDA out of it for a minute. I just want to know from your standpoint as somebody from regulatory, that would be important to you, the PHN would be the focus of the piece as opposed to pain?

A. Absolutely.

Q. As a person involved in regulatory if somebody were to come to you and say here is a

piece and it was primarily about pain and only a little bit about PHN, what would you tell them?

A. That we couldn't approve that.

Q. Why?

A. Because the focus has to be on label PHN.

Q. Why does the focus have to be on PHN?

A. Because that's the indication Neurontin was -- got from the FDA, so that's what we have to -- we stay on label we have to focus on P LN.

Q. I just want to make SPNUR I understand. If there was a promotional piece that was primarily about pain and just a little bit about -- just sort of mentioned PHN, what would be wrong with that?

A. So if you are asking about a disease state piece, that is a different type of piece as opposed to a branded piece that would have Neurontin on it?

Q. Yes. P-PB.

Okay, let's talk about branded pieces. Okay. Strike that. We'll move on.

Would you agree with me there is some extension between marketing and regulatory?

A. I would like to think that we work together but, yes, I guess that is a good way of characterizing it.

Q. And could you describe that tension?

A. Well, I think that their goals are different.

Q. Could you explain that?

A. I want to make sure that we provide the appropriate information to insure public health while staying within the regulations.

Q. What's your understanding of the goal of marketing?

A. To market.

Q. Sell product, is that fair?

A. To sell product appropriately it is just a mattor of their interpretation of the regs may be different.

Q. I'm not trying to get too deep here I am just saying the people who want to sell the product would like to sell as much OFP it as they can and the people who want to regulate the product want to stay within the law as much as they can is that fair generally?

A. I think I would just say that they are focus is different. They have a marketing hat

on and that's appropriate.

Q. Are you a shareholder of Pfizer?

A. Yes, I am.

Q. You KWAUBT that stock PHRAOEUS to go up, right?

A. Sure, as a shareholder I would like that.

Q. STKWRAO you talked a little bit about clinical studies. Could you tell me your understanding of what clinical studies have to be provided to the FDA with regard to a drug, if any?

A. Depending on what you need, what your intent is. So if you are submitting a dossier for an indication you need too well controlled, adequate well controlled placebo run studies.

Q. Is that sometimes referred to as the gold standard? Have you heard that?

A. Yes, I have heard of that term.

Q. What if you have another study? Let's say instead of doing two you do three and two of them are positive and one of them is negative. What's your understanding of the obligation of Pfizer to advise the FDA of the negative study?

A. If it's been run under an IND you have

to submit all the studies and that is or practice anyway.

Q. So it is Pfizer's practice to provide the FDA with all studies, positive or negative?

A. Run under the EUPBD, sure.

Q. Okay. And when you say run under the EUPBD -- well, first of all what's an EUBD?

A. The EUPBD is investigational new drug application and it is what you run clinical studies under and some studies may not be run under because we have many country offices that run their own studies.

Q. So could you explain that for the jury REU? You say there are some studies that are run not within the EUPBD, correct?

A. That is correct.

Q. And do you report those, is that a policy at Pfizer to report those to the NDA?

A. They get reported to the NDA in terms of safety.

Q. To the FDA?

A. Yes, I'm sorry to the IND if TPHR-R any safety issues that come up a RORTD an SAE they get reported anyway three TKPW-T STKPWAO our R167896 database -PPLGTS but the doesn't

need TOBO BETD into the FDA because T-TD not run under the IND.

Q. What is a study report?

A. It is the information and alleye that is come PHRAOBUTD once the study has been KPHREPTod SAPBTD data analyze.

Q. When you you are talking about a study report is this something that's done by Pfizer?

A. Yes. <!0> <!0>

Q. So Pfizer sometimes has study reports that it does not provide to the FDA, correct?

A. That is correct.

Q. There is nothing that preevents it from PROEUGSD it to the FDA, correct?

A. That is correct.

Q. But Pfizer chooses not to provide that to the FDA, correct?

A. The study RORTD, yes, we provide all safety information, though.

Q. Well, study report can have safety information, can't it?

A. Yes.

Q. Do provide that -- is that your standard, that you always -- Pfizer always provides that to the FDA?

A. The FDA always gets a study TPRORGT you a all our clinical trials whether they are under the IND or not.

Q. Okay. That's been your experience the entire time you have been at Pfizer?

A. Yes.

Q. Was that your experience when you were at Novartis or do you know?

A. I don't recall.

Q. <!0> do you know how many countries in the wormed are you aware of that allow direct to consumer advertising?

A. Not many.

Q. How many can you name?

A. Well, they allow direct to consumer PH but in a different manner than in the U.S., so, for example, in some Asian countries you are allowed to provide information on a disease state, you don't talk about the drug, the same thing as in Europe with you you can't talk about the product.

Q. But I'm talking about direct consumer advertising that everybody in this room seize on TV and in magazine cease and in newspapers, branded to consumer advertising. How many

countries in the world allow that?

A. I'm not sure to be quite honest if anybody allows it the same way as the U.S. does.

Q. Does Pfizer consider there to be any additional responsibility because the United States allows direct consumer advertising?

A. Additional responsibility?

Q. As compared to the when it advertises in the rest of the world?

A. I think that we certainly take our need to educate consumers very seriously and our materials certainly reflect that, and in fact all our D T C campaigns are cleared with the agency.

Q. But I am talking now about direct to consumer branded advertising, okay? United States is the only country you can -PG of that allows that, correct?

MR. GUNTER: Objection, that was asked and answered.

A. Yes, like I said I don't know of any other country that allows it the same way but I don't know gore sure.

Q. And your responsibility if I understood you was world affairs, is that

correct?

A. Yes, but --

Q. And you have responsibility for the U.S.,?

A. Yes.

Q. Correct? And you meet the people who had the responsibility for the other countries, don't you?

A. The other countries, I don't know how they handle their promotion because I was -- I was not responsible for country level promotion.

Q. Let me ask you this. In your position at Pfizer, has anybody ever indicated to you that the United States has any kind of responsibility -- that Pfizer has a responsibility in the United States that it might not have in other countries because in the United States they are marketing directly to consumers as opposed to physicians who would presumably have a higher level of knowledge?

MR. GUNTER: Object to the form.

Q. You can answer.

A. So the information to consumers is completely different in tone and in wording so that a consumer can understand it because that's

what would be appropriate and that's exactly how we do our materials.

Q. Is as a regular HRETD later have you ever said I want to see some studies that will show me that the public is understanding our materials the way that we think they are being understood? Have you ever asked for that or seep that?

A. I know that actually the FDA is doing some of that and I have seen that at conferences.

Q. But I'm not askinging about the FDA. I am asking about Pfizer, the person who is selling the drugs or making the profits, okay?

My question is, to your knowledge is Pfizer ever done any studies to your knowledge that would indicate whether or not this educational process is being understood by the public who you are trying to educate?

A. I believe we have. I don't think specific to Neurontin, but I believe that our senior management did some similar study. I'm not sure what kind of pieces or themes were looked at to be quite honest.

Q. Well, who in regulatory would have

been provided with that information?

A. Our senior management.

Q. And the senior management -- who is senior management in regulatory?

A. Our VP of regulatory.

Q. I'm sorry?

A. Our VP of regulatory.

Q. Who is the VP of regulatory?

A. Robert Clark.

Q. HO*UPB how do you know that Mr. Clark saw that information?

A. The report I recollect was a presentation that our CEO made to the FDA. And we all saw it, actually.

Q. So it wasn't just report to senior management you saw it as well, is that right?

A. Yes, but I just like I said I am trying to recollect but I don't remember the specifics office it.

Q. That's okay.

Does are there any regulations you deal with with regard to the price of drugs?

A. No.

Q. Now, you mentioned an IND a moment ago. An IND precedes an TPHAPBD, is that

correct?

A. That is correct.

Q. Could you explain that process for the jury SUPPBLGT the INDs are opened when you are going to start studying in a specific area and if you are studying something in a different area you have to open a separate IND and you require some basic animal information in order to open that IND and the FDA also looks at the protocol that you are going to stand with and they provide comments TRA TEUGS naturally to your initial IND.

Q. You say different area what do you mean by area is that an indication?

A. No, not necessarily. A good way of thinking of it is for example therapeutic area.

MR. LEVIN: We need too change tapes, why don't we take a break.

THE VIDEOGRAPHER: Going off the record, the time is ten '03 a.m. This is the end of tape one.

(Recess)