UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| IN RE NEURONTIN MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | ) ) ) ) ) | |
| THIS DOCUMENT RELATES TO: | ) ) ) | MDL Docket No. 1629 Master File No. 04-10981 Judge Patti B. Saris |
| ALL MARKETING AND SALES PRACTICES ACTIONS | ) ) ) | Mag. Judge Leo T. Sorokin |

## **PLAINTIFFS' OBJECTIONS TO DISCOVERY ORDER NO. 12**

Pursuant to Rule 72(a) of the Federal Rules of Civil Procedure and Rule 2(b) of the Local Rules for United States Magistrate Judges, the Coordinated Plaintiffs, Aetna, Inc., the Guardian Life Insurance Company of America, Kaiser Foundation Hospitals, and Kaiser Foundation Health Plan, (collectively, "Plaintiffs") respectfully submit these objections to Discovery Order No. 12, entered by Magistrate Judge Leo T. Sorokin on June 25, 2007 (Dkt. No. 771, the "Order").[1]

---

[1] Rule 72(a) provides that a party may file objections "[w]ithin 10 days after being served with a copy of the magistrate judge's order." Rule 6(a) provides that "when the period of time prescribed or allowed is less than 11 days, intermediate Saturdays, Sundays, and legal holidays shall be excluded in the computation." Rule 5(b)(2)(D) governs service via the Court's CM/ECF e-filing system. Rule 6(e) provides that "whenever a party must act within a prescribed period after service and service is made under Rule 5(b)(2)(B), (C), or (D), 3 days are added after the prescribed period which would otherwise expire under subdivision (a)." Applying these rules, the 10 day period allowed by Rule 72(a) for the Order entered on June 25, 2007 would expire on July 10 (due to the exclusion of weekends and Independence Day); adding three days to that period means that objections to the Order must be filed by July 13, 2007.

I.     **INTRODUCTION**

In Discovery Order No. 12, Magistrate Judge Sorokin directed that Plaintiffs answer Defendants' Second Set of Interrogatories seeking data relating to prescriptions filled by Plaintiffs for identified cheaper or more optimal drugs and ordering that Plaintiffs create and provide data to cross-reference Neurontin prescription claims data with claims data for certain other drugs.

Simply put, Defendants' Second Set of Interrogatories purport to on their face seek, in the alternative, either private patient medical records,[2] which this Court's prior Orders and now Discovery Order No. 12 expressly prohibit, or information from Plaintiffs' medical claims data on an aggregate level,[3] which Defendants have baselessly contended may not prohibitively invade patient privacy. Nonetheless, Defendants also contended that aggregate medical claims data is problematic and a poor substitute for patient records.[4]

This information sought by Defendants' Second Set of Interrogatories is substantially the same as the information sought in Defendants' First Set of

---

[2] Defendants' Memorandum of Law in Support of Motion to Compel Discovery from Plaintiffs (Dkt #754) (hereafter referred to as "Defendants' Memorandum") states that they "are entitled to know not only what these putative 'cheaper and more optimal' alternative medications were, <u>but also the extent to which plaintiffs' Members were taking them, at what dosages, and for how long, and the number and percentage of plaintiffs' Members who were taking these and other drugs approved or commonly used to treat the conditions primarily at issue in this case.</u>" Defendants' Memorandum at 5 (emphasis added).

[3] "Interrogatories No. 4-8, seek only the 'number and percentage' of Members who took Neurontin and certain alternative medications <u>on an aggregate level</u>." Defendants' Memorandum at 7 (emphasis added).

[4] "<u>Aggregate market data</u> such as IMS data or NDC data cannot substitute for this information as the particular 'cocktail' of drugs a given Member is prescribed will vary from patient to patient." Defendants' Memorandum at 6-7 (emphasis added).

Interrogatories and Defendants' First Request for Production of Documents which Plaintiffs answered and objected to in the summer of 2005. Plaintiffs' objections to the overbroad, burdensome and unreasonable nature of Defendants' first salvo of discovery requests were the subject of motion practice last summer.

Last year, on July 27, 2006, Defendants filed a motion to compel Plaintiffs to produce this same information, offering the same reasoning currently offered:

> First, the third-party payor plaintiffs have refused to produce non-Neurontin prescription drug claims data for members and their dependents who took Neurontin ( Neurontin-takers ). Production of this information should be compelled because these data could be used to determine whether Neurontin was effective for these individuals and whether it was prescribed off-label, both of which are facts relevant to whether the third-party payors suffered a loss. These drug claims data will also be relevant to calculating the third-party payors alleged damages because they will indicate what drugs they would have paid for had Neurontin not been prescribed, as well as the cost of these alternative drugs. Such information, while relevant to the class third-party payors claims, is particularly relevant to the Coordinated Plaintiffs, who are claiming that they suffered a loss because they could have purchased a cheaper alternative to Neurontin.

See Defendants' Memorandum of Law In Support Of Their Motion To Compel Discovery From Plaintiffs (Dkt. #403). Foreshadowing the events of this summer, Magistrate Judge Sorokin granted Defendants' summer 2006 Motion to Compel (Discovery Order No. 4, Dkt. # 445) and additional motion practice followed with Plaintiffs' objections to the Magistrate Judge's Order. (See Dkt. # 462, 478, 487).

This Court held a long hearing on September 27, 2006 and entered an electronic Order on the same date:

> Judge Patti B. Saris : Electronic ORDER entered re 478 Motion for Reconsideration re 445 Order No. 4. "After hearing, I conclude that the burden, expense and invasion of privacy of the proposed discovery outweighs its likely benefit. See Fed. R. Civ. P. 26 (b)(2). This conclusion is based on the supplemental record not available before the Magistrate Judge and a fuller explanation of plaintiff's theory of the case.

> If either party intends to call a treating physician to give an opinion on effectiveness, sanitized patient records shall be produced to the extent the physician is relying on his experience with treating that patient (as opposed to a clinical trial). Kaiser shall produce a breakdown of neurontin prescriptions (i.e. what percentage is for bipolar, etc.) to the extent the data is reasonably available. Guardian and Aetna shall sumbit an affidavit discussing whether the existing database provides this breakdown and whether this data is reasonably available. If the data cannot be produced without unreasonable burden, they are stopped from relying on any data to show damages other than the industry wide data."

Despite the clear instruction from the Court in its September 27, 2006 Order, and the context given the Court's Order by the colloquy at the September 27, 2006 hearing, Defendants served their duplicative Second Set of Interrogatories seeking virtually the same information:

| **Defendants' First Request for Production of Documents (served May 2, 2005)** | **Defendants' Second Set Of Interrogatories (served March 13, 2007)** |
|---|---|
| **Request 50**<br>　　All documents, including any in an electronic data format, showing individual claims submitted to and payments made by Plaintiff for Neurontin to Members or to providers or other parties on behalf of any Member.  For each transaction, data should include information regarding the type of contract and funding methodology between the parties.  These documents or databases should include all information or all fields necessary to adjudicate claims, including but not limited to the following: encrypted member i.d., member age, date of service, date of payment, amount billed, amount paid by plan, co-pay, deductible, coinsurance, third party liability, ICD-9 code, CPT, HCPCS, NDC or local code used by the plan, physician i.d., and claim status/adjudication code.  If fields containing confidential information (e.g., member name, social security number) are encrypted, they should be encrypted so as | **Interrogatory No. 3**<br>　For each of your Members who were prescribed Neurontin, state whether s/he also received one or more of the drugs identified in response to Interrogatory No. 2 and state which drug(s) each such Member received.  State the dosage and number of prescriptions filled for each alternative drug prescribed to each such Member.  Describe how you arrived at these figures.<br><br>**Interrogatory No. 4**<br>　For each calendar year of the proposed Class Period, state the number and percentage of your Members who were prescribed Neurontin and who also were prescribed at least one of the drugs identified in response to Interrogatory No. 2.  Describe how you arrived at this figure.<br><br>**Interrogatory No. 5**<br>　　For each calendar year of the proposed Class Period, state the number |

| | |
|---|---|
| to allow the tracking of an individual Member over time.<br><br>**Request 51**<br>       For each Member's claim or payment identified in Plaintiff's response to Request No. 50, provide documents, including any in an electronic data format, showing all individual claims submitted to and payments made by Plaintiff for any prescription drug to those Members or to providers or other parties on behalf of those Members.  For each transaction, data should include all information necessary to adjudicate claims, including but not limited to the following: encrypted member i.d., member age, name of drug, reason drug was prescribed to Member, date of service, date of payment, amount billed, amount paid by plan, co-pay, deductible, coinsurance, third party liability, ICD-9 code, CPT, HCPCS, NDC or local code used by the plan, physician i.d., and claim status/adjudication code.  If fields containing confidential information (e.g., member name, social security number) are encrypted, they should be encrypted so as to allow the tracking of an individual Member over time (including tracking the Member against the information provided in response to Request No. 50). | and percentage of your Members who were prescribed Neurontin and who also were prescribed any other drug approved or commonly used to treat any aspect of bipolar disorder or depression.<br><br>**Interrogatory No. 6**<br>       For each calendar year of the proposed Class Period, state the number and percentage of your Members who were prescribed Neurontin and who also were prescribed any other drug approved or commonly used to treat any type of neuropathic pain.<br><br>**Interrogatory No. 7**<br>       For each calendar year of the proposed Class Period, state the number and percentage of your Members who were prescribed Neurontin and who also were prescribed any other drug approved or commonly used to treat epilepsy.<br><br>**Interrogatory No. 8**<br>   For each calendar year of the proposed Class Period, state the number and percentage of your Members whom you identified in response to more than one of Interrogatories Nos. 5, 6, and 7. |

       Although Defendants attempt to partially limit their recent request to data relating to the identified cheaper or more optimal alternative drugs and other unidentified drugs that are "any other drug approved or commonly used to treat" various conditions, the current interrogatories now request substantially the same information as Request 51 did in May of 2005.  Moreover, Interrogatories 4-8, which are also duplicative of the information sought by Request 51 in 2005, now add to the burden of data retrieval an

additional burden to do analysis and calculations.[5]

In support of the papers submitted when the Court decided this matter last year, Plaintiffs submitted multiple declarations regarding the burden and difficulty of retrieving data and formatting data again sought by Defendants. See, e.g., Dkt # 465, 568. In addition, Plaintiffs now submit additional declarations with this Objection that specifically set forth the burden of the data now again sought, and Plaintiffs intend to further supplement the record before the Court at or before hearing on this Objection. See Exhibit "A", attached hereto.

In addition, Defendants' former national marketing manager, Christine Grogan, has now testified that Defendants had at their disposal during Defendants' fraudulent marketing of Neurontin "audited data" which showed the number of Neurontin prescriptions "broken out" by "use." In addition, Miss Grogan testified that Defendants had data which showed on a plan by plan level and for by category of use Neurontin purchases by Third Party Payers.

For these reasons, that the materials purportedly sought by Defendants are overbroad, burdensome and not reasonably calculated to lead to the discovery of admissible evidence, Plaintiffs filed their an Opposition (Dkt #756) to Defendants'

---

[5] Moreover, Defendants also requested this information, which was denied by the Court's prior Order, at Request 71 of Defendants' First Request for Production of Documents, where Defendants also overbearingly sought all pharmacy claims paid by Plaintiffs since 1994:

**Request 71**
Documents sufficient to show (a) all drugs for which Plaintiff provides coverage; (b) the amount Plaintiff has paid for each drug, both brand name and generics, for each year since January 1, 1994, including but not limited to any pricing lists and contracts with pharmaceutical manufacturers; and (c) the amount, if applicable, Plaintiff charges to its Members for Neurontin.

Motion to Compel Discovery from Plaintiffs (Dkt #753) and respectfully submit this Objection to Discovery Order No. 12, entered by Magistrate Judge Leo T. Sorokin on June 25, 2007 (Dkt. No. 771), asking this Court to set aside the portions of the order requiring further response to interrogatories.

## II.     FACTUAL BACKGROUND

Defendants' Motion to Compel Discovery from Plaintiffs (Dkt #753) ignored the record, pleadings, voluminous materials already produced in discovery and the Court's prior rulings in this case. Defendants boldly stated the theme of their current contentions in the "Preliminary Statement" of their Memorandum of Law in Support of Motion to Compel Discovery (Dkt #754):

> Demonstrating the existence of drugs that plaintiffs claim are cheaper and more optimal alternatives to Neurontin for the relevant off-label uses is a critical component of plaintiffs' theory of recovery. Despite this, plaintiffs now refuse to supply defendants any evidence relevant to this theory of recovery.

Defendants' Memorandum at 1.

The existence of cheaper or more optimal alternatives is pled in the Third Coordinated Amended Complaint (Dkt #530) where, at paragraph 173, Plaintiffs set forth lists of alternative cheaper or more desirable medications for the identified conditions, including the average daily and monthly costs for these alternative drugs as compared to Neurontin. Defendants' claim that "Plaintiffs now refuse to supply defendants any evidence relevant to this theory of recovery" is without merit. Defendants seek to force Plaintiffs, at great cost and expense, to forage through their patient bases for claims data relating to these alternative drugs which the Defendants' witnesses testified that Defendants had at their disposal during Defendants' fraudulent marketing of Neurontin

and which Defendants' counsel has previously argued is problematic. Moreover, there are many publicly available sources for data.

Defendants attempt to disguise their instant motives, but their Memorandum of Law in Support of their Motion to Compel Discovery revealed their true intent:

> Defendants are entitled to know not only what these putative "cheaper and more optimal" alternative medications were, but also <u>the extent to which plaintiffs' Members were taking them, at what dosages, and for how long, and the number and percentage of plaintiffs' Members who were taking these and other drugs approved or commonly used to treat the conditions primarily at issue in this case</u>.

Defendants' Memorandum at 5 (emphasis added).[6]

Alternatively, Defendants claim that they only seek "aggregate data" and not patient specific medical records: "Interrogatories No. 4-8 seek only the 'number and percentage' of Members who took Neurontin and certain alternative medications on <u>an aggregate level</u>." Memorandum at 7 (emphasis added). In apparent contradiction of this reasoning and Defendants' oft-stated intent to disavow any request for private patient medical records, Defendants' Memorandum states that "<u>Aggregate market data</u> such as IMS data or NDC data cannot substitute for this information as the particular 'cocktail' of drugs a given Member is prescribed will vary from patient to patient." Memorandum at 6-7 (emphasis added).

Thus, if "aggregate market data" is not useful then how is Plaintiffs' data "on an aggregate level" useful? For example, at points during the class period, Plaintiff Aetna's covered population exceeded 20 million members. Even the most amateur statistician

---

[6] Although Defendants' stated purpose for the interrogatory request appears to clearly implicate private patient medical information, the Court has specifically prohibited such requests and thus Defendants go to great length to "expressly disavow any request herein for that information [private patient medical records]." Memorandum at page 6, footnote 5.

could comfortably state that Aetna's data "on an aggregate level" will not substantially diverge from industry "aggregate market data." Moreover, the Court addressed this issue and dismissed Defendants' concerns about Plaintiffs' use of industry data and weighed the burden when Defendants previously attempted to force Plaintiffs to generate data sets at their expense. (*See* transcript of Sept. 27, 2006 hearing at 56-57, Dkt # 503).

By contending that <u>aggregate data</u> cannot substitute for "the particular 'cocktail' of drugs a given Member is prescribed," Defendants both acknowledge a lack of relevancy and usefulness of the data and confirm that their interrogatory requests are burdensome and not reasonably calculated to lead to the discovery of admissible evidence.

Following the Magistrate's entry of Discovery Order No. 12 on June 25, 2007, Plaintiffs had the opportunity to depose Defendants' former national marketing manager, Christine Grogan, who testified that Defendants had at their disposal during Defendants' fraudulent marketing of Neurontin "audited data" which showed the number of Neurontin prescriptions identified by use or application:

> Q. And are you familiar with the term "Scott Levin data"?
>
> A. Yes, Scott Levin; yeah.
>
> Q. What is Scott Levin data?
>
> A. Scott Levin is -- it's audited data.
>
> Q. And let's start it this way: Scott Levin is a company; correct?
>
> A. Yeah.
>
> Q. And Scott Levin provides a service to pharmaceutical manufacturers such as Pfizer; correct?
>
> A. Yeah.

>   Q.   And they provide data that shows both the number and dollar volume of prescriptions; correct?
>
>   A.   I don't know. Do they do that, the dollar, too? Maybe they do. It's been -- I don't in my current marketing role, I don't have Scott Levin data, so it's been a while. I know they gave us audited data. I thought it was more on uses, but it could be on dollars. If you showed me a chart, I could identify it better.

See Deposition of Christine Grogan, June 26, 2007, transcript of testimony at page 639, line 18 through 640, l. 15, attached hereto as Exhibit "B". Miss Grogan further testified that the Scott Levin audited data would reveal the uses of Neurontin:

>   Q.   Would you agree that as of 2001, Neurontin was used primarily by patients with neuropathic pain?
>
>   MR. POLUBINSKI:  Objection.
>
>   A.   As of 2001, no. I don't remember that that was the biggest chunk. The Scott Levin data would probability the elaborate better, but I don't know that that was the biggest area.
>
>   Q.   What do you think was the biggest area in 2001 for Neurontin usage?
>
>   A.   Honestly, without seeing something, I'm going to guess either the all over bucket was probably a big chunk, it was many different areas people were pilling out applications for. It depends on how they broke it out. It could be neuropathic pain in general, not specifically neuropathic pain. It depends how Scott Levin broke it out.

See Grogan tr. at 641, l. 20 to 642, l. 13. In addition to the audited Scott Levin data, Defendants had a second source which they used for application and use data regarding Neurontin called IMS data. In fact, Defendants relied on this IMS data to set their marketing strategy in their Neurontin 2003 Global Product Platform:

>   Q.   And let me direct your attention to page 2 at the bottom, there's a chart. AED diagnosed profile IMS. What's IMS?

> A. IMS is a data capture house, IMS data.
>
> Q. And it's similar to - - you'll probably find it faster than me?
>
> A. Scott Levin.
>
> Q. Scott Levin data; correct?
>
> A. Scott Levin is more audited. IMS, I think it's more extrapolated, and it's about 90 percent accurate based on, I think, pharmacies.
>
> Q. And I notice in this chart, one of the things they show is the share of scripts for neuropathic pain in the U.S. domestic market for Neurontin is 77.9 percent. Do you see that?
>
> A. Yep.
>
> Q. Now, at this time, it wasn't an approved use; correct?
>
> MR. POLUBINSKI: Objection.

See Grogan tr. at 651, l. 7 to 652, l. 2. See also Neurontin 2003 Global Product Platform, Christine Grogan deposition exhibit 36, attached hereto as Exhibit "C".

In addition to the Scott Levin and IMS data showing Neurontin's market share for various applications and uses, Defendants also had data which showed on a plan by plan level the Neurontin purchases by Third Party Payers:

> Q. So, Pfizer knew with respect to the plans in this document what the particular plans actually really their purchases, but it's industry sales of what AEDs were; correct?
>
> A. Yes.
>
> Q. And the next column, column H, what is your understanding, if any, of the data in column H?
>
> A. It would be, I think, the total prescriptions annualized. So when I'm working here, annualized is an annual year of that particular category.
>
> Q. So, again, Pfizer would have at its disposal the number of

-11-

> prescriptions with respect to each particular plan contained in this document an annual basis; correct?
>
> MR. POLUBINSKI: Objection.
>
> A. Without seeing the whole document, I would say that we would know how much prescriptions there are of the class of drugs that this document is pertaining to, and I'm guestimating based on Depakote and Topamax, it's for the anti-epileptic category.
>
> Q. To your knowledge, did Pfizer have similar information for other categories?
>
> A. Yes, as managed care organization, that's what you do. You know, all drug companies do that. And you, I think you know that probably working at Aetna.
>
> Q. I know that, but the jury doesn't, so we have to make a record about it.

<u>See</u> Grogan tr. at 681, l. 22 to 683, l. 7.  <u>See also</u> Grogan deposition exhibit 49, attached hereto as Exhibit "D".

Ironically, Defendants' former national marketing manager Christine Grogan had two sources of industry data reflecting Neurontin's volume and market share for various applications and uses.  In addition, Miss Grogan and Pfizer had at their disposal the number of prescriptions with respect to each particular Third Party Payer's plan on an annual basis for the various categories of use.  In Miss Grogan's words: "that's what you do.  You know, all drug companies do that."  Now, despite the fact that Defendants admittedly have information about Neurontin's use on both an application and a plan basis, Defendants burdensomely seek for Plaintiffs to search for the same data and then create an analysis collating Neurontin use with the use of other cheaper or more optimal alternatives.

In addition to the tremendous burden to capture and then analyze the data sought

by Defendants (see Exhibit "A"; and see Dkt. # 465, 568), the Defendants have previously criticized third party payer's claims data as being of questionable value. At oral argument before the Court on September 27, 2006, when previously trying to obtain access to private patient medical data, Defendants' counsel already argued that it was problematic to waste energy and resources producing and analyzing claims records in a vacuum. At the September 27, 2006 hearing, Mr. Rouhandeh himself said, "And we think that this is a problem we're having because their claims data they're giving us doesn't show us what the use is for. The only way to get that data is from medical records." (Sept. 27, 2006 tr. at 47). The Court has already made clear its ruling on the issue of private patient medical data, and it is inappropriate for Defendants to try to end run the Court and attempt to re-visit the issue here by claiming that Defendants "cannot substitute" aggregate data for "the particular 'cocktail' of drugs a given Member is prescribed."

This very issue regarding available industry data which the drug manufacturers themselves rely upon and the need for expert analysis to draw conclusions from that data was discussed in great detail at the September 27, 2006 hearing before the Court:

> MR. HIMMELSTEIN: Your Honor, I can give you a very concrete and specific answer to your question if you will allow me about three minutes or two minutes or one minute. There is data, reliable data, for every diagnostic code about what drugs are prescribed. You'll have so much percent are prescribed this drug, and it has this average cost; so much percent are prescribed this drug, and it has this average cost. All of that data is available. So we show Neurontin was prescribed for, say – I'm just pulling numbers out of the air – 100,000 patients for bipolar disorder. If you would have taken that 100,000 patients and assumed that they would be prescribed the same distribution on average of drugs as the general population for that condition, we can quantify to the penny what those

> drugs would have cost.
>
> THE COURT: And you need an expert to put in that they are equivalent.
>
> MR. HIMMELSTEIN: Yes, I mean, really the FDA has a list of what drugs are approved for what condition. It's not a big deal. It's not, like, a big battle. There's a list of what drugs are approved for what condition, and there's data about how frequently they're prescribed for each condition and the average cost to the penny of those prescriptions. We can quantify all that. It's not a problem.
>
> THE COURT: Well, is there a drug approved for shaking leg syndrome? I imagine that it's true for some of those indications and not others.
>
> MR. HIMMELSTEIN: There's one, I've seen TV commercials on it, about how you could never get up from the couch. Have you seen that one? They're going to finally cure whatever it is that makes people be couch potatoes 24 hours a day. They're running a commercial on it, so it must be approved. I've seen that.
>
> THE COURT: I wouldn't necessarily jump to that, but, in any event, let me say, I don't know. I'm not willing to prejudge it. To the extent you're putting on doctors or experts to say something and they're relying on individual patient experience, that will have to be produced. Similarly, to the extent you're going to put on doctors based on individual patient experience, you know, just like any expert, you've got to put on the factual basis. What I'm not going to allow is a foraging through the third-party payors' patient base.

Sept. 27, 2006 tr. at 38-39. Regrettably, in their instant requests, Defendants again improperly seek to forage through the third party payers' patient base.

**III.    ARGUMENT**

Although discovery is generally permissible as to any non-privileged matter that is relevant to the claim or defense of any party, it may be limited in scope where the court

determines that it is unduly burdensome. *Daniels v. Am. Power Conversion Corp.*, C.A. No. 05-459ML, 2007 WL 539643, at *1 (D.R.I. Feb 15, 2007). In making a decision regarding the burdensomeness of an interrogatory, a court should balance the burden on the interrogated party against the benefit to the discovering party of having the information. *Pulsecard, Inc. v. Discover Card Serv., Inc., et al.*, 168 F.R.D. 295, 304 (D. Kan. 1996). In addition, "interrogatories must be sufficiently definite, clear, and concise, and they must adequately advise the interrogated party of the information requested." *Capacchione v. Charlotte-Mecklenburg Sch.*, 182 F.R.D. 486, 491 (W.D.N.C. 1998). "Interrogatories that are facially overbroad are impermissible and require no response from the responding party." *Mackey v. IBP, Inc.*, 167 F.R.D. 186, 197 (D. Kan. 1996).

   Defendants in this matter have been given far more than sufficient information to defend against Plaintiffs' claim that cheaper or more optimal alternatives existed for Neurontin. The Court has already prohibited production of private patient medical information. Plaintiffs have promised to produce additional information about damages through their experts at the appropriate times in the schedule of this action, and the instant attempt to burden Plaintiffs to produce aggregate claims data about prescriptions for Neurontin and alternative drugs, which Defendants have conceded is problematic and cannot substitute for "the particular 'cocktail' of drugs a given Member is prescribed," is burdensome and a frivolous waste of resources.

Wherefore, Plaintiffs respectfully request that the Court set aside the portions of the order requiring further response to interrogatories.

Dated: July 13, 2007

**For Plaintiff Aetna, Inc.:**

 /s/ Peter A. Pease
Peter A. Pease, Esq.  (BBO # 392880)
**BERMAN DEVALERIO PEASE
  TABACCO BURT & PUCILLO**
One Liberty Square
Boston, MA  02109
Telephone:  (617) 542-8300
Facsimile:   (617) 542-1194

**OF COUNSEL:**

**LOWEY DANNENBERG BEMPORAD
    SELINGER & COHEN, P.C.**
Richard W. Cohen, Esq.
Gerald Lawrence, Esq.
White Plains Plaza - - 5th Floor
One North Broadway
White Plains, NY  10601-2310
Telephone: (914) 997-0500
Facsimile:   (914) 997-0035

**BERMAN DEVALERIO PEASE
  TABACCO BURT & PUCILLO**
Joseph J. Tabacco, Jr., Esq.
425 California Street, Suite 2025
San Francisco, CA  94104-2205
Telephone:  (415) 433-3200
Facsimile:   (415) 433-6382

**JOHN F. INNELLI, LLC**
John F. Innelli, Esq.
1818 Market Street, Suite 3620
Philadelphia, PA  19103
Telephone:  (215) 5612-1011
Facsimile:   (215) 561-0012

**For Plaintiff Guardian Life Insurance Co. Of America:**

 /s/ Thomas G. Shapiro
Thomas G. Shapiro (BBO # 454680)
Theodore Hess-Mahan (BBO # 557109)
**SHAPIRO HABER & URMY LLP**
53 State Street
Boston, MA 02109
Telephone: (617) 439-3939
Facsimile: (617) 439-0134


**OF COUNSEL:**

**KAPLAN FOX & KILSHEIMER LLP**
Linda P. Nussbaum, Esq.
805 Third Avenue, 22nd Floor
New York, NY 10022
Telephone: (212) 687-1980
Facsimile: (212) 687-7714

**RAWLINGS & ASSOCIATES, PLLC**
Mark D. Fischer, Esq.
Mark Sandmann, Esq.
325 W. Main Street
Louisville, KY 40202
Telephone: (502) 587-1279
Facsimile: (502) 584-8580


**For Plaintiffs Kaiser Foundation Health Plan, Inc. and Kaiser Foundation Hospitals:**

 /s/ Thomas G. Shapiro
Thomas G. Shapiro (BBO # 454680)
Theodore Hess-Mahan (BBO # 557109)
**SHAPIRO HABER & URMY LLP**
53 State Street
Boston, MA 02109
Telephone: 617-439-3939
Facsimile: 617-439-0134

-17-

**OF COUNSEL:**

**KAPLAN FOX & KILSHEIMER LLP**
Linda P. Nussbaum, Esq.
805 Third Avenue, 22nd Floor
New York, NY 10022
Telephone: (212) 687-1980
Facsimile: (212) 687-7714

-19-

## **CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3.

                              ATTORNEY FOR PLAINTIFFS

                              <u>/s/  Rachel Turner</u>
                              Rachel Turner, Esq.