UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

------------------------------------------------ x
: 
In re:  NEURONTIN MARKETING AND : MDL Docket No. 1629
SALES PRACTICES LITIGATION :
:
: Master File No. 04-10981
------------------------------------------------ x
:
THIS DOCUMENT RELATES TO: : Judge Patti B. Saris
:
:
------------------------------------------------ x Magistrate Judge Leo T. Sorokin
:
THE GUARDIAN LIFE INSURANCE COMPANY OF :
AMERICA v. PFIZER INC. and :
:
:
AETNA, INC. v. PFIZER INC. :
:
:
------------------------------------------------ x

**MEMORANDUM OF LAW IN OPPOSITION TO COORDINATED
PLAINTIFFS' OBJECTIONS TO DISCOVERY ORDER NO. 12**

DAVIS POLK & WARDWELL
450 Lexington Avenue
New York, NY 10017
(212) 450-4000

*Attorneys for Defendants Pfizer Inc.
and Warner-Lambert Company*

Defendants Pfizer Inc. and Warner-Lambert Company (collectively, "defendants") submit this memorandum of law in opposition to the objections of Aetna, Inc. ("Aetna"), the Guardian Life Insurance Company of America ("Guardian"), and Kaiser Foundation Hospitals Inc. and Kaiser Foundation Health Plan, Inc. (collectively, "Kaiser") to Discovery Order No. 12.

## PRELIMINARY STATEMENT

Unlike class plaintiffs, who allege that Neurontin is ineffective for each and every use for which they seek recovery, Aetna, Guardian, and Kaiser (collectively, "coordinated plaintiffs") make no such allegation. Indeed, as discussed below, coordinated plaintiffs *admit* that Neurontin has been *proven* to be an effective treatment for some of these off-label uses and, in some cases, *require* their insureds to take gabapentin before they may take medications approved by the FDA for those uses.

The gravamen of coordinated plaintiffs' complaint is that, but for defendants' conduct, their insureds who were prescribed Neurontin for these off-label uses would have received allegedly "cheaper and more optimal" medications instead. The interrogatories that are the subject of the present appeal require coordinated plaintiffs to answer a question squarely raised by their claims, namely, "How many of your insureds who were prescribed Neurontin in fact *received* one of these allegedly 'cheaper and more optimal' medications?"

Notwithstanding the self-evident relevance of this question to their claims, coordinated plaintiffs refused to answer defendants' interrogatories, and defendants moved to compel. Following review of the plaintiffs' and defendants' submissions, a

two-hour hearing on June 12, 2007, and nearly two weeks' post-hearing deliberation, Magistrate Judge Sorokin issued Discovery Order No. 12 (Dkt # 771), which granted defendants' motion to compel.  The Magistrate Judge concluded that the discovery sought by defendants' interrogatories "relates to some of the central issues in the case;" that the discovery sought does not implicate any colorable privacy concerns or contravene the Court's electronic order dated September 27, 2006; and that any burden on the coordinated plaintiffs (none of whom bothered to substantiate or explain its assertions of burden) is modest and entirely warranted given the scope and complexity of this litigation.[1]

Coordinated plaintiffs now appeal.  Rather than addressing the interrogatories and discovery order at issue, however, coordinated plaintiffs prefer to object to interrogatories that defendants have not propounded and orders that the Magistrate Judge has not issued.  Instead of explaining how compliance with Discovery Order No. 12 would entail a substantial burden or implicate any colorable privacy interests, coordinated plaintiffs dwell on the burden entailed and the privacy interests implicated by a collection and review of patient medical records (which Discovery Order No. 12 plainly does not

---

[1] Class plaintiffs, who have alleged that their insureds would have received "cheaper and more optimal" medications as an alternative theory of recovery, also refused to respond to defendants' interrogatories.  *See* Third Am. Class Action Compl. (Dkt # 580) ¶ 308.  Class plaintiff ASEA/AFSCME Local 52 Health Benefits Trust ("ASEA") initially represented that it "ha[d] already provided Defendants with [anonymized] prescription records of its insureds who were prescribed Neurontin."  *See* Class Pls.' Mem. Law Opp'n Defs.' Mot. Compel Disc. from Pls. (Dkt # 757) at 1–2.  After defendants protested that they had not received the records that ASEA purported to have produced, ASEA realized that it had requested and obtained these records from its pharmacy benefits manager, but inadvertently failed to produce them to defendants.  Discovery Order No. 12 at 4.  ASEA nonetheless refused to produce the records it had inadvertently withheld, although their production would obviously have posed no burden.  *Id.*  The Magistrate Judge granted defendants' motion to compel as against both coordinated plaintiffs and class plaintiffs.  Class plaintiffs, however, have not objected to Discovery Order No. 12, and only coordinated plaintiffs are parties to the present appeal.

require). Coordinated plaintiffs likewise argue at length that defendants can purchase "industry data reflecting Neurontin's volume and market share for various applications and uses" (data that the interrogatories do not seek), but fail to proffer any evidence that third-party commercial data vendors are capable of answering the question that the interrogatories in fact pose: whether plaintiffs' insureds who were prescribed Neurontin actually *received* the "cheaper and more optimal" medications that plaintiffs claim they *would have received* but for the defendants' conduct.

Additionally, coordinated plaintiff Kaiser asserts for the first time on appeal that preparing responses for 75% of its insureds "would take more than one month" and that preparing responses for the remainder "could take longer." Kaiser's suggestion that this expenditure—trivial in comparison to the recovery that plaintiffs seek and to the discovery-related costs they have required defendants to incur—constitutes an undue burden is galling, given that Kaiser for purposes of its internal cost containment programs produces reports of precisely the sort that defendants now seek.

Discovery Order No. 12 represents an eminently reasonable exercise of the Magistrate Judge's discretion, and coordinated plaintiffs' objections present no reason to disturb the Magistrate Judge's order.

## ARGUMENT

A "magistrate's order on a nondispositive motion shall be modified or set aside by the district court only if 'found to be clearly erroneous or contrary to law.'" *Phinney v. Wentworth Douglas Hosp.*, 199 F.3d 1, 5 (1st Cir. 1999) (quoting Fed. R. Civ. P. 72(a)). "This means that [the district court] must accept both the [magistrate's] findings of fact and the conclusions drawn therefrom unless, after scrutinizing the entire record, [it]

3

'form[s] a strong, unyielding belief that a mistake has been made.'" *Id.* at 4 (quoting *Cumpiano v. Banco Santander P.R.*, 902 F.2d 148, 152 (1st Cir. 1990)). The present record admits no basis for such a belief, and the Magistrate Judge's order should therefore be affirmed.

I.  **The Magistrate Judge Properly Concluded that Defendants Are Entitled to Know the Factual Basis for the Coordinated Plaintiffs' Claims and to Obtain Information Relevant to Both Damages and the Expert Phase of Discovery**

"Interrogatories properly may inquire into the detailed factual basis for particular allegations or alleged causes of action of a party." 7 Moore's Federal Practice § 33.74, at 33-59 (Daniel R. Coquillette et al. eds., 3d ed. 2007) (observing that "[t]he propriety of such interrogatories is based on the defendant's right to know the factual basis of plaintiff's allegations"). Coordinated plaintiffs, however, appear to labor under the misimpression that they may claim that they suffered economic harm because their insureds received Neurontin instead of other, less expensive alternatives, but refuse to disclose whether their insureds in fact received those "alternative" medications. The Magistrate Judge sought to disabuse coordinated plaintiffs of this notion and ordered them to respond to defendants' interrogatories, which he recognized "relate to some of the central issues in the case." Discovery Order No. 12 at 4.

A comparison of the class plaintiffs' and coordinated plaintiffs' theories of recovery underscores the correctness of the Magistrate Judge's order and the relevance of the information sought. Class plaintiffs allege that Neurontin is ineffective for each and every use for which they seek recovery, and have predicated their motion for class certification on the assumption that, had defendants made appropriate disclosures to prescribing physicians, only an anomalous physician—a "bubble boy" in class plaintiffs'

4

words—would have prescribed Neurontin for any of the off-label uses at issue.
Transcript of Hearing on Class Certification, May 4, 2007 (Dkt # 745), at 31.[2]

In sharp contrast, the coordinated plaintiffs—despite having had the benefit of all allegedly "suppressed" (but subsequently published) studies and all information obtained in the course of this litigation—*admit* that Neurontin has been proven effective for some of these uses:

> Q.  Just to clarify that, Kaiser's position is that there now exists documented evidence establishing the efficacy of Gabapentin for diabetic peripheral neuropathy, is that correct?
>
> A.  That is correct.

Deposition of Albert Carver, taken July 12 & 13, 2007 ("Carver Dep.") at 89–90 (attached as Ex. 1 to July 27, 2007 Declaration of Rajesh S. James ("James Decl.")). Indeed, coordinated plaintiff Aetna currently *requires* insureds diagnosed with diabetic peripheral neuropathy to take gabapentin before taking a medication approved by the FDA for that indication. *See* Pharmacy Clinical Policy Bulletins: Aetna Non-Medicare Prescription Drug Plan, Subject: Anticonvulsants (James Decl. Ex. 2) at 3; *see also* Pharmacy Clinical Policy Bulletins: Aetna Non-Medicare Prescription Drug Plan, Subject: Anti-Migraine Agents (James Decl. Ex. 3) at 2 (insureds under some Aetna plans may be required to take gabapentin or another migraine prophylaxis drug before taking medications approved by the FDA for treatment of migraine).[3]

---

[2] Class plaintiffs have failed to substantiate this critical assumption, but have assured the Court that they will do so with "documentary evidence as well as expert testimony" to be furnished at some unspecified point in the future. Class Pls.' Post-Argument Submission (Ex. A, Dkt # 752) at 2–8.

[3] Class plaintiffs' arguments and coordinated plaintiffs' admissions are incompatible in other respects as well. Class plaintiffs have argued (again with no evidentiary support) that the existence of a single "negative" clinical trial can conclusively establish that Neurontin is ineffective for a given off-label

5

Rather than basing their right to recovery on allegations of inefficacy, coordinated plaintiffs instead claim that they were economically harmed because, but for defendants' conduct, their insureds who were prescribed Neurontin would have received allegedly "cheaper and more optimal" medications instead.  Third Coordinated Am. Compl. (Dkt # 583) ¶ 173.[4]

Defendants' interrogatories pose an obvious question arising from this claim, namely, "How many of your insureds who were prescribed Neurontin in fact *received* these allegedly 'cheaper and more optimal' medications?"  The relevance of the information sought to the subject matter of this litigation is self-evident.  As Magistrate Judge Sorokin recognized, the discovery sought "relate[s] to some of the central issues in the case."  Discovery Order No. 12 at 4.

---

use. *See* Reply Memorandum of Law in Support of Plaintiffs' Motion for Class Certification (Dkt # 678) at 15 ("If Neurontin were truly effective . . . , how could there be negative clinical trials?").  Coordinated plaintiffs, by contrast, acknowledge that the existence of a single "negative" study does not establish that a prescription drug is ineffective for the treatment of a given medical condition and that the conclusions that can be drawn from any clinical trial must be informed by the trial's design and the treatment regimen studied.  *See* Carver Dep. (James Decl. Ex. 1) at 175; *see also* Drug Monograph: Gabapentin (Neurontin®) Removal of Restrictions (James Decl. Ex. 4) at KAIS-004630–004631 (recommending removal of prescribing restrictions on gabapentin notwithstanding the fact that the Gorson study "failed to demonstrate significant pain relief in three of the four efficacy measures at a GBP dose of 900 mg/day" because the dose studied "may have been too low" and the "[a]n inadequate washout period between treatments may also have contributed to the similar results found for GBP and placebo treatments").

[4] Coordinated plaintiffs' claims appear to be patterned on the claims asserted in *Desiano v. Warner-Lambert Co.*, 326 F.3d 339 (2d Cir. 2003).  There, the Second Circuit held that where "a defendant drug company markets a 'new,' much more expensive drug claiming it is a great advancement (safer, more effective, etc. than [an existing] drug)" when in fact the drug is neither safer nor more effective than the existing drug, third-party payors that can establish that "they would not have bought Defendants' product, rather than available cheaper alternatives, had they not been misled by Defendants' misrepresentations" may be able to recover "the excess money [they] paid Defendants for the [more expensive drug] that they claim they would not have purchased 'but for' Defendants' fraud."  *Id.* at 349–50.  Unlike the plaintiffs in *Desiano*, however, coordinated plaintiffs do not allege that defendants claimed that Neurontin is a safer or more effective drug than the allegedly "cheaper and more optimal" medications that they have identified.

6

In particular, in asserting their claims, coordinated plaintiffs have squarely placed at issue (1) whether "cheaper and more optimal" alternatives to Neurontin exist, and (2) whether, but for the defendants' conduct, coordinated plaintiffs' insureds who were prescribed Neurontin would have received one of these "cheaper and more optimal" medications instead.  Coordinated plaintiffs' responses to the interrogatories at issue will aid defendants' experts in their evaluation of both issues.  Discovery Order No. 12 at 3–4.  If the physicians seldom, if ever, prescribed a particular medication to insureds who were prescribed Neurontin, that fact would cast doubt on plaintiffs' claims that the medication constituted a plausible therapeutic alternative to Neurontin.  The information sought is also relevant to coordinated plaintiffs' claims of injury, insofar as it will enable defendants' experts to form opinions as to (1) whether coordinated plaintiffs' insureds were prescribed Neurontin only after their physicians determined that these insureds were intolerant of or unresponsive to these allegedly "cheaper and more optimal" alternatives; and (2) whether prescribing physicians prescribed Neurontin as a supplement, rather than as an "alternative," to the allegedly "cheaper and more optimal" medications.

Discovery obtained from coordinated plaintiff Kaiser underscores the relevance of the information sought.  Following the emergence of clinical data supporting the use of gabapentin in the treatment of post-herpetic neuralgia and diabetic neuropathy, Kaiser, in 1999, removed restrictions it had previously placed on gabapentin prescriptions, but issued guidelines that its physicians should prescribe gabapentin only to "those patients unresponsive to or intolerant of other available treatment modalities, including tricyclic antidepressants (alone or in combination with narcotic analgesic agents), carbamazepine and topical agents." KAIS-001063 (attached as Ex. 1 to the Declaration of Rajesh S.

7

James (Dkt # 763), dated June 8, 2007); Carver Dep. (James Decl. Ex. 1) at 178–79. If Kaiser physicians followed these guidelines and prescribed gabapentin only after exhausting "other treatment modalities"—that is, after determining that no "cheaper and more optimal" alternative medications were available—Kaiser's damages should be nil. While Kaiser admits that its insureds' physicians follow these restrictions "in a majority of cases," it has speculated that Kaiser physicians might disregard the guidelines issued by its P&T committee in some cases. Carver Dep. (James Decl. Ex. 1) at 77–78. The information sought by defendants' interrogatories is needed to enable defendants' experts to form an opinion as to the number of occasions, if any, in which Kaiser physicians prescribed Neurontin in violation of the guidelines issued by Kaiser's P&T Committee (i.e., the number of occasions in which Kaiser physicians may have prescribed Neurontin without first determining that there were no "cheaper and more optimal" medications available).

Likewise, documentary evidence indicates that Kaiser physicians did not regard lithium (an alleged "cheaper and more optimal" alternative) as a therapeutic "alternative" to Neurontin for the treatment of bipolar disorder. Instead, Kaiser physicians prescribed gabapentin as a supplement to lithium and other medications. *See, e.g.*, E-mail message from Dr. Robin Dea to Dr. Jon Zweig, dated June 4, 2002 (James Decl. Ex. 5), at KAIS-005840 (explaining that she had "a number of patients who[se] increased stability on gabapentin (*with lithium*) is without question" (emphasis added)); Carver Dep. (James Decl. Ex. 1) at 393–401. The discovery sought will enable defendants' experts to form an opinion as to the number of instances in which gabapentin was prescribed as a

8

supplement to, rather than a substitute for, alleged "alternative" medications such as lithium.

Coordinated plaintiffs also argue that prescription claims data is irrelevant because defendants have previously argued that prescription claims data is no substitute for anonymized patient medical records. *See* Objs. at 13. Defendants agree that the prescription claims data they now seek are no substitute for anonymized patient medical records. For example, carbemazepine, one of the medications that coordinated plaintiffs allege is a "cheaper and more optimal" alternative to Neurontin, is known to cause birth defects, a property that would render it an unsuitable medication for some patients. Kaiser Permanente, Anticonvulsants for Chronic Pain (James Decl. Ex. 6) at 2. Likewise, tricyclic antidepressants ("TCAs"), medications that Kaiser has encouraged its physicians to prescribe in place of Neurontin for neuropathic pain (on the ground that TCAs are cheaper and that there is "no difference in efficacy" between TCAs and Neurontin) can cause painful and potentially deadly side-effects in the elderly. Kaiser Permanente Drug Utilization Action Team, Videoconference on "Successful Practices," Mar. 12, 2003 (James Decl. Ex. 7) at KAIS-001115; Carver Dep. (James Decl. Ex. 1) at 387–89. Absent access to anonymized medical records, defendants cannot accurately assess whether these and other allegedly "cheaper and more optimal" medications would have proven harmful or deadly to some insureds to whom Neurontin was prescribed. The fact that defendants have been denied access to the most highly probative evidence, however, supplies no basis for denying them access to all relevant discovery. *See* Discovery Order No. 12 at 4 ("the information sought may not be the most probative information, but that is not the test for discovery").

Coordinated plaintiffs are—for obvious reasons—reluctant to disclose information that may cast doubt on their claims that "cheaper and more optimal" medications to Neurontin existed, and that, but for defendants' conduct, their insureds who were prescribed Neurontin would have received these "alternative" medications instead. Coordinated plaintiffs' understandable reluctance to make potentially damaging disclosures, however, should not deprive defendants of their right to fully examine the factual underpinnings of coordinated plaintiffs' claims.

## II.  Defendants' Interrogatories Do Not Implicate Any Colorable Privacy Interests or This Court's Prior Order

Coordinated plaintiffs also argue that their compliance with Discovery Order No. 12 would "prohibitively invade patient privacy." Objs. at 2. Plaintiffs apparently base this argument on the mistaken assumption that responding to defendants' interrogatories will somehow entail the production of "private patient medical records." *Id.* at 8.

Both the argument and its premise are flawed, and the Magistrate Judge appropriately recognized them as such. Five of the six interrogatories at issue (Interrogatories Nos. 4–8) do not call for the production of any individual patient data. *See* Discovery Order No. 12 at 2. The remaining interrogatory, Interrogatory No. 3, "does seek Member level data," but only to the extent that it asks "Plaintiffs, for each Member prescribed Neurontin, to specify the dosage and number of prescriptions filled with the arguably cheaper more optimal drugs." *Id.* (observing that Interrogatory No. 3 does not seek any "data identifying the Members"). Kaiser, Aetna, and Guardian fail to explain how disclosure of particular combinations of drugs prescribed, without disclosure of any further information, could conceivably implicate any colorable privacy interest.

10

Coordinated plaintiffs' contentions that the present interrogatories seek "virtually the same information" as the discovery requests that were the subject of this Court's September 27, 2006 electronic order and thereby contravene that order are likewise without merit. The Court's prior order was based (1) on the "burden, expense and invasion of privacy" that production of individual medical records would entail, and to a lesser extent, (2) on the burden involved in "produc[ing] a breakdown of . . . prescriptions [by use] (e.g., what percentage is for bipolar, etc.)" (which coordinated plaintiffs insisted would require them to collect and review individual medical records).

Neither consideration is implicated by the present set of interrogatories. The present interrogatories do not call for the collection, review, or production of patient medical records. Nor do they require coordinated plaintiffs to specify the uses for which Neurontin or any other medication was prescribed to their members. *Compare* Req. No. 51 of Defs.' First Req. for Produc. of Docs., served May 2, 2005 (Ex. 1, Dkt # 404) (requiring plaintiffs to specify that "reason drug was prescribed to Member"), *with* Interrogs. Nos. 3–8 of Defs.' Second Set of Interrogs., served Mar. 13, 2007 (Ex. A, Dkt # 658) (making no similar request).

Defendants, moreover, have tailored the interrogatories at issue to avoid any conceivable privacy concerns: Whereas the discovery requests that were the subject of this Court's prior order called for plaintiffs to specify a number of fields for each pharmacy claim, including "encrypted member i.d., member age, date of service, date of payment, amount billed, amount paid by plan, co-pay, deductible, coinsurance, third party liability, ICD-9 code, CPT, HCPCS, NDC or local code used by the plan, physician i.d., and claim status/adjudication," Req. No. 50 of Defs.' First Req. for Produc. of Docs.,

11

served May 2, 2005 (Ex. 1, Dkt # 404), the present interrogatories do not request this information.

Given that the present interrogatories neither "seek" nor "open the door to patient level discovery," Discovery Order No. 12 at 2, 4, the Magistrate Judge properly rejected plaintiffs' arguments that the interrogatories would contravene the Court's prior order or "invade" unspecified privacy interests.

**III.    Plaintiffs Cannot Resist Discovery and Demand that Defendants Purchase the Information Sought from a Third-Party Commercial Vendor, Especially Where Plaintiffs Have Proffered No Evidence that Commercial Vendors Are Capable of Supplying This Information.**

Aetna, Guardian, and Kaiser also attempt to resist discovery on the ground that defendants can purchase the information that they seek from third-party commercial data vendors. This argument is fundamentally flawed, and like coordinated plaintiffs' arguments respecting patient privacy, suggests that plaintiffs have not bothered to read either the interrogatories to which they object or the discovery order from which they appeal. Coordinated plaintiffs expend several pages of their objections contending that third-party commercial data vendors are capable of supplying "data reflecting Neurontin's volume and market share for various applications and uses." Objs. at 12; *see also* Objs. at 6, 9–11. These contentions, however, are wholly irrelevant to the present dispute because the interrogatories at issue *simply do not ask plaintiffs to supply this information*. As the Magistrate Judge recognized, the interrogatories do not call for plaintiffs to supply information respecting the "various applications and uses" for which Neurontin may have been prescribed, but instead "require the Plaintiffs to cross-reference

12

Neurontin prescription claims data with prescription claims data for certain other drugs." Discovery Order No. 12 at 4.

Coordinated plaintiffs have failed to provide an iota of record evidence suggesting that any third party commercial data vendors are capable of cross-referencing prescription claims data in this manner and thereby providing the information that defendants' interrogatories actually seek. IMS Health Inc. ("IMS"), Scott Levin Associates ("Scott Levin"), and other data vendors take sample snapshots of patient populations. As coordinated plaintiffs themselves note, these vendors may be capable of supplying estimates of "Neurontin's volume and market share" at a given point in time. Objs. at 12. The coordinated plaintiffs have proffered no evidence, either to the Magistrate Judge or to this Court, that any data vendor is capable of tracking particular patients over time (as coordinated plaintiffs can) and thereby informing defendants whether coordinated plaintiffs' insureds who were prescribed Neurontin also received allegedly "cheaper and more optimal" medications.

Even if third-party commercial data vendors *were* capable of supplying the information sought on a nationwide, aggregate basis (there is no evidence that they are), defendants are entitled to learn this information on an entity-by-entity basis because differences in drug utilization policies and procedures may well affect which patients receive which drugs. Thus, even if IMS or Scott Levin could tell defendants what percentage of individuals nationwide took the identified drugs before taking Neurontin, that information might well prove useless as against particular plaintiffs whose policies and procedures steered patients toward or away from particular medications. In light of Kaiser's prescription guidelines discussed above, for example, the percentage of Kaiser's

13

insureds who took gabapentin only after proving "unresponsive to or intolerant of" carbemazepine and "other available treatment modalities" will necessarily differ from the corresponding percentage of patients insured by a third-party payor that did not issue similar guidelines.  Whereas coordinated plaintiffs claim that "[e]ven the most amateur statistician could comfortably state that [coordinated plaintiffs'] data 'on an aggregate level' will not substantially diverge from industry 'aggregate market data,'" Objs. at 9, in fact, only an amateur with no understanding of statistics whatsoever could reach that conclusion.[5]

### IV.  Coordinated Plaintiffs' Have Failed to Demonstrate Any Burden that Would Warrant Depriving Defendants of Their Right to Know the Factual Bases of Plaintiffs' Claims

Coordinated plaintiffs' assertions of undue burden are likewise unavailing.  An objecting party cannot sustain its evidentiary burden of showing that interrogatories are unduly burdensome through conclusory assertions.  *See* 7 Moore's Federal Practice § 33.173[3][a], at 33-93 (responding party can sustain its burden only "by setting forth facts that demonstrate the extent and nature of the burden imposed by answering in affidavits or by supplying other evidence in support of its objections"); *Prozina Shipping Co. v. Thirty-Four Autos.*, 179 F.R.D. 41, 48 (D. Mass. 1998).  But as the Magistrate Judge noted, none of the coordinated plaintiffs, "while asserting burden, provided either

---

[5] The federal discovery rules in any event do not authorize coordinated plaintiffs to refuse to respond to interrogatories on the ground that defendants can purchase the information sought from a third-party commercial data vendor.  *See* 7 Moore's Federal Practice § 33.73, at 33-59 & n.7; *Petruska v. Johns-Manville*, 83 F.R.D. 32, 35 (E.D. Pa. 1979) (responding party cannot object to request for production of records in its possession on the ground that propounding party could obtain the same records from an industry association).  Thus, even if defendants *could* purchase the information sought from a third-party vendor (there is no evidence they can), that would not form a legitimate basis for coordinated plaintiffs to deny defendants access to relevant discovery from their files.

14

an affidavit or even an articulation of the burdens in their pleadings." Discovery Order No. 12 at 4–5.

On appeal, two of the three coordinated plaintiffs—Aetna and Guardian—again decline to substantiate their assertions of undue burden.[6] While Kaiser, like Aetna and Guardian, made no discernible effort to satisfy its evidentiary burden before the Magistrate Judge, it now seeks to satisfy its burden with a declaration that it submits for the first time on appeal. Kaiser's efforts to satisfy its burden are both too little and too late.

*First*, a district court's review of a magistrate judge's order on a nondispositive matter should be confined, "in ordinary cases, [to] limited review on the existing record." *Conetta v. Nat'l Hair Care Ctrs., Inc.*, 236 F.3d 67, 74 (1st Cir. 2001); *e.g., Holmes Prods. Corp. v. Dana Lighting, Inc.*, 926 F. Supp. 264, 266 (D. Mass. 1996). A party that has made no discernible effort to satisfy its evidentiary burden before the Magistrate Judge "cannot avail itself of an appeal to satisfy . . . that burden," because to allow a party to do so "would render referrals to Magistrates meaningless and a waste of time." *Branch v. Mobil Oil Corp.*, 143 F.R.D. 255, 256 (W.D. Okla. 1992).

*Second*, Kaiser's belatedly filed declaration is largely irrelevant to the order from which Kaiser now appeals. While the declaration dwells on the burden entailed and

---

[6] Both Aetna and Guardian instead reference declarations that they submitted in connection with their objections to Discovery Order No. 4. Those declarations attest to the burdens of "review[ing] many thousands of individual handwritten patient records," Declaration of Michael Sullivan, dated October 10, 2006 (Dkt # 568) ¶ 3, and reviewing "patient medical data and attempting to link the timing of physician visits, claims and records with the payment of pharmacy claims," Declaration of JoBeth Levy, dated Dec. 1, 2006 (Dkt # 568) ¶ 5. Neither of these declarations has any relevance to Discovery Order No. 12, which does not require plaintiffs to review handwritten patient records or to cross-reference medical and pharmacy claims data.

15

privacy concerns implicated by the collection and review of individual medical records, *see* Declaration of Elizabeth F. Villaluz, dated July 13, 2007 (Ex. A, Dkt # 794), ("Villaluz Decl.") ¶¶ 7–8, Discovery Order No. 12 does not require Kaiser to perform such collection or review. And while the declarant opines that "it would not be possible to determine the purpose for which each Kaiser member was prescribed a given drug" "without going back to each member's individual medical record," Villaluz Decl. ¶ 7, the interrogatories at issue do not ask Kaiser to identify the uses for which its insureds were prescribed any medications.

*Third*, the single paragraph of Kaiser's declaration that does address the burden to Kaiser of complying with the Discovery Order No. 12 falls far short of demonstrating a burden that would warrant barring defendants' from obtaining highly relevant discovery. For Northern and Southern California—which together account of 75 percent of Kaiser's membership, Carver Dep. (James Decl. Ex. 1) at 61—the declarant estimates that responses to defendants' interrogatories "would take more than one month to prepare." Villaluz Decl. ¶ 5. For the remaining 25 percent of Kaiser's membership, the declarant speculates that responses "could take longer to prepare and produce." *Id.* (explaining that the "the individual who would generate the reports [a pharmacist] . . . is currently away and not available to discuss the production of these reports").[7]

The declaration provides no explanation as to why Kaiser would require one month to respond to defendants' interrogatories. Moreover, even if the Court were to

---

[7] Discovery Order No. 12 was entered June 25, 2007. By July 31, 2007, the date by which the Magistrate Judge ordered Kaiser to respond to defendants' interrogatories, "more than one month" will have elapsed. Had Kaiser invested the same level of resources in complying with Discovery Order No. 12 that it has invested in objecting to that order, it could have—even by its own estimate—supplied most, if not all, of the information requested by defendants' interrogatories by the July 31 deadline.

16

accept Kaiser's assertion at face value, the magnitude of the burden that Kaiser asserts—a one-month investment of a pharmacist's time—is trivial both in comparison to the magnitude of the recovery that the coordinated plaintiffs seek and in comparison to the millions of dollars of discovery-related costs that plaintiffs have already required defendants to incur. *See, e.g.*, *Roberts v. Heim*, 130 F.R.D. 424, 429 (N.D. Cal. 1989) (acknowledging that preparing answers to defendants' interrogatories would require plaintiffs "to expend a great deal of time and energy," but refusing to sustain undue burden objection because "Plaintiffs have brought a massive and complex . . . action and Defendants are entitled to know the factual basis for the claims which have been brought against them"); 7 Moore's Federal Practice § 33.173[3][b], at 33-94. As the Magistrate Judge explained in rejecting the undue burden arguments of class plaintiff Louisiana Health (which asserted that it would need six months to write and validate the algorithms needed to respond to defendants' interrogatories): "That task, however, is not an unusual or particularly burdensome one, especially in a case of this scope and complexity and the absence of any explanation of either the cost of writing the algorithm or the reason the process would take six months." Discovery Order No. 12 at 4.

*Fourth*, Kaiser's protestations of undue burden are especially galling in light of the fact that Kaiser, in the ordinary course of its business, produces reports of precisely the sort that defendants now seek. Between 2002 and 2004, Kaiser implemented a drug utilization program designed to steer physicians from Neurontin and toward tricyclic antidepressants as a "first-line treatment for neuropathic pain." Kaiser Permanente Drug Utilization Action Team, Videoconference on "Successful Practices," Mar. 12, 2003 (James Decl. Ex. 7) at KAIS-001115, 001117. To monitor the success of this program,

Kaiser prepared periodic analyses of the number of its insureds who had been prescribed Neurontin who had not yet received (or were "naive to") these antidepressants. *See, e.g.*, *id.* at KAIS-001103–001105; Carver Dep. (James Decl. Ex. 1) at 250 (explaining that these analyses "look[ed] at whether not a . . . patient that was given Gabapentin had previously been given an tricyclic antidepressant"). While Kaiser apparently believes that its internal cost containment programs warrant whatever resource expenditure is required to generate these analyses, Kaiser apparently believes that its obligations under the federal discovery rules do not warrant the same expenditure of resources.

      The coordinated plaintiffs have failed to demonstrate that their compliance with Discovery Order No. 12 would entail a burden of an order that would warrant denying defendants highly relevant discovery, and Magistrate Judge Sorokin's rejection of coordinated plaintiffs' unsubstantiated assertions of undue burden was eminently reasonable.

## CONCLUSION

For all of the foregoing reasons, coordinated plaintiffs' Objections to Discovery Order No. 12 should be overruled.

Dated: July 27, 2007

> DAVIS POLK & WARDWELL
>
> By:   /s/ James P. Rouhandeh
>       James P. Rouhandeh
>       Rajesh S. James
>
> 450 Lexington Avenue
> New York, New York 10017
> (212) 450-4000
>
>     - and -HARE & CHAFFIN
>
> By:   /s/ David B. Chaffin
>       David B. Chaffin
>
> 160 Federal Street
> Boston, Massachusetts 02110
> (617) 330-5000
>
> *Attorneys for Defendants Pfizer Inc. and Warner-Lambert Company*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system has been served pursuant to Case Management Order #3 on July 27, 2007.

>     /s/David B. Chaffin

19