# EXHIBIT 1

```
                  UNITED STATES DISTRICT COURT
                  DISTRICT OF MASSACHUSETTS
                  MDL Docket No. 1629/Master File No. 04-10981


----------------------------X

IN RE: NEURONTIN MARKETING      MDL Docket No. 1629

SALES PRACTICES, AND PRODUCTS   Master File No.

LIABILITY LITIGATION            04-10981

----------------------------X



          VIDEOTAPED DEPOSITION OF ALBERT CARVER

                 New York, New York

                  July 12, 2007
```

Reported by:
Amy A. Rivera, CSR, RPR

Page 2

```
1
2   SUPREME COURT OF THE STATE OF NEW YORK
    COUNTY OF NEW YORK
3
4   ---------------------------x
5   IN RE: NEURONTIN PRODUCTS
6   LIABILITY LITIGATION        Index Number 765000/2006
7   ---------------------------x
8
9
10
11      VIDEOTAPED DEPOSITION OF ALBERT L. CARVER
12
13
14              New York, New York
                July 12, 2007
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1
2
3
4        Deposition of ALBERT L. CARVER, held
5   at KAPLAN FOX, 850 Third Avenue, New York, New
6   York, before Amy A. Rivera, a Notary Public of the
7   State of New York.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
1
2   A P P E A R A N C E S:
3   KAPLAN FOX & KILSHEIMER, LLP
    Attorneys for Plaintiffs
4       850 Third Avenue
        New York, New York 10022
5   BY:   LINDA N. NUSSBAUM, ESQ.
          AVIAH COHEN PIERSON, ESQ.
6         MITCHELL COHEN, ESQ.
7
8   JUSTIN BLOOM, ESQ.
    Attorneys for Class Plaintiffs
9       29 W. 70th Street, Suite 2B
        New York, New York  10023
10
11  DAVIS POLK & WARDWELL
    Attorneys for Defendants Pfizer, Inc. & Warner-Lambert
12      450 Lexington Avenue
        New York, New York  10017
13  BY:   RAJESH JAMES, ESQ.
          NAHAL KAZEMI, ESQ.
14
15
16  ALSO PRESENT:  CRAIG ATELLA, Videographer
                   NATIONWIDE VIDEO PRODUCTIONS, INC.
17      Partners
18
19
20
21
22
23
24
25
```

Page 5

```
1
2                INDEX
3   WITNESS              DIRECT
4   ALBERT L. CARVER
5   BY MR. JAMES       7
6             EXHIBITS
7   NUMBER      DESCRIPTION         PAGE
8   Kaiser-1    Notice          29
9   Kaiser-2    Gabapentin review 9/1997    79
10  Kaiser-3    Complaint         87
11  Kaiser-4    Drug monograph 6/1999      138
12  Kaiser-5    E-mail dated 3/16/99      148
13  Kaiser-6    E-mail dated 12/17/98     154
14  Kaiser-7    Drug monograph        155
15  Kaiser-8    Gabapentin review of
                restrictions        178
16
17  Kaiser-9    Final draft dated 1/21/04    190
18  Kaiser-10   CMI review for chronic pain
                management in Primary Care   191
19
20
21
22
23
24
25
```

Page 6

1
2        IT IS HEREBY STIPULATED AND AGREED by and
3   between counsel for the respective parties hereto that
4   all rights provided by the C.P.L.R., including the right
5   to object to any question, except as to the form, or to
6   move to strike any testimony at this examination, are
7   reserved; and, in addition, the failure to object to any
8   question or to move to strike any testimony at this
9   examination shall not be a bar or waiver to make such
10  motion at, and is reserved for, the trial of this
11  action.
12       IT IS FURTHER STIPULATED AND AGREED that
13  this examination may be signed and sworn to, by the
14  witness being examined, before a notary public other
15  than the notary public before whom the examination was
16  begun, but the failure to do so, or to return the
17  original of this examination to counsel, shall not be
18  deemed a waiver of the rights provided by Rules 3116 and
19  3117 of the C.P.L.R. and shall be controlled thereby.
20       IT IS FURTHER STIPULATED AND AGREED that
21  the filing of the original of this examination shall be
22  and the same hereby is waived.
23
24
25

Page 7

1             A. Carver
2        VIDEOGRAPHER:  Good afternoon.  My
3   name is a Craig Atella from Nationwide Video
4   Productions located in Roseland, New Jersey.
5        The date today is July 12, 2007 and
6   the time is approximately 1:14.  This deposition
7   is being held at the offices of Kaplan Fox,
8   located at 850 Third Avenue, New York, New York.
9        The caption of this case, In Re:
10  Neurontin Marketing and Sales Practices Litigation
11  in the United States District Court for the
12  District of Massachusetts, Docket Number 1629.
13       The caption is also:  In Re:  New York
14  Products Liability Litigation, in the Supreme
15  Court of the State of New York, County of New
16  York, Index Number 765000.
17       The name of the witness is Albert
18  Carver.
19       At this time, the attorneys will
20  identify themselves and the parties they
21  represent, after which our court reporter, Amy
22  Rivera, will swear in the witness and we can
23  proceed.
24       MS. NUSSBAUM:  Linda Nussbaum, Kaplan
25  Fox for the witness, the Kaiser plaintiff entities

Page 8

1             A. Carver
2   and the coordinated plaintiffs.
3        MS. PIERSON:  Aviah Cohen Pierson
4   from Kaplan Fox, also representing the Kaiser
5   plaintiffs and the witness.
6        MR. COHEN:  Mitchell Cohen, Kaiser
7   Foundation Health Plan.
8        MR. BLOOM:  Justin Bloom, representing
9   the class plaintiffs.  I don't intend to ask any
10  questions.
11       MR. JAMES:  Rajesh James, of Davis
12  Polk, representing the defendants Pfizer and
13  Warner-Lambert.
14       MS. KAZEMI:  Nahal Kazemi, also of
15  Davis, Polk & Wardwell representing the
16  defendants.
17  A L B E R T  L.  C A R V E R, having been duly sworn,
18  testified as follows:
19       MS. NUSSBAUM:  Before we begin the
20  deposition, I just want to make a statement for
21  the record.
22       Mr. Carver is here and prepared today
23  to testify, both in his individual capacity
24  pursuant to the Notice of Deposition served on
25  June 18th and also as a 30(b)(6) witness on behalf

Page 9

1             A. Carver
2   of the Kaiser plaintiffs pursuant to the Notices
3   served on July 5th, the 30(b)(6) Notice on
4   corporate structure that was served on June 22nd
5   and the corporate and document retention 30(b)(6)
6   Notice served on June 22nd.
7        All of this was set forth in the
8   letter to Matthew Roland dated July 5th.
9   Mr. Carver is prepared to be deposed today and
10  tomorrow.  There is 12 hours allocated to the
11  defendants.  There is only one attorney here that
12  is not from Davis Polk, and that is an attorney
13  representing the class who has indicated on the
14  record that he will not seek any time.
15       We're ready to begin the deposition.
16  DIRECT EXAMINATION
17  BY MR. JAMES:
18       Q.   Hello, Mr. Carver.  My name is Rajesh
19  James.  As I stated, I represent the defendants in
20  this action, Pfizer and Warner-Lambert.
21       During this deposition, I'll refer to
22  the plaintiffs Kaiser Foundation Hospitals and
23  Kaiser Foundation Health as "Kaiser."
24       Could you please state your full name
25  for the record?

Page 10

```
 1            A. Carver
 2    A.   Albert L. Carver.
 3    Q.   Are you employed by Kaiser?
 4    A.   I am.
 5    Q.   Is that Kaiser Foundation Hospital or
 6  Kaiser Foundation Health?
 7    A.   I'm employed by Kaiser Foundation
 8  Health Plan.
 9    Q.   What's the relationship between those
10  two entities?
11    A.   There's a contractual relationship
12  between Kaiser Foundation Hospitals, which Kaiser
13  Foundation Health Plan, Inc. contracts for
14  hospital services.
15    Q.   And what is your position with Kaiser?
16    A.   I'm vice-president of pharmacy
17  strategy and operations in California.
18    Q.   Have you ever been deposed before?
19    A.   Yes, I have.
20    Q.   I'll just go over some general rules
21  which you might well be familiar with.
22         I'll need verbal answers because the
23  court reporter can't record a nod or other
24  nonverbal gesture.  Please try to wait until my
25  question is done, and I'll do my best to wait
```

Page 11

```
 1            A. Carver
 2  until your answer is completed before answering --
 3  before asking the next question.
 4         And we can take breaks at any time.
 5  So, please let me know if you need a break.  I may
 6  ask you to complete answering any question that's
 7  still outstanding.  But otherwise, you know,
 8  please let me know if you need to take a break any
 9  time.
10         Your lawyer may object to the way I
11  ask a question, but you can still answer until she
12  instructs you not to do so.  You can ask me to
13  rephrase a question if you don't understand it,
14  and we can ask the reporter to read back any
15  questions that you need to hear again.
16         Do you understand those instructions?
17    A.   Yes, I do.
18    Q.   The relevant period for the purposes
19  of this deposition is 1994 to the present.  So, if
20  I ask any question, you should understand that
21  question to refer to that time period unless I
22  specify otherwise.  And if you need greater
23  specificity, please let me know; otherwise, I'll
24  assume that your answer applies to the period from
25  1994 to the present.
```

Page 12

```
 1            A. Carver
 2         You mentioned that you had previously
 3  been deposed.
 4         Could you please describe the
 5  circumstances?
 6    A.   Roughly three or four years ago, I was
 7  deposed in a personnel matter, and secondly, the
 8  other deposition that comes to mind is two or
 9  three years ago, I was deposed in a -- a
10  pharmaceutical company litigation matter.
11    Q.   With regard to the latter matter, who
12  were the parties in that matter?
13    A.   The parties were Kaiser and then
14  Abbott Laboratories.
15    Q.   And Kaiser was the plaintiff in that
16  matter?
17    A.   Yes.
18    Q.   Have you ever given prior testimony in
19  any other matter, either in court or in
20  legislative hearings or by affidavit, or it was
21  all other legal proceedings?
22    A.   Not in any recent history.  I was
23  involved in a legal proceeding back in the '80s.
24  It was a civil matter related to a construction
25  litigation involving Kaiser.
```

Page 13

```
 1            A. Carver
 2         I was involved in a personal, very
 3  small automobile thing back in 1970.  And then I
 4  was involved in a criminal matter from the
 5  standpoint of I had just a very small piece of
 6  testimony in a murder case.
 7    Q.   I wanted to just go over your
 8  background before we begin the heart of the
 9  30(b)(6) deposition.
10         Can you go over your postsecondary
11  schooling with me?
12    A.   Well, I received a pharmacy degree
13  from Oregon State University in 1970, and that is
14  my formal education.
15    Q.   And then after you graduated from
16  Oregon, what was your -- what was your first
17  position?
18    A.   My first position was a pharmacist at
19  the Los Angeles Medical Center.
20    Q.   And either at Oregon or in your first
21  job as a pharmacist, did you learn about off-label
22  prescription or off-label promotion?
23         MS. NUSSBAUM:  Objection.  Overly
24  broad.
25    Q.   You can answer if you understand the
```

4 (Pages 10 to 13)

A. Carver

1              A. Carver
2    question.
3        A.    That goes back 37 years and so, I
4    really don't recall 37 years ago if I was
5    well-versed in off-label use of medications or
6    not.
7        Q.    After your initial position as a
8    pharmacist, what was your next position after
9    that?
10       A.    My next position was an assistant
11   chief pharmacist at the Los Angeles Medical Center
12   of Kaiser Permanente.
13       Q.    And what were your responsibilities in
14   that role?
15       A.    I had a responsibility for the
16   management of both the outpatient pharmacy piece
17   of the organization at Los Angeles Medical Center,
18   as well as the inpatient pharmacy services at the
19   Los Angeles Medical Center.  I was in that
20   capacity for three years.
21       Q.    That takes us to what year, roughly?
22       A.    1975.
23       Q.    And then at that point, you moved to
24   which role?
25       A.    I moved to the role of the staff

1              A. Carver
2    assistant to the director of pharmacy in southern
3    California.  I was in that capacity for
4    approximately one year.
5        Q.    How did your responsibilities change
6    between those two positions?
7        A.    My responsibilities changed from being
8    the active manager of pharmacy services delivery
9    to one of more writing policies and procedures,
10   etc. for the entire region.  So, in a sense, my
11   responsibilities were expanded to having an impact
12   on the region.
13       Q.    That region is southern California?
14       A.    That's correct.
15       Q.    How many regions does Kaiser have
16   altogether?
17       A.    Eight regions.
18       Q.    What are those?  Those are southern
19   California --
20       A.    Southern California, northern
21   California, Hawaii, northwest, Colorado, Ohio,
22   Georgia, and mid-Atlantic.
23       Q.    Going back to your career history, you
24   said that you were in the last role for one year,
25   and then at that point, you --

1              A. Carver
2        A.    Correct.  And then I became the area
3    pharmacy director for one of the service areas in
4    southern California known as the Harbor City
5    service area at that time.  I was in that capacity
6    for a period of four years.
7        Q.    And your responsibilities in that
8    capacity?
9        A.    I had the overall responsibility for
10   pharmacy services, both inpatient and outpatient
11   services for the pharmacy services that were
12   provided in that geographic region or area within
13   the southern California region.
14       Q.    Does that take us up to 1980, now?
15       A.    That takes us to 1980.
16             In 1980, I became the area pharmacy
17   director in the Orange County area of Kaiser
18   Permanente.  So, it was a lateral move to an area
19   that was closer to my home and it was an area to
20   which we had just opened as a new service area.
21       Q.    And how long were you in that role?
22       A.    I was in that role for approximately
23   one year.  And during the period of time that I
24   was in that role, I also assumed responsibility as
25   the manager of a large project to acquire and

1              A. Carver
2    implement our pharmacy computer system in southern
3    California known as PIMS.  I was in that capacity
4    until the middle of 1986.
5        Q.    Does each region typically have a
6    different computer system?
7        A.    The -- as part of my role there, we
8    implemented the system in southern California, and
9    then while I was in that position also in Colorado
10   and in the northwest, and then my successors
11   completed implementation of that system in Hawaii,
12   Ohio, and in Georgia.
13             We actually ended up with the same
14   computer system, but it came with an acquisition
15   in that region essentially.  And so the answer is
16   the outpatient pharmacy piece of business in
17   Kaiser Permanente in those days and to this day
18   all have the same pharmacy computer system.  That
19   leaves us a different computer system in
20   mid-Atlantic and in northern California.
21       Q.    And I think now, I guess moving back
22   to the career history, if you could proceed, it
23   was all the '80s up to the next position?
24       A.    Okay.  In 1986, I became the director
25   of pharmacy operations for southern California.

Page 18

1           A. Carver
2      Q.   And that role involved what
3  responsibilities?
4      A.   That role involved the executive
5  leadership and management of all pharmacy services
6  for Kaiser Permanente in southern California.  So
7  that entailed our outpatient business for southern
8  California, as well as the hospital pharmacy
9  business, as well as responsibility for pharmacy
10  services to home infusion pharmacies or home
11  health patients.  It was all our home infusion
12  pharmacies.
13           It also entailed responsibility for
14  oversight of our warehouse and purchasing
15  operations in southern California and also for
16  oversight of the drug information service in
17  southern California and oversight of our pharmacy
18  computer systems in southern California.
19      Q.   What is the Drug Information System in
20  southern California?
21      A.   Excuse me.  It's a drug information,
22  as much as -- not a system, perhaps I misspoke if
23  I used the word "system."  The Drug Information
24  Service is a service that is a department of
25  pharmacists, and it was quite a small department

Page 19

1           A. Carver
2  back in those days, but a department that is
3  involved in answering inquiries regarding
4  medications that come from the medical staff or
5  the pharmacy staff or the nursing staff.  So it's
6  a centralized service providing drug information
7  to those professionals.
8      Q.   You said to pharmacy staff and what
9  were the other groups?
10      A.   To nurses, to doctors, to pharmacists.
11      Q.   Do you affirmatively provide that
12  information, or was it something like a hotline
13  that the staff could call in when they deemed it
14  useful?
15      A.   It was a responsive service.
16      Q.   Proceeding to your next role.
17      A.   My job was expanded at approximately
18  the beginning of 1998 to also have responsibility
19  for pharmacy services in northern California, so
20  essentially pharmacy services for the entire
21  state.
22      Q.   And you had that position in 1998
23  until what time?
24      A.   I currently have that position.  Until
25  now.

Page 20

1           A. Carver
2      Q.   So during the relevant period in 1994
3  forward, you have had two positions which have
4  involved similar responsibilities, except that in
5  1998, the geographic scope of that position
6  expanded to encompass all of California, as
7  opposed to simply southern California?
8      A.   That's correct.
9      Q.   Have you participated in continuing
10  education from 1994 forward?
11      A.   Yes, I have.
12      Q.   What type of continuing education
13  generally?
14      A.   Generally the continuing education
15  sufficient to retain my license as a pharmacist.
16      Q.   What would the subject matter of those
17  continuing education programs be?
18      A.   A variety of pharmacy and drug-related
19  content sufficient to maintain my license.
20      Q.   Did some of those programs involve
21  attending conferences?
22      A.   Yes.
23      Q.   Have you spoken at any conferences?
24      A.   I don't believe so.
25      Q.   And have you participated in seminars?

Page 21

1           A. Carver
2      A.   Yes, I have.
3      Q.   Have you led any seminars?
4      A.   No, I have not.
5      Q.   Have you received any specific
6  training in your current role or the role that you
7  had prior to 1998?
8      A.   I attended two -- two programs that
9  have been relevant and helpful in my current
10  position.  One was a Kaiser Permanente executive
11  program at Stamford University that was a
12  several-week program.
13           The second one was an advanced
14  leadership program at the Keenan Flagler Business
15  School at the University of North Carolina.
16      Q.   In an effort to remain up to date in
17  your field, do you read articles or similar
18  resources?
19      A.   Yes, I do.
20      Q.   How often?
21           MS. NUSSBAUM:  If you can estimate.
22  Don't speculate.
23      A.   Just intermittently.
24      Q.   What sorts of articles do you read?
25           MS. NUSSBAUM:  Overly broad;

A. Carver

1
2 objection.
3     A.   Articles regarding pharmacy service
4 delivery, hospital pharmacy articles, occasionally
5 articles regarding specific therapies.
6     There is a requirement to keep, you
7 know, to review some articles related to
8 regulations and law, etc., as it relates to
9 pharmacy practice, but just general -- general
10 articles to keep me generally current with the
11 profession.
12     Q.   Have any of these articles discussed
13 off-label prescription?
14         MS. NUSSBAUM:  If you recall, don't
15 speculate.
16     A.   Not that I recall.
17     Q.   Have any of the articles concerned
18 off-label promotion?
19         MS. NUSSBAUM:  If you recall.
20     A.   Not that I recall specifically.
21     Q.   Have any articles concerned Neurontin?
22         MS. NUSSBAUM:  If you recall.
23     A.   Not that I recall specifically.
24     Q.   In your current role, are you
25 responsible for managing Kaiser's management with

A. Carver

1
2 pharmacy benefit managers?
3     A.   We have an extremely limited
4 relationship with pharmacy benefit managers in
5 that Kaiser Foundation Health Plan, and Kaiser
6 Foundation Hospitals owns and operates its own
7 pharmacies and provides directly the pharmacy
8 services and prescriptions to our members and
9 provides directly nearly all the prescriptions,
10 and when I say "nearly all," I would say
11 98 percent.  And so that's a very limited role as
12 it relates to any pharmacy benefit manager.
13     Q.   And does the pharmacy benefit manager
14 cover the remaining 2 percent?
15     A.   Yes, the pharmacy benefit manager
16 would have a -- would administer contractually an
17 arrangement for that roughly 2 percent.
18     Q.   And are you responsible for managing
19 that relationship?
20     A.   I have signed the agreement, or at
21 least extensions to the agreement or amendments to
22 the agreement with Med Impact and so, in a sense,
23 yes.
24     Q.   Are you involved in deciding the scope
25 of prescription drug coverage?  This is setting

A. Carver

1
2 aside the pharmacy benefit manager question, and I
3 guess, in focusing on the 98 percent again --
4         MS. NUSSBAUM:  If you understand the
5 question.
6     Can you be more specific?
7     Q.   Are you involved in deciding the scope
8 of prescription drug coverage to Kaiser's
9 insureds?
10     A.   Certainly I have discussions and
11 influence regarding the prescription drug
12 benefits; however, I don't make the final decision
13 regarding the design of prescription drug
14 benefits.
15     Q.   And does your role include formulary
16 management?
17     A.   My role in -- has involved
18 recommendations within the health plan related to
19 linking the drug benefit coverage to the
20 formulary.
21         My role also has involved serving on
22 the medical staff pharmacy and therapeutics
23 committee who are administering the formulary.
24     Q.   Is that referred to as a P&T
25 committee?

A. Carver

1
2     A.   Yes, it is.
3     Q.   Is there a separate P&T committee for
4 each region or is there a single P&T committee for
5 Kaiser nationally?
6     A.   There is not a national P&T committee.
7 There is a P&T committee that makes formulary
8 decisions for each region.
9     Q.   Do those P&T committees communicate
10 with each other regarding their decisions?
11     A.   Yes, they did.
12     Q.   Are you involved in assessing the
13 efficacy of prescription drugs?
14         MS. NUSSBAUM:  Can you explain what
15 you mean by that?
16     Q.   You can answer to the extent you
17 understand the question.
18     A.   I would ask if you are asking the
19 question from the standpoint of me personally or
20 if you are asking the question from the standpoint
21 of Kaiser Foundation Health Plan, or what's the
22 context?
23     Q.   No -- actually, I guess at this point,
24 I'm just asking about your role personally.  I
25 think in a few minutes, we will get to asking

A. Carver

1
2    questions about Kaiser Foundation Health Plan.
3        A.    Okay.  I do not personally evaluate
4    the efficacy of the drugs; no.
5        Q.    Are you responsible for containing
6    costs associated with prescription drugs?
7        A.    I'm responsible for helping to assure
8    the appropriate use of our health plan members'
9    money, and so to the degree that that -- so in a
10   sense, yes.
11       Q.    How do you define an appropriate use
12   of your health plan members' money?
13       A.    I don't want our health plan members
14   to pay any more money for their drugs, either the
15   members directly or the groups that contract with
16   us for provision of our services than they should
17   have to pay.
18       Q.    And what is your role in that process?
19       A.    Could you give me a little bit more
20   context?  Again, is this my personal role?
21       Q.    Again, this is still personal role.
22   I'll try to be very clear when we move to asking
23   questions in the corporate capacity.
24       A.    My personal role then is to try to
25   assure that we have processes in place that would

A. Carver

1
2    help us manage the use of drugs within our
3    membership.  By that, I mean we have Drug
4    Information Services to answer questions should
5    physicians have them and we have other activities
6    that are -- that would review usage.
7        Q.    What are some of those other
8    activities?
9        A.    We have a -- a drug use management
10   infrastructure, I would call it, so I have
11   reporting to me two drug use management leaders
12   that cover -- that have responsibility essentially
13   in California.
14       Q.    Is that separated geographically so
15   one covers northern California and the other
16   southern California?
17       A.    It is, but both work very
18   collaboratively with each other.  But, yes, that's
19   a correct assessment.
20       Q.    You mentioned earlier that you serve
21   on the P&T committee.
22             Is it for both northern and southern
23   California?
24       A.    Yes.
25       Q.    So you're on two separate committees?

A. Carver

1
2        A.    Yes.
3        Q.    Are you serving on any other committee
4    within Kaiser?
5        A.    Not as it relates to drugs or, or
6    relevant specifically to pharmacy, per se.
7        Q.    What other committees are you formally
8    a member of?
9        A.    I'm a member of the executive
10   compliance committee in northern California.  I'm
11   a member of the fee schedule oversight group,
12   which has national scope.  I'm a member of the
13   clinical content oversight group of the health
14   connect project.
15             Perhaps there's others that are not
16   coming to mind, but that at least, I think, gives
17   you a flavor of my involvement.
18       Q.    Have you been previously on any
19   committees related to pharmacy that you're no
20   longer a member of?
21             MS. NUSSBAUM:  If you recall?
22       A.    I co-launched the biotechnology
23   committee a few years back in conjunction with a
24   physician.  Basically that was intended to give
25   special attention to biotechnology-derived

A. Carver

1
2    products.  I'm no longer on that committee.
3    That's the only thing that comes to mind at the
4    moment.
5        Q.    Are you aware that this deposition is
6    being taken in connection with a lawsuit filed by
7    Kaiser in which it alleges that the defendants
8    made fraudulent statements or omissions that
9    caused doctors to prescribe Neurontin for
10   off-label uses?
11       A.    I am.
12             MR. JAMES:  I'd like to mark the first
13   exhibit.
14             (Kaiser-1 marked for identification.)
15       A.    Yes, I recognize this.
16       Q.    And do you understand that you're
17   providing answers on behalf of Kaiser, a plaintiff
18   in this action, in response to this -- to this
19   document?
20       A.    I do.
21       Q.    And could you confirm that you've been
22   designated as Kaiser's corporate representative
23   with regard to each of the topics in this notice?
24       A.    Yes.
25       Q.    How did you prepare to testify

1          A. Carver
2 regarding the topics that have been noticed?
3          MS. NUSSBAUM: I would caution the
4 witness not to divulge any discussions with
5 counsel as part of that preparation.
6      Q.   I guess, just to clarify, I understand
7 that the witness can testify that he met with
8 counsel for a particular span of time, but just
9 shouldn't get into any legal advice that's been
10 provided to you by counsel or any information you
11 provided to counsel seeking legal advice.
12     A.   Yes. In preparation for today, I have
13 met with counsel and I have reviewed briefly a
14 number of documents that have been provided to me
15 by counsel.
16     Q.   Have you met with anyone other than
17 counsel?
18     A.   No, I have not.
19     Q.   And roughly how long did you meet with
20 counsel?
21     A.   I would say roughly four or five hours
22 total, including a little bit of time this
23 morning.
24     Q.   About how many meetings in total were
25 there?

1          A. Carver
2     A.   I believe a total of three.
3     Q.   When did those meetings take place?
4     A.   Over the course of the last three
5 weeks, I believe. And these were, other than
6 today, just telephone meetings.
7     Q.   And when you refer to counsel, are you
8 referring to Ms. Nussbaum or other individuals as
9 well?
10     A.   Yes. Ms. Nussbaum, as well as Mitch
11 Cohen. Only counsel that are present here today,
12 I believe.
13     Q.   And were any facts conveyed to you by
14 counsel that are responsive to this notice?
15         MS. NUSSBAUM: Objection, as to any
16 conversations between the witness and his counsel.
17         MR. JAMES: Are you taking the
18 position that factual information which Mr. Carver
19 might be providing in response to this Notice is
20 subject to the attorney-client privilege?
21         MS. NUSSBAUM: I'm taking the position
22 that discussions that Mr. Carver and counsel
23 with respect to this litigation are privileged
24 discussions. If you want to, in general, ask did
25 he and counsel discuss the subject matters

1          A. Carver
2 contained in this 30(b)(6) Notice, as well as the
3 other Notices that he is testifying to today as to
4 corporate structure and as to document retention,
5 certainly we will allow him to answer that
6 question.
7         MR. JAMES: But you would direct him
8 not to answer questions regarding what factual
9 information was provided to him with counsel
10 responsive to this Notice?
11         MS. NUSSBAUM: I am not going to have
12 him testify as to specific discussions that he had
13 with counsel.
14     Q.   You noted that you had reviewed some
15 documents in order to prepare yourself for this
16 deposition.
17         Roughly how many documents were they?
18     A.   I would really be guessing, but
19 generally, documents that had been provided as a
20 result of your requests for documents to counsel,
21 and then just making certain, I think, that I had
22 the benefit of at least seeing what some of these
23 documents were, and so I would tell you maybe
24 documents of this many, I couldn't tell you how
25 many documents that that represented. I'm sorry,

1          A. Carver
2 I don't know.
3     Q.   Can you describe the documents
4 generally?
5         MS. NUSSBAUM: I believe it's asked
6 and answered. The witness just said that they
7 were documents produced to you in this litigation
8 responsive to requests that he had made.
9     Q.   Is there any more specific description
10 that you can give of the documents that you have
11 reviewed?
12         MS. NUSSBAUM: I would object to this
13 question. If it's documents that he received from
14 counsel on work product, so if you have, you know,
15 a specific question or you have a specific
16 document you want to ask him whether or not he
17 reviewed that, but you know, the documents that
18 have been produced to you in this litigation and
19 that's what he's told you that he's reviewed.
20         MR. JAMES: Are you directing him not
21 to answer the question?
22         MS. NUSSBAUM: Well, I think that if
23 what you're asking for is work product, that is an
24 improper question. And that's the position that
25 Davis Polk has taken in all of the depositions

Page 34

1          A. Carver
2  that they have defended.
3          So if you asking are there particular
4  documents that counsel showed you in preparation,
5  the consistent position has been that that's work
6  product and improper.  The witness has already
7  told you that the documents that he looked at were
8  documents that were produced in discovery.  If you
9  want to specifically ask, did he specifically
10 review document A or document B if he recalls, he
11 can answer that question.
12     Q.   Did you do anything else to prepare,
13 other than the discussions with counsel in
14 reviewing these documents that were provided to
15 you by counsel?
16     A.   No, I did not.
17     Q.   Did you have experience or knowledge
18 regarding these topics before your preparation?
19     A.   Yes, I did.
20     Q.   Which topics would you identify?
21     A.   Do you want me to go through each one
22 separately?
23     Q.   You don't have to say anything much
24 about them.  I think just identifying which ones
25 were ones previously in your knowledge?

Page 35

1          A. Carver
2          MS. NUSSBAUM:  Okay.  To clarify, you
3  want to go through Kaiser Exhibit 1 seriatim, and
4  with respect to, starting on page 8, concerning
5  topics, he should simply say, for example, topic
6  one, yes, I had knowledge prior to preparation;
7  topic two, yes, I had knowledge, or no, I did not
8  have knowledge.  That's what you want?
9          MR. JAMES:  Right.
10         MS. NUSSBAUM:  That's what he wants.
11     A.   Yes, thank you for the clarification.
12         Topic one, yes.  Topic two, yes.
13 Topic three, yes.  Topic four, yes.  Topic five,
14 yes.  Topic six, yes.  Topic seven, yes.  Eight,
15 yes.  Nine, yes.  Ten, yes.  Eleven, yes.  Twelve,
16 yes.  Thirteen, yes.  Fourteen, yes.  Fifteen,
17 yes.  Sixteen, yes.  Seventeen, yes.  Eighteen,
18 yes.  Nineteen, yes.  Twenty, yes.  Twenty-one,
19 yes.  Twenty-two, yes.  Twenty-three, yes.
20     Q.   Getting from this point in the
21 deposition, if I use the phrase "you," I will be
22 referring to Kaiser and all of subsidiaries, and
23 if I mean you personally, I'll specify that I do.
24 And if you mean to refer to yourself personally
25 rather than to Kaiser, you should tell me.

Page 36

1          A. Carver
2  Otherwise, I'll refer to -- I'll assume that
3  you're answering on behalf of Kaiser.
4          What is Kaiser's purpose?
5      A.   Kaiser's purpose is to provide high
6  quality, affordable healthcare services to its
7  membership and also to improve the health of our
8  membership and to improve the communities in which
9  we serve to the degree that we can do that.
10     Q.   Does Kaiser operate for profit?
11     A.   Kaiser does not operate for profit.
12 Both Kaiser Foundation Hospitals and Kaiser
13 Foundation Health Plans, Inc. are non-profit,
14 charitable organizations.
15     Q.   Has that been the case since 1994?
16     A.   Yes, it has.
17     Q.   Outside the -- or actually, can you
18 tell me where Kaiser is located?
19         MS. NUSSBAUM:  Are you talking about
20 the main corporate offices?
21     Q.   I guess, where do you -- not actually
22 your corporate offices, but where do you actually
23 provide your services?  I think some of the
24 regions you gave me earlier are self-explanatory,
25 so --

Page 37

1          A. Carver
2      A.   And I, to only elaborate slightly upon
3  those regions that I provided to you, Hawaii is
4  self-explanatory.  The northwest entails primarily
5  services in the state of Oregon and some members
6  in the state of Washington.  California, I
7  believe, is self-explanatory.  Colorado is
8  self-explanatory.  Ohio is self-explanatory.
9  Georgia is self-explanatory.  Mid-Atlantic states
10 includes the geographic area contingent and around
11 Washington, D.C.
12         So we have membership in Maryland,
13 Virginia, and the District of Columbia.
14     Q.   How is Kaiser structured?  I guess
15 you've told me how the two principal entities that
16 are plaintiffs in this action are structured?
17     A.   Yes.
18         MS. NUSSBAUM:  Can you be more
19 specific?  I think that's already been, in
20 general, asked and answered.  If you have a more
21 specific question, the witness is happy to answer
22 it.
23     Q.   Well, we have the two plaintiffs and
24 then are each of them organized into eight
25 regions?

A. Carver

1
2    A.   Kaiser Foundation Health Plan, Inc.
3    is -- is made up of the medical care delivery
4    operations in California and Hawaii.  And then
5    each of the other regions have subsidiary health
6    plans.
7         Each of the regions have a board of
8    directors.  The board of directors is a common
9    board of directors between Kaiser Foundation
10   Hospitals and Kaiser Foundation Health Plans, Inc,
11   and those I represent, the plaintiffs.  And Kaiser
12   Foundation Health Plan, Inc. contracts with
13   Permanente Medical Groups for the delivery of
14   medical care.
15        The Kaiser -- the Permanente Medical
16   Groups are separate corporate structures, have
17   their own board of directors and are responsible
18   for the organization and the management and the
19   delivery of the physician medical services in each
20   of the respective regions.
21        Q.   So, all three entities, I guess the
22   two plaintiffs here, plus Permanente Medical Group
23   are each divided into these eight regions, is that
24   correct?
25        A.   Conceptually, yes.

A. Carver

1
2        Q.   And the two plaintiffs have a separate
3    board of directors for each of the eight regions,
4    but that board of directors is shared between the
5    two entities, is that right?
6        A.   We -- there is a common board of
7    directors for Kaiser Foundation Health Plan, Inc.,
8    which includes California and Hawaii, and then the
9    other regions are subsidiary regions that also
10   have their board of directors, and many of the
11   members are common across each of the health
12   plans.
13        Q.   Okay.  So, there's board members who
14   may be members of multiple regions?
15        A.   Yeah, correct.
16        Q.   Do these directors handle issues
17   related to prescription drug benefits?
18        MS. NUSSBAUM:  Do you understand the
19   question?
20        A.   I don't understand the question
21   specifically.
22        Q.   So do members of the boards of
23   directors of each of these regions have
24   responsibility for handling issues relating to the
25   provision of prescription drug benefits?

A. Carver

1
2        A.   And could you help me with what you
3    mean regarding issues?
4        MS. NUSSBAUM:  Is your question is it
5    a function of the members of the board of
6    directors to determine physician -- to determine
7    prescription drug benefits?
8        Q.   I guess in addition to actually
9    determining them, do they have some other role, I
10   guess, related to the determination of
11   prescription drug benefits?
12        A.   Not directly.
13        Q.   Do they have any role in deciding the
14   scope of pharmacy coverage?
15        A.   Not directly.
16        Q.   What sort of indirect role would they
17   have?
18        MS. NUSSBAUM:  If any?
19        A.   I think only to the degree that the
20   board of directors provides oversight to the
21   hospitals and the health plans, that's just a
22   general oversight role that they provide.  The
23   specific drug benefits are defined in each of the
24   program regions under the responsibility of the
25   health plan manager.

A. Carver

1
2        Q.   Who was the health plan manager in the
3    southern California area?
4        A.   I would say that the health plan
5    manager in southern California would be -- there's
6    a general health plan manager responsible for the
7    benefits, and that would be Gerald Fleming.
8        Q.   And what is the scope of his
9    responsibilities?
10       A.   From a practical point of view as it
11   relates to the drug benefits, serves on the
12   benefits committee who makes a determination
13   regarding benefits and has overall responsibility
14   for some of the marketing efforts.
15       Q.   Who else is on the benefits committee?
16       A.   I'm not sure that I know the makeup of
17   the benefits committee.
18       Q.   Do you know generally what sorts of
19   people they are?  Are they all Kaiser employees?
20       A.   There are Kaiser employees.  There are
21   not, to my knowledge, any external members to the
22   benefits committee.  And I believe that there is
23   some physician membership that may serve to the
24   degree that there's a need for input on just
25   medical benefits per se.

Page 42

```
1              A. Carver
2     Q.   Does Kaiser have a website?
3     A.   Yes, we do.
4     Q.   And how long has Kaiser had this
5  website?
6     A.   For several years.  I'm sorry.  I
7  don't know the exact year in which the website was
8  launched.
9     Q.   Who creates or decides its content?
10    A.   The content of the website generally
11 is under the health plan leadership.
12    Q.   And how often is the content of the
13 website changed?
14    A.   Not frequently enough.  I don't know
15 the schedule of changing the website, but it's
16 been a fairly stable website in terms of the types
17 of content.  But I can't tell you the frequency of
18 updating or editing specific components of the
19 website.
20    Q.   Can Kaiser access its old web pages?
21    A.   I'm not sure that I understand that
22 question.
23    Q.   I guess to the extent there was
24 material posted on the website in the past which
25 is no longer visible on the website, does Kaiser
```

Page 43

```
1              A. Carver
2  have access to an archive of that sort of
3  information?
4     A.   I believe we would have, yes.
5     Q.   Have responsive documents been
6  produced from the website?
7     MS. NUSSBAUM:  That is a legal
8  question and I don't think that, you know, the
9  witness is a lawyer.  If you want to ask him about
10 the document production here, you know, in general
11 he's a 30(b)(6) witness.  He is prepared to
12 respond to that.
13    Q.   In response to the defendant's request
14 for production of documents, was the website then
15 passed -- web pages searched?
16    A.   Could I ask a question of
17 clarification?  What do you mean by "website"?
18    Q.   You indicated that Kaiser has a
19 website; correct?
20    A.   I did.
21    Q.   And which website were you referring
22 to?
23    A.   I was referring to a website that's a
24 public website, and from your line of questioning,
25 I'm not sure that that's what you were -- I'm now
```

Page 44

```
1              A. Carver
2  confused as to what you are meaning by the
3  "website."
4     Q.   In addition to the public website,
5  does Kaiser maintain internal websites?
6     A.   Yes, we do.
7     Q.   So then I guess returning to the
8  question, I guess first were documents that are
9  either currently visible on Kaiser's website or
10 otherwise were previously posted to that website
11 during the relevant period searched in response
12 for -- to the defendant's requests for productions
13 of documents?
14    A.   I believe they were.
15    Q.   What's the basis for that belief?
16    A.   The basis for the belief is that your
17 request for documents and information came to our
18 legal counsel.  I believe that --
19    MS. NUSSBAUM:  I would ask you not to
20 give any specific advice or discussion that you
21 had with counsel with respect to their request.
22    Q.   Does anyone at Kaiser have knowledge
23 of whether the public website, including its
24 previously posted content, was searched except
25 information derived from Kaiser's legal counsel?
```

Page 45

```
1              A. Carver
2     A.   I do not know whether or not previous
3  versions of publicly-available information on the
4  website were searched or not.
5     Q.   But the currently available website
6  was -- public website was searched?
7     MS. NUSSBAUM:  To the best of your
8  knowledge.
9     A.   To the best of my knowledge, all the
10 information has been provided from all of our
11 current public -- all of our current sources of
12 information.
13    Q.   And that's information you obtained
14 from legal counsel, is that right?
15    MS. NUSSBAUM:  I'm unclear now, when
16 you say that's information that you obtained from
17 your legal counsel, would you rephrase that
18 question?
19    MR. JAMES:  In stating that the public
20 website has been searched, does he have any basis
21 for that belief other than information from legal
22 counsel?
23    Q.   Is there anyone at Kaiser, other than
24 Kaiser's legal counsel, who would know whether
25 information relating to Kaiser's public website
```

A. Carver

1
2    was searched in response to defendant's document
3    requests?
4        A.   I'm not sure.  We would have legal
5    counsel that would be familiar with whether or not
6    the website was searched, and then we would have
7    the administrator of the public website that would
8    be familiar with whether or not it was searched.
9        Q.   With regard to the private websites
10   that you mentioned --
11       A.   Yes --
12       Q.   -- earlier, were those searched in
13   response to the requests for production of
14   documents?
15       A.   I believe they were.
16       Q.   Is there anyone at Kaiser other than
17   its legal counsel who would be able to confirm
18   that fact?
19           MS. NUSSBAUM:  I think that this
20   witness just confirmed the fact.  He said, yes, he
21   believes that they were.
22       Q.   What's the basis for that belief?
23       A.   I believe that -- that legal counsel
24   requested from a broad variety of people within
25   Kaiser Permanente information and the searching of

A. Carver

1
2    information that would be responsive to your
3    request for information.
4        Q.   Do you specifically know whether any
5    individuals responsible for the private websites
6    were contacted?
7        A.   Yes, I do.
8        Q.   Who were those individuals?
9        A.   From the people that maintain our
10   pharmacy website information, Calvin Tagasi and
11   Dennis Arocki.
12       Q.   What are their titles?
13       A.   Calvin Tagasi is a supervisor in the
14   pharmacy analytical services department.  And
15   Dennis Arocki is a pharmacist in the pharmacy
16   analytical services department.
17       Q.   Just returning to the organizational
18   structure, within each of these eight regions,
19   there's a board of directors, although California
20   and Hawaii are both served by the board of
21   directors of Kaiser Foundation Health Plan,
22   correct?
23       A.   Correct.
24       Q.   Beneath the board of directors, what
25   are the -- what are the different departments of

A. Carver

1
2    the plaintiffs in these regions?
3        A.   At the highest level, there's a
4    president of each of the respective regions.  So
5    president for Hawaii, a president for southern
6    California, a president from -- for northern
7    California, etc., for each of the regions that
8    I've outlined.
9        Q.   And then beneath the president, what
10   other departments were there?
11       A.   And then, and then beneath the
12   president in -- there is a -- there can be one or
13   more chief operating officers.  And so I will give
14   you an example, if I might.
15           For southern California, there are two
16   chief operating officers that then have overall
17   responsibility for the operation of the hospitals,
18   as well as the health plan functions.  There is a
19   chief financial officer.  There is legal counsel.
20   There's public affairs.  There's -- I've already
21   mentioned the health plan manager function.  There
22   are, you know, some other direct reports to the
23   president that are related to strategy and
24   planning and those kinds of functions.
25           The facilities piece of the business,

A. Carver

1
2    and I might be, you know, overlooking a person or
3    two, but those I would say are the -- the very key
4    positions involved in the running of the region in
5    each of the respective regions.
6        Q.   And is it the health plan manager
7    function that has responsibility for setting
8    policy and procedure regarding coverage of
9    prescription drugs?
10       A.   Yes.
11       Q.   And is your personal role within the
12   health plan manager function?
13       A.   My personal role is not within the --
14   could you restate the question because I want to
15   make sure --
16       Q.   Right.
17           I was trying to get a sense of where
18   your -- I mean, that was speaking briefly of you
19   in your personal capacity where you fit within
20   this organization?
21       A.   Oh, where do I fit?  I am basically a
22   direct report to one of those COs, chief operating
23   officers.  That's both in northern and southern
24   California.
25       Q.   And the P&T committee on which you

1             A. Carver
2 serve, does that fit into this organizational
3 structure somewhere?
4      A.   No.  It didn't from the standpoint of
5 the P&T committee is generally a medical staff
6 committee, and I happen to be the health plan
7 representative on that.  It's a committee of
8 doctors essentially, and the doctors are the ones
9 who are the primary voting members on the P&T
10 committees.
11         I am the only voting health plan
12 person.  And so I, in the case of southern
13 California, I am one of 12 or 13 voting members of
14 which the -- all of whom the others are physicians
15 and in northern California, same position, but
16 there is 17 or 18 voting physician members.
17      Q.   Is the P&T committee actually under
18 Permanente Medical Group, as opposed to the
19 plaintiffs' organizational structure?
20      A.   It is.  It is a -- it is under
21 Permanente Medical Group, but the health plan
22 recognizes the pharmacy and therapeutics committee
23 as the body to make decisions regarding specific
24 drugs.  And so, well, that's it.
25      Q.   And the plaintiffs' contract with

1             A. Carver
2 Kaiser Permanente to provide medical services, is
3 that the correct relationship?
4      A.   The plaintiffs, meaning the whole plan
5 and the hospitals' contract with the Permanente
6 Medical Group to provide the medical services.
7 Was that your question?
8      Q.   Yes.  That answers my question.
9         In what businesses does Kaiser,
10 meaning the plaintiffs, engage?
11      A.   The plaintiffs engage in the business
12 of providing health insurance, selling health
13 insurance to individuals, as well as employer
14 groups for purposes of organizing that aspect
15 of -- making available essentially care that would
16 be delivered by the Permanente Medical Groups and
17 then they will also engage in the ownership and
18 operation of the hospitals, and so therefore, the
19 direct provision of hospital services, at least in
20 California and a couple of the other regions.
21      Q.   And some regions, Kaiser didn't
22 provide hospital services, is that correct?
23      A.   Kaiser, as part of insurance, provides
24 hospital services, but Kaiser does not own and
25 operate the hospitals, and so therefore, they

1             A. Carver
2 contract for the delivery of hospital services in
3 those regions, which we do not own and operate our
4 own hospitals.
5      Q.   Which regions are those?
6      A.   The regions that own and operate their
7 own hospitals are Hawaii, northwest and
8 California.  The others arrange for, contract for
9 the delivery of hospital services.
10      Q.   With regard to the other regions that
11 arrange for delivery of hospital services, what
12 would the P&T committee be comprised of,
13 physicians who are, I guess, basically not
14 employees of the Permanente Medical Group?
15      A.   I do not believe there would be anyone
16 that's not a part of the medical, you know, the
17 physicians are employed by the Permanente Medical
18 Groups and they represent -- and they are the
19 physician folks on that P&T committee, and then
20 the other members of that P&T committee would be
21 the pharmacy director in each of those respective
22 regions.
23      Q.   Are all of Kaiser's clients fully
24 insured?
25         MS. NUSSBAUM:  If you can answer that.

1             A. Carver
2 That's a very broad question.  What do you mean by
3 "fully insured"?
4      Q.   Well, with regard to medical and
5 health insurance or medical and pharmacy benefits
6 that Kaiser provides, is Kaiser or its clients at
7 risk -- I guess if they were not at risk and
8 Kaiser was at risk, I would refer to them as being
9 fully insured.
10         MS. NUSSBAUM:  I don't understand that
11 question.
12      Q.   Does Kaiser -- I guess, what types of
13 clients does Kaiser generally serve?
14         MS. NUSSBAUM:  I don't understand that
15 question either.
16      Q.   Well, if you understand the question,
17 you can answer it.
18      A.   Maybe you could rephrase it.
19      Q.   Actually, I guess earlier you stated
20 that Kaiser sells health insurance to individual
21 and employer groups?
22      A.   Correct.
23      Q.   Could you elaborate on that?
24      A.   The elaboration would be perhaps just
25 a restatement.  Kaiser sells health insurance to a

Page 54

```
1              A. Carver
2   wide variety of companies who are acquiring
3   healthcare benefits for their employee population,
4   either their existing employees or their retiree
5   population. So that would be what I would refer
6   to as the group business.
7         And then in addition to that, Kaiser
8   has available health insurance that individual
9   members can acquire directly by paying a monthly
10  premium to the health plan.
11     Q.   With regard to the employer groups,
12  are there any that Kaiser is providing
13  administrative services only to?
14     A.   I -- and so, by that, are you
15  referring to administrative services because the
16  employer group would be self-insured?
17     Q.   Yes.
18     A.   I do not believe that we are doing
19  that at this time.
20     Q.   Was there an earlier time within the
21  relevant period in which you were doing that?
22     A.   I don't believe so. I believe it's --
23  I believe we have an interest in doing it in the
24  future, but we're not quite there yet.
25     Q.   How does Kaiser charge for health
```

Page 55

```
1              A. Carver
2   insurance?
3         MS. NUSSBAUM: That's also a very
4   broad question. Can you -- do you have a more
5   specific --
6      Q.   You can answer if you understand.
7      A.   I can give you a broad answer. And
8   the broad answer is that we estimate the premiums
9   that are necessary to provide healthcare to the
10  group of individuals that we are going to be
11  providing the healthcare to.
12        And so that's -- that's very broad,
13  but basically that would establish -- would result
14  in a premium that groups would pay to us, and then
15  there are just a variety of benefit designs that
16  would determine how much any individual person
17  would pay as a copayment, as an example as part of
18  the package that they acquire.
19     Q.   How is the level of premium set?
20        MS. NUSSBAUM: Asked and answered.
21  This is what the witness just stated.
22     Q.   What sort of analysis is done to
23  determine the premium level?
24     A.   The premium is set as a result of
25  the -- our actuaries looking at current costs and
```

Page 56

```
1              A. Carver
2   projected costs and then determining what the
3   current costs and projected costs for providing
4   healthcare services to the large groups will be,
5   establishing for those services a premium
6   essentially and deducting from those premiums the
7   amount of money that would be the offset from any
8   individual patient's copay or cost sharing that is
9   involved.
10     Q.   If the cost of a prescription drug
11  increases, would the premium then increase for the
12  next period?
13     A.   Yes, that's correct.
14     Q.   Does Kaiser reinsure its risk for its
15  fully-insured policies?
16     A.   Kaiser basically is at risk for the
17  policies that, as you call them, that we -- that
18  we sell.
19     Q.   And it doesn't reinsure that risk with
20  any other entities?
21     A.   I do not believe so.
22     Q.   What are the documents called that
23  would set forth the health benefits for Kaiser's
24  insured individuals?
25     A.   There's a document called an evidence
```

Page 57

```
1              A. Carver
2   of coverage that outlines all of the details
3   regarding what is covered and what is excluded,
4   etc., including both the basic healthcare
5   provisions as well as the supplemental drug
6   benefits, as well as any drugs that might be
7   included as part of the basic health plan dues or
8   coverage.
9      Q.   Have those documents been produced
10  here, to your knowledge?
11     A.   I believe they have.
12     Q.   Does Kaiser only offer certain
13  standard types of insurance policies or are they
14  negotiated separately with different clients?
15     A.   Kaiser has developed some flexibility
16  in the design of the individual benefits that are
17  offered to the groups, and most of that
18  flexibility comes in the way of different levels
19  of copayments that might be associated with the
20  copayment for a doctor office visit, or the
21  copayment for emergency room visit, or the
22  copayment that might be associated with the
23  hospital -- hospitalization, or the copayment that
24  might be -- the copay level that might be
25  associated with a particular drug benefit.
```

Page 58

```
1              A. Carver
2        And so as a result of those different
3  levels of copayment and that type of flexibility,
4  we do, in fact, or have, in fact, you know, ended
5  up with a whole variety of various benefits that
6  can vary somewhat.
7        Q.   Aside from copay levels, does
8  prescription drug coverage defer in other ways
9  from one contract to the next?
10       A.   Well, it does.  There is a very -- a
11 very small percentage, perhaps 5 percent of our
12 membership that does not have a drug benefit as an
13 example.
14       But what the -- with the exception of
15 that 5 percent, essentially all of the other
16 members of Kaiser Permanente have some type of a
17 drug benefit, and with the -- with the variants
18 basically being related to that copayment
19 structure, it's a one-tier, two-tier, those kinds
20 of variances that you're probably familiar with.
21       MR. JAMES:  I'm informed we have five
22 minutes left on this tape, so I guess we'll take a
23 break, if no one has an objection.
24       THE WITNESS:  Okay.
25       MS. NUSSBAUM:  Let's try to, if it's
```

Page 59

```
1              A. Carver
2  okay with you, keep the breaks extremely short,
3  like five minutes.
4        MR. JAMES:  That's fine.
5        VIDEOGRAPHER:  The time is
6  approximately 2:33.  This ends tape number one.
7  We're now going off the record.
8        (Recess.)
9        VIDEOGRAPHER:  The time is
10 approximately 2:41.  This begins tape number two.
11 We're now on the record.
12 BY MR. JAMES:
13       Q.   We were discussing the policies that
14 Kaiser has with its insureds.  How often are
15 Kaiser's policies reissued to its clients?
16       A.   Yearly.
17       Q.   And what sort of changes are made from
18 one year to the next?
19       A.   It would vary depending upon the year
20 and the customer.
21       Q.   And you had mentioned premiums as one
22 thing that could change from one year to the next?
23       A.   Yes.
24       Q.   What other kinds of changes might be
25 implemented in a policy for one-year periods?
```

Page 60

```
1              A. Carver
2        A.   Copay levels.
3        Q.   Any others?
4        A.   Generally, not -- I don't think there
5  are any major -- major changes in terms of new
6  services or exclusions of services.  I think
7  generally they remain fairly constant.
8        Q.   How often are Kaiser standard
9  contracts revised?
10       A.   What -- could you tell me what you
11 mean by a "standard contract"?
12       Q.   Well, for example, I understand that
13 for the 95 percent of clients that have a
14 prescription drug benefit, the benefit is largely
15 similar, except for some differences in copay
16 levels.  I assume they are all based on one
17 standard contract, is that correct?
18       A.   There would be a different contract or
19 different provisions for that, would describe each
20 of the various copay levels as an example, whether
21 it would be the drugs or the emergency room visit
22 or the doctor office visit or the
23 hospitalizations.  They may all have a different
24 contract, and many of those benefit levels and
25 contracts are developed in response to the
```

Page 61

```
1              A. Carver
2  marketplace.
3        And so, it would be different
4  offerings or developed and then offered on an
5  annual basis.
6        Q.   Does Kaiser provide a description of
7  its benefit coverage to insureds, individuals?
8        A.   Yes.
9        Q.   In what format?
10       A.   Paper format.
11       Q.   Aside from the evidence of coverage
12 referred to earlier, is there a separate document?
13       A.   I believe that is the recognized
14 document.
15       Q.   Has Kaiser offered pharmacy benefits
16 to its clients for the entire relevant period?
17       A.   Yes.
18       Q.   And you mentioned earlier that
19 5 percent of Kaiser insureds do not receive
20 pharmacy benefits.  Has that percentage changed
21 over the relevant period?
22       MS. NUSSBAUM:  Approximately?
23       A.   I believe it's been relatively
24 consistent.  If anything, it would have diminished
25 slightly.
```

1          A. Carver
2     Q.   Are there any reasons for that?
3     A.   Yes.  Medicare Part D.
4     Q.   Are there specific Kaiser products
5  that contain no pharmacy benefit?
6     A.   Yes, there are.
7     Q.   What are those?
8     A.   Could you elaborate or ask it a little
9  differently?  I'm not sure I understand.
10    Q.   When you answer that there are Kaiser
11 products that contained no pharmacy benefit, what
12 did you have in mind?
13    A.   What I had in mind is there is a
14 description of a contract or a set of services
15 basically, the full set of services, healthcare
16 services that would -- in which the drug benefit
17 would be absent because the drug benefit is a
18 supplemental drug benefit.  It is not an automatic
19 package or not an automatic portion of the package
20 that comes along with the standard health benefit
21 coverage.  And so, there is such a contract that
22 exists.
23    Q.   You mentioned that some Kaiser
24 insureds might use Medicare Part D, as opposed to
25 pharmacy coverage through Kaiser.

1          A. Carver
2       Is that accurate?
3     A.   No.
4     Q.   How is that inaccurate?
5     A.   It's inaccurate in that Kaiser offers
6  a Medicare Part D benefit to each of the Medicare
7  beneficiaries that are not already covered by
8  their employer groups.
9     Q.   What are the reasons why certain
10 insureds might opt not to have Kaiser pharmacy
11 benefit coverage?
12       MS. NUSSBAUM:  If you know.
13       These are the reasons that the
14 insureds would have?
15    Q.   Actually, what reasons does Kaiser
16 know -- does Kaiser know of reasons why its
17 insureds sometime opt not to have pharmacy benefit
18 coverage?
19       MS. NUSSBAUM:  Don't speculate,
20 please.
21    A.   A situation in which I'm aware would
22 be a labor trust that represents some small number
23 or some number of its workers that may have
24 decided to obtain their drug benefit coverage
25 elsewhere.  That is the circumstance in which I am

1          A. Carver
2  referencing.
3     Q.   And you mentioned earlier that copays
4  might vary between one contract and another.
5       What are the different kinds of copays
6  that are incorporated in Kaiser's plans?  I guess
7  to start off, are fixed copays involved in some
8  plans?
9     A.   Yes.
10    Q.   And are percentage copays involved in
11 others?
12    A.   Typically not.
13    Q.   And aside from fixed or percentage,
14 are there any other kinds of copay structures?
15    A.   The primary variant would be just a
16 two-tier in which there would be a different
17 copayment for a generic product as compared to a
18 branded product.  And so that would be the major
19 other variant compared to just a single fixed
20 copay.
21    Q.   With regard to percentage copays, I
22 think you said something like principally not.
23       In what instances would you see a
24 percentage copay?
25    A.   There are no percentage copays in

1          A. Carver
2  California at all, and that -- that covers
3  75 percent of our membership around the country.
4  And I -- generally, there are not percentage
5  copayments in our programs, but there may be an
6  exception and a region may have some little
7  contract basically.
8       That's -- that's why I said
9  principally not.  The situation I'm aware of that
10 has such an arrangement would be in Colorado,
11 where there is a percentage -- percentage
12 copayment up to a maximum on some of the
13 biopharmaceutical products.
14    Q.   Who decides whether to have such a
15 maximum?  I can be a bit more helpful.
16       Is that something that an individual
17 employer group approaches Kaiser with?  I mean, do
18 they state that they want to impose that kind of
19 cap?
20    A.   Yes, employer groups do approach
21 Kaiser and often have particular benefits in mind.
22    Q.   And Kaiser is able to provide certain
23 customized benefits structures?
24    A.   Yes.
25    Q.   And earlier you said that each of the

A. Carver

1
2    regions does have a P&T committee.
3        Have each of the regions had a P&T
4    committee over the entire relevant period?
5        A.   Yes, I believe so.
6        Q.   Have the P&T committees been having
7    roughly the same level of activity throughout the
8    relevant period?
9        A.   I believe so.
10       Q.   Has Kaiser relied on Med Impacts' P&T
11   committee at all?
12       A.   No.
13       Q.   And you said in southern California
14   the P&T committee has 12 or 13 members, is that
15   correct?
16       A.   That's correct.
17       Q.   And the northern California P&T
18   committee has 18?
19       A.   17 or 18.  I -- yes.
20       Q.   Do you know the approximate number of
21   members of each of the other regions' P&T
22   committees?
23       A.   I do not.
24       Q.   Who would know that information?
25       A.   The pharmacy director in each of the

A. Carver

1
2    respective regions, as well as the director in
3    each of the respective regions.
4        Q.   With regard to the southern California
5    P&T committee, is 12 or 13 the number of voting
6    members or is that the number of total voting and
7    nonvoting members?
8        A.   No, there are several other nonvoting
9    members.
10       Q.   Several would be a number like six or
11   any estimate as to roughly how many nonvoting
12   members there are?
13       A.   Twelve.
14       Q.   And the voting members are, in
15   addition to yourself, entirely composed of
16   physicians employed by the Permanente Medical
17   Group?
18       A.   Correct.
19       Q.   And then who are the nonvoting
20   members?
21       A.   Generally the area of pharmacy
22   directors and then there is an additional
23   physician nonvoting member.
24       Q.   Who is also employed by the Permanente
25   Medical Group?

A. Carver

1
2        A.   Yes.
3        Q.   Aside from yourself and the area of
4    pharmacy directors, are there other individuals on
5    the P&T committee who would have pharmacy
6    training?
7        A.   Attending the meeting generally are
8    representatives, or at least in recent years have
9    been representatives of the Drug Information
10   Service.
11       Q.   How long do members typically serve on
12   the P&T committee?
13       A.   I don't know that there is an average,
14   generally there has not been high turnover on the
15   P&T committee.  For example, in southern
16   California, I think we just have the second
17   chairman since I've been participating in the P&T
18   committee.  So that's 20 years.  Two chairmen, a
19   lot of stability.
20       Q.   And does the P&T committee determine
21   what drugs are placed on the formulary?
22       A.   They do.
23       Q.   And you mentioned that there's often a
24   two-tier formulary, is that correct?
25       A.   In recent years, yes, that's become

A. Carver

1
2    the -- become available, yes.
3        Q.   And it's the same formulary for all
4    clients in a particular region, is that right?
5        A.   That's correct.
6        Q.   When you say in recent years it's
7    become available earlier, was it just a
8    single-tier formulary?
9        A.   Yes.
10       Q.   When did two-tier formularies become
11   available?
12       A.   I would be estimating, but I would say
13   more prevalent in the last five years.
14       Q.   Has Kaiser ever used a three-tier
15   formulary?
16       A.   Not in the classical sense.
17       Q.   In what sort of non-clinical sense has
18   Kaiser ever used a three-tier formulary?
19       A.   Tier one would be generic.  Tier two
20   would be a branded.  And then the third category
21   would be products that are patients that just pay
22   full price for.
23       Q.   And that kind of formulary has been
24   implemented at some point at Kaiser?
25       A.   Yes.  It's not the formulary, that's

A. Carver

1
2 the benefit design. For the formulary, the
3 product is either in the formulary or not in the
4 formulary.
5    Q.   Who actually determines the benefit
6 design?
7    A.   I think I mentioned that the people
8 that have input in the benefit design or the
9 benefit committee, and ultimately it's the health
10 plan manager that adopts and then sells the
11 various benefit designs.
12    Q.   The P&T committee determines whether
13 the drug is on or off the formulary before you
14 didn't have input into whether a patient might pay
15 more or less copay for a particular drug?
16    A.   That's correct.
17    Q.   Who is on the benefit committee?
18    A.   By name, I -- maybe I could -- is
19 there such a thing as providing the names after
20 the fact or fill in the blanks?
21    Q.   Actually, I'm not interested in
22 particular names.
23       MS. NUSSBAUM:  Categories of
24 employees?
25       MR. JAMES:  Yes, right.

A. Carver

1
2    A.   The health plan manager, there is
3 the -- we actually have benefit development people
4 within the health plan who would be a category of
5 people that would serve, and then there are --
6 there's representation from marketing on the
7 committee, and then I think as I previously
8 mentioned, there's physician representation
9 particularly as it relates to the medical benefit.
10    Q.   Have the responsibilities of the P&T
11 committee been roughly the same throughout the
12 relevant period?
13    A.   Of the P&T committee, yes.
14    Q.   And what about the benefits committee?
15    A.   I would say yes.
16    Q.   What factors does the P&T committee
17 consider in deciding whether or not to put a drug
18 on the formulary?
19    A.   They consider the safety of the
20 product.  They -- if information is available,
21 they consider what therapeutic advantage a
22 particular product would have relative to other
23 products that are already on the formulary.  That
24 they would consider the effectiveness of a
25 product, relative to other products on the

A. Carver

1
2 formulary.  And when other considerations are
3 about equal, they also are mindful of the cost of
4 a particular agent.
5    Q.   Are there any other issues you can
6 think of?
7    A.   Not that are relevant to this case.
8 Certainly there are -- there's discussion
9 regarding warnings or advisory information that
10 should be considered for inclusion in our
11 electronic medical record number, electronic
12 medical record system, which is really a new
13 responsibility of the P&T committee.  But that's
14 about it.
15    Q.   Has a drug ever been denied placement
16 on Kaiser's formulary because it was not safe?
17    A.   Yes, there have been such
18 circumstances that have occurred.
19    Q.   Are you aware of any recent examples?
20    A.   I don't know by recent.  I can recall
21 specifically a few years ago, Interluken 2 was not
22 added to the formulary, but it was being used for
23 a cancer indication, and it appeared that more
24 people were dying than being helped by the product
25 at the time.

A. Carver

1
2    Q.   I think earlier you said that the
3 committee looks at the therapeutic advantage of
4 the product relative to other products currently
5 on the formulary and also the effectiveness of the
6 product relative to other products, are, I guess
7 as a safety of the new product relative to other
8 products on the formulary also considered?
9    A.   Yes.
10    Q.   And are side effects considered as
11 well?
12    A.   Yes.
13    Q.   Are off-label uses of a drug
14 considered when deciding to add a drug to the
15 formulary?
16       MS. NUSSBAUM:  Can you be more
17 specific?
18    Q.   Does the fact that a particular drug
19 is prescribed off-label enter into the committee's
20 considerations in some way?
21       MS. NUSSBAUM:  I'm still not
22 understanding.  Can you be more specific with
23 respect to that?
24    Q.   You can answer if you understand the
25 question.

1            A. Carver
2        A.    We would, I would say the answer to
3    that is no, not generally.  Generally when a
4    product is reviewed, it's a new entry to the
5    market and the product is evaluated based upon the
6    approved indications and the information that's
7    available at the time that the product has been --
8    has entered the market.
9        Q.    After the P&T committee decides to add
10   a drug to the formulary, does it revisit that
11   decision, and you know, decide to remove a
12   particular drug from the formulary?
13       A.    Sure.
14       Q.    Under what occasions would that occur?
15       A.    It would -- it primarily occurs when
16   additional agents come to market and an additional
17   agent would be superior to the product that's on
18   the formulary.
19            Other occasions that happens quite
20   regularly would be if there is a therapeutic
21   substitute, a comparable product that's become
22   available generically and then therefore, at
23   significantly less cost, and if it has the
24   comparable effectiveness for its intended use,
25   then those circumstances also result in the

1            A. Carver
2    removal of the product from the formulary.
3            Another situation would be when a
4    branded product goes off patent, becomes available
5    generically itself and then that particular old
6    branded product is removed from the formulary and
7    is replaced with the generic product or the
8    generic form of the product.  Those are three
9    examples that come to mind.
10       Q.    Is there any policy of reviewing all
11   drugs, prescription drugs on the formulary on some
12   sort of periodic basis?
13       A.    I don't believe we have such a policy
14   to review all drugs.  You know.
15       Q.    I mean, so if something, if a drug
16   were introduced in 1994 --
17       A.    Yes --
18       Q.    -- there would be no reason to, I
19   mean, unless one of these sorts of events that you
20   described occurred, there would be no reason to
21   revisit its formulary status?
22       A.    Generally not.
23       Q.    Once the P&T committee decides to
24   place a drug on the formulary, are there any
25   individuals at Kaiser who could override the

1            A. Carver
2    committee's recommendation or decision?
3        A.    No.
4        Q.    I guess in 1994, at the beginning of
5    the relevant period, what was -- actually --
6    sorry -- strike that.
7            Once a drug is added to the formulary,
8    can any Kaiser Permanente physician prescribe that
9    drug?
10       A.    Well, technically, yes.  Technically
11   yes, they can.
12       Q.    Are there any restrictions that would
13   circumscribe their use in some way?
14       A.    There are occasions in which the P&T
15   committee will try to limit the prescribing to
16   specialists or subspecialists depending upon what
17   the drug is.
18            As an example, the cancer drugs are
19   usually relegated to the oncologists or
20   hematologists.  And so there are some restrictions
21   that on occasion are applied.
22       Q.    How are those restrictions enforced?
23       A.    It's really a -- since this is a
24   medical staff committee and a physician decision
25   essentially, it's one generally of

1            A. Carver
2    self-administration, self-policing within the
3    medical group, and once a prescription is actually
4    written and prescribed and sent to one of our
5    pharmacies for a product that is on the formulary,
6    then it gets dispensed and paid for.
7        Q.    Has Kaiser had a problem with doctors
8    not following these restriction guidelines?
9            MS. NUSSBAUM:  I would ask for
10   clarification of what you mean by that.  What do
11   you mean by a "problem"?
12       Q.    Do Kaiser physicians typically follow
13   the restrictions that you described?
14           MS. NUSSBAUM:  I would -- again, I
15   don't know that there's a typical case here.  What
16   period of line?  What restrictions you're talking
17   about?
18       Q.    You can answer if you understand the
19   question.
20           MS. NUSSBAUM:  Please don't speculate.
21       A.    Could you ask me the question again,
22   please?
23           MR. JAMES:  Could you read back the
24   question?
25           (Record read.)

Page 78

```
1              A. Carver
2      A.   I think there was a question
3  subsequent to that that had the word "problem" in
4  it.
5      Q.   Actually, no, I struck the -- you can
6  strike the earlier question.  I think the
7  question, as I understand, was the latter one.
8      A.   The one that says: Does Kaiser have a
9  problem with something?
10     Q.   No, I think you can ignore that
11 question.
12         MS. NUSSBAUM:  So what is the question
13 you want him to answer?
14         MR. JAMES:  If you can read back the
15 question you just read.
16         (Record read.)
17         MS. NUSSBAUM:  And again, only if you
18 can testify without speculating and if you
19 understand what "typically" and "restrictions"
20 mean.
21     A.   I would say in a majority of cases,
22 probably so.
23     Q.   Has Kaiser identified non-compliance
24 as a particular problem to be addressed?
25         MS. NUSSBAUM:  Please don't speculate.
```

Page 79

```
1              A. Carver
2      A.   I believe in circumstances in which
3  prescribing is far beyond what is intended, then I
4  believe that we do take steps to make certain that
5  the prescribing is more in line with what's
6  intended.
7          MR. JAMES:  I'd like to mark another
8  exhibit.
9          (Kaiser-2 marked for identification.)
10     Q.   Have you seen this document before?
11     A.   I believe I have.
12     Q.   What is it?
13     A.   This is a document that provides some
14 information to the -- that's provided some
15 information to the P&T committee back in September
16 of 1997 regarding the drug Neurontin.  It provides
17 a short amount of background regarding it having
18 been -- it being Gabapentin added to the formulary
19 in September of '94.
20     Q.   Do you see a line, the third line from
21 the top of the document that says, "P&T review
22 date"?
23     A.   Of September 1997?  Yeah.
24     Q.   Is this the kind of document that
25 would be used by Kaiser in the ordinary course of
```

Page 80

```
1              A. Carver
2  its business?
3      A.   Yes.
4      Q.   Is there a particular name for this
5  document?
6      A.   Well, I don't see a title on it.  It's
7  just summary information for P&T committee.
8      Q.   On the, I guess the third bullet point
9  beneath the heading background, could you read
10 that line aloud?
11     A.   "Gabapentin was reviewed by the
12 regional P&T committee in September of '94 and the
13 decision was made to accept Gabapentin to the
14 formulary.  Restricted to neurology."
15     Q.   And what does the phrase "restricted
16 to neurology" mean?
17     A.   What that means is the prescribing
18 ought to be restricted to the neurologists, given
19 this product was introduced to the market for the
20 treatment of seizures.  And the neurologists are
21 primarily the physicians involved in the treatment
22 of seizure disorders.
23     Q.   If another type of physician were to
24 try to prescribe Neurontin, would they be able to
25 do so?
```

Page 81

```
1              A. Carver
2          MS. NUSSBAUM:  That's a hypothetical
3  question.
4      Q.   With regard to enforcement of this
5  restriction, is this the sort of -- sort of
6  self-policing practice that you referred to
7  earlier?
8      A.   Yes, it is.
9      Q.   How would this restriction be
10 communicated to physicians?
11     A.   It would be communicated by way of a
12 communication of the various decisions of the P&T
13 committee, and in 1997, I believe that was done by
14 way of paper.
15     Q.   Would they receive paper periodically
16 or just the initial time that the --
17     A.   Subsequent to the P&T committee
18 meetings.
19     Q.   If, at a later point in time, a
20 particular physician wanted to know whether they
21 were allowed to prescribe Neurontin or whether
22 there was a restriction, you know, pertaining to
23 Neurontin that would limit it to some other
24 physician group, how would they go about finding
25 that out?
```

Page 82

A. Carver

1        A.   The -- the physician would most likely
2  ask the question of their local pharmacy and
3  therapeutics committee chairman or a member of
4  that committee.
5        Q.   Can you read the bullet point
6  following the one that you just read beginning
7  with the word "recently"?
8        A.   "Recently, the chiefs of
9  anesthesiology requested that the restriction for
10 Gabapentin be expanded to include anesthesiology
11 for the treatment of reflex sympathetic
12 dystrophy."
13       Q.   Who are the individuals within Kaiser
14 that can propose an expansion of a restriction for
15 a particular prescription drug?
16       A.   Any physician could.
17       Q.   Any individual physician could?
18       A.   They could.
19       Q.   Who typically does so?
20            MS. NUSSBAUM:  Don't speculate.  If
21 there is a typical case, or if the answer has
22 already been given.
23       A.   Often requests related to the
24 formulary would come forward from specialists or

Page 83

A. Carver

1  subspecialists' physicians.
2        Q.   Two recommendations often come from
3  chiefs of particular specializations?
4        A.   Yes.
5        Q.   What does the term "chief of
6  anesthesiology" or "chief of neurology" mean?
7        A.   At each of the medical centers within
8  a geographic region, there is a chief of service
9  of that particular service.  So a chief of, in
10 this particular case, a chief of anesthesiology.
11            There would be a chief of anesthesia
12 at each of the medical centers.  Those chiefs
13 collectively are referred to as the chiefs of
14 anesthesiology.
15       Q.   And that would be a group within one
16 of the regions?  This would be a southern
17 California chiefs of anesthesiology?
18       A.   Correct.
19       Q.   Did the chiefs of anesthesiology
20 provide any reason to the P&T committee that they
21 were making this request?
22            MS. NUSSBAUM:  If you know.
23       A.   I do not -- I do not know.  I do not
24 recall.

Page 84

A. Carver

1        Q.   Do specialty chiefs generally provide
2  reasons to the P&T committee motivating their
3  requests?
4        A.   Generally, yes.
5        Q.   In what form do they provide those
6  reasons?
7        A.   As part of the recommendation, part of
8  the rationale for wanting to, for the P&T to make
9  a ruling.
10       Q.   And that would be a document separate
11 from this one, is that right?
12       A.   It may be a document.  It may be
13 expressed through the P&T chief to -- excuse me,
14 from the specialty group to the P&T chair as to
15 the rationale.
16       Q.   Are there requests generally made
17 directly to the P&T committee or do they go
18 through other divisions of Kaiser before they make
19 their way to the P&T committee?
20       A.   No, they generally go directly to the
21 P&T committee.  There may be some discussion with
22 the Drug Information Services, as an example.
23       Q.   Between September 1994 and the date of
24 this document, would the formulary have restricted

Page 85

A. Carver

1  Gabapentin to neurology?
2        A.   That would have been the status of
3  Neurontin on the formulary; yes.
4        Q.   Are you aware of any off-label use for
5  which a neurologist might have prescribed
6  Neurontin?
7             MS. NUSSBAUM:  Please restate your
8  question.  That's totally unclear.
9        Q.   If you understand the question, you
10 can answer.
11            MS. NUSSBAUM:  Do you want to know if
12 during this period of time if a doctor, be it a
13 neurologist or any other doctor wrote a
14 prescription for Neurontin, would Kaiser have paid
15 for it?
16       Q.   Actually, if Kaiser physicians had
17 followed this restriction that was in place
18 between 1994 and 1997, would they have prescribed
19 Neurontin for any off-label use?
20            MS. NUSSBAUM:  Objection.
21       A.   Which doctors?
22       Q.   Kaiser physicians.
23            MS. NUSSBAUM:  Objection.
24            Do you understand the question?

Page 86

1                A. Carver
2     A.   Well, I wouldn't know why the
3 prescription was being written.
4     Q.   You told me that.  I go back one step.
5          When it's written that there's a
6 restriction to neurology, does that mean that a
7 neurologist can prescribe the particular
8 prescription drug for any -- for any use?
9     A.   Yes.
10    Q.   And it didn't necessarily have to be a
11 use related to neurology?
12    A.   The neurologists could prescribe the
13 drug for any purpose that the neurologist chose.
14    Q.   And that would comply with this
15 restriction?
16    A.   Yes.
17    Q.   Is Kaiser seeking to recover damages
18 from the defendants for any off-label use that
19 would be typically treated by a neurologist?
20         MS. NUSSBAUM: Objection.  The damages
21 that Kaiser is seeking or set forth in the
22 Complaint and other legal documents will be the
23 subject of expert testimony.
24         MR. JAMES: I'm actually not calling
25 for expert testimony.

Page 87

1                A. Carver
2     Q.   Are you familiar with the uses for
3 which Kaiser is seeking damages?
4     A.   Generally; yes.
5     Q.   Can you list those uses?  If it would
6 be helpful to have a copy of the Complaint, I can
7 mark the Complaint as an exhibit.
8     A.   Oh, that would be very helpful.
9          (Kaiser-3 marked for identification.)
10    Q.   Do you recognize this document?
11    A.   Yes, I do.
12    Q.   And what is it?
13    A.   What this represents in my lingo, and
14 perhaps not legal lingo, would be the Complaint
15 against Pfizer regarding Neurontin and its
16 marketing practices and off-label use regarding
17 off-label use and the -- the deceit and fraud and
18 all that that occurred in influencing doctors to
19 prescribe Neurontin for indications that were far
20 beyond what it was intended for.
21    Q.   And reviewing this document, can you
22 determine what uses Kaiser is seeking to recover
23 damages for?
24         MS. NUSSBAUM: This document is 133
25 pages, and the witness has had it for, I don't

Page 88

1                A. Carver
2 know, 45 seconds.  If you want to direct his
3 attention to a particular page or section of the
4 document, you know, he can answer your question.
5 Otherwise, I think it's really unfair.
6         MR. JAMES: Well, the document has a
7 table of contents in the first couple of pages so
8 that might help you recall where you might find
9 the uses that Kaiser is seeking to recover damages
10 for.
11        MS. NUSSBAUM: Okay.  Are you
12 referring to the table of contents, page two,
13 little i that begins, talking about page 40,
14 "False and misleading statements regarding pain"
15 and then there's a list of other indications as
16 well?  Is that what you're referring to?
17        MR. JAMES: I mean, I just want to
18 know what uses Kaiser is seeking to recover
19 damages for.  Those pages may be helpful, but you
20 know, I'm actually --
21        MS. NUSSBAUM: The witness has already
22 indicated the off-label uses, and he's indicated
23 as a result of the fraud perpetrated by the
24 defendant.
25        MR. JAMES: I was actually looking for

Page 89

1                A. Carver
2 a statement of any given off-label use.
3     A.   Off-label uses including the use for
4 pain regarding the use for restless leg syndrome,
5 regarding the use for bipolar disorders, socio
6 phobias, panic disorder, migraine, prophylaxis
7 treatment, basically related to suggestions or
8 dosages that were far in excess of those that were
9 recognized as being effective for a variety of
10 conditions and any such situations in which if
11 there were any that Neurontin would have been used
12 as the sole source of therapy for -- as it relates
13 to epilepsy or seizure disorders.
14    Q.   You didn't mention -- diabetic
15 peripheral neuropathy, which is mentioned in the
16 Complaint, is that a condition in which Kaiser is
17 seeking to recover damages for?
18        MS. NUSSBAUM: If you know.
19    A.   To the extent that there was
20 suggestions for use for peripheral neuropathies
21 including diabetic neuropathy, prior to there
22 being any documented evidence that was legitimate
23 documented evidence in the literature, then yes.
24    Q.   Just to clarify that, Kaiser's
25 position is that there now exists documented

1          A. Carver
2    evidence establishing the efficacy of Gabapentin
3    for diabetic peripheral neuropathy, is that
4    correct?
5        A.   That is correct.
6        Q.   So a patient who took Gabapentin for
7    diabetic peripheral neuropathy would receive an
8    effective treatment?
9        A.   That's correct.
10       Q.   And would the same patient have
11   received effective treatment had they been
12   prescribed Gabapentin for diabetic peripheral
13   neuropathy at the beginning of the class period?
14       MS. NUSSBAUM:  I think that's been
15   asked and answered.
16       Q.   You can answer.
17       A.   To the degree that there were known,
18   proven, recognized therapies for diabetic
19   peripheral neuropathy, including diabetic
20   peripheral neuropathy earlier in the period and
21   there was -- and Neurontin would have been used as
22   first-line therapy, as opposed to relegated to a
23   lower level of therapy, then I believe that some
24   remuneration is indicated.
25       Q.   Remuneration is indicated if there was

1          A. Carver
2    an alternative therapy?
3        A.   In 1995, as an example.
4        Q.   And Neurontin was prescribed as a
5    first-line, as opposed to adjunctive therapy, are
6    those the two conditions that would have to be
7    satisfied?
8        MS. NUSSBAUM:  Once again, I would
9    object.  This witness is not here as an expert
10   witness.  I think that the Complaint sets forth --
11   you asked a question in general.  And he's given
12   you a general answer.  And I think with respect
13   to, you know, particular conditions, if you want
14   him to go to page 44 of the Complaint, which is I
15   guess the section --
16       MR. JAMES:  If you have an objection
17   to the question, could you just state the
18   objection and then we can move on?
19       MS. NUSSBAUM:  I don't think it's fair
20   to try to mislead the witness.  As I said before,
21   this is a 139-page document that he's had before
22   him right now for, you know, two or three minutes.
23   So, if the witness before he can testify about the
24   document wants to look at it, I think it's only
25   fair that you give him that opportunity.

1          A. Carver
2        Q.   Have you examined this document before
3    the last 45 seconds?
4        A.   I have reviewed it generally, yes.
5        Q.   And were you able to determine in what
6    instances Kaiser believes that it's entitled to
7    remuneration for prescriptions of Gabapentin that
8    are paid for?
9        A.   I believe with -- I believe I would
10   add to what I have already provided to you any
11   situations in which this product was used for
12   attention deficit disorder.
13       Q.   Actually, I'd like to go back to the
14   question I had earlier about the circumstances in
15   which Kaiser believes that it's entitled to
16   remuneration for prescriptions of Gabapentin for
17   diabetic peripheral neuropathy?
18       A.   Yes.
19       Q.   And you indicate in 1995, remuneration
20   would be appropriate in some circumstances, is
21   that correct?
22       MS. NUSSBAUM:  I would again state my
23   objection.
24       MR. JAMES:  No.  You know, we've
25   actually heard your objection.

1          A. Carver
2        MS. NUSSBAUM:  Because if you are
3    referring to a document, that I believe the
4    witness has the opportunity to look at the section
5    that starts at page 42 of the document, let him
6    look at it and then he can give you a response.  I
7    think it's very unfair to be playing a memory game
8    with a 139-page document.
9        Q.   Have you been able to determine the
10   circumstances in which Kaiser believes its
11   entitled to remuneration for diabetic peripheral
12   neuropathy?
13       A.   Not totally; however, upon review of,
14   you know, of information that's contained on page
15   42, it was -- it was less than clear that
16   Neurontin was effective for the treatment of
17   diabetic peripheral neuropathy.
18       Q.   And you've told me that it now is
19   clear that Neurontin is effective for diabetic
20   peripheral neuropathy?
21       MS. NUSSBAUM:  If you know.
22       Q.   As corporate representative of Kaiser,
23   if you know?
24       A.   Well, I believe that you -- that the
25   Food and Drug Administration has still not

Page 94

1              A. Carver
2    approved it for that particular indication.
3         Q.   I guess my question was somewhat
4    different.  Would you like to have it restated?
5         A.   Okay.
6         MR. JAMES:  Could you read back the
7    question?
8         (Record read.)
9         A.   And you're going to restate that?
10        Q.   No, that was the question.
11        MS. NUSSBAUM:  The question is:  Do
12   you know?  And if you don't, then you just don't.
13        A.   Yeah, I don't.
14        Q.   Kaiser has no knowledge of whether or
15   not Neurontin is effective for diabetic peripheral
16   neuropathy?
17        A.   I'd say that Kaiser, the health plan,
18   would rely upon the physicians to make that
19   determination.
20        Q.   And how the physicians made the
21   determination -- again, if you know?
22        A.   Yeah.  I don't know that they formally
23   have.
24        Q.   Did anyone from Kaiser authorize the
25   filing of this Complaint?

Page 95

1              A. Carver
2         A.   Yes, certainly -- well, I had
3    discussion with counsel regarding the filing of
4    this Complaint.
5         Q.   And did you authorize the filing of
6    this Complaint?
7         A.   I certainly indicated that we should
8    move forward with it; yes.
9         Q.   So the answer is yes?
10        A.   The answer is yes.
11        Q.   And in filing this Complaint, you were
12   seeking damages from the defendants for
13   Gabapentin prescribed for diabetic peripheral
14   neuropathy, is that correct?
15        MS. NUSSBAUM:  The document speaks for
16   itself.
17        MR. JAMES:  You know, you've made the
18   same objection like three times, you know, I am
19   asking what Kaiser is seeking recovery for --
20        MS. NUSSBAUM:  And it's set forth in
21   the third coordinated Amended Complaint.
22        MR. JAMES:  No, it's certainly not.
23        MS. NUSSBAUM:  Filed by Kaiser.
24        MR. JAMES:  And if it's so clear, he
25   can definitely, you know, answer that question.

Page 96

1              A. Carver
2         Q.   In filing this Complaint, was Kaiser
3    seeking recovery from the defendants for Neurontin
4    prescribed for diabetic peripheral neuropathy?
5         A.   I believe that we are seeking damages
6    or money basically for all of the uses for
7    Neurontin for which there was not sufficient
8    demonstration of its effectiveness and for which
9    there was a number of promotional efforts that --
10        Q.   You know, actually, we will get to
11   those --
12        A.   Fraudulently, basically characterizing
13   this particular product for uses for which there
14   was insufficient evidence and to the degree that
15   diabetic peripheral neuropathy was part of that in
16   1995, then my answer would be yes.
17        Q.   And to just to state the answer as a
18   yes or no, in filing this Complaint, was Kaiser
19   seeking recovery from the defendants for Neurontin
20   prescribed for diabetic peripheral neuropathy?
21   It's a yes-or-no question.
22        A.   Then to be absolutely accurate, I need
23   to review this to determine whether or not it's in
24   there or not.
25        Q.   Aside from looking at this document,

Page 97

1              A. Carver
2    you have no knowledge as Kaiser's corporate
3    representative of whether it's seeking recovery
4    for diabetic peripheral neuropathy?
5         MS. NUSSBAUM:  Objection, again.  You
6    know, it's in the Complaint.  We are not yet at
7    expert testimony here.
8         MR. JAMES:  I'm not calling for expert
9    testimony.  I'm asking for what damages you're
10   seeking to recover in this action.  If you don't
11   have knowledge of what damages you're seeking from
12   the defendant, you know, then say so.
13        MS. NUSSBAUM:  I think it's set forth
14   in the document, in the Complaint.
15        Q.   Would you like --
16        MS. NUSSBAUM:  I specifically refer
17   you in the Complaint to the allegations.
18        MR. JAMES:  I prefer that you not
19   coach the witness on the answer, if you could.
20        MS. NUSSBAUM:  I'm not coaching the
21   witness, but I think that you're being very unfair
22   with, you know -- you know, with a 139-page
23   complaint that's been filed by the court.
24        Q.   You have named a total of eight or --
25   yes, actually nine indications, if we are to

1           A. Carver
2 include diabetic peripheral neuropathy for which
3 Kaiser is seeking recovery.  And it's actually
4 either eight or nine, depending on whether
5 diabetic peripheral neuropathy is included.
6       Do you know whether Kaiser is seeking
7 recovery for eight uses or for nine?
8    A.   Not without further review.
9    Q.   So, at this point, you have no
10 knowledge of whether Kaiser is seeking recovery
11 for diabetic peripheral neuropathy?
12      MS. NUSSBAUM:  You want to specify the
13 years for which it's seeking recovery for that?
14      MR. JAMES:  I'd like to know.  I
15 actually don't know what years Kaiser is seeking
16 recovery for.
17      MS. NUSSBAUM:  Are you talking about
18 the entire class period?  What are you talking
19 for?
20    Q.   For any portion of the class period,
21 are you seeking recovery for Neurontin prescribed
22 for diabetic peripheral neuropathy?
23    A.   To the degree that it would have been
24 used as a first-line agent way before there was
25 evidence, then yes.

1           A. Carver
2    Q.   Okay.  So that the few conditions are,
3 it must have been before there was evidence and it
4 was used as a first-line agent?
5    A.   Correct.
6    Q.   So, if Neurontin was prescribed as an
7 adjunctive therapy for diabetic peripheral
8 neuropathy at any point in the class period,
9 Kaiser --
10      MS. NUSSBAUM:  The witness has not
11 stated that.  The witness has not stated that.
12    Q.   Is that an accurate statement of your
13 testimony?
14      MS. NUSSBAUM:  Well, I would object to
15 this line of testimony.  As I said, we are not yet
16 in the damages phase.  There has been other
17 answers to interrogatories and other discovery
18 here.
19      You know, the witness has testified to
20 the best of his ability on this, and I think that
21 you're badgering the witness at this point.
22 You're misstating his testimony, and we should
23 move on.
24    Q.   Would you believe that Pfizer is
25 entitled to know the uses of Neurontin for which

1           A. Carver
2 Kaiser is seeking to recover damages from it?
3      MS. NUSSBAUM:  Objection.
4    Q.   Actually, this is just you in your
5 personal capacity?
6    A.   In my personal capacity, yes.
7    Q.   Why would that be?
8      MS. NUSSBAUM:  This is not an expert
9 witness on that.
10      MR. JAMES:  I'm not asking for expert
11 testimony.  He's testifying in his personal
12 capacity.  I'm wondering whether in his opinion he
13 believes that Pfizer is entitled to know the uses
14 of Neurontin for which Kaiser is seeking to
15 recover damages from it.  He's answered the
16 question as yes.  And I've asked the natural
17 follow-up, which is why?
18      MS. NUSSBAUM:  Well, let's correct the
19 record then.  Pfizer does know, there have been
20 answers to discovery requests filed in this --
21    Q.   You know, at this point in this
22 deposition, you won't tell me whether you're
23 seeking recovery for diabetic peripheral
24 neuropathy or not, and I really have no idea.
25    A.   That misstates my testimony, sir.

1           A. Carver
2      MS. NUSSBAUM:  That misstates --
3    Q.   You have indicated that if it
4 was first-line therapy and it was prior to a given
5 period, in the class period, then you are seeking
6 recovery, but as to whether adjunctive therapy
7 is -- you are also seeking recovery for, that's
8 not clear.
9      MS. NUSSBAUM:  Okay.  This totally
10 misstates the witness' testimony.  He has said
11 that they are seeking recovery for prescriptions
12 for that purpose, okay.  And we have indicated
13 that precisely which prescriptions and which
14 period of time will continue to be the subject
15 here of expert testimony, and this is not a
16 witness who's here for expert testimony.  The rest
17 of this has been described in great detail in the
18 Complaint and in discovery responses and I suggest
19 that we move on.
20    Q.   Would you take the view that you would
21 have to consult experts in the future before you
22 could determine whether you are seeking recovery
23 for adjunctive therapy of Neurontin as a diabetic
24 peripheral neuropathy treatment?
25      MS. NUSSBAUM:  Once again, I object.

Page 102

1             A. Carver
2 You're asking for a legal conclusion.
3             MR. JAMES:  No, I'm asking if you
4 know.
5             MS. NUSSBAUM:  He's relying on
6 counsel, here, okay, relying on counsel, relying
7 on discovery in this case.  This is not a lawyer.
8 This is not an expert.  He's a fact witness.  He
9 said that they've reviewed the Complaint.  The
10 Complaint was authorized.  I suggest that we move
11 on.
12     Q.   Do you think Neurontin is the same
13 product today that it was in 1994?
14             MS. NUSSBAUM:  Do you understand that
15 question?
16     A.   Yes, I do.  Yes, I believe it is.
17     Q.   And the patient taking Neurontin would
18 obtain precisely the same therapeutic values that
19 the same patient would have received in 1994, is
20 that correct?
21             MS. NUSSBAUM:  Objection,
22 hypothetical.  Calls for expert testimony.  And
23 speculative.
24     Q.   You can answer.
25     A.   Okay.  My answer would be that

Page 103

1             A. Carver
2 Neurontin would -- would act in the body today the
3 same that it did in 1994.
4     Q.   So it would have the same efficacy
5 today that it would have in 1994?
6             MS. NUSSBAUM:  Objection, speculative.
7     Q.   You can answer.
8     A.   Yes, that's likely that it would.
9     Q.   Can you think of any reason why it
10 wouldn't?
11             MS. NUSSBAUM:  Again, I would ask the
12 witness not to speculate.  Efficacy for what?  You
13 know, this is a totally hypothetical --
14     Q.   Do you think the efficacy of Neurontin
15 for any use would have changed between 1994 and
16 today?
17             MS. NUSSBAUM:  Objection.  The witness
18 is not here as an expert.  He's not a medical
19 doctor.  This is not proper in any of the
20 depositions noticed here, and I suggest that we
21 move on.
22             MR. JAMES:  Are you instructing the
23 witness not to answer that question?
24             MS. NUSSBAUM:  Well, I'm suggesting
25 that it's a highly speculative question calling

Page 104

1             A. Carver
2 for expertise that as you've qualified this
3 witness before and went through his background he
4 does not have.
5     Q.   What's your role at Kaiser again, your
6 title?
7     A.   I'm vice president of pharmacy
8 strategy and operations.
9     Q.   And as vice president of pharmacy
10 strategy and operations, you have not developed
11 the expertise necessary to answer whether
12 Neurontin in 1994 would have the same efficacy
13 that it has today, is that correct?
14     A.   I believe that it would be as
15 effective in 2007 as it was in 1994 and as useless
16 in 2007 as it was in 2005 depending upon the
17 indication.
18     Q.   And with regard to diabetic peripheral
19 neuropathy, is it effective in 2007 as it would
20 have been from 1994?
21             MS. NUSSBAUM:  Objection.  Calls for
22 expert testimony, speculative.
23     Q.   You can answer.
24     A.   If it were used in exactly the same
25 manner in 2007 as it was in 1994 at exactly the

Page 105

1             A. Carver
2 same doses, then I would say that the answer to
3 that would be yes.
4     Q.   Are you seeking to recover for
5 prescriptions of Neurontin prescribed in 2004 as
6 first-line therapy for diabetic peripheral
7 neuropathy?
8             MS. NUSSBAUM:  If you know.
9     A.   To the degree that we paid -- that
10 Kaiser paid excessive money for a product and used
11 that preferentially over other products that were
12 effective then at that time, then I would say that
13 the overly exuberant marketing of this particular
14 product resulted in Kaiser paying more money at
15 that time than they should have.
16     Q.   So you're seeking recovery for
17 diabetic peripheral neuropathy in some
18 circumstances over the entire class period, is
19 that correct?
20     A.   I have not specified the class period
21 because it's -- it's -- I'm not aware without
22 talking to experts at what point in time this was
23 demonstrated to be effective for diabetic
24 peripheral neuropathy.
25     Q.   Is there some time period after which

1          A. Carver
2  you're no longer seeking any recovery for
3  Neurontin prescribed for diabetic peripheral
4  neuropathy?
5          MS. NUSSBAUM: Objection. Again, this
6  is for expert testimony. This is for damages. We
7  are now in fact discovery.
8      Q.   You can answer.
9          MS. NUSSBAUM: Please don't speculate.
10 Only if you know.
11     A.   I cannot speculate.
12     Q.   So whether Kaiser is seeking damages
13 for diabetic peripheral neuropathy at all points
14 in the -- during the class period is not a
15 question that you could answer without
16 speculation, is that correct?
17     A.   That's correct.
18     Q.   Let's turn back to the exhibit marked
19 Kaiser-2. Going back to the uses that you just
20 reviewed for me, which one of the uses that you
21 just named for me would have been a use often
22 prescribed by neurologists?
23     A.    Bipolar disorder would likely have
24 been treated by a neurologist.
25     Q.   Are there any others?

1          A. Carver
2      A.   And then certainly diabetic peripheral
3  neuropathy, such patients may have been referred
4  to a neurologist.
5      Q.   Any others that you've seen?
6      A.   Exclusively by a neurologist, no.
7      Q.   Often by a neurologist?
8      A.   Or often by --
9          MS. NUSSBAUM: Objection as to what
10 "often" means. Sometimes bipolar is seen by a
11 psychiatrist, sometimes neurologist. "Often" is a
12 meaningless term.
13         Do you want to clarify your answer?
14     Q.   Well, returning back to this document
15 here, if you look at the heading "efficacy," could
16 you read aloud the first bullet point beneath that
17 heading.
18         MS. NUSSBAUM: Which document are you
19 referring to?
20         MR. JAMES: Kaiser-2.
21     A.   It says, "Randomized clinical trials
22 of Gabapentin for the treatment of RSD could not
23 be found in the literature."
24     Q.   And could you read the first sentence
25 of the following bullet?

1          A. Carver
2      A.   "Two letters to the editors reported
3  the efficacy of Gabapentin in relieving symptoms
4  in a total of 14 refractory RSD patients. The
5  doses of Gabapentin range from 900 to 2,400
6  milligrams per day, and in each patient, pain
7  relief was noted."
8      Q.   And did you see a sentence in that
9  same paragraph that says, "The information
10 presented in these two letters was very limited
11 and these were not clinical trials"?
12     A.   Yes, I do.
13     Q.   Do you know if the P&T committee in
14 1997 accepted the request of the chiefs of
15 anesthesiology that the restriction of Gabapentin
16 be expanded to include RSD?
17     A.   I think they did, yes.
18     Q.   Do you think that was an appropriate
19 decision for them to make in light of the status
20 of the clinical literature at the time?
21         MS. NUSSBAUM: Objection. In what
22 capacity are you asking him if he thought that was
23 an appropriate decision?
24     Q.   Does Kaiser view that decision as an
25 appropriate clinical decision to have made?

1          A. Carver
2          MS. NUSSBAUM: Objection. The
3  document speaks for itself.
4      Q.   This document sets forth a summary of
5  a request by the chiefs of anesthesiology, is that
6  correct?
7      A.   It is.
8      Q.   And I'd like to know Kaiser's view
9  regarding the appropriateness of their response of
10 the P&T committee to that request.
11         MS. NUSSBAUM: Objection. View at
12 what time? View after they learned of the
13 whistleblower suit or view of the allegations or
14 at the time that the decision was made?
15     Q.   Today does Kaiser review this decision
16 by the P&T committee in September of 1997 as an
17 appropriate decision?
18         MS. NUSSBAUM: Objection. Only if you
19 know.
20     A.   I think, yes, today this would be a
21 questionable decision.
22         MR. JAMES: I think we'll take our
23 break now since the tape is running out.
24         VIDEOGRAPHER: The time is
25 approximately 3:59. This ends tape number two.

Page 110

```
 1              A. Carver
 2  We're now going off the record.
 3        (Recess.)
 4        VIDEOGRAPHER:  The time is
 5  approximately 4:12.  This begins tape number
 6  three.  We are now on the record.
 7   BY MR. JAMES:
 8     Q.   When we last went off the record, we
 9  were discussing the P&T committee's decision in
10  1997 to expand the restriction of Gabapentin to
11  include RSD, and I believe you had stated that
12  Kaiser today might or would regard that decision
13  as questionable, is that correct?
14     A.   That's correct.
15     Q.   Is it might or would?
16     A.   Would.
17     Q.   Why would that decision be regarded as
18  questionable by Kaiser today?
19     A.   It would be regarded as questionable
20  because of this, the RSD basically being a
21  collection of various pains that required
22  treatment basically for which I think if we look
23  at the evidence today, there was -- there's little
24  evidence that this product would be effective in
25  some of these indications, and I believe that --
```

Page 111

```
 1              A. Carver
 2  that in seeking approval for a more general use of
 3  Neurontin, that the anesthesiologists were likely
 4  influenced by the information that was available
 5  in the marketplace regarding the marketing and
 6  other activities that had taken place to persuade
 7  people of the effectiveness of the use of
 8  Neurontin in pain.  And so looking back today, I
 9  think that a different decision would be made.
10     Q.   You stated that the anesthesiologists
11  might have been influenced by information in the
12  marketplace or that they definitely were
13  influenced by information in the marketplace?
14     A.   I would say that our anesthesiologists
15  were charged with basically helping provide relief
16  to a number of pain indications for patients that
17  are seeking relief, and I think that our
18  anesthesiologists were trying to be helpful and
19  the P&T committee certainly was trying to be
20  respectful of that desire of the anesthesiologists
21  to be helpful to patients.
22     Q.   Do you have any information that would
23  suggest that the defendants communicated any
24  information to the anesthesiologists that
25  influenced this recommendation?
```

Page 112

```
 1              A. Carver
 2     A.   I do not.  I think that counsel and --
 3  I believe that that information is still in the
 4  process of coming forward through the process with
 5  counsel.
 6     Q.   But as of today, as Kaiser's corporate
 7  representative, you have no knowledge of any facts
 8  that would indicate that the defendants influenced
 9  the decision of the anesthesiologists --
10        MS. NUSSBAUM:  Objection --
11     Q.   -- to request the expansion of the
12  Gabapentin restriction in 1997?
13        MS. NUSSBAUM:  Objection, as set forth
14  very clearly in the Complaint, which you have
15  marked --
16        MR. JAMES:  You know, your objection
17  is preserved.
18        MS. NUSSBAUM:  The scheme that was out
19  there that was relied upon by these plaintiffs.
20     Q.   You can answer the question.
21     A.   I have no specific thing that I could
22  point to that said that representatives of the
23  defendants called upon specific anesthesiologists
24  within the Permanente Medical Group.
25     Q.   Do you have any information that --
```

Page 113

```
 1              A. Carver
 2     A.   And so I would --
 3     Q.   -- any representative of the
 4  defendants communicated information to members of
 5  the Permanente Medical Group that influenced their
 6  request that the restriction for Neurontin be
 7  expanded in 1997?
 8     A.   Today I have no specific evidence
 9  other than the information that was -- became
10  generally available regarding the widespread
11  practices of the defendants regarding trying to
12  convince physicians of the usefulness of Neurontin
13  for a variety of indications for which the
14  evidence was lacking and in some cases misleading
15  and just fraudulent.
16     Q.   Other than information obtained by
17  reading magazines or newspaper articles, you have
18  no knowledge that that would indicate that this
19  particular decision in 1997 was actually
20  influenced by the defendants in any way?
21        MS. NUSSBAUM:  You're misstating the
22  record.  He did say that this information is based
23  on magazines and news articles.  That clearly is
24  part of it, but I think that he's also testified
25  that there's other information including the
```

1          A. Carver
2  government action, the whistleblower case, and
3  it's set forth in the Complaint.
4      Q.   Other than publicly-available
5  information set forth in the Complaint, are you
6  aware of any information that would indicate that
7  the defendants somehow influenced the decision of
8  the chiefs of anesthesiology to make this request
9  in 1997?
10     A.   I'm --
11     Q.   This should be easy.
12     A.   Is this public information?  You know,
13  I'm not certain.  We've laid out the basis for all
14  of these activities that have occurred in the
15  Complaint.  I'm not sure specifically.  I do not
16  have information personally that that can pinpoint
17  a representative of the defendants contacting a
18  representative of the anesthesiologists that
19  resulted in this.
20          But I believe that that information is
21  part of the legal discovery process and we're
22  looking forward to reviewing it.
23     Q.   Other than data that's set forth in
24  the Complaint, you have no knowledge of any of the
25  defendants or their representatives influencing

1          A. Carver
2  this request by the anesthesiologists in 1997, is
3  that correct?
4          MS. NUSSBAUM:  That's been asked and
5  answered three times now.  I suggest we move on.
6      Q.   Was it the decision by the P&T
7  committee in 1997 an appropriate decision at the
8  time it was made?
9          MS. NUSSBAUM:  Objection.  What do you
10  mean by "appropriate"?
11     Q.   Did Kaiser regard the decision of the
12  P&T committee in 1997 to expand the restriction of
13  Neurontin to include RSD as an appropriate
14  decision at the time it was made?
15          MS. NUSSBAUM:  The document speaks for
16  itself.
17     Q.   You can answer the question.
18     A.   I believe that the -- I believe I've
19  answered that also from the standpoint of, I
20  believe that the -- that all of this was based
21  upon a hope that, based upon limited information,
22  that there was usefulness of this product.  And I
23  believe it's based upon that hope that the P&T
24  committee made the decision and that the
25  anesthesiologists were seeking use of this

1          A. Carver
2  product.
3      Q.   So given the information that was
4  available to the P&T committee in 1997, this was
5  an inappropriate decision, is that correct?
6          MS. NUSSBAUM:  The witness has not
7  said that.  I think he's previously testified that
8  given the information that was available, the
9  information in the marketplace, at that point,
10  that this was the decision made.
11          MR. JAMES:  But was it an appropriate
12  decision?
13          MS. NUSSBAUM:  From looking at it
14  today, from looking at it in '97?
15     Q.   In 1997, did Kaiser regard this as an
16  appropriate decision?
17          MS. NUSSBAUM:  If you know?
18     A.   In 1997, yes.
19     Q.   And today, does Kaiser regard this as
20  an appropriate decision given the information that
21  was available to the P&T committee at that time?
22          MS. NUSSBAUM:  If you know?
23     A.   I don't know how to answer that from
24  the standpoint of -- it's always easy to
25  second-guess something many years later.  At the

1          A. Carver
2  time, the P&T committee made the decision based
3  upon what little information there was available
4  and so, I would say that based upon their action
5  at the time, that their decision at the time,
6  based upon that limited information they made
7  was -- was appropriate.
8      Q.   What information did they make that
9  decision on the basis of?
10          MS. NUSSBAUM:  Again, the document
11  speaks for itself.  There's been no testimony that
12  this witness was part of this committee or has any
13  personal knowledge.  He's here as a corporate
14  representative and you have the document.
15     Q.   Aside from the information set forth
16  in this document, was there any other information
17  that the P&T committee relied on in making this
18  decision?
19     A.   I do not know.
20     Q.   Who would know?
21     A.   Perhaps the chair of the P&T
22  committee.
23     Q.   Is that the same individual today as
24  it was in 1997?
25     A.   I believe so.

Page 118

1           A. Carver
2      Q.   And what's the name of that
3  individual?
4      A.   Dale Daniel.
5      Q.   Did you speak to Mr. Dale Daniel in
6  advance of your deposition?
7      A.   I did not speak to Dr. Dale Daniel in
8  advance of the deposition.
9      Q.   Were you personally on the P&T
10 committee in September 1997?
11     A.   Yes, I was.
12     Q.   Do you have any recollection of
13 reviewing this request?
14     A.   I do not.
15     Q.   Have the practices of the P&T
16 committee changed between 1997 and today in terms
17 of the information it considers when evaluating
18 one of these requests or the processes by which it
19 evaluates these requests?
20     A.   I would say that in recent years, the
21 evaluation process has become more robust.
22     Q.   How so?
23     A.   Robust from the standpoint of
24 preparing very detailed evidence tables regarding
25 an evaluation of the evidence, and I'd like to

Page 119

1           A. Carver
2  make clear, even though -- and maybe I haven't,
3  even though there's focus on this formulary
4  decision and perhaps I was not clear earlier when
5  I talked about, you know, the previous decision
6  with respect to the neurologists in 1994, what I
7  do want to make clear is that the physicians, even
8  though the P&T committee is giving some guidance,
9  the Neurontin is a formulary product, and so when
10 Neurontin is prescribed by a doctor, it's
11 dispensed by the pharmacy and paid for by the
12 health plan.
13          Because I'm not certain that I
14 understand the -- the detail around this decision
15 of the P&T on whether or not some pain physicians
16 were appropriate prescribers or the
17 anesthesiologists were appropriate prescribers or
18 the neurologists were appropriate prescribers.
19          In reality, even though there's a P&T
20 decision that is being made here -- that is being
21 made, the reality is, is that Neurontin has been
22 on the formulary since 1994 and Neurontin
23 prescribed by a Permanente physician with
24 physicians that go to the Kaiser pharmacies
25 basically are dispensed and they're paid for.

Page 120

1           A. Carver
2      Q.   But before 1997, if an
3  anesthesiologist had prescribed Neurontin, that
4  would have been inconsistent with the restriction,
5  is that correct?
6      A.   It would have been inconsistent with
7  the technical restriction, yes.  But what I'm
8  trying to articulate, and maybe I'm just not
9  saying it properly, is that there's not much
10 relevance to it.
11     Q.   To the restriction?
12     A.   That's correct.
13     Q.   Is that because they're not
14 communicated to physicians?
15     A.   No, it's not.  It's because of a -- if
16 a physician decides in the course of treating a
17 patient that the physician wants to prescribe
18 Neurontin, then the very act of prescribing
19 Neurontin results in that prescription being
20 dispensed by the pharmacy.
21          There's not a second review body here.
22 There's nobody that's saying, Doctor, you can't do
23 that as it relates to the health plan covering the
24 payment or the -- or the coverage of that
25 particular Neurontin prescription, as it relates

Page 121

1           A. Carver
2  to the basic health plan drug benefit.
3          And so a prescription written for
4  Neurontin is a prescription that's dispensed for
5  Neurontin is a prescription that's paid for by the
6  health plan.  And so, I'm sorry, if I'm, you know,
7  belaboring this, but I just -- I don't understand
8  maybe this subtle difference that you're trying to
9  make here and I just -- maybe I didn't make myself
10 clear earlier when we talked about Neurontin being
11 added to the formulary.  It was added.  It's
12 always been on the formulary.
13     Q.   Right.  But until a certain point, it
14 would have been inappropriate for certain
15 physicians, or I won't say inappropriate, it would
16 have been inconsistent with the restrictions for
17 certain physicians to prescribe Neurontin?
18          MS. NUSSBAUM:  Objection.  I think
19 that that misstates the testimony of the witness;
20 okay.
21     Q.   Is that an inaccurate statement that I
22 made?
23     A.   The prescribing -- to your question,
24 the prescribing by anesthesiologists prior to 1997
25 may have been inconsistent with the guidance that

1          A. Carver
2  was provided earlier when the product was added to
3  the formulary, but it's of no relevance as it
4  relates to the health plan than picking up the tab
5  for the prescription.
6          So there obviously is a technical
7  inconsistency, there's no doubt about it.
8      Q.   Are our prescribing physicians aware
9  of that technical inconsistency?
10         MS. NUSSBAUM:  Objection.  That again
11 misstates.
12         I think that what the witness has
13 stated that once a drug is on the formulary, which
14 he testified this drug has been on since 1994, if
15 a physician writes a prescription, he testified
16 that prescription will be dispensed by the
17 pharmacy and paid for by the plan.  He just said
18 that.
19     Q.   Is it your testimony that once a
20 prescription drug is added to the formulary, it
21 will be paid for regardless of who prescribes it?
22     A.   That's -- that is the case.
23     Q.   That's correct; okay.
24         But although it may be paid for in
25 some instances, those prescriptions might be

1          A. Carver
2  inconsistent with restrictions or guidance
3  supplied by the P&T committee, is that correct?
4          MS. NUSSBAUM:  What does
5  "inconsistent" mean?
6      Q.   There are certain restrictions that
7  are approved by the P&T committee at various times
8  regarding Neurontin and other prescription drugs,
9  is that correct?
10         MS. NUSSBAUM:  The witness has used
11 the word "guidance" provided by the P&T committee.
12     Q.   Is the word "restriction" also used to
13 refer to this "guidance"?
14     A.   Yes, it is.
15     Q.   And if an anesthesiologist had
16 prescribed Neurontin prior to 1997, that
17 prescription would have been paid for, but it
18 would have been inconsistent with the restriction,
19 is that correct?
20         MS. NUSSBAUM:  Objection to the word
21 "restriction."
22     A.   You know, perhaps I'm just not being
23 clear here.  But if a -- even if -- if a
24 Permanente physician prescribes a drug that is
25 non-formulary, not even on the formulary, and

1          A. Carver
2  indicates that that prescription is medically
3  necessary for the patient, the pharmacy provides
4  it and the health plan pays for it, and that's the
5  end of the story.
6          There is -- we have left the
7  prescribing decision in the hands of the physician
8  based upon the patient's condition, the patient
9  being in his office, the judgment of the physician
10 in all cases, whether or not a product is a
11 formulary drug or not, whether it is on the
12 formulary and would be -- and for which there has
13 been a guideline established and whether or not
14 there is the term of a restriction established in
15 any event when it's prescribed, it's dispensed and
16 it's covered or it's paid for by the plan.
17         Now, maybe I'm too dense to understand
18 here, I'm sure.
19     Q.   Limiting ourselves to drugs on the
20 formulary, do you believe that restrictions have
21 any influence on Kaiser physicians prescribing
22 decisions?
23         MS. NUSSBAUM:  If you know.
24     A.   I -- they may; yes.
25     Q.   But they may not?

1          A. Carver
2      A.   But they may not depending upon the
3  circumstance of the individual patient that's
4  presented.
5      Q.   Why would it depend on individual
6  circumstances?
7      A.   The patient who presents with a
8  medical condition and for which the doctor is
9  offering and providing treatment, the situation is
10 that the physician is free to prescribe a product,
11 whether or not it is consistent with the guideline
12 or the restriction that has been decided by the
13 P&T committee.
14     Q.   What's the reason for that policy?
15     A.   The reason for the policy is because
16 the health plan is not second-guessing the
17 physicians who are -- who the health plan has
18 contracted with to provide the medical services
19 and who trust that the prescribing represents the
20 therapy that's needed by the patient, or that the
21 physician believes is appropriate for the
22 treatment of that patient.
23     Q.   Are individual prescribing physicians
24 the best equipped to make individual prescription
25 decisions?

1           A. Carver
2      MS. NUSSBAUM: Objection. I mean,
3   that calls for speculation, expert testimony.
4      Q.   As a matter of Kaiser policy, does
5   Kaiser believe that it's Kaiser's discretion to
6   prescribe a particular drug is best left in the
7   hands of the individual physicians?
8      A.   Kaiser absolutely believes that. And
9   that is a basic tenet that goes back to 1994 in
10  southern California, actually the period of '93 in
11  which we -- and when I say '93, it -- we started
12  the process of linking the drug benefit coverage
13  to the formulary and a basic tenet of that linkage
14  of what would be covered was specifically that we
15  are going to leave it in the hands of the
16  physicians. And so -- and --
17     Q.   What's the rationale --
18     A.   The rationale is we do have confidence
19  in our physicians. They are in the best position
20  to make a decision regarding the appropriate and
21  the necessary treatment of the patients and there
22  will not be any second-guessing of that by the
23  health plan.
24         And so, that was a -- a basic tenet
25  and principle that was incorporated into this

1           A. Carver
2   whole linkage of the formulary to the contract, to
3   the benefit language.
4      Q.   Are they in a better position, talking
5   about individual physicians, than the P&T
6   committee to make individual decisions?
7      MS. NUSSBAUM: In what sense? Again,
8   this is a very vague question. I think the
9   witness has given an answer and I don't think, you
10  know --
11     Q.   Actually, do I understand your answer
12  correctly as being that the physicians are better
13  equipped than anyone else including the P&T
14  committee to make prescription decisions for their
15  patients?
16     A.   Absolutely.
17     Q.   Do physicians have the same
18  familiarity with clinical studies and research
19  that the P&T committee members would have?
20     MS. NUSSBAUM: Objection. It's
21  speculative. There are thousands of physicians
22  here.
23     A.   We do have many physicians, and I
24  believe that the sentiment is, or the belief is
25  that the subspecialist physicians and the

1           A. Carver
2   specialist physicians are well-informed regarding
3   the appropriate and the contemporary treatment of
4   patients. But that doesn't mean that they're
5   immune from the various sources of information,
6   you know, such as continuing education, meetings,
7   continuing medical education meetings and
8   conferences, and you know, the chiefs of -- and
9   the subspecialists go off to continuing medical
10  education conferences and gain information and I
11  think are generally familiar with the literature
12  and certainly are influenced by the industry.
13     Q.   As a general matter, we can't conclude
14  whether physicians or the P&T committee at the
15  time it makes one of these kinds of decisions is
16  better informed as to the status of clinical
17  research?
18     MS. NUSSBAUM: Objection, because the
19  status of clinical research is not the issue here.
20  It's not the issue in this Complaint.
21     MR. JAMES: Well, I'm not asking this
22  question about clinical research, you know, even
23  if it happens to be irrelevant to the Complaint.
24     MS. NUSSBAUM: Well, if it's
25  irrelevant to the Complaint and irrelevant to the

1           A. Carver
2   case, I will ask the witness not to answer.
3      Q.   Well, you can answer. It's not a
4   matter of like attorney-client privilege or
5   something of that sort.
6      MS. NUSSBAUM: What is the relevance
7   of the question?
8      MR. JAMES: I'm asking whether the P&T
9   committee at the time it makes these sorts of
10  decisions or individual Kaiser physicians as a
11  general matter are better acquainted with clinical
12  studies and other research. I mean, if you can
13  make --
14     MS. NUSSBAUM: It's speculative.
15  There are thousands of physicians.
16     Q.   Can you not draw any conclusion
17  regarding that question without speculation?
18     A.   I cannot.
19     Q.   So, as a general matter, you would not
20  be able to make a conclusion one way or the other
21  regarding whether physician -- Kaiser physicians
22  as a whole or the P&T committee is better
23  acquainted with clinical studies and research?
24     MS. NUSSBAUM: With what clinical
25  studies and research? Objection.

Page 130

1          A. Carver
2      MR. JAMES:  Pertaining to the sorts of
3  research that the P&T committee reviews in
4  connection with considering these kinds of
5  requests.
6      A.   I would say this:  That the P&T
7  committee is comprised of physicians from various
8  specialties and that if you have a group of
9  cardiologists, for example, who are weighing in on
10  a drug that's used uniquely in their practice,
11  then it's quite common for the P&T committee to
12  rely upon the views of the cardiologists regarding
13  that particular drug.  And therefore, a decision
14  that's made.
15      Q.   Why do they rely on the
16  recommendations of those physicians?
17      MS. NUSSBAUM: Objection.  Again, it's
18  speculation.
19      A.   Well, after all, they are the
20  subspecialist physicians who are charged with
21  treating patients day in and day out.
22      Q.   Is there any useful information they
23  can provide beyond the information that the P&T
24  committee could get by serving, you know, clinical
25  studies and other publications?

Page 131

1          A. Carver
2      MS. NUSSBAUM: This is all
3  hypothetical at this point.  It's speculation.
4  And I would really ask you to go on.  I think that
5  we've exhausted this.
6          If you have a specific question to ask
7  as to the real practice, what really has occurred,
8  ask.  Either the witness will have knowledge or he
9  won't.  But now we're really just in the realm of
10  pure speculation.
11      Q.   You can answer if you understand the
12  question.
13      A.   Well --
14      MS. NUSSBAUM: I would ask the
15  question to be repeated.
16      (Record read.)
17      MS. NUSSBAUM: This is an
18  unintelligible question.  It's highly speculative
19  and hypothetical.  I don't think it can be
20  answered.
21      Q.   Are you able to answer the question?
22      A.   Well, I would offer this, and you
23  know, maybe I'm not being clear, I'll give a
24  different example.
25      MS. NUSSBAUM: I don't think that the

Page 132

1          A. Carver
2  present question is even capable of being
3  answered.  It's really not.
4      MR. JAMES:  Are you directing your
5  witness not to answer the question?
6      MS. NUSSBAUM: Yeah, I don't think
7  that there's a question pending.  If you have a
8  specific non-hypothetical question, this is a fact
9  witness.
10      Q.   Is it the policy of the P&T to rely on
11  the recommendations made by physicians in deciding
12  whether to accept requests such as this one to
13  expand the restriction of Neurontin for RSD?
14      MS. NUSSBAUM: It's asked and
15  answered.  The witness has already said that's one
16  of the things that they rely on.
17      Q.   And what is the -- and I guess my last
18  question was, to get at the rationale underlying
19  that reliance, what is it that physicians can
20  bring to the table that the P&T committee cannot
21  get by serving clinical studies and other
22  research?
23      MS. NUSSBAUM: If you know.
24      A.   I believe that generally, the
25  subspecialist physicians can bring the perspective

Page 133

1          A. Carver
2  of -- from them being expert in the use of the
3  particular type of drug and the treatment of
4  particular type of medical conditions.  And that
5  can be valuable information from a practical point
6  of view, in addition to perhaps the physician,
7  subspecialists have attended a medical conference
8  and have some new information that is being
9  reported at that continuing medical education
10  conference that's -- that they feel is relevant,
11  new information that's being presented that would
12  affect their view on the treatment of a particular
13  medical condition.
14          That information may not be contained
15  in the medical literature at the moment.  Or would
16  not have been necessarily all published and so,
17  therefore, if the P&T committee is relying upon
18  totally published information as an example, then
19  that would be of value or another point of
20  information that the subspecialist group would
21  bring to the table as perhaps relevant.
22      Q.   Do I understand you correctly that
23  that information gathered from their clinical
24  experience is one useful piece of information that
25  physicians can provide in this process?

Page 134

1              A. Carver
2     A.   Yes.
3     Q.   And do I also understand you to have
4  said that physicians sometime attend conferences
5  or other events at which research that has not yet
6  been published might be publicized in advance of
7  its publication?
8     A.   Yes, or -- or the sharing of results,
9  etc., yes, that is the case.  It may be like, you
10 know, the psychiatrists attending a continuing
11 medical education conference, and part of the
12 topic would be on the treatment of bipolar
13 disorder, and if there were information that was
14 presented to the psychiatrists or the -- for such
15 treatment, it may influence their view in a
16 recommendation or a request, or their view of the
17 use of a particular product, or their view of the
18 usefulness of a particular product, and you know,
19 I don't know.  I may have misspoke earlier.  I
20 don't know.
21          But in a question, as I'm looking at
22 this page here and putting together this answer
23 for you, I may have said mistakenly "neurologists"
24 instead of "psychiatrists" on bipolar.  I may have
25 done that, upon reflection.

Page 135

1              A. Carver
2     Q.   So, with regard to neurologists then,
3  the answer should have been just diabetic
4  peripheral neuropathy, is that right?
5     A.   That's correct, yes.  But does that
6  give you another example --
7     Q.   Yes, that's very helpful --
8     A.   -- at what you're trying to get at
9  here?
10    Q.   Returning to this exhibit, so this
11 decision was made based on two letters to the
12 editor and information that was provided by the
13 chiefs of anesthesia, is that correct, so far as
14 you can tell?
15          MS. NUSSBAUM:  I think that the
16 witness has answered that he has no personal
17 recollection of the discussion at the meeting nor
18 who made the presentation or anything else.  So
19 his knowledge is simply what's in the document and
20 nothing more.
21    Q.   Today, is there a policy in place that
22 would preclude the P&T committee from expanding a
23 restriction based on this level of clinical
24 trials?
25          MS. NUSSBAUM:  That misstates the

Page 136

1              A. Carver
2  record.
3     A.   I don't know that there's a policy per
4  se.  But I think that the process has just evolved
5  where there's a higher standard, but in terms of a
6  policy that I could point to, the answer to that
7  would be no.
8     Q.   What is the standard that's in place
9  today?
10    A.   I believe that I described to you, and
11 it's our expectation that the -- for new drugs or
12 for monographs that are developed for drugs, that
13 a fairly exhaustive evidence table be put together
14 that are really weighing the evidence or stating
15 the evidence, and you know, such things as two
16 letters to the editor, so wouldn't make the cut.
17    Q.   Well, you now gather a lot of
18 evidence, but is there something that you demand
19 that that evidence show?  I can be more specific.
20          First of all, do you authorize
21 prescriptions for off-label uses or do you demand
22 FDA approval?
23    A.   The -- if we're talking about you
24 being the health plan and the health plan benefit
25 or -- excuse me -- the drug benefit, then yes, we

Page 137

1              A. Carver
2  demand that a product itself, the chemical entity,
3  the product be approved by the Food and Drug
4  Administration.
5          And then as it relates to off-label
6  use, that's in the hands of the physician, in the
7  hands of the prescriber as we mentioned
8  previously.  I -- the pharmacy department for the
9  health plan really would know whether a product is
10 being used off-label or not.
11    Q.   Is it Kaiser's view that medications
12 can be effective for uses if they're not approved
13 for by the FDA?
14          MS. NUSSBAUM:  I would object.  I
15 think that it assumes a conclusion that Kaiser has
16 a view on that.  I think the witness has already
17 stated that Kaiser, as long as the drug has been
18 FDA approved, will fill the prescription if it's
19 prescribed by the physician.
20    A.   Yeah, I think we're back to the --
21 it's in the hands of the doctor in terms of the
22 doctor treating the patient and evaluating whether
23 it's necessary therapy or not.
24    Q.   In 1999, was the restriction for
25 Gabapentin further expanded to encompass

Page 138

1              A. Carver
2  psychiatrists?
3      A.   I believe it was.
4      Q.   Do you know what the reasons for that
5  decision was?
6      A.   Not from memory.
7           MR. JAMES:  I'd like to mark another
8  exhibit.
9           (Kaiser-4 marked for identification.)
10     Q.   Do you recognize this document?
11     A.   Yes, this is the monograph for -- that
12 appears to have been used by the pharmacy and
13 therapeutics committee in southern California in
14 response to a request by the chiefs of psychiatry.
15     Q.   And is this the document that would be
16 created by Kaiser in the ordinary course of its
17 business?
18     A.   Yes, it is.
19     Q.   And reviewing this document, does it
20 refresh your recollection as to what the bases for
21 this decision were?
22     A.   I believe that the basis for the
23 request from the chiefs of psychiatry was to
24 provide yet another alternative for the treatment
25 of bipolar conditions.

Page 139

1              A. Carver
2      Q.   If you could go to, I guess, the
3  second page at the top, it says, "Clinical trial
4  analysis."
5           Can you read the first sentence?
6      A.   "The efficacy and unsafety of
7  Gabapentin has been studied in only one randomized
8  double-blind placebo controlled evaluating the
9  acute treatment of bipolar, one depression in 18
10 patients.  This study has not yet been published."
11          And it goes on to talk about ten other
12 case reports.
13     Q.   Does Kaiser believe that the decision
14 of the committee to approve the expansion of the
15 restriction of Gabapentin to psychiatrists was a
16 questionable decision?
17          MS. NUSSBAUM:  Well, are you talking
18 about based on the information that was available
19 to Kaiser in June of 1999 or are you talking about
20 based on the information that became available
21 when they learned about the whistleblower suit and
22 the off-label promotion and any other facts
23 alleged in the Complaint?
24     Q.   The timing of this decision was at the
25 time this decision was made, was it an appropriate

Page 140

1              A. Carver
2  decision?
3      A.   At the time, based upon the
4  information that was available, I believe the P&T
5  committee was yielding to the chiefs of psychiatry
6  for having yet another alternative for bipolar
7  disease, and so my answer would be yes, at that
8  time.
9      Q.   Was there anything deficient about the
10 process by which you went about gathering
11 information?
12     A.   At that time, I'm not sure.  At that
13 time, there's reference to this randomized
14 double-blind placebo controlled trial.  A very
15 small number of patients had not yet been
16 published, and so, I think it's questionable, but
17 again, I don't recall the context, and for that
18 information and the -- and the context in which
19 the chiefs of psychiatry would have brought it to
20 us basically.
21          I'm not sure what had influenced the
22 chiefs of psychiatry to make this request or
23 believing that the product would be effective for
24 this particular purpose.
25     Q.   Who would know that information?

Page 141

1              A. Carver
2          MS. NUSSBAUM:  If you know?
3      A.   I don't know.  I would be speculating
4  in my answer.
5      Q.   You wouldn't know who would know what
6  the basis for the chief of psychiatry's
7  recommendation was?
8          MS. NUSSBAUM:  You know, this is a
9  meeting that occurred eight years ago.  I think
10 that the witness has no allegation other than
11 what's in the document, and the document speaks
12 for itself.
13     Q.   Have you made any efforts to speak
14 with anyone?
15     A.   No, I have not -- no, no, I have not.
16     Q.   Are there any circumstances in which
17 it might be appropriate to expand a restriction
18 for prescription drug based on one unpublished
19 randomized double-blind placebo controlled trial
20 involving 18 patients and ten case reports and
21 open label trials?
22          MS. NUSSBAUM:  That misreads the
23 document Exhibit 4, which also says that the
24 chiefs of psychiatry requested this, and you do
25 not know whether they were sampled, whether they

Page 142

A. Carver

1  were detailed, whether they attended, you know,
2  medical education and so, I think that that's a
3  very misleading question.
4      Q.   You can answer.
5      A.   Could you state the question again,
6  please?
7          MR. JAMES:  Could you read back the
8  question?
9          (Record read.)
10         MS. NUSSBAUM:  Again, it misstates
11 that that's simply one portion of the document.
12 This is the clinical trial analysis and it is not
13 the rest of the document that talks about many
14 other factors that were considered.
15     A.   I would have to know what -- what had
16 influenced the chiefs of psychiatrists, what
17 information they had to believe -- believe that
18 use of this product was likely to be effective.
19     Q.   Is there other information that they
20 might have had beyond what's stated in this
21 document?
22     A.   I would --
23         MS. NUSSBAUM:  That's speculative.
24     A.   I would have to speculate.

Page 143

A. Carver

1      Q.   Well, no.  I guess if you take the
2  view that there could not have been any other
3  information that they had aside from what's in
4  this document --
5          MS. NUSSBAUM:  Wait a minute.  That's
6  not based on any evidence, that's not based on the
7  document, That's not based on the record, so why
8  should he take that view?  It's not based on the
9  Complaint.  That's not based on the allegations in
10 the Complaint about detailing about free samples
11 to psychiatrists, about off-label promotion, about
12 continuing medical education.
13         MR. JAMES:  I guess what I'm asking
14 is --
15     Q.   Is there other relevant information
16 that the psychiatrists could have had beyond
17 what's stated in this document?
18     A.   There very well may have been.
19     Q.   And what kinds of --
20     A.   It would be speculation on my -- on my
21 point -- I mean, from my point of view.
22     Q.   Right.  I'm not asking you what it
23 was.  I'm asking if there could have been such
24 additional evidence and what kind of information

Page 144

A. Carver

1  would that have been that they could have brought
2  to the table that wouldn't be recorded in this
3  document?
4      A.   The members of the chief of psychiatry
5  department could have attended medical education
6  conferences as an example and perhaps that could
7  have influenced their thinking regarding the
8  usefulness of this product.  But that's
9  speculation on my part.  I do not have evidence of
10 that specifically.
11     Q.   But knowing -- knowing that
12 information would affect your view as to whether
13 this was an appropriate basis on which to decide
14 to expand the restriction on Gabapentin at the
15 time?
16         MS. NUSSBAUM:  Objection as to whether
17 or not this witness has a view as to whether it
18 was appropriate or inappropriate.  I think that he
19 stated, based on the information available to
20 Kaiser in June of 1999 and based on a meeting
21 which included the chiefs of psychiatry, and he
22 stated that he does not specifically know whether
23 they were detailed, whether they got sampled,
24 whether they attended the Medical Information that

Page 145

A. Carver

1  this was the decision.
2      Q.   Based on just what's in this document,
3  without knowing what the chiefs of psychiatry told
4  the P&T committee about, can you make a
5  determination as to whether this -- this was an
6  appropriate decision that would have been
7  consistent with P&T's policies today?
8          MS. NUSSBAUM:  Objection.  What is
9  "appropriate decision?"  Please restate your
10 question.
11     Q.   Based on this document, can you tell
12 whether this decision would be inappropriate by
13 reference to the policies and practices that the
14 P&T committee today has when it regards these
15 kinds of requests?
16         MS. NUSSBAUM:  Objection.  It's highly
17 speculative.  You're asking the witness to
18 speculate.  He's already testified based on the
19 information they had, they made this decision and
20 that in his view it was appropriate at the time it
21 was made.
22     Q.   Is that accurate to say that you
23 thought it was an appropriate decision at the time
24 it was made, you being Kaiser?

Page 146

A. Carver

1
2    A.   It's accurate from the standpoint of
3 Kaiser.  I think that I have to believe that the
4 decision -- the recommendation from the chiefs of
5 psychiatrists, the decision by the P&T committee
6 at that time was appropriate, particularly in the
7 context of which was being presented here and that
8 being that this was being suggested for patients
9 who have failed the other treatments for bipolar.
10        So you have the chiefs of psychiatry
11 who were the specialists in the treatment of
12 bipolar disorder making a recommendation to the
13 P&T committee for use in certain circumstances,
14 and it would seem, you know, seem that such
15 recommendation comes from those subspecialists was
16 okay at that time.
17    Q.   You say it's still okay today to
18 prescribe Gabapentin for bipolar disorder in
19 certain circumstances?
20        MS. NUSSBAUM: Objection.  And I would
21 ask the witness not to answer.  I don't know what
22 it means, okay, to prescribe it under certain
23 circumstances.  What does that mean?
24    Q.   I think I took it from the witness'
25 answer, but the P&T committee regarded it as

Page 147

A. Carver

1
2 medically appropriate to prescribe Gabapentin for
3 bipolar disorder in certain circumstances today?
4        MS. NUSSBAUM: Objection.  I think
5 that today, 2007, we don't have any testimony as
6 to what, or if any, there's a recommendation of
7 the P&T committee on bipolar prescriptions for
8 Neurontin.
9    Q.   Does the P&T committee have any view
10 regarding whether it's appropriate to prescribe
11 Neurontin in certain circumstances for bipolar
12 disorder?
13    A.   In the year 2007?
14    Q.   Yes.
15    A.   Yes, they do.
16    Q.   And what is that view?
17    A.   The view is no.
18    Q.   So, it's the view of the P&T committee
19 that it is never under any circumstances
20 appropriate to prescribe Gabapentin for bipolar
21 disorder?
22        MS. NUSSBAUM: The witness did not say
23 never under no circumstances.  He gave an answer.
24 I think it's unfair to keep on asking the same
25 question six different ways and it's very

Page 148

A. Carver

1
2 confusing.  You asked your question.  You got an
3 answer, and I think we should move on.
4    Q.   The question, I guess there's two
5 possibilities.  One is it's appropriate in certain
6 circumstances, and the other is it's appropriate
7 in any circumstances?
8    A.   No, the view of the P&T committee is
9 that it's not effective.
10    Q.   In any circumstances?
11    A.   It's just not effective for the
12 treatment of bipolar disorder and -- but that does
13 not overrule or negate the -- it's in the hands of
14 the doctor.
15        MR. JAMES:  We'll mark another
16 exhibit.
17        (Kaiser-5 marked for identification.)
18    Q.   Do you recognize this document?
19    A.   I do not recognize the document.
20    Q.   Did you review it in preparing for
21 this deposition?
22    A.   I did not, no.  This is the first time
23 I've seen this document.
24    Q.   Do you know who Richard Moldawsky is?
25    A.   I'm sorry, I do not.

Page 149

A. Carver

1
2    Q.   Do you know who Debbie Kubota is?
3    A.   I do.
4    Q.   Who is she?
5    A.   She is a pharmacist in our Drug
6 Information Service.
7    Q.   And what role does the Drug
8 Information Service play in this process by which
9 the P&T committee decides whether to expand
10 restriction on prescription drugs?
11        MS. NUSSBAUM: I think that you are
12 assuming facts that have not been testified to
13 that there's any role.
14        MR. JAMES:  Actually, I'll withdraw
15 that.
16    Q.   Does the Drug Information Service play
17 any role in the process by which the P&T committee
18 decides whether to approve or deny requests to
19 expand restriction on prescription drugs?
20    A.   The Drug Information Service has a
21 record of the decisions of the P&T committee.
22    Q.   Is its role confined to maintaining a
23 record of decisions that the P&T committee has
24 made?
25    A.   No, I believe I've testified that the

A. Carver

1
2  Drug Information Service also has a role in being
3  responsive to questions from physicians,
4  pharmacists and nurses and so --
5      Q.   I was actually referring specifically
6  to this process by which the P&T committee decides
7  to expand or not expand restrictions on
8  prescription drugs?
9      MS. NUSSBAUM:  That question has
10 already been asked and answered and the witness
11 just answered that question for you.  He also said
12 he does not recognize this document.
13     Q.   I'm actually not asking about the
14 document.  I'm asking about aside from recording
15 the P&T committee's decisions, does the Drug
16 Information Service play another role with regard
17 to the decision-making process of the P&T
18 committee -- I guess, I mean, you told me that
19 they record the P&T.
20     MS. NUSSBAUM:  Why don't we stop at
21 your first question and not ask multiple
22 questions.
23     I think your first question was:  Do
24 they play any role in the decisions of the P&T
25 committee?  Is that your question?

A. Carver

1
2      MR. JAMES:  Yes, and I think he
3  answered that they record their decisions.  I'm
4  wondering if there's anything else.
5      MS. NUSSBAUM:  Anything else?
6      A.   Yes.
7      Q.   And what is that --
8      A.   The Drug Information Service is also
9  responsible for accumulating this information --
10 this information I'm referring to is this -- in
11 the preparation of the drug monograph in
12 preparation for a P&T committee meeting.
13     Q.   How do they go about assembling the
14 monograph?
15     MS. NUSSBAUM:  If you know.
16     A.   They assemble the monograph by
17 conducting literature searches and also by
18 interacting with and obtaining a view from
19 specialists or subspecialists' positions regarding
20 the role of a particular drug and therapy.
21     Q.   Has that process changed over the
22 class period, the class period, the relevant
23 period?
24     A.   I don't -- I don't believe so.  It may
25 have -- well, I think the answer to that is, no,

A. Carver

1
2  not in generally.
3      Q.   This document, which I acknowledge you
4  haven't seen, states, it starts --
5      MS. NUSSBAUM:  We're not going to have
6  this witness speculate as to an e-mail
7  communication between two people, neither of which
8  is this witness.  He's not copied on this
9  document.  And he said he never saw it.
10     Q.   Is there any reason why a Kaiser
11 physician would be interested in knowing whether
12 there's a restriction applicable to a particular
13 prescription drug?
14     MS. NUSSBAUM:  Objection.  Calls for
15 speculation.
16     MR. JAMES:  Actually, I'll withdraw
17 that question.
18     Q.   Do any physicians ask the Drug
19 Information Service whether there are restrictions
20 on particular prescription drugs?
21     MS. NUSSBAUM:  Objection.  Again, it's
22 hypothetical.  It calls for speculation.
23     A.   I don't know.
24     Q.   Can a prescribing physician prescribe
25 a prescription drug just as easily whether or not

A. Carver

1
2  there is a restriction on that drug?
3      A.   Yes, they can.
4      Q.   Is there -- am I correctly stating
5  your testimony that you don't know whether the
6  restrictions have any influence on Kaiser's
7  physicians' behavior prescribing patterns?
8      MS. NUSSBAUM:  I would object.  This
9  has been asked and answered.  The witness has
10 testified and I believe you're misstating his
11 testimony.
12     Q.   Was I misstating your testimony?
13     A.   Could you repeat the question?  It's
14 been a while.  I don't know if you were expecting
15 me to respond.  I think that you did, but you put
16 a little twist on my testimony.
17     MR. JAMES:  Could you read back the
18 question?
19     (Record read.)
20     MS. NUSSBAUM:  I would object again.
21 You know, this witness has testified there are
22 something like, what did you say, 10,000
23 physicians, thousands and thousands and thousands
24 of physicians.  So, I think it's absolutely
25 speculative to say whether some decisions may be

Page 154

1              A. Carver
2  influenced, may be partially influenced, may not
3  at all be influenced.
4       Q.   You can answer if you can understand
5  the question.
6       A.   Well, I understand the question. I
7  believe that I previously testified that the
8  placement of guidelines and restrictions basically
9  are intended to be used by the physician groups
10  themselves, and in their approach to prescribing,
11  and I think that there's a whole variety of
12  approaches that are taken by individual physicians
13  regarding honoring those physicians, but I also
14  want to reemphasize that regardless of whether or
15  not there is a restriction or specific guidance
16  that when physicians prescribe a particular
17  product, it is dispensed by the pharmacy and paid
18  for by the health plan.
19            MR. JAMES:  I'm going to mark another
20  exhibit.
21            (Kaiser-6 marked for identification).
22       Q.   Have you seen this document before?
23       A.   No, I have not.
24       Q.   I guess the third line of this first
25  e-mail says, "Lamictal and Neurontin will be used

Page 155

1              A. Carver
2  as fourth and fifth line for bipolar, but may move
3  to third ahead of Tegretol." And in parentheses,
4  it says, "(PDS get lost of side effects) if there
5  are more tolerated and literature holds up."
6            And it's your prior testimony that the
7  P&T committee no longer regards Neurontin as an
8  appropriate fourth or fifth-line treatment for
9  bipolar, or for that matter, that it has any role
10  in the treatment of bipolar disorder?
11       A.   That's correct.
12            MS. NUSSBAUM:  Objection. Three
13  things here:  First, this is an e-mail between two
14  people who have not been identified. The witness
15  has testified he has never seen this document. I
16  note that he is neither an author, recipient, or
17  copied on the document. I also note that the date
18  of the document is December of 1998.
19       Q.   Can I just ask whether the view
20  expressed in this document was consistent with the
21  P&T committee's current views, and the witness
22  answered the question?
23            MS. NUSSBAUM:  I move to strike that
24  answer.
25            (Kaiser-7 marked for identification.)

Page 156

1              A. Carver
2       Q.   Do you recognize this document?
3       A.   Yes, this was the drug monograph
4  prepared and discussed apparently at the
5  September 1999 P&T committee.
6       Q.   And what is the proposal that's under
7  consideration in this document, if any?
8       A.   I'm just refreshing my memory here, if
9  I might.
10            The subject of this request and -- is
11  a request coming in from the integral medicine
12  committee to broaden the use of Neurontin to
13  include treatment by primary care doctors for the
14  treatment of post-herpetic and diabetic neuralgias
15  when that's done in consultation with the
16  neurology department.
17            And then a recommendation or a request
18  from the chiefs of family practice to allow their
19  prescribing, in addition to the internal medicine
20  doctors, the prescribing of Gabapentin pursuant to
21  some guidelines.
22       Q.   And do you know the reasons that those
23  requests were made?
24            MS. NUSSBAUM:  Well, I think that the
25  document speaks for itself.

Page 157

1              A. Carver
2            Do you have any independent
3  recollection of the meeting in September of 1999
4  other than what's reflected in this document?
5            THE WITNESS:  I do not.
6       Q.   Had you seen this document in
7  preparing for this deposition?
8       A.   It may have been included in what I
9  glanced over. I certainly didn't study it, but it
10  may have been included, so I --
11       Q.   Do you know if the P&T committee acted
12  on this recommendation?
13       A.   I just don't independently recall.
14       Q.   Actually, what I'm asking is:  In your
15  capacity as corporate representative whether you
16  know the answer to that question?
17       A.   Well, it would be helpful to speak
18  authoritatively, if I had the, you know, the --
19  the minutes or the recommendation was approved.
20  And so, lacking that, my assumption would be --
21            MS. NUSSBAUM:  Please don't assume.
22       A.   Okay. Then I would need to have the
23  minutes of the meeting to speak authoritatively to
24  that, in fact, the requested action was taken.
25       Q.   Would there be members of the meeting?

1            A. Carver
2       A.   Yes, there would.
3       Q.   Would Kaiser still have those minutes?
4       A.   Yes, we would.
5       Q.   Do you know if those minutes have been
6  produced to the defendants?
7            MS. NUSSBAUM:  By counsel, to the
8  extent that there have been any relevant documents
9  with respect to this or any other meeting, those
10 documents have been produced.
11      Q.   Other than communications with
12 counsel, do you have any reason to know if any
13 minutes from this meeting were produced to the
14 defendants?
15           MS. NUSSBAUM:  By counsel, we don't
16 even know if a meeting occurred.  This, you know,
17 is a drug monograph --
18      Q.   Did a meeting occur at this time in
19 1999?
20      A.   I would have to refer to the minutes
21 of the meeting.  I just, I don't know
22 independently whether a meeting occurred eight
23 years ago or not.
24      Q.   Is it possible that the P&T committee
25 acted without ever meeting?

1            A. Carver
2            MS. NUSSBAUM:  Don't speculate.  Is it
3  possible or not possible.  I think the witness is
4  saying he has no independent recollection other
5  than the document before him.
6       A.   I believe the meeting occurred in
7  that -- I cannot recall the cancellation of any
8  P&T committee meetings ever, but to give you an
9  authoritative answer regarding the outcome of the
10 recommendation, I really would need to refer to
11 the minutes of the meeting.
12      Q.   But they may not exist because there
13 may not have been no meeting?
14           MS. NUSSBAUM:  To the extent that
15 there were minutes of the meeting concerning
16 Neurontin, we believe that they've been produced.
17           MR. JAMES:  You know --
18      Q.   The committee -- do you know what
19 the -- do you know what minutes of the P&T
20 committee meetings looked like?
21      A.   Yes, I do.
22      Q.   Do they have a heading designating
23 them as --
24      A.   Yes, they do.
25      Q.   Under "potential advantages," does the

1            A. Carver
2  first bullet point state that Gabapentin has
3  relatively benign side effect profile?
4       A.   It states that.
5       Q.   Is that a view that the P&T committee
6  still holds?
7            MS. NUSSBAUM:  Objection.  The
8  document speaks for itself.  The witness has
9  testified he has no independent recollection other
10 than the document.
11      Q.   As corporate representative of Kaiser,
12 are you aware of any information that the P&T
13 committee has subsequently learned that would shed
14 doubt on that conclusion?
15           MS. NUSSBAUM:  I would object again.
16 I mean, that's not in this 30(b)(6) Notice, in any
17 of the 30(b)(6) Notices specifically.  And the
18 document speaks for itself.
19      Q.   So, it's your testimony that you don't
20 know whether the P&T committee has knowledge of
21 any additional information that would alter this
22 conclusion?
23           MS. NUSSBAUM:  Well, that's -- the
24 witness has stated and the Complaint states that
25 information became available to them as -- because

1            A. Carver
2  of the whistleblower suit, because of articles,
3  because of information that counsel has developed.
4       Q.   That would shed doubt on this
5  particular conclusion?
6            MS. NUSSBAUM:  Concerning Neurontin.
7       Q.   I'm actually asking about whether you
8  received any information that would shed doubt on
9  this conclusion that Gabapentin has relatively
10 benign side effect profile?
11      A.   I do not know.
12      Q.   Who would know that?
13      A.   I -- our Drug Information Service
14 would know whether or not there has been new
15 information since what was printed here.
16      Q.   Would a relatively benign side effect
17 profile be a general reason to expand the
18 restriction on Gabapentin's prescription?
19           MS. NUSSBAUM:  Objection.  That
20 misstates the document.  This is a multipage
21 document.  That is one fact in the document.  So
22 it really totally misstates the content of the
23 document.
24      Q.   You can answer the question.
25           MS. NUSSBAUM:  The witness has already

Page 162

1          A. Carver
2  testified that he has no specific recollection on
3  what's reflected in the document.
4      Q.   Do you need to have the question read
5  back?
6      A.   The -- that particular aspect being a
7  benign side effect profile by itself would be
8  insufficient.  I think it's just a piece of
9  information in a broader context of this
10 particular product, relative to a variety of
11 products, and so one piece of information would be
12 taken into consideration, but not sufficient as a
13 stand-alone for doing anything, just a piece of
14 information.
15     Q.   Under "potential advantages," can you
16 read the first bullet point?
17     A.   I'm sorry.  Read the first bullet
18 point?
19     Q.   Under the heading "potential
20 disadvantages" at the bottom of the page.
21     A.   "Use of Gabapentin as an adjunctive or
22 first-line anti-epileptic drug for the treatment
23 of bipolar disorder would result in potentially
24 significant cost impact.  See estimated cost
25 impact/pharmacoeconomics followed by XXXXXX."

Page 163

1          A. Carver
2      Q.   Is cost impact a consideration that
3  enters into the P&T committee's decision-making?
4      A.   It's just another piece of
5  information.
6      Q.   Can you read the next bullet point
7  after that?
8      A.   "As the manufacturer does not intend
9  to seek FDA approval for the use of Gabapentin in
10 the treatment of pain or neuropathies, it would
11 seem unlikely that further large randomized
12 clinical trials to study the efficacy and safety
13 of Gabapentin for this indication would be
14 forthcoming."
15     Q.   Did the P&T committee understand at
16 the time that this request to remove restriction
17 on Neurontin was pending that it was unlikely that
18 further large randomized clinical drug trials to
19 study the efficacy and safety of Gabapentin for
20 this indication would be forthcoming?
21         MS. NUSSBAUM:  That misstates the
22 document.  The document says that that is
23 information that the manufacturer, i.e., the
24 defendants in this action, gave to Pfizer, okay,
25 and gave to Kaiser, and so that was information

Page 164

1          A. Carver
2  from the manufacturer, the defendant, that Kaiser
3  was considering as one of the factors in September
4  of 1999 in this drug monograph.
5      Q.   Will you agree with your counsel that
6  Kaiser -- did you say the defendants informed?
7          MS. NUSSBAUM:  Yeah.  It says as the
8  manufacturer, the manufacturer is referring to
9  who, to the defendants in this action, does not --
10     Q.   Actually, I wanted to ask the witness
11 a question.
12         Would you agree with your counsel that
13 in September of 1999, the defendants informed
14 Kaiser that it did not intend to seek FDA approval
15 for the use of Gabapentin in the treatment of pain
16 or neuropathies and that it would be unlikely that
17 further randomized clinical drug trials to study
18 the efficacy and safety of Gabapentin for the
19 indications described in this document would be
20 forthcoming?
21     A.   I would agree with counsel that that
22 the manufacturer had apparently indicated to
23 Kaiser that the manufacturer did not intend to
24 seek FDA approval for the use of Gabapentin in the
25 treatment of pain or neuropathies.

Page 165

1          A. Carver
2      Q.   And what about the second half of the
3  sentence?
4      A.   It would seem unlikely that further
5  large randomized clinical trials to study the
6  efficacy and safety for Gabapentin would be
7  forthcoming.  I'm not sure if that piece, if that
8  came from the manufacturer or whether or not that
9  would have been someone's conclusion based upon
10 information from the manufacturer that they didn't
11 intend to seek FDA approval.
12         MR. JAMES:  We'll break there.  We
13 have less than a minute.
14         THE WITNESS:  Okay.
15         VIDEOGRAPHER:  The time is
16 approximately 5:37.  This ends tape number three.
17 We're now going off the record.
18         (Recess.)
19         VIDEOGRAPHER:  The time is
20 approximately 5:53.  This begins tape number four.
21 We are now on the record.
22     Q.   Before we were going off the record,
23 we were referring to the sentence that carries
24 over from page one to page two of Deposition
25 Exhibit Number 7, and I believe that you were

1              A. Carver
2   stating that while the information in the first
3   half of the sentence came from -- likely came from
4   the manufacturer, you couldn't be sure whether the
5   latter half of that sentence came from the
6   manufacturer or from another source, is that
7   correct?
8       A.   That's correct.
9       Q.   If it didn't come from the
10  manufacturer, who did it come from?
11      MS. NUSSBAUM:  Speculation.
12      A.   I would not know.
13      Q.   Would -- did Kaiser draw the inference
14  in the second half of the sentence from the first
15  half of the sentence?
16      MS. NUSSBAUM:  You're asking the
17  witness to speculate.  He didn't write the
18  document.
19      A.   Yeah.  I really do not know.
20      Q.   In your personal capacity, would you
21  have any reason for believing that because the
22  manufacturer does not intend to seek FDA approval
23  for the use of a particular drug for a particular
24  purpose, it's unlikely that further large
25  randomized clinical drug trials to study the

1              A. Carver
2   efficacy and safety of the drug for that use are
3   likely to occur?
4       MS. NUSSBAUM:  Are you asking that
5   specific to Neurontin in 1999?
6       Q.   I'm asking generally first.
7       MS. NUSSBAUM:  Objection.  There's no
8   basis for the question.  It's asking him to
9   speculate.
10      Q.   You can answer the question.
11      A.   It would be speculation.  If the
12  manufacturer indicated to us that they were not
13  going to seek FDA approval for neuropathies and
14  pain, then it could go either of two ways.
15      One way would be that the manufacturer
16  also indicated that they were not likely to
17  conduct large clinical trials, or it could have
18  been the author of this that speculated, and from
19  my -- in either case, I think that we all have a
20  view that randomized clinical trials are
21  expensive.
22      And so, I don't know who -- I don't
23  know the source as it's been stated and it would
24  be speculation on whether the source was the
25  defendant or whether this was speculation on

1              A. Carver
2   behalf of the author of this paragraph.
3       Q.   Going to the second page, it's the
4   fourth bullet down from clinical trial, the
5   heading Clinical Trial Analysis, can you read the
6   first sentence?
7       A.   "The efficacy and safety of Gabapentin
8   for the treatment of diabetic peripheral
9   neuropathy was studied in two randomized
10  double-blind placebo controlled trials involving
11  205 patients."
12      Q.   And the sentence following that is
13  what?
14      A.   "In the first study in which
15  67 percent of the Gabapentin-treated patients
16  received 3,600 milligrams per day, Gabapentin
17  demonstrated significant pain relief usually by
18  week two."
19      Q.   Does Kaiser have any reason to believe
20  that the results of that study were misstated in
21  this document?
22      MS. NUSSBAUM:  Objection.  Do you know
23  which study that was?  Do you know who the authors
24  of the study were?  I mean, you can't identify
25  that study based on this document.

1              A. Carver
2       Q.   Are you able to answer the question?
3       A.   Yeah, I do not know.
4       Q.   Is it because you can't determine
5   which study is being referred to?
6       A.   Could you restate the question,
7   please?
8       Q.   Is the reason that you're unable to
9   answer --
10      A.   No, the previous question.
11      MR. JAMES:  Could you read it back?
12      (Record read.)
13      A.   And the point of reference would be at
14  the time that this was written?
15      Q.   No, today, does Kaiser have any reason
16  to believe that the results of this study have
17  been mischaracterized?
18      MS. NUSSBAUM:  The Complaint and
19  Answers --
20      MR. JAMES:  If you have an objection,
21  I'd recommend that you just object and then
22  preserve your objection and then we'll move on.
23      MS. NUSSBAUM:  I object.  You cannot
24  identify --
25      MR. JAMES:  I please ask that you just

Page 170

```
1              A. Carver
2  state your objection and we'll move on, thank you.
3          MS. NUSSBAUM:  Your question is very
4  unfair.
5          MR. JAMES:  We have about 12 hours and
6  I'm gathering the impression that two or three
7  hours are being consumed by speaking objections.
8  I think if we can keep the objections kind of
9  brief and to the point...
10         MS. NUSSBAUM:  We'd also like fair
11 questions and not to have the witness misled.
12    Q.  Do you need to have the question read
13 back?
14    A.  I think the answer to your question is
15 I don't know what the view of the P&T committee
16 would be today relative to whether or not this
17 study was accurate.
18    Q.  The question I'm asking -- so you
19 don't know as the corporate representative of
20 Kaiser whether the P&T committee or anyone else at
21 Kaiser has information indicating that this -- the
22 results of this study have been mischaracterized
23 in this document?
24    A.  I do not know.
25    Q.  If you go down a couple of sentences,
```

Page 171

```
1              A. Carver
2  do you see a sentence beginning, "The second study
3  crossover trial"?
4    A.  Yes, I see that sentence.
5    Q.  And does that indicate that the P&T
6  committee was aware that there was a crossover
7  trial that failed to demonstrate significant pain
8  relief in 1999 when it was considering whether to
9  remove restrictions from Gabapentin?
10   A.  Yes, I believe the P&T committee that
11 this information, that's what this document was
12 prepared for.
13   Q.  And beside this paragraph, there's --
14 or in the right margin, there are two sort of
15 letters, S-6 and S-11, is that correct?
16   A.  That's correct.
17   Q.  And if you turn to the last page of
18 this document, there's a listing of studies with
19 the letters next to them, is that correct?
20   A.  That's correct.
21   Q.  And do the letters S-6 and S-7 on the
22 second page of the document refer to these studies
23 on the last page of the document?
24   A.  Those are the references, the
25 cross-references to those statements, yes.
```

Page 172

```
1              A. Carver
2    Q.  And is the final study on that list on
3  the last page one who the -- which is first
4  authored by someone with the last name Gorson and
5  appears to have been published in 1999?
6    A.  Yes.
7    Q.  Did the P&T committee know in 1999
8  when it was considering whether to remove
9  restrictions on Gabapentin that there was a study
10 authored by someone named Gorson which failed to
11 demonstrate significant pain relief?
12   A.  At a dose of 900 milligrams per day.
13         MS. NUSSBAUM:  The document speaks for
14 itself.
15   Q.  900 milligrams a day, is that correct?
16   A.  Well, I believe that -- yes, I believe
17 the P&T committee had the benefit of this
18 information at the time.
19   Q.  And does the failure of a clinical
20 trial to demonstrate significant pain relief mean
21 that it's inappropriate to prescribe Neurontin for
22 that use?
23         MS. NUSSBAUM:  Objection.  This
24 witness is not an expert witness as to whether or
25 not it's appropriate to prescribe something for a
```

Page 173

```
1              A. Carver
2  particular use.
3    Q.  Did the P&T committee believe that it
4  was appropriate to remove restrictions from
5  Gabapentin prescriptions in light of its knowledge
6  that a crossover trial had failed to demonstrate
7  significant pain relief?
8          MS. NUSSBAUM:  Objection.  This drug
9  monograph makes reference to a lot of information.
10 That's just one very small piece of information
11 that's contained in it.
12   A.  The information that's stated here is
13 that there was a trial that demonstrated
14 effectiveness at 3,600 milligrams per day.  It
15 refers to a second trial which indicates it failed
16 to demonstrate efficacy at 900 milligrams a day.
17 That's the information that the P&T committee had.
18   Q.  And did the committee believe it
19 was appropriate in light of that information to
20 remove the restriction from Neurontin?
21   A.  If the P&T committee approved this
22 recommendation, then I would say yes.
23   Q.  When the committee approved a
24 recommendation, is it safe to say that the
25 committee believes that that action is
```

```
1              A. Carver
2  appropriate?
3     A.   Yes, it is.
4         MS. NUSSBAUM: Based on the
5  information that they have in the file.
6     Q.   And based on the information that
7  would be stated in this monograph?
8     A.   Based upon the information stated in
9  the monograph and other sources of information
10 that we've already spoken about regarding
11 information may be available from subspecialists,
12 groups of physicians.
13    Q.   Is there anything inconsistent about
14 the results of the two studies that you were just
15 describing which are in this bullet point?
16        MS. NUSSBAUM: Objection.  The studies
17 are not before the witness.  He hasn't read the
18 studies and he's not an expert as to whether or
19 not these studies are consistent or inconsistent.
20    Q.   Just from what's stated here, does it
21 seem that one person is saying that the sky is
22 green and another person is saying that the sky is
23 purple, are they just mutually inconsistent
24 statements?
25        MS. NUSSBAUM: Objection.  That's
```

```
1              A. Carver
2  speculative.
3     A.   I view that the two studies as just
4  two different studies.  One in which you
5  demonstrated or attempted to demonstrate
6  effectiveness at a particular dose and at a much
7  lower dose are not demonstrated, so I don't see an
8  inconsistency with that.  I would say what's the
9  dose?
10    Q.   So to determine whether the two
11 studies were inconsistent, you have to know the
12 dose that was studied on each occasion?
13        MS. NUSSBAUM: Objection.  I think
14 that there are many other factors that a witness
15 would need to look at, including looking at the
16 studies, consulting with medical.
17        MR. JAMES: I think your objection has
18 been made known.
19    Q.   Is that one of the factors, that you
20 have to know the dose that was studied?
21    A.   Absolutely.
22    Q.   Are there any other factors that you
23 could think of that you would have to know?
24    A.   I did not profess to be an expert in
25 reviewing clinical studies, and so I would rely
```

```
1              A. Carver
2  upon information from those who are.
3     Q.   And do the members of the P&T
4  committee feel that they need to know more about a
5  study other than simply its dose before they can
6  take action on a recommendation such as this one?
7     A.   The P&T members may review in total
8  the -- any and all of the studies upon which
9  they're relying upon to make a decision if they
10 choose to do so.
11    Q.   And they might examine the dose that
12 was studied, is that correct?
13    A.   Yes.
14        MS. NUSSBAUM: This is speculative as
15 to what the P&T committee might or might not have
16 reviewed in September of 1999.
17    Q.   In 1999, do you know what the P&T
18 committee knew about these -- about these two
19 reports?
20    A.   I do not.
21    Q.   Is it safe to say that they would have
22 read this monograph carefully?
23        MS. NUSSBAUM: Objection.  Calls for
24 speculation.
25    A.   There are, you know, many members of
```

```
1              A. Carver
2  the P&T committee, and I do not know exactly what
3  they've done.
4     Q.   Does the committee make a practice of
5  reading the monographs such as this one that have
6  been prepared?
7     A.   I think --
8         MS. NUSSBAUM: Objection, speculation.
9     A.   It would be physician-specific and
10 likely drug-specific.
11    Q.   But at least one physician on the P&T
12 committee would generally make a practice of
13 reading the monograph, is that true?
14        MS. NUSSBAUM: Objection, speculation.
15    A.   I really cannot speculate on that.
16    Q.   So without resorting to speculation,
17 you can't tell me whether at least one member of
18 the P&T committee has reviewed the monograph
19 closely before the P&T committee makes a decision?
20    A.   In its entirety, no, I cannot.
21    Q.   At this point in time, does Kaiser
22 view this decision that was made in 1999 as an
23 inappropriate one?
24        MS. NUSSBAUM: Objection.  "At this
25 point in time" meaning what?
```

Page 178

1           A. Carver
2      Q.   No, today, does Kaiser regard this as
3 an inappropriate decision?
4          MS. NUSSBAUM:  What decision?  What we
5 have here is a drug monograph.  We don't have a
6 decision.  We don't have minutes of the meeting.
7 So what decision --
8      Q.   Following the submission of this
9 monograph, was a decision made to remove
10 restrictions from Gabapentin --
11         MS. NUSSBAUM:  If you know.
12     A.   I think I previously testified that I
13 would need the minutes of the meeting to respond
14 to you authoritatively.
15         MR. JAMES:  I'd like to mark another
16 exhibit.
17         (Kaiser-8 marked for identification.)
18     Q.   Do you recognize this document?
19     A.   I believe this is the decision of the
20 committee regarding the formulary consideration,
21 although it's not dated.  I believe this is the
22 conclusion.
23     Q.   Did this occur in 1999?
24         MS. NUSSBAUM:  If you know.
25     A.   I believe so.

Page 179

1           A. Carver
2      Q.   And what's the basis for that belief?
3      A.   The basis for the belief is that this
4 status section indicates that restrictions have
5 been removed essentially and the P&T committee
6 voted to remove prescribing restrictions for
7 Gabapentin capsules and add guidelines for use,
8 and the recommendations that had been used in that
9 decision were based upon other requests of
10 internal medicine, family medicine, you know,
11 neurology, psyche, etc., and these expert
12 recommendations would be consistent with the
13 request that was made which included the internal
14 medicine and family medicine, physicians.
15         And so that's the basis upon which I
16 would come to that conclusion, although the
17 document is not dated.
18     Q.   And at the same time, it removed
19 restrictions from Gabapentin, and did the
20 committee add guidelines as to its use?
21     A.   That's correct.
22     Q.   And what were those guidelines?
23     A.   The guidelines are contained on the
24 five bullets at the bottom of the page under
25 guidelines for the use of Gabapentin.

Page 180

1           A. Carver
2      Q.   Have those guidelines changed between
3 1999 and today?
4          MS. NUSSBAUM:  If you know.
5      A.   They have changed.  They changed.
6      Q.   Actually, let's go one by one.
7          Starting with, let's start with the
8 first one under the guidelines for use of
9 Gabapentin.  It says that it's indicated as
10 adjunctive therapy in the treatment of partial
11 seizure without secondary generalizations with
12 adults with epilepsy, is that correct?
13     A.   That's correct.
14     Q.   And is that consistent with the
15 information that Kaiser has today?
16     A.   Yes, it is.
17     Q.   And then moving to the second bullet
18 point, it indicates that, "There are published
19 case reports describing the efficacy of Gabapentin
20 in the treatment of refractory cases of RSD."
21         First of all, have I read that
22 sentence correctly?
23     A.   Yes, you have.
24     Q.   And is that information consistent
25 with the information that Kaiser has today?

Page 181

1           A. Carver
2      A.   I'm uncertain if you have a, in your
3 documents, a more recent set, then I could speak
4 authoritatively on that particular one, RSD.
5      Q.   Do you know what the guidelines today
6 are with regard to RSD?
7      A.   I do not.
8      Q.   And at this point, you have no
9 knowledge of whether this guideline for RSD
10 remains in place today, is that correct?
11     A.   That's correct, out of just memory.
12     Q.   From your memory, it's possible that
13 the guidelines apply to Kaiser physicians is still
14 that Gabapentin can be an effective treatment for
15 refractory cases of RSD, is that correct?
16         MS. NUSSBAUM:  Objection.  It calls
17 for speculation.  Also, didn't indicate whether or
18 not these published case reports or records that
19 are reflected in the complaint as being
20 fraudulent.  So I think --
21     Q.   First of all, these guidelines -- at
22 this moment, are you aware of any information that
23 would tell you that this guidance is not the
24 guidance that's currently in place at Kaiser with
25 regard to treatment of RSD?

Page 182

A. Carver

1
2    A.   I think I've answered that.
3    Q.   What was the answer?
4    A.   I'm uncertain.
5    Q.   Do you have any information
6    inconsistent with that?
7         MS. NUSSBAUM:  The witness said he's
8    uncertain, which means he doesn't know if he did
9    or didn't.  He doesn't know.
10   Q.   Is your uncertainty caused by
11   conflicting information or an absence of --
12   A.   No, just an absence of familiarity
13   with specifically that aspect of the guideline for
14   use of Gabapentin today.  I'm sorry.  I do not
15   know.
16   Q.   Who would know what the guideline for
17   Gabapentin today was?
18   A.   I believe that our Drug Information
19   Service would have the record of what it might be.
20   Q.   The next guideline deals with bipolar
21   disorder, is that correct?
22   A.   Yes, it is.
23   Q.   And is that view expressed in that
24   bullet point inconsistent with Kaiser's view
25   today?

Page 183

A. Carver

1
2         MS. NUSSBAUM:  If you know.
3    A.   I believe that that has been removed
4    from the guidelines today.
5    Q.   When was that removed?
6    A.   I believe it was removed in the time
7    period of perhaps 2003 after the revelations
8    regarding the marketing and promotion and
9    educational efforts and all of that related to the
10   promotion of Neurontin.
11   Q.   So you believe that Kaiser has changed
12   its guidance of its use of Gabapentin for bipolar
13   effective disorder?
14   A.   I believe so, based upon information
15   from various -- from the chiefs of -- of
16   psychiatry and other physician groups involved in
17   the drug use management process that found that
18   there was no place for the use of Neurontin in
19   bipolar effective disorder, and when I say, "no
20   use," I'm, you know, I'm not saying as you
21   questioned me previously about does that mean 100
22   percent.  Never, never, no, it doesn't.  But I
23   don't believe this is contained in the guideline
24   today.
25   Q.   And do you believe there is a P&T

Page 184

A. Carver

1
2    committee meeting at about 2003 in which this
3    change was made?
4         MS. NUSSBAUM:  The witness
5    testified -- you're misstating his testimony that
6    when the truth came out with respect to the
7    fraudulent scheme, that they reevaluated bipolar.
8    Q.   Did the P&T committee reevaluate
9    bipolar in 2003?
10   A.   I believe that the P&T committee
11   received recommendations regarding the appropriate
12   and many inappropriate uses of Neurontin and
13   agreed that use for bipolar was inappropriate.
14   Q.   And they changed the guidelines as a
15   result?
16   A.   I -- I've asked for, and if you have a
17   document that has the current guideline, I'd be
18   happy to review it.  I don't know from memory
19   precisely what the guideline is today.
20   Q.   Aside from -- do you recall what
21   information was presented to the P&T committee
22   that made them alter their view regarding the use
23   of Gabapentin for bipolar effective disorder?
24   A.   Not specifically.
25   Q.   In general terms, do you know what

Page 185

A. Carver

1
2    that information was?
3    A.   In general, I believe that after it
4    became known of these promotional efforts and
5    promotion of -- inappropriate promotion of
6    Gabapentin or Neurontin, the chiefs of psychiatry
7    as well as other chiefs groups took a look at how
8    Neurontin was being used and concluded that some
9    efforts needed to be taken to get the -- to reduce
10   the use for which there was lack of demonstrated
11   effectiveness.
12   Q.   Did Kaiser believe that there was
13   demonstrated effectiveness in 1999 when these
14   restrictions were removed?
15        MS. NUSSBAUM:  I think you're
16   misstating, you know, his testimony.  The document
17   speaks for itself with respect to the two
18   documents, 7 and 8.
19        MR. JAMES:  I think your objection has
20   been --
21        MS. NUSSBAUM:  What he didn't know in
22   1999.
23   Q.   Did the P&T committee believe that
24   there was demonstrated efficacy of Neurontin for
25   bipolar disorder in 1999?

Page 186

1          A. Carver
2          MS. NUSSBAUM:  The document does not
3  say that.  The document speaks for itself.
4          MR. JAMES:  I'm actually asking a
5  question independent of the document.
6          MS. NUSSBAUM:  Do you have an
7  independent recollection of a P&T committee
8  meeting other than in September of 1999, other
9  than the two documents that you've been shown,
10  Exhibits 7 and 8?
11     Q.   From the beginning of the relevant
12  period, which is 1994 up through 1999, I believe
13  we've discussed four different changes in the
14  restrictions applicable to Gabapentin at Kaiser,
15  is that correct?
16     A.   I believe that's correct.
17     Q.   And the four were the initiation in
18  1994, but restricted to neurology, is that
19  correct?
20     A.   Correct.
21     Q.   And the second one was expansion of
22  that restriction to anesthesiologists in 1997, is
23  that correct?
24     A.   That's correct.
25     Q.   And the third was an expansion to

Page 187

1          A. Carver
2  psychiatry in 1999, is that right?
3          MS. NUSSBAUM:  Well, the documents
4  speak for themselves.  I don't think you can
5  broadly state an expansion to psychiatry.  I think
6  that the documents are much more complex than that
7  and they speak for themselves.
8     Q.   Is that accurate?
9          MS. NUSSBAUM:  It's asked and
10  answered.  I would ask that you not misstate his
11  testimony.
12     Q.   And was there an expansion to
13  psychiatry in 1999, is that correct?
14     A.   Yes, I believe we've just gone over
15  that.
16     Q.   And aside from those three changes and
17  this fourth change noted in this present document,
18  are you aware of any other changes in the
19  guidelines applicable to Gabapentin at Kaiser from
20  1994 to 1999?
21     A.   I'm not -- based upon what you've
22  presented here, no.
23     Q.   During that period, the use of
24  Neurontin was in all cases expanded, it was never
25  restricted further, is that correct?

Page 188

1          A. Carver
2          MS. NUSSBAUM:  Are you talking about
3  from 1994 to 1999 now?
4          MR. JAMES:  Yes.
5          MS. NUSSBAUM:  Whether or not Kaiser
6  paid more for Neurontin?
7          MR. JAMES:  No, no, I'm actually
8  asking what the guidelines were.
9     Q.   Was the scope of Neurontin's use under
10  the guidelines ever narrowed between 1994 and
11  1999?
12     A.   I don't believe so.
13     Q.   In every case that some action was
14  taken, the scope of its use was expanded, is that
15  correct?
16     A.   That's correct.
17     Q.   And since then -- actually, strike
18  that.
19          Actually, I'd like to switch over to
20  this last document that we were looking at.
21     Q.   Do you see the next-to-last bullet
22  point?
23     A.   Which document are we speaking --
24          MR. JAMES:  I'm sorry.  This last one
25  that we were looking at.

Page 189

1          A. Carver
2          MS. NUSSBAUM:  8.
3          MR. JAMES:  That's right.
4     Q.   And the next-to-last bullet point has
5  a line that says, "Studies have shown Gabapentin
6  to be effective in the treatment of diabetic and
7  post-herpetic neuropathies."
8          Is that correct?
9     A.   That's what it says, yes.
10     Q.   The following line, could you read
11  that one aloud?
12     A.   "The use of Gabapentin for the
13  treatment of neuropathy should be reserved for
14  those patients unresponsive to, or intolerant of
15  other available treatment modalities including the
16  tricyclic anti-depressants (alone or in
17  combination with narcotics, analgesic agents,
18  Carbamazepine and topical agents)."
19     Q.   Is that guideline in place today?
20          MS. NUSSBAUM:  If you know.
21     A.   I do not know.
22     Q.   And with respect to the final bullet
23  point on there, regarding initial prescription
24  quantities, do you know if that guideline is in
25  place?

```
1              A. Carver
2      A.   I do not know.
3      Q.   Do you know the present guidelines
4  with regard to the use of Gabapentin for any use
5  at Kaiser today?
6          MS. NUSSBAUM:  The witness has already
7  testified as to some, so if you have a document,
8  he's happy to look at it.
9      Q.   Which ones are you aware of?
10         MS. NUSSBAUM:  I think he's already
11 testified as to bipolar, that after the fraud came
12 out, they reevaluated with respect to that.
13     Q.   Aside from your belief as to what the
14 current guideline is with regard to bipolar, are
15 you aware of any other guidelines?
16     A.   No, I'm not.  I need to have my memory
17 refreshed as to what the current guideline is.
18         (Kaiser-9 marked for identification.)
19     Q.   Are you familiar with this document?
20     A.   I am not.
21     Q.   Do you know what kind of document it
22 is?
23     A.   I believe this document represents the
24 draft of a recommendation for the use of a fax to
25 be sent to physicians under certain circumstances.
```

```
1              A. Carver
2      Q.   Do you know if they "say" draft is
3  consistent with the final document that was
4  created, if any?
5          MS. NUSSBAUM:  If you know.
6      A.   I do not know.
7          (Kaiser-10 marked for identification.)
8          VIDEOGRAPHER:  The time is
9  approximately 6:32.  We are now going off the
10 record.
11         (Recess.)
12         VIDEOGRAPHER:  The time is
13 approximately 6:36.  We are now back on the
14 record.
15 BY MR. JAMES:
16     Q.   If you could take a look at this
17 document for a couple of minutes, there's
18 certainly no need to read every page.
19         Are you familiar with this document?
20     A.   I have seen it before.
21     Q.   Was that only in preparation for this
22 deposition or had you seen it earlier?
23     A.   I may have seen it earlier, but I did
24 glance at it in preparation for this deposition.
25     Q.   And what is this document?
```

```
1              A. Carver
2      A.   Did not study it for this deposition.
3          This document represents the work of
4  the Care Management Institute and represents the
5  guideline that they have published as it relates
6  to providing guidance to primary care for the
7  treatment of chronic pain.
8      Q.   Is the Care Management Institute
9  referred to as CMI?
10     A.   Yes, it is.
11     Q.   And where is the CMI in Kaiser's
12 organizational structure?  Is it in a particular
13 region?
14     A.   The CMI, I believe, is convened under
15 the auspices of the Federation, the Kaiser
16 Federation, which is a Federation of the
17 Permanente Medical Groups, each of the Permanente
18 Medical Groups, and they have an organization
19 entitled "The Federation."
20         There's an executive of the Permanente
21 Federation and they are involved in some work on a
22 more global basis of the medical groups, including
23 the development of guidelines for some things.
24     Q.   What's the plaintiff's relation to the
25 CMI, if any?
```

```
1              A. Carver
2      A.   The CMI works for or is under the
3  auspices of the medical groups, the federation of
4  medical groups.  To the degree that the CMI
5  generates guidelines, those guidelines are
6  intended to influence physician practice and the
7  relationship then of the plaintiffs, the health
8  plan hospitals would be -- there is not a direct
9  relationship.
10         The relationship that exists would be
11 between the Federation, CMI, and the physician
12 groups in helping influence practices by
13 physicians.
14     Q.   How does the CMI influence practices
15 by physicians?
16     A.   By a review of the medical evidence
17 and the publication of guidelines for
18 consideration by the respective medical groups and
19 relevant specialties within those medical groups.
20     Q.   Is this distributed in paper form when
21 it's presented?
22     A.   I'm uncertain as to how it's
23 distributed.
24     Q.   Is it distributed to all Kaiser
25 physicians?
```

1           A. Carver
2      A.  I do not know.
3      Q.  Aside from this document, are there
4  other documents that are distributed by the CMI,
5  either to physicians or to some other staff
6  members?
7           MS. NUSSBAUM:  I would object.  This
8  witness has testified that the CMI is an
9  organization that is not directly related to the
10  plaintiffs here.  The document was produced
11  because.  Clearly, the plaintiffs here got a copy
12  of this document and it was in their files, but I
13  don't think he can speak with respect to the CMI.
14           MR. JAMES:  Well, to the organization,
15  to the plaintiffs' knowledge, did the CMI
16  distribute other documents to Kaiser physicians
17  other than this document here?
18           MS. NUSSBAUM:  If you know.
19      A.  I can only say generally, yes.  That
20  they have been involved in the development of
21  guidelines for a variety -- the treatment of a
22  variety of medical conditions.  But I could not
23  enumerate for you those medical conditions.
24      Q.  When was this document created?
25           MS. NUSSBAUM:  If you know.

1           A. Carver
2      A.  I have no independent knowledge
3  regarding the creation or the specific -- it
4  indicates that it was published in May of 2002,
5  reviewed and revised in May of 2004 with another
6  revision date of May 2006, but I'm not familiar
7  enough with the guideline to know what the
8  particular revisions were in terms of content.
9  That would be relevant to the specific revision
10  dates.
11      Q.  Turning to page three of this
12  document, which has the Bates stamp KIS 001516.
13           Could you take a look at the two
14  paragraphs that follow the heading "biases"?
15  There's no need to ready them aloud.
16      A.  Okay.
17      Q.  And does the first sentence of this
18  paragraph that I asked you to restate that the
19  literature review and guidelines have a bias might
20  reflect the results?
21           MS. NUSSBAUM:  The document speaks for
22  itself.  The witness was not an author, not a
23  recipient, is only, you know, as he said, vaguely
24  familiar because he reviewed the document.  It's
25  not a document created by either of the

1           A. Carver
2  plaintiffs.
3           MR. JAMES:  And your objection is
4  noted.
5           MS. NUSSBAUM:  Oh, I don't understand
6  the point of your question.  Can he read the
7  English sentence?  He can read it.
8      Q.  Is Kaiser aware of any bias that may
9  affect the literature review or attendant chronic
10  pain guidelines?
11           MS. NUSSBAUM:  I would object.  This
12  is not a Kaiser document.  This is a sentence
13  taken out of context in a document that he already
14  testified was created by an entity with which they
15  just have a contractual relationship.
16      Q.  Is Kaiser aware of any such bias?
17      A.  I'm only aware of what is printed
18  here.
19      Q.  Are members of the P&T aware of this
20  sort of bias?
21           MS. NUSSBAUM:  Objection.  What
22  members of what P&T committee?  When?
23      Q.  Southern California P&T committee over
24  the time period at issue, have they been aware of
25  the bias that's referenced in this paragraph?

1           A. Carver
2           MS. NUSSBAUM:  What bias?  There's no
3  testimony that the P&T committee got this
4  document, received the document.
5      Q.  I'm asking whether they're aware of
6  the bias that's described or --
7      A.  I cannot answer.  I do not know.
8      Q.  Would this document have been
9  distributed to members of the P&T committee?
10      A.  I do not know.  I testified that I do
11  not know the distribution of this document, to
12  which physicians it went, whether it went to a
13  subset of physicians, to all physicians, if it
14  went -- I just -- I can't speculate.
15      Q.  Is there any overlap between the
16  persons affiliated with the CMI and the members of
17  the P&T committees for the different Kaiser
18  regions?
19           MS. NUSSBAUM:  If you know.
20      A.  Not that I'm aware.  I do not believe
21  so.
22      Q.  And is information developed by the
23  CMI taken into account when the P&T committees
24  make their decisions?
25           MS. NUSSBAUM:  If you know.  Don't

1          A. Carver
2    speculate.
3        A.   I have not seen a reference to a CMI
4    guideline that I can recall in a P&T, you know,
5    meeting.  It doesn't mean it hasn't occurred, I
6    just don't recall.
7        Q.   Who at Kaiser would know whether
8    members of P&T committees review information
9    provided by the CMI when they're making decisions
10   as to whether to accept or reject recommendations
11   that have been made to the P&T committees?
12         MS. NUSSBAUM:  This witness is a
13   member of the committee as he's testified and he's
14   just answered that question.  So, unless you have
15   something more specific, I think we should move
16   on.
17       Q.   Will you have to go to each P&T
18   committee member --
19       A.   To determine whether or not they have
20   reviewed this or not?
21         MS. NUSSBAUM:  Also, I think that's a
22   little disingenuous, as you were the last time.
23         MR. JAMES:  Your objection is noted.
24   Thank you.  Thank you.
25         MS. NUSSBAUM:  And you're asking him

1          A. Carver
2    whether or not there are such minutes?
3        Q.   Excuse me.  Have I actually shown you
4    P&T committee minutes during the course of this
5    deposition?
6        A.   Not yet.
7        Q.   Have you -- do you have any reason to
8    believe I have P&T committee minutes in my folder,
9    as your counsel suggested?
10       A.   I have no idea what you have in your
11   folder.
12       Q.   Are you aware of any information that
13   would indicate that I have P&T committee minutes
14   on me?
15       A.   I can't answer that.  That calls for
16   the ultimate speculation.
17       Q.   I've got them in the back of my suit.
18   She has x-ray goggles.
19         As a matter of policy, no information
20   is shared between the CMI and the P&T committee
21   for the various areas, is that correct?
22       A.   Not as a matter of policy.
23         MS. NUSSBAUM:  Objection.
24       Q.   The physicians on the P&T committees
25   are employed by the Permanente Medical Group, is

1          A. Carver
2    that correct?
3        A.   That's correct.
4        Q.   And CMI is produced by The Federation,
5    which is composed of those same medical groups, is
6    that right?
7        A.   It's comprised of representation from
8    each of those medical groups.  CMI has its own
9    executive director and staff.  And then I believe
10   CMI may solicit input from physicians that would
11   be physicians within relevant specialties,
12   depending upon what it is they're developing a
13   guideline for.
14       Q.   CMI develops its information and the
15   P&T committees develop their own information and
16   the two do so pretty much independently, is that
17   correct?
18       A.   I think that is a generally correct
19   characterization.
20       Q.   Are you aware of any discussions to
21   use information from the CMI in the P&T committee
22   decision-making process?
23       A.   I'm not -- I'm not directly aware of
24   whether or not the P&T committee has reviewed or
25   CMI guidelines have been input into the

1          A. Carver
2    preparation of a monograph as an example just by
3    my independent recollection.
4        Q.   Why would the plaintiff have a copy of
5    this document?
6        A.   Well, I think that --
7          MS. NUSSBAUM:  If you know.
8        A.   I believe that counsel requested
9    information from a wide variety of sources to be
10   responsive to all of your requests for provision
11   of any information regarding to Neurontin.
12       Q.   But you would have no knowledge as to
13   who would have had a copy of this document or who
14   would have received --
15       A.   No, I don't know the source of this
16   document to counsel or to you.
17       Q.   If I wanted to find out what the
18   current P&T committee restriction on Gabapentin's
19   prescription, what document would I look to?
20       A.   One place to look would be to the
21   formulary.
22       Q.   I think my question is different,
23   because the formulary would principally just tell
24   you whether it's on the formulary or not, right?
25   Is that the -- I mean, it would be -- give you a

1                   A. Carver
2   binary piece of information, either it's on the
3   formulary or it's not on the formulary, is that
4   correct?
5        A.    There also is additional information
6   contained in the formulary that would be
7   information regarding use of the product or
8   whether there are guidelines, and contained in the
9   formulary, I cannot speak to Neurontin
10  specifically, but contained in the guidelines --
11  contained in the formularies, at least in the
12  past, there have been some guidelines for use of
13  specific products, but I can't tell you whether or
14  not there's anything specific to Neurontin, just
15  because I don't know.
16       Q.    Did you review any document in
17  preparation for this deposition that would tell
18  you what the current guidelines with regard to
19  prescription of Neurontin or Gabapentin are at
20  Kaiser?
21       A.    I did not.
22       Q.    And you have no knowledge of that --
23  those guidelines from any other source; right?
24       A.    Just not independent knowledge, no.  I
25  mean, Neurontin is one of many drugs and I did not

1                   A. Carver
2   review what is the current -- what are the current
3   guidelines regarding the use of Gabapentin today.
4        Q.    Do you have any reason to believe that
5   the plaintiffs have produced any document that
6   would contain the current guidelines, as opposed
7   to the guidelines in place in 1999?
8        A.    I do not know.  Specifically, the call
9   was made for documents, and we believe that the
10  various people have been responsive to that, but I
11  do not know.  I'm sorry.
12       Q.    And were any such documents among
13  those sent to you that you reviewed yesterday?
14       A.    I don't know whether there was any
15  documents contained in what I've recently reviewed
16  regarding the current guidelines.  I'm sorry.  I
17  just don't have a recollection.
18       Q.    Just to clarify, there are two sets of
19  guidelines.  One is sort of a set of restrictions
20  or guidelines promulgated by the regional P&T
21  committees, and then there's a second set of
22  guidelines distributed by the CMI, is that
23  correct?
24            MS. NUSSBAUM:  Objection.  That
25  misstates the testimony of the witness.

1                   A. Carver
2        Q.    Have I misstated your testimony?
3        A.    There are guidelines that the CMI
4   process has produced some guidelines for
5   management of chronic pain which we're discussing
6   now;
7             And then we've previously spoken about
8   approvals of the P&T committee as it relates to
9   the use of Neurontin, whether it was in the --
10  whether it was in the formulary or not.  And then
11  some expansion of guidelines up to the point of
12  sometime in 1999, I believe.
13       Q.    Does Kaiser agree with the statement
14  that, "Although no more effective than TCAs or
15  other anti-convulsants, Gabapentin may be safer
16  due to fewer drug interactions"?
17            MS. NUSSBAUM:  Where are you reading
18  from?
19            MR. JAMES:  I think the document is
20  kind of irrelevant because he doesn't have a
21  personal knowledge of it.
22            MS. NUSSBAUM:  So you're taking a
23  sentence out of context and asking whether or not
24  the two corporate plaintiffs agree with that
25  sentence?

1                   A. Carver
2            MR. JAMES:  Yes.  Do the corporate
3   plaintiffs agree with the view that Gabapentin may
4   be no more effective than TCAs or other
5   anti-convulsants, but they may be safer due to
6   fewer drug interactions.
7            MS. NUSSBAUM:  At what time?  Based on
8   what?
9            MR. JAMES:  I'm asking for the current
10  view of the corporate plaintiffs.
11           MS. NUSSBAUM:  We don't know, does
12  Kaiser have such a view?  It's outside the scope
13  of the 30(b)(6).  He can't speak to that.
14           MR. JAMES:  I think our tape is coming
15  to an end, so we'll take a break here.
16           VIDEOGRAPHER:  The time is
17  approximately 6:57.  We're now going off the
18  record.
19           (Recess.)
20           (Proceedings adjourned to July 13,
21  2007 at 8:30 a.m.)
22
23
24
25

Page 206

```
 1            A. Carver
 2          J U R A T
 3         I, ALBERT L. CARVER, the witness herein,
 4  having read the foregoing testimony of the pages of this
 5  deposition, do hereby certify it to be a true and
 6  correct transcript, subject to the corrections, if any,
 7  shown on the attached page.
 8
 9         _____
10             ALBERT L. CARVER
11     Subscribed and sworn to before me
12  this _____ day of _____ 2007.
13  _____
14       NOTARY PUBLIC
15
16
17
18
19
20
21
22
23
24
25
```

Page 207

```
 1            A. Carver
 2  STATE OF NEW YORK   )    Pg.  of Pgs.
 3                      ) ss.:
 4  COUNTY OF NEW YORK   )
 5       I wish to make the following changes, for the
 6  following reasons:
 7  PAGE  LINE
 8  ____  ____    CHANGE: _____
 9         REASON: _____
10  ____  ____    CHANGE: _____
11         REASON: _____
12  ____  ____    CHANGE: _____
13         REASON: _____
14  ____  ____    CHANGE: _____
15         REASON: _____
16  ____  ____    CHANGE: _____
17         REASON: _____
18  ____  ____    CHANGE: _____
19         REASON: _____
20  ____  ____    CHANGE: _____
21         REASON: _____
22  ____  ____    CHANGE: _____
23         REASON: _____
24  ____  ____    CHANGE: _____
25         REASON: _____
```

Page 208

```
 1            A. Carver
 2  PAGE  LINE
 3  ____  ____    CHANGE: _____
 4         REASON: _____
 5  ____  ____    CHANGE: _____
 6         REASON: _____
 7  ____  ____    CHANGE: _____
 8         REASON: _____
 9  ____  ____    CHANGE: _____
10         REASON: _____
11  ____  ____    CHANGE: _____
12         REASON: _____
13  ____  ____    CHANGE: _____
14         REASON: _____
15  ____  ____    CHANGE: _____
16         REASON: _____
17  ____  ____    CHANGE: _____
18         REASON: _____
19  ____  ____    CHANGE: _____
20         REASON: _____
21  ____  ____    CHANGE: _____
22         REASON: _____
23  ____  ____    CHANGE: _____
24         REASON: _____
25
```

Page 209

```
 1            A. Carver
 2          CERTIFICATE
 3         I, AMY A. RIVERA, a Notary Public and
 4  Certified Shorthand Reporter of the State of New York,
 5  do hereby certify that prior to the commencement of the
 6  examination ALBERT L. CARVER was duly sworn by me to
 7  testify the truth, the whole truth and nothing but the
 8  truth.
 9         I DO FURTHER CERTIFY that the foregoing
10  is a true and accurate transcript of the testimony as
11  taken stenographically by and before me at the time,
12  place and on the date hereinbefore set forth.
13         I DO FURTHER CERTIFY that I am neither a
14  relative nor employee nor attorney nor counsel of any of
15  the parties to this action, and that I am neither a
16  relative nor employee of such attorney or counsel, and
17  that I am not financially interested in the action.
18
19  _____
20       Notary Public of the State of New York
21       My commission expires August 29, 2009
22       License No. XI00939
23  Dated: July 16, 2007
24
25
```

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
MDL Docket No. 1629/Master File No. 04-10981


----------------------------X

IN RE: NEURONTIN MARKETING      MDL Docket No. 1629

SALES PRACTICES, AND PRODUCTS   Master File No.

LIABILITY LITIGATION            04-10981

----------------------------X


VIDEOTAPED DEPOSITION OF ALBERT L. CARVER

New York, New York

July 13, 2007


Reported by:
Amy A. Rivera, CSR, RPR

Page 211

```
1
2    SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF NEW YORK
3
4    ---------------------------x
5    IN RE: NEURONTIN PRODUCTS
6    LIABILITY LITIGATION       Index Number 765000/2006
7    ---------------------------x
8
9
10
11      VIDEOTAPED DEPOSITION OF ALBERT L. CARVER
12
13
14              New York, New York
                July 13, 2007
15
16
17
18
19
20
21
22
23
24
25
```

Page 213

```
1
2        Deposition of ALBERT L. CARVER, held
3    at KAPLAN FOX, 850 Third Avenue, New York, New
4    York, before Amy A. Rivera, a Notary Public of the
5    State of New York.
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 212

```
1
2    A P P E A R A N C E S:
3    KAPLAN FOX & KILSHEIMER, LLP
        Attorneys for Plaintiffs
4          850 Third Avenue
           New York, New York 10022
5    BY:    LINDA N. NUSSBAUM, ESQ.
           AVIAH COHEN PIERSON, ESQ.
6          MITCHELL COHEN, ESQ.
7
8    JUSTIN BLOOM, ESQ.
        Attorneys for Class Plaintiffs
9          29 W. 70th Street, Suite 2B
           New York, New York  10023
10
11   DAVIS POLK & WARDWELL
        Attorneys for Defendants Pfizer, Inc. & Warner-Lambert
12         450 Lexington Avenue
           New York, New York  10017
13   BY:   RAJESH JAMES, ESQ.
           REID SKIBELL, ESQ.
14
15
16   ALSO PRESENT:  JIM ROBERTS, Videographer
                    NATIONWIDE VIDEO PRODUCTIONS, INC.
17
18
19
20
21
22
23
24
25
```

Page 214

```
1
2                    INDEX
3    WITNESS        DIRECT  CROSS  REDIRECT
4    ALBERT L. CARVER
5    BY MR. JAMES      216        506
6    BY MS. NUSSBAUM         493
7            EXHIBITS
8    NUMBER      DESCRIPTION           PAGE
9    Kaiser-11   Neurontin article        231
10   Kaiser-12   DUAT article             235
11   Kaiser-13   DUAT videoconference 3/12/03  248
12   Kaiser-14   E-mail dated 6/10/99       260
13   Kaiser-15   Answers to interrogatories   330
14   Kaiser-16   KPSC DUAT Jan. to Dec. 2004  354
15   Kaiser-17   Approved minutes          375
16   Kaiser-18   E-mail dated 9/2/03       385
17   Kaiser-19   E-mail dated 6/4/02       392
18   Kaiser-20   E-mail dated 7/3/01       400
19   Kaiser-21   Business resources retention  423
20   Kaiser-22   Kaiser Permanente document    438
21   Kaiser-23   Article              454
22   Kaiser-24   E-mail dated 1/17/99       483
23   Kaiser-25   Neuropathic pain document    488
24   Kaiser-26   Article              504
25
```

Page 215

1
2        IT IS HEREBY STIPULATED AND AGREED by and
3  between counsel for the respective parties hereto that
4  all rights provided by the C.P.L.R., including the right
5  to object to any question, except as to the form, or to
6  move to strike any testimony at this examination, are
7  reserved; and, in addition, the failure to object to any
8  question or to move to strike any testimony at this
9  examination shall not be a bar or waiver to make such
10  motion at, and is reserved for, the trial of this
11  action.
12        IT IS FURTHER STIPULATED AND AGREED that
13  this examination may be signed and sworn to, by the
14  witness being examined, before a notary public other
15  than the notary public before whom the examination was
16  begun, but the failure to do so, or to return the
17  original of this examination to counsel, shall not be
18  deemed a waiver of the rights provided by Rules 3116 and
19  3117 of the C.P.L.R. and shall be controlled thereby.
20        IT IS FURTHER STIPULATED AND AGREED that
21  the filing of the original of this examination shall be
22  and the same hereby is waived.
23
24
25

Page 216

1              A. Carver
2        VIDEOGRAPHER:  Good morning.  We're
3  going on the record.  The date is July 13, 2007.
4  The time is approximately 8:42 a.m.  This begins
5  volume two, tape number one in the deposition of
6  Albert Carver.
7        You may proceed.
8  DIRECT EXAMINATION (continued)
9  BY MR. JAMES:
10     Q.   Good morning.  Since we left the
11  record last night, have you had any further
12  discussions regarding the items noticed in the
13  Kaiser 30(b)(6) Notice?
14     A.   I have not.
15     Q.   Have you reviewed any additional
16  documents regarding those?
17     A.   I have not.
18     Q.   And have you had any further
19  recollections regarding answers to questions that
20  I asked you yesterday?
21        MS. NUSSBAUM:  This is overly broad.
22  If you want to ask a specific question and see
23  whether or not he's had a further recollection,
24  but we had over five hours' worth of testimony,
25  and I'm not going to right now let him answer

Page 217

1              A. Carver
2  whether or not he doesn't have a transcript.
3        MR. JAMES:  Your objection is noted.
4     Q.   Is there any answer that you would
5  like to supplement that comes to mind at this
6  point?
7     A.   Not at this point.
8     Q.   Yesterday we discussed Kaiser's
9  formulary, and I understood that there is a
10  different formulary for each of the regions, is
11  that correct?
12     A.   That's correct.
13     Q.   And was Neurontin added to each of
14  these eight formularies in 1994?
15     A.   I believe it was.
16     Q.   And was it use restricted in any way
17  on those formularies?
18     A.   I do not know whether or not there
19  were restrictions in the formularies outside of
20  California.
21     Q.   Who would know the answer to that
22  question?
23     A.   The pharmacy director in each of the
24  respective regions.
25     Q.   With regard to the formularies in

Page 218

1              A. Carver
2  northern California and southern California, were
3  there any restrictions imposed on Neurontin's use?
4        MS. NUSSBAUM:  Can you define the term
5  "restriction" as you've used it in your question?
6     Q.   You can answer if you understand the
7  question.
8     A.   I believe that we discussed yesterday
9  in great detail the southern California formulary
10  in which there's a notation there of a guideline
11  suggesting that the prescribing in 1994 be
12  restricted to neurologists.
13     Q.   Is that actually part of the formulary
14  or is that a separate set of guidelines apart from
15  the formulary?
16     A.   Well, it's -- it was just part of the
17  recommendation or recommendation regarding the
18  placement of Neurontin, and I believe, as I stated
19  yesterday, either Neurontin or any drug either is
20  on the formulary or it's not on the formulary and
21  it was added to the formulary.
22     Q.   And when it's on the formulary, it
23  will be reimbursed by Kaiser for any use for which
24  a Kaiser physician prescribes it, is that correct?
25     A.   In which a Permanente physician

Page 219

```
1              A. Carver
2  prescribes it.  Yes, that's correct.
3      Q.   And did that change at any point
4  during the relevant period?
5          MS. NUSSBAUM:  Do you want to define
6  the relevant period?
7      Q.   From 1994 to the present?
8      A.   I'm not sure I understand your
9  question from the standpoint of Neurontin was
10  added to the formulary in 1994.  It as the branded
11  Neurontin from Pfizer remained on the formulary
12  until, I believe, 2004.  During all of that period
13  of time, it was when it was prescribed by a
14  Permanente physician would have been reimbursed or
15  paid for by the health plan.
16      Q.   In 2004, what occurred?
17      A.   Well, I believe in 2004, the branded
18  Neurontin product from Pfizer was removed from the
19  formulary and replaced with a generic.
20      Q.   And at that time, did the restrictions
21  that were in place with regard to branded
22  Neurontin change for generic Gabapentin?
23          MS. NUSSBAUM:  To the extent that
24  there were any restrictions in 2004, if you know,
25  did they change in any way as a result of the
```

Page 220

```
1              A. Carver
2  generic coming to market?
3          THE WITNESS:  I don't recall.
4      Q.   Do you know what the current
5  restrictions that Kaiser has in place with regard
6  to generic Gabapentin today are?
7      A.   I do not know.
8      Q.   Who would know that fact?
9      A.   Well, our Drug Information Service
10  would have a record of the disposition.
11      Q.   Does the Drug Information Service
12  report to you?
13      A.   Yes, it does, everyone directly.
14      Q.   Were you able to speak with any
15  individual in part of the Drug Information Service
16  organization in preparation for your deposition
17  today?
18      A.   I did not.
19      Q.   Today, if Permanente physicians were
20  to prescribe branded Neurontin, what would occur?
21      A.   The -- depends upon whether or not the
22  physician indicated that the branded Neurontin was
23  medically necessary for the specific patient and
24  if it were, then it would be dispensed by the
25  pharmacy and provided to the patient.  Otherwise,
```

Page 221

```
1              A. Carver
2  if the physician did not indicate that the
3  prescription was to be dispensed as written and
4  medically necessary, then it would be -- then the
5  generic product would be provided.
6      Q.   If the physician prescribed it as
7  being medically necessary, would anyone at Kaiser
8  review that, that statement?
9          MS. NUSSBAUM:  Hypothetical.  I ask
10  the witness not to answer.
11      Q.   You can answer, if you can.
12          MS. NUSSBAUM:  Do you understand the
13  question?
14          THE WITNESS:  I understand the
15  question.
16      A.   And the answer to the question is no.
17  No one at Kaiser would be second-guessing the
18  physician.
19      Q.   How would the pharmacist know not to
20  dispense branded Neurontin without the specific
21  statement from the physician or is that -- or am I
22  misunderstanding the process?
23          MS. NUSSBAUM:  Well, you know, I just
24  want to clarify now, are you talking about their
25  mandatory state substitution laws in every state
```

Page 222

```
1              A. Carver
2  in the United States, including California?
3          So, if you want him to tell you if he
4  knows as a pharmacist if California has a
5  substitution, mandatory substitution law, when
6  there's a generic available or any pharmacy, or if
7  you want, if Kaiser is different, but right now
8  that's a very unclear question.
9      Q.   Just returning to your prior
10  testimony, if a physician did not indicate that
11  branded Neurontin was medically necessary, Kaiser
12  would not reimburse that payment, is that correct?
13          Could you take me step by step through
14  the process?  If a physician wrote a prescription
15  for branded Neurontin, without including a
16  statement that it was medically necessary, what
17  would the processing be like?  What would happen
18  when the -- when a patient went to fill that
19  prescription?
20          MS. NUSSBAUM:  I object.  It misstates
21  the testimony.  The witness said --
22          MR. JAMES:  The objection is noted.
23  The objection is preserved.  Thank you.  The
24  objection is preserved.
25          MS. NUSSBAUM:  You're misstating his
```

4 (Pages 219 to 222)

Page 223

1                A. Carver
2 testimony.
3     Q.   If you could clarify your prior
4 testimony, if necessary, and answer the question?
5     A.   I believe my testimony was that if a
6 prescription is written today for Neurontin, brand
7 name Neurontin with a notation that the brand name
8 Neurontin is medically necessary, then that
9 prescription would be dispensed as written by the
10 physician and paid by Kaiser in the absence of
11 that notation that it was medically necessary,
12 then the prescription likely would be dispensed
13 using a generic Gabapentin for which the -- for
14 which Kaiser also would pay.
15        Have I been clear or --
16     Q.   Yes, that's very helpful.
17        Are there any drugs on the formulary
18 that are restricted by use?  And I guess here when
19 I use the word "restricted," I'm not referring to
20 the fact that there may be guidelines in place
21 that Permanente physicians should only prescribe a
22 drug for a particular use or in given
23 circumstances.
24        I'm actually referring to an instance
25 in which Kaiser would actually only reimburse for

Page 224

1                A. Carver
2 a particular drug if it were prescribed for a
3 particular use?
4        MS. NUSSBAUM:  I would object.  That's
5 outside the scope of the Notice.
6        MR. JAMES:  I believe the first topic
7 refers to policies and practices concerning
8 payment for reimbursement or payments for drug
9 prescriptions.  That's clearly within the scope.
10        MS. NUSSBAUM:  The witness has
11 testified as to that, and that we previously, in
12 numerous meet-and-confers, made clear that there
13 are hundreds of drugs on the formulary, and that
14 no witness can testify with respect to each and
15 every drug.  If there's general policies and
16 practice, he's already testified to that.
17     Q.   If you can answer the question.
18     A.   I could only answer in general, and in
19 general, I believe I'm not aware of any
20 circumstance in which the payment for a product is
21 restricted to a specific indication.  Now, there
22 perhaps would be an exception, but not that comes
23 to mind.
24     Q.   From 1994 to the present, did Kaiser
25 implement any programs or policies to contain the

Page 225

1                A. Carver
2 costs of prescription drugs?
3     A.   Yes.
4     Q.   What policies or programs?
5     A.   We implemented in the year 2000 a
6 program known as -- as DUAT in southern California
7 and DRUG in northern California that were intended
8 to influence and promote the appropriate use of
9 drugs in a variety of therapeutic classes.
10     Q.   Are there any other cost containment
11 programs or policies that you're aware of?
12     A.   That have been implemented since 1994?
13     Q.   Yes.
14     A.   Not -- not that come to mind.
15     Q.   And with regard to -- can I call them
16 DUAT and DRUG?  Is that --
17     A.   Yes, that would be fine.
18     Q.   Are DUAT and DRUG essentially
19 equivalent except that one is in southern
20 California and the other is in northern
21 California?
22     A.   Yes.
23     Q.   And how do those programs operate?
24     A.   They -- I'm not sure what you mean by
25 "operate."

Page 226

1                A. Carver
2     Q.   What do the programs involve?
3     A.   The programs involve some key
4 physicians working with some pharmacy
5 representation in an organized manner to review
6 drug usage, to initiate initiatives or launch
7 initiatives that are intended to influence the use
8 of particular drugs within Kaiser Permanente.
9     Q.   Does DUAT and DRUG, do those programs
10 focus on particular drugs?
11        MS. NUSSBAUM:  Only if you understand
12 the question.  I think the witness has described
13 the program.
14     A.   There has been -- there has been a
15 focus on particular therapeutic categories of
16 drugs, yes.
17     Q.   And who decides which categories of
18 drugs to focus on?
19     A.   The DUAT and the DRUG committees.
20     Q.   And who are the members of those
21 committees?
22     A.   By name or --
23     Q.   Not by name, just by the --
24        MS. NUSSBAUM:  Job title?
25     Q.   Yeah, job title.  What kinds of people

Page 227

1           A. Carver
2 are on these committees?
3      A.   There are physician leaders.  By that,
4 I mean physicians who some of -- there's a
5 physician co-chair in southern California is a
6 physician who is from the clinical services
7 department of the SCPMG of the medical group of
8 southern California, and then there is a physician
9 representative, I believe, from each of the
10 geographic regions in southern California, or at
11 least a representation of physicians from the
12 areas in southern California.
13           There may not be representation from
14 each, but some representation there.  And then
15 there is an individual with the title of a drug
16 use management leader who works within the
17 pharmacy organization, and another individual
18 entitled the "drug use manager" who also works
19 within the pharmacy organization, and generally
20 that's the composition of both northern and
21 southern California.
22      Q.   And these committee members decide
23 which drugs or drug categories to focus these
24 programs on?
25      A.   Yes, yes, they do.

Page 228

1           A. Carver
2      Q.   How do they make the determination as
3 to which drugs or drug categories to focus on?
4      A.   I think based upon their estimation of
5 opportunities for improving prescribing or
6 managing costs, reducing utilization, whatever the
7 topic may be.
8      Q.   And how do they make those estimates?
9           MS. NUSSBAUM:  If you know.
10      A.   I'm not sure.  I'm not a member of the
11 committee, have not participated in the committee,
12 based upon their professional judgment.
13      Q.   Do you know the names of the physician
14 cochairs of the two committees?
15      A.   Joel Hyatt is the cochair in southern
16 California.  Tim Batchelder is the cochair in
17 northern California.
18      Q.   And do you know the names of the drug
19 use management leaders?
20      A.   The drug use management leader in
21 southern California is Richard Wagner and in
22 northern California, Jamie Chan.
23      Q.   Once the committee identifies a
24 particular drug or drug class as a focus of this
25 program, what's the next step that occurs?

Page 229

1           A. Carver
2           MS. NUSSBAUM:  Objection.
3           This is now outside the scope.  You've
4 asked for policies and practices.  He's given it
5 to you.  The witness has said he's not a member of
6 the committee, so, I think that we're really
7 getting a little far afield here.
8           MR. JAMES:  I think the first topic
9 refers to drug utilization review and disease
10 management programs.  This appears to be plainly a
11 drug utilization program, and I feel I'm entitled
12 to ask questions about it.
13           MS. NUSSBAUM:  Right.  You've asked
14 the policies and practices and he's told you.
15 You're now asking for internal workings of the
16 committee which he's told you he's on.
17           MR. JAMES:  Your objection is
18 preserved.
19      Q.   Do you know what the next step of the
20 program is --
21           MS. NUSSBAUM:  Only if you know --
22      Q.   -- once the committee decides that a
23 particular drug or drug class does an appropriate
24 focus?
25      A.   I cannot answer sequentially.  I can

Page 230

1           A. Carver
2 tell you generally the steps that are -- generally
3 the steps in the process, but not necessarily
4 sequentially.
5      Q.   And what are those steps in the
6 process?
7      A.   Generally, a review of the overall
8 utilization of the product, the establishment, if
9 there's opportunity for improvement, then the
10 establishment of some goal or a target for what
11 they are wanting to achieve in terms of either
12 reduction in utilization or increase in
13 utilization or those kinds of things, and then
14 some metrics to measure progress toward such
15 goals, and then in reporting to key physician
16 groups regarding the progress toward those goals.
17      Q.   One of the steps you mentioned was
18 review of overall utilization of the product?
19           How does a committee determine the
20 overall utilization of a product?
21           MS. NUSSBAUM:  Once again, I'd caution
22 the witness that this is not a committee that you
23 were on and not something that you have personal
24 knowledge of.  This is outside the scope of the
25 topic, which is simply asking the policies and

Page 231

1          A. Carver
2  procedure; okay. We've given you the policies and
3  practices with respect to this, and unless you
4  have personal knowledge, I would caution you not
5  to answer.
6      A.   I'm not sure of the details involved
7  in how they go about it.
8      Q.   Do you know what information Kaiser
9  has that may be able to assist them in determining
10 drug utilization?
11         MS. NUSSBAUM: If you know personally.
12     A.   Well, prescription information,
13 prescription -- prescription information.
14     Q.   And what information would that
15 provide?
16     A.   It would provide how many
17 prescriptions in a particular therapeutic category
18 or for a particular drug, the prescribers of such.
19     Q.   Beyond telling you the numbers of
20 prescriptions of a particular drug, would it tell
21 you the uses for which they were prescribed?
22         MS. NUSSBAUM: I, once again, caution
23 the witness unless you have personal knowledge,
24 not to speculate.
25     A.   I'm not certain what -- what all

Page 232

1          A. Carver
2  sources of information that might be used beyond
3  just the prescription information that I've
4  outlined.
5      Q.   Do you know of -- or strike that.
6          Just to confirm, the only information
7  that you're confident that Kaiser would have would
8  be the number of prescriptions for a particular
9  drug, and aside from resorting to speculation, you
10 can't tell me whether additional information such
11 as the use for which the drug is being prescribed
12 is available to Kaiser?
13         MS. NUSSBAUM: That's what the witness
14 testified to. Asked and answered.
15         MR. JAMES: I would like him to
16 confirm.
17     A.   That's correct.
18         MR. JAMES: I'm going to mark an
19 exhibit.
20         (Kaiser-11 marked for identification.)
21     Q.   Do you recognize this document?
22     A.   Yeah, I believe I've seen the first
23 page of the document.
24     Q.   And what is the document?
25         MS. NUSSBAUM: If you know.

Page 233

1          A. Carver
2      A.   I believe it's the announcement of a
3  videoconference regarding Gabapentin.
4      Q.   And are videoconferences one of the
5  means by which DUAT and DRUG attempt to influence
6  physician-prescribing behavior?
7      A.   Yes.
8      Q.   Are there any other means by which
9  DUAT and DRUG attempt to influence physician
10 prescribing behavior outside videoconferences?
11     A.   I'm not sure of, you know, all of
12 the -- of the various techniques that DRUG and
13 DUAT might use. As I mentioned, I'm not a member
14 of the committee.
15     Q.   If you look at the first line of text
16 of this document, there's a heading saying,
17 "Overall needs assessment."
18         Following that, there's a statement
19 that says that, "Providers outside the specialties
20 of neurology and psychiatry write the majority of
21 prescriptions for Gabapentin."
22         Do you know why neurology and
23 psychiatry are specified in that sentence?
24         MS. NUSSBAUM: I would object.
25 There's no testimony that this witness in the

Page 234

1          A. Carver
2  ordinary course received this document, wrote this
3  document, had any input into this document or
4  knows where the information contained in the
5  document came from.
6      Q.   Let me take one step back. You
7  mentioned that you had seen the first page of this
8  document before, is that correct?
9      A.   Yes, that's correct.
10     Q.   Is this a document that Kaiser would
11 create in the ordinary course of business?
12     A.   Yes, I believe so.
13     Q.   In what context did you see the first
14 page of this document?
15     A.   In that bundle of documents that I
16 glanced at.
17         MS. NUSSBAUM: I would object as to
18 documents that the witness received from counsel,
19 and we're not going to have any questions. It's
20 work product.
21         Other than in preparation for your
22 deposition, had you ever seen this document before
23 to your recollection?
24         THE WITNESS: No.
25     Q.   From your personal knowledge, do you

7 (Pages 231 to 234)

Page 235

1          A. Carver
2  know why the first sentence of this document might
3  refer to specialty -- to the specialties of
4  neurology and psychiatry?
5          MS. NUSSBAUM:  Objection.
6          The witness just said that other than
7  in preparation for the deposition.  He's never
8  seen this document and didn't write it, has no
9  personal knowledge of it.  Therefore, the document
10  speaks for itself.  I'm not going to let him
11  speculate as to why some unknown author wrote
12  something in the document.
13     Q.  I'm asking the question whether as
14  vice-president you would have knowledge of why the
15  author of this document might refer specifically
16  to specialties of neurology and psychiatry?
17     A.  No.
18     Q.  Are considerations such as safety and
19  efficacy taken into account by DUAT and DRUG in
20  deciding which drugs or classes of drugs to focus
21  on?
22          MS. NUSSBAUM:  Can you repeat the
23  question?
24          MR. JAMES:  Could you read the
25  question back?

Page 236

1          A. Carver
2          (Record read.)
3     A.  Well, I believe the answer to that is
4  yes, but it's speculation because I'm not a part
5  of the committee.
6          MS. NUSSBAUM:  I'd ask you not to
7  speculate.
8          MR. JAMES:  I'd like to mark another
9  exhibit.
10          (Kaiser-12 marked for identification.)
11     Q.  I guess there's no need to go through
12  the whole document.  But do you recognize the
13  document?
14          MS. NUSSBAUM:  Do you want to tell him
15  what you mean by "recognize" so we don't have the
16  same confusion as we did with the last document
17  where it turned out that the witness had never
18  received the document or seen it in his ordinary
19  course of business.
20     Q.  In your corporate capacity as a
21  corporate representative of Kaiser, do you
22  recognize this document?
23     A.  I believe that this document
24  represents a presentation that was made at an
25  interregional meeting dated April 2004. I was

Page 237

1          A. Carver
2  present at that meeting.  I don't recall whether
3  or not I received a document, but I -- I can
4  recall a presentation by a Dr. Rodriguez.
5     Q.  Did you state April 2004?
6     A.  That's the date that's on this -- on
7  this document.
8          MR. JAMES:  That's fine.  We'll take a
9  look at this document first.
10     Q.  What do you recall being discussed at
11  that meeting?
12     A.  The only thing that I specifically
13  recall from the meeting was information that was
14  reviewed and contained on pages 13 and -- 13 and
15  12, and this document, page 12 comes after page
16  13, but regarding the wide range of conditions
17  for -- in which Gabapentin had been used.
18     Q.  Regarding page 13, does reviewing that
19  refresh your recollection that Kaiser is able to
20  determine the uses for which particular
21  prescription drugs are prescribed?
22          MS. NUSSBAUM:  Objection.
23     A.  It does not, in that I do not know how
24  this information was assembled.  I just am
25  testifying that I was present at a presentation

Page 238

1          A. Carver
2  and of this entire document, the only thing that
3  comes to my mind from something that occurred
4  three years ago is -- was this assessment of the
5  wide range of uses to which Neurontin had been
6  put.
7     Q.  And do you have no knowledge as to how
8  this information was assembled?
9     A.  I do not.
10     Q.  And you don't know whether Kaiser can
11  create this sort of information in its ordinary
12  course of business?
13          MS. NUSSBAUM:  I think the witness has
14  already stated that Kaiser cannot create this kind
15  of information in the ordinary course of business.
16     Q.  Is it your testimony that Kaiser
17  cannot create the information of the sort
18  contained on page 13 of this document in its
19  ordinary course of business?
20     A.  Well, I don't know how this was
21  assembled.  This is a Kaiser document.  So I am
22  not here to say that it's impossible, because
23  obviously it's been done, but I don't know how it
24  was done.
25     Q.  To clarify, your testimony is that you

1            A. Carver
2  do not know whether or not Kaiser is able to
3  create this sort of chart in its ordinary course
4  of business?
5     A.   That's correct.
6     Q.   Okay.
7     A.   The information that's contained on
8  page 12 indicates that it was done as a result of
9  chart review, which is a laborious painstaking
10 process to identify patients, and then review
11 charts one by one by one to figure out why and how
12 Neurontin would have been used.
13       And I don't know what kind of a
14 process was used for purposes of assembling that
15 information on page 13, on whether an
16 extraordinarily laborious process was used or
17 whether or not some other technique was used to
18 categorize prescriptions into these various
19 diagnoses.
20    Q.   Is it possible that the information
21 contained on page 13 was assembled, it was all
22 chart review?
23       MS. NUSSBAUM:  Asked and answered.
24 The witness has said three times he has no idea --
25       MR. JAMES:  Your objection is noted --

1            A. Carver
2     Q.   I'm saying --
3        MS. NUSSBAUM:  -- how page 13 was
4  assembled.
5     Q.   Did you testify that it's possible
6  that the information on page 13 was assembled
7  through a laborious process of chart review?
8     A.   I did not.  I said that I don't know
9  how it was assembled.  I truly do not know what
10 technique was used to put this together.
11    Q.   With regard to the information
12 contained on page 12, was it your testimony that
13 this information was assembled, it was all chart
14 review?
15       MS. NUSSBAUM:  I believe that the
16 witness said he did not know, he did not create
17 this document, and he did not know how the
18 document was created.
19       MR. JAMES:  Your objection is
20 preserved.
21    A.   I'm relying upon this San Gabriel
22 Valley chart review.
23       MS. NUSSBAUM:  Do you know anything
24 personally about how the information contained in
25 this document was gathered?

1            A. Carver
2        THE WITNESS:  I do not.
3     Q.   In what circumstances does Kaiser
4  undergo the process of chart review?
5        MS. NUSSBAUM:  I would object.
6  There's no testimony that it undergoes, quote,
7  "the process of chart review."  I think the
8  witness testified yesterday that the physicians
9  belong to a separate entity that contracts with
10 Kaiser.  Kaiser does not have charts.  I suggest
11 we move on.
12    Q.   With regard to the information on page
13 12, which entity would have undertaken the process
14 of chart review?
15    A.   I do not know.  I'm testifying that I
16 was present at a presentation.
17    Q.   And you don't know whether it was the
18 plaintiffs or another Kaiser entity that undertook
19 the chart review described on page 12?
20       MS. NUSSBAUM:  The witness indicated
21 that he didn't even know if there was chart
22 review.  He indicated he knows nothing about this
23 document other than what's on the face of the
24 document.  He did not put this together.  He did
25 not know how it was put together.  He did not know

1            A. Carver
2  who put it together.
3     Q.   In the course of your preparation for
4  this deposition, did you consult anyone involved
5  in either DUAT or DRUG to determine how they go
6  about obtaining information regarding prescription
7  drug usage?
8     A.   I did not.
9     Q.   Did you review any documents that
10 would be relevant to that subject?
11       MS. NUSSBAUM:  I would caution you not
12 to discuss any discussions with counsel.
13    Q.   Is the answer no?
14    A.   The answer would be no.
15    Q.   On page 20 of this document, if you
16 could turn to that page, in the second paragraph,
17 there's a statement that the evidence indicates
18 that Gabapentin, Neurontin is no more effective
19 than tricyclic antidepressants, TCAs, for
20 neuropathic pain.
21       Is that a subject that you recall
22 being discussed at this meeting in March 2004?
23    A.   I do not -- I do not recall.
24    Q.   Is that a statement that's consistent
25 with Kaiser's present views?

A. Carver

1
2      MS. NUSSBAUM:  I would object.  This
3  is outside the scope of the examination here.  The
4  document has been produced.  The document speaks
5  for itself.  The witness has no independent
6  knowledge.
7      MR. JAMES:  I'd note that topic number
8  7 calls for any analysis that you or your
9  representatives or agents including your
10  third-party administrators and pharmacy benefit
11  managers performed regarding whether Neurontin
12  provides a medical benefit to patients to take off
13  label dosages or for a broad range of off-label
14  uses, one of them being pain.  And so, I feel this
15  is plainly within the scope of the 30(b)(6)
16  Notice.
17      MS. NUSSBAUM:  Well, the document --
18      Q.   Is that statement consistent with
19  analysis that Kaiser or its agents have undertaken
20  and that Kaiser presently holds?
21      A.   I believe the document speaks for
22  itself.  The document is dated April 2004, that
23  earlier pages in the document indicate that it's
24  sometime prior to this document, Kaiser became
25  aware --

A. Carver

1
2      MR. JAMES:  I'd appreciate it if you
3  state your objections in a concise manner and
4  allow the witness to answer the question.
5      THE WITNESS:  Can you ask your
6  question again, please?
7      MR. JAMES:  Could you read back the
8  question.
9      (Record read.)
10      A.   Well, I believe that I've testified
11  that -- that Kaiser, to my knowledge, has not
12  undertaken analysis per se, and that -- that this
13  was information that is provided to physicians
14  from physicians.  And in the course of this
15  presentation, there's information regarding --
16  that's been provided by a physician to other
17  physicians regarding the use of Neurontin.
18      Q.   Did you state that Kaiser has not
19  undertaken any analysis?
20      A.   The health plan per se?
21      Q.   The plaintiffs or their agents,
22  including third-party administrators or pharmacy
23  benefit managers?
24      A.   Well, there appears to be some
25  snapshot.

A. Carver

1
2      MS. NUSSBAUM:  Let's break that --
3  that's a three-part question.
4      Q.   The first part is have the plaintiffs
5  in this action, Kaiser Foundation Health Plan or
6  the hospitals, have they undertaken such an
7  analysis to your knowledge?
8      A.   And to my knowledge, no.
9      MS. NUSSBAUM:  His second question
10  was, do you want to read the second question
11  whether or not the drug manager has undertaken
12  that on behalf of Kaiser?
13  BY MR. JAMES:
14      Q.   Actually, did the second step, have
15  any agents of the plaintiffs undertaken such an
16  analysis?
17      MS. NUSSBAUM:  What does "agent" mean?
18  Have they requested that a third party undertake
19  the analysis?
20      Q.   Has any other party undertaken an
21  analysis on behalf of the plaintiffs?
22      MS. NUSSBAUM:  Has Kaiser requested
23  that some third party --
24      Q.   I request that you answer my question
25  rather than --

A. Carver

1
2      A.   Not to my knowledge.
3      Q.   Referring to analysis -- if I define
4  "analysis" to mean any analysis regarding the
5  efficacy of Neurontin for neuropathic pain, does
6  it remain true that the plaintiffs have not
7  themselves undertaken any analysis -- let me
8  restate the question.
9      Have the plaintiffs themselves
10  undertaken any analysis regarding whether or not
11  Neurontin is effective in treating neuropathic
12  pain?
13      A.   If the question is whether or not the
14  plaintiffs have conducted clinical trials
15  regarding the effectiveness for Neurontin for
16  pain, I believe the answer to that is no.
17      Q.   Aside from conducting trials
18  themselves, have you conducted an analysis by
19  reviewing clinical trials conducted by other
20  parties or clinical literature that would enable
21  you to form a conclusion regarding whether or not
22  Neurontin is an effective treatment for
23  neuropathic pain?
24      MS. NUSSBAUM:  The witness has
25  testified yesterday as to the analysis.

Page 247

1          A. Carver
2          MR. JAMES:  Your objection is
3  preserved to this question.
4      Q.   Can you answer the question?
5      A.   I do believe that yesterday you showed
6  me several documents that were assembled for the
7  P&T committee regarding, in some cases, a summary
8  of the literature that was available at the
9  time -- at that particular time, and there -- I'm
10  not aware that we've done any independent analysis
11  to figure out the integrity of some of those
12  pieces of information that were presented or
13  provided to the P&T committee upon which they may
14  have made a ruling and so, that's -- and I hope
15  I'm being responsive to your question.
16      Q.   Yes, you are.
17      Aside from the information that I
18  showed you yesterday, you're not aware of any
19  other analyses that the plaintiffs have themselves
20  undertaken regarding whether or not Neurontin is
21  an effective treatment for neuropathic pain, is
22  that correct?
23      A.   That's -- that's correct.
24      Q.   Have any agents of the plaintiffs
25  undertaken such an analysis, again, excluding any

Page 248

1          A. Carver
2  information that I showed you yesterday?
3          MS. NUSSBAUM:  I would object.  Do you
4  want to define what you mean by "agents," and
5  unless it was at the request of the plaintiffs,
6  how would he know whether or not somebody else has
7  done an analysis?
8      Q.   Have any parties undertaken an
9  analysis of whether or not Neurontin is an
10  effective treatment for neuropathic pain on the
11  plaintiff's behalf?
12      A.   Not that I'm aware of.
13      Q.   And have any other parties
14  communicated a conclusion regarding whether or not
15  Neurontin is an effective treatment for
16  neuropathic pain to the plaintiffs that the
17  plaintiffs now agree?
18          MS. NUSSBAUM:  I would object.
19          MR. JAMES:  Actually, I withdraw that
20  question.
21          Do you mind taking a break at this
22  time?
23          MR. LAWRENCE:  I thought we've been
24  going for an hour, so we can take a short
25  five-minute break.

Page 249

1          A. Carver
2          MS. NUSSBAUM:  Very short.
3          VIDEOGRAPHER:  Going off the record at
4  9:32 a.m.
5          (Recess.)
6          (Kaiser-13 marked for identification.)
7          VIDEOGRAPHER:  We're going back on the
8  record at 9:44 a.m.  This is the beginning of tape
9  two, volume two, deposition of Albert Carver.
10  BY MR. JAMES:
11      Q.   Do you know what this document is?  Do
12  you recognize the document?
13      A.   I believe this was the content of a
14  DUAT videoconference dated March 12th of 2003.
15      Q.   Is this a document that Kaiser would
16  produce in the ordinary course of its business?
17          MS. NUSSBAUM:  I would object.
18          What do you mean by that?  It's clear
19  that Kaiser produced the document.
20      Q.   Is this the kind of document that
21  Kaiser would use in its business?
22          MS. NUSSBAUM:  I object.  Which Kaiser
23  entity are you talking about, the plaintiffs here?
24      Q.   Would the plaintiffs use or see this
25  document in the ordinary course of their business?

Page 250

1          A. Carver
2      A.   That's a double question.  I'm not
3  sure what you mean by that.
4      Q.   You can answer if you understand the
5  question.
6      A.   I believe this was the content that
7  was used in the videoconference by the physician
8  speakers at the videoconference.
9      Q.   Turning to page nine of the document,
10  do you have any understanding of what this chart
11  shows?
12      A.   Yes, I do.
13      Q.   And what does it show?
14      A.   It shows an analysis of patients based
15  upon prescription records looking at whether or
16  not a prescription or a patient that was given
17  Gabapentin had previously been given an tricyclic
18  antidepressant.
19      Q.   And from your prior testimony, I take
20  it that you don't know how this information would
21  be assembled?
22      A.   That's correct.
23      Q.   Do you know the purpose for which this
24  information was assembled?
25          MS. NUSSBAUM:  Do you have any

Page 251

```
 1              A. Carver
 2  personal knowledge about this document?
 3       THE WITNESS:  I do not.
 4       MS. NUSSBAUM:  Were you one of the
 5  authors?
 6       MR. JAMES:  I would please ask that
 7  you reserve your questions for the time allotted
 8  to you at the conclusion of the sessions.
 9       MS. NUSSBAUM:  I have two hours
10  allotted.
11    Q.   As corporate representative of Kaiser,
12  do you know why this information was assembled?
13    A.   I believe this information was
14  assembled as part of this DUAT effort basically to
15  begin taking a very close look at the use of
16  Neurontin, given the revelations that are
17  contained regarding how Neurontin had been
18  promoted.
19    Q.   Actually, I'd like to focus on a
20  question raised by your response.  At some point,
21  did DUAT or DRUG decide to focus on Gabapentin or
22  Neurontin?
23    A.   Yes, they did.
24    Q.   And at what time did that occur?
25    A.   I believe that there was quite a bit
```

Page 252

```
 1              A. Carver
 2  of focus on Neurontin during the period of late
 3  2002, 2003, 2004.
 4    Q.   So, at the earliest, DUAT or DRUG
 5  decided to focus on Neurontin in late 2002?
 6    A.   I don't know specifically, but if it
 7  was at the earliest, whether it was late 2002, but
 8  I believe in the years 2002, '3 and '4, there's
 9  been focus on Neurontin use, particularly given,
10  you know, the revelations that are contained on
11  page number 5, which were very disconcerting.
12    Q.   And what were the reasons for this
13  focus on Neurontin in 2002?
14    A.   The reason was the waking up to
15  perhaps there was significant over-utilization of
16  Neurontin for a variety of conditions, which we
17  needed to begin examining.  After all, the
18  plaintiffs in this case were paying a lot of money
19  for Neurontin prescriptions.
20    Q.   And that realization came in 2002, is
21  that right?
22    A.   I believe so, based upon when some
23  public information became available, particularly
24  as it related to the, you know, the fraudulent
25  promotion of Neurontin.
```

Page 253

```
 1              A. Carver
 2    Q.   What public information was that?
 3    A.   I believe that there was -- there's
 4  contained on this document information regarding
 5  the promotion of Neurontin for unapproved uses and
 6  the fact that some revelations had come as a
 7  result of the unsealing of documents in federal
 8  court, and then a Wall Street Journal article also
 9  that talks about the promotion of Neurontin for
10  unapproved uses that were the result of hiring
11  advertising agencies to mount this all-out
12  marketing war.
13       So I think that that's very concerning
14  to a health plan who is paying millions of dollars
15  for Neurontin to feel that perhaps a lot of that
16  payment has been for inappropriate use, and I'm
17  sure that our physicians wondered whether or not
18  they'd been duped.
19       MS. NUSSBAUM:  Can I just ask for a
20  clarification?
21       When the witness said "this document,"
22  I'm not sure if he was referring to Exhibit 12 or
23  13.
24    Q.   You're free to state whether you were
25  referring to document Kaiser-13 or Kaiser-12
```

Page 254

```
 1              A. Carver
 2  when --
 3    A.   I think that some of the same
 4  information is contained in -- excuse me.  It's
 5  upside down; 13 as contained in 12 in terms of
 6  these revelations.
 7    Q.   Do you have a particular page of
 8  either document in mind?
 9       MR. LAWRENCE:  Page 5 of document 12.
10    A.   Page 5 of -- excuse me, document 13.
11    Q.   And --
12    A.   Mine is upside down.
13    Q.   Aside from --
14    A.   Excuse me.  Pages 2, 3, 4 of document
15  number 12 in which the page 4 of document 12 is,
16  you know, appears to have some of the same
17  information as page 5 in document 13.  And there's
18  reference, pharmaceutical marketing strategies and
19  increased utilization in expenditures increasing
20  off-label use, and the rest in document number 12.
21       So I think that both documents contain
22  similar information that caused concern.
23    Q.   Aside from newspaper articles such as
24  the ones referenced on page 5 of document 13 and
25  page 4 of document 12 and the unsealing of federal
```

1          A. Carver
2  court records which you referred to, are there
3  other reasons that caused DUAT and DRUG to focus
4  on Neurontin in the 2002-to-2004 time period?
5          MS. NUSSBAUM: I would just caution
6  the witness not to discuss any conversations or
7  documents or advice that you got from counsel,
8  either Kaiser Permanente's counsel or Kaiser's
9  counsel or outside counsel.
10     A.  Not that come to mind.
11     Q.  Did DUAT or DRUG implement this
12 business program based on information supplied by
13 counsel?
14         MS. NUSSBAUM: I would object to any
15 question that calls for an answer that in any way
16 implicates conversations that the witness had,
17 either with Kaiser's counsel or with outside
18 counsel. I think that the document speaks for
19 itself and the witness has testified as to the
20 fraud.
21     Q.  You can answer.
22         MS. NUSSBAUM: He can't answer to the
23 extent that you're asking for the conclusion based
24 on discussions that he had with counsel.
25         MR. JAMES: I'm asking whether they

1          A. Carver
2  took a business decision to implement a drug
3  utilization program based on information supplied
4  to them by counsel. I don't think it has anything
5  to do with legal advice.
6          MS. NUSSBAUM: I would think that has
7  exactly to do with legal advice. If your lawyers
8  advise you to do something, what your lawyers
9  advise you that there's been a fraud that's
10 affected you, I think it has to do with legal
11 advice.
12     Q.  Setting aside any information supplied
13 by counsel that might have motivated this action
14 by DUAT and DRUG, is there other information aside
15 from these newspaper articles referenced on these
16 two pages and the unsealing of federal court
17 documents that caused DUAT and DRUG to undertake
18 these programs at this time?
19         MS. NUSSBAUM: If you know.
20     A.  Not other than the significant
21 increase in expenditure for Neurontin by Kaiser.
22     Q.  When did that significant expenditure
23 occur?
24         MS. NUSSBAUM: Approximately? I
25 mean --

1          A. Carver
2      A.  The -- I don't know specific years of
3  the specific expenditure at Kaiser, but I would
4  say in the year 1995, the expenditure was quite
5  low, in the 1 to $2 million range, and that
6  expenditure increased to in the 30s of millions by
7  2003.
8      Q.  One point was in 1995 and the other
9  was in 2003; is that correct?
10     A.  That's correct.
11     Q.  And you're unaware of what the
12 expenditures looked like in the interim?
13     A.  I just don't recall from memory. I
14 would only say that in many -- in many of the
15 successive years, the costs were increasing
16 dramatically, by a magnitude of 50 percent or so,
17 but perhaps you have information there regarding
18 the specific years.
19         I'm sorry. I'm not trying to avoid
20 your question. I just don't recall specific
21 expenditure by specific year.
22     Q.  Unfortunately, I don't have such
23 information.
24         But you believe that in some of those
25 years, expenditures increased by 50 percent or

1          A. Carver
2  more, but you're not entirely sure of in which
3  years those increases occurred; is that right?
4          MS. NUSSBAUM: Objection. We don't
5  want the witness to speculate. He's testified
6  that the drug, over roughly a ten-year period,
7  went from a drug that was several million
8  dollars --
9          MR. JAMES: Your objection is noted.
10     Q.  But, I mean, is it your testimony that
11 you don't know today whether that increase
12 occurred in 2000, 2002 or 1999?
13     A.  It's my testimony that the
14 expenditures for Gabapentin were growing momentum
15 and were on a growth curve like this between the
16 year of 1995 and up to in the 30s of millions by
17 the year 2003.
18     Q.  And this --
19     A.  I just can't pinpoint from memory
20 exactly what the specific points were on that
21 curve over that period.
22     Q.  And this issue came to DUAT and DRUG's
23 attention at around 2002, is that right?
24         MS. NUSSBAUM: Well, I think, you
25 know, the witness has testified that these --

Page 259

```
 1              A. Carver
 2      MR. JAMES: You know, rather than
 3 stating the witness' prior testimony, why don't --
 4 if you'd like to object to the question, you're
 5 free to, but, you know, just allow the --
 6      MS. NUSSBAUM: It misstates the prior
 7 testimony here that this information came to the
 8 attention in 2002. It misstates the prior record.
 9    Q.   Have I misstated the prior record in
10 some way?
11    A.   I lost track of your question. I'm
12 sorry.
13      MR. JAMES: Could you read back the
14 question?
15      (Record read.)
16      MS. NUSSBAUM: What issue are you
17 referring to?
18      MR. JAMES: The issue we're discussing
19 was the growth of Gabapentin prescriptions paid
20 for by Kaiser.
21      MS. NUSSBAUM: You want to know if
22 that's something that was discussed by DUAT in
23 that period of time? I mean, what does it mean
24 that the issue came to their attention?
25    Q.   If you understand the question, you
```

Page 260

```
 1              A. Carver
 2 can answer.
 3      MS. NUSSBAUM: No, I'm asking you to
 4 rephrase the question. I don't understand the
 5 question.
 6    Q.   Well, the relevant matter is whether
 7 the witness understands the question.
 8    A.   Could we just try rephrasing it so
 9 that we're all on the same page here?
10    Q.   Have the issue of growth of Gabapentin
11 prescriptions paid for by Kaiser come to DUAT or
12 DRUG's attention prior to 2002?
13      MS. NUSSBAUM: I would object, again.
14 What does it mean, "comes to the attention of the
15 committee"?
16    Q.   If you understand the concept of come
17 to attention, you're free to answer.
18    A.   I don't know.
19    Q.   You don't know what "come to
20 attention" means or you --
21    A.   No. I do not know whether DRUG or
22 DUAT had on their radar screen Neurontin prior to
23 2002.
24    Q.   In the first action that they took
25 with regard to Neurontin, however, occurred no
```

Page 261

```
 1              A. Carver
 2 earlier than 2002, is that correct?
 3    A.   I do not know. I'm not a member of
 4 that committee. I believe that you've asked me to
 5 comment on at least these videoconference
 6 presentations that occurred in 2003, 2004, and I
 7 believe that their efforts actually got launched
 8 in 2002. And so, if you have documents that show
 9 something slightly different, I'm trying to -- I'm
10 not trying to mislead you.
11      (Kaiser-14 marked for identification.)
12    Q.   Do you recognize this document?
13    A.   I do not.
14    Q.   Yesterday you testified that you do
15 know who Debbie Kubota is?
16    A.   I do, yes.
17    Q.   Do you know who any of the other
18 individuals copied on this e-mail are -- let's
19 start off with Rich Lieblich.
20    A.   If you could just bear with me for a
21 moment until I could read this document.
22      Okay. I'm ready to answer your
23 question, sorry.
24    Q.   Do you know who Rich Lieblich is?
25    A.   Rich Lieblich was in our
```

Page 262

```
 1              A. Carver
 2 pharmaceutical contracting department at that
 3 time.
 4    Q.   Let me ask a general question.
 5      At KPNC, that's Kaiser Permanente
 6 northern California, is that correct?
 7    A.   Correct.
 8    Q.   And "Kai Per M" is Kaiser Permanente
 9 Medical Group?
10    A.   Where are you?
11    Q.   Actually on the cc.
12    A.   To which are you referring?
13    Q.   I guess the address of Mirta Millares
14 and Susan Nakahiro on the cc line of the e-mail.
15    A.   No, Kai Perm is just -- it's not
16 referencing the medical group. It's just an
17 e-mail address.
18    Q.   People with that e-mail address, would
19 they be employees of Permanente Medical Group or
20 of the plaintiffs?
21      MS. NUSSBAUM: If you know.
22    A.   These employees are employees of the
23 plaintiffs.
24    Q.   Is it correct that this e-mail states
25 that "the potential population for this drug could
```

1                    A. Carver
2  be huge"?
3          MS. NUSSBAUM: Objection.
4          The witness has stated that he's never
5  seen this document. He cannot identify this
6  document. He's neither an author nor a recipient
7  of the document. So I would ask that you not ask
8  him questions that would cause him to speculate.
9     Q.   You can answer whether this document
10 states that or not.
11         MS. NUSSBAUM: No. I mean, he's
12 simply reading words from a document. It's not a
13 reading test. The witness has stated he's not an
14 author recipient and he's never seen it.
15    A.   Yeah, I've never seen this document.
16    Q.   Did you have any discussions with
17 Debbie Kubota or others who report to you or
18 worked with you in 1999 indicating that the
19 potential population for Gabapentin could be huge?
20         MS. NUSSBAUM: If you recall.
21    A.   Not that I recall.
22    Q.   I'd like to return to the reasons that
23 DUAT focused on Gabapentin around 2002. You had
24 mentioned these newspaper articles that are
25 referenced in Kaiser 12 and Kaiser 13, is that

1                    A. Carver
2  right?
3     A.   That's right.
4     Q.   And I think in referring to those
5  revelations, as you put it, you referred to them
6  as -- as fraudulent, is that right?
7     A.   I believe that -- that's right.
8     Q.   You described the conduct of, I guess,
9  Warner-Lambert reported by these articles as
10 fraudulent conduct, is that correct?
11    A.   Yes.
12    Q.   Are any -- is any information relating
13 to fraudulent conduct contained on these pages?
14         MS. NUSSBAUM: I would caution that
15 the witness is not an attorney, so I'd ask that
16 you define the term "fraud."
17         And also, if you have the full
18 articles here, these are simply sentences from
19 articles. If you want to look at the entire
20 article to see whether the word "fraud" is used.
21    Q.   Well, actually, in your common
22 understanding, what does the word "fraud" mean?
23    A.   It is just a common understanding?
24    Q.   Right. I'm not asking you for a legal
25 definition.

1                    A. Carver
2     A.   My common understanding would be that
3  something has happened that is not as it's
4  purported to be, something that's been dishonest
5  for purposes of -- of gain, financial gain, and I
6  have no idea if that's any kind of -- would hold
7  up to any kind of a legal definition, but that
8  would be my general common understanding of the
9  word "fraud."
10    Q.   And that's all I've asked for.
11         Would it be accurate to say that in
12 your common understanding of fraud, one element of
13 that would be a falsehood?
14    A.   Yes, that's correct.
15    Q.   If you turn to this first excerpt from
16 the New York Times on, I guess, on page 5 of
17 Kaiser-13, do you see any reference to a falsehood
18 being made?
19         MS. NUSSBAUM: I would object.
20         MR. JAMES: Your objection is
21 preserved. Thank you.
22         MS. NUSSBAUM: If you want to show the
23 entire articles --
24         MR. JAMES: I'm actually asking
25 specifically about this excerpt.

1                    A. Carver
2          MS. NUSSBAUM: You want to know about
3  this phrase, the several words, the portion of the
4  sentence?
5          MR. JAMES: That's correct. Thank
6  you.
7          MS. NUSSBAUM: What do you want to
8  know with respect to that, whether you see the
9  word fraud in these words?
10         MR. JAMES: Would you read back the
11 question?
12         (Record read.)
13         MS. NUSSBAUM: I would ask the witness
14 to read out loud the sentence you're referring to,
15 just to make certain that we're all on the same
16 page here.
17    Q.   You're free to read out the question.
18 Sorry. Read out the excerpt from the New York
19 Times.
20    A.   "Some physicians in exchange for money
21 have allowed pharmaceutical sales representatives
22 into their examining rooms to meet with patients,
23 review medical charts and recommend what medicines
24 to prescribe."
25    Q.   And do you have an answer to the

Page 267

A. Carver

1    question?
2        A.    That's very problematic for me in that
3    a nonphysician, a representative of a
4    pharmaceutical company has access to both patients
5    and to the medical chart and is paying a doctor to
6    gain that access.
7        Q.    Actually, I guess the question was
8    whether a falsehood is -- whether there's a
9    statement that Warner-Lambert or the defendants
10   made a falsehood in that excerpt?
11       A.    Well, I think that this is -- this
12   kind of behavior is highly unusual.  If I go into
13   a patient's -- if I go to my physician and there's
14   an individual in the room, I'm presuming that that
15   individual is a medical professional.  I'm
16   certainly not expecting there to be a
17   pharmaceutical representative in there that's paid
18   to gain access to be part of my examination or
19   treatment.  I think that's -- that's terrible
20   behavior on behalf of a pharmaceutical
21   representative.
22       Q.    But I guess the question was whether
23   there's actually a falsehood being made by the
24   defendants?
25

Page 268

A. Carver

1        MS. NUSSBAUM:  You're badgering the
2    witness.  The falsehood --
3        MR. JAMES:  I'm not badgering with
4    regard to what the falsehood is.
5        MS. NUSSBAUM:  He's testified to that.
6    He's testified to what the falsehood is.
7        Q.    I guess if we move to the second
8    excerpt --
9        MS. NUSSBAUM:  Do you want to read
10   that out loud?
11       A.    "Marketing executives at
12   Warner-Lambert urged their superiors to let them
13   promote the epilepsy drug, Neurontin, for an
14   unapproved use rather than to perform the clinical
15   studies to prove the medicine was safe for such
16   patients according to a corporate memorandum
17   unsealing on Friday in federal court."
18       Q.    And does this excerpt indicate that
19   any falsehood was made by the defendants?
20       A.    I believe that it's inappropriate and
21   beyond what is approved and legal for a
22   pharmaceutical manufacturer's representative to be
23   promoting a product for unapproved uses.
24       Q.    Actually, I hadn't asked whether it

Page 269

A. Carver

1    was inappropriate to or beyond what is legal for a
2    pharmaceutical manufacturer's representatives to
3    do.  I had asked whether there was any indication
4    that a false statement was made.
5        MS. NUSSBAUM:  Well, I would object.
6    You're badgering the witness.  He says that it's
7    unlawful.
8        MR. JAMES:  Actually, I'll move along,
9    I have another question.
10       Q.    Would it be possible to promote a drug
11   off-label but in a truthful way?
12       MS. NUSSBAUM:  The witness is not a
13   lawyer.  I'm going to not permit him to answer
14   that.
15       MR. JAMES:  I'm actually asking for a
16   common understanding.
17       MS. NUSSBAUM:  There is no common
18   understanding.
19       Q.    Would it be possible to make a
20   truthful statement to promote use for a drug for
21   off-label indication?
22       MS. NUSSBAUM:  I would direct this
23   witness not to answer.  It's not covered by your
24   30(b)(6) Notice or anything else.  He's not a

Page 270

A. Carver

1    lawyer and you're asking for a legal conclusion.
2        Q.    You can answer in your personal
3    capacity.
4        MS. NUSSBAUM:  No, you can't.  I'm
5    asking him not to answer.
6        MR. JAMES:  On what ground?
7        MS. NUSSBAUM:  On the ground that he's
8    not a lawyer.  You're asking for a legal
9    conclusion as to whether or not it would be legal
10   for a pharmaceutical representative to promote a
11   drug for off-label use, as long as what they're
12   saying they believe is truthful, as opposed to an
13   outright lie?  That calls for a legal conclusion.
14   This witness is not a lawyer.
15       MR. JAMES:  Do you believe that a
16   question calling for a legal conclusion is an
17   appropriate cause to direct a witness not to
18   answer a question?
19       MS. NUSSBAUM:  In this particular,
20   yes, because his answer would be meaningless.
21       Q.    Is it possible for any truthful
22   positive statement to be made regarding the use of
23   a drug for an off-label indication?
24       MS. NUSSBAUM:  Totally speculative and

Page 271

```
1              A. Carver
2    hypothetical.
3        Q.   You can answer.
4        MS. NUSSBAUM:  No -- I would ask you
5    not to speculate to a hypothetical question as to
6    whether or not it's possible for somebody to tell
7    somebody something.
8        Q.   You can answer if you understand the
9    question.
10       A.   I cannot speculate.
11       Q.   Without speculation, you can't tell me
12   whether it would be possible to say anything
13   positive regarding the use of a prescription drug
14   for an off-label indication?
15       MS. NUSSBAUM:  Please don't speculate.
16       A.   I cannot speculate.  I'm not a lawyer.
17       Q.   With regard to the final excerpt on
18   this page from the Wall Street Journal, do you see
19   any indication that a false statement was made by
20   the defendants?
21       MS. NUSSBAUM:  Please read it out loud
22   so we don't have confusion on the record.
23       A.   "A drug company now owned by Pfizer in
24   an alleged effort to promote epilepsy drug
25   Neurontin for unapproved uses went so far as to
```

Page 272

```
1              A. Carver
2    hire a New York advertising agency to wage an
3    all-out marketing war according to documents that
4    are part of a lawsuit."
5        Q.   And whether opining as to whether the
6    action is legal or whether it's appropriate, can
7    you tell me whether this excerpt does or it does
8    not state that the defendants made a false
9    statement?
10       MS. NUSSBAUM:  I would object to that.
11   This is a sentence taken out of context from an article.
12   Certainly if --
13       MR. JAMES:  Your objection is noted.
14       MS. NUSSBAUM:  -- if Warner-Lambert
15   were not telling people that this was an outside
16   advertising agency, then that's the falsehood.  If
17   you want to give him the article, the entire
18   article and you want him to tell you all the
19   falsehoods, we're happy to do it.
20       Q.   Can you answer the question?
21       MS. NUSSBAUM:  Please don't speculate,
22   and if you need to see the entire article and
23   don't want to opine --
24       MR. JAMES:  I actually haven't made
25   any question regarding the entire article.  I have
```

Page 273

```
1              A. Carver
2    asked whether this excerpt stated on page 5 of
3    document Kaiser-13 indicates that the defendants
4    made any falsehood.
5        A.   Well, from my -- from my point of
6    view, the hiring of a New York advertising agency
7    to promote unapproved uses of Neurontin would be a
8    problem.
9        Q.   Right.  I'll move along.
10           The third reason that you mentioned
11   that DUAT and DRUG focused on Neurontin and
12   Gabapentin in 2002 was the unsealing of federal
13   court records.
14           Do you recall whether those court
15   records indicated that the defendants had made any
16   false statements regarding Neurontin or
17   Gabapentin?
18       MS. NUSSBAUM:  And I would again
19   caution the witness not to divulge any
20   conversations at all that you've had with counsel
21   of Kaiser or outside counsel with respect to the
22   Franklin suit, the whistleblower suit or the
23   unsealing of any court records.
24       Q.   Excluding discussions with counsel,
25   are you able to tell me whether the federal court
```

Page 274

```
1              A. Carver
2    records that were unsealed at some point in 2002
3    or before then indicated that the defendants had
4    made false statements regarding Neurontin or
5    Gabapentin?
6        MS. NUSSBAUM:  Are you stating in your
7    question that the whistleblower suit or the
8    records were unsealed before 2002?
9        MR. JAMES:  Actually, I'll restate my
10   question this time.
11       Q.   You have indicated that DUAT and DRUG
12   focused on Neurontin or Gabapentin in 2002 or
13   thereabouts, partly as a result of the unsealing
14   of federal court records, is that correct?
15       A.   As stated on page 5 here referencing.
16       MS. NUSSBAUM:  What exhibit are you
17   referring to, please?
18       THE WITNESS:  Referencing this New
19   York Times article.
20       MS. NUSSBAUM:  Just for the record,
21   we're talking about Exhibit 13, page 5?
22       THE WITNESS:  Page 5.
23       Q.   Beyond that statement that's made in
24   this document, is there anything you could tell me
25   regarding the unsealing of those federal court
```

1            A. Carver
2  records excluding any discussions with counsel?
3         MS. NUSSBAUM:  Right.  Please, no
4  discussion with Mr. Cohen, myself or any other
5  counsel.
6      A.   I do not know.
7      Q.   Turning back to the DUAT and DRUG
8  programming, what was their objective with regard
9  to Neurontin and Gabapentin?
10        MS. NUSSBAUM:  Asked and answered.
11     Q.   Well, you can answer it.
12        MS. NUSSBAUM:  I believe the witness
13  has already testified as to that.
14     A.   I think the objective was to assess
15  the use in light of the information that -- assess
16  the use in light of significant increase in
17  expenditures and in light of information that had
18  become publicly available regarding the promotion
19  of the particular product for unapproved uses.
20     Q.   Beyond assessing the use, were you
21  actually attempting to modify the use in some
22  way -- actually, I said you, I should have
23  substituted the word "DUAT" or "DRUG."
24        I guess the question was beyond
25  assessing the use of Neurontin or Gabapentin, was

1            A. Carver
2  DUAT or DRUG attempting to modify the use of
3  Gabapentin or Neurontin by Kaiser-prescribing
4  physicians?
5         MS. NUSSBAUM:  Outside the scope of
6  the 30(b)(6).  This witness cannot state as to
7  what DUAT was or was not, or DRUG was or was not
8  doing, and has stated that he was not a member of
9  these committees.
10        MR. JAMES:  I think as I've previously
11  stated, drug utilization programs are plainly one
12  of the topics.
13        MS. NUSSBAUM:  Sir, your 30(b)(6)
14  Notice asks for policies or practices relating to
15  that.  We've now had way over an hour of
16  testimony, so I think any judge would find that we
17  have more than fulfilled the 30(b)(6) obligation
18  on that topic.
19     Q.   You can answer the question if you
20  know.
21        MS. NUSSBAUM:  Do you want to repeat
22  your question?
23        MR. JAMES:  Can you read back the
24  question?
25        (Record read.)

1            A. Carver
2         MS. NUSSBAUM:  And I would object,
3  this witness is here --
4         MR. JAMES:  I think you've previously
5  objected --
6         MS. NUSSBAUM:  No, on behalf of the
7  plaintiffs in this action, okay.  This committee
8  he's indicated is physicians primarily and the
9  witness has stated that he is not a member of the
10  committee.
11        MR. JAMES:  Are you directing him not
12  to answer the question?
13        MS. NUSSBAUM:  Do you want to know if
14  he has personal knowledge?
15        Do you have personal knowledge?
16        THE WITNESS:  I don't.
17     Q.   And do you have knowledge as a
18  corporate representative of Kaiser?
19        MS. NUSSBAUM:  Of the plaintiffs in
20  this action.
21     A.   Not independent knowledge.
22        MS. NUSSBAUM:  He does not.
23     Q.   So your testimony is that DUAT and
24  DRUG were attempting to assess the use of
25  Gabapentin, but you have no knowledge as to

1            A. Carver
2  whether they actually planned to do anything after
3  making that assessment?
4         MS. NUSSBAUM:  That is not what the
5  witness has testified to.  He has testified.
6      Q.   If that's not what you testified,
7  please let me know.
8      A.   I believe these efforts represent
9  physicians -- physician efforts at modifying --
10  assessing, modifying, changing, if appropriate,
11  the use of Gabapentin for the treatment of a
12  variety of things based upon the content of these
13  presentations.
14     Q.   And you're not able to provide any
15  further information regarding what modifications
16  DUAT or DRUG sought to make?
17     A.   Not independently; no.
18     Q.   It would not refresh your recollection
19  if I were to represent to you that DUAT and DRUG
20  were attempting to encourage physicians to
21  substitute antidepressants for Neurontin in
22  certain circumstances?
23     A.   I believe that that's contained in the
24  presentation material here.
25     Q.   Do you know under what conditions

Page 279

1          A. Carver
2   physicians were being encouraged to prescribe
3   antidepressants rather than Neurontin?
4          MS. NUSSBAUM:  I would object.  If you
5   want to point to a page in the document, please do
6   so.  The witness has stated that he was not on the
7   committee and has no independent recollection.
8      Q.   Did we refer to a page of the document
9   earlier that showed the number of patients covered
10  by Kaiser who had taken Gabapentin or Neurontin
11  and were naive to TCAs?
12         MS. NUSSBAUM:  If you have a page that
13  you want to refer the witness to, please do it.
14         MR. JAMES:  Actually, I'll withdraw
15  the question.
16     Q.   Let's move to page 18 of Kaiser 12.
17         MS. NUSSBAUM:  Just off the record,
18  you know, I realize pages are missing.  Mine goes
19  from page 33 to page 37, and they are also put
20  together upside down and not in order.  So I think
21  that perhaps do you have other copies of these
22  documents with you?
23         MR. LAWRENCE:  No, these were how they
24  were produced to us.
25         MS. NUSSBAUM:  I doubt that this is

Page 280

1          A. Carver
2   how they were produced to you.
3      Q.   Actually, is your -- does your copy
4   have also upside-down pages?
5      A.   Who?  Mine is missing those same
6   pages.  There's a gap apparently between 23 and
7   37 -- oh, excuse me, wait, I think maybe, there's
8   25, 26 and 27, maybe it's just a matter of how
9   they were assembled here; sorry.
10         MR. JAMES:  We'll move on quickly.
11     Q.   Can you find page 18 of the document?
12     A.   We'll try.
13         Yes.
14     Q.   And does reading this statement, "Use
15  TCAs preferentially for treatment of neuropathic
16  pain and reserve Neurontin for TCA failures or
17  contraindications" refresh your recollection
18  regarding the circumstances in which Kaiser was
19  making an effort to modify physician prescribing
20  behavior?
21         MS. NUSSBAUM:  Objection.  Are you
22  talking about here Kaiser, the plaintiffs in this
23  action?  Are you talking about the physician
24  entities with which Kaiser contracts?
25         MR. JAMES:  Actually, let's just refer

Page 281

1          A. Carver
2   to DUAT and DRUG.
3          MS. NUSSBAUM:  You've asked if it
4   refreshes his recollection.  I believe that this
5   witness has stated that he did not write this
6   document.
7          MR. JAMES:  But he did attend one of
8   the videoconferences involved in this same
9   campaign.
10     Q.   Is that correct?
11         MS. NUSSBAUM:  Do you have any
12  personal recollection?
13         THE WITNESS:  I do not.  I do not
14  recall page 18 of that presentation from memory.
15     Q.   And either as corporate representative
16  of the plaintiffs or in your personal capacity,
17  you're unable to confirm the truth or falsity of
18  this statement that the objective of this program
19  was to use TCAs preferentially for treatment of
20  neuropathic and reserve Neurontin for TCA failures
21  or contraindications?
22         MS. NUSSBAUM:  The document speaks for
23  itself.
24         MR. JAMES:  I've asked him whether he
25  could confirm its truth or falsehood.

Page 282

1          A. Carver
2          MS. NUSSBAUM:  Do you have any
3   independent knowledge outside the document?
4      A.   I do not.
5      Q.   Do you know if any efforts are being
6   made today to have physicians use TCAs
7   preferentially for the treatment of neuropathic
8   pain?
9          MS. NUSSBAUM:  If you know.
10     A.   I do not know.
11         MR. JAMES:  I'd like to move back to
12  the complaint, which is Kaiser-3.
13         Actually, I'm sorry, I'll go back to
14  my whole topic for a bit.
15     Q.   Aside from DUAT and DRUG, are you
16  aware of any other cost containment programs
17  relating to Neurontin specifically?
18         MS. NUSSBAUM:  The witness has already
19  testified to that; asked and answered.
20     Q.   Is the answer no?
21     A.   The answer is no.
22     Q.   Were any other kinds of costs
23  containment programs considered from 1994 to the
24  present with regard to containing the cost of
25  Neurontin?

Page 283

1          A. Carver
2      MS. NUSSBAUM:  If you know.
3      A.   I do not know.
4      Q.   Are you aware of what a drug
5  limitation is?
6      A.   Perhaps you can define it for me.
7      Q.   Do you have any independent
8  understanding of that term?
9      A.   I would just like to know what you
10  mean by the words "drug limitation."
11     Q.   Are there programs by which a health
12  insurer, or actually I should say pharmacy
13  benefits provider can limit the dosage of a drug
14  that's prescribed to a patient?
15     MS. NUSSBAUM:  Are you asking a
16  hypothetical question?  Does any pharmacy benefit
17  manager ever limit the drug or the dose of any
18  drug?
19     MR. JAMES:  I'm asking him if he's
20  aware of whether such programs exist.
21     MS. NUSSBAUM:  In general, do you have
22  any knowledge of that?
23     A.   I'm not well versed in the industry
24  outside of Kaiser Permanente.
25     Q.   I'd like you to turn to the Notice,

Page 284

1          A. Carver
2  which was Kaiser-1, I think.  If you could turn to
3  page 9 of that document.
4      A.   Nine?
5      Q.   Yeah, page 9, and the paragraph
6  numbered six.  Do you see reference to drug
7  limitations or quantity limits in that paragraph?
8      A.   Yes, I do.
9      Q.   And do you have an understanding of
10  what those terms refer to?
11     A.   I would presume that you -- that this
12  is in the context of a drug limitation or a
13  quantity limitation that would be applied by the
14  prescription drug benefit.  That would be
15  contained in the evidence of coverage or what it
16  is, the particular prescription drug benefit that
17  has been sold by Kaiser to the various purchasers.
18     Q.   Do Kaiser's programs implement any
19  drug limitations or quantity limits?
20     MS. NUSSBAUM:  In general, or does?
21     MR. JAMES:  In general.
22     A.   As part of the specific -- in general,
23  no.  And then I believe that we spoke yesterday
24  about different copay levels and another piece of
25  what goes along with the various copay levels in

Page 285

1          A. Carver
2  terms of benefit offerings to the employer groups
3  or individuals would be a day supply.
4      So, as an example, there may be a
5  benefit that has a 30-day supply, a benefit that
6  would have a 100-day supply.  That would be the
7  contractual limitation upon the supply of
8  medication that would be covered under the
9  prescription drug benefit.
10     Q.   Has the imposition of a drug
11  limitation or a quantity limit been considered
12  with regard to Neurontin ever since 1994?
13     A.   Not in terms of the coverage that's
14  provided or the drug benefit coverage that's
15  provided by Kaiser Health Plans.
16     Q.   Has Kaiser Health Plans discussed with
17  any of its employer groups whether it might make
18  sense to impose a drug limitation or quantity
19  limit on Neurontin?
20     MS. NUSSBAUM:  If you know, if you
21  have any recollection --
22     A.   I do not know.  I do not know.
23     MS. NUSSBAUM:  If you have any
24  recollection of any discussion.
25     Q.   I guess paragraph six also makes

Page 286

1          A. Carver
2  reference to academic detailing.
3      Do you have an understanding of what
4  that term means?
5      A.   I do.
6      Q.   And what does it refer to?
7      A.   It refers to the provision of
8  objective information regarding a particular drug
9  to a -- to physicians.  It was a term that was, I
10  believe, coigned by Jerry Avorn at Harvard Medical
11  School back in the early '80s.
12     Q.   Is academic detailing something that
13  Kaiser undertakes?
14     A.   Yes.
15     Q.   Has it done so with regard to
16  Neurontin?
17     A.   I do not know.
18     Q.   In what circumstances generally does
19  Kaiser engage in academic detailing?
20     A.   Circumstances in which there are --
21  I'm speaking generally.  Circumstances in which
22  there are therapeutic alternatives that are
23  equally effective and perhaps lower cost as a
24  general response.
25     Q.   From Kaiser's view, would any of those

Page 287

A. Carver

1            A. Carver
2  circumstances be applicable in the context of
3  Neurontin?
4        MS. NUSSBAUM:  Are you talking about
5  at any particular time?  The witness has testified
6  that subsequent to the news coming out in 2002,
7  Kaiser did engage in a program.
8     Q.   In 2002, was it Kaiser's view that the
9  circumstances in which academic detailing occur
10 were applicable with regard to Neurontin?
11       MS. NUSSBAUM:  I don't understand that
12 question.
13       MR. JAMES:  I'll withdraw that
14 question.
15    Q.   Would any of the activities of DUAT
16 and DRUG be characterized as academic detailing?
17    A.   To the degree that physician
18 specialists are providing objective factual
19 information regarding the appropriate use of a
20 product to other physicians, yes, that would fall
21 under the umbrella of academic detailing in
22 general, I would say.
23    Q.   And are there other organizations at
24 Kaiser or Permanente Group that engage in academic
25 detailing, aside from DUAT and DRUG?

Page 288

1            A. Carver
2     A.   Yes, but in conjunction with approved
3  programs, that would be under the auspices of
4  either the P&T committee or DRUG and DUAT.  So
5  there -- excuse me.
6     Q.   Is it correct that the P&T committee,
7  DRUG and DUAT, are kind of the three bodies that
8  might either engage in academic detailing
9  themselves or have academic detailing done under
10 these auspices?
11    A.   That's correct.
12    Q.   There are no other groups at Kaiser
13 that you're aware of that would be involved in
14 academic detailing?
15    A.   Not that I'm aware of.
16    Q.   In what circumstances is the P&T
17 committee engaged in academic detailing?
18       MS. NUSSBAUM:  If you know.
19    A.   The P&T committee has -- provides
20 approval to any kind of academic detailing
21 programs so that people are not independently
22 dreaming up programming and implementing such.
23    Q.   Do the other parties approach the P&T
24 committee with ideas of academic detailing
25 programs?

Page 289

1            A. Carver
2        MS. NUSSBAUM:  You mean has that ever
3  happened?  To your knowledge, has that ever
4  happened?
5     A.   I just don't recall; I'm sorry.
6     Q.   I guess also on this list in paragraph
7  6, page 9 of the Notice, is the term "prior
8  authorization."
9        Do you have an understanding of that
10 term?
11    A.   I do.
12    Q.   Is that utilized by Kaiser?
13    A.   It is not.
14    Q.   I think now we're ready to move to the
15 Complaint, which I had indicated we would move to
16 earlier.
17       Is Kaiser alleging that false
18 statements were made?
19       MS. NUSSBAUM:  Excuse me.  Are you
20 referring to a particular page in the Complaint?
21       MR. JAMES:  Well, you might look at
22 page ii -- not II, but two small i's.
23       MS. NUSSBAUM:  The table of contents,
24 in other words, two small i's?
25       MR. JAMES:  Right.

Page 290

1            A. Carver
2     A.   I'm sorry.  I'm confused.  Are we on
3  the two small i's?  Okay.
4     Q.   And this page may not help you.
5        Is Kaiser alleging that false
6  statements were made by the defendants with regard
7  to each of the uses of Neurontin for which it's
8  claiming damages?
9        MS. NUSSBAUM:  I'm just showing the
10 witness, you're referring to after the
11 introduction, two, three, four, where it says
12 "false and misleading statements," from there?
13       MR. JAMES:  Right.  And I mean, if
14 that assists his memory, you know, I don't mean to
15 like limit him to this document.
16       MS. NUSSBAUM:  What's your question?
17    Q.   Is Kaiser alleging that the defendants
18 made false statements with regard to each of the
19 off-label uses of Neurontin for which it's seeking
20 damages from the defendants?
21       MS. NUSSBAUM:  I think that calls for
22 a legal conclusion.  The witness testified
23 yesterday that the Complaint was prepared by
24 lawyers and it was authorized by the plaintiffs,
25 and the Complaint is 140 pages.

Page 291

A. Carver

1         A. Carver
2     Q.   Do you know whether Kaiser is alleging
3  that false statements were made with regard to
4  each of the off-label uses for which it's seeking
5  damages from the defendants?
6         MS. NUSSBAUM:  To the best of your
7  knowledge.
8     A.   I believe so, with reliance upon
9  counsel for the preparation.
10        MS. NUSSBAUM:  Please don't testify as
11 to any discussions with counsel.
12    Q.   Is Kaiser aware of any false
13 statements regarding the use of Neurontin for no
14 susceptive pain?
15        MS. NUSSBAUM:  Are you referring to
16 any particular portion of the Complaint?
17        MR. JAMES:  Actually, let me -- I'll
18 withdraw that question.
19    Q.   Were any statements made by the
20 defendants to Kaiser itself regarding the use of
21 Neurontin?
22    A.   Of course.  I mean, over the -- over
23 the course of the last ten years, there have been
24 numerous interactions between representatives of
25 the defendants and Permanente physicians --

Page 292

1         A. Carver
2     Q.   Actually, I'm not asking about
3  Permanente physicians, just the plaintiffs
4  themselves.
5         Physicians are technically not
6  employed by the plaintiffs, is that right?
7     A.   That's correct.
8         MS. NUSSBAUM:  Well, I think the
9  witness testified yesterday the Permanente
10 physicians write the prescriptions.
11        MR. JAMES:  Right, I understand that.
12    Q.   But have any statements been made by
13 the defendants to the plaintiffs themselves
14 regarding the use of Neurontin?
15        MS. NUSSBAUM:  You want to know
16 whether or not the defendants, Warner-Lambert and
17 Pfizer, either made -
18        MR. JAMES:  Actually, you know --
19        MS. NUSSBAUM:  -- statements to the
20 two plaintiffs in this case?
21        MR. JAMES:  -- the two plaintiffs in
22 this case or their employees.
23    A.   I believe that the defendants have
24 provided information to our Drug Information
25 Service who -- and certainly they are employed by

Page 293

1         A. Carver
2  the plaintiffs.
3     Q.   Aside from information provided to the
4  Drug Information Service, are you aware of any
5  other statements made by the defendants to the
6  plaintiffs regarding the use of Neurontin?
7         MS. NUSSBAUM:  Over this ten-year
8  period?
9         MR. JAMES:  Yes.
10    A.   Not specific interactions or
11 information; no, of course not.
12    Q.   And with regard to information
13 provided by Pfizer regarding the use of Neurontin
14 to the Drug Information Service, which statements
15 are you aware that the defendants made?
16    A.   Specific statements, I cannot attest
17 to.
18        MS. NUSSBAUM:  Well, but can you in
19 general?
20        MR. JAMES:  That's fine.  Actually,
21 that was entirely responsive to my question.
22    Q.   Are you aware of any false statements
23 made by the defendants to the Drug Information
24 Service regarding the use of Neurontin?
25        MS. NUSSBAUM:  You want to know in

Page 294

1         A. Carver
2  general, is he generally aware?
3     Q.   If you understand the question, you
4  can answer.
5     A.   The specific statements, I'm not aware
6  of.  I think that the information that would be
7  provided to the Drug Information Service would be
8  information provided by the defendants' marketing
9  individuals, as well as through information that
10 was generally available through the literature, or
11 in some cases, perhaps studies that the defendants
12 may have written or had written on their behalf.
13        I'm not aware of specific instances to
14 which I could point.
15    Q.   Are you aware generally of any false
16 statements made to the Drug Information Service?
17    A.   Not specific false information, no.
18    Q.   I guess now setting aside the
19 plaintiffs, with regard to Permanente physicians,
20 are you specifically aware of any statements made
21 by the defendants or their agents to Permanente
22 physicians regarding the off-label uses of
23 Neurontin?
24    A.   And by "specific," are you asking me
25 to cite a specific interaction between a

1              A. Carver
2 representative of the defendants and a specific
3 interaction between a Permanente physician?
4      Q.   Do you know of any such specific
5 interaction?
6      A.   Not specific interactions, but
7 certainly the Permanente physicians have attended
8 conferences, read the literature, attended
9 continuing medical education conferences, do a
10 whole variety of things basically upon which they
11 are able to gain information that's available and
12 so, that Permanente physicians, Permanente
13 physicians can be, they come out of residency
14 programs in which they may have been influenced by
15 these marketing efforts.  They can join the
16 Permanente Medical Group and bring with them
17 whatever information they've received.
18         There's a whole variety of things, I
19 think, in which the defendants may have influenced
20 the thinking of individual physicians and groups
21 of physicians regarding the use of Neurontin,
22 whether it be on-label or off-label.
23      Q.   Are you aware of any specific
24 conference that any Permanente physician attended
25 at which the defendants made false statements?

1              A. Carver
2         MS. NUSSBAUM:  I would object.
3      Q.   Setting aside any information supplied
4 to you by your lawyers?
5         MS. NUSSBAUM:  Yeah, I would object,
6 number one, on attorney-client.
7         Number two, as you well know, some of
8 that information and some of those documents have
9 not yet been produced in this action.
10      Q.   I'm talking about your current
11 knowledge.
12         MS. NUSSBAUM:  We're talking about ten
13 years here.
14         MR. JAMES:  Yes.
15      A.   I am unaware of the attendance by any
16 specific physician at any specific conference that
17 would have been influenced or held by the
18 defendants.
19      Q.   Roughly how many Permanente
20 prescribing physicians are there today?
21         MS. NUSSBAUM:  Today or over this
22 ten-year period or more, 15-year period?
23         MR. JAMES:  I specifically said today.
24      A.   I believe today, there are
25 approximately 13,000-plus Permanente physicians

1              A. Carver
2 across the country.
3      Q.   And in 1994, do you have a sense of
4 how many there were?
5      A.   I would not have that.  It would be
6 some number that would be smaller, but I do not
7 know.
8      Q.   I guess turning to, I guess it's page
9 two small i's at the bottom, heading number two,
10 you know, it states, "False and misleading
11 statements regarding pain," is that correct?
12         MS. NUSSBAUM:  If you are reading
13 correctly, the table of contents of the Complaint?
14         MR. JAMES:  Correct.
15      A.   That's what it says.
16      Q.   I know that you can't tell me about
17 any specific Permanente physician who, you know,
18 received a false or misleading statement regarding
19 pain, but can you tell me generally that any false
20 or misleading statement regarding pain was made to
21 a Permanente physician?
22         MS. NUSSBAUM:  I would object.  The
23 document speaks for itself.  Kaiser authorized the
24 filing of the Complaint.  The complaint clearly
25 states in numerous places that Kaiser was targeted

1              A. Carver
2 by the defendants.
3         MR. JAMES:  Well --
4      Q.   Are you aware of any false or
5 misleading statements regarding pain that would
6 have been made to some Kaiser Permanente physician
7 by the defendants or their agents?
8         MS. NUSSBAUM:  I would object.  The
9 witness has said that Kaiser physicians, who
10 number in the tens of thousands, okay, were out
11 there.
12         MR. JAMES:  Your objection is noted,
13 preserved for the record.
14         MS. NUSSBAUM:  The whole list.
15      Q.   You can answer the question.
16      A.   I believe that I've answered it from
17 the standpoint of I'm unable to cite the
18 attendance of any specific physician at any
19 specific conference that may have been held by the
20 defendants.  And -- but certainly there were
21 numerous conferences, apparently all over the
22 country, and so I'm just not able to cite the
23 specific attendance of a specific physician.  I
24 would not have those records, you know, of
25 attendance.  Perhaps you have those records.

Page 299

1          A. Carver
2     Q.   Do you know when Kaiser first filed
3   this lawsuit?
4          MS. NUSSBAUM:  Do you have any
5   independent recollection?
6          THE WITNESS:  Not independent
7   recollection.
8     Q.   As the corporate representative, do
9   you know?
10    A.   Well, I would be speculating on a
11  specific date, I'm sorry.
12         MS. NUSSBAUM:  We can leave a blank in
13  the in the transcript and we'll fill in the date
14  that the Summons and Complaint were filed.
15  INSERT: _____
16    Q.   Do you understand that it's been a
17  couple of years now?
18    A.   I believe so.
19    Q.   In those two years, has Kaiser made
20  any effort to contact any Permanente physician to
21  find out whether they were told any false or
22  misleading statements by the defendants or their
23  agents?
24         MS. NUSSBAUM:  I believe the witness
25  already testified that the physicians do.

Page 300

1          A. Carver
2          MR. JAMES:  Your objection is
3   preserved.
4          MS. NUSSBAUM:  They work for a
5   separate corporation.
6          MR. JAMES:  I think it's not
7   implicated by my question at all.
8     A.   I do not know.
9     Q.   You don't know whether those efforts
10  were undertaken?
11    A.   I do not know.
12    Q.   Aside from the newspaper articles and
13  the federal court records that we referenced
14  earlier, are you aware of any facts that would
15  indicate that the defendants made any false or
16  misleading statement to any Kaiser physician
17  during the relevant period?
18         MS. NUSSBAUM:  It's been asked and
19  answered.  I think that the witness already
20  stated, yes, that he is aware.
21    Q.   Are you aware?
22    A.   Well, to the extent that the
23  defendants have basically taken a very, very
24  aggressive effort here at influencing continuing
25  medical education content and publications and

Page 301

1          A. Carver
2   meetings, and all that type of content, and have
3   provided content for a variety of journals, then
4   I -- it is our position that -- that certainly the
5   Permanente physicians had to have been influenced
6   by all of this information.
7          Can I cite a specific instance of a
8   physician reading a particular journal or
9   attending a specific conference?  The answer to
10  that is no.
11    Q.   Would it be accurate to say that your
12  view is that the defendants made a number of
13  statements and a number of media, and that it's
14  likely that some Kaiser physician was exposed to
15  one of those statements at some point from 1994
16  forward?
17         MS. NUSSBAUM:  Objection, objection.
18  The witness has stated what his testimony is.
19    Q.   You can answer.
20         MS. NUSSBAUM:  It's totally
21  prejudicial -- no, you're totally, you're
22  misstating it.  There's no question.  He's stated
23  his view three times.  If you want him to state it
24  again, he can state it in his words.  He's not
25  going to adopt your words.

Page 302

1          A. Carver
2          MR. JAMES:  Can you read back the
3   question?
4          (Record read.)
5     Q.   And I asked you whether it's accurate
6   to say, so you can either accept or reject that
7   statement?
8     A.   I would accept that statement.  Our
9   physicians are just not immune from all the
10  information that's available in the marketplace.
11    Q.   And aside from that general view, do
12  you have any other information that would indicate
13  that the defendants made or may have made a false
14  statement to any Kaiser physician from 1994
15  forward?
16         MS. NUSSBAUM:  Objection.  The
17  Complaint, which is 140 pages plus discovery
18  that's been served in this case.
19         MR. JAMES:  I'd recommend that you
20  just state the grounds for your objection.
21         MS. NUSSBAUM:  Indicates articles that
22  were suppressed, false statements, misleading
23  statements detailing sampling, all of that is
24  indicated and the plaintiffs have indicated here
25  that, yes, both the physicians --

24 (Pages 299 to 302)

1          A. Carver
2          MR. JAMES:  Actually, I don't need you
3  to testify.
4      Q.   You can answer the question.
5          MS. NUSSBAUM:  He has, three times.
6      A.   I believe I have.
7      Q.   You have additional information beyond
8  your allegations that there are a number of
9  statements made and that there are a large number
10  of Kaiser physicians, so it's likely that one of
11  the statements hit one of the Kaiser physicians?
12          MS. NUSSBAUM:  That's not what the
13  witness said.  You're misstating his testimony.
14  Okay.  You're also misstating -- he said that
15  individuals from Warner-Lambert and Kaiser did
16  visit with people at the plaintiffs and did
17  marketing there.
18          MR. JAMES:  I'll move on.
19          Actually, I think we have only five
20  minutes left on the tape.  We'll take a break.
21          VIDEOGRAPHER:  Going off the record at
22  10:59.  This is the end of tape two, volume two,
23  in the deposition of Albert Carver.
24          (Recess.)
25          VIDEOGRAPHER:  Going back on the

1          A. Carver
2  record at 11:19 a.m.  This is the beginning of
3  tape three, volume two in the deposition of Albert
4  Carver.
5  BY MR. JAMES:
6      Q.   I asked you earlier about false
7  statements that were made by the defendants to
8  Kaiser physicians.  I guess now I didn't want to
9  focus on that, but I wanted to focus on false
10  statements that, you know, the defendants have
11  made to anyone regarding the indications of
12  Neurontin for which you're seeking damages from
13  the defendants.
14          I guess if we go to page with two
15  little i's in the Complaint, the second entry is
16  titled, "False and misleading statements regarding
17  pain."
18          Are you aware of any false and
19  misleading statements regarding pain -- or
20  actually, I guess specifically the use of
21  Neurontin or Gabapentin for pain made by the
22  defendants?
23      A.   To whom?
24      Q.   Just generally.
25          MS. NUSSBAUM:  Well, the Complaint

1          A. Carver
2  indicates what those statements are in addition to
3  that.
4          MR. JAMES:  If you have an objection,
5  please note the --
6      Q.   Are you aware of any false statements
7  made by the defendants regarding the use of
8  Neurontin for pain?
9          MS. NUSSBAUM:  I would ask the witness
10  to look at page 39 of the Complaint.
11          MR. JAMES:  I'd rather you not have --
12  coach the witness on how to respond to my
13  questions.
14          MS. NUSSBAUM:  You're looking at the
15  Complaint, you're showing him a document, you want
16  to show him a document.  Let him look at the
17  document.  We can sit here an hour and go through
18  the whole 140 pages and go through the Complaint,
19  and when you find the false statements regarding
20  pain, please let the lawyer know.
21      A.   I'm unable to say whether or not
22  specifically.
23          MS. NUSSBAUM:  You want to reread the
24  question?
25          MR. JAMES:  I'd ask you to let the

1          A. Carver
2  witness --
3          MS. NUSSBAUM:  Do you remember the
4  question?
5      A.   Could you just ask the question -- it
6  was very, very long, and then it changed to
7  reference to item number 2, and then there was
8  another part to the question, so if we could just
9  ask it in smaller pieces perhaps, perhaps I could
10  follow better.
11          MR. JAMES:  Could you read back the
12  last question I asked?
13      A.   If you could restate it, it would be
14  more helpful to me.
15      Q.   Let's try asking the question again
16  and then we'll see if it requires restatement.
17          (Record read.)
18          MS. NUSSBAUM:  As made to anyone?
19          MR. JAMES:  Yes.
20      A.   Well, as outlined in the Complaint
21  here, there is citations of specific
22  representatives of the defendants and individuals
23  who have made false and misleading statements to
24  the medical community.
25      Q.   Could you cite me to any particular

1              A. Carver
2    statement?
3       A.   Well, there's a citation here
4    regarding a Dr. David Longmire who is citing that
5    Neurontin was effective for the treatment of pain.
6       Q.   Which paragraph of the Complaint are
7    you referring to?
8       A.   "False and misleading statements
9    regarding pain," paragraph 104.
10      Q.   And do you know what statement
11   Dr. David Longmire made?
12         MS. NUSSBAUM:  Are you asking the
13   witness to read the Complaint and tell you what it
14   says?
15         MR. JAMES:  No.  I'm asking whether he
16   knows what -- whether he or anyone else at Kaiser
17   knows what Dr. David Longmire said that was false
18   regarding pain on the defendant's behalf.
19         MS. NUSSBAUM:  The witness has already
20   indicated that Kaiser has authorized the filing of
21   the Complaint.
22      A.   Well --
23      Q.   Can you tell in the Complaint what
24   Dr. Longmire said regarding pain?
25      A.   I cannot tell specifically his words;

1              A. Carver
2    however, the Complaint references that in 1996, in
3    specific meetings, Dr. Longmire was making
4    statements regarding the use of Neurontin for
5    pain, that Neurontin was approved in 1994 for
6    seizure disorder.
7       Q.   I guess the question was:  Did he say
8    a false statement regarding the use of Neurontin
9    for pain?  I didn't ask you whether he made a
10   statement regarding an off-label use of Neurontin.
11         MS. NUSSBAUM:  Okay.  I would, you
12   know, ask that you rephrase the question.  I'm not
13   sure what you're looking for here.
14         MR. JAMES:  Can you read back the
15   question that you read previously -- well,
16   actually, sorry.  I'll restate the question.
17      Q.   Are you aware of any false statement
18   that Dr. David Longmire made regarding the use of
19   Neurontin for pain?
20         MS. NUSSBAUM:  Other than discussions
21   with counsel, either Mr. Cohen or myself or any
22   other counsel, do you have any independent
23   awareness, and other than the allegations in the
24   Complaint, do you have any other independent
25   awareness?

1              A. Carver
2         THE WITNESS:  I do not; no.
3       Q.   Are you aware of anyone else at Kaiser
4    who would have any independent awareness of any
5    false statement made by Dr. David Longmire
6    regarding the use of Neurontin for pain?
7       A.   Not specifically.
8       Q.   And is there any other instance in
9    which a false statement regarding the use of
10   Neurontin for pain is known by you or any other
11   individual at Kaiser, to your knowledge?
12         MS. NUSSBAUM:  Well --
13         MR. JAMES:  Let me withdraw the
14   question and actually ask it in a better syntactic
15   form.
16      Q.   Are you or anyone else at Kaiser aware
17   of any instance in which the defendants made a
18   false statement regarding the use of Neurontin for
19   pain excepting information that you received from
20   your counsel?
21         MS. NUSSBAUM:  I think that that
22   misstates the testimony.
23         MR. JAMES:  I'm not stating testimony.
24   I'm asking a question.
25         MS. NUSSBAUM:  But the witness has

1              A. Carver
2    already testified --
3         MR. JAMES:  I'd ask you to state the
4    grounds for your objection, preserve it in the
5    record, and allow the witness to answer.
6         MS. NUSSBAUM:  You're misstating the
7    testimony here.
8         MR. JAMES:  You can answer.
9       A.   I have testified that I cannot cite
10   specific instances of an individual that was
11   speaking to someone at Kaiser or to an individual
12   physician regarding the use of Neurontin for pain.
13      Q.   Okay.  I just want to clarify that my
14   earlier questions related to Kaiser physicians and
15   now I'm expanding this to anyone.
16         Does it still remain the case that
17   neither you nor anyone else at Kaiser has any
18   independent knowledge aside from knowledge
19   obtained from counsel regarding any misstatement
20   made by the defendants regarding the use of
21   Neurontin for pain?
22         MS. NUSSBAUM:  Objection.  This
23   witness is testifying himself.  He clearly is not
24   testifying for anybody else at Kaiser.  He's
25   testifying for himself.

Page 311

A. Carver

2    Q.   As corporate representative of Kaiser,
3  do you have any knowledge of that?
4    A.   It would be impossible.
5        MS. NUSSBAUM:  Objection.  Again, it
6  would be impossible for him.  Kaiser has thousands
7  of people.
8    Q.   If Kaiser has thousands of people,
9  would it be impossible for you to know of a single
10 instance in which a statement was made by the
11 defendants that was false regarding the use of
12 Neurontin for pain to any one of those individuals
13 or anyone else?
14       MS. NUSSBAUM:  He already testified as
15 to articles, as to conferences that were relied
16 upon.  He's already testified.
17   Q.   Would you like to identify any
18 conference or article at which a false statement
19 was made?
20       MS. NUSSBAUM:  It's set forth in the
21 complaint.
22   Q.   Are you aware of any specific false
23 statement that was made in any one of those
24 articles or at any one of those conferences,
25 independent of knowledge you've obtained from your

Page 312

A. Carver

2  counsel?
3        MS. NUSSBAUM:  Are you personally
4  aware other than knowledge from counsel or work
5  product from counsel or interviews from counsel?
6        THE WITNESS:  No.
7    Q.   And as corporate representative, are
8  you aware of any other individual at Kaiser that
9  would have such knowledge independent of
10 information received from counsel?
11   A.   I'm not.
12   Q.   And I take it that you're taking the
13 position that any information received from
14 counsel regarding the factual basis of these
15 allegations is protected by the attorney-client
16 privilege?
17       MS. NUSSBAUM:  If you want to ask a
18 particular question, I'll object or not object.
19   Q.   Can you tell me information you've
20 received from counsel regarding a specific factual
21 misstatement made by the defendants or their
22 agents from 1994 forward regarding the use of
23 Neurontin for pain?
24       MS. NUSSBAUM:  I would object as
25 privileged.

Page 313

A. Carver

2        MR. JAMES:  I'll move on.
3    Q.   Are you aware -- are you or anyone
4  else at Kaiser aware of any false or misleading
5  statement made by the defendants regarding the use
6  of Neurontin or Gabapentin for restless leg
7  syndrome from 1994 forward, independent of
8  information obtained from counsel?
9        MS. NUSSBAUM:  Objection.  This
10 witness can answer for himself.
11   Q.   You can answer for yourself and you
12 can also answer as corporate representative of
13 Kaiser at this 30(b)(6) deposition.
14       MS. NUSSBAUM:  No.  We have repeatedly
15 indicated that there are thousands of people
16 employed by Kaiser, and this witness cannot state
17 specifically whether or not there was a
18 conversation between any of the defendants or
19 their agents or representatives and any individual
20 presently employed or that had been employed at
21 Kaiser for a period of ten years.
22   Q.   Are you aware of a single
23 misstatement?
24   A.   I am personally not aware of -- of a
25 misstatement that I could cite specifically

Page 314

A. Carver

2  because no such misstatement has been made to me
3  personally.
4    Q.   And as corporate representative of
5  Kaiser, are you aware of any instance on which
6  misstatements were made to others?
7        MS. NUSSBAUM:  He's already testified
8  to that with respect to articles that were out
9  there, with respect to information out there in
10 the medical community.  He's testified to that,
11 and that that affected Kaiser.  And he's also
12 testified that representatives of the defendants
13 personally came to Kaiser and marketed Kaiser with
14 respect to this drug.
15       MR. JAMES:  That I believe he has not
16 testified to.
17       MS. NUSSBAUM:  I believe he has.
18       MR. JAMES:  The record will speak for
19 itself.
20       MS. NUSSBAUM:  No.  Ask him that.  Ask
21 him that.  If you think he hasn't, ask him that.
22       MR. JAMES:  If you like to do so, you
23 can take it up within your two hours.
24   Q.   I could go through the remaining
25 indications for which Kaiser is seeking damages

Page 315

1           A. Carver
2  from the defendants.
3           Do you believe your answers with
4  regard to those would be consistent with the
5  answers you've provided me thus far with regard to
6  pain and restless leg syndrome?
7           MS. NUSSBAUM: Objection.
8           We're not going to have -- if you have
9  specific questions, ask him.
10     Q.   Looking over the indication that
11 you've told me Kaiser is seeking damages from the
12 defendants for, that would be bipolar disorder,
13 social phobia, panic disorder, migraine,
14 monotherapy for epilepsy and dosages up to the FDA
15 approved maximum?
16          Did any one of them occur to you as an
17 indication for which your answers would be
18 different from the answers that you've given me
19 thus far with regard to pain and restless leg
20 syndrome?
21          MS. NUSSBAUM: Objection.
22          If you have a specific question --
23          MR. JAMES:  Please state your grounds
24 for the objection.
25          MS. NUSSBAUM: It's unintelligible. I

Page 316

1           A. Carver
2  don't know what you're talking about.  I can't let
3  him answer the question.
4      Q.   If it's intelligible to you, I'll ask
5  you to answer the question.
6           MR. JAMES:  I'd prefer you not
7  instruct the witness at such length.
8           MS. NUSSBAUM: I prefer you not to try
9  to mislead him or confuse him.
10     Q.   Have you reviewed the remaining
11 indications?
12     A.   Yes, I have.
13     Q.   And do you believe that your answers
14 would be materially different with regard to those
15 indications from the responses you've provided me
16 with regard to pain and restless leg syndrome?
17          MS. NUSSBAUM: Objection.  Do you
18 understand the question?
19          THE WITNESS:  I believe I do
20 understand the question.
21     A.   And that although I cannot cite
22 specific conversations regarding statements that
23 would have been made, I would refer back to
24 previous testimony regarding the fact that
25 representatives of the defendants have met with

Page 317

1           A. Carver
2  representatives of the Drug Information Service
3  and provided information to them, the specific
4  details of which I would not know, and certainly
5  had been provided, and certainly I think that both
6  the Drug Information Service, as well as
7  physicians have been exposed to a variety of
8  pieces of information, the details of which I'm
9  unable to cite at the moment.
10          So, I hope I've been responsive to
11 your question.  And that would be my answer with
12 respect to the remaining indications or medical
13 conditions, including the restless leg syndrome,
14 bipolar, etc., as you have outlined.
15     Q.   If you're unable to tell me whether
16 there were instances in which particular
17 representatives of the defendants made statements
18 in any way to anyone else regarding any of these
19 indications, are you able to tell me what the
20 content of those representations was?  Do you
21 understand the question?
22     A.   I do not understand that question.
23     Q.   Okay.  Regarding pain, what was the
24 message that was communicated that was false and
25 misleading, do you know?

Page 318

1           A. Carver
2           MS. NUSSBAUM: Objection.
3           The Complaint sets forth in great
4  detail --
5           MR. JAMES:  I'm asking the witness for
6  evidence, as opposed to allegations made in the
7  Complaint.
8           MS. NUSSBAUM: Well, he has the
9  Complaint in front of him.  That's -- you haven't
10 told him to put the Complaint away.  He's
11 indicated that the Complaint --
12          MR. JAMES:  I'd rather you not put
13 words in his mouth and just allow him to answer
14 the question.
15     A.   I think we're back to square one in
16 which Neurontin was approved for treatment of
17 seizure disorders and there was not any further
18 approval of indications beyond that for quite some
19 time quite a number of years, and there was, in
20 fact, a number of marketing promotions and efforts
21 and continuing education and publications and a
22 variety of things that occurred during the period
23 before there was an expansion of the indications
24 that led physicians to prescribe Neurontin for
25 pain and a variety of other indications that are

1           A. Carver
2  outlined in the Complaint here.
3      Q.   As corporate representative of Kaiser,
4  do you take the view that every off-label
5  prescription of Neurontin made by a Kaiser
6  physician for one of the indications for which
7  you're seeking damages was induced by a fraudulent
8  statement made by the defendants?
9      MS. NUSSBAUM:  That calls for a legal
10  conclusion, and the Complaint, which was
11  authorized by Kaiser, clearly sets forth the
12  theory of damages here.
13      Q.   You can answer the question.
14      MS. NUSSBAUM:  Well, he's not a
15  lawyer.  Do you feel that you can answer that
16  question?
17      THE WITNESS:  I do not.
18      Q.   Setting aside any legal terminology,
19  do you have any common understanding of what that
20  question would mean?
21      MS. NUSSBAUM:  Do you want to repeat
22  the question?
23      MR. JAMES:  You can read back the
24  question.
25      (Record read.)

1           A. Carver
2      MS. NUSSBAUM:  I would caution you not
3  to testify to anything that you discussed with or
4  learned from your lawyer.
5      Q.   I'm actually asking for a view.  I'm
6  not asking for any discussions that you've had
7  with counsel.
8      MS. NUSSBAUM:  So you're asking if he
9  has a view separate and apart from discussions
10  with counsel?
11      MR. JAMES:  It may have been informed
12  by that, but I'm asking what the position that
13  you're taking in this litigation is.
14      MS. NUSSBAUM:  That's set forth on
15  page 64 of the Complaint.
16      Q.   If looking at page 64 of the
17  Complaint, as your counsel has recommended that
18  you do would help you, that's fine.  I'd like to
19  know the answer.
20      A.   Well, if your question is whether or
21  not every single prescription written for every
22  single patient written by a Permanente physician
23  for every single patient for which the health plan
24  paid for each and every one of those single
25  prescriptions was caused directly by the efforts

1           A. Carver
2  of the marketing efforts, I could not testify to
3  that.
4      But I would say that those
5  prescriptions were the result generally of the
6  promotion efforts and the influencing of
7  educational efforts connected by and the
8  information that was introduced into the
9  marketplace in the form of studies or references
10  or case studies, etc.
11      Basically, that plus attendance at
12  meetings, etc., then had to have formed the basis
13  for informing individual physicians of making a
14  decision to use Neurontin for whatever they were
15  using it for.
16      Q.   Every single one?
17      A.   I would say that for Permanente
18  physicians who prescribed Neurontin, the
19  information that was available in the marketplace,
20  whether it be educational conferences or
21  publications or meetings or their attendance at
22  meetings or conferences or being detailed by the
23  pharmaceutical representatives, etc., all added up
24  to influencing a decision on the prescribing of
25  Neurontin for whatever the particular medical

1           A. Carver
2  condition that was being treated was.
3      Q.   Is it your view that had truthful
4  information been provided to any one of these
5  physicians when they were making any of their
6  prescriptions that corrected whatever false
7  impression was out there in the marketplace, they
8  would have not prescribed Neurontin?
9      MS. NUSSBAUM:  That's speculative.
10  You know, so I would ask the witness not to
11  speculate.  He said that the information contained
12  in the marketplace was false.  You're saying if
13  they never did any false information, is that what
14  you're saying?
15      MR. JAMES:  No.  I'm actually asking
16  a -- well, let's take an example.
17      Q.   Do DRUG and DUAT provide useful
18  information to Kaiser physicians?
19      A.   They attempt to do that, yes.
20      Q.   Regarding off-label prescriptions of
21  Neurontin?
22      MS. NUSSBAUM:  Objection.
23      If you're talking about off-label
24  prescriptions of Neurontin and you want to talk
25  about something very specific, the DRUG or DUAT,

1                A. Carver
2  then let's get specific.
3      Q.   You can answer that question.
4      A.   It would be my view that truthful
5  information provided to physicians regarding a
6  product would influence their prescribing decision
7  and use of that product.
8      Q.   Actually, I guess the question is:  Do
9  DUAT -- or I should say have DUAT and DRUG
10 provided useful information to physicians
11 regarding off-label uses of Neurontin?
12         MS. NUSSBAUM:  Are you saying from
13 2002 on, Exhibits 12 and 13?
14     Q.   I'm asking throughout the relevant
15 period.
16     A.   Well, I believe that documents that we
17 reviewed a little while ago were efforts by DUAT
18 to provide some objective information to
19 physicians regarding the use of Neurontin.
20         I don't know whether or not that
21 was -- whether or not there was additional
22 information that would have been provided to them
23 or not.  I'm just judging from the content of
24 these videoconferences that you have asked me to
25 review.

1                A. Carver
2      Q.   Did DUAT or DRUG correct any
3  misimpressions that Kaiser physicians might have
4  about Neurontin's off-label uses?
5          MS. NUSSBAUM:  Objection.
6          That's totally speculative, and I
7  would ask the witness not to answer.
8      Q.   Are there any reasons that a physician
9  might prescribe Neurontin off-label other than the
10 alleged fraudulent promotional activities?
11         MS. NUSSBAUM:  I would object.
12         The witness is not a physician.  He's
13 previously testified the physician group is a
14 separate entity.  So, it's not possible for him to
15 answer.  If you have a specific question, you can
16 ask.
17     Q.   You can answer if you understand the
18 question.
19     A.   I do understand the question, but I'm
20 not a physician and could not place myself in the
21 physician's shoes for purposes of answering a
22 question.
23     Q.   Was your role vice-president of
24 pharmacy and strategic operations, is that correct
25 or have I misstated it?

1                A. Carver
2      A.   You're close.  Pharmacy strategy and
3  operations.  That's close enough.
4      Q.   Have you developed any understanding
5  in that role of the reasons that physicians
6  prescribe prescription drugs?
7          MS. NUSSBAUM:  Objection.  That's
8  overly broad and speculative again.
9      A.   To treat patients.
10     Q.   And do you have any idea of the
11 information that they look to in making those
12 decisions?
13         MS. NUSSBAUM:  This is what, if I was
14 a physician, any of the tens of thousands of
15 physicians, what kinds of information they look
16 at.
17         MR. JAMES:  I'm asking whether he's
18 developed any personal knowledge generally about
19 why physicians prescribe prescription drugs.
20     A.   Well, of course.
21     Q.   Do you have any understanding of why
22 physicians prescribe prescription drugs off-label?
23         MS. NUSSBAUM:  Objection.
24         This is just generally why any drug
25 might be prescribed off-label?

1                A. Carver
2          MR. JAMES:  Yes.
3      A.   Well, of course I do.  Physicians
4  basically are trying to treat the individual
5  patients, and why they select a particular product
6  for the treatment of a particular condition is
7  based upon their education, their training, their
8  information that they've gained in their residency
9  program, in some cases, their continuing
10 education, their attendance at meetings, their
11 interaction with peers, their interaction with
12 representatives of the pharmaceutical industry and
13 their desire to be successful in providing care to
14 a patient.  That's why they prescribe.
15     Q.   Do they prescribe, in part, based on
16 their own clinical experience?
17     A.   Yes, they do.
18     Q.   If a physician prescribed a drug
19 on-label to a patient who had two indications and
20 the drug proved effective with the other off-label
21 indications as well, do you think that might
22 influence their subsequent prescription behavior?
23         MS. NUSSBAUM:  Objection.
24         At this point, this has become so
25 speculative and so hypothetical, I would really

1           A. Carver
2    ask the witness not to answer.  I think you've
3    asked a general question.  He's given a general
4    answer.  Now you're going into hypotheticals.
5    He's not an expert.  It's not a hypothetical
6    question.  It's improper.
7        Q.   If you understand the question, you
8    can answer.
9        MS. NUSSBAUM:  No, no.  It's a
10   hypothetical speculative.  He can't.  He's here as
11   a fact witness.
12       Please don't answer.  It's just a
13   totally improper question.
14       MR. JAMES:  You're taking the view
15   that it calls for speculation as a ground for
16   directing a witness not to answer a question?
17       MS. NUSSBAUM:  Yeah, it calls for
18   total speculation and it's a hypothetical
19   question.
20       Q.   Would you know of any instances in
21   which a physician has prescribed a drug off-label
22   because they had success treating that condition
23   off-label with a patient who also had the
24   on-label?
25       A.   I do not.  I'm not a physician.  I

1           A. Carver
2    don't walk in the shoes of the physician, so I
3    cannot answer your question.
4        Q.   So why don't we turn to our favorite
5    page of the Complaint?
6        MS. NUSSBAUM:  Table of contents.
7    Lucky we put one in.  We usually don't.
8        Q.   Has Kaiser or anyone acting on its
9    behalf undertaken an analysis regarding the
10   efficacy of Neurontin or Gabapentin for no
11   susceptive pain?
12       A.   Not to my -- I just want to make sure
13   I heard that right.
14       Q.   Why don't you finish the answer and
15   then we'll repeat it?
16       MS. NUSSBAUM:  No, I want to hear it
17   before he gives an answer.
18       A.   Maybe you could just repeat the
19   question and I'll try.
20       (Record read.)
21       A.   Not to my knowledge, in terms of an
22   analysis or a study.
23       Q.   Has Kaiser or anyone acting on its
24   behalf undertaken an analysis of the efficacy of
25   Neurontin or Gabapentin for restless leg syndrome?

1           A. Carver
2        A.   Maybe you could help me understand
3    what you mean by the word "analysis."
4        Q.   Has anyone analyzed that question,
5    either by conducting studies on their own or by
6    reviewing clinical literature?  I'm excluding
7    information that you've obtained from counsel in
8    this question.
9        A.   And could you answer -- or please just
10   repeat the general question?
11       Q.   The general question:  Has Kaiser or
12   anyone acting on its behalf conducted an analysis
13   of whether or not Neurontin or Gabapentin is
14   effective for restless leg syndrome?
15       MS. NUSSBAUM:  Also, that's a
16   different question now, okay.  So that's now your
17   question?
18       MR. JAMES:  That's now my question.
19       MS. NUSSBAUM:  Repeat it now so that
20   we hear it because it's a different question.
21       (Record read.)
22       MS. NUSSBAUM:  To your knowledge,
23   specifically has Kaiser done that.
24       A.   To my knowledge, no, certainly not in
25   terms of any clinical studies.

1           A. Carver
2        Q.   Or in terms of serving the clinical
3    literature?
4        A.   I do not know.
5        Q.   What about with regard to bipolar
6    disorder?
7        A.   I do not know independently.
8        Q.   What about social phobia?
9        A.   I do not know independently.
10       Q.   What about panic disorder?
11       A.   I do not know independently.
12       Q.   What about migraine?
13       A.   I do not know independently.
14       Q.   Monotherapy for epilepsy?
15       A.   I do not know independently.
16       Q.   And regarding dosages above the FDA
17   approved maximum?
18       A.   I do not know independently whether or
19   not any research has been done to try to
20   substantiate using doses above the approved
21   labeling.
22       Q.   Did you personally authorize this
23   Complaint to be filed?
24       A.   I believe so, with counsel.
25       MR. JAMES:  We're going to mark

1                A. Carver
2    another exhibit.
3              (Kaiser-15 marked for identification.)
4       Q.    Have you seen this document before?
5       A.    I believe that I have.
6       Q.    Do you know what it is?
7              MS. NUSSBAUM: I'd like the witness to
8    have an opportunity to read it, if you want to
9    focus him on, I assume pages 6 and 7. Well, the
10   rest of it is just legal gobbledygook. I assume
11   you don't want to focus him on that.
12      Q.    Have you had an opportunity to review
13   the document?
14      A.    I'm just about finished. Thank you.
15             MS. NUSSBAUM: Take your time.
16      A.    Okay. I've reviewed the last couple
17   of pages.
18      Q.    Do you know what this document is?
19      A.    Not from a technical legal point of
20   view. I'm sorry.
21      Q.    Do you understand generally that the
22   defendants posed certain questions to Kaiser and
23   that these are Kaiser's responses to those
24   questions?
25      A.    I do.

1                A. Carver
2       Q.    And do you understand that these
3    responses are intended to provide a truthful and
4    complete answer to the defendant's questions?
5              MS. NUSSBAUM: Objection.
6       Q.    Is that an understanding that you
7    have, not as a lawyer, is it your understanding
8    that these were intended to be a truthful and
9    complete answer?
10             MS. NUSSBAUM: Objection.
11             If your understanding came from your
12   counsel, I would ask that you not divulge any
13   conversations with counsel.
14      Q.    So, you're unable to tell me whether
15   you as corporate representative of Kaiser can tell
16   me whether you understand these responses to have
17   been truthful and complete?
18             MS. NUSSBAUM: That's a different
19   story. You can ask him that.
20      Q.    Were these responses truthful and
21   complete?
22             MS. NUSSBAUM: To the best of your
23   knowledge.
24      A.    To the best of my knowledge, yes.
25      Q.    Can Kaiser supply any information --

1                A. Carver
2    well, actually, well, let me withdraw that.
3              Turning to the final sentence of this
4    document on page 7, beginning with the phrase,
5    "These alternative cheaper or more desirable
6    medications"?
7       A.    Yes.
8       Q.    Did Kaiser supply information to its
9    counsel in allowing counsel to come up with this
10   sentence?
11             MS. NUSSBAUM: I would object as to
12   conversations between Kaiser and Kaiser's counsel.
13   I will state, and this will not in any way
14   infringe on the privilege, but we will not go any
15   further than that, that this was prepared in
16   conjunction with Kaiser's counsel and appropriate
17   representatives at Kaiser.
18      Q.    Did representatives at Kaiser supply
19   information for this sentence?
20             MS. NUSSBAUM: If you know.
21      A.    I do not know.
22      Q.    So it's possible that no one at Kaiser
23   supplied any information that was used to cite the
24   sentence?
25             MS. NUSSBAUM: Objection.

1                A. Carver
2    I think that --
3              MR. JAMES: I'll move along --
4              MS. NUSSBAUM: -- this was prepared by
5    counsel and by representation of counsel was
6    prepared in conjunction with the plaintiffs and
7    counsel for Kaiser.
8              MR. JAMES: Fair enough.
9       Q.    I'd also like to address your
10   attention to page 65 of the Complaint. The --
11   this page has a table listing certain medications?
12      A.    Yes.
13      Q.    Are these in your understanding
14   cheaper or more desirable medications than
15   Neurontin?
16             MS. NUSSBAUM: I would object. It
17   misstates the Complaint.
18             MR. JAMES: I'm just asking for his --
19             MS. NUSSBAUM: Well, he's the
20   corporate representative. He said that this is an
21   authorized document by the company, so why should
22   we mislead -- let's just look at the paragraph and
23   he can answer. It's paragraph 173.
24      A.    And what is the question?
25      Q.    Are these cheaper or more desirable

Page 335

1          A. Carver
2  medications than Neurontin?
3      A.   I believe these medications are all
4  approved for use for the respective medical
5  conditions here.
6      Q.   You believe that each of these
7  medications is approved for the use under which
8  it's listed?
9      A.   I believe so.  For example,
10  amphetamine for attention deficit disorder.
11  Methylphenidate for attention deficit disorder.  I
12  believe that is my answer.  I believe that's the
13  case that they're approved uses of these products
14  and lower in cost.
15      Q.   Does cheaper or more desirable have
16  any meaning other than FDA approved and cheaper in
17  cost?
18          MS. NUSSBAUM:  If you know.  Are you
19  talking about now the sentence in the Complaint
20  that says, "These alternative cheaper or more
21  desirable medications included" --
22          MR. JAMES:  Yes, exactly.
23          MS. NUSSBAUM:  You want to know what
24  that term "cheaper or more desirable" means?
25          MR. JAMES:  Yes.

Page 336

1          A. Carver
2          MS. NUSSBAUM:  If you personally know.
3      Q.   Well, I'm actually saying it as a
4  representative of Kaiser, as well as the
5  individual who authorized the filing of this
6  Complaint, you know, if you have any understanding
7  of what this means, that would be helpful.
8          MS. NUSSBAUM:  If that understanding
9  does not in any way come from discussions that you
10  had with counsel either at Kaiser or outside
11  counsel with respect to the preparation of this
12  document and advice of counsel.
13      A.   Well, an alternative -- an alternative
14  is lower cost and equally or more effective would
15  be something that's desirable.  The wording
16  actually says "cheaper or more desirable."  That
17  does mean that some of these medications are
18  cheaper, but not more desirable.
19          MS. NUSSBAUM:  Once again, this is a
20  legal document prepared by counsel and so --
21          MR. JAMES:  Your objection is noted.
22          MS. NUSSBAUM:  Any language at all
23  comes from discussions with counsel, I would
24  direct you not to answer.
25      A.   I'm unable to answer.

Page 337

1          A. Carver
2      Q.   You're unable to answer what this term
3  means?
4      A.   Based upon a discussion with counsel.
5  And --
6      Q.   Apart from discussions with counsel,
7  do you have any understanding of what the purpose
8  of filing a complaint is?
9      A.   Well, of course the filing of a
10  complaint is an effort to encourage and seek
11  reimbursement for the overpayment by Kaiser for
12  the prescriptions for Neurontin.
13      Q.   Well, actually, I was just referring
14  to a complaint generally, not this specific
15  Complaint.
16          What is the purpose of a Complaint
17  aside from any discussions you've had with
18  counsel?
19          MS. NUSSBAUM:  You're asking him for
20  his layman's view of the purpose of filing a
21  complaint?
22          MR. JAMES:  Yes, layman's --
23          MS. NUSSBAUM:  It's totally
24  irrelevant.
25      Q.   Is it supposed to set forth the basis

Page 338

1          A. Carver
2  of relief?
3          MS. NUSSBAUM:  He's not a lawyer.
4  You've asked what his layman's view is and what
5  did you say?  Repeat your answer?
6      A.   To remedy a problem.
7      Q.   And is it supposed to provide the
8  defendant with some indication of the reasons that
9  you're asking for damages?
10          MS. NUSSBAUM:  Objection.
11          You know, he's not a lawyer.  The
12  legal standard for what a Complaint needs to do or
13  not do, I would just state for the record that
14  you've made your motion to dismiss.  The judge has
15  denied it.  The Complaint has been sustained.  So,
16  let's move on.
17      Q.   Do you have nothing to answer that
18  question?
19      A.   I have nothing further.
20      Q.   Speaking as an individual, do you feel
21  that the defendants are entitled to know what the
22  term "cheaper and more desirable" which appears in
23  your Complaint means?
24          MS. NUSSBAUM:  Objection.
25          He's a layman.  This Complaint was

1                A. Carver
2   done with counsel.
3          MR. JAMES:  Actually, I'm just asking
4   his layman's opinion.
5          MS. NUSSBAUM:  His layman's opinion is
6   totally irrelevant.  This a legal document and the
7   legal --
8          MR. JAMES:  You've stated the grounds
9   for your objection and I'd appreciate it if you
10  would allow the witness to answer.
11         MS. NUSSBAUM:  But it's a meaningless
12  question.
13         MR. JAMES:  I feel that your lengthy
14  speaking objections may result in us having to
15  call the witness on a second occasion.
16         MS. NUSSBAUM:  I don't think we're
17  going to get the witness on a second -- for this
18  kind of question.  If you think the judge is going
19  to give the witness on a second occasion, go
20  ahead, repeat.  What' his question?  Let's get it
21  so the record is clear for the judge.
22         MR. JAMES:  You can repeat the
23  question.
24         (Record read.)
25         MS. NUSSBAUM:  You know as a layman if

1                A. Carver
2   this is his personal nonlegal view?
3          MR. JAMES:  Yes, right.
4          MS. NUSSBAUM:  If you have any view, I
5   would object as to any discussions you've had with
6   counsel, if you have any view.
7      A.   My personal view would be we've
8   overpaid.  Kaiser has overpaid.
9      Q.   Actually, was the answer to my
10  question yes or no?
11         MS. NUSSBAUM:  The witness has
12  answered the question.
13         MR. JAMES:  Can you read the question
14  back?
15         (Record read.)
16         MS. NUSSBAUM:  The witness has
17  answered the question.
18         MR. JAMES:  You've stated the grounds
19  for this objection at least three times.
20         MS. NUSSBAUM:  It's also -- this is a
21  term of legal art.
22         MR. JAMES:  I've asked him for his
23  layman's opinion.
24         MS. NUSSBAUM:  What difference does
25  that make?

1                A. Carver
2          MR. JAMES:  I'm not even asking what
3   the meaning of the term is.  I'm asking his
4   layman's opinion as to whether the defendants are
5   entitled to know the meaning of the term.
6          MS. NUSSBAUM:  Do you know what --
7   what his understanding of the term "cheaper" and
8   "desirable"?
9      Q.   Do you understand the question?
10     A.   I'm not sure that I do.
11         MR. JAMES:  Can you read it back one
12  more time?
13         (Record read.)
14         MS. NUSSBAUM:  Object.
15         I think that this is a meaningless
16  question.
17     Q.   You can answer.
18         MS. NUSSBAUM:  Let's just move on.
19     A.   My personal view regarding "cheaper"
20  would mean that it's less costly.  And my personal
21  view regarding "more desirable" medication would
22  be that this is a medication that's more effective
23  or it's a medication that is proven to be
24  effective, particularly relative to the use of
25  another drug which has not been proven to be

1                A. Carver
2   effective and in some cases would not have been
3   effective at all.
4          That's like I paid a bunch of money
5   for a glass of water.  So, in my personal view,
6   that would be -- and hopefully I'm being
7   responsive to your question of what something more
8   desirable would be -- that means I would be
9   getting more value for my dollar.
10     Q.   And are each of these drugs both
11  cheaper and more desirable or are some of them
12  simply cheaper and FDA approved?
13         MS. NUSSBAUM:  Okay.  I will really
14  suggest at this point that we move on.  This
15  witness is not here as an expert witness.  The
16  Complaint is written the way it is written.  Let's
17  move along.
18         It says "cheaper or more desirable"
19  and I think we should move along.
20     Q.   Has Kaiser done any independent
21  analysis to determine whether these drugs are
22  cheaper or more desirable medications than
23  Neurontin?
24         MS. NUSSBAUM:  Please don't divulge
25  any discussions with counsel, any analysis by

Page 343

1            A. Carver
2    counsel, any work product by counsel.
3         A.    Then independent of that, no.
4         Q.    Are each of these drugs cheaper or
5    more desirable with regard to every patient who
6    might be prescribed Neurontin for the listed use?
7         MS. NUSSBAUM:  Objection.
8         I don't think the witness can testify
9    as to every patient.  The Complaint states what it
10   states; okay?
11        Q.    In your personal knowledge as a
12   trained pharmacist, do you know whether or not an
13   amphetamine is an appropriate treatment for anyone
14   with attention deficit disorder?
15        A.    I think that that's impossible to
16   answer from the standpoint of whether or not
17   the -- in the context of your question, whether or
18   not the amphetamine is the most desirable product
19   for each and every patient.  I think it's
20   patient-specific.  It's decided by the physician
21   based upon the physician's analysis of the
22   situation.
23        Q.    Would it be true to say that no
24   generalizations could be made across all patients?
25        MS. NUSSBAUM:  I would object to that.

Page 344

1            A. Carver
2    I think that the witness has said --
3         MR. JAMES:  You've already stated the
4    grounds for the objection.  I don't think you need
5    to recharacterize the grounds for your objection.
6    You can state an answer, if you understand the
7    question.
8         A.    Could you repeat your question,
9    please?
10        MR. JAMES:  I would appreciate it if
11   no objections would follow the repeating of the
12   question so that, you know, the witness can
13   actually answer the question shortly after he
14   hears it.
15        (Record read.)
16        MS. NUSSBAUM:  Objection.
17        I would -- this is not an expert
18   witness and I would ask that he not answer.
19        Q.    You can answer the question.
20        A.    I would refer back to the fact that
21   I'm not a physician and I'm not walking in the
22   shoes of a physician as it relates to the
23   treatment of patients.
24        Q.    So, in your capacity at Kaiser, you're
25   unable to know whether or not an amphetamine would

Page 345

1            A. Carver
2    be an appropriate treatment for all patients with
3    attention deficit disorder?  If that's not a
4    question you could answer yes or no?
5         A.    I could not answer that yes or no for
6    100 percent of patients.  No, I cannot.
7         Q.    It might be true that an amphetamine
8    is actually an appropriate treatment for all 100
9    percent of patients with attention deficit
10   disorder?
11        A.    I cannot say that.
12        Q.    If I were to run through the remaining
13   medications listed on this table and ask the same
14   question, would your response be the same?
15        MS. NUSSBAUM:  Ask the questions.
16        Q.    Let's make an aside on the record.
17   There are a number of medications listed here.  I
18   could go through the process of individually
19   asking these questions for each one of them.  If
20   you know at this time that you'll give me
21   materially the same response, we won't go through
22   that exercise and we can save a bit of time, you
23   know, otherwise we can, you know, do it the
24   longer, harder way.
25        MS. NUSSBAUM:  I don't understand what

Page 346

1            A. Carver
2    your question is, if you want to state your
3    question again.
4         You want to know if any particular
5    medication would be the optimal desirable
6    medication for 100 percent of patients presenting
7    with a particular indication?  Is that your
8    question?
9         MR. JAMES:  Can you ask my last
10   question with regard to amphetamines.
11        (Record read.)
12        Q.    And if I ask that exact same question
13   substituting each of these medications and instead
14   of attention deficit disorder, the indication
15   that's listed above them, would your answer be the
16   same?
17        A.    Yes, it would.
18        Q.    I'd like to turn back to that last
19   exhibit that was marked, the responses to the
20   defendant's second set of interrogatories.
21        If you go to the sixth line from the
22   bottom, do you see a reference to aspirin and
23   Ibuprofen?
24        A.    Yes, I do.
25        Q.    Is Kaiser of the view that in any

Page 347

```
1              A. Carver
2  instance in which Neurontin was prescribed for an
3  off-label indication, but for the defendant's
4  conduct, the physician might have prescribed
5  aspirin or Ibuprofen instead?
6      A.   Yes, that's -- that is our position.
7      Q.   In what circumstances would a
8  physician prescribe aspirin -- or not even
9  prescribe, but recommend aspirin or Ibuprofen
10 instead of Neurontin?
11     A.   Pain.
12     Q.   What kind of pain would Neurontin be
13 prescribed off-label for, typically by Kaiser
14 physicians?
15         MS. NUSSBAUM:  If you specifically
16 know individually.
17     A.   I do not specifically know
18 individually what all of those various pain
19 conditions are that it may have been prescribed
20 off-label for.  It seemed that the defendants were
21 interested in having it prescribed for just about
22 any kind of pain.
23     Q.   So go back to Kaiser Exhibit Number
24 12 --
25     A.   Yes.
```

Page 348

```
1              A. Carver
2      Q.   -- on page 13, there's --
3      A.   Just one second, please.
4      Q.   Sure.
5      A.   Exhibit 12?
6      Q.   Yes.
7      A.   Page?
8      Q.   13.
9          MS. NUSSBAUM:  Where it says "external
10 benchmarking"?
11         MR. JAMES:  No, page 13.
12         MS. NUSSBAUM:  That's what mine has,
13 Exhibit 12.  Excuse me.  What's the name of your
14 Exhibit 12?  Maybe we're looking at -- this is the
15 April 24th exhibit?  April 2004, is that correct?
16         MR. JAMES:  What's the Bates stamp on
17 the first page?  You mean -- excuse me.  Page 13
18 is what it says, "External benchmarking."  Are you
19 maybe looking at Exhibit 13?  Wasn't this -- can
20 we see the first page of what you're looking at?
21         MS. NUSSBAUM:  No.
22         MR. SKIBELL:  It's the second page 13.
23         MS. NUSSBAUM:  Where does that appear?
24         MR. LAWRENCE:  The chart review on
25 page 10.
```

Page 349

```
1              A. Carver
2          MS. NUSSBAUM:  You know, I'm going to
3  object to really any more questions about this
4  document, because --
5          MR. JAMES:  I'm actually not going to
6  ask about, if you'd rather not look at the
7  document while I'm asking questions, that's fine.
8          MS. NUSSBAUM:  The problem is this
9  document clearly has mixed-in pages.  We don't
10 even know whether or not this is one complete
11 document.
12         MR. JAMES:  Right.
13         MR. LAWRENCE:  This is how it
14 was produced to us.
15         MS. NUSSBAUM:  Well, I'm not sure that
16 that's correct.  But we're not certain that this
17 is one coherent document.
18     Q.   Do you know what DM neuropathy is?
19         MS. NUSSBAUM:  Where are you?
20         MR. JAMES:  I'm on my page 13.  It's
21 Bates number KSIS000823.
22         MS. NUSSBAUM:  823?
23         MR. JAMES:  Yes.
24     A.   I believe that refers to diabetes
25 neuropathy.
```

Page 350

```
1              A. Carver
2      Q.   Do you know if aspirin is prescribed
3  for diabetic neuropathy?
4      A.   I do not know.
5      Q.   What about neuropathy, it looks like
6  inflammation and toxic neuropathy, is aspirin
7  prescribed by physicians for that type of
8  neuropathy?
9      A.   I do not know.
10     Q.   Do you know if physicians use aspirin
11 for trigeminal neuralgia?
12     A.   I do not know.
13     Q.   Do you know of any of the pain
14 indications on this list that a physician would
15 commonly prescribe aspirin for?
16     A.   I cannot speak authoritatively, no.
17     Q.   I'd like to go back to the Complaint,
18 page 65.  Actually, it's the carryover sentence
19 from page 64.
20         What's the relevance of these
21 alternative medications to the relief that Kaiser
22 is seeking?
23         MS. NUSSBAUM:  If you know.  This is a
24 legal document.
25         Do you have an understanding not from
```

Page 351

1              A. Carver
2    counsel?
3        A.   Not from -- not independent of
4    discussions with counsel.
5        Q.   And do you know what amount of money
6    you're asking for in this litigation?
7        A.   I believe that that's being -- the
8    amount is being determined as -- in an effort by
9    and with counsel, and I don't know that a final
10   amount has been determined at this point.
11       Q.   Do you know how that amount is going
12   to be calculated?
13       MS. NUSSBAUM:  Objection.
14       By counsel, that's going to be done
15   with counsel and expert witnesses and expert
16   discovery and I would ask that the witness not
17   answer.
18       Q.   On page 65, the Complaint lists the
19   costs per day of Neurontin and then the cost per
20   day -- or sorry -- strike that.
21       Page 65 lists the costs per day of
22   these various alternative medications.  Is that --
23   I mean, do you disagree with that
24   characterization?
25       A.   I do not disagree with that

Page 352

1              A. Carver
2    characterization.
3        Q.   And why are you informing either the
4    defendants or the Court of the costs of these
5    medications?
6        MS. NUSSBAUM:  Objection.
7        If you know that answer only because
8    of discussions with counsel, either Mr. Cohen or
9    myself, I direct you not to answer.
10       A.   Then I cannot answer.
11       Q.   Is the alleged harm that Kaiser
12   suffered in any way tied to the existence of these
13   cheaper and more desirable medications?
14       MS. NUSSBAUM:  Objection.
15       Again, if that is something that you
16   have a view of only as a result of discussions
17   with either Mr. Cohen or myself, I would direct
18   you not to answer.
19       A.   I cannot answer.
20       Q.   Do you have any independent knowledge
21   aside from counsel of what you're asking for in
22   this litigation?
23       MS. NUSSBAUM:  I would again object.
24   What does that mean, "aside from counsel"?  If
25   your knowledge as to what the claims and remedies

Page 353

1              A. Carver
2    are based on conversations with either Mr. Cohen
3    or myself, or other counsel, then I would direct
4    you not answer.  This witness has testified now
5    for almost two days.  He's certainly testified as
6    to what he --
7        MR. JAMES:  You've apprised me as to
8    what your objection is about and I believe --
9    actually, I don't really know if the defendant is
10   entitled to --
11       MS. NUSSBAUM:  What the defendant is
12   entitled to --
13       MR. JAMES:  Rather, I know what the
14   defendant is entitled to.  I don't know what the
15   plaintiffs believes that they're entitled to.
16       MS. NUSSBAUM:  Well, we will have
17   expert discovery and you'll get it very clearly.
18       MR. JAMES:  Do you anticipate
19   producing some evidence regarding these cheaper,
20   more desirable alternatives in the future?
21       MS. NUSSBAUM:  Objection.
22       If, you know, your knowledge is based
23   on discussions that you've had either with
24   Mr. Cohen, myself, or other counsel, please do not
25   answer.

Page 354

1              A. Carver
2        A.   I cannot answer.
3        Q.   Is Kaiser seeking to recover in
4    instances where a patient took one of these
5    alternative medications and was intolerant to it
6    and they subsequently took Neurontin?
7        MS. NUSSBAUM:  Objection.
8        If your understanding as to Kaiser's
9    theory of recovery and damages here is based
10   exclusively on discussions with counsel, either
11   myself or Mr. Cohen, I direct you not to answer.
12       A.   I cannot answer.
13       Q.   As a personal matter, do you feel at
14   some point the defendants are entitled to know the
15   circumstances in which you're seeking that the
16   Court order that defendants paid the damages to
17   you?
18       MS. NUSSBAUM:  Objection.
19       I think that that misstates the
20   record.  The defendants have a Complaint that has
21   a prayer for relief that has a chart on page 65
22   that articulates a theory of damages.  You have
23   answers to interrogatories.  Let's get the record
24   nice and clear here.
25       They have answers to the

Page 355

1              A. Carver
2  interrogatories, and if you want more clarity or
3  you want to seek more relief, you know the way to
4  get it; okay?
5              His personal opinion, he's not a
6  lawyer, is totally irrelevant and speculative here
7  and outside the scope of your 30(b)(6) and outside
8  the scope of any of the four notices we have.  We
9  have a couple of hours left.  Let's move on to
10 what's appropriate.
11             MR. JAMES:  Let's take a break at this
12 point.
13             VIDEOGRAPHER:  Going off the record at
14 12:28 approximately.  This ends tape number three.
15             (Luncheon recess.)
16             A F T E R N O O N   S E S S I O N
17             1:10 p.m.
18             (Kaiser-16 marked for identification.)
19             MR. JAMES:  Can we mark this exhibit?
20             VIDEOGRAPHER:  We're going back on the
21 record at 1:10 approximately.  This is tape four,
22 volume two, in the deposition of Albert Carver.
23      BY MR. JAMES:
24      Q.   Actually, I direct your attention to
25 page 32 and following of this document --

Page 356

1              A. Carver
2              MS. NUSSBAUM:  Are you referring to
3  Exhibit 16?
4              MR. JAMES:  Yes.
5      A.   I'm sorry.  Which page, it --
6      Q.   It has KIS000820 stamped at the bottom
7  of it.
8      A.   Neuropathic pain initiative, 32.
9      Q.   That's right.
10             So if you could just look at the --
11 look over the pages that follow that page.
12     A.   Okay.
13     Q.   I think you can stop once you get up
14 to KIS000826, which has a text "cancer drug
15 initiative" on it.
16             MS. NUSSBAUM:  I have a different
17 number, so mine says 000038.  It says, "cancer
18 drug initiative."
19             MR. JAMES:  I think there might have
20 been two copies of this document produced.
21     Q.   Let's take the page -- you can stop at
22 the page that has the text "cancer drug
23 initiative" on it.
24             Have you had a chance to review that?
25     A.   I have, yes.

Page 357

1              A. Carver
2      Q.   Do you know what this document is?
3      A.   This is a -- a document that's
4  produced by the DUAT in southern California and is
5  labeled as an executive scorecard that is
6  providing information regarding utilization of
7  Neurontin in the medical center areas of southern
8  California.
9      Q.   Have you seen this document before?
10     A.   I believe that I have.
11     Q.   Was it prior to your preparation for
12 this deposition?
13     A.   No.
14     Q.   In preparing for this deposition, did
15 you require any understanding of when this
16 document was produced other than what you had
17 gained simply by looking at the document itself?
18             MS. NUSSBAUM:  Objection to the extent
19 that any discussions you had with counsel would be
20 part of your answer.  Please do not divulge any
21 communications with counsel.
22     A.   Your question was:  When was it
23 produced?
24     Q.   No.
25             MR. JAMES:  Could you read back the

Page 358

1              A. Carver
2  question?
3             (Record read.)
4      A.   No.
5      Q.   Have you seen documents entitled
6  "Executive Scorecard" before in your personal
7  experience?
8      A.   On occasion, yes.
9      Q.   Were they created by DUAT at well?
10     A.   Yes.
11     Q.   And what's the purpose of an executive
12 scorecard?
13     A.   To provide primarily, information
14 primarily to the medical directors of the
15 respective service areas regarding the progress
16 that's being made on DUAT initiatives within their
17 respective areas.
18     Q.   Are the medical directors employed by
19 the Permanente Group?
20     A.   Yes, there are.
21     Q.   I guess I'm looking at the first page
22 of this document, at the very top following the
23 word "medical directors," there's the words
24 "medical group administrators"?
25     A.   Yes.

A. Carver

1
2    Q.   What's their role?
3    A.   They, within each of the medical
4 center areas, there is a medical group
5 administrator who is an employee of the Permanente
6 Medical Group who manages primarily the delivery
7 of services, medical services to our patients
8 within those respective facilities.  And they're
9 involved in the, you know, the hiring and the
10 supervision and management of, I guess, the clinic
11 operations would be the best way to describe it.
12    Q.   In the next category of individuals is
13 service area managers?
14    A.   Yes, service area managers are an area
15 executive within each of those respective service
16 areas.
17    Q.   What sort of background do those
18 individuals have?
19        MS. NUSSBAUM:  If you know.
20    A.   The service area managers typically
21 come from the hospital administration track of
22 professional development.
23    Q.   And I think we've discussed local and
24 regional DUATs before.  So, with regard to
25 regional and divisional sponsors, who are they?

A. Carver

1
2    A.   The regional sponsor of the DUAT is
3 the medical director for the southern California
4 Permanente Medical Group as well as the president
5 of the region.
6    Q.   Are there separate and distinct
7 initiatives that DUAT and DRUG undertakes?
8    A.   I'm not sure I understand the
9 question.
10    Q.   Actually, we could turn to page 32.
11        MS. NUSSBAUM:  So you've withdrawn
12 that question?
13        MR. JAMES:  Yes, I've withdrawn that
14 question.
15    Q.   With regard to the words "neuropathic
16 pain initiative," what does "initiative" mean in
17 this context?
18        MS. NUSSBAUM:  If you know.
19    A.   I'm not sure about the details of this
20 particular initiative.
21    Q.   Do you know if sponsors are assigned
22 to particular initiatives, it was referring to
23 regional divisional sponsors?
24        Are they assigned to particular
25 initiatives?

A. Carver

1
2    A.   No, that is not the context, I
3 believe, in terms of how that is used here.  If I
4 wasn't clear, the regional sponsor would be -- is
5 the sponsor of this whole effort and so,
6 therefore, it's the medical director who is the
7 sponsor of the physicians' efforts in addressing
8 drug usage issues via the DUAT.
9        And so, it's not a sponsor of an
10 individual initiative, it's more of a --
11    Q.   The entire program?
12    A.   The umbrella sponsorship of a program.
13    Q.   And the final category is pharmacy
14 leaders on the first page, again?
15    A.   Yes.
16    Q.   And those are who?
17    A.   The pharmacy leaders are a better term
18 would be the area pharmacy directors, so that
19 would be the pharmacy director and each of the
20 respective service areas that have responsibility
21 for pharmacy services inpatient, outpatient, etc.
22    Q.   And they refer to leaders because
23 they're leaders in their particular area or
24 because they're --
25        MS. NUSSBAUM:  Objection.

A. Carver

1
2        The witness has stated who they are
3 and what they do.
4    Q.   Is it true that they are not assigned
5 to particular initiatives either?
6    A.   That's correct.  They are -- this is
7 a -- the reason I use the -- a better term being
8 the area of pharmacy director is this leader term
9 was something that was in vogue a few years ago,
10 but I think that a better descriptor of their
11 position would be an area pharmacy director
12 unrelated to any initiatives.  They are
13 responsible for the management and the delivery of
14 pharmacy services in a respective geographic area.
15    Q.   And would they typically have a
16 pharmacy background?
17    A.   Yes, each of them are pharmacists.
18    Q.   Are they Permanente Group employees?
19    A.   No, they are not.
20    Q.   Are they employees of one of the
21 plaintiffs?
22    A.   Yes, they are.
23    Q.   I guess it would not be the hospital,
24 it would be the Kaiser Foundation Health Plan, is
25 that correct?

Page 363

A. Carver

1
2    A.    That's correct.
3    Q.    Do individuals within this category
4  report up to you?
5        MS. NUSSBAUM:  Within which category?
6    Q.    This pharmacy leaders category?
7    A.    Indirectly, what does the
8  organizational structure look like?  I -- this was
9  asked and answered yesterday, I believe.  You want
10  to know between the pharmacy leaders and the
11  witness what the levels are?
12    Q.    Yes.
13        MS. NUSSBAUM:  Just not anything we
14  did yesterday, please.
15    A.    There is a position -- an
16  individual -- a position called the pharmacy
17  operations leader that is my direct report, and a
18  better term, better descriptive term for the
19  pharmacy operations leader would be the regional
20  pharmacy director.
21        So, in this case, a regional pharmacy
22  director for southern California.  That individual
23  by position is the supervisor or manager of these
24  pharmacy leaders, otherwise known as the area
25  pharmacy directors.

Page 364

A. Carver

1
2    Q.    Aside from receiving these executive
3  scorecards, do these pharmacy leaders or area
4  pharmacy managers participate in DUAT in other
5  ways?
6        MS. NUSSBAUM:  If you know.
7    A.    The area pharmacy leaders participate
8  in the area DUAT activities.
9    Q.    And what activities would those be?
10        MS. NUSSBAUM:  Once again, if you
11  know, if there's specific activities that are
12  engaged in an area specifically --
13    A.    The activities would be the same
14  activities executed at the area level as the
15  regional initiatives.
16    Q.    I think earlier we discussed
17  videoconferences and meetings.
18        Are there other activities that come
19  to mind?
20    A.    Not specifically.
21    Q.    Turning to page 32 again, did you have
22  any knowledge regarding the neuropathic pain
23  initiative?
24    A.    Not specific knowledge; no.  I believe
25  I previously testified that I'm not part of that

Page 365

A. Carver

1
2  DUAT committee or group.
3    Q.    Do any of the pharmacy leaders or the
4  regional pharmacy directors inform you of DUAT
5  activities?
6    A.    No, they do not.
7    Q.    Do you receive this executive
8  scorecard directly or is it something that you've
9  seen because one of your reports has brought it to
10  your attention?
11    A.    Yes, because one of my reports has
12  brought it to my attention and I would be, and
13  I've on occasion been forwarded similar reports.
14    Q.    For what reason do individuals forward
15  this report to you?
16        MS. NUSSBAUM:  You know, I would
17  object.  I think the witness has already testified
18  this particular report was not forwarded to him.
19  He did not see this report outside preparation for
20  this deposition.  He has no knowledge of what's
21  contained in this report.  If, on occasion,
22  another report once or twice was forwarded to him,
23  you know, what is the relevance of that?
24    Q.    You can answer the question if you
25  understand it.

Page 366

A. Carver

1
2        MS. NUSSBAUM:  If you recall
3  specifically, if in the past you saw a different
4  report and if you specifically recall why somebody
5  showed you that report.
6        MR. JAMES:  If you want to read back
7  my original question rather than Ms. Nussbaum's
8  question.
9        (Record read.)
10        MS. NUSSBAUM:  And that assumes a fact
11  not in evidence, which was this report was
12  forwarded, which he's already testified it wasn't.
13        If you want to ask if on the
14  occasions, the rare occasions that he's received a
15  report, does he specifically recall why it
16  was forwarded to him, I would let him answer that
17  question.
18    A.    I believe just for general
19  information.
20    Q.    If you turn to page -- turn to page
21  33, do you have an understanding of how to read
22  this table?
23    A.    I do not.  I'm just not sure of the
24  metrics that go into or the formulas that go
25  into --

Page 367

```
1              A. Carver
2       MS. NUSSBAUM: Please do not
3  speculate. The witness has testified he didn't
4  receive this document in the ordinary course of
5  business. He didn't write it, he did not
6  participate. Please do not speculate.
7       Q.  Is this a kind of a metric that's
8  often used in executive reports, or executive
9  scorecards, rather?
10      MS. NUSSBAUM: Objection. Do you
11 understand the question?
12      A.  I do in terms -- I understand the
13 question.
14      MS. NUSSBAUM: Do you have any
15 specific knowledge?
16      A.  I don't have specific knowledge
17 regarding the specific metrics that are used for
18 the various initiatives, and then therefore the
19 development of specific metrics or the reporting
20 of those specific metrics other than, you know,
21 there's a metric that's being used here.
22      Q.  If you could turn to the following
23 page, do you have an understanding of what this
24 table means?
25      MS. NUSSBAUM: Please don't speculate
```

Page 368

```
1              A. Carver
2  if you don't specifically know.
3       A.  I'm afraid I would have to speculate
4  because I don't know. I didn't create the table,
5  nor create the algorithms that went into the
6  preparation of the table.
7       Q.  I guess I wanted to focus, not on how
8  the table was created so much as how a reader
9  would understand this table.
10      And I was wondering whether you just
11 know how to understand --
12      A.  The information that's being presented
13 here as opposed to how it was created?
14      MS. NUSSBAUM: I think the witness has
15 indicated he did not receive this document. He
16 didn't regularly receive these reports, and that
17 he's not familiar with this table. So, I would
18 ask that he not speculate because his view would
19 be no more relevant than yours or mine.
20      Q.  Is it true that your view regarding
21 this table would likely be no more informative,
22 than mine or Ms. Nussbaum's?
23      A.  I'm not certain of that, but I may --
24 I may misinterpret something because it would be
25 an interpretation on my part. And so -- and I
```

Page 369

```
1              A. Carver
2  don't want to stack up how the three of us would
3  do on the interpretation here. I might come out
4  ahead, but maybe just slightly. I'm not sure.
5       Q.  Was it your testimony that you've only
6  received executive scorecards on a small handful
7  of occasions?
8       A.  Yes, that is correct.
9       Q.  Do you know roughly when DUAT began
10 creating these executive scorecards?
11      A.  I don't specifically. I believe that
12 I testified that the DUAT was created in around
13 the year 2000. And sometime subsequent to that
14 creation of DUAT, information was used to report
15 progress.
16      Q.  Prior to the creation of DUAT in 2000,
17 was there any group within Kaiser that, or
18 Permanente Group that had a similar function?
19      A.  There was not.
20      Q.  Were you involved in, personally
21 involved in the discussions that led to the
22 creation of DUAT?
23      A.  Yes, I was, at a high level.
24      Q.  When did those discussions take place?
25      A.  And -- if I recall correctly --
```

Page 370

```
1              A. Carver
2       MS. NUSSBAUM: Well, I would ask you
3  if you don't think you recall correctly not to
4  speculate or testify.
5       A.  I do recall correctly, but perhaps not
6  specifically regarding the date, but in the late
7  1990s, 1998-ish, McKenzie & Company spent some
8  time with us and provided some ideas regarding how
9  to better approach drug use management. And then
10 out of that effort became then an organized
11 process known as DUAT and DRUG. And that occurred
12 late 1990s and was certainly, I have a
13 recollection of right about the beginning of the
14 year 2000, the commissioning, the chartering and
15 the beginning of these groups.
16      Q.  Who else at Kaiser was involved in
17 these discussions?
18      A.  At the time, Dr. Joel Hyatt in
19 southern California, Dr. Sharon Levine in northern
20 California, I can recall specifically. Beyond
21 that, I don't recall.
22      Q.  Do you know the types of people who
23 might have been involved other than the two
24 individuals that you named?
25      MS. NUSSBAUM: By "types," you mean
```

Page 371

```
 1            A. Carver
 2 job categories of people?
 3            MR. JAMES:  By job categories.
 4            MS. NUSSBAUM:  If you specifically
 5 know.
 6      A.   Yeah, I don't recall specifically, but
 7 each of these individuals are very high level
 8 Permanente physician leader people within the
 9 respective medical groups.
10      Q.   Any other outside advisories involved
11 other than McKenzie?
12      A.   No, and McKenzie was not involved
13 specifically in the chartering of DUAT and DRUG.
14 Theirs was more of a concept recommendation.
15            MR. JAMES:  I'd like to mark one more
16 exhibit.
17            I made a decision that's going to save
18 us some time.  Can I unmark the exhibit?
19      Q.   Beyond these DUAT scorecards that
20 we've looked at, are there any other drug
21 utilization reports that you personally receive?
22      A.   The only drug use reports that I
23 receive on a regular basis are just reports of
24 expenditure and prescriptions within a variety of
25 therapeutic categories, any therapeutic categories
```

Page 372

```
 1            A. Carver
 2 I guess.  That's just a normal business report
 3 that I receive, and I don't believe there are any
 4 other reports specific to drugs and that report is
 5 not specific to individual drugs.  It references
 6 just broad therapeutic categories of drugs.
 7      Q.   And that shows expenditures and other
 8 information?
 9      A.   Well, the dollar expenditures and
10 the -- and the number of prescriptions and
11 therefore, prescription utilization rates.  And
12 that's essentially it.
13      Q.   How often do you receive those
14 reports?
15      A.   Monthly.
16      Q.   And how long have you been receiving
17 them?
18      A.   I don't recall specifically, but for,
19 you know, the last few years, but I can't -- I
20 can't be specific on what "few" means.  I'm not
21 trying to be evasive.  I just don't recall
22 specifically.
23      Q.   Do you know whether prior to 2000 you
24 were receiving reports like this?
25      A.   I don't.  I just don't recall.  I'm
```

Page 373

```
 1            A. Carver
 2 sorry.
 3      Q.   Are you aware of drug utilization
 4 reports that other people receive that you don't
 5 receive on a regular basis, you know, again,
 6 excluding this day, what the scorecard that we've
 7 already gone over?
 8      A.   I'm not aware, no, regarding what
 9 other -- what reports other individuals besides
10 myself may receive or to testify to that
11 authoritatively at all.
12      Q.   Do you view these reports that you
13 receive every month just for general information
14 or do you have any specific purpose in mind when
15 you review these documents?
16            MS. NUSSBAUM:  I would object.  Are
17 you talking about the particular report that he
18 just told you he receives monthly?
19            MR. JAMES:  Yes.
20            MS. NUSSBAUM:  You want to know if
21 it's just for general information or if there's
22 some specific use that he puts the report to?
23            MR. JAMES:  Yes.
24      A.   I use it for the purpose of generally
25 tracking the overall costs on an ongoing basis,
```

Page 374

```
 1            A. Carver
 2 and also that information is used when we are
 3 trying to assess our prospective costs in the
 4 future.
 5      Q.   With regard to the first purpose of
 6 tracking ongoing costs, why do you do that?
 7      A.   Well, why we do it, it's a basic
 8 business function from the standpoint of, I
 9 believe that I explained yesterday that we -- we
10 provide prescription drug benefits to various
11 groups of individuals, and so it's important for
12 us to track what our costs are and then also to be
13 able to reasonably, accurately estimate our costs
14 for the future given we prospectively set our
15 rates for prescription drugs well in advance of --
16 of our actually -- our delivery of those
17 prescription or pharmacy services.  So that's
18 generally it.  It's just for general business
19 purposes, I would say.
20      Q.   Before these reports were produced,
21 was there another means of tracking ongoing costs?
22      A.   Not that was very elegant and it was a
23 matter of primarily just referring to financial
24 reports on how much money did you spend on drugs
25 during the previous year and/or during the
```

A. Carver
1  previous month, and it just has become more
2  important with the escalating costs of
3  pharmaceuticals to be able to understand what are
4  the drivers or what are the therapeutic categories
5  for which we are spending substantial amounts of
6  money and what might that look like in the future.
7  Q.   So prior to these reports being
8  created, there wasn't a way to really look at
9  costs for particular therapeutic categories, is
10 that right?
11       MS. NUSSBAUM:  Asked and answered.
12 A.   That's correct.  Not in any kind of a
13 sophisticated manner.
14 Q.   Was anyone charged with the
15 responsibility of tracking costs by therapeutic
16 category, I guess, from 1994 forward?
17       MS. NUSSBAUM:  If you know.
18 A.   I don't know.  Not that I recall
19 specifically.
20 Q.   Today, aside from you personally
21 reviewing these reports every month, are there
22 other individuals who have reviewed these reports
23 to track costs on an ongoing basis?
24 A.   Yes, I forwarded the particular report

1        A. Carver
2  previous month, and it just has become more
3  important with the escalating costs of
4  pharmaceuticals to be able to understand what are
5  the drivers or what are the therapeutic categories
6  for which we are spending substantial amounts of
7  money and what might that look like in the future.
8  Q.   So prior to these reports being
9  created, there wasn't a way to really look at
10 costs for particular therapeutic categories, is
11 that right?
12      MS. NUSSBAUM:  Asked and answered.
13 A.   That's correct.  Not in any kind of a
14 sophisticated manner.
15 Q.   Was anyone charged with the
16 responsibility of tracking costs by therapeutic
17 category, I guess, from 1994 forward?
18      MS. NUSSBAUM:  If you know.
19 A.   I don't know.  Not that I recall
20 specifically.
21 Q.   Today, aside from you personally
22 reviewing these reports every month, are there
23 other individuals who have reviewed these reports
24 to track costs on an ongoing basis?
25 A.   Yes, I forwarded the particular report

1        A. Carver
2  that I use to, or to various people on my staff.
3       (Kaiser-17 marked for identification.)
4  Q.   Actually, I guess, look at the cover
5  page to -- this might help you know what the
6  document is, and then if you could turn to the
7  page that has the Bates stamp KIS001464, that's
8  the page I will be asking a question about.
9  A.   Okay.
10 Q.   Do you know what this document is?
11 A.   I do.  This is the pharmacy and
12 therapeutics committee minutes from December 12,
13 2001 from the TPMG, The Permanente Medical Group
14 in northern California.
15 Q.   What does TPMG stand for?
16 A.   The Permanente Medical Group.
17 Q.   Is it correct that you're a member of
18 the pharmacy and therapeutics committee for
19 northern California?
20 A.   It is, correct.
21 Q.   Do you have any recollection of
22 personally attending this meeting?
23 A.   Not from six years ago.  Other than
24 I'm listed there, but I don't have independent
25 recollection of six years ago.

1        A. Carver
2  Q.   And on the page marked KIS001464,
3  under .13.3, there's a statement that,
4  "Gabapentin, Neurontin:  Request to designate
5  Gabapentin a non-detailable formulary product."
6       Do you have an understanding of what
7  that request is?
8  A.   I do.
9  Q.   And what is that a request for?
10 A.   It's a request for, just as it's
11 stated there, to deem Gabapentin a product for
12 which pharmaceutical manufacture or
13 representatives would not be able to detail
14 physicians regarding, you know, individual
15 physicians regarding the use of the product.
16 Q.   Was it the policy at the time that
17 this document was created that as a general matter
18 manufacturer's representatives could detail
19 physicians regarding formulary products?
20 A.   Yes, that's correct.
21 Q.   And was it also the case that certain
22 drugs were designated as non-detailable?
23 A.   Yes, that is also correct.
24 Q.   And how is it this -- I'll call it a
25 restriction, if there's a better word for it, let

1        A. Carver
2  me know, but how is this restriction enforced?
3       MS. NUSSBAUM:  If you know.
4  A.   I don't know specifically other than
5  generally we'd make known to the manufacturers
6  situations in which a product is non-detailable as
7  we do when a product is removed from the
8  formulary, but I don't know specifically how we
9  implemented this particular recommendation.
10 Q.   What was the testimony that you
11 informed the manufacturer that the product is
12 non-detailable?
13 A.   My testimony is that generally we
14 would do that.  I don't -- I don't know from five
15 years ago or six years ago now if a letter was
16 specifically sent to Pfizer or not.  I'm sorry.  I
17 just don't know.
18 Q.   Are physicians also notified that the
19 particular product is non-detailable?
20      MS. NUSSBAUM:  If you know.
21 A.   Physicians are distributed the outcome
22 of formulary decisions basically from the P&T
23 committee.
24 Q.   Are you aware of any recent problems
25 that you've had with a manufacturer being told

Page 379

1           A. Carver
2 that a product is non-detailable, but the
3 manufacturer nonetheless sends representatives to
4 detail Kaiser physicians regarding the same
5 product?
6           MS. NUSSBAUM: Objection.
7           I think that is speculative. It's
8 hypothetical and I would ask that the witness not
9 answer.
10     A.  I can't answer that because I don't
11 know.
12     Q.  Actually, that's all I wanted to know,
13 whether you know of any instances.
14     A.  Yeah, I don't know.
15     Q.  Do you know the reasons that this
16 request was made to designate Gabapentin a
17 non-detailable formulary product?
18     A.  I would only speculate based upon --
19           MS. NUSSBAUM: I'd ask you not to
20 speculate.
21     A.  So the answer to that would be no.
22     Q.  So either in your personal capacity or
23 in your corporate capacity, you don't know the
24 reasons that this request was made?
25     A.  I don't recall the reasons, yes.

Page 380

1           A. Carver
2     Q.  As a matter of general policy now,
3 turning away from this decision years ago, just as
4 a general policy matter today, what are the
5 reasons that -- well, actually, first I should ask
6 you: Is it still the case today that sometimes
7 requests are made to designate certain
8 prescription drugs as non-detailable formulary
9 products?
10     A.  Yes, it is.
11     Q.  And does it remain the case today that
12 the general policy is that drugs are detailable
13 and that certain drugs are excluded from that?
14           MS. NUSSBAUM: I don't think the
15 witness has ever said that that was the general
16 policy. If you want to give him a particular time
17 frame and ask whether or not there was any general
18 policy, you can do that.
19     Q.  I think you said that at the time this
20 document was created, as a general matter
21 formulary drugs were detailable, but that requests
22 would be made to designate certain drugs as
23 non-detailable formulary products?
24     A.  That's correct.
25     Q.  Does that remain the case today?

Page 381

1           A. Carver
2     A.  Yes, it does.
3     Q.  And today when such a request is made,
4 what are the reasons given for that -- for that
5 request?
6           MS. NUSSBAUM: If you know, and if
7 there are reasons that are general reasons as
8 opposed to particular reasons with particular
9 products.
10     A.  One of the general reasons is related
11 to the concern or the prospect for inappropriate
12 or over-utilization of a particular product and
13 there may be an antibiotic -- as an example, I'll
14 give you an example.
15           There may be an antibiotic as an
16 example that may be a very powerful antibiotic
17 that would be added to the formulary that would
18 hopefully be prescribed primarily by infectious
19 disease physicians, but as I've stated, there's
20 really not anything to prohibit a family practice
21 physician or infectious disease physician from
22 prescribing that antibiotic, if they felt it
23 was medically necessary.
24           This effort -- and so, certainly we
25 would not want -- just because a product has been

Page 382

1           A. Carver
2 deemed a formulary product, and because we
3 generally allow detailing of products, we would
4 not want the detailing of family practitioners and
5 infectious disease physicians regarding the use of
6 this antibiotic if the intent was to have it, you
7 know, used by the infectious disease
8 subspecialists.
9           So, I hope that would give you an
10 example of a reason that we would use today for
11 deeming a formulary product non-detailable.
12     Q.  How does Kaiser know if certain drugs
13 are being overutilized?
14           MS. NUSSBAUM: Only if you understand
15 that question and can answer it without
16 speculating.
17     A.  I would be speculating because I'm not
18 the individual that's charged with determining the
19 appropriate utilization or the utilization of a
20 product.
21     Q.  Who is that person?
22     A.  The prescribing is done by our
23 physicians, and so the physicians are key in any
24 such decision as well as bodies that we have
25 spoken about over the last two days here, the P&T

1              A. Carver
2   committee, as well as the DUAT and DRUG groups,
3   who are charged with -- specifically the DUAT and
4   DRUG who are charged at a high level with trying
5   to assure appropriate utilization of medications.
6       Q.   Besides over-utilization, what other
7   reasons might, as a general matter, be given for
8   designating a prescription drug as a
9   non-detailable formulary product?
10      A.   There may be a safety concern about a
11  particular product also, in which the product
12  would be left best to -- I'm talking about a very
13  serious safety concern in which a product would be
14  left best prescribed by some specialist or
15  subspecialist group of individuals.  So,
16  therefore, again by definition, if it's added to
17  the formulary because it's effective, then the
18  physicians generally may not want to have other
19  nonspecialists being detailed or having a
20  particular product promoted to them, so I would
21  say for reasons for safety as well as the
22  potential for over-utilization.
23      Q.   Aside from safety and
24  over-utilization, are there any other reasons that
25  come to mind?

1              A. Carver
2       MS. NUSSBAUM:  These are general
3   reasons?
4       MR. JAMES:  Yes.
5       MS. NUSSBAUM:  If you know, and don't
6   speculate.
7       A.   Those are the two that come to my
8   mind.
9       Q.   This document appears to be dated
10  December 12, 2001.  Do you have -- do you have any
11  knowledge as to when this request was actually
12  implemented?
13      Well, actually, first, I guess I
14  should take a step back.  Was this request
15  approved?
16      A.   The record here reflects that it was.
17      Q.   And do you know when this request
18  would have been actually put into place?
19      MS. NUSSBAUM:  If it was.
20      A.   I don't recall.
21      Q.   And today, typically when a request
22  like this is made and approved, about how long
23  does it take for the request to be put into
24  effect?
25      MS. NUSSBAUM:  If there is a typical

1              A. Carver
2   situation.
3       A.   I would estimate three months or so.
4   Given there's notifications, etc., that need to
5   occur.
6       Q.   Do you have any sense of whether that
7   approximate time has changed over the last seven
8   years or so?
9       A.   I do not.
10      Q.   Have you had any reports of the
11  defendant's representatives detailing any Kaiser
12  physician following the approval of this request?
13      MS. NUSSBAUM:  Has he personally had
14  any reports prior to the date that this request
15  was approved?
16      MR. JAMES:  No, not prior, actually
17  after the request was approved.
18      MS. NUSSBAUM:  Do you want to know
19  after December 12, 2001, has he personally
20  received any reports with respect to detailing by
21  Pfizer for Neurontin?
22      MR. JAMES:  Right.
23      Q.   Either in your personal capacity or in
24  preparation for this deposition, have you had any
25  knowledge of any Pfizer representative detailing a

1              A. Carver
2   Kaiser physician?
3       A.   I have not.  I've not seen any
4   reports, nor has anything been called to my
5   attention.  I just do not know.
6       (Kaiser-18 marked for identification.)
7       Q.   Okay.  How do you recognize this
8   document?
9       A.   I do not recognize the document.  I've
10  not seen it before today.
11      Q.   Do you know if this e-mail address
12  after the word "to" is?  It's DWNY-SCAL?
13      A.   I do.  That references a location,
14  Downy, in the southern California region, and then
15  to the drug information inquiry service, which is
16  located in Downy in southern California.
17      Q.   Is that an e-mail address for the
18  overall Drug Information Service?
19      A.   Yes, I believe it is.
20      Q.   Is that for the entire southern
21  California region?
22      A.   Yes, it is.
23      Q.   Are there a number of individuals who
24  receive any e-mails sent to this address?
25      A.   I believe that that's a repository to

A. Carver

1   which inquiries flow, and then from which, you
2   know, the queue of them is worked down and
3   answered. And so it's a general e-mail box, I'll
4   call it.
5       Q.   Is Debbie Kubota the -- who is
6   apparently the author of this e-mail -- employed
7   by the Drug Information Service?
8       A.   Yes, she is.
9       Q.   Do you know whether DUAT had promoted
10  the use of Nortriptyline and desipramine in lieu
11  of Neurontin for neuropathic pain?
12      MS. NUSSBAUM: Only if you have
13  personal knowledge. Don't speculate. Since you
14  were not copied on this document and you're not
15  the author of this document, if your knowledge is
16  not personal knowledge based on your knowledge, as
17  opposed to this document, please don't speculate.
18      A.   Could you ask -- ask the question
19  again, please?
20      Q.   Right. And I'll preface it just by
21  saying that if you have -- I mean, if it helps you
22  to look at this document, that's fine.
23      But, you know, separate and apart from
24  the document, do you either have personal
25

A. Carver

1
2   knowledge or knowledge as Kaiser's corporate
3   representative that DUAT is promoting the use of
4   Nortriptyline and desipramine in lieu of Neurontin
5   for neuropathic pain?
6       A.   I believe that was the case; however,
7   I do not know precisely the time period.
8       Q.   And just from your personal knowledge
9   as a pharmacist, do you know whether nortriptyline
10  and desipramine are tricyclic antidepressants?
11      A.   Yes, I do. And yes, they are.
12      Q.   Do you know if tricyclic
13  antidepressants are FDA approved for neuropathic
14  pain?
15      A.   I do not know independently off the
16  top of my head.
17      Q.   And as a pharmacist, do you know what
18  the term "contraindicated" means?
19      A.   Contraindicated, yes, I do. I know
20  the term and it means they should not be used.
21      Q.   Do you know the reasons why --
22      A.   Should be avoided.
23      Q.   Do you know why a particular drug
24  might be contraindicated for a set of individuals?
25      MS. NUSSBAUM: It calls for

A. Carver

1
2   speculation. He's not here as an expert witness.
3   He's defined the term. I think we should move on.
4       MR. JAMES: I'll withdraw that
5   question.
6       Q.   Do you know what the term
7   "anticholinergic" means?
8       A.   I do generally.
9       Q.   What does it mean?
10      A.   It means side effects such as dry
11  mouth, urinary retention, and other side effects
12  that I've probably forgotten.
13      Q.   Do you know, again, from your personal
14  knowledge, whether TCAs are believed to have these
15  sorts of properties with regard to the elderly?
16      MS. NUSSBAUM: Only if you have
17  specific personal knowledge, and please don't rely
18  on the e-mail which you didn't receive or anything
19  else.
20      A.   I'm not well-versed on the use of the
21  various TCAs and their appropriateness in the use
22  of the elderly.
23      Q.   Do you know who Rod St. John is?
24      A.   I do.
25      Q.   And who is he?

A. Carver

1
2       A.   Rod St. John was a project manager
3   basically that, I believe, that was involved in
4   the preparation of some of those tables that I
5   wasn't able to interpret for you.
6       Q.   What kind of educational background
7   does he have?
8       A.   I'm sorry. I do not know.
9       Q.   Do you know what sort of job function
10  he has? You've told me the title project manager,
11  but what does that involve?
12      A.   He supports the DUAT process by
13  putting together the scorecards and the like.
14  That's my general impression. I don't supervise
15  Rod St. John, so I don't know any more detail
16  other than that.
17      Q.   Do you know whether or not he has a
18  medical background?
19      A.   I do not know. He's not a physician,
20  I can assert that.
21      Q.   And do you know if he has any pharmacy
22  background?
23      MS. NUSSBAUM: The witness already
24  said he doesn't know. I think we should just move
25  on.

Page 391

```
 1              A. Carver
 2      Q.   You can answer the question.
 3      A.   I'm sorry.  I do not know.  He's not a
 4  pharmacist, nor is he a physician, but I don't
 5  know what his background is specifically.
 6      Q.   Do you know if in his role as a
 7  project manager he makes requests to the Drug
 8  Information Service?
 9          MS. NUSSBAUM:  You're calling for
10  speculation.  You know he's said three times he
11  really doesn't know exactly what this person does
12  or what his background is.
13      A.   Yeah, I don't know independently.  Had
14  I not seen this memo, I wouldn't have any idea
15  whether or not he would have made inquiries of the
16  Drug Information Service.
17      Q.   Do you have any understanding of what
18  this e-mail states, that Rod St. John wanted from
19  the Drug Information Service?
20          MS. NUSSBAUM:  The witness has already
21  stated he's never seen it, he's not the author,
22  he's not a recipient, so I'm not going to let him
23  speculate as to some understanding of an e-mail
24  that he's never seen, he didn't author, and he
25  doesn't know anything about.
```

Page 392

```
 1              A. Carver
 2      A.   All I can say from reading the article
 3  is that he's requesting a Med Line search.
 4      Q.   What does a Med Line search involve?
 5      A.   It's a mainframe search of the
 6  literature that's being requested of Mary White,
 7  who is our medical librarian, the details of how
 8  the medical librarian would go about initiating or
 9  conducting a search, I don't know.  That's why we
10  have a medical librarian to do these things for
11  us.
12      Q.   Do you know whether you can pull up
13  studies regarding prescription drugs from Med
14  Line?
15          MS. NUSSBAUM:  Objection, you know --
16      Q.   You can answer from your personal
17  knowledge.
18          MS. NUSSBAUM:  I mean, I would object
19  to continued inquiries about this e-mail that this
20  witness has said he really knows nothing about.
21          MR. JAMES:  I'm not referring to the
22  e-mail specifically.
23      Q.   Do you know whether you can obtain
24  studies regarding prescription drugs from Med
25  Line?
```

Page 393

```
 1              A. Carver
 2          MS. NUSSBAUM:  When?  During the
 3  entire period here?  Recently?  At the time of
 4  this e-mail?  In 2003?  I would suggest that Med
 5  Line is a third party that you can just as easily
 6  as he research what kind of information you can
 7  get from them.
 8      Q.   Do you have personal knowledge
 9  regarding this matter?
10      A.   I've never done a Med Line search
11  personally.
12      Q.   Do you have an understanding of what
13  sort of information Med Line provides?
14      A.   My general understanding would be that
15  it provides the ability to ask questions and have
16  specific studies presented that would be
17  responsive to the request that was placed into the
18  Med Line search.  But I have no more detailed
19  knowledge than that.
20      Q.   Do you have any knowledge if there's
21  articles that are available on Med Line that may
22  not actually involve actual studies?
23      A.   I do not.
24          (Kaiser-19 marked for identification.)
25      Q.   Have you seen this document before?
```

Page 394

```
 1              A. Carver
 2      A.   I have not.
 3      Q.   Do you know who John, I'm not sure
 4  quite how to pronounce it, Zweig?
 5      A.   John Zweig is a physician in northern
 6  California.  I believe he is a --
 7          MS. NUSSBAUM:  Well, don't speculate.
 8  He's a physician.  Don't speculate, please.
 9      Q.   Do you know anything other -- about
10  Mr. Zweig than the fact that he's a physician in
11  northern California?
12      A.   No, I don't.
13      Q.   Do you know if he has any
14  administrative role in the Permanente Group aside
15  from his medical responsibilities?
16      A.   John Zweig is a P&T chair for one of
17  the areas in northern California.
18      Q.   Below the P&T committee, are there
19  separate, sort of P&T committees in each area
20  within the region?
21      A.   There are.
22      Q.   About how many areas are there within
23  southern California?
24      A.   About 11.
25      Q.   Those P&T committees do not make
```

Page 395

```
1              A. Carver
2  formulary decisions or is that an incorrect
3  statement?
4     A.  It is a correct statement that those
5  area P&T committees do not make formulary
6  decisions.  The regional P&T makes formulary
7  decisions.
8     Q.  What sort of decisions does an area
9  P&T committee make?
10     MS. NUSSBAUM:  You know, this is
11  really asked and answered.  We went through this
12  at length yesterday and again today, and you know,
13  we have very little time left, so I'd really
14  suggest that if you have new material, we do it.
15     MR. JAMES:  Actually, going back to my
16  old question.
17     Q.  Do you have any recollection of
18  discussing area P&T committees yesterday?
19     A.  I believe that I testified that the
20  regional P&T committee was comprised of the chairs
21  of the area P&T committees.
22     Q.  Have you described the functions of
23  the regional P&T committees before?
24     A.  I don't recall doing that.
25     Q.  Can you please tell me what those
```

Page 396

```
1              A. Carver
2  functions are?
3     A.  The area P&T committee is a medical
4  staff committee that's charged with the overall
5  drug use decisions primarily for the hospital.
6  Given we operate hospitals, it's a required
7  committee in order -- a requirement for hospitals
8  to have a P&T committee and so, that's why it
9  exists.
10     It spends a fair amount of time
11  related then to the distribution, the use of,
12  etc., drugs in the acute care hospital, in the
13  emergency room, and then also is involved in some
14  discussion regarding potential or prospective
15  regional P&T committee decisions as it relates to
16  specific drugs.
17     So that's about as concise of a review
18  of an area P&T that I can give you.
19     Q.  That was very helpful.
20     Is the formulary applicable to drugs
21  that have been administered in hospitals?
22     A.  Yes, it is.
23     Q.  And how are these drug-use decisions
24  that are made by the area P&T committees -- well,
25  actually, how do they operate?  I mean, they
```

Page 397

```
1              A. Carver
2  obviously don't affect the formulary.  How do they
3  have an effect on the delivery of drugs in
4  hospitals?
5     MS. NUSSBAUM:  If they do.  And if you
6  know.
7     A.  A lot of their time is spent on just
8  the drug delivery system, the evaluation of
9  adverse drug events that may occur.  The
10  exercising the responsibility as it relates to
11  drug use evaluation in which there's generally --
12  it's not a big effort, but it's the evaluation of
13  a particular drug that's used in the hospital to
14  assure that it's appropriate for use.
15     Evaluating opportunities for improving
16  safety of the medication distribution system in
17  the hospital.  There's a lot of area P&T committee
18  work or time that's spent on those kinds of
19  control and distribution of drugs in an acute care
20  hospital to hospitalized patients.
21     Q.  Is the end product of all these
22  evaluations a set of guidelines that's applicable
23  to hospitals?
24     A.  I would say that a better end product
25  would be described as the approval of policies and
```

Page 398

```
1              A. Carver
2  procedures as it relates to the distribution and
3  use, more the distribution of products in the
4  acute care hospital versus focus on drug use
5  management or anything.
6     Q.  Have you ever had any communications
7  with Mr. Zweig -- or Dr. Zweig?
8     A.  Dr. Zweig.  I'm sure that I have over
9  the course of the years, but I -- I've had
10  personal chats with him at a P&T committee.
11  Whether or not he's ever corresponded with me, you
12  know, formally through other means, I don't know.
13  But nothing that stands out in my mind.
14     Q.  Would it be accurate to say that you
15  have no specific recollection of any discussions
16  with Dr. Zweig regarding the expenditure of money
17  on Neurontin or Gabapentin?
18     A.  That would be a fair characterization.
19  I can recall no discussions with Dr. Zweig
20  regarding expenditure for Gabapentin.
21     Q.  Do you know who Robin Dee is?  I'm
22  looking at the upper left corner of this document.
23     A.  Robin Dee, let's see, chief of
24  psychiatry.
25     Q.  Is that for a particular region or is
```

Page 399

1           A. Carver
2  that for a particular location?
3       A.  I believe the coordinating chief for
4  the -- chiefs of psychiatrists in northern
5  California.
6       Q.  Do you know Dr. Dee personally?
7       A.  I do not.
8       Q.  Would you -- have you ever heard
9  anyone at Kaiser express a sentiment similar to
10 the one that Dr. Zweig is making in his e-mail
11 message?
12      MS. NUSSBAUM:  Please don't speculate.
13 If you have a specific recollection of somebody
14 saying that to you, testify to it, but otherwise
15 please don't speculate.
16      A.  Could you repeat your question,
17 please?
18      MR. JAMES:  Could you read back the
19 question?
20      (Record read.)
21      A.  I cannot cite specific correspondence.
22      Q.  And take a moment to review Dr. Dee's
23 e-mail message.
24      A.  I would reference, you know, us back
25 to documents that were reviewed earlier today

Page 400

1           A. Carver
2  regarding some content they're regarding.  The
3  amount of money spent on Neurontin and -- and that
4  type of content.
5       So it's not that I have never seen
6  anything.  You know, you discussed such documents
7  with me earlier today, but I don't have, you know,
8  e-mails or notes specifically.
9       Q.  Has anyone at Kaiser or any Permanente
10 physician expressed views to you similar to those
11 expressed by Dr. Dee in her response?
12      MS. NUSSBAUM:  If you specifically
13 have any recollection of that.
14      A.  I do not have any specific
15 recollection.
16      Q.  Would you agree with the statement
17 that we must be careful when being astounded that
18 clinicians are using medications to augment the
19 treatment for very difficult and dangerous
20 conditions that frequently has death as a final
21 outcome?
22      MS. NUSSBAUM:  I would object.
23      This witness was not copied, did not
24 discuss, did not author, has never seen this
25 document.

Page 401

1           A. Carver
2       MR. JAMES:  I'm just asking whether
3  you personally agree or disagree with that
4  sentiment.
5       MS. NUSSBAUM:  Well, it's taken out of
6  context.  It's part of an e-mail.  We're not going
7  to let him speculate.
8       Q.  Are you unable to answer that
9  question?
10      A.  I'm unable to answer the question.
11      (Kaiser-20 marked for identification.)
12      Q.  Do you recognize this document?
13      A.  I do not.  I have never seen this
14 document before this minute.
15      Q.  Do you know who Mark Glatt is?
16      A.  Mark Glatt is a physician who was a
17 member of the P&T committee in northern
18 California.
19      Q.  That's the regional committee as
20 opposed to an area committee?
21      A.  Yes, he's on the regional committee,
22 and a member of a local committee as well.
23      Q.  Do you know who Mary Talaga is?
24      A.  Mary Talaga is one of those area
25 pharmacy directors that I referenced in

Page 402

1           A. Carver
2  northern California.
3       Q.  And what about Cathlene Richmond?
4       A.  Cathlene Richmond is a pharmacist in
5  our Drug Information Service.
6       Q.  And are you acquainted with Jack
7  Rozance?
8       A.  Jack Rozance is a physician and chief,
9  which is comparable to another term, would be the
10 area medical director for one of the areas in
11 northern California.
12      Q.  Now, what about George Palma?
13      A.  I'm sorry.  I do not know that
14 individual.
15      Q.  And the last individual?
16      A.  I'm sorry.  I do not know that
17 individual either.
18      Q.  Have you had any communications with
19 Dr. Glatt?
20      A.  I have not.
21      Q.  Did anyone in July 2001 earlier
22 express an opinion to you that the reason for how
23 utilization of certain medications might be a
24 result of physicians being detailed by drug reps?
25      MS. NUSSBAUM:  Can you repeat the

Page 403

A. Carver

1
2  question?
3          MR. JAMES:  Could you read the
4  question back?
5          (Record read.)
6      A.    Not that I can recall, specifically to
7  me.
8      Q.    Are you aware of such sentiments being
9  expressed within Kaiser, there again in the same
10 time frame, July 2001 earlier?
11         MS. NUSSBAUM:  And what's -- repeat
12 your question?
13     Q.    I believe the sentiment was whether
14 the growth and utilization of prescription drugs
15 may be attributable to physicians being detailed
16 by drug reps?
17     A.    At that time in July of 2001, I just
18 do not recall.
19     Q.    Okay.
20         Or any time earlier?
21     A.    I don't recall.
22     Q.    In the e-mail from Brian Fitch,
23 there's a statement that, "These" -- which refers
24 to some medications including Neurontin -- "tend
25 to be less sedating, cause less weight gain and

Page 404

A. Carver

1
2  lack the hepatotoxicity of Tegretol and Depakote."
3          Has anyone, or actually has either
4  Kaiser or anyone acting on its behalf done any
5  analysis regarding this issue since 2001?
6          MS. NUSSBAUM:  Objection.
7          The witness has testified he's never
8  seen this, he didn't write it, he didn't receive
9  it.  Separate and apart from this e-mail, if you
10 want to ask him does he specifically know whether
11 or not in X time period Kaiser analyzed, he'll
12 answer it yes or no, but I don't want to tie any
13 questions to an e-mail that the guy has never
14 seen.
15         MR. JAMES:  I don't mean to tie the
16 information to the e-mail, except to the extent
17 that it helps you recall.
18         MS. NUSSBAUM:  He didn't recall.  He's
19 never seen that.  Let's put that down.  If you
20 have a question, ask the question.  If he can
21 answer it, he will and he won't speculate.
22     Q.    Since 2001, has Kaiser or anyone
23 acting on its behalf performed any analysis as to
24 whether Neurontin is less sedating, causes less
25 weight gain, or lacks the hepatotoxicity of

Page 405

A. Carver

1
2  Tegretol and Depakote?
3          MS. NUSSBAUM:  Do you know?
4      A.    I don't know specifically.
5      Q.    Do you know -- as a personal matter,
6  do you know what sorts of uses Tegretol and
7  Depakote have?
8          MS. NUSSBAUM:  Objection.
9          Do you want to know during what period
10 of time, what the -- if a specific pharmaceutical
11 product --
12     Q.    Or at any time, today, do you have any
13 knowledge to what uses Tegretol and Depakote --
14         MS. NUSSBAUM:  If you know without
15 specific to the PDR or something else.
16     A.    Depakote is an antiseizure medication.
17 Tegretol is used for at least trigeminal
18 neuralgia.
19     Q.    Does Depakote have any other uses
20 other than the use that you've just listed?
21         MS. NUSSBAUM:  If you specifically
22 know.
23     A.    I'm not certain.
24         MR. JAMES:  We'll take our break at
25 this time.

Page 406

A. Carver

1
2          VIDEOGRAPHER:  Going off the record at
3  2:30.  This is the end of tape four in the
4  deposition of Albert Carver.
5          (Recess.)
6          VIDEOGRAPHER:  Going back on the
7  record at 2:43 approximately.  This is the
8  beginning of tape five in the deposition of Albert
9  Carver.
10 BY MR. JAMES:
11     Q.    Could you turn back to Kaiser-3, which
12 is the Complaint?
13     A.    Yes.
14     Q.    I guess if you to turn page 65 of the
15 Complaint again, are there any alternative
16 medications listed for pain on this page?
17     A.    Not specifically.
18     Q.    Are there any listed that may be
19 applicable to pain in some more general sense?
20         MS. NUSSBAUM:  Are you including
21 aspirin or Ibuprofen or are you just looking at
22 the chart?
23     A.    Actually, I should include those as
24 well.
25         MS. NUSSBAUM:  Including aspirin and

1            A. Carver
2  Ibuprofen, he wants to know whether or not there
3  is any alternate medication that could be used for
4  pain.
5      A.   I'm confused, I'm sorry.
6      Q.   Actually, I want to withdraw the last
7  question.
8          We can set aside aspirin and
9  Ibuprofen.  I think you had answered my earlier
10 question by saying that there were not any listed
11 on this chart for pain specifically, and I was
12 wondering if you meant to qualify your answer
13 somehow by the word "specifically"?
14     A.   No.
15     Q.   You might turn to Kaiser-15, which is
16 the interrogatory responses, and setting aside
17 aspirin and Ibuprofen, do you know whether these
18 responses list any alternative medications to
19 Neurontin for pain?
20     A.   I believe that this -- this section
21 restates this table.
22     Q.   Okay.
23         Does either then state the name of a
24 alternative cheaper and more desirable medication
25 to Neurontin for pain?

1            A. Carver
2      MS. NUSSBAUM:  Well --
3      Q.   Setting aside aspirin --
4      MS. NUSSBAUM:  Yeah, but why are you
5  excluding aspirin and Ibuprofen?  Aspirin and
6  Ibuprofen are listed in both the Complaint and the
7  response to the interrogatories as alternative
8  cheaper medications that could be used for some of
9  these conditions.
10     Q.   I mean, if you'd like to state, and I
11 can retrace my question that way and state:  Are
12 you aware of -- I guess it's a matter of whether I
13 say the words "aspirin" or "Ibuprofen" or you do.
14 If you prefer to answer the question, does page 65
15 of the Complaint or the interrogatory responses
16 which you state -- restate the information on page
17 65 of the Complaint, state the names of any
18 alternative cheaper or more desirable medications
19 to Neurontin for pain?
20     A.   Well, I believe that the -- what is
21 contained here, there were numerous alternative
22 medications that were cheaper and more optimal
23 than Neurontin to treat the conditions for which
24 dependents were touting Neurontin, including
25 several medications such as aspirin and Ibuprofen

1            A. Carver
2  not ordinarily covered by plaintiff's formularies.
3          This, in my reading, does not limit
4  the claim to only the specific medical conditions,
5  but Neurontin was presumably also used off-label
6  for pain, for which in some situations aspirin and
7  Ibuprofen may very well be a cheaper alternative
8  as it relates to what is paid for by the plan.
9      Q.   I guess the question is:  Aside from
10 Aspirin and Ibuprofen, which you mentioned, does
11 either page 65 of the Complaint or the
12 interrogatory responses specifically identify any
13 alternative cheaper or more desirable medication
14 to Neurontin for pain?
15     MS. NUSSBAUM:  I think the documents
16 speak for themselves.  You know, the Complaint
17 indicates that these are some examples, okay, and
18 the interrogatory response indicates that it will
19 be supplemented, and it is the subject of expert
20 testimony and that it's premature.
21     Q.   You can answer my question.
22     A.   I would refer back to the answer that
23 I just previously gave, which it doesn't appear to
24 me that this is limiting the uses of Neurontin to
25 these specific conditions that are contained on

1            A. Carver
2  this table or that are contained on the last
3  paragraph of page 7 of number 15.
4      Q.   No, I understand that.
5          I guess the question is:  Are there
6  any medications specifically identified that are
7  alternative cheaper or more desirable medications
8  to Neurontin for pain in either of these two
9  documents?
10     MS. NUSSBAUM:  Asked and answered.
11 The witness already said aspirin and Ibuprofen.
12     MR. JAMES:  Is that the total answer?
13     MS. NUSSBAUM:  Other than that, if
14 this is a reading test, he can read the chart and
15 the word "pain" does not appear on the chart.  So
16 if that's what you want him to do, just a reading
17 exercise, he can do that.
18     Q.   Is it correct that aspirin and
19 Ibuprofen are the only documents or medications
20 identified in either of these documents that has
21 an alternative cheaper or desirable medication to
22 Neurontin?
23     A.   That are contained on these two pages,
24 yes.
25     Q.   Actually, the document as a whole --

Page 411

1            A. Carver
2      MS. NUSSBAUM:  You want him to read
3  the document as a whole?  I guess that we can
4  finish your two hours doing that.
5      Q.   All right.  Why don't you limit it to
6  the shorter document.  You limit it to page 65 of
7  the Complaint and the interrogatory responses.
8  And your counsel previously had identified the
9  first several pages as being legal gobbledygook,
10  so I think you can safely skip those.
11      A.   Well, I don't think I can answer your
12  question in terms of whether or not there is
13  anything else contained in this filing or these
14  documents that would state less costly
15  alternatives for the treatment of pain, if that's
16  your question.
17      Q.   It's actually a bit different.  It's
18  whether any medications are identified on page 65
19  of the Complaint or within the interrogatory
20  responses as being alternative cheaper and more
21  desirable medications to Neurontin for pain.
22      MS. NUSSBAUM:  You know, I really
23  think at this point that this is argumentative and
24  leading.  The answers to interrogatories state in
25  plain English, and I'm reading it, okay, it's

Page 412

1            A. Carver
2  objected to as premature and calling for expert
3  testimony.
4      MR. JAMES:  I wasn't really asking
5  whether --
6      MS. NUSSBAUM:  There's a right to
7  supplement.
8      MR. JAMES:  You definitely have a
9  right to supplement, and I'm not -- I'm asking
10  whether --
11      MS. NUSSBAUM:  This is a reading
12  exercise right now.
13      Q.   As of this time, have you identified
14  on page 65 of the Complaint and in the
15  interrogatory responses any other drug other than
16  aspirin and Ibuprofen as being alternative cheaper
17  and more desirable medications than Neurontin for
18  pain?  I fully acknowledge that you may seek to
19  supplement this response at some point in the
20  future.
21      MS. NUSSBAUM:  By counsel, do you
22  understand, or I can just make a representation by
23  counsel so we can just move on.  Do you understand
24  his question?
25      THE WITNESS:  I think so.

Page 413

1            A. Carver
2      A.   The answer is no.
3      Q.   Thank you.
4      Does Kaiser presently know of any
5  other alternative cheaper and more desirable
6  medications to Neurontin for pain?
7      MS. NUSSBAUM:  Objection.  Do not
8  give any answer that would reflect any litigation
9  strategy, discussion or discussions with either
10  Mr. Cohen or myself or any other lawyers with
11  respect to this litigation.
12      A.   I'm unable to answer your question.
13      Q.   Do you know of information regarding
14  that any of these other alternative cheaper or
15  more desirable medications to Neurontin for pain
16  that have not been identified in response to the
17  defendant's interrogatories?
18      MS. NUSSBAUM:  Repeat that question.
19      MR. JAMES:  You can read the question
20  back.
21      (Record read.)
22      MS. NUSSBAUM:  I think that's an
23  unintelligible question.
24      Q.   If you understand the question, you
25  can answer.

Page 414

1            A. Carver
2      MS. NUSSBAUM:  You want him to give a
3  list like from the PDR?
4      MR. JAMES:  I have initially asked
5  him --
6      MS. NUSSBAUM:  As to the category of
7  medications for the treatment of pain?
8      Q.   Do you understand the question?
9      A.   Maybe you could state it very simply.
10      Q.   Did you indicate earlier that this
11  interrogatory response suggests that there may be
12  other alternative medications that are cheaper and
13  more desirable medications to Neurontin for
14  various off-label uses?
15      A.   I indicated --
16      MS. NUSSBAUM:  That's what it says.
17  It's a legal document and the document speaks for
18  itself.
19      Q.   Is that consistent with your prior
20  testimony?
21      A.   I believe it's consistent with my
22  testimony.
23      Q.   And I've asked you whether at this
24  time Kaiser knows of the identities of any of
25  those other alternative cheaper and more desirable

Page 415

A. Carver

1    medications to Neurontin for pain, you know, the
2    existence of which is possibly hinted at by the
3    interrogatory responses.
4        MS. NUSSBAUM:  Okay.  And let me
5    caution you that if your answer would include
6    information based on discussions that you've had
7    with myself, Mr. Cohen, others in legal counsel's
8    office with respect to this litigation, litigation
9    strategy, damage theory, expert testimony and the
10   like, please do not answer.
11      A.   That I'm unable to answer.
12      MR. JAMES:  Let's state for the record
13   that it appears that there may be additional
14   information responsive to the defendant's
15   discovery requests.  In fact, the plaintiffs are
16   withholding on the basis of attorney-client
17   privilege which they have yet to disclose to the
18   defendants.
19      MS. NUSSBAUM:  And I'll state for the
20   record that the exhibit that you've marked here,
21   Kaiser-15, which is a supplemental response to the
22   defendant's second set of interrogatories, also
23   contains certain objections to those
24   interrogatories, numerous objections, five pages

Page 416

A. Carver

1    worth of objections, including the fact that these
2    interrogatories are premature and call for expert
3    testimony, and there is a representation that
4    Kaiser reserves its rights to supplement up to and
5    through its expert reports the answers to this
6    interrogatory.
7        MR. JAMES:  Counsel, is it your
8    understanding that the right to supplement
9    includes the right to postpone the disclosure of
10   information that's presently known to you at the
11   time of the interrogatory response?
12      MS. NUSSBAUM:  Sir, nobody testified
13   that there's any information presently known,
14   okay?  Nobody testified to that.
15      MR. JAMES:  Are you denying that there
16   is any other information presently known, or are
17   you holding open the possibility that there is
18   information presently known that is being withheld
19   from the defendants?
20      MS. NUSSBAUM:  Nothing is being
21   withheld from the defendants.  We're taking a
22   consistent position, okay, as we've taken before
23   the magistrate judge on the record as reflected on
24   page 7 of Exhibit 15, that this is premature.

Page 417

A. Carver

1        MR. JAMES:  We can proceed on the
2    assumption --
3        MS. NUSSBAUM:  That expert testimony
4    and that it will be timely supplemented.
5        MR. JAMES:  I'll take it that the
6    responses provided are an accurate representation
7    of the plaintiffs' state of knowledge at the time
8    that the responses were provided.
9        Q.   Have any alternative cheaper and more
10   desirable medications to Neurontin for the
11   treatment of restless leg syndrome been identified
12   by the plaintiffs to the defendants?
13      MS. NUSSBAUM:  Objection.
14      Again, and I think that this is the
15   same exact line of questioning.  Maybe to move on
16   to get this done during the time period allotted,
17   we can stipulate that at present, the information
18   is contained on page 65 of the Complaint and the
19   objections and right to supplement and objections
20   as to prematurity is contained in Kaiser Exhibit
21   15, the interrogatory responses.
22      Q.   Can you stipulate that the objection
23   is not being used to withhold from disclosure
24   information presently known to Kaiser?

Page 418

A. Carver

1        MS. NUSSBAUM:  Nobody is withholding
2    anything from disclosure that should be disclosed.
3    Okay.  We have supplemented these responses
4    before.  These were supplemental responses that
5    were supplemented as soon as, under the rules, it
6    should have been supplemented.  And we will
7    continue to supplement responses as soon as it's
8    appropriate under the rules; okay?
9        Q.   As a personal matter when you
10   authorized filing of this suit, were you aware of
11   any alternative cheaper and more desirable
12   medications to Neurontin for the treatment of
13   restless leg syndrome excluding any discussions
14   with counsel?
15      MS. NUSSBAUM:  As a personal matter?
16      MR. JAMES:  Yes.
17      MS. NUSSBAUM:  Was he personally
18   aware, not on behalf of Kaiser, as to himself?
19      MR. JAMES:  Correct.
20      MS. NUSSBAUM:  Whether or not there
21   were drugs other than Neurontin available to be
22   prescribed for restless leg syndrome?
23      MR. JAMES:  Yes.
24      MS. NUSSBAUM:  If you specifically

Page 419

```
1            A. Carver
2   know whether or not -- through what period of
3   time?
4         MR. JAMES:  As of the filing of the
5   Complaint.
6      Q.   Were you aware of any cheaper and more
7   desirable medications to Neurontin for the
8   treatment of restless leg syndrome?
9      A.   Not specifically.
10     Q.   Do you know whether there are any
11  FDA-approved drugs indicated for restless leg
12  syndrome?
13        MS. NUSSBAUM:  You have a particular
14  time in mind?
15     Q.   At the present time?
16        MS. NUSSBAUM:  Okay.  Without looking
17  at a PDR or going online on the FDA website --
18     Q.   There's no need to look at those
19  resources.
20     A.   No, I do not know.
21     Q.   Does Kaiser in its corporate capacity
22  know whether there are any -- well, actually,
23  withdraw that question.
24        I guess earlier we talked about drug
25  limitations or quantity limitations.
```

Page 420

```
1            A. Carver
2         How expensive are drug limitations to
3   implement if a particular employer or group wants
4   to implement a drug limitation on a particular
5   drug?
6         MS. NUSSBAUM:  I don't understand the
7   question.  If this is hypothetical or speculative,
8   I'm going to ask the witness not to answer.
9      Q.   Well, first, do you recall how we use
10  the term "drug limitation" or "quantity
11  limitation"?
12     A.   I believe I do.
13     Q.   And if an employer group requests
14  Kaiser to implement a drug limitation or quantity
15  limitation on a given drug, is that something that
16  Kaiser is capable of doing?
17        MS. NUSSBAUM:  Objection.  Outside the
18  scope of the 30(b)(6) and outside of this witness'
19  deposition.  I mean, let's just do the relevant
20  things that we're here to do and get done now.  We
21  have like an hour and a half left.
22     Q.   I believe topic number six actually
23  expressly refers to drug limitation or quantity
24  limits.
25        MS. NUSSBAUM:  And we went through
```

Page 421

```
1            A. Carver
2   that you wanted to know the practices and
3   policies.  We went quite a bit of time on that
4   this morning.
5      Q.   I'd like to know if it's something
6   that Kaiser can implement on behalf of employer
7   groups.
8         MS. NUSSBAUM:  Asked and answered.
9      Q.   You can answer.
10     A.   I don't believe that we can -- could
11  do such other than, that would be drug specific,
12  other than what I've outlined to you in terms of
13  the general limitation on a particular drug
14  benefit.  That would be like a 30-day supply or a
15  60-day supply or 100-day supply or something like
16  that that's applicable to all the medications that
17  a patient receives pursuant to their drug benefit.
18        But to then dive into some other
19  quantity limitation on a particular product, I
20  don't believe our systems would support that at
21  this time.
22     Q.   In light of your personal industry
23  knowledge, are you aware of other health insurers
24  or PBMs that are capable of providing drug,
25  specific drug limitations or quantity limits?
```

Page 422

```
1            A. Carver
2         MS. NUSSBAUM:  I would object.  He's
3   not here as an industry expert.  He's here as a
4   fact witness, or 30(b)(6).
5      Q.   And I've asked in your personal
6   knowledge.  I don't expect you to be an industry
7   expert necessarily.
8         MS. NUSSBAUM:  You just asked whether
9   he has industry knowledge about what's going on in
10  the industry.  He's not here as an industry expert
11  for you.
12     A.   I think I've previously testified that
13  I'm not well versed on the details of features
14  that PBMs may have available to them to administer
15  drug benefits.
16     Q.   Did Med Impact have that capability?
17        MS. NUSSBAUM:  What capability?
18        MR. JAMES:  To provide drug
19  limitations or quantity limits?
20        MS. NUSSBAUM:  At what time?
21        MR. JAMES:  At any time during the
22  relevant period?
23        MS. NUSSBAUM:  Don't you have a
24  document or something you want to show him?
25        MR. JAMES:  No.
```

A. Carver

1
2    A.   I do not know.  I think that we
3  explained yesterday that the amount of the number
4  of prescriptions, the amount of Kaiser business
5  that goes through Med Impact is really small,
6  maybe about 2 percent of our total business and
7  so, I -- it's -- it was not explored.
8        And if they had that capability, why
9  would we do something for 2 percent of the
10  population that we wouldn't administer for the
11  other 98 percent of the population, so that would
12  be problematic.  So it's not been explored and I
13  do not know their capability as a PBM whether or
14  not they could administer that or not.
15    Q.   You've obviously given me quite a bit
16  of information regarding the structure of the
17  regional P&T committee, and today you
18  supplemented that with information regarding the
19  area of P&T committees in southern California.
20        Do they have a similar structure of
21  both regional P&T and area P&T committees and the
22  other regions that you identified yesterday?
23    A.   No -- excuse me, in northern
24  California, yes.  And I can't speak to the
25  specific design of the P&T committee factually and

A. Carver

1
2  the other regions.  But just please remember in
3  California we have about 30 medical centers which
4  are really large medical centers, that which we
5  are providing medical care and pharmacy services
6  to 6.4 million members or so, which represents
7  75 percent of Kaiser's total business.  And so it
8  may be that there's a little bit leaner structure
9  once we get to Ohio, which has a very small
10  population.
11        MR. JAMES:  Mark another exhibit.
12        (Kaiser-21 marked for identification.)
13    Q.   Do you know what this document is,
14  aside from the first page?
15    A.   This represents Kaiser's policies as
16  it relates to the retention of business records.
17    Q.   And either from your knowledge as a
18  30(b)(6) witness or from this document, can you
19  tell which documents relating to the provision of
20  prescription pharmacy benefits would be regarded
21  as business records subject to this policy?
22    A.   Just give me a minute to refresh my
23  memory here.
24        Yes, the -- section related to
25  pharmacy records would be under, if you want to

A. Carver

1
2  get to times, I would reference this to page.
3  It's marked at the top page 3 of this photo, which
4  says actually, so as I don't confuse us, it's
5  marked as page 2 of 5 on the document.
6    Q.   All right.
7    A.   Okay.  And then I would reference this
8  down to the section number 1, retention period for
9  business records governed by law as it relates to
10  the prescription records.
11    Q.   Is that records of prescriptions made
12  to individual Kaiser insureds?
13    A.   Yes, it is.  And -- well, I'll let you
14  ask the questions.
15    Q.   Are there other documents that relate
16  to the provision of prescription pharmacy benefits
17  that are also covered by this policy?
18    A.   Well, I think the retention period
19  generally is for those that are mandated to be
20  specific.  This policy, the corporate policy
21  indicates that the retention period for documents
22  is seven years unless otherwise defined by law or
23  accreditation or particular business needs.
24        Specifically, as it relates to
25  prescription records, the previous policies at the

A. Carver

1
2  regional level have been generally the storage of
3  pharmacy records, including prescriptions for a
4  period of five years.  The requirement for the
5  requirements vary from state to state, but
6  typically three years for prescriptions and two
7  years for controlled substance prescriptions.
8        So we have -- we had established a
9  five-year time frame for prescriptions, and then
10  more recently in 2005 with the -- in anticipation
11  and preparation for the requirements of CMS as it
12  relates to Medicare Part D prescriptions, that has
13  been extended now effective January of 2006 to 10
14  years.
15        And so that -- that represents the
16  record retention policy for prescriptions.  And
17  then there are other retention periods for other
18  pharmacy-related documents that typically are
19  5 percent, such as invoices, and you know, the
20  purchase of drugs and those kinds of documents,
21  and for pharmaceutical contracts, I believe the
22  period of time is seven years, which would be
23  under my authority or area of accountability, I
24  guess, but generally that is the retention period
25  within Kaiser for our records.

Page 427

```
1              A. Carver
2      Q.   The policy, is there any policy
3  applicable to the retention of formularies that
4  are in place at a given time?
5      MS. NUSSBAUM:  If you know
6  specifically with respect to that.
7      A.   The -- I can only speak to the
8  regulatory requirement in California is for a
9  five-year period of time for formularies.  I don't
10 know whether that might vary in states outside of
11 California or not.  So I cannot speak to that.
12     Q.   Within California, do you preserve it
13 just up to the five years required by law or do
14 you preserve those documents for an additional
15 time as a matter of company policy?
16     A.   As a matter of company policy, it
17 would be up to seven years.
18     Q.   I believe we touched on this
19 yesterday, what efforts has Kaiser made to
20 identify and produce documents responsive to the
21 defendant's document requests?
22     MS. NUSSBAUM:  And just, if I may,
23 please answer, but please do not divulge specific
24 discussions, instructions, or communications with
25 Mr. Cohen or anybody on his staff or with myself,
```

Page 428

```
1              A. Carver
2  my colleague, or anybody on my staff.
3      Do you want to be more specific maybe?
4  I mean, the witness is --
5      Q.   Can you answer the question?
6      MS. NUSSBAUM:  Can I make a suggestion
7  maybe?  Does he know whether or not documents were
8  produced in this case and what the steps were,
9  something like that, something concrete.
10     MR. JAMES:  I might return to this.
11     Q.   We went over the organizational
12 structure of the southern California region
13 yesterday.
14     Were every department and divisions
15 documents searched in response to the defendant's
16 requests?
17     A.   I believe that they were.
18     Q.   Did you produce documents from regions
19 outside southern California?
20     A.   Did I personally produce?
21     Q.   No.  Did you, Kaiser, produce
22 documents from regions outside southern
23 California?
24     A.   Yes, I think we've seen such documents
25 today.
```

Page 429

```
1              A. Carver
2      Q.   Were documents produced from all
3  regions within the United States?
4      A.   To my knowledge, all the documents
5  responsive have been produced.
6      Q.   As a personal matter, would it strike
7  you as a surprise that there might be no
8  responsive documents from, say, Colorado or Ohio
9  or the mid-Atlantic region?
10     A.   I would be surprised; yes.
11     Q.   Yesterday we discussed the process by
12 which restrictions were placed on and removed from
13 Gabapentin at various times in the southern
14 California region.
15     Do you expect that outside northern
16 California and southern California steps such as
17 that might have been taken at some point in 1994
18 forward?
19     MS. NUSSBAUM:  This is a hypothetical,
20 that steps might have been taken at unspecified
21 times.  We had very, very lengthy discussions as
22 to this yesterday.  If you have a specific
23 question, the witness will endeavor to answer it.
24     Q.   I guess I asked you specifically
25 yesterday about changes that are made in southern
```

Page 430

```
1              A. Carver
2  California, and I am thinking maybe to some extent
3  in northern California.
4      Do you have knowledge of changes made
5  with regard to formulary restriction guidelines on
6  Neurontin or Gabapentin in other regions?
7      A.   Not specifically, no.
8      Q.   As a general matter, do you have any
9  knowledge?
10     MS. NUSSBAUM:  Asked and answered
11 yesterday.  As a general matter, he testified that
12 Neurontin was on all formularies in all regions
13 from 1994 on, once it came to market.
14     Q.   The question dealt with restriction
15 guidelines as opposed to formulary.  I do
16 understand that Neurontin has been on the
17 formulary of Kaiser from 1994 until the
18 introduction of generic Gabapentin.  But with
19 regard to restriction guidelines, do you know of
20 any changes made in that regard in other regions?
21     A.   I do not know specifically.
22     Q.   And would it surprise you if there
23 were no documents memorializing any such changes
24 that were made in other regions from 1994 forward?
25     A.   Regarding restrictions?
```

Page 431

1           A. Carver
2    Q.    Yes.
3    A.    It would not surprise me from the
4  standpoint of, I believe, that southern California
5  has been more energetic regarding attempting
6  restrictions in other regions.  There has been
7  certainly fewer restrictions, even in northern
8  California, related -- relative to southern
9  California, and I think it's been more of just a
10 philosophy or a tradition.
11         And so, then it would not surprise me
12 that there could be variances in enthusiasm for
13 trying to implement restrictions in regions
14 outside of California.
15    Q.    Other than the larger number of
16 insureds in California and in other regions, is
17 there any other reason that California has been
18 more active with regard to attempting
19 restrictions?
20         MS. NUSSBAUM:  If you know
21 specifically.
22    A.    I don't know specifically.
23    Q.    I think yesterday you mentioned
24 briefly that there is some communication between
25 the regional P&T committees for the various

Page 432

1           A. Carver
2  regions?
3    A.    Correct.
4    Q.    Do they share information regarding
5  restriction on particular prescription drugs?
6    A.    The information that is shared is
7  generally the monograph that's developed regarding
8  the use of all of drugs essentially, each other
9  drug, whether it's Neurontin or not, and then --
10 then each of the P&T committees outside of
11 California deals with their decisions as they see
12 fit in their respective regions.
13    Q.    Is there a formal program for
14 exchanging those monographs, or is it kind of done
15 on an ad hoc basis?
16    A.    It's not an exchange as much as it's
17 an outflow from the Drug Information Service in
18 California.
19    Q.    Does Kaiser have drug information
20 services in other regions?
21    A.    Not formal drug information services.
22 Calls from other regions come into California's
23 Drug Information Service.
24    Q.    Am I correct to understand that Kaiser
25 has searched its e-mails in response to the

Page 433

1           A. Carver
2  defendant's document production requests?
3    A.    I believe so.
4    Q.    And does Kaiser, meaning the
5  plaintiffs, have a separate e-mail system from
6  Permanente Group?
7    A.    There is one e-mail system, one big
8  e-mail system that all the people within health
9  plan, hospitals as well as the Permanente Medical
10 Groups utilize.
11    Q.    And were all responsive documents from
12 that sort of single e-mail group produced?
13    A.    I hope so.
14         MS. NUSSBAUM:  The requests are for
15 the plaintiff's documents.  All documents for the
16 plaintiffs were produced.  To the extent that
17 there is a contractual relationship with others
18 and not access to individuals, you know, who are
19 not employees of the plaintiff's documents, they
20 are not being produced.  So to the extent that
21 documents, you know, may have been created by
22 others who were not employees of the plaintiffs
23 here but were in the files of the plaintiffs as we
24 saw today and yesterday by things that are marked,
25 those things were produced.

Page 434

1           A. Carver
2         But third-party documents that are not
3  in our possession and that are not under our
4  control were clearly not produced.
5    Q.    Are there any documents in Permanente
6  Group's custody that are within the plaintiff's
7  control?
8         MS. NUSSBAUM:  Can you explain what
9  you mean by that?
10         THE WITNESS:  Yeah.
11    Q.    Do you have the right to request any
12 documents from Permanente Group, you know, as a
13 matter of contractual right?
14         MS. NUSSBAUM:  I think that that's
15 been asked and answered.  The witness testified
16 that they employ physicians who they interview,
17 who they employ, who they train, that the
18 plaintiffs here have nothing to do with any of
19 that process, and that the relationship between
20 the entities is simply a contractual relationship
21 and nothing more.
22         We've taken that position in front of
23 Justice Saris, we've taken that position in front
24 of Judge Sorokin.  That information is publicly
25 available, if you go online, you can research the

Page 435

```
 1              A. Carver
 2  corporate structures yourself and that's the
 3  situation.
 4     Q.   Do you know how long the contractual
 5  relationship between the Permanente Medical Group
 6  and the plaintiffs has been in place?
 7     A.   Since 1945.
 8     Q.   Were they founded at the same time?
 9        MS. NUSSBAUM:  If you specifically
10  know.
11     A.   I do not specifically know region by
12  region.  But the relationship dates back to
13  approximately 1945 and then as regions have grown
14  around the company, whatever those dates were.
15     Q.   Will you characterize it as an arm's
16  length contractual relationship?
17        MS. NUSSBAUM:  The witness is not a
18  lawyer.  I think that the relationship has been
19  characterized by him repeatedly throughout this
20  deposition and by the plaintiffs in this
21  litigation repeatedly to the courts.  The
22  relationship is what it is and I'm not going to
23  have the witness give legal opinions because he's
24  not a lawyer.
25     Q.   We actually talked about this as a
```

Page 436

```
 1              A. Carver
 2  contractual relationship.
 3         Are there particular contracts in
 4  place between the plaintiffs and the Permanente
 5  Medical Group?
 6     A.   Yes, there are.
 7     Q.   Is there a single, like plaster
 8  contract or there are a large number of individual
 9  contracts?
10        MS. NUSSBAUM:  If you know, and this
11  is beyond the scope of the 30(b)(6) deposition
12  here.  He's not from the legal counsel's office,
13  and so we're happy, you know, to the extent that
14  he has specific knowledge, to testify as to that,
15  but you know, we don't want to have any
16  speculation here.
17     Q.   What do you know?
18     A.   There is a medical service agreement
19  in southern California.  There's a separate
20  medical service agreement in northern California
21  with TPMG.  I do not know the specifics of the
22  medical service agreements in the regions outside
23  of California.
24     Q.   Is that medical service agreement the
25  only contract of which you're aware of between the
```

Page 437

```
 1              A. Carver
 2  plaintiffs and Permanente Medical Group and
 3  northern and southern California?
 4     A.   To which I'm aware?
 5     Q.   Yes.
 6     A.   Yes.
 7     Q.   Well, what's the term of that contract
 8  or those two contracts?
 9        MS. NUSSBAUM:  If you know.
10     A.   I do not know.
11     Q.   Do you have any familiarity with
12  whether those contracts are renegotiated
13  periodically?
14        MS. NUSSBAUM:  Presumably all
15  contracts are negotiated periodically, but if you
16  don't have any specific understanding as to the
17  term of the contract, I would ask you not to
18  speculate.
19     A.   I can't speculate in terms of the
20  length of individual service agreements or the
21  frequency at which it's renegotiated.
22        MS. NUSSBAUM:  You know, with all due
23  respect, Mr. James, we've talked ad nauseam with
24  your colleague Mr. Roland about the scope of the
25  various 30(b)(6) Notices here.  This was not the
```

Page 438

```
 1              A. Carver
 2  terms of this particular contract and the lengths
 3  were not areas that he indicated to us you wanted
 4  a 30(b)(6) witness on.
 5         Nevertheless, what I would suggest is
 6  if you have a specific two, three, four questions
 7  such as the length of the, you know, present
 8  contract or whatever, let's just ask the question.
 9  We can leave a blank in the transcript and we will
10  endeavor to get the answer from the appropriate
11  person, but I don't want speculation, and I know
12  you don't either, the length of the contract and
13  whatever you have, another question or two,
14  whatever, just ask them.
15         Unless you have personal, you know,
16  knowledge, please don't testify, but we will
17  endeavor to get the answer from the appropriate
18  person.
19     Q.   I actually just have one more
20  question.
21         Just to your personal knowledge, are
22  you aware of any occasion on which the plaintiffs
23  and Permanente Medical Group have failed to reach
24  an agreement on a renewed contract at some point
25  from 1945 to the presence?
```

Page 439

1          A. Carver
2      MS. NUSSBAUM:  If you know.
3      A.   I do not know.
4      Q.   Is this something that keeps you awake
5  at night?
6      A.   It is not.
7          (Kaiser-22 marked nor identification.)
8      Q.   Have you had a chance to review this
9  document?
10     A.   I have.
11     Q.   Is this -- whose website is this?  If
12 you look at the upper right-hand corner --
13     MS. NUSSBAUM:  If you know.
14     A.   I don't know.
15     MS. NUSSBAUM:  Does counsel want to
16 represent where this document came from?
17     A.   I've never seen the document, so I
18 really do not know.
19     Q.   Have you heard of the website
20 kaiserpermanente.org?
21     A.   Yes, I have.
22     Q.   And whose website is that?
23     MS. NUSSBAUM:  If you know.
24     A.   I don't know the legal owner of it.
25     Q.   Do you know who maintains this

Page 440

1          A. Carver
2  website?
3      A.   I don't.
4      Q.   Does -- do the plaintiffs have a
5  separate public website you know which is not
6  kaiserpermanente.org?
7      A.   I do not believe so.  Are you talking
8  about a public website?
9      Q.   Yes.
10     A.   That's to the public, external?
11     Q.   Exactly.
12     A.   I believe there's just one website.
13     Q.   And it's kaiserper.org?
14     A.   Yes, kp.org.
15     Q.   Do you know if the two are equivalent?
16     MS. NUSSBAUM:  The witness testified
17 he doesn't know what website this is and he didn't
18 know where you got this document, what he's aware
19 of is kp.org.
20     Q.   Are you aware of a site called kp.org,
21 but not a site called kaiserper.org?
22     A.   Yes, from a technical issue I don't
23 know what it's called.
24     Q.   The logo in the upper left-hand corner
25 of this document, is that the logo, the Permanente

Page 441

1          A. Carver
2  Medical Group's logo, or is it a logo associated
3  with some other Kaiser entity, or you know,
4  something that you've never seen before?
5      A.   No, this a logo for Kaiser Permanente,
6  the umbrella organization.
7      Q.   So for both the plaintiffs and the
8  Permanente Medical Group, is that correct?
9      A.   That's correct.  I cannot tell from
10 this logo that's been used whether or not this is
11 part of the Permanente Medical Group context or
12 not.  But certainly the logo up there belongs to
13 the umbrella, I guess, branding of our
14 organization.
15     Q.   If I were to represent to you that my
16 colleague seated here had printed this document
17 from the worldwide web from this address in the
18 upper right-hand corner, would you have any reason
19 to doubt that?
20     A.   No, I wouldn't.  If you're asserting
21 that, I wouldn't doubt it.
22     Q.   If this were a publicly accessible
23 document at an address called
24 kaiserpermanente.org, would you be concerned about
25 the content of this document?

Page 442

1          A. Carver
2      MS. NUSSBAUM:  Objection.  It calls
3  for his personal speculation.  As to whether or
4  not he'd be concerned about the document, I'm not
5  going to let him answer that.  I don't know what
6  that means.
7      Q.   You can answer the question, if you
8  understand it.
9      MS. NUSSBAUM:  What does "concern"
10 mean?
11     Q.   If you have a comment as to the
12 meaning of the word concern, you're free to answer
13 the question?
14     MS. NUSSBAUM:  Why don't you define it
15 using of the word concern.  I'm not going to have
16 him answer the question until you articulate a
17 question that can be answered.
18     Q.   Do you understand what the term
19 "concern" means?
20     A.   Could we reask the question, please?
21     MR. JAMES:  Could you read back the
22 question?
23         (Record read.)
24     MS. NUSSBAUM:  I ask you to define the
25 term concern as you're using it --

```
1              A. Carver
2    Q.  If you understand the question, you
3  can answer.
4       MS. NUSSBAUM:  This witness is
5  testifying, are you asking this in his personal
6  capacity?
7    Q.   Yes, in your personal capacity, would
8  you be concerned?
9       MS. NUSSBAUM:  Do you understand what
10  the word "concern" means or would you like that
11  defined so that you understand what Mr. James is
12  looking for?
13       THE WITNESS:  I'll give it a try to
14  see if I meet your definition of the word
15  "concern."
16       MS. NUSSBAUM:  No, because you don't
17  know his definition.  I don't know how you can
18  give a try.  Maybe you should learn his
19  definition.
20    A.   Okay.  So help me understand the
21  specific question.
22    Q.   If I recall, the former President had
23  trouble with the word as it is, but in any
24  event --
25    A.    Please do not associate me with that
```

```
1              A. Carver
2  former President.
3    Q.   Fair enough.  You don't deserve that.
4  I'll read some lines from this document.
5    A.   I have to defend myself on that one,
6  Counsel.
7    Q.   "People who took Gabapentin for
8  chronic pain said they felt one-third less pain
9  while they were taking Gabapentin."
10       Do you have an understanding of of what
11  the term "chronic pain" means?
12       MS. NUSSBAUM:  I will object.  We have
13  no idea what this document is, where it's from, it
14  says Healthwise on it, who it's for, who it's
15  addressed to, what purpose it serves.
16       The witness has testified that he has
17  never seen this document before and does not
18  recognize the document.  So, I think that it's
19  really totally a waste of time to ask him about
20  the meaning of words or sentences in the document
21  that he's already indicated he has never seen, he
22  did not know what it's for, who it's for, what its
23  purpose is, who writes it, who it's addressed to
24  or anything else.
25    Q.   Apart from this document, do you have
```

```
1              A. Carver
2  an understanding of the term "chronic pain"?
3       MS. NUSSBAUM:  You want to know his
4  layman's definition?
5    Q.   No, actually, as a pharmacist, do you
6  have an understanding of the term chronic pain?
7       MS. NUSSBAUM:  As a pharmacist, do you
8  have an understanding or do you have a layman's
9  understanding?
10    A.   I would have a layman's understanding
11  relative to how it might be defined by our
12  specialists that treat chronic pain.
13       MS. NUSSBAUM:  Well, no, you're
14  testifying now in your individual capacity.  Do
15  you have an understanding as a layman of the term?
16       MR. JAMES:  I'd ask you to reserve
17  your own questions to your two hours, which should
18  shortly come up.
19    Q.   It was your testimony that at least
20  kp.org was searched in response to the defendant's
21  document request, is that correct?
22    A.   Yes.
23    Q.   So if this document appeared on
24  kp.org, it should have been produced to the
25  defendants?
```

```
1              A. Carver
2       MS. NUSSBAUM:  You know what, he's not
3  legal counsel.  He testified as to his knowledge
4  as to the production of documents here.  He's not
5  making a determination as to whether or not
6  something is relevant or not relevant or what
7  particular request something would be relevant to.
8       This is something that was downloaded
9  at 8:22 last night.  We have no idea when this
10  document appeared, where it appeared.  I'm not
11  going to let him answer that.  If it's publicly
12  available, this is equally accessible to you as to
13  us.
14    Q.   With regard to kp.org, do the
15  plaintiffs have any input into the content of that
16  website?
17       MS. NUSSBAUM:  The plaintiffs in this
18  action, do they have input into that website, if
19  you know?
20       THE WITNESS:  They do specifically, as
21  it relates to that, I can speak to factually is
22  related to the reorders of your refill
23  prescriptions as an example.  So the answer to
24  that would be yes.
25    Q.   And does Permanente Medical Group
```

Page 447

1           A. Carver
2  supervise the content of the remainder of the
3  website?
4      A.  I'm sorry, I do not know.
5      Q.  Do you know who does manage the
6  content of the plaintiff's public website?
7          MS. NUSSBAUM:  Are you referring to
8  the kp.org website, and you want to know who
9  manages the content of that website, if he knows?
10          MR. JAMES:  Yes.
11      A.  There is a manager that's responsible,
12 her name is not coming to my mind at this second,
13 but I'm be happy to provide it to you as soon as
14 it does, or through counsel.  There is a manager
15 of the -- of this particular website.
16      Q.  Would you personally feel compelled to
17 take some action if you learned that Permanente
18 Group's public website was advising visitors that,
19 "People who took Gabapentin for chronic pain said
20 they felt one-third less pain while they were
21 taking Gabapentin"?
22          MS. NUSSBAUM:  Objection.  I'm going
23 to ask the witness not to answer that.
24      Q.  You can answer.
25          MS. NUSSBAUM:  No, first of all, it's

Page 448

1           A. Carver
2  an unintelligible question.
3          Second of all, it's a question that
4  calls for the witness' personal opinion, which is
5  totally irrelevant in the action.
6          Third, we have not been able to
7  identify whose website this is.
8          Fourth, we have not been able to
9  identify this is a small piece of something, what
10 this is, who it's available to, what its purpose
11 is.  I think that your question is highly
12 misleading and I will not have the witness answer
13 it.  I don't think it's capable of being answered
14 and it would simply be speculation and
15 hypothetical.
16          MR. JAMES:  Are you directing the
17 witness not to answer the question?
18          MS. NUSSBAUM:  I think that there's
19 not a question that's capable of being answered
20 without speculation, a hypothetical question and
21 having to do with his personal feelings about
22 something which is totally irrelevant in this
23 action.
24      Q.  Do you understand that questions
25 relating to the witness' personal feelings are a

Page 449

1           A. Carver
2  basis for counsel directing the witness not to
3  answer?
4          MS. NUSSBAUM:  I didn't say that.  You
5  want to ask a question that's capable of being
6  answered, we will see if that's possible.  You
7  want to identify this document and not give a
8  misleading few pages of something that there's no
9  testimony as to where it comes from or who
10 contained the content or anything else, then I'm
11 happy to address appropriate questions.  The
12 witness has been answering questions now for two
13 full days.
14          MR. JAMES:  To be clear, you're not
15 asserting the attorney-client privilege over the
16 response?
17          MS. NUSSBAUM:  Excuse me?
18          MR. JAMES:  Attorney-client privilege
19 is not in any way implicated by my question, is
20 that correct?
21          MS. NUSSBAUM:  I don't even understand
22 your question, so how can I know whether or not it
23 implicates attorney-client privilege?  I have no
24 idea if it's written by attorneys or supervised by
25 attorneys or anything else.  The present question

Page 450

1           A. Carver
2  is not capable of being answered.  Do you want to
3  ask a question that's capable of being answered,
4  you know, he'll attempt to answer it as he's been
5  doing for two full days here.
6      Q.  If you turn to the second page of the
7  document, do you have any familiarity with who
8  Shannon Erstadt is, at the bottom?
9      A.  I'm sorry, I do not.
10      Q.  Actually at this point, flipping over
11 to the third page, do you have any understanding
12 of what the company Healthwise, Incorporated is?
13      A.  I do from personal experience in that
14 Healthwise is in the business of producing general
15 health information.  I was a recipient of the
16 Healthwise -- a document called the Healthwise
17 Handbook at my home a few years ago, and it had
18 information regarding just a number of simple
19 little things regarding medical conditions and
20 their management, so, it was really intended --
21 the document that I received, which actually was a
22 booklet, was intended to be, to assist individual
23 patients or members -manage really minor
24 conditions such as if you have a cough or if you
25 have a sore throat or something of that -- that

1          A. Carver
2  nature.
3          And that is the context in which I
4  know anything about Healthwise as a corporation,
5  and this was mentioned, I have no -- no knowledge
6  of this linkage or this doctor that's listed as a
7  primary medical reviewer, or this individual
8  that's credited as the author or any of these
9  people or anything about this.  Actually, it comes
10  as a surprise to me.
11      Q.   Have you reviewed information
12  currently visible on Kaiser's public website in
13  preparation for this deposition?
14      A.   No, I have not.
15      Q.   And have you reviewed information on
16  Kaiser's public website relating to either
17  Gabapentin or Neurontin in the past year?
18      A.   No, I have not.
19      Q.   Turning to page two of this
20  document --
21          MS. NUSSBAUM:  But wait a minute, the
22  witness has already said he knows absolutely
23  nothing about the document.
24          MR. JAMES:  Right, if it helps.
25          MS. NUSSBAUM:  And as you just pointed

1          A. Carver
2  out, okay, as you just pointed out, the document
3  appears to be authored by Healthwise, which is
4  apparently an independent and unaffiliated
5  corporation, and the witness further testified
6  that he is totally unfamiliar with any of the
7  names of people listed as the author, editor,
8  associate editor, so I really think at this point
9  there's nothing further to be asked with respect
10  to this document that he's never seen and he knows
11  nothing about, that you've provided no further
12  information about and that your own testimony has
13  made clear this is from an independent
14  corporation, who he says he knows nothing about
15  and no relationship with.
16      Q.   Did you testify that Healthwise has no
17  business relationship with Kaiser?
18          MS. NUSSBAUM:  Are you aware of any
19  relationship between.
20          MR. JAMES:  Actually, that's a
21  different question.
22      Q.   One is can you say with knowledge that
23  there is no business relationship between
24  Healthwise and Kaiser?
25      A.   I cannot.

1          A. Carver
2      Q.   At the bottom of page two, there's a
3  list of four citations.
4          Has Kaiser or anyone acting on
5  Kaiser's behalf reviewed any of these publications
6  in advance of bringing this lawsuit?
7          MS. NUSSBAUM:  If you know.
8      A.   I do not know.
9      Q.   Does Kaiser communicate with its
10  members regarding prescription drugs?
11          MS. NUSSBAUM:  Are you talking about
12  the plaintiffs in this action?
13          MR. JAMES:  Yes.
14          MS. NUSSBAUM:  If you know
15  specifically.
16      A.   There's just a director of personal
17  communication between the pharmacist and the
18  patient for all new prescriptions that are
19  dispensed.
20      Q.   Between the patient and the --
21      A.   And the pharmacist at the time of
22  providing the medication to the patient.
23          MS. NUSSBAUM:  I think we're done with
24  this document.
25          THE WITNESS:  Okay.

1          A. Carver
2      Q.   Are there any other communications
3  with insureds?
4          MS. NUSSBAUM:  You know, this is not
5  part of this 30(b)(6) Notice, so we'll give you a
6  little bit of latitude, but I also think your time
7  is about up, so if there's anything else you want
8  to cover, we should do it.
9          Do you know what the time is here?  I
10  think we have now hit the number of hours.
11          VIDEOGRAPHER:  542 minutes.
12          MS. NUSSBAUM:  You have not too much
13  time left.
14          MR. JAMES:  Should we take a break
15  now?  One more tape would exhaust our time, is
16  that correct?
17          VIDEOGRAPHER:  The tape is an hour and
18  20 minutes.
19          MS. NUSSBAUM:  You have less than
20  that, you have a little less than that.
21          MR. JAMES:  Why don't we take a break?
22          MS. NUSSBAUM:  We really want to just
23  go through.
24          VIDEOGRAPHER:  We have 15 minutes left
25  on this.

Page 455

```
 1              A. Carver
 2        MR. JAMES:  One more tape would
 3  exhaust our time, all of our time?
 4        MS. NUSSBAUM:  What?
 5        MR. JAMES:  One more tape would
 6  exhaust our allotted time?
 7        MS. NUSSBAUM:  Your 12 hours.
 8        MR. JAMES:  Yes.
 9        MS. NUSSBAUM:  Okay, fine, we'll take
10  a short break and that will be that.
11        VIDEOGRAPHER:  Going off the record at
12  3:50 approximately.  This is the end of tape five
13  in the deposition of Albert Carver.
14        (Recess.)
15        VIDEOGRAPHER:  Going back on the
16  record at 4:03 approximately.  This is the
17  beginning of tape six, volume two, in the
18  deposition of Albert Carver.
19        MR. JAMES:  I'd like to mark another
20  exhibit.
21        (Kaiser-23 marked for identification.)
22    Q.   Once you've had a chance to look over
23  the document, let me know.
24        MS. NUSSBAUM:  Do you want him
25  actually to read the document?
```

Page 456

```
 1              A. Carver
 2        MR. JAMES:  No, there's no need to
 3  read the document.  Just look over it generally
 4  and see if you can determine whether you recognize
 5  it and what sort of document it is.
 6        Are you identifying something to the
 7  witness at this point?
 8        MS. NUSSBAUM:  Yeah, on your document
 9  I'm showing him to go through it carefully.
10    Q.   Have you seen this document before?
11    A.   I have not.
12    Q.   Do you know Dr. Maizels?
13    A.   I know of Dr. Maizels.  I do not know
14  him personally.
15    Q.   Who is he?
16    A.   He's a physician located in southern
17  California at the Woodland Hills Medical Center.
18    Q.   And how do you know of him?
19    A.   At one point in time he was on the P&T
20  committee.  That was several years ago.  I don't
21  recall what year he went off the P&T committee.
22    Q.   Is that the regional committee for
23  southern California?
24    A.   Yes, it is.
25    Q.   Do you recall forming any impression
```

Page 457

```
 1              A. Carver
 2  of Dr. Maizels as a member of the same committee?
 3        MS. NUSSBAUM:  Objection.  Only very
 4  specific, if you have any very specific
 5  recollection.
 6    A.   I don't have any specific
 7  recommendation or recollection, excuse me, of Dr.
 8  Maizels.
 9    Q.   Do you have any knowledge of
10  Dr. McCarberg?
11    A.   No, I do not.
12    Q.   Do you have any knowledge of the
13  publication of the American Family Physician?
14    A.   No, I do not.  It's not something I
15  read.
16    Q.   Is there any policy at Kaiser by which
17  Permanente physicians would need to seek any
18  approval before publishing articles in medical
19  journals or other publications?
20        MS. NUSSBAUM:  If you know.
21    A.   I do not know.  These are -- these
22  individual physician are employed by the
23  Permanente Medical Group and I do not know what
24  their rules or guidance to individual physicians
25  may or may not be.
```

Page 458

```
 1              A. Carver
 2    Q.   If an individual were to represent in
 3  2005 that Gabapentin was an effective treatment of
 4  neuropathic pain, would the plaintiffs regard that
 5  as a false statement?
 6        MS. NUSSBAUM:  That's hypothetical,
 7  not tied into anything and not within the scope of
 8  the 30(b)(6) or the scope of his expertise here as
 9  a fact witness.  I don't think that the witness
10  should answer that.
11        MR. JAMES:  I just note for the record
12  that item 8 of the Notice calls for any
13  conclusions or views that you or your
14  representatives or agents have or had regarding
15  whether Neurontin provides medical benefit to and
16  may be appropriately prescribed by physicians for
17  patients who take it, among other conditions, for
18  neuropathic pain conditions, and so I believe that
19  it's --
20        MS. NUSSBAUM:  And the witness has
21  already testified about that today.
22    Q.   Does Kaiser have any view as to
23  whether that's a false statement at this point in
24  time?
25        MS. NUSSBAUM:  What's a false
```

Page 459

```
1              A. Carver
2  statement?
3        MR. JAMES:  The statement that
4  Gabapentin is effective in the treatment of
5  neuropathic pain.
6        MS. NUSSBAUM:  This witness is not
7  here on behalf of Kaiser with respect to that.
8  That was not covered by the Notice.  He's in
9  general discussed Kaiser's view.  It's a legal
10 conclusion.  There's a complaint here.  There's
11 discovery that reflects Kaiser's view, and any
12 additional view that he might have would be as a
13 result of conversations that he's had with
14 counsel, either Mr. Cohen, myself or my
15 colleagues.
16    Q.   Did Kaiser form a conclusion or a view
17 regarding whether Neurontin provides a medical
18 benefit to and may appropriately be prescribed by
19 a physician for patients who take it for the
20 treatment of neuropathic pain?
21        MS. NUSSBAUM:  Objection.  I think
22 that Kaiser's view is reflected in the Complaint
23 and is also reflected in their responses in
24 discovery in this action, and that is Kaiser's
25 view.
```

Page 460

```
1              A. Carver
2    Q.   You can answer.
3        MS. NUSSBAUM:  Are you adopting what's
4  set forth in the complaint and in your previously
5  submitted discovery request and responses?
6        THE WITNESS:  Now we are adopting that
7  view.
8    Q.   And what is that view?
9    A.   The view that's represented in the
10 Complaint.
11   Q.   Do you know what it is?
12       MS. NUSSBAUM:  We can go through the
13 Complaint if you'd like.  Let's reread the
14 question.
15   Q.   Without referencing the document or
16 the Complaint itself, do you have any knowledge of
17 what that view is?
18       MS. NUSSBAUM:  Do you want to refresh
19 your recollection?
20       THE WITNESS:  Sure.
21       MS. NUSSBAUM:  You want to repeat the
22 question and he'll go through the Complaint?  Take
23 your time.
24       MR. JAMES:  You can reread the
25 question.
```

Page 461

```
1              A. Carver
2        (Record read.)
3        MS. NUSSBAUM:  Is there a particular
4  time frame that you have in mind, Mr. James?
5        MR. JAMES:  Well, why don't we find
6  out if they've formed a conclusion at all and we
7  can ask whether that view has changed over time.
8    Q.   Have you found any view?
9    A.   I have not yet, I'm sorry.
10   Q.   Actually, I'll withdraw the question
11 at this point.
12        When did Kaiser first learn of the
13 off-label promotion of Neurontin?
14        MS. NUSSBAUM:  Asked and answered this
15 morning.  The witness testified it was in or about
16 the spring of 2002.  There was testimony this
17 morning at great length.
18   Q.   Is that correct?
19   A.   That is correct.  I believe it's
20 contained in the documents that we referenced.
21   Q.   You learned about the off-label
22 promotion in the spring of 2002?
23   A.   I believe that's correct, yes.  There
24 was a citation, I believe, of something in the
25 Wall Street Journal, which we painstakingly went
```

Page 462

```
1              A. Carver
2  through.  There was something else in the New York
3  Times that we painstakingly went through, and I
4  believe all of those were early in 2002 roughly,
5  or sometime in 2002.
6    Q.   And the detailing restriction was
7  placed on Neurontin in advance of your knowledge
8  of off-label promotion of Neurontin, is that
9  correct?
10        MS. NUSSBAUM:  If you have a document
11 that you want to refer him to, I think after two
12 full days of testimony, unless he has a particular
13 recollection as to the date of the restriction
14 over a 15-year period, show him the documents and
15 he's happy to answer your questions.
16   Q.   Are you able to answer the question
17 without reference to documents?
18   A.   Well, it's contained in that P&T
19 Permanente document that we previously reviewed.
20   Q.   All right.
21   A.   I'm getting a little tired.
22   Q.   Fair enough.
23   A.   I can't pinpoint these things as
24 accurately, I'm sorry.
25   Q.   I want to bring up Kaiser-1, the
```

1             A. Carver
2  Notice again.
3          MR. JAMES:  Do you know what the time
4  on the current tape is?
5          VIDEOGRAPHER:  15 minutes.
6      Q.  With regard to the first topic, have
7  we discussed the --
8          MR. JAMES:  Wait, the witness doesn't
9  have this.
10     Q.  Sorry, this is Kaiser-1, the Notice.
11     A.  I'm sorry.  Where are we?
12     Q.  On Kaiser-1, I'm sorry, on page 8,
13  have we exhausted your knowledge regarding the
14  policies and practices concerning payment or
15  reimbursement of claims as referred to in topic
16  one here?
17         MS. NUSSBAUM:  Objection.  You had two
18  days asking this witness questions.  You've asked
19  him whatever you wanted, you've got your answers.
20  If you have not asked a question that exhausted
21  his knowledge, I mean, how could he possibly
22  answer that?  He's given complete, honest answers
23  to the best of his ability to your questions.  Do
24  you want to go through the transcript now?  You
25  want to show him what he said about things?  You

1             A. Carver
2  want to show him the question, ask him the answer
3  and then say as he sits here 12 hours later does
4  he remember anything else, we're happy to go
5  through that exercise.
6      Q.  I'll take one detour and come back to
7  this.
8          With regard to the Federal Court
9  documents that were unsealed which we talked about
10  earlier today, do you recall that?
11     A.  Yes, I believe there was reference
12  made to that in that same page five or page four,
13  depending upon the document perhaps.
14     Q.  I actually can bring the Complaint
15  back.  You want to look at the Complaint?
16         MR. JAMES:  Yes.
17         MS. NUSSBAUM:  Okay.
18     Q.  And I'd like you to turn your
19  attention to page 92, paragraph 220.
20         Have you read that paragraph?
21     A.  Yes, I have.
22     Q.  Are you familiar with the case United
23  States versus Warner-Lambert Company, LLC, that's
24  referenced in paragraph 220?
25     A.  Not the specifics.

1             A. Carver
2      Q.  Do you know whether the information in
3  that case has any relevance to the present action
4  brought by the plaintiffs?
5          MS. NUSSBAUM:  I'd object.  This
6  witness is not a lawyer.  I would note that Judge
7  Saras and Judge Sorokin seem to think it does, but
8  you know, this witness is not a lawyer, he was a
9  30(b)(6) witness and a fact witness and he's not
10  going to give a legal opinion as to relevance.
11         MR. JAMES:  Actually, item 20 of the
12  Notice says, "Any information that you have
13  regarding the civil action United States of
14  America, David Franklin versus Parke-Davis, et
15  al., or any government investigation into
16  off-label use or promotion of Neurontin."
17         MS. NUSSBAUM:  And he's given that to
18  you, sir.  Look at Exhibits 12 and 13 which deal
19  with that.  Look at the Complaint, which has
20  allegations with respect to that.  He's also
21  chatted today about the whistleblower suit, which
22  refers to that, but if you're asking him now the
23  term "relevance" which is a legal term, whether or
24  not it's legally relevant, I suggest that both the
25  judge, the lead counsel for the defendants here,

1             A. Carver
2  and the magistrate judge all have found that
3  that's relevant.
4          Documents in that case have been
5  produced in this case.  As under the rules, we
6  would assume that it's relevant and I suggest that
7  we move to something that he can really testify
8  to.
9      Q.  Are you aware that the allegations in
10  the government allegation -- sir, in the
11  government investigation related to the off-label
12  promotion of Neurontin as opposed to the false
13  promotion of Neurontin?
14         MS. NUSSBAUM:  Take your time, read
15  the allegation in the Complaint and anything else
16  you need to look at to refresh your recollection.
17  And I would suggest that --
18         MR. JAMES:  I'd rather you not suggest
19  anything.
20         MS. NUSSBAUM:  You suggested his
21  attention to paragraph 220, but really it starts
22  at paragraph 217, which is on page 91, so I think
23  if you don't want to mislead the witness, let him
24  look at the entire sequence of events here which
25  it says J, related government actions, and it

Page 467

1        A. Carver
2   starts at paragraph 217.
3        Do you want to have the court reporter
4   read the question?
5        THE WITNESS:  Please.
6        (Record read.)
7        MS. NUSSBAUM:  You know, you're asking
8   for legal terms and legal conclusions.  If you
9   want him to tell you what he as a layman
10  understands the whistleblower suit to have
11  concerned, he can do that, but also if you want to
12  give particular definitions for legal terms, this
13  witness is not a lawyer.
14        MR. JAMES:  Actually, I'll withdraw
15  that question.
16     Q.   Are you aware of the time frame in
17  which the alleged conduct occurred that was, you
18  know, the subject of this case, United States
19  versus Warner-Lambert Company?
20        MS. NUSSBAUM:  Are you talking now
21  about the Franklin case, you want to know about
22  the time period?
23        MR. JAMES:  Why don't we take the
24  Franklin case first.
25     Q.   Do you know the time period of the

Page 468

1        A. Carver
2   conduct alleged in the Franklin case?
3        MS. NUSSBAUM:  If you know.
4     A.   I do not know.
5     Q.   If the conduct actually concluded in
6   1997, would Kaiser have any basis for recovering
7   damages from the defendants for Neurontin
8   prescriptions paid for following 1997?
9        MS. NUSSBAUM:  Objection.  First of
10  all, he is -- he doesn't know the time period in
11  the Franklin case.
12        Second of all, it's really misleading
13  to the witness because this Complaint is full of
14  allegations concerning misstatements by the
15  defendants and misconduct by the statements and
16  their agents way past 1997.
17        MR. JAMES:  Right, but I'm not
18  interested in other allegations made by the
19  Complaint.  I'm actually interested in the
20  Franklin suit specifically.
21        MS. NUSSBAUM:  The witness just said
22  he has no independent knowledge of the relevant
23  time period in the Franklin suit, is that correct,
24  sir?
25        THE WITNESS:  That's correct.

Page 469

1        A. Carver
2     Q.   So with regard to those, you know,
3   revelations, I think as you put it earlier today,
4   that were published in 2002 regarding the Franklin
5   suit, you have no knowledge as to when that
6   conduct alleged in the Franklin suit actually --
7   actually concluded?
8        MS. NUSSBAUM:  Do you have any
9   independent recollection, as you sit here today,
10  of when the wrongful conduct alleged in the
11  Franklin suit concluded?
12        THE WITNESS:  I do not.
13     Q.   And when you authorized this lawsuit
14  to go forward, were you aware of any allegations
15  made in the Franklin suit that postdated 1997?
16        MS. NUSSBAUM:  Objection.  Other than
17  discussions that you've had either with myself,
18  Mr. Cohen or my colleagues or Mr. Cohen's
19  colleagues, do you have any independent
20  recollection, as you sit here today, of when this
21  Complaint was initially filed, you knew the time
22  period alleged in the Franklin suit.
23        MR. JAMES:  I'd like to just state for
24  the record that the defendants take the position
25  that while legal advice is clearly protected, a

Page 470

1        A. Carver
2   fact such as the date that a particular suit was
3   filed or the date that the allegations in the suit
4   concerned is just sort of a bare fact that really
5   has no protection under any doctrine.
6        MS. NUSSBAUM:  We have no problem with
7   that, and if you were to have a copy of the
8   unsealed Complaint in Franklin and show it to him
9   and say look at this, this shows the date from A
10  to B, do you have any reason --
11        MR. JAMES:  Actually, my question is
12  if he knows that information.
13        MS. NUSSBAUM:  He said he has no
14  personal recollection.
15     Q.   To confirm, when you authorized this
16  suit to go forward, you were not aware of any
17  allegations in in the Franklin suit postdating
18  1997, is that correct?
19        MS. NUSSBAUM:  The question is whether
20  he recalls as he sits here today.  He said he has
21  no recollection.
22     Q.   I guess there's two separate questions
23  then.
24        Is your testimony that you now have no
25  recollection that when you authorized this suit to

Page 471

1              A. Carver
2  go forward you knew about any conduct alleged in
3  the Franklin suit postdating 1997?
4          MS. NUSSBAUM: He didn't say that. He
5  said as he sits here today, he did not know what
6  the date of the conduct alleged in the Franklin
7  suit were.
8          MR. JAMES: I think that was clearly
9  stated in the second question, at the time that
10 you authorized this lawsuit to go forward, did you
11 know whether or not there was any conduct alleged
12 in the Franklin suit postdating 1997?
13         MS. NUSSBAUM: If you recall.
14     A.   I do not recall.
15     Q.   If the conduct at issue in the
16 Franklin suit ended in 1997 -- actually,
17 withdrawn.
18         When you approach an employer group to
19 sell a health insurance Plan, or do you market
20 cost savings as an advantage of choosing Kaiser
21 over other health insurance providers?
22         MS. NUSSBAUM: If you know.
23     A.   I do not know if we market the price
24 differential, if there is a price differential or
25 not.

Page 472

1              A. Carver
2      Q.   Do you know about the marketing of
3  health plans to employer groups generally by
4  Kaiser?
5          MS. NUSSBAUM: Could you repeat that
6  question?
7          (Record read.)
8          MS. NUSSBAUM: Do you understand that
9  question?
10     A.   I do. And I would say, yes,
11 generally, but what that means is that the -- we
12 have a sales and marketing piece of our
13 organization that handles the contact between --
14 represents Kaiser and the contact between the
15 purchaser or prospective purchasers.
16     Q.   Do you know?
17     A.   And I'm not involved personally in any
18 of those activities or discussions or
19 presentations or proposals.
20     Q.   Do you know if they do make proposals,
21 either requests for proposals or some other
22 procedure of that sort?
23         MS. NUSSBAUM: Only if you
24 specifically know what the marketing group
25 specifically does.

Page 473

1              A. Carver
2      A.   I do know factually that we do receive
3  requests for proposals for the provision of health
4  insurance to large groups.
5      Q.   And do those, or are you involved in
6  the completion of those requests?
7      A.   I am not, I am not.
8      Q.   Do you know what the content of those
9  RFPs is?
10     A.   I do not specifically.
11     Q.   Do you know if they concern pharmacy
12 benefits?
13     A.   In some situations, they do.
14     Q.   And do you know if they concern the
15 cost containment programs available through Kaiser
16 for pharmacy benefits?
17         MS. NUSSBAUM: Do you specifically
18 know that?
19     A.   I do know that in some RFPs, there is
20 a request to describe what type of efforts that
21 you have to help manage the cost of that -- for
22 that prospective employer group.
23     Q.   In response to that kind of
24 description, have you ever described any program
25 that we haven't discussed over the past two days?

Page 474

1              A. Carver
2      A.   I don't believe so, other than the
3  extensive use of generic products to help contain
4  costs.
5      Q.   Just to make sure I had your earlier
6  testimony correct, you said aside from your
7  personal interaction between the pharmacist and
8  the insured, the plaintiffs have no direct contact
9  with their insureds, is that right?
10     A.   I believe that the question that you
11 asked and the answer that I provided was from the
12 pharmacy department -- do I recall that correctly?
13     Q.   Okay. And is that the exclusive
14 contact between the pharmacy department and the
15 insureds?
16         MS. NUSSBAUM: To the best of your
17 knowledge.
18     A.   There's that direct contact time of
19 presenting a prescription to a patient. There can
20 also be telephone contact, you know, a patient may
21 call, but that's generally the nature of the
22 contact between the pharmacist and the patient,
23 and the exercising their duties and the provision
24 of pharmacy services.
25     Q.   I guess outside the pharmacy

Page 475

1              A. Carver
2    department, do the plaintiffs have other contacts
3    with their insureds?
4         A.   Yes, they do.  There are occasional
5    bulletins or brochures that are provided generally
6    to membership of Kaiser Permanente.  I can recall
7    receiving those brochures or bulletins myself as a
8    member of the health plan.  I believe that the
9    publication that I am thinking about is a
10   publication entitled Planning For Health.
11        Q.   What does that publication concern?
12        A.   A variety of topics regarding the
13   Kaiser Permanente program and healthcare delivery.
14        Q.   Do you know who prepares that
15   publication?
16        A.   Not specifically.  It's generally
17   prepared by a publication group within the health
18   plan.
19        Q.   Do you know if particular prescription
20   drugs or classes of drugs are discussed in that
21   publication?
22        A.   Generally not, but I don't want to sit
23   here and say that never have prescription drugs
24   been discussed there.  There has been content that
25   I can recall that's related to how to use your

Page 476

1              A. Carver
2    pharmacy or how to access pharmacy services, how
3    to order your refills, etc.  And then occasionally
4    there has been content regarding specific disease
5    states.
6         Q.   Including perhaps the appropriate
7    treatments of those disease states?
8              MS. NUSSBAUM:  Don't speculate.  If
9    you know.
10        A.   I don't recall the specifics of any of
11   that, I can just recall generally.
12        Q.   Are there any other publications
13   besides the one we were just referring to that are
14   sent to Kaiser insureds by Kaiser that concern
15   either prescription drugs or classes of
16   prescription drugs?
17             MS. NUSSBAUM:  Only if you know.
18        A.   Not that I'm aware of specifically.
19        Q.   Have the plaintiffs ever considered
20   sending publications to their insureds, advising
21   them that certain prescription drugs may be
22   effective or ineffective in treating particular
23   disease states?
24             MS. NUSSBAUM:  Only if you know.
25        A.   I need to correct my previous answer.

Page 477

1              A. Carver
2    Sometimes there is direct communication with a
3    patient regarding a therapeutic substitution of
4    their product going from product A to product B in
5    such circumstances where a prescription may be
6    mailed to the individual.  So that would be a
7    fuller answer to your previous question, and I'm
8    sorry, I don't recall your last question.
9              MR. JAMES:  Could we have you read
10   that one back?
11             (Record read.)
12             MS. NUSSBAUM:  Only if you recall any
13   specific discussion.
14        A.   I do not recall any specific
15   publications or issues of publications or such
16   correspondence.
17        Q.   Do you know with confidence that such
18   publications involving those discussions have gone
19   out in the past?
20             MS. NUSSBAUM:  The witness just said
21   he didn't recall.
22        Q.   I think you said you don't recall
23   specific instances.  I'm saying that you can say
24   confidently as a general matter that has occurred.
25             Could you please let me know?

Page 478

1              A. Carver
2         A.   As a general matter, I believe my
3    testimony is occasionally such has occurred.  I
4    cannot recall the specifics of any particular drug
5    or therapeutic classes of drugs or management of
6    any particular disease state as I sit here before
7    you today.
8         Q.   Yesterday you had mentioned that you
9    had testified in connection with an action against
10   Abbott Laboratories, is that correct?
11        A.   That's correct.
12        Q.   Has that lawsuit been resolved?
13        A.   That matter is still in the litigation
14   process.
15        Q.   When was that lawsuit filed?
16             MS. NUSSBAUM:  To the best of your
17   recollection, if you know.  Otherwise, we can
18   leave a blank in the transcript and counsel will
19   provide the year that it was filed.
20        A.   I would ask that we leave a blank in
21   the transcript and we will provide that
22   information.  I don't recall from memory
23   specifically which year it was.
24        Q.   Do you know roughly whether it
25   was like last year or five years ago, or can you

1              A. Carver
2    give a ballpark estimate with any confidence?
3         A.   If ballpark is good enough, within the
4    last five years, but not within the last year.
5    Closer to five than to one.
6         Q.   Is that, do you know the court in
7    which that litigation is pending?
8         A.   I'm sorry, I do not.  It's -- I'm sure
9    that we could provide that to you.  Again, if you
10   want to leave a blank, I'm not trying to be
11   nonresponsive to your question.  I just don't
12   know.  I'm not a lawyer and I don't deal with the
13   details of that.
14        Q.   Do you know what the subject matter of
15   that lawsuit is?
16        A.   Yes, I do.
17        Q.   And what is that?
18        A.   The subject matter had to do with
19   tactics taken by Abbott Laboratories to delay
20   entry into the market of the generic form of
21   Hytrin.
22        Q.   And when did you provide testimony in
23   that matter?
24        MS. NUSSBAUM:  Approximately.
25        A.   Within the last two years.

1              A. Carver
2         Q.   Were you serving as a 30(b)(6) witness
3    of Kaiser in that matter?
4         A.   I don't recall, I'm sorry.
5         Q.   With regard to the present litigation,
6    when did you first hear about the idea of Kaiser
7    bringing this lawsuit?
8         MS. NUSSBAUM:  If you recall.
9         A.   I don't recall specifically.
10        Q.   Do you have any idea who might have
11   told you about the possibility that Kaiser could
12   bring this lawsuit?
13        MS. NUSSBAUM:  If it's a discussion
14   with counsel, just say with discussion, but please
15   don't go into the sum and substance of what was
16   discussed.
17        A.   It was in discussion with counsel, the
18   specific date of which I cannot provide it, I
19   don't recall.
20        Q.   Do you know who the first individual
21   at Kaiser was who had the idea of filing this
22   lawsuit?
23        A.   I don't know in terms of who may have
24   had the first idea.  I think that's impossible to
25   answer.

1              A. Carver
2         Q.   Were you involved relatively early in
3    the process?
4         MS. NUSSBAUM:  If you know.
5         A.   As -- I do not know.
6         Q.   Do you know who else was involved in
7    that decision-making process?
8         MS. NUSSBAUM:  If you know.
9         A.   Mitch Cohen.
10        MS. NUSSBAUM:  That's counsel?
11        THE WITNESS:  That's counsel.
12        Q.   Anyone else?
13        MS. NUSSBAUM:  You don't want to go
14   into any discussion.
15        A.   And I believe Steve Satkin, counsel as
16   well.
17        Q.   Those are the two names that you can
18   think of?
19        A.   Yes.
20        Q.   Do you know if Kaiser approached
21   counsel with the idea of bringing this lawsuit or
22   whether counsel initiated the idea of bringing
23   this lawsuit?
24        MS. NUSSBAUM:  Well, I believe that
25   the counsel you're referring to are counsel at the

1              A. Carver
2    plaintiff organizations.
3         Q.   Actually, I guess, do you believe it
4    was an employee of Kaiser or an external counsel
5    that first came up with the idea of Kaiser
6    bringing this lawsuit?
7         MS. NUSSBAUM:  I would object at this
8    point.  I think that the witness has said that the
9    initial conversation he had was with counsel, and
10   I think that the subject of conversations in
11   answer of litigation is one that is not to be
12   asked about.
13        If you have a specific question, once
14   again, we are delighted to answer.
15        Q.   Following your decision to bring this
16   lawsuit, did you initiate additional document
17   retention policies beyond the ones that we
18   discussed earlier which were stated in the
19   exhibit?
20        MS. NUSSBAUM:  If you know.
21        A.   The -- the advice of counsel and the
22   request of counsel was to preserve any document
23   relative to Neurontin and to this lawsuit and to
24   preserve those until any, you know -- until this
25   matter is resolved.

Page 483

```
1                 A. Carver
2      Q.    And were all paper documents preserved
3  from that point forward?
4      A.    I believe so.
5      Q.    And was all e-mail archived from that
6  point forward?
7      A.    I believe so, to the degree that it's
8  relevant to this case.
9      Q.    And in compliance with the ordinary
10 document retention policy which might call for the
11 destruction of records following 7 years was
12 suspended, is that right?
13     A.    Yes, the requirement basically is for
14 the retention of any documents that may be
15 relevant to this matter.
16         MR. JAMES:  Can we take a short break
17 now, and how many minutes do I have left?
18         VIDEOGRAPHER:  About 20.
19         We're going off the record.  It is
20 4:46 p.m.
21         (Recess.)
22         VIDEOGRAPHER:  Going back on the
23 record at 4:54 p.m.
24         (Kaiser-24 marked for identification.)
25   BY MR. JAMES:
```

Page 484

```
1                 A. Carver
2      Q.    You can take a moment to look at this
3  document and see whether you recognize it or what
4  it refers to.
5          Have you had an opportunity to look
6  over the document?
7      A.    Yes, I have.
8      Q.    Do you know what it is?
9      A.    By the title of it, it's information
10 related to a chief of neurology meeting held on
11 June 17, 1999.  This is the way it's labeled.  And
12 then there's some synopsis of that -- and I --
13 there appears to contain someone's notes regarding
14 that meeting.
15         And then on the subsequent page,
16 there's a synopsis of the discussion that occurred
17 at the chief of neurology meeting.  And then
18 that's followed by a local area, or actually,
19 excuse me -- a position document from Art Flippin,
20 who at that time was apparently the regional
21 coordinating chief of neurology in southern
22 California, which is followed by the drug
23 monograph documents that appear to be the same
24 documents that we reviewed yesterday, basically.
25     Q.    On the page KIS 004619?
```

Page 485

```
1                 A. Carver
2      A.    4619, yes.
3      Q.    Is Dr. Flippin endorsing off-label use
4  of Neurontin?
5          MS. NUSSBAUM:  The document speaks for
6  itself.
7      A.    There's a box checked there that
8  indicates support for removing the prescribing
9  restrictions and for the use of some guidelines.
10     Q.    Are the guidelines those on 800462?
11         MS. NUSSBAUM:  I don't think we've
12 established that he has any personal knowledge
13 with respect to this document or received it or
14 wrote it.
15     A.    I did not participate in any of this.
16 It appears the guidelines are contained on 4617.
17         MS. NUSSBAUM:  Do you have any
18 knowledge of this document other than looking at
19 the piece of paper?
20         THE WITNESS:  No, I do not.
21         MS. NUSSBAUM:  You've never seen this
22 before?
23         THE WITNESS:  No.
24         MR. JAMES:  Please let me use my
25 precious 15 minutes.
```

Page 486

```
1                 A. Carver
2      Q.    Returning to page 4615 --
3      A.    Yes.
4      Q.    -- in the last paragraph it appears to
5  state, "Unrestricted in northern California use in
6  past year, 30,384 prescriptions versus southern
7  California, 18,519 prescriptions."
8          Is that your understanding of that
9  text?
10         MS. NUSSBAUM:  Don't speculate.  Only
11 if you specifically know on this document, which
12 you haven't seen before.
13     A.    I don't know this -- you know the
14 specific, what was intended there specifically.
15     Q.    Does this refresh your recollection
16 that Kaiser was able to track the number of
17 prescriptions of particular prescription drugs by
18 region as early as 1999?
19         MS. NUSSBAUM:  Objection.  It calls
20 for speculation.  The witness has not seen this
21 before.
22         MR. JAMES:  I'm actually asking him
23 whether it refreshes his independent recollection.
24         MS. NUSSBAUM:  Does this refresh your
25 recollection as to anything?
```

A. Carver

1            A. Carver
2       A.   If your question is did we have the
3   ability to count prescriptions?
4            MS. NUSSBAUM:  Only if you know, do
5   you know where this information came from?
6            THE WITNESS:  I don't know where the
7   information came from.
8       Q.   I'm not actually asking whether this
9   information -- I'm saying having looked at this,
10  does this remind you that Kaiser was able to track
11  the number of prescriptions for a particular drug
12  as early as 1999?
13           MS. NUSSBAUM:  Does this refresh your
14  recollection?
15           MR. JAMES:  I'd rather he just answer
16  my question rather than yours.
17           MS. NUSSBAUM:  Are you asking him
18  whether it reminds --
19           MR. JAMES:  You're consuming my
20  remaining 10 minutes.  I'm shocked by the lack of
21  courtesy.
22      Q.   If you could answer the question?
23      A.   I don't know about the reminder.  We
24  were able to know how many prescriptions were
25  dispensed for a product in 1999, if that's the

A. Carver

1            A. Carver
2   answer that you're looking for.
3       Q.   Looking at these numbers of
4   prescriptions, I mean, do you think 18,519
5   prescriptions of Neurontin would be a high number
6   if all of those prescription were for Neurontin's
7   on-label use?
8       A.   I do not have a view.
9            MS. NUSSBAUM:  Objection, calls for
10  speculation.
11      Q.   Do you know when Kaiser first became
12  aware that Neurontin was being prescribed
13  off-label?
14           MS. NUSSBAUM:  Objection.  Only if you
15  specifically know.
16      A.   I don't specifically recall precisely
17  when we -- when Kaiser became aware.
18           (Kaiser-25 marked for identification.)
19      Q.   I'll actually just ask you to flip
20  through it quickly and tell me if you recognize
21  it.
22      A.   I believe this is a document that we
23  reviewed a few hours ago.
24      Q.   Okay.  I will not ask anymore
25  questions regarding that document.

A. Carver

1            A. Carver
2       A.   Yes, I'm getting tired, but not that
3   tired.
4            MR. JAMES:  I think I'll conclude the
5   questions for today on the part of the defendants
6   and state on the record that we reserve all
7   further rights with regard to this witness.
8            MS. NUSSBAUM:  I'm not sure what that
9   means.
10           MR. JAMES:  We are not waiving any
11  rights either today or yesterday with regard to
12  this witness.
13           MS. NUSSBAUM:  Well, this witness was
14  produced in his personal capacity, in his 30(b)(6)
15  capacity, as on behalf of the corporation on the
16  general 30(b)(6) Notice and on the two
17  supplemental notices.
18           I observed that questions were asked
19  with respect to all 3 of the 30(b)(6) Notices and
20  questions were also asked with respect to his
21  individual capacity.  So, as far as we're
22  concerned, all 30(b)(6) Notices have been
23  satisfied, as well as Mr. Carver's individual
24  deposition documents have been produced.
25  Documents have been shown, questions have been

A. Carver

1            A. Carver
2   asked as to each and every one of those notices.
3            That was our understanding, that was
4   our position in the letter to Mr. Roland referred
5   to yesterday, that was the position that we took
6   at the very beginning of the deposition yesterday.
7   You did not object to that position.
8            MR. JAMES:  I would like to clarify
9   one point, that if you make a statement as to your
10  position and I don't immediately jump all over
11  you, that does not indicate that the defendants
12  are waiving any rights that they might have under
13  the Federal Rules, under the case management order
14  in this case or under any other applicable law.
15           MS. NUSSBAUM:  And I would suggest
16  that this witness has been asked questions about
17  the document production here, about the document
18  preservation policy, the general corporate
19  30(b)(6) deposition, as well as individual, so
20  he's been asked questions as to all four notices.
21  He's provided testimony as to all four notices.
22  He has competently testified as to all four
23  notices.
24           He testified that he was able to
25  testify as to all of the particular subjects.  He

```
1              A. Carver
2  did testify as to all the particular subjects, and
3  so from our perspective, these depositions are all
4  concluded.
5         MR. JAMES:  And we understand that to
6  be your position, but we don't necessarily accept
7  any or all of your conclusions and we reserve all
8  rights.
9         MS. NUSSBAUM:  Well, if you have a
10 specific issue, let's hear it now.  We're still
11 here.  The witness is here.  Let's get it done.
12        MR. JAMES:  I prefer to consult with
13 my co-counsel and --
14        MS. NUSSBAUM:  Your co-counsel is
15 right -- consult with him and -- do you have a
16 problem with what's happened?  If you have a
17 problem with anything that we've said, if you
18 think you haven't had opportunity to question this
19 witness as to the corporate 30(b)(6), the document
20 retention policy 30(b)(6), the computer systems
21 30(b)(6), the preservation 30(b)(6) or in his
22 individual capacity, let us know right now because
23 he's been asked questions as to all of that.
24        MR. JAMES:  I'll just note as one
25 example that the witness is not aware of the
```

```
1              A. Carver
2  current restriction practices as regards to
3  Neurontin or generic Gabapentin that Kaiser has in
4  place today.
5         Beyond that, I don't think that this
6  is the time or place to discuss any possible
7  deficiencies in the witness' testimony or any
8  further testimony that we might need to take of
9  this witness or other witnesses at Kaiser.  I'd
10 prefer to consult with Mr. Hyunda and my client.
11        MS. NUSSBAUM:  This witness has
12 testified for two days.  He testified as to
13 restrictions.  He testified with respect to the
14 best of his ability.  I think he testified that
15 your client's product is no longer on the
16 formulary and that they now have a generic product
17 on the formulary.
18        So, he has testified as to the status
19 of Neurontin on the present formulary and that's
20 what the 30(b)(6) Notice requested, so I think
21 he's given testimony.
22        MR. JAMES:  An initial matter past
23 1999.
24        MS. NUSSBAUM:  We also indicated that
25 if there's a very specific factual question that
```

```
1              A. Carver
2  we have, we've had on a number of occasions said
3  leave a blank and we'll fill it in when he's
4  reading the deposition.
5         MR. JAMES:  As I said before, this is
6  not the time or place to make a final
7  determination.  We will confer with the
8  appropriate parties and let you know.  I do agree
9  with you that the witness has made his best
10 personal effort to testify and I appreciate that
11 recollection.
12        MS. NUSSBAUM:  Okay, so your
13 deposition is closed.
14        VIDEOGRAPHER:  We're going off the
15 record at 5:09 p.m.  This is the end of tape six
16 and concludes today's portion of the deposition of
17 Albert Carver.
18        MS. NUSSBAUM:  I have some time that
19 I'd like to use.
20        (Recess.)
21        VIDEOGRAPHER:  We're going back on the
22 record at 5:16 p.m.
23 CROSS-EXAMINATION
24 BY MS. NUSSBAUM:
25     Q.  Good afternoon, Mr. Carver.  My name,
```

```
1              A. Carver
2  as you know, is Linda Nussbaum, and I'm an
3  attorney the representing Kaiser, the plaintiffs
4  in this action.
5         I simply want to ask you a few
6  questions to clarify a number of the exhibits that
7  have been previously marked by the defendants'
8  lawyer, if we might, okay?
9     A.  Okay.
10    Q.  First let's look at what's previously
11 been marked the Third Coordinated Amended
12 Complaint, if we can, please.  And in particular,
13 if you can go to page 43 of that Complaint.
14        Starting on page 43 in paragraph 112,
15 there is a multi-paragraph discussion of a trial
16 and article that was conducted by a Dr. Kenneth
17 Gorson.
18        Do you see that?
19    A.  Yes, I do.
20    Q.  And the Complaint alleges that the
21 article that was written by Dr. Gorson was part of
22 the wrongful conduct in this action, is that
23 correct?
24    A.  That's correct.
25    Q.  Now, leaving the Complaint open to
```

Page 495

A. Carver

1        A. Carver
2  page 43, and looking, if you would please, at
3  what's been previously marked as Kaiser-7, and
4  that is a document that says, "Drug monograph KAIS
5  004629 through 004637."
6        Do you have that document in front of
7  you, sir?
8     A.  I do.
9     Q.  Now, with respect to the drug
10 monograph KAIS Exhibit 77, if you would please
11 turn to the last page of that document, and that
12 last page indicates references, is that correct?
13    A.  That's correct.
14    Q.  And references a list of the articles
15 and contacts that were relied upon by Kaiser with
16 respect to their preparation of the drug
17 monograph, is that correct?
18    A.  That's correct.
19    Q.  And S-7, the last reference on the
20 page KAIS 004637 indicates the article by
21 Dr. Kenneth Gorson, is that correct?
22    A.  That's correct.
23    Q.  And that is the article that's
24 referred to in the Complaint on paragraphs 112
25 through 114 and 115 with respect to the wrongful

Page 496

A. Carver

1        A. Carver
2  conduct by these defendants, is that correct?
3     A.  That's correct.
4     Q.  I'd also draw your attention, sir, to
5  reference number 2, also on K 004637, and that
6  says personal?
7        MR. JAMES:  I'm sorry, which document
8  are you referring to?
9        MS. NUSSBAUM:  We're still on
10 Kaiser-7, the last page under references, it says,
11 "Personal communication, Monica Patel, Pharm.D.,
12 Parke-Davis, May 1999."
13       Do you see that?
14    A.  I see that.
15    Q.  And does that refer to a personal
16 communication by a representative of Parke-Davis
17 in May of 1999 to the plaintiffs here with respect
18 to Neurontin?
19    A.  To the plaintiffs or to the
20 defendants?
21    Q.  I'm sorry, no, to the plaintiffs, to
22 Kaiser, does that indicate in the references
23 that --
24    A.  Yes, it does.  Yes, it does.
25    Q.  So it indicates to you that Kaiser, in

Page 497

A. Carver

1        A. Carver
2  preparation of its drug monograph, relied on a
3  personal communication by an employee of
4  Parke-Davis, Monica Patel, is that correct?
5     A.  That's correct.
6     Q.  Now, let me draw your attention to
7  Exhibit 23, which is the article, "Antidepressants
8  And Anti-herpetic Drugs For Chronic Non-cancer
9  Pain," written by Drs. Maizels and McCarberg.
10       Do you see that?
11    A.  I do.
12    Q.  Now, with respect to that, sir,
13 turning you to the next to the last page, Kaiser
14 003808, and the last paragraph that indicates that
15 Dr. Maizels is on the speaker bureau for Pfizer,
16 Inc.
17       Do you see that?
18    A.  I do.
19    Q.  Now, were you aware that Dr. Maizels
20 was on the speaker bureau for Pfizer, Inc. in or
21 about 2005 or at any other time?
22    A.  No, I was not.
23    Q.  It also indicates that Dr. Maizels is
24 a paid consultant for Pfizer, do you see that?
25    A.  Yes, I do.

Page 498

A. Carver

1        A. Carver
2     Q.  Now, were you ever aware that
3  Dr. Maizels was a paid consultant for Pfizer?
4     A.  Never.
5     Q.  It also indicates that Dr. McCarberg
6  is on the speaker bureau for Pfizer, do you see
7  that?
8     A.  Yes, I do.
9     Q.  And were you ever aware that
10 Dr. McCarberg was a speaker for Pfizer?
11    A.  Never aware.
12    Q.  Now, drawing your attention, sir, to
13 what has previously been marked as Exhibit 17, and
14 this is the approved minutes, TPMG regional
15 pharmacy and therapeutics committee.  And that is
16 KAIS 001460 through 001467.
17       Do you have that document before you?
18    A.  I do.
19    Q.  And sir, if you would turn to a page
20 in the middle, it says 001464 and under Gabapentin
21 (Neurontin) it says that it's a request to
22 designate Gabapentin a non-detailable formulary
23 product.
24       Do you see that?
25    A.  I do see that.

Page 499

A. Carver

1    
2    Q.    And I think that you previously told
3    Mr. James that that was approved so that
4    Gabapentin became a non-detailable formulary
5    product, is that correct?
6    A.    That's correct.
7    Q.    And I think that you also told
8    Mr. James that although the minutes reflected the
9    meeting occurred in December of 2001, that because
10   to needed to be notification to the pharmacy
11   company and in other notifications that that
12   process would take several months, is that
13   correct?
14   A.    That's correct.
15         MR. JAMES:  I believe that misstates
16   the witness' prior testimony.
17         MS. NUSSBAUM:  Sir, I'll ask the
18   question then.
19   Q.    Is it fair to say that it would take
20   between 3 and six months in the ordinary course
21   once a determination had been made for a product
22   to become a non-detailable formulary product for,
23   in fact, a pharmaceutical company to stop
24   detailing physicians?
25   A.    I believe I said approximately 3

Page 500

A. Carver

1    
2    months.
3    Q.    Approximately three months?
4    A.    Yes.
5    Q.    Okay.
6          Now, is it fair to say by looking at
7    this document that prior to early 2002, which
8    would be 3 months after the meeting of the P&T
9    committee in December 2001 when it was approved,
10   that Neurontin became a non-non-detailable
11   formulary product, that prior to that Neurontin
12   was in fact a detailable formulary product?
13   A.    Yes.
14   Q.    And what does that mean, sir?
15   A.    That means that the medical service
16   representatives from the company would have access
17   to and be able to detail their product to the
18   physicians within the Permanente Medical Group.
19   Q.    Okay.
20         So prior to the spring of 2002, it is
21   fair to say that first Parke-Davis and then Pfizer
22   were detailing the physicians that worked for the
23   Permanente Medical Group with respect to
24   Neurontin, is that correct?
25   A.    That's correct.

Page 501

A. Carver

1    
2    Q.    Okay.  And in your review of the
3    Complaint, is it fair to say that there are
4    numerous allegations that the detailing of
5    physicians by first Parke-Davis and then Pfizer
6    were part of the wrongful scheme and the wrongful
7    conduct that's been alleged here?
8    A.    Yes, there are such citations.
9    Q.    And is it fair to say as part of your
10   experience that physicians that are detailed and
11   physicians that are detailed inappropriately with
12   respect to off-label promotion such as that
13   alleged in this Complaint are likely --
14         MR. JAMES:  I'd object on the ground
15   he's not an expert.
16   Q.    -- principals for the pharmaceutical
17   product for which they're detailed?
18         MR. JAMES:  I'd object on the ground
19   he's not an expert with regard to the subject.
20   Q.    You can answer the question.
21   A.    My view would be that, yes, the
22   detailing of products by pharmaceutical companies
23   does result in the writing of prescriptions by
24   physicians.
25   Q.    Okay.  Also, with respect to the same

Page 502

A. Carver

1    
2    people that work for Parke-Davis and Pfizer that
3    detail, those are also the people that would give
4    physicians free samples, is that correct?
5    A.    That's correct.
6    Q.    Okay.  And is it fair to say based on
7    your understanding of the pharmaceutical industry
8    that giving physicians free samples leads to more
9    prescriptions being written for the particular
10   product for which the free samples are given?
11   A.    Yes, that's a fair assessment of the
12   effect in the industry.
13         MR. JAMES:  I'd object to that
14   response, insofar as it calls for speculation.
15   Q.    So it's fair to say that the
16   allegations in the Complaint which refer to
17   off-label promotion by Pfizer detailers, refer to
18   the giving of inappropriate free samples of
19   Neurontin by the Pfizer detailers; in fact, those
20   same detailers were free and did detail the
21   physicians that worked for the Kaiser Permanente
22   Group from the time that the drug went on
23   formulary in or about 1994 until the early spring
24   of 2002 as reflected in Exhibit 17?
25         MR. JAMES:  I object to the lack of

Page 503

1           A. Carver
2  foundation, and I'd also object to just a
3  generally confusing question, and I'd object to
4  form, and I also object if the witness were now to
5  become an expert for which he was unable to render
6  an opinion during the course of direct
7  examination.
8      Q.   Can you answer my question, sir?
9      A.   Yes.
10     Q.   And what is your answer?
11     A.   Yes.
12     Q.   Now, in the Complaint, if you again
13 look this time to page 30, there is a chart at the
14 bottom of the page, this is in paragraph 83, and
15 this is the set of allegations with respect to
16 medical education systems, MES, which is a medical
17 marketing firm in Philadelphia, that it allegedly
18 engaged in wrongful conduct with Parke-Davis with
19 respect to the off-label promotion of Neurontin,
20 and turning specifically to paragraph 83 and the
21 chart, there's a list of alleged authors of
22 articles and subjects of articles.
23         Do you see that?
24     A.   I do.
25     Q.   And if you go four down, an article

Page 504

1           A. Carver
2  says, Patricia (Tricia Suppes, S-U-P-P-E-S).
3         Do you see that?
4      A.   I do.
5      Q.   And the article concerns mania and
6  hypomania.
7         Do you see that?
8      A.   I do.
9         (Kaiser-26 marked for identification.)
10     Q.   Now, let me show you a document which
11 we are marking as a Kaiser exhibit.  It's KAIS
12 404322 through 004326.
13         Now, looking at Exhibit 26, is that
14 the article that is referred to on page 30 of the
15 Amended Coordinated Complaint that is the article
16 by Patricia Suppes?
17     A.   It appears to be.
18     Q.   Okay.  And I note that on the lower
19 right-hand corner, this article bears a Bates
20 stamp number from Kaiser.
21         Do you see that?
22     A.   I do.
23     Q.   And does that reflect to you that this
24 is a document that was produced from Kaiser files
25 in this litigation?

Page 505

1           A. Carver
2      A.   It does.
3      Q.   And does that then reflect to you that
4  this was an article that was requested and used
5  and relied upon by Kaiser in making its decisions
6  with respect to Neurontin?
7         MR. JAMES:  Objection.  It
8  was previously stated that he didn't have any
9  knowledge regarding specific articles such as this
10 regarding Neurontin or relied on by Kaiser.
11     Q.   Well, does this refresh your
12 recollection, sir, the fact that this article was
13 in Kaiser's files and produced in this litigation
14 that this is an article that Kaiser had that the
15 people whose files were searched produced this
16 article and that the article was in Kaiser's files
17 and relied upon by Kaiser in this litigation?
18         MR. JAMES:  I object to his answering
19 regarding reliance.
20         MS. NUSSBAUM:  That's okay, you can
21 object.
22     A.   Yes, this document came from the
23 Kaiser files, and so I think the answer to your
24 question is yes.
25     Q.   That is that this is a document that

Page 506

1           A. Carver
2  was used and relied by Kaiser as part of the
3  information they considered with respect to their
4  determinations concerning Neurontin, is that
5  correct?
6      A.   Correct.
7         MS. NUSSBAUM:  I have no further
8  questions of this witness at this time.  The
9  deposition is concluded.
10        VIDEOGRAPHER:  We're going off the
11 record at 5:32 p.m.  This is the end of tape six
12 and concludes today's deposition of Albert Carver.
13        (Recess.)
14        VIDEOGRAPHER:  Back on the record at
15 5:33 p.m.
16 REDIRECT EXAMINATION
17 BY MR. JAMES:
18     Q.   I won't keep you long.  I have one
19 question.
20        You testified just now that this
21 document that Ms. Nussbaum showed you was one that
22 was relied upon by Kaiser in some way, is that
23 correct?
24     A.   That's correct.
25     Q.   And could the same be said of any

Page 507

1          A. Carver
2 article that was produced from Kaiser's files?
3     A.   I believe that that's correct in terms
4 of articles that would have been taken into
5 consideration.
6          MS. NUSSBAUM:  If you have a
7 particular --
8     Q.   Is there anything distinct about this
9 article relative to other ones that were produced
10 from Kaiser's files that led you to believe that
11 this one might have been relied upon?
12          MS. NUSSBAUM:  If you have a
13 particular article that you want to show the
14 witness that's been --
15          MR. JAMES:  No, I'm actually asking
16 for --
17     Q.   What is the basis for your conclusion
18 that this article was relied upon?
19     A.   The basis for the conclusion is the
20 fact that it was contained in our files and
21 produced subsequent to information that we had on
22 Neurontin.
23          MR. JAMES:  Thank you.  That's all I
24 have.
25          VIDEOGRAPHER:  Off the record at

Page 508

1          A. Carver
2 5:34 p.m.  This is the end of tape six and
3 concludes the deposition of Albert Carver.
4      (Whereupon the proceedings were
5 concluded at 5:34 p.m.)
6          J U R A T
7      I, ALBERT L. CARVER, the witness herein,
8 having read the foregoing testimony of the pages of this
9 deposition, do hereby certify it to be a true and
10 correct transcript, subject to the corrections, if any,
11 shown on the attached page.
12
13      _____
14      ALBERT L. CARVER
15   Subscribed and sworn to before me
16 this ____ day of _____ 2007.
17 _____
18     NOTARY PUBLIC
19
20
21
22
23
24
25

Page 509

1          A. Carver
2 STATE OF NEW YORK   )   Pg. of Pgs.
3                 ) ss.:
4 COUNTY OF NEW YORK   )
5      I wish to make the following changes, for the
6 following reasons:
7 PAGE LINE
8 ____ ____     CHANGE: _____
9          REASON: _____
10 ____ ____     CHANGE: _____
11          REASON: _____
12 ____ ____     CHANGE: _____
13          REASON: _____
14 ____ ____     CHANGE: _____
15          REASON: _____
16 ____ ____     CHANGE: _____
17          REASON: _____
18 ____ ____     CHANGE: _____
19          REASON: _____
20 ____ ____     CHANGE: _____
21          REASON: _____
22 ____ ____     CHANGE: _____
23          REASON: _____
24 ____ ____     CHANGE: _____
25          REASON: _____

Page 510

1          A. Carver
2 PAGE LINE
3 ____ ____     CHANGE: _____
4          REASON: _____
5 ____ ____     CHANGE: _____
6          REASON: _____
7 ____ ____     CHANGE: _____
8          REASON: _____
9 ____ ____     CHANGE: _____
10          REASON: _____
11 ____ ____     CHANGE: _____
12          REASON: _____
13 ____ ____     CHANGE: _____
14          REASON: _____
15 ____ ____     CHANGE: _____
16          REASON: _____
17 ____ ____     CHANGE: _____
18          REASON: _____
19 ____ ____     CHANGE: _____
20          REASON: _____
21 ____ ____     CHANGE: _____
22          REASON: _____
23 ____ ____     CHANGE: _____
24          REASON: _____
25

Page 511

```
 1
 2              CERTIFICATE
 3         I, AMY A. RIVERA, a Notary Public and
 4   Certified Shorthand Reporter of the State of New York,
 5   do hereby certify that prior to the commencement of the
 6   examination ALBERT L. CARVER was duly sworn by me to
 7   testify the truth, the whole truth and nothing but the
 8   truth.
 9         I DO FURTHER CERTIFY that the foregoing
10   is a true and accurate transcript of the testimony as
11   taken stenographically by and before me at the time,
12   place and on the date hereinbefore set forth.
13         I DO FURTHER CERTIFY that I am neither a
14   relative nor employee nor attorney nor counsel of any of
15   the parties to this action, and that I am neither a
16   relative nor employee of such attorney or counsel, and
17   that I am not financially interested in the action.
18
19   _____
20      Notary Public of the State of New York
21      My commission expires August 29, 2009
22      License No. XI00939
23   Dated: July 17, 2007
24
25
```