EXHIBIT  C

## COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX , SS.

SUPERIOR COURT
DEPARTMENT of the TRIAL COURT
Civil Action No.

07-2338

FILED
IN THE OFFICE OF THE
CLERK OF COURTS
FOR THE COUNTY OF MIDDLESEX

JUN 21 2007

CLERK

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Allan M. Huberman,
    Plaintiff

vs.

Pfizer, Inc. and Parke-Davis, Division of
Warner-Lambert Company,
    Defendants.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

)
)
)
)
)
)
)
)
)
)
)

7771E000006/21/07CIVIL          240.
7771E000006/21/07SUR CHARGE     15.

### Plaintiff's Complaint.

7771E000006/21/07SUMMONS        10.

PARTIES:

(1)    The Plaintiff Allan M. Huberman ("Allan Huberman") is a resident of Saugus, Essex County, Massachusetts.

7771E000006/21/07SECC           20.

(2)    The Defendant Pfizer, Inc. ("Pfizer") is a Delaware corporation with a principal place of business in New York, New York. Upon information, Pfizer has a usual place of business in Cambridge, Massachusetts. Pfizer is principally engaged in the manufacture and sale of pharmaceuticals. In 2000, Pfizer acquired Warner-Lambert Company (Warner-Lambert) including Warner-Lambert's Parke-Davis division ("Parke-Davis"). As a result of the acquisition, Pfizer is responsible for all liabilities which result from any acts or omissions of Parke-Davis or Warner-Lambert which occurred prior to the Warner-Lambert acquisition.

(3)    The Defendant Warner-Lambert Company ("Warner-Lambert") is a company engaged in the manufacture of pharmaceuticals with a principal place of business in New York, New York.

(4)    Parke-Davis was, until 2000, a division of Warner-Lambert, a corporation with a principal place of business in Morris Plains, New Jersey. At all times material hereto, Parke-Davis was principally engaged in the sale and manufacture of pharmaceuticals falling under the jurisdiction and regulation of the United States Food and Drug Administration (FDA).

(5)    At all times material hereto, Parke-Davis and/or Pfizer conducted substantial business within the Commonwealth of Massachusetts, maintained permanent employees and offices in Massachusetts and made and continue to make significant sales within Massachusetts. For the reasons which will be set forth, Parke-Davis and Pfizer have caused tortuous injury in this Commonwealth. Accordingly, Pfizer is subject to personal jurisdiction in the Commonwealth of Massachusetts pursuant to M.G.L.c. 223A, Section 3.

FACTS:

A.    The Regulatory Scheme The Restricts the Marketing and Reimbursement of Neurontin

(6)    Federal regulations prohibit certain marketing practices which have a propensity to lead to the unnecessary and ineffective prescription of pharmaceuticals New pharmaceutical drugs may not be marketed in the United States until the sponsor of the pharmaceutical has proved to the Food and Drug Administration (FDA) that the drug is safe and effective for specific indications at specified dosages. The indications and dosages approved by the FDA are set forth in the drug's labeling, the content of which is also approved by the FDA. Although it is not unlawful for physicians to prescribe approved drugs for indications or at dosages different than those set forth in a drug's labeling, the Food Drug and Cosmetic Act prohibits drug companies from marketing or promoting approved drugs for uses other than those set forth in the drugs' approved labeling. This regulatory scheme protects patients and consumers by insuring that drug companies do not promote drugs for uses other than those found to be safe and effective by an independent, scientific governmental body.

(7)    The Medicare and Medicaid anti-kickback laws, 42 U.S.C. § 1320a-7b(b) also regulate drug marketing in order to prevent overutilization of prescription medication. Under the anti-kickback laws, drug companies may not offer or pay any remuneration, in cash or kind, to induce physicians or others to order or recommend drugs which may be paid for by a federal healthcare program such as Medicare or Medicaid. These regulations not only prohibit outright bribes and rebate schemes, but prohibit any payment by a drug company to a physician which has as one of its purposes the inducing of the physician to write additional prescriptions for the company's pharmaceuticals.

(8)    Parke-Davis initially created the drug, Gabapentin (brand name: Neurontin), for the treatment of epilepsy. Neurontin was approved in 1993 for the treatment of partial seizures with and without secondary generalization in adults with epilepsy.

(9)    Concern about improper drug marketing practices increased at just about the time Parke-Davis began its marketing of Neurontin. In 1994 the Inspector General of the Department of Health and Human Services issued a Special Fraud Alert concerning prescription drug marketing practices that violated the anti-kickback laws. Among the improper practices cited by the Inspector General were drug companies' payment of

"research grants" to substantial prescribers of its medications; payments to physicians for "studies" of the company's products when the studies were "of questionably scientific value and require little or no actual scientific pursuit"; and payments to physicians where the physician had offered no particular services of benefit to the drug company but the payment appeared to have been based on the volume of business the doctor generated in the past, or could generate in the future, for the drug company.

(10)    As described below, Parke-Davis, between 1994 through at least 1998, and probably thereafter, knowingly and intentionally violated the regulatory schemes described above in their marketing of Neurontin.

B.    Parke-Davis's Deliberate Decision to Avoid FDA Approval and Market Neurontin Off-Label

(11)    In December, 1993, the FDA approved Neurontin as 'adjunctive therapy" for the treatment of certain types of these seizures in adult patients suffering from epilepsy. "Adjunctive therapy" meant that the drug could not be prescribed by itself for the treatment of epilepsy, but as an add-on drug in the event that a primary anti-epilepsy drug was not successful. The FDA approved labeling of Neurontin stated that the drug is only effective at 900 to 1800 mg/day.

(12)    At the time Neurontin was approved, Park-Davis' original patent on Neurontin was set to expire in December, 1998. This left Parke-Davis with only a small window of exclusivity for this drug; after the expiration of the Neurontin patent Parke-Davis would be forced to share the market for Neurontin with generic drug manufacturers, substantially reducing its profits and its ability to keep Neurontin's retail price high.

(13)    At the time Parke-Davis filed its NDA (New Drug Application) with the FDA, Parke-Davis intended Neurontin to be used for other uses besides epilepsy adjunctive therapy. In October, 1990, Parke-Davis filed a patent for Neutonton claiming it to be effective in the treatment of depression. In November 1990, it filed another patent application for Neutontin claiming it to be effective for the treatment of neurogenerative disease. In 1995, additional patent applications were filed by Parke-Davis for mania and bipolar disease and for anxiety and panic. Notwithstanding the claims made in its patent applications, neither Parke-Davis not Pfizer ever sought FDA approval for the use of Neurontin to treat the conditions described in the four patent applications referenced above.

(14)    The market for the only approved use for Neurontin, adjunctive therapy for epilepsy patients, is, and was, limited. On the other hand, the market for the other uses of Neutontin contemplated by Parke-Davis – pain management, psychiatric disorders, anxiety and depression – were huge. Parke-Davis knew that if these markets could be tapped, Parke-Davis could enjoy enormous profits from Neurontin.

(15)    Initially, Parke-Davis intended to file supplemental NDAs in order to expand Neurontin's approved indications, including applications for monotherapy (which

3

would permit Neurontin to be prescribed by itself for epilepsy treatment) and for various psychiatric and neurological indications. However, by 1995 Parke-Davis recognized it would be uneconomical to assume the expense and time necessary to conduct clinical trials necessary to prove that Neurontin was sage and effective for these uses. Assuming Neurontin could be proven to be safe and effective, the near term expiration of the patent meant that generic manufacturers of Neurontin would reap much of the reward of proving Neurontin could be safely used for other indications.

(16)    After performing extensive economic analysis, senior officials at Parke-Davis determined that it was not sufficiently profitable for Parke-Davis to obtain FDA approval for Neurontin's alternative uses. Instead, Parke-Davis officials developed a strategy that would allow Parke-Davis to avoid the costs of proving that Neurontin was safe and effective for these other uses, while allowing Parke-Davis to compete in the lucrative off-label markets. Taking advantage of a loophole in the FDA's off-label marketing rules, Parke-Davis decided to employ a "publication strategy" that would allow it to promote Neurontin by the massive distribution of publications supposedly written by independent researchers that purportedly described the scientific evaluation of Neurontin. Another advantage of this strategy, from Parke-Davis's perspective, was that it could be employed immediately – there was no need to wait for the results of scientifically conducted clinical trials to determine if Neurontin was actually effective in the treatment of these conditions.

(17)    Although federal regulations did not permit Parke-Davis to promote unapproved uses of Neurontin, Parke-Davis was permitted to distribute publications created by third parties that described results of off-labeled use of Neurontin, provided such material was only distributed in response to non-solicited requests from physicians. Parke-Davis decided to exploit this narrow exception by creating events and programs that would allow special Parke-Davis employees and independent contractors under Parke-Davis' control to promote off-label usage under circumstances that would allow the company to plausibly deny that it had solicited off-label usage.

(18)    Significant ingenuity and resourcefulness was necessary in order to execute this unlawful scheme without detection. Faced with the fact that its "publication strategy" required publications from independent physicians when no such publications existed, Parke-Davis hired non-physician technical writers to create articles from medical journals and then paid actual specialists to be the articles' "authors". Faced with the fact that its normal marketing force could not deliver the off label message, Parke-Davis trained its medical liaisons, technical employees who were supposed to provide balanced scientific information to doctors, to sell off-label and solicit interest in off label uses. Faced with the fact that in order for a "publication strategy" to actually increase usage of a drug, Parke-Davis required a large group of doctors who were interested in receiving information about those experiments. Parke-Davis generated both groups by liberally distributing payments to both groups of physicians through "consultants" meetings, speakers bureaus, medical education seminars, grants, "studies", advisory boards and teleconferences. Further details of these programs are described below.

4

(19)     Notwithstanding their knowledge that they could not promote Neurontin lawfully for non-approved uses, marketing executives at Parke-Davis' headquarters in Morris Plains, New Jersey and in its five regional customer business units (CBUs) selected a marketing strategy which would deliberately lead to increased off-label usage of Neurontin. These executives knew that Parke-Davis was not supposed to create or design the contents of the communications that would be distributed pursuant to the "publication strategy" or do anything to generate the practicing physicians' interest in receiving such communications. As demonstrated below, Parke-Davis ignored these legal requirements and, instead, put into effect a pervasive pattern of illegal conduct, described below, lasting from at least 1994 through 1998, and Plaintiff believes, through 2000.

          C.     Parke-Davis' Systematic Payments to Doctors for the Purpose of Increasing Neurontin Prescriptions

(20)     Parke-Davis' "publication strategy" required physicians (and its medical liaisons) to perform the work normally performed by the Company's salesman in order to promote Neurontin. Adoption of this strategy required Parke-Davis to make tens of thousands of payments to the physicians who would act as a surrogate sales force as well as the practicing physicians who would receive the message. In other words, adoption of the "publication strategy" required Parke-Davis to make thousands of payments to physicians for the purpose of having those doctors either recommend the prescription of Neurontin or to order Neurontin, in violation of the Medicaid kickback regulations. Parke-Davis was aware that these regulations were violated routinely. A description of the various programs Parke-Davis used to make these payments to physicians follows.

**Consultants' Meetings**

(21)     A common ploy by Parke-Davis to funnel illegal payments to physicians to encourage them to prescribe off-label was through "consultants" meetings. Under this guise Parke-Davis recruited physicians to dinners or conferences and paid them to hear presentations about off-label uses of Neurontin. Under the fiction that these doctors were acting as consultants, Parke-Davis sometimes (but not always) had the doctors sign sham consulting agreements. At these meetings Parke-Davis would give these doctors lengthy presentations relating to Neurontin, particularly regarding off-label usage. Presentations would be made by Parke-Davis employees or physician speakers hired by Parke-Davis for the purpose of promoting Neurontin, and attendees' questions relating to the administration of Neutontin use would be solicited and answered. At some conferences, the sponsoring organization or Parke-Davis intentionally posed questions to the speakers about off-label use to insure that the attendees were exposed to such information

(22)     At some, but not all, "consultants" meetings a few questions would be posed to the "consultants" regarding Parke-Davis marketing of Neurontin or how Parke-Davis sales force could provide better service to the doctors The consultants' meetings, however, were not held (and the "consultants" were not paid) for the purpose of

providing Parke-Davis with expert, independent advice. Parke-Davis in many cases did not even record the "advice" provided by its "consultants" and what advice was collected was never acted upon or reviewed. Indeed, no legitimate business would need hundreds of "consultants" to advise it on the same topic.

(23)    Parke-Davis did, however, routinely analyze whether the consultants were successful in getting the attendees to change their prescription writing practices. At some meetings, the "consultants" were directly asked if they would write more Neurontin as a result of the meeting. Such a question would have been irrelevant if the actual purpose of the meeting was to receive the "consultants'" advice. Parke-Davis also routinely tracked consultants' Neurontin prescription writing practices after these meetings. Using market data purchased from third parties, Parke-Davis analyzed whether the doctors they had paid had in fact written more Neurontin prescriptions after the meeting. Again, such data was only relevant if the real purpose of the payments was to influence the doctors to order more Neurontin.

(24)    A typical consultants' meeting was held in Jupiter Beach, Florida for neurologists from the North East CBU during the weekend of April 19-21, 1996. The "consultants" selected for this meeting were not chosen on the basis of their consulting acumen, but because of their potential to write Neurontin prescriptions. In a memorandum announcing the event to Parke-Davis personnel, the Neurontin Marketing Team acknowledged that in order to target neurologists with the greatest potential for writing Neurontin prescriptions, sales personnel must select potential attendees from a list of the top prescription writers for anti-epileptic drugs in the Northeast; only persons who fell within this desirable demographic were allowed to be invited.

(25)    Qualifying physicians were given a round-trip airfare to Florida (worth $800.00), two-nights accommodations (worth $340.00), free meals and entertainment, ground transportation and a "consultant's fee" of $250.00. Ample time was provided so that Parke-Davis consultants could enjoy the beach resort. The value of the junket was approximately $2,000.00 per physician.

(26)    The Jupiter Beach consultants' meeting included two half days of presentations by Parke-Davis relating to Neurontin, including extensive presentations relating to off-label uses. Although technically the presentations were provided by an independent company, Proworx, all aspects of the presentations were designed, monitored, and approved by Parke-Davis. It selected the speakers, picked the presentation topics and previewed the content of the presentations to make sure that they were acceptable. Parke-Davis paid all expenses relating to the Consultants' meeting including all payments to the attendees and the presenters, all travel, accommodation, meals and entertainment expenses, all presentation expenses, all expenses and fees incurred by Proworx, and the substantial fees paid to the presenting physicians. Notwithstanding the FDA's prohibition regarding the provision of promotional materials on off-label uses, Parke-Davis provided written abstracts of the presentations that detailed off-label use of Neurontin to each of its "consultants."

6

(27)  No effort was made to obtain professional advice at Jupiter Beach from the "consultants" Parke-Davis had wined, dined, and entertained during the weekend. A follow-up memorandum to Parke-Davis marketing officials noted that "the participants were delivered a hard hitting message about Neurontin" and emphasized that the participants were encouraged to use Neurontin at higher doses. More importantly, after the conference Parke-Davis generated "trending worksheets" listing the doctors who attended the consultants' meeting. These worksheets enabled Parke-Davis to track Neurontin prescription habits of the attendees before and after the consultant's meetings to determine if these "high writing" prescribers wrote more Neurontin scripts after the conference. . Persuading these heavy prescribers to order more Neurontin for their patients was, in fact, the sole purpose of the Jupiter Beach junket.

(28)  Jupiter Beach was not unique. Parke-Davis hosted dozens of consultants' meetings between late 1995 and 1997 in which the "consultants" received payments and gratuities as well as presentations on off-label Neurontin use designed to change the physicians' prescription writing habits. Comparable consultants' meetings included, but were not limited to, the following:

| TOPIC | LOCATION | DATES |
|---|---|---|
| Mastering Epilepsy | La Costa Resort, CA | July 20-23, 1995 |
| Mastering Epilepsy | Santa Fe, New Mexico | Nov. 16-19, 1995 |
| Neurontin Consultants Conference | Marco Island, FL | February 2-4, 1996 |
| Pediatric Epilepsy | Hutchinson Island, FL | February 9-11, 1996 |
| Mastering Epilepsy Science | Walt Disney World, FL | Feb.22-25, 1996 |
| Pediatric Epilepsy | Hutchinson Island, FL | March 8-10, 1996 |
| Mastering Epilepsy | Ritz Carlton, Aspen, CO | April 18-21, 1996 |
| Affective Disorders in Psychiatry | Marco Island, FL | April 20, 1996 |
| Affective Disorder Consultants Conference | Southern Pines, NC | April 27, 1996 |
| Neuropathic Pain Conference | Palm Beach, FL | May 11, 1996 |
| Regional Consultants Conference | Ritz Carlton, Boston, MA | May 10-11, 1996 |
| Epilepsy Management Advisors Meeting | Sheraton Grande Torrey Pines, La Jolla, CA | June 21-23, 1996 |
| Epilepsy Management | Rancho Bernardo, CA | June 28-30, 1996 |
| Use of Anti-Convulsants in Psychiatric Disorders | Short Hills, NJ | Oct. 18-19, 1996 |
| Non-epileptic Uses of Neurontin | Longboat Key, FL | Nov. 6, 1996 |
| Neurological Conditions Conference | Ritz Carlton, Atlanta, GA | Sept. 27-28, 1997 |

Other consultants' meetings took place at Charleston, S.C., Coconut Grove, FL, Naples, FL, Memphis, TN, Louisville, KY, Washington, D.C., Aspen, CO, and other places. Hundred, if not thousands, of physicians received kickbacks to attend these events.

(29)  Not all payments to consultants were made at conferences as elaborate as Jupiter Beach. Many consultants' meetings consisted of lavish dinners at local restaurants. The emphasis on these meetings was also on off-label uses, and $200 "honorariums" were

paid to the physicians who did nothing for the payment except show up. At none of the events did the consultants provide legitimate consultation to Parke-Davis, but at all of the events the "consultants" were encouraged to increase their Neurontin prescription writing.

## Medical Education Seminars

(30)    Another format where Parke-Davis paid kickbacks to physicians to hear off-label promotion of Neurontin were programs billed as Continuing Medical Education seminars (CME). These conferences and seminars were set up to appear to qualify for an exception to the FDA's off-label marketing restrictions which permits physicians to learn about off-label uses of pharmaceuticals at independent seminars. Such seminars, however, must be truly independent of the drug companies. The companies may make "unrestricted grants" for the purpose of a seminar, but may not be involved in formulating the content of the presentations, picking the speakers or selecting the attendees. None of these requirements were observed with regard to the CME seminars sponsored by Parke-Davis for the promotion of off-label uses of Neurontin. While Parke-Davis retained third party organizations, such as Proworx and Medical Education Systems, to present the event seminars, it had control of virtually every aspect of these events, and the seminar companies obtained Parke-Davis' approval for all content presented at the seminars. Parke-Davis also paid all expenses, including all the seminar companies' fees.

(31)    Although the seminar companies acted as the conduit for the payments and gratuities given to the physician attendees, like the Jupiter Beach consultants' meetings, Parke-Davis controlled every aspect of the CME programs. It designed and approved the programs; hand-picked the speakers for the seminars; approved the seminar presentations of the seminars; previewed, in most cases, the contents of the seminars prior to delivery; selected the attendees based on their ability and willingness to prescribe high quantities of Neurontin; evaluated the presentations to make sure Parke-Davis' "message" was appropriately delivered; black-listed presenters whose presentations were not sufficiently pro-Neurontin; and monitored the prescribing patterns of the physicians who attended these conferences to insure the purpose of the conference – increased writing of Neurontin prescriptions – was achieved. Follow-up reports to marketing executives at Parke-Davis highlighted that the attendees received presentations regarding off-label marketing and recommendations for dosages larger than those labeled effective by the FDA. These memoranda also reported to senior executives the pledges made by attendees to order more Neurontin for their patients.

(32)    For some seminars, high prescription writing physicians were selected to receive junkets comparable to those Parke-Davis provided to the attendees of the Jupiter Beach consultants' meetings. Others were less lavish, but physicians received free tuition, free accommodations, free meals, and cash. Frequently the Parke-Davis CME seminars were accredited by continuing medical education organizations, which meant that the physicians taking advantage of Parke-Davis' junkets did not have to pay tuition or

8

spend additional time to fulfill their continuing medical education licensure requirements by attending truly independent medical education programs.

(33)    Representative CME programs sponsored by Parke-Davis where it paid extensive kickbacks to attending physicians, included, but are not limited to, the following:

| SEMINAR | LOCATION | DATE |
|---|---|---|
| Merritt-Putnam Epilepsy Postgraduate Course | | Jan. 19, 1996 |
| Merritt-Punam Seminar | Chicago, IL | |
| New Frontiers in AntiEpileptic Drug Use | California | Sept-Oct 1996 |
| Diabetic Neuropathy | Ritz Carlton, Boston, MA | June 22-24, 1996 |
| Merritt Putnam Symposium | Key Biscayne, FL | September 11, 1997 |
| Merritt Putnam Conference on Monotherapy | Palm Springs, CA | September 19, 1997 |
| Merritt Putnam Conference on Monotherapy | St. Louis, MO | October 3, 1997 |
| Merritt Putnam Symposium | Boston, MA | December 5, 1997 |

### Grants and "Studies"

(33)    Parke-Davis also made outright payments, in the form of grants, to reward demonstrated Neurontin believers and advocates. Parke-Davis sales managers identified key doctors who actively prescribed Neurontin or programs which were willing to host Neurontin speakers and encouraged such persons or programs to obtain "educational grants" from Parke-Davis. Under this program of kickbacks Parke-Davis paid:

- $2,000.00 to Berge Ninmpolan, MD, "a great Neurontin believer," to attend a neurology seminar in San Francisco, in March 1996.
- $1,000.00 to the University of Texas Department of Neurology to host a symposium where presentations would be made regarding successful off-label treatment with Neurontin.
- $3,000.00 to the University of Texas Medical School to host a conference in August 1996 at which a well-known specialist in epilepsy, who prescribed Neurontin, would attend
- $4,000.00 to pay for a neurologist from the University of Texas at San Antonio to attend the American Epilepsy Society Conference in December, 1996, a conference at which Parke-Davis was presenting extensive documentation on off-label uses for Neurontin.
- $2,500.00 to the University of Texas in Houston to bring Dr. B.J. Wilder to the campus to hold a seminar. Dr. Wilder was one of Neurontin's biggest boosters for off-label indications and had been paid tens of thousands of dollars to promote Neurontin's off-label uses for Parke-Davis across the country.

- $2,500.00 in June, 1996 to pay for representatives from the University of Pennsylvania Medical Center to attend a conference in Saint Petersburg, Russia on the utilization of anti-epileptic drugs, including Nerontin.
- $5,000.00 to Dr. Alan B. Ettinger, of Stonybrook, N.Y. in December 1996, a physician who had informed Parke-Davis that he was interested in possibly doing research in Neurontin and maintained a database of patients who were treated with Neurontin.
- $500.00 to Bruce Ehrenberg, of Boston, MA, a leading speaker for Parke-Davis regarding off-label use of Neurontin, to attend a conference in China.
- $1,000 to Israel Abrams, M.D., Paul C. Marshall, M.S., Beth Rosten, M.D. and Spencer G. Weig, of Worcester, MA for educational programs in February 1996. According to the local Parke-Davis representative requesting the grant, "much of the Neurontin success in Worcester has been attributed to … the 4 pedi epileptologists below."
- $1400 to Dr. Ahmad Beydoun of Ann Arbor, MA for post-graduate training in March 1996. This grant was processed on a quick turnaround, the Parke-Davis representative noting "I realize that this is a very short time line; however, Dr. Beydoun is a very important customer."
- $1,500 to Jim McAuley, R.Ph, Ph.D. for educational materials relating to epilepsy. Parke-Davis decided to provide the funds because McAuley was an advocate of Neurontin and he was important in getting another Parke-Davis drug, Cerebryx, accepted on the formulary for Ohio State University.
- A grant in an unknown amount to University Hospital in Cleveland in exchange for the hosting programs regarding Neurontin's use in treating neuropathic pain at conferences specifically devoted to obtaining referrals from other doctors

(34)    These grants, and others, were charges to the Nerontin marketing budget. Each of these grants was made solely because an individual who would receive the money was a large Neurontin supporter or would host a program where a well known Neurontin supporter would recommend that other physicians increase their prescriptions of Neurontin. Each of these grant awards constituted a reward or kickback for the recipient's advocacy of Neurontin.

(35)    Parke-Davis' medical liaisons informed leading Neurontin subscribers that significant advocacy for Neurontin would result in the payment of large grants. These studies did not involve significant work for the physicians. Often times they required little more than collating and writing up office notes or records. Indeed, as noted below, Parke-Davis frequently hired technical writers to write the articles for which the "authors" had been given grants.

(36)    Parke-Davis was aware that these articles and studies provided minimal scientific benefit. In a letter to the FDA in June 1997, Parke-Davis submitted a list of "studies relating to pain, pain syndromes, and psychiatric disorders" which failed to include any of these numerous studies, purportedly funded by Parke-Davis. Parke-

Davis intentionally neglected to report these "studies" to the FDA because they knew the funded "research" had no scientific value and would not be deemed to be studied by the FDA. Payments Parke-Davis made for "studies" included, but were not limited to the following:

| Funded Project | Payee | Payment |
|---|---|---|
| Statistical Analysis of Patients Treated with Neurontin for Pain | Hans Hansen, M.D.; Statesville, NC | $ 7,000.00 |
| Reduction of Sympathetically Medicated Pain and Sudomotor Function | David R. Longmire, M.D.; Russelville, AL | $ 7,000.00 |
| Data Entry for Neurontin and Pain Analysis | Travis Jackson, M.D.; David Meyer, M.D.; Winston-Salem, NC | |
| Trial of Neurontin for distal symmetric Polyneuropathy associated with AIDS | Joseph Weissman, M.D. Atlanta, GA | $20,000.00 |
| Neurontin for Neuropathic pain in Chronic Pain syndromes | Lavern Brett, M.D. Washington, D.C. | $25,000.00 |
| Retrospective chart analysis of Neurontin Use with Bipolar Disorder Patients | Ralph S. Rybeck, M.D. | $ 5,000.00 |
| Retrospective Analysis of Neurontin in the treatment of pain | David R. Longmire, M.D.; Russellville, AL | $ 2,000.00 |
| Retrospective Analysis of Neurontin in the treatment of chronic pain | Don Schanz, D.O. Traverse City, MI | $ 8,000.00 |
| Case historied relating to use of Neurontin as an adjuvant analgesic | Elizabeth J. Narcessian, M.D. W. Orange, NJ | $ 4,000.00 |

Plaintiff is informed and avers that other payments were made to physicians for other "studies" of questionable scientific credibility.

(37) One particularly large study conducted by Parke-Davis served as yet another engine to financially reward physicians for prescribing Neurontin. In 1995 and 1996 Parke-Davis conducted an enormous Phase IV trial known as STEPS. Although STEPS took the form of a research clinical trial, it was, in fact, a marketing ploy designed to induce neurologists to become comfortable prescribing Neurontin at a far higher dose than indicated in the FDA approved labeling. While most clinical studies have a limited number of investigators treating a number of patients qualified for the study, the STEPS protocol called for over 1,200 "investigators" to enroll only a few patients each. The

11

participating physicians were instructed to titrate their patients to higher than labeled dosages of Neurontin to demonstrate that patients could tolerate high dosages of the drug. Rewarding physicians for prescribing high doses on Neurontin was another way to increase Neurontin sales because higher per patients dosages increased the amount of Neurontin sold. Additionally, the STEPS study was also designed to habituate physicians to place non-study patients on Neurontin on doses higher than found effective in the clinical trials monitored by the FDA.

(38)    Physicians enrolling in the STEPS study were paid for agreeing to participate in the study and for every patient enrolled. At the conclusion of the study, Parke-Davis offered each of the 1,200 investigators additional cash for each patient the doctor kept on Neurontin after the study ended. These payments were unquestionably kickbacks, each participating doctor was expressly paid for writing Neurontin prescriptions for their patients. The number of investigators who received such payments are too many for the Relator to list. Additionally, Parke-Davis has exclusive control of the information regarding who received such payments at the conclusion of the STEPS trial.

### Payments to "Authors" of Ghost Written Articles

(39)    Yet another method of rewarding doctors for their advocacy of Neurontin was to pay them honorarium for lending their names to scientific articles which were actually prepared and written by third parties retained by Parke-Davis. In 1996 Parke-Davis retained AMM/ADELPHI, Ltd. and Medical Education Systems, Inc., to prepare no less than twenty (20) articles for publication in various neurology and psychiatry journals. Most of these articles concerned off-label usage of Neurontin and were generated so that Parke-Davis would have completely controlled publications it could distribute pursuant to its "publication strategy." The content of these articles were actually written by non-physician technical writers retained by Parke-Davis, and Parke-Davis had the right to control the content of all of the articles. Parke-Davis paid all expenses in connection with the creation of these publications.

(40)    Once Parke-Davis and the technical writers conceived the articles, Parke-Davis and its outside firms attempted to find recognized Neurontin prescribers whose names could be used as the authors of these articles. In some cases, drafts of the articles were completed even before an "author" agreed to place his or her name on the article. This even occurred in connection with the case histories that purported to describe the "author's" personal treatment of actual patients. The "authors" were paid an honorarium of $1,000.00 to lend their names to these articles, and also were able to claim publication credit on their curriculum vitae.

(41)    After the technical writers completed their work, Parke-Davis and its outside firms found journals that would publish the articles. Parke-Davis' role in creating, approving and sponsoring the articles was hidden from the public. While the articles might reference that the author received an honorarium from the outside firm, the articles failed to state that the honorarium was paid with money provided by Parke-David and that Parke-Davis had approved the content and hired the actual authors. For example, an article created by Medical Education Systems (MES), *Gabapentin and*

12

*Lemotrignine: Novel Treatments for Mood and Anxiety Disorders*, published in CNS Spectrums noted that "an honorarium was received from Medical Education Systems for preparation of this article," but never revealed Parke-Davis' retention and payment of MES or the fact that MES personnel, while under contract to Parke-Davis wrote the article.

(42)    Parke-Davis used these publications as part of their "publication strategy" by presenting the articles as evidence of independent research conducted by persons with no monetary interest in Neurontin. This impression, of course, was false. Parke-Davis created the article to promote off-label uses for Neurontin, purchased the names and reputations of the authors with kickbacks and controlled the content of the article.

### Speakers' Bureau

(43)    Parke-Davis also formed the Speakers Bureau, another method to make large and numerous payments to physicians who recommended Neurontin at teleconferences, dinner meetings, consultants meetings, educational seminars, and other events. These speaker repeatedly gave short presentations relating to Neurontin which they were paid anywhere from $250.00 to $3,000.00 per event. Speaker such at Seven Schachter, B.J. Wilder, Ilo Leppik, Gary Mellick, David Longmire, Gregory Bergey, Michael Merren, David Treiman, Michael Sperling, Martha Morrell, R. Eugene Ramsay, John Pellock, Ahmad Beyoun, Thomas Browne, John Gates, Jeffrey Gelblum, Dennis Nitz, Robert Knobler and others received tens of thousands of dollars annually in exchange for recommending to fellow physicians that Neurontin be prescribed, particularly for off-label uses. The payments that these doctors received were far in excess of the fair value of the work they performed for Parke-Davis. Speakers who most zealously advocated Neurontin were hired most frequently for speaking events, notwithstanding the fact that many of these events purported to be independent medical education seminars where independent information was supposed to be delivered. Plaintiff is informed and avers that extensive payments through the Speaker's bureau took place between 1995 and 1997. Plaintiff is aware that off-label promotion of Neurontin pursuant to the "publication strategy" continued after 1997 and accordingly believes such kickback payments continued through 2000.

(44)    Parke-Davis' marketing personnel, including its medical liaison stag, informed physicians of the lucrative reward of joining the Neurontin Speaker's Bureau. Physicians were informed that if they prescribed enough Neurontin, they, too, could also be eligible for receiving substantial payments just for describing their clinical experience to peers at events dedicated to promoting Neurontin's of-label uses. Parke-Davis marketing personnel, however, made it clear that the only way the doctors could receive such cash payments was if they prescribed substantial amounts of Neurontin to the patients, preferably for off-label uses.

(45)    Parke-Davis either knew that the payments described above constituted kickbacks or acted in reckless disregard of laws and regulations of which it was aware. Parke-Davis was well aware of the Medicare and Medicaid Fraud and Abuse laws, which included the Medicaid anti-kickback statute. It was further aware that the safe

13

harbors established by the Department of Health and Human Services did not cover the extensive payments it made to doctors. Parke-Davis was aware that its payments did not comply with the AMA's guidelines for payments to physicians. It also knew that the payments had been made for the express purpose of encouraging the physicians to order Neurontin for their patients. Parke-Davis was also aware of the Inspector General's Special Fraud Alert which raised particular concerns about drug marketing. Nonetheless, Parke-Davis did nothing to curb its kickback payments to physicians, and could not have marketed Neurontin's off-label uses without such payments.

(46)    In 1997, in the wake of an investigation by the FDA, Parke-Davis conducted a review of its marketing practices in light of existing Medicaid kickback regulations. As a result of that review, Parke-Davis determined that none of the programs described above should have been conducted in the manner previously conducted by Parke-Davis. Parke-Davis issued guidelines to comply with Federal Regulations which essentially prohibited each of the programs described above. Nonetheless, the payments to physicians for the off-label marketing of Neurontin did not cease and the programs continued at least until 1998. Given that Parke-Davis's records demonstrate payments of inappropriate kickbacks to doctors through 1998, Plaintiff is informed that such payments continued through the merger of Parke-Davis' parent, Warner-Lambert, with Defendant Pfizer, or perhaps even through calling of a grand jury regarding Parke-Davis's marketing practices relating to Neurontin.

D.      Parke-Davis's Use of Medical Liaisons to Promote Neurontin Off-Label

(47)    Parke-Davis's normal sales force was not permitted to promote off-label uses of Neurontin to its physician customers. The FDA, however, permitted drug company representatives to provide balanced, truthful information regarding off-label usage if specifically requested by a physician and if there was no attempt to solicit such information by the drug company. Commencing in 1995 Parke-Davis increasingly hired medical liaisons and trained them to aggressively solicit requests for off-label information from physicians. Once this door was open, Parke-Davis trained the medical liaisons to engage in full scale promotion of Neurontin's off-label uses, including repetition of non-scientific, anecdotal information designed to convince physicians that off-label usage of Neurontin was safe and effective. In effect, Parke-Davis used the medical liaisons as a surrogate sales force who had the liberty to solicit physicians regarding off-label uses. Indeed, medical liaisons were selected and promoted based on their ability to sells and sales training was encouraged.

(48)    Parke-Davis knew this use of medical liaisons was inappropriate. When he was hired by Parke-Davis in March 1996, David Franklin, a former employee Parke-Davis employee and Relator in the action of United States of America ex rel David Franklin, Plaintiff vs. Pfizer, Inc. and Parke-Davis Division of Warner Lambert Company, Defendants, U.S. Dist. Ct. (MA) No. 96-111651-PBS, brought pursuant to 31 U.S.C. Section 3130, "Civil Action for False Claims", at the time of his hiring by Parke-Davis was specifically questioned about whether he had difficulty working in gray areas or bending rules. High level personnel within Parke-Davis acknowledged to

David Franklin that the use of medical liaisons by the South Central, North Central and North East CBUs were thinly disguised methods of evading the FDA's policies on off-label promotion.

(49)    Similarly, on April 16, 1996, at a training sessions for medical liaisons Parke-Davis in-house lawyers stopped the video taping of medical liaison training sessions to advise the liaisons that notwithstanding formal policies to the contrary, liaisons could cold call on physicians so long as they had executed request forms (forms that supposedly verified that the physician had initiated the meeting) at the end of the call. Moreover, the liaisons were informed that the request forms could be filled out by Parke-Davis' sales representatives instead of the doctors. Company lawyers also informed the liaisons in training that there was no need to present balanced information to the customers, and that liaisons should always remember that sales were necessary in order to keep the company profitable. The liaisons were also informed by the lawyers, off camera, that there really was no definition of "solicitation" and that there were methods to induce the physicians to inquire about off-label uses. In effect, once the medical liaison got a meeting with a doctor, there were ways to get the information about off-label uses to the doctor even if the physician had not requested off-label information. The lawyers also warned the liaisons under no circumstances should any information about off-label uses be put in writing.

(50)    Medical liaisons were instructed in the clearest possible terms that they were to market and sell Neurontin based on its off-label uses. On a teleconference on May 24, 1996, John Ford, a senior marketing executive at Parke-Davis' Mottis Plains headquarters directly informed the medical liaisons that in order to market Neurontin effectively, Neurontin had to be marketed for monotherapy, pain, bipolar disease, and other psychiatric uses, all of which were off-label. Ford conceded that such marketing had to be primarily performed by the medical liaisons, because they were the only one who could discuss these matters. At another meeting with the medical liaisons, Ford was even blunter:

> "I want you out there every day selling Neurontin. Look this isn't just me, it's come down from Morris Plains that Neurontin is more profitable ... We all know Neurontin's not growing adjunctive therapy, besides that is not where the money is. Pain management, now that's money. Monotherapy, that's money. We don't want to share these patients with everybody, we want them on Neurontin only. We want their whole drug budget, not a quarter, not half, the whole thing...We can't wait for them to ask, we need to get out there and tell them up front ... That's where we need to be holding their hand and whispering in their ear Neurontin for pain, Neurontin for monotherapy, Neurontin for bipolar, Neurontin for everything ... I don't want to see a single patient coming off Neurontin until they have been up to at least 4800mg/day. I don't want to hear that safety crap either, have you tried Neurontin, every one of you should take one just to see there is nothing, it's a great drug."

(51)    Thus, David Franklin and the other medical liaisons were trained to cold call high decile physicians (those who saw the most patients in a given specialty), and sell

them on the off-label benefits of Neurontin. A key aspect of this selling was misrepresentation. The first thing to be misrepresented was usually the status of the medical liaisons. With the full approval of marketing officials at Parke-Davis such as John Ford, Phil Magistro, and John Krukar, medical liaisons were routinely introduced as specialists in the specific drug they were presenting at a particular meeting. Thus, medical liaisons could be experts in anti-epileptic drugs at one moment and an hour later by an expert in cardiac medication. Medical liaisons were also encouraged to represent themselves as medical researchers, even though they neither conducted medical research nor analyzed medical research performed by others. It was no uncommon for medical liaisons to be introduced as physicians, even through they had no such qualifications. Sales personnel were instructed to introduce medical liaisons as scientific employees who were given momentary leave of their academic duties to make an individual presentation to the physician; the fact that the liaisons were part of Parke-Davis standard marketing detail was intentionally hidden.

(52)    Extensive misrepresentations were also made regarding the scientific information concerning off-label usage of Neurontin. The following misrepresentations relating to off-label usage of Neurontin were routinely made to high devile physicians in the North East and other CBUs with the knowledge and consent of persons such as Phil Magistro, John Krukar, and other marketing personnel at Parke-Davis. In 1995 and 1996 the medical liaisons were trained to make such misrepresentations. Given that medical liaisons were trained to make such statements by senior personnel, the Plaintiff is informed that such conduct continued after July, 1996.

1.    *Bipolar Disorder.* Medical Liaisons informed psychiatrists that early results from clinical trials evaluating Neurontin for the treatment of bipolar disorder indicated a ninety percent (90%) response rate when Neurontin was started at 900mg/day dosage and increased to a dosage of 4800mg/day. No such results existed. Nor was any type of clinical trial being conducted other than a pilot study. There were no clinical trials or studies indicating that Neurontin was sage or effective up to 4800mg/day. Indeed, Parke-Davis was in possession at this time of clinical trial evidence which showed that there was no dose response difference between patients who received 600 mg, 1200 mg, and 2400 mg/day. Any data relating to the use of Neurontin in bipolar disorder was strictly anecdotal and of nominal scientific value. Indeed, most of the published reports on this topic had been written and commercially sponsored by Parke-Davis, although this fact was hidden. Medical liaisons were trained to inform psychiatrists that there were no reports of adverse effects for Neurontin when used for psychiatric purposes. In fact, such reports had been reported to parke-Davis personnel but Parke-Davis attempted to hide such reports from physicians.

2.    Peripheral Neuropathy, Diabetic Neuropathy, and Other Pain Syndromes. Medical liaisons were trained and instructed to report that "leaks" from clinical trials demonstrated that Neurontin was highly effective in the treatment of various pain syndromes and that a ninety percent (90%) response rate in the treatment of pain was being reported. No such body of evidence existed. Nor

was there any legitimate pool of data from which a response rate, much less a ninety percent (90%) response rate, could be calculated. Medical liaisons were trained to claim support for these findings as a result of inside information about clinical trials where no such information existed. The only support for these claims were anecdotal evidence of nominal scientific value. Many of the published case reports had been created and/or sponsored by Parke-Davis in articles which frequently his Parke-Davis's involvement in the creation of the article. Parke-Davis's payment for the creation of these case reports was also hidden from physicians.

3.    *Epilepsy Monotherapy.* Medical liaisons were strongly encouraged to push neurologists to prescribe Neurontin as the sole medication to treat epilepsy, even though studies only found it safe and effective as adjunctive therapy. Medical liaisons were trained to inform neurologists that substantial evidence supported Parke-Davis' claim that Neurontin was effective as monotherapy. In fact, at this time, Parke-Davis knew that clinical trials regarding Neurontin's efficacy as a monotherapy were inconclusive. One of Parke-Davis' clinical trials, 945-82, demonstrated that Neurontin was not an effective monotherapy agent; the vast majority of patients in the study taking Neurontin were unable to continue with Neurontin alone. The same study showed that there was no effective difference between administration of Neurontin at 600, 1200 or 2400mg. Notwithstanding this data, the company continued to claim that physicians should use Neurontin at substantially higher doses than indicated be the labeling. Indeed, although medical liaisons routinely claimed Neurontin to be effective as monotherpay, in 1997 the Food and Drug Administration refused to find Neurontin to be a safe and effective monotherapy.

4.    *Reflex Sympathetic Dystrophy("RSD").* Medical liaisons informed physicians that extensive evidence demonstrated the efficacy of Neurontin in the treatment of RSD. The only such evidence that existed was anecdotal reports of nominal scientific value. Medical liaisons were trained to refer to case reports, most of which had been created or sponsored by Parke-Davis, as "studies."

5.    *Attention Deficit Disorder ("ADD").* Medical liaisons were instructed to inform pediatricians that Neurontin was effective for the treatment of ADD. No data, other than occasional anecdotal evidence, supported this claim. Nonetheless, the medical liaisons were trained to report that large number of physicians had success treating ADD with Neurontin, when no such case reports existed.

6.    *Restless Leg Syndrome ("RLS").* RLS was another condition where Parke-Davis medical liaisons were trained to refer to a growing body of data relating to the condition, when no scientific data existed. The only reports were anecdotal, most of which had been created and/or sponsored by Parke-Davis.

7.    *Trigeminal Neuralgia.* Although medical liaisons represented that Neurontin could treat Trigeminal Neuralgia, again no scientific data supported

17

this claim with the exception of occasional anecdotal reports. No data demonstrated that Neurontin was as effective as currently available pain killers, most of which were inexpensive.

8.    *Post-Herpatic Neuralgia ("PHN").* Medical liaisons were trained to tell physicians that seventy-five percent (75%) to eight percent (80%) of al PHN patients were successfully treated with Neurontin. Once again, no clinical trial data supported such a claim.

9.    *Essential Tremor Periodic Limb Movement Disorder ("ETPLMD").* Medical liaisons were trained to allege that Neurontin was effective in the treatment of these conditions. No scientific data supported such claims with the exception of anecdotal reports of nominal scientific value.

10.    *Migraine.* Claims that Neurontin was effective in the treatment of migraine headaches were made by the medical liaisons and were supposedly based on early results from clinical trials. Although pilot studies had been suggested and undertaken, no early results of clinical trials existed to support these claims. Once again, any data relating to treatment of migraines was purely anecdotal and of nominal scientific value. Most of the case reports were either created or sponsored by Parke-Davis.

11.    *Drug and Alcohol Withdrawal Seizures.* Medical liaisons suggested that Neurontin be used in the treatment of Drug and Alcohol Withdrawals despite the lack of any data supporting Neurontin as an effective treatment for these conditions.

(53)    The representations stated above were routinely made to high decile physicians in the North East CBU and other CBUs. Among others, the representations were made to David Franklin, made to physicians by Michael Davies, Joseph McFarland, Phil Magistro, Lisa Kellett, Joseph Dymkowski, Daryl Moy, Richard Grady, Ken Lawler and others. The Plaintiff is informed that the CBU's medical liaisons also delivered the misrepresentations described above as part of their standard pitch on off-label uses.

(54)    The CBU's medical liaisons did not make all of the misrepresentations to each physician, but ach specialist would receive the misrepresentations relating to his or her practice. If physician's practice focused on epilepsy, that doctor would not have received information relating to the treatment of ADD, but he or she would have received misrepresentations relating to monotherapy. Regardless of the specialty, unsupported claims of effectiveness for off-label usage was a key portion of medical liaisons presentations relating to Neurontin.

(55)    Misrepresentations by Parke-Davis were not limited to presentations by medical liaisons. As noted above, publications Parke-Davis distributed as part of its "publication strategy", intentionally misrepresented Parke-Davis' role in the creation and sponsorship of the publications. Physicians were led to believe that the publications were the independent, unbiased research of the authors of the articles. In fact, many of

18

the publications distributed to physicians were created by Parke-Davis and written by third parties retained by Parke-Davis who were under Parke-Davis's control. The fact that these articles were authored by ghost writers retained by Parke-Davis was intentionally hidden, and the fact that the authors had financial ties to Parke-Davis was also intentionally undisclosed. For example, an article widely circulated by Parke-Davis concerning the use of Neurontin in the treatment of Restless Leg Syndrome asserted that the authors Gary A. Mellick and Larry B. Mellick, had not and never would receive financial benefit from anyone with an interest in Neurontin, yet the Mellick brothers had received tens of thousands of dollars for acting as speakers at Parke-Davis events, This financial connection was hidden from the persons who received copies of the Mellick brothers' articles.

(56)   Although Parke-Davis knew that Neurontin was hazardous for persons with bipolar disorder, and should not be prescribed for persons with bi-polar disorcer, Parke-Davis never issued a warning to medical professionals to refrain from prescribing Neurontin/Gabapentin for persons with bipolar disorder.

## E.    Prescription of Neurontin to Allan Huberman.

(57)   Allan Huberman suffers from bi-polar disorder. In 1998, he was under a prescription for Prozac.

(58)   In 1998, Allan Huberman was referred to Christine Demopolous, M.D. ("Dr. Demopolous"), for treatment for mania and depression.

(59)   Dr. Demopolous did not know that Neurontin should not be prescribed to individuals with bi-polar disorder.

(60)   In March, 1998, Dr. Demopulos prescribed Allan Huberman to take Neurontin in dosages of 300 mg several times per day.

(61)   After beginning to take Neurontin, Allan Huberman became lethargic, confused, and withdrawn, and felt that his body felt like a "piece of soft rubber with probably very little coordination."

(62)   Allan Huberman  began to get constant palpitations, intermittent at first and then constant.  He felt constantly fatigued.  He was told that he had, "manic tendencies."

(63)   Allan Huberman had difficulty concentrating.   Although Allan Huberman had been an ornamental plant grower his entire life, after beginning to take Neurontin he was unable to determine the formulae to spray pesticides. He was then referred to other physicians and ceased taking Neurontin. On one occasion, Allan Huberman almost drove his truck off Route 128 in Lynnfield.

(64)   After approximately three months use of Neurontin, Allan Huberman ceased taking Neurontin and discontinued treating with Dr. Demopolous.

19

(65)   Allan Huberman presumed that Dr. Demopolous had made a mistake in prescribing Neurontin for his condition.

(66)   Allan Huberman's condition was caused by his prescribed use of Neurontin, the foreseeable dangerous effects upon a person of Allan Huberman's condition being known to Parke-Davis, but which Parke-Davis withheld during its advertising and marketing Neurontin as beneficial for a person suffering from a bi-polar condition.

(67)   In May, 2004, Warner-Lambert plead guilty, and paid  more than $430 million to resolve criminal charges and civil liabilities in connection with its Parke-Davis division's illegal and fraudulent promotion of unapproved uses for the drug Neurontin (gabapentin) in the action of  United States of America ex rel David Franklin, Plaintiff vs. Pfizer, Inc. and Parke-Davis Division of Warner Lambert Company, Defendants, U.S. Dist. Ct. (MA) No. 96-111651-PBS, brought pursuant to 31 U.S.C.  Section 3130, "Civil Action for False Claims."

(68)   Upon information, among the charges which Warner-Lambert admitted was improperly representing that Neurontin was beneficial to persons suffering from bipolar disorder, when in fact Parke-Davis was knowledgeable that Neurontin was possibly hazardous to persons suffering from bi-polar disorder.

(69)   Allan Huberman did not realize that Parke-Davis was negligent in its marketing of Neurontin until the summer of 2004, when he learned that Warner-Lambert had agreed to plead guilty and pay more than $430 million to resolve criminal charges and civil liabilities in connection with its Parke-Davis division's illegal and fraudulent promotion of unapproved uses for the drug Neurontin (gabapentin) in the action of United States of America ex rel David Franklin, Plaintiff vs. Pfizer, Inc. and Parke-Davis Division of Warner Lambert Company, Defendants, U.S. Dist. Ct. (MA) No. 96-111651-PBS, brought pursuant to 31 U.S.C.  Section 3130, "Civil Action for False Claims."

(70)   Allan Huberman believes and avers that Dr. Demopolous did not know of Neurontin's dangerous effects upon a person suffering from bi-polar disorder, but instead incorrectly believed, in reliance upon Parke-Davis's marketing, that Neurontin was beneficial to persons suffering from bi-polar disorder.

(71)   If Parke-Davis had properly labeled and provided precautionary warnings against the use of Neurontin for persons who were bi-polar, Dr. Demopolous would not have prescribed Neurontin to Allan Huberman and he would not have suffered the resultant injuries.

(72)   Allan Huberman was prescribed Neurontin, and took Neurontin pursuant to his prescription. His use of Neurontin was detrimental to his condition of bi-polar disorder, and caused him to suffer physical injuries and  great pain of body and mind.

## Count 1
## Uniform Commercial Code.

(73)   Parke-Davis's preparation and marketing Neurontin constituted a violation of express and implied warranties, 106 M.G.L.c. 106, Sections 2-313, 2-314 and 2-315, and as a result of which Allan Huberman was prescribed Neurontin, which was detrimental to his condition of bi-polar disorder, and caused him to suffer physical injuries and great pain of body and mind.

WHEREFORE, Plaintiff demands judgment against Defendants in the amount of his damages, plus interest and costs.

## Count 2
## Negligence.

(74)   Parke-Davis was negligent in its manufacture and marketing of Neurontin, which negligence resulted in Allan Huberman being prescribed Neurontin, which was detrimental to his condition of bi-polar disorder, and caused him to suffer physical injuries and great pain of body and mind.

WHEREFORE, Plaintiff demands judgment against Defendants in the amount of his damages, plus interest and costs.

## Count 3
## "Unfair and Deceptive Act or Practice" declared
## Unlawful by M.G.L.c. 93A, Sections 2 and 9.

(75)       The actions of the Defendants constitute "unfair and deceptive acts or practices" declared unlawful by M.G.L.c.; 93A, Sections 1, 2 and 9, for the following reasons:

(a) Parke-Davis  marketed Neurontin in a manner which violated express and implied warranties, which is a violation of M.G.L.c. 93A, Section 9, per the Regulations of the Attorney General, 940 C.M.R. Sections 3.01, 3.02, 3.03, 3.05 and 3.08(b);

(b) Parke-Davis failed to disclose to a buyer a fact, the disclosure of which may have influenced Allan Huberman not to purchase the drug. See Regulations of the Attorney General, 940 C.M.R. 3.16 (2); and

(c) The Defendants' actions violate the Federal Trade Commission Act, the Federal Consumer Credit Act or other Federal Consumer Protection Statutes

within the purview of M.G.L.c. 93A, Section 2. See Regulations of the Attorney General, 940 C.M.R. 3.16 (3).

(76)     The Defendants committed their actions in the course of the conduct of their "trade" or "commerce", as defined by M.G.L.c. 93A, Section 1.

(77)     The "unfair and deceptive acts or practices" resulted in Allan Huberman being prescribed Neurontin, which was detrimental to his condition of bi-polar disorder, and caused him to suffer physical injuries and  great pain of body and mind.

(78)     The Defendants' actions constitute  "willful or knowing" violations of M.G.L.c. 93A, Section 9(3).

(79)     On April 6, 2007, Allan Huberman, by his  attorney, sent to Pfizer, Inc. and Warner-Lambert Company  a written demand for relief pursuant to M.G.L.c. 93A, Section 9(3). A copy of the letter (without exhibits) is annexed hereto as Exhibit A.

(80)     The Defendants did not serve any response.

(81)     The Defendants' refusal  to make a reasonable offer of settlement was,"…in bad faith, with knowledge or reason to know that the act or practice complained of" constitutes a violation of M.G.L.c. 93A, Section 2.

WHEREFORE, the Plaintiff  requests that the Court enter judgment against the Defendants, for the following relief:

    a.  Damages;
    b.  Double or treble damages, both for the reasons that the Defendants' actions  constitute "willful or knowing" violations of M.G.L.c. 93A, Sections 2 and 9, and/or the failure to make a reasonable offer of settlement was  ,"…in bad faith, with knowledge or reason to know that the act or practice complained of" constitutes a violation of M.G.L.c. 93A, Section 2; and
    c.  Interest, costs and reasonable attorneys and expert witness' fees, as provided by M.G.L.c. 93A, Section 9(3).

## Count 4
## Racketeer Influence and Corrupt Organizations.

(82)     Parke-Davis, in the course of its marketing of Neurontin, committed actions which constitute mail fraud, as the terms are used in 18 U.S.C. Section 1961 et seq, the Racketeer, Influence and Corrupt Organizations Act.

(83)    The actions of Parke-Davis in their fraudulent marketing of Neurontin involved the use of the U.S. Mail.

(84)    The actions of Parke-Davis had an effect on interstate commerce.

(85)    The actions of Parke-Davis  constitute a "pattern of racketeering activity" declared unlawful by 18 U.S.C. Section 1961 et seq., with Allan Huberman a person who has been damaged thereby.

(86)    The actions of Parke-Davis  resulted in Allan Huberman being prescribed Neurontin, which was detrimental to his condition of bi-polar disorder, and caused him to suffer physical injuries and  great pain of body and mind.


WHEREFORE, the Plaintiff requests that the Court award him damages,  plus treble damages, attorneys fees, interest and costs, all as provided by 18 U.S.C. Section 1961, et seq.


Date: June 21, 2007.


Attorney for Plaintiff
Paul S. Hughes, Esq.
B.B.O. No. 243780
2 Newton Executive Park, Suite 108
Newton, Massachusetts  02462
(617)  244-5620.

23