EXHIBIT A



| "McGroder, Lori (SHB)" <LMCGRODER@shb .com> 09/05/2007 12:59 PM | To | KennethFromson@lawampm.com |
| | cc | "Sayler, Scott (SHB)" <SSAYLER@shb.com>, "Zissu, Erik M." <zissu_unixmbx@davispolk.com> |
| | bcc | |
| | Subject | eSOP request |

Ken, I am told that we will be able to produce documents responsive to your informal request by approximately September 17.

Regards,
Lori McGroder
Shook, Hardy & Bacon
816-559-2290
lmcgroder@shb.com

Mail Gate made the following annotations on Wed Sep 05 2007 12:00:24 CONFIDENTIALITY NOTICE: This e-mail message including attachments, if any, is intended for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message. Thank you.

---

This Email has been scanned for all viruses by PAETEC Email Scanning Services, utilizing MessageLabs proprietary SkyScan infrastructure. For more information on a proactive anti-virus service working around the clock, around the globe, visit http://www.paetec.com.

---

# EXHIBIT B



Howard S. Finkelstein, P.C. (NY)
Andrew G. Finkelstein, P.C. (NY & NJ)
George M. Levy (NY)
Kenneth L. Oliver, P.C. (NY)
Joel S. Finkelstein, P.C. (NY, NJ, MA & FL)
Duncan W. Clark (NY)
Ronald Rosenkranz (NY)
Robert J. Camera (NY & NJ)
Joseph P. Rones (NY & FL)
Steven Lim (NY)
George A. Kohl, 2nd (NY & MA)
Eleanor L. Polimeni (NY)
Steven H. Cohen (NY)
Francis Navarra (NY)
Andrew J. Genna, LLM (NY & PA)
Thomas C. Yatto (NY)

Elyssa M. Fried-DeRosa (NY)
Mary Ellen Wright (NY)
Kenneth B. Fromson (NY, NJ & PA)
Joel Bossom (NY)
Nancy Y. Morgan (NY, NJ & PA)
Andrew L. Spitz (NY)
James W. Shuttleworth, III (NY)
Lawrence D. Lissauer (NY)
David E. Gross (NY & NJ)
Terry D. Horner (NY)
Robert F. Moson (NY)
Julio E. Urrutia (NY)
—
Debra J. Reisenman (NY)
Michael T. McGarry (NY)
Steven P. Shultz (NY & MA)

Victoria Lieb Lightcap (NY & MA)
Ann R. Johnson (NY & CT)
Marshall P. Richer (NY)
Thomas J. Pronti (NY)
Kristine M. Cahill (NY & CT)
Kera L. Campbell (NY & CT)
Arieh Mezoff (NY)
Christopher T. Milliman (NY)
Silvia Fermanian (NY)
Edward M. Steves (NY)
Karen M. Queenan (NY & CT)
Marie M. DuSault (NY)
Glenn W. Kelleher (NY)
Melody A. Gregory (NY & CT)
Gail Schlanger (NY)
Elizabeth A. Wolff (NY & MA)

*Of Counsel*
Jules P. Levine, P.C. (NY & FL)
Michael O. Gittelsohn, P.C. (NY)
Joel A. Reback (NY & Israel)
Sheila Rosenrauch (NY)
Kenneth Cohen (NJ)
Cynthia M. Maurer (NY & NJ)
Raye D. Futerias (NJ)
Frances M. Bova (NY & NJ)
Kenneth G. Bartlett (CT & NJ)
Ari Kresch (NY & MI)
Gustavo W. Alzugaray (NY & NJ)

*Accredited CLE Provider*

A Limited Liability Partnership

(800) 634-1212
Fax: (845) 562-3492
www.lawampm.com

REFER TO OUR FILE #: 200599

June 15, 2007

James Rouhandeh, Esq.
Davis Polk & Wardwell
450 Lexington Avenue
New York, NY 10017

Lori McGroder, Esq.
Shook, Hardy & Bacon, LLP
2555 Grand
Kansas City, Missouri 64108

Dear Counsel:

Please consider this correspondence in lieu of a formal request for production arising out of the testimony of defense witness Adrian Vega. I am available to confer on the issues set forth below.

First, Mr. Vega testified that he reviewed certain documents for purposes of refreshing his recollection. Kindly provide those documents to my attention immediately. To the extent you have an objection, please reach out to me so that we can discuss the matter prior to any motion to compel said documentation. As a courtesy, I am setting forth below excerpts of Mr. Vega's testimony from an unofficial copy of the reporter's transcript:

> Q. Have you reviewed prior to your deposition today but for purposes of refreshing your recollection about your involvement in the medical information department any standard response documents that pertain to inquires involving suicide?
> A.    I saw several documents.
>
> Q.    And what documents did you see that pertain to do suicide and standard response documents if any?
> A.    Standard response document?
>
> Q.    Are you asking may or telling me?
> A.    I'm asking you.
>
> Q.    Okay. Yeah. What standard response documents regarding suicide if any did you review to assist in refreshing your recollection about the issues you handle between 2002 and 2004, that's were I'm try to go determine? MS. McGRODER: Object to the form.
> A.    Standard letter, package insert.

Newburgh • Albany • Binghamton • Kingston • Middletown • Monroe • New Windsor • Newark • Port Jervis • Poughkeepsie • Spring Valley • Syracuse • Troy • Utica

436 ROBINSON AVENUE
NEWBURGH, NY 12550

50 PARK PLACE, 10th FLOOR
NEWARK, NJ 07102

Q.    Well Ms. Line of questioning is solely due to the fact that I asked you what did you look at to refresh your recollection and in preparation for the deposition you identified a particular standard response document regarding suicide.  I'm just trying?
A.    No you asked me about that I said I looked at several documents.

. . . .

Q.    My question, Mr. Vega, was:  Did you   review prior to your deposition today but for   purposes of refreshing your recollection about your involvement in the medical information   department any standard response documents that pertained to inquires involving suicide, your answer was I aw several documents.  I asked you And what documents did you see that pertained to suicide and standard response documents if any? Do you recall that line of questioning or did you  believe I was asking you about something else?
A.     I believe -- I thought you were asking me in general.

Q.    So let's go back?
A.    Sure.

Q.    You said you reviewed several documents can you identify what they were for us?
A.    The specific titles I don't remember.

Q.    Do you recall what they involved?
A.    They were about Neurontin.

Q.    Did they involve specific adverse event inquiries?
A.    Most the.

Q.    Well they were stand response  documents; right?
A.    Yes, they would include safety information in them.

Q.    And what did you do where I the documents did you keep them or give them back to your counsel?
A.    No I did not keep them.

Under both the federal rules of civil procedure, as well as the NY CPLR, Plaintiffs' position is that this testimony would require Defendants to disclose and exchange the documents reviewed by Mr. Vega before his deposition for the purpose of refreshing his recollection.

Second, Mr. Vega provided testimony regarding *drafts* of standard response documents that may be kept in the Phoenix database. It is my understanding that defense counsel has provided us with portions of both the Merlin and Phoenix databases.  It is further my understanding that the information within the databases includes the final versions of the standard response documents.  I do not defense counsel has provided Plaintiffs with *drafts*. Kindly supplement your disclosure immediately so as to include the *drafts* presuming they exist; alternatively, I would ask that you clarify whether the *drafts* are actually the documents in the Phoenix system as opposed to the documents being the final versions.  Clearly, the documents cannot be both *drafts* and final versions. I am available to confer on the issue.

Third, Mr. Vega's testimony included an explanation of the approval process regarding standard response documents. In this regard, he was questioned about the whereabouts of documents that would reflect his actual approval of the standard response document so that it could be put into use and disseminated in response to inquiries:

```
Q.    Was there any type of document that would reflect that you approved it?
A.    I believe the process within the system would have a process flow of the
review, the peer review and the approval; yes.

Q.    And where would those documents be kept in a notebook in a database?
A.    They would probably be within the Pfoenix system.
```

I am informed that neither the merlin or phoenix databases provided by defense counsel include documents that reflect any particular defendant employee's review, peer review and/or approval. Kindly provide said documents (presuming they exist) immediately. I am available to confer on the issue.

Fourth, Mr. Vega testified about standard monthly reports. During the course of discovery, defense counsel has provided limited numbers of standard monthly reports since they did exist in certain custodial files of employees. However, Mr. Vega explained that these monthly reports have been stored electronically in one centralized location. Kindly provide a full/complete copy of said reports immediately as they exist in the warehouse described by Mr. Vega:

```
Q.    Right, but the U.S., the report that is are generated where are they
warehoused where are they kept?
A.    The ones they created.
Q.    You said they're warehoused I I'm

A.    They're kept on a database.  The term that we use is the term that the
business intelligence told us.  They call it a data warehouse.  The reports, once
they're completed were put on a share drive.

Q.    How do you get access to that drive?
A.    That shared drive is accessible to the folks in medical information.

Q.    Is there a name for it?
A.    They used to be used in the P drive which was mentioned yesterday.
```

To the extent defense counsel maintains that any of the above information has previously been provided, please provide the courtesy of identifying where in your exchange these documents exist (e.g., bates numbers). I look forward to hearing from you regarding the above.

Very truly,

Kenneth B. Fromson
845-562-0203 x2755

EXHIBIT C



# Finkelstein & PARTNERS
## Counselors At Law

Howard S. Finkelstein, P.C. (NY)
Andrew G. Finkelstein, P.C. (NY & NJ)
George M. Levy (NY)
Kenneth L. Oliver, P.C. (NY)
Joel S. Finkelstein, P.C. (NY, NJ, MA & FL)
Duncan W. Clark (NY)
Ronald Rosenkranz (NY)
Robert J. Camera (NY & NJ)
Joseph P. Rones (NY & FL)
Steven Lim (NY)
George A. Kohl, 2nd (NY & MA)
Eleanor L. Polimeni (NY)
Steven H. Cohen (NY)
Francis Navarra (NY)
Andrew J. Genna, LLM (NY & PA)
Thomas C. Yatto (NY)

Elyssa M. Fried-DeRosa (NY)
Mary Ellen Wright (NY)
Kenneth B. Fromson (NY, NJ & PA)
Joel Bossom (NY)
Nancy Y. Morgan (NY, NJ & PA)
Andrew L. Spitz (NY)
James W. Shuttleworth, III (NY)
Lawrence D. Lissauer (NY)
David E. Gross (NY & NJ)
Terry D. Horner (NY)
Robert F. Moson (NY)
Julio E. Urrutia (NY)

Debra J. Reisenman (NY)
Michael T. McGarry (NY)
Steven P. Shultz (NY & MA)

Victoria Lieb Lightcap (NY & MA)
Ann R. Johnson (NY & CT)
Marshall P. Richer (NY)
Thomas J. Pronti (NY)
Kristine M. Cahill (NY & CT)
Kara L. Campbell (NY & CT)
Arieh Mezoff (NY)
Christopher T. Milliman (NY)
Silvia Fermanian (NY)
Edward M. Steves (NY)
Karen M. Queenan (NY & CT)
Marie M. DuSault (NY)
Glenn W. Kelleher (NY)
Melody A. Gregory (NY & CT)
Gail Schlanger (NY)
Elizabeth A. Wolff (NY & MA)

*Of Counsel*
Jules P. Levine, P.C. (NY & FL)
Michael O. Gittelsohn, P.C. (NY)
Joel A. Reback (NY & Israel)
Sheila Rosenrauch (NY)
Kenneth Cohen (NJ)
Cynthia M. Maurer (NY & NJ)
Raye D. Futerfas (NJ)
Frances M. Bova (NY & NJ)
Kenneth G. Bartlett (CT & NJ)
Ari Kresch (NY & MI)
Gustavo W. Alzugaray (NY & NJ)

A Limited Liability Partnership

(800) 634-1212
Fax: (845) 562-3492
www.lawampm.com

*Accredited CLE Provider*

REFER TO OUR FILE #: 200599

June 21, 2007

Erik Zissu
Davis Polk & Wardwell
450 Lexington Avenue
New York, NY 10017

Re:     Neurontin Litigation
        Deposition of Andrea Garrity

Dear Erik:

In light of Ms. Andrea Garrity's testimony, I am writing to you to recover certain items of discovery. I am available to confer on the issues set forth below.

First, Ms. Garrity testified that she reviewed certain documents prior to her deposition for purposes of refreshing her recollection. Kindly provide those documents to my attention immediately. To the extent you have an objection, please reach out to me so that we can discuss the matter prior to any motion to compel said documentation. As a courtesy, I am setting forth below excerpts of Ms. Vega's testimony from an unofficial copy of the reporter's transcript:

> Q.  Did you review any materials during those meetings to refresh your recollection of anything?
> A.  Couple of documents.
>
> Q.  What documents?
>
> MR. BARNES:  Objection, I instruct the witness not to answer. That's work product, attorney-client privilege.

Under both the federal rules of civil procedure, as well as the NY CPLR, Plaintiffs' position is that this testimony would require Defendants to disclose and exchange the documents reviewed by Ms. Garrity before her deposition that were used to refresh her recollection of facts pertaining to her involvement with Neurontin.

Second, Ms. Garrity identified a binder of information she received from colleagues with whom she consulted in Ann Arbor to assist her in learning about Neurontin. Kindly produce the binder. To the extent the binder has been previously provided, please provide the courtesy of the bates number corresponding to the documents. Your attention is referenced to Ms. Garrity's testimony as follows:

> Q.  We discussed earlier the very broad topics about which you had responsibilities for Neurontin, right?
> A.  Yes.
>
> Q.  They included a whole bunch of stuff like marketing and safety and promotion and labeling, right?
> A.  Yes.

Newburgh • Albany • Binghamton • Kingston • Middletown • Monroe • New Windsor • Newark • Port Jervis • Poughkeepsie • Spring Valley • Syracuse • Troy • Utica

436 ROBINSON AVENUE
NEWBURGH, NY 12550

50 PARK PLACE, 10th FLOOR
NEWARK, NJ 07102

Q.   So given that, what if any concerns did you have with respect to safety issues and    Neurontin during the timeframe where you had responsibilities about Neurontin?

A.   So when I met with my colleagues in Ann Arbor part of the purpose of that was to    understand the issues involved with the product at the time that's why I was working with    filling out that knowledge transfer template. And that was -- one of the underlying purpose was to be a trigger for us to highlight all issues, any issues, and that would include safety. And, you know, based on that, because, again, we were trying to get up to speed with many products and we felt like this was best way to kind of hone in and figure out what we need to know and then we could take time to learn  about the product obviously as time went on so  between discussions with my colleagues and reviewing -- they put together binders of  information for each of the Warner Lambert products, with reviewed those and it was supposed to contain all information about indications, safety, efficacy, history of labeling, so, yes, I made it a point of reviewing that document.

. . . .

Q.   Did the binder have a name?

A.   I don't remember a name knowledge transfer binder? I'm not really sure.

Q.   But in any event you recall receiving a binder of information with respect to the various drugs that were involved in the transition?

A.   Yes.

. . . .

Q.   So there should be a binder with respect to Neurontin that gave you an understanding of the life cycle of the drug, right?

A.   It was a synopsis, hm-hmm.

To the extent defense counsel maintains that any of the above information has previously been provided, please provide the courtesy of identifying where in your exchange these documents exist (e.g., bates numbers).  I look forward to hearing from you regarding the above.

Very truly,

Kenneth Fromson

EXHIBIT D



# Finkelstein
## & PARTNERS
### Counselors At Law

Howard S. Finkelstein, P.C. (NY)
Andrew G. Finkelstein, P.C. (NY & NJ)
George M. Levy (NY)
Kenneth L. Oliver, P.C. (NY)
Joel S. Finkelstein, P.C. (NY, NJ, MA & FL)
Duncan W. Clark (NY)
Ronald Rosenkranz (NY)
Robert J. Camera (NY & NJ)
Joseph P. Rones (NY & FL)
Steven Lim (NY)
George A. Kohl, 2nd (NY & MA)
Eleanor L. Polimeni (NY)
Steven H. Cohen (NY)
Francis Navarra (NY)
Andrew J. Genna, LLM (NY & PA)
Thomas O. Yatto (NY)

Elyssa M. Fried-DeRosa (NY)
Mary Ellen Wright (NY)
Kenneth B. Fromson (NY, NJ & PA)
Joel Bossom (NY)
Nancy Y. Morgan (NY, NJ & PA)
Andrew L. Spitz (NY)
James W. Shuttleworth, III (NY)
Lawrence D. Lissauer (NY)
David E. Gross (NY & NJ)
Terry D. Horner (NY)
Robert F. Meson (NY)
Julio E. Urrutia (NY)

Debra J. Reisenman (NY)
Michael T. McGarry (NY)
Steven P. Shultz (NY & MA)

Victoria Lieb Lightcap (NY & MA)
Ann R. Johnson (NY & CT)
Marshall P. Richer (NY)
Thomas J. Pronti (NY)
Kristine M. Cahill (NY & CT)
Kara L. Campbell (NY & CT)
Arieh Mazoff (NY)
Christopher T. Milliman (NY)
Silvia Fermanian (NY)
Edward M. Steves (NY)
Karen M. Queenan (NY & CT)
Mario M. DuSault (NY)
Glenn W. Kelleher (NY)
Melody A. Gregory (NY & CT)
Gail Schlanger (NY)
Elizabeth A. Wolff (NY & MA)

*Of Counsel*
Jules P. Levine, P.C. (NY & FL)
Michael O. Gittelsohn, P.C. (NY)
Joel A. Reback (NY & Israel)
Sheila Rosenrauch (NY)
Kenneth Cohen (NJ)
Cynthia M. Maurer (NY & NJ)
Raye D. Futerfas (NJ)
Frances M. Bova (NY & NJ)
Kenneth G. Bartlett (CT & NJ)
Ari Kresch (NY & MI)
Gustavo W. Alzugaray (NY & NJ)

A Limited Liability Partnership

(800) 634-1212
Fax: (845) 562-3492
www.lawampm.com

*Accredited CLE Provider*

REFER TO OUR FILE #: 200599

June 29, 2007

Jim Rouhandeh
Erik Zissu
Davis Polk & Wardwell
450 Lexington Avenue
New York, NY 10017

Re:     Neurontin Litigation
        Deposition of Lloyd Knapp

Dear Erik:

In light of Mr. Lloyd Knapp's testimony, I am writing to you to recover certain items of discovery. I am available to confer on the issues set forth below.

First, Mr. Knapp testified that he reviewed certain documents prior to his deposition for purposes of preparation of his testimony in the capacity of a witness under Federal Rule 30b6; he also reviewed documents prior to his deposition that refreshed his recollection as to knowledge regarding Neurontin. Kindly provide those documents to my attention immediately. To the extent you have an objection, please reach out to me so that we can discuss the matter. As a courtesy, I am setting forth below excerpts of Mr. Knapp's testimony from an unofficial copy of the reporter's transcript.

For example, during questioning by Mr. Notargiacomo, the following testimony is reflected:

Q. Okay. What did you do to prepare for today's deposition?
A. I had several meetings with my attorneys. I reviewed documents that seemed would be appropriate to review for this meeting. And that was about it.

Q. How many meetings did you have with your attorneys? I'm not asking you to discuss anything you -- anything that was said in those meetings. I just want to know how many you had.
A. It and would be appropriate to discuss what was said at those meetings. But I believe three meetings, something of that order.

Q. And when did those take place -- take place?
A. I don't remember when the -- when the first one was. Several months ago. And then more recently a couple of meetings within the last couple of weeks.

Q. All told how many times do you think you met with your attorneys to prepare for this deposition?
A. Probably of the order of seven, eight, nine hours total.

Newburgh • Albany • Binghamton • Kingston • Middletown • Monroe • New Windsor • Newark • Port Jervis • Poughkeepsie • Spring Valley • Syracuse • Troy • Utica

436 ROBINSON AVENUE
NEWBURGH, NY 12550

50 PARK PLACE, 10th FLOOR
NEWARK, NJ 07102

Q.  And you said you reviewed documents as appropriate. Do you recall what documents you reviewed?

MR. SAYLER: Objection. Privileged. I instruct you not to answer.

MR. NOTARGIACOMO: His recollection of what documents he reviewed for preparation for this deposition is privileged?

MR. SAYLER. Yes. The documents given do him were all selected by counsel. Reflect our mental impressions and work product.

A further example of the testimony that serves as a basis for the disclosure of the documents in question is reflected in the questions I posed to Mr. Knapp and testimony he provided on June 27, 2007:

Q.  Did your review of documents provided to you by counsel refresh your recollection as to any of your knowledge regarding the labeling history of Neurontin.
A.  Certainly.

Q.  How much time did you spend reviewing those types of documents that actually refreshed your recollection of the labeling history of Neurontin? Just focusing on those.
A.  Oh, I see. I see. It probably would be included in that estimate of five to ten hours.

Under both the federal rules of civil procedure, as well as the NY CPLR, Plaintiffs' position is that this testimony required Defendants to immediately disclose and exchange the documents reviewed by Mr. Knapp so that Plaintiff's counsel could have an opportunity to review and utilize such depositions during Mr. Knapp's testimony.

Second, Mr. Knapp provided testimony that identified Drusilla Scott, as well as her role and responsibilities with the Neurontin product. Plaintiff's position is that Drusilla Scott is an individual from whose custodial file Plaintiff should have been provided documents responsive to discovery demands served throughout this litigation. Excerpts from the unofficial deposition transcript clearly demonstrate Dr. Scott as a person with knowledge of regulatory affairs issues relevant to Neurontin:

Q.  This is a memo it appears from Drusilla L. Scott who is identified as PGRD world wide regulatory affairs Ann Arbor to members of the labeling review committee for U.S. Neurontin neuropathic pain supplemental FDA. Is that accurate?
A.  That's what this reads, yes.

Q.  Are you were you a member of the labeling subcommittee as identified in this document?
A.  Yes, as identified in this document, yes.

Q.  Okay. We discussed the various committees that you served on of claims yesterday. We didn't discuss the labeling sub committee. Is that another team or sub committee or committee that you served on?
A.  Certainly I would have served on this one, the context of the question yesterday and testimony that was given as I understood it that is the context as I understood it and the response was to standing committees. And I responded to standing committees that meet regularly. This was a committee that is, you know, purpose driven. It's an ad hoc situation and, therefore, wouldn't have been -- wouldn't have met regularly and continuously. It would have met for a purpose and then when that purpose was completed, then the labeling sub committee would not continue to meet. So I think that both are consistent.

Q.  What was the purpose of the -- of this labeling sub committee?
A.  The purpose was to ensure that proposed labeling was reviewed through all appropriate disciplines required to have technical expertise, regulatory expertise regarding information to be included in the proposed update to the Neurontin label regarding the then-neuropathic pain submission which subsequently, of course, was amended to post-herpetic neuralgia.

Q. Who is in charge of the proposed label? Is there an individual who headed up that, that piece of the application?

A. Yes. That would typically fall to the lead regulatory person who assumes that role of -- of taking the label through its various stages of preparation to its ultimate label that is -- that is approved for submission. And that would be Dr. Scott.

Q. Did she also to your recollection head up the effort or the drafting of the labeling when the SNDA was amended to just include PHN?

A. I don't recall specifically. The strategic discussion of that I actually led. The implementation of the agreement to -- to alter our approach would have fallen to Dr. Scott, yes, in terms of -- okay -- what label change are we actually going to make. There would have -- there would have been some general discussion of that in the strategic discussion around the fact that we had submitted for neuropathic pain and now we felt that it was in the best interest of Pfizer and Neurontin and patients to go with post-herpetic neuralgia.

It is my understanding that Defendants have not produced any documents that would be identified as having been produced from her custodial files, and we believe this deficiency should be resolved by the disclosure of her documents, as well as an explanation as to why no documents have yet been provided. To the extent documents from Dr. Scott's custodial files have been produced, kindly provide the courtesy of the bates range numbers that correspond accordingly.

Very truly,

Kenneth Fromson

EXHIBIT E



# Finkelstein & PARTNERS
### Counselors At Law

Howard S. Finkelstein, P.C. (NY)
Andrew G. Finkelstein, P.C. (NY & NJ)
George M. Levy (NY)
Kenneth L. Oliver, P.C. (NY)
Joel S. Finkelstein, P.C. (NY, NJ, MA & FL)
Duncan W. Clark (NY)
Ronald Rosenkranz (NY)
Robert J. Camera (NY & NJ)
Joseph P. Rones (NY & FL)
Steven Lim (NY)
George A. Kohl, 2nd (NY & MA)
Eleanor L. Polimeni (NY)
Steven H. Cohen (NY)
Francis Navarra (NY)
Andrew J. Genna, LLM (NY & PA)
Thomas C. Yatto (NY)

Elyssa M. Fried-DeRosa (NY)
Mary Ellen Wright (NY)
Kenneth B. Fromson (NY, NJ & PA)
Joel Bossom (NY)
Nancy Y. Morgan (NY, NJ & PA)
Andrew L. Spitz (NY)
James W. Shuttleworth, III (NY)
Lawrence D. Lissauer (NY)
David E. Gross (NY & NJ)
Terry D. Horner (NY)
Robert F. Moson (NY)
Julio E. Urrutia (NY)

Debra J. Reisenman (NY)
Michael T. McGarry (NY)
Steven P. Shultz (NY & MA)

Victoria Lieb Lightcap (NY & MA)
Ann R. Johnson (NY & CT)
Marshall P. Richer (NY)
Thomas J. Pronti (NY)
Kristina M. Cahill (NY & CT)
Kara L. Campbell (NY & CT)
Arieh Mezoff (NY)
Christopher T. Milliman (NY)
Silvia Fermanian (NY)
Edward M. Steves (NY)
Karen M. Queenan (NY & CT)
Marie M. DuSault (NY)
Glenn W. Kelleher (NY)
Melody A. Gregory (NY & CT)
Gail Schlanger (NY)
Elizabeth A. Wolff (NY & MA)

*Of Counsel*
Jules P. Levine, P.C. (NY & FL)
Michael O. Gittelsohn, P.C. (NY)
Joel A. Reback (NY & Israel)
Sheila Rosenrauch (NY)
Kenneth Cohen (NJ)
Cynthia M. Maurer (NY & NJ)
Raye D. Fulorias (NJ)
Frances M. Bova (NY & NJ)
Kenneth G. Bartlett (CT & NJ)
Ari Kresch (NY & MI)
Gustavo W. Alzugaray (NY & NJ)

A Limited Liability Partnership

(800) 634-1212
Fax: (845) 562-3492
www.lawampm.com

*Accredited CLE Provider*

REFER TO OUR FILE #: 200599

June 28, 2007

Jim Rouhandeh
Erik Zissu
Davis Polk & Wardwell
450 Lexington Avenue
New York, NY 10017

Re:    Neurontin Litigation

Counsel:

Please disregard my previous letter of today as it was incomplete. I am providing to you further information that may be useful to you in addressing issues relating to the Merlin data previously disclosed.

Attached please find a document disclosed by Defendants during the course of the litigation. The document depicts a chart entitled, "Neurontin Inquiries in USMI (2001 – present)" with bates stamp Pfizer_JSu_0031385. In particular, the chart purportedly depicts the numbers of inquiry responses during the subject time period.

Our review of the data included in the Merlin database previously disclosed by defendants as it pertains to inquiry responses does not equal the figures depicted in the abovementioned chart. While this discrepancy could be for a number of reasons (including a simple typographical error in the chart), we are obviously concerned that we were not provided with all of the discoverable data: the data we received are less than the data expressed in the chart. I am including as an attachment pertinent data from the Merlin database that was provided to our office.

Kindly accept this letter as a request to confer on the above issue set forth above. To the extent that the Defendants' disclosure is deficient and the parties are unable to resolve the matter, it is our intention to seek judicial intervention.

Very truly,

Kenneth B. Fromson

Newburgh • Albany • Binghamton • Kingston • Middletown • Monroe • New Windsor • Newark • Port Jervis • Poughkeepsie • Spring Valley • Syracuse • Troy • Utica

436 ROBINSON AVENUE
NEWBURGH, NY 12550

50 PARK PLACE, 10th FLOOR
NEWARK, NJ 07102

| YMCompleted | Expr1 |
|---|---|
| 1998-12 | 1230 |
| 1999-01 | 1322 |
| 1999-02 | 1734 |
| 1999-03 | 2110 |
| 1999-04 | 1687 |
| 1999-05 | 1184 |
| 1999-06 | 1226 |
| 1999-07 | 1368 |
| 1999-08 | 1638 |
| 1999-09 | 1754 |
| 1999-10 | 1491 |
| 1999-11 | 1407 |
| 1999-12 | 997 |
| 2000-01 | 1201 |
| 2000-02 | 1471 |
| 2000-03 | 1923 |
| 2000-04 | 1277 |
| 2000-05 | 1259 |
| 2000-06 | 1129 |
| 2000-07 | 945 |
| 2000-08 | 1367 |
| 2000-09 | 948 |
| 2000-10 | 779 |
| 2000-11 | 572 |
| 2000-12 | 520 |
| 2001-01 | 925 |
| 2001-02 | 710 |
| 2001-03 | 721 |
| 2001-04 | 724 |
| 2001-05 | 641 |
| 2001-06 | 687 |
| 2001-07 | 611 |
| 2001-08 | 688 |
| 2001-09 | 630 |
| 2001-10 | 642 |
| 2001-11 | 539 |
| 2001-12 | 474 |
| 2002-01 | 770 |
| 2002-02 | 702 |
| 2002-03 | 718 |
| 2002-04 | 773 |
| 2002-05 | 628 |
| 2002-06 | 522 |
| 2002-07 | 517 |
| 2002-08 | 743 |
| 2002-09 | 1152 |
| 2002-10 | 1589 |
| 2002-11 | 1131 |
| 2002-12 | 857 |
| 2003-01 | 982 |
| 2003-02 | 949 |
| 2003-03 | 797 |
| 2003-04 | 841 |
| 2003-05 | 750 |
| 2003-06 | 683 |
| 2003-07 | 857 |
| 2003-08 | 874 |
| 2003-09 | 57 |



# Finkelstein & PARTNERS
## Counselors At Law

A Limited Liability Partnership

(800) 634-1212
Fax: (845) 562-3492
www.lawampm.com

Howard S. Finkelstein, P.C. (NY)
Andrew G. Finkelstein, P.C. (NY & NJ)
George M. Levy (NY)
Kenneth L. Oliver, P.C. (NY)
Joel S. Finkelstein, P.C. (NY, NJ, MA & FL)
Duncan W. Clark (NY)
Ronald Rosenkranz (NY)
Robert J. Camera (NY & NJ)
Joseph P. Rones (NY & FL)
Steven Lim (NY)
George A. Kohl, 2nd (NY & MA)
Eleanor L. Polimeni (NY)
Steven H. Cohen (NY)
Francis Navarra (NY)
Andrew J. Genna, LLM (NY & PA)
Thomas C. Yatto (NY)

Elyssa M. Fried-DeRosa (NY)
Mary Ellen Wright (NY)
Kenneth B. Fromson (NY, NJ & PA)
Joel Bossom (NY)
Nancy Y. Morgan (NY, NJ & PA)
Andrew L. Spitz (NY)
James W. Shuttleworth, III (NY)
Lawrence D. Lissauer (NY)
David E. Gross (NY & NJ)
Terry D. Horner (NY)
Robert F. Mason (NY)
Julio E. Urrutia (NY)

Debra J. Reisenman (NY)
Michael T. McGarry (NY)
Steven P. Shultz (NY & MA)

Victoria Lieb Lightcap (NY & MA)
Ann R. Johnson (NY & CT)
Marshall P. Richer (NY)
Thomas J. Pronti (NY)
Kristine M. Cahill (NY & CT)
Kara L. Campbell (NY & CT)
Arieh Mezoff (NY)
Christopher T. Milliman (NY)
Silvia Fermanian (NY)
Edward M. Steves (NY)
Karen M. Queenan (NY & CT)
Marie M. DuSault (NY)
Glenn W. Kelleher (NY)
Melody A. Gregory (NY & CT)
Gail Schlanger (NY)
Elizabeth A. Wolff (NY & MA)

Of Counsel
Jules P. Levine, P.C. (NY & FL)
Michael G. Gittelsohn, P.C. (NY)
Joel A. Reback (NY & Israel)
Sheila Rosenrauch (NY)
Kenneth Cohen (NJ)
Cynthia M. Maurer (NY & NJ)
Raye D. Futerfas (NJ)
Frances M. Bova (NY & NJ)
Kenneth G. Bartlett (CT & NJ)
Ari Kresch (NY & MI)
Gustavo W. Alzugaray (NY & NJ)

Accredited CLE Provider

REFER TO OUR FILE #: 200599

June 28, 2007

Jim Rouhandeh
Erik Zissu
Davis Polk & Wardwell
450 Lexington Avenue
New York, NY 10017

Re: Neurontin Litigation

Counsel:

Attached please find a document disclosed by Defendants during the course of the litigation. The document depicts a chart entitled, "Neurontin Inquiries in USMI (2001 – present)" with bates stamp Pfizer_JSu_0031385. In particular, the chart purportedly depicts the numbers of inquiry responses during the subject time period.

Our review of the data included in the Merlin database previously disclosed by defendants as it pertains to inquiry responses does not equal the figures depicted in the abovementioned chart. While this discrepancy could be for a number of reasons (including a simple typographical error in the chart), we are obviously concerned that we were not provided with all of the discoverable data: the data we received are less than the data expressed in the chart.

Kindly accept this letter as a request to confer on the above issue set forth above. To the extent that the Defendants' disclosure is deficient and the parties are unable to resolve the matter, it is our intention to seek judicial intervention.

Very truly,

Kenneth B. Fromson

Newburgh • Albany • Binghamton • Kingston • Middletown • Monroe • New Windsor • Newark • Port Jervis • Poughkeepsie • Spring Valley • Syracuse • Troy • Utica

436 ROBINSON AVENUE
NEWBURGH, NY 12550

50 PARK PLACE, 10th FLOOR
NEWARK, NJ 07102

EXHIBIT F

200599

**Shook,**
**Hardy &**
**Bacon** L.L.P.*

July 24, 2007

www.shb.com

Vincent E. Gunter

Kenneth B. Fromson
Finkelstein & Partners
436 Robinson Avenue
Newburgh, NY 12550

2555 Grand Blvd.
Kansas City
Missouri 64108-2613
816.474.6550
816.421.5547 Fax
vgunter@shb.com

Re:  **Neurontin Litigation -- Response to Letters Dated June 15, 21, 28, and 29, 2007**

Dear Ken:

This letter serves as a response to the questions and issues raised in your letters dated
June 15, 21, 28, and 29, 2007.

First, several of your letters request copies of those documents that Dr. Adrian Vega, Dr.
Lloyd Knapp, and Andrea Garrity reviewed in preparation for their deposition testimony.
This letter serves to notify you of our objections to these requests. The bases for our
objections are detailed herein.

Your letter of June 15, 2007, states that according to the deposition transcript, you asked
Dr. Vega, "Have you reviewed prior to your deposition today, but for purposes of
refreshing your recollection about your involvement in the Medical Information
Department, any standard response documents that pertain to inquiries involving
suicide?" Similarly, your letter dated June 21, 2007, states that Ms. Garrity was asked,
"Did you review any materials during those meetings to refresh your recollection of
anything."

Clearly, any documents shown by counsel to the witnesses "**for purposes of refreshing**"
their recollection, by necessity, include the mental impressions of counsel and are
therefore protected by the attorney-client privilege and attorney work-product doctrine.
*See* FED. R. CIV. P. 26(b)(3) ("the court shall protect against disclosure of the mental
impressions, conclusions, opinions, or legal theories of an attorney or other representative
of a party concerning the litigation."). Plaintiffs did not elicit testimony from Dr. Vega or
Ms. Garrity regarding whether any documents had in fact refreshed their recollection.
Accordingly, the deposition testimony quoted in your letters does not demonstrate that
Dr. Vega's or Ms. Garrity's memories were ever refreshed and no such documents are
identified in their testimony.

Your letter dated June 29, 2007, states that Dr. Knapp's review of documents provided by
counsel refreshed his recollection regarding the labeling history of Neurontin. Counsel
for plaintiffs, however, failed to ask Dr. Knapp to identify which documents refreshed his
recollection. Although you cite the Federal Rules of Civil Procedure and New York Civil
Practice Law and Rules, you provide no specific provision that requires defendants to

Geneva
Houston
Kansas City
London
Miami
Orange County
San Francisco
Tampa
Washington, D.C.



Shook,
Hardy&
Bacon.L.L.P.
www.shb.com

Mr. Kenneth B. Fromson
July 24, 2007
Page 2

disclose and exchange after a deposition's conclusion documents that refreshed a witness' recollection.

Second, with respect your inquiry regarding standard response documents ("SRDs") found on the Merlin and Pfoenix databases and whether these databases contain drafts of those documents – raised in your letter dated June 15, 2007 – you indicate that it is your understanding that "portions of both the Merlin and Phoenix [sic] databases" were provided to you. To clarify, you have received the portions of those databases that pertain to Neurontin that contain both draft and final versions of SRDs created by the Medical Information department. Indeed, plaintiffs counsel affirmatively used draft SRDs with Dr. Vega at his deposition. *See* Vega Exhibit 34.

To determine whether a SRD is a draft or a final approved version, you must refer to the "Document Reference" table that is found in both the Merlin and Pfoenix databases that Pfizer previously produced to you. For Pfoenix, click on the "Pfoenix Neurontin.mdb" icon to open the Microsoft Access file. From there, click on the "Document Reference" table on the left side of the screen (use the same process for the Merlin database, except click on the icon titled "Merlin Neurontin.mdb"). The "Document Reference" tables indicate which standard response documents are approved. Approved versions are identified with a point zero after the version number (*e.g.* 2.0, 3.0, 4.0, etc.). Any document identified with a number that does not end in point zero is a non-final (unapproved) version (*e.g.* 2.1). Additionally, plaintiffs may also possess draft SRDs to the extent they were produced from employee custodial files. Documents produced from custodial files should have a Bates-stamp identifier.

Third, your letter of June 15 refers to Dr. Vega's testimony regarding "documents that would reflect his actual approval of the standard response document." Specifically, in response to your question about where these documents may be kept, Mr. Vega stated: "They would probably be within the Pfoenix system." As above, we have produced portions of the Merlin and Pfoenix databases that pertain to Neurontin. It is our understanding that there is no reference in Pfoenix demonstrating which Medical Information employee approved a specific SRD . As a courtesy, we are attempting to ascertain whether this information can be obtained from another source. If so, we propose to provide a spreadsheet of the approved document identification numbers with a corresponding "approved by" field that identifies the Pfizer employee who approved the SRD for those documents in which you are interested. Once we know whether this information can be ascertained, please provide a list of the SRDs for which you would like to know approval information.

Fourth, your letter of June 15 also requests copies of U.S. Medical Information standard monthly reports. To the extent defendants have previously provided these documents in the production of custodial files, plaintiffs share the same access as defendants to look for and identify these reports in the documents previously produced. Defendants have

Geneva
Houston
Kansas City
London
Miami
Orange County
San Francisco
Tampa
Washington, D.C.



Shook,
Hardy &
Bacon L.L.P.
www.shb.com

Mr. Kenneth B. Fromson
July 24, 2007
Page 3

already produced the responsive documents from Dr. Vega's custodial file. As a courtesy, however, we have made inquiries to determine whether there is a single locus that houses "standard monthly reports." Based on our initial efforts, it appears that we can obtain copies of U.S. Medical Information standard monthly reports that relate to Neurontin. Accordingly, we are attempting to secure those reports and we will produce them as soon as practicable.

Regarding your letter of June 21, 2007, you also request that defendants provide identifying information for a binder of documents that Ms. Garrity referred to during her deposition. Defendants have produced responsive documents from Ms. Garrity's files to plaintiffs and plaintiffs share the same access to those materials as defendants.

With respect to your inquiry regarding Drusilla Scott – raised in your letter of June 29, 2007 – please note that Ms. Scott is a former employee who left Pfizer in 2002. To date, defendants have been unable to locate any documents from her custodial file.

Please do not hesitate to contact me if you have any questions or if you wish to confer to discuss these issues in more detail.

Sincerely,

Vincent E. Gunter

Geneva
Houston
Kansas City
London
Miami
Orange County
San Francisco
Tampa
Washington, D.C.

EXHIBIT G



**Finkelstein & PARTNERS**
*Counselors At Law*

Howard S. Finkelstein, P.C. (NY)
Andrew G. Finkelstein, P.C. (NY & NJ)
George M. Levy (NY)
Kenneth L. Oliver, P.C. (NY)
Joel S. Finkelstein, P.C. (NY, NJ, MA & FL)
Duncan W. Clark (NY)
Ronald Rosenkranz (NY)
Robert J. Camera (NY & NJ)
Joseph P. Rones (NY & FL)
Steven Lim (NY)
George A. Kohl, 2nd (NY & MA)
Eleanor L. Polimeni (NY)
Steven H. Cohen (NY)
Francis Navarra (NY)
Andrew J. Genna, LLM (NY & PA)
Thomas C. Yatto (NY)

Elyssa M. Fried-DeRosa (NY)
Mary Ellen Wright (NY)
Kenneth B. Fromson (NY, NJ & PA)
Joel Bossom (NY)
Nancy Y. Morgan (NY, NJ & PA)
Andrew L. Spitz (NY)
James W. Shuttleworth, III (NY)
Lawrence D. Lissauer (NY)
David E. Gross (NY & NJ)
Terry D. Horner (NY)
Robert F. Moson (NY)
Julio E. Urrutia (NY)
————
Debra J. Reisenman (NY)
Michael T. McGarry (NY)

Steven P. Shultz (NY & MA)
Victoria Lieb Lightcap (NY & MA)
Ann R. Johnson (NY & CT)
Marshall P. Richer (NY)
Thomas J. Pronti (NY)
Kristine M. Cahill (NY & CT)
Kara L. Campbell (NY & CT)
Christopher T. Milliman (NY)
Silvia Fermanian (NY)
Edward M. Steves (NY)
Mario M. DuSault (NY)
Glenn W. Kelleher (NY)
Melody A. Gregory (NY & CT)
Gail Schlanger (NY)
Elizabeth A. Wolff (NY & MA)

*Of Counsel*
Jules P. Levine, P.C. (NY & FL)
Michael O. Gittelsohn, P.C. (NY)
Joel A. Reback (NY & Israel)
Kenneth Cohen (NJ)
Cynthia M. Maurer (NY & NJ)
Raye D. Futerfas (NJ)
Frances M. Bova (NY & NJ)
Kenneth G. Bartlett (CT & NJ)
Ari Kresch (NY & MI)
Gustavo W. Alzugaray (NY & NJ)

A Limited Liability Partnership

(800) 634-1212
Fax: (845) 562-3492
www.lawampm.com

*Accredited CLE Provider*

REFER TO OUR FILE #: 200599

August 29, 2007

Jim Rouhandeh
Davis Polk & Wardwell
450 Lexington Avenue
New York, NY 10017

Re:    Neurontin Litigation

The Court's previous order requires Plaintiffs' motion to compel discovery be filed in time for the upcoming September 2007 conference/hearing. In this regard, it is our intention to seek the following discovery via motion in the event we are unable to resolve the issues between us:

1.    Plaintiffs will seek leave to serve upon Defendants a Request for Admissions that is identical to the Requests for Admissions served in <u>Crone v. Pfizer</u> (California), dated June 27, 2007.

2.    Plaintiffs seek to have from Defendants the documents utilized by witnesses (Vega, Garrity, Knapp) in preparation for their depositions and which specifically refreshed their recollections as to facts and circumstances regarding Neurontin. Your attention is referenced to previous correspondence in this regard, dated 6/15/07, 6/21/07, and 6/29/07. Your attention is further referenced to Defendants' responsive correspondence, dated 7/24/07. Plaintiffs will also seek to have from Defendants the documents utilized by witness Manfred Hauben for purposes of preparing for his deposition. This line of testimony is referenced at pages 76-80 of the witness's transcript. We will also seek to depose a witness with knowledge and the ability to testify to pharmacovigilance practices during the Warner Lambert period. Our review of Manfred Hauben's testimony reflects he had inadequate knowledge and did not adequately prepare to answer questions regarding the Warner Lambert period.

3.    Plaintiffs seek to have Defendants provide the binder of information as identified by witness Andrea Garrity during her deposition. Alternatively, Plaintiffs had requested the courtesy of the bates range for these documents, presuming Defendants believe same has been provided. Your attention is referenced to previous correspondence, dated 6/21/07, as well as Defendants' responsive correspondence, dated 7/24/07.

4.    Plaintiffs will seek to compel the deposition testimony of a witness with specific knowledge of the *Merlin* database so that we can resolve the dispute as to the data/information outlined in previous correspondence, dated 6/28/07.

Newburgh • Albany • Binghamton • Kingston • Middletown • Monroe • New Windsor • Newark • Port Jervis • Poughkeepsie • Spring Valley • Syracuse • Troy • Utica

436 ROBINSON AVENUE
NEWBURGH, NY 12550

50 PARK PLACE, 10th FLOOR
NEWARK, NJ 07102

August 29, 2007  Page 2

5.    Plaintiffs will seek to compel, or otherwise seek leave to demand from Defendants the Electronic
       Standard Operating Procedures (ESOP) database, and any Standard Operating Procedures (SOPs) within
       the possession, custody or control of Defendants that pertain to the preparation of Standard Response
       Documents (e.g., documents used by the Medical Information Department to respond to inquiries about
       Neurontin). Plaintiffs will also seek leave to serve a Request for Admissions in order to confirm the
       identity of *draft* standard response documents versus *final* standard response documents; we may also
       seek to compel the deposition testimony of a witness most knowledgeable regarding the *Merlin* and
       *Phoenix* databases who can specifically delineate the identity of *draft*  Standard Response Documents
       versus *final* Standard Response Documents.

6.    Plaintiffs will seek leave to serve Requests for Admissions, or otherwise get a brief discovery extension
       for the limited purpose of determining whether documents are in fact Defendants' 'business records'.
       Your attention is referenced to the Court's August 1, 2005 transcript (attached hereto) wherein the issue
       was discussed with the Court and the Court made informal suggestions on when to resolve this issue
       (beginning at page 68). Also see attached the Court's August 9, 2005 Order. We intend to seek an
       additional 30 days to provide you with the documents that would be encompassed by the Order.
       Although the general discovery deadline in the litigation was April 16, 2007, Defendants have continued
       to provide discovery, even in August 2007. Thus, we believe our window to provide you with these
       documents in a manner consistent with the Court's August 9, 2005 Order (an order based upon motion
       practice for which Product Liability Plaintiffs had no formal involvement), should be extended.

Very truly,

Kenneth B. Fromson
845-562-0203 x2755

# EXHIBIT H

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

IN RE:                          )  C.A. No. 04-10981-PBS
NEURONTIN MARKETING AND         )
SALES PRACTICES LITIGATION      )  Courtroom No. 14
                                )  1 Courthouse Way
                                )  Boston, MA  02210

AUGUST 1, 2005

2 p.m.

BEFORE THE HONORABLE LEO T. SOROKIN

UNITED STATES MAGISTRATE JUDGE

VALERIE A. O'HARA

OFFICIAL COURT REPORTER

Page 68

1    under the impression we were arguing --

2          THE COURT:  I was under the impression if you

3    hadn't resolved it, we would address it today.  My strong

4    inclination on the requests for admissions are basically to

5    order that what I suggested last time because it seemed

6    reasonable, and nobody would really jump up and down and

7    complain about it.  I guess what I'm going to do since

8    Mr. Himmelstein is not here is suggest this:

9          I think what seems to me ought to happen is that

10   the requests for admission ought to be -- that the

11   defendants should not have to respond to those requests now.

12   As I understand it, the requests for admissions that have

13   been propounded seek an admission with respect to every

14   document in the Franklin, 1, that the document is a business

15   record of the defendants; and, 2, it is authentic within the

16   meanings of the rules of evidence.

17         I think that that request multiplied 24,000 or

18   44,000 times, whatever it is, at this stage is overbroad and

19   inefficient, and instead what should happen is those

20   requests the defendants don't have to respond to whether I'm

21   granting a protective order or whether the plaintiffs are

22   going to withdraw them, and at a later stage in this

23   proceeding after a substantial portion of the discovery has

24   been completed, there will come a time in the schedule when

25   the plaintiffs will need to identify those documents that

a687f350-e9b3-472c-8436-f9b724e6094e

Page 69

1   they intend to rely upon, and they will then, it seems to

2   me, produce a list of those documents to the defendants or

3   among the documents and ones they believe that meet the

4   criteria are authentic business records of the defendants,

5   and they will give them to the doctors at which point the

6   defendant will either say yes or no, that, yes, it meets

7   both, it's authentic and a business record or no, it's

8   not.

9          If there's disagreements, if you resolve them all,

10  there won't be need for requests for admission, and if

11  there's disputes about them, then there's going to be

12  disputes about a far smaller number of documents because,

13  first of all, Plaintiffs receive documents beyond the 44,000

14  so they might want admissions with respect to those, and

15  many of these 44,000 may not be relevant at that point as to

16  the ones that are in dispute.  If it has to be, if the

17  parties can't reach an agreement, then you can take, my

18  inclination would be that you take deposition discovery just

19  as to those two questions, just as to the documents the

20  defendant didn't agree to.  The ones that are in dispute,

21  you're entitled to dispute them, you're entitled to take

22  some discovery on them, especially at that point when you

23  know what documents you want to rely upon.

24          You people had worked out I think a two-day limit

25  on depositions.  It would seem to me I would view this as

a687f350-e9b3-472c-8436-f9b724e6094e

Page 70

1    separate, take your two days on a witness now and later, if

2    you had to, you get to depose that person again with respect

3    to the documents, then the deposition is only, and that just

4    goes to the question about the business authentication,

5    which is I think a little more detail we laid out when we

6    were here last time.  That would be my inclination as to

7    suggest it to be done in the absence of an agreed proposal.

8            Since Mr. Himmelstein is not here, what I'm going

9    to do is say that I'll tell you that's my tentative view.

10   I'm not going to memorialize that in an order now.

11   Mr. Rouhandeh, from your perspective, is that something

12   you're willing to agree to?

13           MR. ROUHANDEH:  Just one clarification, your

14   Honor, on that issue.  In terms of the two-day deposition,

15   it seems to me it doesn't make any sense to let them depose

16   somebody a second time if they already had those documents

17   at the time they initially deposed someone.  Now, if they

18   say, look, it's going to take more than two days to depose

19   someone for documents, shouldn't they have to try to

20   authenticate documents and go through the business records?

21           THE COURT:  The reason I was thinking about this

22   is this, at least 44,000, because there are 44,000 documents

23   that are referenced in the admissions.

24           MR. ROUHANDEH:  22,000.

25           THE COURT:  If there's 22,000 documents, I suppose

Page 71

1    some of these documents are multiple pages, and there's

2    information on them, there's all sorts of issues that could

3    arise.  They might not know at the time they take the

4    depositions about which documents they want to use, and so

5    to the extent they're going to take discovery on it,

6    deposition discovery, they got to do it during the

7    depositions.  It's going to inevitably force them, if they

8    prove, to take deposition discovery with respect to

9    documents that they in the end, they're not going to rely

10   on, which is going to put them through a burden, it's going

11   to put Pfizer to a burden, it's going to put you through a

12   burden.

13              It seems to me in my judgment that level of burden

14   is likely to be greater than at the end of the day, not at

15   the very end of the case, but at some further down-the-road

16   point when they focused in on all the discovery which

17   documents they're going to rely upon and you decided which

18   ones there isn't really a real issue about and ones that you

19   identify there is a real issue about in this case, then a

20   much narrower set, and the amount of deposition time likely

21   to be taken to deal with those I would think would be much

22   less because you may say there's an issue about these

23   hundred and they may explain why, and at which time they say

24   we see what you're saying about some of these, and they give

25   up on some percentage of that one hundred because they

1    realize it doesn't make sense or it's not important to

2    them.

3              MR. ROUHANDEH:  Your Honor, my only concern is

4    that it may put off to the day when this later point comes

5    along they may have a bigger, it won't be a request to

6    admit, it will be stipulate as to these documents in a row.

7    We are producing more documents before 1998, and that's just

8    simply not how it's done in general litigation.  It's really

9    done, you take the deposition of the witness with the

10   documents that you would have.

11             I understand if we later produce a document they

12   didn't have at the time of the deposition, they're

13   inevitable arguments about the documents, do we get to open

14   up the deposition again?  That's a separate issue here.

15   They ought to try to authenticate the documents, establish

16   they're business records through the depositions.  If they

17   get to the end of the day --

18             THE COURT:  Here's what I'm going to do, I

19   understand what you're unhappy with.  This is my tentative

20   view.  It's not memorialized in any way.  Is Mr. Himmelstein

21   the person designated?

22             MR. GREENE:  He is, your Honor.

23             THE COURT:  You go talk to Mr. Himmelstein.  If

24   you guys come to terms about how to come to a different set

25   of terms that seems reasonable about how to resolve the

1   situation, come to an agreement, that's going to be probably

2   fine with me.  If you don't reach an agreement by the end of

3   today is Monday, if you don't reach an agreement by a week

4   from today, then you file something that proposes simply

5   what you propose, all right.

6          You want to propose something different, you

7   propose it sounds like that no request for admission and

8   they just do, take in all their depositions now and they

9   will propose either what I've outlined or they'll propose

10  something different, I don't know.  I'll think about what

11  you're saying, and they may say they're willing to do that,

12  but then they want two and a half days.  I'm not sure.

13          MR. ROUHANDEH:  That's fine.

14          THE COURT:  Don't file more briefing, just file

15  this is what you propose and you can say, and that's all.

16  That's enough.  I understand what the issues are, then I'll

17  take yours or theirs, or I'll make my own up in between.

18          MR. ROUHANDEH:  That's fine.

19          MS. NUSSBAUM:  Your Honor, I think the concern and

20  why Plaintiffs served these requests earlier rather than

21  later here is because otherwise we have many different

22  constituencies here who are going to be sharing this very

23  limited amount of deposition time of the witnesses in

24  common, and documents that I may need to authenticate or

25  want as business records may be quite different than yours

1    and quite different than yours, and none of us want to spend

2    the bulk of those depositions going through the litany of

3    questions, but, you know, I thought that your suggestion of

4    the two-day deposition of a custodian of records as to when,

5    maybe what we could do is a two-day deposition of a

6    custodian of records now before we start the depositions on

7    the merits because it may be that large groups of these

8    documents, large groups of minutes of regularly health

9    committees and meetings and the like can simply in a

10   custodian-type deposition up front be authenticated.

11            THE COURT:  That's what you can talk to

12   Mr. Himmelstein on.  You're free to propose any sort of

13   reasonable solution whether you want to agree with them or

14   not, either of you.  Mr. Rouhandeh, suppose I agree with you

15   on that principle that it should be done, there shouldn't be

16   two phases, I propose, why shouldn't they at that point,

17   they get through, then it's a question do they do it in the

18   form of admissions, or do they do it in the form of

19   depositions?  Then my question to you is in a sense, since

20   it still comes back to fundamentally the same question,

21   which is a lot of these documents presumably you'd agree are

22   authentic as business records and many of them you'd

23   probably say no, they're not or you don't know.

24            Why isn't it more efficient even though it blows

25   through the limits and the rules, but the fact of the

1    matter, we're efficient here.  Why isn't it more efficient

2    and do it as an admissions, most of them, as opposed to

3    doing all of them by deposition?

4            MR. ROUHANDEH:  I think they arguably could be

5    done by stipulation, but I thought where we were going at

6    the last hearing was, the defendants would -- and I think

7    this first speaks to the same -- during the depositions, try

8    to establish business records with respect to the documents

9    of the witnesses whose depositions we're going to take.  You

10   get to the end of the case, typically what happens is

11   there's a pretrial order that has to be prepared.  Both

12   sides will ask the other side to stipulate with respect to

13   authenticity, business records with respect to a host of

14   documents, then this is the piece where it kind of depends

15   on the case.

16           If at that point, you know, there's a bunch of

17   issues in dispute, if it's a small number of issues and the

18   witnesses are going to testify at trial anyway, sometimes it

19   gets wrapped up and it's done at trial.  A lot of judges

20   don't want to spend very much time during trial addressing

21   those issues.  I think the way that that could be dealt

22   with, they would simply have to seek leave to take

23   depositions related solely to those issues, but they would

24   have to ask for leave.  They wouldn't just be able to do it

25   because if they do it to us, again, we could appear and say,

a687f350-e9b3-472c-8436-f9b724e6094e

1    well, we still don't know what we want.

2              THE COURT:  That's not my understanding what I

3    outlined last time.  My understanding what I outlined last

4    time, now maybe it might not have been clear or people might

5    have understood it differently, which is fine, but I'm only

6    saying I've outlined one way to go about it.  It strikes me

7    as reasonable.  There's clearly other ways to do it.  You

8    talk to Mr. Himmelstein, you guys can reach an agreement

9    that is different from what I propose, if it's reasonable,

10   I'll sign it.  If you guys don't reach an agreement, then

11   you each can propose competing proposals and I'll review

12   them and I'll decide.

13             My sort of what I'm thinking about, it seems to me

14   I'm thinking about what's reasonable in sort of resolving

15   it, and my gut impression is that I can't believe all of you

16   are going, all of you, I don't mean just the defense

17   counsel, I mean all counsel, are going to have serious

18   disputes of anywhere between 22,000 and 200,000 documents,

19   and to impose upon what I'm guessing is going to be at least

20   10 lawyers at any deposition, but potentially way more, and

21   a witness, this burden of simply going through lots and lots

22   of documents that aren't going to be disputed just seems to

23   be a waste of time, and there's got to be a more efficient

24   way.  That's what I'm thinking about.

25             MR. ROUHANDEH:  Just as I understand it, the

1   period when they've looked back at documents to say is there

2   anything else, is that prior to the end of discovery?

3   That's the piece I misunderstood from last time.

4           THE COURT:  I'm assuming it's before summary

5   judgment, right, you're going to have a close of discovery

6   date, and then you're going to have a summary judgment brief

7   of schedule.  Either you say discovery goes to here, it's

8   closed and then you have a period of time for them to

9   identify all the documents and you have a period of time to

10  respond, then if there are issues left, you have a window to

11  do this other authentication business record kind of

12  depositions.  To the extent you take them, maybe you move

13  that all back, it's within the discovery period.  I don't

14  know.  That's nomenclature, I think.

15          But it seems to me it's before summary judgment

16  because if they get to summary judgment and summary

17  judgment, they've got to produce records, they've got to

18  have admissible evidence, and I suppose you people think

19  it's after summary judgment, but I think that that process

20  would happen before they file their motions for summary

21  judgment.  They file their motions for summary judgment,

22  whatever is in it, you know, it's agreed, it's a business

23  record and authentic or you guys know that you both disagree

24  about it and any discovery that has been done, and then the

25  Court makes a ruling in summary judgment and its theory in

1    summary judgment, and then you could impanel the jury.  I

2    know it wouldn't go exactly like that.

3              MR. ROUHANDEH:  I think all that your Honor could

4    be done by amendment to the case management orders in the

5    earlier scheduling requests to admit.

6              THE COURT:  That's why I'm suggesting that my

7    tentative view would grant your motion for protective order,

8    they'll withdraw them, one or the other would be done, and

9    you guys can flesh it out or I can flesh it out in an order,

10   and it would be incorporated.  I'm a little frankly confused

11   by the case management order.  I understand the case

12   management order is more in the nature of like structure as

13   opposed to a schedule, though it sounds like it's a little

14   bit of both.

15             I couldn't care.  You can put in the case

16   management order, you can do it in the form of a request.  I

17   suggested a little while ago we might need a revised

18   schedule.  To the extent that calls for redoing the case

19   management orders, we redo the case management orders, but

20   what I'm thinking is trying to resolve these issues and to

21   the extent it's necessary revise the schedule now to deal

22   with whatever we anticipated we deal with, however you want

23   to do this issue, then we'll get a realistic, workable

24   schedule to work on.  That would be my hope and expectation

25   that barring an unforeseen development that would be the

1    schedule we live with.

2        MR. ROUHANDEH:  That's fine, your Honor, we'll

3    work on a schedule and confer with Mr. Himmelstein and

4    hopefully have something agreed upon.

5        THE COURT:  You had something you wanted to say,

6    sir?

7        MR. FROMSON:  Although it may be procedural and

8    immaterial in nature, we, as the plaintiffs liability

9    steering committee, were not privy to the negotiations for a

10   two-day deposition, and obviously we would be equally

11   concerned about things in this record during that bulk of

12   time.  In addition, as you referenced, they could have way

13   more attorneys from the various plaintiffs' counsel than the

14   states, so we would probably be seeking an additional day to

15   have those depositions completed, where necessary.  I just

16   didn't want to sit on my hands here today.

17       THE COURT:  I understand that.  The three

18   provisions -- as I read the case management order, the three

19   provisions in the case management order that are at issue, I

20   don't have it in front of me.  Do you all have to go to

21   catch planes or what have you?

22       MR. ROUHANDEH:  We're here until your Honor needs

23   us.

24       THE COURT:  It would be my inclination that I'd

25   rather at least talk about the case management order now.  I

Page 80

1  had one question that pertains to the court reporter.  Do

2  you all want a court reporter each time?

3      MR. ROUHANDEH:  Yes, your Honor.

4      MR. FROMSON:  Yes.

5      THE COURT:  I wasn't sure.  Normally I don't have

6  a court reporter and we have a tape recorder, but if you

7  want a court reporter, I'll arrange it each time.

8      THE COURT:  You want to order the transcripts by

9  and large each time?

10     THE COURT:  Yes.  Why don't take a 15-minute

11  recess, and we'll come back and talk about the case

12  management order, and I think that's about it.

13     (A recess was taken.)

14     THE CLERK:  All rise.

15     THE COURT:  We were talking about the case

16  management orders.  What are the three paragraphs in issue

17  again?

18     MR. ROUHANDEH:  The first one who is going to be

19  responsible for the discovery relating to sales and

20  litigation of the sales and marketing claims.  It's going to

21  be the plaintiffs' Steering Committee, or is any plaintiff

22  that comes along here going to be able to litigate that in

23  their own case?

24     The second issue is should the plaintiffs be

25  permitted to take a deposition twice, take a defendants'

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

)
IN RE NEURONTIN MARKETING, SALES        )
PRACTICES, AND PRODUCTS LIABILITY       )
LITIGATION                              )
                                        )
                                        )
THIS ORDER RELATES TO:                  )
                                        )
ALL ACTIONS                             )
                                        )
                                        )

MDL Docket No. 1629
Master File No. 04-10981
Judge Patti B. Saris
Mag. Judge Leo T. Sorokin

<u>ORDER</u>

August 9, 2005

SOROKIN, M.J.

Based upon the similar, but not identical, proposals submitted by the parties concerning Plaintiffs' approximately 44,000 requests for admissions it is ORDERED as follows.

1.    The Class and Non-Class Plaintiffs' First Set of Requests for Admissions served on May 11, 2005 are deemed withdrawn as proposed by plaintiffs. Defendants' Motion for a Protective Order (Docket # 148) is DENIED as moot.

2.    Not more than thirty (30) days after the close of discovery, Plaintiffs will provide Defendants with a list of documents, by Bates number, that Plaintiffs intend to introduce at trial, or in opposition to summary judgment, and that have not previously been authenticated or qualified as a business record.

1

3.     Not more than thirty (30) days after service of the aforementioned list, defendants will respond by stating whether they will stipulate as to the authenticity and/or applicability of the business record designation for each document listed.

4.     Plaintiffs will have a limited opportunity to depose or re-depose witnesses solely on the issues of the authenticity and/or the application of the business record designation for the documents in dispute.

5.     The time period for and any limits on the number and/or length of the depositions will be determined by the Court at a later date, based upon the reasonableness of plaintiffs' list and the progress of the litigation.  In order to narrow the number of documents in dispute at the close of fact discovery, as to each deposition, counsel for plaintiffs and defendant should attempt, by discussions among counsel, to identify the documents pertaining to the deponent upon which no authentication or business record dispute exists.

/s/ Leo T. Sorokin
LEO T. SOROKIN
United States Magistrate Judge

2

EXHIBIT I

061407av

267

```
 1
 2              UNITED STATES DISTRICT COURT
                DISTRICT OF MASSACHUSETTS
 3
 4
 5    ----------------------------X
 6    IN RE: NEURONTIN MARKETING      MDL Docket No. 1629
 7    SALES PRACTICES, AND PRODUCTS  Master File No.
 8    LIABILITY LITIGATION              04-10981
 9    ----------------------------X
10
11       VIDEOTAPED DEPOSITION OF ADRIAN VEGA, SR.
12                  New York, New York
13                    June 14, 2007
14
15                     VOLUME II
16
17
18
19
20
21    Reported by:
      Amy A. Rivera, CSR, RPR
22
23
24
25
```

268

```
 1
 2    SUPREME COURT OF THE STATE OF NEW YORK
      COUNTY OF NEW YORK
 3
 4    ----------------------------X
```

Page 1

061407av

5  IN RE: NEURONTIN PRODUCTS

6  LIABILITY LITIGATION        Index Number 765000/2006

7  ---------------------------x

8

9

10

11     VIDEOTAPED DEPOSITION OF ADRIAN VEGA, SR.

12

13

14                              New York, New York
                                June 14, 2007
15

16

17

18

19

20

21

22

23

24

25

D

269

1

2

3

4          Deposition of ADRIAN VEGA, SR., held

5  at DAVIS, POLK & WARDWELL, LLP, 450 Lexington

6  Avenue, New York, New York, before Amy A. Rivera,

7  a Notary Public of the State of New York.

8

9

10

Page 2

061407av
Vega - examination

1
2  charge of the product and in cases in
3  collaboration with their manager.
4        Q.    So, in response to a query about
5  behavior by healthcare professional, what was the
6  process to determine which adverse events from
7  United States clinical trials prior to approval
8  would be referenced in a standard response
9  document, if at all?
10       A.    What kind of behaviors are you talking
11  about?
12       Q.    Well, let's consider the standard
13  response document for behavioral changes.
14       A.    That's a very broad term.
15            MS. MCGRODER:  You need to show it to
16  him.
17       Q.    Are you aware of whether there is a
18  specific standard response document for behavioral
19  changes that was in existence during the time
20  frame you were handling Neurontin?
21       A.    If you show me the document, it might
22  help refresh my memory.
23       Q.    And are you aware of whether there was
24  a standard response document during the time frame
25  that you were handling Neurontin that pertained to

374

1                    Vega - examination
2  suicide?
3       A.    With regards to an incidence of as an
4  adverse event report?  Or use of, I'm not sure --
5       Q.    I can accept that caveat, sure.  Are
6  you aware of such response documents?

Page 87

061407av

```
 7              MS. MCGRODER:  Object to form.
 8       A.    This is with regard to Neurontin?
 9       Q.    Yes.
10       A.    If there was a question that was asked
11   with regards to the topic that we're discussing, I
12   would believe that there would be a standard
13   response document.
14       Q.    Have you reviewed prior to your
15   deposition today, but for purposes of refreshing
16   your recollection about your involvement in the
17   Medical Information Department, any standard
18   response documents that pertain to inquiries
19   involving suicide?
20       A.    I saw several documents.
21       Q.    And what documents did you see that
22   pertained to suicide and standard response
23   documents, if any?
24       A.    Standard response document?
25       Q.    Are you asking me or telling me?
```

375

```
 1                    Vega - examination
 2       A.    I'm asking you.
 3       Q.    Okay.  Yeah.
 4              What standard response documents
 5   regarding suicide, if any, did you review to
 6   assist in refreshing your recollection about the
 7   issues you handled between 2002 and 2004?  That's
 8   were I'm trying to determine?
 9              MS. MCGRODER:  Object to the form.
10       A.    Standard letter, package insert.
11       Q.    Okay.  When --
12              MR. FROMSON:  Do you have a copy of
```

Page 88

061407av

13   it, Counsel?

14           MS. McGRODER:   No.

15      Q.   When did you look at it?

16      A.   Are you asking me specifically?

17      Q.   Well, this line of questioning is

18   solely due to the fact that I asked you:  What did

19   you look at to refresh your recollection and in

20   preparation for the deposition?  You identified a

21   particular standard response document regarding

22   suicide.  I'm just trying --

23      A.   No, you asked me about that, I said I

24   looked at several documents.

25      Q.   Are you saying you didn't look at

                                                    376

1                   Vega - examination

2   several documents regarding suicide?

3      A.   No.  Your question was did I look at

4   any documents with regards to Neurontin?  I did

5   look at standard response documents; yes.

6      Q.   My question, Mr. Vega, was:  Did you

7   review prior to your deposition today but for

8   purposes of refreshing your recollection about

9   your involvement in the Medical Information

10   Department any standard response documents that

11   pertained to inquiries involving suicide?

12           Your answer was:  I saw several

13   documents.

14           I asked you:  And what documents did

15   you see that pertained to suicide and standard

16   response documents, if any?

17           Do you recall that line of questioning

18   or did you believe I was asking you about

Page 89

061407av

19    something else?

20         A.    I believe -- I thought you were asking

21    me in general.

22         Q.    So, let's go back.

23         A.    Sure.

24         Q.    You said you reviewed several

25    documents.  Can you identify what they were for

                                                                377

1                        Vega - examination

2    us?

3         A.    The specific titles, I don't remember.

4         Q.    Do you recall what they involved?

5         A.    They were about Neurontin.

6         Q.    Did they involve specific adverse

7    event inquiries?

8         A.    Most of the --

9               MS. McGRODER:  Object to form.

10        Q.    Well, they were standard response

11    documents; right?

12        A.    Yes, they would include safety

13    information in them.

14        Q.    And what did you do with the

15    documents?  Did you keep them or give them back to

16    your counsel?

17        A.    No, I did not keep them.

18        Q.    What did you do with them?

19              MS. McGRODER:  Object to form.  Now

20    you're going too far into privilege.

21              MR. FROMSON:  My basis for it is my

22    understanding of the New York CPLR which would

23    entitle me to have produced immediately today any

24    document that the witness used to refresh his

Page 90

061407av

25    recollection.  And so, he's testified that he used

378

1                    Vega - examination

2    the document to refresh his recollection and I'd

3    like to have it.  But I understand he doesn't have

4    it with him today.  All I can do is reserve my

5    right to get the document, and I'd ask that

6    counsel make an inquiry to get it.  I'll serve a

7    formal letter, and we'll move on, and your

8    objection --

9                MS. McGRODER:  Noted and I object.

10                MR. FROMSON:  Okay.

11        Q.    So, let me go back to the original

12   line of questioning then.

13                If a -- let me withdraw the question.

14                What, if any, recollection did those

15   documents refresh?

16                MS. McGRODER:  Object to form.

17        A.    The documents were to look at the

18   format of our standard documents.

19        Q.    And what did you learn -- what, if

20   anything, was refreshed in terms of your

21   recollection of the format of the standard

22   documents?

23        A.    I was explaining the format of our

24   documents.

25        Q.    Was anything -- did you -- withdrawn.

379

1                    Vega - examination

2                Was your recollection refreshed as to

3    anything else other than the format?

4                MS. McGRODER:  Object to form.

5        A.    Not that I remember at this time.
                    Page 91

EXHIBIT J

Untitled
                                                              1
1                   ANDREA GARRITY

2              UNITED STATES DISTRICT COURT

3            FOR THE DISTRICT OF MASSACHUSETTS

4       -----------------------------x

5    IN RE NEURONTIN MARKETING AND
     SALES PRACTICES LITIGATION
6
     MDL Docket No. 1629
7    Master File No., 04-10981
     Judge Patti B. Saris
8    Magistrate Leo T. Sorokin
     -----------------------------x
9

10

11          SUPREME COURT OF THE STATE OF NEW YORK

12                  COUNTY OF NEW YORK,

13
     -----------------------------x
14
     IN RE:  NEW YORK NEURONTIN
15   PRODUCTS LIABILITY LITIGATION

16   Case Management
     Index No. 765,000/2006
17   Hon., Marcy S. Friedman
     -----------------------------x
18
                                  June 19, 2007
19                                9:14 a.m.

20

21

22

23

24

25

                          Page 1

Untitled

                                                          75
1                     ANDREA GARRITY

2        Q.    And then yesterday, was it less than

3    half a day?

4        A.    No.

5        Q.    It was about half a day?

6        A.    A little bit longer.

7        Q.    A little bit longer than half a day,

8    but not a full day?

9        A.    Yes.

10       Q.    Did you review any materials during

11   those meetings to refresh your recollection of

12   anything?

13       A.    Couple of documents.

14       Q.    What documents?

15            MR. BARNES:  Objection, I instruct the

16   witness not to answer.  That's work product,

17   attorney-client privilege.

18            DR. PLYMALE:  Well, for the record, if

19   she used documents to refresh her memory, we are

20   entitled to see what those documents are.

21            MR. BARNES:  My objection stands.  I

22   understand your position but my objection

23   stands.

24            DR. PLYMALE:  Okay.

25            MR. BARNES:  Okay.