# EXHIBIT K

0626071k

1

```
 1              UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF MASSACHUSETTS
 2

 3                                  :
 4  IN RE NEURONTIN MARKETING      : MDL DOCKET NO. 1629
    AND SALES PRACTICES            : Master File No. 04-10981
 5  LITIGATION                     : Judge Patti B. Saris
                                   : Magistrate Leo T. Sorokin
 6                                  :
                                   :
 7  -------------------------- X ------------------------
    SUPREME COURT OF THE STATE    : Case Management
 8  OF NEW YORK                   : Index No. 765,000/2006
    COUNTY OF NEW YORK            : Hon. Marcy S. Friedman
 9  --------------------------    :
    IN RE: NEW YORK NEURONTIN     :
10  PRODUCTS LIABILITY            :   DEPOSITION UPON ORAL
    LITIGATION                    :     EXAMINATION OF
11                                :      DR. LLOYD KNAPP
                                  :        VOLUME I
12  -------------------------- X ------------------------

13

14

15         TRANSCRIPT of testimony as taken by and before

16  MARK SCHAFFER, a Certified Shorthand Reporter and

17  Notary Public of the States of New Jersey and New

18  York, at the offices of Davis, Polk & Wardwell, P.C.,

19  450 Lexington Avenue, New York, New York 10017 on

20  Tuesday, June 26, 2007, commencing at 9:15 in the

21  forenoon.

22

23

24

25
```

2

```
 1  A P P E A R A N C E S

 2
```

0626071k

1    Proctor, on behalf of Teva Pharmaceuticals USA,

2    Inc. With me today is summer associate Robert

3    Morvillo.

4         MR. GUNTER:  Vince Gunter for Pfizer.

5         MR. SAYLER:  Scott Sayler, Shook, Hardy &

6    Bacon on behalf of the Pfizer defendants.

7         (A discussion is held off the record.)

8         MR. SAYLER: Before you swear the witness, let

9    me go ahead and begin with a statement.

10        Pursuant to agreement of the parties, Lloyd

11   Knapp is voluntarily appearing today both as a

12   fact witness and as a 30(b)(6) labeling witness,

13   subject to the objections that have been filed to

14   that 30(b)(6) labeling notice.  He will appear

15   today and respond to questions simultaneously

16   under both notices, and the questioning will take

17   place consistent with the order of questioning set

18   out in CMO 5.

19        Any objection?

20        Hearing none, let me continue on with this

21   statement.

22        Lloyd Knapp is appearing for deposition today

23   with the understanding that the following terms

24   apply:  This deposition, including the cross

25   noticing of it in certain state court cases, is

1    being taken in accordance with Case Management

2    Order Numbers 3 and 5 entered in In re: Neurontin

Untitled

160

1       A.   Say that again, please.

2       Q.   Have you ever seen or read the complaint in

3  this litigation?

4       A.   I have to be clear which complaint you are

5  referring to.  I have seen the citizens' petition.

6       Q.   Okay.

7       A.   I'm not sure that I've actually -- I'm not

8  sure that I've actually --

9       Q.   When you say you have seen the citizens'

10  petition, what are you referring to?

11       A.   I would have to consult -- I'm referring to

12  the -- the litigation regarding suicide.

13       Q.   Okay.  Have you ever seen the complaint

14  setting out allegations relating to the sales and

15  marketing of Neurontin?

16       A.   I actually don't believe that I have, or if I

17  have, I certainly do not remember -- do not remember

18  it as such.

19       Q.   Okay.  What did you do to prepare for today's

20  deposition?

21       A.   I had several meetings with my attorneys.  I

22  reviewed documents that seemed would be appropriate to

23  review for this meeting.  And that was about it.

24       Q.   How many meetings did you have with your

25  attorneys?

Untitled

161

1          I'm not asking you to discuss anything you --
2     anything that was said in those meetings.  I just want
3     to know how many you had.
4          A.   It would be appropriate to discuss what was
5     said at those meetings.  But I believe three meetings,
6     something of that order.
7          Q.   And when did those take place -- take place?
8          A.   I don't remember when the -- when the first
9     one was.  Several months ago.  And then more recently
10    a couple of meetings within the last couple of weeks.
11         Q.   All told, how long do you think you met with
12    your attorneys to prepare for this deposition?
13         A.   Probably of the order of seven, eight, nine
14    hours total.
15         Q.   And you said you reviewed documents as
16    appropriate.  Do you recall what documents you
17    reviewed?
18              MR. SAYLER: Objection.   Privileged.
19              I instruct you not to answer.
20              MR. NOTARGIACOMO: His recollection of what
21    documents he reviewed for preparation for this
22    deposition is privileged?
23              MR. SAYLER: Yes. The documents given t5o him
24    were all selected by counsel, reflect our mental
25    impressions and work product.

Untitled

423

1    A.    How much time did I spend doing what exactly?

2    Q.    What you just said.

3    A.    Multiple hours, which would -- you know,

4    let's say somewhere between five and ten hours.

5    Q.    And did you review --

6          MR. FROMSON: Withdrawn.

7    Q.    What documents, again, with respect to the

8    updated language in 2005 did you review?

9    A.    The draft and labeling that ultimately

10   resulted, Integrated Summary of Safety that would have

11   supported those.

12   Q.    This block of time that you referenced, is

13   that inclusive of the time you spent with -- with

14   counsel?

15   A.    No, that's -- I'm speaking of separate from

16   counsel.

17   Q.    Did your review of documents provided to you

18   by counsel refresh your recollection as to any of your

19   knowledge regarding the labeling history of Neurontin?

20   A.    Certainly.

21   Q.    How much time did you spend reviewing those

22   types of documents that actually refreshed your

23   recollection of the labeling history of Neurontin?

24   Just focusing on those.

25   A.    Well, I'm talking about with counsel and I'm

424

1    talking about my separate review.  So I --

2    Q.    I know.  We have limited it now to the

3    documents that you used to refresh your recollection,

Page 1

Untitled

 4   the ones that you -- what -- how much time --

 5         MR. FROMSON: Let me withdraw the question.

 6     Q.   You indicated that -- you indicated certainly

 7   to my question, did you review -- did your review of

 8   documents refresh your recollection --

 9         MR. FROMSON: Let me withdraw the question.

10         Mr. Reporter, could you read, please, back

11         the question at Page 180, Line 10 starting with

12         "Did you review." And then it says "repeat,"

13         because I think it's phonetic.

14         (A discussion is held off the record.)

15     Q.   The question posed was:  "Did your review of

16   documents provided to you by counsel refresh your

17   recollection as to any of your knowledge regarding the

18   labeling history of Neurontin?"

19         You answered "Certainly."

20         My question is:  How much time did you spend

21   looking at those documents?

22     A.   Oh, I see.  I see.  It probably would be

23   included in that estimate of five to ten hours.

24     Q.   Okay.

25     A.   I'm sorry.  I may have misunderstood the

                                                        425


 1   intent of where you were going with your questioning.

 2   But it would be five to ten hours in total on that

 3   particular area of review of documents, that is:  PHN

 4   and changes in the 2005 time frame.

 5     Q.   And what, if any, knowledge based upon that

 6   -- the review of those documents was actually

 7   refreshed?

                          Page 2

# EXHIBIT L

Untitled

1

```
 1              UNITED STATES DISTRICT COURT

 2              DISTRICT OF MASSACHUSETTS

 3    ----------------------- :

 4    In Re:                 :   MDL Docket
                             :   No. 1629
 5    NEURONTIN MARKETING,   :
      SALES PRACTICES AND    :   Master File
 6    PRODUCTS LIABILITY     :   No. 04-10981
      LITIGATION             :   JUDGE PATTI B. SARIS
 7                           :   MAGISTRATE JUDGE
                             :   LEO T. SOROKIN
 8                           :
                             :   CONFIDENTIAL
 9                           :   VIDEOTAPE DEPOSITION OF:
                             :   MANFRED HAUBEN
10                           :   (VOLUME I)
                             :
11    - - - - - - - - - - -

12

13            TRANSCRIPT of the stenographic notes of

14    the proceedings in the above-entitled matter, as

15    taken by and before LINDA M. HOFFMANN, a Certified

16    Court Reporter and Notary Public, held at the office

17    of DAVIS POLK & WARDWELL, ESQUIRES, 450 Lexington

18    Avenue, New York, New York, on Thursday, July 12,

19    2007, commencing at 9:09 in the forenoon.

20

21

22

23

24

25
```

D

Untitled
Hauben - cross                                    9

1        A.      Good morning.

2        Q.      Can you tell by whom you're presently

3    employed?

4        A.      I'm employed by Pfizer Inc.

5        Q.      Are you Medical Director of Risk

6    Management Strategy for Pfizer?

7        A.      I am one of the Medical Directors of

8    Risk Management Strategy at Pfizer.

9        Q.      And is that a department?

10       A.      Yes.

11       Q.      And is there a specific title for the

12   department; in other words, is it Risk Management

13   Strategy?

14       A.      Yes.

15       Q.      And what's the purpose of the Risk

16   Management Strategy Department at Pfizer?

17       A.      It's to detect, understand, identify,

18   and take appropriate mitigating and management

19   activities to -- to manage risks associated with the

20   use of medicines.

21       Q.      All right.  For how long have you been

22   employed at Pfizer?

23       A.      For going on, approximately, 13 years.

24       Q.      If you could take us through your tenure

25   at Pfizer, to the best that you can, so that we know

Untitled

1  gentleman named Wolleben.  And I understand that was

2  part of your department.  Am I correct?

3      A.    Well, you are correct with the -- but I

4  think with the exception -- I just want to make sure

5  that I made it clear -- that within -- there were

6  sort of groups with different names within that

7  department.  So it's -- it's --

8      Q.    Let's -- identify for me, then, the

9  names of the groups that are within this overall

10 department, the name of which we don't recall today.

11     A.    Okay.  I -- I'm not -- I'm not good with

12 the names of departments, but I can tell you

13 functionally what they did.

14           There was one group which basically

15 wrote safety analysis reports in response to various

16 ad hoc queries.

17           There was a group of epidemiologists,

18 and I think at that time there may have been -- and

19 I -- I'm pretty sure there was also a PS -- PSUR

20 group, as well.

21     Q.    And any other groups or functional areas

22 that you can describe that were part of this overall

23 department?

24           MS. MCGRODER:  Object to form.  I mean,

25 to the extent he remembers.

Untitled

Hauben - cross                                          52

1          Q.      Well, you're here to speak on behalf of

2     Pfizer.  Correct?

3          A.      Yes.

4                  MS. McGRODER:  To the extent you

5     understand the process.

6          A.      To -- to the extent I understand the

7     process and on specific issues of post-marketing

8     surveillance and drug safety.

9          Q.      Okay.  And are you prepared to testify

10    as to post-marketing surveillance and drug safety as

11    it -- as it should have been handled by Parke-Davis

12    and Warner-Lambert?

13                 MS. McGRODER:  Object to form.

14         A.      I'm probably not as familiar with it as

15    I -- as I am with the Pfizer -- with what is done at

16    Pfizer.

17         Q.      Understanding that you might not be as

18    familiar with it, are you prepared to discuss what

19    pharmacovigilance practices and drug safety issues

20    should have been addressed by

21    Parke-Davis/Warner-Lambert?

22                 MS. McGRODER:  Object to form.

23         Q.      Regarding Neurontin.

24                 MS. McGRODER:  Object to form,

25    misleading.

Untitled

auben - cross                                              55

1    of Pfizer, I'm the voice of Parke-Davis, and I'm the

2    voice of Warner-Lambert, and I'm going to tell you

3    today, and educate this jury, on what a good company

4    should do in terms of being pharmacovigilant and

5    addressing safety concerns," and certainly you are

6    capable of rendering those types of your -- of

7    rendering those types of opinions regarding what a

8    company should or should not do.  Do you believe

9    that?

10        A.    I believe I can discuss good prin --

11   good practices of pharmacovigilance, yes.

12        Q.    And you believe you could -- you could

13   discuss good practices of pharmacovigilance as they

14   should have been executed by Parke-Davis and

15   Warner-Lambert.  Right?

16            MS. MCGRODER:  Well, I object to the

17   form of that question.  It assumes facts in evidence.

18   Your characterization of what they should have done

19   assumes that they did not do something.  That's

20   misleading and objectionable.

21            MR. FROMSON:  Okay.  I'd appreciate if

22   you would just say, "Objection, misleading," and not

23   provide a speaking objection.  It will make things

24   move a lot faster, and I promise I will the same with

25   you when you're asking questions.

Untitled

Hauben - cross                                      58

```
 1        Q.     And as part of your role at Pfizer in
 2   Risk Management, when, if at all, did you become
 3   aware that Pfizer took on the product line of
 4   Neurontin from Parke-Davis/Warner-Lambert?
 5        A.     Well, I know that -- I -- I believe it
 6   was as part of -- I don't know if it was a merger or
 7   acquisition, I'm actually very bad with the business
 8   activities.  I don't really understand them very
 9   well.
10        Q.     Did you say what year approximately?  I
11   don't know if --
12               MS. MCGRODER:  No, I don't think he
13   didn't complete the answer.
14        Q.     Approximately when did you believe that
15   Neuro -- Neurontin was taken on by Pfizer?
16        A.     What do you mean by "taken on"?
17        Q.     Well, when did Pfizer buy
18   Parke-Davis/Warner-Lambert, and then basically sell
19   Neurontin as a Pfizer drug, and not a Warner-Lambert
20   drug?
21               MS. MCGRODER:  I object to the form of
22   that.  Go ahead.
23        A.     Quite honestly, I don't remember.
24        Q.     Okay.  Do you generally remember
25   Neurontin becoming -- do you generally remember --
```

Untitled

1    presentation at the meeting, it could be a joint
2    presentation, for all I know, where -- where they've
3    worked together.  But -- I don't remember the
4    details, but my expectation would be that a company
5    that had accumulated the experience in it would have
6    valuable input into that.
7         Q.    And with respect to this particular
8    drug, Neurontin, and in preparation for this
9    particular deposition, and to assist you in
10   discussing safety issues regarding Neurontin, what
11   steps, if any, did you take to go back and look for
12   any documents or slides, or any information that was
13   reflected in any knowledge transfer meeting?
14             MS. McGRODER:  I object on grounds of
15   privilege and work product.  I mean the documents he
16   looked at were selected by me, and the information
17   selected to prepare him was by me.
18             MR. FROMSON:  I understand "objection."
19             MS. McGRODER:  I'm going to instruct him
20   not to answer.
21             MR. FROMSON:  All right.  All right.
22        Q.    Without explaining -- without
23   identifying any documents that may have been provided
24   to you by counsel, all right, I don't want to know
25   what was provided to you by your lawyer, if anything.

1    Do you understand that?

Untitled

2      A.      Yes.

3      Q.      All right.  With respect to this

4   particular drug, Neurontin, and in preparation for

5   this particular deposition, did you review any

6   documents to assist you in discussing safety issues

7   regarding Neurontin?

8                MS. MCGRODER:  Well, I -- I object to

9   form.  To the extent you understand that question,

10  you can answer it.

11     A.      To the extent I understand the question,

12  which is, did I independently go back and look for

13  documents?  Is that the question?

14     Q.      In part, absolutely.

15     A.      No.

16     Q.      Okay.  And any particular reason why you

17  did not go back to look for documents independently

18  to assist in refreshing your recollection of safety

19  information regarding Neurontin?

20               MS. MCGRODER:  Objection, relevance.

21     A.      Well, I'm new to the deposition process,

22  and I felt that whatever materials that I need to

23  review, I would be provided.

24     Q.      All right.  And when you say you're new

25  to the deposition process, have you ever been in a

Hauben - cross                                    76


1   deposition before?

2      A.      No.

3      Q.      This is your first time.

4      A.      Yes, yes.

5      Q.      Have you ever testified in litigation

Page 2

Untitled

6    before --

7        A.    No.

8        Q.    -- in court?

9        A.    No.

10       Q.    Okay.  And were there any documents that

11   you did review, without telling me what they were,

12   were there any documents that you did review that

13   actually refreshed your recollection of things you

14   didn't recall before looking at them?

15            MS. MCGRODER:  Object on the basis of

16   privilege and work product, and don't answer the

17   question.

18            MR. FROMSON:  You're instructing him not

19   to answer the question?

20            MS. MCGRODER:  Yes, I am.

21            MR. FROMSON:  All right.  We need to

22   call the judge.  Let's go off the record.

23            THE VIDEOGRAPHER:  Going off the record.

24   The time is 10:39 a.m.

25            (A discussion takes place off the

Hauben - cross                              77


1    record.)

2            THE VIDEOGRAPHER:  We are back on the

3    record.  The time is 10:51 a.m.

4        Q.    We had a break.  Do you even remember

5    the question that was posed, or do you need me to

6    rephrase it?

7        A.    I -- probably, I may not be recollecting

8    it entirely accurately, so prob -- probably better to

9    rephrase -- to restate it.

Page 3

Untitled

10      Q.      Doc, here are the -- here are the line

11  of questions that led to the ultimate question and

12  our break.  It was:

13          "QUESTION:  And any particular reason

14  why you did not go back to look for documents

15  independently to assist in refreshing your

16  recollection of safety information regarding

17  Neurontin?"

18          There was an objection, relevance.

19          Your answer was:  "Well, I'm new to the

20  deposition process and I felt that whatever materials

21  that I needed to review, I would be provided.

22          I then asked you:

23          "QUESTION:  And when you say you're new

24  to the deposition process, have you ever been in a

25  deposition before?"

Hauben - cross                                  78


1          Your answer was no.

2          I said, "This is your first time?"

3          You said yes.

4          "QUESTION:  Have you ever testified in

5  litigation?"

6          You said no.

7          I said:  "In court?"

8          You said no.

9          And I asked you this question:  "And

10  were there any documents that you did review, without

11  telling me what they were, were there any documents

12  that you did review that actually refreshed your

13  recollection of the things you didn't recall before

Page 4

Untitled
14   looking at them?"

15          That's the question posed.

16     A.    And so what was the resolution of the

17   off-line discussion?

18     Q.    That you can answer the question.

19     A.    Okay.  The answer is there were

20   documents that I saw that I recall refreshed my

21   memory somewhat.

22     Q.    And what were the topics included in

23   those documents that you saw, and which you recall

24   refreshed your memory somewhat?

25     A.    I -- I -- I just don't recall which ones

Hauben - cross                                79


1   I saw and I thought refreshed my memory.  I just

2   recall that there were some.

3        Q.    And for the record, I would call for the

4   production of those documents during the pendency of

5   today's deposition mand we can discuss it off-line.

6          MS. McGRODER:  And I would object to

7   that request.

8     Q.    Okay.

9          Did you learn anything new about the

10   Neurontin drug safety profile in preparation for this

11   deposition that you did not know previously to your

12   preparation for this deposition?

13          MS. McGRODER:  Well, I'm going to -- I'm

14   going to object on the basis of privilege to the

15   extent if he learned anything new that he learned

16   from me, that's -- that's privileged.  So to the

17   extent you can answer that question without providing

Page 5

Untitled

18  anything responsive that deals with something that we

19  talked about, then you may answer.

20       A.    Well, I will say this, since -- again,

21  since this was so long ago, it is very difficult for

22  me to say I did or I didn't learn something new.

23  I -- I -- my suspicion is that I had a very good

24  understanding back then, but I just don't -- I

25  obviously can't recall exactly what was in my mind at

Hauben - cross                                         80

1  the time and what ideas and knowledge I had, so it

2  would be an impossible determination for me to really

3  make.

4       Q.    As part of the -- I'm sorry.

5             Did you -- do you recall whether -- did

6  you learn anything new about the drug safety profile

7  of Neurontin as that information existed during the

8  Warner-Lambert/Parke-Davis era?

9             MS. MCGRODER:  Objection.  Sorry.  Were

10  you done?

11      Q.    During the preparation for your

12  deposition, that you did not already know previously

13  to preparing for your deposition?

14            MS. MCGRODER:  Same objection on the

15  basis of privilege, and also it's overly broad.

16      Q.    Go ahead.

17      A.    Can you re -- just say the question

18  again?

19      Q.    Sure.  In preparation for your

20  deposition, did you learn anything new about the drug

21  safety profile for Neurontin, as it existed during

Page 6

Untitled

22    the Warner-Lambert/Parke-Davis era, that you did not

23    already know before you began to prepare for the

24    deposition?

25              MS. MCGRODER:   Same objection.


Hauben - cross                                          81


1         A.    So, in other words, are -- is your

2    question, was there something about the safety

3    profile of Neurontin as defined back in the days of

4    Warner-Lambert that I didn't know, that I knew at

5    this time?

6         Q.    I'll adopt that.  That -- that would be

7    appropriate.

8         A.    Well, was that -- was that an

9    accurate --

10        Q.    That's fair enough.

11        A.    Is that the -- an accurate description

12   of what you were asking?

13        Q.    Primarily it's accurate, yeah.

14        A.    I don't think so.

15              MS. MCGRODER:   And I object to the

16   formulation of the question by my own witness.  But

17   go ahead and answer.

18        A.    I -- I can't think of a specific thing

19   that I learned that -- that I thought was new or --

20        Q.    Okay.  And what, if anything, in

21   preparation for this deposition, did you learn about

22   Warner-Lambert/Parke-Davis' pharmacovigilance

23   practices?

24              MS. MCGRODER:   I'm sorry.  Can you --

25   can you repeat that question?

Page 7

Untitled

1                   (Whereupon, the court reporter reads as

2      requested.)

3                   MS. McGRODER:   Same objection on the

4      basis of privilege.   To the extent that you can

5      answer that without revealing attorney/client

6      communications, you may answer.

7           A.     I -- I honestly find it's just kind of a

8      broad question.   I'm sort of not even sure how to

9      answer it.

10          Q.     Well, we -- you indicated in sum and

11     substance earlier that -- that you were prepared to

12     discuss principles of pharmacovigilance.

13          A.     Yes.

14          Q.     Correct?

15          A.     Yes.

16          Q.     And those principles of

17     pharmacovigilance cross over both the

18     Warner-Lambert/Parke-Davis era through the Pfizer

19     era.   Correct?

20          A.     The pharmacovigilance principles are --

21     are scientific principles, so yes.

22          Q.     The principles are the principles

23     basically.

24          A.     Yes.

25                 MS. McGRODER:   Object to form.

1           Q.     No matter what pharmaceutical company

2      is -- is handling the drug in question.   Right?

Page 8

Untitled

3      A.      That seems sort of a fair statement.

4      Q.      Okay.  So what did you do in preparation

5   for this deposition to learn about

6   Warner-Lambert/Parke Davis pharmacovigilance

7   practices --

8      A.      Well, that's --

9      Q.      -- as it pertained to Neurontin?

10     A.      Well, that's a different --

11             MS. McGRODER:  Objection on the basis of

12   privilege.

13     Q.      That's the question I'm asking now.

14             MS. McGRODER:  Objection on the basis of

15   privilege.

16             To the extent that you can answer the

17   question without revealing attorney/client

18   communications, you may answer.

19     A.      Okay.  I'm -- I'm going to ask you to

20   repeat it because it's now a different question than

21   the last one, so I'm just -- I just -- could you

22   please repeat it?

23     Q.      What did you do in preparation for this

24   deposition to learn about Warner-Lambert/Parke-Davis

25   pharmaco -- pharmacovigilance practices as it

Hauben - cross                                     84


1   pertained to Neurontin?

2             MS. McGRODER:  Objection.  To the extent

3   that you can answer that without revealing

4   attorney/client privilege, then you may answer it.

5      A.      I -- I -- then I don't think I can

6   answer that.

Page 9

Untitled

7      Q.     So every -- why can't you -- why can't

8  you answer it?  Is it because everything you

9  received, you received from counsel, and therefore

10 you believe in your counsel's objection?

11      A.     Yes.

12      Q.     Okay.

13             Did you go and speak to any individuals,

14 other than your lawyers, about

15 Warner-Lambert/Parke-Davis' pharmacovigilance

16 practices regarding Neurontin?

17             MS. McGRODER:  You mean independently?

18             MR. FROMSON:  Yeah.

19      A.     No, I didn't.

20      Q.     Well, did you seek out any documents

21 from the Warner-Lambert/Parke-Davis era that would

22 assist you in understanding the

23 Warner-Lambert/Parke-Davis pharmacovigilance

24 practices?

25             MS. McGRODER:  I object on the basis of

Hauben - cross                                        85


1  asked and answered, and he's already told you that

2  everything he looked at document-wise, he got from

3  me.  So you're invading the attorney/client work

4  product privilege, Ken.

5      Q.     Did anyone ever tell you not to go and

6  seek out independently any documents regarding the

7  Warner-Lambert/Parke-Davis pharmacovigilance

8  practices?

9             MS. McGRODER:  I object on the basis of

10 privilege.  Any -- anyone other than your lawyers.

Untitled

11          A.      Oh.  So the -- can you do the ques --
12     repeat the question, please.
13          Q.      Sure.  I don't understand why -- I don't
14     want to know what your lawyers told you.
15          A.      Okay.
16          Q.      And did anyone tell you not to seek out
17     documents independently regarding
18     Parke-Davis/Warner-Lambert pharmacovigilance
19     practices?
20               MS. MCGRODER:  Objection on privilege
21     grounds.
22               Who would the "anyone" be, I mean other
23     than his lawyers?
24               MR. FROMSON:  I would assume his lawyers
25     wouldn't tell him to do that.

     Hauben - cross                              86

1                MS. MCGRODER:  Of course not.
2          Q.      But, so, did anyone tell you --
3                MS. MCGRODER:  Who else would be
4     preparing him for his deposition, Ken?
5                MR. FROMSON:  Just make your deposition,
6     Lori.
7                MS. MCGRODER:  Well, I object.  It
8     invades the attorney/client and work product
9     privileges.
10         Q.      Did anyone other -- did anyone else tell
11     you not to go and seek out any documents to assist in
12     your preparation for this deposition so you can
13     testify as to Warner-Lambert/Parke-Davis
14     pharmacovigilance practices?
                    Page 11

Untitled

15      A.      Just one more time repeat it?  It -- I

16  just want to make sure I'm --

17      Q.      Has anyone -- I don't want to know what

18  your lawyers said.

19      A.      Oh, okay, okay, all right.

20      Q.      Has anybody told you not to go and seek

21  out independently documents that would reflect

22  Warner-Lambert/Parke-Davis pharmacovigilance

23  practices as it pertained to Neurontin?

24      A.      No.

25      Q.      Okay.

Hauben - cross                                    87

1               Has anyone told you not to go and

2  discuss with another person anything regarding

3  Warner-Lambert/Parke-Davis' pharmacovigilance

4  practices regarding Neurontin?

5               MS. McGRODER:  Objection on the basis of

6  privilege.  To the extent you can answer that without

7  talking about our communications, you may answer.

8      A.      I don't -- I don't think I ever had any

9  conversation about that with anyone.

10      Q.      Okay.  Have you discussed this case with

11  anyone other than counsel?

12      A.      No, not -- not substantively.

13      Q.      Have you discussed

14  Warner-Lambert/Parke-Davis' pharmacovigilance

15  practices, as it pertained to Neurontin, with anyone

16  other than counsel, in preparation for the

17  deposition?

18      A.      Just -- I'm sorry.  One more time?

Untitled

19      Q.      Sure.  In preparation for this
20  deposition, have you discussed this case with anyone
21  other than your counsel as it pertains to
22  Warner-Lambert/Parke-Davis' pharmacovigilance
23  practices?
24      A.      No.
25      Q.      All right.

Hauben - cross                                          88

1              Approximately when did you find out you
2   were going to be speaking at a deposition on behalf
3   of the companies, Parke-Davis, Warner-Lambert and
4   Pfizer, regarding Neurontin?
5       A.      Let me think back.  I think the best I
6   could say would be that it was in the spring, but I
7   just -- I don't remember -- I -- I'm not even sure of
8   the month.
9       Q.      And how much time did you spend
10  preparing for the deposition?
11      A.      I would ballpark it -- and what do you
12  mean by "preparing for the deposition"?
13      Q.      Did you meet with counsel?
14      A.      Yes.
15      Q.      Okay.  And would you consider that you
16  met with counsel to prepare for the deposition?
17      A.      Yes.
18      Q.      And for how much time did you meet with
19  counsel?
20      A.      Okay.  I would -- ballparking it, that
21  we probably met six times, five or six times, and I
22  think, on average, we probably met for five, six
                        Page 13

Untitled

23    hours a day, with a one-hour lunch break.

24        Q.    And did you spend any time preparing for

25    your deposition outside of meetings with counsel?

Hauben - cross                                    89


1        A.    I think I probably reviewed some -- went

2    back and reviewed just some of the articles that I

3    had published.

4        Q.    And what articles do you recall

5    reviewing that you published, as part of your

6    preparation for the deposition?

7        A.    The only one I remember specifically,

8    although it could have been more, was the British

9    Medical Journal.

10        Q.    What was the title of that article?

11        A.    I believe it was "Anecdotes as

12    Evidence."

13        Q.    What other documents, if any, did you

14    review independently as part of your preparation for

15    the deposition, outside of what you've already

16    discussed.

17        A.    There was, on occasion, a spare moment,

18    I know that I did sort of a haphazard literature

19    search, looking at drug-induced depression.

20        Q.    What other documents, if any, outside of

21    literature searches, did you --

22        A.    Oh, I -- I --

23        Q.    -- did you seek out to -- as part of

24    your preparation, and outside of your specific

25    meetings with counsel?

Page 14

Untitled

Hauben - cross                                          90

1        A.      Well, sometimes I'll -- I'll Google it,

2  because sometimes some articles that are not Medline

3  indexed, I -- I could find, but that was it.

4        Q.      Did you print out any of the literature

5  on drug-induced depression that you reviewed as part

6  of your literature search?

7        A.      Yes.

8        Q.      Okay.  And do you have them with you?

9        A.      No.

10       Q.      Do you still -- did you still maintain

11  them?

12       A.      I don't think so.

13       Q.      All right.  And not to be repetitive,

14  but was there anything else that you reviewed?

15       A.      Let me think.

16              MS. MCGRODER:  Independently.

17       Q.      Independently --

18       A.      Independently.

19       Q.      -- meaning not in the presence of your

20  attorney.

21       A.      Right, right.  To the best of my

22  recollection, that would be it.

23       Q.      Okay.  Did you, as part of your

24  preparation for the deposition, all right, did you go

25  back and seek out any of the regulatory submissions

Hauben - cross                                          91

1  from the Warner-Lambert/Parke-Davis era?

2              MS. MCGRODER:  Objection.

Page 15

Untitled
```
 3              Independently.

 4      Q.      Independently.

 5      A.      No.

 6      Q.      Okay.

 7              If you had not met with counsel and

 8  reviewed with counsel whatever you reviewed, do you

 9  believe you would have been able to provide testimony

10  regarding Warner-Lambert/Parke-Davis

11  pharmacovigilance practices?

12              MS. MCGRODER:  Objection on relevance.

13      Q.      Okay.  You have the objection.  You can

14  answer.

15      A.      Well, as I said, it's an -- it's an area

16  that I've been removed from for quite some time, so

17  I -- well, specifically pharmacovigilance as relates

18  to that product and the activities that happened

19  years ago, I have not committed that to memory.

20      Q.      Notwithstanding your -- your answer,

21  because I don't know if it was responsive to my

22  question.

23              My -- my question was, would you have

24  been able -- do you feel that you would be able to

25  testify as to the Warner-Lambert/Parke-Davis
```

Hauben - cross                                    92

```
 1  pharmacovigilance practices on a factual basis?

 2              In other -- in other words, have an

 3  understanding of what Warner-Lambert/Parke-Davis did

 4  with whatever information it had, without having

 5  spoken to counsel and having whatever conversations

 6  you had with counsel, and reviewing whatever you
```

Untitled

7   reviewed with counsel.

8            MS. MCGRODER:  Well, I object to that

9   question.

10           MR. FROMSON:  Okay, you can have -- you

11  can have your objection.

12           MS. MCGRODER:  No.  No, you asked us to

13  produce a 30(b)(6) witness on the company's

14  pharmacovigilance.  That's what we're doing.  Why

15  don't you ask him questions about the company's

16  pharmacovigilance, Ken.  Whether he feels like,

17  without talking to counsel, he could answer those

18  questions, how does he know when he doesn't know what

19  the questions are?

20           MR. FROMSON:  Your objection stands.

21           MS. MCGRODER:  It's -- you're just going

22  too far.  Why don't you just ask him questions --

23           MR. FROMSON:  Let him answer the

24  question.

25           MS. MCGRODER:  -- about 30 -- about

    Hauben - cross                              93


1   the --

2            MR. FROMSON:  I will.

3            MS. MCGRODER:  -- 30(b)(6) notice.

4            MR. FROMSON:  I will, I have.

5       Q.   You can answer the question.

6       A.   Okay.  I want to re -- I want to make --

7   to make sure that I understand your question.  I just

8   want to understand -- rephrase it.

9            If I understand your question you're

10  asking me, essentially, having been removed from --

                    Page 17

Untitled

11   not removed, but not involved with product-specific

12   work for a number of years now, would I have been,

13   through just pure recollection, been able to have

14   commented on the details of what happened with

15   Warner-Lambert, I would have to say the answer is no.

16         Q.      Okay.

17                 Do you know of any individual at Pfizer

18   who you believe has a recollection of the facts and

19   circumstances that existed during the

20   Warner-Lambert/Parke-Davis era regarding Neurontin

21   and regarding the pharmacovigilance practices?

22                 MS. MCGRODER:  Objection, foundation.

23         A.      What do you mean -- and what do you

24   mean, at Pfizer?

25         Q.      Meaning, if not you, since you don't --

Untitled

Hauben - cross                                                   107

1      '    Q.      In line with these examples that you're

2      asking me and given your answer as to the fact that

3      it wouldn't necessarily be important, would you want

4      to know how many individuals from the clinical trials

5      had actually experienced the drug adverse experiences

6      of depression, and would that change your answer?

7           A.      No.

8           Q.      Okay.  And is that because -- and why

9      wouldn't it?  Why wouldn't it change your answer?

10          A.      Well, your question was, was the concern

11     raised in 1992.  So even knowing that the numbers

12     were there, the fact that the concern was addressed

13     and resolved, and that the concern didn't reflect the

14     latest thinking of the FDA, I would say my answer is

15     still no.

16          Q.      All right.  Is it your understanding --

17     well, let me ask you this:  Do you know as you sit

18     here today, without me having read that example to

19     you, that the statement was, in fact, made by the

20     FDA?

21          A.      Yes.

22          Q.      Okay.  And that's because you had

23     reviewed a document in preparation for this

24     deposition.  Right?

25                  MS. McGRODER:  Object on the basis of

Hauben - cross                                                   108

1      privilege and work product.

2           Q.      What was the basis for your knowledge of
                            Page 1

Untitled

3    knowing the statement was made?

4                MS. MCGRODER:  I object on the basis of

5    work product and attorney/client privilege.  He's

6    already told you that everything he -- every document

7    he looked at, is because of the fact I gave it to

8    him.  So if he looked at it, I gave it to him.

9                MR. FROMSON:  Are you directing him not

10   to answer?

11               MS. MCGRODER:  Yes.

12               MR. FROMSON:  Okay.

13       Q.    How do you know the issue was resolved?

14       A.    I don't.

15       Q.    And if you don't know the issue was

16   resolved as of today, then why isn't it important to

17   know whether something should be evaluated?

18       A.    Well --

19               MS. MCGRODER:  Wait, wait.  Which

20   question do you want him to answer?

21               MR. FROMSON:  He answered the question.

22   He said no, he doesn't know, it hasn't been resolved.

23       A.    No, I didn't say the issue was resolved.

24   I said the issue as --

25               MS. MCGRODER:  Wait, don't answer.  I

Untitled

Hauben - cross                                                    140

```
 1       Q.     If you didn't understand my question,
 2  I'll move on.
 3       A.     Okay.
 4       Q.     You understand that a drug can be
 5  associated with having therapeutic effects, like
 6  Neurontin can have therapeutic effects on the
 7  epilepsy patients who are being treated with the drug
 8  for epilepsy.  Right?
 9       A.     Well, I understand that the drugs are
10  being made because they have therapeutic value.
11       Q.     Right.  Do you have an understanding as
12  to the mechanism of action of Neurontin?
13       A.     No, the molecular level science, I'm
14  just so far removed from it, I would have to defer to
15  an expert like Dr. Taylor.
16       Q.     Have you evaluated the post-marketing
17  surveillance results for Neurontin to determine
18  whether there is a signal involving psychiatric
19  adverse events with the use of Neurontin?
20       A.     I was involved in signal detection for
21  Neurontin, including those types of events.
22       Q.     And so in terms of your participation,
23  did you think it was important to understand the
24  drug's mechanism of action?
25       A.     At the time, I think it might have been
```

Hauben - cross                                                    141

```
 1  helpful, but I just don't have an understanding now.
 2       Q.     Do you have any understanding,
```
Page 1

Untitled

3   whatsoever, as to the drug's mechanism of action as

4   you sit here today?

5             MS. MCGRODER:  Well, I object.  That's

6   outside the scope of what he's here to testify about.

7   We objected specifically to that in the 30(b)(6)

8   notice in our responses and objections.  And you

9   haven't established that it connects up to

10  post-market safety, so I'm not going to let him talk

11  about the mechanism of action of drugs.

12            MR. FROMSON:  He just said.

13            MS. MCGRODER:  No, he said, in fact, it

14  didn't.

15            MR. FROMSON:  He indicated he was

16  involved in the signal detection for Neurontin.

17            MS. MCGRODER:  Of course.

18            MR. FROMSON:  And I asked him:  "And so

19  in terms of your participation, did you think it was

20  important to understand the drug's mechanism of

21  action?"

22            His answer was:  "At the time I think it

23  might have been helpful.  I just don't have an

24  understanding now."

25            So he did answer that question, and he

Page 2

Untitled

1    the exhibit, and I know you haven't read the whole

2    thing, are you able to give us an indication as to

3    the faulty methodology that you had referenced

4    earlier?

5         A.    Yeah.   I think probably a better term

6    might have been "faulty interpretation."  And I think

7    that, to me, looking at this, it's -- it's basically

8    misinterpreting the analysis of the data and

9    overinterpreting it.  And this is something that was

10   really looked at on multiple occasions.  And no

11   signal was confirmed for -- for these events.

12              And so I, while I -- so to me for

13   something to rise to the level of above an adverse

14   event, you have to have a certain level of evidence,

15   and we've looked at that repeatedly and it doesn't

16   seem to be there, so I think it's a faulty

17   interpretation, perhaps better than "faulty

18   methodology."

19         Q.    And what was your understanding as to

20   the events or data that was interpreted and which you

21   believe was faulty in terms of the interpretation?

22         A.    Well, we did multiple analysis of

23   suicide-related events.

24         Q.    And when you say "we," you mean Pfizer?

25         A.    Yes.

1         Q.    And when did you do that?

2         A.    There was report that -- various

Page 1

Untitled

3   analyses were looked at in 2001.  I think 2004, 2005,

4   and 2006.

5        Q.      When you referenced 2001, did you do --

6   did Pfizer do that -- let me withdraw the question.

7   Just in case I want to make sure we're on the same

8   page.  The petition was in 2004?

9        A.      Um-hum.

10       Q.      Okay.  Yes?  You have to say "yes."

11       A.      Oh, yes.

12       Q.      Great.

13               And so what, if any, evaluation was done

14   by Pfizer in 2001 regarding the events that

15   ultimately were reflected in the citizen's petition

16   in 2004?

17       A.      Well, a few things were done.  Number

18   one, of course, each case is looked at carefully on

19   intake.  So there's a clinical assessment.

20               And then as part of a -- part of a

21   review for the neuropathic pain application, it was

22   looked at.

23       Q.      What's "it"?

24       A.      Oh, suicide-related events and

25   depression.

Hauben - cross                                    317


1        Q.      What, if anything, prompted that review

2   of suicide-related events and depression in 2001?

3        A.      What was there?  I would describe it

4   best as essentially a theoretical speculation, and I

5   think that would be the best description.

6        Q.      Okay.  Can you expand on it?

Page 2

Untitled
7      A.      Yeah.  Well, in other words, we said,

8   well, theoretically you've got these populations that

9   may experience these events very frequently, and so

10   potentially there could be an association that could

11   arise just as a theoretical speculation.

12      Q.      And what were the populations involved

13   at that time that you were evaluating in 2001?

14      A.      I think -- I think it was a neuropathic

15   pain population.  Well, actually, it may have been

16   both.  I'd have to go back and check what Dr. Reich's

17   analysis was.

18      Q.      Neuropathic pain was one.  You say it

19   may have been both.  What was the other?

20      A.      Well, everything else in the database.

21      Q.      What do you mean?  I'm sorry.  When you

22   say both, I'm thinking there's only two.

23      A.      Yeah.

24      Q.      When you're saying everything in the

25   database, what are you talking about?

Hauben - cross                                      318


1      A.      Well, I don't know all the reports -- I

2   don't know every indication listed in every adverse

3   reaction report.  And so there could have been

4   under -- there could have been other reports in the

5   database for which were not an epilepsy indication or

6   a neuropathic pain indication.

7      Q.      Okay.  And you referenced Dr. Reich?

8      A.      Yes.

9      Q.      And what, if anything, did Dr. Reich do

10   with this information?

Page 3

Untitled
```
11      A.      He -- he distributed his findings, and I
12  saw them.   I don't remember everyone who saw, who it
13  was distributed.
14      Q.      Well, you indicate that there was a
15  theoretical speculation.
16              MS. MCGRODER:  Wait.  Were you finished
17  with your answer?
18      Q.      Were you?  Done.  I didn't mean to
19  interrupt you.
20      A.      No, I was done.
21      Q.      Oh, thank you.  I'm sorry.  I don't want
22  to step on you -- on your words, that is.
23              You indicated there was some theoretical
24  speculation in 2001, and I'm sorry if I asked you,
25  and I don't mean to be duplicative, but what sparked
```

Hauben - cross                                          319

```
 1  the review itself in 2001?  Was there a request made
 2  by somebody?  Was there something that you saw in
 3  some database?  What happened?
 4              MS. MCGRODER:  Objection, asked and
 5  answered.  Go ahead.
 6      A.      If I recall correctly, it was -- well,
 7  it was in response to the neuropathic pain
 8  submission, but the -- but my recollection, Dr. Reich
 9  just came up with a potential analysis plan in a
10  sense to just go beyond even being diligent, just
11  being sort of extra careful.
12      Q.      When you indicate that this review was
13  done in response to a neuropathic pain submission --
14      A.      If I said that, I meant as part of.
```

Page 4

Untitled

15        Q.      Okay.  So as part of the neuropathic

16  pain submission to the FDA --

17        A.      I may be getting my -- I may be

18  getting -- it's late in the day, so I'm getting

19  tired.  I may be getting the words mixed up, but I

20  don't know if it -- it was done as a result of the

21  neuropathic pain submission.  I'm not really sure if

22  it ended up being part of the submission, although I

23  think it might have.

24        Q.      All right.  In 2001 -- let me withdraw

25  the question.

Hauben - cross                                320

1              Is it your understanding that there was

2  a New Drug Application or Supplemental New Drug

3  Application for neuropathic pain submitted to the

4  FDA?

5        A.      Yes.

6        Q.      Okay.  Is it your understanding that

7  there was, in approximately 2002, a submission to the

8  FDA for postherpetic neuralgia?

9              MS. McGRODER:  Objection, foundation.

10       Q.      I'm sorry.  Is it your recollection that

11  in 2001 there was a submission to the FDA for the

12  indication of postherpetic neuralgia?

13             MS. McGRODER:  Objection on foundation

14  grounds.  Go ahead.

15       A.      That, I think that strikes a

16  recollection.

17       Q.      Do you know whether the evaluation that

18  we've been discussing regarding suicide was done for

Page 5

Untitled

19    a neuropathic pain indication or for a postherpetic
20    neuralgia indication?
21        A.    I don't remember now.
22        Q.    Okay.  And why was there an evaluation
23    of suicide-related events included in a submission to
24    the FDA for a neuropathic pain or postherpetic
25    neuralgia indication, whichever it was?

Hauben - cross                                    321

1             MS. McGRODER:  Object to form and
2    foundation, and misstates the statement.
3        A.    I --
4        Q.    Okay.  There's no question because I
5    don't want to misstate your testimony.
6        A.    Okay.
7             MS. McGRODER:  It was the part about
8    submitted that it was submitted to the FDA, because
9    he already said he doesn't know if it was submitted
10   to the FDA.
11       Q.    Oh, okay.
12             So was it essentially a situation where
13   during the time frame of the neuropathic submission
14   there was this evaluation that was done at that time?
15       A.    Yes.
16       Q.    All right.  And now do you know what
17   sparked the evaluation to be done?  In other words, I
18   think I asked you earlier and you gave me a time
19   frame when it was done, but to whose attention was
20   the issue brought so that the evaluation could be
21   done in the first place?
22       A.    Um-hum.

Page 6

Untitled
23            MS. McGRODER:  Object to form.  And if
24   you understand that question, you can answer it.
25         A.     Well, it seems like the question, there

Hauben - cross                                    322


1    may have been two questions in there sort of in one.
2    I'm trying to sort of understand what -- it sounded
3    like you went from what sparked it to who got it.
4         Q.     Let me ask it a really simple way.
5                Somebody woke up one day and said I'm
6    going to do an evaluation on suicide, and I want to
7    know how that came about.
8         A.     Okay.
9         Q.     And you can explain it any way you want.
10               MS. McGRODER:  Okay.  Object to form.
11   Go ahead.
12        A.     Okay.  I'm probably not the best person
13   to answer that, and I think probably the best person
14   to answer that would be the person who came up with
15   the proposed plan.
16        Q.     Okay.  Who would that be?
17        A.     Lester Reich.
18        Q.     Have you seen -- I'm sorry if I asked
19   you this.  Have you seen his report?  Was there a
20   report?  Did he --
21        A.     Yes.
22        Q.     Okay.  Do you have any recollection, as
23   you sit here today, although he may be the person to
24   talk to that was more knowledgeable than you, but
25   you're here today and he's not.

EXHIBIT M

From:        Reich, Lester
Sent:        Thursday, March 15, 2001 2:24 PM
To:          Hauben, Manfred

*W*

gabapentin safety
summary for ...

here is the revised proposal you might want to send it out with all the caveats.

1

Pfizer_MHauben_0000122

**Objective:** With the post marketing use of gabapentin in patients other than with epilepsy it is important to identify whether these new populations may be particularly susceptible to specific adverse drug effects both labeled and unlabeled and to identify conditions under which specific adverse events may be more likely to occur in these new patient population. The development of the safety profile of any drug product is an evolving process. As with any marketed drug in order to provide guidance for the safe and judicious use of gabapentin for the specific clinical application which we are seeking in the United States (neuropathic pain), accumulation and analysis of the broader population's safety experience is critical for the ongoing development of an accurate safety profile. The intent of this review is to summarize the experience of the overall population using the ICH pharmacovigilance safety update report format with additional focused reviews of selected events for potential signals which might be of particular relevance to the neuropathic pain population. It should be noted that a dedicated Product Maintenance and Pharmacovigilance (PMP) committee for gabapentin will be formed to perform an on-going review of serious events on a periodic basis.

Report Format

I Overall Description of Postmarketing Dataset

A. **Section 1**

1.  Total number of cases and events. Sources of report (reporter versus country of origin versus both). Gender distribution. Age breakdown. Serious cases. Outcomes. Breakdown by dose 0-2400, 2400-3600 and > 3600. Indications breakdown.

2.  Table of body systems containing 2% or more (others can be included as "other") of the events with the most commonly reported events in each of those body systems in the text below the table

3.  Table of those events reported in 2% or greater of events per case by COSTART Body System. Unlabeled events will be bold faced. Any unlabeled events will be reviewed in a general sense to see the nature of the events and whether they are consistent with the labeling. Sentence or two about the nature of events in off-label use. Breakdown by off label use. If we cannot get a summary table we can summarize the findings of the previous Periodic Safety Update Reports (PSUR).

4.  Possibly provide a summary of events with a positive rechallenge by frequency.


Tables should combine WAERS and ARIS g reports

B. **Section 2**

This section will contain a table of events by Costart Body System reviewed in the 10 psurs and in all expert reports/pharmacovigilance assessment reports. Broken down by date of report, source of request in case of expert or pharmacovigilance reports. Summary of findings and current labeling status. The table will then be summarized in text below emphasizing the ongoing evaluation of cases in the database.

C. **Section 3**

Pfizer_MHauben_0000123

Analysis of literature cases (brief summary of those cases with labeled events). Case summaries of those cases with unlabeled events. This is included based on the level of documentation and clinical detail usually required by the peer review process

## D. Section 4

Review of fatal cases.

## E. Section 5

Review of events of relevance to the neuropathic pain population. The intent would be to note whether there are possible signals of specific adverse events in the neuropathic pain population that may be diluted by the overall population and to assess the strength of any signal. A signal might be a positive rechallenge in the absence of risk factors and these cases if any would be summarized, otherwise a general overview would suffice with a conclusion based on medical review. The intent of the review of these events is to satisfy ourselves that the neuropathic pain population is not at an increased risk to develop these specific events.

Psychiatric (Nervous System)

Patients with chronic neuropathic pain may represent a population with a significant amount of comorbid depression (150 cases) and suicide (15). Therefore these cases will be looked at to include or exclude any significant signal of drug induced depression/worsening depression.

Cardiac

Heart failure and congestive heart failure (21) because of the high incidence of comorbid cardiovascular disease in the diabetic population.

Because of the high of incidence of peripheral edema in clinical trials of neuropathic pain and because it is one of the more commonly reported spontaneous events, this event may assume increased significance in patients with comorbid cardiovascular disease such as the diabetic population with neuropathic pain. Edema peripheral and peripheral edema will be looked at to see if there is an association with cardiovascular events and their sequelae. The intent of looking at these events is not to confirm or refute causality with gabapentin but to determine if edema and edema associated events may cause cardiovascular compromise in the neuropathic pain patient.

QT related events – Drugs from multiple therapeutic areas have been associated with QT interval prolongation and the neuropathic pain population would be expected to have significant comorbid cardiovascular disease, which might predispose patient to QT prolongation. Events to be looked at include cardiac arrest, ventricular fibrillation, heart arrest, QT interval prolonged, fibrillation ventricular, ventricular tachycardia.

Endocrine; Metabolic and nutrition

Diabetes Mellitus, diabetic coma, hyperglycemia, hypoglycemia, (70 cases) will be looked at. Do these cases generate a signal that gabapentin may effect glycemic control

Nervous

Addiction, drug dependence, withdrawal syndrome, (approximately 220 cases) will be looked at because it is a CNS active drug being used to treat a pain disorder.

Peripheral neuritis, neuropathy, neuralgia and polyneuritis will be looked at because gabapentin is a drug that effects nerves, and these patients have preexisting peripheral neuropathy which might may make them more susceptible to any drug induced peripheral neurotoxicity.

Urogenital events

Albuminuria, kidney failure, kidney function abnormal or nephrosis based on the strong association of diabetes with renal disease.

Special Senses

Retinal events. Association of diabetes with retinopathy

## II. Drug Interaction

Focusing on interactions with oral sulfonlyureas, metformin, insulin, acarbose, thiazolidinediones, (hyperglycemia or hypoglycemia for these) antidepressants, steroids, analgesics, NSAIDS since these are the agents that would be expected to be used by neuropathic pain patients. In addition we would summarize drug interaction sections of 10 psurs.

## III. Overdose

Overdose intentional, accidental, intoxication, Also summarize findings of 10 previous PSURs.

## IV. Use in Pregnancy

Findings of previous PSURs plus case analysis

## V. Children and Elderly

Will do a comparison table between elderly and all and children and all based on the differing age distribution between epilepsy, post-herpetic neuralgia and diabetic population. In order to do that we would need a table listing event frequency ($\geq$ 2% of children and all cases). We will make note of any event reported with a greater proportionate frequency $\geq$ 3:1 ratio in either special population when compared to the over all population. Another alternative would be to list the 10 most frequently reported events in the special populations compared to the overall population and then make a statement as to whether or not they are labeled or unlabeled. Any signals from 10 PSURs will be noted.

# EXHIBIT N

213785-06 I

1    Donald S. Edgar, Esq. (State Bar No. 139324)
     Jeremy R. Fietz, Esq. (State Bar No. 200396)
2    THE LAW OFFICE OF DONALD S. EDGAR
     408 College Avenue
3    Santa Rosa, CA 95401
     Telephone: (707) 545-3200
4    Facsimile: (707) 578-3040

5    Kenneth Fromson, Esq. *(Admitted Pro Hac Vice)*
     Ronald Rosenkranz, Esq. *(Admitted Pro Hac Vice)*
6    Finkelstein & Partners, LLP
     436 Robinson Avenue
7    Newburgh, NY 12550
     Telephone: 800-634-1212
8    Facsimile: 845-562-3492

9    Attorney for Plaintiffs

10

11               SUPERIOR COURT OF THE STATE OF CALIFORNIA

12                       FOR THE COUNTY OF LAKE

13

14   NICOLLETTE CRONE, et al.              CASE NO. CV400432

15                  Plaintiffs

16   V.                                    REQUEST FOR ADMISSIONS, SET ONE

     PFIZER INC., at al.

17                  Defendants.

18

19   PROPOUNDING PARTY: Plaintiff NICOLLETTE CRONE, Individually and as
20                      Guardian ad litem for CASSIE MARIE CRONE, a
                        minor, and BENJAMIN JONATHAN CRONE, all
21                      individually and as Successors in interest to ESTATE
                        OF RICK ARTHUR CRONE

22   RESPONDING PARTY:  Defendants, PFIZER INC., PARKE-DAVIS, a division of
23                      Warner Lambert Company, WARNER LAMBERT COMPANY

     SET NUMBER:        ONE
24

25        You are requested to admit the truth of each of the following matters of fact

26   pursuant to Code of Civil Procedure § 2033. Your sworn, written response to these

27   requests for admissions must be served on the undersigned on or before 30 days after

28   these requests are served, pursuant to Code of Civil Procedure § 2033.

                                    1        REQUEST FOR ADMISSIONS, SET ONE

1      **REQUESTS FOR ADMISSIONS**

2      <u>**REQUEST FOR ADMISSION NO. 1:**</u>

3          Admit that on January 16, 2003, Dr. Catherine Clarey was employed by the Pfizer

4      Defendants as a Sr. Medical Director.

5      <u>**REQUEST FOR ADMISSION NO. 2:**</u>

6          Admit that on or about January 16, 2003, Dr. Catherine Clarey stated to National

7      Public Radio:  "There is absolutely no evidence that Neurontin in – in – with all these

8      prescriptions that it has been associated with suicidal behavior or that it can cause

9      suicidal behavior."

10     <u>**REQUEST FOR ADMISSION NO. 3:**</u>

11         Admit that in April 2005, Bryant Haskins was employed by the Pfizer Defendants.

12     <u>**REQUEST FOR ADMISSION NO. 4:**</u>

13         Admit that in April 2005, Pfizer spokesman Bryant Haskins stated to a

14     representative of the San Francisco Chronicle as follows:

15         a.   "Pfizer maintains an extensive program for tracking and reporting medical

16     events associated with the use of Neurontin, as we do for all our medicines. . . . The

17     comprehensive data – including clinical trial results – that we've submitted to the FDA

18     over the past decade refute any suggestion that Neurontin causes depression, suicidal

19     thoughts or suicidal behavior."

20         b.   The data does not support a demand for a prominent "black box" warning

21     on Neurontin's label.

22         c.   "It's simply irresponsible to promote the false impression that a causal link

23     exists between the use of Neurontin and suicide."

24     <u>**REQUEST FOR ADMISSION NO. 5:**</u>

25         Admit that in April 2005, Paul Fitzhenry was employed by the Pfizer Defendants.

26

27

28

          2      REQUEST FOR ADMISSIONS, SET ONE

1    **REQUEST FOR ADMISSION NO. 6:**

2        Admit that in April 2005, Paul Fitzhenry stated to a representative of U.S.A. Today

3    that Neurontin adverse event reports over the past decade "show no link between

4    Neurontin and suicidal thoughts or behavior."

5

6    Dated:  June 27, 2007

                                          THE LAW OFFICE OF DONALD S. EDGAR
                                          DONALD S. EDGAR

7                                              JEREMY R. FIETZ
                                          Attorneys for Plaintiffs

8                                              FINKELSTEIN & PARTNERS, LLP

9

10                                             KENNETH B. FROMSON

11                                             RONALD ROSENKRANZ
                                          Counsel (admitted pro hac vice) for Plaintiffs

12

13   SIDLEY AUSTIN LLP
    555 West Fifth Street, Suite 4000

14   Los Angeles, CA 90013-1010
    (213) 896-6000

15

16   LAW OFFICES OF STEVEN D.
    HILLYARD, PC.

17   345 California Street, Suite 1770
    San Francisco, CA  94104

18   Telephone:   (415) 334-6880

19

20

21

22

23

24

25

26

27

28

REQUEST FOR ADMISSIONS, SET ONE

### PROOF OF SERVICE

1

STATE OF NEW YORK    )

2                    ) ss.:

COUNTY OF ORANGE    )

3

4    RONALD ROSENKRANZ, being duly sworn, deposes and says:

5    I am employed in the County of Orange, State of New York.  I am over the age of 18 and

6    not a party to the action.  My business address is FINKELSTEIN & PARTNERS, LLP, 436

7    Robinson Avenue, Newburgh, New York 12550.  I am a partner with the law firm of

8    FINKELSTEIN & PARTNERS, LLP, and I have been admitted *pro hac vice* to participate in this

9    matter.  On June 27, 2007, I served the below listed document described as:

10   **REQUESTS FOR ADMISSIONS, SET ONE**

11   by causing true copies thereof enclosed in sealed envelopes to be served by UPS Next Day Air

12   service, from Newburgh, New York, on all interested parties in this action as follows:

13   Thomas P. Hanrahan, Esq.
     Kimberly H. Clancy, Esq.

14   SIDLEY AUSTIN LLP
     555 West Fifth Street, Suite 4000

15   Los Angeles, CA 90013-1010
     Telephone:    (213) 896-6000

16   Facsimile:    (213) 896-6600
     **Attorneys for Defendants Pfizer, Inc.,**

17   **Parke-Davis, a division of**
     **Warner-Lambert Company,**

18   **and Warner-Lambert Company**

19   Steven D. Hillyard, Esq.
     LAW OFFICES OF STEVEN D. HILLYARD, PC

20   345 California Street, Suite 1770
     San Francisco, CA 94104

21   Telephone:    (415) 334-6880
     Facsimile:    (415) 334-6967

22   **Attorneys for Defendant Raymond D. Jennings, M.D.**

23

24                                        RONALD ROSENKRANZ

25   Sworn to before me this
     27th day of June, 2007:

26

27   Notary Public

28   MARY A. DUXBURY
     Notary Public, State of New York
     Qualified in Dutchess County
     Registration #01DU5038796
     Commission Expires February 6, ____