# EXHIBIT C

```
                    UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS
--------------------------------------------------------
In re:    Neurontin Marketing, Sales Practices,
          and Products Liability Litigation
--------------------------------------------------------
                              MDL Docket No. 1629
                              Master File No. 04-10981

Harden Manufacturing Corporation;
Louisiana Health Service Indemnity Company, dba
BlueCross/BlueShield of Louisiana; International
Union of Operating Engineers, Local No. 68 Welfare
Fund; ASEA/AFSCME Local 52 Health Benefits Trust;
Gerald Smith; and Lorraine Kopa, on behalf of
themselves and all others similarly situation, v.
Pfizer, Inc. and Warner-Lambert Company.
--------------------------------------------------------

The Guardian of Life Insurance Company of America
v. Pfizer Inc.,

and

Aetna, Inc. v. Pfizer Inc.
--------------------------------------------------------

             SUPREME COURT OF THE STATE OF NEW YORK
                      COUNTY OF NEW YORK
--------------------------------------------------------

In Re:    Neurontin Product Liability Litigation
--------------------------------------------------------

                         RULE 30(b)(6)

                          DEPOSITION
                             OF
                       SUSAN M. SCHEID


DATE TAKEN:  7/24/07         BY:  Amy L. Larson, RPR
```

*Condensed Copy*

Page 54

```
 1   members?
 2 A. I don't know.
 3 Q. Do you know who would know whether or not --
 4 A. Kevin Lile.
 5 Q. Kevin Lile?
 6 A. Yup.
 7 Q. Kevin Lile would know whether Aetna maintains
 8    call logs with members and providers?
 9 A. Yeah. He runs the customer service
10    department, so...
11 Q. And would Kevin Lile know whether Aetna
12    maintains correspondence with members and
13    providers?
14 A. I would assume so.
15       MR. LAWRENCE: Objection.
16 BY MR. MIZELL:
17 Q. And what business unit was Kevin Lile a
18    member of?
19       MR. LAWRENCE: Objection.
20       THE WITNESS: He's part of
21    pharmacy. Actually, I think that's changing,
22    in the process of changing. So I'm not sure
23    if it's still pharmacy or -- or not.
24 BY MR. MIZELL:
25 Q. Does Aetna provide newsletters to its
```

Page 55

```
 1    members?
 2 A. I believe we did at one time. I'm not sure
 3    if that's still an ongoing practice or not.
 4 Q. Do you know someone would who be familiar
 5    with whether or not that's an ongoing
 6    process?
 7 A. Michael Brodeur would probably know the
 8    communications.
 9 Q. Does Aetna provide newsletters to medical
10    providers?
11 A. Say that again.
12 Q. Newsletters to medical providers?
13 A. Um, that's another good Michael question.
14 Q. Okay. Well, we'll be seeing him in a couple
15    of days.
16       (Whereupon, Deposition Exhibit 2
17       was marked for identification.)
18 BY MR. MIZELL:
19 Q. Ms. Scheid, I'm going to hand you what's been
20    marked as Deposition Exhibit 2. Do you
21    recognize this document?
22 A. I don't. Huh-uh.
23 Q. Does Aetna maintain a website at
24    www.aetna.com?
25 A. Yes, I am familiar with that.
```

Page 56

```
 1 Q. Have you been to the website aetna.com?
 2 A. Yes.
 3 Q. Do pages on that website have this format as
 4    it appears in this exhibit?
 5 A. I don't recognize this one, but...
 6 Q. On the second page it says the chairman and
 7    chief executive officer and president is
 8    Ronald A. Williams. Is that correct?
 9 A. Yes. I'm not sure he has all three titles.
10    (Reviews document.) I guess he does,
11    according to this document.
12 Q. The document states that there's nearly
13    10.5 million pharmacy members. Is that
14    consistent with your understanding?
15 A. Yes.
16 Q. The document also says that it -- Aetna
17    provides benefits through employers in all 50
18    states. Is that true?
19 A. I don't know.
20 Q. Do you know of any states in which Aetna does
21    not provide benefits through employers?
22 A. Not --
23       MR. LAWRENCE: Objection.
24       THE WITNESS: -- specifically.
25
```

Page 57

```
 1 BY MR. MIZELL:
 2 Q. Are you familiar -- familiar with how Aetna
 3    sets rates for insured groups?
 4 A. I am not.
 5 Q. Who is familiar with how Aetna sets rates for
 6    insured groups?
 7 A. I would assume it's either actuary or
 8    financial department.
 9 Q. And those departments are in Connecticut?
10 A. I believe so.
11 Q. Any particular individuals?
12 A. I don't know who leads those departments.
13 Q. Okay.
14       THE WITNESS: Is this a good time
15    for a break?
16       MR. MIZELL: Sure.
17       THE WITNESS: Okay.
18       THE VIDEOGRAPHER: We're going off
19    the record at 10:11.
20       (Whereupon, a brief recess
21       was taken.)
22       THE VIDEOGRAPHER: We'll be going
23    back on the record at 10:21.
24       (Whereupon, Deposition Exhibit 3
25       was marked for identification.)
```

**Page 106**

1  A. I don't know that --
2  Q. -- Michael?
3  A. Yeah. I would just stick with him, yeah.
4  Q. All right. Do you know whether Aetna ever
5     received any information regarding whether
6     Neurontin was effective for any of the
7     members whose claims that it paid?
8        MR. LAWRENCE: Objection.
9        THE WITNESS: No.
10 BY MR. MIZELL:
11 Q. Do you know how Aetna might go about
12    determining whether Neurontin was effective
13    for any particular member?
14       MR. LAWRENCE: Objection;
15    speculative.
16       THE WITNESS: I have no idea.
17 BY MR. MIZELL:
18 Q. Do you know anyone at Aetna who might have
19    information about how Aetna would go about
20    determining whether Neurontin was effective
21    for any particular member?
22 A. No, I don't. Huh-uh.
23 Q. Do you know whether current or former
24    directors of Aetna were interviewed to
25    determine whether they ever discussed

**Page 107**

1     off-label uses of Neurontin?
2        MR. LAWRENCE: Objection.
3        THE WITNESS: Can you read that
4     back?
5        (Whereupon, the last question
6        was read by the court reporter.)
7        THE WITNESS: Oh, I don't know.
8  BY MR. MIZELL:
9  Q. Do you know whether, as part of the process
10    of responding to Defendant's Request for
11    Production, whether the minutes of the board
12    meetings were reviewed?
13 A. When you say, "Board meetings," are you --
14 Q. Board of directors.
15 A. Oh, I have no idea.
16 Q. Okay. Other than counsel, have you ever
17    discussed the off-label use of Neurontin with
18    someone outside Aetna?
19 A. Not that I recall.
20 Q. Do you know whether Aetna can determine how
21    many of its members have taken Neurontin?
22 A. Members, yeah, we can -- we should be able to
23    run a utilization report that identifies
24    utilizing members.
25 Q. And who would run -- who would run that

**Page 108**

1     report?
2  A. Jo Beth Levy.
3  Q. Can Aetna also identify for how long each of
4     these members took Neurontin?
5  A. I think so.
6  Q. Could Jo Beth Levy also produce that
7     information?
8  A. Uh-huh. Yeah. Yup.
9  Q. Do you know whether Aetna has ever evaluated
10    how long its members took Neurontin?
11 A. I don't know. We didn't focus much on that
12    class, so I...
13 Q. And by the "class" you mean?
14 A. On the anticonvulsants or -- uh-huh.
15 Q. Okay. Does Aetna cover individuals
16    throughout the country?
17 A. I believe so.
18 Q. For each member who took Neurontin, would
19    Aetna also have records as to other drugs
20    they took?
21 A. Yes, as long as it was administered through
22    Aetna. Uh-huh.
23 Q. Would they have a -- would they be able to --
24    would Aetna be able to determine when and how
25    often those other drugs were taken?

**Page 109**

1        MR. LAWRENCE: Objection.
2        THE WITNESS: I believe that we
3     could.
4  BY MR. MIZELL:
5  Q. You had mentioned earlier a chief medical
6     officer at Aetna?
7  A. Yes.
8  Q. What was his name again?
9  A. Actually, it's chief pharmacy officer.
10 Q. Oh.
11 A. Mark Rabino.
12 Q. How long has he been in that position?
13 A. I don't know the exact date. I would say
14    about five years or so.
15 Q. And who does he report to?
16 A. Steve Meholic.
17 Q. Are there individuals that report to
18    Mark Rabino?
19 A. Yes.
20 Q. Do you know any other names?
21 A. Yeah, Michael Brodeur.
22 Q. Okay.
23 A. I'm trying to think of each unit here. I
24    believe Don Bishop. We've had a lot of
25    turnover, so -- um, there's a few others.

28 (Pages 106 to 109)

Page 110

1  Um, I just can't think of the names.
2  Q. Are there lists or charts maintained as to
3  who reports to whom within Aetna?
4  A. There should be somewhere, yeah.
5  Q. Do you know who within Aetna might -- might
6  maintain those charts or lists?
7  A. Maybe Mark Rabino's administrative assistant.
8  Q. What are Mark Rabino's responsibilities?
9  A. He has the -- the pharmacy and therapeutics
10  process, since Michael reports through him.
11  He manages the clinical pharmacy directors,
12  represents Aetna externally in terms of
13  anything clinically -- clinical in nature,
14  and then also represents pharmacy inside the
15  corporate Aetna for any global initiatives.
16  And I'm sure there's many more
17  responsibilities.
18  Q. When you say, "Represent pharmacy," is that
19  the same business unit that you worked in?
20  A. Yeah, yeah.
21  Q. Okay. He manages, what is it called, clinic
22  pharmacy directors?
23  A. Clinical pharmacy directors.
24  Q. What are their functions?
25  A. I'm not so sure. I think they represent

Page 111

1  pharmacy in each of the regions to the health
2  plans. That's kind of vague.
3  Q. In your capacity as designee for Aetna, when
4  did Aetna first become aware of the case
5  called Franklin v. Pfizer?
6  A. When did Aetna become aware?
7  Q. Yeah.
8  A. I don't know. I don't know what that is.
9  Q. You haven't heard of the case called
10  Franklin v. Pfizer?
11  A. No.
12      MR. LAWRENCE: Mr. Mizell, maybe
13  if you suggest a subject matter of that case
14  to her. She might not know the name of it.
15      MR. MIZELL: Oh.
16  BY MR. MIZELL:
17  Q. Are you aware of a suit in which the
18  defendants pled guilty to nonfraudulent
19  off-label promotion?
20  A. Oh, yes.
21  Q. Okay. When did you first hear about that?
22  A. Um, I don't recall specific timelines on it.
23  Um, a year or two ago maybe. I -- I don't
24  really know. I --
25  Q. Okay.

Page 112

1  A. It's part of the business, I would say, just
2  in terms of just knowing what's going on
3  within the pharmaceutical industry. I don't
4  have specific...
5  Q. Would information like that be contained in
6  the daily e-mails from Ellen Frasco?
7  A. They could be, uh-huh.
8  Q. Okay. Do you know whether the daily e-mails
9  from -- was it he Ellen Frasco --
10  A. Uh-huh. Uh-huh.
11  Q. Do you know whether they were reviewed in
12  conjunction with Aetna's responses to
13  Defendant's Request for Production?
14  A. Say that again.
15      (Whereupon, the last question
16      was read by the court reporter.)
17      MR. LAWRENCE: Objection.
18      THE WITNESS: I don't understand
19  it. I'm sorry.
20      MR. MIZELL: Okay.
21  BY MR. MIZELL:
22  Q. You're aware that Aetna has produced a volume
23  of -- of material to the defendants --
24  A. Yes.
25  Q. -- pursuant to requests?

Page 113

1  A. Uh-huh.
2  Q. Do you know whether those daily e-mails were
3  searched for anything responsive to
4  defendant's requests?
5  A. Oh, I don't know.
6  Q. Okay. Do you know whether Aetna is party to
7  other lawsuits concerning prescription drugs?
8      MR. LAWRENCE: Objection.
9      THE WITNESS: I'm just trying to
10  think of any. Not that I recall at the time.
11      MR. MIZELL: Would you mark that.
12      (Whereupon, Deposition Exhibit 7
13      was marked for identification.)
14      MR. LAWRENCE: Why don't you take
15  a look at that.
16      THE WITNESS: Huh?
17      MR. LAWRENCE: Take a look at that
18  and make sure you understand what it is or if
19  you have an understanding what it is.
20  BY MR. MIZELL:
21  Q. Ms. Scheid, I've handed you what's been
22  marked, what, Defendants Exhibit 7?
23  A. Uh-huh.
24  Q. Which bears the caption of, "Aetna,
25  Incorporated vs. Pfizer, Incorporated, civil

VERITEXT CORPORATE SERVICES (800) 567-8658

### Page 138

1  these drugs are less expensive and more
2  effective than Neurontin for treating each of
3  the conditions listed?
4      MR. LAWRENCE: Objection.
5      THE WITNESS: I would say that
6  these are most likely lower in cost, because
7  they are generics. So they're probably
8  cheaper. But I can't state that for a fact.
9  But I would assume so. And I can't speak to
10  the efficacy.
11 BY MR. MIZELL:
12 Q. Can you identify anybody else at Aetna who
13  would be able to speak to whether these are
14  both lower cost and more efficacious
15  alternatives to Neurontin?
16      MR. LAWRENCE: Objection.
17      THE WITNESS: The cost portion of
18  it would -- would be something that we -- we
19  could provide. The efficacy part, I guess
20  that would be more peer review literature
21  type information. So maybe that's more of a
22  Michael question.
23      MR. MIZELL: All right.
24
25 BY MR. MIZELL:

### Page 139

1 Q. Do you know whether Aetna maintains a library
2  or collection of peer review literature?
3 A. I don't know.
4      (Whereupon, Deposition Exhibit 13
5      was marked for identification.)
6 BY MR. MIZELL:
7 Q. I've handed you Deposition Exhibit 13, which
8  is Plaintiff Aetna, Incorporated's Responses
9  and Objections to Defendant's First Request
10  for Production of Documents dated June 3,
11  2005. It's a lengthy document with about 124
12  requests. But, thankfully, I'm only going to
13  ask you about 20 of them.
14 A. Twenty?
15 Q. Not 125.
16 A. Oh, look at the time.
17      MR. GOLDSER: That's why we're
18  scheduled for two days.
19 BY MR. MIZELL:
20 Q. If I could direct your attention to page 7.
21  Will you just read with me on Request Number
22  4. It requests that Aetna provide "all
23  documents concerning any communications
24  between plaintiff, any third-party plan
25  administrator or preferred provider,

### Page 140

1  including insurance companies, plaintiff's
2  members or anyone acting on their behalf and
3  any provider or pharmacy relating to
4  Neurontin, including but not limited to
5  payments, prior authorizations, preapprovals or
6  coverage of claims." And in Aetna's response
7  it said that it would provide "exemplar
8  communications." What kinds of
9  communications are responsive to this
10  request?
11      MR. LAWRENCE: Objection with
12  completeness. It -- the entire response is
13  more than Mr. Mizell indicated. Anyway, you
14  can answer the question.
15      THE WITNESS: Can you ask me the
16  question again?
17 BY MR. MIZELL:
18 Q. Essentially, what kinds of communications are
19  responsive to Request Number 4?
20 A. What -- I'm sorry. What did we provide in --
21  in request of Number 4 or what do we have?
22 Q. Yeah, what kinds of communications would --
23  might exist that would be responsive to this
24  request?
25      MR. LAWRENCE: Objection.

### Page 141

1      THE WITNESS: Well, since
2  Neurontin is a class that -- that we did not,
3  you know, manage per se, I don't believe that
4  we had a lot of -- any communications that
5  I'm aware of other than the fact of how it
6  was positioned on the formulary in terms of
7  where it would be as part of the
8  reimbursement on their plan benefit design.
9  I'm not sure, other than formulary position
10  of the product, whether it was formulary or
11  nonformulary, what other type of
12  communication we would have had as it relates
13  to it.
14 BY MR. MIZELL:
15 Q. When you say Aetna did not manage Neurontin,
16  what do you mean by "manage" it?
17 A. Well, manage the class through -- you know,
18  we were focused on the nonsteroidal
19  antiinflammatories or the PPI's, Proton pump
20  inhibitors, or some of these key therapeutic
21  categories that, you know, comprised
22  significant dollar amounts on our total
23  pharmacy budget. This therapeutic class,
24  anything related to central nervous system is
25  typically much more difficult to manage due

36 (Pages 138 to 141)

**Page 142**

to the nature of tangible results. You can't measure, you know, like blood pressure or cholesterol levels, for example. It's just something that's more difficult to manage. And so we wouldn't have a lot of communications other than coverage -- coverage communications that would be communicated.

Q. You say it's more difficult to manage because you can't measure. You're saying you can't measure disorders of or the performance of the central nervous system?

A. Yeah, it's more difficult. There's not a tangible measurement of -- you know, like there's not a goal. Like cholesterol there's a goal to achieve. Blood pressure there's a goal. Neurontin is something that, you know, it could work differently between you and I. And to determine the effectiveness is -- is a more harder -- it's a more difficult task, I guess.

Q. Okay. Do you know whether Aetna has a collection of industry publications?

A. Industry publications regarding?

Q. Formularies, P&T practices --

**Page 143**

A. Oh, I don't know.

Q. -- those kinds of areas?

A. I -- I don't know.

    MR. LAWRENCE: Objection.
    MR. MIZELL: Okay.

BY MR. MIZELL:

Q. Do you know what effort was made to determine whether Aetna had any advertisements, catalogs or industry publications concerning Neurontin?

    MR. LAWRENCE: Objection.
    THE WITNESS: Tell me again or where were you reading from?

BY MR. MIZELL:

Q. It's actually Request Number 5 at the bottom of page 8. And the question is are you familiar with any effort undertaken to identify whether Aetna had such documents in its possession?

A. Oh, I don't know.

Q. Okay.

A. Well, invoices, I mean, I guess if you're including rebate invoices, unless that's not what you meant by invoices. But that's not public, so, sorry.

**Page 144**

Q. Are you familiar with the efforts that were undertaken to identify documents responsive to any of these requests?

A. No. Specific -- I mean, typically if -- if we're asked to supply something we would -- you know, that's related to our unit, we would supply it or go somewhere where we could try to obtain the information.

Q. Do you recall reading any newspaper articles about the off-label use of Neurontin?

A. There might have been just miscellaneous communications that were out in the public. I don't remember anything specifically.

Q. Have you ever undertaken your own personal inquiry on the Internet or magazine articles or other materials about off-label uses of Neurontin?

A. No.

Q. Okay. Do you know of anyone else at Aetna who may have?

A. Oh, I don't know. Um --

Q. No one has ever told you they have?

A. No.

Q. Okay. Is there a particular unit or group of persons that would collect and maintain

**Page 145**

documents concerning the safety and efficacy of prescription drugs?

A. I would say --

    MR. LAWRENCE: Objection.
    THE WITNESS: -- Michael's team in terms of -- you know, through their clinical review documents that they prepare for P&T. But they would be the -- you know, there's several pharmacists that work within the organization. So if they gather things for their own reason, I don't know. But, I mean, most likely Michael's unit as a function or role within Aetna would be to -- to gather that information to present to the -- to the P&T if applicable.

BY MR. MIZELL:

Q. Do you know how far back in time Aetna archives its e-mails?

A. Oh, I don't. Huh-uh.

Q. Do you know anybody within Aetna who would have that information?

A. Um, somebody within IT, I suppose. I don't know who runs IT either.

Q. And you don't know one way or the other whether Aetna's e-mails were reviewed for

37 (Pages 142 to 145)

**Page 146**

1  whether or not they had any responsive
2  materials to these requests?
3  A. If it was -- I suppose if it was asked for.
4  I don't know.
5  Q. You don't know?
6  A. Huh-uh.
7  Q. Do you ever recall seeing any documents or
8  e-mails questioning the volume of Neurontin
9  claims being reimbursed by Aetna?
10 A. No, I don't recall.
11 Q. Would -- would documents related to an
12 analysis of the potential or expected costs
13 of reimbursing members for Neurontin be part
14 of the formulary analysis?
15         MR. LAWRENCE: Objection.
16         THE WITNESS: Tell me again the --
17 the -- what section are you on?
18 BY MR. MIZELL:
19 Q. Well, I'm trying to --
20 A. Oh, sorry. Okay.
21 Q. I was trying to rephrase one to make it --
22 A. Okay.
23 Q. -- a little bit more general.
24 A. Okay.
25 Q. Were documents related to an analysis of

**Page 147**

1  potential or expected costs of reimbursing
2  members, would that be part of determining
3  Neurontin's formulary status?
4          MR. LAWRENCE: Objection.
5          THE WITNESS: Yeah, we would look
6  at utilization of Neurontin.
7          MR. MIZELL: Okay.
8  BY MR. MIZELL:
9  Q. Is there a chart that depicts the positions
10 within your pharmacy group?
11         MR. LAWRENCE: Objection.
12         THE WITNESS: That depicts the
13 positions? You mean like an organizational
14 chart?
15         MR. MIZELL: Exactly.
16         THE WITNESS: Yeah, I think we --
17 if you didn't receive it, I'm sure that there
18 is one available somewhere --
19         MR. MIZELL: Okay.
20         THE WITNESS: -- that -- that
21 would help. I -- I think we were saying
22 maybe it's Mark Rabino's AA or somebody that
23 would have it or maybe Steve Meholic's AA
24 would have a document like that.
25 BY MR. MIZELL:

**Page 148**

1  Q. Would Mark Rabino's --
2          MR. LAWRENCE: I think -- I'd like
3  to interject -- or object. I think, for the
4  record, we have produced these. I'm sort of
5  surprised that you don't have them.
6          MR. MIZELL: Yeah, we don't --
7          MR. LAWRENCE: -- a few years ago.
8  I may be mistaken. I may be able to get you
9  copies of them --
10         MR. MIZELL: Yeah, we could look
11 further into that.
12         MR. LAWRENCE: -- for -- for when
13 we continue.
14         MR. MIZELL: Okay.
15         MR. LAWRENCE: But I'm certain as
16 I can be without having a document in front
17 of me that we produced them. We certainly
18 have no reason not to. So we'll -- we'll
19 look into it.
20         MR. MIZELL: Okay. Great. I'm
21 just doing a little editing as we go along.
22 BY MR. MIZELL:
23 Q. Other than P&T committee meetings, would
24 there be other -- any other meetings within
25 Aetna within which off-label prescribing of

**Page 149**

1  medicines would be discussed?
2  A. There could be ad hoc meetings. There's
3  nothing formal like a set meeting like P&T
4  is. But, certainly, if -- you know, there's
5  ad hoc meetings to discuss issues all the
6  time as it relates to the cost of
7  prescription drugs. So it's certainly fair
8  that would take place, uh-huh.
9  Q. Do you recall ever participating in such an
10 ad hoc meeting that discussed the off-label
11 use of drugs?
12 A. No, not specific to -- to that agenda,
13 huh-uh.
14 Q. If such a meeting were to take place, who
15 within Aetna would likely participate?
16 A. Someone in -- in the contracting department.
17 Probably the three areas again. The clinical
18 programs as well as -- as the clinical -- the
19 clinical team. Pharmacoeconomic team, once
20 it's -- once it's up and going again, that
21 would be a responsibility of it as well.
22 Q. Would representatives of any other groups or
23 teams participate?
24 A. They could. If it's Medicare maybe there's
25 going to be somebody from the regulatory