UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re:  NEURONTIN MARKETING, SALES PRACTICES,
        AND PRODUCTS LIABILITY LITIGATION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

THIS DOCUMENT RELATES TO:

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

HARDEN MANUFACTURING CORPORATION;
LOUISIANA HEALTH SERVICE INDEMNITY COMPANY,
dba BLUECROSS/BLUESHIELD OF LOUISIANA;
INTERNATIONAL UNION OF OPERATING ENGINEERS,
LOCAL NO. 68 WELFARE FUND; ASEA/AFSCME LOCAL
52 HEALTH BENEFITS TRUST; GERALD SMITH; and
LORRAINE KOPA, on behalf of themselves and all others
similarly situated, v. PFIZER INC. and WARNER-LAMBERT
COMPANY.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

THE GUARDIAN LIFE INSURANCE COMPANY OF
AMERICA v. PFIZER INC. and

AETNA, INC. v. PFIZER INC.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MDL Docket No. 1629

Master File No. 04-10981

Judge Patti B. Saris

Magistrate Judge Leo T.
Sorokin

## DECLARATION OF MATTHEW B. ROWLAND

MATTHEW B. ROWLAND declares upon penalty of perjury in accordance with 28

U.S.C. § 1746 as follows:

1.      I am an attorney associated with the law firm Davis Polk & Wardwell, counsel for

Defendants Pfizer Inc. and Warner-Lambert Company in this action.

2.     I submit this declaration in support of Defendants' Opposition to Plaintiffs'
Motion To Compel Discovery Relating to Communications Between Defendants and Third-Party
Payor Plaintiffs, filed on September 11, 2007.

3.     Attached as Exhibit A is a true and correct copy of excerpts from the deposition
of Leslie Tive, taken July 11& 12, 2007.

4.     Attached as Exhibit B is a true and correct copy of excerpts from the deposition of
Christine Grogan, taken June 25 & 26, 2007.

5.     Attached as Exhibit C is a true and correct copy of excerpts from the deposition of
Margaret Yoder, taken June 20 & 21, 2007.

6.     Attached as Exhibit D is a true and correct copy of excerpts of Plaintiff Aetna,
Inc.'s Responses and Objections to Defendants' First Request for Production of Documents,
dated June 3, 2005.

7.     Attached as Exhibit E is a true and correct copy of excerpts of Plaintiff Louisiana
Health Service Indemnity Company d/b/a BlueCross/BlueShield of Louisiana's Objections and
Response to Defendants' First Request for Production of Documents, dated June 3, 2005.

8.     Attached as Exhibit F is a true and correct copy of excerpts of Plaintiff Aetna,
Inc.'s Responses and Objections to Defendants' First Set of Interrogatories, dated June 3, 2005.

9.     Attached as Exhibit G is a true and correct copy of excerpts of Plaintiff Kaiser
Foundation Health Plan, Inc. and Kaiser Foundation Hospitals Responses and Objections to
Defendants' First Set of Interrogatories, dated June 3, 2005.

2

10.     Attached as Exhibit H is a true and correct copy of excerpts of Plaintiff Louisiana Health Service Indemnity Company d/b/a BlueCross/BlueShield of Louisiana's Objections and Response to Defendants' First Set of Interrogatories, dated June 3, 2005.

11.     Attached as Exhibit I is a true and correct copy of excerpts of Plaintiff The Guardian Life Insurance Company, Inc.'s Supplemental Responses and Objections to Defendants' First Set of Interrogatories, dated August 17, 2005.

12.     Attached as Exhibit J is a true and correct copy of excerpts of Plaintiff Guardian Life Insurance Company's Supplemental Responses to Defendant Pfizer's First Set of Interrogatories, dated April 13, 2007.

13.     Attached as Exhibit K is a true and correct copy of a letter from Elana Katcher to Deborah MacGregor, dated August 9, 2007.

14.     Attached as Exhibit L is a true and correct copy of excerpts of the deposition of the Rule 30(b)(6) designee of ASEA, Fred Grant Brown, taken October 19 & 20, 2005.

15.     Attached as Exhibit M is a true and correct copy of excerpts of the deposition of the Rule 30(b)(6) designee of Harden, Walter Eugene Matthews, taken December 15, 2005.

16.     Attached as Exhibit N is a true and correct copy of excerpts of the deposition of the Rule 30(b)(6) designee of Louisiana Health, Milam W. Ford, taken January 19 & 20, 2006.

17.     Attached as Exhibit O is a true and correct copy of excerpts of the deposition of the Rule 30(b)(6) designee of Guardian Life Insurance Company, Ariel Fernando, taken July 18 & 19, 2007.

18.    Attached as Exhibit P is a true and correct copy of excerpts of the deposition of the Rule 30(b)(6) designee of Kaiser Foundation Health Plan, Inc. and Kaiser Foundation Hospitals, Albert L. Carver, taken July 12 & 13, 2007.

19.    Attached as Exhibit Q is a true and correct copy of excerpts of the deposition of the Rule 30(b)(6) designee of Aetna, Inc., Michael Brodeur, taken July 26 & 27, 2007.

20.    Attached as Exhibit R is a true and correct copy of excerpts of Defendants' Responses and Objections to Class and Non-Class Plaintiffs' First Request for Production of Documents, dated April 11, 2005.

Dated:  New York, New York
        September 11, 2007

                                    /s/ Matthew B. Rowland
                                    Matthew B. Rowland

## CERTIFICATE OF SERVICE

    I hereby certify that this document filed through the ECF system has been served
pursuant to Case Management Order #3 on September 11, 2007.

                                    /s/ David B. Chaffin

# EXHIBIT A

CONFIDENTIAL

1
2    Q    You just don't remember whether the
3    message was in it or not, was that your testimony?
4    A    Yes.
5    Q    And you don't remember whether the
6    message that we reviewed a moment ago on Bates 072
7    was contained in the manuscript, correct?
8    A    Right.  Typically, blanket statements
9    like that are not contained in a manuscript, so --
10   MR. GREENE:  Move to strike,
11   nonresponsive.
12   (Tive Exhibit Number 66 marked for
13   identification as of this date.)
14   Q    Let me show you what we have marked
15   as Exhibit 66.
16   MR. GOODELL:  For Exhibit 66, we
17   would incorporate as if fully stated herein
18   our comments and objections to Exhibit 46.
19   Q    Dr. Tive --
20   MR. GOODELL:  As we previously
21   stated, Dr. Tive, we talked a little bit
22   yesterday about advisory boards, didn't we?
23   A    Yes.
24   Q    You defined what they were for us.
25   Do you recall that?

7/12/2007  Tive, Leslie (MDL)

---

CONFIDENTIAL

1
2    correct?
3    A    Yes.
4    Q    You knew that, when I say -- well,
5    you personally knew that FDA wasn't going to
6    approve neuropathic pain as of that date, or prior
7    to that day, didn't you?
8    A    I think we were still talking about
9    it, but, yes, we were pretty sure.
10   Q    Didn't we spend a significant amount
11   of time --
12   MR. GOODELL:  Would you let her
13   finish her answer?
14   Q    Did you finish the answer?
15   A    I don't remember the date
16   specifically.
17   Q    Do you want to get the exhibits
18   out to refresh your memory?  Do you recall
19   attending a May 14, 2001 meeting with the FDA in
20   which the FDA said that Pfizer was not going to
21   get the approval for the broad neuropathic pain
22   indication for Neurontin?
23   A    They said that they -- they probably
24   wouldn't happen, yes, yes.
25   Q    Do you want to look at Exhibit 54 to

7/12/2007  Tive, Leslie (MDL)

---

CONFIDENTIAL

1
2    A    I did.
3    Q    You said you attended one in New
4    York.
5    Do you recall that?
6    A    Yes.
7    Q    It was for psychiatrists?
8    A    Yes.
9    Q    What we have marked as Exhibit 66 is
10   a document from your custodial file, isn't it?
11   A    Yes.
12   Q    And that's your handwriting, and you
13   put it in your file, employer advisory board?
14   A    Yes.
15   Q    So, when you wrote employer advisory
16   board, what does that refer to?
17   A    This was a meeting that we had with
18   payors to see -- to tell them that we were
19   applying to the FDA with a neuropathic pain -- for
20   a neuropathic pain indication at the time and to
21   see how they would respond to that.
22   This was with employers, people
23   who -- benefit managers.
24   Q    The date of this presentation or this
25   advisory board is November 8th, 7 to 8, 2001;

---

CONFIDENTIAL

1
2    refresh your --
3    A    No.
4    Q    Do you remember the Crown Plaza Ann
5    Arbor meeting, Pfizer consultant meeting?  We
6    marked the minutes from that meeting as Exhibit 54
7    yesterday.
8    Do you recall that?
9    A    Yes.
10   Q    Okay.
11   And you recall the experts that
12   Pfizer retained them, informing Pfizer that they
13   would not, based on the data, they would not get
14   approval for neuropathic pain?
15   A    Yes.
16   Q    And do you recall Dr. Max commented
17   you are done.
18   Do you remember that?
19   A    Yes.
20   Q    And that was because of the negative
21   DPN study and the negative Nordic study; correct?
22   A    Yes.
23   Q    And we reviewed that yesterday in the
24   minutes we marked as Exhibit 54.
25   Do you recall that?

```
 1                    CONFIDENTIAL
 2        A     Yes.
 3        Q     Okay.  And then you participated in
 4   an advisory board, an employer advisory board that
 5   was held November 7 to 8, 2001; correct?
 6        A     Yes.
 7        Q     And you made, Pfizer made a
 8   presentation on neuropathic pain, correct?
 9        A     Yes.
10        Q     Did you participate in this?
11        A     Yes, I did.
12        Q     And you made a presentation, didn't
13   you, entitled, "Treatment options for neuropathic
14   pain"?
15        A     Yes.
16        Q     And you made this in front of a
17   number of different companies, correct?
18        A     Yes.
19        Q     American Express, American Federation
20   of Teachers, General Building Contractors
21   Association?
22        A     Yes.
23        Q     Lucent Technologies, MAC Trucks Inc.,
24   NESA, the Michigan Teachers Union, Southern
25   Company, the Coca Cola Company, Pitney Bowes,
```

7/12/2007 Tive, Leslie (MDL)

```
 1                    CONFIDENTIAL
 2        Q     GE, were they there?
 3        A     I don't remember.
 4        Q     Keystone Energy?
 5        A     I don't remember.
 6        Q     M&M Mars?
 7        A     I don't remember.
 8        Q     How much were these employers paid to
 9   attend this advisory board, do you know?
10        A     I don't know.
11        Q     Mobil Corporation, were they there?
12        A     I don't remember.
13        Q     These were companies that were
14   invited to hear your presentation, right?
15        A     Yes.
16        Q     Nabisco Foods Group, Inc.?
17        A     Yes.
18        Q     Ryder System?
19        A     Yes.
20        Q     TRW?
21        A     Yep.
22        Q     Union Carbide Corporation?
23        A     Yep.
24        Q     And Viacom?
25        A     Yep.
```

7/12/2007 Tive, Leslie (MDL)

```
 1                    CONFIDENTIAL
 2   Public Service Enterprise Group, American Greeting
 3   and Honeywell; is that right?
 4        A     Yep.
 5        Q     Merrill Lynch and the State of New
 6   York, the health benefit manager, Priscilla
 7   Keinberg?
 8        A     Yep.
 9        Q     Were there other companies that were
10   invited to that advisory board?
11        A     I believe so.
12        Q     And they are listed in that exhibit,
13   on the third page of the exhibit, Bates last three
14   digits 498; correct?
15        A     Yes.
16        Q     They are 3M, ABC, Inc., AOL/Time
17   Warner, CHD Meridian Health care.
18              Did any of those companies attend
19   that advisory board meeting?
20        A     I don't remember.
21        Q     How about Citigroup, were they there?
22        A     I don't remember.
23        Q     Consolidated Edison Company of New
24   York, were they there?
25        A     I don't remember.
```

```
 1                    CONFIDENTIAL
 2        Q     You intended to make a presentation
 3   in front of all of those companies, didn't you?
 4        A     I intended to?
 5        Q     Yes.
 6        A     Yes.
 7        Q     And you did?
 8        A     Yes.
 9              (Tive Exhibit Number 67 marked for
10   identification as of this date.)
11        Q     I show you what we marked as Exhibit
12   67.
13              MR. GOODELL:  Do you have another
14   copy for me?
15              MR. GREENE:  I'm sorry.
16              MR. GOODELL:  67.  We would
17   incorporate our comments and objections to
18   Exhibit 67 as if fully stated herein, those
19   same comments and objections that we have
20   made to Exhibit 46.
21        Q     Now, do you have what we marked as
22   Exhibit 67?
23        A     Yes.
24        Q     Identify what it is.
25        A     This is neuropathic pain issues in
```

```
1                  CONFIDENTIAL
2    the workplace meeting report.
3         Q      This was prepared by Managed Care
4    Communications?
5         A      Yes, I guess so, it says that.
6         Q      That is a company Pfizer hired?
7         A      Yes.
8         Q      And they reported, they prepared a
9    meeting report of the meeting that was held on
10   neuropathic pain issues in the workplace, the
11   Pfizer advisory board?
12        A      Yes.
13        Q      November 7, 8, 2001, in New York
14   City, correct?
15        A      Right.
16               Can I finish my answer, please?
17               Also November 13th and 14th in
18   Scottsdale.
19        Q      You are getting a little ahead of me.
20               A similar advisory board was held
21   November 13th and 14th in Scottsdale, Arizona,
22   correct?
23        A      Yes.
24        Q      And there were a number of employers
25   invited to that presentation; correct?
```

7/12/2007  Tive, Leslie (MDL)

```
1                  CONFIDENTIAL
2    study.
3         Q      Did you talk about Dr. Gorson's
4    study?
5         A      Again, no.
6         Q      Is it your testimony that any time
7    you made a presentation before an advisory board
8    and presented information on Neurontin's use in
9    treating neuropathic pain, that you have always
10   disclosed the negative study conducted by Dr.
11   Reckless?
12        A      I think it is, yes.
13        Q      And if you didn't, would you agree
14   that that would be misleading, not to do that?
15               MR. GOODELL:  Object to form and
16          foundation.
17        A      I wouldn't leave it out.
18        Q      Because it would be misleading to
19   leave it out, right?
20               MR. GOODELL:  Objection, form and
21          foundation.
22        A      I guess I am being forced to use a
23   word that I wouldn't use.
24               MR. GOODELL:  You don't have to be
25          forced.
```

7/12/2007  Tive, Leslie (MDL)

```
1                  CONFIDENTIAL
2         A      Yes.
3         Q      And you made a presentation on the
4    treatment options for neuropathic pain; correct?
5         A      At the New York advisory board.  I
6    don't remember if I did at the Scottsdale one or
7    not.
8         Q      You don't remember?
9         A      No.
10        Q      And when you made your presentation
11   in New York, you stated that there were, and let
12   me direct your attention to Bates 495, last three
13   digits 495, for our record, Exhibit 67.
14               And at the New York meeting, you
15   began your presentation with an overview of
16   treatment options for neuropathic pain, correct?
17        A      Yes.
18        Q      And you presented data on the
19   effectiveness of gabapentin in diabetic neuropathy
20   and post-herpetic neuralgia; correct?
21        A      Yes.
22        Q      Did you disclose the two negative
23   studies for diabetic neuropathy?
24        A      I know that I -- well, I know.  I'm
25   fairly certain they talked about the Reckless
```

```
1                  CONFIDENTIAL
2         Q      Let's use the word integrity, which
3    is one of Pfizer values, correct?
4         A      Correct.
5         Q      And we defined that yesterday, or
6    Pfizer defines it as being honest, right?
7         A      Yes.
8         Q      So if you made a presentation about
9    Neurontin and treating diabetic peripheral
10   neuropathy and you left out Dr. Reckless negative
11   study, would that be honest?
12               MR. GOODELL:  Excuse me, if she made
13          a presentation to an advisory board, or any
14          presentation anywhere in the world?
15               MR. GREENE:  To an advisory board.
16               MR. GOODELL:  Objection.
17        A      I think I would do my best to show
18   all the data that were available to me.
19        Q      Would it be, would it be dishonest to
20   leave out Dr. Reckless study if you were making
21   that type of presentation before an advisory
22   board?
23               MR. GOODELL:  Objection, form and
24          foundation.
25        Q      Answer my question.
```

```
1              CONFIDENTIAL
2       A     I'm again being forced to use a word
3  that I wouldn't necessarily use.  I believe in
4  full disclosure of the data, that is all I'm going
5  to say.
6       Q     If you made a presentation before an
7  advisory board on treatment options for
8  neuropathic pain and you presented evidence on
9  gabapentin's effectiveness in treating diabetic
10 neuropathy but did not disclose the results of Dr.
11 Reckless study, would that be truthful and
12 non-misleading?
13           MR. GOODELL:  Object to form,
14       foundation.  You have answered the question.
15       If that's the best you can do, that's the
16       best you can do.
17      A     It would be, it would depend on the
18 context, but I would try to include it, that's all
19 I can say.
20      Q     Why don't you tell us, did you
21 disclose Dr. POPP's -- excuse me, did you disclose
22 the POPP study?
23           Is something humorous about this?
24      A     No.
25      Q     Did you disclose the negative POPP
```

831

7/12/2007  Tive, Leslie (MDL)

```
1              CONFIDENTIAL
2  study when you made your presentation before the
3  advisory board in New York on November 7 and 8,
4  2001?
5       A     No.
6       Q     Pardon me?
7       A     No.
8           MR. GOODELL:  So the record is clear,
9       in response to your comment about is there
10      something humorous, counsel, you have been
11      smirking at the witness repeatedly during
12      the deposition.
13          MR. GREENE:  I object to that, that
14      is an outrage for you to say that, sir.
15          MR. GOODELL:  It's also a fact.
16          MR. GREENE:  It is not a fact.
17          MR. GOODELL:  You can yell all you
18      want, counsel.
19          MR. GREENE:  Why --
20          MR. GOODELL:  You are implying.
21          MR. GREENE:  You get down in the
22      gutter with a comment like that and there is
23      no call for it.
24          MR. GOODELL:  Well, facts are the
25      facts and that's what you have done.
```

832

```
1              CONFIDENTIAL
2           MR. GREENE:  That is an outrageous
3       misrepresentation, and you know it.
4           MR. GOODELL:  I do not know it and
5       you are not being truthful if you are saying
6       that.
7           Go ahead.
8           MR. GREENE:  What are you saying,
9       sir?  Are you saying that I am lying?
10          MR. GOODELL:  I'm saying --
11          MR. GREENE:  Are you calling me a
12      liar?
13          MR. GOODELL:  I am saying that you
14      have smirked --
15          MR. GREENE:  Are you calling me a
16      liar, that's what I want to know?
17          MR. GOODELL:  I'm saying you have
18      smirked at this witness repeatedly during
19      the deposition, so for you to challenge her
20      when she smiles back at you --
21          MR. GREENE:  That's an outrage, and
22      she was not smiling at me, she was laughing.
23      She may take this lightly, my clients don't.
24          MR. GOODELL:  Nobody takes this
25      lightly, Counsel.
```

833

7/12/2007  Tive, Leslie (MDL)

```
1              CONFIDENTIAL
2           Next question.
3       Q     Will you turn to page 33 of that
4  exhibit, Bates last three digits 506.  This
5  meeting report contains post-meeting surveys that
6  were summarized; is that right, Doctor?
7       A     I missed what page you told me to
8  turn to, so could you do that again.
9       Q     The last three digits, 506.
10      A     Okay.
11      Q     Exhibit 67, for the record.
12      A     All right.
13      Q     The question is:  There were
14 post-meeting surveys that were summarized by
15 Managed Care Communications that are contained in
16 this exhibit; correct?
17      A     Yes.
18      Q     And you are now on a page where one
19 of those summaries appears; correct?
20      A     Yes.
21      Q     Have you had an opportunity to look
22 at that?
23      A     Yes.
24      Q     And in part, that page summarizes an
25 attendee's impression, which is contained in the
```

834

```
1                    CONFIDENTIAL
2    third paragraph.
3              Do you see that?
4         A    Yes.
5         Q    In the last sentence of that
6    paragraph, he states, "Another attendee said that
7    he now realizes that Neurontin is safer and has
8    less side effects and is more effective than he
9    originally thought."
10             Correct?
11        A    Yes.
12        Q    Was it your intent to convey to the
13   attendees of this advisory board that Neurontin is
14   safe, has less side effects and is effective for
15   neuropathic pain?
16        A    It was my intent to show them the
17   data and let them come to their own conclusions.
18        Q    You gave a talk on treatments for
19   neuropathic pain, correct?
20        A    Yes.
21        Q    Were there managed care organizations
22   that attended this advisory board meeting?
23        A    Yes.
24        Q    And managed care organizations are
25   also referred to as MCOs?
```

835

7/12/2007  Tive, Leslie (MDL)

```
1                    CONFIDENTIAL
2         A    Yes.
3         Q    And just for our record, what is a
4    managed care organization?
5         A    They are -- I don't know if I have
6    the official definition, but the way I define them
7    are they are providers of medical care.
8         Q    Do managed care organizations pay for
9    prescription drugs?
10        A    Yes.
11        Q    And are managed care organizations a
12   customer of Pfizer?
13        A    Yes.
14        Q    And does Pfizer, did Pfizer market
15   Neurontin to managed care organizations?
16        A    I don't -- I don't know.  I mean,
17   some managed care organizations don't allow
18   detailing.  So, but in general, yes, to some, yes.
19        Q    Well, Pfizer wants managed care
20   organizations to order or purchase their products,
21   don't they?
22             MR. GOODELL:  Object to form and
23        foundation.
24        A    Yes, they do.  But I'm not involved
25   in the interface with managed care, so I'm limited
```

836

```
1                    CONFIDENTIAL
2    in what I can speak to there.
3         Q    Based on your experience, you know
4    they are a customer of Pfizer's?
5         A    Yes.
6         Q    And you know managed care
7    organizations pay for Neurontin, don't you?
8         A    Yes.
9         Q    Exhibit 68.
10             (Tive Exhibit Number 68 marked for
11        identification as of this date.)
12             MR. GOODELL:  We would incorporate
13        our same objection and comments to Exhibit
14        68 as we made to Exhibit 46 and incorporate
15        them herein as if fully stated.
16        Q    Do you have Exhibit 68 in front of
17   you?
18        A    Yes.
19        Q    Do you have Exhibit 68 in front of
20   you?
21        A    68.
22        Q    Just identify what it is, Dr. Tive.
23        A    I am not really sure what it is.
24   It's a presentation, medical overview and
25   discussion by me, but I'm not sure of when it was
```

837

7/12/2007  Tive, Leslie (MDL)

```
1                    CONFIDENTIAL
2    presented.
3         Q    Turn to the last -- next to the last
4    page.
5         A    Okay.
6         Q    For the record, I will say that
7    these, this document, Exhibit 68, as marked, the
8    first Bates is Pfizer_Leslie Tive_ 0074464.  And
9    the next to the last page of the exhibit is
10   0074477.
11             These documents we produced to us in
12   this order and that's why the exhibit is marked in
13   this fashion.
14             But in looking at the next to the
15   last page, would you agree with me that this is
16   the program agenda for a neuropathic pain advisory
17   board that Pfizer held on January 11 and 12, 2002,
18   at the Four Seasons Resort in Palm Beach, Florida.
19        A    Yes.
20        Q    And you made a presentation there on
21   Saturday, January 12, 2002, Medical Overview and
22   Discussion?
23        A    Yes.
24        Q    And was this meeting held?
25        A    I believe so it was, yes.
```

838

**Page 839**

```
 1                    CONFIDENTIAL
 2         Q      Do you recall making a presentation
 3    there?
 4         A      I do.
 5         Q      And is that -- what was the title of
 6    your presentation?
 7         A      Medical Overview and Discussion.
 8         Q      Okay.  And now, if you turn back to
 9    the first page of 68, do you have that?
10         A      Yes.
11         Q      Are those the slides that you used at
12    this advisory board when you made your
13    presentation?
14         A      I don't remember, but they have the
15    same title, so they may have been, but I can't
16    testify that they were.
17         Q      Who prepared the slides?
18         A      I -- I don't remember who prepared
19    the slides?
20         Q      Did you -- have you had a chance to
21    look at the slides?
22         A      Yes.
23         Q      Were you involved in the preparation
24    of the slides?
25         A      Was I involved in the preparation?
```

7/12/2007  Tive, Leslie (MDL)

**Page 841**

```
 1                    CONFIDENTIAL
 2         Q      And you have listed four trials;
 3    correct?
 4         A      Yes.
 5         Q      Dr. Gorson is not listed; correct?
 6         A      Right.
 7         Q      His negative study, Neurontin for the
 8    treatment of the diabetic peripheral neuropathy,
 9    is not included here; correct?
10         A      His single site study, no, no, it's
11    not.
12         Q      And that was published, correct?
13         A      I don't know.
14         Q      It's your testimony today you don't
15    know?
16                MR. GOODELL:  That's what she just
17         said.
18         Q      You collected all the published data
19    for Neurontin as part of your job for Pfizer;
20    correct?
21         A      I don't know when that study was
22    published, so I don't know if it had been
23    published at this time or not.
24         Q      When you prepared these slides, did
25    you do a literature search to see what data was
```

7/12/2007  Tive, Leslie (MDL)

**Page 840**

```
 1                    CONFIDENTIAL
 2    Yes.
 3         Q      Did you approve these slides?
 4         A      Yes.
 5         Q      Have you used, had you used these
 6    slides prior to this presentation on January 12,
 7    2002?
 8         A      I don't believe so.
 9         Q      You think this is the first time you
10    used them?
11         A      Maybe.
12         Q      Did you use these slides after the
13    January 12th presentation?
14         A      I don't remember.
15         Q      Turn to Bates 467.
16         A      Okay.
17         Q      You had a slide there entitled
18    "clinical data from neuropathic pain trials"?
19         A      Yes.
20         Q      And this is a slide you used in the
21    presentation on January 12, 2002?
22         A      Yes.
23         Q      And you listed there the clinical
24    data for neuropathic pain trials; correct?
25         A      The published data, yes.
```

**Page 842**

```
 1                    CONFIDENTIAL
 2    published before you prepared this slide?
 3         A      These?  No, I did not.
 4         Q      You certainly wanted to make a
 5    complete and accurate presentation at this
 6    advisory board, didn't you?
 7         A      Yes.
 8         Q      You wanted to make a complete and
 9    accurate presentation concerning the clinical data
10    from the neuropathic pain trials, didn't you?
11         A      Yes.
12         Q      But you didn't conduct a literature
13    search to make sure you had all the data?
14         A      I didn't include all the studies, no.
15         Q      What other studies did you not
16    include?
17         A      I didn't intentionally leave any
18    studies out.  These were large multi-center
19    trials.
20         Q      Dr. Bickers' study is not included
21    here?
22         A      It hadn't been published yet.
23         Q      You were certainly aware of it,
24    weren't you?
25         A      Yes.
```

CONFIDENTIAL

```
 1                CONFIDENTIAL
 2        Q      And you said -- how about the POPP
 3   study, you were aware of that, weren't you?
 4        A      Yes.
 5        Q      You didn't disclose that in here, did
 6   you?
 7             MR. GOODELL:  The slide?
 8        Q      In the slide?
 9        A      Not in the slide, no.
10        Q      Did you disclose the negative results
11   of the Gorson study or the POPP study or the
12   Reckless study in another slide that is part of
13   this presentation that I am not looking at?
14        A      Not in a slide, but I think I did
15   speak to it.
16        Q      Okay.  Is it your testimony -- let me
17   get the question out.
18             Is it your sworn testimony today that
19   you remember saying something about the POPP study
20   at this presentation?
21        A      No.
22        Q      Is it your sworn testimony today that
23   you remember saying something about the Reckless
24   study at this presentation?
25        A      Yes, it is.
```

843

7/12/2007  Tive, Leslie (MDL)

CONFIDENTIAL

```
 1                CONFIDENTIAL
 2        A      I don't remember.  Let me see who was
 3   there.  I don't remember.
 4        Q      Is it your testimony that some
 5   speaker from Pfizer told the audience that the FDA
 6   was not going to approve Neurontin for treatment
 7   of neuropathic pain, is that your testimony or are
 8   you saying you just don't remember?
 9        A      I think we talked about the fact that
10   we were expecting approval for the post-herpetic
11   neuralgia claim.  I don't know that we talked
12   about not getting the diabetic peripheral
13   neuropathy claim.
14        Q      My question had nothing to do with
15   post-herpetic neuralgia and nothing to do with
16   diabetic neuropathy.
17        A      I'm sorry.
18        Q      Please listen to my question.
19        A      I'm sorry.
20        Q      Did you tell the audience that you
21   presented to at this advisory board or did you
22   hear a Pfizer employee tell the audience that the
23   FDA was not going to grant Pfizer approval for
24   Neurontin's use in treating neuropathic pain?
25        A      No.
```

845

7/12/2007  Tive, Leslie (MDL)

CONFIDENTIAL

```
 1                CONFIDENTIAL
 2        Q      What did you say?
 3        A      I said there was a study done in the
 4   U.K. on diabetic peripheral neuropathy patients,
 5   and that study did not show separation from
 6   placebo, and that we were analyzing the data and
 7   trying to publish the study.
 8        Q      Is there some reason you didn't put
 9   it on the slide?
10        A      Because it wasn't published.
11        Q      Did you disclose the -- you made this
12   presentation in January 2002; correct?
13        A      Yes.
14        Q      When you made this presentation, did
15   you tell your audience that the FDA would not give
16   Pfizer approval for neuropathic pain for Neurontin
17   because the data didn't support the product
18   indication?
19             MR. GOODELL:  Object to form and
20        foundation.
21        A      I'm not sure that I actually said
22   that, but I think that it was discussed during the
23   course of the meeting.
24        Q      When you say I think it was
25   discussed, who, who mentioned that at the meeting?
```

844

CONFIDENTIAL

```
 1                CONFIDENTIAL
 2        Q      Did you tell the audience that Pfizer
 3   had amended their application before the FDA to
 4   seek only the narrow indication post-herpetic
 5   neuralgia?
 6        A      Yes.
 7        Q      And in telling them that, did you
 8   explain that the reason Pfizer did that is because
 9   the FDA expressed the opinion that the data Pfizer
10   submitted did not support approval for the broad
11   indication of neuropathic pain?
12             MR. GOODELL:  Object to form and
13        foundation.
14        A      I think what we told them was that
15   the FDA was saying that they would not give any
16   compound that indication, that that was not an
17   indication they were prepared to give.
18        Q      That is not my question.  My question
19   is:  Did you disclose to your audience that the
20   FDA said that Pfizer's data did not support the
21   broad claim neuropathic pain?
22             MR. GOODELL:  Same objection.
23        A      No.
24             MR. GREENE:  You had -- I can put
25        this on the record or we can go off the
```

846

CONFIDENTIAL

```
 1              CONFIDENTIAL
 2     record for a minute, however you guys --
 3           MR. GOODELL:  Whatever you want to
 4     do.
 5           MR. GREENE:  You mentioned yesterday
 6     you might allow us to go out of order, and I
 7     know one of my colleagues has a flight to
 8     catch and he may have some questions.  All I
 9     ask, I don't want to take a long break,
10     could we take minute or two?
11           MR. GOODELL:  Take as much time as
12     you want.  You guys do it as you want, as
13     long as it's within your nine hours.
14           THE VIDEOGRAPHER:  Going off the
15     record.  The time is 10:53.
16           This ends tape two.
17           (Recess taken.)
18           THE VIDEOGRAPHER:  Back on the
19     record.  The time is 11:05.
20           This is tape three.
21  EXAMINATION
22  BY MR. SIMMER:
23     Q     Dr. Tive, my name is Scott Simmer.  I
24  just want to have some time to go through some
25  issues with you that Mr. Greene just talked you
```

CONFIDENTIAL

```
 1              CONFIDENTIAL
 2     for Neurontin, and what would happen with managed
 3     care plans and how they would treat that?
 4     A     Yes.
 5     Q     And there was a concern that they
 6     would take Neurontin off some of their
 7     formularies; is that right?
 8           MR. GOODELL:  I'm going to object.
 9     Concern for who?  She can't speak for
10     Pfizer.  She can answer that in a persona
11     capacity.
12     Q     Based on your knowledge and
13     experience at the time, am I right that the
14     discussion was that there are was a concern that
15     managed care plans would take Neurontin off their
16     formularies; is that right?
17           MR. GOODELL:  Same objection.
18     A     Which discussion are you talking
19     about?
20     Q     I'm talking about the folks that you
21     were talking to at Pfizer at the time, both in the
22     medical area and in the sales and marketing, were
23     concerned that managed care plans might take
24     Neurontin off their formularies; isn't that right?
25           MR. GOODELL:  Same objection.
```

CONFIDENTIAL

```
 1              CONFIDENTIAL
 2     about a bit.
 3           You mentioned, I believe on the
 4     record, that Pfizer considering managed care or
 5     MCO's, managed care plans, to be their customers;
 6     is that right?
 7     A     Yes.
 8     Q     And that's because these payors are
 9     paying for the significant costs of Neurontin;
10     isn't that right?
11           MR. GOODELL:  Object to form and
12     foundation.
13     A     They pay for all our medicines, yes.
14     Q     And I think you also testified
15     that -- that Pfizer had an obligation to be
16     truthful in its presentations to managed care
17     plans, too; isn't that right?
18           MR. GOODELL:  Object.  Overly broad.
19     You can answer.
20     A     Yes.
21     Q     At the time when -- and you talked
22     about advisory board's with managed care plans.
23           Am I right that what was going on in
24     the company is about concern about what would
25     happen with the obtaining of this new indication
```

CONFIDENTIAL

```
 1              CONFIDENTIAL
 2     A     I don't remember what -- what the
 3     reasons for talking to managed care plans were,
 4     but I know Suzanne Doft, it was her idea and her
 5     program.  So I think she would be the best one to
 6     answer the concerns that went into planning the
 7     programs for managed care.
 8     Q     Do you remember her talking about
 9     that subject?
10     A     Specifically at the meeting with the
11     managed care plans?
12     Q     Yes.
13     A     No.
14     Q     Do you remember attending another
15     advisory board with -- in Orlando, Florida,
16     with -- before I do that, in Orlando, Florida,
17     with pharmacy benefit manager representatives?
18     A     Do I specifically remember that?  No.
19     But -- if you have something to show me, I may.
20           MR. GOODELL:  Do you have an extra
21     for me?  So, this is the extra?
22           This will be 69.
23           MR. GREENE:  What number?
24           MR. GOODELL:  69.
25           For the record we would incorporate
```

CONFIDENTIAL

1      CONFIDENTIAL
2      all comments and objections to 69 that we
3      made to Exhibit 46 as if fully stated
4      herein.
5           (Tive Exhibit Number 69 marked for
6      identification as of this date.)
7      BY MR. SIMMER:
8      Q     For the record, I have handed you
9      what we have marked as Tive 69, which is a
10     Pfizer_CGrogan_0005992 through
11     Pfizer_CGrogan_0006002.
12     A     Yep.
13     Q     And if you would look at the third to
14     the last page of that exhibit.
15     A     Okay.
16     Q     The list of Pfizer attendees.
17     A     Yes.
18     Q     Do you see your name on there?
19     A     Yes, I do.
20     Q     Does that refresh your recollection
21     that you were at this conference?
22     A     Yes.
23     Q     And would you also look at the prior
24     page, which is the heading appendix before?
25     A     Um-hum, yes.

851

7/12/2007  Tive, Leslie (MDL)

1      CONFIDENTIAL
2      Q     And Medical Impact?
3      A     Yes.
4      Q     And DOD, that is Department of
5      Defense?
6      A     Yes.
7      Q     ACS consultant; right?
8      A     Yes.
9      Q     Northwest Pharmacy Services?
10     A     Yes.
11     Q     NCS Healthcare?
12     A     Yes.
13     Q     WellPoint Pharmacy Management?
14     A     Yes.
15     Q     Express Scripts.
16     A     Yes.
17     Q     Something called VAMC Denver?
18     A     Yes.
19     Q     And First Health?
20     A     Yes.
21     Q     Do you have any idea how these PBM's
22     were selected for this?
23     A     I don't.
24     Q     If you go back to the second page of
25     the exhibit, do you see under there the list of

853

7/12/2007  Tive, Leslie (MDL)

1      CONFIDENTIAL
2      Q     And do you see the list of attendees
3      from the PBM industry?
4      A     Yes.
5      Q     What is a PBM, by the way?
6      A     I'm not sure.  Pharmacy benefits
7      manager, maybe.
8      Q     Do you have an understanding, based
9      on your experience, what PBM's do in the industry?
10     A     I think they are the ones that decide
11     what products can be on formulary and which can't.
12     Q     And they do so on behalf of managed
13     care plans; isn't that right?
14           MR. GOODELL:  Object to the form and
15     foundation.
16     A     I'm not sure.  I think so.  I don't
17     really know how that works so well so --
18     Q     If you look at the list of the PBM's
19     that were in attendance, we have Merck Medco is
20     the first?
21     A     Yes.
22     Q     And Caremark?
23     A     Yes.
24     Q     And Walgreen's Health Initiative?
25     A     Yes.

852

1      CONFIDENTIAL
2      bullets?
3      A     Yes.
4      Q     The goals for the panel?
5      A     Yes.
6      Q     And do you see where it says the
7      first was to gain insights on market trends and
8      managing neuropathic pain?
9      A     The first bullet?
10     Q     Yes.
11           MR. GOODELL:  No, no.  Go to the
12     second page.
13     A     I'm sorry.  Yes.
14     Q     So, would you agree with me that one
15     of the purposes of this was to gain insights from
16     the PBM perspective about how they're managing
17     neuropathic pain?
18     A     Yes.
19     Q     Okay.  Then also the second bullet,
20     another purpose was to elicit from managed care
21     customers their needs in managing neuropathic
22     pain; right?
23     A     Yes.
24     Q     And you agree with me that that's
25     another purpose for this advisory board; right?

854

CONFIDENTIAL

1
2         MR. GOODELL:  Objection.  It's
3     another purpose stated in the document.
4         A     Could I just have a second to look at
5     this?
6         Q     Absolutely.
7         A     Okay, okay, yes.
8         Q     And then the third bullet, it says to
9     help advisory board members learn more about
10    Pfizer and the Neurontin team minutes resources?
11        A     Yes.
12        Q     That was a purpose of the conference
13    as stated here in these goals as well; is that
14    right?
15        MR. GOODELL:  Objection.
16        A     Yes.
17        Q     And the final bullet, it says, to
18    enhance -- Pfizer's relationships with important
19    managed care customers; right?
20        A     Yes.
21        Q     So, a clear purpose was not just to
22    obtain information about Neurontin, but to also
23    enhance the company's relationships with these
24    major managed care customers; right?
25        A     Right.

7/12/2007  Tive, Leslie (MDL)

CONFIDENTIAL

1
2         Q     On page three of this report.
3         A     Oh, yes, yes, yes.
4         Q     What is your understanding of what is
5     meant by re-review Neurontin in the context of
6     what it is stated here?
7         A     Well, based on what comes afterwards,
8     they are not going to take it off formulary when
9     it gets the PHN indication.
10        Q     And that was important to the company
11    at the time, wasn't it?
12        MR. GOODELL:  Object to form and
13    foundation.  You can answer for you.
14        A     It was important to the team, to the
15    commercial team, who are the ones who set up this
16    meeting, yeah.
17        Q     Thank you.
18        Do you recall also that you gave a
19    presentation at this conference?
20        A     When you showed me the agenda and it
21    said my name on it, I recalled it.
22        Q     Do you recall if the presentation you
23    gave was similar at this advisory board was
24    similar to the one that Mr. Greene just went over
25    with you?

7/12/2007  Tive, Leslie (MDL)

CONFIDENTIAL

1
2         MR. GOODELL:  I'm going to object.
3     This is as stated by Health Strategies
4     Group, Inc.  If you want to ask for her view
5     of it, you are certainly welcome to.
6     BY MR. SIMMER:
7         Q     Do you recall then discussion with
8     these managed care entities about how they managed
9     neuropathic pain?
10        A     Do I recall specifically those
11    conversations, no.
12        Q     Look at the next page.
13        Do you see the heading at the top of
14    the page, it says, PBM's have a limited motivation
15    to address neuropathic pain; right?
16        A     Right.
17        Q     Do you recall that statement or that
18    conclusion made during this advisory board?
19        A     I don't, no.  I mean, now I do that
20    you are showing me the minutes, but I don't
21    remember that being stated in the meeting.
22        Q     Okay.  If you look at the next
23    page, that is page three, which is 5995.  Also
24    there it says PBM's will not re-review Neurontin.
25        A     Where is this?

CONFIDENTIAL

1
2         A     I don't remember.  I really don't
3     remember.
4         (Tive Exhibit Number 70 marked for
5         identification as of this date.)
6         MR. GOODELL:  As to Exhibit 70, which
7         has just been handed to the witness, we
8         would incorporate, as if fully stated, our
9         comments and objections that we had made to
10        Exhibit 46.
11    BY MR. SIMMER:
12        Q     Dr. Tive, for the record we just
13    handed you Tive Exhibit 70, which is Bates labeled
14    Pfizer_ Leslie Tive_00422389 through 42432.
15        Could you take a minute and just look
16    at that and identify if that is the -- that is the
17    slide deck for the presentation you gave at this
18    advisory board?
19        A     Well, the dates are the same, so I
20    would make the assumption that it was.
21        Q     If you would turn to page, I guess on
22    slide 20, which is Tive 42408.  And the heading on
23    this is "Clinical Data from Neuropathic Pain
24    Trials."
25        Do you recall having given, in your

```
1                    CONFIDENTIAL
2    presentation of this slide deck, information about
3    these five trials?
4         A    I mentioned them.
5         Q    Okay.  Are these, and I believe they
6    are the same five that you talked about in your
7    other presentation that you had given back in
8    January; isn't that right?
9         A    I think there are only four trials
10   stated here.
11        Q    I'm sorry.  It is four.
12        A    Right.
13        Q    Are those the same four though that
14   you had used in your last slide presentation?
15        A    Yes.  Yes.
16        Q    And, again, not listed in this slide
17   presentation are the Gorson trial; right?
18        A    Right.
19        Q    Nor is the POPP's trial in here?
20        A    Right.
21        Q    Nor is the Dr. Reckless trial in
22   here?
23        A    Yes.
24        Q    So, you did not include any
25   information in these slides about those three
```

859

7/12/2007  Tive, Leslie (MDL)

```
1                    CONFIDENTIAL
2         Q    Concern by whom?
3              MR. SIMMER:  Within the company.
4              MR. GOODELL:  You can answer if you
5    have any personal knowledge of that.
6         A    Concern within the company?
7         Q    Yes, ma'am.
8         A    I think -- I'm sorry.
9              Can you restate the question?  Wasn't
10   it the company's concern that --
11        Q    Wasn't it the company's concern that
12   and reason for having these advisory boards is
13   that the additional indications you were seeking
14   would drive up utilization and put Neurontin on
15   the radar screen of managed care?
16             MR. GOODELL:  Object to form and
17        foundation.
18        A    I don't think that was the reason for
19   having the meetings, no.  But I am not sure.
20   Again, Suzanne Doft is the one that organized the
21   meetings and she would know why they were
22   organized, I think, better than anyone else.
23        Q    So, you had never had any discussion
24   about a purpose of the meetings was to try to
25   understand whether managed care would start
```

861

7/12/2007  Tive, Leslie (MDL)

```
1                    CONFIDENTIAL
2    trials as well; isn't that right?
3         A    Yes.
4         Q    Do you recall there being a
5    discussion at these advisory boards, that you
6    attended with managed care companies, some of the
7    largest in the country, about whether they would
8    continue to tolerate off-label use of Neurontin?
9              MR. GOODELL:  I'm going to object to
10        the characterization of the managed care.
11        Subject to that, you can answer.
12        A    Could you repeat the question,
13   please?  I don't remember what was the question.
14             MR. SIMMER:  Can you read it back?
15             (Record read.)
16             MR. GOODELL:  Same objection.
17        A    No, I don't remember.
18        Q    Wasn't there a concern at the time
19   that with the new indications that the company was
20   attempting to seek for PHN at the time that this
21   would increase the utilization of the product and
22   put it in the top 20 and that would cause
23   additional scrutiny on Neurontin?
24             MR. GOODELL:  Object to form.  Vague
25        and ambiguous.
```

860

```
1                    CONFIDENTIAL
2    applying increasing scrutiny to Neurontin as a
3    result of these additional indications you were
4    seeking?
5              MR. GOODELL:  Objection.  Go ahead.
6         A    My recollection was that we were
7    trying to make them aware that we were going to be
8    seeking a new indication, so it was really to tell
9    them in advance that we would be doing this.  But
10   beyond that, my knowledge is limited.
11             (Tive Exhibit Number 71 marked for
12        identification as of this date.)
13             MR. GOODELL:  As to Exhibit 71, we
14        would incorporate by reference, as if fully
15        stated here, our observations and objections
16        to Exhibit 46.
17   BY MR. SIMMER:
18        Q    Dr. Tive, I have handed you what we
19   have marked Tive Exhibit 71, which is
20   Pfizer__CGrogan_0024640 through 0024642.
21        A    Yes.
22        Q    I direct your attention to an e-mail
23   string, but the e-mail in the middle of the page,
24   from Ellen Dukes to a group of the people.
25             Who is Ellen Dukes?
```

862

CONFIDENTIAL

```
1                 CONFIDENTIAL
2       A       Ellen Dukes was the Outcomes Research
3   Representative on the Neurontin team?
4       Q       And one of your colleagues on
5   Neurontin team; right?
6       A       She wasn't really a medical
7   colleague.  She was in a different division, which
8   was Outcomes Research, so she was one of the
9   people that was on the team with me.
10      Q       Look at her e-mail in the middle of
11  the page, an e-mail dated January 25th, 2002.
12              And she says in her e-mail, I will
13  just read this, the third sentence "I was
14  wondering and really anticipating that with a
15  launch in the NPP."
16              What would NPP represent?
17      A       I'm sorry.  I don't know where you
18  are.
19      Q       I'm in the middle of the page, her
20  e-mail.
21      A       Middle of first page?
22      Q       Yes, the third sentence.
23      A       Okay.
24      Q       She says, "I was wondering and really
25  anticipating with a launch in the NPP pain area,"
```

7/12/2007 Tive, Leslie (MDL)

CONFIDENTIAL

```
1                 CONFIDENTIAL
2   by managed care organization to control drug
3   utilization; is that right?
4               MR. GOODELL:  Object to form and
5       foundation.
6       A       I guess so.
7       Q       You see above that, the e-mail from
8   John Marino, he was one of your colleagues also on
9   the Neurontin team; isn't that right?
10      A       On the commercial team, yeah.
11      Q       And he was worldwide team leader;
12  isn't that right?
13      A       Yes.
14      Q       And you see at the top here he says
15  in response, "in fact, today in Scottsdale,
16  Arizona, the beautiful Four Seasons, there is a
17  meeting with managed care to discuss this exact
18  topic.  Let's see how it goes once we receive
19  their feedback.  You definitely are correct to
20  suspect something here, but NTN" -- would that be
21  Neurontin?
22      A       I would assume so.
23      Q       -- "has amazingly been under the
24  radar screen."  Do you see that?
25      A       Um-hum.
```

7/12/2007 Tive, Leslie (MDL)

CONFIDENTIAL

```
1                 CONFIDENTIAL
2   that would be neuropathic pain area?
3       A       I would assume so.  I don't know.
4       Q       With a further surge in product
5   growth, if all of a sudden the request for health
6   system impact information and formal C/E would
7   start to roll in.
8               What is C/B be?  Any idea?
9       A       No.
10      Q       Would it be cost effectiveness?
11              MR. GOODELL:  She said she didn't
12      know.
13      Q       That is not a term you are familiar
14  with?
15      A       No.
16      Q       There the prior offering and third
17  tiering come into play.
18              Do you know what those two terms
19  represent?
20      A       I believe they have to do with where
21  you are on formulary in a managed care
22  organization, whether you need prior authorization
23  for them to prescribe something or for them to pay
24  for it or not.
25      Q       And so these are terms that are used
```

CONFIDENTIAL

```
1                 CONFIDENTIAL
2       Q       And the NeP launch could change that.
3               What was he talking about, NeP
4   launch?
5       A       He was talking about the
6   post-herpetic neuralgia launch.
7       Q       He doesn't say post-herpetic
8   neuralgia.
9       A       No.
10      Q       So, it's your belief that he could
11  only be talking about post-herpetic neuralgia,
12  because you had already decided to withdraw the
13  NeP indication; is that right?
14      A       Yes.
15              MR. GOODELL:  I'm going to object to
16      her interpretation of that.  She is not
17      copied on it.  I don't know that she has
18      ever seen it before, but she can answer to
19      the extent of her knowledge.
20  BY MR. SIMMER:
21      Q       Do you have an understanding what
22  that term means as he is using it here?
23      A       I can only think that it would mean
24  one thing.
25      Q       And that is?
```

```
1                    CONFIDENTIAL
2         A     The post-herpetic neuralgia.
3         Q     So, at least, would you agree with me
4    that some of your colleagues were viewing these
5    advisory boards as a way to understand what
6    managed care's reaction would be to this
7    additional indication that you were seeking for
8    Neurontin; isn't that right?
9              MR. GOODELL:  Objection, form and
10        foundation as to what her colleagues
11        understood.  You need to ask her colleagues
12        what they understood.
13        A     I can't really speak to their views
14   or how they were viewing it.
15        Q     I just want to go back and just ask a
16   couple of questions about the two vendors that Mr.
17   Greene was asking you about.
18              He talked about two of them that were
19   helping with the publication of these studies,
20   Medical Action Communications; is that right?
21        A     Yes.
22        Q     And Fallon Medica?
23        A     Yes.
24        Q     These were organizations that were
25   hired by Pfizer; isn't that right?
```

# EXHIBIT B

**Page 392**

```
 1              C. Grogan
 2  answered; calls for speculation.
 3      A.   You keep going to the same thing, sir.
 4  You're getting at something that's a hypothetical
 5  that didn't occur.  So, you know, I don't know
 6  what you're looking at, but we worked on PHN and
 7  our messages were around PHN.  It's all I can tell
 8  you, and that's all I remember.
 9      Q.   I want to show you a document marked
10  as Exhibit 8 and ask if you can identify this
11  document.
12      MR. POLUBINSKI:  Take your time
13  looking at it.
14      MR. THRASH:  And for the record the
15  document is identified as Bates stamp Pfizer C.
16  Grogan 0006038-6039.
17      Q.   Ms. Grogan, do you recognize this
18  document?
19      MR. POLUBINSKI:  Are you done looking
20  at it?
21      THE WITNESS:  I'm trying to remember.
22      A.   Yeah.
23      Q.   What is this document?
24      A.   It's an agenda.  Nothing to do with
25  positioning, if we're still on that topic,
```

**Page 393**

```
 1              C. Grogan
 2  absolutely nothing to do with positioning.  It was
 3  an advisory board.
 4      Q.   That's not what the document was?
 5      A.   I thought we were on the same
 6  conversation.  I just want to make it clear.  This
 7  is an agenda for a managed care advisory board at
 8  the Rihga Royal Hotel, R-I-H-G-A Hotel in New York
 9  City.  Actually, I remember this.
10      Q.   Did you make a presentation at the
11  managed care advisory board meeting?
12      A.   I think so, because it says from 8:30
13  to 9, I did, so I'm sure I did.
14      Q.   And you presented on the overview of
15  Pfizer in the neuropathic pain market?
16      A.   I'm sure.
17      Q.   Did you prepare a presentation or a
18  script for your presentation?
19      A.   I don't think I did.  I probably used
20  preexisting slides that we had.
21      Q.   And at this time, was your
22  presentation limited to PHN?
23      A.   No, this actually was not specific to
24  the launch of PHN.  I believe it was trying to
25  understand the market because we were still
```

**Page 394**

```
 1              C. Grogan
 2  evaluating whether or not to go forward with
 3  neuropathic pain indication, which would be, you
 4  know, part of the life cycle planning.  So, I
 5  wouldn't say this was specific to the launch.
 6      Q.   Were you involved in setting up this
 7  advisory board meeting?
 8      A.   No, I think it was mainly done by
 9  Health Strategies Group.  I was, you know,
10  ancillarily involved, but I would say that they
11  were the drivers of it.
12      Q.   And at this managed care advisory
13  board meeting, do you recall who were the target
14  attendees for this?
15      A.   It would have been managed care, you
16  know, people, managed care, places.  We were
17  trying to understand what their concerns were,
18  what things were on top of their minds, so going
19  forward, if we were to pursue an indication, we'd
20  have a better understanding of the marketplace.
21  That's usually what you do on an advisory board.
22      Q.   At this point in time, you were
23  talking about Neurontin's effectiveness in
24  neuropathic pain?
25      MR. POLUBINSKI:  Objection.
```

**Page 395**

```
 1              C. Grogan
 2      Go ahead.
 3      A.   Yeah.  It's an advisory board, so it's
 4  a two-way dialogue.  So, we might have spoke about
 5  some of our data, but really the market as a whole
 6  and trying to more understand from them and
 7  extract from them what their concerns were, what
 8  they understood the market to be, you know, what
 9  kind of goals and objectives they had as a managed
10  care company, so we could work better with them.
11      Q.   And this would have had nothing to do
12  with PHN?
13      MR. POLUBINSKI:  Objection.
14      A.   Yeah.  I really -- I don't remember,
15  but I would think that we would have at least
16  alluded to PHN, because it is a subset of
17  neuropathic pain, so probably it was discussed.
18      Q.   Who was responsible for organizing
19  this advisory board meeting, to your knowledge?
20      MR. POLUBINSKI:  Objection.
21      A.   Yeah, I mentioned before, Health
22  Strategies Group.
23      Q.   Who in Health Strategies Group?
24      A.   Cheryl Hawkins and Jeff Larson.
25      Q.   I want to show you another document
```

# EXHIBIT C

1       A.    There's an entire department, and I
2   think they were set up by brands.
3       Q.    Do you know who was responsible for the
4   Neurontin brand?
5       A.    I don't recall.
6       Q.    Okay.  One of the other things that you
7   said was part of your leading the team of marketers
8   in the U.S. operational group was conducting advisory
9   boards.  Do you recall having said that?
10      A.    Yes.
11      Q.    What is an advisory board?
12      A.    We would convene a panel of, generally
13  physicians, although it might be consumers or others,
14  to seek specific advice on strategy, promotion.
15  They're used for different things depending on the
16  needs of the brand.
17      Q.    Did you ever participate in any advisory
18  boards?
19      A.    I did.
20      Q.    Did you ever participate in an advisory
21  board with respect to Neurontin?
22      A.    I did.
23      Q.    And what role did you play in the
24  advisory board with respect to Neurontin?
25            MR. POTISCHMAN:  The one or ones in

6/20/2007  Yoder, Margaret (MDL)

1   primary care.
2       Q.    Okay.  And what did you discuss, or what
3   was discussed at the advisory board in New York with
4   payors?
5       A.    It was in anticipation of getting an
6   extended label for a pain indication, and there was a
7   question about how payors would respond to the
8   extended label, and whether they would attempt to
9   restrict the utilization of the product.
10      Q.    What do you mean by the anticipation of
11  extended label for pain indication?  What do you mean
12  by that?
13      A.    Shortly after taking over as the Team
14  Leader, it was very clear that the label was not
15  reflective of how the drug was used, and I, in
16  conjunction with the Worldwide Team Leader, tried to
17  move the organization to get a broader label for the
18  drug, specifically for something in the neuropathic
19  pain area.
20      Q.    In what way did it not reflect how the
21  drug was used?
22      A.    At the time I took over the brand, 1
23  recall seeing market research data that showed about
24  ten percent of the product was used in epilepsy,
25  about 40 percent of the product was used in

6/20/2007  Yoder, Margaret (MDL)

1   which she participated?
2             MR. ARANOFF:  Yes.
3       A.    1 was an attendee.
4       Q.    Did you make any presentations at an
5   advisory board?
6       A.    I believe I made a market presentation
7   at one advisory board.
8       Q.    Can you recall any specifics about the
9   presentation that you made at the advisory board?
10      A.    No.
11      Q.    Can you recall any advisory board
12  meetings in which the -- in which Neurontin was
13  discussed?
14      A.    I recall two.
15      Q.    Okay.  Could you tell me the details of
16  the two that you recall?
17            MR. POTISCHMAN:  Object to form.
18      A.    I recall an advisory board in New York
19  that was with payors.
20      Q.    Can you spell that for the court
21  reporter please?
22      A.    P-A-Y-O-R-S.
23            And I recall being in an advisory board
24  in Florida with a group -- two groups of clinicians,
25  1 believe.  One group was neurologists and one were

1   neuropathic pain states, and about 40 percent of the
2   product was used in CNS disorders, and another ten
3   percent in other.
4       Q.    When you say "other," I know you're
5   using that as a catchall, but do you have any
6   understanding as to what the "other" category would
7   have included?
8       A.    I recall reading a piece of paper that
9   there were 400-plus diagnoses codes that this drug
10  was being used for.  So something in the "other"
11  category might be hot flashes or jet lag, or those
12  types of things.
13      Q.    Do you have an understanding as to when
14  this advisory board in New York took place?
15      A.    I don't recall exactly.  2001, 2002.
16      Q.    And I think you testified at the
17  time, ten percent of Neurontin was prescribed for
18  epilepsy.  Is that right?
19            MR. POTISCHMAN:  Object to form.
20            MR. ARANOFF:  I'm just trying to get a
21  clarification.
22      A.    I said in about, in 2000 when I took it
23  over the market research, that I read shortly after
24  taking the job about ten percent was in epilepsy.
25      Q.    And when you say ten percent, you mean

```
 1              MR. ARANOFF:  This is just background
 2    from where we left off before the meeting.
 3              MR. POTISCHMAN:  You can answer.
 4       A.    I would not be surprised, no.
 5       Q.    Okay.  One of the things we were also
 6    discussing far along before the break actually took
 7    place was you had said that at the advisory board
 8    meeting in New York, one of the things that was
 9    discussed was how payors responded to label and
10    restrict utilizations of the product.  Do you recall
11    having said that?
12       A.    Yes.
13       Q.    Okay.  What did you mean by that?
14       A.    Many payor organizations, insurance
15    companies, employer groups, whoever is paying the
16    drug bill, often times puts restrictions on the
17    utilization of a drug based on a lot of things,
18    whether they have a contract with the drug company
19    for special pricing.  They may put it in a higher
20    tier.
21              There are some instances where they'll
22    restrict it to a certain category of patients.
23    Sometimes they'll request prior authorization for use
24    of a drug if they think it's a high-cost drug.
25       Q.    Did you ever come across a situation
```

121

6/20/2007  Yoder, Margaret (MDL)

```
 1    where a payor's restriction of utilization of
 2    Neurontin had anything to do with its off-label uses?
 3              MR. POTISCHMAN:  Object to form.
 4       A.    No, I didn't.
 5       Q.    You never came across that?
 6       A.    No.
 7       Q.    You also mentioned an advisory board
 8    meeting or two in Florida.  Do you recall having
 9    mentioned that?
10       A.    Yes.
11       Q.    Okay.  And I think you said that it was
12    two groups of clinicians involving neurology and
13    primary care.  Do you recall having said that?
14              MR. POTISCHMAN:  Object to form.
15       A.    Yes.
16       Q.    Okay.  Could you expand a little bit
17    about what went on at the advisory board meetings in
18    Florida?
19              MR. POTISCHMAN:  Object to form.
20       A.    These were meetings prior to the launch
21    in postherpetic neuralgia to seek advice from these
22    two separate groups of physicians.  I don't remember
23    the specific content of -- I don't remember the
24    specific content.  We would have had Medical do a
25    presentation of the material.
```

122

1     disorders, those kind of things.  Was there any
2     discussion about Neurontin for indications such as
3     those discussed at the advisory board meetings in
4     Florida?
5                    MR. POTISCHMAN:  Object to form.
6           A.     There would have been no discussions
7     outside of the neuropathic claim states generally,
8     and specifically the postherpetic neuralgia claim.
9           Q.     And just so that I'm clear because I
10    don't think you mentioned this before, do you have an
11    understanding as to when these meetings in Palm
12    Beach, the advisory board meetings I'm referring to
13    took place, what year?
14          A.     I think the Palm Beach advisory board
15    was in 2002, early; and the payor meeting in the
16    latter part of 2001.
17          Q.     And the payor meeting was in New York?
18          A.     Correct.
19          Q.     And you had -- you mentioned some
20    physicians.  You said there were some physicians and
21    medical personnel, medical presentations made at the
22    Florida advisory board meeting.  Do you recall having
23    said that?
24          A.     Yes.
25          Q.     Do you have any independent recollection

124

```
1              THE VIDEOGRAPHER:  We are going off the
2    record.  The time is 3:15 p.m.
3              (A recess is taken.)
4              THE VIDEOGRAPHER:  We're back on the
5    record.  The time is 3:29 p.m.  This begins tape
6    number five.
7         Q.    Okay.  Miss Yoder, I want to change
8    gears just a little bit and discuss some of the
9    marketing that was done for Neurontin.  And in
10   particular, are you familiar with the term
11   "third-party payors"?  Do you know what that means?
12        A.    Yes.
13        Q.    What is your understanding of the term
14   "third-party payor"?
15        A.    That is the person who pays for drugs.
16        Q.    Okay.  And is it fair to say that third
17   party-payors are most -- are often insurance
18   companies?
19        A.    Insurance companies I would say are the
20   biggest third-party payors, yes.
21        Q.    Are you aware, Ms. Yoder, as you sit
22   here today, of any effort on the part of Pfizer to
23   directly market Neurontin to any third-party payors?
24        A.    No, I'm not.
25        Q.    No, there was no effort; or no, you're
```

195

6/20/2007  Yoder, Margaret (MDL)

```
1    not aware?
2              MR. POTISCHMAN:  The question was is she
3    aware.  She answered it no.
4         A.    I'm not aware of any direct marketing
5    efforts with a third-party payor.
6         Q.    Have you ever heard, Ms. Yoder, of a
7    company or an entity called Cline, Davis & Mann?
8         A.    Yes, I am.
9         Q.    What is Cline, Davis & Mann?
10        A.    They are an advertising agency.
11        Q.    And do you know whether Cline, Davis &
12   Mann ever had any type of professional relationship
13   with Pfizer?
14        A.    Yes, they did.
15        Q.    And what was the nature of the
16   relationship with Pfizer?
17        A.    They were the agency of record for
18   Neurontin.
19        Q.    And when you say they were the agency of
20   record for Neurontin, would that be for the entire
21   period that Pfizer marketed Neurontin?
22        A.    I believe they were the agency of record
23   through the entire life of Neurontin till it went off
24   patent.
25        Q.    Were there any other agencies of record
```

196

# EXHIBIT D

2994/1.124

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| )<br>IN RE NEURONTIN MARKETING AND ) ·<br>SALES PRACTICES LITIGATION )<br> )<br>THIS DOCUMENT RELATES TO: )<br> )<br> )<br>AETNA, INC. v. PFIZER INC., )<br>04 CV 10958 (PBS) )<br> ) | MDL Docket No. 1629<br><br>Master File No. 04-10981<br><br>Judge Patti B. Saris |

**PLAINTIFF AETNA, INC'S RESPONSES AND OBJECTIONS TO DEFENDANTS'
FIRST REQUEST FOR PRODUCTION OF DOCUMENTS**

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, Plaintiff Aetna, Inc.

(hereinafter "Plaintiff" or "Aetna") responds and, by and through its attorneys, objects to

Defendants Pfizer Inc. and Warner-Lambert Company's First Request for Production of

Documents as follows:

**PRELIMINARY STATEMENT**

1. Aetna's responses are subject to all objections as to competence, relevance,

materiality, admissibility, privilege, and privacy, and any and all other objections on grounds that

would require exclusion of any response herein if such were offered in Court, which objections

are reserved and may be interposed at the time of trial.

2. Aetna's responses to all or any part of the Request for Production of Documents

("Document Requests") should not be taken as an admission that: (1) Aetna has documents

responsive to the requests; or (2) documents responsive to a particular request exist. Aetna's

{1825 / INT / 00073016.DOC v1}          1

6/3/05

Subject to and without waiving the foregoing objections, Plaintiff will produce
documents responsive to this request, to the extent they exist.

Request No. 9

All documents concerning Neurontin from any committee, team, council, or other group
of employees, that discussed, recommended, approved, denied, or otherwise considered the
inclusion of Neurontin in Plaintiff's formulary, the payment or denial of Neurontin claims, the
payment of denial of off-label uses of Neurontin, or otherwise addressed Neurontin.

Response No. 9

Please see Response No. 8.

Request No. 10

All documents concerning any communication or interaction between Plaintiff, any third-
party Plan Administrator or Preferred Provider, including insurance companies, Plaintiff's
Members or anyone acting on their behalf, and any Defendant.

Response No. 10

Plaintiff objects to this request on the grounds that it is overly broad, unduly burdensome,
vague, ambiguous, and not reasonably calculated to lead to the discovery of admissible evidence.
Plaintiff further objects to this request on the grounds that it is not limited in time, rendering the
request overly broad and unduly burdensome. Plaintiff further objects to this request to the
extent it seeks information that is confidential or private in nature, that is covered by third-party
confidentiality agreements or protective orders, the medical records privileges of Massachusetts
or the state in which the patients and records are located, the Health Insurance Portability and
Accountability Act of 1996, 29 U.S.C. §§ 1181, et seq. ("HIPPA"), the Federal Privacy Rule, 45
C.F.R. Parts 160, 164, Rule 26 of the Federal Rules of Civil Procedure, or any other applicable

privilege, rule or doctrine. Aetna objects to this request to the extent it seeks information that relates to prescription drugs other than Neurontin on the grounds that the request is overly broad, seeks information irrelevant to this case and is not reasonably calculated to lead to the discovery of admissible evidence.

Request No. 11

All documents concerning any statements obtained by the Plaintiff from any person having, or purporting to have, knowledge or information pertaining to Neurontin.

Response No. 11

Plaintiff objects to this request on the grounds that it is overly broad, unduly burdensome, vague, ambiguous, and not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff further objects to this request on the grounds that it is not limited in time, rendering the request overly broad and unduly burdensome. Plaintiff further objects to this request to the extent that it seeks information which is protected from disclosure by the attorney-client privilege, work product doctrine or other applicable privilege, that otherwise constitute material prepared for or in anticipation of litigation, or are protected from disclosure by any other applicable privilege or protection. Plaintiff further objects to this request to the extent that it seeks information or documents that are already in Defendants' possession, custody or control, or are equally available to Defendants.

Subject to and without waiving the foregoing objections, Plaintiff will produce documents responsive to this request, to the extent they exist.

# EXHIBIT E

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| IN RE NEURONTIN MARKETING AND | ) | MDL Docket No. 1629 |
| SALES PRACTICES LITIGATION | ) |  |
|  | ) | Master File No. 04-10981 |
| THIS DOCUMENT RELATES TO: | ) |  |
| ALL CLASS ACTIONS | ) | Judge Patti B. Saris |
|  | ) |  |

**PLAINTIFF LOUISIANA HEALTH SERVICE INDEMNITY COMPANY D/B/A
BLUECROSS/BLUESHIELD OF LOUISIANA'S OBJECTIONS AND RESPONSE TO
DEFENDANTS' FIRST REQUEST FOR PRODUCTION OF DOCUMENTS**

Now comes Plaintiff Louisiana Health Service Indemnity Company d/b/a

BlueCross/BlueShield of Louisiana ("Plaintiff") and responds to Defendant Pfizer, Inc. and

Warner-Lambert Company's ("Defendants'") First Request for Production of Documents as

follows:

### I.    PRELIMINARY STATEMENT

Plaintiff's responses and objections to these Document Requests are made for the sole

purpose of this litigation. Each response is subject to all objections as to competence, relevance,

materiality, propriety, admissibility, privilege, and privacy, and any and all other objections on

grounds that would require the exclusion of any response herein if such were offered in Court,

which objections are reserved and may be interposed at the time of trial.

No incidental or implied admissions are intended in this response. Plaintiffs' response to

all or any part of the Document Requests should not be taken as an admission that: (1) Plaintiff

accepts or admits the existence of any fact(s) set forth in or assumed by the Document Request;

or (2) Plaintiff has in his/her possession, custody or control documents responsive to that

1

6/3/05

inclusion of Neurontin in Plaintiff's formulary, the payment or denial of Neurontin claims, the payment of denial of off-label uses of Neurontin, or otherwise addressed Neurontin.

Response No. 9

Plaintiff objects to this request on the grounds that it is overly broad, unduly burdensome, vague, ambiguous, and not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff further objects to this request on the grounds that it is not limited in time, rendering the request overly broad and unduly burdensome.

Subject to and without waiving the foregoing objections, Plaintiff will produce documents responsive to this request, to the extent they exist.

Request No. 10

All documents concerning any communication or interaction between Plaintiff, any third-party Plan Administrator or Preferred Provider, including insurance companies, Plaintiff's Members or anyone acting on their behalf, and any Defendant.

Response No. 10

Plaintiff objects to this request on the grounds that it is overly broad, unduly burdensome, vague, ambiguous, and not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff further objects to this request on the grounds that it is not limited in time, rendering the request overly broad and unduly burdensome. Plaintiff further objects to this request on the grounds that the term "interaction" is vague and ambiguous. Plaintiff further objects to this request to the extent it seeks information that is confidential or private in nature, that is covered by third-party confidentiality agreements or protective orders, the medical records privileges of Massachusetts or the state in which the patients and records are located, the Health Information Portability and Accountability Act of 1996, 29 U.S.C. §§ 1181, et seq. ("HIPPA"), the Federal

10

Privacy Rule, 45 C.F.R. §§ 160, 164, Rule 26 of the Federal Rules of Civil Procedure, or any other applicable privilege, rule or doctrine.

Subject to and without waiving the foregoing objections, Plaintiff will produce documents responsive to this request, to the extent they exist.

Request No. 11

All documents concerning any statements obtained by the Plaintiff from any person having, or purporting to have, knowledge or information pertaining to Neurontin.

Response No. 11

Plaintiff objects to this request on the grounds that it is overly broad, unduly burdensome, vague, ambiguous, and not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff further objects to this request on the grounds that it is not limited in time, rendering the request overly broad and unduly burdensome. Plaintiff further objects to this request to the extent that it seeks information which is protected from disclosure by the attorney-client privilege, work product doctrine or other applicable privilege, that otherwise constitute material prepared for or in anticipation of litigation, or are protected from disclosure by any other applicable privilege or protection. Plaintiff further objects to this request to the extent that it seeks information or documents that are already in Defendant's possession, custody or control, or are equally available to Defendant.

Subject to and without waiving the foregoing objections, Plaintiff will produce documents responsive to this request, to the extent they exist.

Request No. 12:

All documents concerning any opinion by any person with an M.D., Ph.D., D.O., M.P.H., or D. Sc., pharmacy degree, or by any similarly trained or educated health care professional or scientist, concerning Neurontin.

11

# EXHIBIT F

2994/ 1.123

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| IN RE NEURONTIN MARKETING AND ) | MDL Docket No. 1629 |
| SALES PRACTICES LITIGATION ) | |
| ) | Master File No. 04-10981 |
| THIS DOCUMENT RELATES TO: ) | |
| ) | Judge Patti B. Saris |
| AETNA, INC. v. PFIZER INC., ) | |
| 04 CV 10958 (PBS) ) | |
| ) | |

**PLAINTIFF AETNA, INC.'S RESPONSES AND OBJECTIONS TO
DEFENDANTS' FIRST SET OF INTERROGATORIES**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Plaintiff Aetna, Inc.

(hereinafter "Plaintiff" or "Aetna"), responds to Defendants Pfizer Inc. and Warner-Lambert

Company's First Set of Interrogatories as follows:

**PRELIMINARY STATEMENT**

1.      Aetna's responses are subject to all objections as to competence, relevance,

materiality, admissibility, privilege, and privacy, and any and all other objections on grounds that

would require exclusion of any response herein if such were offered in Court, which objections

are reserved and may be interposed at the time of trial.

2.      No incidental or implied admissions may be inferred from Plaintiff's responses or

objections.  Aetna's response to all or any part of the Interrogatories should not be taken as an

admission that: (1) Aetna accepts or admits the existence of any fact(s) set forth in or assumed

6/3/05

objects to this Interrogatory insofar as it seeks protected health information that is insulated from

disclosure by federal, state or local law governing disclosure of confidential patient prescription

information, including, but not limited to HIPAA.

Interrogatory No. 14

State whether you have had any communications with Parke-Davis, Warner-Lambert, or
Pfizer, including but not limited to online, phoned, mailed or faxed communications, regarding
Neurontin, including the dates of any such communications.

Response:

Aetna objects to the Interrogatory to the extent it seeks discovery of information which is

equally available to Defendants and/or already in Defendants' possession or obtainable from

another source that is more convenient, less burdensome, or less expensive.

Without waiver of the foregoing objections, Warner-Lambert provided materials to Aetna

which will be produced. The persons identified in the Response to Interrogatory No. 1 may

possess additional knowledge.

Interrogatory No. 15

Itemize all damages you claim to have incurred, directly or indirectly, as a result of the
allegations in your Complaint, including, but not limited to, all pharmaceutical expenses, and the
address of each person who provided goods or services in connection with each such expense,
the nature of the goods or services provided, the dates of all services rendered to you or provision
of goods to you, the monetary amount of each such expense or item of damages, and the name
and address of the person or entity paying such obligation.

# EXHIBIT G

*2994 /1.108*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

IN RE NEURONTIN MARKETING AND )
SALES PRACTICES LITIGATION )
)
THIS DOCUMENT RELATES TO: )
)
THE GUARDIAN LIFE INSURANCE )
COMPANY OF AMERICA )
  v. PFIZER, INC., )
04 CV 10739 (PBS) )
)

MDL Docket No. 1629

Master File No. 04-10981

Judge Patti B. Saris

### PLAINTIFFS KAISER FOUNDATION HEALTH PLAN, INC. AND
### KAISER FOUNDATION HOSPITALS RESPONSES AND OBJECTIONS TO
### DEFENDANTS' FIRST SET OF INTERROGATORIES

      Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Plaintiffs Kaiser

Foundation Health Plan, Inc. and Kaiser Foundation Hospitals (hereinafter "Plaintiff" or

"Kaiser"), responds to Defendants Pfizer Inc. and Warner-Lambert Company's First Set of

Interrogatories as follows:

### PRELIMINARY STATEMENT

      1.    Kaiser's responses are subject to all objections as to competence, relevance,

materiality, admissibility, privilege, and privacy, and any and all other objections on grounds that

would require exclusion of any response herein if such were offered in Court, which objections

are reserved and may be interposed at the time of trial.

      2.    No incidental or implied admissions may be inferred from Plaintiff's responses or

objections.  Kaiser's response to all or any part of the Interrogatories should not be taken as an

admission that: (1) Kaiser accepts or admits the existence of any fact(s) set forth in or assumed

by the Interrogatory; or (2) Kaiser has in its possession, custody or control information

*6/3/05*

Interrogatory No. 11

State whether a representative of Defendants ever made any statement about Neurontin to Plaintiff, and if so, describe in detail the content of those statements, when they were made, who made them, and the circumstances under which they were made.

Response:

Kaiser objects to the Interrogatory to the extent it seeks discovery of information which is

equally available to Defendants and/or already in Defendants' possession or obtainable from

another source that is more convenient, less burdensome, or less expensive.

Without waiver of the foregoing objections, Kaiser will produce certain relevant and

responsive documents setting forth the requested information, to the extent they exist.

Interrogatory No. 12

State whether providers who prescribed Neurontin to Plaintiff's Members ever made any statement about Neurontin to Plaintiff, and if so, describe in detail the content of those statements, when they were made, who made them, and the circumstances under which they were made.

Response:

Kaiser objects to this Interrogatory on grounds that it is overly broad, unduly

burdensome, vague, ambiguous and seeks information that is neither relevant to the subject

matter of this action nor reasonably calculated to lead to the discovery of admissible evidence.

Interrogatory No. 13

State whether Plaintiff or any representative of Plaintiff ever attended any seminars, meetings or events at which the use of Neurontin for any off-label use was discussed; and if so, state the name of the person(s) who attended, the date(s) of the event(s), the location of the event(s), the title of the event(s), and the subject matter discussed.

Interrogatory No. 15

State whether you have had any communications with Parke-Davis, Warner-Lambert, or Pfizer, including but not limited to online, phoned, mailed or faxed communications, regarding Neurontin, including the dates of any such communications.

Response:

Kaiser objects to the Interrogatory to the extent it seeks discovery of information which is

equally available to Defendants and/or already in Defendants' possession or obtainable from

another source that is more convenient, less burdensome, or less expensive.

Without waiver of the foregoing objections, Kaiser will produce certain relevant and

responsive documents setting forth the requested information, to the extent they exist.

Interrogatory No. 16

Itemize all damages you claim to have incurred, directly or indirectly, as a result of the allegations in your Complaint, including, but not limited to, all pharmaceutical expenses, and the address of each person who provided goods or services in connection with each such expense, the nature of the goods or services provided, the dates of all services rendered to you or provision of goods to you, the monetary amount of each such expense or item of damages, and the name and address of the person or entity paying such obligation.

Response:

Kaiser objects to this Interrogatory on grounds that it is overly broad, unduly

burdensome, vague, ambiguous and seeks information that is neither relevant to the subject

matter of this action nor reasonably calculated to lead to the discovery of admissible evidence.

Kaiser further objects to this Interrogatory on the grounds that it is premature given the status of

the litigation. Plaintiff will provide expert disclosures at the time set by the Court.

Interrogatory No. 17

Identify the entity or entities from which Plaintiff purchased Neurontin for its in-house pharmacies or for other purposes, and for each year since January 1, 1994, (a) state the price

- 15 -

# EXHIBIT H

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

IN RE NEURONTIN MARKETING AND )     MDL Docket No. 1629
SALES PRACTICES LITIGATION      )
                               )      Master File No. 04-10981
THIS DOCUMENT RELATES TO:    )
ALL CLASS ACTIONS              )     Judge Patti B. Saris
                               )

**PLAINTIFF LOUISIANA HEALTH SERVICE INDEMNITY COMPANY D/B/A
BLUECROSS/BLUESHIELD OF LOUISIANA'S OBJECTIONS AND RESPONSE TO
DEFENDANTS' FIRST SET OF INTERROGATORIES**

Now comes Plaintiff Louisiana Health Service Indemnity Company d/b/a

BlueCross/BlueShield of Louisiana ("Plaintiff") and responds to Defendant Pfizer, Inc. and

Warner-Lambert Company's ("Defendants'") First Set of Interrogatories as follows:

## I.    PRELIMINARY STATEMENT

Plaintiff's responses and objections to these Interrogatories are made for the sole purpose

of this litigation. Each response is subject to all objections as to competence, relevance,

materiality, propriety, admissibility, privilege, and privacy, and any and all other objections on

grounds that would require the exclusion of any response herein if such were offered in Court,

which objections are reserved and may be interposed at the time of trial.

No incidental or implied admissions are intended in this response. Plaintiffs' response to

all or any part of the Interrogatories should not be taken as an admission that: (1) Plaintiff

accepts or admits the existence of any fact(s) set forth in or assumed by the Interrogatories; or (2)

Plaintiff has in his/her possession, custody or control documents responsive to that Interrogatory;

or (3) documents responsive to that Interrogatory exists. Plaintiff's response to all or any part of

1

Interrogatory No. 10

State whether a representative of Defendant ever made any statement about Neurontin to Plaintiff, and if so, describe in detail the content of those statements, when they were made, who made them, and the circumstances under which they were made.

Response No. 10

Plaintiff objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome, vague, ambiguous, and not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff further objects to this Interrogatory on the grounds that it is premature and discovery is ongoing.

Subject to and without waiving the foregoing objections, Plaintiff is unaware of any such statement at this time, but reserves the right to supplement this response.

Interrogatory No. 11

State whether providers who prescribed Neurontin to Plaintiff's Members ever made any statement about Neurontin to Plaintiff, and if so, describe in detail the content of those statements, when they were made, who made them, and the circumstances under which they were made.

Response No. 11

Plaintiff objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome, vague, ambiguous, and not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff further objects to this Interrogatory to the extent it seeks information not available or known to Plaintiff. Plaintiff further objects to this Interrogatory on the grounds that it is premature and discovery is ongoing.

Subject to and without waiving the foregoing objections, Plaintiff is unaware of any such statement at this time, but reserves the right to supplement this response.

13

Plaintiff is unable to supply an exact date. Plaintiff does not normally know the condition for which a covered drug is prescribed.

Interrogatory No. 14

State whether you have had any communications with Parke-Davis, Warner-Lambert, or Pfizer, including but not limited to online, phoned, mailed or faxed communications, regarding Neurontin, including the dates of any such communications.

Response No. 14

Plaintiff objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome, vague, ambiguous, and not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff further objects to this Interrogatory to the extent it seeks information not available or known to Plaintiff. Plaintiff further objects to this Interrogatory to the extent that it seeks information or documents that are already in Defendant's possession, custody or control, or are equally available to Defendant.

Subject to and without waiving the foregoing objections, Plaintiff is unaware of any such communications at this time, but reserves the right to supplement this response.

Interrogatory No. 15

Itemize all damages you claim to have incurred, directly or indirectly, as a result of the allegations in your Complaint, including, but not limited to, all pharmaceutical expenses, and the address of each person who provided goods or services in connection with each such expense, the nature of the goods or services provided, the dates of all services rendered to you or provision of goods to you, the monetary amount of each such expense or item of damages, and the name and address of the person or entity paying such obligation.

15

# EXHIBIT I

2994/1.272

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

IN RE NEURONTIN MARKETING AND )      MDL Docket No. 1629
SALES PRACTICES LITIGATION      )

     )      Master File No. 04-10981

     )

THIS DOCUMENT RELATES TO:      )      Judge Patti B. Saris

     )

THE GUARDIAN LIFE INSURANCE      )
COMPANY OF AMERICA      )
   v. PFIZER, INC.,      )
04 CV 10739 (PBS)      )

     )

## PLAINTIFF THE GUARDIAN LIFE INSURANCE COMPANY, INC.'S SUPPLEMENTAL RESPONSES AND OBJECTIONS TO DEFENDANTS' FIRST SET OF INTERROGATORIES

### Supplemental Responses

Interrogatory No. 9

     If Plaintiff requires pharmacies or providers to provide any directions, instructions or warnings concerning proper use of Neurontin to prescription takers, or if Plaintiff itself provides such materials, state: (a) the exact contents of such instructions or warning; (b) the place and manner in which such directions, instructions or warnings were to be given to Neurontin takers; and (c) the person or persons who was to provide such directions, instructions or warnings.

Response:

     The Guardian has no such materials in its possession.

Interrogatory No. 10

     State whether a representative of Defendants ever made any statement about Neurontin to Plaintiff, and if so, describe in detail the content of those statements, when they were made, who made them, and the circumstances under which they were made.

8/17/05

Response:

The Guardian maintains that the Defendant is seeking discovery which is possibly already in Defendants' possession or obtainable from another source that is more convenient. The Defendants may have also made statements regarding Neurontin to the Guardian's agent, its Prescription Benefit Manager, but has no first hand knowledge of any such statements. The Guardian is unaware of any such statements made directly to it by any Defendant.

Interrogatory No. 11

State whether providers who prescribed Neurontin to Plaintiff's Members ever made any statement about Neurontin to Plaintiff, and if so, describe in detail the content of those statements, when they were made, who made them, and the circumstances under which they were made.

Response:

The Guardian maintains its objection to this interrogatory which contained in its original responses and objections to the Defendants' first set of interrogatories. Without waiving that objection, the Guardian is unaware of any such statements made by any provider who prescribed Neurontin to Plaintiff's members.

Interrogatory No. 12

State whether Plaintiff or any representative of Plaintiff ever attended any seminars, meetings or events at which the use of Neurontin or any off-label use was discussed; and if so, state the name of the person(s) who attended, the date(s) of the event(s), the location of the event(s) the title of the event(s), and the subject matter discussed.

Response:

No employee of the Guardian ever attended any seminars, meetings, or events at which the use of Neurontin for an off-label use was discussed. The Guardian is still attempting to determine whether any employee of its Prescription Benefit Manager attended any such seminar and, if so, will provide the name or names of those individuals as soon as they become known.

Interrogatory No. 14

State whether you have had any communications with Parke-Davis, Warner-Lambert, or Pfizer, including but not limited to online, phoned, mailed or faxed communications, regarding Neurontin, including the dates of any such communications.

Response:

The Guardian is unaware of any communications with Parke-Davis, Warner-Lambert, or Pfizer, regarding Neurontin. The Guardian maintains that the interrogatory does seek discovery of information which is equally available to the Defendants and/or already in Defendants' possession. Without waiving that objection, some or all of the defendants may have provided materials to The Guardian's Prescription Benefit Manager. The Guardian is working with its Prescription Benefit Manager to determine if those materials do exist.

Interrogatory No. 19

Describe every instance in which you refused to pay for or reimburse the costs of a drug because it had been prescribed for an off-label use.

Response:

Because the dispensation of prescription drugs and payment therefore are done in real time and administered by a Prescription Benefit Manager, the Guardian is unaware of any instance in which it refused to pay for or reimburse the cost of Neurontin or any other drug, because it had been prescribed for an off-label use.

Respectfully submitted,

Mark M. Sandmann
Mark D. Fischer
**RAWLINGS & ASSOCIATES PLLC**
325 W. Main Street
Louisville, KY 40202
Telephone: (502) 587-1279
Facsimile: (502) 584-8580

# EXHIBIT J

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

IN RE NEURONTIN MARKETING AND )
SALES PRACTICES LITIGATION )
)
_____)
THIS DOCUMENT RELATES TO: )
)
_____)
THE GUARDIAN LIFE INSURANCE )
COMPANY OF AMERICA )
v. PFIZER, INC., )
04 CV 10739 (PBS) )
_____)

MDL Docket No. 1629

Master File No. 04-10981

Judge Patti B. Saris

Magistrate Judge Leo T.
Sorokin

## PLAINTIFF GUARDIAN LIFE INSURANCE COMPANY'S
## SUPPLEMENTAL RESPONSES TO DEFENDANT PFIZER'S
## FIRST SET OF INTERROGATORIES

The Guardian Life Insurance Company tenders the following supplemental re

Defendant's First Set of Interrogatories. These supplemental responses incorporates by reference

all objections contained in The Guardian's responses to the Defendant's First Set of

Interrogatories

1.     Guardian's responses are subject to all objections as to competence, relevance,

materiality, admissibility, privilege, and privacy, and any and all other objections on grounds

that would require exclusion of any response herein if such were offered in Court, which

objections are reserved and may be interposed at the time of trial.

2.     No incidental or implied admissions may be inferred from Plaintiff's responses or

objections.  Guardian's response to all or any part of the Interrogatories should not be taken

as an admission that:  (1) Guardian accepts or admits the existence of any fact(s) set forth in

1

number state the volume and dollar amounts incurred by (a) reimbursing Members for

prescriptions; (b) purchasing Neurontin directly for resale in Plaintiff's pharmacies; or (c)

providing Neurontin in any other way (and identify same).

**Supplemental Response to Interrogatory No. 8:**

      See response to Interrogatory No. 7, above.  In addition, Guardian does not purchase
Neurontin directly for resale and does not own any pharmacies.


Interrogatory No. 9

      If Plaintiff requires pharmacies or providers to provide any directions, instructions or

warnings concerning proper use of Neurontin to prescription takers, or if Plaintiff itself provides

such materials, state: (a) the exact contents of such instructions or warning; (b) the place and

manner in which such directions, instructions or warnings were to be given to Neurontin takers;

and (c) the person or persons who was to provide such directions, instructions or warnings.

**Supplemental Response to Interrogatory No. 9:**

      The Guardian does not provide pharmacists with any directions, instructions, or warnings
concerning the proper use of Neurontin to prescription takers.  That is the responsibility of the
Defendant.  Therefore, the Guardian has never provided directions, instructions, or warnings
concerning the proper use of Neurtontin to prescription takers and does not have any documents
that would indicate that they have ever done this.

Interrogatory No. 12

      State whether Plaintiff or any representative of Plaintiff ever attended any seminars,

meetings or events at which the use of Neurontin for any off-label use was discussed; and if so,

state the name of the person(s) who attended, the date(s) of the event(s), the location of the

event(s), the title of the event(s), and the subject matter discussed.

**Supplemental Response to Interrogatory No. 12**

No representative of Guardian ever attended any such meeting.

Interrogatory No. 15

Itemize all damages you claim to have incurred, directly or indirectly, as a result of the
allegations in your Complaint, including, but not limited to, all pharmaceutical expenses, and the
address of each person who provided goods or services in connection with each such expense,
the nature of the goods or services provided, the dates of all services rendered to you or provision
of goods to you, the monetary amount of each such expense or item of damages, and the name
and address of the person or entity paying such obligation.

**Supplemental Response to Interrogatory No. 12:**

Guardian's damages will be determined and demonstrated by expert testimony in this
action. This information will be provided in accordance with any court order regarding the
exchange of expert reports.

Interrogatory No. 13

Describe in detail Plaintiff's knowledge of off-label uses of Neurontin by its Members,
including (a) when plaintiff first learned that Neurontin was being prescribed for off-label uses;
(b) how plaintiff first learned of this fact; (c) who told the Plaintiff this fact; (d) and what, if
anything the Plaintiff did upon learning of this fact.

**Supplemental Response to Interrogatory No. 13:**

Guardian objects to this Interrogatory on the grounds that it is overly broad, vague, and
does not seek information reasonably calculated to lead to admissible evidence insofar as the
issue of whether Neurontin was being prescribed off-label is irrelevant to the extent that the
subject of this litigation is the Defendants' illegal and fraudulent off-label marketing and
promotion of Neurontin for uses that were not approved by the FDA and for which the drug
showed no efficacy. Defendant also objects on the basis that this Interrogatory seeks information

13

that is protected by attorney client privilege and/or work product. Without waiving that objection, the Guardian states that it learned through various news reports that the Defendants had violated federal laws and/or regulations regarding the off-label marketing and promotion of Neurontin.

Interrogatory No. 14

State whether you have had any communications with Parke-Davis, Warner-Lambert, or

Pfizer, including but not limited to online, phoned, mailed or faxed communications, regarding

Neurontin, including the dates of any such communications.

**Supplemental Response to Interrogatory No. 14:**

Guardian has not had any such communications.

Interrogatory No. 15

Itemize all damages you claim to have incurred, directly or indirectly, as a result of the

allegations in your Complaint, including, but not limited to, all pharmaceutical expenses, and the

address of each person who provided goods or services in connection with each such expense,

the nature of the goods or services produced, the dates of all services rendered to you or

provision of goods to you, the monetary amount of each such expense or item of damages, and

the name and address of the person or entity paying such obligation.

**Supplemental Response to Interrogatory No. 15**

Damages will be determined and proven by experts and such damages information will be provided in accordance with any order of the court setting the date for the provision of such expert reports. Guardian objects to the remainder of the Interrogatory on the grounds that it is overly broad and vague. Without waiving that objection, Guardian has provided pharmacy claims data containing information responsive to this request.

# EXHIBIT K



Kaplan Fox & Kilsheimer LLP
Attorneys at Law
850 Third Avenue
New York, NY  10022
phone  212.687.1980
fax  212.687.7714
email  mail@kaplanfox.com
www.kaplanfox.com

August 9, 2007

**VIA EMAIL**

Deborah MacGregor, Esq.
Davis Polk & Wardwell
450 Lexington Avenue
New York, New York  10017

**Re**: **In re Neurontin Marketing and Sales Practices Litigation, MDL No. 1629 (PBS)**

Dear Debbie:

     I write on behalf of the Coordinated Plaintiffs and in response to your August 3 letter, in which you set forth a proposed scope for the noticed 30(b)(6) depositions of the Defendants. Without prejudice to the Coordinated Plaintiffs' right to seek and receive testimony on any of the noticed topics, we would like to raise the following specific concerns with you.

### I.    Document Notice

     Among other things, Defendants' proposed scope offers testimony "regarding the locations of potentially responsive Neurontin documents[.]"  The Coordinated Plaintiffs interpret this offer to include testimony regarding the following topics:  (i) Defendants' document retention policies and procedures; (ii) any intentional or inadvertent damage to or destruction of relevant documents; and (iii) Defendants' policies and procedures with regard to retention of documents created or possessed by former employees.  Please let us know whether we are incorrect in our interpretation.

### II.    Organizational Structure Notice

     Defendants' proposed scope seeks to limit testimony regarding Pfizer's organizational structure to groups located within the United States.  Plaintiffs believe that groups located outside the United States were involved in activities relevant to Neurontin.  For example, Neurontin-related clinical studies prepared outside the United States were submitted to the FDA. We request a witness be made available who can testify as to the structure of Pfizer's worldwide pharmaceutical group, and to the structure of any other foreign group, division or department that was involved in activities related to Neurontin or off-label marketing.



**KAPLAN*FOX***

In addition, the proposed scope currently promises testimony regarding "the general structure of the Warner-Lambert Health Care Management and other Customer Business Units, as well as any group or division that regularly interacted with third-party payors." We request that a witness also be prepared to testify as to the types of documents created or otherwise maintained at each such group or division.

Finally, the proposed scope offers testimony regarding "due diligence related to Neurontin done in connection with Pfizer's merger with Warner-Lambert." We ask that the scope of this topic be broadened to include testimony regarding due diligence related to off-label marketing.

### III.    Third-Party Payor Notice – Non-TPP Communication Topics

Subject Matter 6 calls for testimony regarding "[a]ny conclusions or views you, your agents or representative[s] held regarding whether Neurontin provides any medical benefit to patients who take it for any off-label uses[.]" Defendants' proposed scope offers to provide testimony related only to "sources and locations of documents" relevant to this subject. We cannot accept this limitation and request that a witness be produced who can succinctly testify as to what conclusions and views were actually held by the Defendants on this subject. Note, this request was made in Defendants' own 30(b)(6) notices to the Coordinated Plaintiffs, and witnesses were produced on this topic.

In addition, Subject Matters 8 and 9 call for information about each medical educational seminar in which Neurontin was discussed and at least one Pfizer, Warner-Lambert or Parke Davis representative attended or was involved. As currently stated, Defendants' proposed scope offers to provide testimony only concerning "policies and practices . . . with respect to the Neurontin team's funding or sponsorship" of such events. We ask that a witness also be prepared to testify as to the following topics: (i) the dates and locations of each event; (ii) the identification of any speakers or participants; (iii) the extent of any Defendant's actual involvement in each event; and (iv) the identification of each third-party attendee.

### IV.    Third-Party Payor Notice – TPP Communication Topics

Subject Matters 2, 3 and 10 seek testimony regarding the content of Neurontin-related communications and promotional efforts. As stated, Defendants' proposed scope offers testimony only with regard to the identification of sources for such information. We ask that a witness be produced that can testify as to content, as well as to informational sources. We also request that testimony on any topic related to communications with "third-party payors" not be limited to named parties and that the term "third-party payors" be interpreted to include agents of third-party payors, such as prescription benefit managers.

**KAPLAN*FOX***

Debbie MacGregor, Esq.
August 9, 2007
Page 3 of 3

        We do feel that the differences between us are sufficiently narrow that it would be appropriate to set deposition dates, and we request you forward us the same at your earliest convenience.  In the interim, we thank you for your continued cooperation on these issues.  We look forward to hearing from you soon.


                                Very truly yours,

                                *E. Katcher*
                                Elana Katcher


cc:  Linda Nussbaum, Esq.
     Ronald Aranoff, Esq.
     Annamarie Daley, Esq.
     Kenneth Fromson, Esq.
     Thomas Greene, Esq.
     Gerald Lawrence, Esq.
     Edward Notargiacomo, Esq.
     Ilyas Rona, Esq.
     Mark Sandmann, Esq.
     Daniel Seltz, Esq.
     Scott Simmer, Esq.
     Thomas Sobol, Esq.

# EXHIBIT L

IN RE: NEUROTIN MARKETING AND SALES PRACTICES LITIGATION, et al.

FRED GRANT BROWN 30(b)(6)
October 19, 2005

Page 280

**Brown**

[1]
[2] with any drug manufacturers?
[3]    A: No.
[4]    Q: Are you aware that the Trust or
[5] any of its trustees ever had any
[6] communications with the defendants in this
[7] action?
[8]    A: I'm not aware of any.
[9]    Q: Topic number 12 that was noticed
[10] is, "Any communications that you, the Trust,
[11] or any entity on the Trust's behalf, had with
[12] defendants regarding Neurontin or other
[13] prescription drugs."
[14]    Are you prepared to testify
[15] regarding the communications that the Trust or
[16] any entity on its behalf had with defendants
[17] regarding Neurontin or other prescription
[18] drugs?
[19]    MS. PACHARZINA: Objection.
[20] Mr. Brown is here today as a
[21] 30(b)(6) designee for the Trust as a
[22] trustee. You've subpoenaed Caremark
[23] you've subpoenaed ASI. You've
[24] subpoenaed all their agents, and they
[25] will testify that communications they

Page 281

**Brown**

[1]
[2] may or may not have had with defendants
[3] or anybody else.
[4]    But I just want to clarify,
[5] because there seem to have been some
[6] confusion, that Mr. Brown is testifying
[7] what the trustees in their ordinary
[8] course of being trustees know.
[9]    MR. MURRAY: I understand that.
[10]    MS. PACHARZINA: Okay.
[11]    A: So what was the question again?
[12]    Q: The question is: The trustees,
[13] in the ordinary course of being trustees, do
[14] they know, or are they aware of any
[15] communications that they, the trustees, or any
[16] other entities had with the defendants in this
[17] action regarding Neurontin or other
[18] prescription drugs?
[19]    A: Yeah, I know of none.
[20]    Q: And you're speaking on behalf of
[21] the Trust?
[22]    A: Yes, correct.
[23]    Q: Have you ever had any
[24] communications with the defendants?
[25]    A: No.

Page 282

**Brown**

[1]
[2]    Q: Is the Trust aware that the
[3] defendants pled guilty to regulatory violation
[4] of off-label promotion of Neurontin?
[5]    A: I read that in the Complaint.
[6]    Q: Other than reading that in the
[7] Complaint, do you know any information
[8] regarding that plea and the investigation and
[9] lawsuit that occurred preceding that plea?
[10]    A: I do not outside of the
[11] attorney/client privilege.
[12]    Q: And when I say "you," that
[13] includes the Trust, does the Trust know of any
[14] information regarding that investigation,
[15] besides information that you learned from your
[16] attorney?
[17]    A: No.
[18]    Q: Besides that investigation, are
[19] you aware of any other investigation or
[20] lawsuit into the off-label use or promotion of
[21] Neurontin?
[22]    A: Not outside the attorney/client
[23] privilege.
[24]    Q: The last topic we'll deal with
[25] today is the record retention. You may recall

Page 283

**Brown**

[1]
[2] that was one of the topics noticed in the
[3] 30(b)(6) Notice.
[4]    Does ASEA have a record or
[5] document-retention policy?
[6]    A: Under the terms of the agreement
[7] with ASI, ASI is responsible for maintaining
[8] them.
[9]    Q: So to the extent that trustees
[10] receive documents, do they retain them or do
[11] they rely upon ASI to retain copies of those
[12] documents?
[13]    A: The uniform policy is to rely on
[14] ASI, and once one becomes — is no longer a
[15] trustee, the policy is to destroy any records
[16] in their possession. There's no uniform
[17] practice of keeping records.
[18]    Q: To the extent that a trustee
[19] receives a document, if the trustee
[20] understands that ASI has a copy of that
[21] document, the trustee doesn't have an
[22] obligation to retain a copy of that document?
[23]    A: Correct.
[24]    Q: And does the Trust have a right
[25] to receive any of those documents from ASI?

# EXHIBIT M

```
1              -Matthews-
2      A.   No.
3      Q.   Next one, 11, is "Any information that
4  you have regarding what the uses were for Neurontin
5  prescriptions for which Harden is seeking
6  recovery."
7              Do you have any information regarding
8  what the uses were for the Neurontin prescriptions
9  for which Harden is seeking recovery?
10             (The witness reads document.)
11     A.   No.  I'm sorry, what was the question
12 again, I'm sorry?
13     Q.   Do you or does Harden have any
14 information regarding what the uses were for
15 Neurontin prescriptions for which Harden is seeking
16 recovery?
17     A.   We have information from counsel -- I'm
18 relying on counsel to give me that information.
19     Q.   Other than the information from counsel,
20 Harden doesn't have any other information?
21     A.   No.
22     Q.   Topic 12 is the communications that
23 Harden or any entity on Harden's behalf had with
24 defendants regarding Neurontin or other
25 prescriptions, are you prepared to testify about
```

50

12/14/2005  Matthews, Walter E. (MDL)

```
1              -Matthews-
2  that?
3      A.   Yes.
4      Q.   Are you aware of any such
5  communications?
6      A.   No.
7      Q.   Is there anybody else at Harden who
8  would know about such communications?
9      A.   No.
10     Q.   And 13, "Any information that Harden has
11 regarding whether the Neurontin prescriptions for
12 which it is seeking recovery were written as a
13 result of the alleged off-label promotion."  Are
14 you prepared to testify about that?
15     A.   Yes.
16     Q.   Does Harden have any information
17 regarding whether the Neurontin prescriptions for
18 which its seeking to recover were written as a
19 result of the off-label promotion?
20     A.   We relied on counsel for that
21 information.
22     Q.   Does it have any information that it
23 hasn't obtained from counsel?
24     A.   No.
25     Q.   Some of the requests we'll talk about
```

51

# EXHIBIT N

1          Objection.
2        THE WITNESS:
3          No.
4    BY MR. MURRAY:
5      Q.   Did Louisiana BlueCross ever
6    communicate with drug manufacturers during the
7    relevant period?
8      A.   Yes.
9      Q.   Under what circumstances?
10     A.   Drug manufacturers and drug reps call
11   on people from BlueCross, just like they call on
12   physician offices and hospitals, et cetera.  So
13   to the extent that they would have called on
14   someone from BlueCross, certainly there would
15   have been conversations.
16     Q.   And did Louisiana BlueCross have any
17   communications with Pfizer or Warner-Lambert
18   during the relevant period?
19     A.   Yes.
20     Q.   Under what circumstances?
21     A.   I know that from time to time I've
22   either met or corresponded with a Pfizer
23   representative.  I know that Pfizer worked with
24   the medical quality department a year or so ago
25   in helping sponsor some employee health fairs.

454

1/20/2006  Ford, Milam W. (MDL)

1    They have come in, they will often come in, and
2    I'm speaking not only of Pfizer, but any
3    company, but also Pfizer will come in to provide
4    clinical information or do a clinical review.
5          That's most commonly done when there's
6    a new drug placed on the market or there's a new
7    indication or there's a new landmark study, and
8    they might contact us to ask us if we're aware
9    of it or can they bring in a physician or
10   pharmacist to speak to the health care staff at
11   BlueCross to discuss the new information.  So
12   that's the typical context in which they would
13   contact BlueCross or we would have
14   conversations.
15     Q.   Were any of those communications
16   regarding Neurontin?
17     A.   Not that I'm aware of.
18     Q.   Who at Louisiana BlueCross would have
19   had conversations with Pfizer or Warner-Lambert
20   regarding Neurontin during the relevant period?
21   Both when you were there and then to the extent
22   that you weren't there as well.
23     A.   It would most typically be with someone
24   on the pharmacy staff.  So either a pharmacist
25   or someone on the medical staff, one of the

455

1    physicians.  Any correspondence with the nursing
2    staff would typically be limited to the quality
3    department or perhaps in some cases case
4    management.
5      Q.   So Louisiana BlueCross isn't aware of
6    any communications that Pfizer or Warner-Lambert
7    had with the company regarding Neurontin?
8      A.   No.
9      Q.   And are you aware of, or is Louisiana
10   BlueCross aware of Pfizer or Warner-Lambert ever
11   communicating with any of its PBM's regarding
12   Neurontin?
13     A.   Oh, I mean, this is pure speculation,
14   but I'm sure there's been many conversations
15   with the PBM's regarding Neurontin.
16     Q.   Are you aware of any of them?
17     A.   No, I'm not aware of any of them.
18     Q.   Is Louisiana BlueCross aware of any of
19   them?
20     A.   No, but I'm sure that minimally they
21   happen to the extent that the PBM's and
22   pharmaceutical companies negotiate those rebate
23   contracts and that's part of that, so I'm
24   certain conversations existed, but I'm not aware
25   of any of the specifics of those conversations.

456

# EXHIBIT O

1    because they don't exist any more.
2       Q.   It's, PCS is now part of --
3            MR. SANDMANN: Care Mark.
4            MR. ROWLAND: Care Mark.  It was Advanced, PCS
5       and then Care Mark.
6       A.   That is correct.
7       Q.   Do you know -- Well, do you know when
8    Neurontin was approved by the FDA?
9       A.   My understanding is in 1993, December of
10   1993.
11      Q.   And do you know when Neurontin would have
12   been added to PCS and Medco's formularies?
13      A.   I don't know.
14      Q.   Do you know anything about the process by
15   which it would have been added?
16      A.   I don't know.
17      Q.   Would anyone at Guardian know that?
18      A.   No, it will be based solely on the Medco's
19   process, and PCS process.
20      Q.   Did Guardian ever have any communications
21   with Pfizer, Warner-Lambert or Parke-Davis about
22   Neurontin?
23      A.   As far as I know, we didn't.
24      Q.   Does Guardian ever communicate with drug
25   manufacturers about -- about their drugs?

192

7/18/2007  Fernando, Ariel - Guardian 30(b)(6) - (MDL)

1       A.   Can you elaborate on that?
2       Q.   For example, would anyone from Guardian go to
3    industry sponsored conferences or presentations about
4    pharmaceutical drugs?
5       A.   As far as I know, we don't.
6       Q.   Would anyone from Guardian request
7    information about a drug from a manufacturer?
8       A.   As far as I know, we don't.  However, we were
9    contacted by the makers of Prilosec OTC if we wanted
10   to send out coupons to our members.
11      Q.   Is Guardian ever visited by pharmaceutical
12   sales reps?
13      A.   As far as I know, no.
14      Q.   Do you know if Medco or PCS would ever have
15   communications with Pfizer, Warner-Lambert about
16   Neurontin?
17      A.   Based on my, again, understanding of the
18   complaint, there are evidence to prove that they
19   contacted various PBMs about Neurontin.
20      Q.   Do you have any knowledge about that that you
21   got other than from the complaint?
22      A.   No.
23      Q.   So you never heard from anyone at Medco that
24   they talked to Pfizer about that?
25      A.   That is correct.

193

# EXHIBIT P

A. Carver

1
2    Q.   Actually, I'm not asking about
3    Permanente physicians, just the plaintiffs
4    themselves.
5         Physicians are technically not
6    employed by the plaintiffs, is that right?
7    A.   That's correct.
8         MS. NUSSBAUM:  Well, I think the
9    witness testified yesterday the Permanente
10   physicians write the prescriptions.
11        MR. JAMES:  Right, I understand that.
12   Q.   But have any statements been made by
13   the defendants to the plaintiffs themselves
14   regarding the use of Neurontin?
15        MS. NUSSBAUM:  You want to know
16   whether or not the defendants, Warner-Lambert and
17   Pfizer, either made -
18        MR. JAMES:  Actually, you know --
19        MS. NUSSBAUM:  -- statements to the
20   two plaintiffs in this case?
21        MR. JAMES:  -- the two plaintiffs in
22   this case or their employees.
23   A.   I believe that the defendants have
24   provided information to our Drug Information
25   Service who -- and certainly they are employed by

292

7/13/2007  Carver, Albert L. - 30(b)(6) - (MDL)

A. Carver

1
2    the plaintiffs.
3    Q.   Aside from information provided to the
4    Drug Information Service, are you aware of any
5    other statements made by the defendants to the
6    plaintiffs regarding the use of Neurontin?
7         MS. NUSSBAUM:  Over this ten-year
8    period?
9         MR. JAMES:  Yes.
10   A.   Not specific interactions or
11   information; no, of course not.
12   Q.   And with regard to information
13   provided by Pfizer regarding the use of Neurontin
14   to the Drug Information Service, which statements
15   are you aware that the defendants made?
16   A.   Specific statements, I cannot attest
17   to.
18        MS. NUSSBAUM:  Well, but can you in
19   general?
20        MR. JAMES:  That's fine.  Actually,
21   that was entirely responsive to my question.
22   Q.   Are you aware of any false statements
23   made by the defendants to the Drug Information
24   Service regarding the use of Neurontin?
25        MS. NUSSBAUM:  You want to know in

293

A. Carver

1
2    general, is he generally aware?
3    Q.   If you understand the question, you
4    can answer.
5    A.   The specific statements, I'm not aware
6    of.  I think that the information that would be
7    provided to the Drug Information Service would be
8    information provided by the defendants' marketing
9    individuals, as well as through information that
10   was generally available through the literature, or
11   in some cases, perhaps studies that the defendants
12   may have written or had written on their behalf.
13        I'm not aware of specific instances to
14   which I could point.
15   Q.   Are you aware generally of any false
16   statements made to the Drug Information Service?
17   A.   Not specific false information, no.
18   Q.   I guess now setting aside the
19   plaintiffs, with regard to Permanente physicians,
20   are you specifically aware of any statements made
21   by the defendants or their agents to Permanente
22   physicians regarding the off-label uses of
23   Neurontin?
24   A.   And by "specific," are you asking me
25   to cite a specific interaction between a

294

# EXHIBIT Q

**Page 163**

```
1   those -- who are those written for?
2        A.   Traditionally, when we do make any
3   formulary changes, we give a frequently asked
4   question document to customer service who
5   intercept the member calls.
6        Q.   Are they also prepared for those who
7   intercept calls from the providers?
8        A.   The pre-certification unit that
9   handles the provider calls will use the same
10  document.  It's not any different.
11       Q.   Have you ever had a communication
12  with Pfizer?
13       A.   Yes.
14       Q.   What was that communication about?
15       A.   Well, they're not necessarily one
16  communication.
17       Q.   Okay.  What types of communications
18  do you have with Pfizer?
19       A.   In our normal course of activity in
20  formulary development, we have a national
21  account manager with Pfizer and we have
22  meetings with them on a variety of different
23  topics, as we do formulary development.
24       Q.   Are these in-person communications?
25       A.   A mixture.  Usually, if there's a
```

**Page 164**

```
1   few e-mails here and there, part of normal
2   formulary -- formulary activity is new drugs
3   or when we're re-reviewing drugs or drug
4   classes, we'll met with them about any new
5   information on a drug; anything else that they
6   have they want to go over with us.
7        Q.   Is the national account manager, is
8   that someone with Aetna or at Pfizer?
9        A.   No, the national account manager
10  would be at Pfizer contact that would be our
11  main contact for everybody at Aetna to go to.
12       Q.   So that's the -- you're speaking of
13  someone at Pfizer?
14       A.   Correct.
15       Q.   Do you remember, any of your
16  conversations with Pfizer have anything to do
17  with Neurontin?
18       A.   We meet with all the drug
19  manufacturers all the time.  There's, I'm sure
20  in the context of a meeting while we were
21  reviewing the drug, we had some discussion
22  with Pfizer.  I don't remember the specifics
23  with that discussion, because it's pretty
24  routine part of our business to meet with the
25  manufacturers as we're working on all this
```

**Page 165**

```
1   drug review and preparation for P&T.
2        Q.   What kinds of information do the
3   pharmaceutical manufacturers supply that's
4   relevant to the formulary development process
5   at Aetna?
6             MR. LAWRENCE:  Objection.
7        A.   The national account manager will
8   meet with us in clinical, my unit, as well as
9   other people, such as Sue Shide and maybe
10  others.  So he or she may be supplying
11  different information to different people
12  inside of Aetna.
13            So with clinical, we're interacting
14  with what kind of clinical studies do you
15  have, what's the details around the clinical
16  study.  They may be dealing with Sue Shide,
17  for example, on other topics.
18       Q   (By Mr. Mizell) Other than
19  requesting studies that the manufacturer might
20  have about its drug, any other information
21  that you would request from the manufacturer?
22       A.   I don't remember specifically with
23  Pfizer, any specifics of items we requested.
24  But in a traditional, usual interaction, it's
25  any clinical information and any other
```

**Page 166**

```
1   information about the disease.  What
2   traditionally happens is the national account
3   manager isn't doing the presentation himself,
4   he brings in medical folks from within Pfizer
5   or within that particular manufacturer to come
6   bring that details of information to us.
7        Q.   Any other information from the
8   manufacturers?
9             MR. LAWRENCE:  Objection.
10       Q   (By Mr. Mizell) In this process?
11       A.   Yes, I'm sure in the interactions,
12  there may be others type of stuff that they
13  bring.  Sometimes we ask and sometimes they
14  give it to us unsolicited, such -- it could
15  vary from manufacturer to manufacturer.  I
16  don't remember anything different or specific
17  around Pfizer, but...
18       Q.   Are there any other types of
19  information that Aetna requests from the
20  manufacturers?
21            MR. LAWRENCE:  Objection.
22       A.   The common type of items that we
23  request in clinical is to come in and do a
24  clinical presentation which leaves it a little
25  open to the manufacturer to present what
```

1     information they feel is appropriate.  We

2     traditionally will ask for copies of

3     referenced articles or studies that they are

4     presenting.

5             And other times we also ask about

6     other marketing, just so we understand how a

7     physician is seeing the drug from them.

8         Q   (By Mr. Mizell)  Did you have any

9     communications with Warner-Lambert regarding

10    Neurontin?

11        A.   Again, in our normal process, I am

12    sure we had a meeting at that time when the

13    drug was coming out or being reviewed.  I'm

14    trying to remember when we reviewed it, I

15    think Warner Robin -- Warner-Lambert was part

16    of Pfizer already at that time.  But prior to

17    that, I would have normal interactions with

18    them about products.  I don't remember

19    anything specific about Neurontin.

20          (WHEREUPON, marked for identification,

21    Exhibit-11.)

22        Q   (By Mr. Mizell)  This is the

23    Responses to the Second Set of

24    Interrogatories.

25             MR. LAWRENCE:  Okay.  There are 11.

167

# EXHIBIT R

UNITED STATES DISTRICT COURT
MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re: NEURONTIN MARKETING AND
SALES PRACTICES LITIGATION

THIS DOCUMENT RELATES TO:

ALL ACTIONS,

: MDL Docket No. 1629

: Master File No. 04-10981

: Judge Patti B. Saris

:

:

:

:

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## RESPONSES AND OBJECTIONS OF PFIZER INC. AND WARNER-LAMBERT COMPANY TO PLAINTIFFS' FIRST REQUEST FOR PRODUCTION

Defendants Pfizer Inc. ("Pfizer") and Warner-Lambert Company ("Warner-Lambert") (collectively, "Defendants"), by their undersigned counsel, hereby object and respond to the Class and Non-Class Plaintiffs' First Request for Production of Documents (the "Request" or "Requests"). These responses and objections are made without in any way waiving or intending to waive, but on the contrary reserving and intending to reserve, the right to object on any additional ground at any time to a demand for further response or document production, and the right at any time to revise, supplement, correct, or add to these responses and objections.

## OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS

1.      Defendants object to the definitions and instructions to the extent they seek to impose obligations beyond those imposed by the Federal Rules of Civil Procedure or any other applicable rules.

2.      Defendants object to the definition of "CBU" to the extent that it defines the term to include "any division with [sic] Pfizer that performed the function of a CBU

"all" such documents. Defendants further object on the grounds that it seeks information and documents that are more appropriately sought from other parties, and it is therefore unduly burdensome as posed to Defendants. Defendants further object on the grounds that it is not limited to documents from the relevant time period. Defendants further object to Request No. 60 to the extent that it is unworkable in calling for documents regarding "events at which the off-label use of Neurontin was discussed." Defendants further object on the grounds that they have already produced documents relating to Request No. 60.

Subject to and without waiving the General Objections and the foregoing Specific Objections, Defendants will produce, at a mutually convenient time and location, additional documents, to the extent they exist, from the files of those persons responsible for the marketing of Neurontin, relating to the off-label use of Neurontin through December 31, 1998.

Request No. 61:

All documents relating to communications between any Vendor, including, but not limited to, the Identified Vendors and the Defendants regarding payment of persons who would make presentations at Events at which the off-label use of Neurontin was discussed or was expected to be discussed.

Response to Request No. 61:

In addition to the General Objections, Defendants object to Request No. 61 on the grounds that the request is overly broad and unduly burdensome, including by requesting "all" such documents. Defendants further object on the grounds that it is not limited to documents from the relevant time period and is duplicative of other requests. Defendants further object to Request No. 61 to the extent that it is unworkable in calling for

43

documents regarding "events at which the off-label use of Neurontin was discussed."

Defendants further object on the grounds that they have already produced documents

relating to Request No. 61.

Request No. 62:

All documents relating to communications between any Vendor, including, but not limited to, the Identified Vendors and the Defendants regarding the payment of, or the provision of Goods or Service of Value to persons who made presentations at Events at which the off-label use of Neurontin was discussed or was expected to be discussed.

Response to Request No. 62:

In addition to the General Objections, Defendants object to Request No. 62 on the

grounds that the request is overly broad and unduly burdensome, including by requesting

"all" such documents. Defendants further object on the grounds that it is not limited to

documents from the relevant time period, and is duplicative of other requests.

Defendants further object to Request No. 62 to the extent that it is unworkable in calling

for documents regarding "events at which the off-label use of Neurontin was discussed."

Defendants further object on the grounds that they have already produced documents

relating to Request No. 62.

Request No. 63:

All documents relating to communications between any Vendor, including, but not limited to, the Identified Vendors and the Defendants regarding payment of, or the provision of Goods or Service of Value to, persons who attended Events at which the off-label use of Neurontin was discussed or was expected to be discussed.

Response to Request No. 63:

In addition to the General Objections, Defendants object to Request No. 63 on the

grounds that the request is overly broad and unduly burdensome, including by requesting

"all" such documents. Defendants further object on the grounds that it is not limited to

for the marketing of Neurontin, relating to the off-label use of Neurontin through

December 31, 1998.

Request No. 67:

All documents relating to marketing strategies for Neurontin (whether at the national, regional or CBU level).

Response to Request No. 67:

In addition to the General Objections, Defendants object to Request No. 67 on the

grounds that the request is overly broad and unduly burdensome, including by requesting

"all" such documents. Defendants further object on the grounds that request is not

limited to documents from the relevant time period. Defendants further object to Request

No. 67 on the grounds that it is not confined to off-label uses of Neurontin. Defendants

further object on the grounds that they have already produced documents relating to

Request No. 67.

Subject to and without waiving the General Objections and the foregoing Specific

Objections, Defendants will produce, at a mutually convenient time and location,

additional documents, to the extent they exist, from the files of those persons responsible

for the marketing of Neurontin, relating to the off-label use of Neurontin through

December 31, 1998.

Request No. 68:

All documents relating to tactical plans created to implement marketing strategies for Neurontin (whether at the national, regional or CBU level).

Response to Request No. 68:

In addition to the General Objections, Defendants object to Request No. 68 on the

grounds that the request is overly broad and unduly burdensome, including by requesting

47

"all" such documents. Defendants further object on the grounds that request is not limited to documents from the relevant time period, and is duplicative of other requests. Defendants further object to Request No. 68 on the grounds that it is not confined to off-label uses of Neurontin. Defendants further object on the grounds that they have already produced documents relating to Request No. 68.

Subject to and without waiving the General Objections and the foregoing Specific Objections, Defendants will produce, at a mutually convenient time and location, additional documents, to the extent they exist, from the files of those persons responsible for the marketing of Neurontin, relating to the off-label use of Neurontin through December 31, 1998.

Request No. 69:

All documents relating to any Vendors, including, but not limited to, the Identified Vendors' design, composition, assistance with, execution, drafting or revision of any Neurontin marketing strategy.

Response to Request No. 69:

In addition to the General Objections, Defendants object to Request No. 69 on the grounds that the request is overly broad and unduly burdensome, including by requesting "all" such documents. Defendants further object on the grounds that request is not limited to documents from the relevant time period, and is duplicative of other requests. Defendants further object to Request No. 69 on the grounds that it is not confined to off-label uses of Neurontin. Defendants further object on the grounds that they have already produced documents relating to Request No. 69.

48

Request No. 228:

     All documents relating to approval of slides by Defendants (or by any contractor retained by them, including, but not limited to, the Identified Vendors) to be shown at any presentation relating to Neurontin at any Event.

Response to Request No. 228:

     In addition to the General Objections, Defendants object to Request No. 228 on

the grounds that the request is overly broad and unduly burdensome, including by

requesting "all" such documents.  Defendants further object on the basis that the request

is not limited to documents from the relevant time period.  Defendants further object to

the Request on the grounds that it is not limited to off-label uses of Neurontin.

     Subject to and without waiving the General Objections and the foregoing Specific

Objections, Defendants will produce, at a mutually convenient time and location,

additional documents, to the extent they exist, from the files of those persons responsible

for the marketing of Neurontin, relating to the off-label use of Neurontin through

December 31, 1998.

Request No. 229:

     All documents relating to insurance reimbursement for off-label Neurontin prescriptions.

Response to Request No. 229:

     In addition to the General Objections, Defendants further object on the grounds

that the request is overly broad and unduly burdensome, including by requesting "all"

such documents.  Defendants further object on the grounds that it fails to describe the

documents sought with reasonable particularity.  Defendants further object on the

grounds that it seeks documents from outside the relevant time period.  Defendants

144

further object on the grounds that such documents and information are more

appropriately sought from third parties.

Request No. 230:

All documents relating to third party payor reimbursement for off-label Neurontin prescriptions.

Response to Request No. 230:

In addition to the General Objections, Defendants further object on the grounds

that the request is overly broad and unduly burdensome, including by requesting "all"

such documents. Defendants further object on the grounds that it fails to describe the

documents sought with reasonable particularity. Defendants further object on the

grounds that it seeks documents from outside the relevant time period. Defendants

further object on the grounds that such documents and information are more

appropriately sought from third parties.

Request No. 231:

All documents relating to Neurontin formulary approval for uses others than adjunct epilepsy therapy.

Response to Request No. 231:

In addition to the General Objections, Defendants object to Request No. 224 on

the grounds that the request is overly broad and unduly burdensome, including by

requesting "all" such documents. Defendants further object on the basis that the request

is not limited to documents from the relevant time period. Defendants further object on

the grounds that it fails to describe the documents sought with reasonable particularity.

Defendants further object on the grounds that such documents are more appropriately

sought from third parties.

145

further object on the grounds that they have already produced documents responsive to the request.

Request No. 242:

All documents relating to payment or non-payment of claims relating to prescriptions for off-label use of Neurontin by third-party payors.

Response to Request No. 242:

In addition to the General Objections, Defendants further object on the grounds that the request is overly broad and unduly burdensome, including by requesting "all" such documents. Defendants further object on the grounds that it seeks documents from outside the relevant time period. Defendants further object on the grounds that such documents and information are more appropriately sought from third parties.

Request No. 243:

All documents relating to Defendants' efforts to have Neurontin included on the formularies of third-party payors.

Response to Request No. 243:

In addition to the General Objections, Defendants further object on the grounds that the request is overly broad and unduly burdensome, including by requesting "all" such documents. Defendants further object on the grounds that it fails to describe the documents sought with reasonable particularity. Defendants further object on the grounds that it seeks documents from outside the relevant time period. Defendants further object on the grounds that such documents and information are more appropriately sought from third parties.

Request No. 244:

All documents relating to the effect of the development and potential sale of Lyrica (pregabelin) on the marketing of Neurontin, including but not limited to any effect

the development of Lyrica had on the decision not to seek approval of Neurontin for off-label uses.

Response to Request No. 244:

In addition to the General Objections, Defendants object to Request No. 244 on

the grounds that the request is overly broad and unduly burdensome, including by

requesting "all" such documents. Defendants further object on the basis that the request

is not limited to documents from the relevant time period. Defendants further object to

the Request on the grounds that the request calls for documents that are not relevant to

the present litigation and are not reasonably calculated to lead to the discovery of

admissible evidence.

Request No. 245:

All documents relating to any instructions, comments, advice or communications given by Defendants to physicians or pharmacists regarding how reimbursement should be sought or obtained from third-party payors with regard to Neurontin prescriptions for off-label uses.

Response to Request No. 245:

In addition to the General Objections, Defendants object to Request No. 244 on

the grounds that the request is overly broad and unduly burdensome, including by

requesting "all" such documents. Defendants further object on the basis that the request

is not limited to documents from the relevant time period. Defendants further object to

the Request on the grounds that the request is vague and ambiguous.

Request No. 246:

All documents relating to any applications or certifications filed with the FDA pursuant to Section 401 of the Food and Drug Administration Modernization Act (FDAMA) with regard to off-label use of Neurontin.