# EXHIBIT E(1)

# Exhibit B



DEPARTMENT OF HEALTH & HUMAN SERVICES

Public Health Service

Food and Drug Administration
Rockville MD 20857



RECEIVED
JUL 2 2 1996
WORLDWIDE REGULATORY AFFAIRS

JUL 19 1996

DO NOT COPY

TRANSMITTED VIA FACSIMILE

bcc:    Addressee
        I. Martin
        R. Moffitt (Central File & CBI)

William M. Merino, Ph.D.
Senior Vice President
Worldwide Regulatory Affairs
Parke-Davis
2800 Plymouth Road
Ann Arbor, MI 48105

Re:    NDA 20-235
       Neurontin (gabapentin capsules)
       MACMIS File ID# 4162

Dear Dr. Merino:

The Food and Drug Administration ("FDA") is concerned that Parke-Davis may be
promoting Neurontin for "off-label" uses, i.e., any use beyond the FDA-approved
indications, in printed promotional materials, in detail or sales presentations to
physicians, and through the use of company-solicited physician participation in a
series of teleconferences.  FDA is initiating an inquiry that will focus on these
concerns.  These promotions of Neurontin for off-label uses include, but are not
limited to, its use in chronic pain, bipolar disorders, and other psychiatric
conditions.  As you are aware, Neurontin's only approved indication is as adjunctive
therapy in the treatment of partial seizures with and without secondary
generalization in adults with epilepsy.

The purpose of this letter is to request Parke-Davis' cooperation in this inquiry and
to request that it voluntarily answer the questions posed below and submit the
documents described below:

2

## REQUESTS

FDA has tried to make its request sufficiently comprehensive without being unduly burdensome. However, the request should not be considered all-inclusive. As in any inquiry, it is possible that FDA will find it necessary to seek access to additional records or pursue additional lines of inquiry.

FDA asks that you carefully follow the definitions, instructions, and specifications below:

## DEFINITIONS

The following definitions are not intended to apply generally. They are specific to the purposes of this inquiry.

DEFINITION 1:    "Company" means Parke-Davis, as well as its directors, officers, employees, agents and representatives, its parents, predecessors, divisions, subsidiaries, affiliates, partnerships and joint ventures. The words "subsidiary," "affiliate" and "joint venture" refer to each firm in which there is partial (10 percent or more) as well as total ownership or control between corporations.

DEFINITION 2:    The term "person" means any natural person, governmental entity, corporate entity, partnership, association, joint venture, trust, or other corporation, whether organized for profit or not.

DEFINITION 3:    The term "documents" means all written, printed, recorded, or graphic materials of every kind, prepared by any person, including, but not limited to, letters, telegrams, telexes, memoranda, reports, published articles, unpublished articles, newsletters, group mailings, educational materials, contracts, studies, plans, calendar or diary entries, minutes, pamphlets, "sales aids," typed or handwritten notes, charts, tabulations, records of meetings, conferences, peer influence dinners or other peer influence meetings, and telephone or other conversations or communications, as well as film, audio and video tapes, or slides and all other data compilations in the possession, custody, or control of the Company. The phrase "other data compilations" includes, but is not limited to, information stored in, or accessible through, computer or other information retrieval systems, together with instructions and all other material necessary to use or interpret such data compilations. The term "documents" includes all non-identical copies of each document, including copies upon which notes have been made and drafts, even if the originals are not in your possession, custody or control.

3

**DEFINITION 4:**     Neurontin means the prescription drug product having the established name "gabapentin," that is the subject of New Drug Application No. 20-235 and is manufactured and/or sold by the Company.

**DEFINITION 5:**     The term "employee" means each officer, director, agent, and every person employed by the Company, and each and every person performing services for the Company in exchange for consideration of any type.

**DEFINITION 6:**     "Grant" means the funding provided to any person or organization for research, educational, promotional, or other activities.

**INSTRUCTIONS**

**INSTRUCTION 1:**   Unless otherwise specified, this request calls for the submission of documents dated, generated, or received, or if a contract or agreement, in effect, at any time from December 30, 1993 until the date of final response to this request.

**INSTRUCTION 2:**   Each document that is responsive to this request should be produced in its entirety, including all attachments, even if only a portion of the document is related to the specified subject matter.  This means that an uncut, unexpunged and unedited copy of a responsive document should be submitted, including all appendices, tables, or other attachments.  If an appendix, table or other attachment is not presented with the original, but is attached to a copy thereof or is otherwise available, it should be submitted and clearly marked to indicate the document to which it corresponds.  No document or portion thereof should be masked, redacted, or deleted in any manner.

**INSTRUCTION 3:**   This request calls for all responsive documents in the possession, custody, or control of the Company including, without limitation, those documents held by any of the officers, directors, employees, agents, or representatives of the Company, whether or not such documents are on the premises of the Company. If any such person is unwilling to have his or her files reviewed or is unwilling to produce responsive documents, the Company should provide the following with respect to each and every such person: his or her name, address, telephone number, and relationship to the Company, and each document which the Company believes may be in such person's possession, custody or control.

**INSTRUCTION 4:**   If documents responsive to a particular specification no longer exist, but are known or believed to have been in existence, state the circumstances under which they were lost or destroyed or the circumstances due to which they

4

are otherwise no longer in existence, and identify and provide a summary of all such documents to the fullest extent possible. For each document, also provide the approximate date of its loss or destruction and identify all persons having knowledge of the contents of each such document.

INSTRUCTION 5: The response to each specification should be identified by number and segregated from responses to other specifications. Each page or sheet produced should be marked in a corner with identification and consecutive document control numbers, with the exception of bound pamphlets or books, which may be marked with a single control number.

INSTRUCTION 6: Identify the person(s) responsible for preparing, reviewing, revising or approving the response to this request, describe the role, authority and activities of such person(s) with respect to such response, and submit a copy of all instructions prepared by the Company relating to the steps taken to respond to this request. Where oral instructions were given, provide a verified statement from the person who gave such instructions, detailing the content of the instructions and the person(s) to whom the instructions were given.

INSTRUCTION 7: FDA requests that the Company voluntarily provide all responsive documents. In the event the Company declines to provide any specific document or group of documents, for each such document or group of documents the Company should provide a brief description of the contents of the document(s), and a statement of the reason for withholding the document(s).

SPECIFICATIONS

In accordance with the definitions and instructions above, please submit the documents described in the following specifications:

SPECIFICATION 1:      Documents sufficient to show the Company's document retention policy or policies.

SPECIFICATION 2:      Documents sufficient to show the organizational structure of the Company, including organizational charts.

SPECIFICATION 3:      All documents related to the training or instructions to employee detail representatives, (including any contract detail representatives), territory managers and ABMs or any other agents regarding promotional activities, educational activities or informational activities concerning Neurontin for any use other than as an adjunctive therapy in adults with epilepsy.

5

**SPECIFICATION 4:**    All documents related to any contractual relationship between the Company and any other entity that is responsible for the distribution and/or promotion of Neurontin and all communications pursuant to such relationships. .

**SPECIFICATION 5:**    All documents in the possession, custody or control of any employee or agent of the Company that relates in any way to the promotion, marketing and/or public relations activities, responses to requests for information, or teleconferences on the subject of or otherwise concerning off-label use(s) for Neurontin.  Your response should include, but is not limited to, all marketing plans and strategy documents; communications from the Vice President for Marketing and/or Sales to Field Managers or Representatives; and field visit follow-up memoranda from either the Vice President for Sales and/or Marketing, the Regional Managers, and/or the District Managers.

**SPECIFICATION 6:**    Documents sufficient to show the identity of each of the Company's Product Managers with any responsibilities related to Neurontin, and the specific responsibilities of each such Product Manager.

**SPECIFICATION 7:**    Documents sufficient to show the identity of each and every employee or agent of the Company involved in planning and/or implementing marketing, public relations, sales, or any other promotional, educational or informational programs or activities related to the use of Neurontin, and the name of and type of activity or program involved.

**SPECIFICATION 8:**    Documents sufficient to show the identity, address and business position (title) of each and every Company district, regional, branch, or area manager or supervisor responsible for the supervision and/or training of employees engaged in the promotion of Neurontin.

**SPECIFICATION 9:**    All records, slides, prepared scripts, handouts, "sales aids," and any other documents (including audiotapes) that relate in any way to the Company's participation in any and all scientific meetings -- including teleconferences -- where Neurontin was promoted or discussed.

**SPECIFICATION 10:**    All records, information, "sales aids," audiotapes, prepared scripts or agendas or outlines, or handouts that relate in any way to participation in teleconferences with physicians or other healthcare practitioners during which Neurontin was promoted or discussed.

**SPECIFICATION 11:**    Documents sufficient to show the identity and address of each healthcare professional known to have received copies of promotional or educational materials on off-label uses for Neurontin from the Company or who

6

participated in teleconferences that discussed off-label uses of Neurontin, the dates of participation in any of said teleconferences, the discussion topics of said teleconferences, and copies of the healthcare professional's dated requests for such information. You are also requested to provide labeled copies of the audiotapes of said teleconferences.

SPECIFICATION 12:    Documents sufficient to identify the following persons (explaining their respective titles, responsibilities and relationships vis-a-vis Parke-Davis in the context of the drug Neurontin (e.g., employee, independent contractor, clinical investigator, grantee, recipient of funds, compensated spokesperson, conference call moderator, etc.)): LeeAnne Fogleman, Barbara Williams, Beth Attias-Yon, David Longmire, M.D., David Meyer, M.D., Travis Jackson, M.D., Jeffrey Gelblum, M.D., David Marcotte, M.D., Gary Mellick, D.O., Micheal McLean, M.D., Ph.D., Douglas Mann, M.D., Dr. Cochran, Dr. Hansen, and Dr. Stein.

SPECIFICATION 13:    With respect to each of the individuals identified in Specification 12, identify and describe any contracts, grants, or other arrangements between the Company and such individual, at any time during the past three years; describe fully the nature of such arrangement; identify any payments, grants, honoraria, gratuities, compensation, bonuses, awards, or other items of value provided by the Company to such individual during the past three years, and all research or other services provided by such individual for, on behalf of, or to the Company; and provide all documents memorializing or relating to any such agreement, payment or services.

SPECIFICATION 14:    Documents sufficient to show who or what is "Intercall," Intercall's relationship with the Company and Intercall's relationship with the marketing, public relations, sales, or any other promotional or educational programs or activities related to the use of Neurontin.

SPECIFICATION 15:    All documents pertaining to the recruitment of conference call moderators and investigators for clinical studies for off-label uses of Neurontin, including symposia or teleconferences, and a comprehensive listing of any and all support provided to these persons. For each document responsive to this request that is a publication sponsored (in any manner) by the Company, your response should include a detailed statement defining the relationship between the authors, editors and the Company.

SPECIFICATION 16:    All documents and information, including articles and other publications, that have been authored or edited by any person affiliated with or sponsored by the Company that discuss any off-label use(s) for Neurontin. These documents would include, but are not limited to, newsletters, sole sponsored

7

journals, educational materials, data derived from "peer influence dinners" or other peer influence meetings, and physician programs -- including teleconferences.

SPECIFICATION 17:    All documents related to the Company's policy regarding the issuing of any and all types of grants (including, but not limited to, unrestricted educational grants), funding for post-approval research, funding for any type of foundation or research center, or any other similar program. Your response should include, but is not limited to, a comprehensive and complete listing of all grants or post-approval research funding that have been issued relating in any way to Neurontin. The listing should include the name of the recipient, the address of the recipient, the name of the person approving the grant, the date of the award, the amount of the award and a summary of the project or endeavor including any actual and/or anticipated outcome.

SPECIFICATION 18:    All documents to, from, or between the Company and any health care practitioner, including any clinical investigator, regarding off-label use(s) of Neurontin. Your response should include, but is not limited to, any documents related to any on-going investigation, study or other mechanisms that may be employed to track or influence the utilization of the product(s).

## QUESTIONS

1.    Is the Company currently aware of, involved with or currently sponsoring any clinical trial(s) involving the administration of Neurontin in patients suffering from: cervical pain, trigeminal neuralgia, epilepsy with co-morbid pain syndromes, bipolar disorder or other psychiatric conditions, reflex sympathetic dystrophy ("RSD"), diabetic neuropathy, or various other neuropathic pain syndromes?

2.    If the Company's response to question one is affirmative, please identify the trial(s) and investigator(s), describe the Company's involvement in sponsorship, design, and analysis of the trial, and provide FDA with a copy of all data from such studies that is currently in the Company's possession. FDA encourages the Company to include, as part of its response, any descriptive statement as to possible limitations of such data.

3.    What is an "ABM"? What are the duties of an ABM?

4.    Is the Company currently aware of, involved with, currently sponsoring, or has it sponsored in the past any teleconferences (including, but not limited to, those held in one or more of the following months:   January 1996, February 1996, March 1996, April 1996, May 1996, June 1996) involving the administration of Neurontin to patients suffering from: cervical pain,

8

trigeminal neuralgia, epilepsy with co-morbid pain syndromes, bipolar disorder or other psychiatric conditions, reflex sympathetic dystrophy ("RSD"), diabetic neuropathy, or various other neuropathic pain syndromes?

5.   If the Company's response to question four is affirmative, please identify the conference call moderators and all other participants (e.g., physicians) and describe the Company's involvement in the sponsorship, design, and format of the teleconference, and provide FDA with a copy of all documents (including any audiotapes) pertaining to such teleconferences that are currently in the Company's possession.

6.   If the Company's response to question four is affirmative, please explain the circumstances surrounding the selection of the conference call moderators and all other participants.  Why and how were these individuals selected for their respective roles?   Please include documents sufficient to show the respective individual's relationship with the Company.

7.   If the Company's response to question four is affirmative, please explain the interactions between Company representatives (e.g., "drug or sales" "reps") and all physicians (and other participants) who took part in the teleconferences.
       a) For example, did the reps notify the participants (e.g., physicians) of the existence of the teleconference?
       b) If the reps did not notify the participants of the existence of the teleconference, how was the existence of the teleconference publicized?
       c) Did the "reps" provide food (e.g., lunch), gifts, or any form of remuneration to any of the participants?
       d) Were the conference call moderators compensated by the Company for their time, etc?
Please include any documents that will support or relate to your answer .

FDA would be pleased to discuss this request with the Company and encourages Parke-Davis to contact the undersigned or Lisa Stockbridge, Ph.D.  if it has questions about these requests.   If Parke-Davis has information that will enable us to limit the scope of this request in a manner consistent with our regulatory responsibilities, please bring such information to our attention as soon as possible by contacting the undersigned at (301) 827-2831.

Please address your response to Lesley R. Frank, Ph.D., J.D., at the Food and Drug Administration, Division of Drug Marketing, Advertising and Communications, HFD-40, Rm 17-B-20, 5600 Fishers Lane, Rockville, Maryland 20857.  Within ten

9

business days of receiving this correspondence, please provide written notice of your intention to comply with this request. In addition, your response, including requested documents, should be received by September 3, 1996.

Sincerely,

Lesley R. Frank, Ph.D., J.D.
Special Assistant to the Director
Division of Drug Marketing,
Advertising and Communications
Center for Drug
Evaluation and Research

# Exhibit C



DEPARTMENT OF HEALTH & HUMAN SERVICES                                    Public Health Service

Food and Drug Administration
Rockville, MD 20857

NDA 20-235
NDA 20-882
NDA 21-129

1-3128

Pfizer, Inc.
Attention: Manini Patel
          Director, Worldwide Regulatory Affairs
235 E. 42nd Street  150/7/6
New York, NY 10017

Dear Ms. Patel:

Please refer to your new drug application (NDA) submitted under section 505(b) of the Federal Food, Drug, and Cosmetic Act for Neurontin (gabapentin) Capsules, Neurontin (gabapentin) Tablets, and Neurontin (gabapentin) Oral Solution.

There is evidence that patients with epilepsy are at an elevated risk for suicidality (suicidal thinking and behavior) and completed suicide. Despite this elevated population risk, the concern has been raised that some anti-epileptic drugs (AEDs) may be associated with an increased risk of suicidality. Given the recent observation of suicidality as a drug-induced adverse effect in pediatric patients exposed to various antidepressants in placebo-controlled trials, there is interest in examining data from placebo-controlled trials of AEDs to assess for a similar effect. Based on our experience with the pediatric antidepressant trials, the Division of Neuropharmacological Drug Products (DNDP) has developed a standard approach for evaluating drug-induced suicidality. Thus, we ask that you utilize the approach we have outlined in this letter for evaluating "possibly suicide related" adverse events occurring in placebo-controlled trials for gabapentin.

We request that you identify the trials from your development program (regardless of whether the indication is approved or not) that meet the following criteria: placebo-controlled; parallel arm; short-term (up to six months); at least 30 patients total. Some trials in epilepsy may have utilized a subtherapeutic dose of a standard AED as a comparator arm. Those trials should be included (if they meet the other criteria described above) and the subtherapeutic comparator arm should be coded as a "low dose-placebo" (see variable list below).

Once we have agreed upon the list of trials upon which to focus this exploration, we ask that you utilize the following approach to identifying and further evaluating "possibly suicide related" adverse events occurring in these trials.

NDA 20-235
NDA 20-882
NDA 21-129
Page 2

## Search for "Possibly Suicide-Related" Adverse Events and Preparation of Narrative Summaries

### Time Frame for "Possibly Suicide-Related" Adverse Events

This search should be strictly limited to adverse events that occurred during the double-blind phase of treatment, or within 1 day of stopping randomized treatment. Adverse events should not be included if they occurred prior to randomization or more than 1 day after discontinuing from randomized treatment. The end of trials with a tapering period should be set to be at the beginning of the tapering period. Events occurring more than 1 day after discontinuing from randomized treatment should be excluded even if discontinuation occurred before the nominal endpoint of the trial. For example, if a patient either discontinued of his own volition or was asked to discontinue by the investigator after 2 weeks of randomized treatment in a trial of 8 weeks duration, and the patient then experienced a "possibly suicide related" adverse event 2 days after stopping, that event should not be included.

### Search Strategies for "Possibly Suicide-Related" Adverse Events

The following search strategies should be employed to identity adverse events of possible interest:

- Any events coded to preferred terms that include the text strings "suic" or "overdos," including all events coded as "accidental overdose" should be included.

- Regardless of the preferred term to which the verbatim term is mapped, all verbatim terms should be searched for the following text strings: "attempt", "cut", "gas", "hang", "hung", "jump", "mutilat-", "overdos-", "self damag-", "self harm", "self inflict", "self injur-", "shoot", "slash", "suic-", "poison", "asphyxiation", "suffocation", "firearm" should be included.

   Note: Any terms identified by this search because the text string was a substring of an unrelated word should be excluded (for example, the text string "cut" might identify the word "acute"). These terms might be characterized as "false positives" in the sense that the verbatim term was selected because one of the text strings occurred within that term but the term had no relevance to suicidality. Although we request that such terms be excluded, we ask that you prepare a table listing all such false positives, as follows:

   | Study # | Patient # | Treatment Assignment | Term in Which Text String Occurred |
   |---------|-----------|----------------------|------------------------------------|

   The patients in this table will have as many rows as they have potential events.

- All deaths and other serious adverse events (SAEs) should be included.

- All adverse events coded as "accidental injury" should be included.

NDA 20-235
NDA 20-882
NDA 21-129
Page 3

Preparation of Narrative Summaries for "Possibly Suicide-Related" Adverse Events

A complete set of narrative summaries should be prepared and collected for all "possibly suicide-related" adverse events. In some cases, narratives will have already been prepared, e.g., deaths and SAEs. In other cases, however, you will need to prepare narrative summaries by searching CRFs for any information that might be considered possibly relevant to suicidality. You should also utilize other relevant sources of information, e.g., hospital records, results of consults, questionnaire responses, etc, in preparing these narrative summaries. Depending on how much information is available, narrative summaries may be longer than 1 page, however, in no case, should more than 1 narrative summary be included on a single page. Following is the type of information that should be included in the original narrative summaries:

- Patient ID number
- Trial number
- Treatment group
- Dose at time of event (mg)
- Recent dose change — elaborate on timing and amount of dose change
- Sex
- Age
- Diagnosis
- History of suicidal thoughts
- History of suicide attempt
- History of self harm
- Adverse event Preferred term
- Adverse event Verbatim term
- Serious adverse event (y/n)
- Number of days on drug at time of event
- Treatment was discontinued following event (y/n)
- Patient had an emergency department visit and was discharged (y/n)
- Patient was hospitalized (y/n)
- Patient died (y/n) – if yes, elaborate on cause of death
- Associated treatment emergent adverse events
- Concurrent psychosocial stressors
- Psychiatric comorbidities
- Concomitant medications
  - Other pertinent information (e.g., family history of psychiatric disorders)-

Other relevant information for preparing narrative summaries:
  -Patients may be identified as having events of interest in one or more of the above searches, and they may have more than one event of interest. In no case, however, should there be more than one narrative summary per patient. In cases where there is more than one event for a given patient, each different event should be clearly demarcated in the narrative.

NDA 20-235
NDA 20-882
NDA 21-129
Page 4

-Only events occurring during the "exposure window" defined as during the double-blind phase (including the first day after abrupt discontinuation or the first day of taper, if tapering is utilized) should be included in the narrative summary, i.e., do not include any prerandomization events or events occurring more than 1 day after stopping randomized treatment or during the tapering period.

-Do not exclude events of interest on the basis of your judgment that they might not represent "treatment-emergent" events; we feel this judgment is too difficult to make and we prefer to simply include all potentially relevant events, regardless of whether or not similar thoughts or behaviors may have occurred prior to treatment.

## Classification of "Possibly Suicide-Related" Adverse Events

Once the narrative summaries for "possibly suicide-related" adverse events are prepared and collected, we ask that you accomplish a rational classification of these events using the approach that was well-characterized by the Columbia group for the pediatric suicidality narratives. This approach was described in detail by Dr. Kelly Posner at the September 13 and 14, 2004 advisory committee meeting. The details are provided in her slides for that meeting (available on FDA's website), in the transcript for that meeting, and in other reviews, etc. pertinent to pediatric suicidality and available on FDA's website at the following URLs:

- Slides
  http://www.fda.gov/ohrms/dockets/ac/04/slides/2004-4065S1_06_FDA-Posner.ppt
- Briefing Document, transcripts, etc.
  http://www.fda.gov/ohrms/dockets/ac/cder04.html#PsychopharmacologicDrugs

The categories of interest from FDA's standpoint are as follows:

Suicide attempt (code 1)
Preparatory acts toward imminent suicidal behavior (code 2)
Self-injurious behavior, intent unknown (code 3)
Suicidal ideation (code 4)
Not enough information (code 5)
Self-injurious behavior, no suicidal intent (code 6)
Other: accident; psychiatric; medical (code 7)

Those individuals who classify the narratives must have the appropriate expertise and training to accomplish this task.

Prior to their rational classification, the narratives must be blinded to details that might bias their assessments. The details of appropriate blinding of the narratives can also be obtained in the transcript from the advisory committee meeting referred to above, and the materials available on FDA's website pertinent to that meeting. We request that you block out the following information that could reveal treatment assignment:

- Identifying patient information, identity of study drug, and patient's randomized drug assignment

NDA 20-235
NDA 20-882
NDA 21-129
Page 5

- All identifying information regarding the sponsor, the clinical trial number, and the location of the trial
- All years with the exception of years in remote history
- Study drug start and stop dates (month, day, and year)
- All medications, both prescription and non-prescription, whether taken before, during, or after the study; non-pharmaceutical substances (e.g., alcohol, tobacco) should not be blocked out
- Names of medications involved in overdoses; the number of pills consumed should not be blocked out
- Indications for medications started during or after the study
- Indications for study drug

Once you have decided on an approach to accomplishing the task of blinding and classifying the narratives, we would be happy to review and comment on your plan.

**Data Submission to DNDP**

In order to perform additional analyses investigating the relationship between exposure to AEDs and "suicide-related" adverse events in adults and the pediatric population, we would appreciate your submitting the following variables as outlined in the next table. Note that we are requesting information from placebo (and "low dose-placebo") controlled trials only. We would expect that you will provide us with a completed JMP dataset within 6 months from the date of this letter.

| Variable name | Type | Description | Coding notes |
|---|---|---|---|
| SOURCE | Character | First few letters of your drug name | |
| INDICATION | Character | Disease being studied in trial | E.g., epilepsy- adjunctive, epilepsy- monotherapy, bipolar disorder, migraine, etc. |
| TRIAL | Character | Trial ID | |
| CTPID | Character | Patient ID within each trial | |
| UNIQUEID | Character | A unique ID for every patient | Composed of "TRIAL" and "CTPID" joined in that order with no intervening punctuation or dashes |
| AGE | Numeric | Patient age | In years |
| AGECAT | Numeric | Age category | 1=5-11 2=12-17 3=18-24 y 4=25-64 y 5=65 y or more |
| GENDER | Numeric | Patient gender | 1=female 2=male |

NDA 20-235
NDA 20-882
NDA 21-129
Page 6

| Variable name | Type | Description | Coding notes |
|---|---|---|---|
| RACE | Numeric | Patient race | 1=White Caucasian<br>2=African-American<br>3=Hispanic<br>4=Asian<br>5=Other<br>. = Missing |
| SETTING | Numeric | Setting of trial | 1=inpatient<br>2=outpatient<br>3=both |
| LOCATION | Numeric | Location of trial | 1=North America<br>2=Non-North America |
| TXARM | Numeric | Randomized treatment | 1=drug<br>2=placebo<br>3=active control<br>4=low dose-placebo<br><br>No missing values are allowed in this variable. |
| TXLOW | Character | Name of drug used as low dose-placebo | Leave patients in other treatment arms blank |
| TXACTIVE | Character | Name of drug used as active control | Leave patients in other treatment arms blank |
| EVENT | Numeric | This variable contains the code for the first suicidality event. If a patient had more than one event in the desired "exposure window", then the most severe event should be listed. Severity is decided based on the following order of codes 1>2>4>3>5 | 0=no event<br>1=suicide attempt<br>2=preparatory acts toward imminent suicidal behavior<br>3=self-injurious behavior, intent unknown<br>4=suicidal ideation<br>5=not enough information<br><br>No missing values are allowed in this variable |
| EVENTDAY | Numeric | The number of days to the <u>first</u> suicidal event counting from the day of the first dose. | for patients without events, this variable should contain days until end of trial or until premature discontinuation<br><br>for patients with more than one event, this variable should contain days until the most severe event that is listed under the variable "EVENT" |

NDA 20-235
NDA 20-882
NDA 21-129
Page 7

| Variable name | Type | Description | Coding notes | |
|---|---|---|---|---|
| | | | No missing values are allowed in this variable. | |
| DISCONT | Numeric | The patient discontinued before the end of the controlled portion of the trial | 0=No 1=Yes  No missing values are allowed in this variable | |

If you have questions, call Jacqueline H. Ware, Pharm.D., Senior Regulatory Project Manager, at (301) 594-5533.

Sincerely,

{See appended electronic signature page}

Russell Katz, M.D.
Director
Division of Neuropharmacological Drug Products
Office of Drug Evaluation I
Center for Drug Evaluation and Research

This is a representation of an electronic record that was signed electronically and
this page is the manifestation of the electronic signature.

/s/
----------------------
Russell Katz
3/16/05 07:04:49 AM

# Exhibit D



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Public Health Service
_____
Food and Drug Administration
Rockville, MD 20857

NDA 20-235/S-035
NDA 20-882/S-021
NDA 21-129/S-020

Pfizer Inc
Attention: Mary Ann C. Evertsz, Regulatory Affairs
235 E 42nd Street
New York, NY 10017

Dear Ms. Evertsz:

Please refer to your supplemental new drug applications dated December 21, 2005, received December 22, 2005, submitted under section 505(b) of the Federal Food, Drug, and Cosmetic Act for Neurontin (gabapentin) capsules, tablets, and oral solution.

These "Changes Being Effected" supplemental new drug applications provide for revisions of suicide-related adverse event terms under the subheading **Other Adverse Events Observed During All Clinical Trials** and an update to the number of patients exposed to Neurontin in add-on epilepsy trials.

We have completed our review of these applications. These applications are approved, effective on the date of this letter, for use as recommended in the agreed-upon labeling text.

The final printed labeling (FPL) must be identical to the submitted labeling (package insert submitted December 21, 2005).

Please submit an electronic version of the FPL according to the guidance for industry titled *Providing Regulatory Submissions in Electronic Format - NDA*. Alternatively, you may submit 20 paper copies of the FPL as soon as it is available but no more than 30 days after it is printed. Individually mount 15 of the copies on heavy-weight paper or similar material. For administrative purposes, designate these submissions "**FPL for approved supplement NDA 20-235/S-035, NDA 20-882/S-021, NDA 21-129/S-020.**" Approval of these submissions by FDA is not required before the labeling is used.

In addition, submit three copies of the introductory promotional materials that you propose to use for these products. Submit all proposed materials in draft or mock-up form, not final print. Send one copy to this division and two copies of both the promotional materials and the package inserts directly to:

Food and Drug Administration
Center for Drug Evaluation and Research
Division of Drug Marketing, Advertising, and Communications
5901-B Ammendale Road
Beltsville, MD 20705-1266

NDA 20-235/S-035
NDA 20-882/S-021
NDA 21-129/S-020

Page 2

If you issue a letter communicating important information about this drug product (i.e., a "Dear Health Care Professional" letter), we request that you submit a copy of the letter to this NDA and a copy to the following address:

>  MEDWATCH
>  Food and Drug Administration
>  WO 22, Room 4447
>  10903 New Hampshire Avenue
>  Silver Spring, MD 20993-0002

We remind you that you must comply with reporting requirements for an approved NDA (21 CFR 314.80 and 314.81).

If you have any questions, call Courtney Calder, Pharm.D, Regulatory Project Manager, at (301) 796-1050.

Sincerely,

{See appended electronic signature page}

Russell Katz, MD
Director
Division of Neurology Products
Office of Drug Evaluation I
Center for Drug Evaluation and Research

---

**This is a representation of an electronic record that was signed electronically and this page is the manifestation of the electronic signature.**

---

/s/
- - - - - - - - - - - - - - - - - - - -
Russell Katz
5/3/2006 07:47:25 AM