# EXHIBIT A

File #232413-06/seh

STATE OF NEW YORK
SUPREME COURT : COUNTY OF NEW YORK
---------------------------------------------x
HOWARD ELLIS and ANNE ELLIS,

                        Plaintiffs,

            -against-

PFIZER INC., PARKE-DAVIS,
a division of Warner-Lambert Company           STIPULATION
and Warner-Lambert Company LLC,
WARNER-LAMBERT COMPANY and
WARNER-LAMBERT COMPANY LLC,

                        Defendants.
---------------------------------------------x

        It is hereby stipulated and expressly represented on behalf of
Plaintiff(s) in the above captioned action, that said Plaintiff(s)
will not seek to establish a violation of any state law, as alleged
in any pleading filed, based solely on a finding that the Defendants
violated federal law.

Dated:  June 13, 2005

                        FINKELSTEIN & PARTNERS, LLP
                        Attorneys for Plaintiff
                        Office & P.O. Address
                        436 Robinson Avenue
                        Newburgh, New York  12550


                        BY:_____
                            ANDREW G. FINKELSTEIN, ESQ.


                        CUNEO, POGUST & MASON, LLP
                        116 Washington Street, Suite 1520
                        Conshohocken, PA 19428
                        Harris L. Pogust, Esquire
                        Derek Braslow, Esquire

, FILE #232413-06/seh

DATE OF FILING: 6/16/05
INDEX #: 108387/05

Plaintiff designates
New York County
as the place of trial.

The basis of venue is:
Principal place of
business of Defendant:
PFIZER INC.

Plaintiff resides at:
County of Fillmore
State of Minnesota.

SUPREME COURT STATE OF NEW YORK
COUNTY OF NEW YORK
--------------------------------------------------------------------------X
HOWARD ELLIS and ANNE ELLIS,

                                        Plaintiff(s),

                                                            SUMMONS

                -against-

PFIZER INC., PARKE-DAVIS, a division of Warner-Lambert
Company and Warner-Lambert Company LLC,
WARNER-LAMBERT COMPANY and
WARNER-LAMBERT COMPANY LLC,

                                        Defendant(s).
--------------------------------------------------------------------------X
To the above named defendant(s):

**YOU ARE HEREBY SUMMONED** to answer the complaint in this action and to serve a
copy of your answer, or, if the complaint is not served with this summons, to serve a notice
of appearance, on the Plaintiff's Attorney(s) within –20- days after the service of this
summons, exclusive of the day of service (or within 30 days after the service is complete if
this summons is not personally delivered to you within the State of New York); and in case
of your failure to appear or answer, judgment will be taken against you by default for the
relief demanded in the complaint.

                FINKELSTEIN & PARTNERS, LLP
                    Attorneys for Plaintiff(s)
                      436 Robinson Avenue
                   Newburgh, New York 12550
                        1-845-562-0203

                ANDREW G. FINKELSTEIN, ESQ.

Dated: June  13 , 2005.

DEFENDANT'S ADDRESS:
SEE VERIFIED COMPLAINT

File #232413-06/seh

STATE OF NEW YORK
SUPREME COURT : COUNTY OF NEW YORK
------------------------------------x
HOWARD ELLIS and ANNE ELLIS,

                    Plaintiffs,

        -against-                        VERIFIED COMPLAINT

PFIZER INC., PARKE-DAVIS,
a division of Warner-Lambert Company
and Warner-Lambert Company LLC,
WARNER-LAMBERT COMPANY and
WARNER-LAMBERT COMPANY LLC,

                    Defendants.
------------------------------------x

    Plaintiffs, by attorneys, CUNEO, POGUST & MASON, LLP and

FINKELSTEIN & PARTNERS, LLP, as and for the Verified Complaint

herein allege upon information and belief the following:

### STATEMENT OF THE CASE

    1.    This is an action to recover damages for personal

injuries sustained by husband-plaintiff, hereinafter

"plaintiff", and wife-plaintiff as the direct and proximate

result of defendants' wrongful conduct in connection with the

designing, developing, manufacturing, distributing, labeling,

advertising, marketing, promoting, and selling of the
prescription drug Neurontin, especially for such "off-label"
uses as the treatment of pain, a purpose for which Neurontin had
not received FDA approval, and at dosages higher than had been
approved by the FDA and had been properly tested on humans, even
though the drug had not been tested and studied for that purpose
and had not been found to be safe and effective at any dosage
for the treatment of pain.

### PARTIES AND JURISDICTION

2.    That at all times hereinafter mentioned, the
plaintiffs were and still are residents of the County of
Fillmore, State of Minnesota.

3.    That at all times hereinafter mentioned, upon
information and belief, the defendant, PFIZER INC., was and
still is a foreign corporation organized under the laws of the
State of Delaware.

4.    That at all times hereinafter mentioned, upon
information and belief, the defendant, PFIZER INC., was and
still is a foreign corporation authorized to do business in the
State of New York.

5.    That at all times hereinafter mentioned, upon
information and belief, the defendant, PFIZER INC., was and

2

still is a business entity actually doing business in the State
of New York.

6.    That at all times hereinafter mentioned, upon
information and belief, the defendant, PARKE-DAVIS, a division
of Warner-Lambert Company and Warner-Lambert Company LLC
(hereinafter "PARKE-DAVIS"), was and still is a foreign
corporation organized under the laws of the State of Michigan.

7.    That at all times hereinafter mentioned, upon
information and belief, the defendant, PARKE-DAVIS, was and
still is a foreign corporation authorized to do business in the
State of New York.

8.    That at all times hereinafter mentioned, upon
information and belief, the defendant, PARKE-DAVIS, was and
still is a business entity actually doing business in the State
of New York.

9.    That at all times hereinafter mentioned, upon
information and belief, the defendant, WARNER-LAMBERT COMPANY
was and still is a foreign corporation organized under the laws
of the State of Delaware.

10.   That at all times hereinafter mentioned, upon
information and belief, the defendant, WARNER-LAMBERT COMPANY,
was and still is a foreign corporation authorized to do business
in the State of New York.

3

11.   That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY, was and still is a business entity actually doing business in the State of New York.

12.   That at all times hereinafter mentioned, upon information and belief, the defendant, PARKE-DAVIS, is a division of the defendant, WARNER-LAMBERT COMPANY.

13.   That at all times hereinafter mentioned, upon information and belief, the defendant, PARKE-DAVIS, is a subsidiary of the defendant, WARNER-LAMBERT COMPANY.

14.   That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY LLC, was and still is a foreign limited liability company organized under the laws of the State of Delaware.

15.   That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY LLC, was and still is a foreign limited liability company authorized to do business in the State of New York.

16.   That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY LLC, was and still is a business entity actually doing business in the State of New York.

4

17.   That at all times hereinafter mentioned, upon information and belief, the defendant, PFIZER INC., is the sole shareholder and member of the defendant, WARNER-LAMBERT COMPANY LLC.

18.   That at all times hereinafter mentioned, upon information and belief, the defendant, PARKE-DAVIS, is a division of the defendant, WARNER-LAMBERT COMPANY LLC.

19.   That at all times hereinafter mentioned, upon information and belief, the defendant, PARKE-DAVIS, is a subsidiary of the defendant, WARNER-LAMBERT COMPANY LLC.

20.   That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY, is a division of the defendant, PFIZER INC.

21.   That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY, is a subsidiary of the defendant, PFIZER INC.

22.   That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY, is a successor in interest to the defendant, PARKE-DAVIS.

23.   That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY LLC, is a division of the defendant, PFIZER INC.

24.   That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY LLC, is a subsidiary of the defendant, PFIZER INC.

25.   That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY LLC, is a successor in interest to the defendant, PARKE-DAVIS.

26.   That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY, is a successor in interest to the defendant, PARKE-DAVIS.

27.   That on a date prior to April 2002, the defendant, WARNER-LAMBERT COMPANY, assumed the assets and liabilities of the defendant, PARKE-DAVIS.

28.   That on a date prior to April 2002, the defendant, WARNER-LAMBERT COMPANY, expressly assumed all liabilities and obligations of the defendant, PARKE-DAVIS.

29.   That on a date prior to April 2002, the defendant, WARNER-LAMBERT COMPANY, impliedly assumed all liabilities and obligations of the defendant, PARKE-DAVIS.

30.   That on a date prior to April 2002, the defendant, PARKE-DAVIS, and the defendant, WARNER-LAMBERT COMPANY, merged with each other.

31.   That on a date prior to April 2002, the defendant, PARKE-DAVIS, merged with the defendant, WARNER-LAMBERT COMPANY,

6

and the defendant, PARKE-DAVIS, became a part of the defendant,
WARNER-LAMBERT COMPANY.

32. That on a date prior to April 2002, the defendant,
PARKE-DAVIS, and the defendant, WARNER-LAMBERT COMPANY,
consolidated with each other.

33. That on or about December 31, 2002, the defendant,
WARNER-LAMBERT COMPANY LLC, assumed the assets and liabilities
of the defendant, PARKE-DAVIS.

34. That on or about December 31, 2002, the defendant,
WARNER-LAMBERT COMPANY LLC, expressly assumed all liabilities
and obligations of the defendant, PARKE-DAVIS.

35. That on or about December 31, 2002, the defendant,
WARNER-LAMBERT COMPANY LLC, impliedly assumed all liabilities
and obligations of the defendant, PARKE-DAVIS.

36. That on or about December 31, 2002, the defendant,
PARKE-DAVIS, and the defendant, WARNER-LAMBERT COMPANY LLC,
merged with each other.

37. That on or about December 31, 2002, the defendant,
PARKE-DAVIS, merged with the defendant, WARNER-LAMBERT COMPANY
LLC, and the defendant, PARKE-DAVIS, became a part of the
defendant, WARNER-LAMBERT COMPANY LLC.

7

51.   That on or prior to December 31, 2002, the defendant,
PARKE-DAVIS, and the defendant, WARNER-LAMBERT COMPANY LLC,
consolidated with each other.

39.   That at all times hereinafter mentioned, upon
information and belief, the defendant, WARNER-LAMBERT COMPANY
LLC, is a successor in interest to the defendant, WARNER-LAMBERT
COMPANY.

40.   That on or prior to December 31, 2002, the defendant,
WARNER-LAMBERT COMPANY LLC, assumed the assets and liabilities
of the defendant, WARNER-LAMBERT COMPANY.

41.   That on or prior to December 31, 2002, the defendant,
WARNER-LAMBERT COMPANY LLC, expressly assumed all liabilities
and obligations of the defendant, WARNER-LAMBERT COMPANY.

42.   That on or prior to December 31, 2002, the defendant,
WARNER-LAMBERT COMPANY LLC, impliedly assumed all liabilities
and obligations of the defendant, WARNER-LAMBERT COMPANY.

43.   That on or prior to December 31, 2002, the defendant,
WARNER-LAMBERT COMPANY, and the defendant, WARNER-LAMBERT
COMPANY LLC, merged with each other.

44.   That on or prior to December 31, 2002, the defendant,
WARNER-LAMBERT COMPANY, merged with the defendant, WARNER-
LAMBERT COMPANY LLC, and the defendant, WARNER-LAMBERT COMPANY,
became a part of the defendant, WARNER-LAMBERT COMPANY LLC.

8

45.    That on or prior to December 31, 2002, the defendant, WARNER-LAMBERT COMPANY, and the defendant, WARNER-LAMBERT COMPANY LLC, consolidated with each other.

46.    That at all times hereinafter mentioned, upon information and belief, the defendant, PFIZER INC., is a successor in interest to the defendant, PARKE-DAVIS.

47.    That at all times hereinafter mentioned, upon information and belief, the defendant, PFIZER INC., is a successor in interest to the defendant, WARNER-LAMBERT COMPANY.

48.    That at all times hereinafter mentioned, upon information and belief, the defendant, PFIZER INC., is a successor in interest to the defendant, WARNER-LAMBERT COMPANY LLC.

49.    That on a date prior to April 2002, the defendant, PFIZER INC., assumed the assets and liabilities of the defendant, PARKE-DAVIS.

50.    That on a date prior to April 2002, the defendant, PFIZER INC., assumed the assets and liabilities of the defendant, WARNER-LAMBERT COMPANY.

51.    That on a date prior to April 2002, the defendant, PFIZER INC., expressly assumed all liabilities and obligations of the defendant, PARKE-DAVIS.

9

52.  That on a date prior to April 2002, the defendant, PFIZER INC., impliedly assumed all liabilities and obligations of the defendant, PARKE-DAVIS.

53.  That on a date prior to April 2002, the defendant, PFIZER INC., expressly assumed all liabilities and obligations of the defendant, WARNER-LAMBERT COMPANY.

54.  That on a date prior to April 2002, the defendant, PFIZER INC., impliedly assumed all liabilities and obligations of the defendant, WARNER-LAMBERT COMPANY.

55.  That on or prior to December 31, 2002, the defendant, PFIZER INC., assumed the assets and liabilities of the defendant, WARNER-LAMBERT COMPANY LLC.

56.  That on or prior to December 31, 2002, the defendant, PFIZER INC., expressly assumed all liabilities and obligations of the defendant, WARNER-LAMBERT COMPANY LLC.

57.  That on or prior to December 31, 2002, the defendant, PFIZER INC., impliedly assumed all liabilities and obligations of the defendant WARNER-LAMBERT COMPANY LLC.

58.  That on a date prior to April 2002, the defendant, PFIZER INC., and the defendant, PARKE-DAVIS, merged with each other.

10

59.   That on a date prior to April 2002, the defendant,
PFIZER INC., and the defendant, WARNER-LAMBERT COMPANY, merged
with each other.

60.   That on or before April 2002, the defendant, PFIZER
INC., and the defendant, WARNER-LAMBERT COMPANY LLC, merged with
each other.

61.   That on a date prior to April 2002, the defendant,
PFIZER INC., and the defendant, PARKE-DAVIS, merged with each
other and the defendant, PARKE-DAVIS, became a part of the
defendant, PFIZER INC.

62.   That on a date prior to April 2002, the defendant,
PFIZER INC., and the defendant, WARNER-LAMBERT COMPANY, merged
with each other and the defendant, WARNER-LAMBERT COMPANY,
became a part of the defendant, PFIZER INC.

63.   That on or prior to December 31, 2002, the defendant,
PFIZER INC., and the defendant, WARNER-LAMBERT COMPANY LLC,
merged with each other and the defendant, WARNER-LAMBERT COMPANY
LLC, became a part of the defendant, PFIZER INC.

64.   That on a date prior to April 2002, the defendant,
PFIZER INC., and the defendant, PARKE-DAVIS, consolidated with
each other.

11

65.   That on a date prior to April 2002, the defendant,
PFIZER INC., and the defendant, WARNER-LAMBERT COMPANY,
consolidated with each other.

66.   That at all times hereinafter mentioned, upon
information and belief, the defendant, PFIZER INC., has its
principal place of business in the State of New York.

67.   In the year 2000, the defendant, PFIZER INC., acquired
the defendant, WARNER-LAMBERT COMPANY, and as the result of that
acquisition, the defendant, PFIZER INC., is responsible for all
liabilities resulting from the acts or omissions of the
defendant, WARNER-LAMBERT COMPANY, which occurred prior to such
acquisition.

68.   In the year 2000, the defendant, PFIZER INC., acquired
the defendant, PARKE-DAVIS, a division of Warner-Lambert
Company, and as the result of that acquisition, the defendant,
PFIZER INC., is responsible for all liabilities resulting from
the acts or omissions of the defendant, PARKE-DAVIS, which
occurred prior to such acquisition.

69.   On or prior to December 31, 2002, defendant, PFIZER
INC., acquired the defendant, WARNER-LAMBERT COMPANY LLC, and
pursuant to the terms of and conditions of that acquisition, the
defendant, PFIZER INC., is responsible for all acts or omissions

of the defendant, WARNER LAMBERT-COMPANY, LLC, occurring prior
to such acquisition.

70.    That at all times hereinafter mentioned, upon
information and belief, the defendant, PFIZER INC., presently
markets and sells the drug Neurontin.

71.    That on a date prior to April 2002, the defendant,
PFIZER INC., marketed and sold the drug Neurontin.

72.    That at all times hereinafter mentioned, upon
information and belief, the defendant, PFIZER INC., is engaged
in the business of designing, manufacturing, advertising,
marketing, and selling pharmaceutical drugs, including
Neurontin, and in pursuance of this business, transacts business
within the State of New York and contracts to provide goods and
services in the State of New York.

73.    That at all times hereinafter mentioned, upon
information and belief, the defendant, PFIZER INC., committed a
tortious act inside the State of New York.

74.    That at all times hereinafter mentioned, upon
information and belief, the defendant, PFIZER INC., committed a
tortious act outside the State of New York, which caused injury
to plaintiff inside the State of Minnesota.

75.    That at all times hereinafter mentioned, upon
information and belief, the defendant, PFIZER INC., regularly

13

does and solicits business and engages in a persistent course of conduct in the State of New York, deriving substantial revenue from goods and products consumed in the State of New York.

76.   That at all times hereinafter mentioned, upon information and belief, the defendant, PFIZER INC., expects or should reasonably expect its acts to have consequences in the State of New York, and derives substantial revenue from interstate or international commerce.

77.   That at all times hereinafter mentioned, upon information and belief, the defendant, PARKE-DAVIS, presently markets and sells the drug Neurontin.

78.   That on a date prior to April 2002, the defendant, PARKE-DAVIS, marketed and sold the drug Neurontin.

79.   That at all times hereinafter mentioned, upon information and belief, the defendant, PARKE-DAVIS, is engaged in the business of designing, manufacturing, advertising, marketing, and selling pharmaceutical drugs, including Neurontin, and in pursuance of this business, transacts business within the State of New York and contracts to provide goods and services in the State of New York.

80.   That at all times hereinafter mentioned, upon information and belief, the defendant, PARKE-DAVIS, committed a tortious act inside the State of New York.

14

81. That at all times hereinafter mentioned, upon information and belief, the defendant, PFIZER INC., committed a tortious act outside the State of New York, which caused injury to plaintiff inside the State of Minnesota.

82. That at all times hereinafter mentioned, upon information and belief, the defendant, PARKE-DAVIS, regularly does and solicits business and engages in a persistent course of conduct in the State of New York, deriving substantial revenue from goods and products consumed in the State of New York.

83. That at all times hereinafter mentioned, upon information and belief, the defendant, PARKE-DAVIS, expects or should reasonably expect its acts to have consequences in the State of New York, and derives substantial revenue from interstate or international commerce.

84. That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY, presently markets and sells the drug Neurontin.

85. That on a date prior to April 2002, the defendant, WARNER-LAMBERT COMPANY, marketed and sold the drug Neurontin.

86. That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY, is engaged in the business of designing, manufacturing, advertising, marketing, and selling pharmaceutical drugs,

15

including Neurontin, and in pursuance of this business,
transacts business within the State of New York and contracts to
provide goods and services in the State of New York.

87.   That at all times hereinafter mentioned, upon
information and belief, the defendant, WARNER-LAMBERT COMPANY,
committed a tortious act inside the State of New York.

88.   That at all times hereinafter mentioned, upon
information and belief, the defendant, PFIZER INC., committed a
tortious act outside the State of New York, which caused injury
to plaintiff inside the State of Minnesota.

89.   That at all times hereinafter mentioned, upon
information and belief, the defendant, WARNER-LAMBERT COMPANY,
regularly does and solicits business and engages in a persistent
course of conduct in the State of New York, deriving substantial
revenue from goods and products consumed in State of New York.

90.   That at all times hereinafter mentioned, upon
information and belief, the defendant, WARNER-LAMBERT COMPANY,
expects or should reasonably expect its acts to have
consequences in the State of New York, and derives substantial
revenue from interstate or international commerce.

91.   That at all times hereinafter mentioned, upon
information and belief, the defendant, WARNER-LAMBERT COMPANY
LLC, presently markets and sells the drug Neurontin.

16

92.   That on a date prior to April 2002, the defendant, WARNER-LAMBERT COMPANY LLC, marketed and sold the drug Neurontin.

93.   That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY LLC, is engaged in the business of designing, manufacturing, advertising, marketing, and selling pharmaceutical drugs, including Neurontin, and in pursuance of this business, transacts business within the State of New York.

94.   That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY LLC, committed a tortious act inside the State of New York.

95.   That at all times hereinafter mentioned, upon information and belief, the defendant, PFIZER INC., committed a tortious act outside the State of New York, which caused injury to plaintiff inside the State of Minnesota.

96.   That at all times hereinafter mentioned, upon information and belief, the defendant, WARNER-LAMBERT COMPANY LLC, regularly does and solicits business and engages in a persistent course of conduct in the State of New York, deriving substantial revenue from good and products consumed in the State of New York.

17

97.   That at all times hereinafter mentioned, upon
information and belief, the defendant, WARNER-LAMBERT COMPANY
LLC, regularly does and solicits business and engages in a
persistent course of conduct in the State of New York, deriving
substantial revenue from interstate commerce.

### BACKGROUND

### STATEMENT OF THE CASE

98.   Pursuant to the Food, Drug, and Cosmetic Act ("FDCA")
21 U.S.C. §§ 301 et seq., new pharmaceutical drugs cannot be
distributed in interstate commerce unless the sponsor of the
drug demonstrates to the satisfaction of the Food and Drug
Administration ("FDA") that the drug is safe and effective for
each of its intended uses. 21 U.S.C. § 355(a) and (d).

99.   However, the FDCA does not prevent doctors from
prescribing a drug approved for a particular use for other uses
that are different than those approved by the FDA ("off-label"
usage).

100.  Nonetheless, even though physicians may prescribe
drugs for "off-label" usage, the FDCA prohibits drug
manufacturers themselves from marketing and promoting a drug for
a use that the FDA has not approved.  21 U.S.C. § 331(d).

101.  A manufacturer illegally "misbrands" a drug if the
drug's labeling includes information about unapproved uses or if

18

the manufacturer engages directly or indirectly in marketing or promoting the drug for unapproved uses.

102.   Instead, if a manufacturer desires to market and promote the drug for new uses in addition to those already approved, the materials on "off-label" usage must meet certain stringent requirements and the manufacturer must resubmit the drug to the FDA testing and approval process for the proposed new use.

103.   The above-described statutory and regulatory system and process is designed to protect the public, including plaintiff, from the dangers arising from drugs which, although approved for a certain specific condition, disease or purpose, could cause injury and harm if used for an "off-label" purpose without adequate study and testing of the drug for such "off-label" usage, and to protect the public, including plaintiff herein, from the dangers arising from deceptive, misleading, and inaccurate advertising, marketing, and promotional materials issued directly or indirectly by the manufacturer to encourage the "off-label" usage of the drug without adequate testing and study of that drug for such "off-label" usage.

104.   PARKE-DAVIS, now owned by PFIZER INC., applied for, and in December, 1993, received FDA approval to market and sell Neurontin solely for "adjunctive therapy" in the treatment of certain types of seizures in adult patients suffering from epilepsy, and the FDA approved labeling of Neurontin for that

19

purpose and stated that the drug is only effective at 900 to
1800 milligrams per day.

105. At no time prior to plaintiff's being prescribed
Neurontin, did defendants receive FDA approval for any other use
of Neurontin except for the above-described treatment of
epilepsy or for higher dosages for any purpose, and the FDA
never approved the usage of Neurontin at any dosage for the
treatment of pain.

106. Commencing in 1995, defendants, as the manufacturer
of Neurontin, began to directly and indirectly advertise, market
and promote Neurontin for additional "off-label" uses for which
FDA approval had not been obtained, including treatment for pain
and at higher dosages than had been tested and approved, in
violation of the above-described statutory and regulatory system
and process, including the FDCA, which prohibits manufacturers
from directly or indirectly advertising, marketing and promoting
a drug for "off-label" usage, and instead requires that the
manufacturer resubmit the drug to the FDA testing and approval
process for the proposed new use and that the materials issued
by the manufacturer relating to the proposed new use meet
certain stringent requirements.

107. Defendants, as the manufacturer of Neurontin, directly
and indirectly advertised, marketed and promoted Neurontin for
the treatment of pain and encouraged that higher dosages than
those tested be prescribed, even though defendants knew or

20

should have known that there were not adequate tests and studies establishing and confirming that Neurontin was safe and effective for the treatment of pain, and even though defendants knew or should have known that there were no adequate studies showing that Neurontin was safe when prescribed at dosages higher than those approved by the FDA.

108. At all times hereinafter mentioned, upon information and belief, defendants marketed and promoted Neurontin for the treatment of pain even though defendants knew or should have known that Neurontin caused many symptoms or related risk factors associated with suicidal behavior by persons suffering from pain.

109. At all times hereinafter mentioned, upon information and belief, defendants marketed and promoted Neurontin for the treatment of pain even though defendants knew or should have known that Neurontin had no effect in relieving or correcting the symptoms or causes of pain.

110. Defendants' conduct in promoting "off-label" uses of Neurontin for treatment of pain constituted a wanton, callous and reckless disregard of the safety of the public and, in particular of persons suffering from pain.

111. In promoting "off-label" uses of Neurontin, and at higher dosages than approved by the FDA, including treatment of pain, defendants acted without regard to the potential danger

21

and harm to persons for whom the drug was prescribed for the treatment of pain.

112. Defendants actively distributed, sold and placed Neurontin into the stream of commerce and directly and indirectly advertised, marketed and promoted Neurontin as being safe and effective for the treatment of pain and in dosages higher than those approved by the FDA, even though the only approved use of Neurontin at that time was as "adjunctive therapy" for the treatment of epilepsy and even though the FDA had specified a maximum recommended dosage.

113. Neurontin is not reasonably safe and effective for the treatment of persons suffering from pain, and is not reasonably safe when consumed in higher dosages than those approved by the FDA, and defendants' conduct of illegally advertising, marketing and promoting Neurontin for this "off-label" use was unlawful, deceptive and misleading and was in violation of the FDCA.

114. By reason of defendants' conduct of directly and indirectly advertising, marketing and promoting Neurontin for the treatment of pain in an unlawful manner, physicians commenced prescribing Neurontin to their patients diagnosed as suffering from pain, frequently at dosages higher than those approved by the FDA.

115. Upon information and belief, the defendant, WARNER-LAMBERT COMPANY LLC, was indicted in the United States District

22

Court for the District of Massachusetts for violations of 21
U.S.C. §§ 331(a), 331(d), 333(a), 352(f)(1) and 355, and a copy
of such criminal Information is annexed hereto as Exhibit "A"
and incorporated into this complaint by reference.

116.  Upon information and belief, on or about the 7th day
of June, 2004, the defendant, WARNER-LAMBERT COMPANY LLC,
formally pled guilty to all charges contained in the
Information.

117.  The drug Neurontin was ineffective in the treatment
of the causes and symptoms of plaintiff's condition of chronic
pain and plaintiff, HOWARD ELLIS, sustained injury and harm by
reason of this reliance upon Neurontin to be effective in the
treatment of chronic pain as prescribed by his physicians.

118.  That at all times hereinafter mentioned, plaintiff
was diagnosed by his physician as suffering from chronic pain
and was being treated by his physician for such condition.

119.  That at all times hereinafter mentioned, upon
information and belief, in reliance upon defendants' direct and
indirect advertising, marketing and promoting of Neurontin as
being safe and effective for the treatment of pain, plaintiff's
physician prescribed Neurontin to treat plaintiff's chronic
pain.

120.  That at all times hereinafter mentioned, plaintiff
purchased and consumed Neurontin, as recommended and prescribed

23

by his physician and in the dosages prescribed, in an effort to
control the effects of chronic pain.

121.   The drug Neurontin was not safe and effective for the
treatment of plaintiff's condition of chronic pain, and
plaintiff sustained injury and harm by reason of his consumption
of Neurontin as prescribed by his physician in an effort to
treat his chronic pain.

122.   The drug Neurontin was ineffective in the treatment
of the causes and symptoms of plaintiff's condition of chronic
pain and plaintiff sustained injury and harm by reason of this
reliance upon Neurontin to be effective in the treatment as
prescribed by his physician of such chronic pain.

123.   By reason of plaintiff's consumption of Neurontin in
a manner and at a dosage prescribed by his physician in an
effort to treat his chronic pain, in April 2002, at the age of
42, plaintiff unsuccessfully attempted to commit suicide by
overdosing on various medications, thereby sustaining severe
personal injuries.

124.   The injuries sustained by plaintiff were caused by or
were contributed to by plaintiff's consumption of Neurontin at a
dosage prescribed by his physician for the treatment of chronic
pain in a manner consistent with the direct and indirect
advertising, marketing and promoting of this drug for such "off-
label" use by defendants.

24

## AS AND FOR A FIRST CAUSE OF
## ACTION AGAINST THE DEFENDANTS

125. Plaintiff repeats and reiterates the allegations previously set forth herein.

126. That at all times hereinafter mentioned, defendants were under a duty to exercise reasonable care in the design and development of Neurontin and, in particular, in the advertising, marketing and promoting of Neurontin, both directly and indirectly, to ensure that Neurontin was not used in the treatment of condition such as pain for which it was not effective and to ensure that Neurontin was not used in a manner or to treat conditions where defendants knew or should have known that the user could sustain injuries and harm from the drug.

127. That defendants negligently, recklessly, grossly negligently, wantonly and willfully displayed a morally culpable and conscious disregard of the rights of others in that they failed to exercise reasonable care and failed to fulfill the above-stated duty by the manner that defendants, directly and indirectly, advertised, marketed and promoted Neurontin for the treatment of pain, even though Neurontin had not been scientifically determined to be safe for the treatment of such

25

condition and even though Neurontin was, in fact, not reasonably safe for the treatment of such condition and furthermore, defendant failed to adequately warn of the risk of suicide or aggressive, self-destructive behavior of which defendants knew or should have known about.

128. That defendants were further negligent, reckless, grossly negligent, wanton and willfully displayed a morally culpable and conscious disregard of the rights of others by manufacturing, distributing, selling, advertising, marketing and promoting Neurontin even though such drug was not safe or effective for any purpose because it caused or influenced persons using the drug for any purpose to engage in self-destructive behavior including attempting to commit suicide and by failing to adequately warn the public of such risks.

129. The aforesaid incident and the injuries sustained by plaintiff were caused by or were contributed to by the negligence, recklessness, gross negligence, wantonness, willfulness, and conscious and callous disregard of the safety of the public, including plaintiff, on the part of defendants in the design, manufacture, distribution, advertising, marketing and promoting of Neurontin as being safe and effective in the treatment of pain and by inducing the public, including

plaintiff, to believe that Neurontin was effective in the treatment of the causes and symptoms of pain.

130. That at all times hereinafter mentioned, upon information and belief, the above-described culpable conduct by defendants was a proximate cause of injuries sustained by plaintiff.

131. That at all times hereinafter mentioned, plaintiff did not contribute to his injuries by reason of any negligence or culpable conduct on his part.

132. That by reason of the foregoing, plaintiff was caused to sustain severe and serious personal injuries to his mind and body, some of which, upon information and belief, are permanent with permanent effects of pain, mental anguish, and internal damage. Further, plaintiff was caused to expend and become obligated for diverse sums of money for the purpose of obtaining medical care and/or cure in an effort to alleviate the suffering and ills sustained as a result of this occurrence. Plaintiff further was caused to lose substantial periods of time from his normal vocation as well as from his family, and upon information and belief, may continue to be restricted in that manner into the future and suffer similar losses.

133. By reason of the foregoing, plaintiff was damaged in a sum which exceeds the jurisdictional limits of all lower



courts which would have jurisdiction of this matter, and in addition, plaintiff seeks punitive and exemplary damages against defendants in an amount to be determined upon the trial of this matter.

## AS AND FOR A SECOND CAUSE OF
### ACTION AGAINST THE DEFENDANTS

134.   Plaintiff repeats and reiterates the allegations previously set forth herein.

135.   That at all times hereinafter mentioned, upon information and belief, defendants, by directly and indirectly advertising, marketing and promoting Neurontin for the treatment of pain and by placing this drug in the stream of commerce knowing that Neurontin would be prescribed for the treatment of pain in reliance upon the representations of defendants, expressly warranted to all foreseeable users of this drug, including plaintiff, that Neurontin was safe and effective for the treatment of pain.

136.   That defendants impliedly warranted in manufacturing, distributing, selling, advertising, marketing and promoting Neurontin to all foreseeable users, including plaintiff, that Neurontin was safe and effective for the purposes for which it had been placed in the stream of commerce by defendants, including for the treatment of pain, and that Neurontin was

reasonably safe, proper, merchantable and fit for the intended purpose, including for the treatment of pain.

137.   That at all times hereinafter mentioned, plaintiff relied upon the aforesaid express and implied warranties by defendants.

138.   That at all times hereinafter mentioned, plaintiff's use of Neurontin prior to and up to the time of the above-described incident was consistent with the purposes for which defendants directly and indirectly advertised, marketed and promoted Neurontin, and plaintiff's use of Neurontin was reasonably contemplated, intended and foreseen by defendants at the time of the distribution and sale of Neurontin by defendants, and, therefore, plaintiff's use of Neurontin was within the scope of the above-described express and implied warranties.

139.   Defendants breached the aforesaid express and implied warranties because Neurontin was not safe and effective for the treatment of pain and because plaintiff's use of Neurontin for the treatment of chronic pain caused or contributed to the incident described herein.

140.   Plaintiff gave appropriate notice to defendants of the breach of the aforesaid express and implied warranties or such notice was otherwise excused.

141. By reason of the foregoing, plaintiff was damaged in a sum which exceeds the jurisdictional limits of all lower courts which would have jurisdiction of this matter, and in addition, plaintiff seeks punitive and exemplary damages against defendants in an amount to be determined upon the trial of this matter.

## AS AND FOR A THIRD CAUSE OF ACTION AGAINST THE DEFENDANTS

142. Plaintiff repeats and reiterates the allegations previously set forth herein.

143. That at all times hereinafter mentioned, the drug Neurontin was not suited for the treatment of pain and was not safe and effective for the treatment of pain even though defendants directly and indirectly advertised, marketed and promoted Neurontin for that purpose.

144. That at all times hereinafter mentioned, the drug Neurontin was not safe and was not suited for the purpose for which defendants, directly and indirectly, advertised, marketed and promoted the drug at the time defendants designed, manufactured, distributed and sold the drug and placed the drug in the stream of commerce.

145. That at all times hereinafter mentioned, upon information and belief, defendants assumed a strict products

30

liability to users and to persons using Neurontin, including

plaintiff, who sustained injuries, harm and damages by reason of

the use of Neurontin for purposes directly and indirectly

advertised, marketed, and promoted by defendants, including for

the treatment of pain.

146.  By reason of the foregoing, plaintiff was damaged in

a sum which exceeds the jurisdictional limits of all lower

courts which would have jurisdiction of this matter, and in

addition, plaintiff seeks punitive and exemplary damages against

defendants in an amount to be determined upon the trial of this

matter.

### AS AND FOR A FOURTH CAUSE OF ACTION AGAINST THE DEFENDANTS

147.  Plaintiff repeats and reiterates the allegations

previously set forth herein.

148.  Defendants materially misrepresented material facts

concerning the safety and effectiveness of Neurontin in the

treatment of pain.

149.  Defendants' affirmative misrepresentations include

but are not limited to the acts set forth in the following

paragraphs.

150.  In or about 1993, defendants submitted a new drug

application (NDA) for approval of a drug called Neurontin (also

known by the chemical name "Gabapentin"), which was a new drug
within the meaning of 21 U.S.C. § 321(p) and 21 C.F.R.
§ 310.3(h)(4) and (5).  In that application, defendants sought
to demonstrate the drug's safety and efficacy for, and sought
approval for, use only as adjunctive therapy in the treatment of
partial seizures with and without secondary generalization in
adults with epilepsy.  On or about December 30, 1993, the FDA
approved Neurontin for that specific use only.  Because
defendants had not sought approval of any other uses nor
submitted information in its NDA which demonstrated the safety
and efficacy of Neurontin for any such uses, Neurontin was not
approved for any use or condition other than that approved use.

        151.  Commencing in at least June of 1995 and continuing
through at least the date of this incident, unapproved uses for
Neurontin included post-herpetic neuralgia, pain, painful
diabetic neuralgia, anxiety disorder, social phobias, bipolar
disorder, alcohol withdrawal syndrome, amyotrophic lateral
sclerosis (ALS), spinal cord injury, essential tremor, restless
leg syndrome, reflex sympathetic dystrophy (RSD); and migraine
headaches, among other uses.

        152.  Defendants did not file a new NDA seeking FDA
approval for any of these unapproved uses at any time prior to
the date of this incident.

153.   Defendants conducted evaluations of the market potential for certain of the unapproved uses for Neurontin, including but not limited to:  post-herpetic neuralgia, painful diabetic neuralgia, anxiety disorder, social phobias, pain, and bipolar disorder.

154.   In or about the fall of 1995, defendants' Southeast Customer Business Unit ("SECBU") created a planning document regarding Neurontin, which included a page titled:  "SECBU RIGHT ON THE MARK WITH NEURONTIN AND PAIN" over a picture of a target and listed "Neurontin for Pain Strategies" including plans for conference calls on pain and a pain consultant meeting.

155.   Certain defendants' annual strategic plans and other marketing planning documents for Neurontin included quarterly and annual goals, objectives, strategies and tactics for increasing sales of the unapproved uses of the drug.  The marketing plans budgeted for and funded these tactics.

156.   Commencing in early 1995 and continuing at least through the date of this incident, defendants determined not to seek FDA approval for certain unapproved uses.

157.   In or about April and May of 1995, defendants performed a marketing assessment of proposed psychiatric indications for Neurontin.  In that marketing assessment, defendants forecast potential revenue from Neurontin for pain

33

and depression treatment under two scenarios:  with and without FDA approval. Defendants' Neurontin Development Team and New Product Committee reviewed the potential uses and concluded that the defendants would not seek approval to promote and sell the drug for these unapproved uses.

158.   In or about July of 1995, defendants' assessment of Neurontin's market potential for pain was distributed to defendants' Neurontin Development Team and to defendants' Vice President for marketing.  That assessment stated that "there is no intention to fully develop the indication at this point." Full development would have required submission of an NDA to the FDA for approval.

159.   One of the principal factors defendants considered in determining whether to seek approval for Neurontin for other uses was the short patent protection available for Neurontin. Another factor was the negative impact such approval might generate on potential sales of another drug that defendants were developing.  Defendants expected this new drug would be approved by the FDA not only for epilepsy but also for a variety of uses beyond Neurontin's approved use.

160.   Once Neurontin's patent expired, other companies could seek approval to distribute generic equivalents of Neurontin.  Such approval, however, would be limited to the

34

approved therapeutic use for Neurontin set forth in defendants'
original NDA approval for Neurontin. If defendants sought and
obtained approval for any of the unapproved uses, then upon
expiration of the patent, generic equivalents of Neurontin could
also be sold for those unapproved uses. Defendants were
concerned that under those circumstances the generic equivalents
would undermine sales of the new drug that was under
development.

161. Commencing about June of 1995 until at least the date
of this incident, by certain conduct described in greater detail
below, defendants promoted the sale and use of Neurontin for
certain conditions other than the approved use.

162. In October 1995, a member of defendants' Epilepsy
Disease Team circulated a memorandum to a group including other
senior members of defendants' Epilepsy Disease Team noting that
data purchased from an outside vendor showed that doctors had
reported that the main message of certain sales pitches (known
as "details"), given by 10 of 50 of defendants' sales
representatives for whom data was available in a two-month
period, was for off-label use of Neurontin. Nine were for pain
and one was for reflex sympathetic dystrophy, a painful nerve
damage syndrome.

35

163.  On or about July 10, 1996, defendants' sales representative met with a doctor in Monroe, Louisiana, and detailed a doctor on Neurontin for the treatment of pain.

164.  Also in 1996, a sales representative created a document that stated that sales representatives could ask doctors during a Neurontin detail if they ever used other anti-epileptic drugs for pain and could mention that approximately 35% of all Neurontin use is non-seizure.  This same document, entitled "Neurontin Can Do/Can't Do," stated that sales representatives could present lunch programs on Neurontin and pain.  The document indicated that it was to be forwarded to the Northcentral Customer Business Unit.

165.  Defendants employed "medical liaisons" who were presented to physicians as employees of the company's Medical and Scientific Affairs Department.  On the following occasions, which are not all-inclusive, defendants' medical liaisons promoted Neurontin for unapproved uses:

(a)  In or about June of 1996 defendants' sales representative requested that defendants' medical liaison make a presentation at Longwood Gardens in Kennett Square, Pennsylvania, to a group of physicians who were members of a local medical society.

36

(b)   The sales representative and the medical liaison selected the topic for the presentation to the local medical society.  After deciding in consultation with the sales representative that Neurontin would be the topic of the presentation, the medical liaison prepared the presentation.

(c)   Among the topics of the presentation was the use of Neurontin for unapproved uses.

(d)   During the presentation, in the presence of the sales representative, the medical liaison promoted the use of Neurontin in the treatment of a number of unapproved uses.

(e)   After the presentation, defendants' Medical Director praised the event as "another great example of use of the medical liaisons" and an area business manager called it an "outstanding utilization of . . . one of the medical affairs liaisons."

166.   Defendants organized a consultant meeting at the Jupiter Beach Resort in Palm Beach, Florida, on April 19-21, 1996.  Approximately 42 physicians attended the meeting, including nine physicians who made presentations relating to unapproved uses of Neurontin.

167.   Defendants invited certain doctors to this meeting based upon their history of writing a large number of prescriptions for Neurontin or similar drugs.  As part of this

37

event, defendants paid for accommodations and meals for the invited doctors and their spouse or guest, and paid an honorarium to each of the doctor attendees.

168.  Among the presentations made to the physicians in attendance was one relating to unapproved uses entitled "Reduction of Pain Symptoms During Treatment with Gabapentin." In the meeting's agenda, this presentation was listed as "Anticonvulsant Advances."  During this presentation, Neurontin was promoted for use in the treatment of pain.

169.  Another presentation made at the Jupiter Beach conference was entitled "Anticonvulsant Advances:  Nonepileptic Uses of Anti Epileptic Drugs."  During this presentation, Neurontin was promoted for use in the treatment of essential tremor, episodic dyscontrol and pain.

170.  On or about May 8, 1996, following the Jupiter Beach conference, defendants circulated to employees in the Northeast region the agenda to the meeting, specifying the off-label topics, the faculty list, the attendee list and presentation abstracts discussing the off-label content of the presentations.

171.  From August 1-5, 1996, defendants organized an "advisory board meeting," in Atlanta, Georgia, in conjunction with the 1996 Summer Olympics.  Defendants expressly instructed

several of the physician speakers to address some of the unapproved uses.

172.  During that meeting, defendants hosted doctors at the Chateau Elan Winery and Resort, in Atlanta, Georgia, and paid all the expenses for eighteen "consultants" and their spouses to attend the Olympics, including tickets to the closing ceremonies.  Defendants already had numerous opportunities to consult with the doctors and, in fact, many of them had spoken on defendants' behalf at prior meetings.

173.  Certain of the physician speakers promoted Neurontin for unapproved uses in their presentations.

174.  On or about March 1, 1996, defendants sponsored a teleconference moderated by defendants' employee with a pain specialist as a speaker on Neurontin.  The speaker promoted Neurontin for the treatment of pain to doctors participating in the teleconference.

175.  In or about May, 1996, defendants' Medical Director held such a teleconference entitled "Neurontin, A Clinical Update" in which the Medical Director promoted off-label uses of Neurontin to the doctors participating in the teleconference.

176.  Defendants hosted dozens of "consultants" meetings between late 1995 and 1997 in which the "consultants" received payments and gratuities as well as presentations on "off-label"

Neurontin use designed to change the physicians' prescription writing habits. Such consultants' meetings included, but were not limited to the following:

| Topic | Location | Dates |
|---|---|---|
| Mastering Epilepsy | La Costa Resort, CA | July 20-23, 1995 |
| Mastering Epilepsy | Santa Fe, NM | Nov. 16-19, 1995 |
| Neurontin Consultants Conference | Marco Island, FL | Feb. 2-4, 1996 |
| Pediatric Epilepsy | Hutchinson Island, FL | Feb. 9-11, 1996 |
| Mastering Epilepsy Science | Walt Disney World, FL | Feb. 22-25, 1996 |
| Pediatric Epilepsy | Hutchinson Island, FL | Mar. 8-10, 1996 |
| Mastering Epilepsy | Ritz Carlton, Aspen, CO | Apr. 18-21, 1996 |
| Affective Disorders in Psychiatry | Marco Island, FL | Apr. 20, 1996 |
| Neurological Consultants (discussed previously) | Jupiter Beach, FL | Apr. 19-21, 1996 |
| Affective Disorder Consultants Conference | Southern Pines, NC | Apr. 27, 1996 |
| Neuropathic Pain Conference | Palm Beach, FL | May 11, 1996 |
| Regional Consultants Conference | Ritz Carlton, Boston, MA | May 10-11, 1996 |
| Epilepsy Management Advisors Meeting | Sheraton Grande Torrey Pines, La Jolla, CA | June 21-23, 1996 |

| | | |
|---|---|---|
| Epilepsy Management | Rancho Bernardo, CA | June 28-30, 1996 |
| Use of Anti-Convulsants in Psychiatric Disorders | Short Hills, NJ | Oct. 18-19, 1996 |
| Non-epileptic Uses of Neurontin | Longboat Key, FL | Nov. 6, 1996 |
| Neurological Conditions Conference | Ritz Carlton, Atlanta, GA | Sep. 27-28, 1997 |

Other "consultants" meetings took place at Charleston, SC, Coconut Grove, FL, Naples, FL, Memphis, TN, Louisville, KY, Washington, DC, Aspen, CO, and other places. Hundreds, if not thousands, of physicians received kickbacks to attend these events.

177. Defendants rewarded doctors for their advocacy of Neurontin by paying them honoraria for lending their names to scientific articles which were actually prepared and written by third parties retained by defendants. In 1996, defendants retained AMM/ADELPHI, Ltd. and Medical Education Systems, Inc., to prepare no less than twenty (20) articles for publication in various neurology and psychiatry journals. Most of these articles concerned "off-label" usage of Neurontin and were generated so that defendants could completely control the publications distributed pursuant to its "publications strategy." The content of these articles were actually written by non-physician technical writers retained by defendants and

defendants had the right to control the content of all the articles. Defendants paid all expenses in connection with the creation of these publications.

178. Defendants also founded a speakers' bureau, another method of making large and numerous payments to physicians who recommended Neurontin for "off-label" uses, together with teleconferences, dinner meetings, consultants meetings, educational seminars, and other events.

179. Defendants utilized medical liaisons who were provided with new company slides that detailed methods to increase "off-label" use of Neurontin, including the following:

Reflex sympathetic dystrophy (RSD)

Peripheral neuropathy

Diabetic neuropathy

Trigeminal neuralgia

Post-herpetic neuralgia

Essential tremor

Restless leg syndrome (RLS)

Attention deficit disorder (ADD)

Periodic limb movement disorder

Migraine

Bipolar disorder

Amyotrophic lateral sclerosis (ALS/Lou Gehrig's Disease)

Drug or alcohol withdrawal seizures

180.  The following enumerated misrepresentations, which are not intended to be all-inclusive, relating to "off-label" usage of Neurontin were routinely made to physicians with the knowledge and consent of marketing personnel of defendants:

a.  *Bipolar Disorder*.  Medical liaisons informed psychiatrists that early results from clinical trials evaluating Neurontin for the treatment of bipolar disorder indicated ninety percent (90%) response rate when Neurontin was started at 900 mg/day dosage and increased to a dosage of 4800 mg/day. No such results existed.

b.  *Peripheral Neuropathy, Diabetic Neuropathy, and Other Pain Syndromes*.  Medical liaisons stated that clinical trials demonstrated that Neurontin was highly effective in the treatment of various pain syndromes and that a ninety percent (90%) response rate in the treatment of pain was being reported. No such body of evidence existed.  Defendants continued to claim that physicians should use Neurontin at substantially higher doses than indicated by the labeling.  Indeed, although medical liaisons routinely claimed Neurontin to be effective as

43

monotherapy, in 1997 the FDA refused to find Neurontin as a safe and effective monotherapy.

    c.    *Reflex Sympathetic Dystrophy ("RSD")*.  Medical liaisons informed physicians that extensive evidence demonstrated the efficacy of Neurontin in the treatment of RSD. The only such evidence that existed was anecdotal reports of nominal scientific value.

    d.    *Attention Deficit Disorder ("ADD")*.  Medical liaisons were instructed to inform pediatricians that Neurontin was effective for the treatment of ADD.  No data, other than occasional anecdotal evidence, supported this claim.

    e.    *Restless Leg Syndrome ("RLS")*.  RLS was another condition where defendants' medical liaisons were trained to refer to a growing body of date relating to the condition, when no scientific date existed.

    f.    *Trigeminal Neuralgia*.  Although medical liaisons represented that Neurontin could treat trigeminal neuralgia, again no scientific data supported this claim with the exception of occasional anecdotal reports.  No data demonstrated that Neurontin was as effective as currently available pain killers, most of which were inexpensive.

    g.    *Post-Herpetic Neuralgia ("PHN")*.  Medical liaisons were trained to tell physicians that seventy-five

44

percent (75%) to eighty percent (80%) of all PHN patients were successfully treated with Neurontin.  Once again, no clinical trial data supported such a claim.

h. *Essential Tremor Periodic Limb Movement Disorder ("ETPLMD")*.  Medical liaisons were trained to allege that Neurontin was effective in the treatment of these conditions.  No scientific data supported such claims with the exception of anecdotal reports of nominal scientific value.

i. *Migraine*.  Claims that Neurontin was effective in the treatment of migraine headaches were made by the medical liaisons and were supposedly based on early results from clinical trials.  Although pilot studies had been such suggested and undertaken, no early results of clinical trials existed to support these claims.  Once again, any data relating to treatment of migraines was purely anecdotal and of nominal scientific value.  Most of the case reports were either created or sponsored by defendants.

j. *Drug and Alcohol Withdrawal Seizures*.  Medical liaisons suggested that Neurontin be used in the treatment of drug and alcohol withdrawals despite the lack of any data supporting Neurontin as an effective treatment for these conditions.

181.   Defendants sponsored a 1998 study, which was scientifically valid, conducted at the Harvard Research Program, which concluded that patients receiving Neurontin did worse than those on sugar pills, but even though defendants were fully aware of these results from the tests which they sponsored, defendants did not publish the results until two years later after a substantial number of physicians had already been induced to prescribe Neurontin and a substantial number of patients had already been induced to take Neurontin.

182. On or about June 29, 2001, the FDA Division of Drug Marketing, Advertising and Communications (DDMAC) advised defendants that through routine monitoring and surveillance, the DDMAC has identified a slim jim (ID #NSJ5095A1) for Neurontin that is misleading and in violation of the FDCA and applicable regulations, in that this slim jim misleadingly claims improvement in quality of life (QOL) parameters based on the Neurontin Evaluation of Outcomes in Neurological Practice (NEON) study, that among other QOL parameters, the misleading presentation includes improvement in social limitations, memory difficulties, energy level, and work limitations, and that the NEON study is not considered to be substantial evidence for claims of QOL improvements because it is not a controlled study.

46

183. On or about July 1, 2002, the DDMAC advised defendants that through routine monitoring and surveillance, the DDMAC has identified a model (#NE 102254) for Neurontin (gabapentin) that is in violation of the FDCA and applicable regulations because it makes representations about Neurontin which are false or misleading, in that this suggestion of proof of the mechanism of action is false and contrary to the language in the approved product labeling that states "[t]he mechanism by which gabapentin [Neurontin] exerts its anticonvulsant action is unknown," and that, furthermore, the full presentation of the areas of the human brain accompanied by purported "Mechanism of Action" and the prominent display of the name "Neurontin" is misleading because it suggests that Neurontin is useful for a broader range of central nervous system conditions than has been demonstrated by substantial evidence.

184. From July 1995 through at least August 5, 2002, defendants engaged in a marketing program to promote the use of Neurontin, and to induce physicians to prescribe Neurontin, for medical conditions for which the FDA had not approved Neurontin to be used (i.e., "unapproved" or "off-label" uses). That program included: (a) illegally promoting the sale and use of Neurontin for a variety of conditions other than the one condition for which its use was approved by the FDA and for

47

which defendants had not performed the required FDA testing or established safety and efficacy, in violation of the Federal Food Drug and Cosmetic Act, 21 U.S.C. § 331, et seq.; (b) offering and paying illegal remuneration to doctors, either directly or through third parties, to induce them to promote and prescribe Neurontin for off-label uses, in violation of the federal Anti-kickback Statute, 42 U.S.C. § 1320a-7b(b); and (c) making and/or disseminating false statements in presentations and marketing literature sales personnel provided to doctors concerning, among other things, the uses for which the FDA had approved Neurontin, the conditions for which the use of Neurontin was otherwise medically accepted and/or the existence of adequate evidence of the safety and efficacy for such use.

185.   This "off-label" promotion scheme remained hidden until a complaint by a former medical liaison, Dr. David Franklin, was fully unsealed by the United States District Court for the District of Massachusetts in May 2002.

186.   On information and belief, defendants' "off-label" promotion scheme continued after the filing of Dr. Franklin's whistleblower complaint and still continues.  For example, through the third quarter of 2002, there were no published scientific studies to support Neurontin's use for a wide variety of diseases that it is being prescribed for including anxiety

48

disorder, attention deficit disorder, bipolar disorder, cluster
headache, pain, dosages in excess of 1800 mg per day and many
other disorders that physicians are now prescribing Neurontin
for that are "off-label." Despite this lack of scientific
evidence, Neurontin sales for these and other "off-label" uses
have steadily increased, to the point that, according to an
article published in the December 1, 2003 issue of Medical
Marketing & Media, 90% of Neurontin sales are for "off-label"
use. No other drug in the United States has such a high
percentage of "off-label" use. The same article estimates that
$1.8 billion worth of Neurontin has been sold for "off-label"
uses. This increase in sales, and the repeated and increased
prescription of Neurontin for "off-label" uses, without any
supporting scientific studies that would be prompting such use,
cannot be a random event and could not occur without continuing
"off-label" promotion by defendants' sales force.

187. As a result of the activities described above, many
of which continue to occur after Dr. Franklin filed his
whistleblower suit, physicians were inundated with false
information about Neurontin. As a result, they continue to
prescribe Neurontin for "off-label" uses for which there is no
reliable scientific support.

188.   On information and belief, Pfizer has a company-wide practice of marketing "off-label" indications.  "Off-label" marketing plans exist for Cox 2 inhibitors and, on information and belief, also exist for Neurontin.

189.   This continuing course of conduct is evidenced in part by the staggering growth of Neurontin sales for "off-label" uses.  Because there are no valid scientific studies supporting such use, a reasonable inference is that the use results from past and continuing promotional efforts by defendants.  This clear and unavoidable conclusion follows from observations regarding the ongoing extent of prescriptions written for "off-label" Neurontin use.

190.   First, from the perspective of overall Neurontin sales, "off-label" usage of Neurontin has actually increased during the years since 1999; in recent years, "off-label" prescriptions for Neurontin have exceeded 90% of all sales and, in some months, it appears that approved indication usage is negligible.

191.   Second, although Neurontin is prescribed for scores of "off-label" indications, since 1999 the types of "off-label" usage continue to be weighted in the precise areas where defendants focused their illegal marketing efforts:  bipolar disorder, pain, peripheral neuropathy, migraine, etc.

192.  Third, these focus treatment areas of continuing
unapproved usage are subject to very intense competition between
therapeutic substitutes (other drugs or treatments).  Indeed,
because manufacturers' incremental cost for drugs in these areas
is very small (e.g., only pennies to manufacture an additional
pill), manufacturers compete aggressively for market share by
spending huge amounts of money for marketing, promotional and
sales activities.  If any company was to simply pack its tent
and discontinue programmatic promotional effort in any
therapeutic arena, significant loss of overall sales within that
diagnosis regime would certainly occur.  For Neurontin, no such
dip in overall sales, let alone any significant drop, has
occurred.

193.  Fourth, Pfizer, like most branded drug companies,
monitors the relationship of its sales to its promotional
efforts in very short timeframe; Pfizer would be concerned about
a drop in sales within a certain therapeutic regime not after a
yearly look-back, or even a quarterly look-back, but over just
weeks.  The persistent maintenance of high Neurontin sales
within multiple, targeted areas for "off-label" promotion over a
period of years defies the conclusion that any significant
backing away on the marketing, sales or promotion of Neurontin
to each of those approved therapeutic areas.

51

194.   For example, sales of Neurontin for the treatment of pain have steadily increased since its introduction.  This increase is a direct result of defendants' sales representatives recommending to doctors its use for this purpose and their distribution of unapproved promotional materials.  These promotional efforts did not stop in 1999, but continued thereafter.  There are no valid scientific studies that support Neurontin's use for pain.  Dr. C. Seth Landefeld has submitted an expert opinion in the _Franklin_ litigation that a review of Drugdex for Neurontin, as of the end of August 2002, reveals "no published scientific studies to support Neurontin's use for . . . pain."  As a result, tens of thousands of patients who need help and could use other drugs whose effectiveness has been established, were given and are being given Neurontin.  These prescriptions for this purpose are still being written and as a direct result of defendants' pre-2000 illegal promotional activities and post-2000 illegal promotional activities.

195.   Likewise, sales of Neurontin for depression, ALS, attention deficit disorder, bipolar disorder and dosages in excess of 1800 mg per day, are also increasing without any scientific evidence supporting use of Neurontin for such indications.  Again, as noted by Dr. Landefeld, as of the end of the third quarter of 2002 "there were no published scientific

52

studies to support Neurontin's use for" any of these indications or in an increased dose.

196. Overall, "off-label" sales of Neurontin have steadily increased since 1998, and from 2000 to the present have consistently remained at 93% to 94% of all sales. Actual sales for approved uses has declined. Given the absence of scientific support for such uses, the genesis for those sales can only be past and continuing efforts by defendants to promote "off-label" use.

197. Defendants made additional fraudulent misrepresentations as to the safety and effectiveness of Neurontin, which are not detailed herein but will be determined in discovery.

198. Defendants affirmatively and fraudulently misrepresented that Neurontin was safe and effective in the treatment of pain when, in actuality, Neurontin was ineffective in treating such condition and instead influenced users to engage in self-destructive behavior.

199. Defendants affirmatively and fraudulently misrepresented that Neurontin was safe for human consumption in general, when in actuality, Neurontin influenced users to engage in self-destructive behavior.

200. Defendants knew that Neurontin was not safe and effective in the treatment of pain and that Neurontin was not safe for human consumption in general because such drug influenced users to engage in self-destructive behavior.

201. Defendants knew that physicians, health care providers, and mental health care providers would justifiably rely upon defendants' misrepresentations in prescribing Neurontin in the treatment of pain and in prescribing Neurontin for human consumption in general for the treatment of illnesses and medical and mental conditions and that the public, including persons such as plaintiff, would justifiably rely upon defendants' misrepresentations in using Neurontin as prescribed by physicians, health care providers and mental health care providers in the treatment of pain and for other prescribed uses.

202. Plaintiff justifiably relied upon defendants' misrepresentations and, accordingly, consumed Neurontin as prescribed by his physician in the treatment of chronic pain.

203. By reason of plaintiff's consumption of Neurontin in justifiable reliance upon defendants' fraudulent misrepresentations, plaintiff sustained injuries.

204. By reason of the foregoing, plaintiff was damaged in a sum which exceeds the jurisdictional limits of all lower

54

courts which would have jurisdictional limits of this matter, and in addition, plaintiff seeks punitive and exemplary damages against defendants in an amount to be determined upon the trial of this matter.

## AS AND FOR A FIFTH CAUSE OF
## ACTION AGAINST THE DEFENDANTS

205.   Plaintiff repeats and reiterates the allegations previously set forth herein.

206.   Defendants knowingly and willfully engaged in unfair, deceptive and unconscionable acts and practices and disseminated information that was deceptive, misleading and false in a material way, in connection with the promotion and sale of Neurontin, in violation of Minn. Stat. § 325F.69, for the purpose of influencing and inducing physicians and medical providers to prescribe Neurontin, at excessively high dosages, for unapproved "off-label" uses, including treatment for pain, to disabled patients/consumers such as plaintiff, and knowingly took advantage of the inability of disabled patients/consumers such as plaintiff reasonably to protect their interests because of their physical and mental impairments, and causing such disabled patients/consumers to purchase, acquire and use Neurontin, at high dosages, for unapproved "off-label" uses,

55

including treatment for pain, as prescribed by their physicians and medical providers

207. By reason of defendants' unconscionable, deceptive and unfair acts and practices, and dissemination of deceptive misleading and false information, reasonable patients/consumers acting reasonably, such as plaintiff, were caused to attempt to commit suicide and to sustain actual damages and injuries.

208. By reason of the foregoing, plaintiff was damaged in a sum which exceeds the jurisdictional limits of all lower courts which would have jurisdiction of this matter, and in addition, plaintiff seeks punitive and exemplary damages against defendants in an amount to be determined upon the trial of this matter, and reasonable attorney's fees, as may be found by the Court upon the trial of this Action.

## AS AND FOR A SIXTH CAUSE OF ACTION AGAINST THE DEFENDANTS

209. Plaintiff repeats and reiterates the allegations previously set forth herein.

210. As a result of the injuries sustained by plaintiff, wife-plaintiff, ANNE ELLIS, has been deprived of the assistance, companionship, consortium and society of her husband, all to her loss and detriment.

56

211.   That as a result of defendants' negligence as aforesaid, wife-plaintiff has been damaged.

212.   By reason of the foregoing, wife-plaintiff was damaged in a sum which exceeds the jurisdictional limits of all lower courts which would have jurisdiction of this matter, and in addition, wife-plaintiff seeks punitive and exemplary damages against defendants in an amount to be determined upon the trial of this matter.

WHEREFORE, plaintiff demands judgment against the defendants as follows:

(1)   A sum which exceeds the jurisdictional limits of all lower courts which the jury would find to be fair, adequate and just on the First Cause of Action, together with punitive damages and exemplary damages in an amount to be determined upon the trial of this Action;

(2)   A sum which exceeds the jurisdictional limits of all lower courts which the jury would find to be fair, adequate and just on the Second Cause of Action, together with punitive damages and exemplary damages in an amount to be determined upon the trial of this Action;

(3)   A sum which exceeds the jurisdictional limits of all lower courts which the jury would find to be fair, adequate and just on the Third Cause of Action, together with punitive

57

damages and exemplary damages in an amount to be determined upon the trial of this Action;

(4)   A sum which exceeds the jurisdictional limits of all lower courts which the jury would find to be fair, adequate and just on the Fourth Cause of Action, together with punitive damages and exemplary damages in an amount to be determined upon the trial of this Action;

(5)   A sum which exceeds the jurisdictional limits of all lower courts which the jury would find to be fair, adequate and just on the Fifth Cause of Action, together with punitive damages and exemplary damages in an amount to be determined upon the trial of this Action; and

(6)  A sum which exceeds the jurisdictional limits of all lower courts which the jury would find to be fair, adequate and just on the Sixth Cause of Action, together with punitive damages and exemplary damages in an amount to be determined upon the trial of this Action, together with the interest, costs and disbursements of this Action.

                    Yours, etc.,

                    FINKELSTEIN & PARTNERS, LLP
                    Attorneys for Plaintiff
                    Office & P.O. Address
                    436 Robinson Avenue
                    Newburgh, New York  12550
                    BY: _____
                        ANDREW G. FINKELSTEIN, ESQ.

                    CUNEO, POGUST & MASON, LLP
                    116 Washington Street, Suite 1520
                    Conshohocken, PA 19428
                    Harris L. Pogust, Esquire
                    Derek Braslow, Esquire

TO:   PFIZER INC.
      Defendant
      c/o Secretary of State
      41 State Street
      Albany, New York   12231

      PARKE-DAVIS, a division of
      Warner-Lambert Company and
      Warner-Lambert Company LLC
      Defendant
      201 Tabor Road
      Morris Plains, New Jersey   07950

      WARNER-LAMBERT COMPANY
      Defendant
      201 Tabor Road
      Morris Plains, New Jersey   07950

      WARNER-LAMBERT COMPANY LLC
      Defendant
      c/o Secretary of State
      41 State Street
      Albany, New York   12231

STATE OF NEW YORK, COUNTY OF ORANGE          ss:

I, the undersigned, am an attorney admitted to practice in the
courts of New York State, & say that:

I am the attorney of record, or of counsel with the attorney(s)
of record, for the plaintiff.   I have read the annexed Verified
Complaint know the contents thereof and the same are true to my
knowledge, except those matters therein which are stated to be
alleged on information & belief, and as to those matters I
believe them to be true.

My belief, as to those matters therein not stated upon
knowledge, is based upon the following:

Facts and information contained in deponent's file.   The reason
I make this affirmation instead of the plaintiff is because the
plaintiff resides outside of county where deponent maintains his
office.

I affirm that the foregoing statements are true under penalties
of perjury.

Dated:   June  17 ,  2005.

ANDREW G. FINKELSTEIN, ESQ.