UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---

| | |
|---|---|
| In re: NEURONTIN MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION | MDL Docket No. 1629 <br><br> Master File No. 04-10981 <br><br> Judge Patti B. Saris <br><br> Magistrate Judge Leo T. Sorokin |
| THIS DOCUMENT RELATES TO: <br><br> PRODUCTS LIABILITY ACTIONS | |

**DEFENDANTS' CASE MANAGEMENT PROPOSAL FOR THE PRODUCTS LIABILITY ACTIONS AND RESPONSE TO EMERGENCY MOTION FOR LEAVE TO WITHDRAW AS COUNSEL FOR PLAINTIFFS HOWARD AND ANNE ELLIS**

In Discovery No. 14, dated September 27, 2007, the Court asked counsel for the Product Liability Plaintiffs and Pfizer Inc. and Warner-Lambert Company ("Defendants") to suggest how the parties and the Court can avoid future disruptions to the orderly management of the Products Liability cases like that caused by plaintiffs' dismissal of the *Strickland* matter and plaintiffs' counsel's motions to withdraw from two of the other Track One cases (*Mendoza* and *Fenelon*). Less than two weeks after the Court issued Discovery Order No. 14, and despite the Court's admonition in that Order that "[a] recurring pattern of such dismissals or Motions would also potentially raise Rule 11 or 28 U.S.C. § 1927 issues as well as interfering with the expeditious management and resolution of this MDL," counsel for Product Liability Plaintiffs have filed a motion to withdraw in yet another case – *Ellis v. Pfizer*. Plaintiffs' counsel filed this latest motion to withdraw just days <u>after</u> learning of Defendants' intent to designate *Ellis* as a replacement Track One case. If that were not enough, plaintiffs' counsel also advised that they intend to file a motion to dismiss in *Wendorf v. Pfizer*, another case Defendants had indicated

was a potential Track One replacement case.[1]  This is pure gamesmanship.  Plaintiffs and their counsel continue to "significantly impede[] the orderly management and adjudication of the Products Liability cases" and "interfer[e] with the expeditious management and resolution of this MDL."  Discovery Order No. 14.

In the first section of this memorandum, Defendants set forth what they perceive to be glaring deficiencies in plaintiffs' counsel's preliminary investigation in the above cases, as required by Rule 11 of the Federal Rules of Civil Procedure.  Including *Ellis* and *Wendorf*, plaintiffs' counsel have now dismissed (or announced an intent to dismiss) or have sought to withdraw from almost half of the Track One cases – five out of 12 – after Defendants spent significant time and resources conducting discovery in those cases.  Had plaintiffs' counsel conducted thorough plaintiff interviews and medical records review, they would have learned prior to filing that these plaintiffs' claims have no arguable merit.

Defendants have serious and well-founded concerns that plaintiffs' counsel's preliminary inquiries into many of their other cases may be similarly deficient.  Among other things, the plaintiffs/decedents in at least four of the five cases plaintiffs' counsel have sought to dismiss or withdraw from had prior suicide attempts before ever using Neurontin – in some instances, multiple prior attempts. More troubling is the fact that lead plaintiffs' counsel Andrew Finkelstein represented to the FDA in April 2005 that <u>none</u> of his clients had attempted suicide before using Neurontin, and Mr. Finkelstein made similar representations to Judge Stearns of this District Court and the *San Francisco Chronicle*.  Mr. Finkelstein either has his facts wrong or his

---

[1] The Court required Defendants to identify their two new Track One trial workup cases by October 10, 2007.  *See* Discovery Order No. 14.  On October 4, counsel for Defendants, as a courtesy, informally advised plaintiffs' counsel of Defendants' intention to select *Ellis v. Pfizer* as one of its two Track One selection cases.  On October 5, counsel for Defendants served a notice for the deposition of Mr. Ellis and requested that plaintiffs' counsel provide authorizations for the collection of medical records in *Ellis* and two other cases, including *Wendorf v. Pfizer*.  On

firm failed to adequately screen these claims before filing suit. Either way, Defendants ask the Court to take appropriate action to remedy this problem going forward.

To prevent similar disruptions of the management of this MDL in the future, Defendants propose in Section II of this memorandum that the Court enter a *Lone Pine* case management order requiring plaintiffs and their counsel to make a proffer of basic information as to each of their cases. As discussed below, courts have used *Lone Pine* orders to help to eliminate meritless cases and streamline matters in complex litigation, thus reducing unnecessary expenditures and inefficiencies.

Defendants ask the Court to enter a *Lone Pine* order requiring plaintiffs' counsel to provide Defendants a sworn statement pursuant to Rule 11 for each of their cases, supported by specifically cited and attached documents and other supporting evidence, stating: the specific injury alleged; the date and circumstances of the injury; the dates of Neurontin use; counsel have collected and reviewed all medical records; counsel have produced all medical records to Defendants; and counsel and plaintiffs(s) fully intend to pursue the case. In addition, the sworn statements would be accompanied by a declaration for each case from a qualified expert stating the expert's opinion that the alleged injury was the result of ingesting Neurontin. Pursuant to Rule 11, all of this is information that plaintiffs should have had before filing their claims.

Entry of a *Lone Pine* order here would provide Defendants – and the Court – reasonable assurances that, consistent with Rule 11, plaintiffs' counsel believe the remaining products liability actions have evidentiary support and they and plaintiffs have every intention of fully pursuing those claims. In the wake of plaintiffs' and their counsel's recent conduct, a *Lone Pine* order is warranted.

---

October 8, plaintiffs' counsel informed counsel for Defendants that they intend to file a motion to withdraw as counsel in the *Ellis* case, and that Ms. Wendorf wished to "discontinue [her] case."

In Discovery Order No. 14, the Court also asked counsel for the parties to confer and propose a new schedule for expert discovery and summary judgment in the two Track One cases designated for trial workup (*Smith*, and a case to be selected by Defendants). Counsel have conferred and have jointly submitted a proposed schedule that would apply to the two designated trial cases if the Court rules in favor of the Product Liability Plaintiffs on the issues of general causation and preemption. *See Joint Proposal Regarding Expert Discovery and Summary Judgment in Two Designated Trial Cases* (Doc. #906). However, further amendment to the current schedule is needed due to the disruption to the MDL schedule caused by plaintiffs' dismissal of and withdrawal from Defendants' potential Track One replacement cases. Section III of this memorandum sets forth Defendants' proposed amendment to the current schedule, which includes a 45-day period for plaintiffs to comply with the requirements of a *Lone Pine* order.

**I.    PLAINTIFFS' COUNSEL DID NOT PERFORM AN ADEQUATE INQUIRY INTO THE CLAIMS IN *STRICKLAND, MENDOZA*, *FENELON* AND OTHER CASES PRIOR TO FILING SUIT, WHICH CALLS INTO QUESTION THE SUFFICIENCY OF THE CLAIMS IN THEIR OTHER CASES**

Andrew Finkelstein, lead counsel for the Product Liability Plaintiffs, represented to an FDA official in April 2005 that "one hundred percent of [his Neurontin] clients . . . never attempted suicide before." Letter from Andrew Finkelstein to Dr. Russell Katz (Apr. 15, 2005), at 2 (Ex. A). Mr. Finkelstein also made the following statements in a May 2004 letter to Judge Stearns of this District Court:

> Over the past several months, my firm has been contacted and has been retained by thousands of Neurontin users . . . . Thus far, we are aware of one hundred sixty (160) Americans who, having ***never*** attempted any form of suicide before taking Neurontin, committed suicide while on the drug. Additionally, we are aware of over two thousand (2,000) Americans who, having ***never***

- 4 -

attempted suicide before taking Neurontin, were hospitalized following a suicide attempt while taking the drug.

Letter from Andrew Finkelstein to Judge Richard Stearns (May 18, 2004), at 2 (Ex. B) (emphasis in original). Moreover, in an article published in the *San Francisco Chronicle*, Mr. Finkelstein is quoted as saying that after his firm ran ads asking if patients exhibited suicidal behavior while on Neurontin, it received thousands of calls and "***he weeded out people who had ever attempted suicide before taking the drug***." *FDA tells companies to review safety data on epilepsy drugs; Agency responds to charge that Neurontin raises suicide risk among all patients who take it*, S.F. CHRON., Apr. 21, 2005, at A1 (Ex. C) (emphasis added). The facts belie Mr. Finkelstein's representations.

In the memorandum in support of their motion to dismiss *Strickland* plaintiffs stated that "after thoroughly considering the discovery produced in this case, including Mr. Strickland's medical records and the deposition testimony of Mr. Strickland and his treating physicians," plaintiffs and plaintiffs' counsel agree that they "would be unable to prove their claim that Mr. Strickland's injuries were caused by his ingestion of Neurontin." Pls.' Br. at 5 (Doc. #841). The reality, however, is that the determination that the *Strickland* case was without merit could – and should – have been made before the suit was filed. Pursuant to Rule 11, in filing *Strickland*, plaintiffs' counsel were "certifying that to the best [their] knowledge, information, and belief, formed after an inquiry reasonable under the circumstances . . . the allegations and other factual contentions have evidentiary support . . . ." Fed. R. Civ. P. 11. Thus, they should have conducted a reasonable investigation – at minimum, a thorough interview of Mr. Strickland and review of his medical records – <u>before</u> filing the suit. They clearly did not, and, as a result, Defendants were forced to expend significant time and resources conducting discovery in a case that should never have been filed.

Plaintiffs' complaint alleges that Mr. Strickland attempted suicide on three occasions – November 1, 2000, April 1, 2001, and April 1, 2003 – as a result of ingesting Neurontin. *See* Compl. ¶ 113. Had plaintiffs' counsel conducted a reasonably thorough interview and records review prior to filing suit, they would have ascertained the following facts:

- There were two purported suicide attempts that were the basis for the Strickland's lawsuit, not three. These two events occurred on October 12, 2000 and July 29, 2001, not the dates identified in the complaint.

- Medical records show that Mr. Strickland was admitted to the hospital on October 12, 2000 for an accidental valium overdose. Both Mr. Strickland and his wife contemporaneously denied that this was a suicide attempt. None of the records from the hospitalization reference Neurontin as a current medication of Mr. Strickland's.

- Medical records show that Mr. Strickland intentionally overdosed on fiorinal on July 29, 2001. He testified that one of the primary reasons he tried to kill himself was because of the shooting death of his son and the subsequent release of his killer. None of the hospital records reference Neurontin as a current medication of Mr. Strickland's.

- Mr. Strickland suffered no apparent injuries from either of these events. (Plaintiffs' complaint alleges "severe personal injuries.") (Compl. ¶ 113.)

- Mr. Strickland attempted suicide on at least five prior occasions (pre-Neurontin use), dating back to the early 1970s, and testified that he has always had suicidal thoughts. His prior suicide attempts involved a drug overdose, ingesting poison, jumping from a speeding car, "getting high and drinking," and injecting himself with four grams of cocaine. Four of these attempts were documented in his medical records.

- Mr. Strickland has suffered from severe and chronic drug and alcohol abuse for nearly 40 years, and he was diagnosed in the 1980s with paranoid schizophrenia.

Finally, Mr. Strickland continued to use Neurontin for his nerve pain even after the filing of the lawsuit and, at the time of his deposition in April 2007, was still using Neurontin – with good results. Mr. Strickland testified that he has continued to use Neurontin since 2001 because it helps with the nerve pain in his legs. This testimony is in direct contradiction to his complaint, which alleges, as do all the complaints, that Neurontin was ineffective for treating his

condition (Compl. ¶ 107). All of this information could have been obtained by plaintiffs' counsel had they conducted the reasonable inquiry required by Rule 11.

The same is true with regard to the Track One cases from which plaintiffs' counsel seek to withdraw – *Mendoza* and *Fenelon*. Whatever the "irreconcilable differences" plaintiffs' counsel have represented as the source for their decision to withdraw from these cases (and now *Ellis*), it is evident that these claims also were not properly screened before filing, and lack merit.

In the case of Mr. Mendoza, the complaint alleges that he attempted suicide on November 27, 2000, as a result of ingesting Neurontin. *See* Compl. ¶ 123. Mr. Mendoza's testimony and medical records revealed that on the above date he presented to the emergency room and asked to be admitted to a domiciliary after being kicked out of his group home/assisted living facility. At that time, he denied any suicidal intention. When the hospital refused to admit him, he went to the hospital's patient advocate and stated that he didn't want to be admitted, but wanted to get into the domiciliary, and he said he was actually doing well. When the patient advocate explained that they could not take him in unless he was in danger of harming himself or others, he left. Mr. Mendoza returned several hours later, claiming that he had taken 60 pills of Neurontin and Haldol, and was then admitted to the hospital. The medical records from this date include several suggestions that Mr. Mendoza was faking the suicide attempt in an attempt to find a place to stay. Indeed, Mr. Mendoza testified that he did not want to be admitted, but rather was in need of help with his living situation. Like Mr. Strickland, Mr. Mendoza also has a pre-Neurontin history of suicide attempts and/or ideation – at least 13 instances documented in his medical records dating back to 1996.

The medical records for the decedent in *Fenelon* (a completed suicide case) document at least <u>three</u> prior suicide attempts and quote the decedent as saying, "Pain makes me suicidal." She was prescribed Neurontin for chronic pain, and, according to multiple references in the records (and contrary to the allegations in the cookie-cutter complaint), the drug was helping to treat her pain.

In Discovery Order No. 14, the Court stated that the voluntary dismissal of *Strickland* and the motions to withdraw in *Mendoza* and *Fenelon* "impeded the orderly management and adjudication of the Products Liability cases" and that "[a] recurring pattern of such dismissals or Motions would also potentially raise Rule 11 or 28 U.S.C. § 1927 issues as well as interfering with the expeditious management and resolution of the MDL." Despite this admonition, plaintiffs' counsel have continued this same pattern of conduct.

After being advised of Defendants' consideration of two potential replacement cases (*Ellis* and *Wendorf*), within days, plaintiffs' counsel announced their intention to withdraw from one (*Ellis*), and dismiss the other (*Wendorf*). Not surprisingly, neither of these cases appears to have any arguable merit. Medical records for the decedent in *Wendorf* reflect <u>five</u> documented episodes of suicidal ideation and/or gestures before he ever used Neurontin. In *Ellis*, despite alleging in the complaint that his ingestion of Neurontin caused him "severe personal injuries," (Compl. § 123), plaintiffs have failed to produce any medical records showing that Mr. Ellis sought medical treatment for an alleged suicide attempt, nor does any record describe the manner in which he allegedly attempted suicide. Further, Mr. Ellis identifies three suicide attempts in his interrogatory answers (by month and year only), none of which match the month and year of the alleged suicide attempt in the complaint.

As the above cases illustrate, Mr. Finkelstein, mistakenly or otherwise, misrepresented his clients' status to the FDA, the Court, and the news media. Whatever the case, it seems evident that the "reasonable inquiry" required by Rule 11 was not performed here, calling into question the viability of the other products liability cases.

The sufficiency of plaintiffs' claims is further called into question by plaintiffs' use of "form" complaints that provide minimal information regarding each individual plaintiff's claims. Out of the more than 200 paragraphs in each of the Finkelstein complaints, only a few words in a handful of paragraphs – typically those identifying the plaintiff, his place of residence, the particular condition for which the plaintiff allegedly was prescribed Neurontin, and the date of the alleged suicide attempt or suicide – differ to any degree, thus resulting in nearly identical complaints in every Finkelstein case. More importantly, these complaints have not proven reliable in their factual allegations. Many of the dates listed for the alleged injuries are inaccurate and, in fact, contrary to the plaintiffs' medical records. The circumstances surrounding the alleged suicide attempts and suicides are nowhere alleged. Further, while all or nearly all of the complaints allege that Neurontin was "ineffective" for each plaintiff's condition and that each plaintiff has suffered "severe personal injuries," we need look no further than the facts in *Strickland, Mendoza,* and *Fenelon* to see that this simply is not true.

To avoid further disruptions to the management of the Track One process instituted by the Court such as that caused by the dismissals and/or withdrawal of counsel in the above cases (both past and presently anticipated), Defendants propose that the Court enter, pursuant to Rule 16 of the Federal Rules of Civil Procedure, a *Lone Pine* case management order that would require plaintiffs' counsel to provide Defendants sworn statements, supported by expert declarations, proffering basic information with respect to each case that, if plaintiffs can

prevail on the issue of general causation, would enable them to make a submissible case that Neurontin caused the injuries alleged.

## II. THE COURT SHOULD ENTER A *"LONE PINE"* CASE MANAGEMENT ORDER TO ENSURE THE VIABILITY OF THE REMAINING PRODUCTS LIABILITY CASES BEFORE FURTHER CASE-SPECIFIC DISCOVERY

Rule 16(a)(2) provides courts with the discretion of "establishing early and continuing control so that the case will not be protracted because of lack of management." To accomplish this goal and "facilitate the just, speedy, and inexpensive disposition of [an] action," a district court has the discretion to fashion a pre-trial order that addresses, among other things: (1) the "simplification of the issues, including the elimination of frivolous claims"; (2) "the control and scheduling of discovery"; and (3) "*the need for adopting special procedures* for managing potentially difficult or protracted actions." Fed. R. Civ. P. 16(c)(1), (6), (10), (12), and (16) (emphasis added).

In managing mass tort litigation, courts have recognized the utility of issuing pre-discovery case management orders, or what are often referred to as "*Lone Pine* Orders" after the seminal case of *Lore v. Lone Pine Corp.*, No. L-33606-85, 1986 WL 637507 (N.J. Super. Ct. Nov. 18, 1986). *Lone Pine* Orders are "issued under the wide discretion afforded district judges over the management of discovery under Fed. R. Civ. P. 16." *Acuna v. Brown & Root Inc.*, 200 F.3d 335, 340 (5th Cir. 2000). A "*Lone Pine* Order" is intended "to identify and cull potentially meritless claims and streamline litigation in complex cases involving numerous claimants." *Baker v. Chevron USA, Inc.*, No. 1:05-CV-227, 2007 WL 315346, at *1 (S.D. Ohio Jan. 30, 2007). Moreover, it provides a way to limit discovery unless and until plaintiffs come forward with an initial proffer of evidence, including credible evidence of medical causation.

In *Lone Pine*, plaintiffs sued a local landfill operator and hundreds of other defendants for personal injuries and property damage. Before allowing the parties to proceed with general discovery, the trial court imposed a deadline by which plaintiffs were required to present: (1) the facts of each individual exposure; (2) reports of medical experts supporting each individual plaintiff's claim of personal injury and causation; and (3) reports of real estate experts for diminution in value. When plaintiffs failed to make a *prima facie* showing, the trial court dismissed their claims:

> In this Court's opinion it is time that prior to the institution of such a cause of action, attorneys for plaintiffs must be prepared to substantiate, to a reasonable degree, the allegations of personal injury, property damage and proximate cause.
>
> With the hundreds of thousands of dollars expended to date in this case, it appears that plaintiffs' counsel is moving things along without complying with discovery orders, hoping that some of the defendants, to avoid further delay and expense, would recommend a settlement of the case. However, there is nothing to be settled because there is total and complete lack of information as to causal relationship and damages.
>
> This Court is not willing to continue the instant action with the hope that the defendants eventually will capitulate and give a sum of money to satisfy plaintiffs and their attorney without having been put to the test of proving their cause of action.

*Lone Pine*, 1986 WL 637507, at *4.

Since the *Lone Pine* decision, courts around the country have entered similar orders to manage complex litigation. Some examples include:

- *Burns v. Universal Crop Protection Alliance*, No. 4:07CV00535 SWW, 2007 WL 2811533 (E.D. Ark. Sept. 25, 2007). Eighty-two cotton farmers brought an action against herbicide manufacturers for damage to crops allegedly caused by exposure to defendants' herbicides. The court granted defendants' motion for a *Lone Pine* order requiring plaintiffs to identify, among other things, the location and acreage of each cotton field allegedly injured, the

- 11 -

manufacturer and brand name of each product allegedly transported to each cotton field, the facts supporting plaintiffs' claim that each defendant's product was transported to plaintiffs' cotton fields, and any facts, data, or grounds relied upon by experts in support of product identification. *Id.* at *2.

- *Baker v. Chevron USA, Inc.*, No. 1:05-CV-227, 2007 WL 315346 (S.D. Ohio Jan. 30, 2007). Hundreds of residents of two Ohio towns sued Chevron asserting various claims, including personal injury allegedly resulting from Chevron's operation of a nearby gasoline refinery. Upon motion of Chevron, the court entered a *Lone Pine* order requiring the plaintiffs to provide the following information within 90 days: (1) an expert affidavit setting forth for each plaintiff the specific illness allegedly sustained; (2) the date the illness was diagnosed; (3) the identity of the diagnosing physician; (4) the toxic chemical that allegedly caused the illness; (5) the alleged manner of exposure; and (6) the date, duration, and dose of the exposure. *Id.* at *1.

- *In re Rezulin Prods. Liab. Litig.* (MDL No. 1348), 2005 WL 1105067 (S.D.N.Y. May 9, 2005). After granting Pfizer's motion to exclude general causation testimony on "silent" liver injury, and several motions for summary judgment, the court granted Pfizer's motion for a *Lone Pine* order requiring each plaintiff to produce case-specific expert reports. Among other things, each report was required to include a list of medical records reviewed by the expert and copies of those records, the dates during which the plaintiff used Rezulin and documents relied upon as evidence of that use, and the expert's opinion on causation as to each claimed injury. *Id.* at *1-2.

- *Acuna v. Brown & Root Inc.*, 200 F.3d 335 (5th Cir. 2000). The Fifth Circuit affirmed the district court's use of a pre-trial scheduling order requiring plaintiffs to establish through

expert affidavits for each plaintiff: (1) the injuries or illnesses suffered by the plaintiff that were caused by the alleged uranium exposure; (2) the materials or substances causing the injuries; (3) the facility thought to be their source; (4) the dates or circumstances and means of exposure to the injurious material; and (5) the scientific and medical basis for the expert's opinions. *Id.* at 338. As the Fifth Circuit explained, the scheduling order "essentially required that information which plaintiffs should have had before filing their claims pursuant to Federal Rule of Civil Procedure 11(b)(3)." *Id.* at 340.

- *Renaud v. Martin Marietta Corp.*, 749 F. Supp. 1545 (D. Colo. 1990). The district court required plaintiffs to present a *prima facie* case that contaminants reached plaintiffs' water taps in "quantities sufficient to cause the injuries they have alleged," or face dismissal under a summary judgment standard. *Id.* at 1548.

- *In re Love Canal Actions*, 547 N.Y.S.2d 174 (N.Y. Sup. Ct. 1989). The trial court granted defendants' motion to enter a *Lone Pine* order requiring: (1) evidentiary documentation of exposure to the hazardous waste at issue; (2) reports of physicians and other medical experts documenting the existence of each injury claimed to have been caused by chemicals from the old Love Canal landfill; and (3) reports or affidavits of a physician or other qualified expert demonstrating that each injury was, in fact, caused by exposure to chemicals from the old Love Canal landfill. *Id.* at 174.

Defendants submit that the Court should enter a similar *Lone Pine* order here. As set forth above, counsel have not adequately screened plaintiffs' claims to eliminate those having no arguable merit. Given that Defendants have already expended extensive time and resources on these meritless cases, a *Lone Pine*-type order is essential if the Court and the parties are to avoid repeated *Strickland*-type dismissals in other cases, including Defendants' two new Track One

cases, the selection of which plaintiffs are again manipulating through dismissal and/or withdrawal as counsel.

*Strickland, Mendoza,* and *Fenelon* demonstrate that a *Lone Pine* order is needed for another reason. Like the plaintiffs in these three cases, many of the plaintiffs in this litigation have a significant history of psychiatric problems or severe chronic pain. The rate of suicidal behavior in these patient populations is already much higher than that among otherwise "healthy" adults. Given the host of medical issues, life events, and other environmental factors that can lead to suicidal behavior, plaintiffs should be required to proffer reliable evidence supporting their allegations that the ingestion of Neurontin caused the alleged injuries in each of these cases. Such a proffer should be submitted before Defendants expend significant time and resources conducting further case-specific discovery.

Accordingly, as part of a *Lone Pine* order, the Court should require plaintiffs to provide Defendants basic information for each case in the MDL through sworn statements of counsel and expert declarations. Specifically, the Court should require plaintiffs' counsel to provide Defendants, within 45 days, sworn statements of counsel pursuant to Rule 11 and subject to penalties for perjury, supported by specifically cited and attached documents and other supporting evidence, stating for each plaintiff/decedent:

    (1)    The specific injury alleged;

    (2)    The date and circumstances of the injury;

    (3)    The dates of Neurontin use;

    (4)    Counsel have collected and reviewed all medical records;

    (5)    Counsel have produced all medical records to Defendants; and

    (6)    Counsel and plaintiff(s) fully intend to pursue the case;

as well as a declaration for each MDL case from a qualified expert stating the expert's opinion that the alleged injury was the result of ingesting Neurontin. Cases in which plaintiffs do not provide Defendants the sworn statement of counsel and expert declaration within the 45-day period would be dismissed with prejudice.

Requiring plaintiffs to go through this process will result in the elimination of cases that have no arguable merit, and ensure that plaintiffs have a "good faith" basis for continuing with the remaining cases, such that Defendants may pursue discovery in those cases free of concern that plaintiffs will seek another *Strickland*-type dismissal (or withdrawal as counsel). As plaintiffs' counsel have already sought to dismiss or withdraw from nearly half of the Track One cases (including the two additional cases that Defendants investigated and subsequently designated as Track One replacement cases), the benefits of requiring plaintiffs to make an initial evidentiary proffer seem obvious. No one wins when both sides – and the Court – have to expend valuable resources on cases that should never have been filed. There are far too many cases in this litigation to be wasting time and money on those having no chance of success. Entry of a *Lone Pine* order will help winnow out such cases.

In addition to entry of a *Lone Pine* order, due to the significant time and resources Defendants committed to conducting discovery in the above cases, Defendants ask the Court for such other relief as it deems appropriate under the circumstances. Defendants would also ask the Court to impose an appropriate sanction on plaintiffs' counsel for any such improper conduct in the future.

### III. DEFENDANTS' PROPOSED AMENDMENT TO THE CURRENT PRODUCTS LIABILITY CASE SCHEDULE

Discovery Order Nos. 13 and 14 set forth the current deadlines for the Products Liability cases. Defendants propose the following amendment to this schedule, which revises

certain of the current dates due to the disruption to the MDL schedule caused by plaintiffs' dismissal of and withdrawal from Defendants' potential Track One replacement cases. The proposed new schedule includes a 45-day period up front for plaintiffs' assessment of the products liability cases pursuant to a *Lone Pine* order (calculated from the date of the October 17, 2007 hearing). Following the completion of that case assessment, Defendants would be required to select two new Track One cases, conduct limited discovery in those cases, then select and work up their trial case. Consistent with Discovery Order No. 14, this schedule would require the completion of discovery in Defendants' trial workup case before the filing of *Daubert* and summary judgment motions. Fairness dictates that both sides should be afforded the opportunity to fully work up their trial cases before the submission of summary judgment motions. Moreover, these proposed modifications will not unduly extend the MDL schedule. New proposed dates are identified in *italics*.

| | |
|---|---|
| **October 22, 2007** | Plaintiffs' expert reports on general causation due. |
| **November 12, 2007** | Deadline for Plaintiffs to produce their designated general causation experts for deposition. |
| **December 3, 2007** | Defendants' expert reports on general causation due. |
| *December 3, 2007* | *Deadline for Plaintiffs' counsel to submit sworn statements with supporting expert declarations for each of their cases pursuant to the Court's Lone Pine Order.* |
| *December 17, 2007* | *Deadline for Defendants to select two new Track One cases from the remaining cases to replace their original Track One cases.* |
| **December 21, 2007** | Deadline for Defendants to produce their designated general causation experts for deposition. |
| *January 28, 2008* | *Deadline for Defendants to designate their trial case from their two Track One cases or the remaining cases randomly selected by the Court.* |

| | |
|---|---|
| *March 24, 2008* | *Close of discovery in trial workup case selected by Defendants.* |
| *April 7, 2008* | *Motions for summary judgment on general causation and preemption, and Daubert motions due.* |
| *May 2, 2008* | *Briefing in opposition to summary judgment and Daubert motions due.* |
| *May 27, 2008* | *Reply briefing in support of summary judgment and Daubert motions due.* |
| *June 3, 2008* | *Sur-reply briefing in opposition to summary judgment and Daubert motions due.* |
| *TBD* | *Hearing on summary judgment and Daubert motions.* |

The following additional deadlines, which have been agreed to by the parties and are also set forth in the parties' *Joint Proposal Regarding Expert Discovery and Summary Judgment in Two Designated Trial Cases* (Doc. #906), would apply only if the Court rules in favor of the Product Liability Plaintiffs on the issues of general causation and preemption:

> Plaintiffs must produce reports for experts in the two designated Track One cases within 30 days of the Court's ruling on the general causation and preemption issues.
>
> Plaintiffs must produce their experts in the two designated Track One cases for deposition within 45 days of designating those experts.
>
> Defendants must produce reports for their experts in the two designated Track One cases within 20 days of the deadline for Plaintiffs to produce their experts for deposition.
>
> Defendants must produce their experts in the two designated Track One cases for deposition within 45 days of designating those experts.
>
> Dispositive motions pertaining to the two designated Track One cases due within 30 days of Defendants' deadline to produce their experts for deposition.

>  Briefs in opposition due within 30 days of deadline for filing motions.
>
>  Reply briefs due within 20 days of deadline for filing opposition briefs.
>
>  Sur-reply briefs due within 7 days of deadline for filing reply briefs.
>
>  Hearing on dispositive motions to follow the filing of any sur-reply briefs.

This proposed schedule, in conjunction with entry of a *Lone Pine* order, ensures that only viable cases remain, and sequences discovery in a manner that prevents unnecessary waste of the parties' and the Court's resources.

### IV.  CONCLUSION

For all the reasons discussed herein, Defendants ask the Court to enter the proposed *Lone Pine* case management order; adopt Defendants' proposed amended schedule for the Products Liability actions; and provide Defendants such other relief as the Court deems appropriate under the circumstances.

October 15, 2007  Respectfully submitted,

DAVIS POLK & WARDWELL

By:  /s/ James P. Rouhandeh
     James P. Rouhandeh

450 Lexington Avenue
New York, New York 10017
(212) 450-4000


SHOOK, HARDY & BACON L.L.P.

By:  /s/ Scott W. Sayler
     Scott W. Sayler

2555 Grand Boulevard
Kansas City, Missouri 64108
(816) 474-6550

    - and -

HARE & CHAFFIN

By:  /s/ David B. Chaffin
     David B. Chaffin

160 Federal Street
Boston, Massachusetts 02110
(617) 330-5000

*Attorneys for Defendants Pfizer Inc. and Warner-Lambert Company*

## CERTIFICATE OF SERVICE

    I hereby certify that this document filed through the ECF system has been served pursuant to Case Management #3 on October 15, 2007.

                               /s/ David B. Chaffin