# EXHIBIT J

10/2/2007 Millares, Mirta - 30(b)(6) - (MDL)

```
0001
 1              UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MASSACHUSETTS
 2
                         :
 3   IN RE NEURONTIN MARKETING    : MDL DOCKET NO. 1629
     AND SALES PRACTICES and      :   Master File No.
 4   PRODUCTS LIABILITY           :   04-10981
     LITIGATION                   : Judge Patti B. Saris
 5                                : Magistrate Leo T.
                                  :   Sorokin
 6                                :
                                  :
 7   --------------------------- X
     --------------------------- X
 8   SUPREME COURT OF THE STATE   : Case Management
     OF NEW YORK                  : Index No. 765,000/2006
 9   COUNTY OF NEW YORK           : Hon. Marcy S. Friedman
     --------------------------- :
10   IN RE: NEW YORK NEURONTIN    :
     PRODUCTS LIABILITY           :   DEPOSITION UPON ORAL
11   LITIGATION                   :     EXAMINATION OF
                                  :    MIRTA MILLARES
12                                :   AS INDIVIDUAL AND
                                  :   30(B)(6) WITNESS
13   --------------------------- X ---------------------
14           CONTAINS CONFIDENTIAL INFORMATION
15           TRANSCRIPT of testimony as taken by and before
16   MARK SCHAFFER, a Certified Shorthand Reporter and
17   Notary Public of the States of New Jersey and New
18   York, at the offices of Kaplan, Fox & Kilsheimer,
19   P.C., 805 Third Avenue, New York, New York 10022 on
20   Tuesday, October 2, 2007, commencing at 9:11 in the
21   forenoon.
22
23          REPORTING SERVICES ARRANGED THROUGH:
              VERITEXT CORPORATE SERVICES, INC.
24             258 Vreeland Road, Suite 301
               Florham Park, New Jersey 07932
25      Phone:  (800) 567-8658    Fax:  (973) 410-1313
```

2

10/2/2007 Millares, Mirta - 30(b)(6) - (MDL)

```
 1   A P P E A R A N C E S
 2
 3
     KAPLAN, FOX & KILSHEIMER, P.C.,
 4   BY:  LINDA NUSSBAUM, ESQ.
     805 Third Avenue
 5   New York, New York 10022
     lnussbaum@kaplanfox.com
 6   Attorneys for Kaiser Foundation Health Plans, the
     Coordinated Plaintiffs and the Witness.
 7
 8
 9   DAVIS, POLK & WARDWELL
     BY:  RAJESH JAMES, ESQ.
10   450 Lexington Avenue
     New York, New York  10017
11   212-450-4304
     rajesh.james@dpw.com
12   Attorneys for Defendants Pfizer, Inc.
     and Warner-Lambert Company
13
14
15   ALSO PRESENT:   ADAM M. RAFSKY, Paralegal
                     JAMES ROBERTS, Videographer
16
17
18
19
20
21
22
23
24
25
```

3

10/2/2007 Millares, Mirta - 30(b)(6) - (MDL)

```
 1                  I N D E X
 2
 3   Witness                              Page
 4
 5   M I R T A   M I L L A R E S           9
 6
     DIRECT EXAMINATION BY MR. JAMES        9
 7
 8   CONTINUED DIRECT EXAMINATION BY MR. JAMES  54
 9
10   CONTINUED DIRECT EXAMINATION BY MR. JAMES  96
11   CONTINUED DIRECT EXAMINATION BY MR. JAMES 121
12
13
14
15
16
17                E X H I B I T S
18
19   Description                          Page
20
21
     E-Mail Chain dated 1/17/2000 bearing   27
22   Bates stamps KAIS 005386 through KAIS
     005388 marked Millares-1
23
24   Mid Atlantic State Region Formulary    29
     Process Reference Guide marked Millares-2
25
```

4

10/2/2007 Millares, Mirta - 30(b)(6) - (MDL)

```
 1          E X H I B I T S (Continued)
 2
 3   Description                          Page
 4
 5   E-Mail dated 7/25/2000 bearing Bates  47
     stamps KAIS 005441 through KAIS 005443
 6   marked Millares-3
 7   Formulary Update dated March, 2005 marked  51
     Millares-4
 8
 9   Article Titled Improving Appropriate  58
     Prescription Drug Use to Best Practice:
10   Supporting Evidence-based Drug Use
     bearing Bates stamps KAIS 003368 through
11   KAIS 003375 marked Millares-5
12
     Deposition Notice marked Millares-6   63
13
14   30(b)(6)deposition notice marked      64
     Millares-7
15
16   Gabapentin Formulary History marked   67
     Millares-8
17
18   P&T Review dated September, 1997 marked  68
     Millares-9
19
20   Document Titled Modafinil marked      74
     Millares-10
21
22   Drug Monograph of Neurontin dated June,  74
     1999 marked Millares-11
23
24   Drug Monograph for gabapentin dated   78
     September, 1999 marked Millares-12
25
```

5

10/2/2007  Millares, Mirta - 30(b)(6) - (MDL)

E X H I B I T S (Continued)

| Description | Page |
|---|---|
| SCPMG Regional Pharmacy and Therapeutics Committee Meeting Minutes dated September 14, 1999 marked Millares-13 | 81 |
| Drug Monograph For Topiramate dated March, 2002 marked Millares-14 | 83 |
| Formulary Update dated June 2002 marked Millares-15 | 84 |
| Executive Summary marked Millares-16 | 85 |
| Meeting Minutes dated June 26, 2002 marked Millares-17 | 87 |
| KPSC DUAT Executive Score Card dated January-September, 2004 marked Exhibit 18 | 90 |
| SCPMG Chiefs of Psychiatry and Addiction Medicine Meeting dated July 24, 2004 Synopsis of Pharmacy's Issues marked Millares-19 | 90 |
| Document marked Millares-20 | 103 |
| DUAT Video Conference on Successful Practices dated March 12, 2003 marked Millares-21 | 106 |
| Fifth Annual Region Wide Drug Utilization Action Team Off Site Minutes dated March 4, 2004 marked Millares-22 | 111 |

6

---

10/2/2007  Millares, Mirta - 30(b)(6) - (MDL)

R E Q U E S T S

| Description | Page |
|---|---|
| All documents relating to chart review referred to on Page KAIS 001221 | 97 |
| All documents relating to the San Gabriel Valley chart review | 106 |

8

---

10/2/2007  Millares, Mirta - 30(b)(6) - (MDL)

E X H I B I T S (Continued)

| Description | Page |
|---|---|
| Preliminary Proposed Gabapentin Screening Tool marked Millares-23 | 116 |
| E-mail dated 5/11/2001 marked Millares-24 | 121 |
| E-mail dated 9/26/2003 marked Millares-25 | 123 |
| Article titled Kaiser Permanente's Prescription Drug Benefit marked Millares-26 | 124 |
| Manuscript Published in Medical Care Research and Review marked Millares-27 | 127 |
| Pharmacy Practice Perspective Drug Information Specialist Paper marked Millares-28 | 134 |

7

---

10/2/2007  Millares, Mirta - 30(b)(6) - (MDL)

1    THE VIDEOGRAPHER: Good morning, we are going
2    on the record. My name is James Roberts of
3    Veritext Reporting, located in Florham Park, New
4    Jersey. Today's date is October 2nd, 2007. The
5    time is approximately 9:11 a.m.
6        This deposition is being held in the office
7    of Kaplan, Fox located at eight -- 850 Third
8    Avenue, New York City, New York. The name of the
9    case is In re: Neurontin Marketing and Sales
10    Practices & Products Liability Litigation in the
11    U.S. District Court for the District of
12    Massachusetts, MDL Docket Number 1269, Master File
13    Number 04-10981. The name of the witness is Mirta
14    Millares.
15        At this time the attorneys will please
16    identify themselves and the parties they
17    represent, after which our court reporter, Mark
18    Schaffer, also of Veritext, will swear in the
19    witness.
20        MS. NUSSBAUM: Linda Nussbaum of Kaplan, Fox
21    for the Kaiser plaintiffs and the witness and the
22    coordinated plaintiffs.
23        MR. JAMES: Rajesh James of Davis, Polk &
24    Wardwell for Pfizer and Warner Lambert. With me
25    today is Adam Rafsky, a paralegal with my firm who

9

1    will be assisting with the documents.

2

3    M I R T A   M I L L A R E S,

4    122-54 Bell Flower Boulevard, Downey, California

5    90242, having been duly sworn according to law by the

6    Officer, testified as follows:

7

8    DIRECT EXAMINATION BY MR. JAMES:

9        Q.    My name is Rajesh James and I represent

10    Pfizer and Warner Lambert, which I'll refer to

11    occasionally as "the defendants."  During this

12    deposition, I'll refer to the plaintiffs Kaiser

13    Foundation Hospitals and Kaiser Foundation Health as

14    "Kaiser."

15        Could you please state your full name?

16        A.    Mirta Millares.

17        Q.    Are you employed by Kaiser?

18        A.    I am, yes.

19        Q.    And is that Kaiser Foundation Health, as

20    opposed to Kaiser Foundation Hospitals?

21        A.    Kaiser FOUNDATION HOSPITALS.

22        Q.    By Hospitals, by Hospitals as opposed to the

23    health plan?

24        A.    I believe so, uh-huh.

25        Q.    And what is your position with Kaiser?

10

1        Have you ever given prior testimony on any

2    matter in court, in legislative hearings, by affidavit

3    or through other legal proceedings?

4        A.    Have I ever given testimony in court before?

5        Q.    Yes.

6        A.    I didn't understand the rest of the question.

7        Q.    I guess the full list is in court, in

8    legislative hearings, by affidavit or --

9        A.    Or, okay.

10        Q.    Yes.

11        A.    Yes.

12        Q.    Can you describe those circumstances?

13        A.    I gave testimony in court in a case that

14    involved Kaiser Permanente versus Abbott Laboratories.

15        Q.    And what was -- about how long ago was that?

16        A.    Three years ago.  Give or take.  I don't

17    recall precisely.

18        Q.    Was Kaiser the plaintiff in that case?

19        A.    Yes.

20        Q.    And what was the general subject matter of

21    that case?

22        A.    Basically Abbott Laboratories illegally paid

23    off a generic manufacturer to keep their generic off

24    the market, and Kaiser Permanente was seeking, you

25    know, whatever it's called, was -- well, was -- was

12

1        A.    Manager, Drug Information Services and

2    Pharmacy Outcomes Research.

3        Q.    Have you been deposed before?

4        A.    Yes.

5        Q.    You may already know these rules, but I'll

6    review them in any case.

7        I need verbal answers, because the court

8    reporter can't take, you know, nonverbal gestures such

9    as nods or other gestures.  Wait until my question is

10    finished and I'll do my best to wait until your answer

11    is completed before I launch into my next question.

12        We can take breaks after a pending question

13    is answered; and if you realize that any answer you

14    have given me is incomplete or incorrect, please let

15    me know.

16        Your lawyer may object to a way that I

17    answer -- that I ask a question.  You can still answer

18    unless she instructs you not to.  You can ask me to

19    rephrase a question if you don't understand it, and we

20    can ask the court reporter to read back a question if

21    you need to hear it again.

22        The relevant period, unless specified, is

23    1994 to present.  If at any time you need greater

24    specificity, please let me know and I'll clarify my

25    question.

11

1    complaining about that basically, uh-huh.

2        Q.    Has that lawsuit -- lawsuit been resolved?

3        A.    I don't really know.  I think it keeps going

4    on and on, yeah.

5        Q.    Could you walk me through your education,

6    beginning with your -- starting post secondary school,

7    with your college degree.

8        A.    Sure.  Let's see.  Undergraduate at

9    University of South Florida, as well as San Francisco

10    State University.  Received my Doctor of Pharmacy

11    degree from the University of California at San

12    Francisco School of Pharmacy in 1983; postgraduate, 12

13    month residency, also at UC San Francisco, completed

14    in '84; and a second year postgraduate residency in

15    drug information practice completed in 1985.

16        Q.    What was your undergraduate major at

17    University of South Florida and UCSF?

18        A.    It was Premed, Pre Pharmacy.  Sciences.

19        Q.    How many years is a -- is a DPharm (sic)

20    degree?

21        A.    PharmD?

22        Q.    Right.  Sorry.

23        A.    The PharmD degree itself is four years.

24        Q.    And how does that differ from the degree

25    that, you know, you might ordinarily find a pharmacist

13

1  at -- you know, a dispensing pharmacy would have?
2  A.  I think in this day and age, a lot of people
3  have a doctor of pharmacy degree, pharmacists. It's
4  basically more clinically oriented.
5  Q.  And did you have any particular focus in your
6  studies, you know, when you received your PharmD?
7  A.  I did postgraduate -- post PharmD training in
8  drug information practice.
9  Q.  How is this drug information practice
10  different from other types of pharmacy practice?
11  A.  Drug information specialty focuses on
12  learning about critical analysis of the literature,
13  how to find information, via various resources, and
14  that kind of thing.
15  Q.  And after you completed your second residency
16  in 1984, what was the first -- or what was your next
17  step?
18  A.  I'm sorry.  You said I completed my second
19  residency in '84.  It was '85.
20  Q.  '85.  Sorry.  And what was your next step
21  at that point?
22  A.  I took my first job at the University of
23  Southern California School of Pharmacy as assistant
24  professor of clinical pharmacy, with a practice site
25  at the Kenneth Norris Cancer Hospital.

14

1  A.  I was a Drug Information Specialist.
2  Q.  And what are the responsibilities of that
3  role?
4  A.  I worked in our Drug Information Services
5  Department.  There is many, many, many task and duties
6  that encompass that job; primarily formulary
7  management, inquiry consultation services,
8  publications, that sort of thing.
9  Q.  Are the responsibilities you had in 1988
10  similar to the responsibilities that someone in the
11  same role would have today?
12  A.  Approximately, generally.
13  Q.  And how long were you in the role of Drug
14  Information Specialist?
15  A.  Until 1996, I believe.
16  Q.  I forgot to ask you. While you were a Drug
17  Information Specialist, to whom did you report?
18  A.  I believe -- Let's see.  My first -- I think
19  my direct boss at the time was Steven Grey.
20  Q.  And what was his role?
21  A.  I don't remember what his title was at the
22  time.
23  Q.  Were there other Drug Information Specialists
24  employed by Kaiser during this interval?
25  A.  Yes.

16

1  Q.  What does your work at the cancer hospital
2  involve?
3  A.  Everything that a pharmacist would do in a
4  hospital setting: Reviewing orders, dispensing
5  medications, checking medications, providing
6  consultations.
7  Q.  What subjects did you teach as an assistant
8  professor?
9  A.  Primarily drug information related topics and
10  some, at that time, oncology topics.
11  Q.  Oncology topics?
12  A.  Uh-huh.
13  Q.  How long were you in that role?
14  A.  Three years.
15  Q.  So that takes us up to 1988.  Is that -- is
16  that right?
17  A.  Yes.
18  Q.  Did you publish any papers during those three
19  years?
20  A.  I can't recall if I have any publications
21  during those three years.
22  Q.  In 1988, where did you go to next?
23  A.  1988, I went to Kaiser Permanente.
24  Q.  And in what role were you when you first
25  joined Kaiser Permanente?

15

1  Q.  Approximately how many?
2  A.  In -- When I first began in 1988, there was
3  one.  Over the years, additional pharmacists were
4  added to the staff.
5  Q.  So that by 1996, we got to ...
6  A.  I don't recall.  I would just be guessing.  I
7  don't have a year-by-year analysis of that.
8  Q.  And in 1996, what role did you take?
9  A.  I became supervisor of the department.
10  Q.  And approximately how many people reported to
11  you in that capacity?
12  A.  Again, I don't recall specifically how many
13  at that time.
14  Q.  And how long were you in the role of -- of
15  supervisor of that department?
16  A.  It -- It became supervisor of Southern
17  California, and then supervisor for the California
18  regions shortly thereafter, maybe the next year; and
19  then I became manager of the department in 1999.
20  Q.  What's the distinction between supervisor of
21  the department and manager of the department?
22  A.  A manager has more responsibility in terms
23  of, one, the budget; and, two, the vision of the
24  department, overall goals and objectives and vision,
25  basically.

17

1    Q.    Are there presently supervisors that report
2  to you?
3    A.    Yes.
4    Q.    How many supervisors are they -- are there?
5    A.    Four.
6    Q.    And how are their responsibilities allocated?
7    A.    I have different sections of the department,
8  and, therefore, I've divvied up different sections of
9  the department to different -- each of the
10 supervisors.
11   Q.    And how have you done that divvying up?
12   A.    Okay.  I have one supervisor who oversees
13 our -- primarily our telephone consultation service,
14 our recalls -- recalls and shortages coverage,
15 medication safety issues, and our student and resident
16 rotations.
17   Q.    What's the name of that supervisor?
18   A.    Ken James.
19         I have another supervisor who oversees our KP
20 HealthConnect Clinical Content Team, Marcia Ding.
21   Q.    Marcia Ding?
22   A.    Uh-huh.  I have another supervisor -- I have
23 two supervisors who oversee the formulary management
24 process.  One is located in Southern California and
25 the other is located in northern California.

1    Q.    And who are those individuals?
2    A.    Pardon?
3    Q.    Who are those two individuals?
4    A.    In southern California, Dan Powers; in
5  northern California, Cathlene Richmond.
6    Q.    Are there drug information specialists that
7  report to Dan and Cathlene?
8    A.    Yes.
9    Q.    And between all these different -- or I guess
10 the four individuals that you named, do they basically
11 cover the entire scope of the activities of the Drug
12 Information Service?
13   A.    In addition to me?  Yes.
14   Q.    What other responsibilities do you have
15 beyond the areas of coverage that the four supervisors
16 have?
17   A.    The Pharmacy Outcomes Research Group, I
18 directly oversee them.
19   Q.    You had mentioned that Marcia Ding manages
20 the KP HealthConnect -- what was it?  Clinical --
21   A.    Content.
22   Q.    -- content.
23   A.    Team, uh-huh.
24   Q.    What is KP HealthConnect?
25   A.    It is Kaiser Permanente's electronic medical

1  record.
2    Q.    And who is that information available to, or
3  who is that resource available to?
4    A.    The resource?  What's -- what do you mean by
5  the resource?
6    Q.    HealthConnect.  I guess maybe I don't
7  actually entirely understand what HealthConnect is.
8  You described it as an electronic record?
9    A.    Right, electronic medical records.
10   Q.    Okay.
11   A.    Moving from paper records to electronic
12 records, the organization is transitioning to that.
13   Q.    Over what period has this transition taken
14 place?
15   A.    I can't remember when it started.  It's a
16 long, long process.
17   Q.    And roughly where are you in -- in that
18 transition?
19   A.    Again, I don't oversee that department and I
20 don't keep tabs on exactly what is going on, and it's
21 being rolled out in many, many different sites.  I
22 can't tell you exactly where we are with that.
23   Q.    When it's ultimately completed, do you know
24 what data will be available through KP HealthConnect?
25         MS. NUSSBAUM: Please don't speculate.  If you

1  know.
2    A.    What data?  I don't understand the question.
3  To whom?
4    Q.    I guess what information would someone be
5  able to get from KP HealthConnect once it's been fully
6  rolled out?
7          MS. NUSSBAUM: It's a hypothetical question.
8    A.    "Someone" is very broad.  I don't know.
9    Q.    Would all the data that is available in paper
10 medical records today be available at KP HealthConnect
11 at some point?
12   A.    That would be the -- the goal.  Actually, I
13 don't know all the information that's available in a
14 paper record.  It's a very complex thing.  I don't
15 know precisely every single element that will be
16 available in KP HealthConnect.
17   Q.    And you are not in a position to say at
18 precisely what stage they are right now?
19   A.    No.
20   Q.    Are some individuals already using KP
21 HealthConnect, or is it really in the process of being
22 developed from an IT standpoint?
23   A.    Portions of it have been rolled out in
24 various locations.
25   Q.    And you say that you are also in charge of

1    the Pharmacy Outcomes Research Group.  What kind of
2    activities does that group take on?
3        A.   Basically outcomes research.
4        Q.   And what is that?
5        A.   Research evaluating outcomes of -- of
6    healthcare pharmaceutical interventions, etc.
7        Q.   Do you have discreet projects dealing with
8    particular medications?
9        A.   Yes.
10       Q.   Could you give me a recent example?
11       A.   A recent example would be a project looking
12    at the potential for tacrolimus or pimecrolimus to
13    cause cancer in patients exposed to those drugs.
14       Q.   And how is that study undertaken?
15          MS. NUSSBAUM: I would really object as to
16    relevancy.  It has nothing to do with the subject
17    of this litigation and some of this may be very
18    confidential or proprietary.
19         So unless you can tell me what the relevance
20    is to this litigation, I'd really ask that we move
21    on.
22       Q.   You can answer.
23       A.   And I'm sorry.  Could you repeat what your
24    exact question was?
25         MR. JAMES: Could you read the question back.

1    please don't speculate.
2       A.   There isn't necessarily a regular one.
3    Whatever databases need to be -- are approved by the
4    IRB in order to do the research based on what
5    information is needed.
6       Q.   These are records are Kaiser Permanente
7    patients.  Is that right?
8       A.   Can be.
9       Q.   What else could it be?
10       A.   Well, in the realm of doing research, we
11    sometimes look at mortality data for the State of
12    California.  I mean there's other -- depending on what
13    your research question is, there's lots of resources
14    available for --
15       Q.   When the records of Kaiser Permanente
16    patients are involved, how do you go about gathering
17    that data?
18       A.   How do I go about -- I'm -- I'm generally not
19    on the study as a data analyst.  I'm usually on
20    studies in terms of conceptual development.
21       Q.   And you sort of listed three different types
22    of methodologies.
23       A.   Uh-huh.
24       Q.   Could you sort of go through the other two as
25    well?

1        (The question is read.)
2       A.   I am not one of the principal investigators
3    on that study, so I can't tell you the details of how
4    exactly the project is being carried out.  I know what
5    the goal of the project is, basically.
6       Q.   Are there any technical procedures that you
7    follow from one study to the next?
8       A.   Yes.
9       Q.   And could you describe those?
10       A.   Research can involve -- done by Pharmacy
11    Outcomes Research can involve retrospective database
12    evaluations, decision modeling, prospective
13    naturalistic studies.  Those are the primary
14    methodologies we use.
15       Q.   Could you describe what the first involved,
16    retrospective database evaluation?
17       A.   "Retrospective" means looking back; and under
18    research protocols, evaluating various -- various
19    scientific questions.  It depends on the study.  It
20    varies tremendously depending on what your scientific
21    question is.
22       Q.   And what databases are you looking at?
23         MS. NUSSBAUM: This is again hypothetical, so
24    please don't speculate.  If there is a regular
25    database that you always look at.  But otherwise,

1       A.   A prospective naturalistic study would be
2    where you are approved through IRB to perform research
3    looking prospectively in a naturalistic way at what
4    occurs in clinical practice.
5       Q.   How would that differ from a randomized
6    control trial that might be done elsewhere?
7       A.   You are not interfering with what
8    naturalistically is happening.  The randomized control
9    trial involves a protocol which sets forth precise
10    actions that must be taken and patients that are
11    allowed to be in the study.  In a naturalistic trial,
12    you are just observing what happens naturally.
13       Q.   Is there a danger of introducing various
14    biases that would be eliminated in the randomized
15    control trial?
16       A.   Sure.
17       Q.   And what kind of benefit does the prospective
18    naturalistic study offer over a randomized control
19    trial, if you know?
20         MS. NUSSBAUM: I would object.  This witness is
21    here as a fact witness in a specific case.  She is
22    not here as an expert witness, and I think at this
23    juncture we really should move on.
24       Q.   You can answer.
25         MS. NUSSBAUM: If you know.

1      A.    Repeat the question?

2            MR. JAMES: Could you read back the question?

3            (The question is read.)

4      A.    Well, there are entire courses taught at

5  school on this topic, so --

6      Q.    Right.  There is no need to give me an entire

7  course.

8      A.    Right.

9      Q.    I guess if there is some type of hand waving

10  type answer that is available, I think it would be

11  great.

12      A.    I think it really requires a fair amount of

13  discussion.  They all -- all different types of trials

14  have advantages and disadvantages.  I could -- you

15  know, there's probably 25 I could list for either

16  side.  We'd be here for a long time.

17      Q.    Can you list a few of the principal

18  advantages of a prospective naturalistic study?

19            MS. NUSSBAUM: Look.  I'd object again.  The

20            witness just said that courses are taught on this

21            and that she is not comfortable just shorthanding

22            into a few things.  So, you know, I really suggest

23            she is not here as an expert witness, that we move

24            on.

25      Q.    You can answer if you know.

26

1  model.  I don't understand the question.

2      Q.    What is the purpose of a decision model?

3      A.    To help inform about what happens at these

4  different nodes and what the probabilities are of one

5  thing happening versus another.

6            MR. JAMES: I'd like to mark as exhibit.

7            (E-Mail Chain dated 1/17/2000 bearing Bates

8            stamps KAIS 005386 through KAIS 005388 marked

9            Millares-1 for identification.)

10            MR. JAMES: You can mark this Millares-1.  It

11  is a document bearing the Bates stamps KAIS 005386

12  through KAIS 005388.  At some point it will make

13  its way over to you.

14      Q.    Have you had a chance to look over the

15  document?

16      A.    I've looked over it, yes.

17      Q.    Do you recognize it?

18      A.    It looks like a photocopy of an e-mail chain.

19      Q.    And do you recognize the e-mail chain?

20      A.    I don't remember it precisely.  It's from

21  2000.

22      Q.    Do you know whether the research proposal

23  that Dr. Maizels appears to be making in this e-mail

24  chain was -- was ever implemented?

25      A.    I don't see that Dr. Maizels is making a

28

1      A.    I'll give you one advantage; how's that?  Of

2  a prospective naturalistic trial over a randomized

3  clinical trial.  All types of patients are treated in

4  a randomized, controlled trial.  There are

5  inclusion/exclusion criteria for patients.  If you

6  exclude, for example, patients over 65, patients who

7  have renal failure, patients who have diabetes, it is

8  not really representative of all the patients that you

9  might treat.

10            Naturalistic trial, you are looking at a much

11  more -- the population is much more like the

12  population you would normally treat.

13      Q.    And I guess finally the third type of

14  methodology you noted?

15      A.    Decision modeling.

16      Q.    And what does that involve?

17      A.    Decision modeling involves creating a model

18  with various decision nodes, and as you move through,

19  for example, a treatment strategy at each of the

20  nodes, there is probabilities of going one way or the

21  other taken from the literature.  And that's generally

22  what a decision model is.

23      Q.    Once you develop the model, is it implemented

24  in any way?

25      A.    I -- that's not the purpose of a decision

27

1  research proposal, first.  Second, I don't know what

2  came of this e-mail, but it -- I don't see where --

3  what you just said.  I don't see that here.  If you

4  can point it out, that would be great.

5      Q.    I guess on the first page in this third

6  e-mail down the chain, it says "forward research

7  proposal."

8      A.    I'm sorry?

9      Q.    I guess the subject matter of that e-mail is

10  forwarding a research proposal?

11      A.    I have no idea why it says that.

12      Q.    All right.  I see in the top e-mail of the

13  chain, you in the final line has the phrase "it might

14  be more of an outcomes group study perhaps."

15      A.    Uh-huh.

16      Q.    I realize this e-mail was sent many years

17  ago.  Do you have any sense of what might have led you

18  to write that this work under consideration might be

19  more of an outcomes group study as opposed to

20  something else?

21      A.    I don't recall.  It looks like it says there

22  I don't even know what he is needing now.  It looks

23  like I didn't know then, either.

24      Q.    Fair enough.  We can set that aside.  I'll

25  mark another exhibit.

29

1    (A discussion is held off the record.)

2    THE VIDEOGRAPHER: Off the record 9:45 a.m.

3    (A discussion is held off the record.)

4    (Mid Atlantic State Region Formulary

5    Process Reference Guide marked Millares-2

6    for identification.)

7    THE VIDEOGRAPHER: Back on the record at 9:47

8    a.m.

9

10    CONTINUED DIRECT EXAMINATION BY MR. JAMES:

11    Q.    Have you had a chance to look over this

12    document?

13    A.    I skimmed over it, yes.

14    Q.    Do you recognize it?

15    A.    No.

16    Q.    Do you have a sense as to what it is?

17    A.    I do.

18    Q.    What is it?

19    A.    It says "Midatlantic States Region, Formulary

20    Process Reference Guide," and it has the Kaiser logo

21    on the top.  So it's the Formulary Process Reference

22    Guide for the Midatlantic states, as far as I can

23    tell.

24    Q.    Is there somewhere a document that exists

25    with regard to the California regions?

1    A.    Yes.

2    Q.    I don't have that document, so we'll try to

3    go through this one, and you can alert me if there are

4    important differences between the way things are done

5    in the Midatlantic states, according to this document,

6    and the way things are done with regard to the

7    California regions formulary process.

8    Could you turn to Page 4 of 11.  It's Bates

9    stamp KAIS 044130.0317

10    A.    Okay.

11    Q.    Do each of the California regions have a

12    Regional Pharmacy and Therapeutics Committee?

13    A.    Yes.

14    Q.    And in this document, it states, "The major

15    role of the Regional Pharmacy and Therapeutics

16    Committee" and I'm guessing he means the Midatlantic

17    states regional committee "is to, one, review drugs

18    and biologicals for approval and disapproval; two,

19    develop and implement drug criteria for use --

20    utilization guidelines with appropriate providers;

21    and, three, assess regional priorities for drug

22    utilization."

23    Is that accurate with regard to the

24    California regional P&T committees as well?

25    A.    I don't recall that the California regions

1    formulary process document has a statement that looks

2    like that.

3    Q.    But in terms of their actual roles, is that

4    an accurate statement?

5    A.    I wouldn't word it exactly like that.

6    Q.    Are there any substantive changes that you

7    would make to that statement as it was applied to the

8    California regional P&T committees?

9    A.    You are asking me what are the major roles of

10    the Regional Pharmacy and Therapeutics Committee?

11    Q.    Right.  In California?

12    A.    The first statement, "review drugs and

13    biologics for approval and disapproval."  It's

14    evaluate evidence on pharmaceuticals and make

15    formulary decisions, not approval or disapproval.

16    Q.    And what's the importance of that

17    distinction?

18    A.    I just don't know what "approval and

19    disapproval" means here.  I would just write it

20    differently, I guess.

21    Q.    And then proceeding through the other two

22    prongs of the rule?

23    A.    California region's -- Regional P&T, I -- I

24    don't think Number 2 is a major role of the committee.

25    I think the Number 1 role is really evaluation of

1    drugs for formulary consideration -- of the regional

2    P&T, uh-huh.

3    Q.    Are you personally a member of either the

4    northern California or southern California P&T

5    committees?

6    A.    I am considered a nonvoting member.

7    Q.    How long have you been a nonvoting member?

8    A.    Since -- I don't know exactly when I was

9    considered a nonvoting member in terms of listing me

10    as a nonvoting member; but I have been attending

11    meetings regularly, my -- you know, my entire time at

12    Kaiser.

13    Q.    So from 1988 forward.  Is that right?

14    A.    Correct, for southern California.

15    Q.    And then at what point did you begin

16    attending meetings for northern California as well?

17    A.    Around 1999.

18    Q.    With regard to the California regions, is it

19    true that an FDA approved drug may be evaluated or

20    reevaluated for formulary addition or deletion, or for

21    modification of criteria or restrictions on its use?

22    A.    Are you reading from someplace?

23    Q.    Yes, I am.  It's beneath heading one on the

24    same page.

25    A.    Oh.

1      MS. NUSSBAUM: And you want to know if that's a

2  true sentence?

3      MR. JAMES: Well, whether it would be a true

4  sentence with regard to the California regions'

5  P&T committees.

6      MS. NUSSBAUM: If you know.

7    A.  I don't know what "or for modification of

8  criteria" means, maybe something that the Midatlantic

9  states use. I would say guidelines or restrictions on

10  its use, yes. If that were changed to "guidelines."

11    Q.  I guess the next sentence here states that

12  "any provider or pharmacist may request that a drug or

13  dosage form be added to or deleted from the

14  formulary."

15      Is that true in the California regions as

16  well?

17    A.  No.

18    Q.  Who may request that a drug or dosage form be

19  added to or deleted from the formulary in the

20  California regions?

21    A.  We request if a physician would like to

22  request a modification, they are to go through their

23  local area P&T committee first, or their Chiefs of

24  Service Group. And then the request would come from

25  that committee up to the regional P&T.

34

1  P&T Committee.

2    Q.  And who would make that statement?

3    A.  The -- each pharmacist is assigned various

4  therapeutic categories and, therefore, they are

5  responsible for all pharmaceuticals that fall within

6  their therapeutic categories.

7    Q.  I am going to jump ahead to page KAIS

8  044130.035. The page appears to have something like a

9  flow chart on it. And it seems that we have already

10  been through the -- sort of the first step in the flow

11  chart.

12      You know, on this chart it shows that an

13  individual M.D. can make a request of the Pharmacy

14  Department. But you indicated that in California that

15  request would be routed either through an area P&T

16  committee or through the Chiefs of Service for a

17  particular area.

18      And then I guess going on to the next step,

19  in California it's true, as it is in the Midatlantic

20  states, apparently, that a drug monograph would then

21  be produced. Is that right?

22    A.  Yes.

23    Q.  And in this flow chart, it shows Regional P&T

24  specialists consultants also having some input into a,

25  it seems like a later stage of the drug monograph?

36

1    Q.  Do you have any knowledge of how that process

2  works in regions other than the Midatlantic states and

3  California?

4    A.  Not really.

5    Q.  I guess turning to the next page, beneath the

6  Heading Two, which is titled "Evidence Review and

7  Monograph Development," there is a statement that

8  "Inter Regional Clinical Pharmacy Service Sub

9  Committee assigns a pharmacist to search the medical

10  literature and other credible sources of information

11  about the drug under evaluation."

12      Well, first of all, do you know what the

13  Inter Regional Clinical Pharmacy Services Sub

14  Committee is?

15    A.  No. It must be a Midatlantic committee. I

16  don't know.

17    Q.  Within the California regions -- well, first

18  of all, would a pharmacist be assigned to search

19  medical literature and other sources of information

20  about the drug under evaluation?

21    A.  In the California regions? We -- yes,

22  someone -- a Drug Information Specialist, Formulary

23  Pharmacist in my department would, yes, be assigned to

24  evaluate the evidence available on a drug being

25  considered for formulary evaluation at the Regional

1    A.  That's what it shows here, yes.

2    Q.  Is that the case in the California regions as

3  well?

4    A.  I'll have to explain. North versus south,

5  it's slightly different.

6    Q.  All right.

7    A.  In northern California, we have consultants

8  for various therapeutic categories. If the drug falls

9  within that therapeutic category, it is sent to those

10  consultants for their recommendations.

11      In southern California, we utilize the area

12  P&T committees, so that each area P&T committee is

13  required to make a recommendation on that drug. The

14  area P&T committee is -- is required to go out and

15  seek input from appropriate physicians in that area in

16  order to come to a recommendation. That's how the

17  input is sourced differently from the two.

18    Q.  In northern California, who are the

19  consultants? Not names, but what kind of people are

20  they?

21    A.  We have 750 consultants. They are physicians

22  that practice in various specialty departments.

23    Q.  Are they all Permanente Medical Group

24  physicians?

25    A.  Yes, they are.

1    Q.    And once you have their input, do you create
2    like a subsequent stage of a drug monograph?  I guess
3    in northern California.
4    A.    The input received from physicians is -- is
5    summarized as part of the monograph process.
6    Q.    And I guess on this flow chart they appear to
7    have something, it looks like a blue ribbon with a
8    badge, it says, "Consensus recommendations."
9          Do you have any idea what that is?
10         MS. NUSSBAUM: If you know.  This is a document
11   from August, 2000 --
12   A.    No, I don't know exactly what that means.
13   Q.    Do consensus recommendations play a role in
14   the creation of drug monographs in northern or
15   southern California?
16         MS. NUSSBAUM: If you know what that means.
17         THE WITNESS: Yes.
18   A.    In addition to asking consultants, if you
19   look on the right-hand side, we also go to the Chiefs
20   of Service Committees.  The Chiefs of Service
21   Committees are also asked to make a consensus
22   recommendation from their -- representing their group.
23   Q.    Beneath Regional Chiefs of Service on -- on
24   this chart, there are also these -- these other bodies
25   named.  You know, these are area utilization

38

1    committees, task forces, advisory panel and expert
2    advisors.
3          Do any of these groups play a role in the
4    formulary process in -- in northern or southern
5    California?
6    A.    In northern or southern California, I'm not
7    aware of any committee called area utilization
8    committee.  If there is a task force pertaining to a
9    particular topic, for example, we have a smoking
10   cessation task force.  If the drug falls in that
11   category, we would ask that task force for their
12   recommendation.
13         I don't know what "advisory panel" refers to.
14         And as I mentioned, expert advisors, I
15   already explained how the north and south work in
16   terms of seeking physician input.  We don't -- I don't
17   know what that means there either.
18   Q.    I guess if we moved down below Consensus
19   Recommendations, there is a sort of box that has non
20   physician Regional P&T Committee members.  Well, I
21   guess, first of all, about how many non physician
22   Regional P&T Committee members are there in northern
23   and southern California, if you know?
24   A.    There is one voting member on the northern
25   Cal and southern Cal Regional P&T Committees.

39

1    Q.    Is that Albert Carver?
2    A.    I'm sorry.  There are two voting members;
3    two non physician voting members.
4          Is one Al Carver?  Yes, you are correct.
5    Q.    And who is the other one?
6    A.    The other one is required by CMS regulations
7    to be a pharmacist specializing in geriatrics or
8    disabled patients.
9    Q.    Do you have any idea why they are sort of
10   isolated in a -- in a separate box on this chart?
11   A.    I can tell you that we don't have that box
12   in --
13         MS. NUSSBAUM: Again, I would ask you not to
14   speculate.  He is asking you about this chart
15   which is dated August 2000, and I believe you
16   previously testified that you don't believe you
17   ever saw this document before.
18   Q.    I guess once the monograph has been
19   assembled, with input from the regional Chiefs of
20   Service and the other groups you named, what is the
21   next step in the formulary review process?
22   A.    It is scheduled for presentation at the
23   Regional P&T Committee meeting and for final decision.
24   Q.    About how long in advance of the P&T
25   Committee meeting is the monograph distributed to --

40

1    to committee members?
2    A.    It varies.  It can be anywhere in a
3    three-month window.
4    Q.    I guess going back one step, you said that
5    Regional keeps a service for consulting with regard to
6    formulary review process decisions.  How does that
7    consultation take place?
8    A.    The formulary pharmacist responsible for that
9    drug monograph sends it to the chair of the Chiefs of
10   Service, and there are various ways that's presented
11   to the entire committee.  It's up to the chair of that
12   committee.  Primarily the formulary pharmacist attends
13   the meeting and presents for discussion there.
14   Q.    And what form does the input that the
15   regional Chiefs of Service -- I'm sorry.  Scratch
16   that.
17         The input that the regional Chiefs of Service
18   provide, what form does it take?
19   A.    They make recommendations on formulary status
20   to bring forth to the Regional P&T Committee.
21   Q.    And you said that the drug monograph is
22   scheduled for a presentation at a P&T Committee
23   meeting.  Is that right?
24   A.    Yes.  I'm sorry.  "Presentation" may not be
25   the correct term.  You don't present the monograph at

41

```
1    P&T.  It is on the agenda for discussion, rather than
2    presentation.
3        Q.   Right.  So it's not as though any individual
4    actually attends the meeting and formally presents
5    the -- the monograph?  It is more of a discussion
6    between committee members?  Is that accurate?
7        A.   Yes.
8        Q.   And roughly how long after the P&T Committee
9    meeting does the -- the vote on a formulary decision
10   take place?
11       A.   The vote takes place at the meeting.
12       Q.   And is it generally a unanimous vote?
13       A.   We make 170 formulary decisions a year,
14   approximately at each P&T committee.  It's all over
15   the board.  I couldn't tell you.
16       Q.   Can I ask:  The next step on this chart has
17   the decisions branching out into area utilization
18   committees and pharmacy department.  You had said
19   earlier that area utilization committees don't exist
20   in -- in the California regions.  Is that right?
21       A.   I don't know of any committees by that name.
22       Q.   How would committee formulary decisions be
23   implemented in the California regions?
24       A.   Formulary decisions are implemented --
25   primarily implementation would mean making sure that
```

```
1    the formulary status is correct in our pharmacy
2    systems, and communicating the decision out to our
3    physicians and pharmacists and healthcare providers,
4    which is done within 24 to 48 hours after the decision
5    is made via e-mail.
6        Q.   Aside from e-mail --
7        A.   Currently.
8        Q.   Sorry.
9        A.   I'm speaking of today.  Since I'm supposed to
10   be covering a lot of years, that's what happens today.
11       Q.   Aside from e-mail, are there other modes of
12   communication as well?
13       A.   Yes.
14       Q.   And what are those?
15       A.   We have a -- a newsletter called the
16   formulary Update summarizing decisions made at the
17   preliminary P&T committee meeting that's put together
18   and also sent out via e-mail.  We have an on-line
19   formulary where the formulary status of a drug is
20   identified, an intranet site.  Those -- those are
21   the main consistent ways that notification is made.
22       Q.   If there were a guideline associated with the
23   formulary status, would that also be available on the
24   internet?
25       A.   It is not available on the internet at all.
```

```
1    Intranet.
2        Q.   I'm sorry.  Intranet.
3        A.   If there was a guideline, it would be posted
4    on the on-line formulary currently.  We, in the past,
5    didn't have an on-line formulary, but today we do.
6        Q.   If a physician wanted to know about, you
7    know, whether there was an applicable guideline
8    concerning a particular drug, are there any other ways
9    that she or he could go about finding that information
10   in the California regions?
11       A.   Sure.  Finding out if there is a guideline,
12   they could check the intranet site for formulary
13   decisions, the on-line formulary, or call our
14   consultation service.
15       Q.   I want to look backward in this document to
16   the page bearing the Bates stamp KAIS 044130.033.
17   When you have had a chance to glance over the page,
18   let me know.
19            MS. NUSSBAUM:  The witness is ready.
20       Q.   This page seems to sort of describe six
21   different classifications that a drug reviewed for
22   formulary consideration could have.  I guess in the
23   Middle Atlantic states.  Are these classifications
24   consistent with those in the California regions as
25   well?
```

```
1        A.   No.
2        Q.   And how are they different in -- in
3    California?
4        A.   You don't have the document that I can refer
5    to for the process from California to make sure I get
6    it right?
7        Q.   No, I don't, no.
8        A.   The -- just glancing here there's a few here
9    that I know are not part of the potential formulary
10   recommendations in northern California and southern
11   California.
12       Q.   And which are those?
13       A.   The use of criteria, that's not a term
14   utilized in northern or southern California.
15       Q.   But the term "guidelines" is used?
16       A.   Yes.
17       Q.   Are there any other differences that you can
18   see?
19       A.   Are you referring to the statements for each
20   one of these drugs?
21       Q.   No.
22       A.   Because --
23       Q.   I guess actually you can just focus on the --
24   the heading in bold, without actually going into the
25   description that is provided in this document.
```

1    A.   Ignoring the description?

2    Q.   Right.

3    A.   Formulary status is, yes, in northern and

4   southern California. Formulary with guidelines,

5   another potential status. Formulary with

6   restrictions, another potential status. Non

7   formulary, another potential status. Non formulary

8   with guidelines or non formulary with restrictions,

9   yes.

10    Q.   If a formulary drug has guidelines, what

11   difference does that make to a -- to a prescribing

12   physician?

13    A.   It's not much. It's just a piece of -- of

14   information from the P&T Committee as to a guideline

15   as to what they should think about when prescribing

16   that drug.

17    Q.   So it's -- it's purely advisory?

18    A.   Purely advisory.

19    Q.   And I guess moving to the next category,

20   Formulary Drug With Restrictions, what impact does a

21   restriction have on a -- on a prescribing physician?

22    A.   Again, it's an advisory recommendation of the

23   P&T Committee as to what types of physicians should

24   prescribe the drug.

25    Q.   But again, it's advisory. Is that right?

46

1   non formulary drug with an exception code, then it's

2   covered fully as if it were a formulary drug, it's

3   covered fully for the patient.

4    Q.   But the physician would have to take some

5   steps to indicate that it was medically necessary for

6   that particular patient. Is that right?

7    A.   They write -- they check off a code on the

8   prescription blank or however they are writing the

9   prescription.

10    MR. JAMES: I'd like to mark another exhibit as

11   Millares-3. And the document is a document

12   bearing the Bates stamps KAIS 005441 through KAIS

13   005443.

14    (E-mail dated 7/25/2000 bearing Bates

15   stamps KAIS 005441 through KAIS 005443

16   marked Millares-3 for identification.)

17    Q.   Actually there is no need to go through the

18   entire e-mail chain.

19    A.   Okay.

20    Q.   But I wanted to focus on the third page, the

21   sort of paragraph in the middle.

22    MS. NUSSBAUM: Where it says the word "actual"?

23    MR. JAMES: That's right.

24    MS. NUSSBAUM: Actually.

25    MR. JAMES: That's right.

48

1    A.   Yes.

2    Q.   So if a drug were restricted to neurologists,

3   but a psychiatrist wanted to prescribe it, there would

4   be nothing really stopping him from doing so?

5    A.   Nothing stopping them from doing so, no.

6    Q.   And I guess moving on to -- to non formulary,

7   what impact does that have on a prescribing physician?

8    A.   The physician, again, it's an advisement from

9   the P&T Committee that based on the evidence, it's not

10   considered like a first line agent for the majority of

11   our patients, but that's the only impact really to

12   advisory.

13    Q.   And would a non formulary drug with

14   guidelines be advisory as well?

15    A.   Yes.

16    Q.   And finally there is a "non formulary drug

17   with restrictions." Would that -- would that also be

18   an advisory categorization?

19    A.   Yes.

20    Q.   If a drug is non formulary, does that have an

21   impact on how much a patient will have to -- to pay to

22   obtain that drug?

23    A.   It -- No. It -- It depends on the physician.

24   If a physician feels that the drug is medically

25   necessary for a patient, writes the prescription for a

47

1    MS. NUSSBAUM: And that's an e-mail from Peter

2   Fung to Kyung Togashi.

3    MR. JAMES: That's correct.

4    MS. NUSSBAUM: On which she is not copied and

5   not the recipient and not the author?

6    MR. JAMES: I think it's only ultimately

7   forwarded to her on the first page.

8    Q.   Have you had a chance to look over the

9   paragraph?

10    A.   Yes.

11    Q.   And that paragraph contains a sentence, "My

12   concern is that medications that are used in chronic

13   pain management are being denied to us for use in

14   chronic pain conditions."

15    Would you have any idea what Dr. Fung is

16   referring to in that sentence?

17    A.   No, I don't know.

18    Q.   Given your understanding of restrictions as

19   being entirely advisory, it wouldn't make too much

20   sense to -- for a physician to refer to a drug being

21   denied to him as a result of a restriction. Is that

22   right?

23    MS. NUSSBAUM: No.

24    A.   Correct.

25    MS. NUSSBAUM: I would object. And this is an

49

1    e-mail from seven years ago that this witness was
2    neither an author nor recipient of.
3        Q.   Are you currently the Manager of Drug
4    Information Services for the California regions, or
5    Manager of Drug Information Services nationally?
6        A.   California regions.
7        Q.   And in putting together drug monographs, is
8    there collaboration between different regions?
9        A.   Yes.
10       Q.   What sort of forms does that collaboration
11   take?
12       A.   The formulary pharmacists in my department
13   are part of the Interregional Formulary Sub Committee
14   Group, which has other pharmacists from the other
15   regions as part of that committee.  And we share our
16   monograph or evidence review with all members of that
17   committee and collaborate.  Currently.
18       Q.   How often does that sub committee meet?
19       A.   Currently we meet monthly by teleconference.
20       Q.   Once a Regional P&T Committee votes on a
21   guideline, does that guideline remain in place until a
22   subsequent P&T Committee vote?
23       A.   Not necessarily.
24       Q.   How else could it be modified?
25       A.   If the formulary pharmacist who is monitoring

1        MS. NUSSBAUM: Where it says, "In this issue"?
2        MR. JAMES: That's right.
3        (Formulary Update dated March, 2005
4    marked Millares-4 for identification.)
5        Q.   Have you had a chance to look it over?
6        A.   Yes, uh-huh, yes.
7        Q.   Do you recognize this document?
8        A.   Yes.
9        Q.   What is it?
10       A.   It is a Formulary Update.
11       Q.   And I just wanted to go down the side bar and
12   perhaps you can explain what some of the headings
13   mean?  I think we have gone over class review, and I
14   guess that would be a review of an entire class of
15   drugs.  Is that right?
16       A.   Correct.
17       Q.   And the next listing is "Guidelines," which I
18   think we have also covered.  Is that right?
19       A.   I think so.
20       Q.   Okay.  And what is a 30-30 benefit, which is
21   referred to next?
22       A.   The 30/30 drug benefit is a drug benefit that
23   has specific criteria for inclusions of drugs where
24   they're covered for 30 days.  At a time.
25       Q.   And why does that benefit exist?

1    that therapeutic category believes that it needs to
2    have a modification, or the physicians in those
3    particular therapeutic categories recommend a change.
4        Q.   That change could be made, then, without a
5    vote of the P&T Committee.  Is that right?
6        A.   No.  They can recommend that a change be
7    made.  It would go to the P&T Committee for official
8    change.
9        Q.   Okay.
10       A.   Yeah.
11       Q.   Are there occasions in which an entire class
12   of drugs is reviewed?
13       A.   Yes.
14       Q.   And what kind of occasions are those?
15       A.   Again, it varies.  It could be a request from
16   a physicians' group.  It could be significant new
17   information.
18       Q.   I'm eventually going to mark another exhibit,
19   which would be Millares-4, but a lot of the questions
20   are actually kind of independent of the exhibit, so
21   you don't necessarily need to look at it unless it
22   helps you in some way.
23            No need to read through the entire document.
24   I think if you just look at that side bar on the -- on
25   the first page, that's enough.

1        A.   Well, the normal day supply benefit for
2    Kaiser Permanente patients is 100 days, so there are
3    some drugs based on specific criteria that have been
4    developed which fall into a 30-day supply.  If they
5    meet the 30-day supply criteria, they go in the 30/30
6    benefit.
7        Q.   And the criteria would be developed
8    individually with regard to each drug.  Is that right?
9        A.   No, criteria are set as part of the policy.
10       Q.   Do you know what those criteria are?
11       A.   I can't remember them precisely at the
12   moment.
13       Q.   In general terms, do you know what they --
14   what they involve?
15       MS. NUSSBAUM: Don't speculate.
16       A.   I can't remember them all.  There's three or
17   four or five criteria.  I can't recall.
18       Q.   I guess below 30/30 benefit is a heading,
19   "Administrative Decisions"?
20       A.   Right.
21       Q.   What are those?
22       A.   Generally -- again, there's many types.  For
23   example, if a product, an entity is on the formulary,
24   and it's available on the market in three strengths,
25   and the pharmaceutical company comes out with let's

1    say an additional two new strengths, there is no -- it
2    would fall under administrative decision.
3        Q.    I guess the next heading is "Approved
4    Therapeutic Conversions."  Can you tell me what those
5    are?
6        A.    Therapeutic conversions are programs where
7    patients, under approval by their physicians, are
8    converted from one therapeutic entity to another.
9        Q.    Did you say with approval of their
10   physicians?
11       A.    Correct.
12       Q.    I guess what sort of information about
13   approved therapeutic conversions would sort of a
14   general document like this provide?
15       A.    Well, the formulary update is a summary of
16   formulary decisions.  Let's look on Page 16.  As you
17   can see in the middle of the page, "Approved
18   Therapeutic Conversions," it has one column,
19   "Therapeutic Conversion," which lists what drugs are
20   involved.  The second column says, "Endorsed by."
21   Those are the committees that are endorsing the
22   conversion.  And the third column says, "Decision."
23   That would be the decision made by the P&T Committee.
24       Q.    And is this also an advisory -- does it serve
25   an advisory type function to physicians who might want

1    to make this conversion?
2        A.    This is one way that formulary decisions are
3    communicated, via the formulary update.
4        Q.    I'm told we only have a few minutes of tape
5    left.  So we will go off the record now.
6             THE VIDEOGRAPHER: Going off the record at
7    10:28 a.m. This is the end of Tape 1 of the
8    deposition of Mirta Millares.
9             (A recess is taken.)
10
11   CONTINUED DIRECT EXAMINATION BY MR. JAMES:
12            THE VIDEOGRAPHER: We're going back on the
13   record at 10:46 a.m. This is the beginning of Tape
14   2 of the deposition of Mirta Millares.
15       Q.    Just turning back to the document that we
16   were looking at before we took a break, and the next
17   heading is "Base Benefit Decisions."  Do you know what
18   the base benefit is?
19       A.    It's another drug benefit that has to do with
20   drugs that are covered, not under the drug --
21   supplemental drug benefit, but under the base benefit.
22   All patients receive base benefit drugs, regardless of
23   their supplemental drug benefit.
24       Q.    I guess if we turn to Page 15 of this
25   document, which has the Bates stamp KAIS 043966.  It

1    has beneath the heading "Base Benefit Decisions,"
2    there is the sentence, "The Regional P&T Committee
3    made the following decisions for the list of base
4    benefit drugs.  If accepted, medications are covered
5    under the base benefit for the listed indications
6    only."
7             Can you explain what that sentence means?
8        A.    That the P&T Committee made the decision;
9    these drugs were added to the base benefit list; and
10   they are covered for -- under the base benefit for the
11   indications that are listed in that middle column.
12       Q.    If they were prescribed for another
13   indication, they wouldn't be covered.  Is that right?
14       A.    No, that's not true.  It's a different
15   benefit. The base benefit, for these indications, it's
16   covered under the base benefit.  For another
17   indication, it may be covered under another benefit.
18       Q.    Okay.  But under the base benefit, it
19   wouldn't be covered?
20       A.    It would be covered under a different
21   benefit.  There are certain criteria for which a drug
22   falls under the base benefit versus the supplemental
23   benefit versus another benefit.
24       Q.    Are there certain individuals who have only
25   the base benefit?

1        A.    Not to my knowledge.
2        Q.    And what's the distinction -- or actually
3    what's the relevance of the distinction as to whether
4    a drug is covered under the base benefit or another
5    benefit?
6        A.    There are certain drugs, based on criteria,
7    that are covered under the base benefit.  They are
8    covered for everybody, regardless of any other benefit
9    that they might have.
10       Q.    Are there certain individuals who would not
11   have another benefit other than the base benefit?
12       A.    I already answered that.
13       Q.    And the answer was no?
14            THE WITNESS:  What was the answer I gave?  The
15   question was -- I don't recall if I said no or I
16   said something else related to no.
17            MS. NUSSBAUM: Okay.  I think the witness would
18   like two or three questions ago, the question was
19   whether or not there were people that only have
20   the base benefit.  Could you please read that
21   question and answer.
22            THE WITNESS:  Thank you.
23            (The testimony is read.)
24       Q.    The next thing on the first page of this
25   document there is a compounding formulary.  Can you

1  explain what that is?
2      A.  Compounding formulary is a list of drugs that
3  have been evaluated for addition to the compounding
4  formulary.  Compounded drugs are drugs that aren't
5  commercially available formulations, that a pharmacist
6  can put together upon a physician's order.
7      Q.  And then the next line is "Line Extensions."
8  What's a line extension?
9      A.  Again, we -- similar to what I talked about
10 before.  Now -- okay.  If you turn to Page 15, line
11 extensions, the definition's right under there.  These
12 medications are new dosage formulations of drugs that
13 were currently on the formulary.  New formulation.
14     Q.  Explain to me the NPP, PA, CNM sub formulary.
15 What is that?
16     A.  NP is nurse practitioner, PA is physician
17 assistant, CNM is certified nurse midwife, sub
18 formulary.  At this time there was a formulary
19 specifically for these practitioners.  It no longer
20 exists.
21     Q.  When was it discontinued?
22     A.  I don't recall precisely.  Within the last
23 two years.
24     Q.  And does the Regional P&T Committee also
25 decide whether the status of a drug with regard to

1  this sub formulary?
2      A.  They did.  It no longer exists.  Southern
3  California only.
4          MR. JAMES:  I'm marking another exhibit.
5          (Article Titled Improving Appropriate
6      Prescription Drug Use to Best Practice:
7      Supporting Evidence-based Drug Use bearing
8      Bates stamps KAIS 003368 through KAIS 003375
9      marked Millares-5 for identification.)
10     Q.  This document is marked Millares-5 and it's a
11 document bearing the Bates stamps KAIS 003368 through
12 KAIS 003375.  And when you have had a chance to glance
13 the document over, let me know.
14     A.  Okay.
15     Q.  Do you agree that this document describes two
16 groups, one called the KPMC Drug Utilization Action
17 Team and the other called KPMC Drug Utilization Group?
18         MS. NUSSBAUM:  Objection.  The witness has not
19     said she is familiar with this document.
20         MR. JAMES:  Sorry.  I'll back up one step.
21     Q.  Have you seen this document before?
22     A.  Many years ago.
23     Q.  What is it?
24     A.  It's a publication.
25     Q.  And what sort of publication?

1      A.  It's a publication in the Permanente Journal.
2      Q.  And does it concern the KPMC Drug Utilization
3  Drug Action Team and the KPMC Drug Utilization Group?
4          MS. NUSSBAUM:  I would object.  This witness is
5      neither an author, nor is she listed as a member
6      of any of these teams, so unless you are to
7      establish that she is familiar with this article,
8      I object to her being questioned about it.
9      Q.  You can answer.
10     A.  Like I said, it's been many years since I
11 looked this article over.  I can't recall precisely
12 everything that's in here.
13     Q.  Are you familiar with a group known as the KP
14 Southern California Regional Drug Utilization Action
15 Team?
16     A.  Yes.
17     Q.  Is that team known as DUAT?
18     A.  Yes.
19     Q.  Do you know when that team was first created?
20     A.  No.
21     Q.  Are you a member of that team?
22     A.  No.
23     Q.  Does the Drug Information Service interact
24 with that team in any way?
25     A.  Yes.

1      Q.  How does it interact with that team?
2      A.  The Drug Information Services Department
3  provides evidence, evaluations, information,
4  literature, evaluations to DUAT as well as other
5  committees.
6      Q.  Are you also familiar with a KP Northern
7  California Regional Drug Utilization Group?
8      A.  Yes.
9      Q.  Does it serve a similar function to -- to
10 DUAT?
11     A.  Yes.
12     Q.  And does the Drug Information Service have a
13 similar relationship or interaction with -- with DRUG
14 as it does with DUAT?
15     A.  Yes.
16     Q.  Can you tell me the objectives of DRUG and
17 DUAT?
18         MS. NUSSBAUM:  If you know.  I think she said
19     that she is not a member of the committees.  You
20     just had somebody who was a member of the
21     committee who was deposed two days ago to ask
22     those questions to.
23     Q.  You can answer.
24     A.  I know that they have some like written-out
25 objectives.  I -- I can't recite them for you.

10/2/2007  Millares, Mirta - 30(b)(6) - (MDL)

```
1        Q.   Are you familiar with the Permanente on-line
2   interactive network tools, measures and initiative
3   monitor?
4        A.   Somewhat.
5        Q.   What is that?
6        A.   Point? Are you reading from somewhere?
7        Q.   Yes.  I think the acronym uses POINT NIM?
8        A.   Pardon?
9        Q.   I believe the acronym uses POINT-NIM?
10       A.   Can you point me to where you are looking at
11  in your document there?
12       Q.   Sure.  It's KAIS 0003069?
13       A.   Thank you.
14       Q.   Beneath the heading, "Automated Decisions
15  Support System and Tools."
16       A.   Uh-huh. And the question is?
17       Q.   Are you familiar with that system?
18       A.   I don't use it.  I know about it.
19       Q.   And do you know what types of information it
20  provides?
21       A.   I haven't looked at it in a long, long time.
22       Q.   Are you familiar with PharmaFax?
23       A.   I know what they are.
24       Q.   What are they?
25       A.   It's -- a -- I believe usually one-page
```

10/2/2007  Millares, Mirta - 30(b)(6) - (MDL)

```
1   document that is faxed to various locations at a
2   medical center, medical office.
3        Q.   And what sort of information would that fax
4   contain?
5        A.   It -- the Drug Information Services
6   Department does not create the PharmaFax documents.
7   It generally comes out of a different committee, DUAT
8   or DRUG.
9        Q.   Are you familiar with a GI NSAID risk
10  strategizer?
11       A.   Somewhat.
12       Q.   And what does that system do?
13            MS. NUSSBAUM: I would object to relevance.
14  This case has nothing to do with NSAIDs or cox-2
15  inhibitors or anything else.
16       Q.   You can answer.
17       A.   It is a tool that automatically categorizes
18  patients by risk for appropriate use of NSAIDs,
19  including cox-2 inhibitors, as it says right there.
20       Q.   Are you aware that this deposition is being
21  taken in connection with a lawsuit filed by Kaiser in
22  which it alleges that the defendants made fraudulent
23  statements and omissions that caused doctors to
24  prescribe Neurontin for off-label uses for which it
25  was not effective?
```

10/2/2007  Millares, Mirta - 30(b)(6) - (MDL)

```
1            MS. NUSSBAUM: I would object to any legal
2   definition or legal summary of the case.  The
3   witness is aware that she is here in the Neurontin
4   litigation, but I would object to your summary of
5   what this case is.
6        Q.   You can answer.
7        A.   I'm not a lawyer.  I -- I'm not -- I don't
8   know that that's a correct summary of what this case
9   is about.
10       Q.   Are you aware that this deposition is being
11  taken in connection with a lawsuit filed by Kaiser
12  against defendants that has something to do with the
13  efficacy of -- of Neurontin?
14       A.   No.
15            MS. NUSSBAUM: Objection as to efficacy of
16  Neurontin.  This case, I think that it's an
17  attempt to mislead the witness.
18            I mean, I think a fair rendering would be to
19  ask a witness if she is aware that this deposition
20  is being taken in a lawsuit that was commenced by
21  Kaiser with respect to the off-label promotion of
22  Neurontin.
23       Q.   You can answer your counsel's question.
24       A.   Yes.
25            (Deposition Notice marked Millares-6 for
```

10/2/2007  Millares, Mirta - 30(b)(6) - (MDL)

```
1   identification.)
2            (30(b)(6)deposition notice marked
3   Millares-7 for identification.)
4            MS. NUSSBAUM: Okay.  So six is the one
5   specifically to her and seven is the 30(b)(6).  Is
6   that correct?
7            MR. JAMES: That's correct.
8            MS. NUSSBAUM: So she is ready to answer any
9   questions.
10       Q.   I guess you can simultaneously hold open Page
11  3 of Exhibit Number 6 and Page 8, Exhibit Number 7.
12            Do you understand that you have been named to
13  provide answers on behalf of Kaiser, a plaintiff in
14  this action, in response to the notice marked Exhibit
15  Number 6 concerning Topic Number 2 which appears on
16  Page Number 8 of the exhibit marked 7?
17       A.   I think I followed that.  Number 2 on Page 8
18  of --
19       Q.   That's right.
20       A.   -- Exhibit 7.
21            I have never seen this document before,
22  but...
23            MS. NUSSBAUM: What is your question?
24            MR. JAMES:  My question was whether she
25  understands that she is providing answers on
```

1  behalf of Kaiser with regard to Topic Number 2,
2  which appears on Page 8; but, you know, limited to
3  the time period from September, 1999 to the
4  present.
5      A.  Yeah, sure.
6          MS. NUSSBAUM:  By counsel, yes.  By counsel,
7  yes, she is aware.
8      A.  Uh-huh.
9      Q.  How did you prepare to testify regarding this
10 topic?
11     A.  The attorneys --
12         MS. NUSSBAUM:  Please don't --
13         Okay.  The attorney, her answer started with
14     "the attorney," so I just want to caution her,
15     please do not relate any specific discussion that
16     you had with your attorneys.
17     A.  I met with attorneys a couple of times.
18     Q.  For how long?
19     A.  One meeting for several hours.
20     Q.  Did you talk to anyone else other than the
21 attorneys?
22     A.  No.
23     Q.  Did you review any documents to prepare
24 yourself for this deposition?
25     A.  The attorneys provided me with documents in

68

1  absolute most knowledgeable person with respect to
2  any subcategory here.  She is here prepared.  She
3  said she is prepared.  I say she is prepared.
4  Please ask your questions.
5      Q.  All right.  You can answer my initial
6  question as to about who would know the most about
7  this topic?
8      A.  I have no idea who knows the most.
9          MR. JAMES:  Marking another exhibit.
10         MS. NUSSBAUM:  Is this Number 8?
11         MR. JAMES:  Yes.
12         (Gabapentin Formulary History marked
13     Millares-8 for identification.)
14     Q.  When you have had a chance to review this
15 document --
16         (A discussion is held off the record.)
17     A.  I've reviewed it.
18     Q.  With regard to the southern California
19 region, does this document represent a complete list
20 of all changes in formulary classification of the drug
21 Neurontin from September, 1999 forward?
22     A.  I -- I don't know for certain that it
23 represents everything.  I believe so.
24     Q.  I should clarify that because it's the --
25 it's the 30(b)(6) portion of the deposition.  At this

69

1  this latter part of this case.
2          MS. NUSSBAUM:  I don't want to go further as to
3      a waiver of work product.
4      Q.  Roughly how many documents did you review?
5      A.  I don't know.
6      Q.  Did you review them closely or did you kind
7  of glance over them?
8      A.  Glanced over them, mainly.
9      Q.  And did you do anything else to prepare that
10 I haven't heard?
11     A.  No.
12     Q.  Who would know the most about this topic, if
13 not you?
14     A.  Which topic?
15     Q.  Topic 2, limited from the period of
16 September, 1994 --
17         MS. NUSSBAUM:  I'm going to object.  Okay?
18     This witness is here as a 30(b)(6) witness, and we
19     have represented that she is an adequate witness
20     on behalf of Kaiser with respect to these
21     questions.
22         You want to turn this now to the 30(b)(6)
23     portion.  Ask the questions.  You will see this is
24     a very adequately prepared witness on behalf of
25     the company.  We have no obligation to produce the

67

1  point if I use the phrase "you," I'll be referring to
2  Kaiser and its subsidiaries.  And if I mean you
3  personally, I'll say so.
4          If you mean to refer to yourself personally
5  rather than Kaiser you should tell me, otherwise I'll
6  assume that "you" means Kaiser and that you are
7  speaking on behalf of the company.
8          Going back a bit before 1999, I'll mark
9  another exhibit.
10         (P&T Review dated September, 1997 marked
11     Millares-9 for identification.)
12         MS. NUSSBAUM:  Are you ready?
13     A.  I'm ready.
14     Q.  Do you recognize this document?
15     A.  I don't recall reading this particular
16 document precisely, but yeah.
17     Q.  What is the document?
18     A.  Well, I can't tell precisely if this is an
19 excerpt of a larger document, but it -- it's produced
20 by the Drug Information Services Department on
21 gabapentin.
22     Q.  Is a particular change to the formulary
23 classification of gabapentin at issue in this
24 document?
25     A.  Let me read the review first for a second.

69

1  It's from '97, so...
2         Yes.
3    Q.   And what is that change in classification?
4    A.   The issue at hand is a change in the
5  restriction for gabapentin to expand it to include
6  anesthesiology.
7    Q.   And do you know what the bases for that --
8  well, actually, to take a step back, what is the
9  recommendation of the Drug Information Service with
10  regard to that change?
11   A.   Agreed -- agrees with the Chiefs of
12  Anesthesiology to recommend expanding the restriction
13  to include anesthesiologists.
14   Q.   And what were the bases for the Drug
15  Information Services' recommendation?
16        MS. NUSSBAUM: Are you asking the witness based
17  on what's set forth in Exhibit 9, to read you what
18  it says?
19        MR. JAMES: What's in Exhibit 9 and any other
20  knowledge that she may have.
21   A.   Say again?
22   Q.   I guess --
23        MR. JAMES: Could you read back the question.
24        (The question is read.)
25   A.   Well, in general, the -- this -- this topic

1  is presented here in summary form.  The Chiefs of
2  Anesthesiology have asked to be added to the
3  restricted list for the use of gabapentin.  So the
4  recommendation from the Drug Information Services
5  Department would reflect review of the evidence, along
6  with the recommendations from the physicians who are
7  asking.
8    Q.   Do -- I mean is it appropriate to
9  characterize this document as a monograph?
10   A.   It's not really a monograph.  It's -- it's --
11  It's not.  It's --
12   Q.   To whom would it be -- actually what is it,
13  if it is not a monograph?
14   A.   Well, this is specifically a small issue of
15  expanding a restriction.  A drug -- it wouldn't be
16  considered a drug monograph.
17   Q.   Is there any kind of name that's assigned to
18  this particular type of document?
19   A.   Not really.
20   Q.   When making -- or when considering a change
21  to the formulary classification of a drug, what sorts
22  of evidence does the Drug Information Service
23  consider?
24   A.   Well, it is their job to -- to seek all
25  available evidence, utilize the best available

1  evidence.  So it could be clinical trials published in
2  the literature.  Perhaps the pharmaceutical
3  manufacturer has information that they share with us
4  about any trials they have that aren't yet published.
5  And the input of the specialists.
6    Q.   If you review the paragraph underneath the
7  heading "Efficacy" on the first page of this document,
8  what sorts of evidence are -- is described?
9    A.   It describes how there were no randomized
10  clinical trials found in the literature for the
11  treatment of the RSD, which is in question here.  Then
12  it summarizes that there are basically two letters to
13  the editor that were submitted based on a small number
14  of patients, 14.
15        And I believe that -- again, it summarizes,
16  "the information presented in these two letters was
17  very limited," and that's a summary of what's
18  presented.
19   Q.   And I guess referring back to Document Number
20  8, is it possible to tell me the -- the decision that
21  was ultimately made by the P&T Committee based on
22  this, on this document?
23   A.   Yes.  We expanded restrictions to include
24  pain specialists, which include anesthesiologists.
25   Q.   Is it unusual for the P&T Committee to expand

1  a restriction of a prescription drug or take another
2  action with regard to a drug that's formulary
3  classification on the basis of -- of the evidence
4  that's cited in this document?
5        MS. NUSSBAUM: I would object on two grounds.
6  Fir, clearly the 30(b)(6) notice is limited to
7  Neurontin.  Your question is much broader than
8  Neurontin.
9        And then second, I think it's a question that
10  is so broad that it calls for speculation.  But
11  certainly she is not here as a 30(b)(6) witness
12  for that particular question.
13   Q.   You can answer in your personal capacity.
14        MS. NUSSBAUM: If you can.  If it is not a
15  question that would call for speculation.
16   A.   Can I get the question again.  Sorry.
17   Q.   Sure.
18        MR. JAMES: Can you read back the question.
19        (The question is read.)
20   A.   That would -- I guess I'd be speculating
21  really what -- to answer that.
22   Q.   Does the P&T Committee ordinary demand
23  randomized clinical trials before it approves an
24  expansion of a drug's classification on the -- on the
25  formulary?

1    A.   No.

2    Q.   What other types of evidence does it

3  consider?

4    A.   All available clinical evidence.  It can be

5  randomized controlled clinical trials.  It can be

6  prospective naturalistic trials.  It could be an AMCP

7  formulary dossier document.  Information from

8  pharmaceutical manufacturer, abstracts presented at

9  meetings; whatever we can find.  The best available

10  evidence.

11    Q.   And in some circumstances, will the best

12  available evidence be like in the form of letters to

13  the editor of a journal?

14    MS. NUSSBAUM: Objection.  I think that that

15  again calls for speculation.  We have one

16  particular document here.  The witness has

17  testified as to the pattern and practice.

18    Q.   You can answer.

19    MS. NUSSBAUM: Well, if you know.  Don't

20  speculate.

21    A.   What was the question again?

22    MR. JAMES: Can you read back the question.

23    (The question is read.)

24    A.   Very infrequently.

25    Q.   We are turning to Exhibit Number 8.  Was the

1  June -- from 1999.

2    Q.   And can you tell me the change in formulary

3  classification that this drug monograph concerns?

4    A.   This is a request -- based on a request from

5  of Chiefs of Psychiatry to expand the prescribing

6  prescriptions of gabapentin to include psychiatrists.

7    Q.   And beneath the heading "Potential

8  Advantages," I think the first bullet point on the

9  first page states "gabapentin has a relatively benign

10  side effect -- side effect profile."

11    Is that a true statement today?

12    MS. NUSSBAUM: I would object as to this

13  witness being asked if something is true or not

14  true.  She recognizes the document and can testify

15  as to her understanding of the document.

16    Q.   Are you aware of any facts that have come to

17  light that would shed doubt on -- on that statement?

18    A.   I haven't reviewed the Neurontin or

19  gabapentin adverse drug reaction literature in the

20  recent past, so I would not be aware.

21    Q.   If I were to ask the same question about the

22  next two bullet points beneath "Potential Advantages,"

23  would that basically be your -- be your answer with

24  regard to those as well?

25    A.   The second bullet regarding metabolism by the

1  next change in Neurontin's classification on the

2  southern California regional formulary an expansion of

3  prescribing restrictions to include psychiatrists or

4  the treatment of mood disorders?

5    A.   Yes.

6    MR. JAMES: We can probably mark the next

7  exhibit.

8    (Document Titled Modafinil marked

9  Millares-10 for identification.)

10    A.   I'm ready.

11    Q.   Do you recognize this document?

12    A.   No.

13    Q.   Do you know what it is?

14    A.   It has no markings whatsoever, who wrote it,

15  what date.  I don't recognize it.

16    Q.   Okay.  Move on to the next exhibit.

17    (Drug Monograph of Neurontin dated June,

18  1999 marked Millares-11 for identification.)

19    MS. NUSSBAUM: Are you ready?

20    THE WITNESS: Yes.

21    MS. NUSSBAUM: She's ready.

22    Q.   Do you recognize this document?

23    A.   Yes.

24    Q.   Can you tell me what it is?

25    A.   It's a drug monograph on Neurontin from

1  liver?

2    Q.   Right.

3    A.   No, it is not metabolized by the liver.

4  That's a correct statement.

5    MS. NUSSBAUM: He is asking whether your answer

6  I think would be that you haven't reviewed the

7  literature subsequent to 1999 sufficient to be

8  able to respond to questions with respect to

9  Neurontin.

10    THE WITNESS: Right.

11    A.   The second bullet deals with the metabolism

12  of the drug, which is not in question.  It's been

13  shown in the past and it is not metabolized by the

14  liver.  That is a correct statement.

15    Q.   And with regard to the third bullet point,

16  are you aware of any evidence that's come to light

17  that sheds doubt on that statement?

18    A.   That -- I don't understand your question.

19  That statement is like an opinion statement.  It's

20  somebody's opinion.  I -- It's not necessarily my

21  opinion.  I don't know -- I don't know what that -- I

22  don't understand your question.

23    Q.   Are you aware of any facts that have come to

24  light that would tend to undermine that opinion?

25    A.   Well, okay.  Yes.

**Page 78**

```
 1      Q.   And what are those facts?
 2      A.   Negative published clinical trials showing
 3   that gabapentin does not work well in bipolar
 4   affective disorder.
 5      Q.   Do you have any particular clinical trials in
 6   mind?
 7      A.   I don't recall specifically which ones they
 8   are.
 9      Q.   I guess if you look at the next heading,
10   Potential Disadvantages, the second bullet point
11   states, "As a manufacturer, it does not intend to seek
12   FDA approval for the use of gabapentin in the
13   treatment of bipolar affective disorder, it would seem
14   unlikely that large randomized clinical drug trials to
15   study the efficacy and safety of gabapentin for this
16   indication would be forthcoming."
17           MS. NUSSBAUM: You have read a sentence.  Do
18   you have a question?
19      A.   Question?
20           MR. JAMES: Right.
21      Q.   Can you draw an inference from the fact that
22   a manufacturer does not intend to seek FDA approval
23   for the use of gabapentin in the treatment of bipolar
24   affective disorder, the conclusion that it would be
25   unlikely that large randomized clinical drug trials to
```

**Page 79**

```
 1   study the efficacy and safety of gabapentin for this
 2   indication would be forthcoming."
 3           MS. NUSSBAUM: This witness is here as a fact
 4   witness, not to draw inferences.  The document
 5   says what it says.
 6      Q.   You can answer.
 7      A.   Can I draw an inference?  No.
 8      Q.   Did you review this monograph when --
 9   Personally when it was -- before it was presented to
10   the P&T Committee?
11      A.   No.
12           MR. JAMES: Mark another exhibit.
13           (Drug Monograph for gabapentin dated
14   September, 1999 marked Millares-12 for
15   identification.)
16      A.   I've glanced at it.
17      Q.   Do you recognize this document?
18      A.   Yes.
19      Q.   What is it?
20      A.   It is a drug monograph on Neurontin, uh-huh.
21      Q.   And what's the change in formulary
22   classification that's at issue in this document?
23      A.   In this document, the Internal Medicine
24   Committee has requested to expand the prescribing
25   restrictions to include primary care, and also the
```

**Page 80**

```
 1   Chiefs of Family Practice have requested to expand the
 2   restrictions to -- to include primary care physicians.
 3      Q.   And what is the recommendation made by the
 4   Drug Information Service?
 5      A.   The recommendation is to remove prescribing
 6   restrictions and to add guidelines for use.
 7      Q.   And are those guidelines stated on the third
 8   page of this document?
 9      A.   Yes, they are.
10      Q.   And are those guidelines in place with regard
11   to generic gabapentin today?
12           MS. NUSSBAUM: If you know.
13      A.   I haven't checked, but I believe they still
14   are, um-um.
15      Q.   And were those guidelines in place with
16   regard to branded Neurontin in 2004 before it was
17   removed from the formulary?
18      A.   Yes, in the time period after this decision
19   was made?  Yes.
20      Q.   Did you personally edit this document before
21   it was presented to the P&T Committee?
22      A.   Yes.
23      Q.   And I guess if you turn to the second page of
24   the document, it's the first bullet point from the
25   top.  That states, "as a manufacturer does not
```

**Page 81**

```
 1   intend."
 2      A.   The second page where?  Oh, the first bullet
 3   up there.  Yes.
 4      Q.   Right.
 5      A.   Okay.
 6      Q.   Do you have an understanding as to what that
 7   sentence means?
 8      A.   Yes, in direct communication with the
 9   pharmaceutical manufacturer of Neurontin, Debbie was
10   told that they would not be seeking approval for
11   the -- for use of gabapentin in the treatment of pain
12   or -- or neuropathies.
13      Q.   And what does the second half of that
14   sentence mean?
15      A.   That's a -- Debbie is basically speculating
16   that because the pharmaceutical company has stated
17   that they will not be seeking -- they will not be
18   doing clinical trials in order to seek approval from
19   the FDA, that we -- those will not be forthcoming,
20   according to the pharmaceutical manufacturer.
21      Q.   "Those" being large randomized clinical drug
22   trials?
23      A.   Correct.
24      Q.   Is that because most large randomized
25   clinical drug trials are sponsored by the drug
```

1  manufacturer?

2    A.   Not all.   Not necessarily.

3    Q.   And I ask what's the logic underlying that?

4  Or I guess is there a basis to Debbie's speculation in

5  that sentence?

6        MS. NUSSBAUM: If you know.   Don't speculate.

7    A.   I already said what -- what I thought it

8  meant.

9        (SCPMG Regional Pharmacy and

10       Therapeutics Committee Meeting Minutes dated

11       September 14, 1999 marked Millares-13 for

12       identification.)

13       (A discussion is held off the record.)

14   Q.   I direct your attention initially to the page

15  bearing the stamp KAIS 044013.

16   A.   013?

17   Q.   Right.

18   A.   Okay.

19   Q.   And does this basically reflect the southern

20  California Regional P&T Committee's acceptance of

21  the -- a recommendation of the Drug Information

22  Service that you reviewed?

23   A.   It -- it shows that the action taken was that

24  they removed restrictions and added guidelines for use

25  of gabapentin.

82

1    Q.   Do you know whether those guidelines are the

2  same ones that we just reviewed?

3    A.   Yes.

4    Q.   I want to turn to Page KAIS 044015. And it is

5  the first paragraph beneath "Recommendations,

6  Actions." And I believe it states that "Xenical

7  capsules will not be accepted to the formulary, but

8  then it goes on to say that their inclusion in

9  guidelines for use of weight management drugs is

10  supported." Do you see that?

11       MS. NUSSBAUM: This witness is not here to

12       testify about Xenical capsules and I would object

13       to any discussion of Xenical capsules.

14   Q.   Well, you can answer in your personal

15  capacity?

16       MS. NUSSBAUM: In her personal capacity? She

17       is here as a fact witness with respect to

18       Neurontin, not with respect to Xenical capsules.

19       I suggest we move on.

20   Q.   Well, let me ask you the question first.

21       Is it possible for a drug to be not on the

22  formulary, but nonetheless be included in -- in

23  treatment guidelines?

24   A.   It's infrequent, but it can occur, yes.

25   Q.   And in that case, if a prescribing physician

83

1  were to follow a treatment guidelines, I guess they

2  would check that box that you referred to earlier to

3  make sure that the drug was covered when the patient

4  went to get it at the pharmacy.  Is that right?

5    A.   Yes.

6        (Drug Monograph For Topiramate dated

7        March, 2002 marked Millares-14 for

8        identification.)

9    A.   Yes.

10   Q.   Do you recognize this document?

11   A.   Yes.

12   Q.   What is it?

13   A.   It is a drug monograph of a class review of

14  the anti epileptic agents as they relate to the

15  treatment of bipolar disorder.

16   Q.   And what are the agents reviewed?

17   A.   Topamax, Gabitril, Keppra, Neurontin, and

18  Lamictal.

19   Q.   Let me ask you to turn to the second page.  I

20  guess in the lowest box, the first words are "Drug

21  Information Services Formulary Recommendation."

22       Is there any reason why no recommendation was

23  made with regard to Neurontin?

24       MS. NUSSBAUM: If you know.

25   A.   Let me read the box.  It's been a long time.

84

1        I -- I don't recall.  And I can't tell from

2  reading it.

3    Q.   Who would know?

4    A.   You could ask Debbie Kubota.

5    Q.   Are there any documents that the Drug

6  Information Service would maintain that would shed

7  light on that?

8    A.   This is the main document.

9    Q.   Is it unusual I guess for a class review to

10  be done, but no recommendation to be made with regard

11  to one or more drugs that are part of the review?

12   A.   You know, this document is -- I mean without

13  reviewing, this document is like 25 pages long.

14  Without reviewing every page, I can't -- I can't tell

15  you -- I can't answer those questions for you.

16   Q.   Move on to the next exhibit.

17       (Formulary Update dated June 2002 marked

18       Millares-15 for identification.)

19   Q.   Focus your attention on the page that has the

20  stamp KAIS 043895.

21   A.   895.  Yes, I'm there.

22   Q.   And does this represent the P&T

23  Committee's -- I guess the southern California

24  Regional P&T's Committee's decision based on the drug

25  monograph that we just reviewed?

85

1    A.  Yes, it does.

2    Q.  And with regard to Neurontin, is that

3 decision that it would be retained on the formulary?

4    A.  That the decision on Neurontin, correct,

5 retained on the formulary.

6    Q.  Do you have any understanding of the bases of

7 that decision beyond, you know, whatever might be

8 contained in that, in the drug monograph that we

9 looked at?

10    A.  No.

11    (Executive Summary marked Millares-16

12    for identification.)

13    Q.  Do you recognize this document?

14    A.  Yes, I recognize it.

15    Q.  What is it?

16    A.  It is an executive summary, multi source

17 generic selection summary document.

18    Q.  Is there a particular change in the formulary

19 classification of branded Neurontin that's at issue in

20 this document?

21    A.  Yes, this is adding the generic gabapentin

22 onto the formulary, and deleting the brand Neurontin

23 form of gabapentin from the formulary.

24    Q.  I guess looking back at Exhibit Number 8,

25 which we saw awhile ago. Is it true from -- from 1994

86

1 forward, restrictions on Neurontin or gabapentin were

2 only expanded until the deletion of branded Neurontin

3 from the formulary in 2004?

4    A.  I don't understand your question. Is it

5 true?

6    Q.  I guess at no time during the relevant

7 period, which is from 1994 forward, were any

8 additional restrictions added to the use of Neurontin

9 or -- or more restrictive guidelines placed on

10 Neurontin's use?

11    A.  The restrictions were expanded several times

12 between '94 and the time the generic became available.

13    Q.

14    MR. JAMES: Let's take a five-minute break now.

15    MS. NUSSBAUM: This isn't the lunch break,

16    though? It is just a five-minute break? Okay.

17    MR. JAMES: No.

18    THE VIDEOGRAPHER: Going off the record at

19    11:52 a.m. This is the end of Tape 2 in the

20    deposition of Mirta Millares.

21    (A recess is taken.)

22

23 CONTINUED DIRECT EXAMINATION BY MR. JAMES:

24    THE VIDEOGRAPHER: We are going back on the

25    record at 12:04 p.m. This is the beginning of Tape

87

1 3 in the deposition of Mirta Millares.

2    (Meeting Minutes dated June 26, 2002

3    marked Millares-17 for identification.)

4    Q.  I mark another deposition exhibit, which is

5 Millares-17.

6    MS. NUSSBAUM: Ready?

7    THE WITNESS: Yes.

8    A.  Go ahead.

9    Q.  Do you recognize this document?

10    A.  Yes, uh-huh.

11    Q.  What is it?

12    A.  Meeting minutes from the southern California

13 Regional Drug Utilization Action Team Meeting, June,

14 2002.

15    Q.  And I'll direct your attention to the page

16 bearing the stamp KAIS 001221.

17    Did DUAT have an initiative that focused on

18 gabapentin?

19    A.  When are you referring to?

20    Q.  Like I said, at any time.

21    A.  Yes.

22    Q.  And when did that initiative begin?

23    A.  I can't tell you precisely, but around 2002.

24    Q.  Did DRUG have a similar initiative?

25    A.  I believe so.

88

1    Q.  It started about the same time?

2    A.  I believe so, yes.

3    Q.  Did other Kaiser regions also have similar

4 initiatives?

5    A.  I'm not certain.

6    Q.  Who would know?

7    A.  Someone in each individual region? I don't

8 know.

9    MS. NUSSBAUM: I believe that two days ago, a

10    colleague of yours deposed Rod St. John, who was a

11    regular member of the support staff of DUAT, and

12    those questions were asked and he was the witness

13    with respect to that. She was simply a guest. He

14    was a regular member of DUAT.

15    MR. JAMES: Let me just refer back to the --

16    the 30(b)(6) notice, which is Exhibit Number 7.

17    And this witness is designated with regard to

18    Topic Number 2 which appears on Page 8 of that

19    document.

20    MS. NUSSBAUM: Yes, uh-huh.

21    MR. JAMES: And among the subjects listed in

22    that topic are disease management and drug

23    utilization review relating to Neurontin.

24    MS. NUSSBAUM: Right.

25    Q.  Would you agree that DUAT and DRUG are drug

89

1  utilization review programs?
2      A.  Yes.
3          MS. NUSSBAUM: And she is here to answer
4      questions.
5      Q.  And -- and are similar program -- drug
6  utilization review teams in other Kaiser regions would
7  also fall within that category; correct?
8      A.  I don't know of specific committees that
9  resemble these in the other regions.
10     Q.  What was the objective of the
11 gabapentin-related initiative that was undertaken by
12 DUAT and DRUG?
13     A.  I would have to, if you would refer me to the
14 document that has the goals for that initiative,
15 because the goals I think changed over time.  So I
16 don't want to just recite something that I'm not sure
17 of.
18         MR. JAMES: I guess I will mark two more
19     exhibits.
20         THE WITNESS: Okay.
21         MS. NUSSBAUM: Can we put 17 away?
22         MR. JAMES: No.  Actually keep it.  Keep it on
23     deck.
24         MS. NUSSBAUM: This one is 18?
25         MR. JAMES: Yes.

1          (KPSC DUAT Executive Score Card dated
2      January-September, 2004 marked Exhibit 18
3      for identification.)
4          (SCPMG Chiefs of Psychiatry and
5      Addiction Medicine Meeting dated July 24,
6      2004 Synopsis of Pharmacy's Issues marked
7      Millares-19 for identification.)
8      Q.  I guess with regard to Exhibit 18?
9      A.  Exhibit 18, this one, uh-huh.
10     Q.  Page 4 might be helpful in terms of
11 determining the goals and objectives of DUAT with
12 regard to gabapentin.
13     A.  Okay. This is dated in the front January to
14 September, 2004.
15     Q.  That's correct.
16     A.  Okay.
17         MS. NUSSBAUM: Is there a question?
18         MR. JAMES: Yeah.
19     Q.  Like I said it's my last question, which is:
20 What were the goals of DUAT and DRUG with regard to
21 the gabapentin-related initiative?
22     A.  Okay.  As stated here in this document, I
23 will read what the goal precisely is.  "Decrease
24 Neurontin utilization in patients with non-neuropathic
25 pain and promote the use of low dose tricyclic

1  antidepressants (nortriptyline, desipramine) as first
2  line therapy for treating new start patients with
3  neuropathic pain."
4          That's the goal.
5      Q.  Do you know why a separate objective is
6  stated?
7      A.  In general, goals and objectives are two
8  different items.  A goal is your over-arching -- what
9  you are trying to reach, and an objective is more
10 specific, as to how you are going to reach your goal.
11 I would assume they use normal goal and objective
12 creating techniques.
13     Q.  And the objective here is to use TCA's
14 preferentially for treatment of neuropathic pain and
15 reserve Neurontin for TCA failure or
16 contraindications?
17     A.  Correct.
18     Q.  And these goals and objectives are consistent
19 with the guidelines adopted in 1999 when restrictions
20 were removed from gabapentin.  Is that right?
21     A.  I don't recall that the guidelines referred
22 specifically to -- to this topic here.
23         Where are the guidelines?
24     Q.  We'll turn back to those.  They were listed
25 in Exhibit Number 12.

1      A.  Okay.
2      Q.  On -- on the page with the Bates stamp KAIS
3  003261.
4      A.  I'm referring now to the guideline.  It's
5  worded slightly different in the guideline.  In the
6  guideline it says, "The use for gabapentin for the
7  treatment of neuropathy should be reserved for those
8  patients unresponsive to or intolerant of other
9  treatment modalities, including tricyclic
10 antidepressants," and it lists others.
11     Q.  But the two, meaning the DUAT goals and
12 objectives and the --
13         (A discussion is held off the record.)
14     Q.  The two, meaning the DUAT goals and
15 objectives and the guidelines, you know, while worded
16 differently are consistent with each other.  Is that
17 correct?
18     A.  Yes, for the treatment, yes, of neuropathies,
19 uh-huh.
20     Q.  And the DUAT goals and objectives appear to
21 be designed more toward kind of achieving closer
22 compliance with the guidelines, as opposed to like
23 changing the guidelines in any substantive way?
24     A.  The DUAT goal and objective is not trying to
25 change the guideline.

1     Q.   I guess it's trying to get prescribing
2  physicians to sort of follow the guideline more
3  closely.  Is that an accurate characterization?
4     A.   In that particular -- they relate to each
5  other in that particular section.  The guidelines talk
6  about other treatments as well.
7     Q.   Were the goals and objectives of the DUAT
8  limited to neuropathic pain, or did they also involve
9  other off-label uses of -- of Neurontin?
10    A.   As listed here, non neuropathic pain and
11 neuropathic pain is the goal -- is the focus of this
12 initiative.
13    Q.   But not other indications like RSD or bipolar
14 disorder?
15    A.   They are not listed in this goal or
16 objective, no.
17    Q.   Do you know the indications for which
18 Neurontin is indicated?
19    A.   I do.
20    Q.   What are they?
21    A.   For the treatment of seizures, partial
22 seizures; and later on, not that long ago, it received
23 indication for postherpetic neuralgia.
24    Q.   Would postherpetic neuralgia fall within the
25 DUAT goals and objectives listed in this document?

94

1     Q.   You suggested earlier that the goals and
2  objectives of DUAT or DRUG might have evolved over
3  time.  Is that right?
4     A.   Goals and objectives of DRUG and DUAT could
5  evolve over time?  Yes.
6     Q.   Do you know whether they did with regard to
7  gabapentin?
8     A.   I don't.
9     Q.   I want to turn back to Exhibit 17, which we
10 were looking at earlier.  I guess on Page 5 of that
11 document?
12    A.   We are getting it.  Just a second.
13         MS. NUSSBAUM: I think you still have it there.
14         Oh, I have it.  I'm sorry.
15         What page?
16    Q.   Page 5?
17    A.   Yes.
18    Q.   Which has Bates number KAIS 001221.
19    A.   I got it.  Uh-huh.
20    Q.   I guess the fifth bullet down says, "Mitch
21 Pelter conducted educational programs, invited experts
22 to speak and performed a chart review about one year
23 ago."
24    A.   That's what it says.
25    Q.   Do you know who Mitch Pelter is?

96

1     A.   It would probably be one of numerous types of
2  neuropathic pain.
3     Q.   Do you know whether TCAs are indicated for --
4  for neuropathic pain?
5         MS. NUSSBAUM: What do you mean by the word
6  "indicated"?
7         MR. JAMES: I guess approved by the FDA for use
8  of treatment for neuropathic pain.
9         MS. NUSSBAUM: And is there a specific TCA that
10 you are referring to in a particular time frame
11 with a particular manufacturer?  This is not an
12 expert witness on what particular pharmaceutical
13 product at what point has been approved or not
14 approved by the FDA for particular indications.
15    Q.   Do you know whether any TCA has been approved
16 by the FDA for use as a treatment for neuropathic
17 pain?
18         MS. NUSSBAUM: If you know.
19         At any time by any action?
20         MR. JAMES: Yes, at any time.
21         MS. NUSSBAUM: If you know.  And if you don't
22 without referring to documents, then please let
23 him know that.
24    A.   I'd rather refer to the actual indication
25 list.  I -- I can't recall.

95

1     A.   I do.
2     Q.   Who is he?
3     A.   He is currently a Clinical Operations Manager
4  in Woodland Hills.
5     Q.   What's the role of a Clinical Operations
6  Manager?
7     A.   Primarily to oversee the ambulatory care
8  services that are provided by a pharmacist within that
9  location.
10    Q.   Would he be an employee of the plaintiffs or
11 an employee of the Permanente Medical Group?
12    A.   He is an employee of the plaintiffs.
13    Q.   Do you have any knowledge regarding the chart
14 review that's referred to in this -- in this document?
15    A.   No, I don't.
16    Q.   Do you know of other chart reviews undertaken
17 by DUAT or DRUG?
18    A.   I don't know of any chart reviews undertaken
19 by DUAT or DRUG.
20    Q.   Does this document indicate that DUAT and
21 DRUG undertook a chart review with regard to
22 gabapentin?
23    A.   No.
24    Q.   What does that mean?
25    A.   It means that Mitch Pelter performed a chart

97

1 review. He is not part of DRUG or DUAT.

2 Q. On whose behalf would he have conducted that

3 chart review?

4 MS. NUSSBAUM: If you know.

5 A. It could have been on behalf of the Regional

6 Drug Committee on his side or on behalf of some of the

7 physicians he works for. I have no idea.

8 MR. JAMES: Defendants would request that

9 Kaiser produce all documents relating to this

10 chart review that's referred to on Page KAIS

11 001221.

12 MS. NUSSBAUM: We have produced all relevant

13 documents in this case. Discovery with respect to

14 documents means you have served your request, we

15 have provided our documents.

16 If you want to put an additional request in

17 writing, we'll respond to it.

18 MR. JAMES: I'll mark another exhibit.

19 A. I want to go back for one second.

20 I don't know whether he, Mitch Pelter, was an

21 official member of the SCPMG Regional DUAT at the

22 time. I'm checking the attendance record. He is

23 listed as a "present." As opposed to a guest.

24 I said he wasn't a member and I don't know.

25 I shouldn't say that.

1 MS. NUSSBAUM: Can we put away these other

2 documents now?

3 MR. JAMES: We can put away 17 and 18.

4 MS. NUSSBAUM: We can put them away. Thank

5 you.

6 MR. JAMES: Actually, sorry. We can put away

7 17. Resurrect 18 briefly.

8 Q. If you turn to Page 5 of -- of Exhibit Number

9 18 -- I'm sorry, Exhibit 18.

10 A. Page 5?

11 Q. Right. Do you have an understanding of what

12 this page means?

13 A. I've never seen either of these charts.

14 Q. Do you know how DUAT and DRUG measure their

15 success with regard to -- with regard to achieving the

16 objectives that we discussed earlier?

17 A. Well, it -- they -- it depends on the

18 initiative, the goals and objectives and what was set

19 up as -- as targets. It's variable.

20 Q. Do you know what the targets set with regard

21 to gabapentin were?

22 A. I think if we go back -- what page was that

23 on? Okay. Here we go.

24 Decreasing Neurontin utilization -- I mean I

25 don't -- without looking at those precise charts, what

1 they were -- what their precise target of utilization

2 evaluation was -- I mean it could be, you know, total

3 number of Neurontin prescriptions or something else.

4 I would have see one of their specific reports.

5 MS. NUSSBAUM: By counsel, Exhibit 18 is an

6 85-page document. If you want to specifically ask

7 her to look at something. Otherwise this is not a

8 document that she authored, and sitting here now,

9 she can't possibly tell you whether or not that

10 information is contained in this document.

11 MR. JAMES: The question wasn't whether it was

12 contained in this document, but do you know what

13 the information was.

14 Q. But you may turn to Page 32 --

15 A. Okay.

16 Q. -- of Exhibit Number 18.

17 A. Uh-huh.

18 Q. And the pages that follow it.

19 A. Okay.

20 Q. There is a footnote on Page 36 that may also

21 be relevant.

22 (A discussion is held off the record.)

23 MS. NUSSBAUM: Are these the charts that you

24 previously indicated you did not see before, you

25 don't recall seeing before?

1 THE WITNESS: No, I don't recall seeing these

2 charts before.

3 Q. Do you have any understanding of what the

4 metrics used by DUAT and DRUG were?

5 MS. NUSSBAUM: Well, if the witness has never

6 seen these charts before, I would really not want

7 her to speculate, and neither would you, with

8 respect to, you know, what the metrics is or what

9 the charts mean.

10 Q. If you can turn to Page 34 of the document.

11 The title is "PMPM Cost Differential, Neurontin New

12 Starts and New Start MRNs Naive to TCA"?

13 A. Correct.

14 Q. Do you know what that heading means?

15 A. Neurontin -- a new start is a patient who is

16 started on Neurontin, and looking back, has not

17 received Neurontin before. That's a new start. MRN

18 is a medical record number. Naive to tricyclics would

19 be that the patient has never been tried on a

20 tricyclic antidepressant before that Neurontin is

21 started.

22 Q. What does "PMPM cost differential" mean?

23 A. I know PMPM means per member per month. I

24 don't know how cost differential -- PMPM cost

25 differential, what exactly that means and how it's

1   calculated in this chart.  Don't know.
2          MS. NUSSBAUM: Have you seen this chart before?
3          THE WITNESS:  I've never seen this chart
4   before.
5      Q.   The footnote to this chart --
6      A.   That I recall.
7      Q.   -- the footnote on this same page, that's
8   KAIS 00034, appears to indicate that the data source
9   for determining new starts of Neurontin naive to TCAs
10  was POINT.  Do you know whether POINT is able to
11  provide that kind of information?
12         MS. NUSSBAUM: If you know; and if you have
13  never seen the chart before, I would ask that you
14  not speculate.
15     A.   I don't know.
16         MS. NUSSBAUM: I would also state for the
17  record that at the Rod St. John deposition, these
18  documents were gone through and who this
19  individual Gene Chiu is and what his role was and
20  where he got this information was testified to.
21         MR. JAMES: I guess my response, again, is this
22  witness has been designated as a witness with
23  regard to drug utilization programs from 1999
24  forward.
25         MS. NUSSBAUM: This is not -- no, excuse me.

1      The 30(b)(6) talks about policies and practices
2   and we are delighted to talk about policies and
3   practices.
4      She is here as a 30(b)(6) witness.  You are
5   asking her about a particular footnote, to a
6   particular chart in an 85 page document that she
7   didn't author where she says she hasn't seen the
8   chart.
9      And so I'm simply suggesting that if you want
10  somebody to interpret a particular footnote, that
11  that was interpreted two days ago.
12         MR. JAMES: And I ask again, in having a
13  witness testify on drug utilization programs, we
14  question as to how these programs measure their
15  success and how they went about gathering the data
16  needed to measure that success.
17         MS. NUSSBAUM: That was not included in your
18  30(b)(6) notice.  Your 30(b)(6) notice which has
19  been marked as Exhibit 7 states in pertinent part,
20  "Number 2 your policies and practices concerning
21  Neurontin including:  Disease management and drug
22  utilization review relating to Neurontin."
23         She is perfectly willing and able to talk
24  about policies and practices.  I think we have
25  already spent about an hour on that.  But if you

1   want to do it some more, she is happy to do it
2   some more.  But interpreting one particular chart
3   in the middle of an 85-page document is not a
4   policy or practice.
5      Q.   Can you turn to Exhibit 19, which was marked
6   earlier.
7          MS. NUSSBAUM: She's ready.
8      Q.   Do you recognize this document?
9      A.   It has no author or date.  Well, no, it does
10  have a date on it.  It doesn't have an author on there
11  or where it came from.
12     Q.   Do you know who the author is?
13     A.   Not for certain, no.  It doesn't --
14         MS. NUSSBAUM: No, please don't speculate.
15     A.   I don't know.  It doesn't say.
16     Q.   All right.
17     A.   It doesn't say where it came from.
18     Q.   We can set this exhibit aside.
19         MS. NUSSBAUM: Exhibit 20?
20         MR. JAMES: Right.
21         (Document marked Millares-20 for
22  identification.)
23     A.   Okay.
24     Q.   Do you recognize this document?
25     A.   I don't recognize the front page, but I -- I

1   understand what it says.
2      Q.   What is this document?
3      A.   It says "Kaiser Inter Regional Pharmacy
4   Meeting, April, 2004."
5          MS. NUSSBAUM: Well, we are not having a
6   reading.  If she doesn't recognize the document
7   and she doesn't recognize the front page and all
8   she is doing is reading the title of the document,
9   which she can't recognize or identify the
10  document.
11     Q.   What is a Kaiser Inter Regional Pharmacy
12  Meeting?
13     A.   It is a -- a meeting where representatives
14  from all of the Kaiser regions come together and meet.
15     Q.   How often do these meetings occur?
16     A.   Twice yearly.
17     Q.   Who are the attendees?  I mean, what are
18  their roles in their respective regions?
19     A.   There's various attendees.  One would be the
20  pharmacy directors from each of the regions meet.
21  That's one set of people.  There's some IT people
22  working at Informatics, Pharmacy Informatics computer
23  systems.  They meet.  There's a physicians meeting,
24  that includes the P&T chairs from each of the regions.
25  And a couple of other physicians.

1      And there's the ICPSS Sub Committee, which is
2  a committee of clinical pharmacists from various
3  regions.
4    Q.  If you can turn to Page 10 of this document.
5    A.  Uh-huh.  Ten?
6    Q.  Right.  It is Bates stamped KAIS 003822?
7    A.  3822, yes.
8    Q.  Do you have any knowledge of the chart review
9  that's described on the pages that follow this page?
10    A.  No.
11    Q.  Do you know whether DUAT and DRUG have ever
12  undertaken a chart review to determine gabapentin
13  utilization?
14    A.  No.
15    Q.  Does Page 14 appear to list the particular
16  uses for which gabapentin was prescribed in northern
17  California?
18    MS. NUSSBAUM:  Objection.  You are asking if
19  something appears to list.  I don't think that the
20  witness said she has any personal knowledge about
21  this document.  I think she said that she doesn't
22  recognize it.  She does not appear to be an author
23  or recipient.  And she just said she knows nothing
24  about any chart review that preceded the page.
25    So I would suggest that we don't want her to

1    Q.  If you can turn to Page 9 of this document.
2    A.  Would that be the nine on the side or --
3    Q.  I guess it's actually 9 on the side?
4    A.  Okay.
5    Q.  It is the page with the Bates stamp 001103?
6    A.  Got it.
7    Q.  Do you have any knowledge as to how these
8  statistics were compiled?
9    A.  This is new gabapentin patients for all
10  diagnosis, naive and not naive to TCAs.
11    MS. NUSSBAUM:  He is asking if you have any
12  specific knowledge for how the information on this
13  page was compiled.  Did you do this or have any --
14    THE WITNESS:  No.
15    MS. NUSSBAUM:  No.
16    Q.  And you have no knowledge of how anyone else
17  would have done this?
18    A.  Not specifically.
19    MS. NUSSBAUM:  Well, please don't speculate.
20    Q.  I guess setting this particular chart aside,
21  how would someone at Kaiser go about determining the
22  number of new gabapentin patients for all diagnoses
23  who are naive or not naive to TCAs?
24    MS. NUSSBAUM:  I don't want this witness to
25  speculate, and that's what you are asking.  How

1  speculate as to whether something appears or
2  doesn't appear.
3    MR. JAMES:  All right.  Defendants would
4  request that Kaiser produce all documents relating
5  to the San Gabriel Valley chart review referred to
6  on Page 12 of this document.
7    MS. NUSSBAUM:  Well, as I've said, you served a
8  request, we've served our documents.  If you want
9  to send us a letter, we will take any letter you
10  have sent under advisement.
11    Q.  You can set Exhibit 20 aside.
12    (DUAT Video Conference on Successful
13  Practices dated March 12, 2003 marked
14  Millares-21 for identification.)
15    A.  I'm ready.
16    MS. NUSSBAUM:  She's ready.
17    Q.  Do you recognize this document?
18    A.  Yes.
19    Q.  What is it?
20    A.  These are photocopies of a presentation, a
21  video conference, DUAT video conference.
22    Q.  Did you review this document in preparation
23  of this deposition?
24    MS. NUSSBAUM:  Objection.  It goes to work
25  product.

1  would somebody hypothetically do something.  This
2  is not her job, she didn't do it, she has no
3  knowledge of it and she said she doesn't know how
4  it was done.
5    Q.  You can answer.
6    MS. NUSSBAUM:  It calls for speculation.  It is
7  a hypothetical.  How would somebody do something.
8    A.  I don't -- I don't do these kind of reports
9  myself, so I really don't know.
10    Q.  If you could turn to Page 11 of this
11  document.  Do you know what it shows?
12    MS. NUSSBAUM:  I'm sorry.  And what was your
13  question?
14    MR. JAMES:  Yes.
15    Q.  Do you know what this chart shows?
16    MS. NUSSBAUM:  Not just by reading the title,
17  but do you know, do you have any knowledge of this
18  chart?
19    A.  I don't know how this information was
20  gathered or put together and analyzed.
21    Q.  Do you know what the information represents?
22    A.  The only thing I can tell you is what the
23  title says.
24    Q.  And I guess from the -- does the title mean
25  that this is the number of patients who are prescribed

1    gabapentin for neuropathy or fibromyalgia who are
2    naive or not naive to TCAs?
3        MS. NUSSBAUM: Objection.  If you want to know
4    can she read and did you appropriately read what
5    it says, you know, did he read it correctly;  or
6    -- or if you want something more, I think she said
7    she is not familiar with the chart.  She doesn't
8    know what went into it and she doesn't know.  But
9    if you want to just know did you read the title
10   correctly, she can answer that.
11       Q.  Is the distinction between this chart and the
12   one we reviewed earlier that the earlier chart was for
13   all indications, while this particular chart is
14   limited to two particular uses?
15       MS. NUSSBAUM: And I would again caution the
16   witness not to speculate.  In other words, if your
17   knowledge is simply because you could read the
18   title on the chart, nothing more, then you should
19   not speculate.
20       A.  My knowledge of this is based on the title of
21   the slide.
22       Q.  Let's turn to Page 19 of this document, which
23   has KAIS 001112.
24       A.  Correct.  Page 18, um-um.
25       Q.  Do you have any knowledge of this small

1    crossover study that's -- that's referred to on this
2    page?
3        A.  Just from that bullet.  I can't recall that
4    specific study.
5        Q.  Do you know if any studies have found no
6    difference in pain relief between anatriptyline and
7    gabapentin?
8        A.  I don't recall specifically.
9        Q.  If you could turn to Page 19, the next page.
10       Do you know what the terms "no number needed
11   to treat" and "number needed to harm" mean?
12       A.  I do.
13       Q.  What does "number needed to treat" mean?
14       A.  Well, it's a -- somewhat of a complex
15   statistical term that relates to the number of
16   patients -- based on data in a study, the number of
17   patients that you need to treat in order to get one
18   event, one outcome.
19       Q.  And what is "number needed to harm"?
20       A.  It's the same thing.  In this case the
21   outcome is a negative issue.  It's a harm to the
22   patient.
23       Q.  I'll ask you to turn to the following page,
24   Page 20 -- KAIS 001114.  It appears to list the
25   numbers needed to treat for two uses for both a TCA

1    and for gabapentin.
2        Do you have any knowledge of whether those
3    numbers needed to treat are from the same study or
4    whether they are taken from two different studies?
5        A.  I don't.
6        Q.  We are marking Exhibit 22.
7        MS. NUSSBAUM: 22.
8        (Fifth Annual Region Wide Drug
9    Utilization Action Team Off Site Minutes
10   dated March 4, 2004 marked Millares-22 for
11   identification.)
12       Q.  Do you recognize this document?
13       A.  I personally don't receive the minutes for
14   these meetings, but I can read the title and it looks
15   like it's minutes from the DUAT off-site, March, 2004.
16       Q.  Could you turn to Page 5 of this document.
17   It has the Bates stamp KAIS 001177.
18       A.  77.  Okay.  I'm there.
19       Q.  Do you know who Steve Steinberg is?
20       A.  I'm sorry.  Let's see.  What page are we on?
21       Q.  It's KAIS 1177.
22       A.  Okay.  And who is the person?
23       Q.  Steve Steinberg?
24       A.  Steinberg, yes.
25       Q.  Who is he?

1        A.  He is a physician.  I believe family
2    practitioner.
3        Q.  And what was his involvement in KP
4    HealthConnect?
5        A.  I don't know exactly what his job duties
6    around HealthConnect are.  I know that he is involved
7    in HealthConnect, but I couldn't tell you what his
8    responsibilities are.
9        Q.  I guess the first bullet point in the second
10   set of bullet points there makes a reference to "smart
11   sets."  Do you know what those are?
12       A.  Yes, I do.
13       Q.  What are smart sets?
14       A.  Smart sets are being built for KP
15   HealthConnect, and they are -- they pertain to a
16   particular problem.  And it's like a SOAP note,
17   template for the physicians to use.  A SOAP note
18   template.  It's a template that follows a visit, a
19   physician visit, and provides them with a template for
20   writing in their encounter with a patient for that
21   visit.
22       Q.  Is it something they electronically enter
23   into a computer?
24       A.  It's an option available in KP HealthConnect
25   for some therapeutic interactions in the clinic.

1    Q.   Can you give one example?  Not that I mean to
2   ask extensively about it, but just to make this idea
3   of it more concrete.
4    A.   Sure.  A well-baby visit.  There could be a
5   smart set for well baby visit.  And if I'm seeing a
6   well baby, I can pull that up and -- and fill out the
7   information on my encounter with that patient during
8   that visit via a template, as opposed to going in and
9   building kind of the encounter myself.
10    Q.   And how can a smart set -- smart set be sort
11   of aligned with a DUAT initiative?
12    MS. NUSSBAUM: Do you understand the question?
13    A.   The smart set SOAP note at a certain point in
14   the encounter will deal with therapeutic
15   interventions, perhaps pharmaceuticals that the
16   physician might be choosing to treat that particular
17   problem.
18    And "in alignment" means that the drugs
19   are -- make sure that the formulary drugs for that --
20   that intervention are listed, make sure that they are
21   in line with our formulary guidelines, that kind of
22   thing.
23    Q.   I'll ask again, would it be possible to
24   provide, you know, an example just to make that a bit
25   more concrete?

1    A.   Yes.
2    Q.   -- I mean and use the smart set?
3    A.   Within the smart set, you can pick a drug
4   that's on the smart set or you can go to the library
5   of drugs and pick any drug you want.
6    Q.   Has any smart set been used that -- or
7   created that relates to gabapentin?
8    A.   Created and used?
9    Created, yes; and the second part of your
10   question, used, I can tell you that from my
11   information, smart sets are very rarely used by our
12   physicians.  They don't like them.  They're too hard
13   to find in the electronic medical record.  They are
14   not being used well.
15    Q.   So they have been available for a few years,
16   but haven't really been used extensively?
17    MS. NUSSBAUM: The witness hasn't said that
18   they have been available for a few years.  This
19   document speaks of this as a new tool and the date
20   of this document is March, 2004.  So that's your
21   testimony, not the witness'.
22    Q.   Have smart sets been available for a few
23   years?
24    MS. NUSSBAUM: Smart sets in general?
25    MR. JAMES: Yes.

1    MS. NUSSBAUM: Please don't speculate.  So only
2   if sitting here today you exactly remember
3   particular pharmaceutical products for particular
4   conditions.  Otherwise, I think you have been
5   very, very concrete.  So please do not speculate
6   or guess.
7    A.   I'll give you a concrete example.  The
8   problem of dyslipidemia, high cholesterol, there are
9   various options, all statins.  Some are on
10   formularies, some not.  Some are preferred over
11   others, first line, second line, third line.  We
12   would list them in that order for the physician.  So
13   the first line is the first one available, the second
14   line is second, and third is third.  It helps them
15   individualize.  That's what they have requested they
16   would like help, instead of keeping all of that in
17   their heads.
18    Q.   There is the bullet point that states that
19   specific drugs are not included in the smart set to
20   the general population, only available to those
21   restricted to specific specialties.
22    If a physician wanted to use a smart set but
23   wanted to prescribe a -- a drug that was restricted,
24   you know, to another group of physicians, would the
25   physician still be able to prescribe that drug --

1    A.   Like I -- Well, not everywhere.  This -- this
2   whole system is being rolled out.  There is a massive
3   roll-out schedule that involves many medical centers
4   and clinics.  And I couldn't possibly tell you where
5   something is available and where something is not
6   available.
7    Q.   What is the epic feature that's referred to
8   in the final bullet point here?
9    A.   I'm not sure what they are referring to in
10   terms of -- let's see.  M.D. alerts.
11    MS. NUSSBAUM: Don't speculate.
12    Q.   You can set that aside.
13    MR. JAMES: I'm marking exhibit --
14    MS. NUSSBAUM: Twenty-three.
15    MR. JAMES: -- Number 23.
16    (Preliminary Proposed Gabapentin
17   Screening Tool marked Millares-23 for
18   identification.)
19    A.   Right.
20    Q.   Do you recognize this document?
21    A.   No, I've never seen it.
22    Q.   Are you aware of any proposed gabapentin
23   screening tool?
24    A.   No.
25    Q.   Do you know what a nortriptyline starter pack

1    is?

2        A.    Yes.

3        Q.    What is that?

4        A.    A nortriptyline starter pack is a convenient

5    packaging of nortriptyline for use in treating

6    patients with nortriptyline so that they can titrate

7    their dose easily.

8        Q.    Is the starter pack created by Kaiser or, you

9    know, by someone else?

10        A.    Created by Kaiser.

11        Q.    And who within Kaiser created the starter

12    pack?

13        A.    I have no -- who created the actual pack?

14    It -- I don't know.

15        Q.    Is it tied in any way to the DUAT and DRUG

16    initiatives?

17        A.    Yes.

18        Q.    How so?

19        A.    The starter packs, again, are utilized for

20    treating patients for neuropathic problems with

21    nortriptyline, and so they are promoted as a product

22    that helps patients with their dosing of the

23    nortriptyline.

24        Q.    Do you know if Kaiser has undertaken any

25    study to determine whether the availability -- the

118

1    guidelines, does that affect the physicians to which

2    the drug may be detailed?

3        MS. NUSSBAUM: If you know.

4        A.    No.

5        Q.    Does it affect the kind of detailing that the

6    drug company can make toward Permanente Group

7    physicians?

8        MS. NUSSBAUM: I would object to -- I don't

9        think the question is -- is clear.  In other

10        words, the detailing is done by the pharmaceutical

11        company, not by Kaiser.  So, you know, Kaiser may

12        have some kind of proposed guidelines or whatever,

13        but ultimately what's done and not done is the

14        conduct of the pharmaceutical company.  It's not

15        Kaiser.

16        Q.    Does Kaiser have certain guidelines that

17    pharmaceutical companies are supposed to observe when

18    detailing Permanente Group physicians?

19        A.    Yes.

20        Q.    And as part of those guidelines, if a drug is

21    on formulary, but has certain clinical practice

22    guidelines associated with it, can the drug company

23    detail in a manner inconsistent with those guidelines?

24        MS. NUSSBAUM: Objection.  The witness has

25        already said that the limitation to particular

120

1    availability of these nortriptyline starter packs has

2    actually made physicians more likely to prescribe

3    nortriptyline for -- for chronic pain?

4        A.    I'm not aware of any studies on that.

5        Q.    Just turning back, awhile ago we discussed

6    the different classifications that a drug could have

7    on the California region's formularies.  And how -- I

8    guess what impact do those classifications have on

9    whether a drug is detailable?

10        MS. NUSSBAUM: Well, if you know, if, if any.

11        I mean I think that --

12        What do you mean by "detailable"?

13        MR. JAMES: We can take one step back.

14        Q.    What does it mean for a drug to be

15    detailable?

16        A.    The way we utilize the term "detailable" is

17    that a pharmaceutical company representative can

18    detail, meaning visit a physician and try to sell the

19    product to them.

20        Q.    And if a drug is on the formulary with no

21    guidelines, can a drug company send sales

22    representatives to any Permanente Medical Group

23    physician?

24        A.    Yes.

25        Q.    If a drug is on the formulary, but has

119

1    specialties does not affect the detailing.  It's

2    already been asked and answered.

3        Q.    Can you repeat the question.

4        MS. NUSSBAUM: Do you want to go back to the

5    prior question.

6        MR. JAMES: Actually, I just want to go back to

7    the question I just asked.

8        MS. NUSSBAUM: Would you like to hear the prior

9        question?  It is getting very confusing.  She has

10        already been asked and answered that question.

11        A.    Let's start with the first question.

12        Q.    Let's stop for a moment.

13        I guess initially I asked whether it would

14    preclude a drug manufacturer from detailing particular

15    physicians.  And you said no.  And I guess now the

16    question is a bit different.  I'm not asking whether

17    it would preclude the drug company from detailing any

18    given physician, but would they be able to detail in a

19    manner inconsistent with the guidelines, meaning if

20    Neurontin is indicated as, you know, a second line or

21    third line therapy after TCAs, would it be

22    inconsistent with Kaiser's guidelines for the

23    defendants to -- to promote Neurontin as a first line

24    therapy for -- you know, for the same use?

25        MS. NUSSBAUM: If you can answer the question.

121

1    A.   Well, I -- I got a little confused.  But it
2    got really long there.  And "indicated" I'm not sure
3    what you meant by some of that stuff.
4         MS. NUSSBAUM: You know what?  It's after one.
5    Do you want to break for lunch?
6         THE WITNESS:  Whatever you guys do.
7         MS. NUSSBAUM: We have been going...
8         MR. JAMES: Yeah, that's fine.
9         MS. NUSSBAUM: Let's take a lunch break.
10        THE VIDEOGRAPHER: Going -- going off the
11   record at 1:02 p.m. This is the end of Tape 3 in
12   the deposition of Mirta Millares.
13        (The luncheon recess is taken.)
14
15   CONTINUED DIRECT EXAMINATION BY MR. JAMES:
16        THE VIDEOGRAPHER: We're going back on the
17   record at 2:40 p.m..  This is the beginning of
18   Tape 4 in the deposition of Mirta Millares.
19        (E-mail dated 5/11/2001 marked
20   Millares-24 for identification.)
21        MR. JAMES: I'm marking the next exhibit.  You
22   only need to look at the last page actually.  And
23   in particular it will be --
24   A.   The last page?
25   Q.   Right.  It's KAIS 005528.  And actually the

1    very last paragraph in that last page.
2    A.   Uh-huh, uh-huh.
3    Q.   And, you know, once you have had a chance to
4    read those three sentences or I guess four sentences
5    over, please let me know.
6    A.   Okay.
7    Q.   There is a statement made there, "There have
8    been problems with the pharmacy because it is
9    restricted to neurology."
10   A.   Uh-huh.
11   Q.   Does that statement make -- does that
12   statement make any sense to you?
13   A.   Uh-huh.
14   Q.   And how so?
15   A.   My recollection is that he is referring to
16   the fact that when there is a restriction on a drug,
17   the pharmacist on occasion will call if it's being
18   prescribed by someone outside that restriction to
19   remind the physician that it is restricted to a
20   certain specialty.
21   Q.   Okay.  I guess in that sense is it really a
22   real material obstacle for a psychiatrist to prescribe
23   Neurontin, you know, at a time when Neurontin is
24   restricted to neurologists?
25        I guess what I'm trying to get at is, is

1    it -- is it just a matter of accepting the
2    pharmacist's call, or does something else need to be
3    done in order -- for that prescription to go through?
4    A.   No, probably nothing else would have had to
5    have happened.  They probably had a conversation and
6    if the psychiatrist said I want to use it, they would
7    probably continue.  It's variable what each pharmacist
8    would do.  They are not required to call the
9    physician.  Some will.
10        (E-mail dated 9/26/2003 marked
11   Millares-25 for identification.)
12   Q.   I've marked another exhibit.  I guess look at
13   the entire next page.  I think there is no reason to
14   look at it, but I think it will be helpful to get a
15   general understanding of what the first page concerns.
16   A.   Okay.
17   Q.   Do you recognize this document?
18   A.   It's an e-mail chain.
19   Q.   And what is the e-mail chain about?
20   A.   It starts out with a -- what does it start
21   out with? About restrictions in detailing.
22   Q.   And how do restrictions affect detailing?
23   Does Kaiser have a policy that detailing must be done
24   in a manner consistent with restrictions placed on a
25   drug?

1    A.   Well, we have guidelines, but they're just
2    guidelines.  We don't really have any way to enforce
3    what goes on at the actual interaction between the --
4    the sales rep and the physician.
5    Q.   Are you aware of any cases in which
6    particular drug companies have been sort of banned
7    from Kaiser premises for a period of time for
8    violating this kind of policy?
9    A.   We do sometimes receive input from folks if
10   they're aware that -- that a violation has happened.
11   Q.   Are you aware of any violations involving the
12   defendants and Neurontin from 1994 forward?
13   A.   I couldn't tell you whether they had any or
14   not.
15        MR. JAMES: Mark another exhibit.
16        (Article titled Kaiser Permanente's-
17   Prescription Drug Benefit marked Millares-26
18   for identification.)
19   Q.   Do you recognize this document?
20   A.   Yes.
21   Q.   What is it?
22   A.   It's a copy of a manuscript from Health
23   Affairs.
24   Q.   And you are one of the four coauthors of this
25   manuscript.  Is that right?

1    A.   Yes.

2    Q.   If you turn to the third page of this

3  document, so that's Page 187.

4    A.   Uh-huh.

5    Q.   Just beneath the heading "Formulary

6  Exceptions."

7    A.   Yes.

8    Q.   If you go to the second paragraph, there is a

9  statement made, "In addition the prescribing of some

10  medications is limited to certain specialists and non

11  formulary status cannot be overridden by the pharmacy

12  unless prescribed by the relevant specialist."

13         Does that mean that there are some drugs that

14  are non formulary with restrictions, whereby a

15  physician who is outside those restrictions would not

16  be able to override the non formulary status of the

17  drug?

18    A.   In some situations, yes.

19    Q.   Are you aware of any situations in which the

20  Kaiser California regions considered removing

21  Neurontin from the formulary?

22    A.   I don't recall that ever being on any P&T

23  agenda, no.

24    Q.   Do you recall any instance in which

25  additional guidelines or restrictions were considered

1  this article was written, or was it -- did it go the

2  same route through either the Chiefs of Service or

3  through the area P&T committees?

4    A.   Any Permanente Medical Group physician can

5  fill out a form requesting consideration for a drug to

6  be added to the formulary and they would submit it to

7  either their Chiefs of Service group or their area P&T

8  committee.

9       MR. JAMES:  Another exhibit.

10       (Manuscript Published in Medical Care

11       Research and Review marked Millares-27 for

12       identification.)

13    Q.   Do you recognize this document?

14    A.   Uh-huh, yes.

15    Q.   What is it?

16    A.   This is a copy of a manuscript published in

17  "Medical Care Research and Review."

18    Q.   And here you are one of the five coauthors of

19  this manuscript. Is that right?

20    A.   Correct, uh-huh.

21    Q.   If you can turn to the third page of this

22  document. Under the heading "Method," I guess the

23  third sentence down, there is a statement that

24  "pharmacy database were used to identify a stratified

25  random sample of 2,929 patients."

1  for Neurontin?

2    A.   "Additional" meaning additional to what?  We

3  went through the history already.

4    Q.   Yes, right. Additional to those?

5    A.   Additional to the ones that we already went

6  over?

7    Q.   Yes.  We went over the ones that were

8  actually implemented.

9    A.   Yes.

10    Q.   Are there other situations of which you were

11  aware in which a proposal was made to add additional

12  restrictions or guidelines, but that proposal was, you

13  know, ultimately never implemented?

14    A.   I don't recall any, no.

15    Q.   If you can turn to Page 188 of this document.

16    A.   Uh-huh.

17    Q.   Beneath the heading "Considering New Drugs

18  for the Formulary."

19    A.   Yes.

20    Q.   A couple of sentences down, there's a

21  sentence that states, "In addition any Permanente

22  medical group physician can request that a drug be

23  considered for addition to the formulary."

24    A.   Correct.

25    Q.   Was that a direct request at the time that

1       Do you know which pharmacy databases were

2  used to identify these patients?

3    A.   Yes.

4    Q.   Which ones were they?

5    A.   PIMS is the Pharmacy Information Management

6  System that contains prescription data.

7    Q.   And once those patients were identified for

8  purposes of the study, a series of survey questions

9  was sent out to the -- to the sample patients.  Is

10  that right?

11    A.   Yes.

12    Q.   I was going back one step.  Do you know how

13  the number 2,929 was arrived at?

14    A.   I can't recall.  I -- Yeah.  No.

15    Q.   Was that a number that was necessary to give

16  statistically sound results?

17    A.   There are other investigators on this study

18  that do more of that kind of calculation and things.

19  I don't recall. I wasn't a part of that decision on

20  how many patients were included.  I don't remember.

21    Q.   And I guess if you look at Pages 547 to 548.

22    A.   Uh-huh.

23    Q.   It appears that the appropriateness of, you

24  know, the prescription of a -- of a cox-2 was assessed

25  according to three sets of guidelines.  Is that

1  accurate?

2      A.  It was assessed, yes, according to two

3  guidelines and a publication by Lane.  An article

4  titled "Direct to Consumer Advertising of Cox-2

5  Inhibitors."

6      Q.  Why were two sets of publications used, as

7  opposed to a single guideline?

8      A.  Let me see if I remember.  It was a few years

9  back.  This, this paper has to do with cox-2

10  inhibitors, okay?  So it's a totally different topic

11  than we have been talking about.  But there's

12  different -- the guidelines have -- the guidelines are

13  slightly different.  The SCPMG practice guideline, the

14  modified SCPMG guideline and the Lane criteria in the

15  published literature.

16      So we wanted to test this methodology against

17  all three guidelines, one being more restrictive and,

18  you know, the middle one and then the least

19  restrictive in terms of the definitions that were used

20  to assess the risk of gastrointestinal bleeding in

21  these patients.

22      Q.  And it looks like in order to make a

23  determination whether a prescription was appropriate

24  under these two guideline and the publication, you

25  needed to actually find out whether, for instance,

130

1      Q.  Here's what I meant.  You said that the 2,900

2  some patients were initially identified using the PIMS

3  database?

4      A.  Uh-huh, yes.

5      Q.  Is this information also available through

6  the PIMS database?

7      A.  No.

8      Q.  Or is it available through some other source?

9      A.  Other sources.

10      Q.  And what other sources are those?

11      A.  There's various -- I'm not the person who

12  does the data gathering.  I have data analysts who do

13  that part of the work.  There's various different

14  places that they have to access to get other types of

15  research data.

16      Q.  Is that a combination of electronic records

17  and paper records or is it essentially electronic at

18  this point?

19      A.  I don't recall that we used paper records,

20  but definitely electronic records, yes.

21      Q.  I think it's time we turn to Page 555.

22      A.  Uh-huh.

23      Q.  Beneath the heading "Study Limitations."

24      A.  Yes.

25      Q.  I believe that you note that the results of

132

1  referring to the third method, the patient had a

2  history of ulcer or other GI event, was older than age

3  65 and was currently receiving anti coagulation

4  therapy, and a few other criteria that are listed

5  there.  Is that right?

6      A.  Where are you pointing to?

7      Q.  Actually I guess this is on Page 548.

8      A.  Okay. Yes.

9      Q.  The paragraph beginning "The third method."

10      A.  Right, uh-huh.  The third method is defined

11  using the criteria by Lane in his review article of

12  2001, yes.

13      Q.  And how was that information obtained?

14      A.  An article in the literature?

15      Q.  Oh, no.  Not the Lane article.

16      A.  Okay.

17      Q.  I guess what I was referring to was to find

18  out whether these 2,900-some patients actually

19  satisfied these criteria.  How did you obtain the

20  information necessary to do that?

21      A.  This is an IRB approved research projects.

22  Research projects are written out as a protocol that

23  explains precisely where your methodology is, what

24  data you need to acquire and -- and then so you are

25  able to obtain the data and analyze it.

131

1  your research may not be generalizable from KP to a

2  broader population.  Is that right?

3      A.  Yes, that's the statement, uh-huh.

4      Q.  And one of the reasons cited is because KP

5  provides extensive patient education as well as

6  balanced drug information to its physicians.  Is that

7  correct?

8      A.  That's exactly what it says.

9      Q.  And what sorts of education or information

10  provided to physicians would, you know, potentially

11  affect the results of this study?

12      MS. NUSSBAUM: You are asking specifically with

13  respect to this study of cox-2 inhibiters what was

14  the information that was given to physicians, if

15  she remembers?

16      MR. JAMES: Right.

17      Q.  What information did the authors of the study

18  have in mind when -- when they wrote this sentence?

19      MS. NUSSBAUM: You know, I'm going to object to

20  relevance.  I mean if she can promptly answer if

21  she recalls.  But other than that, we have been

22  going on for ten, 15 minutes on a study having to

23  do with nothing having to do with this litigation,

24  and this is on cox-2 inhibiters.

25      If you remember that particular sentence of

133

1  this study, you know, you can answer the question.
2  Otherwise don't speculate.
3  A.  Well, in this particular example we -- we
4  did -- there were many educational efforts with our
5  physicians, including -- we actually embarked upon our
6  own internal study at Kaiser Permanente, IRB-approved
7  in collaboration with the FDA and Vanderbilt, another
8  organization to study the safety of cox-2 inhibitors.
9  So that was a major research study in
10  collaboration with the FDA, for example, that we were
11  involved in.
12  So there was a lot of work being done in the
13  area of cox-2 inhibitor prescribing at Kaiser.
14  Q.  Beyond the DRUG and DUAT efforts that we
15  discussed earlier today --
16  A.  Correct.
17  Q.  -- are you aware of other physician education
18  efforts made by Kaiser with regard to Neurontin?
19  A.  Okay.  With regard to Neurontin?
20  Q.  Yes.
21  A.  Besides DUAT and DRUG?
22  Q.  Right.
23  A.  No.  All of the -- the documents that I've
24  seen pretty much came out of either a DUAT or DRUG
25  effort.

1  on off-label uses today?
2  A.  Today?  Well, I have to keep up in my job not
3  only on off-label uses, but on on-label uses and
4  adverse events in med safety and all things related to
5  pharmaceutical.  So I read various publications, I
6  have staff that is dedicated to different areas who
7  update me on things, that kind of thing.
8  Q.  Are you aware of a legislative proposal in
9  the California legislature last year regarding
10  off-label use?
11  MS. NUSSBAUM:  Objection as to what she is
12  personally aware of or not personally aware of.
13  It has no relevance to this lawsuit.
14  Q.  All right.  You can answer.
15  A.  I'm not -- I don't have any information about
16  the specifics of any of that.
17  Q.  I'll be more specific.  Are you aware of a
18  proposal that would have required explicit patient
19  consent before a drug was prescribed off-label?
20  A.  No.
21  MS. NUSSBAUM:  Objection.  I mean are you
22  representing that there is presently such a
23  proposal and that Kaiser has taken a position with
24  respect to that?
25  MR. JAMES:  I can represent that there was a

1  Q.  Our final exhibit for today.
2  (Pharmacy Practice Perspective Drug
3  Information Specialist Paper marked
4  Millares-28 for identification.)
5  Q.  Do you recognize this document?
6  A.  Yes.
7  Q.  What is it?
8  A.  It's called a pharmacy practice perspective.
9  It's a short paper I wrote about drug information
10  specialists.
11  Q.  I guess turning to the third paragraph on the
12  first page.
13  A.  Uh-huh.
14  Q.  A page, in the middle of it somewhere there's
15  a statement that one of the aspects of the specialty
16  that you were drawn to was the "need to keep
17  up-to-date on new therapies approved by the FDA in
18  off-label uses."
19  A.  Uh-huh.
20  Q.  When did you first become aware that drugs
21  were prescribed off-label?
22  A.  I believe when I was in pharmacy school.
23  Q.  During your PharmD or --
24  A.  Yes.
25  Q.  And what steps do you take to keep up-to-date

1  proposal and that Kaiser took a position with
2  regard to it.  But if the witness is unaware of
3  it --
4  MS. NUSSBAUM:  Do you have a document or
5  something?
6  Otherwise you are not aware of this?
7  THE WITNESS:  No.
8  MR. JAMES:  That's fine actually.  I'm
9  concluded with my affirmative questioning.
10  MS. NUSSBAUM:  Okay.  I have no questions for
11  the witness.  Okay.  The deposition is concluded
12  now.
13  THE VIDEOGRAPHER:  We are going off the record
14  at 3:04 p.m.  This is the end of Tape 4.  It
15  concludes today's deposition of Mirta Millares.
16  (The witness is excused.)
17  (The deposition is adjourned at 3:04 p.m.)
18  (The reporter retains the exhibits.)
19
20
21
22  *    *    *
23
24
25

10/2/2007  Millares, Mirta - 30(b)(6) - (MDL)

```
 1                    C E R T I F I C A T E

 2

 3

 4          I, MARK SCHAFFER, a Shorthand Reporter and

 5   Notary Public of the States of New York and New

 6   Jersey, do hereby certify that prior to the

 7   commencement of the examination the witness was sworn

 8   by me to testify to the truth, the whole truth and

 9   nothing but the truth.

10          I do further certify that the foregoing is a

11   true and accurate transcript of the testimony as taken

12   stenographically by and before me at the time, place

13   and on the date hereinbefore set forth.

14          I do further certify that I am neither of

15   counsel nor attorney for any party in this action and

16   that I am not interested in the event nor outcome of

17   this litigation.

18

19

20

21

                    MARK SCHAFFER, C.S.R.

22

23   New Jersey C.S.R. License Number XI00794

     Notary Public of the State of New Jersey

24   Commission No. 55985 Expiring September 13, 2011

     Notary Public of the State of New York

25   Registration No. 01SC4953912 Expiring July 31, 2009
```